# EXHIBIT 36

Sarah E. Kane, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

-------------------------------------x

IN RE:  JOHNSON & JOHNSON TALCUM

POWDER PRODUCTS MARKETING, SALES

PRACTICES, AND PRODUCTS          MDL NO:

LIABILITY LITIGATION             16-2738 (FLW)(LHG)

-------------------------------------x

THIS DOCUMENT RELATES TO

ALL CASES

-------------------------------------x

DEPOSITION UNDER ORAL EXAMINATION OF

SARAH E. KANE, M.D.

January 25, 2019, 9:19 a.m.

-  -  -

REPORTED BY: JANET M. SAMBATARO, RMR, CRR, CLR

-  -  -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Sarah E. Kane, M.D.

| Page 2 | Page 4 |
|---|---|
| 1 | 1  APPEARANCES:  (Continued) |
| 2 | 2 |
| 3 | 3  SHOOK, HARDY & BACON L.L.P. |
| 4 | 4  BY:  HUNTER K. AHERN, ESQ. |
| 5 | 5  701 Fifth Avenue, Suite 6800 |
| 6 | 6  Seattle, Washington 98104 |
| 7      Deposition of SARAH E. KANE, M.D., | 7  (206) 344-7600 |
| 8  held at the offices of Sugarman, Rogers, | 8  hahern@shb.com |
| 9  Barshak & Cohen, PC 363 Plantation Street, Boston, | 9  Representing the Defendant, Johnson & Johnson, |
| 10  Massachusetts, pursuant to Agreement before | 10  Johnson & Johnson Consumer Companies, Inc. |
| 11  Janet Sambataro, a Registered Merit Reporter, | 11 |
| 12  Certified Realtime Reporter, Certified LiveNote | 12  DRINKER BIDDLE AND REATH LLP |
| 13  Reporter, and a Notary Public within and for the | 13  BY:  KATHERINE MCBETH, ESQ. |
| 14  Commonwealth of Massachusetts, on January 25, 2019, | 14  One Logan Square, Suite 2000 |
| 15  commencing at 9:19 a.m. | 15  Philadelphia, Pennsylvania 19103-6996 |
| 16 | 16  (215) 988-2700 |
| 17 | 17  katherine.mcbeth@dbr.com |
| 18 | 18  Representing the Defendant, Johnson & Johnson, |
| 19 | 19  Johnson & Johnson Consumer Companies, Inc. |
| 20 | 20 |
| 21 | 21  GORDON & REES SCULLY MANSUKHANI, LLP |
| 22 | 22  BY:  MICHAEL R. KLATT, ESQUIRE |
| 23 | 23  816 Congress Avenue, Suite 1510 |
| 24 | 24  Austin, Texas 78701 |
| 25 | 25  (512) 391-0197 |

| Page 3 | Page 5 |
|---|---|
| 1  APPEARANCES: | 1  APPEARANCES:  (Continued) |
| 2  HAUSFELD LLP | 2 |
| 3  BY:  STEVE ROTMAN, ESQ. | 3  GORDON & REES SCULLY MANSUKHANI, LLP (Continued) |
| 4  One Marina Park Drive | 4  Representing the Defendants, |
| 5  Suite 1410 | 5  Imerys Talc America, Inc. |
| 6  Boston, MA 02210 | 6 |
| 7  (617) 207-0600 | 7 |
| 8  srotman@hausfeld.com | 8  COUGHLIN DUFFY LLP |
| 9  Representing the Plaintiffs | 9  BY:  AMARYAM M. MESEHA, ESQ. |
| 10 | 10  350 Mount Kemble Avenue |
| 11  LEVIN PAPANTONIO | 11  Morristown, New Jersey 07962 |
| 12  BY:  CHRISTOPHER V. TISI, ESQ. | 12  (973) 267-0058 |
| 13  316 South Baylen St. | 13  mmeseha@coughlinduffy.com |
| 14  Pensacola, Florida 32502 | 14  Representing Imerys Talc America, Inc. |
| 15  (850) 435-7000 | 15 |
| 16  ctisi@levinlaw.com | 16 |
| 17  Representing the Plaintiffs | 17  TUCKER ELLIS LLP |
| 18 | 18  BY:  MICHAEL ANDERTON, ESQ. |
| 19  RESTAINO LAW, LLC | 19  950 Main Avenue |
| 20  BY:  JOHN RESTAINO, ESQ. | 20  Cleveland, Ohio 44113 |
| 21  130 Forest Street | 21  (216) 592-5000 |
| 22  Denver, Colorado 80220 | 22  michael.anderton@tuckerellis.com |
| 23  (303) 839-8000 | 23  Representing PTI |
| 24  JRestaino@RestainoLLC.com | 24 |
| 25  Representing the Plaintiffs | 25  - Continued - |

2 (Pages 2 to 5)

Sarah E. Kane, M.D.

**Page 6**

1  APPEARANCES: (Continued)
2
3  SEYFARTH SHAW LLP
4  BY: THOMAS T. LOCKE, ESQ. (Via telephone)
5  975 F Street, N.W.
6  Washington, D.C. 20004
7  (202) 463-2400
8  Representing PCPC
9
10  ALSO PRESENT:
11  Jody Urbati, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 7**

1        I N D E X
2  WITNESS     DIRECT  CROSS  REDIRECT  RECROSS
3  SARAH E. KANE, M.D.
4  By Ms. Ahern  15
5  By Mr. Klatt      318        348
6  By Mr. Rotman     341
7
8        E X H I B I T S
9  Number     Description            Page
10 Exhibit 1  Notice of Oral and Videotaped
11            Deposition of Sarah E. Kane and
12            Duces Tecum                27
13 Exhibit 2  Curriculum vitae of Sarah E.
14            Kane, M.D.                 29
15 Exhibit 3  Invoice from Sarah Kane, M.D., for
16            services 5/19 through 7/14    31
17 Exhibit 4  Invoice from Sarah Kane, M.D., for
18            services 7/28 through 9/12    41
19 Exhibit 5  Invoice from Sarah Kane, M.D., for
20            services 9/18/17 through 2/5/18  43
21 Exhibit 6  Invoice from Sarah Kane, M.D., for
22            services 2/23/18 through 8/3/18  44
23 Exhibit 7  Invoice from Sarah Kane, M.D., for
24            services 9/20/18 through 11/16/18  45
25 Exhibit 8  Excerpt from Blaustein's Second Edition 54

**Page 8**

1        E X H I B I T S
2  Number     Description            Page
3  Exhibit 9  Article entitled "Serous tubal
4            intraepithelial carcinoma, chronic
5            fallopian tube injury, and serous
6            carcinoma development"       91
7  Exhibit 10 "Blaustein's Pathology of the Female
8            Genital Tract," Fourth Edition  95
9  Exhibit 11 Excerpt from "Blaustein's Pathology of
10           the Female Genital Tract,"
11           Fourth Edition              98
12 Exhibit 12 Blaustein's Pathology of the Female
13           Genital Tract"            160
14 Exhibit 13 Excerpt of "Blaustein's Pathology
15           of the Female Genital Tract, Fifth
16           Edition                   160
17 Exhibit 14 Rule 26 Expert Report of Sarah E.
18           Kane, M.D.                164
19 Exhibit 15 Document entitled "References Cited
20           and Other Material and Data
21           Considered"               165
22 Exhibit 16 Document entitled "Additional
23           Material Considered"       181
24 Exhibit 17 Document entitled "Additional Materials
25           to Dr. Sarah Kane"         186

**Page 9**

1        E X H I B I T S
2  Number     Description            Page
3  Exhibit 18 "The Plaintiffs' Steering Committee's
4            Initial Designation and Disclosure of
5            Non-case Specific Expert Witnesses"  194
6  Exhibit 19 Article entitled "Presence of Talc
7            in Pelvic Lymph Nodes of a Woman with
8            Ovarian Cancer and Long-Term Genital
9            Exposure to Cosmetic Talc"   252
10 Exhibit 20 Article entitled "Perineal Exposure
11           to Talc and Ovarian Cancer Risk"  260
12 Exhibit 21 Article entitled "Genital Talc
13           Exposure and Risk of Ovarian Cancer"  266
14 Exhibit 22 Article entitled "Perineal Talc
15           Exposure and Epithelial Ovarian Cancer
16           Risk in the Central Valley of
17           California"               272
18 Exhibit 23 Highlighted copy of Dr. Kane's
19           expert report              284
20 Exhibit 24 Article entitled "Talcum powder,
21           chronic pelvic inflammation and
22           NSAIDs in relation to risk of
23           epithelial ovarian cancer"   289
24 Exhibit 25 Article entitled "The relationship
25           between perineal cosmetic talc usage

Sarah E. Kane, M.D.

---

Page 10

```
 1          E X H I B I T S
 2   Number      Description          Page
 3   Exhibit 25 (Continued)
 4          and ovarian talc particle burden"  308
 5   Exhibit 26 Article entitled "Pycnogenol reduces
 6          Talc-induced Neoplastic Transformation
 7          in Human Ovarian Cell Cultures"   328
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 11

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  We are now on the
 3   record.  My name is Jody Urbati.  I am a
 4   videographer for Golkow Litigation Services.
 5   Today's date is January 25, 2019; the time,
 6   9:19 a.m.
 7          This video deposition is being held in
 8   Boston, Massachusetts, In Re: Johnson & Johnson
 9   Talcum Powder Products Liability Litigation in
10   the United States District Court for the District
11   of New Jersey.
12          The deponent today is Sarah Kane.
13   Counsel will be noted on the stenographic record.
14   The court reporter is Janet Sambataro and will
15   now swear in the witness.
16          (Witness sworn.)
17          MS. AHERN:  Just a quick housekeeping
18   matter.  The defendants would like to lodge an
19   objection to the additional materials to Sarah
20   Kane that were served yesterday at 3:36 p.m. by
21   Ashcraft law firm.  Serving supplementary
22   materials 24 hours before an expert deposition is
23   prejudicial to the defendants' ability to
24   prepare.
25          The number of the documents that were
```

---

Page 12

```
 1   identified yesterday in that list are voluminous
 2   and dense and require additional time to cover,
 3   to the extent that they substantively informed
 4   Dr. Kane's opinions in this case.
 5          We'd also like to object to the
 6   inclusion of those materials on the science day
 7   presentations, which were not intended for any
 8   other purpose than for science day in the MDL.
 9          And that's all I have to say on the
10   objections.
11          MR. ROTMAN:  Go ahead.
12          MR. TISI:  First of all, as you know,
13   many of those documents were documents that were
14   provided to counsel in connection with virtually
15   every depositions that have been taken to date.
16   In fact, it was provided with Dr. Mohrman that
17   was being taken at the same time today; it was
18   provided with Dr. Zelikoff earlier in the week;
19   it was provided almost routinely.
20          Many of them -- some of them,
21   particularly the Health Canada document, were
22   documents that only became available in mid
23   December, number one.
24          Number two, I believe that the science
25   day document that you're referring to, which I
```

---

Page 13

```
 1   think you'll find was not relied on in any way,
 2   was a -- that was the California and not the MDL.
 3   So I just want to be clear about that.
 4          So there is no prejudice, and we would
 5   clearly object to -- these are not documents she
 6   relied on for her report; they just were
 7   supplemental materials.  But -- you can ask
 8   questions, but we will certainly object to
 9   reconvening the deposition at any later time.  We
10   made that clear yesterday.
11          MS. AHERN:  Thank you.
12          MR. ROTMAN:  Yeah, there was -- one of
13   the documents was a textbook that Dr. Kane first
14   looked at two days ago or -- yeah, I think it was
15   two days ago, and so I added it to the list.  And
16   she brought the textbook with her today.
17          MR. KLATT:  Can I just add we had an
18   agreement for all the other depositions, and I
19   assume we continue today, one objection by a
20   party is good for all.
21          MR. TISI:  That's fine, yes.
22          MR. ROTMAN:  And, you know, just so
23   it's clear to anybody reading the transcript that
24   what you received yesterday was the third
25   reference list that we've provided for Dr. Kane,
```

---

4 (Pages 10 to 13)

Sarah E. Kane, M.D.

Page 14

1   the first being with her report in November; the
2   second being on January 4th, which was about ten
3   days before the deposition had been scheduled for
4   January 14th; and then these additional items
5   were materials that either were inadvertently
6   left off or not reviewed until just very
7   recently.
8          MS. AHERN: Okay. To the extent that
9   these new materials inform her substantive
10  opinions and were not included in her report or
11  prior versions of the reference list, then we can
12  talk about that later --
13         MR. TISI: Yeah.
14         MS. AHERN: -- in terms of additional
15  time.
16         And just to clarify, Steve, you said
17  that she reviewed one textbook. It looks like on
18  the list that I received, she reviewed the
19  second, fourth, and fifth editions of the
20  textbook --
21         MR. ROTMAN: I was referring --
22         MS. AHERN: -- or textbooks.
23         MR. ROTMAN: I was referring to that as
24  one textbook, yeah, but you're right, the
25  different editions. And she did bring with her

Page 15

1   today those materials.
2          MS. AHERN: So she has a copy with her
3   today of all of the items listed in the
4   additional materials to Sarah Kane that was
5   served yesterday.
6          MR. ROTMAN: No.
7          MS. AHERN: Okay. Do you know what
8   she -- well, we can -- we'll find out.
9          MR. ROTMAN: Yeah.
10         MS. AHERN: Okay. All right.
11         SARAH E. KANE, M.D.,
12  having been duly sworn, after presenting
13  identification in the form of a driver's license,
14  deposes and says as follows:
15         DIRECT EXAMINATION
16  BY MS. AHERN:
17     Q. Good morning, Dr. Kane.
18     A. Good morning.
19     Q. Can you please state your name for the
20  record?
21     A. Sure. Sarah Kane.
22     Q. And, Dr. Kane, who is your current
23  employer?
24     A. Commonwealth Pathology Partners.
25     Q. And do you have a business address at

Page 16

1   Commonwealth Pathology Partners?
2      A. The address we commonly use is 81
3   Highland Avenue, Salem, Massachusetts. It's
4   01970.
5      Q. Okay. And do you have any separate
6   consulting business?
7      A. No. Other -- outside of this type of
8   medical expert witness work, no.
9      Q. Okay. And how often do you do this
10  sort of medical witness work?
11     A. I am very new at it. I have done one
12  deposition before in a tobacco case.
13     Q. Okay. And the fees that you get from
14  these cases, do they go directly to you or do
15  they go to your -- Commonwealth Pathology
16  Partners?
17     A. They go directly to me.
18     Q. And, Dr. Kane, you're a medical doctor;
19  correct?
20     A. Yes.
21     Q. And what is your medical specialty?
22     A. I am board certified in anatomic and
23  clinical pathology and cytopathology, with
24  fellowship training in gynecologic pathology.
25     Q. Does that mean that you review

Page 17

1   diagnostic materials, slides, and blocks that
2   have been taken from patient procedures and make
3   determinations regarding diagnosis?
4      A. Yes.
5      Q. Do you see patients as part of your
6   medical practice?
7      A. Yes. Occasionally, cytopathologists
8   sometimes perform a procedure that's called a
9   fine-needle aspiration. And so if a patient is
10  seen in clinic and the clinician discovers a
11  palpable nodule, I might be asked to go into the
12  room and perform a fine-needle aspiration.
13     Q. But you don't see patients in the sense
14  that you don't counsel patients and provide
15  ongoing care for an individual patient?
16     A. Well, I mean, I guess my pathology
17  report is part of the -- basically speaks to
18  medical treatment and informs clinical treatment
19  of the patient. So my pathology reports are seen
20  by the patient.
21     Q. I guess what I'm getting at is: Do you
22  see patients as part of your practice, give them
23  a history and physical, provide ongoing care for
24  them outside of the setting of a fine-needle
25  aspiration or a specific procedure related to a

Sarah E. Kane, M.D.

Page 18

1  diagnosis?
2      MR. ROTMAN:  Is this working for you?
3      THE WITNESS:  Oh, I'm sorry?
4      MR. ROTMAN:  Is it working?
5      THE WITNESS:  Yes.
6      MR. ROTMAN:  Okay.
7      A.  Outside of the fine-needle aspiration
8  setting, the only time I might see a patient
9  would be with a blood transfusion reaction.  I
10 might have to go to the floor to examine the
11 patient or patient chart.
12     Ongoing care for them outside of the setting
13 of a fine-needle aspiration, the nature of
14 gynecologic pathology, sometimes I will see a Pap
15 smear from a patient and then a cervical biopsy
16 from a patient and then a LEEP from the patient,
17 and I might speak to the clinician about
18 treatment algorithms, that kind of thing.
19     Q.  Do you actually then go see the patient
20 themselves and discuss with them the results of
21 their Pap smear or other testing?
22     A.  Typically, no.
23     Q.  Have you ever performed a history and
24 physical in your practice as a pathologist?
25     A.  Yes.

Page 19

1      Q.  Under what circumstances?
2      A.  Under blood transfusion reactions.
3      Q.  And what sort of history and physical
4  do you take in relation to a blood transfusion
5  reaction?
6      A.  Well, you might be looking at blood
7  pressure and review of the medical chart,
8  temperature, that kind of thing.
9      Q.  So you review the medical chart.
10     Is that medical chart prepared by another
11 physician?
12     A.  Usually, you're looking at
13 retrospective data at the time of the blood
14 transfusion reaction.
15     Q.  How often will you see the same patient
16 who has had a blood transfusion reaction?
17     A.  Not very often.
18     Q.  Okay.  Do you ever counsel patients on
19 risk factors for ovarian cancer?
20     A.  Have I ever?  Probably, but in my
21 day-to-day practice, I'm not seeing patients on a
22 regular basis to do that.
23     Q.  And the only time you see patients is
24 with regard to specific issues that are within
25 your realm of pathology expertise, a fine-needle

Page 20

1  aspiration, a blood transfusion reaction.
2      Are there any others?
3      A.  I'm trying to think what another
4  possibility might be.
5      I mean, I go into the operative room when
6  patients are in surgery sometimes with the
7  surgeon to do intraoperative frozen sections,
8  which are realtime diagnosis while the patient is
9  having a procedure.
10     Q.  But you're interacting with the
11 physicians in that respect, aren't you, not with
12 the patient?
13     A.  It can be both.
14     MR. ROTMAN:  Objection.  Objection.
15     You can answer.
16     MS. AHERN:  You can answer.
17     A.  The vast majority of the time I'm with
18 frozen sections, I'm interacting with the
19 surgeon.
20     Q.  Are there times where you are
21 interacting with the patient during a surgical
22 procedure?
23     MR. ROTMAN:  When you say
24 "interacting," you mean having a conversation or
25 do you mean having any kind of contact?

Page 21

1      MR. KLATT:  Steve, just limit the
2  objection to "form."
3      MR. ROTMAN:  I'm trying to clarify.
4      MR. KLATT:  It doesn't matter.
5  BY MS. AHERN:
6      Q.  Did you understand --
7      MR. KLATT:  Object to form.
8      Q.  -- the question, Doctor?
9      A.  Let me -- can -- I'm sorry.  Can you
10 read it back or --
11     Q.  You said, "The vast majority of" --
12     MR. ROTMAN:  She's reading, I think.
13     MS. AHERN:  I'll withdraw the question
14 and just remind you.
15 BY MS. AHERN:
16     Q.  You said that the vast majority of the
17 time you're interacting with the physicians;
18 correct?
19     A.  Yes.
20     Q.  What do you mean by "interacting"?
21     A.  During the surgery, the surgeon might
22 have me come up to the operative room or the
23 surgeon might come down to look at the tissue,
24 both grossly and under the microscope with me.
25     Q.  Okay.  Under those circumstances, would

6 (Pages 18 to 21)

Sarah E. Kane, M.D.

---

Page 22

1  you ever speak to the patient?
2      A.  Usually not.
3      Q.  And if you -- have you ever spoken to a
4  patient when you were reviewing frozen sections?
5      A.  I might have during rapid reads of
6  fine-needle aspirations.  So sometimes
7  interventional radiologists will do fine-needle
8  aspirations if they have to be ultrasound guided.
9  So, yes, I'm speaking to patients sometimes in
10  that situation and, obviously, when I do
11  fine-needle aspirations.
12      Q.  Okay.  But you don't have a group of
13  patients that come to you for ongoing care and
14  see you in an office setting, do you?
15      A.  They are basically -- I would say it's
16  the equivalent of physician referral.  So if a --
17  if a clinician is doing a biopsy -- I mentioned
18  women with Pap smears and then cervical biopsies
19  and then cone LEEPs, you know, it's a trajectory
20  of care, but it's physician referred for tissue.
21      Q.  When you say "physician referred," what
22  do you -- what do you mean by that?  Are you
23  interacting with the physician in providing
24  advice or recommendations or are you interacting
25  with the patients themselves and providing advice

---

Page 23

1  or recommendations?
2      A.  The physicians usually.
3      Q.  Okay.  So I'm asking about patients.
4      A.  Yeah.
5      Q.  On a given day -- like what are -- what
6  are the days that you're in the office?
7      A.  Monday through Friday.
8      Q.  So are there days that you do
9  particular tasks, administrative, and then days
10  that you do frozen sections or days that you do
11  just general pathology reads?
12      A.  Rarely, I have an administrative day.
13  It would be nice to have more, but, typically, I
14  am looking at slides the majority of the day.
15      I will be doing frozen sections on some
16  days, but we have a very collegial atmosphere, so
17  I might do frozens with another pathologist.
18  Some days I'm on cytology, so I'm doing the
19  fine-needle aspirations, which is either me
20  performing the fine-needle aspirations or me
21  reading a rapid interpretation that an
22  interventional radiologist has performed.
23      Q.  So on -- in a given week, it's not like
24  you have a patient clinic where patients come to
25  see you and they're scheduled to see you.

---

Page 24

1      A.  That's correct.  They're not scheduled
2  to see me.
3      Q.  Okay.  And so outside of, like you
4  mentioned, procedures like a fine-needle
5  aspiration, you wouldn't generally see patients
6  directly.
7      A.  The fine-needle aspiration would be the
8  only setting where they would have a scheduled,
9  allotted slot time with me.
10      Q.  Okay.  Generally speaking, when you're
11  reviewing slides, what sort of medical records do
12  you have available to you that are relevant to
13  your clinical diagnosis?
14      A.  I have the entire medical record
15  available to me, whatever is in the hospital
16  system for that patient.
17      Q.  What do you routinely rely on or review
18  as part of your review of slides in terms of
19  medical records?
20      A.  Well, it's very patient dependent and
21  very diagnosis dependent, but, for example --
22  I'll stick to the example of cervical biopsy.  So
23  I'll be looking -- if I have a cervical biopsy,
24  I'll look to see the patient's history of Pap
25  smears, HPV tests, that kind of thing.

---

Page 25

1      Q.  Documents that are directly relevant to
2  your review of the current pathology; is that
3  correct?
4      A.  For the most part, I would say so.
5      Q.  In other words, you don't go back
6  through all of their physician records or
7  gynecologic visits, their primary care physician
8  records?
9      A.  Again, it would depend on the
10  situation.  I mean, if I have a lung tumor case,
11  I'll probably be looking at the radiology, the
12  radiology reports, the -- I'll pull up a report
13  with a primary care physician to look for smoking
14  history, that kind of thing, to put the whole
15  piece together for the diagnosis.
16      Q.  Okay.  And, Doctor, you're here today
17  to provide a deposition as an expert witness on
18  behalf of the plaintiffs; is that correct?
19      A.  Yes.
20      Q.  And you said you've given one
21  deposition in the past?
22      A.  Yes, that's correct.
23      Q.  And what sort of case was that?
24      A.  That was a tobacco case.
25      Q.  Were you an expert in that case?

---

7 (Pages 22 to 25)

Sarah E. Kane, M.D.

Page 26

1    A.  Yes.  It was an individual causation
2  case.
3    Q.  Okay.  Were you an expert for the
4  plaintiffs or the defendants?
5    A.  For the plaintiffs.
6    Q.  And what sort of -- what sort of case
7  was that in terms of the injury that was being
8  alleged?
9    A.  It was a patient with lung cancer who
10  was suing a tobacco company.
11    Q.  And what was your specific -- what was
12  your opinion in that case?
13    A.  That it was highly likely that her long
14  history of smoking caused her lung cancer.
15    Q.  So -- and I should have gone over this
16  with you in the beginning, but you're familiar
17  with the deposition rules?
18    A.  In general, I think.
19    Q.  Okay.  You're doing a very good job.
20  And the main things to remember is the two of us
21  will try not to speak over each other so that the
22  court reporter can take a clean transcript down.
23    If you need a break at some time, that's
24  fine, just let me know.  All I ask is if there's
25  a question pending, you go ahead and finish the

Page 27

1  answer to the question and then we'll take a
2  break.
3    If you don't understand a question that I
4  ask you, please don't answer it.  Let me know
5  that you don't understand the question or you'd
6  like me to rephrase it and I'll be happy to do
7  that.  All right?
8    A.  Okay.
9    Q.  Okay.  And if you answer the question,
10  is it fair for me to assume that you understood
11  it?
12    A.  Yes.
13    Q.  All right.
14    (Notice of Oral and Videotaped
15    Deposition of Sarah E. Kane and Duces Tecum
16    marked Exhibit 1.)
17  BY MS. AHERN:
18    Q.  Doctor, I'm handing you what's been
19  marked as Exhibit No. 1 to your deposition.
20    MS. AHERN:  I don't know how many
21  people need copies of these.  I don't have that
22  many, but --
23    MR. TISI:  I'll take a copy.  Thank
24  you.
25    MR. ROTMAN:  Thank you.

Page 28

1    MS. AHERN:  You're welcome.
2  BY MS. AHERN:
3    Q.  Dr. Kane, I've handed you a copy of
4  your Notice of Deposition for today.
5    Have you seen this document before?
6    A.  Yes.
7    Q.  When did you see it?
8    A.  I believe it was sometime in December,
9  because the original deposition date was
10  January 14th.
11    Q.  And, Doctor, do you know whether you
12  produced all of the documents that are responsive
13  to the request in Exhibit 1, your deposition
14  notice?
15    MR. ROTMAN:  We've objected to a number
16  of them.  And so she's producing -- you should go
17  item by item, I think, if you want to -- I'm
18  going to object otherwise.
19    Q.  Doctor, do you know what you brought
20  with you today?
21    A.  Yes.  We have my -- a copy of my
22  updated CV.  We have copies of my invoice.  I
23  believe I have a copy of -- oh, right.  Sorry.
24    I have pages that I found for the Blaustein
25  second edition, which I don't have the actual

Page 29

1  textbook.  I believe I got -- I found this image
2  off of the internet.  But I do have the fourth
3  and fifth editions of the Kurman Blaustein's
4  textbook, and I've marked any relevant pages that
5  I reviewed a couple of days ago.
6    MS. AHERN:  If you --
7    MR. ROTMAN:  One second.
8    MS. AHERN:  It might be easier if you
9  just hand me those and let me take a look.
10    MR. ROTMAN:  In addition, there's the
11  boxes in the room that are the documents that
12  were sent up by counsel from Ashcraft & Gerel.
13    MS. AHERN:  Thank you.
14  BY MS. AHERN:
15    Q.  All right, Doctor.  So let's take these
16  in order, I guess.  Let's look at your --
17    MR. ROTMAN:  She also has a copy of her
18  report.
19    MS. AHERN:  Okay.  We'll mark your
20  updated CV as Exhibit No. 2.
21    (Curriculum vitae of Sarah E.
22    Kane, M.D. marked Exhibit 2.)
23  BY MS. AHERN:
24    Q.  Do you need a copy in front of you?
25    A.  Sure.

8 (Pages 26 to 29)

Sarah E. Kane, M.D.

Page 30

1    Q.  Okay.
2        MS. AHERN:  I don't know if anyone else
3    needs a copy.
4    BY MS. AHERN:
5        Q.  Doctor, Exhibit 2, this is a copy of
6    your current curriculum vitae?
7        A.  Yes.  January 2019, yes, this is the
8    current.
9        Q.  And can you tell me what has been
10   updated since you submitted your report
11   November 15th of 2018?
12       A.  I believe the only change is that I am
13   now director of cytopathology at North Shore
14   Medical Center, which includes Salem Hospital and
15   Union Hospital, which is in Lynn, Massachusetts.
16       Q.  Are there any additional publications
17   that you have included on your updated resume --
18   or, sorry, updated CV?
19       A.  I don't believe so.
20       Q.  The only change is that your position
21   has changed to director?
22       A.  Yes, of cytopathology.
23       Q.  Okay.  And you've also brought with you
24   invoices --
25       A.  Yes.

Page 31

1        Q.  -- for your time spent on talc?
2        A.  I handed them to her.  Yes.
3        MR. ROTMAN:  What we handed, I think,
4    is multiple copies, so you can hand one back, I
5    suppose.
6        MS. AHERN:  We'll mark as Exhibit 3 to
7    your deposition an invoice for rendered services.
8        (Invoice from Sarah Kane, M.D.,
9        for services 5/19 through 7/14 marked
10       Exhibit 3.)
11       MS. AHERN:  I can't see a date, but it
12   looks like it covers -- well, let's just have you
13   look at it.
14   BY MS. AHERN:
15       Q.  Can you tell me the date range covered
16   by that invoice?
17       MR. ROTMAN:  Copy for me?
18       A.  Yes.  It looks like it is from May 19th
19   to June 16th.  That would be -- if this is the
20   first invoice, I believe, that would be of 2017,
21   year 2017.
22       Q.  Okay.  And, Doctor, was this May 19,
23   2017 -- how long after you were retained did you
24   submit this invoice?
25       A.  I wouldn't have sent it until after

Page 32

1    June 16th, which is the last date.  So it would
2    have been after June 16th, 2017.
3        Q.  I'm sorry.  Do you remember when you
4    were retained by the plaintiffs to be an expert
5    in this litigation?
6        A.  I believe I was contacted by Mr. Rotman
7    in early May of 2017.
8        Q.  Okay.  Do you know how Mr. Rotman found
9    your name?
10       A.  I believe he was referred by a
11   colleague.
12       Q.  Do you remember what colleague that is?
13       A.  Dr. Paul Michaels.
14       Q.  And is Dr. Michaels a pathologist?
15       A.  Yes.
16       Q.  Where does Dr. Michaels work?
17       A.  I actually don't know the name of his
18   group, but he is in Austin, Texas now.
19       Q.  Where was he in 2017?
20       A.  Austin, Texas, I believe.
21       Q.  Okay.  Is he a gynecologic pathologist?
22       A.  No.
23       Q.  What type of pathologist is he?
24       A.  He has a cytopathology fellowship, in
25   addition to anatomic and clinical board

Page 33

1    certification.
2        Q.  And how do you know Dr. Michaels?
3        A.  We were residents and fellows together.
4        Q.  Were you -- fellows where?  Mass
5    General?
6        A.  At Massachusetts General, yes.
7        Q.  Was he in the gynecologic pathology
8    fellowship with you or a different fellowship?
9        A.  So my fellowship was kind of
10   interesting.  I was, unfortunately, one of the
11   last groups where a combined anatomic and
12   clinical pathology residency was five years.  I
13   think the next year after I began residency they
14   dropped it to four years.
15       So my surgical pathology and cytopathology,
16   it was a two-year fellowship.  The gyn path and
17   the cytopathology, it was over a two-year period.
18   And the weeks of gynecologic pathology were mixed
19   with weeks of cytopathology, so they spread out
20   the cytopathology fellowship over two years.
21       Paul was a cytopathology fellow the first
22   year of my fellowship, so we did all four years
23   of anatomic and clinical pathology and then the
24   first year of fellowship at the same time.
25       Q.  Okay.  And looking back at Exhibit 3,

9 (Pages 30 to 33)

Sarah E. Kane, M.D.

Page 34

1    this invoice from May 19, 2017, to July 14 of
2    2017, the first entry looks like it's -- it
3    covers a period of May 19th through July 14th,
4    "Communication with firm regarding talc
5    litigation case, one hour"; is that correct?
6        A.   Yes.  Sorry.  Thank you for correcting
7    me.  I saw the last line, 6/16, and figured that
8    was the last day that this covered.  But you're
9    correct, it's -- July 14th would have been the
10   last date that this invoice covered.
11       Yes, June 16th I met with Mr. Rotman,
12   Dr. Thompson, and Mr. Soileau -- I don't know how
13   to pronounce his last name.
14       Q.   Are they all -- they're all attorneys;
15   correct?
16       A.   Correct.
17       Q.   Okay.  What firm?
18       A.   I know Mr. Rotman is with Hausfeld.
19   Dr. Thompson is with Allen Beasley.  I don't know
20   for sure where Mr. Soileau is from.
21       Q.   You said Mr. Thompson is with Beasley
22   Allen.
23       A.   I believe so.  I don't remember for
24   certain.
25       Q.   And at least during --

Page 35

1            MR. ROTMAN:  It's Ms. Thompson.
2            MS. AHERN:  Ms. Thompson.
3            MR. ROTMAN:  Or Dr. Thompson.
4            THE WITNESS:  Doctor.  She's a -- she's
5    a doctor, as well as an attorney.
6        Q.   And for this first invoice, you billed
7    $26,666.67; correct?
8        A.   Yes.
9        Q.   And you spent a total of 53 hours and
10   20 minutes working on talc-related issues?
11       A.   Yes.
12       Q.   Seventeen hours and five minutes of
13   that was reviewing the medical literature, expert
14   reports, and testimony; is that correct?
15       A.   So this was my first time ever
16   recording any sort of invoice for medical expert
17   witness work, so the review of medical
18   literature, expert reports, and testimony,
19   probably some of that will also be included in
20   the generating of medical expert report, because
21   while I was -- I basically began -- you can see
22   from the dates I pretty much started drafting,
23   taking notes in a draft, around May 28th, which
24   was soon after I did my initial medical
25   literature searches.

Page 36

1        So those hours overlap a little bit.  I
2    mean, I kept track of particular hours so that I
3    could bill accurately, but those two things --
4    certainly, generating the medical expert report
5    would also include review of medical literature.
6        Q.   Okay.  So you started on your -- on the
7    draft of your expert report in this case back in
8    May of 2017; is that correct?
9        A.   Late May, yes.
10       Q.   And did you -- do you remember when you
11   started your review of the medical literature?
12   Would it have been May 20th, as reflected in this
13   invoice, Exhibit 3?
14       A.   Yes, I believe so.
15       Q.   You also have on here that you spent
16   some time researching electron microscopy
17   experts.
18       A.   Yes.
19       Q.   Was that at the request of the
20   plaintiffs' counsel?
21       A.   Plaintiffs' counsel was looking for
22   additional people because there are very few
23   electron microscopy units in the country and very
24   few expert electron microscopists.
25       I can't remember if they asked me to or I

Page 37

1    offered to.  It could have been the latter.  But
2    I was aware that they were looking for additional
3    people to potentially use electron microscopy.
4        Q.   Do you know how plaintiffs intended to
5    use the electron microscopy experts?
6            MR. ROTMAN:  Objection.  That's going
7    into areas that you're not entitled to, so she's
8    not going to answer that.
9    BY MS. AHERN:
10       Q.   Doctor, what sort of electron
11   microscopists were you looking for at the
12   plaintiffs' request?
13           MR. ROTMAN:  Same objection.
14           MS. AHERN:  I'm not asking her about
15   communications that she had with counsel; I'm
16   asking her what sort of work --
17           MR. ROTMAN:  Your question --
18           MS. AHERN:  -- she did --
19           MR. ROTMAN:  Your question --
20           MS. AHERN:  -- that she was paid for by
21   the plaintiffs' counsel and that's reflected on
22   the invoice that you've submitted here today.
23           MR. ROTMAN:  You are asking her what
24   she was doing at plaintiffs' counsel's request.
25   That's unrelated to her --

10 (Pages 34 to 37)

Sarah E. Kane, M.D.

Page 38

1    MS. AHERN:  You're --
2    MR. ROTMAN:  -- opinions.
3    MS. AHERN:  -- instructing her not to
4  answer the question of, "Doctor, what sort of
5  electron microscopists were you looking for at
6  plaintiffs' request?"
7    MR. ROTMAN:  Yes.  I'm objecting to
8  that.
9    MR. KLATT:  That's not a communication.
10    MS. AHERN:  That's not a communication.
11  That is what did she do and what was she looking
12  for.
13    MR. TISI:  It's consulting.
14    MS. AHERN:  She's sitting here today as
15  a testifying expert.
16    MR. ROTMAN:  Understood.  She's not
17  going to answer that.
18  BY MS. AHERN:
19    Q.  Doctor, did you make any
20  recommendations regarding electron microscopists?
21    A.  No, ultimately, I did not give them any
22  names.
23    Q.  What electron microscopists were you
24  looking at when you were conducting your
25  research?

Page 39

1    MR. ROTMAN:  Again, this is her work
2  on -- as a consultant not relating to her
3  opinions in this case --
4    Q.  Doctor, do you --
5    MR. ROTMAN:  -- so you're not entitled
6  to this information.
7    MS. AHERN:  You're instructing her not
8  to answer.
9    MR. ROTMAN:  Yes.
10    MS. AHERN:  Then instruct her not to
11  answer.
12    MR. ROTMAN:  I'm instructing you not to
13  answer.
14    THE WITNESS:  Okay.
15  BY MS. AHERN:
16    Q.  Doctor, do you know any electron
17  microscopists?
18    A.  Yes.
19    Q.  Who?
20    A.  I know Dr. Gunnlaugur Nielsen at
21  Massachusetts General Hospital.
22    Q.  How do you spell Gunnlaugur's name?
23    A.  G-U-N-N -- I believe there are two
24  Ns -- L-A-U-G-H-E-R [sic], Nielsen.  That's with
25  an S-E-N.  But he goes by Petur, which is

Page 40

1  P-E-T-U-R.
2    Q.  N-I-E-, Nielsen?
3    A.  I believe so.
4    Q.  -S-S-O-N?
5    A.  No, -L-S-E-N.
6    Q.  Did you speak to Dr. Nielsen about
7  potentially working on the talc litigation?
8    A.  I believe I e-mailed him.
9    Q.  Do you remember when that occurred?
10    A.  It was probably -- I don't remember
11  exactly, but I would imagine it was between 5/22
12  and 6/1 of 2017.
13    Q.  And was he interested in doing any talc
14  work?
15    A.  He was not interested in doing medical
16  expert witness or consulting work.
17    Q.  Did you e-mail anybody else, any other
18  electron microscopists?
19    MR. ROTMAN:  So you keep on asking her
20  about the consulting work that she was doing that
21  had nothing to do with her opinions in this case,
22  which is why we're here today.  We're not here
23  today for you to take the deposition of her
24  consulting work at that stage on this issue, so
25  that whole area is off limits and I'm instructing

Page 41

1  her not to answer.  If you want to continue
2  asking those questions, I'm going to continue to
3  object on the same basis.
4    Q.  Doctor, did you contact any electron
5  microscopists who agreed to work on the talc
6  litigation?
7    MR. ROTMAN:  Objection.
8    Instruct you not to answer for the
9  reasons previously provided.
10    Q.  Doctor, do you know a Dr. Campion?
11    A.  I do not.
12    Q.  Do you know a Dr. John Godleski?
13    A.  I know the name.  I do not know him
14  personally.
15    Q.  Do you know Bill Welch?
16    A.  I know the name.  I do not know him
17  personally.
18    Q.  Okay.
19    (Invoice from Sarah Kane, M.D.,
20  for services 7/28 through 9/12 marked
21  Exhibit 4.)
22  BY MS. AHERN:
23    Q.  Doctor, I'm handing you what's been
24  marked as Exhibit 4 to your deposition.
25    Can you tell me what that is?

11 (Pages 38 to 41)

Sarah E. Kane, M.D.

Page 42

1    A.  This is probably the second invoice.
2  Again, I don't believe I had it numbered on the
3  actual invoice, but this looks like it would be
4  the second invoice.
5    Q.  And what period of time does Exhibit 4
6  cover?
7    A.  This covers July 28th to September 12.
8    Q.  Is this 2017?
9    A.  Yes.
10    Q.  And you spent an additional 37 hours
11  and 40 minutes reviewing literature and
12  generating your expert report; is that correct?
13    A.  Right.  And you'll see I actually
14  combined everything, because it got too
15  complicated to separate them out.  And generating
16  the medical expert report was sort of this
17  organic part of reviewing the literature.
18    Q.  And the total bill was for $19,666.67;
19  correct?
20    A.  Yes.
21    Q.  Okay.  Was all your time on Exhibit 4
22  spent working on your MDL report?
23    A.  I'm sorry.  This invoice?
24    Q.  Yes, ma'am.  Was the time spent on
25  Exhibits 3 and 4, these first two invoices, was

Page 43

1  this all in relation to your work on the talc
2  MDL?
3    A.  Yes.  I'm not involved in any other
4  talc litigation.
5    Q.  Okay.
6    MS. AHERN:  Okay.  I'm marking
7  Exhibit 5 as -- oh, I'm marking, sorry, your
8  third invoice as Exhibit 5 to your deposition.
9    (Invoice from Sarah Kane, M.D.,
10    for services 9/18/17 through 2/5/18 marked
11    Exhibit 5.)
12  BY MS. AHERN:
13    Q.  This is a copy of an invoice submitted
14  by you; correct?
15    A.  Yes.
16    Q.  And what dates does it cover?
17    A.  This covers September 18th, 2017, to
18  February 5th, 2018.
19    Q.  You spent an additional 27 hours and 40
20  minutes working on your report; is that correct?
21    A.  Yes.  Well, 21 hours, 55 minutes
22  reviewing the literature and the medical expert
23  witness report, and then there were a few hours
24  communicating and meeting with the firm, which
25  would likely be Mr. Rotman.

Page 44

1    Q.  Who's been your primary contact?
2    A.  Mr. Rotman.
3    Q.  Okay.  And a total for that bill was
4  $13,835; is that correct?
5    A.  Yes.
6    (Invoice from Sarah Kane, M.D.,
7    for services 2/23/18 through 8/3/18 marked
8    Exhibit 6.)
9  BY MS. AHERN:
10    Q.  I'm handing you what's been marked as
11  Exhibit 6 to your deposition.
12    Can you tell me what that document is,
13  please?
14    A.  So this -- I'm counting now -- looks
15  like this is the fourth invoice -- yes, the
16  fourth invoice that I sent them.
17    Q.  And what period of time does this
18  Exhibit 6 cover?
19    A.  It looks like February 23rd, 2018,
20  through August 7th, 2018.
21    Q.  Okay.  And Exhibit 6 reflects that you
22  spent an additional 16 hours and 55 minutes
23  reviewing literature and generating your medical
24  expert report; is that correct?
25    A.  Yes.

Page 45

1    Q.  And 3 hours and 30 minutes
2  communicating or meeting with the law firms
3  involved.
4    A.  Correct.
5    Q.  Okay.  And the total for that invoice
6  was $10,208; correct?
7    A.  Correct.
8    Q.  Okay.  I'm handing you what's been
9  marked as Exhibit 7 to your deposition.
10    (Invoice from Sarah Kane, M.D.,
11    for services 9/20/18 through 11/16/18
12    marked Exhibit 7.)
13  BY MS. AHERN:
14    Q.  And this is another invoice prepared by
15  you?
16    A.  Yes.
17    Q.  And the period of time that is covered
18  appears to be September 20th, 2018, through
19  November 16th of 2018; is that right?
20    A.  Yes.
21    Q.  And you spent an additional 71 hours
22  and 5 minutes reviewing materials and generating
23  your expert report?
24    A.  Yes.
25    Q.  And about four-and-a-half hours

12 (Pages 42 to 45)

Sarah E. Kane, M.D.

Page 46

1   communicating with the law firms involved?
2       A.  That's correct.
3       Q.  For a total of $37,791.67?
4       A.  Yes.
5       Q.  Doctor, do you have any -- this takes
6   us through -- this last invoice, Exhibit 7, takes
7   us through November of 2018.
8          You've done additional work since November
9   of 2018; correct?
10      A.  I have.
11      Q.  Do you know how much time you have yet
12  to invoice or -- sorry, let me back up.  Withdraw
13  that.
14         Have you sent another invoice to plaintiffs'
15  counsel?
16      A.  I have not.
17      Q.  Okay.  Do you have any idea how many
18  hours you have yet to invoice?
19      A.  I have not added it up.  I don't really
20  have a ballpark.  Maybe -- I would just be
21  guessing.  I haven't added it up, to be honest.
22      Q.  Do you know how much money you've made
23  to date, totaling all of these together?
24         MR. ROTMAN:  Objection.
25      Q.  How much money -- how much money have

Page 47

1   you made in fees associated with your talc work
2   to date?
3       A.  I would need a calculator to add it all
4   up, but this would be the full amount, all added
5   together.
6       Q.  And, Doctor, you're charging $500 an
7   hour; correct?
8       A.  Yes.
9       Q.  Did you ask for a retainer when you
10  were initially asked to get involved in the case?
11      A.  I did not.
12      Q.  Were you offered a retainer?
13      A.  It wasn't discussed.
14      Q.  Does the amount that you charge or your
15  fee, does that change with the activity that
16  you're performing?
17      A.  No.  I think I had a fee schedule where
18  trial might be on a per-day basis, but I don't
19  remember what that is.
20      Q.  Did you actually submit a written fee
21  schedule to the plaintiffs' counsel?
22      A.  I believe I did at some point.
23         MR. ROTMAN:  I don't know.  I don't
24  recall that.
25      Q.  Could you find a copy of that, please,

Page 48

1   and produce it to one of the attorneys involved?
2       A.  Sure.
3       Q.  Thank you.
4          MR. ROTMAN:  She'll find it if it
5   exists.  She'll look for it.
6          MS. AHERN:  Clearly.
7          MR. ROTMAN:  She didn't testify that
8   she produced a fee schedule; she said she
9   believed she did.
10         MS. AHERN:  Understood.  If she finds
11  it --
12         MR. ROTMAN:  Yeah.
13         MS. AHERN:  -- she'll produce it to you
14  and you'll produce it to us.
15         MR. ROTMAN:  Exactly.
16  BY MS. AHERN:
17      Q.  Doctor, how much -- I mean, how do you
18  keep track of your time?  Do you have a
19  spreadsheet?  Do you have some process where you
20  log your hours?
21      A.  I keep a list, an electronic list.
22  It's not an Excel, but it's just a list.
23      Q.  So is it just a Word document and you
24  put your time entries in and multiply that by
25  your hourly rate?

Page 49

1       A.  Basically.
2       Q.  And do you generate the invoices
3   yourself?
4       A.  I do.
5       Q.  Is that through some sort of program or
6   is this just a Word document that you created and
7   you plug the information in?
8       A.  It's just a Word document.
9          (Discussion off the record.)
10  BY MS. AHERN:
11      Q.  So, Doctor, other than the folders that
12  we've just gone through, is there anything
13  related to your opinions in this case that you
14  did not bring with you to the deposition today?
15         MR. ROTMAN:  Objection.
16      Q.  Start with that.
17         MR. ROTMAN:  Objection.
18      A.  I believe I brought all of the
19  literature cited in the initial reports.  I've
20  tried to be complete, as you know, with listing
21  everything that I've reviewed.  It's possible
22  there might have been some things that I reviewed
23  that I forgot to put on a list, but I've tried to
24  be as complete as possible.
25      Q.  How did you track your literature

13 (Pages 46 to 49)

Sarah E. Kane, M.D.

Page 50

1  reviews?
2      A.  So when I was writing the report,
3  you'll notice the first reference list is a list
4  of papers that I actually cited in the text of
5  the report, and then I had -- any papers that I
6  reviewed or other data that I reviewed, I kept in
7  folders on my computer.
8      Unfortunately, I had two hard drives
9  malfunction while I was in the process of writing
10  this report.  Luckily, I backed up most of it, so
11  it's possible a few things didn't get documented,
12  ultimately, but I really tried my best to make it
13  complete and accurate, and that's why you got
14  another list yesterday.
15     Q.  Okay.  And, I'm sorry, we forgot to
16  mark some of these.
17     And so can you tell me -- this is something
18  you brought with you today?
19     A.  Yes.
20         MR. TISI:  Can I -- and he's defending
21  the deposition; I just have a little more
22  knowledge of the documents and how they -- at
23  least I think I do.
24         I think that in the boxes here are the
25  references cited.  The materials considered, I

Page 51

1  don't think we printed out.  I don't think those
2  are in the boxes.  And so I don't want there to
3  be any -- there are documents she reviewed that
4  are not here that are not referenced, but were
5  identified in that list.
6         Does that make sense?
7         MS. AHERN:  Maybe.  I'm going to go
8  through the various reference lists with her --
9         MR. TISI:  Okay.
10        MS. AHERN:  -- and we can kind of
11  clarify as we go.
12        MR. TISI:  Like, for example, I mean, I
13  just -- I'm just using an example -- we
14  supplemented with some Health Canada materials.
15  I don't know if she brought those with her,
16  because they were not in the original report.
17  They weren't available at the time, so they would
18  not be in the reference materials that are in the
19  binders.
20        I know you haven't cracked open the
21  boxes, but I don't want there to be any
22  misimpression.  So in terms of what they are, you
23  can certainly ask her, but she may not know what
24  is in the boxes, because we printed them out for
25  her.  Do you know what I'm saying?

Page 52

1         MR. KLATT:  Chris, let me just clarify.
2  There's four blue cardboard TLS boxes --
3         MR. TISI:  Correct.
4         MR. KLATT:  -- that you're referring
5  to?
6         MR. TISI:  Correct.
7         MR. KLATT:  And they have binders in
8  them?
9         MR. TISI:  They have binders in them.
10  And I haven't even looked at them because they
11  were sent out from the Ashcraft office, but my
12  understanding -- and you can crack them open at
13  break -- but my understanding is there are copies
14  of those.  I don't know how many.  So it's four
15  boxes, but there are duplicates in there.
16         But they are -- if I understand -- and
17  I can correct them on a break -- if I understand
18  them, they are copies of the references.  We did
19  not make copies -- or they did not make copies of
20  the materials that were considered but not
21  referenced in the reports.
22         Do you follow what I'm saying?
23         MR. KLATT:  Yeah.  What I want to
24  clarify is the four boxes here have not been in
25  Dr. Kane's possession, so there's no notations,

Page 53

1  highlighting, stickies --
2         MR. TISI:  Oh, no.
3         MR. KLATT:  -- that she -- that
4  Dr. Kane herself would have put on what's in the
5  boxes --
6         MR. TISI:  No.  Those were print- --
7         MR. KLATT:  -- is that correct?
8         MR. TISI:  Correct.  Those were printed
9  out by the plaintiffs' steering committee.
10  Basically, we took her reference list and printed
11  them out for you all.  There's no -- there are no
12  notes from her or anything like that.
13        What I don't think we printed out for
14  you would be the extensive documents that she
15  reviewed, including the supplemental materials
16  that were identified, and then put them -- we can
17  provide those in a -- you know, on a thumb drive
18  if you want to.  It's just in these depositions
19  we've had so far, half the time the boxes aren't
20  even opened, and we didn't want to just create
21  paper for the purpose of creating paper.  But if
22  you want, we can pull those for you and put them
23  in a Dropbox or whatever.
24        I don't want to waste your time,
25  because I do want there to be -- because she

Sarah E. Kane, M.D.

Page 54

1  doesn't necessarily know what was printed out for
2  her.
3          MS. AHERN:  Understood.  So let's --
4          MR. TISI:  I'm sorry if I --
5          MS. AHERN:  That's okay.
6          MR. TISI:  -- took up time.
7          (Excerpt from Blaustein's Second
8      marked Exhibit 8.)
9  BY MS. AHERN:
10     Q.  Doctor, I'm handing you what's been
11 marked as Exhibit 8 to your deposition.
12     A.  Yes.
13     Q.  Is this something that you brought with
14 you today in response to the Notice of
15 Deposition?
16     A.  It's something I brought because I
17 reviewed it a couple days ago.  It probably falls
18 within the deposition.  I know you wanted to see
19 everything that I reviewed.
20     Q.  So, first of all, tell me what this is.
21 What is Exhibit 8?
22     A.  This is a page from Blaustein's second
23 edition of the Pathology of the Female Genital
24 Tract.
25     Q.  Do you know what page it is?

Page 55

1      A.  Unfortunately, it is cut off.  This --
2  I don't have this textbook.  I found this, I
3  think, on Google Books, actually.
4      Q.  And so why are you bringing it today
5  again?
6      A.  Because I reviewed it.
7      Q.  Okay.  And why did you review this?
8      A.  Well, I recently became aware that
9  Dr. Kurman is a medical expert witness for the
10 defense, so I was more curious.  I actually asked
11 the plaintiffs' attorneys for a report -- any
12 report that Dr. Kurman had done, because I was
13 trying to understand his -- what his viewpoint
14 might be.  I don't have his defense report
15 because they're not available to us yet, but I
16 was trying to get a sense for what defense
17 medical experts -- their viewpoints.
18     And so I did a search for, basically, "talc"
19 and "Kurman" and I found this (indicating).  And
20 then I have two other editions, so I looked
21 through my other editions for any references to
22 talc.  Because Kurman edited the fourth and fifth
23 edition.  I do not believe he edited the second
24 edition, which is -- this one page is from
25 (indicating).

Page 56

1      Q.  And, Doctor, the additional materials
2  to -- of Dr. Sarah Kane that were provided to us
3  yesterday, you list "Kurman defense report" from
4  a case by the name of Ristesund.
5      Did you not receive that?
6      A.  I asked for -- yeah, I did receive
7  that.
8      Q.  You received it?
9          MR. ROTMAN:  What she -- what she was
10 saying is she --
11         MS. AHERN:  Wait.  I'm asking her the
12 question.
13     Q.  Did you receive the report, the Kurman
14 defense report, from a case by the name of
15 Ristesund?
16     A.  Yes.  I had requested a defense report
17 written by Kurman, if they had anything, and that
18 is what I received.
19     Q.  Okay.  I thought just a minute ago you
20 said you had not received one because it wasn't
21 available to you.
22     A.  I'm talking about the MDL, the curr- --
23     Q.  Ah.
24     A.  -- the current defense expert witness
25 reports.

Page 57

1      Q.  Okay.
2      A.  Yeah.
3      Q.  Thank you for the clarification.
4      So you have seen at least one defense report
5  that was written by Dr. Bob Kurman; right?
6      A.  Yes.
7      Q.  And did you -- do you know Dr. Robert
8  Kurman, either personally or by reputation?
9      A.  By reputation and I've gone to dinner
10 with him before, but I don't know him well.
11     Q.  And what do you know about Dr. Kurman?
12     A.  So he is a well-known gynecologic
13 pathologist out of -- he was out of Johns
14 Hopkins.  I believe he recently retired.
15     But he certainly edited one of the main
16 gynecologic pathology textbooks and was -- you
17 know, published quite a bit in gynecologic
18 pathology, so his name is well known in our
19 community.
20     Q.  And you've actually cited to a number
21 of his papers in your report; correct?
22     A.  Yes, I'm sure I have.  I know at least
23 one or two.
24     Q.  And Dr. Kurman was a Robert Scully
25 fellow, as well, wasn't he?

15 (Pages 54 to 57)

Sarah E. Kane, M.D.

Page 58

1    A. I actually don't remember if he trained
2  under Scully. It's possible. I don't remember
3  whether or not he did.
4    Q. Okay. This Exhibit 8 that you brought
5  with you today, are you bringing it here because
6  it mentions granulomatous endometritis caused by
7  foreign bodies?
8    A. It says, "Talc may be introduced into
9  the endometrial cavity by instruments
10  contaminated with talcum powder or by gloves
11  during a pelvic examination. Patients may be
12  asymptomatic or may present with menorrhagia.
13  Microscopically, the extent of the granulomatous
14  inflammatory reaction depends on the quantity of
15  the talc inoculated. The infiltrate is
16  characterized by histiocytes and foreign-body
17  multinucleated giant cells surrounded --
18  surrounding the talc crystals, along with
19  lymphocytes and plasma cells. The crystals
20  appear as refractile, birefringent, needle-like,
21  or fan-shaped splinters in polarizing light."
22    Q. Are you familiar with the type of
23  reactions -- tissue reactions that are elicited
24  by talc in tissue?
25    A. I know -- I'm aware that you can get

Page 59

1  granulomous -- granulomatous inflammation, like
2  here, and you can have acute granulomatous
3  inflammation, for example, in pleurodesis and chronic inflammation,
4  like lymphocytes and plasma cells.
5    Q. Are you an expert in granulomatous
6  inflammation?
7    A. Well, I certainly am familiar with
8  the -- with diagnosis of granulomatous
9  inflammation. I see it quite commonly.
10    Q. Under what circumstances do you
11  commonly see granulomatous inflammation?
12    A. You see it often in -- the most common
13  situation would be foreign-body giant cell. That
14  could be due to foreign bodies or it could be due
15  to -- a common situation we might see them is
16  what's called an epidermal inclusion cyst in the
17  skin, and you actually can get a granulomatous
18  response to keratin that has -- if it's ruptured
19  and gone into the dermis, you can see that.
20    Infections is another one. In tuberculosis,
21  you can see granulomatous inflammation. Fungal
22  infections, you can see granulomatous
23  inflammation.
24    Q. How many different types of
25  granulomatous reactions are there?

Page 60

1    A. I'm not really sure what you mean by
2  "types." You mean foreign body versus infectious
3  versus --
4    Q. Yes.
5    A. Those would be the top of the list.
6    Q. And are there subtypes of granulomatous
7  inflammation within those categories?
8    A. Well, you can have multinucleated giant
9  cells that aren't part of a granuloma.
10    You can see -- another common situation
11  where you'll see granulomas is in Crohn's
12  disease. That's granulomatous inflammation in
13  the colon due to inflammatory bowel disease.
14    And I think -- yeah. So foreign body and
15  infection are -- and certain diseases that may
16  cause granulomatous -- that's sort of the
17  hallmark of that type of disease, sarcoidosis.
18    Q. Have you ever -- the Figure 12.6 in
19  Exhibit 8 actually doesn't have anything to do
20  with granulomatous endometritis, does it?
21    A. No. That figure is of a type of
22  finding you can see in the endometrium that's not
23  a granulomatous reaction.
24    Q. And how did Exhibit 8, if it does,
25  inform your opinions in this case?

Page 61

1    A. Well, it was just a piece of
2  information I found, again because I was curious
3  mostly about what Kurman's opinion might be on
4  this litigation. So...
5    Q. Does -- do you know what -- did this
6  come from a particular chapter in Blaustein's
7  second edition?
8    A. This, I don't -- I have no more
9  information on this particular one. Um --
10    Q. Do you know who authored the chapter?
11    MR. ROTMAN: Excuse me. I think she
12  was in the middle of an answer.
13    Q. I didn't mean to cut you off. Please
14  go ahead.
15    A. Again, I don't have any more
16  information. I brought it because I saw it.
17    Q. Okay. So you don't know who authored
18  the chapter that contains this information in
19  Exhibit 8?
20    A. Not for this edition, I do not.
21    Q. And are you -- do you -- did you say
22  earlier you weren't sure if Dr. Kurman edited
23  this particular version of Blaustein's Pathology?
24    A. I don't believe he did. I know he
25  edited the fourth and fifth, but I don't believe

16 (Pages 58 to 61)

Sarah E. Kane, M.D.

Page 62

1  he did the second.
2      Q.  Does the information in Exhibit 8
3  inform your decisions regarding talc and
4  causation with regard to ovarian cancer?
5      MR. ROTMAN:  Objection.
6      A.  It's another piece of evidence.  It
7  mentions granulomatous inflammation due to talc
8  in the endometrium.
9      Q.  And what does that have to do with
10 ovarian cancer?
11     A.  Well, one of the plausible biologic
12 mechanisms for talc causing ovarian cancer is
13 that it elicits a chronic inflammatory reaction.
14     Q.  And there are different types of
15 chronic inflammatory reactions, aren't there?
16     A.  Yes, there are.
17     Q.  Is a foreign-body reaction the same as
18 the type of inflammation seen, for instance, in
19 ulcerative colitis?  If you know.
20     A.  No, I'm just rereading the question.
21 Ulcerative colitis, you don't typically see
22 foreign-body reaction.
23     Q.  Ulcerative colitis is one of the
24 conditions that has been associated with the
25 development of cancer; correct?

Page 63

1      A.  Those with ulcerative colitis have an
2  increased risk of colon cancer, yes.
3      Q.  Do you know of any particular cancers
4  that have been linked to foreign-body responses?
5      A.  Well, foreign-body responses -- for
6  example, asbestos is known to cause an
7  inflammatory response and asbestos is known to
8  cause mesothelioma and lung cancer, and the IARC
9  states that it causes ovarian cancer.
10     Q.  And how is the response to asbestos
11 different from the response that's been
12 documented with talc in terms of tissue reaction?
13     A.  So you can see a granulomatous reaction
14 to talc.  You can see an acute reaction to talc
15 in pleurodesis patients.
16     This page here mentions plasma cells and
17 lymphocytes, which you do see in Crohn's disease.
18     Q.  You see plasma cells and lymphocytes in
19 a number of different inflammatory conditions;
20 correct?
21     MR. ROTMAN:  You can answer.
22     A.  Yes, you can see lymphocytes and plasma
23 cells in inflammatory conditions.
24     Q.  And you can see inflammatory con- --
25     MR. ROTMAN:  Object -- object -- I was

Page 64

1  going to --
2      MS. AHERN:  One second, please.
3      Q.  You can see inflammatory conditions
4  that are not in any way linked to the development
5  of cancer; correct?
6      A.  So not all chronic inflammation is
7  going to lead to cancer, but chronic inflammation
8  is a well-established cause of different types of
9  cancer.
10     MR. ROTMAN:  I'd like to take a break.
11 We've been going a little over an hour.
12     MS. AHERN:  Okay.
13     THE VIDEOGRAPHER:  Here ends Media 1.
14 Off the record, 10:21 a.m.
15     (A recess was taken.)
16     THE VIDEOGRAPHER:  Here begins Media
17 No. 2 in today's deposition of Sarah Kane, M.D.
18 Back on the record, 10:37 a.m.
19 BY MS. AHERN:
20     Q.  All right.  Dr. Kane, we were -- we
21 left off, we were talking about chronic
22 inflammation and cancer.
23     Do you remember that?
24     A.  Yes.
25     Q.  Okay.  Can you identify for me the

Page 65

1  types of ovarian cancer that have been associated
2  with chronic inflammation?
3      A.  So we know that endometriosis, as an
4  example, causes an inflammatory response.  The
5  types of ovarian cancer that are associated with
6  endometriosis are clear cell carcinoma and
7  endometrioid carcinoma.
8      Q.  Are there other forms of ovarian cancer
9  that are associated in the literature with
10 chronic inflammation?
11     A.  So we do see chronic inflammation
12 within other types of ovarian cancer, so
13 high-grade invasive serous, low-grade serous
14 carcinoma, you do see chronic inflammation within
15 those tumors.
16     Q.  Let me be more precise, because it's
17 sort of a chicken and the egg kind of thing.
18     I'm asking what sort of inflammatory
19 conditions have been associated with the
20 development or the cause of ovarian cancers?
21     A.  Yeah.  So the mechanisms of a lot of
22 ovarian cancer have been somewhat elusive.
23 Unfortunately, it's a rare disease.  It's hard to
24 study.  It's difficult to have sort of a large
25 enough cohort to really get good data on ovarian

17 (Pages 62 to 65)

Sarah E. Kane, M.D.

Page 66

1  cancer, and so we don't really know all of the
2  mechanisms of the initiation of ovarian cancer.
3      But we know that chronic inflammation, we
4  see it in ovarian tumors. We know that -- and
5  putting it in a talc perspective, we know that
6  talc can cause chronic inflammation and so -- and
7  we know that chronic inflammation causes other
8  types of cancer.
9      Q.  So is that -- can you name any other
10  types of ovarian cancers that have been
11  associated in the literature with chronic
12  inflammation in terms of a specific etiology for
13  that cancer?
14      A.  So, again, I would say I don't know if
15  we can say for certain what the specific etiology
16  is for all types of surface epithelial cancer,
17  but we do know that, again, clear cell has been
18  associated with endometriosis, which causes
19  chronic inflammation, and we see chronic
20  inflammation in tumors. But the mechanisms for
21  these types of tumors have not been completely
22  mechan- -- elucidated.
23      Q.  So do you not know of any other
24  specific ovarian tumors that have been associated
25  in the literature causally with chronic

Page 67

1  inflammation?
2      A.  Again, I don't believe that the
3  mechanisms of all of these tumors have been
4  elucidated completely.
5      Q.  And I do understand your answer, but I
6  just want to know if there are -- if you're aware
7  of literature connecting causally chronic
8  inflammation with other types of ovarian cancer
9  other than the two that you've mentioned,
10  endometrioid and clear cell carcinoma.
11      A.  Well, again, I mentioned that in serous
12  tumors, we do see chronic inflammation in those
13  tumors.
14      And with smoking and mucinous ovarian
15  cancers, you know, it's been -- there's some
16  literature that suggests, you know, smoking is
17  associated with mucinous and those -- that can
18  cause inflammatory reactions.
19      But, again, this is all -- it's not entirely
20  clear what the etiology of some of these tumors
21  are.
22      Q.  You mentioned that in high-grade serous
23  carcinoma, you see associated inflammation;
24  correct?
25      A.  You can see associated chronic

Page 68

1  inflammation, yes.
2      Q.  And you would agree that many, if not
3  most, cancers are somewhat proinflammatory.
4      A.  I think tumors can be -- can be
5  proinflammatory, yes.
6      Q.  So the tumor itself can invoke an
7  inflammatory response during its development;
8  correct?
9      A.  Some tumors will.
10      Q.  And often the tumors will hijack
11  portions of the immune system to help them to
12  grow and metastasize; correct?
13      A.  I'm not sure exactly what you mean by
14  "hijack," but there are mechanisms to -- or
15  literature to suggest that.
16      Q.  So just looking at a high-grade serous
17  carcinoma and seeing inflammation doesn't tell
18  you anything about whether that inflammation
19  caused the tumor or whether it was caused by the
20  tumor; is that correct?
21      A.  So, again, the mechanisms are not that
22  clear, so we don't know for sure. But is all
23  chronic inflammation seen in a tumor the cause of
24  the tumor? I don't know if we know the answer,
25  but, you know, it's definitely an associated

Page 69

1  pattern that we see with ovarian tumors.
2      Q.  So my question is a little different,
3  if I can go back and find it. And it's missing.
4      My question is: As a pathologist looking at
5  slides from a particular patient who has ovarian
6  cancer --
7      A.  Mm-hmm.
8      Q.  -- just the observation that there is
9  inflammatory cells associated with that tumor
10  doesn't tell you anything, as a pathologist, in
11  terms of whether that inflammation caused the
12  tumor or if the tumor caused the inflammation.
13      A.  Well, I think it depends on the
14  situation. You know, again, for ovarian tumors,
15  if we have a clear cell carcinoma, we could, you
16  know, deduce, especially if you see associated
17  endometriosis, that that is the likely cause,
18  and, again, depending on the patient and the
19  patient's risk factors.
20      But, yeah, if you're looking just at one
21  slide without any other information, it would be
22  difficult to say.
23      Q.  Well, you would never just be looking
24  at one slide, would you? You'd be looking at all
25  of the slides that were available for a

18 (Pages 66 to 69)

Sarah E. Kane, M.D.

---

Page 70

1  particular patient, which would include
2  diagnostic tissue or tumor tissue, as well as
3  normal, nontumor tissue; correct?
4      A.  Right.
5      Q.  Okay.  So you would never be in a
6  situation where you're just looking at a single
7  slide and making a determination, unless it's
8  maybe cytology or a biopsy; correct?
9      A.  I'm sorry.  I'm just looking at the --
10     Q.  Sure.
11     A.  I'm not sure what the -- the first
12  question came out kind of funny.
13     Q.  What I was saying is there would never
14  be a situation where you're only looking at a
15  single slide to make a diagnostic determination
16  unless it was from a biopsy sample or a cytology.
17     A.  That's what I was going to kind of
18  rewind and clarify, that sometimes there is only
19  one slide.  So --
20     Q.  Is that an accurate statement?
21         MR. ROTMAN:  Let her finish the answer.
22  I think she was saying "so" and then you asked
23  another question.
24     A.  So in a larger specimen type, it's
25  correct you would be looking, usually, at more

---

Page 71

1  slide if there's more tissue that would fit in
2  one cassette to make one slide.
3      Q.  Let's talk about high-grade serous
4  carcinoma.
5      High-grade serous carcinoma is the most
6  common form of ovarian cancer; correct?
7      A.  It's most -- yes.
8      Q.  By far the most common form of ovarian
9  cancer; is that also correct?
10     A.  It's the most common form, yes.
11     Q.  So let's talk about high-grade serous
12  carcinoma in the context of chronic inflammation.
13     Do you know of any published literature that
14  connects chronic inflammation causally with the
15  development of high-grade serous carcinoma?
16     A.  I can -- in my report, I actually do
17  have a section.  Let me find it.
18         MR. ROTMAN:  It might be easier to take
19  off the clip, if that helps you flip the pages,
20  because it's two-sided.
21     Q.  Doctor, while you look for that, just
22  to the best of your recollection, do you remember
23  reading any studies that concluded that --
24         MR. ROTMAN:  I object.  She's in the
25  middle of answering --

---

Page 72

1         MS. AHERN:  I'm not finished with my
2  question.  You can object when I'm done with my
3  question.
4         MR. ROTMAN:  I object to you asking a
5  question --
6         MR. KLATT:  She didn't have --
7         MR. ROTMAN:  -- when she's asking --
8         MS. AHERN:  I can ask a question
9  whenever I want.  She doesn't have to answer the
10  question if you instruct her not to, but while
11  she's spending time looking through her report,
12  I'm going to ask her a different question based
13  on her recollection.
14         MR. ROTMAN:  Well, you've asked her a
15  question, she's in the process of answering it,
16  and you're asking -- you're asking her a second
17  question.  That's what I'm objecting to.
18  BY MS. AHERN:
19     Q.  Doctor --
20         MR. ROTMAN:  Let her finish --
21     Q.  -- can you answer the question without
22  looking at your report?
23     A.  Well, I'd like to refer to my report if
24  you're asking questions.
25     Q.  And that's fine.  My only question,

---

Page 73

1  really, was, just based on your recollection as
2  we sit here discussing chronic inflammation and
3  ovarian cancer, if you are aware of studies that
4  causally associate chronic inflammation with
5  high-grade serous carcinoma?
6      A.  So there's definitely literature that
7  has looked at associations between chronic
8  inflammation and the resulting sort of
9  expressions.
10     And that's what -- I was trying to point you
11  to my report on Page 12, the end of it, where it
12  says, "There also is evidence that talc induces
13  macrophage TNF alpha expression and macrophages
14  that express TNF alpha promote ovarian tumor
15  genesis.  TNF alpha is involved in chronic
16  inflammation and induces mutations in vitro and
17  TNF alpha-induced chromosomal mutations occur
18  mostly in cells with P53 aberrations and, of
19  note, high-grade serous carcinomas typically have
20  inactivating mutations in P53."
21     So, again, we don't know all the mechanisms
22  of all of these tumors, but there's certainly
23  literature that is investigating those types of
24  associations.
25         MR. KLATT:  Object.  Nonresponsive.

19 (Pages 70 to 73)

Sarah E. Kane, M.D.

**Page 74**

1    MS. AHERN:  Same.
2    Q.  But since you brought it up, on Page 12
3  of your report, can you translate for me that
4  paragraph that you just read and put it in lay
5  terms and explain how that has anything to do
6  with causal associations with ovarian cancer and
7  chronic inflammation caused by talc?
8    MR. ROTMAN:  Objection.
9    A.  Well, I think it's there in the report.
10  If talc is inducing macrophage TNF alpha
11  expression and macrophages that express TNF alpha
12  can promote ovarian tumor genesis that occur
13  mostly in the -- TNF alpha-induced chromosomal
14  mutations occur mostly in cells with P53
15  aberrations, I think that's relevant in looking
16  at evidence that -- for a plausible mechanism
17  that inflammation caused by talc can cause
18  aberrations in -- can cause P53 aberrations.  And
19  we know that high-grade serous carcinomas, many
20  of them have P53 mutations.
21    Q.  And high-grade serous carcinomas with
22  P53 mutations, what causes the P53 mutations?
23    A.  Well, again, the literature is still
24  evolving into all of the mechanisms regarding
25  this.  Some of them we know are sort of aberrant

**Page 75**

1  mutations, and we don't always know why they
2  occur.
3    We know that women with BRCA1 and BRCA2
4  mutations have -- can get high-grade -- have a
5  higher risk of high-grade serous carcinoma.
6    But, again, I don't think we know all of the
7  mechanisms that cause, you know, all of these
8  tumors.
9    MS. AHERN:  Objection.  Nonresponsive.
10    Q.  Doctor, do you know, as we sit here
11  today, what causes P53 mutations in high-grade
12  serous carcinoma?
13    A.  I think I answered that.  We know, I
14  mean, what's in my report and women with BRCA1
15  and BRCA2 mutations.  But, again, the literature
16  is evolving with this.
17    Q.  Doctor, are you suggesting that BRCA1
18  and -2 mutations cause P53 mutations in
19  high-grade serous carcinomas.
20    A.  What I'm saying is that we know that
21  BRCA1 and BRCA2 mutation patients have a high
22  risk of ovarian cancer.
23    And so you're asking me what causes, so, you
24  know, I'm telling you the data that we have.
25    Q.  What is the earliest identifiable

**Page 76**

1  genomic event in the development of high-grade
2  serous carcinoma?
3    A.  So, again, I don't know if I -- I don't
4  know if we always know what the earliest
5  identifiable genomic event in the development of
6  high-grade serous carcinoma is.
7    Q.  Have you reviewed the literature on
8  high-grade serous carcinoma from a molecular
9  genetics perspective?
10    A.  Yes, I reviewed papers on molecular
11  genetics, yes.
12    Q.  Do those papers indicate that one of
13  the earliest, if not the earliest, genomic event
14  in the development of high-grade serous carcinoma
15  that has been identified are mutations in P53?
16    A.  So, again, you can see P53 mutations,
17  for example, in the fallopian tubes and you can
18  have sort of serous tubal intraepithelial
19  carcinomas in the fallopian tube, which are
20  thought to be early precursors for high-grade
21  carcinoma.
22    Q.  High-grade serous carcinoma?
23    A.  Mm-hmm.  Sorry, high-grade serous
24  carcinoma.
25    Q.  And do you agree that the STIC lesions

**Page 77**

1  or serous tubal epithelial carcinomas in the
2  fallopian tubes are currently known to be the
3  earliest manifestation of high-grade serous
4  carcinoma?
5    A.  Well, it depends on what you mean by
6  "manifestation."  I mean, it takes a period of
7  time from initial insult until we can recognize
8  something histologically as a precursor to
9  cancer.
10    Q.  That was -- you're right, that was a
11  bad question.
12    Do you recognize serous tubal
13  intraepithelial carcinomas as an in situ serous
14  carcinoma?
15    A.  I think evidence is supportive of
16  serous tubal intraepithelial carcinomas being a
17  precursor to some high-grade serous carcinomas.
18    Q.  And when you say "precursor," do you
19  mean a frank cancer or a premalignant lesion?
20  What do you mean by "precursor"?
21    A.  Well, again, not -- we don't know if
22  all STICs are going to become high-grade serous
23  carcinomas.  STICs were originally discovered in
24  looking at fallopian tubes of BRCA1 and BRCA2
25  patients that had -- what's the word I'm looking

Sarah E. Kane, M.D.

Page 78

1  for? -- prophylactic salpingectomies to decrease
2  their risk of ovarian cancer.
3      And that was -- you know, they had evaluated
4  these precursor lesions, and so the thought is
5  that when you have these atypical cells in the
6  fallopian tube fimbria that are -- that have P53
7  aberrations, that that -- the belief is that
8  that's a precursor to some of the serous invasive
9  carcinomas that we see.
10     Q.  Do you consider STIC lesions to be
11 carcinomas?
12     A.  They're -- the name is intraepithelial
13 carcinoma, so its analogous term would be sort of
14 an in situ cancer.
15     Q.  It is a cancer; correct?
16     A.  Well, they're calling them
17 intraepithelial carcinomas because they have -- I
18 mean, it's sort of semantics.  They have a P53
19 mutation and they're recognizable histologically.
20     Q.  Do you agree that they're carcinomas or
21 cancer?
22     A.  I certainly agree that they can be
23 precursors to invasive serous carcinomas.  It's
24 sort of semantics, precursor -- it -- it's --
25 it's sort of the same question as ductal

Page 79

1  carcinoma in situ in the breast.  There's
2  literature that debate about is ductal carcinoma
3  in situ a true cancer or is it a risk factor for
4  cancer, and what is the meaning of treatment for
5  DCIS in the breast?  And I would say that that's
6  sort of analogous to STIC lesions in the
7  fallopian tube.
8      Q.  Okay.  Do you agree that most
9  high-grade serous carcinomas arise from the
10 endometrial cells in the fallopian tube?
11     A.  High-grade --
12     Q.  Epithelial cells in the fallopian tube.
13 Excuse me.
14     A.  So, again, we -- this was something
15 that the medical community really struggled with,
16 trying to find the precursor lesions to a lot of
17 these tumors.
18     And for a lot of years it was thought that
19 maybe serous carcinomas derived from what are
20 called epithelial inclusion cysts, so, basically,
21 the thought was that during ovulation, you're
22 disrupting the surface epithelium of the ovary
23 and when the ovary sort of heals itself, you get
24 this invaginated epithelium within the ovary and
25 that maybe because of inflammatory response to

Page 80

1  that ovulation event, you might end up with
2  precursors.
3      We don't really have a model in a lot of
4  ovarian cancers where you can follow a precursor
5  all the way through to -- what we think is a
6  precursor all the way through to the final tumor.
7  We just -- we don't really have a lot of data on
8  those in-between steps.
9      So it was very, very interesting when they
10 discovered these STIC lesions in the fallopian
11 tube fimbria that had P53 mutations.  It was
12 pretty compelling that these might be the
13 precursor lesions to serous -- high-grade serous
14 carcinomas.
15     Now, are all high-grade serous carcinomas
16 caused by STIC lesions or are they all -- is a
17 STIC lesion a precursor to all serous --
18 high-grade serous carcinomas?  I don't think we
19 know that.
20     Q.  Do you know of any data associating
21 high -- excuse me, associating chronic
22 inflammation or injury with the development of
23 STIC lesions?
24     A.  So, again, I think the literature is
25 still evolving with this -- these STIC lesions.

Page 81

1      Q.  Sorry.  Were you finished?  I don't
2  want to interrupt you if you're thinking.
3      A.  No, I'm thinking.
4      Again, I don't think we really have the data
5  on where these STIC lesions are coming from.
6      Q.  As part of your literature review for
7  your MDL report, did you search specifically for
8  papers that might be linking or associating
9  chronic inflammation with early precursor lesions
10 to serous invasive carcinomas or high-grade
11 serous carcinomas?
12     A.  I was certainly looking for literature
13 with the association of inflammation with ovarian
14 cancer.
15     Q.  With -- did you look specifically at
16 the various subtypes of ovarian cancer?
17     A.  Yes.
18     Q.  Is there a particular subtype of
19 ovarian cancer that you think is associated with
20 talc use?
21     A.  So most of the epidemiology literature
22 show the highest association with high-grade
23 serous invasive carcinoma.
24     Q.  When you say "highest association," are
25 you talking about strength of association?

21 (Pages 78 to 81)

Sarah E. Kane, M.D.

Page 82

1      A.  I'm talking about the -- for example,
2  on the cohort studies, they found an association
3  with high-grade serous carcinoma.
4      And in a lot of the case-control studies,
5  when they looked at tumor subtype, a lot of those
6  tumors were serous carcinomas.  Now, some of them
7  broke them out by relative risk by subtype; some
8  of them didn't.  I'd have to look at the papers.
9      Q.  Do you remember which cohort study
10 found an association with high-grade serous
11 carcinoma?
12     A.  I believe the Nurses' Health Study.
13 I'd have to look at it to see the numbers.
14     Q.  Was there more than one cohort study
15 that you recall associated talc use with
16 high-grade serous carcinoma?
17     A.  I'd have to look at them just to be
18 sure, but the one that I remember is the Nurses'
19 Health Study.
20     Q.  Are there any other subtypes,
21 histologic types, of ovarian cancer that you
22 believe are associated with talc use?
23     A.  Well, I think talc use -- I think talc
24 use could be associated with the -- any type of
25 surface epithelial cancer.  That seems to bear

Page 83

1  out in the epi data.  They've certainly seen an
2  association with different types of surface
3  epithelial cancers in the epi data, the strongest
4  association being with the serous invasive.
5      Q.  Have you seen any data supporting an
6  association with talc use and a low-grade serous
7  carcinoma?
8      A.  I'd have -- again, I'd have to look at
9  the different studies to break it out, but I know
10 there was a study that found an increased risk
11 with serous borderline carcinomas.  I'd have to
12 look through the individual data sets.
13     Q.  And serous borderline -- are -- serous
14 borderline tumors are not carcinomas; correct?
15     A.  Sorry.  I -- serous borderline tumors,
16 yes.  I misspoke.
17     Q.  And you don't remember what study that
18 was that associated talc use with serous
19 borderline tumors?
20     A.  I would have to look at the data -- or
21 the study.
22     Q.  So do your opinions in this case apply
23 equally to all histologic subtypes of ovarian
24 cancer or are there specific subtype or subtypes
25 that you are opining are caused by talc?

Page 84

1      A.  So I think the most consistent finding
2  is with high-grade serous carcinoma, but there's
3  data for the other types of surface epithelial
4  carcinomas.
5      Q.  And what are the surface types of
6  carcinomas?
7      A.  So they're endometrioid and clear cell,
8  and mucinous less so than, I believe, the
9  endometrioid and clear cell, although I believe,
10 again, in the 2010 Nurses' Health -- is that --
11 I'd have to go back -- I -- there was a mention
12 of mucinous -- I'm not absolutely sure it was the
13 Gates 2010, but there was a mention of an
14 increased risk of mucinous in one of those
15 studies.
16     Q.  Do you agree that the different
17 histologic subtypes of epithelial ovarian cancer
18 are likely to have different genetic causes?
19     A.  I know they're associated with
20 different genetic mutations.
21     Q.  Do they develop along distinct
22 molecular genetic pathways?
23     A.  That's what the literature suggests at
24 this point.
25     Q.  Do they behave differently?

Page 85

1      A.  So the high-grade surface epithelial
2  carcinomas have a more aggressive pathway or
3  presentation.  The low-grade surface endothelial
4  carcinomas tend to have a more indolent
5  progression.
6      Q.  You've used the term "surface
7  epithelial carcinomas" and I haven't seen that
8  term generally used in the literature.
9      When you talk about surface epithelial
10 carcinomas, are you talking about serous or are
11 you talking about endometrioid or are you talking
12 about clear cell?  Mucinous?
13     A.  Epithelial carcinomas.
14     Q.  That would encompass all of those,
15 wouldn't it?  Wouldn't surface epithelial
16 carcinomas encompass mucinous, clear cell,
17 endometrioid, and serous subtypes?  They're all
18 epithelial ovarian cancers; correct?
19     A.  Yes.  That's what I'm referring to when
20 I -- because we also have germ cell tumors and
21 stromal tumors of the ovary.  Those are much more
22 rare, and I'm not -- you know, I don't think
23 there's associations with those.  So, yes, we're
24 talking about epithelial carcinomas, to be clear.
25     Q.  Well, and just -- because I want to

22 (Pages 82 to 85)

Sarah E. Kane, M.D.

Page 86

1    make sure your testimony is also clear.
2        So if we could, if you could use the
3    specific subtype names, like serous or
4    endometriod --
5        A.  Okay.
6        Q.  -- or clear cell.  That way there's no
7    confusion later on about what you intended.
8        So when you say -- let's see.  Let me go
9    down.  Sorry.
10       When you say "high-grade surface epithelial
11   carcinoma," are you talking about high-grade
12   serous carcinomas?
13          MR. ROTMAN:  Objection.  You're asking
14   her to reflect back on all of her prior answers
15   to all of your prior questions, whether she was
16   referring to the same thing in each one?
17       Q.  Do you understand my question?
18       A.  I'd have to figure out what answer
19   you're talking about, but --
20       Q.  So you just -- just a few questions
21   ago, you answered -- I said, "Do the different
22   types -- histologic types develop along the same
23   molecular genetic pathways?"
24       You said, "That's what the literature
25   suggests at this point."

Page 87

1        I asked, "Do they behave differently?"
2        And then you responded, "So the high-grade
3    surface epithelial carcinomas have a more
4    aggressive pathway or presentation.  The
5    low-grade surface epithelial carcinomas tend to
6    have a more indolent..."
7        Were you talking about high-grade serous and
8    low-grade serous carcinomas?
9        A.  I was talking -- sorry.  I was talking
10   about high-grade serous carcinomas, yeah.  And we
11   also have sort of undifferentiated carcinomas
12   that are also considered high grade.
13       Q.  Okay.  And were you talking about
14   low-grade serous carcinomas when you said
15   "low-grade surface"?
16       A.  No.  So "surface" doesn't really refer
17   to cell type; it's just sort of a --
18       Q.  Right.
19       A.  -- an umbrella term for the epithelial
20   carcinoma.
21       Q.  Right, which is my point.  I just
22   wanted to be clear.  When you say "surface" --
23       A.  Yes.
24       Q.  -- could you instead use the actual
25   cell type.

Page 88

1        Does that make sense?
2        A.  Okay.  Yes.  Okay.
3        Q.  Okay.  All right.  So let me ask my
4    question that I asked a little while again, and
5    you tell me -- you can answer it again with the
6    terminology.
7        Do the different histologic subtypes of
8    ovarian cancer behave differently?
9        A.  Yes.  Again, the high-grade ones
10   generally behave differently than the low-grade
11   ones.
12       Q.  Okay.  Do endometrioid and clear cell
13   carcinomas behave differently from high-grade
14   serous carcinomas?
15       A.  The high-grade serous carcinomas tend
16   to behave more aggressively.
17       Q.  Do low-grade serous carcinomas behave
18   differently from endometrioid, clear cell, and
19   high-grade serous carcinomas?
20       A.  They tend to be less aggressive.  They
21   all tend to be less aggressive than the
22   high-grade serous carcinomas or other high-grade
23   carcinomas of the ovary.
24       Q.  And are they thought to each have
25   different cells of origin?

Page 89

1        A.  Again, we're not entirely sure where
2    these tumors are arising from, particularly with
3    mucinous carcinomas.  I think mucinous carcinomas
4    and there's also a type transitional cell, which
5    is very, very rare, and most of the literature,
6    when it comes to the epi data, don't really
7    discuss transitional cell.
8        But putting that aside, mucinous carcinomas
9    we have, I think, the least amount of data on
10   where they are actually arising from.  Clear cell
11   and endometrial carcinomas have an association
12   with endometriosis, but, again, you know, are all
13   cases of endometriod and clear cell carcinomas,
14   are they all arising from endometriosis?  I don't
15   think I can say that.  I don't think we know for
16   sure.
17       And serous carcinomas, we talked about the
18   precursor lesions and the fallopian tubes.
19       So there are differences where we think the
20   tumors are arising from, but, again, I don't
21   think we have absolutes where we can definitively
22   say, you know, this particular tumor in this
23   particular woman arised [sic] from this precursor
24   or...
25       Q.  Okay.  And do you know if the different

23 (Pages 86 to 89)

Sarah E. Kane, M.D.

Page 90

1  histologic subtypes have been associated in the
2  epidemiologic literature with different risk
3  factors?
4      A.  Yes.  Again, I think we touched on some
5  of that before.  There is an association with
6  endometrioid and clear cell with endometriosis
7  and obesity.
8      Mucinous carcinomas have shown to be
9  associated in some studies with a smoking
10  history.
11      High-grade serous carcinomas, it's a little
12  bit harder.  We know that BRCA1 and BRCA2
13  patients have an increased risk.
14      Q.  Now that we're on that topic of
15  genetics, do you know what proportion --
16  currently, what is believed to be the proportion
17  of ovarian cancers that are caused by germline
18  mutations?
19      A.  Off the top of my head, I think -- do I
20  have that in my report?  But I -- I'm thinking
21  it's 10 to 20 percent, but that's off the top of
22  my head.
23      Q.  Have you seen any research coming out
24  of Seattle Cancer Care Alliance over the last 10
25  or 15 years that indicates the number could be as

Page 91

1  high as a quarter of all ovarian cancers being
2  linked to germline mutations?
3      A.  That would roughly fit with what I just
4  said, 10 to 20 percent.  I can't say for sure
5  that I have seen that.  I might have.  But it
6  fits with what I remember.
7      Q.  I had asked you earlier if you had
8  reviewed any literature relating to inflammatory
9  conditions and associations with early STIC
10  lesions.
11      And you -- and, I'm sorry, I don't want to
12  misstate your response.  What was your response
13  to that?
14      A.  Had I reviewed literature?  Yes, I've
15  seen literature.
16      Q.  Okay.
17      (Article entitled "Serous tubal
18  intraepithelial carcinoma, chronic
19  fallopian tube injury, and serous carcinoma
20  development" marked Exhibit 9.)
21  BY MS. AHERN:
22      Q.  I'm handing you what's been marked as
23  Exhibit 9 to your deposition.  And this is --
24      MS. AHERN:  I don't know if anyone else
25  wants one.

Page 92

1      Q.  -- this is an article by Karen
2  Malmberg, et al., entitled "Serous tubal
3  intraepithelial carcinoma, chronic fallopian tube
4  injury, and serous carcinoma development," and it
5  was in Virchows Archives, March of 2016.
6      MR. TISI:  What did you mark this?  I'm
7  sorry.
8      MS. AHERN:  I marked this one 9.  Thank
9  you.  No -- yes, 9.
10      MR. TISI:  Oh, I'm sorry.
11      MS. AHERN:  That's okay.
12      Q.  Do you recall if you've ever reviewed
13  this article?
14      A.  It's possible.  It's certainly possible
15  that I have seen this before in just my daily
16  practice.  I don't believe I cited it in any of
17  the references that I can remember, but it's
18  highly possible that I've seen it.
19      Q.  Do you see the first page that -- you
20  can just skip if you want, take your time reading
21  it if you'd like, but the authors conclude in
22  their study that there is no correlation with
23  chronic tubal injury or inflammation with the
24  development of STIC lesions or the existence of
25  STIC lesions.

Page 93

1      Do you see that?
2      A.  No.  Can you -- I'm sorry, can you
3  point to me --
4      Q.  Oh, sure.
5      A.  -- where?
6      Q.  Do you see the abstract, if you carry
7  it over to the second column?
8      A.  Mm-hmm.  Yes.
9      Q.  It says, "STIC and invasive cancer were
10  seen more often in the older patients than in the
11  younger patients"?
12      A.  Mm-hmm.
13      Q.  This study is -- small study, no
14  correlation with chronic tubal injury or
15  inflammation was identified.
16      A.  Yes, with the caveat -- that was a
17  conclusion with the caveat that it was a small
18  study.
19      Q.  Have you -- as a gynecologic
20  pathologist or a pathologist who has subspecialty
21  training in gynecologic malignancies, how often
22  do you see chronic -- or evidence of chronic
23  inflammation surrounding STIC lesions?
24      Or strike that.  How often do you see STIC
25  lesions?

24 (Pages 90 to 93)

Sarah E. Kane, M.D.

Page 94

1    A.  On -- certainly, I can't give you a
2  number.  I've certainly made the diagnosis and
3  see it -- I can't give you a number of how many
4  times.
5    Q.  Have you ever been involved in a study
6  looking specifically at STIC lesions and
7  high-grade serous carcinomas?
8    A.  I have not been involved in a study,
9  no.
10    Q.  Have you ever seen evidence of chronic
11  inflammation with a STIC lesion?
12    A.  Off the top of my head, I am not sure.
13  It's possible, but I can't really answer that off
14  the top of my head.
15    Q.  How often do you see chronic
16  inflammation in the fallopian tubes associated
17  with high-grade serous carcinoma?
18    A.  You can certainly see it, but it sort
19  of goes along with the discussion that we had
20  before.  You can see chronic inflammation within
21  the tumor, as well.
22    And so I think, you know, the literature
23  is -- the research is ongoing as to, you know...
24    Q.  So once the tumor -- once there's a lot
25  of tumor burden in the abdominal cavity, it's

Page 95

1  difficult to tell where the inflammation is
2  coming from or what started it; is that correct?
3    A.  Well, if there's chronic inflammation
4  in the tumor, it's likely the tumor has something
5  to do with the chronic inflammation.
6    But, again, you know, as we talked about
7  before, I think sometimes it is difficult to
8  tell.
9    MS. AHERN:  Okay.  Housekeeping matters
10  before I forget.
11    Let me go ahead somehow and mark --
12  let's mark -- we can remove this later --
13  "Blaustein's Pathology of the Female Genital
14  Tract," Fourth Edition, as Exhibit 10 to your
15  deposition.
16    ("Blaustein's Pathology of the
17    Female Genital Tract," Fourth Edition,
18    marked Exhibit 10.)
19  BY MS. AHERN:
20    Q.  And, Doctor, you brought this textbook
21  with you today.
22    Is this your textbook?
23    A.  That particular copy is not.  That's my
24  coworker's copy.  This copy is mine (indicating).
25    Q.  Okay.  And inside this, you have what

Page 96

1  looks --
2    MR. ROTMAN:  Just so the record is
3  clear, when you said "this," do you want to
4  identify it?
5    A.  Sorry.  The fourth edition belongs to a
6  colleague.  The fifth edition is my own.
7    MS. AHERN:  Okay.  We'll get to that
8  one.  I'll mark that next.
9    Q.  There is a photocopy here, "Blaustein's
10  Pathology of the Female Genital Tract, Fourth
11  Edition," Pages 300 and -- well, Page 376,
12  Page 539, Page 540, 648, 1216, 1217, 1218.
13    Is this a copy -- are these copies that you
14  made?
15    A.  Yes.
16    Q.  Okay.
17    MR. TISI:  Do you have a stapler?
18  Otherwise I'll go get one.
19    MS. AHERN:  No, I don't have one.
20    MR. TISI:  No, I'll go get one.
21  BY MS. AHERN:
22    Q.  Can you tell me why you made those
23  copies?
24    A.  I made them because it was easier than
25  lugging around a whole textbook.  That's why I

Page 97

1  Xeroxed them.  But --
2    Q.  You had to bring it anyway.
3    Sorry.  Go ahead.
4    A.  But the particular pages that I copied
5  are ones that talk about granulomatous reactions
6  to talc in the female reproductive system.
7    Oh, sorry.  Okay.
8    MS. AHERN:  Okay.  We'll go ahead and
9  mark those copies as Exhibit 10 to your
10  deposition.
11    Q.  And just to confirm --
12    MS. AHERN:  Sorry.  Are we on 10 or 11?
13  We're on 11.  Thank you.
14    Q.  As a --
15    MR. TISI:  Is this the next one?
16    MS. AHERN:  Yeah.  Hold on.  I'm going
17  to clarify it.
18    Q.  So this photocopy that you made from
19  Blaustein's came from the fourth edition?
20    A.  Correct.
21    Q.  The textbook that we have here marked
22  as Exhibit 10.
23    A.  (Witness nodded.)
24    Q.  Okay.  So Exhibit 11 are photocopies of
25  specific pages from Exhibit 10, which is

25  (Pages 94 to 97)

Sarah E. Kane, M.D.

Page 98

1  Blaustein's Pathology of the Female Genital
2  Tract, Fourth Edition.
3          (Excerpt from "Blaustein's
4      Pathology of the Female Genital Tract,"
5      Fourth Edition, marked Exhibit 11.)
6  BY MS. AHERN:
7      Q.  Okay.  And can you tell me, with
8  Exhibit 11, the specific information that you
9  found relevant to your opinions in this case?
10     A.  Okay.  So on Page --
11         MR. ROTMAN:  You marked the copy as
12 Exhibit 11 and the book as Exhibit 10?
13         MS. AHERN:  Mm-hmm.
14         MR. ROTMAN:  Okay.
15     A.  Okay.  You have to bear with me,
16 because I don't have any highlights or anything,
17 so I have to find it.
18     So Page 376, right down -- okay.  The last
19 paragraph under "Zanko Granulomatous
20 Inflammation," it says, "Rarely, talc or another
21 foreign substance may elicit a foreign-body
22 reaction in the endometrium.  Talc may be
23 introduced into the endometrial cavity by
24 instruments contaminated with talcum powder or by
25 gloves during a pelvic examination.  Patients may

Page 99

1  be asymptomatic or may have menorrhagia.
2  Microscopically, the extent of the granulomatous
3  inflammatory reaction depends on the quantity of
4  talc inoculated.  The infiltrate is characterized
5  by histiocytes and foreign-body multinucleated
6  giant cells surrounding the talc crystals, along
7  with lymphocytes and plasma cells.  The crystals
8  appear as refractile, birefringent, needle-like,
9  or fan-shaped splinters in polarizing light."
10     Then on Page 530 --
11     Q.  Sorry.  Let me just -- let's take this
12 in order.
13     So what about that particular passage
14 informs your causation opinions regarding talc
15 and ovarian cancer, if at all?
16     A.  So it is evidence that talc causes
17 foreign-body giant cell reaction and chronic
18 inflammation in the endometrium.
19     Q.  And that is the uterine tissue;
20 correct?
21     A.  That's the lining of the uterus,
22 correct.
23     Q.  And how does that inform your opinions
24 regarding the development of ovarian cancer?
25     A.  Well, I thought, again, it's a piece of

Page 100

1  evidence, and it shows that talc can cause
2  granulomatous or chronic inflammation in the
3  female reproductive tract.
4      Q.  And how is uterine cancer related to,
5  for instance, high-grade serous carcinoma of the
6  ovary?
7      A.  Again, this is just evidence that talc
8  can cause chronic inflammation and granulomas in
9  the endometrium, which I think is another piece
10 of evidence that talc can cause chronic
11 inflammation and granulomatous inflammation in
12 the female reproductive tract.
13     Q.  Doctor, shouldn't talc -- based on the
14 literature that we have available to us over the
15 last 50 years, shouldn't talc induce that
16 response in any tissue that it's found in?
17     A.  Well, again, different tissues will
18 respond in different ways, but I think it also
19 depends -- well, I'll just...
20     Q.  Well, as a pathologist --
21         MR. ROTMAN:  Wait.  Wait.  Are you
22 done?
23         MS. AHERN:  Are you done?
24         THE WITNESS:  I think so.
25     Q.  Okay.  So as an anatomic pathologist

Page 101

1  who knows something about granulomatous
2  reactions, shouldn't a foreign body produce a
3  foreign-body reaction in any tissue that it's
4  found in?
5      A.  Not -- no, not always.  Sometimes you
6  will have a foreign body that won't cause a
7  foreign-body giant cell reaction.  It depends
8  on -- it depends on the particle, the foreign
9  body, the tissue it's in.  You don't always see
10 that.  And also the timing, when you're looking
11 at it, versus how long it's been there.
12     Q.  Well, the timing is just more or less
13 when you observed it, not whether it occurred;
14 correct?
15         MR. ROTMAN:  Objection.
16     A.  So it's hard to know whether or not it
17 occurred -- if it had been there for a long time
18 and you're looking years, you know, in -- years
19 after it's been there, if you don't see a
20 granulomatous or chronic inflammation, that's not
21 evidence that it never occurred; it's just you're
22 not seeing it at that moment.
23     Q.  Do you know of any -- any foreign
24 bodies that generate tissue-specific reactions?
25     A.  Well, we -- I mean, we certainly have

26 (Pages 98 to 101)

Sarah E. Kane, M.D.

Page 102

1  evidence with, say, viruses and bacteria that
2  respond differently -- certain tissues will
3  respond differently to different infections.
4      For esophageal cancer, there's some
5  literature to suggest that very hot liquids
6  increase your risk of esophageal cancer. So,
7  yes, certain tissues will respond differently to
8  different material.
9      Q.  So my question was -- it might be just
10  a little simpler to think of just this
11  question -- do you know of any foreign bodies --
12  I'm not talking about viruses and bacteria which
13  cause immune responses -- but foreign bodies that
14  generate a tissue-specific foreign-body reaction?
15      A.  Well, it's sort of semantics.  I mean,
16  viruses and bacteria -- that's why I answered the
17  way I did -- are foreign to -- and, certainly,
18  foreign bodies can elicit immune response.
19  That's why you see granulomatous reactions and
20  chronic inflammation.
21      So I guess I'm not -- I think I answered the
22  question.
23      Q.  Pathologists distinguish the different
24  types of granulomatous inflammation based on the
25  cause of the inflammation; correct?

Page 103

1      A.  We look for -- if we see granulomatous
2  inflammation in tissue, we certainly look for a
3  potential cause.  We want to rule out infection,
4  so if we see granulomas, we'll routinely do
5  special stains to rule out infection.  Like we'll
6  do an acid-fast Bacillus stain for microbacteria.
7  We'll do fungal stains to rule out a fungal
8  infection that causes inflammation.
9      And then, of course, if we have -- if those
10  are negative and we're trying to figure out if
11  there's a foreign body within a granuloma, we can
12  use polarized light to try to find the foreign
13  body to identify it as a foreign-body giant cell
14  reaction.
15      But often you do have granulomatous
16  inflammation and you won't find fungi -- fungal
17  lesions -- fungal bodies or bacteria or
18  birefringent particles on them, so you don't
19  necessarily know why you have a granulomatous
20  inflammation.
21      Q.  Pathologists categorize granulomatous
22  inflammation, don't they?  They categorize it in
23  terms of the different types of immune granulomas
24  and the etiologic agents for those granulomas,
25  and over here somewhere are the foreign-body

Page 104

1  granulomas, which are caused by talc and
2  cornstarch and certain other inert-type
3  materials; correct?
4      MR. ROTMAN:  Objection.
5      A.  Again, you can have inflammation --
6  granulomatous inflammation due to infection, you
7  can have granulomatous infection -- response due
8  to foreign bodies, and you can have granulomas in
9  certain diseases, like sarcoidosis or Crohn's
10  disease.
11      So in that respect, yes, we're categorizing
12  granulomas, but on a daily basis, other than that
13  type of breakdown, we're not subcategorizing
14  granulomas.
15      Q.  But you are aware of the literature
16  that actually characterizes the different types
17  of granulomas and the types of cells that are
18  involved in the formation of those granulomas;
19  correct?
20      A.  As far as foreign-body giant cells and
21  multinucleated giant cells and inflammatory
22  versus foreign body, yes.
23      Q.  So, you know, a granuloma caused by
24  tuberculosis is going to be very different from a
25  granuloma caused by talc; correct?

Page 105

1      MR. ROTMAN:  Objection.
2      A.  I would say not necessarily.  In
3  microbacterial infections, you can have necrosis
4  within granulomas, but that doesn't mean that
5  you're not necessarily going to see necrosis in a
6  foreign-body granuloma.
7      Q.  How often have you seen necrosis
8  associated with a foreign-body granuloma?
9      A.  I'd say more commonly you see
10  necrotizing or necrotic granulomas in infectious
11  granulomas.
12      Q.  There are different types of
13  macrophages that are involved, too, in
14  foreign-body granulomas and in immune granulomas;
15  correct?
16      A.  As far as macrophages themselves and
17  multinucleated giant cells that can form
18  granulomas.
19      Q.  There are different types, different
20  subtypes of macrophages that are involved in --
21      A.  Yes.
22      Q.  -- those activities; correct?
23      A.  Yes.
24      Q.  Okay.  So there are differences between
25  a foreign-body granuloma and an immune granuloma?

27 (Pages 102 to 105)

Sarah E. Kane, M.D.

Page 106

1      A.   There can be.
2      Q.   Well, there are, aren't there?  I mean,
3   there are papers that characterize these.
4      A.   Yes, but I'm -- yes.  In the
5   literature, yes.  And -- but are we necessarily
6   categorizing them when we're looking at a
7   particular patient?  We're looking for the cause
8   of the granuloma, but we're not necessarily
9   subcategorizing, is my point.
10      Q.   Understood.
11      Oh, I'm sorry.  We were talking about the
12   pages that you copied from Blaustein's.
13      What was the second page in that photocopy,
14   Exhibit 11?
15      A.   Okay.  So Page 539.
16      Q.   What was it on 539 that's relevant to
17   your opinions in this case?
18      A.   Okay.  I think it starts at the very
19   bottom.  I think it carries into Page 540, where
20   it starts talking about foreign-body reactions in
21   the -- this is diseases of the fallopian tube.
22      So it starts, "Foreign material may be
23   introduced into the tube in the course of
24   gynecological investigation, especially
25   hysterosalpingography, lubricant jelly, mineral

Page 107

1   oil, and starch and talc powder may cause lipoid
2   or granulomatous salpingitis.  Talc may cause
3   mucosal or serosal granulomas.  Examination of
4   all granulomas or foreign-body reactions under
5   polarized light is useful in the recognition of
6   these processes."
7      So, again, I'm just referencing the fact
8   that talc can cause granulomatous reaction in the
9   fallopian tube.
10      Q.   So another tissue that's exposed to
11   talc forms the typical type of foreign-body
12   response?
13      A.   That can form a granulomatous reaction.
14      Q.   Okay.  And does that in any way inform
15   your opinions on causation, other than
16   granulomatous reactions occur?
17      A.   Well, so, again, it's another piece of
18   evidence that talc can cause a granulomatous
19   reaction within the female reproductive tract.
20      Now, the fallopian tube, we know some -- has
21   been indicated as a precursor site for certain
22   high-grade serous carcinomas, so I think it's
23   relevant.
24      But, again, you know, we're talking about
25   mechanisms that talc may eventually cause ovarian

Page 108

1   cancer, which is sort of the plausibility arm of
2   the Bradford Hill.  I think it's compelling
3   evidence that we see that you can get
4   granulomatous inflammation and some of these
5   sections have mentioned lymphocytes and plasma
6   cells in the tissue.  I mean, I think it's a
7   further piece of evidence that talc can cause
8   these -- this type of inflammation in female
9   reproductive market.
10      Q.   How often have you, in your career,
11   seen a talc granuloma in gynecologic specimens?
12      A.   We don't routinely do -- perform
13   polarized light microscopy on ovarian tumors,
14   partly because you really need electron
15   microscopy.  You can -- with polarized light
16   microscopy, you can tell that there's a foreign
17   substance there, but that's pretty much as far as
18   you can -- you can get.  You need more testing to
19   be able to determine what type of particle it is,
20   usually.  So we don't, in daily practice,
21   routinely use polarized light microscopy.
22      Now, it's entirely possible that, you know,
23   in the course of my career, I've come across
24   chronic inflammation or granulomas in an ovarian
25   tumor that could have been due to talc that I

Page 109

1   didn't polarize so I didn't see particles, I
2   guess.
3      Q.   So let me back up and just ask you:
4   How often in your career have you seen
5   foreign-body granulomas?  Regardless of whether
6   you've identified the particle in the granuloma,
7   how often have you seen foreign-body granulomas
8   in gynecologic specimens?  Not just tumors, but
9   any gynecologic specimens you've reviewed.
10      A.   No, I understand.
11      Q.   Okay.
12      A.   You can certainly see granulomas -- how
13   often, I can't give you a number; that would just
14   be wildly guessing -- but you can see granulomas
15   in the endometrium.  You can see them in
16   different types of tumor.
17      Sometimes it's -- you'll see granulomas, but
18   you won't see a particle, so you don't know for
19   sure if it's a foreign-body granuloma; you just
20   see the granuloma because you're not using
21   polarized light microscopy on it.
22         MR. KLATT:  Object.  Nonresponsive.
23         MS. AHERN:  Same.
24      Q.   So how often, though, in your career --
25   you can give me an estimate -- have you seen

28 (Pages 106 to 109)

Sarah E. Kane, M.D.

Page 110

1  foreign-body granulomas in gynecologic specimens?
2       MR. ROTMAN: Objection.
3       Q. I'm not talking about immune
4  granulomas, but just foreign-body granulomas.
5  We'll start there.
6       MR. ROTMAN: Objection. You've asked
7  that question. She's answered it.
8       A. So, again, I've seen granulomas in my
9  career in the female reproductive tract, but I
10 don't -- pathologists don't routinely use
11 polarized light microscopy in that instance to
12 look for foreign bodies.
13      Q. Okay. So are you done?
14      MR. ROTMAN: Can we take a break?
15      MS. AHERN: Not just yet. Let me
16 finish this line of questioning and then we can
17 take a break. Because we may want to -- what
18 time is it?
19      MR. ROTMAN: It's been an hour.
20      MS. AHERN: 11:30. If we go a little
21 bit longer, we can break for lunch if you want.
22      MR. ROTMAN: I just want to take a
23 break in the next few minutes.
24      MS. AHERN: Sure.
25

Page 111

1  BY MS. AHERN:
2       Q. Doctor, are you able, as a -- as a
3  pathologist, under regular light microscopy to
4  identify a foreign-body granuloma? Not the
5  content, just the foreign-body granuloma.
6       A. I would say it depends on the specific
7  granuloma. Sometimes, for example, in epidermal
8  inclusion cysts, you can see the keratin under
9  light microscopy that's causing the reaction, but
10 you don't always -- you won't always necessarily
11 see a particle. They're very small. And unless
12 you're looking specifically for polarizable
13 birefringent particles, you're not going to see
14 it just with regular light microscopy.
15      Q. So my question wasn't -- and I thought
16 I was specific -- my question wasn't whether or
17 not you could see the particle; my question was:
18 You should be able to see the foreign-body
19 response in terms of multinucleated giant cells.
20 Do you -- can you see that under regular
21 light microscopy?
22      A. Well, so you're categorizing it as a
23 foreign-body granuloma. What I'm saying is you
24 can see granulomas, of course, under light
25 microscopy. But if you're not looking for a

Page 112

1  foreign body, you're not necessarily going to be
2  able to say whether or not it's a foreign-body
3  granuloma with absolute certainty unless you're
4  looking under polarized light microscopy. And
5  even then, you might not see it under polarized
6  light microscopy, because it depends on the
7  section of the tissue you're looking at and --
8       Q. Okay. Thank you.
9       And if you see a foreign-body response in
10 tissue, do you then go one step further and
11 polarize to see if you can identify whether
12 that's got a foreign body in it?
13      A. It certainly depends on the situation.
14 So, for example, in cases where there's been
15 a surgery and they've taken out more tissue after
16 surgery, you might be looking for polarizable
17 foreign body. Often, you can see a suture on
18 light microscopy. But, yeah, we do -- depending
19 on the situation, we will use polarized light
20 microscopy to find foreign bodies.
21      MR. ROTMAN: Okay.
22      Q. How often do you polarize specimens
23 where you've found a foreign-body response? How
24 often do you do that?
25      A. I think -- I think I tried to come up

Page 113

1  with an estimate. I think I have it in my
2  report, actually, in the beginning.
3       Yes. So I estimated that I use polarized
4  light microscopy for this purpose, which is
5  identifying foreign material to explain an
6  inflammatory reaction, I estimated about twice a
7  month. It's an estimate.
8       And I -- well, that was -- actually, I was
9  referring to calcium oxalate crystals in breast
10 biopsies. That's different. So it's not
11 uncommon, let's put it that way, but I can't
12 really give you a -- an estimate.
13      Q. What was the estimate for breast
14 tissue?
15      A. I think it was twice a month, is what I
16 said.
17      Q. So compared to looking for calcium
18 crystals in breast tissue twice a month, how
19 often in gynecologic specimens do you look for
20 foreign bodies?
21      A. I would say slightly less than that.
22      Q. Maybe once a month, maybe less than
23 that?
24      A. Once a month is probably a good
25 estimate, I guess.

29 (Pages 110 to 113)

Sarah E. Kane, M.D.

Page 114

1    Q.  Do you know, based on your review of
2  the epidemiologic literature, what proportion of
3  women are said to use talc?
4    A.  I believe I've seen in some of the
5  literature -- it depends on the population, I
6  think.  I think I saw -- well, again, I'd have to
7  pull out the papers to be absolutely certain, but
8  I remember there was a reference to
9  African-American women, about 50 percent of them
10  using talc.
11    Q.  Would you say that in 50 percent of the
12  gynecologic specimens you review, you find
13  foreign-body granulomas or granulomas?
14    A.  Well, I wouldn't necessarily expect --
15  I wouldn't expect to, just because, you know,
16  again, we're looking at an ovarian tumor at a
17  very particular point in time.
18      How many granulomas -- how much talc is
19  getting to the ovary, we don't -- we don't know
20  how much talc is getting to the ovary.  We know
21  it's been found there, we know it can get there,
22  but we don't know with how much use, how much is
23  actually getting there.
24      So we wouldn't necessarily find a lot of
25  granulomas in ovarian tissue of women that use

Page 115

1  it, because we don't know exactly how much is
2  getting there or we don't know how long those
3  granulomas are there once the tissue is in the
4  ovary.
5      I mean, 20 years later, when you're looking
6  at the -- at the ovary for a talc particle that's
7  been there, we don't know if the granuloma would
8  still be there or the chronic inflammation would
9  still be there.
10    Q.  And my question wasn't specific to
11  ovarian tissue; it was just gynecologic
12  specimens.
13      Because you review more than ovarian tissues
14  when you're looking at gynecologic samples;
15  correct?
16    A.  Yes.
17    Q.  So looking at all of your gynecologic
18  specimens, your vaginal, vulvar, endometrial,
19  tubal, ovarian, I guess omentum might fall in
20  there, how often do you identify foreign bodies
21  or foreign-body granulomas?
22    A.  I would have to be -- a completely
23  ballpark guess, but, I don't know, maybe every --
24  I'm really trying to figure out a somewhat
25  ballpark figure.  It's tough.

Page 116

1      I mean, it's not -- it's not frequent that
2  you're going to find foreign-body giant cell
3  reactions in tissue, but, again, it doesn't mean
4  that they weren't there.  Maybe --
5    Q.  And this is based just on your
6  experience.  I know that -- I don't want you to
7  guess about what might have been there --
8    A.  Yeah, I'm --
9    Q.  -- but based on your experience as a
10  practicing pathologist.
11    A.  It would just be a pure guess at this
12  point.  I couldn't give you an accurate number.
13    Q.  Do you see foreign-body reactions in
14  50 percent of the gynecologic specimens or cases
15  that you review?
16      MR. ROTMAN:  Objection.
17    A.  I would say it's less than 50 percent.
18    Q.  Is it less than 25?
19    A.  I would say less than 25.
20    Q.  Less than ten?
21    A.  Probably less than ten.
22    Q.  Less than five?
23    A.  That's where I'm not exactly sure.
24    Q.  Okay.
25      MS. AHERN:  All right.  We can go ahead

Page 117

1  and take a break.  Thank you.
2      THE VIDEOGRAPHER:  Here ends Media 2.
3  Off the record, 11:44 a.m.
4      (A recess was taken.)
5      THE VIDEOGRAPHER:  Here begins Media
6  No. 3 in today's deposition of Sarah Kane, M.D.
7  Back on the record, 12:02 p.m.
8  BY MS. AHERN:
9    Q.  All right.  Doctor, can we go ahead and
10  keep moving through that photocopy, Exhibit 11.
11      Can you tell me what the next page was?
12    A.  Okay.  We just read from Page 540, I
13  believe, so the next one is Page 648.
14    Q.  Okay.  And tell me what on 648 caught
15  your eye.
16    A.  Okay.  It's the first paragraph under
17  "Noninfectious Granulomatous Peritonitis."  So it
18  says, "Foreign material typically recognizable on
19  histologic examination can elicit a granulomatous
20  reaction on the peritoneum.  Starch granulomas
21  from surgical gloves, douche fluid, and
22  lubricants typically incite a granulomatous and
23  fibrosing peritonitis.  In occasional cases, the
24  inflammatory reaction may be a tuberculoid type
25  with KCS necrosis.  The periodic acid shift (PAS)

30 (Pages 114 to 117)

Sarah E. Kane, M.D.

| Page 118 |
|---|

1  positive starch granules exhibit the
2  characteristic Maltese cross configuration" --
3        THE COURT REPORTER: I'm sorry, you're
4  reading too fast.
5        THE WITNESS: I'm sorry.
6     A. "The periodic acid shift (PAS) positive
7  starch granules exhibits a characteristic Maltese
8  cross configuration under polarized light. Talc
9  was once an important cause of granulomatous and
10 fibrosing peritonitis because of its use as a
11 lubricant on surgical gloves and talc-induced
12 peritonitis has been described more recently in
13 drug abusers." I think that's kind of where it
14 stops.
15    Q. Okay. And how does that passage that
16 you just read inform your opinions in this case?
17    A. Well, again, it's just another --
18 similar to the last pieces, this is the
19 peritoneum, so this is outside of the fallopian
20 tube. Once particles are outside of the
21 fallopian tube, they are in the peritoneum.
22 That's where the ovary is. And so it's
23 discussing foreign-body granulomatous reactions
24 in the peritoneum.
25    Q. And this question -- this passage that

| Page 119 |
|---|

1  you just read also mentions that starch granules
2  from surgical gloves --
3     A. Yes.
4     Q. -- cause granulomatous and fibrosing
5  peritonitis, which is the same that they mention
6  talc use to.
7        Would you say that starch granules, then,
8  have the capacity to cause chronic inflammation
9  that can lead to cancer?
10    A. Starch can cause inflammatory
11 reactions, but it's a -- very different, in that
12 it's bioabsorbable, and so the particles are
13 absorbed in the body. And the literature hasn't
14 supported a link between starch and ovarian
15 cancer.
16    Q. How many studies have evaluated the
17 association between starch and ovarian cancer?
18    A. I couldn't say, off the top of my head,
19 how many. But I know, you know, they looked at
20 starch when they were evaluating whether or not
21 to remove it from surgical gloves, and they ended
22 up deciding to remove it from surgical gloves.
23       And I -- I think at that point they had done
24 a literature search. I don't think there was --
25 I don't know how many studies off the top of my

| Page 120 |
|---|

1  head.
2     Q. And when you say "they" were looking
3  at, are you talking -- who are you talking about?
4     A. When the -- when the regulatory -- if I
5  recall -- did I put that in my report? -- they
6  removed -- I know that they removed starch from
7  surgical gloves because it was causing an
8  inflammatory reaction.
9        And they had started using starch more
10 commonly because talc had been removed from
11 surgical gloves for also causing inflammatory
12 reactions.
13    Q. And talc particles and cornstarch
14 particles cause the same foreign-body reaction in
15 the peritoneum and fibrosis; correct?
16    A. Well, again, they can cause a
17 granulomatous reaction, but they're
18 bioabsorbable, so it's not going to be -- you
19 know, when we're talking about talc, we're
20 talking about the talc in surgical gloves. And,
21 you know, talc is not bioabsorbable and it will
22 stay in the peritoneum longer than starch, which
23 is bioabsorbable. So it will -- the inflammation
24 will likely resolve more quickly. It's a
25 different -- it's a different type of reaction

| Page 121 |
|---|

1  because it's bioabsorbable.
2     Q. Well, they both cause granulomas;
3  right?
4     A. Mm-hmm.
5     Q. And they both cause fibrosis; correct?
6     A. They can cause fibrosis.
7     Q. Does the biodurability of the causative
8  agent determine how long fibrosis exists?
9     A. Well, the fibrosis is thought to arise
10 from the inflammatory process. And since -- I
11 don't know how much data is really there except
12 to say that starch is bioabsorbable and talc is
13 not. So talc is going to be available for an
14 inflammatory response more than a starch particle
15 will.
16    Q. Is the purpose of a foreign-body
17 granuloma to essentially wall off an irritant, a
18 foreign body, from the rest of the tissue to
19 prevent damage?
20    A. That can be one reason.
21       Another reason is if the particle is large
22 enough and one macrophage can't handle it because
23 of its size, it will sort of recruit more
24 macrophages to the area to try to digest the
25 foreign material, which is not going to -- they

31 (Pages 118 to 121)

Sarah E. Kane, M.D.

Page 122

1  won't be able to digest the talc particle.
2      Q.  If they can't digest the talc particle,
3  these macrophages will fuse to form a
4  multinucleated giant cell and surround the
5  particle to basically encapsulate it and prevent
6  it from harming the surrounding tissue; correct?
7      A.  It's possible that they would, yes,
8  they would recruit more macrophages and
9  potentially do that.
10     Q.  Isn't that the purpose of a
11  foreign-body granuloma?
12     A.  So, again, you can get well-formed --
13  you can get well-formed encapsulated granulomas.
14  You can also get sort of poorly formed granulomas
15  that are -- when more macrophages have been
16  recruited to that site.
17     You can get a -- you can get a histiocytic
18  reaction that isn't a well-formed granuloma in
19  the sense that you're talking about, where it's
20  kind of walling off the foreign body.  You can
21  get histiocytic reactions that aren't as well
22  formed like that.
23     Q.  But we're just talking about the actual
24  granuloma itself, those particles that do result
25  in a well-formed granuloma.

Page 123

1      Once that granuloma has formed, it can
2  persist for many years, can't it, without
3  damaging the surrounding tissue?
4      MR. ROTMAN:  Objection.
5      A.  I think it would depend.  Macrophages
6  have a certain lifespan, so it's going to be
7  constantly recruiting different macrophages to
8  that site.
9      So I don't think we can say for certain that
10  the -- in fact, I think the body is still
11  reacting to that foreign body if it's still
12  recruiting new macrophages in.
13     Q.  Do you know that for a fact based on
14  your reading of the literature of granulomas,
15  that that's the mechanism behind a foreign-body
16  granuloma, as opposed to an immune granuloma?
17     A.  What I'm saying is -- is that
18  macrophages have a certain shelf life, and so
19  they will constantly recruit new macrophages to
20  that area.
21     Now, whether or not there's an exposure in
22  that particle while it's in that process, I don't
23  think we can definitively say.
24     Q.  Can you cite any papers that support
25  your understanding of that process whereby

Page 124

1  macrophages are continuously recruited to
2  foreign-body granulomas?
3      A.  I know that I've read it in the course
4  of my daily practice.  I can search at some point
5  for it, but I know that that's the case, because
6  I know that macrophages, again, have a certain
7  lifespan.
8      But, you know, again, the inflammatory
9  response, we also don't know how long that
10  inflammatory response is going to be there for
11  sure.  Is it possible that at some point the
12  granuloma resolves and you get some fibrosis and
13  the talc particle or whatever particle is there
14  remains?  I think that's possible and likely, in
15  fact, because you do see resolution of granulomas
16  with fibrosis.
17     Q.  Is fibrosis associated with the
18  development of ovarian cancer?
19     A.  There hasn't -- there hasn't been a
20  lot -- again, the causes of ovarian cancer are
21  sort of -- the literature and the research is
22  still bearing all of it out, but from what I know
23  of the literature, I don't think that they found
24  fibrosis itself being an increased risk factor
25  for ovarian cancer.

Page 125

1      Q.  Is fibrosis associated with chronic
2  inflammation?
3      A.  It can be, yeah.  Chronic inflammation
4  can lead to fibrosis.
5      Q.  Do you know of any literature that has
6  linked talc granulomas introduced into the body
7  through the use of talc-dusted surgical gloves
8  with any sort of cancer?
9      A.  So we know that talc can -- there are
10  studies that have shown talc in the ovaries, and
11  we know that chronic inflammation has been
12  implicated in cancer.
13     So if talc can reach the ovaries -- and we
14  also have evidence that talc causes chronic
15  inflammation.  So if talc reaches the ovary, I
16  think it's a plausible mechanism for talc from
17  surgical gloves to cause an inflammatory reaction
18  and lead to cancer.  I think that's plausible.
19     And, again, that's the plausibility arm of
20  it.  You know, that's a piece of the general
21  causation opinion, but, you know, they're still
22  piecing together a lot of the etiology of ovarian
23  cancer.
24     Q.  Then why --
25     MR. KLATT:  Objection, nonresponsive.

32 (Pages 122 to 125)

Sarah E. Kane, M.D.

Page 126

1          MS. AHERN: Nonresponsive, yeah.
2     Q.  Doctor, why are you so sure, then, that
3  talc causes ovarian cancer?
4     A.  It's --
5          MR. ROTMAN: Objection.
6     A.  So I can lay out to you my methodology.
7  It's in the report. I did very in-depth,
8  extensive review of the literature, which
9  included the epi studies, animal studies, and
10 biologic studies.
11    And I think -- well, I know that the epi
12 studies have been very consistent with the
13 increased risk associated with talcum powder
14 product usage -- I'm talking about talcum powder
15 product, what's in the bottle -- and perineal
16 talc application with ovarian cancer.
17    And I think if you're looking at -- if you
18 go through the methodology that I used and you're
19 looking at the Bradford Hill analysis, which I've
20 laid out in the report, I've come to the
21 professional -- you know, my professional
22 judgment is that the talcum powder products --
23 weighing everything, that talcum powder products
24 cause ovarian cancer.
25    And I know -- and, interestingly, about

Page 127

1  three weeks after I wrote my report, there was
2  the Health Canada report that, in reading their
3  methodology and the literature that they
4  reviewed, was very similar to what I reviewed and
5  my methodology. And they came to the same
6  conclusion.
7          MR. KLATT: Objection.
8          MS. AHERN: Objection. Nonresponsive.
9     Q.  Doctor, my question was: Do you know
10 of any literature that has linked -- sorry.
11    My first question we're going to go back to
12 now is: Do you know of any literature that has
13 linked talc granulomas introduced into the body
14 through the use of talc-dusted surgical gloves to
15 any sort of cancer?
16         MR. ROTMAN: Objection.
17         MS. AHERN: What's the objection?
18         MR. ROTMAN: Your question was --
19         MS. AHERN: I'm reading it.
20         MR. ROTMAN: -- why are you so certain.
21         MS. AHERN: Well, I just told you we're
22 going back to this question.
23         MR. ROTMAN: Okay. So you're asking --
24 you're not saying that she didn't -- you're not
25 repeating your former question?

Page 128

1          MS. AHERN: No. We're going back to
2  this question.
3          MR. ROTMAN: Okay. That's fine.
4     So you're asking her again a question
5  that she previously answered.
6          MR. KLATT: No --
7          MS. AHERN: I'm interested in --
8          MR. KLATT: -- a question she didn't
9  answer.
10         MS. AHERN: -- the question she didn't
11 answer first.
12 BY MS. AHERN:
13    Q.  Which is: "Do you know of any
14 literature that has linked talc granulomas
15 introduced into the body through the use of
16 talc-dusted surgical gloves with any sort of
17 cancer?"
18    Do you know or not know of any literature
19 that supports that?
20    A.  Well, first of all, I think we're
21 talking about -- you're talking about surgical
22 glove talc, right, which is pharmaceutical-grade
23 talc, which is different from the talcum powder
24 product that I'm opining about.
25    And we know that these talc particles can

Page 129

1  get to the ovary and we know that talc can cause
2  chronic inflammation.
3     Q.  Doctor, first question about your
4  answer is: What makes you think that cosmetic
5  talc used in Johnson & Johnson baby powder is not
6  pharmaceutical-grade talc?
7     A.  I'm talking about the product, the
8  ultimate product.
9     Q.  Johnson's baby powder; correct?
10    A.  Whatever is in the bottle.
11    Q.  You're saying that's not
12 pharmaceutical-grade talc?
13    A.  Whatever is in the bottle.
14    Q.  Okay.
15    A.  So --
16    Q.  What is your -- what is your
17 understanding of what pharmaceutical-grade talc
18 is and how is that different from what's in
19 Johnson's baby powder?
20    A.  So I didn't opine on the constituents
21 of the talcum powder that -- the baby product --
22 talcum powder products, the Johnson & Johnson. I
23 saw evidence as to what's in the talcum powder
24 products, but I didn't do my own analysis as to
25 what is in the talcum powder products.

33 (Pages 126 to 129)

Sarah E. Kane, M.D.

Page 130

1    But pharmaceutical-grade talc, if we're
2  talking about talc that's used in pleurodesis,
3  for example, is going to be different than talcum
4  powder products in the bottle --
5    Q.  Okay.
6    A.  -- cosmetic talcum powder products.
7    Q.  So how is it different?
8    A.  So, again, I didn't do my own analysis
9  as to what is in the talcum powder product, but
10 that's what I am -- that's what my general
11 causation opinion is on, is the talcum powder
12 product in the bottle, that regular perineal use
13 of that causes ovarian cancer.
14   Q.  My question to you is:  What do you
15 understand the difference between the talcum
16 powder products and pharmaceutical-grade talc --
17       MR. ROTMAN:  Objection.
18   Q.  -- to be?
19   A.  So I've seen evidence that in talcum
20 powder products, there are heavy metals.  There
21 are fragrances that are added to the talcum
22 powder product that, in talc used for
23 pleurodesis, they wouldn't be adding fragrances
24 to that type of talc.
25   Q.  Would -- you're not saying that talcum

Page 131

1  powder products that are sold to consumers have
2  been altered to add heavy metals, are you?
3    A.  Well, I've seen the report of
4  Dr. Crowley that looks at heavy metals and
5  fragrances in the talc, the baby product talc
6  powder that he examined.  I did not do my own
7  analysis of that.
8    Q.  Does pharmaceutical-grade talcum powder
9  also have associated metals and sometimes heavy
10 metals?
11   A.  I'm not sure if I've seen data as to
12 what is specifically in pharmaceutical-grade
13 talcum powder, but, again, to me, what is
14 important is the ultimate product and what is in
15 that bottle.  It can -- whether it's platy talc,
16 fibrous talc, asbestos, heavy metals, fragrance
17 metals.
18   I mean, to me -- you know, I've seen
19 evidence of those things in that product, but to
20 me, what I'm looking at is the final product when
21 it comes to causing ovarian cancer.
22   Q.  So what is different about that final
23 product and pharmaceutical-grade talc?  What
24 specific components have been added to that that
25 affect your opinions in this case?

Page 132

1    A.  Well, I think I've answered, like, to
2  me, it doesn't -- it doesn't really matter
3  what -- the difference between pharmaceutical
4  talc and talcum powder products; it's whatever is
5  in that talcum powder products -- product,
6  whatever is in the bottle that women are buying
7  off the shelf and applying to their perineum.
8       MR. KLATT:  Objection.  Nonresponsive.
9       MS. AHERN:  Objection.  Nonresponsive.
10   Q.  My question was -- originally was:  Do
11 you know of any literature that connects talc
12 dust of surgical gloves and any sort of cancer.
13   And then you said, "First of all, I think
14 we're talking about surgical glove talc, which is
15 a pharmaceutical-grade talc, which is different
16 from the talcum powder product that I'm opining
17 about."
18   So what I'm asking you is:  What is
19 different about the talcum powder product that
20 you're --
21   A.  It's what I'm opining about.  You know,
22 I haven't --
23   Q.  Right.
24   A.  -- looked at the talc that's used for
25 pleurodesis, for example.  It's what I'm

Page 133

1  separating out.
2    I've looked at the talcum powder product
3  that women use on their perineum, what they
4  bought off the shelf.  I haven't looked at
5  pharmaceutical-grade -- let me correct that --
6  pleurodesis talc, for example.  I have not looked
7  at pleurodesis talc and ovarian cancer.  I have
8  not looked at any literature specifically on
9  that.  It's been the talcum powder products that
10 women are buying off the shelf and using on their
11 perineum.
12   Q.  So if I told you that Johnson's baby
13 powder starts out as pharmaceutical-grade talc
14 and that, beyond that, fragrance is added, would
15 it be the fragrance that you're taking issue with
16 that you believe is causally associated with the
17 development of ovarian cancer?
18   A.  Again, I -- it's whatever is in that
19 bottle.  It could be platy talc, fibrous talc,
20 asbestos, heavy metals, fragrance.  It -- to me,
21 it's the product, whatever the product is that
22 they are using.
23   Q.  And you have done a biologic
24 plausibility analysis for fragrances, for metals,
25 for asbestos, for fibrous talc, and for platy

34 (Pages 130 to 133)

Sarah E. Kane, M.D.

Page 134

1  talc --
2      A.  So --
3      Q.  -- each one of those constituents?
4      A.  So I have looked at evidence -- so
5  Dr. Crowley's report, I mentioned.  I've looked
6  at Dr. Longo's report.  I've looked at Hopkins
7  and the Pier charts from their depositions.  I'm
8  aware of evidence that these heavy metals and
9  fragrances and asbestos are in there.
10      However, I haven't done -- what I know, I
11  looked at the -- I've looked at some literature
12  and I've looked at the IARC categorization of the
13  heavy metals.  I've looked at Dr. Crowley's
14  report and I've done an extensive look at
15  asbestos and ovarian cancer.
16      But, ultimately, those are just pieces of
17  biological plausibility.  What I mainly -- what
18  I am opining about is the ultimate product.  And,
19  again, it can be platy talc, it can be fibrous
20  talc, it can be asbestos, it can be heavy metals.
21      It's pieces of information that strengthen
22  the plausibility.  We know that asbestos causes
23  ovarian cancer, that certain heavy metals are
24  carcinogens, which the IARC categorized them as.
25  So it's just -- it's just additional pieces of

Page 135

1  information that strengthen the biological
2  plausibility arm of it.
3      Q.  Doctor, how do you arrive at a
4  causation conclusion without a well-defined agent
5  of exposure?
6      MR. ROTMAN:  Objection.
7      Q.  Do you understand what I'm asking you?
8  How do you arrive at your causation and
9  conclusion when you're not sure what it is about
10  the talcum powder products that's actually
11  biologically relevant?
12      A.  Well, I think -- well, strike that.
13      The epi studies are looking at the product
14  that the women are using.  So that is the agent.
15  It's the -- it's the total product.  That is the
16  agent.
17      So when you're looking through -- let me
18  just -- so let's keep in mind that we're looking
19  at that product.
20      And then if you go through my Bradford Hill
21  analysis, you look at strength of association.
22  And, overall, there's a consistent relative risk
23  that's between 1 and 2.  I would say it's, across
24  studies, averaging 1.3 to 1.4 relative risk, and
25  that's consistent across studies.  That's the

Page 136

1  consistency piece of it.
2      Q.  Can I ask you -- you can go through all
3  of it if you want, but would you rather break it
4  down piece by piece?
5      MR. ROTMAN:  She should answer your
6  question.
7      MS. AHERN:  I'm not sure she's
8  answering my question.  My question was:  How do
9  you come up with causation when you don't know
10  what the exposure is?
11      MR. ROTMAN:  I think she's answering
12  the question.
13      MR. TISI:  That wasn't the question.
14  The question was:  Do you need to know the agent?
15  And she said the agent is the product.
16  BY MS. AHERN:
17      Q.  The agent is everything in it?
18      A.  Yes, the agent is whatever is in that
19  talcum powder product.
20      Q.  So are you basing, then, your causation
21  conclusions on the epidemiologic literature
22  alone?
23      A.  The epidemiologic literature is very
24  comp- --
25      MR. ROTMAN:  She was not done with her

Page 137

1  earlier answer.  Now you've gone two more beyond
2  it.
3      MS. AHERN:  She's answering.  Why don't
4  you let her answer.  If she wants to go back, she
5  can.
6      MR. ROTMAN:  No, I want her to go back.
7  She was -- she was in the middle of going through
8  her Bradford Hill to answer your earlier question
9  and you cut her off.  So she had covered strength
10  of association.
11  BY MS. AHERN:
12      Q.  Doctor, you can answer the question the
13  way you want to answer the question.
14      MR. ROTMAN:  Now there's no question in
15  front of her.
16      MS. AHERN:  Well, because you
17  interrupted it.
18      MR. ROTMAN:  Let's go back to what the
19  question was before you cut her off.  "Do you
20  understand what I'm asking you?  How do you
21  arrive at your causation and conclusion when
22  you're not sure what it is about the talcum
23  powder products that actually biologically --
24  that are biologically relevant?"
25      And then you gave -- then you started

35 (Pages 134 to 137)

Sarah E. Kane, M.D.

Page 138

1    an answer about the epi studies are looking at
2    the product that the women are using, and you
3    were talking about strength of association and
4    then you said, "And that's consistent across
5    studies. That's the consistency piece of it,"
6    and then you were interrupted.
7         So were you done with your answer to
8    that earlier question?
9         THE WITNESS: I can continue, because I
10   think it's important.
11        I mean, I was -- my general causation
12   opinion, the methodology I used was to answer the
13   question: Does perineal application of talcum
14   powder products, the, you know, baby powder
15   product that you buy off the shelf, does that
16   cause ovarian cancer? So it's whatever is in
17   that bottle.
18        So with the methodology that I used,
19   looking at the epi data, but also considering the
20   Bradford Hill criteria -- which, you know,
21   looking for specificity is another one. So most
22   of the studies showed a stronger -- a strong
23   association with serous ovarian cancer, but it
24   was basically associated with epithelial ovarian
25   cancer, so all groups of epithelial ovarian

Page 139

1    cancer. It was pretty specific, the epi data,
2    for that type of ovarian cancer.
3         Temporality. If you look at that, I
4    mean, the case-control studies are retrospective
5    reviews, so we know that they were using talc
6    before their diagnosis of ovarian cancer.
7         Biological gradient. For those studies
8    that looked at a biological gradient, there was
9    an evident -- there was evidence of a
10   dose-response, not all of the times statistically
11   significant, but the trend -- you can see a trend
12   of a dose-response across studies.
13        And then we get into the plausibility
14   piece, which you've been discussing mostly so far
15   in this deposition, which has to do with the
16   plausible mechanism of talcum powder -- what I'm
17   thinking of, talcum powder products -- whatever
18   is in that bottle was what I'm looking at --
19   talcum powder products causing -- the
20   plausibility of it causing a chronic inflammatory
21   response, leading to ovarian cancer. We've been
22   discussing that quite a bit today.
23        And then coherence. So I can refer
24   again to my report. Coherence, in this context,
25   means coherence between epidemiologic and

Page 140

1    generally accepted knowledge of the disease in
2    question.
3         So we know that particles can reach the
4    ovary. We know that talc can cause chronic
5    inflammation. We know that chronic inflammation
6    is associated with certain types of cancer. We
7    know that certain types of ovarian cancer have
8    shown association with chronic inflammatory
9    conditions.
10        So, again, going through all this is
11   experiment and analogy, experiment with the
12   animal studies and the in vitro studies. And
13   analogy, I used the example of asbestos, because
14   even though asbestos is -- you know, asbestos is
15   chemically similar, you can have asbestos fibers
16   and talc fibers, but it's a similar mineral
17   chemically, and we know that that is a
18   carcinogen. So that's part of the analogy.
19        But, again, it's the whole picture. I
20   mean, you look at the -- all of this data
21   following my methodology and you apply the
22   Bradford Hill criteria guidelines -- the Bradford
23   Hill guidelines. And, looking at all that, my
24   professional judgment is that the talcum powder
25   products can cause ovarian cancer.

Page 141

1    Q.  Okay. Are you done? I don't want to
2    interrupt you.
3    A.  I think I answered the question.
4    Q.  Okay. One of the things, and I guess a
5    major component of the talcum powder products,
6    would be talc; correct?
7    A.  Presumably -- it's called talcum
8    powder, so presumably, talc would be a
9    constituent.
10   Q.  Do you know what percentage of talcum
11   powder products is talc?
12   A.  Again, I did not do my own analysis as
13   to how much talc was in that product.
14   Q.  Do you know whether any of the heavy
15   metals that you looked at or were examined by
16   other experts in this litigation, whether any of
17   those are known carcinogens for the ovary?
18   A.  So it's another piece of information.
19   There is not, to my knowledge -- looking at what
20   the IARC looked at, there's not data right now on
21   those heavy metals and ovarian cancer, but
22   it's -- it's a -- it's a piece of the puzzle.
23   It's a piece of information.
24        The IARC has called some of them
25   carcinogenic, some of them probably carcinogenic,

36 (Pages 138 to 141)

Sarah E. Kane, M.D.

Page 142

1    so we know that they can cause cancer. And if
2    they're in the talcum powder products, then it's
3    just another piece to the puzzle of plausibility.
4        Q.  Are you saying that the probably
5    carcinogenic category for IARC means that they
6    can cause cancer?
7        A.  Well, we can look at what the IARC 2A
8    categorization -- category actually says, what
9    they break it down. But my understanding is
10   it's -- probably carcinogenic means it probably
11   causes cancer, more likely than not, probably
12   causes cancer.
13       Q.  How many categories does IARC have?
14       A.  They have four.
15       Q.  What is the -- what is Category 1?
16       A.  Carcinogenic.
17       Q.  Known to be carcinogenic?
18       A.  Mm-hmm.
19       Q.  And then the next?
20       A.  Probably carcinogenic.
21       Q.  And then?
22       A.  Possibly carcinogenic.
23       Q.  And then?
24       A.  I think it's unclassifiable. I have to
25   look. But I think it's uncertain, basically.

Page 143

1        Q.  And then what is the last?
2        A.  And then known not to be carcinogenic.
3        Q.  How many agents are in the known not to
4    be carcinogenic category?
5        A.  Very, very few.
6        Q.  One; right?
7        A.  That's plausible. I haven't looked at
8    the list recently.
9        Q.  So going back to the major component,
10   you don't know what percentage of talcum powder
11   products are actually talc?
12           MR. ROTMAN: Objection.
13       A.  I have not done my own analysis as to
14   what the components are of that talcum powder --
15   of the talcum powder products.
16       Q.  Do you agree that carcinogens can be
17   organ specific?
18       A.  I will agree that certain tissues
19   respond to certain things differently.
20       Q.  Do you agree that carcinogens can be
21   organ specific?
22       A.  Certain tissues respond to certain
23   things differently. If you're casting that wide
24   a net to say that one specific carcinogen only
25   causes one type of cancer, I think that's a

Page 144

1    little too wide a net. I think science is always
2    evolving and there's always the possibility of an
3    unknown cause of a certain type of cancer.
4           MS. AHERN: Objection. Nonresponsive.
5        Q.  My question was just: Can carcinogens
6    be organ specific?
7        A.  And I feel like I answered that fairly.
8        Q.  Do you know of carcinogens that are
9    organ specific?
10       A.  I know -- for example, we know that H.
11   Pylori causes increased risk of gastric cancer,
12   but not oral or esophageal cancer.
13          We know that HPV infection can cause
14   cervical cancer, anal cancer, certain types of
15   squamous cell carcinomas of the oropharyngeal
16   system, but not, you know, of the endometrium,
17   for example.
18          So we know that certain things cause certain
19   cancers and aren't -- haven't been associated
20   with other types of cancers. But to cast that
21   wide a net, to say that a carcinogen is only
22   going to cause one type of cancer or this cancer
23   is caused only by this carcinogen, I think that's
24   too wide a net, because I feel like research is
25   constantly evolving. We're constantly learning

Page 145

1    of new causal factors in cancer.
2        Q.  Do you think that dose is an important
3    consideration when you're looking at the
4    toxicologic effects of an agent on a tissue?
5        A.  I think it is a piece of information.
6    I'm looking at my biological gradient portion of
7    my report, and I said in my report that it was an
8    important factor in my analysis because it does
9    add information to the overall causality.
10       Q.  Are there agents that can be toxic at
11   certain levels and not toxic at other levels?
12       A.  There are certainly agents that are
13   more toxic with increased exposure and increased
14   duration. We don't know all of the thresholds
15   for carcinogenicity of all carcinogens.
16       Q.  As part of the biologic plausibility
17   analysis that you would do on a particular agent,
18   would that take into consideration the relative
19   levels of exposure that a person would have to
20   that agent?
21       A.  Well, dose-response -- I -- I'm taking
22   it -- your question -- can you rephrase the
23   question? I'm sorry. I just want to make sure
24   I'm answering it accurately.
25       Q.  To determine whether it's biologically

37 (Pages 142 to 145)

Sarah E. Kane, M.D.

Page 146

1    plausible for a particular agent to cause a
2    particular harm, would you need to be able to
3    characterize the dose of that agent that is
4    required to elicit the effect that you're looking
5    for?
6        A.   I think it's a piece of the
7    information -- a piece of information, but you're
8    not always going to be able to determine a
9    dose-response.  It's going to depend on the
10   carcinogen, the agent, the routes of exposure.
11   You're just not always going to have that data,
12   unfortunately.  It would be nice to have, but
13   you're not always going to have it, and you don't
14   necessarily have to have it to come to
15   plausibility.
16       Q.   And do you have well-characterized
17   levels of exposure to the ovaries for women who
18   are using talc perineally?
19          MR. ROTMAN:  Objection.
20       A.   So some of the -- we're never really
21   going to be able to figure out what an actual --
22   to characterize what an actual dose -- dose of
23   talcum powder product of what -- of a talcum
24   powder product in a particular use.  We don't
25   know how much a woman is putting on her hand to

Page 147

1    place into the perineum.  We don't know how much
2    of that product is getting to the ovary.  We know
3    that it can get to the ovary because we've seen
4    talc in the ovary.  But where -- it's extremely
5    difficult in this type of situation, when women
6    use the product differently, to know what the
7    dose -- what a single dose is.
8        Now, if you're talking long-term, frequent
9    use of talcum powder products, of course, the
10   exposure is going to be greater than a single use
11   of that product.
12       But are we ever going to know what one dose
13   of talcum powder product is?  I don't think we're
14   going to be able to say that and how much of one
15   dose reaches the ovary.
16       But, certainly, again, with -- over time,
17   increased frequency and duration, it's -- you
18   know, more of that product is going to reach the
19   ovary.
20       Q.   So going back to the discussion we had
21   earlier about surgical glove talc, do you know of
22   any literature that links exposure to talcum
23   powder -- pharmaceutical-grade talcum powder from
24   surgical gloves to any kind of cancer?
25       A.   I did not opine on surgical glove talc

Page 148

1    and ovarian cancer.  I certainly saw some of the
2    data about talc migration and cornstarch on
3    surgical gloves migration, but I didn't
4    specifically -- I don't know if -- I don't even
5    know if that study has really been done.
6        Q.   Did you consider the publications on
7    talc responses -- or, excuse me, did you consider
8    the publications on granulomatous reactions to
9    talc from surgical gloves to be relevant to your
10   biologic plausibility analysis?
11       A.   It's a piece of information that
12   talc -- now, again, surgical glove talc, for me,
13   is different than the talcum powder products.
14       You know, my general causation opinion -- I
15   just want to be clear -- is about, you know,
16   talcum powder products, not the talc used in
17   pleurodesis, not talc on surgical gloves.
18       Having said that, I think it's an important
19   piece of information to know that talc on
20   surgical gloves can cause a granulomatous
21   reaction, because that is further evidence for
22   plausibility that talcum powder products --
23   they're called talcum powder products, so, again,
24   it's sort of an assumption.  It doesn't really
25   matter to me what's in there, but my assumption

Page 149

1    is that whatever -- the talc or whatever is in
2    that product is causing the -- a chronic
3    inflammation.  And so it's part -- it's a piece
4    of evidence for the plausibility.
5        Q.   So are you not aware of any studies,
6    based on the review that you did conduct, that
7    link surgical glove talcum powder with the
8    development of any cancer?
9          MR. ROTMAN:  Objection.
10       A.   So I'm not sure how you could do that.
11   If you're looking at patients who -- I think that
12   would be a very difficult study to design.
13       If you're looking at women -- if you're
14   doing a case-control study -- I'm just
15   thinking -- and you're looking at patients who
16   have been diagnosed with ovarian cancer who have,
17   at any time, had surgery during the time period
18   that talc was used on surgical gloves, I think
19   that would be a difficult study.
20       Q.   My question to you was --
21          MR. KLATT:  Objection.  Nonresponsive.
22       Q.   My question to you was:  Are you aware
23   of any studies or literature that link
24   talc-dusted surgical gloves to the development of
25   any kind of cancer?

38 (Pages 146 to 149)

Sarah E. Kane, M.D.

Page 150

1        MR. ROTMAN:  Objection.
2        THE WITNESS:  My thing is not --
3        MR. ROTMAN:  There's a button you can
4    push.
5        THE WITNESS:  Oh, "follow."
6        MR. ROTMAN:  Do you see the button
7    that's flashing on the right-hand --
8        THE WITNESS:  Yeah.
9        MR. ROTMAN:  -- side?  If you hit that,
10   it should go to the bottom.
11       THE WITNESS:  Okay.  I see.  Yup.
12       MS. AHERN:  And I'll withdraw that,
13   because there's -- the question asked first was,
14   I think, better.  I slightly modified it on
15   accident.
16   BY MS. AHERN:
17       Q.  Are you aware of any studies, based on
18   your review, that link surgical glove talcum
19   powder with the development of any kind of
20   cancer?
21       And, Doctor, to be clear, I'm only
22   interested in whether you know of a study, not
23   whether one could be conducted.
24       A.  Off the top of my head, it's possible
25   that one exists, but I can't come up with one off

Page 151

1    the top of my head.
2        Q.  Do you know of any data linking
3    surgical glove talcum powder with the development
4    of any cancer?
5        MR. ROTMAN:  Objection.
6        A.  It would be my same answer.
7        Q.  That you don't know, but there might
8    be?
9        A.  Sitting here right now, I can't come up
10   with a specific study that evaluated ovarian
11   cancer patients who have had surgery with talcum
12   powder gloves.
13       Q.  Any cancer.  Not ovarian cancer, any
14   cancer.
15       A.  Similar.  Sitting here right now, I
16   cannot think of one off the top of my head.
17       Q.  And wouldn't that have been something
18   you think you would have picked up in your
19   review?
20       A.  It's possible that I did.  I just said
21   I can't think of it off the top of my head.  It's
22   possible that I did at some point.
23       But my -- and, again, I tried to make every
24   effort to be able to identify studies and
25   literature and evidence that were relevant or

Page 152

1    could be helpful information to my general
2    causation opinion.  So it's possible that I did.
3        Q.  Is it in your report or cited in any of
4    your reference lists?
5        A.  Again, I can look through my whole
6    reference list.  It's the same answer.  Off the
7    top of my head, I don't know the answer to that.
8        Q.  Do you know of any studies or any data
9    that link foreign-body granulomas to the
10   development of any kind of cancer?
11       A.  Well, we know that asbestos can cause a
12   granulomatous reaction and asbestos is certainly
13   associated with mesothelioma and lung cancer.
14       Q.  Are there other biologic properties of
15   asbestos that contribute to its carcinogenicity?
16       A.  It can provoke a reactive oxygen
17   species inflammatory response.
18       Q.  Can it disrupt DNA?
19       A.  It can based on that mechanism, yes.
20       Q.  Have you seen any studies or data
21   suggesting that talcum powder can do those
22   things?
23       A.  I've seen studies that show that talcum
24   powder can increase production of reactive oxygen
25   species and can change gene expression in

Page 153

1    mesothelial cells.  So, yes, I mean -- let me go
2    back to your question.
3        So I would say, yes, there are studies that
4    show talc can cause the production of reactive
5    oxygen species and reactive nitrogen species,
6    which can disrupt DNA, similar to asbestos.
7        Q.  How do reactive oxygen and nitrogen
8    species disrupt DNA similar to asbestos?
9        A.  Well, it's the reactive oxygen species
10   -- it's part of this feedback loop with -- what's
11   the word I'm looking for? -- tumor factors like
12   COX and TNF alpha.  It's related to those types
13   of expressions and an inflammatory response.
14       Q.  Are you relying on cell studies?
15       MR. ROTMAN:  Objection.
16       A.  I have looked at cell studies.  The
17   Buz'Zard study is one, and I know Saed has done a
18   lot with myeloperoxidase and ovarian cells.  He
19   recently came out with a paper.
20       So it's, again, a piece of information
21   towards the plausibility arm of my general
22   causation opinion.
23       Q.  Have you seen any studies in animals or
24   in humans that have linked the specific enzymes
25   that Dr. Saed has evaluated in cell studies to

39 (Pages 150 to 153)

Sarah E. Kane, M.D.

| Page 154 |
|---|

1  the development of ovarian cancer?
2      A.  So there have been some studies that
3  have looked at anti-inflammatory drugs, aspirin
4  and NSAIDs in particular.
5      The data on NSAIDs has been less consistent,
6  but the data on aspirin has been consistent, in
7  that it lowers the risk of ovarian cancer with
8  regular aspirin use.
9      And aspirin, one of the mechanisms of action
10  is on the cyclooxygenase expression, which is
11  similar to the cyclooxygenase expression seen in
12  some of the in vitro studies.
13      Q.  So my question was:  Have you seen any
14  studies in animals or in humans that have linked
15  specific enzymes that Dr. Saed has evaluated in
16  his cell studies to the development of ovarian
17  cancer?
18      MR. ROTMAN:  Objection.
19      Q.  Are you relying, then, on epidemiologic
20  studies looking at NSAID and aspirin use?
21      MR. ROTMAN:  Objection.
22      A.  I'm saying that the NSAID and aspirin
23  use is another piece of information that -- as to
24  plausibility, mechanism -- and mechanism of
25  regulation of pathways that can result in

| Page 155 |
|---|

1  reactive oxygen species and cause an inflammatory
2  response.
3      MR. KLATT:  Objection.  Nonresponsive.
4      MS. AHERN:  Same.
5      Q.  Let's go back to that.  We'll finish up
6  this Exhibit 11.
7      What was the next page, if any, the last
8  page in your photocopy?
9      A.  Okay.  So this is Page 1216 of the
10  fourth edition, if I am correct.  Give me one
11  second while I find it.
12      Okay.  So the reason why Page 1216 is there
13  is because it starts the section on ovarian
14  cancer, which then continues on to Page 1217.
15  And it says -- the last paragraph on Page 1217
16  says, "Other suggested factors affecting ovarian
17  cancer risk include talc exposure, a history of
18  mumps infection, and alcohol consumption.  Talc
19  exposure, which has been related to an excess
20  risk of ovarian cancer in a number of
21  case-control studies, is of interest biologically
22  in that ovarian cancer is thought to arise from
23  the mesothelium that lines the peritoneal
24  cavity."
25      MR. ROTMAN:  Slow it down so she can

| Page 156 |
|---|

1  get it.
2      THE WITNESS:  Oh, I'm sorry.
3      A.  "Ovarian cancer may be analogous,
4  therefore, to plural mesothelioma, which has been
5  shown to be caused by asbestos, a chemical
6  similar to talc."
7      Q.  Is that the complete passage that
8  you're looking at?
9      A.  I believe that is why I had highlighted
10  that one, yes.
11      Q.  You'd agree that this version of
12  Blaustein's textbook was published in 1994?
13      A.  Yes, I am aware.
14      Q.  Would you agree that a number of the
15  risk factors that have been identified here,
16  there have been additional studies published on?
17      A.  Yes.
18      Q.  Would you agree that alcohol is a known
19  risk factor these days for ovarian cancer?
20      A.  I don't think that's been borne out to
21  be the case.  But with talc, there's continued to
22  be several case controls and meta-analyses which
23  have continued to be consistent with the
24  increased risk of ovarian cancer cited in the
25  studies that were cited here, which I didn't

| Page 157 |
|---|

1  actually Xerox.  You have the book, so --
2      Yes, I agree this was 1994, but taken into
3  context of the subsequent studies and literature
4  looking at talc and ovarian cancer, I think it's
5  still relevant.
6      Q.  Have there been a number of updates and
7  changes to the classification of tumors since
8  1994?
9      A.  Since 1994, sort of semantically.  We
10  still have the same subtypes of ovarian cancer.
11  There's been a new categorization.  We talked
12  about the Type 1 and Type 2 ovarian cancers.
13      So not a complete overhaul in
14  categorization; I think just different ways to
15  category the same entities, let's --
16      Q.  Has the --
17      A.  -- put it that way.
18      Q.  Sorry.
19      Has the understanding of the origin of
20  ovarian tumors evolved significantly since 1994?
21      A.  So this mentions -- we talked about
22  this a little bit earlier -- this does mention
23  that at this time, in 1994, there was thought
24  that ovarian cancer might arise from the
25  mesothelium.  So the ovary is covered by a layer

Sarah E. Kane, M.D.

Page 158

1  of mesothelium.  That's the outer layer.  And so
2  in 1994, that was still, I would say -- this is
3  before my residency, a little before my time --
4  that that was the most common thought, that
5  that's where the ovarian cancer -- cancers are
6  arising from.  Now, since then we've discussed
7  some of the other more recent findings of the
8  etiology.
9      But, anyway, I just -- I had read this a
10 couple of days ago and, you know, it was -- it
11 was a reference that I think is still relevant
12 because of the -- the subsequent case controls
13 and meta-analyses that were done since then that
14 I think still make it relevant, although, again,
15 I -- we're not -- we're still not absolutely sure
16 where all of these ovarian epithelial tumors are
17 arising from.  But we have a little more evidence
18 than we did in 1994.
19     Q.  And in 1994, the first prospective
20 cohort study had not yet been published; correct?
21     A.  I believe that is correct.
22     Q.  So we would be -- these numbers here
23 in -- that are discussed for talc exposure would
24 be, essentially, just the retrospective case
25 controls that had been published up to that point

Page 159

1  or the specific ones --
2      A.  Yeah.  You have the reference list of
3  the reference numbers 47, 69, 70, and 182.
4      Q.  Cramer?  You said 59?
5      A.  69.
6      Q.  Harlow, 92.
7      A.  70.
8      Q.  70.  Hartge.
9  And 83.
10     A.  And 182.
11     Q.  And Whittemore, 1988.
12     A.  So, yes, that was before.  They only
13 looked up until 1988.
14     Q.  Okay.
15         MR. ROTMAN:  Hunter, a good time to
16 take our lunch break?  It's been an hour since
17 our last -- since we started.
18         MS. AHERN:  Sure.  I'm sure people
19 could use a bio break too.
20     Q.  Are these the only pages that you
21 photocopied from this book -- or in -- sorry.
22 Let me rephrase that.
23         Have we finished with the photocopy of
24 Exhibit 11 or are there more pages?
25     A.  I think -- I think I Xeroxed this last

Page 160

1  page just because it was a continuation of that.
2  So, yes, I think we're done with the fourth
3  edition.
4      Sorry.  I'm starting to talk fast because
5  I'm excited for lunch.
6         MS. AHERN:  We can take a break for
7  lunch, then.
8         THE VIDEOGRAPHER:  Here ends Media 3.
9  Off the record, 1:05 p.m.
10         (Lunch recess was taken.)
11         ("Blaustein's Pathology of the
12         Female Genital Tract," Fifth Edition,
13         marked Exhibit 12.)
14         (Excerpt of Blaustein's
15         Pathology of the Female Genital Tract,"
16         Fifth Edition marked Exhibit 13.)
17         THE VIDEOGRAPHER:  Here begins Media
18 No. 4 in today's deposition of Sarah Kane, M.D.
19 Back on the record, 1:45 p.m.
20 BY MS. AHERN:
21     Q.  Okay.  Hi, Dr. Kane.
22     A.  Hello.
23     Q.  I'm looking here at Blaustein's
24 Pathology of the Female Genital Tract, Fifth
25 Edition, which you brought with you here today.

Page 161

1  I marked it as Exhibit 12 to your deposition.
2  You can have it back.
3      A.  Okay.
4      Q.  Thank you.  And inside, you brought
5  with you a photocopy of the cover page and also
6  Page 629.  I'll hand that back to you.  I think
7  there's only one copy.  I've marked that as
8  Exhibit 13.
9      A.  Oh, okay.
10     Q.  Here you go.
11     A.  Okay.
12         MR. TISI:  What was the page?  I'm
13 sorry.
14         THE WITNESS:  629.  Do you want the
15 textbook back?
16     Q.  Whichever one you'd rather actually
17 pass back to me.  Thank you.
18     Can you tell us, on Page 629, what
19 information you thought was relevant to your
20 review of the talc issue?
21     A.  Yes.  I believe this is under "Foreign
22 Body."  So this is diseases of the fallopian
23 tube.  So under "Foreign Body" -- hold on one
24 second.  Okay.  It says, "Foreign material may be
25 introduced into the tube in the course of

41 (Pages 158 to 161)

Sarah E. Kane, M.D.

Page 162

1  gynecologic investigation, especially
2  hysteroscopic -- I can't say the word,
3  hysterosalpingo -- anyway, HPG, lubricant jelly,
4  mineral oil and starch and talc powder may cause
5  a lipoid or granulomatous salpingitis.  An
6  intense phagocytic reaction to introduce lipid
7  material causes" --
8      THE COURT REPORTER:  Excuse me.
9      A.  Sorry.  I think that's basically the --
10 that is the end.
11     No.  At the very end of the page, it says,
12 "Talc may cause mucosal or serosal granulomas.
13 Examination of all granulomas or foreign body
14 reactions under polarized light is useful in the
15 recognition of these processes.  Other disease
16 processes in the tube such as leprosy or
17 amyloidosis are so infrequent that they are of
18 little clinical or pathologic significance."
19     Q.  How does that information inform your
20 opinions today?
21     A.  So it's just another -- again, similar
22 to the other things that we reviewed in the other
23 edition, just another piece of evidence that talc
24 causes mucosal and serosal granulomas, and
25 they're talking about the fallopian tube in this

Page 163

1  chapter.
2      MR. KLATT:  Can I interrupt?
3      (Discussion off the record.)
4      MR. LOCKE:  I'm on right now.  Thanks,
5  Mike.
6  BY MS. AHERN:
7      Q.  And, Doctor, did you review any other
8  sections of Exhibit 12, Blaustein, Fifth Edition?
9      A.  I believe I did.  I think in this
10 edition, from what I recall, that was the -- the
11 reference was in the fallopian tube.
12     Q.  Is that what we just discussed on
13 Page 629?
14     A.  Yes.  629 was where talc was discussed
15 in the fallopian tube.
16     Q.  Did you see any other information in
17 any of the Blaustein texts that we reviewed today
18 that suggests that foreign body granulomas caused
19 by talc have been associated with the development
20 of ovarian cancer?
21     A.  Well, we saw mention of the
22 epidemiologic studies in the fourth edition that
23 we reviewed.
24     Q.  So other than the epidemiology, is
25 there any reference to pathology studies or

Page 164

1  experimental studies or animal studies
2  linking talc foreign-body responses to
3  development of cancer?
4      A.  From what I can recall in those
5  textbooks, I don't think they went into any more
6  detail than what I've read for you.
7      Q.  Okay.  What else did you bring with you
8  today?  Anything that we haven't covered other
9  than the boxes behind me?
10     A.  Correct.  I don't think so.  Mr. Rotman
11 brought a copy of my report, but that is all.
12 This -- let me look.
13     All of these have been marked already.
14 Yeah.
15     Q.  All right.  Doctor, you've got a copy,
16 but I'm going to hand you another one.  I've
17 marked as Exhibit 14 a copy of your expert report
18 dated November 15, 2018.
19         (Rule 26 Expert Report of Sarah
20     E. Kane, M.D. marked Exhibit 14.)
21     Q.  Can you review Exhibit 14 and tell us
22 if this is indeed your expert report dated
23 November 15, 2018?
24     A.  Yes.  This appears to be my report.
25     Q.  And you brought with you earlier an

Page 165

1  updated copy of your CV; correct?
2      A.  Yes, I did.
3      Q.  Which we marked Exhibit 2.
4         (Document entitled "References
5     Cited and Other Material and Data
6     Considered" marked Exhibit 15.)
7  BY MS. AHERN:
8      Q.  And Exhibit B to your report was
9  entitled "References Cited and Other Material and
10 Data Considered."  I've marked that as Exhibit 15
11 to your deposition.
12     A.  Okay.
13     Q.  Okay.  And Exhibit 15 isn't paginated
14 but consists of 11 pages.  The first ten pages of
15 materials consist of 186 items identified by the
16 caption on the top of Page 1 as "Literature"; is
17 that correct?
18     A.  I'm sorry.  Are you talking about the
19 "References Cited and Other Material and Data
20 Considered," Exhibit 15?
21     Q.  Yes.
22     A.  Yes.  There is a list of 186 literature
23 references.
24     Q.  And the materials listed on Page 11 are
25 identified by a caption as "Other Sources" and

42 (Pages 162 to 165)

Sarah E. Kane, M.D.

Page 166

1  include an additional 17 items; is that correct?
2      A.  Yes.
3      Q.  Okay.  So did you prepare Exhibit 15?
4      A.  Yes.  I did.
5      Q.  Did you type this out yourself?
6      A.  I did.  Yes.
7      Q.  Okay.  And how did you go about pulling
8  this together?
9      A.  I'm -- in what way?
10     Q.  Did you keep a running list of the
11  citations as you went and then pull this all
12  together at the end of your report?
13     A.  Yes.  So what happened is this was my
14  first medical expert witness report I have
15  written.  And you'll notice that -- let's see,
16  all of the -- oh, I'm sorry.  This doesn't
17  include the January 4th list; right?
18     Q.  We'll get there.
19     A.  Okay.  So that's what I kind of want to
20  explain.  What happened is, the reason why you
21  had a January 4th list, is because I wrote
22  this -- the accepted form for published
23  literature is listing literature that you've
24  actually cited within the body of your report,
25  and so it was my misunderstanding.  I was not

Page 167

1  aware at first that you guys were going to want a
2  list of everything that I had reviewed.
3      So what I tried to do is this, I think, was
4  turned in at the same time, so Exhibit 15 was
5  turned in at the same time as Exhibit 14, and it
6  has the literature that was cited within the body
7  of the report.
8      And then when I realized I needed to get a
9  list together of everything, as complete a list
10  of everything that I thought I reviewed, I put
11  together the January 4th list, which was -- I had
12  to sort of recreate -- and I kept almost all of
13  those -- all of this literature in different
14  files.
15     I had to do a little bit of recreation
16  because, as I mentioned before, I lost a couple
17  of hard drives during this whole process, which
18  was not fun.  But thankfully, I was -- I had
19  backed up a lot of it.
20     So I tried to be as complete as possible.
21  It is possible that there are a few things I
22  reviewed that did not make the list, which I
23  think I realized on the list that you got
24  yesterday there might have been a couple that I
25  had reviewed before, but most of that literature

Page 168

1  that you -- the list that you got yesterday is
2  stuff that I had reviewed, I believe.  I have to
3  look at it.
4      But my point is that list that you got
5  yesterday was varied, and -- when I looked at it,
6  and it was just an effort to be as complete as
7  possible.
8      Q.  Okay.  And just looking -- we'll get
9  there, but just looking at Exhibit 15, which --
10  the first ten pages, which are the references?
11     A.  Mm-hmm.
12     Q.  So do you define the references as the
13  specific sources that you cited within the body
14  of your report?
15     A.  These are sources that I cited within
16  the body of my report.
17     Q.  And are these the sources that you rely
18  on to support the opinions expressed in your
19  report?
20     A.  So these are some of the references
21  that I used.  Again, I also had reviewed the
22  subsequent -- the literature and the other data
23  in the subsequent lists.  So I would not say this
24  is all-encompassing, but ultimately, with all the
25  lists you have now, I'm hoping that that is

Page 169

1  encompassing of at least all of the stuff that I
2  considered.  I wouldn't necessarily say "rely
3  on," but at least everything that I considered.
4      Q.  Okay.  And that was -- my next question
5  was:  Do you differentiate between the sources
6  cited here as references and those that you just
7  considered but weren't included as references?
8      A.  Not necessarily.  These are the ones
9  that ended up getting cited in the report.  Now,
10  there were different drafts, which at one point
11  some of the other ones were cited, and there was
12  a little bit of changing it around, which there's
13  a couple -- I think there are a couple of
14  typographical-type errors in a couple of the
15  references because of that.
16     But essentially, there isn't that much of a
17  difference, I would say, except to say that this
18  is the literature that I ended up specifically
19  citing.
20     But all of the literature that I looked at,
21  I considered.
22     Q.  Would you say that all of the
23  literature that you looked at, which would
24  include your other sources here on Exhibit 15,
25  your January 4, 2018, reference list, and the

43 (Pages 166 to 169)

Sarah E. Kane, M.D.

Page 170

1  ones served yesterday, January 24th, would you
2  say that you relied on all of those materials?
3      A.  No.  Well, I at least reviewed those.
4  I would say that I considered them.  I wouldn't
5  necessarily say that I relied upon them.
6      Q.  And when you consider material, what
7  does that mean to you?
8      A.  Well, you know, when I'm -- you can
9  look at my methodology, how I tried to cast as
10 wide a net as possible with the information that
11 I gathered in the information stage.  So I wanted
12 to have as much data, as many literature
13 references, expert reports, whatever I could kind
14 of get my hands on that might be relevant to my
15 general causation report.
16     And then I'm reading through those, and
17 that's actually when I started my draft of the
18 report.  It really started as sort of notes that
19 I took as I read the different literature
20 references, and I sort of built out from there.
21     Does that answer your question?
22     Q.  I think probably so.
23     Did you collect -- did you identify all of
24 the materials in Exhibit 15 yourself, or were
25 some of these provided to you by the plaintiffs'

Page 171

1  counsel?
2      A.  The vast majority of them, I found
3  through my own literature search.  Some of them
4  may have been supplied by the plaintiffs'
5  attorneys.  A lot of those overlapped with what I
6  had already found; the exception, of course,
7  being documents on the other sources that I would
8  not have had access to on my own.
9      So I had asked for, and in forming my
10 opinion, my general causation opinion, I had
11 asked for defense expert reports so I could get a
12 sense of what the defense experts' opinions were,
13 just to get, you know, the other -- just to get
14 more information.
15     So that's -- so those were definitely given
16 to me by plaintiffs' attorneys.
17     Q.  Do you remember, timewise, did you
18 review the defense expert reports and the
19 materials in the other sources earlier on to get
20 a sense of the issues in the litigation and then
21 do your literature search, or the other way
22 around?  What was the timing?
23     A.  I don't remember exactly.  I don't
24 believe I read the -- I'm trying to think timing.
25     I think what I did is -- from what I

Page 172

1  remember, I did my own literature search, read as
2  much as possible, started taking my own notes.
3  And then thought, as I was sort of forming my
4  opinion, thought, you know, it would be nice to
5  know what the defense is saying.  And, of course,
6  I think at that point is when I asked, but I
7  don't remember specific timing.
8      Q.  And did you specifically -- did you ask
9  for specific defense reports or specific defense
10 reports related to particular expertise?
11     A.  If I recall -- I'm looking at this
12 list -- I believe the first request was a
13 general request.
14     Q.  When you say "more general," do you
15 mean for --
16     A.  Meaning --
17     Q.  -- for defense?
18     A.  -- I didn't ask for specific names of
19 people.
20     Q.  Ah.
21     A.  I think at this point, I wasn't
22 necessarily aware of who would have been defense
23 experts.  And so I don't remember exactly, but my
24 inclination is that I had asked for a more
25 general sort of representation.

Page 173

1      Q.  And can you identify on here which of
2  the other sources are from defense experts?
3      A.  Yes.  I'll try my best.
4      The Michael Ober expert report was provided
5  by plaintiffs' counsel.  The deposition of Alice
6  Blount was also provided by plaintiffs' counsel.
7  Both of the Chodosh, his report and his trial
8  testimony, was provided by plaintiffs' counsel.
9  Samuel Cohen was provided by plaintiffs' counsel.
10     And also -- also, let's see, the Cramer, I
11 wouldn't have access to the Cramer sources on the
12 Byrd and Jacqueline Fox.  The expert report of
13 Michael Crowley was given to me.  That,
14 obviously, is a plaintiffs' report that was
15 within a day or two of turning in my report.
16 That was very late in the process.
17     John Godleski, I might have asked for by
18 name.  Of course, he's a plaintiffs' expert.
19 His, I may have asked for by name because of the
20 Cramer papers.
21     Q.  Did you say Cramer was a plaintiff or
22 defense expert?
23     A.  Cramer, I believe, was a plaintiff.
24     Q.  I wasn't sure.  You named him after the
25 defense experts.  I'm sorry.  I'm just going

44 (Pages 170 to 173)

Sarah E. Kane, M.D.

Page 174

1  through the list.
2      MR. ROTMAN:  The list is alphabetical,
3  so she's going down the list.
4  BY MS. AHERN:
5      Q.  Yeah.  My question was:  Which ones are
6  the defense experts?
7      A.  I'm sorry.
8      Q.  If you're done, you're done.  Are there
9  any other defense experts.
10     A.  Well, the John Hopkins and Julie Pier,
11 those exhibits and depositions I got from
12 plaintiffs' counsel.
13     I believe that is it, looking at the list of
14 defense reports.
15     Q.  Did you want to know what the defense
16 experts had to say about epidemiology?
17     A.  I wanted -- yeah.  I wanted as much
18 evidence as I could get, so --
19     Q.  Were you aware that the defendants had
20 designated epidemiologists in the litigation who
21 had given reports and testimony?
22     A.  I don't know if I was aware
23 specifically of that.
24     Q.  Were you aware that the defense had
25 designated a number of gynecologic pathologists

Page 175

1  who had given reports and testimony as well?
2      A.  Again, I don't know if I was
3  specifically aware of that.  No.
4      Q.  Would you have, as a pathologist doing
5  an expert report on this litigation, would you
6  have been interested to know what the defense
7  pathologists had said?
8      A.  Well, I will take any data that I can
9  get to try to see if it's relevant.  I mean, so I
10 had asked for defense reports, and that's what I
11 got.
12     Q.  These reports, these other sources, the
13 17 items here were in response to your request,
14 but they were chosen by the plaintiffs' counsel?
15     MR. ROTMAN:  Objection.
16     A.  I'm not sure how they were chosen or
17 how -- why -- all I know is that I asked for
18 reports, and this is what I received.
19     Q.  And you specifically asked for defense
20 reports; right?
21     A.  I did.
22     Q.  And you got Michael Beer, who is an
23 oncologist; Lewis Chodosh, a cancer biologist;
24 and Sam Cohen, a toxicologist; correct?
25     A.  That would appear, from the list, the

Page 176

1  ones that I received.  Yes.
2      Q.  Is there anyone on this list that's --
3  that specifically addresses gynecologic
4  pathology?
5      A.  I think it's been a long time since I
6  read those reports, but I do remember some of
7  those reports speaking to -- your question was on
8  top.  I'm just making sure.
9      Q.  Sure.
10     A.  Some -- so the gyn onc report
11 definitely went into some gynecologic pathology.
12 Gyn oncs are generally knowledgeable about gyn
13 pathology because we work pretty closely with
14 them.  We often show our gyn pathology, for
15 example, at multiconferences, multidisciplinary
16 conferences.
17     So I vaguely remember a gyn onc one going
18 over some gyn path stuff, but my memory is vague
19 because I have not read these in probably over a
20 year.  I don't know exactly.
21     Q.  Would you be interested in what the
22 epidemiologists that had served reports and given
23 testimony in the litigation the last five years,
24 what they've said?
25     MR. ROTMAN:  Objection.

Page 177

1      A.  Again, I'll take whatever information
2  or data, you know, I can get that might be
3  relevant.
4      Q.  And do you consider expert litigation
5  reports to be data?
6      A.  Yes.  I think it's data.
7      Q.  Okay.  Is it the kind of data you rely
8  on in your everyday practice as a pathologist?
9      A.  I sort of view they're opinion reports.
10 They're opinion, general causation opinions, and
11 a couple of these are -- I can't remember.  All
12 of these were general, I believe, from the
13 defense.
14     So they're professional opinion data, and I
15 would say that's similar to having a consultation
16 with a colleague or a peer.  I mean, you know, in
17 my day-to-day practice, I'm certainly asking
18 opinions of colleagues and different specialties
19 or my own specialty, even.  Those are
20 professional judgments, professional opinions,
21 looking at their knowledge of the literature or
22 data.
23     So I think it's a good analogy; looking at
24 general causation, professional opinions, is
25 similar to kind of getting a colleague's opinion.

45 (Pages 174 to 177)

Sarah E. Kane, M.D.

Page 178

1    Q.  But this is the first time you've
2  relied on litigation reports to inform your own
3  opinions; correct?
4    A.  Well, again, I don't know if I would
5  use the word "rely."  I certainly considered
6  them, you know.  But, again, I think it's very
7  similar to asking a colleague in my daily
8  practice for an opinion on something.
9    Q.  And, Doctor, looking at 186 references
10  that are cited in Exhibit 15.
11    Did you review each one of these carefully
12  and thoroughly?
13    A.  I reviewed each one of them, some of
14  them probably more thoroughly than others,
15  depending on what I was looking for; but yes, I
16  reviewed all of them.
17    Q.  And do you know whether or not the
18  boxes, the four boxes that are sitting behind me,
19  do those include these 186 references on
20  Exhibit 15?
21    MR. TISI:  Let me see if I can help you
22  out.
23    MS. AHERN:  Sure.  Go ahead.
24    MR. TISI:  My understanding is they do.
25    MS. AHERN:  That's the 186?

Page 179

1    MR. TISI:  That would be the references
2  in the report.  It would not be, to my -- I
3  haven't cracked the boxes, so I can only assume
4  from past prologue that the information
5  considered is not in those boxes.  They may be,
6  but the information relied on that is cited in
7  the report are.
8    MS. AHERN:  Okay.  So other sources
9  here that are not cited specifically, well, they
10  may be --
11    MR. TISI:  I don't know, for example --
12  well, maybe we can open them up.  But I don't
13  know, for example, if the expert reports and
14  depositions are in the -- in there.  If they're
15  cited, then they're probably in there.  If
16  they're not cited --
17    THE WITNESS:  I'm not sure because --
18  I'm not sure I cited these in my report because
19  they weren't necessarily reliance.  It was more
20  data.
21    But I thought at the time that I should
22  list what -- because these aren't publicly -- I
23  don't believe any of these are publicly
24  available, what is on this list, so I felt like I
25  should list them.

Page 180

1    But I don't believe I -- well, I might
2  have referenced the Longo.
3  BY MS. AHERN:
4    Q.  Page 5.  I think if you look at Page 5
5  of your report, you reference Dr. Blount --
6    A.  Yes.
7    Q.  -- Dr. Crowley, Longo, Rigler,
8  Hopkins --
9    A.  Yes.
10    Q.  -- Pier?
11    A.  Yes.  Looking back at the list, you're
12  absolutely correct.  I did.
13    Q.  Do you think, as you sit here, that
14  those are --
15    MR. TISI:  I can look at them if it
16  makes your life easier.  I'm happy to do it.
17    But I do think -- Mike is back there
18  looking.  I'm thinking that those are the actual,
19  relied-on referenced materials, not the materials
20  considered, which was a separate list.
21    MS. AHERN:  That's the January 4th, and
22  we're going to get to that one.
23    MR. TISI:  No. it's in the back of the
24  report.  Maybe I'm wrong.
25    MS. AHERN:  There are other sources,

Page 181

1  but she has apparently relied on them --
2    MR. TISI:  That's fine.
3    MS. AHERN:  -- to some extent in
4  performing reviews about fragrances and asbestos.
5  BY MS. AHERN:
6    Q.  Is that right, Doctor?
7    A.  Dr. Crowley's report and Dr. Longo's
8  report, yes.  I --
9    Q.  And what about Dr. Hopkins and Pier?
10    A.  Yes.  I don't believe I read their
11  entire depositions.  I know I had seen the
12  exhibits from the depositions, and I think
13  part -- I listed it here, so I must have at some
14  point.
15    MS. AHERN:  Okay.  So let's put 15 over
16  here, and let's move on to the next one.
17    (Document entitled "Additional
18    Material Considered" marked Exhibit 16.)
19  BY MS. AHERN:
20    Q.  Okay.  Doctor, I'm handing you what's
21  been marked as Exhibit 16 to your deposition.
22    Can you take a look at Exhibit 16 and tell
23  us what that is?
24    A.  Yes.  So this is a combination.  So
25  once I realized that I needed to give you all a

46 (Pages 178 to 181)

Sarah E. Kane, M.D.

Page 182

1  list of -- as complete a list as I could -- I'm
2  not going to say this is a complete list -- and,
3  of course, you have another list that you just
4  got, but I tried to be as complete as I could in
5  recreating the literature and other reports that
6  I had considered.
7      So these are ones that, to my recollection,
8  I didn't specifically cite or were not
9  available -- I mean, obviously, I have some of
10  the plaintiffs' expert reports that weren't
11  available to me until after I had written and
12  submitted my report.  So some of these were
13  available to me only after -- and the Health
14  Canada came out after my report.
15      So these are a combination of things I
16  reviewed subsequent to November 15th and stuff
17  that I had reviewed prior to that but had not
18  specifically cited and recreated the list.
19      Q.  Okay.  And just for the record, this
20  is -- Exhibit 16 is a four-page document.  It's
21  not paginated, but it has 96 items identified as
22  "Additional Materials Considered," so -- served
23  on January 4, 2018.
24      Can you identify, as you look through these
25  items on Exhibit 16, which of those you reviewed

Page 183

1  prior to the submission of your report and which
2  ones you reviewed after?
3      A.  I can do the best that I can.  My
4  memory might be a little -- and I have to jog my
5  memory a little bit on some of them.
6      Clearly, the expert reports that were
7  dated -- the plaintiff expert reports that were
8  dated after my report, I had not seen --
9      Q.  Mm-hmm.
10      A.  -- prior.
11      And, again, the Health Canada came out
12  afterwards, so that was not available when I
13  submitted my report.  The majority of the rest of
14  the literature, I had read prior to submitting my
15  report.
16      Q.  Okay.  Had you seen any draft reports
17  from any of the other experts designated by the
18  plaintiffs in this litigation?
19      A.  Not before my report.  I didn't see any
20  drafts.  I only saw the final reports after my
21  report was submitted.
22      Q.  Okay.  Did you have an opportunity to
23  talk with any of the other experts that were
24  designated by plaintiffs prior to your report
25  being submitted?

Page 184

1      A.  No.
2      Q.  And are there some materials on
3  Exhibit 16 that were provided to you or
4  identified for you by the plaintiffs other
5  than -- and I'm not talking about the litigation
6  materials, but the articles?
7      A.  Again, there might have been some that
8  overlapped with what I had already found.  I'm
9  looking.
10      I believe the April 2014 FDA letter may --
11  although that might have been available on the
12  internet.  I might have come across that on my
13  own first.
14      No.  I believe the vast majority of this
15  stuff was stuff that I -- other than those
16  reports was stuff that I had independently
17  already found.  That's the only one that is
18  ringing a bell as a possibility, but I also seem
19  to remember finding it on the internet.
20      Q.  Okay.  And are any of these materials,
21  materials that you explicitly rely on or, excuse
22  me, are any of the materials on Exhibit 16
23  materials that you rely on to support your
24  opinions?
25      A.  Again, it's all data that I considered.

Page 185

1  I didn't specifically cite them, but there's
2  certainly pieces of information that helped me
3  come to my conclusion.
4      Q.  And you prepared Exhibit 16, didn't
5  you?
6      A.  Yes.
7      Q.  And do you remember when you prepared
8  it?
9      A.  Very shortly before you received it.
10  So it would have been -- you received it
11  January 4th?
12      Q.  Mm-hmm.
13      A.  I think I -- it was only -- I don't
14  remember exactly, but it wasn't very long before
15  that that I put it all together, after
16  recreating -- trying to recreate as best I could
17  the list of literature that I had reviewed.
18      Q.  And did you carefully and completely
19  review all of the information in Exhibit 16?
20      A.  Again, I reviewed all of it.  Some of
21  it was more relevant than others, likely, so --
22  but I reviewed all of them.
23      Q.  Okay.  Obviously, anything that you
24  received after your report is information you
25  would not have relied on to form your opinions in

47 (Pages 182 to 185)

Sarah E. Kane, M.D.

Page 186

1  this case; correct?
2      A.  No.  It's more information for my -- my
3  opinion hasn't changed since I wrote my report.
4  In fact, I know we've talked about Health Canada
5  a little bit, but that was pretty interesting to
6  see that report because their methodology was
7  very similar to mine, and they did a Bradford
8  Hill analysis, and they looked at a lot of the
9  same literature and came to the same conclusion.
10     So that definitely was supportive evidence,
11 I think -- not I think; it is -- of my opinion.
12     Q.  And, Doctor, I only have one copy of
13 this.  It's "Additional Materials to Sarah Kane"
14 that were served last night or yesterday
15 afternoon, January 24th.
16         (Document entitled "Additional
17     Materials to Dr. Sarah Kane" marked Exhibit
18     17.)
19 BY MS. AHERN:
20     Q.  First of all, can you take a look at
21 that?
22     Have you seen it before?
23     A.  Yes.  Yes.  I have.
24     Q.  Did you prepare that?
25     A.  I did.  I had listed -- there are a

Page 187

1  couple of papers that I realize I had read
2  previously and didn't -- I can tell you Purdie,
3  1995, Keskin, 2009, I definitely reviewed while
4  preparing my report, and somehow those got off
5  the list.
6      The other ones, Taher wasn't available.  I'm
7  trying to remember Gordon, if I had seen that.
8  If I had seen that before I submitted a report,
9  it was very late.  It might have been after.
10     The IARC heavy metals, I believe I actually
11 cited that in my reference list, but I was trying
12 to be -- it was one of these last-minute, trying
13 to be as complete as possible, so that actually
14 might be a repeat.
15     The website, I had reviewed prior to turning
16 in my report.  And the Longo supplemental report,
17 obviously, wasn't available until January.  Same
18 with the depositions.  Those weren't available
19 until after they were done.
20     The Kurman defense report, I asked for
21 recently when I realized that Kurman was a
22 listed -- a named expert witness, which is also
23 why I went through my copies of my old textbooks
24 and my partner's old textbooks.  So that, I asked
25 for specifically.

Page 188

1      I think that covers most of them.
2      Q.  What about the EFSA guidance on the use
3  of weight of evidence?
4      A.  Oh, yeah.  That, I think, I reviewed
5  after I had submitted my report.
6      Q.  Did that form part of the basis of your
7  opinions or your methodology?
8      A.  It was more of a -- it basically shows
9  that the methodology that I used is very similar
10 to evidence-based medicine that we would use on a
11 daily basis.  It kind of went through weight of
12 evidence, and it was sort of helpful to see the
13 similarity of the methodology that I used coming
14 to my conclusion.
15     Q.  Was the methodology you used for
16 preparing your opinions in this case and your
17 report in this case taken directly from the EFSA
18 guidance?
19     A.  No.  I think I just -- I saw this EFSA
20 guidance after writing my report.
21     Q.  Did you use any other sort of published
22 methodology on weight of the evidence when you
23 prepared your opinions?
24     A.  I used what we have been trained to
25 use.  I mean, it's evidence.  It's an

Page 189

1  evidence-based medicine model of methodology and
2  coming to conclusions.  So it's -- I tried to do
3  as thorough as possible description of my
4  methodology, which we can refer to in my report
5  if you'd like.
6      Q.  What about the J&J Science Day
7  presentation?
8      A.  That --
9         MR. ROTMAN:  Objection.  Is there a
10 question?
11        MS. AHERN:  I'm about to get there if
12 you'd let me finish my question.
13        MR. ROTMAN:  I thought you were.
14 Sorry.
15        MS. AHERN:  You might just hold off.
16 BY MS. AHERN:
17     Q.  What about the J&J Science Day
18 presentation?  Is that something that you
19 reviewed?
20     A.  I reviewed that very quickly, and I
21 only received that maybe a week ago.  It was very
22 recently.
23     Q.  Did you request that information?
24     A.  I think, from what I remember, it was
25 part of asking for more sort of defense side of

Sarah E. Kane, M.D.

Page 190

1  the story; what, you know, your experts might
2  have been saying; what kind of -- you know, I was
3  trying to figure out how somebody who had looked
4  at the same body of evidence that I did come
5  to a different conclusion, so it was part of sort
6  of that request.
7      I think I probably got it after I requested
8  Kurman's defense report from a prior litigation,
9  if memory serves me correctly.
10     Q.  You would agree that a very large part,
11 not just volume, but a very large part of your
12 report and your opinions in this case are related
13 to the observational epidemiology on talc and
14 ovarian cancer; is that correct?
15     A.  Well, I think that epidemiology
16 literature is extremely compelling.  You have
17 30 case-control studies over different periods of
18 time in different populations that have come to
19 the same -- same ballpark relative risk, I would
20 say, 1.3 to 1.4.
21     Now, not all of those have been
22 statistically significant, but some of those
23 studies were smaller studies, and so that tends
24 to decrease the power of the study and your
25 confidence intervals will be wider.

Page 191

1      But I thought the epi data was really
2  compelling.  And often in causation, the epi data
3  sort of leads the way in paving a path to
4  figuring out causation.
5      A perfect example is tobacco.  You know, the
6  Surgeon General issued his report in the 1960s
7  about tobacco before they had any mechanism for
8  tobacco causing -- so that was a perfect example
9  of the epi data leading to causation.
10     So it's true, a lot of the studies looking
11 at talcum powder products and ovarian cancer are
12 epidemiology studies, but they're extremely
13 informative in that they are very consistent in
14 their findings.  And, again, different authors,
15 different populations, different countries.
16     And there's also the cohort.  So I went
17 through the cohort studies.  The cohort studies,
18 some of them showed an association with serous
19 invasive carcinoma, but the cohort studies didn't
20 tend to find, other than that, a statistically
21 significant increased risk, although some of them
22 did find increased risk.
23     But we can talk about cohort studies versus
24 case-control studies if you want, but I think the
25 difficulty with cohort studies is ovarian cancer

Page 192

1  is such a rare disease, and you're sort of, you
2  know, rolling the dice when you enroll patients
3  as to whether or not they're going to end up with
4  a disease at the end that you want to study.
5      So you're sort of -- and these cohorts are
6  also designed for multiple endpoints and multiple
7  diseases.  They weren't just looking, most of
8  them -- I believe the sister -- well, the sister
9  study -- anyway, we can pull it out if I have to,
10 but my point is the cohort studies are designed
11 for multiple different things, especially the
12 Nurses' Health Study.
13     And so it's a difficult type of study to
14 design with a very rare disease.  And I think
15 that's where the case-control studies are
16 important because you can start with the disease
17 and work backwards, and so you can have an easier
18 time getting cases.
19     Q.  Did you find it interesting or odd that
20 you were provided with a number of defense expert
21 reports, but not a single one of them related to
22 the epidemiology specifically from an
23 epidemiologist?
24     A.  Well, you know, again, I don't pretend
25 to know why I was sent what I was sent.  I just

Page 193

1  know that I asked for reports, and I got what I
2  got.  So I have no idea what the process was in
3  deciding what I received; if there was even a
4  decision.  For all I know, it's just what they
5  had readily available.
6      Sorry.  What is the question?
7      Q.  Well, let me ask another question.
8      MR. ROTMAN:  Let her finish the answer
9  because you can read -- she can go back and read
10 from the realtime what the question was and see
11 if she's done.
12     A.  So I guess I don't know if there was
13 thinking -- what the thinking was or if there was
14 any.  But also I can say that the epi data -- I
15 knew that by that point that the epi data was
16 consistent by the time I -- I think that was the
17 first literature that I was looking at, and so I
18 knew that it was consistent.
19     So it's -- anyway, I don't really -- I don't
20 know is the answer, the short answer.
21     The long answer, the short answer is I don't
22 know why I got what I did.  I just did.
23     Q.  Okay.  And you've seen the designations
24 in this case from November of 2017 in which you
25 were listed formally and publicly as an expert

49 (Pages 190 to 193)

Sarah E. Kane, M.D.

Page 194

1  for the MDL?  Have you seen that document?
2      A.  I'm not sure that I have, actually.
3      Q.  Were you aware that in November of
4  2017, you were listed on a court document as an
5  expert for the plaintiffs in the MDL litigation?
6      MR. ROTMAN:  Objection.
7      A.  I don't know the timing or I don't
8  think I saw the document, so I...
9          ("The Plaintiffs' Steering
10     Committee's Initial Designation and
11     Disclosure of Non-case Specific Expert
12     Witnesses" marked Exhibit 18.)
13 BY MS. AHERN:
14     Q.  Okay.  I'm marking Exhibit 18 to your
15 deposition.  Do you see this document,
16 Exhibit 18, is entitled "Plaintiff Steering
17 Committee's Initial Designation and Disclosure of
18 Non-case Specific Expert Witnesses"?
19     A.  Okay.
20     Q.  And if you turn to -- first of all,
21 let's see.  Unfortunately, I can't find the date
22 on that, and I apologize.
23     MR. TISI:  It's January, if I'm not
24 mistaken.  I think it was mid-January of 2017.
25     MS. AHERN:  Is that what it is?

Page 195

1      MR. TISI:  Yeah.  And, Counsel, since I
2  was involved in this process, if you don't mind
3  if I place an objection here.
4      MS. AHERN:  Sure.
5      MR. TISI:  As you may not know, during
6  the status conference where this was ordered -- I
7  don't have the transcript in front of me -- it
8  was intended to be an interim -- I don't know
9  what the questions are going to be, but it was
10 intended to be an interim disclosure to help
11 guide the legal process for identifying issues
12 that would be involved in Judge Wolfson looking
13 at the science.
14     It was never -- I don't know -- again,
15 not knowing what your questions are, I don't even
16 think it would be intended to be used as an
17 expert -- as an exhibit in a deposition.
18     But, you know, whatever your questions
19 are, we would like to reserve that because --
20     MS. AHERN:  Sure.
21     MR. TISI:  -- this was intended to be
22 a -- more of an informative document than
23 anything else.
24     MS. AHERN:  Okay.  Your objection is
25 noted.

Page 196

1      MR. TISI:  That's fine.
2      MS. AHERN:  Absolutely.
3      I have the date as November 6, 2017.
4      MR. TISI:  You are exactly -- well, it
5  is what it is.
6      MS. AHERN:  Okay.  Either way.
7  BY MS. AHERN:
8      Q.  Okay.  Doctor, if you turn to -- if you
9  turn to Page 8, the bottom of Page 8, do you see
10 your name?
11     A.  Yes.
12     Q.  Okay.  And did you -- go ahead and
13 review the text here associated with your name
14 and designation.
15         (Witness complies.)
16     Q.  Just let me know when you're finished.
17     A.  I'm finished reading my blurb.  I'm
18 just looking...
19     Q.  Sure.
20     A.  Okay.
21     Q.  Were you aware in November of 2017 that
22 you had been publicly disclosed as an expert on
23 behalf of plaintiffs in the MDL?
24     MR. TISI:  Okay.  That's -- and you do
25 kind of need to know the context in which this

Page 197

1  was done.
2      MS. AHERN:  I'm just asking if she was
3  aware she was publicly -- she was already
4  retained at that point.
5      MR. TISI:  She was retained, but there
6  was no -- the judge was very clear when she
7  ordered that this be done.  She understood that
8  this was not a disclosure of experts.
9      So when you ask the question "You
10 understand you were being identified as an expert
11 at that time," she would have no way of knowing
12 that because we didn't know it.
13     MR. KLATT:  Chris, you've got to limit
14 your objection.
15     MR. TISI:  No.  But it's unfair
16 because --
17     MR. KLATT:  You're coaching the
18 witness.  You're telling her the whole story.
19     MR. TISI:  It's a true story.  Why
20 don't we ask her to leave, and we'll put it on
21 the record.  I have no problem with that.
22     MR. KLATT:  All right.
23     MR. TISI:  We can ask her to leave, and
24 we can put it on the record.
25     MR. KLATT:  Let's do that.

50 (Pages 194 to 197)

Sarah E. Kane, M.D.

Page 198

1           MR. ROTMAN:  Go get a cookie.
2           MS. AHERN:  Sorry, doctor.
3           (Witness exited)
4           MS. AHERN:  My questions on this are
5    fairly limited to the time period that she was
6    retained, time period she was intending to be an
7    expert, that sort of thing --
8           MR. TISI:  Yeah.
9           MS. AHERN:  -- and the subject matter
10   that she is being designated for.
11          MR. TISI:  Yeah.  But, you see, the
12   issue in the case -- and the reason why this was
13   a tricky issue for the judge and -- well, I won't
14   speak for the judge, but for us when we disclosed
15   this was because we didn't know -- we didn't have
16   expert reports.  We didn't even have opinions
17   yet.
18          So this was being done in a way that
19   said, "Okay, Judge, she wants to know, A, are
20   there new and different witnesses that were going
21   to be designated that were different than what
22   was designated in the state court?"
23          MS. AHERN:  I do recall this, yes.
24          MR. TISI:  The second issue, she was
25   very clear that she understood that there was a

Page 199

1    lot of discovery that needed to be done,
2    documents to be reviewed, science that was going
3    to come out.  So she was pretty clear that this
4    was more informative than anything else.
5           And so when you ask her a question
6    about -- when you ask her questions, "You know
7    when this document was disclosed when you were
8    identified as an expert," you know, it implies
9    that she had agreed to be -- you know, what her
10   opinions actually were at that time.
11          She -- I can tell you that these
12   reports were done over a period of time.  So it's
13   misleading, and it really is an unfair thing to
14   do to a witness because this was a court request
15   having nothing to do with her opinions or her
16   expert report.
17          MS. AHERN:  Okay.
18          MR. TISI:  Do you understand where I'm
19   coming from?
20          MS. AHERN:  I understand where you're
21   coming from.
22          Here is my question to you:  Did Dr. --
23   was Dr. Kane not aware that you were going to
24   designate her or that you had at least publicly
25   disclosed her to the Court?

Page 200

1           MR. TISI:  She was probably not, I
2    mean, what she was aware of when she had been
3    retained.
4           MS. AHERN:  Did she agree to be
5    disclosed as an expert?
6           MR. TISI:  She agreed to be retained.
7    She was disclosed as an expert when she reached
8    her conclusions in the case.
9           And so what the Court was requiring us
10   to do was to give us a broad brush, and she was
11   very clear.  I remember standing in court, and
12   she said, "Look, some of these may fall off your
13   list.  Some of these may -- we may have people
14   that might be added, but I want a snapshot in
15   time as to what I'm dealing with in terms of" --
16          MR. KLATT:  We don't need to waste time
17   on the record on this.
18          MR. TISI:  We can go off the record if
19   you want.  I just don't want to be -- use this as
20   an unfair -- you know, none of your questions
21   have been unfair up until now.
22          But to take this document and to
23   suggest in some fashion -- and I don't know what
24   you're going to do with it.  Maybe we just need
25   to wait and see.

Page 201

1           But I think this is -- I don't think
2    anyone ever intended that this document would be
3    used as an exhibit in a deposition of one of
4    these witnesses.  I don't think the court
5    intended that to be the case, just like she --
6    when she ordered the Tardek report --
7    informational only.
8           MR. KLATT:  Are we off the record?
9    We're just going on here.  Let's go off the
10   record.
11          MR. TISI:  Yeah.
12          THE VIDEOGRAPHER:  Off the record,
13   2:38 p.m.
14          (A recess was taken.)
15          THE VIDEOGRAPHER:  Back on the record,
16   2:42 p.m.
17          (Witness returns)
18   BY MS. AHERN:
19      Q.  Okay.  Doctor, I've just shown you a
20   copy of some early designations that were
21   submitted in the talc MDL, and you saw your name
22   listed as one of the people who was being
23   considered as an expert; correct?
24      A.  My name is in this document.  Yes.
25      Q.  Okay.  Is there any -- do you have any

51 (Pages 198 to 201)

Sarah E. Kane, M.D.

Page 202

1  issues with the description of the testimony that
2  you were going to offer to give?
3      A.  I believe that to be accurate.
4      Q.  Okay.  And you had been working on your
5  report at this point since May of 2017; correct?
6      A.  I started in May.  "Writing the report"
7  is a very loose description.  What I was -- what
8  I started, as I mentioned before, was I started
9  to review literature.  I sort of took notes.  So
10  I sort of counted that as writing.  So I started
11  that process in May.
12      Q.  Okay.  And the only thing I was going
13  to ask you about in this report is, as you look
14  through it, do you note that there are a number
15  of professional epidemiologists that have been
16  listed in this report on behalf of plaintiffs?
17      A.  I'd have to go through the list.  I
18  actually, even though I did have access to
19  several final reports, after I had submitted my
20  report, I don't remember who was what specialty,
21  what field, for the majority of them.
22      Q.  Well, how about this question:  Of the
23  experts -- are you aware of which experts have
24  submitted reports on behalf of the plaintiffs?
25      A.  I would need to look at the list that I

Page 203

1  reviewed, which I think is all of the ones that
2  were submitted, and compare it to this list.
3      I mean, I know Jack Siemiatycki is an
4  epidemiologist, off the top of my head.
5  Dr. Singh, I believe, is an epidemiologist.
6      But without going through the list and sort
7  of jogging my memory as to the reports, I skimmed
8  a lot of these reports.
9      Q.  Okay.  And I guess the point is:  Are
10  you aware, as we sit here today, that the
11  plaintiffs have designated a number of
12  epidemiologists in this MDL litigation who have
13  given reports and/or testimony at this point on
14  the topic of epidemiology, talc and ovarian
15  cancer?
16      A.  I am aware that they have
17  epidemiologists that have submitted reports for
18  this MDL.
19      Q.  Okay.  And specifically, if you can
20  think back to your initial contact with
21  plaintiffs' counsel when you were asked to get
22  involved in the litigation, what specifically
23  were you asked to do, or what was your
24  understanding of what your role would be?
25      A.  Yeah.  My understanding was they had

Page 204

1  asked me if I would be willing to do an extensive
2  review of the literature and decide what my
3  opinion would be on talcum powder products
4  causing ovarian cancer.
5      Q.  Did you ask them or discuss with them
6  what your role would be in terms of your specific
7  area of expertise in anatomic pathology?
8      A.  I did not specifically talk to them
9  about that because I know that I'm a gynecologic
10  pathologist, so I thought that would be my area
11  where I weigh in on my opinion.
12      Q.  And where in your report specifically
13  do you address your expertise in gynecologic
14  pathology, anatomic pathology?
15      A.  I list it in the beginning of my
16  report, I think.  I talk about -- I talk about my
17  background.
18      Is that what you mean?
19      Q.  I mean more in terms of the opinions
20  that you're giving informed by your
21  expertise in anatomic pathology.
22      A.  Well, again, I'm an expert in
23  gynecologic pathology, and the question is about
24  a causation of ovarian cancer, so certainly that
25  falls into my area of expertise.

Page 205

1      Q.  And do you specifically address in
2  terms of anatomic pathology or ovarian cancer
3  pathogenesis the question of talc and ovarian
4  cancer?
5      A.  I think that goes to the plausibility,
6  the mechanisms, as part of it.
7      Q.  And which particular mechanisms are
8  informed by the discipline of anatomic pathology
9  and gynecologic pathology?
10      A.  Well, I think pathologists, anatomical
11  and clinical pathologists, have training in
12  inflammation and immunology and certainly
13  epidemiology, looking at epidemiologic studies.
14  I think all of it is within the realm of
15  gynecologic pathology.
16      Q.  Did you discuss anywhere specifically
17  in your report the biology of foreign body
18  reactions and granulomas as a part of the
19  biologic plausibility for exposure?
20      A.  Let me refer to my report.  I
21  definitely talk about inflammation.  I can do a
22  word search for granulomas, if you would like.
23      Q.  Do you talk about inflammation --
24      MR. ROTMAN:  Would you like --
25      Q.  -- in the context of anatomic

52 (Pages 202 to 205)

Sarah E. Kane, M.D.

Page 206

1  pathology?
2      MR. ROTMAN: Would you like to do that?
3  Because I can get your report up electronically.
4      MS. AHERN: I know where she's
5  mentioned granulomas. I already know. I'm just
6  asking her if she knows.
7      MR. ROTMAN: So she wants to find it
8  quickly.
9      MS. AHERN: You can give her your
10  computer and let her search.
11     MR. ROTMAN: Okay. That's what I was
12  asking.
13  BY MS. AHERN:
14     Q. Do you cite any publications describing
15  the biology of granulomas?
16     A. I know some of the literature talks
17  about granulomatous inflammation, discusses
18  granulomatous inflammation.
19     MR. ROTMAN: If you want to search, do
20  you know how to do it on this computer? Edit,
21  Find, then you can type in a word that you want
22  to search.
23     MR. KLATT: Is there a question?
24     A. So I mention it in the animal studies,
25  injecting talc into the pleural spaces causes

Page 207

1  granulomatous response. It looks like those are
2  the two.
3      And then I cite the Mostafa 1985 paper,
4  "Foreign body granulomas in normal ovaries."
5  I'm double-checking. It looks like in doing
6  a word search for granuloma, that's what is
7  popping up.
8  BY MS. AHERN:
9      Q. Okay. Are there any other portions of
10  your report that directly address ovarian cancer
11  pathogenesis from a pathology standpoint?
12     MR. ROTMAN: Objection.
13     A. This might be attorney work product
14  draft stuff.
15     MR. ROTMAN: Do you want to talk to me
16  outside where I can understand what you're
17  getting at?
18     THE WITNESS: Sure. Sure.
19     THE VIDEOGRAPHER: Off the record,
20  2:50 p.m.
21     (A recess was taken.)
22     THE VIDEOGRAPHER: Back on the record,
23  2:54 p.m.
24  BY MS. AHERN:
25     Q. Okay. Doctor, I had asked: "Are there

Page 208

1  any other portions of your report that directly
2  address ovarian cancer pathogenesis from a
3  pathology standpoint," and --
4      A. So my answer is I did the work, but I
5  can't discuss it because of attorney work product
6  issues.
7      Q. Okay.
8      MR. ROTMAN: You can -- she can -- you
9  can ask her questions about it.
10     MS. AHERN: Sure.
11     MR. ROTMAN: But she's -- as to what is
12  in the report or not in the report, that's the
13  work product piece.
14     MS. AHERN: That's kind of all the
15  questions.
16     MR. ROTMAN: Ask her about the science.
17     MS. AHERN: I'll ask, and you can
18  object.
19     MR. KLATT: Find out what is in or is
20  not in the report.
21     MS. AHERN: Let's pick up the
22  foundation here.
23  BY MS. AHERN:
24     Q. Doctor, first of all, you said you did
25  the work relating to ovarian cancer pathogenesis

Page 209

1  from a pathology standpoint; correct?
2      A. Yes.
3      Q. Was it ever in your report?
4      MR. ROTMAN: That's part of the work
5  product objection.
6      MR. KLATT: We've got to establish the
7  facts to know whether there's a basis to assert
8  the objection.
9      MR. ROTMAN: You can ask the question.
10  But in order to answer the question, you're
11  invading the domain of what is protected under
12  the Federal Rules in terms of the drafting of
13  expert reports.
14     I will object and instruct her not to
15  answer.
16     What's in the report, you have. What
17  was in drafts of the report, you're not entitled
18  to.
19     So that's the problem we have.
20     MR. KLATT: She's not asking what was
21  in the report. She's asking whether it was or
22  isn't. So we can establish if there's anything
23  to even have a dispute about.
24     MR. ROTMAN: You can ask her about what
25  is in the report all you want.

53 (Pages 206 to 209)

Sarah E. Kane, M.D.

| Page 210 | Page 212 |
|---|---|

**Page 210**

1    MS. AHERN: Well, she's already said
2  there was a section on ovarian cancer
3  pathogenesis from a pathology standpoint in the
4  report, and it was removed; correct?
5    MR. TISI: That's not what she
6  testified.
7    MS. AHERN: Read back.
8    MR. TISI: Why don't we read what she
9  said because she said the answer is:
10    "ANSWER: I did the work, but I can't
11  discuss it because of attorney work product."
12    MS. AHERN: Okay. Okay.
13    MR. TISI: She never said it was in the
14  report.
15    MS. AHERN: Thank you.
16    MR. TISI: Line 48.
17  BY MS. AHERN:
18    Q.  When you say you "did the work," did
19  you take any notes on any reading that you did on
20  ovarian cancer pathogenesis?
21    A.  So in writing this report, I generally
22  did not take any notes, handwritten notes. It
23  was sort of a living document that I used.
24    Q.  Now, earlier, you referred several
25  times to taking notes as you were going through

**Page 211**

1  literature.
2    Are all those notes something that became --
3  on a single document that ultimately became a
4  report?
5    A.  It was one document that went through
6  numerous, numerous editing on my part and, of
7  course, suggestions from attorneys at different
8  points.
9    Q.  Now, as an anatomic pathologist and as
10  the only pathologist that has been designated by
11  the plaintiffs in this MDL, did you think it
12  was important to opine on the pathogenesis of
13  ovarian cancer from an anatomic pathology
14  standpoint?
15    MR. ROTMAN: Objection. For what
16  purpose?
17    MS. AHERN: I'm asking her.
18    Q.  Can you answer the question?
19    A.  First of all, I wasn't aware I was the
20  only pathologist because I didn't have a list of
21  their named experts.
22    I did work on -- I'm not sure how much I can
23  really talk about the whole draft process.
24    MR. ROTMAN: You can't --
25    Q.  So my question was: As an anatomic --

**Page 212**

1  let me rephrase it.
2    As a gynecologic pathologist who was asked
3  to opine on ovarian cancer and talc, did you
4  assume that part of your opinions would be to
5  incorporate your expertise in anatomic pathology
6  and gynecologic pathology?
7    MR. ROTMAN: Wait. Wait. Wait. Wait.
8  Wait.
9    MS. AHERN: I'm only concerned if she
10  understands the question.
11  BY MS. AHERN:
12    Q.  Do you understand the question?
13    MR. ROTMAN: No. You have to let me
14  see if I understand the question to see if I'm
15  going to object to it before she's allowed to
16  answer.
17    MS. AHERN: Why don't you make an
18  objection, and we'll move on.
19    MR. TISI: Because he may instruct her
20  not to answer the question.
21    MS. AHERN: This is not -- this is not
22  a question that should invade your privilege.
23    MR. TISI: It involves the discussion
24  between counsel and in the drafting of the
25  reports, what would be in, what would be out,

**Page 213**

1  what she thought, what she didn't think. You're
2  not entitled to any of that.
3    MR. ROTMAN: So if you can find the
4  question, read the question, and I will object to
5  the question, but you can answer it.
6    A.  Okay. So you want me to reread the
7  question?
8    MR. ROTMAN: To yourself.
9    So my question was -- do you see that?
10    THE WITNESS: Yeah.
11    A.  Well, I feel as if I did that in my
12  final report. I certainly -- the -- my opinions
13  that are in my final report are certainly within
14  the realm of gynecologic pathology.
15    Q.  And can you specifically point to the
16  opinions and the discussions in your report that
17  are within your personal expertise in gynecologic
18  pathology?
19    A.  So, again, review of epidemiology is
20  something that physicians do on a regular basis.
21  We're trained to look at epi data. We're trained
22  to practice evidence-based medicine, which has a
23  very similar, if not identical, methodology.
24    So -- and we certainly are trained in
25  inflammation, the immune system, talc and

54 (Pages 210 to 213)

Sarah E. Kane, M.D.

Page 214

1    tissue -- I have a section on talc and tissue --
2    the epi data.
3        Not -- I don't think any of this report is
4    outside of my -- I know that none of this is
5    outside of my expertise as a gynecologic
6    pathologist.
7        Q.   Okay.  Doctor, were you retained as an
8    expert epidemiologist in this case?
9        A.   I was retained as a gynecologic
10   pathologist.
11       Q.   And you are not an epidemiologist;
12   correct?
13       A.   I'm not a epidemiologist, but we
14   certainly review epidemiology and critique
15   epidemiology studies on a regular basis in our
16   daily practice.
17       Q.   When people ask you what you do for a
18   living, you don't tell them you're an
19   epidemiologist, do you?
20       A.   I often have to explain what a
21   pathologist is, so I spend half the time just
22   trying to describe what a pathologist is, so...
23           MR. KLATT:  Objection.  Nonresponsive.
24           MS. AHERN:  Yeah.
25           MR. ROTMAN:  She's not done answering

Page 215

1    your question.  She's in the middle of an answer.
2        A.   So my point is I'm unlikely to describe
3    myself as an epidemiologist when I'm trying to
4    describe what a pathologist does, but that's the
5    big picture.
6        But the real picture is, on a daily basis,
7    we are evaluating epidemiologic data in the
8    literature.
9    BY MS. AHERN:
10       Q.   When was the last time you did a
11   systematic review of the literature for the
12   purpose of opining on causation?
13       A.   So we review literature --
14       Q.   You.  I'm just talking about you.
15       A.   Hold on one second.  Let me just review
16   the question.  I'm way behind here on my --
17       Well, I do literature searches all the time
18   and looking -- when I'm looking at cases to
19   figure out causation.
20       I've been involved in one other legal case,
21   but it is -- this was the first medical-legal
22   general causation report.
23       But, again, this is all the same methodology
24   that we use in evidence-based medicine and our
25   practice.

Page 216

1        Q.   You do a full systematic review of the
2    literature, as that term is defined
3    epidemiologically?
4        A.   We certainly do when we're doing
5    research, when we're writing papers, but we still
6    do literature searches when we're assigning out
7    cases that are relevant to individual patients.
8        Q.   When was the last time you conducted a
9    full systematic review of the literature and a
10   Bradford Hill analysis to opine on causation?
11       A.   So, again, this is not something that's
12   completely foreign to me.  The legal aspect of it
13   is new to me, but this methodology is not new to
14   me.
15       The last time -- I mean, there was a tobacco
16   case that I worked on, but in my daily practice,
17   again, I'm still looking at epidemiology
18   literature all the time.
19       Q.   Well, there is a difference, Doctor,
20   wouldn't you agree, between looking at the
21   epidemiology to inform yourself about a
22   particular issue and doing a systematic review of
23   the literature and a full Bradford Hill analysis
24   to opine on causation?  Is there a difference?
25       A.   Well, this was a deep dive, so I'll say

Page 217

1    I was aware of the literature on talcum powder
2    and ovarian cancer before I became involved in
3    this litigation.
4        I will say, you know, it wasn't until they
5    asked me to form my opinion on this that I did a
6    deep dive on the literature again on this
7    particular issue.
8        Again, I've certainly done extensive
9    literature reviews before to, you know -- in
10   research and in practice.
11       Q.   But nothing like this?
12       A.   It's very similar.
13           MR. ROTMAN:  Objection.
14       A.   The methodology is very similar to
15   this.  It's identical.
16       Q.   Doctor, can you point me to -- take a
17   look at Exhibit 2, your CV.
18       Can you point me to something in your CV
19   that demonstrates some specialized knowledge or
20   expertise in epidemiology?  A course, a class
21   you've taught?  A paper that you've published?  A
22   case-control study you've been involved in?
23   Anything that would indicate that you have
24   specialized expertise in epidemiology?
25       A.   It's part of our medical training as

55 (Pages 214 to 217)

Sarah E. Kane, M.D.

Page 218

1  part of evidence-based medicine.
2      I'm trying to find my CV. I'm not sure I
3  have it in front of me. Maybe it's under here.
4  Well, you're sitting in -- I mean, all of these
5  involved epidemiology research.
6      MR. ROTMAN: All of what?
7      A. I'm sorry. All of these research
8  projects start with -- the pathology publications
9  start with looking at the literature of
10  epidemiology.
11     Q. Which ones are you pointing to --
12  sorry. Let's look at the peer-reviewed
13  publications.
14     Is that what you're talking about?
15     A. Yes. Sorry.
16     Q. So the first publication is Narasimhan,
17  "Temperature Induced Interstrand Crosslinks in
18  Cisplatin-DNA Adducts Detected by Electrophoresis
19  and UV Spectrophotometer."
20     That's not an epi study, is it?
21     A. Some of these were biology. The one
22  that comes to mind when I'm looking at this list
23  is the "Yersinia pestis and the plague." That
24  was a review article. That was around -- that
25  was after the 2001 mailings of the pattern

Page 219

1  substance. And so the literature was very
2  interested in Yersinia pestis at the time, and so
3  I did a review article on that.
4      Q. Was that a systematic review and a
5  Bradford Hill analysis?
6      A. The Bradford Hill analysis is part of
7  evidence-based medicine when you're coming to a
8  conclusion. So --
9      Q. This isn't a case-control study or a
10  prospective cohort study --
11     MR. ROTMAN: You're not allowing her to
12  finish her answer.
13     Q. -- or epidemiology study, is it?
14     A. But my general causation opinion is
15  very similar to a review article on causation.
16  It's a review of the epi data and mechanisms.
17     Q. Did you do a full review of the epi
18  data and mechanisms on Yersinian plague?
19     It's kind of a done deal; right? We already
20  know that; isn't that right?
21     A. Well, you're still looking at -- you're
22  still looking at data. The question is -- the
23  question was at the time: Can Yersinia pestis be
24  a dangerous weapon of destruction or
25  terrorist-type agent?

Page 220

1      So that was sort of more the review on that.
2      Q. Who is S.M. Rollins?
3      A. That's my ex-husband.
4      Q. What is his specialty?
5      A. He's a microbiologist.
6      Q. What about Ryan?
7      A. He is an infectious disease physician.
8      Q. Okay. What portion of "Yersinia pestis
9  and the plague" did you draft or did you
10  contribute?
11     A. I drafted the entire -- I was the lead
12  author, and I -- the primary author, and I
13  drafted that report.
14     Q. Okay. So if we go in there, we're
15  going to find you used statistical methods or
16  analysis in any way to weigh the evidence and
17  conduct a systematic review?
18     A. It's definitely a review article. Off
19  the top of my head, I don't know if I did a
20  statistical analysis, but...
21     Q. Would you describe it as more of a
22  narrative review of the literature?
23     A. A review of the literature. I don't
24  know about the word "narrative," but review.
25     Q. What about the Grundy paper,

Page 221

1  "Specificity of tRNA-mRNA Interactions in
2  Bacillus substilis tyrS Antitermination"?
3      Is that an epi study?
4      A. No.
5      Q. What about the Rollins paper,
6  "Diagnostic yield of muscle biopsy in patients
7  with clinical evidence of mitochondrial
8  cytopathy"?
9      Is that an epidemiologic article?
10     A. No. That's not an epidemiology
11  article, but we --
12     Q. Sorry?
13     A. It's getting late in the day.
14     MR. TISI: Do you need some water?
15     THE WITNESS: Sure.
16     A. But it's interesting that it actually
17  did involve electron microscopy. And when we do
18  muscle biopsies for mitochondrial cytopathy, we
19  use electron microscopy anyway, regularly.
20     MR. KLATT: Objection. Nonresponsive.
21     Q. And what about the Rollins
22  "Autoimplants and serous borderline tumors of the
23  ovary: A clinicopathologic study of 30 cases and
24  a process to be distinguished from serous
25  adenocarcinoma"?

56 (Pages 218 to 221)

Sarah E. Kane, M.D.

Page 222

1    Was that a systematic review of the
2  literature, or an epidemiologic study?
3    A.  There's definitely review of literature
4  as part of that study because the question arises
5  with autoimplants, sometimes they're misdiagnosed
6  as invasive serous.
7    So there is definitely literature review for
8  that study.
9    Q.  This would be described as you have it
10  in the title, this is a clinicopathologic study?
11    A.  Correct.
12    Q.  So you were looking at this as a
13  pathologist; correct?
14    A.  Well, I'm looking at -- I mean, some of
15  these were before I was -- the first couple are
16  before I was an M.D., but all of the subsequent
17  ones I'm looking at as a pathologist.
18    Q.  What about the Chan study,
19  "Clinicopathologic Correlation of Fetal Vessel
20  Thrombosis in Mono- and Dichorionic Twin
21  Placentas"?
22    Is that an epidemiologic study?
23    A.  That's a clinicopathologic correlation.
24    Q.  And then the publication with Jonathan
25  Hecht, "Endometrial Interepithelial Neoplasia,"

Page 223

1  is that an epidemiology study?
2    A.  That was a review of a new terminology
3  in endometrial precursor lesions.  So that was a
4  pathologic -- an anatomic pathology article.
5    Q.  And then you have the one with Haspel,
6  which is "Successful Implementation of a
7  Longitudinal, Integrated Pathology Curriculum
8  During the Third Year of Medical School"?
9    A.  That was a medical-education-type
10  article.
11    Q.  Okay.  And do you have any proceedings
12  of meetings, poster presentations, that were from
13  a case-control or a cohort study that you
14  conducted?
15    A.  Let me look.  I don't believe these
16  poster presentations were case -- well, I mean,
17  case-control or cohort epi-type studies.
18    Q.  Okay.  And, Doctor, to be fair, you
19  don't have a degree in epidemiology; correct?
20    A.  I do not have a degree.  But, again,
21  it's -- epidemiology is a very big part of
22  evidence-based medicine and what we practice as
23  M.D.s.
24    MR. KLATT:  Objection.  Nonresponsive.
25    Q.  And, Doctor, you understand that there

Page 224

1  are degreed epidemiologists who have been
2  designated on behalf of plaintiffs to look at
3  these issues; correct?
4    A.  I'm aware of that now.  I didn't know
5  who their list was before I submitted my report.
6    Q.  You've never published -- as we just
7  looked through here -- an epidemiologic study, a
8  case-control study, or a cohort study?
9    A.  I have not published; but, again, that
10  doesn't -- I mean, it doesn't mean I haven't done
11  them.  It's just that --
12    Q.  Have you done them?
13    A.  They haven't been published.  Well,
14  again, literature reviews of epidemiology is part
15  of our regular practice.
16    Q.  I'm asking about, like, actual study
17  designs.
18    Have you conducted a case-control or a
19  cohort study?
20    A.  Not of an epi- --
21    Q.  Okay.
22    A.  -- specific design.
23    Q.  Have you ever taught an epidemiology
24  course?
25    A.  No.

Page 225

1    Q.  Do you have any grant funding to
2  conduct epidemiologic observational studies?
3    A.  No.
4    Q.  Have you ever given any lectures or
5  presentations specifically on epidemiology
6  methodologies?
7    A.  That's possible.  I'm trying to think.
8  It's been a long time.  Medical school through
9  residency, fellowship, not that I can think of
10  off the top of my head.
11    Q.  Okay.  And have you ever designed a
12  clinical trial?
13    A.  I have not designed a clinical trial.
14    Q.  Have you designed a case-control study?
15    A.  I have not designed a case-control
16  study.
17    Q.  Have you designed a cohort study?
18    A.  I have not designed a cohort study;
19  but, again, these are -- we can critically
20  evaluate.  Just because I haven't designed one
21  doesn't mean I can't critically evaluate
22  case-control studies or cohort studies.
23    Q.  Doctor, you haven't conducted a
24  meta-analysis or a pooled analysis to evaluate
25  potential risk factors for any disease, have you?

57 (Pages 222 to 225)

Sarah E. Kane, M.D.

Page 226

1      A.  No, I haven't.
2      Q.  Are you qualified to conduct a
3   meta-analysis or a pooled analysis?
4      A.  I'm -- I'm sure I could develop one.
5      Q.  As we sit here today, are you qualified
6   to conduct a meta-analysis or a pooled analysis?
7      A.  If it was sort of a joint venture, I'm
8   sure; but, again, that doesn't mean that I can't
9   critically evaluate them, because that's what I
10  do on a daily basis.
11     Q.  Have you authored any paper or
12  conducted a study -- well, have you authored any
13  paper on the methods of causal interpretation?
14     A.  Have I authored a paper on the methods
15  of causal interpretation?
16     I don't believe I've authored.  It would be
17  on my list.
18     Q.  Okay.  Doctor, I should have asked you
19  this when it was in front of you:  Do you have a
20  copy of that one-page additional materials?
21     A.  Probably.  Let's see.
22     Q.  Thank you.  Maybe I have.  Maybe I have
23  it too.
24     A.  Exhibit 17?
25     Q.  Yes.  Yes.

Page 227

1      You received a copy of the Longo
2   supplemental report; correct?
3      A.  I did.  Yes.
4      Q.  And it's, what, 404 pages?
5      A.  That's possible.  I don't think I
6   looked.
7      Q.  That was my next question:  Did you
8   review it?
9      A.  I did review it.  I did skim a lot of
10  it because, again, it was additional information
11  that was nice to have, but it was after my
12  report.
13     And, again, my general causation opinion is
14  not dependent on asbestos being in the product.
15  My general causation opinion is based on whatever
16  is in the bottle.  So it was interesting
17  information to have.
18     Q.  So your opinions here, it doesn't
19  matter for your opinions whether or not there's
20  asbestos in talcum powder products; is that your
21  testimony?
22     A.  What I'm saying is my opinion is based
23  on whatever is in the talcum powder product's
24  bottle.  Now, it's up to the jury to decide if
25  there's asbestos in it.  However, if there is

Page 228

1   asbestos in it, that would certainly add to the
2   plausibility of causation.
3      Q.  If there was not asbestos in talcum
4   powder products and there was not fragrance in
5   talcum powder products and you were just left
6   with the pharmaceutical-grade talc, what would
7   your biologic plausibility argument be?
8      MR. ROTMAN:  Objection.
9      Q.  In other words, what is your mechanism
10  by which pharmaceutical-grade talc would cause
11  ovarian cancer?
12     MR. ROTMAN:  Objection.  Are you asking
13  about causation or about biological plausibility?
14     MS. AHERN:  I'm asking --
15     MR. ROTMAN:  You mixed them.
16     MS. AHERN:  -- about her mechanism.
17  BY MS. AHERN:
18     Q.  What is your mechanism by which
19  pharmaceutical-grade talc would cause ovarian
20  cancer?
21     A.  So there are -- again, most of the
22  studies are dealing with talc powder products.
23  If we were to say that all that was in there is
24  pharmaceutical -- it's completely hypothetical
25  because I don't know what's in there -- I still

Page 229

1   think the mechanisms would be similar where, you
2   know, there's evidence that talc can cause
3   inflammation, and we know that inflammation is a
4   cause of cancer.
5      And so I -- and there's also, you know,
6   Dr. Cramer talked about anti-MUC-1 antibodies, so
7   there's an immune -- plausible immune mechanism,
8   so I think all of those are still on the table
9   and the hypothetical situation that it's only
10  pharmaceutical-grade talc in that bottle.
11     But, again, I -- I'm not opining about what
12  is in the bottle; I'm just opining about that --
13  whatever that product is in that bottle causing
14  ovarian cancer.
15     Q.  Okay.  Let's take a look at your expert
16  report again, Exhibit 14, if you will.
17     Just let me know when you've got it.
18     A.  Yeah.
19     Q.  Okay.  Doctor, does Exhibit 14, your
20  November 15, 2018, expert report, contain all of
21  the opinions that you intend to offer as a
22  witness in this matter?
23     A.  I wouldn't box myself in that way.
24  There might be questions that I'm asked here
25  today or in trial that aren't necessarily in my

58 (Pages 226 to 229)

Sarah E. Kane, M.D.

Page 230

1  report.
2      Q.  Okay.  But the opinions that you intend
3  to offer, absent somebody asking you to offer
4  other opinions, are all outlined or contained
5  within Exhibit 14, your report; is that correct?
6      A.  Again, I wouldn't want to say "all."  I
7  wouldn't want to limit myself.  There's always
8  the possibility that something else will come up,
9  and I even have a thing that additional
10  information may come up.
11      Q.  Okay.  As we sit here today, do you
12  understand that this is our opportunity to ask
13  you about the opinions in your report, and we
14  have the day to do it?
15      Do you understand that?
16      A.  I understand.
17      Q.  Okay.  So to the extent that you think
18  you're going to offer additional opinions or
19  different opinions, we need to know that today.
20      I understand that if something comes up two
21  weeks from now and it's additional information,
22  you might supplement your report.
23      But as of today, as we sit here today, is
24  this report an accurate reflection of the
25  opinions that you have formed and that you intend

Page 231

1  to offer in this case?
2      A.  I would say it's an accurate reflection
3  of the opinions I have formed with the exception
4  of anything that might be asked that is not in
5  the report; but yes.
6      Q.  All right.  All right.
7      And as we sit here today, is your report
8  complete?
9      A.  Well, it's signed and turned in, so --
10      Q.  Do you, as the expert designated in
11  this case, Sarah Kane, do you consider your
12  report to be complete as we sit here today?
13      A.  Yes.
14      MR. ROTMAN:  Off the record.
15      (Discussion off the record.)
16      THE VIDEOGRAPHER:  Off the record,
17  3:24 p.m.
18      (A recess was taken.)
19      THE VIDEOGRAPHER:  Here begins Media
20  No. 5 in today's deposition of Sarah Kane, M.D.
21  Back on the record, 3:39 p.m.
22  BY MS. AHERN:
23      Q.  Okay.  Dr. Kane, we were talking about
24  your report.  Just some basic housekeeping first.
25      We have the four boxes back here which

Page 232

1  probably have within them all the references to
2  your report.  Other than those and what you
3  brought with you today, is there anything else
4  related to your work on your report that you have
5  in your possession that you haven't been able to
6  bring with you today?
7      A.  Not that I'm aware of.  I've tried to
8  be very complete in my list of what I reviewed.
9  It's possible -- again, it's possible there are a
10  couple of things that might have been left off,
11  but I tried to be as complete as possible.
12      Q.  Okay.  And you mentioned earlier you
13  had done some work on the pathogenesis of ovarian
14  cancer.
15      Did you have any articles or publications
16  that are related to that work that are not
17  referenced in your report?
18      A.  I believe they should be in the list.
19  They should be included in the list that you
20  have.
21      Q.  The one from -- your initial report?
22      A.  Taken all together.  Taken all
23  together.  So that, probably, is more -- the
24  January 4th one would probably be some of those.
25      And then I can't remember what's on that one

Page 233

1  that you just got, but if there's a couple on
2  there.
3      But I would think if they weren't cited in
4  the report, the majority of those should be in
5  the January 4th list.
6      Q.  Okay.  And those would pertain to the
7  various histologic categorizations of ovarian
8  cancer; what is known about etiology.
9      Is that kind of the gist of the information
10  that you researched?
11      A.  Yes.  Yes.  That was certainly part of
12  it.
13      Q.  And were there other parts to that?
14      THE WITNESS:  Is that -- I don't know
15  if --
16      MR. ROTMAN:  Yeah.  You can say what
17  work you did.
18      A.  There was -- so a good bit of it was
19  sort of background information on the pathologic
20  diagnosis of ovarian cancer and different, as you
21  said, different subtypes.
22      There was -- I'm trying to remember -- it
23  was so long ago -- what some of the -- I believe
24  there was a little bit more on inflammation, but
25  I can't say for sure.

Sarah E. Kane, M.D.

Page 234

1  BY MS. AHERN:
2      Q.  And would that have been just related
3  to ovarian cancer pathogenesis?
4      A.  Yes.  Yes.
5      Q.  And you think that all of the
6  publications that you found, identified, reviewed
7  in relation to that work are identified in one of
8  the lists or across several lists?
9      A.  I'm hoping that across all of the
10  lists, that encompasses the vast majority, if not
11  all.  But let's just keep it at vast majority.
12      And, of course, you know, I'm a gynecologic
13  pathologist, so I read tons of other stuff that,
14  you know, is just my background knowledge that
15  I'm not going to put on these lists.  So I can't
16  say it's all-inclusive; but, again, I tried.
17      Q.  Understood.  Understood.
18      And you've now seen at least one report from
19  Dr. Robert Kurman; correct?
20      A.  That's correct.  That was an individual
21  causation report, though.  So...
22      Q.  And he had a very large background
23  section on ovarian cancer pathogenesis; correct?
24      A.  To be honest with you, I sort of
25  skimmed it, but I do remember seeing a section on

Page 235

1  that.  Yes.
2      Q.  Okay.  Did you skim the section that
3  was case-specific?
4      A.  No.  Mostly the background since I
5  already know that stuff.
6      Q.  Okay.  And is the stuff that was in his
7  background section similar to the research that
8  you did?
9      A.  I would say yes.  If I am remembering
10  accurately, it was similar.  I wouldn't say
11  identical, but similar.
12      Q.  Okay.  And did anyone other than your
13  attorneys assist you in preparing the report?
14      A.  No.
15      Q.  And you said earlier, I think, that you
16  didn't consult with any of the other experts in
17  the MDL litigation in forming your opinions or
18  preparing your report?
19      A.  That's correct.
20      Q.  And you didn't review any draft reports
21  from any other experts in this litigation?
22      A.  No.  The only time I saw their reports
23  was after we had all turned them in to the court.
24      Q.  Okay.  And are all of the words, the
25  ideas, the analysis that's contained in

Page 236

1  Exhibit 14, your expert report, are they solely
2  the product of your own work?
3      A.  Yes.  I wrote the report.  Certainly,
4  again, there were drafts that went back and
5  forth.  There may have been suggestions from
6  attorneys where language was -- that I accepted
7  into my report; but yes.
8      Q.  Okay.  You didn't borrow language from
9  other experts or from other publications and then
10  not quote that in your report?
11      A.  I certainly tried not to.  No.  I
12  certainly cited anything that I -- I tried to
13  cite everything that I referenced --
14      Q.  Okay.
15      A.  -- to the best of my ability.
16      You know, again, I was taking the notes as I
17  wrote, so it's plausible there might be
18  something, but I was very cognizant of trying not
19  to -- trying to cite everything that I was
20  referencing.
21      Q.  And in reaching your opinions, was it
22  important to you that you review the data in a
23  fair and objective way?
24      A.  Yes.  I think it's always important to
25  review data in a fair and objective way.

Page 237

1      Q.  I know.  It's kind of a basic question.
2      When you were doing your literature reviews
3  and searches, were you looking both for papers or
4  data that supported talc and ovarian cancer
5  connection as well as for data and literature
6  that did not or that -- well, that did not
7  support?
8      A.  When I was doing my literature search,
9  I was looking for any data that spoke to talcum
10  powder products and ovarian cancer.  I was really
11  trying to cast as wide a net as possible to get
12  as much data as I could.
13      Now, certainly, there are limitations when
14  you're doing searches.  It's possible there are
15  studies that I missed; but when I was retrieving
16  studies, reading them, I would also reference
17  their references as a sort of cross-check.  So I
18  tried to be as complete as I could.
19      Q.  So when you were reading someone else's
20  work and they referenced an article as the basis
21  for synthesis or the statement in their paper,
22  did you then go and review the underlying
23  reference as well?
24      A.  Yes.  I pulled up those references.
25      Q.  Okay.  And you reviewed those as well?

60 (Pages 234 to 237)

Sarah E. Kane, M.D.

Page 238

1   A. Yes.
2   Q. Okay. And you mentioned on Page 4 of
3   your report that your interest in talc and
4   ovarian cancer began during your training, your
5   fellowship training, at Mass General; is that
6   right?
7   A. I became aware of it. I mean, both
8   Dr. Scully and Dr. Bell were still there at my
9   time of training, and Dr. Scully was a coauthor
10  on Cramer's first 1982 paper.
11  And then Dr. Bell was a coauthor in one of
12  the subsequent -- I think his 1992 paper with
13  Harlow.
14  So I was certainly aware of literature on
15  talcum powder and ovarian cancer.
16  Q. And neither one of them published
17  anything else on talc; is that correct?
18  A. I believe those were the only two that
19  they were on. That's correct.
20  Q. And did you understand that the role
21  that Dr. Scully played on Dr. Cramer's first
22  publication was simply that of pathologist and
23  determining or confirming the diagnosis of the
24  samples that were being studied?
25  A. I was aware that he did a pathologic

Page 239

1   review of the case.
2   Q. Okay. Did you ever have an opportunity
3   to talk to Dr. Scully about talc and ovarian
4   cancer?
5   A. I believe my conversations were -- my
6   memory is -- this is 20 years ago now -- it's
7   possible, but probably with Dr. Bell, more. I
8   interacted more with Dr. Bell than Dr. Scully.
9   Dr. Scully was semiretired at the time. He
10  would come in for half the day, but that was
11  usually when I was with other attendings. But I
12  did spend a significant time with Dr. Bell, and I
13  do remember being aware of that literature.
14  Now, if you're going to ask me the specific
15  conversation, I probably can't prompt that at the
16  moment.
17  I was also, when I was at Beth Israel
18  Deaconess, my colleague Jonathan Hecht is there.
19  And I was aware he was doing work on the Nurses'
20  Health Study.
21  We didn't -- I can't remember if we really
22  talked about talc at that point because the Gates
23  2010 paper that he was doing, talc was a very
24  small -- it was almost, like, a side comment in
25  that report. But I think we had talked about --

Page 240

1   I know we talked about the Nurses' Health Study.
2   That's funny, though, I actually did talk --
3   I saw Jonathan last night, so it's kind of funny
4   timing. But anyway...
5   Q. Have you talked to Dr. Hecht since
6   then, since you first discussed with him the
7   Nurses' Health Study?
8   Have you spoken with him on talc and ovarian
9   cancer?
10  A. Yes. I saw him last night. We went
11  out for a drink.
12  Q. Did he give you any opinions on what he
13  thought about talc and ovarian cancer?
14  A. He told me that he had met with defense
15  counsel at one point; did not want to do medical
16  expert witness work but did a brief sort of
17  intro, I guess, overview for the defense.
18  Q. Did he tell you what his personal or
19  his professional opinion was on whether or not
20  talc causes ovarian cancer?
21  A. Yes. He thought that -- so I'll say in
22  my report, I did not spend a lot of time on
23  migration because in the gynecologic world, it's
24  widely accepted that migration happens. He told
25  me that he specifically told the defense counsel

Page 241

1   he met with not to use migration because it's
2   widely accepted that it occurs.
3   We did talk about the Nurses' Health paper.
4   He said that the data set was very small, it was
5   very difficult with classification, and that
6   that -- there just really wasn't a lot of data in
7   that 2010 study.
8   And he thinks that it is plausible for
9   talcum powder to cause ovarian cancer.
10  Q. Have you spoken to any other
11  pathologist or colleagues about talc and ovarian
12  cancer?
13  A. I have talked to my coworkers about it
14  because -- as a conflict-of-interest notification
15  for our group and for our hospital, Partners
16  Healthcare, and I discussed my findings with my
17  partners.
18  And I've also talked about it at
19  multidisciplinary conferences; recently at, for
20  example, at a thoracic conference. There were
21  gyn oncs there and radiologists and rad onc
22  people there.
23  Q. And you talked to them specifically
24  about talc and ovarian cancer?
25  A. So I told them about my work on it and

61 (Pages 238 to 241)

Sarah E. Kane, M.D.

Page 242

1   the research that I had done, and I was asking
2   them -- it was a thoracic conference, so I was
3   curious if any of them had asked any of their
4   mesothelioma patients that didn't have
5   nonasbestos exposure if they've ever asked them
6   if they'd had talc exposure.
7       And they said no, they hadn't really done
8   it, they hadn't thought about it, but maybe it
9   was something that they should be asking.
10      Q.   And, by the way, what were the
11  circumstances under which you and Dr. Hecht had
12  dinner the other night?
13      A.   His birthday is coming up.  We're still
14  friends, so it was one of these -- I actually
15  stayed in a hotel last night because it took me
16  an hour and a half to drive from Topsfield
17  yesterday morning, and I didn't want to be
18  worried about traffic.  So I decided to stay in a
19  hotel last night.  His birthday is coming up, so
20  I said, "Let's just grab a drink."
21      Q.   You mentioned while you were at Mass
22  General, the fellowship director for your program
23  was Robert Young; correct?
24      A.   Yes.
25      Q.   Is he someone that you look up to as a

Page 243

1   pathologist?
2       A.   Yes.  He's very well-respected.
3       Q.   By the way, who do you send second
4   opinion consults to when you have a difficult
5   case?
6       A.   We have a relationship with Mass
7   General, so I'll occasionally send -- if I need
8   another set of eyes on, I'll send it to either --
9   it's sort of their gyn pathology group in
10  general, so it might be Dr. Young.  It might be
11  Esther Oliva.  Those are the two that I would say
12  most frequently would receive any consults from
13  our group for gyn path.
14      Q.   Have you ever spoken with Dr. Young
15  about talc and ovarian cancer?
16      A.   It's possible.  I haven't recently.  He
17  and I aren't in regular communication, so I
18  certainly wouldn't have talked to him -- I don't
19  know if I've talked to him since starting this.
20      It's more of a professional-type
21  relationship, so I don't know if it would have
22  come up recently.  But it's possible in training,
23  but I don't remember specifically.
24      Q.   And Robin Young inherited all of
25  Dr. Scully's case files in his office when

Page 244

1   Dr. Scully retired; is that right?
2       A.   Yes.  He inherited his consult service.
3   So it's a separate service from our regular
4   clinical work.  So it's pathologists from all
5   over the country or even world that have
6   difficult cases, they will send as a specific
7   private consult to -- it was Dr. Scully, and now
8   it's Dr. Young.
9       Q.   Okay.  When you were first contacted by
10  the plaintiffs' counsel back in 2017, what were
11  your opinions regarding talc and ovarian cancer
12  at that point?
13      A.   First contacted?  When I was first
14  contacted, I was aware of the literature,
15  certainly.  I hadn't come to a strong opinion one
16  way or the other.  In fact, I'd probably say I
17  was aware that the epi data had been relatively
18  consistent.  That was kind of all I knew about it
19  until I did my sort of deep dive into the
20  literature for my general causation opinion.
21      Q.   So as a pathologist, you never had a
22  particular interest in pursuing additional
23  research in the area --
24          MR. ROTMAN:  Objection.
25      Q.   -- of talc and ovarian cancer?

Page 245

1       A.   Well, there's certainly a lot of things
2   to study in gynecologic pathology.  And so I
3   hadn't decided to take that -- to do that study
4   at the time that I was contacted by counsel.
5   That's not to say I never would have or I never
6   would have thought about it, but I hadn't at the
7   time.
8       Q.   Okay.  In your report on Page 4, you
9   say that you've maintained a professional
10  interest -- "since your fellowship, you've
11  maintained a professional interest and have
12  continued to monitor developments in the science
13  regarding talcum powder exposure and ovarian
14  cancer, and it has been the subject of
15  professional discussions predating the
16  litigation."
17      So what sort of professional discussions
18  about talc and ovarian cancer did you have before
19  the plaintiffs retained you?
20      A.   So, again, I was aware of the
21  literature.  And I knew -- I saw some of the
22  newer epi data come out.  I had had conversations
23  with Dr. Bell that I remember specifically;
24  again, with Jonathan.  I knew he was working on
25  that Nurses' Health.  We certainly talked about

Sarah E. Kane, M.D.

Page 246

1    that study at some point.
2        But, you know, I was certainly aware of the
3    literature as it came out.
4        Q.  And you call it a "professional
5    interest."
6        Did you take -- other than just reviewing
7    the literature, did you do anything
8    professionally to either advance your knowledge
9    or other people's knowledge about this potential
10   association?
11       A.  Not -- I mean, not at the time.  I
12   think "professional interest" in my mind, you
13   know, means being aware of what's going on in the
14   literature.  Again, that doesn't necessarily mean
15   an in-depth review of everything but being
16   generally aware of it.
17       Q.  Would you say that since you first
18   learned about this in your fellowship and were
19   interested in the topic, did it influence the way
20   you looked at gynecologic cases as a professional
21   pathologist?
22       A.  Yeah.  It's not really routine practice
23   to use polarized light microscopy in gynecologic
24   pathology.  It's just -- we use it more commonly
25   for breast cases, so...

Page 247

1        And also, you know, even if we found
2    birefringent particles and granulomas or -- in
3    the tissue, it wouldn't necessarily mean that
4    they're talc unless you do subsequent studies.
5    So I wouldn't say it changed my daily
6    practice in diagnosing tumors.
7        Q.  Okay.  Doctor, if you can turn to
8    Page 4 and 5 of your report.
9        Is this where you set out a summary of your
10   opinions?
11       A.  Yes.  This is.
12       Q.  Under Heading 2, Page 4, "General
13   causation opinions."
14       A.  Okay.
15       Q.  And you list, it looks like, five
16   specific opinions; is that correct?
17       A.  I see where you are.  Yes.
18       Q.  And are those -- again, are those all
19   the opinions that you have that you intend to
20   offer in this case?
21       MR. ROTMAN:  Objection.
22       A.  Same answer as before.  Again, there
23   might be something that comes up today or at
24   trial that I'm asked that I, you know, didn't put
25   in this report.  But I tried to be as -- complete

Page 248

1    in the report.
2        Q.  Okay.  And the first opinion is that
3    talc can migrate to the ovaries through the
4    genital tract through the lymphatic system and
5    through inhalation.
6        Is that an accurate summary of your first
7    opinion or set of opinions?
8        (reading from document)
9        A.  Yes.  The talcum powder products can
10   reach the ovaries; that they can be transported
11   through the lymphatic system; and there is
12   evidence that it can be inhaled as well with
13   transport to the ovaries.
14       Q.  And the second opinion in the case or
15   second set of opinions is that talc causes
16   chronic inflammation in the ovaries, causes
17   increased oxidative stress in the ovaries, and
18   causes immunosuppression.
19       Is that an accurate summary of your
20   mechanism?
21       A.  Well, if you're going to read it word
22   for word, it's "Once reaching the ovaries, talcum
23   powder products can cause chronic inflammation,
24   can increase oxidative stress, and can reduce
25   immune response.  These are biologically

Page 249

1    plausible and likely mechanisms for ovarian
2    cancer development and progression."
3        Q.  Okay.  When you say "reduce the immune
4    response," is that essentially discussing, like,
5    an immunosuppressive effect?
6        A.  That's referencing the MUC-1 antibody
7    paper that Cramer published in 2005.
8        Q.  Are you aware that Dr. Cramer himself
9    has disclaimed that theory as a "hypothesis
10   that's not ready for prime time"?  I believe
11   those were his words, "prime time."
12       A.  I don't know where you saw those words.
13       Q.  His testimony in the litigation.
14       A.  Okay.  I don't believe I saw his
15   testimony in the litigation.  But, again, it's
16   not -- I'm not seeing it as something that needs
17   to be proven.  I'm looking at it as a
18   plausibility that, you know, it's a plausible
19   mechanism.  If it's not proven, it doesn't really
20   change the fact that it's plausible.
21       Q.  So are you building -- so is your
22   plausibility opinion independent of whether or
23   not the basis for that opinion is proven?
24       MR. ROTMAN:  Objection.
25       Q.  In other words, are you -- do you have

Sarah E. Kane, M.D.

Page 250

1  a plausibility opinion that's based on a bunch of
2  other potential or plausible mechanisms?
3      MR. ROTMAN:  Objection.
4      A.  Right.
5      MR. ROTMAN:  I just objected, but you
6  can answer.  If you can understand the question,
7  you can answer it.
8      A.  Well, I think -- I think they're all
9  somewhat interrelated.
10     I think there's the chronic inflammation.
11 There's the immune response.  Those are plausible
12 mechanisms for ovarian cancer.
13     And the Bradford Hill guidelines, you don't
14 have to prove -- prove mechanism in order to have
15 causation.  We have plenty of -- again, plenty of
16 examples of that in prior diseases, like smoking
17 and lung cancer.  And even certain drugs, they
18 don't know the mechanism of action, very common
19 drugs like lithium, for example, or metformin.
20     So you don't need to prove mechanism in
21 order for it to be an important part of a
22 causation because it's part of the plausibility
23 component.
24     Q.  Do any of the bases on which you -- any
25 of the bases that you use to support plausibility

Page 251

1  for talc and ovarian cancer, do any of them have
2  to be proven or established?
3      MR. ROTMAN:  Objection.
4      A.  I think it's important to have evidence
5  to support it.  There may be evidence that
6  refutes it as well, but you're sort of looking
7  at -- you're balancing the weight of it.
8      And the plausibility, a plausible mechanism,
9  now, is that always going to be probable or
10 definite?  No.  It's plausible.
11     In this case, I think it's a compelling
12 mechanism, chronic inflammation, because, again,
13 we know that talcum powder can reach the ovaries,
14 and we know that it can cause chronic
15 inflammation, and we know chronic inflammation is
16 implicated in cancer.
17     So I think it's a high degree of
18 plausibility in that case.
19     Q.  So when you mention that you know that
20 talc can reach the ovaries, are you referring to,
21 for example, the Heller study?
22     A.  So Heller found talc in women's
23 ovaries.  Yes.  Cramer found talc in pelvic lymph
24 nodes.  We have other animal and human studies of
25 talc or particulates similar in size to talc

Page 252

1  reaching the ovaries.
2      So -- and, again, it's widely accepted in
3  the gynecologic community that migration occurs.
4  In fact, endometriosis, we really -- the evidence
5  is that endometriosis is caused by retrograde
6  menstruation of endometrium.
7      So there's a substantial amount of evidence
8  and widely accepted that migration occurs.
9      And I'm aware of studies that didn't find
10 migration, but I think, you know, those few
11 negative studies don't cancel out the positive
12 studies.
13     And, you know, certainly, looking for
14 migrated particles is very difficult.  You know,
15 again, we're talking about dose.  How much do you
16 inject to get there?
17     And so I think the positive studies are
18 compelling, and it's widely accepted that
19 migration occurs.
20     (Article entitled "Presence of
21 Talc in Pelvic Lymph Nodes of a Woman with
22 Ovarian Cancer and Long-Term Genital
23 Exposure to Cosmetic Talc" marked Exhibit
24 19.)
25

Page 253

1  BY MS. AHERN:
2      Q.  Doctor, I'm handing you what's been
3  marked as Exhibit 19 to your deposition.
4      A.  Okay.
5      MR. TISI:  Thank you.
6      MS. AHERN:  You're welcome.
7      Q.  Exhibit 19 is an article drafted by
8  Dr. Dan Cramer, the "Presence of talc in pelvic
9  lymph nodes of a woman with ovarian cancer and
10 long-term genital exposure to cosmetic talc."
11     Is this a paper that you were referring to a
12 few minutes ago?
13     A.  The 2005, yes.
14     Q.  This is 2007.
15     A.  I'm sorry.  Did I say 2005?  Yes.  This
16 is the paper, anyway.
17     Q.  And the authors are Dan Cramer and Bill
18 Welch, Ross Berkowitz, and John Godleski.
19     Do you see that?
20     A.  Yes.
21     Q.  And three of those individuals have
22 been disclosed as plaintiffs' experts in the talc
23 litigation.
24     Were you aware of that?
25     A.  I was not aware of Bill Welch.  I knew

64 (Pages 250 to 253)

Sarah E. Kane, M.D.

Page 254

1  after -- at some point, I was aware that
2  Dr. Cramer and Dr. Godleski was. I don't believe
3  I was aware of that at the beginning of my
4  research, but I became aware of that. Yes.
5      Q.  Okay. Are you aware that Dr. Welch has
6  been designated in maybe three cases and given
7  testimony in those cases?
8      A.  Again, I was not aware that Bill Welch
9  had been retained.
10      Q.  Are you aware that Dr. Welch has run
11  the pathology portion of Dr. Cramer's study
12  program for 40 years?
13      A.  I'm aware who Dr. Welch is, and I've
14  certainly seen his name on papers. But now
15  his -- his role in these studies specifically, I
16  don't know if I can speak to other than he's
17  involved.
18      Q.  He's testified that his only role was
19  in identifying the types of tumors involved in
20  the study to keep people honest.
21      Are you aware that Dr. Welch has repeatedly
22  refused to give -- refused to give a causation
23  opinion like you're giving today?
24      A.  I'm not aware of Dr. Welch's opinions.
25  I didn't know that he was an expert, so I

Page 255

1  wouldn't have reviewed any of that testimony.
2      Q.  Okay. You weren't provided with any of
3  his testimony or his reports in the litigation?
4      A.  No. I was not aware that he was a
5  medical expert witness.
6      Q.  Okay. Do you see under the
7  "Background" section here, it says, "Although
8  epidemiologic studies suggest talc may increase
9  ovarian cancer risk, there is no proof that talc
10  used externally reaches the pelvis"?
11      A.  That's what it says.
12      Q.  Are then if you look down in the -- I'm
13  sorry. I'm sorry.
14      If you look down in the first paragraph, he
15  mentions, "An epidemiologic association between
16  the use of cosmetic talc and genital hygiene and
17  ovarian cancer was first described in 1982."
18      That's Cramer citing Cramer; isn't it?
19      A.  Let's see. Let me double-check. I'm
20  assuming because it's 1982. But let me
21  double-check. Or -- yeah. It's 1999. He's
22  referencing his 1999 paper.
23      Q.  And he says, "And the many subsequent
24  studies found talc use to increase the risk for
25  ovarian cancer."

Page 256

1      A.  I'm sorry. Where are you now?
2      Q.  Same sentence. He just finishes it
3  with "Many subsequent studies found --
4      A.  Okay.
5      Q.  -- "talc use to increase the risk for
6  ovarian cancer."
7      But he just cites himself again from 1982;
8  correct?
9      A.  Sorry?
10      Q.  The only cite he provides for that
11  statement is his own study from 1982?
12      A.  Oh, the one -- the No. 1?
13      Q.  Mm-hmm.
14      A.  Yes. That's his 1999, it says. 1999.
15      Q.  Okay. Sorry about that. You're right.
16      And then he says, "However, the causality of
17  the relationship has been challenged for several
18  reasons."
19      Do you see that?
20      A.  I do.
21      Q.  And he says, "First, the association is
22  a relatively weak one; i.e., summary relative
23  risk of approximately 1.3."
24      Do you agree that a summary relative risk of
25  1.3 is a weak association?

Page 257

1      A.  I've seen "weak" or "moderate" used to
2  describe a 1.3, but that doesn't mean it's not a
3  significant one, especially in a rare disease
4  like ovarian cancer.
5          MS. AHERN: Objection to the
6  nonresponsive portion.
7      Q.  But I agree it's been described as
8  "weak," at least here by Dr. Cramer?
9      A.  That's -- the sentence says, "First,
10  the association is a relatively weak one; i.e.,
11  summary relative risk of approximately 1.3."
12      Q.  And he says, "Second, there's no clear
13  increase in risk with duration of use."
14      Do you agree with that, as of 2007, there
15  was no clear dose-response in the studies that
16  looked at talc and ovarian cancer?
17      A.  I think there was evidence of a
18  dose-response by 2007.
19      Q.  So do you disagree with Dr. Cramer's
20  statement in the 2007 publication that as of that
21  time, there was no clear increase in risk with
22  duration of use in most studies?
23      A.  I wouldn't necessarily phrase it that
24  way: There's no clear increased risk. I think,
25  again, there isn't a lot of data, but what data

65 (Pages 254 to 257)

Sarah E. Kane, M.D.

## Page 258

1  there was -- I believe at that time, I'm trying
2  to think if I was in 2007 -- would be evidence
3  that there was a dose-response.
4      Q.  And which papers, prior to 2007, did
5  they find dose-response that was clear?
6      A.  I would have to look back.
7      Okay.  So I tried to do this in chronologic
8  order.
9      Q.  What page are you on?
10     A.  I'm looking at 16.
11     Q.  Page 16 of Exhibit 14?
12     A.  Yes.
13     Q.  Okay.  Were --
14     A.  I'm just trying to refresh my memory.
15     So Harlow's -- let's see -- 1992 study was,
16  it looks like, the first one that I have listed
17  that had a dose-response -- evaluated for
18  dose-response.
19     They both -- let's see.  The confidence
20  intervals all included the null.  Life- -- so
21  what I wrote here -- this is Page 18 -- "lifetime
22  application ORs when compared to control women
23  with no perineal talc exposure were 1.3, 4 less
24  than 1,000, with a confidence interval of 0.7 to
25  2.7; 1.5 for 1,000 to 10,000 with a confidence

## Page 259

1  interval of 0.9 to 2.4; and 1.8 for greater than
2  10,000 with the confidence interval of 1.0 to
3  3.0.
4      And then I also -- yeah.  So that's after
5  2007, the Terry and the Lou studies.
6      Q.  You're looking at Harlow 1992?
7      A.  Yes.  That's the paragraph I'm looking
8  at.
9      Q.  And Harlow 1992 found a
10  nonstatistically significant increased risk; is
11  that correct?
12     A.  So the confidence intervals included
13  the null.  So, yeah, it was not statistically
14  significant.  I'm not sure -- I don't have the
15  numbers here, though, of how many they had
16  dose-response data on, which would -- which might
17  increase the interval.
18     In fact, if you look at the confidence
19  intervals, they're pretty wide, trending toward
20  higher.
21     Q.  What are the confidence intervals
22  you're looking at?
23     A.  For less than 1,000 lifetime
24  applications, we're looking at 0.7 to 2.7.
25     For 1,000 to 10,000, we're looking at 0.9 to

## Page 260

1  2.4.
2      And for greater than 10,000, we're looking
3  at 1.0 to 3.0.
4      Q.  And when they just adjusted -- when
5  they excluded -- when they looked at lifetime
6  talc applications and ovarian cancer after
7  excluding use following hysterectomy or tubal
8  ligation, they found no evidence of an
9  exposure-response relationship, didn't they?
10     A.  Are you looking at the actual paper?
11     Q.  Do you need it?
12     A.  If you're asking me questions about it.
13     Q.  Yeah.  That wasn't in your report -- or
14  is it?
15     MR. ROTMAN:  What is the "it" referring
16  to?
17     Q.  That particular finding is not in her
18  report on dose-response from Harlow in 1992?
19     A.  Well, yeah.  Let me look at the --
20     MS. AHERN:  Sure.
21     (Article entitled "Perineal
22  Exposure to Talc and Ovarian Cancer Risk"
23  marked Exhibit 20.)
24     MS. AHERN:  I'll mark as Exhibit 20 to
25  your deposition "Perineal Exposure to Talc and

## Page 261

1  Ovarian Cancer Risk" by Harlow, 1992.  That's my
2  only copy.  Sorry.
3      MR. ROTMAN:  Exhibit 20.
4      A.  Okay.  So, I'm sorry, where are you
5  looking?
6      Q.  Let me find it.  Take your time, if you
7  need to.  I'm trying to find my copy.
8      Okay.  If you look at Table 3, "Estimated
9  total lifetime perineal applications of talc
10  containing powders and cases and controls."
11     A.  Okay.  I see Table 3.
12     MR. ROTMAN:  Is there a question?
13     MS. AHERN:  She asked to see the study.
14  I asked her to confirm that once they excluded
15  cases after hysterectomy or tubal ligation, there
16  was no exposure-response relationship.
17     A.  These look to be similar -- oh, I see.
18  Okay.  Total applications.
19     Well, if you actually look at the numbers,
20  the ones above, which are, I believe, what I
21  quoted in my report, so under "Total
22  applications."
23     And then you're asking me about applications
24  excluding use after hysterectomy or tubal
25  ligation?

Sarah E. Kane, M.D.

Page 262

1    BY MS. AHERN:
2        Q.   Mm-hmm.
3        A.   What was your question about it?  I'm
4    sorry.
5        Q.   There's no statistically significant
6    dose-response relationship with lifetime
7    application?
8        A.   So the confidence intervals are
9    somewhat similar, but -- are somewhat similar, it
10   looks like, to the top.
11       Q.   There's no statistically significant
12   dose-response relationship, is there?
13       A.   They all include the null.  That's
14   correct.  But, again, they're trending high.
15       Q.   But if they include the null, then it's
16   consistent with the null hypothesis that there's
17   no association; isn't that true?
18           MR. ROTMAN:  Objection.
19       A.   It's possible.  The null hypothesis is
20   included in "Possibilities."
21       Q.   It also basically means you can't
22   exclude chance as a reason for the findings;
23   correct?
24       A.   Again, it's possible.  I would say it's
25   trending higher, but it does include the null

Page 263

1    hypothesis.
2        Q.   Do you see on Page 25, in the first
3    column on the left-hand side, the first full
4    paragraph, "In our analysis"?
5        Okay.  The authors say, "In our analysis, we
6    first calculated all genital applications of talc
7    based on frequency and years of use.  As a
8    continuous variable in a multivariate model, no
9    significant dose-response was observed between
10   total genital applications of talc and ovarian
11   cancer risk"; correct?
12       A.   That's what it says.
13       Q.   And the reason they excluded
14   hysterectomy and tubal ligation is the next
15   sentence, "because the translocation theory
16   assumes an open genital tract, we then excluded
17   application after tubal ligation or hysterectomy
18   but observed no appreciable change in the
19   dose-response."
20       In other words, still no significant
21   dose-response; correct?
22       A.   That's what it says.
23       Q.   So the authors interpreted both the
24   data you cite in your report as well as the data
25   you didn't cite in your report as showing no

Page 264

1    dose-response?
2        A.   Well, I state in my report what the
3    confidence intervals are.  So certainly, I'm
4    showing that it did include the null hypothesis.
5    But I think it's still -- just because it's not
6    statistically significant, I think it's still
7    data, and I wouldn't completely discount it.
8        But it does -- does contain the null.  The
9    numbers weren't super high, if I remember.  But
10   on their -- I'll have to find it.
11       On -- in their abstract conclusion, they
12   still say that "The greatest ovarian cancer risk
13   associated with perineal talc use was observed in
14   the subgroup of women estimated to have made more
15   than 10,000 applications during years when they
16   were ovulating and had an intact genital tract
17   with the OR of 2.8 and a statistically
18   significant confidence interval of 1.4 to 5.4.
19   However, this exposure was found in only
20   14 percent of the women with ovarian cancer."
21       Q.   Okay.  But we were just asking -- you
22   mentioned the study as support for a
23   dose-response relationship in your report?
24       A.   As evidence of a dose -- a
25   dose-response; again, with the caveat, which is

Page 265

1    here, that it includes the null hypothesis.
2        Q.   Okay.  And what about Cramer in 1999?
3           MR. ROTMAN:  Objection.  I don't think
4    that's a question.
5           MS. AHERN:  Fair point.
6    BY MS. AHERN:
7        Q.   In Cramer 1999, you've also cited as
8    evidence after dose-response, correct, on Page 35
9    of your report?
10       A.   I see that.  Yes.  It's listed in a
11   reference list.
12       Q.   And the authors, including Cramer,
13   basically say they "failed to demonstrate
14   consistent dose-response relationships with
15   measures of intensity of exposure."
16          MR. ROTMAN:  Do you have -- do you have
17   the paper?
18          MS. AHERN:  Do you want the paper?
19          MR. TISI:  Is that the one you
20   identified before?
21          MS. AHERN:  No.  This is a new one.
22          MR. ROTMAN:  She's getting the paper
23   out.
24          MS. AHERN:  I thought I had it too.
25   Maybe it's in one of the boxes.  Let me see if I

67 (Pages 262 to 265)

Sarah E. Kane, M.D.

Page 266

1  can find my own copy.
2       Okay.  Sorry.  This is the only copy I
3  have right now.
4       THE WITNESS:  Okay.
5       MS. AHERN:  We can mark it, if you
6  want.
7  BY MS. AHERN:
8       Q.  It's a copy of the Cramer 1999
9  publication that you cited in your report in
10  support of dose-response.
11       MR. TISI:  Are you marking it?
12       THE COURT:  I can if you want me to.  I
13  just didn't want to mark my copy.
14       MR. KLATT:  I don't think I do.
15       MS. AHERN:  That's all right.  I don't.
16  We'll mark Cramer -- oops, no, we won't because
17  this is the wrong study.  Sorry.  The old "wrong
18  study" trick.
19       THE WITNESS:  I can't find that
20  information.  Oh, I've got the wrong reference.
21  Sorry.  All righty.
22       (Article entitled "Genital Talc
23       Exposure and Risk of Ovarian Cancer" marked
24       Exhibit 21.)
25

Page 267

1  BY MS. AHERN:
2       Q.  Okay.  So, Doctor, this is Exhibit 21,
3  which is "Genital Talc Exposure and Risk of
4  Ovarian Cancer," Dan Cramer, 1999.
5       A.  Okay.
6       Q.  This is something else.
7       Can you find -- I don't have it in front of
8  me, so I'm going to rely on you to find the
9  tables that show their dose-response analysis.
10       MR. ROTMAN:  You made that Exhibit 21?
11       MS. AHERN:  Yes.
12       MR. TISI:  It's 21.  Yes.
13       THE WITNESS:  Would that be Table 2,
14  what you're referring to (indicating)?
15  BY MS. AHERN:
16       Q.  I believe the numbers were -- they were
17  looked at in terms of zero years' duration, less
18  than 20, 20 to 30, and greater than 30.
19       Do you see that on there?
20       A.  I'm looking.  This one says "less
21  than -- frequency of use."
22       Q.  There's a frequency and a duration.
23       A.  Okay.
24       Q.  Yeah.
25       A.  Sorry.  Why am I not seeing it?  It's

Page 268

1  in the table.  Let me see.
2       Q.  I think so.  If you want to go to --
3       A.  Oh.
4       Q.  You got it.
5       A.  Yes.  I see it now.  Sorry.  It was
6  buried in Table 3, very small print.  Okay.  Yes.
7  So Table 3, years of use.  Yup.
8       Q.  Do you see they're not showing a
9  statistically significant dose-response
10  relationship?
11       A.  So for less than 20 years, the
12  confidence intervals were 1.16 to 3; at 20 and 30
13  and greater than 30, they did -- the confidence
14  intervals did include the null.
15       But, again, I don't know how many -- I can't
16  remember.  Oh, here are the cases.
17       Yeah.  So there are 55, less than 20 cases;
18  thirty-two 20 to 30; and 59 greater than 30.
19       Q.  And you see also the frequency
20  analysis?  It also did not find a significant
21  dose-response relationship as a statistically
22  significant dose-response relationship?
23       A.  Yes.  For less than 30 years, the
24  adjusted OR was 2.21 with a confidence interval
25  of 1.37 to 3.56.

Page 269

1       The 30 to 39 was adjusted OR of 1.17 with
2  confidence intervals .78 to 1.76.
3       And the 40-plus adjusted OR was 1.57 with
4  confidence intervals of 0.8 to 3.10.
5       Q.  So not only did the point estimate go
6  down with more use, but the higher the
7  concentration, there was also no statistical
8  significance; correct?
9       A.  Yeah.  I mean, the numbers -- so the
10  only one that doesn't include the null -- let me
11  just double-check.
12       Actually, there are two.  So the less than
13  20 years or less than 30 per month are
14  statistically significant.
15       Q.  It's only the first dose category in
16  each group --
17       A.  Yeah.
18       Q.  -- shows statistical significance.
19       And as the doses got higher, the exposure
20  frequency got higher, the point estimates went
21  down and statistical significance went away;
22  correct?
23       A.  The confidence intervals did include
24  the null.  And I think this illustrates how
25  difficult sort of dose and frequency can be to

68 (Pages 266 to 269)

Sarah E. Kane, M.D.

Page 270

1  study because we don't really know what the doses
2  are, and we don't really have granularity as far
3  as frequency of use. Well, I have to look at --
4      Q.  These are studies that you cited in
5  your report as evidence of a dose-response,
6  correct, the Harlow and the Cramer papers? You
7  both cited yourself.
8      Did you evaluate the internal validity of
9  those studies and critically evaluate the methods
10  and study populations when you included them in
11  your report?
12      A.  Let me -- well, I said -- this is the
13  sentence -- "Most have found an increased risk of
14  ovarian cancer with increased exposure." So,
15  yet, when studies have evaluated duration of
16  frequency of perineal talc use.
17      So this list is the studies that evaluated
18  duration and frequency of perineal talc use. And
19  I said, "Most have found an increased risk." So
20  what I'm citing here are the studies that looked
21  at duration and frequency.
22      Q.  Okay. And we were referring to
23  Cramer's 2007 publication where he himself says
24  that the association has been challenged because
25  it's weak and because there's no clear increase

Page 271

1  in risk with duration of use.
2      And you didn't agree with that statement,
3  and you referred me to Harlow 1992; correct?
4      A.  I was going to where I mentioned the
5  dose-response studies.
6      Q.  Okay. Just to button up and finish up
7  with Cramer 1999, if you look at Page 355, the
8  authors included, "They failed to demonstrate
9  consistent dose-response relationships with
10  measures of intensity of exposure."
11      Do you see that?
12      A.  I'm sorry. Where are you?
13      Q.  On Page 355.
14      A.  Okay. I'm seeing "in attempting" --
15  sorry. I see, "Most talc and ovarian cancer
16  studies that have addressed dose-response,
17  including this one, have failed to demonstrate
18  consistent dose-response relationships with
19  measures of the intensity of the exposure,
20  especially when the trend is examined among users
21  only. In attempting to address this weakness, we
22  point out that it is difficult to quantify the
23  amount of powder actually used and degree of
24  perineal dusting that might constitute an
25  application of talc," quote/unquote around

Page 272

1  "application of talc."
2      "Another factor that may affect the
3  dose-response relationship is whether use
4  occurred at a time when the female tract was
5  open. There is evidence from several studies
6  that the talc/ovarian cancer association is
7  modified by closure of the female tract as a
8  result of tubal ligation or hysterectomy.
9      Q.  Doctor, did they say they didn't find a
10  dose-response relationship?
11      A.  I'm trying to find what they said other
12  than that on Page 355.
13      Yeah. They said, "Studies that have
14  dose-response, including this one, have failed to
15  demonstrate consistent dose-response
16  relationships."
17      But it goes on to qualify with the
18  difficulty of measuring dose and frequency, which
19  is what I described earlier.
20      Q.  Mm-hmm.
21      (Article entitled "Perineal Talc
22  Exposure and Epithelial Ovarian Cancer Risk
23  in the Central Valley of California" marked
24  Exhibit 22.)
25

Page 273

1  BY MS. AHERN:
2      Q.  Okay. The next one -- are you done,
3  sorry, with that one?
4      A.  If we're moving on, sure.
5      Q.  If you're done.
6      The next one you mention, you cite in your
7  report for dose-response is Mills 2004, which I'm
8  handing you now marked as Exhibit 22.
9      Oh, yeah. We'll leave that here for right
10  now.
11      A.  Okay.
12      MR. ROTMAN:  Can I see the one you just
13  finished with?
14      MR. TISI:  This is 22; right?
15      MS. AHERN:  Yes, sir.
16  BY MS. AHERN:
17      Q.  And this one, you're welcome to read
18  through it if you want. All I wanted to point
19  out is if you look right up front in the
20  abstract, a little more than midway down, they
21  say, "The odds ratio for ever use of talc was
22  1.37 with the confidence interval of 1.02 to 1.85
23  compared to never users. However, no
24  dose-response association was found."
25      Do you see that?

69 (Pages 270 to 273)

Sarah E. Kane, M.D.

| Page 274 | Page 276 |
|---|---|

**Page 274**

1  A. I see where it says that.
2  Q. And if you want to look through there
3  and convince yourself of that, go for it. I
4  think the table that we're looking at is Table 2
5  on Page 460.
6  A. Yeah. The 4 to 12 years had an OR of
7  1.86 that was statistically significant at 1.16
8  to 2.98. But the others, which were never --
9  which, of course, is the null, 4 to 12 years,
10  which -- oh, the 13 to 30 was adjusted OR of
11  1.45, confidence interval .9 to 2.32.
12  And then the greater than 30 years was OR of
13  1.22 with confidence interval of .72 and 2.08.
14  So the 13 to 30 and the greater than 30 includes
15  the null.
16  And then if we look at frequency, cumulative
17  use, frequency types duration, there was a
18  statistically significant increase with second
19  quartile and third quartile divisions. But then
20  it dropped in the fourth quartile, the highest
21  exposure.
22  And, you know, again, sort of difficulty in
23  measuring this. But you do see an increase in
24  the second and third quartile, between the second
25  and third, that was statistically significant.

**Page 275**

1  And then --
2  Q. But the authors themselves interpret
3  their data as no dose-response association;
4  correct?
5  A. In the abstract, that's what they
6  state. I'm trying to figure out what their --
7  what they said. They must have said a little bit
8  more.
9  Q. Doctor, you reviewed this study before;
10  right?
11  A. I did. Yes.
12  Q. Okay.
13  A. I'm just refreshing my memory.
14  Q. Okay. If you look at Page 463.
15  MR. ROTMAN: Are you changing the
16  topic?
17  MS. AHERN: No. Same topic.
18  MR. ROTMAN: She was looking for
19  something as part of a prior answer.
20  BY MS. AHERN:
21  Q. As part of your prior answer that there
22  was no dose-response?
23  A. As part of the answer that they stated
24  that in the abstract. I was trying to find out
25  where they had a discussion.

**Page 276**

1  Q. I was trying to point you a little bit
2  toward this. It's Page 463. There's some
3  discussion of it.
4  If you look at the third paragraph down, "As
5  in other studies, the present study did not find
6  a clear dose-response based on duration of use or
7  cumulative use."
8  And then it says, "Limiting the analysis of
9  dose-response to women who reported ever use of
10  talc did not affect the results, data not shown.
11  The lack of dose-response between talc use and
12  epithelial ovarian cancer may be explained by the
13  inability to quantify the actual amount of talc
14  used per application and the timing of the
15  application."
16  A. Yeah. So with that caveat.
17  Q. Well, the findings are what they are;
18  right?
19  The findings are no dose-response
20  relationship?
21  A. The findings are what they are. But,
22  again, it's not an easy -- there's not huge
23  numbers in these cases.
24  And, again, you still don't know from woman
25  to woman what one dose is, so there's a ton of

**Page 277**

1  variability. It's not like a cigarette, where,
2  you know, from one cigarette to the next or, you
3  know, a drug dose is probably a more accurate
4  analogy, you know.
5  Q. True. But just because it's difficult
6  to study, it doesn't mean if we could study it
7  better, we would get a positive result, does it?
8  A. I -- oh, my thing is not working. I
9  think I have to plug my thing in.
10  MR. ROTMAN: Can you?
11  COURT REPORTER: I'd have to break to
12  do it.
13  MR. ROTMAN: Let's go off the record.
14  THE VIDEOGRAPHER: Off the record.
15  4:37 p.m.
16  (A recess was taken.)
17  THE VIDEOGRAPHER: Back on the record,
18  4:44 p.m.
19  BY MS. AHERN:
20  Q. Okay. Doctor, you saw the Mills paper
21  in front of you?
22  A. Yes.
23  Q. Okay. Could you look at your report on
24  Page 21?
25  (Witness complies.)

70 (Pages 274 to 277)

Sarah E. Kane, M.D.

Page 278

1    A.  Okay.
2    Q.  Let's see, where is my copy?
3    And turn to Page 3 of the Mills publication.
4    A.  Page 3, which would be Page 460?
5    Q.  That's a good question.
6    Where is my Mills publication?
7        MS. AHERN:  Do you have it?
8        MR. TISI:  Sure.
9        MS. AHERN:  Thank you.
10   Oh, I know where it is.
11   BY MS. AHERN:
12   Q.  I'm sorry.  I thought I had the
13   specific passage marked.  And I do, somewhere in
14   here.  Okay.  Sorry.  It's on Page 460.  I
15   apologize.
16   A.  Okay.
17   Q.  All right.  Do you see on the Mills
18   publication on Page 460 that bottom paragraph on
19   the left, "ever use of talcum powder"?
20   A.  Yes.
21   Q.  And if you read down toward the bottom
22   part of that paragraph, on the fourth line from
23   the bottom, the sentence starts "Duration of
24   use."
25   A.  Okay.

Page 279

1    Q.  "Duration of use of talcum powder was
2    associated with increased risk, although the
3    pattern was also not clear-cut in that the point
4    estimate peaked among those reporting 4 to 12
5    years of use and declined somewhat among those
6    reporting longer duration of use."
7        Do you see that statement?
8    A.  I see that.  Yup.
9    Q.  And if you look at your report on
10   Page 21, the top paragraph, about midway, a
11   little -- well, a third of the way down, you pick
12   up with "Duration of use of talc was also
13   associated with increased risk, although the risk
14   peaked."
15       Do you see that statement?
16   A.  Yes.
17   Q.  If you compare those statements, are
18   they almost identical with the exception of the
19   statement by Mills that the pattern was not
20   clear-cut?
21   A.  They are similar.  This might have
22   been, like I described earlier, where, if I was
23   taking notes, some of the language might have
24   gotten incorporated, although I do have the
25   citation.

Page 280

1    Q.  Is there a reason that that entire
2    portion of your report is copied identically from
3    Mills except for the qualifier that the pattern
4    was not clear-cut for dose-response?
5    A.  Well, I think it still has the same
6    meaning.
7    Q.  Without the qualifier?
8    A.  I think the qualifier is in the -- in
9    the data.
10   Q.  Okay.
11   A.  I don't think I was -- I wasn't trying
12   to make it sound anything different than what it
13   was.  I think I was trying to report the data.
14   Q.  Okay.  All right.  And, Doctor, if you
15   turn to Page 10 of your report, the section on
16   inflammation.
17       Are you there?
18   A.  Yes.
19   Q.  You start on the second paragraph under
20   "Inflammation" discussing oxidative stress.
21   A.  Okay.
22   Q.  Okay.  Were you aware that a
23   significant amount of the section of your report
24   on oxidative stress is copied verbatim?  More
25   than 60 percent of it, I think, is copied

Page 281

1    verbatim from Dr. Saed's 2018 publication?
2    A.  Again, if the language is similar, it
3    was not an intentional.  I am citing him here, so
4    it's -- you know, it's clear that those are the
5    references.  Again, it might have been due to
6    note-taking, but the citation is clear.
7    Q.  Do you ever take verbatim language out
8    of another scientist's work and not set it off in
9    quotation marks in your professional work?
10   A.  I think I've cited the source here.
11   It's -- so it's not -- again, it's not like I was
12   intentionally copying his words.  It was, again,
13   probably an editing while I was taking notes, but
14   the citations are clear.
15   Q.  Is your -- is the underlying
16   understanding that you have related to oxidative
17   stress and inflammation drawn primarily from
18   Dr. Saed's work?
19   A.  No.  I mean, oxidative stress and
20   inflammation is something that we study -- that
21   I've studied.
22   Q.  Have you ever published a study on
23   oxidative stress or redox biology?
24   A.  I have not published on oxidative
25   stress.

71 (Pages 278 to 281)

Sarah E. Kane, M.D.

Page 282

1    Q.  What sort of work as a pathologist have
2  you done that incorporates redox biology?
3    A.  Well, again, this is part of our
4  medical training.  Certainly in training to be a
5  physician, that is something that we learn.  And,
6  you know, pathologists do quite frequently come
7  across inflammatory -- inflammation literature.
8    Q.  Are you -- is it your position that the
9  information in your report under "Inflammation"
10  that discusses oxidative stress and redox biology
11  is common knowledge among pathologists?
12    A.  That oxidative stress and inflammation,
13  yes.  I think -- yes.  I think that's widely
14  accepted.
15    Q.  The specific information contained on
16  Pages 10 and 11 of your report that was drawn
17  from Dr. Saed's work, is that information that is
18  common knowledge?
19    The specific enzymes that are discussed, the
20  research on these issues, is that specific
21  information there common knowledge?
22    A.  It's common knowledge that these types
23  of cancer are associated with inflammation, and
24  certainly oxidative stress is part of
25  inflammation.

Page 283

1    Q.  Was this common knowledge to you before
2  you reviewed Dr. Saed's 2018 publication?
3    A.  Yes.  I was just citing his report at
4  this point.
5    Q.  Are you aware you also cited his
6  underlying citations in the same spots that he
7  cited them?
8    A.  That's possible because I reviewed his
9  citations as I was reading his citations.
10    Q.  Did Dr. Saed give you permission to
11  copy his -- the language from his publication?
12    A.  I wouldn't characterize it as
13  "copying."  I think it may be similar language,
14  again, because I was writing as I was reading.
15  But I am certainly clearly citing his work and
16  the other citations.
17    Q.  Do you agree that Dr. Saed's 2018
18  paper is a compilation of his own synthesis and
19  review of the underlying articles that he
20  incorporated into his paper, and do you think
21  it's appropriate for you to just lift the
22  language from his paper and use the citations that he
23  found and synthesized and put it in your report
24  and not attribute it to him with quotation marks?
25    MR. ROTMAN:  Objection.

Page 284

1    A.  I did attribute -- I certainly cited
2  him in several places in this area.  And, again,
3  it was not an intentional copying.  Again, it
4  might have just happened with my editing, but I
5  certainly tried to cite everything that I was
6  looking at in the proper place.
7    But I do believe that it's common knowledge
8  that chronic inflammation can cause different
9  types of cancer.  This is not really new data.
10    Q.  Dr. Saed says that it's new data.
11    A.  In what respect, though?  If we're
12  talking about myeloperoxidase, yes.  But I'm
13  talking about oxidative stress and chronic
14  inflammation with known association with certain
15  types of cancer.
16    Q.  So it's your testimony that the
17  verbatim text that you used in the section from
18  Dr. Saed's 2018 paper was appropriately cited and
19  attributed to him?
20    MR. ROTMAN:  Objection.
21    A.  Again, I'm not sure it's absolutely
22  verbatim, but I certainly cited him in every
23  place that I was referencing.
24    Q.  Okay.  We'll just move on.
25    (Highlighted copy of Dr. Kane's

Page 285

1  expert report marked Exhibit 23.)
2  BY MS. AHERN:
3    Q.  Doctor, I've marked as Exhibit 23 to
4  your deposition a highlighted copy of your report
5  that shows the verbatim text that has been
6  carried over from various publications into your
7  report.
8    If you turn to Page 10 and 11, you'll see
9  that the highlighted portions are copied directly
10  from Dr. Saed's work.
11    MR. ROTMAN:  Do you have a copy for me
12  of this exhibit?
13    MS. AHERN:  Oh.  I do.  Sorry about
14  that.
15    MR. ROTMAN:  So we're at Page 10 and
16  11?
17    MS. AHERN:  That's just for the Saed
18  publication.  And there's one in there that Saed
19  was also on.
20    MR. ROTMAN:  Does she have the Saed
21  publication in front of her?
22    MS. AHERN:  I can find it for you.
23  BY MS. AHERN:
24    Q.  But my point is, are you aware that
25  that -- that there's a significant portion of

72 (Pages 282 to 285)

Sarah E. Kane, M.D.

| Page 286 | Page 288 |
|---|---|
| 1  that section of your report that is just | 1  biology and inflammation, are you? |
| 2  cut-and-pasted from Dr. Saed's work? | 2      A.  I am not currently participating in a |
| 3      A.  I don't believe -- again, it's -- it | 3  study of oxidative stress or redox biology. |
| 4  wasn't intentional with the citations, and it | 4      Q.  You don't have any funding related to |
| 5  could have happened with my note-taking or other | 5  oxidative stress and inflammation, do you? |
| 6  suggested input.  But, again, I cited -- I | 6      A.  No, I do not. |
| 7  certainly cited him in that section. | 7      Q.  Have you ever applied for any funding |
| 8      Q.  Okay. | 8  in that area? |
| 9      MR. TISI:  Did you mark that? | 9      A.  No.  I have not. |
| 10      MS. AHERN:  Hmm? | 10      Q.  Have you ever authored a systematic |
| 11      MR. TISI:  Did you mark that as an | 11  review of the literature on oxidative stress and |
| 12  exhibit? | 12  inflammation? |
| 13      MS. AHERN:  Yes.  I think it's 23. | 13      A.  Oxidative stress and inflammation, no. |
| 14  Sorry. | 14  I don't believe I have. |
| 15      MR. TISI:  That's okay. | 15      Q.  Have you ever authored a systematic |
| 16      MR. ROTMAN:  Do you have the Saed in | 16  review of the literature on oxidative stress and |
| 17  front of you? | 17  cancer? |
| 18  BY MS. AHERN: | 18      A.  No.  I have not authored a systematic |
| 19      Q.  I think it's -- it wasn't intentional | 19  review on that. |
| 20  is your testimony, and it's probably just a | 20      Q.  Okay.  Doctor, moving on to |
| 21  result of your note-taking process; is that | 21  inflammation and ovarian cancer. |
| 22  correct? | 22      Generally, on inflammation, can you cite to |
| 23      A.  Well, because I cited him specifically, | 23  a published experiment that was conducted in |
| 24  certainly it wasn't intentional to be verbatim. | 24  animals in vivo that establishes a role of any |
| 25  And I'm not sure exactly the process, but | 25  particular inflammatory cell or cytokine or |

| Page 287 | Page 289 |
|---|---|
| 1  certainly I'm citing him several times there. | 1  enzyme in tumor regenesis? |
| 2      Q.  Okay.  That's fine.  We'll just move | 2      A.  Oh.  Let me -- let me bring up my |
| 3  on. | 3  inflammation section.  Sorry.  I'm just |
| 4      And, Doctor, just to be clear, I understand | 4  refreshing myself as to what I stated in my |
| 5  your testimony is that it is common knowledge to | 5  report. |
| 6  pathologists that oxidative stress and | 6      Oh, this is low battery again.  I don't |
| 7  inflammation are related; correct? | 7  think this is plugged in. |
| 8      A.  Yes. | 8      MR. ROTMAN:  Can we take five minutes |
| 9      Q.  Okay.  But you are -- we're talking | 9  off the record? |
| 10  about oxidative stress and redox biology | 10      MS. AHERN:  Yes. |
| 11  specifically as a field of study or research. | 11      THE VIDEOGRAPHER:  Off the record, |
| 12      You're not an expert in that field of study | 12  5:02 p.m. |
| 13  or research, are you? | 13      (A recess was taken.) |
| 14      A.  I certainly have read literature in | 14      THE VIDEOGRAPHER:  Here begins Media |
| 15  that area. | 15  No. 6 in today's deposition of Sarah Kane, M.D. |
| 16      Q.  Does that make you an expert? | 16  Back on the record, 5:28 p.m. |
| 17      A.  I mean -- I mean, I'm familiar with | 17      (Article entitled "Talcum |
| 18  literature in the area.  That's -- that's my | 18  powder, chronic pelvic inflammation and |
| 19  answer. | 19  NSAIDs in relation to risk of epithelial |
| 20      Q.  Okay.  But you don't conduct studies in | 20  ovarian cancer" marked Exhibit 24.) |
| 21  oxidative stress and redox biology, do you? | 21  BY MS. AHERN: |
| 22      A.  I do not conduct studies in oxidative | 22      Q.  Dr. Kane, I'm marking what's been -- |
| 23  stress and redox biology. | 23  well, I'm marking Exhibit 24 to your deposition, |
| 24      Q.  You're not currently participating in a | 24  which is a copy of the Merritt 2008 publication. |
| 25  study looking at oxidative stress or redox | 25  And I'm sorry, I don't have an extra.  I'm going |

73 (Pages 286 to 289)

Sarah E. Kane, M.D.

Page 290

1  to share.
2      It's "Talcum powder, chronic pelvic
3  inflammatory -- sorry, chronic pelvic
4  inflammation and NSAIDs in relation to risk of
5  epithelial ovarian cancer."
6      And you cite Dr. Merritt's paper a couple of
7  times in your report; is that correct?
8      A.  I believe I cited it, yes.
9      Q.  I think you cite it as a statistically
10 significant positive talc study on Page 17 of
11 your report?
12     A.  Oh, let me get to that, if that's the
13 section I'm thinking of.
14     Q.  There are a couple of places?
15     A.  There was -- yes.  This happened in
16 editing.  I believe if this is -- so the sentence
17 ended up, it originally didn't have the
18 "statistically significant."  It was just, you
19 know, an odds ratio greater than one and listed.
20     And then I mistakenly didn't delete.  When I
21 changed it to "statistically significant," for
22 some reason -- I don't know if it happened in the
23 editing between additions or something -- somehow
24 I seem to remember deleting them.  But in the
25 final, they ended up all there.  So that was a --

Page 291

1      MR. ROTMAN:  What page was this?
2      A.  -- typographical error.
3      It's in there twice.  I noticed it after I
4  submitted it, and it was one of those --
5      Q.  Are you saying Merritt is not
6  statistically significant?
7      A.  So I know which -- again, I'd have -- I
8  have to go through.  It's been a long day, and
9  the names are starting to get all confused.
10     Q.  Yeah.
11     A.  But I know that that sentence, with
12 "all of those" at the end of that sentence, is
13 incorrect because I had changed -- I had meant to
14 list cumulatively the statistically significant
15 ones and ended up --
16     Q.  Okay.  So just to clarify for the
17 record, on Page 17, we're talking about the first
18 full paragraph that says, "In addition to the
19 Cramer 1982 study, numerous other case-control
20 studies addressing talc use and ovarian cancer
21 have shown statistically significant odds ratios
22 greater than one indicating talc use is
23 associated with an increased ovarian cancer
24 risk."
25     And then there's a string cite with a number

Page 292

1  of multiple publications.
2      A.  Right.
3      Q.  You're saying that some of those
4  publications shouldn't be in there because you
5  added "statistically significant" as a criteria
6  later?
7      A.  Exactly.
8      Q.  Okay.  That's actually not my question
9  about Merritt, but thank you.
10     A.  I knew that was going to come up --
11     Q.  That's okay.
12     A.  -- at some point.
13     Q.  While we're there, since we're sitting
14 here looking at this, so these are -- you listed
15 out case-control studies addressing talc, and
16 they're supposed to be those that have
17 statistically significant odds ratios; correct?
18     A.  That's correct.  That was the
19 intention.
20     Q.  And Gertig 2000 is there, and Houghton
21 2014 are there, and they're obviously cohort
22 studies?
23     A.  So, again, I think that somehow that
24 paragraph got all -- and I didn't catch it in the
25 final edits.

Page 293

1      Q.  Okay.
2      A.  I know that that was at least a
3  different paragraph at first, possibly two
4  paragraphs that got condensed.  And then somehow,
5  the references didn't get changed in the final.
6      Q.  Okay.  Do you happen to know -- and if
7  you don't it's okay -- but do you happen to know
8  which of these studies should be there and which
9  should be removed?
10     A.  Off -- I would want to look just to
11 make sure.
12     Q.  Okay.
13     A.  But I'm -- if I am -- I'd want to look
14 just to make sure, but I know there are some that
15 should not be there.
16     Q.  All right.  But looking at Merritt,
17 there are a couple of places where Merritt is
18 cited in your report.  One is Page 17 in that
19 paragraph we just looked at.  Another is Page 28
20 in Section -- the "Pooled study regarding talc
21 use and ovarian cancer" section.
22     It says some -- let's see, you're talking
23 about the advantages of pooled studies, and you
24 cited Merritt 2008.
25     A.  Okay.

74 (Pages 290 to 293)

Sarah E. Kane, M.D.

Page 294

1      Q.   And then on Page 35, Merritt is cited.
2  "Studies evaluating duration and frequency of
3  perineal use, most have found an increased risk
4  of ovarian cancer with increased exposure."
5      We already went through this paragraph
6  earlier --
7      A.   Yeah.  Yeah.
8      Q.   -- and discussed Merritt a little bit
9  in that context.
10        MR. ROTMAN:  Page 30 -- the last one
11  was Page 35?
12        MS. AHERN:  Thirty-five.  Yeah.  I
13  apologize.  We may not have discussed Merritt.
14  BY MS. AHERN:
15      Q.   But looking at Merritt now, you're
16  aware that Merritt looked specifically at
17  inflammatory conditions as part of their
18  exploration of the hypothesis that chronic
19  inflammation could lead to ovarian cancer; is
20  that right?
21      A.   Yes.  There was a component from what I
22  remember.
23      Q.   They say in the abstract that "Chronic
24  inflammation has been proposed as the possible
25  causal mechanism that explains the observed

Page 295

1  association between certain risk factors such as
2  the use of talcum powder or talc in the pelvic
3  region and epithelial ovarian cancer."
4      Do you see that?  It's in the abstract, the
5  first sentence?
6      A.   Yeah.  Okay.  The first sentence.
7      Q.   Okay.  They go on to say, "To address
8  the issue, we evaluated the potential role of
9  chronic local ovarian inflammation in the
10  development of the major subtypes of epithelial
11  ovarian cancer."
12      Do you see that?
13      A.   Yes.
14      Q.   Okay.  And just want to ask you:  They
15  conducted the study as a case-control study
16  looking at 2319 women with epithelial ovarian
17  cancer; correct?
18      A.   I don't remember the exact number, but
19  I will -- I will --
20      Q.   I think that's -- that's okay.
21      A.   I don't remember the exact number.
22      Q.   Okay.  So they looked at a number of
23  factors that are theoretically associated with
24  chronic inflammation, didn't they, including
25  pelvic inflammatory disease and talc use,

Page 296

1  endometriosis.
2      And do you see if you turn to -- I'm trying
3  to get through this quickly.  You're welcome to
4  point out anything you want, but I kind of want
5  to move us along.
6      A.   Okay.
7      Q.   If you look at the "Discussion"
8  section, I, unless I missed it, on Page 174, the
9  right-hand column, second full paragraph, they
10  note that "It has been hypothesized that talc is
11  linked to ovarian cancer development through
12  inflammation.  However, evidence linking an
13  inflammatory response with talc contamination of
14  the ovaries is lacking."
15      Do you agree or disagree with that statement
16  that evidence linking an inflammatory response
17  with talc contamination of the ovaries is
18  lacking?
19      A.   I don't know if I would phrase it that
20  way.  Have there been studies that have followed
21  talc from application up to the ovaries and
22  documenting an inflammatory response after talc?
23  No.  There's not going to be that study.
24      That would be -- I don't think you could do
25  that study today with talc being called by the

Page 297

1  IARC a possible carcinogen.  I don't think you
2  could design that study right now and do that in
3  women.
4      But, again, I think -- I think it's still a
5  highly compelling, plausible mechanism because we
6  know talc can cause inflammation, and
7  inflammation is associated with certain cancers,
8  including certain types of ovarian cancers.
9      So I don't know if I would state it that
10  way.
11      Q.   When you say inflammation is associated
12  with ovarian cancer, what studies are you
13  referring to?
14      A.   I'm referring to, for example, clear
15  cell carcinomas that have arisen from
16  endometriotic lesions that we've talked about
17  before.
18      Q.   And those cells are -- the originating
19  cells are thought to come from the endometrium
20  itself, the uterus; correct?
21      A.   I don't know if we know for sure.  I
22  mean, is it endometriosis that's in the ovary
23  causing chronic inflammation in the ovarian cells
24  that are causing the clear cell?  I don't know if
25  that's been completely delineated.

75 (Pages 294 to 297)

Sarah E. Kane, M.D.

Page 298

1       Q.   But there are markers that will
2  distinguish ovarian surface epithelial cells from
3  endometrioid cells which resemble endometrial
4  cells; correct?
5       A.   There are some stains that you can do.
6  But, again, I don't know if it's going to be --
7  been completely elucidated.
8       Q.   Are you aware of recent studies that
9  have demonstrated that there is some abnormality
10 in the endometrium of women who develop
11 endometriosis when compared to women who don't
12 develop endometriosis?
13      A.   I'm aware that retrograde migration of
14 the endometrium is thought to -- has been
15 associated with endometriosis. I don't know what
16 you mean by "abnormalities" of the -- you have to
17 be more specific. I can't --
18      Q.   I don't have the publication with me.
19 I was just asking if you were aware of those
20 studies.
21      A.   I probably read them at some point, but
22 off the top of my head, I'm not really sure
23 without knowing more specifically.
24      Q.   And would you agree that the studies,
25 though, that show a decreased risk of ovarian

Page 299

1  cancer for women who have tubal ligation are
2  studies -- well, are more highly associated with
3  endometrioid clear cell carcinomas than with
4  high-grade serous?
5       A.   With tubal ligation, off the top of my
6  head, I believe that's -- that that's the case.
7       But with salpingectomy, which removes the
8  fallopian tube fimbriae, there's -- that
9  decreases the risk of serous carcinomas.
10      Q.   To a lesser extent, then, the decrease
11 for clear cell and endometrioid, which some
12 people have suggested supports the retrograde
13 migration of endometrial cells into the abdominal
14 cavity?
15      A.   Some people have said that that
16 supports the retrograde migration of the
17 endometrial cells. That is correct.
18      Q.   And I got off topic. We're looking at
19 Merritt. Page 174, if you look, let's see --
20 here it is. Sorry. I apologize, on Page 175.
21      The very bottom of the summary paragraph, it
22 says, "The elevation in ovarian cancer risk
23 associated with use of talc in the perineal
24 region that we and others have observed has been
25 regarded as the main evidence supporting an

Page 300

1  inflammatory mechanism in the development of
2  epithelial ovarian cancer. However, experimental
3  evidence that perineal talc use elicits an
4  inflammatory response in the ovaries is lacking,
5  and overall, we conclude that chronic
6  inflammation does not play a major role in
7  development of ovarian cancer."
8       Is there a reason you didn't cite the
9  Merritt study in your report specifically when
10 discussing evidence of chronic inflammation and
11 ovarian cancer, a link between those two?
12      A.   In the places that I -- let me just
13 double-check. Places that I mention, was I
14 not -- I wasn't talking about inflammation. Is
15 that what you're --
16      Q.   Yes. You agree you cited Merritt in
17 several places in your report?
18      A.   Yes.
19      Q.   But you didn't cite anything about the
20 inflammation findings from Merritt.
21      A.   I'm not sure I can completely agree
22 with their conclusion. It's true we don't
23 have -- like I mentioned before, we don't have a
24 study that has looked at women who use talc,
25 follow it up, and then see chronic inflammation

Page 301

1  in the ovary.
2       But I think that's going to be -- again, we
3  don't know how long that chronic inflammation is
4  going to be there. We don't know what dose is
5  getting into the ovary.
6       I still think -- and, again, this is the
7  plausibility part of it -- I think there's still
8  compelling evidence that talc can cause an
9  inflammatory response that would explain the risk
10 of increased risk of ovarian cancer with talcum
11 powder products.
12      So, I mean, I certainly read this. It had
13 some good information in it. I don't think I was
14 purposely trying to leave out something that had
15 evidence. This was their opinion.
16      And I'm -- I don't know if I would phrase it
17 that way, the exact words that they use.
18      Q.   Well, if those are exactly their
19 findings here -- if you look at the top of the
20 summary paragraph, "In summary, most factors that
21 could potentially cause ovarian inflammation such
22 as pelvic inflammatory disease, HPV infection,
23 and postpubertal mumps were not associated with a
24 significant elevation in ovarian cancer risk in
25 our study. In addition, the expected corollary,

Sarah E. Kane, M.D.

Page 302

1  an inverse association with regular use of
2  anti-inflammatory medications, was also not
3  observed -- or was not observed."
4      A.  Yes.  Yeah.  Yeah.
5      Q.  They looked at multiple sources or
6  multiple causes of inflammation in the pelvic
7  region and did not find an association with the
8  risk of ovarian cancer, and they didn't find a
9  decreased risk in people that used
10  inflammatory -- anti-inflammatory medications.
11     A.  I think I mentioned --
12     Q.  So this is an inflammation study, isn't
13  it?
14     A.  Yeah.  I think I mentioned in -- about
15  NSAIDs that I might have cited them in that
16  section, that the evidence was not consistent
17  with NSAIDs, if I remember correctly.
18     I definitely looked at this paper when I was
19  looking at NSAID and aspirin use and certainly
20  inflammation as well.  So...
21     Q.  It's actually not cited anywhere with
22  NSAID use or regarding inflammation at all.
23     So maybe it was an earlier draft and was
24  removed at some point?
25     A.  It's possible.

Page 303

1      Q.  And you also -- you cite -- you do cite
2  some of the NSAID studies and aspirin studies,
3  but you leave out others.  You leave out Baandrup
4  2013, which was a negative study; Bonovas, 2005,
5  which was a negative study; Ni, 2012, which was a
6  negative study.
7      When you did your review of inflammation
8  including anti-inflammatory medications and the
9  risk of ovarian cancer, did you pull out more
10  studies in review than you actually included in
11  your report?
12     A.  Yes.  There are definitely more studies
13  than were cited in my report.
14     Q.  Is there a reason you didn't cite the
15  negative studies?
16     A.  I didn't intentionally leave out the
17  negative studies, but I do mention that the
18  evidence had been inconsistent with NSAID.
19     Q.  Okay.  And you mentioned the Heller
20  study in a couple of places.  You mentioned
21  several times that part of your plausibility
22  opinions involve the fact that talc has been
23  observed in the ovaries; correct?
24     A.  Can you show me?  I'm sorry.  I just
25  want to make sure.

Page 304

1      Q.  I'm sorry.  I'm just referring
2  generally.
3      Do your opinions, in part, depend on the
4  finding of talc in ovaries?
5      A.  No.  Because I think, again, it's
6  difficult to find talc in the ovaries.  So I
7  would not expect to see -- to find, to
8  histologically find talc in every ovary of a
9  woman who has used talcum powder products.  I
10  think that would be extremely difficult to do in
11  every patient.
12     And I know we talked about the MUC-1 theory
13  earlier, but if that is the mechanism, that would
14  not require talc to get to the ovary.
15     So, no, I don't think it's necessary to find
16  talc in the ovary in every woman to come --
17  that's a user.
18     Q.  Let's talk about evidence for
19  talc-induced inflammation in the ovary.
20     For instance, you've cited the Heller study
21  from 1996 in your "Migration translocation,
22  inhalation, and lymphatic transport" section on
23  Page 14.
24     A.  Mm-hmm.
25     Q.  Heller actually states in their study

Page 305

1  that they did not find on their H&E slides any
2  response -- any expected response to talc
3  particles.
4      Do you remember that?
5      A.  I do remember that vaguely.  Yes.
6      Q.  Did any of the studies that you cite in
7  that section for the proposition that talc has
8  been found in ovarian tissue, did any of those
9  find a reaction to talc in the ovaries?
10     A.  I don't believe the studies that have
11  found talc in the ovaries have all looked for
12  chronic inflammation.  Some of them, if I'm
13  remembering correctly, I don't know if they all
14  looked histologically; but the ones that did, I
15  don't believe they had mentioned finding chronic
16  inflammation near the talc particles.
17     But again, you know, depending on how long
18  that inflammatory response is going to be there,
19  depending how long that particular talc particle
20  has been there, you wouldn't necessarily expect
21  to still see it 20 years later.
22     Q.  Okay.  In the Heller study, they looked
23  at ovarian tissue -- ovaries from one of their
24  subjects who had 1.7 or approximately
25  1.669 million particles per gram of wet weight by

77 (Pages 302 to 305)

Sarah E. Kane, M.D.

Page 306

1  electron microscopy and found on hematoxylin and
2  eosin stain slides from the analyzed sections of
3  the tissue that no evidence of response to talc
4  such as foreign body giant cell reactions or
5  fibrosis in the tissue.
6      Is that consistent with the other studies
7  that have reported findings from H&E have also
8  reported no response to talc or supposed talc
9  they found?
10     What is an alternative explanation for how
11 microscopists doing these sorts of studies might
12 find talc by TEM or SEM without any histologic
13 response --
14     MR. ROTMAN:  Objection.
15     Q.  -- to talc in the tissue?
16     A.  Well, I think I addressed that a little
17 earlier.  Again, I don't know -- we don't know
18 how long a chronic inflammatory response would be
19 there after a particular talc particle lands on
20 the ovary.
21     But the important thing would be that that
22 chronic inflammation, the initial chronic
23 inflammation, whenever that may be, however long
24 it is there, causes oxidative stress that induces
25 an oncogenic change in an ovarian cell or

Page 307

1  fallopian tube cell, for that matter.
2      So -- and these are very small studies that
3  looked at histologic -- that looked
4  histologically for talc in these ovaries.
5      So, you know, I don't necessarily think -- I
6  don't think that you would have to find chronic
7  inflammation if you're looking at an ovary at a
8  particular point in time when we're talking about
9  long-term talc use from, you know, up to 20 years
10 ago or something.
11     Q.  Well, if they're finding 1.7 million
12 particles per gram of wet tissue right then and
13 there, and their slides from that time period
14 don't show any response whatsoever to talc that
15 they would expect to see, what's an alternative
16 explanation?
17     A.  An alternative explanation is that
18 there was chronic inflammation, and it has since
19 resolved.
20     Q.  How about there might be contamination
21 of their samples with talc, which is ubiquitous
22 in many laboratories?
23     A.  I believe they -- I have to look at the
24 study to -- do you have the study?
25     MR. ROTMAN:  Thank you.  What number?

Page 308

1      MS. AHERN:  What number are we on?
2      COURT REPORTER:  Twenty-five.
3      MS. AHERN:  Twenty-five.
4      MR. TISI:  So 24 was --
5      MS. AHERN:  We'll wait.
6      (Article entitled "The
7  relationship between perineal cosmetic talc
8  usage and ovarian talc particle burden"
9  marked Exhibit 25.)
10     A.  I believe they went through standard
11 electron microscopy methods, which controls for
12 contamination.
13 BY MS. AHERN:
14     Q.  How?
15     A.  I don't know if it goes through the
16 whole -- but they're very careful in how they
17 handle tissue before they prep for electron
18 microscopy.
19     Q.  Doctor, do you know where they got the
20 tissue from?
21     A.  Yeah.  It's listed.
22     Q.  Did they collect the tissue themselves
23 from the patient in a particulate-free
24 environment and handle it with particulate-free
25 gloves in containers, or did they get it from

Page 309

1  hospital paraffin-embedded tissue?
2      If you look on Page 1508, "Ovarian tissue in
3  blocks was reparafinized, rehydrated, blotted dry
4  and weighed, and then digested with reagents."
5      A.  So I think these women were talc users.
6  I'm trying to find controls that they had ovaries
7  from -- if I remember correctly, they had ovaries
8  from fetal cases that did not show talc, if I
9  remember correctly.  I'm trying to find that.
10     Yeah.  "In addition, the ovaries of two
11 stillborn fetuses were analyzed as negative
12 controls."
13     Q.  Does it say anything about where those
14 stillborn fetus ovaries came from and if they
15 were handled in the same hospital in the same way
16 that the parafinized blocks were handled?
17     A.  If they didn't have a separate section
18 of their methods how they handled it, it would be
19 the same methodology.
20     Q.  Well, assuming it's not contamination
21 and there's still no reaction to talc, another
22 alternative explanation might be that talc
23 doesn't cause chronic inflammation in the
24 ovaries.
25     A.  But they didn't find talc in their

Sarah E. Kane, M.D.

Page 310

1    negative controls, which were fetal females that
2    would never have been exposed to talc.
3        Q.   Except for after the tissues were taken
4    from the fetuses and processed?
5        A.   I'm just trying to find where they --
6    what they did.
7        Q.   What I wonder and what I don't think is
8    in the paper, unless you can find it, is an
9    explanation for how the fetal ovaries were
10   obtained and processed.
11       Did they come from the same hospital
12   system --
13       A.   It would be the same.
14       Q.   -- from the laboratory so that any
15   contamination that occurred to those tissues
16   prior to the Heller group getting them was
17   accounted for?
18       Or did they purchase them separately through
19   a company or something else that handled them
20   differently from the hospital samples?
21           MR. ROTMAN:  Objection.
22       A.   If those were obtained differently, it
23   should have been in the methodology.  So the fact
24   that it's not there, the next sentence after they
25   say, "In addition, the ovaries of two stillborn

Page 311

1    fetuses were analyzed as negative controls," that
2    is where, if it had been a different methodology
3    or different purchased ovarian cell blocks from
4    fetuses, which I have never -- anyway, it would
5    be -- it would be there.  And it's not.
6        Q.   Hmm.  So my next question is:  I had
7    asked you earlier if there was an alternative
8    explanation for why there's no tissue response
9    seen in this study to talc particles, and you
10   said it could be because the chronic inflammation
11   was there and not there at the time that they
12   looked at the H&Es?
13       A.   Yeah.  I mean, you're looking at an
14   ovary at a very -- at one time point.  So we
15   don't know how long those talc particles were
16   there.  We don't know if -- how long -- we don't
17   know how long the chronic inflammation is there.
18       But the important thing is that the chronic
19   inflammation would cause an event to change to an
20   oncogenic phenotype, gene type.
21       Q.   So chronic inflammation is, by
22   definition, chronic; correct?  Doesn't just -- it
23   doesn't just resolve in a couple of days.
24       It's ongoing; is that correct?
25       A.   It is -- acute inflammation would be

Page 312

1    something that would happen over days.  Chronic
2    inflammation is generally longer, but it still
3    resolves.
4        Q.   And are -- for instance, pelvic
5    inflammatory disease is -- the effects of pelvic
6    inflammatory disease can be seen by pathologists
7    for a very long time; correct?
8        A.   You can see fibrosis.  So...
9        Q.   And one of the things that you
10   mentioned earlier is that talc can cause
11   fibrosis?
12       A.   Talc can cause fibrosis.  You get -- in
13   the ovary, however, you will get surface
14   fibrosis, generally, from the mesothelial cells
15   in the surface.
16       But, again, you're not always going to have
17   fibrosis with chronic inflammation, either.
18       Q.   If it's chronic inflammation that is
19   significant enough to lead to a transformative
20   event, shouldn't you expect to see some evidence
21   of that chronic inflammation?
22       A.   Well, we don't know how much chronic
23   inflammation is necessary to cause a carcinogenic
24   effect.
25       Q.   By analogy, wouldn't you look at

Page 313

1    something like ulcerative colitis and colon
2    cancer since that seems to be a fairly
3    well-established association?
4        A.   Yes.  And as soon as patients are
5    diagnosed with ulcerative colitis and Crohn's
6    disease, they are carefully followed at the
7    beginning.  We don't wait 20 years to start
8    following them.  We know that, you know, the risk
9    is there.  As soon as they're diagnosed, we know
10   there is a risk for increased cancer, so we start
11   surveying them.
12       Q.   But there's massive evidence of
13   inflammation -- tissue-damaging inflammation in
14   ulcerative colitis; correct?
15       A.   Not always massive, but there's chronic
16   inflammation.
17       Q.   Throughout the entire GI tract or
18   bowel?
19       A.   In -- it's not always the whole, but
20   yeah, there's chronic inflammation in the
21   intestines.
22       Q.   There's nothing in the literature that
23   suggests that talc causes that kind of an
24   inflammatory reaction, is there?
25       A.   That talc causes a chronic

79 (Pages 310 to 313)

Sarah E. Kane, M.D.

Page 314

1 inflammation?
2     Q.  That talc causes that sort of chronic
3 inflammatory reaction.
4     A.  Well, I showed you some excerpts where
5 they mention lymphocytic and plasmacytic
6 inflammation due to talc.  We know that talc
7 causes an acute inflammation.  I know we weren't
8 talking about acute inflammation, but we know it
9 causes acute inflammation in the -- after a
10 pleurodesis.  And I'm sure you could have
11 lymphocytes in plasma cells there too.
12     Again, I don't think it's the -- sure.  The
13 amount and duration of chronic inflammation, I
14 mean, would that increase the risk?  But even a
15 small amount of chronic inflammation for a
16 relatively short period of time, I think it's
17 plausible.
18     And, again, this is all under the plausible
19 thing that this would cause a mutagenic effect.
20     Q.  Can you name other chronic inflammatory
21 conditions that are not associated with cancer?
22     A.  Chronic inflammatory conditions that
23 are not associated with cancer?  Well, I'm not
24 sure we absolutely know every -- that a chronic
25 inflammatory condition won't cause a cancer,

Page 315

1 but -- so I'm not really sure.  I'm not really
2 sure what you're getting at.
3     Q.  Can you list five chronic inflammatory
4 conditions?
5     A.  That don't cause --
6     Q.  Just list five chronic inflammatory
7 conditions.
8     A.  Well, we have rheumatoid arthritis that
9 increases risk of lymphomas.  We have
10 Helicobacter pylori infections that increase
11 gastric cancer.  We have the ulcerative colitis,
12 Crohn's disease, that increase the risk of
13 cancer.  Agent exposures like asbestos that
14 causes chronic inflammation and causes cancer.
15 HPV infection causes cancer.  I mean...
16     Q.  Can you name one that doesn't involve a
17 virus or an underlying immune dysfunction?
18     A.  I named asbestos.
19     Q.  Asbestos.
20     And was there another?
21     A.  Again, I don't know if we have all the
22 data on potential carcinogens and whether or not
23 they cause chronic inflammation for sure.  I
24 think that, you know, we're still getting that
25 data.

Page 316

1     Q.  Have you ever diagnosed a patient with
2 a talc-related ovarian cancer?
3     A.  It's entirely possible that I have, but
4 I have not used polarized light microscopy on
5 ovarian tumors, so it's possible I have and
6 didn't look for talc -- didn't look for talc.
7         MR. KLATT:  Objection.  Nonresponsive.
8     Q.  My question was:  Have you ever
9 diagnosed a patient with a talc-related ovarian
10 cancer, meaning you have said, "Your cancer is
11 related to talc use"?
12     A.  Well, first of all, I wouldn't have
13 said that if I'm not looking for talc.
14     But secondly, in our pathology reports, even
15 though we're thinking and looking at causation,
16 we're not necessarily putting in our individual
17 patient reports what caused their cancer.
18     We're certainly putting the diagnosis
19 together with their medical history and their --
20 to kind of make all the pieces fit together, but
21 we're not necessarily in every patient putting
22 out a report on what causes their cancer.
23         MR. KLATT:  Objection.  Nonresponsive.
24         MS. AHERN:  Objection.  Nonresponsive.
25     Q.  I just want to know if you've ever

Page 317

1 actually diagnosed a patient with a talc-related
2 ovarian cancer.  It sounds like the answer is no.
3     If it is, it's okay.  I need an answer.
4     A.  I'm trying to answer your question.
5 Honestly, it's entirely possible that I have.
6     But have I specifically put in a patient's
7 report, "This ovarian cancer was caused by talc,"
8 no.
9     Q.  Thank you.  That's all I was asking.
10     What about at tumor boards?  Do you attend
11 tumor boards?
12     A.  I do.
13     Q.  Have you ever suggested in a tumor
14 board meeting with other colleagues that a
15 particular patient's ovarian cancer was caused by
16 talc use?
17     A.  I've certainly discussed with
18 oncologists and radiation oncologists about my
19 recent work.  Again, it's been only in the last
20 year and a half that I have really done this deep
21 dive in this literature.
22     And I've certainly talked to radiation
23 oncologists, oncologists about it at tumor boards
24 in a way of sort of educating them about my
25 findings, but we haven't discussed in the context

80 (Pages 314 to 317)

Sarah E. Kane, M.D.

Page 318

1  of a particular patient.
2      Q.  And were these discussions with
3  radiation oncologists, were these people that
4  focused on -- if they focus on -- gynecologic
5  malignancies?  Were they more pulmonary?  Is
6  there a difference with radiologists in terms of
7  specialty?
8      A.  There are some subspecialties.  In this
9  one, they were more general radiation
10 oncologists.
11     Q.  Okay.
12         MS. AHERN:  How much time do we have?
13         THE VIDEOGRAPHER:  Fifteen minutes.
14         MS. AHERN:  I'm going to turn it over
15 to my colleagues so they have an opportunity to
16 ask questions.  Thank you very much.  I
17 appreciate it.
18         THE WITNESS:  Thank you.
19         MR. KLATT:  How much time do we have?
20 We're at 6:37 right now.
21         Are you ready for me to continue?
22         CROSS-EXAMINATION
23 BY MR. KLATT:
24     Q.  Dr. Kane, are you ready to continue?
25     A.  Yes.

Page 319

1      Q.  Can you hear me okay?
2      A.  Yes.
3      Q.  Yes.  Dr. Kane, my name is Mike Klatt,
4  and I represent a company called Imerys Talc
5  America in this case.
6      Before this lawsuit, have you ever heard of
7  Imerys Talc America?
8      A.  I don't believe I had, no.
9      Q.  Do you know what Imerys Talc America
10 does?
11     A.  From my understanding, they mine talc,
12 and they supply -- they're the talc -- one of the
13 talc suppliers for Johnson & Johnson.
14     Q.  You said earlier you reviewed an
15 exhibit of Julie Pier's deposition.
16     Do you know who Julie Pier is?
17     A.  I know she was a designated
18 representative.  I don't know if it was for J&J
19 or for Imerys off the top of my head.
20     Q.  Ms. Pier works at Imerys, and she's an
21 expert microscopist and at analyzing talc for any
22 extraneous substances like asbestos.
23     She testified that the evidence you looked
24 at did not indicate in any way that talc that
25 ended up in Johnson & Johnson's baby powder had

Page 320

1  asbestos in it.
2      Are you choosing to believe the plaintiffs'
3  asbestos experts over Ms. Pier's testimony?
4          MR. TISI:  Objection.
5      A.  Again, I think these were pieces of
6  information for me.  I wasn't relying on her --
7  the exhibit from her testimony for my general
8  causation.  I wasn't -- and I didn't see
9  Dr. Longo's reports until very late in my process
10 from what I recall.
11     It's interesting information for me.  It's
12 informative in that if the talcum powder products
13 cause [sic] asbestos, that certainly lends
14 significance to plausibility.  But I'm --
15         MR. ROTMAN:  Do you want to reread your
16 answer there?  I think you misspoke.
17         THE WITNESS:  Okay.  Sorry.
18     A.  Yes.  I did.  If the talcum powder
19 contains asbestos, that certainly adds to the
20 plausibility.  But I'm not opining on whether or
21 not talcum powder products contain asbestos.
22     Q.  And you wouldn't have the expertise to
23 decide that Dr. Longo's testimony about asbestos
24 in talc is more credible than Ms. Pier's
25 testimony about asbestos in talc, do you?

Page 321

1      A.  I have a, I would say, cursory
2  knowledge of how they would test for asbestos.  I
3  couldn't say that I am an expert in the methods
4  that they use to detect asbestos.
5      Q.  But my specific question is:  You don't
6  have the expertise to determine that Dr. Longo's
7  testimony about asbestos and talc is more
8  credible with or more believable or more
9  scientifically valid or less scientifically valid
10 than Ms. Pier's testimony about asbestos and
11 talc; correct?
12     That's my question.
13     A.  Again, it's pieces of information for
14 me.  I don't know anything, really, about
15 Dr. Longo versus Ms. Pier.  I just have seen the
16 exhibit from Ms. Pier's testimony and Dr. Longo's
17 report, but I don't have more information nor
18 have I really sought it out about their
19 credentials.  I was just using it as pieces of
20 information.
21     Q.  But again my question is:  You have no
22 ability or expertise on your own to judge whether
23 Ms. Pier's testimony that there's not asbestos in
24 talc is correct or Dr. Longo's testimony is
25 correct.  That's not an area of your expertise;

81 (Pages 318 to 321)

Sarah E. Kane, M.D.

Page 322

1    correct?
2        A.  It -- I wouldn't say I'm an expert in
3    that area.
4        Q.  You mentioned earlier in response to
5    Ms. Ahern's questions, you talked about heavy
6    metals.
7        Are you aware that IARC has not singled out
8    a single heavy metal as a cause of ovarian
9    cancer?
10       A.  Yes.  I have seen that.  I have
11   reviewed the IARC monograph on heavy metals, and
12   I'm aware.
13       But, again, it's another sort of piece of
14   the plausibility puzzle.  If we -- we know that
15   some of them are either listed as carcinogens or
16   probable carcinogens.  If they're in the talcum
17   powder product, that's just another piece of the
18   biological plausibility puzzle.  And I --
19       Q.  Well, is it your -- I'm sorry.  I
20   didn't mean to cut you off.
21       A.  No.  Sorry.
22       Q.  Is it your testimony that if something
23   is considered a carcinogen for one organ system
24   by IARC, that it's capable of causing cancer in
25   all organ systems?

Page 323

1        A.  As I've testified several times here
2    today, I think different tissues respond in
3    different ways to different carcinogens.  So I
4    would not make a blanket statement that a
5    carcinogen in one site will definitely cause
6    cancer in another site.
7        However, having carcinogens, known
8    carcinogens in a product, it can add to the
9    biological plausibility.  And we're not talking
10   about these heavy metals sort of in the
11   environment.  I mean, these are -- there's
12   evidence that they are in a product that's used
13   regularly and frequently.
14       Q.  Are you -- are you aware that the same,
15   exact heavy metals are in bottled drinking water?
16       A.  So, again, I don't know what the levels
17   of these heavy metals are in drinking water.  I
18   know that they are found in the environment
19   commonly.
20       Q.  Are you aware they're in foods?
21       A.  I'm aware that they are in the
22   environment and foods regularly.  Yes.  But --
23       Q.  Are you aware they're in multivitamins?
24       MR. ROTMAN:  Wait.  Wait.
25       I was hearing a "but" and not a period

Page 324

1    at the end of the answer before you started your
2    next question.
3        A.  So I'm aware that they're in these
4    things.  What I'm looking at is a product that's
5    used frequently and for -- in a lot of women for
6    a long duration of time.  So their exposure -- if
7    they are in the talcum powder, their exposure to
8    those heavy metals would be greater than the
9    exposure they're getting in the environment.
10       Q.  Those same, exact heavy metals are in
11   drinking water, bottled water, food, and
12   multivitamins that people take every single day,
13   and there's no evidence that they cause ovarian
14   cancer; correct?
15       A.  There has not been a link with heavy
16   metals to ovarian cancer specifically as of yet.
17       Q.  And there's no evidence of are you aware
18   that the tissue levels of any heavy metals are
19   higher in talc users than in women who never used
20   talc; correct?
21       A.  I don't -- I'm not aware of that study
22   being done.
23       Are you talking tissue levels?
24       Q.  Blood levels --
25       A.  Blood levels.

Page 325

1        Q.  -- tissue levels.  Anything you want.
2    You're -- there's no medical or scientific
3    evidence that you would tell this court that the
4    levels of heavy metals in women who use talcum
5    powder in the genital area are higher than women
6    who have never used talcum powder?
7        A.  I'm not aware of studies that have been
8    done that have looked at the levels of those
9    heavy metals in ovarian tissue or blood levels.
10       Q.  Earlier you mentioned there was a study
11   about changing gene expression in the presence of
12   talc in mesothelial cells?
13       A.  Yes.
14       Q.  The mere fact that you have changing
15   gene expression in no way implies something is
16   carcinogenic; correct?
17       A.  It -- it's evidence that it's changing
18   gene expression within those cells, and --
19       Q.  If -- I'm sorry.  Go ahead.
20       A.  And the genes in that study that had
21   increased expression are involved in the
22   inflammatory -- are pieces in the inflammatory
23   response.
24       Q.  You're aware that many of those genes
25   in that study were antioxidant genes and

82 (Pages 322 to 325)

Sarah E. Kane, M.D.

Page 326

1    anti-inflammatory genes that were elevated;
2    correct?
3        A.   They can regulate or deregulate, and I
4    think it's interesting -- let's say that they
5    were antioxidant -- they were producing
6    antioxidant enzymes.  I think that is evidence
7    that it's trying -- that the cell is trying to
8    respond and is trying to prepare itself for an
9    insult, an inflammatory insult.  Otherwise, why
10   would that gene be expressed?
11       So, I mean, there's increased and decreased
12   regulation.
13       Q.   But, Dr. Kane, you're aware that
14   strenuous exercise can increase gene expression
15   of prooxidants, antioxidants, proinflammatory,
16   anti-inflammatory proteins; correct?
17       A.   Strenuous exercise can increase
18   antioxidants in proinflammatory,
19   anti-inflammatory proteins.
20       But, again, I'm opining about a product that
21   someone is going to be using regularly with
22   frequency over a long period of time.
23       Q.   You're aware that --
24       A.   It just adds to the -- I'm not -- you
25   know, I don't have an opinion about whether or

Page 327

1    not those heavy metals are in talc.  I've looked
2    at some evidence that they are there, but I don't
3    have an opinion that they're actually in talc.
4    It's just another piece of evidence, again, for
5    the biological plausibility.
6        Q.   Well, you're not saying that people who
7    regularly engage in chronic exercise, chronic
8    strenuous exercise, for a long period of time are
9    at increased risk of cancer because they have
10   increased gene expression, are you?
11       A.   Well, there hasn't been epidemiologic
12   evidence that is consistent that people who do
13   routine strenuous exercise get cancer.
14       Q.   The Buz'Zard study you cited, that
15   actually showed that talc -- increasing doses of
16   talc decreased release of reactive oxygen species
17   from ovarian cells, not increased it; correct?
18       A.   I believe it was different -- I would
19   have to look at the study, but it was over
20   different time periods.  It fluctuated.
21       Q.   The highest level of reactive oxygen
22   species in the Buz'Zard study was the group of
23   cells that had no talc applied at all; correct?
24       A.   I'd have to re-review the study.
25       Q.   Let's --

Page 328

1             MR. KLATT:  Can we mark that?
2             MR. ROTMAN:  Can we get a time check?
3             THE VIDEOGRAPHER:  6:30.
4             MR. ROTMAN:  Thank you.
5             (Article entitled "Pycnogenol
6    reduces Talc-induced Neoplastic
7    Transformation in Human Ovarian Cell
8    Cultures" marked Exhibit 26.)
9             MS. AHERN:  That's 26.
10       Q.   Referring to Exhibit 26, Dr. Kane, is
11   this the Buz'Zard study you were mentioning
12   earlier?
13       A.   Yes, this is it.
14       Q.   And if you'll flip over to Page 3 --
15   excuse me, 582, Figure 3, do you see Figure 3
16   is --
17             MR. ROTMAN:  Can I have a copy of that,
18   please?
19             MR. KLATT:  I'm sorry?
20             MR. ROTMAN:  I'm waiting for a copy of
21   that.
22             MR. KLATT:  Oh.  Yes.  We do provide
23   copies.
24             MR. ROTMAN:  This is Exhibit No. 1?
25             THE WITNESS:  I'm sorry.  Which table?

Page 329

1             MS. AHERN:  Twenty-six.
2    BY MR. KLATT:
3        Q.   Figure 3.  Page 582.
4             MR. ROTMAN:  What exhibit are we on?
5             COURT REPORTER:  Twenty-six.
6             MR. ROTMAN:  Thank you.
7    BY MR. KLATT:
8        Q.   And you see Figure 3 is "ROS."
9    That stands for reactive oxygen species?
10       A.   That's --
11       Q.   And, by the way, ROS are generated by
12   every cell of the body every day, 24 hours a day;
13   correct?
14       A.   Reactive -- you do see it in daily cell
15   life.  But, again, I'm talking about an
16   additional exposure, an agent that that is being
17   applied in addition to what you're seeing on --
18   basically the cell has, as we just discussed,
19   they have ways of mitigating reactive oxygen
20   species.
21       The cell can increase their antioxidant
22   enzymes, but at some point, they can get
23   overloaded.  So if you're giving it a higher dose
24   at a higher frequency than those systems can
25   handle, you're going to have an increased risk of

                                      83 (Pages 326 to 329)

Sarah E. Kane, M.D.

Page 330

1  mutagenesis.
2      Q.  Well, let's look at what Buz'Zard found
3  when talc was applied to surface ovarian cells.
4      Do you see that?  That's Figure 3A up at the
5  top?
6      A.  A, up at the top.  Yes.
7      Q.  And you'll agree with me, you see on
8  the Y axis it says "Percentage of reactive oxygen
9  species generation in OSE2a cells"; correct?
10     A.  Yes.
11     Q.  That's ovarian surface epithelial
12  cells; correct?
13     A.  Yes.
14     Q.  And you'll see at the zero talc level
15  on the X axis --
16     A.  Mm-hmm.
17     Q.  -- that had 100 percent talc -- excuse
18  me -- a 100 percent reactive oxygen species
19  generation at all three time periods; correct?
20     A.  That is correct.  And --
21     Q.  And when talc was applied?
22         MR. ROTMAN:  Wait.  Wait.
23         Did you finish your answer?
24     A.  Well, we were just talking about how
25  cells can have innate ROS generation.

Page 331

1      Q.  And this graph shows that as you
2  applied increasing doses of talc, the level of
3  generation of reactive oxygen species in the
4  ovarian cells went down.
5      It didn't go up; correct?
6      A.  Well, it goes up at -- what's the 50 --
7  the 50 micrograms per milliliter.  It goes up at
8  that dose at the 120 hour, and then it goes up at
9  the 200 microgram level.
10     Q.  That's not talc, is it?
11     A.  I'm sorry.  I'm looking at -- I'm
12  looking at -- it says "Talc micrograms per
13  milliliter," and then it lists the different
14  hours on the right; that they're color-coded to
15  the different hours.
16     Q.  And 17 out of the 18 measurements they
17  took when talc is applied to ovarian cells showed
18  the ovarian cells generated less reactive oxygen
19  species than no talc at all; correct?
20     A.  And I --
21     Q.  Is that correct?
22     A.  It looks like at different periods of
23  time at the 100 micrograms and 500, there was
24  less than the lower.  But I'm not sure what the
25  threshold dose would be for optimal ROS

Page 332

1  generation for each talc microgram.
2      Q.  Do you see in the far right column,
3  they applied 200 micrograms of hydrogen peroxide?
4      A.  Yes.
5      Q.  And that resulted in a 200 percent
6  increase in reactive oxygen species during those
7  time periods; correct?
8      A.  That is what it says.  Yes.
9      Q.  And that's their positive control;
10  correct?
11     A.  Let me just double-check.
12     If I'm remembering the study correctly, yes,
13  you are -- you are right.
14     Q.  People gargle with hydrogen peroxide;
15  correct?
16     A.  They shouldn't.
17     Q.  Well, you know, it's allowed on the
18  bottle.
19     You know that; correct?
20     A.  If you're telling me they gargle with
21  it, that's fine.
22     Q.  Well, they put it on cuts; right?
23     A.  They shouldn't put it on cuts.  It's
24  actually --
25     Q.  It's sold for that, isn't it?

Page 333

1      A.  I think most MDs would tell you that
2  it's probably better not to use hydrogen peroxide
3  on open cuts because it can cause a pretty severe
4  reaction.
5      Q.  You're aware that it's sold over the
6  counter in stores every day for -- as an
7  antiseptic?
8      A.  Talcum powder is sold for everyday use
9  on babies.
10     Q.  So are you telling us that hydrogen
11  peroxide now causes cancer?
12     A.  I'm saying that it will release ROS
13  species generation.
14     Q.  Far more than talc; correct?
15     A.  Based on this study, it appears that
16  way.
17     Q.  And you --
18     A.  This one study.
19     Q.  You agree with me this shows, as you
20  apply talc, reactive oxygen species in ovarian
21  cells decreases.
22     It doesn't increase at 17 out of 18 time
23  points; correct?
24     A.  They're -- I will agree with you,
25  except there is a time point where it is

84 (Pages 330 to 333)

Sarah E. Kane, M.D.

Page 334

1  increased.  And I don't know -- my caveat is I
2  don't know where the threshold would be where the
3  ROS would stop being generated.
4      Q.   Is aspirin approved by any
5  pharmaceutical company or recommended by any
6  medical organization for prevention of ovarian
7  cancer?
8      A.   That is not on the label description.
9      Q.   If aspirin prevented ovarian cancer,
10 don't you think it would be marketed for that
11 purpose?
12         MR. TISI:  Objection.
13         MR. ROTMAN:  Objection.
14     A.   I'm sure it may be after years of FDA
15 red tape and approval, but the literature --
16 again, I've said the literature is not as beefy
17 as the epi data when we're looking at aspirin and
18 NSAIDs.
19         NSAID, in particular, is not as consistent.
20 The aspirin data does appear to be consistent in
21 lowering the risk, but there are not a lot of
22 studies looking at this yet.
23         Again, though, just a piece of the puzzle
24 for a biologic plausibility.
25     Q.   Well, certainly, we're not at the point

Page 335

1  for aspirin and ovarian cancer that we are, for
2  example, with aspirin in terms of cardiovascular
3  risk; correct?
4      A.   I would agree with that sentiment.
5      Q.   And doctors and medical organizations
6  have recommended aspirin for reduction of
7  cardiovascular risk; correct?
8      A.   That's correct.  Although the dosage
9  has -- as of late, they're kind of parsing out
10 the -- they're reevaluating what dosages, but
11 you're correct.
12     Q.   And you can't cite a single medical
13 organization that at this point in time says the
14 evidence that aspirin reduces ovarian cancer is
15 sufficient that women should take it on a regular
16 basis to reduce ovarian cancer; correct?
17     A.   Well, I think I've said there aren't
18 that many studies yet.  It's only -- that I'm
19 aware of, there are only a handful.  They've been
20 consistent with aspirin.  Not so much with NSAID.
21 That's, I think, as far as the evidence takes us
22 as this point.
23     Q.   There's actually studies showing that
24 chronic aspirin ingestion doesn't decrease
25 ovarian cancer risk; correct?

Page 336

1      A.   I have to look at the studies.  There
2  might be one where it wasn't statistically
3  significant, but I think the majority of the ones
4  that looked at aspirin use showed a decreased
5  risk of ovarian cancer.
6      Q.   Are you -- are you a member of the
7  International Society of Gynecologic
8  Pathologists?
9      A.   I don't think I'm a member currently.
10 No.
11     Q.   Have you ever been?
12     A.   I believe so.
13     Q.   It's not on your CV.
14     A.   Okay.  I'm not currently.  I know that.
15     Q.   Are you a member of the American
16 Society of Clinical Pathology?
17     A.   I actually am.
18     Q.   It's not on your CV.
19     A.   Okay.  That should be updated, then.
20     Q.   Have you ever been a member of any
21 working group or organization on the
22 classification of female reproductive organ
23 tumors?
24     A.   No.  I can't -- no.
25     Q.   You mentioned the Surgeon General's

Page 337

1  report in 1964.  You're aware that when that came
2  out about smoking, there were numerous studies in
3  the literature at that point in time showing that
4  the chemicals in cigarette smoke actually damaged
5  DNA and resulted in cancer; it wasn't based just
6  on epidemiology?
7      A.   I think epidemiology -- my point was
8  that the epidemiology was the sort of first --
9  there were pathologists that had noticed on
10 autopsies in patients that smoked -- it was
11 actually pathologists and a surgeon in the early
12 years -- that had noticed some changes, some
13 squamous metaplastic changes.
14         But it was really the epi data that sort of
15 drove the research on smoking and tobacco
16 initially.  But, again, there were some studies
17 that had shown some pathologic changes in
18 smokers.  That's true.
19     Q.   You're aware that the cohort studies,
20 the hospital-based case-control studies, and the
21 population-based case-control studies all
22 uniformly showed that smoking increased the risk
23 of lung cancer; correct?
24     A.   That's correct.
25     Q.   And that's not true for talc and

85 (Pages 334 to 337)

Sarah E. Kane, M.D.

| Page 338 | Page 340 |
|---|---|
| 1 ovarian cancer; correct?<br>2     A. Well, I have some issues with the<br>3 cohort studies.<br>4     Q. I know that.<br>5     But my statement is true; correct?<br>6     A. But I think it's relevant because the<br>7 cohort studies, I don't believe, followed<br>8 patients for a long enough time.<br>9     The Nurses' Health Study only asked about<br>10 talcum powder use once in 1982, so there's<br>11 certainly room for misclassifications of users as<br>12 never users.<br>13     And some of -- some of -- again, there's<br>14 smaller numbers because it's a -- it's a cohort<br>15 study.<br>16     Q. You're aware that the National Cancer<br>17 Institute doesn't agree with you on that, aren't<br>18 you?<br>19     A. I have seen the NCI website. I<br>20 certainly considered what they say about it. I<br>21 don't know if they have done the same type of<br>22 analysis as I've done. I don't believe it's on<br>23 their website what methodology they used and what<br>24 literature they reviewed.<br>25     So I'm aware of what they've stated. But, | 1 that one statement.<br>2     Go ahead.<br>3     MR. ROTMAN: If you want to do that,<br>4 that's fine.<br>5 BY MR. KLATT:<br>6     Q. That draft -- Health Canada issued a<br>7 draft assessment that's undergoing a 60-day<br>8 public comment period; correct?<br>9     A. That's true.<br>10     Q. And then they have up to two years to<br>11 decide whether to take any action or no action at<br>12 all; correct?<br>13     A. Well, there's two pieces of that. From<br>14 my understanding is that they've already done the<br>15 scientific. They've already done the literature<br>16 review. They've already done their Bradford Hill<br>17 analysis, and they've come to the conclusion that<br>18 they've come to.<br>19     And then there's the public commentary. And<br>20 then here's the regulatory aspect of it.<br>21     Now, I am -- I would not claim to be an<br>22 expert in regulatory. I know we have regulatory<br>23 experts that are coming on. But in -- from my<br>24 understanding, the regulatory aspect is different<br>25 than the scientific aspect. |

| Page 339 | Page 341 |
|---|---|
| 1 you know, I've still done this extensive review<br>2 that I'm not sure they did to come to my<br>3 conclusion.<br>4     Q. You honestly don't know what the NCI<br>5 did in terms of review to come to their<br>6 conclusion, do you?<br>7     A. They didn't state what they did, so I<br>8 do not know. So that would -- but that's<br>9 something that I'm thinking about when I'm taking<br>10 into consideration.<br>11     Q. And you are aware that they just<br>12 updated their statement that the evidence does<br>13 not support a link between talc and ovarian<br>14 cancer in January 2019, the same month we're<br>15 sitting here today?<br>16     A. I don't know if I've gone to the NCI<br>17 website this month.<br>18     But I'm also aware of Health Canada that<br>19 came out and did -- and we know what the<br>20 methodology and literature they -- they spelled<br>21 it out very clearly what their methodology was,<br>22 what literature review they did, and they came to<br>23 the same conclusion that I did.<br>24     MR. ROTMAN: Off the record, Mike?<br>25     MR. KLATT: Let me just follow up on | 1     MR. ROTMAN: Mike, you're done? I just<br>2 want to --<br>3     MR. KLATT: I'm through.<br>4     MR. ROTMAN: I just want to go off the<br>5 record.<br>6     We're done with seven hours.<br>7     MR. KLATT: Yes. I'm done.<br>8     MR. TISI: Let's take a minute.<br>9     THE VIDEOGRAPHER: Off the record,<br>10 6:31 p.m.<br>11     (A recess was taken.)<br>12     THE VIDEOGRAPHER: Back on the record,<br>13 6:40 p.m.<br>14     CROSS-EXAMINATION<br>15 BY MR. ROTMAN:<br>16     Q. Dr. Kane, I know it's been a long day<br>17 for you, but I'm going to ask you a few<br>18 questions. I will be brief.<br>19     A. Okay.<br>20     Q. At one point today, you were asked some<br>21 questions by Attorney Ahern about certain<br>22 negative studies on inflammation, and she<br>23 mentioned Bonovast 2005 and Ni 2012, which she<br>24 asked you about.<br>25     Do you recall that? |

86 (Pages 338 to 341)

Sarah E. Kane, M.D.

Page 342

1    A.  Yes.
2    Q.  She did not show you those studies, did
3 she?
4    A.  I don't believe I saw them.
5    Q.  Are you able to agree with her
6 characterization that these were negative studies
7 without having -- without looking at them?
8    A.  I should have asked for them and had
9 them in front of me while asking questions.
10    Q.  Now, you were asked questions --
11    A.  I mean answering questions.
12    Q.  -- throughout the day about
13 inflammation as a biologically plausible
14 mechanism for explaining talc causing ovarian
15 cancer in light of the epi study findings.
16    A.  Yes.
17    Q.  You were also asked questions about
18 cigarette smoking at various times throughout the
19 day?
20    A.  Yes.
21    Q.  Does cigarette smoking have an
22 inflammatory effect?
23    A.  Yes.
24    Q.  What is the --
25    A.  It does cause chronic inflammation.

Page 343

1    Q.  You were also asked questions about
2 heavy metals being present in food and water and
3 vitamins; correct?
4    A.  I remember.  Yeah.
5    Q.  Do -- what is different between those
6 circumstances and the situation that we have been
7 discussing all day today involving talcum powder?
8    A.  With talcum powder, we do have the epi
9 data that are consistent and show an increased
10 risk of ovarian cancer with talcum powder use.
11    Q.  And with respect -- you were asked some
12 questions in relation to the Buz'Zard study about
13 hydrogen peroxide and the reactive oxygen species
14 reaction?
15    A.  Yes.
16    Q.  Are you aware of any evidence that
17 hydrogen peroxide -- the effect of hydrogen
18 peroxide in the female genital tract?
19    A.  I'm not aware that women routinely use
20 hydrogen peroxide in the female genital tract.
21    Q.  And is there anything in particular
22 about the -- that part of the anatomy that where
23 certain agents, exposure to certain agents, would
24 raise any particular concerns -- strike that.
25    I think that was a bad question, so I'll

Page 344

1 just strike that.
2    You were asked questions about surgical
3 gloves and surgical-grade talc on surgical
4 gloves.
5    A.  Yes.
6    Q.  Do you recall that?
7    A.  Yes.
8    Q.  And I think you were asked if you were
9 aware of any studies linking the use of talcum
10 powder on surgical gloves with the occurrence of
11 ovarian cancer.
12    Do you recall that?
13    A.  Yes.
14    Q.  Is there a difference, a notable
15 difference, between talcum powder on surgical
16 gloves and the talcum powder products in perineal
17 use that, regardless of the constituent of the
18 powder, that you would want to point out?
19        MR. KLATT:  Objection.  Form.
20        MS. AHERN:  Same.
21    A.  So a patient's exposure to surgical
22 gloves are going to be infrequent and not of long
23 duration.  It's not the same type of exposure as
24 regular and frequent application of perineal
25 talcum powder that we're seeing in the epi data.

Page 345

1        MR. ROTMAN:  No further questions.
2 It's 6: --
3        (Discussion off the record.)
4        MR. ROTMAN:  You're right.
5 BY MR. ROTMAN:
6    Q.  I have some questions for you about
7 your testimony on the Harlow paper.
8    A.  Okay.
9    Q.  Can you pull that out in front of you,
10 which was Exhibit 20?
11    A.  Okay.
12    Q.  Can you turn to Table 3.
13    A.  Okay.
14    Q.  And do you recall that you were asked
15 questions about dose-response in this study?
16    A.  Yes.
17    Q.  And do you recall that you were
18 specifically asked questions about this Table 3?
19    A.  Yes.
20    Q.  Could you look at the middle part of
21 Table 3, at the column with "adjusted odds
22 ratios"?
23    A.  Yes.
24    Q.  What can -- what do you observe with
25 respect to the adjusted odds ratio as the -- as

87 (Pages 342 to 345)

Sarah E. Kane, M.D.

---

Page 346

1    the -- as the number of applications goes from
2    less than 1,000 to greater than 10,000?
3        A.   The adjusted ORs go from -- the null,
4    1.0 at none, 1.4 at less than 1,000, to 1.7 at
5    greater than 10,000.
6        Q.   And so what, just looking at the
7    adjusted odds ratio, what --
8        A.   It's an increase with increased --
9        Q.   -- what is your takeaway?
10       A.   So it does show an increased odds ratio
11   with increased applications.
12       The confidence intervals do include the
13   null, but they're -- the higher end, it's higher
14   confidence interval at the upper end.
15       And it's not very far from the null on the
16   lower end.
17       And it, in fact, includes -- it's 1.0 at
18   greater than 10,000.
19       Q.   And so for the 1,000 to 10,000
20   applications, the lower bound of the confidence
21   interval is .9?
22       A.   Correct.
23       Q.   And how close is that to being a
24   statistically significant finding?
25       A.   Very close.

---

Page 347

1        Q.   And can you also take a look at the
2    discussion on that page in the left-hand column
3    in the paragraph that begins with "We also
4    examined"?
5        A.   Okay.
6        Q.   Is there a discussion in that paragraph
7    concerning the author's discussion of
8    dose-response?
9        A.   Yeah.  There's a sentence that states,
10   "The categorical analysis showed that relative to
11   nonusers, the risk was greatest in women who
12   applied talc at least once per day.  When years
13   of use was included as a continuous variable, the
14   test for linear trend was 3.32, p-value of .07.
15       "The categorial analysis show that relative
16   to nonusers, women who applied talc for more than
17   ten years were at a 60 percent greater risk for
18   ovarian cancer.  Likewise, perineal applications
19   of talc early in life, before age 20, or
20   applications within six months of diagnosis
21   reference age for controls produced the stronger
22   ORs."
23       Q.   And I'd like to also call your
24   attention to the page 24 in the right-hand
25   column.

---

Page 348

1        A.   Yes.
2        Q.   And this is -- this is in the
3    "Discussion" section of the paper; is that right?
4        A.   Yes.
5        Q.   And do you see in the paragraph that
6    I'm pointing to that begins with "Our study"?
7        A.   Yes.
8        Q.   Could you read into the record and
9    comment on the last sentence in that paragraph.
10       A.   "Daily versus less-than-daily talc use
11   and talc use for more than ten years versus less
12   than ten years were associated with greater risk
13   for ovarian cancer."
14       Q.   And can you comment on that?
15       A.   So that does show a trend for a
16   dose-response.
17       MR. ROTMAN:  Okay.  So I have 6:48.
18   You've got eight minutes.
19           RECROSS-EXAMINATION
20   BY MR. KLATT:
21       Q.   That Harlow study you were just looking
22   at --
23       A.   Yeah.
24       Q.   -- is that the 1992 Harlow study?
25       A.   It's the 1992 from Exhibit 20.

---

Page 349

1        Q.   And can you look on the last page of
2    this study, the page where the article ends and
3    the reference begins.
4        Did Harlow find the strength of association
5    between genital use of talc and ovarian cancer
6    was strong or weak?
7        A.   So they use -- they say, "Because the
8    overall association between genital use of talc
9    and ovarian cancer remains weak."
10       And, again, "weak" is sort of a relative.
11   I've seen weak to moderate with this odds ratio.
12   And this is also 1992.
13       MR. KLATT:  Object.  Nonresponsive.
14       Q.   I'm simply asking you, Dr. Kane, does
15   Harlow say strength of association between
16   ovarian cancer and talc use is strong or weak?
17       A.   Well, I'm putting it in context.  He
18   states -- I agree with you that's what the words
19   say, but I'm putting it in context in that "weak
20   to moderate" is used amongst epidemiologists for
21   this level of overall risk.
22       And this is 1992, so there wasn't the
23   subsequent studies that have gone on that show
24   consistent, similar overall risk odds ratio.
25       Q.   And would it be correct that the

88 (Pages 346 to 349)

Sarah E. Kane, M.D.

Page 350

1  statement that I asked you to read says in full,
2  "Because the overall association between genital
3  use of talc and ovarian cancer remains weak, it
4  is unlikely that this exposure disease pathway is
5  the principal one involved in ovarian cancer
6  etiology"?
7      Is that what Harlow said?
8      A.  That's what it states.  But, again,
9  that is 1992.  This is the very beginning of the
10 epi data looking at this exposure and ovarian
11 cancer.
12     MR. KLATT:  Object and move to strike
13 everything after "That's what it says."
14     Q.  And, by the way, the odds ratio that
15 Harlow found overall was 1.5.
16     And that's even a little higher than the
17 odds ratios the more recent meta-analyses have
18 shown; correct?
19     A.  So --
20     Q.  So they're even weaker than Harlow.
21     A.  I'm sure some epidemiologists might
22 take -- I'm not -- but, again, I've seen, even
23 with 1.3 and 1.4, epidemiologists refer to that
24 as "moderate."
25     So I don't know if it's semantics, but it's

Page 351

1  1.3.  It's a 30 percent increased risk.  In this
2  case, 1.5, a 50 percent increase in risk.  And in
3  a rare disease like ovarian cancer, that's
4  significant.
5      Q.  And Harlow calls a 1.5 odds ratio weak;
6  correct?
7      A.  That's what he says in this 1992 paper.
8      Q.  And you'd agree with me the more recent
9  meta-analyses of talc and ovarian cancer have a
10 lower odds ratio than 1.5?
11     A.  They seem to be between 1.3 and 1.4,
12 but the important thing to me is the consistency.
13     Q.  And you're aware that epidemiologists
14 say with case-control studies that odds ratios in
15 the range of 1.0 to 1.5 are well within the range
16 that can be explained by bias and confounding?
17     MR. ROTMAN:  Objection.
18     A.  I think all of the studies were
19 aware -- all of the authors were aware of
20 potential recall bias and confounding and sought
21 to control as much as possible those factors in
22 their control studies.  Most of them, I feel,
23 were relatively well-designed to assess for and
24 adjust for multiple confounding factors.
25     And as far as recall bias, there's an

Page 352

1  element of recall bias in case-control studies,
2  but the authors are aware.  Many of them talk
3  about that and discuss why they feel recall bias
4  wasn't an explanation.
5      And, again, we're talking about multiple
6  studies over numerous populations over different
7  periods of time, most of them well before the
8  general public knew about an association between
9  talcum powder and ovarian cancer.
10     And even further, the fact that there's a
11 strong association in the literature with serous
12 invasive cancer would argue against a recall bias
13 because the lay public is not knowledgeable about
14 the histologic subtypes of epithelial ovarian
15 carcinoma.
16     Q.  Let me ask you this, Dr. Kane:  We
17 lawyers, before we have to go to trial, like to
18 know if the prospective jurors have already made
19 up their mind about the case.
20     Do you know if in any of these case-control
21 studies where the women who had ovarian cancer,
22 were they asked before they entered the study,
23 "Do you have a preconceived notion about what
24 caused your ovarian cancer?"
25     A.  I'm not aware of a case-control design

Page 353

1  that would ask that question because even asking
2  that question would potentially add an element of
3  recall bias --
4      Q.  But if a woman already --
5      MR. TISI:  She wasn't finished.
6      Q.  Were you finished?
7      A.  I was going to say in a lot of these
8  studies, they also asked about smoking history
9  and other potential lifestyle issues in addition
10 to talcum powder use that would -- and yet, those
11 types of questions didn't show an elevated risk
12 like talcum powder products.
13     Q.  Well, wouldn't you want to know --
14 before you interviewed the women who have ovarian
15 cancer, wouldn't you want to know if they have a
16 preconceived notion about what caused their
17 ovarian cancer so if you didn't exclude them from
18 the study, at least you could take that
19 preconceived bias into account when you did the
20 statistics?
21     A.  I would think if you're designing a
22 case-control study and trying to avoid recall
23 bias, there are better ways to do that because
24 just by asking, "Do you have a preconceived
25 notion about it?", you're introducing potential

89 (Pages 350 to 353)

Sarah E. Kane, M.D.

Page 354

1   bias because they might think, Oh, maybe there is
2   an association. And you're adding bias,
3   potentially, that way.
4       Q. You mentioned cigarette smoking just a
5   minute ago in response to Mr. Rotman's questions.
6       And you said cigarette smoking involves a
7   chronic inflammatory condition in the body;
8   correct?
9       A. There is an inflammatory response in
10  the body.
11      Q. But cigarette smoking has not been
12  shown to increase the risk of the two most common
13  forms of ovarian cancer, which is serous invasive
14  and endometrioid invasive; correct?
15      A. So, again, different tissues will
16  respond to different agents in different ways.
17  Mucinous carcinoma has been associated in some
18  studies with smoking, so there is evidence that
19  epithelial ovarian cancer can be caused by
20  smoking.
21      MR. KLATT: Object. Nonresponsive.
22      Q. The two most common forms of invasive
23  ovarian cancer -- serous, which is the most
24  common, and endometrioid, which is the second
25  most common -- have not been shown to be elevated

Page 355

1   as a result of smoking; correct?
2       A. The data has not shown an association
3   between those two types with smoking.
4       Q. Even though smoking involves a chronic
5   inflammatory state; correct?
6       A. But, again --
7       Q. That is -- did you hear my question?
8       Even though smoking involves a chronic
9   inflammatory state; correct?
10      A. We're talking about different types of
11  exposures.
12      Q. Does smoking --
13      A. Different agent --
14      MR. ROTMAN: One second, Mike.
15      Do you want an answer to the question?
16  Because you're cutting --
17  BY MR. KLATT:
18      Q. My question is: Does smoking
19  involve --
20      MR. ROTMAN: Wait. Wait, Mike. Let
21  her answer the question, and then you're done
22  because we're over.
23      Do you know what the question was?
24      A. Does smoking involve an inflammatory
25  state?

Page 356

1       Yes. It involves an inflammatory state.
2       MR. KLATT: Thank you, Doctor.
3       MR. TISI: Just one question.
4       (Discussion off the record.)
5       MR. ROTMAN: We're done.
6       MR. TISI: Thank you.
7       THE VIDEOGRAPHER: Here ends today's
8   deposition. Off the record, 6:58 p.m.
9       (Deposition concluded at 6:58 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 357

1           - - - - - -
             E R R A T A
2           - - - - - -
3   PAGE LINE CHANGE
4   ____ ____ _____
5       REASON: _____
6   ____ ____ _____
7       REASON: _____
8   ____ ____ _____
9       REASON: _____
10  ____ ____ _____
11      REASON: _____
12  ____ ____ _____
13      REASON: _____
14  ____ ____ _____
15      REASON: _____
16  ____ ____ _____
17      REASON: _____
18  ____ ____ _____
19      REASON: _____
20  ____ ____ _____
21      REASON: _____
22  ____ ____ _____
23      REASON: _____
24  ____ ____ _____
25      REASON: _____

Sarah E. Kane, M.D.

Page 358

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2              I,_____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7
     _____
 8   SARAH E. KANE, M.D.         DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
25
```

Page 359

```
 1          C E R T I F I C A T E
 2   COMMONWEALTH OF MASSACHUSETTS
 3   SUFFOLK, SS.
 4        I, Janet M. Sambataro, a Registered Merit
 5   Reporter and a Notary Public within and for the
 6   Commonwealth of Massachusetts do hereby certify:
 7        THAT SARAH E. KANE, M.D., the witness whose
 8   testimony is hereinbefore set forth, was duly sworn
 9   by me and that such testimony is a true and accurate
10   record of my stenotype notes taken in the foregoing
11   matter, to the best of my knowledge, skill and
12   ability; that before completion of the deposition
13   review of the transcript was requested.
14        I further certify that I am not related to any
15   parties to this action by blood or marriage; and that
16   I am in no way interested in the outcome of this
17   matter.
18        IN WITNESS WHEREOF, I have hereunto set my hand
19   this 28th day of January, 2019.
20
21        _____
          JANET M. SAMBATARO
22            Notary Public
     My Commission Expires:
23   July 16, 2021
24
25
```

91 (Pages 358 to 359)