# EXHIBIT 37

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY


---------------------------------X

IN RE:  JOHNSON & JOHNSON

TALCUM POWDER PRODUCTS            MDL No.:
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY            16-2738 (FLW)(LHG)
LITIGATION


THIS DOCUMENT RELATES TO
ALL CASES
---------------------------------X

VIDEOTAPED DEPOSITION OF

PATRICIA G. MOORMAN, M.S.P.H., PH.D.

_____

FRIDAY, JANUARY 25, 2019

9:04 A.M.
_____


Taken by the Defendants
at Cambria Hotel & Suites Durham
2306 Elba Street
Durham, North Carolina 27705



-  -  -


Reported by Sophie Brock, RPR, RMR, RDR, CRR

-  -  -



GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Patricia G. Moorman, M.S.P.H., Ph.D.

## Page 2

1           A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3       ASHCRAFT & GEREL, LLP
            4900 Seminary Road
4           Alexandria, Virginia 22311
            Telephone: (703) 931-5500
5       By:  MICHELLE A. PARFITT, ESQ.
            mparfitt@ashcraftlaw.com
6
            - and -
7
        MUELLER LAW, LLC
8           404 W 7th Street
            Austin, Texas 78701
9           Telephone: (512) 478-1236
        By:  STEVE FARIES, ESQ.
10          steve.faries@muellerlaw.com
        - and -
11
12      NAPOLI SHKOLNIK PLLC
            400 Broadhollow Road, Suite 305
13          Melville, New York 11747
            Telephone: (631) 224-1133
14      By:  ALASTAIR J.M. FINDEIS, ESQ.
            afindeis@napolilaw.com
15
16  ON BEHALF OF THE DEFENDANTS JOHNSON & JOHNSON:
17      SHOOK, HARDY & BACON L.L.P.
            600 Travis Street, Suite 3400
18          Houston, Texas 77002
            Telephone: (713) 227-8008
19      By:  SCOTT A. JAMES, ESQ.
            sjames@shb.com
20
            - and -
21
        DRINKER BIDDLE & REATH, LLP
22          600 Campus Drive
            Florham Park, New Jersey 07932-1047
23          Telephone: (973) 549-7164
        By:  JESSICA L. BRENNAN, ESQ.
24          jessica.brennan@dbr.com
25

## Page 3

1           A P P E A R A N C E S (Continued)
2   ON BEHALF OF THE DEFENDANT IMERYS TALC AMERICA, INC.:
3       GORDON & REES, LLP
            816 Congress Avenue, Suite 1510
4           Austin, Texas 78701
            Telephone: (512) 391-0197
5       By:  JENNIFER A. FOSTER, ESQ.
            jfoster@gordonrees.com
6
            - and -
7
        COUGHLIN DUFFY LLP
8           350 Mount Kemble Avenue
            Morristown, New Jersey 07962
9           Telephone: (973) 267-0058
        By:  JONATHAN F. DONATH, ESQ.
10          jdonath@coughlinduffy.com
11
    ON BEHALF OF THE DEFENDANT PERSONAL CARE PRODUCTS
12  COUNCIL:
13      SEYFARTH SHAW LLP
            975 F Street, N.W.
14          Washington, DC 20004-1454
            Telephone: (202) 463-2400
15      By:  RENÉE B. APPEL, ESQ.
            rappel@seyfarth.com
16
17  ON BEHALF OF THE DEFENDANT PTI:
18      TUCKER ELLIS LLP
            233 South Wacker Drive
19          Chicago, Illinois 60606
            Telephone: (312) 624-6300
20      By:  JAMES W. MIZGALA, ESQ.
            james.mizgala@tuckerellis.com
21
22  VIDEOGRAPHER:
23      Brad Smith
24
25

## Page 4

1           INDEX OF EXAMINATIONS
2                                       PAGE
3   BY MR. JAMES . . . . . . . . . . . . . .9, 302, 315
4   BY MS. FOSTER . . . . . . . . . . . . . . . . . 280
5   BY MS. APPEL . . . . . . . . . . . . . . . . . . 294
6   BY MS. PARFITT . . . . . . . . . . . . . . . . . 310
7
8           INDEX OF EXHIBITS
9   NUMBER          DESCRIPTION          MARKED
10  Exhibit 1   Invoices of Patricia G. Moorman,  . . .15
                Ph.D.
11
12  Exhibit 2   Errata Page from Deposition . . . . . .17
                Transcript of Patricia Moorman,
13              Ph.D.
14
15  Exhibit 3   Curriculum Vitae of Patricia  . . . . .20
                Moorman, M.S.P.H, Ph.D.
16  Exhibit 4   Notice of Oral and Videotaped . . . . .32
                Deposition of Patricia G. Moorman
17              and Duces Tecum
18  Exhibit 5   Binder of Materials Considered . . . . .35
    Exhibit 6   Plaintiffs' Steering Committee's  . . .36
19              Response and Objections to the
                Notice of Oral and Videotaped
20              Deposition of Patricia G. Moorman
                and Duces Tecum
21  Exhibit 7   Rule 26 Expert Report of Patricia . . .37
                G. Moorman, M.S.P.H., Ph.D.
22
    Exhibit 8   Additional Materials to . . . . . . . .41
23              Dr. Patricia Moorman
24  Exhibit 9   Reliance Materials of Patricia  . . . .45
                Moorman, Ph.D., Produced March 5,
25              2018

## Page 5

1           INDEX OF EXHIBITS (Continued)
2   NUMBER          DESCRIPTION          MARKED
3   Exhibit 10  References and Materials  . . . . . . .49
                Considered List for the MDL Report
4
    Exhibit 11  Deposition Transcript of Patricia . . .61
5               Moorman, M.S.P.H., Ph.D., dated
                March 12, 2018
6
7   Exhibit 12  FDA Action Related to Talc  . . . . . .77
8   Exhibit 13  FDA Letter dated April 1, 2014  . . . .84
9   Exhibit 14  IARC Monographs Document titled . . . .91
                "Arsenic, Metals, Fibres, and
10              Dusts, Volume 100 C, A Review of
                Human Carcinogens"
11  Exhibit 15  AACR Journal Article titled "Does . . 107
                Exposure to Asbestos Cause Ovarian
12              Cancer? A Systematic Literature
                Review and Meta-analysis," by
13              Alison Reid, et al.
14  Exhibit 16  American Journal of Epidemiology  . . 136
                Article titled "Ovarian Cancer Risk
15              Factors in African-American and
                White Women," by Patricia G.
16              Moorman, et al.
17  Exhibit 17  Cancer Causes Control Article . . . . 139
                titled "Primary peritoneal and
18              ovarian cancers: an epidemiological
                comparative analysis," by Delores
19              J. Grant, et al.
20  Exhibit 18  Printout from ACOG's Website: . . . . 149
                "Talc Use and Ovarian Cancer"
21
22
23
24
25

Golkow Litigation Services - 1.877.370.DEPS

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 6

INDEX OF EXHIBITS (Continued)
NUMBER          DESCRIPTION          MARKED

Exhibit 19  National Cancer Institute PDQ . . . . 151
            titled "Ovarian, Fallopian Tube,
            and Primary Peritoneal Cancer
            Prevention (PDQ®) - Health
            Professional Version

Exhibit 20  Epidemiology Article titled . . . . . . 165
            "Perineal Talc Use and Ovarian
            Cancer, A Systematic Review and
            Meta-Analysis," by
            Ross Penninkilampi, et al.

Exhibit 21  Review Article titled "Genital . . . 169
            use of talc and risk of ovarian
            cancer: a meta-analysis," by
            Wera Berge, et al.

Exhibit 22  Research Report titled "Perineal . . 173
            use of talc and risk of ovarian
            cancer," by H. Langseth, et al.

Exhibit 23  Anticancer Research Article . . . . . 175
            titled "Perineal Application of
            Cosmetic Talc and Risk of Invasive
            Epithelial Ovarian Cancer: A
            Meta-analysis of 11,933 Subjects
            from Sixteen Observational
            Studies," by Michael Huncharek,

Exhibit 24  AACR Journal Research Article . . . . 180
            titled "Genital Powder Use and Risk
            of Ovarian Cancer: A Pooled
            Analysis of 8,525 Cases and 9,859
            Controls," by Kathryn L. Terry,
            et al.

Exhibit 25  JNCI Article titled "Perineal . . . . 202
            Powder Use and Risk of Ovarian
            Cancer," by Serena C. Houghton,
            et al.

Page 7

INDEX OF EXHIBITS (Continued)
NUMBER          DESCRIPTION          MARKED

Exhibit 26  Journal of the National Cancer . . . 205
            Institute Article, titled
            "Prospective Study of Talc Use and
            Ovarian Cancer," by Dorota M.
            Gertig, et al.

Exhibit 27  PLOS ONE Research Article . . 227
            "Comparison of Estimates between
            Cohort and Case-Control Studies in
            Meta-Analyses of Therapeutic
            Interventions: A
            Meta-Epidemiological Study," by Amy
            Lanza, et al.

Exhibit 28  AACR Journal Research Article . . . . 234
            titled "Association between Body
            Powder Use and Ovarian Cancer: The
            African American Cancer
            Epidemiology Study (AACES)," by
            Joellen M. Schildkraut, et al.

Exhibit 29  AACR Journal Article titled "Body . . 237
            Powder and Ovarian Cancer Risk -
            What is the Role of Recall Bias?"
            by Britton Trabert

Exhibit 30  International Journal of Cancer . . . 273
            Article titled "Perineal Talc
            Exposure and Epithelial Ovarian
            Cancer Risk in the Central Valley
            of California," by Paul K. Mills,
            et al.

Exhibit 31  Paper titled "Systematic Review . . . 307
            and Meta-Analysis of the
            Association between Perineal Use of
            Talc and Risk of Ovarian Cancer,"
            by Mohamed Kadry Taher, et al.

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on record.  Today's date is January 25th, 2019, and the time is approximately 9:04 a.m.  This is the videotaped deposition of Dr. Patricia Moorman.

Could counsel please now introduce themselves for the record, and then our court reporter will swear in the witness.

MR. JAMES:  Scott James for the Johnson & Johnson Defendants.

MS. BRENNAN:  Jessica Brennan for the Johnson & Johnson Defendants.

MS. FOSTER:  Jennifer Foster for Imerys Talc America, Inc.

MR. DONATH:  Jonathan Donath for Imerys Talc, Inc.

MS. APPEL:  Renée Appel, here for Personal Care Products Council.

MR. MIZGALA:  James Mizgala for PTI.

MR. FINDEIS:  Alastair Findeis, Plaintiffs' Steering Committee.

MR. FARIES:  Steve Faries for the Plaintiffs.

MS. PARFITT:  Michelle Parfitt for the Plaintiffs.

Page 9

Whereupon,
PATRICIA G. MOORMAN, M.S.P.H., PH.D. having first been duly sworn/affirmed, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE JOHNSON & JOHNSON DEFENDANTS
BY MR. JAMES:

Q.  Good morning, Dr. Moorman.

A.  Good morning.

Q.  My name is Scott James.  We've had the pleasure of meeting before the deposition.  I'm counsel for the J&J Defendants in this matter.

Do you understand that?

A.  I do.

Q.  Super.  Could you state your name for the record, please.

A.  My name is Patricia Moorman.

Q.  And you have been deposed before in a talc ovarian cancer case; correct?

A.  Yes, I have.

Q.  And you've testified on behalf of the Plaintiffs in that case; correct?

A.  Yes, I did.

Q.  And the allegations in that case were that cosmetic talc powders cause ovarian cancer; correct?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 10

1     A. That's correct.
2     Q. You were deposed in the Ingham case.
3        Do you recall the name of the case?
4     A. Yes, I do.
5     Q. And you were last deposed in that case in
6  March of 2018. Do you recall that?
7     A. Yes, I do.
8     Q. Has there been any change in your employment
9  status since your March 2018 deposition?
10    A. I am still a professor at Duke University,
11 yes.
12    Q. Has there been any change in your work or
13 teaching activities since your deposition?
14    A. Yes.
15    Q. What are those changes?
16    A. I am in a preretirement transition, and so
17 I have been reducing my effort. And so I do not --
18 I'm not doing as much teaching as I was a year ago.
19    Q. Other than that fairly significant change,
20 are there any other changes in your teaching or work
21 activities since the deposition?
22    A. No.
23    Q. Have you done any new expert witness work
24 since the last deposition other than the talc MDL that
25 we're here about today?

Page 11

1     A. No, I have not.
2     Q. And you understand that we are taking your
3  deposition today in the talc MDL; correct?
4     A. Yes.
5     Q. Who first contacted you about serving as an
6  expert in the talc MDL?
7     A. It was -- let's see -- Jeff Gibson was the
8  first person who contacted me about talc litigation.
9     Q. When you say "talc litigation," are you
10 referring to the Ingham case?
11    A. I'm afraid that I'm a little unclear on --
12 you know, there are multiple attorneys, multiple
13 cases, and I don't know who was the Defendant and when
14 he first approached me.
15    Q. Understood.
16    A. Or the Plaintiff, rather. I'm sorry.
17    Q. Do you recall the time frame that Mr. Gibson
18 contacted you?
19    A. It was in summer of 2016.
20    Q. Are you retained in any talc cases other than
21 the talc MDL and the Ingham case?
22    A. Not to my knowledge, no.
23    Q. Sitting here today, do you have the ability
24 to distinguish as to whether any attorney contacted
25 you specifically about the talc MDL?

Page 12

1     A. I'm afraid I'm a little bit unclear about the
2  particular cases. I understand that this is an MDL
3  case. I have been in touch with attorneys about
4  various cases since, you know, 2016, but I'm a little
5  bit unclear about the distinctions.
6     Q. In preparing for today's deposition for the
7  talc MDL, did you meet with counsel?
8     A. Yes.
9     Q. Okay. And who did you meet with?
10    A. I have met with the individuals here,
11 Michelle Parfitt, Steve Faries, Alastair, and -- I'm
12 blanking on his last name all of a sudden -- and Jeff
13 Gibson.
14    Q. Are those the only attorneys that you've met
15 with regard to your deposition today?
16    A. Yes.
17    Q. In preparing your MDL talc report, are there
18 any other attorneys that you worked with other than
19 the ones that you just mentioned with regard to the
20 MDL?
21        MS. PARFITT: Objection. Form.
22        You may answer.
23        I just wanted to make sure that -- I believe
24 he's asking the names of people, not the
25 communications.

Page 13

1        MR. JAMES: Yes.
2        THE WITNESS: Okay. I believe that on
3  teleconferences, Chris Tisi was also on one of the --
4  at least one of the teleconferences, probably more
5  than one.
6  BY MR. JAMES:
7     Q. Was Mr. Tisi involved in teleconferences
8  pertaining to the report that you authored?
9     A. Yes.
10    Q. And, again, I'm not asking you about the
11 substance of the communications, just the
12 identification of the attorneys that you've worked
13 with. Okay?
14    A. Okay.
15    Q. Are there any other attorneys that you've
16 worked with on the MDL report?
17    A. None that I recall.
18    Q. Are you working with any of the counsel that
19 you just identified on any other litigation or
20 matters?
21    A. No, I am not.
22    Q. Okay. Today at the deposition, we'll follow
23 the same ground rules as the Ingham deposition. So
24 I know that you're familiar with them, but as a
25 reminder, my questions will be verbal and I ask that

4 (Pages 10 to 13)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 14

1    your answers be verbal as well. Okay?
2        A. Okay.
3        Q. And that's so the court reporter can take
4    down what you're saying and can take down what I'm
5    saying as well.
6        Also, Michelle has told you this, but
7    anytime you need a break, just let us know and we'll
8    be happy to accommodate you. Okay?
9        A. Okay.
10       Q. And if you have any -- if you have any -- let
11   me rephrase that.
12       If you don't understand any questions that
13   I ask you, please ask me to rephrase. Okay?
14       A. Okay.
15       Q. Great.
16       What are you charging Plaintiffs' counsels
17   in the MDL?
18       A. My rate is $400 per hour.
19       Q. How much have you invoiced in the MDL to
20   date?
21       A. For the MDL, I believe it is 21,000.
22       Q. Okay. And prior -- sorry. Did I cut you
23   off?
24       A. No, you did not.
25       Q. This morning, your counsel handed me a copy

Page 15

1    of the invoices that you furnished in the MDL, and I'm
2    going to mark this as Exhibit No. 1.
3        (Exhibit No. 1 was marked for identification.)
4    BY MR. JAMES:
5        Q. Exhibit No. 1 is containing four invoices.
6    I'm going to hand those to you and ask you to confirm
7    that those are the invoices that you have prepared for
8    your work in the MDL.
9        A. There are some for -- that work that was done
10   with the Ingham case, and my understanding, that's not
11   part of the MDL.
12       Q. That's fair. Yes.
13       A. Okay.
14       Q. So are the invoices that I've handed you as
15   part of Exhibit 1, are those the invoices related to
16   the work that you've done on the MDL?
17       A. I -- I'm sorry. I'm -- I'm trying to answer
18   your question, but the ones for prior -- other than
19   the Ashcraft & Gerel, my understanding was that these
20   were for, like, the Ingham case and the state cases,
21   not the MDL.
22       Q. Okay. Let me ask it this way: Are these the
23   invoices that you've submitted to Michelle Parfitt?
24       A. They've been submitted to the people noted on
25   there. So --

Page 16

1        MS. PARFITT: And I've just got to add
2    some clarity to that.
3        MR. JAMES: Sure.
4        MS. PARFITT: There might be some
5    overlap. I think that's the problem. There might
6    just be some overlap.
7    BY MR. JAMES:
8        Q. Are there any invoices that you have prepared
9    for your work in the talc litigation that you have not
10   produced to us today in the MDL, be it Exhibit 1 or in
11   your work in Ingham?
12       A. These are the only invoices related to the
13   talc litigation, period.
14       Q. And do you have an estimate of -- when you
15   say that these are the only invoices for the talc
16   litigation -- and if these questions continue to be
17   confusing, let me know -- but are there other invoices
18   that you submitted in the Ingham case that are not
19   part of Exhibit 1?
20       A. No. These are all the invoices submitted.
21       Q. We got there finally. Sorry about that.
22       A. Okay.
23       Q. Have you discussed your work in this
24   litigation with any other experts who are working on
25   behalf of the Plaintiffs?

Page 17

1        A. No. To my knowledge, I have not.
2        Q. Have you had any emails or other
3    communications with Plaintiffs' experts in the talc
4    litigation?
5        A. No, I have not.
6        Q. And you recall giving your testimony in the
7    Ingham case in March 2018; correct?
8        A. Yes, I do.
9        Q. After that testimony that you provided, you
10   also had an opportunity to review that testimony;
11   correct?
12       A. I did.
13       Q. And do you recall preparing a single
14   correction to the Ingham transcript?
15       A. Yes.
16       Q. And so I have with me a copy of what we refer
17   to as an errata sheet, which is the correction sheet
18   that you signed in Ingham. I'm going to mark that as
19   Exhibit No. 2. Okay?
20       (Exhibit No. 2 was marked for identification.)
21   BY MR. JAMES:
22       Q. And the way that we're configured, there's
23   some space between me and your counsel. So when
24   I have exhibits, as I will throughout the day --
25   we may have to figure out how to approach this, but I

5 (Pages 14 to 17)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 18

1   may hand them to you and ask that you hand them over
2   since we're all miked up.
3          Okay.  And do you recognize your handwriting
4   on that Exhibit?
5          A.  I do.
6          Q.  Does that reflect the correction that you
7   made to your testimony?
8          A.  Yes, it does.
9          Q.  And if you flip over to the other side of
10  Exhibit 2, does that contain your signature?
11         A.  Yes, it does.
12         Q.  By signing that errata sheet, you confirmed
13  that the testimony that you gave in Ingham was true
14  and correct; correct?
15         A.  Yes.
16         Q.  Do you still stand behind the testimony that
17  you provided in Ingham today?
18         A.  Yes, I do.
19         Q.  Subject to the one correction that you made;
20  correct?
21         A.  Yes, I do.
22         Q.  Sitting here today, do you believe there are
23  any other changes or corrections that you need to make
24  to your testimony in Ingham?
25         A.  I can't think of any, no.

Page 19

1          Q.  Did you review your Ingham deposition in
2   preparation for today's deposition?
3          A.  I did within the last few weeks, yes.
4          Q.  And so when you've reread the transcript in
5   the last few weeks, did you see anything in that
6   transcript that you wanted to correct?
7          A.  No.
8          Q.  Since your Ingham deposition in March of
9   2018, have you authored any publications or articles
10  pertaining to talc, asbestos, or ovarian cancer risk
11  factors?
12         A.  Yes, I have.
13         Q.  Okay.  And let's break up that, then.
14         Have you authored any articles pertaining to
15  talc?
16         A.  I have not authored any articles that
17  directly address talc as the main focus of the paper.
18  Talc has been mentioned in at least one paper as a
19  potential confounder.
20         Q.  And what was the name of that article,
21  please.
22         A.  If you'll give me just a moment, let me
23  look --
24         Q.  Dr. Moorman, are you looking at a copy of
25  your CV?

Page 20

1          A.  I am.
2          Q.  Okay.  So for purposes of the record, this
3   morning, before the deposition, your counsel handed me
4   a copy of your updated CV.
5          Is that what you're looking at right now?
6          A.  Yes, it is.
7          Q.  Okay.  I'm going to mark a copy of that as
8   Exhibit No. 3.
9          (Exhibit No. 3 was marked for identification.)
10         MR. JAMES:  Michelle, you have a copy,
11  I presume?
12         MS. PARFITT:  Actually, I think I gave
13  them all to you.  Sorry.
14         MR. JAMES:  Again, apologies for having
15  to handle it that way.
16         THE WITNESS:  Oh, I'm sorry.
17         MS. PARFITT:  Thank you.
18         THE WITNESS:  Okay.  The article that
19  I was referring to is -- the first author is Park.
20  The title of the article is "Benign gynecologic
21  conditions are associated with ovarian cancer risk in
22  African-American women:  A case-control study."
23         And I was a coauthor on that paper, and talc
24  was included as a potential confounder.
25

Page 21

1   BY MR. JAMES:
2          Q.  And, for the record, can you tell us the
3   number of the item you're looking at on your CV?
4          A.  On page 14, it is Article No. 120.
5          Q.  And in that paper, Dr. Moorman, did you say
6   that you described talc as a potential confounder?
7          A.  Yes.
8          Q.  In that paper, did you include a disclosure
9   of your involvement in this talc litigation as an
10  expert for the Plaintiffs?
11         A.  I disclosed it -- actually, I had a
12  discussion with the senior author on this paper, who's
13  Michele Cote, and disclosed what I was doing.  And she
14  was -- she actually said she had also done some work
15  related to talc and ovarian cancer and she was going
16  to check with the editor and see if it required a
17  disclosure.  And so there was no disclosure.  So
18  apparently the editor did not feel it was warranted.
19         Q.  So the article, as published, does not
20  contain a disclosure of your involvement in the
21  litigation; correct?
22         A.  That is correct.
23         Q.  Did you review the disclosure requirements of
24  the journal in which the article was published?
25         A.  I can't remember if I specifically looked at

6 (Pages 18 to 21)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 22

1  that journal's requirements. I don't recall if I did
2  or not.
3       Q. Do you believe that it is important -- for an
4  author who's working on an article for a publication
5  pertaining to an issue that she's testifying about in
6  litigation, do you believe it's important to disclose
7  that to the reader of the article?
8       A. I think that it is important to disclose it
9  in conjunction with the journal's policies, as I
10 described. I did disclose it to the corresponding
11 author, who said she was going to discuss it with the
12 editor. So I think that I did what was appropriate.
13      Q. Did you communicate your involvement in the
14 litigation to anyone with the journal?
15      A. I did not. It is typical that the
16 communication with the journal is through the
17 corresponding author.
18      Q. Have you attempted to amend any disclosures
19 in your prior papers since the last deposition?
20           MS. PARFITT: Objection. Form.
21           THE WITNESS: I do --
22           MR. JAMES: You're looking at your
23 counsel. Michelle can correct me if I'm wrong. She's
24 allowed to make the objections. And once she does,
25 unless she tells you not to answer, you may answer.

Page 23

1           MS. PARFITT: That's fine.
2           THE WITNESS: Okay. Yes. In my last
3  deposition, there was an article that I was one of 40
4  authors that looked at about 20 different risk factors
5  for ovarian cancer. I acknowledged in my deposition
6  that it was an oversight. In my career, you know,
7  spanning 25 years, I've never had to make disclosures
8  about potential conflicts of interest. I acknowledged
9  that it was an oversight on my part. When it was
10 brought to my attention, I contacted the journal, and
11 they said, "Okay. What's your disclosure?" And
12 I disclosed it.
13 BY MR. JAMES:
14      Q. So just to be clear, this was after the
15 deposition; correct?
16      A. It was.
17      Q. Is this the Peres paper?
18      A. Yes.
19      Q. Did they respond to you in any way about the
20 reported conflict?
21      A. The editor just said, "Okay. What is your
22 disclosure?"
23           And I gave it to him. And I believe that
24 they subsequently published a correction to the
25 article.

Page 24

1       Q. Did they communicate with you about the
2  disclosure in a written format?
3       A. It was an email communication.
4       Q. Was it a single email, or was it multiple
5  emails?
6       A. As I recall, I sent an email to the editor
7  disclosing the situation, and he -- I think he
8  responded that, yes, it should be disclosed. And then
9  I believe there was another email from -- I don't
10 know -- an editorial assistant or someone asking
11 specifically what was the -- what was the wording of
12 the disclosure that I wanted to make, and I gave them
13 that.
14           So it was, you know, two or three emails,
15 but...
16      Q. Do you still have that email traffic in your
17 possession?
18      A. Probably.
19      Q. It's on your computer?
20      A. I would think so.
21      Q. Okay. Could you ensure that you preserve
22 that email traffic for us, please.
23      A. Yes.
24           MR. JAMES: And then, Michelle, we will
25 request a copy of the email traffic.

Page 25

1           MS. PARFITT: We'll certainly take it
2  under advisement, sure.
3  BY MR. JAMES:
4       Q. Do you have any similar written
5  communications about the disclosure with the paper
6  that we just discussed, the Park paper?
7       A. No, I do not. That was a telephone
8  conference.
9       Q. Other than the Park article that you just
10 identified, have you authored any other articles since
11 your last deposition concerning talc, asbestos, or
12 risk factors for ovarian cancer?
13      A. As you can see on my CV, since the last
14 deposition, Article No. 121 is a paper on effect of
15 cultural, folk, and religious beliefs on delays in
16 diagnosis of ovarian cancer. I was first author on
17 that paper.
18           Article 119, first author Anderson, was
19 looking at individual, social, and societal correlates
20 of health-related quality of life among
21 African-American survivors of ovarian cancer.
22           And I was a coauthor on a paper by Mills
23 that was looking at immune regulatory molecular
24 expression.
25      Q. Since your Ingham deposition, have you

7 (Pages 22 to 25)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 26

1    authored any articles that pertain to talc or asbestos
2    other than the Park article?
3        A.  No.
4        Q.  Are you currently working on any articles or
5    publications that pertain to the issues addressed in
6    your expert report?
7        A.  I am a coauthor on a paper that is in
8    preparation that is describing the OCWAA Consortium,
9    which stands for Ovarian Cancer in Women of African
10    Ancestry.  And this is a relatively newly formed
11    consortium, and it's describing the overall structure
12    of the consortium and some of the factors that we
13    intend to consider.  And in the draft of the paper,
14    talc is included along with a long list of other risk
15    factors that we will be considering.
16        Q.  Is that paper in draft form?
17        A.  It is in draft form.  It's being -- yeah, it
18    has not been submitted yet.
19        Q.  So it has not been submitted for peer review?
20        A.  No, it has not.
21        Q.  Is talc mentioned in the context of a
22    potential confounder, like the Park paper?
23            MS. PARFITT:  Object to form.
24            THE WITNESS:  Talc is mentioned in that
25    paper as one of many ovarian cancer risk factors that

Page 27

1    we hope to examine in this -- within this consortium.
2    BY MR. JAMES:
3        Q.  So one of the purposes of that paper, as
4    you've described, is that you will be looking at the
5    association between talc and ovarian cancer; is that
6    correct?
7            MS. PARFITT:  Objection.  Form.
8            THE WITNESS:  It is -- the purpose of
9    the paper is to describe the consortium.  So there is
10    relatively little data about risk factors for ovarian
11    cancer among African -- African-American women, or
12    women of African ancestry.  And so the purpose of the
13    paper is not focused just on talc, but it is
14    describing how the consortium hopes to compare risk
15    factors for ovarian cancer between African-American
16    and white women.  So talc is among a long list of risk
17    factors that will be considered as we progress with
18    this consortium.
19    BY MR. JAMES:
20        Q.  Have you yet disclosed your involvement in
21    the litigation with respect to that paper?
22        A.  The -- I will disclose it when the paper will
23    be submitted, which is the typical time when such a
24    disclosure would be made.
25        Q.  Have you engaged in any written

Page 28

1    communications or written paperwork about your
2    conflict for that paper?  Your litigation disclosure
3    for that paper?  Is there anything in writing about
4    that to anyone or the journal itself, or a journal?
5        A.  At this point, no, because it is still in
6    draft form.  It's not ready to be submitted.
7        Q.  Okay.  Other than the papers we have
8    discussed this morning, are there any other papers
9    that you -- that are works in progress that discuss
10    talc or asbestos that you're working on?
11        A.  Another paper that is in progress is looking
12    at infertility as a risk factor for ovarian cancer.
13    And talc is, again, considered as a potential
14    confounder of that association.
15            So, again, draft form.  It hasn't been
16    disclosed yet because it's not at the point where one
17    would disclose that.
18        Q.  Okay.  And you answered my next question, and
19    that's fine.  So thank you.
20            Can you identify the coauthors on the paper
21    that you've just -- that you just mentioned, the
22    infertility paper?
23        A.  The infertility paper?  Okay.  This was work
24    that was done with a medical student, Tolu Teniola is
25    the medical student that I was working with.  And then

Page 29

1    all of the AACES -- this is, again, African American
2    Cancer Epidemiology Study, which is an ovarian cancer
3    study that I've worked on for about the last nine or
4    ten years, and so all of the collaborators on that
5    study.
6            And when you look at the CV, the papers that
7    come from AACES, it's Dr. Schildkraut, Dr. Bondy,
8    Dr. Cote.  It's a large multicenter study; there are
9    many coauthors, and so they would all be included.
10        Q.  And with respect to the other
11    work-in-progress paper that you have identified, can
12    you identify the coauthors on that paper.
13            MS. PARFITT:  Are you speaking of the
14    infertility paper?
15            MR. JAMES:  The first question was
16    about the infertility.  So now we're back to the first
17    work-in-progress paper that you identified.
18            THE WITNESS:  Okay.  So the study
19    describing the OCWAA Consortium, is that what you're
20    asking me about?
21    BY MR. JAMES:
22        Q.  Yes, Doctor.  Thank you for clearing that up.
23        A.  Okay.  So it includes -- again, this is a
24    multicenter study -- quite a few coauthors.  They
25    would include Dr. Schildkraut, Lynn Rosenberg, Traci

8 (Pages 26 to 29)

Patricia G. Moorman, M.S.P.H., Ph.D.

1    Bethea, Wendy Setiawan.
2        Again, it's a large consortium with a lot of
3    coauthors.  There would be probably at least a dozen,
4    probably more.
5        Q.  For both work-in-progress papers, are you
6    aware of whether any of those coauthors are experts
7    for the Plaintiffs in the talc litigation?
8        A.  I am not aware of -- if any of them are.
9        Q.  Have you -- are there any other works in
10   progress that pertain to talc or asbestos that you're
11   working on?
12       A.  No, I do not believe so.
13       Q.  Have you submitted the substance of your
14   opinions in the MDL report to anyone for peer review?
15       A.  No, I have not.
16       Q.  Have you engaged in any internet postings,
17   blogs, chatroom postings concerning your opinions in
18   this litigation?
19       A.  No, I have not.
20       Q.  Have you given any presentations, speeches,
21   or lectures concerning talc or asbestos or ovarian
22   cancer risk factors since your March 2018 deposition?
23       A.  No, I have not.
24       Q.  Have you given any interviews, public
25   statements, or other public speaking engagements

1    concerning talc, asbestos, or ovarian cancer risk
2    factors since your Ingham deposition?
3        A.  No, I have not.
4        Q.  Since your Ingham deposition -- and I'm
5    structuring my questions sometimes this way in hopes
6    of expediting.  Okay?
7        So since your Ingham deposition, have you
8    discussed your opinions in this litigation with any of
9    your professional colleagues?
10       A.  To some extent, yes.
11       Q.  Okay.  And can you tell me who that is?
12       A.  I already mentioned Dr. Cote, Michele Cote,
13   described the work that I was doing.
14       I have mentioned some of the work that I'm
15   doing to some of my colleagues within my department,
16   Dr. Truls Ostbye for one, Dr. Kat Pollak for another.
17       Q.  And when you say that you've mentioned your
18   litigation work with your department colleagues, what
19   have you told them?
20       A.  I have basically described that I have been
21   working as an expert witness in this -- in this case,
22   and expressing my opinion, you know, that -- working
23   for the Plaintiffs and my opinion that talc is a cause
24   of ovarian cancer.
25       Q.  And have you engaged in any written

1    communications with your professional colleagues about
2    your opinions?
3        A.  No, I have not.
4        Q.  And when I say "about your opinions," I mean
5    about your opinions in this litigation.
6        Is there any written communications, emails,
7    or other writings expressing your opinions in this
8    litigation to your professional colleagues?
9        A.  No, I do not believe so.
10       Q.  Have you had any discussions, since your
11   Ingham deposition, with any healthcare professionals
12   who treat ovarian cancer patients about your
13   litigation opinions?
14       A.  No, I have not.
15       Q.  Have you prepared any letters to the editor
16   about any of the publications that you cite in your
17   MDL report?
18       A.  No, I have not.
19       Q.  Okay.  I am going to hand you a copy of the
20   deposition notice for this case.  I'm going to mark
21   that as Exhibit No. 4.
22       (Exhibit No. 4 was marked for identification.)
23           MR. JAMES:  Michelle, do you need a
24   copy?
25           MS. PARFITT:  I believe I might have

1    given you mine.  If you would be so kind, I appreciate
2    that.
3            MR. JAMES:  Dr. Moorman.
4            THE WITNESS:  Thank you.
5    BY MR. JAMES:
6        Q.  Okay.  Dr. Moorman, have you seen the
7    deposition notice that I just handed you before?
8        A.  Yes, I have.
9        Q.  Okay.  And you understand from your prior
10   deposition, that this is a document that formally
11   notices the time and place and why we're here; right?
12       A.  Yes.
13       Q.  And if you turn to page 3 of the notice, you
14   see that there is a section for definitions, and then
15   it follows with a list of document requests; correct?
16       A.  Yes.
17       Q.  Okay.  And your counsel this morning has
18   produced to me a copy of your invoices, a copy of your
19   updated CV, an additional-materials-considered list,
20   and has also indicated that the references to your MDL
21   report are going to be available to us on a thumb
22   drive.
23       Other than those materials that I just
24   described, are there any other materials that you've
25   brought with you today that respond to this deposition

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 34

```
 1   notice?
 2       A.  No, there are no other documents.
 3           MR. JAMES:  Michelle, is there anything
 4   else that you brought with you that is responsive to
 5   the deposition notice?
 6           MS. PARFITT:  You know, the only thing
 7   that might -- I believe you asked this, Mr. James --
 8   any notes that she might have taken.
 9           MR. JAMES:  Yes, I was going to ask
10   that.
11           MS. PARFITT:  So why don't we just wait
12   for that.  I do have something for that.
13           MR. JAMES:  Okay.  Fair enough.
14   BY MR. JAMES:
15       Q.  Dr. Moorman, did you provide to your counsel
16   any working copies of materials that you've reviewed
17   for purposes of preparing your report or preparing for
18   today's deposition?
19       A.  Can you tell me what you mean by "working
20   copies"?
21       Q.  Sure.  Have you made any notes on any of the
22   materials that you reviewed for purposes of your work
23   on the MDL?
24       A.  Yes.  In this notebook here, there are
25   articles.  Most of them are the epidemiologic studies.
```

Page 35

```
 1   And on some of them, I have notes that basically help
 2   me kind of categorize and -- categorize the articles
 3   and some of the main things that they looked at.  You
 4   know, did they address dose-response?  Did they look
 5   at histology?  Those types of things.  It was just to
 6   kind of help me sort them out.
 7       Q.  And you brought that binder with you here
 8   today; correct?
 9       A.  Correct.
10           MR. JAMES:  Michelle, I'm going to mark
11   that as Exhibit No. 5.
12           MS. PARFITT:  You can.  What I would
13   ask, last evening we didn't have the ability to get
14   everything copied.  So what we will do is, we can mark
15   that, and we'll make some arrangements to get that
16   copied so we can get the originals back to
17   Dr. Moorman.
18           MR. JAMES:  Sure.  That's fine.
19           So I'm going to mark this binder
20   Exhibit No. 5.
21           (Exhibit No. 5 was marked for identification.)
22   BY MR. JAMES:
23       Q.  Dr. Moorman, other than what you've provided
24   to me in Exhibit No. 5, are there any other notes or
25   working copies of materials considered that you have
```

Page 36

```
 1   in your possession that are not contained in this
 2   binder?
 3       A.  No.  It's there and the report.  That's it.
 4           MS. PARFITT:  Mr. James, if we could,
 5   do you mind, could she have that back?  In the event
 6   you start to ask her questions about it, she may want
 7   hers instead, and then we'll make sure you get it.
 8           Thank you.
 9   BY MR. JAMES:
10       Q.  And before we commenced this morning, your
11   counsel, Ms. Parfitt, handed me a copy of the
12   objections that they have lodged -- that the
13   Plaintiffs have lodged to the deposition.
14           MR. JAMES:  Ms. Parfitt, do you want to
15   mention that on the record?
16           MS. PARFITT:  Yes.  If we could kindly
17   have marked as Exhibit No. -- I believe it's 6 now.
18   This is the Plaintiffs Steering Committee's Response
19   and Objections to the Oral and Video Deposition of
20   Dr. Patricia Moorman.
21           Thank you.
22           (Exhibit No. 6 was marked for identification.)
23   BY MR. JAMES:
24       Q.  Dr. Moorman, I'm just going to hand you a
25   copy of this because it looks like you're keeping a
```

Page 37

```
 1   pile over there for us of all the exhibits.  Okay?
 2   I'm not going to ask any questions about it.
 3       A.  Okay.
 4       Q.  Okay.  Dr. Moorman, in anticipation -- or in
 5   preparation for your work on the MDL, or in
 6   conjunction with your work on the MDL, you also
 7   authored an expert report; correct?
 8       A.  That is correct.
 9       Q.  I'm going to mark a copy of that as
10   Exhibit No. 7.  And we'll be talking about this
11   throughout the day today.  Okay?
12       A.  Okay.
13           (Exhibit No. 7 was marked for identification.)
14       Q.  Okay.  I'm handing you Exhibit 7.  Is that a
15   copy of your report that you've authored in the MDL?
16       A.  Yes, it is.
17       Q.  Do you agree that the report defines the
18   scope of the opinions that you intend to offer in the
19   MDL?
20       A.  Yes.
21           MS. PARFITT:  If I may, Scott, may
22   I just see a copy of that report?
23           MR. JAMES:  I have extra copies as
24   well, Michelle.  If you need anything, just let me
25   know.
```

Patricia G. Moorman, M.S.P.H., Ph.D.

---

Page 38

1        MS. PARFITT: Thank you. That would be
2    great.
3        MR. FARIES: I'll be the runner on this
4    one.
5        MR. JAMES: Thank you.
6    BY MR. JAMES:
7    Q. Did you review your report prior to -- in
8    preparation -- let me start that over.
9        Did you review your report in preparation
10   for today's deposition?
11   A. Yes, I did.
12   Q. Are there any changes that you want to make
13   to the report today?
14   A. No, there are not.
15   Q. Did you write the report?
16   A. Yes, I did.
17   Q. Okay. Are all parts of the report in your
18   wording?
19   A. Yes.
20   Q. Okay. If you can turn with me, Dr. Moorman,
21   to page 41. And you see here that there is a list of
22   references; correct?
23   A. Yes.
24   Q. Okay. And if you also turn to page 50, do
25   you see that there's a separate list that begins on

---

Page 39

1    page 50, halfway down, that's titled "Additional
2    materials and data considered"?
3    A. I'm sorry --
4    Q. On page 50.
5    A. -- let me get to the right page.
6        Yes.
7    Q. Can you explain to me the difference between
8    the reference list and the additional materials and
9    data considered list?
10   A. Okay. The reference list are the references
11   to support the opinions and the statements in the
12   report that I wrote. There are some other materials
13   that I was provided, might have read, but they just
14   did not meet the level of actually needing to be
15   referenced in the report to support a certain
16   statement.
17       Some of these I might have read in more
18   detail than others, but I feel like the reference list
19   are the ones that actually supported the statements
20   that I made in my report.
21   Q. As described by you just now, are there items
22   on the additional materials and data considered list
23   that you have not reviewed at all?
24   A. There are -- along the way, there seem to be
25   some -- like, for example, item 62, comparing a

---

Page 40

1    transcript for Curtis Omiencinski, I do not recall
2    reviewing that at all. It might have been provided to
3    me, but I don't recall reviewing it.
4    Q. Is there any way sitting here today that we
5    can efficiently identify which items on the additional
6    materials list that you have reviewed and which you
7    haven't?
8    A. I don't know what you mean by "efficiently."
9    You know, it's kind of hard to recall exactly. You
10   know, there are lots of articles here. That might
11   have been provided to me. I don't know how I could go
12   through it in just a few minutes to say did I look at
13   it or not. It would just take some time.
14   Q. Did Plaintiffs' counsel provide you all the
15   items on this list, the additional materials list?
16   A. No, I don't believe so. I mean, some of the
17   articles I've had -- like, again, some of them just
18   kind of jump out at me, like the reference 31,
19   Fathalla, "Incessant ovulation and ovarian cancer, a
20   hypothesis," that is an article that I have probably
21   referred to dozens of times.
22   Q. So the additional materials list contains a
23   mixture of items that you had on your own and items
24   that were provided to you; is that fair?
25   A. That is correct.

---

Page 41

1    Q. Now, do you intend to rely on any materials
2    for your opinions in this case that are not identified
3    in the reference list or the additional materials
4    list?
5        MS. PARFITT: Objection. Form.
6        THE WITNESS: I mean, I am relying on
7    the expertise that I developed over more than 25 years
8    as an epidemiologist. And so there may be
9    publications, knowledge that I have that is not
10   specifically listed here. But, in general, I think
11   that is a fairly comprehensive list. I don't know
12   that I could say that it is completely exhaustive.
13   BY MR. JAMES:
14   Q. All right. I'm going to mark now as
15   Exhibit No. 8 a copy of a list entitled "Additional
16   Materials to Dr. Patricia Moorman."
17       (Exhibit No. 8 was marked for identification.)
18   BY MR. JAMES:
19   Q. Have you seen a copy of Exhibit 8 before,
20   Dr. Moorman?
21   A. I don't think that I have seen this
22   particular list.
23       MS. PARFITT: And for the record, this
24   list was compiled by Plaintiffs' counsel, Mr. James,
25   and I'm not sure whether or not my office -- the

---

11 (Pages 38 to 41)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 42

1    materials were sent, but I'm not sure whether the list
2    was sent to Dr. Moorman.
3        MR. JAMES:  Okay.
4    BY MR. JAMES:
5        Q.  Looking at this list, Dr. Moorman, this list
6    was furnished to us this week.
7        Do you understand that?
8        MS. PARFITT:  Objection.
9        THE WITNESS:  I -- if you say so.
10   BY MR. JAMES:
11       Q.  Fair enough.  This list -- does this list
12   include items that you were provided after you
13   authored your MDL report?
14       A.  Yes.
15       Q.  This list of materials did not form the
16   opinions that you included in your MDL report;
17   correct?
18       MS. PARFITT:  Objection.  Form.
19       THE WITNESS:  I did not have access,
20   you know, to these expert reports and all before
21   I wrote my report, no.  So they did not inform my
22   report.
23   BY MR. JAMES:
24       Q.  Have you reviewed the materials on this list
25   as Exhibit No. 8 in their entirety?

Page 43

1        A.  No, not in their entirety.
2        Q.  Have you reviewed some and not reviewed
3    others?  Is that fair?
4        A.  I have -- yes, I have reviewed some of them.
5    I have not reviewed all of them.
6        Q.  Okay.  Is there any way for us to, again,
7    efficiently determine today which of these you've
8    reviewed and which ones you haven't?
9        A.  I -- again, I could go through them and, to
10   the best of my knowledge, tell you which ones
11   I reviewed.  Again, some of them I reviewed in more
12   detail, read more completely; others I looked at
13   more -- in a more cursory way.
14       Q.  Did your review of any of these additional
15   materials change the opinions that you've included in
16   your MDL report?
17       A.  No, they did not change my opinion.
18       Q.  Did you review all of these expert reports
19   listed?
20       A.  I did not review all of them.  I reviewed
21   some of them.
22       Q.  Okay.  And these are the Plaintiffs' expert
23   reports that are listed on this list; correct?
24       A.  That is my understanding.
25       Q.  Okay.  Which of the Plaintiffs' expert

Page 44

1    reports have you reviewed?
2        A.  Again, I have reviewed them in different
3    levels of detail and completeness.  But I have looked
4    at the report of Anne McTiernan, April
5    Zambelli-Weiner, Daniel Clarke-Pearson, David Kessler,
6    Jack Siemiatycki, Michael Crowley, Rebecca
7    Smith-Bindman, and Sonal Singh, you know, to some
8    extent.
9        And I might have looked at some of the
10   others, but those were the ones that I specifically
11   recall looking at to some extent.
12       Q.  Did you ask for Plaintiffs' counsel to
13   furnish you the expert reports in the litigation?
14       A.  I did not.  They provided them to me without
15   asking.
16       Q.  Why did you review the reports of the other
17   experts?
18       A.  Intellectual curiosity is the main thing.
19   I'm always interested to learn other people's
20   perspectives.  And also to see if there was any
21   additional evidence that I might consider.
22       Q.  And after reviewing those reports, did you
23   find any additional evidence that you might consider
24   that you didn't list in your MDL report?
25       A.  I really didn't.  I thought that there was a

Page 45

1    remarkable level of consistency in the opinions,
2    particularly among the people who were reviewing the
3    epidemiologic literature.
4        Q.  Dr. Moorman, I am going to now hand you a
5    copy of the reliance materials -- which is the title
6    of the list -- that you cited in the Ingham case.
7    Okay?  I'm going to mark that as Exhibit No. 9.
8        (Exhibit No. 9 was marked for identification.)
9    BY MR. JAMES:
10       Q.  Does that list look familiar to you?
11       A.  Yes.
12       Q.  And you see on the front of that list, it
13   says it was produced on March 5th, 2018; correct?
14       A.  That is correct.
15       Q.  And did you prepare this list?
16       A.  I did not personally prepare it, no.
17       Q.  Do you know that the reliance list that you
18   produced in Ingham and the reliance list that you have
19   attached as a reference list and a materials
20   considered list to your MDL report are substantially
21   different?
22       A.  I would --
23       MS. PARFITT:  Objection.  Form.
24       THE WITNESS:  I would not be surprised
25   to say that there are some different references cited,

12 (Pages 42 to 45)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 46

1  yes.
2  BY MR. JAMES:
3      Q.  Do you understand that there's a large number
4  of additional references that you have now cited in
5  your MDL report?
6      A.  I -- the reference list is longer, yes.
7      Q.  Do you have any idea by how much?
8          MS. PARFITT:  Objection.  Form.
9          THE WITNESS:  No, I do not.
10 BY MR. JAMES:
11     Q.  Would it surprise you to find out that there
12 are 94 new items listed in your MDL report that were
13 not listed in your March 2018 report?
14         MS. PARFITT:  Objection.  Form.
15         THE WITNESS:  I -- you know, as you go
16 along, I think that it is not unusual to include more
17 references.  I didn't know the exact number of new
18 items.
19 BY MR. JAMES:
20     Q.  Again, did you prepare the lists that are
21 attached to your MDL report?
22     A.  The -- the list of references, I prepared
23 that.  The list of additional items, I think that was
24 a combination of some of what I had prepared and
25 I think what counsel had provided to me.

Page 47

1      Q.  When you provided your opinion in March of
2  2018 in the Ingham case, did you do so based on a
3  comprehensive review of the literature?
4      A.  I think that -- yes, I believe that it was a
5  comprehensive review, particularly of the
6  epidemiologic data.
7      Q.  Why did you expand your list of references
8  and materials considered for the MDL?
9      A.  I think just as you acquire, you know, become
10 aware of more references, maybe if there were any new
11 publications, or just as I expanded the knowledge,
12 I think that it would be appropriate to include more
13 references.
14     Q.  Do you know that a number -- a large number
15 of the new references and materials considered were
16 available in the public domain or in the -- in this
17 litigation at the time that you gave your March 2018
18 deposition?
19         MS. PARFITT:  Objection.  Form.
20         THE WITNESS:  It would not surprise me
21 to say that -- to see that some of them were there.
22 BY MR. JAMES:
23     Q.  So, to be clear, the additional materials
24 that you have added between March 2018 and your MDL
25 report, those materials are not simply materials that

Page 48

1  have become part of the public domain since that time.
2  Do you understand that?
3          MS. PARFITT:  Objection.  Form.
4          THE WITNESS:  I understand that some of
5  them had been published before my deposition in March
6  2018.
7  BY MR. JAMES:
8      Q.  Are there specific topics of the new
9  materials that you added between your Ingham
10 deposition and your MDL report?
11     A.  I'm trying to think what they might be.  I --
12 some -- I think that some of the work, for example, by
13 Fletcher and Saed describing some of their work
14 related to possible biological mechanisms by which
15 talc exposure could lead to ovarian cancer -- I think
16 that was some work that I, perhaps, had not been aware
17 of previously.  And so that's one thought that comes
18 to mind.
19     Q.  All of the items that you added from March
20 2018 Ingham list to your MDL list, were all of those
21 items provided to you by Plaintiffs' counsel?
22         MS. PARFITT:  Objection.  Asked and
23 answered.
24         THE WITNESS:  I don't -- I don't think
25 so.

Page 49

1  BY MR. JAMES:
2      Q.  Would you say the majority of the items that
3  you've added from March 2018 to your MDL report were
4  provided to you by Plaintiffs' counsel?
5          MS. PARFITT:  Objection.  Form.
6          THE WITNESS:  I don't know what
7  quantity, what fraction was provided by counsel and
8  which I identified.
9          MR. JAMES:  Okay.  I'm going to mark as
10 Exhibit No. 10 a copy of your references and materials
11 considered list for the MDL report.
12     (Exhibit No. 10 was marked for identification.)
13 BY MR. JAMES:
14     Q.  Okay.  Dr. Moorman --
15         MS. PARFITT:  Just one correction,
16 Mr. James.  I think Exhibit 10 is just identified as
17 "references."  I believe you characterized it as
18 "references and material considered."
19         MR. JAMES:  Yeah.  I think if you keep
20 flipping, Michelle -- or Ms. Parfitt -- it contains
21 both.
22         MS. PARFITT:  Fair enough.
23 BY MR. JAMES:
24     Q.  Okay.  And you see, Dr. Moorman, if you've
25 had a chance to flip through it while counsel have

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 50

1    been talking, you see that this Exhibit 10 includes
2    some highlighting; right?
3         A.  Yes.
4         Q.  The highlighting, I'll state for the record,
5    represents our effort to capture the items that have
6    been added between Ingham and your MDL report.
7            Do you see that highlighting?
8         A.  Mm-hmm.
9         Q.  Again, I think we discussed this earlier, but
10   does it surprise you to find out that there are 94 new
11   items on the two MDL lists?
12           MS. PARFITT:  Objection.  Asked and
13   answered.
14           THE WITNESS:  Again, I believe that
15   I answered that question previously.
16   BY MR. JAMES:
17        Q.  13 of the 20 references that are new were
18   available to you as of March 2018.  Did you know that?
19           MS. PARFITT:  Objection.  Asked and
20   answered.
21           THE WITNESS:  Again, I answered the
22   question when you asked it previously.
23   BY MR. JAMES:
24        Q.  I don't think that we've talked specifically
25   about the references, but the references -- the

Page 51

1    references that you've cited to your MDL report, those
2    are materials that you say form the opinions issued in
3    your MDL report; correct?
4         A.  Yes.
5         Q.  And you added 20 new references from your
6    Ingham list to your MDL report.  Do you know that?
7         A.  I know that there are new references, yes.
8         Q.  And did you know that 13 of the 20 new
9    references -- again, the references are the list of
10   materials that formed your MDL report -- those were
11   available before March 2018?  Did you know that?
12        A.  I am aware that some of them were available.
13          Would like to make the point that many of
14   the points that I make in my report can be supported
15   by many, many references.  And so the fact that
16   I added new references, that's really not too
17   surprising.  It's -- again, if I felt like wanted to
18   emphasize a point more strongly, including additional
19   references, I don't think that would be surprising to
20   add additional references.
21        Q.  Did you change your standards or search terms
22   that you used in the Ingham literature review for the
23   MDL review?
24          MS. PARFITT:  Objection to form.
25          THE WITNESS:  When we talk about

Page 52

1    "search terms" or the primary search that was done, it
2    was very simple.  It was "talc" or "talcum powder" and
3    "ovarian cancer."  But many times, the initial search
4    will not generate all of the articles that you would
5    need to describe the science.  There may be additional
6    articles, either things that I was aware of or
7    different searches that might be done.
8            But the overall search term to find the
9    literature on talc and ovarian cancer, I did not
10   change that.
11           Would it be a good time to take a break?
12   We've been going for over an hour.
13           MR. JAMES:  For sure.
14           MS. PARFITT:  Certainly.
15           THE VIDEOGRAPHER:  Going off record at
16   10:05 a.m.
17           (Recess taken from 10:05 a.m. to 10:18 a.m.)
18           THE VIDEOGRAPHER:  Back on record at
19   10:18 a.m.
20   BY MR. JAMES:
21        Q.  Dr. Moorman, are you ready to proceed?
22        A.  I am.
23        Q.  Great.  Dr. Moorman, do you consider yourself
24   to be an expert in animal studies and talc?
25        A.  No, I do not.

Page 53

1         Q.  Do you consider yourself to be an expert in
2    cell studies and talc?
3         A.  No, I do not.
4         Q.  Okay.  Do you consider yourself to be an
5    expert in cytotoxicity studies and talc?
6         A.  No, I do not.
7         Q.  Do you consider yourself to be an expert in
8    mutagenicity studies and talc?
9         A.  No, I do not.
10        Q.  Do you consider yourself to be an expert in
11   genotoxicity studies and talc?
12        A.  No, I do not.
13        Q.  Do you consider yourself to be an expert in
14   mineral testing methods?
15        A.  No, I do not.
16        Q.  Okay.  Do you consider yourself an expert in
17   mineral characterization?
18        A.  No, I do not.
19        Q.  Do you consider yourself to be an expert in
20   cancer biology?
21        A.  I am not a cancer biologist; however, I
22   consider cancer biology frequently in my work.
23        Q.  Do you consider yourself to be an expert in
24   geology?
25        A.  No, I do not.

14 (Pages 50 to 53)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 54

1    Q. And do you consider yourself to be an expert
2  in mining?
3        A. No, I do not.
4        Q. Do you have expertise in pathology?
5        A. I -- once again, I am not a pathologist.
6  Sometimes rely on pathology and have collaborated with
7  pathologists, but I am not an expert pathologist.
8        Q. And would you agree do that not have
9  expertise in pathology?
10       MS. PARFITT: Objection. Asked and
11  answered.
12       THE WITNESS: You asked that I -- I do
13  not have expertise in pathology. I stated that I am
14  not a pathologist, but I do know some pathology from
15  my work in ovarian cancer and other cancers over the
16  years. So to say that I have no expertise isn't --
17  I don't think that is correct. But we both -- I
18  acknowledge that I am not a trained pathologist.
19  BY MR. JAMES:
20       Q. Do you recall being asked in Ingham if you
21  considered yourself to have expertise in pathology?
22       A. I don't recall that question, specifically.
23       Q. I'm going to hand you a copy of the
24  transcript from Ingham that I brought with me, and I'm
25  going to refer you --

Page 55

1        MR. JAMES: And, Ms. Parfitt, I have
2  two copies, unfortunately, not three. And this will
3  be just a couple questions, Ms. Parfitt. So if you
4  bear with me --
5        MS. PARFITT: You can just direct me to
6  the page.
7        MR. JAMES: Sure. Looking at page 280.
8        MS. PARFITT: Just bear with us both --
9  me. All right.
10       MR. JAMES: I'm looking at lines 12
11  through 14.
12       MS. PARFITT: Thank you.
13  BY MR. JAMES:
14       Q. Do you see the question, Dr. Moorman, where
15  you were asked if you have expertise in pathology?
16       Do you see that question?
17       A. I do.
18       Q. Okay. And you answered that you do not;
19  correct?
20       MS. PARFITT: Objection.
21       THE WITNESS: Yes, that is how
22  I answered. I think that the more qualified answer
23  that I gave today is probably a more accurate
24  representation.
25

Page 56

1  BY MR. JAMES:
2        Q. Have you done anything between your March
3  deposition and today in regards to obtaining expertise
4  in pathology?
5        A. No, I have not.
6        Q. Dr. Moorman, that's all I have on the
7  transcript for right now.
8        Dr. Moorman, do you agree that, prior to
9  offering expert opinion on a particular topic, an
10  expert should be conducted to -- expected to conduct a
11  comprehensive review of the medical and scientific
12  literature on that topic?
13       A. I'm sorry, I'm reading the question.
14       I -- I think that it is important to be
15  comprehensive. I think it's also important to
16  recognize that there are expertise in different areas.
17  And so we recognize that my expertise is in
18  epidemiology, and I have supplemented that with
19  other -- information from other areas as well.
20       Q. And with respect to the epidemiology on talc
21  and ovarian cancer, do you believe you conducted a
22  comprehensive review of that body of literature?
23       A. I believe that I have.
24       Q. Do you believe you conducted a comprehensive
25  review of the literature and scientific evidence on

Page 57

1  mechanism?
2        A. I considered the scientific mechanisms and,
3  again, recognizing what my expertise is. As I have
4  indicated earlier, I am not a cancer biologist. I'm
5  not a laboratory scientist. I consider some of that
6  data, but I recognize that I am not -- you know, that
7  is not my major area of expertise.
8        Q. And I do understand from your MDL report that
9  you considered biology; correct?
10       A. I did consider biology.
11       Q. And so my precise question is whether you
12  conducted a comprehensive review on the issue of
13  mechanism.
14       MS. PARFITT: Objection. Asked and
15  answered.
16       THE WITNESS: I considered it, and,
17  again, I think that there is information out there
18  that a cancer biologist would have the expertise to
19  review it in more detail because of their training,
20  which is different than the training and expertise
21  that I have.
22       MR. JAMES: I object to the
23  nonresponsive portion of the answer.
24  BY MR. JAMES:
25       Q. Dr. Moorman, did you conduct a comprehensive

15 (Pages 54 to 57)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 58

1  review of all of the literature on animal studies and
2  talc?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: I don't believe that -- I
5  cannot say that I considered -- identified or
6  considered every animal study.
7          MR. JAMES: Object to the nonresponsive
8  answer.
9  BY MR. JAMES:
10     Q. Did you conduct a comprehensive review of the
11  literature on animal studies and talc?
12          MS. PARFITT: Asked and answered.
13  Objection.
14          THE WITNESS: I -- I believe that
15  I answered your question. I said that I don't think
16  that I identified or considered every animal study
17  related to talc and ovarian cancer.
18  BY MR. JAMES:
19     Q. Did you conduct a comprehensive review of
20  cell studies and talc?
21     A. Once again, I considered some of that
22  literature. Whether it was comprehensive or not, I --
23  I don't think that I have the expertise to say that
24  I considered all of the cell studies and talc.
25     Q. Did you conduct a comprehensive review on the

Page 59

1  issue of migration in this case?
2     A. I believe -- again, I considered every study
3  that I was aware of on migration of talc. It's a
4  little bit outside my area of expertise, so I am not
5  sure that I identified every single study in that
6  regard.
7     Q. And with the methods that you applied in this
8  case, was it your intention to capture every study
9  pertaining to the issue of migration?
10          MS. PARFITT: Objection. Form.
11          THE WITNESS: I tried -- you know, my
12  intent was to read the articles that I was aware of,
13  that were brought to my attention. Because it is a
14  little bit outside my area of expertise, I cannot say
15  with 100 percent certainty that I identified every
16  single study related to migration.
17  BY MR. JAMES:
18     Q. But you testified that your intent was to
19  read the articles that you are aware of or that were
20  brought to your attention.
21          When you say brought to your attention, was
22  that by Plaintiffs' counsel?
23     A. It's some -- some of them could have been
24  brought to my attention in that way. Some of them
25  could have been -- like, an article that I read might

Page 60

1  have referred to another article.
2     Q. Did you conduct a comprehensive review of the
3  genotoxicity studies that are relevant to talc and
4  ovarian cancer?
5     A. My answer to this question is similar to the
6  answers that I have given there.
7          I have read some of the mechanistic studies.
8  I would not say that I necessarily identified every
9  relevant genotoxicity study.
10     Q. And I'm not asking you, Dr. Moorman, if you
11  did find 100 percent of the studies. I'm asking you
12  if part of your review in this case began with the
13  intention to capture that body of literature.
14          MS. PARFITT: Objection. Asked and
15  answered several times.
16          THE WITNESS: My intent was, as an
17  epidemiologist, to be very comprehensive in my
18  area of expertise. There were certainly some other
19  related areas where I reviewed the literature, but
20  there are experts that will speak to that more
21  directly because of their expertise.
22  BY MR. JAMES:
23     Q. Okay. So will you agree with me today that
24  you have not conducted a comprehensive review of the
25  cell studies and talc?

Page 61

1          MS. PARFITT: Objection. Misstates her
2  testimony.
3          You may answer, Dr. Moorman.
4          THE WITNESS: I -- I think that --
5  I think that it is fair to say that I have probably
6  not reviewed every cell study and talc.
7  BY MR. JAMES:
8     Q. Okay. Dr. Moorman, I'm going to refer you
9  back to the Ingham transcript, please, that's in front
10  of you.
11          MS. PARFITT: Are we marking this,
12  Scott?
13          MR. JAMES: We can. Sure.
14          Dr. Moorman, when we finish this, I'll take
15  that back from you and mark it as Exhibit No. 11.
16  Okay?
17          (Exhibit No. 11 was marked for identification.)
18  BY MR. JAMES:
19     Q. Dr. Moorman, if you look at page 35 of your
20  transcript, please. And if you look at lines -- it's
21  lines 11 through 17. It's a question and answer. If
22  you could review that for me.
23     A. Okay.
24     Q. And do you see that on line 16, you answered
25  in Ingham:

16 (Pages 58 to 61)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 62

1          "I have not done a comprehensive
2    review of those studies."
3          And there, you're referring to cell studies;
4    correct?
5      A. Yes, that is what it says here.
6      Q. Is that a truthful answer?
7      A. I think --
8          MS. PARFITT: Objection. Form.
9      Go ahead.
10          THE WITNESS: I think that we -- you
11    know, as you have asked me the questions and I have
12    responded to them, that it's -- I have looked at some
13    of these studies. I would not have looked at all of
14    them.
15    BY MR. JAMES:
16      Q. As an epidemiologist, do you understand the
17    significance of the term "comprehensive review"?
18      A. Yes, I understand the term.
19      Q. Okay. And you understand that you have
20    testified that you conducted a comprehensive review of
21    the epidemiology literature for talc and ovarian
22    cancer; correct?
23          MS. PARFITT: Asked and answered.
24          THE WITNESS: Yes.
25

Page 63

1    BY MR. JAMES:
2      Q. And so I'm asking if you have applied the
3    same comprehensive review to these other areas,
4    including cell studies, animal studies, and mechanism
5    studies.
6          MS. PARFITT: Objection. Form. Asked
7    and answered.
8    BY MR. JAMES:
9      Q. Have you conducted the same comprehensive
10    review on that body of literature that you've
11    conducted on the epidemiology?
12          MS. PARFITT: Objection.
13          THE WITNESS: Once again, I have
14    answered the question. This is not my primary area of
15    expertise. And so I have not done the review to the
16    depth and the -- as comprehensive as I have done in my
17    area of expertise, which is epidemiology.
18    BY MR. JAMES:
19      Q. Have you done a comprehensive review of the
20    epidemiology on the relationship between asbestos and
21    ovarian cancer?
22      A. I believe that I have looked at a pretty
23    comprehensive -- I've had a pretty comprehensive look
24    at the asbestos and ovarian cancer. I believe that
25    I have looked at the talcum -- talc and ovarian cancer

Page 64

1    literature in greater detail.
2      Q. Have you undertaken a comprehensive review of
3    literature pertaining to the allegation that asbestos
4    may contaminate talcum powder products?
5          MS. PARFITT: Objection. Form.
6          THE WITNESS: A comprehensive review of
7    the literature pertaining to the allegation that
8    asbestos may contaminate talcum powder?
9          I have read quite a few articles and
10    documents addressing that. Whether or not I have read
11    every document addressing that, I'm not absolutely
12    sure.
13    BY MR. JAMES:
14      Q. Okay. Dr. Moorman, you're answering a
15    question that I didn't ask. And so I object to the
16    nonresponsiveness again.
17          Did you conduct a comprehensive review of
18    the body of literature assessing whether asbestos
19    contaminates talcum powder products?
20      A. I believe that I have answered your question.
21    It's --
22      Q. Could you please answer it again.
23      A. I have read many articles on it. I do not
24    know that I have read every article related to that
25    topic, again. So...

Page 65

1      Q. You understand that if you were going to
2    publish an opinion in peer-reviewed literature about
3    the allegation that asbestos contaminates talcum
4    powder products, you would be expected to conduct a
5    comprehensive review of that literature; correct?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: If I were to publish an
8    opinion in a peer-reviewed literature, you would want
9    to have a comprehensive review of the literature, yes.
10    BY MR. JAMES:
11      Q. And have you conducted a comprehensive review
12    of the literature on that topic, such that you would
13    feel comfortable providing an opinion for a
14    peer-reviewed journal?
15          MS. PARFITT: Objection. Form.
16    BY MR. JAMES:
17      Q. And the topic being the allegation that
18    asbestos contaminates talcum powder products.
19          MS. PARFITT: Objection. Form.
20          THE WITNESS: I think that I'm maybe
21    having some difficulty answering this question because
22    it would seem like this would be a topic that would be
23    more appropriately addressed by a mineralogist. And
24    I -- I actually cannot see myself writing a
25    peer-reviewed article about this because it seems

17 (Pages 62 to 65)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 66

1    somewhat -- it's related to the epidemiology of talc
2    and ovarian cancer, but I would not be writing an
3    article focused solely on that.
4    BY MR. JAMES:
5        Q. You understand that, in your expert report,
6    you have opined with -- that there's "credible
7    evidence" there has been asbestos in talcum power
8    products.
9            Do you recall making that conclusion in your
10   report?
11       A. Yes.
12       Q. So to support that conclusion that you
13   believe there's "credible evidence" in talcum powder
14   products, did you conduct a systematic review of the
15   literature to support that conclusion?
16       A. I did not --
17           MS. PARFITT: I'm going to object to
18   the form of the question. Some words were left out.
19       You may answer.
20           THE WITNESS: In my report, I cited
21   literature that did support that opinion.
22           Did I conduct a systematic review that
23   identified possibly every piece of literature that
24   addressed the topic? No, I did not do that.
25

Page 67

1    BY MR. JAMES:
2        Q. Do you believe that the standards for
3    providing opinions in litigation reports differ from
4    the standards for providing opinions in published
5    literature?
6            MS. PARFITT: Objection. Form.
7            THE WITNESS: No. No. I think that
8    one is trying to provide evidence to support one's
9    opinions.
10   BY MR. JAMES:
11       Q. With respect to the issue of asbestos
12   contamination, Dr. Moorman, you said you did review
13   some articles.
14           How did you characterize that?
15       A. I said that I reviewed some -- some articles
16   and some -- some documents. I don't think that
17   I reviewed every article or document that is available
18   on that topic.
19       Q. With respect to documents, are you referring
20   to company documents provided to you by Plaintiffs'
21   counsel?
22       A. That -- that's part of what I reviewed, some
23   of those documents provided by counsel.
24       Q. And looking at those documents provided the
25   basis for your opinion; is that right?

Page 68

1        A. It was part of the basis for my opinion,
2    along with some peer-reviewed literature.
3        Q. Okay. With respect to the company documents,
4    were those documents hand-selected for you by
5    Plaintiffs' counsel?
6            MS. PARFITT: Objection. Form.
7            THE WITNESS: They were provided to me
8    by Plaintiffs' counsel.
9    BY MR. JAMES:
10       Q. Okay. When you saw those documents, did you
11   ask if there were additional documents that would
12   address the issue of asbestos contamination?
13       A. I don't know that I asked if there were
14   additional documents. It was my impression that there
15   were probably many other documents related to this
16   that were not provided to me.
17       Q. And as a scientist, wouldn't you be
18   interested in knowing if there are other documents
19   that have been produced in this litigation that rebut
20   the claim that asbestos contaminates talcum powder
21   products?
22           MS. PARFITT: Objection. Form.
23           THE WITNESS: This is an interesting
24   question because the claim had been made that
25   asbestos -- or, rather, that talcum -- talcum powder

Page 69

1    products had been asbestos-free since 1976. And it
2    is -- the documents provided, including the
3    peer-reviewed as well as the other, saying that --
4    provide evidence that that is not an accurate
5    statement.
6            We're not saying that every container of
7    talcum powder contains asbestos, but what I was saying
8    in my report is that there is evidence that some
9    talcum powder products have asbestos in them.
10           MR. DONATH: Move to strike,
11   nonresponsive.
12   BY MR. JAMES:
13       Q. So are you changing your report -- because in
14   the report, you say that there is "credible evidence."
15           Do you recall making that conclusion?
16       A. Yes.
17       Q. As a scientist, you understand that to give
18   something credit, you would necessarily need to
19   consider both sides of the story; correct?
20           MS. PARFITT: Objection. Misstates her
21   testimony. She's...
22           You can answer, Dr. Moorman.
23           THE WITNESS: I'm sorry?
24           MS. PARFITT: I said it misstates what
25   you're trying to suggest to the ladies and gentlemen

18 (Pages 66 to 69)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 70

1    of the jury.
2           But if you can answer that question again,
3    please try and answer Mr. James' question.  And
4    look -- if you need to look at the question, please
5    do.
6           THE WITNESS:  I think that I did -- it
7    says "As a scientist, you understand that to give
8    something credit, you would necessarily need to
9    consider both sides of the story."
10          And I think that I did consider both sides
11   of the story.
12          I think that, as I stated, the evidence does
13   not suggest that every container of talcum powder has
14   detectable asbestos in it.  But my statement that
15   there is credible evidence that some talcum powder
16   products contain asbestos, I think that that statement
17   is absolutely true.  There is some evidence to
18   indicate that some talcum powder -- or asbestos has
19   been identified in some talcum powder products.
20   BY MR. JAMES:
21       Q.  Do you understand what Johnson & Johnson's
22   position is with respect to that claim?
23       A.  I -- I don't know specifically.  Perhaps you
24   could -- could tell me.
25       Q.  You understand that Johnson & Johnson's

Page 71

1    position is that talcum powder products have not been
2    contaminated with asbestos?  Do you know that that's
3    Johnson & Johnson's position?
4        A.  I -- if you are telling me that now, I don't
5    know that I have -- I -- I'm trying to think what
6    I have read.  I think that, yes, I have probably read
7    statements from the company that describes that as
8    their position.
9        Q.  And do you know what Johnson & Johnson bases
10   their position on?
11       A.  Not specifically.
12       Q.  Wouldn't that be pretty important to
13   understand before making an opinion about whether
14   there's credible evidence of asbestos contamination?
15          MS. PARFITT:  Objection.  Form.
16          THE WITNESS:  Again, I think that when
17   one is trying to make a statement that there is no
18   asbestos contained in talc products, if you are
19   finding evidence from multiple sources that there is
20   asbestos contained in some talc products, that
21   supports the statement that I made in report that
22   there is credible evidence that not all talc products
23   are asbestos-free.
24   BY MR. JAMES:
25       Q.  How many hours did you spend reviewing

Page 72

1    company documents and other materials to support your
2    conclusions about asbestos contamination?
3        A.  I -- I wouldn't be able to quantify that.
4    I don't know specifically.
5        Q.  Can you give us an estimate?
6        A.  I think it would be pretty difficult to come
7    up with an estimate.  You know, I read some documents
8    from the company.  I read documents -- some
9    peer-reviewed literature.  I reviewed documents
10   provided by Plaintiffs' counsel.
11          Perhaps -- I don't know.  Perhaps ten -- ten
12   hours or so.
13       Q.  When you said that you reviewed company
14   documents, again, those are the documents provided to
15   you by Plaintiffs' counsel; correct?
16       A.  Yes.
17          MS. PARFITT:  Objection.  Form.
18          THE WITNESS:  Yes, the Plaintiff
19   provided those documents to me.
20   BY MR. JAMES:
21       Q.  And you did not ask Plaintiffs' counsel to
22   provide you additional documents once you saw the
23   first batch of documents; correct?
24          MS. PARFITT:  Objection.  Form.
25          THE WITNESS:  I did not ask, no.

Page 73

1    BY MR. JAMES:
2        Q.  You also looked at litigation reports from
3    Plaintiffs' expert regarding asbestos contamination;
4    correct?
5        A.  Yes, I did.
6        Q.  And you understand those experts are paid
7    litigation experts by the Plaintiffs; correct?
8          MS. PARFITT:  Objection.  Form.
9          THE WITNESS:  Yes, I understand that
10   they are paid by the Plaintiffs.
11   BY MR. JAMES:
12       Q.  One of those experts is Longo; correct?
13       A.  That is correct.
14          MS. PARFITT:  Is that Dr. Longo?
15          MR. JAMES:  Thank you, Michelle.
16   BY MR. JAMES:
17       Q.  Dr. Longo; is that correct?
18       A.  That is correct.
19       Q.  Okay.  So you reviewed Dr. Longo's reports?
20       A.  I looked at them, yes.
21       Q.  Okay.  Do you understand that in this
22   litigation, Johnson & Johnson has presented experts to
23   rebut Dr. Longo's findings?
24          MS. PARFITT:  Objection.  Just let the
25   record reflect that the defense expert reports have

19 (Pages 70 to 73)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 74

1    not yet been provided in this litigation, in the MDL
2    litigation, so it would have been difficult to provide
3    that to Dr. Moorman.
4    BY MR. JAMES:
5        Q. You can still answer the question.
6        A. It would not surprise me to know that there
7    were reports provided by -- that was done for the
8    defense, but I have not seen them.
9        Q. Did you ask to see them?
10            MS. PARFITT: Objection. Form.
11            THE WITNESS: I did not ask to see --
12    no, I did not.
13    BY MR. JAMES:
14        Q. And counsel just made a note on the record
15    about these litigation reports from the defense not
16    being made available yet in the MDL.
17            Do you understand that the defense has
18    presented experts, for example, in the Ingham case to
19    rebut Dr. Longo's findings?
20        A. I was not specifically aware of that. It
21    would not surprise me, however.
22        Q. You understand Dr. Longo's litigation reports
23    that you reviewed, those are not peer-reviewed.
24            Do you understand that?
25            MS. PARFITT: Objection. Form.

Page 75

1            THE WITNESS: Yes, I know that they are
2    not peer-reviewed.
3    BY MR. JAMES:
4        Q. With regard to the literature that you've
5    referenced having reviewed pertaining to the
6    allegation that talcum powder products are
7    contaminated with asbestos, what does that literature
8    say about Johnson & Johnson products specifically?
9        A. I'm trying to recall specifically. I believe
10    that some of the articles were not specific about the
11    particular brand names that they tested. I think they
12    just described them as commercially available
13    products. But I believe that -- I want to say that
14    I recall at least one that described the products as
15    being Johnson & Johnson.
16        Q. With respect to everything that you reviewed
17    pertaining to your claim in your report of "credible
18    evidence" of contamination of talcum powder products,
19    what did everything you reviewed tell us about the
20    amount of contamination in the products?
21            Do you have any opinions about amount?
22        A. I do. My opinions are that most of the
23    analyses that detected asbestos fibers in talcum
24    powder products detected low levels, and putting that
25    in the context that asbestos has been characterized as

Page 76

1    there's no safe level of asbestos, that any level of
2    asbestos in a talcum powder product is bad for the
3    health of the people who use it.
4        Q. Do you intend to offer any opinions about the
5    purported amount of contamination in talcum powder
6    products over the course of history?
7            MS. PARFITT: Objection. Form.
8            THE WITNESS: I am not going to offer
9    an opinion about the quantity of asbestos in talcum
10    powder products.
11    BY MR. JAMES:
12        Q. Have you, in the course of forming your
13    opinions in this case, ever reviewed the FDA testing
14    of talcum powder products for the presence of
15    asbestos?
16        A. I recall reviewing a document from FDA, yes.
17        Q. Okay. And that document is not discussed in
18    your report, is it?
19        A. No, I don't think that I specifically
20    reference that.
21        Q. Why is that?
22        A. I don't -- I don't know why I didn't
23    reference it. I read it, but...
24            MR. JAMES: I'm marking Exhibit No. 11
25    [sic] talc testing information from the FDA, that I'm

Page 77

1    handing you, Dr. Moorman.
2            (Exhibit No. 12 was marked for identification.)
3            MR. JAMES: I provided an extra copy if
4    you want to hand one to your counsel, please. Thank
5    you much.
6            MR. FARIES: This is 12.
7            MS. PARFITT: 11 is the transcript.
8            MR. JAMES: Got it. Thank you. I'll
9    fix the sticker once we finish the question.
10            MS. PARFITT: No worries.
11    BY MR. JAMES:
12        Q. Okay. Dr. Moorman, is this the document that
13    you had seen before?
14        A. I'm not sure if this is the same one or if
15    I -- no, I -- actually, I think that I did see this.
16        Q. And if you look over on page 2 of the
17    exhibit -- it's page 2 of 8 -- do you see at the
18    bottom, it says in the section "The results of FDA's
19    survey" -- do you see where I'm reading?
20        A. Yes.
21        Q. And the FDA here says (as read):
22            "The survey found no asbestos
23            fibers or structures in any of the
24            samples of cosmetic-grade raw
25            material talc or cosmetic products

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 78

1         containing talc."
2         Did I read that correctly?
3       A. You did.
4           MS. PARFITT: Are you going to complete
5   this paragraph, or are you going to leave it at that?
6           MR. JAMES: Michelle, you'll have an
7   opportunity to ask your questions.
8           MS. PARFITT: Well, just for
9   completeness. Certainly, if that's how you'd like to
10  handle it, that's fine.
11          MR. JAMES: Okay. That's how it works.
12          MS. PARFITT: Oh, I -- Scott, you don't
13  have to educate me on how it works. I get how you're
14  working, and we'll make it work on our side too.
15  Thank you.
16  BY MR. JAMES:
17      Q. Dr. Moorman, is that conclusion cited
18  anywhere in your report?
19      A. That --
20          MS. PARFITT: Objection to the partial
21  conclusion.
22          Please answer.
23          THE WITNESS: Right. It's -- I did not
24  put it in there. However, I considered as I was, you
25  know, evaluating this literature, what it goes on to

Page 79

1   say (as read):
2           "The results were limited by the
3           fact that only four talc suppliers
4           submitted samples and by the
5           number of products tested."
6   BY MR. JAMES:
7       Q. Okay.
8       A. And so it goes on to say, you know,
9   (as read):
10          "They do not prove that most or
11          all talc or talc-containing
12          cosmetic products currently
13          marketed in the US are likely to
14          be free of asbestos
15          contamination."
16          So...
17      Q. You're offering opinions in the MDL -- let me
18  re-ask this.
19          Are you offering opinions in the MDL that
20  Johnson & Johnson talcum powder products have been
21  contaminated with asbestos at some point in time?
22      A. In my opinion, I am referring to talcum
23  powder products. Okay? I don't believe in my report,
24  I ever specifically say Johnson & Johnson talcum
25  powder products, but I do recognize that a large

Page 80

1   proportion of the talcum powder products in the US are
2   Johnson & Johnson products.
3       Q. Do you know if the FDA test results
4   specifically pertain to Johnson & Johnson products?
5       A. I'm -- I believe that some of the products
6   tested -- I believe that some of them were Johnson &
7   Johnson products, if I'm not mistaken. But I can't
8   say that with certainty.
9           Actually, when I look at the report, I do
10  see that they list Johnson's baby powder.
11      Q. And, Dr. Moorman, you're referring to page 7;
12  correct?
13      A. Yes.
14      Q. Okay. Do you understand that the FDA also
15  tested samples provided to them by the supplier of
16  talc for Johnson & Johnson products? Did you know
17  that?
18      A. I -- I think that I knew that. I believe
19  I did know that.
20      Q. Again, that's not quoted anywhere in your
21  report either, is it?
22      A. No, that is --
23          MS. PARFITT: Object to form.
24          THE WITNESS: -- not.
25

Page 81

1   BY MR. JAMES:
2       Q. Before offering opinions about "credible
3   evidence," don't you think it would be important to
4   mention the findings of the FDA on such an important
5   issue?
6           MS. PARFITT: Objection. Form.
7           THE WITNESS: As I have stated before,
8   my opinion was that there is credible evidence that --
9   from peer-reviewed articles, from some other sources
10  as well, that asbestos has been found in talcum powder
11  products. I believe that that evidence is credible.
12          I did not make the statement that it is in
13  all products, but I think that my statement that there
14  is credible evidence that some talcum powder products
15  contain asbestos I think is accurate.
16  BY MR. JAMES:
17      Q. And is that a conclusion that you would feel
18  comfortable providing in published peer-reviewed
19  literature?
20          MS. PARFITT: Objection. Form.
21          THE WITNESS: To say that there is
22  credible evidence that some talcum powder products
23  contain asbestos, I think that that -- I would feel
24  comfortable saying that based on peer-reviewed
25  literature that has found that.

21 (Pages 78 to 81)

Patricia G. Moorman, M.S.P.H., Ph.D.

---

Page 82

1    BY MR. JAMES:
2       Q.  But you never undertook an effort to conduct
3    a comprehensive review of the literature on the topic,
4    did you?
5            MS. PARFITT:  Objection.  Form.  Asked
6    and answered several times.
7            THE WITNESS:  Yes, I feel like I -- you
8    have asked that, and I think that I have answered it.
9    BY MR. JAMES:
10      Q.  What's your answer?
11      A.  My answer is that I have found evidence
12   that -- from peer-reviewed literature, from other
13   documents, that some asbestos has been detected in
14   some talcum powder products.
15      Q.  With regard to the company documents that you
16   reviewed that were provided to you by Plaintiffs'
17   counsel, do you consider yourself an expert in
18   reviewing the information conveyed by those documents?
19           MS. PARFITT:  Objection.  Form.
20           THE WITNESS:  As I have indicated
21   previously, I am not a mineralogist or a geologist,
22   and so I would not consider myself an expert in
23   reviewing those types of documents.
24   BY MR. JAMES:
25      Q.  Do you have any knowledge about the

---

Page 83

1    specifications that are used by Johnson & Johnson in
2    manufacturing its talcum powder products?
3       A.  No, I do not.
4       Q.  Do you have any expertise in the sufficiency
5    of the specifications to detect the presence of
6    asbestos?
7       A.  No, I do not.
8       Q.  Did you know that Johnson & Johnson produces
9    its talcum powder products in accordance with
10   specifications set out by the US Pharmacopeial
11   Convention?
12           MS. PARFITT:  Objection.  Form.
13           THE WITNESS:  I was not specifically
14   aware of that.  I don't know what their specifications
15   are.
16   BY MR. JAMES:
17      Q.  Did Plaintiffs' counsel provide to you those
18   specifications?
19      A.  Not that I recall.
20      Q.  Did you know that the specifications provide
21   mechanisms to test for the absence of asbestos?
22           MS. PARFITT:  Objection.  Form.
23           THE WITNESS:  I have already stated
24   that I -- I don't know what those specifications are.
25

---

Page 84

1    BY MR. JAMES:
2       Q.  Dr. Moorman, have you seen a 2014 letter from
3    the FDA addressing a request for a warning on talcum
4    powder products?
5       A.  Yes, I have.
6       Q.  Do you know that within that letter, the FDA
7    comments on the issue of alleged asbestos
8    contamination?
9            MS. PARFITT:  Objection.  Form.
10           THE WITNESS:  If I could see the
11   document.  It has been a while since I have actually
12   looked at it.
13   BY MR. JAMES:
14      Q.  Absolutely.
15           MR. JAMES:  And if counsel could remind
16   me, are we now on 13?
17           MS. PARFITT:  We are indeed.
18           MR. JAMES:  Thank you.
19           MS. PARFITT:  You are very welcome.
20   (Exhibit No. 13 was marked for identification.)
21   BY MR. JAMES:
22      Q.  Okay.  Dr. Moorman, I'm handing you a copy of
23   the 2014 FDA letter with an extra copy to pass to your
24   counsel.
25           MS. PARFITT:  Thank you.

---

Page 85

1    BY MR. JAMES:
2       Q.  Dr. Moorman, if you could turn to the second
3    page of the letter.  Is this the letter that you've
4    seen before, Dr. Moorman?
5       A.  Yes, it is.
6       Q.  And do you see that, in the section entitled
7    "Chemistry Findings," there's a discussion there by
8    the FDA pertaining to asbestos; correct?
9       A.  Yes, I see that.
10      Q.  And do you see that at the bottom of the
11   letter, the very last sentence, the FDA says
12   (as read):
13           "You have not provided evidence
14           that asbestos-contaminated
15           talc-containing cosmetic products
16           are currently being marketed,
17           since the data submitted is almost
18           40 years old."
19       Do you see that?
20      A.  I do see that.
21      Q.  Okay.  And you said that you have reviewed
22   this letter in its entirety before?
23      A.  I have read it, yes.
24      Q.  Do you have any reason to quarrel with the
25   scientists at the FDA that have looked at the issue of

---

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 86

1    asbestos contamination in talcum powder products?
2            MS. PARFITT:  Objection.  Form.
3            THE WITNESS:  I don't know who those
4    scientists are.  I don't know any scientists at the
5    FDA who would have done -- would have done this.  I --
6    so I can't say that I have a quarrel with them because
7    I don't know them.
8    BY MR. JAMES:
9        Q.  Do you have any opinions about the type of
10    asbestos that is alleged to contaminate talcum powder
11    products?
12        A.  I am certainly aware that there are different
13    types of asbestos.  Again, from a health perspective,
14    there is no safe form of asbestos.  So if there are
15    different types, it really doesn't make a lot of
16    difference in terms of the potential health effects.
17            MR. JAMES:  Object to the nonresponsive
18    portion.
19    BY MR. JAMES:
20        Q.  Do you intend to offer any opinions about the
21    type of asbestos that Plaintiffs contend contaminates
22    talcum powder products?
23        A.  No, I am not going to specifically address
24    the types of asbestos in talcum powder products.
25        Q.  Do you hold the opinion that asbestos causes

Page 87

1    ovarian cancer?
2        A.  Yes.
3        Q.  Do you hold the opinion that exposure to
4    asbestos through use of talcum powder products causes
5    ovarian cancer?
6        A.  My opinion is based on exposure to talcum
7    powder products and whatever is contained within them.
8    And so if there is asbestos within talcum powder
9    products, which we have some evidence to suggest that
10    that is the case, then that provides a mechanism --
11    biological mechanism by which talcum powder products
12    could cause ovarian cancer.
13        Q.  The opinion that you have pertaining to
14    asbestos and ovarian cancer, did you form that opinion
15    in the context of litigation?
16            MS. PARFITT:  Objection.  Form.
17            THE WITNESS:  I'm not sure how -- could
18    you perhaps restate the question?
19    BY MR. JAMES:
20        Q.  Absolutely.
21        A.  I'm not sure --
22        Q.  Absolutely.
23        A.  -- what you're asking.
24        Q.  Did you form the opinion that -- did you
25    form -- let me start over.

Page 88

1        Did you form your opinions about asbestos
2    and talcum powder that are contained within your MDL
3    report after being retained as an expert?
4            MS. PARFITT:  Object to form.
5            THE WITNESS:  I -- it is often -- has
6    often been reported in the literature that talcum
7    powder contained asbestos prior to 1976, and that
8    products produced after that did not contain asbestos.
9        And as I became involved in this litigation,
10    I was made aware of and discovered some of the
11    articles that showed that talcum powder products after
12    1976 contained asbestos.
13        And so my opinion was that -- my opinion
14    that asbestos in current or recently marketed talcum
15    powder products could explain -- was part of the
16    biological mechanism by which exposure to talcum
17    powder, that was -- that was formed as I became aware
18    of more of the available information, when I became
19    involved in this litigation.
20    BY MR. JAMES:
21        Q.  Setting aside the issue of asbestos in talcum
22    powder, do you believe that asbestos is a cause of
23    ovarian cancer?
24        A.  Yes, I do.
25        Q.  How many studies have explored the link

Page 89

1    between asbestos and ovarian cancer?
2            MS. PARFITT:  Objection.  Form.
3            THE WITNESS:  In terms of epidemiologic
4    literature, there have been a couple of meta-analyses;
5    and the exact number, I don't have that off the top of
6    my head, but I want to say approximately a dozen
7    studies.
8    BY MR. JAMES:
9        Q.  Did you review the entire body of literature
10    looking at a purported link between asbestos and
11    ovarian cancer?
12            MS. PARFITT:  Objection.  Form.
13            THE WITNESS:  I know that I looked at
14    the meta-analyses.  I looked at some data from IARC,
15    and I believe that I have looked in some degree at,
16    I think, all of the epidemiologic studies about
17    asbestos and ovarian cancer.
18    BY MR. JAMES:
19        Q.  So did you look at all of the studies that
20    are discussed in the IARC monograph?
21            MS. PARFITT:  Objection.  Form.
22            THE WITNESS:  I have -- the IARC
23    monograph, as they typically do, they look at many of
24    the animal studies, some of the laboratory studies.
25    I have not looked at all of them.  I have looked at

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 90

1  the epidemiologic studies, which, again, is my area of
2  expertise.
3      BY MR. JAMES:
4          Q. And we're speaking currently about the IARC
5  monograph on asbestos; correct?
6          A. Correct.
7          Q. On page 34 of your report, if that you have
8  handy, Dr. Moorman -- actually, I think I have the
9  wrong page number. Give me one second.
10         Okay. It's actually page 35. My apologies.
11         And you see -- I'm looking at the first --
12  the top paragraph. And you state in the second
13  sentence -- do you see where I am? It starts with
14  "IARC"?
15         A. Yes.
16         Q. Says (as read):
17             "IARC has stated that a causal
18             association between exposure to
19             asbestos and cancer of the ovary
20             was clearly established based on
21             strongly positive cohort mortality
22             studies of women with occupational
23             exposure to asbestos, as well as
24             studies of women with
25             environmental exposure to

Page 91

1             asbestos."
2          A. Yes.
3          Q. Do you see where I was reading?
4          A. Yes.
5          Q. To be clear, Dr. Moorman, that's not
6  precisely how IARC has stated that, is it?
7              MS. PARFITT: Objection. Form.
8              THE WITNESS: I --
9      BY MR. JAMES:
10         Q. I'm sorry, Doctor.
11             If I may, Dr. Moorman, I'll just provide you
12  a copy. Is that okay?
13         A. Okay.
14         Q. I'm going to mark as Exhibit 14 a copy of
15  the -- what we're referring to as the asbestos
16  monograph that's 100C.
17         (Exhibit No. 14 was marked for identification.)
18             MS. PARFITT: Mr. James, just for the
19  record, that's not the entire 100C monograph, is it?
20             MR. JAMES: Thank you. Thank you. Let
21  me clarify. This is excerpts of -- Exhibit 14 is
22  excerpts of the monograph.
23             MS. PARFITT: Thank you.
24      BY MR. JAMES:
25         Q. Okay. And if we turn to page 254,

Page 92

1  Dr. Moorman.
2          A. Yes.
3          Q. Actually, 256 is where it carries into. And
4  on page 256, there's a section entitled "syntheses."
5          Do you see where I am, Dr. Moorman?
6          A. Yes.
7          Q. Okay. And if you look at the right-hand
8  column, it's the first full paragraph in the middle of
9  the page.
10         A. Yes.
11         Q. And there, the IARC states that (as read):
12             "The working group noted that a
13             causal association between
14             exposure to asbestos and cancer of
15             the ovary was clearly established
16             based on five strongly positive
17             cohort mortality studies of women
18             with heavy occupational exposure
19             to asbestos."
20         Do you see that?
21         A. Yes.
22         Q. Okay. And so the IARC then goes on to say,
23  in the next sentence, that the conclusion (as read):
24             "Received additional support from
25             studies showing that women and

Page 93

1             girls with environmental, but not
2             occupational exposure to asbestos,
3             had positive, but nonsignificant,
4             increases in both ovarian cancer
5             incidence and mortality."
6          Do you see that?
7          A. Yes.
8          Q. And so the IARC's conclusion here with
9  respect to asbestos and ovarian cancer.
10             Again, this conclusion is being made outside
11  the context of talcum powders; correct?
12         A. Right. This is based on asbestos exposure.
13         Q. And the way that IARC has structured this
14  paragraph is that they have said that they've based
15  their conclusion on the occupational studies; correct?
16             MS. PARFITT: Objection. Form.
17             THE WITNESS: Yes.
18      BY MR. JAMES:
19         Q. And then they do note the additional support
20  after that sentence; correct?
21             MS. PARFITT: Objection to form.
22             THE WITNESS: Yes.
23      BY MR. JAMES:
24         Q. Okay. And just to be clear, the IARC here
25  acknowledges that the non-occupational studies report

24 (Pages 90 to 93)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 94

1  nonstatistically significant associations; correct?
2      A. They note "positive, though nonsignificant
3  increases."
4          Yes, that's what it states.
5      Q. And if you turn with me to page 280 of the
6  same monograph, Dr. Moorman, with respect to talcum
7  powder, specifically, on the right-hand column of
8  page 280, it's the third full paragraph down, the IARC
9  monograph states (as read):
10         "The association between exposure
11         to talc, potential or retrograde
12         translocation to the ovarian
13         epithelium, and the development of
14         an ovarian cancer is
15         controversial."
16      Do you see where I was reading that?
17      A. I do see that.
18      Q. So in the same monograph where they're
19  talking about asbestos and ovarian cancer in general,
20  the IARC calls out the issue of talcum powder as a
21  controversial association; correct?
22         MS. PARFITT: Objection. Form.
23         THE WITNESS: That's what it states,
24  yes.
25

Page 95

BY MR. JAMES:
1
2      Q. Did you cite that conclusion in your report?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: I did not specifically
5  cite this, because, you know, again, this was a
6  conclusion made IARC 2010, and additional data has
7  accumulated. And so I think that we're seeing that if
8  they had -- you know, of course, I have no way of
9  knowing what they would conclude, but I think that, in
10  light of additional evidence that has arisen since the
11  time that this report was written, a different
12  conclusion could have been reached.
13         MR. JAMES: Okay. And I object to the
14  nonresponsive portion of that answer.
15  BY MR. JAMES:
16      Q. And for purposes of the record, Dr. Moorman,
17  the monograph that we're looking at here together was
18  published in 2012; correct?
19      A. That is correct.
20      Q. I think that you're probably thinking of the
21  other monograph, which is the 2010 monograph; correct?
22  When you said 2010?
23      A. Well, I was looking at what was stated in
24  that paragraph.
25      Q. Fair enough. Fair enough.

Page 96

1      A. Yes.
2      Q. The IARC has not concluded that the presence
3  of asbestos in talc powders renders such powders as
4  carcinogenic, has it?
5          MS. PARFITT: Objection. Form.
6          THE WITNESS: I can't recall if they
7  have made that conclusion or not.
8  BY MR. JAMES:
9      Q. You understand that when the IARC separately
10  assessed talcum powders in the other monograph that
11  we're talking about, they classified perineal talc use
12  as a 2B do you know that?
13         MS. PARFITT: And you're referring to
14  the 2010 monograph?
15         MR. JAMES: Yes, and I think that's
16  what I said, and if I didn't, my apologies.
17         THE WITNESS: Yes, to be a possible
18  carcinogenic.
19  BY MR. JAMES:
20      Q. Okay. And by designating perineal talc use
21  as a 2B, the IARC is not concluding that it is, in
22  fact, a carcinogenic; correct?
23      A. What they are concluding is that it is a
24  possible carcinogen.
25      Q. IARC has multiple classifications; correct?

Page 97

1      A. That is correct.
2      Q. If they characterize -- if they -- if they
3  characterize something as a carcinogen, they label it
4  as a Group 1; correct?
5      A. That is correct.
6      Q. If they characterize something as a probable
7  carcinogen, they label it a 2A; correct?
8      A. That is correct.
9      Q. And if they characterize something as a
10  possible, it's a 2B; correct?
11      A. That is correct.
12      Q. And the IARC has settled on 2B with talc --
13  and with perineal talc use; correct?
14         MS. PARFITT: Objection. Form.
15         THE WITNESS: Once again, at the time
16  of the report, that's what they decided on.
17  BY MR. JAMES:
18      Q. The opinions that you're offering in
19  litigation in this MDL report are contrary to those
20  reached by IARC; correct?
21         MS. PARFITT: Objection. Form.
22         THE WITNESS: No. I don't think that
23  they are contrary. I think possible carcinogen --
24  they are not saying it is not a carcinogen; they're
25  saying a possible carcinogen.

25 (Pages 94 to 97)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 98

1        And I -- my report, with the additional
2   information that has been published since the time
3   that this report was done, I think that it strengthens
4   the conclusions.  And that's why I felt comfortable
5   saying that it is a cause of ovarian cancer.
6   BY MR. JAMES:
7        Q.  And so what you're saying is different than
8   what the IARC said in 2010; correct?
9             MS. PARFITT:  Objection.  Misstates her
10  testimony.  Asked and answered.
11            THE WITNESS:  I'm saying that there is
12  additional evidence that has arisen, and it
13  strengthens the -- it strengthens the evidence for the
14  association between talc and ovarian cancer.
15  BY MR. JAMES:
16       Q.  And in 2010, IARC did not determine that
17  perineal talc use was carcinogenic; correct?
18       A.  They said --
19            MS. PARFITT:  Objection.  Misstates
20  testimony.
21            THE WITNESS:  -- it was a possible
22  carcinogen.
23            MR. JAMES:  I didn't misstate any
24  testimony.  I didn't state anything about her
25  testimony.  I asked a question.

Page 99

1             MS. PARFITT:  You actually
2   misrepresented her answer in your question.  That was
3   my objection.  You can go ahead.
4             MR. JAMES:  If you'd like to read the
5   realtime, I didn't say anything about what she
6   testified to.  I asked a question --
7             MS. PARFITT:  You said, "In 2010" --
8             (Over-speaking.)
9             MR. JAMES:  But if you want to continue
10  to do that all day --
11            MS. PARFITT:  -- "IARC did not
12  determine that peritoneal [sic] talc was carcinogenic;
13  correct?"
14       Just before that, she had said that it was
15  carcinogenic.
16            MR. JAMES:  But I wasn't misstating her
17  testimony.
18            MS. PARFITT:  Well, when you say that,
19  and she answered the question before that that's not
20  what IARC said, and then you say that is what IARC
21  says, you are misstating her testimony.
22            MR. MIZGALA:  It's "perineal," not
23  "peritoneal."
24            MR. JAMES:  Let's just move on.  If you
25  continue to --

Page 100

1             MR. MIZGALA:  There's a big difference.
2             MR. JAMES:  Let's just move on.
3             MS. PARFITT:  I didn't say
4   "peritoneal."  That may be what the court reporter --
5        And, Sophie, the record should reflect that
6   when we are saying -- for the most part, when someone
7   wants to say something, it's "perineal" --
8             MR. JAMES:  May we continue?
9             MS. PARFITT:  I appreciate it.  Thank
10  you.
11       I just want to help the court reporter out,
12  Scott.  I'm sure you want a very clear record.
13       And, James, thank you very much for making
14  sure it is clear.
15       So, Sophie, thank you.  When we say
16  "perineal," we mean "perineal."  Not your fault at
17  all.
18       Thank you.
19            MR. JAMES:  Are we good?
20            MS. PARFITT:  We are so good.
21  BY MR. JAMES:
22       Q.  In 2010, the IARC declared talc -- perineal
23  talc a 2B; correct?
24       A.  That is correct.
25       Q.  Okay.  In 2010, the evidence that was before

Page 101

1   the IARC -- was the evidence at that time sufficient
2   for IARC to have said something more than 2B?
3             MS. PARFITT:  Objection.  Form.
4             THE WITNESS:  I'm not quite sure.
5   BY MR. JAMES:
6        Q.  You want me to rephrase?
7        A.  Yes, if you wouldn't mind.
8        Q.  You alluded to evidence that has -- and if
9   I'm misstating your testimony, Ms. Parfitt, please
10  object, because now I actually am talking about your
11  testimony.
12       A.  Okay.
13       Q.  But you alluded earlier that evidence has
14  developed since the 2010 monograph; correct?
15       A.  Right.
16       Q.  And so my question is, in your expert
17  assessment in 2010, when the IARC declared perineal
18  talc use to be a 2B, was the evidence at that snapshot
19  in time sufficient to support something more than 2B,
20  less than 2B, or did the IARC get it right?
21            MS. PARFITT:  Objection.  Form.
22            THE WITNESS:  I -- I think that their
23  statement that it is a possible carcinogen -- I don't
24  know if you can -- you know, possible versus probable,
25  it's -- I don't know that there is any checklist to

26 (Pages 98 to 101)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 102

1  say this level of evidence would lead it to possible
2  versus probable.
3            And so to say whether or not they got it
4  right, I don't know how to answer that question.
5  I think that they certainly are indicating that there
6  was evidence indicating a problem, and now we have
7  more evidence that strengthens the -- I think there's
8  greater evidence that talc can cause ovarian cancer.
9  BY MR. JAMES:
10     Q.  If someone had asked you to assess the body
11  of scientific and medical literature in 2010 on the
12  claim that talcum powder products cause ovarian
13  cancer, would you have opined in 2010 that the
14  evidence was sufficient to state that talcum powder
15  products generally cause ovarian cancer?
16            MS. PARFITT:  Objection.  Form.
17            THE WITNESS:  I think that it is
18  impossible to say with certainty what -- at that point
19  in time what would I have opined?  I think that, as we
20  are well aware, the body of literature has continued
21  to grow over time.  I think that it has only
22  strengthened over time.  At what point would I have
23  been able to opine that talc is a cause of ovarian
24  cancer?  I can't pinpoint that exactly.
25

Page 103

1  BY MR. JAMES:
2     Q.  And when you say in 2010 IARC declared talc a
3  2B, I think the phrasing that you used was that they
4  were saying that there was, quote, a problem.
5            Is that what you said?
6     A.  I think that I said something to that effect.
7     Q.  Okay.  You understand that the IARC's
8  classification system does have a checklist of sorts
9  to determine if something is a 1, a 2A, or a 2B;
10  correct?  Or a 3 and so on and so forth.
11     A.  I am not familiar with the exact checklist.
12  Yes.
13     Q.  Do you understand that, if IARC declares
14  something a 2B, it's concluding that chance, bias, and
15  confounding cannot be ruled out?  Did you know that?
16     A.  Again, off the top of my head, I cannot
17  recall exactly what are their -- you know, as you put
18  it, what is their checklist.
19     Q.  Returning now back to the body of literature
20  on asbestos and ovarian cancer, you have testified
21  that you have reviewed that body of literature;
22  correct?
23     A.  Yes.
24     Q.  Do you recognize any limitations to that body
25  of literature?

Page 104

1            MS. PARFITT:  Objection to form.
2            THE WITNESS:  I -- when I look at some
3  of the studies, there are limitations, as there are
4  with -- I would say, with any study of humans and
5  cancer.
6            One of the things that comes to mind as a
7  possible limitation is that, in the occupational
8  studies, the cohorts are relatively small for looking
9  at cancer outcomes.  So in many -- maybe the
10  majority -- of them, they had a few hundred people in
11  the cohort; and, when you looked at the expected
12  versus the observed number of cases, we're talking
13  about a handful of cases.
14            So it might be, you know, two or three
15  observed cases versus .6 expected or something like
16  that.
17            So that is a limitation of all of -- as
18  I recall, all of the occupational cohort studies that
19  the sample cites of the cohort.
20  BY MR. JAMES:
21     Q.  Would you also acknowledge that another
22  limitation to that body of literature is the fact that
23  it's in the occupational context?
24            MS. PARFITT:  Objection.  Form.
25            THE WITNESS:  I don't necessarily

Page 105

1  consider that a limitation.  That is where people had
2  exposure to this -- to asbestos in an occupational
3  setting.  So if you want to look at the health effects
4  of that exposure, that's exactly where you would do
5  the study.
6  BY MR. JAMES:
7     Q.  Do you agree that the body of literature in
8  the occupational context, which looks at exposure to
9  asbestos in the occupational setting, is different
10  than the allegation that exposure to contaminated
11  talcum powder products causes ovarian cancer?
12     A.  The -- I agree that there is some difference
13  in the exposure, but it's part of the body of
14  literature.  It's -- people exposed in this way, they
15  are at increased risk for ovarian cancer.  So they may
16  have different levels of exposure, different routes of
17  exposure, but it's all part of the body of literature.
18     Q.  You would agree that someone that's exposed
19  to asbestos-containing products in a factory
20  environment for a full workday is experiencing a
21  different level of exposure to someone who is using
22  allegedly contaminated asbestos talcum powder
23  products?
24            MS. PARFITT:  Objection.  Form.
25

27 (Pages 102 to 105)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 106

1  BY MR. JAMES:
2      Q.  Let me rephrase that, because I jumbled that
3  up.
4          Would you agree that the level of exposure
5  that someone would experience in the occupational
6  setting to asbestos products is qualitatively
7  different than what Plaintiffs are alleging in this
8  case, which is exposure to talcum powder products that
9  are allegedly contaminated with asbestos?
10     A.  I acknowledge that the exposures are
11 different.  It's how they are applied -- or, you know,
12 the -- you know, we're talking about exposure to the
13 genital area when we're talking about talcum powder
14 products that may contain asbestos, where we would not
15 expect to have genital exposure of asbestos in an
16 occupational setting.
17         So, yes, there are differences.
18     Q.  Do you acknowledge another limitation in the
19 body of literature that IARC looked at to be
20 misclassification?
21     A.  In epidemiology, we -- we recognize that
22 there is likely to be misclassification in any
23 epidemiologic study that you do.  This is not a
24 situation like with laboratory studies of animals
25 where you can control every exposure, measure it very

Page 107

1  accurately.
2          So some potential misclassification is
3  possible, as it is in any epidemiologic study.
4      Q.  And the issue of misclassification has been
5  specifically acknowledged in this body of literature;
6  correct?
7          MS. PARFITT:  Objection to form.
8          THE WITNESS:  Can you be more specific
9  about which misclassification you're referring to?
10 BY MR. JAMES:
11     Q.  Sure.  So what I'm referring to is
12 misclassification of disease.
13         Do you -- do you recall that, in this body
14 of literature, there is discussion that, given the
15 small number of cases which you described earlier,
16 misclassification -- the potential for disease
17 misclassification is a limitation to this body of
18 literature?
19     A.  I am aware that that is an issue that has
20 been discussed in this literature, yes.
21         MR. JAMES:  And I'm going to mark as
22 Exhibit No. 15 the Reid paper.
23         (Exhibit No. 15 was marked for identification.)
24 BY MR. JAMES:
25     Q.  And, Dr. Moorman, you've seen this Reid

Page 108

1  meta-analysis before; correct?
2      A.  I have.
3      Q.  You don't have any discussion of the Reid
4  paper in your report; correct?
5      A.  I don't -- I don't believe I do.
6      Q.  Do you understand that the Reid paper
7  conflicts in part with the claim that asbestos is a
8  cause of ovarian cancer?
9          MS. PARFITT:  Objection.
10         THE WITNESS:  I know what they -- what
11 these authors concluded.
12 BY MR. JAMES:
13     Q.  And if you look with me on page 1294,
14 Dr. Moorman, in the "conclusions" section, you see at
15 the bottom of that paragraph, with the sentence
16 beginning with the word "however" -- it's sort of
17 three-fourths of the way down -- the authors state
18 (as read):
19         "However, the authors of this
20         article suggest that the IARC
21         decision to determine asbestos
22         exposure as a cause of ovarian
23         cancer was premature and not
24         wholly supported by the evidence."
25     Do you see where I read that?

Page 109

1      A.  I do see that.
2      Q.  Okay.  And so you acknowledge here that the
3  authors of this paper have called into question the
4  IARC decision; correct?
5          MS. PARFITT:  Objection.  Form.
6          THE WITNESS:  I see what they have
7  stated here, that --
8  BY MR. JAMES:
9      Q.  And --
10     A.  -- that is their opinion, yes.
11     Q.  Excuse me, Doctor.  My apologies.
12     A.  Yes.
13     Q.  And, again, this paper is assessing the
14 IARC's conclusion about asbestos and ovarian cancer in
15 general; correct?
16         MS. PARFITT:  Objection.  Form.
17 BY MR. JAMES:
18     Q.  It's not -- this article isn't pertaining to
19 the issue of alleged asbestos contamination in talcum
20 powder products, is it?
21     A.  Right.  This is focused just on asbestos and
22 ovarian cancer.
23     Q.  And if you look at the bottom of that -- the
24 very last sentence in that paragraph, you see where
25 the authors there discuss the potential problem of

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 110

1  misclassification?
2      Q. I'm sorry, where are you?
3      Q. It's the very last sentence, Doctor.
4      A. Yes, I see what is written there.
5      Q. So this article conflicts with your
6  litigation opinion; correct?
7          MS. PARFITT: Objection. Form.
8          THE WITNESS: This reflects the opinion
9  of these authors. There was another meta-analysis of
10  asbestos and ovarian cancer that I believe was
11  published in the same year. And as I recall, the
12  conclusions of those authors, while acknowledging
13  potential misclassification of disease, they felt like
14  the evidence was adequate to rule that out as a
15  possible source of bias that would explain the
16  association that was observed.
17  BY MR. JAMES:
18      Q. And you're speaking of the Camargo article,
19  I believe?
20      A. Yes.
21      Q. And have you separately assessed the issue of
22  misclassification and whether, in your mind, that
23  presents a significant enough problem to call into
24  question the IARC conclusions?
25          MS. PARFITT: Objection. Form.

Page 111

1          THE WITNESS: Let me read your...
2          I believe that I was convinced by the
3  information presented in the Camargo article that
4  I don't think that misclassification was enough of a
5  problem to change the conclusion.
6  BY MR. JAMES:
7      Q. Are you familiar with -- did you undertake a
8  Bradford Hill analysis of the literature on asbestos
9  and ovarian cancer to reach the conclusion that
10  asbestos is a cause of ovarian cancer?
11      A. I didn't -- did not do the Bradford Hill
12  analysis as I did with the talcum powder products and
13  ovarian cancer. I felt like it was pretty well
14  accepted.
15      Q. Did you consider a body of literature
16  commonly referred to as the "miners and millers
17  studies"?
18      A. Please -- I'm sorry. When you talk about the
19  miners and millers studies, I'm not sure that I'm on
20  the same page with you.
21      Q. Are you familiar -- are you aware of the fact
22  that there's a body of literature that has looked at
23  cancer incidence rates in miners and millers of talc?
24      A. Yes, I am aware of some of those articles.
25      Yes.

Page 112

1      Q. Did you review those articles?
2      A. I did look at them, and as I recall, almost
3  all of those -- the miners and -- almost all of the
4  miners, and probably the millers, they were focusing
5  primarily on males who were the people who were mostly
6  involved in that type of work.
7      Q. You would agree with me that if talcum
8  powder, that is used in cosmetic talc products, is, in
9  fact, contaminated with asbestos, then you would
10  expect to see increased cancer incidence rates, for
11  example, of mesothelioma, in cosmetic talc miners and
12  millers; correct?
13          MS. PARFITT: Objection. Form.
14          THE WITNESS: I wouldn't be surprised
15  to see that, yes.
16  BY MR. JAMES:
17      Q. And did you know that that body of literature
18  reports no increased cancer incidence in talc miners
19  and millers?
20      A. It has been a while since I have looked at
21  those papers, so I don't remember exactly what they
22  reported.
23      Q. And those papers are not discussed in your
24  report; correct?
25      A. Once again, I was focusing primarily on

Page 113

1  ovarian cancer. And as many of these were on male
2  subjects, I had looked at them, but they were of
3  somewhat lesser importance to my review.
4      Q. If --
5          MS. PARFITT: I don't want to
6  interrupt, and maybe a few follow-up questions. We're
7  probably into about an hour and 20 minutes or so. But
8  I don't want to interrupt your flow either.
9          MR. JAMES: I can finish up in a few,
10  or if you need a break now, we can take it now.
11          THE WITNESS: Let's finish up in a few.
12          MR. JAMES: And when I say "finish up,"
13  I just mean this line. I apologize for that. That
14  was misleading, I think.
15          Sure. Give me a couple more, and then we'll
16  take a break.
17          THE WITNESS: Yeah, we can go a few
18  more minutes.
19          MS. PARFITT: Thank you, Scott.
20  BY MR. JAMES:
21      Q. If asbestos-contaminated talcum powder
22  products have existed on the market for some period of
23  time, wouldn't you expect to find higher incidence
24  rates of other cancers of talcum powder users?
25          MS. PARFITT: Objection. Form.

29 (Pages 110 to 113)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 114

1    THE WITNESS: It depends.
2    BY MR. JAMES:
3    Q. For example -- oh, I'm sorry. I thought you
4    were done.
5    A. I am done. Go ahead.
6    Q. For example, if asbestos has contaminated
7    talcum powder products for some period of time,
8    wouldn't you expect to see higher rates of
9    mesothelioma in users of cosmetic talcum powder
10   products?
11   A. You know, mesothelioma is an exceedingly rare
12   cancer, and I don't know -- I don't know to what
13   extent it has been -- talcum powder products --
14   cosmetic talcum powder products has been examined as a
15   risk factor for that.
16   Q. Are you aware of any data showing that users
17   of cosmetic talcum powder products are at greater risk
18   of mesothelioma, asbestosis, or any other
19   asbestos-related diseases?
20   MS. PARFITT: Objection. Form.
21   THE WITNESS: I can't think of that
22   data right offhand, no.
23   MR. JAMES: Okay. And how about now
24   for a break?
25   THE WITNESS: Okay.

Page 115

1    MS. PARFITT: Thank you.
2    THE VIDEOGRAPHER: Going off record at
3    11:45 a.m.
4    (Recess taken from 11:45 a.m. to 12:39 p.m.)
5    THE VIDEOGRAPHER: Back on record at
6    12:39 p.m.
7    BY MR. JAMES:
8    Q. Dr. Moorman, you include in your MDL report
9    references to "talc occurring in the fibrous habit."
10   Do you recall referring to that in your
11   report?
12   A. Yes, I do.
13   Q. That terminology is new to the MDL for you,
14   isn't it?
15   MS. PARFITT: Objection. Form.
16   BY MR. JAMES:
17   Q. I'll clarify.
18   A. Please. Please do.
19   Q. You did not -- in your Ingham testimony,
20   where you provided your opinions in the Ingham case,
21   you did not refer to "fibrous talc," did you?
22   A. No, I don't believe I did.
23   Q. So that -- sorry.
24   So that's a new component of your opinion in
25   the MDL?

Page 116

1    MS. PARFITT: Objection. Form.
2    THE WITNESS: I considered it as part
3    of the constituents of the talcum powder products. My
4    overall opinion is based on exposure to talcum powder
5    products and whatever constituents are in there,
6    including the fibrous talc.
7    BY MR. JAMES:
8    Q. Given that you have opined in your MDL report
9    for the first time on fibrous talc and did not provide
10   that opinion in the Ingham case, can you tell me what
11   you're basing your opinion on with regard to the
12   fibrous talc?
13   MS. PARFITT: Objection.
14   Hey, Scott, if I can ask -- I'm sorry, it
15   isn't rolling. Is there some reason? I don't want to
16   interrupt. We'll deal with it.
17   THE COURT REPORTER: I can come over
18   and do it, but we'll have to go off.
19   MS. PARFITT: Sorry about that.
20   THE VIDEOGRAPHER: Going off the record
21   at 12:40 p.m.
22   (Off the record.)
23   THE VIDEOGRAPHER: Back on record at
24   12:41 p.m.
25

Page 117

1    BY MR. JAMES:
2    Q. Dr. Moorman, before the quick break -- I'll
3    just restate the question.
4    A. Okay.
5    Q. So what do you base your opinions on with
6    regard to fibrous talc?
7    A. Okay. My opinion, I guess, is -- again, it's
8    always been based on the constituents of the talcum
9    powder products. And so maybe clarifying based on
10   maybe further reading on the constituents of, like,
11   asbestiform talc, that this again contributes to the
12   biological plausibility of it, that this is another
13   potential constituent of the talcum powder product
14   that could contribute to ovarian cancer risk.
15   Q. So one component of your opinion is that
16   there is fibrous talc in talcum powder products;
17   correct?
18   A. Yes.
19   Q. Okay. And given that that is a new opinion,
20   I am attempting to source the bases for that opinion.
21   Are the opinions that you have about the
22   presence of fibrous talc in talcum powder products
23   based upon the same materials that you rely on for
24   your opinions about the presence of asbestos in talcum
25   powder products?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 118

1      MS. PARFITT: Objection. Form. As far
2  as a new opinion.
3      THE WITNESS: I'm sorry, let me read
4  that.
5      So my opinions about the presence of fibrous
6  talc in talcum powder products is based on some of the
7  same materials that have done analyses of talcum
8  powder products, yeah.
9  BY MR. JAMES:
10     Q. Would that include the Longo -- Dr. Longo
11  litigation testing?
12     A. I believe that he did make some mention of
13  that in his report, yes.
14     Q. And other -- would that include other
15  litigation reports that you reviewed?
16     MS. PARFITT: Objection. Form.
17     THE WITNESS: I'm -- precisely where
18  the information came from, that there is fibrous talc
19  in talcum powder products, I -- I don't recall exactly
20  where -- where I gleaned that information.
21  BY MR. JAMES:
22     Q. And did you -- did you ask counsel if there
23  was any information provided by Johnson & Johnson in
24  the talc litigation rebutting the claim that there's
25  fibrous talc present in the products?

Page 119

1      MS. PARFITT: Objection. Form.
2      THE WITNESS: No, I did not
3  specifically ask them for that information.
4  BY MR. JAMES:
5      Q. Have you relied on any epidemiology
6  substantiating a claim that fibrous talc is
7  carcinogenic?
8      A. I am not aware of any epidemiologic
9  literature that specifically addressed that question.
10     Q. Turning to your opinions on heavy metals,
11  Dr. Moorman, you have opined in your report about
12  chromium, nickel, and cobalt; correct?
13     A. Yes, I have.
14     Q. Yet your opinions in the MDL report about the
15  alleged presence of chromium, nickel, and cobalt in
16  talcum powder products is new in the sense that you
17  did not express that opinion in the Ingham case;
18  correct?
19     MS. PARFITT: Objection. Misstates her
20  testimony -- our testimony.
21     THE WITNESS: I think the gist of my
22  opinions are based on talcum powder products and
23  whatever constituents are in there; so talc, asbestos,
24  any fragrances or other contaminants that may be in
25  there. So it's based on the product.

Page 120

1  BY MR. JAMES:
2      Q. Would you defer to others with regard to the
3  question of whether heavy metals are in the talcum
4  powder products?
5      A. I -- by deferring to others, okay, I clearly
6  do not do the analyses of those -- of those -- those
7  types of analyses myself, so I am relying on a report.
8  In this case, it was a report done by Dr. Crowley.
9      Q. Just to clarify, and Ms. Parfitt can correct
10  me if I'm wrong, but when you refer to Dr. Crowley's
11  report, are you referring to Dr. Crowley's report
12  about fragrances?
13     A. And I believe that it was not just
14  fragrances, but it was a number of substances that he
15  analyzed in that -- that he addressed in his analysis.
16     Q. Did you do any independent searching for
17  materials or scientific literature on the allegation
18  that heavy metals in cosmetic talc powders cause
19  ovarian cancer?
20     MS. PARFITT: Objection.
21     THE WITNESS: Okay. I'm reading your
22  question again.
23     No. I -- the -- what I looked at in regards
24  to heavy metals -- again, we have this report
25  indicating that these can be found in some talcum

Page 121

1  powder products, and then again we have data
2  indicating that these heavy metals can cause certain
3  types of cancer.
4      So it contributes to the biological
5  plausibility that there are substances in the talcum
6  powder products that could lead to cancer.
7  BY MR. JAMES:
8      Q. With regard to opinions about the presence of
9  heavy metals in talcum powder products, did you ask to
10  see any information or materials presented in the talc
11  litigation by Johnson & Johnson as to that claim?
12     A. No, I did not.
13     Q. Did you do any separate analysis of the
14  talcum powder products to determine the presence of
15  heavy metals in these products?
16     A. I did not do any analyses of talcum powder
17  products.
18     Q. Do you have any knowledge concerning the
19  testing that is performed by Johnson & Johnson and
20  third parties with respect to constituent elements in
21  the products?
22     A. No. This is outside my area of expertise.
23     Q. Do you have any information about allowable
24  levels of constituent elements in the talcum powder
25  products?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 122

1  A. No, I do not.
2      Q. Do you have any basis to believe that if
3  talcum powder products exceeded allowable levels for
4  constituent elements, that those products went to
5  market?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: No, I -- I don't have any
8  information in that regard.
9  BY MR. JAMES:
10     Q. Okay. Turning to -- with -- to your opinion
11 on -- strike that.
12     Do you hold the independent opinion that
13 cadmium, chromium, and cobalt cause ovarian cancer?
14         MS. PARFITT: Objection. Form.
15         THE WITNESS: I do -- I am not aware of
16 papers that have directly addressed those metals in
17 relation to ovarian cancer risk. I am basing it more
18 on the conclusions from IARC that they do have
19 carcinogenic potential.
20 BY MR. JAMES:
21     Q. And is the same true for nickel?
22     A. Yes.
23     Q. With regard to the alleged carcinogenicity of
24 the constituent metal elements that you've identified
25 in your report, did you consider anything other than

Page 123

1  the IARC monograph that you cited?
2      A. No, I did not.
3      Q. Did the IARC monograph that you cited include
4  any assertion that the presence of these metals in
5  talcum powders rendered those powders carcinogenic?
6      A. I do not believe so.
7      Q. Did the IARC 2010 monograph on talc include
8  any assertion that the presence of heavy metals in
9  those powders supports the 2B conclusion?
10         MS. PARFITT: Objection. Form.
11         THE WITNESS: I don't recall any
12 mention of heavy metals in that monograph.
13 BY MR. JAMES:
14     Q. Returning back to fragrances, in your MDL
15 report, you refer to a report by Crowley. Did I say
16 that right?
17     A. I've never met the man, so I don't know how
18 it's pronounced, but yes, that's what I said.
19     Q. And that's the report you identified for the
20 basis of your fragrance opinions; correct?
21     A. Yes.
22     Q. Do you have -- do you hold the independent
23 opinion that the fragrance ingredients in talcum
24 powder products renders those products carcinogenic?
25         MS. PARFITT: Objection.

Page 124

1          THE WITNESS: I -- I think that we do
2  not have the data to specifically address that
3  question specifically in regard to ovarian cancer.
4  BY MR. JAMES:
5      Q. With regard to the opinions you've expressed
6  as to fragrances, is the sole basis of those opinions
7  the value of work?
8      A. That's the only document that I referred to.
9      Q. And you understand --
10         MR. JAMES: Ms. Parfitt, is it
11 Dr. Crowley?
12         MS. PARFITT: Dr. Crowley.
13 BY MR. JAMES:
14     Q. Okay. Do you understand that Dr. Crowley is
15 a paid expert in this litigation for the Plaintiffs?
16     A. I do understand that.
17     Q. Do you know if Dr. Crowley conducted any sort
18 of risk assessment with regard to his calculations?
19     A. I do not know that.
20     Q. If Johnson & Johnson talcum powder products
21 were not contaminated with asbestos, if you would
22 accept that proposition from me, would you still hold
23 the opinion that talcum powder products are a general
24 cause of ovarian cancer?
25         MS. PARFITT: Objection. Form.

Page 125

1      You can answer.
2          THE WITNESS: Okay. The opinion
3  I formed is based primarily on the epidemiologic data;
4  and the epidemiologic data is based on talcum powder
5  products, whatever is contained in them. And in study
6  after study, we see increased risk for ovarian cancer.
7  So whatever is contained in the talcum powder products
8  leads me to conclude that it can cause ovarian cancer.
9  BY MR. JAMES:
10     Q. And just to make sure that I understand your
11 answer --
12     A. Yes.
13     Q. -- if the talcum powder products were not
14 contaminated with asbestos, would you still reach the
15 general cause opinion that you've offered in this
16 case?
17         MS. PARFITT: Objection. Form.
18         THE WITNESS: I am -- I think that I've
19 answered the question that it's based on talcum powder
20 products, whatever is contained them -- in them. If
21 it is shown that there is no asbestos, that doesn't
22 change the fact that these dozens of epidemiologic
23 studies have led to the conclusion of increased risk.
24 BY MR. JAMES:
25     Q. And does that same answer hold true if

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 126

1  I asked you the same question with respect to heavy
2  metals, fibrous talc, and fragrance ingredients?
3          MS. PARFITT: Objection. Form.
4          THE WITNESS: Yes. I am basing my
5  opinion on the use of talcum powder products and
6  whatever are -- whatever their constituents are.
7  BY MR. JAMES:
8      Q. As a professional epidemiologist -- is that a
9  fair way to say it?
10     A. Yes.
11     Q. Okay. As a professional epidemiologist, part
12 of your day-in, day-out work is to look at literature
13 on purported associations and make conclusions about
14 the strengths or weaknesses of that literature;
15 correct?
16     A. Yes.
17     Q. And you have done that before you were
18 brought into the talc litigation on a variety of
19 different exposures or other things evaluated for
20 associations; correct?
21     A. That is correct.
22     Q. And setting aside the issue of talcum powder
23 products, have you ever before, in assessing other
24 exposures or other associations, relied upon company
25 documents to reach your conclusions?

Page 127

1      A. I -- I'm trying to think.
2          We have -- my colleagues and I have
3  published systematic reviews of oral contraceptive use
4  and ovarian cancer and other cancer risk. And as part
5  of that procedure -- this was through the Agency on
6  Healthcare Research and Quality, or AHRQ -- and as
7  part of that procedure trying to ensure that we have
8  all relevant documents, I believe that there was an
9  effort to see if there were any company document
10 studies that would be relevant to that systematic
11 review.
12     Q. What about any internal company testing
13 documents? Have you ever looked at any internal
14 company testing documents in assessing any association
15 that you've considered throughout your career?
16     A. No --
17         MS. PARFITT: Objection.
18         THE WITNESS: -- I did not.
19 BY MR. JAMES:
20     Q. Have you ever considered any paid litigation
21 expert reports in assessing any other association that
22 you've looked at through your career?
23         MS. PARFITT: Objection. Form.
24         THE WITNESS: I -- I can't think of
25 another instance where I have done that.

Page 128

1  BY MR. JAMES:
2      Q. On page 4 of your -- actually, it's page 5 of
3  your report, Dr. Moorman. You refer on the top of
4  that page, in the first full paragraph, to the
5  Schildkraut 2016 study; correct?
6      A. First paragraph? Yes, that is correct.
7      Q. And you say in that paragraph -- and if
8  you're looking at the same paragraph as I am -- you
9  say there that (as read):
10         "This was the first study of talc
11          use and ovarian cancer focused
12          exclusively on African-American
13          women."
14     Correct?
15     A. Yes, I do.
16     Q. And to be clear, Dr. Moorman, that study did
17 not look exclusively at talc use, did it?
18     A. No. The purpose of the African American
19 cancer epidemiology study was to look at the
20 epidemiology of ovarian cancer in African American
21 broadly. So we've looked at a number of exposures.
22     Q. And specific to the issue of powder, the
23 Schildkraut 2016 study -- and I guess is the
24 underlying study, the AACES -- looks at body powder,
25 not talc per se; correct?

Page 129

1      A. That was how the question was asked in the
2  questionnaire, yes.
3      Q. Okay. And so the statements in your report
4  that state that the study looked at talc powder should
5  be clarified; correct?
6          MS. PARFITT: Objection. Form.
7          THE WITNESS: I think to be absolutely
8  precise, we should have -- I should have said body
9  powder. But based on other literature, most body
10 powder use is talcum powder product use. So I agree,
11 I could have been more precise in my language there.
12 BY MR. JAMES:
13     Q. And you understand body powders are made up
14 of a variety of constituents; correct?
15     A. Yes.
16     Q. There are baby powders that are made of
17 things other than talc; correct?
18     A. I believe so, that there are cornstarch
19 powders as well.
20     Q. And there are deodorizing powders that are
21 made of things other than talc; correct?
22     A. I believe so, yes.
23     Q. And you know cornstarch, if there's a baby
24 powder made of cornstarch, that product does not
25 contain talc; correct?

33 (Pages 126 to 129)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 130

1    A. Yes.
2    Q. Or -- I should clarify.
3        If the version of the baby powder one is
4  purchasing is labeled as a cornstarch product, it's
5  cornstarch, not talc; correct?
6    A. That is correct.
7    Q. So the study participants in this study are
8  not limited to talc users; correct?
9    A. That is correct.
10   Q. You also say in the report, in conjunction
11 with these statements, that the study found a high
12 prevalence of talc use; correct?
13   A. Yes.
14   Q. And we're looking at the same paragraph,
15 Dr. Moorman. And, again, to be clear, the study
16 didn't find that. The study, instead, found a high
17 prevalence of powder use; correct?
18       MS. PARFITT: Objection.
19       THE WITNESS: Again, once I -- as I
20 acknowledged earlier, I could have been more precise
21 in the language, that it's -- I think that it -- based
22 on our knowledge of the sales and other studies that
23 have specifically reported on the types of powder use,
24 the majority of the powder use would have been talc.
25

Page 131

1  BY MR. JAMES:
2    Q. You're not offering opinions on the MDL
3  litigation about cornstarch, are you?
4    A. No, I am not.
5    Q. And you understand that the body of
6  epidemiological literature that has developed over the
7  last several decades has included findings looking at
8  talc powders versus cornstarch powders versus non-talc
9  powders; correct?
10   A. Some studies, yes, have looked at the
11 different powders.
12   Q. And your -- the Schildkraut 2016 study didn't
13 undertake the effort to make that distinction, did it?
14       MS. PARFITT: Objection.
15       THE WITNESS: I've already acknowledged
16 that the question in the questionnaire just asked
17 about body powder use.
18 BY MR. JAMES:
19   Q. You state that this study found a
20 statistically significant increase for risk among talc
21 users; right?
22   A. Yes. We're in the same paragraph. Right?
23   Q. Yes, Doctor. Thank you.
24   A. Yes.
25   Q. But you did not know in this paragraph, or

Page 132

1  anywhere else in your report, that for any genital use
2  of body powder with an interview date before 2014, the
3  results were not statistically significant; correct?
4        MS. PARFITT: Objection.
5        THE WITNESS: If you would give me just
6  a moment to look through the report, I'd like to
7  verify how I addressed that.
8        I -- on page 23, I acknowledged that there
9  was an attenuation of the odds ratio when comparing
10 the women who were interviewed in the later time frame
11 than in the earlier time frame.
12 BY MR. JAMES:
13   Q. Okay. And I'm looking at where you're
14 looking, I believe, and it's the middle paragraph on
15 page 23; correct?
16   A. That is correct.
17   Q. And there you say (as read):
18       "The fact that the association was
19       attenuated but not eliminated when
20       considering the full study
21       population suggested that the
22       association was not due entirely
23       to recall bias."
24       Did I read that correctly?
25   A. That is correct.

Page 133

1    Q. Okay. And, again, here you do not report --
2  let me start over.
3        The association for talc users before 2014
4  date was not statistically significant; correct?
5        MS. PARFITT: Objection. Form.
6        THE WITNESS: Yes. The -- the odds
7  ratio was elevated but not statistically significant.
8  BY MR. JAMES:
9    Q. And you don't call that out in your report,
10 do you?
11       MS. PARFITT: Objection. Form.
12       THE WITNESS: No. It's as it's
13 written.
14 BY MR. JAMES:
15   Q. And as it's written, it says, "The
16 association was attenuated but not eliminated."
17       That's the wording you used; correct?
18   A. Yes.
19   Q. Okay. But if the association is not
20 statistically significant, would you still refer to
21 that association as attenuated and not eliminated? Is
22 that the proper way to refer to it?
23   A. If the association was eliminated, if there
24 was no association, we would have had an odds ratio of
25 1. We have an odds ratio of 1.19.

34 (Pages 130 to 133)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 134

1     It is -- I acknowledge that it was not
2  statistically significant, but it was not eliminated.
3  It was attenuated. I think that my statement in my
4  report is accurate.
5     Q. So for any epidemiologic study that has an
6  odds ratio that crosses 1 but is reported to be above
7  1 with the odds ratio crossing 1 -- do you understand
8  what I'm asking? -- would you refer to that as an
9  association, an null association, a not statistically
10  significant association? What terminology would you
11  use?
12     A. I would refer to it as a non-statistically
13  significant association. If the data show 19 percent
14  increased risk, it's not statistically significant.
15     Q. And by saying that, what you're saying is
16  that the odds ratio that -- could fall within any --
17  within the range identified; correct?
18          MS. PARFITT: Objection. Form.
19          THE WITNESS: The -- when you report a
20  95 percent confidence interval, it gives a range of
21  values which is statistically compatible with what you
22  found. Like, if the study were repeated again with
23  other samples, you might find an odds ratio that was a
24  bit higher or a bit lower.
25          But I think that it's very important to make

Page 135

1  the distinction between no association and no
2  statistically significant association.
3  BY MR. JAMES:
4     Q. But you didn't make that distinction in your
5  report?
6          MS. PARFITT: Objection.
7          THE WITNESS: You've asked the
8  question, and I've acknowledged that I did not address
9  statistical significance in that sentence.
10  BY MR. JAMES:
11     Q. On the same page of your report, if we go
12  back to page 5, you refer to a 2009 paper entitled
13  "Ovarian Cancer Risk Factors in African-American and
14  White Women"; correct?
15     A. Let me get to page 5. Which paragraph are
16  you --
17     Q. So it's the second paragraph. In fact, you
18  refer to it here as the North Carolina Ovarian Cancer
19  Study; correct?
20     A. Right. Right. Okay. Yes.
21     Q. My apologies. I -- with -- in conjunction
22  that study, you published a paper in 2009; correct?
23     A. Right. Talc was not the primary focus of it,
24  but it was one of the risk factors that we looked at.
25     Q. And do you recall the results of that study

Page 136

1  with respect to talc?
2     A. If you -- I know you have it right in front
3  of you. So if I could see it, so I could report it
4  accurately. I think I know what I found, but that was
5  paper that was done ten years ago.
6          MR. JAMES: Okay. And, Dr. Moorman,
7  I'm marking as Exhibit 16 a paper entitled "Ovarian
8  Cancer Risk Factors in African-American and White
9  Women."
10          I'm handing you two copies to pass along.
11     (Exhibit No. 16 was marked for identification.)
12          THE WITNESS: Okay. So we reported on
13  talc use for white women and for African-American
14  women. Neither association was statistically
15  significant, again, particularly for the African
16  American, which can be a reflection of the relatively
17  small sample size for African-American women. It was
18  an odds ratio of 1.19; in the white women, it was
19  1.04.
20  BY MR. JAMES:
21     Q. And those two associations reported in your
22  paper in 2009 are not reported in your report, are
23  they?
24     A. I did not -- I do not believe that I reported
25  those specific odds ratios. Data from the

Page 137

1  North Carolina ovarian cancer study was included in
2  the meta-analyses that I did describe.
3     Q. And with respect to odds ratio of 1.04 for
4  white women -- do you see that? Are we looking at the
5  same table together? Table 2?
6     A. Yes.
7     Q. Okay. And the 1.04 association there is very
8  close to the null; correct?
9          MS. PARFITT: Objection. Form.
10          THE WITNESS: Yes, it's close to 1.
11  BY MR. JAMES:
12     Q. And it has the odds ratio that crosses 1;
13  correct? The odds ratio range? Is that a fair way to
14  say it?
15     A. No.
16     Q. Okay. Tell me how to say it.
17     A. The 95 percent confidence interval --
18     Q. That's right.
19     A. -- does cross 1.
20     Q. So we have the 1.04 with the CI crossing 1;
21  correct?
22     A. Yes.
23     Q. Would you refer to the 1.04 as an association
24  that is attenuated but not eliminated?
25     A. Well, first of all, I would not refer to it

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 138

1  as attenuated because that implies that there's a
2  comparison with something else; and in the other
3  paper, it was comparing the full study population to a
4  subset.  So I would never refer to this as attenuated.
5        This is what was shown in this particular
6  study.  It's an odds ratio of 1.04.  It's very close
7  to 1.
8        Q.  Fair enough.  And fair point about
9  attenuated.
10       Would you refer to a 1.04 with a CI that
11 crosses 1 as a positive association, as professional
12 epidemiologist?
13       A.  When I would look at that, I would say that
14 there's little evidence of an association, very close
15 to 1, in this study population -- in this study.
16       Q.  You've also published another study coming
17 out of the North Carolina Ovarian Cancer Study;
18 correct?
19       A.  I have published quite a few papers that came
20 out of the North Carolina Ovarian Cancer Study.
21       Q.  And do you recall publishing a paper in 2010
22 entitled "Primary peritoneal and ovarian cancers:  An
23 epidemiologic comparative analysis"?
24       A.  I was a coauthor on that paper, yes.
25       Q.  Okay.  And is this paper discussed in your

Page 139

1  expert report at all?
2        A.  I don't think that I specifically addressed
3  it.  Again, the data from the North Carolina Ovarian
4  Cancer Study was included in the Terry analysis --
5        MR. JAMES:  And I've marked the study
6  that I just referenced as Exhibit No. 17.  I'm going
7  to hand you two copies.
8        (Exhibit No. 17 was marked for identification.)
9  BY MR. JAMES:
10       Q.  And, Dr. Moorman, if we turn to page 995,
11 there is a Table 2 continued onto page.  And if you
12 look down, this paper does report odds ratios for talc
13 use; correct?
14       A.  Yes, it does.
15       Q.  And for -- if you look over to the right, all
16 the way to the right, you see that you've reported a
17 1.15 not statistically significant association for
18 serous invasive ovarian cancer; correct?
19       A.  That's correct.
20       Q.  And that's with a CI that crosses 1; correct?
21       A.  That is correct.
22       Q.  And if you look to the left of that, you've
23 reported here a .76 odds ratio for the relationship
24 between talc use and primary peritoneal cancer;
25 correct?

Page 140

1        A.  Yes, that's what's reported there based on a
2  quite small sample size.
3        Q.  And, again, both of these associations are
4  not statistically significant; correct?
5        A.  That is correct.
6        Q.  And also I see over here to the left, the
7  category listed here is labeled "Talc use"; correct?
8        A.  Yes.
9        Q.  So this paper looks specifically at talcum
10 powders; is that right?
11       A.  I -- I believe that, in that questionnaire,
12 it was specifically asking about talc use.
13       Q.  And, again, the results of this study are not
14 reported in your report; correct?
15       A.  As I said before when you asked that, the
16 data from the North Carolina Ovarian Cancer are
17 included in the Terry paper that combined data from
18 multiple studies.
19       Q.  On page 11 of your report, Dr. Moorman, you
20 state, in the -- I guess it's the second paragraph
21 down from the top, starting with the "it is important"
22 language.
23       A.  Mm-hmm.
24       Q.  Okay.  And if you look down to the second
25 sentence, you note there that (as read):

Page 141

1            "It is not unusual for scientists
2            and epidemiologists to weigh the
3            Hill factors differently in
4            reaching the conclusion."
5        Correct?
6        A.  Yes, I state that.
7        Q.  And then in the next sentence, you go on to
8  provide examples of that; correct?
9        A.  Correct.
10       Q.  And you note there (as read):
11           "The evidence that cigarette
12           smoking causes lung cancer or
13           asbestos causes lung disease."
14       Right?
15       A.  Yes.
16       Q.  And those are the examples that you're
17 providing to support the prior sentence that
18 epidemiologists can sometimes weigh things
19 differently; is that right?
20       A.  I give that as an example, yes.
21       Q.  For the two examples that you've provided
22 there, has the medical and scientific community
23 accepted that smoking causes lung cancer and that
24 asbestos causes lung disease?
25       A.  I think that, yes, that is true.  Now, the

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 142

1   point that I am making here is that some scientists,
2   especially in the early years when the data were
3   accumulating related to smoking and lung cancer, some
4   people weighted the evidence differently.
5          For example, some of the studies looked at
6   whether people reported whether or not they inhaled or
7   not, and some funny results were observed there. And
8   some scientists thought that was really important
9   evidence against an association, whereas others
10  thought it was -- it was not to be regarded very
11  seriously.
12     Q. Do you regard the body of evidence on smoking
13  and asbestos to be equivalent to the body of evidence
14  on talc and ovarian cancer with regard to evaluating
15  cause?
16         MS. PARFITT: Objection.
17         THE WITNESS: Could you clarify what
18  you mean by "equivalent"?
19  BY MR. JAMES:
20     Q. Sure. By providing these two examples
21  here -- first, the smoking example, and second, the
22  asbestos example -- are you suggesting that the body
23  of evidence to support the causal conclusion with
24  respect to asbestos and smoking is qualitatively
25  and/or quantitatively the same or similar to the body

Page 143

1   of evidence we have in 2019 as to talc and ovarian
2   cancer?
3      A. To say that it is the same is -- I don't know
4   that you can say that it's the same. It's different
5   studies done in different time frames. The assessment
6   of the exposure is a bit different.
7          So there are similarities and, you know, the
8   criteria that I applied to come to my conclusion of
9   causality, I think, are similar to what has been
10  applied to smoking and lung cancer. But the data are
11  different. There are different studies, different
12  time frame.
13     Q. Would you say that the data on smoking and
14  lung cancer is stronger than the data on talc and
15  ovarian cancer --
16         MS. PARFITT: Objection.
17  BY MR. JAMES:
18     Q. -- to support a causal conclusion?
19     A. I'm not sure why one would make such a
20  comparison of what is stronger or not. I mean,
21  clearly, we know that smoking and lung cancer is one
22  of the strongest associations between an exposure and
23  a cancer.
24         The odds ratio that is associated with talc
25  use and ovarian cancer is not as large, but I think

Page 144

1   that the criteria that I applied to come to a
2   conclusion of causality are based on strong data.
3          MR. JAMES: Object to the nonresponsive
4   answer.
5          THE WITNESS: Maybe you can clarify
6   your question, because I'm -- maybe I didn't
7   understand what you were asking.
8   BY MR. JAMES:
9      Q. Sure. Dr. Moorman, you provided these
10  examples in your report; correct?
11     A. These are examples to make the point that, as
12  we have said here, that some people weigh different
13  parts of the evidence a bit differently.
14     Q. And so if someone who's reading your report
15  gets an impression that you are equating the body of
16  scientific and medical evidence on the issue of
17  smoking and lung cancer to the body of scientific
18  evidence on talc and ovarian cancer, then they would
19  be getting the wrong impression; is that correct?
20         MS. PARFITT: Objection.
21         THE WITNESS: I don't think that I am
22  equating the evidence for the two. I am -- equating
23  the evidence for the two types of cancer. I was using
24  that to illustrate -- to support the sentence right
25  before that, is that, when we look at these Hill

Page 145

1   factors, scientists can look at them and they might
2   weight one more heavily than another.
3   BY MR. JAMES:
4      Q. And you -- you believe that the medical
5   community accepts that smoking is a cause of lung
6   cancer; correct?
7      A. Yes, in general, I think that's true.
8      Q. Does the medical community believe that talc
9   is a cause of ovarian cancer? Is that the medical
10  community's consensus?
11         MS. PARFITT: Objection. Form.
12         THE WITNESS: I'm not sure who you mean
13  by "the medical community." I -- I think that there
14  are certainly -- there's plenty of evidence to support
15  my conclusion. We have evidence very recently from
16  Health Canada that they have come to the same
17  conclusion. So...
18  BY MR. JAMES:
19     Q. Did Health Canada come to a causal
20  conclusion?
21     A. That was my reading of their document.
22     Q. When's the last time you've read the
23  documents from Health Canada?
24     A. Probably within the last few days.
25     Q. Did Plaintiffs' counsel provide those to you?

37 (Pages 142 to 145)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 146

1    A. Yes, they did.
2    Q. Okay. And your recollection is that the
3  Health Canada documents state that talc is a cause of
4  ovarian cancer?
5    A. I definitely recall them using the "causal"
6  language in the document. If -- we can pull it up if
7  we want to confirm the precise language.
8    Q. Other than identifying Health Canada, which
9  you've just done, are there any other bodies or
10 scientific organizations or medical organizations that
11 you can cite to that have concluded that talc is a
12 cause of ovarian cancer?
13   A. We've already discussed the IARC conclusion
14 that it's possibly carcinogenic.
15   Q. And so, again, I'm asking you about -- sorry.
16   A. Sorry. Go ahead.
17   Q. Sorry. My apologies.
18   A. Okay.
19   Q. Were you done?
20   A. I'm finished.
21   Q. So my question, I think, is different than
22 that the one you're answering.
23   A. Yeah.
24   Q. So I'm asking you if you're aware of any
25 scientific or medical bodies that have concluded that

Page 147

1  talc is a general cause of ovarian cancer.
2    A. I'm not aware of a -- I'm not aware of a
3  statement that has been published, other than the ones
4  that I mentioned.
5    Q. And by others that you mentioned, you're
6  referring to the Health Canada document?
7    A. Yes.
8    Q. Okay. And we will turn back to that, and
9  that way we can have a copy in front of us both.
10 Okay?
11   A. Okay.
12   Q. With regard to IARC, again, you understand
13 that they have concluded "possible." Correct?
14   A. They conclude possible at that point in time,
15 which was 2010.
16   Q. Have you ever looked to see if any medical
17 organizations that represent the gynecologic oncology
18 community have concluded that talc is a cause of
19 ovarian cancer?
20   A. I am aware that, in a recent article in
21 Obstetrics and Gynecology, which is one of the leading
22 journals in the field, they were summarizing some of
23 the information that is new. They were describing the
24 Penninkilampi meta-analysis, and their conclusion was
25 that talc is associated with increased risk for

Page 148

1  ovarian cancer. So...
2    Q. And when you say talc -- sorry. I think
3  you're dropping off a bit, and so I'm jumping in too
4  quickly. And I apologize.
5      Are you done?
6    A. I'm finished, yes.
7    Q. You're referring there to a journal article;
8  is that right?
9    A. It was a summary of -- I think it was
10 something like "What's new in ovarian cancer." It was
11 published maybe --
12   Q. And do you believe the article that you're
13 referring to represents the consensus view of the
14 medical community?
15        MS. PARFITT: Objection. Form.
16        THE WITNESS: I don't know that it does
17 or not. It wasn't presented as the official opinion
18 of that organization.
19 BY MR. JAMES:
20   Q. And the article that you were mentioning, you
21 said increased risk -- or increased association. Is
22 that what you said? I don't have the realtime in
23 front of me right now.
24   A. I don't have it in front of me either.
25   Q. Okay.

Page 149

1    A. I am recalling something like there is --
2  I don't know what the phrasing was. It's associated
3  with increased risk or there is an increased risk of
4  ovarian cancer with talc use.
5    Q. Do you recall if that article made a
6  statement on causality?
7    A. I don't recall.
8    Q. Have you consulted information provided by
9  the ACOG or the SGO with respect to the talc ovarian
10 cancer hypothesis?
11        MS. PARFITT: Objection.
12        THE WITNESS: I don't recall if I have
13 or not.
14 BY MR. JAMES:
15   Q. Would you be interested to know the positions
16 by the leading organizations for the gynecologic
17 oncology community on this issue?
18        MS. PARFITT: Objection. Form.
19        THE WITNESS: Of course. Any
20 information is important to know.
21        MR. JAMES: I'm going to mark as
22 Exhibit No. 18 a copy of a statement issued by ACOG on
23 talc use and ovarian cancer.
24   (Exhibit No. 18 was marked for identification.)
25        MR. JAMES: I'm handing you two copies

38 (Pages 146 to 149)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 150

1  again.
2  BY MR. JAMES:
3      Q. Dr. Moorman, have you seen this statement
4  before?
5      A. I don't recall if I have or not. I might
6  have.
7      Q. Do you see at the bottom of the statement --
8  it's a single paragraph -- the statement concludes
9  with the quote (as read):
10         "There was no medical consensus
11         that talcum powder causes ovarian
12         cancer."
13      Do you see where I was reading?
14      A. I do see that.
15      Q. Do you disagree with that statement?
16      A. Again, going back to the recent conclusion
17  from Health Canada, I think that that is some evidence
18  of medical consensus. And I do acknowledge that
19  this -- what is said here, that -- yeah, I acknowledge
20  what they have written here, yes.
21      Q. Have you, in preparing your report for this
22  litigation, have you taken a look to see what the
23  National Cancer Institute has said about the purported
24  association between talc and ovarian cancer?
25      A. Yes, I have.

Page 151

1      Q. Okay. And what do they say?
2      A. I -- when you are -- I think you are
3  referring to the PDQ --
4      Q. Yes.
5      A. -- from NCI.
6      Q. Would you like a copy of it?
7      A. I would very much like a copy.
8      Q. Fair enough.
9      Okay. Dr. Moorman, I'm going to hand you a
10  copy of the NCI PDQ on "Ovarian, Fallopian Tube, and
11  Primary Peritoneal Cancer, Health Professional
12  Version."
13      (Exhibit No. 19 was marked for identification.)
14      THE WITNESS: Thank you.
15  BY MR. JAMES:
16      Q. And if you turn to -- this is not paginated,
17  unfortunately -- have you gotten there already? Or
18  I can count for us. I flipped seven times to get
19  there. Looks like you beat me to it.
20      A. Okay.
21      Q. And do you see here that is this the PDQ you
22  were thinking of, Dr. Moorman?
23      A. Yes.
24      Q. Okay. And in here, do you see that the NCI
25  has listed perineal talc exposure as a factor with

Page 152

1  inadequate evidence of an association?
2      A. Yes.
3      And if I may address this document --
4      Q. If you could give me just one second, and
5  then --
6      A. Okay.
7      Q. -- I'll let you finish, if you don't mind.
8      A. Okay.
9      Q. Have you considered this before?
10      A. Have I --
11      MS. PARFITT: Objection.
12  BY MR. JAMES:
13      Q. Yes.
14      A. -- considered it?
15      Q. In forming your opinions in this case?
16      A. Yes.
17      Q. Okay. It's not cited or discussed in your
18  report, is it?
19      A. I don't know that I have, but again, it's one
20  of the documents that I have -- I have seen in my --
21  in my work.
22      Q. And so within your report, you do discuss
23  findings of IARC; correct?
24      A. Yes.
25      Q. But you don't discuss findings of the NCI; is

Page 153

1  that right?
2      A. I don't think that I specifically addressed
3  it.
4      Q. Is that because it conflicts with your
5  litigation opinion?
6      MS. PARFITT: Objection.
7      THE WITNESS: No.
8      May I ask --
9  BY MR. JAMES:
10      Q. And, Dr. Moorman, you said you wanted to
11  comment, and now is fine.
12      A. Let's see. I wanted -- when did you print
13  out this version of the PDQ, if I may ask you?
14      Q. So do you understand that this is a -- this
15  is a -- well, if you turn to the back page of the copy
16  that I handed you --
17      A. Mm-hmm.
18      Q. -- the very back --
19      A. Okay.
20      Q. -- it says "Updated: December 21, 2018."
21      A. Okay.
22      Q. All the way on the back page.
23      A. Yeah.
24      Q. Got it.
25      A. Okay. One of the -- I have looked at this

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 154

1  very recently, and on the online version, there were
2  some rather what I considered kind of interesting
3  conclusions that were made. I'm actually not seeing
4  it in this version here. But, for example, they --
5  I'm sorry. I don't see it even mentioned here.
6       But on the online version, they had listed
7  DMPA -- depot medroxyprogesterone acetate -- as
8  something that there was adequate evidence of reduced
9  effect. And they were basing that -- there are very
10 few studies on that to begin with, and as they
11 summarized it, again, the last time I looked at it
12 online, they said it was inconsistent data, but they
13 still summarized that there was adequate evidence.
14      And then in regard to things like comparing
15 the evidence for something like breastfeeding, they
16 said (as read):
17           "Based on solid evidence,
18      breastfeeding is associated with
19      decreased risk of ovarian cancer."
20      If we compare the evidence to breastfeeding
21 to the evidence for talcum -- talc use, again, the
22 online version that I last looked at, it gave a little
23 bit more detail about the meta-analyses and so on.
24      So the meta-analyses for breastfeeding and
25 the meta-analyses for talc, there were a lot of

Page 155

1  similarities. There are roughly 30 studies addressing
2  each of them. For breastfeeding, it's about a
3  25 percent reduction in risk; for talc, about a
4  25 percent increased risk.
5       When you look at the overall number of
6  studies, roughly 90 percent of them support
7  breastfeeding -- in terms of just looking at the
8  direction of the effect -- about 90 percent of them
9  support that breastfeeding is associated with reduced
10 risk. When you look at the meta-analyses for talc,
11 about 90 percent of the studies have an odds ratio
12 greater than 1.
13      And so when we look at the overall body of
14 evidence, to me, I think it's comparable for
15 breastfeeding versus talc, but they conclude that the
16 evidence is adequate for breastfeeding but not
17 adequate for talc. And they don't really describe
18 their methodology for how they reach their
19 conclusions.
20      So it leaves me just a little bit baffled
21 about why is one adequate evidence and one inadequate
22 evidence.
23      Q. If the NCI's PDQ that's available on their
24 website as of today classifies talc as a factor with
25 inadequate evidence of an association, do you disagree

Page 156

1  with the NCI?
2       A. Okay. Just looking at this, and it came
3  up -- it says "with inadequate evidence of an
4  association."
5       Did you say "adequate" or "inadequate"?
6       Q. I said "inadequate."
7       A. Okay. My judgment based on the evidence is
8  that there is adequate evidence. So I would disagree
9  with the NCI in the conclusion that they reached.
10      Q. With regard to your discussion that we've had
11 just now on the body of evidence to look at
12 breastfeeding and ovarian cancer risk --
13      A. Yes.
14      Q. -- and this is a yes-or-no question -- did
15 you conduct a comprehensive review of the scientific
16 medical literature and evidence surrounding the
17 association between breastfeeding and ovarian cancer?
18      A. I did not do as comprehensive a review of
19 that literature as I did for the talc.
20      Q. And have you, in the course of your career,
21 ever looked comprehensively at the body of scientific
22 and medical evidence surrounding the association of
23 breastfeeding and ovarian cancer to the cell studies,
24 the plausibility, the dose-response, have you done all
25 of that with respect to breastfeeding and ovarian

Page 157

1  cancer?
2       A. I -- in the course of looking at ovarian
3  cancer, I have actually never written a paper that was
4  strictly focused on breastfeeding and ovarian cancer,
5  and that is typically where one would go through the
6  very comprehensive review.
7       I am familiar with much of the literature,
8  but the degree to which I reviewed the literature was
9  not in the same level of detail as I did the talc
10 literature.
11      Q. And do you know if the scientists at the NCI
12 who have commented on the association between
13 breastfeeding and ovarian cancer have conducted an
14 examination of the scientific and medical literature
15 that is more comprehensive, less comprehensive, or the
16 same that you've conducted?
17           MS. PARFITT: Objection to form.
18           THE WITNESS: They do not describe
19 their methodology, and so I can't say if it was more
20 or less comprehensive.
21 BY MR. JAMES:
22      Q. Okay. Dr. Moorman, on page 10 of your
23 report --
24      A. Yes.
25      Q. -- you have the -- it's the third full

Golkow Litigation Services - 1.877.370.DEPS

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 158

1  paragraph down, and you make the statement that
2  meta-analyses are "considered to be some of the
3  strongest evidence for a causal association."
4          Do you see where I'm reading that?
5  A.  Yes, I do.
6  Q.  Okay.  So that's -- so you've made that
7  comment.
8          And then further down, you say (as read):
9          "Data from meta-analyses are
10         particularly important for
11         evaluating exposure-disease
12         relationships such as talc and
13         ovarian cancer where the relative
14         risks for most individuals are
15         approximately 1.2 to 1.5."
16         Do you see where I've read that?
17 A.  Yes, I do.
18 Q.  Can you cite any published authority for the
19 statement that meta-analyses are considered to be some
20 of the strongest evidence for causal association?
21         A.  I'm trying to think of whether it's a
22 published source.  It's something that I have seen,
23 for example, multiple times in lectures and so on
24 where it will give a hierarchy of evidence.  And
25 meta-analyses combining data from multiple studies is

Page 159

1  often put at kind of the top of the pyramid for making
2  causal assessments.
3          I want to say that maybe some of the
4  evidence-based medicine -- I know that there are
5  online summaries of evidence-based medicine that would
6  describe meta-analyses as kind of some of the
7  strongest evidence for causality.
8  Q.  Meta-analyses combine data from underlying
9  studies; correct?
10 A.  That is correct.
11 Q.  Meta-analyses do not correct for bias and
12 confounding in underlying studies; correct?
13 A.  The meta-analysis itself -- no.  They combine
14 the data.  They...
15 Q.  And -- were you finished?
16 A.  Yeah.  They do not correct for the bias.
17 Q.  Meta-analyses, for example, do not eliminate
18 recall bias if there is a recall bias problem in the
19 underlying studies; correct?
20 A.  That is correct.  Meta-analyses cannot do
21 that.
22 Q.  And the meta-analyses studies that you
23 reviewed and discussed in your report all concede that
24 point, don't they?
25 A.  They acknowledge that they are combining the

Page 160

1  data as reported.  It could not correct the bias.
2  Q.  So to the extent the meta-analyses are
3  collecting data from underlying studies that are
4  flawed by recall bias or confounding, those
5  inaccuracies carry over into the meta-analyses;
6  correct?
7          MS. PARFITT:  Objection.
8          THE WITNESS:  I would not characterize
9  it as "carry over."  We recognize when we combine the
10 data from the meta-analyses, it is combining the
11 reported data.  If there were biases that either led
12 to an underestimate or an overestimate of the relative
13 risk, they are not correcting that.
14 BY MR. JAMES:
15 Q.  And do you caution the reader of your MDL
16 report about that limitation to meta-analyses anywhere
17 in your report?
18 A.  I do not specifically make that caution, no.
19 Q.  The meta-analyses that we have on the talc
20 ovarian cancer issue, they are progressed over a
21 period of time; correct?
22 A.  That is correct.
23 Q.  And we know that there's been two recent
24 meta-analyses.  And all of the meta-analyses that have
25 been published on this association are in some ways

Page 161

1  overlapping; correct?
2          MS. PARFITT:  Objection to form.
3          THE WITNESS:  The meta-analyses, their
4  intent is to combine all the published data.  So, yes,
5  there is some overlap.  More recent ones would have
6  included studies that had been published in prior
7  meta-analyses.
8  BY MR. JAMES:
9  Q.  And recognizing that meta-analyses can differ
10 here and there for various -- various reasons, the
11 talc ovarian cancer meta-analyses generally pull data
12 from the same body of literature; is that fair?
13 A.  Yes.
14 Q.  And any suggestion that because you have
15 multiple meta-analyses reaching around the same odds
16 ratio and that that somehow demonstrates consistency,
17 isn't that a little bit misleading?
18         MS. PARFITT:  Objection.  Form.
19         THE WITNESS:  I think that when we look
20 at it, when we see that, early on, you see some
21 meta-analyses were done, I want to say maybe in the
22 '90s, and then as more data are added in, you -- they
23 still settled in on roughly the same summary odds
24 ratio as even more data were accumulated.
25         Sometimes there is a concern that early on

41 (Pages 158 to 161)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 162

1  the studies with positive associations are published,
2  and then after -- as time goes on, other studies are
3  done that didn't find that association. So you would
4  expect that the summary odds ratio might become
5  attenuated as more studies were added.
6         And that's not the situation with the talc
7  literature. It's been pretty consistent from the
8  meta-analyses done in the 1990s to the 2000s to 2018.
9  BY MR. JAMES:
10        Q. And the 2018 meta-analyses that they are
11 grabbing in the studies from decades prior, they're
12 grabbing in the same studies that the 1990s
13 meta-analyses grabbed in; right?
14        MS. PARFITT: Objection. Form.
15        THE WITNESS: Yeah. The purpose is to
16 include all of the published data. So yes, of course.
17 BY MR. JAMES:
18        Q. And in your report, you place significant
19 emphasis -- if that's a fair word -- on meta-analyses.
20 Is that a fair way to describe it?
21        MS. PARFITT: Objection.
22        THE WITNESS: Yes, I think I -- I think
23 that's fair to characterize it that way.
24 BY MR. JAMES:
25        Q. You -- did you read the conclusions of all of

Page 163

1  the meta-analyses performed to date?
2        A. I did.
3        Q. Do any of the authors of the meta-analyses
4  performed to date conclude causation?
5        A. If I may take a minute to address the issue
6  of how causation is reported in the epidemiologic
7  literature.
8        Q. With all due respect, Doctor, if you could
9  just answer the question.
10       A. I think that they typically refer to, like,
11 increased risk. I don't know that any of them refer
12 to -- made the conclusion of -- I don't know that they
13 used the word "causal."
14       Q. In fact, many of the meta-analyses
15 specifically caution against a causal interpretation,
16 don't they?
17       MS. PARFITT: Objection.
18       THE WITNESS: Once again, if -- may
19 I take a moment to address how the word --
20 BY MR. JAMES:
21       Q. Because my time is limited --
22       A. Okay.
23       Q. -- I'm really going to have to respectfully
24 ask you to answer my question to the extent that
25 you're able, and then your counsel will have an

Page 164

1  opportunity to ask questions afterwards.
2        A. Some of them did raise some concerns about
3  whether or not it could be a causal association.
4        Q. We're going to take a look at the studies
5  shortly as I grab these folders out.
6        Did you report in your report for the MDL
7  any of the cautionary language from these
8  meta-analyses about causation?
9        A. I -- in my report, when you look at some of
10 the cautionary language, they will refer to perhaps
11 concerns about recall bias or things like that.
12       In my report, I went through potential
13 biases and how I weighed that and whether I thought it
14 was an important concern in the studies that
15 contributed to the meta-analyses.
16       Q. Did you talk about any weaknesses or problems
17 with the meta-analyses themselves?
18       A. I don't believe I did in my report.
19       Q. And just -- okay.
20       MR. JAMES: I'm going to mark as
21 Exhibit No. 20 a meta-analysis that I think that
22 you've mentioned this morning. It's the Penninkilampi
23 study.
24       THE WITNESS: Yes.
25       MR. JAMES: I'm going to hand you two

Page 165

1  copies again.
2        (Exhibit No. 20 was marked for identification.)
3        MR. JAMES: It's marked as Exhibit 20.
4        THE WITNESS: Would this be a good time
5  to take a break before we get into --
6        MR. JAMES: Absolutely.
7        THE WITNESS: Okay.
8        THE VIDEOGRAPHER: Going off record at
9  1:48 p.m.
10       (Recess taken from 1:48 p.m. to 2:03 p.m.)
11       THE VIDEOGRAPHER: Back on record at
12 2:03 p.m.
13 BY MR. JAMES:
14       Q. Dr. Moorman, I handed you had a copy of the
15 Penninkilampi paper.
16       A. I'm sorry, the papers were moved while
17 I was...
18       Q. It was marked as Exhibit 20, I believe.
19       Here, I have an extra, if that would speed
20 things along. I'm sure it's somewhere in there.
21       A. It got moved around. Oh, here it is.
22       Q. Okay. Again, Dr. Moorman, this is one of the
23 meta-analyses that you reviewed to inform your
24 opinions in this case; correct?
25       A. That is correct.

42 (Pages 162 to 165)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 166

1    Q. It's also one of the more recent
2  meta-analyses on the issue; correct?
3    A. That's correct.
4    Q. And what did the Penninkilampi authors say
5  about causation?
6    A. Okay. They describe perineal talc is
7  associated with a 24 to 39 percent increased risk of
8  ovarian cancer.
9      And this is a very typical way that it would
10  be described in the epidemiologic literature. It --
11  as described very eloquently in some articles in the
12  American Journal of Public Health last spring, they
13  noted that, to the detriment of the science, that
14  epidemiologists are frequently loathe -- or don't
15  often use the word "causal" when they describe a risk
16  factor; and, in part, this is because we are relying
17  on observational data. This is not an experimental
18  study.
19      And so, many times, reviewers, if they refer
20  to "we found that talc caused ovarian cancer," they
21  would object to that, saying that it wasn't a
22  randomized controlled trial.
23      But in this series of articles in the
24  American Journal of Public Health, they indicated that
25  the tendency not to use the word "causal" is to the

Page 167

1  detriment of the science. It's like "Why would we be
2  looking at risk factors for a disease if we didn't
3  think that it caused the disease?"
4      So I think that when an epidemiologist sees
5  an increased risk of ovarian cancer, we are thinking
6  that this is -- this causes ovarian cancer.
7    Q. But epidemiologists, including many of the
8  meta-analyses that we're about to review, have talked
9  about cause, haven't they?
10      MS. PARFITT: Objection.
11      THE WITNESS: Some of them have
12  addressed, yes.
13  BY MR. JAMES:
14    Q. For example, Penninkilampi doesn't seem shy
15  of the word "cause." If we look at page 42,
16  Dr. Moorman, we see, in the top paragraph in the
17  left-hand column, at the bottom of that paragraph, the
18  Penninkilampi authors write, quote -- this is the last
19  sentence --
20    A. Wait. Page 42?
21    Q. Page 42.
22    A. Yes.
23    Q. It's the top left paragraph. The bottom last
24  sentence of that paragraph, the authors state
25  (as read):

Page 168

1      "Hence, while perineal talc use
2      has not been shown to be safe, in
3      a similar regard, a certain causal
4      link between talc use and ovarian
5      cancer has not yet been
6      established."
7      That's what the authors say; correct?
8    A. That's what they say, yes.
9    Q. Okay. So they caution that causation has not
10  been established; correct?
11      MS. PARFITT: Objection.
12      THE WITNESS: They say a certain causal
13  link has not been established -- not yet been
14  established.
15  BY MR. JAMES:
16    Q. And you're here today testifying about what
17  you believe to be evidence supporting the causal link;
18  correct?
19    A. Yes, I am -- I am.
20    Q. Okay. And so where in your report do you
21  advise the reader that the Penninkilampi authors
22  expressed reservations about causation?
23    A. I do not have anything like that in my
24  report.
25      MR. JAMES: The next meta-analysis that

Page 169

1  we can look at is the Berg -- or Berge meta-analysis.
2  I'm going to mark that as Exhibit 21.
3      (Exhibit No. 21 was marked for identification.)
4  BY MR. JAMES:
5    Q. Do the Berge authors conclude that the
6  evidence is sufficient to support a causation
7  conclusion?
8    A. They do not make that conclusion, no.
9    Q. In fact, they actually -- they do address
10  causation, don't they?
11    A. They state their opinion, yes.
12    Q. Okay. And their opinion is expressed several
13  times throughout the article. The first is in the
14  abstract of the article; correct?
15      If we look at the abstract, it's the first
16  page of the article, page 248, the last sentence of
17  the abstract. Do you see that?
18    A. Yes, I do.
19    Q. They say (as read):
20      "The heterogeneity of results by
21      study design, however, detracts
22      from a causal interpretation of
23      this association."
24      Correct?
25    A. That's what it says, yes.

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 170

1    Q. Where do you advise the reader of your MDL
2  report that the authors of the Berge meta-analyses
3  expressed reservations about causation?
4          MS. PARFITT: Objection. Form.
5          THE WITNESS: That is not in my report.
6  BY MR. JAMES:
7    Q. Do you see at the very end of article, at
8  the very last page on 256, before the acknowledgment
9  section, again, the authors conclude the article with
10  a statement that the results (as read):
11          "do not support a causal
12          interpretation of the
13          association."
14    Do you see where I'm reading?
15    A. They say some -- several aspects of the
16  results there.
17    Q. Fair enough.
18    A. Yes.
19    Q. So let's just read the sentence in full. So
20  they say (as read):
21          "Several aspects of our results,
22          including the heterogeneity of
23          results between case-control and
24          cohort studies, however, do not
25          support a causal interpretation of

Page 171

1          the association."
2    That's what they say; correct?
3    A. Right.
4    Q. And, again, do you advise the readers of your
5  MDL report that those are the conclusions of the Berge
6  meta-analysis?
7          MS. PARFITT: Objection. Form.
8          THE WITNESS: I do not specifically do
9  that. But in my report, I think that I really address
10  some of the heterogeneity of the results between
11  case-control and cohort studies and why some of the
12  differences might be observed and, for example, some
13  of the biases in the cohort studies would lead to an
14  underestimate of the --
15  BY MR. JAMES:
16    Q. And, Dr. Moorman --
17          MS. PARFITT: Excuse me --
18  BY MR. JAMES:
19    Q. -- I'm going to ask you questions about that.
20          MS. PARFITT: -- Mr. James, she was in
21  the middle of her sentence.
22          MR. JAMES: I object to the
23  nonresponsive portion of her answer.
24          MS. PARFITT: You may, but let her
25  complete her answer.

Page 172

1          MR. JAMES: And I'm going to reserve
2  the time that it takes --
3          MS. PARFITT: No, you're not going to
4  reserve the time. You asked her a question; she was
5  answering it.
6          MR. JAMES: It was a yes-or-no
7  question.
8          MS. PARFITT: You can object -- it was
9  not, Scott. Let's have her finish her statement, and
10  you can decide what you want to do it with it. But
11  she's going to finish her comment.
12    Dr. Moorman, please.
13          THE WITNESS: So I think that in my
14  report, I did address the aspects of the heterogeneity
15  of the results, although I might not specifically have
16  addressed -- said anything specifically about the
17  limitation of the Berge.
18  BY MS. PARFITT:
19    Q. Right. So my question, which was very
20  precise, is where do you note in your MDL report the
21  causation reservations of the Berge authors?
22          MS. PARFITT: Objection.
23          THE WITNESS: And as I stated before,
24  that is not in -- that specific reservations of the
25  Berge authors, I do not have that in my -- in my

Page 173

1  report.
2  BY MS. PARFITT:
3    Q. The next meta-analyses is -- and I'm working
4  backwards chronologically -- is the Langseth
5  meta-analyses.
6    Are you familiar with that paper?
7    A. Yes, I have seen that paper.
8          MR. JAMES: And I'm going to mark the
9  Langseth paper as Exhibit No. 23.
10    (Exhibit No. 22 was marked for identification.)
11          MR. JAMES: I'm handing you two copies.
12          MR. DONATH: 23 or 22?
13          MS. BRENNAN: 22.
14          MR. JAMES: It's 22. So we'll sub
15  stickers.
16  BY MR. JAMES:
17    Q. So Langseth is 22. Did the authors of
18  Langseth conclude that causation is shown? Yes or no,
19  please.
20    A. They -- if I may take just a moment to read
21  through it --
22    Q. Sure.
23    A. -- as it...
24    No, they do not.
25    Q. And, in fact, the authors do address the

44 (Pages 170 to 173)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 174

1  issue of causation on page 359 of the article;
2  correct, under the section "Proposal to research
3  community."
4        Do you see where I am?
5     A. I do see that.
6     Q. Okay. And the authors state (as read):
7        "The current body of experimental
8        and epidemiological evidence is
9        insufficient to establish a causal
10       association between perineal use
11       of talc and ovarian cancer risk."
12    A. That is correct. And, again, noting the date
13 of this paper, 2008. So quite a lot of evidence has
14 emerged since then. And one of the authors on the
15 paper has since concluded that there is sufficient
16 evidence for causality.
17    Q. And you're talking about a paid expert in
18 this case; correct?
19       MS. PARFITT: Objection.
20       THE WITNESS: Dr. Siemiatycki, who's a
21 paid expert, well-respected epidemiologist.
22 BY MR. JAMES:
23    Q. And he's a paid expert in this litigation for
24 the Plaintiffs; correct?
25       MS. PARFITT: Objection.

Page 175

1        THE WITNESS: That is correct.
2  BY MR. JAMES:
3     Q. Where in your report -- and this is a
4  yes-or-no question, or actually it's not "yes" or
5  "no." You tell me if it exists or not.
6        Where in your report do you show to the
7  reader of the report that the Langseth authors
8  reserved judgment on causation?
9        MS. PARFITT: Objection to form.
10       THE WITNESS: I did not specifically
11 include that in my report.
12 BY MR. JAMES:
13    Q. Dr. Moorman, have you reviewed the Huncharek
14 2003 meta-analyses?
15    A. Yes, I have.
16       MR. JAMES: And I'm going to mark the
17 Huncharek 2003 meta-analyses as Exhibit No. 23, and
18 we'll switch stickers at the break.
19    (Exhibit No. 23 was marked for identification.)
20 BY MR. JAMES:
21    Q. I'm handing you two copies, Dr. Moorman.
22       Is this another meta-analysis that you
23 reviewed in forming your opinions in this case?
24    A. Yes, it is.
25    Q. Okay. Did the authors of this meta-analysis

Page 176

1  conclude that the evidence was sufficient to support
2  causation?
3     A. No, they did not.
4     Q. Okay. And, in fact, the authors did address
5  causation in their paper in the abstract; correct?
6        MS. PARFITT: Objection. Form.
7        THE WITNESS: Yes, they do.
8  BY MR. JAMES:
9     Q. Okay. And at page 195 in the conclusion of
10 the abstract, the authors say (as read):
11       "The available observational data
12       do not support the existence of a
13       causal relationship between
14       perineal talc exposure and
15       increased risk of epithelial
16       ovarian cancer. Selection bias
17       and uncontrolled confounding may
18       account for the positive
19       associations seen in prior
20       epidemiological studies."
21    That's what the authors say; correct?
22    A. That is what these authors say.
23    Q. And did you report to the reader of your MDL
24 report the Huncharek authors' reserved judgment on
25 causation?

Page 177

1        MS. PARFITT: Objection.
2        THE WITNESS: As with the other
3  meta-analysis, this is now 16 years old, and I did not
4  specifically report that, but I did consider in my
5  report the biases and uncontrolled confounding that
6  they were concerned about.
7  BY MR. JAMES:
8     Q. Do any of the -- there are a handful of
9  meta-analyses that precede the Huncharek 2003
10 meta-analyses; correct?
11    A. That is correct.
12    Q. Do any of those meta-analyses conclude
13 causation?
14       MS. PARFITT: Objection. Form.
15       THE WITNESS: I don't believe that they
16 do.
17 BY MR. JAMES:
18    Q. And returning back to our discussion on the
19 Langseth meta-analyses, you noted sort of -- when I
20 asked you a question about their conclusions on
21 causation, you noted the timing of the article;
22 correct?
23    A. Yes.
24    Q. You noted that the article was published
25 in --

45 (Pages 174 to 177)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 178

```
1        A. 2008.
2        Q. -- 2008?
3        A. Yes.
4        Q. That is right?
5        So is your opinion that the evidence in 2008
6  was, in fact, insufficient to support a causal
7  conclusion but has now transitioned to a status where
8  it is sufficient?
9        MS. PARFITT: Objection. Form.
10       THE WITNESS: You have asked me that
11 question in -- that or a similar question before.
12       There is a growing body of evidence.
13 I would be hard-pressed to say at what point in time,
14 you know, it reached the tipping point where there is
15 enough evidence to say that there is this causal
16 association.
17       At this point in time, I feel very confident
18 in saying that, but I can't say when sufficient data
19 accumulated to say that. I think that's an impossible
20 answer -- or an impossible question to answer.
21 BY MR. JAMES:
22       Q. And the reason I asked it again is because
23 you made the qualification in discussing the Langseth
24 paper. When I asked you about the authors'
25 conclusions on causation, you specifically noted that
```

Page 179

```
1  it was a paper from the 2008 time frame; correct?
2        A. Right. And I think that -- I think that it
3  is obvious that one of the authors, considering all
4  the additional data that's accumulated, would -- has
5  made a different conclusion at this point in time.
6        Q. And the author you're referring to there is
7  the author that we were discussing as a paid expert in
8  this case; correct?
9        MS. PARFITT: Objection. Form.
10       THE WITNESS: Yes. We established he
11 is a paid expert and, at the same time, a very
12 well-respected epidemiologist.
13 BY MR. JAMES:
14       Q. There's also a pooled analysis that you
15 looked at to inform your opinions in this case;
16 correct?
17       A. Yes.
18       Q. Okay. And the pooled analysis is the Terry
19 2013 paper?
20       A. That is correct.
21       Q. Okay. Did the Terry 2013 paper conclude
22 cause?
23       MS. PARFITT: Objection. Form.
24 BY MR. JAMES:
25       Q. It's yes or no.
```

Page 180

```
1        A. No --
2        MS. PARFITT: Objection.
3        THE WITNESS: -- for the same reasons
4  I described prior.
5        MR. JAMES: And I'm going to mark the
6  2013 Terry paper as Exhibit 24.
7        (Exhibit No. 24 was marked for identification.)
8        MR. JAMES: I think I'm back on track
9  on the numbers. I'm handing you two copies.
10 BY MR. JAMES:
11       Q. And again, Dr. Moorman, you've used this
12 paper to inform your opinions in the case; correct?
13       A. That is correct.
14       Q. And if you look at the last page of the text
15 on 820 with me, you see in the last paragraph, which
16 is -- the last paragraph on page 820, the authors
17 state at the top right-hand column (as read):
18       "More work is needed to understand
19       how genital powders may exert a
20       carcinogenic effect and which
21       constituents may be involved."
22       Do you see that sentence?
23       A. Yes, I do.
24       Q. There, the authors are again noting that --
25 let me rephrase it this way.
```

Page 181

```
1        The authors there are reserving judgment on
2  causation; correct?
3        MS. PARFITT: Objection. Form.
4        THE WITNESS: I don't think that that
5  is how I would necessarily interpret that.
6  BY MR. JAMES:
7        Q. Okay.
8        A. I think that, first of all, basically, any
9  scientific paper concludes with "more work is needed."
10 And so it's talking about, you know, trying to advance
11 scientific knowledge by understanding the biological
12 mechanism.
13       But I don't see anything -- any statement
14 there related to causal. It says "small to moderate
15 increased risk of ovarian cancer." And as I've stated
16 previously, basically, when we talk about risk
17 factors, we are thinking that this is something that
18 causes this cancer.
19       Q. So in your professional opinion, the word
20 "risk factor" is equivalent to "causation"?
21       A. Not always equivalent. And if I may give an
22 example.
23       Women who have higher educational level are
24 at increased risk for breast cancer. And so higher
25 education level, we might describe it as a risk factor
```

46 (Pages 178 to 181)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 182

1  for breast cancer. But, clearly, going to college is
2  not going to cause breast cancer. It's the other
3  factors that are associated with it, like your
4  childbearing patterns, alcohol use, other things.
5        But when we talk about a risk factor and
6  there is a plausible biological mechanism to get from
7  that exposure to cancer, I think that "risk factor"
8  and "cause" are pretty synonymous.
9        Q. But to say something is associated in
10  epidemiologic literature is not to say that it's
11  causal.
12        Do you agree with that?
13        MS. PARFITT: Objection.
14        THE WITNESS: Yes. That's kind of
15  epi 101, that everything that is associated is not
16  necessarily a cause.
17  BY MR. JAMES:
18        Q. To reach a causal conclusion, it's -- one
19  must undertake a more in-depth analysis; correct?
20        A. As I did for this, and as all of us in this
21  room are well aware, the Bradford Hill framework is a
22  framework for taking the data and leading to making a
23  judgment on causality.
24        Q. So if a paper refers to something as a risk
25  factor or a potential risk factor or a modifiable risk

Page 183

1  factor, that terminology by itself does not suggest
2  that the authors of that paper have concluded
3  causation; correct?
4        A. I -- I think that I have answered that
5  question already.
6        When they're -- if they refer to it as a
7  risk factor, they may or may not have gone through the
8  full Bradford Hill evaluation of it. And then, also,
9  some things that we refer to as risk factors, where
10  there is not a plausible biological mechanism, we
11  wouldn't equate risk factor and cause in that
12  situation as well.
13        Q. So you -- returning back to the Penninkilampi
14  meta-analysis, which I believe will be somewhere in
15  that pile --
16        A. Mm-hmm.
17        Q. -- you cite Penninkilampi 14 times in your
18  report.
19        Were you aware of that?
20        A. I don't know how many times I've cited it.
21        Q. It's one of the most cited articles in your
22  report.
23        Were you aware of that?
24        A. I know that I referred to it frequently
25  because it is one of the most up-to-date, most recent

Page 184

1  meta-analyses.
2        Q. Are you aware of any flaws in the
3  Penninkilampi study?
4        MS. PARFITT: Objection. Form.
5        THE WITNESS: Overall, I felt like it
6  seemed to be a very well done meta-analysis. When we
7  look at judgments of meta-analyses, we like to see
8  things like, you know, what were the search terms they
9  used? What were the criteria for including or
10  excluding studies? Were the study questions defined
11  in advance?
12        And when I look through all of that,
13  I judged it overall to be a very well done
14  meta-analysis.
15  BY MR. JAMES:
16        Q. And so your answer to the question that
17  I asked is no; correct?
18        MS. PARFITT: Objection.
19        THE WITNESS: I -- I don't see any
20  serious problems with any -- you characterized it as
21  "flaws." I don't -- I don't see anything that I would
22  characterize as a flaw in their methodology.
23  BY MR. JAMES:
24        Q. If you look at page 47 with me, Dr. Moorman,
25  in the "Conclusions" section.

Page 185

1        The conclusions section, I think you had
2  previously read in the first sentence of the
3  conclusions, the percentage increased risk reported in
4  the paper.
5        The second sentence says (as read):
6        "While the results of case-control
7        studies are prone to recall bias,
8        especially with intense media
9        attention following the
10        commencement of litigation in
11        2014, the confirmation of an
12        association in cohort studies
13        between perineal talc use and
14        serous invasive ovarian cancer is
15        suggestive of a causal
16        association."
17        Do you see where I was reading?
18        A. Yes, I do.
19        Q. Okay. So here we see that Penninkilampi is
20  acknowledging the recall bias problems of the
21  case-control studies; correct?
22        A. They are acknowledging that it is a
23  possibility.
24        Q. Okay.
25        A. Okay.

47 (Pages 182 to 185)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 186

1          MS. PARFITT: Wait. Are you still --
2    thank you.
3          Please, finish.
4          THE WITNESS: Yes. And, you know, this
5    is, again, one of the things that I addressed in my
6    report. I very carefully considered recall bias and
7    how it could have contributed or not to the elevated
8    risk that has been seen across so many studies.
9    BY MR. JAMES:
10       Q. And one of the -- so within the sentence
11   "after acknowledging the recall bias" that we just
12   discussed, the Penninkilampi authors emphasize the
13   confirmation of an association in cohort studies.
14         Do you see that?
15       A. I do.
16       Q. Okay. Are there cohort studies that support
17   the association?
18       A. There are three cohort studies that have
19   examined talc use and ovarian cancer, and you're
20   probably very much aware of them: the Gonzalez study,
21   the Houghton -- which was from the Sister Study -- the
22   Houghton study, which was the Women's Health
23   Initiative; and the Nurses' Health Study, which has
24   been published in several of them.
25         And as they indicate in here, when you look

Page 187

1    at the studies that reported on invasive serous -- and
2    if you will give me just a second here -- find it on
3    this paper. Okay.
4          When they report in Table 2 that combining
5    the two studies that reported on the histologic
6    subtypes, there was a significantly increased risk of
7    serous invasive cancer in the cohort studies as well
8    in the case-control studies.
9        Q. Sorry.
10       A. Okay.
11       Q. You did pause there.
12       A. I did.
13         The one study that really found no
14   association whatsoever with talc was the Gonzalez
15   study, the Sister Study, that has numerous problems
16   with it, most specifically in their assessment of the
17   talc exposure, the sample size, the duration of
18   follow-up.
19       Q. And returning to my question about this
20   article, were you aware that the Penninkilampi authors
21   didn't factor in the Gates 2010 data at all?
22       A. When one does a meta-analysis, sometimes when
23   data are reported in a couple of reports, you have to
24   make a decision about which one to include.
25         I believe they used data from the -- I'm not

Page 188

1    entirely sure of their rationale for why they looked
2    at one rather than the other. There were some
3    differences between the studies; like the later study,
4    the unexposed group was actually women who had used it
5    for less than once a week rather than never used. And
6    so they don't really go into the detail why they made
7    that decision.
8          But investigators will make a judgment
9    sometimes about which of a -- which studies to include
10   when there's more than one publication from a given
11   study.
12       Q. And do you know that with respect to the NHS
13   cohort, they have published two studies arising from
14   the NHS cohort looking at the issue of talc and the
15   ovarian cancer association; correct?
16         MS. PARFITT: Objection. Form.
17         THE WITNESS: They actually -- they
18   have published two studies, and data from the Nurses'
19   Health Study was also included in at least one other
20   publication. I believe Cramer was -- I'm not sure if
21   he was the first author or one of the authors where
22   they combined data.
23   BY MR. JAMES:
24       Q. The NHS cohort has published two papers with
25   respect to the talc/ovarian cancer association;

Page 189

1    correct?
2        A. I just answered the question. It's -- data
3    from it was also in another -- in another publication.
4        Q. The Gertig 2000 paper reported on the
5    talc/ovarian cancer association; correct?
6        A. Yes.
7        Q. And that's an NHS publication; correct?
8        A. It is.
9        Q. The Gates 2010 paper reported on talc/ovarian
10   cancer association; correct?
11       A. That is correct.
12       Q. And that's an NHS publication; correct?
13       A. Correct.
14       Q. An NHS publication of 2010 offered an
15   additional ten years of follow-up to the talc/ovarian
16   cancer hypothesis; correct?
17         MS. PARFITT: Objection. Form.
18         THE WITNESS: It was additional
19   follow-up, but no update on exposure during that
20   time -- period of follow-up.
21   BY MR. JAMES:
22       Q. For that period of follow-up, they followed
23   the study participants for an additional ten years;
24   correct?
25         MS. PARFITT: Objection. Form.

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 190

1    THE WITNESS: Yes. I answered that
2  already. Yes.
3  BY MR. JAMES:
4    Q. And you agree more follow-up for a cohort is
5  better; correct?
6    MS. PARFITT: Objection. Form.
7    THE WITNESS: In general, longer
8  follow-up would be desirable. However, when they're
9  not updating exposure information, that could -- that
10  creates a bias, a possible bias.
11  BY MR. JAMES:
12    Q. Do you think the 2010 data and the Gates
13  paper with respect to the talc ovarian cancer issue is
14  superior to the 2000 data in the Gertig 2000 paper?
15    MS. PARFITT: Objection. Form.
16    THE WITNESS: I already made the point
17  that how they define the unexposed group was different
18  between the two studies; and so including some women
19  who had low levels of exposure in their unexposed
20  group, that could potentially have had the effect of
21  attenuating the association.
22    And so, you know, longer follow-up is
23  generally better, but some of the other things they
24  did, that's -- they were not so good.
25

Page 191

1  BY MR. JAMES:
2    Q. Elsewhere in your report, you do complain
3  about lack of follow-up in the cohort studies, don't
4  you?
5    A. I do mention that as one of the limitations,
6  yes.
7    Q. And you specifically discuss the NHS cohort
8  as having a period of -- I believe you say it's
9  14 years; is that right?
10    A. From -- yeah. I -- I can't remember
11  specifically. It's from the 1980s to -- I don't
12  remember the exact date of the last -- the last date
13  of follow-up in their papers.
14    Q. And, again, that's the exposure period that
15  Penninkilampi is looking at as well; correct?
16    Or excuse me, not the exposure period, the
17  period of time that they follow the study
18  participants; correct?
19    Penninkilampi is looking at from
20  questionnaire to 2000; correct?
21    A. Correct.
22    Q. Okay. And when you say in your report that
23  the NHS study has a 14-year follow-up period, that's
24  what you're looking at too, as well; correct?
25    A. Right. From the time of exposures --

Page 192

1    Q. So one of your complaints --
2    A. So I --
3    Q. Sorry.
4    A. Okay.
5    Q. One of your issues with the cohort studies is
6  lack of follow-up; correct?
7    A. For -- yes, for -- there are -- it's one of
8  several concerns I have about the cohort studies.
9    Q. And the Penninkilampi study did not factor in
10  the additional period of follow-up through the 2010
11  paper; correct?
12    A. I don't believe they did. I think they went
13  with the earlier study.
14    Q. In fact, they didn't even cite to the Gates
15  2010 data, did they?
16    MS. PARFITT: Objection.
17    THE WITNESS: No, they -- they didn't.
18  BY MR. JAMES:
19    Q. And they didn't offer any explanation about
20  why they went with the earlier study, did they?
21    A. Not that I recall.
22    Q. And do you understand that in the 2010 NHS
23  paper through Gates, the association with serous
24  ovarian cancer washed out?
25    MS. PARFITT: Objection to form.

Page 193

1    THE WITNESS: "Washed out," I don't
2  like that term. But again, I fully acknowledge that
3  the later study showed weaker associations, yes.
4  BY MR. JAMES:
5    Q. And the association for serous invasive
6  ovarian cancer in the Gates 2010 paper was not
7  statistically significant; correct?
8    A. I believe that is correct.
9    Q. So when you include the critique in your
10  report about the follow-up being a 14-year period, you
11  also, like Penninkilampi, aren't crediting the
12  additional ten years of follow-up that the Gates paper
13  published on; correct?
14    MS. PARFITT: Objection to form.
15    THE WITNESS: "Aren't crediting the
16  additional ten years of follow-up."
17    You know, as I have stated before, when
18  people do meta-analyses, they will make decisions
19  about which studies to include. I acknowledge that
20  Penninkilampi didn't describe in detail why they went
21  with the Gertig rather than a later study.
22    My understanding, however, is that other
23  people -- other meta-analyses have looked at -- have
24  included the later study, and the overall conclusions
25  were not changed in any real way.

49 (Pages 190 to 193)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 194

1  BY MR. JAMES:
2      Q. Well, Penninkilampi, you say, didn't describe
3  in detail about why they went with the earlier study,
4  but, in truth, they didn't describe it at all.
5          MS. PARFITT: Objection.
6          THE WITNESS: That's -- that's correct.
7  BY MR. JAMES:
8      Q. And when you refer to other studies that
9  have, in fact, looked at the Gates 2010 cohort data
10 that provides a longer period of follow-up, those
11 papers have necessarily noted that the serous
12 relationship found in Gertig 2000 disappeared in 2010;
13 correct?
14         MS. PARFITT: Objection. Form.
15         THE WITNESS: Can you -- can we -- tell
16 me which -- specifically which article you're --
17 BY MR. JAMES:
18     Q. Sure. Let's turn to the Berge article.
19     A. Okay.
20     Q. The Berge article was marked as
21 Exhibit No. 21. And you have it before you, Doctor?
22     A. I do.
23     Q. Okay. And if you turn to Figure 2, which is
24 on page 254, do you see that there that in the forest
25 plot, they have listed the cohort studies at the

Page 195

1  bottom; correct?
2      A. Correct.
3      Q. Okay. And there they report data from the
4  Gates 2010 study; correct?
5      A. Correct.
6      Q. Okay. They do not report the data from the
7  Gertig 2000 paper; correct?
8      A. That is correct.
9      Q. And if you look at the conclusions of the
10 Berge authors -- and we talked about this before --
11 but if you look at the abstract of the paper,
12 Dr. Moorman, the authors say (as read):
13         "The heterogeneity of results by
14         study design, however, detracts
15         from a causal interpretation of
16         this association."
17     Do you see that?
18     A. Yes. You've asked that before. Yes.
19     Q. And what the authors there are saying is that
20 the results from the case-control studies, the
21 meta-analyses of the case-control studies, and the
22 results of the meta-analyses of the cohort studies are
23 different; right?
24         MS. PARFITT: Objection.
25         THE WITNESS: They -- yes.

Page 196

1  BY MR. JAMES:
2      Q. They're heterogeneous. Did I pronounce that
3  correctly?
4      A. No. Heterogeneous.
5      Q. Heterogeneous. Thank you. I figured I got
6  that wrong.
7      So what they're saying there is that the
8  results by the study design are different; right?
9      A. That's -- yes, that's what they are saying.
10     Q. And here we see, again, that this study used
11 the more recent data; correct?
12         MS. PARFITT: Objection. Form.
13         THE WITNESS: It used the more recent
14 publication from the Nurses' Health Study, yes.
15 BY MR. JAMES:
16     Q. Which includes the more recent data; correct?
17         MS. PARFITT: Objection.
18         THE WITNESS: Yes.
19 BY MR. JAMES:
20     Q. On page 8 of your report, Dr. Moorman, you
21 say at the bottom paragraph (as read):
22         "Cohort studies and case-control
23         studies each have advantages and
24         disadvantages for assessing talc
25         as a risk factor for ovarian

Page 197

1          cancer, and one study design is
2          not clearly superior to the
3          other."
4      Do you see where I was reading that?
5      A. Yes, I do.
6      Q. So your expert opinion in this case is that
7  the cohort studies on talc ovarian cancer and the
8  case-control studies on talc ovarian cancer are on
9  equal footing?
10     A. I think -- again, using terminology like
11 "equal footing," it's -- I wouldn't really describe it
12 like that.
13     I think that case-control studies and cohort
14 studies are both well-established, well-accepted
15 methods for studying cancer epidemiology. There are
16 strengths and weaknesses to each design, as I have
17 indicated here. And some of them very -- some of the
18 strengths and weaknesses are very specific to this
19 exposure and outcome.
20     Q. Doesn't the body of talc ovarian cancer
21 literature that you've looked at for your MDL opinions
22 emphasize the importance of cohort data on the issue?
23         MS. PARFITT: Objection. Form.
24         THE WITNESS: I considered all of the
25 epidemiologic data; and when we look at the body of

50 (Pages 194 to 197)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 198

 1  literature, more of the literature comes from
 2  case-control studies than from cohort studies.  So all
 3  of the data are important.  There just happen to be
 4  more case-control studies than cohort studies.
 5  BY MR. JAMES:
 6      Q.  But your testimony is that the cohorts are
 7  not superior to the case-controls, and the
 8  case-controls are not superior to the cohorts;
 9  correct?
10      A.  As I describe in my report -- the same page,
11  I say (as read):
12          "Rather than making a judgment
13          based only on the overall study
14          design, the evaluation and
15          interpretation of the findings of
16          the studies must consider the
17          strengths and weaknesses of the
18          individual studies."
19      And I think that I did consider that.
20  I considered strengths and weaknesses of the cohort
21  studies.  I considered strengths and weaknesses of the
22  case-control studies.
23      Q.  And you're not claiming that the study design
24  of these studies -- the cohort versus the
25  case-control -- one is superior to the other?  You're

Page 199

 1  not claiming that?
 2          MS. PARFITT:  Objection.  Asked and
 3  answered several times.
 4          THE WITNESS:  Right.  I -- again,
 5  I think that I have answered that, that they -- the
 6  study designs are both well-accepted study designs;
 7  they have advantages and disadvantages; and so you
 8  have to look at some of the specific characteristics
 9  of the individual studies.
10  BY MR. JAMES:
11      Q.  And so the body of talc literature that
12  you've looked at, whether it be cohort studies,
13  meta-analyses, case-control studies, are you aware
14  that that body of literature has generally emphasized
15  the importance of cohort data on this topic?
16          MS. PARFITT:  Objection.  Misstates the
17  record -- scientific record.
18          THE WITNESS:  I am aware -- I have read
19  some studies that mistakenly say that the cohort
20  studies, because they involve 40,000 or 60,000 people,
21  that they provide more of the evidence than all the
22  case-control studies, which are generally smaller.
23          However, just, again, to take the example of
24  the Gonzalez sisters study, that's a cohort with
25  40,000 people in it, but there were only 154 cases.

Page 200

 1  And it's the number of cases rather than the overall
 2  size of the cohort that contributes to the statistical
 3  power.  And that doesn't address all the other
 4  problems with that study.
 5          But sometimes people will mistakenly say
 6  these large studies -- you know, this large study,
 7  40,000 people, and they didn't find an association.
 8  But they're not looking into all the limitations of
 9  that particular study.
10  BY MR. JAMES:
11      Q.  Okay, Dr. Moorman, I'm going to object to the
12  nonresponsive nature of your answer.
13      A.  I -- I think that I was responsive, but
14  please ask your question again.
15      Q.  Okay.  So the question that I asked you is
16  whether you are aware that the body of literature that
17  you've looked at has generally emphasized the
18  importance of cohort data on this topic.  The answer
19  is yes or the answer is no.
20          MS. PARFITT:  The answer is -- first,
21  I object to the question.  And the witness has
22  answered the question several times.  Your time.
23  You're on your clock.
24  BY MR. JAMES:
25      Q.  Are you aware that the body of literature has

Page 201

 1  emphasized the importance of cohort data?  Are you
 2  aware of that?  Yes or no?
 3          MS. PARFITT:  Objection.
 4          THE WITNESS:  I -- I disagree that --
 5  your characterization of it.
 6  BY MR. JAMES:
 7      Q.  Then, the answer is no.
 8      A.  No.  You asked am I aware --
 9      Q.  The answer is yes or it's no, Dr. Moorman.
10  I have limited time to ask questions today.
11          Were you aware -- are you aware that the
12  body of literature on talc and ovarian cancer has
13  emphasized the importance of cohort data on this
14  topic?
15          MS. PARFITT:  Objection.  Form.
16          THE WITNESS:  I don't think --
17          MS. PARFITT:  Asked and answered.
18          THE WITNESS:  -- the statement is true.
19  I think that the --
20  BY MR. JAMES:
21      Q.  So then the answer is no.
22          MS. PARFITT:  Stop.  Let her answer.
23          THE WITNESS:  No.  You're asking me if
24  I'm aware --
25          MS. PARFITT:  Why do you ask her the

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 202

1    same question?
2         THE WITNESS: -- that this has
3    emphasized that. And I don't think that is it at all.
4         I think that the body of literature
5    emphasizes again and again and again that of the
6    roughly 25 to 30 studies, only three of them are
7    cohort studies.
8         It's part of the data on the topic, but it's
9    just part of it. So to say that it has emphasized the
10   importance of cohort data, I don't agree with that
11   statement.
12   BY MR. JAMES:
13        Q. I marked the Houghton WHI study as
14   Exhibit No. 25, and I'm going to hand you two copies.
15        (Exhibit No. 25 was marked for identification.)
16        THE WITNESS: Thank you.
17   BY MR. JAMES:
18        Q. All right. Dr. Moorman, you see here in the
19   abstract, the "Background" section of the paper, the
20   authors of the WHI study in 2014 say that (as read):
21             "The purpose of this analysis was
22             to assess perineal powder use and
23             risk of ovarian cancer
24             prospectively."
25        Correct?

Page 203

1         A. That is what it says, yes.
2         Q. Okay. And if we look towards page 5, we see,
3    at the top of the left-hand column, the authors there
4    emphasize (as read):
5              "The prospective nature of our
6              study would eliminate the
7              potential for recall bias."
8         Do you see that?
9         A. I do see that.
10        Q. Do you agree with that general proposition?
11   "Yes" or "no"?
12        A. It eliminates the potential for recall bias.
13   It does not eliminate the potential for inaccurate
14   recall.
15        Q. And if you look at page 4, it's the preceding
16   set of sentences, the authors note -- quote -- at the
17   bottom of the right column (as read):
18             "One potential reason that
19             case-control studies have found
20             slight increases in risk is the
21             potential for an overestimation of
22             the true association due to recall
23             bias, because the participants are
24             aware of their ovarian cancer
25             status when reporting powder

Page 204

1         exposure."
2         Do you see where I read that?
3         A. I do.
4         Q. Okay. Again, do you agree with that
5    statement as a general proposition?
6         A. I would like to point out there are --
7    potential reason, a potential for an overestimation.
8    And in my own report, I acknowledge the potential for
9    recall bias, and I go back to explain why I don't
10   think that recall bias is a full explanation for this
11   association.
12        Q. Nevertheless, you will agree with me that the
13   authors of this paper are acknowledging the importance
14   of cohort data? Agree?
15        MS. PARFITT: Objection.
16        THE WITNESS: As you would expect the
17   investigators on a cohort study to do.
18   BY MR. JAMES:
19        Q. And the answer was yes --
20        A. Yes.
21        Q. -- comma, as you would expect?
22        MS. PARFITT: Objection.
23        THE WITNESS: Yes.
24        MR. JAMES: I'm going to mark as the
25   next exhibit the Gertig 2000 paper, which is

Page 205

1    Exhibit No. 26.
2         (Exhibit No. 26 was marked for identification.)
3    BY MR. JAMES:
4         Q. Again, this is the NHS 2000 paper; correct?
5         A. That is correct.
6         Q. And we see that in the abstract of this
7    cohort paper, the authors state at the -- well, it's
8    not in the abstract -- it's right above the "Methods"
9    section, the authors state (as read):
10             "Despite the relative consistency
11             among studies, the limited
12             supporting biologic evidence,
13             together with the possibility of
14             recall and selection bias in
15             case-control studies, has raised
16             questions about the plausibility
17             of the association. We,
18             therefore, prospectively examined
19             the relationship between perineal
20             talc use and ovarian cancer risk
21             in a large cohort of US women."
22        Do you see where I read that?
23        A. Yes, I do.
24        Q. And again, methodologically, the authors of
25   this cohort paper are emphasizing the importance of

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 206

```
 1   cohort data on the topic; correct?
 2        MS. PARFITT:  Objection.
 3        THE WITNESS:  Yes.  Again, they
 4   emphasize the importance of doing it prospectively, as
 5   you would expect the investigators on a cohort study
 6   to do.
 7   BY MR. JAMES:
 8        Q.  Do you think that's just because there's some
 9   sort of subjective bias the authors of that cohort
10   paper have towards cohorts?  Do you think that's just
11   their personal opinion?
12        MS. PARFITT:  Objection.
13        THE WITNESS:  I have no way of knowing
14   what their opinion is.
15   BY MR. JAMES:
16        Q.  A number of the meta-analyses that we've
17   looked at today and that you looked at to inform your
18   report have also talked about the benefits of cohort
19   data.  And I've asked that question before, and that's
20   where we -- that's where we sort of ran into issues,
21   so I'll just strike that question.
22        If you can turn to -- back to the
23   Penninkilampi study.  And the Penninkilampi study is
24   the recent meta-analysis that you cited 14 times in
25   your report; correct?
```

Page 207

```
 1        MS. PARFITT:  Objection.  Form.
 2        THE WITNESS:  As stated below -- or
 3   stated above, I have cited it.  I don't know how many
 4   times.
 5   BY MR. JAMES:
 6        Q.  And meta-analyses also are what you refer to
 7   in your report as some of the strongest evidence;
 8   correct?
 9        A.  Yes, that is correct.
10        Q.  Okay.  And so the authors of this
11   meta-analysis, on page 47 in the conclusion section,
12   which we have looked at already, again note that
13   case-control studies are "prone to recall bias";
14   right?
15        A.  That's what it says, yes.
16        Q.  Okay.  And then if you continue on past the
17   section that we've already read -- and actually, it
18   begins at the bottom of page 47 and carries to 48 --
19   but the authors state (as read):
20        "Additional epidemiologic evidence
21         from prospective studies with
22         attention to effects within
23         ovarian cancer subtype is
24         warranted."
25        So here the authors of Penninkilampi are
```

Page 208

```
 1   again stressing the desire for cohort data on this
 2   topic; correct?
 3        MS. PARFITT:  Objection.  Misstates the
 4   evidence.
 5        THE WITNESS:  When -- if we were to
 6   look at a cohort study where women were enrolled in
 7   the study early in their life when they started using
 8   talc and they were followed throughout their life and
 9   exposure information was updated throughout the period
10   of follow-up and you followed them for 50 years, that
11   would be a wonderful way -- a stronger design than to
12   do a case-control study.  So I could not disagree with
13   that.
14        But we're being asked to make a judgment on
15   the data that we have here -- here and now, not
16   something that's decades away.
17   BY MR. JAMES:
18        Q.  Do you agree that case-control studies are
19   low-level evidence?
20        A.  No, I do not agree with that.
21        Q.  Do you know that the Penninkilampi authors
22   referred to case-control studies as low-level
23   evidence?
24        A.  I see that in their paper.
25        Q.  Do you --
```

Page 209

```
 1        A.  I --
 2        Q.  I'm sorry.
 3        A.  I will disagree with that.  It's -- just
 4   using the example of my own study, the AACES study.
 5   Of all the studies that have looked at talc and
 6   ovarian cancer, I believe that one is the one that has
 7   been most recently funded.  So about 2009, 2010.  It's
 8   quite an expensive study, and I can't imagine that the
 9   National Cancer Institute would have invested that
10   much money in the study if they thought that we were
11   only going to get low-level evidence.
12        MS. PARFITT:  Scott, we've been going
13   about an hour and ten.
14        You may want to keep going?  Just let me
15   know.
16        THE WITNESS:  I could use a break.
17        MR. JAMES:  May I finish this line?  Is
18   that okay with you?
19        THE WITNESS:  Yes.
20        MR. JAMES:  Everyone?
21        MS. PARFITT:  Sure.
22   BY MR. JAMES:
23        Q.  Dr. Moorman, if you can turn with me to the
24   Langseth study.  It's Exhibit 22.  And this will be
25   the last series of questions, and then we'll take our
```

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 210

1   break.
2       A. Langseth -- okay. The exhibit number is
3   incorrect.
4       Q. Oh, you're right. And I'm going to fix that
5   at break. Thank you.
6       A. Okay.
7       Q. If you turn with me to page -- well, you
8   don't have to turn. It's page 358. It's the first
9   page of the article. And, again, Langseth is one of
10  the meta-analyses upon which you rely; correct?
11      A. Correct.
12      Q. And the meta-analyses authors here say, in
13  the left-hand column at the bottom, the second
14  sentence of the bottom paragraph, they say (as read):
15          "In the cohort study, arguably the
16          strongest study because of its
17          partly prospective ascertainment
18          of exposure, there was no
19          association between cosmetic talc
20          use and risk of all subtypes of
21          ovarian cancer combined."
22      Do you see that?
23      A. Yes.
24      Q. Okay. You agree with the Langseth authors
25  that the cohort study is arguably the strongest study

Page 211

1   because of its prospective nature?
2       A. I really can't say that I agree with that,
3   because the prospective aspect of it is certainly a
4   positive for the study, but the way they did exposure
5   assessment kind of weakened the study.
6          So I think that there were some very well
7   done case-control studies, so I wouldn't necessarily
8   say this was the strongest study.
9              MR. JAMES: And now is a good time for
10  the break.
11             THE WITNESS: Okay.
12             MR. JAMES: Thank you.
13             THE VIDEOGRAPHER: Going off record at
14  3:02 p.m.
15      (Recess taken from 3:02 p.m. to 3:16 p.m.)
16             THE VIDEOGRAPHER: Back on record at
17  3:16 p.m.
18  BY MR. JAMES:
19      Q. Dr. Moorman, on page 25 of your report, you
20  make a comment about power and the cohort studies;
21  correct?
22      A. Can you --
23      Q. It's the bottom of first paragraph, where you
24  cite the Narod article.
25      A. Yes.

Page 212

1       Q. And you cite Narod for your comments about
2   power in the cohorts; correct?
3       A. Yes.
4       Q. Have you analyzed the calculations performed
5   by Narod? Have you separately analyzed his
6   calculations?
7       A. No, I did not.
8       Q. Have you considered any other commentaries or
9   articles looking at the issue of power in the cohort
10  studies in the talc ovarian cancer literature?
11      A. I -- I'm trying to remember specifically. It
12  seems like the Sister Study might have mentioned power
13  as a limitation of their study because of the number
14  of cases.
15      Q. Did you consider -- let me just hand this to
16  you. We already have it marked. It's the Berge
17  article, which is Exhibit 21.
18      A. Okay.
19      Q. And I'm turning to page 253. And at the
20  far -- the right column, top paragraph, and halfway
21  down through that paragraph, the authors state
22  (as read):
23          "It should be noted that the
24          cohort studies included in the
25          meta-analyses comprised a total of

Page 213

1           429 cases of ovarian cancer
2           exposed to genital talc and 943
3           unexposed cases. The statistical
4           power of the meta-analysis of
5           these cohort studies to detect a
6           relative risk of 1.25, similar to
7           the result of meta-analyses of
8           case-control studies, was .99.
9           Thus low power of cohort studies
10          cannot be invoked as an
11          explanation of the heterogeneity
12          of results."
13      You see where I was reading?
14      A. I do.
15      Q. Have you considered this portion of the Berge
16  article before?
17      A. I have looked at this article, and I have
18  considered all aspects of it, as I did all of the
19  other meta-analyses and articles.
20      Q. You did not cite the Berge article with
21  regard to the issue of power in your report; correct?
22             MS. PARFITT: Objection. Form.
23             THE WITNESS: No, I -- I did not.
24  BY MR. JAMES:
25      Q. Okay. And why is that?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 214

1      A. I can't cite any specific reason.
2      Q. Is that because this conflicts with your
3  litigation opinion on power?
4          MS. PARFITT: Objection. Form.
5          THE WITNESS: No. I -- I don't -- that
6  was not my reason, no.
7  BY MR. JAMES:
8      Q. Do you have any reason to disagree with the
9  power analysis set forth in the Berge paper?
10     A. I -- I don't have a reason to disagree with
11 the power issue, but I think that it's only one part
12 of the picture, that there are other factors that
13 could contribute to differences in the findings
14 between the cohort studies and the case-control
15 studies.
16     Q. With respect to this precise power
17 calculation in the Berge paper, do you have any
18 criticisms of this power calculation?
19     A. They do not provide much detail on how they
20 calculated it, so there's really -- I can't say if
21 they did it correctly or not. But I -- I just can't
22 comment on it. It's just a single sentence there.
23     Q. Similar to the Narod sentence that you
24 reviewed?
25     A. I --

Page 215

1      Q. Let me rephrase it if it helps.
2          Did you separately assess the Berge --
3  excuse me -- the power calculation in either the Narod
4  article or the Berge article?
5      A. If I may go back to my report for just a
6  moment.
7      Q. Sure.
8      A. I think that this statement that I have
9  here -- I'm -- I think my intent in my report was
10 indicating that the lack of statistical significance
11 in the individual studies was a power concern.
12         Berge was talking about the statistical
13 power for the combined studies. So I think that there
14 is some distinction there between what I'm referring
15 to individual studies versus what Berge is describing
16 as the power of the combined analysis.
17     Q. Well, Berge is saying that the low power of
18 cohort studies cannot be invoked as an explanation for
19 the heterogeneity of results.
20         Do you agree or disagree with that
21 statement?
22     A. When they are combining them, I -- I don't
23 disagree with that. I think there are other reasons
24 that can explain the heterogeneity.
25     Q. On page 25, we've touched upon this already,

Page 216

1  but with respect to the issue of follow-up -- it's the
2  paragraph above the Narod comment.
3          Do you see where I am?
4      A. Yes.
5      Q. Okay. And there, we talk about -- excuse me.
6  There, you talk about the follow-up for the cohort
7  studies; correct?
8      A. Yes.
9      Q. Okay. And with respect to the NHS follow-up,
10 there is where you report 14 years of follow-up;
11 right?
12     A. Correct.
13     Q. And as we discussed earlier today, that does
14 not account for the additional ten years of data as
15 reflected by the Gates 2010 paper; correct?
16     A. What I am referring here, I'm describing the
17 three cohort studies in the most recent meta-analyses
18 and what they reported in that meta-analysis --
19     Q. Understood.
20     A. Okay.
21     Q. So you're referring there to the
22 Penninkilampi meta-analysis; correct?
23     A. I believe that is the case. Let me check the
24 reference. Yes.
25     Q. So Penninkilampi reports the 14 years of

Page 217

1  follow-up; correct?
2      A. I believe so.
3      Q. And we know that the Penninkilampi paper did
4  not include the additional 10 years of follow-up as
5  reflected by the Gates 2010 paper; correct?
6      A. Yes. We have already -- you've already asked
7  and I've already answered that.
8      Q. And then the next one you discuss is the WHI
9  study where you are reporting Penninkilampi's
10 reporting of 12.4 years of follow-up; correct?
11     A. That is correct.
12     Q. And do you know that the follow-up period in
13 the WHI -- do you know that the WHI asked about
14 duration of talc use?
15     A. May I go back to that study?
16     Q. Sure.
17     A. Do you --
18     Q. It's 25.
19     A. Yes, they describe in their exposure
20 assessment, that they did ask about duration of use
21 using five categories from less than a year all the
22 way up to 20 or more years.
23     Q. And so we know that they -- they followed the
24 study participants for, according to Penninkilampi,
25 12.4 years. But, in addition to that, they also asked

55 (Pages 214 to 217)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 218

1  about the -- study participants about their prior
2  duration of usage; correct?
3      A.  They asked about that, but I think that one
4  has to consider some of the caveats that go along with
5  that.  These -- may I continue?
6          These women, they report that they were, on
7  average, 63 years of age when they -- at baseline, so
8  at the start of enrollment in the cohort.  So they
9  were asking them to recall an exposure that went back,
10 for many women, that probably started in their teens
11 or twenties.  So there was certainly the possibilities
12 of some inaccurate recall because they were asking
13 them to recall an exposure that went back quite a few
14 years.
15         Another consideration with this study is
16 they excluded roughly -- let's see -- the cohort
17 was -- they started off with 90-some-thousand women in
18 the cohort, and they excluded any history of any women
19 with cancer at baseline, which is appropriate to do,
20 but the potential concern about that is, if there were
21 talc users who had developed ovarian -- or had
22 developed ovarian cancer before the follow-up began,
23 that would never be captured.
24         MR. JAMES:  Okay.  Dr. Moorman, just
25 very respectfully, I'm going to have to object to the

Page 219

1  nonresponsive portion of the answer.
2  BY MR. JAMES:
3      Q.  So the question that I asked is not the
4  question that you ended up answering.
5      A.  I did answer your question, I believe.
6      Q.  Okay.  I didn't ask you for your critiques of
7  the WHI.  I asked you about the follow-up issue.
8  Okay?  Do we need to look at the question again?
9          I asked -- my question is:
10         "Question:  But in addition to that,
11         they also asked about -- the study
12         participants about their prior
13         duration of usage; correct?"
14     A.  And I answered it but thought that there were
15 important relevant considerations.
16         MR. JAMES:  Can we go off the record
17 for a second --
18         MS. PARFITT:  Yes.
19         MR. JAMES:  -- please?
20         THE VIDEOGRAPHER:  Off record at 3:29.
21         (Discussion off the record.)
22         THE VIDEOGRAPHER:  Back on record at
23 3:31 p.m.
24 BY MR. JAMES:
25     Q.  On page 25 of your report, Dr. Moorman --

Page 220

1  excuse me -- page 26, you discuss updating exposure
2  information in the cohort studies.
3      A.  Yes.
4      Q.  Do you have any basis to dispute the accuracy
5  of the reported talc use at the time it was initially
6  ascertained in the cohort studies?
7      A.  The accuracy of the reported talc use at the
8  time that they started follow-up in the cohorts.
9      Q.  Correct.
10     A.  I believe that, when you are asking people to
11 recall exposures that occurred over a long period of
12 time, there will be some inadvertent inaccuracies.
13     Q.  And are you saying with respect to questions
14 about duration?
15     A.  It could be with ever use or with duration.
16 Some women who used it might have forgotten and never
17 reported it.  So that's just kind of an inherent
18 problem anytime you ask someone to recall exposures,
19 particularly if they might have occurred decades ago.
20     Q.  Is that true for the case-control studies as
21 well?
22     A.  Yes.  In my report, I indicate that -- I make
23 the distinction between recall bias and inaccurate
24 recall and indicate that inaccurate recall --
25 specifically on page 21, make the distinction between

Page 221

1  recall bias and inaccurate recall that is difficult --
2  inaccurate recall and exposure that is difficult to
3  remember with precision.
4          And that's an issue with any type of study
5  when you're asking people to recall past exposures.
6      Q.  And transitioning to the topic that you
7  brought up, which is the recall bias.  We can stay on
8  page 216 your report.
9      A.  Yes.
10     Q.  And there, you address -- at the bottom
11 paragraph, you say that (as read):
12         "Recall bias, which theoretically
13         could result in the bias estimate
14         of the relative risk, must be
15         considered."
16         Do you see where I am?
17     A.  I do.
18     Q.  And you cite three situations where recall
19 bias would be a "particular threat" to a study's
20 validity; right?
21     A.  Yes.
22     Q.  And with -- let's walk through those three
23 together.
24         The first is -- the first threat that you
25 identify is "if the exposure of interest is one that

56 (Pages 218 to 221)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 222

1  could be considered sensitive"; right?
2      A.  Yes.
3      Q.  Okay.  And then you address that reason in
4  turn on the next page, on page 22 of your report?
5      A.  Yes.
6      Q.  And you state there that (as read):
7          "In regard to the situation,
8          genital talc use would 'not be
9          considered a particularly
10         sensitive topic.'"
11     Right?
12     A.  That's what I state in my report, yes.
13     Q.  Okay.  And what basis do you have for that
14  statement?  Do you cite to anything?  Have you
15  conducted any studies to support that statement?  What
16  scientific basis do you have for that statement?
17     A.  This is based on my professional judgment,
18  based on years and years of doing studies where we
19  collect data, getting feedback from interviewers.  In
20  our studies, we ask about a lot of personal things,
21  you know, their menstrual history, their contraceptive
22  history, those kind of things.
23          And I have never gotten the impression that
24  these were things that women considered sensitive and
25  did not want to reveal, whereas when you get into

Page 223

1  other topics, say -- like, I give the example of
2  induced abortion, that, I have heard from some of our
3  interviewers, that sometimes that evokes strong
4  emotions in the women.
5          And so I think that, you know, there are
6  some exposures that are sensitive, as I describe, that
7  women might be hesitant to report.  And I contrast
8  that with things that are personal but not
9  particularly sensitive.
10         When a woman has agreed to be in a study,
11  she knows that we're going to be asking some of these
12  questions.  And I have never had any comments from
13  any of the interviewers in the many studies I've done
14  that this was a question that women felt uncomfortable
15  with.
16     Q.  Do you acknowledge the possibility that a
17  person's use of a cosmetic talcum powder in their
18  genital region could be viewed by some as a sensitive
19  topic?
20     A.  I -- again, I -- I kind of make the
21  distinction between something that is personal -- and
22  we ask them a lot of personal questions, but it's --
23  I don't see any aspect of that that would seem
24  particularly sensitive, why someone might be
25  embarrassed or feel that someone was going to judge

Page 224

1  them, or any reason why a woman, if she's telling you
2  her whole pregnancy and menstrual history, why she
3  would feel embarrassed about her use of genital talc.
4      Q.  And do you have any empirical data to support
5  that opinion?
6      A.  I am unaware of any empirical data that
7  specifically addresses that.
8      Q.  Okay.  The second situation you identify on
9  page 21 and then discuss on page 22 is if -- is if the
10  study hypotheses are known to the study subjects or
11  interviewers.
12         Do you see that?
13     A.  Yes.
14     Q.  Okay.  And your analysis is on page 22.
15         What did you do to evaluate this factor?
16     A.  Whether the study hypotheses are known to the
17  study subjects or interviewers?
18     Q.  Correct.  With respect to the talc ovarian
19  cancer literature.
20     A.  Okay.  Again, this is based on my experience
21  in having done epidemiologic studies for many years.
22  As I state here, it's standard practice in
23  epidemiologic research where we're not discussing the
24  hypotheses with the interviewers.  We're asking a lot
25  of questions.  Some thought to increase risk; some

Page 225

1  thought to decrease risk.  It's standard that you
2  would not really discuss the hypotheses with the
3  interviewers.
4          And, similarly, when we invite or ask women
5  to be in our studies, we will tell them that, you
6  know, it is a study of ovarian cancer, but we're not
7  telling them which factors we think might be
8  associated with increased risk and which ones might be
9  associated with decreased risk.
10     Q.  To support this statement, did you conduct
11  any post-interview interviews?
12     A.  Can you restate that?  Tell me -- I'm not
13  sure what you're asking.
14     Q.  So to determine if study hypotheses were
15  known to the study subjects at the time that they were
16  asked the questions, there would be methods or ways to
17  which you could find that out; correct?
18     A.  We -- I'm thinking about it.  I have never
19  known that to be -- I've never known a study that has
20  done that.
21          In one breast cancer study, at the end of
22  the interview, we asked the women if they had any
23  ideas about what caused breast cancer.  And, you know,
24  we thought it might maybe raise some new ideas, but we
25  found that it was largely -- we didn't see anything

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 226

1    that was usable. I think that the most common
2    response was that women thought it was stress. So --
3        Q. But you don't have any evidence of anything
4    similar being done in the talc ovarian cancer
5    literature; correct?
6        A. Not to my knowledge.
7        Q. At the bottom of page 22, and then carrying
8    over through 23, you cite to the Lanza study; correct?
9        A. That's correct.
10       Q. And you cite Lanza for the proposition
11   that -- to provide "further evidence that recall bias
12   in case-control studies does not inevitably lead to an
13   overestimate."
14          Do you see where I was reading? It's at the
15   bottom of 22.
16       A. Yes. Yes, I see where you're reading.
17       Q. Lanza did not pertain to talc and ovarian
18   cancer; correct?
19       A. As I state in my report, yes. It's looking
20   at a variety of meta-analyses that looked at both
21   case-control studies and cohort studies. And the
22   point of that paper was to determine if recall bias
23   seemed to lead to a consistently increased risk. And
24   their conclusion, as I state in here, there's no
25   significant difference in the effect estimates between

Page 227

1    the case-control and cohort studies, suggesting that
2    the study design didn't have an important impact on
3    the conclusions of the meta-analyses.
4          MR. JAMES: Okay. I marked Lanza as
5    Exhibit 27. I'll hand you two copies.
6        (Exhibit No. 27 was marked for identification.)
7    BY MR. JAMES:
8        Q. And so Lanza concerns therapeutic
9    interventions; correct?
10       A. Yes.
11       Q. And isn't -- and correct me if I'm wrong
12   here, but looking at Lanza, isn't what Lanza doing is
13   they're comparing the odds ratios reached in both the
14   case-control studies and in the prospective studies on
15   a completely different body of literature; right?
16       A. It is not dealing with talc and ovarian
17   cancer, if that is your question.
18       Q. Were you looking at whether the results of
19   the case-control studies on that separate body of
20   literature and the results of the prospective cohort
21   studies on that separate body of literature reached
22   different results; right?
23       A. Yes.
24       Q. Okay. And so the author's conclusions in the
25   abstract here are -- which you note in your report --

Page 228

1    are that the estimates did not differ between
2    case-control and prospective or retrospective cohort
3    studies; correct?
4        A. Where are you reading, please?
5        Q. I'm in the "Results" section.
6        A. Okay. Yes.
7        Q. And then they say, "Heterogeneity was also
8    low," below that; right?
9        A. Yes.
10       Q. Again, if I'm understanding this paper
11   correctly, the situation for talc and ovarian cancer
12   is completely different, isn't it? Where we do have
13   heterogeneity between the prospective studies and the
14   retrospective case-control studies; right?
15          MS. PARFITT: Objection. Form.
16          THE WITNESS: We have one example in
17   the talc and the -- and the ovarian cancer -- in the
18   meta-analyses, they did note some heterogeneity
19   between the cohort studies and the case-control
20   studies.
21          I think that the point that I was trying to
22   get with that is in the observational studies, there's
23   always concern, as several of these people have -- as
24   several of the meta-analyses and other papers have
25   reported, that the stronger association due to --

Page 229

1    among the case-control studies was due to some kind of
2    recall bias.
3          So the point is, if it was recall bias, you
4    would expect to see that case-control studies always
5    had higher estimates than the cohort studies; and this
6    study is making the point that in this wide variety of
7    interventions that they looked at, that doesn't seem
8    to be the case at all. Okay.
9    BY MR. JAMES:
10       Q. So, again, this study is saying, "Look, the
11   results of case-control studies and the results of
12   prospective cohort studies on these therapeutic
13   interventions are similar, same ballpark, and so thus,
14   we can conclude that recall bias in this body of
15   literature must not be a big deal."
16          Is that a layman's fair way to describe the
17   results of this paper?
18          MS. PARFITT: Objection. Form.
19          THE WITNESS: Yeah. I -- I mean,
20   I think that it's one part of the -- I think that,
21   overall, that's a pretty fair summary of the point
22   that this paper is making. So...
23   BY MR. JAMES:
24       Q. And if you acknowledge that in the talc
25   ovarian cancer literature, there is a disparity

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 230

1    between the retrospective case-control studies and the
2    prospective cohort studies, then Lanza isn't really
3    applicable at all, is it?
4                MS. PARFITT:  Objection.
5                THE WITNESS:  It is -- I think that it
6    is very applicable because it's trying to get at the
7    recall -- is recall bias -- is that a problem in
8    case-control studies that is going to inevitably lead
9    to higher risk estimates than what you would get in
10   cohort studies?
11               And as we have seen in these articles, we
12   see recall bias is frequently cited as a potential
13   reason that we saw stronger associations in
14   case-control studies than in cohort studies.
15               And I think this paper is really pointing
16   out that that's not inevitable, that you're always
17   going to have higher estimates with case-control
18   studies than cohort studies.
19               Specifically in relation to the
20   heterogeneity between the cohort studies and the
21   case-control studies in talc, I think that we have to
22   consider other biases that may be operating.
23   BY MR. JAMES:
24        Q.  I mean, the justification for the Lanza
25   conclusions is that the results in the two study

Page 231

1    designs are pretty much the same.  So these two study
2    designs didn't reach different results.  And so in
3    this body of literature, we don't really need to be
4    worried about recall bias.  Recall bias was not
5    operating to create a disparity of results in this
6    body of literature.
7                But, in contrast, in the talc ovarian cancer
8    world, there is a disparity in the results by study
9    design; right?
10        A.  We've already acknowledged there is some
11   heterogeneity in results.  Is it due to recall bias?
12   Is it -- do we have to assume that recall bias is in
13   play here and that explains the higher -- or the
14   stronger associations generally reported in the
15   case-control studies.
16               And this article is addressing one -- one
17   potential bias, the recall bias.  And I don't --
18   I think that it provides support that we cannot just
19   do a knee-jerk reaction of "case-control studies, they
20   have the potential for recall bias, that leads to
21   higher estimates, and therefore, these studies are
22   biased."
23               There are other biases in play in the cohort
24   studies that I think are very plausible explanations
25   for why there might be some differences.

Page 232

1        Q.  If you're looking at Lanza objectively,
2    doesn't it say exactly the opposite of what you're
3    saying here, Doctor?
4                I mean, again, the justification for Lanza
5    is the results are the same, and so recall bias isn't
6    a problem.  But that justification doesn't exist in
7    the world of talc ovarian cancer.
8                That will be my last question on that.
9        A.  No.  I think that this addresses the recall
10   bias in the -- you know, I acknowledge it doesn't
11   directly address talc and ovarian cancer in this
12   paper; but it does address this -- this commonly-cited
13   thing that, you know, recall bias in case-control
14   studies could lead to higher risk estimates.  And it's
15   saying that's not necessarily the case always.
16        Q.  I promised that was my last question --
17        A.  Okay.
18        Q.  -- so we'll move on.
19               The third factor that you discuss as a
20   particular threat for recall bias is if there is
21   considerable media attention.
22               Do you see where I've returned back to on
23   page 22?
24               21 is where you -- 21 through 22 is where
25   you lay out the three reasons.  At the top of 22, you

Page 233

1    say "considerable media attention."
2        A.  Yes.
3        Q.  And then you evaluate the media attention
4    factor on the following page; right?
5        A.  On page 23, yes.
6        Q.  On 23, you say that, for the media attention
7    concern, you say in the middle of the first full
8    paragraph (as read):
9                "The concern is not relevant to
10               the vast majority of the studies
11               as virtually all the data
12               collection in the epidemiologic
13               studies of talc and ovarian cancer
14               occurred prior to such
15               litigation."
16        Do you see that?
17        A.  Yes, I do.
18        Q.  And you agree that media attention is not
19   limited to litigation; correct?
20        A.  Yes.
21        Q.  Did you undertake any effort to analyze the
22   extent of publicity or media attention to the talc
23   ovarian cancer issue prior to 2014?
24        A.  I did not do any specific analysis of that.
25   I personally was unaware of any media attention on

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 234

1  this topic prior to the litigation.
2      Q.  Then I believe on page 23, you go on to
3  discuss the Schildkraut 2016 paper; correct?
4      A.  Yes.
5      Q.  Okay.  And if we can pull that back out.  It
6  is the exhibit -- did I mark it?
7          MS. PARFITT:  I don't think so.
8          MR. JAMES:  Okay.  I'll mark it as the
9  next one, so you don't have to fish for it here.  It's
10  Exhibit 28.
11      (Exhibit No. 28 was marked for identification.)
12          MR. JAMES:  Which is the Schildkraut
13  2016 paper.  I'll hand you two copies.
14  BY MR. JAMES:
15      Q.  And so we touched upon this a bit earlier,
16  Dr. Moorman, where we talked about the phraseology
17  where you say the association was "attenuated but not
18  eliminated."
19      Do you recall that exchange we had earlier?
20          THE WITNESS:  Yes, I do.
21  BY MR. JAMES:
22      Q.  Okay.  And in this 2016 paper, again, you,
23  among the authors, compared the odds ratios for talc
24  and ovarian cancer for participants before 2014 and
25  for participants after 2014; correct?

Page 235

1      A.  Correct.
2      Q.  And if we look at page 1414 -- I'm looking
3  for my place here.
4      If you look at Table 2, Dr. Moorman, you see
5  there where you have broken out the data on interview
6  date after 2014; right?
7      A.  Yes.
8      Q.  And then above that is the interview date
9  before 2014; correct?
10      A.  Yes.
11      Q.  And we see that the odds ratio here for
12  interview date after 2014 is 2.91; correct?
13      A.  That is correct.
14      Q.  That's well in excess of any odds ratio
15  reported in any of the meta-analyses; correct?
16      A.  For the overall summary odds ratio, yes.
17      Q.  And before 2014, we see that the odds ratio
18  is a 1.19 that is not statistically significant, which
19  is what we discussed earlier; correct?
20      A.  Yes, we discussed that earlier.
21      Q.  And you also report in this article a
22  distinction between the pre-2014 interviewees and the
23  post-2014 interviewees based upon their reported talc
24  usage; right?
25      A.  Yes.

Page 236

1      Q.  And you -- I believe this table reflects --
2  though I'm still looking for it, and maybe you can
3  help me with it -- but the data in this table reflects
4  that pre-2014 interviewees reported talc usage at the
5  rate of 36 percent, and post-2014 interviewees
6  reported rates -- excuse me, reported usage at the
7  rate of 51 percent.
8      A.  Yes, I see that in the table.
9      Q.  And so that's a significant disparity in
10  reported usage rates; would you agree with that?
11          MS. PARFITT:  Objection.  Form.
12          THE WITNESS:  Clearly, it is what it
13  is.  It's 36 percent as -- versus 51 percent.  Okay.
14  BY MR. JAMES:
15      Q.  And so we have your paper here showing that
16  before 2014, before the onset of the litigation, you
17  had study participants reporting talc usage at a lower
18  rate; right?
19      A.  Than -- yes.
20      Q.  And if you isolated the association analysis
21  to those -- to that group, you also have a
22  non-statistically significant association; correct?
23      A.  And again, when you stratify -- we've already
24  covered that.  I acknowledge that prior to 2014, it
25  was not statistically significant.  We also indicated

Page 237

1  certainly in the range of what many other studies have
2  seen.  But when you stratify like that, you are
3  getting into smaller sample sizes.  So there's
4  statistical significance that -- the fact that it's no
5  longer statistically significant is not all that
6  surprising.
7      Q.  Have you seen the Trabert editorial that
8  followed the publication of the Schildkraut article?
9      A.  I'm sure that I have read it at some point,
10  but --
11      Q.  Okay.  I'm going to -- I'm sorry.
12      A.  -- please, let's -- I haven't looked at it in
13  quite some time.
14      Q.  So I'm going to mark as Exhibit 29 an
15  editorial by Britton Trabert entitled "Body Powder and
16  Ovarian Cancer Risk -- What is the Role of Recall
17  Bias?"
18      I'll hand you two copies.
19      (Exhibit No. 29 was marked for identification.)
20  BY MR. JAMES:
21      Q.  Dr. Moorman, does this editorial look
22  familiar to you?  Have you seen it before?
23      A.  Yes, I have seen it before.
24      Q.  Have you ever spoken with or communicated
25  with Britton Trabert about this editorial?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 238

1    A. No, I have not.
2    Q. And you see that in the right-hand column,
3 about midway down, Dr. Trabert refers to the data
4 points that we were just discussing; correct?
5    A. Yes.
6    Q. And if you look to the second page of the
7 editorial, Trabert reports, at the last paragraph of
8 the article (as read):
9          "The current study highlights the
10         concern over recall bias in
11         case-control studies, particularly
12         once an exposure becomes the
13         subject of considerable media
14         coverage."
15    Do you see where I was reading that?
16    A. Yes, I do.
17    Q. Do you agree with Dr. Trabert's concerns
18 about media coverage impacting the results of the
19 Schildkraut study?
20    A. I -- I think that the investigators on our
21 study, they had that concern. That's why we did those
22 analyses. So...
23    Q. So do you acknowledge the possibility that
24 the results of the 2016 study may reflect recall bias
25 in the study?

Page 239

1    A. In this discussion -- if I may take just a
2 moment to --
3    Q. Certainly.
4    A. Okay. You know, I think that
5 Dr. Schildkraut, who did the major writing of this
6 article -- and I think all of the coauthors were in
7 agreement -- that we were concerned about the recall
8 bias. As I said, that was some of the reason for
9 doing those analyses.
10    I think that it's also important to point
11 out here the other possibility. There may have been
12 some recall bias. But she also makes the statement
13 that (as read):
14         "It is possible that the lawsuit
15         sharpened memories of body powder
16         use and improved the accuracy of
17         reported use for both cases and
18         controls interviewed in 2014 or
19         later."
20    I think that that goes to say that anytime
21 someone -- you know, there's some memory trigger, it
22 could have made actually more accurate recall.
23    So we --
24    Q. And Dr. --
25    A. I'm sorry. So we acknowledge both the

Page 240

1 possibility of recall bias, but I think that we looked
2 at the other side of the coin as well.
3    Q. And can you tell me where you're reading that
4 sentence from, Dr. Moorman?
5    A. Let's see. The -- it is on page 1416, the
6 right-hand column, and it's about -- probably about
7 eight or nine lines down.
8    So I think that this sentence -- or this
9 whole paragraph gives a pretty balanced assessment of
10 the data, that we thoughtfully considered the issue of
11 recall bias, but we also considered that maybe the
12 greater publicity led to -- was kind of a memory
13 trigger that led to more accurate recall.
14    Q. And in your report, do you include a caution
15 on the Schildkraut 2016 study about the potential for
16 recall bias based upon the 2014 pre- and post-data?
17    A. I -- let's see. We have discussed that
18 section of the report a couple of times already. And
19 I state that there is the possibility that recall bias
20 could have led to the higher odds ratios when
21 including women interviewed during the time when there
22 was more media attention focused on this exposure.
23    Q. And you're at page 23; right?
24    A. Yes.
25    Q. Okay. And then you conclude the middle

Page 241

1 paragraph with the statement that -- the "attenuated
2 but not eliminated" statement. But I'm not going to
3 ask about that again. But you go on in that sentence
4 to say (as read):
5          "The association is not due
6          entirely to recall bias."
7    Do you see that phrasing that I just read?
8    A. Yes.
9    Q. So are you conveying in that wording that you
10 think some portion of the odds ratio that you are
11 seeing in these case-control studies that you're
12 relying on or the meta-analyses that you're relying
13 on, that some portion of that odds ratio is
14 attributable to recall bias?
15    MS. PARFITT: Objection.
16    THE WITNESS: I think that probably
17 every meta-analysis published, probably every
18 case-control study that was published, we acknowledge
19 this as a -- recall bias is a potential bias. But
20 I think that we went on to give evidence --
21 I explained why I did not think that it was a complete
22 explanation.
23    Can we completely rule out any possibility
24 of recall bias? I don't know that we can do it. But
25 I think that as -- for some of the reasons

61 (Pages 238 to 241)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 242

1  I articulated.
2      I know that Dan Cramer in his 2016 paper
3  also went into great detail considering the issue of
4  recall bias. And I don't think that we can attribute
5  this association to recall bias.
6  BY MR. JAMES:
7      Q. Can you cite to any publication that has
8  analyzed the literature and ruled out recall bias --
9          MS. PARFITT: Objection.
10 BY MR. JAMES:
11     Q. -- as a method -- as a basis for the elevated
12 odds ratio of the 1.2 to 1.3 that you're citing in
13 your report?
14         MS. PARFITT: Objection.
15         THE WITNESS: Okay. I went back to the
16 Dan Cramer article, and I'm hoping that I'm recalling
17 that particular article, the date of it, accurately.
18 But he did analyze the data and the degree of
19 misclassification that would have had to occur for
20 recall bias to account for this association. He gave
21 other reasons for why it seemed unlikely that recall
22 bias would account for this association.
23         So I think he did a pretty thorough
24 analysis -- a thoughtful analysis of it.
25

Page 243

1  BY MR. JAMES:
2      Q. Can you cite any other publications other
3  than the Cramer 2016 paper, sitting here today, that
4  have addressed recall bias in the fashion that you
5  just described?
6      A. The Cramer article is the one that I -- that
7  comes to mind as the one that addressed it most
8  thoroughly.
9      Q. Have you ever published the three factors
10 that you have addressed with regard to recall bias?
11     A. The three factors are --
12     Q. Sure. So --
13     A. Okay.
14     Q. Within your report, you -- we just walked
15 through the three factors that you've considered, the
16 three factors that you deemed to be a particular
17 threat to case-control studies for recall bias;
18 correct? We just walked through those three?
19     A. Yes.
20     Q. Have you ever published those three in any
21 article or journal or anything else?
22     A. I have not published that. That is just
23 based on my general epidemiologic knowledge from doing
24 this type of research and teaching in this field for
25 the last couple of decades.

Page 244

1      Q. Okay. Dr. Moorman, on page 11 of your
2  report, you talk about -- this is where you begin your
3  analysis of the Bradford Hill factors.
4      A. Yes.
5      Q. And are you there with me?
6      A. Yes, I am.
7      Q. Okay. You say, in page 11 -- you have a
8  section titled "Strength and consistency of the
9  association"; correct?
10     A. Correct.
11     Q. You say in the first sentence that strength
12 and consistency are "deeply intertwined." Correct?
13     A. Yes.
14     Q. Can you cite to any publication where you
15 have combined the analysis of strength and consistency
16 before?
17     A. I -- I can't cite any publication that
18 specifically addresses that, no.
19     Q. Can you cite any published authority that
20 states these two Bradford Hill criteria are deeply
21 intertwined?
22     A. I -- I think that as I was -- I cannot cite a
23 published authority.
24         I think that, again, this is based on when
25 I was looking at these and how I was weighting these

Page 245

1  considerations.
2      Q. Do you agree that strength is an important
3  criteria in and of itself?
4      A. I think that the strength of the association
5  is an important criteria, but I think that we also
6  have to bear in mind that as -- that there are many
7  well-established causal associations that are
8  certainly not in the order of magnitude of what we
9  see, for example, with smoking and lung cancer.
10     Q. Do you think the criteria of strength is met
11 with the talc and ovarian cancer literature?
12     A. When -- as I go through my report, I give
13 numerous examples of well-accepted causal associations
14 that are of a similar magnitude as what we see with
15 talc and ovarian cancer, and so I think that the data
16 are strong enough.
17     Q. And I think that I'm going to ask my question
18 again.
19     A. Okay.
20     Q. Do you think that the criteria of strength is
21 met with the talc and ovarian cancer literature?
22     A. Okay --
23         MS. PARFITT: Objection. Asked and
24 answered.
25         Try again, Dr. Moorman.

62 (Pages 242 to 245)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 246

```
 1          THE WITNESS:  Okay.  So, once again,
 2  I -- we have to use -- we have to be careful of --
 3  Dr. Hill did not refer to these as "criteria," but
 4  guidelines or viewpoints I think was the terminology
 5  he used.  And I do think that the criteria of strength
 6  has been met.
 7  BY MR. JAMES:
 8      Q.  Can you cite to a single study in the talc
 9  ovarian cancer literature that refers to the
10  association as a strong association?
11      A.  I -- I cannot, off the top of my head, think
12  of anyone that refers to it as a strong association.
13  I do, once again, want to say that we see evidence of
14  causal associations of similar magnitude; so I think
15  that it is strong enough to be a causal association.
16      Q.  Do you understand that a number of the papers
17  that you have cited in your reference list or
18  materials-considered list refer to the association as
19  weak?
20          MS. PARFITT:  Objection.
21          THE WITNESS:  Which papers are you
22  referring to specifically?
23  BY MR. JAMES:
24      Q.  If an author in the talc ovarian cancer
25  literature has referred to the association as a weak
```

Page 247

```
 1  association, would you agree or disagree with that
 2  characterization?
 3          MS. PARFITT:  Object to form.
 4          THE WITNESS:  I would disagree with
 5  the -- I would disagree with that.
 6  BY MR. JAMES:
 7      Q.  If an author or authors in the talc ovarian
 8  cancer literature have referred to the association as
 9  modest, would you agree or disagree with that?
10      A.  Once again, I think that many of the risk
11  factors that we are considering are not going to be
12  the odds ratios of 10 or greater that we saw with
13  this.
14          And when you read the papers written by
15  Dr. -- by Bradford Hill, he certainly makes the point
16  that some weaker associations can certainly be real.
17      Q.  So is this a weaker association?
18      A.  Weaker is in comparison to what?  It's not --
19  it's weaker than smoking and lung cancer.  It is --
20  I keep making the point that it -- we fully
21  acknowledge that it is not a tenfold increased risk.
22  It's a 25 to 30 percent increased risk.
23      Q.  Would you call the association modest?
24          MS. PARFITT:  Objection.  Asked and
25  answered.
```

Page 248

```
 1          MR. JAMES:  It hasn't been answered.
 2          MS. PARFITT:  It's been asked.
 3          THE WITNESS:  I don't think that we
 4  have any actual definition of what is modest.  I think
 5  that the association is what it is, a 25 to 30 percent
 6  increased risk.
 7  BY MR. JAMES:
 8      Q.  As an epidemiologist, you're not capable of
 9  discerning whether an association is modest or not
10  modest?
11          MS. PARFITT:  Objection.
12          THE WITNESS:  As I have said before,
13  I don't think there is any clear definition of that
14  adjective.
15  BY MR. JAMES:
16      Q.  Is there a definition in the epidemiologic
17  community of a weak association?  Are you able to
18  understand what that would mean in the epidemiologic
19  community?
20      A.  Once again, there is no -- to my knowledge,
21  there is nothing that would say, you know, an odds
22  ratio in this range is weak, this is modest, this is
23  moderate, this is strong.
24          And, again, going back to Bradford Hill, he
25  certainly emphasizes that there are some associations
```

Page 249

```
 1  that are not in the magnitude of smoking and lung
 2  cancer, but they are certainly real.
 3      Q.  And I think you're conflating -- or you're
 4  misunderstanding my question, because you're answering
 5  the question about whether the association is real or
 6  not real, and my question for you is whether the
 7  association is weak, modest, or strong.
 8          How would you characterize it?
 9      A.  And I would -- as I have said, there is no
10  absolute terminology that would say what is a weak
11  association, what is modest, and what is strong.  So
12  I think that it is more accurate just to describe it
13  as it is, a 25 to 30 percent increased risk of ovarian
14  cancer.
15      Q.  Well, in assessing the Bradford Hill factors
16  or considerations or criteria -- in assessing that and
17  determining whether the association is strong or not
18  strong, as an epidemiologist, don't you need to be
19  capable of determining whether the association is
20  strong or not strong?
21      A.  Once again, it is an adjective that is not
22  well defined.  And --
23      Q.  And do you -- I'm sorry.
24      A.  I -- I -- I keep going back to I think that
25  the association that we see is what it is, a 25 to
```

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 250

1    30 percent increased risk. It is consistent with
2    other factors that we consider causal associations.
3    They have a similar strength of association.
4        Q. And I do -- I do intend to go to that very
5    next topic next --
6        A. Okay.
7        Q. -- but in assessing strength, what I'm asking
8    is whether, in all of the papers that you've cited,
9    when the epidemiologists that you've cited refer to
10   the association as weak or modest or small, is that
11   terminology that you can accept, or is that
12   terminology that you reject?
13       A. I say that it is terminology that is
14   imprecise. What one would consider modest, someone
15   else might consider moderate. It's imprecise
16   terminology.
17       Q. And certainly in the epidemiology world, if
18   you have a small or modest or weak association, what
19   you're saying is that that doesn't bar a causal
20   conclusion. But wouldn't you agree with me that if
21   the association is small or modest or weak, it makes
22   the other considerations more important?
23           MS. PARFITT: Objection.
24           THE WITNESS: I think that all of the
25   considerations are important. It's --

Page 251

1    BY MR. JAMES:
2        Q. Do you agree that, with a small association,
3    there's more concern for recall bias?
4            MS. PARFITT: Objection.
5            THE WITNESS: I think that with a
6    smaller association, there is more concern that it
7    could be due to bias from various reasons.
8    BY MR. JAMES:
9        Q. Can you cite to any scientific agency or
10   organization that has described the talc ovarian
11   cancer association as strong?
12       A. I do not recall anyone describing it that
13   way.
14       Q. Okay. And then we will turn now to page 12
15   of your report, Dr. Moorman, where you cite a number
16   of other exposures.
17       A. Yes.
18       Q. And do you see where I am?
19       A. Yes.
20       Q. And you say on page 12 that (as read):
21           "Well-accepted exposure to these
22           associations have relative risks
23           of similar magnitude and are
24           generally accepted to be causal."
25           Do you see where I was reading?

Page 252

1        A. Yes.
2        Q. And these associations that you've listed,
3    you have concluded are generally accepted to be
4    causal; correct?
5        A. I think so, yes.
6        Q. And below that, you state that the IARC has
7    reached a causal conclusion with respect to each of
8    these associations; is that right?
9        A. Yes, that is what I state.
10       Q. And so to state that, are you saying that all
11   five of these exposures and associations have been
12   classified by IARC as Category 1?
13       A. I don't recall if -- I don't recall the
14   classifications, specifically, for all of these.
15       Q. Well, to say that the IARC has made a causal
16   judgment on these associations, you are necessarily
17   saying that they have classified these associations as
18   Category 1; correct?
19       A. I -- you know, I answered the question.
20   I don't recall which IARC category that each of these
21   exposures is right off the top of my head.
22       Q. But do you say in the report that they are
23   judged to be causal by IARC; correct?
24       A. I do say that in my report.
25       Q. And IARC has not judged talc ovarian cancer

Page 253

1    to be a causal association, has it?
2        A. As we have discussed several times today,
3    they describe it as possibly carcinogenic.
4        Q. Can you cite to any publication that assesses
5    the strength of an epidemiologic association by
6    considering "similar magnitude" odds ratios from
7    unrelated exposures to diseases?
8        A. I -- off the top of my head, I can't cite any
9    such publication.
10       Q. Have any scientific agencies that have looked
11   at this issue assessed strength of the talc ovarian
12   cancer relationship by considering similar magnitude
13   associations of unrelated exposures to diseases?
14       A. I know that in the Health Canada report, they
15   went through assessing the strength of the
16   association. I don't recall if they kind of
17   considered it in relation to other exposures that have
18   a similar magnitude of association.
19       Q. With regard to the associations that you have
20   identified on page 12, did you review the entire body
21   of scientific and medical literature pertaining to
22   those associations?
23       A. In -- let's see. Since when I cited these,
24   I did not go through the same level of detail like
25   I have done for the talc and ovarian cancer.

64 (Pages 250 to 253)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 254

1     The oral contraceptive use and breast cancer
2  that I cite, I was part of a team of researchers that
3  did a systematic review and meta-analysis of oral
4  contraceptives in relation to ovarian cancer as well
5  as breast cancer and some other cancers.
6     The other ones, again, I did not go in --
7  did not review the body of literature in the same
8  detail as I did the talc and ovarian cancer.
9     Q. Did you assess, in any of these bodies of
10  literature, the risks for recall bias?
11     A. I did not.
12     Q. Did you consider, in these bodies of
13  literature, biologic mechanism for these five
14  exposures that you've identified?
15     A. I considered biologic mechanism, again, not
16  in the level of detail with the talc and ovarian
17  cancer.
18     Q. Did you assess them in a manner sufficient to
19  which you would opine in a published article or a
20  litigation report about the evidence supporting
21  causation?
22     A. I'm reading your question again.
23     Q. So am I.
24     A. I'm not sure.
25     Q. For these five exposures and diseases that

Page 255

1  you've cited on page 12, did you assess the body of
2  scientific and medical literature and evidence in a
3  manner sufficient to which you would feel comfortable
4  offering an opinion in the published literature or in
5  a litigation report about causation?
6     A. I think that I have answered the question
7  repeatedly that I did not do it in the detail that
8  I did the talc and ovarian cancer. If I were to put
9  in published literature or a litigation report,
10  I would want to make sure that I had done it as
11  absolutely thoroughly as possible.
12     Q. Your comparison of the odds ratios to these
13  five exposures -- you acknowledge that there are
14  exposures that you have not identified in your report
15  that are in the 1.2 to 1.3 range that are not causal
16  or have not proven to be causal; correct?
17     MS. PARFITT: Objection. Form.
18     THE WITNESS: I acknowledge that -- of
19  course, that there are reports of exposures that have
20  reported relative risk in this range, and it could
21  either be something that was associated with another
22  risk factor and it was not the causal factor or the
23  level of evidence was not adequate. Maybe people --
24  there were fewer articles, people have not gone
25  through the whole evaluation of the causal criteria.

Page 256

1  BY MR. JAMES:
2     Q. So in your report, when you are assessing
3  strength, and you discuss the fact that there are
4  similar magnitude odds ratios from other exposures
5  upon which one could conclude causation, you do not
6  also remark that there are similar magnitude ratios
7  upon one which could not conclude causation.
8     Why is that? Why did you lay out the
9  analysis this way?
10     A. What I was trying to do here is to make the
11  point that an association in the range of a 25 to
12  30 percent increased risk is something that there are
13  multiple examples of this being generally accepted as
14  a causal association.
15     I -- it was not my intent to describe the
16  entire universe of exposures and some that might be in
17  this range.
18     Q. There are certainly examples that you didn't
19  cite in the 1.2 to 1.3 range that are not causal;
20  right?
21     A. Did you have something specific in mind that
22  you are --
23     Q. I'm asking you, actually.
24     Did you just go searching for similar
25  magnitude ratios upon which one could reach a

Page 257

1  causation conclusion?
2     A. I -- I think that I was trying to get at that
3  is this association strong enough to be causal? And
4  we have evidence from these other exposures that, yes,
5  it's certainly possible.
6     The point is that you do not -- or you do
7  not dismiss an association of 1.25 or 1.3 as it
8  couldn't possibly be causal. We have evidence to
9  suggest that it -- there are many examples of it.
10     Q. But in your report, Dr. Moorman, you're not
11  just not dismissing it. You're not just using the
12  similar magnitude odds ratios to not dismiss the
13  possibility that this is a real association. You're
14  using the similar magnitude ratios in an effort to
15  ascribe strength to the association; correct?
16     A. Right. I am saying that I think this is
17  strong enough to be a real association, and I think
18  that we have other examples of similar magnitude
19  associations that are generally accepted as causal
20  associations.
21     Q. But if there are other odds ratios for other
22  exposures to diseases that you did not identify in
23  your report in the 1.2 to 1.3 range that are not
24  causal, then the magnitude ratio that you have here in
25  the top ovarian cancer literature, in that instance,

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 258

1  is not strong enough to support causation?
2          MS. PARFITT: Objection. Form.
3  BY MR. JAMES:
4      Q. I'll just restate it because it's confusing.
5      A. Yeah, it is.
6      Q. To support strength in your report, why do
7  you select only similar magnitude ratios that, by your
8  estimation, are Category 1 -- by your estimation, have
9  been declared by IARC to be causal associations? Why
10  do you only select associations by which one has -- by
11  which IARC has concluded causation? Why don't you
12  also acknowledge that there are associations of a
13  similar magnitude that don't support causation?
14          MS. PARFITT: Objection.
15          THE WITNESS: I'm not really sure --
16  I'm still not really sure what you're getting at with
17  this question.
18          I think that I was trying to make the point
19  that the association we see here is strong enough to
20  be accepted as a causal association. I'm not -- I'm
21  not saying that every association of this magnitude
22  has gone through the same process of assessing all of
23  the Bradford Hill viewpoints and have come to the same
24  conclusion, but I am saying that we have multiple
25  examples of where an association of this magnitude is

Page 259

1  causal.
2          MS. PARFITT: Scott, is this a breaking
3  point or no?
4          MR. JAMES: How long have we been
5  going?
6          MR. FARIES: About an hour and 15.
7          MS. BRENNAN: Yeah, we've been going
8  about an hour and 15.
9          MR. JAMES: Sure. Are we ready for a
10  break?
11          MS. PARFITT: Sure. Just a short one,
12  yeah. Thank you.
13          THE VIDEOGRAPHER: Going off the record
14  at 4:33 p.m.
15          (Recess taken from 4:33 p.m. to 4:46 p.m.)
16          THE VIDEOGRAPHER: Back on record at
17  4:47 p.m.
18  BY MR. JAMES:
19      Q. Dr. Moorman, on page 13 to 14 of your report,
20  and really the top of page 14, you have a sentence
21  stating that (as read):
22          "The evidence for talc and ovarian
23          cancer is as significant as for
24          passive smoke exposure and lung
25          cancer."

Page 260

1      Do you see where I'm reading that?
2      A. Yes.
3      Q. There, are you referring to epidemiologic
4  literature?
5      A. What -- you're taking one sentence and --
6  I think that I discussed what I considered related to
7  the passive smoke exposure and lung cancer and
8  described it in more detail on page 13, the first full
9  paragraph.
10      Q. And is it fair to say that that body of
11  evidence that you're referring to there is the
12  epidemiologic literature?
13      A. Yes.
14      Q. You're not referring there to any sort of
15  mechanistic studies or plausibility studies or
16  anything like that; correct?
17      A. No. I was looking at -- basically, I was
18  comparing the two -- or the meta-analyses for the two
19  topics.
20      Q. On page 14, Dr. Moorman, you discuss the
21  "prevalence of exposure."
22      Do you see where I am? It's the --
23      A. It's about halfway down?
24      Q. Yeah, second full paragraph.
25      A. Yes.

Page 261

1      Q. And you say that it's critical to consider
2  the prevalence of exposure in conjunction with
3  considering strength; correct?
4      A. I say (as read):
5          "It's critical to consider the
6          prevalence of the exposure in the
7          population when evaluating its
8          public health impact."
9      Q. Before that, you say "in conjunction with
10  strength of the association." Right?
11      A. Yes.
12      Q. Okay. Do you think that the prevalence of
13  exposure in the population, that that impacts your
14  analysis on whether an association is strong or not
15  strong?
16      A. I think that the way that I stated it here
17  is, you know, as an epidemiologist, a public health
18  professional, I'm interested in the public health
19  impact and how many cases of disease could be
20  attributable to this exposure.
21      So I go through and describe that factor
22  that has a stronger association but is less common in
23  the population could have potentially less public
24  health impact than a risk factor that is -- doesn't
25  have as high an odds ratio but you have many more

66 (Pages 258 to 261)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 262

1    exposed people in the population.
2         Q.  Moving on to consistency, Dr. Moorman, is
3    consistency met on this body of literature?
4         A.  I do feel that consistency is met.
5         Q.  And on page 14, you -- I think it's page 14.
6    Yes.  In the first full paragraph, you discuss your --
7    you see the last sentence of that paragraph, where you
8    say (as read):
9              "This observation has been quite
10             consistent with findings
11             replicated in studies conducted by
12             different teams of investigators
13             in different geographic locations
14             and different race ethnic groups
15             over a span of several decades."
16        Do you see that?
17        A.  Yes, I do.
18        Q.  Is that reflective of -- is that the basis
19   upon which you conclude consistency is met?
20        A.  It is part of the basis of it.  I think that,
21   when we look at the overall meta-analyses, we look at
22   the direction of the effect in all the studies and of
23   these, like, 27 different studies, like, 90 percent of
24   them show an increased -- or an odds ratio greater
25   than 1.

Page 263

1              When we look at epidemiologic data, for
2    reasons that we have discussed earlier today, it is
3    very uncommon for every single study to reach the same
4    conclusion.  Some are going to have higher risk; some
5    are going to be lower risk.  And the level of
6    consistency seen here, where virtually every study is
7    showing an odds ratio greater than 1, I consider that
8    quite consistent.
9         Q.  You understand that Bradford Hill, when he
10   describes consistency, he talks about consistency
11   across study design.
12        Were you aware of that?
13        A.  Yes, I am.  And I actually do -- the way that
14   I described consistency, where even, you know -- two
15   of the three cohort studies -- and we've already
16   discussed the concerns I have about the Sister Study,
17   which is really quite an outlier when we look at this
18   whole body of literature.  But both the Houghton study
19   and the Nurses' Health Study, they are consistent in
20   terms of the direction of the effect.  And we have
21   discussed the statistical significance at all.
22        But in terms of the direction of the effect,
23   I think that it is consistent.
24        Q.  So is your position that the cohorts
25   demonstrate an association between talc and ovarian

Page 264

1    cancer?
2         A.  They -- if we can go back to them, we see
3    that there are multiple studies from the Nurses'
4    Health Study, and then the Houghton study.  They are
5    showing a relative risk in most cases, I think, 1.12
6    to 1.19.  And, again, we have discussed some of the
7    biases that might result in an attenuation of the
8    association.
9              And so I acknowledge that, with the
10   exception of the serous invasive cancer in one of the
11   studies, the associations have not been statistically
12   significant, but they are certainly kind of in the
13   direction of -- as the case-control studies.
14        Q.  Doctor, let's turn back briefly to the
15   Houghton study.  It's Exhibit 25.
16        Are you with me?
17        Dr. Moorman, if we look at the Houghton
18   study on the first page in the results section of the
19   abstract.  Do you see where I'm looking?
20        A.  Yes.
21        Q.  Okay.  The authors there, they report
22   every-use odds ratio as a 1.06.
23        Do you see that?
24        A.  I do see that --
25        Q.  Okay.  I'm running out of time, Dr. Moorman,

Page 265

1    so I really am going to ask you to answer my precise
2    question.
3              Do you see where the authors, they say
4    there -- the authors say that it's "not associated
5    with risk of ovarian cancer compared with never-use."
6         Do you see that?
7         A.  Yes, that is what they state.
8         Q.  Okay.  And 1.06 is -- again, it's not a
9    statistically significant association; correct?
10        A.  With the confidence interval that they
11   report.  That's what tells you whether or not it's
12   statistically significant.  And with that confidence
13   interval, no, it is not statistically significant.
14        Q.  And it's also very close to the null, isn't
15   it?
16        A.  Yes.  It's the 1.06, yes.
17        Q.  And the conclusion of the authors here is
18   that (as read):
19             "Perineal powder use does not
20             appear to influence ovarian cancer
21             risk."
22        Correct?
23        A.  That's what they state, yes.
24        Q.  So this is one of the cohorts that you're
25   talking about today; correct?

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 266

1    A. Right. And --
2    Q. And the authors here conclude that there's
3   not an association between ovarian cancer risk and
4   perineal talc use, don't they?
5    MS. PARFITT: Objection. Form.
6    THE WITNESS: Okay. Yes, I acknowledge
7   that's their conclusion. And I think that -- I'm
8   sorry -- the data that I was referring to comes from
9   Table 3. And I, again, acknowledge that it was not
10  statistically significant, but he said only genital
11  powder use -- which is mostly what we're
12  considering -- it had a hazard ratio of 1.4 or 1.3 --
13  I'm sorry -- 1.14 or 1.13.
14        And so, again, it's in the direction of
15  effect, and, as we have discussed, biases could have
16  led to some attenuation.
17  BY MR. JAMES:
18    Q. Are you saying that you believe that there's
19  consistency among -- or between the case-control
20  studies and the cohort studies in the talc ovarian
21  cancer literature?
22    A. I am saying that -- as I have pointed out
23  here and with also the Nurses' Health Study, I am
24  saying that there is consistency in the direction of
25  the effect that they observed, and acknowledging that

Page 267

1   these were not statistically significant findings.
2    Q. So even though the authors report that
3   there's not an association, you're claiming today that
4   the cohort studies are consistent with the
5   case-control studies in finding an association?
6    MS. PARFITT: Objection. Form.
7    THE WITNESS: I think that I have
8   answered the question already that, in terms of the
9   direction of the effect, that the Houghton study for
10  the genital powder use and as well as some of the data
11  from the Nurses' Health Study, it is consistent that
12  there -- the odds ratio is greater than 1.
13  BY MR. JAMES:
14    Q. So as long as the odds ratio, even if it's
15  statistically insignificant, exceeds 1, then you are
16  claiming that that's reflective of an association that
17  is consistent with the case-control studies?
18    MS. PARFITT: Objection. Form.
19    THE WITNESS: I am saying that there is
20  consistency in the direction of the effect.
21        If I may clarify. If you look at something
22  like alcohol use and ovarian cancer, which is a fact,
23  which overall there seems to be little association
24  between alcohol and ovarian cancer, if you look at the
25  meta-analyses from there, the overall estimate is

Page 268

1   right around 1. About half the studies have odds
2   ratios greater than 1; about half have odds ratios
3   less than 1. So in that case, I would say there is no
4   consistency.
5        I contrast it with this where, when you look
6   at the forest plots from the meta-analyses, nearly all
7   of the studies have odds ratios greater than 1.
8   BY MR. JAMES:
9    Q. And you're including in that testimony the
10  cohort studies?
11    A. Yes.
12    Q. Odds ratios that are not statistically
13  significant, in your mind, demonstrate consistency
14  by -- among study design. Is that your testimony?
15    MS. PARFITT: Objection. Form.
16    THE WITNESS: I'm sorry --
17  BY MR. JAMES:
18    Q. Your testimony here today is that the results
19  reached by the cohort studies and the case-control
20  studies are consistent. Is that your testimony?
21    A. My testimony, as I have stated repeatedly,
22  that there is a great deal of consistency in the
23  direction of the effect, that nearly all of the
24  studies report an odds ratio greater than 1. And
25  I acknowledge that not all studies are statistically

Page 269

1   significant, but I'm just saying that the direction of
2   the effect is very consistent.
3    Q. And we talked earlier today about the Berge
4   paper; correct?
5    A. Yes, we did.
6    Q. And they have performed an analysis for
7   heterogeneity on the -- by study design; right?
8    A. If I could go back to that.
9    Q. Sure.
10    A. Okay.
11    Q. Dr. Moorman, if we look at the abstract of
12  the paper, at the beginning, this is the point we
13  discussed earlier. Here, the authors say (as read):
14        "The heterogeneity of results by
15        study design detracts from a
16        causal interpretation."
17        Correct?
18    A. That is the statement that they make in their
19  abstract, yes.
20    Q. Okay. And then we looked earlier also at the
21  Figure 2; correct?
22    A. Yes, we did.
23    Q. Okay. And, again, that reflects an analysis
24  of the cohorts as compared to the case-controls;
25  correct?

68 (Pages 266 to 269)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 270

1    A. Yes.
2    Q. If you look at page 253 of the Berge article,
3  and we look at the right column, the first -- the
4  second full paragraph, the authors there state
5  (as read):
6         "The fact that the association
7         between genital talc use and risk
8         of ovarian cancer is present in
9         case-control but not in cohort
10        studies can be attributed to bias
11        in the former type of studies."
12     Do you see that?
13    A. I do see what they say.
14     I -- I think that they are not considering
15  that there is also potential bias in the cohort
16  studies. They say "bias in the former type of
17  studies," not acknowledging the biases in the cohort
18  studies.
19     When you look at these data for the cohort
20  studies, you look at the Gonzalez study, which again,
21  I have referred to it as kind of an outlier with its
22  relative risk of .73, there are many problems with
23  that study. They assessed exposure in the past 12
24  months. The level of exposure is very different than
25  many of the other studies.

Page 271

1         And so part of the heterogeneity by study
2  design could be attributed to this Gonzalez study that
3  has very significant biases.
4    Q. If other experts for Plaintiffs in this MDL
5  litigation have conceded that there is not consistency
6  between the cohorts and the case-controls, then you
7  would differ with those experts; correct?
8    MS. PARFITT: Objection. Form.
9    THE WITNESS: I have --
10   MS. PARFITT: Misstates the evidence.
11  Thank you.
12   THE WITNESS: I have answered the
13  question, I think I've answered it repeatedly, why
14  I think that the aspect of consistency is met.
15  BY MR. JAMES:
16   Q. Okay. On dose-response -- on page 30, you
17  include discussion of dose-response in the literature.
18    A. Yes.
19    Q. And you acknowledge in your report that there
20  are inconsistencies in reported dose-response;
21  correct?
22    A. I -- what I state is (as read):
23        "While the inconsistency in
24        reported dose-response trends for
25        talc and ovarian cancer have been

Page 272

1         noted in some meta-analysis and
2         reviews, there are considerations
3         about those that should be taken
4         into account."
5    Q. Do you believe that there are inconsistencies
6  in the literature with regard to dose-response? Yes
7  or no.
8    A. I think that, yes, that there -- that across
9  the studies, some have found a dose-response, some
10  have not.
11    Q. At the bottom of page 30, you say that
12  (as read):
13        "When considering the studies that
14        examine dose-response associations
15        considering both dose and
16        frequency to estimate the total
17        number of applications of talc,
18        the majority did find significant
19        trends of higher risk with more
20        lifetime applications of talc."
21     Do you see that, where I read that?
22    A. Yes.
23    Q. Okay. And so for that proposition, you're
24  citing to eight studies. If you look at the
25  footnotes, you would agree with me that that's

Page 273

1  reflective of eight studies cited; correct?
2    A. Yes.
3    Q. And you're saying that five of the eight
4  studies that have looked at dose and frequency
5  together did find significant trends; correct?
6    A. Yes.
7    Q. Among those studies that you cite for that
8  proposition that the majority of those studies reflect
9  a dose-response, you cited to the Mills study;
10  correct?
11    A. I believe so.
12    MS. PARFITT: And, Dr. Moorman, you
13  have your binder in front of you as well if you need
14  it.
15    MR. JAMES: Okay. I'm going to mark
16  Mills as Exhibit 30.
17   (Exhibit No. 30 was marked for identification.)
18  BY MR. JAMES:
19   Q. I'm going to hand you two copies.
20    And, again, this is one of the papers you've
21  cited for the proposition that there's a dose-response
22  in the majority of studies that have looked at
23  frequency times duration; correct?
24    A. Okay. Yes.
25    Q. And we're looking at Table 2 as the relevant

69 (Pages 270 to 273)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 274

1  table with the data; correct?
2      A. Yes.
3      Q. And if you look at Table 2, you go down to
4  the cumulative use category, it says "frequency times
5  duration"; correct?
6      A. Yes.
7      Q. And if I'm looking at this correctly,
8  Dr. Moorman, doesn't the data in that table reflect an
9  actual decrease in the odds ratio for the highest
10  exposure category?
11      MS. PARFITT: Objection. Form.
12      THE WITNESS: It is -- the highest
13  category, yes, does report an odds ratio of 1.06.
14  BY MR. JAMES:
15      Q. And based upon that, is it fair to say that
16  this paper reflects a dose-response when measuring
17  frequency times duration?
18      A. They looked at the -- they did a test for
19  trend, and we have a p-value of .051, so right at
20  borderline statistically significant. Some people
21  would argue that you should never use two decimal
22  points for p-values. But nonetheless, it's -- the
23  trend test was what I was referring to here, that it
24  was right at borderline statistical significance.
25      Q. And if you look at page 463 of the article,

Page 275

1  the third full paragraph down -- 463 in the left
2  column -- the authors -- this is in the authors'
3  words. They say (as read):
4      "As in other studies, the present
5      study did not find a clear
6      dose-response based on duration of
7      use or cumulative use."
8      Do you see that?
9      A. Right. And they go on to say that -- again,
10  I was basing what I said here based on their test for
11  trend, and -- and I think they do acknowledge that in
12  that category where they had relatively few exposed
13  cases, they didn't -- it was not a perfectly linear
14  association.
15      Q. So the authors are concluding that there's
16  not dose-response for cumulative use; correct?
17      MS. PARFITT: Objection.
18  BY MR. JAMES:
19      Q. Yes or no? That's what the authors conclude
20  in the text that we just read together?
21      A. I -- what we read -- yes. I'm trying --
22  let's see.
23      Yeah, I think that they are acknowledging
24  that it was not a perfect linear increase. My report
25  was basing it on the test for trend that they did.

Page 276

1      Q. And they're not just acknowledging that
2  there's not a perfect linear increase; they're saying
3  that there's no dose-response for cumulative use.
4      A. They say there is not a clear dose-response.
5  I think -- you know, again, that's what they say. My
6  conclusion here was, again, based on the test for
7  trend that they did. I don't think that it was
8  inaccurate, what I said here.
9      Q. Another paper that you cite for the majority
10  claim is the Terry 2013 paper; correct?
11      A. Yes.
12      Q. And do you know what the authors concluded in
13  that paper about dose-response for cumulative use?
14      A. May we look at that article?
15      Q. Sure. It's Exhibit 24. And if we look at
16  the abstract first together, the abstract says, the
17  second sentence from the bottom (as read):
18      "Among genital powder users, we
19      observed no significant trend in
20      risk with increasing number of
21      lifetime applications assessed in
22      quartiles."
23      Did I read that correctly?
24      MS. PARFITT: In the abstract?
25      THE WITNESS: I'm sorry, I wasn't quite

Page 277

1  there with you. Could you --
2  BY MR. JAMES:
3      Q. Understood. No worries.
4      A. Okay.
5      Q. So second sentence from the bottom of the
6  abstract, the author's conclusions on dose-response
7  are as follows (as read):
8      "Among genital powder users, we
9      observed no significant trend in
10      risk with increasing number of
11      lifetime applications assessed in
12      quartiles."
13      A. That's what they describe, and --
14      Q. I just asked, is that -- did I read that
15  correctly?
16      A. You did read that correctly.
17      Q. So the authors of the paper that you've cited
18  as one of the five papers that finds dose-response by
19  measuring lifetime of cumulative use says the exact
20  opposite; correct?
21      MS. PARFITT: Objection.
22      THE WITNESS: If I may take just a
23  moment. I want to find the part of this paper that
24  supported the statement that I made in my report.
25      MR. JAMES: Sure. Let's go off the

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 278

```
 1   record.
 2            THE VIDEOGRAPHER:  Going off record at
 3   5:14 p.m.
 4            (Off the record.)
 5            THE VIDEOGRAPHER:  Back on record at
 6   5:15 p.m.
 7            THE WITNESS:  Okay.  On page 817, it
 8   reads (as read):
 9            "Although a significant increase
10            in risk with an increasing number
11            of genital powder applications was
12            found for non-mucinous epithelial
13            ovarian cancer when non-users were
14            included in the analysis."
15            And it then goes on (as read):
16            "Note trend in cumulative use was
17            evident in analyses restricted to
18            ever-users of genital powders."
19            And so, again, my -- the statement that
20   I had here, "a significant trend with increasing
21   number of genital powder applications," they make the
22   distinction of looking at the trend when you include
23   non-users, and that's a pretty standard thing to do in
24   epidemiology.  It's -- you look -- can look as
25   non-users as your reference group and then assess a
```

Page 279

```
 1   trend.
 2            I know what they say here, but I -- but
 3   I think that what I stated in my report is accurate,
 4   that they did find that a significant trend.  So
 5   I don't think that I'm misstating what -- the data in
 6   the paper.
 7   BY MR. JAMES:
 8      Q.  So the results that are reported by the
 9   authors in the abstract you disagree with; correct?
10            MS. PARFITT:  Objection.  Form.
11   BY MR. JAMES:
12      Q.  The statements in the abstract pertaining to
13   dose-response, do you disagree with those statements?
14      A.  What they say is "among genital powder
15   users."  And so the statement that they make is
16   accurate, but I think that they are citing data
17   that -- it's one way to look at the data, but I think
18   that considering the non-users in their test for trend
19   is also a very well-accepted way to do that, to do a
20   test for trend.
21            And so I think that both -- they reported
22   one aspect of their analysis, and I reported what
23   I think accurately reflects another aspect of their
24   analysis.
25      Q.  Okay.  I am getting close to the end of my
```

Page 280

```
 1   questions, Dr. Moorman.
 2            MR. JAMES:  Michelle, is it fine if
 3   I have some time to review my notes while the others
 4   are asking questions and then come back?
 5            MS. PARFITT:  Sure.
 6            MR. JAMES:  Is that okay with you?
 7            MS. PARFITT:  That's fine.  Sure.
 8            MS. FOSTER:  Can we go off and I'll
 9   switch.
10            THE VIDEOGRAPHER:  Going off the record
11   at 5:18 p.m.
12            (Off the record.)
13            THE VIDEOGRAPHER:  Back on record at
14   5:20 p.m.
15      CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT
16            IMERYS TALC AMERICA, INC.
17   BY MS. FOSTER:
18      Q.  Good evening, Dr. Moorman.  We met a long
19   time ago this morning.  My name is Jennifer Foster.
20   I represent one of the Defendants in this action,
21   Imerys Talc America, Inc.  Do you understand that?
22      A.  Yes, I do.
23      Q.  And before you got involved in this
24   litigation, did you know who Imerys Talc America, Inc.
25   was?
```

Page 281

```
 1      A.  No, I did not.
 2      Q.  Had you ever heard of them before?
 3      A.  No.
 4      Q.  And do you have an understanding of who they
 5   are now that you've become involved in the litigation?
 6      A.  I do.
 7      Q.  And you understand that Imerys mines and
 8   supplies talc to Johnson & Johnson for use in some of
 9   its talcum powder products?
10      A.  That is my understanding, yes.
11      Q.  Do you understand that Imerys does not sell
12   talcum powder products directly to consumers?
13      A.  That was my understanding, yes.
14      Q.  And based on some testimony earlier today
15   about the basis of your opinions being grounded in
16   epidemiology studies about talcum powder products, am
17   I correct that you wouldn't have any personal
18   knowledge with respect to the composition of the talc
19   that Imerys mines and supplies to Johnson & Johnson?
20            MS. PARFITT:  Objection.
21            THE WITNESS:  No, I would not have that
22   personal knowledge.
23   BY MS. FOSTER:
24      Q.  And you have no opinions about any talc
25   mining practices that Imerys employs; correct?
```

71 (Pages 278 to 281)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 282

1    A. I know nothing about their mining practices.
2    Q. And you have no opinions about Imerys's
3  compliance with any applicable standards or
4  specifications regarding the mining of talc; correct?
5    A. I do not know anything about that.
6    Q. And I'm going to be hopping around a lot
7  because Mr. James covered a lot of ground, so just
8  bear with me. If I go somewhere and you don't know
9  what I'm talking about, please just tell me you don't
10 know what I'm talking about --
11    A. Okay.
12    Q. -- and I'll rephrase so that we can get on
13 the same page.
14    One of the first things you talked about
15 this morning when you were talking to Mr. James is
16 that you have entered a period I think you called
17 preretirement transition. Do I have that right?
18    A. Yes.
19    Q. Okay. And do you have a retirement date in
20 mind?
21    A. That's still somewhat being discussed with my
22 husband.
23    Q. Okay. So you don't have a set "I'm going to
24 retire in a year," for example?
25    A. The exact date is not defined yet.

Page 283

1    Q. And when you do retire, are you still going
2  to have any involvement with what you've defined as
3  the AACES study, the African American Cancer
4  Epidemiology Study?
5    A. That is still to be determined as well.
6    Q. And am I correct that that study is still
7  ongoing?
8    A. The funding for that study ended -- I think
9  it was 2015/2016. I don't recall the exact date. And
10 so we have not collected any data for that study since
11 that time.
12    We have continued to do analysis of data
13 that we have collected, and we are also trying to
14 secure funding to continue data collection with that
15 study.
16    Q. That was going to be my question. Who have
17 you made that request to for additional funding?
18    A. The grant application was submitted to
19 National Cancer Institute.
20    Q. And that's who funded the original research;
21 correct?
22    A. That is correct.
23    Q. And you also mentioned a publication that is
24 in draft form regarding something called the OCWAA
25 Consortium; is that correct?

Page 284

1    A. Yes, that is.
2    Q. And is that a study that's designed to
3  collect new data from study participants, or is that
4  going to be an evaluation of data that you already
5  have collected from other studies?
6    A. It is a consortium that is planning to
7  analyze data that have already been collected. It
8  involves -- I believe it is a total of seven studies;
9  some case-control, some cohort studies.
10    Q. And -- were you finished? I'm sorry.
11    A. Go ahead.
12    Q. And how were the studies selected to be
13 included in that consortium?
14    A. It was -- the purpose of that was to try to
15 put more data together, especially related to women of
16 African ancestry. So they're all US studies, so
17 African American. Recognizing that the AACES study,
18 with about 600 cases, we still have some issues with
19 statistical power. So we contacted -- Dr. Schildkraut
20 is the PI on this study as well.
21    And so studies that had a reasonable number
22 of African American study participants, they were
23 contacted to see if they were interested in
24 participating in such a study.
25    And so it includes studies such as the Black

Page 285

1  Women's Health Study Cohort, that's out of Boston
2  University; the Multiethnic Cohort, which is out of
3  California; the Southern Community Cohort Study; the
4  Women's Health Initiative; as well as a Los Angeles
5  case-control study and a case-control study out of
6  Chicago, in addition to the AACES study.
7    I think that that's most of them.
8    Q. Okay. Are you involved in any current
9  research where the intent is to collect new data for
10 evaluation of risk factors for ovarian cancer?
11    A. Other than what I described to you, that we
12 hope to -- that we are applying for funding to
13 continue the AACES study, I'm not currently doing any
14 data collection related to ovarian cancers.
15    Q. Are the coauthors and coinvestigators that
16 you worked with on the AACES and the North Carolina
17 Ovarian Cancer Study aware of your involvement in the
18 talcum powder litigation?
19    A. Some of them are. I -- you know, as --
20 I have disclosed it on one publication, and if they've
21 read it, they are aware. I've discussed it with some
22 of them but not all of them. You know, I haven't had
23 a conversation, per se, with all of them.
24    Q. And you mentioned earlier, with respect to
25 some of the new publications that are in draft form

72 (Pages 282 to 285)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 286

1    that are currently in the peer review process, that
2    they have talc as a -- as a confounding factor under
3    investigation; correct?
4        A. I think -- I'm going to reread your --
5        Q. I can rephrase it.
6            I think when you were talking earlier about
7    the studies that you have in draft, the question was
8    whether or not you had any publications that, you
9    know, mentioned talc. And I thought your testimony
10   was that talc was listed as a possible confounding
11   factor in some of the studies that were in draft form.
12   Is that correct?
13       A. Right. I mentioned that specifically in
14   relation to the infertility and ovarian cancer paper
15   that is in draft form, it's -- talc is considered as a
16   confounder there.
17           In regard to the description of the OCWAA
18   study, that paper, we are listing it as one of the
19   factors that we are likely to evaluate as a risk
20   factor for ovarian cancer.
21       Q. Okay. And my question is have you ever
22   included asbestos as a risk factor under investigation
23   in your epidemiology studies?
24       A. If I am not mistaken, I think that we had a
25   question on the AACES questionnaire that we asked if

Page 287

1    women had ever been -- ever had a job where they were
2    exposed to asbestos, and I don't know that we have
3    analyzed that data yet.
4        Q. Okay. And you had some discussion with
5    Mr. James earlier today about different types of
6    terminology that might be used to describe
7    associations in the epidemiology literature.
8            Do you recall that?
9        A. Yes.
10       Q. And you were talking about weak associations,
11   modest associations, strong associations. Do you
12   remember that general discussion?
13       A. Yes.
14       Q. Now, as an epidemiologist, how would you
15   define a weak positive association?
16       A. As we have said before, there is no absolute
17   cut-point what's a weak association, what's a modest,
18   what's a moderate association. I -- I can't put a
19   number on that. I don't think any epidemiologist
20   could.
21       Q. In papers that you've authored that have used
22   the words "weak positive association," what do the
23   authors mean by that?
24       MS. PARFITT: Objection. Form.
25       THE WITNESS: I'm -- I'm not -- if --

Page 288

1    did you have a particular paper in -- in mind?
2    BY MS. FOSTER:
3        Q. Not with 20 minutes left, no.
4        A. I'm sorry. I just -- you know, you're asking
5    me what did they mean, and I'm not even sure which
6    paper might have described something as a weak
7    positive association, and I'm not sure who would have
8    used that terminology or what was going through their
9    mind when they chose those words.
10       Q. I assume there are standard epidemiology
11   textbooks that you use in your field; correct?
12       A. Yes.
13       Q. Okay. And what are some of your go-to
14   epidemiology textbooks?
15       A. Let's see. Ken Rothman's Modern Epidemiology
16   is -- different editions of it have been around since
17   I was in school 30 years ago. I still refer to that.
18           When I have taught the physician assistant
19   students, the textbook we use, which is a little
20   bit lower-level textbook, was going to us. Those are
21   probably my go-to ones.
22       Q. Okay. Do any of the standard epidemiology
23   textbooks use terms like "weak," "modest," "strong,"
24   to describe associations?
25       A. I -- I imagine that in the textbooks, they

Page 289

1    might use that. But the point that I have been trying
2    to make is that there is no numerical value to go
3    along with those descriptors.
4        Q. All right. Switching topics, I want to talk
5    a little bit about some of the things that you
6    reviewed before you came and gave your deposition
7    today.
8            Now, you confirmed earlier that you reviewed
9    the reports of some of the other Plaintiffs' experts
10   in this case; correct?
11       A. Yes.
12       Q. And you reviewed those all between the time
13   that you finished your report and when you came here
14   to testify; correct?
15       A. That is correct.
16       Q. And those were all provided to you by
17   Plaintiffs' counsel; correct?
18       A. That is correct.
19       Q. And how did you choose which of the 22 expert
20   reports that you were going to sit down and read?
21       A. I knew which of the ones that were more of
22   the epidemiology-focused ones. And because that is my
23   area of expertise, those were the ones that I went to
24   first.
25           Also, some of it was, you know, some of the

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 290

1    names that I recognized: David Kessler, former chair
2    of the -- former head of the FDA; Daniel
3    Clarke-Pearson, who is a gynecologic oncologist who
4    was formerly at Duke. He's now at UNC.
5        Q. Do you know Dr. Clarke-Pearson?
6        A. Only by reputation.
7        Q. You haven't talked to him about your opinions
8    in this litigation?
9        A. No, I have not.
10       Q. And you haven't talked to any other
11   Plaintiffs' expert about your opinions in this
12   litigation?
13       A. No, I have not.
14       Q. In reviewing those reports, did you work
15   under the assumption that the authors of those reports
16   had employed generally accepted methodologies in
17   forming their conclusions?
18       A. I -- I assumed that they had. You know, some
19   of the experts, they are names that I know, even if
20   I don't know the individual personally. You knows,
21   Dr. Siemiatycki, Dr. McTiernan, these are very
22   well-known epidemiologists. And so my assumption is
23   that they use generally accepted methodologies.
24       Q. I noticed on the
25   additional-materials-provided list -- I think it was

Page 291

1    marked as Exhibit 8 earlier. It's a document that
2    I believe you said counsel had prepared, and it has
3    the expert reports on it. It also has a couple of
4    deposition transcripts on it from Dr. Plunkett and
5    Dr. Singh.
6        Did you review either of those before you
7    came and testified today?
8        A. Dr. Plunkett and Dr. Singh, S-I-N-G-H?
9        Q. Yes.
10       A. I don't believe that I read Dr. Plunkett's
11   deposition. I did read a fair bit of Dr. Singh's
12   deposition.
13       Q. When did you do that?
14       A. Probably a week or so ago.
15       Q. Do you have any intention of reading the rest
16   of the reports that Plaintiffs' counsel sent to you
17   after you're closed here today?
18       A. I think that it is possible that I will read
19   some of them, time permitting.
20       Q. You testified about a literature search that
21   you conducted on talcum powder and ovarian cancer.
22       When did you first conduct that search?
23       A. I believe that probably the first time I did
24   that search was not long after I was contacted about
25   possible involvement in this. So probably summer of

Page 292

1    2016, and then updated it to make sure that my report
2    reflected the current literature.
3        Q. Did you do any kind of Bradford Hill analysis
4    of the claimed association between talcum powder usage
5    and ovarian cancer before you were retained as an
6    expert in the talcum powder litigation?
7        A. Doing -- considering the talcum powder -- or
8    considering the Bradford Hill criteria, this is
9    something that we do in our work all the time. It's
10   probably not as formalized as what was done here.
11       As you're aware, I was a coauthor, but I was
12   not the lead author on the AACES study of talc and
13   ovarian cancer. And in regard to the North Carolina
14   Ovarian Cancer Study, that was not the major focus of
15   the -- those papers that reported on talc and -- that
16   reported on talc as a risk factor.
17       So have I done the Bradford Hill criteria?
18   Certainly not in the detail that I have done for the
19   report that I prepared.
20       Q. And when you were -- when Mr. James asked you
21   about the NCI PDQ -- and you all looked at that as an
22   exhibit to the deposition.
23       Do you recall that earlier today?
24       A. Yes, I do.
25       Q. And one of the things that you mentioned is

Page 293

1    you see some kind of inconsistency in the way that NCI
2    evaluates data as to whether there is adequate
3    evidence of association or inadequate evidence of
4    association and specifically used the example of the
5    way that that they evaluated the breastfeeding data.
6        Do you remember that?
7        A. Right. What I -- I think the point that
8    I was trying to make when I was asked about that is
9    that the NCI PDQ, they do not describe their
10   methodology. So we're kind of left at what method did
11   they use to evaluate the data? Did they do a complete
12   systematic review, or was it -- was it something less
13   than a complete systematic review?
14       And my point is that, from the information
15   provided, we don't know what methods they used.
16       Q. Have you ever tried to communicate with any
17   of the editorial board members who write the NCI PDQ?
18       A. No, I have not.
19       Q. And you haven't submitted your report to
20   IARC; correct?
21       A. My --
22       Q. Your expert report. You haven't submitted a
23   copy of your expert report to IARC for their
24   consideration; correct?
25       A. No, I have not.

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 294

1    Q. Being conscious of the fact that we have
2  limited time left, I'm going to -- okay. One last
3  question.
4          In terms of the expert report that you
5  provided in the MDL litigation that we've been talking
6  about all day today, are all of the opinions that you
7  intend to give in this litigation contained within
8  that report?
9      A. I believe they are, yes.
10         MS. FOSTER: I don't have anything else
11  for you. So I'm going to pass you on to my colleague
12  here. Thank you very much.
13         THE WITNESS: Okay.
14     CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANTS
15           PERSONAL CARE PRODUCTS COUNCIL
16  BY MS. APPEL:
17     Q. Hi, Dr. Moorman. You can you hear me okay?
18     A. I can, yes.
19     Q. And just as a reminder from this morning,
20  I am Renée Appel, and I represent Personal Care
21  Products Council. And I just have a handful of
22  questions to follow up on.
23         When did you first form your opinion in your
24  expert report that talcum powder products can cause
25  ovarian cancer?

Page 295

1      A. I think that we have talked about this, that
2  the literature on talc and ovarian cancer has been
3  accruing since 1982, and to say at what point I formed
4  my opinion that it causes ovarian cancer, I can't
5  pinpoint that date.
6          I can say that I have considered talc as a
7  risk factor for ovarian cancer for quite some time.
8  Just over my career, it just seems like it has been an
9  accumulating volume of evidence.
10     Q. Did you hold that opinion before you were
11  retained as an expert in the talc litigation dating
12  back to the Ingham case?
13     A. I think that, yes, I did.
14     Q. But, sitting here today, you can't recall a
15  specific year or point in time in which you formed
16  that opinion?
17         MS. PARFITT: Objection.
18         THE WITNESS: I think that I've
19  answered that. I can't pinpoint at what point that
20  I concluded it was a risk factor for ovarian cancer.
21  It's been something that I've considered a risk factor
22  for ovarian cancer for quite -- quite a number of
23  years.
24  BY MS. APPEL:
25     Q. And when you refer to "it," Doctor, are you

Page 296

1  referring to talcum powder products?
2      A. Yes, because all of the literature is -- the
3  epidemiologic literature is based on talcum powder
4  products, whatever the women reported that they used.
5      Q. So is it correct, Dr. Moorman, that you had
6  not formed an opinion as to whether pure talc is a
7  risk factor for forming ovarian cancer?
8          MS. PARFITT: Objection.
9          THE WITNESS: Again, my opinion is
10  based on the product that women have used, and my
11  understanding is that all of the products, they have
12  other constituents in them. So they may contain, you
13  know, as we have discussed previously, fragrances, for
14  example. We have also talked about that there are
15  other -- there's evidence to suggest other
16  constituents, such as asbestos or possibly heavy
17  metals.
18  BY MS. APPEL:
19     Q. And as to those constituents, would you defer
20  to other experts to opine on them, based on the
21  examples you just provided, fragrances or heavy
22  metals?
23         MS. PARFITT: Objection. Form.
24         THE WITNESS: You're asking me defer to
25  other estimates to opine on them in what sense? Opine

Page 297

1  on them in what sense?
2  BY MS. APPEL:
3      Q. Sure. Would you defer to other experts to
4  opine on whether those particular constituents in
5  isolation are a risk factor for ovarian cancer?
6          MS. PARFITT: Objection. Form. Asked
7  and answered.
8          THE WITNESS: Okay. Those particular
9  constituents in isolation are a risk factor for
10  ovarian cancer.
11         I think that we have discussed this
12  previously today, that what is the evidence about, for
13  example, the heavy metals in isolation in ovarian
14  cancer and limited to -- limited epidemiologic data in
15  that regard.
16         So I don't know that I'm deferring to other
17  experts, but, as I phrased it earlier today, I --
18  the -- whether or not these substances are in talc
19  products, it adds to the biologic plausibility, but
20  the epidemiologic data is based on the talc products.
21  That's what the women were exposed to.
22  BY MS. APPEL:
23     Q. Okay. So in forming your opinion, you are
24  assuming that those constituents that you've
25  mentioned -- heavy metals, asbestos -- that they are

Patricia G. Moorman, M.S.P.H., Ph.D.

---

Page 298

1    in the talc powder product that you've rendered an
2    opinion about today?
3            MS. PARFITT: Objection. Misstates her
4    earlier opinions.
5        You might want to read that.
6            THE WITNESS: I -- I am not making,
7    really, any assumptions that these are in the
8    products. My -- you know, my focus on the
9    epidemiologic data is based on the use of the talc
10   products, whatever is contained in them.
11   BY MS. APPEL:
12       Q. In your report on page 30, you've indicated
13   that -- second paragraph, I'm reading from. And I'll
14   give you a moment to turn to it. (As read):
15           "For an association like talc and
16            ovarian cancer, the dose that is
17            most relevant is the amount of
18            talc that actually reaches the
19            fallopian tubes and ovaries."
20        Did I read that correctly?
21       A. Yes, you did.
22       Q. There is, in fact, though, no dose that has
23   been determined that actually reaches the fallopian
24   tubes and the ovaries in any of the studies that
25   you've relied upon; correct?

---

Page 299

1            MS. PARFITT: Objection. Form.
2            THE WITNESS: Let's see.
3    BY MS. APPEL:
4        Q. I can rephrase if you don't understand.
5        A. If you wouldn't mind, please.
6        Q. Absolutely.
7        In the studies that you've relied upon in
8    forming your opinion, none of those studies have
9    determined a particular dose of talc that actually
10   reaches the fallopian tubes and ovaries; correct?
11           MS. PARFITT: Objection.
12           THE WITNESS: Okay. So if we are
13   talking about the epidemiologic studies, there -- no,
14   of course, they did not measure what dose of talc
15   reached the ovaries and fallopian tubes. That would
16   not be feasible to do for -- reflecting the many, many
17   years of use, and also it would be completely
18   unfeasible to do something like that in an
19   epidemiologic study.
20   BY MS. APPEL:
21       Q. But you maintain the opinion that a
22   determination of that amount -- the amount being what
23   talc reaches the fallopian tubes and ovaries -- is
24   important to making a determination about an
25   association between talc and ovarian cancer; correct?

---

Page 300

1            MS. PARFITT: Objection. Form.
2            THE WITNESS: I think that the sentence
3    that followed the one that you're reading is that, for
4    all the pragmatic reasons, we rely on the measures of
5    external application as a surrogate of the level of
6    exposure. There's no way that we could measure what
7    dose of talc reached the ovaries or the fallopian
8    tubes for something that women might have applied over
9    20, 30, 40 years of their lives.
10   BY MS. APPEL:
11       Q. Earlier today, you had discussed the
12   hierarchy of scientific evidence.
13        Do you recall that discussion?
14       A. I don't think that I used that terminology,
15   but I think that -- in talking about the
16   meta-analyses, yes. Yes.
17       Q. In terms of that hierarchy, that you
18   understand that I'm referring to based on that prior
19   discussion, where do cohort studies fall in comparison
20   to case-control studies?
21           MS. PARFITT: Objection. Asked and
22   answered.
23           THE WITNESS: Okay. If you have a
24   cohort study that was able to determine exposure
25   completely and accurately, and follow women for a

---

Page 301

1    sufficient period of time, I think most people would
2    consider that a -- generally a stronger design than a
3    case-control study.
4        But, as I have indicated in my report, you
5    can't rely just on what is the stronger study design,
6    in general. You look -- have to look at the strengths
7    and limitations of the individual studies.
8        Cohort studies have some strengths; they
9    have some notable weaknesses. And I've described
10   those weaknesses several times over the course of
11   today. And I also acknowledge that case-control
12   studies have some weaknesses, but they also have
13   noticeable strengths too.
14   BY MS. APPEL:
15       Q. Is it accurate, Dr. Moorman, that, when you
16   were previously discussing meta-analyses and where
17   that falls on the hierarchy, you were envisioning a
18   pyramid graphic? Is that correct?
19       A. I have -- yes, I have seen graphics that
20   depict it like that.
21       Q. And in those particular graphics, where is
22   cohort studies listed in comparison to case-control
23   studies?
24           MS. PARFITT: Objection.
25           THE WITNESS: As I have said, that in

---

76 (Pages 298 to 301)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 302

1    that pyramid, it is -- typically, the cohort study is
2    ranked as a stronger study design. But, again, I
3    cannot emphasize strongly enough that you have to
4    consider strengths and weaknesses of individual.
5    BY MS. APPEL:
6        Q. And, Dr. Moorman, have you considered
7    publishing your expert report or the findings that you
8    arrived at in your expert report?
9        A. I have considered it. I have not actually
10   done anything to translate it into a manuscript.
11       MS. APPEL: Okay. Thank you,
12   Dr. Moorman. That concludes my questions.
13       THE WITNESS: Okay.
14       MR. JAMES: I think there's about eight
15   minutes. Off the record.
16       THE VIDEOGRAPHER: Going off the record
17   at 5:50 p.m.
18       (Discussion off the record.)
19       THE VIDEOGRAPHER: Back on record at
20   5:51 p.m.
21       FURTHER EXAMINATION BY COUNSEL FOR THE
22   JOHNSON & JOHNSON DEFENDANTS
23   BY MR. JAMES:
24       Q. Dr. Moorman, in regard to your general cause
25   opinion, do you hold the opinion that the evidence is

Page 303

1    sufficient to support a general cause opinion for all
2    subtypes of ovarian cancer or do you distinguish among
3    the subtypes?
4        A. Okay. The majority of the studies looked at
5    epithelial ovarian cancer as a whole. Some of the
6    studies did look at subtypes. As we are aware, the
7    serous subtype is the vast majority, probably about
8    60 -- maybe "vast majority" is overstating it. But
9    serous subtypes are roughly 60 percent of ovarian
10   cancer cases. And so the studies that looked at the
11   subtypes tended to focus on that.
12       The other subtypes -- the mucinous, the
13   clear cell, and the other subtypes -- they are a much
14   smaller percentage of epithelial ovarian cancer. And
15   so there's really not adequate data to make a
16   conclusion about these subtypes.
17       Q. With regard to inhalation, which you touch
18   upon in your report, do you hold the opinion that
19   inhalation of talcum powder products can cause ovarian
20   cancer?
21       A. I have stated that that is a possible route
22   of exposure to the ovaries. The epidemiologic studies
23   have not specifically addressed the risk associated
24   with inhalation only of talcum powder products.
25       Q. So is there evidence upon which you believe

Page 304

1    is sufficient to conclude that inhaled talcum powder
2    can cause ovarian cancer?
3        A. I do not think that there are epidemiologic
4    studies that have actually looked at inhaled talcum
5    powder in relation to ovarian cancer.
6        Q. And so is your answer that -- let me just ask
7    this again.
8        Do you believe there's sufficient evidence
9    upon which you can conclude that inhaled talc powder
10   causes ovarian cancer?
11       MS. PARFITT: Objection.
12       THE WITNESS: I think that I answered
13   that when I said that I don't think that there are
14   epidemiologic studies that have looked at that. So
15   I can't say that there is sufficient evidence.
16   BY MR. JAMES:
17       Q. Dr. Moorman, are you generally aware that, in
18   the African-American population, there is a lower
19   incidence of ovarian cancer?
20       A. Yes.
21       Q. And you have -- have you also seen in the
22   literature that there is at least some discussion in
23   the literature that the prevalence of talcum powder
24   used in the African-American populations may be
25   higher?

Page 305

1        A. Yes.
2        Q. If both of those things are true, can you
3    provide us an explanation as to why -- why that would
4    be the case?
5        A. There are many causes of ovarian cancer. And
6    some of the risk factors are more common in
7    African-American women; some are less common.
8        So when you consider the whole spectrum of
9    risk factors, you know, breastfeeding, pregnancy, oral
10   contraceptive use, to pinpoint one factor like talc
11   that is used more frequently in African Americans and
12   then say that that conflicts with the lower incidence
13   of ovarian cancer that we see in African-American
14   women, it doesn't take into account the full spectrum
15   of risk factors.
16       Q. With regard to the Health Canada assessment
17   that we discussed much earlier today, do you
18   understand that that assessment is in draft form
19   currently?
20       MS. PARFITT: Objection.
21       THE WITNESS: My understanding is that
22   the scientific assessment they did is complete and
23   that they are -- that there is a period of comment
24   that -- so, I'm sorry, I want to make sure...
25

77 (Pages 302 to 305)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 306

1  BY MR. JAMES:
2      Q.  Do you understand that right now that
3  assessment is currently in the process of a comment
4  period?
5          MS. PARFITT:  Objection.  Form.
6          THE WITNESS:  My understanding is the
7  assessment of the risk that they did, that is
8  complete, and then they are assessing -- or it is in a
9  comment period.  And I think that, you know,
10  potentially, if there were some serious concerns
11  raised, they might revisit the risk assessment that
12  they did.  But my understanding is what they published
13  is their -- that they felt like the risk assessment
14  was complete.
15  BY MR. JAMES:
16      Q.  And to be very quick here, I understand that
17  one of the materials provided to you in the additional
18  materials list was the Taher paper; correct?
19      A.  Yes.
20      Q.  And do you understand that the Taher paper is
21  one of the items discussed in the Health Canada
22  assessment?
23      A.  Yes.
24      Q.  And do you understand the Taher paper's
25  conclusion is consistent with the IARC's conclusion of

Page 307

1  possible cause?
2          MS. PARFITT:  Objection.  Form.
3  Misstates the evidence.
4          THE WITNESS:  If you have the Taher
5  paper -- again, just recalling exactly what they
6  stated, I -- too many papers to remember all the
7  detail.
8  BY MR. JAMES:
9      Q.  When is the last time you reviewed the Taher
10  paper?
11      A.  I would say probably a week or two ago.
12          MR. JAMES:  So if Michelle doesn't cut
13  me off, I will hand you a copy of it.  I'm going to
14  mark it as Exhibit 31.
15      (Exhibit No. 31 was marked for identification.)
16  BY MR. JAMES:
17      Q.  I'll hand you two copies.
18      Okay.  And, Dr. Moorman, again, because I'm
19  running out of time, I'll direct you to the precise
20  portion of the article that founds my question.  It's
21  on page 49, and it's in the conclusion section of the
22  paper.
23      And you see in the last sentence -- in the
24  last sentence, they report that the data indicates
25  "possible cause of ovarian cancer"?

Page 308

1      A.  Yes, I --
2          MS. PARFITT:  Is the question is that
3  what it says?
4  BY MR. JAMES:
5      Q.  That is the question.
6      We had a discussion earlier today about
7  possible cause; correct?
8      A.  Yes.
9          MS. PARFITT:  Objection.
10  BY MR. JAMES:
11      Q.  And, Dr. Moorman, with respect to the
12  Bradford Hill analysis --
13          MS. PARFITT:  Can we stop for a minute?
14      Are you going to tell us when we're off and
15  when we're done?
16          THE VIDEOGRAPHER:  Just one minute.
17          MS. PARFITT:  Thank you.  Oh, that's
18  good.
19  BY MR. JAMES:
20      Q.  With respect to your Bradford Hill
21  analysis -- and this should be my last question --
22      A.  Okay.
23      Q.  -- you will agree with me that in order to
24  reach a causal conclusion, you must rely on items
25  other than the cohorts, case controls, and

Page 309

1  meta-analyses of the epidemiologic literature;
2  correct?
3          MS. PARFITT:  Objection.  Form.
4          THE WITNESS:  The -- some of the
5  Bradford Hill aspects which I think I discussed in my
6  report were the biological plausibility, and so I did
7  rely on literature other than the epidemiologic
8  literature.
9  BY MR. JAMES:
10      Q.  And those are necessary as part of your
11  methodology to reach a causal conclusion; correct?
12          MS. PARFITT:  Objection.  Form.
13          THE WITNESS:  They are a consideration.
14  When you do a Bradford Hill analysis, of course you
15  take into account the biological plausibility and the
16  data that may come from cancer biology studies, animal
17  studies, and so on.  So yes, it should be considered.
18          MR. JAMES:  Okay.  Dr. Moorman, thank
19  you for your time.
20          THE WITNESS:  Okay.
21          MS. PARFITT:  Can we go off the record,
22  please.
23          THE VIDEOGRAPHER:  Going off the record
24  at 6:01 p.m.
25      (Recess taken from 6:01 p.m. to 6:14 p.m.)

78 (Pages 306 to 309)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 310

1    THE VIDEOGRAPHER:  Back on record at
2  6:15 p.m.
3    CROSS-EXAMINATION BY COUNSEL FOR THE PLAINTIFF
4  BY MS. PARFITT:
5    Q.  Dr. Moorman, good evening.
6    A.  Good evening.
7    Q.  I just have a few questions to follow up with
8  counsel for J&J and then for PCPC.
9    Dr. Moorman, you were asked not too long ago
10  by Mr. James a question with regard to your general
11  causation opinions as they relate to does talc -- do
12  talcum powder products cause ovarian cancer.
13    Do you remember that discussion?
14    A.  Yes, I do.
15    Q.  All right.  And I believe the question dealt
16  with subtypes of epithelial ovarian cancer.
17    Do you remember that?
18    A.  Yes.
19    Q.  All right.  And I believe your testimony was
20  that there's really not adequate data to make a
21  conclusion about the subtypes.
22    Did you mean, when you said that, that
23  there's not adequate data to make a conclusion about
24  these other subtypes, that that was because the
25  non-serous subtypes were relatively rare?

Page 311

1    A.  Yes, but the bulk of the literature is
2  addressing epithelial ovarian cancer, which includes
3  all of the subtypes.
4    Q.  All right.  So that the ladies and gentlemen
5  are clear as to what your opinion is, is it your
6  opinion that talcum powder products can cause -- or
7  exposure -- let me strike that.
8    Is it your opinion that exposure to talcum
9  powder products can cause ovarian cancer?  Is that
10  your opinion?
11    A.  That is my opinion.
12    Q.  All right.  And does that include all types
13  of epithelial ovarian cancer?
14    A.  That -- yes.  The data are based -- are
15  largely based on all types of epithelial ovarian
16  cancer.  Yes.
17    Q.  You were questioned a little earlier, and
18  briefly, about the Health Canada assessment.  Do you
19  recall those discussions?
20    A.  Yes.
21    Q.  Okay.  And have you had an opportunity to
22  review the recommendations of Health Canada?
23    A.  I have, yes.
24    Q.  All right.  Based upon your review of the
25  Health Canada assessment, what is your understanding

Page 312

1  of the opinion of Health Canada vis-à-vis exposure to
2  talcum powder products and ovarian cancer?
3    A.  My -- my understanding is that Health Canada
4  indicated that talcum powder products can cause
5  ovarian cancer.
6    Q.  Mr. James showed you a study, the Taher
7  study.
8    A.  Yes.
9    Q.  And you had an opportunity to review the
10  Taher study as well; correct?
11    A.  Yes.
12    Q.  Is the Taher study a -- one of the pieces of
13  evidence that you looked at in your review of the
14  Health Canada assessment?
15    A.  One of -- it's one of the pieces of evidence,
16  but not the sole body of evidence that they
17  considered.
18    Q.  Okay.  And is the Taher study also considered
19  a meta-analysis?
20    A.  Yes.
21    Q.  Okay.  For purposes of rendering your
22  opinions in this case, that talcum powder products can
23  cause ovarian cancer, you have shared with the ladies
24  and gentlemen of the jury that you have reviewed
25  multiple meta-analyses; correct?

Page 313

1    A.  That is correct.
2    Q.  And I believe that you spent time today talking
3  with us with regard to the various meta-analyses that
4  you've looked at, examined, and assessed; correct?
5    A.  That is correct.
6    Q.  Okay.  Based upon the totality of the
7  meta-analyses that you have reviewed, what is your
8  opinion with regard to whether or not they demonstrate
9  that talcum powder products can cause ovarian cancer?
10    A.  I think that the meta-analyses show
11  consistent conclusions of a 25 to 30 percent increased
12  risk for ovarian cancer; and that coupled with the
13  other criteria that I considered -- the biological
14  plausibility and the various other Bradford Hill
15  criteria -- that I came to the conclusion that talc is
16  a cause of ovarian cancer.
17    Q.  Dr. Moorman, is it fair to say that the
18  method -- method of review and your methodology and
19  the analysis that you performed, for purposes of the
20  preparation of your report and the opinions that you
21  shared today, is the type of methodology and the type
22  of process that is generally accepted in your
23  scientific community of epidemiologists?
24    MS. FOSTER:  Objection to form.
25    THE WITNESS:  I think that the methods

that I used are what I do routinely in my work as an epidemiologist and that is routinely done when we conduct systematic reviews.
BY MS. PARFITT:
Q. You were questioned numerous times today with regard to the IARC review of talcum powder products and ovarian cancer. Do you recall those discussions?
A. Yes, I do.
Q. The IARC committee put out a monograph in 2010. Is that your understanding?
A. That is my understanding, yes.
Q. Do you have any knowledge as to when the IARC committee met to make their findings as it pertained to the role of talcum powder products in ovarian cancer?
A. I don't recall the exact date, but I believe that it was quite a bit earlier than that. I'm not sure of the exact date.
Q. Okay. But it preceded the monograph that came out in 2010?
A. Yes.
MS. PARFITT: Dr. Moorman, I have no further questions. Thank you very much. I appreciate it. A long day.
MR. JAMES: Dr. Moorman, just a handful

more questions. Okay?
THE VIDEOGRAPHER: Mr. James.
MR. JAMES: Oh, of course.
Can we go off just for one second?
How long did Ms. Parfitt go?
THE VIDEOGRAPHER: Going off record at 6:22 p.m.
(Discussion off the record.)
THE VIDEOGRAPHER: Back on record at 6:23 p.m.
FURTHER EXAMINATION BY COUNSEL FOR THE
JOHNSON & JOHNSON DEFENDANTS
BY MR. JAMES:
Q. Dr. Moorman, since the IARC published its monograph in 2010, we have had the publication of additional cohort data on the talc ovarian cancer association; correct?
A. Correct.
Q. With regard to the subtypes issue, do you believe that different subtypes of ovarian cancer have different risk profiles?
MS. PARFITT: Objection. Form.
You can answer.
BY MR. JAMES:
Q. And I'm talking about in general.

A. The most pronounced difference that we are aware of is that smoking seems to be more strongly associated with mucinous ovarian cancer than with other subtypes.
But in most -- for most other risk factors, there -- the risk factors seem to be pretty consistent across the subtypes.
Q. Are you aware that many clinicians consider the various subtypes of ovarian cancer to be different diseases?
MS. PARFITT: Objection. Form.
THE WITNESS: I think that clinicians recognize that they -- there are differences. Again, going to pathologists, they can distinguish between them.
But in terms of how they treat them, it's my -- I'm not aware of any real difference in how they would treat the different subtypes of ovarian cancer.
BY MR. JAMES:
Q. And other than smoking, which is the factor that you just mentioned, can you think of any other risk factors that have a different impact on a specific subtype of ovarian cancer as opposed to another subtype?
A. That is the only one that comes to mind.

MR. JAMES: That's all I have. Thank you again for your time.
THE WITNESS: Okay.
MS. PARFITT: Thank you.
THE VIDEOGRAPHER: This concludes the deposition of Dr. Patricia Moorman. The time going off record is 6:25 p.m.
(Whereupon, at 6:25 p.m., the deposition ceased.
Signature was reserved.)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 318

1              ACKNOWLEDGMENT OF DEPONENT
2          I, PATRICIA G. MOORMAN, M.S.P.H., PH.D., do
3     hereby acknowledge that I have read and examined the
4     foregoing testimony, and the same is a true, correct,
5     and complete transcription of the testimony given by me,
6     and any corrections appear on the attached errata sheet
7     signed by me.
8
9     _____  _____
10        (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 320

1      STATE OF NORTH CAROLINA  )
                              ) C E R T I F I C A T E
2      COUNTY OF ORANGE        )
3          I, Sophie Brock, Court Reporter and Notary Public,
4      the officer before whom the foregoing proceeding was
5      conducted, do hereby certify that the witness(es) whose
6      testimony appears in the foregoing proceeding were duly
7      sworn by me; that the testimony of said witness(es) were
8      taken by me to the best of my ability and thereafter
9      transcribed under my supervision; and that the foregoing
10     pages, inclusive, constitute a true and accurate
11     transcription of the testimony of the witness(es).
12         I do further certify that I am neither counsel for,
13     related to, nor employed by any of the parties to this
14     action, and further, that I am not a relative or
15     employee of any attorney or counsel employed by the
16     parties thereof, nor financially or otherwise interested
17     in the outcome of said action.
18         This, the 26th day of January, 2019.
19
20
21
                 _____
22
                 Sophie Brock, RDR, CRR
23               Notary Number: 200834000001
24
25

Page 319

1          E R R A T A
2     CASE NAME:  TALCUM POWDER LITIGATION MDL NO. 2738
3     WITNESS NAME:  PATRICIA G. MOORMAN, M.S.P.H., PH.D.
4     CASE NUMBER:  16-2738 (FLW)(LHG)
5     PAGE  LINE     READS        SHOULD READ
6     ____ ____ _____ _____
7     ____ ____ _____ _____
8     ____ ____ _____ _____
9     ____ ____ _____ _____
10    ____ ____ _____ _____
11    ____ ____ _____ _____
12    ____ ____ _____ _____
13    ____ ____ _____ _____
14    ____ ____ _____ _____
15    ____ ____ _____ _____
16    ____ ____ _____ _____
17    ____ ____ _____ _____
18    ____ ____ _____ _____
19    ____ ____ _____ _____
20    ____ ____ _____ _____
21    ____ ____ _____ _____
22    ____ ____ _____ _____
23    ____ ____ _____ _____
24    ____ ____ _____ _____
25    ____ ____ _____ _____

81 (Pages 318 to 320)

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 321

**A**

**a.m**
1:15 8:4 52:16,17
52:17,19 115:3,4
**AACES**
7:12 29:1,7 128:24
209:4 283:3
284:17 285:6,13
285:16 286:25
292:12
**AACR**
5:11 6:18 7:10,13
**ability**
11:23 35:13 320:8
**able**
72:3 102:23 163:25
248:17 300:24
**abortion**
223:2
**absence**
83:21
**absolute**
249:10 287:16
**absolutely**
64:11 70:17 84:14
87:20,22 129:7
165:6 255:11
299:6
**abstract**
169:14,15,17 176:5
176:10 195:11
202:19 205:6,8
227:25 264:19
269:11,19 276:16
276:16,24 277:6
279:9,12
**accept**
124:22 250:11
**accepted**
111:14 141:23
251:24 252:3
256:13 257:19
258:20 290:16,23
313:22
**accepts**
145:5

**access**
42:19
**accommodate**
14:8
**account**
176:18 216:14
242:20,22 272:4
305:14 309:15
**accruing**
295:3
**accumulated**
95:7 161:24 178:19
179:4
**accumulating**
142:3 295:9
**accuracy**
220:4,7 239:16
**accurate**
55:23 69:4 81:15
134:4 239:22
240:13 249:12
279:3,16 301:15
320:10
**accurately**
107:1 136:4 242:17
279:23 300:25
**acetate**
154:7
**acknowledge**
54:18 104:21
106:10,18 109:2
134:1 150:18,19
159:25 193:2,19
204:8 223:16
229:24 232:10
236:24 238:23
239:25 241:18
247:21 255:13,18
258:12 264:9
266:6,9 268:25
271:19 275:11
301:11 318:3
**acknowledged**
23:5,8 107:5
130:20 131:15
132:8 135:8

231:10
**acknowledges**
93:25
**acknowledging**
110:12 185:20,22
186:11 204:13
266:25 270:17
275:23 276:1
**acknowledgment**
170:8 318:1
**ACOG**
149:9,22
**ACOG's**
5:20
**acquire**
47:9
**action**
5:6 280:20 320:14
320:17
**activities**
10:13,21
**actual**
248:4 274:9
**add**
16:1 51:20
**added**
47:24 48:9,19 49:3
50:6 51:5,16
161:22 162:5
**addition**
217:25 219:10
285:6
**additional**
4:22 39:1,8,22 40:5
40:15,22 41:3,15
43:14 44:21,23
46:4,23 47:23
51:18,20 52:5
68:11,14 72:22
92:24 93:19 95:6
95:10 98:1,12
179:4 189:15,18
189:23 192:10
193:12,16 207:20
216:14 217:4
283:17 306:17

315:16
**additional-mater...**
33:19
**additional-mater...**
290:25
**address**
19:17 35:4 68:12
86:23 124:2 135:8
152:3 163:5,19
169:9 171:9
172:14 173:25
176:4 200:3
221:10 222:3
232:11,12
**addressed**
26:5 65:23 66:24
119:9 120:15
122:16 132:7
139:2 153:2
167:12 172:16
186:5 243:4,7,10
303:23
**addresses**
224:7 232:9 244:18
**addressing**
64:10,11 84:3
155:1 231:16
311:2
**adds**
297:19
**adequate**
110:14 154:8,13
155:16,17,21
156:5,8 255:23
293:2 303:15
310:20,23
**adjective**
248:14 249:21
**advance**
181:10 184:11
**advantages**
196:23 199:7
**advise**
168:21 170:1 171:4
**advisement**
25:2

**afindeis@napoli...**
2:14
**afraid**
11:11 12:1
**African**
7:11 26:9 27:11,12
29:1 128:18,20
136:15 283:3
284:16,17,22
305:11
**African-American**
5:15 20:22 25:21
27:11,15 128:12
135:13 136:8,13
136:17 304:18,24
305:7,13
**age**
218:7
**agencies**
253:10
**agency**
127:5 251:9
**ago**
10:18 136:5 220:19
280:19 288:17
291:14 307:11
310:9
**agree**
37:17 54:8 56:8
60:23 105:7,12,18
106:4 112:7
129:10 182:12
190:4 202:10
203:10 204:4,12
204:14 208:18,20
210:24 211:2
215:20 233:18
236:10 238:17
245:2 247:1,9
250:20 251:2
272:25 308:23
**agreed**
223:10
**agreement**
239:7
**ahead**

Patricia G. Moorman, M.S.P.H., Ph.D.

62:9 99:3 114:5
146:16 284:11
**AHRQ**
127:6
**al**
5:13,16,19 6:8,10
6:12,17,20,23 7:5
7:9,12,18,21
**Alastair**
2:14 8:20 12:11
**alcohol**
182:4 267:22,24
**Alexandria**
2:4
**Alison**
5:13
**allegation**
64:3,7 65:3,17 75:6
105:10 120:17
**allegations**
9:24
**alleged**
84:7 86:10 109:19
119:15 122:23
**allegedly**
105:22 106:9
**alleging**
106:7
**allowable**
121:23 122:3
**allowed**
22:24
**alluded**
101:8,13
**amend**
22:18
**America**
3:2 8:14 280:16,21
280:24
**American**
5:14 7:11 29:1
128:18,20 136:16
166:12,24 283:3
284:17,22
**Americans**
305:11

**amount**
75:20,21 76:5
298:17 299:22,22
**Amy**
7:8
**analyses**
75:23 118:7 120:6
120:7 121:16
238:22 239:9
278:17
**analysis**
5:18 6:19 111:8,12
120:15 121:13
138:23 139:4
179:14,18 182:19
202:21 214:9
215:16 224:14
233:24 236:20
242:24,24 244:3
244:15 256:9
261:14 269:6,23
278:14 279:22,24
283:12 292:3
308:12,21 309:14
313:19
**analyze**
233:21 242:18
284:7
**analyzed**
120:15 212:4,5
242:8 287:3
**ancestry**
26:10 27:12 284:16
**and/or**
142:25
**Anderson**
25:18
**Angeles**
285:4
**animal**
52:24 58:1,6,11,16
63:4 89:24 309:16
**animals**
106:24
**Anne**
44:4

**answer**
12:22 15:17 22:25
22:25 55:22 57:23
58:8 60:5 61:3,21
62:6 64:22 66:19
69:22 70:2,3 74:5
78:22 82:10,11
95:14 99:2 102:4
125:1,11,25 144:4
163:9,24 171:23
171:25 178:20,20
184:16 200:12,18
200:19,20 201:7,9
201:21,22 204:19
219:1,5 265:1
304:6 315:23
**answered**
28:18 48:23 50:13
50:15,20,21 54:11
55:18,22 57:15
58:12,15 60:15
61:24 62:23 63:7
63:14 64:20 82:6
82:8 98:10 99:19
125:19 183:4
189:2 190:1 199:3
199:5 200:22
201:17 217:7
219:14 245:24
247:25 248:1
252:19 255:6
267:8 271:12,13
295:19 297:7
300:22 304:12
**answering**
64:14 65:21 146:22
172:5 219:4 249:4
**answers**
14:1 60:6
**Anticancer**
6:13
**anticipation**
37:4
**anytime**
14:7 220:18 239:20
**apologies**

20:14 90:10 96:16
109:11 135:21
146:17
**apologize**
113:13 148:4
**apparently**
21:18
**appear**
265:20 318:6
**appears**
320:6
**Appel**
3:15 4:5 8:17,17
294:16,20 295:24
296:18 297:2,22
298:11 299:3,20
300:10 301:14
302:5,11
**applicable**
230:3,6 282:3
**application**
6:14 283:18 300:5
**applications**
272:17,20 276:21
277:11 278:11,21
**applied**
59:7 63:2 106:11
143:8,10 144:1
300:8
**applying**
285:12
**appreciate**
33:1 100:9 314:23
**approach**
17:25
**approached**
11:14
**appropriate**
22:12 47:12 218:19
**appropriately**
65:23
**approximately**
8:4 89:6 158:15
**April**
5:7 44:4
**area**

57:7 59:4,14 60:18
63:14,17 90:1
106:13 121:22
289:23
**areas**
56:16,19 60:19
63:3
**arguably**
210:15,25
**argue**
274:21
**arisen**
95:10 98:12
**arising**
188:13
**arrangements**
35:15
**arrived**
302:8
**Arsenic**
5:9
**article**
5:11,14,17 6:6,9,13
6:18,21 7:3,6,10
7:13,16 19:20
20:18,20 21:4,19
21:24 22:4,7 23:3
23:25 25:9,14,18
26:2 40:20 59:25
60:1 64:24 65:25
66:3 67:17 108:20
109:18 110:5,18
111:3 147:20
148:7,12,20 149:5
169:13,14,16
170:7,9 174:1
177:21,24 187:20
194:16,18,20
210:9 211:24
212:17 213:16,17
213:20 215:4,4
231:16 235:21
237:8 238:8 239:6
242:16,17 243:6
243:21 254:19
270:2 274:25

Patricia G. Moorman, M.S.P.H., Ph.D.

276:14 307:20
**articles**
19:9,14,16 25:10
26:1,4 34:25 35:2
40:10,17 52:4,6
59:12,19 64:9,23
67:13,15 75:10
81:9 88:11 111:24
112:1 166:11,23
183:21 212:9
213:19 230:11
255:24
**articulated**
242:1
**asbestiform**
117:11
**asbestos**
5:11 19:10 25:11
26:1 28:10 30:10
30:21 31:1 63:20
63:24 64:3,8,18
65:3,18 66:7
67:11 68:12,20,25
69:7,9 70:14,16
70:18 71:2,14,18
71:20 72:2 73:3
75:7,23,25 76:1,2
76:9,15 77:22
79:14,21 81:10,15
81:23 82:13 83:6
83:21 84:7 85:8
86:1,10,13,14,21
86:24,25 87:4,8
87:14 88:1,7,8,12
88:14,21,22 89:1
89:10,17 90:5,19
90:23 91:1,15
92:14,19 93:2,9
93:12 94:19 96:3
103:20 105:2,9,22
106:6,9,14,15
108:7,21 109:14
109:19,21 110:10
111:8,10 112:9
114:6 117:24
119:23 124:21

125:14,21 141:13
141:24 142:13,22
142:24 286:22
287:2 296:16
297:25
**asbestos-containi...**
105:19
**asbestos-contami...**
85:14 113:21
**asbestos-free**
69:1 71:23
**asbestos-related**
114:19
**asbestosis**
114:18
**ascertained**
220:6
**ascertainment**
210:17
**ascribe**
257:15
**Ashcraft**
2:3 15:19
**aside**
88:21 126:22
**asked**
34:7 48:22 50:12
50:19,22 54:10,12
54:20 55:15 57:14
58:12 60:14 62:11
62:23 63:6 68:13
82:5,8 98:10,25
99:6 102:10 126:1
129:1 131:16
135:7 140:15
172:4 177:20
178:10,22,24
184:17 195:18
199:2 200:15
201:8,17 206:19
208:14 217:6,13
217:25 218:3
219:3,7,9,11
225:16,22 245:23
247:24 248:2
277:14 286:25

292:20 293:8
297:6 300:21
310:9
**asking**
12:24 13:10 24:10
29:20 44:15 60:10
60:11 63:2 87:23
134:8 140:12
144:7 146:15,24
201:23 218:9,12
220:10 221:5
223:11 224:24
225:13 250:7
256:23 280:4
288:4 296:24
**aspect**
211:3 223:23
271:14 279:22,23
**aspects**
170:15,21 172:14
213:18 309:5
**assertion**
123:4,8
**assess**
102:10 202:22
215:2 254:9,18
255:1 278:25
**assessed**
96:10 110:21
253:11 270:23
276:21 277:11
313:4
**assesses**
253:4
**assessing**
64:18 109:13
126:23 127:14,21
196:24 249:15,16
250:7 253:15
256:2 258:22
306:8
**assessment**
101:17 124:18
143:5 187:16
211:5 217:20
240:9 305:16,18

305:22 306:3,7,11
306:13,22 311:18
311:25 312:14
**assessments**
159:2
**assistant**
24:10 288:18
**associated**
20:21 143:24
147:25 149:2
154:18 155:9
166:7 182:3,9,15
225:8,9 255:21
265:4 303:23
316:3
**association**
7:10,20 27:5 28:14
90:18 92:13 94:10
94:21 98:14
110:16 127:14,21
132:18,22 133:3
133:16,19,21,23
133:24 134:9,9,10
134:13 135:1,2
136:14 137:7,23
138:11,14 139:17
142:9 148:21
150:24 152:1
155:25 156:4,17
156:22 157:12
158:3,20 160:25
162:3 164:3
169:23 170:13
171:1 174:10
178:16 185:12,16
186:13,17 187:14
188:15,25 189:5
189:10 190:21
192:23 193:5
195:16 200:7
203:22 204:11
205:17 210:19
228:25 234:17
236:20,22 241:5
242:5,20,22 244:9
245:4 246:10,10

246:12,15,18,25
247:1,8,17,23
248:5,9,17 249:5
249:7,11,17,19,25
250:3,10,18,21
251:2,6,11 253:1
253:5,16,18
256:11,14 257:3,7
257:13,15,17
258:19,20,21,25
261:10,14,22
263:25 264:8
265:9 266:3 267:3
267:5,16,23 270:6
275:14 287:15,17
287:18,22 288:7
292:4 293:3,4
298:15 299:25
315:17
**associations**
94:1 126:13,20,24
136:21 140:3
143:22 162:1
176:19 193:3
230:13 231:14
245:7,13 246:14
247:16 248:25
250:2 251:22
252:2,8,11,16,17
253:13,19,22
257:19,20 258:9
258:10,12 264:11
272:14 287:7,10
287:11,11 288:24
**assume**
231:12 288:10
**assumed**
290:18
**assuming**
297:24
**assumption**
290:15,22
**assumptions**
298:7
**attached**
45:19 46:21 318:6

Patricia G. Moorman, M.S.P.H., Ph.D.

**attempted**
22:18
**attempting**
117:20
**attention**
23:10 59:13,20,21
59:24 185:9
207:22 232:21
233:1,3,6,18,22
233:25 240:22
**attenuated**
132:19 133:16,21
134:3 137:24
138:1,4,9 162:5
234:17 241:1
**attenuating**
190:21
**attenuation**
132:9 264:7 266:16
**attorney**
11:24 320:15
**attorneys**
11:12 12:3,14,18
13:12,15
**attributable**
241:14 261:20
**attribute**
242:4
**attributed**
270:10 271:2
**Austin**
2:8 3:4
**author**
20:19 21:12 22:4
22:11,17 25:16,18
179:6,7 188:21
246:24 247:7
292:12
**author's**
227:24 277:6
**authored**
13:8 19:9,14,16
25:10 26:1 37:7
37:15 42:13
287:21
**authority**

158:18 244:19,23
**authors**
23:4 108:11,17,19
109:3,25 110:9,12
163:3 166:4
167:18,24 168:7
168:21 169:5
170:2,9 172:21,25
173:17,25 174:6
174:14 175:7,25
176:4,10,21,22
179:3 180:16,24
181:1 183:2
186:12 187:20
188:21 195:10,12
195:19 202:20
203:3,16 204:13
205:7,9,24 206:9
207:10,19,25
208:21 210:12,24
212:21 234:23
247:7 264:21
265:3,4,17 266:2
267:2 269:13
270:4 275:2,15,19
276:12 277:17
279:9 287:23
290:15
**authors'**
176:24 178:24
275:2
**available**
33:21 47:16 50:18
51:11,12 67:17
74:16 75:12 88:18
155:23 176:11
**Avenue**
3:3,8
**average**
218:7
**aware**
30:6,8 47:10 48:16
51:12 52:6 59:3
59:12,19 74:20
83:14 86:12 88:10
88:17 102:20

107:19 111:21,24
114:16 119:8
122:15 146:24
147:2,2,20 182:21
183:19,23 184:2
186:20 187:20
199:13,18 200:16
200:25 201:2,8,11
201:11,24 203:24
263:12 285:17,21
292:11 303:6
304:17 316:2,8,17

### B
**B**
3:15
**baby**
80:10 129:16,23
130:3
**back**
29:16 35:16 36:5
52:18 61:9,15
103:19 115:5
116:23 123:14
135:12 147:8
150:16 153:15,18
153:22 165:11
177:18 180:8
183:13 204:9
206:22 211:16
215:5 217:15
218:9,13 219:22
232:22 234:5
242:15 248:24
249:24 259:16
264:2,14 269:8
278:5 280:4,13
295:12 302:19
310:1 315:9
**Background**
202:19
**backwards**
173:4
**BACON**
2:17
**bad**

76:2
**baffled**
155:20
**balanced**
240:9
**ballpark**
229:13
**bar**
250:19
**base**
117:5
**based**
47:2 81:24 87:6
90:20 92:16 93:12
93:14 116:4 117:8
117:9,23 118:6
119:22,25 125:3,4
125:19 129:9
130:21 140:1
144:2 154:17
156:7 198:13
222:17,18 224:20
235:23 240:16
243:23 244:24
274:15 275:6,10
276:6 281:14
296:3,10,20
297:20 298:9
300:18 311:14,15
311:24 313:6
**baseline**
218:7,19
**bases**
71:9 117:20
**basically**
31:20 35:1 181:8
181:16 260:17
**basing**
116:11 122:17
126:4 154:9
275:10,25
**basis**
67:25 68:1 122:2
123:20 124:6
220:4 222:13,16
242:11 262:18,20

281:15
**batch**
72:23
**bear**
55:4,8 245:6 282:8
**beat**
151:19
**began**
60:12 218:22
**beginning**
108:16 269:12
**begins**
38:25 207:18
**behalf**
2:2,16 3:2,11,17
9:21 16:25
**beliefs**
25:15
**believe**
12:23 13:2 14:21
18:22 22:3,6
23:23 24:9 30:12
32:9,25 34:7
36:17 40:16 47:4
49:17 50:14 56:21
56:23,24 58:4,14
59:2 63:22,24
64:20 66:13 67:2
75:9,13 79:23
80:5,6,18 81:11
88:22 89:15 108:5
110:10,19 111:2
115:22 118:12
120:13 122:2
123:6 127:8
129:18,22 132:14
136:24 140:11
145:4,8 148:12
164:18 165:18
168:17 177:15
183:14 187:25
188:20 191:8
192:12 193:8
209:6 216:23
217:2 219:5
220:10 234:2

Patricia G. Moorman, M.S.P.H., Ph.D.

236:1 266:18
272:5 273:11
284:8 291:2,10,23
294:9 303:25
304:8 310:15,19
313:2 314:16
315:20
**benefits**
206:18
**Benign**
20:20
**Berg**
169:1
**Berge**
6:10 169:1,5 170:2
171:5 172:17,21
172:25 194:18,20
195:10 212:16
213:15,20 214:9
214:17 215:2,4,12
215:15,17 269:3
270:2
**best**
43:10 320:8
**Bethea**
30:1
**better**
190:5,23
**bias**
7:14 103:14 110:15
132:23 159:11,16
159:18,18 160:1,4
164:11 176:16
185:7,20 186:6,11
190:10,10 203:7
203:12,23 204:9
204:10 205:14
206:9 207:13
220:23 221:1,7,12
221:13,19 226:11
226:22 229:2,3,14
230:7,12 231:4,4
231:11,12,17,17
231:20 232:5,10
232:13,20 237:17
238:10,24 239:8

239:12 240:1,11
240:16,19 241:6
241:14,19,19,24
242:4,5,8,20,22
243:4,10,17 251:3
251:7 254:10
270:10,15,16
**biased**
231:22
**biases**
160:11 164:13
171:13 177:5
230:22 231:23
264:7 266:15
270:17 271:3
**BIDDLE**
2:21
**big**
100:1 229:15
**binder**
4:17 35:7,19 36:2
273:13
**biologic**
205:12 254:13,15
297:19
**biological**
48:14 87:11 88:16
117:12 121:4
181:11 182:6
183:10 309:6,15
313:13
**biologist**
53:21 57:4,18
**biology**
53:20,22 57:9,10
309:16
**bit**
12:1,5 59:4,14
134:24,24 143:6
144:13 148:3
154:23 155:20
161:17 234:15
288:20 289:5
291:11 314:17
**Black**
284:25

**blanking**
12:12
**blogs**
30:17
**board**
293:17
**bodies**
146:9,25 254:9,12
**body**
7:10,13 56:22
60:13 63:10 64:18
89:9 102:10,20
103:19,21,24
104:22 105:7,13
105:17 106:19
107:5,13,17
111:15,22 112:17
128:24 129:8,9,13
131:5,17 132:2
142:12,13,22,25
144:15,17 155:13
156:11,21 161:12
174:7 178:12
197:20,25 199:11
199:14 200:16,25
201:12 202:4
227:15,19,21
229:14 231:3,6
237:15 239:15
253:20 254:7
255:1 260:10
262:3 263:18
312:16
**Bondy**
29:7
**borderline**
274:20,24
**Boston**
285:1
**bottom**
77:18 85:10 108:15
109:23 150:7
167:17,23 195:1
196:21 203:17
207:18 210:13,14
211:23 221:10

226:7,15 272:11
276:17 277:5
**Brad**
3:23
**Bradford**
111:8,11 182:21
183:8 244:3,20
247:15 248:24
249:15 258:23
263:9 292:3,8,17
308:12,20 309:5
309:14 313:14
**brand**
75:11
**break**
14:7 19:13 52:11
113:10,16 114:24
117:2 165:5
175:18 209:16
210:1,5 211:10
259:10
**breaking**
259:2
**breast**
181:24 182:1,2
225:21,23 254:1,5
**breastfeeding**
154:15,18,20,24
155:2,7,9,15,16
156:12,17,23,25
157:4,13 293:5
305:9
**Brennan**
2:23 8:11,11
173:13 259:7
**briefly**
264:14 311:18
**Britton**
7:15 237:15,25
**Broadhollow**
2:12
**broadly**
128:21
**Brock**
1:21 320:3,22
**broken**

235:5
**brought**
23:10 33:25 34:4
35:7 54:24 59:13
59:20,21,24
126:18 221:7
**bulk**
311:1

---
**C**
---
**C**
2:1 3:1 5:9 6:22 8:1
320:1,1
**cadmium**
122:13
**calculated**
214:20
**calculation**
214:17,18 215:3
**calculations**
124:18 212:4,6
**California**
7:18 285:3
**call**
110:23 133:9
247:23
**called**
109:3 282:16
283:24
**calls**
94:20
**Camargo**
110:18 111:3
**Cambria**
1:17
**Campus**
2:22
**Canada**
145:16,19,23 146:3
146:8 147:6
150:17 253:14
305:16 306:21
311:18,22,25
312:1,3,14
**cancer**
5:12,14,17,20 6:3,4

Patricia G. Moorman, M.S.P.H., Ph.D.

6:7,10,12,15,19
6:22 7:3,4,11,11
7:14,16,17,21
9:19,25 19:10
20:21 21:15 23:5
25:12,16,21 26:9
26:25 27:5,11,15
28:12 29:2,2
30:22 31:1,24
32:12 40:19 48:15
52:3,9 53:20,21
53:22 54:15 56:21
57:4,18 58:17
60:4 62:22 63:21
63:24,25 66:2
87:1,5,12,14
88:23 89:1,11,17
90:19 92:14 93:4
93:9 94:14,19
98:5,14 102:8,13
102:15,24 103:20
104:5,9 105:11,15
108:8,23 109:14
109:22 110:10
111:9,10,13,23
112:10,18 113:1
114:12 117:14
120:19 121:3,6
122:13,17 124:3
124:24 125:6,8
127:4,4 128:11,19
128:20 135:13,18
136:8 137:1
138:17,20 139:4
139:18,24 140:16
141:12,23 142:3
142:14 143:2,10
143:14,15,21,23
143:25 144:17,18
144:23 145:6,9
146:4,12 147:1,19
148:1,10 149:4,10
149:23 150:12,23
150:24 151:11
154:19 156:12,17
156:23 157:1,3,4

157:13 158:13
160:20 161:11
166:8,20 167:5,6
168:5 174:11
176:16 181:15,18
181:24 182:1,2,7
185:14 186:19
187:7 188:15,25
189:5,10,16
190:13 192:24
193:6 197:1,7,8
197:15,20 201:12
202:23 203:24
205:20 207:23
209:6,9 210:21
212:10 213:1
218:19,22 224:19
225:6,21,23 226:4
226:18 227:17
228:11,17 229:25
231:7 232:7,11
233:13,23 234:24
237:16 245:9,11
245:15,21 246:9
246:24 247:8,19
249:2,14 251:11
252:25 253:12,25
254:1,4,5,8,17
255:8 257:25
259:23,25 260:7
264:1,10 265:5,20
266:3,21 267:22
267:24 270:8
271:25 278:13
283:3,19 285:10
285:17 286:14,20
291:21 292:5,13
292:14 294:25
295:2,4,7,20,22
296:7 297:5,10,14
298:16 299:25
303:2,5,10,14,20
304:2,5,10,19
305:5,13 307:25
309:16 310:12,16
311:2,9,13,16

312:2,5,23 313:9
313:12,16 314:7
314:15 315:16,20
316:3,9,18,23
**cancers**
5:18 54:15 113:24
  138:22 254:5
  285:14
**capable**
248:8 249:19
**capture**
50:5 59:8 60:13
**captured**
218:23
**carcinogen**
96:24 97:3,7,23,24
  97:25 98:22
  101:23
**carcinogenic**
96:4,18,22 98:17
  99:12,15 119:7
  122:19 123:5,24
  146:14 180:20
  253:3
**carcinogenicity**
122:23
**Carcinogens**
5:10
**Care**
3:11 8:18 294:15
  294:20
**career**
23:6 127:15,22
  156:20 295:8
**careful**
246:2
**carefully**
186:6
**Carolina**
1:18 135:18 137:1
  138:17,20 139:3
  140:16 285:16
  292:13 320:1
**carries**
92:3 207:18
**carry**

160:5,9
**carrying**
226:7
**case**
9:19,22,24 10:2,3,5
  11:10,21 12:3
  15:10,20 16:18
  17:7 31:21 32:20
  41:2 45:6 47:2
  59:1,8 60:12
  74:18 76:13 87:10
  106:8 115:20
  116:10 119:17
  120:8 125:16
  152:15 165:24
  174:18 175:23
  179:8,15 180:12
  197:6 216:23
  229:8 232:15
  268:3 289:10
  295:12 305:4
  308:25 312:22
  319:2,4
**case-control**
7:7 20:22 170:23
  171:11 185:6,21
  187:8 195:20,21
  196:22 197:8,13
  198:2,4,22,25
  199:13,22 203:19
  205:15 207:13
  208:12,18,22
  211:7 213:8
  214:14 220:20
  226:12,21 227:1
  227:14,19 228:2
  228:14,19 229:1,4
  229:11 230:1,8,14
  230:17,21 231:15
  231:19 232:13
  238:11 241:11,18
  243:17 264:13
  266:19 267:5,17
  268:19 270:9
  284:9 285:5,5
  300:20 301:3,11

301:22
**case-controls**
198:7,8 269:24
  271:6
**cases**
1:9 6:19 11:13,20
  12:2,4 15:20
  104:12,13,15
  107:15 199:25
  200:1 212:14
  213:1,3 239:17
  261:19 264:5
  275:13 284:18
  303:10
**categories**
217:21
**categorize**
35:2,2
**category**
140:7 252:12,18,20
  258:8 274:4,10,13
  275:12
**causal**
90:17 92:13 142:23
  143:18 145:19
  146:5 158:3,20
  159:2 163:13,15
  164:3 166:15,25
  168:3,12,17
  169:22 170:11,25
  174:9 176:13
  178:6,15 181:14
  182:11,18 185:15
  195:15 245:7,13
  246:14,15 250:2
  250:19 251:24
  252:4,7,15,23
  253:1 255:15,16
  255:22,25 256:14
  256:19 257:3,8,19
  257:24 258:9,20
  259:1 269:16
  308:24 309:11
**causality**
143:9 144:2 149:6
  159:7 174:16

Patricia G. Moorman, M.S.P.H., Ph.D.

182:23
causation
163:4,6 164:8
166:5 168:9,22
169:6,10 170:3
172:21 173:18
174:1 175:8 176:2
176:5,25 177:13
177:21 178:25
181:2,20 183:3
254:21 255:5
256:5,7 257:1
258:1,11,13
310:11
cause
5:11 9:25 31:23
87:12 88:22 98:5
102:8,12,15,23
108:8,22 111:10
120:18 121:2
122:13 124:24
125:8,15 142:15
145:5,9 146:3,12
147:1,18 167:9,15
179:22 182:2,8,16
183:11 294:24
302:24 303:1,19
304:2 307:1,25
308:7 310:12
311:6,9 312:4,23
313:9,16
caused
166:20 167:3
225:23
causes
5:17 86:25 87:4
105:11 141:12,13
141:23,24 150:11
167:6 181:18
295:4 304:10
305:5
caution
160:15,18 163:15
168:9 240:14
cautionary
164:7,10

caveats
218:4
ceased
317:8
cell
53:2 58:20,24
60:25 61:6 62:3
63:4 156:23
303:13
Central
7:17
certain
39:15 121:2 168:3
168:12
certainly
25:1 52:14 60:18
78:9 86:12 102:5
145:14 211:3
218:11 237:1
239:3 245:8
247:15,16 248:25
249:2 250:17
256:18 257:5
264:12 292:18
certainty
59:15 80:8 102:18
certify
320:5,12
chair
290:1
chance
49:25 103:14
change
10:8,12,19 43:15
43:17 51:21 52:10
111:5 125:22
changed
193:25
changes
10:15,20 18:23
38:12
changing
69:13
characteristics
199:8
characterization

caveats
53:17 201:5 247:2
characterize
67:14 97:2,3,6,9
160:8 162:23
184:22 249:8
characterized
49:17 75:25 184:20
charging
14:16
chatroom
30:17
check
21:16 216:23
checklist
101:25 103:8,11,18
Chemistry
85:7
Chicago
3:19 285:6
childbearing
182:4
choose
289:19
chose
288:9
Chris
13:3
chromium
119:12,15 122:13
chronologically
173:4
CI
137:20 138:10
139:20
cigarette
141:11
cite
32:16 95:2,5
146:11 158:18
183:17 192:14
211:24 212:1
213:20 214:1
221:18 222:14
226:8,10 242:7
243:2 244:14,17
244:19,22 246:8

251:9,15 253:4,8
254:2 256:19
273:7 276:9
cited
45:6,25 46:4 51:1
66:20 78:17 123:1
123:3 152:17
183:20,21 206:24
207:3 230:12
246:17 250:8,9
253:23 255:1
273:1,9,21 277:17
cites
104:19
citing
242:12 272:24
279:16
claim
68:20,24 70:22
75:17 102:12
108:7 118:24
119:6 121:11
276:10
claimed
292:4
claiming
198:23 199:1 267:3
267:16
clarified
129:5
clarify
91:21 115:17 120:9
130:2 142:17
144:5 267:21
clarifying
117:9
clarity
16:2
Clarke-Pearson
44:5 290:3,5
classification
103:8
classifications
96:25 252:14
classified
96:11 252:12,17

classifies
155:24
clear
23:14 47:23 91:5
93:24 100:12,14
128:16 130:15
248:13 275:5
276:4 303:13
311:5
clearing
29:22
clearly
90:20 92:15 120:5
143:21 182:1
197:2 236:12
clinicians
316:8,12
clock
200:23
close
137:8,10 138:6,14
265:14 279:25
closed
291:17
coauthor
20:23 25:22 26:7
138:24 292:11
coauthors
28:20 29:9,12,24
30:3,6 239:6
285:15
cobalt
119:12,15 122:13
cohort
7:7 90:21 92:17
104:11,18,19
170:24 171:11,13
185:12 186:13,16
186:18 187:7
188:13,14,24
190:4 191:3,7
192:5,8 194:9,25
195:22 196:22
197:7,13,22 198:2
198:4,20,24
199:12,15,19,24

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 328

200:2,18 201:1,13
202:7,10 204:14
204:17 205:7,21
205:25 206:1,5,9
206:18 208:1,6
210:15,25 211:20
212:9,24 213:5,9
214:14 215:18
216:6,17 218:8,16
218:18 220:2,6
226:21 227:1,20
228:2,19 229:5,12
230:2,10,14,18,20
231:23 263:15
266:20 267:4
268:10,19 270:9
270:15,17,19
284:9 285:1,2,3
300:19,24 301:8
301:22 302:1
315:16
**cohorts**
104:8 198:6,8
206:10 212:2
220:8 263:24
265:24 269:24
271:6 308:25
**coin**
240:2
**coinvestigators**
285:15
**collaborated**
54:6
**collaborators**
29:4
**colleague**
294:11
**colleagues**
31:9,15,18 32:1,8
127:2
**collect**
222:19 284:3 285:9
**collected**
283:10,13 284:5,7
**collecting**
160:3

**collection**
233:12 283:14
285:14
**college**
182:1
**column**
92:8 94:7 167:17
180:17 203:3,17
210:13 212:20
238:2 240:6 270:3
275:2
**combination**
46:24
**combine**
159:8,13 160:9
161:4
**combined**
140:17 188:22
210:21 215:13,16
244:15
**combining**
158:25 159:25
160:10 187:4
215:22
**come**
29:7 72:6 116:17
143:8 144:1
145:16,19 258:23
280:4 309:16
**comes**
48:17 104:6 198:1
243:7 266:8
316:25
**comfortable**
65:13 81:18,24
98:4 255:3
**coming**
138:16
**comma**
204:21
**commenced**
36:10
**commencement**
185:10
**comment**
153:11 158:7

172:11 211:20
214:22 216:2
305:23 306:3,9
**commentaries**
212:8
**commented**
157:12
**comments**
84:7 212:1 223:12
**commercially**
75:12
**committee**
8:21 314:9,13
**Committee's**
4:18 36:18
**common**
226:1 261:22 305:6
305:7
**commonly**
111:16
**commonly-cited**
232:12
**communicate**
22:13 24:1 293:16
**communicated**
237:24
**communication**
22:16 24:3
**communications**
12:25 13:11 17:3
25:5 28:1 32:1,6
**community**
141:22 145:5,8,13
147:18 148:14
149:17 174:3
248:17,19 285:3
313:23
**community's**
145:10
**company**
67:20 68:3 71:7
72:1,8,13 82:15
126:24 127:9,12
127:14
**comparable**
155:14

**comparative**
5:18 138:23
**compare**
27:14 154:20
**compared**
234:23 265:5
269:24
**comparing**
39:25 132:9 138:3
154:14 227:13
260:18
**comparison**
7:6 138:2 143:20
247:18 255:12
300:19 301:22
**compatible**
134:21
**compiled**
41:24
**complain**
191:2
**complaints**
192:1
**complete**
78:4 171:25 241:21
293:11,13 305:22
306:8,14 318:5
**completely**
41:12 43:12 227:15
228:12 241:23
299:17 300:25
**completeness**
44:3 78:9
**compliance**
282:3
**component**
115:24 117:15
**composition**
281:18
**comprehensive**
41:11 47:3,5 56:11
56:15,22,24 57:12
57:25 58:10,19,22
58:25 60:2,17,24
62:1,17,20 63:3,9
63:16,19,23,23

64:2,6,17 65:5,9
65:11 82:3 156:15
156:18 157:6,15
157:15,20
**comprehensively**
156:21
**comprised**
212:25
**computer**
24:19
**concede**
159:23
**conceded**
271:5
**concern**
161:25 164:14
215:11 218:20
228:23 233:7,9
238:10,21 251:3,6
**concerned**
177:6 239:7
**concerning**
25:11 30:17,21
31:1 121:18
**concerns**
164:2,11 192:8
227:8 238:17
263:16 306:10
**conclude**
95:9 125:8 147:14
155:15 163:4
169:5 170:9
173:18 176:1
177:12 179:21
229:14 240:25
256:5,7 262:19
266:2 275:19
304:1,9
**concluded**
96:2 108:11 146:11
146:25 147:13,18
174:15 183:2
252:3 258:11
276:12 295:20
**concludes**
150:8 181:9 302:12

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 329

317:5
**concluding**
96:21,23 103:14
275:15
**conclusion**
66:9,12,15 69:15
78:17,21 81:17
92:23 93:8,10,15
95:2,6,12 96:7
109:14 111:5,9
123:9 125:23
141:4 142:23
143:8,18 144:2
145:15,17,20
146:13 147:24
150:16 156:9
163:12 169:7,8
176:9 178:7 179:5
182:18 207:11
226:24 250:20
252:7 257:1
258:24 263:4
265:17 266:7
276:6 303:16
306:25,25 307:21
308:24 309:11
310:21,23 313:15
**conclusions**
72:2 98:4 108:14
110:12,24 122:18
126:13,25 154:3
155:19 162:25
171:5 177:20
178:25 184:25
185:1,3 193:24
195:9 227:3,24
230:25 277:6
290:17 313:11
**conditions**
20:21
**conduct**
56:10 57:25 58:10
58:19,25 60:2
64:17 65:4 66:14
66:22 82:2 156:15
225:10 291:22

314:3
**conducted**
56:10,21,24 57:12
60:24 62:20 63:9
63:11 65:11
124:17 157:13,16
222:15 262:11
291:21 320:5
**conference**
25:8
**confidence**
134:20 137:17
265:10,12
**confident**
178:17
**configured**
17:22
**confirm**
15:6 146:7
**confirmation**
185:11 186:13
**confirmed**
18:12 289:8
**conflating**
249:3
**conflict**
23:20 28:2
**conflicts**
23:8 108:7 110:5
153:4 214:2
305:12
**confounder**
19:19 20:24 21:6
26:22 28:14
286:16
**confounding**
103:15 159:12
160:4 176:11
177:5 286:2,10
**confusing**
16:17 258:4
**Congress**
3:3
**conjunction**
22:9 37:6 130:10
135:21 261:2,9

**conscious**
294:1
**consensus**
145:10 148:13
150:10,18
**consider**
26:13 44:21,23
52:23 53:1,4,7,10
53:13,16,19,22,23
54:1 57:5,10
69:19 70:9,10
82:17,22 105:1
111:15 122:25
177:4 198:16,19
212:15 218:4
230:22 250:2,14
250:15 254:12
261:1,5 263:7
301:2 302:4 305:8
316:8
**considerable**
232:21 233:1
238:13
**consideration**
218:15 293:24
309:13
**considerations**
219:15 245:1
249:16 250:22,25
272:2
**considered**
4:17 5:3 27:17
28:13 35:25 39:2
39:9,22 45:20
47:8,15 49:11,18
54:21 57:2,9,16
58:5,6,16,21,24
59:2 78:24 116:2
127:15,20 152:9
152:14 154:2
158:2,19 186:6
197:24 198:20,21
212:8 213:15,18
221:15 222:1,9,24
240:10,11 243:15
253:17 254:15

260:6 286:15
295:6,21 302:6,9
309:17 312:17,18
313:13
**considering**
26:15 132:20 179:3
242:3 247:11
253:6,12 261:3
266:12 270:14
272:13,15 279:18
292:7,8
**consistency**
45:1 161:16 205:10
244:8,12,15 262:2
262:3,4,19 263:6
263:10,10,14
266:19,24 267:20
268:4,13,22 271:5
271:14
**consistent**
162:7 250:1 262:10
263:8,19,23 267:4
267:11,17 268:20
269:2 306:25
313:11 316:6
**consistently**
226:23
**consortium**
26:8,11,12 27:1,9
27:14,18 29:19
30:2 283:25 284:6
284:13
**constituent**
117:13 121:20,24
122:4,24
**constituents**
116:3,5 117:8,10
119:23 126:6
129:14 180:21
296:12,16,19
297:4,9,24
**constitute**
320:10
**consulted**
149:8
**consumers**

281:12
**contacted**
11:5,8,18,24 23:10
284:19,23 291:24
**contain**
18:10 21:20 70:16
81:15,23 88:8
106:14 129:25
296:12
**contained**
36:1 71:18,20 87:7
88:2,7,12 125:5,7
125:20 294:7
298:10
**container**
69:6 70:13
**containing**
15:5 78:1
**contains**
40:22 49:20 69:7
**contaminants**
119:24
**contaminate**
64:4,8 86:10
**contaminated**
71:2 75:7 79:2
105:10,22 106:9
112:9 114:6
124:21 125:14
**contaminates**
64:19 65:3,18
68:20 86:21
**contamination**
67:12 68:12 71:14
72:2 73:3 75:18
75:20 76:5 79:15
84:8 86:1 109:19
**contend**
86:21
**context**
26:21 75:25 87:15
93:11 104:23
105:8
**continue**
16:16 99:9,25
100:8 207:16

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 330

218:5 283:14
285:13
**continued**
3:1 5:1 6:1 7:1
102:20 139:11
283:12
**contraceptive**
127:3 222:21 254:1
305:10
**contraceptives**
254:4
**contrary**
97:19,23
**contrast**
223:7 231:7 268:5
**contribute**
117:14 214:13
**contributed**
164:15 186:7
**contributes**
117:11 121:4 200:2
**control**
5:17 106:25
**controlled**
166:22
**controls**
6:20 239:18 308:25
**controversial**
94:15,21
**Convention**
83:11
**conversation**
285:23
**conveyed**
82:18
**conveying**
241:9
**convinced**
111:2
**copied**
35:14,16
**copies**
34:16,20 35:25
  37:23 55:2 136:10
  139:7 149:25
  165:1 173:11

175:21 180:9
202:14 227:5
234:13 237:18
273:19 307:17
**copy**
14:25 17:16 19:24
  20:4,7,10 24:25
  32:19,24 33:18,18
  36:11,25 37:9,15
  37:22 41:15,19
  45:5 49:10 54:23
  77:3 84:22,23
  91:12,14 147:9
  149:22 151:6,7,10
  153:15 165:14
  293:23 307:13
**cornstarch**
129:18,23,24 130:4
  130:5 131:3,8
**correct**
9:19,22,25 10:1
  11:3 17:7,11
  18:14,14,20 19:6
  21:21,22 22:23
  23:15 27:6 33:15
  35:8,9 37:7,8
  38:22 40:25 42:17
  43:23 45:13,14
  51:3 54:17 55:19
  57:9 62:4,22 65:5
  69:19 72:15,23
  73:4,7,12,13,17
  73:18 80:12 85:8
  90:5,6 93:11,13
  93:20 94:1,21
  95:18,19,21 96:22
  96:25 97:1,4,5,7,8
  97:10,11,13,20
  98:8,17 99:13
  100:23,24 101:14
  103:10,22 107:6
  108:1,4 109:4,15
  110:6 112:12,24
  117:17 119:12,18
  120:9 123:20
  126:15,20,21

128:5,6,14,25
129:5,14,17,21,25
130:5,6,8,9,12,17
131:9 132:3,15,16
132:25 133:4,17
134:17 135:14,19
135:22 137:8,13
137:21 138:18
139:13,18,19,20
139:21,25 140:4,5
140:7,14 141:5,8
141:9 144:10,19
145:6 147:13
152:23 159:9,10
159:11,12,16,19
159:20 160:1,6,21
160:22 161:1
165:24,25 166:2,3
168:7,10,18
169:14,24 171:2
174:2,12,18,24
175:1 176:5,21
177:10,11,22
179:1,8,16,20
180:12,13 181:2
182:19 183:3
184:17 185:21
188:15 189:1,5,7
189:10,11,12,13
189:16,24 190:5
191:15,18,20,21
191:24 192:6,11
193:7,8,13 194:6
194:13 195:1,2,4
195:5,7,8 196:11
196:16 198:9
202:25 205:4,5
206:1,25 207:8,9
208:2 210:10,11
211:21 212:2
213:21 216:7,12
216:15,22 217:1,5
217:10,11 218:2
219:13 220:9
224:18 225:17
226:5,8,9,18

227:9,11 228:3
233:19 234:3,25
235:1,9,12,13,15
235:19 236:22
238:4 243:18
244:9,10,12 252:4
252:18,23 255:16
257:15 260:16
261:3 265:9,22,25
269:4,17,21,25
271:7,21 273:1,5
273:10,23 274:1,5
275:16 276:10
277:20 279:9
281:17,25 282:4
283:6,21,22,25
286:3,12 288:11
289:10,14,15,17
289:18 293:20,24
296:5 298:25
299:10,25 301:18
306:18 308:7
309:2,11 312:10
312:25 313:1,4,5
315:17,18 318:4
**correcting**
160:13
**correction**
17:14,17 18:6,19
  23:24 49:15
**corrections**
18:23 318:6
**correctly**
78:2 132:24 196:3
  214:21 228:11
  274:7 276:23
  277:15,16 298:20
**correlates**
25:19
**corresponding**
22:10,17
**cosmetic**
6:14 9:25 77:25
  79:12 85:15 112:8
  112:11 114:9,14
  114:17 120:18

210:19 223:17
**cosmetic-grade**
77:24
**Cote**
21:13 29:8 31:12
  31:12
**COUGHLIN**
3:7
**Council**
3:12 8:18 294:15
  294:21
**counsel**
8:6 9:5,12 12:7
  13:18 14:25 17:23
  20:3 22:23 33:17
  34:15 36:11 40:14
  41:24 44:12 46:25
  48:21 49:4,7,25
  59:22 67:21,23
  68:5,8 72:10,15
  72:21 74:14 77:4
  82:17 83:17 84:15
  84:24 118:22
  145:25 163:25
  280:15 289:17
  291:2,16 294:14
  302:21 310:3,8
  315:11 320:12,15
**counsels**
14:16
**count**
151:18
**COUNTY**
320:2
**couple**
55:3 89:4 113:15
  187:23 240:18
  243:25 291:3
**coupled**
313:12
**course**
76:6,12 95:8
  149:19 156:20
  157:2 162:16
  255:19 299:14
  301:10 309:14

Patricia G. Moorman, M.S.P.H., Ph.D.

315:3
**court**
1:1 8:7 14:3 100:4
100:11 116:17
320:3
**coverage**
238:14,18
**covered**
236:24 282:7
**Cramer**
188:20 242:2,16
243:3,6
**create**
231:5
**creates**
190:10
**credible**
66:6,13 69:14
70:15 71:14,22
75:17 81:2,8,11
81:14,22
**credit**
69:18 70:8
**crediting**
193:11,15
**criteria**
143:8 144:1 184:9
244:20 245:3,5,10
245:20 246:3,5
249:16 255:25
292:8,17 313:13
313:15
**critical**
261:1,5
**criticisms**
214:18
**critique**
193:9
**critiques**
219:6
**cross**
137:19
**CROSS-EXAMI...**
280:15 294:14
310:3
**crosses**

134:6 137:12
138:11 139:20
**crossing**
134:7 137:20
**Crowley**
44:6 120:8 123:15
124:11,12,14,17
**Crowley's**
120:10,11
**CRR**
1:21 320:22
**cultural**
25:15
**cumulative**
274:4 275:7,16
276:3,13 277:19
278:16
**curiosity**
44:18
**current**
88:14 174:7 238:9
285:8 292:2
**currently**
26:4 79:12 85:16
90:4 285:13 286:1
305:19 306:3
**Curriculum**
4:13
**cursory**
43:13
**Curtis**
40:1
**cut**
14:22 307:12
**cut-point**
287:17
**CV**
19:25 20:4 21:3
25:13 29:6 33:19
**cytotoxicity**
53:5

_____
**D**
**D**
8:1
**Dan**

242:2,16
**Daniel**
44:5 290:2
**data**
27:10 39:2,9,22
47:6 57:6 85:17
89:14 95:6 114:16
114:22 121:1
124:2 125:3,4
134:13 136:25
139:3 140:16,17
142:2 143:10,13
143:14 144:2
154:12 158:9,25
159:8,14 160:1,3
160:10,11 161:4
161:11,22,24
162:16 166:17
176:11 178:18
179:4 182:22
187:21,23,25
188:18,22 189:2
190:12,14 192:15
194:9 195:3,6
196:11,16 197:22
197:25 198:3
199:15 200:18
201:1,13 202:8,10
204:14 206:1,19
208:1,15 216:14
222:19 224:4,6
233:11 235:5
236:3 238:3
240:10 242:18
245:15 263:1
266:8 267:10
270:19 274:1,8
279:5,16,17
283:10,12,14
284:3,4,7,15
285:9,14 287:3
293:2,5,11 297:14
297:20 298:9
303:15 307:24
309:16 310:20,23
311:14 315:16

**date**
8:3 14:20 132:2
133:4 163:1,4
174:12 191:12,12
235:6,8,12 242:17
282:19,25 283:9
295:5 314:16,18
318:10
**dated**
5:5,7
**dating**
295:11
**David**
44:5 290:1
**day**
17:24 37:11 99:10
294:6 314:24
320:18
**day-in**
126:12
**day-out**
126:12
**days**
145:24
**DC**
3:14
**deal**
116:16 229:15
268:22
**dealing**
227:16
**dealt**
310:15
**decades**
131:7 162:11
208:16 220:19
243:25 262:15
**December**
153:20
**decide**
172:10
**decided**
97:16
**decimal**
274:21
**decision**

108:21 109:4
187:24 188:7
**decisions**
193:18
**declared**
100:22 101:17
103:2 258:9
**declares**
103:13
**decrease**
225:1 274:9
**decreased**
154:19 225:9
**deemed**
243:16
**deeply**
244:12,20
**Defendant**
3:2,11,17 11:13
280:15
**Defendants**
1:16 2:16 8:10,12
9:6,12 280:20
294:14 302:22
315:12
**defense**
73:25 74:8,15,17
**defer**
120:2 296:19,24
297:3
**deferring**
120:5 297:16
**define**
190:17 287:15
**defined**
184:10 249:22
282:25 283:2
**defines**
37:17
**definitely**
146:5
**definition**
248:4,13,16
**definitions**
33:14
**degree**

Patricia G. Moorman, M.S.P.H., Ph.D.

89:15 157:8
242:18
**delays**
25:15
**Delores**
5:18
**demonstrate**
263:25 268:13
313:8
**demonstrates**
161:16
**deodorizing**
129:20
**department**
31:15,18
**depends**
114:1
**depict**
301:20
**DEPONENT**
318:1
**deposed**
9:18 10:2,5
**deposition**
1:11 4:11,15,19 5:4
8:5 9:11 10:9,13
10:21,24 11:3
12:6,15 13:22,23
19:1,2,8 20:3
22:19 23:3,5,15
25:11,14,25 30:22
31:2,4,7 32:11,20
33:7,10,25 34:5
34:18 36:13,19
38:10 47:18 48:5
48:10 56:3 289:6
291:4,11,12
292:22 317:6,8
**depot**
154:7
**deps@golkow.com**
1:25
**depth**
63:16
**describe**
27:9 52:5 137:2

155:17 157:18
159:6 162:20
166:6,15 181:25
193:20 194:2,4
197:11 198:10
217:19 223:6
229:16 249:12
253:3 256:15
261:21 277:13
287:6 288:24
293:9
**described**
21:6 22:10 27:4
31:13,20 33:24
39:21 75:12,14
107:15 166:10,11
180:4 243:5
251:10 260:8
263:14 285:11
288:6 301:9
**describes**
71:7 263:10
**describing**
26:8,11 27:14
29:19 48:13
147:23 215:15
216:16 251:12
**description**
4:9 5:2 6:2 7:2
286:17
**descriptors**
289:3
**design**
169:21 195:14
196:8 197:1,16
198:14,23 208:11
227:2 231:9
263:11 268:14
269:7,15 271:2
301:2,5 302:2
**designating**
96:20
**designed**
284:2
**designs**
199:6,6 231:1,2

**desirable**
190:8
**desire**
208:1
**Despite**
205:10
**detail**
39:18 43:12 44:3
57:19 64:1 154:23
157:9 188:6
193:20 194:3
214:19 242:3
253:24 254:8,16
255:7 260:8
292:18 307:7
**detect**
83:5 213:5
**detectable**
70:14
**detected**
75:23,24 82:13
**determination**
299:22,24
**determine**
43:7 98:16 99:12
103:9 108:21
121:14 225:14
226:22 300:24
**determined**
283:5 298:23 299:9
**determining**
249:17,19
**detracts**
169:21 195:14
269:15
**detriment**
166:13 167:1
**developed**
41:7 101:14 131:6
218:21,22
**development**
94:13
**diagnosis**
25:16
**differ**
67:3 161:9 228:1

271:7
**difference**
39:7 86:16 100:1
105:12 226:25
316:1,17
**differences**
106:17 171:12
188:3 214:13
231:25 316:13
**different**
23:4 44:2 45:21,25
52:7 56:16 57:20
86:12,15 95:11
98:7 105:9,16,16
105:21 106:7,11
126:19 131:11
143:4,5,6,11,11
143:11 144:12
146:21 179:5
190:17 195:23
196:8 227:15,22
228:12 231:2
262:12,13,14,23
270:24 287:5
288:16 315:20,21
316:9,18,22
**differently**
141:3,19 142:4
144:13
**difficult**
72:6 74:2 221:1,2
**difficulty**
65:21
**direct**
55:5 307:19
**direction**
155:8 262:22
263:20,22 264:13
266:14,24 267:9
267:20 268:23
269:1
**directly**
19:17 60:21 122:16
232:11 281:12
**disadvantages**
196:24 199:7

**disagree**
150:15 155:25
156:8 201:4
208:12 209:3
214:8,10 215:20
215:23 247:1,4,5
247:9 279:9,13
**disappeared**
194:12
**discerning**
248:9
**disclose**
22:6,8,10 27:22
28:17
**disclosed**
21:11,13 23:12
24:8 27:20 28:16
285:20
**disclosing**
24:7
**disclosure**
21:8,17,17,20,23
23:11,22 24:2,12
25:5 27:24 28:2
**disclosures**
22:18 23:7
**discovered**
88:10
**discuss**
22:11 28:9 109:25
152:22,25 191:7
217:8 220:1 224:9
225:2 232:19
234:3 256:3
260:20 262:6
**discussed**
16:23 25:6 28:8
31:8 50:9 76:17
89:20 107:20
112:23 138:25
146:13 152:17
159:23 186:12
216:13 235:19,20
240:17 253:2
260:6 263:2,16,21
264:6 266:15

Patricia G. Moorman, M.S.P.H., Ph.D.

285:21 296:13
297:11 300:11
305:17 306:21
309:5
**discussing**
178:23 179:7
224:23 238:4
301:16
**discussion**
21:12 85:7 107:14
108:3 156:10
177:18 219:21
239:1 271:17
287:4,12 300:13
300:19 302:18
304:22 308:6
310:13 315:8
**discussions**
32:10 311:19 314:7
**disease**
107:12,16 110:13
141:13,24 167:2,3
261:19
**diseases**
114:19 253:7,13
254:25 257:22
316:10
**dismiss**
257:7,12
**dismissing**
257:11
**disparity**
229:25 231:5,8
236:9
**dispute**
220:4
**distinction**
131:13 135:1,4
215:14 220:23,25
223:21 235:22
278:22
**distinctions**
12:5
**distinguish**
11:24 303:2 316:14
**DISTRICT**

1:1,2
**DMPA**
154:7
**Doctor**
29:22 91:10 109:11
110:3 131:23
163:8 194:21
232:3 264:14
295:25
**document**
1:9 5:8 33:10,15
64:11 67:17 76:16
76:17 77:12 84:11
124:8 127:9
145:21 146:6
147:6 152:3 291:1
**documents**
34:2 64:10 67:16
67:19,20,23,24
68:3,4,10,11,14
68:15,18 69:2
72:1,7,8,9,14,14
72:19,22,23 82:13
82:15,18,23
126:25 127:8,13
127:14 145:23
146:3 152:20
**doing**
10:18 21:13 31:13
31:15 206:4
222:18 227:12
239:9 243:23
285:13 292:7
**domain**
47:16 48:1
**Donath**
3:9 8:15,15 69:10
173:12
**Dorota**
7:4
**dose**
272:15 273:4
298:16,22 299:9
299:14 300:7
**dose-response**
35:4 156:24 271:16

271:17,20,24
272:6,9,14 273:9
273:21 274:16
275:6,16 276:3,4
276:13 277:6,18
279:13
**dozen**
30:3 89:6
**dozens**
40:21 125:22
**Dr**
4:23 8:5 9:8 19:24
21:5 29:7,7,8,25
31:12,16,16 33:3
33:6 34:15 35:17
35:23 36:20,24
37:4 38:20 41:16
41:20 42:2,5 45:4
49:14,24 52:21,23
55:14 56:6,8
57:25 60:10 61:3
61:8,14,19 64:14
67:12 69:22 73:14
73:17,19,23 74:3
74:19,22 77:1,12
78:17 80:11 84:2
84:22 85:2,4 90:8
91:5,11 92:1,5
94:6 95:16 107:25
108:14 115:8
117:2 118:10
119:11 120:8,10
120:11 124:11,12
124:14,17 128:3
128:16 130:15
136:6 139:10
140:19 144:9
150:3 151:9,22
153:10 157:22
165:14,22 167:16
171:16 172:12
174:20 175:13,21
180:11 184:24
195:12 196:20
200:11 201:9
202:18 209:23

211:19 218:24
219:25 234:16
235:4 237:21
238:3,17 239:5,24
240:4 244:1
245:25 246:3
247:15 251:15
257:10 259:19
260:20 262:2
264:17,25 269:11
273:12 274:8
280:1,18 284:19
290:5,21,21 291:4
291:5,8,8,10,11
294:17 296:5
301:15 302:6,12
302:24 304:17
307:18 308:11
309:18 310:5,9
313:17 314:22,25
315:14 317:6
**draft**
26:13,16,17 28:6
28:15 283:24
285:25 286:7,11
286:15 305:18
**DRINKER**
2:21
**drive**
2:22 3:18 33:22
**dropping**
148:3
**Duces**
4:16,20
**due**
132:22 163:8
203:22 228:25
229:1 231:11
241:5 251:7
**DUFFY**
3:7
**Duke**
10:10 290:4
**duly**
9:3 320:6
**duration**

187:17 217:14,20
218:2 219:13
220:14,15 273:23
274:5,17 275:6
**Durham**
1:17,18
**Dusts**
5:9

_____

**E**

**E**
2:1,1 3:1,1 8:1,1
319:1 320:1,1
**earlier**
50:9 57:4 101:13
107:15 130:20
132:11 192:13,20
194:3 216:13
234:15,19 235:19
235:20 263:2
269:3,13,20
281:14 285:24
286:6 287:5 289:8
291:1 292:23
297:17 298:4
300:11 305:17
308:6 311:17
314:17
**early**
142:2 161:20,25
208:7
**editions**
288:16
**editor**
21:16,18 22:12
23:21 24:6 32:15
**editorial**
24:10 237:7,15,21
237:25 238:7
293:17
**educate**
78:13
**education**
181:25
**educational**
181:23

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 334

effect
25:14 103:6 154:9
155:8 180:20
190:20 226:25
262:22 263:20,22
266:15,25 267:9
267:20 268:23
269:2
effects
86:16 105:3 207:22
efficiently
40:5,8 43:7
effort
10:17 50:5 82:2
127:9 131:13
233:21 257:14
eight
240:7 272:24 273:1
273:3 302:14
either
52:6 80:21 113:8
148:24 160:11
215:3 255:21
291:6
Elba
1:17
elements
121:20,24 122:4,24
elevated
133:7 186:7 242:11
eliminate
159:17 203:6,13
eliminated
132:19 133:16,21
133:23 134:2
137:24 234:18
241:2
eliminates
203:12
ELLIS
3:18
eloquently
166:11
email
24:3,4,6,9,16,22,25
emails

17:2 24:5,14 32:6
embarrassed
223:25 224:3
emerged
174:14
emotions
223:4
emphasis
162:19
emphasize
51:18 186:12
197:22 203:4
206:4 302:3
emphasized
199:14 200:17
201:1,13 202:3,9
emphasizes
202:5 248:25
emphasizing
205:25
empirical
224:4,6
employed
290:16 320:13,15
employee
320:15
employment
10:8
employs
281:25
ended
219:4 283:8
engaged
27:25 30:16 31:25
engagements
30:25
enrolled
208:6
enrollment
218:8
ensure
24:21 127:7
entered
282:16
entire
89:9 91:19 253:20

256:16
entirely
132:22 188:1 241:6
entirety
42:25 43:1 85:22
entitled
41:15 85:6 92:4
135:12 136:7
138:22 237:15
environment
105:20
environmental
90:25 93:1
envisioning
301:17
epi
182:15
epidemiologic
34:25 45:3 47:6
89:3,16 90:1
106:23 107:3
119:8 125:3,4,22
134:5 138:23
163:6 166:10
182:10 197:25
207:20 224:21,23
233:12 243:23
248:16,18 253:5
260:3,12 263:1
296:3 297:14,20
298:3 299:13,19
303:22 304:3,14
309:1,7
epidemiological
5:18 131:6 174:8
176:20
epidemiologist
41:8 60:17 62:16
126:8,11 138:12
167:4 174:21
179:12 248:8
249:18 261:17
287:14,19 314:2
epidemiologists
141:2,18 166:14
167:7 250:9

290:22 313:23
epidemiology
5:14 6:6 7:12 29:2
56:18,20 62:21
63:11,17,20 66:1
106:21 119:5
128:19,20 197:15
250:17 278:24
281:16 283:4
286:23 287:7
288:10,14,15,22
epidemiology-foc...
289:22
epithelial
6:15 7:17 176:15
278:12 303:5,14
310:16 311:2,13
311:15
epithelium
94:13
equal
197:9,11
equate
183:11
equating
144:15,22,22
equivalent
142:13,18 181:20
181:21
errata
4:11 17:17 18:12
318:6
especially
142:2 185:8 284:15
ESQ
2:5,9,14,19,23 3:5
3:9,15,20
establish
174:9
established
90:20 92:15 168:6
168:10,13,14
179:10
estimate
16:14 72:5,7
221:13 267:25

272:16
estimates
7:6 226:25 228:1
229:5 230:9,17
231:21 232:14
296:25
estimation
258:8,8
et
5:13,16,19 6:8,10
6:12,17,20,23 7:5
7:9,12,18,21
ethnic
262:14
evaluate
224:15 233:3
286:19 293:11
evaluated
126:19 293:5
evaluates
293:2
evaluating
78:25 142:14
158:11 261:7
evaluation
183:8 198:14
255:25 284:4
285:10
evening
35:13 280:18 310:5
310:6
event
36:5
ever-users
278:18
every-use
264:22
evidence
44:21,23 56:25
66:7,13 67:8 69:4
69:8,14 70:12,15
70:17 71:14,19,22
75:18 81:3,8,11
81:14,22 82:11
85:13 87:9 95:10
98:12,13 100:25

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 335

| | | | | |
|---|---|---|---|---|
| 101:1,8,13,18 | examination | 184:10 | 17:24 37:1 | 291:3 292:6 |
| 102:1,6,7,8,14 | 9:5 157:14 302:21 | **exclusively** | **exist** | 293:22,23 294:4 |
| 108:24 110:14 | 315:11 | 128:12,17 | 232:6 | 294:24 295:11 |
| 138:14 141:11 | **EXAMINATIONS** | **excuse** | **existed** | 302:7,8 |
| 142:4,9,12,13,23 | 4:1 | 109:11 171:17 | 113:22 | **expertise** |
| 143:1 144:13,16 | **examine** | 191:16 215:3 | **existence** | 41:7 54:4,9,13,16 |
| 144:18,22,23 | 27:1 272:14 | 216:5 220:1 236:6 | 176:12 | 54:21 55:15 56:3 |
| 145:14,15 150:17 | **examined** | **exert** | **exists** | 56:16,17 57:3,7 |
| 152:1 154:8,13,15 | 9:4 114:14 186:19 | 180:19 | 175:5 | 57:18,20 58:23 |
| 154:17,20,21 | 205:18 313:4 | **exhaustive** | **expand** | 59:4,14 60:18,21 |
| 155:14,16,21,22 | 318:3 | 41:12 | 47:7 | 63:15,17 83:4 |
| 155:25 156:3,7,8 | **example** | **exhibit** | **expanded** | 90:2 121:22 |
| 156:11,16,22 | 39:25 48:12 74:18 | 4:10,11,13,15,17 | 47:11 | 289:23 |
| 158:3,20,24 159:7 | 112:11 114:3,6 | 4:18,21,22,24 5:3 | **expect** | **experts** |
| 168:17 169:6 | 141:20 142:5,21 | 5:4,6,7,8,11,14,17 | 106:15 112:10 | 16:24 17:3 30:6 |
| 174:8,13,16 176:1 | 142:22 154:4 | 5:20 6:3,6,9,11,13 | 113:23 114:8 | 44:17 60:20 73:6 |
| 178:5,12,15 | 158:23 159:17 | 6:18,21 7:3,6,10 | 162:4 204:16,21 | 73:7,12,22 74:18 |
| 199:21 205:12 | 167:14 171:12 | 7:13,16,19 15:2,3 | 206:5 229:4 | 271:4,7 289:9 |
| 207:7,20 208:4,19 | 181:22 199:23 | 15:5,15 16:10,19 | **expected** | 290:19 296:20 |
| 208:23 209:11 | 209:4 223:1 | 17:19,20 18:4,10 | 56:10 65:4 104:11 | 297:3,17 |
| 226:3,11 241:20 | 228:16 245:9 | 20:8,9 32:21,22 | 104:15 | **explain** |
| 246:13 254:20 | 282:24 293:4 | 35:11,20,21,24 | **expediting** | 39:7 88:15 110:15 |
| 255:2,23 257:4,8 | 296:14 297:13 | 36:17,22 37:10,13 | 31:6 | 204:9 215:24 |
| 259:22 260:11 | **examples** | 37:14 41:15,17,19 | **expensive** | **explained** |
| 271:10 293:3,3 | 141:8,16,21 142:20 | 42:25 45:7,8 | 209:8 | 241:21 |
| 295:9 296:15 | 144:10,11 245:13 | 49:10,12,16 50:1 | **experience** | **explains** |
| 297:12 300:12 | 256:13,18 257:9 | 61:15,17 76:24 | 106:5 224:20 | 231:13 |
| 302:25 303:25 | 257:18 258:25 | 77:2,17 84:20 | **experiencing** | **explanation** |
| 304:8,15 307:3 | 296:21 | 91:14,17,21 | 105:20 | 192:19 204:10 |
| 312:13,15,16 | **exceeded** | 107:22,23 136:7 | **experimental** | 213:11 215:18 |
| **evidence-based** | 122:3 | 136:11 139:6,8 | 166:17 174:7 | 241:22 305:3 |
| 159:4,5 | **exceedingly** | 149:22,24 151:13 | **expert** | **explanations** |
| **evident** | 114:11 | 164:21 165:2,3,18 | 4:21 10:23 11:6 | 231:24 |
| 278:17 | **exceeds** | 169:2,3 173:9,10 | 21:10 26:6 31:21 | **explored** |
| **evokes** | 267:15 | 175:17,19 180:6,7 | 37:7 42:20 43:18 | 88:25 |
| 223:3 | **exception** | 194:21 202:14,15 | 43:22,25 44:13 | **exposed** |
| **exact** | 264:10 | 204:25 205:1,2 | 52:24 53:1,5,7,10 | 105:14,18 213:2 |
| 46:17 89:5 103:11 | **excerpts** | 209:24 210:2 | 53:13,16,19,23 | 262:1 275:12 |
| 191:12 277:19 | 91:21,22 | 212:17 227:5,6 | 54:1,7 56:9,10 | 287:2 297:21 |
| 282:25 283:9 | **excess** | 234:6,10,11 | 66:5 73:3,25 | **exposure** |
| 314:16,18 | 235:14 | 237:14,19 264:15 | 82:17,22 88:3 | 5:11 7:17 48:15 |
| **exactly** | **exchange** | 273:16,17 276:15 | 101:16 124:15 | 87:3,6 88:16 |
| 40:9 102:24 103:17 | 234:19 | 291:1 292:22 | 127:21 139:1 | 90:18,23,25 92:14 |
| 105:4 112:21 | **excluded** | 307:14,15 | 174:17,21,23 | 92:18 93:2,12 |
| 118:19 232:2 | 218:16,18 | **exhibits** | 179:7,11 197:6 | 94:10 105:2,4,8 |
| 307:5 | **excluding** | 4:8 5:1 6:1 7:1 | 289:19 290:11 | 105:10,13,16,17 |

Case 3:16-md-02738-MAS-RLS   Document 33005-40   Filed 07/23/24   Page 98 of 131
PageID: 203227
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 336

105:21 106:4,8,12
106:15,25 108:22
116:4 143:6,22
151:25 176:14
182:7 187:17
189:19 190:9,19
191:14,16 197:19
204:1 208:9
210:18 211:4
217:19 218:9,13
220:1 221:2,25
238:12 240:22
251:21 259:24
260:7,21 261:2,6
261:13,20 270:23
270:24 274:10
300:6,24 303:22
311:7,8 312:1
**exposure-disease**
158:11
**exposures**
106:10 126:19,24
128:21 191:25
220:11,18 221:5
223:6 251:16
252:11,21 253:7
253:13,17 254:14
254:25 255:13,14
255:19 256:4,16
257:4,22
**express**
119:17
**expressed**
124:5 168:22
169:12 170:3
**expressing**
31:22 32:7
**expression**
25:24
**extent**
31:10 44:8,11
114:13 160:2
163:24 233:22
**external**
300:5
**extra**

37:23 77:3 84:23
165:19

─────────────
**F**
─────────────
**F**
3:9,13 320:1
**fact**
51:15 79:3 96:22
104:22 111:21
112:9 125:22
132:18 135:17
163:14 169:9
173:25 176:4
178:6 192:14
194:9 237:4 256:3
267:22 270:6
294:1 298:22
**factor**
28:12 114:15
151:25 155:24
166:16 181:20,25
182:5,7,25,25
183:1,7,11 187:21
192:9 196:25
224:15 232:19
233:4 255:22,22
261:21,24 286:2
286:11,20,22
292:16 295:7,20
295:21 296:7
297:5,9 305:10
316:20
**factors**
5:15 19:11 23:4
25:12 26:12,15,25
27:10,15,17 30:22
31:2 135:13,24
136:8 141:3 145:1
167:2 181:17
182:3 183:9
214:12 225:7
243:9,11,15,16
244:3 247:11
249:15 250:2
285:10 286:19
305:6,9,15 316:5

316:6,22
**factory**
105:19
**fair**
15:12 34:13 40:24
42:11 43:3 49:22
61:5 95:25,25
126:9 137:13
138:8,8 151:8
161:12 162:19,20
162:23 170:17
229:16,21 260:10
274:15 291:11
313:17
**fairly**
10:19 41:11
**fall**
134:16 300:19
**fallopian**
6:3 151:10 298:19
298:23 299:10,15
299:23 300:7
**falls**
301:17
**familiar**
13:24 45:10 103:11
111:7,21 157:7
173:6 237:22
**far**
118:1 212:20
**Faries**
2:9 8:22,22 12:11
38:3 77:6 259:6
**fashion**
243:4
**Fathalla**
40:19
**fault**
100:16
**fax**
1:24
**FDA**
5:6,7 76:13,16,25
77:21 80:3,14
81:4 84:3,6,23
85:8,11,25 86:5

290:2
**FDA's**
77:18
**feasible**
299:16
**feedback**
222:19
**feel**
21:18 39:18 65:13
81:17,23 82:7
178:17 223:25
224:3 255:3 262:4
**felt**
51:17 98:4 110:13
111:13 184:5
223:14 306:13
**fewer**
255:24
**fibers**
75:23 77:23
**Fibres**
5:9
**fibrous**
115:9,21 116:6,9
116:12 117:6,9
117:22 118:5,18
118:25 119:6
126:2
**field**
147:22 243:24
288:11
**figure**
17:25 194:23
269:21
**figured**
196:5
**finally**
16:21
**financially**
320:16
**find**
44:23 46:11 50:10
52:8 60:11 113:23
130:16 134:23
162:3 187:2 200:7
225:17 272:18

273:5 275:5
277:23 279:4
**Findeis**
2:14 8:20,20
**finding**
71:19 267:5
**findings**
73:23 74:19 81:4
85:7 131:7 152:23
152:25 198:15
214:13 262:10
267:1 302:7
314:13
**finds**
277:18
**fine**
23:1 28:19 35:18
78:10 153:11
280:2,7
**finish**
61:14 77:9 113:9
113:11,12 152:7
172:9,11 186:3
209:17
**finished**
146:20 148:6
159:15 284:10
289:13
**first**
9:3 11:5,8,14 20:19
25:16,18 29:15,16
72:23 90:11 92:8
116:9 128:4,6,10
137:25 142:21
169:13,15 181:8
185:2 188:21
200:20 210:8
211:23 221:24,24
233:7 244:11
260:8 262:6
264:18 270:3
276:16 282:14
289:24 291:22,23
294:23
**fish**
234:9

Patricia G. Moorman, M.S.P.H., Ph.D.

**five**
92:16 217:21
   252:11 254:13,25
   255:13 273:3
   277:18
**fix**
77:9 210:4
**flaw**
184:22
**flawed**
160:4
**flaws**
184:2,21
**Fletcher**
48:13
**flip**
18:9 49:25
**flipped**
151:18
**flipping**
49:20
**Florham**
2:22
**flow**
113:8
**FLW**
1:7 319:4
**focus**
19:17 135:23
   292:14 298:8
   303:11
**focused**
27:13 66:3 109:21
   128:11 157:4
   240:22
**focusing**
112:4,25
**folders**
164:5
**folk**
25:15
**follow**
13:22 191:17
   294:22 300:25
   310:7
**follow-up**

113:6 187:18
   189:15,19,20,22
   190:4,8,22 191:3
   191:13,23 192:6
   192:10 193:10,12
   193:16 194:10
   208:10 216:1,6,9
   216:10 217:1,4,10
   217:12 218:22
   219:7 220:8
**followed**
189:22 208:8,10
   217:23 237:8
   300:3
**following**
185:9 233:4
**follows**
9:4 33:15 277:7
**footing**
197:9,11
**footnotes**
272:25
**foregoing**
318:4 320:4,6,9
**forest**
194:24 268:6
**forgotten**
220:16
**form**
12:21 22:20 26:16
   26:17,23 27:7
   28:6,15 41:5
   42:15,18 45:23
   46:8,14 47:19
   48:3 49:5 51:2,24
   58:3 59:10 62:8
   63:6 64:5 65:6,15
   65:19 66:18 67:6
   68:6,22 71:15
   72:17,24 73:8
   74:10,25 76:7
   80:23 81:6,20
   82:5,19 83:12,22
   84:9 86:2,14
   87:14,16,24,25
   88:1,4 89:2,12,21

91:7 93:16,21
   94:22 95:3 96:5
   97:14,21 101:3,21
   102:16 104:1,24
   105:24 107:7
   109:5,16 110:7,25
   112:13 113:25
   114:20 115:15
   116:1 118:1,16
   119:1 122:6,14
   123:10 124:25
   125:17 126:3
   127:23 129:6
   133:5,11 134:18
   137:9 145:11
   148:15 149:18
   157:17 161:2,18
   162:14 170:4
   171:7 175:9 176:6
   177:14 178:9
   179:9,23 181:3
   184:4 188:16
   189:17,25 190:6
   190:15 192:25
   193:14 194:14
   196:12 197:23
   201:15 207:1
   213:22 214:4
   228:15 229:18
   236:11 247:3
   255:17 258:2
   266:5 267:6,18
   268:15 271:8
   274:11 279:10
   283:24 285:25
   286:11,15 287:24
   294:23 296:23
   297:6 299:1 300:1
   305:18 306:5
   307:2 309:3,12
   313:24 315:22
   316:11
**formalized**
292:10
**formally**
33:10

**format**
24:2
**formed**
26:10 51:10 88:17
   125:3 295:3,15
   296:6
**former**
270:11,16 290:1,2
**formerly**
290:4
**forming**
76:12 152:15
   175:23 290:17
   296:7 297:23
   299:8
**forth**
103:10 214:9
**Foster**
3:5 4:4 8:13,13
   280:8,17,19
   281:23 288:2
   294:10 313:24
**found**
77:22 81:10,25
   82:11 120:25
   130:11,16 131:19
   134:22 136:4
   166:20 187:13
   194:12 203:19
   225:25 272:9
   278:12
**founds**
307:20
**four**
15:5 79:3
**fraction**
49:7
**fragrance**
123:20,23 126:2
**fragrances**
119:24 120:12,14
   123:14 124:6
   296:13,21
**frame**
11:17 132:10,11
   143:12 179:1

**frames**
143:5
**framework**
182:21,22
**free**
79:14
**frequency**
272:16 273:4,23
   274:4,17
**frequently**
53:22 166:14
   183:24 230:12
   305:11
**FRIDAY**
1:14
**front**
45:12 61:9 136:2
   147:9 148:23,24
   273:13
**full**
92:8 94:8 105:20
   128:4 132:20
   138:3 157:25
   170:19 183:8
   204:10 233:7
   260:8,24 262:6
   270:4 275:1
   305:14
**fully**
193:2 247:20
**funded**
209:7 283:20
**funding**
283:8,14,17 285:12
**funny**
142:7
**furnish**
44:13
**furnished**
15:1 42:6
**further**
117:10 158:8
   226:11 302:21
   314:23 315:11
   320:12,14

Patricia G. Moorman, M.S.P.H., Ph.D.

**G**

**G**
1:12 4:10,15,19,21
  5:15 8:1 9:2
  318:2 319:3
**Gates**
187:21 189:9
  190:12 192:14,23
  193:6,12 194:9
  195:4 216:15
  217:5
**general**
41:10 94:19 109:15
  124:23 125:15
  145:7 147:1 190:7
  203:10 204:5
  243:23 287:12
  301:6 302:24
  303:1 310:10
  315:25
**generally**
102:15 161:11
  190:23 199:14,22
  200:17 231:14
  251:24 252:3
  256:13 257:19
  290:16,23 301:2
  304:17 313:22
**generate**
52:4
**genital**
6:9,18 106:13,15
  132:1 180:19
  213:2 222:8
  223:18 224:3
  266:10 267:10
  270:7 276:18
  277:8 278:11,18
  278:21 279:14
**genotoxicity**
53:11 60:3,9
**gentlemen**
69:25 311:4 312:24
**geographic**
262:13
**geologist**

82:21
**geology**
53:24
**Gerel**
2:3 15:19
**Gertig**
7:5 189:4 190:14
  193:21 194:12
  195:7 204:25
**getting**
144:19 222:19
  237:3 258:16
  279:25
**Gibson**
11:7,17 12:13
**girls**
93:1
**gist**
119:21
**give**
19:22 69:17 70:7
  72:5 90:9 113:15
  132:5 141:20
  152:4 158:24
  181:21 187:2
  223:1 241:20
  245:12 294:7
  298:14
**given**
30:20,24 33:1 60:6
  107:14 116:8
  117:19 188:10
  318:5
**gives**
134:20 240:9
**giving**
17:6
**gleaned**
118:20
**go**
40:11 43:9 46:15
  62:9 99:3 113:17
  114:5 116:18
  135:11 141:7
  146:16 157:5
  188:6 204:9 215:5

217:15 218:4
219:16 234:2
241:3 245:12
250:4 253:24
254:6 256:24
261:21 264:2
269:8 274:3 275:9
277:25 280:8
282:8 284:11
289:2 309:21
315:4,5
**go-to**
288:13,21
**goes**
78:25 79:8 92:22
  162:2 239:20
  278:15
**going**
15:2,6 17:18 20:7
  21:15 22:11 32:19
  32:20 33:21 34:9
  35:10,19 36:24
  37:2,9 41:14 45:4
  45:7 49:9 52:12
  52:15 54:23,25
  61:8 65:1 66:17
  76:8 78:4,5 86:23
  91:14 107:21
  115:2 116:20
  139:6 149:21
  150:16 151:9
  163:23 164:4,20
  164:25 165:8
  169:2 171:19
  172:1,3,11 173:8
  175:16 180:5
  182:1,2 200:11
  202:14 204:24
  209:11,12,14
  210:4 211:13
  218:25 223:11,25
  230:8,17 237:11
  237:14 241:2
  245:17 247:11
  248:24 249:24
  259:5,7,13 263:4

263:5 265:1
273:15,19 278:2
280:10 282:6,23
283:1,16 284:4
286:4 288:8,20
289:20 294:2,11
302:16 307:13
308:14 309:23
315:6 316:14
317:6
**GOLKOW**
1:24
**Gonzalez**
186:20 187:14
  199:24 270:20
  271:2
**good**
9:8,9 52:11 100:19
  100:20 165:4
  190:24 211:9
  280:18 308:18
  310:5,6
**GORDON**
3:3
**gotten**
151:17 222:23
**grab**
164:5
**grabbed**
162:13
**grabbing**
162:11,12
**grant**
5:19 283:18
**graphic**
301:18
**graphics**
301:19,21
**great**
14:15 38:2 52:23
  242:3 268:22
**greater**
64:1 102:8 114:17
  155:12 240:12
  247:12 262:24
  263:7 267:12

268:2,7,24
**ground**
13:23 282:7
**grounded**
281:15
**group**
92:12 97:4 188:4
  190:17,20 236:21
  278:25
**groups**
262:14
**grow**
102:21
**growing**
178:12
**guess**
117:7 128:23
  140:20
**guidelines**
246:4
**gynecologic**
20:20 147:17
  149:16 290:3
**Gynecology**
147:21

**H**

**H**
6:12
**habit**
115:9
**half**
268:1,2
**halfway**
39:1 212:20 260:23
**hand**
15:6 18:1,1 32:19
  36:24 45:4 54:23
  77:4 139:7 151:9
  164:25 202:14
  212:15 227:5
  234:13 237:18
  273:19 307:13,17
**hand-selected**
68:4
**handed**

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 339

14:25 15:14 20:3
33:7 36:11 153:16
165:14
**handful**
104:13 177:8
294:21 314:25
**handing**
37:14 77:1 84:22
136:10 149:25
173:11 175:21
180:9
**handle**
20:15 78:10
**handwriting**
18:3
**handy**
90:8
**happen**
198:3
**happy**
14:8
**hard**
40:9
**hard-pressed**
178:13
**HARDY**
2:17
**hazard**
266:12
**head**
89:6 103:16 246:11
252:21 253:8
290:2
**health**
6:4 76:3 86:13,16
105:3 145:16,19
145:23 146:3,8
147:6 150:17
151:11 166:12,24
186:22,23 188:19
196:14 253:14
261:8,17,18,24
263:19 264:4
266:23 267:11
285:1,4 305:16
306:21 311:18,22

311:25 312:1,3,14
**health-related**
25:20
**healthcare**
32:11 127:6
**hear**
294:17
**heard**
223:2,12 281:2
**heavily**
145:2
**heavy**
92:18 119:10 120:3
120:18,24 121:2,9
121:15 123:8,12
126:1 296:16,21
297:13,25
**help**
35:1,6 100:11
236:3
**helps**
215:1
**hesitant**
223:7
**heterogeneity**
169:20 170:22
171:10 172:14
195:13 213:11
215:19,24 228:7
228:13,18 230:20
231:11 269:7,14
271:1
**heterogeneous**
196:2,4,5
**Hey**
116:14
**Hi**
294:17
**hierarchy**
158:24 300:12,17
301:17
**high**
130:11,16 261:25
**higher**
113:23 114:8
134:24 181:23,24

229:5 230:9,17
231:13,21 232:14
240:20 263:4
272:19 304:25
**highest**
274:9,12
**highlighting**
50:2,4,7
**highlights**
238:9
**Hill**
111:8,11 141:3
144:25 182:21
183:8 244:3,20
246:3 247:15
248:24 249:15
258:23 263:9
292:3,8,17 308:12
308:20 309:5,14
313:14
**histologic**
187:5
**histology**
35:5
**history**
76:6 218:18 222:21
222:22 224:2
**hold**
86:25 87:3 122:12
123:22 124:22
125:25 295:10
302:25 303:18
**hope**
27:1 285:12
**hopes**
27:14 31:5
**hoping**
242:16
**hopping**
282:6
**Hotel**
1:17
**Houghton**
6:22 186:21,22
202:13 263:18
264:4,15,17 267:9

**hour**
14:18 52:12 113:7
209:13 259:6,8
**hours**
71:25 72:12
**Houston**
2:18
**Human**
5:10
**humans**
104:4
**Huncharek**
6:16 175:13,17
176:24 177:9
**hundred**
104:10
**husband**
282:22
**hypotheses**
224:10,16,24 225:2
225:14
**hypothesis**
40:20 149:10
189:16

---

**I**

**IARC**
5:8 89:14,20,22
90:4,14,17 91:6
92:11,22 93:13,24
94:8,20 95:6 96:2
96:9,21,25 97:12
97:20 98:8,16
99:11,20,20
100:22 101:1,2,17
101:20 103:2,13
106:19 108:20
109:4 110:24
122:18 123:1,3,7
146:13 147:12
152:23 252:6,12
252:15,20,23,25
258:9,11 293:20
293:23 314:6,9,12
315:14
**IARC's**

93:8 103:7 109:14
306:25
**idea**
46:7
**ideas**
225:23,24
**identification**
13:12 15:3 17:20
20:9 32:22 35:21
36:22 37:13 41:17
45:8 49:12 61:17
77:2 84:20 91:17
107:23 136:11
139:8 149:24
151:13 165:2
169:3 173:10
175:19 180:7
202:15 205:2
227:6 234:11
237:19 273:17
307:15
**identified**
13:19 25:10 29:11
29:17 41:2 49:8
49:16 58:5,16
59:5,15 60:8
66:23 70:19
122:24 123:19
134:17 253:20
254:14 255:14
**identify**
28:20 29:12 40:5
221:25 224:8
257:22
**identifying**
146:8
**Illinois**
3:19
**illustrate**
144:24
**imagine**
209:8 288:25
**Imerys**
3:2 8:13,15 280:16
280:21,24 281:7
281:11,19,25

Patricia G. Moorman, M.S.P.H., Ph.D.

Imerys's
282:2
immune
25:23
impact
227:2 261:8,19,24
316:22
impacting
238:18
impacts
261:13
implies
138:1
importance
113:3 197:22
199:15 200:18
201:1,13 202:10
204:13 205:25
206:4
important
22:3,6,8 56:14,15
71:12 81:3,4
134:25 140:21
142:8 149:20
158:10 164:14
198:3 219:15
227:2 239:10
245:2,5 250:22,25
299:24
impossible
102:18 178:19,20
imprecise
250:14,15
impression
68:14 144:15,19
222:23
improved
239:16
in-depth
182:19
inaccuracies
160:5 220:12
inaccurate
203:13 218:12
220:23,24 221:1,2
276:8

inadequate
152:1 155:21,25
156:3,5,6 293:3
inadvertent
220:12
Incessant
40:19
incidence
93:5 111:23 112:10
112:18 113:23
304:19 305:12
include
21:8 29:25 42:12
46:16 47:12 115:8
118:10,14 123:3,7
162:16 175:11
187:24 188:9
193:9,19 217:4
240:14 271:17
278:22 311:12
included
20:24 26:14 29:9
42:16 43:15 131:7
137:1 139:4
140:17 161:6
188:19 193:24
212:24 278:14
284:13 286:22
includes
29:23 50:1 196:16
284:25 311:2
including
51:18 63:4 69:2
116:6 167:7
170:22 184:9
190:18 240:21
268:9
inclusive
320:10
inconsistencies
271:20 272:5
inconsistency
271:23 293:1
inconsistent
154:12
incorrect

210:3
increase
131:20 224:25
275:24 276:2
278:9
increased
105:15 112:10,18
125:6,23 134:14
147:25 148:21,21
149:3,3 155:4
163:11 166:7
167:5 176:15
181:15,24 185:3
187:6 225:8
226:23 247:21,22
248:6 249:13
250:1 256:12
262:24 313:11
increases
93:4 94:3 203:20
increasing
276:20 277:10
278:10,20
independent
120:16 122:12
123:22
INDEX
4:1,8 5:1 6:1 7:1
indicate
70:18 186:25
220:22,24
indicated
33:20 57:4 82:20
166:24 197:17
236:25 298:12
301:4 312:4
indicates
307:24
indicating
102:5,6 120:25
121:2 215:10
individual
25:19 198:18 199:9
215:11,15 290:20
301:7 302:4
individuals

12:10 158:14
induced
223:2
inevitable
230:16
inevitably
226:12 230:8
infertility
28:12,22,23 29:14
29:16 286:14
influence
265:20
inform
42:21 165:23
179:15 180:12
206:17
information
56:19 57:17 76:25
82:18 88:18 98:2
111:3 118:18,20
118:23 119:3
121:10,23 122:8
147:23 149:8,20
190:9 208:9 220:2
293:14
Ingham
10:2 11:10,21
13:23 15:10,20
16:11,18 17:7,14
17:18 18:13,17,24
19:1,8 25:25 31:2
31:4,7 32:11 45:6
45:18 47:2 48:9
48:20 50:6 51:6
51:22 54:20,24
61:9,25 74:18
115:19,20 116:10
119:17 295:12
ingredients
123:23 126:2
inhalation
303:17,19,24
inhaled
142:6 304:1,4,9
inherent
220:17

initial
52:3
initially
220:5
Initiative
186:23 285:4
insignificant
267:15
instance
127:25 257:25
Institute
6:3 7:3 150:23
209:9 283:19
insufficient
174:9 178:6
Intellectual
44:18
intend
26:13 37:18 41:1
76:4 86:20 250:4
294:7
intense
185:8
intent
59:12,18 60:16
161:4 215:9
256:15 285:9
intention
59:8 60:13 291:15
interest
23:8 221:25
interested
44:19 68:18 149:15
261:18 284:23
320:16
interesting
68:23 154:2
internal
127:12,13
International
7:16
internet
30:16
interpret
181:5
interpretation

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 341

163:15 169:22
170:12,25 195:15
198:15 269:16
**interrupt**
113:6,8 116:16
**intertwined**
244:12,21
**interval**
134:20 137:17
265:10,13
**interventions**
7:8 227:9 229:7,13
**interview**
132:2 225:22 235:5
235:8,12
**interviewed**
132:10 239:18
240:21
**interviewees**
235:22,23 236:4,5
**interviewers**
222:19 223:3,13
224:11,17,24
225:3
**interviews**
30:24 225:11
**introduce**
8:6
**invasive**
6:14 139:18 185:14
187:1,7 193:5
264:10
**invested**
209:9
**investigation**
286:3,22
**investigators**
188:8 204:17 206:5
238:20 262:12
**invite**
225:4
**invoiced**
14:19
**invoices**
4:10 15:1,5,7,14,15
15:23 16:8,12,15

16:17,20 33:18
**invoked**
213:10 215:18
**involve**
199:20
**involved**
13:7 88:9,19 112:6
180:21 280:23
281:5 285:8
**involvement**
21:9,20 22:13
27:20 283:2
285:17 291:25
**involves**
284:8
**isolated**
236:20
**isolation**
297:5,9,13
**issue**
22:5 57:12 59:1,9
67:11 68:12 81:5
84:7 85:25 88:21
94:20 107:4,19
109:19 110:21
126:22 128:22
144:16 149:17
160:20 163:5
166:2 174:1
188:14 190:13
197:22 212:9
213:21 214:11
216:1 219:7 221:4
233:23 240:10
242:3 253:11
315:19
**issued**
51:2 149:22
**issues**
26:5 192:5 206:20
284:18
**item**
21:3 39:25
**items**
39:21 40:5,15,23
40:23 42:12 46:12

46:18,23 48:19,21
49:2 50:5,11
306:21 308:24

───────────

**J**

**J**
5:19
**J&J**
9:12 310:8
**J.M**
2:14
**Jack**
44:6
**James**
2:19 3:20 4:3 8:9,9
8:19 9:7,10 13:1,6
15:4 16:3,7 17:21
20:10,14 21:1
22:22 23:13 24:24
25:3 27:2,19
29:15,21 32:23
33:3,5 34:3,7,9,13
34:14 35:10,18,22
36:4,9,14,23
37:23 38:5,6
41:13,18,24 42:3
42:4,10,23 45:9
46:2,10,19 47:22
48:7 49:1,9,13,16
49:19,23 50:16,23
52:13,20 54:19
55:1,7,10,13 56:1
57:22,24 58:7,9
58:18 59:17 60:22
61:7,13,18 62:15
63:1,8,18 64:13
65:10,16 66:4
67:1,10 68:9
69:12 70:20 71:24
72:20 73:1,11,15
73:16 74:4,13
75:3 76:11,24
77:3,8,11 78:6,11
78:16 79:6 81:1
81:16 82:1,9,24
83:16 84:1,13,15

84:18,21 85:1
86:8,17,19 87:19
88:20 89:8,18
90:3 91:9,18,20
91:24 93:18,23
95:1,13,15 96:8
96:15,19 97:17
98:6,15,23 99:4,9
99:16,24 100:2,8
100:13,19,21
101:5 102:9 103:1
104:20 105:6
106:1 107:10,21
107:24 108:12
109:8,17 110:17
111:6 112:16
113:9,12,20 114:2
114:23 115:7,16
116:7 117:1 118:9
118:21 119:4
120:1 121:7 122:9
122:20 123:13
124:4,10,13 125:9
125:24 126:7
127:19 128:1
129:12 131:1,18
132:12 133:8,14
135:3,10 136:6,20
137:11 139:5,9
142:19 143:17
144:3,8 145:3,18
148:19 149:14,21
149:25 150:2
151:15 152:12
153:9 157:21
160:14 161:8
162:9,17,24
163:20 164:20,25
165:3,6,13 167:13
168:15,25 169:4
170:6 171:15,18
171:20,22 172:1,6
173:8,11,14,16
174:22 175:2,12
175:16,20 176:8
177:7,17 178:21

179:13,24 180:5,8
180:10 181:6
182:17 184:15,23
186:9 188:23
189:21 190:3,11
191:1 192:18
193:4 194:1,7,17
196:1,15,19 198:5
199:10 200:10,24
201:6,20 202:12
202:17 204:18,24
205:3 206:7,15
207:5 208:17
209:17,20,22
211:9,12,18
213:24 214:7
218:24 219:2,16
219:19,24 227:4,7
229:9,23 230:23
234:8,12,14,21
236:14 237:20
242:6,10 243:1
246:7,23 247:6
248:1,7,15 251:1
251:8 256:1 258:3
259:4,9,18 266:17
267:13 268:8,17
271:15 273:15,18
274:14 275:18
277:2,25 279:7,11
280:2,6 282:7,15
287:5 292:20
302:14,23 304:16
306:1,15 307:8,12
307:16 308:4,10
308:19 309:9,18
310:10 312:6
314:25 315:2,3,13
315:24 316:19
317:1
**James'**
70:3
**james.mizgala@t...**
3:20
**January**
1:14 8:3 320:18

Patricia G. Moorman, M.S.P.H., Ph.D.

jdonath@coughl...
3:10
**Jeff**
11:7 12:12
**Jennifer**
3:5 8:13 280:19
**Jersey**
1:2 2:22 3:8
**Jessica**
2:23 8:11
jessica.brennan...
2:24
jfoster@gordonr...
3:5
**JNCI**
6:21
**job**
287:1
**Joellen**
7:12
**Johnson**
1:5,5 2:16,16 8:9
8:10,12,12 9:6,6
70:21,25 71:3,9,9
73:22,22 75:8,8
75:15,15 79:20,20
79:24,24 80:2,2,4
80:4,6,7,16,16
83:1,1,8,8 118:23
118:23 121:11,11
121:19,19 124:20
124:20 281:8,8,19
281:19 302:22,22
315:12,12
**Johnson's**
70:21,25 71:3
80:10
**Jonathan**
3:9 8:15
**journal**
5:11,14 6:18 7:3,10
7:13,16 21:24
22:14,16 23:10
28:4,4 65:14
148:7 166:12,24
243:21

**journal's**
22:1,9
**journals**
147:22
**judge**
223:25
**judged**
184:13 252:23,25
**judgment**
156:7 175:8 176:24
181:1 182:23
188:8 198:12
208:14 222:17
252:16
**judgments**
184:7
**jumbled**
106:2
**jump**
40:18
**jumping**
148:3
**jury**
70:1 312:24
**justification**
230:24 232:4,6

---
**K**

**K**
7:18
**Kadry**
7:21
**Kat**
31:16
**Kathryn**
6:20
**keep**
49:19 209:14
247:20 249:24
**keeping**
36:25
**Kemble**
3:8
**Ken**
288:15
**Kessler**

44:5 290:1
**kind**
33:1 35:2,6 40:9,18
154:2 159:1,6
182:14 211:5
220:17 222:22
223:20 229:1
240:12 253:16
264:12 270:21
292:3 293:1,10
**kindly**
36:16
**knee-jerk**
231:19
**knew**
80:18 289:21
**know**
11:12,13 12:4
13:24 14:7 16:17
23:6 24:10,14
31:22 34:6 35:4
37:25 40:8,9,10
40:11 41:11 42:20
44:7 45:17 46:15
46:17 47:9,14
49:6 50:18 51:6,7
51:8,11 54:14
57:6 59:11 62:11
64:24 68:13 70:23
71:2,5,9 72:4,7,11
74:6 75:1 76:22
78:25 79:8 80:3
80:16,19 83:8,14
83:20,24 84:6
86:3,4,7 89:13
95:5,8 96:12
101:24,24,25
102:4 103:15,17
104:14 106:11,12
108:10 112:17
114:11,12,12
123:17 124:17,19
129:23 131:25
136:2,4 143:3,7
143:21 148:16
149:2,15,20

152:19 157:11
159:4 160:23
163:11,12 178:14
181:10 183:20,24
184:8 186:4
188:12 190:22
193:17 200:6
207:3 208:21
209:15 217:3,12
217:13,23 222:21
223:5 225:6,23
232:10,13 239:4
239:21 241:24
242:2 248:21
252:19 253:14
261:17 263:14
276:5,12 279:2
280:24 282:1,5,8
282:10 285:19,22
286:9 287:2 288:4
289:25 290:5,18
290:19,20 293:15
296:13 297:16
298:8 305:9 306:9
**knowing**
68:18 95:9 206:13
**knowledge**
11:22 17:1 41:9
43:10 47:11 82:25
121:18 130:22
181:11 226:6
243:23 248:20
281:18,22 314:12
**known**
224:10,16 225:15
225:19,19
**knows**
223:11 290:20

---
**L**

**L**
2:23 6:20
**L.L.P**
2:17
**label**
97:3,7

**labeled**
130:4 140:7
**laboratory**
57:5 89:24 106:24
**lack**
191:3 192:6 215:10
**ladies**
69:25 311:4 312:23
**Langseth**
6:12 173:4,9,17,18
175:7 177:19
178:23 209:24
210:2,9,24
**language**
129:11 130:21
140:22 146:6,7
164:7,10
**Lanza**
7:9 226:8,10,17
227:4,8,12,12
230:2,24 232:1,4
**large**
29:8 30:2 46:3
47:14 79:25
143:25 200:6,6
205:21
**largely**
225:25 311:15
**LAW**
2:7
**lawsuit**
239:14
**lay**
232:25 256:8
**layman's**
229:16
**lead**
48:15 102:1 121:6
171:13 226:12,23
230:8 232:14
292:12
**leading**
147:21 149:16
182:22
**leads**
125:8 231:20

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 343

learn
44:19
leave
78:5
leaves
155:20
lectures
30:21 158:23
led
125:23 160:11
240:12,13,20
266:16
left
66:18 139:22 140:6
167:23 275:1
288:3 293:10
294:2
left-hand
167:17 203:3
210:13
lesser
113:3
let's
11:7 19:13 99:24
100:2 113:11
153:12 170:19
172:9 194:18
218:16 221:22
237:12 240:5,17
253:23 264:14
275:22 277:25
288:15 299:2
letter
5:7 84:2,6,23 85:3
85:3,11,22
letters
32:15
level
39:14 45:1 76:1,1
102:1 105:21
106:4 157:9
181:23,25 253:24
254:16 255:23
263:5 270:24
300:5
levels

44:3 75:24 105:16
121:24 122:3
190:19
LHG
1:7 319:4
LIABILITY
1:7
life
25:20 208:7,8
lifetime
272:20 276:21
277:11,19
light
95:10
limitation
104:7,17,22 105:1
106:18 107:17
160:16 172:17
212:13
limitations
103:24 104:3 191:5
200:8 301:7
limited
79:2 130:8 163:21
201:10 205:11
233:19 294:2
297:14,14
line
61:24 113:13
209:17 319:5
linear
275:13,24 276:2
lines
55:10 61:20,21
240:7
link
88:25 89:10 168:4
168:13,17
list
5:3 26:14 27:16
33:15,19 38:21,25
39:8,9,10,18,22
40:6,15,15,22
41:3,4,11,15,22
41:24 42:1,5,5,11
42:11,15,24 43:23

44:24 45:6,10,12
45:15,17,18,19,20
46:6,22,23 47:7
48:20,20 49:11
51:6,9 80:10
246:17,18 290:25
306:18
listed
41:10 43:19,23
46:12,13 140:7
151:25 154:6
194:25 252:2
286:10 301:22
listing
286:18
lists
46:20 50:11
literature
5:12 45:3 47:3
51:22 52:9 56:12
56:22,25 58:1,11
58:22 60:13,19
62:21 63:10 64:1
64:3,7,18 65:2,5,8
65:9,12 66:15,21
66:23 67:5 68:2
72:9 75:4,7 78:25
81:19,25 82:3,12
88:6 89:4,9
102:11,20 103:19
103:21,25 104:22
105:7,14,17
106:19 107:5,14
107:18,20 111:8
111:15,22 112:17
119:9 120:17
126:12,14 129:9
131:6 156:16,19
157:7,8,10,14
161:12 162:7
163:7 166:10
182:10 197:21
198:1,1 199:11,14
200:16,25 201:12
202:4 212:10
224:19 226:5

227:15,20,21
229:15,25 231:3,6
242:8 245:11,21
246:9,25 247:8
253:21 254:7,10
254:13 255:2,4,9
257:25 260:4,12
262:3 263:18
266:21 271:17
272:6 287:7
291:20 292:2
295:2 296:2,3
304:22,23 309:1,7
309:8 311:1
litigation
1:7,24 11:8,9 13:19
16:9,13,16,24
17:4 21:9,21 22:6
22:14 27:21 28:2
30:7,18 31:8,18
32:5,8,13 44:13
47:17 67:3 68:19
73:2,7,22 74:1,2
74:15,22 87:15
88:9,19 97:19
110:6 118:11,15
118:24 121:11
124:15 126:18
127:20 131:3
150:22 153:5
174:23 185:10
214:3 233:15,19
234:1 236:16
254:20 255:5,9
271:5 280:24
281:5 285:18
290:8,12 292:6
294:5,7 295:11
319:2
little
11:11 12:1,4 27:10
59:4,14 138:14
154:22 155:20
161:17 267:23
288:19 289:5
311:17

lives
300:9
LLC
2:7
LLP
2:3,21 3:3,7,13,18
loathe
166:14
locations
262:13
lodged
36:12,13
long
26:14 27:16 220:11
259:4 267:14
280:18 291:24
310:9 314:24
315:5
longer
46:6 190:7,22
194:10 237:5
Longo
73:12,14,17 118:10
118:10
Longo's
73:19,23 74:19,22
look
19:23 29:6 35:4
40:12 45:10 61:19
61:20 63:23 70:4
70:4 77:16 80:9
89:19,23 92:7
104:2 105:3
108:13 109:23
112:2 126:12
128:17,19 132:6
138:13 139:12,15
139:22 140:24
144:25 145:1
150:22 155:5,10
155:13 156:11
161:19 164:4,9
167:15 169:1,15
180:14 184:7,12
184:24 186:25
195:9,11 197:25

Patricia G. Moorman, M.S.P.H., Ph.D.

199:8 203:2,15
208:6 219:8
229:10 235:2,4
237:21 238:6
262:21,21 263:1
263:17 264:17
267:21,24 268:5
269:11 270:2,3,19
270:20 272:24
274:3,25 276:14
276:15 278:24,24
279:17 301:6,6
303:6
**looked**
21:25 23:4 35:3
43:12 44:3,9
62:12,13 63:22,25
73:2,20 84:12
85:25 89:13,14,15
89:25,25 104:11
106:19 111:22
112:20 113:2
120:23 127:13,22
128:21 129:4
131:10 135:24
142:5 147:16
153:25 154:11,22
156:21 179:15
188:1 193:23
194:9 197:21
199:12 200:17
206:17,17 207:12
209:5 213:17
226:20 229:7
237:12 240:1
253:10 269:20
273:4,22 274:18
292:21 303:4,10
304:4,14 312:13
313:4
**looking**
19:24 20:5 21:3
22:22 25:19,23
27:4 28:11 42:5
44:11 55:7,10
67:24 89:10 90:11

95:17,23 104:8
128:8 130:14
131:7 132:13,14
137:4 155:7 156:2
157:2 167:2
188:14 191:15,19
191:24 200:8
212:9 226:19
227:12,18 232:1
235:2 236:2
244:25 260:17
264:19 273:25
274:7 278:22
**looks**
36:25 105:8 128:24
140:9 151:19
**Los**
285:4
**lot**
30:2 86:15 154:25
174:13 222:20
223:22 224:24
282:6,7
**lots**
40:10
**low**
75:24 190:19 213:9
215:17 228:8
**low-level**
208:19,22 209:11
**lower**
134:24 236:17
263:5 304:18
305:12
**lower-level**
288:20
**lung**
141:12,13,23,24
142:3 143:10,14
143:21 144:17
145:5 245:9
247:19 249:1
259:24 260:7
**Lynn**
29:25

|  M  |
| :---: |
**M**
7:4,12
**M.S.P.H**
1:12 4:14,21 5:5
9:2 318:2 319:3
**magnitude**
245:8,14 246:14
249:1 251:23
253:6,12,18 256:4
256:6,25 257:12
257:14,18,24
258:7,13,21,25
**main**
19:17 35:3 44:18
**maintain**
299:21
**major**
57:7 239:5 292:14
**majority**
49:2 104:10 130:24
233:10 272:18
273:8,22 276:9
303:4,7,8
**making**
66:9 69:15 71:13
100:13 142:1
159:1 182:22
198:12 229:6,22
247:20 298:6
299:24
**male**
113:1
**males**
112:5
**man**
123:17
**manner**
254:18 255:3
**manufacturing**
83:2
**manuscript**
302:10
**March**
4:24 5:5 10:6,9
17:7 19:8 30:22

45:13 46:13 47:1
47:17,24 48:5,19
49:3 50:18 51:11
56:2
**mark**
15:2 17:18 20:7
32:20 35:10,14,19
37:9 41:14 45:7
49:9 61:15 91:14
107:21 149:21
164:20 169:2
173:8 175:16
180:5 204:24
234:6,8 237:14
273:15 307:14
**marked**
4:9 5:2 6:2 7:2 15:3
17:20 20:9 32:22
35:21 36:17,22
37:13 41:17 45:8
49:12 61:17 77:2
84:20 91:17
107:23 136:11
139:5,8 149:24
151:13 165:2,3,18
169:3 173:10
175:19 180:7
194:20 202:13,15
205:2 212:16
227:4,6 234:11
237:19 273:17
291:1 307:15
**market**
113:22 122:5
**marketed**
79:13 85:16 88:14
**MARKETING**
1:6
**marking**
61:11 76:24 136:7
**material**
49:18 77:25
**materials**
4:17,22,24 5:3
33:23,24 34:16,22
35:25 39:2,8,12

39:22 40:6,15,22
41:1,3,16 42:1,15
42:24 43:15 45:5
45:19 47:8,15,23
47:25,25 48:9
49:10 51:2,10
72:1 117:23 118:7
120:17 121:10
306:17,18
**materials-consid...**
246:18
**matter**
9:12
**matters**
13:20
**McTiernan**
44:4 290:21
**MDL**
1:6 5:3 10:24 11:3
11:6,21,25 12:2,7
12:17,20 13:16
14:17,19,21 15:1
15:8,11,16,21
16:10 30:14 32:17
33:20 34:23 37:5
37:6,15,19 42:13
42:16 43:16 44:24
45:20 46:5,12,21
47:8,24 48:10,20
49:3,11 50:6,11
51:1,3,6,10,23
57:8 74:1,16
79:17,19 88:2
97:19 115:8,13,25
116:8 119:14
123:14 131:2
160:15 164:6
170:1 171:5
172:20 176:23
197:21 271:4
294:5 319:2
**mean**
32:4 34:19 40:8,16
41:6 100:16
113:13 142:18
143:20 145:12

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 345

229:19 230:24
232:4 248:18
287:23 288:5
310:22
**measure**
106:25 299:14
300:6
**measures**
300:4
**measuring**
274:16 277:19
**mechanism**
57:1,13 63:4 87:11
88:16 181:12
182:6 183:10
254:13,15
**mechanisms**
48:14 57:2 83:21
**mechanistic**
60:7 260:15
**media**
185:8 232:21 233:1
233:3,6,18,22,25
238:13,18 240:22
**medical**
28:24,25 56:11
102:11 141:22
144:16 145:4,8,9
145:13 146:10,25
147:16 148:14
150:10,18 156:16
156:22 157:14
253:21 255:2
**medicine**
159:4,5
**medroxyprogeste...**
154:7
**meet**
12:7,9 39:14
**meeting**
9:11
**Melville**
2:13
**members**
293:17
**memories**

239:15
**memory**
239:21 240:12
**menstrual**
222:21 224:2
**mention**
36:15 81:4 118:12
123:12 191:5
**mentioned**
12:19 19:18 26:21
26:24 28:21 31:12
31:14,17 147:4,5
154:5 164:22
212:12 283:23
285:24 286:9,13
292:25 297:25
316:21
**mentioning**
148:20
**mesothelioma**
112:11 114:9,11,18
**met**
12:10,14 123:17
245:10,21 246:6
262:3,4,19 271:14
280:18 314:13
**meta-analyses**
7:7 89:4,14 137:2
154:23,24,25
155:10 158:2,9,19
158:25 159:6,8,11
159:17,20,22
160:2,5,10,16,19
160:24,24 161:3,7
161:9,11,15,21
162:8,10,13,19
163:1,3,14 164:8
164:15,17 165:23
166:2 167:8 170:2
173:3,5 175:14,17
177:9,10,12,19
184:1,7 193:18,23
195:21,22 199:13
206:16 207:6
210:10,12 212:25
213:7,19 216:17

226:20 227:3
228:18,24 235:15
241:12 260:18
262:21 267:25
268:6 300:16
301:16 309:1
312:25 313:3,7,10
**meta-analysis**
5:12 6:7,10,15 7:20
108:1 110:9
147:24 159:13
164:21 168:25
169:1 171:6
175:22,25 177:3
183:14 184:6,14
187:22 206:24
207:11 213:4
216:18,22 241:17
254:3 272:1
312:19
**Meta-Epidemiol...**
7:8
**metal**
122:24
**metals**
5:9 119:10 120:3
120:18,24 121:2,9
121:15 122:16
123:4,8,12 126:2
296:17,22 297:13
297:25
**method**
242:11 293:10
313:18,18
**methodologically**
205:24
**methodologies**
290:16,23
**methodology**
155:18 157:19
184:22 293:10
309:11 313:18,21
**methods**
53:14 59:7 197:15
205:8 225:16
293:15 313:25

**Michael**
6:16 44:6
**Michele**
21:13 31:12
**Michelle**
2:5 8:24 12:11 14:6
15:23 20:10 22:23
24:24 32:23 34:3
35:10 37:24 49:20
73:15 78:6 280:2
307:12
**middle**
92:8 132:14 171:21
233:7 240:25
**midway**
238:3
**migration**
59:1,3,9,16
**miked**
18:2
**millers**
111:16,19,23 112:4
112:12,19
**Mills**
7:18 25:22 273:9
273:16
**mind**
36:5 48:18 101:7
104:6 110:22
152:7 243:7 245:6
256:21 268:13
282:20 288:1,9
299:5 316:25
**mine**
33:1
**mineral**
53:14,17
**mineralogist**
65:23 82:21
**miners**
111:16,19,23 112:3
112:4,11,18
**mines**
281:7,19
**mining**
54:2 281:25 282:1

282:4
**minute**
163:5 308:13,16
**minutes**
40:12 113:7,18
288:3 302:15
**misclassification**
106:20,22 107:2,4
107:9,12,16,17
110:1,13,22 111:4
242:19
**misleading**
113:14 161:17
**misrepresented**
99:2
**misstate**
98:23
**misstates**
61:1 69:20,24 98:9
98:19 119:19
199:16 208:3
271:10 298:3
307:3
**misstating**
99:16,21 101:9
279:5
**mistaken**
80:7 286:24
**mistakenly**
199:19 200:5
**misunderstanding**
249:4
**mixture**
40:23
**Mizgala**
3:20 8:19,19 99:22
100:1
**Mm-hmm**
50:8 140:23 153:17
183:16
**moderate**
181:14 248:23
250:15 287:18
**Modern**
288:15
**modest**

Case 3:16-md-02738-MAS-RLS    Document 33005-40    Filed 07/23/24    Page 108 of 131
PageID: 203237
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 346

247:9,23 248:4,9
248:10,22 249:7
249:11 250:10,14
250:18,21 287:11
287:17 288:23
**modifiable**
182:25
**Mohamed**
7:21
**molecular**
25:23
**moment**
19:22 132:6 163:19
173:20 215:6
239:2 277:23
298:14
**money**
209:10
**monograph**
89:20,23 90:5
91:16,19,22 94:6
94:9,18 95:17,21
95:21 96:10,14
101:14 123:1,3,7
123:12 314:9,19
315:15
**Monographs**
5:8
**months**
270:24
**Moorman**
1:12 4:10,12,14,15
4:19,21,23,24 5:5
5:16 8:5 9:2,8,17
19:24 21:5 33:3,6
34:15 35:17,23
36:20,24 37:4
38:20 41:16,20
42:2,5 45:4 49:14
49:24 52:21,23
55:14 56:6,8
57:25 60:10 61:3
61:8,14,19 64:14
67:12 69:22 74:3
77:1,12 78:17
80:11 84:2,22

85:2,4 90:8 91:5
91:11 92:1,5 94:6
95:16 107:25
108:14 115:8
117:2 119:11
128:3,16 130:15
136:6 139:10
140:19 144:9
150:3 151:9,22
153:10 157:22
165:14,22 167:16
171:16 172:12
175:13,21 180:11
184:24 195:12
196:20 200:11
201:9 202:18
209:23 211:19
218:24 219:25
234:16 235:4
237:21 240:4
244:1 245:25
251:15 257:10
259:19 260:20
262:2 264:17,25
269:11 273:12
274:8 280:1,18
294:17 296:5
301:15 302:6,12
302:24 304:17
307:18 308:11
309:18 310:5,9
313:17 314:22,25
315:14 317:6
318:2 319:3
**morning**
9:8,9 14:25 20:3
28:8 33:17 36:10
164:22 280:19
282:15 294:19
**Morristown**
3:8
**mortality**
90:21 92:17 93:5
**Mount**
3:8
**move**

69:10 99:24 100:2
232:18
**moved**
165:16,21
**Moving**
262:2
**mparfitt@ashcra...**
2:5
**mucinous**
303:12 316:3
**MUELLER**
2:7
**multicenter**
29:8,24
**Multiethnic**
285:2
**multiple**
11:12,12 24:4
71:19 96:25
140:18 158:23,25
161:15 256:13
258:24 264:3
312:25
**mutagenicity**
53:8

_____

**N**

**N**
2:1 3:1 8:1
**N.W**
3:13
**name**
9:10,15,17 10:3
12:12 19:20
280:19 319:2,3
**names**
12:24 75:11 290:1
290:19
**NAPOLI**
2:12
**Narod**
211:24 212:1,5
214:23 215:3
216:2
**National**
6:3 7:3 150:23

209:9 283:19
**nature**
200:12 203:5 211:1
**NCI**
151:5,10,24 152:25
156:1,9 157:11
292:21 293:1,9,17
**NCI's**
155:23
**nearly**
268:6,23
**necessarily**
60:8 69:18 70:8
104:25 181:5
182:16 194:11
211:7 232:15
252:16
**necessary**
309:10
**need**
14:7 18:23 32:23
37:24 52:5 69:18
70:4,8 113:10
219:8 231:3
249:18 273:13
**needed**
180:18 181:9
**needing**
39:14
**neither**
136:14 320:12
**never**
23:7 82:2 123:17
138:4 157:3 188:5
218:23 220:16
222:23 223:12
225:18,19 274:21
**never-use**
265:5
**Nevertheless**
204:12
**new**
1:2 2:13,22 3:8
10:23 46:12,17
47:10,15 48:8
50:10,17 51:5,7,8

51:16 115:13,24
117:19 118:2
119:16 147:23
148:10 225:24
284:3 285:9,25
**newly**
26:10
**NHS**
188:12,14,24 189:7
189:12,14 191:7
191:23 192:22
205:4 216:9
**nickel**
119:12,15 122:21
**nine**
29:3 240:7
**non-mucinous**
278:12
**non-occupational**
93:25
**non-serous**
310:25
**non-statistically**
134:12 236:22
**non-talc**
131:8
**non-users**
278:13,23,25
279:18
**nonresponsive**
57:23 58:7 69:11
86:17 95:14 144:3
171:23 200:12
219:1
**nonresponsiveness**
64:16
**nonsignificant**
93:3 94:2
**nonstatistically**
94:1
**North**
1:18 135:18 137:1
138:17,20 139:3
140:16 285:16
292:13 320:1
**notable**

Patricia G. Moorman, M.S.P.H., Ph.D.

301:9
**Notary**
320:3,23
**note**
74:14 93:19 94:2
140:25 141:10
172:20 203:16
207:12 227:25
228:18 278:16
**notebook**
34:24
**noted**
15:24 92:12 166:13
177:19,21,24
178:25 194:11
212:23 272:1
**notes**
34:8,21 35:1,24
280:3
**notice**
4:15,19 32:20 33:7
33:13 34:1,5
**noticeable**
301:13
**noticed**
290:24
**notices**
33:11
**noting**
174:12 180:24
**null**
134:9 137:8 265:14
**number**
4:9 5:2 6:2 7:2 21:3
46:3,17 47:14,14
79:5 89:5 90:9
104:12 107:15
120:14 128:21
155:5 200:1
206:16 210:2
212:13 246:16
251:15 272:17
276:20 277:10
278:10,21 284:21
287:19 295:22
319:4 320:23

**numbers**
180:9
**numerical**
289:2
**numerous**
187:15 245:13
314:5
**Nurses'**
186:23 188:18
196:14 263:19
264:3 266:23
267:11

---

**O**

**O**
8:1
**object**
26:23 57:22 58:7
64:15 66:17 80:23
86:17 88:4 95:13
101:10 144:3
166:21 171:22
172:8 200:11,21
218:25 247:3
**objection**
12:21 22:20 27:7
41:5 42:8,18
45:23 46:8,14
47:19 48:3,22
49:5 50:12,19
51:24 54:10 55:20
57:14 58:3,13
59:10 60:14 61:1
62:8 63:6,12 64:5
65:6,15,19 67:6
68:6,22 69:20
71:15 72:17,24
73:8,24 74:10,25
76:7 78:20 81:6
81:20 82:5,19
83:12,22 84:9
86:2 87:16 89:2
89:12,21 91:7
93:16,21 94:22
95:3 96:5 97:14
97:21 98:9,19

99:3 101:3,21
102:16 104:1,24
105:24 107:7
108:9 109:5,16
110:7,25 112:13
113:25 114:20
115:15 116:1,13
118:1,16 119:1,19
120:20 122:6,14
123:10,25 124:25
125:17 126:3
127:17,23 129:6
130:18 131:14
132:4 133:5,11
134:18 135:6
137:9 142:16
143:16 144:20
145:11 148:15
149:11,18 152:11
153:6 157:17
160:7 161:2,18
162:14,21 163:17
167:10 168:11
170:4 171:7
172:22 174:19,25
175:9 176:6 177:1
177:14 178:9
179:9,23 180:2
181:3 182:13
184:4,18 188:16
189:17,25 190:6
190:15 192:16,25
193:14 194:5,14
195:24 196:12,17
197:23 199:2,16
201:3,15 204:15
204:22 206:2,12
207:1 208:3
213:22 214:4
228:15 229:18
230:4 236:11
241:15 242:9,14
245:23 246:20
247:24 248:11
250:23 251:4
255:17 258:2,14

266:5 267:6,18
268:15 271:8
274:11 275:17
277:21 279:10
281:20 287:24
295:17 296:8,23
297:6 298:3 299:1
299:11 300:1,21
301:24 304:11
305:20 306:5
307:2 308:9 309:3
309:12 313:24
315:22 316:11
**objections**
4:18 22:24 36:12
36:19
**objectively**
232:1
**observation**
262:9
**observational**
6:16 166:17 176:11
228:22
**observed**
104:12,15 110:16
142:7 171:12
266:25 276:19
277:9
**Obstetrics**
147:21
**obtaining**
56:3
**obvious**
179:3
**occupational**
90:22 92:18 93:2
93:15 104:7,18,23
105:2,8,9 106:5
106:16
**occur**
242:19
**occurred**
220:11,19 233:14
**occurring**
115:9
**OCWAA**

26:8 29:19 283:24
286:17
**odds**
132:9 133:6,24,25
134:6,7,16,23
136:18,25 137:3
137:12,13 138:6
139:12,23 143:24
155:11 161:15,23
162:4 227:13
234:23 235:11,14
235:16,17 240:20
241:10,13 242:12
247:12 248:21
253:6 255:12
256:4 257:12,21
261:25 262:24
263:7 264:22
267:12,14 268:1,2
268:7,12,24 274:9
274:13
**offer**
37:18 76:4,8 86:20
192:19
**offered**
125:15 189:14
**offering**
56:9 79:17,19 81:2
97:18 131:2 255:4
**offhand**
114:22
**office**
41:25
**officer**
320:4
**official**
148:17
**oh**
20:16 78:12 114:3
165:21 210:4
308:17 315:3
**okay**
12:9 13:2,13,14,22
14:1,2,8,9,13,14
14:22 15:13,22
16:22 17:19 18:3

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 348

19:13 20:2,7,18
21:4 23:2,11,21
24:21 28:7,18,23
29:18,23 31:6,11
32:19 33:6,9,17
34:13 37:1,3,4,11
37:12,14 38:17,20
38:24 39:10 42:3
43:6,22,25 45:7
49:9,14,24 53:4
53:16 55:18 60:23
61:8,16,23 62:19
64:14 68:3,10
73:19,21 76:17
77:12 78:11 79:7
79:23 80:14 84:22
85:21 90:10 91:12
91:13,25 92:7,22
93:24 95:13 96:20
100:25 101:12
103:7 109:2
114:23,25 117:4,7
117:19 120:5,21
122:10 124:14
125:2 126:11
129:3 132:13
133:1,19 135:20
136:6,12 137:7,16
138:25 140:24
146:2,18 147:8,10
147:11 148:25
151:1,9,20,24
152:6,8,17 153:19
153:21,25 156:2,7
157:22 158:6
163:22 164:19
165:7,22 166:6
168:9,20 169:12
174:6 175:25
176:4,9 179:18,21
181:7 185:19,24
185:25 186:16
187:3,10 191:22
192:4 194:19,23
195:3,6 200:11,15
203:2 204:4

207:10,16 209:18
210:2,6,24 211:11
212:18 213:25
216:5,9,20 218:24
219:6,8 222:3,13
224:8,14,20 227:4
227:24 228:6
229:8 232:17
234:5,8,22 236:13
237:11 239:4
240:25 242:15
243:13 244:1,7
245:19,22 246:1
250:6 251:14
261:12 264:21,25
265:8 266:6
269:10,20,23
271:16 272:23
273:15,24 277:4
278:7 279:25
280:6 282:11,19
282:23 285:8
286:21 287:4
288:13,22 294:2
294:13,17 297:8
297:23 299:12
300:23 302:11,13
303:4 307:18
308:22 309:18,20
311:21 312:18,21
313:6 314:19
315:1 317:3
**old**
85:18 177:3
**Omiencinski**
40:1
**once**
22:24 54:5 58:21
63:13 72:22 77:9
97:15 112:25
130:19 163:18
188:5 238:12
246:1,13 247:10
248:20 249:21
**oncologist**
290:3

**oncology**
147:17 149:17
**one's**
67:8
**ones**
12:19 15:18 39:19
43:8,10 44:10
147:3 161:5 225:8
254:6 288:21
289:21,22,23
**ongoing**
283:7
**online**
154:1,6,12,22
159:5
**onset**
236:16
**operating**
230:22 231:5
**opine**
102:23 254:19
296:20,25,25
297:4
**opined**
66:6 102:13,19
116:8 119:11
**opinion**
31:22,23 43:17
47:1 56:9 65:2,8
65:13 66:21 67:25
68:1 71:13 76:9
79:22 81:8 86:25
87:3,6,13,14,24
88:13,13 109:10
110:6,8 115:24
116:4,10,11 117:7
117:15,19,20
118:2 119:17
122:10,12 123:23
124:23 125:2,15
126:5 148:17
153:5 169:11,12
178:5 181:19
197:6 206:11,14
214:3 224:5 255:4
294:23 295:4,10

295:16 296:6,9
297:23 298:2
299:8,21 302:25
302:25 303:1,18
311:5,6,8,10,11
312:1 313:8
**opinions**
30:14,17 31:8 32:2
32:4,5,7,13 37:18
39:11 41:2 42:16
43:15 45:1 51:2
67:3,4,9 75:21,22
76:4,13 79:17,19
81:2 86:9,20 88:1
97:18 115:20
117:5,21,24 118:5
119:10,14,22
121:8 123:20
124:5,6 131:2
152:15 165:24
175:23 179:15
180:12 197:21
281:15,24 282:2
290:7,11 294:6
298:4 310:11
312:22 313:20
**opportunity**
17:10 78:7 164:1
311:21 312:9
**opposed**
316:23
**opposite**
232:2 277:20
**oral**
4:15,19 36:19
127:3 254:1,3
305:9
**ORANGE**
320:2
**order**
245:8 308:23
**organization**
148:18 251:10
**organizations**
146:10,10 147:17
149:16

**original**
283:20
**originals**
35:16
**Ostbye**
31:16
**outcome**
197:19 320:17
**outcomes**
104:9
**outlier**
263:17 270:21
**outside**
59:4,14 93:10
121:22
**ovarian**
5:11,14,18,20 6:3,6
6:9,12,15,19,22
7:4,11,14,17,21
9:19,25 19:10
20:21 21:15 23:5
25:12,16,21 26:9
26:25 27:5,10,15
28:12 29:2 30:21
31:1,24 32:12
40:19 48:15 52:3
52:9 54:15 56:21
58:17 60:4 62:21
63:21,24,25 66:2
87:1,5,12,14
88:23 89:1,11,17
93:4,9 94:12,14
94:19 98:5,14
102:8,12,15,23
103:20 105:11,15
108:8,22 109:14
109:22 110:10
111:9,10,13 113:1
117:14 120:19
122:13,17 124:3
124:24 125:6,8
127:4 128:11,20
135:13,18 136:7
137:1 138:17,20
138:22 139:3,18
140:16 142:14

Patricia G. Moorman, M.S.P.H., Ph.D.

143:1,15,25
144:18 145:9
146:4,12 147:1,19
148:1,10 149:4,9
149:23 150:11,24
151:10 154:19
156:12,17,23,25
157:2,4,13 158:13
160:20 161:11
166:8,20 167:5,6
168:4 174:11
176:16 181:15
185:14 186:19
188:15 190:13
192:24 193:6
196:25 197:7,8,20
201:12 202:23
203:24 205:20
207:23 209:6
210:21 212:10
213:1 218:21,22
224:18 225:6
226:4,17 227:16
228:11,17 229:25
231:7 232:7,11
233:13,23 234:24
237:16 245:11,15
245:21 246:9,24
247:7 249:13
251:10 252:25
253:11,25 254:4,8
254:16 255:8
257:25 259:22
263:25 265:5,20
266:3,20 267:22
267:24 270:8
271:25 278:13
285:10,14,17
286:14,20 291:21
292:5,13,14
294:25 295:2,4,7
295:20,22 296:7
297:5,10,13
298:16 299:25
303:2,5,9,14,19
304:2,5,10,19

305:5,13 307:25
310:12,16 311:2,9
311:13,15 312:2,5
312:23 313:9,12
313:16 314:7,14
315:16,20 316:3,9
316:18,23
**ovaries**
298:19,24 299:10
299:15,23 300:7
303:22
**ovary**
90:19 92:15
**Over-speaking**
99:8
**overall**
26:11 52:8 116:4
155:5,13 184:5,13
193:24 198:13
200:1 229:21
235:16 262:21
267:23,25
**overestimate**
160:12 226:13
**overestimation**
203:21 204:7
**overlap**
16:5,6 161:5
**overlapping**
161:1
**oversight**
23:6,9
**overstating**
303:8
**ovulation**
40:19

──────────
**P**
──────────
**P**
2:1,1 3:1,1 8:1
**p-value**
274:19
**p-values**
274:22
**p.m**
115:4,6 116:21,24

165:9,10,10,12
211:14,15,15,17
219:23 259:14,15
259:15,17 278:3,6
280:11,14 302:17
302:20 309:24,25
309:25 310:2
315:7,10 317:7,8
**page**
4:2,11 21:4 33:13
38:21,24 39:1,4,5
55:6,7 61:19
77:16,17 80:11
85:3 90:7,9,10
91:25 92:4,9 94:5
94:8 108:13
111:20 128:2,2,4
132:8,15 135:11
135:12,15 139:10
139:11 140:19
153:15,22 157:22
167:15,20,21
169:16,16 170:8
174:1 176:9
180:14,16 184:24
194:24 196:20
198:10 203:2,15
207:11,18 210:7,8
210:9 211:19
212:19 215:25
219:25 220:1,25
221:8 222:4,4
224:9,9,14 226:7
232:23 233:4,5
234:2 235:2 238:6
240:5,23 244:1,7
251:14,20 253:20
255:1 259:19,20
260:8,20 262:5,5
264:18 270:2
271:16 272:11
274:25 278:7
282:13 298:12
307:21 319:5
**pages**
320:10

**paginated**
151:16
**paid**
73:6,10 124:15
127:20 174:17,21
174:23 179:7,11
**paper**
7:19 19:17,18
20:23 21:5,8,12
23:17 25:5,6,14
25:17,22 26:7,13
26:16,22,25 27:3
27:9,13,21,22
28:2,3,11,20,22
28:23 29:11,12,14
29:17 107:22
108:4,6 109:3,13
135:12,22 136:5,7
136:22 138:3,21
138:24,25 139:12
140:9,17 157:3
165:15 173:6,7,9
174:13,15 176:5
178:24 179:1,19
179:21 180:6,12
181:9 182:24
183:2 185:4 187:3
189:4,9 190:13,14
192:11,23 193:6
193:12 195:7,11
202:19 204:13,25
205:4,7,25 206:10
208:24 214:9,17
216:15 217:3,5
226:22 228:10
229:17,22 230:15
232:12 234:3,13
234:22 236:15
242:2 243:3 269:4
269:12 274:16
276:9,10,13
277:17,23 279:6
286:14,18 288:1,6
306:18,20 307:5
307:10,22
**paper's**

306:24
**papers**
22:19 28:7,8 29:6
30:5 112:21,23
122:16 138:19
165:16 188:24
191:13 194:11
228:24 246:16,21
247:14 250:8
273:20 277:18
287:21 292:15
307:6
**paperwork**
28:1
**paragraph**
78:5 90:12 92:8
93:14 94:8 95:24
108:15 109:24
128:4,6,7,8
130:14 131:22,25
132:14 135:15,17
140:20 150:8
158:1 167:16,17
167:23,24 180:15
180:16 196:21
210:14 211:23
212:20,21 216:2
221:11 233:8
238:7 240:9 241:1
260:9,24 262:6,7
270:4 275:1
298:13
**Parfitt**
2:5 4:6 8:24,24
12:11,21 15:23
16:1,4 20:12,17
22:20 23:1 25:1
26:23 27:7 29:13
32:25 34:6,11
35:12 36:4,11,14
36:16 37:21 38:1
41:5,23 42:8,18
45:23 46:8,14
47:19 48:3,22
49:5,15,20,22
50:12,19 51:24

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 350

| | | | | |
|---|---|---|---|---|
| 52:14 54:10 55:1 | 162:21 163:17 | 316:11 317:4 | 294:11 | 207:25 208:21 |
| 55:3,5,8,12,20 | 167:10 168:11 | **Park** | **passive** | 216:22,25 217:3 |
| 57:14 58:3,12 | 170:4 171:7,17,20 | 2:22 20:19 25:6,9 | 259:24 260:7 | 217:24 |
| 59:10 60:14 61:1 | 171:24 172:3,8,18 | 26:2,22 | **pathologist** | **Penninkilampi's** |
| 61:11 62:8,23 | 172:22 173:2 | **part** | 54:5,7,14,18 | 217:9 |
| 63:6,12 64:5 65:6 | 174:19,25 175:9 | 15:11,15 16:19 | **pathologists** | **people** |
| 65:15,19 66:17 | 176:6 177:1,14 | 23:9 48:1 60:12 | 54:7 316:14 | 12:24 15:24 45:2 |
| 67:6 68:6,22 | 178:9 179:9,23 | 67:22 68:1 88:15 | **pathology** | 76:3 104:10 105:1 |
| 69:20,24 71:15 | 180:2 181:3 | 100:6 105:13,17 | 54:4,6,9,13,14,21 | 105:14 112:5 |
| 72:17,24 73:8,14 | 182:13 184:4,18 | 108:7 116:2 | 55:15 56:4 | 142:4,6 144:12 |
| 73:24 74:10,25 | 186:1 188:16 | 126:11 127:4,7 | **patients** | 193:18,23 199:20 |
| 76:7 77:7,10 78:4 | 189:17,25 190:6 | 166:16 202:8,9 | 32:12 | 199:25 200:5,7 |
| 78:8,12,20 80:3 | 190:15 192:16,25 | 214:11 229:20 | **Patricia** | 220:10 221:5 |
| 81:6,20 82:5,19 | 193:14 194:5,14 | 254:2 262:20 | 1:12 4:10,12,13,15 | 228:23 255:23,24 |
| 83:12,22 84:9,17 | 195:24 196:12,17 | 271:1 277:23 | 4:19,21,23,24 5:4 | 262:1 274:20 |
| 84:19,25 86:2 | 197:23 199:2,16 | 309:10 | 5:15 8:5 9:2,17 | 301:1 |
| 87:16 88:4 89:2 | 200:20 201:3,15 | **partial** | 36:20 41:16 317:6 | **people's** |
| 89:12,21 91:7,18 | 201:17,22,25 | 78:20 | 318:2 319:3 | 44:19 |
| 91:23 93:16,21 | 204:15,22 206:2 | **participants** | **patterns** | **percent** |
| 94:22 95:3 96:5 | 206:12 207:1 | 130:7 189:23 | 182:4 | 59:15 60:11 134:13 |
| 96:13 97:14,21 | 208:3 209:12,21 | 191:18 203:23 | **Paul** | 134:20 137:17 |
| 98:9,19 99:1,7,11 | 213:22 214:4 | 217:24 218:1 | 7:18 | 155:3,4,6,8,11 |
| 99:18 100:3,9,20 | 219:18 228:15 | 219:12 234:24,25 | **pause** | 166:7 236:5,7,13 |
| 101:3,9,21 102:16 | 229:18 230:4 | 236:17 284:3,22 | 187:11 | 236:13 247:22 |
| 104:1,24 105:24 | 234:7 236:11 | **participating** | **PCPC** | 248:5 249:13 |
| 107:7 108:9 109:5 | 241:15 242:9,14 | 284:24 | 310:8 | 250:1 256:12 |
| 109:16 110:7,25 | 245:23 246:20 | **particular** | **PDQ** | 262:23 303:9 |
| 112:13 113:5,19 | 247:3,24 248:2,11 | 12:2 41:22 56:9 | 6:3,4 151:3,10,21 | 313:11 |
| 113:25 114:20 | 250:23 251:4 | 75:11 138:5 200:9 | 153:13 155:23 | **percentage** |
| 115:1,15 116:1,13 | 255:17 258:2,14 | 221:19 232:20 | 292:21 293:9,17 | 185:3 303:14 |
| 116:19 118:1,16 | 259:2,11 266:5 | 242:17 243:16 | **peer** | **Peres** |
| 119:1,19 120:9,20 | 267:6,18 268:15 | 288:1 297:4,8 | 26:19 30:14 286:1 | 23:17 |
| 122:6,14 123:10 | 271:8,10 273:12 | 299:9 301:21 | **peer-reviewed** | **perfect** |
| 123:25 124:10,12 | 274:11 275:17 | **particularly** | 65:2,8,14,25 68:2 | 275:24 276:2 |
| 124:25 125:17 | 276:24 277:21 | 45:2 47:5 136:15 | 69:3 72:9 74:23 | **perfectly** |
| 126:3 127:17,23 | 279:10 280:5,7 | 158:10 220:19 | 75:2 81:9,18,24 | 275:13 |
| 129:6 130:18 | 281:20 287:24 | 222:9 223:9,24 | 82:12 | **performed** |
| 131:14 132:4 | 295:17 296:8,23 | 238:11 | **Penninkilampi** | 121:19 163:1,4 |
| 133:5,11 134:18 | 297:6 298:3 299:1 | **parties** | 6:8 147:24 164:22 | 212:4 269:6 |
| 135:6 137:9 | 299:11 300:1,21 | 121:20 320:13,16 | 165:15 166:4 | 313:19 |
| 142:16 143:16 | 301:24 304:11 | **partly** | 167:14,18 168:21 | **perineal** |
| 144:20 145:11 | 305:20 306:5 | 210:17 | 183:13,17 184:3 | 6:6,11,14,21 7:16 |
| 148:15 149:11,18 | 307:2 308:2,9,13 | **parts** | 185:19 186:12 | 7:20 96:11,20 |
| 152:11 153:6 | 308:17 309:3,12 | 38:17 144:13 | 187:20 191:15,19 | 97:13 98:17 99:22 |
| 157:17 160:7 | 309:21 310:4 | **pass** | 192:9 193:11,20 | 100:7,16,16,22 |
| 161:2,18 162:14 | 314:4,22 315:5,22 | 84:23 136:10 | 194:2 206:23,23 | 101:17 151:25 |

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 351

166:6 168:1
174:10 176:14
185:13 202:22
205:19 265:19
266:4
**period**
16:13 113:22 114:7
160:21 189:20,22
191:8,14,16,17,23
192:10 193:10
194:10 208:9
217:12 220:11
282:16 301:1
305:23 306:4,9
**peritoneal**
5:17 6:4 99:12,23
100:4 138:22
139:24 151:11
**permitting**
291:19
**person**
11:8
**person's**
223:17
**personal**
3:11 8:18 206:11
222:20 223:8,21
223:22 281:17,22
294:15,20
**personally**
45:16 233:25
290:20
**perspective**
86:13
**perspectives**
44:20
**pertain**
26:1,5 30:10 80:4
226:17
**pertained**
314:13
**pertaining**
13:8 19:10,14 22:5
59:9 64:3,7 75:5
75:17 85:8 87:13
109:18 253:21

279:12
**ph**
1:24
**Ph.D**
1:12 4:10,12,14,21
4:24 5:5 9:2
318:2 319:3
**Pharmacopeial**
83:10
**phrased**
297:17
**phraseology**
234:16
**phrasing**
103:3 149:2 241:7
**physician**
288:18
**PI**
284:20
**picture**
214:12
**piece**
66:23
**pieces**
312:12,15
**pile**
37:1 183:15
**pinpoint**
102:24 295:5,19
305:10
**place**
33:11 162:18 235:3
**Plaintiff**
11:16 72:18 310:3
**Plaintiffs**
2:2 8:23,25 9:22
16:25 21:10 30:7
31:23 36:13,18
73:7,10 86:21
106:7 124:15
174:24 271:4
**Plaintiffs'**
4:18 8:21 14:16
17:3 40:14 41:24
43:22,25 44:12
48:21 49:4 59:22

67:20 68:5,8
72:10,15,21 73:3
82:16 83:17
145:25 289:9,17
290:11 291:16
**planning**
284:6
**plausibility**
117:12 121:5
156:24 205:16
260:15 297:19
309:6,15 313:14
**plausible**
182:6 183:10
231:24
**play**
231:13,23
**please**
8:6 9:16 14:13
19:21 24:22 61:9
61:20 64:22 70:3
70:4 77:4 78:22
101:9 111:18
115:18,18 172:12
173:19 186:3
200:14 219:19
228:4 237:12
282:9 299:5
309:22
**pleasure**
9:11
**plenty**
145:14
**PLLC**
2:12
**PLOS**
7:6
**plot**
194:25
**plots**
268:6
**Plunkett**
291:4,8
**Plunkett's**
291:10
**point**

28:5,16 51:13,18
79:21 102:18,22
138:8 142:1
144:11 147:14
159:24 178:13,14
178:17 179:5
190:16 204:6
226:22 228:21
229:3,6,21 237:9
239:10 247:15,20
256:11 257:6
258:18 259:3
269:12 289:1
293:7,14 295:3,15
295:19
**pointed**
266:22
**pointing**
230:15
**points**
51:14 238:4 274:22
**policies**
22:9
**Pollak**
31:16
**pooled**
6:19 179:14,18
**population**
132:21 138:3,15
261:7,13,23 262:1
304:18
**populations**
304:24
**portion**
57:23 86:18 95:14
171:23 213:15
219:1 241:10,13
307:20
**position**
70:22 71:1,3,8,10
263:24
**positions**
149:15
**positive**
90:21 92:16 93:3
94:2 138:11 162:1

176:18 211:4
287:15,22 288:7
**possession**
24:17 36:1
**possibilities**
218:11
**possibility**
185:23 205:13
223:16 238:23
239:11 240:1,19
241:23 257:13
**possible**
48:14 96:17,24
97:10,23,25 98:21
101:23,24 102:1
104:7 107:3
110:15 147:13,14
190:10 239:14
255:11 257:5
286:10 291:18,25
303:21 307:1,25
308:7
**possibly**
66:23 146:14 253:3
257:8 296:16
**post-2014**
235:23 236:5
**post-data**
240:16
**post-interview**
225:11
**postings**
30:16,17
**potential**
19:19 20:24 21:6
23:8 26:22 28:13
86:16 87:10 94:11
107:2,16 109:25
110:13 117:13
122:19 164:12
182:25 203:7,12
203:13,18,21
204:7,7,8 218:20
230:12 231:17,20
240:15 241:19
270:15

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 352

**potentially**
190:20 261:23
306:10
**powder**
1:6 6:18,22 7:11,14
52:2 64:4,8,19
65:4,18 66:13
68:20,25 69:7,9
70:13,15,18,19
71:1 75:6,18,24
76:2,5,10,14
79:20,23,25 80:1
80:10 81:10,14,22
82:14 83:2,9 84:4
86:1,10,22,24
87:4,7,8,11 88:2,7
88:11,15,17,22
94:7,20 102:12,14
105:11,22 106:8
106:13 109:20
111:12 112:8
113:21,24 114:7,9
114:13,14,17
116:3,4 117:9,13
117:16,22,25
118:6,8,19 119:16
119:22 120:4
121:1,6,9,14,16
121:24 122:3
123:24 124:20,23
125:4,7,13,19
126:5,22 128:22
128:24 129:4,9,10
129:10,24 130:3
130:17,23,24
131:17 132:2
150:11 202:22
203:25 223:17
237:15 239:15
265:19 266:11
267:10 276:18
277:8 278:11,21
279:14 281:9,12
281:16 285:18
291:21 292:4,6,7
294:24 296:1,3

298:1 303:19,24
304:1,5,9,23
310:12 311:6,9
312:2,4,22 313:9
314:6,14 319:2
**powders**
9:25 93:11 96:3,3
96:10 120:18
123:5,5,9 129:13
129:16,19,20
131:8,8,9,11
140:10 180:19
278:18
**power**
66:7 200:3 211:20
212:2,9,12 213:4
213:9,21 214:3,9
214:11,16,18
215:3,11,13,16,17
284:19
**practice**
224:22
**practices**
1:6 281:25 282:1
**pragmatic**
300:4
**pre-**
240:16
**pre-2014**
235:22 236:4
**precede**
177:9
**preceded**
314:19
**preceding**
203:15
**precise**
57:11 129:8,11
130:20 146:7
172:20 214:16
265:1 307:19
**precisely**
91:6 118:17
**precision**
221:3
**pregnancy**

224:2 305:9
**premature**
108:23
**preparation**
19:2 26:8 37:5 38:8
38:9 313:20
**prepare**
45:15,16 46:20
**prepared**
15:7 16:8 32:15
46:22,24 291:2
292:19
**preparing**
12:6,17 17:13
34:17,17 150:21
**preretirement**
10:16 282:17
**presence**
76:14 83:5 96:2
117:22,24 118:5
119:15 121:8,14
123:4,8
**present**
118:25 270:8 275:4
**presentations**
30:20
**presented**
73:22 74:18 111:3
121:10 148:17
**presents**
110:23
**preserve**
24:21
**presume**
20:11
**pretty**
63:22,23 71:12
72:6 111:13 162:7
182:8 229:21
231:1 240:9
242:23 278:23
316:6
**prevalence**
130:12,17 260:21
261:2,6,12 304:23
**Prevention**

6:4
**previously**
48:17 50:15,22
82:21 181:16
185:2 296:13
297:12 301:16
**primarily**
112:5,25 125:3
**primary**
5:17 6:4 52:1 63:14
135:23 138:22
139:24 151:11
**print**
153:12
**Printout**
5:20
**prior**
14:22 15:18 22:19
33:9 38:7 56:8
88:7 141:17 161:6
162:11 176:19
180:4 218:1
219:12 233:14,23
234:1 236:24
300:18
**probable**
97:6 101:24 102:2
**probably**
13:4 24:18 30:3,4
40:20 55:23 61:5
68:15 71:6 95:20
112:4 113:7
145:24 186:20
218:10 240:6
241:16,17 288:21
291:14,23,25
292:10 303:7
307:11
**problem**
16:5 102:6 103:4
109:25 110:23
111:5 159:18
220:18 230:7
232:6
**problems**
164:16 184:20

185:20 187:15
200:4 270:22
**procedure**
127:5,7
**proceed**
52:21
**proceeding**
320:4,6
**process**
258:22 286:1 306:3
313:22
**produced**
4:24 16:10 33:18
45:13,18 68:19
88:8
**produces**
83:8
**product**
76:2 117:13 119:25
129:10,24 130:4
296:10 298:1
**products**
1:6,7 3:11 8:18
64:4,19 65:4,18
66:8,14 68:21
69:1,9 70:16,19
71:1,18,20,22
75:6,8,13,14,18
75:20,24 76:6,10
76:14 77:25 79:5
79:20,23,25
80:1,2,4,5,7,16
81:11,13,14,22
82:14 83:2,9 84:4
85:15 86:1,11,22
86:24 87:4,7,9,11
88:8,11,15 102:12
102:15 105:11,19
105:23 106:6,8,14
109:20 111:12
112:8 113:22
114:7,10,13,14,17
116:3,5 117:9,16
117:22,25 118:6,8
118:19,25 119:16
119:22 120:4

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 353

121:1,6,9,14,15
121:17,21,25
122:3,4 123:24,24
124:20,23 125:5,7
125:13,20 126:5
126:23 281:9,12
281:16 294:15,21
294:24 296:1,4,11
297:19,20 298:8
298:10 303:19,24
310:12 311:6,9
312:2,4,22 313:9
314:6,14
**professional**
6:5 31:9 32:1,8
126:8,11 138:11
151:11 181:19
222:17 261:18
**professionals**
32:11
**professor**
10:10
**profiles**
315:21
**progress**
27:17 28:9,11
30:10
**progressed**
160:20
**promised**
232:16
**prone**
185:7 207:13
**pronounce**
196:2
**pronounced**
123:18 316:1
**proper**
133:22
**proportion**
80:1
**Proposal**
174:2
**proposition**
124:22 203:10
204:5 226:10

272:23 273:8,21
**prospective**
7:4 203:5 207:21
210:17 211:1,3
227:14,20 228:2
228:13 229:12
230:2
**prospectively**
202:24 205:18
206:4
**prove**
79:10
**proven**
255:16
**provide**
34:15 40:14 67:8
69:4 72:22 74:2
83:17,20 91:11
116:9 141:8
145:25 199:21
214:19 226:11
305:3
**provided**
17:9 18:17 35:23
39:13 40:2,11,24
42:12 44:14 46:25
47:1 48:21 49:4,7
67:20,23,24 68:7
68:16 69:2 72:10
72:14,19 74:1,7
77:3 80:15 82:16
85:13 115:20
118:23 141:21
144:9 149:8
289:16 293:15
294:5 296:21
306:17
**provides**
87:10 194:10
231:18
**providing**
65:13 67:3,4 81:18
141:17 142:20
**PTI**
3:17 8:19
**public**

30:24,25 47:16
48:1 166:12,24
261:8,17,18,23
320:3
**publication**
22:4 188:10,20
189:3,7,12,14
196:14 237:8
242:7 244:14,17
253:4,9 283:23
285:20 315:15
**publications**
19:9 26:5 32:16
41:9 47:11 243:2
285:25 286:8
**publicity**
233:22 240:12
**publish**
65:2,7
**published**
21:19,24 23:24
48:5 67:4 81:18
95:18 98:2 110:11
127:3 135:22
138:16,19 147:3
148:11 158:18,22
160:25 161:4,6
162:1,16 177:24
186:24 188:13,18
188:24 193:13
241:17,18 243:9
243:20,22 244:19
244:23 254:19
255:4,9 306:12
315:14
**publishing**
138:21 302:7
**pull**
146:6 161:11 234:5
**purchasing**
130:4
**pure**
296:6
**purported**
76:5 89:10 126:13
150:23

**purpose**
27:8,12 128:18
162:15 202:21
284:14
**purposes**
20:2 27:3 34:17,22
95:16 312:21
313:19
**put**
78:24 103:17 159:1
255:8 284:15
287:18 314:9
**putting**
75:24
**pyramid**
159:1 301:18 302:1

————————
**Q**
**qualification**
178:23
**qualified**
55:22
**qualitatively**
106:6 142:24
**quality**
25:20 127:6
**quantify**
72:3
**quantitatively**
142:25
**quantity**
49:7 76:9
**quarrel**
85:24 86:6
**quartiles**
276:22 277:12
**question**
15:18 28:18 29:15
50:15,22 54:22
55:14,16 56:13
57:11 58:15 60:5
61:21 63:14 64:15
64:20 65:21 66:18
68:24 70:2,3,4
74:5 77:9 87:18
98:25 99:2,6,19

101:16 102:4
109:3 110:24
117:3 119:9 120:3
120:22 124:3
125:19 126:1
129:1 131:16
135:8 144:6
146:21 156:14
163:9,24 172:4,7
172:19 175:4
177:20 178:11,11
178:20 183:5
184:16 187:19
189:2 200:14,15
200:21,22 202:1
206:19,21 219:3,4
219:5,8,9,10
223:14 227:17
232:8,16 245:17
249:4,5,6 252:19
254:22 255:6
258:17 265:2
267:8 271:13
283:16 286:7,21
286:25 294:3
307:20 308:2,5,21
310:10,15
**questioned**
311:17 314:5
**questionnaire**
129:2 131:16
140:11 191:20
286:25
**questions**
13:25 14:12 16:16
31:5 36:6 37:2
55:3 62:11 78:7
113:6 164:1
171:19 184:10
201:10 205:16
209:25 220:13
223:12,22 224:25
225:16 280:1,4
294:22 302:12
310:7 314:23
315:1

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 354

quick
117:2 306:16
quickly
148:4
quite
29:24 64:9 101:4
138:19 140:2
174:13 209:8
218:13 237:13
262:9 263:8,17
276:25 295:7,22
295:22 314:17
quote
103:4 150:9 167:18
203:16
quoted
80:20

**R**

R
2:1 3:1 8:1 319:1,1
320:1
race
262:14
raise
164:2 225:24
raised
205:15 306:11
ran
206:20
randomized
166:22
range
134:17,20 137:13
237:1 248:22
255:15,20 256:11
256:17,19 257:23
ranked
302:2
rappel@seyfarth...
3:15
rare
114:11 310:25
rate
14:18 236:5,7,18
rates

111:23 112:10
113:24 114:8
236:6,10
ratio
132:9 133:7,24,25
134:6,7,16,23
136:18 137:3,12
137:13 138:6
139:23 143:24
155:11 161:16,24
162:4 235:11,14
235:16,17 241:10
241:13 242:12
248:22 257:24
261:25 262:24
263:7 264:22
266:12 267:12,14
268:24 274:9,13
rationale
188:1
ratios
136:25 139:12
227:13 234:23
240:20 247:12
253:6 255:12
256:4,6,25 257:12
257:14,21 258:7
268:2,2,7,12
raw
77:24
RDR
1:21 320:22
re-ask
79:18
reach
111:9 125:14
126:25 155:18
182:18 231:2
256:25 263:3
308:24 309:11
reached
95:12 97:20 156:9
178:14 227:13,21
252:7 268:19
299:15 300:7
reaches

298:18,23 299:10
299:23
reaching
141:4 161:15
reaction
231:19
read
39:13,17 43:12
59:12,19,25 60:7
64:9,10,23,24
71:6,6 72:7,8
76:23 77:21 78:2
79:1,9 85:12,23
90:16 92:11,23
94:9 99:4 108:18
108:25 111:1
118:3 128:9
132:17,24 140:25
141:10 145:22
150:9 154:16
158:8,16 162:25
167:25 169:19
170:10,19,20
173:20 174:6
176:10 180:17
185:2,5 195:12
196:21 198:11
199:18 202:20
203:4,17 204:2
205:9,22 207:17
207:19 210:14
212:22 221:11
222:6 233:8 237:9
238:8 239:13
241:4,7 247:14
251:20 259:21
261:4 262:8
265:18 269:13
270:5 271:22
272:12,21 275:3
275:20,21 276:17
276:23 277:7,14
277:16 278:8,15
285:21 289:20
291:10,11,18
298:5,14,20 318:3

319:5
reader
22:7 160:15 168:21
170:1 175:7
176:23
readers
171:4
reading
56:13 77:19 91:3
94:16 117:10
120:21 144:14
145:21 150:13
158:4 170:14
185:17 197:4
213:13 226:14,16
228:4 238:15
240:3 251:25
254:22 260:1
291:15 298:13
300:3
reads
278:8 319:5
ready
28:6 52:21 259:9
real
193:25 247:16
249:2,5,6 257:13
257:17 316:17
really
44:25 51:16 86:15
142:8 155:17
163:23 171:9
187:13 188:6
197:11 211:2
214:20 225:2
230:2,15 231:3
258:15,16 259:20
263:17 265:1
298:7 303:15
310:20
realtime
99:5 148:22
reason
85:24 116:15
178:22 203:18
204:7 214:1,6,8

214:10 222:3
224:1 230:13
239:8
reasonable
284:21
reasons
161:10 180:3
215:23 232:25
241:25 242:21
251:7 263:2 300:4
**REATH**
2:21
**Rebecca**
44:6
rebut
68:19 73:23 74:19
rebutting
118:24
recall
7:14 10:3,6 11:17
13:17 17:6,13
22:1 24:6 40:1,3,9
44:11 54:20,22
66:9 69:15 75:9
75:14 76:16 83:19
96:6 103:17
104:18 107:13
110:11 112:2
115:10 118:19
123:11 132:23
135:25 138:21
146:5 149:5,7,12
150:5 159:18,18
160:4 164:11
185:7,20 186:6,11
192:21 203:7,12
203:14,22 204:9
204:10 205:14
207:13 218:9,12
218:13 220:11,18
220:23,24,24
221:1,1,2,5,7,12
221:18 226:11,22
229:2,3,14 230:7
230:7,12 231:4,4
231:11,12,17,20

Patricia G. Moorman, M.S.P.H., Ph.D.

232:5,9,13,20
234:19 237:16
238:10,24 239:7
239:12,22 240:1
240:11,13,16,19
241:6,14,19,24
242:4,5,8,20,21
243:4,10,17 251:3
251:12 252:13,13
252:20 253:16
254:10 283:9
287:8 292:23
295:14 300:13
311:19 314:7,16
**recalling**
149:1 242:16 307:5
**Received**
92:24
**Recess**
52:17 115:4 165:10
211:15 259:15
309:25
**recognize**
18:3 56:16,17 57:6
79:25 103:24
106:21 160:9
316:13
**recognized**
290:1
**recognizing**
57:3 161:9 284:17
**recollection**
146:2
**recommendations**
311:22
**record**
8:3,7 9:16 20:2
21:2 36:15 41:23
50:4 52:15,18
73:25 74:14 91:19
95:16 100:5,12
115:2,5 116:20,22
116:23 165:8,11
199:17,17 211:13
211:16 219:16,20
219:21,22 259:13

259:16 278:1,2,4
278:5 280:10,12
280:13 302:15,16
302:18,19 309:21
309:23 310:1
315:6,8,9 317:7
**reduced**
154:8 155:9
**reducing**
10:17
**reduction**
155:3
**REES**
3:3
**refer**
17:16 54:25 61:8
115:21 120:10
123:15 128:3
133:20,22 134:8
134:12 135:12,18
137:23,25 138:4
138:10 163:10,11
164:10 166:19
183:6,9 194:8
207:6 246:3,18
250:9 288:17
295:25
**reference**
39:8,10,18 40:18
41:3 45:19 46:6
76:20,23 216:24
246:17 278:25
**referenced**
39:15 75:5 139:6
**references**
5:3 33:20 38:22
39:10 45:25 46:4
46:17,22 47:7,10
47:13,15 49:10,17
49:18 50:17,25,25
51:1,5,7,9,9,15,16
51:19,20 115:9
**referred**
40:21 60:1 111:16
124:8 183:24
208:22 246:25

247:8 270:21
**referring**
11:10 20:19 62:3
67:19 79:22 80:11
91:15 96:13 107:9
107:11 115:10
120:11 147:6
148:7,13 151:3
179:6 215:14
216:16,21 246:22
260:3,11,14 266:8
274:23 296:1
300:18
**refers**
182:24 238:3 246:9
246:12
**reflect**
18:6 73:25 100:5
238:24 273:8
274:8
**reflected**
216:15 217:5 292:2
**reflecting**
299:16
**reflection**
136:16
**reflective**
262:18 267:16
273:1
**reflects**
110:8 236:1,3
269:23 274:16
279:23
**regard**
12:15,19 59:6 75:4
82:15 116:11
117:6 120:2 121:8
122:8,23 124:3,5
124:18 142:12,14
147:12 154:14
156:10 168:3
213:21 222:7
243:10 253:19
272:6 286:17
292:13 297:15
302:24 303:17

305:16 310:10
313:3,8 314:6
315:19
**regarded**
142:10
**regarding**
73:3 282:4 283:24
**regards**
56:3 120:23
**region**
223:18
**regulatory**
25:23
**Reid**
5:13 107:22,25
108:3,6
**reject**
250:12
**relate**
310:11
**related**
5:6 15:15 16:12
21:15 48:14 58:17
59:16 60:19 64:24
66:1 68:15 142:3
181:14 260:6
284:15 285:14
320:13
**RELATES**
1:9
**relation**
122:17 230:19
253:17 254:4
286:14 304:5
**relationship**
63:20 139:23
176:13 194:12
205:19 253:12
**relationships**
158:12
**relative**
158:13 160:12
205:10 213:6
221:14 251:22
255:20 264:5
270:22 320:14

**relatively**
26:10 27:10 104:8
136:16 275:12
310:25
**relevant**
60:3,9 127:8,10
219:15 233:9
273:25 298:17
**reliance**
4:24 45:5,17,18
**relied**
119:5 126:24
298:25 299:7
**religious**
25:15
**rely**
41:1 54:6 117:23
210:10 300:4
301:5 308:24
309:7
**relying**
41:6 120:7 166:16
241:12,12
**remark**
256:6
**remarkable**
45:1
**remember**
21:25 112:21
191:10,12 212:11
221:3 287:12
293:6 307:6
310:13,17
**remind**
84:15
**reminder**
13:25 294:19
**rendered**
123:5 298:1
**rendering**
312:21
**renders**
96:3 123:24
**Renée**
3:15 8:17 294:20
**repeated**

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 356

134:22
**repeatedly**
255:7 268:21
271:13
**rephrase**
14:11,13 101:6
106:2 180:25
215:1 282:12
286:5 299:4
**replicated**
262:11
**report**
4:21 5:3 6:11 12:17
13:8,16 26:6
30:14 32:17 33:21
34:17 36:3 37:7
37:15,17,22 38:7
38:9,13,15,17
39:12,15,20 42:13
42:16,21,22 43:16
44:4,24 45:20
46:5,12,13,21
47:25 48:10 49:3
49:11 50:6 51:1,3
51:6,10,14 57:8
66:5,10,20 69:8
69:13,14 71:21
75:17 76:18 78:18
79:23 80:9,21
88:3 90:7 93:25
95:2,11 97:16,19
98:1,3 108:4
112:24 115:8,11
116:8 118:13
119:11,14 120:7,8
120:11,11,24
122:25 123:15,15
123:19 128:3
129:3 130:10
132:1,6 133:1,9
134:4,19 135:5,11
136:3,22 139:1,12
140:14,19 144:10
144:14 150:21
152:18,22 157:23
159:23 160:16,17

162:18 164:6,6,9
164:12,18 168:20
168:24 170:2,5
171:5,9 172:14,20
173:1 175:3,6,7
175:11 176:23,24
177:4,5 183:18,22
186:6 187:4 191:2
191:22 193:10
195:3,6 196:20
198:10 204:8
206:18,25 207:7
211:19 213:21
215:5,9 216:10
218:6 219:25
220:22 221:8
222:4,12 223:7
226:19 227:25
235:21 240:14,18
242:13 243:14
244:2 245:12
251:15 252:22,24
253:14 254:20
255:5,9,14 256:2
257:10,23 258:6
259:19 264:21
265:11 267:2
268:24 271:19
274:13 275:24
277:24 279:3
289:13 292:1,19
293:19,22,23
294:4,8,24 298:12
301:4 302:7,8
303:18 307:24
309:6 313:20
**reported**
1:21 23:20 88:6
112:22 130:23
134:6 136:12,21
136:22,24 139:16
139:23 140:1,14
142:6 160:1,11
163:6 185:3 187:1
187:5,23 189:4,9
216:18 220:5,7,17

228:25 231:14
235:15,23 236:4,6
236:6,10 239:17
255:20 271:20,24
279:8,21,22
292:15,16 296:4
**reporter**
8:7 14:3 100:4,11
116:17 320:3
**reporting**
203:25 217:9,10
236:17
**reports**
42:20 43:18,23
44:1,13,16,22
67:3 73:2,19,25
74:7,15,22 112:18
118:15 127:21
187:23 216:25
238:7 255:19
289:9,20 290:14
290:15 291:3,16
**represent**
147:17 280:20
294:20
**representation**
55:24
**represents**
50:5 148:13
**reputation**
290:6
**request**
24:25 84:3 283:17
**requests**
33:15
**required**
21:16
**requirements**
21:23 22:1
**reread**
19:4 286:4
**research**
6:11,13,18 7:6,10
127:6 174:2
224:23 243:24
283:20 285:9

**researchers**
254:2
**reservations**
168:22 170:3
172:21,24
**reserve**
172:1,4
**reserved**
175:8 176:24 317:9
**reserving**
181:1
**respect**
27:21 29:10 56:20
67:11,19 68:3
70:22 75:16 93:9
94:6 121:20 126:1
136:1 137:3
142:24 149:9
156:25 163:8
188:12,25 190:13
214:16 216:1,9
220:13 224:18
252:7 281:18
285:24 308:11,20
**respectfully**
163:23 218:25
**respond**
23:19 33:25
**responded**
24:8 62:12
**response**
4:18 36:18 226:2
**responsive**
34:4 200:13
**rest**
291:15
**restate**
87:18 117:3 225:12
258:4
**restricted**
278:17
**result**
213:7 221:13 264:7
**results**
77:18 79:2 80:3
132:3 135:25

140:13 142:7
169:20 170:10,16
170:21,23 171:10
172:15 185:6
195:13,20,22
196:8 213:12
215:19 227:18,20
227:22 228:5
229:11,11,17
230:25 231:2,5,8
231:11 232:5
238:18,24 264:18
268:18 269:14
279:8
**retained**
11:20 88:3 292:5
295:11
**retire**
282:24 283:1
**retirement**
282:19
**retrograde**
94:11
**retrospective**
228:2,14 230:1
**returned**
232:22
**returning**
103:19 123:14
177:18 183:13
187:19
**reveal**
222:25
**review**
5:9,12 6:7,9 7:19
17:10 19:1 21:23
26:19 30:14 38:7
38:9 43:14,18,20
44:16 47:3,5
51:22,23 56:11,22
56:25 57:12,19
58:1,10,19,25
60:2,12,24 61:22
62:2,17,20 63:3
63:10,15,19 64:2
64:6,17 65:5,9,11

Patricia G. Moorman, M.S.P.H., Ph.D.

66:14,22 67:12
82:3 89:9 112:1
113:3 127:11
156:15,18 157:6
167:8 253:20
254:3,7 280:3
286:1 291:6
293:12,13 311:22
311:24 312:9,13
313:18 314:6
**reviewed**
34:16,22 39:23
40:6 42:24 43:2,2
43:4,5,8,11,11,20
44:1,2 60:19 61:6
67:15,17,22 72:9
72:13 73:19 74:23
75:5,16,19 76:13
82:16 85:21
103:21 118:15
157:8 159:23
165:23 175:13,23
214:24 289:6,8,12
307:9 312:24
313:7
**reviewers**
166:19
**reviewing**
40:2,3 44:22 45:2
71:25 76:16 82:18
82:23 290:14
**reviews**
127:3 272:2 314:3
**revisit**
306:11
**right**
20:5 33:11 39:5
41:14 50:2 55:9
56:7 67:25 78:23
93:12 101:15,20
102:4 109:21
114:22 123:16
131:21,22 135:20
135:20,23 136:2
137:18 139:15,16
140:10 141:14,19

144:24 148:8,23
153:1 162:13
171:3 172:19
178:4 179:2 191:9
191:25 195:23
196:8 199:4
202:18 203:17
205:8 207:14
210:4 212:20
216:11 221:20
222:1,11 227:15
227:22 228:8,14
231:9 233:4 235:6
235:24 236:18
240:23 252:8,21
256:20 257:16
261:10 266:1
268:1 269:7 270:3
274:19,24 275:9
282:17 286:13
289:4 293:7 306:2
310:15,19 311:4
311:12,24
**right-hand**
92:7 94:7 180:17
238:2 240:6
**risk**
5:14 6:9,12,14,18
6:22 7:14,17,21
19:10 20:21 23:4
25:12 26:14,25
27:10,14,16 28:12
30:22 31:1 105:15
114:15,17 117:14
122:17 124:18
125:6,23 127:4
131:20 134:14
135:13,24 136:8
147:25 148:21
149:3,3 154:19
155:3,4,10 156:12
160:13 163:11
166:7,15 167:2,5
174:11 176:15
181:15,16,20,24
181:25 182:5,7,24

182:25,25 183:7,9
183:11 185:3
186:8 187:6
196:25 202:23
203:20 205:20
210:20 213:6
221:14 224:25
225:1,8,9 226:23
230:9 232:14
237:16 247:10,21
247:22 248:6
249:13 250:1
255:20,22 256:12
261:24 263:4,5
264:5 265:5,21
266:3 270:7,22
272:19 276:20
277:10 278:10
285:10 286:19,22
292:16 295:7,20
295:21 296:7
297:5,9 303:23
305:6,9,15 306:7
306:11,13 313:12
315:21 316:5,6,22
**risks**
158:14 251:22
254:10
**RMR**
1:21
**Road**
2:3,12
**role**
7:14 237:16 314:14
**rolling**
116:15
**room**
182:21
**Rosenberg**
29:25
**Ross**
6:8
**Rothman's**
288:15
**roughly**
155:1,6 161:23

202:6 218:16
303:9
**route**
303:21
**routes**
105:16
**routinely**
314:1,2
**RPR**
1:21
**rule**
4:21 110:14 241:23
**ruled**
103:15 242:8
**rules**
13:23
**runner**
38:3
**running**
264:25 307:19

---

## S

**S**
2:1 3:1 8:1
**S-I-N-G-H**
291:8
**Saed**
48:13
**safe**
76:1 86:14 168:2
**sales**
1:6 130:22
**sample**
104:19 136:17
140:2 187:17
237:3
**samples**
77:24 79:4 80:15
134:23
**saw**
68:10 72:22 230:13
247:12
**saying**
14:4,5 69:3,6,7
81:24 97:24,25
98:5,7,11 100:6

103:4 134:15,15
166:21 178:18
195:19 196:7,9
215:17 220:13
229:10 232:3,15
250:19 252:10,17
257:16 258:21,24
266:18,22,24
267:19 269:1
273:3 276:2
**says**
45:13 62:5 70:7
77:18,21 85:11
90:16 99:21
133:15 153:20
156:3 169:25
181:14 185:5
203:1 207:15
274:4 276:16
277:19 308:3
**Schildkraut**
7:12 29:7,25 128:5
128:23 131:12
234:3,12 237:8
238:19 239:5
240:15 284:19
**school**
288:17
**science**
52:5 166:13 167:1
**scientific**
56:11,25 57:2
102:11 120:17
141:22 144:16,17
146:10,25 156:15
156:21 157:14
181:9,11 199:17
222:16 251:9
253:10,21 255:2
300:12 305:22
313:23
**scientist**
57:5 68:17 69:17
70:7
**scientists**
85:25 86:4,4 141:1

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 358

142:1,8 145:1
157:11
**scope**
37:18
**Scott**
2:19 8:9 9:10 37:21
61:12 78:12
100:12 113:19
116:14 172:9
209:12 259:2
**se**
128:25 285:23
**search**
51:21 52:1,1,3,8
184:8 291:20,22
291:24
**searches**
52:7
**searching**
120:16 256:24
**second**
85:2 90:9,12
135:17 140:20,24
142:21 152:4
185:5 187:2
210:13 219:17
224:8 238:6
260:24 270:4
276:17 277:5
298:13 315:4
**section**
33:14 77:18 85:6
92:4 108:14 170:9
174:2 184:25
185:1 202:19
205:9 207:11,17
228:5 240:18
244:8 264:18
307:21
**secure**
283:14
**see**
11:7 19:5 21:16
25:13 33:14 37:22
38:21,25 44:20
45:12 47:21 49:24

50:1,7 55:14,16
61:24 65:24 74:9
74:11 77:15,17,19
80:10 84:10 85:6
85:9,10,19,20
90:11,13 91:3
92:5,20 93:6
94:16,17 108:14
108:25 109:1,6,24
110:4 112:10,15
114:8 121:10
125:6 127:9 136:3
137:4 139:16
140:6 147:16
150:7,13,14,22
151:21,24 153:12
154:5 158:4,16
161:20,20 167:16
169:17 170:7,14
174:4,5 180:15,22
181:13 184:7,19
184:21 185:17,19
186:14 194:24
195:17 196:10
197:4 202:18
203:2,8,9 204:2
205:6,22 208:24
210:22 213:13
216:3 218:16
221:16 223:23
224:12 225:25
226:14,16 229:4
230:12 232:22
233:16 235:4,11
235:17 236:8
238:2,15 240:5,17
241:7 245:9,14
246:13 249:25
251:18,25 253:23
258:19 260:1,22
262:7,16 264:2,19
264:23,24 265:3,6
270:12,13 272:21
275:8,22 284:23
288:15 293:1
299:2 305:13

307:23
**seeing**
95:7 154:3 241:11
**seen**
33:6 41:19,21 74:8
77:13 84:2 85:4
107:25 150:3
152:20 158:22
173:7 176:19
186:8 230:11
237:2,7,22,23
263:6 301:19
304:21
**sees**
167:4
**select**
258:7,10
**selected**
284:12
**selection**
176:16 205:14
**sell**
281:11
**Seminary**
2:3
**senior**
21:12
**sense**
119:16 296:25
297:1
**sensitive**
222:1,10,24 223:6
223:9,18,24
**sent**
24:6 42:1,2 291:16
**sentence**
85:11 90:13 92:23
93:20 108:15
109:24 110:3
135:9 140:25
141:7,17 144:24
167:19,24 169:16
170:19 171:21
180:22 185:2,5
186:10 210:14
214:22,23 240:4,8

241:3 244:11
259:20 260:5
262:7 276:17
277:5 300:2
307:23,24
**sentences**
203:16
**separate**
38:25 121:13
227:19,21
**separately**
96:9 110:21 212:5
215:2
**Serena**
6:22
**series**
166:23 209:25
**serious**
184:20 306:10
**seriously**
142:11
**serous**
139:18 185:14
187:1,7 192:23
193:5 194:11
264:10 303:7,9
**SERVICES**
1:24
**serving**
11:5
**set**
83:10 203:16 214:9
282:23
**Setiawan**
30:1
**setting**
88:21 105:3,9
106:6,16 126:22
**settled**
97:12 161:23
**seven**
151:18 284:8
**SEYFARTH**
3:13
**SGO**
149:9

**shared**
312:23 313:21
**sharpened**
239:15
**SHAW**
3:13
**sheet**
17:17,17 18:12
318:6
**SHKOLNIK**
2:12
**SHOOK**
2:17
**short**
259:11
**shortly**
164:5
**show**
134:13 175:6
262:24 313:10
**showed**
88:11 193:3 312:6
**showing**
92:25 114:16
236:15 263:7
264:5
**shown**
125:21 138:5 168:2
173:18
**shy**
167:14
**sic**
76:25 99:12
**side**
18:9 78:14 240:2
**sides**
69:19 70:9,10
**Siemiatycki**
44:6 174:20 290:21
**signature**
18:10 317:9 318:10
**signed**
17:18 318:7
**significance**
62:17 135:9 215:10
237:4 263:21

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 359

274:24
significant
10:19 94:1 110:23
131:20 132:3
133:4,7,20 134:2
134:10,13,14
135:2 136:15
139:17 140:4
162:18 193:7
226:25 235:18
236:9,22,25 237:5
259:23 264:12
265:9,12,13
266:10 267:1
268:13 269:1
271:3 272:18
273:5 274:20
276:19 277:9
278:9,20 279:4
significantly
187:6
signing
18:12
similar
25:4 60:5 142:25
143:9 168:3
178:11 213:6
214:23 226:4
229:13 245:14
246:14 250:3
251:23 253:6,12
253:18 256:4,6,24
257:12,14,18
258:7,13
similarities
143:7 155:1
similarly
225:4
simple
52:2
simply
47:25
Singh
44:7 291:5,8
Singh's
291:11

single
17:13 24:4 59:5,16
150:8 214:22
246:8 263:3
Sister
186:21 187:15
212:12 263:16
sisters
199:24
sit
289:20
sitting
11:23 18:22 40:4
243:3 295:14
situation
24:7 106:24 162:6
183:12 222:7
224:8 228:11
situations
221:18
Sixteen
6:16
size
136:17 140:2
187:17 200:2
sizes
237:3
sjames@shb.com
2:19
slight
203:20
small
104:8 107:15
136:17 140:2
181:14 250:10,18
250:21 251:2
smaller
199:22 237:3 251:6
303:14
Smith
3:23
Smith-Bindman
44:7
smoke
259:24 260:7
smoking

141:12,23 142:3,12
142:21,24 143:10
143:13,21 144:17
145:5 245:9
247:19 249:1
316:2,20
snapshot
101:18
social
25:19
societal
25:19
sole
124:6 312:16
solely
66:3
solid
154:17
somewhat
66:1 113:3 282:21
Sonal
44:7
Sophie
1:21 100:5,15
320:3,22
sorry
11:16 14:22 15:17
16:21 20:13,16
39:3 56:13 69:23
91:10 110:2
111:18 114:3
115:23 116:14,19
118:3 146:15,16
146:17 148:2
154:5 165:16
187:9 192:3 209:2
237:11 239:25
249:23 266:8,13
268:16 276:25
284:10 288:4
305:24
sort
35:6 108:16 124:17
177:19 206:9,20
260:14
sorts

103:8
source
110:15 117:20
158:22
sources
71:19 81:9
South
3:18
Southern
285:3
space
17:23
span
262:15
spanning
23:7
speak
60:20
speaking
29:13 30:25 90:4
110:18
specific
48:8 75:10 107:8
128:22 136:25
172:24 197:18
199:8 214:1
233:24 256:21
295:15 316:23
specifically
11:25 21:25 24:11
41:10 44:10 50:24
54:22 70:23 71:11
72:4 74:20 75:8,9
76:19 79:24 80:4
83:13 86:23 94:7
95:4 107:5 119:3
119:9 124:2,3
130:23 139:2
140:9,12 153:2
160:18 163:15
171:8 172:15,16
175:10 177:4
178:25 187:16
191:7,11 194:16
212:11 220:25
224:7 230:19

244:18 246:22
252:14 286:13
293:4 303:23
specifications
83:1,5,10,14,18,20
83:24 282:4
spectrum
305:8,14
speeches
30:20
speed
165:19
spend
71:25
spent
313:2
spoken
237:24
spring
166:12
stand
18:16
standard
224:22 225:1
278:23 288:10,22
standards
51:21 67:2,4 282:3
stands
26:9
start
36:6 38:8 87:25
133:2 218:8
started
208:7 218:10,17
220:8
starting
140:21
starts
90:13
state
9:15 15:20 50:4
90:12 98:24
102:14 108:17
129:4 131:19
140:20 141:6
146:3 167:24

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 360

169:11 174:6
180:17 205:7,9
207:19 212:21
222:6,12 224:22
226:19,24 240:19
252:6,9,10 265:7
265:23 270:4
271:22 320:1

**stated**
54:13 70:12 81:7
83:23 90:17 91:6
95:23 109:7
172:23 181:15
193:17 207:2,3
261:16 268:21
279:3 303:21
307:6

**statement**
39:16 69:5 70:14
70:16 71:17,21
81:12,13 101:23
134:3 147:3 149:6
149:22 150:3,7,8
150:15 158:1,19
170:10 172:9
181:13 201:18
202:11 204:5
215:8,21 222:14
222:15,16 225:10
239:12 241:1,2
269:18 277:24
278:19 279:15

**statements**
30:25 39:11,19
71:7 129:3 130:11
279:12,13

**states**
1:1 92:11 94:4,9,23
244:20

**stating**
259:21

**statistical**
135:9 200:2 213:3
215:10,12 237:4
263:21 274:24
284:19

**statistically**
131:20 132:3 133:4
133:7,20 134:2,9
134:14,21 135:2
136:14 139:17
140:4 193:7
235:18 236:25
237:5 264:11
265:9,12,13
266:10 267:1,15
268:12,25 274:20

**status**
10:9 178:7 203:25

**stay**
221:7

**Steering**
4:18 8:21 36:18

**Steve**
2:9 8:22 12:11
steve.faries@mu...
2:10

**sticker**
77:9

**stickers**
173:15 175:18

**stop**
201:22 308:13

**story**
69:19 70:9,11

**stratify**
236:23 237:2

**Street**
1:17 2:8,17 3:13

**strength**
244:8,11,15 245:2
245:4,10,20 246:5
250:3,7 253:5,11
253:15 256:3
257:15 258:6
261:3,10

**strengthened**
102:22

**strengthens**
98:3,13,13 102:7

**strengths**
126:14 197:16,18

198:17,20,21
301:6,8,13 302:4

**stress**
226:2

**stressing**
208:1

**strictly**
157:4

**strike**
69:10 122:11
206:21 311:7

**strong**
144:2 223:3 245:16
246:10,12,15
248:23 249:7,11
249:17,18,20,20
251:11 257:3,17
258:1,19 261:14
261:15 287:11
288:23

**stronger**
143:14,20 208:11
228:25 230:13
231:14 261:22
301:2,5 302:2

**strongest**
143:22 158:3,20
159:7 207:7
210:16,25 211:8

**strongly**
51:18 90:21 92:16
302:3 316:2

**structure**
26:11

**structured**
93:13

**structures**
77:23

**structuring**
31:5

**student**
28:24,25

**students**
288:19

**studies**
6:16 7:7 34:25

52:24 53:2,5,8,11
58:1,11,20,24
60:3,7,11,25 62:2
62:3,13 63:4,4,5
88:25 89:7,16,19
89:24,24 90:1,22
90:24 92:17,25
93:15,25 104:3,8
104:18 106:24
111:17,19 125:23
127:10 130:22
131:10 140:18
142:5 143:5,11
154:10 155:1,6,11
156:23 158:25
159:9,12,19,22
160:3 161:6 162:1
162:2,5,11,12
164:4,14 170:24
171:11,13 176:20
184:10 185:7,12
185:21 186:8,13
186:16,18 187:1,5
187:7,8 188:3,9
188:13,18 190:18
191:3 192:5,8
193:19 194:8,25
195:20,21,22
196:22,23 197:7,8
197:13,14 198:2,2
198:4,4,16,18,21
198:22,24 199:9
199:12,13,19,20
199:22 200:6
202:6,7 203:19
205:11,15 207:13
207:21 208:18,22
209:5 211:7,20
212:10,24 213:5,8
213:9 214:14,15
215:11,13,15,18
216:7,17 220:2,6
220:20 222:15,18
222:20 223:13
224:21 225:5
226:12,21,21

227:1,14,14,19,21
228:3,13,14,19,20
228:22 229:1,4,5
229:11,12 230:1,2
230:8,10,14,14,18
230:18,20,21
231:15,19,21,24
232:14 233:10,13
237:1 238:11
241:11 243:17
260:15,15 262:11
262:22,23 263:15
264:3,11,13
266:20,20 267:4,5
267:17 268:1,7,10
268:19,20,24,25
270:10,11,16,17
270:18,20,25
272:9,13,24 273:1
273:4,7,8,22
275:4 281:16
284:5,8,9,12,16
284:21,25 286:7
286:11,23 298:24
299:7,8,13 300:19
300:20 301:7,8,12
301:22,23 303:4,6
303:10,22 304:4
304:14 309:16,17

**study**
7:4,8,12 20:22 29:2
29:3,5,8,18,24
58:6,16 59:2,5,8
59:16 60:9 61:6
104:4 105:5
106:23 107:3
125:5,6 128:5,10
128:16,19,23,24
129:4 130:7,7,11
130:15,16 131:12
131:19 132:20
134:5,22 135:19
135:22,25 137:1
138:3,6,15,15,16
138:17,20 139:4,5
140:13 164:23

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 361

166:18 169:21
184:3,10 186:20
186:21,22,23
187:13,15,15
188:3,11,19
189:23 191:17,23
192:9,13,20 193:3
193:21,24 194:3
195:4,14 196:8,10
196:14 197:1
198:13,23 199:6,6
199:24 200:4,6,9
202:13,20 203:6
204:17 206:5,23
206:23 208:6,7,12
209:4,4,8,10,24
210:15,16,25,25
211:4,5,8 212:12
212:13 217:9,15
217:24 218:1,15
219:11 221:4
223:10 224:10,10
224:16,17 225:6
225:14,15,19,21
226:8 227:2 229:6
229:10 230:25
231:1,8 236:17
238:9,19,21,24,25
240:15 241:18
246:8 263:3,6,11
263:16,18,19
264:4,4,15,18
266:23 267:9,11
268:14 269:7,15
270:20,23 271:1,2
273:9 275:5 283:3
283:4,6,8,10,15
284:2,3,17,20,22
284:24 285:1,3,5
285:5,6,13,17
286:18 292:12,14
299:19 300:24
301:3,5 302:1,2
312:6,7,10,12,18
**study's**
221:19

**studying**
197:15
**sub**
173:14
**subject**
18:19 238:13
**subjective**
206:9
**subjects**
6:15 113:2 224:10
224:17 225:15
**submitted**
15:23,24 16:18,20
26:18,19 27:23
28:6 30:13 79:4
85:17 283:18
293:19,22
**subsequently**
23:24
**subset**
138:4
**substance**
13:11 30:13
**substances**
120:14 121:5
297:18
**substantially**
45:20
**substantiating**
119:6
**subtype**
207:23 303:7
316:23,24
**subtypes**
187:6 210:20 303:2
303:3,6,9,11,12
303:13,16 310:16
310:21,24,25
311:3 315:19,20
316:4,7,9,18
**sudden**
12:12
**sufficiency**
83:4
**sufficient**
101:1,19 102:14

169:6 174:15
176:1 178:8,18
254:18 255:3
301:1 303:1 304:1
304:8,15
**suggest**
69:25 70:13 87:9
108:20 183:1
257:9 296:15
**suggested**
132:21
**suggesting**
142:22 227:1
**suggestion**
161:14
**suggestive**
185:15
**Suite**
2:12,17 3:3
**Suites**
1:17
**summaries**
159:5
**summarized**
154:11,13
**summarizing**
147:22
**summary**
148:9 161:23 162:4
229:21 235:16
**summer**
11:19 291:25
**Super**
9:15
**superior**
190:14 197:2 198:7
198:8,25
**supervision**
320:9
**supplemented**
56:18
**supplier**
80:15
**suppliers**
79:3
**supplies**

281:8,19
**support**
39:11,15 66:12,15
66:21 67:8 72:1
92:24 93:19
101:19 141:17
142:23 143:18
144:24 145:14
155:6,9 169:6
170:11,25 176:1
176:12 178:6
186:16 222:15
224:4 225:10
231:18 258:1,6,13
303:1
**supported**
39:19 51:14 108:24
277:24
**supporting**
168:17 205:12
254:20
**supports**
71:21 123:9
**sure**
12:23 16:3 25:2
34:21 35:18 36:7
41:25 42:1 52:13
55:7 59:5 61:13
64:12 77:14 87:17
87:21 100:12,14
101:4 107:11
111:19 113:15
125:10 142:20
143:19 144:9
145:12 165:20
173:22 188:1,20
194:18 209:21
215:7 217:16
225:13 237:9
243:12 254:24
255:10 258:15,16
259:9,11 269:9
276:15 277:25
280:5,7 288:5,7
292:1 297:3
305:24 314:18

**surprise**
46:11 47:20 50:10
74:6,21
**surprised**
45:24 112:14
**surprising**
51:17,19 237:6
**surrogate**
300:5
**surrounding**
156:16,22
**survey**
77:19,22
**survivors**
25:21
**swear**
8:8
**switch**
175:18 280:9
**Switching**
289:4
**sworn**
320:7
**sworn/affirmed**
9:3
**synonymous**
182:8
**syntheses**
92:4
**system**
103:8
**systematic**
5:12 6:7 7:19 66:14
66:22 127:3,10
254:3 293:12,13
314:3

──────────────
**T**
──────────────
**T**
319:1 320:1,1
**table**
137:5,5 139:11
187:4 235:4 236:1
236:3,8 266:9
273:25 274:1,3,8
**Taher**

Patricia G. Moorman, M.S.P.H., Ph.D.

7:21 306:18,20,24
307:4,9 312:6,10
312:12,18
**take**
14:3,4 25:1 40:13
52:11 61:14
113:10,16 163:5
163:19 164:4
165:5 173:20
199:23 209:25
239:1 277:22
305:14 309:15
**taken**
1:16 34:8 52:17
115:4 150:22
165:10 211:15
259:15 272:3
309:25 320:8
**takes**
172:2
**talc**
3:2 5:6,20 6:6,9,12
6:14 7:4,16,21
8:14,16 9:18,25
10:24 11:3,6,8,9
11:20,21,25 12:7
12:17 16:9,13,15
17:3 19:10,15,17
19:18 20:23 21:6
21:9,15 25:11
26:1,14,21,24
27:5,13,16 28:10
28:13 30:7,10,21
31:1,23 48:15
52:2,9,24 53:2,5,8
53:11 56:20 58:2
58:11,17,20,24
59:3 60:3,25 61:6
62:21 63:25 66:1
71:18,20,22 76:25
77:25 78:1 79:3
79:11 80:16 94:11
96:3,11,20 97:12
97:13 98:14,17
99:12 100:22,23
101:18 102:8,23

103:2 111:23
112:8,11,18 115:9
115:21 116:6,9,12
117:6,11,16,22
118:6,18,24,25
119:6,23 120:18
121:10 123:7
126:2,18 128:10
128:17,25 129:4
129:17,21,25
130:5,8,12,24
131:8,20 133:3
135:23 136:1,13
139:12,24 140:7
140:12 142:14
143:1,14,24
144:18 145:8
146:3,11 147:1,18
147:25 148:2
149:4,9,23 150:24
151:25 154:21,25
155:3,10,15,17,24
156:19 157:9
158:12 160:19
161:11 162:6
166:6,20 168:1,4
174:11 176:14
185:13 186:19
187:14,17 188:14
190:13 196:24
197:7,8,20 199:11
201:12 205:20
208:8 209:5
210:19 212:10
213:2 217:14
218:21 220:5,7
222:8 224:3,18
226:4,17 227:16
228:11,17 229:24
230:21 231:7
232:7,11 233:13
233:22 234:23
235:23 236:4,17
245:11,15,21
246:8,24 247:7
251:10 252:25

253:11,25 254:8
254:16 255:8
259:22 263:25
266:4,20 270:7
271:25 272:17,20
280:16,21,24
281:8,18,24 282:4
286:2,9,10,15
292:12,15,16
295:2,6,11 296:6
297:18,20 298:1,9
298:15,18 299:9
299:14,23,25
300:7 304:9
305:10 310:11
313:15 315:16
**talc-containing**
79:11 85:15
**talc/ovarian**
188:25 189:5,9,15
**talcum**
1:6 52:2 63:25 64:4
64:8,19 65:3,18
66:7,13 68:20,25
68:25 69:7,9
70:13,15,18,19
71:1 75:6,18,23
76:2,5,9,14 79:20
79:22,24 80:1
81:10,14,22 82:14
83:2,9 84:3 86:1
86:10,22,24 87:4
87:6,8,11 88:2,6
88:11,14,16,21
93:11 94:6,20
96:10 102:12,14
105:11,22 106:8
106:13 109:19
111:12 112:7
113:21,24 114:7,9
114:13,14,17
116:3,4 117:8,13
117:16,22,24
118:6,7,19 119:16
119:22 120:3,25
121:5,9,14,16,24

122:3 123:5,23
124:20,23 125:4,7
125:13,19 126:5
126:22 129:10
140:9 150:11
154:21 223:17
281:9,12,16
285:18 291:21
292:4,6,7 294:24
296:1,3 303:19,24
304:1,4,23 310:12
311:6,8 312:2,4
312:22 313:9
314:6,14 319:2
**talk**
51:25 111:18
164:16 181:16
182:5 216:5,6
244:2 289:4
**talked**
50:24 167:8 195:10
206:18 234:16
269:3 282:14
290:7,10 295:1
296:14
**talking**
37:10 50:1 94:19
96:11 101:10
104:12 106:12,13
174:17 181:10
215:12 265:25
282:9,10,15 286:6
287:10 294:5
299:13 300:15
313:2 315:25
**talks**
263:10
**taught**
288:18
**teaching**
10:13,18,20 243:24
**team**
254:2
**teams**
262:12
**Tecum**

4:16,20
**teens**
218:10
**teleconferences**
13:3,4,7
**telephone**
2:4,9,13,18,23 3:4
3:9,14,19 25:7
**tell**
21:2 31:11 34:19
43:10 70:24 75:19
116:10 137:16
175:5 194:15
225:5,12 240:3
282:9 308:14
**telling**
71:4 224:1 225:7
**tells**
22:25 265:11
**ten**
29:4 72:11,11
136:5 189:15,23
193:12,16 209:13
216:14
**tended**
303:11
**tendency**
166:25
**tenfold**
247:21
**Teniola**
28:24
**term**
52:8 62:17,18
193:2
**terminology**
115:13 134:10
183:1 197:10
246:4 249:10
250:11,12,13,16
287:6 288:8
300:14
**terms**
51:21 52:1 86:16
89:3 155:7 184:8
263:20,22 267:8

Patricia G. Moorman, M.S.P.H., Ph.D.

288:23 294:4
300:17 316:16
**Terry**
6:20 139:4 140:17
179:18,21 180:6
276:10
**test**
80:3 83:21 274:18
274:23 275:10,25
276:6 279:18,20
**tested**
75:11 79:5 80:6,15
**testified**
9:4,21 59:18 62:20
99:6 103:20 291:7
291:20
**testify**
289:14
**testifying**
22:5 168:16
**testimony**
17:6,9,10 18:7,13
18:16,24 61:2
69:21 98:10,20,24
98:25 99:17,21
101:9,11 115:19
119:20,20 198:6
268:9,14,18,20,21
281:14 286:9
310:19 318:4,5
320:6,7,11
**testing**
53:14 76:13,25
118:11 121:19
127:12,14
**Texas**
2:8,18 3:4
**text**
180:14 275:20
**textbook**
288:19,20
**textbooks**
288:11,14,23,25
**thank**
20:17 28:19 29:22
33:4 36:8,21 38:1

38:5 55:12 73:15
77:4,8 78:15
84:18,25 91:20,20
91:23 100:9,13,15
97:18,21 180:6
100:18 113:19
115:1 131:23
151:14 186:2
196:5 202:16
210:5 211:12
259:12 271:11
294:12 302:11
308:17 309:18
314:23 317:1,4
**theoretically**
221:12
**therapeutic**
7:7 227:8 229:12
**thereof**
320:16
**thing**
34:6 44:18 232:13
278:23
**things**
35:3,5 52:6 104:6
126:19 129:17,21
141:18 154:14
164:11 165:20
182:4 183:9 184:8
186:5 190:23
222:20,22,24
223:8 282:14
289:5 292:25
305:2
**think**
16:5 18:25 20:12
22:8,12 24:7,20
41:10,21 46:16,23
46:25 47:4,9,12
48:11,12,15,24
49:16,19 50:9,24
51:19 54:17 55:22
56:14,15 57:17
58:15,23 61:4,5
62:7,10 65:20
67:7,16 70:6,10
70:12,16 71:5,6

71:16 72:6 75:11
76:19 77:15 80:18
81:3,13,15,23
82:8 89:16 90:8
95:7,9,20 96:15
97:22,23 98:3
101:22 102:5,7,17
102:19,21 103:3,6
111:4 113:14
114:21 119:21
124:1 125:18
127:1,24 129:7
130:21 134:3,25
136:4 139:2
141:25 143:9,25
144:21 145:7,13
146:21 148:2,9
150:17 151:2
153:2 155:14
158:21 161:19
162:22,22 163:10
164:21 167:3,4
171:9 172:13
178:19 179:2,2
180:8 181:4,8
182:7 183:4 185:1
190:12 192:12
197:10,13 198:19
199:5 200:13
201:16,19 202:3,4
204:10 206:8,10
211:6 214:11
215:8,9,13,23
218:3 223:5 225:7
226:1 228:21
229:20,20 230:5
230:15,21 231:18
231:24 232:9
234:7 238:20
239:4,6,10,20
240:1,8 241:10,16
241:20,21,25
242:4,23 244:22
244:24 245:4,5,10
245:15,17,20
246:4,5,11,14

247:10 248:3,4,13
249:3,12,24
250:24 251:5
252:5 255:6 257:2
257:16,17 258:18
260:6 261:12,16
262:5,20 263:23
264:5 266:7 267:7
270:14 271:13,14
272:8 275:11,23
276:5,7 279:3,5
279:16,17,21,23
282:16 283:8
285:7 286:4,6,24
287:19 290:25
291:18 293:7
295:1,13,18
297:11 300:2,14
300:15 301:1
302:14 304:3,12
304:13 306:9
309:5 313:10,25
316:12,21
**thinking**
95:20 151:22 167:5
181:17 225:18
**third**
94:8 121:20 157:25
232:19 275:1
**thorough**
242:23
**thoroughly**
243:8 255:11
**thought**
44:25 48:17 114:3
142:8,10 164:13
209:10 219:14
224:25 225:1,24
226:2 286:9
**thoughtful**
242:24
**thoughtfully**
240:10
**threat**
221:19,24 232:20
243:17

**three**
24:14 55:2 104:14
186:18 202:6
216:17 221:18,22
232:25 243:9,11
243:15,16,18,20
263:15
**three-fourths**
108:17
**thumb**
33:21
**time**
8:4 11:17 27:23
33:11 40:13 47:17
48:1 52:11 79:21
95:11 97:15 98:2
101:1,19 102:19
102:21,22 113:23
114:7 116:9
132:10,11 143:5
143:12 145:22
147:14 154:11
160:21 162:2
163:21 165:4
172:2,4 178:13,17
179:1,5,11 189:20
191:17,25 200:22
201:10 211:9
220:5,8,12 225:15
237:13 240:21
264:25 280:3,19
283:11 289:12
291:19,23 292:9
294:2 295:7,15
301:1 307:9,19
309:19 313:2
317:2,6
**times**
40:21 52:3 60:15
82:6 151:18
158:23 166:19
169:13 183:17,20
199:3 200:22
206:24 207:4
240:18 253:2
273:23 274:4,17

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 364

301:10 314:5
**timing**
177:21
**tipping**
178:14
**Tisi**
13:3,7
**title**
20:20 45:5
**titled**
5:8,11,14,17 6:3,6
6:9,11,14,18,21
7:3,6,10,13,16,19
39:1 244:8
**today**
10:25 11:3,23
12:15 13:22 16:10
18:17,22 33:25
35:8 37:11 38:13
40:4 43:7 55:23
56:3 60:23 155:24
168:16 201:10
206:17 216:13
243:3 253:2 263:2
265:25 267:3
268:18 269:3
281:14 287:5
289:7 291:7,17
292:23 294:6
295:14 297:12,17
298:2 300:11
301:11 305:17
308:6 313:2,21
314:5
**today's**
8:3 12:6 19:2 34:18
38:10
**told**
14:6 31:19
**Tolu**
28:24
**top**
89:5 90:12 103:16
128:3 140:21
159:1 167:16,23
180:17 203:3

212:20 232:25
246:11 252:21
253:8 257:25
259:20
**topic**
56:9,12 64:25
65:12,17,22 66:24
67:18 82:3 199:15
200:18 201:14
202:8 206:1 208:2
221:6 223:19
234:1 250:5
**topic.'**
222:10
**topics**
48:8 223:1 260:19
289:4
**total**
212:25 272:16
284:8
**totality**
313:6
**touch**
12:3 303:17
**touched**
215:25 234:15
**Trabert**
7:15 237:7,15,25
238:3,7
**Trabert's**
238:17
**Traci**
29:25
**track**
180:8
**traffic**
24:16,22,25
**trained**
54:18
**training**
57:19,20
**transcribed**
320:9
**transcript**
4:12 5:4 17:14 19:4
19:6 40:1 54:24

56:7 61:9,20 77:7
**transcription**
318:5 320:11
**transcripts**
291:4
**transition**
10:16 282:17
**transitioned**
178:7
**transitioning**
221:6
**translate**
302:10
**translocation**
94:12
**Travis**
2:17
**treat**
32:12 316:16,18
**trend**
274:19,23 275:11
275:25 276:7,19
277:9 278:16,20
278:22 279:1,4,18
279:20
**trends**
271:24 272:19
273:5
**trial**
166:22
**tried**
59:11 293:16
**trigger**
239:21 240:13
**true**
18:13 70:17 122:21
125:25 141:25
145:7 201:18
203:22 220:20
305:2 318:4
320:10
**Truls**
31:16
**truth**
194:4
**truthful**

62:6
**try**
70:3 245:25 284:14
**trying**
15:17 48:11 67:8
69:25 71:5,17
75:9 127:1,7
158:21 181:10
212:11 228:21
230:6 256:10
257:2 258:18
275:21 283:13
289:1 293:8
**Tube**
6:3 151:10
**tubes**
298:19,24 299:10
299:15,23 300:8
**TUCKER**
3:18
**turn**
33:13 38:20,24
85:2 91:25 94:5
139:10 147:8
151:16 153:15
194:18,23 206:22
209:23 210:7,8
222:4 251:14
264:14 298:14
**turning**
119:10 122:10
212:19
**twenties**
218:11
**two**
24:14 50:11 55:2
104:14 136:10,21
139:7 141:21
142:20 144:22,23
149:25 160:23
164:25 173:11
175:21 180:9
187:5 188:13,18
188:24 190:18
202:14 227:5
230:25 231:1

234:13 237:18
244:20 260:18,18
263:14 273:19
274:21 307:11,17
**type**
86:9,21 112:6
221:4 243:24
270:11,16 313:21
313:21
**types**
35:5 82:23 86:13
86:15,24 120:7
121:3 130:23
144:23 287:5
311:12,15
**typical**
22:15 27:23 166:9
**typically**
89:23 157:5 163:10
302:1

**U**
**unaware**
224:6 233:25
**UNC**
290:4
**unclear**
11:11 12:1,5
**uncomfortable**
223:14
**uncommon**
263:3
**uncontrolled**
176:17 177:5
**underestimate**
160:12 171:14
**underlying**
128:24 159:8,12,19
160:3
**understand**
9:13 11:2 12:2
14:12 33:9 42:7
46:3 48:2,4 57:8
62:16,18,19 65:1
66:5 69:17 70:7
70:21,25 71:13

Golkow Litigation Services - 1.877.370.DEPS

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 365

73:6,9,21 74:17
74:22,24 80:14
96:9 103:7,13
108:6 124:9,14,16
125:10 129:13
131:5 134:7 144:7
147:12 153:14
180:18 192:22
246:16 248:10
263:9 280:21
281:7,11 299:4
300:18 305:18
306:2,16,20,24
**understanding**
15:10,19 43:24
181:11 193:22
228:10 281:4,10
281:13 296:11
305:21 306:6,12
311:25 312:3
314:10,11
**Understood**
11:15 216:19 277:3
**undertake**
111:7 131:13
182:19 233:21
**undertaken**
64:2
**undertook**
82:2
**unexposed**
188:4 190:17,19
213:3
**unfeasible**
299:18
**unfortunately**
55:2 151:17
**UNITED**
1:1
**universe**
256:16
**University**
10:10 285:2
**unrelated**
253:7,13
**unusual**

46:16 141:1
**up-to-date**
183:25
**update**
189:19
**updated**
20:4 33:19 153:20
208:9 292:1
**updating**
190:9 220:1
**usable**
226:1
**usage**
218:2 219:13
235:24 236:4,6,10
236:17 292:4
**use**
5:20 6:6,9,12,18,22
7:4,11,20 76:3
87:4 96:11,20
97:13 98:17
101:18 126:5
127:3 128:11,17
129:10,10 130:12
130:17,23,24
131:17 132:1
134:11 136:13
139:13,24 140:7
140:12 143:25
149:4,23 154:21
166:15,25 168:1,4
174:10 182:4
185:13 186:19
202:22 205:20
209:16 210:20
217:14,20 220:5,7
220:15 222:8
223:17 224:3
239:16,17 246:2
254:1 265:19
266:4,11 267:10
267:22 270:7
274:4,21 275:7,7
275:16 276:3,13
277:19 278:16
281:8 288:11,19

288:23 289:1
290:23 293:11
298:9 299:17
305:10
**users**
113:24 114:9,16
130:8 131:21
133:3 218:21
276:18 277:8
279:15

---
**V**

**validity**
221:20
**Valley**
7:17
**value**
124:7 289:2
**values**
134:21
**variety**
126:18 129:14
226:20 229:6
**various**
12:4 161:10,10
251:7 313:3,14
316:9
**vast**
233:10 303:7,8
**verbal**
13:25 14:1
**verify**
132:7
**version**
6:5 130:3 151:12
153:13 154:1,4,6
154:22
**versus**
101:24 102:2
104:12,15 131:8,8
155:15 198:24
215:15 236:13
**Video**
36:19
**VIDEOGRAPH...**
3:22 8:2 52:15,18

115:2,5 116:20,23
165:8,11 211:13
211:16 219:20,22
259:13,16 278:2,5
280:10,13 302:16
302:19 308:16
309:23 310:1
315:2,6,9 317:5
**videotaped**
1:11 4:15,19 8:5
**view**
148:13
**viewed**
223:18
**viewpoints**
246:4 258:23
**Virginia**
2:4
**virtually**
233:11 263:6
**vis-à-vis**
312:1
**Vitae**
4:13
**volume**
5:9 295:9

---
**W**

**W**
2:8 3:20
**Wacker**
3:18
**wait**
34:11 167:20 186:1
**walk**
221:22
**walked**
243:14,18
**want**
36:6,14 38:12 65:8
75:13 77:4 89:6
99:9 100:11,12
101:6 105:3 113:5
113:8 116:15
146:7 159:3
161:21 172:10

209:14 222:25
246:13 255:10
277:23 289:4
298:5 305:24
**wanted**
12:23 19:6 24:12
51:17 153:10,12
**wants**
100:7
**warning**
84:3
**warranted**
21:18 207:24
**washed**
192:24 193:1
**Washington**
3:14
**wasn't**
99:16 148:17
166:21 276:25
**way**
15:22 17:22 20:15
23:19 31:5 39:24
40:4 43:6,13
59:24 93:13 95:8
105:14 108:17
126:9 133:22
137:13 139:16
147:9 153:22
162:20,23 166:9
180:25 193:25
206:13 208:11
211:4 217:22
229:16 251:13
256:9 261:16
263:13 279:17,19
293:1,5 300:6
**ways**
160:25 225:16
**we'll**
13:22 14:7 25:1
35:15 36:7 37:10
78:14 113:15
116:16,18 173:14
175:18 209:25
232:18

Case 3:16-md-02738-MAS-RLS    Document 33005-40    Filed 07/23/24    Page 128 of 131
PageID: 203257
Patricia G. Moorman, M.S.P.H., Ph.D.

Page 366

**we're**
10:25 17:22 18:2
29:16 33:11 69:6
90:4 91:15 95:7
95:17 96:11
104:12 106:12,13
113:6 130:14
131:22 164:4
167:8 208:14
223:11 224:23,24
225:6 266:11
273:25 293:10
308:14,15
**we've**
9:10 50:24 52:12
128:21 146:13
156:10 206:16
207:17 209:12
215:25 231:10
236:23 259:7
263:15 294:5
**weak**
246:19,25 248:17
248:22 249:7,10
250:10,18,21
287:10,15,17,22
288:6,23
**weakened**
211:5
**weaker**
193:3 247:16,17,18
247:19
**weaknesses**
126:14 164:16
197:16,18 198:17
198:20,21 301:9
301:10,12 302:4
**website**
5:20 155:24
**week**
42:6 188:5 291:14
307:11
**weeks**
19:3,5
**weigh**
141:2,18 144:12

**weighed**
164:13
**weight**
145:2
**weighted**
142:4
**weighting**
244:25
**welcome**
84:19
**well-accepted**
197:14 199:6
245:13 251:21
279:19
**well-established**
197:14 245:7
**well-known**
290:22
**well-respected**
174:21 179:12
**Wendy**
30:1
**went**
122:4 164:12
192:12,20 193:20
194:3 218:9,13
241:20 242:3,15
253:15 289:23
**Wera**
6:10
**whatsoever**
187:14
**When's**
145:22
**WHI**
202:13,20 217:8,13
217:13 219:7
**white**
5:15 27:16 135:14
136:8,13,18 137:4
**wholly**
108:24
**wide**
229:6
**witness**
8:8 10:23 13:2

20:16,18 22:21
23:2 26:24 27:8
29:18 31:21 33:4
41:6 42:9,19
45:24 46:9,15
47:20 48:4,24
49:6 50:14,21
51:25 54:12 55:21
57:16 58:4,14
59:11 60:16 61:4
62:10,24 63:13
64:6 65:7,20
66:20 67:7 68:7
68:23 69:23 70:6
71:16 72:18,25
73:9 74:11 75:1
76:8 78:23 80:24
81:7,21 82:7,20
83:13,23 84:10
86:3 87:17 88:5
89:3,13,22 91:8
93:17,22 94:23
95:4 96:6,17
97:15,22 98:11,21
101:4,22 102:17
104:2,25 107:8
108:10 109:6
110:8 111:1
112:14 113:11,17
114:1,21,25 116:2
118:3,17 119:2,21
120:21 122:7,15
123:11 124:1
125:2,18 126:4
127:18,24 129:7
130:19 131:15
132:5 133:6,12
134:19 135:7
136:12 137:10
142:17 144:5,21
145:12 148:16
149:12,19 151:14
153:7 157:18
160:8 161:3,19
162:15,22 163:18
164:24 165:4,7

167:11 168:12
170:5 171:8
172:13,23 174:20
175:1,10 176:7
177:2,15 178:10
179:10 180:3
181:4 182:14
184:5,19 186:4
188:17 189:18
190:1,7,16 192:17
193:1,15 194:6,15
195:25 196:13,18
197:24 199:4,18
200:21 201:4,16
201:18,23 202:2
202:16 204:16,23
206:3,13 207:2
208:5 209:16,19
211:11 213:23
214:5 228:16
229:19 230:5
234:20 236:12
241:16 242:15
246:1,21 247:4
248:3,12 250:24
251:5 255:18
258:15 266:6
267:7,19 268:16
271:9,12 274:12
276:25 277:22
278:7 281:21
287:25 294:13
295:18 296:9,24
297:8 298:6 299:2
299:12 300:2,23
301:25 302:13
304:12 305:21
306:6 307:4 309:4
309:13,20 313:25
316:12 317:3
319:3
**witness(es)**
320:5,7,11
**woman**
223:10 224:1
**women**

5:15 20:22 26:9
27:11,12,16 90:22
90:24 92:17,25
128:13 132:10
135:14 136:9,13
136:14,17,18
137:4 181:23
188:4 190:18
205:21 208:6
218:6,10,17,18
220:16 222:24
223:4,7,14 225:4
225:22 226:2
240:21 284:15
287:1 296:4,10
297:21 300:8,25
305:7,14
**Women's**
186:22 285:1,4
**wonderful**
208:11
**word**
108:16 162:19
163:13,19 166:15
166:25 167:15
181:19
**wording**
24:11 38:18 133:17
241:9
**words**
66:18 275:3 287:22
288:9
**work**
10:12,20,23 15:8,9
15:16 16:9,11,23
21:14 28:23 31:13
31:14,18 34:22
37:5,6 48:12,13
48:16 53:22 54:15
78:14 112:6 124:7
126:12 152:21
180:18 181:9
290:14 292:9
314:1
**work-in-progress**
29:11,17 30:5

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 367

| | | | | |
|---|---|---|---|---|
| workday | X | 1 | 5:3 49:10,12,16 | 5:7 50:17 51:8 |
| 105:20 | X | 4:10 5:7 15:2,3,5 | 50:1 157:22 217:4 | 84:16,20 259:19 |
| worked | 1:3,10 | 15:15 16:10,19 | 247:12 | 260:8 |
| 12:18 13:12,16 | | 97:4 103:9 133:25 | 10:05 | 136 |
| 29:3 285:16 | Y | 134:6,7,7 137:10 | 52:16,17 | 5:14 |
| working | yeah | 137:12,19,20 | 10:18 | 139 |
| 13:18 16:24 22:4 | 26:17 49:19 113:17 | 138:7,11,15 | 52:17,19 | 5:17 |
| 26:4 28:10,25 | 118:8 146:23 | 139:20 155:12 | 100 | 14 |
| 30:11 31:21,22 | 150:19 153:23 | 252:12,18 258:8 | 5:9 59:15 60:11 | 5:8 21:4 55:11 |
| 34:16,19 35:25 | 159:16 162:15 | 262:25 263:7 | 100C | 91:14,17,21 |
| 78:14 92:12 173:3 | 191:10 229:19 | 267:12,15 268:1,2 | 91:16,19 | 183:17 191:9 |
| works | 258:5 259:7,12 | 268:3,7,24 | 101 | 206:24 216:10,25 |
| 28:9 30:9 78:11,13 | 260:24 275:23 | 1.04 | 182:15 | 259:19,20 260:20 |
| world | year | 136:19 137:3,7,20 | 107 | 262:5,5 |
| 231:8 232:7 250:17 | 10:18 110:11 | 137:23 138:6,10 | 5:11 | 14-year |
| worried | 217:21 282:24 | 1.06 | 11 | 191:23 193:10 |
| 231:4 | 295:15 | 264:22 265:8,16 | 5:4 61:15,17,21 | 1414 |
| worries | years | 274:13 | 76:24 77:7 140:19 | 235:2 |
| 77:10 277:3 | 23:7 29:4 41:7 | 1.12 | 244:1,7 | 1416 |
| wouldn't | 54:16 85:18 136:5 | 264:5 | 11,933 | 240:5 |
| 68:17 71:12 72:3 | 142:2 177:3 | 1.13 | 6:15 | 149 |
| 101:7 112:14 | 189:15,23 191:9 | 266:13 | 11:45 | 5:20 |
| 113:23 114:8 | 193:12,16 208:10 | 1.14 | 115:3,4 | 15 |
| 183:11 197:11 | 216:10,14,25 | 266:13 | 11747 | 4:10 5:11 107:22 |
| 211:7 250:20 | 217:4,10,22,25 | 1.15 | 2:13 | 107:23 259:6,8 |
| 281:17 299:5 | 218:7,14 222:18 | 139:17 | 119 | 151 |
| write | 222:18 224:21 | 1.19 | 25:18 | 6:3 |
| 38:15 167:18 | 288:17 295:23 | 133:25 136:18 | 12 | 1510 |
| 293:17 | 299:17 300:9 | 235:18 264:6 | 5:5,6 55:10 77:2,6 | 3:3 |
| writing | yes-or-no | 1.2 | 251:14,20 253:20 | 154 |
| 28:3 65:24 66:2 | 156:14 172:6 175:4 | 158:15 242:12 | 255:1 270:23 | 199:25 |
| 239:5 | York | 255:15 256:19 | 12.4 | 16 |
| writings | 2:13 | 257:23 | 217:10,25 | 5:14 61:24 136:7 |
| 32:7 | | 1.25 | 12:39 | 136:11 177:3 |
| written | Z | 213:6 257:7 | 115:4,6 | 16-2738 |
| 24:2 25:4 27:25 | Zambelli-Weiner | 1.3 | 12:40 | 1:7 319:4 |
| 28:1 31:25 32:6 | 44:5 | 242:12 255:15 | 116:21 | 165 |
| 95:11 110:4 | | 256:19 257:7,23 | 12:41 | 6:6 |
| 133:13,15 150:20 | 0 | 266:12 | 116:24 | 169 |
| 157:3 247:14 | 051 | 1.4 | 120 | 6:9 |
| wrong | 274:19 | 266:12 | 21:4 | 17 |
| 22:23 90:9 120:10 | 07932-1047 | 1.5 | 121 | 4:11 5:17 61:21 |
| 144:19 196:6 | 2:22 | 158:15 | 25:14 | 139:6,8 |
| 227:11 | 07962 | 1:48 | 1294 | 173 |
| wrote | 3:8 | 165:9,10 | 108:13 | 6:11 |
| 39:12 42:21 | 1 | 10 | 13 | 175 |

Patricia G. Moorman, M.S.P.H., Ph.D.

6:13
**18**
5:20 149:22,24
**180**
6:18
**19**
6:3 134:13 151:13
**195**
176:9
**1976**
69:1 88:7,12
**1980s**
191:11
**1982**
295:3
**1990s**
162:8,12

**2**

**2**
4:11 17:19,20
  18:10 77:16,17
  137:5 139:11
  187:4 194:23
  235:4 269:21
  273:25 274:3
**2.91**
235:12
**2:03**
165:10,12
**20**
4:13 6:6 23:4 50:17
  51:5,8 113:7
  164:21 165:2,3,18
  217:22 288:3
  300:9
**2000**
189:4 190:14,14
  191:20 194:12
  195:7 204:25
  205:4
**20004-1454**
3:14
**2000s**
162:8
**2003**

175:14,17 177:9
**2008**
174:13 178:1,2,5
  179:1
**200834000001**
320:23
**2009**
135:12,22 136:22
  209:7
**2010**
95:6,21,22 96:14
  98:8,16 99:7
  100:22,25 101:14
  101:17 102:11,13
  103:2 123:7
  138:21 147:15
  187:21 189:9,14
  190:12 192:10,15
  192:22 193:6
  194:9,12 195:4
  209:7 216:15
  217:5 314:10,20
  315:15
**2012**
95:18
**2013**
179:19,21 180:6
  276:10
**2014**
5:7 84:2,23 132:2
  133:3 185:11
  202:20 233:23
  234:24,25 235:6,9
  235:12,17 236:16
  236:24 239:18
  240:16
**2015/2016**
283:9
**2016**
11:19 12:4 128:5
  128:23 131:12
  234:3,13,22
  238:24 240:15
  242:2 243:3 292:1
**2018**
4:25 5:5 10:6,9

17:7 19:9 30:22
  45:13 46:13 47:2
  47:17,24 48:6,20
  49:3 50:18 51:11
  153:20 162:8,10
**2019**
1:14 8:3 143:1
  320:18
**202**
3:14 6:21
**205**
7:3
**21**
6:9 153:20 169:2,3
  194:21 212:17
  220:25 224:9
  232:24,24
**21,000**
14:21
**216**
221:8
**22**
6:11 173:10,12,13
  173:14,17 209:24
  222:4 224:9,14
  226:7,15 232:23
  232:24,25 289:19
**22311**
2:4
**224-1133**
2:13
**227**
7:6
**227-8008**
2:18
**23**
6:13 132:8,15
  173:9,12 175:17
  175:19 226:8
  233:5,6 234:2
  240:23
**2306**
1:17
**233**
3:18
**234**

7:10
**237**
7:13
**24**
6:18 166:7 180:6,7
  276:15
**248**
169:16
**25**
1:14 6:21 23:7 41:7
  155:3,4 202:6,14
  202:15 211:19
  215:25 217:18
  219:25 247:22
  248:5 249:13,25
  256:11 264:15
  313:11
**253**
212:19 270:2
**254**
91:25 194:24
**256**
92:3,4 170:8
**25th**
8:3
**26**
4:21 7:3 205:1,2
  220:1
**267-0058**
3:9
**26th**
320:18
**27**
7:6 227:5,6 262:23
**273**
7:16
**2738**
319:2
**27705**
1:18
**28**
7:10 234:10,11
**280**
4:4 55:7 94:5,8
**29**
7:13 237:14,19

**294**
4:5
**2A**
97:7 103:9
**2B**
96:12,21 97:10,12
  100:23 101:2,18
  101:19,20 103:3,9
  103:14 123:9

**3**

**3**
4:13 20:8,9 33:13
  103:10 266:9
**3:02**
211:14,15
**3:16**
211:15,17
**3:29**
219:20
**3:31**
219:23
**30**
7:16 155:1 202:6
  247:22 248:5
  249:13 250:1
  256:12 271:16
  272:11 273:16,17
  288:17 298:12
  300:9 313:11
**302**
4:3
**305**
2:12
**307**
7:19
**31**
7:19 40:18 307:14
  307:15
**310**
4:6
**312**
3:19
**315**
4:3
**32**

Patricia G. Moorman, M.S.P.H., Ph.D.

Page 369

4:15
**34**
90:7
**3400**
2:17
**35**
4:17 61:19 90:10
**350**
3:8
**358**
210:8
**359**
174:1
**36**
4:18 236:5,13
**37**
4:21
**39**
166:7
**391-0197**
3:4

**4**
4
4:15 32:21,22
  128:2 203:15
**4:33**
259:14,15
**4:46**
259:15
**4:47**
259:17
**40**
23:3 85:18 300:9
**40,000**
199:20,25 200:7
**400**
2:12 14:18
**404**
2:8
**41**
4:22 38:21
**42**
167:15,20,21
**429**
213:1

**45**
4:24
**463**
274:25 275:1
**463-2400**
3:14
**47**
184:24 207:11,18
**478-1236**
2:9
**48**
207:18
**49**
5:3 307:21
**4900**
2:3

**5**
5
4:17,24 35:11,20
  35:21,24 128:2
  135:12,15 203:2
**5:14**
278:3
**5:15**
278:6
**5:18**
280:11
**5:20**
280:14
**5:50**
302:17
**5:51**
302:20
**50**
38:24 39:1,4
  208:10
**51**
236:7,13
**512**
2:9 3:4
**549-7164**
2:23
**5th**
45:13

**6**
6
4:18 36:17,22
  104:15
**6:01**
309:24,25
**6:14**
309:25
**6:15**
310:2
**6:22**
315:7
**6:23**
315:10
**6:25**
317:7,8
**60**
303:8,9
**60,000**
199:20
**600**
2:17,22 284:18
**60606**
3:19
**61**
5:4
**62**
39:25
**624-6300**
3:19
**63**
218:7
**631**
2:13

**7**
7
4:21 37:10,13,14
  80:11
**703**
2:4
**713**
2:18
**73**
270:22
**76**

139:23
**77**
5:6
**77002**
2:18
**78701**
2:8 3:4
**7th**
2:8

**8**
8
4:22 41:15,17,19
  42:25 77:17
  196:20 291:1
**8,525**
6:19
**816**
3:3
**817**
278:7
**820**
180:15,16
**84**
5:7
**877.370.3377**
1:24

**9**
9
4:3,24 45:7,8
**9,859**
6:19
**9:04**
1:15 8:4
**90**
155:6,8,11 262:23
**90-some-thousand**
218:17
**90s**
161:22
**91**
5:8
**917.591.5672**
1:24
**931-5500**

2:4
**94**
46:12 50:10
**943**
213:2
**95**
134:20 137:17
**973**
2:23 3:9
**975**
3:13
**99**
213:8
**995**
139:10