Exhibit 21

Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEW JERSEY

3

4      ----------------------------

5      IN RE:  JOHNSON & JOHNSON     MDL NO.:

6      TALCUM POWDER PRODUCTS        16-2738 (MAS)(RLS)

7      MARKETING, SALES PRACTICES,

8      AND PRODUCTS LIABILITY

9      LITIGATION

10     ----------------------------

11

12                    EXPERT DEPOSITION OF

13                      ANN G. WYLIE, PHD

14

15

16                   Monday, June 24, 2024

17                   8:58 a.m. Eastern Time

18

19

20

21

22

23     Reported by:  Denise Dobner Vickery, CRR, RMR

24     JOB NO.: 6754009

Page 2

1

2

3

4

5

6

7

8                        Monday, June 24, 2024

9                        8:58 a.m. Eastern Time

10

11            Expert Deposition of ANN G. WYLIE,

12    PHD, held at the offices of:

13

14                    SKADDEN ARPS SLATE MEAGHER & FLOM LLP

15                    The Washington Building

16                    1440 New York Avenue NW

17                    Washington, DC 20005

18

19

20            Pursuant to notice, before Denise

21    Dobner Vickery, Certified Realtime Reporter,

22    Registered Merit Reporter, and Notary Public in

23    and for the District of Columbia.

24

```
                                                  Page 3

 1    APPEARANCES:

 2

 3    For MDL PLAINTIFFS (Via Zoom):

 4            COHEN PLACITELLA & ROTH

 5            BY:  CHRISTOPHER M. PLACITELLA, ESQ.

 6            BY:  ERIC S. PASTERNACK, ESQ.

 7            BY:  DREW M. RENZI, ESQ.

 8            127 Maple Avenue

 9            Red Bank, NJ 07701

10            732.747.9003

11            cplacitella@cprlaw.com

12            epasternack@cprlaw.com

13            wukzmin@cprlaw.com

14

15

16    For MDL Plaintiffs:

17            ASHCRAFT & GEREL LLP

18            BY:  MICHELLE A. PARFITT, ESQ.

19            1825 K Street NW, Suite 700

20            Washington, DC 20006

21            202.759.7648

22            mparfitt@ashcraftlaw.com

23

24
```

```
                                              Page 4

 1    APPEARANCES:

 2

 3    For MDL PLAINTIFFS (Via Zoom):

 4            BEASLEY ALLEN

 5            BY:  LEIGH O'DELL, ESQ.

 6            218 Commerce Street

 7            Montgomery, AL 36103-4160

 8            308.874.3186

 9            leigh.odell@beasleyallen.com

10

11

12    For DEFENDANTS JOHNSON & JOHNSON AND JOHNSON &

13    JOHNSON CONSUMER INC.:

14            KING & SPALDING LLP

15            BY:  KEVIN HYNES, ESQ.

16            1185 Avenue of the Americas

17            New York, NY 10036

18            212.790.5349

19            khynes@kslaw.com

20

21

22

23

24
```

Page 5

1    APPEARANCES:

2

3    For PERSONAL CARE PRODUCTS COUNCIL (PCPC)

4    (Via Zoom):

5             REILLY MCDEVITT & HENRICH PC

6             BY:  KEVIN KOTCH, ESQ.

7             3 Executive Campus, Suite 310

8             Cherry Hill, NJ 08002

9             856.317.7180

10            kkotch@rmh-law.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 6

```
 1                      INDEX

 2   EXAMINATION OF ANN G. WYLIE, PHD              PAGE

 3   BY MR. PLACITELLA                               7

 4

 5

 6                  DEPOSITION EXHIBITS

 7   NUMBER       DESCRIPTION                       PAGE

 8   EXHIBIT 1    Small Binder with tabs:           113

 9                Wylie February 25, 2019 Report;

10                Wylie April 9, 2024 Report;

11                Wylie May 3, 2024 Report.

12                Front Pocket is Corrected

13                Figure 21 Associated with

14                Tabs 2 and 3

15

16         (Exhibit 1 attached to transcript.)

17

18                  REFERENCED EXHIBITS

19   NUMBER                                         PAGE

20   EXHIBIT 6.2 May 30, 2024 Expert Report of      24

21                Ann G. Wylie

22

23

24
```

Page 7

```
 1              P R O C E E D I N G S

 2                     - - -

 3              ANN G. WYLIE, PHD

 4    called for examination, and, after having been

 5    duly sworn, was examined and testified as

 6    follows:

 7                     - - -

 8                 EXAMINATION

 9                     - - -

10  BY MR. PLACITELLA:

11       Q.     Good morning, Dr. Wylie.  How are

12  you today?

13       A.     Fine.  Thank you.

14       Q.     We're here today for purposes of

15  taking your deposition.  This is the second

16  deposition that was taken of you in these MDL

17  proceedings.

18              Did you have the opportunity to

19  review your prior transcript before coming here

20  today?

21       A.     Several weeks ago I looked at it.

22       Q.     Okay.  And did you have any changes

23  or concerns about what was in your prior

24  transcript?
```

Page 8

1          A.      No.
2          Q.      Okay.  Can you tell us what
3    materials you specifically reviewed in preparation
4    for today's deposition.
5          A.      Are you asking me about what I
6    reviewed from my report or --
7          Q.      No.
8          A.      -- what I reviewed for being here
9    today?
10          Q.      For the deposition today.
11          A.      Oh.  I just looked over my reports.
12          Q.      So you looked at nothing else?
13          A.      No, not specifically for -- no.
14          Q.      Okay.  And who did you meet with in
15    preparation for today's deposition?
16          A.      Kevin Hynes.
17          Q.      Anyone else?
18          A.      No.
19          Q.      Did you speak with anyone else in
20    preparation for this deposition?
21          A.      Yes.  Let's see.  What was the name?
22    What's the name?  These names have gone out of my
23    head.  The other lawyer that was here on Zoom when
24    we were here the other day for deposition.

Page 9

1                    I can't remember.

2          Q.      You don't remember who that was,

3   whether it was --

4          A.      I'll think of it in just a minute.

5   He has twin sons.

6          Q.      Let me see if I can change the form.

7          A.      (Laugh).  What's his name?

8                    MS. PARFITT:  That should be

9          identifiable.

10                    MR. HYNES:  Do you want me to

11          just remind you of the name?

12                    THE WITNESS:   That would be

13          helpful.

14                    MR. HYNES:  John Ewald.

15                    THE WITNESS:  Yes, John Ewald.

16          Sorry.  His name just went out of my

17          head.

18   BY MR. PLACITELLA:

19          Q.      Okay.  Well, we won't tell John you

20   can't remember.

21          A.      Please don't.  (Laugh).

22          Q.      How much time do you think you spent

23   preparing for today's deposition?

24          A.      Subsequent to writing the report?

Page 10

1    Subsequent?

2           Q.        Yes.  Yes, ma'am.

3           A.        Two or three, four hours.

4           Q.        And how long did you take to prepare

5    your report?

6           A.        I don't remember exactly.  I

7    provided invoices that give the number of hours.

8           Q.        Okay.  Since the last deposition

9    that you gave, have you ever tested any Johnson &

10   Johnson product to determine whether it contains

11   asbestos?

12          A.        No.

13          Q.        Have you ever tested any Johnson &

14   Johnson product to determine whether it contains

15   asbestos?

16          A.        I've looked at a couple of samples

17   on my -- for myself, not for anyone.

18          Q.        And when you say you looked at a

19   couple of samples, when did you do that?

20          A.        Well, let's see.  I did -- I did one

21   before the last deposition, I think, and I did one

22   between then and now.  I used a sample that I

23   purchased at the grocery store for -- as

24   background material for the study I was doing for

Page 11

1   ASTM and, of course, I looked at the material for

2   that purpose.

3         Q.      And when did you purchase that

4   sample at the grocery store?

5         A.      It was right after Johnson & Johnson

6   announced they were no longer going to be selling

7   it in the United States.

8         Q.      Okay.  So after they said they

9   weren't going to sell it, you were still able to

10  buy it on the shelf --

11        A.      The next day.

12        Q.      -- at the grocery store?

13        A.      Yes, the next day.

14        Q.      And did you ever provide the results

15  of your analysis to Johnson & Johnson or its

16  attorneys?

17        A.      No.

18        Q.      Why not?

19        A.      It's not part of what I was doing

20  with them -- for them.

21        Q.      Have you ever asked them to test any

22  of the samples at issue in this case?

23        A.      No.

24        Q.      Why not?

Page 12

1          A.          It's not what I'm here to do.

2          Q.          When you tested the Johnson &

3     Johnson -- do you have the results of your testing

4     for the -- of the Johnson & Johnson product?

5          A.          No.

6          Q.          Did you record the result?

7          A.          No.

8          Q.          What testing methods did you use

9     when you were looking at the Johnson & Johnson

10    product?

11         A.          Polarized light microscopy.

12         Q.          And when specifically was that test

13    done?

14         A.          One of them I looked at in around

15    2018.  That was a sample that I -- that I had

16    given to the University of Maryland that came out

17    of my personal collection.

18                     And the other one would have been,

19    you know, sometime -- I'm not all that good on

20    dates.  I'm sorry.  I would say 20 -- 2000,

21    2001 -- 21.  2020, 2021, something like that.  I

22    don't really remember exactly.

23         Q.          And did you create any record in

24    terms of photomicrographs or anything of those

Page 13

1  tests?

2        A.      There's a photomicrograph that I

3  took of the -- in 2018 of a tremolite fragment

4  that's in the talk that I gave to the FDA at

5  JIFSAN, and you have those pictures.

6        Q.      Did you ever use PLM -- well, when

7  you did your own test of a Johnson & Johnson, was

8  it baby powder?

9        A.      Yes.

10        Q.      When you tested the Johnson &

11  Johnson baby powder, did you look to determine

12  whether or not it contained chrysotile asbestos?

13        A.      When I was going to use it as a

14  background material to spike that I was doing for

15  some ASTM testing of material, I did look at the

16  material to see if I could find serpentine in it

17  of any type.

18              I didn't do an extensive study, but

19  I did look at it, yes.

20        Q.      When you said you didn't do an

21  extensive study, but you did look at it, what do

22  you mean by that?

23        A.      Well, I mean, I wasn't -- my purpose

24  in it was just to determine if I could see

Page 14

1    anything in there and I made several mounts, but I
2    didn't, you know, I didn't find anything.
3         Q.      Did you follow all the methodologies
4    and standards that are set forth in your report at
5    issue in this case when you looked at the Johnson
6    & Johnson for serpentine using PLM?
7         A.      Yes.  There wasn't anything to look
8    at.  So I would have had I found any serpentine.
9    I would have definitely used all of the methods,
10   yes.  I would have attempted to apply them all.
11   You can't always do that.
12        Q.      Okay.  Did you ever try to use TEM
13   in looking at the Johnson & Johnson samples?
14        A.      No.
15        Q.      Why not?
16        A.      I wasn't engaged to do TEM analyses.
17        Q.      Isn't it your opinion in this
18   report, however, that TEM should be done in
19   addition to PLM if you're looking for chrysotile
20   asbestos in Johnson's Baby Powder?
21        A.      Yes.
22        Q.      But you didn't do that yourself when
23   you were doing your own testing?
24        A.      I wasn't really testing it.  I just

Page 15

1    looked to see if I could find serpentine and I

2    didn't by PLM.

3         Q.      Right.

4              But under your own standards in your

5    report, in order to have a definitive conclusion,

6    you would have had to use TEM, correct?

7         A.      I was not -- my -- my goal here was

8    simply to make sure that I didn't see a lot of

9    serpentine in there.  It would be an interference

10   that -- and I didn't.  I was not analyzing this

11   for anyone.  I was looking at it for myself.

12        Q.      So do you use a different scientific

13   method when doing testing for yourself versus

14   being paid by someone?

15                    MR. HYNES:  Objection to form.

16        Argumentative.

17                    THE WITNESS:  No, but I didn't

18        use TEM and I wouldn't.

19   BY MR. PLACITELLA:

20        Q.      But you did put in a report for two

21   different courts that the standard methodology you

22   would use is to any time you use PLM also use TEM,

23   correct?

24        A.      Any time I -- only -- only if I am

Page 16

1    trying to authenticate the presence of chrysotile.

2    If I want to confirm it, I would certainly use

3    TEM.  If I have a whole amount of chrysotile under

4    the microscope, I don't need the TEM to go and

5    confirm that if I have nothing but chrysotile

6    under the microscope.  So it's not always the

7    case.

8              But if you're trying to find a small

9    amount of chrysotile at very, very low levels, the

10   TEM would be a reliable way to do that, especially

11   when the optical properties are inconsistent with

12   chrysotile.

13        Q.      So when you yourself purchased

14   Johnson's Baby Powder and did your own analysis,

15   you did not use TEM, correct?

16        A.      No, I didn't.

17        Q.      Okay.  Did you consult anyone else

18   in preparation for the report at issue today?

19        A.      No.

20        Q.      Did anyone supply you with any

21   materials in order to assist you in preparing your

22   report in this case?

23                    MR. HYNES:  Vague.

24                    THE WITNESS:   Other than --

Page 17

1                and I was supplied the MAS reports, if

2                that's what you're asking me.

3        BY MR. PLACITELLA:

4                Q.        Is that -- that's the only thing you

5        were supplied?

6                A.        Yes.

7                Q.        Now, you issued two different

8        reports.  One for the federal litigation and one

9        for the state court litigation, correct?

10               A.        That's correct.

11               Q.        And what's the difference between

12       the two reports?

13               A.        The second report has more examples

14       and an appendix.  I added an appendix to that, and

15       I also added a table that gives the data from the

16       MAS analyst sheets.  I just compiled some of that

17       data into a table.

18               Q.        Are your opinions any different from

19       one report to the other?

20               A.        No.

21               Q.        And why is it that you thought it

22       was important to an amend your reports when you

23       issued the second report?

24                         MR. HYNES:  Objection to form.

Page 18

```
 1                    THE WITNESS:   I just thought
 2         maybe some more examples would be
 3         helpful.
 4    BY MR. PLACITELLA:
 5         Q.      But I noticed in your report there
 6    were actual language changes in the report.
 7                    Why did you make language changes in
 8    the report in addition to finding more examples?
 9                    MR. HYNES:  Vague.
10                    THE WITNESS:   I don't know
11         really to what you're referring, but the
12         first report was written very quickly and
13         I may have tried to -- made a few
14         grammatical changes here and there, but
15         nothing substantive other than what I
16         just described.
17    BY MR. PLACITELLA:
18         Q.      Why was it that the first report was
19    issued very quickly?
20         A.      Well, I was asked to provide it on a
21    Friday and I provided it on a Tuesday, the
22    following Tuesday.  I didn't have much time.
23         Q.      So they were -- J&J gave the
24    materials on a Friday and you provided a final
```

Page 19

```
 1   report on a Tuesday?

 2                  MR. HYNES:  Misstates

 3        testimony.

 4                  You can answer.

 5                  THE WITNESS:  No.  I was asked

 6        to give -- make a formal report on a

 7        Friday, but I had received the MAS

 8        reports in the time preceding that.

 9   BY MR. PLACITELLA:

10        Q.       Have you ever used PLM to identify

11   chrysotile asbestos in cosmetic talc other than

12   Johnson & Johnson talc?

13        A.       No.

14        Q.       Have you ever analyzed a cosmetic

15   talc product other than Johnson & Johnson to

16   determine whether it contained any form of

17   asbestos?

18        A.       No.

19        Q.       So as you sit here today, the only

20   testing you ever did of -- of cosmetic talc to

21   determine if it contained asbestos was the two

22   samples that you did on your own that you bought

23   off the shelf; is that fair?

24        A.       I think that's probably true.
```

Page 20

1   Certainly that's all that I have in my memory in

2   terms of products.

3                    I mean, over the years, early

4   particularly in '70s and '80s, I was sent a lot of

5   materials.  For all I know, they were used in

6   cosmetic talc.  I really didn't know, but they

7   weren't out of a bottle or a product or, you know,

8   something I could identify as being having been

9   sold to anyone.

10       Q.      So in terms of your qualification

11  before a court, if asked by a judge, you would say

12  other than the two tests that you did on your own,

13  you have no recollection of ever conducting a

14  single test on cosmetic talc using any method to

15  determine if it contains asbestos, correct?

16                    MR. HYNES:  Form.

17                    THE WITNESS:   Cosmetic talc

18        products, please.

19  BY MR. PLACITELLA:

20       Q.      Sorry?

21       A.      Cosmetic talc products.  In other

22  words, they're identified as a consumer product.

23  That would be correct.

24       Q.      Okay.  Have you test any industrial

Page 21

1    talc products to determine if it contained

2    asbestos to date?

3          A.      Yes, many.

4          Q.      Okay.  And what were the sources of

5    that industrial talc?

6          A.      Well, mostly they came to me from

7    companies that wanted to know if there was

8    asbestos in the materials they were going to use.

9    This was in the '70s and '80s.  There were a few

10   labs that could do it, and they were -- did not

11   want to put asbestos in anything they were using.

12   So they wanted to be sure their products were --

13   were free of asbestos.

14         Q.      Did you ever test any talc,

15   industrial talc or any talc, for that matter, from

16   any of the mines that Johnson & Johnson used to --

17   to manufacture Johnson's Baby Powder?

18         A.      I don't know.

19         Q.      Did you ever test any talc from any

20   Vermont mine?

21         A.      Yes.

22         Q.      What Vermont mine?

23         A.      I don't know.

24         Q.      Do you have a record of that?

Page 22

1          A.       No.

2          Q.       When you do the testing, do you --

3    when you did the testing historically of

4    industrial talc, did you keep records of that

5    testing?

6          A.       At the time, yes.

7          Q.       And what happened to those records?

8          A.       Well, I threw them all away when I

9    had to close up my -- most of my university

10   activities.

11         Q.       Okay.  And when did you throw them

12   all away?

13         A.       10, 12 years ago.

14         Q.       When you did the testing of the

15   Vermont talc, to your recollection, what testing

16   method did you use?

17         A.       Polarized light microscopy.

18         Q.       Did you ever use TEM?

19         A.       No.

20         Q.       Did you believe at the time that you

21   did the testing of Vermont talc that TEM was --

22   was the gold standard for determining ultimately

23   whether there was asbestos in the Vermont talc?

24         A.       Sorry, but I would disagree with you

Page 23

1    that it's the gold standard.  It would be so for

2    chrysotile, but not necessarily said for

3    amphibole.

4          Q.      Okay.  So is it your opinion that

5    TEM is the gold standard for determining whether

6    there's chrysotile in Vermont talc?

7          A.      I would say that you need both.  My

8    position would be that I would always look at

9    everything by polarized light microscopy first.

10   You see much more of the sample.  If there's

11   amphibole there, you can always see it.

12                The only thing you couldn't see any

13   polarized light microscopy were individual fibrils

14   of chrysotile, and you can't see those.  Fibril

15   bundles you would be able to see.

16                If there's ambiguity in the PLM

17   analysis, then TEM would be -- that's the way I

18   would proceed, that TEM would be the place I would

19   go.

20         Q.      So -- so we're just clear on your

21   opinion, you cannot see individual chrysotile

22   fibrils using PLM, correct?

23         A.      That's correct.

24         Q.      So if they exist, you would need to

Page 24

1    look at that under TEM, correct?

2         A.       Only if they exist independently of

3    others.  If they're in groups --

4         Q.       Okay.

5         A.       -- you would be able to see them.

6         Q.       If they exist independently, they

7    are not identifiable under PLM, but they are

8    identifiable under TEM.

9                  Is that your testimony?

10        A.       Yes.

11        Q.       Okay.  I want to go to -- hold on

12   one second.

13                 I have your MDL report, which I've

14   marked as Wylie Exhibit 6.2 and I'm blowing up for

15   you.

16        A.       Oh, yeah.

17                     MR. HYNES:  Chris, for

18          purposes of the record, is that the May

19          report you're referring to?

20                     MR. PLACITELLA:  Correct.

21                     MR. HYNES:  Thank you.

22                     THE WITNESS:   Okay.

23                     MR. HYNES:  And which page was

24          that?

Page 25

```
 1                    MR. PLACITELLA:  Okay.  I'm
 2        curious.  The view that the reporter is
 3        using, is everyone seeing?  I'm trying to
 4        understand what view is being used just
 5        to maximize the --
 6                    MR. HYNES:  Yeah, we can see.
 7                    MR. PLACITELLA:  -- your
 8        ability to see.
 9                    MR. HYNES:  Your boxes -- your
10        speaker box is pinned and so you are the
11        largest image on the screen, and we see
12        essentially -- I'll describe this.
13                    We see your face in the top
14        left, and then we see a document --
15                    MR. PLACITELLA:  Okay.
16                    MR. HYNES:  -- to your right
17        with a callout taking up a majority of
18        the screen.
19                    MR. PLACITELLA:  Okay.  So you
20        have no problem seeing the callout,
21        correct?
22                    MR. HYNES:  Correct.
23     BY MR. PLACITELLA:
24        Q.    Okay.  Just for curiosity purposes,
```

Page 26

1    you have a computer in front of you, Dr. Wylie.

2         A.        (Nods head).

3         Q.        What's on that computer?

4         A.        Just exactly what he described,

5    Kevin described.

6                   So I see you in the upper left-hand

7    corner.  I see a version of the whole page, which

8    I can't read because it's not clear.  And then I

9    see an insert with larger writing and the

10   paragraph beginning "Another polarizer."

11        Q.        Okay.  So in 6.2, which is your May

12   report, you say that:

13                  "Although not depicted in Figure 1,

14   if a tungsten light source is utilized, a blue

15   filter should be added above it."

16                  Do you see that?

17        A.        Yes.

18        Q.        Is that statement published in any

19   standard, or is that just your opinion?

20                       MR. HYNES:  Objection.  Form.

21                       THE WITNESS:   It's part of

22            the proper techniques for polarized light

23            microscopy, and it's very well-described

24            in Bloss's books.

Page 27

1    BY MR. PLACITELLA:

2          Q.       I'm sorry.  In what?

3          A.       Bloss, Donald Bloss.  "Introduction

4    to the Methods of Optical Crystallography" by

5    Donald Bloss.  Bloss published --

6          Q.       Okay.

7          A.       You want me to keep going?

8                   There's two versions.

9          Q.       And what proof do you have that that

10   was not done here?

11         A.       I have no proof.

12                  My reason I brought it up is because

13   the coloring in some of the pictures appear to be

14   a little bit more orange than I would have

15   expected them to be and a little bit on the red

16   side, and so I thought perhaps -- I gave two

17   possibilities -- either the voltage wasn't turned

18   up all the way possibly, or there was no blue

19   filter in the system.  And I don't really know.  I

20   mean, that -- it was just a suggestion.

