# Exhibit 22

Ann G. Wylie, Ph.D.

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF NEW JERSEY

 3

 4    ---------------------------x

 5    IN RE JOHNSON & JOHNSON        ) MDL No.

 6    TALCUM POWDER PRODUCTS         ) 16-2738 (FLW)(LHG)

 7    MARKETING SALES PRACTICES,     )

 8    AND PRODUCTS LIABILITY         )

 9    LITIGATION                     )

10                                   )

11    THIS DOCUMENT RELATES TO       )

12    ALL CASES                      )

13    ---------------------------x

14

15              VIDEOTAPED DEPOSITION OF

16                ANN G. WYLIE, Ph.D.

17                 WASHINGTON, D.C.

18            WEDNESDAY, MARCH 13, 2019

19                    9:19 A.M.

20

21

22

23

24

25    Reported by: Leslie A. Todd
```

Ann G. Wylie, Ph.D.

1      Deposition of ANN G. WYLIE, Ph.D., held at the

2    offices of:

3

4

5        SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

6        1440 New York Avenue, Northwest

7        Washington, D.C. 20005

8        (202) 371-7105

9

10

11

12

13

14      Pursuant to notice, before Leslie Anne Todd,

15    Court Reporter and Notary Public in and for the

16    District of Columbia, who officiated in

17    administering the oath to the witness.

18

19

20

21

22

23

24

25

Ann G. Wylie, Ph.D.

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFFS:

 4        CHRISTOPHER M. PLACITELLA, ESQUIRE

 5        COHEN PLACITELLA ROTH, PC

 6        127 Maple Avenue

 7        Red Bank, New Jersey 07701

 8        (888) 219-3599

 9

10        LEIGH O'DELL, ESQUIRE

11        JENNIFER K. EMMEL, ESQUIRE

12        BEASLEY, ALLEN, CROW, METHVIN,

13          PORTIS & MILES, P.C.

14        218 Commerce Street

15        Montgomery, Alabama 36103-4160

16        (334) 269-2343

17

18   ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:

19        JACK N. FROST, JR., ESQUIRE

20        DRINKER, BIDDLE & REATH, LLP

21        600 Campus Drive

22        Florham Park, New Jersey 07932-1047

23        (973) 549-7000

24

25
```

Ann G. Wylie, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3       NINA R. ROSE, ESQUIRE

 4       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 5       1440 New York Avenue, Northwest

 6       Washington, D.C. 20005

 7       (202) 371-7105

 8

 9       JOHN L. EWALD, ESQUIRE

10       ORRICK, HERRINGTON & SUTCLIFFE LLP

11       51 West 52nd Street

12       New York, New York 10019-6142

13       (212) 506-3792

14

15   ON BEHALF OF THE PCPC:

16       THOMAS T. LOCKE, ESQUIRE

17       SEYFARTH SHAW LLP

18       975 F Street, NW

19       Washington, D.C. 20004

20       (202) 463-2400

21

22

23

24

25
```

Ann G. White, Ph.D.

```
 1   APPEARANCES (Continued):

 2

 3   ON BEHALF OF PHARMATECH INDUSTRIES (PTI):

 4        TARIQ M. NAEEM, ESQUIRE

 5        TUCKER ELLIS, LLP

 6        950 Main Avenue

 7        Suite 1100

 8        Cleveland, Ohio 44113-7213

 9        (216) 696-3675

10

11   ALSO PRESENT:

12        DAVID EAGLEMAN, Ph.D.

13        DANIEL HOLMSTOCK, Videographer

14        ELIJAH JAMES, Videographer Assistant

15

16

17

18

19

20

21

22

23

24

25
```

Ann G. Wylie, Ph.D.

```
 1                C O N T E N T S
 2    EXAMINATION OF ANN G. WYLIE, Ph.D.          PAGE
 3         By Mr. Placitella            11, 272, 287
 4         By Mr. Frost                     253, 285
 5                E X H I B I T S
 6             (Attached to transcript)
 7    WYLIE DEPOSITION EXHIBITS                    PAGE
 8    No. AW-16   JNJTALC000300517 Metadata        168
 9    No. AW-17   Letter to Howard Wensley from
10                Ann G. Wylie, dated November 7,
11                1986                             164
12    No. AW-31   Article entitled "The Importance
13                of Width in Asbestos Fiber
14                Carcinogenicity and Its
15                Implications for Public Policy,"
16                Bates BOL044220 to 044233        188
17    No. AW-35   IMERYS446869 Metadata            199
18    No. AW-36   Curriculum Vitae of Ann Wylie
19                (retained by counsel)             19
20    No. AW-40   1985 Report by Dr. Wylie for
21                R.T. Vanderbilt (retained by
22                counsel)                         175
23    No. AW-44   Expert Report of Ann G. Wylie,
24                Ph.D. for General Causation
25                Daubert Hearing, dated 2/25/19    40
```

Ann G. Wylie, Ph.D.

```
 1              E X H I B I T S (Continued)

 2               (Attached to transcript)

 3    WYLIE DEPOSITION EXHIBITS                    PAGE

 4    No. AW-50   Pad of paper with notes

 5                made at deposition               158

 6    No. AW-50A  Handwritten document             244

 7    No. AW-51   Department of Mineral Exploration

 8                Report of Italian Mine Samples

 9                J&J, Bates FDP000000495 to

10                000000615                        100

11    No. AW-52   Supplemental List of References

12                for Ann Wylie, PhD               252

13    No. AW-53   Curriculum Vitae of Ann Gilbert

14                Wylie                            235

15    No. AW-54   Letter to Honorable Barbara

16                Boxer from Ann G. Wylie, dated

17                June 16, 2007                    255

18    No. AW-55   EPA Test Method document,

19                Interim Method for the

20                Determination of Asbestos in

21                Bulk Insulation Samples,

22                December 1982                    264

23    No. AW-56   Deposition transcript of

24                Frederick Pooley, Ph.D. taken on

25                February 1, 2018                 267
```

Ann G. Wylie, Ph.D.

```
 1    OTHER EXHIBITS USED

 2    J&J-65       Examination for Talc Samples

 3                 Argonaut Ore Body, Report by

 4                 Vernon Zeitz, 24 April 1974        71

 5    J&J-89       Letter to Vern Zeitz from Gene

 6                 Grieger, dated 1 July 1975         74

 7    J&J-97       Report of Investigation of

 8                 Italian Mine Samples and

 9                 Related Powders                    100

10    J&J-179      Letter to Roger Miller from

11                 Mark Palenik, dated 2 November

12                 1984                               80

13    J&J-188      Stipulation of Dismissal from

14                 Edley vs. E&B Mill Supply case,

15                 July 23, 1987                      62

16    J&J-202      Interoffice Correspondence

17                 Re Cyprus Ore Reserves -

18                 Arsenic & Tremolite, March 25,

19                 1992                               85

20    Hopkins-28   Spreadsheet                        100

21

22

23

24

25
```

Ann ... Wylie, Ph.D.

```
1            P R O C E E D I N G S

2            -------------------

3            MR. FROST:  I just want to note for

4   the record that plaintiffs' counsel have brought

5   David Eagleman to this deposition today.

6   Dr. Eagleman is not an attorney for any of the

7   parties here; therefore, he does not have a right

8   under Section (1)(b)(3) of CMO-11 to attend.

9            When we learned about Dr. Eagleman

10  coming last night, and we -- "we" being the

11  Johnson & Johnson defendants -- objected to his

12  presence at this deposition as no application has

13  been made per the terms of the Case Management

14  Order.

15            And that said, without waiving our

16  rights to object in the future, we're going to

17  allow him to stay for now.  If he becomes

18  disruptive in any way or if he in any way affects

19  the proceedings, we will seek to enforce CMO-11,

20  and we will seek to have him, you know, no longer

21  admitted to the deposition.

22            Finally, I have asked plaintiffs'

23  counsel to forward a copy of the confidentiality

24  order that Dr. Eagleman -- that Dr. Eagleman

25  previously signed.  If we can't find it, we'll
```

Ann R. Wylie, Ph.D.

```
 1    have him execute another one, but that is

 2    certainly one of the terms by which we will

 3    require that he stays here.

 4              MR. PLACITELLA:  So I was there when

 5    Dr. Eagleman signed the first time with Mr. Bicks

 6    at the Hopkins deposition.  Hopefully -- I know

 7    that Dr. Eagleman has been asked to leave parties

 8    that are a lot more fun than this one.  So,

 9    hopefully, we will never get to that.

10              MR. FROST:  I'm not too worried.  I

11    mean, based on the representation of counsel, I'm

12    sure there's one signed.  If not, we can always

13    execute a new one today if we need to.

14              That said, we can begin.

15              THE VIDEOGRAPHER:  All right.  Everybody

16    ready?

17              MR. LOCKE:  Actually, one more thing.

18    Tom Locke for the Personal Care Products Council.

19    We did not get notice of Dr. Eagleman's

20    participation.  We join in Johnson & Johnson's

21    objection, but more importantly, we would just

22    like to get notice of what's happening with these

23    depositions before the deposition.

24              That's it.

25              THE VIDEOGRAPHER:  We are now on the
```

Ann M. Wylie, Ph.D.

```
 1   record.  My name is Daniel Holmstock.  I am the

 2   videographer for Golkow Litigation Services.

 3   Today's date is March 13th, 2019, and the time on

 4   the video screen is 9:19 a.m.

 5            This video deposition is being held at

 6   Skadden Arps, 1440 New York Avenue, Northwest, in

 7   Washington, D.C., in the matter of In Re:  Johnson

 8   & Johnson Talcum Powder Products Marketing, Sales

 9   Practices and Products Liability Litigation, MDL

10   No. 2738, pending before the United States

11   District Court for the Eastern District of New

12   Jersey.

13            The deponent today is Dr. Ann Wylie.

14            Counsel for appearances will be noted on

15   the stenographic record.

16            The court reporter is Leslie Todd, who

17   will now administer the oath to the witness.

18                 ANN WYLIE, Ph.D.,

19        and having been first duly sworn,

20        was examined and testified as follows:

21                 DIRECT EXAMINATION

22   BY MR. PLACITELLA:

23        Q    Good morning, Dr. Wylie.  I'm Chris

24   Placitella.  How are you?

25        A    I'm fine.  Thank you.
```

Ann C. Wylie, Ph.D.

```
1        Q    My son told me to be nice to you and
2   told me to wear the Terps scarf, because he spent
3   some of his best years there, but I thought that
4   might be a little over the top.
5             So today I plan on covering four areas:
6   Your background, your area of expertise, the
7   methodology that you used in coming to your
8   opinions in this case, and the information and
9   data that form the basis of your opinions.
10            Got that?
11       A    I do.
12       Q    Okay.  We're on the same page?
13       A    That will be fine.
14       Q    Okay.  First, I want to start with your
15  affiliation with Johnson & Johnson.  When is the
16  first work you ever did with Johnson & Johnson on
17  issues related to talc?
18       A    This involve -- this litigation.  The
19  first, this litigation.
20       Q    When you say "this litigation," what do
21  you mean by that?
22       A    I was retained to review the documents
23  and provide a report.  That's the first time I've
24  worked for Johnson & Johnson.
25       Q    And when were you retained?
```

Ann L. Wylie, Ph.D.

```
 1        A     Let's see.  I -- I think Mr. Frost came
 2   to see me sometime in November of 2018, and I
 3   think I agreed to do it at the end of November,
 4   early December 2018.
 5        Q     Okay.  So prior to being -- that's when
 6   you were retained by Johnson & Johnson?
 7        A     Yes.
 8        Q     Okay.  And what were the terms of your
 9   retainer?
10        A     I'm sorry.  Could you be more specific,
11   the terms?
12        Q     Sure.  Yeah.  What were the conditions
13   of your -- were there any conditions of -- of your
14   being retained?  Did you have any conditions?
15        A     Well, the scope of work was outlined,
16   and I agreed to a particular scope of work.
17        Q     And what was that?
18        A     That I would review the literature on
19   the deposits that had been used by Johnson &
20   Johnson, Italy and Vermont, and that I would
21   review the reports that were provided by
22   Drs. Longo and Rigler.
23        Q     Okay.  Now, is that the first time you
24   ever actually worked with anyone at Johnson &
25   Johnson on the issues related to talc?
```

Ann D. Wylie, Ph.D.

```
 1        A     Yes.

 2        Q     Now, I'm not talking about being paid by

 3   Johnson & Johnson.  I'm asking specifically, was

 4   that the first interaction you had with anyone at

 5   Johnson & Johnson related to talc?

 6        A     Yes.

 7        Q     Okay.  And November 2018 was the first

 8   consult you had with Johnson & Johnson for

 9   litigation purposes --

10        A     That would be --

11        Q     -- correct?

12        A     Yes.

13        Q     Did Johnson & Johnson ever pay -- pay

14   for you to attend any meetings with any government

15   agencies?

16        A     No.

17        Q     Did they ever fund your expenses to

18   attend any meetings with government agencies?

19        A     No.

20        Q     You attended an FDA workshop in November

21   2018?

22        A     That's correct.

23        Q     Okay.  And did you have any interaction

24   with Johnson & Johnson related to that workshop?

25        A     No.
```

Ann G. Wylie, Ph.D.

```
1       Q     So you had no contact with Johnson &

2  Johnson at all related to that workshop.

3       A     No.

4       Q     Do you know who William Ashton is?

5       A     No.

6       Q     Do you have any -- did you ever work

7  with William Ashton?

8       A     No.

9       Q     Did you ever do any work for the -- the

10  Cosmetics Trade Association?

11       A     No.

12       Q     Okay.  I understand that you did do work

13  with respect to ASTM, correct?

14       A     Do work with respect -- I'm a member of

15  D22.

16       Q     Right.  And how long have you been a

17  member?

18       A     About three years.

19       Q     Three years?

20       A     Mm-hmm.

21       Q     And D22 meaning what?

22       A     That's the -- a committee that deals

23  with issues around asbestos.

24       Q     Okay.  Did you ever do any work with

25  ASTM related to talc other than on just asbestos?
```

Ann G. Wylie, Ph.D.

```
1        A      No.

2        Q      Did you ever work on any committees

3   dealing with talc or asbestos with respect for

4   the AS -- with respect to the ASTM?

5        A      Well, within the last three years I'm on

6   this committee, and there are -- there are

7   methods, draft methods that revolve around

8   identification of materials in talc, and that's

9   the ongoing business of the committee.

10       Q      Okay.  And are there any members of

11  Johnson & Johnson on that committee with you?

12       A      I don't know.

13       Q      Now, you are -- your degree is in

14  geology?

15       A      Yes.

16       Q      And you have a Ph.D. in geology?

17       A      Yes.

18       Q      Okay.  And the year you got your Ph.D.

19  is?

20       A      1972.

21       Q      And from where?

22       A      Columbia University.

23       Q      Okay.  And you're not an epidemiologist,

24  correct?

25       A      No.
```

Ann G. Wylie, Ph.D.

```
 1          Q     Okay.  You're not an expert in
 2   biological activity of substances' effect on the
 3   human body?
 4          A     No.
 5          Q     You're not a toxicologist?
 6          A     No.
 7          Q     Okay.  You have no medical degree?
 8          A     No.
 9          Q     Okay.  You've never performed any animal
10   studies yourself?
11          A     No.
12          Q     Okay.  You have no pathology experience,
13   correct?
14          A     No training, no.
15          Q     Okay.  When is the last ongoing research
16   that you did as a geologist?
17          A     I have ongoing research now.
18          Q     In what capacity?  Doing what?
19          A     I'm interested in the characteristics of
20   mineral dust that are known to cause mesothelioma
21   in particular.
22          Q     Okay.
23          A     And why the incidence of mesothelioma
24   among exposed populations varies.
25          Q     Tell me if you agree or disagree with
```

Ann P. Wylie, Ph.D.

```
 1    this statement.  Do you consider yourself, by the

 2    way, a job -- an earth scientist?

 3         A    That's a general term for a geologist.

 4         Q    Okay.  Do you agree with the statement

 5    that a job of earth scientist is not to decide

 6    what is toxic, but to assist the health committee

 7    and regulators -- health community and regulators

 8    by carefully describing the physical and chemical

 9    properties of natural materials?

10              MR. FROST:  Objection to form.

11              THE WITNESS:  I think I would agree with

12    that.

13              MR. PLACITELLA:  Okay.  Now, can we go

14    to --

15              (Counsel conferring.)

16              MR. FROST:  So, Chris, I take it this

17    screen in front of Dr. Wylie is --

18              MR. PLACITELLA:  Mm-hmm.

19              MR. FROST:  -- what's projected up

20    there?  Can you see the screen, Doctor?  Is that

21    big enough?

22              THE WITNESS:  If I get very close.

23              MR. FROST:  It seems very tiny.

24              MR. PLACITELLA:  I'll blow things up for

25    you.
```

1           THE WITNESS:  Okay.

2           (Wylie Exhibit No. AW-36 was

3           marked for identification.)

4   BY MR. PLACITELLA:

5      Q    What I'm describing to you is -- I have

6   it marked AW-36, and I'll have a copy made at the

7   break because I got this late last night.  This is

8   your curriculum vitae signed in January, it looks

9   like 1989.  Is that your signature?

10     A    It is.

11     Q    Okay.  And I just want to go through

12  with you your curriculum vitae.

13          In your curriculum vitae, it -- you have

14  listed a publication that you did for the American

15  Society of Testing and Materials.

16          Is that fair?

17     A    Yes.

18     Q    Okay.

19     A    They published it, yes.

20     Q    All right.  So you did have some

21  affiliation with the ASTM before three years ago.

22     A    That -- as I recollect, I was invited by

23  whoever was organizing this particular volume to

24  contribute, but I wasn't a member of ASTM at that

25  time.

Ann F. Wylie, Ph.D.

```
 1        Q      But you did work with them.

 2        A      I submitted a paper to this publication.

 3        Q      Okay.

 4        A      So I -- I wouldn't have interpreted your

 5   question working with them to assume that a

 6   publisher was working with them.

 7        Q      Well, you attended their conference?

 8        A      I -- I'm sorry, what conference?

 9        Q      Do you recall ever attending any

10   conferences for the ASTM more than --

11        A      I remember --

12        Q      -- three years ago?

13        A      I remember presenting this paper.

14        Q      Okay.

15        A      So, perhaps, but I didn't recollect it.

16        Q      Okay.  And in -- in your section

17   there is a -- or in your resume there's a section

18   on consulting.

19        A      Yes.

20        Q      Do you see that?

21        A      Yes, uh-huh.

22        Q      And it says that you consulted Avon

23   Products in 1973.

24        A      That's correct.

25        Q      And what was your consultation with Avon
```

Ann G. Wylie, Ph.D.

```
 1   Products in 1973?

 2       A    There was a new method being developed

 3   for identification of fiber in talc, and they

 4   asked me to review the methodology.

 5       Q    And Avon Products was a company that

 6   sold talc-containing products?

 7       A    I -- I -- I think so.

 8       Q    Okay.  You also have here consulting

 9   with R.T. Vanderbilt Company, and the first year

10   you have listed is 1977, and the last year you

11   have listed here is 1987.  Do you see that?

12       A    Yes.

13       Q    Have you consulted for R.T. Vanderbilt

14   after 1987?

15       A    I have done some mineral analysis for

16   them post this time.

17       Q    Okay.

18       A    And I gave a deposition for them, I

19   think post this time.

20       Q    Okay.  And in working for R.T.

21   Vanderbilt, did you work on them -- work for them

22   in the context of litigation related to the talc

23   that they sold?

24       A    I gave a deposition in a -- once for

25   that purpose.
```

1      Q     Okay.  And did you issue reports for

2   R.T. Vanderbilt that were litigation related?

3      A     I did mineral analysis for them.

4            I don't believe that I knew whether they

5   were litigation related or not.  But one of them

6   when they -- when the deposition was taken,

7   certainly those reports were part of that

8   litigation at that time.

9      Q     Okay.  And you have listed here, and I

10  have highlighted it, "Desert Mineral Products,

11  1979."  That's a company that sold talc, correct?

12     A     Yes.

13     Q     And what work did you do for Desert

14  Mineral Products in 1979?

15     A     I analyzed some samples of talc.

16     Q     And did that in any way relate to

17  litigation?

18     A     It related to an administrative hearing

19  in California.

20     Q     Okay.  Next you have listed United

21  States Mineral Products, 1981.  Do you see that?

22     A     Yes.

23     Q     That was a company that sold asbestos-

24  containing fireproofing?

25     A     I really don't remem- -- I don't know

Ann E. Wylie, Ph.D.

1    that.

2         Q    Do you remember they were from Stanhope,

3    New Jersey?

4              MR. FROST:  Objection to form.

5              THE WITNESS:  No.

6    BY MR. PLACITELLA:

7         Q    Do you ever remember dealing with a man

8    name -- named Jim Verhalen?

9         A    No.

10        Q    Okay.  Do you remember what you did for

11   United States Mineral Products in 1981?

12        A    I -- I must have analyzed a sample.

13        Q    What kind of samples?

14        A    I have absolutely no recollection.

15        Q    You have listed here Celotex

16   Corporation, 1986 and 1987.  Do you see that?

17        A    Yes.

18        Q    Celotex Corporation was a company that

19   manufactured asbestos-containing products,

20   correct?

21             MR. FROST:  Objection to form.

22             THE WITNESS:  I don't know that.

23   BY MR. PLACITELLA:

24        Q    What work did you do for Celotex in 1986

25   and 1987?

Ann D. Wylie, Ph.D.

```
 1        A    I assume I analyzed a sample.

 2        Q    Okay.  Well, when you put this resume

 3   together, what was the foundation for what you

 4   were listing?

 5             MR. FROST:  Objection to form.

 6   BY MR. PLACITELLA:

 7        Q    What did -- what records did you look

 8   at?

 9             MR. FROST:  Objection to form.

10             THE WITNESS:  I -- I don't remember.

11   BY MR. PLACITELLA:

12        Q    Okay.

13        A    Whatever -- I don't remember.

14        Q    Do you know whether you did -- the work

15   that you did for Celotex Corporation was related

16   to litigation?

17        A    I don't think so.  I don't remember.  My

18   work for any of these was primarily mineral

19   analysis.  It was not litigation.

20        Q    Okay.  And it says -- the next one you

21   list is GAF Corporation, 1986.  Do you see that?

22        A    Yes.

23        Q    Do you understand that they manufactured

24   asbestos-containing products?

25             MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

```
 1              THE WITNESS:  I don't believe I know

 2   that.

 3   BY MR. PLACITELLA:

 4       Q    Did you know that they owned an asbestos

 5   mine?

 6              MR. FROST:  Objection to form.

 7              THE WITNESS:  No.

 8   BY MR. PLACITELLA:

 9       Q    Okay.  Did you know that they owned an

10   asbestos mine in the state of Vermont?

11              MR. FROST:  Objection to form.

12              THE WITNESS:  I did not.

13   BY MR. PLACITELLA:

14       Q    Okay.  Do you know what work you did for

15   GAF Corporation?

16       A    As I indicated before, the only work I

17   did was -- in general, would be to analyze a

18   sample for asbestos.

19       Q    So they would give a sample of their

20   product to you and ask you to analyze it?

21       A    I have no idea what they gave me,

22   frankly.

23       Q    Next you have listed Keene Corporation,

24   1986 and 1987.  Do you know that they were a

25   manufacturer of asbestos-containing products?
```

Ann G. Wylie, Ph.D.

```
 1       A    No.

 2              MR. FROST:  Objection to form.

 3              THE WITNESS:  No.

 4  BY MR. PLACITELLA:

 5       Q    Okay.  And do you know what work you did

 6  for Keene Corporation?

 7       A    The only work I did for any of these,

 8  it's been a long time, is an analysis of samples

 9  for the presence of asbestos.

10       Q    The next one I have highlighted here is

11  Southern Talc.  That was a manufacturer and seller

12  of talc, correct?

13              MR. FROST:  Objection to form.

14              THE WITNESS:  Yes.

15  BY MR. PLACITELLA:

16       Q    Okay.  And what did you do for them?

17       A    I did analysis of samples that they sent

18  me for the presence of asbestos.

19       Q    Okay.  And did you do an analysis --

20  when you did your -- when you said you did

21  analysis for Celotex, GAF and Keene, was that all

22  for the presence of asbestos?

23              MR. FROST:  Objection to form.

24              THE WITNESS:  To the best of my

25  recollection.
```

Ann L. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q    Okay.  And when people hire you, do you

 3   ever ask them what the nature of their business

 4   is?

 5        A    No.

 6        Q    Okay.  I noticed in your current CV that

 7   U.S. Mineral, Celotex, GAF and Keene are no longer

 8   on your CV; is that correct?

 9        A    That's correct.

10        Q    Why is that?

11        A    The academic -- the form of the

12   university's CVs don't ask for consulting, and

13   this is my university CV.

14        Q    Okay.  Did R.T. Vanderbilt play a role

15   in your securing tenure at the University of

16   Maryland?

17             MR. FROST:  Objection.

18             THE WITNESS:  No.

19   BY MR. PLACITELLA:

20        Q    Did R.T. Vanderbilt write a letter in

21   support of your tenure at the University of

22   Maryland?

23        A    The promotion and tenure process at the

24   University of Maryland requests letters

25   anonymously.  They don't tell me.  They don't tell
```

Ann G. Wylie, Ph.D.

1    the candidate.  So they -- they request letters,

2    and the letters come in, and the candidate does

3    not necessarily know who was invited to provide

4    letters.

5         Q    But as you sit here today, do you know

6    that R.T. Vanderbilt actually wrote to the

7    University of Maryland in support of your tenure?

8              MR. FROST:  Objection to form.

9              THE WITNESS:  Someone told me that

10   sometime ago, but I actually only learned of it

11   recently.

12   BY MR. PLACITELLA:

13        Q    And how did you learn of it?

14        A    Someone -- someone told me who had been

15   in a case somewhere, and I can't remember exactly

16   who told me.  I -- or why it was even a subject of

17   discussion since I wasn't involved, and I think

18   that was the reason why they told this subject had

19   come up.

20        Q    Who was the chairman -- your chairman at

21   the time when you secured tenure at the University

22   of Maryland?

23        A    Galt Siegrist.

24        Q    And are you aware that your chairman

25   actually wrote to R.T. Vanderbilt and advised them

Ann G. Wylie, Ph.D.

```
 1    that their recommendation, quote, will constitute

 2    the most important document to be used in the

 3    entire promotion and tenure process?

 4              MR. FROST:  Objection to form.

 5    BY MR. PLACITELLA:

 6         Q    Are you aware of that?

 7         A    No.

 8         Q    You never heard that before?

 9         A    No.

10         Q    Am I correct that R.T. Vanderbilt has

11    funded graduate student research for your

12    department?

13         A    Yes.

14         Q    And they've funded that in excess of a

15    half a million dollars?

16         A    No.

17         Q    Do you ever recall testifying in the

18    Westin case?

19         A    That -- the name doesn't ring any bells,

20    so...

21         Q    Do you ever recall -- did you -- have

22    you ever learned that R.T. Vanderbilt funded your

23    student research for over $500,000?  You never

24    heard that before?

25         A    That's simply not the case.
```

Ann   M. Wylie, Ph.D.

```
 1          Q     Okay.  Did you ever appear in a film for

 2    R.T. Vanderbilt that was used for Vanderbilt's

 3    lobbying purposes?

 4                MR. FROST:  Objection to form.

 5                THE WITNESS:  I did appear in a film for

 6    them.

 7    BY MR. PLACITELLA:

 8          Q     And that was used for lobbying by them?

 9          A     I don't know.

10          Q     And have you ever received research

11    grants from Southern Talc Company?

12          A     Yes.

13          Q     Okay.  And --

14          A     One.

15          Q     In excess of $17,000?

16          A     That would be correct.

17          Q     Have you ever seen -- received research

18    grants from Ford Motor -- General Motor and

19    Chrysler?

20          A     Yes.

21          Q     Okay.  And you know that they made

22    asbestos-containing products, correct?

23                MR. FROST:  Objection to form.

24                THE WITNESS:  I didn't know they made

25    them.
```

Ann E. Wylie, Ph.D.

1    BY MR. PLACITELLA:

2        Q    Okay.  You didn't know they made

3    asbestos-containing brakes?

4        A    I thought they used them.  I didn't know

5    they made them.

6        Q    Okay.  And did the research grants that

7    you received from the automotive industry total

8    somewhere in excess of a half a million dollars?

9        A    It did, yes.

10        Q    Now, you have been, I know, asked and

11    you have testified before Congress on more than

12    one occasion, correct?

13        A    Once only, I think.

14        Q    And you testified before a Senate

15    Committee?

16        A    That would be correct, yes.

17        Q    Okay.  During your testimony before the

18    Senate Committee, did -- did members of the Senate

19    raise concerns with the statements you were

20    providing to them concerning your ties to

21    industry?

22            MR. FROST:  Objection to form.

23            THE WITNESS:  That one senator did ask a

24    question of me about my ties to industry.

25    BY MR. PLACITELLA:

Ann G. Wylie, Ph.D.

```
 1        Q    Right.  And -- and you denied that you
 2   had any connection or any ties or did any work for
 3   any asbestos-containing product manufacturer,
 4   correct?
 5        A    No.
 6             MR. FROST:  Objection to form.
 7             THE WITNESS:  The -- the question -- let
 8   me go back.
 9             The hearing was about a banned asbestos
10   bill, and I testified on that bill.  I didn't
11   testify against the bill.  In fact, I would be in
12   favor of such a bill.
13             I testified to ask the Senate to expand
14   the definitions of "asbestos," include more
15   minerals than are currently in the regulatory
16   policy and identification, because I thought that
17   there were other forms of amphibole that form
18   asbestos and should have been included in the law.
19   So that was the one point that I made.
20             And the other point was that we needed
21   definitions that would enable us to discriminate
22   asbestos from non-asbestos forms of the same
23   mineral, and I urged them to do so.
24             MR. PLACITELLA:  Respectfully, ma'am, I
25   move to strike your testimony.
```

Ann_for_Wylie_, Ph.D.

```
1   BY MR. PLACITELLA:

2        Q    What was my question?

3        A    I'm not exactly sure.

4        Q    Okay.  Well, let me show you your

5   testimony.

6        A    All right.

7        Q    Okay?  You were asked:  "Have you worked

8   for businesses that make money selling products

9   that may have caused disease associated with

10  asbestos?"

11           Do you see that?

12       A    Yes.

13           MR. FROST:  I'm going to object to the

14  form on this one.  This doesn't look like an

15  official transcript from the Senate hearing.

16           MR. PLACITELLA:  Well, if you have the

17  official one, I'm happy to put it up.  Or if you

18  think somehow it's misstatement -- a misstatement,

19  I'm happy to correct it.

20           MR. FROST:  I'm just preserving for the

21  record.

22           MR. PLACITELLA:  That's fine.

23           MR. FROST:  I have no ability at this

24  time --

25           MR. PLACITELLA:  Okay.
```

Ann D. Wylie, Ph.D.

```
 1              MR. FROST:  -- to verify that, but this

 2    certainty does not look like a transcript that

 3    would have been generated by the United States

 4    government.

 5              MR. PLACITELLA:  Okay.

 6    BY MR. PLACITELLA:

 7       Q    And your answer was:  "No."

 8              And the senator said:  "Well, I have a

 9    number of receipts that show you've worked as a

10    paid defense witnesses -- witness for businesses

11    in asbestos litigation, and I must consent that

12    these documents be put into the record, minding

13    you answer my question honestly."

14              Do you remember what year this testimony

15    was, by the way?

16       A    Sometime around 2003 or something like

17    that.

18       Q    And it says:  "I did.  I've never worked

19    for an asbestos manufacturer."

20              And you said -- and then the question

21    was:  "I didn't say that."

22              And you said:  "Or an asbestos

23    fabricator."

24              And the question was:  "I didn't ask you

25    that.  I said, Have you ever worked as a paid
```

Ann B. Wylie, Ph.D.

```
 1   defense witness for a business in asbestos

 2   litigation?"

 3           Your answer is:  "I have testified on --

 4   on or about three occasions for, uh, on the nature

 5   of materials involved."

 6           And you wrote -- and the question was:

 7   "Who paid you?"

 8           Answer:  "R.T. Vanderbilt, three times

 9   or thereabouts.

10           Senator:  "So your original answer was

11   incorrect?

12           You said:  "I -- I misunderstood."

13           And the senator said:  "Okay.  Well, let

14   me be clear, I think it's very important that we

15   determine before this committee" --

16           And you said:  "I agree."

17           Now, what I want to do is focus on

18   your -- your testimony a little further up where

19   it says:  "I -- I did.  I never worked for an

20   asbestos manufacturer or an asbestos fabricator."

21   Do you see that?

22       A    Yes.

23       Q    Okay.  When you gave that testimony, you

24   had already worked for United States Mineral

25   Corporation, Celotex Corporation, GAF Corporation,
```

Ann D. Wylie, Ph.D.

```
 1    and Keene Corporation, correct?

 2         A    Yes.

 3         Q    And when you gave that testimony, you

 4    had all -- you had actually put that on your CV,

 5    correct?

 6         A    Yes.

 7         Q    Okay.  Now, let me ask you, focusing on

 8    your methodology in this case, tell -- tell me

 9    what methodology you used or you employed in

10    arriving at your opinions in this case.

11              MR. PLACITELLA:  Can you get me the

12    ELMO?

13              THE VIDEOGRAPHER:  Sure.

14              THE WITNESS:  In -- in this --

15    BY MR. PLACITELLA:

16         Q    Yes, ma'am, in this case.

17         A    Okay.  All right.

18         Q    And I -- I'm going to write it down so

19    we have it.  Okay?

20         A    What methodologies?  I reviewed the

21    literature, I did a literature search.

22         Q    Okay. Hold on.  Okay.  Reviewed

23    literature.

24         A    Mm-hmm.  And I reviewed the reports by

25    MAS, Longo's and Rigler's reports.
```

Ann F. Wylie, Ph.D.

```
 1        Q     Anything else?

 2        A     I don't think so, no.

 3        Q     Okay.  So your methodology --

 4        A     I also reviewed two reports that were

 5   not published literature by Dr. Pooley and

 6   associates on the -- his reports on the mines in

 7   Vermont and in Italy.  So that --

 8        Q     Okay.  So, one, you reviewed literature.

 9   Two, you reviewed reports of Longo?

10        A     Yes.

11        Q     And, three, you reviewed unpublished

12   reports of Dr. Pooley.  Correct?

13        A     That's correct.

14        Q     Okay.  And where did you get those?

15        A     From Mr. Frost.

16        Q     So they came from Mr. Frost?

17        A     Yes.

18        Q     Okay.  Anything else?

19        A     No.

20        Q     So I'm just going to write here,

21   "Nothing else."

22              MR. FROST:  Objection to form.

23   BY MR. PLACITELLA:

24        Q     Okay.  Now, did you do any testing

25   related to Johnson & Johnson products?
```

Ann G. Wylie, Ph.D.

```
 1        A    No.

 2        Q    Okay.  Did you request to do any testing

 3   related to Johnson & Johnson products?

 4        A    No.

 5        Q    Okay.  Did you review any internal

 6   testing done by Johnson & Johnson of its

 7   talc-related products?

 8        A    No.

 9        Q    Did you ask to review any internal

10   testing done by Johnson & Johnson of its talc-

11   related products?  And what I mean testing, I mean

12   for asbestos.

13        A    No.

14        Q    Okay.  You said that you reviewed the

15   literature.  How did you do that?  The published

16   literature.

17        A    Yes.  I had literature, which I looked

18   at.  I did a search on GeoRef, which is a database

19   for geological information.

