# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON      )
TALCUM POWDER PRODUCTS        )
MARKETING, SALES PRACTICES,   ) MDL NO. 16-2738(MAS)(RLS)
AND PRODUCTS LIABILITY        )
LITIGATION,                   )
_____)

VIDEOCONFERENCE DEPOSITION

OF

DANIEL CLARKE-PEARSON, M.D.

(Taken virtually by Defendants)

Wednesday, January 17, 2024

Reported by:  Christine A. Taylor, RPR

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Page 2

1 REMOTE APPEARANCES:

2

3 Representing the Plaintiffs:

4    BEASLEY ALLEN
     BY: LEIGH O'DELL, ESQ.
5    MARGARET M. THOMPSON, ESQ.
     218 Commerce Street
6    Montgomery, Alabama  36104
     334.269.2343
7    leigh.odell@beasleyallen.com

8
     ASHCRAFT & GEREL, LLP
9    BY: MICHELLE A. PARFITT, ESQ.
     1825 K Street NW, Suite 700
10   Washington, DC  2006
     202.783.6400
11   mparfitt@ashcraftlaw.com

12

13 Representing the Defendants Johnson & Johnson and
   Johnson & Johnson Consumer Inc.:
14
     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
15   BY: JESSICA DAVIDSON, ESQ.
     ASHER TRANGLE, ESQ.
16   One Manhattan West
     New York, New York  10001
17   212.735.3000
     jessica.davidson@skadden.com
18   asher.trangle@skadden.com

19

20

21

22

23

24

25

Page 3

CONTENTS

1                 C O N T E N T S

2                          PAGE

3 EXAMINATION BY MS. DAVIDSON                6

4 EXAMINATION BY MS. O'DELL                221

5

6

7                    * * *

8

9               E X H I B I T S

10 EXHIBIT          DESCRIPTION          PAGE

11 Exhibit 1   Invoices dated 8/29/21, 10/14/21,   14

12    and 12/31/23

13 Exhibit 2   Dr. Clarke-Pearson talc Litigation   14

14    Expert Work Invoices Spreadsheet

15 Exhibit 3   9/14/22 E-mails, Subject: RE: Baby   41

16    Powder and Ovarian Cancer, Bates

17    Clarke-Pearson 000001 - 5

18 Exhibit 4   Yahoo/Finance article - "J&J puts   42

19    talc liabilities into bankruptcy"

20 Exhibit 5   Woolen article - "Association       60

21    between the frequent use of perineal

22    talcum powder products and ovarian

23    cancer: A systematic review and

24    meta-analysis"

25

Page 4

1 Exhibit 6   O'Brien article - "Association of   61

2    Powder Use in the Genital Area with

3    Risk of Ovarian Cancer"

4 Exhibit 7   Wentzensen, O'Brien article - "talc,   64

5    body powder, and ovarian cancer: A

6    summary of the epidemiologic

7    evidence"

8 Exhibit 8   Second Amended Rule 26 Expert Report   69

9    of Daniel L. Clarke-Pearson, MD

10 Exhibit 9   Saed Documents, Bates               84

11    SAED_SEPT222021_SUPPL_000001 - 284

12 Exhibit 10  Mandarino article - "The effect of   114

13    talc particles on phagocytes in

14    co-culture with ovarian cancer

15    cells"

16 Exhibit 11  Emi article - "Transcriptomic and   123

17    epigenomic effects of insoluble

18    particles on J774 macrophages"

19 Exhibit 12  Phung article - "Effects of risk    127

20    factors for ovarian cancer in women

21    with and without endometriosis"

22 Exhibit 13  Woolen article - "Association        129

23    between the frequent use of perineal

24    talcum powder products and ovarian

25    cancer: A systematic review and

Page 5

1    meta-analysis"

2 Exhibit 14  Taher article - "Critical review of   157

3    the association between perineal use

4    of talc powder and risk of ovarian

5    cancer"

6 Exhibit 15  Wu article - "Markers of             162

7    inflammation and risk of ovarian

8    cancer in Los Angeles County"

9 Exhibit 16  NCI PDQ - "Ovarian, Fallopian Tube,   169

10    and Primary Peritoneal Cancers

11    Prevention (PDQ) - Health

12    Professional Version"

13 Exhibit 17  Materials Considered list            208

14 Exhibit 18  Johnson's Baby Talcum Powder A       210

15    Comprehensive Review, 3/17/20, Bates

16    JNJTALC001465273 - 1465527

17

18

19

20

21

22

23

24

25

Daniel Clarke-Pearson, M.D.

Page 6

1    On January 17, 2024, commencing at
2  9:05 a.m., the videoconference deposition of
3  DANIEL CLARKE-PEARSON, M.D., was taken pursuant to
4  notice and pursuant to the Federal Rules of Civil
5  Procedure, on behalf of the Defendants, remotely
6  via Zoom.
7                    - - -
8         P R O C E E D I N G S
9                    - - -
10        DANIEL CLARKE-PEARSON,
11    having first been duly sworn, was examined
12        and testified as follows:
13        EXAMINATION
14  BY MS. DAVIDSON:
15    Q.  Good morning, Dr. Clarke-Pearson.  It's
16  nice to meet you.  I understand you've been deposed
17  before.  We've got a lot of ground to cover today,
18  so I'm not going to go into the basics of a
19  deposition.  But, basically, if you need a break,
20  let me know, and please provide verbal answers to
21  every question.  Okay?
22    A.  Okay.
23    Q.  Can you state your full name for the
24  record?
25    A.  Daniel Lyle Clarke-Pearson.

Page 7

1    Q.  And, Dr. Clarke-Pearson, where are you
2  testifying from today?
3    A.  I'm in Chapel Hill, North Carolina, at
4  the Carolina Inn.
5    Q.  Do you still reside in North Carolina?
6    A.  Yes.
7    Q.  Do you have any materials with you
8  today?
9    A.  Yes.
10    Q.  Can you please tell me what you have
11  with you?
12    A.  Oh, my.  Predominantly publications
13  that have been listed in my reports.  I have my
14  reports.  I have Dr. Longo's reports.  I have some
15  specific epidemiology papers.  I have a
16  reviewers -- document of reviewers looking at a
17  paper Dr. Saed wrote.  I have a list of all my
18  materials considered.  Two binders that have all
19  those -- all those publications, those papers and
20  materials adjacent to my table here.  I have
21  invoices that I've submitted since the last
22  deposition.  I believe that covers it -- covers it.
23    Q.  Who prepared the binders of
24  publications and papers?
25    A.  Our attorneys did.

Page 8

1    Q.  And when you say "our attorneys," who
2  are you referring to?
3    A.  I'm talking about Ms. O'Dell.
4    Q.  And you said you have specific epi
5  papers.  Who put those together?
6    A.  I did.
7    Q.  And do you have any notes on those epi
8  papers?
9    A.  Yes.
10    Q.  Have you produced those notes to us?
11    A.  Not that I'm aware of.
12    MS. DAVIDSON:  I'm going to request
13  that those notes be produced to us, either
14  during a break or if they are not produced
15  to us until after the deposition, I'm going
16  to have to hold the deposition open.  We --
17    THE WITNESS:  Sorry, I can't hear you.
18    MS. DAVIDSON:  -- don't have any
19  notes --
20    MS. O'DELL:  We can't hear you,
21  Jessica, I'm sorry.  Would you mind
22  repeating it?
23    MS. DAVIDSON:  We did not receive any
24  notes that Dr. Clarke-Pearson had on any epi
25  papers.  So I need to ask for those to be

Page 9

1  produced.  I don't know if those can be
2  produced during today's deposition or we'll
3  have to hold the deposition open.
4    MS. O'DELL:  I mean, I think you're --
5  you're welcome to ask him about his notes
6  and you're welcome to mark the papers.  And
7  Dr. Clarke-Pearson will be happy to walk you
8  through any notes that he has.  To my
9  knowledge, they're very limited.  And then
10  you can ask him about them.
11    Happy to have those -- copies of those
12  papers marked as exhibits to the deposition,
13  but we will not agree to hold the deposition
14  open.
15    MS. DAVIDSON:  Well, because the
16  deposition is remote, I don't have an
17  ability to see those notes to question about
18  them, and I believe they should have been
19  produced before.  Those notes are subject to
20  production under Rule 26.
21    So we're going to need to get those,
22  and I'll have to take a look and see if we
23  need to ask further questions.  So we will
24  be holding the deposition open.  You can
25  object to that.

Daniel L. Clarke-Pearson, M.D.

Page 10

1      MS. O'DELL: We will object to that.
2      And, certainly, it was your decision to
3      conduct the deposition remotely. There was
4      no order to do that. You certainly could
5      have been here in person if you had chosen
6      and made the election not to do that. So we
7      we'll try to address this, Jessica. Let's
8      just proceed. We aren't going to agree.
9  BY MS. DAVIDSON:
10     Q. Dr. Clarke-Pearson, how did you prepare
11 for your deposition?
12     A. It's been going on for a while. I've
13 been reviewing materials that -- that I've listed
14 and reviewed my reports, my general report as well
15 as reports from my patients. I've reviewed
16 literature that I thought might be useful in this
17 deposition. I think that's the core of what I've
18 done over the last couple of weeks in preparing for
19 this deposition.
20     Q. Did you meet with counsel to prepare
21 for the deposition?
22     A. I have.
23     Q. Whom did you meet with?
24     A. Ms. O'Dell and Dr. Thompson.
25     Q. When did you meet with them?

Page 11

1      A. I'm sorry, again, I didn't hear you.
2      Q. When did you meet with them?
3      A. I met with them yesterday.
4      Q. For how long?
5      A. Approximately five hours.
6      Q. Have you had any other meetings with
7  them in the last few months?
8      A. We've had a Zoom meeting. I'm not sure
9  when it was. Within the last two weeks.
10     Q. How many Zoom meetings?
11     A. I believe just one.
12     Q. And how long did that last?
13     A. A few hours.
14     Q. Was that also to prepare for the
15 deposition?
16     A. Yes.
17     Q. Have you had any other meetings, calls,
18 or Zooms to prepare for the deposition?
19     A. Can you give me a time frame?
20     Q. For this deposition?
21     A. For this deposition. No, I don't think
22 so.
23     Q. Did you review your prior depositions
24 to prepare for this deposition?
25     A. No, I haven't.

Page 12

1      Q. You were deposed in August 2021. Do
2  you recall that?
3      A. Yes.
4      Q. When is the last time you looked at
5  that deposition testimony?
6      A. I may have scanned it shortly after the
7  deposition when it became available to me. That
8  would be the last time.
9      Q. You were deposed in 2019, correct,
10 in the MDL?
11     A. Yes.
12     Q. And when is the last time you took a
13 look at that deposition?
14     A. I don't recall.
15     Q. Do you stand by all the testimony that
16 you gave in 2019?
17     A. Yes.
18     Q. And do you stand by all the testimony
19 that you gave in August 2021?
20     A. Yes.
21     Q. Is there any testimony from either
22 deposition that you wish to change?
23     A. Not that I'm aware of.
24     Q. Did Ms. O'Dell and Ms. Thompson show
25 you any documents to prepare for this deposition?

Page 13

1      MS. DAVIDSON: You can answer that
2      question if you were shown or were not
3      shown, but not the substance of what was
4      discussed or what was shown.
5      THE WITNESS: Other than one document
6      that I recall is different than documents
7      that I would have had already was the
8      journal reviewer's comments about Dr. Saed's
9      paper.
10 BY MS. DAVIDSON:
11     Q. You produced three invoices to us this
12 week. Do you know that?
13     A. I'm sorry, the fire truck just went by
14 here. Let me -- can you repeat that? I didn't
15 hear you.
16     Q. Are you aware that you produced three
17 invoices to defendants this week?
18     A. I produced invoices. They're here.
19 I'm not sure there are three.
20     MS. DAVIDSON: All right. Let's mark
21     those.
22     MS. O'DELL: Are you marking them all
23     as one exhibit, Jessica, or are you going to
24     mark them individually?
25     MS. DAVIDSON: Asher?

Page 14

1    MR. TRANGLE:  Yes.
2    MS. DAVIDSON:  You're marking
3    collectively --
4    MR. TRANGLE:  Right.
5    MS. DAVIDSON:  -- all the three
6    invoices we got this week; is that correct?
7    MR. TRANGLE:  Correct.
8    MS. DAVIDSON:  Okay.  So let's mark
9    those as Exhibit 1.  And in order to make
10   this easier, I created a demonstrative.  So
11   let's mark as Exhibit 2 the summary of the
12   invoices.
13       (Exhibits 1 and 2 marked for
14   identification.)
15   MS. DAVIDSON:  Thanks Asher.
16   BY MS. DAVIDSON:
17   Q.  So this document shows the five
18   invoices we received in the past from you and the
19   most recent three invoices, and my math is kind of
20   lousy --
21   MS. O'DELL:  Jessica --
22   MS. DAVIDSON:  Both my math and my eyes
23   are lousy.
24   MS. O'DELL:  -- Dr. Clarke-Pearson
25   asked if it could be made bigger, Jessica.

Page 15

1    So, Asher, if you could do that.  Thank
2    you.
3        And then, secondly, would you mind
4    putting this document in the chat.
5    MR. TRANGLE:  Sure.
6    MS. O'DELL:  Thank you.
7    BY MS. DAVIDSON:
8    Q.  Dr. Clarke-Pearson, this shows about
9    $125,000.
10   MS. O'DELL:  I'm sorry, we don't know
11   where you're looking at, Jessica, if you --
12   MS. DAVIDSON:  You didn't let me finish
13   my question, Leigh.  Maybe just wait until
14   I'm done with my question.
15   MS. O'DELL:  I'm sorry.  Please
16   proceed.
17   MS. DAVIDSON:  I was in the middle of
18   the question.  Let's just start the question
19   again.
20   BY MS. DAVIDSON:
21   Q.  Dr. Clarke-Pearson, for invoices 6, 7,
22   and 8 in total, this shows about $128,000.  Does
23   this reflect all the work you've done since
24   August 20 -- August -- I guess we'd say August 1,
25   2021?

Page 16

1    A.  No.  This includes work up until
2    December 31st, 2023.
3    Q.  About how many hours would you say
4    you've worked since December 31?
5    A.  Well, I don't like to guess in a
6    deposition, so I can't tell you for sure.
7    Q.  Would it be more or less than 50 hours?
8    A.  Probably more than 50 hours.
9    Q.  Would it be more or less than
10   100 hours?
11   A.  Probably less.
12   Q.  Okay.  So somewhere between 50 hours
13   and 100 hours of unbilled time.  When do you plan
14   to submit those bills?
15   A.  After this deposition.
16   Q.  All right.  I'm going to request on the
17   record that that invoice be produced to us.
18       Dr. Clarke-Pearson, did you somewhere
19   between October and December -- October 2021 and
20   December 2023 raise your rate from 800 to 900
21   dollars an hour?
22   A.  Yes, I did.
23   Q.  When did you do that?
24   A.  I don't remember specifically.
25   Q.  And, Dr. Clarke-Pearson, what

Page 17

1    percentage of your income would you say is derived
2    from expert testimony?
3    A.  Well, I'm retired at this point in
4    time.  So my income is quite different than it was
5    when I was in practice and working at the
6    university.  So I still work at the university but
7    on a very reduced salary.
8        In the past, my income from
9    medical-legal work was approximately about
10   10 percent of my salary.  I can't give you an exact
11   number now that I'm retired and living on Social
12   Security and a pension and some other mandatory
13   deductions from my retirement accounts.
14   Q.  Fair to say that now that you're
15   retired it's significantly more than 10 percent?
16   MS. O'DELL:  Object to the form.
17   Excuse me.  Object to the form.
18   THE WITNESS:  It's more than
19   10 percent, yes.
20   BY MS. DAVIDSON:
21   Q.  Can you estimate about what percentage
22   it is?
23   A.  No, I really can't.
24   Q.  Is it more than 25 percent?
25   A.  It may be.

Daniel Clarke-Pearson, M.D.

Page 18

1    Q.  Is it more than 50 percent?
2    A.  I don't think so.
3    Q.  So is your best estimate that it's
4  somewhere between 25 and 50 percent of your income
5  currently is from expert work?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  I just can't give you a
8  specific number.  I'm sorry.
9  BY MS. DAVIDSON:
10    Q.  Do you know what your annual earnings
11  are from your pension?
12    MS. O'DELL:  Object.  He's not --
13  you're not entitled to know that
14  information, Jessica.  So I would object to
15  the question.
16    And, Dr. Clarke-Pearson, you don't have
17  to respond to that.
18    MS. DAVIDSON:  I am trying to determine
19  what percentage of his income comes from
20  expert work which is a completely
21  appropriate question.  In order to determine
22  that, I need to know how much his pension
23  is.
24    MS. O'DELL:  No, Jessica.  I mean, he's
25  given you his best estimate of the

Page 19

1  percentage, and he's testified to that.
2  You're not entitled to walk through, you
3  know, his retirement accounts or any of that
4  information.  You know, that's not subject
5  to disclosure.  What you're entitled to know
6  is how much he's been paid for this work in
7  this case, which we've provided that
8  information to you and he's testified to.
9  And so we would object to the questions
10  about his assets.
11  BY MS. DAVIDSON:
12    Q.  Dr. Clarke-Pearson, are you refusing to
13  testify to what percentage of your income comes
14  from expert work?
15    MS. O'DELL:  So to be clear,
16  Dr. Clarke-Pearson has already responded to
17  your questions.  And Dr. Clarke-Pearson is
18  here to answer your questions that are
19  appropriate under the rules.  And asking him
20  about the value of his retirement, his other
21  assets.  Those questions are inappropriate.
22  So I've instructed him not to answer.
23  BY MS. DAVIDSON:
24    Q.  Dr. Clarke-Pearson, do you know how
25  much your pension is per year?

Page 20

1    MS. O'DELL:  Same instruction,
2  Dr. Clarke-Pearson.
3    MS. DAVIDSON:  I'm asking him simply if
4  he knows.
5  BY MS. DAVIDSON:
6    Q.  Do you know how much your pension is
7  per year?  I'm not asking what it is.
8    MS. O'DELL:  I don't know what you mean
9  by the question what's his pension per year,
10  Jessica.  But, you know, Dr. Clarke-Pearson,
11  what he knows or what he doesn't know about
12  his pension, retirement, et cetera are not
13  appropriate subject matter for this
14  deposition.  And he has testified to your
15  questions about percentages to the best of
16  his knowledge.
17    MS. DAVIDSON:  Well, he said he doesn't
18  know and, therefore, I'd like to know if he
19  knows his pension because if he knows his
20  pension, then he does know what percentage
21  it is.
22    MS. O'DELL:  I don't think that's what
23  he said.  He gave you his estimate.
24    MS. DAVIDSON:  He did not.
25    MS. O'DELL:  Yes, he did.

Page 21

1    MS. DAVIDSON:  Leigh, are you going to
2  let me take this deposition?
3    MS. O'DELL:  I am.  But I am --
4  absolutely --
5    MS. DAVIDSON:  Instructing --
6    MS. O'DELL:  Don't interrupt me.  Let's
7  just start off -- start the day well.
8    MS. DAVIDSON:  You're interrupting my
9  questions.
10    MS. O'DELL:  Don't interrupt me.  What
11  I said to him is he's given you his estimate
12  of the appropriate -- his estimate of the
13  percentage of his current income to the best
14  of his knowledge.  You're not entitled to
15  know other information about his retirement,
16  et cetera, as I've stated.
17  BY MS. DAVIDSON:
18    Q.  Dr. Clarke-Pearson, Ms. O'Dell has
19  represented that you told me what percentage of
20  your current income is from expert work.  What
21  percentage is that?  Because I didn't hear an
22  answer.
23    MS. O'DELL:  He gave an estimate
24  previously.  Dr. Clarke-Pearson, if you want
25  to repeat the previous testimony you've

Page 22

1    given about your best information, you may
2    about a percentage, but other information
3    they're not entitled to.
4        THE WITNESS:  I think my response to
5    you was within a range.  The court reporter
6    might want to read back what I said.
7        MS. DAVIDSON:  I'm sorry,
8    Dr. Clarke-Pearson, I couldn't hear you.
9        THE WITNESS:  I said I gave you a
10   range.  25 percent was some number you threw
11   out there, and I said it was probably close
12   to that.  The court reporter could probably
13   read back specifically what I said.
14   BY MS. DAVIDSON:
15       Q.  Dr. Clarke-Pearson, if I ask a
16   question, I am entitled to an answer rather than
17   asking the court reporter to repeat your testimony.
18       Are you testifying that it's
19   approximately 25 percent of your income that comes
20   currently from expert work?
21       A.  I don't know exactly what it is.
22       Q.  I understand you don't know exactly
23   what it is, but is it approximately 25 percent or
24   more than 25 percent?
25       A.  I don't know.

Page 23

1        Q.  Have you had to travel for this
2    litigation?
3        A.  With regard to this deposition?
4        Q.  Have you had to travel at all with
5    respect to your MDL work?
6        A.  Yes.
7        MS. O'DELL:  At any point in time,
8    Jessica?  I'm just trying to understand what
9    your question is.
10       MS. DAVIDSON:  Dr. Clarke-Pearson
11   understood the question and he said yes.
12   BY MS. DAVIDSON:
13       Q.  When did you travel for the MDL
14   proceeding?
15       MS. O'DELL:  You're free to answer the
16   question.
17       THE WITNESS:  As best I recall, I went
18   to -- I think we stayed in Princeton, New
19   Jersey, and went to federal court in the MDL
20   case.  I don't know the exact dates.
21   BY MS. DAVIDSON:
22       Q.  Does counsel for -- sorry, I thought
23   you were done.
24       A.  Sorry, you too.  I stopped for a
25   moment.

Page 24

1        I don't recall any other travel except
2    around Chapel Hill here in North Carolina.
3        Q.  Does counsel play -- for plaintiffs pay
4    for your travel?
5        A.  Yes, I think so.
6        Q.  Do you have any requirements with
7    respect to travel?
8        MS. O'DELL:  Object to the form.
9    Vague.  I mean, what do you mean by
10   requirements?
11       And I'm not sure I understand the
12   question.
13   BY MS. DAVIDSON:
14       Q.  Dr. Clarke-Pearson, do you fly first
15   class?
16       A.  That is a request that's on my fee
17   schedule, yes.
18       Q.  Asher, if you could put up the invoice
19   from October 14, 2021, which was part of Exhibit 1.
20   Dr. Clarke-Pearson, do you know why there's
21   redactions on this invoice?
22       A.  No, I don't.
23       MS. O'DELL:  I'll represent, Jessica,
24   that redaction relates to a case in which
25   Dr. Clarke-Pearson is not disclosed as an

Page 25

1    expert.  He consulted.
2        So you're not entitled to that
3    information.  But, certainly, we provided
4    the number of hours extended as well as the
5    total bill.
6    BY MS. DAVIDSON:
7        Q.  Dr. Clarke-Pearson --
8        MS. O'DELL:  Excuse me, Jessica, I'm
9    sorry.
10       MS. DAVIDSON:  I'm sorry, Leigh.
11       MS. O'DELL:  I'm sorry.  There was just
12   a little feedback here.  I'm just asking if
13   there was something on.  Okay.  Sorry about
14   that.
15   BY MS. DAVIDSON:
16       Q.  Dr. Clarke-Pearson, what are the
17   Callahan and Baker cases that are referenced on
18   this sheet?
19       A.  Yeah, I see what you're saying.  I
20   honestly don't recall.  Been so focused on this
21   case that I don't recall these cases that I did a
22   little bit of work on.
23       Q.  And, Dr. Clarke-Pearson, in your expert
24   report submitted on November 2023, you stated that
25   your rate is the $800 per hour.  Is that an error?

Daniel Clarke-Pearson, M.D.

Page 26

1    A.   That's an error.  Currently, it's $900
2  an hour.
3    Q.   And why did you raise your rate?
4    A.   Just like other things in the economy,
5  my rate is moving with inflation, I suppose, you
6  know, best way to describe it.
7    Q.   Do you do any expert work for anyone
8  other than Ms. O'Dell, Ms. Thompson, and
9  Ms. Parfitt?
10    A.   Yes.
11    Q.   What other expert work do you do?
12    A.   Not product liability, but other
13  medical malpractice issues.
14    Q.   Have you appeared as an expert in any
15  medical malpractice cases in the last four years?
16    A.   To the extent you mean appear by
17  deposition, court?  What do you mean by that?
18    Q.   Either.
19    A.   In the last four years, I don't believe
20  I've had any depositions.  I've just been
21  consulting with attorneys.
22    Q.   In the last four years, has all of your
23  expert income come from the talc litigation?
24    A.   Can I correct what I just said a minute
25  ago to your last question?  I did have a deposition

Page 27

1  recently within the past month.  Lasted for about
2  two hours.
3    MS. DAVIDSON:  I do not believe that
4    was disclosed, Leigh.  So I would request
5    that you amend his disclosure.
6  BY MS. DAVIDSON:
7    Q.   What was that deposition in?
8    A.   I'm sorry.
9    Q.   What was the case where you were
10  deposed?
11    A.   I believe it was the Albright case in
12  St. Louis.
13    Q.   What does that case involve?
14    A.   What does that case involve?
15    Q.   I'm sorry, I didn't hear --
16    A.   It involves an abnormal Pap smear that
17  the patient alleges was not reported to her.
18    Q.   Did the patient have cancer?
19    A.   She ultimately developed cancer
20  18 months after her Pap smear.
21    Q.   What kind of cancer?
22    A.   Cervical cancer.
23    Q.   Were you paid $900 an hour for that
24  matter?
25    A.   Yes.  But I correct that, I'm not sure.

Page 28

1  I may have started working with that attorney when
2  I was at $800 an hour.  I'd have to check my
3  records to be sure.  It may well be $800 an hour.
4    Q.   So in the middle of that proceeding,
5  you didn't raise your rates?
6    MS. O'DELL:  Object to the form.
7    THE WITNESS:  I stayed with the rate
8    that I offered to work for this attorney
9    when I originally was engaged.
10  BY MS. DAVIDSON:
11    Q.   In the talc matter, however, you didn't
12  stay with your rate; is that correct?
13    A.   I didn't stay with the rate.  I got
14  approval from Ms. O'Dell to increase my rate.
15    Q.   Were you retained in Albright by the
16  plaintiff or by the defendant?
17    A.   By the defendant.
18    Q.   Who was the defendant?
19    A.   I can't remember specifics.  It was a
20  nurse practitioner and a physician that worked in a
21  clinic affiliated with Barnes-Jewish Hospital in
22  St. Louis, Washington University.
23    Q.   Did you conclude that the Pap smear had
24  been normal?
25    A.   I'm sorry?

Page 29

1    Q.   Did you conclude that the Pap smear
2  was, in fact, normal?
3    A.   No, it wasn't normal.  I concluded
4  based on what I read on the Pap smear report.
5    Q.   So what was the substance of your
6  expert opinion there?
7    A.   So the patient had an abnormal Pap
8  smear that showed some precancerous changes on her
9  Pap smear and HPV, human papillomavirus of high
10  risk types.  And the allegation is that the patient
11  was never informed about that.  There's evidence
12  that the nurse practitioner who obtained the Pap
13  smear tried to communicate with the patient by way
14  of telephone and left a phone message and also
15  tried to communicate by -- through their medical
16  record which is Epic through MyChart, sent a
17  message in MyChart to the patient, and the patient
18  never responded to either one of those attempts at
19  communication.
20    MS. O'DELL:  Dr. Clarke-Pearson, when
21    you say "MyChart," do you mean your chart or
22    what is that?  That may be confusing.
23    THE WITNESS:  Sure.  MyChart is a
24    software piece in the Epic, the electronic
25    medical record that communicates.

Page 30

1    MS. DAVIDSON: I understood. MyChart,
2    capital M, capital C, Leigh.
3    THE WITNESS: Okay.
4    BY MS. DAVIDSON:
5    Q. Okay. Have you published any papers
6    related to talc since 2021?
7    A. No.
8    Q. Have you made any public statements
9    concerning talc and ovarian cancer since 2021?
10   A. No.
11   Q. Have you spoken in a public forum about
12   talc and ovarian cancer since 2021?
13   A. I lecture -- I don't lecture. I talk
14   to the medical students, it's a case-based
15   discussion every -- nearly every week as part of my
16   teaching responsibilities. And in the course of
17   those discussions, talcum powder is raised as part
18   of a discussion.
19   Q. Do you use slides for those
20   presentations?
21   A. No, I don't. It's a case-based
22   discussion. The students are given a case to
23   review and about a dozen to 15 questions for them
24   to answer, and then we have a Zoom gathering where
25   I ask them to answer the questions that I've posed.

Page 31

1    So one of those questions is what are the risk
2    factors for ovarian cancer. And the student
3    oftentimes will -- I'm not sure what percentage,
4    sometimes they'll bring up talcum powder as one of
5    the risk factors that they've identified in their
6    research and preparing for my conference.
7    And other times they'll go to the point
8    of talking about tubal ligation being a -- and
9    hysterectomy being a risk-reducing procedure. And
10   we then -- or I will then say -- and inform them
11   about talcum powder being a risk factor as well.
12   Q. When you say there's a case, is it a
13   case of a real person?
14   A. No, it's a hypothetical case so I can
15   get the main points of what I want them to learn.
16   So it's a case I've made up.
17   Q. Does the hypothetical plaintiff -- has
18   the hypothetical plaintiff used talcum powder?
19   MS. O'DELL: Objection to form.
20   Patient, not plaintiff.
21   BY MS. DAVIDSON:
22   Q. Has the hypothetical --
23   A. The hypothetical patient has ovarian
24   cancer. And some of those risk factors are
25   included based, you know, for example, the age of

Page 32

1    the patient that I have hypothetically is I think
2    in her sixties. But there are many other risk
3    factors that are not part of that particular case,
4    but then I ask the students to expand on what other
5    risk factors could the patient possibly have.
6    Q. My question is do you state in the case
7    that the patient used talcum powder?
8    A. No.
9    Q. When did you start talking about talcum
10   powder as a risk factor to medical students?
11   A. I'm not sure I know when. I can't give
12   you a date.
13   Q. Was it before or after you were
14   retained in this litigation?
15   A. It was probably before I was retained
16   in this litigation. But as has been discussed in a
17   prior deposition, I became retained after I became
18   better educated about talcum powder by reviewing
19   literature at the time.
20   Q. You were -- sorry.
21   A. The literature that I was not aware of
22   to begin with.
23   Q. You were retained in this litigation in
24   2018; correct?
25   A. I believe so, yes.

Page 33

1    Q. Is it your testimony that you discussed
2    talcum powder as a risk factor for ovarian cancer
3    with medical students before 2018?
4    MS. O'DELL: Jessica, I just object to
5    this questioning. The purpose of this
6    deposition is to ask questions about what's
7    occurred since his last deposition,
8    August 2021. He was asked questions about
9    what he was telling students and others in
10   2018 -- before 2018 in his first deposition.
11   And so we just ask you to focus on activity
12   after August 2021.
13   BY MS. DAVIDSON:
14   Q. Dr. Clarke-Pearson, you can answer the
15   question.
16   A. I don't --
17   MS. O'DELL: Would you repeat it or
18   have Jessica, please. I'm not sure I
19   remember it. Dr. Clarke-Pearson may not
20   either.
21   MS. DAVIDSON: Court reporter, can you
22   repeat my question.
23   (The reporter read the last question.)
24   THE WITNESS: I don't recall when I
25   started talking to medical students about

Daniel Clarke-Pearson, M.D.

Page 34

1    talcum powder per se. I'm sorry --
2        MS. O'DELL: You guys, can we go off
3    the record just for a moment? We need to
4    check the power cord for Dr. Clarke-Pearson,
5    so let's go off the record.
6    (Recess taken from 9:37 a.m. until 9:38 a.m.)
7    BY MS. DAVIDSON:
8        Q. Dr. Clarke-Pearson, have you made any
9    public statements about asbestos and ovarian cancer
10   since August 2021?
11       A. Not that I'm aware of.
12       Q. Have you spoken in any public forum
13   about asbestos and ovarian cancer since
14   August 2021?
15       A. No.
16       Q. Do you recall giving a speech at Duke
17   earlier this year entitled "Reflections on
18   Gynecologic Oncology at Duke: Lessons Learned"?
19       A. Yes.
20       Q. Did you mention talc during this
21   lecture?
22       A. The lecture had nothing to do with
23   ovarian cancer.
24       Q. Is it your testimony that you didn't
25   address ovarian cancer in that lecture?

Page 35

1        A. We may have talked about the research
2    that was done at Duke over the 50 years that I was
3    reviewing. I'm sure there was some discussion
4    about notation of clinical trials that we
5    participated in that we have looked at other
6    treatments -- new treatments for ovarian cancer.
7    I'm not aware I had any discussion about risk
8    factors for ovarian cancer, including talcum
9    powder.
10       Q. Did you discuss the BRCA1 gene in that
11   lecture?
12       A. I may have. That was a discovery that
13   some of my colleagues at Duke made. So that was a
14   contribution to what Duke had contributed -- had
15   made to the oncology.
16       Q. Did you mention 12 genetic variants
17   known to increase the risk of developing epithelial
18   ovarian cancer in that lecture?
19       A. I don't recall that, no.
20       Q. Did you mention asbestos in that
21   lecture?
22       A. I don't believe I did.
23       Q. Do you have any forthcoming speeches or
24   presentations that relate to talcum powder?
25       A. Not that I'm aware of.

Page 36

1        Q. Are you working on any articles or
2    studies that pertain to asbestos or talcum powder?
3        A. No.
4        Q. Do you still see patients?
5        A. No, I don't.
6        Q. When did you stop seeing patients?
7        A. Approximately March of 2020.
8        Q. March 2020?
9        A. Yes. I may have continued. I'm not
10   sure the exact end date of the last time I
11   interacted with a patient in the clinical setting.
12   It may have been a few months later. We were doing
13   Zoom virtual visits with patients after March of
14   2020. I was still doing some of that, but I can't
15   recall exactly when my last Zoom session was with a
16   patient.
17       Q. Do you still teach any classes?
18       A. Yes. I teach medical students like
19   I've talked about before. I also teach residents
20   and fellows in gynecologic oncology and residents
21   in obstetrics and gynecology at UNC.
22       Q. As part of training residents, you
23   don't see patients with them?
24       A. I stopped doing clinical work when I
25   was -- when the pandemic hit, and I had a medical

Page 37

1    condition, which we don't need to talk about, that
2    put me at high risk to develop COVID, and I was --
3    decided to stop doing clinical work. I was in my
4    70s and felt like I had given it a good run in the
5    time that I provided care to patients and decided
6    it was time to stop the clinical work and
7    interacting with patients.
8        Q. So how do you train residents?
9        A. I give lectures. I do case-based
10   discussions. I mentor them. I've done some
11   collaboration with some publications that they were
12   working on. So that's sort of training them. Not
13   teaching them how to do surgery anymore. Although,
14   I do actually, now that you brought that up, on a
15   consistent basis, approximately every six weeks, I
16   work with two other faculty members face to face
17   with the residents in a simulation lab to teach
18   them how to do a hysterectomy.
19       Q. In August 2021 when you said you still
20   saw patients, was that erroneous?
21       A. That would have been a mistake if
22   that's what I said.
23       Q. Do you -- when you speak to med
24   students about talc being a risk factor for ovarian
25   cancer, do you tell the med students that you are a

Daniel Clarke-Pearson, M.D.

Page 38

1  paid expert for plaintiffs in talc litigation?
2      A.  That doesn't usually come up, no.
3      Q.  Do you tell --
4      A.  Sometimes it does.  Sometimes it does.
5      Q.  What do you mean by sometimes it does?
6      A.  Sometimes -- sorry.  Sometimes I will
7  happen to bring that up in part of the
8  conversation.
9      Q.  Do you have a practice of always
10 letting students know that you're an expert in talc
11 litigation if the subject of talc comes up?
12     A.  No, I don't.
13     Q.  Do you tell residents that talc is a
14 risk factor for ovarian cancer?
15     A.  I'm not sure I've had that discussion
16 with the residents.
17     Q.  Is it still the case that you have
18 never told a patient that their ovarian cancer was
19 caused by talc use?
20     A.  I'm sorry, I didn't hear your question.
21     Q.  Is it still the case that you have
22 never told a patient that their ovarian cancer was
23 caused by talc use?
24         MS. O'DELL:  Object to form.
25         THE WITNESS:  Yes, I think I've said

Page 39

1      that before.  And I haven't seen patients
2      since then, so I wouldn't have had that
3      conversation.
4  BY MS. DAVIDSON:
5      Q.  Is there a way to know today in 2024
6  whether a woman who used talcum powder and
7  developed ovarian cancer would not have developed
8  ovarian cancer if she had not used talc?
9          MS. O'DELL:  You're coming in very
10     faintly.  Our speaker has not moved, but
11     you're coming in very faintly.  So would you
12     mind repeating the question?
13         MS. DAVIDSON:  Court reporter, can you
14     repeat the question just so we make sure
15     it's worded exactly the same.
16     (The reporter read the last question.)
17         MS. O'DELL:  Object to the form.
18         THE WITNESS:  I'm not sure, it seems
19     like almost a double negative question
20     you're asking me.  Can you maybe restate it
21     in some way?
22  BY MS. DAVIDSON:
23     Q.  If a woman used talcum powder and
24  developed ovarian cancer, is there a methodological
25  way to know that she would not have developed that

Page 40

1  ovarian cancer if she had not used talc?
2          MS. O'DELL:  Object to the form.  It's
3      a double negative.
4          THE WITNESS:  I know that if she used
5      talcum powder, she would be at higher risk.
6      And I would -- if she used talcum powder to
7      be a cause -- as part of the cause for her
8      ovarian cancer.  If she didn't use talcum
9      powder, she could still ovarian cancer, of
10     course.
11 BY MS. DAVIDSON:
12     Q.  You testified in August 2021 that you
13 reached out to multiple people at ACOG to encourage
14 them to issue a statement about talc use and
15 ovarian cancer.  Do you recall that?
16     A.  Yes, I do.
17     Q.  Have you reached out to ACOG since
18 then?
19     A.  Yes, I have.  I also reached out to the
20 Society of Gynecologic Oncology leadership.
21     Q.  Let's mark as Exhibit 3 an October 15,
22 2021, an e-mail from you to Maureen Phipps and
23 Christopher Zahn.  Who are Maureen Phipps and
24 Christopher Zahn?
25         MS. O'DELL:  Just a moment.

Page 41

1          THE WITNESS:  Can I get the e-mails in
2      front of me, please?
3          (Exhibit 3 marked for identification.)
4  BY MS. DAVIDSON:
5      Q.  Asher is going to put it up on the
6  screen.
7          Do you know without looking at the
8  e-mail, though, who Maureen Phipps and Christopher
9  Zahn are?
10     A.  Maureen Phipps is an
11 obstetrician-gynecologist, who was at that point in
12 time the CEO of the American College Obstetrics and
13 Gynecology.
14         Christopher Zahn, I'm not sure of his
15 exact title, but he was, let's just say, the vice
16 president for clinical affairs.  I worked with him
17 on several committees.  Then I was active with ACOG
18 leadership myself.
19     Q.  Do you recall an article that you sent
20 them in October 15, 2021?
21     A.  I'm sorry, I'm looking at my e-mail
22 here.
23     Q.  It's up on the screen.
24     A.  It's small.  Let me look at this.
25         MS. DAVIDSON:  Here, Asher, you can

Page 42

1  make it bigger.  Asher, can you center it,
2  please.
3       MR. TRANGLE:  It's centered on my
4  screen.  Is it not?
5       MS. DAVIDSON:  For me, the writing on
6  the right is cut off, maybe not for others.
7       THE WITNESS:  I can see it.  I would
8  have to go to the link to be sure what this
9  is.  But I think it was indicating that the
10 FDA had found asbestos in Johnson & Johnson
11 Baby Powder.
12 BY MS. DAVIDSON:
13     Q.  This is a link to an article from Yahoo
14 Finance; correct?
15     A.  I see there's a Yahoo --
16 Finance.Yahoo.com news.  I'm not sure exactly what
17 it said.
18     MS. DAVIDSON:  Asher, can we mark the
19 article as Exhibit 4.
20     (Exhibit 4 marked for identification.)
21     MS. O'DELL:  Just for the record,
22 Jessica, was the e-mail that was displayed
23 on the screen, is that Exhibit 3?  And is
24 that the only portion of Exhibit 3 is that
25 e-mail?

Page 43

1       MS. DAVIDSON:  I marked that as
2  Exhibit 3.  We'll be going back to it.
3       MS. O'DELL:  Okay.  I just wanted to
4  make sure that was the only document
5  included in Exhibit 3.  Do I understand that
6  correctly?
7       Do I understand that correctly?
8       Jessica, there was one page shown on
9  the screen --
10     MS. DAVIDSON:  When we go back to
11 Exhibit 3, I'll check.  Asher will flip
12 through it.
13     Asher, I don't know if --
14     MR. TRANGLE:  It's all one PDF, the
15 production from you.
16     MS. DAVIDSON:  We're going to go right
17 back to it, Leigh.  I thought that
18 Dr. Clarke-Pearson would know what article
19 he had sent.  Since he didn't know, we need
20 to pull up the article, and then we'll go
21 back.
22     MS. O'DELL:  That's more than fine.  We
23 just saw one page.  And if it was a multiple
24 page exhibit, I just wanted to understand
25 that.

Page 44

1       MS. DAVIDSON:  Okay.
2       MS. O'DELL:  Fair enough.
3       MS. DAVIDSON:  Asher is also putting
4  every exhibit in the chat, Leigh.
5       MR. TRANGLE:  I'll add that now.  It's
6  just whatever you sent, Leigh, the whole
7  package of all the e-mails and that one PDF
8  that you guys sent over is the whole
9  exhibit.
10     MS. O'DELL:  Thank you, Asher.  That
11 was my question.
12     MS. DAVIDSON:  Asher, can you put up
13 the Yahoo finance?
14     MR. TRANGLE:  Yeah, can I put it up
15 now?  I didn't know if we were ready.
16     MS. DAVIDSON:  Yes, please.
17     MR. TRANGLE:  Adding it now.
18 BY MS. DAVIDSON:
19     Q.  Dr. Clarke-Pearson, you testified a
20 minute ago that you thought the article was about
21 the FDA.  Is that what the article is about?
22       Can you read the -- can you read the
23 headline?
24     A.  Certainly.  It says, "J&J puts talc
25 liabilities into bankruptcy."

Page 45

1       Q.  Why would you have sent ACOG an article
2  about J&J putting talc liabilities into bankruptcy?
3       A.  Because I wanted to make sure ACOG was
4  aware that J&J was putting it into bankruptcy, that
5  J&J's baby powder had been found to have asbestos
6  in it, and that ACOG should think about why J&J is
7  going into bankruptcy at this point in time.
8       Q.  Would you consider this to be a
9  scientific article?
10     A.  No, it's a news report.
11     Q.  Was it your idea to send this specific
12 article --
13     A.  Yes.
14     Q.  -- or is it the lawyers?
15     A.  My idea.
16     Q.  Did anyone tell you to send this
17 article to ACOG?
18     A.  No.  I'd been trying to communicate
19 with ACOG and SGO, as you know, previously on other
20 topics related to talc and ovarian cancer.  This is
21 just one more attempt at communicating with them,
22 trying to get their attention.
23     Q.  Did you consider sending ACOG a
24 scientific article about talc and ovarian cancer as
25 opposed to a news article about J&J's bankruptcy?

Page 46

1    MS. O'DELL:  Objection to form.

2    THE WITNESS:  I believe in the past I

3  have sent them scientific articles.

4  BY MS. DAVIDSON:

5    Q.  What scientific articles had you sent

6  them in the past?

7    A.  I would have to go back to my e-mails

8  to answer your question.

9    As you might be aware, I -- if it's all

10  part of the same exhibit, my communication on

11  February 14 to ACOG and SGO has a link to

12  demonstrate 31 to 65 percent increased risk of

13  ovarian cancer in women with baby powder used twice

14  a week.  That link is a scientific article.

15    Q.  Who wrote that article?

16    A.  I would have to pull that up to see the

17  link.

18    Q.  Do you know if that article was written

19  by a paid plaintiffs' expert?

20    A.  I don't know.  You'll have to tell me

21  who the article was written by.

22    Q.  Do you know if you told ACOG whether

23  the article was written by a paid plaintiffs'

24  expert?

25    A.  Most articles usually have a disclosure

Page 47

1  on them, explains who -- any financial or conflict

2  of interest.

3    Q.  My question is did you tell ACOG that

4  the author of the paper was a plaintiffs' expert?

5    MS. O'DELL:  Object to the form.

6    THE WITNESS:  What I told ACOG is on

7    the e-mail.  I told them nothing more.

8  BY MS. DAVIDSON:

9    Q.  In other words, you did not tell ACOG

10  that the article was by a plaintiffs' lawyer;

11  correct?

12    MS. O'DELL:  Object to the form.

13    THE WITNESS:  I didn't specifically say

14    that in this -- in this e-mail, no.

15  BY MS. DAVIDSON:

16    Q.  Is it your testimony that this article

17  from Reuters references an FDA finding of asbestos?

18    MS. O'DELL:  Are you talking about

19    Exhibit 4?

20    MS. DAVIDSON:  I am.  I believe you

21    said a minute ago that you sent this to ACOG

22    because you wanted them to know about the

23    FDA finding of asbestos in one lot of

24    Johnson's baby powder.  So is it your

25    recollection that this article references

Page 48

1  that?

2    MS. O'DELL:  So just for a moment, just

3  stop you for a moment there, Jessica.  I

4  think Asher indicated he was going to put

5  the article in the chat.  He's not done that

6  yet.

7    So, Asher, if you don't mind doing

8  that, the Exhibit 4 in the chat.  Let's see,

9  I don't have it in mine.  So I have only the

10  chart that was previously marked regarding

11  Dr. Clarke-Pearson's invoices.  So if you

12  wouldn't mind maybe putting it up again

13  because that's all I'm seeing at the moment.

14    MS. DAVIDSON:  Asher --

15    MS. O'DELL:  It just appeared.  And so

16  if you've got a question about what was said

17  in the article, then Dr. Clarke-Pearson can

18  pull it up in the chat and look at the

19  article and be able to review it.

20    So, Dr. Pearson, if you need assistance

21  opening the article in the chat, we're happy

22  to do that.

23    MS. DAVIDSON:  Asher --

24    MR. TRANGLE:  Yeah.

25    MS. DAVIDSON:  Can you put it back on

Page 49

1  the screen.

2    And, Leigh, I'd really appreciate it if

3  you didn't testify or coach the witness.

4    MS. O'DELL:  I am not.

5    MR. TRANGLE:  I'll put it back.

6    MS. O'DELL:  I am not.  But if an

7  article has been marked and there's been

8  questions about what's in the substance of

9  the article, he's entitled to review it, not

10  just what's on the screen.

11    So if you -- Dr. Clarke-Pearson, you

12  can open the chat and -- at the bottom.  And

13  once you open the chat, then you'll be able

14  to open that article and then review it if

15  you need to and then you're welcome to

16  respond to Ms. Davidson's questions.

17    MS. DAVIDSON:  Thank you for that

18  colloquy, Leigh.

19    THE WITNESS:  All right.  Okay.

20  BY MS. DAVIDSON:

21    Q.  Dr. Clarke-Pearson, given Leigh's

22  lecture, you may have forgotten the question.  The

23  question was you testified earlier that you sent

24  this article to ACOG because you wanted ACOG to

25  know that the FDA had found asbestos in talc.  And

Page 50

1  I'm wondering is it your testimony that this
2  article references that?
3      A.  Actually, I think I answered your
4  question once I saw what the article was.  So I was
5  mistaken.  This article talks about talc, the J&J
6  putting talc liabilities into bankruptcy.
7      Q.  And it doesn't mention FDA's finding --
8  purported finding of talc in one lot of --
9      MS. O'DELL:  Object.
10      THE WITNESS:  I would -- I would have
11  to --
12  BY MS. DAVIDSON:
13      Q.  I'm in the middle of my question,
14  Dr. Clarke-Pearson.  I request that you don't
15  interrupt me and let me finish my question.
16      To your knowledge, having reviewed now
17  this article, which I believe is in front of you,
18  there is no reference to any FDA purported finding
19  of talc in any Johnson's Baby Powder; correct?
20      MS. O'DELL:  Object to the form.
21      THE WITNESS:  I haven't really reviewed
22  this.  I asked that the link be opened up so
23  I could see what the article -- publication
24  was.  Now that I've got the publication in
25  front of me, I can read it for you.  So I

Page 51

1  was misspoken if, in fact, this doesn't say
2  that FDA found talc.  I would have to reread
3  this article.  It's been a while.
4      What I was referencing earlier in this
5  brief conversation was another link you were
6  asking if I had sent scientific articles to
7  ACOG, and I was referencing a e-mail that I
8  sent on February 14, 2022.  This is a link
9  to a scientific publication.
10  BY MS. DAVIDSON:
11      Q.  And that scientific publication was
12  co-authored by a plaintiffs' expert; correct?
13      A.  You'll have to tell me which expert
14  you're talking about.
15      Q.  Do you know whether that article was
16  co-authored by a plaintiffs' expert?
17      A.  I need to pull that article up and look
18  at all the authors to be able to answer your
19  question.
20      Q.  Okay.  We're going to talk about that
21  article later.  So just to be clear, are you -- are
22  you correcting your earlier testimony that you
23  shared this with ACOG in order to share information
24  about the FDA?
25      MS. O'DELL:  Object to the form.

Page 52

1      THE WITNESS:  If you would like me to
2  reread this article from Reuters and be sure
3  of what I'm saying, then we can take the
4  time to read it.  Otherwise, I think what I
5  was trying to do was to alert ACOG to this
6  article and let them read it and be aware of
7  what J&J was doing.
8  BY MS. DAVIDSON:
9      Q.  Do medical associations typically make
10  scientific decisions based on whether a company has
11  put its -- a subsidiary into bankruptcy?
12      A.  I think medical organizations make
13  decisions based on lots of things that are not
14  specifically scientific, public opinion,
15  legislation, other information that organizations
16  are able to acquire.  ACOG being concerned about
17  women's health.  SGO being concerned about women
18  with ovarian cancer and preventing ovarian cancer.
19  I would use some of this information as part of
20  their decision-making.
21      Q.  Is it your opinion that the fact that
22  lawsuits have been filed against a company
23  supports -- should support public health decisions?
24      MS. O'DELL:  Object to the form.
25      THE WITNESS:  Can I try to rephrase

Page 53

1  what you're asking me?
2      Are you saying that medical
3  organizations would make decisions based on
4  the fact that the lawsuit was filed?
5  BY MS. DAVIDSON:
6      Q.  Or in this case based on the fact
7  according to this article that tens of thousands of
8  lawsuits were filed; correct?
9      MS. O'DELL:  Object to the form.
10      THE WITNESS:  If that's what it says in
11  this article, you know, tens of thousands.
12  So would a medical organization make a
13  decision based on that only?  No, of course
14  not.
15      But it's just a piece of information
16  that they can use as they consider, go
17  through a full evaluation of the issue.
18  BY MS. DAVIDSON:
19      Q.  Are you an expert on bankruptcy?
20      A.  No, I'm not.
21      Q.  Did anyone at ACOG respond to this
22  e-mail?
23      A.  I believe we sent you an e-mail
24  response.
25      MS. DAVIDSON:  Asher, do you want to go

Page 54

1    back to Exhibit 3 and put up ACOG's
2    response.
3        MR. TRANGLE:  I don't think I saw a
4    response for this one.
5    BY MS. DAVIDSON:
6        Q.  Dr. Clarke-Pearson, did ACOG send a
7    response that you did not provide to us in
8    discovery?
9        A.  I'm looking at the e-mails that I have
10   in front of me, which you have the same e-mails.  I
11   don't -- I don't recall.  I could not find a e-mail
12   response from ACOG on that topic -- on this
13   particular e-mail.
14       Q.  There's a redacted e-mail at the top of
15   this e-mail.  Is that simply you forwarding this
16   e-mail to counsel?
17       MS. O'DELL:  I would represent that
18       that is the case, that's a communication
19       with counsel, and that's the reason it was
20       redacted.
21   BY MS. DAVIDSON:
22       Q.  So sitting here today, do you know
23   whether ACOG responded to this e-mail or not?
24       A.  I don't have any evidence that ACOG
25   responded.

Page 55

1        Q.  Are you familiar with two papers that
2    were published by a woman named O'Brien?
3        A.  Yes.  You want to be specific about
4    which two papers?
5        Q.  Are you aware of two papers published
6    by a woman named O'Brien with respect to ovarian
7    cancer?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  These two papers that
10       she's been a co-author on.
11   BY MS. DAVIDSON:
12       Q.  Have you sent any of the O'Brien papers
13   to either ACOG or SGO?
14       A.  Not that I'm aware of.
15       Q.  Why not?
16       A.  Because if I started sending every
17   paper that came out, I would be sending papers all
18   the time.  So I have not sent those two or any
19   others that have come out.
20       Q.  Is it your opinion that the Yahoo
21   Finance article about J&J's bankruptcy has more
22   scientific value than the O'Brien publications
23   about talc and ovarian cancer?
24       MS. O'DELL:  Object to the form.
25       Misstates his testimony.

Page 56

1        THE WITNESS:  The Reuters article is
2    not a scientific article.  I think I said
3    that.
4    BY MS. DAVIDSON:
5        Q.  Is it your opinion that the Reuters
6    article is more relevant to ACOG's analysis of the
7    talc issue than the published O'Brien papers?
8        MS. DAVIDSON:  Object to the form.
9        THE WITNESS:  They are two different
10       issues.
11   BY MS. DAVIDSON:
12       Q.  What do you mean by that?
13       MS. O'DELL:  I'm sorry, I didn't hear
14       that.  Please restate the question.
15   BY MS. DAVIDSON:
16       Q.  I just asked him to explain what he
17   means by that.
18       MS. O'DELL:  You're coming in very
19       faintly.
20       THE WITNESS:  Very faint.
21       MS. O'DELL:  Jessica, I think it may be
22       either -- if you don't mind getting closer
23       to your microphone.
24       MS. DAVIDSON:  I am so close.  I'm like
25       3 inches away from my microphone.

Page 57

1        MS. O'DELL:  Yeah.  Thank you for that,
2    but --
3        MS. DAVIDSON:  Can't get closer.
4        MS. O'DELL:  We can hear Christine
5    fine.  So I think it's something on your
6    setup because Christine comes in loud and
7    clear when she's spoken.  So if you don't
8    remind repeating that, that would be
9    helpful.
10   BY MS. DAVIDSON:
11       Q.  I just asked Dr. Clarke-Pearson what he
12   meant by what he said.
13       A.  Now I've lost track of what we were
14   talking about.  We were talking about Reuters
15   article.
16       Q.  I was asking you whether you believe
17   that the Reuters article is more relevant to ACOG's
18   assessment of the talc and ovarian cancer issue
19   than the O'Brien publications?
20       MS. O'DELL:  Object to the form.
21       THE WITNESS:  So my answer is it's a
22       piece of information that I would say it's
23       more relevant than the whole picture of
24       talcum powder causing ovarian cancer.  It
25       was a point in time that I felt was

Page 58

1  important to point out to ACOG.

2  BY MS. DAVIDSON:

3      Q.  And you did not feel it was important

4  to share the O'Brien papers with ACOG; is that

5  correct?

6          MS. O'DELL:  Object to the form.

7          THE WITNESS:  There's a lot of papers

8      that I could have shared above and

9      beyond the O'Brien paper.  I chose not to

10     continue to deluge them with publications

11     coming out showing talcum powder causing

12     ovarian cancer.

13  BY MS. DAVIDSON:

14     Q.  Is that what the O'Brien papers show?

15     A.  I'd have to look at the O'Brien paper

16  to answer your question.

17     Q.  And when you sent this on October 15,

18  2021, was that before or after O'Brien published

19  any of her papers with respect to talc and ovarian

20  cancer?

21     A.  Again, I don't know without seeing the

22  papers and dates of publication.

23     Q.  All right.  Let's move to the

24  Valentine's Day e-mail to ACOG, February 14, 2022.

25  Were any of the O'Brien papers about talc and

Page 59

1  ovarian cancer published before February 14, 2022?

2          MS. O'DELL:  Object to the form, vague.

3      Dr. O'Brien has published a number of

4      papers.  And so the questions aren't clear.

5          MS. DAVIDSON:  Leigh --

6          MS. O'DELL:  Let me just finish.  I

7      would say further Dr. Clarke-Pearson was

8      examined about the O'Brien paper extensively

9      in his August 2021 deposition.  And as you

10     know, Jessica, this is a deposition to

11     update his testimony on any new materials

12     since August 2021.

13  BY MS. DAVIDSON:

14     Q.  Dr. Clarke-Pearson, when you sent these

15  papers -- this paper, this link to ACOG in

16  February 14, 2022, was that before or after O'Brien

17  had published papers relating to talc and ovarian

18  cancer?

19     A.  I don't know the exact dates that

20  O'Brien published in this specific paper you're

21  referring to which she has co-authored and authored

22  a number of papers.  So some of those papers were

23  before this Valentine's Day 2022 e-mail that I

24  submitted.

25     Q.  Why did you decide to share this --

Page 60

1  this link, which is the Woolen article, with ACOG

2  and not the O'Brien papers?

3          MS. O'DELL:  Object to the form.

4          THE WITNESS:  I think this paper -- I

5      mean, it's a powerful paper.  It says that

6      frequent use greater than two times a week

7      based on their analysis increases the risk

8      of ovarian cancer significantly.

9  BY MS. DAVIDSON:

10     Q.  Are you aware that the link to this,

11  which is the Woolen paper, let's mark that as

12  Exhibit 5, Asher.

13          MS. O'DELL:  If you want to get the

14      Woolen paper, you can read that.  We have

15      it.

16          (Exhibit 5 marked for identification.)

17  BY MS. DAVIDSON:

18     Q.  Are you aware that the Woolen

19  meta-analysis that you sent to ACOG was based on a

20  meta-analysis that was prepared for this

21  litigation?

22          MS. O'DELL:  I object to the form.

23          THE WITNESS:  I was not aware it has

24      anything to do with the litigation.

25  BY MS. DAVIDSON:

Page 61

1      Q.  Are you familiar with any of the names

2  of the authors of this paper?

3      A.  Well, Smith-Bindman, I know has been an

4  expert for the plaintiff.  I do not know her.  The

5  other two authors, I don't know at all.

6      Q.  Is there a convention in published

7  papers have the most senior person's name last?

8      A.  I'm sorry.  Senior person's name last?

9      Q.  Uh-huh.

10     A.  It's a convention that is usually used,

11  but I think that's an agreement amongst all the

12  authors.  There's only three authors in this paper.

13     Q.  Let's mark O'Brien 2020 as Exhibit 6.

14          (Exhibit 6 marked for identification.)

15  BY MS. DAVIDSON:

16     Q.  This is a pooled analysis, correct,

17  Dr. Clarke-Pearson?

18     A.  Let me take a moment to pull it up.

19     Q.  It's on the screen.  And if you look

20  at --

21     A.  Well, first of all, it's so small I

22  can't read it and.

23     Q.  There you go.

24          MS. O'DELL:  Plus he's happy to respond

25      to appropriate questions.  But he was

1    examined at length on the O'Brien paper in
2    his 2021 deposition.  And this deposition is
3    for purposes of you inquiring about
4    materials disclosed that are new since
5    August of 2021.  And so I object to any
6    examination that goes into the details of
7    O'Brien.
8    BY MS. DAVIDSON:
9       Q.  Dr. Clarke-Pearson, this was a pooled
10   analysis; correct?
11          If you look under design, it says,
12   "data were pooled."
13          MS. O'DELL:  Feel free to review the
14   paper until you're prepared to answer
15   questions, Dr. Clarke-Pearson.
16          THE WITNESS:  I'm having a hard time
17   finding it specifically.
18   BY MS. DAVIDSON:
19      Q.  Can you please look at it on the screen
20   so that we can move on because I have limited time
21   here today?
22          MS. O'DELL:  Would you mind repeating
23   your question please or ask Christine if you
24   would read it back.
25   BY MS. DAVIDSON:

1       Q.  Dr. Clarke-Pearson, this is a pooled
2    analysis of cohort studies; correct?
3       A.  I see that in the abstract, yes.
4       Q.  Thank you.
5       A.  Sorry.
6       Q.  If you look at the authors, are you
7    familiar with any of these authors?
8       A.  Actually, Dr. Kaunitz, I believe if
9    he's from Florida, I know him.  We've done a little
10   bit of work together on morcellation of uterine
11   sarcoma and fibroids.
12          O'Brien, I'm only familiar with because
13   she has a number of publications.  The other
14   authors that I'm looking at on the screen, I'm not
15   at all familiar with or don't know them.
16      Q.  Are any of them plaintiffs' experts to
17   your knowledge in this litigation?
18      A.  Not that I know of.
19      Q.  Are any of them NIH scientists?
20      A.  I'm not sure what their affiliation is.
21      Q.  You're not familiar with
22   Dr. Wentzensen?
23      A.  Sorry.  Dr. who?
24      Q.  Wentzensen, the senior author.
25      A.  I'm not aware of what Dr. Wentzensen's

1    position is aside from being a M.D., Ph.D.
2       Q.  And you didn't send this to ACOG;
3    correct?
4       A.  I'm sorry, would you repeat that?  I
5    didn't hear you.
6       Q.  You did not send this article to ACOG;
7    correct?
8       A.  No.  That's correct.
9       Q.  Can we mark as Exhibit 7 Wentzensen,
10   O'Brien 2021.
11          (Exhibit 7 marked for identification.)
12          MS. DAVIDSON:  Please put it up on the
13   screen, Asher, and send it in the chat.
14          MS. O'DELL:  The same objection to the
15   Wentzensen, O'Brien article.  That article
16   was referenced and included on the materials
17   list in Dr. Clarke-Pearson's July 2021
18   report.  He was examined on it during his
19   August 2021 deposition at pages 15, pages
20   21, 86, 278 through 286.  That was on --
21          MS. DAVIDSON:  Hey, Leigh?
22          MS. O'DELL:  -- that was on his
23   August 26th deposition and --
24          MS. DAVIDSON:  Instead of trying to
25   derail this deposition, why don't you wait

1    to hear my questions to determine whether
2    they actually are repeating prior questions.
3          MS. O'DELL:  Let me finish.
4          MS. DAVIDSON:  Because you've now
5    objected to every single question I've
6    asked.  It's very clear you're trying to
7    drain the clock.  It's extremely
8    unprofessional behavior.
9          So why don't you wait until my question
10   and then decide if you want to object to it.
11          Asher, are you putting it up on the
12   screen?
13          MR. TRANGLE:  Yes.
14          MS. O'DELL:  Excuse me.
15          MS. DAVIDSON:  If you want to object,
16   please object.  Stop wasting hours and hours
17   of this deposition.
18          MS. O'DELL:  I'm entitled to state
19   the -- excuse me, let me finish.  I'm
20   entitled to state the basis -- excuse me.
21   Please let me finish.  And I've done that in
22   a very professional and courteous way, but
23   the purposes of these depositions are quite
24   clear.  And it's very clear that you want to
25   retread ground that was previously covered.

Page 66

1    And I'm entitled to note my objection for
2    the record which I've done so.
3        So if you have a high-level question
4    about O'Brien and Wentzensen, ask it, and
5    let's move on.  But we are going to object
6    and get the judge on the phone for any
7    detailed retreading of old material.  That's
8    what I'm trying to convey to you.
9        MS. DAVIDSON:  I am going to have to
10   reserve the right to go beyond seven hours
11   because, Leigh, you are clearly
12   filibustering and trying to fill as much of
13   this record as possible with your
14   objections.
15       Asher, can you please --
16       Stop interrupting me.
17       MS. O'DELL:  The amount of the time for
18   the deposition today is four hours, and just
19   be clear on that.  That's what the order
20   says.  And that's what we'll be available
21   for today.
22   BY MS. DAVIDSON:
23   Q.  Dr. Clarke-Pearson, can you read to me
24   Dr. Wentzensen and Dr. O'Brien's titles here?
25   A.  Titles on the -- so Wentzensen is from

Page 67

1    the Division of Cancer Epidemiology and Genetics,
2    National Cancer Institute, National Institutes of
3    Health.
4        And O'Brien is epidemiology branch,
5    National Institute of Environmental Health
6    Sciences, Research Triangle Park.
7    Q.  Is either of them an expert in this
8    litigation?
9    A.  Not that I'm aware of.
10   Q.  Did you send this document to ACOG or
11   SGO?
12   A.  No.
13       MS. DAVIDSON:  Let's go off the record.
14   (Recess taken from 10:20 a.m. until 10:35 a.m.)
15       MS. O'DELL:  So counsel for Johnson &
16   Johnson seeks to extend this deposition
17   beyond four hours.  The plaintiffs' position
18   is that this is a supplemental deposition
19   only on materials that are new in
20   Dr. Clarke-Pearson's report since August of
21   2021.  And we submit that the deposition
22   should be limited to four hours, and we will
23   stop the deposition at that time.
24       MS. DAVIDSON:  The Court's -- Asher,
25   what's the date of the Court's order?

Page 68

1        MR. TRANGLE:  10/10/23.
2        MS. DAVIDSON:  The Court's order of
3    10/10/2023 explicitly states that general
4    causation expert supplemental depositions
5    will be four hours.  If the general
6    causation expert also has specific opinions,
7    it will be 7 hours or 14 hours.  The order
8    could not be clearer.  This order was issued
9    in October 2023, so it clearly contemplated
10   supplemental reports.
11       Dr. Clarke-Pearson has amended his case
12   specific opinions.  He has also added case
13   specific materials to his materials
14   considered.  If you end the deposition after
15   four hours, you are in violation of the
16   order.
17       MS. O'DELL:  We disagree.
18       MS. DAVIDSON:  Also, additional
19   opinions with respect to Godleski that
20   wasn't in the original report.  There are
21   material updates related to
22   Dr. Clarke-Pearson's case specific opinions.
23   If this deposition ends after hour hours as
24   opposed to 14, you are in violation of the
25   Court's order.  Let's continue with the

Page 69

1    deposition.
2        MS. O'DELL:  We disagree with that
3    position.  There are no new opinions about
4    Dr. Godleski and others, but let's proceed.
5    And that took two minutes.
6    BY MS. DAVIDSON:
7    Q.  Dr. Clarke-Pearson, I'd like to mark
8    your second amended report from 11/15/2023 as
9    Exhibit 8.
10       (Exhibit 8 marked for identification.)
11       MS. DAVIDSON:  If we could turn to
12   page 6, Asher.
13       MR. TRANGLE:  Page 6?
14       MS. DAVIDSON:  Uh-huh.
15   BY MS. DAVIDSON:
16   Q.  Dr. Clarke-Pearson, is it --
17       MS. DAVIDSON:  Asher, that's not on the
18   screen.  That's all the way to the right.
19       MR. TRANGLE:  Can you guys see it?
20       MS. DAVIDSON:  No.
21   BY MS. DAVIDSON:
22   Q.  Is it your opinion, Dr. Clarke-Pearson,
23   that Harper and Saed have demonstrated that
24   exposure to Johnson's Baby Powder causes p53
25   mutations, cell proliferation and malignant

Page 70

1  transformation in normal ovarian epithelial cells?
2      A.  Yes.  That's what they say in their
3  paper.
4      Q.  I'm not asking you what they say in
5  your paper.  You say in your report that they have
6  demonstrated this.  Is it your opinion that they
7  demonstrated these things?
8      A.  That is my opinion, yes.
9      Q.  Who is Dr. Saed?
10     A.  He's a translational research
11 scientist, as best I understand, at Wayne State
12 University in the cancer center there.
13     Q.  Is a plaintiffs' expert in this
14 litigation?
15     A.  I believe so.
16     Q.  Had you ever heard of him prior to this
17 litigation?
18     A.  He's written a review article and -- in
19 the Gynecologic Oncology Journal I read pretty
20 consistently.  I'm not sure when he wrote that
21 article.  So I'm aware of him from research he's
22 done outside of this litigation.
23     Q.  Have you ever cited Dr. Saed in any of
24 your non-litigation work?
25     MS. O'DELL:  Object to the form.

Page 71

1      THE WITNESS:  I'm sorry, cited him in
2      what situation?
3  BY MS. DAVIDSON:
4      Q.  Any non-litigation work.
5      A.  No.  I don't think I've written
6  anything that would require a citation about him or
7  by him.
8      Q.  Had you heard of his lab before you
9  were involved in this litigation?
10     A.  I'm not sure what you mean by heard of
11 his lab.  I was aware that he had written a review
12 article and he is a scientist.  I would assume that
13 he has a lab.
14     Q.  Have you taken any steps to assess the
15 reliability of his conclusions or findings in the
16 paper that we've marked as Exhibit 8?
17     MS. O'DELL:  She's -- just object to
18     the form.  And Dr. Clarke-Pearson's report I
19     believe is Exhibit 8.  I'm not sure you've
20     marked the paper.
21 BY MS. DAVIDSON:
22     Q.  Have you taken any steps to assess the
23 reliability of Dr. Saed's conclusions or findings
24 in Harper 2023?
25     A.  You're referencing the Harper paper as

Page 72

1  the lead author?
2      Q.  Correct.  The one that we just talked
3  about where you --
4      A.  The technique that they used to --
5  thank you, Margaret.
6         The technique that they used to assess
7  proliferation and identify malignant transformation
8  is a commercial technique.  And I'm aware that
9  technique was considered to be used in assessing
10 other chemicals and products as to their
11 carcinogenicity, the chance it can cause cancer.
12 And so it's a technique that's used in
13 laboratories.
14     Q.  What technique is that that you're
15 referring to?
16     A.  Well, let me turn to their paper to
17 give you the name of it.  I'm sorry, I'm skimming
18 the materials section here to try to identify.
19     Q.  I believe you testified that the
20 technique they used was one you're familiar with.
21 What technique is that?
22     A.  No, I didn't say I was familiar with
23 it.  I said I had read about it enough to
24 understand that it's used more than just in his
25 laboratory to identify products, things that could

Page 73

1  cause cancer.
2      Q.  Where else have you read about the
3  technique used by Dr. Saed?
4      MS. O'DELL:  He's trying to review the
5      paper and answer your question, Jessica, if
6      you'll just give him a moment.
7  BY MS. DAVIDSON:
8      Q.  Dr. Clarke-Pearson, if you need to
9  review the article, I'd like to go off the record.
10 This was listed in your materials reviewed.  If you
11 want to read the article, I'd like to go off the
12 record.  Are you planning to read the article
13 before answering?
14     A.  I'm just trying to specifically find
15 this technique that they describe in their
16 materials.  So I've seen the -- I'm sorry, I don't
17 have the name.  But the technique is described in
18 the company that manufactures its website.
19     Q.  Dr. Clarke-Pearson, what are you doing
20 now?
21     A.  I'm looking for the rest of this paper
22 so I can see if I can help us understand what the
23 name of the methodology is that he's using.
24     Q.  All right.  Well, I don't have all day
25 here.

Page 74

1    A.   I understand.

2    Q.   Although, I am entitled to 14 hours,
3    your counsel intends to cut this deposition off
4    prematurely.  So if you don't know what technique
5    he used, let's move on.

6    A.   Okay.

7    Q.   Do you know where else you've read
8    about this technique?

9    A.   I've looked it up on the website of the
10   company that makes -- manufactures this technique.

11   Q.   Have you ever heard of Minerva before?

12   A.   Anova?

13   Q.   Minerva.

14   A.   Minerva.  The publication?

15   Q.   Uh-huh.

16   A.   It's a scientific peer-reviewed
17   publication.  I'm not sure I've heard of it per se.
18   It's not something I would usually read.

19   Q.   When was the last time you read an
20   article published in this journal?

21   A.   Probably I've never read an article
22   published in this journal.

23   Q.   Have you ever submitted an article to
24   this journal?

25   A.   No.

Page 75

1    Q.   Are you aware of any groundbreaking
2    scientific developments ever being published in
3    this journal?

4        MS. O'DELL:  Object to the form.

5        THE WITNESS:  I don't have an opinion
6        on that.

7    BY MS. DAVIDSON:

8    Q.   Do you know of any groundbreaking
9    scientific developments that were ever published in
10   Minerva?

11       MS. O'DELL:  Object to the form.  Asked
12       and answered.

13       THE WITNESS:  Again, I don't have an
14       opinion.

15   BY MS. DAVIDSON:

16   Q.   I don't know what that means.  Is that
17   a yes or no?

18   A.   It means I don't know.

19   Q.   Have you ever cited a piece from
20   Minerva in your professional work?

21       MS. DAVIDSON:  Objection.  Asked and
22       answered.

23       THE WITNESS:  Not that I'm aware of.

24   BY MS. DAVIDSON:

25   Q.   What's your basis for saying that

Page 76

1    Harper and Saed demonstrated that Johnson's Baby
2    Powder causes p53 mutations?

3    A.   Based on what they say in their paper.

4    Q.   Did you independently evaluate whether
5    that is an accurate statement?

6    A.   I did not do any independent
7    investigation on that topic, no.

8    Q.   Did you do any independent
9    investigation on the validity of Harper and Saed's
10   claim that they have shown that exposure to
11   Johnson's Baby Powder causes p53 mutations, cell
12   proliferation, or malignant transformation?

13       MS. O'DELL:  Object to form.

14       THE WITNESS:  I didn't do any separate
15       investigation, though I read the paper.

16   BY MS. DAVIDSON:

17   Q.   Did you discuss the paper with anyone
18   in the field before making the statement?

19   A.   No.

20       MS. O'DELL:  Object to the form.

21       THE WITNESS:  No, I didn't.

22   BY MS. DAVIDSON:

23   Q.   I take it from your statements earlier
24   today about the materials you reviewed in
25   preparation for your deposition that you're aware

Page 77

1    that this paper was rejected by numerous journals;
2    is that correct?

3        MS. O'DELL:  I'm sorry.  You cut out
4        there for a minute.  They were rejected by
5        whom?

6    BY MS. DAVIDSON:

7    Q.   By several publications; is that
8    correct?

9        MS. O'DELL:  Object to the form.

10       THE WITNESS:  I've seen a reviewers or
11       maybe more than reviewers list of comments
12       about a paper.  I'm not sure it's
13       specifically this paper.

14   BY MS. DAVIDSON:

15   Q.   Do you know which publications rejected
16   this paper?

17   A.   Let me go to the -- what I was given.
18   Looks like the start of this says Plus One.
19   Several reviewers and comments.  Minor comments.
20   What I have looks like it's all reviewed from Plus
21   One.

22   Q.   Do you know whether Reproductive
23   Sciences rejected this paper?

24   A.   Not aware of that.

25   Q.   Do you know whether this paper was

Page 78

1   submitted to Gynecologic Oncology?

2       A.   I do not know.

3       Q.   Do you know whether Gynecologic

4   Oncology rejected this paper?

5       A.   I don't know.

6       Q.   What is Gynecologic Oncology?

7       A.   It's a peer-reviewed publication that

8   deals with gynecologic oncology topics both

9   clinical and translational research.

10      Q.   Have you --

11      A.   It's --

12           MS. O'DELL:  I don't believe he was

13      finished.

14           THE WITNESS:  It's a publication of the

15      Society of Gynecologic Oncologists.

16   BY MS. DAVIDSON:

17      Q.   Have you published papers there before?

18      A.   Yes.

19      Q.   Have you been on the editorial board?

20      A.   Yes.

21      Q.   Have you been a peer reviewer?

22      A.   Yes.

23      Q.   Have you been a peer reviewer for

24   multiple journals?

25      A.   Yes.

Page 79

1       Q.   What does a peer reviewer do?

2       A.   A peer reviewer is asked to review the

3   manuscript that's been submitted, evaluate it for

4   its content, for lack of a better word, offer any

5   criticism, any suggestions for improvement, and

6   ultimately submit those comments which then usually

7   go back to both the editor of the journal and --

8   and the author of the manuscript.

9       Q.   At Gynecologic Oncology, have you ever

10  been responsible for selecting peer reviewers?

11      A.   No, I have not.

12      Q.   Do you know how Gynecologic Oncology

13  selects peer reviewers?

14      A.   Well, having been on the editorial

15  board, I have some general idea that the peer

16  reviewers -- there's a lengthy list of possible

17  peer reviewers that have -- people that have agreed

18  to participate as a peer reviewer.  And then the

19  editor, and I've never been an editor of GYN

20  Oncology to pick out peer reviewers.  I think I

21  just answered that question to you -- for you.  But

22  the editor then goes through the panel of possible

23  reviewers and picks out a few, usually two or

24  three, to review the paper and submit and sends

25  that to the reviewer.  The editor would look at the

Page 80

1   peer reviewers and select peer reviewers that are

2   most appropriate to review that particular paper.

3   So a paper I might submit on clinical issues would

4   not be reviewed by a basic scientist.

5           Likewise, a clinician like myself would

6   not necessarily be asked to review a translational

7   research paper.  So the editor tries to match the

8   reviewer with the content and -- of that paper.

9       Q.   So for a paper like Dr. Saed's, what

10  sort of peer reviewers would Gynecologic Oncology

11  look for?

12      A.   I would think they would pick peer

13  reviewers that are doing research -- laboratory

14  research.

15      Q.   Okay.  Dr. Clarke-Pearson, do you know

16  whether it's biologically possible to show

17  malignant cell transformation in 72 hours?

18      A.   That is what this paper says and that

19  is what the manufacturer of the technique that they

20  used says.

21      Q.   If Dr. Saed found malignant cell

22  transformation after 72 hours of exposure to talc,

23  would that be a revolutionary finding?

24           MS. O'DELL:  Object to the form.

25           THE WITNESS:  Not that I'm aware of.

Page 81

1   BY MS. DAVIDSON:

2       Q.   What do you mean by that?

3       A.   What do you mean by a revolutionary

4   finding?

5       Q.   Would that be a huge scientific

6   development for a scientist to find that exposure

7   to talc can cause malignant cell transformation

8   after 72 hours?

9           MS. O'DELL:  Object to the form.

10          THE WITNESS:  Based on what I

11      understand about this technique, the

12      technique is used to identify products that

13      cause cancer.  So if this transformation is

14      considered malignant, then that's what this

15      technique is showing.

16  BY MS. DAVIDSON:

17      Q.   Can you identify any other situations

18  where this technique has shown malignant

19  transformation?

20      A.   I have not done a literature review on

21  the use of this technique.

22      Q.   You previously testified that it would

23  require 50 years of chronic inflammation or some

24  period of decades to -- for ovarian cancer to --

25  for talc exposure to cause ovarian cancer.  Do you

Page 82

1    recall testifying to that effect?
2        MS. O'DELL:  Object to the form.
3    Jessica, is there specific testimony that
4    you're referring to?
5        Dr. Clarke-Pearson has testified over
6    three days and a Daubert hearing.  So I'm
7    just asking what testimony you're referring
8    to and if you can give us a page and line,
9    we'd be happy to --
10       MS. DAVIDSON:  Leigh --
11       MS. O'DELL:  -- put that in front of
12   him.
13       MS. DAVIDSON:  Leigh, I'm taking the
14   deposition.
15       MS. O'DELL:  I understand that.
16       MS. DAVIDSON:  And your obstruction is
17   really getting out of control.
18   BY MS. DAVIDSON:
19       Q.  Dr. Clarke-Pearson, do you recall
20   offering that testimony?
21       MS. O'DELL:  Let me just state my
22   objection very briefly.  That's not a
23   quotation of Dr. Clarke-Pearson.  If you
24   would like to put in front of him specific
25   testimony, I think that would be appropriate

Page 83

1    before you ask that question.
2    BY MS. DAVIDSON:
3        Q.  Dr. Clarke-Pearson, do you recall ever
4    testifying that it would require chronic
5    inflammation for a period of decades for exposure
6    to talc to cause ovarian cancer?
7        A.  I think in general -- I'm not sure I
8    testified -- but I believe that it does take time
9    with chronic inflammation in the situation with
10   talc to expose the ovary to talcum powder to result
11   in transformation, the number of mutations that are
12   required to result in clinical evidence of ovarian
13   cancer.
14       Q.  Why would it take 50 years of chronic
15   inflammation to get malignant transformation if
16   Dr. Saed was able to demonstrate malignant
17   transformation after 72 hours?
18       MS. O'DELL:  He said decades, not 50
19   years.  Misstates his testimony.  Object to
20   the form.
21       You may answer, Doctor.
22       THE WITNESS:  I think I would defer to
23   Dr. Saed and other scientists that are more
24   familiar with this technique in terms of
25   explaining how they achieve malignant

Page 84

1    transformation.
2    BY MS. DAVIDSON:
3        Q.  But -- so are you just taking it on
4    good faith and trust that Dr. Saed actually
5    demonstrated malignant transformation?
6        MS. O'DELL:  Object to the form.
7        THE WITNESS:  I have investigated the
8    technique they used is used in other
9    situations to identify carcinogenicity of
10   products like talcum powder.
11   BY MS. DAVIDSON:
12       Q.  But sitting here today, you can't
13   identify any other situations where this technique
14   has shown carcinogenicity; correct?
15       A.  I would defer to the scientists that
16   have done this kind of work.
17       MS. O'DELL:  Object.
18       MS. O'DELL:  Let's mark the
19   peer-reviewed comments on Harper 2023 as
20   Exhibit 9.
21       (Exhibit 9 marked for identification.)
22       MR. TRANGLE:  Is there a page you want
23   me to go to?
24       MS. DAVIDSON:  Let's go to the
25   Gynecologic Oncology reviewers.  If we could

Page 85

1    go to sentence that begins "As presented."
2        MS. O'DELL:  Give us a Bates Number for
3    that particular page.
4        MR. TRANGLE:  This is page 69.
5        MS. O'DELL:  Okay.  Thank you.
6        MS. DAVIDSON:  Can you center "as
7    presented" on the screen, Asher?
8        MR. TRANGLE:  It's kind of hard.
9        THE WITNESS:  I don't think I have
10   that.
11       MS. O'DELL:  So -- you may have a copy.
12   BY MS. DAVIDSON:
13       Q.  Dr. Clarke-Pearson, could you read the
14   first two sentences of the paragraph that begins
15   "as presented" out loud?
16       A.  Certainly.  What it says is, "As
17   presented, the manuscript presents several major
18   issues that warrant attention prior to publication.
19   Of primary concern is reliance on a single
20   commercial assay for assessment of transformation
21   that has not been established in the literature."
22       Q.  Okay.
23       A.  Yeah.
24       Q.  I was just asking you to read two
25   sentences.

1    Dr. Clarke-Pearson, this states that
2  the technique used by Dr. Saed has not been
3  established in the literature; correct?
4    A.  That's what it says, yes.
5    Q.  Do you disagree with that?
6    A.  I don't agree -- disagree with what it
7  says, no.
8    Q.  Is it your testimony that the -- that
9  this commercial assay for assessment of
10  transformation has been established in the
11  literature?
12    MS. O'DELL:  Objection.  Form.
13    THE WITNESS:  I'm not aware of whether
14    it has or hasn't been established.  I
15    haven't done that review.
16  BY MS. DAVIDSON:
17    Q.  But you are offering the opinion that
18  Dr. Saed has demonstrated malignant transformation;
19  correct?
20    A.  Yes.
21    Q.  Does it give you pause that the
22  commercial assay he used has not been established
23  in the literature as a reliable means for
24  assessment of transformation?
25    MS. O'DELL:  Object to the form.

1    THE WITNESS:  I am not aware of that.
2    What I just read to you is a reviewer, who
3    seems to be anonymous, offering the opinion
4    about not being a review established in the
5    literature that I read to you.
6  BY MS. DAVIDSON:
7    Q.  In your experience, does Gynecologic
8  Oncology have credentialed and capable peer
9  reviewers?
10    MS. O'DELL:  Object to the form.
11    THE WITNESS:  I'm not sure what you
12    mean by credentialed.
13  BY MS. DAVIDSON:
14    Q.  What has been your experience about the
15  caliber of reviewers for Gynecologic Oncology?
16    MS. O'DELL:  Object to the form.  If
17    you have any.
18    THE WITNESS:  I mean it depends upon
19    what the reviewer is being asked to do and
20    what their qualifications are.  So I don't
21    know who this reviewer is or what their
22    qualifications are.
23  BY MS. DAVIDSON:
24    Q.  Have you done any work that would
25  enable you to disagree with what this reviewer

1  wrote?
2    MS. O'DELL:  Object to the form.
3    THE WITNESS:  I have not done any work
4    on that topic, no.
5  BY MS. DAVIDSON:
6    Q.  The reviewer goes on to say that
7  "appropriate statistical tests were not applied and
8  thus the data are difficult to interpret."
9    Do you see disagree with that
10  statement?
11    A.  So let me back up from this.  This is a
12  review, I'm not sure when it was done.  This paper
13  was not published in GYN Oncology.  So these are
14  comments that were submitted to the authors.  And,
15  in general, it's been my experience as an author
16  myself of 250 some odd peer-reviewed papers that
17  the comments that I've received back from a
18  reviewer after submitting a manuscript are those
19  that I would evaluate and decide whether I want to
20  add those edits to and corrections, if you will.
21  In this case, though, what you're reading about
22  statistics, Dr. Saed was basically -- it was
23  suggested that he do something more with
24  statistics.
25    So this isn't a review of the paper

1  that is sitting in front of me that was published
2  in Minerva.  These are comments about a manuscript
3  prior to publication that was probably edited.  I
4  would have to go through -- you and I would have to
5  go through this manuscript and see whether he made
6  those changes that are being suggested by this
7  reviewer.
8    But these comments are not necessarily
9  comments that would apply to the current manuscript
10  that was published in a peer-reviewed publication.
11    Q.  To your knowledge, did Dr. Saed make
12  any changes to his statistical tests?
13    A.  I would have to look at this reviewer's
14  comments and then go to Dr. Saed's -- actually
15  Dr. Harper's paper and see whether those changes
16  were made.
17    Q.  If Dr. Saed did not make changes to his
18  statistical tests, would that concern you?
19    MS. O'DELL:  Objection.
20    THE WITNESS:  Yes.  I would think that
21    he would take to heart those suggestions.
22    Now he may disagree with those suggestions
23    and not make those changes.  And he would
24    have to offer up why he didn't make the
25    changes.  Maybe he is perfectly confident

Daniel Clarke-Pearson, M.D.

Page 90

1    and secure and certain that what he has done
2    and that this reviewer could be wrong.
3    BY MS. DAVIDSON:
4        Q.  The GYN Oncology reviewer also said the
5    results of this study are overinterpreted.
6        Do you have reason to disagree with the
7    GYN Oncology reviewer that the results of this
8    study are overinterpreted?
9        MS. O'DELL:  Directing us to where,
10       please?  I'm not seeing it on the screen.  I
11       may be overlooking it.
12       MS. DAVIDSON:  Asher, if you can put it
13       up on the screen.
14   BY MS. DAVIDSON:
15       Q.  Dr. Clarke-Pearson, can you respond to
16   my statement:  Do you disagree -- to my question.
17       Do you disagree with the statement that
18   the results of this study are overinterpreted?
19       MS. O'DELL:  Object to the form.
20       THE WITNESS:  I will take that you're
21       reading this from somewhere that's on the
22       screen.  I don't see it.  Is it
23       overinterpreted?  That's that reviewer's
24       opinion.
25   BY MS. DAVIDSON:

Page 91

1        Q.  I'm asking your opinion, right?  Do you
2    disagree with that comment?
3        A.  This comment is being made about a
4    manuscript that was not published.  What we have,
5    the published manuscript is probably different than
6    what this reviewer is commenting on.
7        Q.  Do you have reason to believe that
8    Dr. Saed made changes to the results of his study
9    that the SGO reviewer said were overinterpreted?
10       A.  Do I have reason to believe?  I think
11   common sense would be that a author that submits a
12   paper for publication and goes through the
13   peer-review process and the reviewer returns
14   comments the author would then respond to
15   those comments.
16       Q.  The reviewer told Dr. Saed -- stated
17   that the use of the word "malignant" was improper.
18   Did Dr. Saed's final paper use the word "malignant
19   transformation"?
20       MS. O'DELL:  Object to the form.
21       Jessica, if that's on the page that's
22       displayed on the screen, would you mind --
23       or, Asher, would you mind directing us to
24       where that's stated.
25   BY MS. DAVIDSON:

Page 92

1        Q.  Dr. Clarke-Pearson, did the final paper
2    state that the authors had found malignant
3    transformation?
4        A.  Yes, it did.
5        Q.  Do you believe the statement that the
6    authors had found malignant transformation is
7    overinterpreted?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  No, I don't believe it's
10       overinterpreted.
11   BY MS. DAVIDSON:
12       Q.  And what's your basis for that?
13       A.  That this is work that was done with an
14   assay that, once again, is used to identify
15   compounds that cause cancer, and that the
16   transformation of these benign cells to malignant
17   cells is established by this assay.
18       Q.  Has that ever been shown in
19   peer-reviewed literature?
20       MS. O'DELL:  Objection, form.  Asked
21       and answered.
22       THE WITNESS:  I have not done any
23       further research on that topic.
24   BY MS. DAVIDSON:
25       Q.  So the only research you did was

Page 93

1    looking at the assay manufacturer's website; is
2    that correct?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  Yes.
5    BY MS. DAVIDSON:
6        Q.  The Gynecological Oncology reviewer
7    also said that the dose of talcum powder is
8    extremely high.
9        Page 70, Asher.
10       Do you have an opinion as to whether
11   the dose of talcum powder was extremely high?
12       MS. O'DELL:  Would you point out,
13       please, where it says that.
14       MR. TRANGLE:  This is the bottom,
15       reviewer number 2.
16   BY MS. DAVIDSON:
17       Q.  Doctor, do you have an opinion as to
18   whether the dose of talcum powder was extremely
19   high?
20       A.  So a researcher can use whatever dose,
21   if you will, that they choose to explore.  Is this
22   extremely high compared to what might thrive on a
23   woman's ovaries after using talcum powder?  Maybe
24   so.  I don't know for sure.
25       So this is the interpretation -- this

Page 94

1 is the opinion of this reviewer. I don't know what
2 the reviewer bases his opinion on, what's high,
3 what's low, what's reasonable.
4     Q.   This reviewer states that the data are
5 premature, restricted to two cell lines, and really
6 offer no significant mechanistic insight. Do you
7 disagree with that statement?
8     A.   Well, premature, I don't agree with it
9 at all because I mean the first time somebody
10 publishes something, that's oftentimes considered
11 premature. It's new information. So it comes out
12 first, then it would be in some people's minds
13 premature. Obviously, additional research needs to
14 be done to establish certain findings.
15         Restricted to two cell lines, well, he
16 used two cell lines. More work needs to be done to
17 get a third, fourth, fifth cell line.
18         And mechanistic insight, I think
19 there's mechanistic insight, not only in this paper
20 but in many others before that talcum powder causes
21 reactive oxygen species, reactive nitrogen species
22 causes secondary to the inflammation that talcum
23 powder causes, which then causes ultimately going
24 down through the whole chain malignant
25 transformation.

Page 95

1     Q.   And you believe that can all happen
2 within 72 hours?
3         MS. O'DELL: Object to the form.
4         THE WITNESS: I believe that's what
5         this technique is showing in this particular
6         lab, laboratory model, yes.
7 BY MS. DAVIDSON:
8     Q.   And, again, that opinion is based
9 solely on the assay company's website and not any
10 published scientific literature; correct?
11         MS. O'DELL: Object to the form.
12         THE WITNESS: And what is in this
13         publication.
14 BY MS. DAVIDSON:
15     Q.   You testified a minute ago that you
16 don't know how the peer reviewer decided the dose
17 of talcum powder was extremely high. But if you
18 look at this comment, he specifically states, "I
19 calculate it to be 263MM for the lower dose which
20 is unlikely to ever replicate physiological
21 dosing."
22         Did you calculate what the dose of
23 talcum powder was in this experiment?
24     A.   No, I did not.
25     Q.   Do you have any reason to believe this

Page 96

1 is inaccurate?
2         MS. O'DELL: Object to the form.
3         THE WITNESS: No.
4 BY MS. DAVIDSON:
5     Q.   Would this dose ever replicate
6 physiological dosing?
7         MS. O'DELL: Objection. Form.
8         THE WITNESS: I don't know what
9 physiological dosing is. Many times in
10 pharmaceutical evaluation of drugs when we
11 talk about dose response and toxicity, the
12 drug is given to -- you know, in a
13 laboratory setting to animals or otherwise
14 at a variety of doses. And in some
15 situations defined what the maximum dose is,
16 the researchers will go beyond what is, you
17 know, excessively high dose, and it's
18 recognized that that dose results in severe
19 toxicity and, therefore, that pharmaceutical
20 product dosing is dropped down to where it's
21 safe.
22         So I don't know -- it's not
23 unreasonable to use a high dose when you're
24 investigating the toxicity of a particular
25 drug.

Page 97

1 BY MS. DAVIDSON:
2     Q.   This isn't a drug, though. Do you know
3 whether Dr. Saed used an excessively high dose or
4 not?
5     A.   He used -- I don't know how you define
6 excessively high dose.
7     Q.   It was your term --
8     A.   It was the dose he used.
9         MS. O'DELL: Let him finish.
10 BY MS. DAVIDSON:
11     Q.   It was your term.
12         Do you have an opinion as to the
13 whether or not the dose he used was excessively
14 high?
15     A.   I don't -- it's the dose -- the dose is
16 what it was.
17     Q.   Do you disagree with this peer reviewer
18 that it was extremely high?
19         MS. O'DELL: Object to the form.
20         THE WITNESS: I don't have an opinion
21         about this peer reviewer's comments.
22 BY MS. DAVIDSON:
23     Q.   This peer reviewer states that "The use
24 of IHC to determine p53 mutation status is not very
25 sensitive."

Page 98

1    Do you disagree with that statement?
2        MS. O'DELL: Object to the form.
3        THE WITNESS: I don't disagree with
4    what you read. IHC is used to detect p53
5    mutations, both wild type and malignant
6    transformation.
7    BY MS. DAVIDSON:
8        Q. Is IHC sensitive for detecting p53
9    mutation?
10       A. Yes.
11       Q. And what's your opinion for that based
12   on?
13       A. Extensive personal experience with
14   pathologists sustaining with IHC for p53 mutations
15   in ovarian cancers that I've -- in humans, women,
16   that I've taken care of.
17       Q. The author says that the high dosing
18   was a major experimental flaw.
19       Do you disagree with that?
20       MS. O'DELL: I'm sorry, Jessica, where
21   are you reading?
22       MS. DAVIDSON: Right there.
23   BY MS. DAVIDSON:
24       Q. Do you disagree that the dosing was a
25   major experimental flaw?

Page 99

1        MS. O'DELL: Object to the form.
2        THE WITNESS: No. As I said before,
3    oftentimes in investigating the dosing of a
4    particular drug or a product in this case,
5    the researcher will run a gamut of different
6    doses to evaluate that particular -- the
7    reaction of the response of cells to
8    those -- to that tissue in this case, to
9    that product, in this case talcum powder.
10   BY MS. DAVIDSON:
11       Q. So you disagree with this author's
12   statements that it's a major experimental flaw?
13       A. Yes.
14       Q. Let's move on the PLOS ONE peer review
15   comments. The PLOS ONE reviewer states quote --
16       Page 101, Asher.
17       -- "It was not clear or explained how
18   an acute 72-hour exposure to talc powder leads to
19   cell transformation."
20       Do you believe that it was clear or
21   explained in the manuscript in the article how an
22   acute 72-hour exposure to talc powder leads to cell
23   transformation?
24       MS. O'DELL: Doctor, if you need to
25       refer to the paper.

Page 100

1        THE WITNESS: Yeah, I'm not sure where
2    we are.
3        MR. TRANGLE: It's number 2 here under
4    major comments in the middle of the screen.
5        MS. O'DELL: Thank you.
6        THE WITNESS: Thank you.
7    BY MS. DAVIDSON:
8        Q. My question is do you believe it's
9    clear in the paper how an acute 72-hour exposure to
10   talc powder leads to cell transformation?
11       MS. O'DELL: What's your question?
12       THE WITNESS: So I'm not sure. Again,
13   I'd have to reread the paper to answer your
14   question about whether it's been explained.
15       Oftentimes in the explanation about
16   a -- in the evaluation of the results of a
17   paper, that occurs in the discussion
18   section. And, you know, authors choose to
19   discuss certain points and disregard other
20   points. They can't -- a discussion section
21   could go on forever and ever.
22       So it was if it was not explained, it's
23   not necessarily surprising to me.
24   BY MS. DAVIDSON:
25       Q. How can a peer reviewer evaluate the

Page 101

1    validity of a scientific paper if it's not
2    explained?
3        A. I'm sorry, you faded out on me there.
4        Q. How can a peer reviewer evaluate
5    validity of a scientific article if it's not
6    properly explained?
7        MS. O'DELL: Object to the form.
8        THE WITNESS: Because peer reviewers
9    should have the acumen, if you will, to
10   understand what is going on and not have to
11   have everything explained to them in the
12   discussion -- in the specific paper.
13   BY MS. DAVIDSON:
14       Q. So are you saying that the fault here
15   is with the peer reviewer and not the paper?
16       MS. O'DELL: Objection.
17       THE WITNESS: The peer reviewer may or
18   may not have understood the explanation for
19   the acute 72-hour exposure. We don't know
20   what did the peer reviewer knows.
21       The peer reviewer was asking, as I read
22   this, to have an explanation. It doesn't
23   mean the peer reviewer doesn't know. Maybe
24   the peer reviewer feels like other readers
25   should have an explanation so they can

Daniel Clarke-Pearson, M.D.

Page 102

1    understand.
2        This is the typical peer review process
3    where the peer reviewer offers up
4    suggestions about how one -- how they, that
5    reviewer, might suggest that the paper be
6    enhanced or changed to be more useful.
7    BY MS. DAVIDSON:
8        Q.  Dr. Clarke-Pearson, do you believe it
9    was clear and explained in the article how an acute
10   72-hour exposure to talc powder leads to cell
11   transformation?
12       A.  I don't think there was an explanation
13   in the article.  I'm not sure it's required in the
14   article.  Just because this peer reviewer says it
15   wasn't explained doesn't mean that it has to be in
16   the article.
17       Q.  Can you please read major comment
18   number 4?
19       A.  "Based on the minimal amount of data
20   provided in this manuscript, the authors'
21   conclusions suggests an acute exposure of talcum
22   powder -- talc powder to ovarian epithelial cells
23   associated with ovarian cancer are outrageous and
24   not supported by the manuscript's data."
25       Q.  Have you ever received a comment from a

Page 103

1    peer reviewer suggesting that any article you wrote
2    was outrageous?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  I've had some pretty
5    unhappy comments from peer reviewers.  I'm
6    not sure anybody has used the word
7    "outrageous."  I've been unhappy sometimes
8    when I receive peer reviewers' comments back
9    that are, you know, strongly negative and --
10   BY MS. DAVIDSON:
11       Q.  But nobody --
12       A.  -- have to just deal with that.
13       Q.  But nobody has used the word
14   outrageous; correct?
15       A.  I'm sorry, I talked over you.
16       Q.  I said nobody has ever called your work
17   outrageous; correct?
18       MS. O'DELL:  Object to the form.
19       THE WITNESS:  I don't recall that.
20   BY MS. DAVIDSON:
21       Q.  Do you disagree with the statement?
22       A.  Yes, I think that's a little overstated
23   in terms of the emotions that are involved with
24   this comment.  I think I would have been -- I was
25   not happy with the way this paper was written.  I

Page 104

1    would be professional about it and outrageous goes
2    a little bit beyond what I consider professional
3    communication with a colleague.
4        Q.  Do you think the authors' conclusions
5    suggesting acute exposure of talc powder to ovarian
6    epithelial cells is associated with ovarian cancer
7    are valid?
8        A.  That's what we've been talking about,
9    yes.
10       Q.  And that view is based, again, not on
11   any other peer-reviewed literature, but based
12   solely on the assay company's website; correct?
13       MS. O'DELL:  Objection to form.
14       THE WITNESS:  Yes.
15   BY MS. DAVIDSON:
16       Q.  If we could continue, the reviewer
17   states that the "authors would need to conduct a
18   more diverse battery of tests to show that the
19   so-called transformed cells possess a tumor or
20   cancer cell phenotype."
21       Do you disagree with that?
22       A.  This is a first of its kind paper.  We
23   talked about premature, the word premature, and I
24   was saying this is now the first time this has been
25   published in this format.  And, yes, additional

Page 105

1    research, additional studies should be done.
2        Q.  But you wrote in your report that they
3    demonstrated p53 mutation cell proliferation and
4    malignant transformation?
5        A.  Yes.  In this -- in this experiment.
6    And doing more experiments with more cell lines,
7    maybe different doses would be perfectly
8    appropriate to continue this line of investigation
9    in the laboratory.
10       Q.  But it's your opinion that they have
11   already demonstrated that exposure to Johnson's
12   Baby Powder causes p53 mutations, cell
13   proliferation, and malignant transformation in
14   normal ovarian epithelial cells; correct?
15       MS. O'DELL:  Object to the form.
16       Misstates his testimony.
17   BY MS. DAVIDSON:
18       Q.  I literally just read from his report.
19       A.  Yes.  And what I'm saying is I am
20   commenting with regard to this specific paper that
21   more research can be done and should be done, I
22   think, to continue to confirm or not confirm these
23   findings.  But these findings are what they are.
24       Q.  If we can move on to the next reviewer.
25   This reviewer states that all claims from malignant

Page 106

1  transformation should be changed to cell
2  transformation. Do you agree with that comment?
3      MS. O'DELL: What are you reading from,
4      please?
5      MR. TRANGLE: This is number 5, at the
6      end of number 5 right above number 6 on the
7      page.
8  BY MS. DAVIDSON:
9      Q. "All claims for malignant
10  transformation should be changed to cell
11  transformation."
12      Do you disagree with that statement?
13      A. That's a suggestion of the reviewer. I
14  think that Dr. Harper need to take that under
15  consideration and make a decision as to whether he
16  should or shouldn't make that change that the
17  reviewer is suggesting.
18      Q. Did they make that change?
19      A. I believe they stuck with malignant
20  transformation.
21      Q. Is cell transformation sufficient to
22  show malignancy?
23      A. No. It's a process moving towards
24  malignancy.
25      Q. Okay. Page 104. Another peer-reviewed

Page 107

1  comment.
2      MS. O'DELL: So --
3  BY MS. DAVIDSON:
4      Q. "The problems with this submission are
5  too numerous to count, and the science,
6  methodology, and data cannot be trusted."
7      Do you see that statement?
8      MS. O'DELL: Just a moment, please.
9      Asher, would you mind putting that in the
10      chat? We don't have access to that page.
11      MR. TRANGLE: Sure.
12  BY MS. DAVIDSON:
13      Q. Dr. Clarke-Pearson, do you see the
14  sentence on the screen that says, "The problems
15  with this submission are too numerous to count and
16  the science, methodology, and data cannot be
17  trusted"?
18      MS. O'DELL: Object to the form. I
19      think if you just give him a moment to read
20      what's being shown. Not the whole page is
21      not being shown, just to make sure he has it
22      available to him.
23      THE WITNESS: I've read that. That's
24      what this reviewer is saying.
25  BY MS. DAVIDSON:

Page 108

1      Q. Do you disagree with the reviewer's
2  statements?
3      A. I think that reviewer's statement is
4  just a big overview of details that he's included
5  in the prior comments. And so one would really
6  need to go back and address each one of those
7  comments and this is -- again, this is a reviewers'
8  comments. Dr. Harper would have taken, in my
9  opinion, those comments and reevaluated his
10  manuscript and adjusted the manuscript to not
11  necessarily follow what the reviewer says, but to
12  consider what the reviewer is suggesting or saying
13  and rewrite the manuscript as much as he needed to.
14      Q. Did Dr. Saed or Harper address any of
15  these comments to your knowledge?
16      MS. O'DELL: Object to the form.
17      THE WITNESS: The way they would
18      address the comments would be to go back to
19      their original manuscript, which you and I
20      don't have -- or I don't have it, maybe you
21      do, and compare that manuscript with the
22      manuscript that got published and see where
23      the differences are in that. Those
24      differences probably would reflect at least
25      some of the comments that these reviewers

Page 109

1  have been making.
2  BY MS. DAVIDSON:
3      Q. Sitting here today, do you know whether
4  Dr. Saed made any changes to the paper to address
5  these comments?
6      A. I have no knowledge one way or the
7  other on that topic.
8      Q. Have you ever received peer reviewer
9  comments saying that your science cannot be
10  trusted?
11      MS. O'DELL: Objection.
12      THE WITNESS: I'm not sure that would
13      be the terminology that would be -- that
14      I've seen, but I've seen significant
15      questions about papers that I've submitted
16      to asking me to expand or validate and
17      comment or redo the statistics.
18  BY MS. DAVIDSON:
19      Q. But nobody's ever said that your
20  science cannot be trusted; correct?
21      MS. O'DELL: Object to form. Misstates
22      the document.
23  BY MS. DAVIDSON:
24      Q. That's correct; right?
25      MS. O'DELL: Object to the form.

Page 110

1   Misstates the document. Does not say
2   science.
3       THE WITNESS: You know, nobody's ever
4   said that to me or written that to me.
5       MS. DAVIDSON: Thank you. Let's go off
6   the record.
7   (Recess taken from 11:23 a.m. until 11:34 a.m.)
8   BY MS. DAVIDSON:
9       Q. Dr. Clarke-Pearson, before we left on
10  our break, we were talking about peer-reviewed
11  comments that were submitted with respect to
12  Dr. Saed's paper. And just to recap, there were
13  two peer reviewers for Gynecologic Oncology, two
14  peer reviewers for PLOS ONE, and there were also
15  two peer reviewers for Reproductive Sciences; is
16  that correct?
17      MS. O'DELL: Object to the form. I
18  don't know that all those documents have
19  been shown to Dr. Clarke-Pearson. So not
20  sure that's a fair question.
21      MS. DAVIDSON: I believe it was all
22  part of the same exhibit.
23      Asher, if you want to run through and
24  show on this --
25      MR. TRANGLE: Happy to.

Page 111

1   BY MS. DAVIDSON:
2       Q. So we can agree there are peer-reviewed
3   comments from three publications and multiple peer
4   reviewers for each publication.
5       You don't have these with you, Leigh?
6       MS. O'DELL: I have some of these
7   pages, but I don't have all of these pages.
8   As you know, the production for Dr. Saed was
9   pretty extensive. So I do not have
10  everything.
11      MR. TRANGLE: I put it in the chat when
12  I first displayed it. It's all one PDF. So
13  here it says two experts.
14  BY MS. DAVIDSON:
15      Q. Do you see, Dr. Clarke-Pearson, where
16  Gynecologic Oncology says your paper has been
17  reviewed by at least two experts in the field?
18      A. Yes.
19      Q. Okay. Let's move on to the next. So
20  that's GYN Oncology. You agree there were two peer
21  reviewers; correct?
22      A. Yes.
23      Q. PLOS ONE. It says both reviewers have
24  raised serious concerns about the experimental
25  design, analyses, and interpretation of the

Page 112

1   findings; is that correct?
2       Asher, you should learn how to
3   highlight.
4       A. Yes, I see that.
5       Q. Okay. So there were two peer reviewers
6   for PLOS ONE; correct?
7       A. That's what it looks like, yes.
8       Q. So that's four reviewers total so far;
9   correct?
10      A. Yes.
11      Q. And are you aware that Reproductive
12  Sciences also rejected this paper?
13      A. I was not aware of that.
14      Q. All right. Are you now --
15      MS. O'DELL: Would you mind letting us
16  know what the Bates Number is at the bottom
17  of this document?
18      MR. TRANGLE: Sure. It's the same --
19  it's the same prefix and it ends in 128.
20      MS. O'DELL: Thank you. Because what
21  you put in the chat is a 284-page document,
22  so --
23      MR. TRANGLE: I can put in the chat the
24  number.
25      MS. O'DELL: I just want to make sure

Page 113

1   we understood what we're seeing because I'm
2   not sure that Dr. Clarke-Pearson has been
3   shown this page previously.
4       THE WITNESS: No, I have not seen this
5   one.
6   BY MS. DAVIDSON:
7       Q. Dr. Clarke-Pearson, are you now aware
8   that Reproductive Sciences also rejected this
9   paper?
10      A. That's what I see on the screen, yes.
11      Q. And they also had peer reviewers;
12  correct?
13      A. Yes.
14      Q. And is it typical to have two peer
15  reviewers for each journal? Is that sort of
16  standard operating procedure?
17      A. I think I said earlier in the
18  conversation between you and me that sometimes two,
19  sometimes three.
20      Q. Got it. So at least six peer reviewers
21  felt that this paper was not suitable for
22  publication; correct?
23      A. Yes.
24      Q. How many of these peer-reviewed
25  comments had you read before you wrote your 2023

Page 114

1  report?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  I have not -- before I
4  wrote my November 15, 2023, report?
5  BY MS. DAVIDSON:
6       Q.  Correct.
7       A.  I have not seen any of these comments.
8       Q.  When did you first see these comments?
9       A.  I believe it was yesterday.
10      Q.  Are you familiar with a paper called
11  Mandarino 2020?
12      A.  Yes.
13      MS. DAVIDSON:  Let's mark that as
14  Exhibit 10.
15      (Exhibit 10 marked for identification.)
16  BY MS. DAVIDSON:
17      Q.  If we could go back to your expert
18  report, which is Exhibit 8, you added citations to
19  Mandarino; correct?
20      A.  Yes.  This is a new publication.
21      Q.  What does Mandarino say that supports
22  your opinion here?
23      A.  That talcum powder stimulated
24  macrophages to produce increased reactive oxygen
25  species.  We've talked about that before.  And

Page 115

1  changes in gene and expression that could promote
2  pro-tumorigenic environment.
3       Q.  You look like you're reading from
4  something.  What are you reading from?
5       A.  Reading from my report.
6       Q.  Do you recognize any of the names of
7  the authors of this paper?
8       A.  Let me look.  Yes.
9       Q.  Which name do you recognize?
10      A.  Dr. Godleski.
11      Q.  Can you turn to the declaration of
12  interest.  Do you see the declaration of interest?
13      A.  Yes, I do.  It's on the last page
14  before references.
15      Q.  Can you read the second sentence in the
16  declaration of interest?
17      A.  "JJG has served as an independent
18  expert and provided expert testimony in talc and
19  other environmentally related litigation."
20      Q.  Who's JJG?
21      A.  I presume it's Dr. Godleski.
22      Q.  And Dr. Godleski is a plaintiffs'
23  expert; correct?
24      A.  Yes.
25      Q.  Does this declaration make clear that

Page 116

1  Dr. Godleski testifies on behalf of plaintiffs?
2       A.  He says he gives expert testimony in
3  talc and other environmental related litigation.
4       Q.  Okay.  My question was does this --
5  does this declaration of interest make clear that
6  Dr. Godleski testifies on behalf of plaintiffs?
7       A.  I see what you're saying.  It doesn't
8  say plaintiff, no.
9       Q.  In fact, it says he's an independent
10  expert; correct?
11      A.  Yes.
12      Q.  How do you understand the term
13  "independent expert"?
14      MS. O'DELL:  Object to the form.
15      THE WITNESS:  I'm not sure I understand
16  what independent expert means.
17  BY MS. DAVIDSON:
18      Q.  Is it your opinion that this paper
19  shows the carcinogenic properties of talc?
20      A.  Well, as I said in my report, and I'll
21  just maybe paraphrase it, working with macrophages
22  exposed to talc, the macrophages in that
23  environment increased production of reactive oxygen
24  species.  It changed the genes in the macrophages
25  and decreased immune surveillance, all of which

Page 117

1  could, would increase the risk of the patient
2  developing cancer or the cancer progressing because
3  of decreased immune surveillance of the macrophages
4  that had been damaged by talcum powder.
5       Q.  Dr. Clarke-Pearson, thank you for that.
6  If you could try to answer my questions directly,
7  I'd appreciate it, since we are limited in our
8  time.
9       A.  Okay.
10      Q.  Although, there's a clear
11  misunderstanding as to how we're limited in our
12  time.  I want to make clear again that based on the
13  Court's ruling, I do have 14 hours with you.
14      Dr. Clarke-Pearson, do you believe the
15  study shows the carcinogenic properties of talc;
16  yes or no?
17      MS. O'DELL:  Object to the form.  Asked
18  and answered.
19      You may answer it in the fashion you'd
20  like.
21      THE WITNESS:  I think -- I think it's
22  demonstrating mechanisms that lead to
23  malignant transformation.
24  BY MS. DAVIDSON:
25      Q.  The authors state that their study did

Page 118

1   not investigate the carcinogenic properties of talc
2   per se; correct?
3       A.   They say changes -- this is in their
4   abstract.  Changes in expression of macrophage
5   genes pertinent in cancer development and
6   immunosurveillance.
7       Q.   Do the authors explicitly state that
8   their study did not investigate the carcinogenic
9   properties of talc?
10      MS. O'DELL:  Objection.
11      THE WITNESS:  I'd have to reread.  Do
12   you have a sentence you want to show me that
13   says that?
14      MR. TRANGLE:  On the screen it's in the
15   very bottom right-hand corner, last sentence
16   on the page.
17      THE WITNESS:  "In our study we did not
18   investigate carcinogenic properties of talc
19   per se."
20      Yes, that's what he says.
21   BY MS. DAVIDSON:
22      Q.   You disagree with the authors on that?
23      MS. O'DELL:  Object to the form.
24      THE WITNESS:  I disagree -- no, I don't
25   disagree with the authors.  That's what they

Page 119

1   said.  They weren't -- no, I mean, I don't
2   disagree with them.
3   BY MS. DAVIDSON:
4       Q.   Did the authors investigate whether the
5   activity they discovered would involve an increased
6   likelihood of tumor growth?
7       A.   They say what they found were changes
8   that were -- and I'm quoting from them -- pertinent
9   in cancer development.  It doesn't say it caused
10   cancer development.  These are steps leading up to
11   cancer development that they are identifying in
12   their research project.
13      Q.   So this paper does not show the
14   initiation of cancer in ovarian cells from talc;
15   correct?
16      MS. O'DELL:  Objection.
17      THE WITNESS:  Would you repeat the
18   specific about your comments about cancer?
19   BY MS. DAVIDSON:
20      Q.   This paper does not show the initiation
21   of cancer in ovarian cells from talc; correct?
22      A.   That's my understanding.  That's
23   correct.
24      Q.   And the authors also did not show
25   whether talc has any effect on phagocytes in

Page 120

1   humans' correct?
2       A.   Sorry.  Any effect on what?
3       Q.   Phagocytes in humans.
4       MS. O'DELL:  Object to the form.
5       THE WITNESS:  Phagocytes in humans
6   you're saying?
7   BY MS. DAVIDSON:
8       Q.   Uh-huh.
9       A.   Not this model that they're using.
10   They weren't using human cells, as I recall.
11      Q.   And they didn't test whether talc has
12   any kind of mutagenic or transformative effect on
13   human cells of any kind; correct?
14      MS. O'DELL:  Object to the form.
15      THE WITNESS:  That's correct.  They
16   used an animal model that's common in
17   laboratory research.
18   BY MS. DAVIDSON:
19      Q.   In fact, they used rodent cells; right?
20      A.   I'd have to look at the specifics.  I
21   know they weren't human cells.
22      Q.   And did the authors determine whether
23   the changes they found were unique to talc?
24      MS. O'DELL:  Would you mind repeating
25   the question, please?  I couldn't hear it.

Page 121

1   Excuse me.  Would you mind repeating the
2   question, please?  I'm sorry, I couldn't
3   hear that.
4   BY MS. DAVIDSON:
5       Q.   Did the authors determine whether the
6   changes they found are unique to talc?
7       A.   They were unique to talc when they
8   compared it with other products such as titanium
9   dioxide, urban air concentration, and diesel
10   exhaust particles.
11      Q.   If we could turn to page 9, sentence
12   beginning, "We also did not aim."
13      MR. TRANGLE:  The bottom of the left
14   column.
15   BY MS. DAVIDSON:
16      Q.   Can you read the sentence that begins
17   "We also did not aim."
18      Asher, if you could highlight it.
19      A.   I see it.
20      Q.   Can you read that sentence aloud?
21      A.   So we did not -- let me look at it.
22   "we did not aim to determine whether the changes we
23   found are unique to talc.  The focus of our
24   experiments was to demonstrate whether talc is
25   inert when phagocytized in a high-estrogen milieu."

Page 122

1       That was their intent.

2    Q.  So they did not aim to determine

3  whether the changes were unique to talc; correct?

4      MS. O'DELL:  Objection to form.

5      THE WITNESS:  Well, there may be other

6      products that could cause similar changes.

7      The products that they used that I just

8      identified, including titanium oxide, did

9      not cause the same changes that talc did.

10  BY MS. DAVIDSON:

11    Q.  And did this study examine gene

12  expression levels or mutations?

13    A.  I think it looked at gene expression

14  models.

15    Q.  Is a change in gene expression the same

16  as inducing a mutation?

17    A.  No.

18    Q.  Do changes in gene expression levels

19  always lead to carcinogenesis?

20    A.  No.

21    Q.  Did this study use already malignant

22  ovarian cancer cells?

23    A.  I believe they did.

24    Q.  Okay.  Let's move on to Exhibit 11, Emi

25  2021.

Page 123

1    A.  I'm sorry, what are you going to?

2    Q.  Exhibit 11.  We're going to put it up

3  on the screen.  Emi 2021.

4      (Exhibit 11 marked for identification.)

5  BY MS. DAVIDSON:

6    Q.  Emi '21, "Transcriptomic and epigenomic

7  effects of insoluble particles on J774 of

8  macrophages."  Are you familiar with that paper?

9      MS. O'DELL:  Let me get it in front of

10      him.  Okay.

11  BY MS. DAVIDSON:

12    Q.  Dr. Clarke-Pearson, you cited this

13  paper in your report; correct, in your supplemental

14  report?

15    A.  Yes.

16    Q.  Why?

17    A.  Because it, again, is a new in vitro

18  research paper that shows the effect of talcum

19  powder on cell proliferation, immune response and

20  signaling, immunosurveillance, and apoptosis.  So

21  all those things that can lead to ovarian cancer.

22    Q.  Does the study examine effects on human

23  ovarian cells?

24    A.  Let me just double-check.

25      No.  I think it's again a murine model,

Page 124

1  a mass model.

2    Q.  And what type of cell does it look at?

3      MS. O'DELL:  Object to the form.  Asked

4    and answered.

5      THE WITNESS:  Well, they were

6    chromosomally female cells which is relevant

7    to women getting ovarian cancer and widely

8    used in macrophage and phagocyte --

9    phagocyte model cell lines.

10  BY MS. DAVIDSON:

11    Q.  It discusses the effects on

12  macrophages; right?

13    A.  Yes.

14    Q.  Are those ovarian cells?

15    A.  No.  These are macrophages.  Part of

16  the immune system that is stimulated by reactive

17  oxygen species in chronic inflammation.

18    Q.  What did Emi find about titanium

19  dioxide?

20      MS. O'DELL:  Objection.  Form.

21  BY MS. DAVIDSON:

22    Q.  Do you recall whether this paper found

23  that titanium dioxide also leads to gene expression

24  and transcription changes in phagocytes?

25    A.  I'd have to reread it.  I believe that

Page 125

1  it does to a lesser degree.

2    Q.  Does that surprise you?

3    A.  Not necessarily.  I mean, it's a

4  foreign body as well that can simulate an

5  inflammatory response, but apparently not as much

6  as talcum powder.

7    Q.  So both talcum powder and the supposed

8  control, which is titanium dioxide, led to changes

9  in phagocytes; correct?

10      MS. O'DELL:  Object to form.

11      THE WITNESS:  I'm sorry, you'll --

12    would you please repeat that question.  I

13    didn't hear it?

14      MS. DAVIDSON:  Did you get the

15    question, court reporter?

16    (The reporter read back the last question.)

17      THE WITNESS:  And my answer is yes.

18  BY MS. DAVIDSON:

19    Q.  Does Emi say anything about

20  carcinogenesis?

21      MS. O'DELL:  Object to the form.

22      THE WITNESS:  Not that I recall.

23  BY MS. DAVIDSON:

24    Q.  And, again, it doesn't use human cells;

25  correct?

Page 126

1    A.   No, it doesn't.  It uses mouse cells.

2    Q.   And it doesn't use ovarian cells;

3  correct?

4    A.   That's correct.

5    Q.   And it looks at gene expression, not

6  malignancy; correct?

7         MS. O'DELL:  Object to the form.

8         THE WITNESS:  It identifies gene

9    expression, yes.

10 BY MS. DAVIDSON:

11   Q.   So this paper does not examine whether

12 talc causes mutations; correct?

13        MS. O'DELL:  Objection, form.

14        THE WITNESS:  It doesn't identify

15   mutations, you're correct.

16 BY MS. DAVIDSON:

17   Q.   So how does the study support your

18 opinion that talc causes ovarian cancer?

19   A.   Would you repeat that question?

20        MS. DAVIDSON:  Court reporter.

21 (The reporter read back the last question.)

22   A.   Right.  So these are all

23   studies showing mechanisms that result from

24   chronic inflammation caused by talc.  And

25   those properties that are induced, that

Page 127

1    inflammation reactive oxygen species, immune

2    alterations, alterations apoptosis, many

3    other things are all components of what

4    results in the development of ovarian cancer

5    caused by talc.

6  BY MS. DAVIDSON:

7    Q.   Is it still your opinion that the

8    mechanism by which talc allegedly causes ovarian

9  cancer is through inflammation?

10   A.   Absolutely.

11        (Exhibit 12 marked for identification.)

12   Q.   If we can mark as Exhibit 12 Phung

13 2022.  In your report, you cite this paper, Phung

14 2022.  Do you recall that?

15   A.   I do.

16   Q.   Do you know who the authors were of

17 this paper?

18   A.   It's a consortium.  There's multiple

19 authors.

20   Q.   Do you recognize the name Daniel

21 Cramer?

22   A.   I'm sorry, what about Daniel Cramer?

23   Q.   Do you recognize that name?

24   A.   Yes.

25   Q.   How do you recognize his name?

Page 128

1    A.   He's been involved with several

2  peer-reviewed publications regarding talcum powder

3  causing ovarian cancer.

4    Q.   Is he a plaintiffs' expert in this

5  litigation?

6    A.   I believe he has been.

7    Q.   If we could turn to his disclosure.

8    A.   Where is that?  At the end of the

9  paper?

10   Q.   Asher is putting it up on the screen.

11        MS. O'DELL:  Published version.

12        MS. DAVIDSON:  I'm going to read his

13   disclosure aloud to you.

14 BY MS. DAVIDSON:

15   Q.   "DWC reports payments for expert

16 testimony from Ferraro Law Firm and Ashcraft and

17 Gerel Law Firm."

18        Do you see that?

19   A.   I just found it, yes.

20   Q.   Does this sentence state whether

21 Dr. Cramer is an expert for plaintiffs or for

22 defendants?

23        MS. O'DELL:  Object to the form.

24        THE WITNESS:  He doesn't -- he doesn't

25   say plaintiff or defendant.

Page 129

1  BY MS. DAVIDSON:

2    Q.   Does it say that he's an expert in talc

3  litigation?

4    A.   No.  It says he's an expert working

5  with these two law firms and also with grant

6  funding from NIH.

7    Q.   Someone reading this disclosure would

8  not know that Dr. Cramer is an expert for

9  plaintiffs in talc litigation; correct?

10        MS. O'DELL:  Object to the form.

11        THE WITNESS:  I don't have an opinion

12   about what people would know.

13 BY MS. DAVIDSON:

14   Q.   Does this sentence make clear that

15 Dr. Cramer is an expert for plaintiffs in talc

16 litigation?

17   A.   No.

18   Q.   Thank you.  Let's move on to mark as

19 Exhibit 13 Woolen 2022.  We've talked about this

20 paper; correct?

21   A.   Yes.

22        (Exhibit 13 marked for identification.)

23 BY MS. DAVIDSON:

24   Q.   This is the paper that you sent to ACOG

25 and SGO; correct?

Daniel Clarke-Pearson, M.D.

Page 130

1    A.  Yes.
2    Q.  Following those submissions by you to
3  ACOG and SGO, did they change any of their public
4  statements with respect to talc?
5    A.  I'm not aware of any changes.
6    Q.  Following your submissions to ACOG and
7  SGO, have they issued any statements suggesting
8  that talc is a risk factor for ovarian cancer?
9    A.  Not that I'm aware of.
10   Q.  Okay.  Have you read
11 Dr. Smith-Bindman's reports in this litigation?
12   A.  Her report?
13   Q.  Uh-huh.
14   A.  I have not read her expert report, no.
15   Q.  And, as a result, you're not aware that
16 Dr. Smith-Bindman began this -- the meta-analysis
17 that led to Woolen paper in her litigation report;
18 is that correct?
19       MS. O'DELL:  Object to the form.
20   Misstates the evidence.
21       THE WITNESS:  I'm not aware.
22 BY MS. DAVIDSON:
23   Q.  Were you aware that Dr. Smith-Bindman
24 did a meta-analysis for this litigation before this
25 paper was published?

Page 131

1    A.  I was not aware.
2    Q.  Were you aware that Dr. Woolen received
3  Dr. Smith-Bindman's litigation report before
4  setting out to do the study?
5       MS. O'DELL:  Objection.  Form.
6       THE WITNESS:  I was not aware of that.
7  BY MS. DAVIDSON:
8    Q.  And you were not aware that 9 of the 11
9  studies in this paper had already been the subject
10 of a litigation meta-analysis; correct?
11       MS. O'DELL:  Objection to the form.
12       THE WITNESS:  I was not aware of that
13   either.
14 BY MS. DAVIDSON:
15   Q.  Are you familiar with the term "post
16 hoc analysis"?
17   A.  Somewhat, yes.
18   Q.  What does that mean?
19   A.  It means after the study has been done,
20 somebody -- not necessarily the primary researcher,
21 but somebody could have access to the database and
22 reanalyze the database or, you know, asking another
23 question that might be contained in the data that's
24 there.
25   Q.  Do post hoc analyses raise any issues

Page 132

1  with respect to scientific integrity?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  No.  I think scientific
4   integrity obviously ties back to
5   publication.  Otherwise, if it's just
6   sitting on somebody's desk, it's not --
7   doesn't mean anything.
8       So that integrity goes through the peer
9   review process before it gets published.
10  And identifying, you know, in the manuscript
11  that it's a post hoc analysis is important
12  for full disclosure.
13 BY MS. DAVIDSON:
14   Q.  Is the reliability of a meta-analysis
15 contingent on proper selection of studies and data
16 sets?
17       MS. O'DELL:  Objection.
18       THE WITNESS:  I would say yes.
19 BY MS. DAVIDSON:
20   Q.  Did Woolen 2022 include the prospective
21 data from the O'Brien 2020 pooled analysis?
22       MS. O'DELL:  Objection.  Form.
23       THE WITNESS:  It obtained -- it
24   included information supplied by O'Brien
25   from the Minerva health study one that, as I

Page 133

1   understand it, had not been published
2   previously.
3  BY MS. DAVIDSON:
4    Q.  Do you know why Woolen 2022 did not
5  include prospective data from O'Brien 2020
6  published?
7       MS. O'DELL:  Objection to form.
8       THE WITNESS:  The data in 2020 is
9   different than the data that was supplied by
10  O'Brien for this Woolen paper.
11 BY MS. DAVIDSON:
12   Q.  Do you know what the reason for that
13 is?
14   A.  Because O'Brien hadn't published
15 previously on daily exposure in the previously
16 published national health study -- national health
17 study participants.
18   Q.  Did O'Brien 20220 use the term
19 "frequent exposure"?
20   A.  I have to go back to O'Brien 2020.
21       MS. DAVIDSON:  Why don't we mark
22   O'Brien 2020.  We haven't marked that yet --
23   oh, I think we did actually.
24       MR. TRANGLE:  We did.
25       MS. DAVIDSON:  O'Brien 2020 was

Daniel Clarke-Pearson, M.D.

Page 134

1    Exhibit 6.  Let's put that up, Asher,
2    because we want to move things along and
3    then we'll come back to this.
4    BY MS. DAVIDSON:
5        Q.  If you could turn --
6    Dr. Clarke-Pearson, if you could look up on the
7    screen just to move things along.  Do you see where
8    it says exposure -- "exposures" in the abstract?
9        A.  Looking at the abstract.
10       Q.  Do you see on the screen the word
11   "exposures"?
12       A.  There's lots of words on the screen.
13       Q.  There's a heading on the screen.
14       A.  I gotcha.  Okay.
15       Q.  Can you read what it says?
16       A.  Yeah.  It says, "Exposures.  Ever,
17   long-term greater than 20 years and frequent
18   greater than once a week."
19       Q.  Okay.  So --
20       A.  Equal and once a week, yeah.
21       MS. O'DELL:  I don't think he was
22   finished.
23   BY MS. DAVIDSON:
24       Q.  So before Woolen was ever published,
25   O'Brien had already defined the term "frequent;" is

Page 135

1    that correct?
2        MS. O'DELL:  Object to the form.
3        THE WITNESS:  I think it's --
4        MS. O'DELL:  Object to the form.  You
5    may answer.
6    BY MS. DAVIDSON:
7        Q.  Dr. Clarke-Pearson --
8        A.  I think --
9        MS. O'DELL:  Let him finish his answer,
10   please, Jessica.
11   BY MS. DAVIDSON:
12       Q.  Dr. Clarke-Pearson, I just was going to
13   repeat the question because there was so much
14   chatter by Leigh.  Before --
15       A.  Okay.  Go ahead.
16       MS. O'DELL:  Oh, yes.
17   BY MS. DAVIDSON:
18       Q.  Before Dr. Woolen published her
19   meta-analysis, Dr. O'Brien in her paper had defined
20   the term "frequent" as greater or equal to one
21   week; is that correct?
22       MS. O'DELL:  Object to the form.
23   BY MS. DAVIDSON:
24       Q.  Once a week?
25       MS. O'DELL:  Object to the form.

Page 136

1        THE WITNESS:  I believe that's what
2    they report in this 2020 paper, yes.
3    BY MS. DAVIDSON:
4        Q.  Does Dr. Woolen explain anywhere in her
5    paper why she decided to deviate from Dr. O'Brien's
6    definition of the word "frequent"?
7        MS. O'DELL:  Objection to form.
8        THE WITNESS:  Well, she -- I mean
9    frequent can have many definitions.  And
10   Dr. Woolen has chosen the definition that's
11   slightly different than the definition that
12   Dr. O'Brien used in the 2020 paper.
13   BY MS. DAVIDSON:
14       Q.  How many of the papers -- we can go
15   back to Woolen, Asher.
16       How many of the papers cited in Woolen
17   involved two days per week of use?
18       A.  As I review -- as I see Table 2, it
19   would appear that all those papers would be at
20   least two days per week.
21       Q.  Do any of them involve two or three
22   days per week of use?
23       MS. O'DELL:  Object to form.
24       THE WITNESS:  Not that I see in the
25   column on Table 2.

Page 137

1    BY MS. DAVIDSON:
2        Q.  Do any of them involve four days a week
3    of use?
4        MS. O'DELL:  Objection to the form.
5        THE WITNESS:  They could.
6    BY MS. DAVIDSON:
7        Q.  Which would that be?
8        A.  Four days -- four days per week, for
9    example, Chang, 25 times per month.  That's
10   almost -- that's almost daily if you exclude her
11   menstrual period during that month.  So that would
12   be every day of that month the patient in the Chang
13   studies were exposed.  So that's four or five or
14   six days per week.
15       Q.  Are any of them limited to just four
16   days per week?
17       MS. O'DELL:  Objection to the form.
18       THE WITNESS:  Mills says four to seven
19   times per week.
20   BY MS. DAVIDSON:
21       Q.  Do you know if Dr. Woolen used the data
22   from Mills for four times per week?
23       A.  I have no reason to think she didn't.
24       Q.  When you said excluded menstrual
25   period, what did you mean?

Daniel Clarke-Pearson, M.D.

Page 138

1      Asher, we're seeing your e-mail, so
2  please turn off your screen.
3      When you said excluded -- excluding
4  menstrual period, what did you mean by that?
5      A.  What do I mean?
6      Q.  Uh-huh.
7      A.  Well, most women in this study were
8  premenopausal and likely, in my humble opinion,
9  were having a menstrual period once a month.  So if
10  we look at 30 days per month on an average month,
11  several of those days when the patient is having
12  her menstrual period and those women may or may not
13  be using talcum powder during that time.  But 25
14  times per month is not necessarily 30 times per
15  month like every day, but 25 times per month would
16  expose the patient, to answer your question, to
17  four times per week for sure.
18      Q.  But that would be much more than four
19  times per week; correct?
20      A.  It could be.
21      Q.  Well, if you take 30 and you divide it
22  by 25, that's almost every day; right?
23      A.  25 out of 30 is almost every day, yes.
24      Q.  I was asking if you're aware of any
25  data they used based on use only four days a week?

Page 139

1      A.  I didn't understand your question that
2  way.  Could you repeat it now?
3      Q.  Are you aware of any data used by
4  Woolen that involved use of just four days per
5  week?
6      A.  Woolen defined frequent use as two or
7  more times per week.  So four times per week is
8  greater than two times per week.  So she included
9  patients that had four times per week.
10      Q.  Which of the underlying papers used by
11  Woolen involved use just two to four times per
12  week?
13      MS. O'DELL:  Objection to form.
14      THE WITNESS:  I'm not aware of any of
15      those papers that were just two times per
16      week.  All of them were more than -- all of
17      them were more than two times per week.
18  BY MS. DAVIDSON:
19      Q.  Are you aware of any papers that were
20  just three times a week?
21      MS. O'DELL:  Object to form.
22      THE WITNESS:  No.
23  BY MS. DAVIDSON:
24      Q.  Are you aware of any papers that were
25  just four times per week?

Page 140

1      A.  I think you just asked me that
2  question.
3      Q.  Your answer was not clear?
4      A.  My answer was that four times per week
5  is in the Mills study.
6      Q.  Dr. Clarke-Pearson, why would a woman
7  who has her period not use talcum powder?
8      A.  It's a personal preference.  I mean, I
9  don't know.  I'm not a woman and I've never used
10  talcum powder.  I've never been around anybody that
11  I can personally say used talcum powder to give me
12  just an informal answer.  So, I mean, obviously I'm
13  aware of studies where women have used talcum
14  powder on their perineal pad when they're having
15  their period.
16      Q.  I just wanted to understand the basis
17  for your statement earlier about taking out the
18  time that a woman has her period?
19      A.  Well, I think exposure to talcum powder
20  is more likely when the patient is not having her
21  period when the reproductive tract doesn't have
22  blood flowing out of it.  So talcum powder can
23  ascend to the ovary and tubes.
24      Q.  So is it your opinion that talcum
25  powder is less likely to ascend a woman's genital

Page 141

1  tract when she has her period?
2      A.  Yes.
3      MS. DAVIDSON:  All right.  Let's go off
4      the record for five minutes.
5      (Recess taken from 12:13 p.m. until 12:23 p.m.)
6  BY MS. DAVIDSON:
7      Q.  Dr. Clarke-Pearson, would it have been
8  more accurate for the Woolen paper to have defined
9  frequent use as four days or more of use given what
10  you saw in Table 2?
11      MS. O'DELL:  Object to the form.
12  BY MS. DAVIDSON:
13      Q.  Table 1.  Sorry.  Was it -- wait.
14      MS. O'DELL:  Object to the form.
15      MS. DAVIDSON:  Let me just make sure
16      I've got the right table.
17      MR. TRANGLE:  It's 2.
18      MS. DAVIDSON:  Asher, can you put it
19      back up on the screen.  I think it's Table
20      2.  I think I had it right the first time.
21      So let me just re-ask the question.
22  BY MS. DAVIDSON:
23      Q.  Based on our review before the break of
24  Table 2, would it have been more accurate to define
25  this study as looking at use of four days or more

Page 142

1  per week?
2      MS. O'DELL:  Object to the form.
3      THE WITNESS:  So now you're sounding
4  exactly like the peer reviewers, looking at
5  a paper and then saying, well, maybe it
6  should be looked at differently.
7      My answer to you is this is what
8  Dr. Woolen chose to use, greater than two
9  times per week.  She could have looked at it
10  at four times per week.
11  BY MS. DAVIDSON:
12     Q.  But, Dr. Clarke-Pearson, she did look
13  at it as only four times per week or more; correct?
14  We concluded before the break that Table 2 does not
15  show any data for use between two and four days a
16  week; right?
17     MS. O'DELL:  Object to the form.
18     THE WITNESS:  Between two and four days
19  per week.  No, I mean you had asked me about
20  four days a week, and I cited the Mills
21  paper.
22  BY MS. DAVIDSON:
23     Q.  Right.  So, Dr. Clarke-Pearson, the
24  Woolen paper does not use any data for two or three
25  days per week of use; correct?

Page 143

1      MS. O'DELL:  Objection to the form.
2      THE WITNESS:  It used two or greater
3  days per week, is that what you're --
4  BY MS. DAVIDSON:
5      Q.  Two or three?
6      A.  Two or three.
7      MS. O'DELL:  Object.
8      THE WITNESS:  No, I don't -- it would
9  have included three.  Two or more days per
10  week would include three.
11  BY MS. DAVIDSON:
12     Q.  If someone used -- if there were papers
13  that reported on talc use for two or three times
14  per week, was that covered in Table 2?
15     MS. O'DELL:  Object to the form.
16     THE WITNESS:  Those patients would be
17  included in Table 2.
18  BY MS. DAVIDSON:
19     Q.  Patients who only used talc two or
20  three days a week are included in Table 2?
21     A.  Two or more days per week are included
22  in Table 2.
23     Q.  Where in Table 2 can you point me to
24  patients who use talc either two days a week or
25  three days a week?

Page 144

1      A.  So I think what you're trying to say is
2  specifically only two days per week or only three
3  days per week.  Is that what you're trying to say?
4      Q.  Correct, sir.
5      A.  I see.  So there's no specific
6  identification of that sort of patient.
7      Q.  So wouldn't it be more accurate if this
8  paper stated that it defined frequent use as four
9  or more days per week?
10     MS. O'DELL:  Object to the form.
11     THE WITNESS:  They could have, but they
12  chose to use greater than two days per week.
13  BY MS. DAVIDSON:
14     Q.  But where are the data for two or three
15  days per week?
16     MS. O'DELL:  Objection.  Form.
17     THE WITNESS:  This is greater than two
18  days per week.  All these studies, the 11
19  studies of patients that receive -- that use
20  talcum powder two or more days per week.
21  BY MS. DAVIDSON:
22     Q.  But, in fact, the only data used by
23  Woolen are people who use talc four or more days
24  per week; correct?
25     MS. O'DELL:  Object to the form.

Page 145

1      THE WITNESS:  I think that probably
2  would be correct.
3  BY MS. DAVIDSON:
4      Q.  Do you know if there are data available
5  anywhere from any of these studies that would
6  reflect two or three days per week of use?
7      A.  Not that I know of in these studies,
8  no.
9      Q.  Would you be surprised to learn that
10  some of these studies do include data for use that
11  correlates to two or three days per week?
12     MS. O'DELL:  Object to the form.
13     THE WITNESS:  If they use two or three
14  days per week, then they would have been
15  using two or more days per week which would
16  be included in this analysis.
17  BY MS. DAVIDSON:
18     Q.  So it's your testimony that if any of
19  the studies listed in Table 2 provided data for two
20  days per week of use, they would have been included
21  here; correct?
22     MS. O'DELL:  Objection.  Form.
23     THE WITNESS:  Two or more days per week
24  would be included in this study, yes.
25  BY MS. DAVIDSON:

Page 146

1    Q.  Are you aware that when it came to
2  O'Brien the Woolen authors only used data for
3  patent women?
4    A.  I didn't hear your whole question.  I'm
5  sorry.
6    Q.  Are you aware that the Woolen authors
7  only used data for patent women from the NHS1
8  study?
9    A.  Yes.  And that was harmonized with many
10  of the other studies -- of the other ten where the
11  authors chose to only focus on patients that had
12  patent fallopian tubes and an intact uterus.
13    Q.  Can you point to a single one of those
14  ten studies that only focuses on patent women?
15    A.  I would have to go back to those
16  studies and look at them, but I know there are some
17  in there.
18    Q.  So it's your testimony that some of
19  those ten studies are reported in Table 2 only for
20  patent women?
21    A.  That included only patency, yes.
22    Q.  How many of the ten?
23    A.  I don't know.  I just told you.  I'd
24  have to go back and look at them.  That's why they
25  harmonized.  You wouldn't harmonize with patients

Page 147

1  that didn't have patency and report it under
2  footnote number 5.
3    Q.  Would it surprise you that not a single
4  one of those ten other studies actually was
5  restricted to women with patent reproductive
6  tracts?
7    MS. O'DELL:  Objection to form.
8    THE WITNESS:  Again, I would have to
9    look at those studies once again.
10  BY MS. DAVIDSON:
11    Q.  Would it surprise you, if it were the
12  case, that not one of those ten studies was limited
13  to women with patent reproductive tracts?
14    MS. O'DELL:  Objection to the form.
15    THE WITNESS:  I don't know because I
16    would have to look at these studies again.
17  BY MS. DAVIDSON:
18    Q.  But you testified a few moments ago
19  that it was done to harmonize with these other ten.
20  Is that still your testimony?
21    A.  That's what the author says in footnote
22  number 5.
23    Q.  Do you know if that's accurate?
24    A.  I believe it is.
25    Q.  What is that belief based on?

Page 148

1    A.  My understanding is that some of these
2  other studies 1 through 10 included -- focused only
3  on patients with patent fallopian tubes.
4    Q.  What's that understanding based on?
5    A.  On having previously read these papers.
6  But I at this moment cannot tell you which papers
7  have patency as their criteria.
8    Q.  Do you have an opinion as to whether
9  it's some, most, of those ten?
10    A.  I'd have to review those papers.
11    Q.  If none of the studies in 1 through 10
12  is restricted to women with patent reproductive
13  tracts, would that footnote that we just looked at
14  about harmonization be inaccurate?
15    MS. O'DELL:  Object.
16    THE WITNESS:  Is a hypothetical
17    question if none of them had patency?
18  BY MS. DAVIDSON:
19    Q.  If none of those ten studies is limited
20  to patency, then is footnote number 5 about
21  harmonization inaccurate?
22    MS. O'DELL:  Object to form.
23    THE WITNESS:  Hypothetical case, yes.
24    But I don't know why they would say
25    harmonize if there were none that had

Page 149

1  patency as part of their criteria.
2  BY MS. DAVIDSON:
3    Q.  Okay.  Could we look at the data that
4  are listed here for Wu on line 10.
5    A.  I see it.
6    MS. DAVIDSON:  Great, Asher.  Asher has
7    mastered highlighting.  Excellent.
8    THE WITNESS:  Yeah, that's terrific.
9    Thank you, Asher.
10    MS. DAVIDSON:  Let's do that going
11    forward, Asher.  I was going to ask you on a
12    break to chat with a paralegal and figure it
13    out, and we're glad you've mastered that
14    important skill that they do not teach in
15    law school.
16  BY MS. DAVIDSON:
17    Q.  Dr. Clarke-Pearson, we're looking at
18  the Wu study, right, that's a case-control study
19  from 2009.  You read that study before; correct?
20    A.  Yes.
21    Q.  And the data provided here for Wu says
22  greater than 30 times per month; correct?
23    A.  Yes.
24    Q.  And so how many times per week is that?
25    A.  Well, assuming that there's a 30 to

Page 150

1  31 days a month, it seems like it would be every
2  day.
3      Q.   Correct.  Do you know whether Wu -- do
4  you recall from your review of that paper whether
5  it also provided -- you can leave that, Asher.
6          Are you familiar whether Wu also
7  provided data with respect to women who used talc
8  ten times per month?
9          MS. O'DELL:  Object to the question --
10         or to, one, we need to get the paper in
11         front of Dr. Clarke-Pearson.  Wu is a study
12         that was produced sometime ago.  It was
13         involved -- or was cited in his first report
14         and he was examined it on during his first
15         deposition.  So just wait a moment and we'll
16         put it in front of him.
17  BY MS. DAVIDSON:
18     Q.   I would just like to note for the
19  record that Ms. O'Dell is objecting to my asking
20  about a study that's included in a paper that's in
21  your current report.
22     Dr. --
23         MS. O'DELL:  That's not the basis of my
24         objection.  I'm just saying this is not a
25         memory test.  And he is entitled to see a

Page 151

1          study that he's being asked about, specific
2          questions about the data.  That's all.  And
3          just give him a moment and he's happy to
4          answer your questions.  But we just need to
5          get the study in front of him.
6  BY MS. DAVIDSON:
7      Q.   Dr. Clarke-Pearson, do you know
8  whether -- what are you looking at right now?
9      A.   I'm looking at the paper trying to
10  find --
11     Q.   Which paper?
12     A.   -- the information that you're asking
13  me about with regard --
14     Q.   Which paper?
15     A.   -- to utilization.
16         What's that?
17     Q.   Which paper are you looking at?
18     A.   The Wu paper.  That's what we're
19  talking about, isn't it?
20     Q.   Because we're doing this by video, I'd
21  appreciate it if you let me know when you're
22  looking at something that isn't up on the screen.
23     A.   Oh, certainly.  This is Wu 2015.
24     Q.   Do you have an --
25     A.   You want to put it up on the screen for

Page 152

1  me?  I'd be happy to --
2      Q.   Do you have notes on Wu 2015?
3      A.   No, I don't.
4      Q.   Okay.  Do you know whether --
5      A.   2009.
6      Q.   Do you know whether Wu provided --
7  there's a lot of movement in the room.
8      A.   I'm being handed a copy of the paper
9  you want to talk about, which is 2009.
10     Q.   Dr. Clarke-Pearson, do you know whether
11  Wu 2009 provided data from multiple time periods of
12  use?
13     A.   I don't recall.
14     Q.   Do you know whether they provided data
15  for multiple frequencies of use?
16     A.   I'm looking at a table that says yes.
17  Be happy to look at that table with you if you
18  like.
19     Q.   Dr. Clarke-Pearson, if somebody uses a
20  product ten times per month or more, how many days
21  per week is that?
22     A.   You're averaging this out, so that
23  would be probably on average three days per week.
24     Q.   So that would be more than two days;
25  right?

Page 153

1      A.   Yes.
2      Q.   So if the Wu study had provided data
3  for use ten times per month, that would have
4  satisfied the Woolen criteria of more than two
5  times per week; correct?
6          MS. O'DELL:  Object to form.
7          THE WITNESS:  I think we just averaged
8          that out.  So 10 times per month, so 10 --
9          10 out of 30, let's call a month 30 days, so
10         that's one out of three days.  So that would
11         be two or three times per week.
12  BY MS. DAVIDSON:
13     Q.   So if Wu had reported data for use ten
14  times or more per month, that would have satisfied
15  the frequent definition used by Woolen; correct?
16         MS. O'DELL:  Objection.  Form.
17         THE WITNESS:  I believe it would.
18  BY MS. DAVIDSON:
19     Q.   But Woolen only used the data for 30
20  times or more per month; correct?
21     A.   That's what I think I recall from
22  the -- the table you had up earlier.
23     Q.   We can put Table 2 back up.  Do you
24  know why Woolen would have used data for 30 times
25  per month as opposed to data for 10 times per

Page 154

1  month?

2      A.  I can only speculate as to what

3  Dr. Woolen was thinking.  Maybe ten times per month

4  didn't satisfy her criteria for greater than two

5  times per month -- or per week.

6      Q.  But we've just done the math and ten

7  times per month is more than two times per week;

8  correct?

9      MS. O'DELL:  Object to form.

10      THE WITNESS:  That's on average.

11  BY MS. DAVIDSON:

12      Q.  Just the same way that 30 times per

13  month on average is once a day; correct?

14      A.  That's correct.

15      Q.  Okay.  Let's move on.

16      Do you know how Woolen came to the

17  conclusion that two times a week reflects frequent

18  use?

19      A.  No, I don't.

20      Q.  Are you aware that in

21  Dr. Smith-Bindman's expert report she also defined

22  regular use, and she defined that as three times

23  per week?

24      MS. O'DELL:  Object to form.

25      THE WITNESS:  You called it -- I'm

Page 155

1      sorry, I don't recall.  She called it what

2      did you say?

3  BY MS. DAVIDSON:

4      Q.  Are you aware that Dr. Smith-Bindman's

5  meta-analysis for the litigation was based on

6  defined regular use as three times per week?

7      MS. O'DELL:  Objection.

8      THE WITNESS:  I think I already

9      indicated I hadn't read her report, so I

10      don't recall that.

11  BY MS. DAVIDSON:

12      Q.  And, therefore, you also don't know why

13  she changed her exposure metric from three times

14  per week to two times per week; correct?

15      MS. O'DELL:  Objection to form.

16      THE WITNESS:  So you're saying Woolen

17      paper because Ms. Bindman is a co-author had

18      something to do with the definition.  I

19      don't have any opinion about that.  I'm

20      speculating.

21  BY MS. DAVIDSON:

22      Q.  Let me ask you another question.  If we

23  could look at Table 1 of Woolen 2022.  Do you know

24  what the Newcastle Ottawa scale is?

25      A.  Only vaguely.  This is a metric, a

Page 156

1  tool, if you will, that biostatisticians use.  In

2  general, my general view is that it sort of talks

3  about the strength of a study.  It grades the

4  strength of a study.  So as you'll see in the far

5  left hand, there's a column there that has a total

6  score, but that's about as much as I can tell you.

7      Q.  Do you recall any other publication

8  that you've reviewed for purposes of this

9  litigation that uses the Newcastle Ottawa score --

10  scale?

11      A.  Can I check on one?

12      Q.  Sure.  Which one are you checking on?

13      A.  I'm looking at Lynch.

14      That may not be correct.  So I'm not

15  aware of the studies that have used that.

16      Q.  Sorry.  I didn't mean to interrupt you.

17  Sometimes it's hard to tell when you're done.

18      A.  I understand.  I'm not aware of other

19  studies that have used the Newcastle scale, but ...

20      Q.  Do you recall a meta-analysis called

21  Taher?

22      A.  Maher?

23      Q.  Taher.

24      A.  Taher, yes.

25      Q.  Do you recall whether they used the

Page 157

1  Newcastle Ottawa scale?

2      A.  That's a memory test.  I don't recall.

3      MS. DAVIDSON:  Asher, why don't we put

4      that up on the screen.  Wait a minute.  Let

5      me just look at my numbers.  I believe Taher

6      or Taher, I have no idea how to pronounce

7      it, would be Exhibit 14.

8      (Exhibit 14 marked for identification.)

9  BY MS. DAVIDSON:

10      Q.  So we're marking as Exhibit 14 --

11      A.  Did you get it for me, Margaret?

12      MS. O'DELL:  Give me a moment, Jessica,

13      to put the Taher paper in front of him.

14      Obviously, he was examined on the Taher

15      paper during his 2019 deposition and -- at

16      least and possibly the 2021 deposition.

17      MS. DAVIDSON:  Asher, can you put the

18      Taher paper up or is this the Taher paper

19      that's up?

20      MR. TRANGLE:  This is it.

21  BY MS. DAVIDSON:

22      Q.  Can you turn to page 1 just so we have

23  it in the record and then you can go back to that.

24  Taher, "Critical review of the association between

25  perineal use of talcum powder and risk of ovarian

Page 158

1 cancer." It's a meta-analysis. Do you recall this
2 paper?
3 A. I do.
4 Q. Okay. This is Exhibit 14. And if we
5 could turn to page 90. It says, "The quality of
6 included studies was assessed using the Newcastle
7 Ottawa scale."
8 Does that refresh your recollection?
9 A. Yes. Yes.
10 Q. Have you -- I take it since you did not
11 recall this that you have not compared the Woolen
12 papers scores for the underlying studies with the
13 Taher papers scores for the underlying studies; is
14 that correct?
15 A. That's correct. I have not compared.
16 Q. Would it surprise you to know that the
17 Woolen paper rated every single component
18 case-control study higher on the Newcastle Ottawa
19 scale than Taher did?
20 A. I don't know if there's anything that
21 surprises me. I mean, there's differences of
22 opinion about quality which are -- which are not
23 quantitative but qualitative evaluations of papers.
24 Q. Do you know why Woolen would have
25 scored every single study higher than Taher did?

Page 159

1 MS. O'DELL: Objection to the form.
2 THE WITNESS: I don't know. I'd only
3 be conjecting -- only be guessing.
4 BY MS. DAVIDSON:
5 Q. And so do you know -- do you know how
6 many of the nine case-control studies listed here
7 were rated higher by Woolen than by Taher?
8 MS. O'DELL: Object to the form.
9 THE WITNESS: I don't know. I'd have
10 to put the two studies side by side.
11 BY MS. DAVIDSON:
12 Q. Do you recall that Taher said that
13 these case-control studies provided only a week
14 evidence?
15 MS. O'DELL: Object to form.
16 MS. DAVIDSON: If we could turn to
17 that, Asher.
18 BY MS. DAVIDSON:
19 Q. Can you read the sentence that Asher
20 has highlighted in yellow from Taher?
21 A. Sure. "Using GRADEpro for the
22 assessment, the certainty of the evidence was
23 classified as very low."
24 Q. Did Woolen agree with that in her
25 paper?

Page 160

1 MS. O'DELL: Object to the form.
2 BY MS. DAVIDSON:
3 Q. In their paper, in the Smith paper?
4 A. I don't know if she commented on it.
5 I'm not sure what GRADEpro is.
6 Q. Got it. So you disagree with Taher
7 that the certainty of the evidence is very low?
8 MS. O'DELL: Object to the form.
9 THE WITNESS: That's what he says. I
10 don't -- I don't agree or disagree.
11 BY MS. DAVIDSON:
12 Q. Okay. If Woolen had used all women
13 from NHS1 instead of the just patent women, do you
14 know if it would have affected the results of the
15 paper?
16 A. I'm not aware of that data, so I don't
17 know how it would have affected the results.
18 Q. What's the typical age when a woman
19 gets a tubal ligation?
20 A. Typical age. Well, once she's decided
21 she doesn't want to have any more children, one. I
22 would have to -- I don't know the data. From my
23 experience as a gynecologist, I would say somewhere
24 between 35 and 40.
25 Q. And do you know what the typical age is

Page 161

1 when women start using talc?
2 A. My understanding, in the teenage years
3 once they start having periods.
4 Q. So if you are only looking at patent
5 women, you're probably excluding a lot of women who
6 could have used talc for upwards of a decade or
7 two; correct?
8 MS. O'DELL: Objection to form.
9 THE WITNESS: Yes.
10 BY MS. DAVIDSON:
11 Q. And just to be clear, you would be
12 excluding women who could have used talc for a
13 decade or two before their tubal ligation; right?
14 A. Yes. From the time of their teenage
15 years until whenever they had their tubes tied.
16 Q. Okay. If we could go back to the Wu
17 paper.
18 A. I'm sorry, the Wu paper?
19 Q. Uh-huh. We were talking about -- on
20 the Wu paper, if we could go to Table 3.
21 A. Oh, I'm sorry, one second.
22 Q. Table 2, sorry. Table 2 of the Wu
23 paper --
24 A. Yes.
25 Q. -- which we're going to mark as

Daniel Clarke-Pearson, M.D.

Page 162

1  Exhibit 15 because I never marked Wu.
2       (Exhibit 15 marked for identification.)
3       For women who used talc greater than 10
4  but less than 30 times a month, is the
5  statistical -- is the association identified by Wu
6  statistically significant?
7       MS. O'DELL: Objection, form. 20
8       years, greater than 10, less than 30 times a
9       month, is that the line? Thank you.
10      THE WITNESS: I'm sorry. Your question
11      was was that statistically significant?
12  BY MS. DAVIDSON:
13      Q. Correct.
14      A. And the answer is, no, it overlaps one.
15      Q. Of all the associations listed here for
16  different periods of use, how many are
17  statistically significant?
18      A. So greater than 20 years and greater
19  than 30 times per month is statistically
20  significant.
21      Q. So only one is statistically
22  significant; correct?
23      A. If you go up to --
24      Q. I just mean in this section. In this
25  section that looks at frequency and duration.

Page 163

1       A. Just frequency and duration, not the
2  lines above it?
3       Q. Correct.
4       A. Yes. Then that's -- one second. Well,
5  then if you go down, they're statistically
6  significant increased greater than 200 times per
7  month -- or per year.
8       Q. I'm looking at --
9       MS. O'DELL: Please don't interrupt.
10      Jessica, it may be difficult to understand
11      Doctor. If you're not hearing him, let us
12      know, but he wasn't finished with his
13      answer. And if you'd kindly let him finish,
14      I think the record will be clear.
15  BY MS. DAVIDSON:
16      Q. Dr. Clarke-Pearson, I'm just talking
17  about the subsection that says frequency and
18  duration of talc use, not total times. If you just
19  look at the subsection entitled "frequency and
20  duration of talc use," there are one, two, three,
21  four, five -- there are six point estimates there;
22  correct?
23      A. Yes.
24      Q. And one, two -- and four of those six
25  involve use of at least two times per week because

Page 164

1  four of those six involve use of greater than ten
2  times per month: The second one, the third one,
3  the fifth one, and the sixth one. There are --
4  yeah, Asher, it would be great if you highlight
5  them. So --
6       MS. O'DELL: Finished with your
7       question?
8       MS. DAVIDSON: Yeah, okay.
9       MS. O'DELL: Object to form.
10  BY MS. DAVIDSON:
11      Q. So if you see the four that are
12  highlighted, we've highlighted the four point
13  estimates from Wu that involve use on average of
14  more than two days per week; correct?
15      A. Yes.
16      Q. And of those four, only one is
17  statistically significant; correct?
18      A. Yes.
19      Q. And of those four, the one with the
20  highest relative risk is the one that was used by
21  Woolen in her paper; correct?
22      A. I believe so.
23      Q. Okay. Thank you. You can take that
24  down.
25      Is there a scientific definition for

Page 165

1  frequent use of talc?
2       MS. O'DELL: Objection to form.
3       Asher, if you would please put Wu in
4       the chat, I would appreciate it. Thank you.
5       THE WITNESS: To answer your question,
6       Ms. Davidson, I'm not aware of any specific
7       definition of what was -- I'm sorry, what
8       was your term, "frequent use"?
9  BY MS. DAVIDSON:
10      Q. Yeah. That was a subjective decision
11  by the authors how to define frequent use; correct?
12      MS. O'DELL: Objection.
13      THE WITNESS: Yes, I have no problem
14      with that at all.
15  BY MS. DAVIDSON:
16      Q. I'm just asking you, was that a
17  subjective decision by the authors?
18      I'm not asking whether you had a
19  problem with it.
20      MS. O'DELL: Objection to form.
21      THE WITNESS: Yes, that's a decision by
22      the authors.
23  BY MS. DAVIDSON:
24      Q. Thank you. And nowhere in their paper
25  do they explain how they came to that decision;

Daniel Clarke-Pearson, M.D.

Page 166

1  correct?
2      A.  Not that I'm aware of.  A reviewer
3  might have asked them to do that if they felt that
4  was important.
5      Q.  Do you know how much the sample size
6  would have increased if the authors had not limited
7  the NHS1 data to patent women?
8      A.  No, I don't.
9      Q.  Do you know if it would have doubled?
10      A.  I don't know.
11      Q.  Do you know if it would have tripled?
12      MS. O'DELL:  Doctor, just let us know
13      when you get --
14      THE WITNESS:  I would have to go back
15      to the original O'Brien paper to answer your
16      question.
17  BY MS. DAVIDSON:
18      Q.  What's NCI PDQ?
19      A.  What is it?
20      Q.  Uh-huh.
21      A.  It's a publication that the NCI puts
22  out for information, as my recollection is they
23  have a version for lay people and a version for
24  physicians.
25      Q.  Do you know if the NCI -- when is the

Page 167

1  last time you looked at the NCI PDQ?
2      A.  Probably whichever.
3      Q.  When is the last time you looked at NCI
4  PDQ with respect to ovarian cancer?
5      A.  Yesterday.
6      Q.  Do you recall whether it addresses
7  Woolen?
8      A.  I would have to look and see.  They
9  have references.  It's not all-inclusive.
10      Q.  But you don't recall even though you
11  looked at it yesterday whether it addresses Woolen?
12      A.  So it has 14 references, and Woolen is
13  not in there, no.  It didn't cite Penocolappy there
14  either, so --
15      Q.  I'm confused.  Dr. Clarke-Pearson,
16  because this deposition is on Zoom, I've asked you
17  multiple times, I'm asking you again, if you are
18  looking at a document that is not up on the screen,
19  you need to let me know.
20      A.  I wasn't aware that was a rule.  I've
21  got --
22      Q.  I asked you before.
23      A.  I'm sorry, I missed it.
24  BY MS. DAVIDSON:
25      Q.  Are you looking at a document now --

Page 168

1  are you looking at a document now to respond to my
2  question?
3      MS. O'DELL:  Just a moment, please.
4      Dr. Clarke-Pearson is free to look at what
5      he would like to to respond to the
6      questions.
7      MS. DAVIDSON:  And I'm free to know
8      what he is looking at.
9      MS. O'DELL:  And he's telling you,
10      Jessica.
11      MS. DAVIDSON:  He didn't -- I didn't --
12      MS. O'DELL:  Excuse me, number one,
13      please don't interrupt me.  Number two,
14      please be respectful of Dr. Clarke-Pearson
15      who has been most courteous despite the tone
16      of your questions.  So let's just proceed.
17      If you've got a question about -- he's here
18      and available to answer them.
19      MS. DAVIDSON:  Thank you, Leigh, for
20      your colloquy.
21      MS. O'DELL:  You're welcome.
22  BY MS. DAVIDSON:
23      Q.  Dr. Clarke-Pearson, I was asking you
24  whether the NCI PDQ references Woolen, and it
25  sounded like you were looking at something.  What

Page 169

1  were you looking at?
2      A.  I'll hold it up in front of the screen
3  for you.  It's the NCI PDQ.
4      Q.  Okay.  And is that the version you
5  looked at yesterday?
6      A.  Yes.
7      Q.  Okay.  Can we mark as Tab 10 the NCI --
8  I'm sorry, as Exhibit 16 the NCI PDQ on ovarian
9  cancer?
10      (Exhibit 16 marked for identification.)
11      MS. DAVIDSON:  Can you go to the top,
12      please, Asher.
13  BY MS. DAVIDSON:
14      Q.  Dr. Clarke-Pearson, is this the same
15  NCI PDQ document that you looked at yesterday?
16      A.  I believe it is.  At the top of mine,
17  it says October 4, 2023.
18      Q.  Okay.  If we could move down to where
19  it references, ours is October 16, 2023.  So is
20  that different from the one you looked at?
21      MS. O'DELL:  Is that on page 27, Asher,
22      just so we can follow along?
23      MS. DAVIDSON:  I can't hear you, Leigh.
24      MS. O'DELL:  Is that on page 22 -- or
25      27 so we can follow along with where you

Page 170

1  are.
2      MS. DAVIDSON:  I'm trying to determine
3  if Dr. Clarke-Pearson is looking at the same
4  document that's on the screen.  Do we know
5  the answer to that?
6      MS. O'DELL:  He can answer.  I believe
7  that to be the case.  But he's got it in
8  front of him.
9      THE WITNESS:  Everything I see so far
10  looks like what I have in front of me.
11  BY MS. DAVIDSON:
12      Q.  Okay.  If we could go to the sentence
13  that begins the meta-analysis.
14      Asher, are you going to use your new
15  highlighting skills?
16      "A meta-analysis of ten case-control
17  studies," can you highlight that, Asher?  It
18  disappeared.  I don't know what happened.
19  Technical glitch.
20      MR. TRANGLE:  I can't highlight it.
21  It's like a printed document.
22  BY MS. DAVIDSON:
23      Q.  Just point to where the sentence is.
24      You see where it says, "A meta-analysis
25  of ten case-control studies in a highly selected

Page 171

1  subset analysis of one prospective cohort study
2  found in association among women who use perineal
3  talc at least twice a week."  And then it's
4  followed by footnote 10?
5      Do you see that on the screen, Doctor?
6  I think it would be easier if you looked on the
7  screen.
8      A.  Okay.  I'll look at the screen.  So a
9  meta-analysis 16 study --
10      Q.  No.  The third sentence of that
11  paragraph.
12      A.  The -- show me which sentence.
13      MS. DAVIDSON:  Right there, Asher.
14  Asher, there is a way to highlight something
15  like this.  Please on our next break ask
16  someone.
17      THE WITNESS:  A meta-analysis of ten
18  case-control studies, is that where you are?
19  BY MS. DAVIDSON:
20      Q.  Uh-huh.
21      A.  I see the arrow now.  "And a highly
22  selected subset analysis of one prospective cohort
23  study found an association, operation 1.4 to 7
24  statistically significant by a woman who used
25  perineal talc at least twice a week."

Page 172

1      Q.  Followed by footnote 10?
2      A.  10, uh-huh.
3      Q.  What does footnote 10 refer to?
4      A.  You'll have to show me.
5      Q.  Oh, okay.
6      A.  I would presume it's Woolen, but I'm
7  not sure.
8      Q.  That is correct.  Does this change your
9  testimony as to whether the NCI PDQ addresses
10  Woolen?
11      A.  Yes, it changes my testimony.  This PDQ
12  version does include Woolen.
13      Q.  And the one you looked at yesterday
14  does not?
15      A.  Apparently not.
16      Q.  Can you look at footnote 10 of the one
17  you looked at yesterday and tell me if it addresses
18  Woolen?
19      A.  I'm sorry.  Ask the question again.
20      Q.  Can you look at the hard copy of the
21  one you looked at yesterday and see if there was a
22  footnote 10 addressing Woolen?
23      A.  Actually, it is here.  I'm sorry.
24      Q.  Okay.  So we are looking at the same
25  one and there was just a mistake?

Page 173

1      A.  Yes.  My oversight.
2      Q.  Okay.  Let's go back to the top where
3  we were talking about Woolen.
4      "The authors refer to a highly
5  selective subset analysis of one prospective cohort
6  study."
7      What are they referring to there?
8      A.  Once again, they're talking about
9  Woolen.
10      Q.  When the authors say "a highly selected
11  subset of one prospective cohort study," what does
12  that refer to?
13      A.  That's the interpretation of whoever
14  wrote this PDQ.
15      Q.  It says, "A meta-analysis of ten
16  case-control studies and a highly selected subset
17  analysis of one prospective cohort study."
18      What does that phrase "a highly
19  selected subset analysis of one prospective cohort
20  study" refer to?
21      A.  Refers to Woolen, just like I said.
22      Q.  Woolen is the highly selected subset
23  analysis of one prospective cohort study?
24      MS. O'DELL:  Objection to form.
25      THE WITNESS:  Yes, because the

Page 174

1  meta-analysis, the ten case-control studies
2  wouldn't include Woolen because Woolen
3  doesn't include only case-control study, it
4  includes the cohort study as well.
5  BY MS. DAVIDSON:
6  Q.  Which prospective cohort study is this
7  phrase referring to?
8  A.  Prospective cohort study would be the
9  data from O'Brien that's included in the Woolen
10  study.
11  Q.  Why does NCI state that it's a highly
12  selected subset analysis?
13  A.  I'm not sure why they use those terms.
14  It's a subset analysis that's been performed.  It
15  went through a peer-reviewed process.  It was
16  published in a reputable journal.
17  Q.  The authors go on to state, "The subset
18  analysis of the prospective study was inconsistent
19  with the main findings of the original report."
20     Do you see that sentence?
21  A.  Yes.
22  Q.  What does that refer to?
23  A.  It was referring back to whatever
24  number 11 is, which is the O'Brien study --
25  Q.  Can we go back up, Asher.

Page 175

1  A.  -- in 2020.
2  Q.  So what do the authors mean by --
3     MS. DAVIDSON:  Asher, something weird
4  has happened.  Can you go back to the paragraph we
5  were on?
6  BY MS. DAVIDSON:
7  Q.  What did the authors mean when they
8  say, "the subset analysis of the prospective study
9  was inconsistent with the main findings of the
10  original report"?
11  A.  The data that's in the -- in Woolen is
12  different than the data that was in the original
13  O'Brien.  So 10 has different data than 11, those
14  references.
15  Q.  And what is inconsistent?
16     MS. O'DELL:  Objection to form.
17     THE WITNESS:  I'm sorry, what did what
18  consist of?
19  BY MS. DAVIDSON:
20  Q.  What do the authors mean?  Can you tell
21  me what's inconsistent?  How is the subset analysis
22  inconsistent with the main findings of O'Brien?
23  A.  Well, that's the authors'
24  interpretation.  I wouldn't say it's inconsistent.
25  They are two different data sets.  And O'Brien

Page 176

1  submitted to Woolen data from the original nurse's
2  health study that specifically addressed frequency
3  of use in patients with patent tubes.  So it's not
4  inconsistent, it's just different.
5  Q.  The author says it's inconsistent with
6  the main findings of the original report.  What
7  were the main findings of O'Brien 2020?
8     MS. O'DELL:  Objection.
9     THE WITNESS:  I'd have to look at
10  O'Brien 2020, but I think there was an
11  increased risk of talcum powder -- increased
12  risk of ovarian cancer in patients that used
13  talcum powder that had patent tubes.
14  BY MS. DAVIDSON:
15  Q.  Was that the main finding of the
16  report?
17     MS. O'DELL:  Objection to form.
18     THE WITNESS:  That's my recollection.
19  BY MS. DAVIDSON:
20  Q.  "Because of the structure of this
21  analysis, the results should be interpreted with
22  care."  What do the authors mean by that?
23  A.  I think all interpretations should be
24  undertaken with care.  They're just advising take a
25  look at it.

Page 177

1  Q.  Based on this discussion, has Woolen
2  changed the NCI PDQ's views about the potential
3  relationship between talc and ovarian cancer?
4  A.  Apparently, it hasn't changed NIH's NCI
5  view.  Clearly, it's an incomplete analysis by NIH.
6  They have many references that are missing.  They
7  didn't do their own meta-analysis of their own
8  evaluation.  They're citing some papers in a
9  meta-analysis.
10  Q.  Have you ever reached out to NCI or NIH
11  to share your views about talc and ovarian cancer?
12  A.  No, I have not.
13  Q.  Have you ever reached out to O'Brien or
14  Wentzensen to share your views about talc or
15  ovarian cancer?
16  A.  No.
17  Q.  Do you have any reason to doubt the
18  ability of O'Brien and Wentzensen as scientists or
19  epidemiologists?
20     MS. O'DELL:  Object to the form.
21     THE WITNESS:  I think there's a number
22  of comments that have been published in a
23  letter to the editor outlining a number of
24  criticisms about that publication.
25  BY MS. DAVIDSON:

Page 178

1    Q.  Have any of the letters that have been
2   published criticizing O'Brien and Wentzensen been
3   written by someone who is not a plaintiffs' expert
4   in the litigation?
5        MS. O'DELL:  Object to the form.
6        THE WITNESS:  I know that Dr. Cramer
7   who's a plaintiffs' expert has written a
8   fairly lengthy letter to the editor that
9   outlines a number of issues that he would
10   contend are incorrect and should be changed
11   and altered in the interpretation.  I think
12   there are other authors that have authored
13   other papers.  I'm not aware of their names
14   and whether they're involved with
15   plaintiffs' legal actions or not.
16  BY MS. DAVIDSON:
17   Q.  Would it surprise you to know that
18   nobody has written a letter to the editor with
19   respect to O'Brien and Wentzensen who is not a
20   plaintiffs' expert in this litigation?
21        MS. O'DELL:  Objection.  Asked and
22   answered.
23        THE WITNESS:  I would just have to see
24   all the letters.
25  BY MS. DAVIDSON:

Page 179

1    Q.  I see.  Are you aware sitting here
2   today of anybody who's not a plaintiffs' expert in
3   the litigation who has written a letter with
4   respect to O'Brien or Wentzensen's publications?
5        MS. O'DELL:  Object to form.  He stated
6   he doesn't know who's written the letter or
7   whether they're in litigation or not.
8        MS. DAVIDSON:  Leigh, you have just
9   coached the witness.  I appreciate it.  I'm
10   sure the witness appreciates it.  Please
11   stop doing it.
12  BY MS. DAVIDSON:
13   Q.  Dr. Clarke-Pearson, sitting here today,
14   are you aware of anyone who is not an expert for
15   plaintiffs in talc litigation who has written any
16   letters involving any publications about talc by
17   O'Brien and Wentzensen?
18        MS. O'DELL:  Objection to form.
19        THE WITNESS:  As I said before, I would
20   have to go back and look at what's been
21   published in letter to the editor before I
22   could answer your question.
23  BY MS. DAVIDSON:
24   Q.  Do you have any views about Dr. O'Brien
25   or Dr. Wentzensen's abilities as a scientist?

Page 180

1    A.  As scientist, I think none of us are
2   perfect.
3    Q.  Hmm?
4    A.  I said none of us are perfect.  And I'm
5   sure they're not either.
6    Q.  Do you know anything about either
7   Dr. O'Brien or Dr. Wentzensen's professional
8   reputation?
9    A.  I don't.  I think I said already I
10   didn't know anything about them.
11   Q.  Are you aware that a federal court
12   excluded Dr. Smith-Bindman's meta-analysis in a
13   talc case -- that a state court excluded
14   Dr. Smith-Bindman's meta-analysis in a talc case?
15        MS. O'DELL:  Objection.
16        THE WITNESS:  I was not aware of that,
17   no.
18  BY MS. DAVIDSON:
19   Q.  Since you're not aware of that, I take
20   it you didn't review that opinion?
21        MS. O'DELL:  Object to the form.
22        THE WITNESS:  I didn't know there was
23   an opinion.
24  BY MS. DAVIDSON:
25   Q.  Are you familiar with Dr. McTiernan?

Page 181

1    A.  Yes.
2    Q.  Who's she?
3    A.  She is an epidemiologist.
4    Q.  Does your view that no scientist is
5   perfect extend to Dr. Saed and Dr. Smith-Bindman as
6   well?
7        MS. O'DELL:  I'm sorry, I didn't hear
8   that question.  Would you please repeat it?
9        MS. DAVIDSON:  Court reporter.
10  (The reporter read back the last question.)
11        THE WITNESS:  Yes, I just said that all
12   of us -- none of us are perfect.
13  BY MS. DAVIDSON:
14   Q.  Can you point to any flaws in
15   Dr. Saed's paper, Harper 2023?
16   A.  Can I point to any what?
17   Q.  Flaws.
18        MS. O'DELL:  Object to form.
19        THE WITNESS:  Flaws?
20  BY MS. DAVIDSON:
21   Q.  Uh-huh.
22   A.  Not at this point in time, no.
23   Q.  Can you point to any flaws in Woolen?
24        MS. O'DELL:  Object to form.
25        THE WITNESS:  No.  There are

Page 182

1   limitations that are cited by the authors in
2   their papers.  I don't call those flaws.
3   BY MS. DAVIDSON:
4       Q.  You included a forest plot in your
5   amended expert report; is that correct?
6       A.  I did.
7       Q.  How did you get that forest plot?
8       A.  It was supplied by Dr. McTiernan.  It
9   was an updated forest plot similar to, but updated
10  from the one I've used in a previous report.
11      Q.  Who provided it to you?
12      A.  My attorney.
13      Q.  Did you independently examine the
14  forest plot for accuracy before putting it in your
15  report?
16      A.  I reviewed it.  I didn't go case by --
17  paper by paper to relook at the numbers.
18      Q.  Did you check if it was missing any
19  studies?
20      A.  I'm sorry?
21      Q.  Did you check if it was missing any
22  studies?
23      A.  I think at the date and time when I
24  received it, which I don't recall exactly, I
25  thought it was up to date.

Page 183

1       Q.  Are you aware that a federal court
2   excluded Dr. McTiernan's opinions as unreliable in
3   the Zantac litigation?
4       MS. O'DELL:  Object to form.
5       THE WITNESS:  No, I wasn't.
6   BY MS. DAVIDSON:
7       Q.  Are you aware that Dr. McTiernan has
8   testified that she followed the same scientific
9   methodology in Zantac as she did in talc?
10      MS. O'DELL:  Object to the form.
11      THE WITNESS:  I'm not aware of her
12  testimony.
13  BY MS. DAVIDSON:
14      Q.  Are you aware of any independent
15  scientists not retained by plaintiffs in this
16  litigation who has concluded that talc use causes
17  ovarian cancer?
18      A.  I'm sorry, who?
19      Q.  Are you aware of any independent
20  scientists not retained by plaintiffs in this
21  litigation who has concluded that talc use causes
22  ovarian cancer?
23      A.  Well, we can look at the forest plot
24  you're looking at right here and see a number of
25  the case-control studies that are all -- that are

Page 184

1   statistically significant.  Those, as I believe,
2   are all independent scientists that have published
3   those case-control studies.  And then we can go on
4   down to the meta-analysis, all of which are
5   statistically significant.  I'm not aware of any of
6   them being plaintiffs, defendants either.
7       Q.  Did any of those authors state that
8   their studies -- did any of those authors state in
9   their papers that they've concluded that talc use
10  causes ovarian cancer?
11      A.  I think they showed a statistical
12  significant increased risk of developing ovarian
13  cancer because of the use of talcum powder.
14      Q.  That was not my question.
15      MS. O'DELL:  You cut him off, Jessica.
16      If you could just let him finish, please.
17  BY MS. DAVIDSON:
18      Q.  Dr. Clarke-Pearson, can you please
19  answer my question.  Are you aware of any
20  independent scientist not retained by plaintiffs in
21  this litigation who has stated that talc use can
22  cause ovarian cancer?
23      MS. O'DELL:  Object to the form.
24      THE WITNESS:  So the word you're using
25  is cause, is that where we're pivoting?

Page 185

1   BY MS. DAVIDSON:
2       Q.  Correct.
3       A.  I'm not sure -- I would have to reread
4   these papers to know whether they were somehow
5   screening those papers to see whether they use the
6   word "cause."  Clearly they come up with a finding
7   that is statistically associated with the
8   development of ovarian cancer which to me means
9   cause.
10      Q.  So is it your testimony that anytime
11  there's an association, that means cause?
12      MS. O'DELL:  Object to the form.
13      THE WITNESS:  No.
14  BY MS. DAVIDSON:
15      Q.  I think that's what you just said.  You
16  said statistically association which to me means
17  cause; correct?
18      A.  I think a lot of people would interpret
19  it as cause.
20      Q.  Again, sitting here today, you can't
21  identify a single independent scientist not
22  retained by plaintiffs in this litigation who has
23  stated that talc use causes ovarian cancer;
24  correct?
25      MS. O'DELL:  Object to the form.

Daniel Clarke-Pearson, M.D.

1    THE WITNESS:  Not that I can recall to
2    answer your question.
3    BY MS. DAVIDSON:
4    Q.   Are you aware of any published paper in
5    the scientific literature by an independent
6    scientist who is not a paid expert in this
7    litigation that concludes that talc use causes
8    ovarian cancer?
9         MS. O'DELL:  Object to form.  Asked and
10        answered.  It also retreads ground that was
11        previously covered in prior depositions.
12        And so if you have a question about a
13        specific paper that has been included in
14        Dr. Clarke-Pearson's report since July of
15        2021, you know, then I would ask you to
16        direct your questions to those publications,
17        not a re-review of everything he has looked
18        at over the course of this six-year
19        litigation.
20        MS. DAVIDSON:  Leigh, this is an
21        ongoing effort by you to obstruct this
22        deposition.
23        MS. O'DELL:  It is not.  It is to state
24        my objection on the record.
25   BY MS. DAVIDSON:

1    Q.  I will keep my question.
2    Dr. Clarke-Pearson, sitting here today, are you
3    aware of any published literature -- any published
4    paper in this scientific literature by an
5    independent scientist who is not a paid expert in
6    this litigation that reaches the conclusion that
7    talc use causes ovarian cancer?
8    A.  Not aware of that, no.
9    Q.  Are you aware of a single scientific
10   body in the United States that has concluded that
11   talc use causes ovarian cancer?
12   A.  So a number of scientific bodies have
13   identified asbestos as causing ovarian cancer.  We
14   know that asbestos is in ovarian cancer in
15   Johnson's Baby Powder.  So in many ways I view baby
16   powder with asbestos as a carcinogen that causes
17   ovarian cancer.
18   Q.  Do you have --
19   A.  So there are a number of scientific
20   organizations that have identified asbestos as
21   causing ovarian cancer, including IARC, EPA, and
22   others.
23   Q.  Are you aware of a single scientific
24   body in the United States that has stated that
25   cosmetic talc use causes ovarian cancer?

1    MS. O'DELL:  Object to the form.  Asked
2    and answered.
3         THE WITNESS:  I will go to IARC, for
4    one, that says that the source of talc
5    outside of mining and industrial exposure is
6    most likely secondary to cosmetic exposure.
7    BY MS. DAVIDSON:
8    Q.   Again, I'm going to ask the question,
9    are you aware of a single scientific body in the
10   United States that has stated that cosmetic talc
11   use causes ovarian cancer?
12        MS. O'DELL:  Objection, form.  Asked
13        and answered.
14        THE WITNESS:  Cosmetic talc Johnson's
15        Baby Powder has asbestos in it.  Asbestos
16        causes ovarian cancer.  Many organizations
17        at the highest level of our government and
18        scientific community have identified
19        asbestos as causing ovarian cancer.
20   BY MS. DAVIDSON:
21   Q.   Can you identify a single scientific
22   body in the United States that has stated cosmetic
23   talc use causes ovarian cancer?
24        MS. O'DELL:  Objection to form.  The
25        question was just asked.  Dr. Clarke-Pearson

1    gave his answer.  Dr. Clarke-Pearson, you're
2    welcome to respond again, but if you -- if
3    it's the same answer you've previously
4    given, you can say that.
5         MS. DAVIDSON:  Leigh, you're continuing
6    your pattern of obstructing this deposition
7    and coaching the witness.
8    BY MS. DAVIDSON:
9    Q.   Dr. Clarke-Pearson, with all due
10   respect, you are not answering the question I
11   asked.
12        My question is whether there is any
13   United States scientific body -- any scientific
14   body in the United States that has stated that
15   cosmetic talc use causes ovarian cancer?
16        MS. O'DELL:  Objection to form.  Asked
17        and answered.
18        Please do not badger Dr. Clarke-Pearson
19        or be disrespectful.
20        THE WITNESS:  If you're focusing only
21        on the term "talc," then I'm not aware of
22        that.  But talc has asbestos in it.
23   BY MS. DAVIDSON:
24   Q.   Dr. Clarke-Pearson, do you have an
25   opinion as to what percentage of Johnson's Baby

Page 190

1 Powder that's been sold in this country contained
2 asbestos?
3     A.  Relying on Dr. Longo's analysis, it's
4 more likely than not and in some cases, for example
5 Chinese talc, nearly all of it has at least fibrous
6 talc, if not other asbestos --
7     Q.  So it's your opinion --
8     A.  -- fibers.
9     Q.  Do you have an opinion as to what
10 percentage of Johnson's Baby Powder sold in the
11 United States over the last 50 years contains
12 asbestos?
13     MS. O'DELL:  Objection.  Asked and
14     answered.  You may respond.
15     THE WITNESS:  Dr. Longo's data goes
16     back and the sources of talcum powder for
17     Johnson's Baby Powder from three different
18     sources over three different time periods
19     that have different levels of talcum powder
20     as I read Dr. Longo's reports, all of which
21     are in excess of 50 percent.
22 BY MS. DAVIDSON:
23     Q.  Are all of your opinions about whether
24 or not Johnson's Baby Powder contains asbestos
25 based on Dr. Longo's report?

Page 191

1     A.  No.  The FDA found asbestos and
2 Johnson's Baby Powder brought it off the shelf.
3     Q.  How many lots of Johnson's Baby Powder
4 did the FDA find asbestos in?
5     A.  I think Johnson & Johnson took one lot
6 of 3,000 bottles off the shelf based on the
7 analysis.
8     Q.  FDA found asbestos in one lot of
9 Johnson's Baby Powder?
10     A.  Yes.
11     Q.  And was that a trace level or a
12 subtrace level?
13     MS. O'DELL:  Object to the form.
14     THE WITNESS:  I don't know how to
15     define a trace level.
16 BY MS. DAVIDSON:
17     Q.  And that's because you're not an expert
18 on asbestos; right?
19     MS. O'DELL:  Objection.
20     THE WITNESS:  I'm not sure what you
21     mean by -- I know what asbestos does to
22     women that have ovaries.
23 BY MS. DAVIDSON:
24     Q.  Dr. Clarke-Pearson, can you point me to
25 any epidemiological studies showing that the level

Page 192

1 of asbestos to which a woman is allegedly exposed
2 from talcum powder can cause ovarian cancer?
3     MS. O'DELL:  Objection to form.
4     Incomplete hypothetical.
5     THE WITNESS:  I'm unaware of any
6     threshold, if you will, or minimum amount of
7     asbestos that would or would not cause
8     ovarian cancer.
9 BY MS. DAVIDSON:
10     Q.  Is it your opinion that talcum powder
11 that does not contain asbestos causes ovarian
12 cancer?
13     A.  I'm not aware of any talcum powder
14 based on the data that I've seen that doesn't
15 contain asbestos.
16     Q.  If a woman were to use cosmetic talc
17 that doesn't contain asbestos, would she be at an
18 increased of ovarian cancer?
19     A.  I would think that the evidence shows
20 that if you make the hypothetical there's no
21 asbestos in it, then the talcum powder and all the
22 studies that have been done and, hypothetically,
23 that those patients were exposed, those women were
24 exposed to talcum powder that didn't have asbestos,
25 they still had a higher risk of ovarian cancer

Page 193

1 caused by talcum powder.
2     Q.  Do you believe that the mechanism by
3 which talcum powder can cause ovarian cancer is the
4 same for talcum powder that contains asbestos and
5 talcum powder that doesn't contain asbestos?
6     MS. O'DELL:  Objection to the question.
7     This is retreading ground that was covered
8     in -- I believe it was January or
9     February 2019 almost completely, and
10     Dr. Clarke-Pearson's already answered the
11     questions.
12     MS. DAVIDSON:  Court reporter, can you
13     please repeat the question.
14     Doctor, because Ms. O'Dell interrupts
15     every questions, it takes twice as long to
16     ask every question.
17     Court reporter, can you please --
18     MS. O'DELL:  That's incorrect.  But you
19     know that.  I'm just -- what you stated is
20     an error on the record.  Please ask your
21     question.
22     (The reporter read back the last question.)
23     THE WITNESS:  Yes.
24     MS. DAVIDSON:  Okay.  Let's go off the
25     record.

Page 194

1    (Recess taken from 1:23 p.m. until 1:25 p.m.)
2        MS. DAVIDSON:  So, number one, the
3    Court's order is very clear that case
4    specific experts will be deposed for -- I'm
5    going to read the order exactly.
6        MS. O'DELL:  Dr. Clarke-Pearson has
7    already been deposed for 14 hours --
8        MS. DAVIDSON:  Excuse me, you're like
9    literally interrupting me.  You're literally
10   interrupting me.
11       MS. O'DELL:  -- on his case specific
12   opinions and that occurred in August of --
13       MS. DAVIDSON:  You're interrupting me,
14   Leigh.  You literally interrupted me
15   mid-sentence.
16       MS. O'DELL:  Well --
17       MS. DAVIDSON:  According to order, as I
18   was saying before I was interrupted,
19   depositions of experts who address case
20   specific issues for individual plaintiffs in
21   addition to providing new or supplemental
22   reports on general causation shall be
23   limited to a total of one day, seven hours.
24   If the expert issues case specific reports
25   in three or more cases, in which case the

Page 195

1    deposition is limited to two days, 14 hours
2    of testimony time.
3        This order was issued several months
4    ago.  If you guys choose to be in violation
5    of the order, we will take it up with the
6    Court.  I would also like to point out,
7    Leigh --
8        MS. O'DELL:  Our position is, Jessica,
9    just to be clear, we are not in violation of
10   the order because Dr. Clarke-Pearson has
11   already sat for two days, seven hours each,
12   for his case specific opinions.  The purpose
13   of the deposition today was to examine him
14   on any new references or any new -- in his
15   report that was served November 2023 or any
16   new opinions that he might have.  He's been
17   available today.  That deposition is limited
18   to four hours.  That's how we understand the
19   order and that's how we're proceeding.
20       That's how we proceeded previously with
21   the depositions of these experts, including
22   last week.  So I just -- that's our
23   position.  We can agree to disagree.  But
24   today just so you're clear and you
25   understand, we've been on the record for

Page 196

1    3 hours and 39 minutes, and there's
2    21 minutes left.
3        MS. DAVIDSON:  I understand that you
4    have decided not to fulfill the Court's
5    order, and that's your prerogative.  We will
6    take it up with the Court and make very
7    clear to the Court that we read the ruling
8    into the record and you chose not to follow
9    it.
10       Leigh, I would also like to raise with
11   you before we get into this tomorrow that
12   Dr. Moorman, we were never served with her
13   2021 report, and so we are entitled to eight
14   hours, four hours on her 2021 report and
15   four hours on her 2023 report.
16       MS. O'DELL:  I'm going to let Michelle
17   respond to that.
18       MS. DAVIDSON:  Okay.  I'm going to give
19   you the heads up now.
20       MS. O'DELL:  We should be off the
21   record, though, for that.
22       MS. DAVIDSON:  We can go off the
23   record.
24       MS. O'DELL:  Before we do that, I would
25   just ask since we are going to stop at four

Page 197

1    hours today, can we proceed with the
2    remaining 21 minutes --
3        MS. DAVIDSON:  I need a break.
4        MS. O'DELL:  -- and then conclude.  You
5    need a break?  You're saying you need a
6    break.
7        MS. DAVIDSON:  I need a break.
8        MS. O'DELL:  If you cannot continue for
9    21 minutes --
10       MS. DAVIDSON:  I need a break.  I can
11   cut it short.
12       MS. O'DELL:  Then we will be available
13   in 15 minutes to -- I certainly want you to
14   have a break.  And then we'll come back in
15   15 minutes at 1:30 and you can finish.
16       MS. DAVIDSON:  It's 1:28.  It's 1:28.
17   1:30 would be in two minutes.
18       MS. O'DELL:  I'm sorry.  1:45 is what I
19   meant to say.
20    (Recess taken from 1:28 p.m. until 1:52 p.m.)
21   BY MS. DAVIDSON:
22       Q.  Dr. Clarke-Pearson, are you familiar
23   with talc pleurodesis?
24       A.  Yes.
25       Q.  You testified earlier that you believed

Page 198

1 that cosmetic talc is virtually all contaminated
2 with asbestos; correct?
3      A.  Yes.
4      Q.  Is that your opinion about
5 pharmaceutical grade talc as well?
6      A.  I don't have an opinion about
7 pharmaceutical grade talc.
8      Q.  Have you reviewed the literature on
9 talc pleurodesis?
10      A.  No.  I have not reviewed the
11 literature.  I'm familiar with the technique having
12 used it on patients that I've taken care of.
13      Q.  When you used that procedure on
14 patients that you've taken care of, do you believe
15 that you injected asbestos into their lungs?
16      MS. O'DELL:  Object to the form.
17      THE WITNESS:  I'm not sure what's in
18      the pharmaceutical grade of talc.
19 BY MS. DAVIDSON:
20      Q.  Has IARC addressed whether pleurodesis
21 can cause cancer?
22      MS. O'DELL:  Objection.  Form.
23      THE WITNESS:  I'm not familiar that
24      they have.  The IARC documents are quite
25      extensive, so I may have missed something.

Page 199

1 BY MS. DAVIDSON:
2      Q.  Do you know whether pharmaceutical
3 grade talc and cosmetic talc can come from the same
4 mines?
5      A.  I don't know.
6      Q.  Are you aware that the FDA tested talc
7 in 2010, 2019, 2021, and 2022, and on all of those
8 occasions found no asbestos?
9      MS. O'DELL:  Object to the form.
10      THE WITNESS:  I was not aware of that,
11      no.
12 BY MS. DAVIDSON:
13      Q.  Do you think the FDA was wrong in 2010
14 when it found no asbestos in cosmetic talc?
15      MS. O'DELL:  Object to the form.
16      THE WITNESS:  I have no opinion about
17      that.  I don't know how they -- to what
18      extent they tested it, what techniques they
19      used.  I don't know how many samples they
20      tested.  So I don't have an opinion about
21      that.
22 BY MS. DAVIDSON:
23      Q.  Do you have an opinion -- do you
24 believe the FDA was wrong in 2019 when it tested
25 cosmetic talc and found no asbestos?

Page 200

1      MS. DAVIDSON:  Objection.  Form.
2      THE WITNESS:  I can only believe what
3      the FDA reported.
4 BY MS. DAVIDSON:
5      Q.  Do you believe the FDA was wrong in
6 2021 when it tested cosmetic talc and found no
7 asbestos?
8      A.  I wasn't aware that there was testing
9 at that point in time.
10      Q.  Do you believe the FDA was wrong in
11 2022 when it tested cosmetic talc and found no
12 asbestos?
13      MS. O'DELL:  Objection.  Form.
14      THE WITNESS:  Once again, I wasn't
15      aware that they tested in 2022.
16 BY MS. DAVIDSON:
17      Q.  Are you surprised that the lawyers
18 didn't provide you with those testing results?
19      MS. O'DELL:  Objection.  Form.
20      THE WITNESS:  I didn't ask for that.
21      No.
22 BY MS. DAVIDSON:
23      Q.  Would it have been relevant to your
24 opinion to know that the FDA tested cosmetic talc
25 four times and didn't find asbestos?

Page 201

1      MS. O'DELL:  Objection to form.
2      THE WITNESS:  No.
3 BY MS. DAVIDSON:
4      Q.  That wouldn't be relevant to your
5 opinions?
6      A.  No.
7      Q.  Do Duke and UNC perform pleurodesis?
8      A.  Have I asked that to be done on my
9 patients?  Yes.
10      Q.  Have you ever suggested to Duke or to
11 UNC that they stopped performing pleurodesis
12 because of the risk of injecting asbestos into
13 patients?
14      A.  No.  Most of my patients that needed
15 pleurodesis were dying of ovarian cancer.  I was
16 trying to give them some relief from their
17 respiratory distress.
18      Q.  So it wouldn't have mattered to you if
19 that procedure put asbestos into someone's --
20      MS. O'DELL:  Objection to form.
21 BY MS. DAVIDSON:
22      Q.  -- lungs?
23      A.  I knew that their latency -- a latency
24 period for talc and -- could cause cancer was
25 years, and these women had months and days to live.

Daniel Clarke-Pearson, M.D.

Page 202

1  So, no, I didn't. It wasn't really a
2  consideration.
3      Q. Is it your opinion that pleurodesis
4  would be a proper procedure even if it injected
5  asbestos into people's lungs?
6          MS. O'DELL: Objection to form.
7          THE WITNESS: Depends upon the
8      circumstances.
9  BY MS. DAVIDSON:
10     Q. Have you ever told UNC or Duke that
11 you're concerned that the pleurodesis procedure is
12 injecting asbestos into people's lungs?
13         MS. O'DELL: Object to form.
14         THE WITNESS: I don't know that it's
15     injecting talc -- that the pleurodesis
16     injecting asbestos into the lungs.
17 BY MS. DAVIDSON:
18     Q. When --
19     A. I don't have any data on that topic.
20     Q. When did you come to the opinion that
21 most talc -- cosmetic talc contains asbestos?
22         MS. O'DELL: Objection.
23         THE WITNESS: When I started seeing
24     Dr. Longo's reports in particular.
25 BY MS. DAVIDSON:

Page 203

1      Q. As a scientist, you'd agree that your
2  job is to evaluate all the relevant evidence;
3  right?
4      A. Yes. That's part of the comprehensive
5  differential diagnosis. Go ahead.
6      Q. Are you aware that defendants have an
7  expert named Matt Sanchez from RJ Lee who has
8  rebutted Dr. Longo's reports?
9          MS. O'DELL: Objection to form.
10         THE WITNESS: Not aware -- I have not
11     seen or was not aware of another expert.
12 BY MS. DAVIDSON:
13     Q. Have you asked plaintiffs' lawyers to
14 give you all the relevant evidence about asbestos
15 testing?
16         MS. O'DELL: Objection to form.
17         THE WITNESS: I have not asked for
18     that.
19 BY MS. DAVIDSON:
20     Q. Would it have been relevant to your
21 opinion to review Mr. Sanchez's report --
22         MS. O'DELL: Objection.
23 BY MS. DAVIDSON:
24     Q. -- responding to Mr. Longo's testing
25 for asbestos?

Page 204

1          MS. O'DELL: Objection. Form.
2          THE WITNESS: It might have been
3      relevant. I wasn't aware that there was
4      anybody else offering opinions.
5  BY MS. DAVIDSON:
6      Q. You'd agree that if there's other
7  available science refuting Dr. Longo's -- or
8  rebutting Dr. Longo's opinions, that would be
9  relevant for you to review in reaching a conclusion
10 with respect to asbestos and talc; correct?
11         MS. O'DELL: Objection to form.
12     Misstates record.
13         THE WITNESS: Certainly.
14 BY MS. DAVIDSON:
15     Q. Dr. Clarke-Pearson, you attached to
16 your 11/15/2023 expert report an amended list of
17 materials considered; correct?
18     A. Yes.
19     Q. Was that a list you created or did the
20 lawyers create that for you?
21     A. They created it after we collaborated
22 and came up with a list of references that I was
23 using.
24     Q. Did you read all the documents that are
25 listed on that materials reviewed list?

Page 205

1      A. I have scanned many of them, looked at
2  their abstracts. Read some of them in quite
3  detail.
4      Q. How did you decide which -- when to
5  just read the abstract and when to read an article
6  in full?
7          MS. O'DELL: Let me just say two things
8      for the record. Jessica, one, are
9      you asking about the recently added
10     references? Because he's been examined at
11     length about the references that were -- or
12     materials that were included in his list in
13     his November 2018 report.
14         And then second, I want to make sure
15     that you had the updated list of materials
16     that were provided three days before
17     Dr. Clarke-Pearson's deposition.
18         MS. DAVIDSON: I would like to state
19     for the record that this is another example
20     of you obstructing and filibustering the
21     deposition because my question very clearly
22     referred to the 11/15/2023 reliance list.
23         MS. O'DELL: And you asked him a global
24     question about everything on the list. He's
25     previously been asked that question and he's

Page 206

1  testified to it. And as you know, this is a
2  update deposition. This is not a retread of
3  everything.
4       And, second, I'm just asking did you
5  receive in the Dropbox the updated materials
6  list? I just wanted to make sure we were
7  communicating and Dr. Clarke-Pearson had in
8  front of him the list that you're talking
9  about.
10      MS. DAVIDSON: It is now 2:00. I will
11  put the list up after your hearing. But I
12  will not end this deposition in the middle
13  of a question. So I need an answer to this
14  question that's pending before we take our
15  break for your hearing.
16  BY MS. DAVIDSON:
17      Q. Dr. Clarke-Pearson, did you -- how did
18  you decide -- with respect to the materials on your
19  amended reliance list, how did you decide when to
20  read an article in full or when to just read the
21  abstract?
22      A. Good question. First of all, when I
23  did my search, I would look at the title and see if
24  it was at all relevant to what I was looking for.
25  And then if it was, then I would open that document

Page 207

1  up, usually PubMed, and the scan can go straight to
2  them in the abstract. And if it was something that
3  I wanted more detail on, give you the whole paper.
4       MS. DAVIDSON: Okay. It's 2:00. I
5  know you guys have a hearing. So we'll
6  reconvene when I hear from you. Thank you.
7  (Recess taken from 2:01 p.m. until 3:43 p.m.)
8  BY MS. DAVIDSON:
9      Q. Dr. Clarke-Pearson, how did you
10  identify the new studies that are listed on your
11  supplemental reliance list?
12      A. Well, a combination. I think we talked
13  about searching PubMed in particular, and actually
14  I use Google once in a while, to search for key
15  words, talc being a keyword. Ovarian cancer and
16  talc being a combination that I would use on
17  PubMed. So identified a number that way as time
18  goes on -- as time has gone on since the last
19  deposition. I've also been sent references, papers
20  from Ms. O'Dell.
21      Q. Is there a way for me to know which
22  items on your second amended reliance list you
23  found on your own and which were sent to you by
24  Ms. O'Dell?
25      A. Oh, man, I've looked at them for so

Page 208

1  many times, I can't tell you where -- who
2  identified which. Sorry.
3      Q. You testified in 2021 that you're not
4  relying on company documents to support your
5  opinions; is that correct?
6      MS. O'DELL: Object to the form.
7      THE WITNESS: Yes, that's correct.
8  BY MS. DAVIDSON:
9      Q. Is that still the case?
10      A. Yes.
11      MS. O'DELL: Object to form.
12  BY MS. DAVIDSON:
13      Q. Did you add any company documents to
14  your second amended reliance list?
15      A. I don't recall.
16      Q. If you could look at Item 121. Let's
17  put that up on the screen, Asher. We're marking
18  your second supplemental reliance list as
19  Exhibit 17 and let's go to Item 121.
20      MR. TRANGLE: 121, okay.
21      (Exhibit 17 marked for identification.)
22  BY MS. DAVIDSON:
23      Q. And at 121 says JNJTALC001465273. Do
24  you recall adding that to your supplemental
25  reliance list?

Page 209

1      A. I -- I don't, no.
2      MS. O'DELL: If you're identifying --
3  excuse me, if you're identifying something
4  by Bates Number, which obviously there are
5  hundreds of combinations of Bates numbers
6  which would be difficult for anyone to
7  remember much less in relation to all of the
8  things that Dr. Clarke-Pearson has reviewed.
9  If there's a specific document you want to
10  ask him about, just if you could pull it up
11  and he could identify it by something other
12  than a Bates Number.
13      MS. DAVIDSON: Well, Leigh, I have
14  asked multiple times today --
15      MS. O'DELL: It seems to be a very
16  unfair way to try to identify a document for
17  him.
18      MS. DAVIDSON: Leigh, I've asked you
19  multiple times today to please keep your
20  objections to objection to form. Your
21  testimony is not called for here. You're
22  not the witness. And it is inappropriate
23  under federal law that you continue to try
24  to testify and tell the witness what to say.
25  BY MS. DAVIDSON:

Page 210

1    Q.   Dr. Clarke-Pearson, correct that you
2 stated that you don't recall what this document is;
3 right?
4    A.   I don't even what -- you're talking
5 about Document 121.
6    Q.   121, yes.
7    A.   Yes, I don't know what that is.
8         MS. DAVIDSON:  Asher, could you please
9    mark as Exhibit 18 document Bates Number
10   JNJTALC001465273 which is a March 17, 2020,
11   comprehensive review.
12        (Exhibit 18 marked for identification.)
13 BY MS. DAVIDSON:
14   Q.   Dr. Clarke-Pearson, do you recall this
15 document now that it's in front of you?
16   A.   I just see a title so far on the
17 document.
18   Q.   Is the title familiar to you?
19        MS. O'DELL:  I think if you -- I would
20   request that you put it in the chat so
21   Dr. Clarke-Pearson can see the document.
22 BY MS. DAVIDSON:
23   Q.   Is this title familiar to you,
24 Dr. Clarke-Pearson?
25   A.   Vaguely.  Am I not allowed to see the

Page 211

1 document?
2    Q.   You absolutely can.
3    A.   Okay.  Bring it on.
4         MS. DAVIDSON:  Asher, you want to go to
5    the next page.  It's a big document.
6         MR. TRANGLE:  It's taking a while to
7    upload to the chat, but it should be added.
8 BY MS. DAVIDSON:
9    Q.   It's 255 pages, so we obviously can't
10 show that all to you.  But if you could go to the
11 next page, perhaps this will refresh
12 Dr. Clarke-Pearson's recollection.
13        Does this refresh your recollection
14 Dr. Clarke-Pearson, as to whether you've reviewed
15 this entire document?
16   A.   I'm sorry, I don't recall this
17 document.
18   Q.   Do you know how you -- do you know how
19 you received this document?
20   A.   I believe it would be through my
21 attorneys.
22   Q.   Did they -- did you ask them for this
23 document or did they provide it to you without
24 being asked?
25   A.   I think they provided it to me.

Page 212

1    Q.   Are you relying on this document in
2 forming your opinions?
3    A.   No.
4    Q.   Okay.  Dr. Clarke-Pearson, if we could
5 go back to your expert report, page 13.
6    A.   Yes.
7    Q.   To your -- the section of your report
8 on the dose response.  If you could put that up on
9 the screen, Asher.
10        Do the Emi Mandarino papers talk about
11 dose response?
12   A.   Talk about dose response in terms of
13 the cell biology modification by exposure to
14 different doses of talcum, yes.
15   Q.   Did Emi involve multiple exposure
16 metrics?
17   A.   I believe it did.  I'd have to go back
18 and take a look at it.
19   Q.   If Emi did not involve multiple
20 exposure metrics, would it be relevant to
21 biological gradient or dose response?
22        MS. O'DELL:  Objection.
23        THE WITNESS:  Is that a hypothetical
24   question?
25 BY MS. DAVIDSON:

Page 213

1    Q.   You can answer it as a hypothetical if
2 you don't know the answer to whether Emi involved a
3 single short-term exposure or a different exposure
4 dosages, sure.
5    A.   May I look at Emi for a minute?
6    Q.   Sure.
7    A.   Thank you.
8    Q.   If you'd like, I can -- if we could put
9 Emi page 1068 up on the screen after footnote 40.
10        Can you see that sentence that says,
11 "We believe we are the first to show."
12        "We believe we are the first to show
13 that a single short-term exposure in vitro to
14 particles can be linked to epigenome-wide DNA
15 methylation changes."
16        Do you see that?
17   A.   Yes, I do.
18   Q.   Does a single short-term exposure tell
19 you anything about dose response?
20   A.   Shows about exposure, doesn't show
21 about dose.
22   Q.   Do you know why you cited Emi under
23 your dose response section of your supplemental
24 report?
25   A.   Yes.  I believe if you look at

Daniel Clarke-Pearson, M.D.

Page 214

1  Figure 5, you'll see a bar graph that shows dose
2  response.
3      Q.   Is that relevant to your Bradford Hill
4  analysis which relates to epidemiology?
5          MS. O'DELL:  Object to form.
6          THE WITNESS:  The question you're
7      asking me has to do with the dose response
8      and the experimental -- in an experiment
9      that uses talc.
10 BY MS. DAVIDSON:
11     Q.   In the Bradford Hill criteria, does the
12 dose response biological gradient consideration go
13 to experimental studies or does it go to
14 epidemiological studies?
15     A.   Well, as I have my title in my report
16 here, it's biologic gradient/dose response, which I
17 interpret to go beyond just talking about dose
18 response in humans to looking at issues that
19 overlap with experiment which is also in the
20 Bradford Hill criteria.
21     Q.   So do the Bradford Hill criteria
22 suggest that under dose response you should
23 consider experimental evidence, or is there a
24 separate consideration for experimental evidence?
25         MS. O'DELL:  Object to form.

Page 215

1          THE WITNESS:  I think that there's a
2      separate issue that -- a separate criteria
3      in Bradford Hill, as I understand it, that
4      talks about experiments.  So doing
5      experiments support the impact, the
6      causation of talcum powder causing ovarian
7      cancer.  Those are experiments in the
8      laboratory -- in those laboratory
9      experiments, there is a gradient and dose
10     response in these studies.  So I included it
11     in both places.
12 BY MS. DAVIDSON:
13     Q.   Okay.  Asher, can you go back to
14 Figure 5.
15         Can you show me, Dr. Clarke-Pearson, on
16 Figure 5 where it would suggest that there were
17 different amounts of talc?
18     A.   Well, I can't do that for you right
19 now.  Maybe -- maybe I'm quoting the wrong figure.
20 Maybe it's Figure 6 is probably the one that we
21 should look at.
22     Q.   So looking at Figure 5, which you
23 identified earlier, that does not show different
24 amounts of talc; correct?
25     A.   I think I was mistaken.  It's actually

Page 216

1  Figure 6.
2      Q.   Can you explain to me how Figure 6
3  shows different amounts of talc?
4      A.   I guess it's the effect of estrogen.
5  I'm mistaken.  I'm sorry.
6      Q.   Again, does the Emi paper support your
7  opinion that there's a dose dependent effect of
8  talcum powder on molecular changes associated with
9  carcinogenesis?
10         MS. O'DELL:  I'm sorry, would you mind
11     repeating the last bit, Jessica, you trailed
12     off.
13         MS. DAVIDSON:  Court reporter, did you
14     get it.
15     (The reporter read back the last question.)
16         THE WITNESS:  Give me one moment.  I
17     would like to look at the Harper paper
18     again.
19 BY MS. DAVIDSON:
20     Q.   We're talking about the Emi paper, not
21 the Harper paper.
22     A.   You asked if there's any paper.
23     Q.   I said does the Emi paper, E-M-I.
24     A.   Okay.  That's not what I heard.
25     Q.   I heard any, A-N-Y.

Page 217

1      A.   The Emi paper, I cannot identify an
2  area where it shows a dose response.
3      Q.   So was that an error in your report?
4      A.   Apparently so.
5      Q.   Did Davis 2021 find a dose response?
6      A.   Let me turn to Davis 2021.
7      Q.   Okay.
8          MS. O'DELL:  So we're starting another
9      area of inquiry.  Christine, I would just
10     how long have we been going?
11         THE REPORTER:  14 minutes.
12         MS. O'DELL:  So that's over 4 hours.
13     All right.  Jessica, you understand our
14     position on four hours.  And so in terms of
15     further inquiry today, you know, you've
16     exceeded your time limit.  I think we've
17     given you a little extra time actually.  So
18     that's our position.
19         MS. DAVIDSON:  Are you instructing
20     Dr. Clarke-Pearson not to answer the pending
21     question?
22         MS. O'DELL:  There was no pending
23     question.  You asked him to look at Davis.
24     He was pulling Davis.
25         MS. DAVIDSON:  I asked him whether

Page 218

1  Davis identified a dose response.

2  MS. O'DELL: I'll allow him to answer

3  that question and then -- and then the

4  deposition for today will be concluded.

5  THE WITNESS: There is some dose

6  response demonstrated here in frequency of

7  general powder use in whites -- I'm sorry,

8  correct me, I'm wrong on that.

9  I would say that I don't see that.

10  MS. DAVIDSON: Asher, can we put Davis

11  2021 on the screen. Has that already been

12  marked?

13  MR. TRANGLE: It's not.

14  MS. O'DELL: It's not marked and you

15  had a question pending. I allowed him to

16  answer that question. He responded and --

17  MS. DAVIDSON: He did not respond.

18  MS. O'DELL: -- you're over four hours,

19  Jessica. That's the bottom line.

20  MS. DAVIDSON: For the tenth time, you

21  are in violation of the order which makes

22  very clear that I get 14 hours, number 1,

23  which I am not even going to ask. I was not

24  going to ask for 14 hours.

25  Number 2, he did not finish answering

Page 219

1  the question. He was in the middle of

2  answering whether Davis found a dose

3  response. First, he said it did, then he

4  said he wasn't sure. I don't think he's

5  done. I was going to help him out by

6  pointing him to the discussion in Davis of

7  dose response so that he could answer the

8  question accurately. If you'd like to leave

9  his inaccurate answer on the record, that's

10  your prerogative. We will go to court.

11  MS. O'DELL: Well, you've made your

12  position clear. You're going to court

13  anyway. I believe he answered your

14  question.

15  Your inquiry today was limited to four

16  hours. That's our position. We're going to

17  maintain that. I recognize we have a

18  disagreement, so be it the Court will have

19  to deal with that.

20  In terms of your further inquiry, I

21  think your questions are concluded for the

22  day. I have three small areas I'll follow

23  up on.

24  MS. DAVIDSON: Wait. Your position is

25  that you're now going to follow up with

Page 220

1  questions with Dr. Clarke-Pearson and not

2  going to allow me to ask rebuttal to those

3  questions, is that your position?

4  MS. O'DELL: That's correct. You know,

5  we have a time limit, Jessica.

6  MS. DAVIDSON: Yes, we do, in an order

7  and it's 14 hours.

8  MS. O'DELL: It's four hours.

9  MS. DAVIDSON: Leigh, that's false.

10  MS. O'DELL: Excuse me. Let me finish,

11  Jessica. It's not wrong.

12  MS. DAVIDSON: It's false.

13  MS. O'DELL: He's already --

14  MS. DAVIDSON: False.

15  MS. O'DELL: -- been through 14 hours

16  on his case specific opinions.

17  MS. DAVIDSON: I understand. That

18  ruling is from 2023. I mean you're just

19  continuing to say false statements.

20  MS. O'DELL: You're interrupting. Your

21  rudeness -- please don't interrupt me.

22  MS. DAVIDSON: You have spent the

23  entire day, A, telling me that I only have

24  4 hours for a 14-hour deposition, and then

25  with very long speaking objections to every

Page 221

1  question in order to filibuster my time. So

2  please don't me tell me that I was being

3  rude.

4  MS. O'DELL: That is not accurate and

5  you know that. So I'm going to follow up on

6  three small areas and then the deposition

7  will be concluded for today.

8  EXAMINATION

9  BY MS. O'DELL:

10  Q. So, Dr. Clarke-Pearson, I have a few

11  questions for you. First, what was marked

12  previously as Exhibit 4, I believe, was a Yahoo

13  article that you sent to leadership at ACOG and

14  SGO. Do you recall that discussion?

15  A. Yes, I do.

16  Q. And only a portion of this article was

17  put on the screen for you to see at that time, and

18  now we've had that printed. And I will mark it for

19  purposes of the record if it's not already -- it's

20  already been marked, excuse me, Exhibit 4.

21  And I'd like for you to look at this

22  article, Dr. Clarke-Pearson, and specifically look

23  at page 3 of this exhibit. Do you see that --

24  A. Yes.

25  Q. -- at the bottom?

1        And does this article reference that
2   Johnson's Baby Powder and other talc products
3   contained asbestos and caused cancer, does it state
4   that?
5        A.   In this article it says
6   Johnson & Johnson Baby Powder and other talc
7   products contain asbestos and cause cancer, which
8   the company denies.
9        Q.   And when you referred to this article
10  as referencing asbestos earlier, is that -- is that
11  what you were referring to?
12       A.   Yes.
13       MS. DAVIDSON:  Objection.
14  BY MS. O'DELL:
15       Q.   Now, if you would, Dr. Clarke-Pearson,
16  would you put the Woolen study in front of you, if
17  you don't have it.
18       A.   I have it.
19       Q.   And just for purposes of the record,
20  that study was previously marked as -- I believe it
21  was Exhibit 13.  And I would ask you if you would
22  turn to Table 2 of the study.
23       A.   Okay.  I have it.
24       Q.   And, Dr. Clarke-Pearson, what is the
25  title of Table 2?

1        A.   Process -- "Table 2.  Publications
2   included in the systematic review.  Most frequent
3   perineal talcum powder use reported for each study
4   was abstracted."
5        Q.   And so did Dr. Woolen and others make
6   clear that the data they extracted from the studies
7   they included would be the data from those studies
8   that was the most frequent application?
9        A.   That's what it says, yes.
10       Q.   And so when you were asked questions
11  about Wu and different levels of exposure that were
12  included in that study, wouldn't the greatest
13  exposure characterized in Wu be the appropriate
14  data to have included in the Woolen meta-analysis?
15       A.   That's what it says in Table 2.  I
16  don't recall the table that -- exactly in Wu, but
17  it was, as I recall, greater than 20 years in a lot
18  of -- we can pull that up if you want.  It seemed
19  like that was the highest level, yes.
20       Q.   And, also, in regard to Woolen, do you
21  have the supplemental tables in front of you for
22  Woolen?
23       A.   Yes.
24       Q.   And I would like to direct you to
25  Supplemental Table Number 1.

1        A.   I have it.
2        Q.   And in this table, Supplemental
3   Table 1, did Woolen and others report the data not
4   only from women with patent fallopian tubes, but
5   all women?
6        A.   Yes.  On the first -- the top part of
7   the table is all women and nonusers, less frequent
8   users, and daily users.
9        Q.   And what was the adjusted hazard ratio
10  for daily users of all women?
11       A.   Adjusted was 1.27 with a confidence
12  interval of 1.09.
13       Q.   And that was statistically significant?
14       A.   Yes.
15       Q.   And in terms of studies that were
16  included in Woolen, let me ask you specifically
17  regarding women with patent tubes.  You were asked
18  some questions about that.  Do women who have
19  hysterectomies or tubal ligation have a patent
20  reproductive tract?
21       A.   No.  I mean this is -- you take out the
22  uterus, there's no way for talcum powder to get to
23  the tubes.  So the tubes really aren't functional.
24  And if the tubes have been tied, then they're not
25  patent either.

1        Q.   So for studies that excluded in the
2   exposed cases, women with hysterectomies or tubal
3   ligation, that would essentially be only included
4   women in the cases who have patent tracts?
5        A.   If you take out those that have had
6   hysterectomies and tubal ligations, then the
7   remaining patients all have patent tubes.
8        Q.   Nothing further, Doctor.  Thank you.
9        A.   Thank you.
10       MS. DAVIDSON:  Before we go off the
11  record, I'm asking you again, am I allowed
12  to ask follow-up questions on that?  You're
13  not going to let me do that?
14       MS. O'DELL:  You know, Jessica, I --
15       MS. DAVIDSON:  You're continuing to
16  be --
17       MS. O'DELL:  I'm quite confident that
18  when it comes to that point in time when we
19  are examining expert witnesses on behalf
20  of -- as -- on behalf of the plaintiffs
21  steering committee, I'm examining a witness
22  that is a defense expert that you will hold
23  me to the minute and second.  And we've
24  given you very clear notice about what we
25  feel the ground rules are here under the

Daniel Clarke-Pearson, M.D.

Page 226

1    order.  And, further, we have given you
2    additional minutes, and we're not going to
3    give any further.
4        MS. DAVIDSON:  You are continuing to
5    violate the order.  And in violating the
6    order, not only are you preventing me from
7    having the time that I'm entitled to, but
8    you are also enabling your witness to
9    prepare further for the line of questioning
10   that has begun which is highly
11   inappropriate.  And we will raise this with
12   the Court.  Thank you.  We'll go off the
13   record.
14                    - - -
15       (Read and sign reserved.)
16                    - - -
17       (Time noted at 4:09 p.m.)
18                    - - -
19
20
21
22
23
24
25

Page 228

1          DEPOSITION ERRATA SHEET
2
3    Our Assignment No:  348852
4    Case Caption:  Talcum Powder Litigation MDL 2738
5
6        DECLARATION UNDER PENALTY OF PERJURY
7        I declare under penalty of perjury that I
8    have read the entire transcript of my deposition
9    taken in the captioned matter or the same has been
10   read to me, and the same is true and accurate, save
11   and except for changes and/or corrections, if any,
12   as indicated by me on the DEPOSITION ERRATA SHEET
13   hereof, with the understanding that I offer these
14   changes as if still under oath.
15       Signed on the _____ day of _____,
16   20 __.
17
18
19
20       _____
21          DANIEL CLARKE-PEARSON, M.D.
22
23
24
25

Page 227

1          CERTIFICATE OF REPORTER
2
3        I, Christine A. Taylor, Registered
     Professional Reporter and Notary Public for the
4    State of North Carolina at Large; do hereby
     certify:
5        That the foregoing deposition was taken
     before me on the date and at the time and location
6    as stated in this transcript; that the deponent was
     located in Orange County, North Carolina; that the
7    deponent was duly sworn to testify to the truth,
     the whole truth and nothing but the truth; that the
8    testimony of the deponent and all objections made
     at the time of the examination were recorded
9    stenographically by me and were thereafter
     transcribed; that the foregoing deposition as typed
10   is a true, accurate and complete record of the
     testimony of the deponent and of all objections
11   made at the time of the examination to the best of
     my ability.
12       I further certify that I am neither related
13   to nor counsel for any party to the cause pending
     or interested in the events thereof.  Witness my
14   hand, this 29th of January, 2024.
15
16
17       _____
18       Christine A. Taylor,
         Registered Professional Reporter
19       Notary Public 19960530077
         State of North Carolina
20
21
22
23
24
25

Page 229

1          DEPOSITION ERRATA SHEET
2
3    Page No. _____ Line No. _____ Change to: _____
4    _____
5    Reason for Change: _____
6    Page No. _____ Line No. _____ Change to: _____
7    _____
8    Reason for Change: _____
9    Page No. _____ Line No. _____ Change to: _____
10   _____
11   Reason for Change: _____
12   Page No. _____ Line No. _____ Change to: _____
13   _____
14   Reason for Change: _____
15   Page No. _____ Line No. _____ Change to: _____
16   _____
17   Reason for Change: _____
18   Page No. _____ Line No. _____ Change to: _____
19   _____
20   Reason for Change: _____
21
22   SIGNATURE: _____ DATE:_____
23       DANIEL CLARKE-PEARSON, M.D.
24
25

Daniel Clarke-Pearson, M.D.

Page 230

```
 1      DEPOSITION ERRATA SHEET
 2
 3    Page No. _____ Line No. _____ Change to: _____
 4    _____
 5    Reason for Change: _____
 6    Page No. _____ Line No. _____ Change to: _____
 7    _____
 8    Reason for Change: _____
 9    Page No. _____ Line No. _____ Change to: _____
10    _____
11    Reason for Change: _____
12    Page No. _____ Line No. _____ Change to: _____
13    _____
14    Reason for Change: _____
15    Page No. _____ Line No. _____ Change to: _____
16    _____
17    Reason for Change: _____
18    Page No. _____ Line No. _____ Change to: _____
19    _____
20    Reason for Change: _____
21
22
23    SIGNATURE: _____ DATE: _____
24        DANIEL CLARKE-PEARSON, M.D.
25
```

## WORD INDEX

**< $ >**
**$125,000**
  15:*9*
**$128,000**
  15:*22*
**$800**  25:*25*
  28:*2, 3*
**$900**  26:*1*
  27:*23*

**< 0 >**
**000001**  3:*17*

**< 1 >**
**1**  3:*11*
  14:*9, 13*
  15:*24*
  24:*19*
  141:*13*
  148:*2, 11*
  155:*23*
  157:*22*
  218:*22*
  223:*25*
  224:*3*
**1.09**  224:*12*
**1.27**  224:*11*
**1.4**  171:*23*
**1:23**  194:*1*
**1:25**  194:*1*
**1:28**  197:*16, 20*
**1:30**  197:*15, 17*
**1:45**  197:*18*
**1:52**  197:*20*
**10**  4:*12*
  17:*10, 15, 19*
  114:*14, 15*
  148:*2, 11*
  149:*4*

153:*8, 9, 25*
162:*3, 8*
169:*7*
171:*4*
172:*1, 2, 3, 16, 22*
175:*13*
**10/10/2023**
68:*3*
**10/10/23**
68:*1*
**10/14/21**
  3:*11*
**10:20**  67:*14*
**10:35**  67:*14*
**100**  16:*10, 13*
**10001**  2:*16*
**101**  99:*16*
**104**  106:*25*
**1068**  213:*9*
**11**  4:*16*
122:*24*
123:*2, 4*
131:*8*
144:*18*
174:*24*
175:*13*
**11/15/2023**
69:*8*
204:*16*
205:*22*
**11:23**  110:*7*
**11:34**  110:*7*
**114**  4:*12*
**12**  4:*19*
35:*16*
127:*11, 12*
**12/31/23**
  3:*12*
**12:13**  141:*5*
**12:23**  141:*5*

**121**  208:*16, 19, 20, 23*
  210:*5, 6*
**123**  4:*16*
**127**  4:*19*
**128**  112:*19*
**129**  4:*22*
**13**  4:*22*
129:*19, 22*
212:*5*
222:*21*
**14**  3:*11, 13*
  5:*2*  24:*19*
46:*11*  51:*8*
58:*24*  59:*1, 16*  68:*7, 24*
74:*2*
117:*13*
157:*7, 8, 10*
158:*4*
167:*12*
194:*7*
195:*1*
217:*11*
218:*22, 24*
220:*7, 15*
**1465527**
5:*16*
**14-hour**
220:*24*
**15**  5:*6*
30:*23*
40:*21*
41:*20*
58:*17*
64:*19*
114:*4*
162:*1, 2*
197:*13, 15*
**157**  5:*2*
**16**  5:*9*
169:*8, 10, 19*
171:*9*
**162**  5:*6*

**16-2738(MAS)( RLS**  1:*1*
**169**  5:*9*
**17**  1:*1*
  5:*13*  6:*1*
208:*19, 21*
210:*10*
**18**  5:*14*
27:*20*
210:*9, 12*
**1825**  2:*9*
**19960530077**
  227:*19*

**< 2 >**
**2**  3:*13*
14:*11, 13*
93:*15*
100:*3*
136:*18, 25*
141:*10, 17, 20, 24*
142:*14*
143:*14, 17, 20, 22, 23*
145:*19*
146:*19*
153:*23*
161:*22*
218:*25*
222:*22, 25*
223:*1, 15*
**2:00**  206:*10*
207:*4*
**2:01**  207:*7*
**20**  15:*24*
134:*17*
162:*7, 18*
223:*17*
228:*16*
**200**  163:*6*
**2006**  2:*10*

**2009**  149:*19*
152:*5, 9, 11*
**2010**  199:*7, 13*
**2015**  151:*23*
152:*2*
**2018**  32:*24*
33:*3, 10*
205:*13*
**2019**  12:*9, 16*  157:*15*
193:*9*
199:*7, 24*
**202.783.6400**
  2:*10*
**2020**  36:*7, 8, 14*  61:*13*
114:*11*
132:*21*
133:*5, 8, 20, 22, 25*  136:*2, 12*  175:*1*
176:*7, 10*
210:*10*
**2021**  12:*1, 19*  15:*25*
16:*19*
24:*19*  30:*6, 9, 12*  33:*8, 12*  34:*10, 14*
37:*19*
40:*12, 22*
41:*20*
58:*18*  59:*9, 12*  62:*2, 5*
64:*10, 17, 19*
67:*21*
122:*25*
123:*3*
157:*16*
186:*15*
196:*13, 14*
199:*7*
200:*6*

Daniel Clarke-Pearson, M.D.

208:*3*
217:*5, 6*
218:*11*
**2022**  51:*8*
58:*24*  59:*1,
16, 23*
127:*13, 14*
129:*19*
132:*20*
133:*4*
155:*23*
199:*7*
200:*11, 15*
**20220**
133:*18*
**2023**  16:*2,
20*  25:*24*
68:*9*  71:*24*
84:*19*
113:*25*
114:*4*
169:*17, 19*
181:*15*
195:*15*
196:*15*
220:*18*
**2024**  1:*1*
6:*1*  39:*5*
227:*14*
**208**  5:*13*
**21**  64:*20*
123:*6*
196:*2*
197:*2, 9*
**210**  5:*14*
**212.735.3000**
2:*17*
**218**  2:*5*
**22**  169:*24*
**221**  3:*4*
**25**  17:*24*
18:*4*  22:*10,
19, 23, 24*
137:*9*

138:*13, 15,
22, 23*
**250**  88:*16*
**255**  211:*9*
**26**  4:*8*  9:*20*
**263MM**
95:*19*
**26th**  64:*23*
**27**  169:*21,
25*
**2738**  228:*4*
**278**  64:*20*
**284**  4:*11*
**284-page**
112:*21*
**286**  64:*20*
**29th**  227:*14*

**< 3 >**
**3**  3:*15*
40:*21*  41:*3*
42:*23, 24*
43:*2, 5, 11*
54:*1*  56:*25*
161:*20*
196:*1*
221:*23*
**3,000**  191:*6*
**3/17/20**  5:*15*
**3:43**  207:*7*
**30**  138:*10,
14, 21, 23*
149:*22, 25*
153:*9, 19, 24*
154:*12*
162:*4, 8, 19*
**31**  16:*4*
46:*12*  150:*1*
**31st**  16:*2*
**334.269.2343**
2:*6*
**348852**
228:*3*

**35**  160:*24*
**36104**  2:*6*
**39**  196:*1*

**< 4 >**
**4**  3:*18*
42:*19, 20*
47:*19*  48:*8*
102:*18*
169:*17*
217:*12*
220:*24*
221:*12, 20*
**4:09**  226:*17*
**40**  160:*24*
213:*9*
**41**  3:*15*
**42**  3:*18*

**< 5 >**
**5**  3:*17, 20*
60:*12, 16*
106:*5, 6*
147:*2, 22*
148:*20*
214:*1*
215:*14, 16,
22*
**50**  16:*7, 8,
12*  18:*1, 4*
35:*2*  81:*23*
83:*14, 18*
190:*11, 21*

**< 6 >**
**6**  3:*3*  4:*1*
15:*21*
61:*13, 14*
69:*12, 13*
106:*6*
134:*1*
215:*20*
216:*1, 2*

**60**  3:*20*
**61**  4:*1*
**64**  4:*4*
**65**  46:*12*
**69**  4:*8*  85:*4*

**< 7 >**
**7**  4:*4*
15:*21*  64:*9,
11*  68:*7*
171:*23*
**70**  93:*9*
**700**  2:*9*
**70s**  37:*4*
**72**  80:*17, 22*
81:*8*  83:*17*
95:*2*
**72-hour**
99:*18, 22*
100:*9*
101:*19*
102:*10*

**< 8 >**
**8**  4:*8*
15:*22*  69:*9,
10*  71:*16, 19*
114:*18*
**8/29/21**  3:*11*
**800**  16:*20*
**84**  4:*10*
**86**  64:*20*
**877.370.3377**
1:*1*

**< 9 >**
**9**  4:*10*
84:*20, 21*
121:*11*
131:*8*
**9/14/22**  3:*15*
**9:05**  6:*2*
**9:37**  34:*6*

**9:38**  34:*6*
**90**  158:*5*
**900**  16:*20*
**917.591.5672**
1:*1*

**< A >**
**a.m**  6:*2*
34:*6*  67:*14*
110:*7*
**abilities**
179:*25*
**ability**  9:*17*
177:*18*
227:*11*
**able**  48:*19*
49:*13*
51:*18*
52:*16*  83:*16*
**abnormal**
27:*16*  29:*7*
**absolutely**
21:*4*
127:*10*
211:*2*
**abstract**
63:*3*  118:*4*
134:*8, 9*
205:*5*
206:*21*
207:*2*
**abstracts**
205:*2*
**abtracted**
223:*4*
**access**
107:*10*
131:*21*
**accounts**
17:*13*  19:*3*
**accuracy**
182:*14*
**accurate**
76:*5*  141:*8,*

Daniel Clarke-Pearson, M.D.

*24* 144:*7*
147:*23*
221:*4*
227:*10*
228:*10*
**accurately**
219:*8*
**achieve**
83:*25*
**ACOG**
40:*13, 17*
41:*17* 45:*1,*
*3, 6, 17, 19,*
*23* 46:*11, 22*
47:*3, 6, 9, 21*
49:*24* 51:*7,*
*23* 52:*5, 16*
53:*21* 54:*6,*
*12, 23, 24*
55:*13* 58:*1,*
*4, 8, 24*
59:*15* 60:*1,*
*19* 64:*2, 6*
67:*10*
129:*24*
130:*3, 6*
221:*13*
**ACOG's**
54:*1* 56:*6*
57:*17*
**acquire**
52:*16*
**actions**
178:*15*
**active** 41:*17*
**activity**
33:*11* 119:*5*
**acumen**
101:*9*
**acute** 99:*18,*
*22* 100:*9*
101:*19*
102:*9, 21*
104:*5*

**add** 44:*5*
88:*20*
208:*13*
**added**
68:*12*
114:*18*
205:*9* 211:*7*
**Adding**
44:*17*
208:*24*
**addition**
194:*21*
**additional**
68:*18*
94:*13*
104:*25*
105:*1* 226:*2*
**address**
10:*7* 34:*25*
108:*6, 14, 18*
109:*4*
194:*19*
**addressed**
176:*2*
198:*20*
**addresses**
167:*6, 11*
172:*9, 17*
**addressing**
172:*22*
**adjacent**
7:*20*
**adjusted**
108:*10*
224:*9, 11*
**advising**
176:*24*
**affairs**
41:*16*
**affiliated**
28:*21*
**affiliation**
63:*20*

**age** 31:*25*
160:*18, 20,*
*25*
**ago** 26:*25*
44:*20*
47:*21*
95:*15*
147:*18*
150:*12*
195:*4*
**agree** 9:*13*
10:*8* 86:*6*
94:*8* 106:*2*
111:*2, 20*
159:*24*
160:*10*
195:*23*
203:*1* 204:*6*
**agreed**
79:*17*
**agreement**
61:*11*
**ahead**
135:*15*
203:*5*
**aim** 121:*12,*
*17, 22* 122:*2*
**air** 121:*9*
**Alabama**
2:*6*
**Albright**
27:*11* 28:*15*
**alert** 52:*5*
**allegation**
29:*10*
**allegedly**
127:*8* 192:*1*
**alleges**
27:*17*
**ALLEN** 2:*4*
**all-inclusive**
167:*9*
**allow** 218:*2*
220:*2*

**allowed**
210:*25*
218:*15*
225:*11*
**aloud**
121:*20*
128:*13*
**alterations**
127:*2*
**altered**
178:*11*
**amend** 27:*5*
**Amended**
4:*8* 68:*11*
69:*8* 182:*5*
204:*16*
206:*19*
207:*22*
208:*14*
**American**
41:*12*
**amount**
66:*17*
102:*19*
192:*6*
**amounts**
215:*17, 24*
216:*3*
**analyses**
111:*25*
131:*25*
**analysis**
56:*6* 60:*7*
61:*16*
62:*10* 63:*2*
131:*16*
132:*11, 21*
145:*16*
171:*1, 22*
173:*5, 17, 19,*
*23* 174:*12,*
*14, 18* 175:*8,*
*21* 176:*21*
177:*5*

**190:*3*
191:*7* 214:*4*
**and/or**
228:*11*
**Angeles** 5:*8*
**animal**
120:*16*
**animals**
96:*13*
**annual**
18:*10*
**anonymous**
87:*3*
**Anova**
74:*12*
**answer**
13:*1* 19:*18,*
*22* 21:*22*
22:*16*
23:*15*
30:*24, 25*
33:*14* 46:*8*
51:*18*
57:*21*
58:*16*
62:*14* 73:*5*
83:*21*
100:*13*
117:*6, 19*
125:*17*
135:*5, 9*
138:*16*
140:*3, 4, 12*
142:*7*
151:*4*
162:*14*
163:*13*
165:*5*
166:*15*
168:*18*
170:*5, 6*
179:*22*
184:*19*
186:*2*

189:*1, 3*
206:*13*
213:*1, 2*
217:*20*
218:*2, 16*
219:*7, 9*
**answered**
50:*3* 75:*12,*
*22* 79:*21*
92:*21*
117:*18*
124:*4*
178:*22*
186:*10*
188:*2, 13*
189:*17*
190:*14*
193:*10*
219:*13*
**answering**
73:*13*
189:*10*
218:*25*
219:*2*
**answers**
6:*20*
**A-N-Y**
216:*25*
**anybody**
103:*6*
140:*10*
179:*2* 204:*4*
**anymore**
37:*13*
**anytime**
185:*10*
**anyway**
219:*13*
**apoptosis**
123:*20*
127:*2*
**apparently**
125:*5*

172:*15*
177:*4* 217:*4*
**appear**
26:*16*
136:*19*
**APPEARAN
CES** 2:*1*
**appeared**
26:*14* 48:*15*
**application**
223:*8*
**applied** 88:*7*
**apply** 89:*9*
**appreciate**
49:*2* 117:*7*
151:*21*
165:*4* 179:*9*
**appreciates**
179:*10*
**appropriate**
18:*21*
19:*19*
20:*13*
21:*12*
61:*25* 80:*2*
82:*25* 88:*7*
105:*8*
223:*13*
**approval**
28:*14*
**Approximate
ly** 11:*5*
17:*9* 22:*19,*
*23* 36:*7*
37:*15*
**Area** 4:*2*
217:*2, 9*
**areas**
219:*22*
221:*6*
**ARPS** 2:*13*
**arrow**
171:*21*

**article** 3:*18,*
*20* 4:*1, 4, 12,*
*16, 19, 22*
5:*2, 6*
41:*19*
42:*13, 19*
43:*18, 20*
44:*20, 21*
45:*1, 9, 12,*
*17, 24, 25*
46:*14, 15, 18,*
*21, 23* 47:*10,*
*16, 25* 48:*5,*
*17, 19, 21*
49:*7, 9, 14,*
*24* 50:*2, 4, 5,*
*17, 23* 51:*3,*
*15, 17, 21*
52:*2, 6*
53:*7, 11*
55:*21* 56:*1,*
*2, 6* 57:*15,*
*17* 60:*1*
64:*6, 15*
70:*18, 21*
71:*12* 73:*9,*
*11, 12* 74:*20,*
*21, 23* 99:*21*
101:*5*
102:*9, 13, 14,*
*16* 103:*1*
205:*5*
206:*20*
221:*13, 16,*
*22* 222:*1, 5,*
*9*
**articles**
36:*1* 46:*3,*
*5, 25* 51:*6*
**asbestos**
34:*9, 13*
35:*20* 36:*2*
42:*10* 45:*5*
47:*17, 23*

49:*25*
187:*13, 14,*
*16, 20*
188:*15, 19*
189:*22*
190:*2, 6, 12,*
*24* 191:*1, 4,*
*8, 18, 21*
192:*1, 7, 11,*
*15, 17, 21, 24*
193:*4, 5*
198:*2, 15*
199:*8, 14, 25*
200:*7, 12, 25*
201:*12, 19*
202:*5, 12, 16,*
*21* 203:*14,*
*25* 204:*10*
222:*3, 7, 10*
**ascend**
140:*23, 25*
**ASHCRAFT**
2:*7* 128:*16*
**ASHER**
2:*15* 13:*25*
14:*15* 15:*1*
24:*18* 41:*5,*
*25* 42:*1, 18*
43:*11, 13*
44:*3, 10, 12*
48:*4, 7, 14,*
*23* 53:*25*
60:*12*
64:*13*
65:*11*
66:*15*
67:*24*
69:*12, 17*
85:*7* 90:*12*
91:*23* 93:*9*
99:*16*
107:*9*
110:*23*
112:*2*

121:*18*
128:*10*
134:*1*
136:*15*
138:*1*
141:*18*
149:*6, 9, 11*
150:*5*
157:*3, 17*
159:*17, 19*
164:*4*
165:*3*
169:*12, 21*
170:*14, 17*
171:*13, 14*
174:*25*
175:*3*
208:*17*
210:*8*
211:*4*
212:*9*
215:*13*
218:*10*
**asher.trangle
@skadden.co
m** 2:*18*
**aside** 64:*1*
**asked** 14:*25*
33:*8* 50:*22*
56:*16*
57:*11* 65:*6*
75:*11, 21*
79:*2* 80:*6*
87:*19*
92:*20*
117:*17*
124:*3*
140:*1*
142:*19*
151:*1*
166:*3*
167:*16, 22*
178:*21*
186:*9*

Daniel Clarke-Pearson, M.D.

188:*1, 12, 25*
189:*11, 16*
190:*13*
201:*8*
203:*13, 17*
205:*23, 25*
209:*14, 18*
211:*24*
216:*22*
217:*23, 25*
223:*10*
224:*17*
**asking**
19:*19*  20:*3,
7*  22:*17*
25:*12*
39:*20*  51:*6*
53:*1*  57:*16*
70:*4*  82:*7*
85:*24*  91:*1*
101:*21*
109:*16*
131:*22*
138:*24*
150:*19*
151:*12*
165:*16, 18*
167:*17*
168:*23*
205:*9*
206:*4*
214:*7*
225:*11*
**assay**  85:*20*
86:*9, 22*
92:*14, 17*
93:*1*  95:*9*
104:*12*
**assess**  71:*14,
22*  72:*6*
**assessed**
158:*6*
**assessing**
72:*9*

**assessment**
57:*18*
85:*20*  86:*9,
24*  159:*22*
**assets**  19:*10,
21*
**Assignment**
228:*3*
**assistance**
48:*20*
**associated**
102:*23*
104:*6*
185:*7*  216:*8*
**Association**
3:*20*  4:*1,
22*  5:*3*
157:*24*
162:*5*
171:*2, 23*
185:*11, 16*
**associations**
52:*9*  162:*15*
**assume**
71:*12*
**assuming**
149:*25*
**attached**
204:*15*
**attempt**
45:*21*
**attempts**
29:*18*
**attention**
45:*22*  85:*18*
**attorney**
28:*1, 8*
182:*12*
**attorneys**
7:*25*  8:*1*
26:*21*
211:*21*
**August**
12:*1, 19*

15:*24*  33:*8,
12*  34:*10, 14*
37:*19*
40:*12*  59:*9,
12*  62:*5*
64:*19, 23*
67:*20*
194:*12*
**author**  47:*4*
63:*24*  72:*1*
79:*8*  88:*15*
91:*11, 14*
98:*17*
147:*21*
176:*5*
**authored**
59:*21*
178:*12*
**authors**
51:*18*  61:*2,
5, 12*  63:*6, 7,
14*  88:*14*
92:*2, 6*
100:*18*
102:*20*
104:*4, 17*
115:*7*
117:*25*
118:*7, 22, 25*
119:*4, 24*
120:*22*
121:*5*
127:*16, 19*
146:*2, 6, 11*
165:*11, 17,
22*  166:*6*
173:*4, 10*
174:*17*
175:*2, 7, 20,
23*  176:*22*
178:*12*
182:*1*
184:*7, 8*

**author's**
99:*11*
**available**
12:*7*  66:*20*
107:*22*
145:*4*
168:*18*
195:*17*
197:*12*
204:*7*
**average**
138:*10*
152:*23*
154:*10, 13*
164:*13*
**averaged**
153:*7*
**averaging**
152:*22*
**aware**  8:*11*
12:*23*
13:*16*
32:*21*
34:*11*  35:*7,
25*  45:*4*
46:*9*  52:*6*
55:*5, 14*
60:*10, 18, 23*
63:*25*  67:*9*
70:*21*
71:*11*  72:*8*
75:*1, 23*
76:*25*
77:*24*
80:*25*
86:*13*  87:*1*
112:*11, 13*
113:*7*
130:*5, 9, 15,
21, 23*  131:*1,
2, 6, 8, 12*
138:*24*
139:*3, 14, 19,
24*  140:*13*

146:*1, 6*
154:*20*
155:*4*
156:*15, 18*
160:*16*
165:*6*
166:*2*
167:*20*
178:*13*
179:*1, 14*
180:*11, 16,
19*  183:*1, 7,
11, 14, 19*
184:*5, 19*
186:*4*
187:*3, 8, 9,
23*  188:*9*
189:*21*
192:*13*
199:*6, 10*
200:*8, 15*
203:*6, 10, 11*
204:*3*

**< B >**
**Baby**  3:*15*
5:*14*  42:*11*
45:*5*  46:*13*
47:*24*
50:*19*
69:*24*  76:*1,
11*  105:*12*
187:*15*
188:*15*
189:*25*
190:*10, 17,
24*  191:*2, 3,
9*  222:*2, 6*
**back**  22:*6,
13*  43:*2, 10,
17, 21*  46:*7*
48:*25*  49:*5*
54:*1*  62:*24*
79:*7*  88:*11,*

Daniel Clarke-Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| 17 103:8 | 95:8 98:11 | **behalf** 6:5 | 200:2, 5, 10 | **biostatistician** 156:1 |
| 108:6, 18 | 102:19 | 116:1, 6 | 211:20 | **bit** 25:22 |
| 114:17 | 104:10, 11 | 225:19, 20 | 212:17 | 63:10 |
| 125:16 | 117:12 | **behavior** | 213:11, 12, | 104:2 |
| 126:21 | 138:25 | 65:8 | 25 219:13 | 216:11 |
| 132:4 | 141:23 | **belief** | 221:12 | **blood** |
| 133:20 | 147:25 | 147:25 | 222:20 | 140:22 |
| 134:3 | 148:4 | **believe** 7:22 | **believed** | **board** |
| 136:15 | 155:5 | 9:18 11:11 | 197:25 | 78:19 79:15 |
| 141:19 | 177:1 | 26:19 27:3, | **benign** | **bodies** |
| 146:15, 24 | 190:25 | 11 32:25 | 92:16 | 187:12 |
| 153:23 | 191:6 | 35:22 46:2 | **best** 18:3, | **body** 4:5 |
| 157:23 | 192:14 | 47:20 | 25 20:15 | 125:4 |
| 161:16 | **bases** 94:2 | 50:17 | 21:13 22:1 | 187:10, 24 |
| 166:14 | **basic** 80:4 | 53:23 | 23:17 26:6 | 188:9, 22 |
| 173:2 | **basically** | 57:16 63:8 | 70:11 | 189:13, 14 |
| 174:23, 25 | 6:19 88:22 | 70:15 | 227:11 | **bottles** |
| 175:4 | **basics** 6:18 | 71:19 | **better** | 191:6 |
| 179:20 | **basis** 37:15 | 72:19 | 32:18 79:4 | **bottom** |
| 181:10 | 65:20 | 78:12 83:8 | **beyond** | 49:12 |
| 190:16 | 75:25 | 91:7, 10 | 58:9 66:10 | 93:14 |
| 193:22 | 92:12 | 92:5, 9 | 67:17 | 112:16 |
| 197:14 | 140:16 | 95:1, 4, 25 | 96:16 | 118:15 |
| 212:5, 17 | 150:23 | 99:20 | 104:2 | 121:13 |
| 215:13 | **Bates** 3:16 | 100:8 | 214:17 | 218:19 |
| 216:15 | 4:10 5:15 | 102:8 | **big** 108:4 | 221:25 |
| **badger** | 85:2 | 106:19 | 211:5 | **Bradford** |
| 189:18 | 112:16 | 110:21 | **bigger** | 214:3, 11, 20, |
| **Baker** 25:17 | 209:4, 5, 12 | 114:9 | 14:25 42:1 | 21 215:3 |
| **bankruptcy** | 210:9 | 117:14 | **bill** 25:5 | **branch** 67:4 |
| 3:19 44:25 | **battery** | 122:23 | **bills** 16:14 | **BRCA1** |
| 45:2, 4, 7, 25 | 104:18 | 124:25 | **binders** | 35:10 |
| 50:6 52:11 | **BEASLEY** | 128:6 | 7:18, 23 | **break** 6:19 |
| 53:19 55:21 | 2:4 | 136:1 | **Bindman** | 8:14 |
| **bar** 214:1 | **began** | 147:24 | 155:17 | 110:10 |
| **Barnes-** | 130:16 | 153:17 | **biologic** | 141:23 |
| **Jewish** | **beginning** | 157:5 | 214:16 | 142:14 |
| 28:21 | 121:12 | 164:22 | **biological** | 149:12 |
| **based** 29:4 | **begins** 85:1, | 169:16 | 212:21 | 171:15 |
| 31:25 | 14 121:16 | 170:6 | 214:12 | 197:3, 5, 6, 7, |
| 52:10, 13 | 170:13 | 184:1 | **biologically** | 10, 14 |
| 53:3, 6, 13 | **begun** | 193:2, 8 | 80:16 | 206:15 |
| 60:7, 19 | 226:10 | 198:14 | **biology** | **brief** 51:5 |
| 76:3 81:10 | | 199:24 | 212:13 | |

briefly 82:22
bring 31:4 38:7 211:3
brought 37:14 191:2

< C >
calculate 95:19, 22
caliber 87:15
call 153:9 182:2
Callahan 25:17
called 103:16 114:10 154:25 155:1 156:20 209:21
calls 11:17
Cancer 3:16, 23 4:3, 5, 14, 20, 25 5:5, 8 27:18, 19, 21, 22 30:9, 12 31:2, 24 33:2 34:9, 13, 23, 25 35:6, 8, 18 37:25 38:14, 18, 22 39:7, 8, 24 40:1, 8, 9, 15 45:20, 24 46:13 52:18 55:7, 23 57:18, 24 58:12, 20 59:1, 18

60:8 67:1, 2 70:12 72:11 73:1 81:13, 24, 25 83:6, 13 92:15 102:23 104:6, 20 117:2 118:5 119:9, 10, 11, 14, 18, 21 122:22 123:21 124:7 126:18 127:4, 9 128:3 130:8 158:1 167:4 169:9 176:12 177:3, 11, 15 183:17, 22 184:10, 13, 22 185:8, 23 186:8 187:7, 11, 13, 14, 17, 21, 25 188:11, 16, 19, 23 189:15 192:2, 8, 12, 18, 25 193:3 198:21 201:15, 24 207:15 215:7 222:3, 7
Cancers 5:10 98:15
capable

87:8
capital 30:2
Caption 228:4
captioned 228:9
carcinogen 187:16
carcinogenesis 122:19 125:20 216:9
carcinogenic 116:19 117:15 118:1, 8, 18
carcinogenicity 72:11 84:9, 14
care 37:5 98:16 176:22, 24 198:12, 14
Carolina 7:3, 4, 5 24:2 227:3, 6, 19
case 19:7 23:20 24:24 25:21 27:9, 11, 13, 14 30:22 31:12, 13, 14, 16 32:3, 6 38:17, 21 53:6 54:18 68:11, 12, 22 88:21 99:4, 8, 9 147:12 148:23 170:7 180:13, 14 182:16

194:3, 11, 19, 24, 25
capital 30:2
195:12
208:9
220:16
228:4
case-based 30:14, 21 37:9
case-control 149:18 158:18 159:6, 13 170:16, 25 171:18 173:16 174:1, 3 183:25 184:3
cases 25:17, 21 26:15 190:4 194:25 225:2, 4
causation 68:4, 6 194:22 215:6
cause 40:7 72:11 73:1 81:7, 13, 25 83:6 92:15 122:6, 9 184:22, 25 185:6, 9, 11, 17, 19 192:2, 7 193:3 198:21 201:24 222:7 227:13
caused 38:19, 23 119:9

126:24
127:5
193:1 222:3
causes 69:24 76:2, 11 94:20, 22, 23 105:12 126:12, 18 127:8 183:16, 21 184:10 185:23 186:7 187:7, 11, 16, 25 188:11, 16, 23 189:15 192:11
causing 57:24 58:11 128:3 187:13, 21 188:19 215:6
cell 69:25 76:11 80:17, 21 81:7 94:5, 15, 16, 17 99:19, 22 100:10 102:10 104:20 105:3, 6, 12 106:1, 10, 21 123:19 124:2, 9 212:13
cells 4:15 70:1 92:16, 17 99:7 102:22 104:6, 19

105:*14*
119:*14, 21*
120:*10, 13,*
*19, 21*
122:*22*
123:*23*
124:*6, 14*
125:*24*
126:*1, 2*
**center** 42:*1*
70:*12* 85:*6*
**centered**
42:*3*
**CEO** 41:*12*
**certain** 90:*1*
94:*14*
100:*19*
**certainly**
10:*2, 4*
25:*3* 44:*24*
85:*16*
151:*23*
197:*13*
204:*13*
**certainty**
159:*22*
160:*7*
**CERTIFICA**
**TE** 227:*1*
**certify**
227:*4, 11*
**Cervical**
27:*22*
**cetera**
20:*12* 21:*16*
**chain** 94:*24*
**chance**
72:*11*
**Chang**
137:*9, 12*
**change**
12:*22*
106:*16, 18*
122:*15*

130:*3*
172:*8*
229:*3, 5, 6, 8,*
*9, 11, 12, 14,*
*15, 17, 18, 20*
230:*3, 5, 6, 8,*
*9, 11, 12, 14,*
*15, 17, 18, 20*
**changed**
102:*6*
106:*1, 10*
116:*24*
155:*13*
177:*2, 4*
178:*10*
**changes**
29:*8* 89:*6,*
*12, 15, 17, 23,*
*25* 91:*8*
109:*4*
115:*1*
118:*3, 4*
119:*7*
120:*23*
121:*6, 22*
122:*3, 6, 9,*
*18* 124:*24*
125:*8*
130:*5*
172:*11*
213:*15*
216:*8*
228:*11, 14*
**Chapel** 7:*3*
24:*2*
**characterize**
**d** 223:*13*
**chart** 29:*21*
48:*10*
**chat** 15:*4*
44:*4* 48:*5,*
*8, 18, 21*
49:*12, 13*
64:*13*

107:*10*
111:*11*
112:*21, 23*
149:*12*
165:*4*
210:*20*
211:*7*
**chatter**
135:*14*
**check** 28:*2*
34:*4* 43:*11*
156:*11*
182:*18, 21*
**checking**
156:*12*
**chemicals**
72:*10*
**children**
160:*21*
**Chinese**
190:*5*
**choose**
93:*21*
100:*18*
195:*4*
**chose** 58:*9*
142:*8*
144:*12*
146:*11*
196:*8*
**chosen** 10:*5*
136:*10*
**Christine**
1:*1* 57:*4, 6*
62:*23*
217:*9*
227:*1, 18*
**Christopher**
40:*23, 24*
41:*8, 14*
**chromosomal**
**ly** 124:*6*
**chronic**
81:*23* 83:*4,*

9, 14 124:*17*
126:*24*
**circumstance**
**s** 202:*8*
**citation** 71:*6*
**citations**
114:*18*
**cite** 127:*13*
167:*13*
**cited** 70:*23*
71:*1* 75:*19*
123:*12*
136:*16*
142:*20*
150:*13*
182:*1*
213:*22*
**citing** 177:*8*
**Civil** 6:*4*
**claim** 76:*10*
**claims**
105:*25*
106:*9*
**CLARKE-**
**PEARSON**
1:*1* 3:*13,*
*17* 4:*9* 6:*3,*
*10, 15, 25*
7:*1* 8:*24*
9:*7* 10:*10*
14:*24* 15:*8,*
*21* 16:*18, 25*
18:*16*
19:*12, 16, 17,*
*24* 20:*2, 10*
21:*18, 24*
22:*8, 15*
23:*10*
24:*14, 20, 25*
25:*7, 16, 23*
29:*20*
33:*14, 19*
34:*4, 8*
43:*18*

44:*19*
48:*17*
49:*11, 21*
50:*14* 54:*6*
57:*11* 59:*7,*
*14* 61:*17*
62:*9, 15*
63:*1* 66:*23*
68:*11* 69:*7,*
*16, 22* 73:*8,*
*19* 80:*15*
82:*5, 19, 23*
83:*3* 85:*13*
86:*1* 90:*15*
92:*1* 102:*8*
107:*13*
110:*9, 19*
111:*15*
113:*2, 7*
117:*5, 14*
123:*12*
134:*6*
135:*7, 12*
140:*6*
141:*7*
142:*12, 23*
149:*17*
150:*11*
151:*7*
152:*10, 19*
163:*16*
167:*15*
168:*4, 14, 23*
169:*14*
170:*3*
179:*13*
184:*18*
187:*2*
188:*25*
189:*1, 9, 18,*
*24* 191:*24*
194:*6*
195:*10*
197:*22*

Daniel Clarke-Pearson, M.D.

204:*15*
206:*7, 17*
207:*9*
209:*8*
210:*1, 14, 21, 24* 211:*14*
212:*4*
215:*15*
217:*20*
220:*1*
221:*10, 22*
222:*15, 24*
228:*21*
229:*23*
230:*24*
**Clarke-Pearson's**
48:*11*
64:*17*
67:*20*
68:*22*
71:*18*
186:*14*
193:*10*
205:*17*
211:*12*
**class** 24:*15*
**classes**
36:*17*
**classified**
159:*23*
**clear** 19:*15*
51:*21* 57:*7*
59:*4* 65:*6, 24* 66:*19*
99:*17, 20*
100:*9*
102:*9*
115:*25*
116:*5*
117:*10, 12*
129:*14*
140:*3*
161:*11*

163:*14*
194:*3*
195:*9, 24*
196:*7*
218:*22*
219:*12*
223:*6*
225:*24*
**clearer** 68:*8*
**clearly**
66:*11* 68:*9*
177:*5*
185:*6*
205:*21*
**clinic** 28:*21*
**clinical**
35:*4* 36:*11, 24* 37:*3, 6*
41:*16* 78:*9*
80:*3* 83:*12*
**clinician**
80:*5*
**clock** 65:*7*
**close** 22:*11*
56:*24*
**closer** 56:*22*
57:*3*
**coach** 49:*3*
**coached**
179:*9*
**coaching**
189:*7*
**co-author**
55:*10*
155:*17*
**co-authored**
51:*12, 16*
59:*21*
**co-culture**
4:*14*
**cohort** 63:*2*
171:*1, 22*
173:*5, 11, 17,*

19, 23 174:*4, 6, 8*
**collaborated**
204:*21*

**collaboration**
37:*11*
**colleague**
104:*3*
**colleagues**
35:*13*
**collectively**
14:*3*
**College**
41:*12*
**colloquy**
49:*18*
168:*20*
**column**
121:*14*
136:*25*
156:*5*
**combination**
207:*12, 16*

**combinations**
209:*5*
**come** 26:*23*
38:*2* 55:*19*
134:*3*
185:*6*
197:*14*
199:*3*
202:*20*
**comes**
18:*19*
19:*13*
22:*19*
38:*11* 57:*6*
94:*11*
225:*18*
**coming**
39:*9, 11*
56:*18* 58:*11*

**commencing**
6:*1*
**comment**
91:*2, 3*
95:*18*
102:*17, 25*
103:*24*
106:*2*
107:*1*
109:*17*
**commented**
160:*4*
**commenting**
91:*6* 105:*20*
**comments**
13:*8* 77:*11, 19* 79:*6*
84:*19*
88:*14, 17*
89:*2, 8, 9, 14*
91:*14, 15*
97:*21*
99:*15*
100:*4*
103:*5, 8*
108:*5, 7, 8, 9, 15, 18, 25*
109:*5, 9*
110:*11*
111:*3*
113:*25*
114:*7, 8*
119:*18*
177:*22*
**Commerce**
2:*5*
**commercial**
72:*8* 85:*20*
86:*9, 22*
**committee**
225:*21*
**committees**
41:*17*

**common**
91:*11*
120:*16*

**communicate**
29:*13, 15*
45:*18*
**communicates** 29:*25*
**communicating** 45:*21*
206:*7*
**communication** 29:*19*
46:*10*
54:*18* 104:*3*
**community**
188:*18*
**company**
52:*10, 22*
73:*18*
74:*10*
208:*4, 13*
222:*8*
**company's**
95:*9* 104:*12*
**compare**
108:*21*
**compared**
93:*22*
121:*8*
158:*11, 15*
**complete**
227:*10*
**completely**
18:*20* 193:*9*
**component**
158:*17*
**components**
127:*3*
**compounds**
92:*15*
**Comprehensive** 5:*15*

Daniel Clarke Pearson, M.D.

203:*4*
210:*11*
**concentratio n** 121:*9*
**concern**
85:*19* 89:*18*
**concerned**
52:*16, 17*
202:*11*
**concerning**
30:*9*
**concerns**
111:*24*
**conclude**
28:*23* 29:*1*
197:*4*
**concluded**
29:*3*
142:*14*
183:*16, 21*
184:*9*
187:*10*
218:*4*
219:*21*
221:*7*
**concludes**
186:*7*
**conclusion**
154:*17*
187:*6* 204:*9*
**conclusions**
71:*15, 23*
102:*21*
104:*4*
**condition**
37:*1*
**conduct**
10:*3* 104:*17*
**conference**
31:*6*
**confidence**
224:*11*

**confident**
89:*25*
225:*17*
**confirm**
105:*22*
**conflict** 47:*1*
**confused**
167:*15*
**confusing**
29:*22*
**conjecting**
159:*3*
**consider**
45:*8, 23*
53:*16*
104:*2*
108:*12*
214:*23*

**consideration**
106:*15*
202:*2*
214:*12, 24*
**Considered**
5:*13* 7:*18*
68:*14* 72:*9*
81:*14*
94:*10*
204:*17*
**consist**
175:*18*
**consistent**
37:*15*
**consistently**
70:*20*
**consortium**
127:*18*
**consulted**
25:*1*
**consulting**
26:*21*
**Consumer**
2:*13*

**contain**
192:*11, 15,
17* 193:*5*
222:*7*
**contained**
131:*23*
190:*1* 222:*3*
**contains**
190:*11, 24*
193:*4*
202:*21*
**contaminate d** 198:*1*

**contemplated**
68:*9*
**contend**
178:*10*
**content**
79:*4* 80:*8*
**contingent**
132:*15*
**continue**
58:*10*
68:*25*
104:*16*
105:*8, 22*
197:*8*
209:*23*
**continued**
36:*9*
**continuing**
189:*5*
220:*19*
225:*15*
226:*4*
**contributed**
35:*14*
**contribution**
35:*14*
**control**
82:*17* 125:*8*
**convention**
61:*6, 10*

**conversation**
38:*8* 39:*3*
51:*5* 113:*18*
**convey** 66:*8*
**copies** 9:*11*
**copy** 85:*11*
152:*8*
172:*20*
**cord** 34:*4*
**core** 10:*17*
**corner**
118:*15*
**correct**
12:*9* 14:*6,
7* 26:*24*
27:*25*
28:*12*
32:*24*
42:*14*
47:*11*
50:*19*
51:*12* 53:*8*
58:*5* 61:*16*
62:*10* 63:*2*
64:*3, 7, 8*
72:*2* 77:*2,
8* 84:*14*
86:*3, 19*
93:*2* 95:*10*
103:*14, 17*
104:*12*
105:*14*
109:*20, 24*
110:*16*
111:*21*
112:*1, 6, 9*
113:*12, 22*
114:*6, 19*
115:*23*
116:*10*
118:*2*
119:*15, 21,
23* 120:*1, 13,
15* 122:*3*

123:*13*
125:*9, 25*
126:*3, 4, 6,
12, 15* 129:*9,
20, 25*
130:*18*
131:*10*
135:*1, 21*
138:*19*
142:*13, 25*
144:*4, 24*
145:*2, 21*
149:*19, 22*
150:*3*
153:*5, 15, 20*
154:*8, 13, 14*
155:*14*
156:*14*
158:*14, 15*
161:*7*
162:*13, 22*
163:*3, 22*
164:*14, 17,
21* 165:*11*
166:*1*
172:*8*
182:*5*
185:*2, 17, 24*
198:*2*
204:*10, 17*
208:*5, 7*
210:*1*
215:*24*
218:*8* 220:*4*
**correcting**
51:*22*
**corrections**
88:*20*
228:*11*
**correctly**
43:*6, 7*
**correlates**
145:*11*

Daniel Clarence Pearson, M.D.

**cosmetic**
187:*25*
188:*6, 10, 14,*
*22* 189:*15*
192:*16*
198:*1*
199:*3, 14, 25*
200:*6, 11, 24*
202:*21*
**counsel**
10:*20*
23:*22* 24:*3*
54:*16, 19*
67:*15* 74:*3*
227:*13*
**count** 107:*5,*
*15*
**country**
190:*1*
**County** 5:*8*
227:*6*
**couple**
10:*18*
**course**
30:*16*
40:*10*
53:*13*
186:*18*
**COURT**
1:*1* 22:*5,*
*12, 17* 23:*19*
26:*17*
33:*21*
39:*13*
125:*15*
126:*20*
180:*11, 13*
181:*9*
183:*1*
193:*12, 17*
195:*6*
196:*6, 7*
216:*13*

219:*10, 12,*
*18* 226:*12*
**courteous**
65:*22*
168:*15*
**Court's**
67:*24, 25*
68:*2, 25*
117:*13*
194:*3* 196:*4*
**cover** 6:*17*
**covered**
65:*25*
143:*14*
186:*11*
193:*7*
**covers** 7:*22*
**COVID**
37:*2*
**Cramer**
127:*21, 22*
128:*21*
129:*8, 15*
178:*6*
**create**
204:*20*
**created**
14:*10*
204:*19, 21*
**credentialed**
87:*8, 12*
**criteria**
148:*7*
149:*1*
153:*4*
154:*4*
214:*11, 20,*
*21* 215:*2*
**Critical** 5:*2*
157:*24*
**criticism**
79:*5*
**criticisms**
177:*24*

**criticizing**
178:*2*
**current**
21:*13, 20*
89:*9* 150:*21*
**currently**
18:*5* 22:*20*
26:*1*
**cut** 42:*6*
74:*3* 77:*3*
184:*15*
197:*11*


**< D >**
**daily**
133:*15*
137:*10*
224:*8, 10*
**damaged**
117:*4*
**DANIEL**
1:*1* 4:*9*
6:*3, 10, 25*
127:*20, 22*
228:*21*
229:*23*
230:*24*
**data** 62:*12*
88:*8* 94:*4*
102:*19, 24*
107:*6, 16*
131:*23*
132:*15, 21*
133:*5, 8, 9*
137:*21*
138:*25*
139:*3*
142:*15, 24*
144:*14, 22*
145:*4, 10, 19*
146:*2, 7*
149:*3, 21*
150:*7*
151:*2*

152:*11, 14*
153:*2, 13, 19,*
*24, 25*
160:*16, 22*
166:*7*
174:*9*
175:*11, 12,*
*13, 25* 176:*1*
190:*15*
192:*14*
202:*19*
223:*6, 7, 14*
224:*3*
**database**
131:*21, 22*
**date** 32:*12*
36:*10*
67:*25*
182:*23, 25*
227:*5*
229:*22*
230:*23*
**dated** 3:*11*
**dates** 23:*20*
58:*22* 59:*19*
**Daubert**
82:*6*
**DAVIDSON**
2:*15* 3:*3*
6:*14* 8:*12,*
*18, 23* 9:*15*
10:*9* 13:*1,*
*10, 20, 25*
14:*2, 5, 8, 15,*
*16, 22* 15:*7,*
*12, 17, 20*
17:*20* 18:*9,*
*18* 19:*11, 23*
20:*3, 5, 17,*
*24* 21:*1, 5, 8,*
*17* 22:*7, 14*
23:*10, 12, 21*
24:*13* 25:*6,*
*10, 15* 27:*3,*

6 28:*10*
30:*1, 4*
31:*21*
33:*13, 21*
34:*7* 39:*4,*
*13, 22* 40:*11*
41:*4, 25*
42:*5, 12, 18*
43:*1, 10, 16*
44:*1, 3, 12,*
*16, 18* 46:*4*
47:*8, 15, 20*
48:*14, 23, 25*
49:*17, 20*
50:*12*
51:*10* 52:*8*
53:*5, 18, 25*
54:*5, 21*
55:*11* 56:*4,*
*8, 11, 15, 24*
57:*3, 10*
58:*2, 13*
59:*5, 13*
60:*9, 17, 25*
61:*15* 62:*8,*
*18, 25* 64:*12,*
*21, 24* 65:*4,*
*15* 66:*9, 22*
67:*13, 24*
68:*2, 18*
69:*6, 11, 14,*
*15, 17, 20, 21*
71:*3, 21*
73:*7* 75:*7,*
*15, 21, 24*
76:*16, 22*
77:*6, 14*
78:*16* 81:*1,*
*16* 82:*10, 13,*
*16, 18* 83:*2*
84:*2, 11, 18,*
*24* 85:*6, 12*
86:*16* 87:*6,*
*13, 23* 88:*5*

90:*3, 12, 14, 25*  91:*25*
92:*11, 24*
93:*5, 16*
95:*7, 14*
96:*4*  97:*1, 10, 22*  98:*7, 22, 23*  99:*10*
100:*7, 24*
101:*13*
102:*7*
103:*10, 20*
104:*15*
105:*17*
106:*8*
107:*3, 12, 25*
109:*2, 18, 23*
110:*5, 8, 21*
111:*1, 14*
113:*6*
114:*5, 13, 16*
116:*17*
117:*24*
118:*21*
119:*3, 19*
120:*7, 18*
121:*4, 15*
122:*10*
123:*5, 11*
124:*10, 21*
125:*14, 18, 23*  126:*10, 16, 20*  127:*6*
128:*12, 14*
129:*1, 13, 23*
130:*22*
131:*7, 14*
132:*13, 19*
133:*3, 11, 21, 25*  134:*4, 23*
135:*6, 11, 17, 23*  136:*3, 13*
137:*1, 6, 20*
139:*18, 23*

141:*3, 6, 12, 15, 18, 22*
142:*11, 22*
143:*4, 11, 18*
144:*13, 21*
145:*3, 17, 25*
147:*10, 17*
148:*18*
149:*2, 6, 10, 16*  150:*17*
151:*6*
153:*12, 18*
154:*11*
155:*3, 11, 21*
157:*3, 9, 17, 21*  159:*4, 11, 16, 18*  160:*2, 11*  161:*10*
162:*12*
163:*15*
164:*8, 10*
165:*6, 9, 15, 23*  166:*17*
167:*24*
168:*7, 11, 19, 22*  169:*11, 13, 23*  170:*2, 11, 22*
171:*13, 19*
174:*5*
175:*3, 6, 19*
176:*14, 19*
177:*25*
178:*16, 25*
179:*8, 12, 23*
180:*18, 24*
181:*9, 13, 20*
182:*3*
183:*6, 13*
184:*17*
185:*1, 14*
186:*3, 20, 25*
188:*7, 20*
189:*5, 8, 23*

190:*22*
191:*16, 23*
192:*9*
193:*12, 24*
194:*2, 8, 13, 17*  196:*3, 18, 22*  197:*3, 7, 10, 16, 21*
198:*19*
199:*1, 12, 22*
200:*1, 4, 16, 22*  201:*3, 21*
202:*9, 17, 25*
203:*12, 19, 23*  204:*5, 14*
205:*18*
206:*10, 16*
207:*4, 8*
208:*8, 12, 22*
209:*13, 18, 25*  210:*8, 13, 22*  211:*4, 8*
212:*25*
214:*10*
215:*12*
216:*13, 19*
217:*19, 25*
218:*10, 17, 20*  219:*24*
220:*6, 9, 12, 14, 17, 22*
222:*13*
225:*10, 15*
226:*4*
**Davidson's**
49:*16*
**Davis**  217:*5, 6, 23, 24*
218:*1, 10*
219:*2, 6*
**day**  21:*7*
58:*24*
59:*23*
73:*24*

137:*12*
138:*15, 22, 23*  150:*2*
154:*13*
194:*23*
219:*22*
220:*23*
228:*15*
**days**  82:*6*
136:*17, 20, 22*  137:*2, 8, 14, 16*
138:*10, 11, 25*  139:*4*
141:*9, 25*
142:*15, 18, 20, 25*  143:*3, 9, 20, 21, 24, 25*  144:*2, 3, 9, 12, 15, 18, 20, 23*  145:*6, 11, 14, 15, 20, 23*  150:*1*
152:*20, 23, 24*  153:*9, 10*
164:*14*
195:*1, 11*
201:*25*
205:*16*
**DC**  2:*10*
**deal**  103:*12*
219:*19*
**deals**  78:*8*
**decade**
161:*6, 13*
**decades**
81:*24*  83:*5, 18*
**December**
16:*2, 4, 19, 20*
**decide**
59:*25*
65:*10*

88:*19*
205:*4*
206:*18, 19*
**decided**
37:*3, 5*
95:*16*
136:*5*
160:*20*
196:*4*
**decision**
10:*2*  53:*13*
106:*15*
165:*10, 17, 21, 25*
**decision-making**
52:*20*
**decisions**
52:*10, 13, 23*
53:*3*
**declaration**
115:*11, 12, 16, 25*  116:*5*
228:*6*
**declare**
228:*7*
**decreased**
116:*25*
117:*3*
**deductions**
17:*13*
**defendant**
28:*16, 17, 18*
128:*25*
**Defendants**
1:*1*  2:*13*
6:*5*  13:*17*
128:*22*
184:*6*  203:*6*
**defense**
225:*22*
**defer**  83:*22*
84:*15*

define 97:5
141:24
165:11
191:15
defined
96:15
134:25
135:19
139:6
141:8
144:8
154:21, 22
155:6
definition
136:6, 10, 11
153:15
155:18
164:25
165:7
definitions
136:9
degree
125:1
deluge
58:10
demonstrate
46:12
83:16
121:24
demonstrate
d 69:23
70:6, 7
76:1 84:5
86:18
105:3, 11
218:6
demonstratin
g 117:22
demonstrativ
e 14:10
denies 222:8
dependent
216:7

depends
87:18 202:7
deponent
227:6, 7, 8,
10
deposed
6:16 12:1,
9 27:10
194:4, 7
DEPOSITIO
N 1:1 6:2,
19 7:22
8:15, 16
9:2, 3, 12, 13,
16, 24 10:3,
11, 17, 19, 21
11:15, 18, 20,
21, 24 12:5,
7, 13, 22, 25
16:6, 15
20:14 21:2
23:3 26:17,
25 27:7
32:17 33:6,
7, 10 59:9,
10 62:2
64:19, 23, 25
65:17
66:18
67:16, 18, 21,
23 68:14, 23
69:1 74:3
76:25
82:14
150:15
157:15, 16
167:16
186:22
189:6
195:1, 13, 17
205:17, 21
206:2, 12
207:19
218:4

220:24
221:6
227:5, 9
228:1, 8, 12
229:1 230:1
depositions
11:23
26:20
65:23 68:4
186:11
194:19
195:21
deps@golko
w.com 1:1
derail 64:25
derived 17:1
describe
26:6 73:15
described
73:17
DESCRIPTI
ON 3:10
design
62:11
111:25
desk 132:6
despite
168:15
detail 205:3
207:3
detailed
66:7
details 62:6
108:4
detect 98:4
detecting
98:8
determine
18:18, 21
65:1 97:24
120:22
121:5, 22
122:2 170:2

develop
37:2
developed
27:19 39:7,
24, 25
developing
35:17
117:2
184:12
development
81:6 118:5
119:9, 10, 11
127:4 185:8
development
s 75:2, 9
deviate
136:5
diagnosis
203:5
diesel 121:9
differences
108:23, 24
158:21
different
13:6 17:4
56:9 91:5
99:5 105:7
133:9
136:11
162:16
169:20
175:12, 13,
25 176:4
190:17, 18,
19 212:14
213:3
215:17, 23
216:3
223:11
differential
203:5
differently
142:6

difficult
88:8
163:10
209:6
dioxide
121:9
124:19, 23
125:8
direct
186:16
223:24
Directing
90:9 91:23
directly
117:6
disagree
68:17 69:2
86:5, 6
87:25 88:9
89:22 90:6,
16, 17 91:2
94:7 97:17
98:1, 3, 19,
24 99:11
103:21
104:21
106:12
108:1
118:22, 24,
25 119:2
160:6, 10
195:23

disagreement
219:18
disappeared
170:18
disclosed
24:25 27:4
62:4
disclosure
19:5 27:5
46:25
128:7, 13

129:7
132:12
**discovered**
119:5
**discovery**
35:12  54:8
**discuss**
35:10
76:17
100:19
**discussed**
13:4  32:16
33:1
**discusses**
124:11
**discussion**
30:15, 18, 22
35:3, 7
38:15
100:17, 20
101:12
177:1
219:6
221:14
**discussions**
30:17  37:10
**displayed**
42:22
91:22
111:12
**disregard**
100:19
**disrespectful**
189:19
**distress**
201:17
**DISTRICT**
1:1
**diverse**
104:18
**divide**
138:21
**Division**

67:1
**DNA** 213:14
**Doctor**
83:21
93:17
99:24
163:11
166:12
171:5
193:14
225:8
**document**
7:16  13:5
14:17  15:4
43:4  67:10
109:22
110:1
112:17, 21
167:18, 25
168:1
169:15
170:4, 21
206:25
209:9, 16
210:2, 5, 9,
15, 17, 21
211:1, 5, 15,
17, 19, 23
212:1
**Documents**
4:10  12:25
13:6
110:18
198:24
204:24
208:4, 13
**doing** 36:12,
14, 24  37:3
48:7  52:7
73:19
80:13
105:6
151:20

179:11
215:4
**dollars**
16:21
**dosages**
213:4
**dose** 93:7,
11, 18, 20
95:16, 19, 22
96:5, 11, 15,
17, 18, 23
97:3, 6, 8, 13,
15  212:8, 11,
12, 21
213:19, 21,
23  214:1, 7,
12, 17, 22
215:9
216:7
217:2, 5
218:1, 5
219:2, 7
**doses** 96:14
99:6  105:7
212:14
**dosing**
95:21  96:6,
9, 20  98:17,
24  99:3
**double**
39:19  40:3
**double-**
**check**
123:24
**doubled**
166:9
**doubt**
177:17
**dozen** 30:23
**Dr** 3:13
6:15  7:1,
14, 17  8:24
9:7  10:10,
24  13:8

14:24  15:8,
21  16:18, 25
18:16
19:12, 16, 17,
24  20:2, 10
21:18, 24
22:8, 15
23:10
24:14, 20, 25
25:7, 16, 23
29:20
33:14, 19
34:4, 8
43:18
44:19
48:11, 17, 20
49:11, 21
50:14  54:6
57:11  59:3,
7, 14  61:17
62:9, 15
63:1, 8, 22,
23, 25  64:17
66:23, 24
67:20
68:11, 22
69:4, 7, 16,
22  70:9, 23
71:18, 23
73:3, 8, 19
80:9, 15, 21
82:5, 19, 23
83:3, 16, 23
84:4  85:13
86:1, 2, 18
88:22
89:11, 14, 15,
17  90:15
91:8, 16, 18
92:1  97:3
102:8
106:14
107:13
108:8, 14

109:4
110:9, 12, 19
111:8, 15
113:2, 7
115:10, 21,
22  116:1, 6
117:5, 14
123:12
128:21
129:8, 15
130:11, 16,
23  131:2, 3
134:6
135:7, 12, 18,
19  136:4, 5,
10, 12
137:21
140:6
141:7
142:8, 12, 23
149:17
150:11, 22
151:7
152:10, 19
154:3, 21
155:4
163:16
167:15
168:4, 14, 23
169:14
170:3
178:6
179:13, 24,
25  180:7, 12,
14, 25  181:5,
15  182:8
183:2, 7
184:18
186:14
187:2
188:25
189:1, 9, 18,
24  190:3, 15,
20, 25

Daniel Clarke-Pearson, M.D.

191:*24*
193:*10*
194:*6*
195:*10*
196:*12*
197:*22*
202:*24*
203:*8*
204:*7, 8, 15*
205:*17*
206:*7, 17*
207:*9*
209:*8*
210:*1, 14, 21, 24*  211:*12, 14*  212:*4*
215:*15*
217:*20*
220:*1*
221:*10, 22*
222:*15, 24*
223:*5*
**drain**  65:*7*
**Dropbox**
206:*5*
**dropped**
96:*20*
**drug**  96:*12, 25*  97:*2*
99:*4*
**drugs**  96:*10*
**due**  189:*9*
**Duke**  34:*16, 18*  35:*2, 13, 14*  201:*7, 10*
202:*10*
**duly**  6:*11*
227:*7*
**duration**
162:*25*
163:*1, 18, 20*
**DWC**
128:*15*

**dying**
201:*15*

**< E >**
**earlier**
34:*17*
49:*23*  51:*4, 22*  76:*23*
113:*17*
140:*17*
153:*22*
197:*25*
215:*23*
222:*10*
**earnings**
18:*10*
**easier**  14:*10*
171:*6*
**economy**
26:*4*
**edited**  89:*3*
**editor**  79:*7, 19, 22, 25*
80:*7*
177:*23*
178:*8, 18*
179:*21*
**editorial**
78:*19*  79:*14*
**edits**  88:*20*
**educated**
32:*18*
**effect**  4:*12*
82:*1*
119:*25*
120:*2, 12*
123:*18*
216:*4, 7*
**effects**  4:*17, 19*  123:*7, 22*
124:*11*
**effort**
186:*21*
**eight**  196:*13*

**either**  8:*13*
12:*21*
26:*18*
29:*18*
33:*20*
55:*13*
56:*22*  67:*7*
131:*13*
143:*24*
167:*14*
180:*5, 6*
184:*6*
224:*25*
**election**
10:*6*
**electronic**
29:*24*
**e-mail**
40:*22*  41:*8, 21*  42:*22, 25*
47:*7, 14*
51:*7*  53:*22, 23*  54:*11, 13, 14, 15, 16, 23*
58:*24*
59:*23*  138:*1*
**E-mails**
3:*15*  41:*1*
44:*7*  46:*7*
54:*9, 10*
**Emi**  4:*16*
122:*24*
123:*3, 6*
124:*18*
125:*19*
212:*10, 15, 19*  213:*2, 5, 9, 22*  216:*6, 20, 23*  217:*1*
**E-M-I**
216:*23*
**emotions**
103:*23*

**enable**
87:*25*
**enabling**
226:*8*
**encourage**
40:*13*
**endometriosis**  4:*21*
**ends**  68:*23*
112:*19*
**engaged**
28:*9*
**enhanced**
102:*6*
**entire**
211:*15*
220:*23*
228:*8*
**entitled**
18:*13*  19:*2, 5*  21:*14*
22:*3, 16*
25:*2*  34:*17*
49:*9*  65:*18, 20*  66:*1*
74:*2*
150:*25*
163:*19*
196:*13*
226:*7*
**environment**
115:*2*
116:*23*
**Environmental**  67:*5*
116:*3*
**environmentally**  115:*19*
**EPA**  187:*21*
**epi**  8:*4, 7, 24*
**Epic**  29:*16, 24*

**epidemiologic**  4:*6*
**epidemiological**  191:*25*
214:*14*
**epidemiologist**  181:*3*
**epidemiologists**  177:*19*

**epidemiology**
7:*15*  67:*1, 4*  214:*4*
**epigenome-wide**  213:*14*
**epigenomic**
4:*17*  123:*6*
**epithelial**
35:*17*  70:*1*
102:*22*
104:*6*
105:*14*
**Equal**
134:*20*
135:*20*
**ERRATA**
228:*1, 12*
229:*1*  230:*1*
**erroneous**
37:*20*
**error**  25:*25*
26:*1*
193:*20*
217:*3*
**ESQ**  2:*4, 5, 9, 15*
**essentially**
225:*3*
**establish**
94:*14*
**established**
85:*21*  86:*3, 10, 14, 22*
87:*4*  92:*17*

Daniel Clarke-Pearson, M.D.

estimate
17:*21*  18:*3,
25*  20:*23*
21:*11, 12, 23*
estimates
163:*21*
164:*13*
estrogen
216:*4*
et  20:*12*
21:*16*
evaluate
76:*4*  79:*3*
88:*19*  99:*6*
100:*25*
101:*4*  203:*2*
evaluation
53:*17*
96:*10*
100:*16*
177:*8*
evaluations
158:*23*
events
227:*13*
evidence
4:*7*  29:*11*
54:*24*
83:*12*
130:*20*
159:*14, 22*
160:*7*
192:*19*
203:*2, 14*
214:*23, 24*
exact  17:*10*
23:*20*
36:*10*
41:*15*  59:*19*
exactly
22:*21, 22*
36:*15*
39:*15*
42:*16*

142:*4*
182:*24*
194:*5*
223:*16*
EXAMINAT
ION  3:*3, 4*
6:*13*  62:*6*
221:*8*
227:*8, 11*
examine
122:*11*
123:*22*
126:*11*
182:*13*
195:*13*
examined
6:*11*  59:*8*
62:*1*  64:*18*
150:*14*
157:*14*
205:*10*
examining
225:*19, 21*
example
31:*25*
137:*9*
190:*4*
205:*19*
exceeded
217:*16*
Excellent
149:*7*
excess
190:*21*
excessively
96:*17*  97:*3,
6, 13*
exclude
137:*10*
excluded
137:*24*
138:*3*
180:*12, 13*
183:*2*  225:*1*

excluding
138:*3*
161:*5, 12*
Excuse
17:*17*  25:*8*
65:*14, 19, 20*
121:*1*
168:*12*
194:*8*
209:*3*
220:*10*
221:*20*
exhaust
121:*10*
EXHIBIT
3:*10, 11, 13,
15, 18, 20*
4:*1, 4, 8, 10,
12, 16, 19, 22*
5:*2, 6, 9, 13,
14*  13:*23*
14:*9, 11*
24:*19*
40:*21*  41:*3*
42:*19, 20, 23,
24*  43:*2, 5,
11, 24*  44:*4,
9*  46:*10*
47:*19*  48:*8*
54:*1*  60:*12,
16*  61:*13, 14*
64:*9, 11*
69:*9, 10*
71:*16, 19*
84:*20, 21*
110:*22*
114:*14, 15,
18*  122:*24*
123:*2, 4*
127:*11, 12*
129:*19, 22*
134:*1*
157:*7, 8, 10*
158:*4*

162:*1, 2*
169:*8, 10*
208:*19, 21*
210:*9, 12*
221:*12, 20,
23*  222:*21*
exhibits
9:*12*  14:*13*
expand
32:*4*  109:*16*
experience
87:*7, 14*
88:*15*
98:*13*
160:*23*
experiment
95:*23*
105:*5*
214:*8, 19*

experimental
98:*18, 25*
99:*12*
111:*24*
214:*8, 13, 23,
24*
experiments
105:*6*
121:*24*
215:*4, 5, 7, 9*
Expert  3:*14*
4:*8*  17:*2*
18:*5, 20*
19:*14*
21:*20*
22:*20*  25:*1,
23*  26:*7, 11,
14, 23*  29:*6*
38:*1, 10*
46:*19, 24*
47:*4*  51:*12,
13, 16*  53:*19*
61:*4*  67:*7*
68:*4, 6*

70:*13*
114:*17*
115:*18, 23*
116:*2, 10, 13,
16*  128:*4, 15,
21*  129:*2, 4,
8, 15*  130:*14*
154:*21*
178:*3, 7, 20*
179:*2, 14*
182:*5*
186:*6*
187:*5*
191:*17*
194:*24*
203:*7, 11*
204:*16*
212:*5*
225:*19, 22*
experts
63:*16*
111:*13, 17*
194:*4, 19*
195:*21*
explain
56:*16*
136:*4*
165:*25*
216:*2*
explained
99:*17, 21*
100:*14, 22*
101:*2, 6, 11*
102:*9, 15*
explaining
83:*25*
explains
47:*1*
explanation
100:*15*
101:*18, 22,
25*  102:*12*
explicitly
68:*3*  118:*7*

Daniel Clarke-Pearson, M.D.

explore 93:21
expose 83:10 138:16
exposed 116:22 137:13 192:1, 23, 24 225:2
exposure 69:24 76:10 80:22 81:6, 25 83:5 99:18, 22 100:9 101:19 102:10, 21 104:5 105:11 133:15, 19 134:8 140:19 155:13 188:5, 6 212:13, 15, 20 213:3, 13, 18, 20 223:11, 13
exposures 134:8, 11, 16
expression 115:1 118:4 122:12, 13, 15, 18 124:23 126:5, 9
extend 67:16 181:5
extended 25:4

Extensive 98:13 111:9 198:25
extensively 59:8
extent 26:16 199:18
extra 217:17
extracted 223:6
extremely 65:7 93:8, 11, 18, 22 95:17 97:18
eyes 14:22

< F >
face 37:16
fact 29:2 51:1 52:21 53:4, 6 116:9 120:19 144:22
factor 31:11 32:10 33:2 37:24 38:14 130:8
factors 4:20 31:2, 5, 24 32:3, 5 35:8
faculty 37:16
faded 101:3
faint 56:20
faintly 39:10, 11 56:19
Fair 17:14 44:2 110:20

fairly 178:8
faith 84:4
Fallopian 5:9 146:12 148:3 224:4
false 220:9, 12, 14, 19
familiar 55:1 61:1 63:7, 12, 15, 21 72:20, 22 83:24 114:10 123:8 131:15 150:6 180:25 197:22 198:11, 23 210:18, 23
far 112:8 156:4 170:9 210:16
fashion 117:19
fault 101:14
fax 1:1
FDA 42:10 44:21 47:17, 23 49:25 50:18 51:2, 24 191:1, 4, 8 199:6, 13, 24 200:3, 5, 10, 24
FDA's 50:7
February 46:11 51:8 58:24 59:1, 16 193:9
Federal 6:4 23:19

180:11 183:1 209:23
fee 24:16
feedback 25:12
feel 58:3 62:13 225:25
feels 101:24
fellows 36:20
felt 37:4 57:25 113:21 166:3
female 124:6
Ferraro 128:16
fibers 190:8
fibroids 63:11
fibrous 190:5
field 76:18 111:17
fifth 94:17 164:3
figure 149:12 214:1 215:14, 16, 19, 20, 22 216:1, 2
filed 52:22 53:4, 8
filibuster 221:1
filibustering 66:12 205:20
fill 66:12

final 91:18 92:1
Finance 42:14 44:13 55:21
Finance.Yahoo.com 42:16
financial 47:1
find 54:11 73:14 81:6 124:18 151:10 191:4 200:25 217:5
finding 47:17, 23 50:7, 8, 18 62:17 80:23 81:4 176:15 185:6
findings 71:15, 23 94:14 105:23 112:1 174:19 175:9, 22 176:6, 7
fine 43:22 57:5
finish 15:12 50:15 59:6 65:3, 19, 21 97:9 135:9 163:13 184:16 197:15 218:25 220:10

Daniel Clarke-Pearson, M.D.

finished
78:*13*
134:*22*
163:*12*
164:*6*
**fire** 13:*13*
**Firm**
128:*16, 17*
**firms** 129:*5*
**first** 6:*11*
24:*14*
33:*10*
61:*21*
85:*14* 94:*9,
12* 104:*22,
24* 111:*12*
114:*8*
141:*20*
150:*13, 14*
206:*22*
213:*11, 12*
219:*3*
221:*11*
224:*6*
**five** 11:*5*
14:*17*
137:*13*
141:*4*
163:*21*
**flaw** 98:*18,
25* 99:*12*
**flaws**
181:*14, 17,
19, 23* 182:*2*
**flip** 43:*11*
**FLOM** 2:*13*
**Florida** 63:*9*
**flowing**
140:*22*
**fly** 24:*14*
**focus** 33:*11*
121:*23*
146:*11*

focused
25:*20* 148:*2*
**focuses**
146:*14*
**focusing**
189:*20*
**follow**
108:*11*
169:*22, 25*
196:*8*
219:*22, 25*
221:*5*
**followed**
171:*4*
172:*1* 183:*8*
**Following**
130:*2, 6*
**follows** 6:*12*
**follow-up**
225:*12*
**footnote**
147:*2, 21*
148:*13, 20*
171:*4*
172:*1, 3, 16,
22* 213:*9*
**foregoing**
227:*5, 9*
**foreign**
125:*4*
**forest** 182:*4,
7, 9, 14*
183:*23*
**forever**
100:*21*
**forgotten**
49:*22*
**form** 17:*16,
17* 18:*6*
24:*8* 28:*6*
31:*19*
38:*24*
39:*17* 40:*2*
46:*1* 47:*5,*

*12* 50:*20*
51:*25*
52:*24* 53:*9*
55:*8, 24*
56:*8* 57:*20*
58:*6* 59:*2*
60:*3, 22*
70:*25*
71:*18* 75:*4,
11* 76:*13, 20*
77:*9* 80:*24*
81:*9* 82:*2*
83:*20* 84:*6*
86:*12, 25*
87:*10, 16*
88:*2* 90:*19*
91:*20* 92:*8,
20* 93:*3*
95:*3, 11*
96:*2, 7*
97:*19* 98:*2*
99:*1* 101:*7*
103:*3, 18*
104:*13*
105:*15*
107:*18*
108:*16*
109:*21, 25*
110:*17*
114:*2*
116:*14*
117:*17*
118:*23*
120:*4, 14*
122:*4*
124:*3, 20*
125:*10, 21*
126:*7, 13*
128:*23*
129:*10*
130:*19*
131:*5, 11*
132:*2, 22*
133:*7*

135:*2, 4, 22,
25* 136:*7, 23*
137:*4, 17*
139:*13, 21*
141:*11, 14*
142:*2, 17*
143:*1, 15*
144:*10, 16,
25* 145:*12,
22* 147:*7, 14*
148:*22*
153:*6, 16*
154:*9, 24*
155:*15*
159:*1, 8, 15*
160:*1, 8*
161:*8*
162:*7*
164:*9*
165:*2, 20*
173:*24*
175:*16*
176:*17*
177:*20*
178:*5*
179:*5, 18*
180:*21*
181:*18, 24*
183:*4, 10*
184:*23*
185:*12, 25*
186:*9*
188:*1, 12, 24*
189:*16*
191:*13*
192:*3*
198:*16, 22*
199:*9, 15*
200:*1, 13, 19*
201:*1, 20*
202:*6, 13, 22*
203:*9, 16*
204:*1, 11*
208:*6, 11*

209:*20*
214:*5, 25*
**format**
104:*25*
**forming**
212:*2*
**forthcoming**
35:*23*
**forum**
30:*11* 34:*12*
**forward**
149:*11*
**forwarding**
54:*15*
**found** 42:*10*
45:*5* 49:*25*
51:*2* 80:*21*
92:*2, 6*
119:*7*
120:*23*
121:*6, 23*
124:*22*
128:*19*
171:*2, 23*
191:*1, 8*
199:*8, 14, 25*
200:*6, 11*
207:*23*
219:*2*
**four** 26:*15,
19, 22* 66:*18*
67:*17, 22*
68:*5, 15*
112:*8*
137:*2, 8, 13,
15, 18, 22*
138:*17, 18,
25* 139:*4, 7,
9, 11, 25*
140:*4*
141:*9, 25*
142:*10, 13,
15, 18, 20*
144:*8, 23*

163:*21, 24*
164:*1, 11, 12,*
*16, 19*
195:*18*
196:*14, 15,*
*25*  200:*25*
217:*14*
218:*18*
219:*15*
220:*8*
**fourth**  94:*17*
**frame**  11:*19*
**free**  23:*15*
62:*13*
168:*4, 7*
**frequencies**
152:*15*
**frequency**
162:*25*
163:*1, 17, 19*
176:*2*  218:*6*
**frequent**
3:*21*  4:*23*
60:*6*
133:*19*
134:*17, 25*
135:*20*
136:*6, 9*
139:*6*
141:*9*
144:*8*
153:*15*
154:*17*
165:*1, 8, 11*
223:*2, 8*
224:*7*
**front**  41:*2*
50:*17, 25*
54:*10*
82:*11, 24*
89:*1*  123:*9*
150:*11, 16*
151:*5*
157:*13*

169:*2*
170:*8, 10*
206:*8*
210:*15*
222:*16*
223:*21*
**fulfill**  196:*4*
**full**  6:*23*
53:*17*
132:*12*
205:*6*
206:*20*
**functional**
224:*23*
**funding**
129:*6*
**further**
9:*23*  59:*7*
92:*23*
217:*15*
219:*20*
225:*8*
226:*1, 3, 9*
227:*11*

**< G >**
**gamut**  99:*5*
**gathering**
30:*24*
**gene**  35:*10*
115:*1*
122:*11, 13,*
*15, 18*
124:*23*
126:*5, 8*
**general**
10:*14*  68:*3,*
*5*  79:*15*
83:*7*  88:*15*
156:*2*
194:*22*
218:*7*

**genes**
116:*24*
118:*5*
**genetic**
35:*16*
**Genetics**
67:*1*
**Genital**  4:*2*
140:*25*
**GEREL**  2:*7*
128:*17*
**getting**
56:*22*
82:*17*  124:*7*
**give**  11:*19*
17:*10*  18:*7*
32:*11*  37:*9*
72:*17*  73:*6*
82:*8*  85:*2*
86:*21*
107:*19*
140:*11*
151:*3*
157:*12*
196:*18*
201:*16*
203:*14*
207:*3*
216:*16*
226:*3*
**given**  18:*25*
21:*11*  22:*1*
30:*22*  37:*4*
49:*21*
77:*17*
96:*2*
141:*9*
189:*4*
217:*17*
225:*24*
226:*1*
**gives**  116:*2*
**giving**  34:*16*
**glad**  149:*13*

**glitch**
170:*19*
**global**
205:*23*
**go**  6:*18*
31:*7*  34:*2,*
*5*  42:*8*
43:*10, 16, 20*
46:*7*  53:*16,*
*25*  61:*23*
66:*10*
67:*13*  73:*9,*
*11*  77:*17*
79:*7*  84:*23,*
*24*  85:*1*
89:*4, 5, 14*
96:*16*
100:*21*
108:*6, 18*
110:*5*
114:*17*
133:*20*
135:*15*
136:*14*
141:*3*
146:*15, 24*
157:*23*
161:*16, 20*
162:*23*
163:*5*
166:*14*
169:*11*
170:*12*
173:*2*
174:*17, 25*
175:*4*
179:*20*
182:*16*
184:*3*
188:*3*
193:*24*
196:*22*
203:*5*
207:*1*

208:*19*
211:*4, 10*
212:*5, 17*
214:*12, 13,*
*17*  215:*13*
219:*10*
225:*10*
226:*12*
**Godleski**
68:*19*  69:*4*
115:*10, 21,*
*22*  116:*1, 6*
**goes**  62:*6*
79:*22*  88:*6*
91:*12*
104:*1*
132:*8*
190:*15*
207:*18*
**going**  6:*18*
8:*12, 15*
9:*21*  10:*8,*
*12*  13:*23*
16:*16*  21:*1*
41:*5*  43:*2,*
*16*  45:*7*
48:*4*  51:*20*
66:*5, 9*
94:*23*
101:*10*
123:*1, 2*
128:*12*
135:*12*
149:*10, 11*
161:*25*
170:*14*
188:*8*
194:*5*
196:*16, 18,*
*25*  217:*10*
218:*23, 24*
219:*5, 12, 16,*
*25*  220:*2*
221:*5*

225:13
226:2
**GOLKOW**
1:1
**Good**  6:15
37:4  84:4
206:22
**Google**
207:14
**gotcha**
134:14
**government**
188:17
**grade**  198:5,
7, 18  199:3
**GRADEpro**
159:21
160:5
**grades**
156:3
**gradient**
212:21
214:12
215:9

**gradient/dose**
214:16
**grant**  129:5
**graph**  214:1
**Great**  149:6
164:4
**greater**
60:6
134:17, 18
135:20
139:8
142:8
143:2
144:12, 17
149:22
154:4
162:3, 8, 18
163:6

164:1
223:17
**greatest**
223:12
**ground**
6:17  65:25
186:10
193:7
225:25
**groundbreak
ing**  75:1, 8
**growth**
119:6
**guess**  15:24
16:5  216:4
**guessing**
159:3
**guys**  34:2
44:8  69:19
195:4  207:5
**GYN**  79:19
88:13  90:4,
7  111:20
**Gynecologic**
34:18
36:20
40:20
70:19  78:1,
3, 6, 8, 15
79:9, 12
80:10
84:25  87:7,
15  110:13
111:16
**Gynecologica
l**  93:6
**gynecologist**
160:23
**gynecology**
36:21  41:13

**< H >**
**hand**  156:5
227:14

**handed**
152:8
**happen**
38:7  95:1
**happened**
170:18
175:4
**happy**  9:7,
11  48:21
61:24  82:9
103:25
110:25
151:3
152:1, 17
**hard**  62:16
85:8
156:17
172:20
**harmonizatio
n**  148:14, 21
**harmonize**
146:25
147:19
148:25
**harmonized**
146:9, 25
**Harper**
69:23
71:24, 25
76:1, 9
84:19
106:14
108:8, 14
181:15
216:17, 21
**Harper's**
89:15
**hazard**
224:9
**heading**
134:13
**headline**
44:23

**heads**
196:19
**Health**  5:11
52:17, 23
67:3, 5
132:25
133:16
176:2
**hear**  8:17,
20  11:1
13:15
21:21  22:8
27:15
38:20
56:13  57:4
64:5  65:1
120:25
121:3
125:13
146:4
169:23
181:7  207:6
**heard**  70:16
71:8, 10
74:11, 17
216:24, 25
**hearing**
82:6
163:11
206:11, 15
207:5
**heart**  89:21
**help**  73:22
219:5
**helpful**  57:9
**hereof**
228:13
**Hey**  64:21
**high**  29:9
37:2  93:8,
11, 19, 22
94:2  95:17
96:17, 23

97:3, 6, 14,
18  98:17
**higher**  40:5
158:18, 25
159:7
192:25
**highest**
164:20
188:17
223:19
**high-
estrogen**
121:25
**high-level**
66:3
**highlight**
112:3
121:18
164:4
170:17, 20
171:14
**highlighted**
159:20
164:12
**highlighting**
149:7
170:15
**highly**
170:25
171:21
173:4, 10, 16,
18, 22
174:11
226:10
**Hill**  7:3
24:2  214:3,
11, 20, 21
215:3
**hit**  36:25
**Hmm**  180:3
**hoc**  131:16,
25  132:11
**hold**  8:16
9:3, 13

Daniel Clarke-Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| 169:*2* | **humble** | 162:*2* | **important** | 223:*2, 7, 12,* |
| 225:*22* | 138:*8* | 169:*10* | 58:*1, 3* | *14*  224:*16* |
| **holding**  9:*24* | **hundreds** | 208:*21* | 132:*11* | 225:*3* |
| **honestly** | 209:*5* | 210:*12* | 149:*14* | **includes** |
| 25:*20* | **hypothetical** | **identified** | 166:*4* | 16:*1*  174:*4* |
| **Hospital** | 31:*14, 17, 18,* | 31:*5*  122:*8* | **improper** | **including** |
| 28:*21* | *22, 23* | 162:*5* | 91:*17* | 35:*8*  122:*8* |
| **hour**  16:*21* | 148:*16, 23* | 187:*13, 20* | | 187:*21* |
| 25:*25*  26:*2* | 192:*4, 20* | 188:*18* | **improvement** | 195:*21* |
| 27:*23*  28:*2,* | 212:*23* | 207:*17* | 79:*5* | **income** |
| *3*  68:*23* | 213:*1* | 208:*2* | **inaccurate** | 17:*1, 4, 8* |
| **hours**  11:*5,* | **hypotheticall** | 215:*23* | 96:*1* | 18:*4, 19* |
| *13*  16:*3, 7, 8,* | **y**  32:*1* | 218:*1* | 148:*14, 21* | 19:*13* |
| *10, 12, 13* | 192:*22* | **identifies** | 219:*9* | 21:*13, 20* |
| 25:*4*  27:*2* | **hysterectomi** | 126:*8* | **inappropriat** | 22:*19*  26:*23* |
| 65:*16* | **es**  224:*19* | **identify** | **e**  19:*21* | **incomplete** |
| 66:*10, 18* | 225:*2, 6* | 72:*7, 18, 25* | 209:*22* | 177:*5*  192:*4* |
| 67:*17, 22* | | 81:*12, 17* | 226:*11* | **inconsistent** |
| 68:*5, 7, 15,* | **hysterectomy** | 84:*9, 13* | **inches**  56:*25* | 174:*18* |
| *23*  74:*2* | 31:*9*  37:*18* | 92:*14* | **include** | 175:*9, 15, 21,* |
| 80:*17, 22* | | 126:*14* | 132:*20* | *22, 24*  176:*4,* |
| 81:*8*  83:*17* | **< I >** | 185:*21* | 133:*5* | *5* |
| 95:*2* | **IARC** | 188:*21* | 143:*10* | **incorrect** |
| 117:*13* | 187:*21* | 207:*10* | 145:*10* | 178:*10* |
| 194:*7, 23* | 188:*3* | 209:*11, 16* | 172:*12* | 193:*18* |
| 195:*1, 11, 18* | 198:*20, 24* | 217:*1* | 174:*2, 3* | **increase** |
| 196:*1, 14, 15* | **idea**  45:*11,* | **identifying** | **included** | 28:*14* |
| 197:*1* | *15*  79:*15* | 119:*11* | 31:*25*  43:*5* | 35:*17*  117:*1* |
| 217:*12, 14* | 157:*6* | 132:*10* | 64:*16* | **increased** |
| 218:*18, 22,* | | 209:*2, 3* | 108:*4* | 46:*12* |
| *24*  219:*16* | **identification** | **IHC**  97:*24* | 132:*24* | 114:*24* |
| 220:*7, 8, 15,* | 14:*14*  41:*3* | 98:*4, 8, 14* | 139:*8* | 116:*23* |
| *24* | 42:*20* | **immune** | 143:*9, 17, 20,* | 119:*5* |
| **HPV**  29:*9* | 60:*16* | 116:*25* | *21*  145:*16,* | 163:*6* |
| **huge**  81:*5* | 61:*14* | 117:*3* | *20, 24* | 166:*6* |
| **human**  29:*9* | 64:*11* | 123:*19* | 146:*21* | 176:*11* |
| 120:*10, 13,* | 69:*10* | 124:*16* | 148:*2* | 184:*12* |
| *21*  123:*22* | 84:*21* | 127:*1* | 150:*20* | 192:*18* |
| 125:*24* | 114:*15* | **immunosurv** | 158:*6* | **increases** |
| **humans** | 123:*4* | **eillance** | 174:*9* | 60:*7* |
| 98:*15* | 127:*11* | 118:*6* | 182:*4* | **independent** |
| 120:*1, 3, 5* | 129:*22* | 123:*20* | 186:*13* | 76:*6, 8* |
| 214:*18* | 144:*6* | **impact** | 205:*12* | 115:*17* |
| | 157:*8* | 215:*5* | 215:*10* | 116:*9, 13, 16* |

Daniel Clarke Pearson, M.D.

183:*14*, *19*
184:*2*, *20*
185:*21* 187:*5*
186:5
**independentl**
**y** 76:*4*
182:*13*
**indicated**
48:*4* 155:*9*
228:*12*
**indicating**
42:*9*
**individual**
194:*20*
**individually**
13:*24*
**induced**
126:*25*
**inducing**
122:*16*
**industrial**
188:*5*
**inert** 121:*25*

**inflammation**
5:*7* 81:*23*
83:5, *9*, *15*
94:*22*
124:*17*
126:*24*
127:*1*, *9*
**inflammator**
**y** 125:*5*
**inflation**
26:*5*
**inform**
31:*10*
**informal**
140:*12*
**information**
18:*14* 19:*4*,
*8* 21:*15*
22:*1*, *2*
25:*3* 51:*23*

52:*15*, *19*
53:*15*
57:*22*
94:*11*
132:*24*
151:*12*
166:*22*
**informed**
29:*11*
**initiation**
119:*14*, *20*
**injected**
198:*15*
202:*4*
**injecting**
201:*12*
202:*12*, *15*,
*16*
**Inn** 7:*4*
**inquiring**
62:*3*
**inquiry**
217:*9*, *15*
219:*15*, *20*
**insight** 94:*6*,
*18*, *19*
**insoluble**
4:*17* 123:*7*
**Institute**
67:*2*, *5*
**Institutes**
67:*2*
**instructed**
19:*22*
**Instructing**
21:*5* 217:*19*
**instruction**
20:*1*
**intact**
146:*12*
**integrity**
132:*1*, *4*, *8*
**intends** 74:*3*
**intent** 122:*1*

**interacted**
36:*11*
**interacting**
37:*7*
**interest**
47:*2*
115:*12*, *16*
116:*5*
**interested**
227:*13*
**interpret**
88:*8*
185:*18*
214:*17*
**interpretatio**
**n** 93:*25*
111:*25*
173:*13*
175:*24*
178:*11*
**interpretatio**
**ns** 176:*23*
**interpreted**
176:*21*
**interrupt**
21:*6*, *10*
50:*15*
156:*16*
163:*9*
168:*13*
220:*21*
**interrupted**
194:*14*, *18*
**interrupting**
21:*8* 66:*16*
194:*9*, *10*, *13*
220:*20*
**interrupts**
193:*14*
**interval**
224:*12*
**investigate**
118:*1*, *8*, *18*
119:*4*

**investigated**
84:*7*
**investigating**
96:*24* 99:*3*
**investigation**
76:*7*, *9*, *15*
105:*8*
**invoice**
16:*17*
24:*18*, *21*
**Invoices**
3:*11*, *14*
7:*21* 13:*11*,
*17*, *18* 14:*6*,
*12*, *18*, *19*
15:*21* 48:*11*
**involve**
27:*13*, *14*
119:*5*
136:*21*
137:*2*
163:*25*
164:*1*, *13*
212:*15*, *19*
**involved**
71:*9*
103:*23*
128:*1*
136:*17*
139:*4*, *11*
150:*13*
178:*14*
213:*2*
**involves**
27:*16*
**involving**
179:*16*
**issue** 40:*14*
53:*17* 56:*7*
57:*18* 215:*2*
**issued** 68:*8*
130:*7* 195:*3*
**issues** 26:*13*
56:*10* 80:*3*

85:*18*
131:*25*
178:*9*
194:*20*, *24*
214:*18*
**Item** 208:*16*,
*19*
**items**
207:*22*
**its** 52:*11*
73:*18* 79:*4*
104:*22*

**< J >**
**J&J** 3:*18*
44:*24* 45:*2*,
*4*, *6* 50:*5*
52:*7*
**J&J's** 45:*5*,
*25* 55:*21*
**J774** 4:*18*
123:*7*
**January**
1:*1* 6:*1*
193:*8*
227:*14*
**JERSEY**
1:*1* 23:*19*
**JESSICA**
2:*15* 8:*21*
10:*7* 13:*23*
14:*21*, *25*
15:*11*
18:*14*, *24*
20:*10* 23:*8*
24:*23* 25:*8*
33:*4*, *18*
42:*22* 43:*8*
48:*3* 56:*21*
59:*10* 73:*5*
82:*3* 91:*21*
98:*20*
135:*10*
157:*12*

163:*10*
168:*10*
184:*15*
195:*8*
205:*8*
216:*11*
217:*13*
218:*19*
220:*5, 11*
225:*14*
**jessica.david**
**son@skadde**
**n.com** 2:*17*
**JJG** 115:*17,*
*20*
**JNJTALC00**
**1465273**
5:*16*
208:*23*
210:*10*
**job** 203:*2*
**JOHNSON**
1:*1* 2:*13*
42:*10*
67:*15, 16*
191:*5* 222:6
**Johnson's**
5:*14* 47:*24*
50:*19*
69:*24* 76:*1,*
*11* 105:*11*
187:*15*
188:*14*
189:*25*
190:*10, 17,*
*24* 191:*2, 3,*
*9* 222:*2*
**journal**
13:*8* 70:*19*
74:*20, 22, 24*
75:*3* 79:*7*
113:*15*
174:*16*

**journals**
77:*1* 78:*24*
**judge** 66:*6*
**July** 64:*17*
186:*14*

**< K >**
**Kaunitz**
63:*8*
**keep** 187:*1*
209:*19*
**key** 207:*14*
**keyword**
207:*15*
**kind** 14:*19*
27:*21*
84:*16* 85:*8*
104:*22*
120:*12, 13*
**kindly**
163:*13*
**knew**
201:*23*
**know** 6:*20*
9:*1* 13:*12*
15:*10*
18:*10, 13, 22*
19:*3, 4, 5, 24*
20:*6, 8, 10,*
*11, 18, 20*
21:*15*
22:*21, 22, 25*
23:*20*
24:*20* 26:6
31:*25*
32:*11*
38:*10* 39:*5,*
*25* 40:*4*
41:*7* 43:*13,*
*18, 19* 44:*15*
45:*19*
46:*18, 20, 22*
47:*22*
49:*25*

51:*15*
53:*11*
54:*22*
58:*21*
59:*10, 19*
61:*3, 4, 5*
63:*9, 15, 18*
74:*4, 7*
75:*8, 16, 18*
77:*15, 22, 25*
78:*2, 3, 5*
79:*12*
80:*15*
87:*21*
93:*24* 94:*1*
95:*16* 96:*8,*
*12, 17, 22*
97:*2, 5*
100:*18*
101:*19, 23*
103:*9*
109:*3*
110:*3, 18*
111:*8*
112:*16*
120:*21*
127:*16*
129:*8, 12*
131:*22*
132:*10*
133:*4, 12*
137:*21*
140:*9*
145:*4, 7*
146:*16, 23*
147:*15, 23*
148:*24*
150:*3*
151:*7, 21*
152:*4, 6, 10,*
*14* 153:*24*
154:*16*
155:*12, 23*
158:*16, 20,*

*24* 159:*2, 5,*
*9* 160:*4, 14,*
*17, 22, 25*
163:*12*
166:*5, 9, 10,*
*11, 12, 25*
167:*19*
168:*7*
170:*4, 18*
178:*6, 17*
179:*6*
180:*6, 10, 22*
185:*4*
186:*15*
187:*14*
191:*14, 21*
193:*19*
199:*2, 5, 17,*
*19* 200:*24*
202:*14*
206:*1*
207:*5, 21*
210:*7*
211:*18*
213:*2, 22*
217:*15*
220:*4*
221:*5*
225:*14*
**knowledge**
9:*9* 20:*16*
21:*14*
50:*16*
63:*17*
89:*11*
108:*15*
109:*6*
**known**
35:*17*
**knows** 20:*4,*
*11, 19*
101:*20*

**< L >**

**lab** 37:*17*
71:*8, 11, 13*
95:*6*
**laboratories**
72:*13*
**laboratory**
72:*25*
80:*13* 95:*6*
96:*13*
105:*9*
120:*17*
215:*8*
**lack** 79:*4*
**Large** 227:*3*
**Lasted** 27:*1*
**latency**
201:*23*
**Law** 128:*16,*
*17* 129:*5*
149:*15*
209:*23*
**lawsuit** 53:*4*
**lawsuits**
52:*22* 53:*8*
**lawyer**
47:*10*
**lawyers**
45:*14*
200:*17*
203:*13*
204:*20*
**lay** 166:*23*
**lead** 72:*1*
117:*22*
122:*19*
123:*21*
**leadership**
40:*20*
41:*18*
221:*13*
**leading**
119:*10*
**leads** 99:*18,*
*22* 100:*10*

102:*10*
124:*23*
**learn**  31:*15*
112:*2*  145:*9*
**Learned**
34:*18*
**leave**  150:*5*
219:*8*
**lecture**
30:*13*
34:*21, 22, 25*
35:*11, 18, 21*
49:*22*
**lectures**
37:*9*
**led**  125:*8*
130:*17*
**Lee**  203:*7*
**left**  29:*14*
110:*9*
121:*13*
156:*5*  196:*2*
**legal**  178:*15*
**legislation**
52:*15*
**LEIGH**  2:*4*
15:*13*  21:*1*
25:*10*  27:*4*
30:*2*  43:*17*
44:*4, 6*
49:*2, 18*
59:*5*  64:*21*
66:*11*
82:*10, 13*
111:*5*
135:*14*
168:*19*
169:*23*
179:*8*
186:*20*
189:*5*
194:*14*
195:*7*
196:*10*

209:*13, 18*
220:*9*
**leigh.odell@**
**beasleyallen.**
**com**  2:*7*
**Leigh's**
49:*21*
**length**  62:*1*
205:*11*
**lengthy**
79:*16*  178:*8*
**lesser**  125:*1*
**Lessons**
34:*18*
**letter**
177:*23*
178:*8, 18*
179:*3, 6, 21*
**letters**
178:*1, 24*
179:*16*
**letting**
38:*10*
112:*15*
**level**  188:*17*
191:*11, 12,*
*15, 25*
223:*19*
**levels**
122:*12, 18*
190:*19*
223:*11*
**liabilities**
3:*19*  44:*25*
45:*2*  50:*6*
**LIABILITY**
1:*1*  26:*12*
**ligation**
31:*8*
160:*19*
161:*13*
224:*19*
225:*3*

**ligations**
225:*6*
**likelihood**
119:*6*
**Likewise**
80:*5*
**limit**  217:*16*
220:*5*
**limitations**
182:*1*
**limited**  9:*9*
62:*20*
67:*22*
117:*7, 11*
137:*15*
147:*12*
148:*19*
166:*6*
194:*23*
195:*1, 17*
219:*15*
**line**  82:*8*
94:*17*
105:*8*
149:*4*
162:*9*
218:*19*
226:*9*
229:*3, 6, 9,*
*12, 15, 18*
230:*3, 6, 9,*
*12, 15, 18*
**lines**  94:*5,*
*15, 16*  105:*6*
124:*9*  163:*2*
**link**  42:*8,*
*13*  46:*11, 14,*
*17*  50:*22*
51:*5, 8*
59:*15*  60:*1,*
*10*
**linked**
213:*14*

**list**  5:*13*
7:*17*  64:*17*
77:*11*
79:*16*
204:*16, 19,*
*22, 25*
205:*12, 15,*
*22, 24*  206:*6,*
*8, 11, 19*
207:*11, 22*
208:*14, 18,*
*25*
**listed**  7:*13*
10:*13*
73:*10*
145:*19*
149:*4*
159:*6*
162:*15*
204:*25*
207:*10*
**literally**
105:*18*
194:*9, 14*
**literature**
10:*16*
32:*19, 21*
81:*20*
85:*21*  86:*3,*
*11, 23*  87:*5*
92:*19*
95:*10*
104:*11*
186:*5*
187:*3, 4*
198:*8, 11*
**LITIGATIO**
**N**  1:*1*  3:*13*
23:*2*  26:*23*
32:*14, 16, 23*
38:*1, 11*
60:*21, 24*
63:*17*  67:*8*
70:*14, 17, 22*

71:*9*
115:*19*
116:*3*
128:*5*
129:*3, 9, 16*
130:*11, 17,*
*24*  131:*3, 10*
155:*5*
156:*9*
178:*4, 20*
179:*3, 7, 15*
183:*3, 16, 21*
184:*21*
185:*22*
186:*7, 19*
187:*6*  228:*4*
**little**  25:*12,*
*22*  63:*9*
103:*22*
104:*2*
217:*17*
**live**  201:*25*
**living**  17:*11*
**LLP**  2:*7, 13*
**located**
227:*6*
**location**
227:*5*
**long**  11:*4,*
*12*  193:*15*
217:*10*
220:*25*
**Longo's**
7:*14*  190:*3,*
*15, 20, 25*
202:*24*
203:*8, 24*
204:*7, 8*
**long-term**
134:*17*
**look**  9:*22*
12:*13*
41:*24*
48:*18*

51:*17*
58:*15*
61:*19*
62:*11, 19*
63:6  79:*25*
80:*11*
89:*13*
95:*18*
115:*3, 8*
120:*20*
121:*21*
124:*2*
134:*6*
138:*10*
142:*12*
146:*16, 24*
147:*9, 16*
149:*3*
152:*17*
155:*23*
157:*5*
163:*19*
167:*8*
168:*4*
171:*8*
172:*16, 20*
176:*9, 25*
179:*20*
183:*23*
206:*23*
208:*16*
212:*18*
213:*5, 25*
215:*21*
216:*17*
217:*23*
221:*21, 22*
**looked**  12:*4*
35:5  74:*9*
122:*13*
142:*6, 9*
148:*13*
167:*1, 3, 11*
169:*5, 15, 20*

171:*6*
172:*13, 17,*
*21*  186:*17*
205:*1*
207:*25*
**looking**
7:*16*  15:*11*
41:*7, 21*
54:9  63:*14*
73:*21*  93:*1*
134:*9*
141:*25*
142:*4*
149:*17*
151:*8, 9, 17,*
*22*  152:*16*
156:*13*
161:*4*
163:*8*
167:*18, 25*
168:*1, 8, 25*
169:*1*
170:*3*
172:*24*
183:*24*
206:*24*
214:*18*
215:*22*
**Looks**
77:*18, 20*
112:*7*
126:*5*
162:*25*
170:*10*
**Los**  5:*8*
**lost**  57:*13*
**lot**  6:*17*
47:*23*  50:*8*
58:7  152:*7*
161:*5*
185:*18*
191:*5, 8*
223:*17*

**lots**  52:*13*
134:*12*
191:*3*
**loud**  57:*6*
85:*15*
**Louis**  27:*12*
28:*22*
**lousy**  14:*20,*
*23*
**low**  94:*3*
159:*23*
160:*7*
**lower**  95:*19*
**lungs**
198:*15*
201:*22*
202:*5, 12, 16*
**Lyle**  6:*25*
**Lynch**
156:*13*

**< M >**
**M.D**  1:*1*
6:*3*  64:*1*
228:*21*
229:*23*
230:*24*
**macrophage**
118:*4*  124:*8*

**macrophages**
4:*18*
114:*24*
116:*21, 22,*
*24*  117:*3*
123:*8*
124:*12, 15*
**Maher**
156:*22*
**main**  31:*15*
174:*19*
175:*9, 22*
176:*6, 7, 15*

**maintain**
219:*17*
**major**
85:*17*
98:*18, 25*
99:*12*
100:*4*
102:*17*
**making**
76:*18*  109:*1*
**malignancy**
106:*22, 24*
126:*6*
**malignant**
69:*25*  72:*7*
76:*12*
80:*17, 21*
81:*7, 14, 18*
83:*15, 16, 25*
84:5  86:*18*
91:*17, 18*
92:*2, 6, 16*
94:*24*  98:*5*
105:*4, 13, 25*
106:*9, 19*
117:*23*
122:*21*
**malpractice**
26:*13, 15*
**man**  207:*25*
**Mandarino**
4:*12*
114:*11, 19,*
*21*  212:*10*
**mandatory**
17:*12*
**Manhattan**
2:*16*
**manufacture**
**r**  80:*19*
**manufacture**
**r's**  93:*1*

**manufacture**
**s**  73:*18*
74:*10*
**manuscript**
79:*3, 8*
85:*17*
88:*18*  89:*2,*
*5, 9*  91:*4, 5*
99:*21*
102:*20*
108:*10, 13,*
*19, 21, 22*
132:*10*

**manuscript's**
102:*24*
**March**  36:*7,*
*8, 13*  210:*10*
**MARGARE**
**T**  2:*5*  72:*5*
157:*11*
**mark**  9:*6*
13:*20, 24*
14:*8, 11*
40:*21*
42:*18*
60:*11*
61:*13*  64:*9*
69:7  84:*18*
114:*13*
127:*12*
129:*18*
133:*21*
161:*25*
169:*7*
210:*9*
221:*18*
**marked**
9:*12*  14:*13*
41:*3*  42:*20*
43:*1*  48:*10*
49:*7*  60:*16*
61:*14*
64:*11*

Daniel Clarke Pearson, M.D.

69:*10*
71:*16, 20*
84:*21*
114:*15*
123:*4*
127:*11*
129:*22*
133:*22*
157:*8*
162:*1, 2*
169:*10*
208:*21*
210:*12*
218:*12, 14*
221:*11, 20*
222:*20*
**Markers** 5:*6*
**MARKETIN**
**G** 1:*1*
**marking**
13:*22* 14:*2*
157:*10*
208:*17*
**mass** 124:*1*
**mastered**
149:*7, 13*
**match** 80:*7*
**material**
66:*7* 68:*21*
**Materials**
5:*13* 7:*7,*
*18, 20* 10:*13*
59:*11* 62:*4*
64:*16*
67:*19*
68:*13*
72:*18*
73:*10, 16*
76:*24*
204:*17, 25*
205:*12, 15*
206:*5, 18*
**math** 14:*19,*

*22* 154:*6*
**Matt** 203:*7*
**matter**
20:*13*
27:*24*
28:*11* 228:*9*
**mattered**
201:*18*
**Maureen**
40:*22, 23*
41:*8, 10*
**maximum**
96:*15*
**McTiernan**
180:*25*
182:*8* 183:*7*
**McTiernan's**
183:*2*
**MD** 4:*9*
**MDL** 1:*1*
12:*10* 23:*5,*
*13, 19* 228:*4*
**MEAGHER**
2:*13*
**mean** 9:*4*
18:*24* 20:*8*
24:*9* 26:*16,*
*17* 29:*21*
38:*5* 56:*12*
60:*5* 71:*10*
81:*2, 3*
87:*12, 18*
94:*9*
101:*23*
102:*15*
119:*1*
125:*3*
131:*18*
132:*7*
136:*8*
137:*25*
138:*4, 5*
140:*8, 12*
142:*19*

156:*16*
158:*21*
162:*24*
175:*2, 7, 20*
176:*22*
191:*21*
220:*18*
224:*21*
**means**
56:*17*
75:*16, 18*
86:*23*
116:*16*
131:*19*
185:*8, 11, 16*
**meant**
57:*12*
197:*19*
**mechanism**
127:*8* 193:*2*
**mechanisms**
117:*22*
126:*23*
**mechanistic**
94:*6, 18, 19*
**med** 37:*23,*
*25*
**medical**
26:*13, 15*
29:*15, 25*
30:*14*
32:*10* 33:*3,*
*25* 36:*18, 25*
52:*9, 12*
53:*2, 12*
**medical-**
**legal** 17:*9*
**meet** 6:*16*
10:*20, 23, 25*
11:*2*
**meeting**
11:*8*
**meetings**
11:*6, 10, 17*

**members**
37:*16*
**memory**
150:*25*
157:*2*
**menstrual**
137:*11, 24*
138:*4, 9, 12*
**mention**
34:*20*
35:*16, 20*
50:*7*
**mentor**
37:*10*
**message**
29:*14, 17*
**met** 11:*3*
**meta-**
**analysis**
3:*24* 5:*1*
60:*19, 20*
130:*16, 24*
131:*10*
132:*14*
135:*19*
155:*5*
156:*20*
158:*1*
170:*13, 16,*
*24* 171:*9, 17*
173:*15*
174:*1*
177:*7, 9*
180:*12, 14*
184:*4*
223:*14*
**methodologic**
**al** 39:*24*
**methodology**
73:*23*
107:*6, 16*
183:*9*
**methylation**
213:*15*

**metric**
155:*13, 25*
**metrics**
212:*16, 20*
**MICHELLE**
2:*9* 196:*16*
**microphone**
56:*23, 25*
**middle**
15:*17* 28:*4*
50:*13*
100:*4*
206:*12*
219:*1*
**mid-**
**sentence**
194:*15*
**milieu**
121:*25*
**Mills**
137:*18, 22*
140:*5*
142:*20*
**mind** 8:*21*
15:*3* 39:*12*
48:*7, 12*
56:*22*
62:*22*
91:*22, 23*
107:*9*
112:*15*
120:*24*
121:*1*
216:*10*
**minds** 94:*12*
**mine** 48:*9*
169:*16*
**Minerva**
74:*11, 13, 14*
75:*10, 20*
89:*2* 132:*25*
**mines** 199:*4*
**minimal**
102:*19*

Daniel Clarke-Pearson, M.D.

minimum
192:6
mining
188:5
**Minor** 77:19
minute
26:24
44:20
47:21 77:4
95:15
157:4
213:5
225:23
minutes
69:5 141:4
196:1, 2
197:2, 9, 13,
15, 17
217:11
226:2
missed
167:23
198:25
missing
177:6
182:18, 21
misspoken
51:1
**Misstates**
55:25
83:19
105:16
109:21
110:1
130:20
204:12
mistake
37:21
172:25
mistaken
50:5
215:25
216:5

misundersta
nding
117:11
**model** 95:6
120:9, 16
123:25
124:1, 9
models
122:14
modification
212:13
molecular
216:8
moment
23:25 34:3
40:25 48:2,
3, 13 61:18
73:6 107:8,
19 148:6
150:15
151:3
157:12
168:3
216:16
moments
147:18

**Montgomery**
2:6
month 27:1
137:9, 11, 12
138:9, 10, 14,
15 149:22
150:1, 8
152:20
153:3, 8, 9,
14, 20, 25
154:1, 3, 5, 7,
13 162:4, 9,
19 163:7
164:2
months
11:7 27:20
36:12

195:3
201:25
**Moorman**
196:12
morcellation
63:10
morning
6:15
mouse 126:1
move 58:23
62:20 66:5
74:5 99:14
105:24
111:19
122:24
129:18
134:2, 7
154:15
169:18
moved
39:10
movement
152:7
moving
26:5 106:23
mparfitt@as
hcraftlaw.co
m 2:11
multiple
40:13
43:23
78:24
111:3
127:18
152:11, 15
167:17
209:14, 19
212:15, 19
murine
123:25
mutagenic
120:12
mutation
97:24 98:9

105:3
122:16
mutations
69:25 76:2,
11 83:11
98:5, 14
105:12
122:12
126:12, 15
**MyChart**
29:16, 17, 21,
23 30:1

< N >
name 6:23
61:7, 8
72:17
73:17, 23
115:9
127:20, 23,
25
named 55:2,
6 203:7
names 61:1
115:6
178:13
**National**
67:2, 5
133:16
**NCI** 5:9
166:18, 21,
25 167:1, 3
168:24
169:3, 7, 8,
15 172:9
174:11
177:2, 4, 10
nearly
30:15 190:5
necessarily
80:6 89:8
100:23
108:11
125:3

131:20
138:14
**need** 6:19
8:25 9:21,
23 18:22
34:3 37:1
43:19
48:20
49:15
51:17 73:8
99:24
104:17
106:14
108:6
150:10
151:4
167:19
197:3, 5, 7,
10 206:13
needed
108:13
201:14
needs 94:13,
16
negative
39:19 40:3
103:9
neither
227:11
never 29:11,
18 38:18, 22
74:21
79:19
140:9, 10
162:1
196:12
**NEW** 1:1
2:16 23:18
35:6 59:11
62:4 67:19
69:3 94:11
114:20
123:17
170:14

Daniel Clarke-Pearson, M.D.

194:*21*
195:*14, 16*
207:*10*
**Newcastle**
155:*24*
156:*9, 19*
157:*1*
158:*6, 18*
**news** 42:*16*
45:*10, 25*
**NHS1**
146:7
160:*13*
166:7
**nice** 6:*16*
**NIH** 63:*19*
129:6
177:*5, 10*
**NIH's** 177:*4*
**nine** 159:*6*
**nitrogen**
94:*21*
**nobody's**
109:*19*
110:*3*
**non-**
**litigation**
70:*24* 71:*4*
**nonusers**
224:7
**normal**
28:*24* 29:*2,*
*3* 70:*1*
105:*14*
**North** 7:*3,*
*5* 24:*2*
227:*3, 6, 19*
**Notary**
227:*3, 19*
**notation**
35:*4*
**note** 66:*1*
150:*18*

**noted**
226:*17*
**notes** 8:7,
*10, 13, 19, 24*
9:*5, 8, 17, 19*
152:*2*
**notice** 6:*4*
225:*24*
**November**
25:*24*
114:*4*
195:*15*
205:*13*
**number**
17:*11* 18:*8*
22:*10* 25:*4*
59:*3, 22*
63:*13*
83:*11* 85:*2*
93:*15*
100:*3*
102:*18*
106:*5, 6*
112:*16, 24*
147:*2, 22*
148:*20*
168:*12, 13*
174:*24*
177:*21, 23*
178:*9*
183:*24*
187:*12, 19*
194:*2*
205:*8*
207:*17*
209:*4, 12*
210:*9*
218:*22, 25*
223:*25*
**numbers**
157:*5*
182:*17*
209:*5*

**numerous**
77:*1* 107:*5,*
*15*
**nurse** 28:*20*
29:*12*
**nurse's**
176:*1*
**NW** 2:*9*

< O >
**oath** 228:*14*
**object** 9:*25*
10:*1* 17:*16,*
*17* 18:*6, 12,*
*14* 19:*9*
24:*8* 28:*6*
33:*4* 38:*24*
39:*17* 40:*2*
47:*5, 12*
50:*9, 20*
51:*25*
52:*24* 53:*9*
55:*8, 24*
56:*8* 57:*20*
58:*6* 59:*2*
60:*3, 22*
62:*5* 65:*10,*
*15, 16* 66:*5*
70:*25*
71:*17* 75:*4,*
*11* 76:*13, 20*
77:*9* 80:*24*
81:*9* 82:*2*
83:*19* 84:*6,*
*17* 86:*25*
87:*10, 16*
88:*2* 90:*19*
91:*20* 92:*8*
93:*3* 95:*3,*
*11* 96:*2*
97:*19* 98:*2*
99:*1* 101:*7*
103:*3, 18*
105:*15*

107:*18*
108:*16*
109:*21, 25*
110:*17*
114:*2*
116:*14*
117:*17*
118:*23*
120:*4, 14*
124:*3*
125:*10, 21*
126:*7*
128:*23*
129:*10*
130:*19*
132:*2*
135:*2, 4, 22,*
*25* 136:*23*
139:*21*
141:*11, 14*
142:*2, 17*
143:*7, 15*
144:*10, 25*
145:*12*
148:*15, 22*
150:*9*
153:*6*
154:*9, 24*
159:*8, 15*
160:*1, 8*
164:*9*
177:*20*
178:*5*
179:*5*
180:*21*
181:*18, 24*
183:*4, 10*
184:*23*
185:*12, 25*
186:*9*
188:*1*
191:*13*
198:*16*
199:*9, 15*

202:*13*
208:*6, 11*
214:*5, 25*
**objected**
65:*5*
**objecting**
150:*19*
**Objection**
31:*19* 46:*1*
64:*14* 66:*1*
75:*21*
82:*22*
86:*12*
89:*19*
92:*20* 96:*7*
101:*16*
104:*13*
109:*11*
118:*10*
119:*16*
122:*4*
124:*20*
126:*13*
131:*5, 11*
132:*17, 22*
133:*7*
136:*7*
137:*4, 17*
139:*13*
143:*1*
144:*16*
145:*22*
147:*7, 14*
150:*24*
153:*16*
155:*7, 15*
159:*1*
161:*8*
162:*7*
165:*2, 12, 20*
173:*24*
175:*16*
176:*8, 17*
178:*21*

179:18
180:15
186:24
188:12, 24
189:16
190:13
191:19
192:3
193:6
198:22
200:1, 13, 19
201:1, 20
202:6, 22
203:9, 16, 22
204:1, 11
209:20
212:22
222:13
**objections**
66:14
209:20
220:25
227:8, 10
**O'Brien** 4:1,
4 55:2, 6, 12,
22 56:7
57:19 58:4,
9, 14, 15, 18,
25 59:3, 8,
16, 20 60:2
61:13 62:1,
7 63:12
64:10, 15
66:4 67:4
132:21, 24
133:5, 10, 14,
18, 20, 22, 25
134:25
135:19
136:12
146:2
166:15
174:9, 24
175:13, 22,

25 176:7, 10
177:13, 18
178:2, 19
179:4, 17, 24
180:7
**O'Brien's**
66:24 136:5
**obstetrician-**
**gynecologist**
41:11
**obstetrics**
36:21 41:12
**obstruct**
186:21
**obstructing**
189:6
205:20
**obstruction**
82:16
**obtained**
29:12
132:23
**Obviously**
94:13
132:4
140:12
157:14
209:4 211:9
**occasions**
199:8
**occurred**
33:7 194:12
**occurs**
100:17
**October**
16:19
24:19
40:21
41:20
58:17 68:9
169:17, 19
**odd** 88:16
**O'DELL**
2:4 3:4

8:3, 20 9:4
10:1, 24
12:24
13:22
14:21, 24
15:6, 10, 15
17:16 18:6,
12, 24 19:15
20:1, 8, 22,
25 21:3, 6,
10, 18, 23
23:7, 15
24:8, 23
25:8, 11
26:8 28:6,
14 29:20
31:19 33:4,
17 34:2
38:24 39:9,
17 40:2, 25
42:21 43:3,
22 44:2, 10
46:1 47:5,
12, 18 48:2,
15 49:4, 6
50:9, 20
51:25
52:24 53:9
54:17 55:8,
24 56:13, 18,
21 57:1, 4,
20 58:6
59:2, 6
60:3, 13, 22
61:24
62:13, 22
64:14, 22
65:3, 14, 18
66:17
67:15
68:17 69:2
70:25
71:17 73:4
75:4, 11

76:13, 20
77:3, 9
78:12
80:24 81:9
82:2, 11, 15,
21 83:18
84:6, 17
85:2, 5, 11
86:12, 25
87:10, 16
88:2 89:19
90:9, 19
91:20 92:8,
20 93:3, 12
95:3, 11
96:2, 7
97:9, 19
98:2, 20
99:1, 24
100:5, 11
101:7, 16
103:3, 18
104:13
105:15
106:3
107:2, 8, 18
108:16
109:11, 21,
25 110:17
111:6
112:15, 20,
25 114:2
116:14
117:17
118:10, 23
119:16
120:4, 14, 24
122:4
123:9
124:3, 20
125:10, 21
126:7, 13
128:11, 23
129:10

130:19
131:5, 11
132:2, 17, 22
133:7
134:21
135:2, 4, 9,
16, 22, 25
136:7, 23
137:4, 17
139:13, 21
141:11, 14
142:2, 17
143:1, 7, 15
144:10, 16,
25 145:12,
22 147:7, 14
148:15, 22
150:9, 19, 23
153:6, 16
154:9, 24
155:7, 15
157:12
159:1, 8, 15
160:1, 8
161:8
162:7
163:9
164:6, 9
165:2, 12, 20
166:12
168:3, 9, 12,
21 169:21,
24 170:6
173:24
175:16
176:8, 17
177:20
178:5, 21
179:5, 18
180:15, 21
181:7, 18, 24
183:4, 10
184:15, 23
185:12, 25

Daniel Clarke-Pearson, M.D.

186:*9, 23*
188:*1, 12, 24*
189:*16*
190:*13*
191:*13, 19*
192:*3*
193:*6, 14, 18*
194:*6, 11, 16*
195:*8*
196:*16, 20, 24*  197:*4, 8, 12, 18*
198:*16, 22*
199:*9, 15*
200:*13, 19*
201:*1, 20*
202:*6, 13, 22*
203:*9, 16, 22*
204:*1, 11*
205:*7, 23*
207:*20, 24*
208:*6, 11*
209:*2, 15*
210:*19*
212:*22*
214:*5, 25*
216:*10*
217:*8, 12, 22*
218:*2, 14, 18*
219:*11*
220:*4, 8, 10, 13, 15, 20*
221:*4, 9*
222:*14*
225:*14, 17*
**offer**  79:*4*
89:*24*  94:*6*
228:*13*
**offered**  28:*8*
**offering**
82:*20*
86:*17*  87:*3*
204:*4*
**offers**  102:*3*

**oftentimes**
31:*3*  94:*10*
99:*3*  100:*15*
**Oh**  7:*12*
133:*23*
135:*16*
151:*23*
161:*21*
172:*5*
207:*25*
**Okay**  6:*21, 22*  14:*8*
16:*12*
25:*13*  30:*3, 5*  43:*3*
44:*1*  49:*19*
51:*20*  74:*6*
80:*15*  85:*5, 22*  106:*25*
111:*19*
112:*5*
116:*4*
117:*9*
122:*24*
123:*10*
130:*10*
134:*14, 19*
135:*15*
149:*3*
152:*4*
154:*15*
158:*4*
160:*12*
161:*16*
164:*8, 23*
169:*4, 7, 18*
170:*12*
171:*8*
172:*5, 24*
173:*2*
193:*24*
196:*18*
207:*4*
208:*20*

211:*3*
212:*4*
215:*13*
216:*24*
217:*7*
222:*23*
**old**  66:*7*
**once**  49:*13*
50:*4*  92:*14*
134:*18, 20*
135:*24*
138:*9*
147:*9*
154:*13*
160:*20*
161:*3*
173:*8*
200:*14*
207:*14*
**Oncologists**
78:*15*
**Oncology**
34:*18*
35:*15*
36:*20*
40:*20*
70:*19*  78:*1, 4, 6, 8*  79:*9, 12, 20*  80:*10*
84:*25*  87:*8, 15*  88:*13*
90:*4, 7*
93:*6*
110:*13*
111:*16, 20*
**ongoing**
186:*21*
**open**  8:*16*
9:*3, 14, 24*
49:*12, 13, 14*
206:*25*
**opened**
50:*22*

**opening**
48:*21*
**operating**
113:*16*
**operation**
171:*23*
**opinion**
29:*6*  52:*14, 21*  55:*20*
56:*5*  69:*22*
70:*6, 8*
75:*5, 14*
86:*17*  87:*3*
90:*24*  91:*1*
93:*10, 17*
94:*1, 2*
95:*8*  97:*12, 20*  98:*11*
105:*10*
108:*9*
114:*22*
116:*18*
126:*18*
127:*7*
129:*11*
138:*8*
140:*24*
148:*8*
155:*19*
158:*22*
180:*20, 23*
189:*25*
190:*7, 9*
192:*10*
198:*4, 6*
199:*16, 20, 23*  200:*24*
202:*3, 20*
203:*21*
216:*7*
**opinions**
68:*6, 12, 19, 22*  69:*3*
183:*2*

190:*23*
194:*12*
195:*12, 16*
201:*5*
204:*4, 8*
208:*5*
212:*2*
220:*16*
**opposed**
45:*25*
68:*24*
153:*25*
**Orange**
227:*6*
**order**  10:*4*
14:*9*  18:*21*
51:*23*
66:*19*
67:*25*  68:*2, 7, 8, 16, 25*
194:*3, 5, 17*
195:*3, 5, 10, 19*  196:*5*
218:*21*
220:*6*
221:*1*
226:*1, 5, 6*
**organization**
53:*12*

**organizations**
52:*12, 15*
53:*3*
187:*20*
188:*16*
**original**
68:*20*
108:*19*
166:*15*
174:*19*
175:*10, 12*
176:*1, 6*
**originally**
28:*9*

**Ottawa**
155:*24*
156:*9*
157:*1*
158:*7, 18*
**outlines**
178:*9*
**outlining**
177:*23*
**outrageous**
102:*23*
103:*2, 7, 14,*
*17*  104:*1*
**outside**
70:*22*  188:*5*
**Ovarian**
3:*16, 22*
4:*3, 5, 14, 20,*
*24*  5:*4, 7, 9*
30:*9, 12*
31:*2, 23*
33:*2*  34:*9,*
*13, 23, 25*
35:*6, 8, 18*
37:*24*
38:*14, 18, 22*
39:*7, 8, 24*
40:*1, 8, 9, 15*
45:*20, 24*
46:*13*
52:*18*  55:*6,*
*23*  57:*18, 24*
58:*12, 19*
59:*1, 17*
60:*8*  70:*1*
81:*24, 25*
83:*6, 12*
98:*15*
102:*22, 23*
104:*5, 6*
105:*14*
119:*14, 21*
122:*22*
123:*21, 23*

124:*7, 14*
126:*2, 18*
127:*4, 8*
128:*3*
130:*8*
157:*25*
167:*4*
169:*8*
176:*12*
177:*3, 11, 15*
183:*17, 22*
184:*10, 12,*
*22*  185:*8, 23*
186:*8*
187:*7, 11, 13,*
*14, 17, 21, 25*
188:*11, 16,*
*19, 23*
189:*15*
192:*2, 8, 11,*
*18, 25*  193:*3*
201:*15*
207:*15*
215:*6*
**ovaries**
93:*23*
191:*22*
**ovary**  83:*10*
140:*23*
**overinterpret**
**ed**  90:*5, 8,*
*18, 23*  91:*9*
92:*7, 10*
**overlap**
214:*19*
**overlaps**
162:*14*
**overlooking**
90:*11*
**oversight**
173:*1*
**overstated**
103:*22*

**overview**
108:*4*
**oxide**  122:*8*
**oxygen**
94:*21*
114:*24*
116:*23*
124:*17*
127:*1*

**< P >**
**p.m**  141:*5*
194:*1*
197:*20*
207:*7*
226:*17*
**p53**  69:*24*
76:*2, 11*
97:*24*  98:*4,*
*8, 14*  105:*3,*
*12*
**package**
44:*7*
**pad**  140:*14*
**PAGE**  3:*2,*
*10*  43:*8, 23,*
*24*  69:*12, 13*
82:*8*  84:*22*
85:*3, 4*
91:*21*  93:*9*
99:*16*
106:*7, 25*
107:*10, 20*
113:*3*
115:*13*
118:*16*
121:*11*
157:*22*
158:*5*
169:*21, 24*
211:*5, 11*
212:*5*
213:*9*
221:*23*

229:*3, 6, 9,*
*12, 15, 18*
230:*3, 6, 9,*
*12, 15, 18*
**pages**  64:*19*
111:*7*  211:*9*
**paid**  19:*6*
27:*23*  38:*1*
46:*19, 23*
186:*6*  187:*5*
**pandemic**
36:*25*
**panel**  79:*22*
**Pap**  27:*16,*
*20*  28:*23*
29:*1, 4, 7, 9,*
*12*
**paper**  7:*17*
13:*9*  47:*4*
55:*17*  58:*9,*
*15*  59:*8, 15,*
*20*  60:*4, 5,*
*11, 14*  61:*2,*
*12*  62:*1, 14*
70:*3, 5*
71:*16, 20, 25*
72:*16*  73:*5,*
*21*  76:*3, 15,*
*17*  77:*1, 12,*
*13, 16, 23, 25*
78:*4*  79:*24*
80:*2, 3, 7, 8,*
*9, 18*  88:*12,*
*25*  89:*15*
91:*12, 18*
92:*1*  94:*19*
99:*25*
100:*9, 13, 17*
101:*1, 12, 15*
102:*5*
103:*25*
104:*22*
105:*20*
109:*4*

110:*12*
111:*16*
112:*12*
113:*9, 21*
114:*10*
115:*7*
116:*18*
119:*13, 20*
123:*8, 13, 18*
124:*22*
126:*11*
127:*13, 17*
128:*9*
129:*20, 24*
130:*17, 25*
131:*9*
133:*10*
135:*19*
136:*2, 5, 12*
141:*8*
142:*5, 21, 24*
144:*8*
150:*4, 10, 20*
151:*9, 11, 14,*
*17, 18*  152:*8*
155:*17*
157:*13, 15,*
*18*  158:*2, 17*
159:*25*
160:*3, 15*
161:*17, 18,*
*20, 23*
164:*21*
165:*24*
166:*15*
181:*15*
182:*17*
186:*4, 13*
187:*4*
207:*3*
216:*6, 17, 20,*
*21, 22, 23*
217:*1*

**papers** 7:*15, 19, 24* 8:*5, 8, 25* 9:*6, 12* 30:*5* 55:*1, 4, 5, 9, 12, 17* 56:*7* 58:*4, 7, 14, 19, 22, 25* 59:*4, 15, 17, 22* 60:*2* 61:*7* 78:*17* 88:*16* 109:*15* 136:*14, 16, 19* 139:*10, 15, 19, 24* 143:*12* 148:*5, 6, 10* 158:*12, 13, 23* 177:*8* 178:*13* 182:*2* 184:*9* 185:*4, 5* 207:*19* 212:*10*
**papillomavirus** 29:*9*
**paragraph** 85:*14* 171:*11* 175:*4*
**paralegal** 149:*12*
**paraphrase** 116:*21*
**PARFITT** 2:*9* 26:*9*
**Park** 67:*6*
**part** 24:*19* 30:*15, 17* 32:*3* 36:*22* 38:*7* 40:*7* 46:*10* 52:*19*

110:*22* 124:*15* 149:*1* 203:*4* 224:*6*
**participants** 133:*17*
**participate** 79:*18*
**participated** 35:*5*
**particles** 4:*13, 18* 121:*10* 123:*7* 213:*14*
**particular** 32:*3* 54:*13* 80:*2* 85:*3* 95:*5* 96:*24* 99:*4, 6* 202:*24* 207:*13*
**party** 227:*13*
**patency** 146:*21* 147:*1* 148:*7, 17, 20* 149:*1*
**patent** 146:*3, 7, 12, 14, 20* 147:*5, 13* 148:*3, 12* 160:*13* 161:*4* 166:*7* 176:*3, 13* 224:*4, 17, 19, 25* 225:*4, 7*
**pathologists** 98:*14*
**patient** 27:*17, 18* 29:*7, 10, 13,*

17 31:*20, 23* 32:*1, 5, 7* 36:*11, 16* 38:*18, 22* 117:*1* 137:*12* 138:*11, 16* 140:*20* 144:*6*
**patients** 10:*15* 36:*4, 6, 13, 23* 37:*5, 7, 20* 39:*1* 139:*9* 143:*16, 19, 24* 144:*19* 146:*11, 25* 148:*3* 176:*3, 12* 192:*23* 198:*12, 14* 201:*9, 13, 14* 225:*7*
**pattern** 189:*6*
**pause** 86:*21*
**pay** 24:*3*
**payments** 128:*15*
**PDF** 43:*14* 44:*7* 111:*12*
**PDQ** 5:*9, 11* 166:*18* 167:*1, 4* 168:*24* 169:*3, 8, 15* 172:*9, 11* 173:*14*
**PDQ's** 177:*2*
**Pearson** 48:*20*
**peer** 78:*21, 23* 79:*1, 2,*

10, 13, 15, 17, 18, 20 80:*1, 10, 12* 87:*8* 95:*16* 97:*17, 21, 23* 99:*14* 100:*25* 101:*4, 8, 15, 17, 20, 21, 23, 24* 102:*2, 3, 14* 103:*1, 5, 8* 109:*8* 110:*13, 14, 15* 111:*3, 20* 112:*5* 113:*11, 14, 20* 132:*8* 142:*4*
**peer-review** 91:*13*
**peer-reviewed** 74:*16* 78:*7* 84:*19* 88:*16* 89:*10* 92:*19* 104:*11* 106:*25* 110:*10* 111:*2* 113:*24* 128:*2* 174:*15*
**PENALTY** 228:*6, 7*
**pending** 206:*14* 217:*20, 22* 218:*15* 227:*13*
**Penocolappy** 167:*13*

**pension** 17:*12* 18:*11, 22* 19:*25* 20:*6, 9, 12, 19, 20*
**people** 40:*13* 79:*17* 129:*12* 144:*23* 166:*23* 185:*18*
**people's** 94:*12* 202:*5, 12*
**percent** 17:*10, 15, 19, 24* 18:*1, 4* 22:*10, 19, 23, 24* 46:*12* 190:*21*
**percentage** 17:*1, 21* 18:*19* 19:*1, 13* 20:*20* 21:*13, 19, 21* 22:*2* 31:*3* 189:*25* 190:*10*
**percentages** 20:*15*
**perfect** 180:*2, 4* 181:*5, 12*
**perfectly** 89:*25* 105:*7*
**perform** 201:*7*
**performed** 174:*14*
**performing** 201:*11*
**perineal** 3:*21* 4:*23*

Daniel Clarke-Pearson, M.D.

5:3  140:14
157:25
171:2, 25
223:3
**period**
81:24  83:5
137:11, 25
138:4, 9, 12
140:7, 15, 18,
21  141:1
201:24
**periods**
152:11
161:3
162:16
190:18
**Peritoneal**
5:10
**PERJURY**
228:6, 7
**person**  10:5
31:13
**personal**
98:13  140:8
**personally**
140:11
**person's**
61:7, 8
**pertain**  36:2
**pertinent**
118:5  119:8
**ph**  1:1
**Ph.D**  64:1
**phagocyte**
124:8, 9
**phagocytes**
4:13
119:25
120:3, 5
124:24
125:9

**phagocytized**
121:25

**pharmaceuti
cal**  96:10,
19  198:5, 7,
18  199:2
**phenotype**
104:20
**Phipps**
40:22, 23
41:8, 10
**phone**
29:14  66:6
**phrase**
173:18
174:7
**Phung**  4:19
127:12, 13
**physician**
28:20
**physicians**
166:24

**physiological**
95:20  96:6,
9
**pick**  79:20
80:12
**picks**  79:23
**picture**
57:23
**piece**  29:24
53:15
57:22  75:19
**pivoting**
184:25
**places**
215:11
**plaintiff**
28:16
31:17, 18, 20
61:4  116:8
128:25
**Plaintiffs**
2:3  24:3
38:1  46:19,

23  47:4, 10
51:12, 16
63:16
67:17
70:13
115:22
116:1, 6
128:4, 21
129:9, 15
178:3, 7, 15,
20  179:2, 15
183:15, 20
184:6, 20
185:22
194:20
203:13
225:20
**plan**  16:13
**planning**
73:12
**play**  24:3
**please**  6:20
7:10  15:15
33:18  41:2
42:2  44:16
56:14
62:19, 23
64:12
65:16, 21
66:15
90:10
93:13
102:17
106:4
107:8
120:25
121:2
125:12
135:10
138:2
163:9
165:3
168:3, 13, 14
169:12

171:15
179:10
181:8
184:16, 18
189:18
193:13, 17,
20  209:19
210:8
220:21
221:2
**pleurodesis**
197:23
198:9, 20
201:7, 11, 15
202:3, 11, 15
**PLOS**
99:14, 15
110:14
111:23
112:6
**plot**  182:4,
7, 9, 14
183:23
**Plus**  61:24
77:18, 20
**point**  17:3
23:7  31:7
41:11  45:7
57:25  58:1
93:12
143:23
146:13
163:21
164:12
170:23
181:14, 16,
22, 23
191:24
195:6
200:9
225:18
**pointing**
219:6

**points**
31:15
100:19, 20
**pooled**
61:16  62:9,
12  63:1
132:21
**portion**
42:24
221:16
**posed**  30:25
**position**
64:1  67:17
69:3  195:8,
23  217:14,
18  219:12,
16, 24  220:3
**possess**
104:19
**possible**
66:13
79:16, 22
80:16
**possibly**
32:5  157:16
**post**  131:15,
25  132:11
**potential**
177:2
**POWDER**
1:1  3:16,
22  4:2, 5, 24
5:4, 14
30:17  31:4,
11, 18  32:7,
10, 18  33:2
34:1  35:9,
24  36:2
39:6, 23
40:5, 6, 9
42:11  45:5
46:13
47:24
50:19

57:24
58:11
69:24  76:2,
11  83:10
84:10  93:7,
11, 18, 23
94:20, 23
95:17, 23
99:9, 18, 22
100:10
102:10, 22
104:5
105:12
114:23
117:4
123:19
125:6, 7
128:2
138:13
140:7, 10, 11,
14, 19, 22, 25
144:20
157:25
176:11, 13
184:13
187:15, 16
188:15
190:1, 10, 16,
17, 19, 24
191:2, 3, 9
192:2, 10, 13,
21, 24  193:1,
3, 4, 5  215:6
216:8
218:7
222:2, 6
223:3
224:22
228:4
power  34:4
powerful
60:5
practice
17:5  38:9

PRACTICES
1:1
practitioner
28:20  29:12

precancerous
29:8
Predominant
ly  7:12
preference
140:8
prefix
112:19
premature
94:5, 8, 11,
13  104:23
prematurely
74:4
premenopaus
al  138:8
preparation
76:25
prepare
10:10, 20
11:14, 18, 24
12:25  226:9
prepared
7:23  60:20
62:14
preparing
10:18  31:6
prerogative
196:5
219:10

presentations
30:20  35:24
presented
85:1, 7, 15,
17
presents
85:17

president
41:16
presume
115:21
172:6
pretty
70:19
103:4  111:9
preventing
52:18  226:6
Prevention
5:11
previous
21:25
182:10
previously
21:24
45:19
48:10
65:25
81:22
113:3
133:2, 15
148:5
186:11
189:3
195:20
205:25
221:12
222:20
Primary
5:10  85:19
131:20
Princeton
23:18
printed
170:21
221:18
prior  11:23
32:17  65:2
70:16
85:18  89:3
108:5
186:11

Probably
16:8, 11
22:11, 12
32:15
74:21  89:3
91:5
108:24
145:1
152:23
161:5
167:2
215:20
problem
165:13, 19
problems
107:4, 14
Procedure
6:5  31:9
113:16
198:13
201:19
202:4, 11
proceed
10:8  15:16
69:4
168:16
197:1
proceeded
195:20
proceeding
23:14  28:4
195:19
process
91:13
102:2
106:23
132:9
174:15
223:1
produce
114:24
produced
8:10, 13, 14
9:1, 2, 19

13:11, 16, 18
16:17
150:12
product
26:12
96:20  99:4,
9  152:20
production
9:20  43:15
111:8
116:23
PRODUCTS
1:1  3:22
4:24  72:10,
25  81:12
84:10
121:8
122:6, 7
222:2, 7
Professional
5:12  65:22
75:20
104:1, 2
180:7
227:3, 18
progressing
117:2
project
119:12
proliferation
69:25  72:7
76:12
105:3, 13
123:19
promote
115:1
pronounce
157:6
proper
132:15
202:4
properly
101:6

Daniel Clarence Pearson, M.D.

properties
116:*19*
117:*15*
118:*1, 9, 18*
126:*25*
prospective
132:*20*
133:*5*
171:*1, 22*
173:*5, 11, 17, 19, 23* 174:*6, 8, 18* 175:*8*
pro-
tumorigenic
115:*2*
provide
6:*20* 54:*7*
200:*18*
211:*23*
provided
19:*7* 25:*3*
37:*5*
102:*20*
115:*18*
145:*19*
149:*21*
150:*5, 7*
152:*6, 11, 14*
153:*2*
159:*13*
182:*11*
205:*16*
211:*25*
providing
194:*21*
public 30:*8, 11* 34:*9, 12*
52:*14, 23*
130:*3*
227:*3, 19*
publication
50:*23, 24*
51:*9, 11*
58:*22*

74:*14, 17*
78:7, *14*
85:*18* 89:*3, 10* 91:*12*
95:*13*
111:*4*
113:*22*
114:*20*
132:*5*
156:*7*
166:*21*
177:*24*
publications
7:*12, 19, 24*
37:*11*
55:*22*
57:*19*
58:*10*
63:*13* 77:7, *15* 111:*3*
128:*2*
179:*4, 16*
186:*16*
223:*1*
published
30:*5* 55:*2, 5* 56:*7*
58:*18* 59:*1, 3, 17, 20*
61:*6* 74:*20, 22* 75:*2, 9*
78:*17*
88:*13* 89:*1, 10* 91:*4, 5*
95:*10*
104:*25*
108:*22*
128:*11*
130:*25*
132:*9*
133:*1, 6, 14, 16* 134:*24*
135:*18*
174:*16*

177:*22*
178:*2*
179:*21*
184:*2*
186:*4* 187:*3*
publishes
94:*10*
PubMed
207:*1, 13, 17*
pull 43:*20*
46:*16*
48:*18*
51:*17*
61:*18*
209:*10*
223:*18*
pulling
217:*24*
purported
50:*8, 18*
purpose
33:*5* 195:*12*
purposes
62:*3* 65:*23*
156:*8*
221:*19*
222:*19*
pursuant
6:*3, 4*
put 8:*5*
24:*18* 37:*2*
41:*5* 44:*12, 14* 48:*4, 25*
49:*5* 52:*11*
54:*1* 64:*12*
82:*11, 24*
90:*12*
111:*11*
112:*21, 23*
123:*2*
134:*1*
141:*18*
150:*16*
151:*25*

153:*23*
157:*3, 13, 17*
159:*10*
165:*3*
201:*19*
206:*11*
208:*17*
210:*20*
212:*8*
213:*8*
218:*10*
221:*17*
222:*16*
puts 3:*18*
44:*24*
166:*21*
putting
15:*4* 44:*3*
45:*2, 4*
48:*12* 50:*6*
65:*11*
107:*9*
128:*10*
182:*14*

< Q >

qualifications
87:*20, 22*
qualitative
158:*23*
quality
158:*5, 22*
quantitative
158:*23*
question
6:*21* 9:*17*
13:*2* 15:*13, 14, 18* 18:*15, 21* 20:*9*
22:*16* 23:*9, 11, 16* 24:*12*
26:*25* 32:*6*
33:*15, 22, 23*

38:*20*
39:*12, 14, 16, 19* 44:*11*
46:*8* 47:*3*
48:*16*
49:*22, 23*
50:*4, 13, 15*
51:*19*
56:*14*
58:*16*
62:*23* 65:*5, 9* 66:*3*
73:5 79:*21*
83:*1* 90:*16*
100:*8, 11, 14*
110:*20*
116:*4*
120:*25*
121:*2*
125:*12, 15, 16* 126:*19, 21* 131:*23*
135:*13*
138:*16*
139:*1*
140:*2*
141:*21*
146:*4*
148:*17*
150:*9*
155:*22*
162:*10*
164:*7*
165:*5*
166:*16*
168:*2, 17*
172:*19*
179:*22*
181:*8, 10*
184:*14, 19*
186:*2, 12*
187:*1*
188:*8, 25*
189:*10, 12*

193:*6, 13, 16, 21, 22*
205:*21, 24, 25*  206:*13, 14, 22*
212:*24*
214:*6*
216:*15*
217:*21, 23*
218:*3, 15, 16*
219:*1, 8, 14*
221:*1*
**questioning**
33:*5*  226:*9*
**questions**
9:*23*  19:*9, 17, 18, 21*
20:*15*  21:*9*
30:*23, 25*
31:*1*  33:*6, 8*  49:*8, 16*
59:*4*  61:*25*
62:*15*  65:*1, 2*  109:*15*
117:*6*
151:*2, 4*
168:*6, 16*
186:*16*
193:*11, 15*
219:*21*
220:*1, 3*
221:*11*
223:*10*
224:*18*
225:*12*
**quite**  17:*4*
65:*23*
198:*24*
205:*2*
225:*17*
**quotation**
82:*23*
**quote**  99:*15*

**quoting**
119:*8*
215:*19*

**< R >**
**raise**  16:*20*
26:*3*  28:*5*
131:*25*
196:*10*
226:*11*
**raised**
30:*17*
111:*24*
**range**  22:*5, 10*
**rate**  16:*20*
25:*25*  26:*3, 5*  28:*7, 12, 13, 14*
**rated**
158:*17*
159:*7*
**rates**  28:*5*
**ratio**  224:*9*
**reached**
40:*13, 17, 19*
177:*10, 13*
**reaches**
187:*6*
**reaching**
204:*9*
**reaction**
99:*7*
**reactive**
94:*21*
114:*24*
116:*23*
124:*16*
127:*1*
**read**  22:*6, 13*  29:*4*
33:*23*
39:*16*
44:*22*

50:*25*  52:*4, 6*  60:*14*
61:*22*
62:*24*
66:*23*
70:*19*
72:*23*  73:*2, 11, 12*  74:*7, 18, 19, 21*
76:*15*
85:*13, 24*
87:*2, 5*
98:*4*
101:*21*
102:*17*
105:*18*
107:*19, 23*
113:*25*
115:*15*
121:*16, 20*
125:*16*
126:*21*
128:*12*
130:*10, 14*
134:*15*
148:*5*
149:*19*
155:*9*
159:*19*
181:*10*
190:*20*
193:*22*
194:*5*
196:*7*
204:*24*
205:*2, 5*
206:*20*
216:*15*
226:*15*
228:*8, 10*
**readers**
101:*24*
**reading**
88:*21*

90:*21*
98:*21*
106:*3*
115:*3, 4, 5*
129:*7*
**ready**  44:*15*
**real**  31:*13*
**really**  17:*23*
49:*2*  50:*21*
82:*17*  94:*5*
108:*5*
202:*1*
224:*23*
**reanalyze**
131:*22*
**re-ask**
141:*21*
**reason**
54:*19*  90:*6*
91:*7, 10*
95:*25*
133:*12*
137:*23*
177:*17*
229:*5, 8, 11, 14, 17, 20*
230:*5, 8, 11, 14, 17, 20*
**reasonable**
94:*3*
**rebuttal**
220:*2*
**rebutted**
203:*8*
**rebutting**
204:*8*
**recall**  12:*2, 14*  13:*6*
23:*17*  24:*1*
25:*20, 21*
33:*24*
34:*16*
35:*19*
36:*15*

40:*15*
41:*19*
54:*11*  82:*1, 19*  83:*3*
103:*19*
120:*10*
124:*22*
125:*22*
127:*14*
150:*4*
152:*13*
153:*21*
155:*1, 10*
156:*7, 20, 25*
157:*2*
158:*1, 11*
159:*12*
167:*6, 10*
182:*24*
186:*1*
208:*15, 24*
210:*2, 14*
211:*16*
221:*14*
223:*16, 17*
**recap**
110:*12*
**receive**  8:*23*
103:*8*
144:*19*
206:*5*
**received**
14:*18*
88:*17*
102:*25*
109:*8*
131:*2*
182:*24*
211:*19*
**Recess**  34:*6*
67:*14*
110:*7*
141:*5*
194:*1*

Daniel Clarke-Pearson, M.D.

197:*20*
207:7
**recognize**
115:*6, 9*
127:*20, 23,
25*  219:*17*
**recognized**
96:*18*
**recollection**
47:*25*
158:*8*
166:*22*
176:*18*
211:*12, 13*
**reconvene**
207:*6*
**record**  6:*24*
16:*17*
29:*16, 25*
34:*3, 5*
42:*21*  66:*2,
13*  67:*13*
73:*9, 12*
110:*6*
141:*4*
150:*19*
157:*23*
163:*14*
186:*24*
193:*20, 25*
195:*25*
196:*8, 21, 23*
204:*12*
205:*8, 19*
219:*9*
221:*19*
222:*19*
225:*11*
226:*13*
227:*10*
**recorded**
227:*8*
**records**  28:*3*

redacted
54:*14, 20*
**redaction**
24:*24*
**redactions**
24:*21*
**redo**  109:*17*
**reduced**
17:*7*
**reevaluated**
108:*9*
**refer**  99:*25*
172:*3*
173:*4, 12, 20*
174:*22*
**reference**
50:*18*  222:*1*
**referenced**
25:*17*  64:*16*
**references**
47:*17, 25*
50:*2*
115:*14*
167:*9, 12*
168:*24*
169:*19*
175:*14*
177:*6*
195:*14*
204:*22*
205:*10, 11*
207:*19*
**referencing**
51:*4, 7*
71:*25*
222:*10*
**referred**
205:*22*
222:*9*
**referring**
8:*2*  59:*21*
72:*15*  82:*4,
7*  173:*7*

174:*7, 23*
222:*11*
**Refers**
173:*21*
**reflect**
15:*23*
108:*24*
145:*6*
**Reflections**
34:*17*
**reflects**
154:*17*
**refresh**
158:*8*
211:*11, 13*
**refusing**
19:*12*
**refuting**
204:*7*
**regard**  23:*3*
105:*20*
151:*13*
223:*20*
**regarding**
48:*10*
128:*2*
224:*17*
**Registered**
227:*1, 18*
**regular**
154:*22*
155:*6*
**rejected**
77:*1, 4, 15,
23*  78:*4*
112:*12*
113:*8*
**relate**  35:*24*
**related**  30:*6*
45:*20*
68:*21*
115:*19*
116:*3*
227:*11*

relates
24:*24*  214:*4*
**relating**
59:*17*
**relation**
209:*7*
**relationship**
177:*3*
**relative**
164:*20*
**relevant**
56:*6*  57:*17,
23*  124:*6*
200:*23*
201:*4*
203:*2, 14, 20*
204:*3, 9*
206:*24*
212:*20*
214:*3*
**reliability**
71:*15, 23*
132:*14*
**reliable**
86:*23*
**reliance**
85:*19*
205:*22*
206:*19*
207:*11, 22*
208:*14, 18,
25*
**relief**  201:*16*
**relook**
182:*17*
**Relying**
190:*3*
208:*4*  212:*1*
**remaining**
197:*2*  225:*7*
**remember**
16:*24*
28:*19*

33:*19*  209:7
**remind**  57:*8*
**REMOTE**
2:*1*  9:*16*
**remotely**
6:*5*  10:*3*
**repeat**
13:*14*
21:*25*
22:*17*
33:*17, 22*
39:*14*  64:*4*
119:*17*
125:*12*
126:*19*
135:*13*
139:*2*
181:*8*
193:*13*
**repeating**
8:*22*  39:*12*
57:*8*  62:*22*
65:*2*
120:*24*
121:*1*
216:*11*
**rephrase**
52:*25*
**replicate**
95:*20*  96:*5*
**Report**  4:*8*
10:*14*
25:*24*  29:*4*
45:*10*
64:*18*
67:*20*
68:*20*  69:*8*
70:*5*  71:*18*
105:*2, 18*
114:*1, 4, 18*
115:*5*
116:*20*
123:*13, 14*
127:*13*

Daniel Clarke-Pearson, M.D.

130:*12, 14,*
*17* 131:*3*
136:*2*
147:*1*
150:*13, 21*
154:*21*
155:*9*
174:*19*
175:*10*
176:*6, 16*
182:*5, 10, 15*
186:*14*
190:*25*
195:*15*
196:*13, 14,*
*15* 203:*21*
204:*16*
205:*13*
212:*5, 7*
213:*24*
214:*15*
217:*3* 224:*3*
**Reported**
1:*1* 27:*17*
143:*13*
146:*19*
153:*13*
200:*3* 223:*3*
**reporter**
22:*5, 12, 17*
33:*21, 23*
39:*13, 16*
125:*15, 16*
126:*20, 21*
181:*9, 10*
193:*12, 17,*
*22* 216:*13,*
*15* 217:*11*
227:*1, 3, 18*
**reports**
7:*13, 14*
10:*14, 15*
68:*10*
128:*15*

130:*11*
190:*20*
194:*22, 24*
202:*24*
203:*8*
**represent**
24:*23* 54:*17*
**represented**
21:*19*

**Representing**
2:*3, 13*

**Reproductive**
77:*22*
110:*15*
112:*11*
113:*8*
140:*21*
147:*5, 13*
148:*12*
224:*20*
**reputable**
174:*16*
**reputation**
180:*8*
**request**
8:*12* 16:*16*
24:*16* 27:*4*
50:*14*
210:*20*
**require**
71:*6* 81:*23*
83:*4*
**required**
83:*12*
102:*13*

**requirements**
24:*6, 10*
**reread** 51:*2*
52:*2*
100:*13*
118:*11*

124:*25*
185:*3*
**re-review**
186:*17*
**research**
31:*6* 35:*1*
67:*6* 70:*10,*
*21* 78:*9*
80:*7, 13, 14*
92:*23, 25*
94:*13*
105:*1, 21*
119:*12*
120:*17*
123:*18*
**researcher**
93:*20* 99:*5*
131:*20*
**researchers**
96:*16*
**reserve**
66:*10*
**reserved**
226:*15*
**reside** 7:*5*
**residents**
36:*19, 20, 22*
37:*8, 17*
38:*13, 16*
**respect**
23:*5* 24:*7*
55:*6* 58:*19*
68:*19*
110:*11*
130:*4*
132:*1*
150:*7*
167:*4*
178:*19*
179:*4*
189:*10*
204:*10*
206:*18*

**respectful**
168:*14*
**respiratory**
201:*17*
**respond**
18:*17*
49:*16*
53:*21*
61:*24*
90:*15*
91:*14*
168:*1, 5*
189:*2*
190:*14*
196:*17*
218:*17*
**responded**
19:*16*
29:*18*
54:*23, 25*
218:*16*
**responding**
203:*24*
**response**
22:*4* 53:*24*
54:*2, 4, 7, 12*
96:*11* 99:*7*
123:*19*
125:*5*
212:*8, 11, 12,*
*21* 213:*19,*
*23* 214:*2, 7,*
*12, 16, 18, 22*
215:*10*
217:*2, 5*
218:*1, 6*
219:*3, 7*
**responsibiliti**
**es** 30:*16*
**responsible**
79:*10*
**rest** 73:*21*
**restate**
39:*20* 56:*14*

**restricted**
94:*5, 15*
147:*5*
148:*12*
**result** 83:*10,*
*12* 126:*23*
130:*15*
**results** 90:*5,*
*7, 18* 91:*8*
96:*18*
100:*16*
127:*4*
160:*14, 17*
176:*21*
200:*18*
**retained**
28:*15*
32:*14, 15, 17,*
*23* 183:*15,*
*20* 184:*20*
185:*22*
**retired** 17:*3,*
*11, 15*
**retirement**
17:*13* 19:*3,*
*20* 20:*12*
21:*15*
**retread**
65:*25* 206:*2*
**retreading**
66:*7* 193:*7*
**retreads**
186:*10*
**returns**
91:*13*
**Reuters**
47:*17* 52:*2*
56:*1, 5*
57:*14, 17*
**review** 3:*23*
4:*25* 5:*2,*
*15* 11:*23*
30:*23*
48:*19* 49:*9,*

Daniel Clarke-Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| 14 62:13 | 95:16 | 42:6 43:16 | 192:25 | **Saed's** 13:8 |
| 70:18 | 97:17, 23 | 49:19 | 201:12 | 71:23 76:9 |
| 71:11 73:4, | 99:15 | 58:23 | **risk-** | 80:9 89:14 |
| 9 79:2, 24 | 100:25 | 66:10 | **reducing** | 91:18 |
| 80:2, 6 | 101:4, 15, 17, | 69:18 | 31:9 | 110:12 |
| 81:20 | 20, 21, 23, 24 | 73:24 91:1 | **RJ** 203:7 | 181:15 |
| 86:15 87:4 | 102:3, 5, 14 | 98:22 | **rodent** | **safe** 96:21 |
| 88:12, 25 | 103:1 | 106:6 | 120:19 | **salary** 17:7, |
| 99:14 | 104:16 | 109:24 | **room** 152:7 | 10 |
| 102:2 | 105:24, 25 | 112:14 | **RPR** 1:1 | **SALES** 1:1 |
| 132:9 | 106:13, 17 | 120:19 | **rude** 221:3 | **sample** |
| 136:18 | 107:24 | 124:12 | **rudeness** | 166:5 |
| 141:23 | 108:11, 12 | 126:22 | 220:21 | **samples** |
| 148:10 | 109:8 166:2 | 138:22 | **Rule** 4:8 | 199:19 |
| 150:4 | **reviewers** | 141:3, 16, 20 | 9:20 167:20 | **Sanchez** |
| 157:24 | 7:16 77:10, | 142:16, 23 | **Rules** 6:4 | 203:7 |
| 180:20 | 11, 19 79:10, | 149:18 | 19:19 | **Sanchez's** |
| 203:21 | 13, 16, 17, 20, | 151:8 | 225:25 | 203:21 |
| 204:9 | 23 80:1, 10, | 152:25 | **ruling** | **sarcoma** |
| 210:11 | 13 84:25 | 161:13 | 117:13 | 63:11 |
| 223:2 | 87:9, 15 | 171:13 | 196:7 | **sat** 195:11 |
| **reviewed** | 101:8 | 183:24 | 220:18 | **satisfied** |
| 10:14, 15 | 103:5, 8 | 191:18 | **run** 37:4 | 153:4, 14 |
| 50:16, 21 | 108:7, 25 | 203:3 | 99:5 110:23 | **satisfy** 154:4 |
| 73:10 | 110:13, 14, | 210:3 | | **save** 228:10 |
| 76:24 | 15 111:4, 21, | 215:18 | **< S >** | **saw** 37:20 |
| 77:20 80:4 | 23 112:5, 8 | 217:13 | **Saed** 4:10 | 43:23 50:4 |
| 111:17 | 113:11, 15, | **right-hand** | 7:17 69:23 | 54:3 141:10 |
| 156:8 | 20 142:4 | 118:15 | 70:9, 23 | **saying** |
| 182:16 | **reviewer's** | **Risk** 4:3, 19 | 73:3 76:1 | 25:19 52:3 |
| 198:8, 10 | 13:8 89:13 | 5:4, 7 | 80:21 | 53:2 75:25 |
| 204:25 | 90:23 | 29:10 31:1, | 83:16, 23 | 101:14 |
| 209:8 | 97:21 | 5, 11, 24 | 84:4 86:2, | 104:24 |
| 211:14 | 108:1, 3 | 32:2, 5, 10 | 18 88:22 | 105:19 |
| **reviewer** | **reviewing** | 33:2 35:7, | 89:11, 17 | 107:24 |
| 78:21, 23 | 10:13 | 17 37:2, 24 | 91:8, 16 | 108:12 |
| 79:1, 2, 18, | 32:18 35:3 | 38:14 40:5 | 97:3 | 109:9 |
| 25 80:8 | **revolutionar** | 46:12 60:7 | 108:14 | 116:7 |
| 87:2, 19, 21, | **y** 80:23 | 117:1 | 109:4 | 120:6 |
| 25 88:6, 18 | 81:3 | 130:8 | 111:8 181:5 | 142:5 |
| 89:7 90:2, | **rewrite** | 157:25 | **SAED_SEPT** | 150:24 |
| 4, 7 91:6, 9, | 108:13 | 164:20 | **222021_SUP** | 155:16 |
| 13, 16 93:6, | **right** 13:20 | 176:11, 12 | **PL_000001** | 194:18 |
| 15 94:1, 2, 4 | 14:4 16:16 | 184:12 | 4:11 | 197:5 |

Daniel Clarke-Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| says 44:*24* | school | 177:*18* | se 34:*1* | 112:*4* |
| 53:*10*  60:*5* | 149:*15* | 183:*15, 20* | 74:*17* | 113:*10* |
| 62:*11* | science | 184:*2* | 118:*2, 19* | 114:*8* |
| 66:*20* | 107:*5, 16* | score 156:*6,* | search | 115:*12* |
| 77:*18* | 109:*9, 20* | *9* | 206:*23* | 116:*7* |
| 80:*18, 20* | 110:*2*  204:*7* | scored | 207:*14* | 121:*19* |
| 85:*16*  86:*4,* | Sciences | 158:*25* | searching | 128:*18* |
| *7*  93:*13* | 67:*6*  77:*23* | scores | 207:*13* | 134:*7, 10* |
| 98:*17* | 110:*15* | 158:*12, 13* | Second  4:*8* | 136:*18, 24* |
| 102:*14* | 112:*12* | screen 41:*6,* | 69:*8* | 144:*5* |
| 107:*14* | 113:*8* | *23*  42:*4, 23* | 115:*15* | 149:*5* |
| 108:*11* | scientific | 43:*9*  49:*1,* | 161:*21* | 150:*25* |
| 111:*13, 16,* | 45:*9, 24* | *10*  61:*19* | 163:*4* | 156:*4* |
| *23*  116:*2, 9* | 46:*3, 5, 14* | 62:*19* | 164:*2* | 164:*11* |
| 118:*13, 20* | 51:*6, 9, 11* | 63:*14* | 205:*14* | 167:*8* |
| 129:*4* | 52:*10, 14* | 64:*13* | 206:*4* | 170:*9, 24* |
| 134:*8, 15, 16* | 55:*22*  56:*2* | 65:*12* | 207:*22* | 171:*5, 21* |
| 137:*18* | 74:*16*  75:*2,* | 69:*18*  85:*7* | 208:*14, 18* | 172:*21* |
| 147:*21* | *9*  81:*5* | 90:*10, 13, 22* | 225:*23* | 174:*20* |
| 149:*21* | 95:*10* | 91:*22* | secondary | 178:*23* |
| 152:*16* | 101:*1, 5* | 100:*4* | 94:*22*  188:*6* | 179:*1* |
| 158:*5* | 132:*1, 3* | 107:*14* | secondly | 183:*24* |
| 160:*9* | 164:*25* | 113:*10* | 15:*3* | 185:*5* |
| 163:*17* | 183:*8* | 118:*14* | section | 206:*23* |
| 169:*17* | 186:*5* | 123:*3* | 72:*18* | 210:*16, 21,* |
| 170:*24* | 187:*4, 9, 12,* | 128:*10* | 100:*18, 20* | *25*  213:*10,* |
| 173:*15* | *19, 23*  188:*9,* | 134:*7, 10, 12,* | 162:*24, 25* | *16*  214:*1* |
| 176:*5* | *18, 21* | *13*  138:*2* | 212:*7* | 218:*9* |
| 188:*4* | 189:*13* | 141:*19* | 213:*23* | 221:*17, 23* |
| 208:*23* | scientist | 151:*22, 25* | secure 90:*1* | seeing 36:*6* |
| 213:*10* | 70:*11* | 157:*4* | Security | 48:*13* |
| 222:*5* | 71:*12*  80:*4* | 167:*18* | 17:*12* | 58:*21* |
| 223:*9, 15* | 81:*6* | 169:*2* | see  9:*17, 22* | 90:*10* |
| scale | 179:*25* | 170:*4* | 25:*19*  36:*4,* | 113:*1* |
| 155:*24* | 180:*1* | 171:*5, 7, 8* | *23*  42:*7, 15* | 138:*1* |
| 156:*10, 19* | 181:*4* | 208:*17* | 46:*16*  48:*8* | 202:*23* |
| 157:*1* | 184:*20* | 212:*9* | 50:*23*  63:*3* | seeks 67:*16* |
| 158:*7, 19* | 185:*21* | 213:*9* | 69:*19* | seen 39:*1* |
| scan 207:*1* | 186:*6* | 218:*11* | 73:*22*  88:*9* | 73:*16* |
| scanned | 187:*5*  203:*1* | 221:*17* | 89:*5, 15* | 77:*10* |
| 12:*6*  205:*1* | scientists | screening | 90:*22* | 109:*14* |
| schedule | 63:*19* | 185:*5* | 107:*7, 13* | 113:*4* |
| 24:*17* | 83:*23* | | 108:*22* | 114:*7* |
| | 84:*15* | | 111:*15* | |

Daniel Clarke Pearson, M.D.

| | | | |
|---|---|---|---|
| 192:*14* | **sentence** | 67:*11*  91:*9* | 84:*14* | 146:*13* |
| 203:*11* | 85:*1* | 129:*25* | 92:*18* | 147:*3* |
| **select**  80:*1* | 107:*14* | 130:*3, 7* | 107:*20, 21* | 158:*17, 25* |
| **selected** | 115:*15* | 221:*14* | 110:*19* | 185:*21* |
| 170:*25* | 118:*12, 15* | **share**  51:*23* | 113:*3* | 187:*9, 23* |
| 171:*22* | 121:*11, 16,* | 58:*4*  59:*25* | **shows** | 188:*9, 21* |
| 173:*10, 16,* | 20  128:*20* | 177:*11, 14* | 14:*17*  15:*8,* | 213:*3, 13, 18* |
| *19, 22* | 129:*14* | **shared** | 22  116:*19* | **sir**  144:*4* |
| 174:*12* | 159:*19* | 51:*23*  58:*8* | 117:*15* | **sitting** |
| **selecting** | 170:*12, 23* | **sheet**  25:*18* | 123:*18* | 54:*22* |
| 79:*10* | 171:*10, 12* | 228:*1, 12* | 192:*19* | 84:*12*  89:*1* |
| **selection** | 174:*20* | 229:*1*  230:*1* | 213:*20* | 109:*3* |
| 132:*15* | 213:*10* | **shelf**  191:*2,* | 214:*1* | 132:*6* |
| **selective** | **sentences** | *6* | 216:*3*  217:*2* | 179:*1, 13* |
| 173:*5* | 85:*14, 25* | **short**  197:*11* | **side**  159:*10* | 185:*20* |
| **selects**  79:*13* | **separate** | **shortly**  12:*6* | **sign**  226:*15* | 187:*2* |
| **send**  45:*11,* | 76:*14* | **short-term** | **signaling** | **situation** |
| *16*  54:*6* | 214:*24* | 213:*3, 13, 18* | 123:*20* | 71:*2*  83:*9* |
| 64:*2, 6, 13* | 215:*2* | **show**  12:*24* | **SIGNATUR** | **situations** |
| 67:*10* | **serious** | 58:*14* | **E**  229:*22* | 81:*17*  84:*9,* |
| **sending** | 111:*24* | 80:*16* | 230:*23* | *13*  96:*15* |
| 45:*23* | **served** | 104:*18* | **Signed** | **six**  37:*15* |
| 55:*16, 17* | 115:*17* | 106:*22* | 228:*15* | 113:*20* |
| **sends**  79:*24* | 195:*15* | 110:*24* | **significant** | 137:*14* |
| **senior**  61:*7,* | 196:*12* | 118:*12* | 94:*6* | 163:*21, 24* |
| *8*  63:*24* | **SERVICES** | 119:*13, 20,* | 109:*14* | 164:*1* |
| **sense**  91:*11* | 1:*1* | *24*  142:*15* | 162:*6, 11, 17,* | **sixth**  164:*3* |
| **sensitive** | **session** | 171:*12* | *20, 22*  163:*6* | **sixties**  32:*2* |
| 97:*25*  98:*8* | 36:*15* | 172:*4* | 164:*17* | **six-year** |
| **sent**  29:*16* | **sets**  132:*16* | 211:*10* | 171:*24* | 186:*18* |
| 41:*19* | 175:*25* | 213:*11, 12,* | 184:*1, 5, 12* | **size**  166:*5* |
| 43:*19*  44:*6,* | **setting** | 20  215:*15,* | 224:*13* | **SKADDEN** |
| *8*  45:*1* | 36:*11* | *23* | **significantly** | 2:*13* |
| 46:*3, 5* | 96:*13*  131:*4* | **showed** | 17:*15*  60:*8* | **skill**  149:*14* |
| 47:*21* | **setup**  57:*6* | 29:*8*  184:*11* | **similar** | **skills**  170:*15* |
| 49:*23*  51:*6,* | **seven**  66:*10* | **showing** | 122:*6*  182:*9* | **skimming** |
| *8*  53:*23* | 137:*18* | 58:*11* | **simply**  20:*3* | 72:*17* |
| 55:*12, 18* | 194:*23* | 81:*15*  95:*5* | 54:*15* | **SLATE** |
| 58:*17* | 195:*11* | 126:*23* | **simulate** | 2:*13* |
| 59:*14* | **severe**  96:*18* | 191:*25* | 125:*4* | **slides**  30:*19* |
| 60:*19* | **SGO**  45:*19* | **shown**  13:*2,* | **simulation** | **slightly** |
| 129:*24* | 46:*11* | *3, 4*  43:*8* | 37:*17* | 136:*11* |
| 207:*19, 23* | 52:*17* | 76:*10* | **single**  65:*5* | **small**  41:*24* |
| 221:*13* | 55:*13* | 81:*18* | 85:*19* | 61:*21* |

219:*22*
221:*6*
**smear**
27:*16, 20*
28:*23*  29:*1,*
*4, 8, 9, 13*
**Smith**  160:*3*
**Smith-**
**Bindman**
61:*3*
130:*16, 23*
181:*5*
**Smith-**
**Bindman's**
130:*11*
131:*3*
154:*21*
155:*4*
180:*12, 14*
**so-called**
104:*19*
**Social**  17:*11*
**Society**
40:*20*  78:*15*
**software**
29:*24*
**sold**  190:*1,*
*10*
**solely**  95:*9*
104:*12*
**somebody**
94:*9*
131:*20, 21*
152:*19*
**somebody's**
132:*6*
**someone's**
201:*19*
**Somewhat**
131:*17*
**Sorry**  8:*17,*
*21*  11:*1*
13:*13*
15:*10, 15*

18:*8*  22:*7*
23:*22, 24*
25:*9, 10, 11,*
*13*  27:*8, 15*
28:*25*
32:*20*  34:*1*
38:*6, 20*
41:*21*
56:*13*  61:*8*
63:*5, 23*
64:*4*  71:*1*
72:*17*
73:*16*  77:*3*
98:*20*
101:*3*
103:*15*
120:*2*
121:*2*
123:*1*
125:*11*
127:*22*
141:*13*
146:*5*
155:*1*
156:*16*
161:*18, 21,*
*22*  162:*10*
165:*7*
167:*23*
169:*8*
172:*19, 23*
175:*17*
181:*7*
182:*20*
183:*18*
197:*18*
208:*2*
211:*16*
216:*5, 10*
218:*7*
**sort**  37:*12*
80:*10*
113:*15*
144:*6*  156:*2*

**sounded**
168:*25*
**sounding**
142:*3*
**source**
188:*4*
**sources**
190:*16, 18*
**speak**  37:*23*
**speaker**
39:*10*
**speaking**
220:*25*
**species**
94:*21*
114:*25*
116:*24*
124:*17*
127:*1*
**specific**
7:*15*   8:*4*
18:*8*  45:*11*
55:*3*  59:*20*
68:*6, 12, 13,*
*22*  82:*3, 24*
101:*12*
105:*20*
119:*18*
144:*5*
151:*1*
165:*6*
186:*13*
194:*4, 11, 20,*
*24*  195:*12*
209:*9*
220:*16*
**specifically**
16:*24*
22:*13*
47:*13*
52:*14*
62:*17*
73:*14*
77:*13*

95:*18*
144:*2*
176:*2*
221:*22*
224:*16*
**specifics**
28:*19*
120:*20*
**speculate**
154:*2*
**speculating**
155:*20*
**speech**
34:*16*
**speeches**
35:*23*
**spent**
220:*22*
**spoken**
30:*11*
34:*12*  57:*7*
**Spreadsheet**
3:*14*
**St**  27:*12*
28:*22*
**stand**  12:*15,*
*18*
**standard**
113:*16*
**start**  15:*18*
21:*7*  32:*9*
77:*18*
161:*1, 3*
**started**  28:*1*
33:*25*
55:*16*
202:*23*
**starting**
217:*8*
**state**  6:*23*
32:*6*  65:*18,*
*20*  70:*11*
82:*21*  92:*2*
117:*25*

118:*7*
128:*20*
174:*11, 17*
180:*13*
184:*7, 8*
186:*23*
205:*18*
222:*3*
227:*3, 19*
**stated**
21:*16*
25:*24*
91:*16, 24*
144:*8*
179:*5*
184:*21*
185:*23*
187:*24*
188:*10, 22*
189:*14*
193:*19*
210:*2*  227:*6*
**statement**
40:*14*  76:*5,*
*18*  88:*10*
90:*16, 17*
92:*5*  94:*7*
98:*1*
103:*21*
106:*12*
107:*7*
108:*3*
140:*17*
**statements**
30:*8*  34:*9*
76:*23*
99:*12*
108:*2*
130:*4, 7*
220:*19*
**STATES**
1:*1*  68:*3*
86:*1*  94:*4*
95:*18*

Daniel Clarke Pearson, M.D.

97:*23*
99:*15*
104:*17*
105:*25*
187:*10, 24*
188:*10, 22*
189:*13, 14*
190:*11*
**statistical**
88:7  89:*12,*
*18*  162:5
184:*11*
**statistically**
162:*6, 11, 17,*
*19, 21*  163:5
164:*17*
171:*24*
184:*1, 5*
185:7, *16*
224:*13*
**statistics**
88:*22, 24*
109:*17*
**status**  97:*24*
**stay**  28:*12,*
*13*
**stayed**
23:*18*  28:7
**steering**
225:*21*
**stenographic**
**ally**  227:*9*
**steps**  71:*14,*
*22*  119:*10*
**stimulated**
114:*23*
124:*16*
**stop**  36:6
37:3, *6*
48:3  65:*16*
66:*16*
67:*23*
179:*11*
196:*25*

**stopped**
23:*24*
36:*24*
201:*11*
**straight**
207:*1*
**Street**  2:5, *9*
**strength**
156:*3, 4*
**strongly**
103:*9*
**structure**
176:*20*
**stuck**
106:*19*
**student**  31:*2*
**students**
30:*14, 22*
32:*4, 10*
33:*3, 9, 25*
36:*18*
37:*24, 25*
38:*10*
**studies**  36:*2*
63:*2*  105:*1*
126:*23*
131:*9*
132:*15*
137:*13*
140:*13*
144:*18, 19*
145:5, 7, *10,*
*19*  146:*10,*
*14, 16, 19*
147:*4, 9, 12,*
*16*  148:*2, 11,*
*19*  156:*15,*
*19*  158:*6, 12,*
*13*  159:*6, 10,*
*13*  170:*17,*
*25*  171:*18*
173:*16*
174:*1*
182:*19, 22*

183:*25*
184:*3, 8*
191:*25*
192:*22*
207:*10*
214:*13, 14*
215:*10*
223:*6, 7*
224:*15*
225:*1*
**study**  90:*5,*
*8, 18*  91:*8*
117:*15, 25*
118:*8, 17*
122:*11, 21*
123:*22*
126:*17*
131:*4, 19*
132:*25*
133:*16, 17*
138:7
140:5
141:*25*
145:*24*
146:8
149:*18, 19*
150:*11, 20*
151:*1, 5*
153:*2*
156:*3, 4*
158:*18, 25*
171:*1, 9, 23*
173:*6, 11, 17,*
*20, 23*  174:*3,*
*4, 6, 8, 10, 18,*
*24*  175:*8*
176:*2*
222:*16, 20,*
*22*  223:*3, 12*
**Subject**
3:*15*  9:*19*
19:*4*  20:*13*
38:*11*  131:*9*

**subjective**
165:*10, 17*
**submission**
107:*4, 15*
**submissions**
130:*2, 6*
**submit**
16:*14*
67:*21*  79:*6,*
*24*  80:*3*
**submits**
91:*11*
**submitted**
7:*21*  25:*24*
59:*24*
74:*23*  78:*1*
79:*3*  88:*14*
109:*15*
110:*11*
176:*1*
**submitting**
88:*18*
**subsection**
163:*17, 19*
**subset**
171:*1, 22*
173:*5, 11, 16,*
*19, 22*
174:*12, 14,*
*17*  175:*8, 21*
**subsidiary**
52:*11*
**substance**
13:3  29:5
49:*8*
**subtrace**
191:*12*
**sufficient**
106:*21*
**suggest**
102:5
214:*22*
215:*16*

**suggested**
88:*23*  89:6
201:*10*
**suggesting**
103:*1*
104:5
106:*17*
108:*12*
130:7
**suggestion**
106:*13*
**suggestions**
79:5  89:*21,*
*22*  102:*4*
**suggests**
102:*21*
**suitable**
113:*21*
**Suite**  2:*9*
**summary**
4:*6*  14:*11*

**supplemental**
67:*18*  68:*4,*
*10*  123:*13*
194:*21*
207:*11*
208:*18, 24*
213:*23*
223:*21, 25*
224:*2*
**supplied**
132:*24*
133:9  182:8
**support**
52:*23*
126:*17*
208:*4*
215:5  216:6
**supported**
102:*24*
**supports**
52:*23*
114:*21*

**suppose**
26:*5*
**supposed**
125:*7*
**sure** 11:*8*
13:*19* 15:*5*
16:*6* 24:*11*
27:*25* 28:*3*
29:*23* 31:*3*
32:*11*
33:*18* 35:*3*
36:*10*
38:*15*
39:*14, 18*
41:*14* 42:*8,*
*16* 43:*4*
45:*3* 52:*2*
63:*20*
70:*20*
71:*10, 19*
74:*17*
77:*12* 83:*7*
87:*11*
88:*12*
93:*24*
100:*1, 12*
102:*13*
103:*6*
107:*11, 21*
109:*12*
110:*20*
112:*18, 25*
113:*2*
116:*15*
138:*17*
141:*15*
156:*12*
159:*21*
160:*5*
172:*7*
174:*13*
179:*10*
180:*5*
185:*3*

191:*20*
198:*17*
205:*14*
206:*6*
213:*4, 6*
219:*4*
**surgery**
37:*13*
**surprise**
125:*2*
147:*3, 11*
158:*16*
178:*17*
**surprised**
145:*9*
200:*17*
**surprises**
158:*21*
**surprising**
100:*23*
**surveillance**
116:*25*
117:*3*
**sustaining**
98:*14*
**sworn** 6:*11*
227:*7*
**system**
124:*16*
**systematic**
3:*23* 4:*25*
223:*2*

< T >
**Tab** 169:*7*
**table** 7:*20*
136:*18, 25*
141:*10, 13,*
*16, 19, 24*
142:*14*
143:*14, 17,*
*20, 22, 23*
145:*19*
146:*19*

152:*16, 17*
153:*22, 23*
155:*23*
161:*20, 22*
222:*22, 25*
223:*1, 15, 16,*
*25* 224:*2, 3,*
*7*
**tables**
223:*21*
**Taher** 5:*2*
156:*21, 23,*
*24* 157:*5, 6,*
*13, 14, 18, 24*
158:*13, 19,*
*25* 159:*7, 12,*
*20* 160:*6*
**take** 9:*22*
21:*2* 52:*3*
61:*18*
76:*23* 83:*8,*
*14* 89:*21*
90:*20*
106:*14*
138:*21*
158:*10*
164:*23*
176:*24*
180:*19*
195:*5*
196:*6*
206:*14*
212:*18*
224:*21*
225:*5*
**Taken** 1:*1*
6:*3* 34:*6*
67:*14*
71:*14, 22*
98:*16*
108:*8*
110:*7*
141:*5*
194:*1*

197:*20*
198:*12, 14*
207:*7*
227:*5* 228:*9*
**takes** 193:*15*
**talc** 3:*13,*
*19* 4:*4, 13*
5:*4* 26:*23*
28:*11* 30:*6,*
*9, 12* 34:*20*
37:*24* 38:*1,*
*10, 11, 13, 19,*
*23* 39:*8*
40:*1, 14*
44:*24* 45:*2,*
*20, 24* 49:*25*
50:*5, 6, 8, 19*
51:*2* 55:*23*
56:*7* 57:*18*
58:*19, 25*
59:*17*
80:*22* 81:*7,*
*25* 83:*6, 10*
99:*18, 22*
100:*10*
102:*10, 22*
104:*5*
115:*18*
116:*3, 19, 22*
117:*15*
118:*1, 9, 18*
119:*14, 21,*
*25* 120:*11,*
*23* 121:*6, 7,*
*23, 24* 122:*3,*
*9* 126:*12, 18,*
*24* 127:*5, 8*
129:*2, 9, 15*
130:*4, 8*
143:*13, 19,*
*24* 144:*23*
150:*7*
161:*1, 6, 12*
162:*3*

163:*18, 20*
165:*1*
171:*3, 25*
177:*3, 11, 14*
179:*15, 16*
180:*13, 14*
183:*9, 16, 21*
184:*9, 21*
185:*23*
186:*7*
187:*7, 11, 25*
188:*4, 10, 14,*
*23* 189:*15,*
*21, 22* 190:*5,*
*6* 192:*16*
197:*23*
198:*1, 5, 7, 9,*
*18* 199:*3, 6,*
*14, 25* 200:*6,*
*11, 24*
201:*24*
202:*15, 21*
204:*10*
207:*15, 16*
214:*9*
215:*17, 24*
216:*3*
222:*2, 6*
**TALCUM**
1:*1* 3:*22*
4:*24* 5:*14*
30:*17* 31:*4,*
*11, 18* 32:*7,*
*9, 18* 33:*2*
34:*1* 35:*8,*
*24* 36:*2*
39:*6, 23*
40:*5, 6, 8*
57:*24*
58:*11*
83:*10*
84:*10* 93:*7,*
*11, 18, 23*
94:*20, 22*

Daniel Clarke Pearson, M.D.

95:*17, 23*
99:*9*
102:*21*
114:*23*
117:*4*
123:*18*
125:*6, 7*
128:*2*
138:*13*
140:*7, 10, 11, 13, 19, 22, 24*
144:*20*
157:*25*
176:*11, 13*
184:*13*
190:*16, 19*
192:*2, 10, 13, 21, 24* 193:*1, 3, 4, 5*
212:*14*
215:*6*
216:*8*
223:*3*
224:*22*
228:*4*
**talk** 30:*13*
37:*1* 51:*20*
96:*11*
152:*9*
212:*10, 12*
**talked** 35:*1*
36:*19* 72:*2*
103:*15*
104:*23*
114:*25*
129:*19*
207:*12*
**talking** 8:*3*
31:*8* 32:*9*
33:*25*
47:*18*
51:*14*
57:*14*
104:*8*

110:*10*
151:*19*
161:*19*
163:*16*
173:*3, 8*
206:*8*
210:*4*
214:*17*
216:*20*
**talks** 50:*5*
156:*2* 215:*4*
**Taylor** 1:*1*
227:*1, 18*
**teach** 36:*17, 18, 19* 37:*17*
149:*14*
**teaching**
30:*16* 37:*13*
**Technical**
170:*19*
**technique**
72:*4, 6, 8, 9, 12, 14, 20, 21*
73:*3, 15, 17*
74:*4, 8, 10*
80:*19*
81:*11, 12, 15, 18, 21* 83:*24*
84:*8, 13*
86:*2* 95:*5*
198:*11*
**techniques**
199:*18*
**teenage**
161:*2, 14*
**telephone**
29:*14*
**tell** 7:*10*
16:*6* 37:*25*
38:*3, 13*
45:*16*
46:*20* 47:*3, 9* 51:*13*
148:*6*

156:*6, 17*
172:*17*
175:*20*
208:*1*
209:*24*
213:*18*
221:*2*
**telling** 33:*9*
168:*9*
220:*23*
**ten** 146:*10, 14, 19, 22*
147:*4, 12, 19*
148:*9, 19*
150:*8*
152:*20*
153:*3, 13*
154:*3, 6*
164:*1*
170:*16, 25*
171:*17*
173:*15*
174:*1*
**tens** 53:*7, 11*
**tenth** 218:*20*
**term** 97:*7, 11* 116:*12*
131:*15*
133:*18*
134:*25*
135:*20*
165:*8*
189:*21*
**terminology**
109:*13*
**terms** 83:*24*
103:*23*
174:*13*
212:*12*
217:*14*
219:*20*
224:*15*
**terrific**
149:*8*

**test** 120:*11*
150:*25*
157:*2*
**tested** 199:*6, 18, 20, 24*
200:*6, 11, 15, 24*
**testified**
6:*12* 19:*1, 8* 20:*14*
40:*12*
44:*19*
49:*23*
72:*19*
81:*22* 82:*5*
83:*8* 95:*15*
147:*18*
183:*8*
197:*25*
206:*1* 208:*3*
**testifies**
116:*1, 6*
**testify**
19:*13* 49:*3*
209:*24*
227:*7*
**testifying**
7:*2* 22:*18*
82:*1* 83:*4*
**testimony**
12:*5, 15, 18, 21* 17:*2*
21:*25*
22:*17* 33:*1*
34:*24*
47:*16* 50:*1*
51:*22*
55:*25*
59:*11* 82:*3, 7, 20, 25*
83:*19* 86:*8*
105:*16*
115:*18*
116:*2*

128:*16*
145:*18*
146:*18*
147:*20*
172:*9, 11*
183:*12*
185:*10*
195:*2*
209:*21*
227:*8, 10*
**testing**
200:*8, 18*
203:*15, 24*
**tests** 88:*7*
89:*12, 18*
104:*18*
**Thank** 15:*1, 6* 44:*10*
49:*17* 57:*1*
63:*4* 72:*5*
85:*5* 100:*5, 6* 110:*5*
112:*20*
117:*5*
129:*18*
149:*9*
162:*9*
164:*23*
165:*4, 24*
168:*19*
207:*6*
213:*7*
225:*8, 9*
226:*12*
**Thanks**
14:*15*
**thereof**
227:*13*
**things** 26:*4*
52:*13* 70:*7*
72:*25*
123:*21*
127:*3*

134:*2, 7*
205:*7*  209:*8*
**think**  9:*4*
10:*17*
11:*21*  18:*2*
20:*22*  22:*4*
23:*18*  24:*5*
32:*1*  38:*25*
42:*9*  45:*6*
48:*4*  50:*3*
52:*4, 12*
54:*3*  56:*2,
21*  57:*5*
60:*4*  61:*11*
71:*5*  79:*20*
80:*12*
82:*25*  83:*7,
22*  85:*9*
89:*20*
91:*10*
94:*18*
102:*12*
103:*22, 24*
104:*4*
105:*22*
106:*14*
107:*19*
108:*3*
113:*17*
117:*21*
122:*13*
123:*25*
132:*3*
133:*23*
134:*21*
135:*3, 8*
137:*23*
140:*1, 19*
141:*19, 20*
144:*1*
145:*1*
153:*7, 21*
155:*8*
163:*14*

171:*6*
176:*10, 23*
177:*21*
178:*11*
180:*1, 9*
182:*23*
184:*11*
185:*15, 18*
191:*5*
192:*19*
199:*13*
207:*12*
210:*19*
211:*25*
215:*1, 25*
217:*16*
219:*4, 21*
**thinking**
154:*3*
**third**  94:*17*
164:*2*
171:*10*
**THOMPSO
N**  2:*5*
10:*24*
12:*24*  26:*8*
**thought**
10:*16*
23:*22*
43:*17*
44:*20*
182:*25*
**thousands**
53:*7, 11*
**three**  13:*11,
16, 19*  14:*5,
19*  61:*12*
79:*24*  82:*6*
111:*3*
113:*19*
136:*21*
139:*20*
142:*24*
143:*5, 6, 9,*

*10, 13, 20, 25*
144:*2, 14*
145:*6, 11, 13*
152:*23*
153:*10, 11*
154:*22*
155:*6, 13*
163:*20*
190:*17, 18*
194:*25*
205:*16*
219:*22*
221:*6*
**threshold**
192:*6*
**threw**  22:*10*
**thrive**  93:*22*
**tied**  161:*15*
224:*24*
**ties**  132:*4*
**time**  11:*19*
12:*4, 8, 12*
16:*13*  17:*4*
23:*7*  32:*19*
36:*10*  37:*5,
6*  41:*12*
45:*7*  52:*4*
55:*18*
57:*25*
62:*16, 20*
66:*17*
67:*23*
74:*19*  83:*8*
94:*9*
104:*24*
117:*8, 12*
138:*13*
140:*18*
141:*20*
152:*11*
161:*14*
167:*1, 3*
181:*22*
182:*23*

190:*18*
195:*2*
200:*9*
207:*17, 18*
217:*16, 17*
218:*20*
220:*5*
221:*1, 17*
225:*18*
226:*7, 17*
227:*5, 8, 11*
**times**  31:*7*
60:*6*  96:*9*
137:*9, 19, 22*
138:*14, 15,
17, 19*  139:*7,
8, 9, 11, 15,
17, 20, 25*
140:*4*
142:*9, 10, 13*
143:*13*
149:*22, 24*
150:*8*
152:*20*
153:*3, 5, 8,
11, 14, 20, 24,
25*  154:*3, 5,
7, 12, 17, 22*
155:*6, 13, 14*
162:*4, 8, 19*
163:*6, 18, 25*
164:*2*
167:*17*
200:*25*
208:*1*
209:*14, 19*
**tissue**  99:*8*
**titanium**
121:*8*
122:*8*
124:*18, 23*
125:*8*
**title**  41:*15*
206:*23*

210:*16, 18,
23*  214:*15*
222:*25*
**titles**  66:*24,
25*
**today**  6:*17*
7:*2, 8*  39:*5*
54:*22*
62:*21*
66:*18, 21*
76:*24*
84:*12*
109:*3*
179:*2, 13*
185:*20*
187:*2*
195:*13, 17,
24*  197:*1*
209:*14, 19*
217:*15*
218:*4*
219:*15*
221:*7*
**today's**  9:*2*
**told**  21:*19*
38:*18, 22*
46:*22*  47:*6,
7*  91:*16*
146:*23*
202:*10*
**tomorrow**
196:*11*
**tone**  168:*15*
**tool**  156:*1*
**top**  54:*14*
169:*11, 16*
173:*2*  224:*6*
**topic**  54:*12*
76:*7*  88:*4*
92:*23*
109:*7*
202:*19*
**topics**  45:*20*
78:*8*

total 15:22
25:5 112:8
156:5
163:18
194:23
toxicity
96:11, 19, 24
trace
191:11, 15
track 57:13
tract
140:21
141:1
224:20
tracts 147:6,
13 148:13
225:4
trailed
216:11
train 37:8
training
36:22 37:12
TRANGLE
2:15 14:1,
4, 7 15:5
42:3 43:14
44:5, 14, 17
48:24 49:5
54:3 65:13
68:1 69:13,
19 84:22
85:4, 8
93:14
100:3
106:5
107:11
110:25
111:11
112:18, 23
118:14
121:13
133:24
141:17
157:20

170:20
208:20
211:6
218:13
transcribed
227:9
transcript
227:6 228:8

transcription
124:24
Transcripto
mic 4:16
123:6
transformati
on 70:1
72:7 76:12
80:17, 22
81:7, 13, 19
83:11, 15, 17
84:1, 5
85:20
86:10, 18, 24
91:19 92:3,
6, 16 94:25
98:6 99:19,
23 100:10
102:11
105:4, 13
106:1, 2, 10,
11, 20, 21
117:23
transformati
ve 120:12
transformed
104:19
translational
70:10 78:9
80:6
travel 23:1,
4, 13 24:1, 4,
7
treatments

35:6
trials 35:4
Triangle
67:6
tried 29:13,
15
tries 80:7
tripled
166:11
truck 13:13
true 227:10
228:10
truth 227:7
try 10:7
52:25
72:18
117:6
209:16, 23
trying
18:18 23:8
45:18, 22
52:5 64:24
65:6 66:8,
12 73:4, 14
144:1, 3
151:9
170:2
201:16
tubal 31:8
160:19
161:13
224:19
225:2, 6
Tube 5:9
tubes
140:23
146:12
148:3
161:15
176:3, 13

224:4, 17, 23,
24 225:7
tumor
104:19
119:6
turn 69:11
72:16
115:11
121:11
128:7
134:5
138:2
157:22
158:5
159:16
217:6
222:22
twice 46:13
171:3, 25
193:15
Two 7:18
11:9 27:2
37:16 55:1,
4, 5, 9, 18
56:9 60:6
61:5 69:5
79:23
85:14, 24
94:5, 15, 16
110:13, 15
111:13, 17,
20 112:5
113:14, 18
129:5
136:17, 20,
21 139:6, 8,
11, 15, 17
142:8, 15, 18,
24 143:2, 5,
6, 9, 13, 19,
21, 24 144:2,
12, 14, 17, 20
145:6, 11, 13,
15, 19, 23

152:24
153:4, 11
154:4, 7, 17
155:14
159:10
161:7, 13
163:20, 24,
25 164:14
168:13
175:25
195:1, 11
197:17
205:7
type 98:5
124:2
typed 227:9
types 29:10
typical
102:2
113:14
160:18, 20,
25
typically
52:9

< U >
Uh-huh
61:9 69:14
74:15
120:8
130:13
138:6
161:19
166:20
171:20
172:2
181:21
ultimately
27:19 79:6
94:23
unaware
192:5
unbilled
16:13

Daniel Clarke Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| **UNC** 36:*21* | **unique** | 122:*21* | **uses** 126:*1* | **video** |
| 201:*7, 11* | 120:*23* | 125:*24* | 152:*19* | 151:*20* |
| 202:*10* | 121:*6, 7, 23* | 126:*2* | 156:*9* 214:*9* | **VIDEOCON** |
| **underlying** | 122:*3* | 133:*18* | **usually** | **FERENCE** |
| 139:*10* | **UNITED** | 136:*17, 22* | 38:*2* 46:*25* | 1:*1* 6:*2* |
| 158:*12, 13* | 1:*1* 187:*10,* | 137:*3* | 61:*10* | **view** 104:*10* |
| **understand** | *24* 188:*10,* | 138:*25* | 74:*18* 79:*6,* | 156:*2* |
| 6:*16* 22:*22* | *22* 189:*13,* | 139:*4, 6, 11* | *23* 207:*1* | 177:*5* |
| 23:*8* 24:*11* | *14* 190:*11* | 140:*7* | **uterine** | 181:*4* |
| 43:*5, 7, 24* | **university** | 141:*9, 25* | 63:*10* | 187:*15* |
| 70:*11* | 17:*6* 28:*22* | 142:*8, 15, 24,* | **uterus** | **views** 177:*2,* |
| 72:*24* | 70:*12* | *25* 143:*13,* | 146:*12* | *11, 14* |
| 73:*22* 74:*1* | **unprofession** | *24* 144:*8, 12,* | 224:*22* | 179:*24* |
| 81:*11* | **al** 65:*8* | *19, 23* 145:*6,* | **utilization** | **violate** |
| 82:*15* | | *10, 13, 20* | 151:*15* | 226:*5* |
| 101:*10* | **unreasonable** | 152:*12, 15* | | **violating** |
| 102:*1* | 96:*23* | 153:*3, 13* | **< V >** | 226:*5* |
| 116:*12, 15* | **unreliable** | 154:*18, 22* | **Vague** 24:*9* | **violation** |
| 133:*1* | 183:*2* | 155:*6* | 59:*2* | 68:*15, 24* |
| 139:*1* | **update** | 156:*1* | **vaguely** | 195:*4, 9* |
| 140:*16* | 59:*11* 206:*2* | 157:*25* | 155:*25* | 218:*21* |
| 156:*18* | **updated** | 162:*16* | 210:*25* | **virtual** |
| 163:*10* | 182:*9* | 163:*18, 20,* | **Valentine's** | 36:*13* |
| 195:*18, 25* | 205:*15* | *25* 164:*1, 13* | 58:*24* 59:*23* | **virtually** |
| 196:*3* | 206:*5* | 165:*1, 8, 11* | **valid** 104:*7* | 1:*1* 198:*1* |
| 215:*3* | **updates** | 170:*14* | **validate** | **visits** 36:*13* |
| 217:*13* | 68:*21* | 171:*2* | 109:*16* | **vitro** |
| 220:*17* | **upload** | 174:*13* | **validity** | 123:*17* |
| **understandin** | 211:*7* | 176:*3* | 76:*9* 101:*1,* | 213:*13* |
| **g** 119:*22* | **upwards** | 183:*16, 21* | *5* | |
| 148:*1, 4* | 161:*6* | 184:*9, 13, 21* | **value** 19:*20* | **< W >** |
| 161:*2* | **urban** 121:*9* | 185:*5, 23* | 55:*22* | **wait** 15:*13* |
| 228:*13* | **use** 3:*21* | 186:*7* | **variants** | 64:*25* 65:*9* |
| **understood** | 4:*2, 23* 5:*3* | 187:*7, 11, 25* | 35:*16* | 141:*13* |
| 23:*11* 30:*1* | 30:*19* | 188:*11* | **variety** | 150:*15* |
| 101:*18* | 38:*19, 23* | 189:*15* | 96:*14* | 157:*4* |
| 113:*1* | 40:*8, 14* | 192:*16* | **verbal** 6:*20* | 219:*24* |
| **undertaken** | 52:*19* | 207:*14, 16* | **Version** | **walk** 9:*7* |
| 176:*24* | 53:*16* 60:*6* | 218:*7* 223:*3* | 5:*12* | 19:*2* |
| **unfair** | 81:*21* | **useful** | 128:*11* | **want** 21:*24* |
| 209:*16* | 91:*17, 18* | 10:*16* 102:*6* | 166:*23* | 22:*6* 31:*15* |
| **unhappy** | 93:*20* | **users** 224:*8,* | 169:*4* | 53:*25* 55:*3* |
| 103:*5, 7* | 96:*23* | *10* | 172:*12* | 60:*13* |
| | 97:*23* | | **vice** 41:*15* | 65:*10, 15, 24* |

73:*11*
84:*22*
88:*19*
110:*23*
112:*25*
117:*12*
118:*12*
134:*2*
151:*25*
152:*9*
160:*21*
197:*13*
205:*14*
209:*9*
211:*4*
223:*18*
**wanted**
43:*3, 24*
45:*3* 47:*22*
49:*24*
140:*16*
206:*6* 207:*3*
**warrant**
85:*18*
**Washington**
2:*10* 28:*22*
**wasting**
65:*16*
**way** 26:*6*
29:*13* 39:*5,*
*21, 25* 65:*22*
69:*18*
103:*25*
108:*17*
109:*6*
139:*2*
154:*12*
171:*14*
207:*17, 21*
209:*16*
224:*22*
**Wayne**
70:*11*
**ways** 187:*15*

**website**
73:*18* 74:*9*
93:*1* 95:*9*
104:*12*
**Wednesday**
1:*1*
**week** 13:*12,*
*17* 14:*6*
30:*15*
46:*14* 60:*6*
134:*18, 20*
135:*21, 24*
136:*17, 20,*
*22* 137:*2, 8,*
*14, 16, 19, 22*
138:*17, 19,*
*25* 139:*5, 7,*
*8, 9, 12, 16,*
*17, 20, 25*
140:*4*
142:*1, 9, 10,*
*13, 16, 19, 20,*
*25* 143:*3, 10,*
*14, 20, 21, 24,*
*25* 144:*2, 3,*
*9, 12, 15, 18,*
*20, 24* 145:*6,*
*11, 14, 15, 20,*
*23* 149:*24*
152:*21, 23*
153:*5, 11*
154:*5, 7, 17,*
*23* 155:*6, 14*
159:*13*
163:*25*
164:*14*
171:*3, 25*
195:*22*
**weeks**
10:*18* 11:*9*
37:*15*
**weird** 175:*3*
**welcome**
9:*5, 6*

49:*15*
168:*21*
189:*2*
**Well** 9:*15*
10:*14* 16:*5*
17:*3* 20:*17*
21:*7* 25:*4*
28:*3* 31:*11*
61:*3, 21*
72:*16*
73:*24*
79:*14* 94:*8,*
*15* 116:*20*
122:*5*
124:*5*
125:*4*
136:*8*
138:*7, 21*
140:*19*
142:*5*
149:*25*
160:*20*
163:*4*
174:*4*
175:*23*
181:*6*
183:*23*
194:*16*
198:*5*
207:*12*
209:*13*
214:*15*
215:*18*
219:*11*
**went** 13:*13*
23:*17, 19*
174:*15*
**Wentzensen**
4:*4* 63:*22,*
*24* 64:*9, 15*
66:*4, 24, 25*
177:*14, 18*
178:*2, 19*
179:*17*

Wentzensen'
s 63:*25*
179:*4, 25*
180:*7*
**we're** 9:*21*
43:*16*
48:*21*
51:*20*
113:*1*
117:*11*
123:*2*
138:*1*
149:*13, 17*
151:*18, 20*
157:*10*
161:*25*
184:*25*
195:*19*
208:*17*
216:*20*
217:*8*
219:*16*
226:*2*
**West** 2:*16*
**We've** 6:*17*
11:*8* 19:*7*
63:*9* 71:*16*
104:*8*
114:*25*
129:*19*
154:*6*
164:*12*
195:*25*
217:*16*
221:*18*
225:*23*
**whichever**
167:*2*
**whites** 218:*7*
**widely**
124:*7*
**wild** 98:*5*
**wish** 12:*22*

**WITNESS**
8:*17* 13:*5*
17:*18* 18:*7*
22:*4, 9*
23:*17* 28:*7*
29:*23* 30:*3*
33:*24*
38:*25*
39:*18* 40:*4*
41:*1* 42:*7*
46:*2* 47:*6,*
*13* 49:*3, 19*
50:*10, 21*
52:*1, 25*
53:*10* 55:*9*
56:*1, 9, 20*
57:*21* 58:*7*
60:*4, 23*
62:*16* 71:*1*
75:*5, 13, 23*
76:*14, 21*
77:*10*
78:*14*
80:*25*
81:*10*
83:*22* 84:*7*
85:*9* 86:*13*
87:*1, 11, 18*
88:*3* 89:*20*
90:*20* 92:*9,*
*22* 93:*4*
95:*4, 12*
96:*3, 8*
97:*20* 98:*3*
99:*2* 100:*1,*
*6, 12* 101:*8,*
*17* 103:*4, 19*
104:*14*
107:*23*
108:*17*
109:*12*
110:*3*
113:*4*
114:*3*

Daniel Clarke Pearson, M.D.

| | | | | |
|---|---|---|---|---|
| 116:*15* | 181:*11, 19,* | 124:*7* | 160:*12* | 94:*16* |
| 117:*21* | *25*  183:*5, 11* | 138:*7, 12* | 164:*21* | 103:*16* |
| 118:*11, 17,* | 184:*24* | 140:*13* | 167:*7, 11, 12* | **worked** |
| *24*  119:*17* | 185:*13* | 146:*3, 7, 14,* | 168:*24* | 16:*4*  28:*20* |
| 120:*5, 15* | 186:*1* | *20*  147:*5, 13* | 172:*6, 10, 12,* | 41:*16* |
| 122:*5* | 188:*3, 14* | 148:*12* | *18, 22*  173:*3,* | **working** |
| 124:*5* | 189:*7, 20* | 150:*7* | *9, 21, 22* | 17:*5*  28:*1* |
| 125:*11, 17,* | 190:*15* | 160:*12, 13* | 174:*2, 9* | 36:*1*  37:*12* |
| *22*  126:*8, 14,* | 191:*14, 20* | 161:*1, 5, 12* | 175:*11* | 116:*21* |
| *22*  128:*24* | 192:*5* | 162:*3* | 176:*1* | 129:*4* |
| 129:*11* | 193:*23* | 166:*7* | 177:*1* | **writing**  42:*5* |
| 130:*21* | 198:*17, 23* | 171:*2* | 181:*23* | **written** |
| 131:*6, 12* | 199:*10, 16* | 191:*22* | 222:*16* | 46:*18, 21, 23* |
| 132:*3, 18, 23* | 200:*2, 14, 20* | 192:*23* | 223:*5, 14, 20,* | 70:*18*  71:*5,* |
| 133:*8* | 201:*2* | 201:*25* | *22*  224:*3, 16* | *11*  103:*25* |
| 135:*3* | 202:*7, 14, 23* | 224:*4, 5, 7,* | **word**  79:*4* | 110:*4* |
| 136:*1, 8, 24* | 203:*10, 17* | *10, 17, 18* | 91:*17, 18* | 178:*3, 7, 18* |
| 137:*5, 18* | 204:*2, 13* | 225:*2, 4* | 103:*6, 13* | 179:*3, 6, 15* |
| 139:*14, 22* | 208:*7* | **women's** | 104:*23* | **wrong**  90:*2* |
| 142:*3, 18* | 209:*22, 24* | 52:*17* | 134:*10* | 199:*13, 24* |
| 143:*2, 8, 16* | 212:*23* | **wondering** | 136:*6* | 200:*5, 10* |
| 144:*11, 17* | 214:*6* | 50:*1* | 184:*24* | 215:*19* |
| 145:*1, 13, 23* | 215:*1* | **Woolen** | 185:*6* | 218:*8* |
| 147:*8, 15* | 216:*16* | 3:*20*  4:*22* | **worded** | 220:*11* |
| 148:*16, 23* | 218:*5* | 60:*1, 11, 14,* | 39:*15* | **wrote**  7:*17* |
| 149:*8* | 225:*21* | *18*  129:*19* | **words**  47:*9* | 46:*15* |
| 153:*7, 17* | 226:*8* | 130:*17* | 134:*12* | 70:*20*  88:*1* |
| 154:*10, 25* | 227:*13* | 131:*2* | 207:*15* | 103:*1* |
| 155:*8, 16* | **witnesses** | 132:*20* | **Work**  3:*14* | 105:*2* |
| 159:*2, 9* | 225:*19* | 133:*4, 10* | 15:*23*  16:*1* | 113:*25* |
| 160:*9* | **woman** | 134:*24* | 17:*6, 9* | 114:*4* |
| 161:*9* | 39:*6, 23* | 135:*18* | 18:*5, 20* | 173:*14* |
| 162:*10* | 55:*2, 6* | 136:*4, 10, 15,* | 19:*6, 14* | **Wu**  5:*6* |
| 165:*5, 13, 21* | 140:*6, 9, 18* | *16*  137:*21* | 21:*20* | 149:*4, 18, 21* |
| 166:*14* | 160:*18* | 139:*4, 6, 11* | 22:*20*  23:*5* | 150:*3, 6, 11* |
| 170:*9* | 171:*24* | 141:*8* | 25:*22*  26:*7,* | 151:*18, 23* |
| 171:*17* | 192:*1, 16* | 142:*8, 24* | *11*  28:*8* | 152:*2, 6, 11* |
| 173:*25* | **woman's** | 144:*23* | 36:*24*  37:*3,* | 153:*2, 13* |
| 175:*17* | 93:*23* | 146:*2, 6* | *6, 16*  63:*10* | 161:*16, 18,* |
| 176:*9, 18* | 140:*25* | 153:*4, 15, 19,* | 70:*24*  71:*4* | *20, 22*  162:*1,* |
| 177:*21* | **women** | *24*  154:*3, 16* | 75:*20* | *5*  164:*13* |
| 178:*6, 23* | 4:*20*  46:*13* | 155:*16, 23* | 84:*16* | 165:*3* |
| 179:*9, 10, 19* | 52:*17* | 158:*11, 17,* | 87:*24*  88:*3* | 223:*11, 13,* |
| 180:*16, 22* | 98:*15* | *24*  159:*7, 24* | 92:*13* | |

Daniel Clarke Pearson, M.D.

*16*

**< Y >**
**Yahoo**
42:*13, 15*
44:*13*
55:*20*
221:*12*
**Yahoo/Finan**
**ce**  3:*18*
**Yeah**  25:*19*
44:*14*
48:*24*  57:*1*
85:*23*
100:*1*
134:*16, 20*
149:*8*
164:*4, 8*
165:*10*
**year**  19:*25*
20:7, *9*
34:*17*  163:7
**years**  26:*15,*
*19, 22*  35:2
81:*23*
83:*14, 19*
134:*17*
161:2, *15*
162:8, *18*
190:*11*
201:*25*
223:*17*
**yellow**
159:*20*
**yesterday**
11:*3*  114:*9*
167:5, *11*
169:5, *15*
172:*13, 17,*
*21*
**York**  2:*16*

**< Z >**

**Zahn**  40:*23,*
*24*  41:*9, 14*
**Zantac**
183:*3, 9*
**Zoom**  6:*6*
11:*8, 10*
30:*24*
36:*13, 15*
167:*16*
**Zooms**
11:*18*