# EXHIBIT 5

Page 231

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON         )
TALCUM POWDER PRODUCTS           )
MARKETING, SALES PRACTICES,      ) MDL NO. 16-2738(MAS)(RLS)
AND PRODUCTS LIABILITY           )
LITIGATION,                      )
_____)

VIDEOCONFERENCE DEPOSITION

OF

DANIEL CLARKE-PEARSON, M.D. (VOLUME II)

(Taken virtually by Defendants)

Friday, March 8, 2024

Reported by:  Christine A. Taylor, RPR

GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Page 232

1  REMOTE APPEARANCES:
2
3  Representing the Plaintiffs:
4      BEASLEY ALLEN
        BY: LEIGH O'DELL, ESQ.
5           LEANNE PITTARD, ESQ.
        218 Commerce Street
6       Montgomery, Alabama 36104
        334.269.2343
7       leigh.odell@beasleyallen.com
8       and
9       GOLOMB LEGAL
        BY: RICHARD GOLOMB, ESQ.
10      1835 Market Street, Suite 2900
        Philadelphia, Pennsylvania 19103
11      215.278.4449
        rgolomb@golomblegal.com
12
13
    Representing the Defendants Johnson & Johnson and
14  Johnson & Johnson Consumer Inc.:
15      SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
        BY: JESSICA DAVIDSON, ESQ.
16          ASHER TRANGLE, ESQ.
        One Manhattan West
17      New York, New York 10001
        212.735.3000
18      jessica.davidson@skadden.com
        asher.trangle@skadden.com
19
20
21
22
23
24
25

Page 233

1              C O N T E N T S
2                    PAGE
3  EXAMINATION CONTINUED BY MS. DAVIDSON      235
4  EXAMINATION BY MS. O'DELL                  365
5  FURTHER EXAMINATION BY MS. DAVIDSON        378
6  FURTHER EXAMINATION BY MS. O'DELL          388
7  FURTHER EXAMINATION BY MS. DAVIDSON        389
8
9
10             * * *
11
12             E X H I B I T S
13  EXHIBIT       DESCRIPTION        PAGE
14  Exhibit 19  2/22/2024 E-mails, Subject: RE:   242
15     Ovarian Cancer and Talcum powder
16  Exhibit 20  American Cancer Society Cancer Facts   247
17     & Figures 2024
18  Exhibit 21  Materials Considered list       258
19  Exhibit 22  8/27/21 Deposition Transcript of  276
20     Daniel L. Clarke-Pearson, M.D.,
21     Volume 2
22  Exhibit 23  Hilary Converse Report          292
23  Exhibit 24  7/12/2021 Letter to David Dearing  299
24     from Dr. Godleski
25  Exhibit 25  Tamara Newsome Report           304

Page 234

1  Exhibit 26  3/22/2015 Holy Cross Health record,  311
2     Bates NewsomeT-HCHMR-00277 - 278
3  Exhibit 27  Obesity and risk of ovarian cancer  316
4     subtypes: Evidence from the Ovarian
5     Cancer Association Consortium
6  Exhibit 28  Perineal Talc Use and Ovarian    332
7     Cancer, A Systematic Review and
8     Meta-Analysis
9  Exhibit 29  Pasqualina Rausa Report         338
10 Exhibit 30  Genital powder use and risk of   348
11    epithelial ovarian cancer in the
12    Ovarian Cancer in Women of African
13    Ancestry Consortium
14 Exhibit 31  Use of personal care product    354
15    mixtures and incident
16    hormone-sensitive cancers in the
17    Sister Study: A U.S.-wide
18    prospective cohort
19 Exhibit 32  Chang 2024 Supplemental Data    360
20    spreadsheet
21
22
23
24
25

Page 235

1         On March 8, 2024, commencing at 9:21 a.m.,
2    the videoconference deposition of
3    DANIEL CLARKE-PEARSON, M.D., was taken pursuant to
4    notice and pursuant to the Federal Rules of Civil
5    Procedure, on behalf of the Defendants, remotely
6    via Zoom.
7                     - - -
8              P R O C E E D I N G S
9                     - - -
10        DANIEL CLARKE-PEARSON, M.D.,
11   having first been duly sworn, was examined
12      and testified as follows:
13                    - - -
14        EXAMINATION CONTINUED
15   BY MS. DAVIDSON:
16       Q.  Good morning, Dr. Clarke-Pearson. As
17   you know, we're continuing your January 20, 2024,
18   deposition in In Re: Johnson & Johnson Talcum
19   Powder Products.
20       Did you bring any materials with you
21   today?
22       A.  Yes. I brought some journal articles
23   that I thought might be useful to discuss.
24       Q.  Are any of those articles not included
25   on your reliance list or materials considered list?

2 (Pages 232 - 235)

Page 252

1  exact number.
2    Q.  What percentage of women with Lynch
3  syndrome will get ovarian cancer?
4    A.  It's increased over the general
5  population.  I don't know the exact number.
6    Q.  What percentage of women who use talc
7  will get ovarian cancer?
8    A.  Their increased risk is approximately
9  30 to 60 percent.
10    Q.  But that doesn't mean that 30 to
11  60 percent will get ovarian cancer, does it?
12    A.  No.
13    Q.  Do you have an estimate of what
14  percentage of women who use talc in the genital
15  area in your opinion will get ovarian cancer?
16        MS. O'DELL:  Object to the form.
17        THE WITNESS:  They're at increased
18    risk.
19  BY MS. DAVIDSON:
20    Q.  That wasn't my question?
21    A.  Could you repeat the question, please.
22    Q.  You said that 20 percent of women with
23  BRCA1 mutation would get ovarian cancer.  I'm
24  asking you what percentage of women who use talc in
25  a genital area will get ovarian cancer?

Page 253

1        MS. O'DELL:  Object to the form.  I
2    think you misstated his prior testimony,
3    Jessica.  Object to the question.
4        THE WITNESS:  I don't have a specific
5    number in terms of women exposed to talcum
6    powder.
7  BY MS. DAVIDSON:
8    Q.  Why is that?
9    A.  I just don't have that opinion.
10    Q.  Is that because science doesn't know?
11        MS. O'DELL:  Object to the form.
12        THE WITNESS:  Because population-based
13    studies haven't been undertaken to answer
14    that question compared to the studies that
15    have been done with BRCA mutation patients.
16  BY MS. DAVIDSON:
17    Q.  So just to be clear, you disagree with
18  the American Cancer Society that the most important
19  risk factor other than age is a family history of
20  breast or ovarian cancer?
21    A.  A family history now you're talking
22  about or BRCA mutation?
23    Q.  The sentence here, you agree or
24  disagree with it?
25    A.  Which sentence are you reading?

