# EXHIBIT 44

```
                                                           Page 1
 1                    Volume II  Pages 1-200
 2                        Exhibits 26-65
 3         IN THE UNITED STATES DISTRICT COURT
 4            FOR THE DISTRICT OF NEW JERSEY
 5     _____
 6     IN RE JOHNSON & JOHNSON TALCUM
 7     POWDER PRODUCTS MARKETING,            MDL NO.
 8     SALES PRACTICES, AND PRODUCTS     16-2738(MAS)(RLS)
 9     LIABILITY LITIGATION
10     _____
11
12
13
14
15
16            VIDEOCONFERENCE DEPOSITION OF
17                 JOHN GODLESKI, M.D.
18         Friday, March 29, 2024, 9:15 a.m.
19              MARRIOTT BOSTON - QUINCY
20                 1000 Marriott Drive
21           Quincy, Massachusetts  02169
22
23
24       -----REPORTER: Sonya Lopes, RPR, CSR-----
25
```

Page 2

1  APPEARANCES:
2
3  Beasley Allen Law Firm
4      David P. Dearing, Esq.
5      218 Commerce Street
6      Montgomery, Alabama  36103-4160
7      334.269.2343
8      david.dearing@beasleyallen.com
9      for Plaintiffs
10
11 Shook, Hardy & Bacon LLP
12     Mark Hegarty, Esq.
13     2555 Grand Boulevard
14     Kansas City, Missouri  64108-2613
15     816.474.6550
16     mhegarty@shb.com
17     for Defendants
18
19 Also present:  Kerry Stufflebean

Page 3

1                    I N D E X
2
3  WITNESS:         JOHN GODLESKI, M.D.
4
5  EXAMINATION BY:                     PAGE
6  Mr. Hegarty           7, 32, 89, 92
7  Mr. Dearing          31, 89, 94, 153
8
9  EXHIBIT                             PAGE
10 Exhibit 26, March 29, 2021 e-mail..........7
11 Exhibit 27, March 25, 2021 e-mail..........9
12 Exhibit 28, documents regarding Gallardo
13         case........................16
14 Exhibit 29, July 27, 2021 letter..........27
15 Exhibit 30, chain of custody document and
16         table........................27
17 Exhibit 31, send-out request form for
18         Newsome case..................28
19 Exhibit 32, documents regarding Newsome
20         case........................28
21 Exhibit 33, chain of custody documents
22         for Newsome case..............29
23 Exhibit 34, printout from IARC Website....29
24 Exhibit 35, analysis summary for Converse
25         case........................36

Page 4

1                    I N D E X
2
3  EXHIBIT                             PAGE
4  Exhibit 36, invoice for Converse case.....44
5  Exhibit 37, June 22, 2021 letter..........45
6  Exhibit 38, pathology report, chain of
7          custody document, and
8          June 22, 2021 letter..........47
9  Exhibit 39, July 27, 2021 letter..........51
10 Exhibit 40, pathology report for Converse
11         case........................52
12 Exhibit 41, handwritten notes for Converse
13         case........................52
14 Exhibit 42, July 12, 2021 expert report
15         for Converse case.............58
16 Exhibit 43, Image 20 with corresponding
17         spectrum for 41, 42, and 43...96
18 Exhibit 44, analysis summary for Rausa
19         case........................98
20 Exhibit 45, invoice for Rausa case.......101
21 Exhibit 46, pathology report for Rausa
22         case........................102
23 Exhibit 47, second pathology report for
24         Rausa case...................103

Page 5

1                    I N D E X
2
3  EXHIBIT                             PAGE
4  Exhibit 48, handwritten notes for Rausa
5          case........................104
6  Exhibit 49, December 8, 2020 e-mail......109
7  Exhibit 50, chain of custody documents
8          for Rausa case...............113
9  Exhibit 51, chain of custody document....199
10 Exhibit 52, March 4, 2021 letter.........121
11 Exhibit 53, August 23, 2021 letter.......121
12 Exhibit 54, June 21, 2021 expert report
13         for Rausa case...............124
14 Exhibit 55, article titled "Migration of
15         talc from the perineum to
16         multiple pelvic organ
17         sites".......................143
18 Exhibit 56, curriculum vitae.............158
19 Exhibit 57, deposition notice............159
20 Exhibit 58, plaintiffs' response to
21         deposition notice............159
22 Exhibit 59, first set of requests for
23         production of documents......178

Page 6

1  I N D E X
2
3  EXHIBIT                              PAGE
4  Exhibit 60, response to first set of
5       requests for production of
6       documents....................178
7  Exhibit 61, February 4, 2018 letter......193
8  Exhibit 62, PowerPoint presentation......194
9  Exhibits 63-64, consents to release
10      third-party information......196
11 Exhibit 65, e-mail chain.................196
12
13 *Exhibits returned to Mr. Hegarty

