# EXHIBIT 45

```
                                                              Page 1
 1                      Volume I  Pages 1-230
 2                         Exhibits 1-25
 3        IN THE UNITED STATES DISTRICT COURT
 4           FOR THE DISTRICT OF NEW JERSEY
 5     _____
 6    IN RE JOHNSON & JOHNSON TALCUM
 7    POWDER PRODUCTS MARKETING,              MDL NO.
 8    SALES PRACTICES, AND PRODUCTS     16-2738(MAS)(RLS)
 9    LIABILITY LITIGATION
10     _____
11
12
13
14
15
16            VIDEOCONFERENCE DEPOSITION OF
17                   JOHN GODLESKI, M.D.
18        Thursday, March 28, 2024, 9:02 a.m.
19              MARRIOTT BOSTON - QUINCY
20                  1000 Marriott Drive
21           Quincy, Massachusetts  02169
22
23
24       -----REPORTER:  Sonya Lopes, RPR, CSR-----
25
```

Page 2

1 APPEARANCES:
2
3 Beasley Allen Law Firm
4     David P. Dearing, Esq.
5     218 Commerce Street
6     Montgomery, Alabama  36103-4160
7     334.269.2343
8     david.dearing@beasleyallen.com
9     for Plaintiffs
10
11 Shook, Hardy & Bacon LLP
12     Mark Hegarty, Esq.
13     2555 Grand Boulevard
14     Kansas City, Missouri  64108-2613
15     816.474.6550
16     mhegarty@shb.com
17     for Defendants
18
19 Also present:  Kerry Stufflebean
20             Richard Golomb, Esq. (Via Zoom)
21
22
23
24
25

Page 3

1           I N D E X
2
3 WITNESS:     JOHN GODLESKI, M.D.
4
5 EXAMINATION BY:                    PAGE
6 Mr. Hegarty           6, 124, 173, 226
7 Mr. Dearing                123, 172, 224
8
9 EXHIBIT                            PAGE
10 Exhibit 1, list of prior testimony........15
11 Exhibit 2, analysis summary for Gallardo
12          case..........................30
13 Exhibit 3, pathology report for Gallardo
14          case..........................48
15 Exhibit 4, handwritten notes for Gallardo
16          case..........................48
17 Exhibit 5, July 21, 2021 expert report
18          for Gallardo case..............53
19 Exhibit 6, invoice for Gallardo case......54
20 Exhibit 7, July 28, 2021 cover letter and
21          chain of custody documents for
22          Gallardo case..................54
23 Exhibit 8, IARC monographs Volume 100C...112
24 Exhibit 9, image of Particle 730.........121
25 Exhibit 10, spectrum for Particle 730....121

Page 4

1           I N D E X
2
3 EXHIBIT                            PAGE
4 Exhibit 11, analysis summary for Newsome
5          case.........................124
6 Exhibit 12, June 24, 2021 expert report
7          for Newsome case.............128
8 Exhibit 13, pathology report for Newsome
9          case.........................132
10 Exhibit 14, handwritten notes for Newsome
11          case.........................132
12 Exhibit 15, March 26, 2021 letter........136
13 Exhibit 16, chain of custody documents
14          for Newsome case.............137
15 Exhibit 17, July 27, 2021 letter.........144
16 Exhibit 18, invoice for Newsome case.....145
17 Exhibit 19, analysis summary for Judkins
18          case.........................175
19 Exhibit 20, invoice for Judkins case.....178
20 Exhibit 21, pathology report for Judkins
21          case.........................180
22 Exhibit 22, handwritten notes for Judkins
23          case.........................180
24 Exhibit 23, chain of custody documents
25          for Judkins case.............185

Page 5

1           I N D E X
2
3 EXHIBIT                            PAGE
4 Exhibit 24, March 30, 2021 letter........197
5 Exhibit 25, June 18, 2021 expert report
6          for Judkins case.............200
7
8 *Exhibits returned to Mr. Hegarty
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    JOHN GODLESKI, M.D.,
2 having been satisfactorily identified by means of a
3  driver's license, was duly sworn by the notary
4   public, examined, and testified as follows:
5            EXAMINATION
6 BY MR. HEGARTY:
7    Q. Good morning, Dr. Godleski.
8    A. Good morning.
9    Q. Would you please state your full name for
10 the record?
11   A. John Joseph Godleski.
12   Q. Dr. Godleski, are you still the owner of
13 John J. Godleski, M.D., LLC?
14   A. Yes.
15   Q. You testified at a prior deposition that
16 you pay yourself 4,000 a month from this business.
17 Do you recall telling me that in the past?
18   A. That sounds about right.
19   Q. Is that still the case?
20   A. No. It's a little more. It's 6,000 a
21 month now.
22   Q. How long has it been 6,000 a month?
23   A. Past year.
24   Q. When you say "in the past year," how far
25 back?

