# EXHIBIT 33

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3

4     --------------------------

5     IN RE JOHNSON & JOHNSON      )

6     TALCUM POWDER PRODUCTS       )

7     MARKETING, SALES PRACTICES,)

8     AND PRODUCTS LIABILITY       )MDL NO. 16-2738

9     LITIGATION                   )(FLW)(LHG)

10                                 )

11    --------------------------

12

13

14    --- This is the Oral Deposition of JACK

15    SIEMIATYCKI, MSc, PhD, taken via Golkow Litigation

16    Services' Zoom Videoconferencing platform, with all

17    participants attending remotely, on the 21st day of

18    September, 2021.

19

20

21                        --------

22    Reported By:  Deana Santedicola, CSR (Ont.), RPR,

23                  CRR

24

25

Jack Siemiatycki, MSc, PhD

Page 2

1  A P P E A R A N C E S:
2  FOR THE PLAINTIFFS:
3
4  ASHCRAFT & GEREL, LLP
5  PER:  Michelle A. Parfitt, Esq.
6      James Green, Esq.
7      1825 K Street NW,
8      Suite 700
9      Washington, DC 20006
10  Tel.  202.783.6400
11  Email:  mparfitt@ashcraftlaw.com
12
13  LEVIN PAPANTONIO RAFFERTY
14  PER:  Christopher V. Tisi
15      316 South Baylen St.
16      Pensacola, FL 32502
17  Tel.  850.435.7000
18  Email:  ctisi@levinlaw.com
19
20  FOR THE DEFENDANTS, JOHNSON & JOHNSON and
21  JOHNSON & JOHNSON CONSUMER INC.:
22
23  TUCKER ELLIS LLP
24  PER:  Michael C. Zellers, Esq.
25      515 South Flower Street

Page 3

1      42nd Floor
2      Los Angeles, California 90071
3  Tel.  213.430.3400
4  Email:  michael.zellers@tuckerellis.com
5
6  FAEGRE DRINKER BIDDLE & REATH LLP
7  PER:  Eric M. Friedman, Esq.
8      300 North Meridian Street
9      Suite 2500
10      Indianapolis, Indiana 46204
11  Tel.  317.237.0300
12  Email:  eric.friedman@faegredrinker.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1      INDEX OF PROCEEDINGS
2
3  WITNESS:  DR. JACK SIEMIATYCKI
4          PAGES
5  EXAMINATION BY MR. ZELLERS............ 8 - 160
6  EXAMINATION BY MS. PARFITT.......... 160 - 164
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1      INDEX OF EXHIBITS
2
3    NO.  DESCRIPTION              PAGE/LINE
4
5  1  Deposition Notice and document request      9:21
6  of Jack Siemiatycki, MSc, PhD, tab 1
7  Deposition Exhibit Binder Volume 1,
8  tab 1.
9  2  Amended Expert Report of Jack        10:24
10  Siemiatycki, MSc, PhD, dated June 30, 2021,
11  tab 4, Deposition Exhibit Binder Volume 1.
12  3  Red-Lined amended report of Jack       11:11
13  Siemiatycki, MSc, PhD, dated June 30, 2021,
14  tab 5, Deposition Exhibit Binder Volume 1.
15  4  Curriculum Vitae of Jack Siemiatycki,       12:13
16  tab 7, Deposition Exhibit Binder Volume 1.
17  5  Exhibit C to amended report of J.       13:9
18  Siemiatycki, tab 8 of Deposition Exhibit
19  Binder Volume 1.
20  6  Document entitled Additional Materials       14:6
21  Considered by Dr. Jack Siemiatycki, tab 9,
22  Deposition Exhibit Binder Volume 1.
23  7  Binder 1 of documents produced by        16:20
24  counsel for Plaintiffs on September 17,
25  2021, in response to the Deposition Notice.

Jack Siemiatycki, MSc, PhD

1  8  Binder 2 of documents produced by            16:24
2  counsel for Plaintiffs on September 17,
3  2021, in response to the Deposition Notice.
4  9  Invoices of JS EpiTech Inc. (Jack            22:23
5  Siemiatycki, Ph.D.) tab 34, Deposition
6  Exhibit Binder Volume 3.
7  10  Letter to Judge Pisano dated April 5,       41:17
8  2019, tab 11 of the binder.
9  11  April 17, 2019, letter to Judge Pisano      60:2
10 from Ms. Parfitt attaching several
11 additional communications between Dr.
12 Siemiatycki and Mr. Hancock, tab 12,
13 Deposition Exhibit Binder Volume 1.
14 12  April 21st Health Canada Screening          69:6
15 Assessment, tab 23, Deposition Exhibit
16 Binder Volume 1.
17 13  NCI - Ovarian, Fallopian Tube, and          79:4
18 Primary Perineal Cancer Prevention (PDQ),
19 tab 43, Deposition Exhibit Binder Volume 3.
20 14  Wentzensen 2021 article, tab 40,            105:9
21 Deposition Exhibit Binder Volume 3.
22 15  2013 Terry study, tab 38, Deposition       109:14
23 Exhibit Binder Volume 3.
24 16  2020 O'Brien study, tab 30 in              110:2
25 Deposition Exhibit Binder Volume 3.

1  17  Cramer 2016 study, tab 18, Exhibit         115:2
2  Binder Volume 1.
3  18  Dr. Gossett's article titled "Use of       130:7
4  Powder in the Genital Area and Ovarian
5  Cancer Risk, Examining the Evidence", tab
6  22, Deposition Exhibit Binder Volume 1.
7  19  Davis and Schildkraut 2021 study, tab      144:13
8  19, Deposition Exhibit Binder 1.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  -- Upon commencing at 10:04 a.m.
2
3        JACK SIEMIATYCKI, MSc, PhD; AFFIRMED.
4        EXAMINATION BY MR. ZELLERS:
5        Q.  Please state your name for the
6  record.
7        A.  My name is Jack Siemiatycki.
8        Q.  Dr. Siemiatycki, my name is
9  Michael Zellers, and I am going to ask you some
10 questions today on behalf of the J&J Defendants in
11 the talc ovarian cancer MDL proceeding; do you
12 understand that?
13       A.  Yes, I do.
14       Q.  I understand from counsel for the
15 Plaintiffs that at the outset you need to make a
16 statement or a correction to your report?
17       A.  Yes, that is true.
18       Q.  Please do that.
19       A.  Thank you.  So on re-reading my
20 report a few days ago, I noticed a typo that I want
21 to correct, and that is on page 40 of my report,
22 the report dated June 30, 2021, okay, on line -- in
23 the first paragraph, line 8, it begins:  Table 2,
24 all of the RRs are in Figure 1 and all of the RRs
25 in Figure 1 are to the left of the null value.

1  It should be "to the right of the null value".
2        Q.  All right, we will note that
3  correction, and thank you for that.  Any reason we
4  cannot -- yes, Ms. Parfitt?
5        MS. PARFITT:  Michael, what I would
6  do -- Mr. Zellers, what I would do at this point in
7  time, we will at the conclusion of the deposition
8  and before the reporter finalizes this deposition,
9  we will make a correction on that report or ask Dr.
10 Siemiatycki to do that and substitute a correct
11 report page 40, if that is fine with counsel.
12       MR. ZELLERS:  Yes, that is perfectly
13 acceptable.
14       MS. PARFITT:  Thank you.
15       BY MR. ZELLERS:
16       Q.  Dr. Siemiatycki, please take a
17 look at the Deposition Exhibit Binder, Volume 1,
18 and tab 1, we'll mark that as Exhibit 1 to this
19 deposition.  It is the Deposition Notice and the
20 document request.
21       EXHIBIT NO. 1:  Deposition Notice
22           and document request of Jack
23           Siemiatycki, MSc, PhD, tab 1
24           Deposition Exhibit Binder Volume 1,
25           tab 1.

Page 10

BY MR. ZELLERS:

Q. Do you see that, Doctor?

A. Yes, I do.

Q. And did you receive that Notice of Deposition and Request for Documents prior to your deposition here today?

A. Yes, I did.

Q. You will see that, if you look at Schedule "A", there were a number of documents to be produced. Do you know whether or not all of the responsive documents have been produced, as called for in Deposition Exhibit 1?

A. To the best of my knowledge and recollection, all of them have been produced.

Q. Are there any documents that are responsive to the Deposition Notice, and specifically the Request for Documents, that have not been provided by you to the extent they are available to counsel for Plaintiffs?

A. No, I don't think so.

Q. Let's mark as Deposition Exhibit 2 your amended report, and that is tab 4 in Deposition Exhibit Binder Volume 1.

EXHIBIT NO. 2:  Amended Expert Report of Jack Siemiatycki, MSc, PhD, dated

Page 11

June 30, 2021, tab 4, Deposition Exhibit Binder Volume 1.

MR. ZELLERS:  So your amended report is Exhibit 2, and we will substitute in the page that Ms. Parfitt has requested and that you have requested prior to finalizing the exhibits.

Exhibit 3 to this deposition will be a red-lined amended report dated June 30 of 2021, and that is tab 5 in Deposition Exhibit Binder Volume 1.

EXHIBIT NO. 3:  Red-lined amended report of Jack Siemiatycki, MSc, PhD, dated June 30, 2021, tab 5, Deposition Exhibit Binder Volume 1.

BY MR. ZELLERS:

Q. So, Dr. Siemiatycki, what Exhibit 3 is, is a comparison of your amended report to the original report that you prepared in November of 2018.

I have a couple of curriculum vitas, one that was provided with your report, the amended report, June 30, 2021, and then what looks to be a revised curriculum vitae that was produced on or about September I think 17th of 2021.  Are those two CVs different, if you are aware?

Page 12

A. Each time I am asked to send my CV, I go over -- well, certainly there are updates between one and another because I produce things regularly and I do things regularly.

And depending on the purpose of the CV and the request, I may make other modifications that I think are appropriate in the context.

Q. All right.  Well, let's mark for purposes of this deposition the most recent curriculum vitae that was produced to us, and that will be marked as Exhibit 4, and it is tab 7 in the Deposition Exhibit Binder Volume 1.

EXHIBIT NO. 4:  Curriculum Vitae of Jack Siemiatycki, tab 7, Deposition Exhibit Binder Volume 1.

BY MR. ZELLERS:

Q. So, Dr. Siemiatycki, can you take a quick look and just verify that that is your most up-to-date and current curriculum vitae?

A. Yes.  Yes, I think it is.

Q. Are there any additions or corrections that need to be made to that curriculum vitae?

A. No, not -- none that necessarily need to be made.  No, thank you.

Page 13

Q. All right, none that would be relevant, at least in your view, to the issues we are discussing today; is that correct?

A. That's correct.

Q. Let's have Exhibit C to your amended report as a separate exhibit, and we'll mark that as Exhibit 5, and that is tab 8 of the Deposition Exhibit Binder Volume 1.

EXHIBIT NO. 5:  Exhibit C to amended report of J. Siemiatycki, tab 8 of Deposition Exhibit Binder Volume 1.

BY MR. ZELLERS:

Q. So do you see that document?

A. I do see that.

Q. And this is titled "Additional Materials Considered for Jack Siemiatycki Ph.D.";  is that right?

A. That's correct.

Q. Is it your understanding and recollection that this also was attached as Exhibit C to your amended report dated June 30 of 2021?

A. Yes, I believe it was.

Q. Dr. Siemiatycki, we received then a notice of additional materials that you considered, and we'll mark that listing of

Jack Siemiatycki, MSc, PhD

Page 14

1  additional materials considered, and I assume this
2  is beyond what we just marked as Exhibit 5. We'll
3  mark that listing of additional materials as
4  Exhibit 6, and that is tab 9 in the Deposition
5  Exhibit Binder Volume 1.
6      EXHIBIT NO. 6:  Document entitled
7      Additional Materials Considered by Dr.
8      Jack Siemiatycki, tab 9, Deposition
9      Exhibit Binder Volume 1.
10  BY MR. ZELLERS:
11      Q.  So can you take just a quick look
12  at what we have marked as Exhibit 6.
13      A.  Are you now referring again to
14  Exhibit C?
15      Q.  No.
16      A.  All right.
17      Q.  And it is a bit confusing because
18  those documents have the same title, but Exhibit 5
19  is what was Exhibit C to your report. Exhibit 6,
20  which we have just marked, is tab 9 in the
21  Deposition Exhibit Binder 1.
22      A.  Okay.
23      Q.  All right. Have you seen this
24  listing of additional materials considered, the
25  second one that we have marked as Exhibit 6,

Page 15

1  before?
2      A.  I have seen these articles
3  recently, yes.
4      Q.  My understanding is that these
5  materials that are identified on Exhibit 6 are
6  materials that were provided to you after you had
7  completed your June 30, 2021 amended report; is
8  that right?
9      A.  That's correct.
10      Q.  Did you review all of these
11  materials?
12      A.  Not before finalizing my report,
13  obviously, but I have reviewed all of these
14  materials.
15      Q.  All right, since you finalized
16  your report, your amended report that we marked as
17  Exhibit 2; correct?
18      A.  Correct.
19      Q.  Do any of these materials change
20  or alter any of the opinions that you have set
21  forth in your amended report?
22      A.  No. No, they don't.
23      Q.  My understanding is that the
24  opinions that you expect to testify to at any trial
25  or hearing in this matter would be set forth in

Page 16

1  your amended report, MDL report, your original
2  November 2018 MDL report, and anything additional
3  that you may tell me today in response to
4  questioning. Is that your understanding as well?
5      A.  Yes, that's correct.
6      Q.  All right. Finally, there were
7  two large binders of documents that were produced
8  in response to the Deposition Notice by counsel for
9  the Plaintiffs, and so those are the two large
10  binders that were provided to you.
11      Ms. Court Reporter, I'll mark for the
12  record as Deposition Exhibit 7 and 8 the two
13  binders of documents that were produced by counsel
14  for Plaintiffs on September 17, 2021, in response
15  to the Deposition Notice, and those documents, Dr.
16  Siemiatycki, are in the large binders behind you.
17  I think you can assume that for the time being. If
18  there is anything specific that I want you to pull
19  out, then I will ask you to do that.
20      EXHIBIT NO. 7:  Binder 1 of documents
21      produced by counsel for Plaintiffs on
22      September 17, 2021, in response to the
23      Deposition Notice.
24      EXHIBIT NO. 8:  Binder 2 of documents
25      produced by counsel for Plaintiffs on

Page 17

1  September 17, 2021, in response to the
2  Deposition Notice.
3  BY MR. ZELLERS:
4      Q.  But my question is, there is a
5  total of 23 documents that are contained in those
6  binders, Exhibits 7 and 8, that were produced to
7  the Defendants in advance of your deposition. Did
8  you have a role in selecting those documents that
9  were produced, or was that something that was done
10  by counsel for Plaintiffs?
11      A.  I didn't have a role. I didn't
12  select, so I am not sure what is there exactly.
13      Q.  All right. Looking at the
14  documents that were produced in accordance or in
15  response to the Deposition Notice, there are three
16  large reports by Dr. Longo. My understanding is
17  you have reviewed a number of reports of Dr. Longo;
18  is that right?
19      A.  Yes.
20      Q.  Do you review those reports page
21  by page, or do you skim through those reports?
22      A.  I would say it is a mixture of
23  those two modus operandi. When I look at the
24  nature of the document, if I feel that it is very
25  technical in terms of the testing methods, I will

Page 18

1    skim over those parts because it is beyond my area
2    of expertise.  I'll look at the conclusions, and
3    between looking at the conclusions and skimming
4    over the technical parts, I try to get a sense of
5    what the author tried to do and how he interprets
6    the results.
7        Q.   You have reviewed many, many, many
8    documents in connection with the talc litigation;
9    correct?
10       A.   Correct.
11       Q.   All of the documents that are
12   listed today we are going to talk about your
13   additional materials considered list, Exhibit C to
14   your amended report, which we have marked as
15   Exhibit 5 to this deposition and then also those
16   seven or so documents that you were sent after your
17   report, which we have marked as Exhibit 6.  Is
18   it fair -- first question is, have you reviewed all
19   of the materials in some way that are on those
20   lists?
21       A.   I didn't personally assemble the
22   list.  I asked -- there are -- every article that
23   is referenced in my bibliography of my report I
24   reviewed personally.  For the other documents,
25   these were documents that were sent to me by

Page 19

1    counsel, and the degree and the intensity of review
2    would be variable, and I did not make notes of the
3    extent to which I reviewed each one.  I made a
4    judgment call about whether it was useful for me to
5    spend time reviewing document "x" or pass on to
6    document "y" and so on.
7        Q.   In your first deposition that was
8    taken in January of 2019, you made a distinction
9    between publicly available materials and materials
10   that were not publicly available but which were
11   provided to you by counsel for the Plaintiffs.  Do
12   you recall that distinction?
13       A.   I understand the distinction.  I
14   don't recall the discussion about it.
15       Q.   Understood.  Here is my new
16   question for you.  Did you rely on any of the
17   non-public documents that were provided to you in
18   rendering your opinion in this matter?
19       MS. PARFITT:  Objection to form.
20       THE WITNESS:  My recollection is that
21   my opinion about talc and ovarian cancer is almost
22   exclusively based on the publicly available
23   material that I personally read and reviewed and
24   pondered, but there were ancillary issues that
25   influenced how I considered the evidence that I

Page 20

1    personally and intensively reviewed that came from
2    some of the non-public documents, and those
3    were -- the ones I recall offhand had to do with
4    company documents, correspondence, or reports about
5    the presence of talc and the composition of talc
6    going back in time.  And some of that material
7    influenced how I viewed the published public domain
8    information.
9        BY MR. ZELLERS:
10       Q.   Doctor --
11       A.   Yes, sorry, go ahead.
12       Q.   Have you finished your answer?
13       A.   I was going to say, I am not -- I
14   wouldn't categorically say that none of the other
15   unpublished material that was sent to me that
16   I -- none of that influenced how I see this whole
17   picture, but I feel like almost everything that I
18   needed was available in one way or another, in one
19   form or another, in the publicly available domain.
20       Q.   You are not an expert in asbestos;
21   correct?
22       A.   I have done research on asbestos,
23   and I have been involved with asbestos and cancer
24   issues for a long time, not in relation to talc or
25   contamination of talc with asbestos.  That has not

Page 21

1    been an area of research or expertise, but I have
2    been involved in cancer -- in asbestos cancer
3    research.
4        Q.   Understood.  With respect to the
5    identification of asbestos in a product, you are
6    not involved or have you been trained with respect
7    to asbestos testing; is that right?
8        A.   That's correct.
9        MS. PARFITT:  Objection to form.
10       BY MR. ZELLERS:
11       Q.   You understood and you have
12   reviewed reports from Dr. Longo; is that right?
13       A.   Yes.
14       Q.   As of the time of your initial MDL
15   deposition back in January of 2019, you said at
16   that time that you were not capable of adjudicating
17   between the experts for the Plaintiff on asbestos
18   and the experts for the Defence on asbestos.  Is
19   that still your opinion today?
20       MS. PARFITT:  Objection to form.
21       THE WITNESS:  Essentially, yes, that I
22   am capable of ascertaining whether there is a
23   consensus among experts on topics that I am not
24   expert in myself, and I am capable of ascertaining
25   whether there are differences of opinion among

Page 22

1 experts in a domain that I am not expert in.
2 BY MR. ZELLERS:
3 Q. You understand on the issue of
4 asbestos and whether or not asbestos has or has not
5 been found in Johnson & Johnson talc products, that
6 there are experts on the Plaintiff side,
7 specifically Dr. Longo and Dr. Rigler, and there
8 are experts on the Defence side; is that right?
9 A. Yes.
10 MS. PARFITT: Objection to the form.
11 BY MR. ZELLERS:
12 Q. You are not wading into that arena
13 in terms of trying to determine whether the
14 Plaintiff experts are correct or the Defence
15 experts are correct; is that right?
16 A. That's correct.
17 MS. PARFITT: Objection to form.
18 BY MR. ZELLERS:
19 Q. One of the documents that I would
20 like to quickly mark and ask you about are your
21 invoices. We'll mark your invoices as Deposition
22 Exhibit 9.
23 EXHIBIT NO. 9: Invoices of JS EpiTech
24 Inc. (Jack Siemiatycki, Ph.D.) tab 34,
25 Deposition Exhibit Binder Volume 3.

