# EXHIBIT 34

Judith Wolf, M.D.

```
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF NEW JERSEY
 2
 3   ------------------------------
                                   )
 4   IN RE JOHNSON & JOHNSON       )
     TALCUM POWDER PRODUCTS        )  MDL NO.
 5   MARKETING, SALES PRACTICES,   )  16-2738(FLW)(LHG)
     AND PRODUCTS LIABILITY        )
 6   LITIGATION                    )
                                   )
 7   ------------------------------
 8    IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
                    STATE OF MISSOURI
 9
     VALERIE SWANN,                )
10                                 )
          Plaintiff,               )
11                                 )  Cause No.
     v.                            )  1422-CC09326-03
12                                 )
     JOHNSON & JOHNSON, et al.,    )
13                                 )
          Defendants.              )
14   _____
15               — — —
16        Monday, September 13, 2021
                 — — —
17
18        Oral Deposition of JUDITH WOLF, M.D.,
     held at the Fairmont Hotel, 101 Red River
19   Street, Austin, Texas, commencing at
     9:03 a.m. CDT, on the above date, before
20   Michael E. Miller, Fellow of the Academy of
     Professional Reporters, Certified Court
21   Reporter, Registered Diplomate Reporter,
     Certified Realtime Reporter and Notary
22   Public.
23               — — —
24        GOLKOW LITIGATION SERVICES
         877.370.DEPS | fax 917.591.5672
25            deps@golkow.com
```

Judith Wolf, M.D.

```
                                                    Page 2
 1   A P P E A R A N C E S:
 2    BEASLEY ALLEN PC
      BY: MARGARET M. THOMPSON, M.D., ESQUIRE
 3       margaret.thompson@beasleyallen.com
      218 Commerce Street
 4    Montgomery, Alabama 36104
      (334) 269-2343
 5    Counsel for Plaintiffs
 6
      ONDERLAW LLC
 7    BY: CYNTHIA L. GARBER, ESQUIRE
         garber@onderlaw.com
 8    12 Corporate Plaza Drive
      Suite 275
 9    Newport Beach, California 92660
      (949)688-1799
10    Counsel for Plaintiffs
11
12    ASHCRAFT & GEREL LLP
      BY: MICHELLE PARFITT, ESQUIRE
13       mparf@aol.com
      1825 K Street NW,
14    Suite 700
      Washington, D.C. 20006
15    (202)783-6400
      Counsel for Plaintiffs
16
17    BLASINGAME BURCH GARRARD & ASHLEY PC
      BY: SARA SCHRAMM, ESQUIRE
18       sschramm@bbga.com
      440 College Avenue
19    Suite 320
      Athens, Georgia 30601
20    (706)354-4000
      Counsel for Plaintiffs
21
22
23
24
25
```

```
                                                    Page 3
 1   A P P E A R A N C E S:
 2    TUCKER ELLIS LLP
      BY: MICHAEL C. ZELLERS, ESQUIRE
 3       michael.zellers@tuckerellis.com
      515 South Flower Street
 4    42nd Floor
      Los Angeles, California 90071
 5    (213) 430-3400
      Counsel for Johnson & Johnson Defendants
 6
 7    FAEGRE DRINKER BIDDLE & REATH LLP
      BY: ERIC M. FRIEDMAN, ESQUIRE
 8       eric.friedman@faegredrinker.com
         (via Zoom)
 9    300 North Meridian Street
      Suite 2500
10    Indianapolis, Indiana 46204
      (317)237-0300
11    Counsel for Johnson & Johnson Defendants
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                    Page 4
 1              INDEX
 2         JUDITH WOLF, M.D.
 3         September 13, 2021
 4
 5   APPEARANCES                          2
 6   PROCEEDINGS                         10
 7
 8   EXAMINATION OF JUDITH WOLF, M.D.:
 9       BY MR. ZELLERS                  10
10
11   CERTIFICATE                        424
12   ERRATA                             426
13   ACKNOWLEDGMENT OF DEPONENT         427
14   LAWYER'S NOTES                     428
15
```

```
                                                    Page 5
 1            DEPOSITION EXHIBITS
 2    NUMBER                            MARKED
 3   Wolf-1     Notice of Deposition         12
 4   Wolf-2     Documents Produced by        16
 5              Plaintiffs to Dr. Wolf
 6   Wolf-3     7/2/21 MDL Expert Report     17
 7   Wolf-4     Redline of 7/2/21 Expert     17
 8              Report
 9   Wolf-5     Scientific Literature and    19
10              Other Sources
11   Wolf-6     8/11/21 Bondurant Expert     26
12              Report
13   Wolf-7     7/2/21 Gallardo Expert Report 27
14   Wolf-8     7/2/21 Judkins Expert Report  27
15   Wolf-9     7/16/21 Swann Expert Report   28
16   Wolf-10    Invoices                      29
17   Wolf-11    Summary of Comments on        68
18              IMERYS094601
19   Wolf-12    Summary of Comments on        72
20              IMERYS230366
21   Wolf-13    Excerpt from IARC 2012       123
22   Wolf-14    Excerpt from IARC 2012       157
23   Wolf-15    Complete IARC 2012 Monograph 157
24   Wolf-16    Excerpt from IARC 2010       157
25
```

