# EXHIBIT 38

Anne McTiernan, M.D., Ph.D.

1                    IN THE CHANCERY COURT
              OF THE FIRST JUDICIAL DISTRICT
2               OF HINDS COUNTY, MISSISSIPPI
           CIVIL ACTION NO. 25CH1:14-cv-001207
3
4    THE STATE OF MISSISSIPPI,      :
     ex rel. LYNN FITCH, ATTORNEY   :
5    GENERAL,                       :
                                    :
6                   Plaintiff,      :
                                    :
7              vs.                  :
                                    :
8    JOHNSON & JOHNSON, et al.      :
                                    :
9                   Defendants.     :
10
11                   VOLUME I
12
13              Remote deposition of ANNE
14   MCTIERNAN, M.D., Ph.D., taken in the
15   above-entitled matter before Suzanne J. Stotz,
16   Certified Shorthand Reporter, Certified Court
17   Reporter, Certified Realtime Reporter,
18   Registered Professional Reporter, on Tuesday,
19   October 3, 2023, commencing at 9:06 a.m. PDT.
20
21
22
23
24
25

Page 2

1  A P P E A R A N C E S :
2
3  ATTORNEYS FOR PLAINTIFF:
4    (Via Videoconference)
     BEASLEY ALLEN, P.C.
5    BY:  LEIGH O'DELL, ESQ.
     218 Commerce Street
6    Montgomery, Alabama 36104
     (334) 269-2343
7    leigh.odell@beasleyallen.com
8
9  ATTORNEYS FOR DEFENDANTS:
10   (Via Videoconference)
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
11   BY:  JESSICA DAVIDSON, ESQ., and
          ASHER S. TRANGLE, ESQ.
12   One Manhattan West
     New York, New York 10001
13   (202) 735-2588
     jessica.davidson@skadden.com
14   asher.trangle@skadden.com
15      - and -
16   (Via Videoconference)
     BUTLER SNOW LLP
17   BY:  MEADE W. MITCHELL, ESQ.
     1020 Highland Colony Parkway
18   Post Office Box 6010
     Ridgeland, Mississippi 39158-6010
19   (601) 948-5711
     Meade.Mitchell@butlersnow.com
20
21
   ALSO PRESENT:
22
     Michelle Parfitt, Esq.,
23   c/o Ashcraft & Gerel
24   Carolin De La Rosa, Videographer
25

Page 3

I N D E X

EXAMINATION
                                    Page No.
ANNE MCTIERNAN, M.D., Ph.D.
BY MS. DAVIDSON                        7


E X H I B I T S

Exhibit
Name      Description            Page No.

1    Amended Expert Report of        21
     Anne McTiernan, M.D., Ph.D.
2    Plaintiff'S Disclosure of       40
     Expert Witnesses

3    Curriculum Vitae of Anne        50
     McTiernan, M.D., Ph.D.
4    Prior Deposition, Trial and     55
     Hearing Testimony of Anne
     McTiernan, M.D., Ph.D.
5    Anne McTiernan, M.D., Ph.D.     61
     - Materials Considered List

6    Publication entitled,           72
     "Asbestos Exposure and
     Ovarian Cancer - a
     Gynaecological Occupational
     Disease, Background,
     Mandatory Notification,
     Practical Approach," by
     Dennis Nowak, et al.

Page 4

I N D E X (Continued)

E X H I B I T S (Continued)

Exhibit
Name      Description            Page No.

7    Article entitled, "Talcum       79
     powder induces malignant
     transformation in normal
     human primary ovarian
     epithelial cells," by Amy K.
     Harper, et al.
8    Publication entitled,          121
     "Genital powder exposure and
     the risk of epithelial
     ovarian cancer," by Karin A.
     Rosenblatt, et al.
9    The American College of        136
     Obstetrics and Gynecologists
     FAQs on Ovarian Cancer
10   Document entitled, "Centers    141
     for Disease Control:  What
     are the Risk Factors for
     Ovarian Cancer
11   National Cancer Institute      149
     Publication entitled,
     "Ovarian, Fallopian Tube,
     and Primary Peritoneal
     Cancers Prevention
     (PDQ®)–Health Professional
     Version
12   Publication entitled,          158
     "Association Between the
     Frequent Use of Perineal
     Talcum Powder Products and
     Ovarian Cancer:  A
     Systematic Review and
     Meta-analysis," by Sean A.
     Woolen, MD MSc, et al.

Page 5

I N D E X (Continued)

E X H I B I T S (Continued)

Exhibit
Name      Description            Page No.

13   Publication entitled,          193
     "Markers of inflammation and
     risk of ovarian cancer in
     Los Angeles County," by Anna
     H. Wu, et al.

14   Publication entitled, "Talc    218
     powder and ovarian cancer:
     What is the evidence?"  by
     John P. Micha, et al.

     (Exhibits attached to transcript.)

Page 6

1    THE VIDEOGRAPHER:  We're now on the
2 record.  My name is Carolin De La Rosa, a
3 videographer for Golkow Litigation
4 Services.
5    Today's date is October 3, 2023,
6 and the time is 9:06 a.m.
7    This deposition is being held in
8 the matter of Talc (Lynn Fitch AG ex rel.
9 State of Mississippi versus Johnson &
10 Johnson, et al.  The deponent today is
11 Dr. Anne McTiernan.
12    All parties to this deposition are
13 appearing remotely and have agreed for the
14 witness to be sworn in remotely.
15    All parties are noted on the
16 stenographic record.
17    Will the Court please administer
18 the oath to the witness.
19    THE COURT REPORTER:  Doctor, if you
20 could raise your hand.
21    THE WITNESS:  (Complies with
22 request.)
23 A N N E   M C T I E R N A N, M. D., P H. D.,
24 having first been duly sworn, was examined and
25 testified as follows:

Page 7

1    THE COURT REPORTER:  Thank you.
2 You may proceed.
3    MS. DAVIDSON:  Thank you.  Before
4 we start, I just want to make sure you
5 guys can hear me and I don't have to put
6 on my things -- my ear buds.
7    Am -- am I perfectly clear?
8    THE COURT REPORTER:  You sound good
9 to me.
10    MS. DAVIDSON:  Okay.  Great.
11    THE WITNESS:  Yeah, it's clear --
12 it's to me -- it's clear to me also, yeah.
13    MS. DAVIDSON:  Excellent.  Okay.
14    EXAMINATION
15 BY MS. DAVIDSON:
16    Q.   So Dr. McTiernan, it's nice to see
17 you again.
18    Can you please state your full name
19 for the record?
20    A.   Anne McTiernan.
21    Q.   Great.  I know you've been deposed
22 before; and in the interest of not repeating
23 old ground, I'm not going to go through the
24 deposition rules again.  I think you know them
25 quite well.

Page 8

1    Where are you today?
2    A.   I'm in Seattle, Washington, in my
3 home.
4    Q.   Did you bring any materials with
5 you in response to the depo notice?
6    A.   I have copies of my -- of papers
7 that were added to the reliance list.
8    Q.   Is that all you have -- sorry.
9    MS. O'DELL:  And -- and excuse me.
10 Just for the record, Jessica, I'm assuming
11 you got the objections and responses that
12 were filed by the plaintiff about two
13 weeks ago, I think on the record.
14    And we have provided documents
15 yesterday in keeping -- I say that,
16 yesterday; it was last Thursday -- in
17 keeping with those objections and
18 responses.
19    MS. DAVIDSON:  Asher, we got an
20 updated CV and reliance list, right?
21    MR. TRANGLE:  Yes, and testimony
22 list.
23    MS. DAVIDSON:  And that's it,
24 right?
25    MR. TRANGLE:  And testimony list --

Page 9

1    MS. DAVIDSON:  Okay.
2    MR. TRANGLE:  But I think -- but I
3 think that was identical.
4    MS. DAVIDSON:  Okay.
5 BY MS. DAVIDSON:
6    Q.   And that's -- is that all you have
7 in front of you today, Dr. McTiernan?
8    A.   I have the IARC report on asbestos
9 from 2012.  Prior to that, I have -- most of
10 this other documents they're, yeah, things that
11 are in the new reliance list or occasionally
12 something they have referred to in that
13 individual paper.
14    Q.   I'm sorry?
15    A.   So if one of the studies used a
16 reference for their methodology, then I may
17 have a copy of that here.
18    Q.   So -- and are these hard copies?
19    A.   Yes.
20    Q.   So in addition -- can you tell me
21 what documents you have in front of you in
22 addition to the ones that are listed in the
23 Materials Considered List?
24    A.   Let's see.  I don't have them
25 separated out that way by whether they're in

Anne McTiernan, M.D., Ph.D.

Page 10

¹ the -- the materials list, so I could read them
² off --
³     Q.     Okay.
⁴     A.     -- everything that I have here.
⁵     Q.     It sounds good.
⁶     A.     I have Leon, "Occupational
⁷ Environment and Ovarian Cancer Risk."
⁸          I have Wentzensen and O'Brien,
⁹ "Talc Body Powder and Ovarian Cancer:  A
¹⁰ Summary of the Epidemiologic Evidence."
¹¹          I have Micha, "Talc Powder and
¹² Ovarian Cancer:  What is the Evidence."  And
¹³ then there were two letters associated with
¹⁴ that.  So that was an opinion piece.  There
¹⁵ were two letters associated with that also, one
¹⁶ by I think it was by Tran and one by Micha.
¹⁷          I have a correspondence article by
¹⁸ Cramer.  It's called "The Association of Talc
¹⁹ Use and Ovarian Cancer:  Biased or Causal."
²⁰ That was from 2022.
²¹     Q.     Anything else?
²²     A.     Yes, quite a few.  I have
²³ Environmental Protection Agency, EPA, March
²⁴ 2005, "Guidelines for Carcinogen Risk
²⁵ Assessment."  So this would have been

Page 11

¹ referenced by the Lynch papers.
²          I have something that's up on the
³ on the reference list, Cochrane Training,
⁴ Chapter 15, "Interpreting Results and Drawing
⁵ Conclusions."
⁶          I have the O'Brien paper from --
⁷ let's see -- from 2023, "Douching and Gentle
⁸ Talc Use:  Patterns of Use and Reliability of
⁹ Self-Reported Exposure."
¹⁰          I have two papers from the Physical
¹¹ Activity Guidelines Advisory Committee, and
¹² these explain the methodology that was used in
¹³ that committee.  So that refers to my CV.
¹⁴          So these are -- these are papers
¹⁵ that are not on my CV, but they're methodology
¹⁶ for work I did with the U.S. Physical Activity
¹⁷ Guidelines Committee.
¹⁸          So one is by Torres, T-O-R-R-E-S,
¹⁹ 2018, Umbrella and Systematic Review
²⁰ Methodology to Support the 2018 Physical
²¹ Activity Guidelines Advisory Committee.
²²          And then there's another paper by
²³ Pescatello, P-E-S-C-A-T-E-L-L-O, "Best
²⁴ Practices for Better Reviews and Physical
²⁵ Activity and Health Research:  Insights from

Page 12

¹ the Physical Activity Guidelines for Americans
² Advisory Committee Scientific Report."
³          There's some papers here that don't
⁴ make sense to be here.  I can -- I can put
⁵ these away if you want.  There are a couple of
⁶ papers on causal claims and journals, but
⁷ they're not -- that didn't affect my -- my
⁸ opinion; and I don't need them.
⁹          So I could either put them away or
¹⁰ I can tell you what they are.  I don't mind
¹¹ either way.
¹²     Q.     You can just put them away.  I
¹³ think that's --
¹⁴     A.     Okay.
¹⁵     Q.     -- in the interest of time easier.
¹⁶     A.     Okay.
¹⁷     Q.     So the document -- are you done?
¹⁸     A.     No.  There's quite a bit more here.
¹⁹     Q.     Oh.
²⁰     A.     I have -- I showed you that one.
²¹          I have a paper copy of my updated
²² report, expert report, dated June 24, 2021.  I
²³ have two papers by Lynch, et al.  So these -- I
²⁴ don't know.  One is 2023 Lynch, "Systematic
²⁵ Review of Association Between Talc and Female

Page 13

¹ Reproductive Tract Cancers."
²          And the other is Lynch, "Systematic
³ Review" -- where is that -- "of the Scientific
⁴ Evidence of Pulmonary Carcinogenicity of Talc."
⁵          And those -- other papers that are
⁶ with those are the protocols.  So each of those
⁷ papers had a protocol available on their
⁸ website.
⁹          I have a paper that was -- two
¹⁰ papers that were included in these reviews that
¹¹ I downloaded because they were not part of my
¹² review.  One is Urban 2015, "Identifying
¹³ Postmenopausal Women at Elevated Risk for
¹⁴ Epithelial Ovarian Cancer."
¹⁵          And one is Jordan, and that is
¹⁶ 2007, "Risk Factors for Benign, Serous, and
¹⁷ Mucinous Epithelial Ovarian Tumors."
¹⁸          And then another paper that is on
¹⁹ the reliance list, Goodman, "Critical Review of
²⁰ Talc and Ovarian Cancer," 2020.
²¹          I have a paper that was on the
²² reliance list:  "Asbestos Exposure and Ovarian
²³ Cancer."  First author is Nowak, N-O-W-A-K, and
²⁴ that's 2021.  So there's that paper and the
²⁵ protocol that they listed on their website.

Anne McTiernan, M.D., Ph.D.

Page 14

1    Some of these are -- oh, so this
2  Nowak referenced some papers that I did not
3  have previously.  One is Bounin, "Occupational
4  Risk Factors:  Ovarian Cancer Literature
5  Review."
6         There are several cohort studies
7  that they refer to, one by Pira, "Updated
8  Mortality Study of a Cohort of Asbestos Textile
9  Workers; Magnani, M-A-G-N-A-N-I, "Italian Pool
10  of Asbestos Workers Cohorts."
11        One by Wang, "Cause-Specific
12  Mortality in a Chinese Chrysotile Textile
13  Worker Cohort."
14    Q.    Can we stop for a second?
15    A.    Yes.
16    Q.    Pira, Magnani, and Wang are not on
17  your reliance list.
18        Did you review them?
19    A.    Not in detail, and they're not on
20  my reliance list.
21    Q.    If you didn't review them in detail
22  and they're not on your reliance list, why do
23  you have them here?
24    A.    Because -- you know, because these
25  are ones that were referred to in another

Page 15

1  review.
2    Q.    Which review?
3    A.    Nowak, N-O-W-A-K.
4    Q.    When did you review Pira, Magnani,
5  and Wang?
6    A.    I didn't review -- review them --
7  review in depth, but it would have been in the
8  last month or so.
9    Q.    Did you review in depth every
10  single document on your Materials Considered
11  List?
12        MS. O'DELL:  Objection to the form.
13        THE WITNESS:  Sorry.  I didn't -- I
14  missed that.
15  BY MS. DAVIDSON:
16    Q.    Did you review in depth every
17  single document on your Materials Considered
18  List?
19    A.    Yeah.  I missed what Ms. O'Dell
20  said.
21        MS. O'DELL:  I just objected to the
22  form of the question.
23        You may answer if you understood
24  it.
25        THE WITNESS:  Oh, okay.  It depends

Page 16

1  on what it is.  We could go through each
2  one if you want.
3  BY MS. DAVIDSON:
4    Q.    Some -- some of the documents on
5  your Materials Reviewed List you reviewed in
6  depth and some you didn't; is that fair to say?
7        MS. O'DELL:  Objection.
8        Go ahead.
9        THE WITNESS:  It would depend on
10  what it was.
11  BY MS. DAVIDSON:
12    Q.    But there are some documents on
13  your Materials Reviewed List that you did not
14  review in depth, correct?
15        MS. O'DELL:  Objection to form.
16        THE WITNESS:  Yes, depending on
17  what the item was.
18  BY MS. DAVIDSON:
19    Q.    And yet you did not add Pira,
20  Magnani, and Wang to your review list?
21    A.    They're not there because they were
22  referenced within Nowak.
23    Q.    So does your review list not
24  include studies that are referenced in other
25  studies?

Page 17

1    A.    Typically it wouldn't because some
2  of these meta-analyses, systematic reviews
3  could have dozens or hundreds of references, so
4  I wouldn't put each one of those in my reliance
5  list.
6    Q.    Are you offering an opinion on
7  mesothelioma in this litigation?
8    A.    It's -- it's -- yes.  It's listed
9  in my expert -- that -- that will be part of my
10  expert opinion.
11    Q.    You're offering an opinion in the
12  Mississippi case that the use of talc can cause
13  mesothelioma?
14    A.    I just want to see what the actual
15  document says, how it's written.
16        Okay.  So as it's written in the
17  Plaintiff Disclosure of Expert Witnesses that I
18  will "provide expert testimony to a reasonable
19  degree of medical and scientific certainty that
20  exposure to talcum powder products is a cause
21  of ovarian cancer and mesothelioma."
22    Q.    Have you ever offered an opinion
23  before that exposure to talcum powder is a
24  cause of mesothelioma?
25    A.    I do discuss mesothelioma in my

Page 18

1  expert report. And --
2    Q.    Does your expert report state that
3  talcum powder can cause mesothelioma?
4    A.    I will need to look at that. So to
5  answer that I'm happy to look at my report and
6  tell you what I said.
7    Q.    What are you relying on for that
8  opinion?
9    A.    In much of the systematic review
10 that I did for my expert report, there were
11 multiple cancers reviewed, such as the IARC
12 monographs and some other studies.
13   Q.    Can you list for me everything that
14 you're relying on for your opinion that
15 exposure to talc can cause mesothelioma, every
16 material from your Materials Considered List
17 that you're relying on for that opinion?
18   A.    That would take some time to
19 answer. So if you want to take -- me to take
20 the time today, I can do that. It's going to
21 take quite a bit of time to review all of that
22 material and see which studies, which
23 documents, which monograph discussed
24 mesothelioma.
25   Q.    Can you identify any?

Page 19

1    A.    I'm going to look at my report
2  right now, and I'll give you an answer what I
3  find here.
4    Q.    Are you looking at your report?
5    A.    I am. I'm looking online so that I
6  can search for mesothelioma. So I'm looking at
7  the online version.
8    Q.    Which report?
9    A.    So this is the Amended Expert
10 Report dated June 24th, 2021, MDL No. 162738.
11   MS. DAVIDSON: If we could go to
12 the executive summary of that report,
13 let's mark that as Exhibit 1. I'm marking
14 as Exhibit 1, Amended Expert Report of
15 Anne McTiernan, dated Jan- -- June 24th,
16 2021.
17   MS. O'DELL: Jessica, are you
18 withdrawing the last question?
19   I think Dr. McTiernan was
20 endeavoring to answer -- answer that
21 question.
22   MS. DAVIDSON: Dr. McTiernan was
23 going to spend hours going through her
24 report to eat up time, and I'm not going
25 to play these games today.

Page 20

1    MS. O'DELL: She's not playing
2  games --
3    MS. DAVIDSON: That's why we're in
4  court.
5    MS. O'DELL: Let me finish. Let me
6  finish.
7    She was not playing games. You
8  asked her a question about her report, and
9  she was answering your question. If you
10 want to withdraw that question, that's
11 fine; but the assumption --
12   MS. DAVIDSON: -- the question --
13   MS. O'DELL: Please don't interrupt
14 me.
15   But the assertion that
16 Dr. McTiernan was not endeavoring to
17 answer your question in good faith is
18 inappropriate.
19   So if you -- if you want to
20 withdraw that question, please do; and if
21 you have another question -- and -- and
22 I'm sure Anne --
23   MS. DAVIDSON: Leigh, this
24 deposition will go for a month if
25 Dr. McTiernan is going to go through and

Page 21

1  look for the word "mesothelioma" in this
2  expert report.
3    The bottom line is --
4    MS. O'DELL: It will not.
5    MS. DAVIDSON: -- we all know that
6  this expert report was about ovarian
7  cancer. It was not causation
8  mesothelioma. So this is a completely new
9  opinion.
10   (Whereupon, Exhibit No. 1, Amended
11 Expert Report of Anne McTiernan, M.D.,
12 Ph.D., was marked for identification.)
13 BY MS. DAVIDSON:
14   Q.    And I would like to ask you,
15 Dr. McTiernan, in your executive summary to
16 please read the first sentence out loud.
17   A.    I'm looking at the context. I want
18 to see what else is in this executive summary.
19   Q.    You can do that on your own time.
20   I'm asking you in this deposition
21 to please read the first sentence of your
22 executive summary.
23   A.    Okay. "This -- this review
24 assessed relevant published epidemiologic
25 evidence on the association between use of

Anne McTiernan, M.D., Ph.D.

Page 22

¹ talcum powder products in the genital/perineal
² area and the risk of developing epithelial
³ ovarian cancer."
⁴         But this does not mean that -- that
⁵ I did not look at mesothelioma.
⁶     Q.    If we could turn to page 10 where
⁷ you summarize your opinions, can you read the
⁸ sentence "in my opinion"?
⁹     A.    Okay.  On mine it says page 11.
¹⁰ And I just want to --
¹¹     Q.    If you could just look on the
¹² screen --
¹³         MS. O'DELL:  Excuse me.
¹⁴ BY MS. DAVIDSON:
¹⁵     Q.    -- so that we're all working out of
¹⁶ the same exhibit, I think that would be better.
¹⁷         MS. O'DELL:  No.  No.  Excuse me,
¹⁸ please.
¹⁹         MS. DAVIDSON:  I'm sorry.
²⁰         MS. O'DELL:  Please don't --
²¹ please -- please do not interrupt
²² Dr. McTiernan.  If she is speaking,
²³ Jessica, please don't interrupt her; and
²⁴ that will allow this to go a lot more
²⁵ smoothly.

Page 23

¹         You can -- Dr. McTiernan has
² referenced her 2021 report as it relates
³ to mesothelioma.  That's what -- that's
⁴ new in a sense.
⁵         If you're going to through past
⁶ aspects of the report that she's already
⁷ been deposed on, has already testified to,
⁸ that contravenes what the agreement is.
⁹         MS. DAVIDSON:  Thank you, Leigh.
¹⁰ BY MS. DAVIDSON:
¹¹     Q.    Dr. McTiernan, please, for the sake
¹² of the record, I think we should be using the
¹³ official exhibit, which is the expert report
¹⁴ that has been introduced into evidence; and
¹⁵ page 10 is up on the screen.
¹⁶         MS. O'DELL:  So just since --
¹⁷ BY MS. DAVIDSON:
¹⁸     Q.    I would appreciate it if you --
¹⁹         MS. O'DELL:  You're interrupting
²⁰ me.
²¹ BY MS. DAVIDSON:
²²     Q.    I would appreciate if you didn't
²³ look in other documents so that we have a clear
²⁴ record of what you're looking at.
²⁵         And right now this exhibit is up on

Page 24

¹ the screen, and we're looking at page 10.
²         MS. O'DELL:  Just -- excuse me.  I
³ didn't mean to interrupt.  Let me ask.
⁴         Asher, if you will download this to
⁵ the chat.
⁶         If there is some discrepancy in the
⁷ document that's on the screen versus
⁸ Dr. McTiernan's expert report which she
⁹ has in her possession, then it should be
¹⁰ in the chat so she could look at that in
¹¹ context, not be confined to the screen.
¹² BY MS. DAVIDSON:
¹³     Q.    Dr. McTiernan, can you please read
¹⁴ the sentence that begins "in my opinion"?
¹⁵         MS. O'DELL:  Please put that in the
¹⁶ chat, Asher.  And thank you for doing
¹⁷ that.  I'm waiting for it.  I'm sure
¹⁸ Dr. McTiernan is, too.  And then she can
¹⁹ look at the document and ensure that she
²⁰ has it in context.
²¹ BY MS. DAVIDSON:
²²     Q.    Dr. McTiernan, can you please read
²³ the sentence at the top of page 10 out loud?
²⁴         MS. O'DELL:  You -- you may wait if
²⁵ you wish, Dr. McTiernan.  If you're

Page 25

¹ satisfied --
²         MS. DAVIDSON:  If she's going to
³ wait, then we're going to go off the
⁴ record.
⁵         MS. O'DELL:  If she's satisfied
⁶ that that's her report, then she can --
⁷ she can read it.
⁸         That -- I defer to you,
⁹ Dr. McTiernan.
¹⁰         THE WITNESS:  I'd prefer to wait
¹¹ until I can see the doc- -- the full
¹² document.
¹³         MS. DAVIDSON:  Great.  Let's go off
¹⁴ the record.
¹⁵         THE VIDEOGRAPHER:  The time is
¹⁶ 9:30 a.m.  We're off the record.
¹⁷         (Discussion held off the record.)
¹⁸         THE VIDEOGRAPHER:  The time is
¹⁹ 9:335 a.m.  We're back on the record.
²⁰ BY MS. DAVIDSON:
²¹     Q.    Can you read the first sentence at
²² the top of page 10 of your supplemental report?
²³     A.    "In my opinion as an epidemiologist
²⁴ and physician, stated to a reasonable degree of
²⁵ medical and scientific certainty, use of talcum

Page 26

1  powder products, including Johnson & Johnson
2  Baby Powder and Shower to Shower in the
3  genital/perineal area can cause ovarian
4  cancer."
5      Q.   Are you still offering the
6  testimony that this expert report included the
7  opinion that you use of the talcum powder can
8  cause mesothelioma?
9          MS. O'DELL:  Object to the form.
10         THE WITNESS:  At this -- this
11     document does include information on
12     mesothelioma.  Many of the studies that I
13     looked at included mesothelioma.  IARC
14     also reviewed mesothelioma.  And so it's
15     definitely part of my expert report.
16  BY MS. DAVIDSON:
17     Q.   Part of your expert report is an
18  opinion that use of talc causes mesothelioma?
19         MS. O'DELL:  Object to the form.
20  BY MS. DAVIDSON:
21     Q.   That's your testimony?
22         MS. O'DELL:  Object to the form.
23     It misstates the testimony.
24         THE WITNESS:  Can you mis- --
25     repeat your question, please?

Page 27

1  BY MS. DAVIDSON:
2      Q.   Is it your testimony today that
3  this report includes the opinion that talc use
4  can cause mesothelioma?
5      A.   This report included information --
6  I based my opinion on information expertise,
7  scientific studies that included data on
8  mesothelioma as being caused by talcum powder
9  products and asbestos.
10     Q.   Can you point me to any sentence in
11  this expert report that says that the use of
12  talc causes mesothelioma?
13     A.   I would need to review my report in
14  depth to see what has been stated about
15  mesothelioma.
16     Q.   So let's go off the record for you
17  to find for me where this expert report says
18  that the use of talc causes mesothelioma.
19         THE VIDEOGRAPHER:  The time is
20     9:37 a.m.  We're off the record.
21         (Discussion held off the record.)
22         (Meade Mitchell joined the
23     conference.)
24         (Whereupon, a break was taken.)
25         THE VIDEOGRAPHER:  The time is

Page 28

1  10:26 a.m.  We're back on the record.
2      MS. O'DELL:  In response to the
3  previous discussion about the scope of
4  Dr. McTiernan's testimony in this case
5  that she'll be offering the opinion that
6  talcum powder and its constituent parts,
7  including asbestos and talc fibers,
8  cause -- can cause ovarian cancer, that
9  she will not be offering the specific
10  opinion in this case that asbestos and
11  talcum powder causes mesothelioma;
12  however, Dr. McTiernan certainly has read
13  and testified to references like the IARC
14  20- -- 2012 100C Monograph that do discuss
15  mesothelioma being caused by ovarian
16  cancer, and that's certainly part of
17  her -- her body of knowledge.
18      And that's a statement on the
19  record that I would make in regard to
20  mesothelioma causation opinion in this
21  case.
22      MS. DAVIDSON:  Thank you, Leigh.
23  We go --
24      MS. O'DELL:  I'm sorry.  Go ahead.
25  Excuse me.