21         Q.       Regardless of that statement, you

22   were able to reach conclusions based on the

23   information that was provided to you concerning

24   the presence or absence of asbestos in the

Page 28

```
 1   material that was provided, correct?
 2        A.       I was, yes, uh-huh.
 3        Q.       Okay.  And you did not comment
 4   anywhere in your report about the type of light
 5   bulb used changing your opinions or conclusions,
 6   correct?
 7        A.       No, that's correct.
 8        Q.       Okay.  On page 6.4, you list a
 9   number of properties that you believe are
10   significant in using the polarized microscope in
11   evaluating the samples for the presence of
12   asbestos, correct?
13        A.       They're important for identifying
14   the presence of the identity of an unknown.
15        Q.       What do you mean by that?
16        A.       A mineral whose identity you don't
17   know.
18        Q.       Okay.  Well, do all qualified
19   experts use all 11 properties every time they
20   examine a sample of cosmetic talc to determine
21   whether there's asbestos in the talc using
22   polarized light microscopy?
23                     MR. HYNES:  Vague.  Overbroad.
24            Calls for speculation.
```

Page 29

```
 1                    THE  WITNESS:    I  have  no  idea.
 2   BY  MR.  PLACITELLA:
 3       Q.        Do  you  use  all  11  properties  every
 4   time  you  examine  a  sample  --
 5                    MR.  HYNES:    Overbroad.
 6   BY  MR.  PLACITELLA:
 7       Q.        --  to  determine  if  there's
 8   chrysotile  asbestos  in  the  sample?
 9                    MR.  HYNES:   Same  objection.
10                    THE  WITNESS:    These  are  the
11          properties  that  help  you  identify  an
12          unknown  mineral,  and  that's  --  that's  the
13          set  of  properties  that  are  available.
14                    You  can't  always  obtain  all  of
15          these  properties.   It  depends  on  the
16          particle  size.   The  issue  would  be,  did
17          you  attempt  to  try  to  look  at  some  of
18          them.
19                    I  mean,  for  example,  not  all
20          minerals  display  dispersion  of  the  optic
21          axis  and  not  all  minerals  would  you
22          necessarily  be  able  to  get  a  proper
23          orientation,  even  if  you  could  obtain  an
24          interference  figure,  such  that  you  could
```

Page 30

1              evaluate the dispersion of the optic

2              axis.

3                      But sometimes the dispersion

4              of the optic axis is an extremely

5              important variable in telling one mineral

6              from the other.

7                      You know, there are 5,000

8              different minerals, and you need a lot of

9              different qualities of these and

10             properties if you have a material whose

11             identity you do not know.

12                     So that these are the

13             properties that I teach my students in

14             using the polarized light microscope.

15             These are the properties that are

16             described for every mineral in every

17             reference book for optical mineralogy.

18             They're all given, and so that you can

19             evaluate them and should attempt to

20             evaluate them if you have an unknown.

21                     In the analysis of building

22             materials for asbestos, of course they do

23             not do all of these materials because

24             they have a set of -- they have a

Page 31

```
 1          material in which things have only -- are

 2          only there because they were added, and

 3          so you kind of know that they needed to

 4          be a commodity in order to be there.

 5                    So it's not -- you don't have

 6          the world of 5,000 minerals to choose

 7          from among.  But nonetheless, if you have

 8          an unknown, you certainly should --

 9          should attempt to look at these and

10          determine that if you think there's

11          chrysotile that they are consistent with

12          that.

13   BY MR. PLACITELLA:

14        Q.     Well, let me ask the question this

15   way.

16                    In analyzing cosmetic talc for the

17   presence of chrysotile asbestos, do you use every

18   one of these 11 properties in making your

19   analysis?

20        A.     I'm not an analyst, as you know.  I

21   look at materials for their characteristics, for

22   the presence of asbestos, and of course I try to

23   identify the minerals that are present.

24                    So I will attempt to determine as
```

Page 32

1    many of these as I can if I have a material that

2    whose identity I don't know always.

3         Q.       Let me ask the question again.

4              When you're evaluating materials,

5    specifically cosmetic talc, for the presence of

6    chrysotile asbestos, do you use each and every one

7    of these properties?

8                   MR. HYNES:  Asked and

9         answered.

10                  THE WITNESS:   I don't do

11        routine analysis of cosmetic talc.  I'm

12        -- if I have a cosmetic talc and it has

13        an unknown material in it, of course I

14        will attempt to use all of these

15        properties.

16   BY MR. PLACITELLA:

17        Q.       When is the last time you used all

18   of these properties in evaluating a talc sample to

19   determine whether or not it has asbestos?

20        A.       I'm not an analyst.  I don't do

21   analysis at this point in my life, as you know.

22              So the last time I -- I mean, when I

23   was looking and studying industrial talcs,

24   whatever talcs people would send me in the '70s

Page 33

1    and '80s, I always used all -- as many of these as

2    I can measure.

3          Q.      Am I -- is it a subjective judgment

4    call as to what properties you should be looking

5    at in a particular sample to determine whether

6    there's chrysotile asbestos in that sample?

7          A.      No.

8                      MR. HYNES:  Object.

9    BY MR. PLACITELLA:

10         Q.      Is it your opinion that, regardless

11   of your criticism of what properties were

12   considered, Dr. Longo's method produced enough raw

13   data for you to determine whether the talc sample

14   contained chrysotile?

15         A.      Yes.

16         Q.      So regardless of your criticism, the

17   methodology used by Dr. Longo produced enough raw

18   data for you to exercise your own professional

19   judgment to determine whether that data

20   demonstrated if there was asbestos or not in the

21   Johnson's Baby Powder, correct?

22                      MR. HYNES:  Object to form.

23                      THE WITNESS:   Perhaps I

24         should say this again.

Page 34

1                      These properties are used to

2            identify what is there, not to identify

3            what's not there, in a sense.

4                      So there is sufficient

5            information provided in his reports to

6            let me know that he did not have material

7            that were consistent with the optical

8            properties of chrysotile.

9    BY MR. PLACITELLA:

10       Q.       So let me -- just so the record is

11   clear.

12                      Regardless of your criticism on this

13   part of your report, Dr. Longo -- the methods

14   Dr. Longo used generated enough sufficient raw

15   data for you as an independent scientist to

16   determine whether, in your opinion, that that

17   product contained chrysotile asbestos.

18                      True?

19                      MR. HYNES:  Objection to form.

20                      THE WITNESS:   He provided a

21            lot of raw data, and that data was

22            sufficient for me to determine that they

23            were -- the data were inconsistent with

24            chrysotile.  Not what they -- not what

```
                                              Page 35

 1         the material is necessarily, but they

 2         were inconsistent with chrysotile.

 3   BY MR. PLACITELLA:

 4         Q.      And that's based upon your

 5   independent professional judgment and experience,

 6   correct?

 7         A.      Correct.

 8         Q.      Okay.  Is there any published

 9   literature or standard that states that when

10   looking at chrysotile -- when looking at cosmetic

11   talc, when analyzing cosmetic talc, you should

12   look at every one of these properties when using

13   PLM to determine if that product contains

14   chrysotile asbestos?

15                    MR. HYNES:  Asked and

16         answered.

17                    THE WITNESS:  I'm not sure

18         what's different about what you're asking

19         me.

20                    Are you asking me about all

21         the formal methods that are out there?

22         Or what are you asking me?

23   BY MR. PLACITELLA:

24         Q.      I'm asking you whether there is any
```

Page 36

1    published literature that states that when looking

2    at a sample of cosmetic talc to determine whether

3    it has -- contains chrysotile asbestos, you should

4    evaluate each and every one of these properties.

5                      MR. HYNES:  Same objection.

6                      THE WITNESS:   I don't think

7            there are any standards specifically for

8            cosmetic talc, but maybe there are and

9            I'm not aware of them.

10                     So the answer is, I guess, I

11           don't know.

12   BY MR. PLACITELLA:

13           Q.     Okay.  I want to go to -- and I'm

14   going to skip around your report because really

15   the purpose of this deposition is just to better

16   understand the substance of your report.  Okay?

17                     So I'm not going to ask you about

18   every little thing, just things that...

19                     On page 6.5, you talk about

20   recommendations for using different oils, correct?

21           A.     I don't think he's got the same

22   thing I have here.  It looks like he has a

23   different.

24                     Okay.  I'm sorry.  "Instead of the

Page 37

1    recommended two or three."  Yes.  Okay.  Uh-huh.

2          Q.      Okay.  And you cite to a specific

3    article for that proposition, correct?

4          A.      A book.

5          Q.      Oh, that's a book?

6          A.      It's a book.

7          Q.      Okay.  Are there any government or

8    ASTM standards that require the two or three

9    different oils when making this kind of

10   evaluation?

11         A.      What do you mean by "this kind of

12   evaluation"?

13         Q.      Evaluating and looking at the sample

14   -- the information that's produced here to

15   determine whether there was chrysotile in cosmetic

16   talc.

17         A.      Again, I don't think there are any

18   standards specifically for cosmetic talc.

19                 Are there any analytical standard

20   approaches that are specific for cosmetic talc?

21         Q.      That's what I'm asking you.

22         A.      Well, I'm not a professional

23   analyst.  So I'm not aware of any standard -- any

24   standard methods for the analysis of cosmetic talc

Page 38

1   that have been published by ASTM.

2        Q.      Okay.

3        A.      I mean, maybe there are.  I'm just

4   not aware of them.

5        Q.      On page 6.8, you state --

6        A.      Okay.

7        Q.      -- "For all minerals and oils, the

8   'index of refraction' on the label or in reference

9   texts."

10              Do you see that?

11       A.      Yes.

12       Q.      What reference texts are you

13   referring to?

14       A.      All books that mineral --

15   mineralogical books that give optical information

16   on minerals, and that can be from general books in

17   the Deer/Howie assessment series, Bloss's books,

18   Phillips and Revell, the optical properties of

19   minerals, mineralogy texts.  Any kind of

20   mineral -- any kind of text that provide

21   information on the index of refraction of minerals

22   is what I am referring to there.

23       Q.      Okay.  Now, in your report, you

24   criticize Dr. Longo in various contexts about the

Page 39

1   number of mineral oils used.

2                You recall that?

3        A.        I made a comment to the effect that

4   if he had measured in more than one oil, he would

5   have had a better shot at getting a correct answer

6   for the index of refraction at the D line.

7        Q.        Okay.  Well, that's what I'm trying

8   to understand.

9                Because don't you say here in this

10  page that is up on the screen that he used two

11  oils?

12       A.        Yes, he did, but the problem with

13  the two -- and I analyzed the two and demonstrated

14  that they showed you that the index of refraction

15  was much higher than he concluded.  Because he did

16  have two oils and I was able to, you know, take

17  advantage of that.

18                But it still leaves uncertainty when

19  they are far away from the D line.  So you're much

20  better off if you have one on one side and one on

21  the other, and that's a little bit why I said two

22  or three.

23                You know, if you had 1.550, 1.552,

24  and 1.554 you wouldn't really gain much

Page 40

1    information.  So you need to have the three oils

2    that are a little bit further apart, and one on

3    one side of the D line and one on the other would

4    be ideal.  That's the way I taught my students.

5         Q.     Okay.  That's what I'm trying --

6    that's what I'm trying to understand.

7              Because early in your report you

8    said he only used one oil, here you said he used

9    two oils, and then elsewhere in your report you

10   said he used three oils.

11             So I'm trying to understand what

12   your criticism is.

13        A.     He never used --

14             MR. HYNES:  Objection to form.

15   BY MR. PLACITELLA:

16        Q.     Did he use one, two, or three oils?

17             MR. HYNES:  Objection to form.

18             THE WITNESS:   He never used

19        three oils.  He used only 1.550 and

20        1.560, as far as I know.

21             But he didn't record and

22        compile information together.  In order

23        to really use dispersion staining

24        properly, you have to look at what you

Page 41

```
 1          found, the colors in one -- in one oil
 2          and you have to look at how -- what you
 3          found in the other oil.
 4                    And you have to put those
 5          together to produce a dispersion for the
 6          mineral so you can accurately determine
 7          the index of refraction at the D line.
 8  BY MR. PLACITELLA:
 9      Q.    Okay.  So when you say early on he
10  only used one oil, was that a mistake?
11                    MR. HYNES:  Objection to form.
12          Misstates testimony.
13                    THE WITNESS:   I don't
14          understand what you mean by "mistake."
15                    He only used one oil in any of
16          his analyses.  Sometimes it was 1.550 and
17          sometimes it was 1.560, but he never used
18          in a single study both oils at the same
19          time and compiled the dispersion staining
20          colors from the two in such a way that he
21          would learn more about the index of
22          refraction of the material he was using.
23  BY MR. PLACITELLA:
24      Q.    Okay.  Let me just take a little
```

Page 42

1    deeper dive on that.

2                    So I'm going to page 6-10, Exhibit

3    6.10, which is page 10 on your report.

4         A.        Yes.

5         Q.        Okay.  In this, you see the section

6    that's up on the screen, Dr. Wylie?

7         A.        Yes, uh-huh.

8         Q.        It says:

9                    "In some of the MAS optical data

10   sheets, specific values for the parallel and

11   perpendicular to elongation are provided; in

12   others, one can only estimate the value."

13                   You see that part?

14        A.        Yes, uh-huh.

15        Q.        Okay.  And so was a comparison done?

16        A.        I'm sorry.  I don't understand.  Did

17   he do --

18        Q.        Well --

19        A.        -- a comparison between his 1.55?

20        Q.        Yeah.

21        A.        Well, he made some interesting

22   comments about how the different oils affected his

23   results, but he never used the two together to

24   augment his -- at least nothing I saw.  I don't

Page 43

1    know actually how he went from his dispersion

2    staining color to his index of refraction without

3    two oils but -- so I don't know whether I've

4    answered your question.

5            Q.      You don't know exactly what he did?

6            A.      No, I don't know what he did.  I

7    don't know what he did, no.

8            Q.      Okay.  And you do say:

9                    "In some of the MAS optical data

10   sheets."

11                   You see that sentence there?

12           A.      Yes.  Yes.

13           Q.      So his optical data sheets were

14   sufficient for you to draw your own conclusions;

15   is that fair?

16           A.      Well, okay.  So let's make sure that

17   we're talking about the same thing.

18                   In his optical data sheets, he gave

19   a lambda zero parallel and he gave a lambda zero

20   perpendicular, and those information that he

21   provided not in all of the optical data sheets

22   actually, only on some.  And there were a couple

23   in which he had them for every particle, but there

24   were some that he only had them for one particle.

Page 44

1    I mean, it was -- it was not always present.

2                    But those were not two oils.  I

3    mean, I'm a little confused.  Those were parallel

4    and perpendicular in a single oil, and he gives

5    the lambda zero for those.

6         Q.    But my question to you is:  He

7    generated enough raw data here using the

8    methods -- his methods for you to draw your own

9    independent conclusion?

10        A.    Yes, that's correct.

11        Q.    Is that correct?

12        A.    Yes, that is correct.

13        Q.    Okay.  All right.  So the

14   methodology that he used in generating the data

15   was sufficient for you to exercise your own

16   independent judgment and provide your own

17   opinions, correct?

18                    MR. HYNES:  Form.

19                    THE WITNESS:   He -- by and

20         large, I would say that was correct.  It

21         was -- he gave me enough information to

22         know that I did not understand how he was

23         utilizing dispersion staining to obtain

24         the data that he obtained.

Page 45

1              So if that's what you're

2         asking me, the answer is yes.

3    BY MR. PLACITELLA:

4         Q.      Okay.  And let me just go down a

5    little bit further.

6              The next paragraph you say:

7              "I would note that they are a bit

8    more orange than I would expect."

9              Do you see that section?

10        A.      Yes.

11        Q.      Okay.  And does the fact that the

12   dispersion staining colors are a bit more orange

13   than you would expect, did that prevent you from

14   drawing conclusions based upon the data provided?

15        A.      It didn't matter in this case

16   because all of the particles are the same strange

17   orange.  So the talc particles are also a bit more

18   orange than I would have expected.

19              So, no, I was able to draw that

20   conclusion.

21        Q.      But based upon the methodology that

22   Dr. Longo used to generate the data he did, you

23   were able to exercise your own expert opinions and

24   draw your own conclusions, correct?

Page 46

```
 1              MR. HYNES:  Form.
 2              THE WITNESS:   I was able to
 3         draw my own conclusions about the
 4         similarity of color, even though it was
 5         strange, among all the particles, yes.
 6    BY MR. PLACITELLA:
 7         Q.      Okay.  And, in fact, you say:
 8              "What is clear, however, is that all
 9    particles that have the same dispersion staining
10    colors."
11              You state that, correct?
12         A.      Correct.
13         Q.      All right.  So to me that implies
14    that you had enough information -- when you say
15    "what is clear" that you had enough information
16    from the data that was generated to draw your own
17    independent opinions, correct?
18         A.      It's clear, yes.  Particles had the
19    same dispersion staining colors and, therefore,
20    the same lambda zeros and, therefore, the same
21    index of refraction at lambda zero, yes.
22         Q.      So I want to go to figure -- page
23    6.11.
24         A.      Okay.
```

Page 47

1          Q.      Can you see that?

2          A.      Yes.

3          Q.      Now, this is a -- this is a -- I

4    don't want to characterize it.

5                  What is this in front of you?

6          A.      It's a dispersion -- central-stop

7    dispersion staining microphotograph.

8          Q.      Okay.  In this picture, the

9    methodologies used to create this picture were

10   sufficient for you to draw your own independent

11   judgment about what this picture shows, correct?

12         A.      Yes.

13         Q.      Okay.  And what colors are you

14   seeing in this picture?

15         A.      Well, I'm seeing various shades of

16   orangey-yellow and I'm seeing shades of blue/light

17   blue color.  I see two basic colors.

18         Q.      Did you -- did you need to look

19   under the microscope itself in order to conclude

20   that you disagreed with Dr. Longo?

21         A.      About what?

22         Q.      About what this demonstrates, what

23   this shows.

24                 Is the picture enough, or did you

Page 48

1    have to go -- did you need to look under the

2    microscope yourself in order to come to the

3    conclusion?

4          A.       In this case, the pictures are quite

5    clear.

6          Q.       So if someone took the position in a

7    court that in order for Dr. Wylie to make a

8    determination she had to look in the microscope

9    itself, that would be incorrect?

10                        MR. HYNES:  Argumentative.

11   BY MR. PLACITELLA:

12         Q.       Correct?

13                        MR. HYNES:  Overbroad.

14                        THE WITNESS:   It would have

15            -- if I had been sitting with him, I

16            would have asked him a lot of questions,

17            I can tell you that, that would have

18            perhaps clarified for me how he got the

19            information that he did.

20                   So this picture is clear

21            enough for me to conclude that the

22            particle that is labeled as chrysotile

23            has essentially the same dispersion

24            staining colors as the particles that are

Page 49

1          talc and that I don't need to go to the

2          microscope to see that.

3    BY MR. PLACITELLA:

4          Q.      What questions would you have asked

5    him as you were sitting next to him?

6          A.      Well, I would have asked -- I would

7    have loved to have looked at the light source to

8    understand why the particles appear so much more

9    orange.  I would have liked to have known that.

10               I would have liked to known at what

11   temperature this picture was taken.  There's no

12   indication of the temperature in many of the

13   samples.  I can't remember in this one in

14   particular, I have to say, but in many of his

15   pictures there's no temperature.  So that changes

16   the indices of refraction a little bit.

17               So those kinds of questions.

18               But fundamentally, the particle

19   that's labeled here has the same indices of

20   refraction as the other particles in that field,

21   unless they're the blue ones, but the orange ones,

22   and I would not need to go to the microscope to

23   determine that that was true.

24         Q.      Okay.  I'm going to go to 6.12.

Page 50

1                    Can you see that?

2        A.        Yes.

3        Q.        Okay.  Does this picture provide you

4    -- does the method that Dr. Longo used to generate

5    this picture provide you enough information to --

6    to exercise your own independent judgment as to

7    what this picture demonstrates?

8        A.        How I would interpret it, I can

9    interpret -- I can interpret this photograph, yes.

10       Q.        Okay.  And what -- what colors do

11   you see in this photograph?

12       A.        Well, I see various shades of

13   yellow, a little bit of blue.

14                  I'm looking at my hard copy because

15   it's a little bit bigger, but it's the same

16   picture.  I'm just looking over here.

17                  So that's what I see.

18       Q.        And do different scientists based

19   upon their training and experience often see

20   differences in colors when they're looking at a

21   photograph like this?

22                    MR. HYNES:  Calls for

23       speculation.  Overbroad.  Vague.

24                    THE WITNESS:   I have no idea

Page 51

```
 1          what other people would see.  My -- my --
 2          I don't know.
 3   BY MR. PLACITELLA:
 4          Q.      Okay.
 5          A.      I don't see why they would.
 6          Q.      Well, part of what -- when you're
 7   looking at a photo like this, part of what you
 8   bring to this photograph is your years of
 9   experience and judgment, correct?
10          A.      That would be correct.
11          Q.      So somebody with less experience
12   and -- excuse the phrase -- years of experience
13   might see something different in terms of color?
14          A.      I have no idea.  I don't see why
15   but...
16          Q.      Let's go to 6.13.
17                  Now, 6.13, what colors do you see
18   there?
19          A.      I see a blue, a bright bluish -- sky
20   bluish color, and I see a yellowish golden,
21   yellow.
22          Q.      Okay.
23          A.      Yes, yellowish-golden.
24          Q.      Give me a second here.
```

```
                                          Page 52

 1              In your commentary to this photo,

 2    you talk about a -- is this a third oil or a

 3    second oil?

 4         A.      This is 1.560.

 5         Q.      Okay.  And is this oil recognized by

 6    experts as an oil that will help provide

 7    scientific data?

 8                     MR. HYNES:  Vague.  Overbroad.

 9         Calls for speculation.

10                     THE WITNESS:   (Laugh).  I

11         mean, yeah, I can't answer that question.

12         Please be a little more specific.

13         Provide information about --

14    BY MR. PLACITELLA:

15         Q.      Have you ever used the 1.560 oil --

16         A.      Sure.

17         Q.      -- in your analysis --

18         A.      Yes.  Yes.

19         Q.      -- to the D line?  Okay.

20         A.      Yes.  Yes.

21         Q.      Go to 6.14.

22                 On page 614, you state:

23                 "Our first conclusion from Figure 7

24    is that talc and 'chrysotile' are not
```

Page 53

1  distinguished from each other by MAS by dispersion

2  staining colors."

3              Do you see that?

4      A.      Yes.

5      Q.      What do you mean -- who's "our"?

6  What do you mean by "our"?

7      A.      It should have been "my."  I don't

8  know.  Sounds like a teacher.  Sounds like I was

9  in my teacher mode.  (Laugh).

10      Q.      Okay.  So no one else was assisting

11  you when you were doing this?

12      A.      No.  No.

13      Q.      Okay.  You indicate, and I blew it

14  up here:

15              "In my opinion, the colors in

16  Figures 7a and 7b are indicative of a mineral with

17  an index of refraction closer to 1.586 parallel to

18  elongation."

19              You see that?

20      A.      Yes.

21      Q.      Okay.  So am I correct that the

22  methodology used by Dr. Longo provides sufficient

23  data for you to reach the conclusion?

24              MR. HYNES:  Form.

Page 54

1                    THE WITNESS:    I also need --

2           needed information about the dispersion

3           of the mineral, as I think I discuss

4           later on.

5                    But the talc is 1.586.  So

6           around plus or minus .002 I think maybe.

7           So that's what I was basically utilizing.

8                    The indices of refraction are

9           the same as the talc.  If the talc is

10          around 1.586, 1.585, then they are closer

11          to talc.