20        Q    Okay.  I noticed from looking at your

21   report that you also searched the internet for

22   pictures.

23        A    Yes.

24        Q    All right.  So you downloaded some

25   photos from the internet.
```

Ann G. Wylie, Ph.D.

```
 1        A     From the United States Geological

 2   Survey, yes.

 3        Q     Okay.  Am I correct that you didn't

 4   review any internal testing of sources of

 5   Johnson & Johnson talc other than the two Pooley

 6   reports given to you by Mr. Frost?

 7        A     That's --

 8              MR. FROST:  Objection to form.

 9              THE WITNESS:  That is correct.

10   BY MR. PLACITELLA:

11        Q     Did you ask Mr. Frost whether he had

12   supplied you with all of the relevant internal

13   testing of the Johnson & Johnson sourced mines?

14              MR. FROST:  Objection to form.

15              THE WITNESS:  I asked if there were any

16   descriptions of the ore deposits themselves, but I

17   did not ask for reports of product testing.

18   BY MR. PLACITELLA:

19        Q     What about of the mine reports for

20   asbestos in the mines, did you ask for that?

21        A     No.

22        Q     Did you speak to any of the scientists

23   at Johnson & Johnson?

24        A     No.

25        Q     Did you make an effort to determine
```

1   whether the opinions that you were giving in this

2   case agree or disagree with Johnson & Johnson's

3   own scientists?

4        A    No.

5        Q    Did you make an effort to determine

6   whether the opinions you were giving in this case

7   agree or disagree with other experts hired by

8   Johnson & Johnson?

9        A    No.

10       Q    Okay.  Now, I looked at your report,

11  which -- do you have a copy with you?

12       A    I do.

13            (Wylie Exhibit No. AW-44 was

14            marked for identification.)

15  BY MR. PLACITELLA:

16       Q    Okay.  When I looked at your report --

17  which I have marked here as AW-44 -- do you see

18  that?

19       A    Yes.

20       Q    Okay.  And when I look at the first 20

21  pages of your report, I could only find four

22  references to studies in your report that were

23  done by somebody other than yourself.  Is that

24  accurate?

25            MR. FROST:  Objection to form.

Ann G. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q    So let me -- let's walk -- walk through

 3   it.

 4        A    All right.

 5        Q    You see on page 3, there was -- you had

 6   a reference to a Kerrigan study from '17?

 7        A    Yes.

 8        Q    So let's just walk through it.  So

 9   page 1, nothing.  No reference to any studies.

10             MR. FROST:  Objection.  That's the

11   Summary of Opinions.

12   BY MR. PLACITELLA:

13        Q    Just making sure we're doing the right

14   counting.  Nothing on page 1?

15        A    No.

16        Q    Nothing on page 2?

17             MR. FROST:  Same objection.

18   BY MR. PLACITELLA:

19        Q    Correct?

20             I'm just focusing on studies other than

21   citing to yourself.

22        A    Yes, mm-hmm.

23        Q    Okay.  On page 3, I found one, but

24   actually you were part of that study as well.  You

25   just cited it as Kerrigan, et al., on the bottom,
```

Ann G. Wylie, Ph.D.

```
 1   correct?

 2        A    Yes.

 3        Q    All right.  So that would be -- I'll

 4   take that one out.

 5             So none on page 4.

 6        A    There is a reference on page 4, but it

 7   is to my work with that --

 8        Q    Right.  I'm just looking for research

 9   that you did that -- where you found studies to

10   support your conclusions other than citing

11   yourself.  Okay?

12             So nothing on page 4?

13        A    Correct.

14        Q    Okay.  Nothing on page 5?

15        A    That's correct.

16        Q    Nothing on page 6?

17        A    That's correct.

18        Q    You do cite a study on page 7 of 2007

19   concerning rocks around Mount Etna?

20        A    Correct.

21        Q    Okay.  Well, that has -- that doesn't

22   relate to any of the mines at issue in this case,

23   though, correct?

24        A    That's correct.

25        Q    Okay.  Nothing on page 8?
```

Ann F. Wylie, Ph.D.

```
 1          A    I cite EOS.  That's a publication.

 2          Q    Okay.

 3          A    And on page 7, I cite the U.S.

 4   Geological Survey.

 5          Q    Okay.  Let's make sure we get that

 6   right.

 7               That's here (indicating)?

 8          A    Yes.

 9          Q    Okay.  This you cite -- well, let's go

10   back to page 7.  The citation you have on page 7

11   to the U.S. Geological Survey, that does not

12   relate to any of the mines at issue in this case,

13   correct?

14          A    Correct.

15          Q    Okay.  On page 8, you point out that --

16   you cite EOS.  That has to do with mines not

17   involved in this case, correct?

18          A    That's --

19               MR. FROST:  Objection to form.

20               THE WITNESS:  -- correct.

21   BY MR. PLACITELLA:

22          Q    All right.  Page 9, anything?

23          A    The Geological Survey is cited.

24          Q    That's where you downloaded the photo.

25          A    Correct.
```

Ann G. Wylie, Ph.D.

```
 1        Q    Okay.  Does that have anything that's
 2   directly at issue in this case?
 3        A    That's a complicated question.
 4        Q    Well, let me rephrase it.  It was a bad
 5   question.
 6             Does this relate directly to any of the
 7   mines at issue in this case?
 8        A    No.
 9        Q    Okay.  Don't see anything on page 10?
10        A    Yeah, mm-hmm.
11        Q    On page 11, you cite NIOSH and Weill.
12   Are you involved in that Weill paper?
13        A    What page are we on again, please?
14        Q    Page 11.
15        A    I cite -- yes, that's the editor of the
16   journal, special issue of the journal in
17   Toxicology and Applied Pharmacology, and I am an
18   editor, yes.
19        Q    Okay.  So you were a part of that paper.
20        A    It's not a paper.  It's a -- well, it's
21   this chart.
22        Q    Okay.
23        A    Yes.
24        Q    I'll leave it on there.
25             You cite NIOSH.
```

Ann D. Wylie, Ph.D.

```
 1        A    Yes.

 2        Q    Okay.  None of these citations directly

 3   relate to mines at issue in this case, correct?

 4        A    That -- I believe that that -- what

 5   you're asking me, is there anything about these,

 6   Italian mine or the Vermont mine in these

 7   publications.

 8        Q    Correct.

 9        A    That would be correct.

10        Q    Okay.  You cite on page 13 to an article

11   by Crane.  Did the Crane article have anything to

12   do with the Italian or Vermont mine?

13        A    No.

14             MR. FROST:  Objection.

15   BY MR. PLACITELLA:

16        Q    Okay.  Page 14, anything on page 14 have

17   anything directly to do with the Italian or

18   Vermont mine at issue in this case?

19        A    Any of the citations?

20        Q    Yes, ma'am.

21        A    No.

22        Q    Okay.  I should call you "Doctor."

23   I'm -- I apologize.

24        A    That's all right.

25        Q    Page 15, you cite to the report of
```

Ann G. Wylie, Ph.D.

```
 1    Dr. Longo and Rigler, correct?

 2         A    That's correct.

 3         Q    All right.  But to no external research

 4    that you've done to support your opinions in this

 5    case, correct?

 6              MR. FROST:  Objection to form.

 7              THE WITNESS:  That's a complicated

 8    question.

 9    BY MR. PLACITELLA:

10         Q    Well, you don't have any citations on

11    page 15.

12         A    That's correct.

13         Q    Okay.

14         A    That's correct.

15         Q    Okay.  Same question with respect to 16.

16         A    That's correct.

17              MR. FROST:  I'll object to that, that

18    there are citations.

19              MR. PLACITELLA:  Please object to form,

20    and -- and leave it at that.

21              MR. FROST:  Okay.  I'll object to form.

22              MR. PLACITELLA:  Okay.  Thank you.

23    BY MR. PLACITELLA:

24         Q    Page 17, do you have any citations to

25    any studies or literature related to the mines at
```

Ann G. Wylie, Ph.D.

```
 1    issue in this case?

 2              MR. FROST:  Same objection.

 3              THE WITNESS:  No.

 4    BY MR. PLACITELLA:

 5         Q    Okay.  Page 18, you mention the Val

 6    Chisone deposit, correct?

 7         A    Chisone Valley, yes.

 8         Q    Right.  But there are no citations to

 9    any literature related to that on this page,

10    correct?

11         A    Correct.

12         Q    Okay.  On page 19, you have a citation

13    to a work by Sanford in 1982, correct?

14         A    That is correct.

15         Q    That does not relate to any of the

16    mines that -- that does not involve any of the

17    mines at issue in this case, correct?

18         A    No.  Not directly, no.

19         Q    Okay.  Then on page 20, you have the --

20    a citation to Dr. Pooley.  Correct?

21         A    Yes.

22         Q    That was the study that you referred to

23    that was given to you by Mr. Frost?

24         A    That is correct.

25         Q    Okay.  So am I correct that for the
```

Ann G. Wylie, Ph.D.

```
1    first 20 pages of your report, you do not have any

2    citation that is -- directly relates to the mines

3    at issue in this case other than the one report

4    given to you by Mr. Frost?

5              MR. FROST:  Objection to form.

6              THE WITNESS:  There are no citations

7    that specifically relate to -- that specifically

8    mention those deposits.

9    BY MR. PLACITELLA:

10        Q    Okay.  Then on page 21, you do have some

11   citations that relate to the mines at issue in

12   this case, correct?

13        A    Chidester and Gilson.

14        Q    Correct.

15        A    The Argonaut Mine, is -- is that one of

16   the mines?

17        Q    Yes, ma'am.

18        A    So the Chidester article does relate

19   directly to that.

20        Q    Okay.

21        A    Gilson is a little less clear in exactly

22   what the -- you know, what he's describing.  He

23   describes many, many, many occurrences.  So I

24   don't know whether he directly identifies those

25   mines.  He does talk about Windsor County.
```

Ann H. Wylie, Ph.D.

1      Q     Okay, I'll give you that one.

2            Okay.  So let's just focus on these two

3   studies.  Assuming that the evidence in this case

4   is that Johnson & Johnson did not use any Vermont

5   talc before the 1960s, none of the references in

6   your paper directly relate to Vermont talc used

7   before 1960, correct?

8            MR. FROST:  Objection to form.

9   BY MR. PLACITELLA:

10     Q     Well, let me ask the question

11  differently.  It was a bad question.

12           You do not have any references

13  concerning Vermont talc in your report that

14  postdate 1960, correct?

15           MR. FROST:  Objection to form.

16           THE WITNESS:  The Pooley reports

17  postdate that.

18  BY MR. PLACITELLA:

19     Q     I thought the Pooley report that you are

20  citing referenced the Italian talc.

21     A     Oh, there's also a Pooley report that

22  describes the deposits in Ludlow -- around Ludlow,

23  Vermont.

24     Q     Okay.  I don't see that in your report.

25  Where --

Ann G. Wylie, Ph.D.

```
 1        A    It's in my reference list.

 2        Q    But in your report, which comprises and

 3   supports your opinions in this case, you do not

 4   mention any Pooley report related to the Vermont

 5   mines, correct?

 6             MR. FROST:  Objection to form.

 7             THE WITNESS:  That's incorrect.  On

 8   page 20, the subtitle is "Comments on Windsor

 9   County Talc Deposits."

10   BY MR. PLACITELLA:

11        Q    Oh, great.  Okay.

12        A    And I reference Pooley, 1972.

13        Q    Okay, great.

14             So the only reference that you have

15   concerning the Vermont mines that postdates 1960

16   is an unpublished report from Pooley that was

17   given to you by counsel for Johnson & Johnson,

18   correct?

19        A    That would be --

20             MR. FROST:  Objection to form.

21             THE WITNESS:  That would be correct.

22   BY MR. PLACITELLA:

23        Q    Okay.  And -- now, let me just go down

24   to your references for the Val Chisone, Italy

25   deposits.  Do you see that?
```

Ann G. Wylie, Ph.D.

```
 1      A    Yes.

 2      Q    It's on page 21.

 3      A    Yes.  Mm-hmm.

 4      Q    Okay.  You cite to Lightfoot, et al.,

 5  1972.  Was that a published paper?

 6      A    No.  That is the report that Pooley

 7  was -- participated in, but in the reference list

 8  Lightfoot is the first author.

 9      Q    Okay.  So that's an unpublished report.

10      A    That is correct.

11      Q    Okay.  And not peer reviewed.

12      A    No.

13      Q    Okay.  And the other Pooley report that

14  you cited to concerning the Windsor mines, that

15  was not peer reviewed, correct?

16      A    No.  No.

17      Q    Okay.  So I see further that -- by the

18  way, do you know when Johnson & Johnson stopped

19  purchasing talc from its -- the Italian source for

20  use in the United States?

21      A    I think you just told me, didn't you?

22      Q    No.  Italian source.

23      A    Oh.  No.

24      Q    Would that be relevant to your opinions?

25      A    I didn't -- no.  I -- perhaps.
```

1        Q    Okay.  Am I correct that time frame

2   matters in terms of when -- the relevance of

3   sampling done in a mine?

4             MR. FROST:  Objection.

5   BY MR. PLACITELLA:

6        Q    It's relevant.

7        A    It's relevant.

8        Q    All right.  Because you can take a

9   sample from one level of a mine, for example,

10  being explored in 1927, and that may have

11  different results from a level of a mine that was

12  the same mine that was sampled in 1967.

13       A    It -- it would depend on the mine, but

14  in general, I think you'd have to assume the

15  possibility of variation with time.

16       Q    Okay.  Thank you.

17            Am I correct that your report does not

18  cite to a single published study concerning the

19  Italian mines that postdates 1975?

20       A    That would be incorrect.

21       Q    Okay.  Please show me -- oh, you're

22  correct.

23            Let me ask the question again.  Any

24  citation concerning an Italian mine that you have

25  in your report postdates 1975 for published

Ann __, Ph.D.

1   literature, correct?

2            MR. FROST:  Objection to form.

3            THE WITNESS:  There are several articles

4   postdate 1975 that deal directly with the Fontaine

5   mine.

6   BY MR. PLACITELLA:

7        Q    Yes.

8        A    Yes.

9        Q    But all of your citations that support

10   your conclusions concerning the Italian mine in

11   terms of public -- published literature postdate

12   1975, correct?

13            MR. FROST:  Objection to form.

14            THE WITNESS:  Yeah, I think that's

15   correct.

16   BY MR. PLACITELLA:

17        Q    Okay.  Now, you cite -- by the way, do

18   you recall you cited to the Chidester article in

19   1951?

20        A    Yes.

21        Q    Okay.  Do you know what test methods

22   Dr. Chidester used in 1951?

23        A    I do not.

24        Q    Okay.  And were you aware -- or you

25   cited also to the Argonaut Mine as an example in

Ann B. Wylie, Ph.D.

```
 1   your report.
 2              MR. FROST:  Objection to form.
 3              THE WITNESS:  Yes.
 4   BY MR. PLACITELLA:
 5        Q    And -- what page was that?
 6        A    Page 21.
 7        Q    You say that Pooley -- the Pooley
 8   article you referenced for -- for Vermont was
 9   1972, correct?
10        A    That -- that's correct.
11        Q    Okay.  And then you state on page 21
12   that:  "Pooley's detailed descriptions are
13   consistent with published descriptions of talc
14   mines in the Ludlow, Vermont area.  The minerals
15   list in the ore from several mines, including
16   Argonaut Mine by mindat.org."
17              Do you see that?
18        A    Yes.
19        Q    Okay.  What is mindat.org?
20        A    It's a mineral database that's -- lists
21   information about a mineral, any mineral that you
22   want, and they -- in this particular case, they
23   included the Argonaut Mine in the list of
24   minerals.
25        Q    Okay.  But you didn't do any independent
```

Ann E. Wylie, Ph.D.

```
 1    research concerning the Argonaut Mine --

 2         A    I did not.

 3         Q    -- other than that.

 4              And were you aware when you were putting

 5    your report together that the Argonaut Mine did

 6    not open until 1974?

 7              MR. FROST:  Objection to form.

 8              THE WITNESS:  No.

 9    BY MR. PLACITELLA:

10         Q    Would that have been relevant to the

11    consideration of your opinions in this case?

12              MR. FROST:  Objection.

13              THE WITNESS:  Well, perhaps, but I knew

14    there were mines other than the Argonaut Mine

15    providing material.  So...

16    BY MR. PLACITELLA:

17         Q    Well, I understand that, but you picked

18    Argonaut as an example.  Why did you pick

19    Argonaut?

20         A    It's the only thing I could find.

21         Q    Okay.  Well, did Johnson & Johnson ever

22    tell you that they had core sampling results for

23    the Argonaut Mine?

24              MR. FROST:  Objection to form.

25              THE WITNESS:  No.
```

Ann K. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q    Would that have been relevant to your

 3   opinions?

 4             MR. FROST:  Objection.

 5             THE WITNESS:  No.

 6   BY MR. PLACITELLA:

 7        Q    So if Johnson & Johnson had core

 8   sampling results showing there was asbestos in the

 9   Argonaut Mine, that would have no relevance to

10   your opinions?

11             MR. FROST:  Objection to form.

12             THE WITNESS:  It -- no.

13   BY MR. PLACITELLA:

14        Q    Why not?

15        A    Because I was asked to review the

16   literature.  I -- I had a very specific

17   assignment.

18        Q    Okay.  But I'm -- as a scientist, would

19   it matter to you that you were asked to provide a

20   report concerning the likelihood of asbestos being

21   in a Johnson & Johnson mine, and Johnson & Johnson

22   had testing of that mine and never revealed it to

23   you?

24             MR. FROST:  Objection to form.

25             THE WITNESS:  No.
```

Ann G. Wylie, Ph.D.

```
 1    BY MR. PLACITELLA:

 2         Q    Okay.  You say in your report -- well,

 3    let's just go to the summary in your report, your

 4    summary of your opinions -- you state in your

 5    report:  "Based upon their geologic settings,

 6    reports from mine geologists and literature,

 7    descriptions of the ore deposits provided in

 8    cosmetic talc for the relevant body powder, it is

 9    unlikely that asbestos could be found in the talc

10    mines -- in the talc products from these mines."

11    Correct?

12              MR. FROST:  Where are you reading from,

13    Chris?

14              THE WITNESS:  Please show me where you

15    are.

16              MR. PLACITELLA:  Why don't we take a

17    break, and I'll highlight it and move it faster

18    that way.  How's that?

19              MR. FROST:  Sounds good.  Let's take a

20    break.

21              THE VIDEOGRAPHER:  The time is

22    10:14 a.m.  We're going off the record.

23              (Recess.)

24              THE VIDEOGRAPHER:  The time is 10:27

25    a.m., and we are back on the record.
```

Ann, Dr. Wylie, Ph.D.

```
1    BY MR. PLACITELLA:

2        Q    Okay.  I believe you told me that

3    information in possession of the Johnson & Johnson

4    concerning whether there was asbestos in the

5    Johnson & Johnson talc mines was irrelevant to you

6    because it was not part of your charge.  Is that

7    your testimony?

8                MR. FROST:  Objection to form.

9                THE WITNESS:  My charge was to review

10   the literature and the reports by Drs. Longo and

11   Rigler.  So it did not include requests to review

12   anything else.

13   BY MR. PLACITELLA:

14       Q    But you did review unpublished reports

15   provided to you by counsel of Dr. Pooley related

16   to the mines at issue, correct?

17       A    I did.

18       Q    Okay.  So those unpublished reports were

19   relevant to your opinions according to your own

20   report, correct?

21               MR. FROST:  Objection.  Form.

22               THE WITNESS:  They were relevant

23   particularly because of the paucity of data in the

24   literature.

25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
 1       Q    And if Johnson & Johnson had more data
 2   in addition to the Pooley reports, that certainly
 3   would have been relevant to your opinions, just
 4   like the Pooley reports were relevant to your
 5   opinions, correct?
 6             MR. FROST:  Objection to form.
 7             THE WITNESS:  I was not asked to review
 8   testing of materials other than the description of
 9   the geology of the mine.
10   BY MR. PLACITELLA:
11       Q    Doctor, you just told me that the Pooley
12   reports were relevant to your opinions, and in
13   fact, you put them in your report, correct?
14       A    Correct.
15       Q    And if Johnson & Johnson had additional
16   reports concerning analysis of their mine, that
17   certainly would have been relevant to your
18   opinions, just like the Pooley reports were,
19   correct?
20             MR. FROST:  Objection.
21             THE WITNESS:  I was asked to review the
22   basic geology of the mine and the geologic setting
23   of the deposits, and testing reports of products
24   are not relevant.
25   BY MR. PLACITELLA:
```

Ann D. Wylie, Ph.D.

```
1        Q    Ma'am, I'm not talking about products.

2   I'm talking about testing reports related to what

3   was coming out of the mine.

4        A    Oh, I -- I'm sorry --

5             MR. FROST:  Objection to form.

6             THE WITNESS:  -- I misunderstood.

7   BY MR. PLACITELLA:

8        Q    All right.  So if Johnson & Johnson had

9   other testing reports like Pooley's concerning

10  what was coming out of the mine, that certainly

11  would have been relevant to your opinions,

12  correct?

13            MR. FROST:  Objection.

14            THE WITNESS:  It's very hard to say

15  without seeing them.

16  BY MR. PLACITELLA:

17       Q    But you were not provided any reports

18  other than the select report from Dr. Pooley,

19  correct?

20            MR. FROST:  Objection to form.

21            THE WITNESS:  I was only provided the

22  two reports by Dr. Pooley.

23  BY MR. PLACITELLA:

24       Q    Did you ask counsel for Johnson &

25  Johnson, were there any other similar reports of
```

Ann D. Wylie, Ph.D.

1   the Vermont mine other than Dr. Pooley?

2          MR. FROST:  Objection.

3          THE WITNESS:  I asked if -- if there --

4   let me just say what I -- I asked if they had any

5   other information on the geology of the deposits.

6   BY MR. PLACITELLA:

7      Q    And the response was what?

8      A    No.

9      Q    Now -- okay.  I want -- I want to just

10  make sure I got one of the things you said before

11  correct.  Is it your opinion that the geology of

12  all the talc mines in Vermont would be essentially

13  the same?

14     A    It is not.

15     Q    It is not.  Okay.

16          And how would it differ?

17     A    The minerals that are present vary in

18  abundance and in what they are, the identity of

19  the mineral.

20     Q    Okay.  Now, I want to just go back to

21  your report what we were talking about when we

22  broke.  I want to ask you about some statements in

23  your report.

24          You state in your report as a basis for

25  your report, correct --

Ann D. Wylie, Ph.D.

```
 1        A      I'm sorry.  Would you please --

 2        Q      I'm sorry.  Page 4.

 3               "Talc ore is mined for both industrial

 4   and cosmetic use but from different ore bodies and

 5   in different mines."

 6               And then you say:  "Talc ore used for

 7   cosmetic purposes, however, is different."  See

 8   that?

 9        A      Yes.

10        Q      Did Johnson & Johnson tell you that they

11   obtained the talc for industrial use and cosmetic

12   use from the exact same mine in Vermont?

13               MR. FROST:  Objection to form.

14               THE WITNESS:  No.

15   BY MR. PLACITELLA:

16        Q      Did they tell you the opposite?

17        A      No.

18        Q      Okay.

19               (Exhibit J&J-188 was presented to

20               the witness.)

21   BY MR. PLACITELLA:

22        Q      I'm going to show you what's been marked

23   J&J 188.  I'm going to put it on the iPad --

24   sorry.  Got to find a better way to do that.

25               THE VIDEOGRAPHER:  I will pass it over
```

Ann G. Wylie, Ph.D.

```
 1    for you, Counsel.

 2              MR. PLACITELLA:  Okay, thanks.

 3    BY MR. PLACITELLA:

 4        Q    J&J 188 is -- attaches an affidavit from

 5    the president of Windsor Minerals, which is a

 6    Johnson & Johnson subsidiary that owned the

 7    Johnson & Johnson mine.  See that, from Roger

 8    Miller?

 9              And that was submitted in Middlesex

10    County, New Jersey, as part of a basis by Johnson

11    & Johnson to request that the plaintiff dismiss

12    their case as reflected on the first page.  Do you

13    see that?

14              MR. FROST:  Objection to form.

15    BY MR. PLACITELLA:

16        Q    It says:  "Enclosed please find" --

17    here, let's blow it up.

18              It says:  "Enclosed please find an

19    affidavit on behalf of Windsor Minerals, signed by

20    Roger N. Miller, President of Windsor Minerals

21    since 1968:  Do you see that?

22              Then it goes on and says:  "I trust that

23    these documents will now enable you to sign a

24    Dismissal as was done in the Yuhas file.  I have

25    taken the liberty of drafting the Dismissal and
```

Ann D. Wylie, Ph.D.

1    enclosing the same for your signature, along with

2    a self-addressed envelope."

3              Do you see that?

4        A    Yes.

5        Q    And then the affidavit of Johnson &

6    Johnson is attached.  Do you see that?

7              MR. FROST:  Objection to form.

8    BY MR. PLACITELLA:

9        Q    And the affidavit on page -- on

10   paragraph 2 states:  "The exclusive business of

11   Windsor Minerals is/has been for the last 18 years

12   the mining and milling of talc from a single

13   mining district in Windsor, Vermont.  The mining

14   district is the exclusive source of talc for all

15   of the Johnson's Baby Powder sold in the United

16   States.  In addition to supplying the talc for

17   Johnson's Baby Powder, Windsor Mineral also sells

18   a portion of its product to independent industrial

19   users."

20             Do you see that?

21       A    I do.

22       Q    That --

23             MR. FROST:  Objection to the form.

24   BY MR. PLACITELLA:

25       Q    That information was not supplied to you

Ann G. Wylie, Ph.D.

```
1    by Johnson & Johnson when forming your opinions,

2    correct?

3              MR. FROST:  Objection.

4              THE WITNESS:  I've never seen this

5    affidavit.

6    BY MR. PLACITELLA:

7        Q    And after you wrote in your report:

8    "Talc ore is mined for both industrial and

9    cosmetic use but for different -- but from

10   different ore bodies and in different mines,"

11   after you wrote that in your report, Johnson &

12   Johnson never corrected that and told you they had

13   contrary information, correct?

14             MR. FROST:  Objection.  That certainly

15   misstates the document.

16             THE WITNESS:  No.

17   BY MR. PLACITELLA:

18       Q    Okay.  Now, in your report -- going back

19   to the ELMO for a second -- you make a number of

20   statements about geology.

21             The first on page 18, you state:  "Based

22   under geologic settings, report from mine

23   geologists and literature descriptions of the ore

24   deposits providing cosmetic talc for Johnson's

25   Baby Powder and Shower to Shower, it is highly
```

Ann D. Wylie, Ph.D.

1   unlikely that asbestos could be found in the talc

2   products from these mines."  Correct?

3        A    That's what it says, yes.

4        Q    All right.  You further state on page 20

5   of your report, talking about the same deposits:

6   "There is nothing about the mode of formation of

7   this type of talc deposit that favors the

8   formation of asbestos."  Correct?

9        A    That's correct.

10       Q    And then you -- as it relates to Pooley,

11  you say:  "It's my understanding that the ore from

12  the mine was the source of some of the talcum

13  powder involved in this litigation."

14            What mine was Pooley studying?

15            MR. FROST:  Objection to form.

16            If you know.

17  BY MR. PLACITELLA:

18       Q    If you recall.

19       A    I think the name Windsor was in the

20  report, but I -- I don't recollect.

21       Q    Okay.  "He and his team examined the

22  samples he collected throughout the mine,

23  including the ore and foot and hanging wall, and

24  examined them by PLM x-ray defraction and

25  transmission electron microscopy."  See that?

Ann G. Wylie, Ph.D.

```
 1        A    Yes.

 2        Q    Okay.  Then you go on to state, and

 3   we -- we went over this before:  "Pooley's

 4   detailed descriptions are consistent with

 5   published descriptions of talc mines in the

 6   Ludlow, Vermont area.  The minerals list in the

 7   ore from several mines, including the Argonaut

 8   Mine by mindat.org."  Do you see that?

 9        A    Yes.

10        Q    Okay.  And then you go on to state

11   further down the page:  "There is nothing about

12   the mode or formation of this type of talc deposit

13   that favors the formation of asbestos.  However,

14   this type of deposit is not known for associated

15   asbestos."

16             Do you see that?

17             MR. FROST:  I will object to the form.

18             THE WITNESS:  Show me where you're

19   reading.

20   BY MR. PLACITELLA:

21        Q    Yes, ma'am.

22        A    I'm sorry.

23        Q    So your --

24        A    So we've changed from Ludlow.  We're now

25   talking about carbonate-hosted deposits.
```

Ann G. Wylie, Ph.D.

```
 1        Q    So that's different.

 2        A    Yes.

 3        Q    So that's irrelevant to Ludlow?

 4        A    Yes.

 5        Q    Okay.  How come it's in your report?

 6        A    Because it's related to the Italian

 7   mines.

 8        Q    Okay.  And then you state:  "Cosmetic

 9   forming veins of asbestos has not been reported in

10   cosmetic talc ore to my knowledge."

11             Does that refer to --

12        A    Could you repeat the question, please?

13        Q    Yes, ma'am.  In your report you state:

14   "Cosmetic-forming veins of asbestos has" --

15   chryso- -- I'm sorry.  Scratch that.

16             "Chrysotile-forming veins of asbestos

17   has not been reported in cosmetic talc ore to my

18   knowledge."

19             Does that refer to the Italian mines,

20   the Vermont mines, or both?

21        A    This particular comment is under the

22   section on carbonate-hosted sources.  Let me

23   just -- no, I'm sorry, it doesn't.  Three, that

24   would refer to Johnson -- I mean to the talc mines

25   in Vermont.
```

Ann G. Wylie, Ph.D.

```
 1        Q     Okay.

 2        A     Yes, as well.

 3        Q     And in your summary on the top, you say:

 4   "When is asbestos likely to be found in talc

 5   ores?"  Correct?

 6        A     Yes.

 7        Q     And your summary is:  "The formation of

 8   talc does not require or favor the formation of

 9   asbestos in the ore."

10              Do you see that?

11        A     Yes.

12        Q     Okay.

13        A     Yes.

14        Q     And then underneath that is where you

15   say, Chrysotile has never been found in any

16   cosmetic talc ore to your knowledge, and you're

17   talking about Vermont.  Correct?

18        A     Yes.

19        Q     Okay.  Then again in your conclusions

20   you state:  "Although talc and asbestos can form

21   in proximity to one another, the formation of talc

22   does not require or favor the formation of

23   asbestos in the ore."

24              And then you say:  "Based on the

25   geologic settings, reports from the mine
```

Ann G. Wylie, Ph.D.

1    geologists" --

2            When you say "reports from the mine

3    geologists," you're talking about in the published

4    literature?

5        A    The only reports that I have on the

6    mines were from the Pooley -- from Cardiff.

7        Q    Okay.  So when you say "reports from the

8    mine geologists," you're talking about the private

9    reports, not the published reports.

10       A    I am.

11       Q    Okay.  Those are the reports that

12   Johnson & Johnson gave you.

13       A    That's correct.

14       Q    Okay.

15            -- "and literature descriptions of the

16   ore deposits used to source the talc for the

17   cosmetic talc products at issue in this

18   litigation, it is unlikely that asbestos occurs in

19   these deposits."  Do you see that?

20       A    Yes.

21       Q    And when you say "these deposits," do

22   you mean both the Italian and the chrysotile

23   deposits?

24            MR. FROST:  Objection.

25            THE WITNESS:  Chrysotile deposits --

Ann E. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q     My mistake.

 3              Do you mean both the Italian and the

 4   Vermont deposits?

 5        A     Yes.

 6        Q     Okay.  Now -- sorry.  I don't know how

 7   to -- so I just apologize to you.

 8              MR. PLACITELLA:  I'm going back to the

 9   iPad now.

10              THE VIDEOGRAPHER:  Got it, sir.

11              (Exhibit J&J-65 was presented to

12              the witness.)

13   BY MR. PLACITELLA:

14        Q     I've handed you a report from Mr. Vernon

15   Zeitz concerning Windsor Mineral Corporation,

16   "Examination of Talc Samples:  The Argonaut Ore

17   Body."

18              Do you see that?

19        A     Yes.

20        Q     Okay.  And that was done in 1974,

21   correct?

22        A     Yes.

23        Q     The same year of the report that they

24   gave you related to Dr. Pooley, correct?

25        A     I think Dr. Pooley's reports were 1972.
```

Ann G. Wylie, Ph.D.

```
 1       Q    Okay.  And it was done by Walter

 2  McCrone?

 3       A    It was from his lab.

 4       Q    Right.  And they're a respected

 5  laboratory, correct?

 6            MR. FROST:  Objection to form.

 7            THE WITNESS:  They are -- were.

 8  BY MR. PLACITELLA:

 9       Q    And this report was not given to you by

10  Mr. Frost along with the Pooley reports, correct?

11            MR. FROST:  Objection.

12            THE WITNESS:  It was not.  I've never

13  seen it before.

14  BY MR. PLACITELLA:

15       Q    And if you go to Table 2 of the report,

16  do you see where it talks about the results for

17  the electron microscope on the talc ore for core

18  samples?

19       A    Yes.

20       Q    Then if you look at the chart, it

21  actually talks about how far down in the mine they

22  took the samples for each sample.  Do you see

23  that?

24            MR. FROST:  Objection to form.

25  BY MR. PLACITELLA:
```

Ann E. Wylie, Ph.D.

```
 1        Q    If you look at the second row where it
 2   says "Description Designation" --
 3             Here, let's blow it up.
 4        A    It doesn't explain what that is.
 5        Q    Well, I'll represent to you -- do you
 6   know who Dr. Hopkins is?
 7        A    No.
 8        Q    I'll represent to you that Dr. Hopkins
 9   testified in this case that those were the depths
10   from which the samples were taken.  Do you see
11   that?
12        A    I do.
13             MR. FROST:  Objection to form.
14   BY MR. PLACITELLA:
15        Q    Okay.  And do you see that they have a
16   column entitled "Chrysotile"?
17        A    I do.
18        Q    And one for "Amphibole."  Do you see
19   that?
20        A    I do.
21        Q    Okay.  And do you see in all the
22   highlighted sections where McCrone found
23   chrysotile in these core samples?
24             MR. FROST:  Objection to form.
25             THE WITNESS:  I do.
```

Ann F. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q    And this information was never provided

 3   to you in order for you to do your report,

 4   although you were given the unpublished

 5   information from Dr. Pooley, correct?

 6             MR. FROST:  Objection.

 7             THE WITNESS:  I have never seen this

 8   document.

 9   BY MR. PLACITELLA:

10        Q    Is this a document you would have liked

11   to have seen along with Dr. Pooley's report?

12             MR. FROST:  Objection.

13             THE WITNESS:  I mean, I -- I would have

14   to have looked at this quite carefully to know

15   whether it would have been helpful or not, and I

16   haven't had a chance to look at it.  So...

17   BY MR. PLACITELLA:

18        Q    Okay.  Fair enough.

19             It was not supplied to you, so you --

20   you couldn't make a decision whether it was

21   relevant or not, correct?

22        A    That's correct.

23             (Exhibit J&J-89 was presented to

24             the witness.)

25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
 1        Q    Okay.  Now, let me show you 89.  Take a

 2   chance to look at it.

 3             J&J-89 for -- I'll describe it for the

 4   record is a report dated July 1, 1975, from

 5   McCrone to Windsor Mineral Company.

 6             Do you see that?

 7        A    I see -- is there a title where -- the

 8   report you're referring to?  I see a letter --

 9        Q    Right, there's a letter --

10        A    -- from Mr. Grieger --

11        Q    -- with attached -- correct.

12        A    And some tables attached.

13        Q    Correct.  I want to go through those.

14             This letter and tables were never

15   provided to you by Johnson & Johnson along with

16   the Pooley report, correct?