Page 254

1    Q.  The very first sentence says, "The most
2  important risk factor other than age is a family
3  history of breast or ovarian cancer, some of which
4  is related to certain inherited gene mutations."
5        MS. O'DELL:  Hey, Jessica, I'm sorry,
6    there's some background noise on your end.
7    Is somebody doing the dishes or something?
8        MS. DAVIDSON:  I'm going to move to
9    another room.  Okay.
10  BY MS. DAVIDSON:
11    Q.  So where we were was we were looking at
12  this first sentence and it says, "The most
13  important risk factor other than age is a family
14  history of breast or ovarian cancer, some of which
15  is related to certain inherited gene mutations."
16        I'm trying to understand whether you
17  agree or disagree with that statement?
18    A.  I agree with that statement.
19    Q.  "Other medical conditions and
20  characteristics associated with increased risk
21  include a personal history of breast cancer,
22  endometriosis, or pelvic inflammatory disease, and
23  tall adult height."
24        Do you agree with that sentence?
25    A.  Not aware of the tall adult height

Page 255

1  being a risk factor.  The others I would agree
2  with.
3    Q.  Modifiable factors associated with
4  increased risk include use of menopausal hormone
5  therapy, estrogen alone or combined with progestin,
6  previously referred to as hormonal replacement
7  therapy or HRT, and excess body weight for some
8  subtypes."
9        Do you agree with that statement?
10    A.  Yes.
11    Q.  Which subtypes -- for which subtypes is
12  excess body weight a risk factor?
13    A.  I believe it's endometrioid.
14    Q.  Is that the only one?
15    A.  I would have to look at the literature
16  again to give you a complete answer.
17    Q.  Okay.  "Cigarette smoking is associated
18  with a rare subtype, mucinous."
19        Do you agree with that statement?
20    A.  I've seen -- I've seen literature that
21  supports that, yes.
22    Q.  "Factors associated with lower risk
23  include pregnancy, higher number of children, later
24  age at menarche, earlier age at menopause,
25  fallopian tube ligation or removal, and use of

7 (Pages 252 - 255)

Page 272

1  talc use?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  Anything is possible, so
4   yes.
5  BY MS. DAVIDSON:
6    Q.  As of 2024, do you believe that a risk
7  factor is always the same as causation?
8    A.  Risk factor same as causation?  No.
9    Q.  If a woman without children develops
10 ovarian cancer, is it your opinion that her ovarian
11 cancer was always caused by incessant ovulation?
12      MS. O'DELL:  Just a moment here.  It
13  was discussed at length in his August 26th
14  deposition.  Nulliparity was also
15  discussed -- let me just confirm the pages
16  here in the second day.  Let me get the
17  page.  Yeah, page 551, 574, and 622.
18      So by using women without children as
19  the term in your question versus
20  nulliparity, I think that's really not fair.
21  It's covering the same topic, Jessica.
22      He was also asked about it in his 2019
23  deposition as well, but -- if you have
24  another question about new topics, he's
25  certainly available to answer them.

Page 273

1  BY MS. DAVIDSON:
2    Q.  Dr. Clarke-Pearson, if a woman has
3  never had children and develops ovarian cancer, did
4  her incessant ovulation necessarily cause that
5  disease?
6       MS. O'DELL:  Object to the form.  It's
7   recovering old ground.  It's an incomplete
8   hypothetical.
9       So I would just ask you to move on,
10  please.
11 BY MS. DAVIDSON:
12   Q.  Please answer.
13      MS. O'DELL:  Dr. Clarke-Pearson, answer
14  this question.
15      And, Jessica, if you're going to go
16  over old ground, we just have to fight this
17  battle.  I wish we didn't.  But I'll allow
18  him to answer this question, but we're not
19  going to retread the old stuff we've
20  already -- I think we've got an agreement on
21  that and I hope we can keep it.
22      If you could answer the question.
23      THE WITNESS:  Could the court reporter
24  please repeat the question.
25  (The reporter read back the last question.)

Page 274

1       MS. O'DELL:  Object to the form.
2   Incomplete hypothetical.
3       THE WITNESS:  My answer would be no,
4   not necessarily.
5  BY MS. DAVIDSON:
6    Q.  Dr. Clarke-Pearson, are you familiar
7  with any literature suggesting that talc works
8  synergistically with other risk factors to cause
9  ovarian cancer?
10   A.  Not that I'm aware of, no.
11   Q.  Dr. Clarke-Pearson, have you done any
12 further analysis since 2021 as to how many risk
13 factors are needed to cause ovarian cancer?
14      MS. O'DELL:  Object to the form.
15      THE WITNESS:  No.
16 BY MS. DAVIDSON:
17   Q.  Is it still your belief that talc alone
18 is not sufficient to cause an individual woman's
19 ovarian cancer?
20      MS. O'DELL:  Object to the form.  And
21  what are you referring to?
22 BY MS. DAVIDSON:
23   Q.  Dr. Clarke-Pearson, you testified on
24 August 27, 2021, that talc alone is not sufficient
25 to cause an individual woman's ovarian cancer.  I

Page 275

1  just want to make sure that's still your opinion.
2       MS. O'DELL:  And would you please
3   direct us to page and line so he can see the
4   testimony to make sure it's in context.
5       MS. DAVIDSON:  Sure 458/17.  Asher, you
6   want to put it on the screen.  We can mark
7   it as an exhibit.  I think we're on to
8   Exhibit --
9       MR. TRANGLE:  22.
10      MS. DAVIDSON:  -- 22.
11      MS. O'DELL:  458, is that what you
12  said?
13      MS. DAVIDSON:  Yeah.  Asher will put it
14  on the screen.
15      MS. O'DELL:  It's okay.  I can give it
16  to him.  458, what line?
17      MS. DAVIDSON:  Asher is putting it up.
18      MS. O'DELL:  It's okay.  I would just
19  like the line.  I've got the hard copy here.
20      MS. DAVIDSON:  It's line 17.  You'll
21  see it.
22      MR. TRANGLE:  Can you see it here?  I
23  can highlight it if it's easier.
24      MS. DAVIDSON:  Sure.  Highlight it.
25      MR. TRANGLE:  There we go.

12 (Pages 272 - 275)

Page 288

1  MS. DAVIDSON: Enough.
2  BY MS. DAVIDSON:
3  Q. Dr. Clarke-Pearson, were you in the
4  middle -- excuse me. Doctor --
5  MS O'DELL: Be respectful.
6  MS. DAVIDSON: No, you're not being
7  respectful, Leigh.
8  MS. O'DELL: I am.
9  MS. DAVIDSON: Dr. Clarke-Pearson --
10  excuse me, Leigh.
11  BY MS. DAVIDSON:
12  Q. Dr. Clarke-Pearson, were you in the
13  middle of an answer?
14  A. I believe I gave you the answer that I
15  wanted to give you. If you'd like to repeat the
16  question.
17  MS. DAVIDSON: Let's start again.
18  Court reporter, can you repeat the question.
19  (The reporter read back the last question.)
20  MS. O'DELL: Object to the form.
21  THE WITNESS: Could you read my answer
22  then?
23  (The reporter read back the last answer.)
24  BY MS. DAVIDSON:
25  Q. So, Dr. Clarke-Pearson, what other

Page 289

1  things are you referring to there?
2  A. In general, it would be the risk
3  factors that we've been talking off and on
4  throughout this deposition so far.
5  Q. We're talking about Ms. Converse;
6  right?
7  A. Yes.
8  Q. So you mean Ms. Converse's risk
9  factors?
10  A. If we're specifically talking about
11  Ms. Converse, yes, we're talking about her risk
12  factors.
13  Q. I'm really sorry. I'm not trying to be
14  difficult. I really don't understand. Do you
15  believe that Ms. Converse's known risk factors
16  account for all the five to ten mutations that led
17  to her ovarian cancer?
18  A. Oh, okay. Well, that's a different
19  question. The answer is I don't know all the risk
20  factors that she had that ultimately resulted in
21  the -- enough mutations to cause her ovarian
22  cancer.
23  Q. Okay. That's what I didn't understand.
24  I wanted to follow up on something we discussed at
25  your last deposition.