Page 7

1       MR. HEGARTY:  Back on the record.  We're
2  continuing your deposition from yesterday,
3  Dr. Godleski.  Do you understand that you're still
4  under oath?
5       THE WITNESS:  Yes.
6       MR. HEGARTY:  Thank you.
7            EXAMINATION
8  BY MR. HEGARTY:
9    Q.  We were -- I want to start by going over
10 some documents that we were provided yesterday and
11 today and then some follow-up questions about what
12 we did yesterday.
13      The first subject I want to talk about is
14 the e-mail we received yesterday where a request was
15 made for the blocks in the Judkins case.
16      MR. HEGARTY:  I will mark the e-mail as
17 our next exhibit, which is Exhibit 26.
18      (March 29, 2021 e-mail, Exhibit 26,
19 marked)
20   Q.  So I'm showing you, Dr. Godleski,
21 Exhibit 26.  Please tell me what that exhibit is.
22   A.  This is an e-mail from me to Mr. Dearing
23 and Katie Tucker, who's a legal assistant.  And it's
24 a request for blocks on Anne Judkins.
25   Q.  Do you see -- you say at the bottom of that

Page 8

1  e-mail "Critical blocks to have are E2 and G5."  Do
2  you recall why you made note of those two blocks as
3  being critical?
4    A.  We almost always do that.  We -- what the
5  idea is is we're asking here for eight blocks.  And
6  if the hospital is reluctant to give us the eight
7  blocks, we say "These are the most important.  Get
8  these two at least," is basically what we're saying
9  there.
10   Q.  What was or is your criteria for the
11 Judkins case -- and I assume other cases -- for what
12 you consider to be, quote, "critical blocks," closed
13 quote?
14   A.  They would be the blocks that have the most
15 birefringent particles or the clearest intracellular
16 particles.  There can be a number of criteria.  But
17 it's -- if we wanted to look at something in this
18 case, it would be these two blocks more than
19 anything else because we're -- basically all we're
20 saying with that.
21   Q.  Could you find Exhibit No. 21, which is the
22 pathology report for Ms. Judkins?  And when you find
23 that, identify for me the tissues that correspond to
24 blocks E2 and G5.
25   A.  E2 is a right para-aortic lymph node, and

Page 9

1  G5 is ovary.  And I'm trying to look back to make
2  sure that I have the right -- the correct side.  And
3  it's left ovary.
4    Q.  Are you able to recall whether the Judkins
5  case you made the request for -- you identified
6  those two as critical blocks because they had the
7  most birefringent or because they were particular
8  tissue that you were interested in or perhaps both?
9    A.  Both, probably.
10   Q.  Thank you.  I'm going to next mark as
11 Exhibit 27 an e-mail we were provided yesterday,
12 which was a block request e-mail for the Tamara
13 Newsome case.
14      (March 25, 2021 e-mail, Exhibit 27,
15 marked)
16   Q.  Can you please tell me what Exhibit 27 is,
17 Dr. Godleski?
18   A.  This is an -- again, it's a block request.
19 But, also, there was a question posed to us as to
20 whether there was any endometriosis.  So we
21 extensively searched.  We found this one little area
22 that we described that we didn't feel represented
23 endometriosis but that someone might argue that it
24 did, and we didn't feel that was correct.
25      But we had only this one questionable area

3 (Pages 6 - 9)

Page 142

1  Image 14, where is that -- in what tissue is that
2  of?
3     A.  That's Block 12B.  So that is left external
4  iliac.
5     Q.  The image of spectrum -- I'm sorry.  The
6  Electron Image 163 is of the left paraaortic lymph
7  node; correct?
8     A.  Correct.
9     Q.  With regard to the finding of two talc
10 particles in Ms. Rausa's tissue, you did a study
11 where you had a control group of women who indicated
12 they were not talcum powder users.  And in two of
13 the six control-group women, you found, based on
14 your recollection, one talc particle in each?
15    A.  I believe so.
16    Q.  What is that paper?
17    A.  That's the McDonald paper, lymph node
18 digestion.
19        MR. HEGARTY:  Off the record real quick.
20        (A break was taken)
21        MR. HEGARTY:  We're ready to go back on
22 the record after a short break.  When we left off,
23 we were talking about the two talc particles that
24 Dr. Godleski had found in Ms. Rausa's case and, in
25 particular, as it relates to a study he had done

Page 143

1  where he had a control group of women who reported
2  no talcum powder use in the perineal area.
3        I've handed Dr. Godleski an article --
4  first author Sandra McDonald -- titled "Migration of
5  talc from the perineum to multiple pelvic organ
6  sites."  We'll go ahead and mark it as an exhibit so
7  we can keep a record of it.  We'll mark that as
8  Exhibit 55.  If you want to hand that back over,
9  Dr. Godleski, we'll put the sticker on there for
10 you.
11        (Article titled "Migration of talc from
12 the perineum to multiple pelvic organ sites,"
13 Exhibit 55, marked)
14    Q.  So with regard to the paper we've been
15 talking about over the last couple of days as it
16 relates to what you found in a control group of
17 women who didn't report talc use, is Exhibit 55 the
18 paper you've been referencing?
19    A.  Yes.
20    Q.  Previously, you and I had talked about that
21 paper referencing you finding one talc particle in
22 two different patients.  Do you recall us talking
23 about that?
24    A.  Yes.
25    Q.  The paper we marked as Exhibit No. 5 -- 55