Page 7

1    A. 2023.
2    Q. Prior to 2023, was it still the $4,000 a
3 month?
4    A. Yeah.
5    Q. In the last two years, have you received
6 income or other money through your LLC beyond this
7 monthly income we just talked about?
8    A. To me personally?
9    Q. To you personally.
10   A. No.
11   Q. For example --
12   A. Wait a minute.
13   Q. Have you -- let me ask it a different way.
14      Other than the monthly amount that we just
15 talked about, in the last couple of years, have you
16 received anything like a bonus or a year-end
17 distribution on top of that monthly amount?
18   A. No.
19   Q. Have you received any other type of
20 distribution from your LLC in the last couple of
21 years beyond the monthly payments that we just
22 talked about?
23   A. Not really. I do reimburse myself when I
24 pay for things out of pocket or with a personal
25 credit card. But other than that, no.

Page 8

1    Q. What's an example of something you have
2 reimbursed yourself for in the last couple of years?
3    A. I have a subscription to Courtroom View
4 Network. And when I established that, I put -- I
5 established it on a personal credit card rather than
6 the business credit card. And I've never bothered
7 to change it. So I reimburse myself for that 99
8 bucks.
9    Q. So other than the monthly amounts that you
10 receive from the LLC and what you receive through
11 these reimbursements, in the last several years,
12 have you received any other income from your LLC?
13   A. No.
14   Q. Do you recall being deposed in the Cadigan
15 and Forest cases back in 2019?
16   A. Vaguely.
17   Q. Since those depositions -- or if you want
18 to time it, since October of 2019 -- that's about
19 four and a half years ago -- have you received any
20 income from any Harvard school or from Brigham and
21 Women's Hospital?
22   A. No.
23   Q. Since October of 2019, have you been asked
24 by anyone at Harvard to consult on any individual
25 patient's case?

Page 9

1    A. No. I've been asked -- I've consulted on
2 research issues but not a particular case.
3    Q. When you say you've been asked to consult
4 on research issues in the past four and a half years
5 -- and the reason I'm limiting it to the last four
6 and a half years is because you and I brought
7 ourselves up to date on all these activities as of
8 October 2019. So what I'm interested in is any
9 activities along the lines I'm going to ask you
10 about since that time.
11      So with regard to research activities, what
12 type of research activities had you had any consult
13 on with anyone at Harvard or Brigham and Women's
14 Hospital since October of 2019?
15   A. I consulted on the macrophage actions in
16 removal of tattoos as one area that I've consulted
17 on with a group. Another has to do with the, again,
18 macrophage actions relative to uptake of particles.
19 These are all particle-related things as part of a
20 group at the Mass. General, and those are the
21 primary ones.
22   Q. Who are some of the members of the group at
23 Mass. General or the lead member at Mass. General
24 that you have consulted --
25   A. I can't remember the name.

Page 110

1  Q. And in the Dropbox you provided, did you
2  provide all the spectrum and images of all 795
3  particles?
4  A. I believe so. They're usually called
5  reports.
6  Q. How many of the 795 particles were or did
7  you identify as being exogenous material?
8  A. Just a second. 497 had constituents
9  indicative of exogenous, including 200 talc; 157
10 magnesium silicates just outside the 5 percent
11 criteria for talc; 81 magnesium silicates with other
12 cations; 30 fragments, fibers accepted as tremolite
13 asbestos; and 20 other -- 21 other exogenous
14 particles, including various combinations, metals or
15 silicon and nonmetallic elements. So the majority
16 of it was either talc or just outside our criteria
17 for talc.
18 Q. The spectrums you provided make reference
19 to particles that include boron, aluminum, and
20 chromium. Are those typical exogenous metals that
21 you see as part of this work?
22 A. Sometimes we do.
23 Q. And with regard to the spectrum, sometimes
24 the spectrum lists components in red. What does it
25 mean when it's listed in red?