Page 23

1 BY MR. ZELLERS:
2 Q. And those are found at tab 34,
3 Deposition Exhibit Binder Volume 2. I think that
4 is incorrect. I believe it is Deposition Exhibit
5 Binder number 3, tab 34. Do you see those
6 invoices, Doctor?
7 A. I do, sir.
8 Q. And those are the invoices that
9 you have submitted to the Plaintiffs in the MDL
10 litigation; is that right?
11 A. Yes, it is.
12 Q. It refers to JS EpiTech Inc.; is
13 that your company?
14 A. Yes, it is.
15 Q. Do these invoices, along with the
16 two invoices that were produced at your first MDL
17 deposition, represent all of the time that you have
18 spent on the talc litigation working with
19 Plaintiffs' counsel?
20 A. I am just looking at the dates on
21 these things, if you give me a minute.
22 Yes, I would say these -- this
23 constitutes the entire list up to that date, yes.
24 Q. The ending date is June 17th of
25 2021; is that correct?

Page 24

1 A. Yes, I see that.
2 Q. Looking at all six of your
3 invoices, these four invoices we have marked as
4 Exhibit 9 and the first two invoices that were
5 discussed at your first deposition, shows that you
6 have worked 377 hours at $450 an hour and that you
7 have been paid just under $170,000. Does that all
8 seem right?
9 A. It seems right, yes.
10 Q. I don't see that there are any
11 individuals for your company that are billed
12 separately. You do have individuals who assist you
13 in terms of reviewing documents and helping you
14 with reports and whatnot; is that correct?
15 A. That's correct.
16 MS. PARFITT: Objection to form.
17 BY MR. ZELLERS:
18 Q. All right. Are those folks
19 included within the $450 an hour that you charge,
20 or are there separate billings for those
21 individuals?
22 A. There are no separate billings. I
23 roll their time into and their charges into this.
24 But it is very minimal. It is probably less
25 than -- I don't know, I was going to say 1 percent

Page 25

1 of the total, but it is in the single digits
2 percent of the total.
3 Q. Who in your office assisted you
4 with reviewing materials since your original report
5 in November of 2018 up until the present time?
6 A. Nobody. Nobody assists me in
7 reviewing materials. I do that myself.
8 Q. Did anyone assist you in term of
9 preparing your report, your amended report, Exhibit
10 2 to this deposition?
11 A. There are two tasks that I ask
12 other people to carry out. One is to carry out the
13 mechanics of the meta-analyses that I carry out, so
14 I will -- I have a research assistant who is very
15 familiar with the software and with my
16 instructions, and I only need to send her a list of
17 the studies that are involved, a list of the
18 results, the published results from those studies,
19 and I would ask her to carry out a meta-analysis
20 with fixing certain parameters of that analysis,
21 and she would ask me back -- she would perform the
22 analysis, and she would send me back the output
23 from the meta-analysis program that I then take and
24 from which I create the tables that would appear in
25 my report.

Page 26

1    Q.  Dr. Siemiatycki, who is that
2  person?
3    A.  Her name is Mengting Xu, X-u.
4    Q.  Do you have an estimate of the
5  amount of time that Ms. Xu has spent in terms of
6  your meta-analysis and updating the meta-analysis
7  for purposes of your amended report?
8    A.  Not off the top of my head, but if
9  you give me a minute, I can --
10    Q.  Dr. Siemiatycki, all I need to
11  know is whether you, you know, know that off the
12  top of your head or not.  Let me ask you a second
13  question.  Were there any other folks in your
14  office that assisted in the preparation of the
15  amended report or any update to your meta-analysis?
16    A.  Yes, so the other person in my
17  team who assists with this is Leslie Richardson,
18  and she does two things.  She has in the past
19  extracted -- from the studies that I identify as
20  being relevant to this issue, she extracts all the
21  results that are published in those studies and
22  puts them into a database, into a database program
23  called FileMaker, from which she creates Excel
24  files that she sends me.
25    So it is a task of looking at the

Page 27

1  article and, without any judgment or selection or
2  screening, take every single result of a relative
3  risk estimate from any study that I identify, and
4  she puts it into this database.  It is from that
5  that we then assemble lists of studies to be
6  included in meta-analyses.
7    And the other thing that Leslie
8  Richardson does for me is helps with the layout of
9  documents and tables in documents, so she is very
10  capable of -- more capable than me certainly of
11  manipulating Word documents and creating tables
12  that are attractive enough to be understood.  And
13  so she performs that function for me as well.
14    Q.  All right.  Dr. Siemiatycki, did
15  you work with anyone at any of the offices for the
16  Plaintiffs' counsel in this matter in the
17  preparation of your amended report?
18    A.  No, I didn't.
19    Q.  The listing of additional
20  materials, the first listing of additional
21  materials which we marked as Exhibit 5, did counsel
22  for Plaintiffs assist with that?
23    A.  Yes.  Yes, they did.
24    Q.  All right.
25    A.  I mean, I asked them to list all

Page 28

1  of the documents that they have ever sent me, and
2  that is the starting point, I think, for that list.
3    Q.  Your invoices do not say anything
4  about the specific work that you did during that
5  time period.  Is that your practice, or is that
6  something that you were instructed to omit by the
7  counsel for Plaintiffs in this case?
8    MS. PARFITT:  Objection to form.
9    THE WITNESS:  I didn't receive any
10  instructions of how to present my invoices, and no,
11  I didn't think to do it any other way than the way
12  I did it.
13    BY MR. ZELLERS:
14    Q.  Is that typically the way you bill
15  for your services of your company, to give no
16  description of what you did during a particular
17  time period?
18    A.  Well, the description --
19    MS. PARFITT:  Objection to form.
20    THE WITNESS:  The description is --
21    MS. PARFITT:  Thank you, Doctor.
22    THE WITNESS:  I'm sorry, I'm sorry.
23  The description is in the description of the claim,
24  and the work done that I indicate encapsulates
25  everything that was done.

Page 29

1    BY MR. ZELLERS:
2    Q.  Doctor, do you have an estimate to
3  the amount of time you have spent with respect to
4  the talc litigation since June 17th of 2021, just
5  in terms of hours?
6    A.  So I don't have this sort of
7  formally available, but I am guessing that it would
8  now be in the order of 20 hours or 30 hours or
9  maybe -- something in the order of 20 to 30.
10    Q.  Since June 17 of 2021 when your
11  last invoice was sent; is that right?
12    A.  Yes.
13    Q.  I understand that you have done
14  work in the talc litigation for matters other than
15  the MDL proceeding; is that correct?
16    MS. PARFITT:  Objection to form, vague.
17    THE WITNESS:  Yes.
18    BY MR. ZELLERS:
19    Q.  You gave a deposition back in 2016
20  in a matter Oules, O-u-l-e-s.  You testified at a
21  state court trial in California, the Echeverria
22  trial in 2017.  Are those matters included in the
23  377 hours that you had billed in this matter up and
24  through June 17 of 2021, or would those be
25  additional billings to other lawyers?

Page 30

1    A.   They would be additional billings.
2    Q.   What lawyers have you billed time
3  for in the talc litigation other than the MDL
4  lawyers that are here today; do you recall offhand?
5    A.   Is that privileged information?  I
6  am not sure.  Can I answer -- is that --
7    Q.   Well, I guess the question number
8  one is do you recall what lawyers you have worked
9  with generally?
10    A.   Yes.
11    Q.   All right.  Have you worked on
12  matters other than the Oules litigation and the
13  Echeverria litigation?  Are there additional
14  matters that you have worked on?
15    MS. PARFITT:  Objection to -- Dr.
16  Siemiatycki, with regard to any situations where
17  you have been a consultant, that is not the
18  question.  This is where you have been retained --
19    MR. ZELLERS:  Well, Ms. --
20    MS. PARFITT:  Let me just finish --
21  retained and actually presented.  Go ahead, Mr.
22  Zellers.
23    BY MR. ZELLERS:
24    Q.   Ms. Parfitt, my question is a
25  little bit different.

Page 31

1    MS. PARFITT:  I'm sorry.
2    BY MR. ZELLERS:
3    Q.   So, Dr. Siemiatycki, I do not want
4  you to divulge the names of any matters in which
5  you have done work but you have been named as
6  an expert.  I do want you, though, to tell me if
7  there are any such matters.  So I don't want to
8  know the name of the matter.  I don't want to know
9  the name of the lawyer.  I just want to know the
10  number of talc matters that you are making separate
11  billings for.  Are you able to estimate that for me
12  or tell me that?
13    A.   So are you including in that the
14  two that you have mentioned that I did before the
15  MDL?
16    Q.   Yes, so the Oules matter would be
17  a separate billing; correct?
18    A.   Correct.
19    Q.   And the 2017, the Echeverria
20  matter would be a separate billing; is that
21  correct?
22    A.   That's correct.
23    Q.   Are there additional matters in
24  which you have been named as an expert that you
25  have billed for in addition to those two matters

Page 32

1  and the MDL matter?
2    A.   That I have been named to the
3  Court?  I don't think --
4    Q.   All right.
5    A.   Sorry.
6    Q.   Thank you.  Are there additional
7  matters where you have served as a consultant in
8  talc litigation other than the three matters that
9  we have identified?  And that is a yes or a no
10  answer.
11    A.   Yes.
12    Q.   How many additional matters have
13  you billed time on as a consultant?  Without
14  identifying the name of the matter, without
15  identifying the lawyer, just give me the number of
16  other, you know, cases in which you are consulting,
17  the number?
18    A.   One.
19    Q.   One, all right.  All right,
20  Doctor, that is it for the invoices.
21    I want to ask you some questions about
22  Exhibit C to your amended report, which we have
23  marked separately as Exhibit 5 to this deposition.
24  Do you have that in front of you?
25    A.   We are back to binder Volume 1,

Page 33

1  correct?
2    Q.   Binder Volume 1, tab 8.
3    A.   Thank you.  I am going to keep
4  identifying them with the binder and tab number, if
5  that is okay with you.
6    Q.   Well, if there is a need to do
7  that, that is fine, but we have identified all of
8  the documents in the beginning.  And so for the
9  Court record, I think it will be easier just to
10  refer to the Deposition Exhibit, but if at any time
11  you are confused or we need to straighten something
12  out, feel free to do so.
13    A.   Okay.  I didn't keep track of how
14  you re-identified them, I'm sorry.
15    Q.   That is good, and I will try to
16  direct you as we go along.
17    A.   Thank you.
18    Q.   So are you now looking at what was
19  Exhibit C and is Exhibit C to your amended report
20  which we have marked separately in this
21  exhibit -- or in this deposition as Exhibit 5?
22    A.   Yes.  I have it in front of me.
23    Q.   What is meant by the statement at
24  the top "Additional Materials Considered [...]"?
25    A.   Again, as I indicated before, this

Page 34

1  list was compiled subsequent to my request to
2  counsel to make a list of all the materials that
3  they have sent me that are not in my bibliography.
4      Q.   Your understanding is, is that in
5  the amended report you have a bibliography, and the
6  bibliography would be those materials which are
7  cited in your amended report; is that correct?
8      A.   They may be cited, or they may
9  be -- certainly all the cited ones should be there,
10  and there may be some that are important references
11  that I used that maybe didn't find their way into a
12  citation, a specific citation, but that I
13  considered important enough to list as part of the
14  bibliography.
15      Q.   Does Deposition Exhibit 5 that we
16  are looking at contain documents that you were
17  provided both before and after you prepared your
18  original report in November of 2018?
19      A.   Yes, it does.
20      Q.   Are you able to tell for me, if we
21  went down this list, what materials are new - and
22  by "new," I mean provided to you after your
23  original report - and what materials you had
24  previously?  And just give me a yes or no on that.
25      A.   Sorry, can you ask the question

Page 35

1  again?
2      Q.   Sure.  Looking at Exhibit C, if I
3  ask you to go down that list, and there is some --
4  well, it looks like 428 documents, are you able to
5  identify for me or could you identify for me which
6  ones you got before your original report was
7  prepared and which ones you received after your
8  original report was prepared?
9      A.   Not with -- I couldn't do it with
10  certainty.  I can make pretty good guesses, but I
11  couldn't do that with certainty, no.
12      Q.   Understood.  This document,
13  Exhibit 5 to the deposition, was prepared by
14  counsel for the Plaintiffs in the MDL litigation;
15  correct?
16      A.   Correct.
17      Q.   And you requested that they make a
18  list of all of the documents that had been provided
19  to you; is that correct?
20      A.   Yes.
21      Q.   In preparing your amended report,
22  did you do any updated literature searches, or what
23  did you do in preparation for the amended report
24  with respect to collecting new materials or
25  additional materials?

Page 36

1      A.   I carried out literature reviews
2  sort of in the standard way, keeping my eyes open
3  for journal articles that may be relevant to the
4  topic of ovarian cancer and talc use and looked at
5  other review articles that have appeared in the
6  meanwhile to see if there is anything in the
7  reference lists of those that I may have missed,
8  that sort of thing.
9      Q.   In addition, counsel for
10  Plaintiffs in this litigation provided you with
11  some articles.  They provided you with some expert
12  reports.  They provided you with company documents.
13  Is that fair?
14      A.   Yes, that is fair.
15      Q.   All right.  The documents that you
16  thought were significant or that you relied on in
17  preparing your amended report, those documents are
18  referred to or referenced in some form or manner in
19  your amended report; is that right?
20      MS. PARFITT:  Objection to form,
21  misstates his testimony.
22      THE WITNESS:  That's correct.
23  BY MR. ZELLERS:
24      Q.   The other materials that you may
25  have looked at, may have skimmed, just depending

Page 37

1  upon what they were, that's what we have listed in
2  Exhibit 5 and titled "Additional Materials
3  Considered [...]"; correct?
4      A.   That's correct.
5      MS. PARFITT:  Objection to form.
6      BY MR. ZELLERS:
7      Q.   With respect to the company
8  documents that are on your "Materials Considered"
9  list, is it fair to say you have not reviewed each
10  and every one of those documents?
11      A.   It is fair to say that I certainly
12  couldn't affirm that I have reviewed each and every
13  one of them.
14      Q.   You understand that that's just a
15  very small subset of documents that have been
16  produced or provided by the Defendants in this
17  litigation; is that right?
18      A.   Yes, I do.
19      MS. PARFITT:  Objection to form.
20  BY MR. ZELLERS:
21      Q.   Is it important when you are
22  reviewing a medical-legal matter to put things in
23  context?
24      A.   Of course, as in everything in
25  life.

Page 38

1 Q. With respect to the company
2 documents that have been provided to you, do you
3 understand that those are just the documents that
4 have been selected by Plaintiffs' counsel?
5 A. Yes, I understand.
6 MS. PARFITT: Objection to form.
7 BY MR. ZELLERS:
8 Q. And you have not had an
9 opportunity to review any responsive documents or
10 additional documents from the companies that would
11 put what you have been provided into context; is
12 that right?
13 MS. PARFITT: Objection to form,
14 misstates what he has done.
15 THE WITNESS: I am not sure I would
16 express it in the way that you have just expressed
17 it, but --
18 BY MR. ZELLERS:
19 Q. Are you aware that millions of
20 pages of documents have been produced by the J&J
21 and other Defendants in this litigation?
22 A. Yes -- well, I am aware -- I
23 assume that is the case, yes.
24 Q. Have you made any request to
25 Plaintiffs' counsel to provide you with additional

Page 39

1 company documents that have been produced that may
2 or may not put the company documents you were
3 provided into context?
4 A. So I am not sure --
5 MS. PARFITT: Objection to form.
6 THE WITNESS: -- now what you mean by
7 the phrase "to put things into context". I
8 certainly understand that there is a lot more
9 information that I have not been provided. It
10 would be overwhelming, I am sure, to look at
11 everything that exists, and I am not sure whether
12 the documents that I was provided contain enough
13 information to appreciate the context in which
14 these documents -- so I certainly would assume that
15 I have not been sent or made available all possible
16 documents in the companies or elsewhere.
17 Whether these documents that were
18 selected to be sent to me provide appropriate
19 context or not is a separate issue, and I can't
20 opine about that.
21 BY MR. ZELLERS:
22 Q. Last question on this topic. You
23 do not regularly rely on internal company documents
24 for your research and your publications; is that a
25 fair statement?

Page 40

1 A. That is a fair statement.
2 Q. Doctor, a couple of questions
3 about the MDL proceeding. Since the time of your
4 first deposition, do you understand that the
5 parties in the MDL proceeding are conducting
6 discovery in a small number of potential trial
7 cases?
8 A. Sorry, could you repeat that?
9 Q. Sure. Are you aware that in the
10 MDL proceeding that the parties are conducting
11 discovery on a small number of potential trial
12 cases?
13 A. Yes, I understand that in general.
14 I don't have any information about who, where, why,
15 et cetera, but I understand that in general what
16 you have just said is the case.
17 Q. Are you aware of the names of any
18 of the Plaintiffs in this pool of Plaintiffs that
19 are being reviewed and worked up?
20 A. No, I am not.
21 Q. Have you been provided any medical
22 records for any of the Plaintiffs in the pool of
23 potential trial cases?
24 A. No, I have not been.
25 Q. Are you aware of the types of

Page 41

1 ovarian cancers that any of the Plaintiffs in the
2 pool of potential trial cases have?
3 A. No, I am not aware.
4 Q. Are you aware of the specific risk
5 factors that any of the Plaintiffs in the pool of
6 potential trial cases have?
7 A. You mean apart from talc exposure
8 risk factors?
9 Q. Yes.
10 A. Yes, no, I am not aware.
11 Q. Dr. Siemiatycki, I want to ask you
12 some questions about your communications relating
13 to the Taher meta-analysis that was done and Health
14 Canada. Take a look and we'll mark as Exhibit 10
15 to this deposition a letter to Judge Pisano dated
16 April 5th, 2019. It is tab 11 in the binder.
17 EXHIBIT NO. 10: Letter to Judge Pisano
18 dated April 5, 2019, tab 11 of the
19 binder.
20 BY MR. ZELLERS:
21 Q. And you may want to take that out
22 because I am going to have some questions for you
23 about some of the communications contained in that
24 exhibit, and it might be easier for you to have it
25 out of the binder.