Page 6

DEPOSITION EXHIBITS

Wolf-17    Complete IARC 2010 Monograph    158
Wolf-18    Relation of Particle Dimension    159
      to Carcinogenicity in
      Amphibole Asbestoses... by
      Stanton et al
Wolf-19    Mineralogical Features    159
      Associated with Cytotoxic and
      Proliferative Effects of
      Fibrous Talc... by Wylie et al
Wolf-20    Association of Powder Use in    170
      the Genital Area with Risk of
      Ovarian Cancer, by O'Brien
      et al
Wolf-21    Use of Powder in the Genital    186
      Area and Ovarian Cancer Risk,
      by Gossett et al
Wolf-22    6/30/21 Siemiatycki Amended    192
      Expert Report
Wolf-23    Talcum Powder Induces a    194
      Malignant Transformation in
      Normal Ovarian Epithelial
      Cells Poster

Page 7

DEPOSITION EXHIBITS

Wolf-24    Talcum Powder Induces    228
      Malignant Transformation of
      Human Primary Normal Ovarian
      Epithelial Cells But Not Human
      Primary Normal Peritoneal
      Fibroblasts Poster
Wolf-25    Kleiner Trial Testimony    246
Wolf-26    Health Canada Screening    285
      Assessment
Wolf-27    Clinical Presentation of    332
      Endometrioid Epithelial
      Ovarian Cancer with Concurrent
      Endometriosis... by Lim et al
Wolf-28    Risk of Endometrial Polyps in    334
      Women with Endometriosis... by
      Zheng et al
Wolf-29    Medical Record(s),    337
      GALLARDO_ANNA_BJH_00011 -
      GALLARDO_ANNA_BJH_00014
Wolf-30    Medical Record(s),    344
      GALLARDO_ANNA_BJH_00033 -
      GALLARDO_ANNA_BJH_00037

Page 8

DEPOSITION EXHIBITS

Wolf-31    Endometriosis and Infertility,    346
      by Bulletti et al
Wolf-32    Epithelial Mutations in    351
      Endometriosis: Link to Ovarian
      Cancer, by Bulun et al
Wolf-33    Medical Record(s),    358
      GALLARDO_ANNA_DRWASSERMAN_00001 -
      GALLARDO_ANNA_DRWASSERMAN_00014
Wolf-34    Examining the Associations    359
      Among Fibrocystic Breast
      Change, Total Lean Mass, and
      Percent Body Fat, by Chen
      et al
Wolf-35    Caesarean Section and Risk of    363
      Endometriosis... by Andolf
      et al
Wolf-36    Morphological and    371
      Immunohistochemical
      Re-evaluation of Tumors
      Initially Diagnosed as Ovarian
      Cancer... by Lim et al