Page 29

1      MS. DAVIDSON:  Meade, do you have
2  anything to add to that?
3      MR. MITCHELL:  I do not.  My
4  understanding from Leigh's statement that
5  Dr. McTiernan is not going to be offering
6  any personal opinions in this case that
7  asbestos in talcum powder can lead to
8  mesothelioma.  That's my understanding
9  from her statement.
10      MS. DAVIDSON:  Okay.  The reason we
11  got on to this detour was because when we
12  began this deposition, I was asking
13  Dr. McTiernan what documents she had in
14  front of her; and she listed some of the
15  miner and miller studies.
16      So then we got off on to this
17  discussion because I was surprised to hear
18  those were front of Dr. McTiernan so far
19  as they were not on her reliance list.
20  BY MS. DAVIDSON:
21      Q.   But as a result, Dr. McTiernan, we
22  never finished discussing what other documents
23  you have in front of you.
24      And in order to short circuit that,
25  I think the question really was:  What

Anne McTiernan, M.D., Ph.D.

Page 30

1 documents do you have in front of you that are
2 not listed on your Materials Considered List.
3         So I know we said Pira, Magnani,
4 Wang.
5         Are there any other documents that
6 you are looking at today that -- or have you in
7 front of you today that are not listed on your
8 Materials Considered as it was amended and
9 provided to us last week?
10    A.    Let me just take a couple minutes
11 look here.
12    Q.    Sure.
13    A.    I don't see anything else.
14    Q.    Excellent.  And when we were
15 talking about your 2021 updated MDL report, you
16 were looking at it online.
17         I think for the purpose of this
18 deposition, I would appreciate if you would
19 just close all of your computer files and so
20 that we're creating a clear and accurate
21 record, that we're all looking at the same
22 documents.
23         So if there's a document you want
24 to look at, Asher will put it in the chat.  It
25 will also be up on the screen, and I would ask

Page 31

1 that you limit what you look at in this
2 deposition to that.
3         Is that okay?
4         MS. O'DELL:  No.  If -- if she has
5     a copy, for example, of an article that's
6     on her reliance list and she has a paper
7     copy in front of her and Dr. McTiernan
8     prefers to look at a paper copy, then that
9     seems perfectly appropriate.  I wouldn't
10    limit her.
11        MS. DAVIDSON:  That isn't what I
12    was saying, Leigh.  I was talking about
13    looking at things on the computer.
14        MS. O'DELL:  Okay.  Fair.  I
15    misunderstood.
16        MS. DAVIDSON:  Yes.
17 BY MS. DAVIDSON:
18    Q.    Obviously the documents you listed
19 that you have in front of you that are on your
20 reliance list, that's fine.
21        Are any of those documents marked
22 up in any way?
23    A.    These documents that -- paper
24 documents?
25    Q.    Uh-huh.

Page 32

1    A.    Underlined, underlined or high- --
2 or highlighted.
3    Q.    They have underlines and
4 highlights?
5    A.    Some of them.
6    Q.    If you decide during this
7 deposition to look at a document with
8 underlines or highlights, I would ask that you
9 send that to the chat so that we can maybe -- I
10 don't know how we would do that, maybe a PDF of
11 that -- so we all have the benefits of your
12 underlines and highlights while you're looking
13 at them.  We'll figure that out when the time
14 comes.
15        But if you're looking at a document
16 that's underlined and highlighted, I believe we
17 should all have access to that.
18        MS. O'DELL:  If we get to that
19    point, Jessica, I would just suggest just
20    ask about the underlining and highlights
21    or maybe that's something that can be
22    obtained after the deposition; but it
23    won't be possible for her to scan that
24    document, for example, and put it in the
25    chat.

Page 33

1        So if there are hard copies --
2        MS. DAVIDSON:  I believe -- I
3    believe under the rules of -- Meade,
4    correct me if I'm wrong -- that we're
5    entitled to the benefit of those
6    highlights and underlines of a document
7    that Dr. McTiernan is bringing to the
8    deposition.
9        And my understanding is you guys
10    wanted to do this on Zoom, and we're being
11    accommodating; but obviously, that's
12    something that we would need to see.
13        MS. O'DELL:  In the past what we've
14    done is if there -- if this situation
15    comes up -- I don't think it should be
16    controversial now.  If there's a situation
17    that comes up, I'm sure Dr. McTiernan will
18    be prepared to describe that to you and
19    provide a hard copy after the deposition.
20        I'm just talking through the
21    technical issue for today.
22        MR. MITCHELL:  We'll deal with it
23    when it comes up.  Counsel it needs --
24    we'll see if we can work through it when
25    it comes up.

Page 34

1        MS. O'DELL:  Fair enough.
2        MS. DAVIDSON:  Thank you, Meade.
3  All right.
4        THE WITNESS:  Yep.
5        MS. DAVIDSON:  I think we can move
6  on now.  I think we've covered all the
7  logistical issues.
8  BY MS. DAVIDSON:
9     Q.   And let me ask you a question,
10 Dr. McTiernan, on a completely different
11 subject.
12       How much money have you charged
13 plaintiffs to date in the talc litigation?
14    A.   So I think you have invoices
15 through 2020.  So I did not add up the
16 invoices.  I can say that after those invoices,
17 there is 86 and a half hours unbilled as of
18 yet -- I'm sorry, 86 plus 17, so about a little
19 over 100 hours still to be billed.
20    Q.   So just to be clear, you haven't
21 billed plaintiffs since 2020?
22    A.   No.  You have -- you should have
23 invoices -- sorry.
24       You should have invoices through --
25 let's see, yeah, I'm sorry -- through 2022.  So

Page 35

1  this is after that.  It would be about 100
2  hours to be billed.
3     Q.   When you say we should have
4  invoices through 2022, what is your basis for
5  that?
6     A.   These -- I 'e closed these out now.
7  I had my invoices open.
8        But just looking at a spreadsheet
9  of hours, I've documented that my last bill was
10 September 2021 -- no, I'm sorry, September of
11 2022.
12    Q.   In September 2022, how much did you
13 invoice?
14    A.   $2,250.
15    Q.   And what was the invoice before
16 that?
17    A.   10/6/21.
18    Q.   And how much was that?
19    A.   33,350.
20    Q.   And what was the invoice before
21 that?
22       And I think that will take us to
23 where -- what we have.
24    A.   That was 10/6/21, and that was for
25 20 - --- 20,000.

Page 36

1     Q.   I'm sorry.  On 10/6/21, you had two
2  invoices, one for 33,000, one for 20,000?
3     A.   I'm going to have to open up my
4  files and look at the invoice and actually see
5  what they stated.
6     Q.   Okay.  I may have misheard you, but
7  I think you mentioned 10/6/21 twice.  The first
8  time you said 33,000, and the second time you
9  said 20,000.
10    A.   Yes.  And they may have been
11 charged to different accounts.  So that may be
12 why there's two, so I'd have to look on it.
13    Q.   And so -- and the last bill before
14 that was when?
15    A.   Okay.  So you don't want me to look
16 at my voices?
17    Q.   Let's just go through this since
18 you're in this document.
19    A.   Okay.  So the last bill before
20 10/6/21 --
21    Q.   Uh-huh.
22    A.   -- was 8/3/21.
23    Q.   And how much was that for?
24    A.   4,250.
25    Q.   Okay.  And if you go back one more

Page 37

1  before that --
2        MS. O'DELL:  I think --
3  BY MS. DAVIDSON:
4     Q.   -- what's the date on that?
5        MS. O'DELL:  I think that would
6  have been covered, Jessica.
7        She was deposed, and I think after
8  that time.  Certainly it was June.  So I
9  think you're up to date with anything new
10 since the last deposition.
11       MS. DAVIDSON:  Hold on.
12       What was the date of the
13 deposition, Asher?
14       MR. TRANGLE:  The most recent
15 deposition?
16       MS. DAVIDSON:  Uh-huh.
17       MR. TRANGLE:  One second.
18       MS. DAVIDSON:  I'm sorry?
19       MR. TRANGLE:  I'm just looking.
20 One second.
21       MS. DAVIDSON:  Okay.  I know it was
22 2021, but I just want to make sure that it
23 was after August 2021.
24       MS. O'DELL:  It was.  Her -- her
25 report was disclosed --

Page 38

1    MR. TRANGLE:  It was.
2    MS. O'DELL:  Okay.  Great.
3 BY MS. DAVIDSON:
4    Q.    And then you're saying that since
5 September 2022, you have about a hundred
6 unbilled hours, correct?
7    A.    Yes.
8    Q.    And what is your current billing
9 rate?
10    A.    For reviewing documents, it's 500
11 per hour.  For deposition, it's 800 per hour.
12    Q.    But there haven't been any
13 depositions since 2022, so that hundred hours
14 is going to be billed at 500 an hour, right?
15    A.    That's correct.
16    Q.    And you're way better at math than
17 I am, but I think that's another $50,000.
18    A.    I'm --
19    Q.    Does that sound right?
20    A.    I'm not going to estimate right
21 here.
22    Q.    But 100 times 500 is 50,000; is my
23 math right?
24    A.    Yeah, but it's approximately 100
25 so...

Page 39

1    Q.    So approximately 50,000?
2    A.    Yes.
3    Q.    Okay.  Thank you.
4         Other than talc and Zantac, have
5 you served as an expert in any other litigation
6 in the last five years?
7    A.    No.
8    Q.    Approximately how much did you
9 charge in total for your work in the Zantac
10 litigation?
11    A.    So that would have been
12 approximately 500,000.
13    Q.    And are you still working on
14 Zantac?
15    A.    No.
16    Q.    When did you stop working on
17 Zantac?
18    A.    December 2022.
19    Q.    And are you currently working on
20 any other litigation besides talc?
21    A.    No.
22    Q.    How did you prepare for today's
23 deposition?
24    A.    I've read through my report.  I've
25 read through the papers that I mentioned that

Page 40

1 are listed on reliance.  I did a search for any
2 new papers in the area.  And pretty much that's
3 it, is reviewing -- reviewing those documents
4 and reviewing my previous report, my amended
5 report.
6    Q.    Have you reviewed any expert
7 materials from the Mississippi AG case?
8    A.    I reviewed the Complaint and the
9 Amended Complaint.
10    Q.    Anything else from this case?
11    A.    That's all to my knowledge.
12    Q.    Do you know who the other plaintiff
13 experts are in this litigation -- in this
14 specific lawsuit?
15    A.    I don't know specifically who they
16 are.  I've not seen a list of who they'll be.
17    Q.    We've been talking a little bit
18 today about your expert disclosures in this
19 matter.
20    MS. DAVIDSON:  Asher, let's mark
21 that document as Exhibit 2.
22    (Whereupon, Exhibit No. 2,
23 Plaintiff'S Disclosure of Expert
24 Witnesses, was marked for identification.)
25    MS. O'DELL:  Are you referring to

Page 41

1 the Plaintiff's Disclosure of Expert
2 Witnesses?
3    MS. DAVIDSON:  Yeah.  Asher, will
4 mark it and put it up on the screen.
5    MS. O'DELL:  But it's -- just for
6 the record, it's not Dr. McTiernan's
7 disclosure.  It's a pleading filed in the
8 case.
9 BY MS. DAVIDSON:
10    Q.    Dr. McTiernan, have you seen this
11 document before?
12    A.    I only see a little piece of it, so
13 I'm not sure.
14    Q.    Well, just -- have you ever seen a
15 document titled "Plaintiff's Disclosure of
16 Expert Witnesses in the State of Mississippi
17 Versus J&J"?
18    A.    Yes.
19    Q.    And when did you see this document?
20    A.    I think it was recent.  I can't
21 remember if it was last week when I first saw
22 it.
23         And I just looked at it today when
24 you asked me a question earlier.
25    Q.    So you had not seen this document

Anne McTiernan, M.D., Ph.D.

1  until last week?
2      A.   I don't believe.  I'd have to look
3  at my e-mails to see when I would have received
4  it.
5      Q.   Do you have a recollection of
6  reviewing a draft of this document before it
7  was submitted?
8      A.   No.
9      Q.   Did you meet with anyone from
10 plaintiff's counsels office or any of
11 plaintiff's multiple counsel to prepare for
12 this deposition?
13     A.   Yes.
14     Q.   With whom did you meet?
15     A.   With Ms. O'Dell, with Ms. Parfitt,
16 and for some meetings Mr. Green and Mr. Lyons.
17     Q.   How many meetings were there in
18 total?
19     A.   I would have to count that up.  I'm
20 happy to do that, but I don't know exactly.
21     Q.   Approximately how many times did
22 you meet with counsel to prepare for this
23 deposition?
24     A.   Okay.  I'll look at my spreadsheet
25 here because I do mark them whether they're a

1  call or not.
2      Q.   When you say your spreadsheet, what
3  are you referring to?
4      A.   Where I record the hours that I've
5  worked.
6      Q.   I see.  Okay.
7      A.   Somewhere between five and seven
8  Zoom meetings.
9      Q.   Over what period did these Zoom
10 meetings take place?
11     A.   Beginning August 2023.
12     Q.   And approximately how long did each
13 Zoom last?
14     A.   Usually about an hour.
15     Q.   Were you shown any documents at any
16 of these Zoom meetings that are not listed on
17 your materials considered?
18     A.   I don't recall seeing anything no.
19     Q.   Were you shown the miner and miller
20 studies at those meetings?
21         MS. O'DELL:  Objection --
22         THE WITNESS:  For which studies.
23         MS. O'DELL:  Excuse me.
24         THE WITNESS:  Oh, sorry.
25         MS. O'DELL:  So I'm going to object

1  to the degree that this seeks information
2  and communications between Dr. McTiernan
3  and counsel and instruct her not to
4  answer.
5          MS. DAVIDSON:  So my understanding
6  is that we are allowed to ask about what
7  documents were looked at.  We're not
8  allowed to ask about communications.
9          That is my understanding of the
10 law.
11         MS. O'DELL:  I -- I don't -- I
12 think you -- that question delved into
13 communications, and that's the basis of my
14 objection.
15         And -- and so I would instruct her
16 not to answer.
17         If -- you've already asked her
18 about documents that she's seen that are
19 not on her reliance list.  You can
20 certainly explore that but not about the
21 content of the Zoom calls, what was shown,
22 et cetera, discussions that took place,
23 because that deals with --
24         MS. DAVIDSON:  I'm not asking about
25 discussions.

1  BY MS. DAVIDSON:
2      Q.   I'm just asking whether you looked
3  at any miner or miller studies during any of
4  those Zooms, and I believe that is an
5  appropriate question.
6          MS. O'DELL:  I do not believe
7  that's an appropriate question.  Because
8  you're asking if we talked about the miner
9  or miller studies during the conversation,
10 whether that occurred, and that delves
11 into the communication of counsel; and I'm
12 instructing Dr. McTiernan not to answer
13 the question.
14         MS. DAVIDSON:  I'm asking about
15 documents reviewed in those prep sessions,
16 and my understanding is that documents
17 reviewed in a prep session are fair game
18 to know the identities of them not the
19 discussion regarding them that took place.
20         Unless Mississippi law the so
21 generous, that is generally the law.
22         MS. O'DELL:  That is -- that is not
23 the law.
24         Discussions about documents that --
25 that -- and the content of meetings with

Page 46

1    experts and specific topics such as a
2    particular paper, that is protected by the
3    work product privilege; and I'm going to
4    instruct Dr. McTiernan not to answer.
5         MS. DAVIDSON:  So you are
6    instructing her not to identify any
7    documents that she looked at on any Zoom?
8         MS. O'DELL:  Correct.
9    BY MS. DAVIDSON:
10    Q.    Have you published any papers
11   relating to talcum powder or ovarian cancer
12   since your last deposition?
13    A.    I believe on my CV I do mention the
14   one that you mentioned before we got on the
15   call.  So I need to look at that.  And it's
16   not -- the subject matter is not talcum powder,
17   but I think did disclose my expert witness work
18   so...
19    Q.    Are you talking about the exercise
20   paper?
21    A.    Yes.
22    Q.    Have you given any speeches related
23   to talcum powder since your last deposition?
24    A.    No.
25    Q.    Have you written anything online or

Page 47

1    elsewhere about talcum powder since your last
2    deposition?
3    A.    Could you repeat the question?
4         MS. O'DELL:  Court Reporter, could
5    you repeat my question just so we repeat
6    it accurately?
7         THE WITNESS:  So could you repeat
8    the question?
9         THE COURT REPORTER:  I --
10        THE WITNESS:  Oh, okay.
11        THE COURT REPORTER:  That's okay.
12        (At which time the following was
13   read back:
14        "Question:  Have you written
15   anything online or elsewhere about talcum
16   powder since your last deposition?")
17        MS. O'DELL:  Object to the form.
18        And you're talking about something
19   published for the public, correct?  Is
20   that the question?
21        Online, in a book, et cetera, but
22   you're talking about a public document,
23   correct?
24        MS. DAVIDSON:  I'm talking about
25   any doc- --- if you're concerned that I'm

Page 48

1    asking about communications with counsel,
2    I can amend the question to be "have you
3    written anything online or elsewhere,
4    other than communications with counsel,
5    related to talcum powder since your last
6    deposition.
7         MS. O'DELL:  Thank you.
8         THE WITNESS:  I'm going to -- I'm
9    searching through for a paper that I --
10   where I mentioned talcum powder in
11   relation to avoiding carcinogens.
12        So I need to look through my CV to
13   determine what that was.
14        The last deposition was 2021,
15   correct?
16   BY MS. DAVIDSON:
17    Q.    Correct.
18    A.    So it would have to be after that.
19    Q.    I'm sorry.  Dr. McTiernan, can you
20   tell us what you're looking at?
21    A.    So I'm looking through my papers
22   published in recent years to see if any of
23   these include mention of talcum.
24    Q.    So I think I wasn't clear.
25        Because this is a deposition,

Page 49

1    because we're not in person, I can't see what
2    you're looking at.  So what I had asked was
3    that we introduce as an exhibit anything that
4    you're looking at.
5         So if you're looking at your CV,
6    let's introduce that as an exhibit; and let's
7    look at the right version of it.
8         So that's what I had asked when I
9    said, can you please close whatever programs --
10    A.    Okay.  Okay.
11        And so the only one that I can
12   think of is the one that you referred to when
13   we were off camera.
14        So this is dose finding in Physical
15   Activity and Cancer Risk Reduction.
16    Q.    And that article's not actually
17   about talcum powder, correct?
18    A.    Correct.
19    Q.    It's about exercise?
20    A.    That's right.
21    Q.    Okay.  Let's, for the sake of
22   having a proper record -- you were just looking
23   at your CV; is that correct?
24    A.    Yes.
25    Q.    Okay.  Let's introduce the CV as

Page 50

1 Exhibit 3.  And I'm going to ask you once
2 again, please, if you -- to refrain from
3 looking at documents unless you tell me in
4 advance that you're looking at something and
5 that we can have a clear record that every
6 document you're looking at is something that's
7 introduced on the record, as would be the case
8 if we were doing a deposition in person.
9         MS. O'DELL:  For the record,
10 Jessica, I think she mentioned she was
11 looking at her CV earlier.  I think that
12 you may not have heard her, but I'm glad
13 you're marking it as an exhibit, and --
14         MS. DAVIDSON:  Yeah.  Let's just
15 mark everything, and also make sure we're
16 all looking at the same version because I
17 don't know what version of the CV is on
18 her computer.  That's why I think it's
19 better if we do this the proper way.
20         (Whereupon, Exhibit No. 3,
21 Curriculum Vitae of Anne McTiernan, M.D.,
22 Ph.D., was marked for identification.)
23 BY MS. DAVIDSON:
24   Q.   Okay.  So I think we've concluded
25 that you have not published any articles

Page 51

1 regarding talcum powder since your last
2 deposition.
3         MS. O'DELL:  Object to the form.
4 BY MS. DAVIDSON:
5   Q.   Have you published any articles or
6 papers about asbestos since your last
7 deposition?
8   A.   The -- no, I have not published
9 anything with the particular topic was
10 asbestos; but without going through all of my
11 papers, I can't state that there's no mention
12 of asbestos in that paper.
13   Q.   Sitting here today, do you have any
14 recollection of anything you might have written
15 involving asbestos?
16   A.   Are you -- when you say I might
17 have, do you mean since my last deposition or
18 ever?
19   Q.   I do.  Since your last deposition.
20   A.   And as far as I know, I did not
21 write anything where the topic was asbestos.  I
22 do not know if the -- if the word "asbestos"
23 shows up in a paper or any reference.  I can't
24 specify that -- I can't answer that without
25 going through everything.

Page 52

1   Q.   Do you have any forthcoming
2 publications, speeches, or presentations
3 related to talcum powder?
4   A.   No.
5   Q.   Do you have any forthcoming
6 publications, speeches, or presentations
7 related to ovarian cancer?
8   A.   Can you repeat the question?
9   Q.   Sure.
10         MS. DAVIDSON:  Suzanne, you want to
11 repeat the question.
12         (At which time the following was
13 read back:
14         "Question:  Do you have any
15 forthcoming publications, speeches, or
16 presentations related to ovarian cancer?")
17         THE WITNESS:  My answer would be
18 no.
19 BY MS. DAVIDSON:
20   Q.   On the screen is a copy of the CV
21 that you produced on December 23rd [sic].
22         Is this CV current and accurate?
23   A.   I'll need to --
24         MS. O'DELL:  I think -- I think it
25 was September 2020.  I think you said

Page 53

1 December 23rd.
2         Jessica, is that you what you
3 intended to say?
4         MS. DAVIDSON:  September 2023.
5         MS. O'DELL:  Thank you.
6         THE WITNESS:  So I would need to
7 see this in total.  I'd need to see the
8 first page if I'm going to say if that's
9 the most accurate.
10         I know what I sent through to
11 the law- -- Ms. Parfitt and O'Dell that
12 that was the most current at the time I
13 sent it, but I can't see what this one is
14 saying.
15 BY MS. DAVIDSON:
16   Q.   As you can see on the bottom
17 right-hand corner, it says 9/16/2023, correct?
18   A.   I don't see anything like that.
19 It -- it stops at Harborview Medical Center on
20 my screen.
21   Q.   That's strange.  Mine says the
22 date.
23         Do you see the date, 9/16/2023?
24   A.   No.
25   Q.   Are you looking at the Zoom screen

Page 54

¹ on a lap- -- on a monitor, on a computer
² monitor?
³     A.    No.  Laptop.
⁴     Q.    And is the document that's up on
⁵ the screen in the center of your laptop?
⁶     A.    Okay.  Now I've got a different
⁷ view.  It says 9/16/2023.  Okay.
⁸     Q.    And do you have a more recent CV
⁹ than 9/16/2023?
¹⁰    A.    Okay.  So I need to look at my
¹¹ computer for that.  I don't believe I do, but
¹² I'll look.
¹³        No 9/16/2023 is the most recent
¹⁴ that I have.
¹⁵    Q.    The last time you were deposed was
¹⁶ August 2021 in the talc litigation; is that
¹⁷ correct?
¹⁸    A.    I don't know the exact date.  Hold
¹⁹ on.
²⁰    Q.    Are you looking at something?
²¹    A.    Yes.  The same list that you were
²² sent.  I don't know if you can see this.
²³    Q.    Oh, okay.
²⁴    A.    But it's the prior deposition trial
²⁵ and hearing testimony of -- for me.

Page 55

¹     Q.    Okay.  Great.  Let's introduce that
² as Exhibit 4.
³        And again, if you're looking at
⁴ something --
⁵     A.    Yeah.
⁶     Q.    -- if you go to read something,
⁷ please first let me know what it is so that we
⁸ can have a proper record.
⁹        MS. DAVIDSON:  Asher, let's mark as
¹⁰    Exhibit 4 prior testimony and put it up on
¹¹    the screen.
¹²        (Whereupon, Exhibit No. 4, Prior
¹³    Deposition, Trial and Hearing Testimony of
¹⁴    Anne McTiernan, M.D., Ph.D., was marked
¹⁵    for identification.)
¹⁶        MR. TRANGLE:  Just one second.  I'm
¹⁷    sorry.
¹⁸ BY MS. DAVIDSON:
¹⁹    Q.    In any event, while he's putting it
²⁰ up on the screen, Dr. McTiernan, is it correct
²¹ you were deposed in August 2021?
²²    A.    The deposition, yes, August 19th,
²³ 2021.
²⁴    Q.    And you testified in a trial called
²⁵ Giese, correct?

Page 56

¹     A.    Yes.
²     Q.    Have your opinions changed since
³ that deposition and that trial?
⁴     A.    My opinions on?
⁵     Q.    That you're offering in this
⁶ litigation, are they the same as the opinions
⁷ that you offered in that deposition and that
⁸ trial?
⁹     A.    Yes.
¹⁰    Q.    Are all of the opinions you intend
¹¹ to provide in this case included in prior
¹² reports and prior testimony?
¹³    A.    My overall opinion about causation
¹⁴ has not changed, you know, from this previous
¹⁵ testimony and deposition; however, I do have
¹⁶ additional articles on my reliance list.
¹⁷    Q.    Have any of your opinions changed
¹⁸ in any way based on the additional articles in
¹⁹ your reliance list?
²⁰    A.    My opinions have not changed.
²¹ They've just been reaffirmed by the articles on
²² the reliance list, the new articles.
²³    Q.    Did you remove any articles from
²⁴ your reliance list or any other papers or
²⁵ entries?

Page 57

¹     A.    When you say did I remove, do you
² mean from the old list?
³     Q.    Uh-huh.
⁴     A.    I don't recall removing anything,
⁵ but I -- I could be wrong.  I don't recall
⁶ removing anything.
⁷     Q.    Are you offering an opinion in this
⁸ case about whether talc contains asbestos?
⁹     A.    Yes.  I've already given that as
¹⁰ part of my opinion in previous depositions and
¹¹ testimony, and that has not changed.
¹²    Q.    Your opinion that you're offering
¹³ in this litigation that talc contains asbestos,
¹⁴ what is that based on?
¹⁵        MS. O'DELL:  Objection.
¹⁶        So Jessica, that is a complete redo
¹⁷    of material that's been covered in the
¹⁸    initial deposition in early 2019, her
¹⁹    supplemental deposition; and I think we've
²⁰    agreed not to replow that ground.
²¹ BY MS. DAVIDSON:
²²    Q.    Are you offering the opinion that
²³ every bottle of Johnson's Baby Powder sold in
²⁴ Mississippi contained asbestos?
²⁵        MS. O'DELL:  Objection to the form.

Page 58

1    THE WITNESS: I have done -- I have
2    not done a review of the contents of baby
3    powder bottles in Mississippi.
4    BY MS. DAVIDSON:
5    Q.    I understand that you haven't done
6    such a review.
7          Does that mean you're not offering
8    an opinion that every bottle of baby powder
9    sold in Mississippi contains asbestos?
10         MS. O'DELL: Objection to the form.
11   Asked and answered.
12         Dr. McTiernan's being offered as an
13   epidemiologist not as a testing expert for
14   talcum powder, and specifically talcum
15   powder sold in Mississippi.
16   BY MS. DAVIDSON:
17   Q.    You can answer.
18   A.    Can you repeat the question,
19   please, or have it repeated?
20   Q.    Sure.
21         THE COURT REPORTER: Would you like
22   me to repeat it?
23         MS. DAVIDSON: Yes.
24         THE COURT REPORTER: Okay.
25         MS. DAVIDSON: I have a very short

Page 59

1    short-term memory. So anytime someone
2    asks me to repeat a question, I'd
3    appreciate if you did it.
4          THE COURT REPORTER: Yes.
5          (At which time the following was
6    read back:
7          "Question: I understand that you
8    haven't done such a review. Does that
9    mean you're not offering an opinion that
10   every bottle of baby powder sold in
11   Mississippi contains asbestos?")
12         MS. O'DELL: Same objection.
13         THE WITNESS: Of -- of my expertise
14   that I'm an offering as my opinion based
15   on epidemiology and biological mechanisms
16   in my causation analysis, I have not
17   reviewed data or studies on the contents
18   of baby powder sold in the state of
19   Mississippi.
20   BY MS. DAVIDSON:
21   Q.    What expertise do you have about
22   biological mechanism?
23   A.    When you say "biological
24   mechanism," are you referring to talcum powder
25   products and risk of ovarian cancer as in my

Page 60

1    report?
2    Q.    I'm referring to your use of the
3    word "biological mechanism" in your last
4    answer, however you were using it.
5    A.    Okay. So I was referring to
6    biological mechanism that I reviewed studies
7    for -- for my causal analysis of -- the
8    question is does talcum powder product exposure
9    cause ovarian cancer.
10         And for that, I did a causal
11   analysis; and part of that is to do a review of
12   potential biological mechanisms.
13   Q.    Have you done any additional review
14   of the potential biological mechanisms since
15   2021?
16   A.    I need to look at my reliance list.
17         MS. O'DELL: Suzanne, would you
18   mind repeating the question, please.
19         (At which time the following was
20   read back:
21         "Question: Have you done any
22   additional review of the potential
23   biological mechanisms since 2021?")
24   BY MS. DAVIDSON:
25   Q.    Are you looking at the reliance

Page 61

1    list we've been discussing today?
2    A.    Yes.
3          MS. DAVIDSON: Okay. We haven't
4    marked that yet, I believe, correct,
5    Asher?
6          MR. TRANGLE: Correct.
7          MS. DAVIDSON: Let's mark it and
8    put it up on the screen.
9          (Whereupon, Exhibit No. 5, Anne
10   McTiernan, M.D., Ph.D. - Materials
11   Considered List, was marked for
12   identification.)
13         MS. DAVIDSON: So we're marking as
14   Exhibit 5, Anne McTiernan's Materials
15   Considered List, 17 pages.
16         And why don't we go toward -- to
17   the end where you have your additional --
18   BY MS. DAVIDSON:
19   Q.    Do you see where it says Zuckerman,
20   and that's the end of the alphabetical list?
21   A.    Yes.
22   Q.    Is everything after that what you
23   reviewed since 2021?
24   A.    I don't see it on there. I don't
25   see it here.