12   BY MR. PLACITELLA:

13        Q.      So you used your judgment and

14   experience and concluded that the index of

15   refraction at the D line is closer to 1.586 than

16   1.566, correct?

17        A.      Yes.

18        Q.      All right.  But you recognize that

19   others could disagree with your conclusion,

20   correct?

21        A.      I doubt it, no.

22                    MR. HYNES:  Calls for

23          speculation.

24   BY MR. PLACITELLA:

Page 55

1        Q.        No one else disagrees?

2        A.        Well, clearly Dr. Longo disagrees,

3    but remember that 1.586 is the index of refraction

4    of talc.

5                  So what I'm really -- and I go

6    through the analysis a little bit later, and I

7    used the dispersions possibilities for both talc

8    and chrysotile to extrapolate from the observation

9    of a lambda zero in 1.560 or 1.550 to the index of

10   refraction at the D line.

11                 So what I'm speaking about here is

12   that the indices of refraction are closer to talc,

13   and I don't think that any student that I've ever

14   taught would disagree with the fact that when the

15   indices of refraction are the same, the dispersion

16   staining colors are the same.

17       Q.        Am I correct it is based on your

18   professional judgment you believe in looking at

19   the colors in the D line that it's closer to 1.586

20   than 1.566?

21       A.        I agree.  Yes, I do.

22       Q.        Okay.  I'm going to page 6.17 of

23   your report.

24                 You indicate on 6.17 of your report

Page 56

1    that:

2                    "These indices of refraction would

3    not correspond to indices of refraction required

4    for chrysotile."

5                    Correct?

6         A.      That -- yes, that's what it says.

7    Yes.

8         Q.      Okay.  And, again, you disagree with

9    Dr. Longo based on the same data that he generated

10   and the scientific method that he employed,

11   correct?

12        A.      I do not know what scientific method

13   he employed, frankly.  As I told you before, I

14   don't know how he extrapolated from the

15   observation in the 1.550 or 1.560 to the D line.

16   I don't know how he did that.

17        Q.      Okay.

18        A.      So I don't -- I can't.

19        Q.      So you're not offering an opinion on

20   that?

21        A.      No.

22        Q.      All right.  So what you can state

23   that you disagree with Dr. Longo based upon the

24   data that he generated that you were able to

Page 57

1    observe, correct?

2         A.      That's correct.

3         Q.      Okay.  I'm going to the next page

4    6.18.

5                 You indicate -- I'm just looking at

6    the last highlighted sentence.

7                 By the way, does this indicate he

8    was looking at two oils?

9         A.      No.

10        Q.      So it's your opinion he's only

11   looking at one oil?

12        A.      My opinion?  He states it on every

13   photograph what oil he was in.

14        Q.      Okay.  And you state:

15                "We can use the dispersion staining

16   colors MAS reports parallel to elongation in

17   Series E oils 1.550 and 1.560 to test the

18   hypothesis that the dispersion of the particles

19   identified as chrysotile is very small, without

20   knowing the mineral or assuming its dispersion."

21                Did you write that?

22        A.      Yes.

23        Q.      Okay.  And you conclude that you're

24   still able to use the dispersion staining oils of

Page 58

1    1.550 and 1.560 to reach conclusions that disagree

2    with MAS, correct?

3                      MR. HYNES:  Vague.

4                      THE WITNESS:  Yes.  I can use

5            the information I obtained from the two

6            oils to demonstrate that the dispersion

7            of the mineral under question is small,

8            and that's what I did.

9                      I don't know that -- that

10           Dr. Longo would disagree or agree with

11           me.  He never commented on the

12           relationship between the two oils, other

13           than to say something about the

14           birefringence changing from one oil to

15           the other.

16   BY MR. PLACITELLA:

17           Q.      Okay.  I'm on page 6.20.

18           A.      Okay.

19           Q.      You say:

20                   "When the mineral is examined in two

21   different oils, it is clear also that the

22   MAS-reported indices of refraction are

23   inconsistent with the data provided."

24                   Correct?

Page 59

1          A.        That's correct.

2          Q.        So you were able to look at the

3    results from two different oils, make a comparison

4    and draw your own conclusions --

5          A.        That's --

6          Q.        -- correct?

7          A.        That's correct.

8          Q.        Okay.  And that was based upon

9    methods that were used by Dr. Longo in generating

10   the data you rely upon, correct?

11                        MR. HYNES:  Form.

12                        THE WITNESS:   I was using the

13        raw data that he provided, yes.

14   BY MR. PLACITELLA:

15         Q.        And you have no problem with the raw

16   data, the method he used to generate that raw

17   data, do you?

18                        MR. HYNES:  Form.  Vague.

19                        THE WITNESS:  Well, other than

20        the strangeness of the light

21        illumination, I would say that's correct.

22   BY MR. PLACITELLA:

23         Q.        Okay.  Even with the strange light,

24   that didn't interfere with your making your own

Page 60

1    independent judgment and offering your own

2    opinions on what the raw data showed, correct?

3         A.       That's correct.

4         Q.       Going to page 6.24.

5                  You indicate -- and I've highlighted

6    it:

7                  "It is common practice among optical

8    mineralogists when observing particles immersed in

9    oils to 'tap the slide' to encourage particles to

10   rotate along -- around the long axis and to change

11   orientation."

12                 Do you see that?

13        A.       Yes.

14        Q.       And do you have any evidence that

15   was not done in this case?

16        A.       I have no evidence that it was done,

17   no.

18        Q.       One way or the other?

19        A.       One way or the other.

20        Q.       That practice, is that published in

21   any standard or text?

22        A.       I have no idea.

23        Q.       Page 6.26.  You state on page 6.26:

24                 "The assertion by MAS that the

Page 61

```
 1   variations it observed are due to chemical
 2   variability is not supported by chrysotile from
 3   any other source and is directly contradicted by
 4   the data of McCrone."
 5             You see that?
 6      A.     Yes.
 7      Q.     What data of McCrone are you
 8   referring to?
 9      A.     He has a table that provides the
10   lambda zeros parallel and perpendicular to
11   chrysotile from many, many locations throughout
12   the world.
13      Q.     Is that -- and what specific
14   publication should I look at if I wanted to go see
15   what you were referring to?
16      A.     Well, there's two.  One of them he
17   wrote a paper.  I didn't actually use that one.  I
18   used "The Particle Atlas" for that information.  I
19   think that's the name of it.  I referenced it.
20      Q.     Okay.  And you go on to say:
21             "It is my opinion that the particles
22   are talc, not chrysotile, and variations are due
23   to orientation."
24             You see that?
```

Page 62

1        A.        Yes.

2        Q.        First of all, what do you mean by

3    "due to orientation"?

4        A.        Well, I discussed it in the report.

5    Certain materials, certain minerals, depending on

6    how they are oriented on the slide, will change a

7    lot of their properties depending upon

8    orientation.

9              The indices of refraction will range

10   within limits.  The extremes are set but -- by

11   chemistry, but within limits they will vary

12   according to the orientation.  And you could see

13   that if you -- you could see that.

14       Q.        Okay.  And so what you're indicating

15   is that, based on your opinion, particles are talc

16   and not chrysotile, and that's based upon your

17   independent judgment relying upon the materials

18   Dr. Longo supplied to you, correct?

19       A.        That's correct.

20       Q.        I'm going to page 6.30 of your

21   report where it talks about Calidria.

22              Let me know when you're ready.

23       A.        I'm ready.

24       Q.        Okay.  You say:

Page 63

1          "The optical data MAS has presented

2    for the Coalinga chrysotile is not for chrysotile

3    at all."

4          You see that?

5     A.    Yes.

6     Q.    What do you mean by that?

7     A.    It means that the indices of

8    refraction that are consistent with the dispersion

9    stain and colors of the material that he

10   identifies are not consistent with the chrysotile

11   from Coalinga.

12    Q.    Okay.  And what's the basis for that

13   statement?

14    A.    McCrone's data on Coalinga.  My own

15   observations of Coalinga.

16    Q.    So you have -- yourself have

17   analyzed Coalinga under a microscope?

18    A.    Yes.

19    Q.    Okay.  And when is the last time you

20   did that?

21    A.    It says it right there.  The first

22   sentence in this that you've got up there.

23          I looked at Coalinga about six

24   months ago maybe.

Page 64

1          Q.      And what was the source?  Where did
2    you get that from?
3          A.      In my collection.
4          Q.      In your collection?
5          A.      At the University of Maryland's --
6          Q.      Where did it come from?
7          A.      -- collection.
8                  Sorry.  I'm sorry to interrupt you.
9                  The University of Maryland's
10   collection.
11         Q.      Do you know when that Coalinga that
12   you analyzed came into possession of the
13   University of Maryland?
14         A.      1978.
15         Q.      So how do you know that's consistent
16   with what came out, for example, in 1995 for the
17   same mine?
18         A.      Well, of course I don't, and the
19   deposit could vary to some extent depending upon
20   where they were mining it.  So it's not -- there
21   could be variations in the trace minerals, but
22   there isn't any variation that I have seen
23   indicated for the chrysotile itself.
24         Q.      You don't know whether the Coalinga

Page 65

1    that Dr. Longo was preparing to stain was the same

2    that you had previously analyzed, do you?

3         A.      No.

4         Q.      How big is that Coalinga mine?  Do

5    you know?

6         A.      No.

7         Q.      Do you know what -- would the

8    properties potentially change based upon the depth

9    from which the sample is taken?

10        A.      I don't know.  I know nothing about

11   the mine, no.

12               There is a description of the mine

13   that suggests there's lateral variation in some of

14   the trace minerals, but that's the only thing that

15   I know.

16        Q.      Okay.  On 6.30 and 6.31 you talk

17   about temperature.  You mentioned that before.

18               You see at 6.31 you say:

19               "Measurement and correction for

20   temperature is standard procedure in optical

21   mineralogy, yet there is no indication if or how

22   temperature corrections were made in the MAS

23   reports."

24               You see that?

Page 66

```
 1          A.      Yes.
 2          Q.      Okay.  Do you have any evidence that
 3    the temperature variation would have influenced
 4    your interpretation of a material that you were
 5    provided?
 6                          MR. HYNES:  Form.
 7                          THE WITNESS:   No.
 8    BY MR. PLACITELLA:
 9          Q.      Okay.  By the way, you don't have
10    any evidence this was not done in this case,
11    correct?
12                          MR. HYNES:  Form.
13                          THE WITNESS:  No.  It isn't
14          indicated anywhere.  And the pictures are
15          labeled oil 1.550, and if the temperature
16          is 21, it's not 1.550, it's 1.552.
17                      So I guess I would have
18          expected some commentary somewhere, but
19          it's possible they were making these
20          temperature corrections and I just didn't
21          know it.
22    BY MR. PLACITELLA:
23          Q.      All right.  But regardless of your
24    comment about temperature, you were still able to
```

Page 67

 1    take the materials that were generated by

 2    Dr. Longo and draw your own independent opinions,

 3    correct?

 4         A.      Yes.  I assumed that he was

 5    operating at 21 degrees.

 6         Q.      I want to go to 6.35.

 7               See, I'm getting through this fast,

 8    right?

 9         A.      Yeah.

10         Q.      All right.  You indicate on page

11    6.35 that:

12               "In the reports, MAS says it heated

13    the samples but the temperatures given are

14    variable, and include 400C, 425C, 480C, and 400F.

15    It is not clear why MAS does not follow the

16    recommendations of the ISO method."

17               Do you see that?

18         A.      Yes.

19         Q.      What ISO method are you referring to

20    and why do you say they're not followed?

21         A.      There's a discussion in the ISO

22    method -- and, I'm sorry, I don't remember the

23    numbers -- 222 something or the other where it

24    talks about the importance of heating samples in

Page 68

1   advance of analysis to temperatures that would

2   remove organic components that, you know, a piece

3   of cotton or a bat piece, whatever, anything like

4   that.  And it's very explicitly stated in there

5   the temperature that should go to 480C.  As I

6   recollect 480.  I don't have it in front of me,

7   but it recollects it very clearly.

8        Q.      Okay.  And what I'm trying to

9   understand is:  Regardless of this comment, you

10  were still able to take the data that was

11  generated using the methodology employed by

12  Dr. Longo and reach your own independent opinions,

13  correct?

14       A.      That's correct.

15       Q.      So whether or not he followed the

16  recommendations of ISO, you were given enough

17  information to draw your own independent

18  conclusion that disagreed with Dr. Longo, correct?

19       A.      That's correct.

20                  MR. HYNES:  Form.  Overbroad.

21                  THE WITNESS:   That's correct.

22  BY MR. PLACITELLA:

23       Q.      Okay.

24       A.      I mean, pretty correct.

Page 69

1          Q.      You indicate further down -- by the

2    way, whenever you want to take a break, just let

3    me know.  I'm trying to power through this but...

4          A.      Okay.

5          Q.      So we've been going now about an

6    hour and 15 minutes.  You want to keep going or do

7    you want to take a couple minutes?

8                          MR. HYNES:  You want to take

9          five?

10                         THE WITNESS:   Five minutes.

11                         MR. PLACITELLA:  Sure.

12                         MR. HYNES:  I'll be right

13         back.

14                         THE COURT REPORTER:  Off the

15         record at 10:15 a.m.

16                         (Recess.)

17                         THE COURT REPORTER:  Back on

18         the record at 10:23 a.m.

19    BY MR. PLACITELLA:

20          Q.      All right.  I'm still on page 6.35

21    of your report.

22                      You indicate:

23                      "Unless size reduction alters the

24    atomic structure of the material, which is

Page 70

1    unlikely if grinding is done under liquid nitrogen

2    as described, indices of refraction and associated

3    dispersion staining colors will not change."

4                You see that?

5        A.      Yes.

6        Q.      Do you know what the grinding

7    process was for the Johnson's Baby Powder?

8        A.      That MAS used?

9        Q.      Well --

10       A.      Are we talking about MAS --

11       Q.      Yes.

12       A.      -- use --

13       Q.      Yeah.

14       A.      -- or what's used in the mine?

15               I'm not sure I --

16       Q.      Let's start with MAS.

17       A.      I think he -- I think he said a ball

18   mill, but I'm not -- he might have said a disc

19   mill.  I can't remember exactly.  He said he used

20   liquid nitrogen, but he didn't give the length of

21   time for the milling.

22       Q.      Okay.  Does that matter?

23       A.      Yes.

24       Q.      Why does that matter?

Page 71

1          A.       Well, if you, you know, mill

2     something for 10 hours in a ball mill, you might

3     damage it.  It's very mineral-specific,

4     time-specific, temperature-specific,

5     sample-specific.  So I don't know for sure.

6          Q.       Okay.  You also indicate:

7                   "Ball milling can be destructive to

8     the atomic structure of minerals if it persists

9     for many hours, but details of this 'study' are

10    not provided."

11                  Do you need that information in

12    order to reach a conclusion in this case?

13         A.       MAS seems to indicate that by

14    milling, the indices of refraction have changed.

15    That's not possible unless the atomic structure of

16    the mineral has been destroyed in the milling

17    process.  So either he's incorrect or he has --

18    it's no longer what he thinks it is because the

19    atomic structure has been destroyed.

20         Q.       So are you familiar with the ball

21    milling process that Johnson & Johnson uses at the

22    mine in order for it to create the end product?

23         A.       No.

24         Q.       Does the ball milling process have

Page 72

1  the capacity to change the ability to detect

2  chrysotile asbestos in the final product by PLM?

3         A.      Well, that's a very interesting

4  question.  (Laugh).  I'm not sure that I know the

5  answer to that.

6                 I guess my instinct would say that

7  would be no, but I'm not familiar enough to be

8  able to answer specifically.

9         Q.      Well, could you -- could the ball

10  milling process grind the fibers down to a size

11  that PLM would not pick it up?

12         A.      I don't think so, no.

13         Q.      Okay.  And what's your basis for

14  that statement?

15         A.      Well, mineral products that come out

16  of mines are almost always ground by one milling

17  process or the other in ball mills, rod mills.

18  And, generally speaking, the milling process in

19  the mining as part of mining has no impact on the

20  indices of refraction of the material.

21         Q.      So the index of refraction will not

22  change regardless of particle size.

23                 Is that your testimony?

24         A.      That's correct.

Page 73

1          Q.        You indicate at the bottom of 6.35:

2                    "Chrysotile fibrils are most readily

3     identifiable by transmission electron microscopy

4     (TEM).

5                    And then you go on to explain that.

6                    Do you see that?

7          A.        Yes.

8          Q.        You then say:

9                    "Why MAS did not use TEM to confirm

10    the presence of chrysotile in all samples is not

11    clear."

12                   You see that?

13         A.        Yes.

14         Q.        You go on to say:

15                   "Were I concerned about the presence

16    of chrysotile, I would certainly use TEM and not

17    light microscopy."

18                   Correct?

19         A.        Yes.

20         Q.        But you never did that yourself

21    ever --

22         A.        I'm not --

23                        MR. HYNES:  Objection to form.

24    BY MR. PLACITELLA:

Page 74

1          Q.        -- correct?

2                         MR. HYNES:  Objection to form.

3                         THE WITNESS:   I'm not an

4          analyst.  I don't do commercial analysis.

5     BY MR. PLACITELLA:

6          Q.        Well, did you ever have an analyst

7     work for you --

8          A.        No.

9          Q.        -- and did you give them direction?

10         A.        No.

11         Q.        So when you say you're not an

12    analyst, then you're not capable of doing this?

13         A.        No.  I'm --

14                         MR. HYNES:  Objection to form.

15          Objection.  Argumentative.

16                         THE WITNESS:  No.  I don't --

17          I don't do it routinely.

18                         But if I were concerned about

19          the presence of chrysotile and there was

20          ambiguity in the optical information,

21          certainly I would confirm it by TEM

22          because it's such an easy confirmation.

23    BY MR. PLACITELLA:

24         Q.        But -- but you never did that in the

Page 75

1    samples that you analyzed for -- of Johnson &

2    Johnson's baby powder, correct?

3                      MR. HYNES:  Objection to form.

4                      THE WITNESS:   I testified to

5            you that I looked at two samples of

6            Johnson & Johnson's baby powder that were

7            part of the University of Maryland's

8            collection.  I didn't -- and I did not

9            use TEM.  I used only polarized light

10           microscopy.

11                      But I wasn't concerned --

12   BY MR. PLACITELLA:

13           Q.      By the way --

14           A.        -- about the presence of chrysotile.

15           Q.      By the way, did Johnson & Johnson

16   ever supply you with the TEM analysis of their

17   product that was done by McCrone?

18                      MR. HYNES:  Objection to form.

19           Overbroad.

20                      THE WITNESS:  No.

21   BY MR. PLACITELLA:

22           Q.      Were you aware before today that

23   McCrone conducted a TEM analysis on various

24   Johnson & Johnson talc samples?

Page 76

1          A.        Well, I think five years ago when
2     you took my deposition, you put a bunch of
3     analyses in front of me.  I don't remember whether
4     they were -- where they were from.  So I'm
5     assuming that's what you're referring to.
6                    So the answer would be yes because
7     you told me.
8          Q.        Okay.  So since the deposition and
9     in preparation the last deposition, and this
10    report, Johnson & Johnson still has never given
11    you any of the McCrone test results, correct?
12         A.        Correct.
13         Q.        And you didn't think it was
14    important to look at the McCrone TEM test results
15    when criticizing Dr. Longo's report, correct?
16                        MR. HYNES:  Form.
17                        THE WITNESS:    That's
18            irrelevant.
19    BY MR. PLACITELLA:
20         Q.        If McCrone found -- well, we'll do a
21    little of that a little later.
22                    Now, a couple of weeks ago, I saw
23    you at the hearing in Middlesex County, New Jersey
24    where Dr. Longo was testifying.

Page 77

1              Do you recall that?

2      A.      Yes.

3      Q.      All right.  And that was before

4  Judge Viscomi?

5      A.      Yes.  Take your word for it.

6      Q.      Yeah.

7              And what was your role at that

8  hearing?  Why were you there?

9                    MR. HYNES:  Vague.

10                   THE WITNESS:   I was there to

11        listen to Dr. Longo.

12  BY MR. PLACITELLA:

13     Q.      What was -- but what role did you

14  play?

15             You weren't there for your own

16  information, correct?

17     A.      Well, partly, you know.  I wanted to

18  be sure that I would hear -- hear him what I

19  thought he was saying in his written reports.

20     Q.      Okay.  So you paid your own way to

21  go there?

22     A.      No.  No.

23     Q.      You paid -- were you compensated for

24  your time being there?

Page 78

```
 1          A.        I haven't billed it.
 2          Q.        Do you anticipate being compensated
 3   for your time being there?
 4          A.        Probably.
 5          Q.        Okay.   And I saw you sitting next to
 6   Dr. Su.
 7                    Do you recall that?
 8          A.        Yes.
 9          Q.        And what was his function there?
10          A.        You'll have to ask him.
11          Q.        You have no idea?
12          A.        I assume he was there for the same
13   reasons I was there, but I don't know.
14          Q.        Well, did Johnson & Johnson ask you
15   to go there?
16          A.        Yes.
17          Q.        Oh.   And --
18          A.        Excuse me.   They asked me if I
19   wanted to go.   Those were the exact words.   Did I
20   want to go.
21          Q.        And did you help -- you saw
22   Mr. Dubin asking Dr. Longo questions?
23          A.        I did.
24          Q.        Did you meet with Dr. -- with
```

Page 79

1    Mr. Dubin at all in reference to the testimony

2    that Dr. Longo provided?

3          A.      I had dinner with him but, no,

4    wasn't specific.  It was a social dinner.

5          Q.      So you had no substantive

6    conversations with Mr. Dubin about the testimony

7    that Dr. Longo was being provided?

8          A.      No.  I had dinner with him the night

9    before I heard anything from Dr. Longo.

10         Q.      Okay.  So you never debriefed with

11   J&J after Dr. Longo testified?

12         A.      Debriefed.

13         Q.      Yeah.

14                 Did you talk to J&J about what

15   Dr. Longo testified about?

16         A.      I don't think we actually probably

17   did discuss that much.

18         Q.      And I was observing.  I didn't see

19   you take any notes.

20                 You didn't take any notes in

21   relation to the testimony given by Dr. Longo?

22         A.      No.

23         Q.      Is there anything that Dr. Longo

24   said that concerned you?

Page 80

1              MR. HYNES:  Objection to form.

2        Vague.

3              THE WITNESS:   Concerned me

4        about?  You mean about what he was

5        concluding?

6  BY MR. PLACITELLA:

7        Q.      Yes.

8        A.      Well, he was saying things that I

9  don't think are true.

10       Q.      What did Dr. Longo testify to that

11  you disagreed with?

12       A.      He talked about the change in index

13  of refraction with particle size.  I heard that,

14  which I was astounded.

15              And he talked about seeing vague --

16  small amounts of color that no one else could see

17  in the dispersion staining colors.  He said he

18  would see a little red or something, and I didn't

19  -- I didn't understand that.

20       Q.      Anything else?

21       A.      He talked about the use of the

22  Michelle Levy chart and he didn't use it, and I

23  thought that was strange.  He understood it and

24  said that, I think, 90 percent of people do use

Page 81

1    it, but he doesn't, and I thought that was

2    interesting.  He didn't explain why, but I thought

3    that was sort of unusual.