17        A    Correct.

18        Q    Okay.  And in the first paragraph,

19   McCrone advises Johnson & Johnson that:  "We have

20   examined two groups of samples using electron

21   microscope and selected area electron defraction

22   to determine the extent of amphiboles or

23   serpentine contamination in these two groups of

24   samples."

25             See that?
```

Ann fn Wylie, Ph.D.

```
 1      A     I --
 2            MR. FROST:  Objection to form.
 3            THE WITNESS:  I do.
 4   BY MR. PLACITELLA:
 5      Q     It says:  "The first group consisted of
 6   29 samples which were taken from your ore body."
 7            Are you with me?
 8      A     Yes.
 9      Q     Okay.  And they say:  "The second group
10   consists of seven samples which were sent to us
11   subsequently to be analyzed separately.  The
12   general conclusion that we came to in this study
13   is that these samples do show some amphiboles but
14   at extremely low level."
15            Do you see that?
16      A     Yes.
17      Q     Okay.  And in the next paragraph, they
18   talk about that they did a running tabulation of
19   the samples for total fiber content.  Do you see
20   that?
21      A     Yes.
22      Q     Okay.  And if you go to the Table 1,
23   they talk about confirmed asbestos visual.  Do you
24   see that?
25      A     Yes.
```

Ann D. Wylie, Ph.D.

```
 1         Q      And they indicate that on the samples,

 2    at least that I've highlighted, that they found --

 3    they confirmed asbestos visually in talc samples

 4    with the label "HC."  Do you see that?

 5                 MR. FROST:  Objection to form.

 6                 THE WITNESS:  That you have highlighted

 7    that.

 8    BY MR. PLACITELLA:

 9         Q      Yes, ma'am.

10         A      Yes, mm-hmm.

11         Q      I'm sorry.  Yes, Doctor.

12                And were you aware that HC stands for

13    Hammondsville cosmetic talc?

14                 MR. FROST:  Objection to form.

15                 THE WITNESS:  No.

16    BY MR. PLACITELLA:

17         Q      All right.  On the next Table 2, they

18    talk about description of sample content of

19    sediment.  Do you know what sediment generally

20    refers to when they're looking at something

21    geologically?

22         A      Yes.

23         Q      What does that refer to?

24         A      Sediment is particulate that has been

25    deposited by water, generally.
```

Ann T. Wylie, Ph.D.

```
 1        Q    Okay.  And --

 2        A    Or wind.

 3        Q    Okay.  And again, they list sample

 4   numbers, they have the word "asbestos," and then

 5   they quantify low to medium the number of fibers

 6   they saw, correct?

 7             MR. FROST:  Objection to form.

 8             THE WITNESS:  It's not clear to me what

 9   the various columns -- how they relate to one

10   another.

11   BY MR. PLACITELLA:

12        Q    Okay.  Well, you see next to HC, they

13   have the word "asbestos" on the column at the top,

14   and if you go down where it says "HC," it says

15   "low."

16        A    Yes --

17             MR. FROST:  Objection to form.

18             THE WITNESS:  -- I see that.

19   BY MR. PLACITELLA:

20        Q    Okay.  Now, this document was not

21   provided to you as -- for your consideration and

22   for you to determine whether it was relevant or

23   not to your opinions, correct?

24             MR. FROST:  Objection to form.

25             THE WITNESS:  It was not provided to me.
```

Ann G. Wylie, Ph.D.

```
 1    BY MR. PLACITELLA:

 2         Q    Okay.  Now, were you aware that one of

 3    the mines that was owned by Johnson & Johnson,

 4    the -- there was a scientist who testified under

 5    oath in 1983 that they found chrysotile asbestos

 6    in the talc mine?

 7              MR. FROST:  Objection to form.

 8              THE WITNESS:  No.

 9    BY MR. PLACITELLA:

10         Q    Would that have been relevant to your

11    consideration?

12              MR. FROST:  Objection to form.  Assumes

13    it's correct.

14              THE WITNESS:  I don't know.  It --

15    BY MR. PLACITELLA:

16         Q    I'm going --

17         A    Testimony normally I would not have

18    considered relevant.

19         Q    So if a scientist testified under oath

20    that they tested the mine and found chrysotile

21    asbestos in the Johnson talc mine, would that be

22    relevant to your opinions as to whether it was

23    likely or not that there was -- would be asbestos

24    in the Johnson mine?

25              MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

```
 1                   And, Chris, if you have a document you
 2    want to show her --
 3                   MR. PLACITELLA:  I'm just asking in
 4    general.
 5                   MR. FROST:  -- go ahead and do that,
 6    but -- objection.
 7                   THE WITNESS:  As a scientist, I would
 8    like to see data.
 9    BY MR. PLACITELLA:
10        Q    Okay.  So testimony would not be
11    relevant to you.
12                   MR. FROST:  Objection to form.
13                   THE WITNESS:  I -- I would like to see
14    data.
15    BY MR. PLACITELLA:
16        Q    My question is, if there was testimony
17    from the scientist about what he found, that would
18    not be relevant to your considerations?  That's
19    all I'm asking.
20                   MR. FROST:  Objection to form, asked and
21    answered.
22                   THE WITNESS:  No.
23                   (Exhibit J&J-179 was presented to
24                   the witness.)
25    BY MR. PLACITELLA:
```

Ann R. Wylie, Ph.D.

```
 1        Q    Okay.  Let me show you -- you have in

 2   front of you Johnson & Johnson-179, which is a

 3   letter from McCrone Associates to Roger Miller

 4   dated November 2nd, 1984.

 5             Do you see that?

 6        A    Yes.

 7        Q    Was this -- was this document provided

 8   to you by Johnson & Johnson along with the Pooley

 9   report concerning unpublished findings related to

10   the Johnson & Johnson mines?

11             MR. FROST:  Objection to form.

12             THE WITNESS:  No.

13   BY MR. PLACITELLA:

14        Q    Okay.  And in this document it talks

15   about testing that McCrone did concerning air

16   samples using a transmission electron microscope,

17   correct?

18             MR. FROST:  Objection to form.

19             THE WITNESS:  That's correct.

20   BY MR. PLACITELLA:

21        Q    And what they did is, according to this

22   letter from McCrone to -- to Johnson & Johnson,

23   they found chrysotile asbestos in the air samples,

24   correct?

25             MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

```
 1                  THE WITNESS:  That's what the document

 2   says.

 3   BY MR. PLACITELLA:

 4        Q    So, for example, where it says, Sample

 5   No. 8:  6 times 10 to the 4th, what does that mean

 6   to you?

 7        A    Six with four zeroes.

 8        Q    Right.  So how many fibers would -- did

 9   they find?

10                  MR. FROST:  Objection to form.

11                  THE WITNESS:  60,000.

12   BY MR. PLACITELLA:

13        Q    60,000?  Now --

14        A    Pardon me.  It may not indicate that

15   they found that many particles.  They extrapolated

16   from some assessment of the filter, I would

17   imagine.  But I don't know.  I really can't

18   comment.

19        Q    Okay.  You -- you were not provided the

20   underlying data for this, correct?

21        A    No.

22                  MR. FROST:  Objection.

23   BY MR. PLACITELLA:

24        Q    And in order for you to make a fair

25   assessment of what this means, Johnson & Johnson
```

Ann M. Wylie, Ph.D.

```
 1   would have had to have provided you with the

 2   underlying data so you could study it and

 3   determine whether it was relevant or not to your

 4   opinions, correct?

 5            MR. FROST:  Objection to form.

 6            And this is assuming a lot of facts that

 7   certainly aren't in the record.  We've done this

 8   several times now.

 9            MR. PLACITELLA:  Please, that's not a --

10            THE WITNESS:  These are air filters.

11   There's no information on where they came from.

12   BY MR. PLACITELLA:

13       Q    Okay.  And you would need to know that

14   in order to determine whether it was relevant to

15   your opinion, correct, where they came from?

16            MR. FROST:  Objection to form.

17            THE WITNESS:  No.

18   BY MR. PLACITELLA:

19       Q    Why not?

20       A    Because I was not asked to evaluate the

21   Johnson & Johnson products.  That was not my -- my

22   assignment.  My assignment was to review the

23   literature and to review the reports, and that's

24   all.

25       Q    If you reviewed -- so you're -- well,
```

Ann G. Wylie, Ph.D.

1   let me just make sure we're on -- we're on the

2   same sheet of music.

3           What came out of the mine was not part

4   of your assignment, just what was in the mine?

5           MR. FROST:  Objection to form.

6           THE WITNESS:  The -- my -- the request

7   was that I describe generally the origin of talc

8   deposits, look at it from a broad perspective, and

9   to examine -- to find anything I could in the

10  literature on the two mines in particular.

11          And I was asked -- I actually asked I

12  think for other reports -- no, I didn't.  They

13  gave me the Pooley report because I couldn't find

14  much on the mine itself in Vermont.

15  BY MR. PLACITELLA:

16      Q    But if Johnson & Johnson had more

17  information on the mine in Vermont in addition to

18  the Pooley report, that certainly would have been

19  relevant to your consideration, correct?

20          MR. FROST:  Objection to form.

21          THE WITNESS:  This is not information

22  about the mine.

23  BY MR. PLACITELLA:

24      Q    Okay.  I want to -- we'll get there.

25          So -- take a look at this (indicating).

Ann G. Wylie, Ph.D.

```
 1              (Exhibit J&J-202 was presented to

 2              the witness.)

 3   BY MR. PLACITELLA:

 4        Q    I'm just going to describe for the

 5   record, and I'll give you a chance to look at it,

 6   this is a March 25th, 1992 report entitled "Cyprus

 7   Ore Reserves - Arsenic & Tremolite."

 8              MR. FROST:  Objection to form.

 9   BY MR. PLACITELLA:

10        Q    And I'll ask you to take a look at that.

11              MR. FROST:  Misstates the document.

12              THE WITNESS:  Would you like me to read

13   it?

14   BY MR. PLACITELLA:

15        Q    I just want you to look at it.

16        A    Well, I've looked at it.

17        Q    Okay.  And this does pertain to the mine

18   in Vermont, correct?

19              MR. FROST:  Objection to form.

20   BY MR. PLACITELLA:

21        Q    In fact, it pertains directly to the

22   Argonaut Mine in Vermont, correct?

23              MR. FROST:  Same objection.

24              THE WITNESS:  Where do you see that?

25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
 1        Q    Sure.  If you go to the very next page,
 2   under "Tremolite," do you see where it talks right
 3   down at the bottom about the Argonaut and Black
 4   Bear mines?
 5        A    I see that paragraph, yes.
 6        Q    And so this is about the mine.  We
 7   agree?
 8             MR. FROST:  Objection to form.
 9             THE WITNESS:  It appears to be so, yes.
10   BY MR. PLACITELLA:
11        Q    And this particular report was not
12   provided to you along with the Pooley report for
13   information related to the mines that supplied
14   talc for Johnson & Johnson products, correct?
15             MR. FROST:  Again, objection to form.
16   Mischaracterizes the document.
17             THE WITNESS:  The document was not
18   provided to me.
19   BY MR. PLACITELLA:
20        Q    Okay.  So in this report the author
21   states:  "Vermont talcs are derived from altered
22   serpentine - a natural host for asbestiform
23   minerals."  Do you see that?
24        A    I do.
25             MR. FROST:  Same objection.
```

Ann G. Wylie, Ph.D.

1    BY MR. PLACITELLA:

2         Q    Do you agree with that statement?

3         A    I don't think so, no.

4         Q    Okay.  And why do you disagree with that

5    statement?

6         A    The term "altered serpentine" is a very

7    broad term, and so I don't really know how one can

8    just use the term "altered serpentine" and assume

9    that you would conclude that it's a host for

10   asbestiform mineral.

11        Q    Okay.  According to the author of this

12   report, he states:  "There is certainly visible

13   tremolite and actinolite in specific zones of the

14   Vermont deposits - fibrous tremolite was

15   identified by the writer in exposures and cores at

16   the East Argonaut and Black Bear mines."

17             Do you see that?

18        A    I do.

19             MR. FROST:  Objection to form, and

20   again, it mischaracterizes the document.

21   BY MR. PLACITELLA:

22        Q    Do you have any information in your

23   possession provided to you by Johnson & Johnson to

24   contradict that statement?

25             MR. FROST:  Objection to form.

Ann D. Wylie, Ph.D.

```
 1              THE WITNESS:  I have no idea what he
 2    means by "fibrous."  I don't know this person, I
 3    don't know what his qualifications are, and I know
 4    nothing about his terminology use.
 5    BY MR. PLACITELLA:
 6         Q    Okay.  And it says:  "Cyprus staff
 7    report past tremolite from the Hammondsville and
 8    Clifton deposits."
 9              Do you know anything about that?
10              MR. FROST:  Objection to form.
11              THE WITNESS:  No.
12              MR. PLACITELLA:  Okay.  Now -- first,
13    let me give this to your counsel, because I only
14    have two copies.
15              MR. FROST:  I'm just generally going to
16    object to the use of this document --
17              MR. PLACITELLA:  Mm-hmm.
18              MR. FROST:  -- as it's not a document
19    that has been created or provided by Johnson &
20    Johnson.  I believe this was created by
21    plaintiffs' counsel.
22              MR. PLACITELLA:  Actually, it was
23    created by Dr. Hopkins at this deposition, but
24    we'll fight that battle for another day.
25              MR. FROST:  So Dr. Hopkins typed this
```

Ann D. Wylie, Ph.D.

```
 1    out at his deposition; is that --
 2              MR. PLACITELLA:  Actually, what happened
 3    was --
 4              MR. FROST:  -- what relevance for the
 5    record?
 6              MR. PLACITELLA:  -- we did it at the
 7    deposition.  Then you and Dr. Hopkins went in a
 8    room and made some changes to the deposition -- to
 9    the chart, and then we came back out and we went
10    through the chart with Dr. Hopkins to make his
11    corrections.
12              MR. FROST:  Well, given the --
13              MR. PLACITELLA:  So -- but we'll let
14    the -- we'll deal with that another day.
15              MR. FROST:  But given that I was not at
16    Dr. Hopkins' deposition, you know, that statement
17    certainly isn't fully accurate, but --
18              MR. PLACITELLA:  Okay.
19              MR. FROST:  -- I just want to lodge my
20    objection for the record.  This is not a document
21    that was produced by or provided by Johnson &
22    Johnson.
23              MR. PLACITELLA:  Okay.
24              MR. FROST:  Feel free to use it, but I
25    have an objection for the record.
```

Ann G. Wylie, Ph.D.

```
 1                MR. PLACITELLA:  Okay.

 2                MR. LOCKE:  And I was at the deposition,

 3      and I object to the characterization.

 4                MR. PLACITELLA:  Okay.  Okay.

 5                I just want to show you the end of the

 6      deposition, so if you think I'm mischaracterizing

 7      anything.

 8                Can we go to the ELMO?

 9                THE VIDEOGRAPHER:  I can switch it.

10                MR. PLACITELLA:  Okay.  Here is

11      Dr. Hopkins' testimony.

12                MR. FROST:  Again, I object to the use

13      of the video that's not directed as a question to

14      the witness, but --

15                (Audio played):

16                    MR. PLACITELLA:  So let me

17                ask you the question.  Do you need

18                time to take a break, Dr. Hopkins,

19                and look at Hopkins 28 and see if

20                any of the additions or deletions

21                that were made by this -- on the

22                chart today are inaccurate as

23                reflected in your testimony?

24                    MR. BICKS:  Again, I'll

25                just object, and that's the
```

Ann G. Wylie, Ph.D.

```
 1                witness's not -- job is not to do

 2                that, and he need not do it.

 3                     BY MR. PLACITELLA:

 4                     Q.  Okay.  Do you need to

 5                do that?

 6                     A.  I'm not going to -- no,

 7                I'll take my attorney's advice and

 8                I will -- I will not do it.  But

 9                I'll leave this exhibit as being a

10                product of this deposition.

11                     Q.  Okay.  Well, it was not

12                the product of this -- just this

13                deposition.  It's a product of a

14                number of days, correct?

15                     A.  Yes, this deposition

16                and the -- the three days that we

17                -- or four days that we have

18                spent --

19                     Q.  Correct.

20                     A.  -- putting this chart

21                together.

22                     Q.  Correct.

23                     A.  It is a product of this

24                deposition.

25                     Q.  Okay.  Thank you.
```

Ann McTyize, Ph.D.

 1              (Conclusion of audio being

 2              played.)

 3              MR. FROST:  So I actually think that

 4    supports my objection, and my objection stands on

 5    the record.

 6              MR. PLACITELLA:  That's fine.

 7              MR. FROST:  And thank you for showing

 8    that.

 9              MR. PLACITELLA:  I just want to make

10    sure the record is clear.

11    BY MR. PLACITELLA:

12        Q    So let's look at this chart together.

13    Shall we?

14              The chart has a number of columns.  One

15    is the date, the exhibit number, the testing

16    entity, who the author was, the recipient, the

17    purpose, the test method, the mine if we knew what

18    it was, what exactly was tested, any special

19    preparations, what the tests revealed, any

20    comments from Dr. Hopkins, and whether -- and it's

21    cut off, but I represent to you, whether according

22    to Dr. Hopkins the test -- the results satisfied

23    Johnson & Johnson's definition of "asbestos."  Do

24    you see this?

25              MR. FROST:  Again, I'm going to object

Ann F. Wylie, Ph.D.

1    to the characterization of the document.

2    BY MR. PLACITELLA:

3        Q    Okay.  So let's just walk through -- in

4    light of the fact that Johnson & Johnson gave you

5    an unpublished report of Pooley to rely upon, I

6    just want to go through this chart and be clear as

7    to whether any of the reports referenced on this

8    chart as related to the mines alone -- not end

9    products, okay?  Are you with me?

10       A    Okay.  Sort of.

11       Q    -- were provided to you.

12            MR. FROST:  Objection to form.

13   BY MR. PLACITELLA:

14       Q    Okay.  So the first entry on this chart

15   is from 1957 by Battelle -- Battelle related to

16   Italian talc, that was not provided to you, I take

17   it, correct?

18            MR. FROST:  Objection to form.

19            THE WITNESS:  No.

20   BY MR. PLACITELLA:

21       Q    Okay.  The report from 1968 from

22   Battelle concerning Val Chisone where they found

23   tremolite was not provided to you, correct?

24            MR. FROST:  Objection to form.

25            THE WITNESS:  No.

Ann G. Wylie, Ph.D.

```
 1    BY MR. PLACITELLA:
 2         Q    Okay.  The 5/28/1958 report from
 3    Johnson & Johnson from Battelle concerning Val
 4    Chisone where they found 6 tremolite and 6 to
 5    10 percent fibrous talc, that was not provided to
 6    you, correct?
 7              MR. FROST:  Objection to form.
 8              THE WITNESS:  No.
 9    BY MR. PLACITELLA:
10         Q    Okay.  The December 4th, 1970 report
11    from the Colorado School of Mines concerning the
12    Hammondsville mine's core samples finding
13    tremolite, actinolite, and fibrous talc, that was
14    not provided to you, correct?
15              MR. FROST:  Objection to form.
16              THE WITNESS:  No.
17    BY MR. PLACITELLA:
18         Q    Okay.  I want to skip all the ones that
19    talk about just what they found in products.
20              The report from 1971, July 7th, Colorado
21    School of Mines on Vermont talc, that was not
22    provided to you, correct?
23              MR. FROST:  Objection to form.
24              THE WITNESS:  No.
25    BY MR. PLACITELLA:
```

Ann M. Wylie, Ph.D.

```
 1        Q    And certainly you were not provided the
 2   report from McCrone from 1971 finding chrysotile
 3   asbestos in the Shower to Shower satisfying
 4   Johnson & Johnson's definition of "asbestos," that
 5   was never given to you because that was not of the
 6   mine, correct?
 7             MR. FROST:  Objection to form.
 8             THE WITNESS:  It was not provided.
 9   BY MR. PLACITELLA:
10        Q    Okay.  Let's go to the next page.
11             So skipping down to 1973, the 5/1/73
12   report concerning Hammondsville ore, that was not
13   provided to you, correct?
14             MR. FROST:  Objection.
15             THE WITNESS:  No.
16   BY MR. PLACITELLA:
17        Q    Okay.  The May 8, 1973 report concerning
18   the Hammondsville ore, that was not provided to
19   you, correct?
20             MR. FROST:  Objection to form.
21             THE WITNESS:  No.
22   BY MR. PLACITELLA:
23        Q    The 1973 report from the Colorado School
24   of Mines that examined for chrysotile and/or
25   tremolite using TEM in Vermont samples, and
```

Ann F. Wylie, Ph.D.

```
 1   identified chrysotile at a level less than 10

 2   parts per million in the Vermont sample satisfying

 3   Johnson & Johnson's definition of "asbestos," that

 4   was not provided to you, correct?

 5             MR. FROST:  Objection to form.

 6             THE WITNESS:  The document was not

 7   provided.

 8   BY MR. PLACITELLA:

 9        Q    Okay.  The March 1970 report from

10   Dartmouth University concerning ore from the

11   Windsor mine was not provided to you, correct?

12             MR. FROST:  Objection.

13             THE WITNESS:  It was not provided.

14   BY MR. PLACITELLA:

15        Q    Do you see where I -- Dr. Hopkins

16   actually put in his column he has issues with the

17   conclusions in this report?

18             MR. FROST:  Objection to form.

19             THE WITNESS:  I see that.

20   BY MR. PLACITELLA:

21        Q    Okay.  The 4/24/74 report from McCrone,

22   that's the one we just went through, right, where

23   they say the purpose was whether or not there was

24   any significant content of asbestiform materials

25   in the Argonaut, and they found chrysotile and
```

Ann F. Wylie, Ph.D.

1    tremolite, which Dr. Hopkins said satisfied the

2    Johnson & Johnson definition of "asbestos," that

3    was not provided to you, correct?

4                MR. FROST:  Objection.

5                THE WITNESS:  The document was not

6    provided.

7    BY MR. PLACITELLA:

8        Q    Okay.  The 5/8/74 report from McCrone

9    using an optical microscope and TEM on the Windsor

10   ore, and do you see where Dr. Hopkins says here

11   "possible contamination of one test," that was not

12   provided to you, correct?

13               MR. FROST:  Objection to form.

14   BY MR. PLACITELLA:

15       Q    I mean, I'm showing you the good and the

16   bad, so I'm not leaving anything out.

17       A    It was not provided.

18               MR. FROST:  Objection.

19   BY MR. PLACITELLA:

20       Q    Okay.  Do you see the next report from

21   McCrone concerning the Argonaut ore body, where it

22   says "chrysotile fibers in ore and product in

23   one-third of the samples tested," that was not

24   provided to you, correct?

25               MR. FROST:  Objection to form.

Ann M. Wylie, Ph.D.

```
 1            THE WITNESS:  The document was not

 2   provided.

 3   BY MR. PLACITELLA:

 4        Q    Okay.  The report from May 14th, '74,

 5   from McCrone and Dartmouth concerning the

 6   Hammondsville mine, that was not provided to you,

 7   correct?

 8            MR. FROST:  Objection.

 9            THE WITNESS:  The document was not

10   provided.

11   BY MR. PLACITELLA:

12        Q    By the way, do you have that 89 --

13   that J&J 89 in front of you?

14        A    I'm sorry.  Is this something you've

15   given to me before?

16        Q    Yes -- yes, ma'am.  It says "J&J 89" on

17   it.  I just want to go back there for a second.

18        A    Yes.  Yes.

19        Q    And if you -- I just put up here for --

20   under Table 3, just where they describe what

21   they've seen based on the photomicrographs, that's

22   something that you do, correct?  You look at

23   photomicrographs and you describe what you see?

24        A    I -- I look at preparations under the

25   microscope.
```

Ann M. Wylie, Ph.D.

```
1        Q    Okay.  And you see here where it talks
2    about the HC sample:  "Two bundles of amphiboles,
3    two single amphibole fibers."  See that?
4        A    I do.
5        Q    All right.  That would even satisfy your
6    definition of "asbestos," right?
7              MR. FROST:  Objection.
8              THE WITNESS:  I'm sorry, but I don't
9    have any idea what criteria he was using to
10   identify it as amphibole or --
11   BY MR. PLACITELLA:
12       Q    Okay.  Well, let's go back then to the
13   chart.
14             Under that same Exhibit J&J 89 where it
15   says:  "Determine the extent of amphibole or
16   serpentine contamination.  We kept a running
17   tabulation of the asbestos we could possibly
18   identify."
19             And in the chart, it says:  "Confirmed
20   asbestos, low to medium bundles of amphiboles,"
21   and according to Dr. Hopkins, that satisfied
22   Johnson & Johnson's definition of "asbestos."
23   That report was never provided to you, correct?
24             MR. FROST:  Objection to form.
25             THE WITNESS:  The document was not
```

Ann C. Wylie, Ph.D.

```
 1    provided.

 2              (Exhibit J&J-97 was presented to

 3              the witness.)

 4    BY MR. PLACITELLA:

 5         Q    Okay.  And there's another report,

 6    J&J-97, mentioned here from McCrone using TEM on

 7    ore fibers of asbestos, according to Dr. Hopkins

 8    satisfies Johnson & Johnson's definition of

 9    "asbestos," that was never provided to you,

10    correct?

11              MR. FROST:  Objection to form.

12              THE WITNESS:  I'm not sure exactly what

13    you're referring to, but the document, whatever it

14    was, was not provided.

15              (Exhibit Hopkins 28 was presented

16              to the witness.)

17    BY MR. PLACITELLA:

18         Q    Okay.  I'm sorry to have to do this, but

19    I have to make a record.  Given the fact, ma'am,

20    just -- Doctor, just so you know, you were

21    provided some documents and not others, and all I

22    want to do is make a record here of the

23    information you were not provided.

24              Are you with me?

25              MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

 1                    THE WITNESS:  I hear you.

 2    BY MR. PLACITELLA:

 3         Q    Okay.  Now, there is a report here --

 4    you were given a report from Dr. Pooley from 1972.

 5    Do you recall that?

 6         A    Yes.

 7         Q    Okay.  And in this chart there's a

 8    report from 1977 from Dr. Pooley on the Vermont

 9    samples where he found fibers of antigorite.  That

10    was not provided to you, correct?

11                    MR. FROST:  Objection to form.

12                    THE WITNESS:  It was not.

13    BY MR. PLACITELLA:

14         Q    Okay.  The internal report of Johnson &

15    Johnson from 2/9/1974 of the 66 composite samples

16    finding tremolite and actinolite, that was not

17    provided to you, correct?

18                    MR. FROST:  Objection to form.

19                    THE WITNESS:  I don't know where you

20    are, but no.

21    BY MR. PLACITELLA:

22         Q    Okay, ma'am, I'm right here

23    (indicating).  I'm not -- I'm not -- now I'm on

24    the fourth entry down.

25                    In 9/1/83, there was another McCrone

Ann Wylie, Ph.D.

1    report to test for airborne fiber concentrations

2    at the Argonaut and Rainbow Mines finding 118

3    fibers -- no, I'm sorry -- 118 fibers in Argonaut,

4    2,650 fibers in Rainbow, satisfying the Johnson &

5    Johnson definition of "asbestos," that was not

6    provided to you, correct?

7              MR. FROST:  Objection to form.

8              THE WITNESS:  The document was not

9    provided.

10   BY MR. PLACITELLA:

11       Q    Okay.  In terms of your conclusions

12   related to Italian talc, there was a report from

13   1985 to Olson on the Italian talc done in South

14   Plainfield, where they found 71.2 percent fibrous

15   talc and 5.8 percent anthophyllite and asbestiform

16   amphibole satisfying Johnson & Johnson's

17   definition of "asbestos," that document was not

18   provided to you, correct?

19             MR. FROST:  Objection to form.

20             THE WITNESS:  It was not.

21   BY MR. PLACITELLA:

22       Q    Okay.  I'll just go -- I won't go

23   through the conclusion.

24             The -- J&J-184, the 8/5/1986 report from

25   McCrone concerning Hammondsville air samples, that

Ann Wylie, Ph.D.

```
 1    wasn't provided to you, correct?

 2              MR. FROST:  Objection to form.

 3              THE WITNESS:  The document was not

 4    provided.

 5    BY MR. PLACITELLA:

 6         Q    Okay.  We already went through the

 7    Cyprus reports, so I won't do that.

 8              The 2/9/1979 report -- internal report

 9    from Johnson & Johnson related to Windsor, six

10    composite samples, that was not provided to you,

11    correct?

12              MR. FROST:  Objection to form.

13              THE WITNESS:  The document was not

14    provided.

15    BY MR. PLACITELLA:

16         Q    Okay.  The 1958 -- May 9th, 1958 report

17    from Battelle concerning the Italian talc, that

18    was not provided to you, correct?

19              MR. FROST:  Objection to form.

20              THE WITNESS:  The document was not

21    provided.

22    BY MR. PLACITELLA:

23         Q    Okay.  The 1/24/58 report from Battelle

24    concerning Italian talc, that was not provided to

25    you, correct?
```

Ann M. Wylie, Ph.D.

```
 1                MR. FROST:  Objection to form.

 2                THE WITNESS:  The document was not

 3      provided.

 4      BY MR. PLACITELLA:

 5           Q    I'm almost done, I promise.

 6                These are all on products.  Okay.

 7                Down here in 1961, a report from

 8      Battelle on the Hammondsville core, that was not

 9      provided to you, correct?

10                MR. FROST:  Objection to form.

11                THE WITNESS:  The document was not

12      provided.

13      BY MR. PLACITELLA:

14           Q    Okay.  The 1991 reports concerning the

15      Argonaut and Hamm Mines, they were not provided to

16      you either, correct?

17                MR. FROST:  Objection to form.

18                THE WITNESS:  The documents were not

19      provided.

20      BY MR. PLACITELLA:

21           Q    Okay.  And am I correct in order for you

22      to determine whether those -- all the reports that

23      we went through would be relevant to your

24      assessment about whether it was likely or not that

25      there would be asbestos in the mine sources for
```

Ann G. Wylie, Ph.D.

```
 1   Johnson & Johnson talc, you would actually have to

 2   see the reports and make that determination,

 3   correct?

 4            MR. FROST:  Objection to form.

 5            THE WITNESS:  The request by Johnson &

 6   Johnson for me was to review the literature, the

 7   two mine reports, and the lab results from

 8   Drs. Longo and Rigler.

 9   BY MR. PLACITELLA:

10       Q    Well, do you think it's fair to you as

11   the person who is asked to give an opinion to

12   this -- in this case, for Johnson & Johnson to

13   give you some non-published reports but not all of

14   the non-published reports for you to make your own

15   determination as an expert as to whether they

16   would be relevant to your opinions?

17            MR. FROST:  Objection to form.

18   BY MR. PLACITELLA:

19       Q    Do you think that's fair?

20       A    The reports that they provided were

21   helpful because they were a complete assessment of

22   the mine, samples from the footwall, the hanging

23   wall, the ore body, throughout the deposit.  And

24   those reports from Pooley or from his group at

25   Cardiff were -- were relevant.
```

Ann G. Wylie, Ph.D.

```
 1              I couldn't follow everything that you
 2    were saying, but these appeared to be primarily
 3    composites or air samples or things that really
 4    don't relate to the geology of the mine.
 5    BY MR. PLACITELLA:
 6         Q    Okay.  But you don't know without
 7    actually looking at the report.
 8         A    That would be correct.
 9              MR. FROST:  Objection to form.
10              THE WITNESS:  I said only from what you
11    provided.
12              MR. FROST:  And are you going to move on
13    from --
14              MR. PLACITELLA:  Yep.
15              MR. FROST:  -- this line of questioning?
16              MR. PLACITELLA:  Yeah.
17              MR. FROST:  So I just want to lodge
18    another general objection, and move to strike all
19    of the questioning that related to Hopkins 28, as
20    I can't verify here today that the various
21    assumptions and assertions made in this document
22    are accurate regarding the various underlying
23    things.
24              MR. PLACITELLA:  Well, I would have
25    hoped that you would have read the deposition at
```

Ann C. Wylie, Ph.D.

1    some point in time, since he was actually taken on

2    the very subject of what was in Johnson & Johnson

3    files and what, according to his own chart says,

4    the tests revealed.  But we'll go through that

5    another day.  So --

6              MR. FROST:  I'm just making my objection

7    for the record.

8              MR. PLACITELLA:  Okay.

9    BY MR. PLACITELLA:

10       Q    Now, part of your opinions --

11             MR. PLACITELLA:  What time do you want

12   to break for lunch, by the way, just so I can do

13   some timing?

14             MR. FROST:  It's up to Dr. Wylie.  I

15   mean, I think we're fairly flexible.

16             THE WITNESS:  I'm not hungry.

17             MR. PLACITELLA:  That's fine.

18             MR. FROST:  There we go.

19   BY MR. PLACITELLA:

20       Q    Okay.  Part of your opinions in this

21   case focus on what you believe is an acceptable

22   definition of "asbestos," correct?

23             MR. FROST:  Objection to form.

24             THE WITNESS:  Correct.

25   BY MR. PLACITELLA:

Ann Wylie, Ph.D.

```
 1        Q    So I'm just going to ask you --
 2             THE VIDEOGRAPHER:  iPad?
 3             MR. PLACITELLA:  Sure.
 4   BY MR. PLACITELLA:
 5        Q    Do you agree with the definition on the
 6   screen:  "Asbestos is defined to be fibrous
 7   serpentine, chrysotile, and the fibrous forms of
 8   the amphibole group as represented by amosite,
 9   anthophyllite, chrysotile, tremolite, asbestos and
10   actinolite"?
11             Do you agree with that definition?
12             MR. FROST:  Objection to form.
13             THE WITNESS:  No.
14   BY MR. PLACITELLA:
15        Q    Okay.  So as you sit here today, you'll
16   understand that you are testifying that you
17   disagree with the definition of "asbestos" of
18   Johnson & Johnson.  Did you know that?
19             MR. FROST:  Objection to form.
20             THE WITNESS:  No.
21             MR. PLACITELLA:  Give me a second.
22   BY MR. PLACITELLA:
23        Q    Okay.  Do you disagree with the
24   definition put up on the screen:  "Asbestos is
25   defined to be fibrous serpentine and chrysotile,
```

Ann  _____  Wylie , Ph.D.

1    and the fibrous forms of amphibole group as

2    represented by amosite, anthophyllite,

3    crocidolite, tremolite and actinolite"?  Do you

4    agree with that definition?

5              MR. FROST:  Objection to form.

6              THE WITNESS:  No.

7    BY MR. PLACITELLA:

8         Q    I put up that definition of "fiber" from

9    the -- directly from OSHA's website.  And it

10   states:  "Fiber means a particulate form of

11   asbestos 5 micrometers or longer with a length-to-

12   diameter ratio of at least 3 to 1."

13             Do you agree with that definition?

14        A    That is the NIOSH definition.

15        Q    All right.  Do you agree with that

16   definition?

17        A    It is not the way I would use the term

18   "fiber."

19        Q    So you disagree with it?

20        A    Yes.

21        Q    Okay.  Do you know what TSCA is?  TSCA

22   acronym, do you know what it is?