Page 290

1  So I believe in 2021 you testified that
2  the Terry study supported your opinion that talcum
3  powder use can cause clear cell carcinoma, and
4  there might be another study, but you couldn't
5  remember it at the time.
6  I'm wondering if other than Terry, are
7  you relying on any other studies for your clear
8  cell causation opinion at this point?
9  MS. O'DELL: Is there a specific -- let
10  me just make sure I understand the question.
11  Are you taking aback his 2021 deposition, or
12  you talking about -- when you asked that
13  question?
14  BY MS. DAVIDSON:
15  Q. Dr. Clarke-Pearson, do you recall
16  testifying in 2021 that you were relying on Terry
17  for your causation opinion with respect to clear
18  cell carcinoma?
19  A. Yes. Terry includes eight other
20  studies in copy when he pools that data that
21  supports that talcum powder causes clear cell
22  carcinoma.
23  Q. Are you relying on any papers other
24  than Terry with respect to your clear cell opinion?
25  A. I think I'll stick with Terry. Thank

Page 291

1  you.
2  Q. Since 2021, have you gone back to look
3  at any of the epidemiology related to clear cell
4  carcinoma?
5  A. I mean --
6  MS. O'DELL: Object to the form.
7  THE WITNESS: I've looked at Terry. I
8  mean, that's what I'm relying on.
9  BY MS. DAVIDSON:
10  Q. Have you looked since 2021 at any of
11  the other epidemiology addressing clear cell
12  carcinoma?
13  A. No.
14  Q. Since 2021, have you looked into why
15  the Terry paper reports more clear cell cases from
16  the New England consortium than those reported by
17  Dr. Cramer in 2016?
18  MS. O'DELL: Would you mind, Christine,
19  repeating that question.
20  MS. DAVIDSON: I'm sorry?
21  MS. O'DELL: I'm asking Christine to
22  read back the question.
23  (The reporter read back the last question.)
24  MS. O'DELL: Objection to the form.
25  Misstates the evidence. And as you know, he

16 (Pages 288 - 291)

Page 292

1 testified at length to Terry in his prior
2 depositions.
3         THE WITNESS: I have not done any other
4     investigation to answer your question.
5 BY MS. DAVIDSON:
6     Q. Have you reached out to either
7 Dr. Terry or Dr. Cramer since 2021 to try to
8 resolve the difference in clear cell cases reported
9 in 2016 versus the number reported in Terry?
10        MS. O'DELL: Object to the form.
11    Misstates the evidence.
12        THE WITNESS: I have not reached out to
13    them, no.
14 BY MS. DAVIDSON:
15    Q. If we could turn to page 18 of the
16 Converse report. We're marking that as Exhibit 23.
17        MR. TRANGLE: Okay. I'm going to put
18    it in the chat.
19        MS. DAVIDSON: What fixed it, Asher?
20        MR. TRANGLE: I don't know. I just
21    logged in and it worked.
22        (Exhibit 23 marked for identification.)
23 BY MS. DAVIDSON:
24    Q. If we could go to hormone replacement
25 therapy. It says here: "She testified that she

Page 293

1 used hormone therapy for six years. I do not
2 consider this a substantial contributing factor."
3     Do you see that?
4     A. Yes.
5     Q. Is it accurate that she used hormone
6 therapy for only six years?
7     A. That was my understanding reviewing the
8 medical records.
9     Q. Do you recall in your 2021 deposition
10 being shown a record that ▮
11 ▮ ▮ ?
12    A. I don't recall that.
13    Q. Okay. And do you explain here your
14 view that the risk factor for ovarian cancer is
15 tied to only one form of hormone therapy and not
16 another?
17        MS. O'DELL: Jessica, this is not a
18    part of his report that's changed at all.
19    This was covered in his 2021 deposition. If
20    you want to ask him about his general use of
21    the literature on hormone therapy, you're
22    welcome to do that, and to the degree it's
23    changed since 2021.
24        But to re-review parts of the -- his
25    Converse report that have not changed, it's

Page 294

1    really not within the guidelines of this
2    deposition.
3 BY MS. DAVIDSON:
4     Q. Dr. Clarke-Pearson, do you note here
5 what you -- the -- do you note here what you told
6 me earlier today about your views that the risk
7 factor for hormone replacement therapy is only
8 associated with one form of such therapy?
9     A. To be specific, just estrogen.
10    Q. And not when it's combined with
11 progesterone; right?
12    A. That's my understanding of the
13 literature, yes.
14    Q. Can you tell me which literature says
15 that?
16    A. Not at the moment I can't. Sorry.
17    Q. Is any of that literature on your
18 reliance list, materials considered?
19    A. I'm sorry.
20    Q. Is any of that literature included on
21 your materials considered?
22    A. I believe so.
23    Q. Can you point me to that in your
24 materials considered?
25    A. Not at the moment, no.

Page 295

1     Q. If we -- you can't look at your
2 materials considered list and tell me which
3 articles address that issue?
4     A. Would you like me to go through these
5 486-plus articles.
6     Q. You would have to read every article to
7 find it?
8     A. I would have to skim at least the
9 titles to see if there's something relevant.
10    Q. Do you recall researching this question
11 in order to write your report?
12    A. Yes.
13    Q. So is it your testimony that if I were
14 to go through the list of the 486 articles, I would
15 find literature on this topic?
16    A. Yes.
17    Q. Okay. We'll look at a break.
18    A. I'm sorry, what was your question?
19    Q. I said we'll look at a break so that we
20 can move things forward.
21        Have you undertaken any investigation
22 since 2021 as to whether Ms. Converse had any
23 asbestos exposure?
24    A. Any additional investigation since
25 2021?

Page 312

1  BY MS. DAVIDSON:
2      Q.  Dr. Clarke-Pearson, Ms. Newsome was
3  diagnosed with ovarian cancer in March 2015; right?
4      A.  Yes.
5      Q.  If we could turn to this medical record
6  from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7  ▓▓▓ - excuse me, Leigh.
8      MS. O'DELL:  We haven't opened it yet,
9  so --
10     MS. DAVIDSON:  It's right on the
11 screen, Leigh.  Please don't interrupt me.
12 Please stop interrupting me.  You've been
13 interrupting me all day.
14     MS. O'DELL:  That's not true.
15 BY MS. DAVIDSON:
16     Q.  Dr. Clarke-Pearson --
17     MS. O'DELL:  Let us open it.
18     MS. DAVIDSON:  You can open it.  But
19 stop interrupting me.
20 BY MS. DAVIDSON:
21     Q.  Dr. Clarke-Pearson, this medical record
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Do you see that?
23     MS. O'DELL:  Just wait,
24 Dr. Clarke-Pearson, until you've had a
25 chance to look at the document.