Page 144

1  shows that you found two talc particles in two
2  patients of the six in the group of control
3  patients; correct?
4     A.  Yes.
5     Q.  And in particular, that's referenced over
6  on page 598 where it says that "Correlative SEM,"
7  dash, "EDX of the control tissue blocks showed a
8  total of four talc particles across all patients:
9  Two in Patient 2, right ovary, and two in Patient 3,
10 right fallopian tube."  Do you see where I'm
11 reading?
12    A.  That's correct.
13    Q.  With regard to Ms. Rausa, her talc particle
14 count that you found was the same as you found in
15 two of your six control patients in the paper we
16 marked as Exhibit 55; correct?
17    A.  That's correct.
18    Q.  So in Ms. Rausa's case, is it your opinion
19 that, based on what you have reviewed, that she's
20 different from what you would see in a control group
21 of women who -- potentially see in a control group
22 of women who never used talcum powder in the
23 perineal area?
24    A.  These two women, though, both had pelvic
25 surgery more than 30 years ago so that it's possible

Page 145

1  that was the source of their talc.
2     Q.  You don't list here what type of pelvic
3  surgery; correct?
4     A.  No.
5     Q.  It's also possible that the pelvic surgery
6  that they had was not the source of the talc you
7  found; correct?
8     A.  Possible that it was.
9     Q.  And possible that it was not.
10    A.  Exactly.
11    Q.  Going back to my question, though.  Is it
12 still your opinion even or -- let me back up.  Let's
13 start again.
14        Let's assume for purposes of my question
15 that the talc particles in these two women in the
16 paper we marked as Exhibit 55 did not -- were not
17 introduced by pelvic surgery.
18        Is it still your opinion that Ms. Rausa --
19 that four -- what you found in Ms. Rausa can
20 distinguish her based on her talcum powder use from
21 a control group who didn't use talcum powder?
22    A.  Yes.
23    Q.  Tell me what the basis of that opinion is.
24    A.  Ms. Rausa has an exposure history.  I don't
25 know what that is, but that will be brought out.  At

37 (Pages 142 - 145)

Page 198

1  Q. With regard to Exhibit 65 in the -- within
2  the initial e-mail you made reference to, there's a
3  statement that says "If you would be available for
4  phone calls, e-mail, exchanges, or even short-term
5  contracts to help offer scientific opinions on some
6  arguments we have received as we work towards
7  rewriting our screening assessment" or asks that in
8  a question.
9      Was there ever any phone calls or other
10 e-mail exchanges or short-term contracts between you
11 and the folks at Health Canada?
12  A. No.
13  Q. Did the communication with Health Canada
14 end with this e-mail chain?
15  A. Pretty much.
16  Q. Okay. Thank you. Do you have any other
17 documents that concern or relate to your
18 interactions with Health Canada with regard to its
19 risk assessment for talc that we have not marked as
20 exhibits?
21  A. I don't think so. This is it.
22  Q. I believe you already answered this
23 question. Did you ever have any phone calls or
24 other verbal type of communication with anyone at
25 Health Canada regarding their risk assessment?

Page 199

1  A. Not that I recall.
2      MR. HEGARTY: Let's go ahead and go off
3  the record. Take a quick break.
4      (A break was taken)
5      MR. HEGARTY: It's 4:05. We're back on
6  the record, and I'd indicated to counsel that we
7  still have some additional time to complete for
8  Dr. Godleski's MDL deposition but that I am having a
9  little bit of a challenge with the pain in my wrist
10 from a break I had three weeks ago and would
11 appreciate being able to stop now because I'm having
12 some difficulty in continuing.
13     And I think we're in agreement that we
14 can resume and finish this when we get back together
15 the next time with Dr. Godleski when we're going to
16 talk about the Karl and Badarama (verbatim) cases
17 but finish this separately, then switch to Karl and
18 Badarama. Does that sound acceptable?
19     MR. DEARING: Absolutely.
20     MR. HEGARTY: With that, we will stop
21 the deposition today and pick it up when we get back
22 together.
23     (Chain of custody document, Exhibit 51,
24 marked)
25     (Deposition suspended at 4:05 p.m.)

Page 200

1               REPORTER'S CERTIFICATE
2
3      I, SONYA LOPES, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, certify;
6      That the foregoing proceedings were taken
7  before me at the time and place therein set forth,
8  at which time the witness was properly identified
9  and put under oath by me;
10     That the testimony of the witness, the
11 questions propounded, and all objections and
12 statements made at the time of the examination were
13 recorded stenographically by me and were thereafter
14 transcribed;
15     That the foregoing is a true and correct
16 transcript of my shorthand notes so taken.
17     I further certify that I am not a relative or
18 employee of any attorney of the parties, nor
19 financially interested in the action.
20     I declare under penalty of perjury that the
21 foregoing is true and correct.
22     Dated this 11th day of April, 2024.
23     <%11353,Signature%>
24 Sonya Lopes            My Commission Expires:
25 Notary Public          October 28, 2027