Page 111

1  A. When they're listed in red, that means that
2  they're at a level where they can't be determined as
3  being present or being identified in error. So
4  they're generally disregarded.
5  Q. Now, in Ms. Gallardo's case, by your
6  process, you didn't attempt to count all the
7  particles in the tissue that you had available to
8  you; correct?
9  A. That's correct.
10 Q. What you do is you take the number of
11 particles that you find, then extrapolate that to a
12 number using the -- your reference to the Roggli
13 paper; correct?
14 A. Yes.
15 Q. Now, your report over on page 6 in the
16 paragraph below the table, Table 2, makes reference
17 to IARC identifying talc fibers as a Group 1
18 carcinogen, Reference 10. Do you see that, Doctor?
19 A. Yes.
20 Q. I'm going to mark as the next exhibit the
21 portion of that IARC monograph that makes reference
22 to asbestos.
23     MR. HEGARTY: Off the record real quick.
24     (Off record discussion)
25     MR. HEGARTY: Back on the record. I'm

Page 112

1  going to mark this as the next exhibit, which I
2  think is Exhibit 8.
3      (IARC Monographs Volume 100C,
4  Exhibit 8, marked)
5  Q. Can you look at Exhibit 8, Dr. Godleski,
6  and tell me where you're referring to by your
7  citation that IARC has listed talc fibers as a
8  Group 1 carcinogen?
9      I have handed you Reference 10 or, I should
10 say, have handed you the "Arsenic, metals, fibres,
11 and dusts" Volume 100C, recognizing that your
12 Reference 10 refers to monograph Volumes 1 through
13 29 international -- I take it back. Let me start
14 over again.
15     Your Reference 10 says "International
16 Agency For Research on Cancer, Agents classified by
17 IARC Monographs Volume 1 through 29." But I'm
18 handing you specifically the monograph on asbestos.
19 Do you recognize what I've handed you, Dr. Godleski?
20 A. Yes.
21 Q. Is this the reference that you're referring
22 to when you're calling what IARC designated -- the
23 IARC-designated talc fibers as a Group 1 carcinogen?
24 Do you need time to look at that, Doctor?
25 A. Yeah.

Page 113

1     MR. HEGARTY: Let's go off the record.
2     (A break was taken)
3     MR. HEGARTY: We're back on the record.
4  We're going to circle back around when Dr. Godleski
5  has had more time to look at the IARC monograph I
6  handed to him to respond to my question.
7  Q. You make note on page -- at the top of
8  page 8 of your report that the finding of asbestos
9  by the methods you used is highly significant. What
10 did you mean when you say "highly significant"?
11 A. It's a very important finding of finding
12 this material in her tissues that drain the ovary in
13 terms of both its identification as a -- as it
14 documents her exposure as well as finding the
15 particles in her tissues that drain the ovary.
16 Q. Turn over to page 6 of your report. In the
17 paragraph we were talking about where you made
18 reference to IARC, you say at the end of that same
19 paragraph that "The finding of one fiber with the
20 magnesium," slash, "silicon atomic weight percent
21 ratio of a tremolite asbestos fiber, a known and
22 widely accepted carcinogen and a known component of
23 cosmetic talc found in the pelvis tissues --
24 References 11 to 13 -- is similarly of great
25 importance in linking Ms. Gallardo's ovarian cancer

29 (Pages 110 - 113)

Page 230

```
 1              REPORTER'S CERTIFICATE
 2
 3      I, SONYA LOPES, Registered Professional
 4  Reporter and Notary Public in and for the
 5  Commonwealth of Massachusetts, certify;
 6      That the foregoing proceedings were taken
 7  before me at the time and place therein set forth,
 8  at which time the witness was properly identified
 9  and put under oath by me;
10      That the testimony of the witness, the
11  questions propounded, and all objections and
12  statements made at the time of the examination were
13  recorded stenographically by me and were thereafter
14  transcribed;
15      That the foregoing is a true and correct
16  transcript of my shorthand notes so taken.
17      I further certify that I am not a relative or
18  employee of any attorney of the parties, nor
19  financially interested in the action.
20      I declare under penalty of perjury that the
21  foregoing is true and correct.
22      Dated this 11th day of April, 2024.
23
        <%11353,Signature%>
24  Sonya Lopes            My Commission Expires:
25  Notary Public          October 28, 2027
```

59 (Page 230)