Jack Siemiatycki, MSc, PhD

Page 42

```
 1        A.  Okay.  Okay, thank you.
 2        Q.  So taking a look at what we have
 3   marked as Deposition Exhibit 10.
 4        A.  10 or 11?  Sorry.
 5        Q.  So it is Deposition Exhibit 10,
 6   but it is tab 11 in your binder.
 7        A.  Okay.
 8        Q.  I am going to refer to it as
 9   Deposition Exhibit 10.
10        A.  Right.
11        Q.  You have that in front of you; is
12   that right?
13        A.  I do.  Yes, that's right.
14        Q.  If you take a look at the second
15   page, this is an email correspondence from you to
16   Dr. Krewski, Daniel Krewski, December 13 of 2018;
17   is that right?
18        A.  Yes.
19        MS. PARFITT:  Objection -- Mr. Zellers,
20   excuse me, I'm objecting to the extent it deals
21   with a December 13, 2018, communication.  Dr.
22   Siemiatycki was deposed in 2019.  I'll get you the
23   precise date of that deposition.
24        MR. ZELLERS:  Well, Ms. Parfitt, I
25   don't --
```

Page 43

```
 1        MS. PARFITT:  Let me --
 2        MR. ZELLERS:  I understand.  Well, you
 3   are not to do speaking objections.  You can object
 4   to form.  I understand your objection.  I am simply
 5   using this as foundation for the questions that I
 6   am going to ask.
 7        MS. PARFITT:  All right, we'll see
 8   where it goes.  Thank you.
 9        BY MR. ZELLERS:
10        Q.  So, Dr. Siemiatycki, this is a
11   document that you were asked about at your first
12   deposition; is that right?
13        A.  I guess so.
14        Q.  Well --
15        A.  I don't specifically recall every
16   document I was asked to comment about in previous
17   depositions, so I --
18        Q.  Just for context for my later
19   questions here, you wrote to Dr. Krewski in
20   December of 2018 letting him know that you had seen
21   the Env Canada -- is that Environmental Canada?
22        A.  Yes, Environment Canada is the
23   name of the department in the government, yes.
24        Q.  And --
25        A.  It is actually called -- I
```

Page 44

```
 1   think -- they keep changing names, of course.
 2   Environment and -- no, no, these are two separate
 3   departments of the government, Environment Canada
 4   and Health Canada.  I'm sorry, go ahead.
 5        Q.  You wrote to him saying:
 6            "I saw that Env[ironment]
 7        Canada and Health Canada are
 8        proposing to publish an advisory
 9        regarding talc, and that they cite
10        [to a paper] [...] in support of the
11        position [...]"
12        And that was the Taher paper; is that
13   right?
14        A.  Yes.
15        Q.  And at this time, the Taher
16   article had not actually been published; is that
17   your understanding?
18        A.  Yes, that is what I infer from my
19   wording here, yes.
20        Q.  And I believe, as you talked at
21   your original deposition, Dr. Krewski is a
22   colleague and a peer of yours; is that right?
23        A.  That's correct.
24        Q.  So you ask Dr. Krewski for a draft
25   of the Taher article.  Do you recall whether or not
```

Page 45

```
 1   you were ever provided a draft of the Taher article
 2   by Dr. Krewski?
 3        A.  I don't think I was, and I don't
 4   think he ever responded.  I don't recall him ever
 5   responding to that request.
 6        Q.  Do you recall at any time after
 7   this December 13, 2018, correspondence, email,
 8   talking to Dr. Krewski about the Taher
 9   meta-analysis and article?
10        A.  No, I don't recall.
11        Q.  Do you recall talking to any of
12   the authors of that publication about the article
13   and the meta-analysis that was performed?
14        A.  No, I don't recall speaking to any
15   of them.
16        Q.  Let's look at this same exhibit,
17   Exhibit 10, for the communications that occurred
18   after your deposition was taken in January of 2019.
19   The next communication, if you take a look, would
20   be on page 3 of Exhibit 10, and this is a two-page
21   communication that you wrote dated February 6,
22   2019, "To whom it may concern at Health Canada"; do
23   you see that?
24        A.  I do see that.
25        Q.  You testified in your first
```

Jack Siemiatycki, MSc, PhD

Page 46

1  deposition that you had intended to submit an
2  opinion to Health Canada.  Is this the opinion that
3  you submitted to Health Canada, or did you submit
4  something different than this, if you recall?
5      MS. PARFITT:  Objection to form.
6      THE WITNESS:  I think it is the only
7  thing I submitted, and if I used the word "opinion"
8  a couple of weeks before sending this, I guess it
9  was the opinion.  I don't know that the word
10  "opinion" was selected after great judicious
11  consideration, but, yes, I think this is the opinion
12  that I was thinking about.
13      BY MR. ZELLERS:
14      Q.  Before sending this letter to
15  Health Canada February 6 of 2019, did you discuss
16  it with Plaintiffs' counsel in this matter?
17      MS. PARFITT:  Objection to form.
18      THE WITNESS:  I believe I -- I believe
19  I did.  I believe I communicated with Ms. Parfitt
20  to ascertain whether my intervening in a public way
21  in this matter with the Government of Canada would
22  in any way be -- you know, it was really as a
23  courtesy.  I didn't want her to find out from some
24  third party that I had done this, so I thought,
25  well, I'll notify her, see if there are any red

Page 47

1  flags that I should be aware of in doing -- posing
2  such a gesture.  I didn't imagine there would be,
3  but just to be sure.
4      BY MR. ZELLERS:
5      Q.  Did you give Ms. Parfitt or any of
6  her colleagues the opportunity to review your
7  February 6, 2019, letter to Health Canada before
8  you actually sent it?
9      MS. PARFITT:  Objection to form.
10      THE WITNESS:  I don't think so.
11      [Court Reporter intervenes for
12      clarification.]
13      THE WITNESS:  Okay, I'll do a
14  two-second pause to give Ms. Parfitt an
15  opportunity.
16      BY MR. ZELLERS:
17      Q.  Ms. Parfitt is doing just fine,
18  but yes, we want to make it --
19      MS. PARFITT:  Thank you, Michael.
20      BY MR. ZELLERS:
21      Q.  -- easy on the court reporter.
22      Let's take a look at the next
23  correspondence.  So there is a -- so we are looking
24  at Exhibit 10.  There is a February 18, 2019,
25  response that you got from Scott Hancock at Health

Page 48

1  Canada.  Do you see that?
2      A.  I do.
3      Q.  Do you know who Scott Hancock is?
4      A.  Well, I do now.  I didn't know him
5  before.  I didn't know anything about him before.
6      Q.  Have you ever met Mr. Hancock in
7  person?
8      A.  Not knowingly.  I mean, if he went
9  to meetings that I went to in the past, but no, I
10  have never met him.
11      Q.  Is the only way that you know
12  Mr. Hancock at Health Canada through the
13  communications that you have had relating to talcum
14  powder with Health Canada?
15      A.  Yes.
16      Q.  Have you ever had a phone call
17  with Mr. Hancock?
18      A.  Yes, I had a phone call around
19  this time.
20      Q.  And what did you discuss with
21  Mr. Hancock in that phone call?
22      A.  If you don't mind, I -- let me
23  read just these two messages and clarify.  It is
24  not clear in my mind when I spoke to him and what
25  we spoke about, so this might -- reading this might

Page 49

1  clarify it for me.
2      Q.  All right.  And for the record,
3  you are reading the February 18th, 2019, email from
4  Scott Hancock to yourself; is that right?
5      A.  Well, I was going to read that one
6  plus the next two emails.  The exchanges of that
7  day, I guess there were three exchanges that day.
8  I don't know if the phone call was before those
9  exchanges or after.
10      Q.  Well, the first email - and please
11  feel free to read it or to read along - came from
12  Mr. Hancock at 11:37 a.m., and he was requesting an
13  "embargoed copy of the information" that you
14  referenced in your letter of February 6, 2019; is
15  that right?
16      A.  Sorry, I'm looking for the correct
17  sequence of these messages, so the 21st -- the 21st
18  and -- okay, so the message of February 18 seems to
19  be the first one of that stream; correct?
20      Q.  Yes, and in that -- and let me lay
21  a little foundation here.  You have come to
22  understand that Mr. Hancock is a senior manager at
23  Health Canada; is that right?
24      A.  Yes.
25      Q.  Is it your understanding that he

Page 50

1  was the person responsible for the Health Canada
2  Talc Screening Assessment?
3        A.  I believe he was.  You know,
4  I -- he didn't -- I don't know.  Whatever he said
5  in this message to identify himself, I guess, is
6  what I know.  I don't know anything more.
7        Q.  Do you understand he is not a
8  medical doctor?
9        A.  I don't know that for a fact, but
10  it wouldn't surprise me that -- I guess he would
11  have signed his name "MD" if he was.
12        Q.  Is it your understanding that he
13  is also -- Mr. Hancock is not an epidemiologist?
14        MS. PARFITT:  Objection to form.
15        THE WITNESS:  That is what I would have
16  guessed from the fact that I didn't know him,
17  but --
18        BY MR. ZELLERS:
19        Q.  So we understand that Mr. Hancock
20  acknowledged your communication, that he requested
21  the "embargoed copy of the information" that you
22  referenced; is that correct?
23        A.  That's correct.
24        Q.  And then you responded to him on
25  February 21st of 2019; is that correct?

Page 51

1        A.  Yes.
2        Q.  And in that communication, you
3  told Mr. Hancock that you had "not (yet) drafted a
4  manuscript for publication", that you had done a
5  report to the court in November of 2018, and that
6  you "do intend to submit a manuscript for
7  publication, but this is not imminent"; is that
8  correct?
9        A.  That is what I say, yes.
10        Q.  And then Mr. Hancock responded
11  later that day, February 21st of 2019:
12        "Thank you [...] for the [...]
13        response."
14        And said he would get back to you, and
15  he would get back to you on your statement that you
16  would provide him with a copy of your report in
17  this MDL litigation but only if there was a
18  protective order that Mr. Hancock and Health Canada
19  executed.  Is that a fair summary?
20        A.  Yes, that is a fair summary.
21        MS. PARFITT:  Objection to form.
22        BY MR. ZELLERS:
23        Q.  Having gone through that, does
24  that refresh your recollection as to when you had a
25  phone call or had phone calls with Mr. Hancock and

Page 52

1  what was discussed?
2        A.  Not really.  I think it was around
3  this time, and I think it might have been to
4  clarify something in my message to him, but I
5  honestly can't remember what the discussion was
6  about.  I had to -- I mean, after I heard back from
7  him asking for the document, I wasn't sure if I was
8  allowed to send him the document from a litigation
9  procedure.  And so I consulted Ms. Parfitt about
10  that, and initially she indicated that it would
11  need them to sign, I guess, what is called a
12  protective order or something like that, which I
13  communicated to Hancock.
14        And then sometime after that,
15  Ms. Parfitt got back to me and said that --
16        MS. PARFITT:  Objection, Dr.
17  Siemiatycki, with regard to any communications
18  between you and myself.
19        THE WITNESS:  That is fine.
20        MS. PARFITT:  You can say I got back to
21  you.
22        THE WITNESS:  Yes, yes.
23        BY MR. ZELLERS:
24        Q.  Well, Ms. Parfitt got back to you
25  and said that a protective order was not necessary

Page 53

1  and that you could go ahead and send your
2  litigation report to Health Canada; correct?
3        MS. PARFITT:  Objection to form.
4        THE WITNESS:  Well, I guess the correct
5  answer is that after communication from Ms.
6  Parfitt, I felt that I -- I understood that I was
7  able to send them the report and that is what I
8  did.
9        BY MR. ZELLERS:
10        Q.  All right, if you take a look at
11  the same exhibit, Exhibit 10, you wrote to
12  Mr. Hancock on March 1st of 2019:
13        "Dear Mr. Hancock
14        I have had authorization from the
15        lawyer in the litigation to release
16        my report to you without having to
17        sign a 'protective order'.
18        Consequently, I am pleased to share
19        the attached report with you."
20        A.  Correct.
21        Q.  Did I read that correctly?
22        A.  Yes, you did.
23        Q.  So as of March 1st of 2019, you
24  provided your report, your litigation report in
25  this matter dated November of 2018, to Mr. Hancock

Page 54

1    and to Health Canada; is that right?
2        A.  Yes, I did.
3        Q.  Have you when you do your research
4    and you have publications that you author, do you
5    ever rely on or reference litigation reports?
6        MS. PARFITT:  Objection to form.
7        THE WITNESS:  I don't think I have ever
8    done that, so the answer is no.
9        BY MR. ZELLERS:
10       Q.  When you were --
11       MS. PARFITT:  Let him just complete his
12   answer, Mr. Zellers.  I am not sure he completed
13   his response.
14       BY MR. ZELLERS:
15       Q.  Dr. --
16       MS. PARFITT:  Have you completed, Dr.
17   Siemiatycki?
18       THE WITNESS:  For all intents and
19   purposes, I have completed it.  No, I have never
20   done that.
21       BY MR. ZELLERS:
22       Q.  When you worked with IARC in the
23   working groups, 2006 and then 2012, did IARC ever
24   rely, to your knowledge, on expert litigation
25   reports?

Page 55

1        MS. PARFITT:  Objection to form.
2        THE WITNESS:  It is certainly not how
3    things are normally done.  I couldn't say that it
4    has never been done in IARC that they have used
5    reports from litigation, but I don't think I have
6    ever been party to it, and it would be an
7    unusual -- there are rules at IARC, in the IARC
8    monograph program, about what kind of material can
9    be cited and how it should be cited.  They allow
10   for non-published material to be cited under
11   certain circumstances.  But I don't recall the
12   specific instructions and rules about what can be
13   cited and how.
14       BY MR. ZELLERS:
15       Q.  Do you recall any specific rule at
16   IARC that would permit a paid litigation report to
17   be cited as authority?
18       MS. PARFITT:  Objection to form.
19       THE WITNESS:  I don't recall any rules
20   about that.  I wouldn't be surprised if in this
21   sort of evolving issue of how to deal with conflict
22   of interest situations that there may now be rules
23   or at least instructions about how this sort of
24   thing could or should be handled, but I am not
25   aware of it.

Page 56

1        BY MR. ZELLERS:
2        Q.  All right.  Dr. Siemiatycki, take
3    a look in Exhibit 10 at your February 21st, 2019,
4    11:25 a.m. email to Mr. Hancock.  I believe that is
5    on page 5.
6        A.  Yes.
7        Q.  At the very -- in the, I guess,
8    third paragraph of that communication, you told
9    Mr. Hancock that in addition to your litigation
10   report of November of 2018, that you do intend to
11   submit a manuscript for publication; do you see
12   that?
13       A.  I see that.
14       Q.  Have you submitted any manuscript
15   for publication relating to your opinions on talcum
16   powder and ovarian cancer?
17       A.  No, I haven't.
18       Q.  You state then that when you do
19   submit a manuscript for publication, you are not
20   sure if it will contain everything that is in your
21   report regarding the possibility of bias.  Why
22   would you exclude that if you were going to prepare
23   a manuscript?
24       A.  Well --
25       MS. PARFITT:  Objection to form.

Page 57

1        THE WITNESS:  Well, probably the best
2    way to answer that is to point you to my report and
3    indicate that in my report there is a chapter --
4    let me see exactly what it is called and where it
5    is.  I'm sorry, I'm just looking it up now.
6        So section 9.2 of my report going from
7    page 54 to 63 contains -- so how many pages is
8    that?  That is about eight or nine pages
9    typescript.  It contains information on -- you
10   know, pertinent to the issue of biases and errors,
11   and that is what I -- the kind of thing that I was
12   referring to in my letter to Mr. Hancock that you
13   just cited.
14       BY MR. ZELLERS:
15       Q.  Is that important information?
16       MS. PARFITT:  Objection to form.
17       THE WITNESS:  Yes, it is important
18   information.
19       BY MR. ZELLERS:
20       Q.  Why is it something that at least
21   you told Mr. Hancock you may omit in a publication?
22       A.  Well, I don't know that I --
23       MS. PARFITT:  Objection to form.
24   Misstates his testimony.
25       THE WITNESS:  I don't know that I would

Page 58

1  use the word "omit". I didn't say -- I don't --
2  hope I didn't say to him that I would omit, but in
3  any case, a typical manuscript that a journal
4  would -- that is considered receivable by most
5  journals is between 3,000 and 5,000 words long.
6  That boils down to roughly between 8 and 12
7  typescript or 12 and 15 typescript pages.
8        This section of my report, which is
9  8 -- approximately 8 pages long in the report would
10  completely overwhelm my ability to submit a
11  manuscript to a high impact, high recognizability
12  journal.
13        And so what I would do if I were
14  submitting the manuscript would be to present all
15  of the material that I have compiled and the
16  information that I have compiled and boil it down
17  from the 60 or 70 or 80 pages here in the report to
18  about 12, maybe 15 maximum, pages. That means you
19  have got to compress a lot to describe all of the
20  background to the issue, to describe -- because
21  most readers are not experts in talc and ovarian
22  cancer, so there has got to be a section that
23  introduces the topic to the reader. There has got
24  to be a section that describes the methods, which
25  is the meta-analysis that I have done. That is

Page 59

1  quite complicated. A section on the results,
2  presenting multiple tables and figures and graphs.
3  And then a discussion which includes a discussion
4  of all possible biases and errors. And all that in
5  12 to 15 pages.
6        So by necessity, there would be -- have
7  to be a compression, and that compression is what I
8  intended to convey to Mr. Hancock would not be --
9  or at least all of the detail and exposition and
10  explanation that is in the report cannot be
11  conveyed in a 10-, 12-page manuscript. So I would
12  boil it down. It is all important.
13        If that is your point, yes,
14  consideration of biases and errors is absolutely
15  important, and I would never submit a manuscript
16  without a good discussion of that, but it would
17  have to be a very concise discussion rather than
18  the kind that I carried out for this report.
19        BY MR. ZELLERS:
20        Q. Dr. Siemiatycki, go to tab 12 in
21  Deposition Exhibit binder Volume 1. We will mark
22  this as Exhibit 11 to the deposition, and for
23  identification, this is an April 17, 2019, letter
24  to Judge Pisano from Ms. Parfitt, and it attaches
25  several additional communications that you had with

Page 60

1  Mr. Hancock.
2        EXHIBIT NO. 11: April 17, 2019, letter
3        to Judge Pisano from Ms. Parfitt
4        attaching several additional
5        communications between Dr. Siemiatycki
6        and Mr. Hancock, tab 12, Deposition
7        Exhibit Binder Volume 1.
8        BY MR. ZELLERS:
9        Q. Do you have that in front of you?
10        A. Yes, I do.
11        MS. PARFITT: And Mr. Zellers, we don't
12  have to stop at this point. We have gone about an
13  hour and 22 minutes, so when it becomes a good
14  place for both you and Dr. Siemiatycki, perhaps we
15  take a stretch break here.
16        MR. ZELLERS: Well, sounds great. Give
17  us about 10 minutes, if that is okay, Ms. Parfitt.
18        MS. PARFITT: It is fine with me. Dr.
19  Siemiatycki?
20        THE WITNESS: That is fine.
21        MS. PARFITT: Very good.
22        BY MR. ZELLERS:
23        Q. Thank you. So we ended the last
24  exhibit with you receiving authorization to provide
25  your litigation report to Mr. Hancock, and you

Page 61

1  communicated that to him. That was on March 1st of
2  2019. If we now look at Exhibit 11, we see that
3  Mr. Hancock responded to you. Let me find -- so I
4  may be one exhibit behind here.
5        I'm looking for the March 2nd, 2019,
6  communication from Mr. Hancock back to you. Do you
7  see that in Deposition Exhibit 11? Oh, I'm sorry,
8  yes, so it is on the last page of Exhibit 11. So
9  the last page is your March 1st, 2019,
10  communication, and then at the bottom of the -- I
11  guess it would be third page of the exhibit, on
12  March 2nd of 2019, Mr. Hancock responds:
13        "[...] that is great news!
14        Thank you very Much." And he "will
15        read [it] with great interest and I
16        am sure this will be very helpful as
17        we revise our screening assessment
18        for final publication."
19        Did you receive that email from
20  Mr. Hancock?
21        A. Yes, it seems that I did.
22        Q. All right. You understood that
23  Health Canada was going to rely on your expert
24  litigation report to revise and finalize their Talc
25  Screening Assessment; correct?

Page 62

1    MS. PARFITT:  Objection to form.
2    THE WITNESS:  I did not interpret his
3  message as any sort of commitment that they would
4  rely on my report, only is that --
5    BY MR. ZELLERS:
6    Q.  He told you it would be of great
7  interest.
8    A.  Yes.
9    Q.  That it:
10    "[...] will be very helpful as
11    [Health Canada revises] our
12    screening assessment for final
13    publication."
14    MS. PARFITT:  Is that a question?
15    BY MR. ZELLERS:
16    Q.  Yes.  Is that what he wrote to
17  you, Dr. Siemiatycki?
18    A.  That is what he wrote to me.
19    Q.  All right.  Did you inform
20  Mr. Hancock that there were contrary views that
21  were expressed by Defence experts?
22    MS. PARFITT:  Objection to form.
23    THE WITNESS:  I didn't inform him of
24  any other opinions except my own.
25    BY MR. ZELLERS:

Page 63

1    Q.  Did you provide Mr. Hancock with
2  any reports, litigation reports from the
3  Defendants' experts?
4    MS. PARFITT:  Objection to form.
5    THE WITNESS:  No, I did not.
6    BY MR. ZELLERS:
7    Q.  Did you at any time provide
8  Mr. Hancock with any other materials or expert
9  reports, either Plaintiff expert reports or Defence
10  expert reports?
11    A.  No, I didn't.  He didn't ask for
12  any, and the request from Health Canada to which I
13  responded, the generic request that they sent out
14  that I responded to, did not ask for anyone to
15  compile a list of opinions, only to give their own
16  opinions.
17    Q.  All right.  You communicated with
18  Mr. Hancock on March 8th of 2019, and I am, again,
19  referring to Deposition Exhibit 11, and you asked
20  him to keep your litigation report confidential; is
21  that right?
22    A.  Oh, yes, yes, I see that.  Yes.
23    Q.  And then Mr. Hancock responded
24  that same day and said "By all means," you know,
25  and he said that:

Page 64

1    "In writing our final risk
2    assessment we may wish to refer to
3    some of your points, and would cite
4    them as personal communication.....
5    [...]"
6    Do you see that?
7    MS. PARFITT:  If you could complete the
8  remaining sentence, Mr. Zellers, for context,
9  please.
10    BY MR. ZELLERS:
11    Q.  ".....and I would send you the
12    text for your approval before it
13    goes anywhere to make sure you are
14    comfortable with how we are
15    capturing the essence of your
16    thoughts without giving away any
17    confidential info[rmation].....
18    another way around it would be for a
19    phone call later on, when we are
20    writing the doc, [a]nd I could ask
21    you questions over the phone and
22    those answers would be the reference
23    cited to have another layer between
24    the document you shared and what my
25    team will be writing.  Let me know

Page 65

1    if these paths forward would work
2    for you, and thanks again for your
3    help."
4    Did I read that correctly?
5    A.  Are those dots in my original
6  email exchanges, or these are things that you have
7  inserted?
8    Q.  No, I am reading the dots.  I may
9  have said three or four dots.  I think, looking at
10  this, there is actually five dots, but I read that
11  message correctly; is that right, Dr. Siemiatycki?
12    A.  Yes, you read what I have in front
13  of me.  I'm just asking you whether this is
14  literally a copy of my correspondence with him or
15  if the dots represent some editing that you have
16  done to shorten the sentence or to eliminate some
17  unessential wording?  Do I need to go back to the
18  original for any reason to check whether I agree
19  with your statement?
20    Q.  Well, so what I would ask you to
21  do is, if there is anything omitted, then I would
22  like you to advise Ms. Parfitt, you know, at some
23  point after the deposition so that we can correct
24  the record, but I have a couple of questions for
25  you.