Page 9

DEPOSITION EXHIBITS

Wolf-37    Risk of Gynecologic Cancer    373
      According to the Type of
      Endometriosis, by Saavalainen
      et al
Wolf-38    7/21/21 Godleski Expert Report    377
      re: Gallardo
Wolf-39    Perineal Exposure to Talc and    387
      Ovarian Cancer Risk, by Harlow
      et al

Page 10

```
 1         ------------
 2         P R O C E E D I N G S
 3         September 13, 2021, 9:03 a.m. CDT
 4         ------------
 5         JUDITH WOLF, M.D.,
 6         having been duly sworn,
 7         testified as follows:
 8         ------------
 9         EXAMINATION
10         ------------
11  BY MR. ZELLERS:
12    Q.   Can you state your name,
13  please?
14    A.   Dr. Judith Wolf.
15    Q.   Dr. Wolf, my name is Michael
16  Zellers, and I'm here on behalf of the
17  Johnson & Johnson defendants for purposes of
18  both the MDL and also the Swann state court
19  cases.  So I'll have a number of questions
20  for you over the course of the deposition,
21  which will go today and tomorrow.
22         If at any time you don't
23  understand a question that I ask, please tell
24  me you don't understand it, and I'll repeat
25  it or rephrase it.
```

Page 11

```
 1         If there is any reason you need
 2  to take a break, just tell me, and that will
 3  be fine, once we complete, you know, whatever
 4  question or questioning we're doing.
 5         Do you have any questions
 6  before we start?
 7    A.   I don't think so.  Thank you.
 8    Q.   All right.  You have done this
 9  before; is that right?
10    A.   I have.
11    Q.   I understand that you were
12  deposed in the MDL ovarian cancer talc
13  proceedings back in January of 2019; is that
14  right?
15    A.   That's correct.
16    Q.   I also understand that you
17  testified in the Kleiner trial within the
18  last several weeks; is that correct?
19    A.   That's correct.
20    Q.   Other than your MDL deposition
21  and the Kleiner trial testimony, have you
22  given any other deposition or trial testimony
23  related to talc or talc products?
24    A.   No.
25    Q.   You -- well, let me ask you.
```

Page 12

```
 1         Did you receive a copy of the
 2  notice of deposition, which we'll mark as
 3  Exhibit 1?
 4         (Whereupon, Deposition Exhibit
 5         Wolf-1, Notice of Deposition, was
 6         marked for identification.)
 7    A.   I did.
 8  BY MR. ZELLERS:
 9    Q.   Did you have a chance to review
10  that notice of deposition?
11    A.   I did.
12    Q.   Did you provide any responsive
13  documents to the notice of deposition to
14  counsel for the plaintiffs in this
15  litigation?
16    A.   I did not.
17    Q.   All right.  Did you provide any
18  documents to counsel for plaintiffs in this
19  litigation that were responsive to the
20  deposition notice, which we've marked as
21  Exhibit 1?
22    A.   I did not.
23    Q.   Is it my understanding, then,
24  that you relied upon counsel to collect and
25  provide any responsive documents to the
```

Page 13

```
 1  deposition notice?
 2         MS. GARBER:  Object.
 3         DR. THOMPSON:  Object to form.
 4    A.   My understanding of the
 5  question you asked is once I received this,
 6  did I provide them anything.
 7         I received this yesterday, so
 8  since that time, I have not given anything to
 9  plaintiffs' attorneys.
10  BY MR. ZELLERS:
11    Q.   Did you have an opportunity to
12  review the deposition notice?
13    A.   I did.
14    Q.   Did you look at the documents
15  that were requested that you produced?
16    A.   Yes.
17    Q.   Do you believe that all of
18  those documents, to the extent they were or
19  are in your possession, have been provided to
20  counsel for plaintiffs in this litigation?
21    A.   Yes.
22    Q.   You have relied upon counsel
23  for plaintiffs in this litigation to produce
24  the documents responsive to the deposition
25  notice, Exhibit 1; is that right?
```

Judith Wolf, M.D.