Page 62

1    Q.    You don't see what?
2    A.    I think we need to scroll to the
3  next page.
4    Q.    I'm asking, though -- I don't --
5  you may not understand my question, if we could
6  go back.
7          But is anything you reviewed after
8  2021 listed under Zuckerman?
9          That's my question.
10    A.    You mean listed before Zuckerman?
11    Q.    The first 15 and a half pages of
12  this reliance list are in alphabetical order,
13  correct.
14    A.    I think so.  I don't have the full
15  pages --
16    Q.    Okay.
17    A.    -- in front of me.  I have the
18  additions, the new reliance list.
19    Q.    And the last -- the last
20  alphabetical listing is Zuckerman.
21          Do you see that?
22    A.    Yes.
23    Q.    And after that, is everything
24  listed after that the full body of materials
25  that you reviewed and considered after 2021?

Page 63

1    A.    I don't see anything here.  This --
2  on the screen it stops at page 16.
3    Q.    Right.  There's pages 16, and then
4  there's page 17.  My question --
5    A.    Okay.  I'm not seeing that on my
6  screen.
7    Q.    Understood.  But my question is
8  very simple.
9          On the -- on the Materials
10  Considered List that was provided to us, is
11  everything that you looked at after 2021 listed
12  after Zuckerman?
13    A.    Oh, everything that I looked at
14  that was new is -- was after Zuckerman on the
15  copy that I've seen.  I don't know what you
16  have here, so I can't say what's -- I can't say
17  yes or no to that because it's not being shown
18  on the screen.
19    Q.    Asher did show it to you.  He's
20  flipped to page 17.  He can flip to page 17
21  again.
22          MS. O'DELL:  And -- and just as we
23          agreed to in the beginning of the
24          deposition, Asher, if you could just put
25          that in the chat so Dr. McTiernan has the

Page 64

1  benefit of the entire document, I would
2  appreciate it.
3  BY MS. DAVIDSON:
4    Q.    So are -- are the documents on
5  pages 16, the bottom half of 16 and the top
6  half of 17, the documents that you've reviewed
7  since 2021?
8          I'm sorry.  Dr. McTiernan, what are
9  you doing right now?
10    A.    I'm trying to get this open and
11  saved so I can actually look at it, but I
12  can't.  I'm having troubles.
13          MS. DAVIDSON:  Asher, can you put
14          pages 16 and 17 next to each other on the
15          screen.
16          THE WITNESS:  I think it will be
17          too small then.  Okay.  I have something
18          now that I can read.
19          Okay.  I'm not sure if I'm the only
20          one controlling this or if Asher's also
21          controlling it because it's moving all
22          over.
23          MS. DAVIDSON:  I think Asher was
24          doing that.
25          MR. TRANGLE:  Yeah.

Page 65

1          MS. DAVIDSON:  Okay.
2          MR. TRANGLE:  Can you see what's at
3  the top of the page?
4          THE WITNESS:  All I'm seeing right
5  now is pieces of a screen.  I'm seeing
6  parts of Institute of Medicine, part of
7  cancer cause and control, part of a Lynch
8  paper; and that's about all I can see.
9          MR. TRANGLE:  Yeah.  That -- that's
10  all that's on this page.  I can go to the
11  previous page.
12          Did you want to see that?
13          THE WITNESS:  Now you're on page 1.
14  So if you have something starting with
15  American Public Health Associations after
16  the Zuckerman --
17          MR. TRANGLE:  Yep.  That's on --
18  that's on the screen --
19          THE WITNESS:  -- article.
20          MR. TRANGLE:  -- that's on the
21  screen right now.
22          THE WITNESS:  My screen says
23  page 1, document name AMA Analytic
24  Services.  So this is all old.
25          MR. TRANGLE:  Are you looking at

Page 66

1  the screenshare.
2          THE WITNESS:  Oh, sorry.  Okay.
3  Now I see it.  American Public Health,
4  okay.
5          Okay.  So then there's some more
6  after foam -- whoops.  Now it disappeared.
7          MR. TRANGLE:  I was just scrolling
8  to the next page.
9          THE WITNESS:  Okay.
10         MR. TRANGLE:  So it continues.
11 BY MS. DAVIDSON:
12     Q.    Dr. McTiernan, do you remember my
13 question?
14     A.    No, but I'm just trying to -- it's
15 something about -- I'm just trying to see what
16 these are and if they agree with what I
17 understand.
18     Q.    Would you like me to reiterate my
19 question?
20     A.    In a minute, please, yeah.
21     Q.    This is the same reliances that you
22 produced to us, so I'm not sure exactly what
23 this discussion is, what the delay is right
24 now.
25     A.    Okay.  I think I have a version

Page 67

1  that was just before some corrections were made
2  to this.  So that was what I was confused about
3  what you were looking at.
4          But I still don't have this
5  available -- available to me to download or
6  print off.  So it looks like I'm just -- all I
7  see is what's on your screen.
8          Could you repeat the question?
9      Q.    Sure.
10         MS. DAVIDSON:  Court Reporter, can
11 you repeat the question?
12         THE COURT REPORTER:  Just give me a
13 minute to scroll back to it.
14         I think this is the last question.
15         (At which time the following was
16 read back:
17         "Question:  So are -- are the
18 documents on pages 16, the bottom half of
19 16 and the top half of 17, the documents
20 that you've reviewed since 2021?")
21         THE WITNESS:  So my answer, these
22 are the new documents that I've reviewed
23 sips the last deposition and testimony.
24 BY MS. DAVIDSON:
25     Q.    And this is a complete list?

Page 68

1      A.    Of the new documents as far as I
2  know.
3      Q.    Are you offering an opinion as to
4  whether exposure to asbestos -- alleged
5  asbestos in talc is similar to the level of
6  exposure that a person would have from
7  occupational exposure to talc?
8      A.    I did not in my -- in my report and
9  the reviews that I have done -- that I've read,
10 I've not considered the exact amount of talc --
11 of asbestos in talcum powder compared to
12 occupational exposure.
13         Certainly occupational exposure has
14 a range of exposures which could overlap what's
15 in a talcum bottle at some points, but it could
16 be more at some points.
17         So I'm not -- I'm not an expert in
18 assessing content -- amount of asbestos that
19 could be contained in particular bottles of
20 talc.
21     Q.    Are you offering an opinion in this
22 Mississippi case as to whether talc that's
23 inhaled can cause ovarian cancer?
24     A.    In my report, it's certainly
25 included as a potential way for talc and

Page 69

1  contain -- content asbestos to reach various
2  parts of the body, yes.
3      Q.    Can you tell me what studies you're
4  relying on for your inhalation opinion in this
5  Mississippi case?
6          MS. O'DELL:  I just object to the
7  question.
8          Jessica, I think she was examined
9  at length on inhalation for her 2019
10 deposition, and she testified to that at
11 that time.
12 BY MS. DAVIDSON:
13     Q.    I didn't see it there, and so I
14 just need to know for this case what -- what
15 literature you're relying on in this case to
16 support an inhalation opinion?
17         MS. O'DELL:  Again, Dr. McTiernan,
18 you're welcome to answer that.
19         But again, this is an area where
20 she was -- she was -- she was examined on
21 previously.
22 BY MS. DAVIDSON:
23     Q.    Go ahead.
24     A.    The IARC 2012 100C document does
25 discuss inhalation as a way of -- that -- a

Page 70

1 root of exposure. And also, the Nowak study
2 the Nowak, which is a systematic review and
3 meta-analysis of asbestos in relation to
4 ovarian cancer, that they also do mention
5 inhalation.
6         Yeah. I think this would be a
7 great time for a break.
8    Q.    Who's asking for a break?
9    A.    I am.
10        MS. O'DELL: How long do you need,
11 Dr. McTiernan?
12        THE WITNESS: About five, ten
13 minutes.
14        MS. O'DELL: Okay.
15        THE VIDEOGRAPHER: Are we going off
16 the record? Counsel?
17        MS. O'DELL: Yes. Five, ten
18 minutes if you need a quick break,
19 Dr. McTiernan.
20        THE VIDEOGRAPHER: The time is
21 11:18 a.m. We're off the record.
22        (Whereupon, a break was taken.)
23        THE VIDEOGRAPHER: The time is
24 11:28 a.m. We're back on the record.
25

Page 71

1 BY MS. DAVIDSON:
2    Q.    Now, Dr. McTiernan, right before we
3 went off the record, I was asking you about
4 inhalation studies involving talc; and you
5 Nowak and IARC, correct?
6    A.    Yes.
7    Q.    Does either of those studies
8 reference talcum powder -- either of those
9 papers -- obviously IRAC's not a study.
10        Does either of those papers you're
11 referring to reference talcum powder?
12    A.    IARC does state -- so I'm looking
13 at the first page of the IARC 2012 100C,
14 section on asbestos. And the first paragraph
15 under 1.1 Identification of the Agent.
16        And so they state that this section
17 is discussing any type of asbestos, and they
18 list off chrysotile, actinolite, amosite,
19 anthophyllite, crocidolite, and tremolite. And
20 then they said it also includes talc containing
21 asbestos form fibers. And so -- so that is
22 that one.
23        And then Nowak, I need to look at
24 that. So I'm looking at a paper copy of Nowak.
25        So Nowak does discuss talcum and

Page 72

1 does discuss inhaled fibers.
2    Q.    Can you show me where?
3        MS. DAVIDSON: Let's put that --
4 let's mark Nowak as exhibit --
5        MR. TRANGLE: 6.
6        MS. DAVIDSON: 6.
7        (Whereupon, Exhibit No. 6,
8 Publication entitled, "Asbestos Exposure
9 and Ovarian Cancer - a Gynaecological
10 Occupational Disease, Background,
11 Mandatory Notification, Practical
12 Approach," by Dennis Nowak, et al., was
13 marked for identification.)
14        THE WITNESS: So on my version,
15 page 4 out of 24, the section is talking
16 about pathomechanism of asbestos effects
17 in humans, especially in the ovary target
18 organ -- organ.
19        It talks about inhaled asbestos
20 fibers.
21 BY MS. DAVIDSON:
22    Q.    I'm sorry. Does this paper talk
23 about inhaled talcum powder?
24    A.    It says --
25        MS. O'DELL: I'm sorry. Excuse me.

Page 73

1        Dr. McTiernan, if you weren't
2 finished with your last answer, please
3 continue.
4        THE WITNESS: Okay. So it talks
5 about inhaled asbestos fiber, and it
6 states that asbestos fibers are primarily
7 inhaled with the air we breathe.
8        And then it talks about the use of
9 talcum powder and association with risk
10 for ovarian cancer.
11 BY MS. DAVIDSON:
12    Q.    Does this paper talk about
13 inhalation of talcum powder?
14    A.    It talks about --
15        MS. O'DELL: Object to the form.
16        You may answer. Excuse me, Doctor.
17        THE WITNESS: It talks about
18 asbestos fibers being primarily inhaled
19 with the air we breathe.
20 BY MS. DAVIDSON:
21    Q.    I understand.
22        My question is: Does it talk about
23 inhalation of talcum powder specifically?
24        MS. O'DELL: Object to the form.
25        THE WITNESS: It does state that

Anne McTiernan, M.D., Ph.D.

Page 74

1  asbestos fibers can be transvaginally
2  introduced, and so that -- so it talks
3  about two different ways that asbestos
4  fibers can -- can reach the ovary or body
5  areas.
6  BY MS. DAVIDSON:
7      Q.    I'm sorry.  Do you remember my
8  question?
9      A.    Why don't you repeat it.
10     Q.    What -- what did you think I had
11  asked?
12          MS. O'DELL:  Dr. McTiernan, if
13  you'd like the -- Ms. Stotz to repeat the
14  question, I'm sure she'll do that.
15          THE WITNESS:  Please.
16          (At which time the following was
17  read back:
18          "Question:  Does this paper talk
19  about inhalation of talcum powder?")
20          MS. DAVIDSON:  I think I had the
21  word "specifically" there, Suzanne.
22          THE COURT REPORTER:  Then -- then
23  there's an objection, and the next
24  question was...
25          (At which time the following was

Page 75

1  read back:
2          "Question:  I understand.  My
3  question is:  Does it talk about
4  inhalation of talcum powder
5  specifically?")
6          THE COURT REPORTER:  That was the
7  last ans- -- question.  Sorry.
8          THE WITNESS:  To answer this
9  question accurately, I'm going to need
10  some time to reread this paper.
11          MS. DAVIDSON:  Why don't we go off
12  the record.
13  BY MS. DAVIDSON:
14     Q.    This paper was on your reliance
15  list, correct?
16     A.    Yes, but I didn't have every word
17  memorized; so I need to review it to answer
18  that specific question.
19     Q.    Dr. McTiernan, do you need to
20  review every article on your reliance list that
21  I'm going to ask you detailed questions about?
22     A.    It depends on the -- it depends on
23  the question.
24     Q.    Okay.  Let's go off the record.
25  Let us know when you're ready.

Page 76

1          THE VIDEOGRAPHER:  The time is
2  11:35 a.m.  We're off the record.
3          (Whereupon, a break was taken.)
4          THE VIDEOGRAPHER:  The time is
5  11:43 a.m.  We're back on the record.
6  BY MS. DAVIDSON:
7      Q.    Dr. McTiernan, did you talk to your
8  counsel during the break?
9      A.    No.
10     Q.    Do you remember what question was
11  pending when we went on the break?
12     A.    It would be great if I could have
13  it read again.
14          THE COURT REPORTER:  Give me a
15  moment.
16          The last question before the break
17  was...
18          (At which time the following was
19  read back:
20          "Question:  Dr. McTiernan, do you
21  need to review every article on your" --)
22          MS. DAVIDSON:  No, no, no.  The
23  last sensitive question.
24          THE COURT REPORTER:  Okay.
25          (At which time the following was

Page 77

1  read back:
2          "Question:  I understand.  My
3  question is:  Does it talk about
4  inhalation of talcum powder
5  specifically?")
6  BY MS. DAVIDSON:
7      Q.    Have you been able over the break
8  to determine your answer to that question?
9      A.    Yes.
10     Q.    And what's the answer.
11     A.    So I'm looking at the Nowak paper.
12  That was the question.  And on page 7, halfway
13  down, it's talking about possible occupational
14  exposures for gynecologists to inquire about to
15  get a history, a medical history of patients
16  with ovarian cancer.  That's the title of this
17  section.
18          Halfway down it says, "Important
19  sources of danger for inhalation of asbestos
20  dust are or were in particular"; and then
21  there's listed quite a few.
22          And then on the next page, the next
23  paragraph, it says, "In addition, various
24  minerals, for example, soapstone," in
25  parentheses, "(talc) and gabbro diabase

Page 78

1 contains small amounts of asbestos, such as
2 tremolite and actinolite. As a result, they
3 can pose asbestos risk through exposure to
4 mixed dust."
5    Q.   What's soapstone?
6    A.   I don't know. They say in
7 parentheses talc. That's all I can say. This
8 is what they state in the paper.
9    Q.   Do you know what soapstone is?
10   A.   I don't know what soapstone.
11   Q.   When you read this article, did you
12 follow up to determine what soapstone is?
13   A.   No. I noticed that it said talc.
14   Q.   Have you read a paper entitled,
15 "Talcum Powder Induces Malignant Transformation
16 in Normal Human Primary Ovarian Epithelial
17 Cells" by A. Harper?
18   A.   I'm not sure. I don't know if it's
19 on my reliance list. I don't know if it's in
20 my references. So I need to -- I need to look
21 that up.
22       MS. DAVIDSON: Let's mark that
23 paper as Exhibit 7.
24
25

Page 79

1        (Whereupon, Exhibit No. 7, Article
2    entitled, "Talcum powder induces malignant
3    transformation in normal human primary
4    ovarian epithelial cells," by Amy K.
5    Harper, et al., was marked for
6    identification.)
7        MS. O'DELL: And Asher, would you
8    please put that in the chat?
9        MR. TRANGLE: Sure.
10       MS. DAVIDSON: I think Asher knows
11   to do that with every document, so you
12   don't need to ask.
13 BY MS. DAVIDSON:
14   Q.   Dr. McTiernan, does this document
15 look familiar to you?
16   A.   All I see is something on its side
17 and mostly black.
18   Q.   I think there's something wrong
19 with your screen because for the rest of us, we
20 have a full article in the middle -- a full
21 page in the middle of our screen.
22       Can you try to change your view.
23 Perhaps you can figure out why that is that
24 you're not having -- I think for a Zoom
25 deposition, it's rather important that you have

Page 80

1 the proper view on your monitor or your screen
2 so that you can see what the rest of us are
3 seeing. What the rest of us are seeing is a
4 full page.
5        Have you figured out how to get the
6 full page on your --
7    A.   I have -- I have it bigger. And
8 I've worked with many Zoom calls. I've never
9 seen a problem quite like this. And, you know,
10 we -- we only got the Zoom link right before
11 the call, so there wasn't time to test anything
12 out. But no, I could not read this as a --
13   Q.   You don't have a full --
14   A.   It looks full -- like a full page,
15 but I couldn't read it. The print is so small.
16 And somebody's making it bigger and smaller
17 right now so --
18   Q.   He's trying to be helpful.
19   A.   Okay.
20   Q.   Asher's trying to be helpful.
21       Do you see a full page in the
22 middle of your computer?
23       When you say you were only seeing
24 black, that was my concern.
25   A.   All right. Right now I see about

Page 81

1 three quarters of the page.
2    Q.   Okay.
3    A.   I see -- I see the title, and I see
4 down to, like, something that says EOC on the
5 right-hand column.
6    Q.   Does this look familiar to you?
7    A.   I can't see what year this was.
8 2023. I'm not sure. I would have to see if
9 it's in my reference list.
10   Q.   I will let you know, Dr. McTiernan,
11 it is not in your reference list. I'm asking
12 whether it looks familiar to you. That's all.
13   A.   I think I need to read it to say if
14 it's familiar or not.
15       I know that Dr. Saed has done quite
16 a few papers and -- in this area. I just don't
17 know if I've seen this one before without
18 looking at it.
19   Q.   Dr. McTiernan, the problem,
20 obviously, we face is that if every question I
21 ask you about a paper requires you to read the
22 entire paper, this deposition will go on for a
23 month.
24       So it would be ideal if there were
25 some way for us to shortcut that and not have

Anne McTiernan, M.D., Ph.D.

Page 82

¹ to go on every day for the next month in this
² deposition.
³       Are you unable to tell me if you've
⁴ seen this document before without reading the
⁵ entire article?
⁶       MS. O'DELL:  I would just say, just
⁷ object to the colloquy.  I object to
⁸ badgering Dr. McTiernan.  She's trying to
⁹ be helpful.
¹⁰       As you've noted for the record,
¹¹ Jessica, this is not on Dr. McTiernan's
¹² reliance list.  It has been put in the
¹³ chat.
¹⁴       If Dr. McTiernan needs to see this
¹⁵ to determine if she's reviewed it before,
¹⁶ that's a perfectly reasonable request.
¹⁷       And -- and so, you know,
¹⁸ Dr. McTiernan, if you need to do that in
¹⁹ order to answer the question about whether
²⁰ you've seen it before, please do so.  If
²¹ you don't and you don't recognize it, you
²² know, feel free to -- whatever your
²³ knowledge is.
²⁴       But -- but if you need to see it,
²⁵ it's in the chat; and you can download it

Page 83

¹ and open it up.
²       THE WITNESS:  Okay.  Yes.  I'll
³ need to look at it in order to answer that
⁴ question.
⁵ BY MS. DAVIDSON:
⁶    Q.    So just to be clear, you're saying
⁷ that in order to let me know if you've ever
⁸ seen this document before, you need to read the
⁹ entire document?
¹⁰       MS. O'DELL:  That's not what she
¹¹ said.  She just needs to look at it.
¹²       MS. DAVIDSON:  Well, we're looking
¹³ at it.
¹⁴ BY MS. DAVIDSON:
¹⁵    Q.    So you're saying you need to read
¹⁶ it, correct?
¹⁷       MS. O'DELL:  It's --
¹⁸       THE WITNESS:  The print is very
¹⁹ small.  I see Dr. Saed's the senior
²⁰ author.  I know that he has written -- and
²¹ data has written papers based on
²² experiments in this area.  I just don't
²³ know if this particular one is one that I
²⁴ read before.
²⁵

Page 84

¹ BY MS. DAVIDSON:
²    Q.    Okay.  Let's go off the record
³ while you review it, and let us know if you've
⁴ read it before.
⁵       THE VIDEOGRAPHER:  The time is
⁶ 11:51 a.m.  We're off the record.
⁷       (Whereupon, a break was taken.)
⁸       THE VIDEOGRAPHER:  The time is
⁹ 12:05 p.m.  We're back on the record.
¹⁰       MS. DAVIDSON:  I'd like to note for
¹¹ the record that I asked Dr. McTiernan if
¹² she was familiar with this article.
¹³ Dr. McTiernan said she needed to read it
¹⁴ in order to answer that question.  It has
¹⁵ been 15 minutes off the record.
¹⁶ BY MS. DAVIDSON:
¹⁷    Q.    Dr. McTiernan, have you read this
¹⁸ article before?
¹⁹    A.    I did print it off so that I could
²⁰ look through it.  And to my knowledge, I've not
²¹ read this before.
²²    Q.    Did it take you to 15 minutes to
²³ determine that?
²⁴    A.    It takes a while to print it off
²⁵ and to read it, yes.

Page 85

¹    Q.    Did the material covered in this
² article have any familiarity to you?
³    A.    I also took the time to look
⁴ through the -- my materials list that was on
⁵ this -- previous, not the new list.  But it
⁶ looks like these -- some of these authors may
⁷ have presented something similarly in an
⁸ abstract form in the past.  I don't remember
⁹ the exact year.  But I didn't see this paper on
¹⁰ my reliance list either in the old version --
¹¹ the older section nor the new ones.
¹²    Q.    Do you recall reviewing a poster
¹³ presentation on the same topic?
¹⁴    A.    It looked like it was the same
¹⁵ topic, but poster to paper quite often you do
¹⁶ see changes because reviewers will go through a
¹⁷ paper when it's submitted to a journal and make
¹⁸ suggestions for clarifications or changes.  So
¹⁹ the poster may not be the exact same
²⁰ presentation as a paper.
²¹    Q.    Are you relying on that poster for
²² your opinions in this case?
²³    A.    I don't recall what's on the
²⁴ poster, so I cannot answer that question right
²⁵ now.

Anne McTiernan, M.D., Ph.D.

Page 86

1    MS. O'DELL:  Just for the record, I
2 think Dr. McTiernan has -- her last
3 deposition covered the poster.  It
4 certainly -- in abstract, whatever it was
5 at that point during her prior deposition
6 in August of 2021.
7    MS. DAVIDSON:  Thank you, Leigh.
8 BY MS. DAVIDSON:
9    Q.    Will you be relying on this paper
10 in any way at trial?
11    A.    It's not on my reliance list, so
12 I -- I -- I don't know how to answer that
13 question.
14    Q.    Dr. McTiernan, do you have an
15 opinion as to whether there was sufficient
16 epidemiological literature in the 1970s to
17 support the conclusion that perineal talc use
18 can cause ovarian cancer?
19    MS. O'DELL:  Objection to the
20 question.  I mean, she's been deposed at
21 length on all the epidemiologic literature
22 prior to 2021, and -- and that is just a
23 complete retread of -- of what's been
24 covered before.
25    So I would object, and that's

Page 87

1 really beyond the scope of what we've
2 agreed to for this deposition.
3 BY MS. DAVIDSON:
4    Q.    Dr. McTiernan, please respond.
5    A.    Could you repeat the question,
6 please.
7    Q.    Sure.
8    MS. DAVIDSON:  Suzanne, please
9 repeat the question.
10    (At which time the following was
11 read back:
12    "Question:  Dr. McTiernan, do you
13 have an opinion as to whether there was
14 sufficient epidemiological literature in
15 the 1970s to support the conclusion that
16 perineal talc use can cause ovarian
17 cancer?")
18    MS. O'DELL:  Object to the
19 question.  This is treading old ground;
20 and -- and Jessica, I would just ask you
21 to move on.
22    She has testified to all the
23 epidemiologic literature prior to 2021.
24 If -- if you want to ask her about
25 anything that's new since 2021, she's

Page 88

1 available and here and ready to answer
2 your questions, but not --
3    MS. DAVIDSON:  This question has
4 never been asked.  I am not going to move
5 on.  This is a highly relevant question to
6 this litigation.  I am not moving on.
7 BY MS. DAVIDSON:
8    Q.    Dr. McTiernan, please answer the
9 question.
10    MR. MITCHELL:  As a quick notation,
11 timing of knowledge is important in an
12 MCPA suit in ways different than in a
13 products liability suit; and these
14 questions are not repetitious because they
15 relate to timing.
16    MS. DAVIDSON:  We also made very
17 clear in our agreement that we would make
18 best efforts -- it is impossible to talk
19 about epidemiology without -- at some
20 level -- at some level touching in some
21 manner on things that have been discussed
22 before.
23    And I think you are being -- I
24 think you are trying to interfere in this
25 deposition in a manner that is not

Page 89

1 appropriate, and I'd ask you to stop.
2    MS. O'DELL:  I think that is
3 inappropriate.  There is nothing about
4 what I've said that is inappropriate or
5 unprofessional or lacked courtesy.
6    And it was certainly -- my
7 objection was consistent with the prior
8 discussions prior to this deposition.  And
9 the idea that -- that there could be a
10 complete retreading of all the
11 epidemiology for talc prior to 2021 is
12 directly contravenes the agreement between
13 the parties.
14    And as what I understand -- Meade,
15 you can correct me if I'm wrong, but I do
16 not believe I'm wrong -- is what the judge
17 said, is that there's not going to be
18 retreading of old ground.
19    And Dr. McTiernan has testified at
20 length to all of the epidemiologic
21 literature that was published prior to
22 2021, and a lot of questions that goes
23 through time periods, decade or year by
24 year is -- is inappropriate.
25    I mean, it clearly contravenes the

Page 90

1  agreement and what the judge says.
2  That's -- that's not being an
3  obstructionist.  That's trying to keep
4  confined to the scope in terms of this
5  deposition.
6      MR. MITCHELL:  This is a quick
7  response.
8      The judge hasn't ruled on it.  We
9  did indicate to Patrick that we would
10  undertake our best efforts not to retread
11  old ground, but asking a question about
12  specific timing is not -- is not
13  retreading old ground.  Those are kind of
14  questions that would not be asked in
15  products liability depositions but which
16  are very germane to an MCPA suit.
17      MS. O'DELL:  Well, with respect,
18  Meade, these have been -- this type of
19  question and the timing of different
20  studies has been very much a part of the
21  product liability litigation.
22      And so I'm not making a comment
23  about whether it's pertinent for the
24  Mississippi AG case in a consumer products
25  case.  But what I am saying is that she

Page 91

1  has testified at length to all of the
2  epidemiologic studies.
3      And so the purpose of this
4  deposition is to cover new material.  I'm
5  sorry.  I --
6      MR. MITCHELL:  No, no.  I
7  appreciate your comments.  It's not
8  that -- I don't think Jessica's intent is
9  to recover all of the epidemiologic
10  studies.  She's asking a specific
11  questions about whether that revealed
12  causation as a specific date, which is a
13  timing question that are germane to the
14  MCPA suits.
15      MS. O'DELL:  I --
16      MR. MITCHELL:  If I said that
17  wrong, Jessica will correct me; but I
18  wanted to try to make clear that is the
19  nature of the question.
20      MS. DAVIDSON:  I am not asking
21  anything today that retreads prior ground.
22  To the best of my knowledge and ability,
23  I've been very careful about it.
24      This is not retreading old ground.
25  I reviewed the prior testimony.