4                    That's all I can remember right at

5    this moment.

6         Q.      Okay.  Is it fair to say that there

7    were opinions offered by Dr. Longo during that

8    testimony that you did not agree with?

9         A.      That would be correct.

10        Q.      Okay.  Can you tell me what

11    methodology Dr. Longo used in order to reach his

12    opinions that you disagreed with?

13        A.      I don't know what methodology he

14    used.

15                    MR. HYNES:  Form.

16                    THE WITNESS:  He observed a

17         dispersion staining color in a single

18         oil.  I do not know what methodology he

19         used to move from that observation to a

20         determination of the index of refraction

21         at the D line.  There is no methodology

22         described for doing that, and I don't

23         know what he did.

24    BY MR. PLACITELLA:

Page 82

1          Q.       All right.  So you're not here to

2     give an opinion on the methodology that Dr. Longo

3     used in reaching his conclusion, correct?

4          A.       I --

5                    MR. HYNES:  Objection to form.

6          Overbroad.

7     BY MR. PLACITELLA:

8          Q.       You're here to testify that you

9     disagree with the conclusions based upon the data

10    that he generated, correct?

11                   MR. HYNES:  Objection to form.

12         Overbroad.  Misstates testimony.

13                   THE WITNESS:  Yes.  No, I

14         think that's not exactly correct.  I

15         mean, I've commented that he should have

16         -- the methodology that he used was

17         incorrect.

18                   It was -- he didn't look at

19         any of the optical properties of the

20         material he was calling chrysotile.  He

21         didn't measure the indices of refraction.

22         I'm sorry.  He didn't get a dispersion

23         staining color in more than one oil to

24         inform him.

Page 83

1                   He did not provide information

2          on the way he extrapolated from an

3          observation in an oil to get to the value

4          at the D line.

5                   So I think his method --

6          methodology is flawed.

7    BY MR. PLACITELLA:

8        Q.      The method that he used to generate

9    the data that you draw your opinions on, was there

10   a problem with that methodology?

11                   MR. HYNES:  Form.  Asked and

12          answered.

13                   THE WITNESS:   I just

14          described to you the problem of the

15          methods that he was using.

16                   He gave enough information in

17          his raw data for me to determine that the

18          conclusions that he has drawn were

19          inconsistent with what I saw in the raw

20          data.

21                   The method that he used for

22          going from the raw data to his

23          conclusions are not clear, and they were

24          not stated.  They're not described.  I

Page 84

```
 1            don't know how he did that.

 2                   So I can only -- you know, I'm

 3            going to criticize the methodology in

 4            that regard because it's absent from his

 5            papers.  I don't know what he did.

 6   BY MR. PLACITELLA:

 7        Q.      So you can't comment on the exact

 8   validity of his methodology one way or another

 9   because you don't know what it was.

10                   Is that what you're saying?

11                   MR. HYNES:  Objection to form.

12                   THE WITNESS:  Yes, I can

13            comment because I can use independent

14            data and apply the data -- the raw data

15            that he provided, and I come to different

16            conclusions.

17   BY MR. PLACITELLA:

18        Q.      All right.  That's fair.

19                   So he used sound methodology in

20   order to provide data that you can rely upon to

21   come to a different conclusion; is that fair?

22                   MR. HYNES:  Objection to form.

23                   THE WITNESS:   I'm not going

24            to allow you to put the word "sound" in
```

Page 85

```
 1          there because I've told you there's
 2          issues with the light sources that I
 3          don't understand and issues with not
 4          using temperature, not putting his
 5          samples through the high temperature
 6          recommended by ISO.
 7                      There's things that he didn't
 8          do.  So.
 9   BY MR. PLACITELLA:
10        Q.      Well, we went through all that.  I'm
11   not going to do that again.
12        A.      Okay.
13        Q.      So let me ask the question once.
14   Okay?
15        A.      Yes.
16        Q.      The methodology that he used was
17   adequate enough for you to draw your own
18   independent conclusions based upon the data that
19   was generated; is that fair?
20                      MR. HYNES:  Form.
21          Argumentative.  Asked and answered.
22                      THE WITNESS:   I think that's
23          fair.
24   BY MR. PLACITELLA:
```

Page 86

1          Q.       Okay.  Did you discuss with Dr. Su
2     the testimony of Dr. Longo?
3          A.       Not exactly discussion.  I think we
4     both expressed dismay at hearing what we heard.
5          Q.       Well --
6          A.       But we did not discuss it in detail:
7     He said this.  What does this mean.  We did not
8     discuss it in detail.
9          Q.       So did you discuss it at the
10    courthouse, outside the courthouse, on the phone?
11    When did you discuss it?
12         A.       At the courthouse.
13         Q.       Okay.  And do you know if Dr. Su
14    ever looked at your report?
15         A.       I think he has it, but I don't know
16    whether he looked at it or not.
17         Q.       Did you ever look at Dr. Su's
18    report?
19         A.       I did.
20         Q.       And by the way, did Dr. Su -- did
21    you have any problem when you were talking to
22    Dr. Su understanding what he was saying to you?
23         A.       Generally, no.  Occasionally a word
24    here and there.  Generally, no.

Page 87

1          Q.       Did he have any understanding -- a

2     problem understanding what you were saying to him?

3          A.       I don't think so.

4          Q.       Did you disagree with anything that

5     Mr. Dubin was suggesting to the court?

6                         MR. HYNES:  Objection to form.

7               Vague.

8                         THE WITNESS:   I can't answer

9               that question.  I don't know what

10              Dr. Su --

11    BY MR. PLACITELLA:

12         Q.       Well, do you remember when Mr. Dubin

13    was taking the PowerPoint and changing the colors

14    on the PowerPoint during his examination of

15    Dr. Longo?

16         A.       I do.

17         Q.       Okay.  Is that a proper scientific

18    method to employ when analyzing a sample?

19                         MR. HYNES:  Objection to form.

20              Vague.

21                         THE WITNESS:   He wasn't

22              analyzing a sample.  He was simply

23              illuminating a photograph.

24    BY MR. PLACITELLA:

Page 88

1          Q.       So would you do -- is that something

2     you would do, change the color for the photograph

3     to make a point before a court?

4                         MR. HYNES:   Objection to form.

5            Argumentative.

6                         THE WITNESS:   I saw no change

7            of color.   I saw only change of

8            intensity.

9     BY MR. PLACITELLA:

10         Q.       So that's something you would do

11    before a court?  You would take an original

12    scientific document, and then you would change the

13    color before the court in order to make a point?

14                        MR. HYNES:   Objection.

15           Argumentative.

16                        THE WITNESS:   (Laugh).   I

17           wouldn't be there.   (Laugh).   I'm not a

18           lawyer.

19    BY MR. PLACITELLA:

20         Q.       Well, is that -- is that proper do

21    you think to go to a court and change the colors

22    of an original scientific document and suggest

23    that it shows something different?

24                        MR. HYNES:   Objection.

Page 89

1          Argumentative.  Assumes facts.

2                    THE  WITNESS:   He didn't

3          change the colors.  He changed the

4          intensities.

5    BY MR. PLACITELLA:

6          Q.      Okay.  Was that okay by you?

7          A.      Well, the problem we have is that

8    what we have is printed pictures, and so they are

9    not the raw -- they aren't the negatives.  So I

10   don't know whether it's proper or improper.  You

11   know, if you had the negatives, then perhaps you

12   would be able to determine.

13                 If you've ever worked with

14   photography, you know you can change the image by

15   the length of time that you expose and all those

16   other things.

17                 So I can't really comment on whether

18   it's proper or not.  You know, it didn't change

19   the colors.  It only changed the intensity.  So I

20   don't see a violation of scientific principle

21   there, but maybe you could enlighten me.  (Laugh).

22         Q.      With all due respect, I'm asking you

23   to enlighten me.

24                 Do you plan on going before Judge

Page 90

1    Viscomi or the MDL judge and changing the

2    intensity of the color in order to make your

3    point?

4                        MR. HYNES:  Objection to form.

5                        THE WITNESS:   I do not.

6    BY MR. PLACITELLA:

7         Q.      You indicated a number of times in

8    your report that you would require TEM testing to

9    verify the PLM results.

10                       You recall that?

11        A.      Yes.

12        Q.      Okay.  What specific TEM -- go

13   through the steps for me -- well, let's -- let's

14   back up.

15                       You're given a sample of Johnson's

16   Baby Powder and you're going to test it under PLM.

17   Walk through the steps for me that you're going to

18   use in order to run that test to see if it has

19   chrysotile asbestos.

20        A.      Chrysotile.

21                       I would put it in an oil that

22   matched talc and that way -- match talc gamma and

23   beta, and in doing that, I would be able to see

24   much more clearly materials that do not have the

Page 91

1    same indices of refraction of talc.  And they

2    would develop a high relief, and I'd be able to

3    see them.

4                    If I wanted to know what their

5    identity was, I would do all those things on that

6    list of 11 or 12 in the beginning of my report to

7    see if I could get interference figures.

8                    I would change the oils in the -- if

9    I found material that appeared to be fibrous,

10   let's just say for example, and I wanted to know

11   what it was, I would change the oils until I match

12   the oil in that material.

13                   I would examine -- so that -- that

14   would be what I would do.  Multi -- the multi-oil

15   approach.

16        Q.    That's it?

17        A.    If I'm looking for the presence of

18   chrysotile?

19        Q.    Yes.

20        A.    Yes, that would be what I would do.

21                   I would -- I would -- let me -- let

22   me go back a little bit.

23                   Chrysotile doesn't occur in

24   isolation.  Chrysotile fibrils don't just appear,

Page 92

1    and so they are associated with other forms of

2    serpentine, other materials perhaps.  And so I

3    would be looking for any possibility of

4    associations in the material to see if there was

5    any antigorite, lizardite, platy serpentine, that

6    sort of thing.

7              If I were going to court and I had

8    to prove the absence of something -- you know, you

9    can't prove the absence of something very well.

10   In fact, you can't prove the absence of anything,

11   scientifically speaking.  You can assign a

12   detection limit.

13             So depending upon the detection

14   limit and the interest, if I was trying to prove

15   absolutely the absence of chrysotile, I would go

16   to TEM.  Or if I were going to prove its presence,

17   I would go to TEM actually as a confirmation,

18   confirming approach.

19        Q.      I just want to make sure I

20   understand your testimony from earlier.

21             Is it your opinion that if

22   chrysotile asbestos is present in cosmetic talc,

23   you will see it using PLM?

24        A.      I didn't say that.

Page 93

1          Q.        Okay.  Well, let me back up then.

2                    What are the circumstances that you

3     will not find chrysotile that's present in

4     cosmetic talc using PLM?

5          A.        If the only thing that's present are

6     single chrysotile fibrils, you wouldn't see it.

7     Individual separated chrysotile fibrils, you would

8     not see it.

9          Q.        Does the grinding or ball milling

10    process affect the ability to see the product in

11    bundle versus individual fibrils?

12         A.        Well, that's a complicated question,

13    and I'm not sure that I can answer that so

14    generically.  Nor do I have detailed -- I haven't

15    looked at any studies.

16                   But my instincts would be to say no,

17    but I don't know for sure.

18         Q.        You don't know?

19         A.        I don't know for sure.

20         Q.        So you can't -- you can't testify

21    within a reasonable degree of scientific certainty

22    one way or the other?

23         A.        I think that's probably correct,

24    yes.

Page 94

1          Q.      So it is possible that the ball

2     milling process could cause any particular sample

3     to show fibrils versus a bundle depending on the

4     sample, correct?

5                         MR. HYNES:  Objection to form.

6                         THE WITNESS:   I don't know

7             that for sure.  I don't know that -- I

8             don't believe that you can separate

9             chrysotile fibrils from each other so

10            that there are no bundles by any milling

11            process.

12    BY MR. PLACITELLA:

13         Q.      Well, that's what I'm trying to

14    understand.  Let me tease that out a little bit.

15              Do you believe there are

16    circumstances that you can find chrysotile fibrils

17    using TEM in cosmetic talc that you would not see

18    using PLM?

19         A.      I think if it's a contamination, the

20    answer would be yes.

21         Q.      When you say "contamination," what

22    do you mean by that?

23         A.      I mean it was in the air in the lab

24    or it was contaminated by some other process, but

Page 95

1    it was not part of the ore to begin with.  Then I

2    think, yes, I think you would not necessarily --

3    you might have chrysotile fibrils, a few here or

4    there, and you may not see it by polarized light.

5    You wouldn't see it.

6          Q.    So you would disagree with McCrone's

7    conclusions then that found chrysotile asbestos in

8    Johnson's talc that they said there was no

9    evidence of contamination?

10                    MR. HYNES:  Objection to form.

11         Assumes facts.

12                    THE WITNESS:  I don't know

13         anything about that.

14   BY MR. PLACITELLA:

15         Q.    Well, if that was the conclusion

16   reached by -- by McCrone in looking at Johnson's

17   talc, you would say McCrone is wrong?

18                    MR. HYNES:  Objection to form.

19         Assumes facts.

20                    THE WITNESS:  What year was

21         it?

22   BY MR. PLACITELLA:

23         Q.    Does it the matter?

24         A.    Yes.

Page 96

1         Q.      Why?

2         A.      Because chrysotile contamination was

3    everywhere in the '60s and '70s and '80s.  It was

4    in the air in every city.  It was in the dust on

5    every road.  It was on your clothes.  It was in

6    the Antarctic ice.  It was everywhere.

7                 So it would make a lot of difference

8    on whether or not these analyses were done in the

9    '70s or '80s or '90s or whether they were done in

10   2020.

11        Q.      Well, suppose this analysis was done

12   with blanks and the blanks didn't show anything?

13                     MR. HYNES:  Objection.

14         Assumes facts.  Incomplete hypothetical.

15                     THE WITNESS:   The blanks

16         didn't show it.

17   BY MR. PLACITELLA:

18        Q.      Okay.  This is --

19        A.      It could have been on the filters.

20        Q.      -- what I understand.

21        A.      It could have been in the water.  It

22   could have been in a lot of places.

23        Q.      All right.  So tell me.  It's been

24   five years since we took the deposition.  I showed

Page 97

 1    you some documents back then.  The whole issue

 2    here you say -- I think you mention in your report

 3    the word "McCrone" 23 times in your report.

 4                    Is that accurate?

 5         A.        You counted them.  Probably so.

 6         Q.        Okay.  So why is it that you didn't

 7    ask Johnson & Johnson for any of the McCrone

 8    testing results from the products that you're

 9    testifying about?

10         A.        I'm not testifying about any

11    products whatsoever.

12                    I'm talking -- I'm testifying about

13    a report and the techniques that were used in that

14    report and the conclusions that were drawn by the

15    report.

16         Q.        All right.  So you're not here to

17    testify one way or the other whether there is, in

18    fact, asbestos in Johnson & Johnson's talc,

19    correct?

20         A.        Correct.

21         Q.        You're not here to give any -- you

22    don't have any opinion one way or the other as to

23    whether Johnson & Johnson's talc is contaminated

24    with asbestos at the source mine, correct?

Page 98

1                    MR. HYNES:  Overbroad.

2                    THE WITNESS:   I see no

3          evidence to suggest that it is.

4    BY MR. PLACITELLA:

5          Q.     That wasn't my question.

6                  You're not here to provide any

7    testimony that the Johnson & Johnson talc or the

8    source mines were contaminated with asbestos or

9    not, correct?

10         A.     It's not part of my report.  So the

11   answer is yes, I am not here, or no, or whatever.

12   I'm not here to testify about that.

13                 I'm testifying about the nature of

14   the methods and the conclusions that were drawn

15   from a set of analyses by MAS Laboratories.

16   That's it.

17         Q.     So the entirety of your testimony in

18   this case is based upon your observations the

19   conclusion of the raw data that was generated by

20   Dr. Longo in his PLM analysis of the Johnson's

21   talc; is that fair?

22                    MR. HYNES:  Objection to form.

23          Overbroad.

24                    THE WITNESS:   Sounds right.

Page 99

```
 1   BY MR. PLACITELLA:
 2        Q.       Okay.  And that would be the first
 3   time that you disagree on the ultimate conclusions
 4   or opinions based on raw data generated by a
 5   scientist, correct?
 6                        MR. HYNES:  Overbroad.
 7                        THE WITNESS:   I think it is
 8        probably the first.
 9   BY MR. PLACITELLA:
10        Q.       The first time?
11        A.       Yeah.  (Laugh).
12        Q.       Okay.  Now, you've been -- you've
13   been working with Johnson & Johnson on the -- on
14   the issue of testing using PLM testing methods for
15   cosmetic talc going back to the 1980s, right?
16                        MR. HYNES:  Object to form.
17                        THE WITNESS:  No.
18   BY MR. PLACITELLA:
19        Q.       You never had interaction with
20   Johnson & Johnson going back to the 1980s about
21   what the proper methodology was for testing
22   cosmetic talc using PLM?
23        A.       If you're getting at the ASTM work I
24   did in the '80s, that's an industry group.  There
```

Page 100

1    may have been representatives from Johnson &

2    Johnson on that committee.  I really don't know.

3    I think you've told me -- in fact, I think you

4    told me in 2019 that there was someone on there

5    from Johnson & Johnson.

6                    And I think that you showed me a

7    letter that he had written about the development

8    of this method.  I was working on the method for

9    ASTM.  I wasn't a member of ASTM.  I didn't go to

10   the committee meetings for ASTM.

11                   They asked me if I would work on a

12   method for -- for detecting asbestos in talc

13   generally.

14                   And so if that answers your

15   question, I think he did write me a letter, but I

16   really had no recollection of it.  And I didn't

17   work for them, and I didn't interact with them as

18   a company.

19        Q.        Well, they did ask you to change

20   your methodology in order to get the method they

21   wanted approved by the ASTM, didn't they?

22                       MR. HYNES:  Objection to form.

23        Assumes facts and incomplete

24        hypothetical.  Calls for speculation.

Page 101

1                    THE WITNESS:  No.

2    BY MR. PLACITELLA:

3          Q.      That never happened?

4          A.      Not that I recollect.

5          Q.      Okay.  So I'm going to take 10

6    minutes and -- well, let me ask you some questions

7    before that.  Just -- just so I'm clear about your

8    testimony.

9                  Based upon your expertise -- I just

10   want to make sure I understand -- is it possible

11   to grind talc so finely that chrysotile asbestos

12   would not be detected by PLM?

13         A.      Is it possible to do what so finely?

14         Q.      Grind --

15         A.      Oh, grind.

16         Q.      -- the talc so finely that you can't

17   find chrysotile asbestos using PLM?

18         A.      You know, absolutes are hard

19   statements to agree to when you haven't tested

20   them.

21                 So I think the answer would be that

22   would be my inclination, but I can't for sure say

23   that.  But that would be my inclination from what

24   I know about mineral processing and all the mines

Page 102

1    I've visited, all the processing I've seen.  I

2    don't think that ball mills will do that but, you

3    know, in the natural world, there are almost no

4    absolutes.

5          Q.      Okay.  But that's not an opinion

6    you're going to provide in this case?

7          A.      No.

8          Q.      One way or the other?

9          A.      No.

10          Q.      Fair?

11          A.      Fair.

12          Q.      Have you ever used -- do you know

13    what heavy liquid separation is?

14          A.      Yes.

15          Q.      Have you ever used that methodology?

16          A.      Yes.

17          Q.      Is that a valid scientific

18    methodology for analyzing samples, mineral

19    samples?

20                      MR. HYNES:  Vague.  Overbroad.

21                      THE WITNESS:   It's a method

22          that's been used by mineralogists for a

23          very long period of time.  All my life.

24    BY MR. PLACITELLA:

```
                                        Page 103

 1        Q.        Has it ever -- has it ever been used

 2   by mineralogists, to your knowledge, for

 3   determining whether there's asbestos in talc?

 4                      MR. HYNES:  Overbroad.  Calls

 5        for speculation.

 6                      THE WITNESS:   By

 7        mineralogists?

 8   BY MR. PLACITELLA:

 9        Q.        Yes.

10        A.        There was a lady mineralogist whose

11   name is forgotten -- whose name I have forgotten

12   who I think used that.  That would be the only

13   place I know.

14                  It certainly would be a reasonable

15   thing to do for amphibole.

16        Q.        Has it ever been -- is it a

17   reasonable thing to attempt for chrysotile?

18        A.        No, I don't think so.  I don't think

19   it works, but you can attempt it.  But I don't

20   think it works.

21        Q.        Why do you say that?

22        A.        Well, because Dr. Longo used it and

23   he -- his light fraction was 17 to 20 percent of

24   the sample.  So he's clearly not getting rid of
```

Page 104

1    the talc.

2         Q.       But does it assist in doing the

3    analysis whether it gets rid of it all or not?

4         A.       It could.  It was, as I understand

5    it -- and this is secondhand information from Eric

6    Chatfield -- ISO considered it and rejected it as

7    a process because it's inefficient, but there's

8    nothing wrong with attempting it.

9         Q.       Do you have any criticism of

10   attempting to refine the liquid -- heavy liquid

11   separation in order to do analysis to determine

12   whether there's chrysotile asbestos in the talc

13   using PLM?

14                    MR. HYNES:  Vague.

15                    THE WITNESS:   I do not intend

16        to criticize it.

17   BY MR. PLACITELLA:

18        Q.       Okay.  And heavy liquid separation

19   is a valid scientific method for analyzing

20   minerals.

21                 Do you agree?

22        A.       For --

23                    MR. HYNES:  Asked and answered

24        and overbroad.  Vague.

Page 105

1                    THE WITNESS:   It's a valid

2          method for separating minerals.

3    BY MR. PLACITELLA:

4          Q.       Fair.   Thank you.

5          A.       (Nods head).

6          Q.       I am going to -- if you give me 10

7    minutes, I'm going to try to cut this down

8    dramatically because I think you've answered a

9    good percentage of my questions.   So why don't we

10   take 10 minutes and maybe we'll save two hours.

11   Okay?

12         A.       That would be great.   Thank you.

13                       THE COURT REPORTER:  Off the

14          record at 11:02 a.m.

15                       (Recess.)

16                       THE COURT REPORTER:  Back on

17          the record at 11:14 a.m.

18   BY MR. PLACITELLA:

19         Q.       Not much more, actually, so I'm sure

20   you'll be happy about that.

21                       Although maybe I should ask the most

22   important question first and that would determine

23   how far I go, and that is:  Who is the best

24   Maryland basketball player of all time?

Page 106

1          A.       (Laugh).

2                        MS. PARFITT:  There you go.

3                        THE WITNESS:   Gee, that's a

4          tough one, but I'd probably have to go

5          with Len Bias, whom I taught.

6    BY MR. PLACITELLA:

7          Q.       All right.  I see we agree on

8    something.

9          A.       (Laugh).

10         Q.       All right.  Other than the

11   discussion we had about what oils were used, do

12   you have any issue with the sample preparation

13   methodology used by Dr. Longo?

14                        MR. HYNES:  Vague.

15                        THE WITNESS:   I saw nothing

16         in the reports about sample preparation

17         that -- with which I found a problem.  I

18         didn't -- didn't note anything.