23        A    Toxic Substance Control Act.

24        Q    Right.  And you know that that was an

25   act of Congress attempting to control hazards in

Ann G. Wylie, Ph.D.

```
 1    the environment?

 2                MR. FROST:  Objection to form.

 3                THE WITNESS:  Not -- I'm -- not really.

 4    BY MR. PLACITELLA:

 5         Q    Okay.

 6         A    I -- I couldn't verify what you said.

 7         Q    Okay.  I want to show you the definition

 8    from TSCA and ask you if you agree with it.

 9                It says:  "Section 202 defines

10    'asbestos' as the asbestiform varieties of six

11    fiber types:  Chrysotile (serpentine), crocidolite

12    (riebeckite), amosite" --

13                Can you give me that?  I can't say that

14    one.

15         A    Cummingtonite-grunerite.

16         Q    Very good.  You get an A for that one.

17                -- anthophyllite, tremolite or

18    actinolite."

19                The latter five fiber types are

20    amphibole varieties.  Do you see that?  Do you

21    agree with that definition?

22         A    I do.

23                MR. FROST:  Objection to form.

24                And again, I'll generally object to the

25    use of these documents that we're putting up on
```

Ann G. Wylie, Ph.D.

1    the screen.  We're not getting context of where

2    they're coming from, what they are, whether

3    they're regulations, whether they come from the

4    federal regulations, whether they're printoffs of

5    websites.  So I'll just generally lodge an

6    objection to the use of the documents in this

7    manner.

8              MR. PLACITELLA:  Okay.

9    BY MR. PLACITELLA:

10        Q    Has -- has your definition of what

11   constitutes a countable asbestos fiber under the

12   microscope changed at all over time?

13             MR. FROST:  Objection to form.

14             THE WITNESS:  I don't believe I have a

15   countable definition.

16   BY MR. PLACITELLA:

17        Q    All right.  Okay.  Has your definition

18   of "fiber" -- "asbestos fiber" changed over time?

19             MR. FROST:  Objection to form.

20             THE WITNESS:  Perhaps.

21   BY MR. PLACITELLA:

22        Q    Okay.  When you say "perhaps," what do

23   you mean by that?

24        A    Well, I -- I don't remember precisely,

25   but certainly over a course of my life's work,

Ann Wylie, Ph.D.

1    I've learned a lot.  So my guess is that my papers

2    would reflect an evolution in my thinking.

3         Q    Okay.  So what I would like to do, at

4    least before lunch, is at least get down what your

5    definition actually is.  Because I was kind of

6    having a hard time looking at it from your report,

7    and I looked a lot of your articles.

8              So can we just go over, and I'll try to

9    write slowly and correct, get my spelling right of

10   what your -- your, Ann Wylie's, current definition

11   is, and I'll write it down.  So we're all

12   walking -- working from the same sheet of music,

13   okay?

14             All right.  So let's start.

15        A    You can write the TSCA definition down.

16   I'm happy with that.

17        Q    You're -- well, why don't we just write

18   down what your definition is, Ann Wylie.

19        A    The asbestiform varieties" --

20        Q    Okay.

21        A    -- of six regulated minerals.

22   Chrysotile.

23        Q    Uh-huh.

24        A    Anthophyllite.

25        Q    Oh, yeah.

Ann G. Wylie, Ph.D.

```
 1      A     Would you like me to spell it for you?

 2      Q     You want to see if I can do it.

 3            Two Ts, right?

 4      A     No.

 5      Q     Go ahead.

 6      A     Grunerite.

 7      Q     Oh, forget it.  You want to write it

 8  down?

 9      A     Grunerite.

10      Q     Okay.  Anthophyllite.

11            Spell grunerite.

12      A     Grunerite.

13      Q     Go ahead.

14      A     G-R-U-N-E-R-I-T-E.

15      Q     Okay.

16      A     Tremolite.

17      Q     Mm-hmm.

18      A     Actinolite.

19            And what have I left out?  No, it should

20  be -- chrysotile and -- anthophyllite -- no, you

21  have that.

22      Q     We already did that.

23      A     Chrysotile, anthophyllite, grunerite --

24  oh, riebeckite.

25      Q     Spell that one.
```

Ann    White    , Ph.D.

```
1        A     R-I-E-B-E-C-K-I-T-E.

2        Q     That's it?

3        A     Yes.

4        Q     Okay.  Now, just so we're clear, what is

5   this the definition of?

6        A     Regulated minerals.

7        Q     Of regulated minerals.

8        A     It's the definition of "asbestos."

9        Q     Okay.  Now, are there certain things

10  that you look at under a microscope to determine

11  whether what you're seeing satisfies this

12  definition?  What do you look for?

13       A     Yes.

14       Q     And what is that?  By the way, has that

15  changed over time?

16       A     No.

17       Q     Okay.  So we'll just -- tell me what you

18  need.

19       A     I believe we need to be more specific

20  than microscope.

21       Q     Okay.  What do you need?

22       A     A polarized light microscope.

23       Q     Nothing else?

24       A     Well, we could start there.

25       Q     Okay.  So PLM.  Is that fair?
```

Ann G. Wylie, Ph.D.

```
 1        A      Yes.

 2        Q      Okay.  What do we need?

 3        A      We need to see the presence of fiber

 4   bundles.

 5        Q      Okay.  So, one, fiber bundles.

 6               Two?

 7        A      Composed of fibrils of a narrow width.

 8        Q      When you say "narrow width," what --

 9   what's the width?

10        A      Normally less than 0.5 micrometers.

11        Q      Okay.  Less than 0.5 micrometers?

12        A      Yes.

13        Q      Okay.  Now, when you say "fiber

14   bundles," what do you mean by that?

15        A      I mean --

16        Q      You know what, let's just get it down,

17   and then we'll go back.  Okay?

18               So composed of fibrils of narrow width.

19        A      That's correct.

20        Q      Less than 5 -- 0.5?

21        A      0.5.

22        Q      Okay, 0.5.  What else?

23        A      They need to be one of the -- one of the

24   minerals.

25        Q      One of the minerals you --
```

Ann G. Wylie, Ph.D.

```
 1        A     One of the --

 2        Q     -- mentioned before?

 3        A     Yes, mm-hmm.

 4        Q     So one of the recognized minerals?

 5        A     One of the minerals I listed before.

 6        Q     Okay.  I'm going to need space to go

 7   back and fill it in.

 8              Go ahead.  What else?  Four -- I'm on

 9   four now.

10        A     You've turned your chart over, so --

11        Q     Here.  Hold on.  I want to make sure.

12              Fiber bundles.  Composed of fibrils.

13   Needs to be one of the minerals.

14        A     I would say an abundance of high aspect

15   ratio particles.

16        Q     Okay.  Four, abundance of high aspect

17   ratio particles.

18              Anything else?

19        A     I think that would be the criteria I

20   would apply.

21        Q     Okay.

22        A     There are other criteria that can be

23   added, and which I have listed elsewhere which we

24   can add if you'd like, but it -- they're not a

25   necessary criterion.
```

Ann G. Wylie, Ph.D.

```
 1         Q    So -- well, let's put "not necessary,"
 2   and then we'll keep going.  Okay?  Also but not
 3   necessary.  Okay.
 4         A    Fibers showing curvature.
 5         Q    Okay.
 6         A    Matted masses --
 7         Q    My handwriting is horrible.  I should
 8   have had Leigh do this.
 9              Go ahead.
10         A    Matted masses of fibers.
11         Q    Okay.
12         A    Anomalous optical properties.
13         Q    Oh, boy, we'll spend some time on that
14   one.  Anomalous --
15         A    -- optical properties.
16         Q    Okay.
17         A    And those are actually normally present.
18   Anomalous optical properties can be observed.  So
19   I could move that --
20         Q    So they're normally present?
21         A    Yes.  I could put that to the upper
22   list.
23         Q    Oh, you're kidding.  Okay.  Move it to
24   five?
25         A    Mm-hmm.
```

Ann G. Wylie, Ph.D.

```
1        Q      All right.  Okay.  Is that it?

2        A      Sure.

3        Q      Would you find it disrespectful if I

4   took my jacket off?  It's very hot in here.

5        A      No.

6        Q      Good thing I didn't wear my Terps scarf.

7               All right.  Does the term "population"

8   belong anywhere in these criteria?

9        A      Under the optical microscope, these

10  refer to observations you might make about a

11  population of particles that have a single mineral

12  identity.

13       Q      Okay.

14       A      So they don't all have to be present in

15  a single particle.

16       Q      Okay.  So how would -- where do you want

17  me to put "population," under five?

18              MR. FROST:  Can you move it over so we

19  can see?

20              THE WITNESS:  I'm sorry, but I don't

21  think -- I -- you know, you are trying to put this

22  in a way -- I would lay at the beginning to say

23  that "in a population of asbestos, one would

24  normally find," so that way we can begin --

25  BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
 1        Q    Okay.  Okay.  So I'll put here -- you

 2   didn't know I was going to make you work this

 3   hard, right?

 4            Okay.  So let's go back now for each

 5   term, and we can do this up till lunch, and then

 6   we'll -- I'm sure you'll by that time be hungry.

 7            Okay.  So let's just talk about your

 8   first term, your first requirement, fiber bundles.

 9            MR. FROST:  I was going to say, Chris,

10   why don't we take a short break now, we've been

11   going for a little over an hour --

12            MR. PLACITELLA:  Mm-hmm.

13            MR. FROST:  -- and then we can jump into

14   this, and then we'll do lunch after that.

15            MR. PLACITELLA:  That's fine.

16            THE VIDEOGRAPHER:  The time is 11:42

17   a.m.  We're going off the record.

18            (Recess.)

19            THE VIDEOGRAPHER:  The time is 11:57

20   a.m., and we're back on the record.

21   BY MR. PLACITELLA:

22        Q    Okay.  I wanted to define one term that

23   we did not specifically define, and that is your

24   definition of "asbestiform."  And then we'll

25   get in -- go back.
```

Ann C. Wylie, Ph.D.

 1                    Okay.  Can you give me that, please?

 2         A    It -- asbestiform applies to fibrils of

 3    very narrow width that occur in parallel bundles.

 4         Q    Okay.

 5         A    Bundles of parallel fibers, I should put

 6    it that way.

 7         Q    Fibers of very narrow width --

 8         A    -- in bundles that share an axis of

 9    elongation that are --

10         Q    Chair?

11         A    Share.

12         Q    Oh, share.

13         A    Share.

14         Q    Okay.

15         A    An axis of -- axis of elongation.

16         Q    Okay.

17         A    But are randomly oriented in the other

18    crystallographic directions.

19         Q    Randomly oriented --

20         A    -- in the other crystallographic

21    directions.

22         Q    Tell me how you spell crystallographic,

23    and what --

24         A    C-R-Y- --

25         Q    Yeah.

Ann G. Wylie, Ph.D.

```
 1        A    -- S-T-A-L-L-O-G-R-A-P-H-I-C.

 2        Q    Okay.  Crystallographic --

 3        A    -- directions.

 4        Q    -- directions.  Okay.

 5             That sounds like an after-lunch -- okay.

 6             So let's talk about how you define, and

 7   what we went through before, "population," so we

 8   have that down.

 9        A    A number of the same particles of the

10   same type in some way, defined in common -- by a

11   common definition of some sort.

12        Q    A number of particles -- go ahead.

13        A    Defined in some way.

14        Q    In some way.

15        A    Right.  A population of dogs is all

16   composed of dogs.

17        Q    Okay.  So how many particles do you need

18   for a population?  Is two enough?

19             MR. FROST:  Objection to form.

20             THE WITNESS:  I -- I don't really have

21   an answer for that.  I've never tried to restrict

22   it in that way.  And I've never seen something

23   with just two particles in it that --

24   BY MR. PLACITELLA:

25        Q    Well, is three enough to become a
```

Ann G. Wylie, Ph.D.

1   population?  Four?

2       A    It depends.

3           MR. FROST:  Objection to form.

4   BY MR. PLACITELLA:

5       Q    So as you sit here today, you can't tell

6   me the number of particles that would satisfy your

7   definition of "population"?

8       A    No, because it depends upon what the

9   defining characteristic is.

10      Q    Okay.  Well, if I have two dogs, is that

11  a population of dogs?

12      A    Hmm.

13      Q    Or do I need three dogs?

14          MR. FROST:  Objection to form.

15          THE WITNESS:  I -- you want more than

16  that based on the variety of dogs there are out

17  there.

18  BY MR. PLACITELLA:

19      Q    Okay.  So if it's all one kind of dog,

20  that's not a population?

21      A    It would be a population of that kind of

22  dog.

23      Q    So if it was like -- I like Golden

24  Retrievers.  So if I have three Golden Retrievers,

25  that's a population of Golden Retrievers?

Ann G. Wylie, Ph.D.

```
 1        A    I don't know -- would you say you had a

 2   population of Golden Retrievers if --

 3        Q    I've had four, yeah.

 4        A    Did you refer to them as a population?

 5        Q    I don't know.  I'm using your term.

 6        A    Well, I've never applied it to dogs.

 7        Q    Well, you just did.

 8        A    I did, but I -- I was just being

 9   facetious.

10        Q    Okay.  So --

11        A    I don't have a definition.  The United

12   States Geological Survey recommends that you --

13   you should look at several hundred particles to

14   define a "population."  So they have a definition.

15   But I don't think I've ever --

16        Q    Okay.

17        A    -- tried to narrow it down in that way.

18        Q    Okay.  Now, you said "fiber bundles."

19   What do you mean by "fiber," and what do you mean

20   by "bundles"?

21        A    Bundles are groups of fibers that share

22   a common axis of elongation and -- but are easily

23   separable from one another.

24        Q    Groups of fibers that share common axis

25   of -- you got to do me a favor.  People might read
```

Ann G. Wylie, Ph.D.

```
 1    this, so if you see I'm really screwing up on
 2    spelling, just tell me because I don't want to be,
 3    you know, accused like a Dan Quail at some point.
 4             Okay.  So common axis of --
 5        A    -- elongation.
 6        Q    Okay.  What else?
 7        A    I suppose you would have to say in a --
 8    in a particle or in an entity or something -- in a
 9    particle.
10        Q    In a particle.
11        A    I have to say I'm not exactly used to
12    writing things like this on the fly.  I usually
13    spend a lot of time to make sure my definitions
14    are quite rigorous.
15        Q    Well, I'm actually going --
16        A    It's not so easy under these
17    circumstances.
18        Q    Well, I hear you, but I'm trying -- I'm
19    actually going slow, one, so I can understand what
20    you're saying.
21        A    Mm-hmm.
22        Q    And, two, so you take your time because
23    it's going on a record.
24        A    Yes.
25        Q    So by me being a little slow on the
```

Ann G. Wylie, Ph.D.

```
 1    uptake gives you the opportunity to make sure you

 2    have the record the way you want it.  Okay?

 3              So -- so you say -- and then you say

 4    "fiber," how do you define "fiber"?

 5         A    A particle that attains its shape

 6    through growth, formed in nature in that way.

 7         Q    Fiber.  Okay.  Tell me -- say it again.

 8         A    May I say there are more than one

 9    definition of "fiber."

10         Q    Well, I want just your definition.

11         A    Well, I -- I'm telling you there's more

12    than one definition of "fiber."  So there are

13    definitions of "fiber" that apply to counting

14    criteria that the government identifies as fiber.

15    So that's the set of definitions.  So you're not

16    asking me for that.

17         Q    No.  I want your definition.

18         A    So for me, a fiber is a particle that

19    attains -- it's long, thin, and attained its shape

20    in nature.

21         Q    Long, thin, and attained its shape in

22    nature.

23         A    And we refer to that as growing, but I

24    don't want to confuse that with a plant where a

25    geologist could say it grew that way.
```

Ann G. Wylie, Ph.D.

```
 1        Q     Okay.  So you say a particle that is
 2   long and thin.  What do you mean by long?
 3        A     With respect to its width.  Long with
 4   respect to its width.
 5        Q     So you don't have a --
 6        A     No.
 7        Q     -- length in mind?
 8        A     No.
 9        Q     Okay.  So long with respect to its
10   width.  Is there a ratio or something that you
11   need?
12        A     No.
13        Q     So, long equals long width with respect
14   to its width.
15              And what do you mean by thin?
16        A     Thin with respect to its length.
17        Q     Any particular width that you're --
18        A     No.
19        Q     Okay.  So thin with respect to its
20   length.
21              Okay.  And can I put for both of these
22   no particular measurement?
23        A     Yes.
24        Q     No particular length or width, no
25   particular measurement?
```

Ann G. Wylie, Ph.D.

```
 1       A    Well, no, there -- there are sort of
 2  natural restrictions.  You don't tend to find
 3  fibers in nature that are, you know, 5 centimeters
 4  across.
 5       Q    Right.
 6       A    But -- no.
 7       Q    Okay.  So then you say, "Composed of
 8  fibrils of narrow width."  Okay.  What do you mean
 9  by "fibril"?
10       A    That's the smallest particle in an
11  asbestos bundle.  It's a single crystal or it may
12  be twinned.
13       Q    Well, can you actually get down to a
14  final fibril in an asbestos -- when you're talking
15  about asbestos?
16       A    By polarized light microscopy?
17       Q    Yeah.
18       A    You can't usually see the individual
19  fibrils, although if they're, you know, a little
20  bit on the wider side.  But normally you don't see
21  the individual fibrils.  You see groups of
22  fibrils.
23       Q    Okay.  And -- and you -- you say of
24  narrow -- fibrils of narrow width.  What do you
25  mean by that, narrow width?
```

Ann G. Wylie, Ph.D.

```
 1        A    Could we -- could we go back?  We're
 2   talking about the -- again, we're now back not to
 3   the definition of "fiber," but to the definition
 4   of "asbestos" under the microscope.  Let's be
 5   clear what we're speaking about.
 6        Q    Right.  I'm going under -- for what you
 7   require, what you look for under the microscope.
 8        A    All right.
 9        Q    And you said, "Composed of fibrils of
10   narrow width."
11        A    Yes.
12        Q    Okay.  So I just want to make sure I got
13   it down.
14        A    Yes.
15        Q    Go ahead.  Is it less than 5 microns?
16   Is that what you mean?
17        A    That would be -- less than 5 microns?
18   No.
19        Q    0.5 microns.  I'm sorry.
20        A    Well -- yes.
21        Q    Okay.  So narrow width equals less than
22   0.5 microns?
23        A    For optical microscopy.
24        Q    You mean under a PLM?
25        A    Yes.
```

Ann G. Wylie, Ph.D.

```
 1        Q    Okay.  You say -- are we talking about
   one of the regulated minerals?
 2
 3             I'll go back and write them down over
   lunch, okay, so we don't have to do that now.
 4
 5             You say, "Abundance of high aspect ratio
   particles."  What do you mean by "abundance"?
 6
 7        A    What do I mean by "abundance"?  Well --
 8        Q    More than one dog?
 9        A    More than one dog.
10        Q    So "abundance" means more than one?
11        A    More than one.
12        Q    Okay.  Of high aspect ratio -- well,
   let's start with particles.  What do you mean by
13
   particles?
14
15        A    A piece of a mineral or a piece of
   composite minerals.  I mean, it's -- a particle is
16
   just a particle.  We can look these up in the
17
   dictionary.  They're not geologic terms.
18
   "Particle" is not a geologic term.
19
20        Q    Well, I'm just trying to understand --
21        A    That's fine.
22        Q    Okay.  And then high aspect ratio, what
   do you mean by that?  Let me write that down.
23
24        A    Well, I -- I have published 20-to-1.
   That would be high aspect ratio.
25
```

Ann G. Wylie, Ph.D.

1        Q    Okay.  I've also seen publications of

2   yours listing 100-to-1.  Where does that come

3   from?

4        A    Well, you can find asbestos particles

5   that are 100-to-1.

6        Q    But it's not a requirement of yours if

7   yours is 20-to-1?

8        A    Those would be abundant.  If -- those

9   would be abundant in the population.

10       Q    Okay.

11       A    Mm-hmm.

12       Q    So you'd want more than one 20-to-1

13  particle.

14            MR. FROST:  Objection to form.

15            THE WITNESS:  I'm a little unclear.  But

16  if we define a "population" as being a number of

17  particles of similar mineral type, and you need to

18  have an abundance within that population of high

19  aspect ratio particles.  I have actually published

20  mean aspect ratios of 20-to-1 or greater -- yeah,

21  mean.

22  BY MR. PLACITELLA:

23       Q    Okay.  So in a population, what

24  percentage of the particles would you need to be

25  greater than 20-to-1 in order to satisfy your

Ann G. Wylie, Ph.D.

```
 1    definition?

 2         A    I would never apply that kind of

 3    criteria.  You could have bundles that are 3-to-1.

 4         Q    I'm sorry.  I'm not sure I understand.

 5              You said you could have bundles that are

 6    3-to-1?

 7         A    Yes.

 8         Q    But that wouldn't satisfy your --

 9         A    Yes, it's a bundle.  It's a bundle.

10         Q    Okay.  So that's what I'm trying to

11    understand.  In your population --

12         A    Yes.

13         Q    -- what percentage of the particles --

14    right?

15         A    Yes.

16         Q    -- need to be greater than 20-to-1?

17         A    The mean -- what I -- I have published

18    statements that say that the mean aspect ratio is

19    20-to-1 or higher.

20         Q    Mm-hmm.

21         A    And those are of known asbestos

22    materials.

23         Q    Okay.

24         A    So those characteristics are for the

25    asbestos that I've looked at.
```

Ann B. Wylie, Ph.D.

```
 1        Q     Okay.  But you said an abundance, which
 2   is more than one, of minerals --
 3        A     Much more than one.
 4        Q     Okay.
 5        A     I mean you were trying to tell me that I
 6   only needed two.  I think I --
 7        Q     No, I --
 8        A     -- I need much more than that.
 9        Q     Well, I'm just going by what you said.
10   That's why I wrote it down slowly.
11        A     Yes.  Okay.
12        Q     So is three dogs enough?
13        A     Well, greater than one is -- could be a
14   thousand, couldn't it?
15        Q     But it could be two dogs.
16        A     But I would never call on two dogs.
17        Q     Well, how many dogs do we need before
18   you -- it satisfies your definition?
19        A     Well, you have to be --
20              MR. FROST:  Objection to form.
21              THE WITNESS:  You have to be quite
22   careful to make sure that you have sufficient
23   information, and that really depends on -- it
24   really depends.  I can't really quite answer that.
25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
1        Q      Okay.  When you have published that you
2    need aspect ratios of 100-to-1, what did you mean
3    by that?
4        A      I've never said that was a requirement.
5        Q      Never?
6        A      No.
7        Q      Okay.  Now, you say this was not
8    required, right, fibers showing curvature?
9        A      That's not required.
10       Q      Okay.  So I'm going to put first under
11   here, "Not required."
12              Okay.  And what do you mean by "showing
13   curvature"?
14       A      That the particles are not straight.
15       Q      Okay.  This -- this requirement doesn't
16   apply to tremolite, does it?
17       A      It applies --
18              MR. FROST:  Objection to form.
19              THE WITNESS:  It applies to all
20   asbestos.  What are we -- I'm sorry.  What do you
21   mean --
22   BY MR. PLACITELLA:
23       Q      Well, you don't usually get fibers with
24   curvature if you're looking at tremolite, correct?
25       A      It depends on whether it's asbestiform
```

Ann G. Wylie, Ph.D.

1    tremolite or not.

2          Q    So if you see asbestiform tremolite,

3    you -- you usually see curvature?

4          A    You can see it.

5               MR. FROST:  Objection to form.

6    BY MR. PLACITELLA:

7          Q    But not always.

8          A    It's true of all asbestos, not always.

9          Q    Okay.  Then matted masses of fibers.

10   What do you mean by "matted masses"?  Not

11   required, right?

12         A    No.

13         Q    Okay.  So let me write here, "Not

14   required."  Okay.  Okay.  Matted masses.

15              You promise you won't make fun of me

16   when you leave here today, right?

17         A    Promise.

18         Q    Okay.  "Matted masses," what is that?

19         A    These are populations --

20   characteristics, I'm sorry, that I've observed in

21   some asbestos samples where the -- when you see it

22   looking at it under the optical microscope, they

23   appear to be intertwined as though they were --

24   "interwoven" might be the right term.

25         Q    Okay.  And when you say "masses," what

Ann G. Wylie, Ph.D.

1    do you mean by that?

2         A     A particle.

3         Q     Okay.

4         A     That contains these numerous fibers that

5    are intergrown and intertwined.

6         Q     By the way, just so -- because I know

7    this will go in a record, when I'm all done, I'll

8    let you check my work, okay?  So we...

9              Now, you say "anomalous optical

10   properties."

11        A     Yes.

12        Q     What do you mean by that?

13        A     Well, there are a number.  The

14   interference --

15        Q     This is required?

16        A     I have -- I don't think I can think of

17   an instance where I have looked at asbestos and

18   not seen anomalous optical properties.

19        Q     So your -- do you require it or don't

20   require it?

21        A     I expect it.

22        Q     You expect it but not required.

23        A     I expect it.

24        Q     It's kind of like dealing with your

25   kids.

Ann G. Wylie, Ph.D.

```
 1          A    As I said before, I have never seen --

 2          Q    Okay.  So --

 3          A    -- populations of asbestos in which the

 4   optical properties --

 5          Q    So I should say expected but not

 6   required?

 7          A    I have never seen a population where the

 8   properties of asbestos -- where the properties are

 9   not anomalous.

10          Q    Okay.  What --

11          A    Should we go through what optical

12   properties are?

13          Q    Yeah, I'm going to do that.

14          A    All right.

15          Q    I'm just -- first, I want to understand

16   whether it's, in your definition, required.

17   That's all.  If it's expected but not required,

18   I'll write that.  But I just want to make sure I

19   have it down.

20          A    And I'd say again, I've never seen

21   samples that don't have it.

22          Q    So do you require it?

23          A    Well, you know, I guess, so maybe I

24   would.  Although I have to say that if I see fiber

25   bundles and so forth, I may not check the -- this
```

Ann M. Wylie, Ph.D.

1  optical properties because I know they'll be

2  anomalous.

3        Q    Okay.  So what do I write?

4        A    I don't know.

5        Q    Okay.  You don't want me to put a

6  question mark.

7        A    I -- I tried to explain to you as best I

8  can.

9        Q    All right, I'll put a question mark.

10  Expected but not always checked for?

11       A    But not -- well, this is complicated.

12            I'm trying to think back.  It's been a

13  long time since I've analyzed any asbestos.  The

14  optical properties are anomalous in asbestos.  So

15  under PLM, I would look for them.

16       Q    So --

17       A    If they're not there, I think I would

18  not necessarily assume it was asbestos.  So let's

19  put it required.

20       Q    Required.

21       A    Required.

22       Q    I'll tell you what, you have until the

23  end of lunch to change your mind.  How's that?

24       A    All right.

25       Q    Okay.  Tell me what an anomalous optical

Ann G. Wylie, Ph.D.

```
1    property is.
2         A    All right.  For every mineral, there's a
3    set of properties that can be evaluated by
4    polarized light microscopy.  Would you like me to
5    give you a list?
6         Q    Well, just give me an example -- oh,
7    you're going to give me a list for every mineral?
8         A    No.  No.  There's a set of
9    measurements --
10        Q    Okay.
11        A    -- that are called optical properties.
12        Q    Give it to me.
13        A    All right.  The angle of extinction.
14   The sign of elongation.
15        Q    Hold on.
16        A    All right, I'll go slower.
17        Q    You are just playing with me now.  Okay.
18             Okay.  What is it?
19        A    Sign of elongation.
20        Q    Mm-hmm.
21        A    Size of 2V.
22        Q    Size of 2V?
23        A    2V.  Two, capital V.
24        Q    Okay.  Okay.
25        A    The optic sign.
```

Ann G. Wylie, Ph.D.

```
 1        Q     Okay.

 2        A     Birefringence.  Position of the optic

 3    plane.

 4        Q     Don't get impatient.  I'm writing as

 5    fast I can.  I feel like you're getting a little

 6    impatient.

 7              MR. FROST:  Objection to form.

 8              MR. PLACITELLA:  You won't be the first

 9    person that got impatient.

10    BY MR. PLACITELLA:

11        Q     Okay.

12        A     Indices -- principal indices of

13    refraction.

14              Pleochroism.

15        Q     Oh, come on.

16        A     P-L --

17        Q     P-L --

18        A     -- E-O --

19        Q     -- E-O --

20        A     -- C-H --

21        Q     -- C-H --

22        A     -- R --

23        Q     Uh-huh.

24        A     -- O-I-S-M.

25              Dispersion of the optic axis.
```

Ann G. Wylie, Ph.D.

```
 1        Q    Mm-hmm.

 2        A    Could you put it so I could see?

 3        Q    Oh, sorry.

 4        A    Let me just make sure I haven't

 5   forgotten anything.

 6        Q    Sorry.

 7        A    I think -- I think that's --

 8        Q    You know what, I'll let you look at it

 9   at lunchtime.

10        A    I think that's it.

11        Q    Okay.  All right.  Now --

12        A    Oh, one more.

13             Oh, I have that, sign of extinction.

14   Sorry.

15        Q    Okay.  So I want to talk about the

16   aspect ratio.

17        A    Okay.

18        Q    Okay.  Does your position as it relates

19   to the aspect ratio conflict with OSHA's position?

20             MR. FROST:  Objection to form.

21             THE WITNESS:  OSHA has criteria for

22   counting asbestos fiber that do not conform to

23   20-to-1.  But I am not saying that you must have

24   20-to-1, only that they are abundant.

25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

```
 1        Q    So -- but under OSHA's definition, you
 2   could have abundant at 3-to-1, and that would
 3   satisfy their definition, correct --
 4              MR. FROST:  Object.
 5   BY MR. PLACITELLA:
 6        Q    -- but not yours?
 7              MR. FROST:  Objection to form.
 8              THE WITNESS:  That satisfies their
 9   counting criterion, yes, in occupational
10   monitoring.
11   BY MR. PLACITELLA:
12        Q    But it wouldn't satisfy your criteria
13   for determining that you were looking at an
14   asbestiform fiber?
15              MR. FROST:  Objection to form.  We're
16   talking about two very different things here.
17              THE WITNESS:  OSHA's definition applies
18   to occupational monitoring, and in that context,
19   they determined that they were going to count for
20   exposure assessments in environments where
21   asbestos is known to occur, particles that are
22   3-to-1.  That's what they -- longer than 5.
23   BY MR. PLACITELLA:
24        Q    Mm-hmm.
25        A    That -- that is the way they approach
```

Ann G. Wylie, Ph.D.

 1   the analysis of the abundance of asbestos.  I have

 2   never considered it to be a definition for

 3   "asbestos."

 4        Q    Okay.  But when you're counting, you

 5   require seeing an abundance of particles greater

 6   than 20-to-1 aspect ratio, correct?

 7        A    I don't count.

 8             MR. FROST:  Objection to form.

 9   BY MR. PLACITELLA:

10        Q    Okay.  You don't count.

11        A    I don't count.

12        Q    Okay.  What do you do?

13        A    I look in a -- the discussion we

14   began --

15        Q    Yes, ma'am.

16        A    -- was if I have a sample and I want --

17   of material, minerals --

18        Q    Mm-hmm.

19        A    -- and I want to know if the sample is

20   asbestos or isn't it --

21        Q    Mm-hmm.

22        A    -- then I look for these characteristics

23   as a group to determine whether or not it's

24   asbestos or asbestos is present.

25        Q    Okay.  So I looked at the -- and I want

Ann G. Wylie, Ph.D.

1    to go over it with you -- I looked at NIOSH's own

2    report, and it looked to me that if you used a

3    20-to-1 aspect ratio, you would miss most

4    tremolite asbestos.

5                    MR. FROST:  Objection to form.

6    BY MR. PLACITELLA:

7         Q    Is that fair?

8         A    I really don't know what you're

9    referring to.  I'm sorry.

10        Q    Okay.  I'll go back to 30 after lunch.

11             You did a paper -- I'm missing a whole

12   folder.

13                   MR. PLACITELLA:  Can you go to the --

14                   THE VIDEOGRAPHER:  iPad?

15                   MR. PLACITELLA:  -- iPad, please.

16                   THE VIDEOGRAPHER:  Yes, sir.

17   BY MR. PLACITELLA:

18        Q    So I have a paper here by you entitled

19   "Membrane Filter Method for Estimating Asbestos

20   Fiber Exposure."  Do you see that?

21        A    Yes.

22        Q    Okay.  Do you recall that paper?

23        A    Yes.

24        Q    Okay.  I'll blow up the pieces I want to

25   ask you about.  And --

Ann Wylie, Ph.D.

```
 1              MR. FROST:  I was going to say, if you
 2   want, Dr. Wylie, we can pull -- we can try to find
 3   a copy of it somewhere if you want to look at the
 4   whole document.
 5              THE WITNESS:  Perhaps we could see what
 6   questions he has, and if I need to look at the
 7   document, I can do that then.
 8   BY MR. PLACITELLA:
 9        Q    You have a table in your article
10   entitled "The length, width and aspect ratio for
11   some selected asbestos samples."
12        A    Yes.
13        Q    Do you see that?
14        A    Yes, mm-hmm.
15        Q    And one of the minerals that you analyze
16   was amosite, correct?
17        A    These are not my data.
18        Q    It's in your article.
19        A    Yes, but they're all referenced.
20   They're from other sources.  I've never done lung
21   tissue analysis.  These are not my data.  They're
22   literature data.
23        Q    Okay.  Well, let's just go through it.
24        A    Sure.
25        Q    These are data you relied upon in
```

Ann E. Wylie, Ph.D.

1    publishing your paper, though.

2         A    These are data I published.

3         Q    Okay.  And --

4         A    I referenced.

5         Q    Right.  And you have data here on

6    amosite, correct?

7         A    Yes.

8         Q    That by any definition is "asbestos,"

9    right?

10        A    Yes.

11        Q    Okay.  So then you -- in this data you

12   have not just lung tissue but an analysis of bulk

13   samples and samples, you know, that came out of

14   the mine, correct?

15        A    The --

16        Q    It says "bagging" --

17        A    Yes, these are data.  They're from

18   Pooley and Clark or Gibson, Wang.  I'm not sure --

19   I can't remember where they came from, but, yes,

20   they -- they did lung tissue, air -- air analysis.

21        Q    Okay.

22        A    Yes, yes, mm-hmm.

23        Q    Okay.  So if I go to the aspect ratio

24   for this data -- so, for example, I go to the

25   aspect ratio for bagging.

Ann    Wylie, Ph.D.

```
 1        A     Yes.

 2        Q     Do you see that?

 3        A     Yes, mm-hmm.

 4        Q     Okay.  That's this (indicating).  It

 5   says that 32 percent is greater than 17-to-1.

 6        A     Yes, it says, yes.

 7        Q     Okay.  So that meant that -- what

 8   percent was less than 17-to-1?

 9        A     A math test.

10             MR. FROST:  Objection to form.

11             THE WITNESS:  Less than or equal, I

12   would guess --

13   BY MR. PLACITELLA:

14        Q     Less than or equal.

15        A     -- 68.

16        Q     So 68 percent of the amosite asbestos

17   under your definition would not be counted?

18             MR. FROST:  Objection to form.

19   Misstates the document and what she's been

20   testifying to today.

21             MR. PLACITELLA:  Please, only form.

22   Please.  Don't do that.

23             MR. FROST:  And that's why I said I

24   would really like her to have a copy of the

25   article in front of her because you keep blowing
```

Ann G. Wylie, Ph.D.

```
1    up portions of it so we can't see what the

2    actual chart says, and then you're asking her

3    questions.

4              MR. PLACITELLA:  No, I want to -- here,

5    here's the whole chart.  Hold on.  I'll blow up

6    the whole chart.

7              THE WITNESS:  I -- I understand the

8    question.  I feel all right in answering it.