Page 313

1      THE WITNESS:  Take a look at it and
2  calculate for myself.
3      Sorry.  I'm trying to find a BMI
4  calculator on my phone here.
5  BY MS. DAVIDSON:
6      Q.  Dr. Clarke-Pearson, my question was not
7  how you calculate her BMI.  My question does this
8  medical record ▓▓▓▓▓▓▓▓▓▓▓▓?
9      MS. O'DELL:  He will answer your
10 question when he's ready to do so.  Don't
11 rush him, please.
12     MS. DAVIDSON:  Oh, my God, Leigh.
13     THE WITNESS:  I'm trying to see.  It
14 says ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is
15 what it says.
16 BY MS. DAVIDSON:
17     Q.  Is that inconsistent with your
18 statement in the report that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19 ▓▓?
20     A.  Yes.
21     Q.  Is ▓▓▓▓▓▓▓▓▓▓?
22     A.  Yes.
23     Q.  Is this an error in your report?
24     A.  That's why I want to calculate it.  I
25 may have calculated -- it may be an error in the

Page 314

1  medical record.  Have you done that math?
2      Q.  We have multiple medical records
3  showing ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Doctor.  If you
4  would like to do the math, you're welcome to.
5      MS. O'DELL:  Object.
6      THE WITNESS:  That's what I'd like to
7  do.
8      Why can't I find --
9      MS. DAVIDSON:  You could just go on the
10 Internet, there's a thousand BMI
11 calculators, unfortunately for those of
12 us --
13     THE WITNESS:  All right.
14 BY MS. DAVIDSON:
15     Q.  According to AARP it's 30.1.  So
16 actually they underestimated it.  According to the
17 AARP BMI calculator, which I just went online and
18 did, 5-foot-3 and 171 pounds is a BMI of 30.1,
19 Doctor.
20     A.  Well, I'm having trouble with my
21 calculator.  So if you think that's the correct
22 thing, then your question is would I correct my
23 report, and I would say yes.
24     Q.  Is there a reason why you didn't
25 correct this after this was pointed out to you in

Page 315

1  2021?
2      MS. O'DELL:  Object to the form.
3      THE WITNESS:  I wasn't aware that that
4  was pointed out to me.
5  BY MS. DAVIDSON:
6      Q.  Okay.
7      A.  I don't recall that.
8      Q.  Was obesity a risk factor for
9  Ms. Newsome?
10     MS. O'DELL:  Object to the form.
11     THE WITNESS:  If her BMI is over 30,
12 then she's considered obese.  And there's
13 literature that suggests that obesity
14 doesn't really increase the risk unless the
15 patient is severely obese, in other words, a
16 BMI of over 40.  That's reported by IARC as
17 one reference.
18 BY MS. DAVIDSON:
19     Q.  Is it your testimony that the
20 literature has not found an increased risk for
21 endometrioid cancer for obesity with a BMI between
22 30 and 34?
23     MS. O'DELL:  Object to the form.
24     THE WITNESS:  Let me take a look at one
25 reference, if I could.

22 (Pages 312 - 315)

Page 320

1  It's my recollection that I looked at
2  some records that [REDACTED]
   [REDACTED]. And according to this paper that
4  you have on the screen here, if her BMI is
5  less than 30, she does not have a
6  significant increased risk of developing
7  ovarian -- endometrioid ovarian cancer.
8  BY MS. DAVIDSON:
9      Q.  Assuming that we are correct and the
10 medical records are correct, there are multiple
11 medical records, I can show them to you, [REDACTED]
12 [REDACTED], did that put her at an increased
13 of endometrioid cancer?
14     MS. O'DELL:  Object to the form.  Asked
15 and answered.  Misstates the record.
16     THE WITNESS:  Based on this table, she
17 has a slightly increased risk of developing
18 ovarian cancer.
19 BY MS. DAVIDSON:
20     Q.  Do you consider 1.37 to be a slightly
21 increased risk?
22     A.  It's an increased risk.
23     Q.  How would you characterize 1.37 in
24 terms of slight, weak?
25     A.  I'm not going to quantify it by slight,

Page 321

1  moderate, severe.  I'm just going to say it's a
2  37 percent increased risk.
3      Q.  Would you attribute 37 percent of
4  her -- would you attribute 37 percent of her
5  endometrioid cancer to her obesity?
6      MS. O'DELL:  Object to the form.  As
7  Dr. Clarke-Pearson said, this misstates his
8  testimony.  He has already said there are
9  other records.
10     THE WITNESS:  It contributed -- yes, it
11 contributed to her developing ovarian
12 cancer.
13 BY MS. DAVIDSON:
14     Q.  Can you quantify by how much?
15     A.  Somewhere between -- I mean, you know,
16 you see the numbers right there, 1.37.
17     Q.  Have you reviewed any epidemiological
18 studies since 2021 besides Schildkraut and
19 Penninkilampi that address a potential association
20 between talc use and endometrioid cancer?
21     A.  I think there are other papers besides
22 Schildkraut and Penninkilampi that support talc
23 causing endometrioid ovarian cancer.
24     Q.  What are they?
25     A.  I reviewed them before.  I don't -- I

Page 322

1  mean, I didn't re-review them since 2021.
2      Q.  The two you identified in 2021 were
3  Schildkraut and Penninkilampi.  Are there any
4  others you would identify today?
5      A.  I will have to go back and go through
6  my notes and records, and I can send that to you.
7      Q.  Okay.  You can send that to us.  But
8  I'll ask for those after the deposition.
9          But are there any others you would
10 identify sitting here today?
11     A.  Not off the top of my head here today.
12     Q.  Do you know who wrote the Health Canada
13 risk assessment.
14     A.  I don't.  I can look and see if there's
15 an author list.  I have it here with me.
16     Q.  Is Ms. Newsome cancer-free?
17     MS. O'DELL:  He's trying to respond to
18 your question.
19 BY MS. DAVIDSON:
20     Q.  I thought he answered.  He didn't know
21 and he would look.
22     A.  I'm looking right now.
23     Q.  Okay.
24     A.  I don't -- to answer your question, I
25 don't know who specifically wrote it.  Whether it

Page 323

1  was one person or a committee.
2      Q.  I think my next question that I asked
3  apparently prematurely was is Ms. Newsome
4  cancer-free?
5      A.  She is as of June 2023.
6      Q.  Does she have a good prognosis?
7      A.  Yes, I would think so.
8      Q.  Same for Ms. Converse, good prognosis?
9      A.  Yes.
10     Q.  I noticed in your report you decreased
11 Ms. Newsome's duration of use from 1975 to 2020 to
12 1975 to 2015.  What was the reason for that?
13     MS. O'DELL:  Read back the question.
14 (The reporter read back the last question.)
15     MS. O'DELL:  Let me put in front of him
16 his 2021 report so he can see what is being
17 referred to, if anything.
18 BY MS. DAVIDSON:
19     Q.  I'm just asking a simple question,
20 Leigh.  A number change, 2020 changed to 2015.
21     MS. O'DELL:  Well, he's entitled to
22 look at what you're looking at.
23     MS. DAVIDSON:  I'm looking at his
24 report and I'm wondering why it says 2015.
25 What is your basis for --

24 (Pages 320 - 323)

Page 328

1  30 is not -- 30.0 is not what I'm trying to say or
2  is not what I've been trying to say.  That's --
3  that's a ballpark number.
4      Q.  Okay.  Is this -- did you change your
5  opinion in our last break?
6      A.  No.  It just came to my mind that these
7  women are women that are using a lot more talcum
8  powder than a lot of other epidemiological studies
9  reported.
10     Q.  When did this come to your mind?
11     A.  At the break.
12     Q.  So you've been on this case for five
13 years and it came to the mind at the last break
14 that you wanted to change your opinion?
15         MS. O'DELL:  Objection to the form.
16 Misstates his testimony.
17         THE WITNESS:  Yes.
18 BY MS. DAVIDSON:
19     Q.  Well, then we'll have to go back to
20 Ms. Converse.  Did you talk to Ms. O'Dell during
21 the break, Dr. Clarke-Pearson?
22     A.  No, I didn't.  I went to the bathroom.
23     Q.  And in the bathroom you had an epiphany
24 that you wanted to change your specific causation
25 opinion with respect to all three plaintiffs?