Page 66

1  Number one, do you know why Mr. Hancock
2  was suggesting that it might be better to have a
3  phone call with you rather than to simply rely or
4  use your report, if you know or have an
5  understanding.
6  MS. PARFITT:  Objection to form.
7  THE WITNESS:  I am not exactly sure,
8  but I guess it might have been triggered by my
9  concern about whether a document that is in the
10  litigation realm can be shared in the public
11  domain, as it were.  And he knew that I was
12  uncomfortable -- well, uncomfortable.  I was
13  uncertain of how this should be done, and I
14  expressed that to him, I guess.  And I think he is
15  responding to his profession of my discomfort and
16  suggesting other ways around that, except apart
17  from actually citing the document openly.
18  BY MR. ZELLERS:
19  Q.  Okay, Dr. Siemiatycki, did you
20  have some later phone call or calls with
21  Mr. Hancock, if you remember?
22  A.  So I recall having a phone call
23  with him, but I can't remember when and I can't
24  remember what it was about.  And I don't think it
25  was the phone call that is hypothetically alluded

Page 67

1  to in this paragraph as a phone call to discuss
2  substantive issues in my report.  I don't recall
3  ever having a phone call about him over substantive
4  issues in my report.
5  Q.  Do you have any notes from any
6  phone call with Mr. Hancock or anyone else from
7  Health Canada?
8  A.  I don't think so.  I --
9  Q.  I may have asked you this at the
10  outset, and if I'm repeating, I apologize, but do
11  you recall speaking with anyone else at Health
12  Canada other than Mr. Hancock?
13  A.  I don't think I did speak to
14  anybody else or correspond with anybody else.
15  Q.  Did you have any communications,
16  either in writing or at conferences or a phone
17  call, with Mr. Hancock or anyone else at Health
18  Canada after March 8 of 2019 relating to the Talc
19  Screening Assessment that Health Canada was
20  preparing?
21  A.  I don't think so.
22  Q.  Do you have a file or somewhere
23  you could check to make sure?
24  A.  I mean at some --
25  MS. PARFITT:  Objection to form.

Page 68

1  THE WITNESS:  I'm sorry.  At some point
2  Ms. Parfitt's office contacted me and asked me to
3  turn over any communications I had with Health
4  Canada about this, and at that time I searched
5  through my files, my emails and so on, and I sent
6  them everything that I had.
7  So if -- I think what is in -- if you
8  received everything that I sent Ms. Parfitt's
9  office, then you received everything that I had.
10  BY MR. ZELLERS:
11  Q.  Did you ever see the final Health
12  Canada assessment before it was published in April
13  of 2021?
14  MS. PARFITT:  Objection to form.
15  THE WITNESS:  No, I didn't.
16  BY MR. ZELLERS:
17  Q.  Did you make any edits or comments
18  to any draft of the final Health Canada Screening
19  Assessment?
20  MS. PARFITT:  Objection to form.
21  THE WITNESS:  No, I didn't.
22  BY MR. ZELLERS:
23  Q.  Are you aware that in the Health
24  Canada Screening Assessment -- and let's mark that
25  as an exhibit, and I have got a couple of questions

Page 69

1  and then we'll take a break.
2  Take a look at tab 23, Deposition
3  Exhibit binder Volume 1, which is the April 21st
4  Health Canada Screening Assessment that we will
5  mark as Deposition Exhibit 12.
6  EXHIBIT NO. 12:  April 21st Health
7  Canada Screening Assessment, tab 23,
8  Deposition Exhibit Binder Volume 1.
9  BY MR. ZELLERS:
10  Q.  And, Dr. Siemiatycki, if you would
11  just look at page 17, paragraph 5 of Deposition
12  Exhibit 12, I have one question for you.  Do you
13  have that in front of you?
14  A.  Page 17 of the April 2021 report?
15  Q.  Yes, and do you see where there is
16  a reference to -- well, I have this wrong.  So take
17  a look at the authorities that Health Canada
18  references, and do you see the reference to your
19  report?
20  A.  On this page?  On page 17?
21  Q.  No, I had the wrong page for you.
22  So I am looking at --
23  MS. PARFITT:  Mr. Zellers, I believe it
24  is 59.
25  BY MR. ZELLERS:

Page 70

1    Q.   Thank you so much, Ms. Parfitt.
2  So I am looking at page 59, the reference to your
3  litigation report along with other litigation
4  reports; do you see that?
5    A.   I have page 59 -- oh, yes, I see
6  my name there, yes.
7    Q.   All right.  So this states that
8  Health Canada accessed your litigation report in
9  July of 2020, but that is not accurate, is it?
10    MS. PARFITT:  Objection to form.
11    THE WITNESS:  I don't -- I have no idea
12  if they accessed it then.
13    BY MR. ZELLERS:
14    Q.   Well, we know that you provided
15  your litigation report to Mr. Hancock and to Health
16  Canada back in March of 2019, about 15 months
17  earlier; is that right?
18    A.   Yes.
19    MS. PARFITT:  Objection to form.
20    BY MR. ZELLERS:
21    Q.   All right.  I have no more
22  questions at this time on this, you know, topic, so
23  why don't we take a break.
24    And Ms. Parfitt and Dr. Siemiatycki,
25  how long would you like to take a break, and

Page 71

1  Ms. Court Reporter, how long do you need?
2    A.   15 minutes?  Would that work?
3    Q.   That is fine.
4    Ms. Court Reporter, is that okay?
5    THE COURT REPORTER:  [Nodding.]
6    MR. ZELLERS:  And, Ms. Court Reporter,
7  what time are we going off the record?  Can you
8  announce that?
9    THE COURT REPORTER:  We are going off
10  the record at 11:37 a.m.
11    -- RECESSED AT 11:37 A.M.
12    -- RESUMED AT 11:56 A.M.
13    BY MR. ZELLERS:
14    Q.   Dr. Siemiatycki, since your last
15  report -- or your initial report in November of
16  2018, you have not published any material on talc
17  and ovarian cancer; is that correct?
18    A.   That's correct.
19    Q.   In your 2019 deposition, January
20  of 2019, you had some testimony that you were
21  working on or may publish a case control study with
22  Anita Koushik, K-o-u-s-h-i-k.  Do you recall that?
23    A.   I don't remember the discussion
24  about it, but I certainly remember the substance of
25  that, what you refer to, yes.

Page 72

1    Q.   Was that study by Dr. Koushik ever
2  published?
3    A.   Well, it is a study on ovarian
4  cancer risk factors that was initiated over ten
5  years ago, 2008, 2009, somewhere in that ballpark,
6  and it wasn't a study specifically of talc and
7  ovarian cancer.  There were several factors that
8  she was looking at at the time, and she has
9  published some papers that came out of that but not
10  on talc, per se.
11    Q.   All right.  So Dr. Koushik was
12  working on a publication dealing with risk factors
13  for ovarian cancer; correct?
14    A.   She was working on a project that
15  gave rise to multiple publications so far.  I think
16  there have been two or three so far.  I'm not quite
17  sure.  I am not involved with all of them.  But
18  there is -- anyways, I can look up which ones I
19  have been involved with on my CV, but as far as I
20  know, she hasn't published anything on the talc
21  exposure connection to ovarian cancer.
22    Q.   You described your role as working
23  with Dr. Koushik as both a mentor and a
24  co-investigator; is that correct?
25    A.   Yes, I think that is correct, yes.

Page 73

1    Q.   Your understanding is that since
2  January of 2019, Dr. Koushik has published some
3  articles relating to the risk factors of ovarian
4  cancer but not relating to talcum powder; is that
5  correct?
6    A.   So I am not sure if she has
7  published any since 2019.  I can't remember the
8  timing, the dates of her publications from that
9  study.  There may have been some before 2019, and
10  there may have been some since.  I am not sure.
11    Q.   Since January of 2019, other than
12  your communications with Health Canada, have you
13  presented your opinions on the association between
14  talc and ovarian cancer in any context outside of
15  litigation?
16    MS. PARFITT:  Objection to form.
17    THE WITNESS:  I don't think so.  I
18  don't think I have.
19    BY MR. ZELLERS:
20    Q.   All right.  Have you informed any
21  of the scientists and doctors at the University of
22  Montreal of your opinion that talc causes ovarian
23  cancer?
24    A.   That's not typically a thing to
25  inform -- in a university to inform the 4,000 other

Page 74

1  people at the university of everyone's research
2  findings or opinions about things.  So I am not
3  really sure what -- how to address your question.
4  But the answer is no.  The short answer is no, I
5  haven't there, and I haven't in regard to, I guess,
6  any of the 300 other publications that I have
7  published.  I don't go around, you know, the campus
8  advertising my opinions about things or what I have
9  found.
10      Q.  And the same answer, if I ask
11  whether or not you have informed any of the
12  scientists or doctors at McGill University of your
13  opinion with respect to talc and ovarian cancer;
14  you have not done so, correct?
15      A.  I have not done so, and thank God
16  they haven't come to me with all of their opinions.
17      Q.  You have published a number of
18  peer-reviewed articles since you were retained in
19  the talc litigation; correct?
20      A.  Yes.
21      MS. PARFITT:  Objection to form.
22      BY MR. ZELLERS:
23      Q.  Do you have an estimate of the
24  number of peer-reviewed articles that you have
25  published?

Page 75

1      A.  Since when?
2      Q.  Well, since 2015.
3      A.  It is in my CV, but, you know, I
4  would guesstimate between 40 and 50.
5      Q.  I did count --
6      A.  Okay.
7      Q.  -- the number of articles,
8  peer-reviewed articles, that you have published
9  since your deposition in January of 2019, and it
10  was approximately 20 articles.  Does that sound
11  about right?
12      A.  Yes.
13      Q.  And you have given at least 10
14  presentations since your deposition in January of
15  2019; correct?
16      A.  Correct.  I guess so.  Yes, I am
17  sure that is correct.
18      Q.  None of those publications and
19  presentations had anything to do with talc and
20  ovarian cancer; is that right?
21      A.  That's correct.
22      MS. PARFITT:  Objection to form.
23      BY MR. ZELLERS:
24      Q.  You are familiar with the Center
25  for Disease Control as a U.S. agency; is that

Page 76

1  right?
2      A.  Yes.
3      Q.  Do you understand that the mission
4  of the Center for Disease Control is to prevent
5  disease, including cancer?
6      A.  If that is what it says on their
7  mission statement, then I agree with it, that
8  that's their mission.
9      Q.  But you understand generally
10  that --
11      A.  I understand generally what the
12  CDC is about, yes.
13      Q.  And that they are charged with
14  protecting the health and welfare of the American
15  public, right?
16      MS. PARFITT:  Objection to form.
17      THE WITNESS:  Right.
18      BY MR. ZELLERS:
19      Q.  They are also charged with
20  informing the public of dangerous things to avoid
21  and public health issues of which Americans should
22  be aware; is that your understanding?
23      MS. PARFITT:  Objection to form.
24      THE WITNESS:  Well, they, in addition
25  to many other agencies and parties, yes.

Page 77

1      BY MR. ZELLERS:
2      Q.  Are you aware that the CDC has a
3  discussion of ovarian cancer risk factors on its
4  website for doctors and patients?
5      A.  I am not at all surprised by that,
6  yes, I --
7      Q.  Have you had any conversations
8  with the CDC since your last deposition in January
9  of 2019?
10      A.  About what?  About what --
11      Q.  About talc and ovarian cancer?
12      A.  I haven't had any discussions
13  about that or about any of the other things that I
14  work on and never have, no.
15      Q.  All right.  Well, have you
16  informed the scientists and doctors at the CDC that
17  you are of the view that talcum powder causes
18  ovarian cancer?
19      A.  No, I haven't.
20      Q.  All right, how about --
21      A.  That is not how scientists work.
22      Q.  How about the FDA?  Have you
23  informed the FDA that you are of the opinion that
24  talcum powder causes ovarian cancer?
25      A.  No, I haven't.

Page 78

1    Q.   Take a look, Doctor, if you have
2  it in front of you, Exhibit 5, which are your
3  "Additional Materials Considered" list, and that is
4  tab 8 and Deposition Exhibit binder Volume 1, if
5  you need to look there.  But essentially, it is
6  Exhibit C to your amended report.  Do you have that
7  in front of you?
8    A.   Yes, I do, sir.
9    Q.   Let's mark -- well, before I get
10 there, as foundation, document 357 is a document
11 from NCI (PDQ).  Do you see that?
12    A.   No, I am not sure where -- I am
13 not sure where you are looking.
14    Q.   All right.  So on your "Additional
15 Materials Considered" list, do you see document
16 number 357?
17    A.   Okay, yes, I do.  I see what you
18 are referring to now.
19    Q.   All right.  And that is "NCI -
20 Ovarian, Fallopian Tube, and Primary Perineal
21 Cancer Prevention (PDQ)"; is that correct?
22    A.   I see that, yes.
23    Q.   All right.  Let's mark as
24 Deposition Exhibit 13 the NCI (PDQ) referenced as
25 number 357 on your "Additional Materials

Page 79

1  Considered", and, Doctor, you will find that as tab
2  43 in, I believe, Deposition Exhibit Binder Volume
3  3.
4        EXHIBIT NO. 13:  NCI - Ovarian,
5        Fallopian Tube, and Primary Perineal
6        Cancer Prevention (PDQ), tab 43,
7        Deposition Exhibit Binder Volume 3.
8        THE WITNESS:  Did you say 43, tab 43?
9  BY MR. ZELLERS:
10    Q.   Yes, tab 43.
11    A.   All right.  Yes, I have it.
12    Q.   Are you familiar with this
13 document?
14    A.   Only because I think that it was
15 sent to me a week or two ago.
16    Q.   And was it sent to you by the
17 Plaintiff lawyers in this litigation?
18    A.   Yes.
19    Q.   Do you regularly check the
20 NCI -- and NCI stands for National Cancer
21 Institute; correct?
22    A.   That's correct.
23    Q.   Do you have occasion to check the
24 NCI website for information regarding ovarian
25 cancer?

Page 80

1    A.   No, I am not a clinical doctor or
2  a patient to whom that website is geared and aimed.
3    Q.   All right.  If you look at the
4  very last page of Exhibit 13, you can see that it
5  was updated last on July 8 of 2021?
6    A.   Yes, I see that.
7    Q.   And this publication your
8  understanding is directed both to the public and
9  also to the doctors who would be treating ovarian
10 cancer patients?
11    A.   I guess so.  I guess so.
12    Q.   Go to page 18 under "Description
13 of the Evidence".
14    A.   Sorry, I am looking for page
15 numbers and I --
16    Q.   All right, go to the third-to-last
17 page.  It says "Changes to This Summary July 8,
18 2021", and then it has got a sub-heading
19 "Description of the Evidence"?
20    A.   I see that --
21    Q.   It is right at the end of the
22 references.
23    A.   At the end of the references?  Oh,
24 yes, okay.  Now I see it.  So "Changes to This
25 Summary".

Page 81

1    Q.   And looking at the last paragraph:
2        "This summary and written and
3        maintained by the PDQ Screening and
4        Prevention Editorial Board, which is
5        editorially independent of NCI.  The
6        summary reflects an independent
7        review of the literature and does
8        not represent a policy statement of
9        NCI or NIH."
10 Do you see that?
11    A.   I do see that, yes.
12    Q.   All right.  Do you know the
13 composition of the PDQ screening and prevention
14 editorial board?
15    A.   No, I don't.
16    Q.   Do you know if this board
17 represents doctors and scientists in the fields of
18 oncology, cancer prevention, cancer screening,
19 hematology, radiology, urology, statistics and
20 epidemiology?
21    A.   I believe you have read something
22 from their website, and I believe that you have
23 read it faithfully.
24    Q.   All right.
25    A.   So now I know that, yes.

Page 82

1    Q.  So let's take a look at page 13,
2  and again, Doctor, it is about in the middle of the
3  document, and it is a section under the heading
4  "Factors with Inadequate Evidence of an Association
5  Risk of Ovarian, Fallopian Tube, and Primary
6  Peritoneal Cancer."
7    A.  I see --
8    Q.  All right.  If we go down three
9  sections, there is a section from this document,
10  this PDQ, entitled "Perineal talc exposure"; do you
11  see that?
12    A.  I do.
13    Q.  And the first sentence states:
14      "The weight of evidence does
15    not support an association between
16    perineal talc exposure and an
17    increased risk of ovarian cancer."
18    Do you see that?
19    A.  Yes, I do.
20    Q.  Do you disagree with that
21  statement in the National Cancer Institute
22  publication?
23    MS. PARFITT:  Objection to form.
24    THE WITNESS:  Yes, I do.
25    BY MR. ZELLERS:

Page 83

1    Q.  If we go back to page 19, and I am
2  not sure you need to find it, but you are certainly
3  welcome to, the document provides:
4      "Any comments or questions
5    about the summary content should be
6    submitted to Cancer.gov through the
7    NCI website [...]"
8    My question to you is have you ever
9  communicated with either National Cancer Institute
10  or the NIH that you disagree with their statement
11  regarding the inadequacy of the evidence supporting
12  an association between talcum powder use and
13  ovarian cancer?
14    A.  No, I have never communicated with
15  them about that.
16    Q.  And have you corresponded, since
17  your last deposition, with any regulatory authority
18  in the United States about your opinion relating to
19  talcum powder and ovarian cancer?
20    A.  No, I haven't had opportunity or
21  reason to do that.
22    Q.  All right.  Doctor, I want to ask
23  you about some of the epidemiology studies.  That
24  is something that you have reviewed both in
25  preparation of your original report and then

Page 84

1  continued to review for your amended report; is
2  that right?
3    A.  Yes.
4    Q.  Do you agree that ovarian cancers
5  can be diagnostically classified in different ways
6  according to cell type and invasiveness of the
7  tumour?
8    A.  Yes, I do.
9    MS. PARFITT:  Objection to form.
10    BY MR. ZELLERS:
11    Q.  And that is just another way of
12  saying that there are different sub-types of
13  ovarian cancer; correct?
14    A.  Correct.
15    Q.  You have had an opportunity to
16  read the Health Canada publication, the April 2021
17  Screening Assessment for Talc; is that right?
18    A.  Yes, I read it when it first
19  became public.
20    Q.  We marked that previously as
21  Deposition Exhibit 12.  Do you have that Screening
22  Assessment from Health Canada in front of you,
23  Doctor?
24    A.  Sorry, which tab would it be in
25  for --

Page 85

1    Q.  Well, if you go back to the tabs,
2  it is tab 23 from Deposition Exhibit Binder Volume
3  1, and we have marked that as Exhibit 12 to this
4  deposition.
5    A.  Okay, I have got the document in
6  front of me.
7    Q.  Are you aware, Dr. Siemiatycki,
8  that Health Canada concluded that there is
9  considerable uncertainty for how sub-type data
10  should be examined?
11    MS. PARFITT:  Objection.  Is there a
12  particular page you are referring to?
13    BY MR. ZELLERS:
14    Q.  Well, there will be.  Page 17.
15  But my question now was a general question.  So do
16  you need me to repeat it, Doctor?
17    A.  Yes, could you repeat it, please.
18    Q.  Sure.  Are you aware that Health
19  Canada concluded that there was considerable
20  uncertainty for how sub-type data should be
21  examined?
22    MS. PARFITT:  Objection to form,
23  misstates facts.
24    THE WITNESS:  I don't remember that
25  quotation in the report.  I --

Page 86

1    BY MR. ZELLERS:
2         Q.   All right, take a look --
3         A.   I completely believe that -- I
4    mean, it is credible, but if you are asking me
5    whether I remember that quotation in the report,
6    the answer is no.
7         [Court Reporter intervenes for
8         clarification.]
9         THE WITNESS:  Thank you.
10        MS. PARFITT:  Michael, let me just
11   finish.  I said -- well, the objection was I
12   objected to form and said misstates the document.
13   Go ahead, Michael.
14        MR. ZELLERS:  And I believe objections
15   are limited to just form, but we are doing okay, so
16   let's continue here.
17        MS. PARFITT:  We are.  Very good, thank
18   you.
19        BY MR. ZELLERS:
20        Q.   Dr. Siemiatycki, go to page 17 of
21   the Health Canada Screening Assessment, which we
22   have marked as Deposition Exhibit 12; do you have
23   that?
24        A.   I have it in front of me, thank
25   you.