Page 170

1   A.   Okay.
2   Q.   All right.
3   A.   Okay.
4   Q.   Are you, Dr. Wolf, familiar
5   with the O'Brien paper, Association of Powder
6   Use in the Genital Area With Risk of Ovarian
7   Cancer?
8   A.   Is that the JAMA article from
9   January 2012?
10  Q.   Yes.
11  A.   I am.
12  Q.   Deposition Exhibit 20, is this
13  the O'Brien study?
14      (Whereupon, Deposition Exhibit
15      Wolf-20, Association of Powder Use in
16      the Genital Area with Risk of Ovarian
17      Cancer, by O'Brien et al, was marked
18      for identification.)
19  A.   This is.
20  BY MR. ZELLERS:
21  Q.   Do you know any of the authors
22  of the O'Brien paper?
23  A.   I do not.
24  Q.   Are you aware that none of the
25  authors of this paper are experts in the talc

Page 171

1   litigation?
2   A.   Well, I'm assuming they are
3   not, since none of them disclosed that they
4   were.
5   Q.   Was it your idea to include
6   O'Brien in your amended report or was that a
7   study that was provided to you for inclusion
8   by the lawyers?
9       DR. THOMPSON:  Object to form.
10  A.   No, this was my -- this was my
11  idea to include it.
12  BY MR. ZELLERS:
13  Q.   Why did you think it was
14  important to include the O'Brien paper in
15  your amended report?
16  A.   Because it was another new
17  paper that came out that looked at the data,
18  the epidemiologic data to try to help us,
19  give us more information.
20  Q.   More information is good,
21  correct?
22  A.   Yes, and I think the
23  information in this was good.
24  Q.   In O'Brien, the authors pooled
25  data from the four cohort studies; is that

Page 172

1   right?
2   A.   That's correct.
3   Q.   Pooled study means taking data
4   from the cohort studies and analyzing it
5   collectively rather than individually,
6   correct?
7   A.   Yes.
8   Q.   O'Brien was published in JAMA?
9   A.   Yes.
10  Q.   JAMA is one of the world's most
11  prestigious and authoritative medical
12  journals.
13      DR. THOMPSON:  Object to form.
14  BY MR. ZELLERS:
15  Q.   Would you agree?
16  A.   JAMA is a very well-respected
17  journal, and I respect it.
18  Q.   Do you agree that the O'Brien
19  study provides the best and most up-to-date
20  representation of the four cohort studies
21  that have been conducted?
22      DR. THOMPSON:  Object to form.
23  A.   I believe -- I agree that it
24  provides the most up-to-date information of
25  the pooled analysis of the cohort studies.

Page 173

1   BY MR. ZELLERS:
2   Q.   Do you also agree that it's the
3   best representation of the four cohort
4   studies?
5       DR. THOMPSON:  Object to form.
6   A.   I think that's an opinion.  I
7   think it's a -- it's the most up to date.
8   BY MR. ZELLERS:
9   Q.   It's a good study, correct?
10      MS. GARBER:  Object to the
11      form.
12  A.   I think -- you know, my reading
13  of this, it's a big study.  It's a recent
14  study.  It was published in JAMA.  That gives
15  it some weight to me.
16      Is it the best study?  I don't
17  know.  I wouldn't -- I'm not going to say
18  good, bad, indifferent there.
19      I'm going to say that I
20  considered it and I think it was important to
21  include it because it's the newest pooled or
22  meta-analysis study that was published and
23  the most up-to-date of all the cohort
24  studies.
25      ///

Judith Wolf, M.D.

Page 174

BY MR. ZELLERS:
Q. Okay. The pooled study includes 252,745 women, correct?
A. Yes.
Q. That is more women than you believe need to be studied to accurately predict the risk associated with talc use and ovarian cancer, correct?
A. Yes.
DR. THOMPSON: Object to form.
A. Well, I will say that Dr. Narod, who I know I quoted in my report, estimated that it would take 200,000 women, and this one has more than that. So that's one of the reasons that when this came out, it was somewhat exciting, is that -- is it going to give us the answer? And I think it did help give us the answer.
BY MR. ZELLERS:
Q. The total number of person-years studied in this pooled analysis was 3.8 million, correct?
A. Yes.
Q. And if you look at Table 2, the authors provide the factual support for