Page 92

1      I'm going to repeat the question.
2  BY MS. DAVIDSON:
3      Q.  Dr. McTiernan, do you have an
4  opinion as to whether the there was sufficient
5  epidemiological literature in the 1970s to
6  support the conclusion that perineal talc use
7  can cause ovarian cancer?
8      MS. O'DELL:  Objection to the
9  question.  It goes beyond the scope of
10  this deposition.  I'll allow this
11  question; but if we go down a complete
12  retreading of epidemiologic literature
13  from prior decades, then we're just going
14  to need to talk to the judge so I can
15  understand what his ruling was, which I
16  understand was a ruling.
17      He said on the record, I am not
18  going to -- I'm not going to allow you to
19  retread old ground.  That's what I
20  understand.  If I'm mistaken, we can get
21  him on the phone and let him clarify.
22      Dr. McTiernan, if you understand
23  the question, you may answer this
24  question; but we're not going to go beyond
25  the scope of -- of what we had previously

Page 93

1  agreed to.
2      THE WITNESS:  The 1970s, I wasn't
3  yet an epidemiologist; so I didn't have
4  knowledge about the science of talcum
5  powder and ovarian cancer risk.
6      I know from my report that the
7  dates of the studies that they were
8  published was the '80s, but those studies
9  would have started earlier.  They would
10  have started sometime in the '70s.
11      So those investigators must have
12  had a consideration of talcum powder
13  product, perineal product -- perineal
14  powder exposure -- perineal talc exposure,
15  excuse me, and ovarian cancer because
16  those were ovarian cancer studies that
17  were done in those early years.
18      So they must have had some
19  knowledge at that time, but I can't
20  speculate of what the epidemiologic
21  knowledge was to answer that question.
22  BY MS. DAVIDSON:
23      Q.  And is the --
24      MS. O'DELL:  Excuse me just a
25  minute, Jessica.  I'm sorry.

Page 94

1    Would you mind asking Asher to take
2  down this document.
3    Thank you.
4  BY MS. DAVIDSON:
5    Q.   Dr. McTiernan, is the -- is the
6  literature published from the 1970s, the
7  epidemiological literature that you've reviewed
8  from the 1970s, is that a sufficient body of
9  literature from which to reach a causal
10  inference?
11    MS. O'DELL:  Objection to the
12  question.  It goes beyond the scope of
13  this deposition.
14    THE WITNESS:  As I mentioned per my
15  report, the dates of these studies began
16  in the '80s.  The published -- the
17  published papers were in the '80s;
18  however, those studies would have started
19  in the '70s.
20    And when I did my causal analysis,
21  I look at all available research.  I did
22  not stop at different decades and look and
23  see if that was evidence for cause and
24  effect.
25    I looked at the entirety of

Page 95

1  evidence up to the date when I was doing
2  my systematic review and my causal
3  analysis.
4    To my knowledge, it -- in my
5  perspective, it would not have been
6  appropriate for me to look at particular
7  time periods specifically to see what the
8  body of knowledge was at that period.  I
9  didn't have any reason to do that.  I
10  looked at the total body of knowledge at
11  the time I was doing the review.
12  BY MS. DAVIDSON:
13    Q.   Do you have an opinion as an
14  epidemiologist as to whether one case-control
15  study on talc and ovarian cancer would be
16  sufficient to -- to reach a causal inference?
17    MS. O'DELL:  Object to the form.
18    THE WITNESS:  I'm sorry.  Somebody
19  just said something.  I didn't hear.
20    MS. O'DELL:  Object to the form,
21  Doctor.  Sorry.  I couldn't -- I'll speak
22  up.
23    THE WITNESS:  Okay.  Could you
24  repeat the question?
25    THE COURT REPORTER:  Do you want me

Page 96

1  to repeat it?
2    MS. DAVIDSON:  Please.
3    (At which time the following was
4  read back:
5    "Question:  Do you have an opinion
6  as an epidemiologist as to whether one
7  case-control study on talc and ovarian
8  cancer would be sufficient to reach a
9  causal inference?")
10    MS. DAVIDSON:  Case-control,
11  Suzanne.
12    THE WITNESS:  It -- it would depend
13  entirely on the study, and I can't
14  specifically say that one study is or is
15  not sufficient.
16    All I can say is this is -- my
17  analysis was all studies that had been
18  done up until the time when I did my
19  systematic reviews.
20  BY MS. DAVIDSON:
21    Q.   Is a Bradford Hill analysis
22  appropriate if there's just one case-control
23  study in an entire body of literature?
24    MS. O'DELL:  Objection.
25  Bradford Hill has been covered twice in

Page 97

1  her depositions, and these methodologic
2  questions that have been previously
3  covered really are beyond anything that is
4  considered for this deposition.
5    And so I would instruct
6  Dr. McTiernan not to answer.  These
7  general questions about Bradford Hill and
8  other things that she's already covered is
9  not new information, and it's
10  inappropriate.
11    MS. DAVIDSON:  These are different
12  questions about Bradford Hill, as you
13  know, Leigh.  We have not addressed these
14  questions.
15    The fact that I'm using the word
16  "Bradford Hill" cannot be an excuse to
17  instruct the witness not to answer.
18    MS. O'DELL:  It is -- it's an
19  inappropriate question based on our
20  agreement.  I'm instructing Dr. McTiernan
21  not to answer.
22    MS. DAVIDSON:  Let's go off the
23  record.
24    THE VIDEOGRAPHER:  The time is
25  12:19 p.m.  We're off the record.

Page 98

1    (Whereupon, a break was taken.)
2    THE VIDEOGRAPHER: The time is
3    12:28 p.m. We're back on the record.
4    BY MS. DAVIDSON:
5    Q.    Dr. McTiernan, do you have an
6    opinion as to whether the five case-control
7    studies that were published in the 1980s were
8    sufficient to support the conclusion that talc
9    use perineally can cause ovarian cancer?
10    MS. O'DELL: Objection to the
11    question. It's the same type question I
12    just objected to. It's just a new decade,
13    and I'll instruct Dr. McTiernan not to
14    answer. She's testified at length about
15    the prior epidemiologic literature.
16    BY MS. DAVIDSON:
17    Q.    Dr. McTiernan, was a dose response
18    established for talc use and the development of
19    ovarian cancer in the 1980s?
20    MS. O'DELL: Same objection.
21    Dr. McTiernan has testified previously
22    about dose response at length, and
23    instruct her not to answer consistent with
24    the directive of the Court.
25

Page 99

1    BY MS. DAVIDSON:
2    Q.    Dr. McTiernan, was biological
3    plausibility of the alleged ta- -- talcum
4    powder/ovarian cancer relationship established
5    in the 1980s?
6    MS. O'DELL: Same objection.
7    Dr. McTiernan, the same
8    instruction.
9    BY MS. DAVIDSON:
10    Q.    Dr. McTiernan, are you familiar
11    with any mechanistic literature in the 1980s
12    addressing the biological plausibility of a
13    relationship between perineal use of talcum
14    powder and the development of ovarian cancer?
15    MS. O'DELL: Dr. McTiernan has
16    testified at length to biologic
17    plausibility and mechanism in prior
18    depositions, and that goes beyond the
19    scope of what the Court has dictated for
20    this deposition. And I would instruct her
21    not to answer.
22    BY MS. DAVIDSON:
23    Q.    Dr. McTiernan, do you have an
24    opinion as to whether the consistency factor of
25    Bradford Hill was established for the

Page 100

1    epidemiological literature involving talcum
2    powder and ovarian cancer in the 1980s?
3    MS. O'DELL: I have the same
4    objection as it relates to the prior
5    examinations that Dr. -- prior testimony
6    that Dr. McTiernan has given regarding
7    consistency of the epidemiologic
8    literature.
9    And based on the Judge's
10    instructions, I would instruct her not to
11    answer.
12    BY MS. DAVIDSON:
13    Q.    Dr. McTiernan, do you have an
14    opinion as to whether the strength of
15    association factor of Bradford Hill was
16    established by the epidemiological literature
17    on talc as it existed in the 1980s?
18    MS. O'DELL: Same objection and
19    same instruction to the doctor.
20    BY MS. DAVIDSON:
21    Q.    Dr. McTiernan, do you have an
22    opinion as to whether the experiment analogy
23    and temporality factors of Bradford Hill were
24    established with respect to the alleged
25    association between perineal use of talcum

Page 101

1    powder and the development of ovarian cancer
2    during the 1980s?
3    MS. O'DELL: Dr. McTiernan has
4    testified at length to the experiment
5    consideration as part of the Bradford Hill
6    analysis both in deposition and at trial;
7    and because that question goes beyond the
8    scope of what the agreement was and the
9    Court's direction was regarding this
10    deposition, I would instruct her not to
11    answer.
12    BY MS. DAVIDSON:
13    Q.    Dr. McTiernan, prior to the
14    publication of the first meta-analysis
15    addressing the proposed association between
16    talcum powder and the development of ovarian
17    cancer, do you believe that there was a
18    sufficient scientific basis to conclude that
19    perineal talcum powder use can cause ovarian
20    cancer?
21    MS. O'DELL: Back to the question.
22    Dr. McTiernan has testified at length to
23    the meta-analyses that have been published
24    in relation to the genital use of talcum
25    powder and ovarian cancer both during

Page 102

1  deposition and at trial.
2        She's opined to those in her -- in
3  her various reports.  And because that's
4  beyond the scope of the Court's direction
5  and the parties' agreement, I would
6  instruct her not to answer.
7  BY MS. DAVIDSON:
8        Q.    Dr. McTiernan, do you have an
9  opinion as to whether the published
10 epidemiological literature regarding the
11 relationship between perineal talc use and the
12 development of ovarian cancer was sufficient to
13 determine a causal -- whether there was a
14 causal relationship prior to the publication of
15 any cohort studies?
16       MS. O'DELL:  Same objection.
17 Dr. McTiernan has testified at trial and
18 at deposition.  She's opined in her
19 reports regarding the cohort studies, and
20 that ground has been covered at length
21 both on direct examination and
22 cross-examination.
23       And because that question's beyond
24 the scope of the Court's directive and the
25 parties' agreement, I would instruct

Page 103

1  Dr. McTiernan not to answer.
2  BY MS. DAVIDSON:
3        Q.    Dr. McTiernan, do you recall
4  whether there were any meta-analyses published
5  in the 1980s with respect to the potential
6  relationship between perineal talc use and the
7  risk of ovarian cancer?
8        MS. O'DELL:  Dr. McTiernan --
9  again, I object to the question.
10 Dr. McTiernan has testified at length in
11 her trial testimony, her deposition
12 testimony.  She's outlined in her prior
13 reports the dates of all meta-analysis,
14 including the first one.  And that clearly
15 is beyond the scope of what the parties
16 agreed to and the Court's directive.
17       So I'd instruct her not to answer.
18       MS. DAVIDSON:  Meade.
19       MR. MITCHELL:  Yes.  Leigh, Jessica
20 will -- if we keep doing this, she'll end
21 up asking the same questions that she's
22 just asked about the 1980s for the 1990s
23 and the 2000s, correct, Jessica?
24       MS. DAVIDSON:  That is correct.
25       MR. MITCHELL:  To save time,

Page 104

1  because I -- this appears to be an issue
2  that we'll have to raise with the Court,
3  can we just get you to state on the record
4  that you will give the doctor the same
5  objection and instruct her not to answer
6  for the same questions for the 1990s and
7  the 2000s, Leigh?
8        MS. O'DELL:  Yes.  I will -- I
9  would say that to the degree that they're
10 questions that go to evidence that
11 Dr. McTiernan has testified to at length
12 both at trial and deposition, and she's
13 given opinions in her various reports, I
14 will object to those questions as beyond
15 the scope of this deposition and instruct
16 Dr. McTiernan not to answer.
17       Again, Dr. McTiernan is prepared
18 and here to answer questions about new
19 material since her last deposition in the
20 fall of 2021.  If there are any questions
21 about those materials, then please ask
22 them.  We are prepared to answer those
23 questions.  The other --
24       MR. MITCHELL:  I appreciate that.
25       MS. O'DELL:  The other -- the

Page 105

1  other -- just excuse me, Meade, I'm sorry.
2  Sometimes I pause.
3        MR. MITCHELL:  That's my fault.
4        MS. O'DELL:  But to the degree
5  that -- that the questions go to the
6  substance of the materials that she has
7  been examined on extensively, we believe
8  that's objectionable; and that's the basis
9  of my instruction.
10       MS. DAVIDSON:  And I would like to
11 make clear that that was not the agreement
12 that we entered into.  That Dr. McTiernan
13 is here offering epidemiological opinions
14 in this case.
15       And while we are not asking
16 questions that were asked before, there
17 are topics relevant to this case that do
18 overlap in some way with opinions that
19 Dr. McTiernan has previously written in
20 her reports that are not retreading new
21 ground [sic].
22       And the idea that asking any
23 question prior to 2021 is somehow
24 retreading new ground -- is retreading old
25 ground is not anything that we ever agreed

Page 106

1  to or would have agreed to.
2        But Meade, if I said something
3  wrong, please correct me.
4        MR. MITCHELL:  No, you didn't say.
5  We have a disagreement about whether we're
6  retreading old ground.  We think we we're
7  not and think these relate to timing,
8  which is very germane here and would not
9  have been in the other cases.  Plaintiff's
10 counsel disagrees.
11       I'm just trying to get a
12 stipulation that -- that we don't have to
13 just continue to ask questions about the
14 '90s and 2000s for the next hour so that
15 we can move on to the next issue and then
16 take this up with the Court.
17       MS. O'DELL:  We -- we -- we do have
18 a disagreement.  I will stipulate that I
19 will continue to give that instruction,
20 and, you know, we'll look to the Court for
21 guidance on this issue.
22       MR. MITCHELL:  Okay.  Thank you.
23       MS. O'DELL:  Thank you.
24 BY MS. DAVIDSON:
25    Q.    Dr. McTiernan, are you aware that

Page 107

1  the state is asking defendants -- is -- is
2  seeking up to $10,000 in penalties for each
3  bottle of Johnson's Baby Powder sold in the
4  state of Mississippi?
5        MS. O'DELL:  Object to form.
6        You may answer, Doctor, if you --
7  if you understood the question.
8        THE WITNESS:  I don't know the
9  specifics offhand.  I've read through the
10 Complaint and the Amended Complaint, but I
11 don't recall if it mentions anything about
12 specific amount of money per bottle.
13 BY MS. DAVIDSON:
14    Q.    Are you aware that IARC classifies
15 hot beverages in the same category as talc?
16       MS. O'DELL:  Objection to the form.
17 I am confident that Dr. McTiernan
18 has been asked that question previously
19 almost exactly.  That's the same
20 objection.
21       Dr. McTiernan, just to move this
22 along, if you know, answer the question.
23       But again, I'm going to assert the
24 same objection if you're going to go down
25 this same road.

Page 108

1        But if you know the answer to the
2  question, Doctor, you may answer.
3        THE WITNESS:  Without looking at
4  the current document of what IARC is
5  classifying hot beverages as, I can't
6  answer that.
7  BY MS. DAVIDSON:
8    Q.    Do you have a recollection as to
9  whether IARC ever classified hot beverages as
10 Category 2A?
11    A.    I -- I don't recall what hot
12 beverages has been classified as.
13    Q.    Do you recall IARC ever classifying
14 hot beverages as probably carcinogenic?
15       MS. O'DELL:  Objection.  Asked and
16 answered.
17       You may answer.
18       THE WITNESS:  I don't recall what
19 IARC has classified hot beverages -- how
20 it has classified hot beverages in their
21 classification scheme.
22 BY MS. DAVIDSON:
23    Q.    Do you believe that the state of
24 Mississippi should obtain billions of dollars
25 of penalties from every manufacturer of a

Page 109

1  product that is listed by IARC as potentially
2  or probably carcinogenic?
3        MS. O'DELL:  Objection to the
4  question.  Dr. McTiernan is not being
5  offered as a damages expert in this case,
6  and that's a completely inappropriate
7  question.  And I instruct the witness not
8  to answer.
9  BY MS. DAVIDSON:
10    Q.    Dr. McTiernan, did you have any
11 discussions with Mississippi officials before
12 this lawsuit was filed?
13    A.    No, I did not.
14    Q.    Have you provided Mississippi with
15 any advice regarding this litigation?
16    A.    No, I have not.
17    Q.    Have you talked to any public
18 health officials in Mississippi about your
19 opinions regarding talc and ovarian cancer?
20    A.    No, I have not.
21    Q.    Have you advised the State of
22 Mississippi to run public service announcements
23 about talc use?
24    A.    No, I have not.
25    Q.    Have you advised the State of

Anne McTiernan, M.D., Ph.D.

Page 110

1 Mississippi to tell its citizens to throw away
2 the leftover talc they have?
3     A.    No, I have not.
4     Q.    Have you suggested to the State of
5 Mississippi that it screen people who have --
6 women who've been exposed to talc that they get
7 extra screening for ovarian cancer?
8     A.    No, I have not.
9     Q.    Have you advised any public health
10 officials or any hospitals that women who have
11 previously been exposed to talc should obtain
12 additional ovarian cancer screening?
13         MS. O'DELL:  I'm sorry.  I missed a
14     word there, Jessica.
15         Would you mind repeating the
16     question, or can I have Suzanne read it
17     back?
18         MS. DAVIDSON:  I can -- I can
19     rephrase it.
20 BY MS. DAVIDSON:
21     Q.    Have you ever advised any public
22 health official, any hospital that women who
23 have previously been exposed to talc should
24 obtain additional screening for ovarian cancer?
25         MS. O'DELL:  Are you limiting your

Page 111

1     question to time or to geographical area,
2     like your other questions were about
3     Mississippi just so I can understand?
4         MS. DAVIDSON:  I am not.
5         THE WITNESS:  No, I've not.
6 BY MS. DAVIDSON:
7     Q.    Have you ever been to Mississippi?
8     A.    I can't recall.
9     Q.    Do you know whether any Mississippi
10 state-run facilities have ever provided talc?
11     A.    I don't know.
12     Q.    Do you know if talc was ever
13 provided to prisoners or hospital patients in
14 Mississippi?
15     A.    I don't know.
16     Q.    Have you spoken to any women from
17 Mississippi about talc or ovarian cancer?
18     A.    I'm not sure if I have or not.
19 I've talked to patients.  I don't know exactly
20 what state they've been from.
21     Q.    When you say you've talked to
22 patients, what are you referring to?
23     A.    Patients with ovarian cancer.  So
24 if I've given talks in the past, there could
25 have been patient survivors there.

Page 112

1         There were -- when I talked to
2 Congress, there were patients survivors at
3 that.  And so -- and some of the cases, there
4 were patients there.  But I can't state for
5 most of them what state they were from.
6     Q.    Do you recall ever providing any
7 advice to any women from Mississippi about talc
8 or ovarian cancer?
9         MS. O'DELL:  Objection to form.
10     Asked and answered.
11         THE WITNESS:  Are you talking about
12     speaking directly to a patient or giving
13     some public opinion that anybody could
14     read?
15 BY MS. DAVIDSON:
16     Q.    I'm talking about speaking directly
17 to any women from Mississippi that you recall
18 giving advice to with respect to either talc or
19 ovarian cancer.
20         MS. O'DELL:  Object to the form.
21     Asked and answered.
22         THE WITNESS:  And, again, if I was
23     speaking on ovarian cancer, I don't know
24     if there were women from Mississippi in
25     the audience.  I can't -- I can't answer

Page 113

1     that.
2 BY MS. DAVIDSON:
3     Q.    Do you know how many ovarian cancer
4 cases there are in Mississippi every year?
5     A.    I don't have the specific statistic
6 in any head.  I think it was in the Complaint,
7 but I don't recall.
8     Q.    Do you have an opinion as to how
9 many ovarian cancer cases in Mississippi in the
10 1970s were the result of talc use?
11         MS. O'DELL:  Objection to the form.
12         THE WITNESS:  I don't have a -- I
13     don't have -- I have not looked at any
14     literature that would give information on
15     that.  I do not have an answer for that.
16 BY MS. DAVIDSON:
17     Q.    Do you have an opinion as to how
18 many ovarian cancer cases in Mississippi in the
19 1980s you believe are attributable to talcum
20 powder use?
21         MS. O'DELL:  Object to the form.
22         THE WITNESS:  I've -- I have not
23     seen any particular studies on this.  I
24     have not looked at it myself, so I
25     couldn't answer that.

Page 114

1 BY MS. DAVIDSON:
2      Q.   Is -- would that be your answer as
3 well for the 1990s and the 2000s?
4      A.   Yes.
5      Q.   Do you have an opinion as to the
6 percentage of ovarian cancer cases in
7 Mississippi in the 1970s that were the result
8 of talcum powder use?
9          MS. O'DELL:  Objection to form.  I
10 think that was just the question you asked
11 about '70s.
12          MS. DAVIDSON:  Nope.  Different
13 question.  Thanks.
14          MS. O'DELL:  Object to the form.  I
15 think it's the same question.
16          MS. DAVIDSON:  It was not.
17          MS. O'DELL:  Would you mind
18 repeating the question, please, Suzanne.
19 Thank you.
20          (At which time the following was
21 read back:
22          "Question:  Do you have an opinion
23 as to the percentage of ovarian cancer
24 cases in Mississippi in the 1970s that
25 were the result of talcum powder use?")

Page 115

1          MS. O'DELL:  Object to form.
2          THE WITNESS:  I don't have any
3 knowledge of that.  It would depend on
4 information about prevalence of use in
5 that state, and it would depend on
6 estimates of risk.  So I cannot answer
7 that question.
8 BY MS. DAVIDSON:
9      Q.   Have you done any research on the
10 prevalence of perineal talcum powder use in
11 Mississippi?
12      A.   No, I have not.
13      Q.   Do you have an opinion on the
14 percentage of ovarian cancer cases that you
15 believe are attributable to talcum powder use
16 in Mississippi in the 1980s, the 1990s, or the
17 2000s?
18          MS. O'DELL:  Object to the form.
19          THE WITNESS:  No, I don't.
20 BY MS. DAVIDSON:
21      Q.   Have you done any investigation as
22 to patterns of talcum powder use in
23 Mississippi?
24          MS. O'DELL:  Asked and answered.
25          THE WITNESS:  No, I have not.

Page 116

1 BY MS. DAVIDSON:
2      Q.   Are your opinions in this case
3 limited to any specific ovarian cancer
4 subtypes?
5      A.   My opinions relate to epithelial
6 ovarian cancer.
7      Q.   Do you have an opinion as to
8 what -- as to the date on which there was
9 sufficient evidence in the epidemiological
10 literature to reach a causal inference that
11 exposure to talcum powder causes ovarian
12 cancer?
13          MS. O'DELL:  Objection to the
14 question.  It again covers territory that
15 we've agreed we're going to take up with
16 the Judge.  It's prior epidemiologic --
17 based on it's -- it seeks information and
18 testimony about epidemiologic studies and
19 Dr. McTiernan's Bradford Hill analysis
20 that she's previously testified to.
21 BY MS. DAVIDSON:
22      Q.   Will you -- will ou be relying on
23 any nonstatistically significant findings in
24 talc studies for this case?
25          MS. O'DELL:  Same -- same

Page 117

1 objection.  Dr. McTiernan has testified at
2 length about all of the studies, including
3 which ones were statistically significant
4 and which ones were not.
5          And I would assert the same
6 objection I made earlier about that can
7 beyond the scope of this deposition.
8          MS. DAVIDSON:  So just to be clear,
9 are you --
10          MS. O'DELL:  I'm sorry.  Forgive
11 me.  I wasn't finished, Jessica.  I'm
12 sorry because I talk so slow.
13          I'm going to instruct Dr. McTiernan
14 not to answer that question.
15          MS. DAVIDSON:  So just to be clear,
16 are you instructing Dr. McTiernan not to
17 let me know whether she's relying on
18 nonstatistically significant findings in
19 the Mississippi case?
20          MS. O'DELL:  Yes, for this reason.
21 Dr. McTiernan has testified regarding the
22 epidemiologic studies published prior to
23 2021 at length, both that were
24 statistically significant and those that
25 were not.

Page 118

1    And she has relied on those in
2 rendering her opinion that talc can cause
3 ovarian cancer.  That has been
4 well-established, as well as the
5 literature about the significance or
6 insignificance of statistical
7 significance.
8    And so your question really does go
9 back to the heart of what she's testified
10 to before, and I'm going to instruct her
11 not to answer.
12 BY MS. DAVIDSON:
13    Q.   Dr. McTiernan, have any of your
14 opinions on statistical significance changed
15 since your prior deposition in this matter in
16 the talc litigation?
17    A.   Can you explain that more?
18    Q.   I -- have any of your opinions
19 related to statistical significance changed
20 since you were last deposed in talc litigation?
21    A.   I've always been clear that
22 statistical testing is one way to get an es- --
23 an overview of what the -- the use -- the --
24 sorry.
25    Statistical testing gives us a

Page 119

1 picture of how precise a relative risk is.  So
2 scientists look at a couple of different ways
3 to look at how likely something would occur if
4 you retested again and again in the same
5 population.
6    One of those is a confidence
7 interval, usually a 95-percent confidence
8 interval around that relative risk or whatever
9 measure you're looking at.  Another is a P
10 value that's often used.  And these -- these
11 are helpful.
12    They're statistical significance
13 and confidence intervals are highly related to
14 sample size, the number of cases in a study,
15 even more than the number of non-cases.
16    And so if you have a small study,
17 like a cohort study that doesn't have many
18 cases, or -- or a case-control study that is
19 small, you may have results that are -- would
20 be classified as not statistically significant,
21 assuming you use certain criteria for
22 statistical significance.  And whereas, if you
23 have a larger study, it would show up as
24 statistically significant.
25    And so my opinion has always been

Page 120

1 that testing with these statistical measures
2 are another way to give us some information
3 about how to interpret a relative risk or how a
4 relative risk might perform if it was done in
5 another study.
6    When I look at studies overall, so
7 do a causal analysis, I look at all studies.
8 And I don't throw out -- I don't discard
9 studies that don't fall within a particular
10 level of statistical significance or
11 statistical nonsignificance.  I look at them
12 all.
13    We can see that when an effort is
14 made to make the studies larger, either by
15 design or by pulling data from different
16 studies or doing meta-analysis from different
17 studies, very often the results of that effort
18 is -- will result in a statistically
19 significant result because the study is larger.
20    So my opinion remains that while
21 statistical testing is useful, it's -- it's a
22 particular part of what I use to evaluate
23 studies.
24    MS. DAVIDSON:  Asher, can you put
25 up Tab 13 as Exhibit 8.