19   BY MR. PLACITELLA:

20         Q.       Okay.  So you're not going to

21   testify that any of the methodology used by

22   Dr. Longo in preparing the samples for analysis

23   was in any way inconsistent with valid scientific

24   principles; is that fair?

Page 107

1                    MR. HYNES:  Form.  Overbroad.

2          Vague.

3                    THE WITNESS:   (Laugh).  No.

4    BY MR. PLACITELLA:

5          Q.       When was it that you were first

6    retained or consulted by Johnson & Johnson in

7    relation to Talc Litigation?

8                    MR. HYNES:  Objection.  I

9          think asked and answered during day 1 of

10         Dr. Wylie's deposition, but you can

11         answer.

12                   MR. PLACITELLA:  New

13         deposition.  New report.

14                   MR. HYNES:  So to clarify, is

15         this specific to the recent chrysotile

16         report?  The MDL report?

17                   MR. PLACITELLA:  No.  I'm just

18         asking in general.

19                   MR. HYNES:  Okay.  You can

20         answer.

21                   THE WITNESS:  Well, it was

22         sometime before I wrote that report in

23         2019.  So, but I don't recollect.  It was

24         about that report to ask me if I would be

Page 108

1          interested in writing up the discussion
2          that I wrote up.  So it would have -- it
3          would have been six months before that
4          report.  I'm just guessing roughly.
5    BY MR. PLACITELLA:
6          Q.      Okay.  So sometime 2018 or 2019; is
7    that fair?
8          A.      That's fair.
9          Q.      All right.  And you tested the J&J
10   samples subsequent to that time, correct?
11                      MR. HYNES:  Objection.  Vague.
12         Misstates testimony.
13                      THE WITNESS:  No.  Before.
14   BY MR. PLACITELLA:
15         Q.      You tested --
16         A.      I -- wait a minute.  Wait a minute.
17   Let me just make sure it's clear.
18                  The one in which I looked at and
19   spoke about to the FDA, that was before I was
20   contacted by Johnson & Johnson.
21                  The bottle that I purchased from --
22   when they decided they weren't going to have it
23   anymore, that was between the time I was involved
24   with them for the first report.  I didn't hear

Page 109

1   anything from them.  I had no contact with them

2   after that report until just late the end of last

3   year.  So it was a long period of time I wasn't

4   engaged with them at all.

5        Q.        So you tested their product after

6   you were first retained?

7                       MR. HYNES:  Overbroad.

8                       THE WITNESS:   Before I was

9             first retained, I tested the bottle.  The

10            first bottle that I had that I reported

11            on at the JIFSAN conference, that was

12            before I was contacted by them.

13                       But then between the time that

14            I prepared that first report and the time

15            I started on these reports, I had no

16            contact with them.

17                       But I did test that -- test --

18            I looked at that sample that I purchased

19            toward -- right after they indicated they

20            were no longer going to have it, so I

21            would have a sample that I could use to

22            spike my amphiboles for the ASTM method I

23            was working on.

24   BY MR. PLACITELLA:

Page 110

```
 1         Q.        And do you have any one -- so any
 2    one of those samples still exist?
 3         A.        There are two samples.  Yes, they
 4    exist.
 5         Q.        And where are they?
 6         A.        They belong to the University of
 7    Maryland, and they're in the talc collection.
 8         Q.        So the samples that you tested are
 9    at the University of Maryland.
10              True?
11         A.        Yes.
12         Q.        Okay.  And is any of the raw data
13    from your testing at the University of Maryland?
14         A.        There's no raw data.
15         Q.        Were photographs taken of what you
16    were testing?
17         A.        Yes, uh-huh.  There were two taken,
18    and they're in the JIFSAN report.  They're in my
19    PowerPoint presentation.
20         Q.        That was the one before you were
21    retained.
22              What about the one after you were
23    retained?
24         A.        There are -- there's no -- no, I
```

Page 111

1    took no pictures.

2            Q.      You took no pictures?

3            A.      No.  No.

4            Q.      Did you report to Johnson & Johnson

5    what you found?

6            A.      No.

7            Q.      So to this day, Johnson & Johnson

8    has no idea what you found when you did the test

9    after you were retained?

10           A.      Well, I don't -- hmm.  That's an

11   interest questioning.

12                   I mean, I don't know if they've even

13   asked me but -- directly but maybe they -- I might

14   have said I didn't find any in the material.  I

15   can't remember, to tell you the truth.

16           Q.      So if we wanted to go -- if we

17   wanted to test those samples on our own, they're

18   available for testing, correct?

19           A.      No.

20                   MR. HYNES:  Objection.

21       Misstates testimony.

22                   THE WITNESS:   Not

23       necessarily.  You could write to the

24       Department of Geology and request them.

Page 112

1    BY MR. PLACITELLA:

2        Q.        Right.

3                  And was anybody with you when either

4    one of those -- when you conducted either one of

5    those tests?

6        A.        No.

7        Q.        Do you -- do you have a notebook in

8    front of you?

9        A.        Yes.

10       Q.        What -- what is -- can we mark that,

11   please?

12       A.        It just has my three reports.

13                    MR. PLACITELLA:  All right.

14          Well, let's just mark the notebook so we

15          have it incorporated into the deposition.

16                    Okay?  So why don't we just

17          mark it Wylie 1 with the date.

18                    THE WITNESS:  Sure.

19                    MR. HYNES:  Chris, if you

20          want, I can just describe the contents.

21                    It's a small binder with three

22          tabs.  First tab is a February 25, 2019

23          report.  Second tab is an April 9, 2024

24          report.  Third tab is a May 3, 2024

Page 113

1          report.  And in the front pocket is the

2          corrected Figure 21 associated with the

3          tabs 2 and 3.

4                     (Binder marked for

5          identification as Wylie Exhibit 1.)

6  BY MR. PLACITELLA:

7          Q.     Do you have anything else with you

8  today other than that binder?

9          A.     No.

10         Q.     Now, in the course of your

11  testimony, you described what you saw as different

12  colors in different photographs.

13                 Do you recall that?

14         A.     Yeah, I guess.  Yes.

15         Q.     And it's also in your report,

16  correct?

17         A.     Yes.  Yes.

18         Q.     And would you agree with me that not

19  everyone agrees necessarily with what they see in

20  color, that it has variations?

21                     MR. HYNES:  Vague.  Calls for

22          speculation.

23                     THE WITNESS:   I think in

24          particular there's, yes, some

Page 114

1          disagreement even among the experts on

2          how they describe it with words.

3                    So it's not totally clear to

4          me that they're actually saying something

5          different, but they just -- some of the

6          colors for particular lambda zeros they

7          describe slightly differently.  Yes.

8   BY MR. PLACITELLA:

9          Q.      All right.  And some of that -- we

10  said this before -- can be -- can be the subject

11  of experience and wisdom and seeing things in the

12  past.

13                    True?

14                    MR. HYNES:  Objection to form.

15          Vague.

16                    THE WITNESS:  No, I'm not sure

17          about that.  Sometimes people's

18          sensitivity to color varies.  It's a

19          personal -- personal quality

20          characteristic.  Eyes are different.

21  BY MR. PLACITELLA:

22          Q.      All right.  Somebody --

23          A.      (Laugh).

24          Q.      Somebody could see more gold than

Page 115

1    yellow or more blue than green or more -- right?

2              That's -- that's the subject of

3    interpretation by individual scientists based on

4    their experience, correct?

5              MR. HYNES:  Overbroad.  Calls

6         for speculation.

7              THE WITNESS:   I don't think I

8         can answer that because you put those

9         qualifiers in it.

10             I don't think most people -- I

11        think most people would see the

12        difference between blue green and blue,

13        and I don't think that's a personal

14        variation.

15   BY MR. PLACITELLA:

16        Q.    Okay.  Did you ask Johnson &

17   Johnson, in preparing your most recent reports,

18   for any information other than what was supplied

19   in Dr. Longo's report?

20        A.    No.

21        Q.    Okay.  And are all of your -- well,

22   is it fair to say that -- strike that.

23             All of the opinions that you may

24   provide in this case, they're all contained in the

Page 116

1    four corners of your report?

2         A.        Correct.

3         Q.        Is there anything in Dr. Su's report

4    that you disagree with?

5         A.        One statement.

6         Q.        What's that?

7         A.        (Laugh).

8                   He says that today geology

9    departments don't teach optical mineralogy for an

10   entire semester.  They only do it for two weeks,

11   and that's not true.  University of Maryland does

12   it for an entire semester.

13        Q.        Good for you.

14        A.        (Laugh).

15        Q.        That's the only statement you

16   disagree with?

17        A.        Yes.  (Laugh).

18        Q.        And you never asked him about the

19   best Maryland basketball player?

20        A.        And I never did.  (Laugh).

21        Q.        Okay.  I think that's all I have.

22        A.        Okay.

23        Q.        I'm sorry to disappoint you to get

24   you out of here before lunch.

Page 117

1          A.        (Laugh).  It's perfectly all right.

2    Thank you.  Maybe I'll see you at a basketball

3    game.

4                        THE COURT REPORTER:  Off the

5            record at 11:27 a.m.

6                        MR. HYNES:  No one else has

7            any questions?

8                        MR. PLACITELLA:  We're done?

9                        MR. HYNES:  We're done.

10                       MS. PARFITT:  We're done.

11

12                       (Signature not waived, the

13           deposition concluded at 11:27 a.m.)

14

15                            *        *        *

16

17

18

19

20

21

22

23

24

```
                                                   Page 118

 1                          ERRATA SHEET

 2

 3      Page No._____Line No._____Change to:_____

 4      _____

 5      Page No._____Line No._____Change to:_____

 6      _____

 7      Page No._____Line No._____Change to:_____

 8      _____

 9      Page No._____Line No._____Change to:_____

10      _____

11      Page No._____Line No._____Change to:_____

12      _____

13      Page No._____Line No._____Change to:_____

14      _____

15      Page No._____Line No._____Change to:_____

16      _____

17      Page No._____Line No._____Change to:_____

18      _____

19      Page No._____Line No._____Change to:_____

20      _____

21      Page No._____Line No._____Change to:_____

22      _____

23      Page No._____Line No._____Change to:_____

24      _____
```

Page 119

1              DECLARATION UNDER PENALTY OF PERJURY

2

3

4                      I declare under penalty of

5       perjury that I have read the entire transcript of

6       my Deposition taken in the captioned matter

7       or the same has been read to me, and

8       the same is true and accurate, save and

9       except for changes and/or corrections, if

10      any, as indicated by me on the DEPOSITION

11      ERRATA SHEET hereof, with the understanding

12      that I offer these changes as if still under

13      oath.

14

15                  Signed on the _____ day of

16      _____, 2024.

17

18      _____

19              ANN G. WYLIE, PHD

20

21

22

23

24

Page 120

1                    CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA      )

3                    I, Denise Dobner Vickery, a

4    Registered Court Reporter and Notary Public of

5    the District of Columbia, do hereby certify that

6    the witness was first duly sworn by me.

7                    I do further certify that the

8    foregoing is a verbatim transcript of the

9    testimony as taken stenographically by me at the

10   time, place and on the date herein set forth, to

11   the best of my ability.

12                   I do further certify that I am

13   neither a relative nor employee nor counsel of

14   any of the parties to this action, and that I am

15   neither a relative nor employee of such counsel,

16   and that I am not financially interested in the

17   outcome of this action.

18

19                        *Denise D. Vickery*

20

21                   DENISE DOBNER VICKERY, CRR,RMR

                     Notary Public in and for the

22                   District of Columbia

23

24   My Commission expires:  March 14, 2028

**[& - 6.30]**

| & |
|---|
| **&**   1:5 2:14 3:4 |
| 3:17 4:12,12,14 |
| 5:5 10:9,13 |
| 11:5,15 12:2,4 |
| 12:9 13:7,10 |
| 14:6,13 19:12 |
| 19:15 21:16 |
| 71:21 75:1,6,15 |
| 75:24 76:10 |
| 78:14 97:7,18 |
| 97:23 98:7 |
| 99:13,20 100:1 |
| 100:5 107:6 |
| 108:20 111:4,7 |
| 115:16 |

| 0 |
|---|
| **002**   54:6 |
| **07701**   3:9 |
| **08002**   5:8 |

| 1 |
|---|
| **1**   6:8,16 26:13 |
| 107:9 112:17 |
| 113:5 |
| **1.55**   42:19 |
| **1.550**   39:23 |
| 40:19 41:16 |
| 55:9 56:15 |
| 57:17 58:1 |
| 66:15,16 |
| **1.552**   39:23 |
| **1.552.**   66:16 |
| **1.554**   39:24 |

**1.560**   40:20
41:17 52:15
55:9 56:15
57:17 58:1
**1.560.**   52:4
**1.566**   54:16
55:20
**1.585**   54:10
**1.586**   53:17
54:10,15 55:3
55:19
**1.586.**   54:5
**10**   22:13 42:3
71:2 101:5
105:6,10
**10036**   4:17
**10:15**   69:15
**10:23**   69:18
**11**   28:19 29:3
31:18 91:6
**113**   6:8
**1185**   4:16
**11:02**   105:14
**11:14**   105:17
**11:27**   117:5,13
**12**   22:13 91:6
**127**   3:8
**14**   120:24
**1440**   2:16
**15**   69:6
**15207**   120:20
**16-2738**   1:6
**17**   103:23
**1825**   3:19
**1978**   64:14

**1980s**   99:15,20
**1995**   64:16

| 2 |
|---|
| **2**   6:14 113:3 |
| **20**   12:20 103:23 |
| **2000**   12:20 |
| **20005**   2:17 |
| **20006**   3:20 |
| **2001**   12:21 |
| **2018**   12:15 13:3 |
| 108:6 |
| **2019**   6:9 100:4 |
| 107:23 108:6 |
| 112:22 |
| **202.759.7648** |
| 3:21 |
| **2020**   12:21 |
| 96:10 |
| **2021**   12:21 |
| **2024**   1:16 2:8 |
| 6:10,11,20 |
| 112:23,24 |
| 119:16 |
| **2028**   120:24 |
| **21**   6:13 12:21 |
| 66:16 67:5 |
| 113:2 |
| **212.790.5349** |
| 4:18 |
| **218**   4:6 |
| **222**   67:23 |
| **23**   97:3 |
| **24**   1:16 2:8 6:20 |
| **25**   6:9 112:22 |

| 3 |
|---|
| **3**   5:7 6:11,14 |
| 112:24 113:3 |
| **30**   6:20 |
| **308.874.3186** |
| 4:8 |
| **310**   5:7 |
| **36103-4160**   4:7 |

| 4 |
|---|
| **400c**   67:14 |
| **400f**   67:14 |
| **425c**   67:14 |
| **480**   68:6 |
| **480c**   67:14 68:5 |

| 5 |
|---|
| **5,000**   30:7 31:6 |

| 6 |
|---|
| **6-10**   42:2 |
| **6.10**   42:3 |
| **6.11.**   46:23 |
| **6.12.**   49:24 |
| **6.13**   51:17 |
| **6.13.**   51:16 |
| **6.14.**   52:21 |
| **6.17**   55:22,24 |
| **6.18.**   57:4 |
| **6.2**   6:20 24:14 |
| 26:11 |
| **6.20.**   58:17 |
| **6.24.**   60:4 |
| **6.26**   60:23 |
| **6.26.**   60:23 |
| **6.30**   62:20 |
| 65:16 |

**[6.31 - antarctic]**

**6.31**   65:16,18
**6.35**   67:11
    69:20 73:1
**6.35.**   67:6
**6.4**   28:8
**6.5**   36:19
**6.8**   38:5
**60s**   96:3
**614**   52:22
**6754009**   1:24

**7**

**7**   6:3 52:23
**700**   3:19
**70s**   20:4 21:9
    32:24 96:3,9
**732.747.9003**
    3:10
**7a**   53:16
**7b**   53:16

**8**

**80s**   20:4 21:9
    33:1 96:3,9
    99:24
**856.317.7180**
    5:9
**8:58**   1:17 2:9

**9**

**9**   6:10 112:23
**90**   80:24
**90s**   96:9

**a**

**a.m.**   1:17 2:9
    69:15,18
    105:14,17

117:5,13
**ability**   25:8
    72:1 93:10
    120:11
**able**   11:9 23:15
    24:5 27:22
    29:22 39:16
    45:19,23 46:2
    56:24 57:24
    59:2 66:24
    68:10 72:8
    89:12 90:23
    91:2
**above**   26:15
**absence**   27:24
    92:8,9,10,15
**absent**   84:4
**absolutely**
    92:15
**absolutes**
    101:18 102:4
**accurate**   97:4
    119:8
**accurately**   41:6
**action**   120:14
    120:17
**activities**   22:10
**actual**   18:6
**actually**   43:1
    43:22 61:17
    79:16 92:17
    105:19 114:4
**added**   17:14,15
    26:15 31:2
**addition**   14:19
    18:8

**adequate**   85:17
**advance**   68:1
**advantage**
    39:17
**affect**   93:10
**affected**   42:22
**ago**   7:21 22:13
    63:24 76:1,22
**agree**   55:21
    58:10 81:8
    101:19 104:21
    106:7 113:18
**agrees**   113:19
**air**   94:23 96:4
**al**   4:7
**allen**   4:4
**allow**   84:24
**alters**   69:23
**ambiguity**
    23:16 74:20
**amend**   17:22
**americas**   4:16
**amount**   16:3,9
**amounts**   80:16
**amphibole**   23:3
    23:11 103:15
**amphiboles**
    109:22
**analyses**   14:16
    41:16 76:3 96:8
    98:15
**analysis**   11:15
    16:14 23:17
    30:21 31:19
    32:11,21 37:24
    52:17 55:6 68:1

74:4 75:16,23
    96:11 98:20
    104:3,11
    106:22
**analyst**   17:16
    31:20 32:20
    37:23 74:4,6,12
**analytical**
    37:19
**analyzed**   19:14
    39:13 63:17
    64:12 65:2 75:1
**analyzing**
    15:10 31:16
    35:11 87:18,22
    102:18 104:19
**ann**   1:13 2:11
    6:2,21 7:3
    119:19
**announced**
    11:6
**answer**   19:4
    36:10 39:5 45:2
    52:11 72:5,8
    76:6 87:8 93:13
    94:20 98:11
    101:21 107:11
    107:20 115:8
**answered**   32:9
    35:16 43:4
    83:12 85:21
    104:23 105:8
    107:9
**answers**   100:14
**antarctic**   96:6

[anticipate - basis]                                                            Page 3

**anticipate** 78:2
**antigorite** 92:5
**anybody** 112:3
**anymore**
  108:23
**apart** 40:2
**appear** 27:13
  49:8 91:24
**appearances**
  3:1 4:1 5:1
**appeared** 91:9
**appendix** 17:14
  17:14
**apply** 14:10
  84:14
**approach** 91:15
  92:18
**approaches**
  37:20
**approved**
  100:21
**april** 6:10
  112:23
**argumentative**
  15:16 48:10
  74:15 85:21
  88:5,15 89:1
**arps** 2:14
**article** 37:3
**asbestos** 10:11
  10:15 13:12
  14:20 19:11,17
  19:21 20:15
  21:2,8,11,13
  22:23 27:24
  28:12,21 29:8

30:22 31:17,22
32:6,19 33:6,20
34:17 35:14
36:3 72:2 90:19
92:22 95:7
97:18,24 98:8
100:12 101:11
101:17 103:3
104:12
**ashcraft** 3:17
**ashcraftlaw.c...**
  3:22
**asked** 11:21
  18:20 19:5
  20:11 32:8
  35:15 48:16
  49:4,6 78:18
  83:11 85:21
  100:11 104:23
  107:9 111:13
  116:18
**asking** 8:5 17:2
  35:18,20,22,24
  37:21 45:2
  78:22 89:22
  107:18
**assertion** 60:24
**assessment**
  38:17
**assign** 92:11
**assist** 16:21
  104:2
**assisting** 53:10
**associated** 6:13
  70:2 92:1 113:2

**associations**
  92:4
**assume** 78:12
**assumed** 67:4
**assumes** 89:1
  95:11,19 96:14
  100:23
**assuming** 57:20
  76:5
**astm** 11:1 13:15
  37:8 38:1 99:23
  100:9,9,10,21
  109:22
**astounded**
  80:14
**atlas** 61:18
**atomic** 69:24
  71:8,15,19
**attached** 6:16
**attempt** 29:17
  30:19 31:9,24
  32:14 103:17
  103:19
**attempted**
  14:10
**attempting**
  104:8,10
**attorneys** 11:16
**augment** 42:24
**authenticate**
  16:1
**available** 29:13
  111:18
**avenue** 2:16 3:8
  4:16

**aware** 36:9
  37:23 38:4
  75:22
**axis** 29:21 30:2
  30:4 60:10

**b**

**baby** 13:8,11
  14:20 16:14
  21:17 33:21
  70:7 75:2,6
  90:16
**back** 69:13,17
  90:14 91:22
  93:1 97:1 99:15
  99:20 105:16
**background**
  10:24 13:14
**ball** 70:17 71:2
  71:7,20,24 72:9
  72:17 93:9 94:1
  102:2
**bank** 3:9
**based** 27:22
  35:4 45:14,21
  50:18 55:17
  56:9,23 59:8
  62:15,16 65:8
  82:9 85:18
  98:18 99:4
  101:9 115:3
**basic** 47:17
**basically** 54:7
**basis** 63:12
  72:13

**basketball**
105:24 116:19
117:2
**bat** 68:3
**beasley** 4:4
**beasleyallen....**
4:9
**beginning**
26:10 91:6
**believe** 22:20
28:9 55:18 94:8
94:15
**belong** 110:6
**best** 105:23
116:19 120:11
**beta** 90:23
**better** 36:15
39:5,20
**bias** 106:5
**big** 65:4
**bigger** 50:15
**billed** 78:1
**binder** 6:8
112:21 113:4,8
**birefringence**
58:14
**bit** 27:14,15
39:21 40:2 45:5
45:7,12,17
49:16 50:13,15
55:6 91:22
94:14
**blanks** 96:12,12
96:15
**blew** 53:13

**bloss** 27:3,3,5,5
**bloss's** 26:24
38:17
**blowing** 24:14
**blue** 26:14
27:18 47:16,17
49:21 50:13
51:19 115:1,12
115:12
**bluish** 51:19,20
**book** 30:17 37:4
37:5,6
**books** 26:24
38:14,15,16,17
**bottle** 20:7
108:21 109:9
109:10
**bottom** 73:1
**bought** 19:22
**box** 25:10
**boxes** 25:9
**break** 69:2
**bright** 51:19
**bring** 51:8
**brought** 27:12
**building** 2:15
30:21
**bulb** 28:5
**bunch** 76:2
**bundle** 93:11
94:3
**bundles** 23:15
94:10
**buy** 11:10

**c**

**c** 7:1
**calidria** 62:21
**call** 33:4
**called** 7:4
**calling** 82:20
**callout** 25:17
25:20
**calls** 28:24
50:22 52:9
54:22 100:24
103:4 113:21
115:5
**campus** 5:7
**capable** 74:12
**capacity** 72:1
**captioned**
119:6
**care** 5:3
**case** 11:22 14:5
16:7,22 45:15
48:4 60:15
66:10 71:12
98:18 102:6
115:24
**cause** 94:2
**central** 47:6
**certain** 62:5,5
**certainly** 16:2
20:1 31:8 73:16
74:21 103:14
**certainty** 93:21
**certificate**
120:1