9    BY MR. PLACITELLA:

10        Q    Okay.  So my question is, that 68

11   percent of the asbestos in this chart for this

12   sample is less than 20-to-1, correct?

13        A    Yes, could you remove the -- what you

14   just put up and let me look at the full dataset?

15        Q    Sure.

16        A    You see, it says mean length, 2.53.  It

17   also says it was done by TEM, and it also says

18   it's an air sample.  We've been talking about

19   polarized light microscopy and bulk sample

20   analysis and particles that are longer than 5

21   micrometers.  So this is not relevant to our

22   conversation.

23        Q    Well, in your article you're counting as

24   asbestos 68 percent of a sample less than a

25   20-to-1 aspect ratio, correct?
```

Ann G. Wylie, Ph.D.

1      A      I don't apply those definitions to air

2  samples.  We're talking about bulk sample analysis

3  by polarized light microscopy.

4      Q      Okay.

5      A      This is entirely a different kettle of

6  fish.  It's a different method of analysis and

7  there are different criteria.

8             We were talking about polarized light

9  microscopy.  All of these are air data, lung data.

10     Q      Well, actually not, it doesn't say air

11  data.  You see where it says, "Mine TEM"?

12     A      Yes, but I know that it's air data.

13     Q      How do you know?

14     A      Because I know where it came from.

15     Q      Okay.  So if it's air data, then your

16  criteria don't apply?

17     A      The criteria that we were discussing

18  apply to polarized light microscopy examination of

19  bulk materials.  You've switched topic and taking

20  me to TEM analysis of air samples, and they are

21  not comparable.  And there's no limit on the

22  width, so that that is also not comparable.

23     Q      Okay.  So everything you said in this

24  entire pad that we just went through only applies

25  if you're taking a bulk sample using PLM?

Ann G. Wylie, Ph.D.

```
1        A      That's correct.  That's what we were
2   discussing.
3        Q      Okay.  So your -- your opinion is not,
4   for example, that if you use TEM, and you look at
5   a sample, that you need a 20-to-1 aspect ratio in
6   order to call something asbestos?
7             MR. FROST:  Objection to form.
8   BY MR. PLACITELLA:
9        Q      Correct?
10       A      Correct.
11       Q      Okay.  I want to talk to you now about
12  fiber width.  Because maybe we're just -- maybe I
13  was a little confused, and you're straightening me
14  out.  Okay?
15       A      Good.
16       Q      Okay.  Am I correct that under your
17  definition, under PLM, that any fiber bundle
18  greater than 5 microns, you do not count?
19             MR. FROST:  Objection to form.
20             THE WITNESS:  I don't count.  Any fiber
21  bundle I would assume would be evidence for the
22  presence of asbestos, provided the fibrils were
23  small.
24  BY MR. PLACITELLA:
25       Q      Okay.  So -- why don't we -- wait, let
```

Ann G. Wylie, Ph.D.

```
 1    me get your -- I'm glad we wrote all this down.
 2              So you said here -- maybe I should
 3    have -- "composed of fibrils of narrow width less
 4    than 0.5."  Correct?
 5         A    By PLM, yes.
 6         Q    By PLM.  And if you look at it and it's
 7    greater than 0.5, then it doesn't satisfy your
 8    definition?
 9              MR. FROST:  Objection to form.
10    BY MR. PLACITELLA:
11         Q    Even if -- even if it's in a bundle?
12              MR. FROST:  Objection to form.
13    BY MR. PLACITELLA:
14         Q    Well, this is what I'm trying to
15    understand.  Okay?
16         A    Well, try again.
17         Q    And you have to bear with me.
18         A    Yeah, that's fine.
19         Q    Okay?
20              You're saying that it has to be composed
21    of fibrils of narrow width?
22         A    That's correct.
23         Q    When you look at something under PLM,
24    you can't always tell if it -- if it's fibrils
25    composed of fibrils under 0.5 if there are
```

Ann G. Wylie, Ph.D.

```
 1    multiple fibrils making a bundle, correct?
 2         A    If they are less than 0.5, the -- the
 3    result is an anomalous optical property.
 4         Q    Mm-hmm.  But if it's above 0.5, then
 5    you -- then you don't consider that asbestos?
 6              MR. FROST:  Objection to form.
 7    BY MR. PLACITELLA:
 8         Q    If you see it under a microscope.
 9         A    Again, I don't look at a particle-by-
10    particle basis.  It's not an appropriate approach.
11         Q    Okay.  So maybe we have to -- it says
12    here, "Composed of fibrils of narrow width."  So
13    how many fibrils do we need?
14         A    Well, when you have -- I'm talking about
15    bundles.  So you --
16         Q    You said here "composed of fibrils."
17         A    -- -brils, yes.  Bundles are composed of
18    fibrils --
19         Q    Correct.
20         A    -- in asbestos --
21         Q    Correct.
22         A    -- of narrow width.  Yes.
23         Q    Correct.  So composed of fibrils --
24         A    -- -brils.
25         Q    -- of narrow width?
```

```
1        A     Yes.

2        Q     Okay.  How do you make that

3   determination?

4        A     The properties become anomalous.

5        Q     Okay.  So if you look at it and you see

6   something above 0.5, what does that tell you?

7        A     It tells me there's a particle above 0.5

8   in -- on the slide.

9        Q     But you can't tell whether that's

10  asbestos?

11             MR. FROST:  Objection to form.

12             THE WITNESS:  Again, I don't identify

13  particle by particle.  If you get a sample and

14  it's labeled "asbestos," and you look at it under

15  the microscope, sometimes you might find a

16  particle.  Some of the samples may have

17  contaminants of rock fragment from the area in

18  which it was mined.  Some of them are composite.

19             I can't really say what's not; I'm

20  looking for what is.  So it's the presence that's

21  being verified, not the absence.

22  BY MR. PLACITELLA:

23        Q     Well, how many fibrils do we need to

24  look at, do we need to see --

25             MR. FROST:  Objection to form.
```

Ann M. Wylie, Ph.D.

```
 1    BY MR. PLACITELLA:

 2         Q    -- in order to conclude that it's

 3    asbestos.

 4         A    I need to see a fiber bundle of material

 5    that's smaller than 0.5 micrometers.

 6         Q    So you -- oh, so now -- now at least I

 7    think I understand.

 8              So when you say "composed of fibrils of

 9    narrow width" --

10         A    Normally less than 0.5 I think is one of

11    the values.  The word "normally."  So...

12         Q    That really should be composed of fiber

13    bundles less than 0.5.

14         A    No, I think that --

15              MR. FROST:  Objection to form.

16              THE WITNESS:  -- fiber bundle is what's

17    composed.  That's where I think we're think- -- we

18    were talking.  We were talking about fiber

19    bundles, and you asked me what they were, and I

20    said they were composed of fibrils of narrow

21    width.  That's what fiber bundles are.

22    BY MR. PLACITELLA:

23         Q    Okay.

24         A    I believe that's the reason why it's

25    written in this way.
```

Ann G. Wylie, Ph.D.

```
1      Q      Okay.  So maybe I have to rewrite it.

2      A      I don't know.  I --

3      Q      So you're looking under a PLM

4   microscope.

5      A      Yes.

6      Q      And you see a mineral.

7      A      Yes.

8      Q      Okay.  And how do you determine whether

9   that's a fibril or a bundle?  How -- how do you

10  know?

11     A      For most of what you see by polarized

12  light microscopy, they're bundles.

13     Q      So are you able then to go to --

14     A      For asbestos.

15     Q      Okay.  Are you then able to go to the

16  individual fibrils and actually measure them?

17     A      No.

18     Q      So when you say "composed of fibrils

19  less than 0.5," you really can't measure that.

20     A      You can measure 0.5, and you can see

21  that they are less, but you can't measure how much

22  less or what they are.

23     Q      All right.  So if you see -- but you

24  can't always see the fibrils if they're in a

25  bundle.  Correct?
```

Ann M. Wylie, Ph.D.

```
 1        A    You can -- you know they're there

 2   because of the anomalous properties.

 3        Q    Okay.

 4        A    Or the presence of the splayed ends.  So

 5   there -- there are a number of ways you can get at

 6   it.

 7        Q    Okay.  But how do you know when you're

 8   looking at a bundle how many fibrils are in there?

 9        A    You don't.

10        Q    You can't?

11        A    No.

12        Q    Okay.  So -- and when those bundles are

13   -- well, let me ask you this:  Can you inhale

14   fiber bundles that are greater than 0.5?

15             MR. FROST:  Objection to form.

16             THE WITNESS:  Are you asking me about

17   the physiology of the lung?

18   BY MR. PLACITELLA:

19        Q    Well, do you know?

20        A    I -- I think you can, yes.

21        Q    Okay.  And if you have a fiber bundle

22   that's greater than 0.5, does that have the

23   potential to split into thinner fiber bundles

24   inside the body?

25        A    Yes.
```

Ann G. Wylie, Ph.D.

```
1          Q    Okay.  And so something could go into

2    the body greater than 0.5, but when it's in the

3    body, break down to something less than that.

4               MR. FROST:  Objection --

5    BY MR. PLACITELLA:

6          Q    Fair?

7               MR. FROST:  Objection to form.

8               THE WITNESS:  If -- you used the word

9    "something."  I'm sorry, I -- I can't --

10   BY MR. PLACITELLA:

11         Q    An asbestos fiber bundle.

12         A    And we're discussing asbestos, are we

13   not?

14         Q    Yes, ma'am.

15         A    All right.  So in the case of asbestos,

16   I think that that does definitely happen.

17         Q    Okay.  Now, let's just talk about the --

18   so I understand the capabilities here of PLM, what

19   is the capability of PLM in terms of looking at

20   the width of a fibril?  What's -- what's its limit

21   of detection?

22               MR. LOCKE:  Objection.

23               THE WITNESS:  There is -- there are

24   two -- there are two measures:  One is resolution,

25   and the other is visibility.  And they're not the
```

Ann G. Wylie, Ph.D.

 1    same.

 2            So the experiments -- and the visibility

 3    can't really be pre- -- predicted because it

 4    depends on the contrast and the index of

 5    refraction of the material with the substance that

 6    it's mounted in, and the higher that difference,

 7    the more visible small particles might become.

 8            So the literature of which I'm aware is

 9    that visibility of -- for example, I think that --

10    I think it was crocidolite and -- crocidolite in

11    particular, visibility is about 0.15.

12            The resolution limit depends on the --

13    the objective that you're using.  Resolution is

14    determined by the numerical aperture of the

15    objective.  And so that depends.

16            I use a numerical aperture of 0.85.  It

17    also depends upon the wavelength of light.  And so

18    I consider probably something around 0.25 as

19    resolution, ability to resolve, but it might be

20    0.3 or 0.4.

21            You know, resolution has a very

22    technical -- technical meaning.  I'd have to

23    calculate it.  I've sort of forgotten.

24    Wavelength, 0.61 --

25    BY MR. PLACITELLA:

Ann Wylie, Ph.D.

```
 1        Q      You want to --

 2        A      -- divided by a numerical aperture.

 3               I can calculate it.

 4        Q      Okay.

 5        A      Oh, I'm writing on your document.

 6        Q      That's okay.

 7        A      Sorry.

 8        Q      So let me just spend a few --

 9               MR. PLACITELLA:  What time do we have?

10    We got another 15 minutes or do you want to stop

11    now?  You want to stop now?  It's quarter to 1:00.

12               MR. FROST:  We may as well stop now and

13    have lunch.

14               MR. PLACITELLA:  Okay.  Okay.

15               THE VIDEOGRAPHER:  The time is 12:43

16    p.m.  We're going off the record.

17               (Lunch recess.)

18               (Wylie Exhibit No. AW-50 was

19               marked for identification.)

20               THE VIDEOGRAPHER:  The time, it is

21    1:43 p.m., and we are back on the record.

22    BY MR. PLACITELLA:

23        Q      Okay.  A few follow-up questions.

24               We talked this morning about the 20-to-1

25    aspect ratio that you required.  Do you recall
```

Ann G. Wylie, Ph.D.

1    that?

2        A    Mean aspect ratio, yes.

3        Q    Mean aspect, okay.  Is -- is that based

4    upon any geologic criteria?

5        A    When it was first developed, we based it

6    on just simply observations of many samples.

7        Q    Is it --

8        A    It's an empirical guide.

9        Q    Is the 20-to-1 aspect ratio published in

10   any peer-reviewed journal other than a journal --

11   an article that you authored?

12       A    It's part of the EPA working definition.

13   It's published by the EPA.

14       Q    But they just took it from you, right?

15       A    I don't know that.

16           MR. FROST:  Objection to form.

17   BY MR. PLACITELLA:

18       Q    So is there any peer-reviewed geological

19   reference that you have, other than the EPA, that

20   supports that 20-to-1 is a -- based on a geologic

21   criteria?

22           MR. FROST:  Objection to form.

23           THE WITNESS:  I took -- to say "yes" or

24   "no," the information out of the Bureau of Mines

25   may well have included it.  I'd have to review the

Ann G. Wylie, Ph.D.

1    literature for that topic.

2    BY MR. PLACITELLA:

3         Q    But as you sit here today, you can't

4    point to any peer-reviewed literature that adopts

5    the 21 -- 20-to-1 aspect ratio as a geologic

6    criteria, correct?

7              MR. FROST:  Objection to form.

8              THE WITNESS:  As I said, I'd have to

9    review the literature from the Bureau of Mines

10   before I could say -- answer that question.

11   BY MR. PLACITELLA:

12        Q    Right, that's what I'm saying.

13             But as you sit here today, you can't

14   point to any peer-reviewed article, as you sit

15   here today, that adopts your 20-to-1 criteria as a

16   geologic definition, correct?

17             MR. FROST:  Object -- objection.

18             THE WITNESS:  You know, the -- I think

19   the answer must be is it's -- I don't have

20   citations in my head for that.

21   BY MR. PLACITELLA:

22        Q    Well, do you have any authors --

23        A    I believe that --

24        Q    -- other than people who publish with

25   you?

Ann G. Wylie, Ph.D.

```
 1       A    Oh.

 2            MR. FROST:  Objection.

 3            THE WITNESS:  Again, I'd have to review

 4  the literature from the Bureau of Mines.

 5  BY MR. PLACITELLA:

 6       Q    Okay.  But as you sit here today,

 7  perhaps with the exception of something in the

 8  Bureau of Mines literature, you can't point to any

 9  peer-reviewed article or reference that adopts

10  your 20-to-1 criteria as a geologic criteria.

11  Correct?

12            MR. FROST:  Objection.

13            THE WITNESS:  As long as we exclude the

14  Bureau of Mines, I can't think of anything.

15  BY MR. PLACITELLA:

16       Q    Okay.

17       A    But I, you know, can't say it doesn't

18  exist.

19       Q    And you don't know for sure about the

20  Bureau of Mines.

21       A    I can't -- I think it's there, but --

22  that's kind of my memory, but I really would have

23  to look through the literature.

24       Q    Okay.  When you did your searches --

25  your research for today, you limited your searches
```

Ann G. Wylie, Ph.D.

```
 1    to what you term "geologic literature."  You did

 2    not look at medical lecture -- medical literature,

 3    correct?

 4         A    No.  No.

 5         Q    Okay.  Now --

 6         A    There is an article cited included in my

 7    list, which I did not actually end up using,

 8    that's medical.  So I have to say that.

 9         Q    Okay.  Now, in this AW-30, which is your

10    pad or our pad --

11         A    Your pad.

12         Q    -- will you look at it and make sure I

13    got the text right?

14         A    I will look at it.

15         Q    Okay.  And AW-30 -- or 50, I'm sorry,

16    the criteria in here is premised on using PLM as

17    the instrument, correct?

18         A    That's correct.

19         Q    Okay.  And the opinions in your report

20    are premised on using PLM as an -- as a -- as the

21    method, correct?

22         A    Hmm.  You -- are you asking me if I only

23    looked at the PLM component of the Longo reports?

24    Are you asking me that question?

25         Q    Well, how about that question.
```

Ann G. Wylie, Ph.D.

```
 1        A    No, it's not restricted to that.

 2        Q    Okay.  So you looked at the TEM

 3   component as well?

 4        A    I did.

 5        Q    Okay.  Now -- sorry.  Give me a second.

 6             The PLM method, is that the same method

 7   that was recommended by -- that was used by the

 8   EPA?

 9        A    I'm sorry.  The PLM method, which one

10   are we speaking about?

11        Q    All right.  Is there more than one PLM

12   method for testing for asbestos in materials?

13        A    By polarized light microscopy?

14        Q    Mm-hmm.

15        A    Okay.  The PLM method that is actually

16   written as a method, the -- by polarized light,

17   the EPA is certainly the most recent -- the most

18   recent.

19        Q    Okay.  And that's what most laboratories

20   rely upon?

21        A    I don't -- I can't answer that question.

22        Q    Okay.  That's for -- that was written

23   for the analysis of bulk materials, correct?

24        A    That's correct.

25        Q    It was actually written for the analysis
```

Ann G. Wylie, Ph.D.

```
1     of bulk insulation materials, correct?

2          A    Probably.

3          Q    Right.  It -- it was not written for and

4     is inappropriate for analyzing other mineral

5     products, correct?

6          A    No.

7               MR. FROST:  Objection to form.

8     BY MR. PLACITELLA:

9          Q    No what?

10         A    I don't think it's inappropriate.

11         Q    Do you believe it's appropriate to use

12    PLM for analysis beyond bulk insulation materials?

13         A    Yes.

14              (Wylie Exhibit No. AW-17 was

15              marked for identification.)

16    BY MR. PLACITELLA:

17         Q    I just handed you AW-17.  If we can go

18    to the -- okay.

19              This is a letter written by you to the

20    University of Maryland.  Do you see that?

21              MR. FROST:  Objection to form.

22    BY MR. PLACITELLA:

23         Q    On the University of Maryland letterhead

24    to the Massachusetts Department of Health written

25    by you, correct?
```

Ann G. Wylie, Ph.D.

```
 1       A     Yes, um-hmm.

 2       Q     Okay.  And it was written in 1986?

 3       A     Yes.

 4       Q     Correct?

 5       A     Yes.

 6       Q     And can you go to the last paragraph.

 7       A     At the end of the document?

 8       Q     Yes, ma'am -- yes, Doctor.

 9       A     Yes.

10       Q     You write in this paragraph:  "I would

11  like to make one final point.  The PLM method

12  recommended by EPA and published by them, which

13  most laboratories are relying upon -- relying on

14  for the analysis of play sand, was written for

15  analysis of bulk insulation materials found in

16  buildings.  It is inappropriate for the analysis

17  of sand, crushed stone, or other mineral

18  products."

19             Do you see that?

20       A     Yes.

21       Q     It says:  "The reasons are many.

22  Fundamental to this discussion, however, is the

23  fact that if amphiboles are found in insulation,

24  they are most likely to be asbestos.  Asbestos

25  fibers have many unique properties which made them
```

Ann Wylie, Ph.D.

```
 1    ideal for insulation.  Cleavage fragments lack

 2    these properties.  However, when amphiboles are

 3    found in crushed rock, they are not likely to be

 4    asbestos, and criteria to discriminate between

 5    asbestos and non-asbestos must be applied,

 6    discriminators that are not usually necessarily --

 7    necessary when dealing with insulation and which

 8    are not included in the EPA's interim method."

 9            Did I read that correctly?

10    A    That's correct.

11    Q    Okay.  Now, in preparing for today's

12    deposition, how much time did you spend?

13    A    Close to a hundred hours.

14    Q    And how did you spend that hundred

15    hours?

16    A    Researching and writing the report.  And

17    reviewing --

18    Q    I asked about preparing for the

19    deposition.

20    A    Oh, I'm sorry.  I'm sorry.  I

21    misunderstood.

22    Q    Sure.

23    A    Yesterday and the day before.

24    Q    Okay.  And did -- did you do that with

25    someone?
```

Ann G. Wylie, Ph.D.

```
1        A     With Mr. Frost and Mr. Ewald.

2        Q     Okay.  And --

3        A     I think one more person.

4        Q     And then before that, you spent about a

5    hundred hours on your report?

6        A     Approximately.

7              MR. FROST:  Objection to form.

8    BY MR. PLACITELLA:

9        Q     And what was your compensation per hour?

10       A     $350 per hour.

11       Q     Times a hundred hours?

12       A     That's correct.

13       Q     Is that what you billed them for?

14       A     I haven't billed them, but that -- I

15   will bill them at that rate.

16       Q     Okay.  And did you do any research as it

17   relates to the supply of talc from China?

18       A     No.

19       Q     Okay.

20       A     Let me -- let me qualify.  I have not

21   been able to find in the literature much on China,

22   so...

23       Q     Okay.  When -- you were part of the

24   IARC '93 Working Group.  Is that fair?

25       A     '93?
```

Ann G. Wylie, Ph.D.

```
 1        Q      Yeah.

 2        A      No.

 3        Q      You weren't?  Were you part of the IARC

 4   Working Group around 2010?

 5        A      2006.

 6        Q      2006.

 7        A      Yes.

 8        Q      And at any point in time when you were

 9   working in the working group, were you required to

10   disclose your prior or current work for industry

11   at the time?

12        A      I can't recollect.

13        Q      Do you know whether you ever disclosed

14   to the IARC your work with industry?

15              MR. FROST:  Objection to form.

16              THE WITNESS:  I -- I don't recollect.  I

17   think they required -- I'm trying to go back.

18   They must have asked for something.  I can't

19   remember truthfully.  I believe -- yes, let me go

20   back.  I think it talked about within the last

21   three years or two years or something like that.

22   They did have some kind of statement about that,

23   which I would -- would have filled out.

24              (Wylie Exhibit AW-16 was marked

25              for identification.)
```

Ann W. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:
 2        Q    Okay.  Now -- give me a second.
 3             There you go.  I put up on the -- or I'm
 4   putting up on the screen a letter written to you
 5   in 1987 by Johnson & Johnson.  That's you, Ann --
 6   Ann W. Wylie, Professor, correct?
 7        A    Yes.
 8        Q    Okay.  And it is written by a
 9   Mr. Ashton.  Do you see that?
10        A    Yes, I do.
11        Q    Okay.  And it actually copies the
12   medical director for Johnson & Johnson.  You don't
13   know that?
14        A    No.
15        Q    Okay.  And it -- I asked you before
16   whether you had done any work on -- with ASTM
17   for -- prior to three years ago, and you told me
18   no, and you told me you knew nothing about any
19   work with Ashton or Johnson & Johnson.
20             Do you recall that?
21        A    I do.
22        Q    Okay.  Now, here Ashton writes to you
23   and talks about the work you were doing on the
24   ASTM committee concerning polarized light
25   microscopy, correct?
```

Ann G. Wylie, Ph.D.

```
 1                 MR. FROST:  Objection to form, misstates
 2    the document.
 3                 THE WITNESS:  I was not a member of ASTM
 4    D22.
 5    BY MR. PLACITELLA:
 6        Q    But you were working with ASTM and you
 7    were working with Johnson & Johnson, according to
 8    this, correct?
 9                 MR. FROST:  Objection to form, misstates
10    the document.
11                 THE WITNESS:  I had -- I have no
12    recollection that I got this letter from Johnson &
13    Johnson when I replied that I had never worked for
14    them.  I just have no recollection.
15    BY MR. PLACITELLA:
16        Q    Well, this is about --
17        A    And I wasn't working for them.
18        Q    But you were working in conjunction with
19    ASTM in 1987 and interacting with Johnson &
20    Johnson, correct?
21                 MR. FROST:  Objection to form.
22                 THE WITNESS:  I wasn't a member of ASTM.
23    ASTM asked me to develop a polarized light
24    microscopy method for asbestos, and I did work on
25    that.  And I -- I would have said so, but the form
```

Ann G. Wylie, Ph.D.

```
 1    of your question earlier didn't -- it didn't

 2    suggest to me that you were interested in this,

 3    because I wasn't a member of ASTM.

 4              So ASTM wanted a method.  They asked if

 5    I would develop one, and I tried.  It was never

 6    published.  It never made it out of what they

 7    called then the gray sheets, and so it was -- it

 8    never led to anything in particular.

 9    BY MR. PLACITELLA:

10        Q    Well, when did you first start working

11    with the ASTM, even if you weren't a member?

12        A    Oh, I --

13              MR. FROST:  Objection to form.

14              THE WITNESS:  I only did this, whenever

15    this was, '87.  Probably I worked on that document

16    maybe for a year, six months or a year.

17    BY MR. PLACITELLA:

18        Q    Okay.

19        A    As I said, it never went anywhere.

20    So...

21        Q    And so you did work with Johnson &

22    Johnson on -- in conjunction with the -- with the

23    ASTM in terms of standards for testing for

24    asbestos, right?

25              MR. FROST:  Objection to form.
```

Ann Wylie, Ph.D.

```
1              THE WITNESS:  I did not work with

2   Johnson & Johnson.  This Mr. Ashton may have been

3   a member of D22.  I don't know.  And perhaps he

4   read the draft document and wrote me this letter.

5   I have no recollection of knowing Mr. Ashton, and

6   I never worked with Johnson & Johnson.

7   BY MR. PLACITELLA:

8        Q    Well -- let's just go through it.

9        A    Sure.

10       Q    He states in this letter to you:  "At a

11  previous meeting, Mike Beard of Triangle Park

12  EPA" -- do you know who he is?

13       A    I do.

14       Q    -- "appointed Slim Thompson and me to be

15  talc industry specialists on the PLM for ASTM

16  committee."

17            Do you see -- see that?

18       A    I do.

19       Q    And you know who Slim Thompson is,

20  right?

21       A    I do.

22       Q    He worked for who, R.T. Vanderbilt?

23       A    That's correct.

24       Q    And did you work with Slim Thompson from

25  R.T. Vanderbilt on the ASTM specifications?
```

Ann G. Wylie, Ph.D.

```
 1              MR. FROST:  Objection to form.

 2              THE WITNESS:  He was, as this letter

 3     states, their representative.  So perhaps he made

 4     comments to me about the method.

 5     BY MR. PLACITELLA:

 6         Q    So you did work with him?

 7              MR. FROST:  Objection to form.

 8     Misstates testimony.

 9              THE WITNESS:  "Work with him."  I mean,

10     you know, if you -- if you want to say that when I

11     was developing this method, I worked with the ASTM

12     D22 committee, then I would say that would be

13     correct.  They asked me to develop it.  And as you

14     can see, the ASTM committee is preparing my

15     method.  Not me.  They were preparing my method.

16     BY MR. PLACITELLA:

17         Q    Yeah, so all I'm saying is, so you

18     worked with members of the talc industry through

19     the ASTM committee on a method for testing

20     asbestos in talc, correct?

21              MR. FROST:  Objection to form, misstates

22     testimony.

23              THE WITNESS:  They -- there -- there

24     were -- obviously from -- Slim Thompson was from

25     the talc industry, and this Mr. Ashton appears to
```

Ann G. Wylie, Ph.D.

 1    have been.  And there were -- ASTM D22 is a very

 2    large committee.  So there were -- may have been

 3    other members from the talc industry or other

 4    industries on this committee.

 5    BY MR. PLACITELLA:

 6        Q    Okay.  And --

 7        A    So I worked with that committee.  So if

 8    that is responsive to your answer, I worked with

 9    that committee.

10        Q    Okay.  And members of that committee,

11    including Mr. Ashton and Mr. Thompson, made

12    suggestions to you concerning what definitions you

13    should use in your methods.  Correct?

14        A    This --

15            MR. FROST:  Objection to form.

16            THE WITNESS:  This letter states that

17    they would -- wanted me to use definitions that

18    conformed to previous ASTM standards.

19    BY MR. PLACITELLA:

20        Q    Right.  And did you do that?

21        A    I don't remember.  The -- it may be

22    that's the reason that this method never was

23    approved by ASTM.  I don't know.

24        Q    So when did your involvement stop with

25    the ASTM committee that was responsible for coming

Ann M. Wylie, Ph.D.

1    up with standards for testing for asbestos?

2         A    The method that -- that I drafted went

3    into the ASTM bureaucracy, and it came back to me

4    maybe once or twice.  I -- my memory is a

5    little -- and then I never heard from them again.

6         Q    And until the last three or four years?

7         A    Well, I joined ASTM D22 about three

8    years ago.

9         Q    Okay.  And did you come up with a method

10   that was adopted by D22 within the last three

11   years?

12        A    No.

13        Q    Now -- oh, sorry.  Give me a second.

14             (Counsel conferring.)

15             MR. PLACITELLA:  So somebody was -- did

16   she come back with a copy yet?

17             (Wylie Exhibit AW-40 was marked

18             for identification.)

19   BY MR. PLACITELLA:

20        Q    I'm only going to focus on a paragraph.

21   I have up here a one-page report that you did for

22   -- in 1985 for R.T. Vanderbilt.  And I have it

23   identified as AW-40.

24        A    Yes.

25        Q    And it was a report that you did on

Ann E. Wylie, Ph.D.

```
 1    Nytal 99.  Do you see that?

 2         A    Yes.

 3         Q    And that was done for the same

 4    Mr. Thompson, Slim Thompson?

 5              MR. FROST:  Objection to form.

 6    BY MR. PLACITELLA:

 7         Q    Correct?

 8         A    He sent me the samples.

 9         Q    Right.

10         A    Yes.

11         Q    And I'm just focus -- I'm just looking

12    at methodology.  I'm looking at your middle

13    paragraph of this report.

14              You say:  "Asbestos fiber populations

15    are composed of either chrysotile or a member of

16    the amphibole family that occur as a -- as

17    particulates that display some or all of the

18    following characteristics."

19              And you say:  "Fiber bundles with

20    splayed ends, curved fibers, aspect ratios in

21    excess of 20-to-1, and widths less than 1

22    micrometer for fibers longer than 5 micrometers,

23    and matted masses of individual fibers."

24              Do you see that?

25         A    Yes.
```

Ann G. Wylie, Ph.D.

```
 1        Q    Now, in this methodology you indicate

 2   the width can't be less than 1 micrometer,

 3   correct?

 4             MR. FROST:  Objection to form.

 5             THE WITNESS:  That the widths can be

 6   less than 1 micro- -- is that what you said?

 7   BY MR. PLACITELLA:

 8        Q    It says "widths less than."  In other

 9   words, that's what you're requiring, widths less

10   than 1 micrometer --

11        A    Yes.

12        Q    -- for fibers longer than 5 micrometer.

13        A    That's what it says.

14        Q    That's different than what's in AW-50,

15   correct?

16             MR. FROST:  Objection to form, misstates

17   the document.

18             MR. PLACITELLA:  Please don't do that.

19   Please don't do that.

20             THE WITNESS:  Yes.

21   BY MR. PLACITELLA:

22        Q    Okay.  Why is it different?

23        A    Well, they -- 1 micrometer was -- after

24   a lot of study, this was in '86, I felt was not

25   appropriate for fiber bundles, the fibrils in the
```

Ann Wylie, Ph.D.

```
 1    bundles.  And so -- and then this actually says
 2    that the fiber bundles have widths less than
 3    1 micrometer.  That's what it says.
 4         Q    Right.  Well, this is different.  Why is
 5    it different?
 6         A    Well, fiber bundles -- this says fiber
 7    bundles.  This -- this -- what's written here and
 8    what's written there are not the same thing.  You
 9    asked me what were the properties of the
10    materials, the fibrils that formed the fiber
11    bundles.  This just says bundles with splayed
12    ends, curved fibers and -- you know, any particle
13    with widths less than 1 micrometer.
14              So we're really talking about the
15    population as a whole, and in that conversation
16    you and I were having earlier, we were talking
17    about the size of particles in fiber bundles.
18              And over time, I stopped using
19    1 micrometer because I thought that it was
20    confusing.  There's no asbestos that I know that
21    curves in fiber bundles where the fibrils are
22    1 micrometer.
23         Q    When did you stop using that?
24         A    I don't know.
25              And what year was this?  In 1985?
```

Ann M. Wylie, Ph.D.

```
 1        Q     Correct.

 2        A     I -- I'm sorry, I don't remember.  But

 3   it wasn't probably much longer after that, as the

 4   work I was doing was progressing and I had looked

 5   at more samples and things like that.

 6        Q     Okay.

 7        A     Fibrils of asbestos have to be less than

 8   1 micrometer, which is what our earlier

 9   conversation directed at.

10        Q     This AW-50 --

11        A     Yes.

12        Q     -- what's in here, is this, as you've

13   articulated here, adopted in any peer-reviewed

14   geologic literature other than that authored by

15   yourself?

16              MR. FROST:  Objection to form.

17              THE WITNESS:  It's close to the EPA

18   document --

19   BY MR. PLACITELLA:

20        Q     Oh, but --

21        A     -- published in '93.

22        Q     What I'm asking you is the criteria that

23   forms the basis --

24        A     Yes.

25        Q     -- of your opinion here --
```

Ann E. Wylie, Ph.D.

1      A      Yes.

2      Q      -- that's in AW-50, is that -- does that

3   appear in any peer-reviewed geologic literature

4   other than literature authored by yourself?

5      A      We discussed this earlier, I think, and

6   I said that there may be -- it may be in the

7   Bureau of Mines literature.  I would have to do a

8   literature search to find that out.  I actually

9   don't know.  It may be in the Bureau of Mines

10  literature.

11     Q      Actually, I was asking you different

12  questions.

13     A      Oh.

14     Q      So -- but that's okay.  So now I'm

15  asking you the methodology --

16     A      Yes.

17     Q      -- that you're using here in this case

18  as reflected in AW-50, as you sit here, can you

19  point to any peer-reviewed geologic literature

20  that adopts verbatim your methodology?

21            MR. FROST:  Objection to form.

22            THE WITNESS:  As I said, I -- I'd have

23  to review the literature before I could answer

24  that.

25  BY MR. PLACITELLA:

Ann Wylie, Ph.D.

1     Q    Okay.

2     A    It's not really fair to ask me --

3     Q    All right.

4     A    -- about the whole world of literature

5   when -- on a topic I have not had a chance to

6   refresh myself on.

7     Q    I know, but this --

8     A    And I think we've gotten to the point

9   where I told you before that I am not aware at

10   this moment in time other than the EPA or the

11   Bureau of Mines directly.

12     Q    Okay.  Let's just break it down, because

13   I'm a little slow on the uptake.

14          Putting aside the Bureau of Mines and

15   the EPA, which you're not sure of, correct?

16     A    I'm sure of the EPA.

17     Q    You're sure that the EPA adopts

18   identically what's in AW-50?

19     A    I'm sorry, but, you know, you're asking

20   me to verbatim say something about a word-for-word

21   definition, and I'm a writer, and I don't ever --

22   I would never do this.  I'd like to have a chance,

23   as we have discussed, to correct what's written in

24   there to make sure --

25     Q    Okay.  So --

1       A    I am not going to say what you've

2   written down there is appropriate.

3            For example, I think you wrote

4   "20-to-1," and I said "mean aspect ratio."

5       Q    Well, you'll fix -- okay.  We will stop.

6       A    Yes.

7       Q    Okay.  We'll come back to it.

8            MR. PLACITELLA:  Let me just go to a

9   different -- she's not back yet with the stuff?

10  Okay.  Hold on.

11           (Counsel conferring.)

12  BY MR. PLACITELLA:

13      Q    Just before I move to a different topic,

14  can we agree that asbestos in talc is not an

15  analysis of bulk material?

16           MR. FROST:  Objection to form.

17  BY MR. PLACITELLA:

18      Q    When you're looking for asbestos in

19  talc, it's not an analysis of bulk material.

20           MR. FROST:  Same objection.

21           THE WITNESS:  I'm sorry.  What do you

22  think it's an analysis of?