Page 329

1          MS. O'DELL:  Object to the form.
2  Misstates his testimony.
3          THE WITNESS:  I don't think I had an
4  epiphany.  It just -- when I thought about
5  it, it just came to me like these are
6  women -- these three women have used talcum
7  powder extensively.  And the epidemiologic
8  data says the extensive use does increase
9  the risk more than 30 percent.
10 BY MS. DAVIDSON:
11     Q.  And when you're talking about the
12 epidemiological data, you're just talking about
13 Woolen; right?
14     A.  I mean, there's other studies that have
15 dose response to them of difference source.
16     Q.  What studies are you talking about
17 other than Woolen?
18     A.  I think we've talked about that in
19 other depositions too.  I would go to Penninkilampi
20 for one.  Woolen would be another, yes.
21     Q.  Do Penninkilampi and Woolen show --
22 well, let's start with Ms. Converse.
23         What subtype does Ms. Converse have?
24     A.  Let me just double-check.  She has
25 clear cell.

Page 330

1      Q.  Okay.  And does Penninkilampi show --
2  what's the increased risk for Ms. Converse's level
3  of use for clear cell carcinoma in Penninkilampi?
4      A.  I don't think Penninkilampi
5  specifically looks at clear cell.
6      Q.  So what are you --
7          MS. O'DELL:  Excuse me.  If you need to
8  see a paper, Dr. Clarke-Pearson, just feel
9  free to put it -- you know, we can get it in
10 front of you.
11 BY MS. DAVIDSON:
12     Q.  So, Dr. Clarke-Pearson, what are you
13 relying on for your new opinion that you formulated
14 in the middle of this deposition that
15 Ms. Converse's quote/unquote heavy use of talcum
16 powder increased her risk more than 30 percent?
17         MS. O'DELL:  Object to the form.
18 Misstates his testimony.
19         THE WITNESS:  If I can pull
20 Penninkilampi paper and look at it, I can
21 give you some more specifics.
22         MS. DAVIDSON:  Okay.  Let's go off the
23 record for you to do that.
24         MS. O'DELL:  I've got it right here for
25 him.

Page 331

1          MS. DAVIDSON:  We just got a new
2  opinion in the middle of this deposition
3  and --
4          MS. O'DELL:  It's not a new opinion.
5          MS. DAVIDSON:  Oh, come on.
6          MS. O'DELL:  He's testified extensively
7  to Penninkilampi in the past and --
8          MS. DAVIDSON:  No.  Come on.
9          MS. O'DELL:  He testified to
10 Penninkilampi in 2019 as you well know.  And
11 he's testified to it in -- I think he
12 mentioned it in his 2021 deposition.  It's
13 not a new opinion.  You look at his dose
14 response opinion in his report, it's not --
15         MS. DAVIDSON:  We're going to go off
16 the record while you look at this paper.
17         MS. O'DELL:  I think he's ready to
18 answer your questions.
19 BY MS. DAVIDSON:
20     Q.  Dr. Clarke-Pearson, are you ready to
21 answer at this moment?
22     A.  Not right -- not at this moment.
23         MS. DAVIDSON:  Then let's go off the
24 record.
25 (Recess taken from 12:22 p.m. until 12:25 p.m.)

26 (Pages 328 - 331)

Page 332

1    (Exhibit 28 marked for identification.)
2    BY MS. DAVIDSON:
3    Q. Where are you taking us, Doctor?
4    A. Table 1. If you look at the length of
5    talc use, long-term less than 3600, greater than
6    3600, greater than 3600 pushes the testament to
7    1.42.
8    Q. And is that for clear cell?
9    A. It's for all epithelial ovarian
10   cancers.
11   Q. Is there any paper that addresses
12   whether heavier use of talcum powder is associated
13   with a higher risk of clear cell?
14       MS. O'DELL: Object to the form.
15       THE WITNESS: Not that I'm aware of.
16   BY MS. DAVIDSON:
17   Q. Okay. So sitting here today, what
18   percentage, you know, I was -- I was berated for
19   asking this question because it was covered in
20   2021. Now it turns out you actually have a
21   different opinion.
22       Sitting here today, what percentage of
23   Ms. Converse's clear cell ovarian cancer do you
24   attribute to talc use?
25   A. I think I would increase it to

Page 333

1    42 percent based on Penninkilampi's table.
2    Q. Are you basing it on anything else?
3    A. Not at the moment.
4    Q. Are you aware of any epidemiological
5    literature finding a 42 percent increased risk
6    between any amount of talcum powder use and the
7    development of clear cell ovarian cancer?
8        MS. O'DELL: Object to form.
9        THE WITNESS: No.
10   BY MS. DAVIDSON:
11   Q. Okay. Let's go to Ms. Newsome. Now,
12   Ms. Newsome had endometrioid cancer; correct?
13   A. Yes, she did.
14   Q. And, sitting here today, are you able
15   to ascribe a percentage contribution of talc to the
16   cause of her ovarian cancer?
17   A. I would stick with this table from
18   Penninkilampi that we're talking about and say
19   42 percent.
20   Q. And if we can look at this table from
21   Penninkilampi -- Asher, you took it down
22   prematurely -- what is the risk ratio it shows for
23   endometrioid?
24   A. It doesn't specifically for
25   endometrioid. Specifically talks about all

Page 334

1    epithelial ovarian cancers.
2    Q. Are you aware of any paper showing a
3    42 percent increased risk for endometrioid ovarian
4    cancer as a result of genital talc use?
5        MS. O'DELL: I'm sorry, Christine,
6    would you repeat that question, please.
7    (The reporter read back the last question.)
8        MS. O'DELL: Object to the form.
9        THE WITNESS: No, I'm not.
10   BY MS. DAVIDSON:
11   Q. Is Penninkilampi the only paper you're
12   relying on for your 42 percent opinion with respect
13   to both Ms. Newsome and Ms. Converse?
14   A. There are some other papers that I'm
15   aware of that I can't identify for you today.
16   Q. Do those papers --
17       MS. O'DELL: I'm sorry, I don't think
18   he's finished.
19       THE WITNESS: I'm sorry. I broke up.
20   Those papers talk about different sorts of
21   use. Penninkilampi is talking about 3600 or
22   more applications. Others talk about
23   duration and frequency. So they vary a
24   little bit, but they describe heavy use.
25   BY MS. DAVIDSON:

Page 335

1    Q. Do any of those papers have a
2    42 percent risk ratio?
3    A. They have an increase -- I don't have
4    the number on the top of my head. They have an
5    increased risk above the 1.3 that we've been
6    talking about before.
7    Q. Can I ask you a question? And this is
8    just because I'm not a mathematical person.
9        Is a 42 percent increased risk the same
10   thing as saying that you're attributing 42 percent
11   of the cause to something?
12       MS. O'DELL: Object to the form.
13       THE WITNESS: What I'm talking about is
14   the contribution and the increased risk of
15   talcum powder exposure over long period of
16   time as one of the causes of these women's
17   ovarian cancer. Or another way to look at
18   it is it increases her risk by 42 percent.
19   BY MS. DAVIDSON:
20   Q. But it's really important to understand
21   that increasing your risk by 42 percent does not
22   mean a 42 percent risk; right?
23       MS. O'DELL: Objection to form.
24       THE WITNESS: Yes, that's true.
25   BY MS. DAVIDSON:

27 (Pages 332 - 335)

Page 336

1  Q. And that's a common misconception;
2  right?
3     MS. O'DELL: Object to the form.
4     THE WITNESS: I don't know whose
5     conception that is.
6  BY MS. DAVIDSON:
7  Q. Are you changing your opinion with
8  respect to Ms. Rausa as well?
9  A. Yes.
10  Q. And I believe Ms. Rausa's ovarian
11  cancer has a 42 percent attribution to talc use?
12  A. Yes.
13  Q. Is that notwithstanding her tubal
14  ligation?
15  A. I accounted for that in my calculation
16  of how much exposure she had with a patent
17  reproductive tract.
18  Q. Did you look at literature of women who
19  had tubal ligations and consider that literature in
20  terms of what that showed about increased risk?
21     MS. O'DELL: Object to the form. Can
22     you be more specific? Vague.
23  BY MS. DAVIDSON:
24  Q. Doctor?
25  A. I'm going to have to ask the reporter

Page 337

1  to repeat the question.
2  (The reporter read back the last question.)
3  A. So the literature demonstrates the
4  tubal ligation reduces the risk. But I'm not aware
5  of the literature that talks about the tubal
6  ligation plus the duration of exposure that
7  Mrs. Rausa had.
8  Q. So when you -- when you formulated your
9  opinion in the break that Ms. Rausa is now at a
10  42 percent increased risk, did you consider her
11  tubal ligation in that ten-minute period?
12     MS. O'DELL: Object to the form.
13     Misstates his testimony. Asked and
14     answered.
15     THE WITNESS: My answer is, yes, this
16     Penninkilampi paper on Table 1 talks about
17     greater than 3600 exposures and she had that
18     before she had her tubes tied.
19  BY MS. DAVIDSON:
20  Q. The Woolen paper thought it was
21  important to look at women who had patent tubes;
22  right?
23  A. Yes. They excluded women that didn't
24  have patent tubes or had had a hysterectomy.
25  Q. And why did they do that?

Page 338

1  A. To have one hypothesis on my part would
2  be that they wanted to have a consistent group of
3  patients. Some groups may have had more tubal
4  ligations. Others may have had less. So to have a
5  consistent group of patients. And we also know
6  that women that have patent tubes are at higher
7  risk to develop ovarian cancer.
8     Mrs. Rausa had patent tubes for a long
9  time before she had her tubes tied and had that
10  duration of exposure with patency.
11  Q. How many years before her diagnosis
12  were her tubes tied?
13  A. Let me go to my report here. I'm
14  sorry, I had Newsome's report here. Sorry.
15  Q. Asher, did we mark Ms. Rausa's report?
16     MR. TRANGLE: We have not, no.
17     MS. DAVIDSON: Would it be 28?
18     MR. TRANGLE: No. It would be 29.
19     MS. DAVIDSON: Let's mark Ms. Rausa's
20     report as 29.
21     (Exhibit 29 marked for identification.)
22     MR. TRANGLE: It's in the chat. Want
23     me to go to it and display it?
24     MS. O'DELL: Dr. Clarke-Pearson was
25     asked about this during his last deposition.

Page 339

1  If this is a foundational question,
2  certainly he can answer it. But this was
3  explored previously.
4     THE WITNESS: I'm sorry. Is there a
5     question pending?
6  BY MS. DAVIDSON:
7  Q. Uh-huh. There is, indeed.
8  A. Can I have it read back to me, please.
9     MS. DAVIDSON: Of course.
10  (The reporter read back the last question.)
11     THE WITNESS: Okay. So to answer that
12     question, she had her tubes tied in 1988 and
13     she had her ovarian cancer diagnosed in May
14     of 2018.
15  BY MS. DAVIDSON:
16  Q. 30 years; right?
17  A. Yes. And she had 20 years --
18  Q. Is there any --
19     MS. O'DELL: Excuse me.
20     THE WITNESS: She had 20 years of
21     exposure to talcum powder before she had her
22     tubes tied.
23  BY MS. DAVIDSON:
24  Q. I understand. Is there any literature
25  that addresses the increased risk of ovarian

28 (Pages 336 - 339)

Page 344

1  MS. O'DELL: He's ready for your next
2  question.
3 BY MS. DAVIDSON:
4  Q. Dr. Clarke-Pearson, what literature
5 supports your position that ovarian cancer can
6 request have a latency period of more than
7 30 years?
8  A. The general consensus in the oncology
9 world, if you will, is that there's a latency
10 period that can -- that can be quite long. It's
11 certainly not one year. It's certainly not two
12 years of exposure to a carcinogen. I'm not sure
13 how better to answer your question.
14  Q. Well, my question was can you point to
15 a paper that says the latency period for ovarian
16 cancer can be more than three decades. That's my
17 question.
18  MS. O'DELL: Object to the form. He's
19  answered your question.
20  THE WITNESS: I don't think I can give
21  you specific literature. But individual
22  cases we know have been exposed more than
23  30 years beforehand and then develop ovarian
24  cancer.
25 BY MS. DAVIDSON:

Page 345

1  Q. Exposed to what?
2  A. Talcum powder.
3  Q. Are you saying that you know that
4 ovarian cancer has a latency period of more than
5 30 years because there are women who have been
6 exposed to talcum powder and then developed ovarian
7 cancer more than 30 years later?
8  MS. O'DELL: Object to the form.
9  Mischaracterizes.
10  THE WITNESS: Those aren't
11  peer-reviewed papers. Those are just my
12  personal experience as a physician taking
13  care of women with ovarian cancer.
14 BY MS. DAVIDSON:
15  Q. So your opinion that ovarian cancer can
16 have a latency period of more than 30 years is
17 based on your anecdotal experience that women have
18 used talcum powder and then developed ovarian
19 cancer more than 30 years later?
20  MS. O'DELL: Objection. Misstates his
21  testimony.
22  THE WITNESS: The oncology literature
23  recognizes a latency period from the time --
24  prior to -- the amount of time from exposure
25  to whatever the carcinogen is, in this case

Page 346

1  it's talcum powder with asbestos, and it can
2  be longer than 30 years, yes.
3 BY MS. DAVIDSON:
4  Q. But that's what I'm asking. Which
5 literature says it can be longer than 30 years?
6  A. It's general -- I mean, it's just
7 general oncology literature understanding how
8 carcinogenesis happens, how cancers develop.
9  Q. Can you point to any general oncology
10 literature that says ovarian cancer has a latency
11 period of more than 30 years?
12  MS. O'DELL: Object to the form. Asked
13  and answered. Dr. Clarke-Pearson has
14  already answered your question. And please
15  don't badger him.
16 BY MS. DAVIDSON:
17  Q. You can answer.
18  A. I can't answer your question right now.
19 I can find literature for you if you'd like to see
20 it.
21  Q. Okay. We'll follow up on that.
22 There's a couple of things you mentioned today.
23 We'll send a list.
24  A. Okay.
25  Q. Have you investigated whether Ms. Rausa