Page 87

1         Q.   And if you look at the
2    second-to-last paragraph, it states:
3         "The etiology of most ovarian
4         tumors has not been well
5         established, and ovarian cancer is a
6         relatively rare disease [...]"
7         Do you see that?
8         A.   I do see that.
9         Q.   Do you agree with that statement?
10        A.   I am not sure exactly what it
11   means.  If I were editing, I would ask them to be
12   clearer, but I don't disagree with it.
13        Q.   Etiology means cause; correct?
14        A.   I understand.  I understand.  I am
15   not sure if they mean the etiology of specific
16   patients' tumors are uncertain and have not been
17   well established, or if in a generic way that --
18   if what -- when they say "most ovarian tumors", do
19   they mean most sub-types of ovarian cancer or
20   something else?  So they don't use the term
21   "sub-types" in this sentence, so I am not sure what
22   they mean by "most ovarian tumors".
23        Q.   Let me ask you this question, Dr.
24   Siemiatycki.  Do you agree -- and if I'm going
25   outside your expertise, please tell us, but do you

Page 88

1    agree that the cause of most ovarian cancer is not
2    well established?
3         MS. PARFITT:  Objection to form.
4         THE WITNESS:  I would agree if what you
5    mean is the cause of most cases of ovarian cancer.
6    So if you are saying that for most women who get
7    ovarian cancer -- among all the women who get
8    ovarian cancer, for most of them, we don't know why
9    they got it, if that is what you mean, then I
10   agree.
11        BY MR. ZELLERS:
12        Q.   You are not a cancer biologist;
13   correct?
14        A.   That's correct.
15        Q.   You are not an expert on the
16   biological mechanisms by which ovarian cancer may
17   develop; correct?
18        A.   Correct.
19        Q.   Health Canada goes on to state --
20   and I am reading now, Doctor, just the next
21   sentence on page 17, Exhibit 12:
22        "There are a number of
23        different tumor types with
24        characteristic histologic features,
25        distinctive molecular signatures,

Page 89

1         and disease trajectories.  Moreover,
2         these tumors are heterogeneous and
3         can arise from different tissues of
4         the female reproductive tract,
5         including the fallopian tube
6         epithelium."
7         Did I read that statement by Health
8    Canada correctly?
9         A.   Yes, you did.
10        Q.   Do you agree with that statement
11   by Health Canada?
12        A.   I have no reason to disbelieve it.
13        Q.   The next sentence, Doctor, or
14   couple of sentences, in the Health Canada Screening
15   Assessment:
16        "Ovarian tumors can be grouped
17        into categories [e.g., epithelial
18        ovarian cancer, germ cell tumours,
19        gonadal stromal tumours, metastatic
20        neoplasms).  Epithelial ovarian
21        cancers are often designated as Type
22        I or Type II, with further
23        subdivision within each type.  Type
24        I tumours have characteristics quite
25        distinct from Type II tumours, and

Page 90

1    research supports that they have
2    different molecular pathways and may
3    not be ovarian in origin."
4        Do you agree with that statement from
5    Health Canada?
6        A.  I have no reason to disagree with
7    it.
8        MS. PARFITT:  Objection to form.
9        THE WITNESS:  I'm sorry, yes.
10       BY MR. ZELLERS:
11       Q.  Do you know the difference between
12   a Type I and a Type II tumor?
13       A.  I don't remember.  I don't
14   remember how those are separately distinguished.
15   It is based on histology and invasiveness, but I
16   don't remember the precise definitions of each one.
17       Q.  If I ask you to identify which
18   ovarian cancer sub-types are Type II and which
19   ovarian cancer sub-types are Type I, you would need
20   to do some research to try to answer that question;
21   correct?
22       A.  I would need to look something up,
23   yes.
24       Q.  All right.  Are you of the
25   opinion -- well, let me withdraw that.  You have no

Page 91

1    opinion, do you, that talcum powder can cause both
2    Type I and Type II ovarian cancer; is that fair?
3        MS. PARFITT:  Objection to form,
4    misstates his testimony.
5        THE WITNESS:  It is not quite true.  In
6    my review of the literature, I have not found
7    compelling evidence that the relationship between
8    talc and ovarian cancer is different between
9    different types of ovarian cancers, namely, the
10   different types of epithelial and so on tumors.
11       So I don't see any compelling evidence
12   in the epidemiology that the relationship between
13   talc and the different ovarian tumors is different
14   according to the type.
15       How that relates to what is now
16   labelled as Type I and Type II, which are fairly
17   recent nomenclatures that weren't really part of
18   the literature and the discussion about ovarian
19   cancer in the era when most of the epidemiologic
20   studies were carried out and published, how that
21   relates to Type I or Type II, I am not sure.
22       BY MR. ZELLERS:
23       Q.  Doctor, do you believe that talcum
24   powder affects the different molecular pathways
25   that cause both Type I and Type II cancer, ovarian

Page 92

1    cancer?
2        MS. PARFITT:  Objection to form.
3        THE WITNESS:  I don't have an opinion
4    about that.
5        BY MR. ZELLERS:
6        Q.  What is your understanding of the
7    mechanism by which talcum powder is able to work
8    and affect on different molecular pathways that
9    would cause both a Type I and a Type II ovarian
10   cancer?
11       MS. PARFITT:  Objection to form.
12       THE WITNESS:  So I am not saying that
13   it does cause Type I and Type II.  I am saying in
14   the epidemiologic studies, I haven't seen any
15   evidence that it affects the different types
16   differentially.  So I don't have an opinion about
17   which mechanisms would explain the fact that I
18   haven't seen any epidemiologic evidence for it.
19       BY MR. ZELLERS:
20       Q.  Well, would you agree that there
21   is a lack of epidemiologic evidence for at least
22   some sub-types of ovarian cancer?
23       MS. PARFITT:  Objection to form.
24       THE WITNESS:  Yes.
25       BY MR. ZELLERS:

Page 93

1        Q.  This lack of evidence,
2    epidemiologic evidence, makes it difficult to opine
3    with any probability as to a causal relationship
4    between talcum powder use and at least some
5    sub-types of ovarian cancer; correct?
6        MS. PARFITT:  Objection to form.
7        THE WITNESS:  Correct.  It is quite
8    natural that the sub-types that are the most
9    frequent, serous invasive tumors, have the most
10   data available and therefore the most opportunity
11   to have answers to the questions about the risk
12   factors.  For the very rare sub-types, there just
13   aren't enough cases in some -- in many studies to
14   reliably estimate an association with any risk
15   factors.
16       BY MR. ZELLERS:
17       Q.  And that would be true for
18   clear-cell, that would be true for mucinous, and to
19   some degree true for endometrioid ovarian cancer;
20   correct?
21       MS. PARFITT:  Objection to form,
22   misstates his testimony.
23       THE WITNESS:  It is true that there
24   aren't enough studies and enough evidence regarding
25   those sub-types.  In the absence of evidence, my

Page 94

1  default is to assume that the risk factors, when we
2  look at all sub-types of ovarian cancer combined,
3  would be applicable to all types, but that would be
4  subject to revision as new studies appear and new
5  evidence appears that would provide adequate
6  evidence to distinguish the risk factors for the
7  rarer sub-types.
8        BY MR. ZELLERS:
9        Q.  You would agree that that is not
10 scientifically precise, correct, to lump all of the
11 sub-types together?
12       MS. PARFITT:  Objection to form,
13 misstates his testimony.
14       THE WITNESS:  Well, I think that if you
15 provide adequate qualifiers and qualifications to
16 your inferences, you can make scientific inferences
17 from available data and allow the readers of
18 articles or the audience of presentations to give
19 their own weight to the unknown part of the
20 inference.
21       So I don't think it is scientific to go
22 beyond the specific cases, controls, subjects,
23 et cetera, that have been studied in a given study
24 to try to make generalizations, that is what
25 science is about, and to openly admit all of the

Page 95

1  limitations and qualifiers that would apply to
2  those generalizations and inferences.
3        BY MR. ZELLERS:
4        Q.  Doctor, do you have any opinion as
5  to whether mutations in cells that cause Type I
6  ovarian cancer also cause Type II ovarian cancer?
7        A.  I don't have an opinion about
8  that.
9        MS. PARFITT:  Objection to form.
10       BY MR. ZELLERS:
11       Q.  Are you aware that different genes
12 have been associated with different types of
13 ovarian cancer?
14       A.  I have --
15       MS. PARFITT:  Objection to form.
16       THE WITNESS:  -- read that.
17       BY MR. ZELLERS:
18       Q.  Are you aware that the P53 gene is
19 not associated with Type I ovarian cancer?
20       MS. PARFITT:  Objection to form.
21       THE WITNESS:  I don't recall that.
22       BY MR. ZELLERS:
23       Q.  Do you have any evidence that
24 talcum powder can mutate all the different kinds of
25 genes that we know are associated with these

Page 96

1  different histologic types of ovarian cancer?
2        MS. PARFITT:  Objection to form.
3        THE WITNESS:  No, I am not aware.
4        BY MR. ZELLERS:
5        Q.  Are you aware that cigarette
6  smoking is associated with one type of epithelial
7  ovarian cancer and that is mucinous?
8        A.  I recall reading that.  I haven't
9  reviewed any of the evidence.
10       Q.  Do you have a scientific
11 explanation as to why smoking, with whatever
12 mutations cigarette components induce, only cause
13 one histologic sub-type of ovarian cancer where --
14 and let me end there.  Do you have any evidence as
15 to that or explanation as to that?
16       A.  Well, I am not aware that this
17 relationship between smoking and one particular
18 type of ovarian cancer has been firmly established.
19 I just haven't looked at the evidence, and I
20 haven't seen the reviews that would summarize that.
21 So I don't have an opinion.
22       Q.  Understood.  Have you reviewed any
23 of the amended reports or deposition testimony from
24 other Plaintiff experts?
25       A.  In this case?  In the MDL?

Page 97

1        Q.  Yes, in the MDL litigation.  I'm
2  sorry, let me be more precise.
3        A.  You mean since 2019 or what we are
4  talking about?  No, I haven't.
5        Q.  Do you know who Dr. Clarke-Pearson
6  is?
7        A.  I have heard the name.  I don't
8  know.
9        Q.  All right.  Dr. Clarke-Pearson was
10 asked in his recent deposition:
11           "Question:  So if I understand
12       you, talcum powder causes all
13       epithelial ovarian cancers except
14       mucinous; is that right?"
15       And his answer was:
16           "Answer:  Yes, that's correct."
17       Do you have any reason to agree or
18 disagree with Dr. Clarke-Pearson's testimony,
19 assuming that I have read that correctly to you?
20       MS. PARFITT:  Objection to form.
21       THE WITNESS:  I have no reason to agree
22 or disagree.  I don't have -- I haven't seen the
23 evidence to support that.
24       BY MR. ZELLERS:
25       Q.  You have not seen the evidence to

Page 98

1    support that mucinous ovarian cancer is related to
2    talcum powder use; is that what you are saying?
3          MS. PARFITT:  Objection to form,
4    misstates his testimony.
5          THE WITNESS:  Yeah, I thought what you
6    were saying was that he stated that it was not
7    related to mucinous.
8          BY MR. ZELLERS:
9          Q.  And that was his testimony, yes.
10         A.  I haven't -- I haven't seen the
11   evidence to support that convincingly, so I
12   don't --
13         Q.  Have you --
14         A.  Go ahead.
15         Q.  Have you finished?
16         A.  Okay.
17         Q.  Have you seen convincing
18   epidemiologic evidence to support that mucinous
19   ovarian cancer is causally related to talcum powder
20   use?
21         MS. PARFITT:  Objection to form.
22         THE WITNESS:  Let me look in my report.
23         BY MR. ZELLERS:
24         Q.  Doctor, I'll withdraw the
25   question.

Page 99

1          A.  Okay.
2          Q.  I need to keep moving so that we
3    can hopefully finish in our allotted time.
4          Go back to the Health Canada report, if
5    you will.  This is Deposition Exhibit 12, and look
6    at the bottom of page 17 from the section where we
7    have been reviewing the statements of Health
8    Canada.  Are you with me?
9          A.  Yes, I am.
10         Q.  Health Canada goes on to state on
11   page 17, last paragraph:
12              "Tumor subtypes are one of the
13          many subgroup analyses conducted in
14          several of the epidemiology studies
15          and reviews.  However, there was
16          very little consistency in whether,
17          or how, these subgroup analyses were
18          conducted across the available
19          studies, thereby leaving the
20          analyses limited and likely
21          underpowered (low sample sizes).
22          Furthermore, there is considerable
23          uncertainty for how subgroup data
24          should be examined, in particular,
25          for the tumor subtypes."

Page 100

1          Do you agree with that -- number one,
2    did I read it correctly?
3          A.  Yes.
4          Q.  Do you agree with that statement?
5          A.  I agree with the substance of it.
6          Q.  All right.  On page 47 of your
7    amended report, and we marked that as Exhibit 2,
8    have you gotten to page 47?
9          A.  Yes, sir.
10         Q.  All right, in the last paragraph
11   you state:
12              "To the extent that talc
13          exposure might have different
14          effects on different subtypes of
15          ovarian cancer, there would be a
16          clear advantage to segregating the
17          evidence by type of ovarian cancer
18          and evaluating the evidence for each
19          subtype."
20         That is your statement in your amended
21   report and your opinion; is that right?
22         A.  Yes.
23         Q.  You did not conduct a separate
24   Bradford Hill analysis on sub-types of ovarian
25   cancer; correct?

Page 101

1          MS. PARFITT:  Objection to form.
2          THE WITNESS:  Sorry, could you repeat
3    that?
4          BY MR. ZELLERS:
5          Q.  Sure.  You are familiar with the
6    Bradford Hill analysis; correct?
7          A.  I don't know what you mean by it.
8    What is a Bradford Hill analysis?  I have never
9    seen a chapter heading in an epidemiology textbook
10   with that name.
11         Q.  So your testimony as an expert
12   epidemiologist in this case is that you are
13   unfamiliar with the Bradford Hill criteria; is that
14   your testimony?
15         MS. PARFITT:  Objection.
16         THE WITNESS:  Before you used the term
17   "Bradford Hill analysis".  Now you are using the
18   term "Bradford Hill criteria".  What are you
19   talking about?
20         BY MR. ZELLERS:
21         Q.  Are you familiar with Bradford
22   Hill's paper?
23         A.  He had many papers.  I am familiar
24   with Austin Bradford Hill who, along with Richard
25   Doll, was one of the originators of the hypothesis

Jack Siemiatycki, MSc, PhD

Page 102

1  that smoking causes lung cancer and their --
2      Q.  Go ahead, Doctor, finish.
3      A.  And their initial case control
4  study was one of the gateways to opening up the
5  realization that smoking is the most important risk
6  factor for cancer.
7      Q.  Doctor --
8      A.  So I am familiar with him and I am
9  familiar with his paper about considerations in
10  reviewing evidence, but I am not familiar with what
11  you mean by a "Bradford Hill analysis", as if it is
12  a technique, sort of a cookbook technique.  What do
13  you mean by a "Bradford Hill analysis"?
14      Q.  Doctor, did you review the
15  Bradford Hill criteria in formulating your opinion
16  that talcum powder use is causally related to --
17  that talcum powder use is causally related to
18  ovarian cancer?
19      A.  The only Bradford Hill
20  considerations that are referred to as criteria are
21  in the legal -- among legal people.  They are not
22  criteria.  As Bradford Hill himself said, they are
23  not criteria.
24      Q.  Okay, Doctor, go to page 63 of
25  your amended report, please.

Page 103

1      A.  Yes.
2      Q.  I am looking at page 63 of your
3  amended report, section 10:
4      "Bradford Hill Guidelines
5      Applied to Talc and Ovarian Cancer."
6  Do you see that?
7      A.  Yes.
8      Q.  Does this refresh your
9  recollection that you are familiar with the
10  Bradford Hill guidelines?
11      A.  Well, you didn't say "guidelines".
12      MS. PARFITT:  Objection to form.
13      BY MR. ZELLERS:
14      Q.  Doctor, are you familiar with the
15  Bradford Hill guidelines?
16      A.  Yes.
17      Q.  All right.  Doctor, did you use
18  the Bradford Hill guidelines to do an analysis on
19  the sub-types of ovarian cancer?
20      MS. PARFITT:  Objection to form.
21      THE WITNESS:  Did I do an analysis?  I
22  reviewed the Bradford Hill considerations, as he
23  called them, in reviewing the overall evidence of
24  the association between talc and ovarian cancer
25  and, where appropriate, I commented on their

Page 104

1  applicability to sub-types of ovarian cancer.
2      BY MR. ZELLERS:
3      Q.  And you do that in section 10 of
4  your report; is that right?
5      A.  In section 10, I reviewed the -- I
6  commented on the applicability the so-called
7  Bradford Hill guidelines to the evidence regarding
8  talc and ovarian cancer, yes.
9      Q.  Doctor, my question is have you
10  applied the Bradford Hill considerations to do an
11  analysis of the epidemiology for clear-cell,
12  endometrioid, or mucinous ovarian cancer, and
13  whether or not there is an association to talcum
14  powder use?
15      MS. PARFITT:  Objection to form.
16      THE WITNESS:  I commented that I did
17  not see evidence of an association between -- or a
18  differential association between talc exposure and
19  individual types of ovarian cancer, and therefore,
20  the question of applying a list of considerations
21  is moot.
22      BY MR. ZELLERS:
23      Q.  Doctor --
24      A.  There is no evidence of specific
25  associations with specific cell types.  You don't

Page 105

1  need to go further to review that.
2      Q.  Doctor, are you familiar with a
3  publication by Nicolas Wentzensen and Dr. O'Brien,
4  2021?
5      A.  I had just seen that in the last
6  few days.  Is it in your folder, in your binder?
7      Q.  Yes.  We'll mark the Wentzensen
8  2021 article as Deposition Exhibit 14.
9      EXHIBIT NO. 14:  Wentzensen 2021
10      article, tab 40, Deposition Exhibit
11      Binder Volume 3.
12      BY MR. ZELLERS:
13      Q.  Doctor, you'll find that as tab 40
14  in the Deposition Exhibit Binder, Volume 3.  This
15  is listed on the "Additional Materials Considered"
16  list.
17      A.  Yes, I have it in front of me.
18      Q.  And this is a document or a
19  publication you were asked to review in preparation
20  for your deposition; is that right?
21      A.  I don't recall if I was asked to
22  review it.  I was sent it.
23      Q.  All right.
24      A.  And I did look at it.
25      Q.  All right.  In this 2021 article,