Page 175

3.8 million years; is that right?
A. Yes.
Q. If we look at Table 2, the authors list the four cohort studies, NHS, NHS-2, SIS, and WHI-OS.
And you're familiar with each of those cohort studies; is that right?
A. Yes.
Q. The pooled estimate is 3,765,706, correct?
A. Yes.
Q. And if you go down to the right, the last column, the adjusted hazard ratio is 1.08 with a confidence interval of .99 to 1.7; is that correct?
A. In the top half of the chart. In the bottom half of the chart, when they looked at just women with patent reproductive tracts, meaning their tubes were open and they had their uterus, the adjusted hazard rate was 1.13 and the confidence intervals were 1.01 to 1.26. Both of those things are on that chart.
Q. On page 10 of your amended report, Exhibit 3, you state: The overall

Page 176

relative risk for ever use versus never use of genital talcum powder was 1.08, confidence interval, .99 to 1.17; is that right?
A. Yes.
Q. You go on then to say: However, significantly elevated risk was found in women with patent reproductive tracts. And that's the relative risk of 1.13 that you pointed out on Table 2; is that right?
A. That's correct.
Q. The finding for ever versus -- strike that.
The finding for ever/never use is not statistically significant, correct?
DR. THOMPSON: Object to form.
A. The finding for never use is -- I don't know what that means. You said the finding for never use is not statistically significant. I don't know what that means.
BY MR. ZELLERS:
Q. For ever versus never use. So looking at the top part of our Table 2, the 1.08 is not statistically significant?
A. It's a positive association

Page 177

that just barely crosses 1, and to me, that supports the rest of the literature. And specifically, again, looking at the women who I would think were at most risk, those were the talc could have entry in through the fallopian tubes through the uterus, there was a statistically significant increase.
Q. Can you answer my question?
A. I think I did.
Q. My question is: The overall relative risk for ever use versus never use of genital talcum powder of 1.08, you describe that as a positive association, but it is not a statistically significant association, correct?
DR. THOMPSON: Objection.
A. It crosses 1. It's .99 to 1.9 -- 17.
BY MR. ZELLERS:
Q. Is my statement correct?
DR. THOMPSON: Objection.
MS. GARBER: Objection.
A. That means the chances of it being between 99 and 1.17 is 95%. That's my interpretation of that.

Judith Wolf, M.D.

Page 422

1  A. The testing today often has
2  more genes, yes.
3  BY MR. ZELLERS:
4  Q. You're aware that
5  Ms. Gallardo's mother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮?
7  A. I don't recall that from her
8  records.
9  Q. Do you know whether or not
10 Ms. Gallardo's mother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?
12 A. I don't.
13 Q. If she did ▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, correct?
16 A. Most of the time.
17 Q. So we just don't know whether
18 Ms. Gallardo's mother ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮ correct?
21     DR. THOMPSON: Object to form.
22     MS. GARBER: Object to the
23 form.
24 A. We don't know ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Page 423

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2  ▮▮▮▮▮▮▮. So I don't think there's
3  any information to add to that one way or
4  another.
5     MR. ZELLERS: All right. Let's
6  end for today. Because we went out of
7  order on this case, I may have a few
8  follow-up questions tomorrow, but I've
9  covered at least the bulk of my
10 questions relating to Ms. Gallardo.
11    So we'll come back in the
12 morning, and we will do the other
13 three cases.
14    THE WITNESS: Okay.
15    MR. ZELLERS: Okay. We're off
16 the record.
17    (Time noted: 6:01 p.m. CDT)
18    --o0o--

Page 424

CERTIFICATE
I, MICHAEL E. MILLER, Fellow of the Academy of Professional Reporters, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, JUDITH WOLF, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that pursuant to FRCP Rule 30, signature of the witness was not requested by the witness or other party before the conclusion of the deposition.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Notary Public in and for the
State of Texas
My Commission Expires: 7/9/2024

Dated: September 16, 2021

Page 425

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.