Page 121

1    I'm marking as Exhibit 8 "Genital
2 Pattern Exposure and the Risk of
3 Epithelial Ovarian Cancer" by Karin
4 Rosenblatt.
5    (Whereupon, Exhibit No. 8,
6 Publication entitled, "Genital powder
7 exposure and the risk of epithelial
8 ovarian cancer," by Karin A. Rosenblatt,
9 et al., was marked for identification.)
10 BY MS. DAVIDSON:
11    Q.   This article is dated from 2011.
12    Do you see that in the top
13 left-hand corner?
14    A.   Yes.
15    MS. DAVIDSON:  If we could blow up
16 the abstract, Asher.
17    MS. O'DELL:  Jessica, Dr. McTiernan
18 has --
19    MS. DAVIDSON:  Will you let me ask
20 my question before you lodge your
21 objection.  You don't know what my
22 question is.
23    MS. O'DELL:  That -- that's a
24 fair -- that's a fair comment.
25    Dr. McTiernan, just give me a

Anne McTiernan, M.D., Ph.D.

Page 122

¹ moment after the question in case I have
² to lodge -- lodge an objection. Thank
³ you.
⁴ BY MS. DAVIDSON:
⁵    Q.   Dr. McTiernan, in abstracts of this
⁶ paper written in 2011, the authors state, "A
⁷ modest association of ovarian cancer with this
⁸ exposure was seen in our study and in some
⁹ previous ones, but that association generally
¹⁰ has not been consistent within or among
¹¹ studies."
¹²       The authors go on to state,
¹³ "Therefore, no stronger adjective than possible
¹⁴ appears warranted at this time."
¹⁵       Do you agree with these authors
¹⁶ that as of 2011, the -- the strongest adjective
¹⁷ that could be applied to the potential
¹⁸ relationship between talcum powder exposure and
¹⁹ ovarian cancer at that time was, quote,
²⁰ "possible"?
²¹       MS. O'DELL:  This -- this study,
²² the Rosenblatt study, published in 2011 is
²³ something that has been a part of
²⁴ Dr. McTiernan's reports both in 2018 and
²⁵ 2021.  She's testified regarding the data

Page 123

¹ at trial and at deposition.
²       And for the reasons stated earlier,
³ the scope of what we believe this
⁴ deposition was agreed to be as well as
⁵ what the Court's directive is, I would
⁶ instruct Dr. McTiernan not to answer.
⁷       MS. DAVIDSON:  And I will add --
⁸ and, Meade, please join if there's
⁹ anything you would like to add to that --
¹⁰ that the timing of knowledge and what was
¹¹ known is highly relevant to this
¹² litigation.
¹³       What was known when in the
¹⁴ epidemiological community, Dr. McTiernan
¹⁵ as the expert epidemiologist, this is
¹⁶ completely fair game to be -- to be
¹⁷ probing her about in this litigation.
¹⁸ It's highly relevant, and this has not
¹⁹ been a topic that has been probed in prior
²⁰ depositions.
²¹       The idea that because she was asked
²² one question about Rosenblatt, she can
²³ never be asked a question about
²⁴ Rosenblatt again is certainly not what we
²⁵ agreed to and not our understanding of any

Page 124

¹ agreement.
²       Meade, do you have anything to add?
³       MR. MITCHELL:  No.  I think that's
⁴ accurate.
⁵       MS. O'DELL:  Obviously, we
⁶ disagree.  We talked about it at length on
⁷ the record, and we'll seek the Court's --
⁸ Court's guidance.
⁹       But to somehow pick out an
¹⁰ epidemiologic study in this way that she's
¹¹ previously testified to we think is beyond
¹² the scope and inappropriate, and we -- we
¹³ state our objection.
¹⁴ BY MS. DAVIDSON:
¹⁵    Q.   Dr. McTiernan, we talked briefly
¹⁶ about --
¹⁷       MS. O'DELL:  I'm sorry.  I'm sorry.
¹⁸ What exhibit is -- is that 9 or 8?
¹⁹       MS. DAVIDSON:  I have it as 8.
²⁰       MS. O'DELL:  Okay.  Thank you.
²¹       MS. DAVIDSON:  I have Harper as 7
²² and that as 8.
²³       Did I miss one?
²⁴       MS. O'DELL:  I think I miscounted,
²⁵ so thank you.

Page 125

¹       MS. DAVIDSON:  Okay.
² BY MS. DAVIDSON:
³    Q.   Dr. McTiernan, we talked briefly
⁴ about your role as an expert in the Zantac
⁵ litigation.
⁶       Do you remember that?
⁷    A.   Do I remember Zantac, or do I
⁸ remember that we talked about it?
⁹    Q.   How did you come to be retained by
¹⁰ plaintiffs as an expert in the Zantac
¹¹ litigation?
¹²    A.   I was con- -- contacted by a lawyer
¹³ that was part -- I believe part of the MDL and
¹⁴ asked me if I would be interested.
¹⁵    Q.   And who was that lawyer?
¹⁶    A.   John Restaino [sic].
¹⁷    Q.   Did you work with any lawyers in
¹⁸ the Zantac litigation with whom you had also
¹⁹ worked in the talc litigation?
²⁰    A.   Other than him and -- I didn't
²¹ really work with him.  He just made the first
²² contact.
²³       But no, I don't believe there was
²⁴ any overlap for my work.  I don't -- I don't
²⁵ think that I worked with anybody that was in

Page 126

1  both litigations.
2      Q.   Are you aware that the MDL board
3  excluded your causation opinions on
4  December 6th, 19 - -- 2022?
5      A.   Yes.
6      Q.   Have you read her opinion?
7      A.   I read parts of it.  I've not read
8  everything.
9      Q.   Do you recall what her reasons were
10  for excluding your opinions?
11      A.   I don't recall everything.  I
12  recall a few things.
13      Q.   What do you recall?
14      A.   I couldn't list them now.  If you
15  have a particular question, I'm happy to try to
16  answer it.
17      Q.   You said you recall two things.
18          What were you referring to?
19      A.   No, no.  I said a few things.
20          I just -- I just know that from my
21  work on Zantac, I approached it the same way
22  that I did for talc and the same I do for other
23  systematic reviews, which is other systematic
24  reviews, such as what I did for the U.S.
25  government, the Department of Health and Human

Page 127

1  Services Physical Activity Guidelines Advisory
2  Committee where we looked at physical activity
3  and health outcomes.
4          And the same as what we -- what I
5  did when I worked with the World Cancer
6  Research Fund looking at diet, physical
7  activity, obesity, and cancer risk and
8  survival.
9          So used the same methodology for my
10  work on Zantac and did my causal analyses using
11  the same tools that, as an epidemiologist, I
12  would do for other efforts in the same way.
13      Q.   Dr. McTiernan, what did I ask you?
14      A.   Can you repeat the question?
15      Q.   What do you recall me asking you?
16      A.   I think I need you to ask -- as the
17  question.  I don't know specifically.  It was
18  something about the Zantac dismissal.
19      Q.   Did you forget what question I
20  asked?
21      A.   Could you repeat it, please?
22      Q.   You said that you remembered a few
23  things from the ruling, and I asked you what
24  were those few things.
25      A.   And they -- those are --

Page 128

1      Q.   This deposition is going to go very
2  long for many, many days if you're not able to
3  answer the questions that I'm asking.
4          So for everybody's sake, let's try
5  to stick to the questions I'm asking.
6          And my question was:  You had said
7  that you remembered a few things from her
8  ruling, and I wanted to know what those few
9  things were.
10          MS. O'DELL:  I object to the
11  question.  I object to the instruction to
12  Dr. McTiernan prior to the question.
13          Dr. McTiernan, if you need the
14  question be repeated, you can certainly
15  ask the court reporter to do that.
16          And so if you remember the
17  question, you can -- you can go ahead and
18  answer.
19          THE WITNESS:  I think the question,
20  if I'm correct, the question was what few
21  things do I recall.
22          But it's a general thing.  It was
23  several hundred pages long, the Court
24  report; and so I can't list things off.  I
25  wouldn't be able to do it accurately

Page 129

1  without looking at that report again.
2          And so when I say I remembered a
3  few things, maybe I remembered some gist
4  of things; but I could be wrong about what
5  I remember.  So I wouldn't be able to give
6  an accurate answer without looking again
7  at the report.
8  BY MS. DAVIDSON:
9      Q.   When you said "a few things," what
10  were you referring to?
11      A.   I can't recall.
12      Q.   When you said two minutes ago "a
13  few things," you can't recall what you had in
14  mind?
15      A.   No.
16          MS. O'DELL:  Asher, would you mind
17  taking down the document on the screen,
18  please.  Thank you.
19  BY MS. DAVIDSON:
20      Q.   Do you recall whether the Zantac
21  Court addressed your opinions on statistical
22  significance?
23      A.   It sounds familiar, but I can't
24  recall exactly what they said.
25      Q.   Do you recall whether the Zantac

Page 130

1  Court expressed concern about, quote,
2  "commingling data"?
3          MS. O'DELL:  And I'll just say,
4  Jessica, if you want to ask Dr. McTiernan
5  specific questions about the Zantac order,
6  we'll just ask you to mark it as an
7  exhibit for the record and allow her to
8  have it in front of her.
9          MS. DAVIDSON:  Understood.  I just
10  want to know if she recalls anything about
11  it.
12          MS. O'DELL:  I don't think she's
13  required to answer that question unless
14  you put it in front of her.
15          MS. DAVIDSON:  Are you instructing
16  her not to answer?
17          MS. O'DELL:  I'm just asking you to
18  be courteous to the witness.  And if
19  you're going to ask her something about a
20  200-page document about a number of
21  documents, just to put the document in
22  front of her.
23          MS. DAVIDSON:  Understood.
24          MS. O'DELL:  That's a -- that's a
25  perfectly appropriate request.

Page 131

1  BY MS. DAVIDSON:
2      Q.   Dr. McTiernan, do you recall
3  whether the Zantac Court criticized you for,
4  quote, "commingling data"?
5          MS. O'DELL:  Object to form.
6          THE WITNESS:  I don't recall, and I
7  don't even know what it means.  Just
8  you're using that phrase.  I don't know
9  what it was referring to.
10          It could have been referring to
11  anything.  So it's -- I'm not able to
12  answer that question.
13  BY MS. DAVIDSON:
14      Q.   Do you recall whether the Zantac
15  Court said that you had engaged in, quote,
16  "cherry-picking"?
17          MS. O'DELL:  Object to form.
18          THE WITNESS:  The term sounds
19  familiar.  I think that defendants used
20  that term a lot.  I don't recall seeing it
21  in the Court's report.
22  BY MS. DAVIDSON:
23      Q.   Are you still employed by the Fred
24  Hutchinson Cancer Research Center?
25      A.   Yes.

Page 132

1      Q.   Are you a full-time employee?
2      A.   No.
3      Q.   Well, you're a part-time employee?
4      A.   Yes.
5      Q.   What percentage employee are you?
6      A.   Starting this month, 30 percent
7  approximately.  I'm an hourly employee, so
8  that's why I said approximately.
9      Q.   So how much are you paid per hour?
10      A.   $150.
11      Q.   And what -- is your title changing
12  as you go to 30 percent?
13      A.   No.  I'm called professor in the
14  program in epidemiology in the Department of
15  Public Health Sciences -- sorry, Division of
16  Public Health Sciences.
17      Q.   And what -- what are you doing for
18  those 30 hours?
19          Is that 30 hours -- wait,
20  30 percent.  Sorry.
21      A.   30 percent.
22      Q.   What are you doing for -- so
23  30 percent, would that be 30 percent of
24  40 hours a week?
25      A.   Yes, approximately, yes.  I have --

Page 133

1  I'm principal investigator of a clinical trial
2  that's funded through the breast cancer
3  research foundation.
4      Q.   Uh-huh.
5      A.   And as principal investigator, I
6  have to oversee all of it.
7          I continue to write papers.  I do
8  review of journal reviews, grant reviews, give
9  talks.  I'm approximately 5 percent on NIH
10  grant funded through the Diabetes Institute
11  where I provide medical oversight to a trial
12  and I collaborate on that trial.
13          So I do the similar things that I
14  did at a hundred percent just at scaled back.
15      Q.   Are you teaching any classes?
16      A.   Am I teaching classes?  No, I'm
17  not.
18      Q.   When is the last time you taught a
19  course?
20      A.   I don't think I taught courses.
21  I -- I taught individuals, or I would mentor
22  individuals.  I would have students working on
23  Ph.D.'s or master's degrees that come from the
24  university, and they would work with me.  So
25  it's individual one-on-one teaching, and

Page 134

1 occasionally I gave lectures at the university.
2     Q.    Got it.  I didn't realize that.
3         So you've never taught an
4 epidemiological course at the university?
5     A.    That's right.
6     Q.    Have you had any conversations with
7 anyone at Fred Hutchinson Cancer Research
8 Center since 2021 about the alleged
9 relationship between talc and ovarian cancer?
10        MS. O'DELL:  Object to form.
11        You may answer.
12        THE WITNESS:  No.
13 BY MS. DAVIDSON:
14     Q.    Since 2021, has Fred Hutchinson
15 Institute taken a position on whether talc use
16 can cause ovarian cancer?
17     A.    I don't know if they have.  I know
18 that some of our investigators have been first
19 or senior or coinvestigators on several ovarian
20 cancer papers.
21     Q.    Since 2021, have you gone to anyone
22 at Fred Hutch and said we should put on the
23 Fred Hutch website language letting people know
24 that talc may cause ovarian cancer?
25     A.    I don't recall.  There have been

Page 135

1 story articles I believe on the ovarian cancer
2 and talc papers that have come out, and
3 those -- so those may have appeared on the
4 website.
5     Q.    Yeah.  That wasn't my question.
6         My question was:  Have you gone to
7 anyone at Fred Hutchinson and said we should be
8 warning women about the link between talc and
9 ovarian cancer on the Fred Hutchinson website?
10     A.    I don't believe I have.
11     Q.    Does Fred Hutchinson know how much
12 money you have made in connection with your
13 expert work in talc litigation since 2021?
14     A.    They know per year, yes.  Each year
15 I have to report how much I've made.
16     Q.    Have you donated any of the money
17 that you've made in litigation to Fred
18 Hutchinson?
19     A.    I've donated money to them.  I
20 don't know if you'd say -- I didn't say where
21 it came from.  I just donated.
22     Q.    What's ACOG?
23     A.    I believe it's American College of
24 Oncology and Gynecology, but I may not be
25 right.  I'm not sure what you're referring to.

Page 136

1     Q.    Have you looked at the ACOG website
2 since 2021?
3        MS. O'DELL:  Object to form.
4        THE WITNESS:  I don't recall.
5     There's probably several sites on the ACOG
6     website, so I don't recall.
7 BY MS. DAVIDSON:
8     Q.    Are you aware that ACOG updated its
9 frequently asked questions on ovarian cancer in
10 May 2022?
11     A.    I have not looked at that site, no.
12        MS. DAVIDSON:  All right.  Let's
13     mark that as Exhibit 9, I believe
14     Exhibit 9.
15        (Whereupon, Exhibit No. 9, The
16     American College of Obstetrics and
17     Gynecologists FAQs on Ovarian Cancer, was
18     marked for identification.)
19        MS. DAVIDSON:  I am marking as
20     Exhibit 9 the website on the ACOG website
21     that lists risk factors and symptoms of
22     ovarian cancer.
23 BY MS. DAVIDSON:
24     Q.    Do you see that on your screen?
25     A.    I don't see where it says that it's

Page 137

1 ACOG.  I see something that says stage refers
2 to --
3        MS. O'DELL:  Are you going to put
4     that into the chat, Asher?
5        Sorry to --
6        MR. TRANGLE:  Yeah.  I just had to
7     scroll up so she could see.
8        MS. O'DELL:  Thank you.
9        MR. TRANGLE:  Can I go to the next
10     page?
11        MS. DAVIDSON:  Please do.
12 BY MS. DAVIDSON:
13     Q.    Dr. McTiernan, does this list from
14 ACOG of risk factors for ovarian cancer list
15 talc?
16     A.    I don't see all of them.  I just
17 see down to fertility, and it says, "These risk
18 factors include the following."
19        So it doesn't look like it's --
20 that it's looking at all possible or mentioning
21 all possible risk factors.
22     Q.    Dr. McTiernan, on the next break,
23 can you try to figure out why you're not seeing
24 the full screen that we're all seeing?
25     A.    I tried that before, and this is

Anne McTiernan, M.D., Ph.D.

Page 138

1  not a problem I've had before.
2        I think if I'm allowed to open up
3  what Asher puts on --
4    Q.    Sure.
5    A.    -- then -- then I can see better.
6    Q.    Sure.
7        MS. O'DELL:  You can certainly do
8  that, Doctor.
9        MS. DAVIDSON:  Asher, you can also
10  just move it up so that the risk factors
11  are at the top half.
12        Apparently, it seems that
13  Dr. McTiernan has trouble seeing the
14  bottom of the screen, and I don't know
15  why.
16  BY MS. DAVIDSON:
17    Q.    Dr. McTiernan, do you have the
18  pictures of all of us on the side going up and
19  down?
20    A.    No.  They're on -- on top.
21    Q.    So I don't know how to --
22        MS. O'DELL:  I think if you mark it
23  in your -- as standard view,
24  Dr. McTiernan, it may be better.
25        But again, just feel free to

Page 139

1  download the exhibit and take a look at
2  it.
3  BY MS. DAVIDSON:
4    Q.    Anyway, my question was simply:
5  Does this list include talc?
6        MS. O'DELL:  Again, please feel
7  free to look -- look at the document if
8  you -- if you need to.
9  BY MS. DAVIDSON:
10    Q.    Dr. McTiernan, do you have the
11  bullets in front of you?
12    A.    Yes.
13    Q.    Okay.  Do you remember my question?
14    A.    Whether talc was there.  I don't
15  see it.
16    Q.    Okay.  Thank you.
17        And if we could turn to "Reducing
18  Risks, how can I reduce my risk of ovarian
19  cancer," which is about two pages later, and
20  you should have that in -- it's up to you
21  whether you want to look at it on the screen or
22  whether you want to look at it in the document
23  that Asher sent you, but there is a subheading
24  that says, "How can I reduce my risk of ovarian
25  cancer?"

Page 140

1        Do you see that?
2    A.    Yes.
3    Q.    Does ACOG on its website suggest
4  that than one way to reduce the risk of ovarian
5  cancer is not to use talcum powder?
6        MS. O'DELL:  Object to form.
7        THE WITNESS:  It looks like they
8  only talk about the pill and
9  sterilization.  They don't mention
10  aspirin, for example, either.
11        So that -- it's not a full list
12  of -- of ways to prevent ovarian cancer.
13  BY MS. DAVIDSON:
14    Q.    Is talc on there?
15    A.    I don't see talc, no.
16    Q.    And you don't see a recommendation
17  to stop using talcum powder, correct?
18        MS. O'DELL:  Object to the form.
19  Asked and answered.
20        THE WITNESS:  I don't see talc on
21  here at all.
22        MS. DAVIDSON:  Let's -- you can
23  take that down, Asher.
24  BY MS. DAVIDSON:
25    Q.    Dr. McTiernan, you have previously

Page 141

1  testified that CDC is a leading public health
2  authority.
3        Do you still hold that view?
4    A.    I do, yes.
5    Q.    As of your last deposition, CDC's
6  list of risk factors for ovarian cancer did not
7  include cosmetic talc, as you testified in
8  2021.
9        Do you recall that?
10    A.    No, I don't recall.
11    Q.    Do you know whether CDC currently
12  lists talcum powder as a risk fac- -- talcum
13  powder use as a risk factor for ovarian cancer?
14    A.    I have not checked recently, so I
15  don't know.
16        MS. DAVIDSON:  Let's mark
17  Exhibit 10.
18        (Whereupon, Exhibit No. 10,
19  Document entitled, "Centers for Disease
20  Control.  What are the Risk Factors for
21  Ovarian Cancer", was marked for
22  identification.)
23        MS. DAVIDSON:  Exhibit 10 is a
24  document entitled "Centers for Disease
25  Control.  What are the Risk Factors for OC

Page 142

1    and -- Ovarian Cancer."
2  BY MS. DAVIDSON:
3      Q.    And Asher, I believe, has sent it
4  to you if you cannot see it on the screen.
5  This one you might be see it on the screen
6  because the bottom half of the page is blank.
7  So if your problem is the bottom, then you
8  should perhaps be able to see it; but Asher, I
9  believe, has also stuck it in the chat.
10        Let me know when you're ready to
11 talk about it.
12        MS. O'DELL:  You -- you have an
13 indication on the document where it came
14 from?
15        MS. DAVIDSON:  Asher, my hard copy
16 has Centers for Disease Control at the
17 top.
18        MR. TRANGLE:  I can go to their
19 website and reprint it.  It's --
20        MS. DAVIDSON:  Great.
21        MR. TRANGLE:  -- just from their
22 website.
23        MS. O'DELL:  Why don't you put the
24 link in the chat if you don't mind, Asher,
25 just where you're --

Page 143

1        MR. TRANGLE:  Yeah.  That might be
2  easier.
3        MS. O'DELL:  -- getting it.  Yeah.
4  I just -- I'm not doubting you.  I just
5  don't see it on the exhibit.  I just want
6  to make sure I understand what we're
7  looking at.
8        MS. DAVIDSON:  Asher's not really
9  the nefarious sort.
10       MS. O'DELL:  I just -- I want to
11 know what we're looking at.  I'm not
12 suggesting one way or the another.
13 BY MS. DAVIDSON:
14     Q.    Dr. McTiernan, in --
15     A.    Yes.
16     Q.    -- in this list of risk factors for
17 ovarian cancer, does the CDC mention talc or
18 talcum powder use?
19       MS. O'DELL:  And I'll just say for
20 the record, Dr. McTiernan, I did go to the
21 link; and that it is from the CDC website.
22       THE WITNESS:  Okay.  I can't get it
23 open for some reason.  Oh, I see.  It's a
24 link not an actual document.
25       MR. TRANGLE:  What if I just put

Page 144

1  the web page up and share that.  Is
2  that --
3        MS. DAVIDSON:  Great.  Yes.  That's
4  perfect.
5        MR. TRANGLE:  So you can see in
6  the -- in the bar here CDC.
7        MS. DAVIDSON:  Perfect.  And
8  let's -- Asher, when you send the exhibits
9  at the end of the deposition to the court
10 reporter, send this version with --
11       MR. TRANGLE:  I'll send a
12 screenshot of it, yeah.
13       MS. O'DELL:  Thank you.  Thank you.
14 BY MS. DAVIDSON:
15     Q.    Are you ready to answer?
16     A.    Yes.
17     Q.    Do you remember the question?
18     A.    No, I don't.
19     Q.    I'm sorry?
20     A.    No, I don't remember.
21     Q.    My question was:  Does this list of
22 risk factors include talcum powder use?
23     A.    I don't see it there.
24     Q.    Thank you.
25        Have you ever contacted the CDC to

Page 145

1  suggest that they add talcum powder to their
2  website?
3      A.    I don't believe I have, no.
4      Q.    Have you ever contacted to ACOG to
5  suggest that they add talcum powder use to the
6  risk factors listed on their website?
7      A.    No.
8      Q.    All right.  Let's move on.  We've
9  been going about an hour.
10        Do you need a break, or do you want
11 to continue?
12     A.    Actually, a break would be great.
13       MS. DAVIDSON:  Okay.  Let's take
14 five minutes or seven.  What do you want?
15       THE WITNESS:  Ten.
16       MS. DAVIDSON:  Ten.  Oh, my gosh.
17       THE WITNESS:  Yeah.
18       MS. DAVIDSON:  All right.  Your
19 bathroom must be very -- you must have a
20 very big house.  I, on the other hand,
21 live in a tiny Manhattan apartment, so I
22 don't need ten.
23       THE WITNESS:  I have to heat -- I
24 have to heat up my coffee or tea.
25       MS. DAVIDSON:  Got it.  We'll be

Page 146

1    back at 4:32 Eastern, 1:32 Pacific,
2    3:32 Central.
3        THE VIDEOGRAPHER:  The time is
4    1:22 p.m.  We're off the record.
5        (Whereupon, a break was taken.)
6        THE VIDEOGRAPHER:  The time is
7    1:33 p.m.  We're back on the record.
8    BY MS. DAVIDSON:
9        Q.    Dr. McTiernan, you're familiar with
10   the NCI PDQ page; we've previously talked about
11   it in prior depositions, correct?
12       A.    Yes.
13       Q.    Do you know whether that page has
14   been updated since 2021?
15       A.    I don't know.  It's not something I
16   typically go look at.
17       Q.    Have you ever reached out to the
18   authors of the PDQ to suggest that you disagree
19   with what they have written there about ovarian
20   cancer and talcum powder?
21       A.    I have not.
22       Q.    Do you know what the purpose of the
23   PDQ is?
24       A.    I don't.
25       Q.    Do you know what the letters

Page 147

1    "P-D-Q" stand for?
2        A.    Not offhand, no.
3        Q.    Do you know if the "P" in PDQ
4    stands for "physician"?
5        A.    I don't know.
6        Q.    Do you know if physicians are the
7    intended audience of the PDQ?
8        A.    I don't know.  I -- I recall, I
9    think, that there's both a physician and a
10   patient page; but I -- I'm not -- I haven't
11   looked at it recently, so I don't know if
12   that's still the case.
13       Q.    You testified in 2021 that you
14   believe the PDQ is out of date.
15           Is that still your position?
16       MS. O'DELL:  Object --
17       THE WITNESS:  I haven't looked at
18   it recent -- I'm sorry.
19       MS. O'DELL:  Sorry.  I was going to
20   actually object.
21           She said she hadn't seen the reason
22   version.  If you want to ask her whether
23   it's out of date, she would need to look
24   at that.
25

Page 148

1    BY MS. DAVIDSON:
2        Q.    Are you aware that the PDQ was
3    updated in June 2023?
4        A.    Nope.
5        MS. O'DELL:  Object to the form.
6    Asked and answered.  Dr. --
7    Dr. McTiernan's answer was better -- more
8    quick than my objection.  Sorry.
9        MS. DAVIDSON:  I didn't hear the
10   answer because -- everybody is talking
11   over each, so I didn't hear the answer.
12       THE WITNESS:  My answer was no.
13       MS. DAVIDSON:  Okay.  Can we mark
14   as Exhibit 10 the NCI PDQ Ovarian,
15   Fallopian, and Primary Peritoneal Cancer
16   Prevention web page dated June 29th, 2023?
17       THE COURT REPORTER:  I think we're
18   up to 11.  It's Exhibit 11.
19       MS. DAVIDSON:  Oh, I'm sorry.  I
20   forgot to write down CDC, didn't I?
21           After telling -- the one mentorship
22   I gave Asher was always keep a really good
23   list, but then I screwed it up.
24           But yes, 10 was CDC, and 11 as NCI
25   PDQ.

Page 149

1        MS. O'DELL:  And it's in the chat,
2    Dr. McTiernan, if you want to pull up the
3    entire document.
4           (Whereupon, Exhibit No. 11,
5    National Cancer Institute Publication
6    entitled, "Ovarian, Fallopian Tube, and
7    Primary Peritoneal Cancers Prevention
8    (PDQ®)–Health Professional Version", was
9    marked for identification.)
10   BY MS. DAVIDSON:
11       Q.    As of 2023, I'd like to turn your
12   attention to the subsection entitled "Factors
13   With Inadequate Evidence of Association."
14       MS. DAVIDSON:  What page is that,
15   Asher?
16           Here we go.
17       MS. O'DELL:  So Dr. McTiernan, if
18   you need to look at the document before
19   you answer the questions, feel free to do
20   that.
21   BY MS. DAVIDSON:
22       Q.    So do you see the heading on
23   page 17 -- is that 17?  Yes -- that says,
24   "Factors With Inadequate Evidence of An
25   Association Risk of Ovarian, Fallopian Tube,

Page 150

1  and Primary Peritoneal Cancers"?
2      A.    I'm scrolling down so I can find
3  it.
4      Q.    Page 17.
5      A.    I see it.
6      Q.    First item under Factors with
7  Inadequate Evidence of an Association Risk of
8  Ovarian, Fallopian Tube, and Primary Peritoneal
9  Cancers is dietary factors, correct?
10     A.    Yes.
11     Q.    And the second subsection is
12 aspirin and nonsteroidal anti-inflammatory
13 drugs, correct?
14     A.    Yes.
15     Q.    And what is the third subsection
16 under the heading "Factors with Inadequate
17 Evidence of an Association Risk of Ovarian,
18 Fallopian Tube, or Primary Peritoneal Cancers?
19     A.    It states "Peritoneal talc
20 exposure."
21     Q.    Do you disagree with this
22 conclusion?
23     A.    I do.
24     Q.    Do you think that NCI is
25 unreasonable in reaching a different opinion

Page 151

1  from yours?
2      A.    First of all, it's not NCI.  It's a
3  separate board that -- that makes the
4  determination of what or approves what goes
5  into this -- these sections in different areas.
6  And they did not do a systematic review.  They
7  -- and they interpret the data in a different
8  way than I do.
9          For example, you can see they're
10 talking about the meta-analysis and a pooled
11 analysis, and they found a 24-percent increased
12 risk of epithelial-bearing cancer with genital
13 powder use.  That was statistically
14 significant.
15         And I noticed as -- when -- when I
16 opened this document, that they classify
17 obesity that had a lower relative risk as being
18 something that -- adequate evidence.
19         So I'm not sure how they decide
20 what's adequate or inadequate, but I disagree
21 with this classification as being inadequate.
22     Q.    Have you tried to contact the
23 editorial board that is responsible for PDQs to
24 express your concerns?
25     A.    No, I have not.