**certified** 2:21
**certify** 120:5,7
120:12
**change** 9:6
60:10 62:6 65:8
70:3 72:1,22
80:12 88:2,6,7
88:12,21 89:3
89:14,18 91:8
91:11 100:19
118:3,5,7,9,11
118:13,15,17
118:19,21,23
**changed** 71:14
89:3,19
**changes** 7:22
18:6,7,14 49:15
119:9,12
**changing** 28:5
58:14 87:13
90:1
**characteristic**
114:20
**characteristics**
31:21
**characterize**
47:4
**chart** 80:22
**chatfield** 104:6
**chemical** 61:1
**chemistry**
62:11
**cherry** 5:8
**choose** 31:6
**chris** 24:17
112:19

[christopher - conducted]                                         Page 5

| | | | |
|---|---|---|---|
| **christopher**   3:5 | 83:23 101:7 | **columbia**   2:23 | **components** |
| **chrysotile** | 108:17 114:3 | 120:2,5,22 | 68:2 |
| 13:12 14:19 | **clearly**   55:2 | **come**   48:2 64:6 | **computer**   26:1 |
| 16:1,3,5,9,12 | 68:7 90:24 | 72:15 84:15,21 | 26:3 |
| 19:11 23:2,6,14 | 103:24 | **coming**   7:19 | **concerned** |
| 23:21 29:8 | **close**   22:9 | **comment**   28:3 | 73:15 74:18 |
| 31:11,17 32:6 | **closer**   53:17 | 39:3 66:24 68:9 | 75:11 79:24 |
| 33:6,14 34:8,17 | 54:10,15 55:12 | 84:7,13 89:17 | 80:3 |
| 34:24 35:2,10 | 55:19 | **commentary** | **concerning** |
| 35:14 36:3 | **clothes**   96:5 | 52:1 66:18 | 27:23 |
| 37:15 48:22 | **coalinga**   63:2 | **commented** | **concerns**   7:23 |
| 52:24 55:8 56:4 | 63:11,14,15,17 | 58:11 82:15 | **conclude**   47:19 |
| 57:19 61:2,11 | 63:23 64:11,24 | **comments** | 48:21 57:23 |
| 61:22 62:16 | 65:4 | 42:22 | **concluded** |
| 63:2,2,10 64:23 | **cohen**   3:4 | **commerce**   4:6 | 39:15 54:14 |
| 72:2 73:2,10,16 | **collection**   12:17 | **commercial** | 117:13 |
| 74:19 75:14 | 64:3,4,7,10 | 74:4 | **concluding** |
| 82:20 90:19,20 | 75:8 110:7 | **commission** | 80:5 |
| 91:18,23,24 | **color**   43:2 46:4 | 120:24 | **conclusion**   15:5 |
| 92:15,22 93:3,6 | 47:17 51:13,20 | **committee** | 44:9 45:20 48:3 |
| 93:7 94:9,16 | 80:16 81:17 | 100:2,10 | 52:23 53:23 |
| 95:3,7 96:2 | 82:23 88:2,7,13 | **commodity** | 54:19 68:18 |
| 101:11,17 | 90:2 113:20 | 31:4 | 71:12 82:3 |
| 103:17 104:12 | 114:18 | **common**   60:7 | 84:21 95:15 |
| 107:15 | **coloring**   27:13 | **companies**   21:7 | 98:19 |
| **circumstances** | **colors**   41:1,20 | **company** | **conclusions** |
| 93:2 94:16 | 45:12 46:10,19 | 100:18 | 27:22 28:5 |
| **cite**   37:2 | 47:13,17 48:24 | **comparison** | 43:14 45:14,24 |
| **city**   96:4 | 50:10,20 51:17 | 42:15,19 59:3 | 46:3 58:1 59:4 |
| **clarified**   48:18 | 53:2,15 55:16 | **compensated** | 82:9 83:18,23 |
| **clarify**   107:14 | 55:19 57:16 | 77:23 78:2 | 84:16 85:18 |
| **clear**   23:20 | 63:9 70:3 80:17 | **compile**   40:22 | 95:7 97:14 |
| 26:8 34:11 46:8 | 87:13 88:21 | **compiled**   17:16 | 98:14 99:3 |
| 46:15,18 48:5 | 89:3,19 113:12 | 41:19 | **conducted** |
| 48:20 58:21 | 114:6 | **complicated** | 75:23 112:4 |
| 67:15 73:11 | | 93:12 | |

**[conducting - data]**    Page 6

**conducting**
  20:13
**conference**
  109:11
**confirm**   16:2,5
  73:9 74:21
**confirmation**
  74:22 92:17
**confirming**
  92:18
**confused**   44:3
**considered**
  33:12 104:6
**consistent**
  31:11 34:7 63:8
  63:10 64:15
**consult**   16:17
**consulted**   107:6
**consumer**   4:13
  20:22
**contact**   109:1
  109:16
**contacted**
  108:20 109:12
**contained**
  13:12 19:16,21
  21:1 33:14
  34:17 115:24
**contains**   10:10
  10:14 20:15
  35:13 36:3
**contaminated**
  94:24 97:23
  98:8
**contamination**
  94:19,21 95:9

96:2
**contents**   112:20
**contexts**   38:24
**contradicted**
  61:3
**conversations**
  79:6
**copy**   50:14
**corner**   26:7
**corners**   116:1
**correct**   15:6,23
  16:15 17:9,10
  20:15,23 23:22
  23:23 24:1,20
  25:21,22 28:1,6
  28:7,12 33:21
  35:6,7 36:20
  37:3 39:5 44:10
  44:11,12,17,20
  45:24 46:11,12
  46:17 47:11
  48:12 51:9,10
  53:21 54:16,20
  55:17 56:5,11
  57:1,2 58:2,24
  59:1,6,7,10,21
  60:2,3 62:18,19
  66:11 67:3
  68:13,14,18,19
  68:21,24 72:24
  73:18 74:1 75:2
  76:11,12,15
  77:16 81:9 82:3
  82:10,14 93:23
  94:4 97:19,20
  97:24 98:9 99:5

108:10 111:18
  113:16 115:4
  116:2
**corrected**   6:12
  113:2
**correction**
  65:19
**corrections**
  65:22 66:20
  119:9
**correspond**
  56:3
**cosmetic**   19:11
  19:14,20 20:6
  20:14,17,21
  28:20 31:16
  32:5,11,12
  35:10,11 36:2,8
  37:15,18,20,24
  92:22 93:4
  94:17 99:15,22
**cotton**   68:3
**council**   5:3
**counsel**   120:13
  120:15
**counted**   97:5
**county**   76:23
**couple**   10:16,19
  43:22 69:7
  76:22
**course**   11:1
  30:22 31:22
  32:13 64:18
  113:10
**court**   1:1 17:9
  20:11 48:7

69:14,17 87:5
  88:3,11,13,21
  92:7 105:13,16
  117:4 120:4
**courthouse**
  86:10,10,12
**courts**   15:21
**cplacitella**   3:11
**cprlaw.com**
  3:11,12,13
**create**   12:23
  47:9 71:22
**criticism**   33:11
  33:16 34:12
  40:12 104:9
**criticize**   38:24
  84:3 104:16
**criticizing**
  76:15
**crr**   1:23 120:21
**crystallography**
  27:4
**curiosity**   25:24
**curious**   25:2
**cut**   105:7

**d**

**d**   7:1 39:6,19
  40:3 41:7 52:19
  54:15 55:10,19
  56:15 81:21
  83:4
**damage**   71:3
**data**   17:15,17
  33:13,18,19
  34:15,21,21,23

[data - discuss]                                                                                          Page 7

42:9 43:9,13,18
43:21 44:7,14
44:24 45:14,22
46:16 52:7
53:23 56:9,24
58:23 59:10,13
59:16,17 60:2
61:4,7 63:1,14
68:10 82:9 83:9
83:17,20,22
84:14,14,14,20
85:18 98:19
99:4 110:12,14
**date**   21:2
112:17 120:10
**dates**   12:20
**day**   8:24 11:11
11:13 107:9
111:7 119:15
**dc**   2:17 3:20
**debriefed**   79:10
79:12
**decided**   108:22
**declaration**
119:1
**declare**   119:4
**deeper**   42:1
**deer**   38:17
**defendants**
4:12
**definitely**   14:9
**definitive**   15:5
**degree**   93:21
**degrees**   67:5
**demonstrate**
58:6

**demonstrated**
33:20 39:13
**demonstrates**
47:22 50:7
**denise**   1:23
2:20 120:3,21
**department**
111:24
**departments**
116:9
**depending**   62:5
62:7 64:19
92:13 94:3
**depends**   29:15
**depicted**   26:13
**deposit**   64:19
**deposition**   1:12
2:11 6:6 7:15
7:16 8:4,10,15
8:20,24 9:23
10:8,21 36:15
76:2,8,9 96:24
107:10,13
112:15 117:13
119:6,10
**depth**   65:8
**describe**   25:12
112:20 114:2,7
**described**   18:16
26:4,5,23 30:16
70:2 81:22
83:14,24
113:11
**description**   6:7
65:12

**destroyed**
71:16,19
**destructive**
71:7
**detail**   86:6,8
**detailed**   93:14
**details**   71:9
**detect**   72:1
**detected**   101:12
**detecting**
100:12
**detection**   92:12
92:13
**determination**
48:8 81:20
**determine**
10:10,14 13:11
13:24 19:16,21
20:15 21:1
28:20 29:7
31:10,24 32:19
33:5,13,19
34:16,22 35:13
36:2 37:15 41:6
49:23 83:17
89:12 104:11
105:22
**determining**
22:22 23:5
103:3
**develop**   91:2
**development**
100:7
**difference**
17:11 96:7
115:12

**differences**
50:20
**different**   15:12
15:21 17:7,18
30:8,9 35:18
36:20,23 37:9
42:22 50:18
51:13 58:21
59:3 84:15,21
88:23 113:11
113:12 114:5
114:20
**differently**
114:7
**dinner**   79:3,4,8
**direction**   74:9
**directly**   61:3
111:13
**disagree**   22:24
54:19 55:14
56:8,23 58:1,10
82:9 87:4 95:6
99:3 116:4,16
**disagreed**   47:20
68:18 80:11
81:12
**disagreement**
114:1
**disagrees**   55:1
55:2
**disappoint**
116:23
**disc**   70:18
**discuss**   54:3
79:17 86:1,6,8
86:9,11

**[discussed - example]**                                                    Page 8

| | | | |
|---|---|---|---|
| **discussed** 62:4 | **donald** 27:3,5 | **due** 61:1,22 | **eric** 3:6 104:5 |
| **discussion** | **doubt** 54:21 | 62:3 89:22 | **errata** 118:1 |
| 67:21 86:3 | **dr** 7:11 26:1 | **duly** 7:5 120:6 | 119:11 |
| 106:11 108:1 | 33:12,17 34:13 | **dust** 96:4 | **especially** |
| **dismay** 86:4 | 34:14 38:24 | | 16:10 |
| **dispersion** | 42:6 45:22 | **e** | **esq** 3:5,6,7,18 |
| 29:20 30:1,3 | 47:20 48:7 50:4 | **e** 7:1,1 57:17 | 4:5,15 5:6 |
| 40:23 41:5,19 | 53:22 55:2 56:9 | **earlier** 92:20 | **essentially** |
| 43:1 44:23 | 56:23 58:10 | **early** 20:3 40:7 | 25:12 48:23 |
| 45:12 46:9,19 | 59:9 62:18 65:1 | 41:9 | **estimate** 42:12 |
| 47:6,7 48:23 | 67:2 68:12,18 | **eastern** 1:17 | **evaluate** 30:1 |
| 53:1 54:2 55:15 | 76:15,24 77:11 | 2:9 | 30:19,20 36:4 |
| 57:15,18,20,24 | 78:6,22,24 79:2 | **easy** 74:22 | **evaluating** |
| 58:6 63:8 70:3 | 79:7,9,11,15,21 | **effect** 39:3 | 28:11 32:4,18 |
| 80:17 81:17 | 79:23 80:10 | **either** 27:17 | 37:13 |
| 82:22 | 81:7,11 82:2 | 71:17 112:3,4 | **evaluation** |
| **dispersions** | 86:1,2,13,17,20 | **electron** 73:3 | 37:10,12 |
| 55:7 | 86:22 87:10,15 | **elongation** | **evidence** 60:14 |
| **display** 29:20 | 98:20 103:22 | 42:11 53:18 | 60:16 66:2,10 |
| **distinguished** | 106:13,22 | 57:16 | 95:9 98:3 |
| 53:1 | 107:10 115:19 | **employ** 87:18 | **ewald** 9:14,15 |
| **district** 1:1,2 | 116:3 | **employed** | **exact** 78:19 |
| 2:23 120:2,5,22 | **dramatically** | 56:10,13 68:11 | 84:7 |
| **dive** 42:1 | 105:8 | **employee** | **exactly** 10:6 |
| **dobner** 1:23 | **draw** 43:14 | 120:13,15 | 12:22 26:4 43:5 |
| 2:21 120:3,21 | 44:8 45:19,24 | **encourage** 60:9 | 70:19 82:14 |
| **document** | 46:3,16 47:10 | **engaged** 14:16 | 86:3 |
| 25:14 88:12,22 | 59:4 67:2 68:17 | 109:4 | **examination** |
| **documents** | 83:9 85:17 | **enlighten** 89:21 | 6:2 7:4,8 87:14 |
| 97:1 | **drawing** 45:14 | 89:23 | **examine** 28:20 |
| **doing** 10:24 | **drawn** 83:18 | **entire** 116:10 | 29:4 91:13 |
| 11:19 13:14 | 97:14 98:14 | 116:12 119:5 | **examined** 7:5 |
| 14:23 15:13 | **drew** 3:7 | **entirety** 98:17 | 58:20 |
| 53:11 74:12 | **dubin** 78:22 | **epasternack** | **example** 29:19 |
| 81:22 90:23 | 79:1,6 87:5,12 | 3:12 | 64:16 91:10 |
| 104:2 | | | |

**[examples - found]**                                                    Page 9

| | | | |
|---|---|---|---|
| **examples** 17:13 18:2,8 | **extent** 64:19 | 93:7,11 94:3,9 94:16 95:3 | **follow** 14:3 67:15 |
| **except** 119:9 | **extrapolate** 55:8 | **fibrous** 91:9 | **followed** 67:20 68:15 |
| **excuse** 51:12 78:18 | **extrapolated** 56:14 83:2 | **field** 49:20 | **following** 18:22 |
| **executive** 5:7 | **extremely** 30:4 | **figure** 6:13 26:13 29:24 | **follows** 7:6 |
| **exercise** 33:18 44:15 45:23 50:6 | **extremes** 62:10 | 46:22 52:23 113:2 | **foregoing** 120:8 |
| **exhibit** 6:8,16 6:20 24:14 42:2 113:5 | **eyes** 114:20 | **figures** 53:16 91:7 | **forgotten** 103:11,11 |
| | **f** | **filter** 26:15 27:19 | **form** 9:6 15:15 17:24 19:16 20:16 26:20 |
| **exhibits** 6:6,18 | **face** 25:13 | **filters** 96:19 | 33:22 34:19 |
| **exist** 23:24 24:2 24:6 110:2,4 | **fact** 45:11 46:7 55:14 92:10 97:18 100:3 | **final** 18:24 72:2 | 40:14,17 41:11 44:18 46:1 |
| **expect** 45:8,13 | **facts** 89:1 95:11 95:19 96:14 100:23 | **financially** 120:16 | 53:24 59:11,18 66:6,12 68:20 |
| **expected** 27:15 45:18 66:18 | **fair** 19:23 43:15 81:6 84:18,21 85:19,23 98:21 102:10,11 105:4 106:24 108:7,8 115:22 | **find** 13:16 14:2 15:1 16:8 93:3 94:16 101:17 111:14 | 73:23 74:2,14 75:3,18 76:16 80:1 81:15 82:5 82:11 83:11 |
| **experience** 35:5 50:19 51:9,11 51:12 54:14 114:11 115:4 | | **finding** 18:8 | 84:11,22 85:20 |
| | | **fine** 7:13 | 87:6,19 88:4 |
| | | **finely** 101:11 101:13,16 | 90:4 94:5 95:10 95:18 98:22 |
| **expert** 1:12 2:11 6:20 45:23 | **familiar** 71:20 72:7 | **first** 18:12,18 23:9 52:23 62:2 63:21 99:2,8,10 105:22 107:5 108:24 109:6,9 109:10,14 112:22 120:6 | 99:16 100:22 107:1 114:14 |
| **expertise** 101:9 | **far** 39:19 40:20 105:23 | | **formal** 19:6 35:21 |
| **experts** 28:19 52:6 114:1 | **fast** 67:7 | | **forms** 92:1 |
| **expires** 120:24 | **fda** 13:4 108:19 | | **forth** 14:4 120:10 |
| **explain** 73:5 81:2 | **february** 6:9 112:22 | **five** 69:9,10 76:1 96:24 | **found** 14:8 41:1 41:3 76:20 91:9 95:7 106:17 111:5,8 |
| **explicitly** 68:4 | **federal** 17:8 | **flawed** 83:6 | |
| **expose** 89:15 | **fibers** 72:10 | **flom** 2:14 | |
| **expressed** 86:4 | **fibril** 23:14 | | |
| **extensive** 13:18 13:21 | **fibrils** 23:13,22 73:2 91:24 93:6 | | |

[four - historically]                                    Page 10

**four**  10:3 116:1
**fraction**  103:23
**fragment**  13:3
**frankly**  56:13
**free**  21:13
**friday**  18:21,24
  19:7
**front**  6:12 26:1
  47:5 68:6 76:3
  112:8 113:1
**function**  78:9
**fundamentally**
  49:18
**further**  40:2
  45:5 69:1 120:7
  120:12

**g**

**g**  1:13 2:11 6:2
  6:21 7:1,3
  119:19
**gain**  39:24
**game**  117:3
**gamma**  90:22
**gee**  106:3
**general**  38:16
  107:18
**generally**  72:18
  86:23,24
  100:13
**generate**  45:22
  50:4 59:16 83:8
**generated**
  34:14 44:7
  46:16 56:9,24
  67:1 68:11

82:10 85:19
98:19 99:4
**generating**
  44:14 59:9
**generically**
  93:14
**geology**  111:24
  116:8
**gerel**  3:17
**getting**  39:5
  67:7 99:23
  103:24
**give**  10:7 19:6
  38:15 51:24
  70:20 74:9 82:2
  97:21 105:6
**given**  12:16
  30:18 67:13
  68:16 76:10
  79:21 90:15
**gives**  17:15
  44:4
**go**  16:4 23:19
  24:11 36:13
  45:4 46:22 48:1
  49:1,22,24
  51:16 52:21
  55:5 61:14,20
  67:6 68:5 73:5
  73:14 77:21
  78:15,19,20
  88:21 90:12
  91:22 92:15,17
  100:9 105:23
  106:2,4 111:16

**goal**  15:7
**going**  11:6,9
  13:13 21:8 27:7
  36:14,17 42:2
  49:24 55:22
  57:3 60:4 62:20
  69:5,6 83:22
  84:3,23 85:11
  89:24 90:16,17
  92:7,16 99:15
  99:20 101:5
  102:6 105:6,7
  106:20 108:22
  109:20
**gold**  22:22 23:1
  23:5 114:24
**golden**  51:20,23
**good**  7:11 12:19
  105:9 116:13
**government**
  37:7
**grammatical**
  18:14
**great**  105:12
**green**  115:1,12
**grind**  72:10
  101:11,14,15
**grinding**  70:1,6
  93:9
**grocery**  10:23
  11:4,12
**ground**  72:16
**group**  99:24
**groups**  24:3
**guess**  36:10
  66:17 72:6

113:14
**guessing**  108:4

**h**

**hand**  26:6
**happened**  22:7
  101:3
**happy**  105:20
**hard**  50:14
  101:18
**head**  8:23 9:17
  26:2 105:5
**hear**  77:18,18
  108:24
**heard**  79:9
  80:13 86:4
**hearing**  76:23
  77:8 86:4
**heated**  67:12
**heating**  67:24
**heavy**  102:13
  104:10,18
**held**  2:12
**help**  29:11 52:6
  78:21
**helpful**  9:13
  18:3
**henrich**  5:5
**hereof**  119:11
**high**  85:5 91:2
**higher**  39:15
**highlighted**
  57:6 60:5
**hill**  5:8
**historically**
  22:3

**hmm** 111:10
**hold** 24:11
**hour** 69:6
**hours** 10:3,7
  71:2,9 105:10
**howie** 38:17
**huh** 28:2 37:1
  42:7,14 110:17
**hynes** 4:15 8:16
  9:10,14 15:15
  16:23 17:24
  18:9 19:2 20:16
  24:17,21,23
  25:6,9,16,22
  26:20 28:23
  29:5,9 32:8
  33:8,22 34:19
  35:15 36:5
  40:14,17 41:11
  44:18 46:1
  48:10,13 50:22
  52:8 53:24
  54:22 58:3
  59:11,18 66:6
  66:12 68:20
  69:8,12 73:23
  74:2,14 75:3,18
  76:16 77:9 80:1
  81:15 82:5,11
  83:11 84:11,22
  85:20 87:6,19
  88:4,14,24 90:4
  94:5 95:10,18
  96:13 98:1,22
  99:6,16 100:22
  102:20 103:4

104:14,23
  106:14 107:1,8
  107:14,19
  108:11 109:7
  111:20 112:19
  113:21 114:14
  115:5 117:6,9
**hypothesis**
  57:18
**hypothetical**
  96:14 100:24

**i**

**ice** 96:6
**idea** 29:1 50:24
  51:14 60:22
  78:11 111:8
**ideal** 40:4
**identifiable** 9:9
  24:7,8 73:3
**identification**
  113:5
**identified** 20:22
  57:19
**identifies** 63:10
**identify** 19:10
  20:8 29:11
  31:23 34:2,2
**identifying**
  28:13
**identity** 28:14
  28:16 30:11
  32:2 91:5
**illuminating**
  87:23

**illumination**
  59:21
**image** 25:11
  89:14
**immersed** 60:8
**impact** 72:19
**implies** 46:13
**importance**
  67:24
**important**
  17:22 28:13
  30:5 76:14
  105:22
**improper** 89:10
**inclination**
  101:22,23
**include** 67:14
**incomplete**
  96:14 100:23
**inconsistent**
  16:11 34:23
  35:2 58:23
  83:19 106:23
**incorporated**
  112:15
**incorrect** 48:9
  71:17 82:17
**independent**
  34:15 35:5 44:9
  44:16 46:17
  47:10 50:6 60:1
  62:17 67:2
  68:12,17 84:13
  85:18
**independently**
  24:2,6