23  BY MR. PLACITELLA:

24      Q    Well, when you're -- how do you know --

25  I mean it's a mixture, right?  It's not a bulk

Ann M. Wylie, Ph.D.

```
 1    material of one substance.  Can we agree with
 2    that?
 3               MR. FROST:  Objection to form.
 4               THE WITNESS:  I'm sorry, I'm still not
 5    understanding.  Talc when -- you analyze talc by
 6    polarized light microscopy, it's a bulk method.
 7    BY MR. PLACITELLA:
 8         Q    Okay.  That's it.
 9         A    That's the question you asked, I
10    believe.
11         Q    That's it.  That's the only method it
12    is.
13               MR. FROST:  Objection to form.
14    BY MR. PLACITELLA:
15         Q    It's just a bulk method for nothing
16    else.
17         A    Polarized light microscopy is used for
18    analysis of bulk samples.  It's in that regard --
19    I mean, it's not useful for the analysis of air
20    samples.
21         Q    Okay.  And when getting to the aspect
22    ratio --
23         A    Yes.
24         Q    -- of 20-to-1, using polarized light
25    microscopy --
```

Ann G. Wylie, Ph.D.

```
 1      A    Yes.

 2      Q    -- where is that published in the

 3   medical literature -- I'm sorry, in the geologic

 4   literature, other than your own publications?

 5      A    I -- you've asked me this question, and

 6   I would have to search the literature to find out

 7   if it were -- were adopted elsewhere.  I actually

 8   don't know.

 9      Q    Mm-hmm.

10      A    And remember it's not aspect ratio

11   20-to-1, it's mean aspect ratio.

12      Q    Mm-hmm.  Is asbestos in bulk when it's

13   found in talc?

14           MR. FROST:  Objection to form.

15           THE WITNESS:  I -- I'm sorry, but that

16   question doesn't actually make any sense.  I'm not

17   understanding.

18           If we're looking at a sample under

19   polarized light microscopy, that's a bulk sample.

20   BY MR. PLACITELLA:

21      Q    Mm-hmm.

22      A    It's a sample that is something you can

23   hold in your hand.  It's a bulk sample.  It's not

24   an air sample.  So the term "bulk sample" means

25   any sample that's not an air sample.
```

Ann G. Wylie, Ph.D.

```
 1       Q     Okay.

 2       A     Okay?  Or water sample.

 3       Q     Okay.

 4       A     Okay.

 5       Q     So this is what I guess I'm trying to

 6   understand.

 7       A     Yes.

 8       Q     Based upon everything that we went

 9   through in -- and with -- with your right to

10   revise it, okay?

11       A     Mm-hmm.

12       Q     -- in AW-50, if I'm a scientist --

13       A     Mm-hmm.

14       Q     -- a geologist --

15       A     Mm-hmm.

16       Q     -- and I'm not -- I'm not Ann Wylie, how

17   do I duplicate what you do using this criteria?

18   How do I look at the same sample that you do, and

19   use your methodology and come up with a

20   conclusion?

21             MR. FROST:  Objection to form.

22   BY MR. PLACITELLA:

23       Q     And come to the same conclusion.

24       A     Well, number one, you need to be trained

25   in polarized light microscopy.  I don't think you
```

Ann G. Wylie, Ph.D.

 1   could do it.

 2        Q    Not me.  That's -- let me -- let me

 3   rephrase the question.

 4        A    Okay.

 5        Q    I'm somebody who understands and has

 6   been trained in polarized light microscopy.

 7        A    Okay.

 8        Q    I'm a geologist such as yourself.

 9        A    Okay.

10        Q    Okay.  And I'm looking at the same

11   sample that you are.

12        A    Mm-hmm.

13        Q    Okay.  Using your criteria --

14        A    Mm-hmm.

15        Q    -- how do I come to the same conclusions

16   that you do?

17             MR. FROST:  Objection to form.

18   BY MR. PLACITELLA:

19        Q    What -- what do -- how do I do that?

20        A    You apply the criterias, the method the

21   EPA uses.  You apply the criteria.

22        Q    But it seems from the way you are

23   articulating it, with respect, that there is some

24   subjectivity in applying that criteria.  That you

25   look at and you say, This is what I think I see.

Ann G. Wylie, Ph.D.

1   And other people could apply the exact same

2   criteria, have the same exact skills as you, and

3   possibly come to a different conclusion.  Is that

4   possible?

5          MR. FROST:  Objection to form.

6          THE WITNESS:  No.  I'm sorry, but that's

7   not an answerable question.

8   BY MR. PLACITELLA:

9      Q    So if I -- if I am a trained -- if I'm

10  trained in polarized light microscopy, like you

11  are, and I look at the same sample, and I apply

12  your criteria, I will have no -- no -- it's

13  inevitable I will reach the same exact conclusion

14  that you do.

15     A    The EPA method has been tested and used

16  by many places, and I don't think that it is in

17  question.

18     Q    So --

19     A    I believe you would find the same

20  results.

21     Q    So from your perspective, somebody with

22  the same training as you, looking at the same

23  example using your methodology, there is no way

24  they could come to a different conclusion than you

25  do.

Ann Wylie, Ph.D.

```
 1                MR. FROST:  Objection to form.
 2   BY MR. PLACITELLA:
 3        Q    Is that what you are saying?
 4        A    I'm sorry, I can't speak for another
 5   person.  I believe the methods that EPA uses is a
 6   recognized method among microscopists for the
 7   analysis of bulk samples for asbestos, and I don't
 8   think -- I think that the results should be
 9   comparable if we look at the same slide.
10        Q    Okay.  So -- all right.
11             (Wylie Exhibit No. AW-31 was
12             marked for identification.)
13   BY MR. PLACITELLA:
14        Q    Let me go to AW-31.
15             I'm sorry, I should get a smaller table.
16             AW-31 is a paper that was written by you
17   and others?
18        A    With coauthors, yes.
19        Q    Okay.  And including somebody --
20   including RJ Lee.
21        A    He's one of the authors.
22        Q    Okay.  And in your paper at page 241,
23   you state that:  "Asbestos fibers wider than
24   1 micron are composed of bundles of fibrils that
25   readily split longitudinally into individual
```

Ann E. Wylie, Ph.D.

```
 1    fibers of much smaller width.  Even if wider
 2    fibers were inhaled, because of the fibular
 3    structure of asbestos, the fibers desegregate."
 4             Are you with me?
 5        A    I -- I'm not sure where you're reading.
 6    There's a lot on page 241.
 7        Q    That's why I highlighted.
 8        A    Sorry.  I didn't look at the screen.
 9    Let me just look.  (Peruses document.)
10             Yes.
11        Q    Okay.  And you further state:  "Cook and
12    co-workers demonstrated that -- the effectiveness
13    of this process in their animal intratracheal
14    installation experiments with ferro-actinolite
15    asbestos.  In these experiments they showed that
16    the number of fibers found in lung tissue
17    increased following cessation of exposure, and
18    that the increase was due to longitudinal
19    splitting of the asbestos fiber bundles."
20             Do you agree with that?
21        A    It says "the splitting of fiber
22    bundles," but, yes --
23        Q    Okay.
24        A    -- that's what it says.
25        Q    Now, I want to talk to you a little bit
```

Ann C. Wylie, Ph.D.

```
 1   about -- by the way, does any federal agency

 2   recognize fibrous talc as asbestos?

 3              MR. FROST:  Objection to form.

 4              THE WITNESS:  In regulatory policy?  In

 5   regulatory policy?

 6   BY MR. PLACITELLA:

 7       Q    Yes.

 8       A    Not that I'm aware of.

 9       Q    Okay.  I meant to ask you one final

10   question before I move on.

11              Is cosmetic talc a bulk material from

12   your perspective?

13              MR. FROST:  Objection to form.

14              THE WITNESS:  Yes.

15   BY MR. PLACITELLA:

16       Q    Okay.  Is cosmetic talc a building

17   material?  Bulk building material.

18       A    I -- I don't know.  I mean, I don't know

19   whether it was used that way, but it's not.

20       Q    Okay.  Okay.  Now, do -- are you

21   familiar with a -- a testing method known as x-ray

22   defraction?

23       A    Yes.

24       Q    Okay.  And are you familiar with what

25   the limits of detection are with x-ray defraction?
```

Ann G. Wylie, Ph.D.

1        A     I am.

2        Q     Okay.  Can you tell me is -- is x-ray

3  defraction -- well, what's the limit of detection

4  for x-ray defraction for amphiboles, if you know?

5        A     I can't answer that question without

6  talking about the matrix.

7        Q     Okay.

8        A     So in some -- in some materials it might

9  be 5 percent.

10       Q     Okay.

11       A     In some materials it could be 0.1.

12       Q     Okay.  So when you -- if you're using

13  x-ray defraction and looking at talc that comes

14  out of a mine --

15       A     Yes.

16       Q     -- what's the limit of detection for

17  that purpose?

18       A     Okay.  Let me say also, going backward,

19  that the detection limit depends upon the matrix,

20  and it also depends upon the actual material

21  that's forming the -- the amphibole.

22             X-ray defraction cannot identify

23  asbestos.  X-ray defraction can only identify a

24  mineral.  Okay?  So if -- in some minerals, the

25  same mineral from different places may actually

Ann G. Wylie, Ph.D.

```
 1    have different detection limits by x-ray

 2    defraction.

 3            Now, maybe we are splitting hairs here,

 4    and it's the difference between 0.1 and 0.2 or 0.2

 5    and 0.3, or something like that, percent.  But it

 6    does vary depending upon the nature of the

 7    amphibole itself.

 8        Q    Okay.  So let me try to be a little bit

 9    more specific.

10        A    Okay.

11        Q    Looking at a sample, talc sample --

12        A    Yes.

13        Q    -- that comes out of a Vermont talc

14    mine --

15        A    Yes.

16        Q    -- and I'm looking to determine whether

17    that sample contains amphiboles --

18        A    Yes.

19        Q    -- before we even get to whether it's

20    asbestos.

21        A    Yes.

22        Q    Just the mineral -- a mineral amphibole.

23        A    Yes.

24        Q    Okay?

25        A    Yes.
```

Ann ... Wylie, Ph.D.

```
 1       Q    For example, tremolite.

 2       A    Yes.

 3       Q    Okay.  What's the limit of detection?

 4       A    I don't think I know for the Vermont.  I

 5   would say it was some place between 0.2 and 0.5

 6   percent.

 7       Q    0.1 and 0.5 percent?

 8       A    Something like that, yes.

 9       Q    So if you used x-ray defraction as a

10   screening tool --

11       A    Yes.

12       Q    Okay.  For that talc coming out of that

13   mine, would you agree with me that it will not

14   detect low levels of tremolite, putting aside

15   whether they're asbestiform or not?

16       A    You must --

17            MR. FROST:  Object --

18            THE WITNESS:  -- define "low."

19            MR. FROST:  Hold on.  Objection to form.

20            THE REPORTER:  Can you repeat that,

21   please?

22            THE WITNESS:  Please define "low."

23   BY MR. PLACITELLA:

24       Q    Okay.  It cannot -- you can't use x-ray

25   defraction to find tremolite in talc at levels
```

Ann G. Wylie, Ph.D.

1    below 0.1 percent.

2           MR. FROST:  Objection to form.

3           THE WITNESS:  I would say that is

4    probably true.

5    BY MR. PLACITELLA:

6        Q    Okay.  Now, is there -- you get the same

7    talc out of a mine in Vermont, using x-ray

8    defraction, can you find chrysotile asbestos using

9    that method, x-ray defraction?

10          MR. FROST:  Objection to form.

11          THE WITNESS:  Yes.

12   BY MR. PLACITELLA:

13       Q    Okay.  And at what level?  What's the

14   detection level?

15          MR. FROST:  Object -- objection.

16          THE WITNESS:  I've not seen data on

17   that.

18   BY MR. PLACITELLA:

19       Q    Okay.

20       A    But I would guess it was of the same

21   general -- but I -- I -- I haven't seen the data,

22   and there may be overlap in the peaks with

23   chrysotile.  I'm more familiar with amphibole.

24   So --

25       Q    Okay.  So --

Ann G. Wylie, Ph.D.

```
 1         A    I'd have -- I'd have to look at the

 2    defraction pattern again.

 3         Q    So you don't feel comfortable talking

 4    about that?

 5         A    I don't actually.

 6         Q    Okay.  All right.  Be with you in one

 7    second.

 8              I -- I put up in here a statement that

 9    says:  "Tremolite is the commonest asbestos

10    mineral found as a contaminate of talc."

11              Do you agree with that?

12              MR. FROST:  Hold on.  I'm going to

13    object.  We have no idea what this document is.

14              MR. PLACITELLA:  I'm just asking if she

15    agrees with the statement, and then we'll talk

16    about the document.

17              MR. FROST:  Objection to form.

18              MR. LOCKE:  You're asking about this --

19    you're asking her to comment on this sample?

20              MR. PLACITELLA:  No.  I'm asking her

21    whether she agrees with the statement:  Tremolite

22    is the commonest asbestos mineral found as a

23    contaminate of talc.  That's what I'm asking.

24              MR. FROST:  Same objection to form.  I

25    think this is inappropriate to ask her about a
```

Ann G. Wylie, Ph.D.

```
 1   document we don't even know what it is, frankly.
 2   BY MR. PLACITELLA:
 3        Q    Okay.  Do you agree with that statement?
 4             MR. FROST:  Same objection.
 5             THE WITNESS:  I -- are we talking about
 6   the entire -- the entire paragraph?  Can I -- are
 7   we talking about just one sentence?
 8   BY MR. PLACITELLA:
 9        Q    I'm going to ask you about -- are you
10   more comfortable looking at the whole paragraph?
11        A    I don't care.  I just want to know what
12   you're asking me.
13        Q    No, I was just asking you about that one
14   sentence.
15        A    I would say that that was probably
16   correct.
17        Q    Okay.  It says:  "It occurs in
18   asbestiform and non-asbestiform varieties."
19             You agree with that, correct?
20        A    Yes.
21             MR. FROST:  Same objections.
22   BY MR. PLACITELLA:
23        Q    Okay.  And then it talks about a sample.
24   It says:  "This sample is a chunky tremolite, not
25   the asbestiform variety."
```

Ann Wylie, Ph.D.

1                And then it states:  "But when it is

2     ground, it produces some thin, straight particles

3     which conform to the definition of 'fibers' in the

4     method and which are distinguishable from those

5     produced by asbestiform tremolite on grinding."

6                Do you agree with that?

7          A    No.

8                MR. FROST:  And objection to form.

9     Again, we're talking about methods and things like

10    that, and you're not allowing her to get any

11    context from the statement which you're having her

12    read.

13               MR. PLACITELLA:  All I'm asking her is

14    if she agrees with that statement.

15               THE WITNESS:  I can't agree when it says

16    "the method," and I have no idea what you're

17    talking about.

18    BY MR. PLACITELLA:

19         Q    Okay.  Do you agree that when

20    non-asbestiform tremolite is ground, it produces

21    some thin, straight particles which conform to the

22    definition of 'fibers' in the method and which are

23    indistinguishable from those produced by

24    asbestiform tremolite on grinding?

25               MR. FROST:  Same objections.

Ann McDyie, Ph.D.

```
 1                    It's getting absurd, Chris.

 2                    THE WITNESS:  I have no idea what the

 3      method you're talking about is.  I can't possibly

 4      agree to that statement.  I don't know what the

 5      method is.

 6      BY MR. PLACITELLA:

 7           Q    Okay.  Well, I'll give you -- so here we

 8      have a letter from the FDA to Johnson & Johnson,

 9      and it -- let's go through it.  And I'll --

10                    MR. FROST:  Again, objection to the

11      characterization of the document, but --

12                    MR. PLACITELLA:  Well, it's from the FDA

13      to Johnson & Johnson, dated May 14th, 1974.  Is

14      there any dispute about that?

15                    MR. FROST:  It doesn't appear to be a

16      letter.  It's on a letterhead that says

17      "Memorandum."

18                    MR. PLACITELLA:  Oh, okay.

19      BY MR. PLACITELLA:

20           Q    It says:  "The purpose of this study is

21      to check the adequacy of microscopic method for

22      detecting the presence of asbestos minerals in

23      talc and for counting fibers of these minerals.

24      Three reference samples and four samples for

25      analysis are being sent under separate cover."
```

Ann G. Wylie, Ph.D.

1               Do you see that?

2        A    Yes.

3        Q    Okay.  And then it talks about reference

4   samples.  See that?

5               MR. FROST:  Objection to form.

6               THE WITNESS:  I see that -- I -- I have

7   read that part, yes.

8   BY MR. PLACITELLA:

9        Q    So -- now, just going back and this is

10  what I'm trying to understand in context.

11              Do you agree that if you have

12  non-asbestiform tremolite, that when it's ground,

13  it can produce thin, straight particles which

14  conform to the definition of "fibers"?

15              MR. FROST:  Objection --

16  BY MR. PLACITELLA:

17       Q    Do you agree with that?

18              MR. FROST:  Objection to form.

19              THE WITNESS:  I -- I cannot agree when I

20  don't know "the definition of 'fibers'" that this

21  is referring to or in "the method," which I also

22  don't know what they're referring to.

23  BY MR. PLACITELLA:

24       Q    Okay.  In this case you were hired only

25  by Johnson & Johnson or were you hired by other

Ann Wylie, Ph.D.

```
 1    co-defendants in the case as well?

 2         A    Only Johnson & Johnson.

 3              (Wylie Exhibit No. AW-35 was

 4              marked for identification.)

 5    BY MR. PLACITELLA:

 6         Q    Okay.  I want to show you -- AW-35 is a

 7    document entitled "Talc Asbestos Education

 8    Document."

 9              Have you ever seen this before?

10         A    No.

11         Q    Okay.  I'm going to show you to page 8

12    of the document.  Do you know who Julie Pier is,

13    by the way?

14         A    I do.

15         Q    And is she a respected scientist?  Does

16    she know what she is talking about when it comes

17    to microscopy?

18         A    I really -- I think so, but I don't

19    know.  I have not read her work.

20         Q    Okay.  In this document, the author

21    writes:  "The asbestiform morphological criteria,

22    as defined by Wylie, may not apply to fibers that

23    have been aggressively milled and area of size

24    range below the resolution of the light

25    microscope.  See following quote by Wylie.  I do
```

Ann G. Wylie, Ph.D.

```
 1   not know of any outside electron microscopy method

 2   that uses Wylie's definition."

 3            Do you see that?

 4            MR. FROST:  Objection to form.

 5            THE WITNESS:  I'm sorry.  What page are

 6   we on?  I just --

 7   BY MR. PLACITELLA:

 8        Q    Page --

 9            MR. FROST:  Page 6, I believe.

10            MR. PLACITELLA:  -- 6.

11            THE WITNESS:  All right.

12   BY MR. PLACITELLA:

13        Q    Do you agree with this sentence?

14        A    Are we reading J --

15        Q    Yes, ma'am.

16        A    -- WP note?

17        Q    And I think your quote is right

18   underneath it.

19            MR. FROST:  Who is it to?  I believe

20   it's more than one sentence.

21            MR. PLACITELLA:  Yeah.

22            THE WITNESS:  Okay.  What are you asking

23   me to agree to?

24   BY MR. PLACITELLA:

25        Q    I'm asking whether you agree with this
```

Ann ... Wylie, Ph.D.

1    statement by Julie Pier that says:  "The

2    asbestiform morphological criteria," as defined by

3    you, Ann Wylie, "may not apply to fibers that have

4    been aggressively milled and area of the size

5    range below the resolution of the light

6    microscope."

7              Do you agree with that?

8              MR. FROST:  Objection to form.

9              THE WITNESS:  When I was -- I need to

10   give you a little context.

11             When I was working with the Bureau of

12   Mines, we aggressively milled asbestos, and we had

13   no problem identifying it by those criteria

14   following aggressive milling.

15   BY MR. PLACITELLA:

16        Q    Well, you aggressively milled asbestos.

17   I'm not talking about aggressively milling

18   asbestos.  Here they're -- they're talking about

19   aggressively -- well, scratch that.  I withdraw

20   that statement.

21        A    Okay.

22        Q    So when you aggressively milled

23   asbestos, when you -- and you say you did work

24   with the Bureau of Mines?

25        A    The Bureau of Mines aggressively milled

Ann G. Wylie, Ph.D.

1    it.

2         Q    Okay.  You still found asbestos below

3    the limit of detection in a light microscope?

4              MR. FROST:  Objection to form.

5              THE WITNESS:  Found -- I'm sorry, but

6    again your question is not terribly clear.  You

7    asked me if we found asbestos below the resolution

8    of the light microscope?

9    BY MR. PLACITELLA:

10        Q    Well, you refer -- you responded to my

11   question about milling of asbestos.

12        A    Yes.

13        Q    Okay.  And when you're -- when you say

14   that, you're talking about undisputed asbestos

15   products, correct?

16        A    I'm talking about asbestos, yes.

17        Q    Right.  Okay.

18             So that's what I'm asking you.  Do you

19   agree with the statement by Pier that asbestiform

20   morphological criteria, as defined by you, may not

21   apply to fibers that have been aggressively milled

22   and are of the size range below the resolution of

23   the light microscope?

24             MR. FROST:  Objection to form.

25             THE WITNESS:  If the question is, can

Ann G. Wylie, Ph.D.

```
1    you apply definitions to particles you can't see

2    by polarized light microscopy, of course you

3    cannot.

4    BY MR. PLACITELLA:

5        Q    Okay.  Fair enough.

6             I want to see if I can -- I got your

7    tests down correctly when asking you the question,

8    okay?

9             Assume that you have a particle that has

10   the following characteristics:  The morphology of

11   a single fiber with a 3-to-1 aspect ratio,

12   parallel sides, more than 5 microns long.

13            Are you with me so far?

14       A    Yes.

15       Q    And chemical signature of tremolite as

16   determined by EDS or EDXA.

17            Are you with me?

18       A    Yes.

19       Q    Okay.  And the crystalline structure

20   consistent with amphibole asbestos.

21            Are you with me?

22       A    There is --

23            MR. FROST:  Objection to form.

24            THE WITNESS:  There is no structure

25   typical of amphibole asbestos.
```

Ann G. Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q    Oh.  So there is no structure?

 3        A    Typical of amphibole asbestos.

 4   Structures typical of amphibole.

 5        Q    Okay.  Crystalline structure consistent

 6   with amphibole.

 7        A    Amphibole.

 8        Q    Okay.  What analytical techniques are

 9   necessary to tell whether that fiber-shaped

10   particle grew in an asbestiform habit or not?

11        A    A single particle, you can't make a

12   distinction necessarily.  Necessarily.

13        Q    Okay.  So if you're looking at a single

14   fibril under a microscope, the light microscope,

15   you can't tell whether it grew in an asbestiform

16   habit or not.  Correct?

17        A    That's not what I said.

18             MR. FROST:  Objection to form.

19   BY MR. PLACITELLA:

20        Q    Okay.

21        A    You asked me if I had a particle that

22   was 5 micrometers long --

23        Q    Okay.

24        A    -- and it had parallel sides --

25        Q    Okay.
```

Ann G. Wylie, Ph.D.

1         A     -- and it had a 3-to-1 aspect ratio, if

2    I could tell by that single particle whether it

3    formed an asbestiform habit or was formed by

4    cleavage, I think would be the alternative.

5         Q     Okay.

6         A     And I normally don't -- unless there

7    were properties there, and they're optimal

8    properties, they had -- it had anomalous optical

9    properties, I would be able to tell.

10        Q     But if it's not there, you can't tell.

11        A     But if -- that's -- that's right.

12        Q     Okay.  And same assumptions, what

13   analytical techniques are available that would

14   allow you to test the textile -- tensile strength

15   and flexibility of that particle?

16        A     For a 5 micrometer particle, there are

17   none.

18        Q     Okay.  Assuming you have a particle --

19   if you have particles exactly of the same size and

20   shape, chemically, surface area and surface

21   charge, can you tell the difference between what's

22   an asbestiform and non-asbestiform tremolite?

23              MR. FROST:  Objection to form.

24              THE WITNESS:  I can't answer your

25   question.  It's too hypothetical.

Ann G. Wylie, Ph.D.

```
 1              MR. PLACITELLA:  Sorry.  Oh, that's not

 2    very clear.  Is there a way to turn -- turn that

 3    light off?

 4              MR. FROST:  Yeah, it's not particularly

 5    clear on the screen either, though, or on the TV

 6    monitor.

 7              MR. PLACITELLA:  Can we turn the

 8    light -- at least turn the light off?

 9              MR. FROST:  I was going to say we can

10    try, I guess.

11    BY MR. PLACITELLA:

12         Q    So this appeared in an article by Harper

13    in 2008, and in looking at these photomicrographs,

14    are you able to tell what -- which one is

15    asbestiform tremolite and which one is a cleavage

16    fragment?

17              MR. FROST:  Objection to form.

18              THE WITNESS:  So you're telling me that

19    one is a cleavage fragment and one is a fiber?  Is

20    that what you're telling me?

21    BY MR. PLACITELLA:

22         Q    Or both.  Can you tell whether either of

23    them are a cleavage fragment?

24              MR. LOCKE:  Objection to form.

25              THE WITNESS:  I do not make distinctions
```

Ann G. Wylie, Ph.D.

```
 1    on individual particles.  This is an optical

 2    micrograph, and which is inserted a red-1

 3    compensator, and so it obscures some of the

 4    optical properties.  I don't know whether -- what

 5    it would look like under crossed nicols.  There

 6    are other tests to be looked at.  So...

 7    BY MR. PLACITELLA:

 8         Q    Well, this is under a microscope that

 9    you use, though, right?

10         A    Well, yes, but --

11              MR. FROST:  Objection to form.

12              THE WITNESS:  -- you put a phase 1 --

13    you put a phase 1 retardation plate within the

14    microscope system, so you're losing information.

15    BY MR. PLACITELLA:

16         Q    Okay.  So on this slide -- you can't

17    tell from looking at this slide whether this is a

18    cleavage fragment or asbestiform tremble --

19    tremolite, correct?

20              MR. FROST:  Objection to form.

21              THE WITNESS:  I could only guess.

22    BY MR. PLACITELLA:

23         Q    Okay.  So does that help you?

24              MR. FROST:  Objection to form.

25              THE WITNESS:  I suppose that's what
```

Ann G. Wylie, Ph.D.

1  Harper says.  If I had guessed, I probably would

2  have gone that way.  But I don't guess.

3  BY MR. PLACITELLA:

4       Q    Okay.  Now -- I have another slide up

5  here, and can you describe what you're seeing?

6       A    I see elongated mineral particles.

7       Q    Okay.  And what kind of output?

8       A    Oh -- well, number 1 and 4 are pretty

9  clearly from transmission electron microscopy,

10 because I recognize the filter background.  2 and

11 3, I -- I don't know.

12      Q    Are we looking at cleavage fragments or

13 asbestos here?

14           MR. FROST:  Objection to form.

15           THE WITNESS:  As I said before, I don't

16 make determinations based on individual particles,

17 unless I have other information.

18 BY MR. PLACITELLA:

19      Q    Well --

20      A    This is TEM.

21      Q    Okay.  So using this slide, you can't

22 tell whether these are cleavage fragments or

23 asbestos.  Is that fair?

24           MR. FROST:  Objection to form.

25           THE WITNESS:  I can guess.

Ann D. Wylie, Ph.D.

```
1    BY MR. PLACITELLA:

2         Q    Well, I don't want you to guess.

3         A    Okay.

4         Q    You can't tell.

5              MR. FROST:  Objection to form.

6              THE WITNESS:  I would -- let me just say

7    there -- there are properties of cleavage

8    fragments on number 1.

9              Number 2 looks like two different

10   minerals to me, but I don't know what -- you know,

11   I don't know what they are.

12             Number 3, similarly, it looks to me like

13   one mineral and another coating it, so I really

14   don't -- it's obscuring the characteristics.

15             Number 4 has characteristics that would

16   be consistent with cleavage fragments.  But,

17   again, you know, I'd have to look at the

18   population at many particles before I would be

19   willing to do anything other than guess.

20   BY MR. PLACITELLA:

21        Q    So, as we sit here today, it's your

22   testimony that looking at a single particle or

23   fiber using a polarized light microscopy, you

24   cannot make the call about whether that's asbestos

25   or not?
```

Ann C. Wylie, Ph.D.

1              MR. FROST:  Objection to form.

2    BY MR. PLACITELLA:

3         Q     Correct?

4         A     No.  You asked me to look at the

5    polarized light micrographs in the previous slide,

6    in which a red-1 compensator had been inserted,

7    and which the optical properties are therefore

8    obscured other than a sign of elongation.  So

9    there's no other information.

10             So I'm not going to tell you that I

11   couldn't look at that particle and study it in

12   more detail, and with the other properties, the

13   nine or ten properties that I listed, and tell

14   you.  I would have better -- be better able to do

15   that because the asbestos has anomalous

16   properties.

17        Q     All right.  What I'm asking -- what I'm

18   asking you -- okay, we left that.  This -- these

19   are TEM up here on the screen?

20        A     Yes.  The question you asked me included

21   polarized light.  I'm sorry.

22        Q     That was my mistake.

23        A     Okay.

24        Q     What we have here are photomicrographs

25   of TEM, correct?

Ann G. Wylie, Ph.D.

```
 1          A     Yes.

 2          Q     And is it your testimony that you can't

 3    look at these photomicrographs and make a call

 4    about whether they are asbestos or not on a single

 5    particle or fiber basis?

 6                MR. FROST:  Objection to form.

 7    BY MR. PLACITELLA:

 8          Q     Is that what you're saying?

 9          A     I never or almost never try to make

10    distinctions on single particles unless the

11    properties are very clear.

12                On sample 1, there are -- there is a

13    stepwise pattern at the end of the particle that

14    suggests cleavage, but the -- and the particle is

15    not regular in its width through the entire

16    length.  And that would be the case of also

17    number 4.  These would lead me to suspect that

18    they are cleavage fragments.

19          Q     Okay.  But you can't state within a

20    reasonable degree of scientific certainty that

21    these are asbestos or cleavage fragments, given

22    the information you have.

23                MR. FROST:  Objection to form.

24    BY MR. PLACITELLA:

25          Q     Correct?
```

Ann G. Wylie, Ph.D.

```
 1        A    I can't make distinctions.  I rely on

 2  populations.

 3        Q    Okay.  Okay.

 4             MR. FROST:  Do you want to take a break

 5  now, Chris --

 6             MR. PLACITELLA:  Hold one second.

 7             MR. FROST:  -- unless you have more of

 8  these?

 9             MR. PLACITELLA:  Hold one second.  No, I

10  just have this one I want to --

11  BY MR. PLACITELLA:

12        Q    So 1 is a sample from RJ Lee Group,

13  cleavage fragment.

14        A    Mm-hmm.

15        Q    3 is asbestos, that's from the NIST

16  reference material.  You've seen that before, I

17  assume.

18        A    Mm-hmm.

19        Q    Okay.  2 was asbestos, and 4 was

20  cleavage fragment.

21        A    Mm-hmm.

22        Q    Correct?

23        A    Mm-hmm.

24        Q    Okay.  Now, one more --

25             MR. FROST:  Objection to form based
```

Ann G. Wylie, Ph.D.

1    on --

2              MR. PLACITELLA:  I have one more

3    question, then we can take a break.

4              THE WITNESS:  Actually, there's nothing

5    in here that tells me where they're from.

6    BY MR. PLACITELLA:

7         Q    Okay.

8         A    So I -- I said correct.  I'm going to

9    redraw that.  I can't say correct.  There's

10   nothing in there that tells me if these are

11   cleavage fragments or fiber.

12             Could we go back and look?

13        Q    What's your issue?

14        A    That I agreed to something I'm not sure

15   is true.

16        Q    Oh.

17        A    I'd like very much --

18        Q    I was just reading to you what was on

19   the screen.  You don't have to agree or disagree.

20        A    Okay.

21        Q    Okay?

22        A    All right.

23        Q    So I want to show you -- can you tell me

24   if that is asbestos or a cleavage fragment?

25             MR. LOCKE:  Objection to form.

Ann Wylie, Ph.D.

 1               THE WITNESS:  I've told you before that

 2    I'm very unwilling to -- unless there's clear --

 3    and I said that in report -- unless there are

 4    clear characteristics that you can see for

 5    cleavage fragments or for fiber to make

 6    distinctions on a particle-by-particle basis, it's

 7    not reasonably sound.

 8    BY MR. PLACITELLA:

 9        Q    Okay.  So in looking at this particular

10    photo -- by the way, what's -- so the record is

11    clear, what's this an output of?

12        A    Well, you gave it to me.  Perhaps you

13    should tell me.

14        Q    Well, do -- do you know whether it's

15    from TEM, PLM?  What is it?

16               MR. FROST:  Objection to form.

17               THE WITNESS:  It appears to be from TEM.

18    I see the holes in the filter, so --

19    BY MR. PLACITELLA:

20        Q    Right.  And from looking at this TEM --

21    this particle under TEM, you can't tell as you sit

22    here whether that's a cleavage fragment or

23    asbestos, correct?

24               MR. FROST:  Objection to form.

25               THE WITNESS:  You know, it looks to me

Ann G. Wylie, Ph.D.

 1  like it's composite.  I'm not at all clear what's

 2  going on.  The width is uneven through its length,

 3  and that would be unusual for asbestos.

 4  BY MR. PLACITELLA:

 5      Q    So you believe it's a cleavage fragment?

 6      A    I didn't say that.

 7           MR. FROST:  Objection to form.

 8  BY MR. PLACITELLA:

 9      Q    You can't tell.

10      A    I said it would be unusual for it to be.

11      Q    Okay.

12      A    I would not expect it to be asbestos for

13  that reason.

14      Q    Okay.  But as you --

15      A    But it's a coat -- coating on it.  It

16  looks to be like there's more than one mineral,

17  and so we're not really -- it's not really fair.

18  It looks like more than one mineral.

19      Q    Well, I'm -- I can't be fair or unfair.

20  That's why I'm just asking you your opinion.

21      A    It looks like more than one mineral.

22      Q    Okay.  Now --

23           MR. PLACITELLA:  You wanted to take a

24  break, that's fine.

25           MR. FROST:  Yeah, is this a good time?

Ann D. Wylie, Ph.D.

1               MR. PLACITELLA:  Yeah, a break is fine.

2               THE VIDEOGRAPHER:  The time is

3    2:56 p.m., and we're going off the record.

4               (Recess.)

5               THE VIDEOGRAPHER:  The time is 3:44

6    p.m., and we are back on the record.

7               MR. PLACITELLA:  Okay.  I always like to

8    tell people where I am and where I'm going, so I'm

9    about 15 minutes, give or take, until we're done.

10   Okay.

11   BY MR. PLACITELLA:

12        Q    Okay.  I just wanted to go back, finish

13   this line of questioning and then move to a

14   different place.

15              So I put up here three other slides.

16   Are you able to tell from looking at these slides

17   whether they represent asbestos or cleavage

18   fragment?

19        A    I can't read the scale.

20              MR. FROST:  Objection to form.

21   BY MR. PLACITELLA:

22        Q    I guess I can't either.

23              Nope.  Sorry.  That's the best I can do.

24              Can you tell whether it's cleavage

25   fragments or asbestos?

Ann G. Wylie, Ph.D.

```
 1        A     No.

 2        Q     Okay.  And one last one.  See if I can

 3   get this so you can -- that's big enough,

 4   hopefully.

 5              Can you tell whether that slide is a

 6   cleavage frag- -- fragment or asbestos?

 7              MR. FROST:  Objection to form.

 8              THE WITNESS:  There's no scale.

 9   BY MR. PLACITELLA:

10        Q     So you need a scale in order to make

11   that assessment?