Page 347

1 was exposed to any asbestos other than her claimed
2 exposure to asbestos and talcum powder?
3  MS. O'DELL: He was asked that question
4  in his 2021 deposition. If you want to ask
5  if he's done anything since 2021, you're
6  welcome to do that?
7  THE WITNESS: I haven't done --
8 BY MS. DAVIDSON:
9  Q. Go ahead, Doctor.
10  A. I haven't done any subsequent
11 investigation. I'm relying my opinion based on her
12 medical records.
13  Q. Have you done any investigation since
14 2021 with respect to any risk factors Ms. Rausa has
15 with regard to ovarian cancer?
16  MS. O'DELL: Object to the form.
17  THE WITNESS: I -- I have not, no.
18 BY MS. DAVIDSON:
19  Q. At the end of your deposition in the
20 first half of your deposition in January 2024, we
21 started talking about the Davis paper, then we had
22 a little bit of some bickering about whether your
23 deposition was over or not, and we never finished.
24 So let's go back to the Davis paper.
25  A. All right.

30 (Pages 344 - 347)

Page 372

1  Q. You were asked some questions about
2  latency and your opinions about latency. And I
3  would direct you to page 13. Doctor --
4  A. Of my report?
5  Q. Of your report. Dr. Clarke-Pearson,
6  your report. And specifically to the temporality
7  section of your Bradford Hill analysis. Do you see
8  that?
9  A. Yes, I do.
10  Q. And do you stand by and always been
11  your opinion that latency can extend over decades?
12  A. Yes.
13  Q. And what's the reference that you cite
14  there?
15  A. Nadler and Zurbenko 2014.
16  Q. And is your statement in your report
17  consistent with your testimony today that latency
18  can be 30 years or greater?
19  A. Yes.
20  Q. And, Doctor, in relation to you were
21  asked some questions about -- I believe it was
22  Ms. Rausa -- let me --
23      Actually, it was Ms. Newsome's.
24  A. Okay.
25  Q. Yeah. On page 17 of your report for --

Page 373

1  in relation to Ms. Newsome's case, I think you
2  mentioned that you had reviewed records from her
3  June 9, 2023, record in updating your report.
4      Do you recall that?
5  A. Yes, I have that listed in my report.
6  Q. And looking at the paragraph above, did
7  you review other records that were, you know,
8  really they were documentations of visits since
9  your 2021 deposition?
10  A. Yes. I list several interactions
11  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. I
12  didn't go on at any length to describe what those
13  visits were about. They were all basically, ▉▉▉
14  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
15  Q. And for each of these women, did you
16  consider all of the risk factors that are currently
17  accepted in relation to ovarian cancer?
18  A. I believe I did. I listed them
19  separately in each one of the reports.
20  Q. In relation to -- you were asked a lot
21  of questions about your methodology. In your
22  methodology in considering the risk factors for
23  each of these individual --
24  A. Yes.
25  Q. -- women. Is the process and the

Page 374

1  methodology you used to reach your opinions
2  regarding specific causation, is that methodology a
3  methodology that would be generally accepted in --
4  in among ovarian cancer specialists like yourself?
5  A. I guess I would use the term "created a
6  differential diagnosis." So going through the
7  possibilities, if you will, consider all the
8  possibilities and then ranking them into what's
9  most likely to happen. If it's making a diagnosis,
10  what the most likely diagnosis is. In this case,
11  what are the likely things that contributed to
12  these women developing ovarian cancer.
13  Q. In each of those cases --
14      (Zoom audio interference.)
15      In reaching your case specific opinions
16  in each of these individual cases, did you conduct
17  a differential diagnosis?
18  A. As much information as I can gather
19  from medical records, depositions, patient's own
20  statement, putting all that information together
21  and coming up with a differential diagnosis.
22  Q. And is the process -- I think you said
23  this, but I just want to make the record clear. Is
24  the process of employing differential diagnosis, is
25  that methodology generally accepted as in among GYN

Page 375

1  oncology?
2  A. Yes. I mean, you start with all the
3  possibilities and then try to focus and establish a
4  diagnosis.
5  Q. Okay. You were asked a number of
6  questions that earlier talking about the number of
7  mutations needed in order to form cancer, and you
8  were particularly directed back to your deposition
9  from August of 2021. Give me just a moment to turn
10  there.
11      Doctor, you were on page 454 and 455,
12  you gave the following testimony. "So then we can
13  say, and we said yesterday it's multifactorial
14  cancer. It's not just one cause. It's many causes
15  that can add up and it requires five to ten
16  mutations based on what the cancer scientists tell
17  us. You can at least start to see those things
18  that do cause mutations. And we know that
19  mutations of BRCA, for example, are -- put that
20  patient at high risk, but not everybody with BRCA
21  mutation develops ovarian cancer. So other
22  mutations happened on that top of that inherited to
23  ultimately have that patient develop ovarian
24  cancer."
25      Is that your -- that's the testimony

37 (Pages 372 - 375)