Page 106

1  the authors discuss the epidemiology regarding the
2  different histologic sub-types of ovarian cancer;
3  is that right?
4        A.  Can you point me to the page and
5  section where that is stated?
6        Q.  Sure.  Go to page 7, and I am
7  looking at the right-hand column, the first full
8  sentence.  Did you find that, Doctor?
9        A.  Yes, "The relationship between
10  talc use [...]" et cetera?  That sentence?
11        Q.  Yes.  So the authors state in
12  their publication:
13              "The relationship between talc
14          use and the rarer mucinous or clear
15          cell tumor histotypes is more
16          ambiguous, though it is not clear
17          whether this is due to true
18          etiologic differences or because
19          their rarity makes them more
20          difficult to study."
21  Do you see that?
22        A.  Yes, I do.
23        Q.  And do you agree with that
24  statement?
25        A.  I think --

Page 107

1        MS. PARFITT:  Objection to form.
2        THE WITNESS:  -- that's a paraphrase of
3  what I told you a few minutes ago, yes.
4        BY MR. ZELLERS:
5        Q.  All right.  Is there a concept
6  of -- well, do you agree that within the last five
7  years that scientists have gotten better in terms
8  of being able to assess and identify the different
9  sub-types of ovarian cancer?
10        A.  I believe so.
11        MS. PARFITT:  Objection to form.
12        BY MR. ZELLERS:
13        Q.  In earlier studies, do you agree
14  that there may have been misclassifications of
15  sub-types in some of the older studies?
16        MS. PARFITT:  Objection to form.
17        THE WITNESS:  Yeah, I believe that in
18  general in cancer research there has been a growing
19  realization of -- or a growing ability to
20  distinguish different sub-types of the different
21  tumor types and that this has implications for
22  research and treatment.
23        So in general, yes, and I believe that
24  with respect to ovarian cancer, certainly the
25  recent studies, you know, the studies published in

Page 108

1  the last ten years or so, go into much more detail
2  and specificity about sub-types of ovarian cancer
3  than was the case in the 1980s and '90s studies.
4        BY MR. ZELLERS:
5        Q.  All right.  And to the extent that
6  there were misclassifications with respect to
7  sub-types of ovarian cancer in some of the older
8  studies, that would cast at least some doubt as to
9  the validity of their results; would you agree
10  generally with that?
11        A.  Well --
12        MS. PARFITT:  Objection to form.
13        THE WITNESS:  Well, it would only apply
14  to -- the objection that you are raising or the
15  comment that you are making would only apply to
16  those studies that have tried to analyze risk
17  factors for sub-types of ovarian cancer, and those
18  studies, to the extent that there were some in the
19  '80s and '90s, would probably have experienced more
20  misclassification error than studies published in
21  the last ten years or so.
22        But a lot of the studies from the '80s
23  and '90s didn't even analyze the risks by
24  sub-types, and the analyses are valid for when they
25  analyzed all sub-types combined but they run the

Page 109

1  risk of glossing over differences in risk factors
2  for different sub-types.
3        BY MR. ZELLERS:
4        Q.  Doctor, looking at your report,
5  you identify on -- this is your amended report,
6  page 87, you identify on Table 9 the relative risk
7  of the sub-types from Terry and O'Brien; is that
8  right?
9        A.  Yes.
10        Q.  And why don't we mark the Terry
11  study as Deposition Exhibit 15, and that, Doctor,
12  you can find at tab 38, Deposition Exhibit Binder
13  Volume 3.
14        EXHIBIT NO. 15:  2013 Terry study,
15          tab 38, Deposition Exhibit Binder
16          Volume 3.
17        BY MR. ZELLERS:
18        Q.  And let's, Doctor, while you are
19  pulling articles out, let's also mark the O'Brien
20  2020 paper -- and you are familiar with O'Brien
21  2020; correct?
22        A.  Correct.
23        Q.  All right, we'll mark that as
24  Exhibit 16 to the deposition, and Doctor, you can
25  find that at tab 30 in Deposition Exhibit Binder

Jack Siemiatycyk, MSc, PhD

Page 110

1   Volume 3.
2           EXHIBIT NO. 16:  2020 O'Brien study,
3           tab 30 in Deposition Exhibit Binder
4           Volume 3.
5   BY MR. ZELLERS:
6       Q.  Do you have those in front of you,
7   Doctor?
8       A.  Yes, sir.
9       Q.  And you are generally familiar
10  with both of these publications; is that right?
11      A.  Yes.
12      Q.  For clear-cell - and I am
13  referring to your report, but you can also look at
14  the O'Brien paper - O'Brien found a relative risk
15  of 1.17 with a confidence interval of 0.73 to 1.89;
16  correct?
17      A.  Correct.
18      MS. PARFITT:  Objection to form.
19      BY MR. ZELLERS:
20      Q.  You rely on the Terry study, 2013,
21  Exhibit 15 to the deposition, to support your view
22  that talcum powder use can cause clear-cell ovarian
23  cancer; is that correct?
24      A.  I relied on all the studies in my
25  bibliography, yes.

Page 111

1       Q.  Well, Terry is the only study out
2   of all of the studies that supports your view that
3   talcum powder use can cause clear-cell ovarian
4   cancer; correct?
5       MS. PARFITT:  Objection to form.
6       THE WITNESS:  So I didn't do a specific
7   analysis of clear-cell cancers.  I did an analysis
8   of all the cancers and all the sub-types, and I
9   noted that there was no compelling evidence that
10  the risks differed by sub-types.
11          And then I said that for all intents
12  and purposes, we can treat all the sub-types the
13  same.
14      BY MR. ZELLERS:
15      Q.  And that opinion and lumping all
16  of the sub-types together would be subject to the
17  limitations that you talked about earlier; correct?
18      A.  That's correct.
19      Q.  Are you aware that in O'Brien,
20  Berge, 2017 -- you are familiar with that study,
21  right?
22      A.  Yes.
23      Q.  You are familiar with the Taher
24  study, both the draft and then the final; is that
25  right?

Page 112

1       A.  That's right.
2       Q.  Are you generally familiar with
3   the Wong study, W-o-n-g?
4       A.  Refresh my memory or --
5       MS. PARFITT:  Is there a year for the
6   Wong?  Michael, I'm sorry, is there a year for the
7   Wong study?
8       BY MR. ZELLERS:
9       Q.  I don't have a year in front of
10  me.  Doctor, let me withdraw that question.  Let me
11  rephrase.
12          Are you aware that there are a number
13  of studies that have looked at clear-cell and
14  concluded that there is no association with talcum
15  powder use?
16      A.  When you are --
17      MS. PARFITT:  Objection to form.
18      THE WITNESS:  When you are referring in
19  this question to studies of clear-cell, are you
20  making a distinction between original evidence from
21  a given study or meta-analyses that have combined
22  evidence from multiple studies?
23      BY MR. ZELLERS:
24      Q.  I'm including both.
25      A.  You are including both.  I am

Page 113

1   aware that there have been results published on the
2   association with clear-cell cancer, yes.
3       Q.  In your report, you just referred
4   to the Terry 2013 study to support your view that
5   talcum powder can cause clear-cell ovarian cancer;
6   correct?  That is page 87 of your --
7       MS. PARFITT:  Objection to form.
8       THE WITNESS:  Sorry, that is a table,
9   right, that page?
10      BY MR. ZELLERS:
11      Q.  Yes, that is a table.
12      A.  Is there a quotation in my report
13  that you want me to comment on?
14      Q.  No, Doctor, here is my new
15  question.  Are you aware of any study, either
16  original study or meta-analysis, other than Terry
17  2013 that supports your view that talcum powder can
18  cause clear-cell ovarian cancer?
19      MS. PARFITT:  Objection to form, asked
20  and answered.
21      THE WITNESS:  As I have indicated, I
22  don't recall having assembled the evidence
23  regarding clear-cell tumors specifically.  What I
24  do recall is going through all the studies that
25  reported on multiple sub-types and finding, as was

Jack Siemiatycki, MSc, PhD

---

**Page 114**

1  quoted in the Health Canada -- I think was it the
2  Health Canada report or some other report that you
3  just had me read, that the evidence for
4  differential risk due to talc did not -- there was
5  no convincing evidence of differential risk by
6  sub-types in all the studies that had reported
7  results by sub-type.
8          There were some studies where the
9  serous relative risks were higher and some where
10 others were higher, and it bounced around in such a
11 way that, to my eye and my interpretation, I didn't
12 see a pattern that would allow me to conclude that
13 there was a systematic difference.  That is all I
14 said, I believe.
15         BY MR. ZELLERS:
16         Q.  Are you familiar with the Cramer
17 2016 study?
18         A.  I am familiar with the report.
19         Q.  All right.  Take a look at Cramer
20 2016, which we will mark as Exhibit 17 to this
21 deposition, and, Doctor, you can find that at tab
22 18, and that may be a wrong cite, Deposition
23 Exhibit Binder 3.  Let me look and see and give you
24 the correct -- I'm sorry, it is Volume 1.  So
25 Cramer 2016 is tab 18, Exhibit Binder Volume 1, and

---

**Page 115**

1  marked as Exhibit 17 to this deposition.
2          EXHIBIT NO. 17:  Cramer 2016 study,
3          tab 18, Exhibit Binder Volume 1.
4          BY MR. ZELLERS:
5          Q.  Do you see that, Doctor?
6          A.  I see the article, yes.
7          Q.  All right.  Cramer looked at the
8  same data set in 2016 that the Terry study in 2013
9  looked at, and that was data from the New England
10 Consortium; is that your understanding?
11         MS. PARFITT:  Objection to form.
12         THE WITNESS:  Well, the Terry paper
13 included the New England data, but also a lot more.
14 And the --
15         BY MR. ZELLERS:
16         Q.  How do you know, Doctor, that the
17 Terry data included both the New England data plus
18 a lot more?  Is it simply because she reports on
19 more cases, or did you see something in the study,
20 or have you been given some information that helps
21 you understand the data source for the Terry paper?
22         A.  Well, I think it is in the title
23 of the article, in the abstract of the article, in
24 the methods of the article, and in the results of
25 the article that they combined data from eight

---

**Page 116**

1  completely different studies for the Terry paper.
2          Q.  Have you been provided with any
3  information on the Terry study or paper or the data
4  for the Terry study outside of what is in the
5  publication?
6          A.  No.
7          Q.  Did you ever communicate or ever
8  have any communications with the author, Kathryn
9  Terry?
10         MS. PARFITT:  Michael, I am going to
11 object at this point in time.  I let you go for a
12 little while because I thought you were making a
13 comparison between Terry and O'Brien and other
14 studies, but this line of testimony with regard to
15 examining him on Terry was certainly done at his
16 first deposition.
17         BY MR. ZELLERS:
18         Q.  Okay, and that's fair.  Let me
19 make the comparison that I would like to that is
20 referenced in the amended report.  Doctor, you
21 understand that Cramer does not find an association
22 between talc use and clear-cell carcinoma; is that
23 right?
24         A.  Well, I would have to look
25 through --

---

**Page 117**

1          MS. PARFITT:  Objection to form.
2          THE WITNESS:  -- his article to see.
3  It is not fresh in my memory, every result in every
4  paper, so I'll --
5          MS. PARFITT:  And again, to the extent
6  that question is limited to the Cramer study, once
7  again, prior to his January 2019 deposition, he was
8  examined thoroughly with regard to the Cramer
9  study.
10         MR. ZELLERS:  He was, but he raises the
11 issue of a clear-cell and an association between
12 talcum powder use and clear-cell in his amended
13 report.
14         MS. PARFITT:  The same objection,
15 Michael.
16         MR. ZELLERS:  And that is --
17         MS. PARFITT:  I am not sure you have
18 made the link.
19         BY MR. ZELLERS:
20         Q.  Let me wrap it up this way,
21 Doctor.  Do you agree with me that in Dr. Cramer's
22 2016 article in which he is relying on the same
23 data set or at least the New England Consortium
24 data set, that Dr. Cramer did not find an
25 association between talc use and clear-cell

---

Jack Siemiatycki, MSc, PhD

Page 118

1  carcinoma?
2       MS. PARFITT: Objection to form.
3       THE WITNESS: I am just looking for
4  that in the paper, so I am -- if you don't mind, it
5  is not fresh in my memory what every result --
6       BY MR. ZELLERS:
7       Q. And let me just -- I am going to
8  rephrase. I'll withdraw that question. Do you
9  have any recollection as you sit here today that
10  Dr. Cramer found an association based upon the New
11  England Consortium data set between clear-cell
12  ovarian cancer and talcum powder use?
13       A. No, I don't have a recollection.
14       MS. PARFITT: Objection to form.
15       BY MR. ZELLERS:
16       Q. All right. Do we want to take a
17  break or do we want to continue? What is
18  everyone's preference?
19       MS. PARFITT: We have gone awhile. I
20  would suggest a break. Dr. Siemiatycki, a quick
21  break?
22       THE WITNESS: If we -- I am fine to
23  break now or to break in 20 minutes or so.
24  Whatever -- if this is a natural spot and if our
25  transcript person is happy to do it now rather than

Page 119

1  later. I am easy. I would say within half an hour
2  for sure, within 20 or 30 minutes for sure, but it
3  could be now.
4       MR. ZELLERS: All right, let's go off
5  the record for a second.
6       [Discussion Off The Record.]
7       -- RECESSED AT 1:02 P.M.
8       -- RESUMED AT 1:35 P.M.
9       BY MR. ZELLERS:
10       Q. Dr. Siemiatycki, I asked you some
11  questions earlier about your invoices, and we went
12  through your communications with Health Canada and
13  with Ms. Parfitt or with someone on the Plaintiff
14  counsel side relating to Health Canada. Was the
15  time that you spent doing that, communicating with
16  Health Canada and communicating with Plaintiffs'
17  counsel about Health Canada, is that time included
18  in the invoices that you submitted in this matter?
19       A. No, it isn't.
20       Q. Did you bill anyone for that time?
21       A. No, I didn't.
22       Q. Dr. Siemiatycki, you are familiar
23  with the O'Brien paper, and we had previously
24  marked that as Exhibit 16. Do you have that paper
25  in front of you?

Page 120

1       A. Yes, I do.
2       Q. Do you know if the authors of the
3  O'Brien paper, Katie O'Brien is the first named
4  author?
5       A. Are you asking if I know her?
6       Q. Well, either know her or know any
7  of the other authors to this paper, O'Brien 2020?
8       A. I recognize her name and the name
9  of a couple of other authors, co-authors. I don't
10  know any of them well, but one of them I have known
11  sort of as a colleague for a long time.
12       Q. And who is that?
13       A. Dale Sandler.
14       Q. And Dale Sandler is a Ph.D. What
15  is his expertise in?
16       A. She is an epidemiologist.
17       Q. And is she a capable
18  epidemiologist, as far as you are aware?
19       A. Yes, I think so.
20       MS. PARFITT: Objection.
21       BY MR. ZELLERS:
22       Q. Are you aware that none of the
23  authors to this paper are experts in the talc
24  litigation?
25       A. I am not sure what you mean by

Page 121

1  "experts in the talc litigation".
2       Q. You are serving here as an expert
3  witness on behalf of Plaintiffs; correct?
4       A. Oh, you mean Expert with a big
5  "E"?
6       Q. Yes, I'm sorry.
7       A. Big "E" Expert, I'm sorry. I
8  thought you meant a generic expert. I am not
9  aware. I am not aware.
10       Q. Do you know Dr. O'Brien?
11       A. Only from this article. I don't
12  know that I have met her or had any dealings with
13  her. I can't remember.
14       Q. Dr. O'Brien is a part of the
15  National Institute of Environmental Health
16  Scientist, which is a part of NIH; is that right?
17       A. Yes, that's right.
18       Q. NIH is a reputable institution?
19       A. Yes, it is.
20       Q. Dr. O'Brien and this O'Brien
21  article was published in JAMA?
22       A. Yes.
23       Q. JAMA is one of the world's most
24  prestigious and authoritative medical journals; is
25  that right?

Page 122

1    A.  Yes.
2    Q.  Whose idea was it to include this
3  O'Brien paper and study in your amended report?
4        MS. PARFITT:  Objection to form.
5        THE WITNESS:  Whose idea?  I suppose it
6  was my idea.  When I became aware of it, I thought,
7  okay, this needs to be included in my report.
8        BY MR. ZELLERS:
9    Q.  Well, do you recall whether it was
10  suggested to you by Plaintiffs' counsel to include
11  the O'Brien paper or whether this is a paper that
12  you found on your own?  And if you don't recall,
13  you can tell me you don't recall.
14    A.  I honestly don't recall.
15        MS. PARFITT:  Objection to form.
16        BY MR. ZELLERS:
17    Q.  Do you agree that the O'Brien
18  study, Deposition Exhibit 16, provides the best and
19  most up-to-date representation of the four cohort
20  studies that have been conducted?
21        MS. PARFITT:  Objection to form.
22        THE WITNESS:  Yes.
23        BY MR. ZELLERS:
24    Q.  Do you agree that there is little
25  doubt that the results from O'Brien 2020 paper are

Page 123

1  superior and should replace the results of the
2  individual papers that were previously published
3  from the cohort studies?
4        MS. PARFITT:  Objection to form.
5        THE WITNESS:  I assume your question is
6  in regard to talc and ovarian cancer.
7        BY MR. ZELLERS:
8    Q.  That's correct.
9    A.  And then I would say yes.
10    Q.  Do you agree that the O'Brien
11  study, along with Terry 2013, carries the most
12  statistical weight of the studies in this area?
13        MS. PARFITT:  Objection to form.
14        THE WITNESS:  I believe it does.
15        BY MR. ZELLERS:
16    Q.  Do you agree that the O'Brien 2020
17  paper entailed longer follow-up and therefore
18  improved validity?
19    A.  Longer --
20        MS. PARFITT:  Objection to form.
21        THE WITNESS:  Longer follow-up than the
22  previously published individual studies, yes.
23        BY MR. ZELLERS:
24    Q.  And, therefore, improved validity;
25  do you agree with that?

Page 124

1    A.  Over the --
2        MS. PARFITT:  Objection to form.
3        THE WITNESS:  Improved validity over
4  the previously published individual studies, yes.
5        BY MR. ZELLERS:
6    Q.  The O'Brien study included 252,745
7  women; is that your recollection?
8        MS. PARFITT:  Objection to form.
9        THE WITNESS:  Yes.
10        BY MR. ZELLERS:
11    Q.  Do you have the --
12    A.  I have the article in front of me,
13  and I'll just -- I'm sure you read it right.
14    Q.  So, I'm looking at "RESULTS" in
15  the abstract.
16    A.  Yes, okay, I see that.
17    Q.  The total number of person years
18  studied in this pooled analysis was 3.8 million; is
19  that right?
20    A.  If that is what they say, that is
21  right, yes.
22    Q.  Well, take a look at Table 2 on
23  page 53.
24    A.  Yes, I see that.
25    Q.  And in Table 2, the authors

Page 125

1  provide factual support for the 3.8 million years;
2  correct?
3    A.  Correct.
4    Q.  In Table 2, the authors list the
5  four studies which are NHS, NHSII, SIS, and
6  WHI-OS, and you are familiar with each of those
7  cohort studies; correct?
8    A.  Correct.
9    Q.  The pooled estimate is 3,765,706,
10  and we get that from Table 2; correct?
11    A.  Correct.
12    Q.  And if you go to the right, the
13  last column, the adjusted hazard ratio is 1.08 with
14  a confidence interval of 0.99 to 1.17; is that
15  correct?
16    A.  That's correct.
17    Q.  That finding is not statistically
18  significant because it crosses the 1; correct?
19        MS. PARFITT:  Objection to form.
20        THE WITNESS:  You have to specify at
21  what level of confidence you are testing for
22  statistical significance, but in any case, I'll go
23  along with your question.  That confidence interval
24  crosses the 1; if that is what you are stating, I
25  agree with that.

Page 126

1    BY MR. ZELLERS:
2         Q.   All right.  Go to page 56, below
3    Table 4, under "Discussion".  Do you see where I am
4    at?  So page 56, first column, under "Discussion".
5         A.   Yes, I see.
6         Q.   The authors state:
7              "In this pooled analysis of 4
8         large US cohorts, there was no
9         statistically significant
10        association between self-reported
11        use of powder in the genital area
12        and risk of ovarian cancer.  There
13        were no clear dose-response trends
14        for duration and frequency of powder
15        use in the genital area in relation
16        to ovarian cancer risk."
17        Did I read that correctly?
18        A.   Yes, you did.
19        Q.   There is one point, Dr.
20   Siemiatycki, if I understand your report, your
21   amended report correctly.  A data point in O'Brien
22   is that she separates out the ovarian cancer risk
23   among women with a patent reproductive tract.  Do
24   you recall that?
25        A.   Yes.