Page 152

1      Q.    Could a reasonable scientist who
2  conducts a systematic review of the literature
3  in 2023 reach a different conclusion from
4  yours?
5          MS. O'DELL:  Object to form.
6          THE WITNESS:  Could you state it
7  again, the question?
8          Ask the question again.
9  BY MS. DAVIDSON:
10     Q.    Sure.
11         MS. DAVIDSON:  Suzanne.
12         (At which time the following was
13 read back:
14         "Question:  Could a reasonable
15 scientist who conducts a systematic review
16 of the literature in 2023 reach a
17 different conclusion from yours?")
18         MS. O'DELL:  Object to the form.
19         THE WITNESS:  I -- I think if
20 somebody used the principles of looking at
21 of doing systematic reviews, looking at
22 all of the data, doing a Bradford Hill
23 analysis would come to the conclusion that
24 I did, that talcum powder exposure to the
25 peritoneal area can increase risk and

Page 153

1  cause ovarian cancer.
2  BY MS. DAVIDSON:
3      Q.    Are you -- do you personally know
4  either Dr. O'Brien or Dr. Wentzensen?
5      A.    I've had some e-mail correspondence
6  with Dr. Wentzensen about something unrelated,
7  but I don't know him personally.
8      Q.    Do you have respect for
9  Dr. Wentzensen?
10     A.    He's an epidemiologist, and I
11 believe a gynecologist at NCI.
12     Q.    Do you have any reason to doubt his
13 scientific integrity?
14         MS. O'DELL:  Object to form.
15         THE WITNESS:  No.
16 BY MS. DAVIDSON:
17     Q.    Do you know Dr. O'Brien?
18     A.    I don't know her personally.
19     Q.    Do you have any reason to doubt her
20 scientific integrity?
21         MS. O'DELL:  Object to form.
22         THE WITNESS:  No.
23 BY MS. DAVIDSON:
24     Q.    If Dr. O'Brien and Dr. Wentzensen
25 have different opinions from yours, do you

Page 154

1 believe that their opinions are unscientific?
2    A.   That's a -- that's a very -- it's
3 kind of a vague question.  I don't really know
4 how to answer that.
5        I think if we're talking about a
6 pin paper that they've written, about what
7 they -- what they concluded from data, I could
8 answer that.  But I think this is -- it's too
9 vague of a question for me to answer.
10   Q.   Do you believe that every scientist
11 who has reached a different conclusion from you
12 with respect to a potential relationship
13 between talc and ovarian cancer is
14 unreasonable?
15        MS. O'DELL:  Object to the form.
16        THE WITNESS:  I don't know -- I've
17     not seen or heard or talked with the
18     universe of people that might have
19     evaluated this literature, so I can't
20     answer that question.
21 BY MS. DAVIDSON:
22   Q.   Is it possible for someone to
23 disagree with you with respect to perineal talc
24 exposure and still have a reasonable opinion?
25   A.   All I can say --

Page 155

1        MS. O'DELL:  Object to the form.
2        THE WITNESS:  All I can say is that
3     what my evaluation is of the literature,
4     my causal analysis, and what I concluded
5     from that.
6 BY MS. DAVIDSON:
7   Q.   Is it your opinion that the PDQ
8 that's in front of us right now is
9 unreasonable?
10        MS. O'DELL:  Object to the form.
11        THE WITNESS:  It's my opinion that
12     they did not do a systematic review and a
13     causal analysis.  I don't -- and from what
14     is presented here, it's not -- it doesn't
15     look like they have looked at and
16     evaluated all of the available data.
17 BY MS. DAVIDSON:
18   Q.   Is it your opinion that ACOG and
19 CDC are -- are giving unreasonable advice by
20 failing to include talcum powder as a risk
21 factor on their websites?
22        MS. O'DELL:  Object to the form.
23        THE WITNESS:  I believe they're --
24     both websites present some risk factors
25     but not all, and they don't claim to list

Page 156

1 all risk factors.
2        They just said that the risk
3 factors that they presented -- sorry.
4        They just said that the risk
5 factors -- sorry.
6        They just said that risk factors
7 can include or include, and then they list
8 five or six things.  But there are --
9 there would be other risk factors that are
10 missing, and talc is one of them.
11 BY MS. DAVIDSON:
12   Q.   Do you think talcum powder should
13 be on those two lists?
14   A.   Yes.
15   Q.   Do you think it's unreasonable of
16 ACOG and CDC not to have talc on those lists?
17        MS. O'DELL:  Object to form and
18     asked answered.
19        THE WITNESS:  I'm not sure about
20     the word "unreasonable."  I would say it's
21     missing.
22 BY MS. DAVIDSON:
23   Q.   Are you familiar with SGO?
24   A.   I don't know what it stands for.
25   Q.   Are you familiar with the Society

Page 157

1 of Gynecologic Oncology?
2   A.   No.  It sounds familiar, but it's
3 not something I'm part -- that I've ever been
4 part of, and I don't think I've gone to their
5 meetings.
6   Q.   Do you know if the SGO in 2023
7 lists talcum powder as a risk factor for
8 ovarian cancer?
9   A.   I don't know.
10   Q.   Have you ever contacted SGO and
11 asked them to add talcum powder to their list
12 of risk factors for the development of ovarian
13 cancer?
14   A.   No.
15   Q.   Have you reached out to any
16 regulatory agency since 2021 to express your
17 concerns about the alleged link between talcum
18 powder exposure and the development of ovarian
19 cancer?
20        MS. O'DELL:  Object to the form.
21     You can answer.
22        THE WITNESS:  I don't believe I
23     have.
24        MS. DAVIDSON:  I'd like to mark
25     Exhibit 12, a paper called "Association

Page 158

1 Between the Frequent Use of Perineal
2 Talcum Powder Products and Ovarian Cancer:
3 A Systematic Review and Meta-Analysis," by
4 Sean Woolen.
5        (Whereupon, Exhibit No. 12,
6 Publication entitled, "Association Between
7 the Frequent Use of Perineal Talcum Powder
8 Products and Ovarian Cancer: A Systematic
9 Review and Meta-analysis," by Sean A.
10 Woolen, MD MSc, et al., was marked for
11 identification.)
12 BY MS. DAVIDSON:
13    Q.   Are you familiar with this paper?
14    A.   Yes.
15    Q.   When's the last time you read it?
16    A.   I can't say.  Sometime in the last
17 week.
18    Q.   Do you know any of the authors?
19    A.   Let me just look it up.
20        I don't personally know them, no.
21    Q.   Do you recognize any of the names?
22    A.   I recognize Dr. Smith-Bindman.
23    Q.   How do you recognize her name?
24    A.   She's -- sorry.  She's -- I -- I
25 know that she's an expert in talc litigation.

Page 159

1    Q.   Have you read any of her expert
2 opinions in the talc litigation?
3    A.   Not recently.  I think I did read a
4 previous one, but I can't remember when it was.
5    Q.   Do you know if this paper is
6 related to any analysis she undertook in the
7 litigation?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  I don't recall.
10 BY MS. DAVIDSON:
11    Q.   Do you know if she offered an
12 opinion in talc litigation about frequent use
13 of perineal talcum powder products defined in
14 the same way it's defined in this paper?
15    A.   Can you repeat the question,
16 please?
17        MS. DAVIDSON:  Suzanne.
18        (At which time the following was
19 read back:
20        "Question:  Do you know if she
21 offered an opinion in talc litigation
22 about frequent use of perineal talcum
23 powder products defined in the same way
24 it's defined in this paper?")
25        MS. O'DELL:  Object to the form.

Page 160

1        THE WITNESS:  I don't know.
2 BY MS. DAVIDSON:
3    Q.   This meta-analysis grew out of an
4 analysis that Dr. Smith-Bindman did in
5 litigation.
6        Should that be disclosed on the
7 paper?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  I think she did
10 disclose that she has been a paid witness
11 for the talcum powder litigation.
12 BY MS. DAVIDSON:
13    Q.   That wasn't my question.
14        My question was:  If this actual
15 analysis grew out of a litigation project,
16 should that have been disclosed on the paper?
17        MS. O'DELL:  Object to the form.
18        THE WITNESS:  Yeah.  I find -- I
19 can't answer that because I don't have her
20 expert report in front of me.  I don't
21 know what her thinking was.  I don't know
22 if she worked with somebody at that time
23 or did a -- a rough sketch of analysis.
24        So this -- this paper might look
25 very different than her expert report.  I

Page 161

1 would have no way of knowing, so I can't
2 answer your question.
3 BY MS. DAVIDSON:
4    Q.   If you were to publish you're
5 systematic review in the -- if you were to
6 submit it for publication, would you disclose
7 that you conducted the systematic review in
8 association with litigation?
9    A.   If -- it would depend.  The
10 journals have different ways that they ask us
11 to disclose, and I would just follow their
12 guidelines.
13    Q.   Have you submitted your -- any
14 of -- any part of your expert reports from the
15 talc litigation to any journals?
16    A.   No, I have not.
17    Q.   Do you plan to?
18    A.   I haven't thought about it.  I
19 can't answer that.
20    Q.   Have you been asked that before in
21 a deposition?
22    A.   I -- I can't recall every question
23 I've been asked in deposition.  If they -- they
24 were a while ago.  There were lots of
25 questions, so I can't answer that.

Anne McTiernan, M.D., Ph.D.

Page 162

1    Q.    Have you ever heard the term
2    "post-hoc analysis"?
3    A.    Yes.
4    Q.    Is that a term used in
5    epidemiology?
6    A.    It can be used in epidemiology.  It
7    can be used for clinical trials.  There are a
8    lot of different places that I've seen it used.
9    Q.    What does it mean?
10    A.    Typically, it would mean that
11    somebody would do an analysis after a study is
12    completed and -- and done its primary analysis.
13    So for a clinical trial, if the
14    goal of the clinical trial was to test the
15    effect of the medication on some disease
16    process, if after the fact, they decided they
17    wanted to work within certain subgroups, that
18    might be called post-hoc analysis.
19    But it's -- it's an analysis that's
20    commonly done anyway because -- and that's why
21    you collect data on a lot of variables so that
22    you can answer specific questions.  So post-hoc
23    usually just means later.
24    I can say that most of these
25    studies that we've been looking at in talc

Page 163

1    litigation have done analyses and reanalyses at
2    different times.  So any of them could be
3    called post-hoc.
4    And cohort studies, for example,
5    they may do an analysis and then do another in
6    a few years and do some subgroup analysis.
7    That could be called post-hoc.
8    It's really not so much of a
9    relevant term in epidemiology as it is in
10    clinical trials.
11    Q.    Are there concerns in the
12    scientific community about post-hoc analyses?
13    MS. O'DELL:  Objection.  Asked and
14    answered.
15    THE WITNESS:  Yeah.  That's -- I
16    can't answer that question.
17    It's -- can you be more specific.
18    BY MS. DAVIDSON:
19    Q.    What are the risks of doing a
20    post-hoc analysis --
21    MS. O'DELL:  Object to form.
22    BY MS. DAVIDSON:
23    Q.    -- of data from studies that have
24    been published?
25    MS. O'DELL:  Objection to the form.

Page 164

1    Vague.
2    THE WITNESS:  Yes.  It's too vague
3    for me to answer.
4    BY MS. DAVIDSON:
5    Q.    Are there any risks that you can
6    think of?
7    Have you ever done a post-hoc
8    analysis?
9    A.    Can you tell me what kind of
10    post-hoc analysis you mean?
11    Q.    Have you ever done a post-hoc
12    analysis of study data?
13    A.    And by "post-hoc," you mean what?
14    Q.    You defined post-hoc for me just a
15    few minutes ago?
16    A.    I said there are different ways you
17    could call something post-hoc.  It could be a
18    clinical trial is done, and then you decide to
19    look within subgroups and then call that a
20    post-hoc.
21    Q.    Well, let's -- let's take that
22    example.
23    MS. O'DELL:  I'm sorry.  Were you
24    finished, Dr. McTiernan?
25    THE WITNESS:  I'm done.

Page 165

1    MS. O'DELL:  Okay.
2    BY MS. DAVIDSON:
3    Q.    Let's take that example.
4    Are there any concerns that a
5    scientist needs to be careful with in doing
6    what you just described?
7    MS. O'DELL:  Objection.
8    THE WITNESS:  In a clinical trial,
9    you just state the clinical trial was done
10    at a certain point, that this was the
11    protocol.  You usually have -- give the
12    reader access to the study protocol, and
13    now that's pretty routine.  You just state
14    what your hypothesis is.
15    So as long as you have a clear
16    hypothesis and state why you're testing
17    that hypothesis and how it can add to the
18    biology or the clinical information, then
19    I can't think of any particular risk
20    you're going to evolve.
21    If -- if you end up having -- you
22    don't have a study that's large enough to
23    look within separate groups, then that
24    might be an issue; but then you do a power
25    analysis to look at study power beforehand

Anne McTiernan, M.D., Ph.D.

Page 166

1    anyway.
2        And so I can't think of a risk of
3    it. And we do this all the time in our
4    studies. We do it in cohort studies. We
5    do it in case-control studies, and we do
6    it in clinical trials.
7        So there -- often many papers are
8    written using previously designed studies
9    either to look at a different question or
10   in the case of talc and -- talcum powder
11   products and ovarian cancer to pooled data
12   and look at, therefore, have much larger
13   studies and that can answer questions
14   about overall associations but certainly
15   subgroup associations.
16   BY MS. DAVIDSON:
17       Q.   Do post-hoc analysis ever raise
18   concerns about data dredging?
19       MS. O'DELL:  Object to form.
20       THE WITNESS:  They wouldn't for me.
21   BY MS. DAVIDSON:
22       Q.   I'm sorry?
23       A.   They -- they wouldn't for me.
24       Q.   They wouldn't for you?
25       A.   Wouldn't.  They would not for me.

Page 167

1        Q.   And why do you say that?
2        A.   Because I think looking at data to
3    look at sub- -- it depends on what you're
4    talking about post-hoc, so I'm not really sure
5    what you mean there.
6        But if you're looking at specific
7    questions, looking at specific subgroups,
8    answering specific hypotheses, then I think
9    it's in addition to literature rather than a
10   concern.
11       MS. DAVIDSON:  If we could turn to
12   page 2530 of the Woolen paper.
13   BY MS. DAVIDSON:
14       Q.   The authors state on this page, "It
15   is widely speculated that trans-genital
16   migration of talcum powder through the
17   fallopian tubes to the ovaries and peritoneum
18   results in inflammation and a cascade of
19   changes that result in carcinogenesis."
20       Do you see that?
21       A.   Yes.
22       Q.   Do you agree with the authors that
23   this is speculation?
24       MS. O'DELL:  Object to the form.
25       THE WITNESS:  I know there's

Page 168

1    several papers, and I did reference them
2    in my report.  In my -- my original report
3    and my amended report that there is
4    migration of talcum powder up through
5    the -- to the peritoneal area -- sorry, to
6    the peritoneum area.
7    BY MS. DAVIDSON:
8        Q.   My question is simply:  Do you
9    agree with the use of the word "speculated" in
10   this sentence?
11       MS. O'DELL:  Object to the form.
12       THE WITNESS:  It's not a word I
13   would use.
14   BY MS. DAVIDSON:
15       Q.   Is that another way of saying you
16   disagree?
17       A.   I would say I wouldn't use that
18   word.  I would just say -- I would report this
19   is what some studies have shown.
20       Q.   What exclusions/inclusion criteria
21   did the authors of this study use?
22       MS. DAVIDSON:  Asher, I think she's
23   just --
24   BY MS. DAVIDSON:
25       Q.   Are -- are you looking at the one

Page 169

1    Asher is putting up, or do you want to --
2        A.   No.  I downloaded the one that
3    he --
4        Q.   Okay.
5        A.   -- that Asher put into chat.
6        Q.   Yeah.
7        MS. DAVIDSON:  So Asher, I don't
8    think you need to flip back and forth.
9    BY MS. DAVIDSON:
10       Q.   So my question, I believe, was:
11   What were the authors' exclusion/inclusion
12   criteria for this meta-analysis?
13       A.   So it looks like there's a section
14   called "Eligibility Criteria and Study
15   Selection."  And what they state is that they
16   included both observational cohort and
17   case-control study designs, that the studies
18   were included if they reported primary data on
19   frequent to find is two or more times per week,
20   perineal exposure to talc; and they reported an
21   adjusted-odds ratio or hazard ratio in
22   confidence intervals for ovarian malignancy.
23       They excluded other types of powder
24   exposure.
25       Q.   Have you done -- I'm sorry.

Page 170

1          MS. O'DELL:  She's not finished.
2          If you're not finished, Doctor,
3     just you can continue.  But if you are --
4     I just don't want you to get cut off.
5   BY MS. DAVIDSON:
6     Q.    Have you done an analysis of
7   whether they included all data that satisfy
8   these, quote, "eligibility criteria"?
9     A.    I did not.  I assume
10   that they're -- this is a peer-reviewed
11   publication, so that must have been something
12   that was considered by the reviewers.
13     Q.    Do you know why the authors
14   selected greater than two times a week as a
15   proxy for frequent use?
16     A.    I'm going to have to read through
17   the paper and see what they said about that.
18     Q.    Would you like to go off the record
19   and read this paper because I do have a number
20   of questions about it?
21          THE VIDEOGRAPHER:  The time is
22   2:04 p.m.  We're off the record.
23          (Whereupon, a break was taken.)
24          THE VIDEOGRAPHER:  The time is
25   2:24 p.m.  Back on the record.  We're on

Page 171

1   the record.
2          MS. DAVIDSON:  I have to confess
3   that I, too, have forgotten what the
4   pending question was when we went off the
5   record.
6          So can you remind us.
7          THE COURT REPORTER:  Sure.
8          MS. DAVIDSON:  Thanks, Suzanne.
9          THE COURT REPORTER:  You're
10   welcome.
11          (At which time the following was
12   read back:
13          "Question:  Do you know why the
14   authors selected greater than two times a
15   week as a proxy for frequent use?")
16   BY MS. DAVIDSON:
17     Q.    Dr. McTiernan, are you looking at
18   something or --
19     A.    I'd forgotten about that question.
20   I was just trying to read through -- first of
21   all, I printed out the article so I could read
22   it, and I'd forgotten that that -- there was
23   that question pending.
24     Q.    Wait.  I think you said at the
25   beginning of the deposition that you had that

Page 172

1   article in front of you already printed out.
2     A.    No.  I had the one that I
3   downloaded, but I had not printed it.  So I
4   printed it now, and I've been looking through
5   it.
6          It sounds like your question is:
7   Why did the pick two times -- two or more times
8   a week?
9     Q.    As a proxy for frequent use.
10     A.    Yes.  And I didn't see anything on
11   my first review.  I didn't see any reason for
12   that.
13     Q.    Do you know whether any other
14   studies have reported frequent use with a
15   different metric?
16     A.    I don't know.  I noticed that this
17   paper and the supplemental data -- paper do
18   have the Nurses Health Study data showing daily
19   users.  So maybe it's what data were available.
20          For data users, they showed a
21   relative risk of 1.27 that was statistically
22   significant.  So and -- but I'm not sure why
23   overall they picked two plus.  I would have to
24   look at a summary of all those included studies
25   to see how they categorized.

Page 173

1          So when people are asked how often
2   they use things, sometimes they were asked in
3   an interview a specific question, how often per
4   week or per month did you use this; but
5   sometimes they were given categories to choose
6   from.  So perhaps it's for that reason, but I
7   don't know the answer.
8     Q.    Do you recall any other studies
9   that you've reviewed in the talc literature
10   that defined frequent use differently?
11     A.    I would have to look through and
12   see what the different studies have done.
13     Q.    Do you know whether there are any
14   other cohort studies that contain data on talc
15   use of greater than two times a week?
16     A.    I would have to review some of the
17   studies to not have frequency -- like the
18   Women's Health at issue did not have frequency.
19   So it -- it depends on what they had.
20     Q.    My question is:  Do you recall any
21   other cohort studies from your systematic
22   review that provide data on use twice more or
23   more a week?
24          MS. O'DELL:  Objection to the form.
25          Asked and answered.

Page 174

1    THE WITNESS: I don't recall
2 without looking at the specific data to
3 see what they had.
4    I did notice this paper includes
5 Nurses Health Study data for daily use as
6 well as their overall analysis of two or
7 more times a week.
8 BY MS. DAVIDSON:
9    Q.    Does this paper include data from
10 NHS1?
11   A.    No, it does not.
12   Oh, I'm sorry.  This is an NH1,
13 Nurses Health Study.  These are -- these are
14 referred to in different ways.  We always call
15 a Nurses Health -- the first study just Nurses
16 Health Study, and the study after that is
17 Nurses Health 2; but it looks like they're
18 calling it Nurses Health 1 here.
19   Q.    Is the data they rely on from
20 Nurses Health 1 published?
21   A.    It looks like -- let me see.  Let's
22 see what they said.
23   It looks like it was not previously
24 published, but that's standard.  The Terry
25 pooled study included three -- data from three

Page 175

1 studies not previously studied, and other
2 pooled studies have that done as well.
3    MS. O'DELL: Did you say "pooled
4 studies" there at the end?  "Pooled"?
5    THE WITNESS: Pooled, other pooled
6 studies, yes.
7 BY MS. DAVIDSON:
8    Q.    Are you aware of any concerns that
9 can arise with relying on unpublished data?
10   MS. O'DELL: Objection.
11   THE WITNESS: I think it's -- it's
12 a strength to add unpublished data.  This
13 is Nurses Health Study data.  It's
14 well-characterized cohort.
15   If they allow these investigators
16 to have data, then they have to have
17 approved it.  So Nurses Health Study would
18 have had a request -- a system of
19 requesting data and -- and then allowing
20 it.
21   So I think it's a strength that
22 there are data from Nurses Health that
23 weren't previously published.
24 BY MS. DAVIDSON:
25   Q.    Was the sister study included in

Page 176

1 this, in this meta-analysis?
2    A.    It states it wasn't because there
3 were too few people with high exposure
4 category.  Only two women.  So they did not
5 include that.
6    Q.    Did the sister study report on talc
7 use greater than five times per week?
8    A.    I don't know.  I'd have to look at
9 that paper.
10   Q.    Do you recall, sitting here today,
11 whether the sister study reported on frequent
12 use?
13   MS. O'DELL: Objection to the form.
14 Asked and answered.
15   THE WITNESS: It should be in my
16 previous report.  I don't -- I don't
17 recall what was in that.
18 BY MS. DAVIDSON:
19   Q.    Did these authors include all women
20 from the NHS1 study who reported use of more
21 than twice a week?
22   MS. O'DELL: Object to the form.
23   THE WITNESS: I'd have to look
24 through the study to see if they specify
25 some -- whether it's a sub-sample.

Page 177

1 BY MS. DAVIDSON:
2    Q.    You read the study during our
3 break, right?
4    A.    Yes.  But I did not know your
5 questions ahead of them, so I couldn't memorize
6 everything in the paper.  I need to see -- to
7 answer that question, I need to see what they
8 said.
9    Q.    So based on your read, you don't
10 know if you included all the women from the
11 NHS1 study?
12   MS. O'DELL: Objection.  She's
13 trying to answer your question.  This is
14 not a memory test.  If you'd like an
15 answer to your question, give
16 Dr. McTiernan a moment.  I'm sure she'll
17 answer you.
18   Suzanne, would you mind repeating
19 the question, please, the initial
20 question.
21   (At which time the following was
22 read back:
23   "Question: So based on your
24 review" --)
25   THE WITNESS: So -- oh, go ahead.

Anne McTiernan, M.D., Ph.D.

Page 178

1      (At which time the following was
2  read back:
3      "Question: So based on your read,
4  you don't know if you included all the
5  women from the NHS1 study?"
6      MS. O'DELL: Objection.
7      You may answer.
8      THE WITNESS: So this study this
9  analysis included, it looks like, 77,000
10  women without cancer and 1,200 women with
11  cancer from the Nurses Health Study 1.
12      So if we look at the O'Brien
13  analysis, it looks like that included
14  79,055 women and 1,224 with ovarian
15  cancer. So it looks like it's a very
16  similar number.
17  BY MS. DAVIDSON:
18      Q.   So your understanding is that the
19  Woolen paper includes all women from NHS1 who
20  had usage more than twice a week?
21      MS. O'DELL: Objection to the form.
22      THE WITNESS: I didn't see where
23  that is specified. So again, I ' have to
24  read through the paper exactly.
25      But what I can see from

Page 179

1  supplementary Table 1 in Woolen, that
2  there was 77,000 women and 1,200 ovarian
3  cancer cases.
4      And it looks like for the
5  meta-analysis, it's a smaller number. So
6  I'm not sure why -- it looks like it's
7  31,000 unexposed. 38,000 all together and
8  about 600 cases.
9      MS. O'DELL: Do you have another
10  question, Jessica?
11      MS. DAVIDSON: I -- I believe she's
12  still looking for the answer to my
13  question.
14      MS. O'DELL: I think she's answered
15  your question. I think she's answered
16  your question.
17      MS. DAVIDSON: No, I don't think
18  so. She's still looking to figure it out.
19      MS. O'DELL: I -- I don't believe
20  that to be the case.
21      MS. DAVIDSON: I see her looking at
22  a paper.
23      MS. O'DELL: That doesn't mean --
24  that doesn't mean she's not finished with
25  her answer.

Page 180

1      THE WITNESS: Yeah. I -- I can't
2  answer the question. There are different
3  numbers here and different tables. So I'm
4  not sure why those numbers vary, but it
5  looks like they had access to the -- the
6  same Nurses Health Study data as was
7  included in O'Brien.
8  BY MS. DAVIDSON:
9      Q.   So you're saying you don't know why
10  Woolen uses fewer women from NHS1 than O'Brien
11  in terms of daily users; is that correct?
12      MS. O'DELL: Object to the form.
13      THE WITNESS: Well, O'Brien
14  didn't -- didn't analyze daily users so...
15  BY MS. DAVIDSON:
16      Q.   Did O'Brien have information on
17  daily users?
18      MS. O'DELL: Object to the form.
19      THE WITNESS: Again, I'm going to
20  have to look at that. They --
21      MS. O'DELL: Excuse me, Doctor,
22  just quickly.
23      If you're going to ask her to
24  compare the O'Brien pooled analysis to
25  this paper, then I would just ask you to

Page 181

1  mark the O'Brien study so she can -- she
2  can do that.
3      MS. DAVIDSON: The way we got into
4  this is I just wanted to know if this
5  study included all of the available women
6  from NHS1 who reported daily use, and
7  Dr. McTiernan, I think, was comparing it
8  to O'Brien to determine that. I wasn't
9  asking about O'Brien. That's my
10  understanding of what she -- of what she
11  was doing.
12      And I -- my understanding is that
13  Dr. McTiernan has now testified that it
14  looks like the numbers are different, but
15  she doesn't know why.
16  BY MS. DAVIDSON:
17      Q.   Is that accurate Dr. McTiernan?
18      MS. O'DELL: I believe that
19  misstates her testimony.
20      MS. DAVIDSON: Okay. So then I
21  want to --
22      MS. O'DELL: Hang on. There's a
23  number of questions there. Misstates her
24  testimony. And then when you got into
25  O'Brien, you compared the numbers.