**index** 6:1 38:8
  38:21 39:6,14
  41:7,21 43:2
  46:21 53:17
  54:14 55:3,9
  72:21 80:12
  81:20
**indicate** 53:13
  55:24 57:5,7
  60:5 67:10 69:1
  69:22 71:6,13
  73:1
**indicated** 64:23
  66:14 90:7
  109:19 119:10
**indicating**
  62:14
**indication**
  49:12 65:21
**indicative**
  53:16
**indices** 49:16
  49:19 54:8
  55:12,15 56:2,3
  58:22 62:9 63:7
  70:2 71:14
  72:20 82:21
  91:1
**individual**
  23:13,21 93:7
  93:11 115:3
**industrial**
  20:24 21:5,15
  22:4 32:23
**industry** 99:24

**[inefficient - know]**                                                    Page 12

**inefficient**
104:7
**influenced** 66:3
**inform** 82:24
**information**
27:23 34:5
37:14 38:15,21
40:1,22 43:20
44:21 46:14,15
48:19 50:5
52:13 54:2 58:5
61:18 68:17
71:11 74:20
77:16 83:1,16
104:5 115:18
**insert** 26:9
**instinct** 72:6
**instincts** 93:16
**intend** 104:15
**intensities** 89:4
**intensity** 88:8
89:19 90:2
**interact** 100:17
**interaction**
99:19
**interest** 92:14
111:11
**interested**
108:1 120:16
**interesting**
42:21 72:3 81:2
**interfere** 59:24
**interference**
15:9 29:24 91:7
**interpret** 50:8
50:9,9

**interpretation**
66:4 115:3
**interrupt** 64:8
**introduction**
27:3
**invoices** 10:7
**involved** 108:23
**irrelevant**
76:18
**iso** 67:16,19,21
68:16 85:6
104:6
**isolation** 91:24
**issue** 11:22 14:5
16:18 29:16
97:1 99:14
106:12
**issued** 17:7,23
18:19
**issues** 85:2,3

**j**

**j&j** 18:23 79:11
79:14 108:9
**jersey** 1:2
76:23
**jifsan** 13:5
109:11 110:18
**job** 1:24
**john** 9:14,15,19
**johnson** 1:5,5
4:12,12,12,13
10:9,10,13,14
11:5,5,15,15
12:2,3,4,4,9,9
13:7,7,10,11

14:5,6,13,13
19:12,12,15,15
21:16,16 71:21
71:21 75:1,6,15
75:15,24,24
76:10,10 78:14
78:14 97:7,7,18
97:23 98:7,7
99:13,13,20,20
100:1,2,5,5
107:6,6 108:20
108:20 111:4,4
111:7,7 115:16
115:17
**johnson's** 14:20
16:14 21:17
33:21 70:7 75:2
75:6 90:15 95:8
95:16 97:18,23
98:20
**judge** 20:11
77:4 89:24 90:1
**judgment** 33:3
33:19 35:5
44:16 47:11
50:6 51:9 54:13
55:18 60:1
62:17
**june** 1:16 2:8

**k**

**k** 3:19
**keep** 22:4 27:7
69:6
**kevin** 4:15 5:6
8:16 26:5

**khynes** 4:19
**kind** 31:3 37:9
37:11 38:19,20
**kinds** 49:17
**king** 4:14
**kkotch** 5:10
**know** 12:19
14:2 18:10 20:5
20:6,7 21:7,18
21:23 27:19
28:17 30:7,11
31:3,20 32:2,21
34:6 36:11
39:16,23 40:20
43:1,3,5,6,7
44:22 51:2 53:8
56:12,14,16
58:9 62:22
64:11,15,24
65:5,7,10,10,15
66:21 68:2 69:3
70:6 71:1,5
72:4 77:17
78:13 81:13,18
81:23 84:1,2,5
84:9 86:13,15
87:9 89:10,11
89:14,18 91:4
91:10 92:8
93:17,18,19
94:6,7 95:12
100:2 101:18
101:24 102:3
102:12 103:13
111:12

**[knowing - lunch]**                                                Page 13

**knowing**  57:20
**knowledge**
  103:2
**known**  49:9,10
**kotch**  5:6
**kslaw.com**  4:19

**l**

**lab**  94:23
**label**  38:8
**labeled**  48:22
  49:19 66:15
**laboratories**
  98:15
**labs**  21:10
**lady**  103:10
**lambda**  43:19
  43:19 44:5
  46:20,21 55:9
  61:10 114:6
**language**  18:6,7
**large**  44:20
**larger**  26:9
**largest**  25:11
**late**  109:2
**lateral**  65:13
**laugh**  9:7,21
  52:10 53:9 72:4
  88:16,17 89:21
  99:11 106:1,9
  107:3 114:23
  116:7,14,17,20
  117:1
**law.com**  5:10
**lawyer**  8:23
  88:18

**learn**  41:21
**leaves**  39:18
**left**  25:14 26:6
**leigh**  4:5
**leigh.odell**  4:9
**len**  106:5
**length**  70:20
  89:15
**letter**  100:7,15
**levels**  16:9
**levy**  80:22
**liability**  1:8
**life**  32:21
  102:23
**light**  12:11
  22:17 23:9,13
  26:14,22 28:4
  28:22 30:14
  47:16 49:7
  59:20,23 73:17
  75:9 85:2 95:4
  103:23
**liked**  49:9,10
**limit**  92:12,14
**limits**  62:10,11
**line**  39:6,19
  40:3 41:7 52:19
  54:15 55:10,19
  56:15 81:21
  83:4 118:3,5,7
  118:9,11,13,15
  118:17,19,21
  118:23
**liquid**  70:1,20
  102:13 104:10
  104:10,18

**list**  28:8 91:6
**listen**  77:11
**literature**  35:9
  36:1
**litigation**  1:9
  17:8,9 107:7
**little**  27:14,15
  36:18 39:21
  40:2 41:24 44:3
  45:5 49:16
  50:13,15 52:12
  55:6 76:21,21
  80:18 91:22
  94:14
**lizardite**  92:5
**llp**  2:14 3:17
  4:14
**locations**  61:11
**long**  10:4 60:10
  102:23 109:3
**longer**  11:6
  71:18 109:20
**longo**  33:17
  34:13,14 38:24
  45:22 47:20
  50:4 53:22 55:2
  56:9,23 58:10
  59:9 62:18 65:1
  67:2 68:12,18
  76:24 77:11
  78:22 79:2,7,9
  79:11,15,21,23
  80:10 81:7,11
  82:2 86:2 87:15
  98:20 103:22
  106:13,22

**longo's**  33:12
  76:15 115:19
**look**  13:11,15
  13:19,21 14:7
  23:8 24:1 29:17
  31:9,21 35:12
  40:24 41:2
  47:18 48:1,8
  59:2 61:14
  76:14 82:18
  86:17
**looked**  7:21
  8:11,12 10:16
  10:18 11:1
  12:14 14:5 15:1
  49:7 63:23 75:5
  86:14,16 93:15
  108:18 109:18
**looking**  12:9
  14:13,19 15:11
  32:23 33:4
  35:10,10 36:1
  37:13 50:14,16
  50:20 51:7
  55:18 57:5,8,11
  91:17 92:3
  95:16
**looks**  36:22
**lot**  15:8 20:4
  30:8 34:21
  48:16 62:7 96:7
  96:22
**loved**  49:7
**low**  16:9
**lunch**  116:24

**[m - middlesex]**                                                Page 14

| | | | |
|---|---|---|---|
| **m** | 63:1 65:22 | **meagher**   2:14 | 105:2 109:22 |
| **m**   3:5,7 | 67:12,15 70:8 | **mean**   13:22,23 | **methodologies** |
| **ma'am**   10:2 | 70:10,16 71:13 | 20:3 27:20 | 14:3 47:9 |
| **made**   14:1 | 73:9 98:15 | 28:15 29:19 | **methodology** |
| 18:13 39:3 | **match**   90:22 | 32:22 37:11 | 15:21 33:17 |
| 42:21 65:22 | 91:11 | 38:3 41:14 44:1 | 44:14 45:21 |
| **majority**   25:17 | **matched**   90:22 | 44:3 52:11 53:5 | 53:22 68:11 |
| **make**   15:8 18:7 | **material**   10:24 | 53:6 62:2 63:6 | 81:11,13,18,21 |
| 19:6 43:16 48:7 | 11:1 13:14,15 | 68:24 80:4 | 82:2,16 83:6,10 |
| 59:3 88:3,13 | 13:16 28:1 | 82:15 86:7 | 84:3,8,19 85:16 |
| 90:2 92:19 96:7 | 30:10 31:1 32:1 | 94:22,23 | 99:21 100:20 |
| 101:10 108:17 | 32:13 34:6 35:1 | 111:12 | 102:15,18 |
| **making**   31:18 | 41:22 63:9 66:4 | **means**   63:7 | 106:13,21 |
| 37:9 59:24 | 69:24 72:20 | **measure**   33:2 | **methods**   12:8 |
| 66:19 | 82:20 91:9,12 | 82:21 | 14:9 27:4 34:13 |
| **manufacture** | 92:4 111:14 | **measured**   39:4 | 35:21 37:24 |
| 21:17 | **materials**   8:3 | **measurement** | 44:8,8 59:9 |
| **maple**   3:8 | 16:21 18:24 | 65:19 | 83:15 98:14 |
| **march**   120:24 | 20:5 21:8 30:22 | **meet**   8:14 | 99:14 |
| **mark**   112:10,14 | 30:23 31:21 | 78:24 | **michelle**   3:18 |
| 112:17 | 32:4 62:5,17 | **meetings** | 80:22 |
| **marked**   24:14 | 67:1 90:24 92:2 | 100:10 | **microphotogr...** |
| 113:4 | **matter**   21:15 | **member**   100:9 | 47:7 |
| **marketing**   1:7 | 45:15 70:22,24 | **memory**   20:1 | **microscope** |
| **maryland** | 95:23 119:6 | **mention**   97:2 | 16:4,6 28:10 |
| 12:16 64:13 | **maximize**   25:5 | **mentioned** | 30:14 47:19 |
| 105:24 110:7,9 | **mccrone**   61:4,7 | 65:17 | 48:2,8 49:2,22 |
| 110:13 116:11 | 75:17,23 76:11 | **merit**   2:22 | 63:17 |
| 116:19 | 76:14,20 95:16 | **method**   15:13 | **microscopy** |
| **maryland's** | 95:17 97:3,7 | 20:14 22:16 | 12:11 22:17 |
| 64:5,9 75:7 | **mccrone's** | 33:12 50:4 | 23:9,13 26:23 |
| **mas**   1:6 17:1,16 | 63:14 95:6 | 56:10,12 59:16 | 28:22 73:3,17 |
| 19:7 42:9 43:9 | **mcdevitt**   5:5 | 67:16,19,22 | 75:10 |
| 53:1 57:16 58:2 | **mdl**   1:5 3:3,16 | 83:5,8,21 87:18 | **middlesex** |
| 58:22 60:24 | 4:3 7:16 24:13 | 100:8,8,12,20 | 76:23 |
| | 90:1 107:16 | 102:21 104:19 | |

**[mill - observation]**

**mill** 70:18,19
71:1,2
**milling** 70:21
71:7,14,16,21
71:24 72:10,16
72:18 93:9 94:2
94:10
**mills** 72:17,17
102:2
**mine** 21:20,22
64:17 65:4,11
65:12 70:14
71:22 97:24
**mineral** 28:16
29:12 30:5,16
38:14,20 39:1
41:6 53:16 54:3
57:20 58:7,20
71:3,16 72:15
101:24 102:18
**mineralogical**
38:15
**mineralogist**
103:10
**mineralogists**
60:8 102:22
103:2,7
**mineralogy**
30:17 38:19
65:21 116:9
**minerals** 29:20
29:21 30:8 31:6
31:23 38:7,16
38:19,21 62:5
64:21 65:14
71:8 104:20

105:2
**mines** 21:16
72:16 98:8
101:24
**mining** 64:20
72:19,19
**minus** 54:6
**minute** 9:4
108:16,16
**minutes** 69:6,7
69:10 101:6
105:7,10
**misstates** 19:2
41:12 82:12
108:12 111:21
**mistake** 41:10
41:14
**mode** 53:9
**moment** 81:5
**monday** 1:16
2:8
**montgomery**
4:7
**months** 63:24
108:3
**morning** 7:11
**mounts** 14:1
**move** 81:19
**mparfitt** 3:22
**multi** 91:14,14

**n**

**n** 7:1
**name** 8:21,22
9:7,11,16 61:19
103:11,11

**names** 8:22
**natural** 102:3
**nature** 98:13
**necessarily**
23:2 29:22 35:1
95:2 111:23
113:19
**need** 16:4 23:7
23:24 30:8 40:1
47:18 48:1 49:1
49:22 54:1
71:11
**needed** 31:3
54:2
**negatives** 89:9
89:11
**neither** 120:13
120:15
**never** 40:13,18
41:17 42:23
58:11 73:20
74:24 76:10
79:10 99:19
101:3 116:18
116:20
**new** 1:2 2:16
4:17 76:23
107:12,13
**night** 79:8
**nitrogen** 70:1
70:20
**nj** 3:9 5:8
**nods** 26:2 105:5
**notary** 2:22
120:4,21

**note** 45:7
106:18
**notebook** 112:7
112:14
**notes** 79:19,20
**notice** 2:20
**noticed** 18:5
**number** 6:7,19
10:7 28:9 39:1
90:7
**numbers** 67:23
**nw** 2:16 3:19
**ny** 4:17

**o**

**o** 7:1
**o'dell** 4:5
**oath** 119:13
**object** 33:8,22
99:16
**objection** 15:15
17:24 26:20
29:9 34:19 36:5
40:14,17 41:11
73:23 74:2,14
74:15 75:3,18
80:1 82:5,11
84:11,22 87:6
87:19 88:4,14
88:24 90:4 94:5
95:10,18 96:13
98:22 100:22
107:8 108:11
111:20 114:14
**observation**
55:8 56:15

81:19 83:3
**observations**
63:15 98:18
**observe** 57:1
**observed** 61:1
81:16
**observing** 60:8
79:18
**obtain** 29:14,23
44:23
**obtained** 44:24
58:5
**occasionally**
86:23
**occur** 91:23
**offer** 119:12
**offered** 81:7
**offering** 56:19
60:1
**offices** 2:12
**oh** 8:11 24:16
37:5 78:17
101:15
**oil** 39:4 40:8
41:1,3,10,15
44:4 52:2,3,5,6
52:15 57:11,13
58:14 66:15
81:18 82:23
83:3 90:21
91:12,14
**oils** 36:20 37:9
38:7 39:1,11,16
40:1,9,10,16,19
41:18 42:22
43:3 44:2 57:8

57:17,24 58:6
58:12,21 59:3
60:9 91:8,11
106:11
**okay** 7:22 8:2
8:14 9:19 10:8
11:8 14:12
16:17 20:24
21:4 22:11 23:4
24:4,11,22 25:1
25:15,19,24
26:11 27:6 28:3
28:8,18 35:8
36:13,16,24
37:1,2,7 38:2,6
38:23 39:7 40:5
41:9,24 42:5,15
43:8,16 44:13
45:4,11 46:7,24
47:8,13 49:24
50:3,10 51:4,22
52:5,19 53:10
53:13,21 55:22
56:8,17 57:3,14
57:23 58:17,18
59:8,23 61:20
62:14,24 63:12
63:19 65:16
66:2,9 68:8,23
69:4 70:22 71:6
72:13 76:8
77:20 78:5
79:10 81:6,10
85:12,14 86:1
86:13 87:17
89:6,6 90:12

93:1 96:18 97:6
99:2,12 101:5
102:5 104:18
105:11 106:20
107:19 108:6
110:12 112:16
115:16,21
116:21,22
**once** 85:13
**ones** 49:21,21
**operating** 67:5
**opinion** 14:17
23:4,21 26:19
33:10 34:16
53:15 56:19
57:10,12 61:21
62:15 82:2
92:21 97:22
102:5
**opinions** 17:18
28:5 44:17
45:23 46:17
60:2 67:2 68:12
81:7,12 83:9
99:4 115:23
**opportunity**
7:18
**optic** 29:20
30:1,4
**optical** 16:11
27:4 30:17 34:7
38:15,18 42:9
43:9,13,18,21
60:7 63:1 65:20
74:20 82:19
116:9

**orange** 27:14
45:8,12,17,18
49:9,21
**orangey** 47:16
**order** 15:5
16:21 31:4
40:22 47:19
48:2,7 71:12,22
81:11 84:20
88:13 90:2,18
100:20 104:11
**ore** 95:1
**organic** 68:2
**orientation**
29:23 60:11
61:23 62:3,8,12
**oriented** 62:6
**original** 88:11
88:22
**outcome**
120:17
**outside** 86:10
**overbroad**
28:23 29:5
48:13 50:23
52:8 68:20
75:19 82:6,12
98:1,23 99:6
102:20 103:4
104:24 107:1
109:7 115:5
**own** 13:7 14:23
15:4 16:14
19:22 20:12
33:18 43:14
44:8,15,16

45:23,24 46:3
46:16 47:10
50:6 59:4,24
60:1 63:14 67:2
68:12,17 77:15
77:20 85:17
111:17

**p**

**p**  7:1
**page**  6:2,7,19
  24:23 26:7 28:8
  36:19 38:5
  39:10 42:2,3
  46:22 52:22
  55:22 57:3
  58:17 60:4,23
  60:23 62:20
  67:10 69:20
  118:3,5,7,9,11
  118:13,15,17
  118:19,21,23
**paid**  15:14
  77:20,23
**paper**  61:17
**papers**  84:5
**paragraph**
  26:10 45:6
**parallel**  42:10
  43:19 44:3
  53:17 57:16
  61:10
**parfitt**  3:18 9:8
  106:2 117:10
**part**  11:19
  26:21 34:13

42:13 51:6,7
72:19 75:7 95:1
98:10
**particle**  29:16
  43:23,24 48:22
  49:18 61:18
  72:22 80:13
**particles**  45:16
  45:17 46:5,9,18
  48:24 49:8,20
  57:18 60:8,9
  61:21 62:15
**particular**  33:5
  49:14 94:2
  113:24 114:6
**particularly**
  20:4
**parties**  120:14
**partly**  77:17
**past**  114:12
**pasternack**  3:6
**pc**  5:5
**pcpc**  5:3
**penalty**  119:1,4
**people**  32:24
  51:1 80:24
  115:10,11
**people's**  114:17
**percent**  80:24
  103:23
**percentage**
  105:9
**perfectly**  117:1
**period**  102:23
  109:3

**perjury**  119:1,5
**perpendicular**
  42:11 43:20
  44:4 61:10
**persists**  71:8
**personal**  5:3
  12:17 114:19
  114:19 115:13
**phd**  1:13 2:12
  6:2 7:3 119:19
**phillips**  38:18
**phone**  86:10
**photo**  51:7 52:1
**photograph**
  50:9,11,21 51:8
  57:13 87:23
  88:2
**photographs**
  110:15 113:12
**photography**
  89:14
**photomicrogr...**
  13:2
**photomicrogr...**
  12:24
**phrase**  51:12
**pick**  72:11
**picture**  47:8,9
  47:11,14,24
  48:20 49:11
  50:3,5,7,16
**pictures**  13:5
  27:13 48:4
  49:15 66:14
  89:8 111:1,2

**piece**  68:2,3
**pinned**  25:10
**place**  23:18
  103:13 120:10
**places**  96:22
**placitella**  3:4,5
  6:3 7:10 9:18
  15:19 17:3 18:4
  18:17 19:9
  20:19 24:20
  25:1,7,15,19,23
  27:1 29:2,6
  31:13 32:16
  33:9 34:9 35:3
  35:23 36:12
  40:15 41:8,23
  45:3 46:6 48:11
  49:3 51:3 52:14
  54:12,24 58:16
  59:14,22 66:8
  66:22 68:22
  69:11,19 73:24
  74:5,23 75:12
  75:21 76:19
  77:12 80:6
  81:24 82:7 83:7
  84:6,17 85:9,24
  87:11,24 88:9
  88:19 89:5 90:6
  94:12 95:14,22
  96:17 98:4 99:1
  99:9,18 101:2
  102:24 103:8
  104:17 105:3
  105:18 106:6
  106:19 107:4

**[placitella - properties]**                                    Page 18

107:12,17
108:5,14
109:24 112:1
112:13 113:6
114:8,21
115:15 117:8
**plaintiffs** 3:3
3:16 4:3
**plan** 89:24
**platy** 92:5
**play** 77:14
**player** 105:24
116:19
**please** 9:21
20:18 52:12
112:11
**plm** 13:6 14:6
14:19 15:2,22
19:10 23:16,22
24:7 35:13 72:2
72:11 90:9,16
92:23 93:4
94:18 98:20
99:14,22
101:12,17
104:13
**plus** 54:6
**pocket** 6:12
113:1
**point** 32:21
88:3,13 90:3
**polarized** 12:11
22:17 23:9,13
26:22 28:10,22
30:14 75:9 95:4

**polarizer** 26:10
**position** 23:8
48:6
**possession**
64:12
**possibilities**
27:17 55:7
**possibility** 92:3
**possible** 66:19
71:15 94:1
101:10,13
**possibly** 27:18
**potentially** 65:8
**powder** 1:6
13:8,11 14:20
16:14 21:17
33:21 70:7 75:2
75:6 90:16
**power** 69:3
**powerpoint**
87:13,14
110:19
**practice** 60:7
60:20
**practices** 1:7
**preceding** 19:8
**preparation**
8:3,15,20 16:18
76:9 106:12,16
**prepare** 10:4
**prepared**
109:14
**preparing** 9:23
16:21 65:1
106:22 115:17

**presence** 16:1
27:24 28:11,14
31:17,22 32:5
73:10,15 74:19
75:14 91:17
92:16
**present** 31:23
44:1 92:22 93:3
93:5
**presentation**
110:19
**presented** 63:1
**pretty** 68:24
**prevent** 45:13
**previously** 65:2
**principle** 89:20
**principles**
106:24
**printed** 89:8
**prior** 7:19,23
**probably** 19:24
78:4 79:16
93:23 97:5 99:8
106:4
**problem** 25:20
39:12 59:15
83:10,14 86:21
87:2 89:7
106:17
**procedure**
65:20
**proceed** 23:18
**proceedings**
7:17
**process** 70:7
71:17,21,24

72:10,17,18
93:10 94:2,11
94:24 104:7
**processing**
101:24 102:1
**produce** 41:5
**produced** 33:12
33:17 37:14
**product** 10:10
10:14 12:4,10
19:15 20:7,22
34:17 35:13
71:22 72:2
75:17 93:10
109:5
**products** 1:6,8
5:3 20:2,18,21
21:1,12 72:15
97:8,11
**professional**
33:18 35:5
37:22 55:18
**proof** 27:9,11
**proper** 26:22
29:22 87:17
88:20 89:10,18
99:21
**properly** 40:24
**properties**
16:11 28:9,19
29:3,11,13,15
30:10,13,15
31:18 32:7,15
32:18 33:4,11
34:1,8 35:12
36:4 38:18 62:7