12        A     I need a scale.

13        Q     So does -- does that help you in any

14   way?

15        A     Yes.

16        Q     Okay.  So is it a cleavage fragment or

17   asbestos?

18        A     It's 0.7 micrometers in width.

19        Q     Mm-hmm.

20        A     And I see no evidence of fibril bundles.

21        Q     Mm-hmm.

22        A     So, again, with the understanding that I

23   normally do not try to look at individual

24   particles and put them in one bin or the other.

25        Q     Mm-hmm.
```

Ann Wylie, Ph.D.

```
 1        A     But given that, I would say it more
 2   closely resembles a cleavage fragment than an
 3   asbestos fiber.
 4        Q     Can you say that within a reasonable
 5   degree of scientific certainty?
 6        A     As I told you before, I normally do not
 7   try to look at individual particles.
 8        Q     Okay.  So that's why I'm asking you so
 9   the record is clear, and I'm fine with that, you
10   can't state within a reasonable degree of
11   scientific certainty whether this is a cleavage
12   fragment or asbestos?
13             MR. FROST:  Objection to form.
14             THE WITNESS:  I don't know what the
15   mineral is.  It would be very difficult for me to
16   make that determination when I don't even know
17   what the mineral is.
18   BY MR. PLACITELLA:
19        Q     Well, assume it's tremolite.
20        A     Well --
21        Q     Does that change anything?
22        A     Is it tremolite?
23             MR. FROST:  Same objection.
24   BY MR. PLACITELLA:
25        Q     Just assume it's tremolite.
```

Ann M. Wylie, Ph.D.

```
 1        A    I'm sorry, but you just can't tell me

 2  look at a particle and assume it's one mineral and

 3  ask such questions.

 4            It's 0.7 micrometers in width.  I see no

 5  evidence of fiber bundling.  So I would be

 6  inclined to conclude, given only that information

 7  and your assertion that it's tremolite, that it

 8  came from a cleavage fragment population.

 9  BY MR. PLACITELLA:

10        Q    Are you willing to testify to that

11  within a reasonable degree of scientific

12  certainty?

13            MR. FROST:  Objection to form.

14            THE WITNESS:  I've already said I

15  normally don't do it on particle-by-particle

16  basis.

17  BY MR. PLACITELLA:

18        Q    Well, that's fine.  If you say, No, I'm

19  not willing to testify within a reasonable degree

20  of scientific certainty, I'll move on.  That's all

21  I'm asking.

22        A    Aren't I testifying right here?

23        Q    Is that what -- is that your testimony?

24        A    My testimony is that, based on its width

25  and the lack of any evidence of a fiber bundle,
```

Ann Wylie, Ph.D.

1    that I would conclude that it is most likely,

2    within a reasonable degree of scientific

3    certainty, but I can't tell you what it is -- but

4    I would say it's most likely that it's a cleavage

5    fragment.

6         Q    Okay.  But you're not certain.

7         A    I don't even know that -- what the

8    mineral is.

9         Q    Okay.  So you're not certain.

10        A    I can't be certain --

11             MR. FROST:  Objection to form.

12             THE WITNESS:  -- unless I know what the

13   mineral is.

14             (Wylie Exhibit No. AW-51 was

15             marked for identification.)

16             MR. FROST:  Wow, that's a lot of paper.

17   BY MR. PLACITELLA:

18        Q    Okay.  I'm going to show you what we've

19   marked here -- can we go to -- as AW-51.

20             Is this the Pooley report that you

21   reviewed in preparation for your -- for your

22   report?

23        A    Is there a date on it?

24        Q    This is as it was given.  It was from --

25   the second page says "From Light -- Lightfoot."

Ann G. Wylie, Ph.D.

```
1         A    Yes.

2         Q    "Kingston and Pooley."

3         A    Yes.  But it doesn't have a date.

The -- I'd have -- I -- I'm not meaning to

quibble.  It -- I looked at a report by Lightfoot,

et al., on the Italian mine, but there -- I had a

date on the one I looked at.  I don't see a date.

8              MR. FROST:  Here, it --

9              THE WITNESS:  Does it have a date?

10             MR. FROST:  This might help, Chris.  I'm

going to give her the one from --

12             MR. PLACITELLA:  Yeah, go ahead.

13             MR. FROST:  -- from the reliance

materials.  Is that the one --

15             MR. PLACITELLA:  Is that the same

report?

17             MR. FROST:  That's what I'm going to

have her check.  Is that the one you're -- you're

referencing?

20             MR. PLACITELLA:  It has the same exact

title.  That's why I was asking.

22             THE WITNESS:  Let me just look.

23             MR. PLACITELLA:  Sure.

24             THE WITNESS:  Without going through it

page by page, it certainly appears to be the
```

Ann G. Wylie, Ph.D.

 1    report I reviewed.

 2    BY MR. PLACITELLA:

 3          Q     Okay.  And --

 4                MR. FROST:  Here, why don't you use the

 5    one you reviewed.  We can mark yours, and that way

 6    if there is a distinction between the two, we'll

 7    know pretty quickly during questioning.

 8    BY MR. PLACITELLA:

 9          Q     Okay.  Well, it's -- the title is

10    exactly the same --

11          A     Yes.

12          Q     -- as in your paper, correct?

13          A     Yes.  And the first page is the same.

14          Q     Exactly the same.  Okay.  And that's --

15          A     Well --

16          Q     If you see AW-51, it also was Pooley 10.

17    Do you see that?

18          A     Yes.

19          Q     Okay.  Now --

20                MR. PLACITELLA:  Hand that down.

21    BY MR. PLACITELLA:

22          Q     Now, I'm going to show you and hand you

23    a copy of the testimony from Dr. Pooley concerning

24    this exact study.

25                MR. PLACITELLA:  Hold on.  You guys each

Ann Wylie, Ph.D.

```
 1   have your own.

 2         Okay.

 3   BY MR. PLACITELLA:

 4     Q    This was February of last year at the

 5   offices of Johnson & Johnson's attorneys.

 6         MR. FROST:  Yeah, I'm going to object to

 7   this exhibit, Chris, to the extent it's just an

 8   excerpt from the deposition.  It's not the full

 9   transcript.

10         MR. PLACITELLA:  That's fine.

11   BY MR. PLACITELLA:

12     Q    You see I'm going to turn to page 428,

13   where they -- by the way, when you were given the

14   Pooley report, Exhibit 10, no one gave you his

15   sworn testimony about what was in the report,

16   correct?

17     A    No.

18     Q    Okay.  Do you see here on page 428, it

19   says:

20             "Q.  But we've got Exhibit 10,

21             which is your report, and if he's

22             reading your report on the very

23             back, Fred Pooley, that's not what

24             it says, is it?"

25             "A.  Uh-huh."
```

Ann G. Wylie, Ph.D.

```
 1              "Q.  Mr. Bicks has inadequately
 2          quoted this report.  Particles
 3          formed from the amphibole mineral
 4          found at the mine were hardly
 5          fibrous."
 6              "A.  Yeah."
 7              "Q.  'The majority broke to give
 8          compact particles.'"  They got too
 9          small.  Doesn't that mean all of
10          them did, does it?
11              "Doesn't mean all of them
12          did, does it?"
13              "A.  Nope."
14          So he must have been doing this in an
15      English accent.  It would have probably sounded
16      much better.
17              Then he says:
18              "Q.  So he didn't quote it here,
19          but you found tremolite that was
20          asbestiform that didn't break
21          apart, didn't you."
22          Answer by the witness:
23              "A.  Yes.  A few particles, yes."
24          Were -- were you aware --
25          MR. FROST:  Well, hold on.  First, I'm
```

Ann C. Wylie, Ph.D.

1    going to object as to completeness.  They're

2    clearly referring to another part of the

3    transcript here, which you have not included.

4    Therefore, I would object to the sort of small

5    cherry-picked assertion we have here about 10,

6    when it clearly is quoting to other portions of

7    the transcript that are not included here, which I

8    fear are needed for context in order to answer

9    this question.

10   BY MR. PLACITELLA:

11        Q    Okay.  Putting that form objection

12   aside, were you aware that Dr. Pooley had

13   testified under oath that he found asbestiform

14   tremolite in the Italian talc?

15             MR. FROST:  Objection to form.

16             THE WITNESS:  I was not.

17   BY MR. PLACITELLA:

18        Q    Okay.  Now, I know you indicated before

19   that you only looked at information related to the

20   geology of the mines.  Is that fair?

21             MR. FROST:  Objection to form.

22             THE WITNESS:  Say it -- say it one more

23   time.

24   BY MR. PLACITELLA:

25        Q    Well, let me ask the question this way.

Ann G. Wylie, Ph.D.

```
 1      A      Okay.

 2      Q      Part of what you did in this case is you

 3  looked at the actual -- a report by Dr. Longo of

 4  the baby powder that he looked at under a

 5  microscope, correct?

 6      A      I did look at that.

 7      Q      Okay.  And he -- he used TEM, correct?

 8      A      Yes.

 9      Q      And you used TEM, correct?

10             MR. FROST:  Objection to form.

11  BY MR. PLACITELLA:

12      Q      It's one of the -- it's one of the

13  methods that you used to test for asbestos,

14  correct?

15      A      I don't think I've ever used TEM to test

16  for the presence of asbestos.

17      Q      Okay.  And he used PLM, correct?

18      A      Yes.

19      Q      And you used PLM, correct?

20      A      Yes.

21      Q      He mentioned using a concentration

22  technique.  Do you recall that?

23      A      Yes.

24      Q      And you mention in your report that he

25  used a concentration technique, but you didn't
```

Ann D. Wylie, Ph.D.

1    take any issue with that.  Is that fair?

2         A    That's fair.

3         Q    Okay.  So in terms of the methodology

4    that he used, that is the concentration technique

5    and at least the PLM, you don't have a

6    disagreement, correct?

7         A    Oh, yes, I do.

8              MR. FROST:  Objection to form.

9    BY MR. PLACITELLA:

10        Q    You do.

11        A    (The witness nods.)

12        Q    So you disagree with the fact that he

13   used PLM?

14             MR. FROST:  Objection to form.

15   Misstates testimony.

16             MR. PLACITELLA:  Well, let me just --

17   let me just -- maybe because it was a compound

18   question.

19   BY MR. PLACITELLA:

20        Q    Do you disagree with the fact that he

21   used PLM?

22        A    No.

23        Q    Okay.  Do you disagree with the fact

24   that he used the concentration technique?

25        A    No.

Ann Wylie, Ph.D.

```
 1        Q    Okay.  You looked at the same photos

 2   that he did, correct?

 3        A    Yes.

 4        Q    And you reached a different conclusion.

 5   Correct?

 6        A    Yes.

 7             MR. FROST:  Objection to form.

 8   BY MR. PLACITELLA:

 9        Q    Okay.  Now -- and when you -- when you

10   did your analysis, you understood that what

11   would -- what you would find in the end product,

12   you wouldn't find asbestos or tremolite or

13   anything else in the end product if it wasn't in

14   the talc from the mine, correct?

15             MR. FROST:  Objection to form.

16             THE WITNESS:  Unless they added it.

17   BY MR. PLACITELLA:

18        Q    Right.

19        A    Yes.

20        Q    Okay.  So on Hopkins 28, in terms of --

21   and I'm not going to go through it all now, I

22   promise you -- all of these tests that were done

23   of the actual product, that would be relevant to

24   whether -- to the conclusion about whether there

25   was asbestos in Johnson's Baby Powder or Shower to
```

Ann G. Wylie, Ph.D.

```
 1    Shower, correct?

 2              MR. FROST:  Objection to form.

 3              THE WITNESS:  Would you mind repeating

 4    the question?  I got a little bit distracted.

 5    BY MR. PLACITELLA:

 6         Q    Sure.

 7         A    Okay.

 8         Q    On Hopkins 28, we didn't go through it

 9    in detail.  That's this spreadsheet.

10         A    Okay.  Okay.

11         Q    There are a number of -- there are many

12    tests related to the end product.

13         A    Yes.

14         Q    Okay.  Although you looked at the

15    testing of the end product by Dr. Longo, you were

16    not provided any of the test results concerning

17    the end product on Hopkins 28 to determine whether

18    it supported or refuted Dr. Longo conclusions or

19    your conclusions.

20              MR. FROST:  Objection to form.

21    BY MR. PLACITELLA:

22         Q    Correct?

23         A    I did not look at any of those doc- --

24    at any of those documents.

25         Q    Okay.  Nor were they provided to you.
```

Ann C. Wylie, Ph.D.

```
 1                  MR. FROST:  Objection to form.

 2                  THE WITNESS:  No.

 3      BY MR. PLACITELLA:

 4           Q    Okay.  Now, you were -- you were going

 5      to take a look at my tests during the break.  Did

 6      you do that?

 7           A    I did.

 8           Q    Okay.  Do you have that with you?

 9           A    Not yet.

10           Q    Okay.

11           A    Why?

12           Q    What did I get?

13           A    No, I -- you know --

14                  MR. FROST:  We need a couple more

15      minutes.  If you want, we can take a break and get

16      it and bring it back.

17                  MR. PLACITELLA:  No.  Could somebody go

18      get it?

19                  MR. FROST:  It's not done yet.

20      BY MR. PLACITELLA:

21           Q    I mean, did I get a B?  An A?  What did

22      I get?

23           A    You passed.

24                  MR. FROST:  Objection to form.

25      BY MR. PLACITELLA:
```

1      Q    I passed.  Okay.  Well, I guess that's

2   good for you.

3           You were -- questions were asked --

4      A    But I did make some clarifications.

5      Q    That's fine.  That's what -- I told you

6   you could do that.

7      A    I know.  I just wanted to be sure.

8      Q    When the teacher --

9      A    Passing is not necessarily an A.

10     Q    In geology, give me a B.  I'm fine,

11  okay?

12          All right.  Some questions were asked

13  about your deposition.  I want to know if you know

14  the answers.

15          Did you ever have any communications

16  with Mickey Gunther concerning the work you were

17  doing in this case?

18     A    No.

19     Q    Okay.  Did you ever have any

20  communications with Mickey Gunther on the subject

21  of whether there's asbestos in Vermont talc?

22          MR. FROST:  Objection to form.

23          THE WITNESS:  Not that I recollect, no.

24  BY MR. PLACITELLA:

25     Q    Okay.  Did you have any communications

Ann G. Wylie, Ph.D.

```
 1    or conversations with RJ Lee or Matt Sanchez

 2    concerning your opinions in this case?

 3         A    No.

 4         Q    Okay.  Did you ever have any

 5    communications with RJ Lee or Matt Sanchez

 6    concerning the issue of whether there's asbestos

 7    in Vermont talc?

 8         A    No.

 9         Q    Okay.  Did you ever do any work for

10    Colgate Palmolive?

11              MR. FROST:  Objection to form.

12              THE WITNESS:  I met -- no.  No.  I was

13    never paid by Colgate Palmolive.

14    BY MR. PLACITELLA:

15         Q    Were you ever consulted by Colgate

16    Palmolive?

17         A    I think there were lawyers that came to

18    talk with me, but -- from Colgate Palmolive, but

19    I -- I never did anything with that.

20         Q    How come?

21         A    They came and talked to me.

22         Q    How come?

23         A    I just didn't.  I wasn't that interested

24    in --

25         Q    Okay.
```

Ann M. Wylie, Ph.D.

```
1          A    -- doing litigation type work.

2          Q    Did you do any testing for them?

3          A    No.

4          Q    Okay.  What about Cyprus Mines, did you

5    ever do any work for them?

6               MR. FROST:  Objection to form.

7               THE WITNESS:  Long ago, I -- I did

8    analyze some samples for them.

9    BY MR. PLACITELLA:

10         Q    Okay.  And in what context?

11              MR. FROST:  Objection to form.

12              THE WITNESS:  They probably sent them to

13   me.

14   BY MR. PLACITELLA:

15         Q    Was it in the context of litigation or

16   in just the normal course of their business?

17         A    I think just the normal -- I believe, to

18   the best of my recollection, the normal course of

19   their business.

20         Q    Who was the person at Cyprus that you

21   dealt with, do you recall?

22         A    No.

23         Q    Do you recall what you found?

24         A    No.

25              MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

```
 1                MR. PLACITELLA:  Okay.  So I just want

 2     to make sure we have for the record, 53 is a

 3     curriculum vitae, so you have it.

 4                (Wylie Exhibit AW-53 was marked

 5                for identification.)

 6                MR. FROST:  Is this the one --

 7                MR. PLACITELLA:  Mm-hmm.

 8                MR. FROST:  -- you referenced earlier?

 9                MR. PLACITELLA:  Yes, the one I -- that

10     we went and got copies of.

11                AW-16 is the letter from Dr. Ashton to

12     Dr. Wylie.

13     BY MR. PLACITELLA:

14          Q    While we're waiting, you --

15                (Counsel conferring.)

16     BY MR. PLACITELLA:

17          Q    -- you mentioned before something known

18     as a mean aspect ratio.

19          A    Yes.

20          Q    Could you explain that?  How do you

21     determine what a mean aspect ratio is?

22          A    You average measurements.

23          Q    How -- how do you average measurements

24     of a fiber -- in a fiber bundle?

25          A    Well, the mean aspect ratio of the
```

Ann G. Wylie, Ph.D.

```
 1    particle is its length divided by its width.

 2    That's what it is.

 3         Q    Oh, so you don't have to count the

 4    fibrils that make up a bundle?  When you say "mean

 5    aspect ratio," you're just saying it's the -- the

 6    length divided by the width?

 7         A    That's correct.

 8         Q    Okay.  Now, did you base your aspect

 9    ratio of 20-to-1 on the 1984 paper that we went

10    through before?

11              MR. FROST:  Objection to form.

12    BY MR. PLACITELLA:

13         Q    You told me that you use a 20-to-1

14    aspect ratio for PLM when looking at talc.  Fair?

15         A    I look for all of the properties.  And I

16    look for fiber bundles, I look for high aspect

17    ratio particles, I look for all of the properties.

18         Q    I'm giving you that.  That's not my

19    question.

20         A    Okay.

21         Q    So I want to just try to get on the same

22    page.

23         A    Okay.  All right.

24         Q    You -- I'm just talking about the aspect

25    ratio --
```

Ann G. Wylie, Ph.D.

```
1      A      Yes.

2      Q      -- of 20-to-1.

3      A      Yes.

4      Q      What -- where did that come from?

5             MR. FROST:  Objection to form.

6             THE WITNESS:  Hmm, where did it come

7      from?  Probably measurements that were made

8      with -- from the SEM.  Observations on many

9      asbestos samples that I made.  It would be an

10     approximation.  You have under the microscope

11     scales, and so you can kind of see what the aspect

12     ratios are.

13     BY MR. PLACITELLA:

14     Q      Okay.  But you can't -- I'm probably

15     just not making myself clear.  I apologize.  It's

16     late in the day.

17            You -- you use as a standard 20-to-1

18     aspect ratio, correct?

19     A      No.  I -- no.

20     Q      Go ahead.

21     A      I -- when -- when you asked me what my

22     criteria were, I said an abundance of high aspect

23     ratio particles.

24     Q      All right.  20-to-1.

25            MR. FROST:  Objection to form.
```

Ann G. Wylie, Ph.D.

```
 1              THE WITNESS:  An abundance of high
 2    aspect ratio particles with a mean.  Mean.
 3    BY MR. PLACITELLA:
 4         Q    Okay.
 5         A    A mean is not a 20-to-1.  You can have a
 6    10-to-1.
 7         Q    Okay.
 8         A    To get a mean, you have some are less
 9    and some are greater.
10         Q    Okay.
11         A    And the more greater they are, the more
12    they weight the mean.
13         Q    Okay.  So you could have short ones and
14    some long ones, and that's how you get to 20.
15              MR. FROST:  Objection to form.
16              THE WITNESS:  Short ones and long ones,
17    that's how you get to 20.
18              You can have high aspect ratio -- you
19    can have 20-to-1 particles.  You can have less
20    than 20-to-1 particles.
21    BY MR. PLACITELLA:
22         Q    Okay.
23         A    So -- but when you look at a population,
24    you find that -- the mean aspect ratio for the
25    populations that we measured.  All right.  It's
```

Ann G. Wylie, Ph.D.

1   one of the reasons why I said an abundance of high

2   aspect ratio particles being 20-to-1 or greater.

3   But a mean aspect ratio is -- encompasses all

4   particles longer than 5 micrometers.

5       Q    Mm-hmm.

6       A    Longer than 5 micrometers, and an

7   average of their aspect ratio.  That's what the

8   word "mean" means.

9       Q    Okay.  Fair enough.

10          And I'm saying in the standard that you

11  apply, the 20 -- the mean aspect ratio 20-to-1,

12  all right, what is that based on?

13      A    At the time we had -- I had measured

14  quite a few asbestos populations by scanning

15  electron microscopy, and I used that to check for

16  what I might be able to say would be a mean.

17      Q    So you looked at bulk asbestos

18  populations?

19      A    Yes.

20      Q    Okay.  And when you say "populations,"

21  how is that defined when you came to that standard

22  of 20-to-1?

23      A    Well, we measured -- "we" being the

24  Bureau of Mines -- you know, thousands of

25  particles.

Ann G. Wylie, Ph.D.

```
 1          Q    Okay.  So the 20-to-1 aspect ratio --

 2          A    Mean.

 3          Q    -- mean aspect ratio, had no

 4    relationship to your 1984 paper that we went over

 5    before?

 6               MR. FROST:  Objection to form.

 7    BY MR. PLACITELLA:

 8          Q    You didn't get it from there?

 9               MR. FROST:  Objection to form.

10               THE WITNESS:  I didn't get it from the

11    paper I wrote?

12    BY MR. PLACITELLA:

13          Q    That's what I'm asking you.

14          A    You mean I referenced -- I got it from

15    what I wrote?  I would never.  I mean I don't

16    understand your question.  How could I get it from

17    what I wrote?

18          Q    Well --

19          A    I wrote from the -- I got it from the

20    data.

21          Q    Okay.  Well, that's my question.  You

22    didn't get it from the analysis that was in your

23    paper, the ASTM paper from 1984.

24          A    Oh.  I'm sorry.  Where we were talking

25    about all those data that were listed, the air
```

Ann C. Wylie, Ph.D.

```
 1    samples and --

 2         Q    Yes -- yes, Doctor.

 3         A    No.

 4         Q    Okay.  You got that from a separate

 5    analytical system that you did.

 6         A    Yes.

 7              MR. PLACITELLA:  Okay.  Now -- well, I

 8    said 15 minutes.  I kept to it, but I still need

 9    to see my tests.

10              THE WITNESS:  Okay.

11              MR. FROST:  Can we go off the record?

12              MR. PLACITELLA:  Okay.  Yep.

13              THE VIDEOGRAPHER:  The time is 4:09 p.m.

14    We're going off the record.

15              (Recess.)

16              THE VIDEOGRAPHER:  The time is 4:24

17    p.m., and we're back on the record.

18    BY MR. PLACITELLA:

19         Q    Okay.  Did you bring my tests with you?

20         A    I did.

21         Q    Okay.  Just before we go there, would --

22    do you agree that TEM is the gold standard for

23    testing for talc to determine whether there's

24    asbestos?

25              MR. FROST:  Objection to form.
```

```
 1                THE WITNESS:  No.
 2   BY MR. PLACITELLA:
 3        Q    Okay.  Do you have 51?
 4        A    Yes.
 5                MR. FROST:  So --
 6                THE WITNESS:  We need to look at them
 7   together.
 8                MR. FROST:  I was going to say it might
 9   make sense for us to go through, tell you the
10   changes, give it to you, and then you can ask
11   her --
12   BY MR. PLACITELLA:
13        Q    Well, why don't I just flip through it
14   and put it up on the ELMO.
15        A    Oh, okay.
16        Q    Does that work?
17        A    Yes, that works.
18        Q    Or you can sit next to me.
19        A    No, that works.
20        Q    But I didn't think you would really
21   want to do that at the end of the day.
22        A    I wouldn't be in the camera.
23        Q    Oh.  Well, no, you get the camera this
24   way.  I mean, you probably wouldn't want it on
25   record.  Okay.
```

Ann G. Wylie, Ph.D.

```
 1                  All right.  So --
 2        A     I numbered your pages.
 3        Q     Thank you.
 4                  So I'm just going to keep going until I
 5    see something.  How's that?
 6        A     No, I'd like to go through it page by
 7    page --
 8                  MR. FROST:  Yeah, I was going to say --
 9                  THE WITNESS:  -- if you don't mind.
10                  MR. FROST:  -- I think we should do it
11    page by page.
12    BY MR. PLACITELLA:
13        Q     Did you make any changes on number 1?
14        A      I would add, which I didn't add on the
15    piece of paper, but I would certainly want to be
16    put on the record that I have 45 years of
17    experience that I also relied on.
18        Q     Actually, I was going to actually ask
19    you what your diet was, because I think you look
20    awesome.  Okay?  So put that aside.  I assume you
21    have experience.
22                  So I'm flipping through 3 --
23                  MR. FROST:  Yeah, why don't we mark this
24    as --
25                  MR. PLACITELLA:  AW-50-A?
```

Ann G. Wylie, Ph.D.

```
 1                MR. FROST:  Can you hand that to the
 2   court reporter.
 3                MR. PLACITELLA:  Can we make it 50-A?
 4                MR. FROST:  Sure.
 5                THE WITNESS:  Okay.
 6                (Wylie Exhibit No. AW-50-A was
 7                marked for identification.)
 8   BY MR. PLACITELLA:
 9       Q    Well -- okay.  Sorry.
10            What do you want me to do with this?
11       A    You had asked me what approach I would
12   take for the identification of asbestos by
13   polarized light microscopy, and we went through --
14       Q    Right.
15       A    -- a series, and it began on -- keep
16   going -- the page there.
17       Q    Okay.
18       A    All right.  And I rewrote that, just
19   that page, and I think the next, and perhaps even
20   the next, to be sure that it was complete and
21   rigorous.
22            I don't -- it isn't that what you had
23   was so wrong.  It's just that I don't normally
24   want to agree with what someone else has read
25   that -- written that I said.  So I just rewrote it
```

Ann Wylie, Ph.D.

```
1    in a format with which I'm comfortable.  So you

2    could look that over and see if there's anything

3    in what I've written here that we did not discuss.

4         Q    Okay.  We'll you -- you wrote in 50-A.

5    Did you do this by yourself or were in conjunction

6    with your lawyer?

7         A    By myself.

8         Q    Okay.  So before we get there, you still

9    didn't give me a grade.

10             MR. FROST:  Well, handwriting or

11   content?

12             MR. PLACITELLA:  No, on how I did here.

13             THE WITNESS:  B plus.

14             MR. PLACITELLA:  Okay, I'll take it.

15   BY MR. PLACITELLA:

16        Q    Now, 50-A is your amendment to this

17   entire pad, is that fair?

18        A    Not quite.  I'd like to go through it

19   page by page.

20        Q    Okay.

21             Okay.  I -- we'll put this in the

22   record.

23        A    That's fine.

24        Q    That's fine.  I mean your testimony is

25   what it is, and we'll leave this as -- in the
```

Ann G. Wylie, Ph.D.

```
 1   record, okay?

 2            So let's go through 3.

 3       A    That's amended there.

 4       Q    Okay.  4?

 5       A    If there's anything at the bottom,

 6   that -- that's all that shows.  I can only see

 7   down to (c).  Okay.  Yes, that's amended in that

 8   or contributed.

 9       Q    All right.

10       A    I -- I let that stand.

11       Q    Okay.

12       A    I let that stand.

13       Q    Okay.  Population, page 6.  I'm on

14   page 7, fiber bundles.

15       A    I'll let that stand.

16       Q    Okay.  Page 8?

17       A    Could you move it down a little bit so I

18   can see the -- all right.  Yes, I'll let that

19   stand.

20       Q    Okay.  Page 9, one of the regulated --

21   we never actually wrote in it.

22            Okay.  Page 10?

23       A    I corrected "abundance greater than one"

24   to reflect my comment that you need many more than

25   one.
```

Ann G. Wylie, Ph.D.

```
1        Q    How many more?

2        A    I don't know.  Many more.

3        Q    Well, do I need four Golden Retrievers?

4   Five?

5             MR. FROST:  Objection to form.

6   BY MR. PLACITELLA:

7        Q    I mean, how is somebody supposed to

8   apply your method if they don't know what

9   "abundance" means?

10            MR. FROST:  Objection to form.

11  BY MR. PLACITELLA:

12       Q    Doctor, if you're -- you're going to

13  teach somebody, I'm your student, and I'm saying,

14  Well, what do you mean by abundance?  How many

15  Golden Retrievers do I have to look at?  How many?

16       A    Many more than one.

17       Q    But you don't know.

18       A    It very much depends upon the

19  characteristics.  So, for example, if the

20  particles were all totally uniform, you would need

21  fewer.

22       Q    Okay.

23       A    If they're highly variable, you would

24  need more.

25       Q    But a student applying your method
```

1    looking at the same sample that you are --

2         A    Yes.

3         Q    -- how would I know what to look at if I

4    didn't have you whispering in my ear, That's too

5    many, that's too little?

6              MR. FROST:  Objection to form.

7              THE WITNESS:  I -- I think I would just

8    say, There are many more than one.

9    BY MR. PLACITELLA:

10        Q    Okay.  But we can't say how many?

11        A    No.

12        Q    Okay.  Next.

13        A    That's in the -- it's listed in that

14   correction that I gave you.

15        Q    Okay.  But it's not required.

16        A    That's the way I -- yes, that's what

17   mine says.

18        Q    Okay.  12?

19        A    Could I see what's down at the bottom?

20        Q    Uh-huh.

21        A    Yes.

22        Q    It's fine?

23        A    Mm-hmm.

24        Q    13, you wrote?

25        A    That's -- those are my initials.

Ann G. Wylie, Ph.D.

```
 1          Q     Right.

 2          A     I crossed out "expected" and put

 3    "required."

 4          Q     Put -- so you changed your mind.

 5          A     Well, I use --

 6          Q     You thought about it more.

 7          A     I always use it, and I don't know of any

 8    instances where you have asbestos where you do not

 9    have anomalous properties.

10          Q     Okay.

11          A     So I -- I put "required."

12          Q     So your next article, that's what you're

13    going to write?

14                MR. FROST:  Objection to form.

15    BY MR. PLACITELLA:

16          Q     Yes?

17          A     I don't plan -- I'm not -- have any

18    plans to write another article on this topic.

19          Q     You're done with this except for

20    testifying?

21                MR. FROST:  Objection to form.

22                THE WITNESS:  No, I'm not done with

23    this.  What do you mean by "this"?

24    BY MR. PLACITELLA:

25          Q     Well, you don't plan on publishing these
```

Ann G. Wylie, Ph.D.

```
 1   criteria?

 2        A     I don't.

 3        Q     Okay.

 4        A     I have no -- I have no plans to do that.

 5        Q     Okay.  And that's the end of the pad,

 6   correct?

 7        A     Yes.

 8        Q     Okay.  Now -- so I just have one

 9   question.  I know you had a number of consults

10   with Johnson & Johnson's attorney while I was

11   eating cookies, and did any of the consults you

12   had with Johnson & Johnson's attorneys cause you

13   to change your testimony from today in any

14   material way?

15             MR. FROST:  Well, objection to form.

16             First off, the CMO regarding the

17   deposition procedure is very clear that the

18   negotiated resolution was any conferences during

19   breaks were off limits from the deposition.

20             MR. PLACITELLA:  I'm not asking her the

21   substance.  I'm just asking whether any

22   conferences with you and her and the other lawyers

23   at Johnson & Johnson caused her to change her

24   testimony in any material way.

25             MR. FROST:  And again, I think --
```

Ann G. Wylie, Ph.D.

1            MR. PLACITELLA:  That's all.  I'm not

2    asking her about what exactly was said.

3            MR. FROST:  Nope.  Again, I think that's

4    inappropriate.  I think you're diving into

5    attorney-client privilege.  And frankly, I think

6    you're breaking the procedure that was negotiated

7    by both sides in this case.

8            MR. PLACITELLA:  I'm breaking procedure

9    by asking that question?

10           MS. O'DELL:  I think he's clearly not

11   asking the substance of the conversation.

12           MR. PLACITELLA:  Right.

13           MS. O'DELL:  He's not saying you

14   can't --

15   BY MR. PLACITELLA:

16      Q    I'm not asking you what was stated.  All

17   I'm asking you is --

18           MS. O'DELL:  At the last deposition we

19   were at --

20   BY MR. PLACITELLA:

21      Q    -- are you -- based -- having had a

22   consult with your attorney, your attorneys, do you

23   need to change your testimony in any way?

24           MR. FROST:  I'll renew my objection.  I

25   have not instructed my witness not to answer.  But

1    my objection is on the record.

2    BY MR. PLACITELLA:

3         Q    Okay.

4         A    No.

5         Q    Okay.

6              MR. PLACITELLA:  The answer was much

7    shorter than the objection.

8              That's all my questions for now,

9    depending on if your counsel has any questions.

10             But -- oh, can we just -- well, we're

11   just going to put these in the record.  This is

12   AW-44 and Hopkins 28.

13             (Wylie Exhibit No. AW-44 was

14             marked for identification.)

15             MR. PLACITELLA:  So take a look.

16             And 50, if I get a copy -- if I get a

17   copy of this, would you after, for Mr. Frost, put

18   the "B+" on the copy?

19             Okay.  That's all I've got.

20             MR. FROST:  All right.  Let's take a

21   break.  We do have some questions.  And we're

22   actually waiting for some things to be printed.

23             THE VIDEOGRAPHER:  The time is 4:34 p.m.

24   and we're going off the record.

25             (Wylie Exhibit No. AW-52 was

Ann G. Wylie, Ph.D.

 1                   marked for identification.)

 2              (Recess.)

 3              THE VIDEOGRAPHER:   The time is 4:56 p.m.

 4     and we're back on the record.

 5                   CROSS-EXAMINATION

 6     BY MR. FROST:

 7         Q    Good afternoon, Dr. Wylie.  Jack Frost

 8     from Biddle & Reath.  As you know, I represent

 9     Johnson & Johnson in this case.

10              I'm going to ask you a few questions

11     this afternoon.  They shouldn't take too long, and

12     I apologize now, I'm going to be jumping around a

13     bit.

14              But do you recall this morning when you

15     were asked a series of questions about testimony

16     you gave to a United States Senate Committee about

17     an asbestos ban bill?

18         A    I do.

19         Q    Can you explain to me in your own words

20     what happened at that hearing?