| | |
|---|---|
| Page 376<br>1  you gave that day.  Do you stand by that testimony?<br>2     A.  Yes, that's what I believe.  Yes.<br>3     Q.  And is that consistent with the<br>4  testimony you gave earlier today?<br>5     A.  Yes.<br>6     Q.  And based on your opinion that multiple<br>7  risk factors can work together or different<br>8  environmental exposures can work together to cause<br>9  ovarian cancer, is it your opinion that those<br>10 things can work synergistically?<br>11    A.  Yes.  I mean, I think that -- I<br>12 understand that from other oncology points of<br>13 perspectives.  Other -- so they can be additive or<br>14 synergistic, another way for me to put it.<br>15    Q.  Would you use the terms "additive" or<br>16 "synergistic" sort of interchangeably in that<br>17 context?<br>18    A.  I think they're slightly different from<br>19 each other.  You know, that there can be additive<br>20 one thing on top of another.  They don't interact<br>21 with each other.  But they ended up with the<br>22 mutations we need to have to have a cancer.  And<br>23 then I think there are some things that do<br>24 synergize each other, make that risk factor,<br>25 whatever that carcinogen is, even more effective in | Page 378<br>1          FURTHER EXAMINATION<br>2  BY MS. DAVIDSON:<br>3     Q.  Dr. Clarke-Pearson, Ms. O'Dell asked<br>4  you about something about the latency period in the<br>5  Chang paper.  Do you know what it was?<br>6          MS. O'DELL:  I didn't ask about the<br>7     latency period in the Chang paper.<br>8          THE WITNESS:  The paper -- you're<br>9     talking about the paper I referenced in my<br>10    report?<br>11 BY MS. DAVIDSON:<br>12    Q.  The Chang paper we talked about today.<br>13 You mentioned a latency period in the Chang paper.<br>14         MS. O'DELL:  I did not mention that.<br>15    I -- so if there's something you want him to<br>16    look at, happy to have him answer the<br>17    question, but I did not mention latency.<br>18 BY MS. DAVIDSON:<br>19    Q.  Dr. Chang [sic], did you testify in<br>20 response to Ms. Leigh's questions about what the<br>21 latency period was in the Chang paper?<br>22    A.  I don't think --<br>23         MS. DAVIDSON:  Please don't shake your<br>24    head, Leigh, and tell the witness how to<br>25    answer.  Seriously? |
| Page 377<br>1  causing the cancer.<br>2     Q.  Has that, for example, estrogen use<br>3  only and talc use working together to increase the<br>4  risk of cancer --<br>5     A.  Yeah, that would be a great example of<br>6  the interaction of the synergics --<br>7          MS. DAVIDSON:  I'm sorry, I didn't hear<br>8     the question or the answer.<br>9  BY MS. O'DELL:<br>10    Q.  The question was that as an example of<br>11 two things working synergistically estrogen use<br>12 only and talc use causing a greater increased risk<br>13 of ovarian cancer than just talc alone, is that a<br>14 good example?  That's my question.<br>15    A.  I would consider it an example of<br>16 synergism between two different mechanisms that are<br>17 different from each other.<br>18         MS. O'DELL:  Doctor, I don't have<br>19    anything further at the moment.  Thank you.<br>20         MS. DAVIDSON:  I couldn't hear what you<br>21    said.<br>22         MS. O'DELL:  I said I don't have<br>23    anything further at the moment.  I just said<br>24    thank you.<br>25         MS. DAVIDSON:  Okay. | Page 379<br>1          MS. O'DELL:  I didn't.  I just didn't<br>2     ask about that.  I asked about the Chang<br>3     paper, but --<br>4          MS. DAVIDSON:  I didn't ask what you<br>5     asked about.  Please stop.  This is such<br>6     inappropriate conduct.<br>7  BY MS. DAVIDSON:<br>8     Q.  Dr. Clarke-Pearson, did you testify in<br>9  response to Leigh's questions about what the<br>10 latency period was in the Chang paper?<br>11         THE WITNESS:  No.  I referenced the<br>12    Nadler paper that's in my report.<br>13 BY MS. DAVIDSON:<br>14    Q.  Did you testify as to how long the<br>15 latency period was for the sister study in the<br>16 Chang paper?<br>17    A.  No.<br>18    Q.  You did not testify that the latency<br>19 period was 12 months?<br>20    A.  No.  I don't recall saying that at all.<br>21    Q.  In fact, it was longer than 12 months;<br>22 right?<br>23    A.  Is this a paper you brought up in the<br>24 last part of your deposition?<br>25    Q.  The sister study paper. |

38 (Pages 376 - 379)

Page 388

1  Q. -- and talc?
2     MS. O'DELL: Object to form.
3     THE WITNESS: For ovarian cancer,
4  you're specifically talking about?
5  BY MS. DAVIDSON:
6  Q. Yeah. That's --
7  A. Not that I recall.
8  Q. Are you planning to go back and -- are
9  you planning to go back and clarify Ms. Newsome's
10 BMI?
11 A. Yes, I have a note to myself to do
12 that.
13    MS. DAVIDSON: Leigh, do you have any
14 other questions?
15    MS. O'DELL: I have one question
16 actually or two questions maybe. Are you
17 finished?
18    MS. DAVIDSON: Go ahead.
19       FURTHER EXAMINATION
20 BY MS. O'DELL:
21 Q. Dr. Clarke-Pearson, did you review
22 the -- you reviewed the Phung paper in preparation
23 for your opinions in this case?
24 A. Yes.
25 Q. And does the Phung paper report on

Page 389

1  endometriosis and talc?
2  A. Yes. In patients with endometriosis
3  and talc had higher incidence of ovarian cancer.
4  That would be another synergism, if you will, or
5  additive effect based on an inflammatory response.
6        FURTHER EXAMINATION
7  BY MS. DAVIDSON:
8  Q. Was that statistically significant? Do
9  you recall?
10 A. I can pull the paper out. I have it in
11 my stack here.
12 Q. I can't recall if we discussed that in
13 January, to be honest.
14 A. So the relative risk without
15 endometriosis is 1.12 with the confidence interval,
16 it doesn't overlap 1. And with endometriosis and
17 talc, it was 1.38 with the confidence interval, it
18 doesn't overlap 1.
19    MS. DAVIDSON: Can we go off the record
20 for a minute.
21 (Recess taken from 1:56 p.m. until 1:58 p.m.)
22 BY MS. DAVIDSON:
23 Q. We pulled up Phung, which is
24 Exhibit 12. Thank you, Leigh, who has a way better
25 memory than I do.

Page 390

1  Before I question about -- I have one
2  question about it. I just wanted to go back to my
3  notes. I think that Leigh was going to --
4  Dr. Clarke-Pearson and Leigh were going to get back
5  to me on what was the basis for
6  Dr. Clarke-Pearson's note that Ms. Newsome had a
7  28.5 BMI because I couldn't find it in the records.
8  And, also, you were going to get me
9  Dr. Clarke-Pearson's notes on the studies.
10    I think everything else got resolved
11 over the course of the deposition because you
12 pointed to Nadler and latency. And we found the
13 other studies that I had been looking for on the
14 reliance list. So I think everything else was
15 addressed that we were following up on.
16    So let's just cover this and then I
17 think we can all go home, and I hope you make your
18 flight, Leigh.
19    In the results, the authors state,
20 "Overall, we did not find any statistically
21 significant interactions between endometriosis and
22 the ten ovarian cancer risk factors considered in
23 our analysis. Do you see that, Dr. Clarke-Pearson?
24 A. Yes.
25 Q. And one of those ten ovarian cancer

Page 391

1  risk factors they considered was talc; right?
2  A. Yes.
3  Q. So the authors did not believe there
4  was a statistically significant interaction between
5  endometriosis and talc use; right?
6     MS. O'DELL: Object to form.
7     THE WITNESS: Yes. That's what they
8  say.
9  BY MS. DAVIDSON:
10 Q. Do you disagree with them?
11 A. No. I see on Table 2, their P for
12 interaction is .2.
13 Q. So you agree with them?
14 A. Yes.
15    MS. DAVIDSON: Okay. I got no more
16 questions.
17    MS. O'DELL: Nothing further.
18       - - -
19    (Read and sign reserved.)
20       - - -
21    (Time noted at 2:01 p.m.)
22       - - -
23
24
25

41 (Pages 388 - 391)

Page 392

**CERTIFICATE OF REPORTER**

I, Christine A. Taylor, Registered Professional Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location as stated in this transcript; that the deponent was located in Orange County, North Carolina; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 11th of March, 2024.

_Christine A. Taylor_

Christine A. Taylor,
Registered Professional Reporter
Notary Public 19960530077
State of North Carolina

Page 393

**DEPOSITION ERRATA SHEET**

Our Assignment No: 6453284
Case Caption: Talcum Powder Litigation MDL 2738

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20 __.

_____
DANIEL CLARKE-PEARSON, M.D.

Page 394

**DEPOSITION ERRATA SHEET**

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

SIGNATURE: _____ DATE: _____
DANIEL CLARKE-PEARSON, M.D.

Page 395

**DEPOSITION ERRATA SHEET**

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

SIGNATURE: _____ DATE: _____
DANIEL CLARKE-PEARSON, M.D.