Page 127

1         Q.   And in your updated meta-analysis,
2    instead of including all of the data, the data for
3    both the patent reproductive tract and the
4    non-patent reproductive tract, you only include the
5    sub-group of women with a patent reproductive
6    tract; is that correct?
7         A.   I did one analysis with that
8    sub-group and a so-called sensitivity analysis with
9    all the women.
10        Q.   The meta-analysis that you
11   performed only includes the data from O'Brien
12   relating to the ovarian cancer risk among women
13   with a patent reproductive tract; is that correct?
14        MS. PARFITT:  Objection to form, asked
15   and answered.
16        THE WITNESS:  Not quite.  If you look
17   in my report on page 77, Table 3, you will see that
18   there are results there for what I refer to as the
19   "Main Meta-Analysis", and then the next line of
20   results indicates "Substitute O'Brien B for O'Brien
21   A", and that specifically means I substituted the
22   all women result for the women with the patent open
23   tract.
24        So the report contains -- my report, my
25   analysis contains both of those kinds of results,

Page 128

1    and you can contrast them, and you can choose the
2    one you prefer.  I have indicated by labelling one
3    of them my main one which one I think is more
4    valid, but you can see actually that it doesn't
5    make much difference.  Even choosing the other one
6    leads to a meta relative risk that is identical.
7         BY MR. ZELLERS:
8         Q.   The "Main Meta-Analysis" includes
9    only women from O'Brien with a patent reproductive
10   tract; correct?
11        A.   That's correct.
12        MS. PARFITT:  Objection to form.
13        BY MR. ZELLERS:
14        Q.   You describe in your amended
15   report how you selected studies for review, and do
16   you agree with this statement:
17             "A meta-analysis should focus
18        on original results in published
19        studies, and should not include
20        opinion pieces, reviews, and [other]
21        meta-analyses"?
22        A.   I agree.
23        Q.   You included the Terry 2013 pooled
24   analysis in your meta-analysis; is that right?
25        A.   Yes.

Page 129

1         Q.   You chose for your main
2    meta-analysis women with a patent reproductive
3    tract because this probably provides a more valid
4    estimate of the risk since it is not diluted by the
5    inclusion of women in whom talc particles could not
6    reach the ovaries.  Was that your reasoning?
7         A.   That was my reasoning.
8         Q.   Did you consult with any other
9    experts, medical experts or other experts, to make
10   that decision of including only the women with
11   patent reproductive tracts from the O'Brien study
12   in your main meta-analysis?
13        A.   No, I didn't consult anybody about
14   that.  I --
15        Q.   All right.
16        A.   -- took my cue from the authors of
17   the paper who went to the trouble of producing
18   results based on that subset of women and giving it
19   great credibility.
20        Q.   You cite to Dr. Gossett's article
21   or editorial in your 2021 report, is that right,
22   under "Additional Materials Considered"?
23        A.   I have read it, yes.
24        Q.   All right.
25        A.   I had considered it.

Page 130

1       Q.  Let's mark Dr. Gossett's article
2  titled "Use of Powder in the Genital Area and
3  Ovarian Cancer Risk, Examining the Evidence" as
4  Deposition Exhibit 18.  Doctor, you'll find this as
5  tab 22 in the Deposition Exhibits Binder and that
6  should be Volume 1.
7       EXHIBIT NO. 18:  Dr. Gossett's article
8       titled "Use of Powder in the Genital
9       Area and Ovarian Cancer Risk, Examining
10      the Evidence", tab 22, Deposition
11      Exhibit Binder Volume 1.
12      THE WITNESS:  Okay, I have it.
13 BY MR. ZELLERS:
14      Q.  Are you familiar with Dr. Dana
15 Gossett?
16      A.  No, I am not.  I looked her up,
17 and she is a clinician and a gynaecologist
18 obstetrician, as is the co-author, Dr. del Carmen.
19      Q.  Did you see that she is Vice Chair
20 at UCSF Medical Centre?
21      A.  Vice Chair of what?
22      Q.  University of California, San
23 Francisco Medical Centre, that she was the Vice
24 Chair?
25      A.  I don't think she was the Vice

Page 131

1  Chair of the university.  I think she was the Vice
2  Chair of a Department of Obstetrics and Gynecology
3  or something like that.
4       Q.  All right.  Do you see or did you
5  see in your review of her background that she is
6  now Chair of the Department of Obstetrics and
7  Gynecology at NYU Langone?
8       A.  Yes, I think I saw that.
9       Q.  Dr. Gossett discusses the
10 migration of talc in her article here; is that
11 right?
12      A.  I believe so.  I am just looking
13 for that section of her report.
14      Q.  Well, let me direct you, Doctor,
15 and of course, you are free to look at anything you
16 need to look at, but take a look on page 30 in the
17 left-hand column, if you would, please.
18      A.  Yes.
19      Q.  So, Dr. Gossett is talking about
20 patency and makes the statement:
21      "However, it is not possible to
22      equate a patent reproductive tract
23      with exposure and a nonpatent
24      reproductive tract with nonexposure.
25      Women who undergo tubal ligation or

Page 132

1  hysterectomy (nonpatent) and use
2  powders in the genital area cannot
3  be assumed to have started using
4  them only after their surgeries - in
5  fact, this is highly unlikely as
6  women often begin use of powder in
7  the genital area during
8  adolescence."
9       Did I read that correctly?
10      A.  Yes, you did.
11      Q.  Do you have any reason to disagree
12 with that?
13      MS. PARFITT:  Objection to form.
14      THE WITNESS:  I don't disagree with
15 that.  I disagree with the inference that might be
16 made from the way they phrased that argument,
17 namely, the dichotomization -- do you need to deal
18 with something?  Is someone's phone ringing?
19 Sorry, I hear a buzzing.
20      Okay, I'm sorry, I'm sorry for that.
21      MR. ZELLERS:  Let's go off the record
22 for just a second.
23      [Discussion Off The Record.]
24 BY MR. ZELLERS:
25      Q.  So we will continue.  Dr.

Page 133

1  Siemiatycki --
2       MS. PARFITT:  Michael, he was in the
3  middle of responding to a question.
4  BY MR. ZELLERS:
5       Q.  I thought he had finished.  Dr.
6  Siemiatycki --
7       A.  I'm sorry, I didn't --
8       Q.  -- did you finish?
9       A.  I hadn't finished, I'm sorry.
10      Q.  All right, go ahead.  I apologize
11 and finish your answer.
12      A.  Okay, so what I -- one possible
13 interpretation of the way they phrased this is
14 that the distinction between women with patent
15 reproductive tracts and non-patent reproductive
16 tracts has no bearing on exposure to talc
17 particles, and I don't think that is what they
18 meant, but I can easily see that that would be an
19 interpretation.
20      The women with patent reproductive
21 tracts continue to be potentially exposed depending
22 on their personal use of powdering products.  The
23 women who have -- do not have patent reproductive
24 tracts, their point is well taken that some of -- a
25 fraction of their lifetime exposure might have

1    occurred before any surgery to close up the
2    reproductive tracts.  And so they would still have
3    accumulated a certain amount of exposure.  They are
4    not totally historically unexposed.
5            Nevertheless, if you look at the entire
6    group of women and follow them from, you know,
7    early teens or adulthood use of powders to the age
8    of getting ovarian cancer, if -- or not, at the
9    point where they had surgery to close up the
10   reproductive tracts, then their exposure would end,
11   and therefore compared to a woman who started at
12   the same time and remains with an open reproductive
13   tract, they would have much less exposure.
14           So it is not a sort of a black and
15   white exposed, not exposed, but they would have
16   much less exposure than the women who are bundled
17   into the group of non-patent users of powders.
18           BY MR. ZELLERS:
19       Q.  Doctor, did you rely on any
20   studies or scientific articles for the assumptions
21   that you have just told us about?
22       A.  So I haven't made --
23           MS. PARFITT:  Objection to form.
24           THE WITNESS:  I haven't made any
25   assumptions.  I have said that if two women --

1            BY MR. ZELLERS:
2        Q.  Doctor, my question is did you
3    rely on any studies?
4            MS. PARFITT:  Michael, he is trying to
5    answer your question.
6            MR. ZELLERS:  Then that is a question
7    that he can answer yes or no.  Did you rely on any
8    studies --
9            MS. PARFITT:  It may not be.  He is
10   explaining.  Go ahead, Dr. Siemiatycki.  Answer the
11   question.
12           THE WITNESS:  I didn't rely on any
13   specific studies.  I relied on common sense.
14           BY MR. ZELLERS:
15       Q.  Do you agree, Dr. Siemiatycki,
16   that it would be wrong to exclude a group of women
17   from your meta-analysis who had substantial
18   exposure to talcum powder?
19           MS. PARFITT:  Objection to form.
20           THE WITNESS:  It depends on the design
21   of the study.  Sometimes it would be wrong and
22   sometimes it would be right.
23           BY MR. ZELLERS:
24       Q.  Would you agree that the median
25   age at baseline for the women in the O'Brien study

1    was 57 years?  Any reason to disagree with that?
2        A.  No, I would have no reason to
3    disagree with that.
4            MS. PARFITT:  Objection to form.
5            BY MR. ZELLERS:
6        Q.  Have you read in some of the
7    papers that most women begin using talc early in
8    life?
9        A.  Yes --
10           MS. PARFITT:  Objection to form.
11           THE WITNESS:  -- I have read it.
12           BY MR. ZELLERS:
13       Q.  Have you seen or do you know from
14   your experience that most women have tubal
15   ligations or hysterectomies later in life after
16   they are done having children?
17           MS. PARFITT:  Objection to form.
18           THE WITNESS:  Yes, agreed.
19           BY MR. ZELLERS:
20       Q.  And that is discussed in the
21   Gossett paper or article that we marked as Exhibit
22   18; is that right?
23       A.  I'm sorry, can you point me to
24   specific quotations in the article?
25       Q.  Well, let me withdraw that

1    question.  Let me ask this question, and I am going
2    to read a sentence or -- I guess, a sentence from
3    the Gossett article, and I am going to ask you at
4    the end if you agree with it.  So go to page 30 --
5            MS. PARFITT:  Michael -- okay.
6            MR. ZELLERS:  Yes, Ms. Parfitt, what?
7            MS. PARFITT:  Michael, you don't have
8    to get stern.  I was just trying to get the page
9    number, and you just gave it to me.  So I thank you
10   for that.  Yes, no need to get testy.
11           MR. ZELLERS:  I am not getting testy,
12   but --
13           MS. PARFITT:  Okay.  Thank you for the
14   page number.
15           BY MR. ZELLERS:
16       Q.  You are welcome.  Dr. Siemiatycki,
17   are you with me?  Page 30, the left-hand column at
18   the bottom.
19       A.  Yes.
20       Q.  And I am starting with:
21           "The fact that [...]"
22   I am reading from Dr. Gossett's
23   article:
24           "The fact that there are no
25   significant differences in the

Page 138

1  [hazard ratios] in the patent
2  ([hazard ratio], 1.13 [95%
3  [confidence interval], 1.01-1.26])
4  and nonpatent subgroups ([hazard
5  ratio], 0.99 [95% [confidence
6  interval], 0.86-1.15]; P value for
7  heterogeneity comparing these
8  subgroups of .15) confirms the
9  overall conclusion that there is no
10  demonstrable statistically
11  significant association between use
12  of powder in the genital area and
13  ovarian cancer risk. This is the
14  key finding of the study."
15  Do you agree with that statement?
16  A.  No, I don't.
17  Q.  All right. And why do you not
18  agree with that statement?
19  A.  It reveals a shocking lack of
20  understanding of statistical significance, and it
21  is a classic example of what has been decried
22  by...[inaudible].
23  Q.  Dr. Siemiatycki, you have frozen
24  up, and I did not hear you. Let's go off the
25  record. Oh, okay, now we have got him back.

Page 139

1  So, Dr. Siemiatycki, you froze. We did
2  not hear your response. Can you repeat your
3  answer?
4  A.  Am I still frozen?
5  Q.  No, you are -- we can hear you
6  now.
7  A.  Okay. Thank you. So I was
8  starting to say it reveals the lack of
9  understanding of statistical significance, and it
10  reveals why statistical associations like the
11  American Statistical Association and leading
12  epidemiologists and statisticians have decried the
13  way statistical significance is used by -- in many
14  domains to reach incorrect conclusions. And I have
15  many examples. I had a couple of articles here --
16  well, a statement by the American Statistical
17  Association on P-values.
18  Q.  And, Doctor, we have seen that in
19  your amended report.
20  A.  Okay.
21  Q.  So my question is other than you
22  think that Dr. Gossett is misusing statistical
23  significance, any other reason that you disagree
24  with her conclusion that there is no difference
25  between the non-patent and patent group in the

Page 140

1  O'Brien study?
2  A.  Yes. There are two reasons, not
3  two other reasons. I believe so, that was the
4  reason you just cited, but all leading
5  statisticians would -- I am echoing what is the
6  prevalent view among all sophisticated
7  statisticians, and I would say that the difference
8  between an HR of 1.13 and 0.99 in the two
9  sub-groups is not proof that there is no
10  statistical association between use of powder and
11  ovarian cancer risk. It is using inappropriate
12  inferences.
13  Q.  Doctor, I want to go to your
14  meta-analysis, and you included in your main
15  meta-analysis the data from the Schildkraut 2016
16  paper; is that right?
17  A.  Yes, I did.
18  Q.  In "Schildkraut (2016)", and I am
19  reading from your report:
20  "The authors speculated that
21  publicity surrounding two class
22  action lawsuits on talc and ovarian
23  cancer in 2014 may have subsequently
24  included bias in the validity of
25  reporting of talc exposure.

Page 141

1  Consequently, in their analysis and
2  report, they presented two sets of
3  results, one for all women in the
4  study, and another for those
5  interviewed [after] 2014."
6  Is that your understanding?
7  A.  Yes.
8  Q.  There is a difference in odds
9  ratio between those interviewed before 2014 and
10  those interviewed afterwards; is that right?
11  A.  Yes, that's correct.
12  Q.  Rather than using the sub-group
13  from 2014, you chose to use the risk estimates from
14  all of the Schildkraut 2016 data, both before 2014
15  and after 2014; is that right?
16  A.  That's correct.
17  Q.  In doing so, you chose to ignore
18  the authors' suspicions about that group that was
19  exposed to all the publicity; is that right?
20  MS. PARFITT: Objection to form.
21  THE WITNESS: My answer would be
22  similar to the one I gave a few minutes ago about
23  the O'Brien study. I didn't ignore it. I was
24  aware of it, and I carried out an analysis with the
25  Schildkraut data from before 2014, and I presented

Page 142

1 that in my report.
2         So ignoring it is not a correct verb, I
3 think, to describe what I did.
4         BY MR. ZELLERS:
5         Q. Well -- are you finished?
6         A. Yes, I am. Go ahead.
7         Q. Okay. Doing it the way you did,
8 by including all of the data from Schildkraut both
9 before 2014 and after 2014, that gave you a higher
10 relative risk in your meta-analysis; is that
11 correct?
12         A. That's correct.
13         MS. PARFITT: Objection to form.
14         BY MR. ZELLERS:
15         Q. So when you included the O'Brien
16 data, at least in your main meta-analysis you chose
17 a sub-group, and when you included the Schildkraut
18 data, you chose to include the entire group; is
19 that accurate?
20         A. Yes, that is.
21         Q. All right. I want to ask you a
22 couple of questions, Doctor, about dose-response.
23 You are familiar with the concept dose-response?
24         A. Yes.
25         Q. Clearly you address it in your

Page 143

1 amended report and also your original report. Is
2 it accurate, Doctor, that Health Canada did not
3 find a clear dose-response between talcum powder
4 use and ovarian cancer?
5         MS. PARFITT: Objection to form.
6         THE WITNESS: Okay, do you have a
7 particular page --
8         BY MR. ZELLERS:
9         Q. I do, Doctor. I can help you, I
10 think. Go to the Health Canada report. We marked
11 that as Exhibit 12. That is tab 23 in your binder.
12 And take a look specifically at page 33.
13         A. Yes, I have it.
14         Q. Health Canada states or concludes:
15         "Collectively, there is
16         significant exposure information
17         lacking to permit a fulsome
18         assessment of biological gradient."
19         Do they make that statement?
20         A. Yes, they do.
21         Q. Biological gradient is
22 dose-response; correct?
23         A. They are used interchangeably,
24 yes.
25         Q. All right.

Page 144

1         A. In different contexts, yes.
2         Q. Another study that you have
3 referred to and let me ask you if you are familiar,
4 Schildkraut -- it is actually by Davis, is the
5 first author, and Schildkraut 2021. Are you
6 familiar with that study?
7         A. Probably, but if you could point
8 me to it, it will jog my memory.
9         Q. Sure. Take a look, if you will,
10 at tab 19, Deposition Exhibit Binder 1, and we will
11 mark the Davis and Schildkraut 2021 study as
12 Exhibit 19 to this deposition.
13         EXHIBIT NO. 19: Davis and Schildkraut
14         2021 study, tab 19, Deposition Exhibit
15         Binder 1.
16         THE WITNESS: Yes.
17         BY MR. ZELLERS:
18         Q. You reviewed this article; is that
19 right?
20         A. I read it, yes.
21         Q. And you are also familiar with the
22 Schildkraut 2016 meta-analysis; is that right?
23         A. Meta --
24         Q. Let me jog -- I'll jog your
25 memory. The 2016 Schildkraut meta-analysis, we

Page 145

1 referred to it in the last set of questions, but
2 that is a study that you rely on for your opinion
3 that there is a dose-response. Does that refresh
4 your recollection?
5         A. Excuse me, so I don't think it is
6 a meta-analysis that you are referring to.
7         Q. Doctor, I misspoke and I am sorry.
8 The Schildkraut 2016 study.
9         A. Yes.
10         Q. And you are familiar with that
11 study, and you use it as a basis for your opinion
12 that there is a dose-response with talcum powder
13 and the incidence of ovarian cancer; correct?
14         A. Yes, I used that, yes.
15         Q. This article that we have marked
16 as Exhibit 19, which is Davis and Schildkraut 2021,
17 are you familiar with the article?
18         A. You know, I have read it. I just
19 received it a few days ago, and I have read it.
20 And I haven't completely digested it, but I know
21 what it is about.
22         Q. All right. Let me just go through
23 a couple of the high points with you and ask you a
24 couple of questions. So Schildkraut and Davis were
25 studying in this 2021 article the potential

Page 146

1  connection between talc and ovarian cancer in the
2  African-American population; is that right?  And I
3  am reading and looking at "Background", page 1
4  under the abstract.
5      A.  Yes.
6      Q.  And one of the things that the
7  authors concluded in the paper was that
8  African-American women use talcum powder more often
9  than white women; is that correct?
10     A.  Yes, I believe so.
11     Q.  Under "Results", they talk about:
12         "The prevalence of ever genital
13         powder use for cases was 35.8
14         percent among African-American women
15         and 29.5 percent among White women."
16         Again, reading from the "Results" in
17  the abstract; is that correct?
18     A.  Yes.
19     Q.  In this paper, this Davis and
20  Schildkraut paper, they found no dose-response; is
21  that correct?
22     MS. PARFITT:  Objection to form.
23     THE WITNESS:  I would have to look at
24  the results.
25     BY MR. ZELLERS:

Page 147

1      Q.  Yeah, take a look under
2  "Discussion", page 4, and I am looking at the end
3  of the first paragraph under "Discussion",
4  right-hand column.
5      A.  Okay.  Sorry, I was looking at the
6  tables themselves, but -- so you are saying in the
7  "Discussion" section.
8      Q.  So page 4, "Discussion".
9      A.  My numbering of pages is not the
10  same as yours, so --
11     Q.  Oh, I'm sorry.  Do you find
12  "Discussion"?
13     A.  Yes, I have got it.
14     Q.  And the last sentence in the first
15  paragraph under "Discussion", the authors state:
16         "There was not a dose-response
17         relationship regarding frequency or
18         duration of genital powder use and
19         ovarian cancer among
20         [African-American] or White women."
21  Did I read that correctly?
22     A.  You read that correctly.
23     Q.  That finding is contrary to the
24  finding that we discussed previously in the 2016
25  Schildkraut study with respect to dose-response; is