1    I'm just stating if you're going to
2 do that, that's fine.  We just need to
3 mark it for the record and then allow
4 Dr. McTiernan to compare the numbers.
5    But -- so what's your current
6 question?
7 BY MS. DAVIDSON:
8    Q.    Dr. McTiernan, what you said --
9    MS. DAVIDSON:  You objected to my
10 question.
11    What do you mean what's my current
12 question?
13    The one you just objected to.  Does
14 it need to be repeated?
15    I mean, your objections are so long
16 that I can't blame Dr. McTiernan that she
17 forgets the question.
18    MS. O'DELL:  No.  That's not it.
19 That's not it -- that's not it at all.
20    I mean, what I was just trying to
21 explain to you is what the concern was.
22    So Dr. --
23    MS. DAVIDSON:  Suzanne, why don't
24 you just reread the pending question that
25 Leigh just objected to.

1    THE COURT REPORTER:  Okay.  Give me
2 a minute.
3    (At which time the following was
4 read back:
5    "Question:  Did O'Brien have
6 information on daily users?")
7    MS. DAVIDSON:  No, no, no.  It was
8 after that.
9    THE COURT REPORTER:  Oh, okay.
10    MS. DAVIDSON:  The most recent
11 question and Leigh said objection.
12    THE COURT REPORTER:  Okay.  Sorry.
13 Let me know if this is the one.
14    MS. DAVIDSON:  It's where I
15 repeat -- where -- right before Leigh said
16 objection.  Misstates her testimony.  That
17 was the most recent question.
18    THE COURT REPORTER:  Okay.
19    (At which time the following was
20 read back:
21    "Question:  The way we got into
22 this I just wanted to know if this
23 study included all of the available women
24 from NHS1 who reported daily use, and
25 Dr. McTiernan, I think, was comparing it

1 to O'Brien to determine that.  I wasn't
2 asking about O'Brien.  That's my
3 understanding of what she -- of what she
4 was doing.
5    And I -- my understanding is that
6 Dr. McTiernan has now testified that it
7 looks like the numbers are different, but
8 she doesn't know why.  Is that accurate,
9 Dr. McTiernan?")
10    THE WITNESS:  Yeah.  I think I
11 understand now what's going on.  In the
12 one paper, the supplementary table that
13 shows risk of ovarian cancer compared to
14 nonusers, is -- looks at risk in less
15 frequent users and in daily users.
16    And so it shows no increased risk
17 with less frequent users, but a 27-percent
18 statistically significant increase risk
19 with daily users.
20    Now, what was presented in the
21 ta- -- in the figure, figure 2 in the
22 Woolen paper was the data without those
23 less frequent users because that was the
24 question in the Woolen paper:  What is the
25 risk of ovarian cancer in frequent users.

1    So -- and now it makes sense that
2 these numbers are not identical.  So what
3 they did for all these studies, the
4 case-control and the cohort studies, is
5 compare nonusers to women who used two or
6 more times a week.
7    So that explains why those numbers
8 don't match up.
9 BY MS. DAVIDSON:
10    Q.    So what is the NHS1 risk ratio
11 that's reported in the paper?
12    A.    Well, there are two that are
13 reported, but there -- the one for use of two
14 or more times per week what they're defining as
15 frequent is 1.4 with a confidence interval of
16 1.17 to 1.68.
17    Q.    Is that the same as the 27-percent
18 increase you just mentioned?
19    A.    No.  That's the daily users.  So
20 Supplementary Table 1 divides women into daily
21 users, less frequent, and nonusers.
22    Q.    And so what does "less frequent
23 users" mean?
24    A.    I don't know if they define that.
25    I don't think they specify what

Page 186

1 that means.
2    Q.   So is it -- is it your testimony
3 that the 1.27 relates to daily users and that
4 the 1.4 in- -- involves twice-or-more-a-week
5 users?
6        I'm just trying to make sure I
7 understand what you're saying.
8        MS. O'DELL:  Objection to the form.
9        THE WITNESS:  It looks like that's
10    what the data is showing in those two
11    analyses.
12 BY MS. DAVIDSON:
13    Q.   And what's your basis for thinking
14 that?
15    A.   Okay.  Well, Supplementary Table 1
16 says, "Hazard ratio and 95-percent confidence
17 interval for association between frequency of
18 genital powder use and risk of ovarian cancer
19 versus Health Study 1."
20        The top half of the table is all
21 women, and they're comparing nonusers, less
22 frequent users, and daily users.
23        So the adjusted hazard ratio
24 adjusted for multiple potential confounding
25 factors, the has- -- the hazard ratio is .96

Page 187

1 for less frequent users and 1.27 for daily
2 users.
3        Whereas, it looks like when they
4 did a summary meta-analysis for what they're
5 defining as frequent users, two or more times a
6 week, the relative risk is 1.l4; and that's in
7 Figure 2.
8    Q.   Is it your recollection that NHS1
9 divided women into daily and also -- versus two
10 plus weekly --
11        MS. O'DELL:  Objection to the form.
12 BY MS. DAVIDSON:
13    Q.   -- users?
14        MS. O'DELL:  Objection.
15        THE WITNESS:  I'm not sure.
16        Are you talking about what the
17    questionnaire was or what their previous
18    publications were?
19 BY MS. DAVIDSON:
20    Q.   My question is:  Is it your
21 understanding that NHS1 has data both on daily
22 users and on two-times-a-week-or-more users?
23        MS. O'DELL:  Objection to the form.
24        THE WITNESS:  I would have to look
25    at what they reported in the original

Page 188

1    studies.
2 BY MS. DAVIDSON:
3    Q.   But that's your understanding of
4 what the 1.4 is on Figure 2?
5        I think that's where you're
6 looking.
7    A.   All I can say is what it says in
8 the paper, that association between frequent
9 use and risk of ovarian cancer.
10    Q.   Do you recall whether the sister
11 study provides any breakdown of frequency of
12 use?
13    A.   I believe they do, but I don't
14 recall what the frequencies were that they
15 used.
16    Q.   Do you know why the sister study
17 was excluded from this paper?
18        MS. O'DELL:  Object to form.
19        THE WITNESS:  It states there were
20    too few women that had high exposure.
21    There were only two women it states.
22 BY MS. DAVIDSON:
23    Q.   I'm sorry?
24    A.   The paper states that there were
25 only two women.  The data from sister study

Page 189

1 were not provided to us due to the small sample
2 size of exposed individuals and the highest
3 exposure category, N equals two women.  That's
4 what the paper states on page 2527.
5    Q.   Do you know how the author -- if
6 a -- if a study reported more than one OR for
7 two or more applications per week, do you know
8 how the authors decided which one to use?
9        MS. O'DELL:  Objection to the form.
10    Incomplete hypothetical.
11        THE WITNESS:  I don't know if they
12    state that in here.  There's also a
13    registered protocol, which I've not looked
14    at.
15 BY MS. DAVIDSON:
16    Q.   Have you done a full analysis of
17 the study to determine whether you believe that
18 a meta-analysis was properly done?
19    A.   I'm not sure what you mean by "full
20 analysis to determine that a meta-analysis was
21 correctly done."
22    Q.   Have you analyzed this
23 meta-analysis to determine whether you think it
24 was properly conducted?
25        MS. O'DELL:  Object to the form.

Anne McTiernan, M.D., Ph.D.

Page 190

1    THE WITNESS: I'm not sure how
2  to -- how to answer that because I don't
3  have access to the data that they were
4  using.
5    I do know it's in a peer-reviewed
6  journal, that they've had a protocol
7  preregistered, they followed guidelines
8  for measuring data quality and -- and
9  reporting.
10    So beyond that, I can't -- I didn't
11  have access to the data, so I couldn't say
12  whether the analysis is proper or not.
13  BY MS. DAVIDSON:
14    Q.    Do you generally assume that any
15  study or article you read in a peer-reviewed
16  journal has a certain level of validity?
17    MS. O'DELL: Object to the form.
18    THE WITNESS: For every article,
19  you look at it's strengths and weaknesses
20  and value it on that basis. I'm not going
21  to have access to any of these studies
22  that we're reviewing.
23  BY MS. DAVIDSON:
24    Q.    When you say you look at the
25  strengths and the weaknesses, do you mean the

Page 191

1  authors' expressed strengths and weaknesses; or
2  do you do your own analysis of the strengths
3  and weaknesses?
4    A.    I look at strengths and weakness
5  myself.
6    Q.    Do you do an independent evaluation
7  of the weaknesses of papers that you read in
8  the peer-reviewed literature?
9    MS. O'DELL: Objection to the form.
10  Asked and answered.
11    THE WITNESS: Could I have -- have
12  the question read back again, please.
13    (At which time the following was
14  read back:
15    "Question: Do you do an
16  independent evaluation of the weaknesses
17  of papers that you read in the
18  peer-reviewed literature?")
19    THE WITNESS: I'd have to say I
20  don't analyze ever study that I read. If
21  I'm doing a systematic review, then I do
22  evaluate the study for strengths and
23  weaknesses, which is -- which is part of
24  the standardized way of an epidemiologist
25  reviewing other epidemiology studies.

Page 192

1    But I did not have access to data
2  for this study or any of the studies I
3  reviewed to determine whether the correct
4  analyses were done for those data.
5  BY MS. DAVIDSON:
6    Q.    Have you in any way evaluated the
7  strengths and weaknesses of the Woolen
8  meta-analysis?
9    A.    I --
10    MS. O'DELL: Objection. Asked and
11  answered.
12    Excuse me, Doctor.
13    THE WITNESS: I've not written a
14  report, so I have not written down what --
15  what are the exact strengths and
16  weaknesses of the study. I've just
17  reviewed it and looked at it for its
18  ability to answer a particular question,
19  meaning for does more frequent or does
20  frequent use of peritoneal talcum powder,
21  is that associated with risk of ovarian
22  cancer.
23  BY MS. DAVIDSON:
24    Q.    If you turn to Table 2, do you see
25  that the Wu study is included here?

Page 193

1    A.    Yes.
2    Q.    What specification of talc exposure
3  did the authors use from the Wu study?
4    A.    So I see Table 2 does list a
5  specification for each of the studies.
6    Q.    Correct. What's listed for Wu?
7    A.    Yeah. For Wu, it looks like they
8  are saying more than 30 times per month and for
9  more than 20 years.
10    Q.    Do you know whether that was the
11  only measure in the Wu study that satisfies the
12  eligibility criteria for this meta-analysis?
13    A.    No, I don't.
14    MS. DAVIDSON: Let's put up Wu as
15  Exhibit 13.
16    (Whereupon, Exhibit No. 13,
17  Publication entitled, "Markers of
18  inflammation and risk of ovarian cancer in
19  Los Angeles County," by Anna H. Wu,
20  et al., was marked for identification.)
21    MS. DAVIDSON: Asher, did you put
22  Wu in the chart -- in the chat.
23    MR. TRANGLE: Yeah. Sorry. I just
24  added it now.
25    MS. DAVIDSON: Excellent. If we

Page 194

1    could turn --
2         MS. O'DELL:  What exhibit is Wu?
3    BY MS. DAVIDSON:
4         Q.   Do you need a minute to look at
5    this?
6              I'm going to be taking you to
7    Table 2.
8              Will you let me know when you are
9    ready to answer questions, Doctor?
10        A.   Yes.  I'm just looking at it now.
11        Q.   Okay.  I just said just let me know
12   when you're ready to answer questions, okay?
13        A.   Yes.
14        Q.   Great.
15        A.   Okay.  I see Table 2.
16        Q.   So my eyesight is not great; but
17   when -- if you look at frequency and during of
18   use, it looks like there are four different
19   calculated relative risks there that would fit
20   the eligibility criteria for this
21   meta-analysis.
22             Do you agree with that?
23        MS. O'DELL:  Objection to the form.
24        THE WITNESS:  No.  I'd say that
25   there were two.  So the categories that

Page 195

1    are greater than ten, so less than -- oh,
2    I see what you mean.  There could have.
3    BY MS. DAVIDSON:
4         Q.   How many of these risk ratios -- of
5    these calculated risk ratios would fit within
6    the eligibility criteria of Woolen?
7         MS. O'DELL:  Object to the form.
8         THE WITNESS:  Yeah.  It looks like
9    four of them could have.
10   BY MS. DAVIDSON:
11        Q.   I'm looking at those four.  Less
12   than or equal to 20 years and 10 to 30 times a
13   month.
14             What is the risk ratio for that?
15        A.   Which one are you saying now?
16        Q.   Less than or equal to 20 years and
17   greater than 10 to less than 30 times or equal
18   to 30 times a month.
19             What is the relative risk?
20        A.   1.16.
21        Q.   Is it statistically significant?
22        A.   The confidence interval includes
23   one, but that's not relevant for meta-analysis
24   because you would add all of these together,
25   the meta-analysis.

Page 196

1              The final statistical significance
2    of that is what was relevant.  These are just
3    very small numbers.  That's why those
4    confidence intervals include one because you
5    can see those numbers are much smaller.
6         Q.   Let's move along to the next one
7    that would satisfy the criteria.  That is --
8    God, this is killing my eyes.
9              The next one is less than or equal
10   20 years and greater than 30 times a month,
11   right?
12        MS. O'DELL:  Object to the form.
13        THE WITNESS:  Yes.
14   BY MS. DAVIDSON:
15        Q.   And what's the relative risk there?
16        A.   1.23.
17        Q.   Also not statistically significant,
18   right?
19        A.   You can --
20        MS. O'DELL:  Object to form.
21        THE WITNESS:  -- still --
22        MS. O'DELL:  Doctor, give me a
23   minute, Doctor.  Just --
24        THE WITNESS:  I'm sorry.
25        MS. O'DELL:  Yeah.  I -- I just

Page 197

1    wanted to note my objection.
2              You may answer.
3              THE WITNESS:  Okay.  And still not
4    relevant whether it's statistically
5    significant or not.
6    BY MS. DAVIDSON:
7         Q.   Understood your position on that.
8    Let's move down to the next one.
9              Greater than 20 years and greater
10   than 10 or less -- to less than or equal to
11   30 times a month.
12             What's the relative risk there?
13        A.   1.57.
14        Q.   Also not statistically significant?
15        A.   Again, irrelevant because the final
16   analysis is the end -- number we end up with
17   the meta-analysis.  You would never leave out
18   studies because of statistical significance if
19   you're doing a meta-analysis.
20        Q.   Does the Woolen study explain how
21   it selected which of the Wu relative risks it
22   was going to use for its paper?
23        MS. O'DELL:  Object to form.
24        THE WITNESS:  I don't see it.
25        Again, they have a study protocol.  So if

Anne McTiernan, M.D., Ph.D.

1  that states how they would choose if
2  they're multiple levels of a variable that
3  could be chosen, that could give the
4  answer; but I didn't look at that
5  protocol.
6  BY MS. DAVIDSON:
7      Q.   AND you didn't see anything in the
8  paper explaining how they made that selection,
9  right?
10     A.   Again, I have not had time to look
11 in detail for that particular question.
12          I've read -- I've had about 10 or
13 15 minutes to read this article, maybe 10
14 minutes.  And so the questions have been varied
15 and what I would -- to give a best answer, I'd
16 be able to read the article in depth for each
17 question.
18          But from what I can see from a
19 quick read, I can't see anymore explanation of
20 why they chose one of those categories.
21     Q.   Are you aware of any scientific
22 basis for defining frequent talc use as two or
23 more times per week?
24          MS. O'DELL:  Object to form.
25          THE WITNESS:  I haven't seen it

1  defined.  I'd have to look through all of
2  my old studies -- all of the previous
3  studies to see if they use that word
4  "frequent" and how they defined it.
5  BY MS. DAVIDSON:
6      Q.   And I believe you testified already
7  that you don't -- you didn't see anywhere where
8  the Woolen authors explained how they came to
9  that metric, correct?
10     A.   I didn't see that.  Again, I would
11 need to look in depth at the paper to see --
12 and the protocol to see if I could find that
13 answer.
14     Q.   Is use of talc less than twice per
15 week infrequent?
16          MS. O'DELL:  Object to form.
17          THE WITNESS:  I don't know how to
18 answer that.
19 BY MS. DAVIDSON:
20     Q.   Is it your understanding -- going
21 back to Woolen, Exhibit 12, is it your
22 understanding from Table 2 of Woolen that all
23 of the studies in this meta-analysis looked at
24 specifically two days a week or more of
25 exposure?

1          MS. O'DELL:  Object to form.
2          THE WITNESS:  Could you repeat the
3  question, please?
4  BY MS. DAVIDSON:
5      Q.   Is it your understanding that all
6  of the studies included in Woolen specifically
7  looked at two days or more of exposure?
8          MS. O'DELL:  Object to the form.
9          THE WITNESS:  It looks like to be
10 eligible, they had to be multiple times
11 per week, two or more; and I see the title
12 to Table 2, which you're asking about.  It
13 states the most frequent perineal talcum
14 powder use reported for each study was
15 as-directed.
16 BY MS. DAVIDSON:
17     Q.   So what is the range of use covered
18 by this meta-analysis?
19          MS. O'DELL:  Object to form.
20          THE WITNESS:  It looks like some
21 range.  I can't calculate exactly what the
22 lower limit here is, but this is done in
23 epidemiology in other instances.
24          For example, the physical activity
25 guidelines analysis that we did, we looked

1  at for each study the highest versus the
2  lowest level of physical activity.
3          So even though you have a measure
4  that varies across studies, it's a
5  standard way to combine studies.  And so
6  this does, even though the particular
7  metric is different by studies, it does
8  give you a picture of -- of the most
9  frequent versus the least frequent,
10 meaning no use, across studies.
11 BY MS. DAVIDSON:
12     Q.   Does that change your testimony
13 about why Figure 2 has a 1.4 risk ratio for
14 O'Brien?
15          MS. O'DELL:  Object to the form.
16          THE WITNESS:  I can't recall what
17 you mean what my testimony is.
18 BY MS. DAVIDSON:
19     Q.   I believe you testified earlier
20 that you thought that the 1.4 differed from the
21 supplemental table because the 1.4 was two days
22 a week.
23          MS. O'DELL:  Objection to form.
24 Misstates her testimony.
25          THE WITNESS:  Yeah.  It looks like

Page 202

1    Figure 2 in Table 2 are referring to
2    the -- the metric, it looks like versus
3    health study might have been daily.  It
4    might have been frequency that they used.
5    It's not completely clear.
6    BY MS. DAVIDSON:
7    Q.    Is any of the data in Table 2 --
8    does any of the data in Table 2 actually
9    reflect use just two times per week?
10        MS. O'DELL:  Table 2 of Woolen, is
11    that what you're asking, Jessica?
12        MS. DAVIDSON:  Yes.  We're -- we're
13    on Woolen.  If I change tables, I'll say
14    so.
15        THE WITNESS:  It looks like some of
16    them would have been two times a week.
17    Some would be more, and some would be
18    less.  Some could be more than once a day.
19    So it depends on the study how often --
20    what kind of variable how they classified
21    it.
22    BY MS. DAVIDSON:
23    Q.    Which study in Table 2 reflects two
24    times per week?
25    A.    I thought I just answered that.  I

Page 203

1    can't really tell.  There's a range in most of
2    them.
3        And certainly, somebody it says --
4    a study that says daily would be more than two
5    times per week.  So three of those studies are
6    daily.
7    Q.    Uh-huh.  Is there any study on this
8    list that suggests the specification was two
9    times per week?
10        MS. O'DELL:  Object to form.
11        THE WITNESS:  I don't see one that
12    says exactly two times per week.  There
13    are several that would fall into that
14    category.
15    BY MS. DAVIDSON:
16    Q.    Do you know why the authors defined
17    frequent use as two times per week if none of
18    the studies actually that they use involves a
19    specification of two times per week?
20        MS. O'DELL:  Object to the form.
21    Asked answer and had.
22        THE WITNESS:  I don't know.
23    BY MS. DAVIDSON:
24    Q.    Do you see anything in Table 2
25    that's suggestive of useless than four times

Page 204

1    per week?
2        MS. O'DELL:  Objection to the form.
3        THE WITNESS:  I can't tell.
4    BY MS. DAVIDSON:
5    Q.    Would it perhaps have been more
6    accurate for this paper to say that it was
7    looking at use four or more times per week?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  I -- I can't make a
10    determination on -- on that.  I wasn't
11    privy to their deliberations.  I wasn't
12    privy to the data that they were looking
13    at.
14    BY MS. DAVIDSON:
15    Q.    What is the difference between a
16    pooled analysis and meta-analysis?
17    A.    So A pooled analysis is when you
18    have access to individual-level data, and then
19    the data private eyes.  So variables are
20    classified in a similar way.  And then the
21    study is analyzed as if it was one very large
22    study with adjustment for the study of origin,
23    so the control for some potential differences
24    between studies.
25        A meta-analysis uses the relative

Page 205

1    risk or odds ratio or hazard ratio that's given
2    in individual studies and combines those into a
3    combined study.
4        Now, in some cases where a study
5    that's going to be included in a meta-analysis
6    is not previously published, then the authors
7    may request the data, calculate relative risk
8    or hazard ratios for that study, and then add
9    them to the meta-analysis.
10    Q.    And what -- is this a pooled
11    analysis, a meta-analysis, or a hybrid?
12    A.    It's a meta-analysis where I can
13    see.
14    Q.    So even though it uses unpublished
15    data from NHS1, you wouldn't call that pooling;
16    you would call that meta-analysis?
17    A.    Yes.
18    Q.    Okay.  Let's go back to Exhibit 11.
19        MS. DAVIDSON:  Asher, do you want
20    to put that up.
21    BY MS. DAVIDSON:
22    Q.    Do you recall when you were using
23    at the PDQ earlier that there's a discussion of
24    Woolen in this write-up?
25    A.    I don't recall.  We had -- we had

Page 206

1 that up so quickly I wasn't able to see exactly
2 what was on it.
3    Q.    All right.  Well, why don't -- do
4 you want to take a minute to take a look?
5    A.    Yes, please.
6         MS. DAVIDSON:  Asher, why don't you
7    blow up the part about Woolen, the
8    paragraph where it is.
9 BY MS. DAVIDSON:
10    Q.    I said paragraph, but it's just
11 really just three sentences.  So you should be
12 able to review it quickly.  Let me know when
13 you've read that.
14    A.    Okay.
15    Q.    Great.  So I -- the PDQ says, "A
16 meta-analysis of 10 case-controlled studies in
17 a highly selected subset analysis of one
18 perspective cohort study found an
19 association" -- and then it lists the OR and
20 the confidence interval -- "among women who use
21 perineal talc at least twice a week."
22         Do you see that sentence?
23         Did I read that correctly?
24    A.    Yes.
25    Q.    Do you agree with the authors of

Page 207

1 the PDQ that Woolen used, quote, "a highly
2 selected subset analysis of one perspective
3 cohort study"?
4         MS. O'DELL:  Objection to the form.
5         THE WITNESS:  Yeah.  I would say
6    that there -- these were subset analyses
7    of all of these studies because they
8    specifically looked at the highest
9    exposure.
10         So I wouldn't say it was only one
11    study that had a selected subset.  It was
12    a prespecified analysis.  I mean, they --
13    Woolen submitted their protocol in --
14    let's see -- April 2020.  And the paper
15    was not published until '22.  So it's a
16    prespecified study.
17         And yeah, I would call of them a
18    selected subset analysis because of the
19    particular question.  The particular
20    question was:  At the highest level of
21    exposure, in terms of frequency, what is
22    the relative risk of ovarian cancer with
23    high-frequently exposure.
24 BY MS. DAVIDSON:
25    Q.    The PDQ then says, "The subset

Page 208

1 analysis of the perspective study was
2 inconsistent with the main findings of the
3 original report."
4         What do IT mean by "the original
5 report"?
6    A.    Well, they're referencing O'Brien,
7 which is not the original Nurses Health Study
8 report.  This is like the third of Nurses
9 Health.
10         And Nurses Health Study in O'Brien,
11 they use the category of greater than or equal
12 to once per week.  So, of course, it's going to
13 be different.  So it's -- it's no surprise
14 there.
15    Q.    Do you agree with the PDQ that the
16 subset analysis of the perspective study was
17 inconsistent with the main findings of O'Brien?
18         MS. O'DELL:  Object to the form.
19         THE WITNESS:  I think I'll repeat
20    what I said.  They were all -- all those
21    studies were a subset because the question
22    was:  What is the relative risk with the
23    highest frequency.
24         So the study picked out
25    high-frequency exposure compared to

Page 209

1    nonusers.
2         And the subset analysis of their
3    Nurses Health in the Woolen meta-analysis
4    is different from the O'Brien pooled
5    analysis because it was a different
6    question and a different exposure level
7    that was being assessed.  I would expect
8    it to be different.
9 BY MS. DAVIDSON:
10    Q.    The PDQ says, "Because of the
11 structure of this analysis, the results should
12 be interpreted with care."
13         Do you agree?
14    A.    I think I wouldn't agree with that.
15 I think that it really understands what the
16 purpose of that paper was and how it was done.
17         So I wouldn't -- I wouldn't -- I
18 wouldn't agree with that, no.
19    Q.    Do you feel that you have done a
20 sufficient analysis of Woolen to determine
21 whether or not the results should be
22 interpreted with care?
23         MS. O'DELL:  Object to form.
24         THE WITNESS:  I think every study
25    should be interpreted with care.  I think

Anne McTiernan, M.D., Ph.D.

Page 210

1    they all provide useful information.
2         I think Woolen provided really
3    important information about what's the
4    risk and thought when women have the
5    highest level of frequency of exposure.
6         I think different analyses are
7    useful if they're answering different
8    questions, but this is a -- this is a very
9    vague statement anyway.  What does it mean
10   to be interpreted with care?
11   BY MS. DAVIDSON:
12   Q.    If you had included Woolen in an
13   expert report, would you have done a more
14   robust evaluation of the study?
15        MS. O'DELL:  Object to the form.
16        THE WITNESS:  Sorry.
17        MS. O'DELL:  No.  Please.
18        THE WITNESS:  I haven't done a
19   written report yet, so I can't state how I
20   would write that.
21   BY MS. DAVIDSON:
22   Q.    Have you reviewed Woolen to the
23   same extent that you've reviewed studies that
24   you've included in your expert reports in the
25   past?

Page 211

1         MS. O'DELL:  Objection.  Asked and
2    answered.
3         THE WITNESS:  I reviewed it
4    probably not as many times as the other
5    studies because it's a newer study.
6    That's all I can say about it.
7    BY MS. DAVIDSON:
8    Q.    Do you know whether the results in
9    Woolen are limited to women with patent tubes
10   or whether they apply to women -- to all women?
11   A.    I need to -- to relook at the
12   study.  I know there's one subset analysis of
13   the Nurses Health Study looking at women with
14   patent fallopian tubes, but I don't know if
15   that was done for the other studies.
16   Q.    Do you know whether the
17   meta-analysis plot mixes women who with patent
18   tubes with women with nonpatent tubes?
19        MS. O'DELL:  Objection to the form.
20        THE WITNESS:  I don't see any
21   specific analysis presented except with
22   the Nurses Health Study analysis.  I don't
23   see any one that is separate for women
24   with patent tubes versus women without
25   patent tubes.