**[properties - refraction]**                                              Page 19

65:8 82:19
**proposition**
  37:3
**prove**  92:8,9,10
  92:14,16
**provide**  11:14
  18:20 38:20
  44:16 50:3,5
  52:6,13 83:1
  84:20 98:6
  102:6 115:24
**provided**  10:7
  18:21,24 27:23
  28:1 34:5,20
  42:11 43:21
  45:14 58:23
  59:13 66:5
  71:10 79:2,7
  84:15
**provides**  53:22
  61:9
**public**  2:22
  120:4,21
**publication**
  61:14
**published**
  26:18 27:5 35:8
  36:1 38:1 60:20
**purchase**  11:3
**purchased**
  10:23 16:13
  108:21 109:18
**purpose**  11:2
  13:23 36:15
**purposes**  7:14
  24:18 25:24

**pursuant**  2:20
**put**  15:20 21:11
  41:4 76:2 84:24
  90:21 115:8
**putting**  85:4

**q**

**qualification**
  20:10
**qualified**  28:18
**qualifiers**  115:9
**qualities**  30:9
**quality**  114:19
**question**  31:14
  32:3 43:4 44:6
  52:11 58:7 72:4
  85:13 87:9
  93:12 98:5
  100:15 105:22
**questioning**
  111:11
**questions**  48:16
  49:4,17 78:22
  101:6 105:9
  117:7
**quickly**  18:12
  18:19
**quite**  48:4

**r**

**r**  7:1
**range**  62:9
**raw**  33:12,17
  34:14,21 44:7
  59:13,15,16
  60:2 83:17,19
  83:22 84:14

89:9 98:19 99:4
  110:12,14
**reach**  27:22
  53:23 58:1
  68:12 71:12
  81:11
**reached**  95:16
**reaching**  82:3
**read**  26:8 119:5
  119:7
**readily**  73:2
**ready**  62:22,23
**really**  12:22
  14:24 18:11
  20:6 27:19
  36:14 39:24
  40:23 55:5
  89:17 100:2,16
**realtime**  2:21
**reason**  27:12
**reasonable**
  93:21 103:14
  103:17
**reasons**  78:13
**recall**  39:2 77:1
  78:7 90:10
  113:13
**received**  19:7
**recent**  107:15
  115:17
**recess**  69:16
  105:15
**recognize**  54:18
**recognized**
  52:5

**recollect**  68:6
  101:4 107:23
**recollection**
  20:13 22:15
  100:16
**recollects**  68:7
**recommendat...**
  36:20 67:16
  68:16
**recommended**
  37:1 85:6
**record**  12:6,23
  21:24 24:18
  34:10 40:21
  69:15,18
  105:14,17
  117:5
**records**  22:4,7
**red**  3:9 27:15
  80:18
**reduction**
  69:23
**reference**  30:17
  38:8,12 79:1
**referenced**
  6:18 61:19
**referring**  18:11
  24:19 38:13,22
  61:8,15 67:19
  76:5
**refine**  104:10
**refraction**  38:8
  38:21 39:6,14
  41:7,22 43:2
  46:21 49:16,20
  53:17 54:8,15

**[refraction - samples]**    Page 20

55:3,10,12,15
56:2,3 58:22
62:9 63:8 70:2
71:14 72:20,21
80:13 81:20
82:21 91:1
**regard** 84:4
**regardless**
27:21 33:10,16
34:12 66:23
68:9 72:22
**registered** 2:22
120:4
**reilly** 5:5
**rejected** 104:6
**relation** 79:21
107:7
**relationship**
58:12
**relative** 120:13
120:15
**reliable** 16:10
**relief** 91:2
**rely** 59:10
84:20
**relying** 62:17
**remember** 9:1
9:2,20 10:6
12:22 49:13
55:3 67:22
70:19 76:3 81:4
87:12 111:15
**remind** 9:11
**remove** 68:2
**renzi** 3:7

**report** 6:9,10
6:11,20 8:6
9:24 10:5 14:4
14:18 15:5,20
16:18,22 17:13
17:19,23 18:5,6
18:8,12,18 19:1
19:6 24:13,19
26:12 28:4
34:13 36:14,16
38:23 40:7,9
42:3 55:23,24
62:4,21 69:21
76:10,15 86:14
86:18 90:8 91:6
97:2,3,13,14,15
98:10 107:13
107:16,16,22
107:24 108:4
108:24 109:2
109:14 110:18
111:4 112:23
112:24 113:1
113:15 115:19
116:1,3
**reported** 1:23
58:22 109:10
**reporter** 2:21
2:22 25:2 69:14
69:17 105:13
105:16 117:4
120:1,4
**reports** 8:11
17:1,8,12,22
19:8 34:5 57:16
65:23 67:12

77:19 106:16
109:15 112:12
115:17
**representatives**
100:1
**request** 111:24
**require** 37:8
90:8
**required** 56:3
**respect** 89:22
**result** 12:6
**results** 11:14
12:3 42:23 59:3
76:11,14 90:9
97:8
**retained** 107:6
109:6,9 110:21
110:23 111:9
**revell** 38:18
**review** 7:19
**reviewed** 8:3,6
8:8
**rid** 103:24
104:3
**right** 11:5 15:3
25:16 44:13
46:13 54:18
56:22 63:21
66:23 67:8,10
69:12,20 77:3
81:4 82:1 84:18
96:23 97:16
98:24 99:15
106:7,10 108:9
109:19 112:2
112:13 114:9

114:22 115:1
117:1
**rls** 1:6
**rmh** 5:10
**rmr** 1:23
120:21
**road** 96:5
**rod** 72:17
**role** 77:7,13
**rotate** 60:10
**roth** 3:4
**roughly** 108:4
**routine** 32:11
**routinely** 74:17
**run** 90:18

**s**

**s** 3:6 7:1
**sales** 1:7
**sample** 10:22
11:4 12:15
23:10 28:20
29:4,8 32:18
33:5,6,13 36:2
37:13 65:9 71:5
87:18,22 90:15
94:2,4 103:24
106:12,16
109:18,21
**samples** 10:16
10:19 11:22
14:13 19:22
28:11 49:13
67:13,24 73:10
75:1,5,24 85:5
102:18,19

**[samples - small]**                                                                 Page 21

106:22 108:10
110:2,3,8
111:17
**save** 105:10
119:8
**saw** 42:24
76:22 78:5,21
83:19 88:6,7
106:15 113:11
**saying** 77:19
80:8 84:10
86:22 87:2
114:4
**says** 42:8 56:6
63:21 67:12
116:8
**scientific** 15:12
52:7 56:10,12
87:17 88:12,22
89:20 93:21
102:17 104:19
106:23
**scientifically**
92:11
**scientist** 34:15
99:5
**scientists** 50:18
115:3
**screen** 25:11,18
39:10 42:6
**second** 7:15
17:13,23 24:12
51:24 52:3
112:23
**secondhand**
104:5

**section** 42:5
45:9
**see** 8:21 9:6
10:20 13:16,24
15:1,8 23:10,11
23:12,14,15,21
24:5 25:6,8,11
25:13,14 26:6,7
26:9,16 38:10
42:5,13 43:11
45:9 47:1,17
49:2 50:1,11,12
50:17,19 51:1,5
51:13,14,17,19
51:20 53:3,19
60:12 61:5,14
61:24 62:12,13
63:4 65:18,24
67:7,17 70:4
73:6,12 79:18
80:16,18 89:20
90:18,23 91:3,7
92:4,23 93:6,8
93:10 94:17
95:4,5 98:2
106:7 113:19
114:24 115:11
117:2
**seeing** 25:3,20
47:14,15,16
80:15 114:11
**seems** 71:13
**seen** 64:22
102:1
**sell** 11:9

**selling** 11:6
**semester**
116:10,12
**send** 32:24
**sense** 34:3
**sensitivity**
114:18
**sent** 20:4
**sentence** 43:11
57:6 63:22
**separate** 94:8
**separated** 93:7
**separating**
105:2
**separation**
102:13 104:11
104:18
**series** 38:17
57:17
**serpentine**
13:16 14:6,8
15:1,9 92:2,5
**set** 14:4 29:13
30:24 62:10
98:15 120:10
**several** 7:21
14:1
**shades** 47:15,16
50:12
**sheet** 118:1
119:11
**sheets** 17:16
42:10 43:10,13
43:18,21
**shelf** 11:10
19:23

**shot** 39:5
**show** 94:3
96:12,16
**showed** 39:14
60:2 96:24
100:6
**shows** 47:11,23
88:23
**side** 27:16
39:20 40:3
**signature**
117:12 120:20
**signed** 119:15
**significant**
28:10
**similarity** 46:4
**simply** 15:8
87:22
**single** 20:14
41:18 44:4
81:17 93:6
**sit** 19:19
**sitting** 48:15
49:5 78:5
**six** 63:23 108:3
**size** 29:16 69:23
72:10,22 80:13
**skadden** 2:14
**skip** 36:14
**sky** 51:19
**slate** 2:14
**slide** 60:9 62:6
**slightly** 114:7
**small** 6:8 16:8
57:19 58:7
80:16 112:21

[social - system]                                                                                    Page 22

social   79:4
sold   20:9
somebody
    51:11 114:22
    114:24
sons   9:5
sorry   9:16
    12:20 20:20
    22:24 27:2
    36:24 42:16
    64:8,8 67:22
    82:22 116:23
sort   81:3 92:6
sound   84:19,24
sounds   53:8,8
    98:24
source   26:14
    49:7 61:3 64:1
    97:24 98:8
sources   21:4
    85:2
spalding   4:14
speak   8:19
speaker   25:10
speaking   55:11
    72:18 92:11
specific   37:2,20
    42:10 52:12
    61:13 71:3,4,4
    71:5 79:4 90:12
    107:15
specifically   8:3
    8:13 12:12 32:5
    36:7 37:18 72:8
speculation
    28:24 50:23

52:9 54:23
    100:24 103:5
    113:22 115:6
spent   9:22
spike   13:14
    109:22
spoke   108:19
stain   63:9 65:1
staining   40:23
    41:19 43:2
    44:23 45:12
    46:9,19 47:7
    48:24 53:2
    55:16 57:15,24
    70:3 80:17
    81:17 82:23
standard   15:21
    22:22 23:1,5
    26:19 35:9
    37:19,23,24
    60:21 65:20
standards   14:4
    15:4 36:7 37:8
    37:18
start   70:16
started   109:15
state   17:9 38:5
    46:11 52:22
    56:22 57:14
    60:23
stated   68:4
    83:24
statement
    26:18 27:21
    63:13 72:14
    116:5,15

statements
    101:19
states   1:1 11:7
    35:9 36:1 57:12
stenographic...
    120:9
steps   90:13,17
stop   47:6
store   10:23
    11:4,12
strange   45:16
    46:5 59:23
    80:23
strangeness
    59:20
street   3:19 4:6
strike   115:22
structure   69:24
    71:8,15,19
student   55:13
students   30:13
    40:4
studies   93:15
study   10:24
    13:18,21 41:18
    71:9
studying   32:23
su   78:6 86:1,13
    86:20,22 87:10
su's   86:17
    116:3
subject   114:10
    115:2
subjective   33:3
subsequent
    9:24 10:1

108:10
substance
    36:16
substantive
    18:15 79:5
sufficient   34:4
    34:14,22 43:14
    44:15 47:10
    53:22
suggest   88:22
    98:3
suggesting   87:5
suggestion
    27:20
suggests   65:13
suite   3:19 5:7
supplied   17:1,5
    62:18 115:18
supply   16:20
    75:16
supported   61:2
suppose   96:11
sure   15:8 21:12
    35:17 43:16
    52:16 69:11
    70:15 71:5 72:4
    77:18 92:19
    93:13,17,19
    94:7 101:10,22
    105:19 108:17
    112:18 114:16
sworn   7:5
    120:6
system   27:19

| t | | | |
|---|---|---|---|
| **tab** 112:22,23 112:24 | 98:21 99:15,22 100:12 101:11 101:16 103:3 104:1,12 107:7 110:7 | 74:21 75:9,16 75:23 76:14 90:8,12 92:16 92:17 94:17 | **testimony** 19:3 24:9 41:12 72:23 79:1,6,21 81:8 82:12 86:2 92:20 98:7,17 101:8 108:12 111:21 113:11 120:9 |
| **table** 17:15,17 61:9 | | **temperature** 49:11,12,15 65:17,20,22 | |
| **tabs** 6:8,14 112:22 113:3 | **talcs** 32:23,24 **talcum** 1:6 **talk** 13:4 36:19 52:2 65:16 79:14 | 66:3,15,20,24 68:5 71:4 85:4 85:5 | |
| **take** 10:4 39:16 41:24 67:1 68:10 69:2,7,8 77:5 79:19,20 88:11 101:5 105:10 | | **temperatures** 67:13 68:1 **terms** 12:24 20:2,10 51:13 **test** 11:21 12:12 | **testing** 12:3,8 13:15 14:23,24 15:13 19:20 22:2,3,5,14,15 22:21 90:8 97:8 99:14,14,21 110:13,16 111:18 |
| **taken** 7:16 49:11 65:9 110:15,17 119:6 120:9 | **talked** 80:12,15 80:21 **talking** 43:17 70:10 86:21 97:12 | 13:7 20:14,24 21:14,19 57:17 76:11,14 90:16 90:18 109:17 109:17 111:8 111:17 | |
| | **talks** 62:21 67:24 | | **tests** 13:1 20:12 112:5 |
| **talc** 19:11,12,15 19:20 20:6,14 20:17,21 21:1,5 21:14,15,15,19 22:4,15,21,23 23:6 28:20,21 31:16 32:5,11 32:12,18 33:13 35:11,11 36:2,8 37:16,18,20,24 45:17 49:1 52:24 54:5,9,9 54:11 55:4,7,12 61:22 62:15 75:24 90:22,22 91:1 92:22 93:4 94:17 95:8,17 97:18,23 98:7 | **tap** 60:9 **taught** 40:4 55:14 106:5 **teach** 30:13 116:9 **teacher** 53:8,9 **tease** 94:14 **techniques** 26:22 97:13 **tell** 8:2 9:19 48:17 81:10 96:23 111:15 **telling** 30:5 **tem** 14:12,16 14:18 15:6,18 15:22 16:3,4,10 16:15 22:18,21 23:5,17,18 24:1 24:8 73:4,9,16 | **tested** 10:9,13 12:2 13:10 101:19 108:9 108:15 109:5,9 110:8 **testified** 7:5 75:4 79:11,15 **testify** 80:10 82:8 93:20 97:17 98:12 106:21 **testifying** 76:24 97:9,10,12 98:13 | **text** 38:20 60:21 **texts** 38:9,12,19 **thank** 7:13 24:21 105:4,12 117:2 **thing** 17:4 23:12 36:18,22 43:17 65:14 92:6 93:5 103:15,17 **things** 31:1 36:18 80:8 85:7 89:16 91:5 114:11 **think** 9:4,22 10:21 19:24 31:10 36:6,21 |

**[think - upper]**                                                    Page 24

37:17 54:3,6
55:13 61:19
70:17,17 72:12
76:1,13 79:16
80:9,24 82:14
83:5 85:22 86:3
86:15 87:3
88:21 93:23
94:19 95:2,2
97:2 99:7 100:3
100:3,6,15
101:21 102:2
103:12,18,18
103:20 105:8
107:9 113:23
115:7,10,11,13
116:21
**thinks** 71:18
**third** 52:2
112:24
**thought** 17:21
18:1 27:16
77:19 80:23
81:1,2
**three** 10:3 37:1
37:8 39:22 40:1
40:10,16,19
112:12,21
**threw** 22:8
**throw** 22:11
**time** 1:17 2:9
9:22 15:22,24
18:22 19:8 22:6
22:20 28:19
29:4 32:17,22
41:19 63:19

70:21 71:4
77:24 78:3
89:15 99:3,10
102:23 105:24
108:10,23
109:3,13,14
120:10
**times** 90:7 97:3
**today** 7:12,14
7:20 8:9,10
16:18 19:19
75:22 113:8
116:8
**today's** 8:4,15
9:23
**together** 40:22
41:5 42:23
**told** 56:13 76:7
85:1 100:3,4
**took** 13:3 48:6
76:2 96:24
111:1,2
**top** 25:13
**totally** 114:3
**tough** 106:4
**toward** 109:19
**trace** 64:21
65:14
**training** 50:19
**transcript** 6:16
7:19,24 119:5
120:8
**transmission**
73:3
**tremolite** 13:3

**tried** 18:13
**true** 19:24
34:18 49:23
80:9 110:10
114:13 116:11
119:8
**truth** 111:15
**try** 14:12 29:17
31:22 105:7
**trying** 16:1,8
25:3 39:7 40:5
40:6,11 68:8
69:3 92:14
94:13
**tuesday** 18:21
18:22 19:1
**tungsten** 26:14
**turned** 27:17
**twin** 9:5
**two** 10:3 15:20
17:7,12 19:21
20:12 27:8,16
37:1,8 39:10,13
39:13,16,21
40:9,16 41:20
42:23 43:3 44:2
47:17 57:8 58:5
58:12,20 59:3
61:16 75:5
105:10 110:3
110:17 116:10
**type** 13:17 28:4

**u**

**uh** 28:2 37:1
42:7,14 110:17

**ultimate** 99:3
**ultimately**
22:22
**uncertainty**
39:18
**under** 15:4 16:3
16:6 24:1,7,8
47:19 48:1 58:7
63:17 70:1
90:16 119:1,4
119:12
**understand**
25:4 36:16 39:8
40:6,11 41:14
42:16 44:22
49:8 68:9 80:19
85:3 92:20
94:14 96:20
101:10 104:4
**understanding**
86:22 87:1,2
119:11
**understood**
80:23
**united** 1:1 11:7
**university**
12:16 22:9 64:5
64:9,13 75:7
110:6,9,13
116:11
**unknown** 28:14
29:12 30:20
31:8 32:13
**unusual** 81:3
**upper** 26:6

| | | | |
|---|---|---|---|
| **use** 12:8 13:6<br>13:13 14:12<br>15:6,12,18,22<br>15:22,22 16:2<br>16:15 21:8<br>22:16,18 28:19<br>29:3 31:17 32:6<br>32:14 40:16,23<br>57:15,24 58:4<br>61:17 70:12<br>73:9,16 75:9<br>80:21,22,24<br>84:13 90:18<br>109:21<br>**used** 10:22 14:9<br>19:10 20:5<br>21:16 25:4 28:5<br>32:17 33:1,17<br>34:1,14 39:1,10<br>40:8,8,10,13,18<br>40:19 41:10,15<br>41:17 42:23<br>44:14 45:22<br>47:9 50:4 52:15<br>53:22 54:13<br>55:7 59:9,16<br>61:18 70:8,14<br>70:19 75:9<br>81:11,14,19<br>82:3,16 83:8,21<br>84:19 85:16<br>97:13 102:12<br>102:15,22<br>103:1,12,22<br>106:11,13,21 | **uses** 71:21<br>**using** 14:6<br>20:14 21:11<br>23:22 25:3<br>28:10,21 30:14<br>35:12 36:20<br>41:22 44:7<br>59:12 68:11<br>83:15 85:4<br>92:23 93:4<br>94:17,18 99:14<br>99:22 101:17<br>104:13<br>**utilized** 26:14<br>**utilizing** 44:23<br>54:7<br><br>**v**<br><br>**vague** 16:23<br>18:9 28:23<br>50:23 52:8 58:3<br>59:18 77:9 80:2<br>80:15 87:7,20<br>102:20 104:14<br>104:24 106:14<br>107:2 108:11<br>113:21 114:15<br>**valid** 102:17<br>104:19 105:1<br>106:23<br>**validity** 84:8<br>**value** 42:12<br>83:3<br>**values** 42:10<br>**variability** 61:2 | **variable** 30:5<br>67:14<br>**variation** 64:22<br>65:13 66:3<br>115:14<br>**variations** 61:1<br>61:22 64:21<br>113:20<br>**varies** 114:18<br>**various** 38:24<br>47:15 50:12<br>75:23<br>**vary** 62:11<br>64:19<br>**verbatim** 120:8<br>**verify** 90:9<br>**vermont** 21:20<br>21:22 22:15,21<br>22:23 23:6<br>**version** 26:7<br>**versions** 27:8<br>**versus** 15:13<br>93:11 94:3<br>**vickery** 1:23<br>2:21 120:3,21<br>**view** 25:2,4<br>**violation** 89:20<br>**viscomi** 77:4<br>90:1<br>**visited** 102:1<br>**voltage** 27:17<br><br>**w**<br><br>**wait** 108:16,16<br>**waived** 117:12 | **walk** 90:17<br>**want** 9:10 16:2<br>21:11 24:11<br>27:7 36:13<br>46:22 47:4 67:6<br>69:2,6,7,8<br>78:20 92:19<br>101:10 112:20<br>**wanted** 21:7,12<br>61:14 77:17<br>78:19 91:4,10<br>100:21 111:16<br>111:17<br>**washington**<br>2:15,17 3:20<br>**water** 96:21<br>**way** 16:10<br>23:17 27:18<br>31:15 40:4<br>41:20 57:7<br>60:18,19 66:9<br>69:2 75:13,15<br>77:20 83:2 84:8<br>86:20 90:22<br>93:22 97:17,22<br>102:8 106:23<br>**we've** 69:5<br>**weeks** 7:21<br>76:22 116:10<br>**went** 9:16 43:1<br>85:10<br>**whatsoever**<br>97:11<br>**wisdom** 114:11<br>**witness** 9:12,15<br>15:17 16:24 |

**[witness - zoom]**                                             Page 26

18:1,10 19:5
20:17 24:22
26:21 29:1,10
32:10 33:23
34:20 35:17
36:6 40:18
41:13 44:19
46:2 48:14
50:24 52:10
54:1 58:4 59:12
59:19 66:7,13
68:21 69:10
74:3,16 75:4,20
76:17 77:10
80:3 81:16
82:13 83:13
84:12,23 85:22
87:8,21 88:6,16
89:2 90:5 94:6
95:12,20 96:15
98:2,24 99:7,17
101:1 102:21
103:6 104:15
105:1 106:3,15
107:3,21
108:13 109:8
111:22 112:18
113:23 114:16
115:7 120:6
**word**  77:5
84:24 86:23
97:3
**words**  20:22
78:19 114:2
**work**  74:7
99:23 100:11

100:17
**worked**  89:13
**working**  99:13
100:8 109:23
**works**  103:19
103:20
**world**  31:6
61:12 102:3
**write**  57:21
100:15 111:23
**writing**  9:24
26:9 108:1
**written**  18:12
77:19 100:7
**wrong**  95:17
104:8
**wrote**  61:17
107:22 108:2
**wukzmin**  3:13
**wylie**  1:13 2:11
6:2,9,10,11,21
7:3,11 24:14
26:1 42:6 48:7
112:17 113:5
119:19
**wylie's**  107:10

**y**

**yeah**  24:16 25:6
42:20 52:11
67:9 70:13 77:6
79:13 99:11
113:14
**year**  95:20
109:3

**years**  20:3
22:13 51:8,12
76:1 96:24
**yellow**  47:16
50:13 51:21
115:1
**yellowish**  51:20
51:23
**york**  2:16 4:17

**z**

**zero**  43:19,19
44:5 46:21 55:9
**zeros**  46:20
61:10 114:6
**zoom**  3:3 4:3
5:4 8:23

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.