21         A    I went to give testimony on the nature

22     of asbestos.  I went to urge the Committee to

23     expand the definitions of regulated asbestos to

24     include all asbestiform amphibole.  I also

25     requested that a methodology be developed so that

Ann G. Wylie, Ph.D.

```
 1    ordinary rock fragment would not be included.
 2              And at the end of my testimony, I was
 3    asked if I had ever worked for -- or I thought I
 4    was asked if I had ever worked for asbestos
 5    companies, and in the context of that hearing and
 6    what was going on, I answered that question, "No."
 7              The -- Senator Boxer then asked about
 8    some invoices that she had and -- from
 9    R.T. Vanderbilt.  And so I said -- and she -- I
10    asked her to rephrase the question, because I -- I
11    thought perhaps I had answered a question that
12    wasn't exactly asked.  She rephrased the question
13    somewhat and talked about had I ever given a
14    deposition, or something to that effect, in
15    litigation around allegations of asbestos-related
16    diseases or -- and of course, I had to answer in
17    the affirmative then.
18              And it was a very disturbing experience
19    for me because my integrity means a lot.  And so
20    at the conclusion of that event, I wrote the
21    Senator a letter and detailing exactly what my
22    experience had been around the questions that she
23    asked, and just basically trying to explain my
24    misunderstanding and I had no intention to
25    deceive.
```

Ann Wylie, Ph.D.

```
 1        Q    I'm going to mark as --
 2             MR. FROST:  Sorry, what exhibit are we
 3   on?
 4             THE REPORTER:  54.
 5             MR. FROST:  AW-54.  Pass this to the
 6   court reporter.
 7             (Wylie Exhibit No. AW-54 was
 8             marked for identification.)
 9             MR. FROST:  This is for you.
10             THE WITNESS:  Oh.
11             MS. O'DELL:  Do you have a copy for us?
12             MR. FROST:  I don't.  I only have the
13   one.  It was in the reliance materials we
14   forwarded.
15             MS. O'DELL:  Okay.
16             MR. PLACITELLA:  Okay.  We waited for
17   half an hour.  You don't have a copy for me?
18             MR. FROST:  We do.  I was going to say
19   we have the big one.
20   BY MR. FROST:
21        Q    But is this a -- is this a copy of the
22   letter you were talking about, Dr. Wylie?
23        A    Yes.
24             MR. FROST:  I mean, I'm happy to give it
25   to you, Chris, to look at.
```

Ann G. Wylie, Ph.D.

```
 1              MR. PLACITELLA:  Oh, it's -- I believe
 2   her.  I don't have to look at it.
 3              MR. FROST:  Okay.  And again, the --
 4              MS. O'DELL:  For my purposes, what is
 5   the date on it so I can --
 6              THE WITNESS:  June 16th, 2007.
 7   BY MR. FROST:
 8        Q    And does this letter reflect what you
 9   just talked about, the misunderstanding you had
10   about the questions being asked by doctor -- or,
11   sorry, by Senator Boxer?
12        A    Yes.
13        Q    And prior to today -- or I guess I'll
14   strike that.
15              This morning Mr. Placitella asked you a
16   series of questions about whether or not some
17   companies you had done consultation work for
18   manufactured asbestos-containing products; is that
19   correct?
20        A    That's correct.
21        Q    Prior to this morning, did you know that
22   any of those companies may have manufactured
23   asbestos-containing products?
24        A    I did not.
25        Q    And that was something that you learned
```

Ann G. Wylie, Ph.D.

1    today?

2        A    Yes.

3        Q    This morning you were also asked various

4    questions about the methodologies you employed in

5    undertaking or in drafting your expert report.

6             Can you please explain to us what

7    methodology you employed in this case?

8        A    I reviewed the literature.  I -- what I

9    basically did was for review of the literature and

10   the reports, I considered myself as a reviewer of

11   a document like I would in an academic setting for

12   a journal.  And that was my job, and that's what I

13   did.

14       Q    And is what you did to draft your report

15   any different than what you would undertake in

16   this literature review as an academic?

17       A    No.

18       Q    And can you explain to us what steps you

19   took to conduct your literature review?

20       A    I searched through GeoRef, which is a

21   database for geologic literature.  I searched the

22   web, just putting in information and seeing what I

23   could find on the various mines, for example.  I

24   think that's how I found the information on Mindat

25   for the Argonaut Mine.  And of course, I reviewed

Ann C. Wylie, Ph.D.

1    the two Pooley reports.

2        Q    If you were undertaking a scientific

3    review as -- in your role as professor emeritus,

4    is there anything different you would have done in

5    undertaking that literature review than you did

6    here?

7        A    No.

8        Q    Are there any additional sources you

9    would have sought out to consider?

10       A    No.

11       Q    You were also asked a series of

12   questions this morning about articles you relied

13   on, and the question was always asked around, you

14   know, the frame of other than articles in which

15   you were an author.

16            Do -- do you recall that series?

17       A    I do.

18            MR. PLACITELLA:  Objection to the form.

19   BY MR. FROST:

20       Q    Is it acceptable in a scientific

21   literature review to rely on peer-reviewed

22   articles?

23            MR. PLACITELLA:  Objection to form.

24            THE WITNESS:  Yes.

25   BY MR. FROST:

1        Q    And can you explain to me what a

2   peer-reviewed -- like what it means to be a

3   peer-reviewed publication?

4        A    It means that the manuscript that you

5   submit to a journal is sent out, usually

6   anonymously, to experts in the field.  And their

7   comments come back to the editor.  The editor

8   sometimes -- mostly will ask for responses.

9   The -- sometimes the peer review requires another

10  review.  Sometimes it says simply address these

11  issues.  One addresses the issues, makes the

12  revisions or argues that they're unnecessary.  The

13  editor makes the decision at that point about

14  whether to accept an article or require that it go

15  out for additional review.

16             But in the long run, it really means

17  that your work has been reviewed by other experts

18  in the field anonymously -- normally anonymously.

19        Q    And is review of peer-reviewed

20  scientific literature what an academic or a

21  scientist typically does in undertaking a

22  literature review?

23        A    Normally do you look for peer-reviewed

24  information?

25        Q    Yes.

Ann M. Wylie, Ph.D.

```
 1      A     If it's available, certainly.

 2      Q     With respect to the various publications

 3   in your report in which you were an author, are

 4   those peer reviewed?

 5      A     Yes.

 6      Q     Is there any reason it would be

 7   unreliable to rely on your own peer-reviewed

 8   publications to support your opinions here?

 9      A     I hope not.

10      Q     And again, would you agree with me that

11   you've actually published a significant number of

12   articles with respect to asbestos and the

13   identification of asbestos.  Is that correct?

14      A     That's correct.

15            MR. PLACITELLA:  Objection to form.

16   BY MR. FROST:

17      Q     Can you estimate for me how many

18   peer-reviewed articles you've published on this

19   subject?

20      A     I think I put in my report that number

21   38.  I'm happy to recount.

22      Q     Do you know of any other scientists who

23   has published more peer-reviewed papers --

24            MR. PLACITELLA:  In mine it's 39.

25   BY MR. FROST:
```

Ann G. Wylie, Ph.D.

```
 1       Q     Are you aware of any other scientists
 2  who have published more peer-reviewed literature
 3  than you have in these areas?
 4            MR. PLACITELLA:  Objection.  I think
 5  that's beyond her competence, but okay.
 6            THE WITNESS:  Yeah, I -- I would say
 7  certainly I'm among those who have published a
 8  lot.  I couldn't tell you -- I don't -- I would
 9  have to see their CVs.
10  BY MR. FROST:
11       Q     And in addition to your peer-reviewed
12  publications on the identification of asbestos and
13  asbestos, have you done any other work as a
14  scientist in these areas?
15       A     I have done -- oh, yes, mm-hmm.  I have
16  done work that I have not published.
17       Q     And what types of things would this work
18  have undertaken?
19            MR. PLACITELLA:  Object to the form.
20            THE WITNESS:  I've reviewed reports.
21  I've analyzed materials as -- as we've discussed.
22  I've done research in the lab.  I've had students
23  do the work on -- in the topic under my direction.
24  BY MR. FROST:
25       Q     And you would agree with me that you're
```

Ann G. Wylie, Ph.D.

```
 1   bringing all of this prior experience and work

 2   into the opinions you've drafted for this case,

 3   correct?

 4        A    That's --

 5             MR. PLACITELLA:  Objection.  Leading.

 6             THE WITNESS:  That's correct.

 7   BY MR. FROST:

 8        Q    I'm going to turn your attention to a

 9   letter that was previously marked as AW-17.

10        A    Yes.

11        Q    If you could turn to page 3.

12             Do you recall Mr. Placitella asked you a

13   series of questions regarding this -- this

14   particular letter?

15        A    I do.

16        Q    And it appears in the last article that

17   you're taking issue with an EPA interim method on

18   testing of bulk insulation materials.  Is that

19   fair?

20        A    That's fair.

21        Q    What year was this letter written?

22        A    1986.

23        Q    And you've also talked extensively today

24   about the EPA PLM testing methodology; is that

25   correct?
```

Ann G. Wylie, Ph.D.

```
 1        A     That's correct.

 2        Q     And is that the R-93 method?

 3        A     Yes.

 4        Q     Are you aware what year the EPA

 5   published R-93?

 6        A     1993.

 7        Q     So that was certainly after the 1986

 8   drafting of this letter, correct?

 9              MR. PLACITELLA:  Objection.  Leading.

10              THE WITNESS:  That's --

11   BY MR. FROST:

12        Q     I'll reask the question.  Is 1993 after

13   1986 when you drafted this letter?

14              MR. PLACITELLA:  Objection to the form.

15              THE WITNESS:  Yes.

16   BY MR. FROST:

17        Q     Do you know what interim method -- EPA

18   interim method you're talking about on page 3 of

19   this letter?

20        A     Yes, there was a method, an interim

21   method that was published in the '80s.  That's the

22   method I'm referring to.

23              MR. FROST:  I'm going to mark this

24   document as AW-55.  Hand that to the court

25   reporter.
```

Ann ... Wylie, Ph.D.

```
 1              MR. PLACITELLA:  Has that been supplied
 2    to us before?
 3              MR. FROST:  No.
 4              MR. PLACITELLA:  Well, I object to you
 5    asking her any question about any document that
 6    has not been supplied to us before the deposition
 7    or in discovery and which I have no opportunity to
 8    read and review.  So I object to using this at
 9    all, and I object to all questions relating to it.
10              MR. FROST:  Well, that's fine, Chris.
11    This is in direct rebuttal to something you
12    brought up during your examination, and it's a
13    publicly available document.  So your objection is
14    noted, but we're going to continue.
15              MR. PLACITELLA:  Well -- okay.  Well, I
16    sat around here for more than an hour, and you
17    apparently knew that you were going to use this.
18    It would have been nice and courteous if you had
19    handed it to me ahead of time.  But do whatever
20    you will do.
21              MR. FROST:  I will.
22              (Wylie Exhibit AW-55 was marked
23              for identification.)
24              MR. FROST:  Is it marked?  Please give
25    that to Dr. Wylie.
```

Ann Wylie, Ph.D.

1    BY MR. FROST:

2        Q    Take your time to review what's been

3    marked as AW-55.

4        A    Yes.

5        Q    Is this the interim method from the EPA

6    that you were just talking about?

7        A    Yes.

8        Q    And is this the interim method that's

9    referenced in the letter designated as AW-16?

10       A    Yes.

11       Q    Could you point me to where in this

12   document your -- or strike that.

13            What aspect of this interim method is

14   your letter specifically addressing in the final

15   paragraph on page 3 of AW-16?

16            MR. PLACITELLA:  Object to the form.

17            THE WITNESS:  The section of the method,

18   1.7.2.4, "Quantitation of asbestos content."  In

19   the second paragraph:  "For the purpose of this

20   method, asbestos fibers," and that's in quotes,

21   "are defined as having an aspect ratio greater

22   than 3-to-1, and being positively identified as

23   one of the minerals in Table 1.1."

24   BY MR. FROST:

25       Q    Did that portion of the interim method

Ann G. Wylie, Ph.D.

1    make it into R-93?

2        A    It did not.

3        Q    And what was the reason that you're

4    criticizing this particular portion of the interim

5    method?

6        A    It's inadequate to discriminate asbestos

7    from cleavage fragments.

8        Q    All right.  Next I'm going to turn your

9    attention to what has been previously marked as

10   AW-16.  I'll hand that to you.

11           Do you recall when Mr. Placitella was

12   asking you a series of questions about this

13   letter?

14       A    Yes, I do.

15       Q    Okay.  I'm going to make it real easy so

16   the record is clear.

17           Did you work with -- well, strike that.

18   I'll go back first.

19           You testified before, if I'm correct,

20   that the work you were doing in and around 1987

21   was the drafting of a methodology for PLM that you

22   submitted to the ASTM committee.  Is that fair?

23       A    That's fair.

24       Q    Okay.  In drafting that methodology,

25   and I'm going to make this really simple, did you

1    ever work with or have any communications with

2    W. Ashton?

3        A    He wrote me this letter.

4        Q    Other than this letter, did you ever

5    work with W. Ashton on that methodology?

6        A    No.

7        Q    Okay.  And we know you've done other

8    work with Slim Thompson, but did you do any work

9    with Slim Thompson regarding the drafting of this

10   methodology?

11       A    No.

12       Q    Okay.  And in fact, who did you submit

13   the methodology to?

14       A    The committee, ASTM Committee D22507.

15            Actually, I probably sent it to Sharon

16   Kaufman at ASTM.

17       Q    Do you recall before being showed a

18   portion of a deposition transcript from

19   Dr. Pooley?

20       A    I do.

21       Q    And you'd agree with me that that was

22   not the complete deposition transcript you were

23   shown, correct?

24       A    Yes, I am.

25            MR. PLACITELLA:  So -- so stipulated.

Ann H. Wylie, Ph.D.

```
 1              MR. FROST:  I'm going to mark this as

 2    AW-56, please.

 3              (Wylie Exhibit No. AW-56 was

 4              marked for identification.)

 5              MR. PLACITELLA:  I don't want to take it

 6    home.  It's too heavy.

 7              How come you could make a big fat copy

 8    of that, but you couldn't give me a two-page piece

 9    of paper?

10    BY MR. FROST:

11         Q    Turn your attention to page 36, please.

12         A    I'm going to have to move this clamp.

13         Q    That's fine.  Take your time.

14         A    I'm going to take the clamp off.  Okay.

15         Q    Okay.  I'm going to read a portion of

16    the deposition.

17              Starting on page 36, line 8:

18              "Q.  In testing that you did on

19              the two ore deposits and also baby

20              powder products with talc in them,

21              were you ever able to determine

22              whether or not either the ore or

23              any of the baby powder had

24              asbestos in it?

25              "A.  Well, we were -- part of a
```

Ann M. Wylie, Ph.D.

```
1              visit like to take the samples is
2              to look around and see if you can
3              see anything which might represent
4              an asbestos-type contaminant.  And
5              although looking at the rock
6              specimens we brought back, there
7              were amphibole minerals, but there
8              were no obvious asbestos visible
9              in the mine.
10                "Q.  After all the testing that
11             you did, were you able ever to
12             find asbestos in the samples or
13             the deposit samples that you
14             looked at?"
15             MR. PLACITELLA:  Well, can you just put
16  for the record who's asking these questions?
17             MR. FROST:  Sure.
18             MR. PLACITELLA:  Is it the lawyer for
19  Johnson & Johnson?
20             MR. FROST:  Yes.
21             MR. PLACITELLA:  So -- so this is prior
22  to Mr. Lanier's cross, just for context.
23             MR. FROST:  I believe that's correct.
24  This is Mr. Bicks.
25             MR. PLACITELLA:  Okay.  Okay.
```

Ann G. Wylie, Ph.D.

```
 1    BY MR. FROST:
 2         Q    So before we were interrupted,
 3    continuing along --
 4              MR. PLACITELLA:  I just --
 5    BY MR. FROST:
 6         Q    -- on page 37 --
 7              MR. FROST:  That's fine.
 8              MR. PLACITELLA:  I want to make sure the
 9    record is clear.
10    BY MR. FROST:
11         Q    "A.  No.  Mineral types, yeah, amphibole
12    mineral, but no asbestos, no."
13              Did I read that correctly?
14         A    That's -- that's what it says.
15         Q    Based on what you read here, is this
16    consistent with what you saw in Dr. Pooley's
17    report?
18         A    It is.
19         Q    Now, finally, you were asked a series of
20    questions about PLM; is that correct?
21         A    Yes.
22         Q    Is PLM an instrument or a methodology?
23         A    An instrument.
24         Q    Do you take any issue with the fact that
25    Drs. Longo and Rigler used PLM as an instrument in
```

Ann G. Wylie, Ph.D.

1    their testing?

2       A    No.

3       Q    Is there anything that you take issue

4    with?

5            MR. PLACITELLA:  Objection to the form.

6    BY MR. FROST:

7       Q    That wasn't quite done, but is there

8    anything you take issue with with respect to the

9    use of PLM in the -- in Dr. Longo and Rigler's

10   testing?

11      A    I -- I believe I've made those comments

12   in my testimony.

13      Q    Other than what you've testified to

14   today, you know, thus far today, is there anything

15   with respect to the methodology utilized by them

16   under PLM that you take issue with?

17           MR. PLACITELLA:  Objection to the form.

18           THE WITNESS:  Yes.  I think I outlined

19   that.

20   BY MR. FROST:

21      Q    And where do you outline that?

22      A    In -- in my report.

23      Q    Okay.  So your criticisms with the

24   methodology utilized by Drs. Longo and Rigler

25   under PLM are set forth in your report; is that

Ann G. Wylie, Ph.D.

```
 1    correct?

 2         A     Yes.

 3               MR. FROST:  Thank you.  That's all the

 4    questions that we have.

 5               MR. PLACITELLA:  Okay.  I just have five

 6    minutes or less.

 7               MR. FROST:  Well, hold on, how much time

 8    did we use?

 9               THE VIDEOGRAPHER:  That session was 19

10    minutes.

11               MR. PLACITELLA:  Okay.  So I'm good,

12    right?

13               MR. FROST:  So 19 minutes are left.

14               MR. PLACITELLA:  Okay.  Well, I will do

15    it in five minutes or less.

16                    REDIRECT EXAMINATION

17    BY MR. PLACITELLA:

18         Q     As a scientist, a conscientious

19    scientist -- and by the way, this thing with the

20    Senate testimony, I appreciate your testimony.

21    After that happened, did you go back and look at

22    your old CDs and figure out who you worked for to

23    see -- before you wrote the letter to -- to

24    Senator Boxer to say, Hey, did GAF ever make

25    asbestos?  Did Keene ever make asbestos?  Did you
```

Ann G. Wylie, Ph.D.

1    ever do that?

2         A    Her question was quite specific with

3    respect to litigation and disease.

4         Q    Okay.  We'll just leave it there.

5              As a conscientious scientist, do you --

6    but before you come to reach your conclusions, do

7    you like to have all the available information or

8    just partial, part of the information?

9              MR. FROST:  Objection to form.

10             THE WITNESS:  All the information -- I

11   guess I'm not clear exactly.  If you're referring

12   to all of those testings that you showed me, I was

13   asked to review this document as I would a peer

14   review of a publication, and that was what I did.

15   BY MR. PLACITELLA:

16        Q    Yeah, and I appreciate that, Doctor.

17   But what happened in this case is your lawyers

18   cherry-picked non-published information and gave

19   it to you to review but didn't provide you other

20   information.  Correct?

21             MR. FROST:  Objection to form.

22   BY MR. PLACITELLA:

23        Q    That's what happened.

24             MR. FROST:  Objection to form.

25             THE WITNESS:  There certainly is a lot

Ann G. Wylie, Ph.D.

1    of information that you showed me.

2    BY MR. PLACITELLA:

3         Q    Okay.  And to be complete in your

4    analysis, you would at least like to know what it

5    is and decide whether to discard it or consider

6    it.  Do you agree?

7              MR. FROST:  Objection to form.

8              THE WITNESS:  Information by itself

9    doesn't have a lot of meaning.  The context, who

10   did it, the reputation of the person, the skills

11   of the person, and that sort of thing, and so some

12   of those documents you showed me were practically

13   before I was a professor.  I don't know if they

14   would have been helpful to me or not because that

15   information might not have been there.  I don't

16   know.

17   BY MR. PLACITELLA:

18        Q    Well, the Colorado School of Mines,

19   that's a respected entity, is it not, testing

20   entity?

21             MR. FROST:  Objection to form.

22             THE WITNESS:  Yes, so is the University

23   of Maryland, yes.

24   BY MR. PLACITELLA:

25        Q    No question.

Ann G. Wylie, Ph.D.

1       A    Yes.

2       Q    And can we just put it on the record so

3    when I go home and I talk to my Terrapin son

4    graduate that I'm not taking away from the

5    University of Maryland.

6            But Colorado School of Mines clearly is

7    a respected entity for testing, correct?

8            MR. FROST:  Objection to form.

9            THE WITNESS:  Yes.

10   BY MR. PLACITELLA:

11      Q    And you were provided nothing from them,

12   correct?

13      A    Yes.

14      Q    And clearly McCrone is an -- a respected

15   entity for testing, correct?

16           MR. FROST:  Objection to form.

17           THE WITNESS:  As with all testing

18   laboratories, they make mistakes.

19   BY MR. PLACITELLA:

20      Q    Everybody makes mistakes.  Do you agree?

21      A    So, yes, of course.

22      Q    Okay.  And this test method -- this EPA

23   test method where you said that what ended up --

24   or what you had an issue with was the 3-to-1

25   aspect ratio, do you recall that?  Mr. --

Ann C. Wylie, Ph.D.

```
 1         A     Yes.

 2         Q     -- Frost just --

 3         A     Yes.

 4         Q     Other than that, it -- it's fine?

 5         A     I haven't looked at the -- no, I

 6   wouldn't say that.  I'm not going to bless it

 7   because I'd have to look at it very carefully.

 8         Q     Okay.  So --

 9         A     But in the letter that I wrote which you

10   asked me about, I was referring specifically to

11   the aspect ratio and the particle criteria that

12   they put for a definition of "asbestos fiber."

13         Q     Okay.

14         A     That was my objection reflected in that

15   letter.

16         Q     So you had no problem with the fact that

17   they were using a spec for bulk insulation

18   samples, correct?

19               MR. FROST:  Objection to form.

20   BY MR. PLACITELLA:

21         Q     Didn't express that.

22               MR. FROST:  Objection to form.

23               THE WITNESS:  Please -- please -- please

24   ask it again.

25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

1      Q     This --

2      A     Yes.

3      Q     -- was for bulk insulation.

4      A     That's correct.

5      Q     But your problem wasn't that it was for

6  bulk insulation.  It was because they had the

7  wrong aspect ratio, correct?

8            MR. FROST:  Objection to form.

9            THE WITNESS:  My problem was is that

10  because it -- yes.  I would say yes.

11  BY MR. PLACITELLA:

12      Q     Okay.  Now, just so we know, is there

13  tremolite in the Vermont mines that were used for

14  baby powder?

15            MR. FROST:  Objection to form.

16            THE WITNESS:  Yes.

17  BY MR. PLACITELLA:

18      Q     There is?

19      A     Yes.

20      Q     How much?

21      A     I don't know.

22      Q     Okay.  And the only way you would know

23  is if somebody gave you a sample, correct?  And

24  you test -- you tested or had it tested, correct?

25            MR. FROST:  Objection to form.

Ann, et al Wylie, Ph.D.

```
 1   BY MR. PLACITELLA:

 2        Q     That's how you would be certain.

 3        A     I would be certain.

 4        Q     Right.  And that -- and you would take

 5   that sample and you would put it under the PLM

 6   microscope, correct?

 7        A     Correct.

 8        Q     And you would take photomicrographs,

 9   correct?

10        A     Usually.

11        Q     Right.  And then based upon that, you

12   would make the determination about whether that

13   tremolite was asbestos or not, correct?

14              MR. FROST:  Objection to form.

15              THE WITNESS:  Yes.

16   BY MR. PLACITELLA:

17        Q     But that didn't happen in this case,

18   correct?

19              MR. FROST:  Objection to form.

20              THE WITNESS:  I analyzed no samples.

21   BY MR. PLACITELLA:

22        Q     That didn't happen in this case.

23        A     It did not happen.

24              MR. FROST:  Objection to form.

25   BY MR. PLACITELLA:
```

Ann C. Wylie, Ph.D.

```
 1         Q    And just a couple more questions, and
 2    I -- I might be going over by one minute.
 3              In order to determine whether a test was
 4    valid or not, right, let's say PLM, you would
 5    actually need either -- you would actually need
 6    the sample itself and run your own test or the
 7    output from the microscope, correct?
 8              MR. FROST:  Hold on.  First, objection
 9    to form.  Second, objection goes well beyond the
10    examination.
11    BY MR. PLACITELLA:
12         Q    Correct?
13              In other words, if you had to verify a
14    test that was made, right, you would either have
15    to look at the output from a microscope that you
16    trusted, true?
17         A    Look at it with --
18              MR. FROST:  Same objections.
19              THE WITNESS:  Look at it with a
20    microscope myself?
21    BY MR. PLACITELLA:
22         Q    Yes.
23         A    Yes, mm-hmm.
24         Q    Or you would have to take that sample
25    and run the test yourself and draw your own
```

Ann G. Wylie, Ph.D.

1    conclusions.

2              MR. FROST:  Same set of objections.

3    BY MR. PLACITELLA:

4         Q    Correct?

5         A    I think that's what I just said.

6         Q    Okay.  And if the tests output from the

7    microscope aren't available to you, they're no

8    longer available, they're destroyed, that would

9    impact the scientific process of evaluating

10   whether there was asbestos or not in that sample,

11   correct?

12             MR. FROST:  Hold on.  Objection to form.

13   First off, this is outside of the direct

14   examination.  You've gone far afield of anything

15   that we asked.  If you wanted to ask these

16   questions, Chris, you should have asked them

17   during your direct examination.

18             MR. PLACITELLA:  I'm almost done.

19             MR. FROST:  Hold on.  I'm not done yet.

20             And second off, now you're asking

21   questions that have absolutely nothing to do with

22   any of the opinions that Dr. Wylie has rendered in

23   this case.

24             MR. PLACITELLA:  Well, somebody else

25   will make that determination.

Ann L. Wylie, Ph.D.

```
 1    BY MR. PLACITELLA:

 2        Q    So all I'm asking you is, if you wanted

 3    to verify testing that was done by somebody else,

 4    you would need to see the actual output from the

 5    microscope that they were looking at in a clear

 6    and presentable form.  Is that fair?

 7                MR. FROST:  Same set of objections.

 8                THE WITNESS:  I would need a list of the

 9    properties that they measured and the data that

10    they -- and the results of those properties.  I'd

11    like to know if they're calling it tremolite.

12    What is the principal index of refraction, what is

13    the extinction angle, where is the optic plane,

14    and all of those listing things that I gave you.

15    BY MR. PLACITELLA:

16        Q    Right.

17        A    Those could be listed.  They could be

18    listed.  I would not necessarily -- if I had all

19    of that information, I think I would be able to

20    conclude whether they had valid assumptions or

21    valid conclusions.

22        Q    Right.  I'm not quarreling with you.

23        A    I don't need the output from the

24    microscope --

25        Q    Okay.
```

Ann N. Wylie, Ph.D.

```
 1        A    -- in the sense I don't need
 2   necessarily -- I mean, I don't know what you're
 3   really referring to with output --
 4        Q    Were the photomicrographs --
 5        A    Well, that doesn't give you --
 6             MR. FROST:  Objection to form.
 7             THE WITNESS:  -- the optical properties.
 8   BY MR. PLACITELLA:
 9        Q    Okay.  What does give you the optical
10   properties?
11             MR. FROST:  Objection.
12             THE WITNESS:  You have to measure --
13   BY MR. PLACITELLA:
14        Q    No, what output gives you the optical
15   properties that you could look at to verify?
16             MR. FROST:  Objection.
17             THE WITNESS:  I would need a table
18   indicating that they had measured them and what
19   they had found.
20   BY MR. PLACITELLA:
21        Q    Okay.  And without that information,
22   you -- you couldn't really verify one way or the
23   other?
24             MR. FROST:  Same set of objections.
25   BY MR. PLACITELLA:
```

Ann G. Wylie, Ph.D.

1       Q     That's all I'm asking.

2       A     That's right.

3       Q     Right.

4             So if Johnson & Johnson was doing

5    testing historically, the only way that you could

6    verify the validity of those tests is to have the

7    kind of information that you are referring to

8    today, correct?

9             MR. FROST:  Objection to form.  And

10   again, I think these questions are becoming more

11   and more inappropriate as you're going, Chris.

12            THE WITNESS:  Yeah, I have to think a

13   little bit about your answer, because when -- when

14   you apply the EPA method, and they tell you that

15   they have seen that meth- -- that information,

16   and, yes, they verified that they found fiber

17   bundles, and that sort of thing -- you're --

18   you're talking about a legal setting.  I operate

19   in a scientific setting.  So I think they're

20   really quite different.

21            And what I would accept from a

22   scientist's word who I knew was well trained might

23   be different from what you would accept as a

24   lawyer.

25   BY MR. PLACITELLA:

Ann Wylie, Ph.D.

```
1        Q    Okay.  Okay.  What was my question?

2        A    I think you asked me if I had to have

3   the output from the microscope, and I was not

4   clear what that is.

5        Q    Okay.

6        A    These are observations that are made and

7   measurements that were --

8        Q    I was probably inartful.

9             There would be results that you would

10  like to look at in order to verify whether in your

11  opinion you agreed with somebody else's

12  conclusions, correct?

13            MR. FROST:  Same objections.

14            THE WITNESS:  Yes.  And they were not

15  available in the Longo and Rigler report.

16  BY MR. PLACITELLA:

17       Q    And they weren't available for any of

18  the other tests that Johnson & Johnson did,

19  correct?

20            MR. FROST:  Same objection.  You're

21  asking her to speculate now.

22            THE WITNESS:  I haven't seen them.

23  BY MR. PLACITELLA:

24       Q    Would you liked to have seen them?

25            MR. FROST:  Objection.
```

Ann G. Wylie, Ph.D.

BY MR. PLACITELLA:

1    BY MR. PLACITELLA:

2         Q    No?

3         A    No.

4         Q    So if Johnson & Johnson did their own

5    tests on their own samples, that wouldn't have

6    been important to you in terms of your opinions in

7    this case?

8              MR. FROST:  Objection.  Asked and

9    answered several times.

10             THE WITNESS:  I was asked to act as a

11   reviewer.  I was not -- a reviewer of very

12   specific things, and that's what I did.

13   BY MR. PLACITELLA:

14        Q    Okay.  But there's no question, as we

15   end this deposition, that there was tremolite in

16   the Vermont mines used for baby powder, correct?

17             MR. FROST:  Objection to form.

18             THE WITNESS:  Correct.

19             MR. PLACITELLA:  Okay.  No more

20   questions.  Thank you.

21             MR. FROST:  I just have one question,

22   follow up to that.

23                   RECROSS-EXAMINATION

24   BY MR. FROST:

25        Q    When you're -- when you say "tremolite,"

Ann M. Wylie, Ph.D.

```
 1   Dr. Wylie, you're talking about tremolite, the

 2   mineral, which is different than asbestiform

 3   tremolite, right?

 4              MR. PLACITELLA:  Objection.  Leading,

 5   form.  You can't do that.

 6              MR. FROST:  Well, I don't know that you

 7   have --

 8              MR. PLACITELLA:  You can't do that.

 9              MR. FROST:  -- much of a right to object

10   here, but fine.

11   BY MR. FROST:

12       Q    What did you mean by object -- or what

13   do you mean by tremolite, Dr. Wylie, in

14   response --

15              MR. PLACITELLA:  Object --

16   BY MR. FROST:

17       Q    -- to Mr. Placitella's question?

18              MR. PLACITELLA:  Objection.

19              THE WITNESS:  In my report I clearly

20   stated that a mineral name is applied to a

21   chemical composition and an ordered atomic

22   arrangement, and the external morphology or its

23   habit is unrelated entirely to the mineral name.

24   BY MR. FROST:

25       Q    So just because Mr. Placitella was
```

Ann G. Wylie, Ph.D.

```
 1   asking you about tremolite, that doesn't mean that

 2   you believe there's asbestiform tremolite in those

 3   mines, correct?

 4             MR. PLACITELLA:  Objection.  Leading,

 5   form.

 6             THE WITNESS:  No.

 7             MR. FROST:  Okay.  That's all the

 8   questions we have.

 9                  REDIRECT EXAMINATION

10   BY MR. PLACITELLA:

11        Q    You'd have to see all the testing,

12   wouldn't you, to make a final conclusion?

13             MR. FROST:  Objection to form.

14             THE WITNESS:  No.

15             MR. PLACITELLA:  Okay.  That's all the

16   questions I have.  Thank you.

17             THE VIDEOGRAPHER:  All right.  The time

18   is 5:29 p.m., on March 13th, 2019.  We're going

19   off the record, completing the videotaped

20   deposition.

21             (Whereupon, the deposition of

22             ANN G. WYLIE, Ph.D. was

23             concluded at 5:29 p.m.)

24

25
```

Ann G. Wylie, Ph.D.

```
 1        CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

 2         The undersigned Certified Shorthand Reporter

 3    does hereby certify:

 4         That the foregoing proceeding was taken before

 5    me at the time and place therein set forth, at

 6    which time the witness was duly sworn; That the

 7    testimony of the witness and all objections made

 8    at the time of the examination were recorded

 9    stenographically by me and were thereafter

10    transcribed, said transcript being a true and

11    correct copy of my shorthand notes thereof; That

12    the dismantling of the original transcript will

13    void the reporter's certificate.

14         In witness thereof, I have subscribed my name

15    this date:  March 15, 2019.

16

17                    _____

18                    LESLIE A. TODD, CSR, RPR

19                    Certificate No. 5129

20    (The foregoing certification of

21    this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)

25
```

Ann G. Wylie, Ph.D.

```
 1              INSTRUCTIONS TO WITNESS

 2         Please read your deposition over carefully and

 3    make any necessary corrections.  You should state

 4    the reason in the appropriate space on the errata

 5    sheet for any corrections that are made.

 6    After doing so, please sign the errata sheet

 7    and date it.

 8         You are signing same subject to the changes

 9    you have noted on the errata sheet, which will be

10    attached to your deposition.  It is imperative

11    that you return the original errata sheet to the

12    deposing attorney within thirty (30) days of

13    receipt of the deposition transcript by you.  If

14    you fail to do so, the deposition transcript may

15    be deemed to be accurate and may be used in court.

16

17

18

19

20

21

22

23

24

25
```

Ann D. Wylie, Ph.D.

```
 1                    - - - - - -

 2                  E R R A T A

 3                    - - - - - -

 4    PAGE LINE CHANGE

 5    _____ _____ _____

 6    REASON: _____

 7    _____ _____ _____

 8    REASON: _____

 9    _____ _____ _____

10    REASON: _____

11    _____ _____ _____

12    REASON: _____

13    _____ _____ _____

14    REASON: _____

15    _____ _____ _____

16    REASON: _____

17    _____ _____ _____

18    REASON: _____

19    _____ _____ _____

20    REASON: _____

21    _____ _____ _____

22    REASON: _____

23    _____ _____ _____

24    REASON: _____

25
```

Ann G. Wylie, Ph.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2         I,_____, do hereby

 3    certify that I have read the foregoing pages, and

 4    that the same is a correct transcription of the

 5    answers given by me to the questions therein

 6    propounded, except for the corrections or changes

 7    in form or substance, if any, noted in the

 8    attached Errata Sheet.

 9

10    _____

11    ANN G. WYLIE, Ph.D.                    DATE

12

13

14    Subscribed and sworn to

15    before me this

16    _____day of_____,20____.

17    My commission expires:_____

18    _____

19    Notary Public

20

21

22

23

24

25
```

Ann G. Wylie, Ph.D.

1                        LAWYER'S NOTES

2        PAGE   LINE

3        _____  _____   _____

4        _____  _____   _____

5        _____  _____   _____

6        _____  _____   _____

7        _____  _____   _____

8        _____  _____   _____

9        _____  _____   _____

10       _____  _____   _____

11       _____  _____   _____

12       _____  _____   _____

13       _____  _____   _____

14       _____  _____   _____

15       _____  _____   _____

16       _____  _____   _____

17       _____  _____   _____

18       _____  _____   _____

19       _____  _____   _____

20       _____  _____   _____

21       _____  _____   _____

22       _____  _____   _____

23       _____  _____   _____

24       _____  _____   _____

25