Page 148

1  that right?
2      MS. PARFITT:  Objection to form.
3      THE WITNESS:  Yes, the sentence you
4  read differs from the conclusions of the
5  Schildkraut 2016 paper.
6      BY MR. ZELLERS:
7      Q.  Look at the "Conclusions", Doctor,
8  if you will, and I am back to the abstract on page
9  1.  Have you found that?
10     A.  Yes, I have.
11     Q.  The Schildkraut and Davis authors
12  found that even though African-American women use
13  talc more than white women, they found no
14  statistically significant association in
15  African-American women, but they did find in white
16  women, right?
17     MS. PARFITT:  Objection to form.  Is
18  that what it says, or is that does he agree?
19     BY MR. ZELLERS:
20     Q.  Well, let me withdraw that.  Let
21  me -- I am going to read you the first sentence of
22  the "Conclusions" and ask if I have read it
23  correctly and if you agree.
24         "Conclusions.
25         While genital powder use was

Page 149

1         more prevalent among
2         African-American women, the
3         associations between genital powder
4         use and ovarian cancer risk were
5         similar across race and did not
6         materially vary by histotype."
7  Did I read that correctly?
8      A.  You read that correctly.
9      Q.  Now, that is not what you would
10  expect if talcum powder was causing ovarian cancer;
11  correct?
12     MS. PARFITT:  Objection to form.
13     THE WITNESS:  No, not correct.
14     BY MR. ZELLERS:
15     Q.  Well, wouldn't you expect that in
16  the population -- or let me withdraw.  Wouldn't you
17  expect that ovarian cancer rate would be higher in
18  the African-American population if that population
19  in fact uses more talcum powder?
20     A.  What you just said might be a
21  rational way to express it, but that is not what
22  they said.  That is not what their sentence says.
23  Their sentence says the relationship between talc
24  and ovarian cancer does not differ between the
25  races.  They did not say that the risk of ovarian

Jack Siemiatycki, MSc, PhD

Page 150

1    cancer does not vary between the races.
2        So if African-American women have
3    higher use of -- have higher risk factors than
4    white women, we would expect the rates of ovarian
5    cancer to be higher among African-American women.
6    But the relationship between -- the relative risks
7    between talc use and ovarian cancer might not
8    differ at all.  It is the difference between two
9    concepts in epidemiology.  One is relative risk,
10   and the other is effect modification.  Those are
11   different issues, but I don't want to go down that
12   rabbit hole, I don't think.
13       Q.  All right.  Doctor, you are
14   familiar with IARC and served as a member of the
15   IARC scientific council for some period of time; is
16   that right?
17       A.  That's right.
18       Q.  When did your time serving on the
19   IARC scientific council end?
20       A.  Approximately 2010.
21       MS. PARFITT:  Objection to form.
22       BY MR. ZELLERS:
23       Q.  And I am confused a bit in that
24   you were listed as a member of the working group
25   for the 2012 monograph.  Number one, are you aware

Page 151

1    of the 2012 IARC monograph dealing with asbestos?
2        A.  Yes.
3        Q.  Were you a member of the working
4    group that analyzed that issue?
5        A.  Yes.
6        Q.  Is your testimony that your role
7    in analyzing that issue ended around 2010, or did
8    you continue with IARC for some period beyond that?
9        A.  Those two things are completely
10   independent of each other.  Serving on the
11   scientific council and serving on a working group
12   for a monograph have nothing to do with each other.
13       But to answer your question, I can look
14   up my CV and look for exact dates, but I don't
15   remember whether I was still a member of the
16   scientific council when I was on that working group
17   or not.
18       Q.  Fair enough, Doctor, and we can go
19   and we can look at your CV and get an answer to
20   that.  It is fair to state that when you were first
21   deposed -- let me withdraw that.  When you prepared
22   your original report November of 2018, you had long
23   left any service with IARC; correct?
24       MS. PARFITT:  Objection to form.
25       THE WITNESS:  It depends what you mean

Page 152

1    by "service to IARC".  So I was no longer on the
2    scientific council, but I -- over the past 40
3    years, I have been called on by IARC to serve on
4    various ad hoc committees and expert panels and
5    collaborations.  So, you know, things can come up
6    periodically where they ask me to sit in for a year
7    on a committee or not.
8        BY MR. ZELLERS:
9        Q.  All right, fair enough.  Let me be
10   a little more precise then.  You served on the
11   working group and actually were Chair of the
12   working group in 2006 that looked at the perineal
13   use of talcum powder; correct?
14       A.  That's correct.
15       Q.  And you served as a member of the
16   working group in 2012 that looked at the issue of
17   asbestos and cancer risk; correct?
18       A.  Correct, but I am not sure of the
19   date.  The --
20       Q.  Understood.  There was a monograph
21   that was published in 2012.  Your work may have
22   preceded that; correct?
23       A.  That's right.
24       Q.  All right.  And have you been --
25       MS. PARFITT:  And Michael, Mr. Zellers,

Page 153

1    I am going to stop at this point in time, again,
2    unless there is a question about that post-dates
3    January of 2019 when he was deposed.  These
4    questions about the 2010 and 2012 monograph were
5    discussed previously.
6        MR. ZELLERS:  Well, actually, 2012 was
7    not, but, Michelle, this is foundation for the
8    statements and the references to IARC that are
9    contained in the Doctor's amended report.  So I am
10   mindful of your objection.
11       MS. PARFITT:  All right, I appreciate
12   that.
13       BY MR. ZELLERS:
14       Q.  But let me ask a couple of other
15   foundational questions.  You are not today speaking
16   on behalf of IARC; correct?
17       A.  Correct.
18       Q.  And you are not speaking on behalf
19   of IARC either when you prepared your original
20   report in November of 2018 or your amended report
21   in June of 2012; is that right?
22       A.  Correct.  I think you mean June
23   2021.
24       Q.  Yes, I do, Doctor.  Thank you for
25   correcting the record on that.  In your 2019

Page 154

1 deposition, MDL deposition, you stated that you had
2 a quick word with Kurt Straif at IARC about another
3 complete evaluation of talc. Do you recall
4 generally that testimony or at least having a quick
5 word with Kurt Straif?
6        A. Yes, I remember having a word with
7 him about it.
8        Q. And who is Kurt Straif?
9        A. I think the correct question is
10 who was he at the time. He is a scientist. He is
11 an epidemiologist. And he was the Director of the
12 IARC monograph program for, you know, probably 6 or
13 7 years during the teens, and he was in 2018 or
14 '19, when I had a word with him about it. He is no
15 longer the Director of that program. He has moved
16 somewhere else.
17        Q. I'll go back to look at your CV,
18 but you have not been involved in any analysis by
19 IARC of talc or asbestos after the 2012 monograph
20 was published; correct?
21        A. That's correct.
22        Q. Now, in 2019 when you were
23 deposed, you said that you had a quick word with
24 Kurt Straif and that you were going to submit or
25 might submit a more formal proposal. Did you ever

Page 155

1 submit a more formal proposal to IARC about the
2 study or evaluation of talc as a possible
3 carcinogen?
4        A. No, I didn't. I didn't. I heard
5 subsequently that they had put it on a list of
6 topics to address in the future. They have, I
7 think, five-year plans that they lay out, and they
8 invite all interested parties to submit suggestions
9 of agents to evaluate or occupations or industries
10 to evaluate. And I learned, I can't remember when,
11 that they had put talc on such a list. I have no
12 idea at this point where it is in their priorities.
13 I think they get a lot of requests from different
14 interests to evaluate different agents.
15        Q. And I think you refer to this IARC
16 advisory group on page 70 of your amended report;
17 does that sound right?
18        A. I'll have a quick look. I guess
19 so, yes.
20        Q. All right. You also reference in
21 your amended report a commentary by Samet
22 discussing IARC's ongoing role in the scientific
23 review and evaluation of carcinogenic hazards by
24 experts; is that right?
25        A. I think so. Do you know where? I

Page 156

1 think it is in the -- actually, I don't remember
2 mentioning it in this. You say that I mentioned it
3 in my report; is that correct? I might have, but I
4 don't remember.
5        Q. I believe I saw that, and we can
6 take a look under "Materials Considered", if need
7 be. But let me ask you first, are you familiar
8 with that commentary --
9        A. Yes, I am.
10        Q. -- by Samet?
11        MS. PARFITT: Objection to form.
12 Objection to form. You need it in front of you,
13 Dr. Siemiatycki.
14        THE WITNESS: So I am familiar with it,
15 but it is not fresh in my mind.
16 BY MR. ZELLERS:
17        Q. Then I'll be very general with my
18 questions. Do you agree that simply calling
19 something carcinogenic in the absence of
20 epidemiological or experimental data would not be
21 scientifically valid?
22        MS. PARFITT: Objection to form.
23        THE WITNESS: So I think that most
24 cancer scientists would agree that in the absence
25 of epidemiologic evidence, it is possible to

Page 157

1 declare an agent as carcinogenic under certain
2 circumstances.
3 BY MR. ZELLERS:
4        Q. Your testimony is in the absence
5 of epidemiological and experimental data?
6        A. Oh, no, sorry, maybe restate your
7 question? Maybe I misunderstood it.
8        Q. Well -- and we are getting toward
9 the end, so maybe I wasn't as precise. Do you
10 agree that simply calling something carcinogenic in
11 the absence of epidemiological or experimental data
12 would not be scientifically valid?
13        A. Yes, I think so.
14        MS. PARFITT: Objection to form.
15 BY MR. ZELLERS:
16        Q. You would not condone or approve
17 of calling something a human carcinogen just
18 because it grows in the asbestiform habit if there
19 has been no scientific study to support that;
20 correct?
21        MS. PARFITT: Objection to form.
22        THE WITNESS: Well, I think that one
23 would have to examine the consequences of the
24 statement that it grows in the asbestiform habit
25 and how that relates to known carcinogenesis of

Page 158

1  asbestos or any of the types of asbestos.
2      But -- so if you are asking a generic
3  question about whether something that has some
4  characteristics in common with a carcinogen should
5  be labelled as a carcinogen, my answer is no.  But
6  if something that looks like a carcinogen and has
7  some critical biological effects that resemble
8  those of the known carcinogen, then you could make
9  a case for it.  I would certainly not put it into
10  the same level of evidence as an agent which has
11  been evaluated and shown to be carcinogenic in
12  itself, either in human or animal systems.
13      BY MR. ZELLERS:
14      Q.  The bottom line is you need
15  epidemiologic data or experimental data to support
16  that a mineral is carcinogenic; correct?
17      MS. PARFITT:  Objection to form,
18  misstates his testimony.
19      THE WITNESS:  Correct.
20      BY MR. ZELLERS:
21      Q.  All right.  Doctor, do you agree
22  that it would not be scientifically valid to call
23  fibrous minerals a carcinogen until there has been
24  some study?
25      MS. PARFITT:  Objection to form.

Page 159

1      THE WITNESS:  Yes.  I am cognizant of
2  the fact that the terminology around fibrous
3  minerals has been evolving over the past 30 years,
4  and I am not up to date with the latest usages and
5  so on.  But in general, I would agree with what you
6  just said.
7      BY MR. ZELLERS:
8      Q.  I understand IARC may look, you
9  know, in the future at more of these issues, and
10  you have cited, you know, both on page 70, the
11  advisory group and then you are familiar at least
12  with the Samet commentary.  It is true, though,
13  that IARC, at least in the working groups you were
14  involved in, did not cite to any studies showing
15  that asbestiform or fibrous talc were carcinogenic;
16  correct?
17      MS. PARFITT:  Objection to form.
18      THE WITNESS:  I don't recall.
19      BY MR. ZELLERS:
20      Q.  All right.  Ms. Parfitt, let's
21  take a break.  I think I'm essentially finished,
22  but I would like to check with my co-counsel here.
23      So can we take, what, a five,
24  ten-minute break?
25      MS. PARFITT:  Sure, of course.  Of

Page 160

1  course.
2      MR. ZELLERS:  Dr. Siemiatycki, ten
3  minutes good?
4      THE WITNESS:  As you wish.  I am fine,
5  thank you.
6      MR. ZELLERS:  Let's come back in ten
7  minutes.  Thank you.
8      -- RECESSED AT 2:32 P.M.
9      -- RESUMED AT 2:47 P.M.
10      BY MR. ZELLERS:
11      Q.  Dr. Siemiatycki, one last question
12  before I turn it over to counsel for the
13  Plaintiffs, if they have any questions.  Have you
14  made any attempt to publish either your report or
15  your meta-analysis that you have testified about
16  here today?
17      A.  No, I haven't, not yet.
18      Q.  You have not submitted it to any
19  journals?
20      A.  No, I have not.
21      MR. ZELLERS:  I have no further
22  questions for you at this time, subject to a few
23  more questions when Ms. Parfitt or Mr. Tisi are
24  finished examining.
25      EXAMINATION BY MS. PARFITT:

Page 161

1      Q.  Very good.  Thank you.  Dr.
2  Siemiatycki, if you would take your report, your
3  amended report, which is dated 2021, June 30, if
4  you would get that out, sir.
5      A.  Yes.
6      Q.  All right.  If you turn to page 66
7  of your report.
8      A.  Yes.
9      Q.  All right.  Under the category of
10  "Biological plausibility", the first paragraph, are
11  you there?
12      A.  Yes, I am.
13      Q.  It starts with "The first thing
14  [...]"; do you see that?
15      A.  Yes, I do see that.
16      Q.  All right.  It reads:
17          "The first thing to note about
18      this aspect that Bradford Hill
19      listed is that it is called
20      'biological plausibility', not
21      'biological proof.'"
22      Do you still agree with that statement?
23      A.  Yes, I do.
24      Q.  So your opinion is there is a
25  distinction between biological plausibility and

Jack Siemiatycki, MSc, PhD

Page 162

1  biological proof; correct?
2      A.  Correct.
3      Q.  All right.  And it is your opinion
4  that the Bradford Hill principles suggest it is
5  biological plausibility, not biological proof;
6  correct?
7      A.  The Bradford Hill considerations
8  concern biological plausibility.  He never referred
9  to biological proof.
10      Q.  All right.  If you'll turn to the
11  next page, page 67 of your expert report, 2021.
12  Are you there?
13      A.  Yes, I am.
14      Q.  All right.  And the first full
15  paragraph, it starts "As indicated [...]"; are you
16  there?
17      A.  Yes, I am.
18      Q.  In the context of biological
19  plausibility, you state:
20          "As indicated above, commercial
21      cosmetic talcum powder products may
22      contain established carcinogens such
23      as asbestos, asbestiform talc, and
24      some heavy metals."
25      Do you still agree with that statement?

Page 163

1      MR. ZELLERS:  Objection, form.
2      THE WITNESS:  Yes, I do.
3      BY MS. PARFITT:
4      Q.  All right.  You then go on to say
5  and you opine that:
6          "It is biologically plausible
7      that some of these, in contact with
8      the ovaries, can initiate tumors."
9      Did I read that correctly?
10      MR. ZELLERS:  Objection.  Go ahead
11  answer that question, Doctor.
12      THE WITNESS:  Yes.
13      BY MS. PARFITT:
14      Q.  Again, I said:
15          "It is biologically plausible
16      that some of these, in contact with
17      the ovaries, can initiate tumors."
18      Did I read that correctly?
19      A.  Yes, you did.
20      Q.  Is that still your opinion?
21      MR. ZELLERS:  Objection, form.
22      THE WITNESS:  Yes.
23      BY MS. PARFITT:
24      Q.  Dr. Siemiatycki, during the course
25  of the last three or so, four hours, you were asked

Page 164

1  numerous questions by Mr. Zellers.  Is there
2  anything or any question or issue raised by Mr.
3  Zellers that changes your opinion that the use of
4  talcum powder products can cause ovarian cancer?
5      A.  No, nothing has changed my mind.
6      MS. PARFITT:  Okay, with that, I have
7  no further questions.  Thank you so much, Dr.
8  Siemiatycki.  Mr. Zellers.
9      MR. ZELLERS:  Yes, and, Ms. Parfitt,
10  thank you.  Give me one minute just to consult with
11  my co-counsel here, if you will?
12      MS. PARFITT:  Of course.
13      MR. ZELLERS:  Thank you.
14      MS. PARFITT:  Thank you.
15      -- RECESSED AT 2:52 P.M.
16      -- RESUMED AT 2:53 P.M.
17      MR. ZELLERS:  Let's go back on the
18  record.  Doctor, I have no further questions for
19  you today.  Thank you for your time.
20      THE WITNESS:  Thank you very much, Mr.
21  Zellers.
22      MS. PARFITT:  Thank you all.
23
24  -- Adjourned at 2:53 p.m.
25

Page 165

1          CERTIFICATE OF REPORTER
2  CANADA )
3  PROVINCE OF ONTARIO  )
4
5  I, Deana Santedicola, the officer before whom the
6  foregoing deposition was taken, do hereby certify
7  that the witness whose testimony appears in the
8  foregoing deposition was duly sworn by me; that the
9  testimony of said witness was taken by me in
10  shorthand, using Computer Aided Realtime, to the
11  best of my ability and thereafter reduced to
12  written format under my direction; that reading and
13  signing was requested; that I am neither counsel
14  for, related to, nor employed by any of the parties
15  to the action in which the deposition was taken,
16  and further that I am not related or any employee
17  of any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21
22  _____
23  Deana Santedicola, RPR, CRR, CSR (Ont.)
24  Commissioner for taking
25  oaths in the Province of Ontario

Page 166

INSTRUCTION TO WITNESS

1
2
3        Read your deposition over carefully. It
4    is your right to read your deposition and make
5    changes in form or substance. You should assign a
6    reason in the appropriate column on the erratum
7    sheet for any change made.
8        After making any changes in form or
9    substance, and which have been noted on the
10   following erratum sheet, along with the reason for
11   any change, sign your name on the erratum sheet and
12   date it.
13       Then sign your deposition at the end of
14   your testimony in the space provided. You are
15   signing it subject to the changes you have made in
16   the erratum sheet, which will be attached to the
17   deposition before filing. You must sign it in
18   front of a witness. The witness need not be a
19   notary public. Any competent adult may witness
20   your signature.
21       Return the original erratum sheet
22   promptly. Court rules require filing within 30
23   days after you receive the deposition.
24
25

Page 168

1    PROVINCE OF QUEBEC  )
2    MONTREAL REGION    )
3
4        I, the undersigned, declare under
5    penalty of perjury that I have read the foregoing
6    transcript, and I have made any corrections,
7    additions or deletions that I was desirous of
8    making;
9        That the foregoing is a true and
10   correct transcript of my testimony contained
11   therein.
12
13   _____
        (WITNESS)
14
15   Subscribed and sworn to before me this _____
16   day of _____, 2021 at
17   _____, _____.
18       (City)          (Province)
19   _____
20   (Notary Public)
21   My Commission Expires: _____
22
23
24
25

Page 167

1        *** ERRATA SHEET ***
2
3    NAME OF CASE:  IN RE JOHNSON & JOHNSON TALCUM
4    POWDER PRODUCTS MARKETING, SALES PRACTICES, AND
5    PRODUCTS LIABILITY LITIGATION
6    DATE OF DEPOSITION:  SEPTEMBER 21, 2021
7    NAME OF WITNESS:  JACK SIEMIATYCKI, MSc, PhD
8    PAGE  LINE    FROM      TO
9    _____|_____|_____|_____
10   _____|_____|_____|_____
11   _____|_____|_____|_____
12   _____|_____|_____|_____
13   _____|_____|_____|_____
14   _____|_____|_____|_____
15   _____|_____|_____|_____
16   _____|_____|_____|_____
17   _____|_____|_____|_____
18   _____|_____|_____|_____
19   _____|_____|_____|_____
20   _____|_____|_____|_____
21   _____
22   NAME
23   Subscribed and sworn to before me
     this _____ day of _____, 2021.
24   _____
     (Notary Public)
25   My Commission Expires: _____