Page 212

1    BY MS. DAVIDSON:
2    Q.    Is it appropriate in a
3    meta-analysis to mix data involving women with
4    patent tubes and women with nonpatent tubes?
5         MS. O'DELL:  Objection to form.
6         THE WITNESS:  It depends on what
7    the question is that you're asking.
8         Certainly in early studies of
9    ovarian cancer of talc that data was not
10   always available.
11        When it is available, it's very
12   useful to look separately in women with
13   patent tubes versus those without to see
14   if there's a difference in answers.
15        One thing to keep in mind is that
16   people who don't have patent tubes at some
17   point did have patent tubes.  So if they
18   used talc at that point, then the patency
19   of their tube might not have made so much
20   of a difference.
21        So it really depends on what age
22   the person was when they were being
23   exposed.
24        We don't have information in all
25   these studies about early exposure before

Page 213

1    somebody might have had tubal ligation or
2    hysterectomy with fallopian tubes removed.
3    So it's -- it can be a complicated
4    question.
5         But I would say the data are what
6    they are.  When they're available to look
7    separately in the two groups, it's useful
8    additional information, but it's not the
9    whole picture.
10   BY MS. DAVIDSON:
11   Q.    Are there rules about when it's
12   appropriate to mix heterogenous data and when
13   it's not?
14        MS. O'DELL:  Objection to form.
15   BY MS. DAVIDSON:
16   Q.    In a meta-analysis obviously.
17   A.    I think -- that's a very broad
18   question.
19        Can you be more specific?
20   Q.    For example, we're talking right
21   now about mixing data of patent women and
22   nonpatent women.
23        And my question is:  Are there
24   rules in a meta- -- meta-analysis to ensure
25   that the data are homogeneous as opposed to

Page 214

1 heterogeneous?
2         MS. O'DELL:  Objection to the form.
3     Assumes facts.
4         THE WITNESS:  And when you're
5     talking heterogeneous, homogenous compared
6     to what?
7 BY MS. DAVIDSON:
8     Q.    How do you decide whether studies
9 are sufficiently similar and whether data
10 points are sufficiently similar such that they
11 belong together in a meta-analysis?
12     A.    It depends entirely on what
13 question's being asked.  And so it's -- it's
14 not something I could answer as a general
15 question.
16     Q.    Do you know the average age of
17 tubal ligation?
18     A.    I do not know.  I'm sure -- I'm
19 sure it's changed over time.  Some of these
20 women were in their early years when the study
21 started.  Like Nurses Health Studies started in
22 1976, and the women were 35 to 50 years old --
23 35 to 55 years old.
24         Women's Health Initiative studied
25 in '92 when women were 59 to 79 years old.  So

Page 215

1 their experience at tubal ligation, whether it
2 was even available, is going to be very
3 different.  And the same would be true, of
4 course, for the case-controlled studies.
5         So it's not a simple question even
6 if somebody knows right now what's an average
7 age of tubal ligation that might not be
8 relevant to the women in these studies.
9     Q.    Do you know what the average age of
10 tubal ligation was at any period relevant to
11 these studies?
12     A.    I have not looked into that.  I've
13 not done a search on that.
14     Q.    You testified in 2021 that you had
15 not an opportunity to do a power analysis for
16 O'Brien 2020.
17         Do you recall that?
18     A.    No, I don't recall.
19     Q.    Have you since 2021 had the
20 opportunity to do a power analysis of O'Brien
21 2020?
22         MS. O'DELL:  Objection to the form.
23         THE WITNESS:  No, I have not.
24 BY MS. DAVIDSON:
25     Q.    Are you offering an opinion in this

Page 216

1 case as to whether O'Brien 2020 was
2 sufficiently powered?
3         MS. O'DELL:  Objection to the form.
4     She's asked [sic] that question.
5         I mean, she's going to testify to
6     O'Brien.  She's testified to it in the
7     past.  So this is very individual, but...
8 BY MS. DAVIDSON:
9     Q.    Are you going to answer?
10         THE WITNESS:  I'm sorry, Leigh.
11     Did you say something at the very end?
12         You said something about me
13     testifying in the past.
14         MS. O'DELL:  You have testified to
15     O'Brien and the power calculation in the
16     past.  And, you know --
17         I guess what's your question?
18         MS. DAVIDSON:  I just want to know
19     if you're going to be offering an opinion
20     at trial in the Mississippi AG case as to
21     whether O'Brien was sufficiently powered.
22         MS. O'DELL:  She's previously
23     testified to that, and regarding the
24     power, O'Brien; and you should expect her
25     to offer testimony consistent with her

Page 217

1     prior statements whether they're in trial,
2     deposition, or in her reports.
3         MS. DAVIDSON:  Are you instructing
4     her not to answer?
5         MS. O'DELL:  She's previously
6     answered that question; so yes, I am
7     instructing her not to answer.
8 BY MS. DAVIDSON:
9     Q.    I'm moving on to another paper.
10         Do you need a break, Dr. McTiernan?
11     A.    Yes.  That would be great.
12     Q.    All right.  I'd like to get through
13 the next paper before seven.  I do have to stop
14 at seven.
15         So do you want to just take five
16 minutes?
17     A.    Okay.  If you tell what the paper
18 is that I can print it off while you're --
19 while we take a break, I just thought it might
20 save some time.
21     Q.    Sounds great.  So let's mark it
22 before we take our break and then take our
23 break.
24         MS. DAVIDSON:  I am marking as
25     Exhibit 14 -- I hope I got that right --

Page 218

1  "Talc powder and ovarian cancer:  What is
2  the evidence?"  John Micha, Mark
3  Retenmaier, Randy Bohart, and Bram
4  Goldstein.
5         (Whereupon, Exhibit No. 14,
6  Publication entitled, "Talc powder and
7  ovarian cancer:  What is the evidence?"
8  by John P. Micha, et al., was marked for
9  identification.)
10         THE VIDEOGRAPHER:  The time is
11  3:29 p.m.  Off the record.
12         (Whereupon, a break was taken.)
13         THE VIDEOGRAPHER:  The time is
14  3:39 p.m.  We're back on the record.
15  BY MS. DAVIDSON:
16    Q.    Great.  Okay.  Dr. McTiernan, we
17  took some time for you to review the -- I don't
18  know if it's pronounced Micha or Micha
19  [pronunciation differentiation] article from
20  2022.
21         Are you familiar with this paper?
22    A.    Yes.
23    Q.    And what -- would you call this a
24  review paper?
25    A.    Well, I call it an opinion piece.

Page 219

1  It's in the News and Views --
2    Q.    Uh-huh.
3    A.    -- section of the Archives of
4  Gynecology and Obstetrics.
5    Q.    Got it.  And are you familiar with
6  John Micha, Mark Retenmaier, Randy Bohart, or
7  Bram Goldstein?
8    A.    Am I familiar with them?  No.
9    Q.    Have you ever heard of any of them
10  before?
11    A.    No.
12    Q.    Do you know if any of them are
13  experts in this litigation?
14    A.    I don't know.
15    Q.    If I were to tell you that none of
16  them is an -- an expert in this litigation for
17  either side, would you have any reason to doubt
18  that?
19         MS. O'DELL:  Objection to the form.
20         THE WITNESS:  No.
21  BY MS. DAVIDSON:
22    Q.    If you look at the bottom of the
23  first page, it says that Graham Goldstein is at
24  the Women's Cancer Research Foundation.
25         Do you see that?

Page 220

1    A.    It looks like it says,
2  womenscancerfoundation.com, yes, I see.
3    Q.    Women's Cancer Research Foundation.
4    A.    I see, yes.
5    Q.    He's the -- I guess that e-mail is
6  the corresponding e-mail.
7    A.    Okay.
8    Q.    If I'm reading this right, three of
9  the four people who coauthored this piece are
10  from the Women's Cancer Research Foundation; is
11  that correct?
12    A.    It looks like -- yes, it looks like
13  that.
14    Q.    Have you heard of the Women's
15  Cancer Research Foundation?
16    A.    No.
17    Q.    Have you when you read this paper?
18         Did you go and research what the
19  Women's Cancer Research Foundation is?
20    A.    I looked it up to see if I
21  recognized it, but I didn't.  It looks -- oh,
22  sorry.  Go ahead.
23    Q.    When you looked it up, what did you
24  learn about it?
25         MS. O'DELL:  Excuse me.

Page 221

1         You may answer, Dr. McTiernan.  I
2  just felt like you got cut off, and I
3  wanted to make sure you had an opportunity
4  to answer.
5         THE WITNESS:  That -- that was fine
6  because the second question is just what I
7  was going to say.  It looks like they do
8  clinical trials.
9  BY MS. DAVIDSON:
10    Q.    If you could turn to the second
11  page of the article under "Funding," it says,
12  "This study was supported by the Women's Cancer
13  Research Foundation, the family of Susan Berg,
14  and the family of Joan and Len Rullo in memory
15  of Elizabeth Johnson."
16         Do you see that?
17    A.    Yes.
18    Q.    Do you know who Susan Berg is?
19    A.    No.
20    Q.    What journal was this published in?
21    A.    It says it's the Archives of
22  Gynecology and Obstetrics.
23    Q.    Have you ever come across this
24  journal before?
25    A.    I'm not sure.

Page 222

1    Q.   Do you know if it's a reputable
2 journal?
3    A.   I didn't check that out.  It's
4 published by Springer, but they -- they publish
5 a lot of journals.
6    Q.   The authors of this paper state,
7 "Perineal application of talc does not
8 conclusively render vaginal or cervical
9 permeation, much less ovarian infiltration."
10        Do you agree with that statement?
11        MS. O'DELL:  Where are you reading,
12 please?
13        MS. DAVIDSON:  The second column
14 under "Mechanism of Action."
15        THE WITNESS:  And so your question
16 was:  Do I agree with it, or do I agree
17 that that's what it says?
18 BY MS. DAVIDSON:
19    Q.   Do you agree with the statement?
20    A.   Let's see what they're referring
21 to.
22        Yeah.  I haven't looked at their
23 references; but I did -- in my report, I did
24 write about studies that have looked at
25 retrograde transport of articles through the --

Page 223

1 into -- from the peritoneal area in through --
2 up to the fallopian tubes and ovaries.  And
3 also, that the FDA states that it's
4 indisputable that talc can have -- can move in
5 this way.
6        So I don't agree with their
7 statement; but again, this is an opinion piece.
8    Q.   Do you think it's unreasonable for
9 these four researchers to have reached this
10 conclusion?
11        MS. O'DELL:  Object to form.
12        THE WITNESS:  I don't know if
13 they're researchers.  Some of them are
14 clinicians, I would think.  I don't -- I
15 don't know.
16        So I -- I don't think that they've
17 done a full review that -- certainly, from
18 what I've seen, have not done a systematic
19 review of the epidemiology.  It doesn't
20 look like they've done a full review of
21 the studies that have looked at trans- --
22 transport and biological mechanisms.  So
23 if this -- this is their opinion, but I
24 don't agree with it.
25

Page 224

1 BY MS. DAVIDSON:
2    Q.   The next sentence says, "Similarly,
3 the contention that talc migrate -- fibers
4 migrate into the diaphragm via the peritoneal
5 cavity and ultimately pervade the ovaries is
6 quite speculative."
7        Do you see that?
8    A.   Yes.
9    Q.   Do you agree with them that "the
10 contention that talc fibers migrate into the
11 diaphragm via the peritoneal cavity and
12 ultimately pervade the ovaries is quite
13 speculative"?
14    A.   Again, it's not clear that they've
15 done a full review of the literature.
16 Certainly, we -- it's evidenced through
17 presented in IARC for permeation of asbestos
18 fibers through inhalation and then to the blood
19 and lymphatic system.
20        So I don't know what -- what --
21 what type of things they reviewed except for
22 that one reference they have to a read about
23 asbestos in ovarian cancer.
24    Q.   Could a reasonable scientist
25 looking at the relevant literature conclude

Page 225

1 that the proposed mechanism of action for
2 talc-induced ovarian cancer is speculative?
3        MS. O'DELL:  Object to form.
4        THE WITNESS:  Would you repeat the
5 question, please?
6        MS. DAVIDSON:  Please, Suzanne.
7        (At which time the following was
8 read back:
9        "Question:  Could a reasonable
10 scientist looking at the relevant
11 literature conclude that the proposed
12 mechanism of action for talc-induced
13 ovarian cancer is speculative?")
14        MS. O'DELL:  Same objection.
15        THE WITNESS:  I think that one --
16 if the one does a systematic review, such
17 as what IARC did, that a biological
18 mechanism for inhalation and permeation of
19 asbestos fibers through to the blood and
20 lymphatic system is reliable.
21 BY MS. DAVIDSON:
22    Q.   Do you recall a few moments ago
23 that the Woolen paper also referred to the
24 positive biological mechanism as speculative?
25        MS. O'DELL:  Object to form.

Anne McTiernan, M.D., Ph.D.

Page 226

1    THE WITNESS:  I recall the word,
2  but I can't remember what the sentence
3  was.
4  BY MS. DAVIDSON:
5    Q.    Are the Woolen authors and the
6  Micha authors unreasonable in believing that
7  the biological mechanism evidence is
8  speculative?
9    A.    And can you remind me what the
10 "speculative" referred to in Woolen?
11      Was it a different subject matter?
12      I -- I don't even remember what it
13 was.
14    Q.    Do you want to look at Woolen again
15 if you don't remember?
16    A.    Okay.  I've -- I have in front of
17 me Woolen, and there's a sentence and a
18 discussion.  It says, "It is widely speculated
19 that trans-genital migration of talc powder
20 through the fallopian tubes to the ovaries and
21 peritoneum results in inflammation and a
22 cascade of changes that result in
23 carcinogenesis."
24      Is that what you're referring to?
25    Q.    Correct.  Both authors use the

Page 227

1  word -- use -- use a variation on the word
2  "speculative," speculative or speculated, in
3  discussing biological mechanism, correct?
4      MS. O'DELL:  Object to form.
5      THE WITNESS:  These were not a
6  biological mechanism, but rather
7  transport.
8      So Woolen was talking about
9  movement or the trans-genital migration of
10 talc powder through the fallopian tubes
11 and the ovaries and peritoneum resulting
12 in inflammation and a cascade of changes
13 that results in carcinogenesis.
14      And we know with the FDA has stated
15 that it's indisputable that talc can move
16 through the -- the genital tract up to the
17 peritoneal area.  So that's one issue.
18      And then this speculation from
19 Micha is saying the contention that talc
20 fibers migrate into the diaphragm via the
21 peritoneal cavity and ultimately pervade
22 the ovaries is speculative.  And it's not
23 clear since they reference an article on
24 asbestos exactly what they're talking
25 about in terms of speculation.

Page 228

1    So I find it speculative that there
2  are these statements in these two papers,
3  and I think your -- can you remind your
4  question was linking those two, using the
5  similar word or derivative of a word.
6  BY MS. DAVIDSON:
7    Q.    My question was do you think the
8  authors are unreasonable in these two papers to
9  refer biological mechanism theories as
10 speculative?
11    A.    Well, one of them -- one of them is
12 talking about just migration, and one is
13 talking about migration plus biological
14 mechanism.  So it's not exactly the same thing.
15      It's not the words I would use.  I
16 would use words that refer to exactly what
17 they're talking about and give some references.
18    Q.    My question was simply:  Do you
19 think it's unreasonable of them to be using
20 that word?
21      MS. O'DELL:  Objection.  She's
22 answered your question.
23      THE WITNESS:  And I think my answer
24 would stay the same.
25

Page 229

1  BY MS. DAVIDSON:
2    Q.    I'm sorry.  I -- I didn't hear
3  whether you think it's reasonable or
4  unreasonable.  That's my question.
5      MS. O'DELL:  She doesn't have to
6  use the word reasonable or unreasonable.
7  So I object to the form of the question,
8  and I believe Dr. McTiernan has given her
9  answer.
10 BY MS. DAVIDSON:
11    Q.    Is it reasonable to believe that
12 the biological mechanism posited by you in your
13 report and by some other plaintiff's experts is
14 speculative?
15      MS. O'DELL:  Object to the form.
16      THE WITNESS:  The biological
17 mechanisms are, from my review -- and
18 we're talking about my report that's
19 already -- my previous report and -- and
20 the updated report?
21      MS. O'DELL:  Yes.
22      THE WITNESS:  Okay.  And so now
23 you're asking me a question about those.
24      So those biological mechanisms, as
25 I did that I evaluated as part of the

Page 230

1    Bradford Hill causal analysis, the goal is
2    to determine whether there are plausible
3    mechanisms that could explain
4    associations, which is, as what I wrote;
5    and I'll stand by what I wrote at that
6    time.
7    BY MS. DAVIDSON:
8    Q.    Do you recall what my question was?
9    A.    Something about reasonable.
10    Q.    Did you answer it?
11    A.    Maybe we can have the question and
12    my answer read back.
13    Q.    You answered about your opinions.
14        I'm asking you whether those who
15    have contrary opinions, can they reasonably
16    have them, right?
17        That's -- that was my question,
18    wasn't it?
19        We can have Suzanne read it.
20        MS. O'DELL:  It was not the
21    question.  You asked about, actually, her
22    report and other expert -- plaintiff
23    expert reports.
24        So if you have another question,
25    she's available to answer it; but that she

Page 231

1    answered.
2        MS. DAVIDSON:  That -- that was not
3    my question.  I'm sorry if you --
4        MS. O'DELL:  It was.
5        MS. DAVIDSON:  -- I'm sorry if you
6    misunderstood my question.
7        MS. O'DELL:  Go ahead.
8    BY MS. DAVIDSON:
9    Q.    Is it reasonable for scientists to
10    consider your opinions on biological mechanism
11    and those of plaintiff's other experts to be
12    speculative?
13        MS. O'DELL:  Object to form.
14        THE WITNESS:  I can't speak for
15    what other scientists are -- are thinking
16    and what kind of evaluations they have
17    done.  All I know is what I did in
18    reviewing the epidemiology and the biology
19    and identifying plausible mechanisms.
20    BY MS. DAVIDSON:
21    Q.    Fair to say the authors of this
22    paper disagree with you?
23    A.    I don't know if they -- if they
24    disagree or agree with me.
25    Q.    Do you agree with them?

Page 232

1    A.    I just said that I would not use
2    that word that it was -- is -- transport
3    possibilities were speculative.
4        Certainly, the FDA considers it
5    indisputable that there is plausible mechanism
6    of transport through the genital tract to the
7    peritoneum.
8        And IARC and -- has stated that
9    asbestos can be inhaled and then spread through
10    the blood and lymphatic system.
11    Q.    Let's turn to page 932, the first
12    sentence of conclusion.
13        Can you read it out loud?
14    A.    Are you still on Micha?
15    Q.    Yeah.  It's right up on the screen
16    if that's easier for you.
17        If you can read the first sentence
18    aloud under conclusion.
19    A.    I'm trying to see the context here
20    before I'm reading it.
21        So again, they didn't do a
22    systematic review, so I'm not sure which
23    studies they're referring to.
24        But it says, "While several
25    case-control studies have suggested a

Page 233

1    relationship between talc powder and the
2    incidence of ovarian cancer, numerous
3    epidemiologic studies have refuted any such
4    association."
5    Q.    Do you agree with that statement?
6    A.    It's too vague for me to say
7    whether I agree or disagree with it.  Again,
8    they didn't do a systematic review.  They
9    mentioned the pools cohort study of O'Brien.
10    But then they said there was another respective
11    analysis of the Nurses Health Study where it's
12    not recognizing that the Nurses Health Study
13    was part of O'Brien, that it was an updated
14    analysis of O'Brien.
15        They didn't mention all of the
16    potential case controlled studies that somebody
17    would include in a systematic group.
18        So I'm -- I'm not sure what they're
19    referring to here.  So it's not something I can
20    agree with.
21    Q.    Do you believe there are any
22    epidemiological studies that have refuted the
23    association between talc powder and the
24    incidence of ovarian cancer?
25        MS. O'DELL:  Object to form.

Page 234

1    THE WITNESS:  I think that every
2 study adds to the body of knowledge as
3 there's no refutation of -- of data based
4 on one study.  You look at all of the
5 studies to- -- together.
6 BY MS. DAVIDSON:
7    Q.    Can you read the next sentence
8 aloud?
9    I asked aloud.
10    A.    Yes, I know; and I want to see what
11 I'm reading before I read it aloud.
12    Q.    I see.
13    A.    Give me a second.  Thank you.
14    Okay.  It says, "Since clinical
15 research has accorded inconsistent findings, an
16 implicated biomarker for talc powder and
17 ovarian carcinogenesis has not been elucidated,
18 and confounding variables have been
19 insufficiently addressed, an unequivocal
20 conclusion that the observed associations
21 between talc powder and ovarian cancer are
22 causal remain untenable."
23    Q.    Do you agree with that statement?
24    A.    There's a lot to it.  I'd have to
25 pick apart quite a bit of it.  And so I'd say I

Page 235

1 disagree with it in total.
2    Q.    Which parts do you disagree with?
3    A.    Well, it says, "Clinical research
4 has accorded inconsistent findings."
5    I would say that from my systematic
6 review, the studies were quite consistent, most
7 of them showing increased risk of ovarian
8 cancer with talc use.
9    Implicated biomarker for talc
10 powder and ovarian carcinogenesis, it's not
11 clear what biomarker they are referring to.
12    Confounding variables
13 insufficiently addressed, well, most studies
14 have addressed a confounding variables.  If a
15 variable has not been adjusted for, it does not
16 mean that it's confounding.  In many studies
17 epidemiologists will evaluate for potential
18 confounders, and not adjusting does not mean
19 that they -- that it's been -- that it's a
20 weakness.  It means it wasn't confounding in
21 that study.
22    And -- and then it says, "An
23 unequivocal conclusion that they observed
24 associations between talc powder and ovarian
25 cancer causal remains untenable."  I disagree

Page 236

1 with that.
2    Q.    Do you think it was unreasonable
3 for these authors to reach these conclusions?
4    MS. O'DELL:  Object to form.
5    THE WITNESS:  I think they reached
6 them because they did not do a systematic
7 review.  They didn't look at the totality
8 of evidence.
9 BY MS. DAVIDSON:
10    Q.    Are these authors correct that
11 there's been a steady decline in ovarian cancer
12 for nearly 30 years?
13    A.    I haven't checked that.
14    Q.    Do you know what the trends have
15 been of ovarian cancer diagnoses over the last
16 three decades?
17    A.    No.  I haven't looked.
18    Q.    Are you aware that the Berg family
19 referenced in the funding of this paper sued
20 Johnson & Johnson?
21    A.    No.
22    MS. DAVIDSON:  Can we go off the
23 record?
24    THE VIDEOGRAPHER:  The time is
25 4:02 p.m.  We're off the record.

Page 237

1    (Discussion held off the record.)
2    THE VIDEOGRAPHER:  The time is
3 4:03 p.m.  We're back on the record.
4    MR. MITCHELL:  This is Meade
5 Mitchell on behalf of the defendants.
6 We've been going with this deposition from
7 11 a.m. Central time to 6 p.m.
8    The deposition has taken a good
9 deal of time.  There were some disputes
10 concerning mesothelioma issues.  There
11 have been some disputes that have arisen
12 concerning the proper scope of the
13 deposition.  And, of course, there's been
14 some -- some timing issues in connection
15 with review of records.
16    We are at a point where we have to
17 stop for the day.  We have offered to come
18 back tomorrow.  Plaintiff's counsel has
19 indicated that they're not available,
20 which we understand.  We have requested
21 that this deposition resume at a date
22 convenience to all parties in the next two
23 weeks.
24    And my understanding is that
25 counsel for the plaintiff will consider

Anne McTiernan, M.D., Ph.D.

1  our request and let us know if they're
2  willing to do so.
3      MS. O'DELL:  Leigh O'Dell on behalf
4  of the plaintiff, and we have agreed to
5  meet and confer on defense counsel's
6  request.  We will do that.  Neither
7  Dr. McTiernan nor I are available
8  tomorrow.
9      We also have talked with counsel
10  about the prospect of having the Court
11  consider and rule on the outstanding
12  objections, which we believe are
13  well-founded prior to any continuation of
14  the deposition, if at all.
15      And so again, as we discussed off
16  the record, we'll be happy to meet and
17  confer about these issues and see if we
18  can reach resolution.  If for some reason
19  we cannot, you know, we'll have the Court
20  facilitate next steps.
21      So I guess we can go off the
22  record.
23      MS. DAVIDSON:  Meade, anything you
24  want to add to that?
25      MR. MITCHELL:  Only that -- that we

1  would ask that the deposition take place
2  before the Court has an opportunity to
3  review -- to rule on objections because I
4  think that will take some time.
5      We do understand that we're going
6  to engage in good-faith conversations on
7  that, but I do want to make clear that our
8  position is we should go forward.
9      MS. O'DELL:  I understand.  As -- I
10  understand, Meade, as I
11  hope I have made our position clear.  But
12  again, we'll meet and confer and do our
13  best to give dates to get through this.
14      MS. DAVIDSON:  The last thing I
15  want to state on the record for timing
16  purposes and scheduling purposes is that I
17  would say I'm about two-thirds done.  So
18  we 'e over the hill.
19      And in terms of trying to find
20  another day, I am very hopeful about a
21  half day any time in the next two weeks.
22  I'll make myself available, and we should
23  be able to finish this up in a half a day.
24      It would also help -- I would add
25  one more thing that I think it would also

1  help if Dr. McTiernan -- what is mostly
2  left in my examination involves the
3  remaining materials on the Supplemental
4  Reliance List.  So if Dr. McTiernan were
5  to review those right before the
6  deposition, that would also make the
7  remainder of the deposition go much more
8  quickly given that we had to take a number
9  of breaks because she wanted time to
10  reread articles which ate up into some of
11  our afternoon.  Thank you.
12      MS. O'DELL:  We -- we completely
13  disagree with that for various reasons
14  I've said earlier, and so I'm not going to
15  restate that.
16      That -- that somehow
17  Dr. McTiernan -- the suggestion that
18  Dr. McTiernan did not participate today in
19  good faith, which is not the case.
20      And so I think that we've said
21  enough probably for the record at this
22  point.
23      Let's go off the record --
24      MS. DAVIDSON:  I don't --
25      MS. O'DELL:  -- and --

1      MS. DAVIDSON:  I made no such
2  suggestion.  So before we go off the
3  record, I want to make clear --
4      MS. O'DELL:  I believe you did.
5      MS. DAVIDSON:  I want to make clear
6  I did not make any such suggestion.  I was
7  just suggesting that in order to expedite
8  the completion of the deposition, if
9  Dr. McTiernan reviews the articles
10  beforehand, it will make it go much more
11  quickly.  That's all.
12      MS. O'DELL:  That's an
13  inappropriate suggestion.  She had
14  reviewed the articles, but she is entitled
15  to -- these are very complicated
16  materials, and she's entitled to be
17  grounded in the document before she
18  answers questions.
19      I'm not going to say anything
20  further.  I think we've said enough.
21  We'll go off the record; and Meade, we'll
22  be in touch about our meet-and-confer.
23      MS. DAVIDSON:  Meade, do you have
24  anything else to say before we go off the
25  record?

Page 242

1    MR. MITCHELL:  We can go off the
2  record, and let me talk to Leigh for just
3  a second after we go off the record.
4    MS. DAVIDSON:  Sounds good.
5    THE VIDEOGRAPHER:  The time is
6  4:07 p.m.  We're off the record.
7    (The witness is excused.)
8    (Deposition of Anne McTiernan,
9  M.D., Ph.D., adjourned at 4:07 p.m. PDT.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 244

1    E R R A T A   S H E E T
2    I have read my testimony in the foregoing
3  transcript and believe it to be true and
4  correct to the best of my knowledge and belief
5  with the following changes:
6  PAGE   LINE      CHANGE
7  _____ _____ _____
8  _____ _____ _____
9  _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17
18  _____ _____
19  WITNESS SIGNATURE          DATE
20
21  Sworn and subscribed to before me this
22  _____ day of _____ , 2023.
23
24  Notary Public of the
25  State of _____.

Page 243

1    C E R T I F I C A T E
2
3
4    I, SUZANNE J. STOTZ, a
5  Registered Professional Reporter, Certified
6  Realtime Reporter, Certified Court Reporter and
7  Notary Public in and for the State of
8  Washington, do hereby certify that the
9  foregoing is a true and accurate transcript of
10  the stenographic above-captioned matter.
11
12
13      _____
14    SUZANNE J. STOTZ, RPR, CRR, CCR
15    Washington Certification No. 3507
16
17
18  DATED:  October 4, 2023
19
20
21  NOTE:  THE CERTIFICATE APPENDED TO THIS
22  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION
23  OF THE SAME BY ANY MEANS, UNLESS UNDER THE
24  DIRECT CONTROL AND/OR DIRECTION OF THE
25  CERTIFYING COURT REPORTER.