# EXHIBIT 54

Jack Siemiatycki, Ph.D.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY


----------------------------x

IN RE JOHNSON & JOHNSON          ) MDL No.

TALCUM POWDER PRODUCTS           ) 16-2738 (FLW)(LHG)

MARKETING SALES PRACTICES,       )

AND PRODUCTS LIABILITY           )

LITIGATION                       )

                                 )

THIS DOCUMENT RELATES TO         )

ALL CASES                        )

----------------------------x




VIDEOTAPED DEPOSITION OF

JACK SIEMIATYCKI, Ph.D.

MONTREAL, CANADA

THURSDAY, JANUARY 31, 2019

9:49 A.M.




Reported by: Leslie A. Todd

Jack Siemiatycki, Ph.D.

|  | Page 2 |
|---|---|
| 1 | Deposition of JACK SIEMIATYCKI, Ph.D., held at |
| 2 | the offices of: |
| 3 | |
| 4 | |
| 5 | CHUM Research Center |
| 6 | Montreal, Canada |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | Pursuant to notice, before Leslie Anne Todd, |
| 13 | Court Reporter and Notary Public in and for the |
| 14 | District of Columbia, who officiated in |
| 15 | administering the oath to the witness. |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 4 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | RICHARD GOLOMB, ESQUIRE |
| 4 | GOLOMB & HONIK, LLP |
| 5 | 1835 Market Street |
| 6 | Suite 2900 |
| 7 | Philadelphia, Pennsylvania 19103 |
| 8 | (215) 278-4449 |
| 9 | rgolomb@golombhonik.com |
| 10 | ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS: |
| 11 | KIMBERLY OLVEY BRANSCOME, ESQUIRE |
| 12 | KIRKLAND & ELLIS LLP |
| 13 | 333 South Hope Street |
| 14 | Los Angeles, California 90071 |
| 15 | (213) 680-8370 |
| 16 | kimberly.branscome@kirkland.com |
| 17 | JESSICA BRENNAN, ESQUIRE |
| 18 | DRINKER BIDDLE & REATH LLP |
| 19 | 600 Campus Drive |
| 20 | Florham Park, New Jersey 07932 |
| 21 | (973) 540-1000 |
| 22 | jessica.brennan@dbr.com |
| 23 | |
| 24 | |
| 25 | |

|  | Page 3 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | ON BEHALF OF THE PLAINTIFFS: |
| 4 | CHRISTOPHER V. TISI, ESQUIRE |
| 5 | LEVIN PAPANTONIO, LLP |
| 6 | 316 South Baylen Street |
| 7 | Pensacola, Florida 32502 |
| 8 | (850) 435-7184 |
| 9 | ctisi@levinlaw.com |
| 10 | MICHELLE A. PARFITT, ESQUIRE |
| 11 | ASHCRAFT & GEREL, LLP |
| 12 | 4900 Seminary Road, Suite 650 |
| 13 | Alexandria, Virginia 22311 |
| 14 | (703) 997-1774 |
| 15 | MParfitt@ashcraftlaw.com |
| 16 | ALASTAIR J.M. FINDEIS, ESQUIRE |
| 17 | NAPOLI SHKOLNIK, PLLC |
| 18 | 360 Lexington Avenue |
| 19 | 11th Floor |
| 20 | New York, New York 10017 |
| 21 | (212) 397-1000 |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 5 |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | ON BEHALF OF THE PCPC: |
| 4 | RENEE APPEL, ESQUIRE (Telephonically) |
| 5 | SEYFARTH SHAW LLP |
| 6 | 975 F Street, N.W. |
| 7 | Washington, DC 20004 |
| 8 | (202) 828-5371 |
| 9 | rappel@seyfarth.com |
| 10 | ON BEHALF OF THE IMERYS DEFENDANTS: |
| 11 | MICHAEL R. KLATT, ESQUIRE |
| 12 | GORDON & REES SCULLY MANSUKHANI, LLP |
| 13 | 816 Congress Avenue, Suite 1510 |
| 14 | Austin, Texas 78701 |
| 15 | (512) 391-0183 |
| 16 | mklatt@grsm.com |
| 17 | ON BEHALF OF PTI: |
| 18 | CAROLINE M. TINSLEY, ESQUIRE (for PTI) |
| 19 | TUCKER ELLIS, LLP |
| 20 | 100 South 4th Street, Suite 600 |
| 21 | St. Louis, Missouri 63102 |
| 22 | (314) 571-4965 |
| 23 | caroline.tinsley@tuckerellis.com |
| 24 | ALSO PRESENT: |
| 25 | FABIO DEFELICE (Videographer) |

2 (Pages 2 to 5)

Jack Siemiatycki, Ph.D.

Page 6

            C O N T E N T S
EXAMINATION OF JACK SIEMIATYCKI, Ph.D.     PAGE
     By Ms. Branscome          9, 322
     By Mr. Klatt              274, 336
     By Ms. Parfitt            290

            E X H I B I T S
        (Attached to transcript)
SIEMIATYCKI DEPOSITION EXHIBITS           PAGE
No. 1    Notice of Oral and Videotaped
         Deposition of Jack Siemiatycki
         and Duces Tecum (not attached)    15
No. 2    Plaintiffs' Steering Committee's
         Response and Objections to the
         Notice of Oral and Videotaped
         Deposition of Jack Siemiatycki
         and Duces Tecum                    16
No. 3    Addendum to Expert Report of
         Jack Siemiatycki, MSc, PhD, on
         Talcum Powder Use and Ovarian
         Cancer                             17
No. 4    Binder containing various studies  43
No. 5    Binder containing original
         epidemiological studies            46
No. 6    Binder containing meta-analyses    46

Page 7

          E X H I B I T S (Continued)
        (Attached to transcript)
SIEMIATYCKI DEPOSITION EXHIBITS           PAGE
No. 7    JS EpiTech Inc. bill for
         Professional Services, August 9 -
         November 16, 2018                  46
No. 8    JS EpiTech Inc. bill for
         Professional Services, July 1 -
         August 2, 2018                     48
No. 9    Report of Jack Siemiatycki dated
         October 4th, 2016 (not attached)   58
No. 10   Expert Report of Jack Siemiatycki
         Msc, PhDn Talcum Powder Use and
         Ovarian Cancer (not attached)      61
No. 11   Expert Report of Jack Siemiatycki
         MSc, PhD on Talcum Powder Use and
         Ovarian Cancer (with handwritten
         notations)                         110
No. 12   Berge 2012 report (not attached)   194
No. 13   Schildkraut report (not attached)  214
No. 14   Anita Koushik information from
         Environepi website                 278
No. 15   Pages from Environepi website
         discussing Group Research Topics   285

Page 8

          E X H I B I T S (Continued)
        (Attached to transcript)
SIEMIATYCKI DEPOSITION EXHIBITS           PAGE
No. 16   Excerpt from the book entitled
         Risk Factors For Cancer in the
         Workplace by Dr. Jack Siemiatycki
         (Not attached)                     309
No. 17   Article entitled "Degree of
         Confounding Bias Related to
         Smoking, Ethnic Group, and
         Socioeconomic Status in Estimates
         of the Associations Between
         Occupation and Cancer," Journal of
         Occupation Medicine/Volume 30
         No. 8/August 1988                  317

Page 9

          P R O C E E D I N G S
          ------------------
         THE VIDEOGRAPHER:  Good morning.  We're
now on the record.  My name is Fabio DeFelice.
I'm the videographer for Golkow Litigation
Services.  Today's date is January 31st of 2019.
The time is 9:49 a.m.
         This video deposition is being held at
the CHUM Research Center in Montreal, Canada, in
the matter In Re:  Johnson & Johnson Talcum Powder
Products in the United States District Court for
the Eastern District of New Jersey.  The case
number is 16-2738.
         The deponent is Jack Siemiatycki, Ph.D.
         The counsel will be noted on the
stenographic record.  The court reporter is Leslie
Todd, and will now swear in the witness.
         JACK SIEMIATYCKI, Ph.D.,
    and having been first duly sworn,
    was examined and testified as follows:
         DIRECT EXAMINATION
BY MS. BRANSCOME:
    Q   Good morning, Dr. Siemiatycki.
    A   Good morning.  Nice to meet you.
    Q   We met just before the deposition

Jack Siemiatycki, Ph.D.

Page 10

```
 1   started, but my name is Kimberly Branscome, and I
 2   am here to ask you questions today on behalf of
 3   Johnson & Johnson.
 4        Is that all right?
 5   A   Thank you.  Yes.
 6   Q   All right.  We are taking your
 7   deposition today in the case of In Re:  Johnson &
 8   Johnson Talc Litigation, MDL.
 9        Is it your understanding that you have
10   been designated as a testifying expert in that
11   case?
12   A   Yes.
13   Q   When were you first contacted about
14   serving as an expert witness in the MDL
15   litigation?
16   A   I believe it was in the spring or summer
17   of 2018, but I'm not positive about that.
18   Q   Who contacted you?
19   A   Ms. Parfitt.
20   Q   Have you communicated with any other
21   lawyers regarding your work on the talc MDL?
22   A   I've had a couple of meetings with
23   Ms. Parfitt and her colleagues that she works
24   with.
25   Q   Can you identify the individuals with
```

Page 11

```
 1   whom you have met in addition to Ms. Parfitt?
 2   A   Yes, there are two, and they are here
 3   present.  Chris Tisi and Alastair --
 4        MR. FINDEIS:  Findeis.
 5        THE WITNESS:  Say that again.
 6        MS. PARFITT:  Findeis.
 7        THE WITNESS:  And that's -- thank you.
 8   BY MS. BRANSCOME:
 9   Q   How many meetings have you had to
10   prepare for your expert opinions in the MDL?
11   A   One yesterday and one about a month --
12   about three weeks ago.
13   Q   Where did those meetings take place?
14   A   Here.
15   Q   And by "here," do you mean in Montreal?
16   A   In Montreal, yes.
17   Q   How long did each meeting last?
18   A   Yesterday's was about four, five hours
19   maybe.  Four or five hours.  And the earlier one,
20   I guess all told, about ten hours maybe.
21   Q   Did the ten-hour meeting take place over
22   one day?
23   A   Over two days.
24   Q   In addition to the attorneys that you
25   just identified for the record and yourself, was
```

Page 12

```
 1   anyone else present at those meetings?
 2   A   No.
 3   Q   You didn't have anyone from your team,
 4   for example, present?
 5   A   No.
 6        MS. PARFITT:  Objection.  Form.
 7   BY MS. BRANSCOME:
 8   Q   What did you do to prepare for your
 9   deposition today?
10   A   Do you mean from the beginning of my
11   involvement in the MDL case back last summer or do
12   you mean just in the last few days?
13   Q   Let's take it more broadly.
14        What have you done to develop your
15   opinions in this case, and then specifically to
16   prepare for your deposition?
17   A   I reviewed -- I rereviewed the
18   literature about talc and ovarian cancer,
19   scientific literature.  I evaluated it, I wrote a
20   report about it.  And in the last few days, I went
21   over all of the -- not all, but a lot of the
22   material that I had gone through initially and
23   just clarified for myself, looked for any issues
24   that I had missed the first time around, things
25   like that.
```

Page 13

```
 1   Q   As part of your review of materials in
 2   preparation for today, did you identify anything
 3   in your review that changed the opinions that you
 4   have offered in the expert report in the MDL?
 5   A   No.  Those opinions remain valid.
 6   Q   When you say that you rereviewed the
 7   scientific literature in preparation for the
 8   development of your opinions in the MDL, what did
 9   you mean by "rereviewed"?
10   A   Well, I had reviewed -- I've reviewed
11   evidence around talc and ovarian cancer on a few
12   different occasions.  The first time was in 2006
13   when I was on an international review committee on
14   the topic.  Then in 2015, '16, '17, in preparation
15   for another litigation regarding talc and ovarian
16   cancer.  Then in the summer/fall of 2018, in
17   preparation for writing a report that was
18   submitted in this case.  And then in the last
19   week or two, roughly speaking, I went over all of
20   that.  So I refer to that as a rereview.
21   Q   Have you ever discussed your deposition
22   with any of -- of the other experts designated by
23   the plaintiffs in the MDL?
24   A   No, I haven't.
25   Q   Have you discussed your expert opinions
```

4 (Pages 10 to 13)

Jack Siemiatycki, Ph.D.

Page 14

1    with any of the other experts designated by the
2    plaintiffs in the MDL?
3          A    No, I haven't.
4          Q    Are you aware of the list of experts
5    that have been designated by the plaintiffs in the
6    MDL?
7          A    I'm aware of at least some of them.  I'm
8    not sure if I'm aware of all of them, but I'm
9    aware of some of them.
10         Q    Who specifically are you aware of?
11         A    Singh, McTiernan, Laura Plunkett.  And
12   there are a few more, and I could look it up.
13         Q    I'd like to start by just marking the
14   deposition notice for your deposition as
15   Exhibit 1.
16         Dr. Siemiatycki, you will see two large
17   binders over there in front of you.  This will be
18   tab 1.
19         So I'd like --
20         A    I see it.
21         Q    I'd like to mark for identification
22   the document behind tab 1, which is
23   Dr. Siemiatycki's deposition notice as Exhibit 1
24   to this deposition.
25         MS. PARFITT:  Do you want to give me --

Page 15

1          Do you want me to just mark them?  Will
2    that help you, instead of reaching across the
3    table?  It's up to you.  I can put the stickers on
4    it.
5          (A discussion was held off the record.)
6          (Exhibit No. 1 was marked for
7          identification.)
8    BY MS. BRANSCOME:
9          Q    Dr. Siemiatycki, are you familiar with
10   the document that we have just marked as
11   deposition Exhibit 1?
12         A    I've seen something like this.  I'm --
13   not reading through it, I'm not sure if it's
14   exactly the same document that I have seen before,
15   but I guess this is kind of the standard format of
16   notice that is sent to experts ahead of time.  So
17   I've seen -- I've seen that.
18         Q    Do you understand that what has been
19   marked as Exhibit 1, which is the notice for your
20   deposition, requests that you bring certain
21   documents with you to this deposition?
22         A    Yes.
23         Q    All right.  And just for completeness
24   and at the request of plaintiffs' counsel, I will
25   also mark as Exhibit 2 the general objections to

Page 16

1    your deposition that were submitted by plaintiffs'
2    counsel in the MDL.  And this one we actually will
3    need to mark a copy, because it's not in your
4    binder.
5          (Exhibit No. 2 was marked for
6          identification.)
7          MS. BRANSCOME:  Do you have an extra
8    copy, Michelle?
9          MS. PARFITT:  I do.  Not a worry.  I got
10   it.
11   BY MS. BRANSCOME:
12         Q    Dr. Siemiatycki, have you ever seen the
13   document that has been marked as Exhibit 2, which
14   is the plaintiffs' general objections to your
15   deposition notice?
16         A    I'm not sure.
17         MS. PARFITT:  I will represent for the
18   record that's not been provided to
19   Dr. Siemiatycki.
20   BY MS. BRANSCOME:
21         Q    All right.  So if you could,
22   Dr. Siemiatycki, did you bring any materials with
23   you today to the deposition?
24         A    Yes, I brought a lot of documents, just
25   in case.

Page 17

1          Q    Can you identify for me, and we can
2    start with a general category first, if that's
3    helpful, the materials that you brought with you
4    today to your deposition?
5          A    Well, I brought my report.  I brought an
6    addendum to my report, which I think has been
7    provided to you.
8          MS. PARFITT:  Yes, that was the table.
9          THE WITNESS:  It's a long -- it's a set
10   of --
11         MS. PARFITT:  I have a copy of that if
12   you wish to have it marked.  Do you want it -- if
13   you give me a number, I will put it on this one.
14   BY MS. BRANSCOME:
15         Q    Let's see.  Yeah, let's go ahead and
16   mark the addendum to your expert report as
17   Exhibit 3.
18         (Exhibit No. 3 was marked for
19         identification.)
20   BY MS. BRANSCOME:
21         Q    Dr. Siemiatycki, could you just confirm
22   for the record that what we have marked as
23   Exhibit 3 is in fact the complete addendum to your
24   MDL expert report?
25         A    I -- I believe it is.  I believe it is.

5 (Pages 14 to 17)

Jack Siemiatycki, Ph.D.

Page 18

1      Q   What else did you bring with you today?
2      A   I'm not sure if this is the right time
3   to mention it, but there were a couple of -- in
4   the past few days I picked up a couple of typos in
5   my report, and I've hand scribbled them on my
6   copy, and I can tell you about those very quickly,
7   but I'm not sure if this is now the right time for
8   this or later.
9      Q   I will ask you about any corrections
10  that you have, but it is good to know that the
11  report you brought with you has some handwriting
12  on it, so we will make sure to mark that copy.
13     A   Okay.
14     Q   What else did you bring with you today?
15     A   I brought -- well, I brought three
16  binders of material that were part of the -- the
17  references to my report.
18        MS. PARFITT:  And if I may, I provided
19  counsel in advance of the deposition a thumb drive
20  that contains all of Dr. Siemiatycki's report but
21  also the references related to that report.
22        THE WITNESS:  I brought a couple of
23  binders -- well, more than a couple.  It looks
24  like five binders of different documents that I
25  thought might be useful in answering questions

Page 19

1   that you might ask.  So it was -- I was just
2   speculating on the types of questions you might
3   ask and brought documents that might help to
4   answer or to support arguments or statements that
5   I would make.  I brought five --
6         MS. PARFITT:  You can get --
7         THE WITNESS:  -- which --
8         MS. PARFITT:  -- the texts --
9         THE WITNESS:  The textbooks.  I brought
10  five books with me, again in the same spirit that
11  things might come up that it would be helpful to
12  refer to material in these books.  One -- should I
13  tell you what they are?
14  BY MS. BRANSCOME:
15     Q   If you would, please, identify each of
16  the books --
17     A   Okay.
18     Q   -- for the record, and we will return to
19  the eight binders that you just mentioned.
20     A   One is a book called Risk Factors for
21  Cancer in the Workplace.  And it's a book that I
22  wrote 30 years ago about occupational causes of
23  cancer.
24        The other one -- the next one is the
25  monograph of IARC, which is the International

Page 20

1   Agency for Research on Cancer, of the meeting held
2   in Lyon in 2006.  The book was published in 2010,
3   and it contains an evaluation of talc
4   carcinogenicity as of 2006.
5         The next one is a textbook of
6   epidemiology that is probably considered the most
7   respected one in the field at this point, authored
8   by Rothman, T -- R-O-T-H-M-A-N, Greenland,
9   G-R-E-E-N-L-A-N-D, and Lash, L-A-S-H.
10        MR. KLATT:  Dr. Siemiatycki, is there a
11  particular edition or is there --
12        THE WITNESS:  Oh, yeah.  Yeah, this one
13  is third edition.  Thank you.
14        The fourth one is kind of a handbook
15  called Dictionary of Epidemiology, edited by
16  Porta, P-O-R-T-A, which is kind of a very basic
17  book of definitions.
18        And the fifth one is called An
19  Introduction to Meta-Analysis.  The first author
20  is Borenstein, B-O-R-E-N-S-T-E-I-N.
21  BY MS. BRANSCOME:
22     Q   All right.  Focusing first on the books
23  that you brought with you, why did you bring with
24  you a book about Risk Factors --
25     A   For cancer.

Page 21

1      Q   -- for Cancer in the Workplace?
2      A   Because it has -- in that book I -- I
3   described my research.  I described the research
4   findings from my projects in this area.  I also
5   described the process of conducting epidemiologic
6   research and drawing inferences from epidemiologic
7   data, and how -- what are the considerations that
8   would be used in drawing inferences from
9   epidemiologic data for cancer causation.  And I
10  thought this might come up during the day.
11     Q   Do the methodological principles that
12  you outline in your book, Risk Factors for Cancer
13  in the Workplace, are those still current in your
14  view today?
15     A   Yes.
16     Q   And why specifically did you want to
17  have this book available to you during your
18  deposition?
19     A   In case any of the statements that I've
20  made in my report about evaluating causation and
21  how epidemiology is used for evaluating causation
22  are challenged.  And specifically, I was
23  anticipating that there may be challenges to the
24  fact that my approach to this question might be
25  new and just sort of concocted in the context of

Jack Siemiatycki, Ph.D.

Page 22

1　the litigation, and I wanted to show that in my
2　own sort of intellectual history, these ideas have
3　been there forever but certainly for the last 30
4　years, and that these are commonly held views.
5　　Q　Are there specific chapters within the
6　book that you brought with you that you would
7　direct someone to to gain information about the
8　methodology that you applied in the MDL?
9　　MS. PARFITT: Objection. Form.
10　　THE WITNESS: I'm sorry. Could you
11　repeat the question?
12　BY MS. BRANSCOME:
13　　Q　Understanding that what you brought with
14　you --
15　　A　Yes.
16　　Q　-- is a complete book --
17　　A　Yes.
18　　Q　-- are there specific chapters that you
19　contend contain an explanation of the methodology
20　that is similar to what you have applied in your
21　analysis in the MDL?
22　　MS. PARFITT: Objection. Form, broad.
23　　THE WITNESS: So I would say there are
24　two chapters that have relevance to the issue at
25　hand. The last chapter contains a discussion of

Page 23

1　causality and how to use epidemiology in the
2　process of determining causality.
3　　The first -- the second chapter contains
4　information -- excuse me, I think it's the second
5　chapter -- contains information about different
6　epidemiologic research designs, and it's a
7　discussion of case-controlled studies, cohort
8　studies, and other types of epidemiologic designs
9　and their relative advantages and disadvantages.
10　BY MS. BRANSCOME:
11　　Q　Is there a description of the
12　methodology that you have applied in your analysis
13　in the MDL that is directly described in the book
14　that you just referenced?
15　　MS. PARFITT: Objection. Form.
16　　THE WITNESS: I'm not sure what you mean
17　by "directly," and I'm not sure what you mean by
18　"methodology."
19　BY MS. BRANSCOME:
20　　Q　Did you apply a specific methodology in
21　reaching your opinions here in the MDL?
22　　A　What do you mean by "a specific
23　methodology"?
24　　Q　Did you -- did you use a methodology in
25　forming your opinions --

Page 24

1　　A　Yeah.
2　　Q　-- in the MDL?
3　　A　I -- yes, I -- I collected as much
4　information, data from different research studies
5　as possible. I evaluated those studies. I
6　ordered them according to the types of evidence
7　that they provide. I tried to synthesize the
8　evidence in particular in the basket of
9　epidemiologic research on the topic. And I
10　juxtaposed the information from epidemiologic
11　evidence with evidence derived from other domains
12　which are provided by other experts. And I made a
13　professional judgment about how all of that fits
14　with different ways of understanding the
15　relationship between perennial use of talc and the
16　risk of ovarian cancer.
17　　Q　Is the methodology that you just
18　described that you used in forming your opinions
19　in the MDL described in the textbook that you
20　brought with you about risk factors in the
21　workplace?
22　　A　It is implicit. It is implicit in the
23　work of epidemiologists, and it's implicit in the
24　way we synthesize information. So, in
25　epidemiologic practice, the role of -- there's no

Page 25

1　cookbook recipe in how you start the day and
2　finish the day. You collect data. You use your
3　best judgment about how to synthesize and
4　integrate it. And I guess it comes under the
5　rubric of weight of evidence. You look at all of
6　the evidence, and you (weigh it according to your
7　professional judgment.
8　　And most of the agencies that have any
9　policies or statements about synthesizing
10　information will talk about collecting
11　information, evaluating it, weighing it, and
12　making a judgment about it.
13　　Q　If someone were reviewing just your
14　report in the MDL, would they be able to replicate
15　the weight that you gave different pieces of
16　evidence that you considered?
17　　A　The synthesis of scientific information
18　is not an automated process. It can't be done by
19　a robot. And in every description of how such
20　evidence is synthesized and integrated, the final
21　step always involves professional judgment, and as
22　it should, because there are too many moving parts
23　in all of this to be able to, a priori, set up an
24　algorithm that allows you to automate and arrive
25　at some score that tells you, yes or no, this

Jack Siemiatycki, Ph.D.

Page 26

1  agent is dangerous or not dangerous or something
2  like that.
3      So in line with everything I've done in
4  my career, everything that I've been involved with
5  in international and national agencies, whether
6  it's USNCI or the World Health Organization or
7  other agencies, the process depends critically on
8  judgment of the people who are making the
9  decisions or who are making the evaluations.
10     Q   Respectfully, Dr. Siemiatycki, that was
11 not my question.
12     My question was, could someone by
13 reviewing the report that you have provided in the
14 MDL replicate your analysis in the sense that they
15 would understand the weight that you gave to each
16 piece of evidence you considered?
17     A   I think to a considerable extent I've
18 given fairly explicit information in the report on
19 all of the components of information that I used
20 and the relative weight, but -- not in a
21 quantitative way, but the relative importance that
22 I attribute to different parts of the evidence
23 package.
24     Q   You did not do any type of scoring
25 system, for example, in considering the various

Page 27

1  underlying studies that you evaluated.  Is that
2  fair?
3      A   No -- no, I did not, because I don't
4  consider that a valid procedure.
5      Q   Why is that not a valid procedure?
6      A   Because I don't think epidemiologic
7  studies can be summarized in single-digit scores.
8  There are too many different aspects of a study,
9  and any attempt to do so, I think is flawed and --
10     Q   Why is the attempt to assigning a score,
11 single digit or otherwise, a flawed methodology?
12     A   Because there are so many -- a study can
13 be good in one dimension, mediocre in a third,
14 excellent in a fourth, bad in a fifth, so-so in a
15 sixth, and so on.
16     There are so many dimensions of a study,
17 and each one of them can be rated.  And that's --
18 that is something that I do do.  I evaluate
19 everything from participation rate to the
20 population in which the study was carried out, to
21 the way the questions were asked in the
22 questionnaire, to the way the information from the
23 questionnaire was -- was coded and categorized, to
24 the way the design of the -- whether its case
25 controlled or otherwise, how the subjects were

Page 28

1  selected, when they were selected, when they were
2  followed up, how -- all of these things may have a
3  different score, and you may have a hundred
4  dimensions to evaluate on each study.  And nobody
5  has come up with a -- a usable, useful,
6  replicatable method for integrating all of this.
7  There have been some attempts and there are some
8  scoring systems out there.  The fact that there
9  are scoring -- that someone has published a
10 scoring system, and that even a committee has,
11 does not mean that it's valid.
12     But I -- my professional opinion, and
13 that of I think many other people -- because
14 typically studies are not scored in this way.
15 That's -- when people review evidence.  Or if
16 they -- anyway, typically they are not, and my
17 feeling is that there is no valid way really of
18 doing it.
19     But the -- in order to sort of complete
20 the answer to I think what's behind your question
21 of why I didn't do such a thing in my report with
22 all of the studies is that I adopted early on -- I
23 made a decision early on to avoid excluding
24 studies from my analysis based on my opinion about
25 the quality of the study.  This is a decision that

Page 29

1  other meta-analyses have also made implicitly.  I
2  don't know if they've made it explicitly, but
3  there are no studies that have -- as far as I
4  know, there are no meta-analyses that have
5  literally excluded studies on the basis of quality
6  or -- or done a systematic attempt to do this.
7      And I made a decision early on that if I
8  tried to -- if I went down the road of eliminating
9  some studies from my analysis, this would be
10 criticized as some form of cherry-picking, and in
11 an attempt to avoid that criticism, I decided I
12 would include all pieces of evidence,
13 notwithstanding my opinion of the overall quality
14 of the study.
15     Q   Okay.  Dr. Siemiatycki, that was a very
16 long answer, but I will try to unpack a few --
17     A   Yes.
18     Q   -- portions of that.
19     So you would agree that in order for a
20 methodology to be valid, it has to be a process
21 that can be replicated?
22     MS. PARFITT:  Objection.  Form.
23     THE WITNESS:  What do you mean by
24 "replicated"?  You mean that someone else
25 following exactly the same steps and the -- making

8 (Pages 26 to 29)

Jack Siemiatycki, Ph.D.

Page 30

1  the same assumptions as the -- the person who did
2  the analysis would be able to end up with the same
3  statistical estimates at the end? Is that what
4  you mean? Or do you mean that they would make the
5  same judgments?
6  BY MS. BRANSCOME:
7     Q   Well, Dr. Siemiatycki, you indicated one
8  of the reasons why you don't agree with using a
9  quantitative point system was that a methodology
10  had not been developed that was, I believe you
11  said, useful, usable and replicable.
12        What did you mean by the word
13  "replicable" when you used it in your own answer?
14     A   Did I use the word "replicable" in that
15  sentence? Can I -- can I read that? (Peruses
16  monitor.)
17        I'm not sure what I had in mind with the
18  use -- the word -- yes, you can produce a
19  replicable system, but it doesn't mean that it's
20  valid. So useful and usable, yes. I don't think
21  that there is one that would capture, for
22  observational epidemiology, the -- all of the
23  components that are necessary really to tease out
24  good and/or bad studies.
25  BY MS. BRANSCOME:

Page 31

1     Q   My question to you, though,
2  Dr. Siemiatycki, is that, is it important for a
3  methodology to be replicable?
4     A   It is important -- the most important is
5  for it to be valid. The replicability is an issue
6  that involves judgment. Different scientists may
7  have different judgments about the value of
8  different components of evidence. That diversity
9  of judgment is not a bad thing, and there's no
10  benefit to science in forcing everyone to have the
11  same judgment within some scoring system.
12        So science progresses from collection of
13  data and from different scientists evaluating the
14  data, and from the same information base different
15  scientists can make different judgments about it,
16  and in that sense, the final evaluations are not
17  necessarily replicable because different
18  scientists can make different judgments.
19        But they are understandable. You need
20  the different processes to be sufficiently
21  understandable that different readers and so on of
22  reports can understand how you came to the
23  conclusions.
24     Q   And so it is important to be able to
25  understand what weight a particular scientist is

Page 32

1  giving to the pieces of evidence that he or she is
2  considering in reaching their ultimate conclusion.
3  Is that fair?
4        MS. PARFITT: Objection. Form.
5        THE WITNESS: It depends what you mean
6  by "weight." If you mean by "weight" a
7  quantitative number, then, no, that's not
8  necessary.
9        If you mean sort of a heuristic,
10  qualitative understanding of the relative
11  importance of different components of evidence,
12  then I would say yes. It's important to know what
13  played into a -- a reviewer's opinion.
14  BY MS. BRANSCOME:
15     Q   You also indicated that you do in fact
16  rate studies. What did you mean by that?
17     A   Sorry. Can we read back where I said
18  that? I -- (peruses monitor.)
19        I haven't found it, but I -- I think I
20  meant it as a synonym for evaluate. I think I
21  meant I evaluate different studies.
22     Q   Okay. If I could direct your
23  attention --
24     A   Yes.
25     Q   -- to pages -- page 19, lines 6

Page 33

1  through 8.
2     A   Of -- 19 of -- of what?
3     Q   Of the transcript that's --
4     A   Okay.
5     Q   -- in front of you, which understanding
6  is just a rough, but if you want to review your
7  answer.
8     A   Sure. (Peruses document.)
9        Yes, here by "rated," I meant evaluated.
10     Q   Did you rank the different pieces of
11  evidence that you considered in forming your
12  opinion with respect to talc and the risk of
13  ovarian cancer?
14     A   I -- I've never done that in the
15  hundreds and hundreds of evaluations I've carried
16  out, nor in this one do I actually put a score on
17  different components of -- of a study. Yeah.
18     Q   My question is slightly different,
19  Dr. Siemiatycki.
20        It's ranking them relative to each
21  other. So whether or not you're assigning a
22  specific quantitative number to the study, do you
23  evaluate this is, for instance, the most important
24  study and this is the least important study on a
25  particular topic?

9 (Pages 30 to 33)

Jack Siemiatycki, Ph.D.

Page 34

1      MS. PARFITT: Objection. Form.
2      THE WITNESS: You mean overall or in --
3  in each dimension that the -- that a study is
4  comprised of?
5  BY MS. BRANSCOME:
6      Q   Did you do any type of ranking of that
7  nature, be it in a subtopic or overall?
8      A   Not -- not explicitly, no.
9      Q   You mentioned at the -- at the end of
10  your answer that you made a decision not to
11  exclude studies because you would not want to face
12  the criticism of cherry-picking; is that correct?
13     A   Yes, I said that.
14     Q   What is your understanding of the
15  criticism of cherry-picking?
16     A   My understanding is that one would --
17  one might look at a body of evidence, have a
18  preconceived notion about the topic, the
19  hypothesis under consideration, and use those
20  studies that support that hypothesis and discard
21  the other ones in some way.
22     Q   Is that good science, in your opinion?
23     A   No, that's not good science.
24     Q   Why not?
25     A   Because it doesn't produce an objective

Page 35

1  portrait of reality.
2      Q   If a scientist were to selectively
3  identify studies that were supportive of his or
4  her preconceived notion, would you consider that
5  analysis to be a valid one?
6      MS. PARFITT: Objection. Form.
7      THE WITNESS: Do you mean -- just -- I'm
8  just trying to parse your question. You said if a
9  scientist were to identify studies that were
10  supportive, et cetera, but also that were in
11  opposition or to exclude ones that are in
12  opposition?
13  BY MS. BRANSCOME:
14     Q   Fair enough.
15     So referring back to the scenario that
16  you have described as cherry- picking --
17     A   Yes.
18     Q   -- if a scientist were to engage in
19  cherry-picking, would you consider the ultimate
20  conclusion that that scientist reached with
21  respect to causation or increased risk of an agent
22  to be a valid one?
23     A   It should be suspect --
24     MS. PARFITT: Objection. Form.
25     THE WITNESS: It would be a suspect

Page 36

1  conclusion.
2  BY MS. BRANSCOME:
3      Q   When I asked you the question of whether
4  or not the methodology you applied here in forming
5  your opinion in the MDL is contained in the book
6  that you wrote about Risk Factors for Cancer in
7  the Workplace, you said it was implicit.
8      Is that methodology explicitly described
9  in that textbook or any of the other textbooks you
10  brought with you today?
11     A   I'm not sure that the methodology -- you
12  know, I think it -- the collection of data, the
13  evaluation of data, the judgment about the
14  collection of data is a part of the scientific
15  method, and it is so engrained and implicit in
16  epidemiology and in other sciences that you don't
17  really need to -- and scientists don't write in
18  their books or in their -- unless they're talking
19  to first-year students -- talk about this. It's
20  so elementary that those aspects are not really
21  described. One goes further in describing
22  specific methodologies that would pertain to the
23  topic under consideration.
24     Q   Are there different ways to perform a
25  meta-analysis?

Page 37

1      A   Yes.
2      Q   Okay. Did the method that you chose in
3  developing your meta-analysis, is that explicitly
4  described in any of the materials you either
5  brought here with you today or of which you are
6  aware in the scientific community?
7      A   So it partly depends what you mean by "a
8  meta-analysis." And in my lexicon, meta-analysis
9  is a statistical procedure for summarizing a body
10  of -- a set of results from individual studies.
11  And that procedure is pretty standard -- has been
12  pretty standard since the 1980s and 1990s, and
13  there are some refinements since then.
14     Sorry, I may have lost the thread of
15  your question.
16     Q   If I were to try to look at a piece of
17  scientific literature, be it in a book or an
18  article, to find a published description of the
19  method that you used to perform your meta-analysis
20  in the MDL, where would I look?
21     A   The meta-analysis was conducted using a
22  software that is well known, that is commercially
23  available, and I think everyone would recognize
24  the validity of the statistical procedures under
25  those -- under that.

Jack Siemiatycki, Ph.D.

Page 38

1    If you're asking about which -- you
2  know, there are decisions to be made about which
3  studies to include, about which results from
4  studies to include, and all of that sort of thing,
5  which is not strictly part of the statistics of
6  meta-analysis, it's sort of the step before
7  meta-analysis, and that part is utterly unique to
8  each situation.
9    So if you're doing a meta-analysis of
10  clinical trials that have all been designed
11  basically in an identical way for an
12  antihypertensive medication, and whether the study
13  is done in Australia or California or Canada, the
14  design is pretty standard, and a lot of it can
15  be -- you can -- and you end up basically with a
16  single result from the study, what is the impact
17  on blood pressure -- the average impact on blood
18  pressure among people who use it who were given
19  the drug, the experimental group versus a
20  comparison group, et cetera, that is one type of
21  preparation for a meta-analysis.
22    If you're dealing with observational
23  epidemiology, as we are in the case of ovarian
24  cancer, and some of the particularities of the
25  literature in this domain, there are a lot of

Page 39

1  decisions that need to be made in the run-up to
2  the meta-analysis.
3    Q  So in the situation where you are
4  dealing with observational epidemiology, would it
5  be fair to say that you are applying unique
6  judgment in the selection of the studies that you
7  include in your meta-analysis and, more
8  specifically, what data from those studies you
9  include.
10    MS. PARFITT: Objection. Form.
11    THE WITNESS: Any meta-analysis in this
12  area would absolutely need to apply professional
13  judgments to those things.
14  BY MS. BRANSCOME:
15    Q  Okay.
16    A  Mine included and every -- everyone
17  else's included.
18    Q  All right. So, Dr. Siemiatycki, getting
19  back to the materials that you brought with you
20  today, you mentioned that you brought three
21  binders of scientific literature. Was that
22  correct?
23    A  Three binders of the references to my
24  report.
25    Q  Okay. So that's what I wanted to

Page 40

1  clarify.
2    So the three -- the three binders that
3  you referred to as sort of this first set of
4  materials, are those all references that are
5  identified specifically in your report from the
6  MDL?
7    A  Yes, I believe so. And just to be
8  clear, when I sent this material from the
9  lawyers' office, it arrived in four binders. I'm
10  not sure if you received the same four binders. I
11  have re- -- I've taken some things out of there,
12  so I have three binders of those things. Just --
13  I don't know if there's confusion just between the
14  three and four, but...
15    Q  What did you remove from the set of
16  materials that you were provided by plaintiffs'
17  counsel?
18    A  I removed the IARC reports, which I have
19  in books, so I didn't need to carry around
20  hundreds and hundreds of pages extra.
21    I removed some other -- there was
22  another report with, you know, thousands of --
23  hundreds or -- at least of pages where I thought
24  the relevant material was in -- contained in about
25  20 pages. So I kept -- in material that I carry

Page 41

1  around, I kept the 20 pages and put the rest away
2  in a box.
3    Q  Do you remember which document that was?
4    A  If you give me a minute, I'll try to
5  recreate that.
6    Q  We can check that at the break if you
7  want --
8    A  Yeah. Sure, sure.
9    Q  -- to identify that document.
10    So then you -- you spoke about an
11  additional five binders --
12    A  Yeah.
13    Q  -- that you brought with you that
14  contain documents that might help you answer
15  questions during the deposition.
16    Can you describe the contents of those
17  five binders. I'm trying to avoid marking all of
18  these as exhibits.
19    A  Yeah. Please.
20    Okay. Let me just reach down and look
21  at their covers.
22    Yeah, so one contains the recent
23  manuscript of a study by Taher, et al., a Canadian
24  meta-analysis of the issue, plus -- let me see if
25  there's anything else in there. I -- I think

11 (Pages 38 to 41)

Jack Siemiatycki, Ph.D.

Page 42

1  that's it. It's such a -- such a big report with
2  all the appendices and so on, that it takes up a
3  whole binder.
4          Another one, a smaller one, contains the
5  meta -- the main meta-analyses that have been done
6  in this area, apart from the Taher one. So the
7  Berge, Penninkilampi, a few other older ones,
8  Langseth and some of the older ones.
9      Q   Are those materials that are in the set
10  of meta-analysis, the second binder, if you will,
11  are they replicated also in the other set of three
12  binders that you brought with you?
13      A   Yes, they are.
14      Q   Okay.
15      A   Yes, they are.
16          Sorry. There's -- there's another one
17  in -- like that which contains all of the original
18  epidemiology studies that I used or that were
19  available to be used in the meta-analysis. And I
20  had this binder in my previous -- in the previous
21  case that I testified on, and I thought I -- I'd
22  like to have one binder here just of the
23  epidemiology studies because the thick binders,
24  it's harder for me to find articles, so it would
25  be easier for me to find them in this binder. So

Page 43

1  all of these are in the big binders.
2          And there's another one with Health
3  Canada weight of evidence guidelines. Also
4  guidelines from a European agency on weight of
5  evidence and evaluation. I think there might be
6  something from FDA about that, and also some of
7  the information regarding agency -- what agencies
8  have put on their websites, if anything, about
9  talc, which would include the National Cancer
10  Institute and some other agencies.
11          So these are mainly -- well, partly
12  printouts from websites. Partly the Canadian Risk
13  Management scope for talc published very recently
14  from the Canadian Department of Health. And this
15  sort of information. Not -- not all of those are
16  in the thick binders.
17      Q   Are all of the documents in the binder
18  that you are holding there, which I think is your
19  fifth binder, are all of those documents
20  identified within your report or in your reference
21  materials?
22      A   No.
23      Q   I would like to mark that binder as
24  Exhibit 4.
25          (Exhibit No. 4 was marked for

Page 44

1          identification.)
2  BY MS. BRANSCOME:
3      Q   Now, Dr. Siemiatycki, with the exception
4  of a copy of your report, which you previously
5  testified has some handwritten annotations on it,
6  do any of the other materials that you brought
7  with you today have any notes, handwritten or
8  typed, or highlighting or any other form of
9  annotation?
10      A   Yes. The -- the epidemiology studies
11  and probably the meta-analyses, the previous
12  meta-analyses. I -- I tend to scribble notes when
13  I'm reading an article on the side, so some of
14  those may very well have scribbled notes on -- in
15  the margins or things underlined.
16      Q   Dealing first with the binder of the
17  original epidemiological studies that you said you
18  had at a prior deposition, have you annotated that
19  in any way since you brought that to another
20  deposition?
21      A   Since today? Sorry.
22          MS. BRANSCOME: Michelle, perhaps you
23  could help me.
24          MS. PARFITT: Sure. Yeah, absolutely.
25          MS. BRANSCOME: Has that specific binder

Page 45

1  been marked as an exhibit at a prior deposition?
2          MS. PARFITT: Let me see which one.
3          Ms. Branscome, I don't want to
4  represent -- and I would tell you that these were
5  all the studies that he's had over the course of
6  the last few years. I can't imagine it wasn't
7  asked for in prior depositions, but I can't -- I
8  can't represent --
9          MS. BRANSCOME: Okay.
10          MS. PARFITT: -- one way or another. I
11  really can't.
12          MS. BRANSCOME: Let's go ahead. I would
13  like to mark the binder --
14          MS. PARFITT: I will tell you this --
15  maybe I can. There are pink numbers, number 10,
16  number 14, which suggest to me that they might
17  have been referenced in a deposition at one point
18  in time as an exhibit.
19          THE WITNESS: Not -- some of them, but
20  not all of them, have those numbers.
21          MS. PARFITT: Okay.
22          THE WITNESS: They also have numbers in
23  the corner of my -- my team's personal filing
24  system of articles, so things like that.
25          MS. BRANSCOME: Out of an abundance of

12 (Pages 42 to 45)

Jack Siemiatycki, Ph.D.

| Page 46 |
| --- |

1  caution, we will mark the binder that has been
2  described as containing the original
3  epidemiological studies as Exhibit 5, and the
4  binder that contains the meta-analyses as
5  Exhibit 6.
6           (Exhibit Nos. 5 and 6 were marked
7           for identification.)
8  BY MS. BRANSCOME:
9      Q    Did you bring anything else with you to
10  the deposition today?
11     A    Cell phone, glasses, et cetera, but no.
12     Q    I was provided before the deposition
13  began with a single piece of paper that I
14  understand to be a bill for professional services.
15         If we could mark a copy of that as
16  Exhibit 7.
17         MS. BRANSCOME:  Michelle, I don't know
18  if you have an extra copy.
19         MS. PARFITT:  I do.
20         (Exhibit No. 7 was marked for
21         identification.)
22         MS. PARFITT:  I have additional copies
23  for counsel, if you would like.
24         MS. BRANSCOME:  I think we passed one
25  around.

| Page 47 |
| --- |

1  BY MS. BRANSCOME:
2      Q    Dr. Siemiatycki, do you recognize the
3  document that's been placed in front of you that's
4  been marked as Exhibit 7?
5      A    Yes, I do.
6      Q    And could you describe for the record
7  what this document is.
8      A    It's a bill for services that I sent to
9  Ms. Parfitt dated November 18, 2018, in which I
10  billed for work done between August and November
11  2018 on the MDL case.
12     Q    Is it correct that this is a bill that
13  covers 56 hours that you billed in connection with
14  your work on this case in the month of July
15  through August 2nd, 2018?
16     A    Sorry, do -- July?  Is this the same --
17         MS. PARFITT:  August.  I have August to
18  November.
19         THE WITNESS:  Do you have a bill labeled
20  July?
21         MS. PARFITT:  We have July to August,
22  and here's the August --
23  BY MS. BRANSCOME:
24     Q    Sorry, we had different pieces of paper,
25  Dr. Siemiatycki.

| Page 48 |
| --- |

1      A    Okay.
2      Q    So why don't we mark as Exhibit 8 the
3  bill for professional services that covers the
4  month of July.
5           (Exhibit No. 8 was marked for
6           identification.)
7         MS. PARFITT:  Sure.  I don't have extras
8  of those.  Does anyone have a clamp?  If I could
9  have one of those?  Thank you.
10        MR. TISI:  Number 7, for the record, is
11  the one that goes to November.
12        MS. BRANSCOME:  We'll -- we'll clear it
13  up.
14        MR. TISI:  Thank you.
15        THE WITNESS:  Got it.
16  BY MS. BRANSCOME:
17     Q    So, Dr. Siemiatycki, you have two
18  exhibits in front of you there, an Exhibit 7 and
19  an Exhibit 8.
20         Do they both contain bills for
21  professional services for the work that you have
22  done in connection with this litigation?
23     A    Yes, they do.
24     Q    And what has been marked as Exhibit 7
25  covers a work period of August 9th through

| Page 49 |
| --- |

1  November 16th, 2018, during which you billed 136
2  hours; is that correct?
3      A    That's correct.
4      Q    And then Exhibit 8 covers the period of
5  time July 1st through August 2nd, 2018, over which
6  you billed 56 hours; is that correct?
7      A    That's correct.
8      Q    And you bill for your time at $450 an
9  hour, correct?
10     A    That's correct.
11     Q    Do the two bills for professional
12  services that have been marked as Exhibits 7 and 8
13  contain any time for work done by others at your
14  direction?
15     A    They contain work that has been done by
16  a couple of -- by one research assistant, and I
17  make an arrangement with her to reimburse her for
18  her time.  So it's -- it's covered in these, yes.
19     Q    Okay.  And so how is your research
20  assistant's time billed to plaintiffs' counsel?
21     A    It's not billed.  I -- I adjust the
22  billable hours to reflect the time that she works
23  for me.
24     Q    So if I was looking at Exhibit 7 and
25  Exhibit 8, how much in terms of hours of this

13 (Pages 46 to 49)

Jack Siemiatycki, Ph.D.

Page 50

1    reflects your personal time?
2        A    Between 95 percent and 98 percent,
3    almost all of it.
4        Q    And do the two exhibits that you have in
5    front of you here, Exhibit 7 and Exhibit 8, does
6    that cover all of the work that you have done in
7    connection with forming your opinions in this
8    case, meaning the MDL?
9        A    In forming the opinions for the report,
10    yes.
11        Q    These bills do not include time that you
12    spent preparing for today's deposition, correct?
13        A    That's correct.
14        Q    About how much time have you spent
15    preparing for today's deposition?
16        A    I would say the time since November 18,
17    which is referenced here, to today, there were
18    actually two components.  One was preparing for
19    the deposition.  Another was a bit of a flurry of
20    activity in December, I think it was, when a
21    couple of reports from Health Canada and from
22    the Taher group were published, and I reviewed and
23    tried to think about that information as well.
24        So just to be as precise as possible, I
25    just want to make that clear.  It's not -- it

Page 51

1    wasn't only preparation.  But I -- I guess we're
2    talking about a couple of weeks' work in -- since
3    November, but between six and ten days maybe,
4    something in that ballpark.
5        Q    And how would -- what would that be in
6    terms of hours?
7        A    Between 40 and 60 hours or -- subject to
8    revision, I could -- I could look that up.
9        Q    Have you billed plaintiffs' counsel for
10    that time yet?
11        A    No, I haven't.
12        Q    Presumably you will be billing them for
13    the time you spend here today during your
14    deposition as well, correct?
15        A    I -- I presume so as well.
16        Q    You referenced a flurry of activity in
17    December related to the Health Canada information
18    becoming public.
19        Did you produce or generate any type of
20    written work product in connection with your
21    review of those materials?
22        A    No, I didn't.
23        Q    Did you take any notes while reviewing
24    the materials that came out in December -- around
25    December 2018 related to the Taher manuscript and

Page 52

1    paper and the Health Canada statement?
2        A    No, I didn't.
3        Q    Did you annotate any of the materials
4    that you reviewed?
5        A    I'm -- I'm not sure.  I typically have a
6    pen in my hand when I'm reading, so I couldn't say
7    that I never underlined anything or -- I just
8    don't recall making any -- and I don't know that I
9    could find -- if I did look at it in December, I'm
10    not sure I could find that copy because I -- I -- there
11    tend to print things over when -- and I -- there
12    was nothing written that I wanted to retain.  I
13    didn't write anything that I have used or -- yeah.
14        MS. BRANSCOME:  We've been going for a
15    little over an hour.  Is now a good time to take a
16    break?
17        THE WITNESS:  It's a great time.
18        THE VIDEOGRAPHER:  We are going off the
19    record at 10:55 a.m.
20        (Recess.)
21        THE VIDEOGRAPHER:  This begins disc
22    number 2 in the deposition of Jack Siemiatycki.
23    We're going back on the record at 11:15 a.m.
24    BY MS. BRANSCOME:
25        Q    Before we took the break,

Page 53

1    Dr. Siemiatycki, we were looking at the two bills
2    for professional services that have been marked as
3    Exhibit 7 and Exhibit 8.
4        And so in addition to the 56 hours that
5    are on Exhibit 8, the 136 hours on Exhibit 7, and
6    the approximately 40 to 60 hours you have spent
7    since mid-November of 2018, how much time have you
8    spent in connection with your opinions across all
9    talc litigation?
10        MS. PARFITT:  Objection to form.
11        THE WITNESS:  Including the previous
12    case that I was involved in, you're saying?
13    BY MS. BRANSCOME:
14        Q    Yes.
15        A    Whew.  I -- four to six weeks maybe
16    or -- I spent, I think, nearly two weeks in LA
17    while that case was going on, so that's one big
18    block of time.  And then I -- at least a month
19    full time, the equivalent of, before that.  But,
20    I'm sorry, I can't be more precise.
21        Q    What would that be in terms of hours?
22        A    Hours.  Let's say eight hours a day --
23    30, 40 -- 400 hours plus or minus 200.
24        Q    So a range of between 200 to 600 hours,
25    do you think?

14 (Pages 50 to 53)

Jack Siemiatycki, Ph.D.

Page 54

1         MS. PARFITT: Object.
2         THE WITNESS: It would be more than 200
3    for sure. So -- to the best of my recollection,
4    it might be between 400 and 600. But...
5    BY MS. BRANSCOME:
6         Q   How much have you billed to date for all
7    of the work you've done in connection with talc
8    litigation?
9         A   Well, I -- I don't remember.
10        MS. PARFITT: Don't guess.
11        THE WITNESS: I don't remember a total.
12   BY MS. BRANSCOME:
13        Q   Do you charge $450 per hour for all
14   types of work that you have done in connection
15   with the talc litigation?
16        A   Yes, I do.
17        Q   Do the fees that you charge in
18   connection with your work as an expert witness in
19   the talc litigation go directly to you personally?
20        A   Yes, they do. Well, they go to a
21   corporation that -- that I control, as you see in
22   the bills.
23        Q   Do you pay anyone else for the -- using
24   the funds that the corporation has received for
25   the expert work you've done in connection with the

Page 55

1    talc litigation?
2         MS. PARFITT: Objection. Form.
3         THE WITNESS: Yes, when I ask someone to
4    do some specific tasks, I pay them for that.
5    BY MS. BRANSCOME:
6         Q   And are the fees that you pay to other
7    individuals for tasks that they do in support of
8    your work, do those fees get billed to plaintiffs'
9    counsel?
10        A   No, they don't.
11        Q   Can you give me an approximation of how
12   much you have paid to others from the fees you
13   have billed to plaintiffs' counsel?
14        A   In MDL or in total?
15        Q   In all of the talc litigation.
16        A   My guesstimate would be that it's in the
17   order of 2 or 3 or 4 percent -- maybe 2 percent of
18   the total that I've billed.
19        Q   So it's fair to say that approximately
20   96 to 98 percent of all the fees that have been
21   billed to plaintiffs' counsel for your work as an
22   expert in the talc litigation will come to you
23   personally?
24        A   Yes.
25        Q   What percent of your professional time

Page 56

1    do you currently spend performing work in
2    connection with litigation?
3         A   By presently, can you give me a time
4    frame? You don't mean today, I presume. When you
5    say -- do you mean in the last year? In the last
6    10 years?
7         Q   Let's say over -- over the past 12
8    months, what percent of your professional time was
9    spent performing work in connection with
10   litigation?
11        A   Ten to 20 percent ballpark.
12        Q   And has that percentage of time spent on
13   work in connection with litigation changed over
14   the past five years, for example?
15        A   Yes, it's very variable depending on
16   requests for participation in litigation. So in
17   the past five years, my main contact with
18   litigation has been in the ovarian cancer cases,
19   but as -- around four years ago, I was also
20   working on two other cases in Canada.
21        Sorry, what was the question?
22        Q   Sure. How -- I'll ask a new one.
23        How has the percentage of time that --
24        A   Oh, oh.
25        Q   -- you spend in connection with work

Page 57

1    done related to litigation changed?
2         A   Any litigation, right?
3         Q   Yes.
4         A   Or -- or talc litigation?
5         Q   I'll start with all litigation.
6         A   So it's -- as I said, it's very variable
7    from month to month. And -- and -- I mean, I
8    guess over the past five years, it has kind of
9    averaged out at about 10 percent of my time, 10 to
10   20 percent of my time.
11        Q   And over the past two years, has all of
12   the litigation work you've been doing, has that
13   been exclusively focused on talc?
14        A   Yes.
15        Q   The report that -- sorry, the report you
16   prepared in connection with the MDL is not the
17   first expert report you have generated with
18   respect to a potential link between talc and
19   ovarian cancer, correct?
20        A   That's correct.
21        Q   You produced a report in connection with
22   the talcum powder litigation dated October 4th,
23   2016, correct?
24        A   That's correct.
25        Q   If you could turn in your binder there

15 (Pages 54 to 57)

Jack Siemiatycki, Ph.D.

Page 58

1  to tab 2.
2      A  In this big binder?
3      Q  Yes, please.
4         Is the document behind tab 2 your expert
5  report dated October 4th, 2016, that related to
6  the talcum powder litigation?
7      A  Yes, it is.
8      MS. BRANSCOME:  I would like to mark
9  that as Exhibit 9.
10         (Exhibit No. 9 was marked for
11         identification.)
12  BY MS. BRANSCOME:
13     Q  The report marked as Exhibit 9 was not
14  drafted for a particular case; is that correct?
15     A  I -- I -- I'd have to defer -- I'm not
16  exactly sure sometimes whether these reports refer
17  to a specific case or not.
18     Q  Okay.  Let me do it this way:  What was
19  the question that you were attempting to answer in
20  the report that has been marked as Exhibit 9?
21     A  So the question was the generic question
22  of whether there is a causal relationship between
23  use of talcum powder products and ovarian cancer.
24     Q  And specifically, the report marked as
25  Exhibit 9, were you looking specifically at

Page 59

1  perineal or genital use of talc?
2      A  That was the focus, yes.
3      Q  Did your 2016 report address any cancer
4  risk associated with the inhalation of talc?
5      A  Not that I recall.  It certainly wasn't
6  a focus.  There may have been some reason to
7  allude to that issue, but I can't recall that
8  it -- that there was.
9      Q  Okay.  You had your deposition taken on
10  December 15th and 16th, 2016, correct?
11     A  I believe so.
12     Q  And that deposition was for two specific
13  cases, the Oules and the Daniels case, correct?
14     A  I guess so.  But again, I -- that --
15  I'm -- I don't recall exactly which cases.
16     Q  You also have testified at trial in a
17  case involving allegations about Johnson's Baby
18  Powder, correct?
19     A  That's correct.
20     Q  And that was the Echeverria case?
21     A  Yes, it was.
22     Q  And you testified in trial in August of
23  2017, correct?
24     A  Correct.
25     Q  You did not issue an expert report

Page 60

1  specific to the Echeverria case, correct?
2      A  Correct.
3      Q  So the expert report that described the
4  opinions that you were offering in that case is
5  the one that we have just marked as Exhibit 9.  Is
6  that fair?
7      MS. PARFITT:  Objection.  Form.
8      THE WITNESS:  I -- I'm -- I'm hesitating
9  because I'm not sure what the significance of the
10  phrase "the expert report that you offered" is.  I
11  didn't -- I didn't in a sense offer this report
12  for -- at that trial.  I testified at that trial,
13  and they had this expert report available to them.
14  BY MS. BRANSCOME:
15     Q  Okay.  Let me ask it this way:  You
16  generated an expert report specific to the MDL,
17  correct?
18     A  Yes.
19     Q  And we are going to look at that --
20     A  Yes.
21     Q  -- but that is a report that is dated at
22  some point in 2018, correct?
23     A  Correct.
24     Q  Did you generate an expert report at any
25  time in between the expert report that you

Page 61

1  generated there in October 2016 and the expert
2  report that you have supplied that's dated November
3  2018?
4      A  No, I did not.
5      Q  All right.  So if I may, I would like to
6  actually mark your copy of your 2018 report.  And
7  that will be marked as Exhibit 10, if you have
8  that in front of you.
9         (Exhibit No. 10 was marked for
10         identification.)
11         (Counsel conferring.)
12  BY MS. BRANSCOME:
13     Q  To be clear, for the record, I'm marking
14  as Exhibit 10 your MDL expert report, but it is
15  your copy.
16     A  Yes.
17     Q  Okay.  And as I understand it, the copy
18  that you brought with you here today that's now
19  been marked as Exhibit 10 contains some
20  corrections.  Is that -- is that fair?
21     A  Yes.
22     Q  Could you please walk me through the
23  corrections that you have made to your 2018 MDL
24  report that has been marked as deposition
25  Exhibit 10.

16 (Pages 58 to 61)

Jack Siemiatycki, Ph.D.

Page 62

1    A   Yes.  So the first is on page 47.  And
2  in the first full paragraph that begins with
3  "Table 9," on the fourth line --
4    Q   Let me pause you there for a moment,
5  Dr. Siemiatycki.  Are we both looking at page 47?
6    A   Now, I -- I'm not sure whether I printed
7  this in a way that is not -- does not correspond
8  to the version that you have.  I'm sorry.  I
9  printed this just for my own use, so I didn't --
10    Q   No, looking at it, it looks similar.
11    A   Oh, okay.
12    Q   So why don't you direct me to the
13  specific correction.  I thought you were referring
14  to the image of Table 9.
15        MS. PARFITT:  No, no.  I think we're
16  all on the same -- it's the same one you have --
17        THE WITNESS:  Okay.
18        MS. PARFITT:  -- on your thumb drives.
19        THE WITNESS:  Okay.
20  BY MS. BRANSCOME:
21    Q   All right, we'll start again.  So,
22  Dr. Siemiatycki, if you could identify for me the
23  corrections that you are making to your MDL report
24  from November 2018.
25    A   Right.  So on page 47, the first full

Page 63

1  paragraph, the fourth line, there are some
2  numbers.  It says "1.25," and then in parentheses,
3  there is a 1.0 that was really a literal typo.
4  Someone's -- my fingers were too heavy, and the
5  one -- the first 1.0 should be dropped, and so the
6  correct number is 1.15 to 1.36.  Okay?
7        The next one -- I'm sorry.  Oh, the next
8  one is on page 45, so a couple of pages earlier,
9  in the second line -- are you with me? -- the
10  sentence that begins "While the Terry 2013."  It
11  should be the Berge -- "While the Berge" -- the
12  first Terry -- I'm just thinking out loud again.
13  Whether in fact the Terry was the correct --
14  anyway, yesterday when I was correcting this
15  quickly, I thought that it -- that I had
16  miswritten "Terry 2013" in that sentence and that
17  it should have been Berge 2018.
18        Do you mind if I look at this again at
19  lunchtime and just verify which I was referring
20  to?  I'm now confusing myself about that.
21    Q   Not a problem.  We can come back to that
22  after -- either the next break or the lunch break.
23    A   And that -- those are the only
24  corrections I picked up as I was going through it.
25    Q   I noticed as you were flipping through

Page 64

1  your copy of your report that there were other
2  handwritten annotations.
3    A   Yeah.
4    Q   Can you please walk me through -- unless
5  it's voluminous, in which case we can do it after
6  a break -- any notations that you have made in
7  your copy of your MDL report.
8    A   It's not voluminous.  I didn't make
9  many.  One is on page 49.  And in the middle of
10  the page in italics, there is a misconception
11  counting, et cetera, and just before that, I was
12  talking about hospital-based studies and
13  population-based studies.  So the section that
14  begins on page 48 is about hospital-based versus
15  general population-based studies.  And I made a
16  note to myself after that -- at the end of that
17  section, also --
18        I mean, do you want me to quote what I
19  wrote?
20    Q   Yes, please.
21    A   Sure.  I said:  "Also the basin for
22  hospital controls may differ from the basin for
23  cases."
24    Q   And what did you mean by that?
25    A   So, you're familiar with the idea, a

Page 65

1  hospital-based study?  There are actually
2  different types of hospital-based studies, which
3  is something that has not come out in, really, in
4  any of the discussion of this literature.
5        But one of the problems with hospital-
6  based studies is that when you choose a control
7  group, let's say for a series of ovarian cancer
8  cases from a given hospital, and you go to a
9  different ward in that hospital to look for
10  controls who are not -- don't have ovarian
11  cancer -- the reasons for referral and the --
12  pattern of patients coming to hospitals differs
13  for different diseases.  So serious -- it
14  generally is the case that serious diseases in
15  specialized hospitals tend to come from a wider
16  geographic and social area than cases of traffic
17  accident injuries or things that are treated in
18  general hospitals more easily.
19        And if you just take a series of cases
20  of ovarian cancer and go to the emergency
21  department to choose controls or you go to the GI
22  surgery department where they do appendectomies
23  routinely or something like that, you're picking
24  up populations who are quite different.
25        And this is one of the disadvantages of

17 (Pages 62 to 65)

Jack Siemiatycki, Ph.D.

Page 66

1  a hospital-based control strategy, and it's one of
2  the reasons why, in general, epidemiologists favor
3  population-based studies rather than hospital --
4  case control studies, population-based case
5  control studies, rather than hospital-based case
6  control studies, because the cases and the
7  controls -- one of the requisites in a case
8  control design is that the patients -- the cases
9  and the controls should represent the same study
10  base, the same basin of people who if they were
11  cases with the disease in question, ovarian
12  cancer, this is where they would end up, and all
13  of them would end up there.
14      Q  Are there any studies that were relevant
15  to your analysis for your MDL report that you
16  think this particular criticism that you have just
17  explained applies to?
18      A  I'm not sure. I didn't examine them
19  from that point of view.
20          In this section of my report, it was
21  kind of a generic discussion of the issue of -- of
22  the merits of hospital-based versus population-
23  based studies.
24      Q  Okay. Do you have any other annotations
25  that you made in your copy of your MDL report?

Page 67

1      A  At the bottom of that same page, 49, I
2  wrote, quote, "Borenstein." And right now I'm --
3  oh, yes. So this misconception about counting the
4  number of statistically significant results as a
5  valid way of assessing consistency of results
6  among different studies is a basic flaw in the
7  conduct and interpretation of how to review a
8  series of studies.
9          It's well known. I've known and I -- I
10  said it in my report that this is absolutely not
11  the way to synthesize evidence from multiple
12  studies, to count the number of significant ones.
13  And in addition to me saying it and many others, I
14  thought that I could -- if you asked me questions
15  about it or challenged my opinion on that score, I
16  could quote the textbook on meta-analysis, which
17  gives some good examples of why that's wrong.
18      MS. PARFITT: Let's stop here for a
19  minute --
20      MS. BRANSCOME: If we could go off the
21  record.
22      MS. PARFITT: -- and go off the record.
23      THE VIDEOGRAPHER: We're going off the
24  record at 11:39 a.m.
25          (Pause.)

Page 68

1      THE VIDEOGRAPHER: We're going back on
2  the record at 11:41 a.m.
3  BY MS. BRANSCOME:
4      Q  Do you have any other annotations there
5  with you on your copy of your report?
6      A  No. I have one other green sticky on
7  page 67, but there's nothing written on that page,
8  and I don't remember why I put that sticky here.
9      Q  Okay. The report that we just marked as
10  Exhibit 10, does that define the scope of your
11  opinions in the MDL?
12      A  The scope of my opinions. It defines my
13  opinions, yes.
14      Q  Does it contain all of the opinions that
15  you intend to offer at any trial or hearing in the
16  MDL?
17      A  I mean, I guess if I'm asked a question
18  that veers off from something I said in my report,
19  and I address the question, would that be
20  considered going off -- you know, offering an
21  opinion that is not in my report?
22          It's just that -- I'm just not sure
23  about the technicality of your question. I mean,
24  I will offer -- I will answer questions even if
25  they lead off the content of my report.

Page 69

1      Q  As you sit here today --
2      A  Yes.
3      Q  -- does the report that has been marked
4  as Exhibit 10 contain all of the opinions that you
5  have formed as of today about which you would
6  intend to testify at trial or a hearing on this
7  matter?
8      A  I -- I believe so.
9      Q  What was the question that you were
10  asked to answer in connection with the report you
11  generated in 2018?
12      A  I guess I -- I'll just refer back to
13  what it says in the report: "Can application of
14  talcum powder products in the perineal region
15  cause ovarian cancer?"
16      Q  Is that question different from the
17  question you were answering in your 2016 report?
18      A  I -- I don't see them as different.
19      Q  You would agree with me, though, that
20  there are differences between the report that you
21  produced in November 2018 and the report that you
22  produced in October 2016?
23      MS. PARFITT: Objection. Form. Vague.
24      THE WITNESS: Yes, there are some
25  differences.

18 (Pages 66 to 69)

Jack Siemiatycki, Ph.D.

Page 70

BY MS. BRANSCOME:
Q   When you began drafting the report that's been marked there as Exhibit 10, your MDL report, did you begin by using your 2016 report as an initial draft?
A   Yes. But I also had some ideas about new things that I would want to do. Sort of coming out of the Echeverria experience, I realized that there were -- there were a couple of errors in that -- my original report that I wanted to correct. There were ways of doing the analyses that, on reflection, I thought were not optimal and that I could improve on, even if I anticipated that the bottom line results would not change much. But when I came to actually drafting the text, I certainly used the previous report as a primary source for revising -- for -- for drafting the new one.
Q   You mentioned that you wanted to make some modifications because there were things in the 2016 report that were either not optimal or were errors.
      Were any of the modifications that you made done at the suggestion of plaintiffs' counsel?

Page 71

      MS. PARFITT: Objection.
      THE WITNESS: No.
BY MS. BRANSCOME:
Q   So any of the changes that you made between your 2016 report and the MDL report in 2018, were those all at your own prompting?
A   Yes.
      MS. PARFITT: Objection. Form.
      THE WITNESS: Yes.
BY MS. BRANSCOME:
Q   Did you work in the same computer file to draft the 2018 report from start to finish?
      MS. PARFITT: Objection. Form.
      THE WITNESS: You're -- you're referring to the text, not the statistical analyses, which were done in a separate -- I mean, they -- they -- the statistical analyses were based on the addendum that I presented to you, and those are kept on a FileMaker software, which is not on my personal computer, but that my assistant has access to.
      But as far as the text is concerned -- yeah, I think it was the same computer, but I've changed computers since then, so I'm just hesitating because I'm trying to think of the time

Page 72

sequence, and I use both of them now but in different places.
      But -- so is your question, is it exactly the same computer that all the files were kept on or -- is that the sense of your question?
BY MS. BRANSCOME:
Q   How about I ask it this way: Can you describe for me the process by which you drafted your 2018 report that's been marked as Exhibit 10?
A   So I guess there were two parallel things going on, or maybe more. One was to do some reanalyses of the statistical meta-analysis. And so that I initiated at a certain point between -- probably in 2018.
      At the same time, and I'm not sure if this was after or before the statistical analyses were started, I looked at the old draft. I reviewed what was there, what I thought were weaknesses in the way of expressing things or things that could be brought to the report that would enhance the clarity or the force of the -- the exposition, and I started redrafting. So I'm not sure if that answers your question.
Q   Did you personally type the words that are contained in Exhibit 10?

Page 73

A   All -- maybe all of them, and maybe there were some paragraphs that I handwrote because I was on a plane or a train, and when I got back to the office, I asked someone to type up that paragraph or two. But basically it was done by me.
Q   And did you save draft versions along the way?
      MS. PARFITT: Objection. Form --
      THE WITNESS: Not really. Not -- certainly not systematically. I didn't see any reason to save discarded versions of things. Yeah.
BY MS. BRANSCOME:
Q   Did you conduct a new literature review in connection with the 2018 report?
A   I knew that I had all of the literature that was pertinent and published as of 2016. Updating what was available was partly done by asking my research assistant to do a PubMed search of anything new on the topic; asking the lawyers if they had come across anything new in the past year; my own antenna of knowing a lot of epidemiologists and people who work in this area, whether they are aware of anything. So sort of an

Jack Siemiatycki, Ph.D.

Page 74

1  informal updating process from many branches.
2      Q   Did plaintiffs' counsel provide you with
3  studies that had come out since you had generated
4  your 2016 report?
5      A   I think they sort of pointed me to a
6  couple of things that I didn't have at the time.
7  I think one was the Penninkilampi review.
8          We're talking about the epidemiology
9  literature or everything?  Because the
10 epidemiology literature I was pretty much in
11 control of through my networks and my people and
12 so on.
13         The stuff that I asked counsel to help
14 with was identifying literature in the areas of
15 toxicology, composition of talcum powder products,
16 mechanistic research that would bear on the issue.
17 So I asked them if they would provide me any new
18 data that they had available on those topics.
19     Q   Do you consider yourself an expert in
20 toxicology?
21     A   No.  I'm sufficiently familiar to be
22 able to integrate the expertise of -- of real
23 experts.
24     Q   Do you consider yourself an expert on
25 the composition of talc?

Page 75

1      A   No.
2      Q   And do you consider yourself an expert
3  on potential biological mechanisms of the
4  development of ovarian cancer?
5      A   No.
6      Q   Other than being aware of the opinions
7  of others in those particular fields, are you
8  offering any expert opinions in toxicology, the
9  composition of talc, or the biological mechanism
10 by which ovarian cancer may develop?
11     A   I'm --
12         MS. PARFITT:  Objection.  Form.
13         Go ahead.
14         THE WITNESS:  I'm -- I reviewed the
15 information that I was provided, and I took note
16 of the types of evidence that are available in
17 those domains, and I used it mainly in thinking
18 about biological plausibility of the association.
19 It -- those areas of evidence did not in any way
20 influence my opinions about the strength and
21 consistency and so on of the epidemiological
22 evidence.
23 BY MS. BRANSCOME:
24     Q   Did you -- oh, before I forget, what is
25 the name of the software that you used to do the

Page 76

1  statistical analysis for your meta-analysis?
2      A   It's -- I think it's called
3  Meta-Analysis, but -- it's called Comprehensive
4  Meta-Analysis, Version 3.  It's listed in my
5  report on page 34.
6      Q   And is that the only software that you
7  used to perform the statistical analyses in your
8  report?
9      A   It's the only software that I used to
10 perform the meta-analyses.  Are there any other --
11 I'm just trying to think if there are any other
12 analyses in the report besides meta-analyses or
13 statistical.
14         There were a couple of studies, and I --
15 I couldn't point them out just this minute, that
16 did not provide full information allowing -- that
17 didn't provide full information on odds ratios or
18 relative risks in a format that was useful for the
19 meta-analysis.  And -- but they did provide the
20 numbers of cases and controls who were exposed and
21 unexposed.  And that would typically -- I think in
22 at least one instance, maybe two, but at least one
23 instance, there was a situation where they
24 provided odds ratio estimates in different
25 categories of usage of talc or either different

Page 77

1  durations or different amounts used per day or
2  something like that, but didn't summarize that in
3  an overall ever-used-it-at-all versus
4  never-used-it, which was what I was looking to use
5  in the meta-analysis.
6          And I think in those -- in that
7  instance, I did almost a hand calculation.
8  Because it's pretty straightforward how you do
9  this, just re- -- picking the numbers in their
10 tables and recalculating the overall odds ratio.
11         But this is a few years ago, and I --
12 I -- I would have to go back and review that, but
13 it was -- I think in the other meta-analyses,
14 Berge and Penninkilampi, which were carried out
15 completely independently of mine, and I didn't
16 know about theirs, I think they had to do
17 something similar and arrived at the same answers.
18         So -- but, no, I mean there was no -- no
19 other statistical package used.  That kind of
20 calculation can be done by hand.
21     Q   How would -- how would I, if I'm looking
22 at your report, identify which studies you
23 actually calculated the odds ratio or relative
24 risk that you input into your meta-analyses?
25     A   I -- I -- I'd have to look at it at

20  (Pages 74 to 77)

Jack Siemiatycki, Ph.D.

Page 78

1  lunchtime, if you don't mind, and see if there was
2  one.
3        There was one. I don't know if that was
4  retained in the end or if -- I'm sorry. It's --
5        Q   When you say you don't know if a study
6  was retained in the end, are there studies that
7  you considered including in your meta-analysis and
8  ultimately did not?
9        A   Only if they didn't provide evidence on
10  the relationship between talcum powder used in the
11  perineal area and ovarian cancer.
12        Q   All right. If you wouldn't mind looking
13  at that at lunch, we will come back --
14        A   Yes. Thank you.
15        Q   -- to that after the lunch break.
16        THE WITNESS: Someone make a note for
17  me.
18  BY MS. BRANSCOME:
19        Q   Did you --
20        MS. PARFITT: Yes, a note.
21  BY MS. BRANSCOME:
22        Q   Did you personally conduct the
23  meta-analysis that was performed as part of your
24  2018 report?
25        A   No, I did not do the --

Page 79

1        Q   Who did that?
2        A   My student.
3        Q   And what is your student's name?
4        A   Mengting, M-E-N-G-T-I-N-G, Xu, X-U.
5        Q   And -- and what are -- is it Mr. or
6  Dr. Xu?
7        A   It's -- she's a Ph.D. student at the
8  moment. She will be a doctor.
9        Q   What are her qualifications for
10  conducting a meta-analysis?
11        A   She is very skilled at statistical
12  analyses and at -- at computer packages. I'm not
13  sure if she's taken a course in meta-analysis
14  specifically, but it's not rocket science to do
15  that with a package like the one we have.
16        Q   Did you verify that the meta-analysis
17  was performed correctly using the software?
18        A   I looked at the results in various ways
19  to assure myself that everything looked good. By
20  looking good, I mean that there was internal
21  coherence, like she carried out many different
22  meta-analyses under different conditions and --
23  not different conditions, but including some
24  studies and excluding studies -- these are called
25  sensitivity analyses -- and the pattern of results

Page 80

1  from one to another was perfectly in line with
2  what I would expect.
3        Furthermore, the results that we
4  obtained are almost identical to the results that
5  others have independently obtained doing
6  meta-analyses on these topics using basically the
7  same studies. Sometimes the difference of --
8  minor differences of which result from each study
9  they selected, but basically the results are so
10  similar that I'm confident that there was no
11  glitch.
12        Q   Did you save the results of these
13  sensitivity analyses?
14        A   Do you mean the output from the computer
15  software for each one? Is that what you're --
16        Q   Is there any way from the materials that
17  you have produced in connection with your report
18  for someone to replicate the sensitivity analyses
19  that you performed?
20        MS. PARFITT: Objection. Form.
21        THE WITNESS: Well -- I reproduced in
22  the report a few plots of -- that come straight
23  out of the program. So for those, it's absolutely
24  replicable. Anybody can then go to the package
25  and put -- punch in the same input, and they'll --

Page 81

1  they'll get the same output. For the -- I didn't
2  do that for every single sensitivity analysis,
3  just for economy -- to save the reader the burden
4  of that. But I'm pretty sure -- I'm pretty sure
5  that Mengting kept files of each of those
6  analyses.
7  BY MS. BRANSCOME:
8        Q   Did anyone else -- you mentioned a
9  research assistant helped you with PubMed
10  searches. Who was the research assistant?
11        A   She's a woman, who was with me for 30
12  years or so, who was basically the bibliographic
13  expert in our team and helped people find articles
14  and do things necessary, like PubMed searches and
15  so on. So she -- while she was here -- she
16  retired a year or so ago. While she was here, I
17  asked her to look at the ovarian cancer/talc
18  thing, and she dug out some -- she found some
19  articles for me.
20        Q   Is that Sally Campbell?
21        A   Yes, it is.
22        Q   Okay. After Ms. Campbell retired, did
23  anyone else help you perform literature searches?
24        A   Not in a routine way for sure. If I
25  wanted to find a specific article that I knew

21 (Pages 78 to 81)

Jack Siemiatycki, Ph.D.

Page 82

1  about, I would typically ask my student Mengting
2  to dig it out and print it for me.
3      Q   So in addition to Ms. Campbell and
4  Ms. Xu --
5      A   Xu, yes.
6      Q   -- did anyone else help prepare the
7  materials that are in your 2018 report?
8      A   Yes.  So I have another research
9  assistant who's been with me even longer than
10 Sally Campbell, who retired a month ago, and her
11 name is Lesley Richardson.  And she set up and
12 maintained the database system in which we
13 integrated all of the results that are in that
14 addendum that I provided you, and that involved
15 reviewing each article and taking every single
16 result and plugging it into this software.
17     Q   Did Ms. Richardson exercise any of her
18 own judgment in selecting which data to include in
19 the meta-analyses?
20     A   The instruction was to extract
21 everything.  Simple instructions can become
22 difficult in operation.  And some of the
23 frustration in this area and some of the reason
24 why there is some variability in which studies and
25 which results are included in different

Page 83

1  meta-analyses occur because authors are sometimes
2  cryptic about what they say about their data and
3  their results.  And specifically things like what
4  kind of talc use a certain table describes is not
5  always perfectly clear.
6          And so she would need to make a judgment
7  sometimes as to whether this result pertained to
8  all use of talc in the perineal area or only
9  powdering, excluding sanitary napkins or other --
10 sometimes it -- there's ambiguity in the write-up
11 of these things that therefore requires --
12 required some judgment on her part.  And several
13 of these things she would ask my opinion about,
14 and we would discuss it and say, Well, it looks
15 like this or it looks like that, and let's go with
16 this interpretation.
17     Q   Okay.  And at the end of the day,
18 despite receiving help from others in developing
19 your 2018 report, do you personally stand behind
20 everything that is in the report?
21     A   Yes.  Barring more typos.  I know that
22 every time I look at anything I've ever written
23 or, you know, things that are expressed not in the
24 most clear way.  But, yes, I stand behind
25 everything.

Page 84

1      Q   Okay.  And you mentioned reviewing the
2  materials that came out in connection with Health
3  Canada and the Taher manuscript, and we'll talk
4  about that in more detail, but did anything you
5  reviewed since the production of your 2018 report,
6  has any of that changed your opinions or any of
7  the information that is contained in your MDL
8  report?
9      A   It doesn't really change anything.  I
10 would say that the Health Canada report reinforces
11 the notion that this issue is becoming a front
12 burner issue for public health agencies.  But
13 it -- since I don't explicitly address that
14 question in my report, I would say it doesn't
15 change anything that's in my report.
16     Q   Do you intend to offer expert opinions
17 about the different positions of the different
18 public agencies and the relative importance of a
19 potential connection between talc and ovarian
20 cancer?
21         MS. PARFITT:  Objection.  Form.
22         THE WITNESS:  Did I intend -- while
23 writing my report, do you mean, to make -- no.  I
24 don't think that those agencies and those
25 positions necessarily reflect the most up-to-date

Page 85

1  science, and I think the most up-to-date science
2  is in the science community through publications
3  and so on, and public health policies tend to lag
4  behind scientific knowledge.
5  BY MS. BRANSCOME:
6      Q   Are there instances where public health
7  policies are more conservative than the scientific
8  literature out of sort of a principle of
9  precaution?
10         MS. PARFITT:  Objection.  Form.
11         THE WITNESS:  Sorry, I'm not sure I
12 understand the question.
13 BY MS. BRANSCOME:
14     Q   Sure.
15         Are there examples where the public
16 health policy is actually, for instance, more
17 protective than the science might support because
18 the public health agency is exercising an
19 abundance of caution?
20         MS. PARFITT:  Objection.  Form.
21         THE WITNESS:  I -- I believe so.  I
22 mean, I've not done any kind of survey of how
23 public health policy in, you know, Sweden over
24 Argentina or everywhere -- you're talking about
25 generally in the world public health or are you

22 (Pages 82 to 85)

Jack Siemiatycki, Ph.D.

Page 86

1　talking about United States or -- but I -- I
2　imagine there are instances like that, and I think
3　there is a strand in public health to be
4　precautionary in developing policies. But I'm not
5　sure it's universal. I just don't know.
6　BY MS. BRANSCOME:
7　　　Q　You have a References section in your
8　report. It begins at page 109, if you need to
9　refer to it.
10　　　How did you maintain all of the
11　documents that are identified under that list?
12　It's quite voluminous.
13　　　A　So let me --
14　　　Q　And by that, I mean did you keep hard
15　copies? Do you keep electronic copies?
16　　　A　Okay. So the first thing I'll point out
17　is that I deliberately didn't call it a reference
18　section. You'll see that it's called a
19　Bibliography.
20　　　Q　Could you turn to page 109 in your
21　report.
22　　　A　That -- that's where I am.
23　　　Q　Could you turn to the page right before
24　that.
25　　　A　Oh. Ah, yes, I see that.

Page 87

1　　　Q　What is the page -- you have that as
2　page 108?
3　　　A　Yes, I have that page with the word
4　"References" on page 108. Section 16.
5　　　Q　Perhaps we could check at the break. My
6　page numbering got off of yours at some point.
7　　　A　Okay.
8　　　Q　But in any event, you do have a
9　Section 16 that's titled "References," correct?
10　　　A　Yes. Yes, I do. I do.
11　　　Okay. My -- my conscious volition was
12　to call this a bibliography, and the word
13　"references" got in -- into the heading of this
14　section.
15　　　And the reason for that distinction is
16　that I have not -- not everything that is listed
17　is referred to in the text of my report. So
18　technically speaking, a reference section should
19　be those materials that you refer to in your
20　report. And this is not what I have here. And
21　that's why I -- consciously I wanted to call this
22　a bibliography, and somehow the word "references"
23　got -- when they -- when we were compiling it --
24　anyways.
25　　　Q　Okay. So my question again --

Page 88

1　　　A　So, yeah, yeah.
2　　　Q　-- Dr. Siemiatycki, is how -- how do you
3　maintain all of the documents that are listed in
4　your reference section? Do you main hard copies?
5　Do you keep electronic copies?
6　　　A　It's a bit of a mix and match of
7　electronic and hard copies. And these are all the
8　materials that were collected over the years, you
9　know, I would say from the beginning of my
10　involvement in the previous trial and so on, that
11　concern talc and ovarian cancer, including
12　materials that were provided by the lawyers and
13　materials that we found.
14　　　I prefer to work with paper -- I prefer
15　to read paper, but at a certain point, that gets
16　overwhelming, and the material -- I can't tell you
17　right now for sure that everything here is -- that
18　I have it electronically in a file or that I have
19　it in paper.
20　　　Q　There are different sections of your
21　References section. You have Bibliography Part A,
22　B, so on and so forth. Who made the decision of
23　which articles or documents fell into which of
24　the -- of each category?
25　　　A　I -- I guess I made it, but it was

Page 89

1　pretty self-evident. The material in Part A is
2　material that is generally publicly available.
3　It's easy to identify that. And the materials in
4　Part B is material that is not publicly available.
5　And all of that came from the lawyers, I think.
6　　　Q　So that was going to be one of my
7　questions. Did all of the materials identified in
8　Bibliography Part B come to you from plaintiffs'
9　counsel?
10　　　A　Okay. So let me look through this
11　quickly.
12　　　MS. PARFITT: Mm-hmm. Go ahead.
13　　　THE WITNESS: (Peruses document.)
14　　　I think so. I -- I think all of it came
15　from plaintiffs' counsel.
16　BY MS. BRANSCOME:
17　　　Q　I'm not going to ask you about all of
18　these, but I noticed on page, at least in my copy,
19　135, maybe 134 on yours, there's reference to the
20　Berg v. Johnson & Johnson case.
21　　　Do you see that?
22　　　A　Yes, I see that.
23　　　Q　What relevance is it to you as an
24　epidemiologist evaluating the potential risk of
25　ovarian cancer from perineal use of talc to look

23 (Pages 86 to 89)

Jack Siemiatycki, Ph.D.

Page 90

1  at the final jury instructions, judgment, and
2  verdict form from the Berg case?
3      A  I'm not sure.  I relied on plaintiffs'
4  counsel to decide what they thought it would be
5  pertinent for me to be aware of.  So these were
6  documents that they thought would be pertinent for
7  me to -- to be aware of, and I can't say why, and
8  I don't remember -- frankly, I don't remember
9  these documents.
10      Q   As a scientist, do you typically
11  consider jury instructions in forming an opinion
12  with respect to risk of the use of a product in
13  epidemiology?
14          MS. PARFITT:  Objection.
15          THE WITNESS:  Outside of a legal -- no,
16  we wouldn't have access to it or -- no, it never
17  comes up.
18  BY MS. BRANSCOME:
19      Q   As you sit here today, can you come up
20  with any reason why the jury instructions in a
21  case would be relevant to you in evaluating the
22  question you were asked to answer, which is
23  whether or not there is a risk of ovarian cancer
24  from the perineal use of talc?
25          MS. PARFITT:  Objection.  Form.

Page 91

1          THE WITNESS:  You're asking me to
2  speculate as to why plaintiffs' counsel would have
3  sent this to me?
4  BY MS. BRANSCOME:
5      Q   I'm asking --
6      A  Is that what you're asking?
7      Q   I'm asking if you, as the scientist
8  whose name is on this expert report, can you think
9  of any reason why that would be informative to you
10  as a scientist?
11      A  If I had it in front of me, I might
12  recognize something in there that would make it
13  relevant.  But I -- I don't know what is typically
14  in such jury instructions.  I don't know how --
15  what the sweep is of those things.  I'm just not
16  sure.  So I -- I can't answer the question.
17      Q   As you sit here today, do you recall
18  reading the final jury instructions from Berg --
19      A  I don't --
20      Q   -- v. Johnson & Johnson?
21      A  I don't actually recall reading it.
22      Q   Okay.  So is there any way for someone
23  reviewing your report to identify which of these
24  documents you, Dr. Siemiatycki, found relevant and

Page 92

1  informative of your opinions?
2      A   No.  There's no way for anyone else to
3  know that.
4      Q   Okay.  Did you ask plaintiffs' counsel
5  for specific company documents, using that term
6  loosely, to refer to documents that are kept
7  internally within the various companies at issue
8  in this litigation?
9      A   I asked to be sent any information they
10  had about the composition of talcum powder
11  products, historically as well as currently, but
12  actually mainly historic -- I was mainly
13  interested to know what was the history of the
14  composition of talcum powder products.
15          And so many of these materials that they
16  sent me -- and I can't tell you which ones because
17  I don't identify them with these obscure numbers,
18  they don't mean anything to me -- but some of them
19  dealt with internal company documents or internal
20  reports that discussed different types of talc --
21  of powdering products, whether talc products or
22  cornstarch products in different eras, when they
23  started and when, what the market share was in
24  different eras.  So I was interested in that to
25  get a sense of what were the women exposed to who

Page 93

1  were part of these epidemiologic studies.
2      Q   Do you rely on any of the information
3  that you obtained from documents in Part B of your
4  reference list as a basis for forming your expert
5  opinion in the MDL?
6      A   No.  No.
7      Q   Have you viewed any of the deposition
8  transcripts of the depositions that have been
9  taken in the MDL?
10      A   I have looked at a few of them.
11      Q   And which deposition transcripts have
12  you reviewed?
13      A   Plunkett, McTiernan, is it?  And Singh.
14  Not fully -- not the entire transcripts, but
15  portions thereof.  Blount.  I've seen excerpts
16  from, is it, Hopkins?  And a table from Pier, but
17  not the full text.  I didn't review the full text
18  -- transcript.  There may be one or two more, and
19  I can't recall right now.
20      Q   Okay.  Focussing specifically on the
21  expert deposition transcripts from the MDL, did
22  you ask specifically for Drs. Plunkett, McTiernan
23  and Singh's deposition transcripts?
24      A   I didn't know who the other experts
25  were, so I didn't ask for them by name.  And I

Jack Siemiatycki, Ph.D.

Page 94

1  think that I asked if they could share with me
2  transcripts of depositions and reports. So I also
3  had some of the reports from those experts. I'm
4  not sure I had all of them but at least some of
5  them.
6      Q  Well, what materials had you reviewed
7  with respect to other experts in the MDL before
8  you completed your report that we've marked as
9  Exhibit 10?
10     A  None. All of what I've just described
11  was after I completed my report.
12     Q  Did you rely on the work or opinions of
13  any other expert witnesses in forming your own
14  opinions in the MDL?
15     A  No, I don't think I did.
16     Q  So understanding that more depositions
17  have been taken than just Drs. Plunkett, McTiernan
18  and Singh, what specifically was your request to
19  plaintiffs' counsel for which deposition
20  transcripts you would like to see?
21         MS. PARFITT: Objection. Asked and
22  answered, form.
23         THE WITNESS: I'm not sure if my request
24  was to see the ones that they thought were most
25  relevant to -- to me or whether I specifically

Page 95

1  said the epidemiology ones, but I think probably
2  the former, because they sent me, for example,
3  Dr. Plunkett, who is not an epidemiologist. Yeah.
4  BY MS. BRANSCOME:
5      Q  Which expert reports have you reviewed
6  that are from the MDL?
7      A  I looked at the Plunkett report. I
8  think I looked at the Singh and the McTiernan
9  report. But just dipping into it, not -- not
10 reading it fully. Yeah.
11     Q  Any other reports?
12     A  Not that I recall offhand.
13     Q  Okay. The Blount transcript, the
14 Hopkins transcript, and the table from Julie
15 Pier's deposition, were those items that were
16 provided to you by plaintiffs' counsel?
17     A  Yes.
18     Q  Did you request them specifically or
19 were they simply given to you?
20         MS. PARFITT: Objection. Form.
21         THE WITNESS: I requested them to
22 provide me with information that would help me to
23 understand the issue. And one of the issues that
24 has come up in the past few months was the issue
25 of asbestos in talcum powder products, and I think

Page 96

1  I specifically asked at some point to be provided
2  with information that would inform on the presence
3  of asbestos fibers in talcum powder products.
4  BY MS. BRANSCOME:
5      Q  Did you review that material before
6  completing your MDL report?
7         MS. PARFITT: Do you understand the
8  question?
9         THE WITNESS: Yeah.
10         Yes, I think I did look at that before
11 completing my report.
12 BY MS. BRANSCOME:
13     Q  When you say the asbestos is an issue
14 that has come up in the last few months, what do
15 you mean by that?
16     A  Well, my understanding back in 2016,
17 '17, was that while asbestos had been detected in
18 talcum powder products as far back as the '70s --
19 1970s, there was an industry directive or promise
20 or instruction that they would somehow get rid of
21 the problem of asbestos contamination.
22     Q  And what was your basis for that
23 understanding?
24     A  I guess things I've read, and possibly
25 in some of the company documents, possibly in

Page 97

1  publications. I think there have been various
2  publications that have said so that have -- and I
3  can't right now point to those, but that for the
4  last 10 or 20 years have said that asbestos
5  contamination may have been a problem up to the
6  1970s, but that the industry has basically managed
7  to eliminate that contamination. So I've read
8  that, and it seemed to be repeated often enough
9  that I came to take it as a fact.
10         And then I received some -- I guess I
11 received some reports from plaintiffs' counsel of
12 some new studies carried out more recently in
13 the -- by Longo and his team, and some others, put
14 in question whether asbestos fibers were present
15 in talcum powder products. And so this caused me
16 to revisit that whole thing.
17         My opinions offered in 2016, '17, about
18 talc and ovarian cancer were premised on the
19 assumption that whereas there may have been some
20 contamination up to the 1970s, it was basically a
21 nonissue after the 1970s. So the opinions I
22 expressed in -- in 2016, '17, were independent of
23 any hypotheses about asbestos in talc.
24         When I saw the reports from Longo and
25 maybe others in the fall -- I think it was in the

Jack Siemiatycki, Ph.D.

Page 98

1  fall of 2018, I specifically asked counsel to
2  provide me with other information that they had,
3  and I made a point of saying, you know, Are there
4  studies that contradict these -- is there evidence
5  that contradicts these evidence -- these claims of
6  asbestos contamination? And they sent me some
7  material at that point.
8      Q  Okay. The work that Dr. Longo had
9  conducted with respect to analyzing talcum powder
10 products, to your knowledge, has that ever been
11 published?
12     A  I'm not sure. I -- to my knowledge, no,
13 but maybe it has been. I don't know.
14     Q  Okay. What were you -- when you
15 referred to the study that Dr. Longo conducted,
16 what -- are you referring to the work that he has
17 done in connection with litigation on behalf of
18 plaintiffs' counsel?
19     A  I'm referring to a few reports that I
20 think are dated or -- not -- 2017, 2018. I guess
21 they're connected to litigation, but I'm -- I'm
22 not absolutely certain of that. But those are --
23 that's what I'm referring to.
24     Q  Separate and apart from your role as an
25 expert witness, when you're evaluating a

Page 99

1  scientific question, do you typically consult
2  expert reports that are generated for purposes of
3  litigation?
4      MS. PARFITT: Objection. Form.
5      THE WITNESS: I would -- if I had
6  access -- I mean, usually we don't know about such
7  reports if we're not in the litigation process.
8  So it's a hypothetical question, I guess. It --
9  it just doesn't come up in reality that I would be
10 looking at carcinogenicity of diesel engine
11 emissions, and I would have access to reports
12 produced in litigation that are not published.
13 I -- I don't know that I -- I wouldn't have access
14 to such information unless I was part of the
15 litigation. But...
16 BY MS. BRANSCOME:
17     Q  Okay. When you're evaluating scientific
18 literature, do you place a different amount of
19 weight on a study that has been peer reviewed as
20 compared to one that has not?
21     A  Yes, it's one of the considerations.
22     Q  Okay. And --
23     A  There -- there are many considerations
24 that I weigh, including my knowledge of and
25 evaluation of the skill and reputation and quality

Page 100

1  of the investigators. I know many of the people
2  in the area that I work in, and I can -- often
3  have a gut feeling about the quality of their
4  work.
5      Q  Do you know anything about Dr. Longo's
6  qualifications such that you could render an
7  opinion about the quality of his work?
8      A  It's in a different area than mine, so
9  the answer is I -- I couldn't render an opinion
10 about it.
11     Q  When you asked for evidence that might
12 contradict the work that Dr. Longo had done in
13 connection with litigation, what specifically were
14 you provided by plaintiffs' counsel?
15     A  I'm sorry, without digging around and
16 looking at e-mail exchanges, offhand I can't tell
17 you. I was provided with a batch of -- of
18 documents. I can't remember how many were on one
19 side or the other side. I remember there -- well,
20 in my report I refer to a few pieces of evidence
21 that -- yes. So -- can I -- well, on page 30 in
22 my copy --
23     Q  Okay.
24     MS. PARFITT: Why don't you give the
25 category, the title.

Page 101

1      THE WITNESS: Oh, the -- so it's in
2  Section 5.3.2, "What were women exposed to in body
3  powders?"
4  BY MS. BRANSCOME:
5      Q  Were you provided, for example, with the
6  expert reports generated by the expert retained by
7  Johnson & Johnson and Imerys to rebut Dr. Longo's
8  report?
9      A  Can you give me the author's name or --
10     Q  Sure. Were you provided any reports by
11 Dr. Matthew Sanchez?
12     A  I don't recall. I don't recall that.
13     Q  Are you offering an expert opinion about
14 the contents of any of the talcum powder products
15 sold or manufactured by Johnson & Johnson?
16     A  I only take note of what has been
17 provided in the various documents I have access
18 to.
19     Q  What does that mean?
20     A  It means -- can I read the sentence?
21 Basically, I think it summarizes what I mean. And
22 I'll start -- so I'll start on the sentence that
23 on my copy is on the bottom of page 29, still in
24 that Section 5.3.2.
25     "So representatives of the industry have

26 (Pages 98 to 101)

Jack Siemiatycki, Ph.D.

Page 102

1  claimed that talcum powders were free of asbestos
2  fibers since the 1980s" -- and there are a couple
3  of references there --
4       MS. PARFITT: Read them.
5       THE WITNESS: "Hopkins 2018, Pier 2018.
6  -- "but this assertion has increasingly
7  come under doubt as a number of labs have reported
8  finding asbestos fibers in talcum powder
9  products." And it references Blount, '91;
10 Paoletti, '84; Gordon, 2014; Longo, et al., 2017
11 and 2018; Blount deposition, 2018; Pier
12 deposition, 2018.
13      "These various studies that have
14 reported finding asbestos in historic talcum
15 powder samples have been challenged by other
16 reports that failed to find meaningful amounts of
17 asbestos in historic talcum powder samples." And
18 the two citations are CIR 2013 and Anderson 2017.
19 BY MS. BRANSCOME:
20     Q  So what I'm trying to understand,
21 Dr. Siemiatycki, is what role this information
22 plays in your opinions, if any.
23     A  Not much. You know, I would say that
24 the -- my opinions about the association are
25 driven by the strength and consistency of the

Page 103

1  epidemiologic evidence. And this information
2  about asbestos contamination of talcum powder
3  products would be capable of moving the dial in
4  the direction of increasing my belief that there
5  is a causal assoc- -- a causal relationship, if it
6  is demonstrated that there were in fact asbestos
7  fibers contaminating.
8       So if it is shown that they are present,
9  that would increase my level of belief. If it is
10 not shown, if it is not demonstrated, it would not
11 detract from my finding based on the epidemiologic
12 evidence. It could move the dial in one
13 direction. It wouldn't move the dial in another,
14 because there -- there are different conceivable
15 ways that talcum powder products could increase
16 the risk of ovarian cancer. This is one. I'm not
17 capable of adjudicating whether this one is
18 correct or not.
19     Q  So as you sit here today,
20 Dr. Siemiatycki, do you have an opinion to a
21 reasonable degree of scientific certainty that
22 there are in fact contaminants like asbestos or
23 heavy metals in Johnson & Johnson's talcum powder
24 products?
25      MS. PARFITT: Objection. Form. Asked

Page 104

1  and answered.
2       THE WITNESS: You know, I would say the
3  sentences that I read summarize my opinion on that
4  question.
5  BY MS. BRANSCOME:
6       Q  So in your opinion, is it -- is it a
7  question for debate in the scientific community at
8  the moment?
9       MS. PARFITT: Objection. Form.
10 Misstates his testimony.
11      THE WITNESS: It's not an area in which
12 I feel confident to pronounce that the issue has
13 been resolved or not.
14      MS. BRANSCOME: Is now a good time for a
15 break? I don't now how long --
16      MR. TISI: We've been going about an
17 hour and 25 minutes.
18      MS. PARFITT: We have lunch at 1:00, and
19 I don't think it's here.
20      (A discussion was held off the record.)
21      MS. BRANSCOME: We can go off the
22 record.
23      THE VIDEOGRAPHER: This ends disc number
24 in the deposition of Jack Siemiatycki. We're
25 going off the record at 12:42 p.m.

Page 105

1       (Lunch recess.)
2       THE VIDEOGRAPHER: This begins disc
3  number 3 in the deposition of Jack Siemiatycki.
4  We're going back on the record at 1:46 p.m.
5  BY MS. BRANSCOME:
6       Q  Good afternoon, Dr. Siemiatycki.
7       Did you have a chance to look at the
8  various subjects we were going to return to after
9  the lunch break?
10     A  I did.
11     Q  Okay. So we'll take them one at a time.
12     A  Yes, please.
13     Q  Let's start first with, did you identify
14 the document that you had been provided by
15 plaintiffs' counsel that you said you took out all
16 but about 20 pages that you found relevant?
17     A  Right. So I -- I think I mentioned the
18 IARC monographs as being two of them, and I think
19 the third one was the Reference Manual on
20 Scientific Evidence. There was a huge pack of
21 pages that were sent to me, and I took out most of
22 them, but I retained some that I thought were
23 relevant.
24     Q  What portions of the Reference Manual on
25 Scientific Evidence did you retain?

27 (Pages 102 to 105)

Jack Siemiatycki, Ph.D.

Page 106

1  A  I think it was the Epidemiology section
2  and maybe the Statistics section.
3  Q  All right.  During the break, you were
4  also going to check which of the epidemiological
5  studies that you included in your meta-analysis.
6  Did you or someone at your direction
7  independently calculate an odds ratio or relative
8  risk figure that was not published in the report
9  itself?
10  A  Sorry, what?  That was not published in
11  the original report.  So I'm not sure.  The answer
12  is in the time I had available, I couldn't really
13  identify anything like that, and I'm not sure if
14  that occurred at all, and it -- the impact of
15  that, if -- if it had occurred, would have been
16  negligible.
17  Q  If --
18  A  It would have meant -- I'm sorry.  It
19  would have meant that most likely I added -- I put
20  together a two-by-two table by aggregating across
21  two or three or four levels of exposure.  If -- if
22  it had happened, I think that's what would have
23  happened.  And the impact of that would be to
24  produce an odds ratio estimate that is not
25  adjusted for the covariates that they adjusted for

Page 107

1  in their analysis by the categories of dose or
2  whatever they adjusted for.
3  Q  Is there any way by examining your 2018
4  report and the addendum that an outside reader
5  could determine which studies, if any, were
6  subject to this independent calculation?
7  A  So the one thing I didn't check during
8  the break was whether there's a note in the
9  addendum, and it would take me a while, I'd have
10  to go through each study and see if there's any
11  notation in the margin that would indicate that
12  this was done.  So I -- I -- I'm not sure of the
13  answer to your question.
14  Q  If an adjustment like that or an
15  independent calculation had been done, would it be
16  your expectation that a notation would have been
17  made in the addendum?
18  A  Yes.  Yes.
19  Q  All right.  Did you look at anything
20  else over the lunch break?
21  A  Well, we looked to see -- the page --
22  pagination discrepancy between the different
23  versions, and I think Ms. Parfitt could fill you
24  in on -- or maybe she has.  I don't know.
25  MS. PARFITT:  No.  No, I haven't.  I

Page 108

1  think what it is, we've got the signature page on
2  the one report, and then the one he has in his
3  binder appears to not have a signature page on it,
4  and the font seems to be -- when the signature
5  page was put in, the font was slightly larger,
6  which sort of throws off the page numbers.  Same
7  report.
8  MS. BRANSCOME:  So what I would --
9  MS. PARFITT:  Single --
10  MS. BRANSCOME:  -- request so that we
11  keep the record clean going forward and not every
12  question has to say page 108 in mine and page 107
13  in your copy is that we actually mark the version
14  of the report that has been produced to us as
15  Exhibit 11 -- well, let me just, Ms. Parfitt,
16  would you be comfortable marking his copy as
17  Exhibit 11 and switching them and putting the new
18  clean copy as Exhibit 10?  I'm only thinking that
19  there are many prior questions --
20  MS. PARFITT:  Sure, I'm fine with that.
21  MS. BRANSCOME:  -- that refer to his
22  report --
23  MS. PARFITT:  As long as his --
24  MS. BRANSCOME:  -- as Exhibit 10.
25  MS. PARFITT:  Yeah, and just so the

Page 109

1  record is clear, and what appears to have happened
2  is there was a signature page that was put on the
3  report to represent the matter was filed in the
4  United States District Court, the District of New
5  Jersey, in light of the prior report that was in a
6  state court, and that has thrown off not only the
7  page numbers but I think even it might have been a
8  different font.
9  Sure, so we will put on --
10  THE WITNESS:  So do you want to modify
11  the -- this?
12  MS. PARFITT:  Sure.  I think what we're
13  going to do is the one that Dr. Siemiatycki has
14  brought will be now Exhibit 11, and the one that's
15  in -- on the thumb drive and --
16  MS. BRANSCOME:  It is tab 3 in the
17  binder in front of you will be the correct
18  Exhibit 10.
19  MS. PARFITT:  And this will be
20  Exhibit 11.
21  MR. TISI:  And Exhibit 11 will be his
22  copy, the one that he brought.
23  MS. PARFITT:  And this will be 3 -- 3,
24  correct?
25  MS. BRANSCOME:  11 -- I mean 10.  It's

28 (Pages 106 to 109)

Jack Siemiatycki, Ph.D.

Page 110

1   tab 3.
2         MS. PARFITT: 11 -- 10. Tab 3, correct.
3         (Exhibit No. 11 was marked for
4         identification.)
5   BY MS. BRANSCOME:
6         Q   So, Dr. Siemiatycki, can you confirm
7   that Exhibit 10 is a complete copy of your report
8   that was submitted in the MDL? It is a clean copy
9   and does not contain any annotations.
10        A   Yes.
11        Q   Can you also confirm that what we have
12  now marked as Exhibit 11 is the copy of your MDL
13  report that you brought with you here today? It
14  does contain handwritten annotations and the page
15  numbers are just slightly misaligned.
16        A   Yes.
17        Q   Okay. So if you could, in Exhibit --
18  oh, there was one other --
19        A   There was one other, and -- and there's
20  another -- yet another one that I -- a correction
21  to be made, a small one.
22        So do you want to point out what that --
23        Q   Yes. So, Dr. Siemiatycki, do you have
24  any corrections that you would like to make to
25  your report at this time?

Page 111

1         A   So the one outstanding one that we had
2   highlighted -- or we've gone through the three of
3   them.
4         MS. PARFITT: 45.
5         THE WITNESS: Have we --
6         MS. PARFITT: No, 45. Page --
7         MR. TISI: No, 47. 45.
8         MS. PARFITT: Page 45. Excuse me, it's
9   47.
10        THE WITNESS: Oh, yes, that -- the
11  question of whether that sentence should refer to
12  Berge or Terry on that page. It's Berge 2018, not
13  Terry. I was right the first time.
14        MS. PARFITT: Oh, and it is page 45,
15  just for the record. It is not 47. That was the
16  first correction is on page 45.
17        THE WITNESS: In this version.
18  BY MS. BRANSCOME:
19        Q   So just to be clear, Dr. Siemiatycki, on
20  the third line of page 45 of Exhibit 10, the
21  reference to Terry 2013 in the sentence beginning
22  with the word "while" should in fact be Berge
23  2018?
24        A   Yes.
25        Q   Do you have any other corrections you

Page 112

1   would like to make at this time?
2         A   Yes. I'd like to make one -- oh, yes.
3   Well, page 72 in this version.
4         MS. PARFITT: Just refer to the exhibit
5   number, so 11.
6         THE WITNESS: Exhibit 11, page 72,
7   Table 2. Table 2 of the report.
8   BY MS. BRANSCOME:
9         Q   What is the correction you would like to
10  make?
11        A   The correction is -- there's a column
12  called "Included in main meta-analysis," and I
13  think in your copy, as in mine in this version,
14  there are a bunch of question marks. In the
15  original Word document that I submitted, these
16  were not question marks. They were tick marks,
17  checkmarks. And somehow in the translation of
18  Word to PDF, this -- the tick mark -- the tick
19  marks got changed to these funny little question
20  marks. So they should all be tick marks.
21        Q   Are there any other corrections you
22  would like to make to your report?
23        A   Not that I'm aware of at this time.
24        Q   Okay. So if you could turn to
25  Exhibit 10 -- which is in front of you there -- if

Page 113

1   you could turn to your Conclusion section. It
2   should be on page 69.
3         A   Yes.
4         Q   You state in the second paragraph below
5   the Conclusion section that: "Based on the
6   totality of the evidence, it is my opinion to a
7   reasonable degree of scientific certainty that the
8   perineal use of talcum powder products can cause
9   ovarian cancer."
10        First, did I read that correctly?
11        A   Yes, you did.
12        Q   Does that conclusion accurately
13  summarize your opinion in this case as to whether
14  or not perineal use of talcum powder can cause
15  ovarian cancer?
16        A   Yes, it does.
17        Q   You state that your opinion is to a
18  reasonable degree of scientific certainty,
19  correct?
20        A   Correct.
21        Q   Is that a phrase that you have ever used
22  in a scientific publication?
23        A   I don't think so.
24        Q   Why did you use it here?
25        A   I've seen this phrase used in all of the

29 (Pages 110 to 113)

Jack Siemiatycki, Ph.D.

Page 114

```
 1    expert opinions in the legal cases that I've seen,
 2    and I inferred that it's a -- a formula that is
 3    de rigueur in legal communications for this sort
 4    of thing.
 5         Q   When you say "to a reasonable degree of
 6    scientific certainty," what do you mean by that
 7    phrase?
 8         A   So my -- you know, I think somewhere
 9    else in the document, I -- I phrase it in a way
10    that I'm comfortable with, which is a way that
11    also is sort of derivative from my understanding
12    of legal jargon and precedence.  I think that it's
13    more likely than not that there is a causal
14    relationship.
15         Q   You anticipated where I was going with
16    my question.  Do those two sentences mean anything
17    different to you?
18         A   No.
19         Q   What is your understanding of "more
20    likely than not"?
21         A   From a strictly mathematical point of
22    view, it implies that I feel that there's greater
23    than 50 percent probability that this thesis is
24    true.  And I wouldn't put a more quantitative
25    meaning onto it.
```

Page 115

```
 1         Q   Is your opinion that perineal use of
 2    talcum powder products can cause ovarian cancer,
 3    is it specific to a single brand or manufacturer
 4    of talcum powder?
 5         A   No, it isn't.
 6         Q   Why not?
 7         A   Because as I understand it, the
 8    epidemiologic evidence that supports the thesis of
 9    a causal relationship is derived from evidence
10    among women who used all types of talcum powder
11    products that were available in their consumer
12    area of purchase of these products.  And whatever
13    was the frequency distribution of different
14    manufacturers and types of powdering that were
15    available in the consumer -- various consumer
16    markets were the types that lead to the overall
17    inference about causality, and there's no way for
18    me to parse out which particular manufacturer
19    would have been more or less responsible for any
20    of this.
21         Q   If in fact, and we're just talking
22    hypothetically, the biological mechanism by which
23    some talcum powder products can cause ovarian
24    cancer is related to a contaminant in that talcum
25    powder product, does the epidemiological evidence
```

Page 116

```
 1    that exists today enable a scientist to parse that
 2    out?
 3              MS. PARFITT: Objection. Form.
 4              THE WITNESS: I'm not sure I understand
 5    the premise of the question, the "if" part.
 6    BY MS. BRANSCOME:
 7         Q   Okay.  So if the biological mechanism by
 8    which a talcum powder product can cause ovarian
 9    cancer is because of a particular contaminant in
10    that talcum powder product, but that contaminant
11    does not exist in all talcum powder products,
12    would the epidemiological evidence that exists
13    today allow you to see that distinction?
14              MS. PARFITT: Objection. Form.
15              THE WITNESS: The epidemiologic evidence
16    as -- as it exists today would not allow one to
17    parse out anything about the particular
18    manufacturer, the particular product, if I
19    understand your question correctly.
20    BY MS. BRANSCOME:
21         Q   And so therefore, the epidemiological
22    evidence as it exists today does not have a level
23    of detail by which someone reviewing that data
24    could determine if there were different
25    contaminants present in different talcum powder
```

Page 117

```
 1    products that were used by individuals who
 2    developed ovarian cancer --
 3              MS. PARFITT: Objection. Form.
 4    BY MS. BRANSCOME:
 5         Q   -- correct?
 6              MS. PARFITT: Objection. Form.
 7              THE WITNESS: May I read the --
 8              MS. PARFITT: Yes, you can.
 9    BY MS. BRANSCOME:
10         Q   Of course.
11         A   Just to make sure I understand.
12    (Peruses document.)
13              So I -- I don't think that the
14    epidemiological evidence would allow you to
15    attribute causality to a specific type or -- or
16    not.  If one knew -- if part of your hypothetical
17    is the knowledge of what the constituents were of
18    different products in different markets, and
19    the biological mechanism has been established to a
20    high degree of certainty, there might be some room
21    for making inferences about this.  But that seems
22    like a tenuous possibility.
23         Q   But you agree that the current
24    epidemiological evidence as it exists does not
25    enable someone to distinguish between brands of
```

30 (Pages 114 to 117)

Jack Siemiatycki, Ph.D.

Page 118

1    cosmetic talc products, for example?
2        MS. PARFITT: Objection. Form.
3        THE WITNESS: I don't think it does.
4    BY MS. BRANSCOME:
5        Q    Does -- is your opinion that perineal
6    use of talcum powder products can cause ovarian
7    cancer, is that limited to talcum powder products
8    manufactured during a certain time period?
9        A    The evidence as it exists today pertains
10   to products manufactured over half a century,
11   roughly speaking, so I don't think that there's
12   any way to link it to products manufactured in a
13   particular time period.
14           In -- in answer to that question,
15   actually, and to the previous one, hypothetically,
16   one might imagine looking at the different
17   study -- the 30-odd studies that have been carried
18   out in different communities and different cities
19   and different countries, and if one could obtain
20   reliable, reasonably precise and time relevant
21   information on market shares of products in
22   different markets at different times, that could
23   give a first approximation of whether certain
24   company products are more closely linked to the
25   excesses that are seen in the epidemiological

Page 119

1    studies.
2        Q    The application, though, of a market
3    share analysis to the users of talcum powder
4    products, if you're looking at causality, would
5    require that the individuals who developed ovarian
6    cancer had purchased their talcum powder according
7    to the market share, correct?
8        MS. PARFITT: Objection. Form.
9        THE WITNESS: Approximately, yes.
10   BY MS. BRANSCOME:
11       Q    So, for example, if one type of talcum
12   powder product or one time period of talcum powder
13   product is the only type that actually causes
14   ovarian cancer, so all of the positives were
15   derived from those users, you -- you could not
16   determine that simply by applying market share,
17   for example?
18       MS. PARFITT: Objection. Form.
19       THE WITNESS: That -- that's true,
20   except in the circumstance that market share were
21   very, very high in most of the communities that
22   have been investigated. So if one company
23   produced 90 percent or 85 percent or something of
24   the product in a certain area -- that was consumed
25   in a certain area, and there's an excess risk of

Page 120

1    ovarian cancer in that area, it would be
2    improbable that the product of that company were
3    not part of the responsibility, but one of the
4    companies that produced 5 or 10 percent of the
5    market share.
6    BY MS. BRANSCOME:
7        Q    Okay. But as you sit here today, based
8    on the analysis that you have done, you are not
9    able to draw an opinion specifically about an
10   increased risk of ovarian cancer that is tied to a
11   particular brand or a particular time period,
12   correct?
13       MS. PARFITT: Objection. Form.
14       THE WITNESS: That's correct, in part
15   because I don't have data on market share at
16   different times and in different places.
17   BY MS. BRANSCOME:
18       Q    Okay. In forming your opinion that
19   perineal talc use can cause ovarian cancer, did
20   you reach an opinion about how much talcum powder
21   is needed to cause ovarian cancer?
22       A    No.
23       Q    Is there an amount of talcum powder that
24   can be used perineally without increasing a risk
25   for ovarian cancer?

Page 121

1        A    So let me go back to the previous
2    question, and clarify what do you mean by amount?
3    Do you mean like the amount in grams? The amount
4    in number of applications? The amount in number
5    of day -- days on which the powder is applied?
6    These are all different metrics of exposure, and
7    the answer might depend on what kind of -- you
8    know, we're starting with these studies. There
9    are now some hints about the dose-response
10   relationship and what kind of levels of exposure
11   in terms of number of applications in use,
12   observable excess risks.
13       Q    So let me ask it this way: Did you
14   calculate how much talcum powder is needed to
15   cause ovarian cancer in any of the forms, be it
16   frequency of application, the amount in grams that
17   was used?
18       A    I --
19       MS. PARFITT: Objection. Form.
20       THE WITNESS: I did not carry out such a
21   calculation. I'm -- my emphasis was on
22   determining whether there's a dose-response
23   relationship. Going beyond that might involve
24   trying to quantify the dose-response relationship
25   to the extent of determining what the shape of

31 (Pages 118 to 121)

Jack Siemiatycki, Ph.D.

Page 122

1  such a relationship is and how the curve looks,
2  whether there's a threshold effect, and so on.
3  But I don't think there's enough data now to be
4  able to make such estimates.
5  BY MS. BRANSCOME:
6      Q  Can you rule out the possibility that
7  there is a threshold below which perineal use of
8  talc presents no risk of ovary -- of ovarian
9  cancer?
10     MS. PARFITT:  Objection.  Form.
11     THE WITNESS:  No, I -- I don't think --
12  I can't, and I don't think it's possible to do
13  that with most carcinogens.  It's -- it's an
14  extremely difficult and controversial issue of how
15  to detect sort of a minimum level of exposure
16  produces a carcinogenic effect.
17  BY MS. BRANSCOME:
18     Q  In your view, has a dose-response
19  relationship for the perineal application of talc
20  and the development of ovarian cancer been
21  established in the scientific literature?
22     A  My view is that the data are certainly
23  compatible with the notion of a dose-response
24  relationship.  It -- it trends in that direction
25  of that conclusion.  It's not definitive yet.

Page 123

1  It's not definitive.  But I believe the bulk of
2  the evidence, especially from the Terry study and
3  partly from, I think it's the, Schildkraut study,
4  which are the most powerful ones for that
5  question, but certainly the Terry study is by far
6  the most important one, does tend to indicate
7  dose-response relationship.
8      Q  Is the data that exists today also
9  compatible with no dose-response relationship?
10     MS. PARFITT:  Objection.  Form.
11     THE WITNESS:  Yes.  It could be -- in
12  other words, it could be a chance finding.  Is --
13  that's what you're saying.  I think it's unlikely,
14  but it's -- it can't be ruled out.
15  BY MS. BRANSCOME:
16     Q  Are you offering an expert opinion that
17  the inhalation of talc increases or presents any
18  risk of ovarian cancer?
19     A  I -- I don't have an opinion on -- on
20  that.  No.
21     Q  Aside from your participation in the
22  IARC panel in 2006 and the Langseth article on
23  2008, has all of your work on talc and ovarian
24  cancer been in connection with litigation?
25     A  On talc and -- sorry, work on talc and

Page 124

1  ovarian cancer, is that the question?  Almost.
2  But the one qualification I would make in
3  answering that question is that I have a colleague
4  who started working with -- in my academic
5  department about 12 years ago, and she was
6  interested in ovarian cancer as a topic of
7  research, and she wanted to organize a case-
8  control study of ovarian cancer in relation to
9  various factors, and she asked me to kind of
10  mentor her -- she was just starting out -- mentor
11  her in getting grants, in setting up the study,
12  and this sort of thing, and this is what I did
13  with her.
14     So I worked on grant applications with
15  her on some aspects of setting up her study, and
16  that has been going on now for -- I don't know --
17  I think since 2010 maybe that she started.  So --
18  but that has not -- I've been what we call a
19  coinvestigator on that project, not a principal
20  investigator.
21     But apart from that, the next stage in
22  my involvement with talc and ovarian cancer was in
23  the litigation.
24     Q  What is your colleague's name?
25     A  Anita Koushik.

Page 125

1      Q  If you had to give me your best
2  estimate, how many hours total have you spent
3  assisting her with the case-control study?
4      MS. PARFITT:  Objection.  Form,
5  misstates his testimony.
6      THE WITNESS:  It's very hard to answer
7  that.  I mean, ten years ago discussions over
8  coffee about studies and how to write grant
9  applications and reviewing and revising and so on.
10  I -- I don't -- not a trivial amount and not an
11  overwhelming amount.
12  BY MS. BRANSCOME:
13     Q  When was the last time that you spent
14  hours in connection with that case-control study?
15     MS. PARFITT:  Objection.  Form.
16     THE WITNESS:  There was a manuscript
17  that came -- a publication that came from that
18  study.  It was -- the study was only completed in
19  the field, the data collection, around two years
20  ago, and spending a year cleaning data and so on,
21  and then starting to analyze it.
22     And there was an analysis of
23  reproductive and hormonal factors in relation to
24  ovarian cancer, and I helped her review and revise
25  that manuscript.  That would have been a year and

32 (Pages 122 to 125)

Jack Siemiatycki, Ph.D.

Page 126

1  a half ago or so, and I don't know, maybe I spent
2  three or four days on it at the time.
3  BY MS. BRANSCOME:
4      Q   Did that study reach any conclusions
5  with respect to a potential link between perineal
6  use of talc and ovarian cancer?
7      A   The talc information was collected in
8  the questionnaire and has not yet been analyzed.
9      Q   Other than what we just discussed with
10  respect to the case-control study and then your
11  work in connection with the IARC panel and the
12  Langseth paper, have you ever done any original
13  research on the association between perineal
14  talcum powder use and ovarian cancer?
15      A   No.  No, I haven't.
16          It's common -- it's common for me to be
17  asked to review information on which I have not
18  directly worked.  You know, topics.  You know, I
19  recently was asked by the government of France to
20  evaluate a problem of possible cancer risks
21  related to a pesticide that's used in the banana
22  industry in Guadeloupe and Martinique.  I've never
23  studied that pesticide and I've never been to
24  Martinique.  But the kind of expertise that I have
25  can be applied to studying different sorts of

Page 127

1  problems.
2      Q   You have not published the meta-analyses
3  that you -- meta-analysis you performed in
4  connection with the MDL, have you?
5      A   No, I haven't.
6      Q   Have you ever published in any peer-
7  reviewed article the opinion that the perineal use
8  of talcum powder can cause ovarian cancer?
9      A   I -- I've never had occasion to opine
10  about this in any publication, and one doesn't
11  just announce to the New England Journal of
12  Medicine that you want to, you know, write an
13  article about opining about something like this.
14  There has to be some sort of platform basis of
15  research evaluation and so on.
16          And my involvement in this case might
17  lead to such a publication, but in the past I
18  would have not -- I had no reason to publish or to
19  try to publish such an opinion.
20      Q   But you had formed an opinion with
21  respect to the perineal use of talcum powder and
22  an increased risk of ovarian cancer at the time
23  that you published your report in October of 2016.
24          And by "published," I mean within the
25  litigation context, correct?

Page 128

1      A   That's correct.
2      Q   Have you done anything since 2016 to
3  publicly announce your view that the perineal use
4  of talc can cause ovarian cancer?
5      A   No, I've not had really an opportunity.
6  And in a way the -- the publication by Berge,
7  which appeared as a -- after I completed my
8  meta-analyses, and they -- they kind of beat me to
9  the punch with one type of publication output that
10  I might have produced.  So I'm thinking about
11  different ways of communicating my results and my
12  opinions, but mainly my results.
13          I mean, the other part of the answer
14  to -- another part of the answer to your question
15  is that I'm not particularly a fan of individual
16  scientists going into press with opinions before
17  some sort of consensus starts to appear.  I mean,
18  you can -- you can publish hypotheses and ideas,
19  but proclaiming conclusions is something that
20  should come later in the scientific process.  I
21  mean, I -- I think it's best if IARC or an agency
22  like IARC would take on that role, and that would
23  be my hope actually.
24      Q   In your opinion, has consensus formed
25  that peri- -- perineal use of talc can cause

Page 129

1  ovarian cancer?
2      A   I think among people who have reviewed
3  the evidence who -- sort of competent scientists
4  who have reviewed the evidence, I think there's
5  starting to be a ground swell of consensus about
6  it.  You know, I've never done a survey, so I
7  can't say if it's majority or minority.
8          If your denominator is all medical
9  researchers, then the answer is, well, most of
10  them have never heard of this issue, so it's
11  not -- they wouldn't be susceptible to holding
12  such an opinion.  But among the people who have
13  reviewed, are familiar with the issues, I think
14  there's certainly a much higher level of
15  receptivity to this thesis than there was ten
16  years ago.
17      Q   Has a consensus been reached that
18  perineal use of talc probably causes ovarian
19  cancer?
20          MS. PARFITT:  Objection.  Asked and
21  answered.  Form.
22          THE WITNESS:  I can't answer that
23  question.  I -- it's too -- are you trying to make
24  the distinction between probably and -- I -- so --
25  BY MS. BRANSCOME:

33 (Pages 126 to 129)

Jack Siemiatycki, Ph.D.

Page 130

1      Q   Well, what do you understand the phrase
2   "can cause ovarian cancer" to mean?
3      A   Well, it's a synonym with "is a risk
4   factor for" or -- that's how I understand it.
5      Q   All right.  And is that in your mind the
6   same as "it probably causes cancer"?
7          MS. PARFITT: Objection.  Form.
8          THE WITNESS:  "It probably can cause,"
9   is that what you said, or "probably does cause"?
10  BY MS. BRANSCOME:
11     Q   Probably does cause.
12     A   So I don't think any risk factor can be
13  described as -- in a way with the wording "does
14  cause."  You know, smoking does not cause lung
15  cancer.  It can cause lung cancer when there's a
16  constellation of other favorable circumstances.
17  You know, this is part of multifactorial causation
18  of disease.  So, you know, each factor in itself
19  is not the cause, but it's part of a constellation
20  of factors that together can cause the disease.
21  So each of them can cause the disease.
22     Q   So -- you -- you state in your report
23  that -- let me see if I can get the exact
24  language.
25          And perhaps you can get me there more

Page 131

1   quickly.  You talk about that now you would give a
2   different rating under the IARC standard.
3          Ah, here we go.  Page 67 in your 2018
4   report.  You state: "It is now my professional
5   opinion based on the totality of the evidence,
6   that to a reasonable degree of scientific
7   certainty, the causal relationship between
8   perineal talc powder exposure and ovarian cancer
9   is," quote, "probable."
10         Did I read that correctly?
11     A   You did.
12     Q   Do you hold that opinion?
13     A   Yes, I do.
14     Q   What do you mean when you say a "causal
15  relationship between perineal talc powder exposure
16  and ovarian cancer is," quote, "probable"?
17     A   I mean it's more likely than not.
18     Q   Okay.  Has a consensus been reached in
19  the scientific community, understanding we're
20  looking at those who have an interest in this
21  issue, been reached that the causal relationship
22  between perineal talc powder and ovarian cancer is
23  probable?
24         MS. PARFITT: Objection.  Form, asked
25  and answered.

Page 132

1          THE WITNESS:  I don't know -- I haven't
2   carried out a survey among people.  I don't know
3   whether a consensus has been reached.  I don't
4   know what proportion of that community would
5   subscribe to this point of view or not.
6   BY MS. BRANSCOME:
7      Q   Okay.  Setting aside conducting a survey
8   of individuals in the scientific community, would
9   you say that the scientific literature reflects a
10  consensus that the causal relationship between
11  perineal talc powder exposure and ovarian cancer
12  is probable?
13         MS. PARFITT: Objection.  Form.
14         THE WITNESS:  I think the scientific
15  literature supports that conclusion.  I'm not sure
16  that it reflects it.
17         So there's kind of a lag period between
18  the production of research findings and the
19  consens- -- a consensus building around it and
20  being expressed in print.  You know, if we take
21  sort of the classic smoking and lung cancer
22  historical example, evidence was accumulating
23  rapidly in the 1950s.  There were several studies
24  through the 1950s and early 1960s, and it was only
25  in 1964, so many years after some of this evidence

Page 133

1   had been published and been accepted by many
2   scientists, but rejected by others -- there was
3   still controversy around it -- that the Surgeon
4   General's report reflected and created a
5   consensus.
6   BY MS. BRANSCOME:
7      Q   So in early 2019, are we still in the
8   lag period or the period in which the production
9   of research findings is still behind consensus
10  building in the literature?
11         MS. PARFITT: Objection.  Form,
12  misstates his testimony.
13         THE WITNESS:  Does that mean I should
14  answer or --
15         MS. PARFITT:  I'm objecting.  I said it
16  misstates your prior testimony.
17         THE WITNESS:  Okay.  Sorry.  Let me read
18  the question again. (Peruses monitor.)
19         So I can't point to hallmark
20  publications analogous to the Surgeon General's
21  report for smoking and lung cancer that would
22  reflect such a bend in the road kind of general
23  perception of the talc ovarian cancer issue.  It
24  doesn't mean that the evidence isn't there, but
25  the process of recognizing and generalizing and so

34 (Pages 130 to 133)

Jack Siemiatycki, Ph.D.

Page 134

1  on is not -- has not been achieved yet.
2  BY MS. BRANSCOME:
3      Q   Okay. Have you ever given a lecture,
4  either to students or to other scientists, in
5  which you have presented your view that the
6  perineal use of talcum powder can cause ovarian
7  cancer?
8      A   I have to my students -- I mean to the
9  students in my department. I teach epidemiologic
10 methods. I don't teach about ovarian cancer. I
11 don't teach about talc. That's not what I'm paid
12 to do. I'm paid to teach about the methodology
13 and the conduct of -- and the interpretation of
14 epidemiologic -- and I've used the talc/ovarian
15 cancer as an example and walked my students
16 through the evidence. So, yes, I have.
17     Q   When did you start teaching that as part
18 of your epidemiological methods course?
19     A   Probably two years ago. As soon as I
20 started gathering the information and synthesizing
21 it, so two -- two or three years ago.
22     Q   Other than presenting to your students
23 your analysis of talc and ovarian cancer as an
24 illustration of an epidemiological method, have
25 you presented your opinion that perineal use of

Page 135

1  talcum powder can cause ovarian cancer in any
2  other context outside of litigation?
3      A   No, I haven't.
4      Q   Have you spoken with other scientists
5  about the issue of whether perineal use of talcum
6  powder can cause ovarian cancer? Setting aside
7  your students.
8      A   Yeah. Yes, I've spoken to -- to
9  colleagues, friends over -- over coffee, over
10 drinks at conferences, you know, what are you up
11 to, what are you doing, and then describe my
12 involvement in this case. And then we dig a
13 little further into, Well, what -- what do you
14 think, and so on. So I -- I have discussed it in
15 that kind of format.
16     Q   Have you ever spoken with any of the
17 authors on any of the papers that you cite in your
18 report about the potential link between perineal
19 use of talc and ovarian cancer?
20     A   I don't think so. I can quickly scroll
21 through the list to see if anything jogs my --
22 yeah -- no, let me --
23     Q   If you can do that quickly, we could do
24 it now, or we can save that for the next break.
25     A   It will take just three minutes, I

Page 136

1  think. (Peruses document.)
2      Q   Okay.
3      A   No, I've never spoken to any of them
4  about -- I -- I crossed paths with Dr. Cramer in
5  Los Angeles for a -- you know, we were in the same
6  hotel. He was leaving, I was coming, that sort of
7  thing, but I don't think we had any substantive
8  discussion, and I can't -- I know some of the
9  others, but I've never spoken to them about this
10 issue.
11     Q   Do you know personally or professionally
12 any of the other plaintiffs' experts in the MDL?
13     A   No, I don't.
14     Q   You were chair of the working group --
15 the IARC Working Group that published the
16 monograph on talc in 2006 -- or, well, that met in
17 2006, and then was subsequently published in 2010,
18 correct?
19     A   That's correct.
20     Q   And there were roughly 20 members of
21 that working group?
22     A   I think so.
23     Q   In 2006, you agreed with the IARC
24 classification of, quote, "possible" describing
25 the relationship between perineal talc use and

Page 137

1  ovarian cancer, correct?
2          MS. PARFITT: Objection. Form.
3          THE WITNESS: That's correct. I could
4  read the exact wording of what "to be" means, but
5  that's the gist of it.
6  BY MS. BRANSCOME:
7      Q   Okay. IARC has not changed its
8  clarification of talc, and specifically with
9  respect to the peri- -- perineal use of talc since
10 it published the 2010 monograph, correct?
11     A   Technically correct, but actually,
12 what -- the correct statement is IARC has not
13 evaluated talc since 2006 -- has not reevaluated.
14 So there are no changes made to IARC evaluations
15 except through a formal complete reevaluation, and
16 there has not been a formal complete reevaluation
17 of talc since the 2006 meeting. So there's no
18 opportunity for IARC to change anything in one
19 direction or another failing another complete
20 evaluation.
21     Q   What, if you know, can initiate a formal
22 complete evaluation of a constituent like talc?
23     A   Well, it comes I think from different
24 sources. I'm not entirely certain. I know that
25 there is now a public process whereby public

35 (Pages 134 to 137)

Jack Siemiatycki, Ph.D.

Page 138

1 parties can write to the monograph program and
2 make suggestions for chemicals to be evaluated.
3 There are -- they get requests from governments.
4 They get requests from groups of scientists. They
5 have their own internal scientific staff that has
6 its antenna out for different problems that arise,
7 and they generally have sort of a five-year
8 program of agents that they are going to evaluate
9 in every -- in the next five-year period.
10    These things are not quick and easy to
11 organize, and so there's a lot of lead time.
12 There's a lot of, in a way, competition for agents
13 to get onto the list to be evaluated. There are a
14 lot of interested parties that would like the
15 agent that they are exposed to or the "et cetera"
16 to be evaluated. So the exact mechanics of how
17 they make decisions, I haven't been involved in
18 that process, but that's, roughly speaking, how
19 it's done.
20    Q   Have you ever submitted a request to
21 IARC for them to conduct a complete evaluation of
22 talc?
23    A   Have I ever?
24    Q   Have you since the publication of the
25 monograph in 2010 submitted a request to IARC for

Page 139

1 them to conduct another complete evaluation of
2 talc?
3    A   I had a quick word with the director of
4 the monograph program a few months ago, and I
5 suggested it might be time for that. But I'm
6 intending to submit a more formal request along
7 those lines. So...
8    Q   Okay. Who -- who specifically did you
9 speak with a few months ago?
10    A   The director of the monograph program is
11 Kurt Straif, S-T-R-A-I-F.
12    Q   And how did you have occasion to be
13 speaking with the director?
14    A   We're acquaintances, and I met him at a
15 conference in August, I saw him when I was in Lyon
16 in November at a meeting that he organized. So
17 I've seen him a few times in the last six months.
18    Q   When did you have this conversation with
19 the director?
20    A   I think it was in the summer.
21    Q   So the summer of 2018?
22    A   Yeah.
23    Q   And what specifically did you discuss
24 with him?
25    A   I -- I think it might have been a one

Page 140

1 sentence -- you know, in the context of a
2 conversation about many things, as we do when we
3 catch up when we meet. What -- you know, what's
4 on the agenda for the monograph program? By the
5 way, I think talc might be an interesting thing to
6 put on a list for you to consider. And probably
7 the conversation ended -- that part of the
8 conversation ended and moved on to other things.
9 But...
10    MR. KLATT: Should we take a break?
11    MS. BRANSCOME: I understand the noise,
12 but I -- I don't know that Dr. Siemiatycki was
13 finished with his answer.
14    MS. PARFITT: We'll keep going. I
15 didn't -- I was trying to keep a clean record for
16 you. That's fine. Keep going.
17    MS. BRANSCOME: Well, we -- we can
18 pause. I just was trying to let him finish his
19 answer.
20    MS. PARFITT: We'll keep it paused here
21 on the screen. Just a little bit more activity.
22    THE VIDEOGRAPHER: We will pause for a
23 second. We're going off the record, 2:41 a.m. --
24 p.m.
25    (Pause.)

Page 141

1    THE VIDEOGRAPHER: We're going back on
2 the record at 2:43 p.m.
3 BY MS. BRANSCOME:
4    Q   When you spoke with the director of the
5 monograph program for IARC last summer, did you
6 inform him that you have been serving as an expert
7 witness on behalf of plaintiffs in litigation
8 involving talcum powder products and the claim
9 that they cause ovarian cancer?
10    A   I'm not sure if I told him at that time,
11 but I certainly have told him since then.
12    Q   When you were talking to him about the
13 possibility of including talc in a formal,
14 complete evaluation subsequent to the one that was
15 done in 2006 and published in 2010, did you tell
16 him anything about your opinions with respect to
17 the likelihood that perineal use of talc can cause
18 ovarian cancer?
19    A   I don't think I did.
20    Q   What did he say about -- if anything,
21 about conducting a formal evaluation of talc?
22    A   I -- I can't remember if he said
23 anything about it.
24    Q   Have you had any conversations with him
25 other than the conversation you had last summer

36 (Pages 138 to 141)

Jack Siemiatycki, Ph.D.

Page 142

1  about IARC conducting another examination of talc
2  and its potential carcino- -- carcinogenicity --
3  whoops, butchered that one -- about it's ability
4  to cause cancer?
5      A   No.  I don't think I did.
6      Q   Now, you said you have an -- you have
7  the intention to submit something formal to IARC;
8  is that correct?
9      A   Yes.  I've been thinking about it, and
10  I -- when I have time, I'll look into the process.
11     Q   What specifically would you request that
12  IARC do at this time with respect to talc?
13     A   Carry out an evaluation like they did in
14  2006 but with up-to-date data.
15     Q   What data specifically do you think an
16  IARC Working Group would need to consider that was
17  not available in 2006?  What are the key pieces of
18  data that you think should be considered by a
19  working group?
20     A   So from an epidemiological database
21  point of view, there have been a number of
22  publications, as you know, since 2006, including
23  some cohort studies, various case-control studies,
24  various meta-analyses, a pooled analysis from the
25  Terry group.  All of that information bears on the

Page 143

1  evaluation of cancer risk.  It -- it may or may
2  not change the view of a working group vis-à-vis
3  the view held by the 2006 working group, but
4  there's enough new information there that it could
5  potentially change points of view.
6          And in the mechanism area, I understand
7  that there has been additional work on various
8  possible areas of -- concerning the migration of
9  particles around the body and how this might
10  influence the -- the biological plausibility of
11  such a -- a process.  The possible role, roles of
12  inflammation or oxidative stress.  There have been
13  developments -- there are new publications in
14  those areas that might influence a new working
15  group or a working group looking at it with new
16  eyes.
17         For all of those reasons, I think it
18  would be timely, and in any case, if a decision
19  were made today to do this, such a meeting would
20  probably not be held before 2022 or 2023 at the
21  earliest.  They have a horizon of priorities that
22  they're working on.  So -- and by then, there
23  would likely be additional work that would be
24  available.
25         So it's an area where I think there is

Page 144

1  sufficient growth in the information base that
2  would justify it.  And the question is whether
3  there are other priorities -- that they have
4  things with even higher priorities for them to
5  look at.
6      Q   We agree the perineal use of talc
7  currently is classified by IARC as a Group 2B
8  chemical, correct?
9      A   Correct.
10     Q   So the classification or the definition
11  of a Group 2A chemical still applies when there is
12  limited evidence of carcinogenicity in humans and
13  then sufficient evidence of carcinogenicity in
14  experimental animals, correct?
15     A   Yes.
16     Q   Has there been developments in the
17  experimental animal data since the IARC Working
18  Group evaluated the risks associated with the
19  perineal use of talc in 2006?
20     A   I'm not aware whether there has been.
21  I -- it does not spring to mind.  I can't think of
22  any examples.
23     Q   Now, I noticed in your report you have a
24  description, it's on page 24, of the different
25  categories that IARC might rate a chemical.

Page 145

1      Do you see where I am?
2      A   Yes, I see where you are.
3      Q   Okay.  And there's a rating system that
4  IARC uses that ranges from 1 to 4, correct?
5      A   Yes.
6      Q   That -- you have indicated here on
7  page 24 on your report that number 4 is not a
8  carcinogen.  Is that accurate?  Is that an
9  accurate description of category 4?
10     A   The wording is longer than that, but
11  this is my potted version of what that longer
12  version means.
13     Q   The actual definition is that it is
14  probably not carcinogenic, correct?
15     A   Correct.
16         MS. BRANSCOME:  Would now be a good time
17  for a break?
18         MS. PARFITT:  I think so.  We can take a
19  break.  Thank you.
20         THE VIDEOGRAPHER:  We are going off the
21  record at 2:51 p.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  This is the beginning
24  disc number 4 in the deposition of Jack
25  Siemiatycki.  We're going back on the record at

37 (Pages 142 to 145)

Jack Siemiatycki, Ph.D.

Page 146

1  3:27 p.m.
2  BY MS. BRANSCOME:
3      Q  Good afternoon, again, Dr. Siemiatycki.
4      A  Hi.
5      Q  Do you still agree with the IARC
6  characterization that the case-control studies
7  evaluating a potential connection between perineal
8  talc powder exposure and ovarian cancer are
9  unusually consistent?
10     A  Unusually -- they're very consistent.
11  I'm not sure I would choose the word "unusually."
12  Sometimes when 20 people write a document,
13  everyone doesn't agree with every word, but they
14  are very consistent.
15     Q  Do you agree with the IARC determination
16  that the excess in risk in those case-control
17  studies is, quote, modest?
18     A  That the what, the increase in risk?
19     Q  Or the excess of risk.
20     A  Yeah, the -- I mean, the terminology
21  around strength of association -- weak, modest,
22  strong, very strong, medium, et cetera -- it
23  doesn't have -- there are no regulations.  There's
24  no epidemiologic handbook that says if a relative
25  risk is in this range, you call it weak or

Page 147

1  moderate and so on and so forth.
2      So the term "moderate" -- actually, the
3  terminology around strength of associations was
4  probably most influenced by the smoking and lung
5  cancer situation in the '50s and '60s where there
6  were relative risks of ten approximately, ten
7  times as high of risk for smokers as for
8  nonsmokers of getting lung cancer, and that was
9  considered a benchmark for strong associations.
10  And it was not known then whether most carcinogens
11  would fall -- most carcinogens that would be
12  discovered later than that era would fall into the
13  category, you know, of relative risks, around ten
14  or around five or around two or whatever.
15      So the -- the use of the terms "strong,"
16  "medium," "weak" has kind of been -- what's the
17  word? -- benchmarked, I guess, by the smoking-lung
18  cancer association.  And things that --
19  subsequently relative risks that were less than in
20  that order of magnitude of ten or so where people
21  didn't refer to them as strong because they were
22  not as strong as smoking and lung cancer.
23      It has subsequently turned out that the
24  level of relative risk for smoking and lung cancer
25  is exceptional among known carcinogens, and that

Page 148

1  this -- there are not many that have such high
2  relative risks.
3      I'm just giving you a bit of background
4  because the terminology is controversial, and I
5  know it plays into the case of how we -- how we
6  characterize the associations around talc and
7  ovarian cancer.
8      There are a lot of associations that are
9  much less than -- with relative risks much lower
10  than ten that are very well accepted as being
11  causal associations.  And so the idea that
12  associations have to be, quote/un- -- quote,
13  strong in the sense that the smoking-lung cancer
14  association was strong is not really tenable any
15  more.  There are so many -- most known carcinogens
16  don't have such strong -- don't have such high
17  relative risks.  So where you draw the line
18  between strong, moderate, weak, and so on, is a
19  kind of -- is a vague notion.
20      If you're asking me how I would
21  characterize it or how it's characterized -- I'm
22  not sure whether you want to go -- to ask how I
23  would characterize it or how it's characterized by
24  other people or --
25     Q  So, respectfully, Dr. Siemiatycki, my

Page 149

1  question was, do you agree with the IARC
2  classification of the increase in risk as, quote,
3  modest?
4      A  So there was no such classification.  It
5  was a word used in a sentence, I guess.  There
6  is -- they never classified the association as
7  being strong, weak, moderate or whatever.  It was
8  part of a narrative about the -- the body of
9  evidence.
10      Do I agree that -- yeah, I would use
11  that term today.
12      I'm sorry if I digressed from your
13  question.
14     Q  You would agree that the point estimate
15  of the meta-analysis that you conducted in 2018
16  that's contained in your report marked Exhibit 10
17  is actually lower than the point estimate that was
18  reported in the Langseth 2008 study, correct?
19     A  That's correct.
20     Q  And the Langseth 2008 paper, the
21  meta-analysis that you and your coauthors
22  conducted resulted in a 1.35 relative risk,
23  correct?
24     A  That's correct.
25     Q  And in Exhibit 10, your report in the

Jack Siemiatycki, Ph.D.

Page 150

1    MDL, the relative risk point for your 2018
2    meta-analysis is 1.28, correct?
3        A   In the 2018 -- yes, that's correct.
4        Q   Is it your opinion -- well, let me just
5    ask you, what classification should perineal use
6    of talc get with respect to ovarian cancer under
7    the IARC scale?
8            MS. PARFITT: Objection. Form.
9            THE WITNESS: I -- I'm very reluctant to
10   answer that question because it takes a lot of
11   input from different disciplines to produce an
12   IARC evaluation and then IARC classification. And
13   I feel it's presumptuous for any one person from
14   one discipline to take on that function.
15           What I can say is that in this
16   situation, the epidemiologic evidence alone is
17   sufficient to make the -- make me think that it's
18   more likely than not that there is a causal
19   association. How that proposition would feed into
20   an IARC evaluation is something that would -- that
21   a multidisciplinary group would need to work out,
22   but I think there's at least enough evidence to
23   say it's more likely than not.
24   BY MS. BRANSCOME:
25       Q   Because you would agree that a work --

Page 151

1    an IARC Working Group, for example, if a former --
2    formal evaluation was done on talc, in order to
3    classify talc as say a Group 2A, that working
4    group would need to consider multiple lines of
5    evidence, correct?
6            MS. PARFITT: Objection. Form.
7            THE WITNESS: That's correct.
8    BY MS. BRANSCOME:
9        Q   And simply the determination, if it were
10   the case that the epidemiological evidence might
11   support the conclusion that perineal use of talc
12   more likely than not can cause ovarian cancer,
13   would not by itself be sufficient for a Group 2A
14   rating. Is that fair?
15           MS. PARFITT: Objection. Form.
16           THE WITNESS: The IARC classification
17   was developed in the 1970s. It was not developed
18   in order to fit into a template that can be used
19   in the courtroom. So terms like "more likely than
20   not" or, you know, whatever terminology would be
21   used in a courtroom around this sort of thing does
22   not fit perfectly on the IARC classification
23   scale.
24           I understand why courts use IARC
25   evaluations as an input to understanding

Page 152

1    causality, but it's not a one-to-one kind of
2    relationship.
3            Now I've lost the thread. I'm sorry.
4    BY MS. BRANSCOME:
5        Q   That's okay. I'm going to ask you the
6    question again.
7            Simply the fact that the epidemiological
8    evidence --
9        A   Yeah.
10       Q   -- may support a conclusion that more
11   likely than not perineal talc use can cause
12   ovarian cancer, that fact alone is not sufficient
13   to result in a Group 2A classification of a
14   chemical under IARC.
15           MS. PARFITT: Objection. Form.
16   BY MS. BRANSCOME:
17       Q   Is that fair?
18       A   It's fair -- in principle, it's a fair
19   statement. My feeling is that if that occurred in
20   a meeting, and if -- you know, in an IARC Working
21   Group, the group is subdivided into four
22   subgroups: Initially, an epidemiology group,
23   animal experimentation group, other biological
24   mechanisms, and then expose -- an exposure group.
25           If the epidemiology group came back, had

Page 153

1    a feeling that there likely -- it was more likely
2    than not that there is a causal association, they
3    have the prerogative to categorize the evidence as
4    being sufficient or limited. And it's not clear
5    how they would categorize the epidemiologic
6    evidence. That would feed into the final
7    evaluation.
8        Q   So you would say, as you sit here today,
9    based on what you know about the epidemiological
10   evidence with respect to the perineal use of talc
11   and ovarian cancer, it's not clear whether that
12   would satisfy the criteria for sufficient evidence
13   of carcinogenicity. Is that fair?
14           MS. PARFITT: Objection. Misstates his
15   testimony.
16           THE WITNESS: For -- for a particular
17   working group. Because the other particularity of
18   the IARC process, as with other -- from high level
19   scientific processes, is that it depends a lot on
20   scientific judgment. There's -- there are
21   guidelines for how to combine animal evidence and
22   basic biology evidence in epidemiology, but all of
23   these guidelines are just models of how the final
24   evaluation might be determined.
25           Each working group is sovereign and can

39 (Pages 150 to 153)

Jack Siemiatycki, Ph.D.

Page 154

1    take the entire body of evidence and make a
2    decision outside the -- the template -- the -- the
3    typical template. So a working group could look
4    at the evidence and decide is it Group 1, it's
5    Group 2B, Group 2A, based on the totality of
6    evidence.
7            In general, if the epidemiology is
8    convincing, it would be Group 1 or Group 2A if
9    it's convincing but not -- or let's say if it's --
10   if it indicates a risk but it's not definitive.
11   BY MS. BRANSCOME:
12      Q   So you would say if the epidemiology
13   indicates a risk but is not definitive, you think
14   there's a possibility a chemical would be
15   classified as Group 1?
16          MS. PARFITT: Objection. Form.
17          THE WITNESS: It depends how close to
18   definitive it is. So if the feeling of the group
19   is that it's almost certain on the basis of
20   epidemiologic evidence, then they could classify
21   it as Group 1, and they would classify the
22   epidemiologic evidence as sufficient in that case.
23   BY MS. BRANSCOME:
24      Q   Okay. On the scale of definitiveness,
25   where would you place the evidence of the perineal

Page 155

1    use of talc and ovarian cancer as of today?
2       A   Based on the epidemiologic evidence.
3       Q   Correct.
4       A   I -- I go back to more likely than not.
5    Not -- not definite, but more likely than not.
6       Q   Is it possible to have a situation where
7    the epidemiological evidence is supportive of a
8    causal association, but the group working on
9    biological mechanism determines that there isn't a
10   sufficient mechanism by which that chemical could
11   have caused that outcome?
12      A   That can happen.
13      Q   And what would the explanation for an
14   inconsistency like that be?
15      A   It would require quite a high level of
16   understanding of the mechanistic evidence.
17          So -- I -- I don't know if it has
18   happened, so I'm -- I'm trying to think through
19   memory whether I can think of any examples. I'm
20   not sure that it has happened.
21          THE VIDEOGRAPHER: Excuse me, Counsel.
22   The microphone just fell.
23          THE WITNESS: Oh, I'm sorry.
24          MS. BRANSCOME: That's okay. You just
25   knocked off your microphone.

Page 156

1            (A discussion was held off the record.)
2    BY MS. BRANSCOME:
3       Q   Do you remember what you were answering
4    or should we --
5       A   I prefer if -- I'm sorry. If you could
6    ask again and --
7       Q   Let me ask it a different way. Is it
8    possible for a confounding variable to essentially
9    infect all of the epidemiology on a particular --
10   looking at a particular causal relationship?
11          MS. PARFITT: Objection. Form.
12          THE WITNESS: It is possible.
13   BY MS. BRANSCOME:
14      Q   Okay. If that were to happen and you
15   see evidence in the epidemiology that shows a
16   consistent increase in risk but there's the
17   potential for a confounding variable, would it be
18   important to look at the potential biological
19   mechanism to see whether or not the agent might be
20   causing the outcome?
21      A   So the confounding factor is -- is a
22   factor that could be captured in epidemiologic
23   studies but hasn't been. Is that what you are
24   alluding to? And the biologic -- but the biologic
25   mechanism that you're referring to would involve

Page 157

1    that confounding factor or is this -- are you --
2    are you confounding "confounding" with -- with
3    biologic mechanism issues?
4       Q   Okay. Let me -- let me give you a
5    specific hypothetical.
6       A   Yes.
7       Q   Okay. So let's say hypothetically, for
8    example, recall bias --
9       A   Okay.
10      Q   -- affects the epidemiology related to
11   looking at the causal relationship, and whether
12   you agree with it or not, but we'll just say
13   hypothetically that affected the epidemiology of
14   talc use and ovarian cancer.
15      A   Can I just interrupt for a
16   terminological thing? So typically we don't refer
17   to recall bias as a confounding factor.
18      Q   Ah.
19      A   We refer to it as a bias, a type of
20   bias, but -- you know, that's just technical, but
21   for the record, if we're going to be discussing
22   this further.
23      Q   I appreciate the clarification.
24      A   Thank you.
25      Q   Well, first of all, let me just ask you,

Jack Siemiatycki, Ph.D.

Page 158

1    is recall bias something that could affect the
2    reliability of conclusions drawn from
3    epidemiological studies that rely on recall to
4    define exposure to the agent?
5        A   Yes, it could, hypothetically.
6        Q   Okay.  Is recall bias something that
7    potentially could affect the epidemiological
8    studies of the perineal use of talc?
9        A   Yes, theoretically, it could.
10       Q   Okay.  In situations where there is a
11   potential bias or a confounding variable that has
12   not been identified, how should epidemiological
13   evidence be evaluated in comparison to the other
14   categories of evidence that are considered, for
15   example, by an IARC Working Group?
16       A   Well, these things would typically be
17   evaluated in a -- a nonquantitative way.  You
18   can't really quantify what is the potential impact
19   of a confounder that you don't know about or that
20   you haven't measured.  It's kind of a theoretical
21   thing.
22           And the same with -- with recall bias
23   where there could be some evidence about it.  And
24   certainly when I reviewed the evidence on this
25   topic, the possibility of recall bias was one of

Page 159

1    the main stumbling blocks to arriving at an
2    opinion, as it was for the IARC panel in 2006.
3    You know, we are all aware of that hypothetical
4    possibility, and we think about whether something
5    of that magnitude -- something like that could
6    artifactually generate an appearance of a relative
7    risk.
8            My own way of dealing with that was to
9    look at the phenomenon of recall bias from the
10   perspective of both my own research, which has
11   mainly involved case-control studies, some cohort
12   studies but mainly case-control studies, and
13   research that I've read about, experienced,
14   reviewed for journals, et cetera.
15           And if the phenomenon of recall bias
16   were sort of a general across-the-board phenomenon
17   that infects and in a way discredits all
18   case-control studies -- interviewing cases, people
19   who are sick people, interviewing people who are
20   well and comparing the responses -- if this were
21   an inherent systemic problem, what we would
22   observe in general would be a plethora of fake
23   excess risks.  Because almost everything you would
24   ask people about, whether it's smoking, alcohol
25   consumption, physical activity, diet, workplace

Page 160

1    exposures, all -- you know, environmental things
2    that they've been exposed to, et cetera, there --
3    there's no reason why exposure to talc would be
4    the one item in epidemiologic questionnaires that
5    would provoke recall bias where nothing else does.
6            So if it's a part of a general
7    phenomenon, this recall bias, which is certainly a
8    hypothetical possibility, we would see that most
9    of the associations that were tested in case-
10   control studies would be found to be high risks,
11   maybe significantly high risks.
12           That's not what we observed.  That's not
13   what I've observed in my research.  I have
14   estimated -- and in the book that I showed this
15   morning, there are literally thousands of odds
16   ratio estimates in there.  But in all of my
17   research on over nearly four decades, I've
18   published a lot of evidence, and I can show some
19   examples, where there's no difference between
20   cases and controls because there is no effect,
21   there's no causal association between the two
22   things, and the case -- although people were --
23   cases were asked about, let's say, alcohol
24   consumption, and controls were asked about alcohol
25   consumptions, the cases didn't overreport.  They

Page 161

1    didn't say, Oh, well, they want to know if this
2    caused my cancer, and therefore I'm going to tell
3    them, yes, I consumed a lot of beer and wine and
4    so on, or smoking or whatever.
5            So we don't see this as a general
6    phenomenon that people overreport -- that cases
7    overreport compared to controls.
8        Q   Have you looked at the phenomenon of
9    recall bias specifically when the agent being
10   investigated is part of public wide -- wide scale
11   litigation?
12           MS. PARFITT:  Object to form.
13           THE WITNESS:  So I haven't personally --
14   let me just think if any of my research has
15   involved situations analogous to that.
16           Yes.  Cell phones and brain cancer.  So
17   I was involved in a large cell phone and brain
18   cancer study, and we asked cases about their use
19   of cell phones, and we asked controls about their
20   use of cell phones.  And while the interpretation
21   of the results of the study were somewhat
22   controversial, there was no generalized phenomenon
23   of cases reporting more cell phone use than
24   controls in that particular study.
25           So that -- I can't think of another

41 (Pages 158 to 161)

Jack Siemiatycki, Ph.D.

Page 162

1  example in my career of sort of one of these
2  generally suspected things. I mean, I've studied
3  a lot of occupational exposures, but those tend to
4  be more obscure, and people don't, you know, have
5  the same visceral reaction maybe to were you
6  exposed to formaldehyde or benzene or this or
7  that.
8  BY MS. BRANSCOME:
9      Q   For purposes of your meta-analysis, you
10 looked at the binary question of ever having used
11 talc and never having used talc, correct?
12     A   Among other -- not only that, but that
13 in addition to, yeah.
14     Q   Yes. For example, you were not -- your
15 data isn't stratified based off of having used it
16 to a certain degree of frequency, correct?
17     A   The -- the meta-analysis, no.
18     Q   Okay.
19     A   I -- I looked at dose-response
20 information within the studies that provided it,
21 but I didn't do any meta-analyses of the -- of the
22 dose-response data.
23     Q   Okay. So I -- I asked you sort of the
24 broad question about what has changed in the
25 scientific literature with respect to perineal use

Page 163

1  of talc since the 2006 IARC Working Group, but I
2  want to point you now sort of specific to what you
3  say in your report and ask you some more detailed
4  questions about what's changed.
5          So if you could turn to page 67 of
6  Exhibit 10 there.
7      A   Yes.
8      Q   Sorry, just one moment. My pencil has
9  died on me. Just give me one second. All right.
10         All right. So you have a Section 9 here
11 that says: "Contrast with IARC monograph and
12 other reviews." Do you see that?
13     A   I do.
14     Q   All right. And you asked the question
15 in your report: "What has changed in the years
16 since the IARC review?" Correct?
17     A   Correct.
18     Q   All right. And you talk about
19 additional studies and scientific literature
20 addressing a variety of topics, including
21 epidemiology, toxicology, molecular biology and
22 mechanistic studies; is that correct?
23     A   Sorry, are -- you're saying that I
24 referred to those domains?
25     Q   Yes.

Page 164

1      A   Yeah.
2      Q   Are those areas in which you contend
3  there is developments in the scientific literature
4  that is relevant to the question of the connection
5  between perineal use of talc and ovarian cancer?
6      A   Yes.
7      Q   Okay. So I just wanted to talk to you
8  about which of those categories you are
9  independently offering an expert opinion as
10 opposed to you are deferring to others. Does that
11 make sense?
12     A   Yes.
13     Q   All right. So you are offering an
14 expert opinion about developments in the
15 epidemiology, correct?
16     A   Correct.
17     Q   Are you testifying as an expert in
18 developments in the scientific literature with
19 respect to toxicology?
20     A   No.
21     Q   Are you testifying as an expert with
22 respect to developments in the scientific
23 literature in molecular biology?
24     A   No. I -- I'm aware that there have been
25 some publications since 2006 in that domain, but

Page 165

1  I'm not offering an opinion about those.
2      Q   Are you offering an opinion with respect
3  to the biological mechanism by which the perineal
4  use of talc may or may not cause ovarian cancer?
5      A   Not an opinion. Again, I'm -- I'm
6  acknowledging that there is new evidence, and I
7  mention some of that, yes.
8      Q   But as an expert, you're not here to
9  opine on the strengths and weaknesses of that
10 evidence or how it might be weighted against other
11 evidence that's in the field related to biological
12 mechanism; is that fair?
13         MS. PARFITT: Objection. Form.
14         THE WITNESS: That's correct.
15 BY MS. BRANSCOME:
16     Q   Okay. Now, you state in your report
17 that: "The various possible biases" -- this is
18 still on page 67 -- "that are on the table remain
19 substantially similar to the ones that were
20 considered by the IARC panel." Correct?
21     A   Correct, I said that.
22     Q   Okay. What are the various possible
23 biases that you refer to there?
24     A   Well, I -- I'd have to go back to the
25 IARC 2006 report to give you a full answer, but I

42 (Pages 162 to 165)

Jack Siemiatycki, Ph.D.

Page 166

1    guess the main things that were highlighted at the
2    time were measurement error, how to assess
3    exposure to talc, and what the impact of
4    measurement error might be on the estimates,
5    recall bias and the possible impact that that
6    might have.
7        Q   What do you mean by "measurement error"?
8        A   Measurement error is closely related to
9    recall bias, but it's not the same thing.
10   Measurement -- recall bias refers to differences
11   between cases and controls in the way they
12   respond.  Measurement error refers to inaccurate
13   recall and reporting, irrespective of whether
14   there are cases and controls.  There can be
15   exactly the same degree of error in -- in recall
16   between cases and controls.
17       So it's not differential.  It's not --
18   it's not a recall bias between the two groups.
19   But if there's error, if some people report high
20   use, and in fact they had medium use and all --
21   all this sort of thing, that impacts the estimates
22   of relative risk -- even though those errors are
23   the same in the cases and controls, that impacts
24   the estimates of relative risk, and that generally
25   impacts it in the direction of attenuating the

Page 167

1    relative risk estimates, lowering them from what
2    they really are.
3        So that's one error -- one type of error
4    that is -- that permeates epidemiology and that is
5    present, and that we have to be conscious of and
6    try to evaluate.
7        Q   Could there be measurement error related
8    to misdiagnoses?
9        A   Yes.
10       Q   And if there was misdiagnoses in the
11   sense that someone was diagnosed with ovarian
12   cancer but in fact had a different form of cancer,
13   that could actually result in an artificially
14   inflated relative risk, correct?
15       MS. PARFITT:  Objection.  Form.
16       THE WITNESS:  So that kind of error in
17   diagnosis has subtly different meaning in the
18   context of a case-control study and a cohort
19   study.  And if -- if you want, I'll -- I could try
20   to answer your question in -- in each context.
21   BY MS. BRANSCOME:
22       Q   Okay.
23       A   So it has an effect in both contexts,
24   but it's a slightly different effect.
25       So in the context of a cohort study, if

Page 168

1    there is error in diagnose -- I guess you -- what
2    you're alluding to -- let me make sure, you're
3    alluding to possible misdiagnosis between
4    mesothelioma and ovarian cancer.  Is that where
5    you're going?
6        Q   That -- that is one possibility, yes.
7        A   So in the case of a -- in this situation
8    of a cohort study, following up a group of women,
9    some of them really get mesotheliomas that are not
10   linked to talc exposure, but those women are
11   classified as ovarian cancers erroneously.
12   They -- that error would have the effect of
13   reducing the apparent risk compared to the real
14   risk of talc and ovarian cancer.  In that context,
15   it would have that effect.
16       In the context of a case-control study,
17   where you start with a group of women who have
18   been diagnosed with ovarian cancer but in truth
19   some of them had peritoneal mesotheliomas, and you
20   compare them to controls, the women who -- and
21   assuming that talc has no effect on peritoneal
22   mesothelioma, which is another assumption to make,
23   but -- but assuming that it does on ovarian
24   cancer, just for the sake of argument, lumping in
25   the mesotheliomas with the ovarian cancer cases

Page 169

1    would again create a reduction in the estimate of
2    relative risk.
3        So in both situations -- I would have to
4    work it out on a pad of paper, but I think in both
5    cases -- and I did write something about this in
6    my report, so if you don't --
7        Q   Feel free to take a look.  Sure.
8        A   -- mind.  Thinking out loud in the
9    middle of a deposition is sometimes harder than
10   thinking out loud at home.  (Peruses document.)
11       So I'm looking at page 57,
12   Section 7.2.5, at the bottom of the page and then
13   going on to the next page, and see if what I said
14   then is -- corresponds roughly to what I just
15   said.
16       I think basically it -- it agrees with
17   what I just said.  Basically the effect would be
18   to attenuate estimates in this situation.
19       Q   So we discussed -- of the various
20   possible biases that might affect the
21   epidemiology, we talked about measurement error,
22   recall bias, diagnostic error.
23       Are there any other potential biases
24   that should be considered when evaluating the
25   epidemiology on the use of talc peritoneally?

Jack Siemiatycki, Ph.D.

Page 170

1    A   Yes.  So I -- I did list a bunch of
2  possible biases in my report.  And one of them --
3  if you don't mind, I'll just go through the titles
4  of the different things that -- starting on
5  page 53.
6          Bias due to nonresponse or
7  nonparticipation.  If you carry out a case-control
8  study, and you get -- you identify a group of a
9  hundred women who are cases, and you ask them to
10 participate and only 50 agree to participate, and
11 the ones who agree to participate happen to be the
12 only ones who used talcum powder, and the other 50
13 that you don't know about never used it, that
14 would be a problem.  And -- but it also depends
15 what happens among the controls.  Among the
16 controls, do you get the same nonresponse bias?
17 So there's a -- that is one possible bias in
18 case-control studies.
19          The second one I listed was recall or
20 reporting bias that we've discussed.
21          The third one is what I call
22 nondifferential or random error, which we
23 discussed.  It's error in reporting that is equal
24 in cases and controls, but it has an impact on
25 relative risk estimates.

Page 171

1          The fourth one, which we haven't
2  discussed, has to do -- it's mainly a problem for
3  cohort studies.  And if you carry out a cohort
4  study of -- focused on cancer, and you collect
5  information about exposure, and then follow them
6  for two years to find out how many of them got
7  cancer, and whether there is a difference between
8  the people who were exposed and the people who are
9  not exposed, well, that would be pretty hopeless
10 because it takes more than two years for cancers
11 to develop and be diagnosed.  So short follow-up
12 periods in cohort studies would be a source of
13 bias in cohort studies.
14          Diagnostic errors, we've just discussed.
15          Initiation of powdering as a result of
16 ovarian cancer, is it possible that some women
17 who -- that there is a statistical association
18 between powdering and ovarian cancer, but it's
19 because the women who get ovarian cancer in the
20 early stages, to relieve symptoms or to deal with
21 discomfort start to use powdering.  And so that is
22 a potential bias.
23          Confounding is the next category, and
24 that's -- it's a huge category of potential
25 distortion that is a little bit different from the

Page 172

1  other biases.  And this is why I corrected you at
2  the beginning when we were talking about
3  confounding and bias.  I mean it's not -- I'm not
4  criticizing you in any way for this.  It's --
5  there is terminological gray zones in
6  epidemiology, so it's not always clear.  But --
7    Q   Would it be fair to describe a
8  confounding variable in the context of ovarian
9  cancer as something that as of now is unknown that
10 makes a particular individual more likely to
11 develop ovarian cancer that also, for whatever
12 reason, makes them more likely to use talcum
13 powder?
14   A   Yes.  That would be a correct
15 interpretation of "confounding."
16   Q   And that is something that should be
17 taken into account in evaluating the epidemi- --
18 epidemiological literature, correct?
19   A   That's correct.
20   Q   And you would agree that the scientific
21 community at large has not yet understood all of
22 the potential factors that might contribute to a
23 susceptibility to develop ovarian cancer, correct?
24      MS. PARFITT:  Objection.  Form.
25      THE WITNESS:  Sorry, I -- I was hearing

Page 173

1  two things with my two ears.
2      MS. PARFITT:  Sorry.
3      THE WITNESS:  Can you repeat the last
4  part?
5  BY MS. BRANSCOME:
6    Q   Yeah.  You would agree that all of the
7  factors that might make someone susceptible to
8  developing ovarian cancer are not currently known.
9    A   That's correct.
10         So are -- are you -- are you getting at
11 the potential impact of confounding as -- from
12 unknown factors as something that hasn't been
13 properly evaluated or that is part of this
14 picture?
15   Q   I am simply asking you --
16   A   Yes.
17   Q   -- questions about your opinions.
18   A   Yes, yeah.
19   Q   But you agree that the possibility of an
20 unknown confounding variable is something that, as
21 an epidemiologist, you would at least consider
22 when looking at the strength of association
23 established by epidemiological studies, correct?
24   A   I would consider it, and I've considered
25 it in the context of this literature, and in my

44 (Pages 170 to 173)

Jack Siemiatycki, Ph.D.

Page 174

1   opinion, it's unlikely that any confounding factor
2   or factors would create the pattern of results
3   that we see.
4           And if I could give you one piece of
5   evidence about why I -- you know, that illustrates
6   why I think that.  A confounding factor can only
7   bias the result by a certain amount; not as strong
8   as its own relationship to the risk factor.
9           So if there's a risk fact- -- if the
10  relative risk that we see around 1.3 -- ballpark,
11  let's for the sake of argument say 1.3 -- is due
12  to a confounding factor, that confounding factor
13  would have to have an association with ovarian
14  cancer much strong -- stronger than 1.3, but much
15  stronger than 1.3.
16          And I can -- just to illustrate that, I
17  actually have a publication -- I think I gave you
18  a copy of that publication of mine that
19  illustrates my own research on occupational causes
20  of cancer --
21          THE VIDEOGRAPHER:  Sorry.
22          THE WITNESS:  Am I again disconnected?
23  Okay.  When I get excited --
24          Yes, that's the one.  If I could --
25          MS. PARFITT:  Make a copy.

Page 175

1           THE WITNESS:  Do you have any copies?
2           MS. PARFITT:  I'm looking to see.
3           THE WITNESS:  So -- well, if I could
4   just read a couple of sentences from the abstract
5   of this, I'll tell you what this is about.  It's
6   a study of --
7   BY MS. BRANSCOME:
8       Q   Could you, please, Dr. Siemiatycki,
9   identify for me --
10      A   Oh.
11      Q   -- what is the paper from which you are
12  reading.
13      A   Yes.  This is a paper called "Degree of
14  confounding bias related to smoking, ethnic group,
15  and socioeconomic status in estimates of the
16  associations between occupation and cancer."
17      Q   Is this something that you cite to or
18  reference anywhere in the report that you
19  submitted in the MDL?
20      A   It's only in my CV, which is I think
21  part of the record.
22      Q   What led you to specially identifying
23  this article, which you seem to have handy today
24  here at the deposition?
25      A   Because I was thinking about how to

Page 176

1   illustrate the potential impact of confounding in
2   this issue of ovarian cancer and talc, and what --
3   to explain why I believe that the excess risks
4   that we observe are unlikely to be explained by
5   confounding.
6       Q   Okay.  You would agree, though, that if
7   there was a confounding variable that had a
8   relationship with, in this case, ovarian cancer
9   that was stronger than 1.3, it could explain an
10  increase of 1.3 associated with the use of talc if
11  it was similarly connected to the use of talcum
12  powder products --
13          MS. PARFITT:  Objection.  Form.
14  BY MS. BRANSCOME:
15      Q   -- correct?
16          MS. PARFITT:  Objection.  Form.
17          THE WITNESS:  Well, one of the points
18  that I want to illustrate is that not only would
19  it have to be stronger than 1.3, it would have to
20  be a lot stronger than 1.3.
21  BY MS. BRANSCOME:
22      Q   How strong would it need to be?
23          MS. PARFITT:  Objection.  Form.
24          THE WITNESS:  I'll answer that by -- by
25  showing you what -- what we found when we were

Page 177

1   examining the associations between different
2   occupations and lung cancer.
3           So occupation and lung cancer, there are
4   some true associations there, as you probably
5   know, but -- and we collected information about
6   people's occupations.  We also collected
7   information about their smoking history, their
8   socioeconomic status, their ethnicity and so on.
9   A lot of factors.
10          But the most important part of this was
11  looking at the association between lung cancer and
12  smoking and -- lung cancer and occupation.  We
13  chose I think 15 occupations, estimated the odds
14  ratios for 15 different associations between
15  occupations and lung cancer, and we controlled for
16  smoking or we didn't control for smoking.  We
17  compared the results when you control for smoking
18  and when you don't compare -- control for smoking.
19  BY MS. BRANSCOME:
20      Q   Respectfully, Dr. Siemiatycki, I only
21  have seven hours to ask you questions.
22      A   Okay.
23      Q   Your -- your -- counsel for the
24  plaintiffs can ask you to fully explain other
25  research that you've done.

45 (Pages 174 to 177)

Jack Siemiatycki, Ph.D.

Page 178

1    A   Okay.
2    Q   It sounds very interesting.
3    A   Thank you.
4    Q   But my question to you is, in your
5  opinion, how strong would an association have to
6  be with a confounding variable in order to play a
7  significant role in a 1.3 relative risk?
8    A   My --
9        MS. PARFITT:  Objection.  Form.
10       THE WITNESS:  -- guess, it would have to
11  be in the order of 3 to 5.  Because it also
12  depends on the association between a talc
13  powdering behavior and this unknown confounder.
14  BY MS. BRANSCOME:
15   Q   Okay.  Are there limitations to
16  performing a meta-analysis?
17       MR. TISI:  Do you want to mark that or
18  no?
19       MS. BRANSCOME:  No.
20       THE WITNESS:  Are there --
21  BY MS. BRANSCOME:
22   Q   -- limitations to performing a
23  meta-analysis?
24   A   I -- I'm not sure what -- like --
25   Q   I believe you referenced earlier that

Page 179

1  you teach a class on epidemiological
2  methodologies; is that correct?
3    A   Yes.
4    Q   Okay.  So presumably, when you teach a
5  class you discuss the strengths and the
6  limitations of different types of analyses.  Fair?
7    A   It comes into the course, yes.
8    Q   Okay.  So in the context of looking at
9  the strengths and the weaknesses of different
10  types of analyses, are there any weaknesses or
11  limitations to a meta-analysis?
12   A   A weakness, okay.  Because the word
13  "limitation" doesn't always mean weaknesses.
14       Meta-analysis depends on having reliable
15  data.  So the basic studies that you use and the
16  basic data that you use in a meta-analysis has to
17  be sufficiently reliable to support a good
18  meta-analysis.
19       The data have to be sufficiently
20  comparable in nature.  So putting apples and
21  oranges and grapes into the same meta-analysis
22  would be a problem.  Different kinds of apples,
23  yes, but different -- et cetera.  So you have to
24  be careful that you're really measuring the same
25  thing, have the same outcomes.

Page 180

1        In -- one of the differences between --
2  as I mentioned earlier, between -- some types of
3  meta-analyses are carried out on clinical trials,
4  in fact, I would say the bulk of meta-analysis is
5  conducted in clinical trials research where the
6  research protocols are really very standardized
7  from one study to another, and that enhances the
8  ability to make inferences from the results of a
9  meta-analysis.
10       In observational epidemiology, this
11  isn't true.  We have very different kinds of study
12  design and problems that arise in different
13  studies, and this leads in itself to variability
14  and heterogeneity.  And it is sometimes imagined
15  that heterogeneity is a reflection -- some sort of
16  a reflection of different risks in different
17  populations or something like that.  It's mainly
18  -- it's at least in part a reflection of the fact
19  that different study designs and different -- just
20  not just the overall architecture of the design,
21  but the implementation, how people were
22  interviewed, what the questions were and so on,
23  influences the results of a study.  That varies
24  from study to study, and that creates
25  heterogeneity.  So --

Page 181

1    Q   Does heterogeneity -- do you want
2  heterogeneity in a meta-analysis?  Is it a good
3  thing or does it weaken the meta-analysis?
4    A   It depends on the purpose of the
5  meta-analysis.  So some meta-analyses have as one
6  of their objectives to identify populations in
7  which the effect of the drug or the -- whatever
8  you're studying is different from one population
9  to another.  That is a situation where you want to
10  identify heterogeneity, and you want to try to
11  target heterogeneity and the different
12  populations, different studies, the different
13  methods of administering medication, or whatever
14  the differences are between studies.
15       In observational epidemiology, it's
16  rarely the case that heterogeneity -- that a
17  formal evaluation of heterogeneity is -- is useful
18  or actionable.  Usually the bottom line result
19  doesn't change.  For example, there are
20  meta-analyses of smoking and lung cancer where the
21  meta-analysis demonstrates heterogeneity of the
22  results.  The results are always between a
23  relative risk of 5 or 6 and a relative risk of 10
24  or 12.
25       Now, for the question of -- for the

46 (Pages 178 to 181)

Jack Siemiatycki, Ph.D.

Page 182

1  qualitative question does smoking cause lung
2  cancer, it really doesn't matter if the relative
3  risk is 5 or 12. So that heterogeneity has
4  absolutely no bearing on the question that is
5  being asked, and the best answer ignore -- would
6  ignore heterogeneity. It doesn't really matter.
7      If you're trying to find out in which
8  populations does smoking have a greater impact,
9  then you might want to say, Okay, let's -- which
10 are the populations where the relative risks were
11 5 and which are populations where the relative
12 risks are 12? Can we identify differences between
13 it? Are they different countries, different
14 ethnic groups, and so on and so forth.
15     So it's a longwinded answer, and I'm not
16 sure if that gets to the question that you were
17 asking.
18     Q   Well, you said in your report -- and
19 it's on page 17, if you want to look at it -- you
20 stated -- it's at the top of the page.
21     A   Yes.
22     Q   "Unless a significant methodological
23 flaw can be identified that has caused the
24 heterogeneity, the best overall estimate remains
25 the meta-estimate."

Page 183

1      Did I read that correctly?
2      A   Yeah. I guess we should read the
3  beginning of the sentence just to -- oh, yes. Oh,
4  yes, I see. Sorry. Yes, I agree with you.
5      Q   So what is the basis for that statement?
6      A   The basis is that it's correct. Are you
7  offering an alternative to this that I should
8  consider?
9      Q   Is there -- I guess my question is, is
10 it -- is it correct because you think it is
11 correct? Or can you point me to something that
12 would support that principle and explain it more
13 fully?
14     A   I -- I haven't looked for any
15 documentary evidence that this has been written up
16 in this way anywhere. I've been interpreting
17 meta-analyses in this way, and I believe this to
18 be true.
19     Q   Okay. So we talked about a few
20 different things that you articulated as potential
21 weaknesses to a meta-analysis. Are there any
22 other weaknesses to a meta-analysis?
23     A   Possibly. Are there any that you can
24 identify? I will be happy to -- you know, I'm
25 just -- to meta-analysis as a concept, I think one

Page 184

1  of the weaknesses is that it is sometimes
2  fetishized, and that people put too much -- you
3  know, have sort of a magical belief in the value
4  of meta-analysis result, which is not justified.
5  Often the results of certain critical studies are
6  as valuable or more valuable than those of a
7  meta-analysis, especially when -- especially in
8  observational epidemiology when it's hard to
9  really identify all of the parameters that
10 influence the quality of a study.
11     And so determining what studies to
12 include and which data from each study to include
13 is tricky. It requires judgment. Those judgments
14 can be wrong. They can be contested. Sometimes
15 one very good study is as powerful, but -- it's
16 part of -- a meta-analysis is part of a package of
17 information that I would look at in evaluating the
18 risks.
19     Q   Okay. You mentioned the concept that a
20 scientific judgment needs to be used in
21 determining what studies and, more specifically,
22 what data within those studies to include in a
23 meta-analysis, correct?
24     A   That's correct.
25     Q   And you would agree that -- and I

Page 185

1  believe you just referenced it -- that there can
2  be errors in judgment in determining what studies
3  to include or not include or what data to include
4  or not include, correct?
5      A   I --
6      MS. PARFITT: Objection. Form.
7      THE WITNESS: I would not characterize
8  these things as errors in judgment. There can be
9  differences in judgment that are legitimate
10 that -- where people, equally well motivated and
11 well trained and experienced, can arrive at
12 different judgments on some of these things.
13 BY MS. BRANSCOME:
14     Q   Did you have a specific methodology that
15 you used in determining which relative risk or
16 odds ratio to include from each of the studies
17 that you include in your meta-analysis?
18     A   Carefully reading the study, carefully
19 reading the tables and the reports of what is in
20 the paper, understanding what is there, and then
21 making a determination on that basis.
22     Q   And those were, to use your words,
23 quote, judgment calls; is that fair?
24     A   Yes.
25     Q   Okay.

47 (Pages 182 to 185)

Jack Siemiatycki, Ph.D.

Page 186

1      A   There is no alternative to judgment in
2  science.
3      Q   The meta-analysis in your MDL report is
4  different than the meta-analysis in your 2016
5  report; is that correct?
6      A   The bottom line result, you're saying?
7  Well, yes, but also in the 2016 report, I
8  presented I think eight different estimates,
9  depending on scenarios of which studies to include
10  and which result from which studies to include,
11  because there were some borderline judgments where
12  I thought the best thing would be just -- just
13  provide all of the different options.
14          In 2018, I adopted a different strategy.
15  I thought, well, the best service I can provide
16  the court is to give my best estimate of which
17  studies and which data to include, and then to
18  provide a set of alternatives that I call
19  sensitivity analyses.  So that's one difference
20  between the two reports.
21      Q   Okay.
22      A   But there were some differences in which
23  studies were included and which result in which
24  studies were included from the one to the other.
25      Q   Well, let me start at the very basic

Page 187

1  level.  Are there any studies that are included in
2  your 2018 meta-analysis that were not available at
3  the time that you did your 2016 meta-analysis?
4      A   I don't think so.
5      Q   Okay.  So you mention that you made some
6  changes to which studies you included and even
7  within that, some of your numbers are slightly
8  different.
9          Can you explain to me what changes you
10  made with respect to which studies to include?
11      A   So somewhere I did the side-by-side
12  comparison, and I don't think I have -- I don't
13  think I have that with me.  So it would take me a
14  bit of time to just compare the two and see how --
15  how they compare.
16      Q   So you generated actually a side-by-side
17  comparison of your 2016 meta-analysis and your
18  2018 meta-analysis?
19      A   Well, of -- of the studies that went
20  into them.  Well, generated is a kind of a
21  highfalutin word.  I listed on a piece of paper,
22  and then I -- beside it I listed the other ones.
23  So I'm pretty sure I did that at some point just
24  to make sure.  If I didn't do it on paper, I did
25  it in my mind.  I wanted to know, you know, what

Page 188

1  is the difference doing it this way or doing it
2  that way.
3      Q   Okay.
4      A   But it's largely overlapped.  I mean,
5  I'll look at it and see if I can quickly recognize
6  which studies might have been --
7      Q   Well, I can point you --
8      A   Okay.  If you've done it, that's great.
9      Q   Yeah.  So you included Green 1997 in
10  your 2016 meta-analysis, correct?
11      A   Yes.
12      Q   And you did not include Green 1997 in
13  your 2018 meta-analysis, correct?
14      A   Correct.
15      Q   Why did you -- did including Green 1997
16  in your earlier report, do you consider that to be
17  a flaw?
18          MS. PARFITT:  Objection to form.
19          THE WITNESS:  I don't consider any of
20  these things flaws.  They were judgment calls, and
21  I -- actually, in that case, I learned in between
22  some information that I didn't know in 2016 that
23  made that decision the right one.
24  BY MS. BRANSCOME:
25      Q   What information did you learn?

Page 189

1      A   Well, a case-control study was carried
2  out in Australia by a team that involved Green and
3  Purdie, and the publication in 1995, I think it
4  was, described their analysis -- sorry, do you
5  want me to stop while you're --
6      Q   Keep going.
7      A   The paper in Purdie 1995, I think it is,
8  described the association between talc and ovarian
9  cancer.  I had that in my database.
10          And I also had -- a couple of years
11  later, there was a paper by Green that was not
12  focused on talc.  It was focused on risks that
13  were related to -- to other -- well, to other
14  gynecological issues in relation to ovarian
15  cancer.  But in there -- in the text, not in
16  any table but in the text, she provided a result
17  on talc and ovarian cancer.
18          Because that paper was published in
19  2000 -- in 1997, the Green, et al., paper, I
20  assumed that that was an extension of the 2000 --
21  of the data that was used for the 1995 paper, and
22  that it actually included more information and
23  more up-to-date information than the 1995 paper
24  published two years earlier.  I had some doubts
25  about that.  But that was the decision I made in

48 (Pages 186 to 189)

Jack Siemiatycki, Ph.D.

Page 190

1  2016. In general, when there were different
2  reports from the same study at different
3  intervals, I took the most recent one as being the
4  more definitive one.
5       When I started analyzing for the 2018
6  report, I had lingering -- I remained with the
7  lingering doubts about the Green study -- the
8  Green report and whether it actually was an
9  updated version of the talc results from 2016 --
10 from my 2016 report.
11      And I wrote to Adele Green, who I know
12 as an acquaintance, not well but enough to write
13 and say, You know, what's going on with these --
14 what was going on with these two papers? Is it
15 the fact that the result -- which one has the most
16 definitive result on talc and ovarian cancer, the
17 earlier one or the more recent one? And she wrote
18 back and said, The earlier one does. That the
19 later one -- and I can't remember the exact
20 explanation, but it had to do with some cases
21 being dropped because of reasons having nothing to
22 do with talc but having to do with other
23 hypotheses that she was examining.
24      So in any case, the two results are
25 identical. So it makes no difference. But that

Page 191

1  is, in answer to your question, why did it change,
2  it wasn't capricious issues. It wasn't wrong. It
3  was the right thing to do.
4       Q   Did you retain copies of the e-mail
5  correspondence that you had with Green?
6       A   I imagine that I did, but I -- this
7  would have been eight months ago maybe or
8  something.
9       Q   Would it be fair to say that you relied
10 on Green's representation of which dataset was
11 more fulsome in determining what to use in your
12 2018 metadata?
13      A   Yes.
14      Q   And that was something she communicated
15 to you by e-mail, correct?
16      A   That's right.
17      MS. BRANSCOME:  We can meet and confer
18 about this offline, but we would request
19 production of those e-mails.
20      MS. PARFITT:  We'll take it under
21 advisement. Thank you.
22      MS. BRANSCOME:  Okay.
23 BY MS. BRANSCOME:
24      Q   Do you agree that in terms of the trend
25 for relative risk, with the addition of newer

Page 192

1  studies over time, the relative risk for the
2  association between peritoneal use of -- I mean
3  perineal use of talc and the development of
4  ovarian cancer has actually gone down?
5       MS. PARFITT:  Objection. Form.
6       THE WITNESS:  I -- I haven't evaluated
7  that, and I have no reason to agree or disagree
8  with it. If you want me to spend a bit of time
9  looking to see if I can --
10 BY MS. BRANSCOME:
11      Q   Well, for example --
12      A   -- confirm or --
13      Q   You are familiar with the Berge 2018
14 paper, correct?
15      A   Yeah, yeah.
16      Q   And the authors in that paper said: "We
17 confirm the trend toward lower overall risk
18 estimates as more evidence accumulated."
19      MS. PARFITT:  Can we get that article in
20 front of him?
21      MS. BRANSCOME:  Of course.
22      MS. PARFITT:  Thank you.
23      MS. BRANSCOME:  It is tab 48.
24      (A discussion was held off the record.)
25      MS. PARFITT:  It's tab 18?

Page 193

1       THE WITNESS:  Tab 48?
2  BY MS. BRANSCOME:
3       Q   Tab 48.
4       A   I don't have a tab 48.
5       Q   It may be in your second binder.
6       A   Oh.
7       MS. PARFITT:  I will take this one out.
8  And I'll take this one for you.
9       THE WITNESS:  Thank you.
10      MS. PARFITT:  Of course.
11      THE WITNESS:  Thank you.
12 BY MS. BRANSCOME:
13      Q   Dr. Siemiatycki, are you familiar with
14 the article that is located there behind tab 48?
15      A   Yes, I am.
16      Q   Berge is the lead author on this
17 publication titled "Genital use of talc and risk
18 of ovarian cancer: A meta-analysis." Correct?
19      A   Yes, correct.
20      Q   I believe earlier you said that Berge
21 "beat you to the punch" might have been the phrase
22 that you used.
23          What did you mean by that?
24      A   If this had never appeared, I might have
25 worked on a manuscript to submit for publication

49 (Pages 190 to 193)

Jack Siemiatycki, Ph.D.

Page 194

1  on my meta-analysis before today, sometime in the
2  past.
3       Q   Do you rely on Berge 2018?
4           MS. BRANSCOME:  Let's go ahead and mark
5  that actually as Exhibit 12.
6           (Exhibit No. 12 was marked for
7           identification.)
8           MR. TISI:  How long have we been going?
9  How long have we been going?
10          MS. BRANSCOME:  Just under five hours.
11          MR. TISI:  No, how long have we been
12  going on this one?
13          MS. BRANSCOME:  We can take a break
14  if -- do you need a break?
15          MR. TISI:  I'm just asking.
16          MS. PARFITT:  Do you want a break?
17          THE WITNESS:  No, let's finish -- let's
18  finish with this.
19          MS. PARFITT:  Okay.
20          (A discussion was held off the record.)
21  BY MS. BRANSCOME:
22       Q   Do you rely in forming your opinions on
23  this case on the Berge article that we just marked
24  as Exhibit 12?
25       A   I formed my opinions before knowing

Page 195

1  about this article.
2       Q   Do you believe that the Berge 2018 study
3  supports the conclusions that you have reached in
4  your own meta-analysis?
5       A   Yes, I think it does.
6       Q   In what way?
7       A   Well, let me preface that also by saying
8  that there's been a bit of a -- a history to this
9  article of -- I thought the publication -- there
10  was a version published in 2017, which I thought
11  was the definitive version that I've always kept
12  in my binders as the Berge article, and it's only
13  very recently that I actually came upon this
14  particular version, which is not greatly changed
15  from the 2017 but slightly changed, and I haven't
16  fully digested the small changes that have been
17  made.
18       Q   If you could -- sorry for the multiple
19  binders, but if you want to look at your first
20  binder, tab 13, we can see if that's the paper
21  that you previously had reviewed as the Berge
22  paper.
23       A   I -- I don't mind answering questions in
24  relation to this version.  Just -- I just wanted
25  to point out that there are a couple of things

Page 196

1  here that I'm -- I haven't fully integrated into
2  my evaluation of this paper.  But I know what's in
3  it.  I know what's the other one.  I know what's
4  in this one.
5       Q   Okay.  So back to my question,
6  Dr. Siemiatycki.
7       A   Yeah.
8       Q   You stated that you believe that the
9  Berge 2018 study supports the conclusions that you
10  have reached in this litigation, and my question
11  to you was, what do you mean by that?
12       A   Well, it supports it in a few ways.
13  One -- and from my point of view, the most
14  important one, but probably not for anyone else --
15  is that they carried out a search of the
16  literature using a much more intensive and -- a
17  much more intensive procedure than I had.  I had
18  full confidence in the procedure that I had used,
19  but it was not as long, as lengthy, as costly, et
20  cetera, et cetera, as what -- and the bottom line
21  was that they didn't find any papers -- relevant
22  papers that I hadn't found.  So I was very
23  reassured by this.
24          The second thing is that the bottom line
25  meta-analysis result -- well, no, the second thing

Page 197

1  is that the actual results that they chose from
2  the different studies were very similar in most
3  cases to the ones I had chosen from the different
4  study.  So there was a degree of corroboration
5  there that I was happy about.
6          They adopted a different strategy in one
7  important respect, and that concerned how to deal
8  with the Terry paper and the various components of
9  the Terry paper.  And with all due respect to this
10  team, I don't think that there -- theirs was in
11  error.  I prefer my approach that maintained the
12  integrity of the pooled analysis, which has some
13  advantages.  But there's -- you know, I wouldn't
14  expect any large differences on the bottom line
15  estimates from their strategy or my strategy.  And
16  the bottom line results were very similar.
17          They -- also in the previous version,
18  their evaluation of dose-response was, in my view,
19  deficient in not devoting adequate weight to what
20  I think is the most important evidence around
21  dose-response in this area, which is the Terry
22  pooled analysis.  They focused on studies which
23  provided results by duration of exposure and by
24  frequency of exposure.  And I think it's the
25  combination of those two which is the most

50 (Pages 194 to 197)

Jack Siemiatycki, Ph.D.

Page 198

1    important metric.
2        And the fact that the Terry analysis was
3    able to combine an enormous dataset for evaluating
4    dose-response, much greater than any of the
5    studies looking at duration or any of the studies
6    looking at frequency, meant that in my view they
7    missed an opportunity to properly evaluate
8    dose-response by cumulative exposure.
9        I note very recently that they have --
10   they've now used a different statistical procedure
11   for evaluating dose-response by duration and
12   frequency, which is embodied in their Table 3,
13   which I don't fully understand.  It seemed -- this
14   was the new part of this study, which I haven't --
15   I looked quickly in the method section to see a
16   description of exactly what they did, and I
17   couldn't find it, but I don't deny that it's
18   somewhere in the article.  I just haven't had time
19   to properly evaluate that part of it.
20       Q   As you sit here today, do you have any
21   criticisms of the statistical analysis that they
22   performed?
23       A   All of it?  You're referring to all of
24   it?  Well, I --
25           MS. PARFITT:  Objection.  Form.

Page 199

1           THE WITNESS:  I note that their bottom
2    line meta-relative risk is lower than the one that
3    I estimated.  And I'm not sure why that is.  To me
4    the -- the difference in -- the minor differences
5    in the studies included or excluded is not
6    sufficient to explain that, and I wonder if it's a
7    software issue, of them having used a different
8    software for meta-analysis than I used.  But it's
9    not a criticism necessarily.  I just note this
10   discrepancy.
11   BY MS. BRANSCOME:
12       Q   Are there any studies that you included
13   in your meta-analysis in 2018 that the Berge
14   authors failed to consider that you think they
15   should have included?
16       A   So I'll go back to my report, because I
17   do have a table outlining that in my report.
18           MS. PARFITT:  You want your report?
19           THE WITNESS:  Yeah, my report, back to
20   my report.
21           MS. PARFITT:  Let me get you that.
22   BY MS. BRANSCOME:
23       Q   And we'll take a break after we finish
24   this paper.
25       A   Thank you.

Page 200

1        That's 2016.  Okay.
2        Q   Dr. Siemiatycki, if you could just
3    identify for the record where you're looking so I
4    can follow along and the record reflects it.
5        A   Right.  I'm looking in my report of 2018
6    in the appendix, page 103, Appendix B.
7        Q   So looking at Appendix B, which also
8    helpfully compares Penninkilampi as well, are
9    there studies specifically focused on the Berge
10   2018 that in your opinion the authors should have
11   included in their meta-analysis?
12           MS. PARFITT:  Objection.  Form.
13           THE WITNESS:  Okay.  Well, just
14   following this table, I see that Gates 2008 was in
15   my report, but not in theirs.  Now, it wasn't in
16   my main analysis; it was in one of my sensitivity
17   analyses.  So I have no -- my main analysis and
18   their main analysis concurred about Gates.
19           The next one that I see that was in my
20   analysis but not in theirs was what I call
21   Schildkraut B.  And Schildkraut B, for the record,
22   is -- there's no such study, but I've named it
23   Schildkraut B.  It's the result of the analysis of
24   the Schildkraut study of cases that were
25   interviewed before 2014, I think it was.

Page 201

1    BY MS. BRANSCOME:
2        Q   And we will discuss that in more detail,
3    but do you consider it an error for the Berge
4    authors to just have taken the Schildkraut 2016
5    data as a whole?
6        A   No, I don't consider it an error.  In
7    fact, I used it -- not in my main analysis but in
8    one of my sensitivity analyses.
9            The same with Shushan.  So Shushan '96
10   was in my -- one of my sensitivity analyses, not
11   in my main analysis, and they did not include it
12   in their main analysis.  So we agreed on the main
13   analyses there.
14           Terry, I included in mine, and they
15   didn't include Terry.  They included the component
16   parts of Terry.
17           So there was no -- there was no study
18   that was in my main analysis that was not in
19   theirs.
20       Q   Okay.  And looking quickly back at the
21   Berge article, coming full circle to the question
22   that I started with, if you could look on page 253
23   of that paper.
24           MS. PARFITT:  Yes, 253.
25   BY MS. BRANSCOME:

51 (Pages 198 to 201)

Jack Siemiatycki, Ph.D.

Page 202

```
 1        Q   Under the Discussion section, do you see
 2   where I am?
 3        A   Yes, I do.
 4        Q   All right.  The second paragraph under
 5   Discussion from the Berge paper states:  "This
 6   meta-analysis suggests that genital powder use is
 7   associated with a small increased risk of
 8   developing ovarian cancer.  However, this positive
 9   association appears to be limited to the serous
10   histological type and to case-control studies."
11        Did I read that correctly?
12        A   You read it correctly.
13        Q   It continues on:  "This estimate is
14   somewhat lower than that of previous
15   meta-analysis," and in parentheses, it refers
16   specifically to Huncharek and Langseth, colon, "In
17   our cumulative meta-analysis, we confirmed the
18   trend toward lower overall risk estimates as more
19   evidence accumulated."
20        First, did I read that correctly?
21        A   You read it correctly.
22        Q   Do you have any basis to disagree with
23   the statement by the Berge authors in this
24   paragraph in the Discussion section?
25        MS. PARFITT:  Objection.  Form.
```

Page 203

```
 1        THE WITNESS:  So there are a few
 2   statements in this paragraph, not just one.
 3        Do you want me to take them one by one?
 4   BY MS. BRANSCOME:
 5        Q   Sure.
 6        A   So whether "the positive association
 7   appears to be limited to the serous histological
 8   type," I have some problem with that.  I -- I was
 9   looking in their publication for which studies --
10   let me just see if I can -- which studies provided
11   evidence on serous type, and I couldn't find that.
12        In my -- in my analysis, the evidence
13   that I was able to -- to compile that's in this
14   addendum and meta-analyze showed an approximately
15   similar meta-relative risk between serous and all
16   ovarian cancers.
17        So there is no -- I found no evidence
18   that this -- that there was a particular peak of
19   risk for serous types compared to other types.
20        Q   As you sit here today --
21        MS. PARFITT:  Are you done -- are you
22   done with your -- is that --
23        THE WITNESS:  Yeah, for -- for that
24   point on serous, yes.
25        MS. PARFITT:  Thank you.
```

Page 204

```
 1   BY MS. BRANSCOME:
 2        Q   Based on the evidence that's available
 3   today, do you think there is strong enough
 4   epidemiological evidence to reach a conclusion
 5   about the association between talc -- genital talc
 6   use and other specific subtypes of ovarian cancer?
 7        A   I think it becomes very fragile to draw
 8   inferences about other types.  And in the absence
 9   of reliable evidence about other types, you know,
10   especially those that have a smaller fraction of
11   all ovarian cancers than serous type, I think the
12   prudent thing to do is to consider that all
13   ovarian cancers are affected the same way.
14        The same way as with -- we do with lung
15   cancer and smoking and histologic types of lung
16   cancer.  While there is some variability in the
17   degree of relative risk between smoking and
18   adenocarcinoma or squamous cell carcinoma or other
19   types, small cell, large cell, for lung cancer,
20   there is some variability in the degree of
21   relative risk.  Generally speaking, we say smoking
22   causes cancer.  Smoking causes all kinds of --
23   causes lung cancer, all kinds of lung cancer.
24        Q   Are you qualified to evaluate the
25   reasonableness of making an extrapolation from one
```

Page 205

```
 1   subtype of ovarian cancer to all types of ovarian
 2   cancer in terms of what is biologically plausible?
 3        MS. PARFITT:  Objection to form.
 4        THE WITNESS:  My inferences would be
 5   based on the statistical and epidemiological
 6   evidence, and if there is biological,
 7   physiological evidence that would indicate that
 8   talcum powder is more likely to influence one type
 9   of ovarian cancer than another, I would be
10   absolutely open to that interpretation.
11   BY MS. BRANSCOME:
12        Q   All right.  So moving along in that
13   paragraph, are there --
14        A   Okay.
15        Q   -- any other sentences or portions of
16   sentences with which you disagree?
17        A   So, the statement about case-control
18   studies and whether the positive association is
19   limited to case-control studies is -- is a bit
20   contentious.  And I understand very well that the
21   evidence does not -- if we only had the cohort
22   studies, if that's all the evidence that existed,
23   it would be fair to say that that evidence does
24   not argue for an association with -- between
25   ovarian cancer and -- so I would -- I'm not -- I
```

52 (Pages 202 to 205)

Jack Siemiatycki, Ph.D.

Page 206

1  guess if I were writing this, I would qualify it
2  somehow, and -- no, I think I'll just leave --
3  leave that there, and you may have follow-up
4  questions about the case-control/cohort
5  comparison.
6      Q   Is there anything else in this paragraph
7  in the Discussion section of Berge 2018 with which
8  you disagree?
9      MS. PARFITT:  And can you refer him to
10  the left-hand side of the discussion or the
11  entire --
12      MS. BRANSCOME:  The second full
13  paragraph in the Discussion section.
14      MS. PARFITT:  Which starts with "An
15  important."
16      THE WITNESS:  So I -- I think what --
17  BY MS. BRANSCOME:
18      Q   No, it begins with "This meta-analysis
19  suggests."
20      A   Yeah.  Yeah.
21      So your question -- the question is
22  about that sentence that says:  "This estimate is
23  somewhat lower.  In our cumulative meta-analysis,
24  we confirmed the trend towards lower," da, da, da,
25  and that refers I guess specifically to Figure 4

Page 207

1  on the following page.
2      Certainly the confidence intervals, if
3  you look at the confidence intervals of the
4  meta-estimates in that Figure 4, from 1988 through
5  2016, everything is embedded in everything.  So
6  from the point of view of statistical variability,
7  it would be difficult to argue that there is a
8  real statistical -- statistically meaningful
9  difference between the trendline from -- through
10  that whole period.
11      There is a tendency by eye for a
12  decline.  I don't know in their paper, in the text
13  whether they've characterized the decline with any
14  regression coefficients or not.  I don't remember.
15  It seems to me like a rather weak trend to make a
16  big point about.  So I wouldn't disagree with
17  the -- the point they're making, but I think it's
18  not strongly supported.  There isn't a strong
19  trend downwards in this line, in this figure.
20      Q   So you would agree with the authors that
21  there is a downward trend in the risk assessment
22  over time as more evidence accumulated, but you
23  might disagree with them about the strength of
24  that trend.  Is that fair?
25      MS. PARFITT:  Objection.  Form,

Page 208

1  misstates his testimony.
2      THE WITNESS:  It requires looking at
3  which studies were included in each of these
4  meta-analyses, and which results were chosen by
5  the meta-analysis people who did these
6  meta-analyses from each paper.  The meta-analysis
7  is somewhat sensitive to which studies are
8  selected and -- so the same study might have been
9  selected in the 2004 meta-analysis as in the 2016,
10  but they chose -- they decided to choose an
11  estimate from -- a result from that paper that
12  they thought was the most reasonable one and
13  that's different.
14      So one would have to do side-by-side
15  comparisons of which studies were included and
16  which results before concluding that this is
17  because of a downward trend.  You also need to
18  know when the data were collected.
19      You know, I'm not sure if the -- if you
20  are implying or if they are implying that -- you
21  know, I -- a declining trend, if there is one, in
22  meta-analyses -- these are the years of the
23  meta-analysis, not the years that women were
24  exposed.  So there's no implication -- direct
25  implication here that the risks to women are

Page 209

1  declining over time.  So if it's only the fact
2  that meta-analyses carried out at different points
3  in time showed very slightly different results, I
4  don't find that a noteworthy observation.  But...
5  BY MS. BRANSCOME:
6      Q   And you agree that meta-analyses are
7  sensitive to the judgments applied by the authors
8  of those studies, correct?
9      A   Yes, they are, but to -- to a degree.  I
10  mean you have to weigh the -- the degree of
11  bias -- or not the bias, but the -- the influence
12  of particular decisions that you might make.
13      I've done an analysis looking at what
14  happens when you include or exclude studies, and
15  you could exclude any study from my meta-analysis
16  and you'd find the same result.  So if any of
17  these studies in my meta-analysis are completely
18  wrong, if they were completely invented, if the
19  women were never actually interviewed but the
20  investigator just wrote a paper on a Sunday
21  afternoon, and you're suspicious that this study
22  was -- or badly -- whatever, if you take any one
23  of these studies and take it out of the mix, it
24  wouldn't affect the meta-relative risk.
25      MS. BRANSCOME:  Okay.  I think this is a

53 (Pages 206 to 209)

Jack Siemiatycki, Ph.D.

| Page 210 | Page 212 |
|---|---|

**Page 210**

1  good place to take a break.
2      MS. PARFITT: Very good. Thank you.
3      THE VIDEOGRAPHER: We're going off the
4  record at 5:07 p.m.
5      (Recess.)
6      THE VIDEOGRAPHER: This begins disc
7  number 5 in the deposition of Jack Siemiatycki.
8  We're going back on the record at 5:36 p.m.
9  BY MS. BRANSCOME:
10    Q  One of the decisions that you had to
11  make in conducting your meta-analysis was how to
12  treat the Schildkraut 2006 study, correct?
13    A  2000 --
14    Q  -- '16.
15    A  Thank you. Yes.
16    Q  Okay. For purposes of your
17  meta-analysis, you divided Schildkraut 2016 into
18  two sets of results, correct?
19    A  "Divided" isn't quite the right word.
20    Q  How would you describe it?
21    A  Because they're not separate, one
22  includes the other.
23    Q  Okay.
24    A  So just the word "divided" -- I'm not
25  sure what the right word is, but there were two

**Page 211**

1  sets of results reported, and I used both sets of
2  results. One is embedded -- one set is embedded
3  in the other.
4    Q  So correct me if I'm wrong, Schildkraut
5  2016-A shows results from all subjects who were
6  interviewed in the study from 2010 through 2015.
7  Schildkraut 2016-B is a subset of that that
8  includes the results for subjects who were
9  interviewed before 2014, correct?
10    MS. PARFITT: And, Counsel, if we could
11  get Schildkraut in front of him, would that be all
12  right?
13    MS. BRANSCOME: Sure.
14  BY MS. BRANSCOME:
15    Q  If you need to reference it --
16    MS. PARFITT: Sure.
17  BY MS. BRANSCOME:
18    Q  -- to answer my questions, certainly.
19    A  If you're going -- yes, I think you're
20  right in what you said, but if you want me to look
21  at specific results in the paper, maybe I should
22  have it in front of me.
23    Q  I was going to direct you there when we
24  got to those questions.
25    A  Okay.

**Page 212**

1    Q  But if it's your preference to look at
2  the paper now, it is tab 15.
3    A  It's in this binder, I think.
4    MS. PARFITT: Here it is. Thank you.
5    THE WITNESS: Thank you.
6    Okay. The -- so one includes all --
7  Schildkraut A includes all of the cases
8  interviewed the whole period, and the
9  Schildkraut B includes cases after 2014, but I'm
10  not sure if it includes 2014. But...
11  BY MS. BRANSCOME:
12    Q  Let me ask a clarification on that one,
13  Dr. Siemiatycki.
14    Schildkraut 2016-B shows results for
15  individuals interviewed before 2014, correct?
16    A  I'm sorry, which one? Schildkraut B?
17    Q  Schildkraut 2016-B.
18    A  B.
19    Q  I believe you just stated after, so I --
20    A  I see. Okay.
21    Q  -- wanted to seek clarification there.
22    A  Okay. Yeah, I'm --
23    Q  If it's helpful --
24    A  It's late in the day. Let me --
25    Q  Sure. If it's helpful to you to

**Page 213**

1  reference in your report, you discuss your
2  separation of Schildkraut on page 74, Note 6.
3    A  That's why I wanted my report in a small
4  binder, rather than -- before 2014, yes.
5    Q  And the reason that you divided --
6  separated the study into those two groups, one
7  which is inclusive of the other, is to account for
8  the possibility that publicity surrounding two
9  class action lawsuits on talc and ovarian cancer
10  in 2014 may have induced bias in the validity of
11  reporting talc exposure; is that correct?
12    A  That's correct.
13    Q  Okay. But in your main meta-analysis
14  you use Schildkraut A, which includes all subjects
15  interviewed from 2010 to 2015, correct?
16    A  That's correct.
17    Q  When you substituted Schildkraut B,
18  which included only subjects interviewed before
19  2014, for Schildkraut A, all subjects interviewed
20  from 2010 to 2015, the relative risk estimate for
21  the meta-analysis goes down, correct?
22    A  Yes. From 1.28 to 1.27.
23    MS. BRANSCOME: If we could mark
24  Schildkraut as Exhibit 13.
25    THE WITNESS: There's a label here

Jack Siemiatycki, Ph.D.

1    already.
2         MS. PARFITT: There is. I will go ahead
3    and just -- you don't care -- there's a defense
4    label of 1436. Can I go ahead and put the exhibit
5    over top of it? Does it matter to you? Okay.
6    This will be 13.
7         (Exhibit No. 13 was marked for
8         identification.)
9    BY MS. BRANSCOME:
10        Q    All right. If you could,
11   Dr. Siemiatycki, please turn to Table 2, which is
12   on page 1414 of Exhibit 13.
13        A    I see it.
14        Q    Before doing that, can you just simply
15   confirm that Exhibit 13 is in fact the Schildkraut
16   study?
17        A    Yes, it is.
18        Q    And we see in Table 2 that there is a
19   category for interview date less than 2014, and
20   then another category for interview date greater
21   than 2014. Correct?
22        A    Yes, I see that.
23        Q    All right. And we see that there are
24   odds ratios for any genital use for both of these
25   categories, correct?

1         A    Yes, I see that.
2         Q    And the odds ratio for any genital use
3    for individuals who were interviewed after 2014 is
4    higher than the odds ratio for any genital use for
5    those individuals who were interviewed before
6    2014, correct?
7         A    That's correct.
8         Q    And it also shows the number of
9    individuals that fell in those respective
10   categories, correct?
11        A    Yes, correct.
12        Q    And so just simply looking at the
13   reported data, the percentage of women with --
14   with ovarian cancer who reported any genital use
15   of talc who were interviewed before 2014 was
16   36.5 percent, correct?
17        A    Can you run that by me again? Show me
18   where the --
19        Q    Sure.
20        A    So interview date before 2014, any
21   genital use, the percentage 36.5, number 128, is
22   that what --
23        Q    Yes.
24        A    -- you are looking at? Okay.
25        Q    Was that correct?

1         A    Yes, that's correct.
2         Q    All right. And the -- those are for the
3    cases, meaning individuals who had been diagnosed
4    or reported as diagnosed with ovarian cancer,
5    correct?
6         A    Correct.
7         Q    And if you compare that against the
8    controls, 34 percent is the reported number for
9    women without ovarian cancer who reported any
10   genital use of talcum powder that were interviewed
11   before 2014, correct?
12        A    That's correct.
13        Q    And if we look at those same
14   percentages for the individuals who were
15   interviewed after 2014, the percentage of cases,
16   meaning individuals who have been diagnosed or
17   reported as diagnosed with ovarian cancer who
18   claim to have used talc genitally at any point in
19   time, goes up to 51.5 percent compared to a
20   control of 34.4 percent, correct?
21        A    That's correct.
22        Q    All right. And so if we compare
23   individuals interviewed before 2014 who have been
24   diagnosed or reported as diagnosed with ovarian
25   cancer to those individuals in the same category

1    who were interviewed after 2014, you see at least
2    a 12 percent increase in those figures; is that
3    correct?
4         A    12 percent representing which -- which
5    two numbers?
6         Q    Representing the difference between the
7    cases who reported genital use of talcum powder --
8         A    The 36.5?
9         Q    -- as compared to the 51.5 percent.
10        A    So you -- you said it's 12 percent? I
11   think it's like 14 percent.
12        Q    It is.
13        A    Okay.
14        Q    That is correct.
15             But if you do the same comparison for
16   the control group, you don't see a similar
17   increase or a similar difference in the reporting
18   percentages for individuals interviewed before
19   2014 as after 2014, correct?
20        A    That's correct.
21        Q    Okay. Are those results compatible with
22   the existence of recall bias for individuals
23   interviewed after 2014?
24        A    I would say they are compatible with
25   recall bias.

Jack Siemiatycki, Ph.D.

Page 218

1    Q   Okay.  Was litigation-related recall
2  bias considered by IARC as a possible bias that
3  could explain the association between perineal
4  talc use and ovarian cancer?
5    A   In 2006?
6    Q   Correct.
7    A   I -- I can't remember verbatim the
8  discussions, and I can't remember a discussion of
9  litigation-related impact on response bias.  I
10  doubt if there would have been any at that time,
11  but -- and I don't recall any discussion of it.
12    Q   And at least the Schildkraut authors are
13  identifying 2014 as a significant year with
14  respect to widespread knowledge of lawsuits
15  involving talcum powder and a claim of ovarian
16  cancer --
17      MS. PARFITT:  Objection.  Form.
18  BY MS. BRANSCOME:
19    Q   -- correct?
20      MS. PARFITT:  Objection.  Form.
21      THE WITNESS:  I -- if you may, I think
22  what they refer to is localized publicity, not
23  widespread publicity.
24  BY MS. BRANSCOME:
25    Q   If you can, can you refer me to the

Page 219

1  language in the paper that references that.
2    A   So I see a mention of it in the -- on
3  page 1412, second column, last paragraph, about
4  seven or eight lines from the bottom, the sentence
5  beginning:  "Two class action lawsuits were filed
6  in 2014 concerning possible carcinogenic effects
7  of body powder, which may have influenced recall."
8      Now, there's a reference there, but the
9  reference doesn't indicate where those class
10  actions were.  And now I'm going to look in the
11  Discussion section to see if there's any
12  indication.  If anyone knows whether there is or
13  if there is not -- I haven't looked for this
14  specifically.  I just have a vague memory of them
15  referring to localized publicity, but... (peruses
16  document.)
17      Well, in my very quick scanning, I don't
18  see reference to these being local.  You people
19  might know whether these two lawsuits that they
20  refer to in the Reference section, whether they
21  were local in this area.  And this is North
22  Carolina, is it?
23    Q   Well, so that's -- that's a question I
24  have for you, Dr. Siemiatycki.  On page 1412, the
25  paragraph -- the last full paragraph on the second

Page 220

1  column seems to suggest that data was collected
2  from a number --
3    A   Oh.
4    Q   -- of different states across the United
5  States, correct?
6    A   Correct.  Correct.
7    Q   And so at least based on your review as
8  you sit here today, the authors do not seem to
9  have limited the potential effect of publicity of
10  the class action lawsuits to a precise region,
11  correct?
12    A   That seems to be the case.
13    Q   Okay.
14    A   Yes.
15    Q   And so your understanding or your
16  testimony earlier that the publicity was only
17  localized, you're not able to point me to anything
18  in the article to support that, correct?
19    A   That's correct.
20    Q   And in fact, in the two portions of the
21  Schildkraut article that discuss the publicity,
22  there is no specific reference to it being limited
23  to an area, correct?
24      MS. PARFITT:  Objection.  Form.
25      THE WITNESS:  In the two -- sorry.

Page 221

1  BY MS. BRANSCOME:
2    Q   So there's one discussion of the
3  potential public -- the potential effect of
4  publicity, which is on page 1412.
5    A   Yeah.
6    Q   And then there is a second discussion of
7  it on page 1416 --
8    A   Yes.
9    Q   -- in the Discussion section, and
10  neither of those two sections talk about awareness
11  of the class action lawsuits being limited to a
12  specific geographic region, correct?
13    A   That's correct.
14    Q   In fact, the language that the authors
15  use is a heightened awareness of the exposure as a
16  result of two recent class action lawsuits, and
17  they discuss just publicity, correct?
18    A   Yes, I think so.
19    Q   Okay.  Are you relying --
20    A   In that second paragraph in the
21  discussion, the authors seem to discount the --
22  the recall bias hypothesis or to minimize it, and
23  I -- I -- I don't support -- or the opposite of
24  what they're saying.  I just note that they don't
25  seem to be enthusiastic about that hypothesis that

Jack Siemiatycki, Ph.D.

Page 222

1    it's strictly due to response bias.
2        But go ahead and --
3        Q   The authors do recognize, though, that
4    there is a possibility of recall bias may have
5    caused some inflation of the odds ratios, correct?
6        A   Yes.
7        MS. PARFITT:  Wait, that's part --
8    that's part of the sentence.  Objection.
9        THE WITNESS:  Yeah.  Yeah.
10   BY MS. BRANSCOME:
11       Q   Are you relying on Penninkilampi 2018
12   for your opinions in this litigation?
13       A   My opinions were informed before I knew
14   about that article.
15       Q   Do you believe that the Penninkilampi
16   2018 study supports your conclusions in this
17   litigation?
18       A   It's consistent with my conclusions.  A
19   little bit like Berge, the fact that they didn't
20   pick up any studies that I hadn't -- that I had
21   not picked up reassures me that there was nothing
22   amiss in my search of the literature.
23       There were some differences in which
24   studies they included in their meta-analysis and
25   which data.  I'm happy with the decisions -- the

Page 223

1    judgments I had made about it.  So there are some
2    minor variations there.  But essentially they
3    found the same thing that I found, because we're
4    all working with the same data.
5        Q   Okay.  Did you do an independent
6    verification that the data Penninkilampi reports
7    in his article is indeed accurate?
8        MS. PARFITT:  Objection.  Form.
9        THE WITNESS:  By the data, you mean the
10   results that he put into his meta-analysis?
11   BY MS. BRANSCOME:
12       Q   For example, did you look at the
13   reported data in the tables in the Penninkilampi
14   article and compare it to the underlying studies
15   to see if they matched?
16       A   I don't recall doing that comparison.
17   I'm not sure why I would want to.
18       Q   If there were errors in the reporting of
19   any of the odds ratios or confidence intervals in
20   the Penninkilampi 2018 paper, would that call into
21   reliability the meta-analysis, in your opinion?
22       MS. PARFITT:  Objection.  Form.
23       THE WITNESS:  It depends on the nature
24   of the errors.  If there was one decimal point
25   typo sort of thing, it would have absolutely no

Page 224

1    impact on the bottom line result.  Some errors
2    might have large effects, so it would depend what
3    the errors were.
4        But since his studies were mostly the
5    same as the ones I had used and the same ones that
6    Berge had used, and since the results that he had
7    taken out of those studies were mostly the same
8    ones I had taken out and that Berge had taken out,
9    I fully expected his bottom line meta-analysis to
10   produce the same results.
11   BY MS. BRANSCOME:
12       Q   The Penninkilampi study does not
13   consider or include the Gates 2010 cohort study,
14   correct?
15       A   Correct.
16       Q   Do you think Gates 2010 - and if you
17   would prefer to refer to Penninkilampi, it is
18   tab 20.
19       A   Yeah.
20       Q   In your opinion, is --
21       MS. PARFITT:  I have a clean one right
22   here with me -- if we use two books, we can do it
23   to save time, but --
24       THE WITNESS:  Sorry?
25       MS. PARFITT:  Do you want that?

Page 225

1        THE WITNESS:  No.  I'm actually looking
2    for my copy of the Gates 2010.
3        You're going to ask me about his use
4    of -- Gates 2010?
5    BY MS. BRANSCOME:
6        Q   I was simply just going to ask you, is
7    Gates 2010 a significant study, in your opinion,
8    to leave out of a meta-analysis on this topic?
9        MS. PARFITT:  Objection.  Form.
10       THE WITNESS:  A significant study.
11   It -- in my view there are flaws with that study,
12   but there are flaws with many epidemiologic
13   studies.  It's not -- that's not a reason to
14   exclude them.  I would include it but take note of
15   the flaws, including the fact that their reference
16   category for their odds ratios for their relative
17   risk estimates was not an unexposed group, but it
18   was a group that combined women who had never used
19   talc with women who had used it occasionally.
20   BY MS. BRANSCOME:
21       Q   Are there any other errors in the Gates
22   2010 study?  And if you'd like to refer to it --
23       MS. PARFITT:  Thank you.
24       THE WITNESS:  Okay.  Let me find my copy
25   of -- yeah, here we are -- Gates 2010.

57 (Pages 222 to 225)

Jack Siemiatycki, Ph.D.

Page 226

1    Well, yes, there are some flaws with it,
2  but they're related to the fact that this builds
3  on the Nurses' Health Study, which is a good and
4  well deservedly recognized, good prospective
5  cohort study which focused on many factors in
6  women's lives, including predominantly nutritional
7  reproductive, hormonal factors, and all kinds of
8  diseases, all heart disease, diabetes, et cetera,
9  et cetera. There have been hundreds and hundreds
10 of publications that have come out of it.
11    Their collect-- the collection of talc
12 information in the Nurses' Health Study was very
13 weak. The questionnaire was conducted in 1982.
14 It was part of a biannual follow-up mailed
15 questionnaire. The question itself and the
16 structure of the question itself I find very weak
17 from the point of view of designing questions for
18 questionnaires. I mean, I -- I could read it into
19 the record, but it's in the -- it's in the -- it's
20 quoted in the Gertig paper, and it's actually --
21 I've seen that page of the questionnaire, and
22 it's -- I find it ambiguous as to how women would
23 answer that question.
24    And it's only one question for that
25 point in time. There was never any follow-up. So

Page 227

1  between 1982 and 2007 or so, when the follow-up of
2  the -- for the Gates analysis ended, they had no
3  idea whether women were exposed -- whether women
4  who had been exposed in 1982 were in exactly the
5  same exposure category in 1990, in 2000, in 2005
6  and so on. They made the assumption that women's
7  exposure status was stable for 25 years. And so
8  that's a major weakness of the analysis of talc
9  and ovarian cancer in -- from this study.
10 BY MS. BRANSCOME:
11    Q  So in your view, was it proper for the
12 Penninkilampi authors to leave Gates 2010 out of
13 their meta-analysis?
14    A  That's not what I said. That's not what
15 I said.
16    I -- I think to go down the road of
17 making value judgments about each of these studies
18 and including them or not including them would end
19 up in the need for many days of deposition and
20 cross-examination, because each of those -- any
21 decision about any study can be argued umpteen
22 ways. And that's why I took the decision early on
23 not to make exclusions based on my judgment of the
24 quality of the study.
25    Q  Do you personally know any of the

Page 228

1  authors of the Penninkilampi 2018 publication?
2    A  No, I don't.
3    Q  Do you know or have any information
4  about the source or sources of funding for the
5  Penninkilampi article?
6    A  No, I don't, no. I -- I would add,
7  though, that the inclusion or exclusion of Gates
8  2010 probably didn't affect the bottom line result
9  of their meta-analysis by more than 0.01 decimal
10 point of the odds ratio.
11    Q  But did they publish any type of
12 sensitivity analysis that would let you
13 specifically draw that conclusion?
14    A  Well, I -- I have done one myself where
15 I dropped each of the studies in order to see what
16 would be the impact if that study had been
17 dropped. And there's hardly -- no study has more
18 than a 1 decimal -- you know, 0.01 decimal point
19 on the odds ratio.
20    So we could argue about the merits of
21 any of these studies or demerits, but the impact
22 of including them or excluding an individual study
23 is pretty minimal.
24    Q  Shushan 1996 is one of the studies you
25 did not include in your main meta-analysis,

Page 229

1  correct?
2    A  Correct.
3    Q  And you reported that you did not
4  include it because the report was quite cryptic
5  regarding the data collection and the talc
6  exposure variable, correct?
7    A  That's correct.
8    Q  What did you mean by the report was
9  quite cryptic regarding the data collection?
10    A  So I have to take a couple of minutes to
11 review that -- to look at that paper to answer
12 your question.
13    Well, so the first thing that strikes
14 me -- and I haven't read the description of how
15 they collected the data. The first thing that
16 strikes me is they have a table, Table 2 on
17 page 15, with some information about these various
18 variables, including talc exposure. And the two
19 categories of talc exposure that they describe in
20 this table, one is called "Never - seldom," and
21 the other one is called "Moderate - a lot." I
22 don't know what that means. So that's one
23 element -- how they present it and how they
24 analyze the data.
25    But I think actually how they collected

58 (Pages 226 to 229)

Jack Siemiatycki, Ph.D.

Page 230

1 the data also led me to describe the -- the
2 information on exposure as being cryptic.
3    Q   Okay.  Are you familiar with the 2018
4 paper by Mohamed Taher and others entitled "The
5 systematic review and meta-analysis:  The
6 association between perineal use of talc and risk
7 of ovarian cancer"?
8    A   Yes, I am.
9    Q   Okay.  Have you read the Taher 2018
10 manuscript?
11    A   Yes.  I haven't read all the appendices,
12 but I basically read enough that I know what's in
13 it.
14    Q   Did you have access to the Taher 2018
15 article before it was published?
16    A   I don't think it's been published.
17    Q   How did you get access to the Taher
18 manuscript and the appendices?
19    A   I heard about -- I first heard about the
20 Canadian Department of Health advisory, or
21 whatever the word is, about talc and ovarian
22 cancer in the public media.  And I -- I think in
23 the news report that I saw, there was a reference
24 to Taher -- the Taher paper.  That's how I first
25 learned about something by them.

Page 231

1        And I wrote to Ms. Parfitt -- I sent a
2 message to Ms. Parfitt asking her if she knows
3 anything about this and has that information, and
4 she wrote back, I think, and said, No, I thought
5 you might have -- know something about it and have
6 information.
7    MS. PARFITT:  And -- and,
8 Dr. Siemiatycki, you're not to discuss --
9    THE WITNESS:  Okay.
10    MS. PARFITT:  -- discuss our
11 communications.
12    THE WITNESS:  Okay.
13    Subsequently, Ms. Parfitt sent me the
14 Taher paper.
15 BY MS. BRANSCOME:
16    Q   And when -- when did you first request
17 the Taher paper and appendices from Ms. Parfitt?
18    A   I think in December 2018.
19    Q   When were you provided with the Taher
20 manuscript and the appendices and supplemental
21 tables?
22    A   Within a few days after that.
23    Q   Do you know personally any of the
24 authors on the Taher manuscript?
25    A   I know one of them.

Page 232

1    Q   Which author do you know?
2    A   Daniel Krewski.
3    Q   You have published many papers with, is
4 it, Dr. Krewski?
5    A   Yes.
6    Q   Is that correct?
7    A   Yes.  Yes, it is.
8    Q   How many papers have you published with
9 him?
10    A   I'll look at my CV and count.
11    Q   Would it be fair to say over 20?
12    A   Oh, I would be surprised if it was that
13 high.  But if you've counted, I won't contradict
14 what you -- what you say.
15    Q   Let's do it this way:  Would all of the
16 papers that you have coauthored with Dr. Krewski
17 be listed on your CV?
18    A   Yes.
19    Q   Have you discussed your opinion on talc
20 and ovary -- ovarian cancer with Dr. Krewski?
21    A   No.
22    Q   Have you discussed your opinion on talc
23 and ovarian cancer with any of the authors of the
24 Taher manuscript?
25    A   No.

Page 233

1    Q   Have you spoken to or otherwise
2 communicated with Dr. Krewski about your
3 involvement as an expert in this litigation?
4    A   No, I haven't.
5    Q   Do you know if the Taher manuscript has
6 been accepted for publication?
7    A   I don't know if it's been submitted for
8 publication.
9    Q   Do you know anything about the source or
10 sources of funding for the Taher 2018 manuscript?
11    A   I don't have any privileged information
12 about that, but I seem to recall in the manuscript
13 they're saying something about funding from Health
14 Canada.
15    Q   Is it fair to say that your knowledge
16 with respect to the source or sources of funding
17 of the Taher manuscript is limited to what is
18 written in the manuscript itself?
19    A   Yes.
20    Q   Did you attend the National Cancer
21 Institute directors meeting held in Lyon, France,
22 on July 11th through 13th, 2018?
23    A   No, I did not.
24    Q   Now, the Taher 2018 manuscript contains
25 a meta-analysis, correct?

Jack Siemiatycki, Ph.D.

Page 234

1    A    Correct.
2    Q    And Taher 2018 calculates an overall
3  relative risk of 1.28, correct?
4          MS. PARFITT:  If we could just get that
5  in front of him.
6          MS. BRANSCOME:  Oh, of course.
7          MS. PARFITT:  Do you have your copy?  I
8  appreciate that.
9          MS. BRANSCOME:  It is tab --
10         MS. PARFITT:  I think he may have it as
11  well and --
12         THE WITNESS:  I have it --
13         MS. PARFITT:  Make that a little easier
14  and more quicker.
15         MR. TISI:  Do you want to mark it?
16         MS. BRANSCOME:  We have already marked
17  Dr. Siemiatycki's binder.
18         MR. TISI:  Okay.  We can --
19         MS. BRANSCOME:  I believe that contains
20  the -- the manuscript and the exhibits.
21         MS. PARFITT:  And that is binder 6,
22  Exhibit 6.
23         MR. TISI:  You said binder, going with
24  his or the one --
25         MS. PARFITT:  Exhibit 6.

Page 235

1          MS. BRANSCOME:  Exhibit 6 is
2  Dr. Siemiatycki's copy of the Taher manuscript
3  with the appendices and supplemental tables.
4  BY MS. BRANSCOME:
5    Q    Is that correct?
6    A    That's correct.
7          MR. TISI:  And that's in his binder,
8  Exhibit 6.
9          THE WITNESS:  I don't -- I didn't bring
10  the supplemental tables and appendices with me.
11  BY MS. BRANSCOME:
12   Q    Okay.  So could you just describe for
13  the record the contents of Exhibit 6.  It is
14  marked, but just so that I can follow along.
15   A    This document?
16         MR. TISI:  No, the whole thing.
17         THE WITNESS:  Oh, the whole -- the whole
18  thing.  It contains various meta-analyses, so the
19  Berge, Penninkilampi, Huncharek, just the meta --
20  main meta-analyses that have been done.
21         MS. PARFITT:  And, Counsel --
22         THE WITNESS:  Langseth.
23         MS. PARFITT:  Right.
24         -- in light of the fact he has his in
25  front of him, Exhibit 6, is there a corresponding

Page 236

1  one in the binders you gave him?  That may help.
2          MS. BRANSCOME:  It's tab 31.
3          MS. PARFITT:  Thank you.
4          Tab 31.  I appreciate that.
5          No, you can keep yours.
6          THE WITNESS:  Okay.
7          MS. PARFITT:  There you go, just for the
8  record.  Okay.  Thank you.
9  BY MS. BRANSCOME:
10   Q    So my question to you, Dr. Siemiatycki,
11  is Taher 2018 calculates an overall relative risk
12  of 1.28.  Is that correct?
13   A    That's what it says in the abstract,
14  yes.
15   Q    And the confidence interval that they
16  report is 1.2 to 1.37, correct?
17   A    Yes.
18   Q    So the overall relative risk as well as
19  the confidence interval reported in the Taher 2018
20  paper is very similar to the overall relative risk
21  and confidence interval that you report in your
22  analysis for the MDL, correct?
23   A    That's correct.  Which is not
24  surprising.
25   Q    And if you could turn to page 49 of the

Page 237

1  Taher paper.  You see the Conclusion section?
2    A    Yes.
3    Q    The authors of the Taher paper state in
4  the Conclusion section:  "Consistent with previous
5  evaluations, the IARC in 2010 and subsequent
6  evaluations by individual investigators, the
7  present comprehensive evaluation of all currently
8  available relevant data indicates that perineal
9  exposure to talc powder is a possible cause of
10  ovarian cancer in humans."
11         First, did I read that correctly?
12   A    Yes.
13   Q    Okay.  Do you agree first that the Taher
14  2018 paper represents a comprehensive evaluation
15  of all currently available relevant data?
16   A    Yes.  I haven't -- I haven't done the
17  same comparison between which studies and which
18  data points from each study they used compared to
19  the ones that I've used.  I did that for the Berge
20  and for the Penninkilampi, comparing theirs with
21  mine.  I haven't done that for theirs.  So I -- I
22  assume that they used basically the same studies
23  and the same results from each study.
24         But, you know, to answer -- I'm quite
25  sure that they did this comprehensive evaluation

Jack Siemiatycki, Ph.D.

Page 238

1  of all currently available, but to answer that
2  strictly, I would want to do a comparison of the
3  two. But I'm willing to accept.
4      Q   Okay. And we see here even in this
5  sentence that we just read that there's a
6  reference there to the IARC publication in 2010.
7  We've already discussed that, correct?
8      A   Yes.
9      Q   And then there's a reference to
10  subsequent evaluations by individual
11  investigators, and there's a reference there to
12  articles or studies 3, 5 and 69. Do you see that?
13      A   I see that.
14      Q   And looking at the reference pages,
15  beginning on page 51, would you agree that
16  reference 3 is the Berge analysis, this citation
17  is to 2017, correct?
18      A   Correct.
19      Q   Five is Penninkilampi, correct?
20      A   Correct.
21      Q   And the last reference, which is 69, is
22  to the Terry meta-analysis. Do you see that?
23      A   Terry is not a meta-analysis. It's a
24  pooled analysis. But I see that, yes.
25      Q   Okay. So the reference in the Taher

Page 239

1  manuscript to reference 69 is to the Terry pooled
2  analysis from 2013, correct?
3      A   Correct.
4      Q   And so you agree that at least the Taher
5  authors considered the Berge, Penninkilampi, and
6  Terry studies.
7          MS. PARFITT: Objection. Form.
8          THE WITNESS: Were aware of. I'm not
9  sure what you mean by considered. They -- they
10  referenced it. I don't know that they considered
11  it in their -- I don't imagine that there's any
12  place in their statistical analysis where they
13  introduced data from any of those papers. They're
14  just acknowledging that those other meta-analyses
15  found the same thing that they found.
16  BY MS. BRANSCOME:
17      Q   So perhaps we have a different
18  understanding of the word "considered."
19      A   Okay.
20      Q   Would you agree that a fair reading of
21  their Conclusion paragraph would indicate that the
22  Taher authors were first aware --
23      A   Yes.
24      Q   -- of Terry, Berge and Penninkilampi?
25      A   Yes.

Page 240

1      Q   And that they examined those studies
2  closely enough at least to reach the conclusion in
3  their own mind that their results were consistent
4  with those findings.
5          MS. PARFITT: Objection. Form.
6          THE WITNESS: Yes.
7  BY MS. BRANSCOME:
8      Q   Are there any scientific publications
9  that were available to you during your review in
10  connection with your formation of opinions in the
11  MDL that were not available to the authors of the
12  Taher manuscript?
13          MS. PARFITT: Objection. Form.
14          THE WITNESS: So are you talking about
15  the meta-analysis that -- are you talking about
16  studies that went into meta-analysis or are you
17  talking about the, you know, 200 or 300 references
18  in my bibliography?
19  BY MS. BRANSCOME:
20      Q   Fair enough.
21          Are there any studies that you included
22  in your meta-analysis that, at least to your
23  knowledge, were available to you and were not
24  available to the Taher authors?
25          MS. PARFITT: Objection. Form.

Page 241

1          THE WITNESS: Oh, they would have been
2  available because all of my -- the studies I used
3  are in publicly available literature, and I'm sure
4  they were available.
5  BY MS. BRANSCOME:
6      Q   Okay. Do you have any criticisms of the
7  Taher 2018 meta-analysis?
8      A   I haven't evaluated it closely enough
9  to -- to formulate criticisms or praise or --
10      Q   Now, you testified earlier that there
11  was a flurry of activity in December surrounding
12  the information from Health Canada and the Taher
13  manuscript.
14          Is there a reason why you have not
15  reviewed the Taher manuscript in detail and formed
16  an opinion about whether you agree or disagree
17  with its analysis?
18          MS. PARFITT: Objection. Fully
19  misstates his testimony. Form.
20          THE WITNESS: I -- I thought that it
21  would have absolutely no bearing on the results
22  and the opinions that I expressed in my report,
23  plus I didn't have time to do such a review. And
24  so the combination of those two things made it a
25  simple decision not to devote precious time and

61 (Pages 238 to 241)

Jack Siemiatycki, Ph.D.

Page 242

```
1   effort to a -- a futile activity.
2       I'm not uninterested in what they did or
3   what they found, but I can predict pretty quickly
4   what they did and what they found, and I -- I know
5   the studies that they reviewed, that they had
6   access to. There's nothing that they would find
7   that I wouldn't be able to predict.
8       MS. BRANSCOME: Okay.
9       Now may be a good time to take a break.
10      MS. PARFITT: Sure. Okay. Very good.
11      MS. BRANSCOME: Let's go off the record.
12      MR. TISI: Are we switching examiners
13  too?
14      MS. BRANSCOME: I don't know. That's
15  why --
16      MS. PARFITT: Oh, fair enough. Fair
17  enough.
18      THE VIDEOGRAPHER: We're going off the
19  record at 6:22 p.m.
20      (Recess.)
21      THE VIDEOGRAPHER: This begins disc
22  number 5 in the deposition of Jack Siemiatycki.
23  We are going back on the record at 6:40 p.m.
24  BY MS. BRANSCOME:
25      Q   So, Dr. Siemiatycki, if you could open
```

Page 243

```
1   back up to the Taher manuscript again. I believe
2   it's in your binder that's been marked as
3   Exhibit 6, and specifically, if you could go to
4   Figure 3 on page 39.
5       Have you looked at Figure 3 from the
6   Taher 2018 manuscript before now?
7       A   No, I haven't. I may have glanced at it
8   going through it, but I haven't examined it.
9       Q   Did you look at anything in the Taher
10  manuscript to support your opinion that there is
11  at least evidence compatible with the dose-
12  response relationship between perineal use of talc
13  and ovarian cancer?
14      A   I didn't look for that in this paper.
15      Q   If you could look at page 25 of the
16  Taher paper.
17      Do you see here that the authors of the
18  Taher manuscript describe the summary of evidence
19  for each of the Hill criteria of causation? Do
20  you see that?
21      A   I see that.
22      Q   And you are familiar with the Hill --
23  the Hill criteria of causation, correct?
24      A   I'm familiar with what they call the
25  Hill criteria and what some people call the Hill
```

Page 244

```
1   criteria, but which are not criteria and shouldn't
2   be called criteria.
3       Q   Understanding that you have specific
4   views about the appropriateness and application of
5   it, you are at least familiar with what is
6   sometimes referred to as a Bradford Hill analysis
7   or the Hill criteria, correct?
8       A   I don't -- again, the phrase "Bradford
9   Hill analysis" doesn't mean anything. I don't
10  think you would find that phrase in any
11  epidemiology or statistics textbook.
12      Q   Are you saying as you sit here today,
13  Dr. Siemiatycki, you've never heard of the Hill
14  criteria?
15      MS. PARFITT: Objection. Misstates his
16  testimony.
17      THE WITNESS: No, I've heard of it, and
18  I'm saying that it's a misnomer. And so I'd
19  prefer if the correct terminology is used when --
20  if you're asking me questions about it.
21  BY MS. BRANSCOME:
22      Q   The authors of the Taher manuscript use
23  the term "Hill criteria" --
24      A   Yes.
25      Q   -- in their Table 2, correct?
```

Page 245

```
1       A   Yes, they do.
2       Q   And there is a discussion under the --
3   what they refer to as a criterion for strength of
4   association, correct?
5       A   Yes.
6       Q   And the Taher authors report that out of
7   30 epidi- -- epidil- -- epidemiological studies --
8   it's late in the day -- six reported positive
9   association of statistical significance with a
10  risk value, relative risk or odds ratio of 1.5 or
11  greater.
12      Is that description of the
13  epidemiological studies accurate?
14      A   I don't know. I haven't counted. I
15  haven't done that kind of counting, which is
16  irrelevant and wrong from a statistical and
17  epidemiological point of view to do it. So I
18  haven't done it, and I can't confirm that there
19  are six that report odds ratios greater than 1.5.
20  I could do that if you want me to. I can look
21  through studies and see.
22      But there's no -- there's no scientific
23  purpose in doing that. It's a meaningless piece
24  of information.
25      Q   Would you criticize the Taher authors
```

62 (Pages 242 to 245)

Jack Siemiatycki, Ph.D.

Page 246

1    for their discussion of the Hill criteria?
2         A    Yes.
3         Q    And you have explained your criticisms
4    about the Hill criteria in both your trial
5    testimony and in your prior deposition testimony,
6    correct?
7         A    I can't remember the details, but I -- I
8    guess if I was asked about it, I explained what I
9    thought about it.
10        My criticism -- I'm not sure what you
11   mean by my criticisms of the term or of the
12   concepts that the paper that Hill wrote in 1965,
13   the ways -- the umpteen different ways that other
14   people have interpreted it.  What -- what are you
15   referring to when you say I criticized?  What did
16   I criticize?
17        Q    Have your views with respect to the use
18   and application of the so-called Hill criterion
19   changed since you testified in the Echeverria
20   trial?
21        MS. PARFITT:  Objection.  Form.
22        THE WITNESS:  They -- they haven't
23   changed in 40 years.
24   BY MS. BRANSCOME:
25        Q    Okay.  Thank you.

Page 247

1         Now, we have just discussed three
2    meta-analyses:  The Berge meta-analyses, the
3    Penninkilampi meta-analyses, and the Taher
4    meta-analyses.  Correct?
5         A    Yes.
6         Q    Would you agree that none of the authors
7    of those three meta-analyses concluded that talc
8    was a probable cause of ovarian cancer?
9         MS. PARFITT:  Objection.  Form.
10        THE WITNESS:  The purpose of those
11   meta-analyses was to estimate the meta-estimate of
12   relative risk.  In terms of the conclusion about
13   probable causation, I think they all commented on
14   it in their discussions.
15        And can you specify your question again,
16   whether they concluded that it was a probable
17   cause?
18   BY MS. BRANSCOME:
19        Q    Correct.
20        A    I'd have to look at the way they -- what
21   conclusions they drew, I'd have to look at that.
22        Q    Okay.  If we could look at the Berge
23   paper, which should be tab --
24        A    Let me see, I think I have the latest
25   issue of the Berge paper.

Page 248

1         Q    48 in my binder, but I don't know if you
2    have a copy in yours, which might be faster.
3         A    No, this -- I have the -- I have the
4    current Berge paper.  So...
5         Q    At page 9, I believe.
6         Well, that's confusing to say page 9.
7         A    Okay, I see that.
8         Q    Okay.  In reviewing the conclusion that
9    the Berge authors reached, would -- did the Berge
10   authors conclude that genital talc use was a
11   probable cause of ovarian cancer?
12        A    They did not indicate that they
13   concluded that.
14        Q    Okay.  And same for the Penninkilampi
15   study.
16        MS. PARFITT:  Had you finished?  Had you
17   finished your statement.
18        THE WITNESS:  Not quite.
19        There's a difference between the
20   findings of a study and the inferences that are
21   drawn from those findings.  So the findings of
22   their meta-analyses and the findings of the
23   Penninkilampi meta-analyses and findings of the
24   Taher meta-analyses are the same as my findings.
25   All four agree on the findings.

Page 249

1         Interpreting and making inferences is a
2    whole other bailiwick, a whole other activity, and
3    they don't -- didn't conclude in this section that
4    it's a probable cause.  From the same evidence, I
5    do conclude that it's a probable cause.
6    BY MS. BRANSCOME:
7         Q    Right.  And the same is true for the
8    Penninkilampi officer -- authors, correct?
9         A    Sorry, I have to go through it.
10   (Peruses document.)
11        I don't really agree with your
12   statement.  I don't think they conclude that it's
13   probable or not probable.  I don't see -- can you
14   point me to a statement that would imply that it's
15   not -- that they think it's not probable?
16        Q    Do the authors of the Penninkilampi
17   paper use the phrase, quote, suggestive of a
18   causal association, in the Conclusion section?
19        A    Yes, they do.
20        Q    Okay.  Would you say that "suggestive of
21   a causal association" is equivalent to probable
22   causation?
23        MS. PARFITT:  Objection.  Form.
24        THE WITNESS:  That's a semantic
25   question, and how different people and different

Jack Siemiatycki, Ph.D.

Page 250

1  cultures -- and I think these people are
2  Australians -- how Australians tend to use the
3  word "suggestive." I -- I don't read this in a
4  way as to suggest that they don't think it's
5  probable.
6  BY MS. BRANSCOME:
7       Q   So you don't know from reviewing the
8  Conclusion section one way or the other whether
9  the Penninkilampi authors view perineal use of
10 talc as a probable cause of ovarian cancer.
11           MS. PARFITT: Objection. Form,
12 misstates his testimony.
13           Just answer the question.
14           THE WITNESS: Yes, that's right, I -- I
15 don't.
16 BY MS. BRANSCOME:
17      Q   Okay. And as we just looked at in the
18 Taher manuscript, the Taher authors describe that
19 the data indicates perineal exposure to talc
20 powder is a possible cause of ovarian cancer in
21 humans, correct?
22           And if you need the reference, it's
23 page 49.
24      A   That's correct.
25           Possible does not preclude probable, by

Page 251

1  the way. I'm not -- I'm not assume-- are you
2  assuming that they had in mind the IARC
3  classification system and that these two
4  categories are mutually exclusive?
5       Q   My question to you, Dr. Siemiatycki, is
6  did any of the authors of the three other
7  meta-analyses, Berge, Penninkilampi or Taher,
8  conclude in their papers that perineal talc use is
9  a probable cause of ovarian cancer?
10           MS. PARFITT: Objection. Form. Asked
11 and answered.
12           THE WITNESS: They did not use that
13 word. But I would not infer that they don't think
14 it's a probable cause from the write-up of
15 their -- from their write-up. It is possible that
16 they consider the description of this as a --
17 where is the word "possible"? Is that in the
18 Conclusion?
19 BY MS. BRANSCOME:
20      Q   It is.
21      A   Oh, yeah, possible cause.
22           You know, they are -- I mean, I can't
23 speak for them because I haven't spoken to any of
24 them about this, but I don't think they're
25 speaking to a legal audience. And the word

Page 252

1  "possible" here can cover a range of possibilities
2  that includes probable.
3           So if something is possible, that means
4  it could happen, and in their view or in some of
5  their -- those authors' view, the possibility or
6  the probability of -- of such a thing happening
7  might be greater than 50 percent, and they might
8  still describe it as a possible cause of ovarian
9  cancer.
10      Q   You would be --
11           MR. KLATT: Object. Nonresponsive.
12           Sorry.
13 BY MS. BRANSCOME:
14      Q   You would be purely speculating to opine
15 that the Taher authors, for example, when they
16 used the term "possible" to describe the
17 association, they actually meant probable,
18 correct?
19           MS. PARFITT: Objection. Form.
20           THE WITNESS: I didn't say they -- they
21 actually -- I meant -- I said that it could
22 include probable.
23           And so you are -- the sense of your
24 question is to suppose or assume that their use of
25 the word "possible" excludes the concept of

Page 253

1  probable, that they did not think it's -- because
2  they used the word "possible," they absolutely
3  denied that it's probable. And I -- that's what
4  I'm disagreeing with.
5  BY MS. BRANSCOME:
6       Q   Where I'm coming from is not relevant to
7  the question that I'm asking, Dr. Siemiatycki.
8  The question that I'm asking you is, do any of the
9  authors of the three meta-analyses that we just
10 reviewed, Berge, Penninkilampi, and Taher,
11 describe in their papers the association between
12 perineal use of talc and ovarian cancer as a
13 probable causal association?
14           MS. PARFITT: Objection. Form.
15 BY MS. BRANSCOME:
16      Q   Do any of them use that term?
17           MS. PARFITT: Objection. Form.
18           THE WITNESS: None of them use that
19 term, but that doesn't preclude that they -- some
20 of them believe it is probable.
21           MR. KLATT: Object. Nonresponsive.
22 BY MS. BRANSCOME:
23      Q   You have no basis for concluding or even
24 suggesting that any of these authors have the
25 opinion that it is a probable causal association

64 (Pages 250 to 253)

Jack Siemiatycki, Ph.D.

Page 254

```
 1   other than speculating based off of what you're
 2   reading on the page, correct?
 3           MS. PARFITT:  Objection.  Form.
 4           THE WITNESS:  Correct.  Nor do I have
 5   any basis for assuming that they don't think it's
 6   probable on the basis of what I read.
 7   BY MS. BRANSCOME:
 8      Q   When you write scientific manuscripts,
 9   Dr. Siemiatycki, are you careful about your word
10   choice, particularly in your conclusion section?
11          MS. PARFITT:  Objection.  Form.
12          THE WITNESS:  I try to be.  I try to be.
13   BY MS. BRANSCOME:
14      Q   Okay.  If you could turn to tab 33 in
15   your binder.
16          Are you familiar with the document that
17   is located behind tab 33 in your binder there?
18      A   I -- I think so.  I -- mine had a
19   different cover page when I printed it off, but
20   that's fine.  I'm -- I assume it's the same one
21   I -- I had.
22          MR. TISI:  It's not.  It's not.
23          MS. PARFITT:  What are you referring to?
24          MR. TISI:  The draft article is not --
25          MS. PARFITT:  Yeah, I know that.
```

Page 255

```
 1           THE WITNESS:  Is it the Draft Screening
 2   Assessment?
 3           MR. TISI:  No, that's not the same.
 4           THE WITNESS:  No?
 5           MR. TISI:  It's not.
 6           MS. PARFITT:  Do you have a copy of
 7   yours?
 8           THE WITNESS:  Yeah.
 9           MS. BRANSCOME:  Can we go off the record
10   while we figure this out?
11          MS. PARFITT:  Sure, that would be fine.
12          THE VIDEOGRAPHER:  We're going off the
13   record at 6:58 p.m.
14          (Pause in the proceedings.)
15          THE VIDEOGRAPHER:  We're back on the
16   record at 7:01 p.m.
17   BY MS. BRANSCOME:
18      Q   Dr. Siemiatycki, you have a document in
19   front of you that is labeled a "Draft Screening
20   Assessment" dated December 2018; is that correct?
21      A   Yes, I do.
22      Q   And this is a screening assessment by
23   the Environment and Climate Change Canada, Health
24   Canada, correct?
25      A   It's a branch of Health Canada or a
```

Page 256

```
 1   bureau or division.  I'm not quite sure.
 2      Q   Okay.  And the document that you're
 3   looking at there is contained within a binder that
 4   we have previously marked as Exhibit 4, correct?
 5      A   Correct.
 6      Q   All right.  Is this an item -- is this
 7   an item.
 8          Is this Draft Screening Assessment a
 9   document that you considered in forming your
10   opinions in this case?
11      A   No, it isn't.
12      Q   Why not?
13      A   Because I was only aware of it a month
14   or -- a month and a half or two months after I
15   completed my report, and two years after I formed
16   the main part of my opinion.
17      Q   How did you obtain a copy of the Draft
18   Screening Assessment by Health Canada?
19      A   I think that this was on the internet.
20   I think I --
21          THE WITNESS:  Yeah, some other -- there
22   should be a light button that we can press.
23          Excuse me.  Excuse me, just maybe off
24   the record for a second.
25          (A discussion was held off the record.)
```

Page 257

```
 1           THE VIDEOGRAPHER:  We are going off the
 2   record at 7:03 p.m.
 3           (Pause in the proceedings.)
 4           THE VIDEOGRAPHER:  We are back on the
 5   record at 7:03 p.m.
 6   BY MS. BRANSCOME:
 7      Q   Dr. Siemiatycki, we paused because the
 8   lights turned off, but my question to you is, how
 9   did you obtain a copy of the Draft Screening
10   Assessment by Health Canada?
11      A   Either it was sent to me by Ms. Parfitt
12   or her staff, or I found it on the internet.  And
13   I can't quite remember now.
14      Q   Do you remember when you first obtained
15   a copy of the Draft Screening Assessment?
16      A   My guess is just before I went on
17   vacation for Christmas and New Years.  So it would
18   have been mid -- mid to -- mid-December, I guess,
19   something like that.
20      Q   Are you familiar with the process by
21   which draft screening assessments are generated by
22   Health Canada?
23      A   No, not really.  I was involved with
24   this department of Health Canada 30 years ago, and
25   I haven't been involved since.  I don't know how
```

65 (Pages 254 to 257)

Jack Siemiatycki, Ph.D.

1    they function really to produce these evaluations
2    and reports.
3         Q    Did you have any involvement, even
4    tangentially, in the development of the Draft
5    Screening Assessment by Health Canada?
6         A    No.
7         Q    Were you ever asked to consult on any of
8    the content that ultimately ended up in the Draft
9    Screening Assessment?
10        A    No, I wasn't.
11        Q    Were you ever contacted about
12   potentially being involved in a Draft Screening
13   Assessment of talc for Health Canada?
14        A    No. Never.
15        Q    You are aware that this is in fact a
16   draft assessment by Health Canada, correct?
17             MS. PARFITT: Objection. Form.
18             THE WITNESS: I see that's what it says
19   on the cover page.
20   BY MS. BRANSCOME:
21        Q    Are you aware of what further steps in
22   the process must be taken before the draft
23   assessment is potentially accepted or modified?
24             MS. PARFITT: Objection. Form.
25             THE WITNESS: I'm not familiar with the

1    details, no.
2    BY MS. BRANSCOME:
3         Q    What are you familiar with, if not the
4    details?
5         A    I remember seeing that there's a public
6    consultation opportunity, and -- so I guess there
7    will be a period of time during which they will
8    accept public recommendations and comments. And I
9    don't know if it's the same committee that will
10   then review all of that or a committee that's
11   higher up on the administrative pecking order. I
12   don't -- I don't know what happens internally.
13        Q    Do you intend to submit anything for
14   the -- during the public comment period?
15        A    I -- yeah, I hope to do so. I hope to
16   do so.
17        Q    What specifically do you intend to
18   submit?
19        A    I'm not sure yet. I -- I would probably
20   submit an opinion supporting the notion that
21   perineal use of talc is more likely than not
22   related to ovarian cancer.
23        Q    In your submission, do you intend to
24   disclose your role in litigation involving talcum
25   powder products?

1         A    Yes.
2         Q    Do you believe --
3         A    If I make such a submission, yes.
4         Q    Why -- well, first of all, do you think
5    it's important to disclose your involvement in the
6    litigation if you were to submit something for
7    public comment?
8         A    Yes, I think it is.
9         Q    And why is that?
10        A    Because there's a potential conflict of
11   interest, and they should know about it.
12        Q    Would you also notify IARC of your role
13   in litigation involving talcum powder products if
14   you submitted something to them to suggest that a
15   formal evaluation of talc be conducted?
16        A    Yes, I would.
17        Q    Is that for the same reason?
18        A    Yes, it is.
19        Q    Is the Draft Screening Assessment the
20   type of material that you think it is reliable to
21   base an expert opinion on?
22             MS. PARFITT: Objection. Form.
23             THE WITNESS: An expert opinion about
24   what?
25   BY MS. BRANSCOME:

1         Q    About the potential relationship between
2    talc and ovarian cancer.
3              MS. PARFITT: Objection. Form.
4              THE WITNESS: Are you asking if it would
5    influence my opinion on the issue or --
6    BY MS. BRANSCOME:
7         Q    So under- -- understanding that the
8    Draft Screening Assessment came out after you had
9    formed your opinion, I'm asking you that if that
10   had not been the case, if it had come out while
11   you were still forming your expert opinion, is
12   this something that you would rely on?
13        A    I would take cognizance of it, and I'm
14   not sure whether it would persuade me in one
15   direction or another on the strength of the
16   evidence, but it -- it would certainly give me --
17   increase my comfort level to draw inferences to
18   see what inferences other people draw. I won't
19   necessarily follow their opinions, but I find it
20   useful to know what inferences they would draw
21   from it.
22        Q    Is a Draft Screening Assessment the type
23   of report or publication that you see cited in
24   published scientific literature?
25             MS. PARFITT: Objection. Form.

Jack Siemiatycki, Ph.D.

Page 262

1        THE WITNESS:  Not -- not -- in
2   scientific literature, not so much, no.
3   BY MS. BRANSCOME:
4        Q    The draft assessment -- first of all,
5   are you familiar with the proposal with respect to
6   talc that's contained in the draft assessment?
7        A    Which proposal are you referring to?
8        Q    I could refer you specifically to
9   page --
10       MR. TISI:  I spilled coffee on it too.
11   Sorry.  You get what you get.
12   BY MS. BRANSCOME:
13       Q    -- on page 29.
14       A    The Conclusion section?
15       Q    Yes.  Have you reviewed this before?
16       A    I -- I might have looked at it quickly.
17   But let me -- let me review it -- let me read it
18   now.  (Peruses document.)
19            You know, it refers to the fit of the --
20   their findings and conclusions with various
21   articles of law in the Canadian Environmental
22   Protection Act.  I would have to know what those
23   articles of law are that this conforms to, that
24   these sentences purportedly conform to.  I -- I
25   have no reason to doubt what they say, but I -- I

Page 263

1   can't confirm.
2        Q    So as you sit here today, are you
3   capable or prepared to offer an opinion as to how
4   the conclusions in the Draft Screening Assessment
5   relate to other pieces of literature that we've
6   discussed today?
7        MS. PARFITT:  Objection.  Form.
8        THE WITNESS:  How they relate to -- or
9   whether they're concordant with other pieces?
10   It's difficult for me to say without studying this
11   document more and seeing what the conformity is
12   with the Canadian pieces of legislation that they
13   refer to.  So I -- I can't -- I can't give you
14   much more than that.
15   BY MS. BRANSCOME:
16       Q    So as you sit here today, could you --
17   do you have an opinion as to how the proposal in
18   the Draft Screening Assessment with respect to
19   talc relates to the current IARC classification of
20   talc?
21       MS. PARFITT:  Objection.  Form.
22       THE WITNESS:  By proposal, you mean the
23   conclusion?
24       MS. PARFITT:  The entire document.
25       THE WITNESS:  You're -- you're

Page 264

1   describing the conclusion as a proposal?  Or --
2   yeah.
3   BY MS. BRANSCOME:
4        Q    Focusing specifically on the second
5   paragraph where it says:  "It is proposed to
6   conclude that talc meets the criteria under
7   paragraph 64(c) of CEPA as it is entering or may
8   enter the environment in a quantity or
9   concentration or under conditions that constitute
10   or may constitute a danger in Canada to human life
11   or health."
12       MS. PARFITT:  Objection.  Form.
13       THE WITNESS:  It's not a way of
14   describing scientific evidence that I'm intimately
15   familiar with.  So I would need to review this
16   document in more detail and be aware of the
17   paragraph 64(c) of the CEPA.
18   BY MS. BRANSCOME:
19       Q    And that is not something you --
20       A    So I'm not --
21       Q    -- have done as of today?
22       A    It's not something I base -- today I
23   couldn't say I agree with this or I don't agree
24   with this.
25       Q    Okay.  And so this is not -- the Draft

Page 265

1   Screening Assessment by Health Canada is not
2   something that you are relying upon in any way in
3   offering your expert opinions in this case; is
4   that correct?
5        MS. PARFITT:  Objection.  Form,
6   misstates his testimony.
7        THE WITNESS:  No.  As I said, I didn't
8   rely on this to form my opinion.
9   BY MS. BRANSCOME:
10       Q    Okay.
11       MS. BRANSCOME:  Could we go off the
12   record just briefly?
13       MS. PARFITT:  Of course.
14       THE VIDEOGRAPHER:  We're going off the
15   record at 7:15 p.m.
16       (Pause in the proceedings.)
17       THE VIDEOGRAPHER:  We're back on the
18   record at 7:16 p.m.
19   BY MS. BRANSCOME:
20       Q    Dr. Siemiatycki, can you describe -- can
21   you identify for me specifically the pieces of
22   evidence that you would cite to in support of your
23   opinion that there is evidence consistent with a
24   dose-response relationship that was not considered
25   by the IARC 2006 working group?

67 (Pages 262 to 265)

Jack Siemiatycki, Ph.D.

Page 266

1        A    Can --
2        Q    And I'm just looking for an
3    identification of the papers.
4        A    Let me just dig out -- I keep hiding
5    things from myself.
6        MS. PARFITT:  Okay.
7        THE WITNESS:  Oh, there.
8        The primary pieces of evidence -- the
9    primary piece of evidence is the analysis carried
10   out in the Terry, et al., paper where they
11   combined ten different studies from eight
12   different research teams.  They had by far the
13   largest sample size of any conglomeration of
14   studies ever conducted, enough to properly
15   evaluate dose-response.  And that's one of them.
16       The second one is the Schildkraut study,
17   which is much smaller than the Terry study in
18   terms of numbers.
19       And the third -- a third one, which was
20   not part of the evidence that influenced my
21   evaluation, is the latest version of the Berge
22   paper which has some dose-response results in a
23   table whose origin I don't completely understand,
24   but ostensibly it gives dose-response trends that
25   are significant and meaningful for duration and

Page 267

1    frequency of exposure.  But I would put less
2    weight on that until I fully understand what --
3    how they derived those estimates.
4    BY MS. BRANSCOME:
5        Q    Okay.  So the pieces of evidence that
6    you would cite to in support of the idea that
7    there has been a development that is supportive of
8    a dose-response relationship between perineal talc
9    and ovarian cancer since the IARC classification
10   of talc as a 2B would be the Terry, the
11   Schildkraut, and potentially the Berge analysis;
12   is that correct?
13       MS. PARFITT:  Objection --
14       THE WITNESS:  Yes.
15       MS. PARFITT:  -- to the reference of
16   "potentially the Berge."  Form.
17   BY MS. BRANSCOME:
18       Q    You did not rely in any way on the
19   analysis in the Berge 2018 paper for your
20   conclusion that there is evidence compatible with
21   a dose-response relationship between perineal talc
22   use and ovarian cancer, correct?
23       A    That's correct.
24       Q    Okay.  So looking first at the Terry
25   2013 paper.  This is tab 14 or you're welcome to

Page 268

1    use your own copy if that's more convenient.
2        A    Yep.  There we go.  Okay.
3        Q    Did the authors of the Terry 2013 paper,
4    did they conclude in their manuscript that they
5    had observed a statistically significant dose-
6    response relationship between the perineal use of
7    talc and ovarian cancer?
8        A    They reported two different ways of
9    calculating the statistical significance of a
10   trend.  One of them was significant, and the other
11   was formal, in terms of the conventional 0.05
12   statistical significance level, was not
13   significant at that level.
14       Q    And in fact in the abstract, the authors
15   of the Terry paper state that:  "Among genital
16   powder users, we observed no significant trend,
17   p equals 0.17, in risk with increasing number of
18   lifetime applications," in parentheses, "assessed
19   in quartiles."
20       Did I read that correctly?
21       A    That's correct.
22       Q    Okay.  Now, in your 2016 report --
23       A    Yeah.
24       Q    -- you had the statement that:  "The
25   appropriate statistical test for trend is one that

Page 269

1    excludes the baseline unexposed category."
2        Do you remember having that sentence in
3    your 2016 report?
4        A    I remember the -- the idea being there,
5    yes.
6        Q    Okay.  And you would agree that if you
7    apply that statistical test for trend, meaning you
8    exclude the baseline unexposed category, the Terry
9    2013 paper does not demonstrate a dose-response
10   relationship, correct?
11       MS. PARFITT:  Objection.
12       THE WITNESS:  No.
13       MS. PARFITT:  Misstates testimony.
14       THE WITNESS:  So I would not conclude --
15   I would say that it demonstrates dose-response,
16   but not at a statistical -- at a 0.05 statistical
17   significance level.
18       And I would also -- I can't remember the
19   wording and the context in the 2016 report that
20   you're referring to, but I would imagine that I
21   preceded that statement with some mention of the
22   fact that it depends if you are using the overall
23   risk among all exposed people compared to
24   unexposed people as a complementary piece of
25   information.

68 (Pages 266 to 269)

Jack Siemiatycki, Ph.D.

Page 270

1    And it's only in the context when you
2 are using the -- all the exposed compared to all
3 the unexposed, and at the same time carrying out
4 an analysis of the different levels of exposure,
5 that including the unexposed among the -- in that
6 trend analysis becomes overlapping information
7 with the overall -- the significance of the
8 overall estimate.
9 BY MS. BRANSCOME:
10    Q   Okay.
11    A   This -- I'm not quite finished. Sorry.
12    So -- and because I don't want you to
13 think that I believe or believed that on its own
14 there is no evidence of dose-response. There is
15 evidence of dose-response in the Terry analysis.
16 The choice of which p-value to report on the trend
17 analysis depends completely on how one combines
18 that information with the ever exposed/never
19 exposed information and the p-value for that.
20 That when we want completely independent and
21 separate strands of evidence to corroborate each
22 other, then it's appropriate to exclude the
23 unexposed from the p-value computation.
24    When you are using -- when you are not
25 using the binary exposed/unexposed as part of the

Page 271

1 package of information to demonstrate causation,
2 then the correct p-value is the one that includes
3 the unexposed. So it depends how you use these
4 things.
5    If I didn't qualify that statement that
6 you read before, then I was in error.
7    Q   If you did not have the Terry 2013
8 study --
9    A   Yes.
10    Q   -- set that aside for a moment, you did
11 not have that data, would it still be your opinion
12 that the perineal use of talc probably causes
13 ovarian cancer?
14    A   So --
15    MS. PARFITT: Objection. Form.
16    THE WITNESS: So just to be clear what
17 the hypothetical supposition is, so the Terry
18 paper doesn't exist, but the studies underlying
19 the Terry paper still do exist, correct? Or they
20 don't exist either?
21    So there are ten studies underlying the
22 Terry reanalysis. Is your hypothetical question
23 about the possibility that none of those studies
24 existed or that they existed, but nobody actually
25 put them together to combine an analysis? What

Page 272

1 are you positing?
2 BY MS. BRANSCOME:
3    Q   Of those ten studies, which, if any of
4 them, postdate 2006? Do you know?
5    A   Most of them do. I would say -- I think
6 the only one -- ones that were published before
7 2006 were a study by Chang and one or two of the
8 components of Cramer's studies. I think the rest
9 were all published post-2006.
10    Q   Okay. Did you independently do an
11 analysis of the potential dose-response
12 relationship of perineal talc use and ovarian
13 cancer?
14    MS. PARFITT: Objection. Form.
15    THE WITNESS: By "independently," you
16 mean trying to replicate the Terry analysis? No.
17 I don't see why I would be motivated to do
18 something that someone else has already done.
19 BY MS. BRANSCOME:
20    Q   Okay. So you are relying on the data as
21 reported by Terry 2013 that you consider to be
22 evidence in support of a dose-response
23 relationship, correct?
24    A   That's correct.
25    Q   Okay. But the authors themselves do not

Page 273

1 conclude that there has been a statistically
2 significant dose-response relationship established
3 for the perineal use of talc and ovarian cancer,
4 correct?
5    MS. PARFITT: Objection. Form,
6 misstates the evidence.
7    THE WITNESS: I -- I didn't review what
8 they concluded in the Discussion section. If you
9 want, I could review that. And I -- I don't
10 remember what -- what kind of narrative inferences
11 they made about it.
12 BY MS. BRANSCOME:
13    Q   Okay.
14    A   You're asking me to confirm that they
15 didn't conclude, so I would want -- their data in
16 my mind indicates dose-response. How they
17 interpret it -- as I said before, they're two
18 separate things, the production of findings from
19 research and the interpretation of those findings.
20    I am as capable of interpreting -- they
21 aren't as capable of interpreting my findings from
22 my studies as I am or they are as capable -- they
23 have the right to. I have the right to interpret
24 their findings. It's a different activity
25 producing findings and then interpreting them. So

69 (Pages 270 to 273)

Jack Siemiatycki, Ph.D.

Page 274

1  how they interpreted their findings, I don't quite
2  remember exactly what they said about it.
3      Q    Okay.
4          MS. BRANSCOME:  I am going to pass to
5  counsel for Imerys at this time.
6          MR. KLATT:  Can we go off the record for
7  just a couple of minutes?  Let me get organized.
8          THE VIDEOGRAPHER:  We are going to go off the
9  record at 7:31 p.m.
10          (Pause in the proceedings.)
11          THE VIDEOGRAPHER:  We are going back on
12  the record at 7:32 p.m.
13          DIRECT EXAMINATION
14  BY MR. KLATT:
15      Q    Good afternoon -- good evening,
16  Dr. Siemiatycki.
17      A    Good evening.  How are you?
18      Q    I'm Mike Klatt.  I represent Imerys Talc
19  America in this case.
20          I don't know if you recall or not, but
21  you and I had met about two years ago when you
22  were giving a deposition in the Oules and Swan
23  cases.  Do you recall that?
24      A    I do recall that.
25      Q    Okay.

Page 275

1      A    Very fondly.
2      Q    Thank you.
3          I just have a few questions for you, and
4  I want to go back and just make sure the record is
5  clear on something.
6          Your testimony is you've had no contact
7  or communications whatsoever with anyone with
8  Health Canada regarding talc; is that correct?
9      A    That's correct.
10      Q    And you've had no contact or
11  communications whatsoever with Dr. Krewski or
12  anyone else who's an author of the Taher
13  meta-analysis regarding talc?
14      A    That's correct.
15      Q    That's correct.  Okay.
16          A minute ago I believe you told
17  Ms. Branscome that if you continued to interact
18  with IARC or have contact with Health Canada
19  regarding the issue of talc and ovarian cancer,
20  it's incumbent upon you to have a conflict of
21  interest disclosure, correct?
22      A    Yes.  I said that.
23      Q    And you would agree with me it would be
24  important in evaluating any potential bias you
25  have for the people at Health Canada and the

Page 276

1  people at IARC and the public generally to know
2  that you had been a retained and paid expert by
3  plaintiffs' counsel in the talc ovarian cancer
4  litigation; is that correct?
5      A    Sir, can you -- I think I already said
6  that, but could you repeat?  Maybe I'm
7  misunderstanding.
8      Q    Yes.  I'm just saying such a conflict of
9  interest disclosure on your part, it would be
10  important to disclose not merely that you had been
11  a consultant or merely that you had been involved
12  in litigation involving ovarian cancer, but it
13  would be important to specifically disclose that
14  you had been a retained and paid expert by
15  plaintiffs' counsel in the talc/ovarian cancer
16  litigation.  Correct?
17          MS. PARFITT:  Objection.  Form, asked
18  and answered.
19          THE WITNESS:  I -- I'm not sure I
20  understand the distinction between this last
21  affirmation and the one before.  I -- yes, it --
22  BY MR. KLATT:
23      Q    Well, we've had -- we've had other
24  conflict of interest disclosures, and I put that
25  in quotes, where people said that they had been a

Page 277

1  consultant, period.  That wouldn't be sufficient,
2  would it?
3      A    I would --
4          MS. PARFITT:  Objection.  Form.
5          THE WITNESS:  I would not do that.
6  BY MR. KLATT:
7      Q    And we've had people say, I've been
8  involved as an expert in ovarian cancer
9  litigation.  That wouldn't be sufficient either,
10  correct?
11          MS. PARFITT:  Objection.  Form.
12          THE WITNESS:  I would not do that.
13  BY MR. KLATT:
14      Q    What you would do is you would say, I
15  have been a retained and paid expert by
16  plaintiffs' counsel in the talc/ovarian cancer
17  lawsuits, or something essentially equivalent to
18  that.
19      A    I -- I would say something essentially
20  equivalent.  It's quite possible that if there was
21  a submission to a journal, for example, or a
22  manuscript, the journal may have a formulaic way
23  of expressing that.  So...
24      Q    But wouldn't it be important to the
25  readers to know which side of the litigation you

Jack Siemiatycki, Ph.D.

Page 278

1　had been on in evaluating your bias?
2　　　MS. PARFITT: Objection. Form, asked
3　and answered.
4　　　THE WITNESS: I -- I would -- I would
5　disclose the nature of my involvement.
6　BY MR. KLATT:
7　　Q　Including which side?
8　　A　Including which side I was consulting
9　for.
10　　Q　Okay.
11　　　MR. KLATT: Can we mark this as the next
12　exhibit?
13　　　MS. PARFITT: 14.
14　　　(Exhibit No. 14 was marked for
15　　　identification.)
16　BY MR. KLATT:
17　　Q　Dr. Siemiatycki, you said earlier that
18　you worked with Dr. Koushik; is that correct?
19　　A　Yes.
20　　Q　And what is your professional
21　relationship with Dr. Koushik?
22　　A　We are members of the same academic
23　department. We are down the hall from each other.
24　Our offices are nearby each other. We have worked
25　together on various projects.

Page 279

1　　Q　For how long?
2　　A　Ten -- 10 or 12 years now.
3　　Q　And she's very well educated, correct?
4　　　MS. PARFITT: Objection.
5　　　THE WITNESS: I'm not sure what you mean
6　by that. She has a --
7　BY MR. KLATT:
8　　Q　Well, she has a Bachelor --
9　　A　She has a --
10　　Q　-- of Science in pharmacology from the
11　University of Alberta.
12　　A　Correct.
13　　Q　She has a Master's in community health
14　and epidemiological from Queen's University in
15　Kingston, Ontario?
16　　A　Uh-huh.
17　　Q　She has a Ph.D. in epidemiology from --
18　in epidemiology and biostatistics from McGill
19　University here in Montreal, correct?
20　　A　Correct.
21　　Q　And she's had a postdoctoral fellowship
22　at Harvard in the U.S., correct?
23　　A　Correct.
24　　Q　And she is the principal investigator of
25　the Prevention of Ovarian Cancer in Quebec, the

Page 280

1　PROVAQ study, correct?
2　　A　Correct.
3　　Q　And that's the study she is working on
4　with you, correct?
5　　A　More I'm working on with her, but she's
6　the lead on that.
7　　Q　And with the help of others in your
8　group as well --
9　　A　With the help of others, yes.
10　　Q　-- correct?
11　　　And what I've handed you --
12　　　MR. KLATT: And what was the exhibit
13　number?
14　　　MR. TISI: 14.
15　BY MR. KLATT:
16　　Q　Exhibit 14 is Dr. Koushik's web pages
17　from the Environ Epi website. You're familiar
18　with that website, correct?
19　　A　Yes, I am.
20　　Q　And you'll turn to the back page of the
21　exhibit, the final page, and you will see it's
22　copyrighted 2019, correct?
23　　A　Correct.
24　　Q　And let's just see what Dr. Koushik says
25　about her research on the first page. She says:

Page 281

1　"My research program focuses on the epidemiology
2　of ovarian and lung cancers." Correct?
3　　A　Mm-hmm, yes.
4　　Q　"Ovarian cancer is by far the most
5　deadly of all gynecologic cancer. Most patients
6　are diagnosed at advanced stages, leading to the
7　poor prognosis, and we are currently limited in
8　our ability to detect disease early." Correct?
9　　A　Correct.
10　　Q　She says: "There is overwhelming
11　evidence that healthy lifestyle choices can reduce
12　the risk of several cancers. However, we do not
13　yet know of any effective ways to prevent the
14　onset of ovarian cancer."
15　　　Would you agree with that?
16　　　MS. PARFITT: Objection. Form.
17　　　THE WITNESS: I'm sorry, I'm trying to
18　think of what this sentence really means. It's
19　kind of a -- it's kind of a stock sentence that is
20　used in -- by epidemiologists when they're looking
21　for funding and trying to convince funders that
22　we don't know a lot, and therefore they need to
23　give us money. So I can imagine part of this is
24　cut-and-pasted from that sort of document.
25　BY MR. KLATT:

71 (Pages 278 to 281)

Jack Siemiatycki, Ph.D.

Page 282

```
 1        Q   Well, what it means is --
 2        MS. PARFITT:  Wait, wait.  Please let
 3   him finish.
 4   BY MR. KLATT:
 5        Q   Go ahead.
 6        MS. PARFITT:  Thanks, Mike.
 7        THE WITNESS:  There are some risk
 8   factors that are well established for -- for
 9   ovarian cancer, which Anita is very well aware of,
10   genetic and certain reproductive and hormonal
11   factors.
12        The evidence on talc is accumulating,
13   and in my view is sufficient.  Anita has not
14   reviewed that evidence.  And --
15   BY MR. KLATT:
16        Q   Have you talked to Dr. Koushik at all
17   about your involvement in the talc ovarian cancer
18   litigation?
19        A   She's aware that I'm involved in this.
20        Q   Well, let's go on to see what she says
21   here.
22        After saying:  "However, we do not yet
23   know of any effective ways to prevent the onset of
24   ovarian cancer," she says, "the evidence on some
25   lifestyle factors, such as alcohol intake,
```

Page 283

```
 1   physical activity, and smoking, is suggestive but
 2   currently remains unclear."  Correct?
 3        A   Correct.
 4        Q   She doesn't say one word about talc,
 5   does she?
 6        A   No.
 7        MS. PARFITT:  Objection.  Form.
 8        THE WITNESS:  Not here, no.
 9   BY MR. KLATT:
10        Q   And then she goes on to say:  "More
11   research is greatly needed, especially in light of
12   recent discoveries that demonstrate that ovarian
13   cancer is a heterogeneous disease."  She says:  "I
14   am the principal investigator of the Prevention of
15   Ovarian Cancer in Quebec, PROVAQ study, a
16   population-based case-control study conducted in
17   2011, 2016."
18        And one of the things she's evaluating
19   in that study is talc, correct?
20        A   Correct.
21        Q   "This study provides" -- and I'm reading
22   on -- "This study provides a rich data source for
23   the study of multiple hypotheses on lifestyle
24   factors and ovarian cancer.  Current projects
25   focus on associations with shift work, caffeine
```

Page 284

```
 1   intake, and recreational physical activity."
 2   Correct?
 3        A   Correct.
 4        Q   She doesn't say a word about talc there,
 5   does she?
 6        MS. PARFITT:  Objection.  Form.
 7        THE WITNESS:  She doesn't there because
 8   she hasn't started those analyses yet.  She has
 9   started analyses -- or her -- with students on
10   those other factors.
11   BY MR. KLATT:
12        Q   And then flipping over to the next page,
13   Dr. Koushik says:  "Healthy lifestyle choices may
14   also positively impact the health of ovarian
15   cancer survivors.  Indeed, until we know how to
16   prevent ovarian cancers from occurring in the
17   first place, cancer control through tertiary
18   prevention aimed at improving prognosis and
19   quality of life among those diagnosed is
20   critical."  Correct?
21        A   Correct.
22        Q   And again, no mention at all of talc,
23   correct?
24        MS. PARFITT:  Objection.  Form.
25        THE WITNESS:  Correct.
```

Page 285

```
 1        MR. KLATT:  Let's mark that.
 2        MS. PARFITT:  This is now 15.
 3        MR. KLATT:  Have we marked that?
 4        MS. PARFITT:  I just now did.  I was
 5   looking for the stickers.  I'm going to get one --
 6   here they are.
 7        THE WITNESS:  I have a different cover.
 8        MS. PARFITT:  It's a different one.
 9   That's yours.
10        THE WITNESS:  Oh.
11        MS. PARFITT:  This is different, this is
12   a new item.  Let me just put an exhibit on this
13   one.
14        (Exhibit No. 15 was marked for
15        identification.)
16        MS. PARFITT:  Thank you.
17        Okay.  You're done with this.  And he's
18   just showing you this one.
19        Do we have an extra copy, Mike, or is
20   this it?
21        MR. KLATT:  I've got an extra copy if
22   you need it.
23        MS. PARFITT:  Okay, that would be great.
24   I will give him that one.  Thank you very much.
25   BY MR. KLATT:
```

72 (Pages 282 to 285)

Jack Siemiatycki, Ph.D.

Page 286

1    Q    So, Dr. Siemiatycki, I'm now showing you
2  what we marked as exhibit -- what?
3             MS. PARFITT:  15.
4             MR. KLATT:  15?
5             MS. PARFITT:  Yes.
6  BY MR. KLATT:
7    Q    And it's from the Environ Epi website,
8  your website, and it's the web pages discussing
9  group research topics, correct?
10    A    I -- I have to tell you I don't look at
11  this website, and I haven't actually constituted
12  it.  It's my secretary or my assistant who does
13  this.  So I'm looking at it afresh to see what's
14  there.  Yeah.
15    Q    Okay.  Let's -- let's turn to the very
16  back page, and again the copyright is 2019.
17  That's this year, correct?
18    A    Yeah.  Yes.
19    Q    And then if you will flip over to --
20  let's see.  Well, let's start -- let's see.
21             Go first page, second page, third
22  page -- the fourth page, there's a discussion
23  there of the PROVAQ study of Dr. Koushik that we
24  just talked about, correct?
25    A    Yes.

Page 287

1    Q    And the topic says:  "Prevention of
2  Ovarian Cancer in Quebec, the PROVAQ study, a
3  case-control study of modifiable and genetic
4  factors associated with the risk of ovarian
5  cancer."  Correct?
6    A    I see that.
7    Q    And it says Anita Koushik, that's
8  Dr. Koushik, who we've just been talking about,
9  and it says Jack Siemiatycki.  That's you,
10  correct?
11    A    That's right.
12    Q    And then it goes on to describe what the
13  PROVAQ study is, and it says -- and I'll skip the
14  first few sentences -- it says:  "Primary
15  prevention thus offers the most promising approach
16  to reducing the morbidity and mortality associated
17  with this deadly disease.  Established preventive
18  factors for ovarian cancer include high parity,
19  long duration of lactation, oral contraceptive
20  use, and tubal ligation."  Correct?
21    A    That's what it says.
22    Q    Talc is not included in that list of
23  established preventive factors, is it?
24    A    It's not listed there, no.
25    Q    "However, the ability to modify these

Page 288

1  reproductive factors is limited.  There is
2  suggestive evidence that modifiable factors in the
3  vitamin D pathway, (sun exposure, diet), and
4  inflammation pathway (antiinflammatory medication
5  use, talc use for feminine hygiene) may play a
6  role in ovarian cancer risk, though this research
7  has been limited by small sample sizes, crude
8  exposure measurement and lack of control for
9  important confounders."  Correct?
10    A    That's what it says.
11    Q    Did I read that correctly?
12    A    Yes, you did.
13    Q    So on this public website, your
14  Environmental Epi website, Dr. Jack Siemiatycki
15  doesn't say talc use causes ovarian cancer,
16  correct?
17             MS. PARFITT:  Objection.  Form.
18             THE WITNESS:  I don't say anything on
19  that website.
20  BY MR. KLATT:
21    Q    Well, you -- your group doesn't say talc
22  causes ovarian cancer, does it?
23             MR. TISI:  Objection.  Form.
24             THE WITNESS:  In my opinion, this was
25  created somewhere around 2009, 2010, 2012, in that

Page 289

1  ballpark.  This feels to me like a cut and paste
2  from the grant application of 2009 or 2010 that
3  hasn't been changed.
4             There's not really a lot of motivation
5  for us to -- besides just sort of putting our
6  names and faces up there, our institution asks us
7  to put something on this institutional website
8  for a researcher.  I haven't -- I've never looked
9  at this.
10  BY MR. KLATT:
11    Q    You or your organization --
12             MS. PARFITT:  Wait.  Mike -- Mike,
13  excuse me, I think we're done.
14             THE WITNESS:  I've never contributed to
15  this or looked at it.
16             MS. PARFITT:  No, no, Mike,
17  unfortunately, your time is up.
18             MR. KLATT:  You've --
19             MS. PARFITT:  Mike, no more questions.
20  I have a few questions.  I think we're --
21             MR. KLATT:  Are we -- are we done?
22             THE VIDEOGRAPHER:  Yes.
23             MR. KLATT:  All right.
24             MS. PARFITT:  Thank you.  I do have a
25  few.

73 (Pages 286 to 289)

Jack Siemiatycki, Ph.D.

Page 290

```
 1          Dr. Siemiatycki, I'm going to stay right
 2   over here for a moment, okay?  And we can get
 3   through this.  Okay?
 4          MR. KLATT:  Here, I'll give this back to
 5   you.
 6          THE WITNESS:  Hi.
 7          MS. PARFITT:  Tell me when you are
 8   ready.
 9          THE WITNESS:  Who are you?
10          MS. PARFITT:  I know.
11          MR. TISI:  Are we back on?  Are we back
12   on?
13          THE VIDEOGRAPHER:  I didn't stop.
14   Sorry, I --
15          MR. TISI:  Oh, I thought we were off.
16          MS. PARFITT:  Okay.  We didn't -- we
17   didn't know that.
18              CROSS-EXAMINATION
19   BY MS. PARFITT:
20     Q   Dr. Siemiatycki, good evening --
21         Okay.  Dr. Siemiatycki, good evening.  I
22   know it's been a long day, and I have a few
23   questions, and I will be wrapping -- or jumping
24   around a bit, so hopefully try and keep pace with
25   me, and I'll try and speak slowly and -- so that
```

Page 291

```
 1   we can move through the remainder of your
 2   deposition.
 3          Dr. Siemiatycki, do you have an opinion
 4   as to whether the elimination of talcum powder use
 5   in the genital area is a lifestyle activity that
 6   is modifiable?
 7          If you need me to ask the question
 8   again, I'm happy to.
 9     A   Yeah, I'm trying to think of how the
10   word "modifiable" is used.
11     Q   Is it preventable?  Is the use of talcum
12   powder products in the genital area a preventable
13   activity?
14     A   Yes.
15          MS. BRANSCOME:  Objection.
16   BY MS. PARFITT:
17     Q   All right.  Thank you.
18         All right.  You were asked some
19   questions about the Taher article.  You remember
20   that?
21     A   Yes.
22     Q   All right.  And is it your understanding
23   that the Taher article is a meta-analysis that was
24   formed as part of the Health Canada
25   recommendation?
```

Page 292

```
 1          MS. BRANSCOME:  Objection.
 2          THE WITNESS:  I think it was ordered --
 3   it was contracted in order to underpin the Health
 4   Canada evaluation.  That's my --
 5   BY MS. PARFITT:
 6     Q   All right.  Now, it was not the only
 7   study or research that was conducted by Health
 8   Canada; is that correct?  It was the meta-analysis
 9   that was conducted by them.
10          MS. BRANSCOME:  Objection.
11          THE WITNESS:  Sorry, I -- what --
12   BY MS. PARFITT:
13     Q   The Taher study --
14     A   Study.
15     Q   -- is a meta-analysis; is that correct?
16     A   Yes.  Yes.
17     Q   All right.  And the Taher meta-analysis
18   was one part of the information that formulated
19   part of the Health Canada draft assessment?
20     A   That's my understanding, yes.
21     Q   All right.  Now, Daniel Krewski, you
22   indicated, was one of the authors of the Taher
23   paper.
24     A   Yes.  He's listed.
25     Q   And I believe you testified that you
```

Page 293

```
 1   know Daniel Krewski.
 2     A   Yes, I do.
 3     Q   And I believe Mr. Klatt asked you
 4   whether or not you had reached out or perhaps
 5   Ms. Branscome asked you whether or not you have
 6   had any communication with anyone, verbal, oral,
 7   written, that had anything to do with Health
 8   Canada.  Do you remember that?
 9     A   Yes, I do remember.
10     Q   All right.  And it's been many hours,
11   but it was my understanding in response to that
12   question, you did indicate that you had sent an
13   e-mail to Daniel Krewski; is that correct?
14          MS. BRANSCOME:  Objection.
15          THE WITNESS:  I don't remember saying
16   that.
17   BY MS. PARFITT:
18     Q   Okay, let me ask you.  Have you ever
19   reached out to any member or author of the Taher
20   meta-analysis?
21     A   I -- when I learned about it, I sent an
22   e-mail to Dan Krewski asking if this report was
23   intended for publication; and if so, when it would
24   appear, and I haven't -- I didn't have any
25   response.
```

Jack Siemiatycki, Ph.D.

Page 294

1    Q    All right.  So you have had no
2    communication with any of the authors of the Taher
3    study or any of the members of Health Canada?
4        A    No.
5        Q    Okay.  Now, you were asked some
6    questions with regard to the Schildkraut study in
7    particular.  Now, what I'd like you to do is, if
8    you can get that in front of you, and I believe
9    it's part of the documentation in your binder,
10   number 4.
11           And what I'd ask you to also do, if you
12   will, is pull out your paper, your Terry paper --
13   your copy of the Terry paper, and maybe we'll go
14   there first.
15       A    Terry?
16       Q    If you get the Terry.  Do you have the
17   Terry in front of you?
18       A    Yeah, I've got it in front of me, yes.
19       Q    Okay.  Now, Ms. Branscome asked you and
20   referred you to the abstract of the Terry paper.
21   Do you recall that --
22       A    Yes.
23       Q    -- examination?
24       A    Yes.
25       Q    And I believe she focused your attention

Page 295

1    on the very last sentence of the Terry paper, the
2    next to last sentence which started with "Among
3    genital powder users."
4            Do you see that?
5        A    I see that.
6        Q    All right.  And she asked you whether or
7    not indeed the abstract section of the Terry paper
8    said:  "Among genital powder users, we observed no
9    significant trend, p equals 0.17, in risk with
10   increasing numbers of lifetime applications
11   (assessed in quartiles)."
12       A    I see that.
13       Q    All right.  You've had an opportunity to
14   read this --
15       A    I've read it --
16       Q    -- article?
17       A    -- several times over the last three
18   years.
19       Q    All right.  Let me direct your attention
20   to the actual paper, and specifically to -- not
21   the abstract of the paper but to the section
22   that's entitled -- I believe it's the Discussion
23   section and it's over on page 817.
24       A    Yes.
25       Q    All right.  Do you have that in front of

Page 296

1    you?
2        A    Yes, I do.
3        Q    And I believe it's a continuation of the
4    Results section --
5        A    Yes.
6        Q    -- which starts on 815 and continues all
7    the way over to the end of the document.  Do you
8    see that?
9        A    I do.
10       Q    All right.  And specifically about
11   halfway down on page 817 of the Results section of
12   the Terry paper, what did the authors find as it
13   pertains to whether or not there is evidence
14   demonstrating dose-response as it relates to
15   genital powder use and ovarian cancer?
16       A    So are you referring to the sentence
17   that begins "Although a significant increase"?
18       Q    Correct.
19       A    Or before that?
20       Q    Whatever you need to read, but I was
21   specifically --
22       A    Okay.
23       Q    -- referring to the "although."  And you
24   can read that paragraph, please.
25       A    Okay.  So I'll start at the beginning of

Page 297

1    that paragraph.
2        Q    Please, if you will.
3        A    Read out loud?
4        Q    If you will.
5        A    "We evaluated cumulative genital powder
6    exposure as a composite variable of frequency and
7    duration of use.  We have observed similar
8    increased risks of all nonmucinous subtypes of
9    epithelial ovarian cancer combined across
10   quartiles of genital powder compared with nonuse."
11   The OR in the first quartile is 1.18 with
12   confidence intervals.  In the second quartile, it
13   was 1.22.  In the third quartile, it's 1.22.  And
14   the fourth quartile it's 1.37.
15           I didn't read the confidence intervals.
16       Q    Are the confidence intervals for the
17   quartiles you just discussed all statistically
18   significant?
19       A    Yes, they are.
20       Q    All right.  Please continue.
21       A    "Although a significant increase in risk
22   with an increasing number of genital powder
23   applications was found for nonmucinous epithelial
24   ovarian cancer when nonusers were included in the
25   analysis with a p-value that's extremely small,"

75 (Pages 294 to 297)

Jack Siemiatycki, Ph.D.

Page 298

```
 1   highly significant, "no trend in cumulative use
 2   was evident in analyses restricted to ever users
 3   of genital powder for trend .17. Taken together,
 4   these observations suggest that the significant
 5   trend test largely reflects the comparison of ever
 6   regular use with never use."
 7         Q    Okay, and if you would stop there.
 8         What is the significance of the findings
 9   of the authors in that paragraph you just read as
10   it pertains to whether or not this study shows a
11   dose-response increase?
12         A    Well, so my interpretation is that
13   overall there is, for users compared to nonusers,
14   a highly significant trend, and four -- among the
15   four - there are four quartiles, and there is a
16   fifth group called nonusers -- they have a
17   relative risk of 1.0. And in those five groups,
18   the relative risk -- the relative risk estimates
19   go from 1.0 to 1.18 to 1.22, 1.22, 1.3,
20   something, 7. Those five values indicate to me a
21   tendency of increasing risk with increasing
22   exposure. Whether it is -- whether there's formal
23   proof of that in a -- from a statistical
24   significance point of view is a secondary issue as
25   to compared with whether the data is compatible
```

Page 299

```
 1   with dose-response.
 2         So as you may recall, in the IARC 2006
 3   evaluation and in -- I guess in the Langseth
 4   paper, I think we indicated that we were very
 5   concerned about the consistency of increased
 6   risks, but found no evidence of dose-response, and
 7   that held back any inference that the
 8   categorization should be greater than a 2B.
 9         The findings from Terry turn on its head
10   the assumptions that were made at IARC that there
11   was no evidence of dose-response. Now there is
12   evidence of dose-response, whether or not it's
13   significant by one test or another test.
14         Q    All right. Thank you.
15         All right. Let me direct your
16   attention, if I may, to the Health Canada
17   document, specifically the Draft Screening
18   Assessment dated December 2018. Again, I believe
19   it's in your notebook 4.
20         A    6 -- yeah. Yes.
21         Q    All right.
22         A    Okay, I have it.
23         Q    Now -- now --
24         A    Sorry, the Taher or the Draft Screening
25   Assessment?
```

Page 300

```
 1         Q    The Draft Screening Assessment, right.
 2         A    Yes.
 3         Q    Okay. And specifically, let me direct
 4   your attention to Roman number -- Roman numeral
 5   III of that document.
 6         A    Yes.
 7         Q    Okay.
 8         MS. BRANSCOME: Michelle, would you mind
 9   helping me follow along?
10         MS. PARFITT: Oh, I'm sure.
11         MR. TISI: I can give you my copy.
12         MS. PARFITT: Sure. Absolutely.
13         MR. KLATT: You may want those.
14         MS. BRANSCOME: Thank you. What page
15   are we on?
16         MS. PARFITT: Counsel, I'm on Roman
17   numeral III.
18         MS. BRANSCOME: Oh, the page -- I had a
19   section number that I couldn't find --
20         MS. PARFITT: No. At the bottom it has
21   a Roman numeral III.
22   BY MS. PARFITT:
23         Q    Dr. Siemiatycki, referring you to the --
24   first, second, third -- fourth full paragraph of
25   the Draft Screening Assessment, the fourth full --
```

Page 301

```
 1         A    Begins with "full"?
 2         Q    No, it begins with "The meta-analysis."
 3         A    "The meta-analysis." Yep.
 4         Q    Correct.
 5         Would you please -- does it state: "The
 6   meta-analysis of the" -- am I reading this
 7   correctly?
 8         "The meta-analysis of the available
 9   human studies in the peer-reviewed literature
10   indicate a consistent and statistically
11   significant positive association between perineal
12   exposure to talc and ovarian cancer."
13         Did I read that correctly?
14         A    Yes, you did.
15         Q    All right. Is that your opinion,
16   Dr. Siemiatycki, based upon your review of the
17   totality of the literature on talc powder --
18   talcum powder use and ovarian cancer in the
19   genital area?
20         A    Yes, it is.
21         Q    All right. It goes on to say: "Further
22   available data are indicative of a causal effect."
23         Did I read that correctly?
24         A    Yes, you did.
25         Q    All right. Is it your opinion based
```

76 (Pages 298 to 301)

Jack Siemiatycki, Ph.D.

Page 302

```
 1    upon the totality of not only the epidemiological
 2    data and findings but mechanistic data, animal and
 3    in vivo data, that indeed the data is indicative
 4    of a causal effect?
 5         MS. BRANSCOME:  Objection.
 6         MR. KLATT:  Objection.  Form.
 7         THE WITNESS:  I believe it is more
 8    likely than not that there is a causal
 9    relationship between exposure to talc powder and
10    ovarian cancer.  And if those two sentences are
11    taken to be equivalent, then I agree with the
12    sentence.
13    BY MS. PARFITT:
14         Q    Well, let me ask you this,
15    Dr. Siemiatycki:  You've read the draft
16    assessment, and do you have -- is it fair to say
17    that the methodology that the authors performed
18    throughout the course of this particular draft
19    assessment is the same type of methodology that
20    you have performed for purposes of preparing your
21    report and offering the opinions that you have and
22    will continue to offer the court in -- in the
23    litigation involving talcum powder use and ovarian
24    cancer?
25         MS. BRANSCOME:  Objection.
```

Page 303

```
 1         THE WITNESS:  The authors of this report
 2    I think include a group -- a multidisciplinary
 3    group, including toxicologists and possibly
 4    environmental scientists.  I'm not familiar with
 5    them, so I can't say for sure.  And in that sense,
 6    they cover a broader disciplinary background than
 7    I cover myself.  So in that sense, they have a
 8    broader scope to evaluate the totality of the
 9    evidence than I have.
10         Their evaluation of the epidemiologic
11    evidence seems in line with my own, and I have no
12    reason to doubt the validity of their toxicologic
13    analyses of the evidence.
14    BY MS. PARFITT:
15         Q    All right.  Dr. Siemiatycki,
16    specifically let me refer you to page 15, and it's
17    entitled "Perineal Exposure to Talc."  And let me
18    know when you get there.
19         A    Yes, I'm there.
20         Q    All right.  Based upon your review of
21    that section beginning on page 15, and I believe
22    it goes all the way through page 21, are you able
23    to -- do you have a sense as to the methodology
24    again that the authors of the draft assessment
25    employed in order to arrive at their causal
```

Page 304

```
 1    assessment?
 2         MS. BRANSCOME:  Objection.
 3         THE WITNESS:  When you say
 4    "methodology" --
 5    BY MS. PARFITT:
 6         Q    Mm-hmm.
 7         A    -- I'm not sure if you're referring to
 8    sort of high level methodology like collecting
 9    original data, evaluating it, weighing it, and
10    making inferences on the basis of that data.
11    BY MS. PARFITT:
12         Q    What I'm asking is, did the authors
13    perform a Bradford Hill-like causality assessment
14    in the performance of their study entitled Draft
15    Screening Assessment?
16         MR. KLATT:  Objection.  Form.
17         THE WITNESS:  You're saying in the pages
18    between 15 and --
19    BY MS. PARFITT:
20         Q    Correct.  I'll shorten it by --
21         A    -- 21?
22         Q    Correct.  Correct.
23         And if I can refer your attention to or
24    direct you to page 20.
25         A    They commented on various considerations
```

Page 305

```
 1    that Bradford Hill mentioned in his article.
 2         Q    And which ones did they provide
 3    information and findings on?
 4         A    They commented on the strength of the
 5    association, on consistency, specificity,
 6    temporality, biological gradient, biological
 7    plausibility, and coherence.
 8         Q    And what did the authors conclude --
 9    after looking at the various Bradford Hill
10    factors, what did they conclude in that last
11    paragraph of their Bradford Hill assessment?
12         A    "Suggests a small but consistent
13    statistically significant positive association
14    between ovarian cancer and perineal exposure to
15    talc.  Further available data are indicative of a
16    causal effect."
17         Is it -- is that what you're referring
18    to?
19         Q    Yes.  And do you agree with the authors
20    of the draft report of December 2018, when they
21    conclude that:  "The most recent meta-analysis
22    detailed, Taher 2018, and consistent with the Hill
23    criteria suggest a small but consistent
24    statistically significant positive association
25    between ovarian cancer and perineal exposure to
```

77 (Pages 302 to 305)

Jack Siemiatycki, Ph.D.

Page 306

1    talc. Further available data are indicative of a
2    causal effect"?
3        A   Yes.
4        MR. KLATT: Objection to form.
5    BY MS. PARFITT:
6        Q   Thank you. All right.
7        Let me ask a couple other questions, and
8    I need you -- if you will, can you reach over
9    there, I believe it was exhibit number -- do you
10   see your book on occupational diseases? I think
11   it's under -- there you go. Okay.
12       Okay. Now, you were asked many hours
13   ago some questions regarding the book Risk Factors
14   for Cancer in the Workplace.
15       Do you recall that?
16       A   Yes, I do.
17       Q   All right. And that is indeed a book
18   that was authored by you, Jack Siemiatycki,
19   correct?
20       A   Correct.
21       Q   All right. And I believe you were asked
22   whether there was anything in your book that
23   described the methodology that you have employed
24   over the course, and I believe you said the last
25   four decades or almost four decades.

Page 307

1        Do you recall those questions?
2        A   Yes, I do.
3        MS. BRANSCOME: Objection.
4    BY MS. PARFITT:
5        Q   All right. Where in that book, if there
6    is something in that book, does it describe the
7    methodology that you have employed over the course
8    of the last four decades that you still employ
9    today in your analysis and opinions and findings
10   in the talcum powder product litigation and
11   ovarian cancer?
12       MS. BRANSCOME: Object to form.
13       THE WITNESS: I'm looking for -- well, I
14   guess the main thing I would -- I would summarize
15   that --
16   BY MS. PARFITT:
17       Q   And could you tell us for the record --
18       A   Yes.
19       Q   -- Dr. Siemiatycki, where you are?
20       A   Where I'm reading?
21       Q   Yes, please.
22       A   Thank you. I'm looking at page 298 in
23   this book, and I -- did you provide a copy of that
24   chapter?
25       MR. TISI: Doctor, you have copies --

Page 308

1    you have copies in that binder that you had
2    printed out.
3        MS. BRANSCOME: May I have a copy if he
4    is going to read from it?
5        MS. PARFITT: Absolutely. And I thought
6    we had -- do you have any copies in there?
7        THE WITNESS: Oh, for this --
8        MS. PARFITT: No.
9        MR. TISI: It wasn't marked. It was in
10   the stuff you printed out.
11       MS. PARFITT: I think I've got one here.
12       (A discussion was held off the record.)
13       MS. PARFITT: Ms. Branscome, here you
14   go. Here's copies.
15       And let's have this marked as now
16   exhibit -- I'm not sure what we're up to.
17       MR. TISI: We're up to 18. 18.
18       MS. PARFITT: 18. Okay.
19       And for the record, we are marking the
20   face sheet of the book Risk Factors for Cancer in
21   the Workplace by Jack Siemiatycki, and
22   specifically the table --
23       MS. BRENNAN: I have 16.
24       MR. TISI: No, because he marked --
25       MS. BRENNAN: Yeah, 14 --

Page 309

1        MR. KLATT: Actually, it should be 16.
2        MS. PARFITT: 16? Thank you. 16.
3        All right. We are now marking as
4    Exhibit 16 the book entitled Risk Factors for
5    Cancer in the Workplace by Dr. Jack Siemiatycki,
6    which specifically includes the table of contents,
7    Chapter 7, "Interpretation of Findings," pages 297
8    through 308.
9        MR. DONATH: Is that an excerpt, not the
10   whole thing?
11       MS. PARFITT: It is -- it is not. We'll
12   make the book available, but it's just the
13   excerpt.
14       (Exhibit No. 16 was marked for
15   identification.)
16       MS. BRANSCOME: Did someone just join
17   the line?
18       THE REPORTER: They hung up.
19       THE WITNESS: Shall I read a couple of
20   paragraphs from this?
21   BY MS. PARFITT:
22       Q   Well, the question was -- the question
23   was whether or not there was any bases or writings
24   that discussed the methodology that you've
25   employed over the last four decades, and you

78 (Pages 306 to 309)

Jack Siemiatycki, Ph.D.

Page 310

1    commented that it was in your book.
2        MS. BRANSCOME: Object --
3    BY MS. PARFITT:
4        Q   So please tell us what's in your book.
5        MS. BRANSCOME: Object to form.
6        THE WITNESS: Well, I -- I won't read
7    the whole book.
8    BY MS. PARFITT:
9        Q   I appreciate that. We all --
10       A   I have a phone book downstairs that I
11   could -- no, I will just read a couple of
12   paragraphs that talk about interpreting and
13   conducting epidemiologic research in general, not
14   specifically related to this particular study --
15   set of studies that I describe in the book.
16       "The main purpose of epidemiology is to
17   find the cause of disease. Despite some
18   controversy concerning the validity of drawing
19   causal inferences in epidemiology. There is a
20   consensus that sanctions and provides guidelines
21   for the practice. The evaluation of causality
22   between a putative risk factor and disease is a
23   complex and subjective process. Equally competent
24   scientists examining the same information can
25   arrive at different conclusions. However, as

Page 311

1    additional evidence is accumulated, beliefs and
2    consensuses may change. The criteria that are
3    most relevant to the problem of evaluating
4    causality between cancer and an antecedent
5    occupational exposure may be paraphrased as
6    follows:
7        Number 1: "Is sampling variability a
8    plausible explanation for the observed
9    association?"
10       Number 2: "How strong is the
11   association and is there a dose-response
12   relationship?"
13       Number 3: "Is bias or confounding a
14   plausible explanation for the observed
15   association?"
16       Number 4: "Is the association
17   biologically plausible?"
18       Number 5: "Is there relevant supporting
19   evidence from other epidemiologic studies or from
20   non-human test systems, such as animal
21   experimentation or tests of mutagenicity?"
22       I'll stop there. But in answer to your
23   question, this text, published 30 years ago now,
24   encapsulates my approach to how to interpret and
25   use epidemiologic evidence in assessing causality.

Page 312

1    Is that what you were --
2        Q   That's what I wanted to know.
3        A   -- asking?
4        Q   Thank you. All right.
5        Now, do you recall, Dr. Siemiatycki,
6    that you were asked some questions about the
7    mechanism underlying exposure to talc and genital
8    use of talcum powder products and ovarian cancer?
9    Do you remember Ms. Branscome asked you some
10   questions about that?
11       A   The mechanism of exposure or the
12   mechanism of carcinogenesis?
13       Q   The mechanism of exposure --
14       A   Okay.
15       Q   -- between talcum powder products and
16   ovarian cancer. Do you remember there were a
17   series of questions that were asked about that?
18       MS. BRANSCOME: Object to form.
19       THE WITNESS: I'm -- I'm not --
20   BY MS. PARFITT:
21       Q   Okay. Let me -- okay. Let me -- let me
22   do this. Let me refer you to your report, if you
23   will, and I believe it's been marked as -- I think
24   this is 10 -- as 10.
25       Do you have your report in front of you?

Page 313

1        A   Yes.
2        Q   Very good. Okay.
3        All right. And specifically I'm
4    referring to page 64 and 65.
5        A   So I'm one or two pages off, so just
6    tell me which section.
7        Q   Okay. I believe it's -- it's under
8    "Biological Plausibility." Do you see that in the
9    lower part? Let's see.
10       A   "Biological Plausibility" -- (reading to
11   himself.) Strength. Okay. I've got it
12   somewhere -- consistency. Here.
13       Q   Okay.
14       A   "Biological Plausibility," yes.
15       Q   Now, I specific -- I believe
16   specifically the question that you were asked is
17   whether or not you will be testifying with regard
18   to the mechanism and the biological mechanism for
19   causing cancer with genital use of talcum powder
20   products. Do you remember that?
21       A   Yes.
22       Q   Okay. Now, in the course of your
23   analysis and in looking at that issue of
24   biological mechanism for causing cancer, what did
25   you consult and review and assess for purposes of

79 (Pages 310 to 313)

Jack Siemiatycki, Ph.D.

Page 314

```
 1    formulating your opinions on that topic?
 2         MS. BRANSCOME: Objection.
 3         THE WITNESS: I actually started with
 4    the IARC 2006 report where there was a high level
 5    subgroup of toxicologists and basic scientists who
 6    reviewed the evidence. So I read that material.
 7         I've read various articles concerning
 8    migration of particles, articles about
 9    inflammation as a carcinogenic process, oxidative
10    stress as part of the carcinogenic process. And
11    towards the end, started looking at articles about
12    asbestos in talc as filling in some of the
13    information about what the content of talcum
14    powder products were. I at one point was looking
15    at company documents to try to figure out what
16    were the time relationships of using talc versus
17    using substitutes for talc. So all of those kinds
18    of things I was looking for.
19    BY MS. PARFITT:
20         Q   So for purposes of evaluating the
21    evidence and opining on the issue of talcum powder
22    products and ovarian cancer, did you consider the
23    issue of biological plausibility?
24         MS. BRANSCOME: Objection.
25         THE WITNESS: Yes, I considered it.
```

Page 315

```
 1    BY MS. PARFITT:
 2         Q   All right. And what was the basis of
 3    your opinion as to whether or not there was
 4    biological plausibility between talcum powder
 5    product use in the genital area and ovarian
 6    cancer?
 7         MS. BRANSCOME: Objection. Assumes he
 8    formed an opinion.
 9         THE WITNESS: Well, my --
10    BY MS. PARFITT:
11         Q   Dr. Siemiatycki, did you formulate an
12    opinion with regard to whether there was
13    biological plausibility between the use of talcum
14    powder products and ovarian cancer?
15         A   Yes, I did.
16         Q   Okay.
17         A   And the first part of the discussion is
18    what one means by "plausibility." And so one
19    issue that I took off the table quite soon is the
20    notion that biological plausibility is synonymous
21    with biological proof. Neither Bradford Hill nor
22    anyone else who has described the use of
23    biological plausibility as a criterion has ever
24    claimed that biological proof of a mechanism is
25    necessary before you can opine about the -- about
```

Page 316

```
 1    causality.
 2         So the bar for establishing plausibility
 3    for me is, are there credible scientists who are
 4    persuaded or have reasonable confidence that there
 5    is a mechanism that can explain the observation.
 6    And if so, I would defer to that point of view as
 7    being plausible.
 8         I would not accept that one or more
 9    scientists developing a mechanistic theory are
10    definitely proven, but if there is a credible
11    point of view in the scientific community about
12    the mechanism, I would call that plausible. It
13    doesn't mean it's proven. It's plausible.
14         And to my satisfaction, when I looked at
15    the different reports, including reports of
16    experts in the litigations, I was reasonably
17    assured that there are plausible theories and
18    plausible hypotheses.
19         Q   All right. In your section of your
20    expert report on page 64 through 66, did the
21    factors you identify under the subtitle
22    "Biological Plausibility" provide support for your
23    opinions that indeed there is biological
24    plausibility between the use of genital use of
25    talcum powder products and ovarian cancer?
```

Page 317

```
 1         A   I think they provide evidence of
 2    plausibility for those theories.
 3         Q   And did you consider those for purposes
 4    of opining that talcum powder products in the
 5    genital area, used, can cause ovarian cancer?
 6         A   Yes, I considered them.
 7         Q   All right. Dr. Siemiatycki, I'm not
 8    sure of the -- I don't think we marked it as an
 9    exhibit, so let me do that now. I believe we're
10    up to 17.
11         (A discussion was held off the record.)
12         (Exhibit No. 17 was marked for
13         identification.)
14    BY MS. PARFITT:
15         Q   All right. Dr. Siemiatycki, do you
16    recall the discussion you had with Ms. Branscome,
17    again several hours ago, on the issue of
18    confounding and how that can impact study designs?
19         A   Oh, yes.
20         Q   All right. Let me show you a document
21    we have marked as Exhibit No. 17, and it's
22    entitled "Degree of confounding bias related to
23    smoking ethnic group, and socioeconomic status and
24    estimates of the association between occupation
25    and cancer," and I believe that's an article that
```

80 (Pages 314 to 317)

Jack Siemiatycki, Ph.D.

Page 318

```
 1   you were an author, correct?
 2      A   That's correct, yes.
 3      Q   All right.  What, if any, support did
 4   that particular article that you wrote, I guess
 5   back in 1988, provide, if any, for the opinions
 6   that you've rendered in this case on the topic of
 7   confounding and bias?
 8      A   In this study we evaluated 75
 9   associations, 25 occupations in relation to lung
10   cancer, to bladder cancer and to stomach cancer,
11   each of them.  And we looked at the association
12   between each occupation and each of the three
13   types of cancer, adjusting for the smoking history
14   of the patients and the subjects.  But another set
15   of analyses not adjusting for their smoking
16   histories, and their socioeconomic status and
17   their ethnic group.  These are factors that are
18   strongly associated with cancer and with different
19   occupations.  We wanted to see how large a
20   confounding bias could be generated by not having
21   proper confounder information.
22          And so I will just read a couple of
23   sentences from the abstract of this article.
24          "Of the 75 associations studied, only
25   one OR was distorted by more than 40 percent.  A
```

Page 319

```
 1   40 percent distortion would correspond to an odds
 2   ratio of 1.4 when comparing unadjusted with
 3   adjusted estimates.  Three were distorted by
 4   between 30 percent and 40 percent, and four others
 5   by between 20 percent and 30 percent."
 6          So of these 75 associations, not taking
 7   account of very powerful confounders -- smoking is
 8   the most powerful confounder we know.  Ethnicity
 9   and socioeconomic status are important
10   confounders.  They have strong relative risks with
11   these different cancers.  Not taking them into
12   account could create artifactual odds ratios,
13   maximum of 1.4, even though the original odds
14   ratios of the confounders with these cancers could
15   be as high as 10.
16          So there's a very -- the confounding
17   effect, at most, would be 10 percent or 20
18   percent, but the likelihood that there is some
19   unknown confounder with -- with ovarian cancer
20   that is artifactually creating across the board,
21   across all these studies, an artifactual relative
22   risk of around 1.3 would require some -- that
23   unknown confounder to have an extremely high
24   relative risk, certainly higher than 2, maybe
25   higher than 3 or 4, which is not inconceivable but
```

Page 320

```
 1   low probability.
 2          And this is part of what leads me and
 3   what led me in my report to opine that confounding
 4   is unlikely to be the explanation for the observed
 5   relative risks.
 6      Q   Thank you.  All right.
 7          THE VIDEOGRAPHER:  Excuse me, Counsel.
 8          MS. PARFITT:  Off the record, yes.
 9          THE VIDEOGRAPHER:  Off the record?
10          MS. PARFITT:  Yeah, it's a good time,
11   because you're running out of tape.  I could tell.
12          THE VIDEOGRAPHER:  Going off the record
13   at 8:27 p.m.
14          (Recess.)
15          THE VIDEOGRAPHER:  We're going back on
16   the record at 8:31 p.m.
17          MS. PARFITT:  Thank you.
18   BY MS. PARFITT:
19      Q   Dr. Siemiatycki, just one last question.
20          Let me direct your attention to again
21   the documents in your Exhibit No. 4, specifically
22   the "Weight of Evidence:  General Principles and
23   Current Applications at Health Canada," which
24   formed part of the Health Canada recommendation.
25   All right?
```

Page 321

```
 1      A   I'm not sure if it formed part of the
 2   recommendation or if it's a background document.
 3      Q   Very good.  I think you're probably
 4   right.
 5          All right.  And you have -- you have had
 6   a chance to review that, correct?
 7      A   Yes.
 8      Q   All right.  Specifically let me direct
 9   your attention to page 7 of that document.  And
10   I'm going to go down to the very last paragraph,
11   and it starts with:  "The majority of risk
12   assessment reports, however, provide a logical
13   narrative description of the relative strengths or
14   weakness of various lines of evidence considered.
15   For most risk assessments, individual lines of
16   evidence are polled and integrated into a final
17   conclusion based on best professional judgment and
18   not mathematical formula."
19          Did I read that correctly?
20      A   Yes, you did.
21      Q   Do you agree with the statement by
22   Health Canada in their "Weight of Evidence:
23   General Principles"?
24      A   Yes, I do.
25          MS. PARFITT:  All right.  I have no
```

Jack Siemiatycki, Ph.D.

Page 322

1    further questions.  Thank you.
2         THE WITNESS:  This is also in conformity
3    with all guidelines from agencies and experts who
4    understand science.
5         MS. PARFITT:  Very good.
6         THE WITNESS:  The best data is
7    collected, compiled, and then interpreted by human
8    expert judgment.
9         MS. PARFITT:  Thank you very much,
10   Dr. Siemiatycki.  I believe counsel has some
11   follow-up.
12        MS. BRANSCOME:  I do, but I think I need
13   to take a break to confer amongst ourselves.
14        MS. PARFITT:  Go ahead.
15        THE VIDEOGRAPHER:  We're going off the
16   record at 8:33 p.m.
17        (Recess.)
18        THE VIDEOGRAPHER:  We are going back on
19   the record at 8:46 p.m.
20            REDIRECT EXAMINATION
21   BY MS. BRANSCOME:
22   Q    Good evening, Dr. Siemiatycki.
23        I have some follow-up questions to the
24   questions that were just asked to you by
25   plaintiffs' counsel.

Page 323

1         Both myself and counsel for Imerys asked
2    you very specifically if you had had contact with
3    any of the authors in connection with the Taher
4    paper or the Health Canada paper.  Do you recall
5    the questions that we asked you?
6    A    I -- I recall that you asked questions
7    about it, yes.
8    Q    Yeah.  Is there a reason why during my
9    questioning and questioning by counsel for Imerys
10   you did not recall having sent an e-mail to
11   Dr. Krewski with respect to the potential
12   publication of the Taher paper?
13   A    I -- I guess I consider -- well, two
14   parts.  I consider a contact sort of a two-way
15   process, and there was no two-way process.  I sent
16   him a message.  He never responded.
17        And number two, it -- it dropped off of
18   my memory screen.  I -- I just forgot about it
19   until she asked.
20   Q    When did you contact Dr. Krewski about
21   the Taher paper?
22   A    In December, when I first learned about
23   it.
24   Q    What specifically did you ask him?
25   A    My recollection, I asked him if -- the

Page 324

1    gist of it was whether the paper has been or will
2    be submitted for publication.  I don't recall if
3    there were other important components.  It was a
4    brief message, besides pleasantries of people
5    who've known each other for 30 years.
6         But, you know, I said I -- I've learned
7    about this work that you were involved with.  I
8    can't remember what else I said.
9    Q    In your e-mail communication to
10   Dr. Krewski, did you alert him to the fact that
11   you were serving as a -- an expert on behalf of
12   plaintiffs' counsel in litigation involving talcum
13   powder?
14   A    I don't recall.  Your question used the
15   plural, and in my -- you said "in your
16   communications."  That's what I heard.  No?  Okay.
17   Q    I meant it in the singular.
18   A    You meant it in the singular, so I guess
19   the record will reflect.
20        In my one message to Dr. Krewski -- let
21   me -- if I may.
22   Q    My question again, Dr. Siemiatycki --
23   A    Yeah, please.
24   Q    -- is in your e-mail to Dr. Krewski with
25   respect to the Taher paper, did you notify him in

Page 325

1    that e-mail that you were serving as an expert
2    witness retained on behalf of plaintiffs' counsel
3    in litigation involving talcum powder?
4    A    I -- I -- I don't recall if I did or
5    not.  I -- I wouldn't have thought it was a
6    crucial thing to indicate in this first message
7    asking him if his paper was in press or in
8    publication or something like that.
9    Q    Why did you want to know whether it had
10   been submitted for publication?
11   A    I wanted to know what the status of that
12   report was.  I had no -- I didn't follow up my --
13   it wasn't an important issue for me.  I was -- it
14   was kind of an idle gesture of, you know, Hi, I
15   haven't heard from you for a while.  I see that
16   you have this thing.  Are you sending it for
17   publication?  Something like that.
18        And I -- the motivation, was there a
19   specific ulterior motive?  No, there was no --
20   there was nothing I would have done differently.
21   I guess if he had told me, yes, it's about to be
22   submitted, I would have wanted to see the final
23   version, because the version that I saw was
24   obviously an early manuscript.  It was much too
25   long for a -- for a publication submission.  But

Jack Siemiatycki, Ph.D.

Page 326

1    it wasn't a big deal for me to -- to have
2    information about that manuscript.
3        Q    Including communications in which you
4    unilaterally reached out to individuals but may
5    not have received a response, have you
6    communicated in any form with any of the
7    participants in the development of the Health
8    Canada Draft Screening Assessment or the Taher
9    paper, other than what we have discussed with
10   respect to Dr. Krewski?
11       A    No.
12       Q    The Health Canada Draft Screening
13   Assessment, you were asked a number of questions
14   about that by counsel for plaintiffs.  Is that a
15   document that you have reviewed closely in forming
16   your opinions in this case?
17       MS. PARFITT: Objection.  Form.
18       THE WITNESS:  I wouldn't say that I
19   reviewed it closely the way I've reviewed the
20   evidence before submitting my report.  No.
21   BY MS. BRANSCOME:
22       Q    All right.  I want to talk to you about
23   Exhibit 17.  You have that over there.  It's the
24   "Degree of confounding bias related to smoking."
25       A    Oh, yeah.

Page 327

1        Q    All right.  Dr. Siemiatycki, is
2    Exhibit 17 an article that you identified to
3    address the likelihood that a confounding variable
4    could explain the increased risk that you have
5    found in your meta-analysis with respect to the
6    use of talc?
7        A    Yes.
8        Q    Okay.  So I just want to direct you to
9    page 623.  In the right-hand column, do you see a
10   paragraph that begins "One of the criteria"?
11       A    Yes.
12       Q    Does it state:  "One of the criteria
13   used by epidemiologists to distinguish true from
14   false associations is the strength of the
15   association"?  Did I read that correctly?
16       A    Yes, you did.
17       Q    And again, this is an article on which
18   you are the lead author, correct?
19       A    Correct.
20       Q    It continues on:  "That is, among two
21   relative risk assessments which have equal levels
22   of statistical significance but one of which is
23   much greater than 1, while the other is closer
24   to 1, the larger one is considered more likely to
25   reflect a true association than the smaller one."

Page 328

1        Did I read that correctly?
2        MS. PARFITT:  Counsel, just with one
3    correction.  It came out as "estimates."  The
4    article says "estimates," and it came out on the
5    transcript as "assessments."
6        MS. BRANSCOME:  Okay.
7        THE WITNESS:  That -- do you understand
8    what she's indicated?
9    BY MS. BRANSCOME:
10       Q    Yes.  Did I read it correctly?
11       A    You misread one word.
12       Q    Okay.
13       A    But it's not important, but if you want
14   to have it for the record.
15       Q    Well, we can continue on.
16       A    Yes.
17       Q    "This consideration follows from the
18   recognition that some degree of bias is quite
19   likely in any non-experimental study."
20       Did I read that correctly?
21       A    Yes.
22       Q    "Small excess relative risks, even if
23   they are statistically significant, are often
24   interpreted with great caution, if not
25   skepticism."

Page 329

1        Did I read that correctly?
2        A    Yes.
3        Q    "Although there has been no explicit
4    consensus on what level of excess relative risk
5    should be considered too small to be taken
6    seriously, we believe that many epidemiologists
7    use a cut point in the range of 1.2 to 1.5 for
8    this purpose.  Our results indicate that a cut
9    point in this range is reasonable for studies of
10   cancer occupation associations."
11       Did I read that correctly?
12       A    Yes, you did.
13       Q    And the references in those sentences to
14   the words "we" and "our" would include you,
15   Dr. Siemiatycki, correct?
16       A    Correct.
17       Q    And then if we could turn the page to
18   page 624, the paragraph at the top on the
19   left-hand column, I direct your attention to the
20   last complete sentence of that paragraph.
21       "On the other hand, our results also
22   imply that relative risk estimates as low as 1.2
23   for lung cancer associations or 1.1 for bladder or
24   stomach cancer associations run a fair chance of
25   being attributable to confounding bias, even if

83 (Pages 326 to 329)

Jack Siemiatycki, Ph.D.

Page 330

1  they are," quote, "statistically significant."
2       Did I read that correctly?
3       A   Yes, you did.
4       Q   Is that a conclusion that you and your
5  authors reached in the paper that's been
6  identified as Exhibit 17?
7       A   Yes, it was.
8       Q   Your opinion with respect to the
9  existence of biological plausibility of the
10  perineal use of talc and ovarian cancer is limited
11  to the evaluation of whether or not there are
12  credible scientists who are persuaded that there
13  is a mechanism; is that correct?
14       MS. PARFITT: Objection. Form.
15       THE WITNESS: Can you repeat that? I'm
16  sorry.
17  BY MS. BRANSCOME:
18       Q   Your opinion with respect to the
19  existence of biological plausibility of the
20  perineal use of talc and its potential to cause
21  ovarian cancer is limited to an evaluation of
22  whether or not there are credible scientists who
23  are persuaded that there is a mechanism, correct?
24       MS. PARFITT: Objection. Form.
25  Misstates his testimony.

Page 331

1       THE WITNESS: I would say is based on,
2  rather than is limited to.
3  BY MS. BRANSCOME:
4       Q   Do you have expertise that would allow
5  you to determine what the most likely biological
6  mechanism is, if there is one, for perineal use of
7  talc to cause ovarian cancer?
8       A   No, I wouldn't pretend to -- to have
9  that kind of expertise.
10       Q   Okay.  Is it also true that you are not
11  qualified to opine on the ability or not of talc
12  particles to migrate to the ovaries from the use,
13  the perineal application of talc?
14       MS. PARFITT: Objection. Form.
15       THE WITNESS: Not on the basis of my
16  research, not on the basis of my training, but on
17  the basis of my reading of literature concerning
18  that issue, I have an opinion based on what I've
19  read from experts in the -- that field.
20  BY MS. BRANSCOME:
21       Q   But in forming that opinion, you are
22  relying on --
23       A   Yes.
24       Q   -- the expertise of others, correct?
25       A   Yes.

Page 332

1       MS. PARFITT: Object to form.
2       THE WITNESS: Correct.
3  BY MS. BRANSCOME:
4       Q   You indicated in response to questions
5  by plaintiffs' counsel that you were persuaded by
6  the opinions of other experts in the litigation
7  with respect to biological plausibility.  Who are
8  those experts?
9       A   I -- I think I indicated that such
10  experts contributed to the information that I had,
11  not that they were the only ones who persuaded me.
12  So there was literature and there were depositions
13  and reports.
14       So -- I'm trying to remember the names
15  of the various expert reports that I have read and
16  depositions.  I do -- there's the Plunkett, the
17  Saed papers, but I don't know if there was a
18  report by Saed.  There was -- let me look in my
19  list of references.  (Peruses document.)
20       I'm sorry, I'm drawing a blank on the
21  names of the people whose reports and testimonies
22  I've read in the last month or two.
23       Q   When were you provided with copies of
24  these expert reports?
25       A   In the fall.  Some before November 15th

Page 333

1  and some after November 15th.  And -- but also
2  I'm -- I'm reflecting on the various reports and
3  testimonies from the earlier trial, and I read
4  various expert reports from that time.
5       Q   Did you draft the section in your MDL
6  expert report related to biologic plausibility?
7       A   Yes, I did.
8       Q   You personally summarized each of the
9  various studies that you refer to in that section?
10       A   What do you mean by summarized the
11  studies?  I -- I summarized the evidence that's
12  captured there, and I provided references for
13  those statements, yes.
14       Q   You're the original author of the
15  language in that section is my question.
16       A   Yes.  Yes.
17       Q   Can you identify for me which expert
18  reports related to biological plausibility you had
19  reviewed before forming your opinion as
20  represented in the MDL report?
21       A   As I said, it's partly a number of
22  reports that I had seen in the previous trial, and
23  I -- I'm drawing a blank on the names of -- of the
24  people.
25       Q   You understand that there will be

Jack Siemiatycki, Ph.D.

Page 334

1    experts retained by defense counsel who will
2    provide reports addressing biological
3    plausibility, correct?
4        A    I assume so, yeah.
5        Q    Okay.  Are you qualified to evaluate
6    between competing expert reports who is correct
7    about the biological mechanism?
8        MS. PARFITT:  Objection.  Form.
9    BY MS. BRANSCOME:
10       Q    To the extent one exists.
11       MS. PARFITT:  Objection.  Form.
12       THE WITNESS:  No -- no, I wouldn't be.
13   I mean I -- I can read reports from people outside
14   my area and form an opinion about the general
15   coherence and -- and form an initial sense of the
16   credibility of the various reports.  And I'd be
17   happy to review the reports of the experts for the
18   defense on these issues.
19   BY MS. BRANSCOME:
20       Q    But to the extent, for example, that
21   there are credible experts on both sides of the
22   debate, whether or not there has been an
23   established biological mechanism and whether or
24   not there have not been, you are not qualified to
25   evaluate between the two credible experts?

Page 335

1        MS. PARFITT:  Objection.  Form.
2        THE WITNESS:  That's correct.  And I've
3    never pretended that -- make -- that it is
4    necessary for me to establish the correct
5    biological mechanism before drawing inferences
6    about causality.
7    BY MS. BRANSCOME:
8        Q    It is your conclusion that more likely
9    than not perineal use of talc can cause ovarian
10   cancer is based on the epidemiological evidence,
11   correct?
12       MS. PARFITT:  Objection.  Misstates his
13   evidence and testimony today.
14       THE WITNESS:  In part -- in large part.
15   Yes.
16   BY MS. BRANSCOME:
17       Q    Okay.  Well, my question now is about
18   the, in small part, the evidence in addition to
19   that.  What evidence are you considering that you
20   are qualified to independently evaluate?
21       A    I am qualified to evaluate whether there
22   is a plausible theory about it.  Not to establish
23   whether that theory is correct or not.
24       MS. BRANSCOME:  Okay.  All right.  If we
25   could just go off the record very briefly.

Page 336

1        THE VIDEOGRAPHER:  We are going off the
2    record at 9:05 p.m.
3        (Pause in the proceedings.)
4        THE VIDEOGRAPHER:  We're back on the
5    record at 9:06 p.m.
6        MS. BRANSCOME:  At this time I will pass
7    questioning to counsel for Imerys.
8        MS. PARFITT:  Thank you.
9        REDIRECT EXAMINATION
10   BY MR. KLATT:
11       Q    Dr. Siemiatycki, a few more questions,
12   sir.
13       I'm going to read a statement and ask if
14   you agree with it.  Okay?
15       A    Yes.
16       Q    "When a pronounced binary association is
17   present, use of the never or no category in
18   assessing trend can induce a trend where none
19   exists."
20       A    Okay.  Can you -- yeah, thank you.
21       Q    And my question is, do you agree or
22   disagree with that statement?
23       A    Yes, I agree it can -- I agree with it.
24   There are some qualifiers that I would add to that
25   sentence, but I agree with it.

Page 337

1        Q    Could you look at your report, please,
2    sir, in the case on page 65, the discussion of
3    biologic plausibility.
4        A    Yes.
5        Q    And actually I think your biologic
6    plausibility discussion actually begins near the
7    bottom of the previous page, 64, and there's a
8    general discussion on the rest of 64 and the first
9    paragraph or two of 65.  Is that correct?
10       A    I -- I believe it's correct.  The
11   version I have in front of me is that version that
12   has a slightly different formatting, so -- but I'm
13   with you.
14       Q    Okay.
15       MS. PARFITT:  And I believe, just for
16   completeness, it starts on 60 --
17       THE WITNESS:  Mine starts on --
18       MS. PARFITT:  His document starts on 65,
19   goes all the way over to 66.  Mike, yours probably
20   starts on the bottom of 64, goes all the way over
21   to the top of 66.
22   BY MR. KLATT:
23       Q    And what I'm focusing on is the
24   paragraph that you wrote that begins with
25   "Insofar" --

Jack Siemiatycki, Ph.D.

Page 338

1    A   Yes.
2    Q   -- which is where your specific
3  discussion of biologic plausibility regarding
4  talcum powder products begins.
5    A   Yes.
6    Q   Do you -- do you see that paragraph,
7  sir?
8    A   Yes, I do.
9    Q   And moving down, did you read the
10  articles that you cited here carefully?
11    A   I read them. I'm not capable of fully
12  understanding articles in areas that are outside
13  my area of -- of expertise. But to the --
14    Q   Well --
15    MS. PARFITT:  Wait, let him finish.
16    THE WITNESS:  To the extent that I was
17  able to understand them, I read these articles.
18  BY MR. KLATT:
19    Q   I'm focusing on the sentence that you
20  wrote in your report saying: "First of all, there
21  are two possible routes that talcum powder
22  products can take to reach the ovaries."
23    Do you see where I am?
24    A   Yes, I do.
25    Q   The next sentence says: "There is

Page 339

1  published evidence that talcum powder products and
2  its constituents and contaminants that are applied
3  to the vaginal area can migrate from there to the
4  fallopian tubes and ovaries," citing Venter 1979,
5  Henderson 1986, Heller 1996, "or to pelvic lymph
6  nodes," citing Cramer 2007.
7    Is that correct?
8    A   Yes, that's correct.
9    Q   Do you recall, Dr. Siemiatycki, that the
10  Venter 1979 article has nothing to do with talc at
11  all?
12    MS. PARFITT:  Objection. Form.
13    THE WITNESS:  Is that the article about
14  asbestos?
15  BY MR. KLATT:
16    Q   Venter 1979 is the article about albumin
17  microspheres.
18    A   Oh, yeah. Yes.
19    Q   Do you recall that article?
20    A   I do. Well, I don't recall it well, but
21  I recall reading it a year or two ago.
22    Q   And in Venter, nothing was applied to
23  the perineal area, correct? These albumin
24  microspheres were actually injected at the top of
25  the vaginal vault, correct?

Page 340

1    A   I think so. Is this --
2    Q   And the --
3    A   Is this the South African study?
4    Q   I believe you're right.
5    A   Okay.
6    Q   And the women were not women using
7  perineal talc. They were women who were being
8  prepared to undergo gynecologic surgery, correct?
9    A   Correct.
10    Q   And after this solution of albumin
11  microspheres was injected at the top of the
12  vaginal vault, the women were tilted in a head
13  down/pelvis up position for two hours beforehand,
14  correct?
15    A   Correct.
16    Q   So --
17    A   Now I'm saying correct, but I don't
18  remember the details that you're quoting. I
19  remember the article. I'm -- I -- it doesn't --
20  my recollection doesn't contradict anything you're
21  saying.
22    Q   So Venter doesn't tell us anything at
23  all about dry talc particles applied externally to
24  the genital area being able to migrate up the
25  vagina, across the cervix, up the uterus, up the

Page 341

1  fallopian tubes to the ovaries, correct?
2    MS. PARFITT:  Objection. Form.
3    THE WITNESS:  I guess I use this as a
4  reference because some other experts used it as a
5  reference for such a statement. And I read the
6  article, and it sounded plausible.
7  BY MR. KLATT:
8    Q   But you'd agree with me that the Venter
9  1979 article doesn't involve talc particles,
10  doesn't involve external application, and is a
11  very artificial situation compared to the
12  situation of women applying talc to the --
13    MS. PARFITT:  Objection.
14  BY MR. KLATT:
15    Q   -- external genital area?
16    MS. PARFITT:  I'm sorry, Michael.
17  Objection. Form.
18    THE WITNESS:  I -- I -- I don't disagree
19  with what you said.
20  BY MR. KLATT:
21    Q   And then the other two articles you
22  cite, Henderson 1986 and Heller 1996, say nothing
23  at all about migration of talc particles. They
24  simply observe talc particles in tissue already
25  without any reference to how they got there,

Jack Siemiatycki, Ph.D.

Page 342

1  correct?
2       MS. PARFITT: Do you need to see the
3  articles?
4       THE WITNESS: Yes, I think I need to see
5  those articles.
6       MS. PARFITT: Do we have Henderson or
7  Heller?
8       MR. KLATT: I'm sorry, I don't have them
9  with me.
10      MS. PARFITT: Okay. Let's see. In your
11 report -- they're in your report.
12 BY MR. KLATT:
13      Q   And you might want to pull Cramer 2007
14 while you're at it, because again my question is
15 the same, it doesn't say anything at all about
16 migration. It simply identifies particles already
17 in tissue without saying how they got there.
18      MS. PARFITT: Okay. Well, let's wait
19 for a question and let's get the articles. Let's
20 see. It would be tab -- it's a big binder.
21 BY MR. KLATT:
22      Q   Can I -- can I --
23      THE WITNESS: I have it in my office.
24 BY MR. KLATT:
25      Q   Can I short-circuit this?

Page 343

1       A   Yes.
2       Q   I think this -- I can short-circuit
3  this. If you just look at Cramer 2007. Do you
4  have that handy?
5       MS. PARFITT: Cramer 2007. Do you have
6  it? I don't, Michael.
7       THE WITNESS: It would be in my office.
8       MR. KLATT: Could we go off for a second
9  while you are looking?
10      THE VIDEOGRAPHER: We're going off the
11 record at 9:15 p.m.
12      (Pause in the proceedings.)
13      THE VIDEOGRAPHER: We are back on the
14 record at 9:17 p.m.
15 BY MR. KLATT:
16      Q   So, Dr. Siemiatycki, at my request,
17 you've pulled the 2007 article, first author
18 Cramer, called "Presence of talc in pelvic lymph
19 nodes of a woman with ovarian cancer and long-term
20 genital exposure to cosmetic talc," correct?
21      A   That's correct.
22      Q   And my question was simply, this -- this
23 article says nothing about talc migrating. It
24 simply observes that talc was found in a lymph
25 node. Is that correct?

Page 344

1       MS. PARFITT: Objection. Form.
2       Make sure you've read the article.
3       THE WITNESS: (Peruses document.) So
4  I -- I've skimmed it quickly. I haven't read
5  everything, but I don't see that it -- sorry, are
6  we on?
7       MS. PARFITT: Yes.
8       THE VIDEOGRAPHER: We're on the record.
9       THE WITNESS: I don't see that it
10 directly addresses talc moving from the vagina
11 into pelvic lymph nodes, but it certainly concerns
12 the detection of talc in pelvic lymph nodes.
13 BY MR. KLATT:
14      Q   But it says nothing in the article
15 itself about establishing migration, correct?
16      MS. PARFITT: Objection. Misstates his
17 testimony.
18 BY MR. KLATT:
19      Q   That you -- that you see.
20      MS. PARFITT: Objection. Form,
21 misstates his testimony.
22      THE WITNESS: I -- I guess, you know --
23 the question I would have is if it gets to the
24 pelvic lymph nodes, it has to migrate there from
25 somewhere. It's not deposited there deliberately.

Page 345

1  BY MR. KLATT:
2       Q   Well --
3       A   That was my interpretation of -- of
4  this.
5       Q   Well, look at the very first page of
6  this article, Cramer. You see at the very top
7  under where the authors are listed?
8       A   Yes, I do.
9       Q   It says "Background"?
10      A   Yeah.
11      Q   "Although epidemiologic studies suggest
12 talc use may increase ovarian cancer risk, there
13 is no proof that talc used externally reaches the
14 pelvis." Correct?
15      MS. PARFITT: Objection. Form.
16 BY MR. KLATT:
17      Q   That's what it says.
18      A   That's the background to this study.
19 That's not --
20      Q   And it's 2007, correct?
21      A   Correct.
22      Q   Which is after the Henderson study that
23 you cite. Correct?
24      A   Correct.
25      Q   And so after -- and what -- so we have

87 (Pages 342 to 345)

Jack Siemiatycki, Ph.D.

Page 346

1  Venter that you cited and Henderson, and what
2  else?
3        A   Heller -- Heller?
4        Q   What was the third?  Heller, yes.  Thank
5  you.  1995.  And here is --
6        MS. PARFITT:  No, excuse me.  1996, I
7  believe.
8  BY MR. KLATT:
9        Q   Excuse me, 1996.
10       And here in 2007, we have Dr. Cramer
11  saying that there's no proof that externally
12  applied talc reaches the ovaries, correct?
13       MS. PARFITT:  Objection.  Misstates the
14  science and the article and his testimony.  Form.
15  BY MR. KLATT:
16       Q   I'm just asking what the article -- what
17  Dr. Cramer and Dr. Godleski said in the Background
18  section to this article that you cite in 2007.
19       MS. PARFITT:  Objection.  Form.
20       THE WITNESS:  You want me to comment on
21  whether their background -- the Background section
22  of this abstract contradicts the thesis that there
23  was evidence of migration before 2007?  Is that
24  correct?
25  BY MR. KLATT:

Page 347

1        Q   I'm -- my question is, you cited Venter
2  and Henderson and Heller for evidence of
3  migration, correct?
4        A   Right.  Right.
5        Q   And those all predate well before 2007,
6  correct?
7        A   Correct.
8        Q   And here we have Dr. Cramer saying in
9  2007 there is no proof that talc used externally
10  reaches the pelvis, correct?
11       MS. PARFITT:  Objection.  Form,
12  misstates the article.
13  BY MR. KLATT:
14       Q   Is that what he said?
15       A   That's what it says.
16       Q   And you --
17       MS. PARFITT:  Wait.  Wait.  Wait.  Wait,
18  you let him finish.  He said, That's what he said
19  -- finish, please.  Thank you, Michael.
20       THE WITNESS:  The -- the word "proof" in
21  that sentence is a red flag.  I'm not sure what
22  they mean -- they meant by proof.  They might
23  have -- well have said, There is evidence that,
24  but it is not yet conclusive.  That is one
25  interpretation of a sentence like, There is no

Page 348

1  proof.  They haven't -- they didn't say there is
2  no evidence.  They said, There is no proof.
3  BY MR. KLATT:
4        Q   Do you understand -- my question,
5  Dr. Siemiatycki, was simply, did Dr. Cramer say
6  there was no proof?  Correct?
7        MS. PARFITT:  Objection.
8        THE WITNESS:  He said there was no
9  proof.
10       MS. PARFITT:  Asked and answered.
11       THE WITNESS:  He didn't say there was no
12  evidence.
13  BY MR. KLATT:
14       Q   Okay.  Can you go back -- let's see,
15  let's go back to your expert report on biologic
16  plausibility.
17       MS. PARFITT:  Right here.
18  BY MR. KLATT:
19       Q   Oh, one other thing.  When you were just
20  scanning Cramer 2007, I saw you were looking on
21  the page where he discussed the Heller paper.  Did
22  you see that?
23       MS. PARFITT:  Just give him a moment to
24  get that again.  I think it was 17.
25       THE WITNESS:  Sorry.  No. 17?

Page 349

1        MS. PARFITT:  Yeah.
2        THE WITNESS:  You have very good eyes if
3  you saw me looking at the Heller.  I actually
4  wasn't, but --
5  BY MR. KLATT:
6        Q   I thought you were on that page.
7        A   Well, I was -- I scanned each of the
8  four pages.  There aren't that many pages.  The --
9  I see mention of the Heller article.
10       Q   On page 500?
11       A   Yes, I do see that.
12       Q   Do you see where Dr. Cramer in 2007 is
13  suggesting that the explanation for the Heller
14  study may be contamination that was introduced
15  during the processing of the tissue specimens?
16       A   So I see that he says it might have been
17  introduced during processing, and it's a potential
18  weakness.  He doesn't affirm that it is.  He says
19  it might be.
20       Q   So contamination is another explanation
21  potentially for why you might find talc in ovarian
22  or gynecologic tissues?
23       MS. PARFITT:  Objection.  Form.
24       THE WITNESS:  I -- I guess so.  Not
25  being an expert in pathology and physiology, I --

88 (Pages 346 to 349)

Jack Siemiatycki, Ph.D.

Page 350

1  that seems like a plausible -- seems to me like a
2  plausible alternative explanation.
3  BY MR. KLATT:
4      Q   You go on and comment in the next
5  paragraph of your biologic plausibility on two
6  trace heavy metals, chromium and nickel compounds,
7  correct?
8      A   So where are we -- oh, yeah. Yes.
9      Q   You're aware that IARC has made
10  determinations regarding chromium and nickel
11  compounds, correct?
12      A   Yes, correct.
13      Q   And neither one of the determinations
14  found they were linked to ovarian cancer at all,
15  correct?
16      A   That's correct.
17      Q   They found they were related to nasal,
18  sinus and lung cancers in people, primarily
19  workers, who had breathed the fumes, correct?
20      A   That's correct.
21      Q   So that's no way analogous to any trace
22  heavy metals in talc, correct?
23      MS. PARFITT:  Objection.  Form.
24      THE WITNESS:  It's -- it's not directly
25  relevant.  It may be indirectly relevant.  The

Page 351

1  evidence that allowed IARC to make determinations
2  about lung cancer risks is evidence from
3  industrial cohorts of males.
4      And so there has never been an
5  evaluation of ovarian cancer risks in relation to
6  exposed women to chromium and nickel.  It's terra
7  incognita basically.
8  BY MR. KLATT:
9      Q   And so following up on that, you're not
10  aware of any evidence at all that women who have
11  used externally applied talcum powder to the
12  genital area have higher blood or tissue levels of
13  chromium or nickel compounds than women who've
14  never ever used talc at all, correct?
15      MS. PARFITT:  Objection.  Form.
16      THE WITNESS:  I've -- I'm not aware of
17  any evidence.
18      MR. KLATT:  I think that's all the
19  questions I have.
20      MS. PARFITT:  I have no further
21  questions.
22      Dr. Siemiatycki, you are done.  We will
23  read and sign.
24      Thank you, Leslie.
25      Thank you all.

Page 352

1      THE VIDEOGRAPHER:  This ends -- this
2  ends the deposition of Jack Siemiatycki.
3      We are going off the record at 9:28 p.m.
4      (Whereupon, the deposition
5  of JACK SIEMIATYCKI, Ph.D. was
6  concluded at 9:28 p.m.)

Page 353

1      CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
2      The undersigned Certified Shorthand Reporter
3  does hereby certify:
4      That the foregoing proceeding was taken before
5  me at the time and place therein set forth, at
6  which time the witness was duly sworn; That the
7  testimony of the witness and all objections made
8  at the time of the examination were recorded
9  stenographically by me and were thereafter
10  transcribed, said transcript being a true and
11  correct copy of my shorthand notes thereof; That
12  the dismantling of the original transcript will
13  void the reporter's certificate.
14      In witness thereof, I have subscribed my name
15  this date:  February 4, 2019.
16
17      _____
18      LESLIE A. TODD, CSR, RPR
19      Certificate No. 5129
20
21  (The foregoing certification of
22  this transcript does not apply to any
23  reproduction of the same by any means,
24  unless under the direct control and/or
25  supervision of the certifying reporter.)

Jack Siemiatycki, Ph.D.

| Page 354 |
|---|

```
 1          INSTRUCTIONS TO WITNESS
 2      Please read your deposition over carefully and
 3   make any necessary corrections. You should state
 4   the reason in the appropriate space on the errata
 5   sheet for any corrections that are made.
 6      After doing so, please sign the errata sheet
 7   and date it.
 8      You are signing same subject to the changes
 9   you have noted on the errata sheet, which will be
10   attached to your deposition.  It is imperative
11   that you return the original errata sheet to the
12   deposing attorney within thirty (30) days of
13   receipt of the deposition transcript by you. If
14   you fail to do so, the deposition transcript may
15   be deemed to be accurate and may be used in court.
16
17
18
19
20
21
22
23
24
25
```

| Page 356 |
|---|

```
 1          ACKNOWLEDGMENT OF DEPONENT
 2      I,_____, do hereby
 3   certify that I have read the foregoing pages, and
 4   that the same is a correct transcription of the
 5   answers given by me to the questions therein
 6   propounded, except for the corrections or changes
 7   in form or substance, if any, noted in the
 8   attached Errata Sheet.
 9
10   _____
11   JACK SIEMIATYCKI, Ph.D.            DATE
12
13
14   Subscribed and sworn to
15   before me this
16   _____day of_____,20___.
17   My commission expires:_____
18   _____
19   Notary Public
20
21
22
23
24
25
```

| Page 355 |
|---|

```
 1          ------
 2          E R R A T A
 3          ------
 4   PAGE LINE CHANGE
 5   ____ ____ _____
 6   REASON: _____
 7   ____ ____ _____
 8   REASON: _____
 9   ____ ____ _____
10   REASON: _____
11   ____ ____ _____
12   REASON: _____
13   ____ ____ _____
14   REASON: _____
15   ____ ____ _____
16   REASON: _____
17   ____ ____ _____
18   REASON: _____
19   ____ ____ _____
20   REASON: _____
21   ____ ____ _____
22   REASON: _____
23   ____ ____ _____
24   REASON: _____
25
```

Jack Siemiatycki, Ph.D.

**A**

**a.m**
1:20 9:7 52:19,23
67:24 68:2 140:23
**ability**
142:3 180:8 281:8
287:25 331:11
**able**
25:14,23 30:2
31:24 74:22 120:9
122:4 198:3
203:13 220:17
242:7 303:22
338:17 340:24
**absence**
204:8
**absolutely**
39:12 44:24 67:10
80:23 98:22 182:4
205:10 223:25
241:21 253:2
300:12 308:5
**abstract**
175:4 236:13
268:14 294:20
295:7,21 318:23
346:22
**abundance**
45:25 85:19
**academic**
124:4 278:22
**accept**
238:3 259:8 316:8
**accepted**
133:1 148:10 233:6
258:23
**access**
71:21 90:16 99:6
99:11,13 101:17
230:14,17 242:6
**accident**
65:17
**account**
172:17 213:7 319:7
319:12
**accumulated**

192:18 202:19
207:22 311:1
**accumulating**
132:22 282:12
**accurate**
145:8,9 223:7
245:13 354:15
**accurately**
113:12
**achieved**
134:1
**acknowledging**
165:6 239:14
**ACKNOWLED...**
356:1
**acquaintance**
190:12
**acquaintances**
139:14
**across-the-board**
159:16
**Act**
262:22
**action**
213:9 219:5 220:10
221:11,16
**actionable**
181:18
**actions**
219:10
**activity**
50:20 51:16 140:21
159:25 241:11
242:1 249:2
273:24 283:1
284:1 291:5,13
**actual**
145:13 197:1
295:20
**add**
228:6 336:24
**added**
106:19
**addendum**
6:18 17:6,16,23
71:18 82:14 107:4

107:9,17 203:14
**addition**
11:1,24 53:4 67:13
82:3 162:13
191:25 335:18
**additional**
41:11 46:22 143:7
143:23 163:19
311:1
**address**
59:3 68:19 84:13
327:3
**addresses**
344:10
**addressing**
163:20 334:2
**Adele**
190:11
**adenocarcinoma**
204:18
**adequate**
197:19
**adjudicating**
103:17
**adjust**
49:21
**adjusted**
106:25,25 107:2
319:3
**adjusting**
318:13,15
**adjustment**
107:14
**administering**
2:15 181:13
**administrative**
259:11
**adopted**
28:22 186:14 197:6
**advance**
18:19
**advanced**
281:6
**advantages**
23:9 197:13
**advisement**

191:21
**advisory**
230:20
**affect**
158:1,7 169:20
209:24 228:8
**affirm**
349:18
**affirmation**
276:21
**afresh**
286:13
**African**
340:3
**afternoon**
105:6 146:3 209:21
274:15
**agencies**
25:8 26:5,7 43:7,10
84:12,18,24 322:3
**agency**
20:1 43:4,7 85:18
128:21
**agenda**
140:4
**agent**
26:1 35:21 138:15
156:19 158:4
161:9
**agents**
138:8,12
**aggregating**
106:20
**ago**
11:12 19:22 56:19
77:11 81:16 82:10
124:5 125:7,20
126:1 129:16
134:19,21 139:4,9
191:7 257:24
274:21 275:16
306:13 311:23
317:17 339:21
**agree**
29:19 30:8 69:19
117:23 144:6

146:5,13,15 149:1
149:10,14 150:25
157:12 170:10,11
172:20 173:6,19
176:6 183:4
184:25 191:24
192:7 207:20
209:6 237:13
238:15 239:4,20
241:16 247:6
248:25 249:11
264:23,23 269:6
275:23 281:15
302:11 305:19
321:21 336:14,21
336:23,23,25
341:8
**agreed**
136:23 201:12
**agrees**
169:16
**Ah**
86:25 131:3 157:18
**ahead**
15:16 17:15 45:12
75:13 89:12 194:4
214:2,4 222:2
282:5 322:14
**aimed**
284:18
**al**
41:23 102:10
189:19 266:10
**Alastair**
3:16 11:3
**Alberta**
279:11
**albumin**
339:16,23 340:10
**alcohol**
159:24 160:23,24
282:25
**alert**
324:10
**Alexandria**
3:13

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 93 of 149
PageID: 211557
Jack Siemiatycki, Ph.D.

Page 358

algorithm
25:24
allegations
59:17
allow
116:13,16 117:14
331:4
allowed
351:1
allowing
76:16
allows
25:24
allude
59:7
alluding
156:24 168:2,3
alternative
183:7 186:1 350:2
alternatives
186:18
ambiguity
83:10
ambiguous
226:22
America
274:19
amiss
222:22
amount
99:18 120:23 121:2
121:3,3,4,16
125:10,11 174:7
amounts
77:1 102:16
analogous
133:20 161:15
350:21
analyses
70:11 71:15,17
72:16 76:7,12
79:12,25 80:13,18
81:6 179:6,10
186:19 200:17
201:8,10,13 284:8
284:9 298:2

303:13 318:15
analysis
22:21 23:12 26:14
28:24 29:9 30:2
35:5 66:15 76:1
81:2 107:1 119:3
120:8 125:22
134:23 142:24
189:4 197:12,22
198:2,21 200:16
200:17,18,20,23
201:7,11,12,18
203:12 209:13
227:2,8 228:12
236:22 238:16,24
239:2,12 241:17
244:6,9 266:9
267:11,19 270:4,6
270:15,17 271:25
272:11,16 297:25
307:9 313:23
analyze
125:21 229:24
analyzed
126:8
analyzing
98:9 190:5
and/or
30:24 353:24
Anderson
102:18
Angeles
4:14 136:5
animal
144:17 152:23
153:21 302:2
311:20
animals
144:14
Anita
7:21 124:25 282:9
282:13 287:7
Anne
2:12
annotate
52:3

annotated
44:18
annotation
44:9
annotations
44:5 64:2 66:24
68:4 110:9,14
announce
127:11 128:3
answer
19:4 28:20 29:16
30:13 33:7 34:10
41:14 58:19 68:24
69:10 90:22 91:6
100:9 106:11
107:13 118:14
121:7 125:6
128:13,14 129:9
129:22 133:14
140:13,19 150:10
165:25 167:20
176:24 182:5,15
191:1 211:18
226:23 229:11
237:24 238:1
250:13 311:22
answered
94:22 104:1 129:21
131:25 251:11
276:18 278:3
348:10
answering
18:25 69:17 124:3
156:3 195:23
answers
72:23 77:17 356:5
antecedent
311:4
antenna
73:23 138:6
anticipated
70:13 114:15
anticipating
21:23
antihypertensive
38:12

antiinflammatory
288:4
Anybody
80:24
anyway
28:16 63:14
anyways
87:24
apart
42:6 98:24 124:21
apparent
168:13
appear
128:17 293:24
appearance
159:6
APPEARANCES
4:1 5:1
appeared
128:7 193:24
appears
108:3 109:1 202:9
203:7
APPEL
5:4
appendectomies
65:22
appendices
42:2 230:11,18
231:17,20 235:3
235:10
appendix
200:6,6,7
apples
179:20,22
application
69:13 119:2 121:16
122:19 244:4
246:18 289:2
331:13 341:10
applications
121:4,11 124:14
125:9 268:18
295:10 297:23
320:23
applied

22:8,20 23:12 36:4
121:5 126:25
209:7 339:2,22
340:23 346:12
351:11
applies
66:17 144:11
apply
23:20 39:12 269:7
353:22
applying
39:5 119:16 341:12
appreciate
157:23 234:8 236:4
310:9
approach
21:24 197:11
287:15 311:24
appropriate
268:25 270:22
354:4
appropriateness
244:4
approximately
53:6 55:19 119:9
147:6 203:14
approximation
55:11 118:23
architecture
180:20
area
21:4 39:12 42:6
65:16 73:24 78:11
82:23 83:8 100:2
100:8 104:11
115:12 119:24,25
120:1 143:6,25
197:21 219:21
220:23 291:5,12
301:19 315:5
317:5 334:14
338:13 339:3,23
340:24 341:15
351:12
areas
74:14 75:19 143:8

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 94 of 149
PageID: 211558
Jack Siemiatycki, Ph.D.

Page 359

143:14 164:2
338:12
**Argentina**
85:24
**argue**
205:24 207:7
228:20
**argued**
227:21
**argument**
168:24 174:11
**arguments**
19:4
**arrangement**
49:17
**arrive**
25:24 185:11
303:25 310:25
**arrived**
40:9 77:17
**arriving**
159:1
**article**
8:8 37:18 44:13
81:25 82:15
123:22 127:7,13
175:23 192:19
193:14 194:23
195:1,9,12 198:18
201:21 220:18,21
222:14 223:7,14
228:5 230:15
254:24 291:19,23
295:16 305:1
317:25 318:4,23
327:2,17 328:4
339:10,13,16,19
340:19 341:6,9
343:17,23 344:2
344:14 345:6
346:14,16,18
347:12 349:9
**articles**
42:24 45:24 81:13
81:19 88:23
238:12 262:21,23

314:7,8,11 338:10
338:12,17 341:21
342:3,5,19
**articulated**
183:20
**artifactual**
319:12,21
**artifactually**
159:6 319:20
**artificial**
341:11
**artificially**
167:13
**asbestos**
95:25 96:3,13,17
96:21 97:4,14,23
98:6 102:1,8,14
102:17 103:2,6,22
314:12 339:14
**ASHCRAFT**
3:11
**aside**
123:21 132:7 135:6
271:10
**asked**
27:21 36:3 45:7
67:14 68:17 69:10
73:4 74:13,17
81:17 90:22 92:9
94:1,21 96:1 98:1
100:11 103:25
124:9 126:17,19
129:20 131:24
160:23,24 161:18
161:19 162:23
163:14 182:5
246:8 251:10
258:7 276:17
278:2 291:18
293:3,5 294:5,19
295:6 306:12,21
312:6,9,17 313:16
322:24 323:1,5,6
323:19,25 326:13
348:10
**asking**

38:1 73:20,21 91:1
91:5,6,7 148:20
173:15 182:17
194:15 231:2
244:20 253:7,8
261:4,9 273:14
293:22 304:12
312:3 325:7
346:16
**asks**
289:6
**aspects**
27:8 36:20 124:15
**assertion**
102:6
**assess**
166:2 313:25
**assessed**
268:18 295:11
**assessing**
67:5 311:25 336:18
**assessment**
207:21 255:2,20,22
256:8,18 257:10
257:15 258:5,9,13
258:16,23 260:19
261:8,22 262:4,6
263:4,18 265:1
292:19 299:18,25
300:1,25 301:16
302:19 303:24
304:1,13,15
305:11 321:12
326:8,13
**assessments**
257:21 321:15
327:21 328:5
**assigning**
27:10 33:21
**assistant**
49:16 71:20 73:20
81:9,10 82:9
286:12
**assistant's**
49:20
**assisting**

125:3
**assoc-**
103:5
**associated**
59:4 144:18 176:10
202:7 287:4,16
318:18
**association**
75:18 102:24
126:13 146:21
147:18 148:14
149:6 150:19
153:2 155:8
160:21 171:17
173:22 174:13
177:11 178:5,12
189:8 192:2 202:9
203:6 204:5
205:18,24 218:3
230:6 245:4,9
249:18,21 252:17
253:11,13,25
301:11 305:5,13
305:24 311:9,11
311:15,16 317:24
318:11 327:15,25
336:16
**associations**
8:12 147:3,9 148:6
148:8,11,12 160:9
175:16 177:1,4,14
283:25 318:9,24
319:6 327:14
329:10,23,24
**assume**
237:22 252:24
254:20 334:4
**assume-**
251:1
**assumed**
189:20
**Assumes**
315:7
**assuming**
168:21,23 251:2
254:5

**assumption**
97:19 168:22 227:6
**assumptions**
30:1 299:10
**assure**
79:19
**assured**
316:17
**attached**
6:8,12 7:2,11,14,19
7:20 8:2,7 354:10
356:8
**attempt**
27:9,10 29:6,11
**attempting**
58:19
**attempts**
28:7
**attend**
233:20
**attention**
32:23 294:25
295:19 299:16
300:4 304:23
320:20 321:9
329:19
**attenuate**
169:18
**attenuating**
166:25
**attorney**
354:12
**attorneys**
11:24
**attributable**
329:25
**attribute**
26:22 117:15
**audience**
251:25
**August**
7:5,9 47:10,15,17
47:17,21,22 48:25
49:5 59:22 139:15
**Austin**
5:14

Jack Siemiatycki, Ph.D.

Page 360

**Australia**
38:13 189:2
**Australians**
250:2,2
**author**
20:19 193:16 232:1
275:12 293:19
318:1 327:18
333:14 343:17
**author's**
101:9
**authored**
20:7 306:18
**authors**
83:1 135:17 192:16
199:14 200:10
201:4 202:23
207:20 209:7
218:12 220:8
221:14,21 222:3
227:12 228:1
231:24 232:23
237:3 239:5,22
240:11,24 243:17
244:22 245:6,25
247:6 248:9,10
249:8,16 250:9,18
251:6 252:15
253:9,24 268:3,14
272:25 292:22
294:2 296:12
298:9 302:17
303:1,24 304:12
305:8,19 323:3
330:5 345:7
**authors'**
252:5
**automate**
25:24
**automated**
25:18
**available**
21:17 37:23 42:19
60:13 73:19 74:18
75:16 89:2,4
106:12 115:11,15

142:17 143:24
187:2 204:2 237:8
237:15 238:1
240:9,11,23,24
241:2,3,4 301:8
301:22 305:15
306:1 309:12
**Avenue**
3:18 5:13
**average**
38:17
**averaged**
57:9
**avoid**
28:23 29:11 41:17
**aware**
14:4,7,8,9,10 37:6
73:25 75:6 90:5,7
112:23 144:20
159:3 164:24
239:8,22 256:13
258:15,21 264:16
282:9,19 350:9
351:10,16
**awareness**
221:10,15

_____

**B**

**B**
6:7 7:1 8:1 88:22
89:4,8 91:24 93:3
200:6,7,21,21,23
212:9,16,16,18
213:17
**B-O-R-E-N-S-T-...**
20:20
**Baby**
59:17
**Bachelor**
279:8
**back**
12:11 32:17 35:15
39:19 52:23 63:21
68:1 69:12 73:4
77:12 78:13 96:16
96:18 105:4 121:1

141:1 145:25
152:25 155:4
165:24 190:18
196:5 199:16,19
201:20 210:8
231:4 242:23
243:1 255:15
257:4 265:17
274:11 275:4
280:20 286:16
290:4,11,11 299:7
318:5 320:15
322:18 336:4
343:13 348:14,15
**background**
148:3 303:6 321:2
345:9,18 346:17
346:21,21
**bad**
27:14 30:24 31:9
**badly**
209:22
**bailiwick**
249:2
**ballpark**
51:4 56:11 174:10
289:1
**banana**
126:21
**bar**
316:2
**Barring**
83:21
**base**
31:14 66:10 144:1
260:21 264:22
**based**
28:24 65:6 66:23
71:17 103:11
113:5 120:7 131:5
153:9 154:5 155:2
162:15 204:2
205:5 220:7
227:23 254:1
301:16,25 303:20
321:17 331:1,18

335:10
**baseline**
269:1,8
**bases**
309:23
**basic**
20:16 67:6 153:22
179:15,16 186:25
314:5
**basically**
38:11,15 73:5 80:6
80:9 81:12 97:6
97:20 101:21
169:16,17 230:12
237:22 351:7
**basin**
64:21,22 66:10
**basis**
29:5 93:4 96:22
127:14 154:19
183:5,6 185:21
202:22 253:23
254:5,6 304:10
315:2 331:15,16
331:17
**basket**
24:8
**batch**
100:17
**Baylen**
3:6
**bear**
74:16
**bearing**
182:4 241:21
**bears**
142:25
**beat**
128:8 193:21
**becoming**
51:18 84:11
**beer**
161:3
**began**
46:13 70:2
**beginning**

12:10 88:9 111:21
145:23 172:2
183:3 219:5
238:15 296:25
303:21
**begins**
52:21 62:2 63:10
64:14 86:8 105:2
206:18 210:6
242:21 296:17
301:1,2 327:10
337:6,24 338:4
**behalf**
3:3 4:10 5:3,10,17
10:2 98:17 141:7
324:11 325:2
**behavior**
178:13
**belief**
103:4,9 184:3
**beliefs**
311:1
**believe**
10:16 17:25,25
30:10 40:7 59:11
69:8 85:21 123:1
176:3 178:25
183:17 185:1
193:20 195:2
196:8 212:19
222:15 234:19
243:1 248:5
253:20 260:2
270:13 275:16
292:25 293:3
294:8,25 295:22
296:3 299:18
302:7 303:21
306:9,21,24
312:23 313:7,15
317:9,25 322:10
329:6 337:10,15
340:4 346:7
**believed**
270:13
**benchmark**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 96 of 149
PageID: 211560
Jack Siemiatycki, Ph.D.

Page 361

147:9
**benchmarked**
147:17
**bend**
133:22
**benefit**
31:10
**benzene**
162:6
**Berg**
89:20 90:2 91:18
**Berge**
7:19 42:7 63:11,11
63:17 77:14
111:12,12,22
128:6 192:13
193:16,20 194:3
194:23 195:2,12
195:21 196:9
199:13 200:9
201:3,21 202:5,23
206:7 222:19
224:6,8 235:19
237:19 238:16
239:5,24 247:2,22
247:25 248:4,9,9
251:7 253:10
266:21 267:11,16
267:19
**best**
25:3 54:3 125:1
128:21 182:5,24
186:12,15,16
321:17 322:6
**beyond**
121:23
**biannual**
226:14
**bias**
8:9 157:8,17,19,20
158:1,6,11,22,25
159:9,15 160:5,7
161:9 166:5,9,10
166:18 169:22
170:6,16,17,20
171:13,22 172:3

174:7 175:14
209:11,11 213:10
217:22,25 218:2,2
218:9 221:22
222:1,4 275:24
278:1 311:13
317:22 318:7,20
326:24 328:18
329:25
**biases**
165:17,23 169:20
169:23 170:2
172:1
**bibliographic**
81:12
**bibliography**
86:19 87:12,22
88:21 89:8 240:18
**BIDDLE**
4:18
**big**
42:1 43:1 53:17
58:2 207:16 326:1
342:20
**bill**
7:4,7 46:14 47:8,12
47:19 48:3 49:8
**billable**
49:22
**billed**
47:10,13 49:1,6,20
49:21 51:9 54:6
55:8,13,18,21
**billing**
51:12
**bills**
48:20 49:11 50:11
53:1 54:22
**binary**
162:10 270:25
336:16
**binder**
6:22,23,25 16:4
42:3,10,20,22,25
43:17,19,23 44:16
44:25 45:13 46:1

46:4 57:25 58:2
108:3 109:17
193:5 195:20
212:3 213:4
234:17,21,23
235:7 243:2 248:1
254:15,17 256:3
294:9 308:1
342:20
**binders**
14:17 18:16,23,24
19:19 39:21,23
40:2,9,10,12
41:11,17 42:12,23
43:1,16 195:12,19
236:1
**biologic**
156:24,24 157:3
333:6 337:3,5
338:3 348:15
350:5
**biological**
75:3,9,18 115:22
116:7 117:19
143:10 152:23
155:9 156:18
165:3,11 205:6
305:6,6 313:8,10
313:14,18,24
314:23 315:4,13
315:20,21,23,24
316:22,23 330:9
330:19 331:5
332:7 333:18
334:2,7,23 335:5
**biologically**
205:2 311:17
**biology**
153:22 163:21
164:23
**biostatistics**
279:18
**bit**
50:19 88:6 140:21
148:3 171:25
187:14 192:8

195:8 205:19
222:19 290:24
**bladder**
318:10 329:23
**blank**
332:20 333:23
**block**
53:18
**blocks**
159:1
**blood**
38:17,17 351:12
**Blount**
93:15 95:13 102:9
102:11
**board**
319:20
**body**
34:17 37:9 101:2
143:9 149:8 154:1
219:7
**book**
8:4 19:20,21 20:2
20:17,24 21:2,12
21:17 22:6,16
23:13 36:5 37:17
160:14 306:10,13
306:17,22 307:5,6
307:23 308:20
309:4,12 310:1,4
310:7,10,15
**books**
19:10,12,16 20:22
36:18 40:19
224:22
**borderline**
186:11
**Borenstein**
20:20 67:2
**bottom**
67:1 70:14 101:23
169:12 181:18
186:6 196:20,24
197:14,16 199:1
219:4 224:1,9
228:8 300:20

337:7,20
**box**
41:2
**Bradford**
244:6,8 304:13
305:1,9,11 315:21
**brain**
161:16,17
**branch**
255:25
**branches**
74:1
**brand**
115:3 120:11
**brands**
117:25
**Branscome**
4:11 6:3 9:22 10:1
11:8 12:7 15:8
16:7,11,20 17:14
17:20 19:14 20:21
22:12 23:10,19
30:6,25 32:14
34:5 35:13 36:2
39:14 44:2,22,25
45:3,9,12,25 46:8
46:17,24 47:1,23
48:12,16 52:14,24
53:13 54:5,12
55:5 58:8,12
60:14 61:12 62:20
67:20 68:3 70:1
71:3,10 72:6
73:14 75:23 78:18
78:21 81:7 85:5
85:13 86:6 89:16
90:18 91:4 95:4
96:4,12 99:16
101:4 102:19
104:5,14,21 105:5
108:8,10,21,24
109:16,25 110:5
111:18 112:8
116:6,20 117:4,9
118:4 119:10
120:6,17 122:5,17

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 97 of 149
PageID: 211561
Jack Siemiatycki, Ph.D.

Page 362

123:15 125:12
126:3 129:25
130:10 132:6
133:6 134:2 137:6
140:11,17 141:3
145:16 146:2
150:24 151:8
152:4,16 154:11
154:23 155:24
156:2,13 162:8
165:15 167:21
173:5 175:7
176:14,21 177:19
178:14,19,21
185:13 188:24
191:17,22,23
192:10,21,23
193:2,12 194:4,10
194:13,21 199:11
199:22 201:1,25
203:4 204:1
205:11 206:12,17
209:5,25 210:9
211:13,14,17
212:11 213:23
214:9 218:18,24
221:1 222:10
223:11 224:11
225:5,20 227:10
231:15 234:6,9,16
234:19 235:1,4,11
236:2,9 239:16
240:7,19 241:5
242:8,11,14,24
244:21 246:24
247:18 249:6
250:6,16 251:19
252:13 253:5,15
253:22 254:7,13
255:9,17 257:6
258:20 259:2
260:25 261:6
262:3,12 263:15
264:3,18 265:9,11
265:19 267:4,17
270:9 272:2,19

273:12 274:4
275:17 291:15
292:1,10 293:5,14
294:19 300:8,14
300:18 302:5,25
304:2 307:3,12
308:3,13 309:16
310:2,5 312:9,18
314:2,24 315:7
317:16 322:12,21
326:21 328:6,9
330:17 331:3,20
332:3 334:9,19
335:7,16,24 336:6
**break**
41:6 52:16,25
63:22,22 64:6
78:15 87:5 104:15
105:9 106:3 107:8
107:20 135:24
140:10 145:17,19
194:13,14,16
199:23 210:1
242:9 322:13
**breathed**
350:19
**BRENNAN**
4:17 308:23,25
**brief**
324:4
**briefly**
265:12 335:25
**bring**
15:20 16:22 18:1
18:14 20:23 46:9
235:9
**broad**
22:22 162:24
**broader**
303:6,8
**broadly**
12:13
**brought**
16:24 17:3,5,5
18:11,15,15,22
19:3,5,9 20:23

22:6,13 24:20
36:10 37:5 39:19
39:20 41:13 42:12
44:6,19 61:18
72:20 109:14,22
110:13
**building**
132:19 133:10
**builds**
226:2
**bulk**
123:1 180:4
**bunch**
112:14 170:1
**burden**
81:3
**bureau**
256:1
**burner**
84:12
**butchered**
142:3
**button**
256:22

---
**C**

**C**
3:1 6:1 9:1
**caffeine**
283:25
**calculate**
106:7 121:14
**calculated**
77:23
**calculates**
234:2 236:11
**calculating**
268:9
**calculation**
77:7,20 107:6,15
121:21
**California**
4:14 38:13
**call**
86:17 87:12,21
124:18 146:25

170:21 186:18
200:20 223:20
243:24,25 316:12
**called**
19:20 20:15,18
76:2,3 79:24
86:18 112:12
175:13 229:20,21
244:2 298:16
343:18
**calls**
185:23 188:20
**Campbell**
81:20,22 82:3,10
**Campus**
4:19
**Canada**
1:18 2:6 9:9 38:13
43:3 50:21 51:17
52:1 56:20 84:3
84:10 233:14
241:12 255:23,24
255:25 256:18
257:10,22,24
258:5,13,16
264:10 265:1
275:8,18,25
291:24 292:4,8,19
293:8 294:3
299:16 320:23,24
321:22 323:4
326:8,12
**Canadian**
41:23 43:12,14
230:20 262:21
263:12
**cancer**
6:21 7:14,17 8:5,13
12:18 13:11,16
19:21,23 20:1,25
21:1,9,12 24:16
33:13 36:6 38:24
43:9 56:18 57:19
58:23 59:3 65:7
65:11,20 66:12
69:15 75:4,10

78:11 84:20 88:11
89:25 90:23 97:18
103:16 113:9,15
115:2,24 116:9
117:2 118:7 119:6
119:14 120:1,10
120:19,21,25
121:15 122:9,20
123:18,24 124:1,6
124:8,22 125:24
126:6,14,20 127:8
127:22 128:4
129:1,19 130:2,6
130:15,15 131:8
131:16,22 132:11
132:21 133:21,23
134:7,10,15,23
135:1,6,19 137:1
141:9,18 142:4
143:1 146:8 147:5
147:8,18,22,24
148:7,13 150:6
151:12 152:12
153:11 155:1
157:14 161:2,16
161:18 164:5
165:4 167:12,12
168:4,14,18,24,25
171:4,7,16,18,19
172:9,11,23 173:8
174:14,20 175:16
176:2,8 177:2,3
177:11,12,15
181:20 182:2
189:9,15,17
190:16 192:4
193:18 202:8
204:6,15,16,19,22
204:23,23 205:1,2
205:9,25 213:9
215:14 216:4,9,17
216:25 218:4,16
227:9 230:7,22
232:20,23 233:20
237:10 243:13
247:8 248:11

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 98 of 149
PageID: 211562
Jack Siemiatycki, Ph.D.

Page 363

250:10,20 251:9
252:9 253:12
259:22 261:2
267:9,22 268:7
271:13 272:13
273:3 275:19
276:3,12,15 277:8
277:16 279:25
281:4,5,14 282:9
282:17,24 283:13
283:15,24 284:15
284:17 287:2,5,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:24 305:14,25
306:14 307:11
308:20 309:5
311:4 312:8,16
313:19,24 314:22
315:6,14 316:25
317:5,25 318:10
318:10,10,13,18
319:19 329:10,23
329:24 330:10,21
331:7 335:10
343:19 345:12
350:14 351:2,5
**cancer/talc**
81:17
**cancers**
168:11 171:10
  203:16 204:11,13
  281:2,12 284:16
  319:11,14 350:18
**capable**
103:3,17 263:3
  273:20,21,22
  338:11
**capricious**
191:2
**capture**
30:21
**captured**
156:22 333:12
**carcino-**

142:2
**carcinogen**
145:8
**carcinogenesis**
312:12
**carcinogenic**
122:16 145:14
  219:6 314:9,10
**carcinogenicity**
20:4 99:10 142:2
  144:12,13 153:13
**carcinogens**
122:13 147:10,11
  147:25 148:15
**carcinoma**
204:18
**care**
214:3
**career**
26:4 162:1
**careful**
179:24 254:9
**carefully**
185:18,18 338:10
  354:2
**Carolina**
219:22
**CAROLINE**
5:18
**caroline.tinsley...**
5:23
**carried**
27:20 33:15 77:14
  79:21 97:12
  118:17 132:2
  180:3 189:1
  196:15 209:2
  266:9
**carry**
40:19,25 121:20
  142:13 170:7
  171:3
**carrying**
270:3
**case**
9:12 10:7,11 12:11

12:15 13:18 16:25
21:19 27:24 38:23
42:21 47:11,14
50:8 53:12,17
58:14,17 59:13,17
59:20 60:1,4 64:5
65:14 66:4,4,5,7
89:20 90:2,21
113:13 127:16
135:12 143:18
148:5 151:10
154:22 160:22
168:7 176:8
181:16 188:21
190:24 194:23
220:12 256:10
261:10 265:3
274:19 318:6
326:16 337:2
**case-**
124:7 160:9
**case-control**
125:3,14 126:10
  142:23 146:6,16
  159:11,12,18
  167:18 168:16
  170:7,18 189:1
  202:10 205:17,19
  283:16 287:3
**case-control/coh...**
206:4
**case-controlled**
23:7
**cases**
1:12 56:18,20
  59:13,15 64:23
  65:8,16,19 66:6,8
  66:11 76:20 114:1
  159:18 160:20,23
  160:25 161:6,18
  161:23 166:11,14
  166:16,23 168:25
  169:5 170:9,24
  190:20 197:3
  200:24 212:7,9
  216:3,15 217:7

274:23
**catch**
140:3
**categories**
76:25 107:1 144:25
  158:14 164:8
  214:25 215:10
  229:19 251:4
**categorization**
299:8
**categorize**
153:3,5
**categorized**
27:23
**category**
17:2 88:24 100:25
  145:9 147:13
  171:23,24 214:19
  214:20 216:25
  225:16 227:5
  269:1,8 336:17
**causal**
58:22 103:5,5
  114:13 115:9
  131:7,14,21
  132:10 148:11
  150:18 153:2
  155:8 156:10
  157:11 160:21
  249:18,21 253:13
  253:25 301:22
  302:4,8 303:25
  305:16 306:2
  310:19
**causality**
23:1,2 115:17
  117:15 119:4
  152:1 304:13
  310:21 311:4,25
  316:1 335:6
**causation**
21:9,20,21 35:21
  130:17 243:19,23
  247:13 249:22
  271:1
**cause**

69:15 113:8,14
  115:2,23 116:8
  118:6 120:19,21
  121:15 127:8
  128:4,25 130:2,8
  130:9,11,14,14,15
  130:19,20,21
  134:6 135:1,6
  141:9,17 142:4
  151:12 152:11
  165:4 182:1 237:9
  247:8,17 248:11
  249:4,5 250:10,20
  251:9,14,21 252:8
  310:17 317:5
  330:20 331:7
  335:9
**caused**
97:15 155:11 161:2
  182:23 222:5
**causes**
19:22 119:13
  129:18 130:6
  174:19 204:22,22
  204:23 271:12
  288:15,22
**causing**
156:20 313:19,24
**caution**
46:1 85:19 328:24
**cell**
46:11 161:16,17,19
  161:20,23 204:18
  204:19,19
**Center**
2:5 9:9
**century**
118:10
**CEPA**
264:7,17
**certain**
15:20 72:13 83:4
  88:15 98:22 118:8
  118:23 119:24,25
  137:24 154:19
  162:16 174:7

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 99 of 149
PageID: 211563
Jack Siemiatycki, Ph.D.

Page 364

184:5 282:10
**certainly**
22:3 59:5 70:16
73:11 122:22
123:5 129:14
141:11 158:24
160:7 207:2
211:18 261:16
319:24 344:11
**certainty**
103:21 113:7,18
114:6 117:20
131:7
**certificate**
353:1,13,19
**certification**
353:21
**Certified**
353:1,2
**certify**
353:3 356:3
**certifying**
353:25
**cervix**
340:25
**cetera**
35:10 38:20 46:11
64:11 138:15
146:22 159:14
160:2 179:23
196:20,20 226:8,9
**chair**
136:14
**challenged**
21:22 67:15 102:15
**challenges**
21:23
**chance**
105:7 123:12 321:6
329:24
**Chang**
272:7
**change**
70:14 84:9,15
137:18 143:2,5
181:19 191:1

255:23 311:2
355:4
**changed**
13:3 56:13 57:1
71:24 84:6 112:19
137:7 162:24
163:4,15 195:14
195:15 246:19,23
289:3
**changes**
71:4 137:14 187:6
187:9 195:16
354:8 356:6
**chapter**
22:25 23:3,5
307:24 309:7
**chapters**
22:5,18,24
**characterization**
146:6
**characterize**
148:6,21,23 185:7
**characterized**
148:21,23 207:13
**charge**
54:13,17
**check**
41:6 87:5 106:4
107:7
**checkmarks**
112:17
**chemical**
144:8,11,25 152:14
154:14 155:10
**chemicals**
138:2
**cherry-**
35:16
**cherry-picking**
29:10 34:12,15
35:19
**choice**
254:10 270:16
**choices**
281:11 284:13
**choose**

65:6,21 146:11
208:10
**chose**
37:2 177:13 197:1
208:10
**chosen**
197:3 208:4
**Chris**
11:3
**Christmas**
257:17
**CHRISTOPHER**
3:4
**chromium**
350:6,10 351:6,13
**CHUM**
2:5 9:9
**CIR**
102:18
**circle**
201:21
**circumstance**
119:20
**circumstances**
130:16
**citation**
238:16
**citations**
102:18
**cite**
135:17 175:17
265:22 267:6
341:22 345:23
346:18
**cited**
261:23 338:10
346:1 347:1
**cities**
118:18
**citing**
339:4,6
**claim**
141:8 216:18
218:15
**claimed**
102:1 315:24

**claims**
98:5
**clamp**
48:8
**clarification**
137:8 157:23
212:12,21
**clarified**
12:23
**clarify**
40:1 121:2
**clarity**
72:21
**class**
179:1,5 213:9
219:5,9 220:10
221:11,16
**classic**
132:21
**classification**
136:24 144:10
149:2,4 150:5,12
151:16,22 152:13
251:3 263:19
267:9
**classified**
144:7 149:6 154:15
168:11
**classify**
151:3 154:20,21
**clean**
108:11,18 110:8
140:15 224:21
**cleaning**
125:20
**clear**
40:8 48:12 50:25
61:13 83:5,24
109:1 111:19
153:4,11 172:6
271:16 275:5
**Climate**
255:23
**clinical**
38:10 180:3,5
**close**

154:17
**closely**
118:24 166:8 240:2
241:8 326:15,19
**closer**
327:23
**coauthored**
232:16
**coauthors**
149:21
**coded**
27:23
**coefficients**
207:14
**coffee**
125:8 135:9 262:10
**cognizance**
261:13
**coherence**
79:21 305:7 334:15
**cohort**
23:7 142:23 159:11
167:18,25 168:8
171:3,3,12,13
205:21 224:13
226:5
**cohorts**
351:3
**coinvestigator**
124:19
**colleague**
124:3
**colleague's**
124:24
**colleagues**
10:23 135:9
**collect**
25:2 171:4
**collect-**
226:11
**collected**
24:3 88:8 126:7
177:5,6 208:18
220:1 229:15,25
322:7
**collecting**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 100 of 149
PageID: 211564
Jack Siemiatycki, Ph.D.

Page 365

25:10 304:8
**collection**
31:12 36:12,14
  125:19 226:11
  229:5,9
**colon**
202:16
**Columbia**
2:14
**column**
112:11 219:3 220:1
  327:9 329:19
**combination**
197:25 241:24
**combine**
153:21 198:3
  271:25
**combined**
225:18 266:11
  297:9
**combines**
270:17
**come**
19:11 21:10 28:5
  55:22 63:21 65:3
  65:15 73:22 74:3
  78:13 80:22 89:8
  90:19 95:24 96:14
  99:9 102:7 128:20
  226:10 261:10
**comes**
25:4 90:17 137:23
  179:7
**comfort**
261:17
**comfortable**
108:16 114:10
**coming**
65:12 70:8 136:6
  201:21 253:6
**comment**
259:14 260:7
  346:20 350:4
**commented**
247:13 304:25
  305:4 310:1

**comments**
259:8
**commercially**
37:22
**commission**
356:17
**committee**
13:13 28:10 259:9
  259:10
**Committee's**
6:13
**common**
126:16,16
**commonly**
22:4
**communicated**
10:20 191:14 233:2
  326:6
**communicating**
128:11
**communication**
293:6 294:2 324:9
**communications**
114:3 231:11 275:7
  275:11 324:16
  326:3
**communities**
118:18 119:21
**community**
37:6 85:2 104:7
  131:19 132:4,8
  172:21 279:13
  316:11
**companies**
92:7 120:4
**company**
92:5,19 96:25
  118:24 119:22
  120:2 314:15
**comparable**
179:20
**compare**
168:20 177:18
  187:14,15 216:7
  216:22 223:14
**compared**

99:20 161:7 168:13
  177:17 203:19
  216:19 217:9
  237:18 269:23
  270:2 297:10
  298:13,25 341:11
**compares**
200:8
**comparing**
159:20 237:20
  319:2
**comparison**
38:20 158:13
  187:12,17 206:5
  217:15 223:16
  237:17 238:2
  298:5
**comparisons**
208:15
**compatible**
122:23 123:9
  217:21,24 243:11
  267:20 298:25
**competent**
129:3 310:23
**competing**
334:6
**competition**
138:12
**compile**
203:13
**compiled**
322:7
**compiling**
87:23
**complementary**
269:24
**complete**
17:23 22:16 28:19
  110:7 137:15,16
  137:19,22 138:21
  139:1 141:14
  329:20
**completed**
94:8,11 125:18
  128:7 256:15

**completely**
77:15 209:17,18
  266:23 270:17,20
**completeness**
15:23 337:16
**completing**
96:6,11
**complex**
310:23
**component**
201:15
**components**
26:19 30:23 31:8
  32:11 33:17 50:18
  197:8 272:8 324:3
**composite**
297:6
**composition**
74:15,25 75:9
  92:10,14
**compounds**
350:6,11 351:13
**comprehensive**
76:3 237:7,14,25
**comprised**
34:4
**computation**
270:23
**computer**
71:11,20,23 72:4
  79:12 80:14
**computers**
71:24
**conceivable**
103:14
**concentration**
264:9
**concept**
183:25 184:19
  252:25
**concepts**
246:12
**concern**
88:11
**concerned**
71:22 197:7 299:5

**concerning**
143:8 219:6 310:18
  314:7 331:17
**concerns**
344:11
**conclude**
248:10 249:3,5,12
  251:8 264:6 268:4
  269:14 273:1,15
  305:8,10,21
**concluded**
247:7,16 248:13
  273:8 352:6
**concluding**
208:16 253:23
**conclusion**
32:2 35:20 36:1
  113:1,5,12 122:25
  132:15 151:11
  152:10 204:4
  228:13 237:1,4
  239:21 240:2
  247:12 248:8
  249:18 250:8
  251:18 254:10
  262:14 263:23
  264:1 267:20
  321:17 330:4
  335:8
**conclusions**
31:23 126:4 128:19
  158:2 195:3 196:9
  222:16,18 247:21
  262:20 263:4
  310:25
**conclusive**
347:24
**concocted**
21:25
**concordant**
263:9
**concurred**
200:18
**conditions**
79:22,23 264:9
**conduct**

Jack Siemiatycki, Ph.D.

Page 366

67:7 73:15 78:22
134:13 138:21
139:1
**conducted**
37:21 98:9,15
149:15,22 180:5
226:13 260:15
266:14 283:16
292:7,9
**conducting**
21:5 79:10 132:7
141:21 142:1
210:11 310:13
**confer**
191:17 322:13
**conference**
139:15
**conferences**
135:10
**conferring**
61:11
**confidence**
196:18 207:2,3
223:19 236:15,19
236:21 297:12,15
297:16 316:4
**confident**
80:10 104:12
**confirm**
17:21 110:6,11
192:12,17 214:15
245:18 263:1
273:14
**confirmed**
202:17 206:24
**conflict**
260:10 275:20
276:8,24
**conform**
262:24
**conformity**
263:11 322:2
**conforms**
262:23
**confounder**
158:19 178:13

318:21 319:8,19
319:23
**confounders**
288:9 319:7,10,14
**confounding**
8:9 156:8,17,21
157:1,2,2,17
158:11 171:23
172:3,8,15 173:11
173:20 174:1,6,12
174:12 175:14
176:1,5,7 178:6
311:13 317:18,22
318:7,20 319:16
320:3 326:24
327:3 329:25
**confusing**
63:20 248:6
**confusion**
40:13
**conglomeration**
266:13
**Congress**
5:13
**connected**
98:21 176:11
**connection**
47:13 48:22 50:7
51:20 53:8 54:7
54:14,18,25 56:2
56:9,13,25 57:16
57:21 69:10 73:16
80:17 84:2,19
98:17 100:13
123:24 125:14
126:11 127:4
146:7 164:4
240:10 323:3
**conscious**
87:11 167:5
**consciously**
87:21
**consens-**
132:19
**consensus**
128:17,24 129:5,17

131:18 132:3,10
132:19 133:5,9
310:20 329:4
**consensuses**
311:2
**conservative**
85:7
**consider**
27:4 35:4,19 74:19
74:24 75:2 90:11
140:6 142:16
151:4 173:21,24
183:8 188:16,19
199:14 201:3,6
204:12 224:13
251:16 272:21
314:22 317:3
323:13,14
**considerable**
26:17
**consideration**
34:19 36:23 328:17
**considerations**
21:7 99:21,23
304:25
**considered**
20:6 25:16 26:16
33:11 68:20 78:7
142:18 147:9
158:14 165:20
169:24 173:24
218:2 239:5,9,10
239:18 256:9
265:24 314:25
317:6 321:14
327:24 329:5
**considering**
26:25 32:2 335:19
**consistency**
67:5 75:21 102:25
299:5 305:5
313:12
**consistent**
146:9,10,14 156:16
222:18 237:4
240:3 265:23

301:10 305:12,22
305:23
**constellation**
130:16,19
**constituent**
137:22
**constituents**
117:17 339:2
**constitute**
264:9,10
**constituted**
286:11
**consult**
99:1 258:7 313:25
**consultant**
276:11 277:1
**consultation**
259:6
**consulting**
278:8
**consumed**
119:24 161:3
**consumer**
115:11,15,15
**consumption**
159:25 160:24
**consumptions**
160:25
**contact**
56:17 275:6,10,18
323:2,14,20
**contacted**
10:13,18 258:11
**contain**
22:19 41:14 48:20
49:13,15 68:14
69:4 110:9,14
**contained**
36:5 40:24 72:25
84:7 149:16 256:3
262:6
**containing**
6:22,23,25 46:2
**contains**
18:20 20:3 22:25
23:3,5 41:22 42:4

42:17 46:4 61:19
233:24 234:19
235:18
**contaminant**
115:24 116:9,10
**contaminants**
103:22 116:25
339:2
**contaminating**
103:7
**contamination**
96:21 97:5,7,20
98:6 103:2 349:14
349:20
**contend**
22:19 164:2
**content**
68:25 258:8 314:13
**contentious**
205:20
**contents**
41:16 101:14
235:13 309:6
**contested**
184:14
**context**
21:25 127:25 135:2
140:1 167:18,20
167:25 168:14,16
172:8 173:25
179:8 269:19
270:1
**contexts**
167:23
**continuation**
296:3
**continue**
297:20 302:22
328:15
**continued**
4:1 5:1 7:1 8:1
275:17
**continues**
202:13 296:6
327:20
**contraceptive**

Jack Siemiatycki, Ph.D.

287:19
**contracted**
292:3
**contradict**
98:4 100:12 232:13
340:20
**contradicts**
98:5 346:22
**Contrast**
163:11
**contribute**
172:22
**contributed**
289:14 332:10
**control**
54:21 65:6 66:1,4,5
66:6,8 74:11
124:8 160:10
177:16,17,18
216:20 217:16
284:17 288:8
353:24
**controlled**
27:25 177:15
**controls**
64:22 65:10,21
66:7,9 76:20
160:20,24 161:7
161:19,24 166:11
166:14,16,23
168:20 170:15,16
170:24 216:8
**controversial**
122:14 148:4
161:22
**controversy**
133:3 310:18
**convenient**
268:1
**conventional**
268:11
**conversation**
139:18 140:2,7,8
141:25
**conversations**
141:24

**convince**
281:21
**convincing**
154:8,9
**cookbook**
25:1
**copies**
46:22 86:15,15
88:4,5,7 175:1
191:4 307:25
308:1,6,14 332:23
**copy**
16:3,8 17:11 18:6
18:12 44:4 46:15
46:18 52:10 61:6
61:15,17 64:1,7
66:25 68:5 89:18
100:22 101:23
108:13,16,18
109:22 110:7,8,12
112:13 174:18,25
225:2,24 234:7
235:2 248:2 255:6
256:17 257:9,15
268:1 285:19,21
294:13 300:11
307:23 308:3
353:11
**copyright**
286:16
**copyrighted**
280:22
**corner**
45:23
**cornstarch**
92:22
**corporation**
54:21,24
**correct**
34:12 39:22 47:12
49:2,3,6,7,9,10
50:12,13 51:14
57:19,20,23,24
58:14 59:10,13,18
59:19,23,24 60:1
60:2,17,22,23

63:6,13 70:11
87:9 103:18
109:17,24 110:2
113:19,20 117:5
119:7 120:12,14
127:25 128:1
136:18,19 137:1,3
137:10,11,12
142:8 144:8,9,14
145:4,14,15
149:18,19,23,24
150:2,3 151:5,7
155:3 162:11,16
163:16,17,22
164:15,16 165:14
165:20,21 167:14
172:14,18,19,23
173:9,23 176:15
179:2 183:6,10,11
184:23,24 185:4
186:5 188:10,13
188:14 191:15
192:14 193:18,19
209:8 210:12,18
211:4,9 212:15
213:11,12,15,16
213:21 214:21,25
215:6,7,10,11,16
215:25 216:1,5,6
216:11,12,20,21
217:3,14,19,20
218:6,19 220:5,6
220:6,11,18,19,23
221:12,13,17
222:5 224:14,15
229:1,2,6,7 232:6
233:25 234:1,3
235:5,6 236:12,16
236:22,23 238:7
238:17,18,19,20
239:2,3 243:23
244:7,19,25 245:4
246:6 247:4,19
249:8 250:21,24
252:18 254:2,4
255:20,24 256:4,5

258:16 265:4
267:12,22,23
268:21 269:10
271:2,19 272:23
272:24 273:4
275:8,9,14,15,21
276:4,16 277:10
278:18 279:3,12
279:19,20,22,23
280:1,2,4,10,18
280:22,23 281:2,8
281:9 283:2,3,19
283:20 284:2,3,20
284:21,23,25
286:9,17,24 287:5
287:10,20 288:9
288:16 292:8,15
293:13 296:18
301:4 304:20,22
304:22 306:19,20
318:1,2 321:6
327:18,19 329:15
329:16 330:13,23
331:24 332:2
334:3,6 335:2,4
335:11,23 337:9
337:10 339:7,8,23
339:25 340:8,9,14
340:15,17 341:1
342:1 343:20,21
343:25 344:15
345:14,20,21,23
345:24 346:12,24
347:3,6,7,10
348:6 350:7,11,12
350:15,16,19,20
350:22 351:14
353:11 356:4
**corrected**
172:1
**correcting**
63:14
**correction**
62:13 110:20
111:16 112:9,11
328:3

**corrections**
18:9 61:20,23
62:23 63:24
110:24 111:25
112:21 354:3,5
356:6
**correctly**
79:17 113:10
116:19 131:10
183:1 202:11,12
202:20,21 237:11
268:20 288:11
301:7,13,23
321:19 327:15
328:1,10,20 329:1
329:11 330:2
**correspond**
62:7 319:1
**correspondence**
191:5
**corresponding**
235:25
**corresponds**
169:14
**corroborate**
270:21
**corroboration**
197:4
**cosmetic**
118:1 343:20
**costly**
196:19
**counsel**
9:15 15:24 16:2
18:19 40:17 46:23
49:20 51:9 55:9
55:13,21 61:11
70:25 74:2,13
89:9,15 90:4 91:2
92:4 94:19 95:16
97:11 98:1,18
100:14 105:15
155:21 177:23
211:10 235:21
274:5 276:3,15
277:16 300:16

Jack Siemiatycki, Ph.D.

320:7 322:10,25
323:1,9 324:12
325:2 326:14
328:2 332:5 334:1
336:7
**count**
67:12 232:10
**counted**
232:13 245:14
**counting**
64:11 67:3 245:15
**countries**
118:19 182:13
**couple**
10:22 18:3,4,22,23
49:16 50:21 51:2
63:8 70:9 74:6
76:14 102:2 175:4
189:10 195:25
229:10 274:7
306:7 309:19
310:11 318:22
**course**
45:5 79:13 117:10
134:18 179:7
192:21 193:10
234:6 265:13
302:18 306:24
307:7 313:22
**court**
1:1 2:13 9:11,16
109:4,6 186:16
302:22 354:15
**courtroom**
151:19,21
**courts**
151:24
**covariates**
106:25
**cover**
50:6 252:1 254:19
258:19 285:7
303:6,7
**covered**
49:18
**covers**

41:21 47:13 48:3
48:25 49:4
**Cramer**
136:4 339:6 342:13
343:3,5,18 345:6
346:10,17 347:8
348:5,20 349:12
**Cramer's**
272:8
**create**
169:1 174:2 319:12
**created**
133:4 288:25
**creates**
180:24
**creating**
319:20
**credibility**
334:16
**credible**
316:3,10 330:12,22
334:21,25
**criteria**
153:12 243:19,23
243:25 244:1,1,2
244:7,14,23 246:1
246:4 264:6
305:23 311:2
327:10,12
**criterion**
245:3 246:18
315:23
**critical**
184:5 284:20
**critically**
26:7
**criticism**
29:11 34:12,15
66:16 199:9
246:10
**criticisms**
198:21 241:6,9
246:3,11
**criticize**
245:25 246:16
**criticized**

29:10 246:15
**criticizing**
172:4
**cross-examination**
227:20 290:18
**crossed**
136:4
**crucial**
325:6
**crude**
288:7
**cryptic**
83:2 229:4,9 230:2
**CSR**
353:18
**ctisi@levinlaw.c...**
3:9
**cultures**
250:1
**cumulative**
198:8 202:17
206:23 297:5
298:1
**current**
21:13 117:23 248:4
263:19 283:24
320:23
**currently**
56:1 92:11 144:7
173:8 237:7,15
238:1 281:7 283:2
**curve**
122:1
**cut**
289:1 329:7,8
**cut-and-pasted**
281:24
**CV**
175:20 232:10,17

————————
**D**
————————
**D**
9:1 288:3
**da**
206:24,24,24
**Dan**

293:22
**danger**
264:10
**dangerous**
26:1,1
**Daniel**
232:2 292:21 293:1
293:13
**Daniels**
59:13
**data**
21:7,9 24:4 25:2
31:13,14 36:12,13
36:14 39:8 74:18
82:18 83:2 116:23
120:15 122:3,22
123:8 125:19,20
142:14,15,18
144:17 162:15,22
179:15,16,19
184:12,22 185:3
186:17 189:21
201:5 208:18
215:13 220:1
222:25 223:4,6,9
223:13 229:5,9,15
229:24 230:1
237:8,15,18
239:13 250:19
271:11 272:20
273:15 283:22
298:25 301:22
302:2,2,3,3 304:9
304:10 305:15
306:1 322:6
**database**
82:12 142:20 189:9
**dataset**
191:10 198:3
**date**
9:6 54:6 214:19,20
215:20 353:15
354:7 356:11
**dated**
7:10 47:9 57:22
58:5 60:21 61:2

98:20 255:20
299:18
**day**
11:22 21:10 25:1,2
53:22 77:1 83:17
121:5 212:24
245:8 290:22
356:16
**days**
11:23 12:12,20
18:4 51:3 121:5
126:2 227:19
231:22 354:12
**DC**
5:7
**de**
114:3
**deadly**
281:5 287:17
**deal**
171:20 197:7 326:1
**dealing**
38:22 39:4 44:16
159:8
**dealt**
92:19
**debate**
104:7 334:22
**decades**
160:17 306:25,25
307:8 309:25
**December**
50:20 51:17,24,25
52:9 59:10 231:18
241:11 255:20
299:18 305:20
323:22
**decide**
90:4 154:4
**decided**
29:11 208:10
**decimal**
223:24 228:9,18,18
**decision**
28:23,25 29:7
34:10 88:22

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 104 of 149
PageID: 211568
Jack Siemiatycki, Ph.D.

Page 369

143:18 154:2
188:23 189:25
227:21,22 241:25
**decisions**
26:9 38:2 39:1
138:17 209:12
210:10 222:25
**decline**
207:12,13
**declining**
208:21 209:1
**deemed**
354:15
**DeFelice**
5:25 9:4
**DEFENDANTS**
4:10 5:10
**defense**
214:3 334:1,18
**defer**
58:15 316:6
**deferring**
164:10
**deficient**
197:19
**define**
68:10 158:4
**defines**
68:12
**definite**
155:5
**definitely**
316:10
**definition**
144:10 145:13
**definitions**
20:17
**definitive**
122:25 123:1
154:10,13,18
190:4,16 195:11
**definitiveness**
154:24
**degree**
8:8 103:21 113:7
113:18 114:5

117:20 131:6
162:16 166:15
175:13 197:4
204:17,20 209:9
209:10 317:22
326:24 328:18
**deliberately**
86:17 344:25
**demerits**
228:21
**demonstrate**
269:9 271:1 283:12
**demonstrated**
103:6,10
**demonstrates**
181:21 269:15
**demonstrating**
296:14
**denied**
253:3
**denominator**
129:8
**deny**
198:17
**department**
43:14 65:21,22
124:5 134:9
230:20 257:24
278:23
**depend**
121:7 224:2
**depending**
56:15 186:9
**depends**
26:7 32:5 37:7
153:19 154:17
170:14 178:12
179:14 181:4
223:23 269:22
270:17 271:3
**deponent**
9:14 356:1
**deposing**
354:12
**deposited**
344:25

**deposition**
1:16 2:1 6:9,11,16
7:3 8:3 9:8,25
10:7 12:9,16
13:21 14:14,14,23
14:24 15:11,20,21
16:1,15,23 17:4
18:19 21:18 41:15
44:18,20 45:1,17
46:10,12 50:12,15
50:19 51:14 52:22
59:9,12 61:24
93:7,11,21,23
94:19 95:15
102:11,12 104:24
105:3 145:24
169:9 175:24
210:7 227:19
242:22 246:5
274:22 291:2
352:2,4 354:2,10
354:13,14
**depositions**
45:7 93:8 94:2,16
332:12,16
**derivative**
114:11
**derived**
24:11 115:9 119:15
267:3
**describe**
41:16 47:6 72:8
135:11 172:7
210:20 229:19
230:1 235:12
243:18 250:18
252:8,16 253:11
265:20 287:12
307:6 310:15
**described**
21:3,3,5 23:13
24:18,19 35:16
36:8,21 37:4 46:2
60:3 94:10 130:13
189:4,8 306:23
315:22

**describes**
83:4
**describing**
36:21 136:24 264:1
264:14
**description**
23:11 25:19 37:18
144:24 145:9
198:16 229:14
245:12 251:16
321:13
**deservedly**
226:4
**design**
27:24 38:14 66:8
180:12,20
**designated**
10:10 13:22 14:1,5
**designed**
38:10
**designing**
226:17
**designs**
23:6,8 180:19
317:18
**despite**
83:18 310:17
**detail**
84:4 116:23 201:2
241:15 264:16
**detailed**
163:3 305:22
**details**
246:7 259:1,4
340:18
**detect**
122:15 281:8
**detected**
96:17
**detection**
344:12
**determination**
146:15 151:9
185:21
**determinations**
350:10,13 351:1

**determine**
107:5 116:24
119:16 331:5
**determined**
153:24
**determines**
155:9
**determining**
23:2 121:22,25
184:11,21 185:2
185:15 191:11
**detract**
103:11
**develop**
12:14 75:10 171:11
172:11,23
**developed**
30:10 117:2 119:5
151:17,17
**developing**
37:3 83:18 86:4
173:8 202:8 316:9
**development**
13:8 75:4 122:20
192:3 258:4 267:7
326:7
**developments**
143:13 144:16
164:3,14,18,22
**devote**
241:25
**devoting**
197:19
**diabetes**
226:8
**diagnose**
168:1
**diagnosed**
167:11 168:18
171:11 216:3,4,16
216:17,24,24
281:6 284:19
**diagnosis**
167:17
**diagnostic**
169:22 171:14

Jack Siemiatycki, Ph.D.

Page 370

dial
103:3,12,13
**Dictionary**
20:15
**died**
163:9
**diesel**
99:10
**diet**
159:25 288:3
**differ**
64:22
**difference**
80:7 160:19 171:7
186:19 188:1
190:25 199:4
207:9 217:6,17
248:19
**differences**
69:20,25 80:8
166:10 180:1
181:14 182:12
185:9 186:22
197:14 199:4
222:23
**different**
13:12 18:24 23:5
24:4,14 25:15
26:22 27:8 28:3
31:6,7,8,13,14,15
31:17,18,20,21
32:11,21 33:10,17
33:18 36:24 47:24
65:2,9,13,24 67:6
69:16,18 72:2
76:24,25 77:1
79:21,22,23 82:25
84:17,17 88:20
92:20,22,24 99:18
100:8 103:14
107:22 109:8
114:17 115:13
116:24,25 117:18
117:18 118:16,18
118:18,19,22,22
120:16,16 121:6

126:25 128:11
131:2 137:23
138:6 144:24
150:11 156:7
167:12,17,24
170:4 171:25
177:1,14 179:6,9
179:22,23 180:11
180:12,16,16,19
180:19 181:8,11
181:12,12 182:13
182:13 183:20
185:12 186:4,8,13
186:14 187:8
190:1,2 197:2,3,6
198:10 199:7
208:13 209:2,3
220:4 239:17
246:13 249:25,25
254:19 266:11,12
268:8 270:4
273:24 285:7,8,11
310:25 316:15
318:18 319:11
337:12
**differential**
166:17
**differently**
325:20
**differs**
65:12
**difficult**
82:22 122:14 207:7
263:10
**dig**
82:2 135:12 266:4
**digested**
195:16
**digging**
100:15
**digit**
27:11
**digressed**
149:12
**dimension**
27:13 34:3

**dimensions**
27:16 28:4
**dipping**
95:9
**direct**
9:21 22:7 32:22
62:12 208:24
211:23 274:13
295:19 299:15
300:3 304:24
320:20 321:8
327:8 329:19
353:24
**direction**
49:14 103:4,13
106:6 122:24
137:19 166:25
261:15
**directive**
96:19
**directly**
23:13,17 54:19
126:18 344:10
350:24
**director**
139:3,10,13,19
141:4
**directors**
233:21
**disadvantages**
23:9 65:25
**disagree**
192:7 202:22
205:16 206:8
207:16,23 241:16
336:22 341:18
**disagreeing**
253:4
**disc**
52:21 104:23 105:2
145:24 210:6
242:21
**discard**
34:20
**discarded**
73:12

**disciplinary**
303:6
**discipline**
150:14
**disciplines**
150:11
**disclose**
259:24 260:5
276:10,13 278:5
**disclosure**
275:21 276:9
**disclosures**
276:24
**discomfort**
171:21
**disconnected**
174:22
**discount**
221:21
**discovered**
147:12
**discoveries**
283:12
**discredits**
159:17
**discrepancy**
107:22 199:10
**discuss**
83:14 139:23 179:5
201:2 213:1
220:21 221:17
231:8,10
**discussed**
13:21,25 92:20
126:9 135:14
169:19 170:20,23
171:2,14 232:19
232:22 238:7
247:1 263:6
297:17 309:24
326:9 348:21
**discussing**
7:24 157:21 286:8
**discussion**
15:5 22:25 23:7
65:4 66:21 104:20

136:8 156:1
192:24 194:20
202:1,5,24 206:7
206:10,13 218:8
218:11 219:11
221:2,6,9,21
245:2 246:1
256:25 273:8
286:22 295:22
308:12 315:17
317:11,16 337:2,6
337:8 338:3
**discussions**
125:7 218:8 247:14
**disease**
66:11 130:18,20,21
226:8 281:8
283:13 287:17
310:17,22
**diseases**
65:13,14 226:8
306:10
**dismantling**
353:12
**distinction**
87:15 116:13
129:24 276:20
**distinguish**
117:25 327:13
**distorted**
318:25 319:3
**distortion**
171:25 319:1
**distribution**
115:13
**District**
1:1,2 2:14 9:11,12
109:4,4
**diversity**
31:8
**divided**
210:17,19,24 213:5
**division**
256:1
**doctor**
79:8 307:25

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 106 of 149
PageID: 211570
Jack Siemiatycki, Ph.D.

Page 371

**document**
1:11 14:22 15:10
15:14 16:13 33:8
41:3,9 47:3,7 58:4
89:13 105:14
112:15 114:9
117:12 136:1
146:12 169:10
219:16 235:15
249:10 254:16
255:18 256:2,9
262:18 263:11,24
264:16 281:24
296:7 299:17
300:5 317:20
321:2,9 326:15
332:19 337:18
344:3
**documentary**
183:15
**documentation**
294:9
**documents**
15:21 16:24 18:24
19:3 41:14 43:17
43:19 86:11 88:3
88:23 90:6,9
91:25 92:5,6,19
93:3 96:25 100:18
101:17 314:15
320:21
**doing**
28:18 38:9 57:12
70:11 80:5 135:11
188:1,1 214:14
223:16 245:23
354:6
**domain**
38:25 164:25
**domains**
24:11 75:17 163:24
**DONATH**
309:9
**dose**
107:1
**dose-**

243:11 268:5
**dose-response**
121:9,22,24 122:18
122:23 123:7,9
162:19,22 197:18
197:21 198:4,8,11
265:24 266:15,22
266:24 267:8,21
269:9,15 270:14
270:15 272:11,22
273:2,16 296:14
298:11 299:1,6,11
299:12 311:11
**doubt**
102:7 218:10
262:25 303:12
**doubts**
189:24 190:7
**down/pelvis**
340:13
**downstairs**
310:10
**downward**
207:21 208:17
**downwards**
207:19
**Dr**
8:6 9:23 14:16,23
15:9 16:12,19,22
17:21 18:20 20:10
26:10 29:15 30:7
31:2 33:19 39:18
44:3 47:2,25
48:17 53:1 62:5
62:22 79:6 88:2
91:25 95:3 98:8
98:15 100:5,12
101:7,11 102:21
103:20 105:6
109:13 110:6,23
111:19 136:4
140:12 146:3
148:25 175:8
177:20 193:13
196:6 200:2
212:13 214:11

219:24 231:8
232:4,16,20 233:2
234:17 235:2
236:10 242:25
244:13 251:5
253:7 254:9
255:18 257:7
265:20 274:16
275:11 278:17,18
278:21 280:16,24
282:16 284:13
286:1,23 287:8
288:14 290:1,20
290:21 291:3
300:23 301:16
302:15 303:15
307:19 309:5
312:5 315:11
317:7,15 320:19
322:10,22 323:11
323:20 324:10,20
324:22,24 326:10
327:1 329:15
336:11 339:9
343:16 346:10,17
346:17 347:8
348:5,5 349:12
351:22
**draft**
70:5 71:12 72:17
73:7 254:24 255:1
255:19 256:8,17
257:9,15,21 258:4
258:8,12,16,22
260:19 261:8,22
262:4,6 263:4,18
264:25 292:19
299:17,24 300:1
300:25 302:15,18
303:24 304:14
305:20 326:8,12
333:5
**drafted**
58:14 72:8
**drafting**
70:2,15,17

**draw**
120:9 148:17 204:7
228:13 261:17,18
261:20
**drawing**
21:6,8 310:18
332:20 333:23
335:5
**drawn**
158:2 248:21
**drew**
247:21
**DRINKER**
4:18
**drinks**
135:10
**drive**
4:19 18:19 109:15
**driven**
102:25
**drives**
62:18
**dropped**
63:5 190:21 228:15
228:17 323:17
**Drs**
93:22 94:17
**drug**
38:19 181:7
**dry**
340:23
**Duces**
6:12,17
**due**
170:6 174:11 197:9
222:1
**dug**
81:18
**duly**
9:19 353:6
**duration**
197:23 198:5,11
266:25 287:19
297:7
**durations**
77:1

**E**

**E**
3:1,1 6:1,7 7:1 8:1
9:1,1 355:2
**e-mail**
100:16 191:4,15
293:13,22 323:10
324:9,24 325:1
**e-mails**
191:19
**earlier**
11:19 63:8 178:25
180:2 188:16
189:24 190:17,18
193:20 220:16
241:10 278:17
333:3
**earliest**
143:21
**early**
28:22,23 29:7
132:24 133:7
171:20 227:22
281:8 325:24
**ears**
173:1
**easier**
42:25 234:13
**easily**
65:18
**Eastern**
9:12
**easy**
89:3 138:10
**Echeverria**
59:20 60:1 70:8
246:19
**economy**
81:3
**edited**
20:15
**edition**
20:11,13
**educated**
279:3
**effect**

122:2,16 160:20
167:23,24 168:12
168:15,21 169:17
181:7 220:9 221:3
301:22 302:4
305:16 306:2
319:17
**effective**
281:13 282:23
**effects**
219:6 224:2
**effort**
242:1
**eight**
19:19 53:22 186:8
191:7 219:4
266:11
**either**
37:4 63:22 70:21
76:25 134:4
257:11 271:20
277:9
**electronic**
86:15 88:5,7
**electronically**
88:18
**element**
229:23
**elementary**
36:20
**eliminate**
97:7
**eliminating**
29:8
**elimination**
291:4
**ELLIS**
4:12 5:19
**else's**
39:17
**embedded**
207:5 211:2,2
**embodied**
198:12
**emergency**
65:20

**emissions**
99:11
**emphasis**
121:21
**employ**
307:8
**employed**
303:25 306:23
307:7 309:25
**enable**
116:1 117:25
**encapsulates**
311:24
**ended**
140:7,8 227:2
258:8
**ends**
104:23 352:1,2
**engage**
35:18
**engine**
99:10
**England**
127:11
**engrained**
36:15
**enhance**
72:21
**enhances**
180:7
**enormous**
198:3
**enter**
264:8
**entering**
264:7
**enthusiastic**
221:25
**entire**
93:14 154:1 206:11
263:24
**entirely**
137:24
**entitled**
8:4,8 230:4 295:22
303:17 304:14

309:4 317:22
**Environ**
280:17 286:7
**Environepi**
7:22,23
**environment**
255:23 264:8
**environmental**
160:1 262:21
288:14 303:4
**Epi**
280:17 286:7
288:14
**epidemi-**
172:17
**epidemiologic**
21:5,6,9 23:6,8
24:9,10,25 27:6
93:1 103:1,11
115:8 116:15
134:9,14 146:24
150:16 153:5
154:20,22 155:2
156:22 160:4
225:12 303:10
310:13 311:19,25
345:11
**epidemiological**
6:24 44:17 46:3
75:21 106:4
115:25 116:12,21
117:14,24 118:25
134:18,24 142:20
151:10 152:7
153:9 155:7 158:3
158:7,12 172:18
173:23 179:1
204:4 205:5 245:7
245:13,17 279:14
302:1 335:10
**epidemiologist**
89:24 95:3 173:21
**epidemiologists**
24:23 66:2 73:24
281:20 327:13
329:6

**epidemiology**
20:6,15 21:21 23:1
30:22 36:16 38:23
39:4 42:18,23
44:10 74:8,10
90:13 95:1 106:1
152:22,25 153:22
154:7,12 156:9,15
157:10,13 163:21
164:15 167:4
169:21,25 172:6
180:10 181:15
184:8 244:11
279:17,18 281:1
310:16,19
**epidi-**
245:7
**epidil-**
245:7
**EpiTech**
7:4,7
**epithelial**
297:9,23
**equal**
170:23 327:21
**equally**
185:10 310:23
**equals**
268:17 295:9
**equivalent**
53:19 249:21
277:17,20 302:11
**era**
147:12
**eras**
92:22,24
**errata**
354:4,6,9,11 356:8
**erroneously**
168:11
**error**
166:2,4,7,8,12,15
166:19 167:3,3,7
167:16 168:1,12
169:21,22 170:22
170:23 197:11

201:3,6 271:6
**errors**
70:10,22 166:22
171:14 185:2,8
223:18,24 224:1,3
225:21
**especially**
123:2 184:7,7
204:10 283:11
**ESQUIRE**
3:4,10,16 4:3,11,17
5:4,11,18
**essentially**
156:8 223:2 277:17
277:19
**establish**
335:4,22
**established**
117:19 122:21
173:23 273:2
282:8 287:17,23
334:23
**establishing**
316:2 344:15
**estimate**
106:24 125:2
149:14,17 169:1
182:24 186:16
202:13 206:22
208:11 213:20
247:11 270:8
**estimated**
160:14 177:13
199:3
**estimates**
8:11 30:3 76:24
122:4 160:16
166:4,21,24 167:1
169:18 170:25
175:15 186:8
192:18 197:15
202:18 225:17
267:3 298:18
317:24 319:3
328:3,4 329:22
**et**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 108 of 149
PageID: 211572
Jack Siemiatycki, Ph.D.

Page 373

35:10 38:20 41:23
46:11 64:11
102:10 138:15
146:22 159:14
160:2 179:23
189:19 196:19,20
226:8,9 266:10
**ethnic**
8:10 175:14 182:14
317:23 318:17
**ethnicity**
177:8 319:8
**European**
43:4
**evaluate**
27:18 28:4 32:20
32:21 33:23
126:20 138:8
167:6 198:7,19
204:24 266:15
303:8 334:5,25
335:20,21
**evaluated**
12:19 24:5 27:1
33:9 137:13 138:2
138:13,16 144:18
158:13,17 173:13
192:6 241:8 297:5
318:8
**evaluating**
21:20,21 25:11
31:13 89:24 90:21
98:25 99:17 146:7
169:24 172:17
184:17 198:3,11
275:24 278:1
283:18 304:9
311:3 314:20
**evaluation**
20:3 36:13 43:5
99:25 127:15
137:20,22 138:21
139:1 141:14,21
142:13 143:1
150:12,20 151:2
153:7,24 181:17

196:2 197:18
237:7,14,25
260:15 266:21
292:4 299:3
303:10 310:21
330:11,21 351:5
**evaluations**
26:9 31:16 33:15
137:14 151:25
237:5,6 238:10
258:1
**evening**
274:15,17 290:20
290:21 322:22
**event**
87:8
**ever-used-it-at-all**
77:3
**evidence**
13:11 24:6,8,11,11
25:5,6,16,20
26:16,22 28:15
29:12 31:8 32:1
32:11 33:11 34:17
43:3,5 67:11
75:16,19,22 78:9
98:4,5 100:11,20
103:1,12 105:20
105:25 113:6
115:8,9,25 116:12
116:15,22 117:14
117:24 118:9
123:2 129:3,4
131:5 132:22,25
133:24 134:16
144:12,13 149:9
150:16,22 151:5
151:10 152:8
153:3,6,10,12,21
153:22 154:1,4,6
154:20,22,25
155:2,7,16 156:15
158:13,14,23,24
160:18 165:6,10
165:11 174:5
183:15 192:18

197:20 202:19
203:11,12,17
204:2,4,9 205:6,7
205:21,22,23
207:22 243:11,18
249:4 261:16
264:14 265:22,23
266:8,9,20 267:5
267:20 270:14,15
270:21 272:22
273:6 281:11
282:12,14,24
288:2 296:13
299:6,11,12 303:9
303:11,13 311:1
311:19,25 314:6
314:21 317:1
320:22 321:14,16
321:22 326:20
333:11 335:10,13
335:18,19 339:1
346:23 347:2,23
348:2,12 351:1,2
351:10,17
**evident**
298:2
**exact**
130:23 137:4
138:16 190:19
**exactly**
15:14 29:25 58:16
59:15 72:4 166:15
198:16 227:4
274:2
**examination**
6:2 9:21 142:1
274:13 294:23
322:20 336:9
353:8
**examine**
66:18
**examined**
9:20 240:1 243:8
**examiners**
242:12
**examining**

107:3 177:1 190:23
310:24
**example**
12:4 26:25 56:14
95:2 101:5 118:1
119:11,17 132:22
134:15 151:1
157:8 158:15
162:1,14 181:19
192:11 223:12
252:15 277:21
334:20
**examples**
67:17 85:15 144:22
155:19 160:19
**excellent**
27:14
**exception**
44:3
**exceptional**
147:25
**excerpt**
8:4 309:9,13
**excerpts**
93:15
**excess**
119:25 121:12
146:16,19 159:23
176:3 328:22
329:4
**excesses**
118:25
**exchanges**
100:16
**excited**
174:23
**exclude**
34:11 35:11 209:14
209:15 225:14
269:8 270:22
**excluded**
29:5 199:5
**excludes**
252:25 269:1
**excluding**
28:23 79:24 83:9

228:22
**exclusion**
228:7
**exclusions**
227:23
**exclusive**
251:4
**exclusively**
57:13
**excuse**
23:4 111:8 155:21
256:23,23 289:13
320:7 346:6,9
**exercise**
82:17
**exercising**
85:18
**exhibit**
14:15,23 15:6,11
15:19,25 16:5,13
17:17,18,23 43:24
43:25 45:1,18
46:3,5,6,16,20
47:4 48:2,5,18,19
48:24 49:4,24,25
50:5,5 53:3,3,5,5
58:9,10,13,20,25
60:5 61:7,9,14,19
61:25 68:10 69:4
70:3 72:9,25 94:9
108:15,17,18,24
109:14,18,20,21
110:3,7,12,17
111:20 112:4,6,25
149:16,25 163:6
194:5,6,24 213:24
214:4,7,12,15
234:22,25 235:1,8
235:13,25 243:3
256:4 278:12,14
280:12,16,21
285:12,14 286:2
306:9 308:16
309:4,14 317:9,12
317:21 320:21
326:23 327:2

Jack Siemiatycki, Ph.D.

Page 374

326:23 327:2
330:6
**exhibits**
6:9 7:3 8:3 41:18
48:18 49:12 50:4
234:20
**exist**
116:11 271:18,19
271:20
**existed**
205:22 271:24,24
**existence**
217:22 330:9,19
**exists**
116:1,12,16,22
117:24 118:9
123:8 334:10
336:19
**expect**
80:2 197:14
**expectation**
107:16
**expected**
224:9
**experience**
70:8
**experienced**
159:13 185:11
**experimental**
38:19 144:14,17
**experimentation**
152:23 311:21
**expert**
6:18 7:12,15 10:10
10:14 11:10 13:4
13:25 17:16,24
54:18,25 55:22
57:17 58:4 59:25
60:3,10,13,16,24
60:25 61:1,14
74:19,24 75:2,8
81:13 84:16 91:8
93:4,21 94:13
95:5 98:25 99:2
101:6,6,13 114:1
123:16 141:6

164:9,14,17,21
165:8 233:3
260:21,23 261:11
265:3 276:2,14
277:8,15 316:20
322:8 324:11
325:1 332:15,24
333:4,6,17 334:6
348:15 349:25
**expertise**
74:22 126:24 331:4
331:9,24 338:13
**experts**
13:22 14:1,4 15:16
24:12 74:23 93:24
94:3,7 136:12
316:16 322:3
331:19 332:6,8,10
334:1,17,21,25
341:4
**expires**
356:17
**explain**
176:3,9 177:24
183:12 187:9
199:6 218:3 316:5
327:4
**explained**
66:17 176:4 246:3
246:8
**explanation**
22:19 155:13
190:20 311:8,14
320:4 349:13,20
350:2
**explicit**
26:18 329:3
**explicitly**
29:2 34:8 36:8 37:3
84:13
**expose**
152:24
**exposed**
76:20 92:25 101:2
138:15 160:2
162:6 171:8,9

208:24 227:3,4
269:23 270:2,19
351:6
**exposed/never**
270:18
**exposed/unexposed**
270:25
**exposition**
72:22
**exposure**
106:21 121:6,10
122:15 131:8,15
132:11 146:8
152:24 158:4
160:3 166:3
168:10 171:5
197:23,24 198:8
213:11 221:15
227:5,7 229:6,18
229:19 230:2
237:9 250:19
267:1 270:4 288:3
288:8 297:6
298:22 301:12
302:9 303:17
305:14,25 311:5
312:7,11,13
343:20
**exposures**
160:1 162:3
**expressed**
83:23 97:22 132:20
241:22
**expressing**
72:19 277:23
**extension**
189:20
**extent**
26:17 121:25
334:10,20 338:16
**external**
341:10,15
**externally**
340:23 345:13
346:11 347:9
351:11

**extra**
16:7 40:20 46:18
285:19,21
**extract**
82:20
**extrapolation**
204:25
**extras**
48:7
**extremely**
122:14 297:25
319:23
**eye**
207:11
**eyes**
143:16 349:2

# F

**F**
5:6
**Fabio**
5:25 9:4
**face**
34:11 308:20
**faces**
289:6
**fact**
17:23 21:24 28:8
32:15 63:13 97:9
103:6,22 111:22
115:21 152:7,12
166:20 167:12
180:4,18 190:15
198:2 201:7 209:1
214:15 220:20
221:14 222:19
225:15 226:2
235:24 258:15
268:14 269:22
324:10
**fact-**
174:9
**factor**
130:4,12,18 156:21
156:22 157:1,17
174:1,6,8,12,12

310:22
**factors**
8:5 19:20 20:24
21:12 24:20 36:6
124:9 125:23
130:20 172:22
173:7,12 174:2
177:9 226:5,7
282:8,11,25
283:24 284:10
287:4,18,23 288:1
288:2 305:10
306:13 308:20
309:4 316:21
318:17
**fail**
354:14
**failed**
102:16 199:14
**failing**
137:19
**fair**
27:2 32:3 35:14
39:5 55:19 60:6
61:20 151:14
152:17,18,18
153:13 165:12
172:7 179:6
185:23 191:9
205:23 207:24
232:11 233:15
239:20 240:20
242:16,16 302:16
329:24
**fairly**
26:18
**fake**
159:22
**fall**
97:25 98:1 147:11
147:12 332:25
**fallopian**
339:4 341:1
**false**
327:14
**familiar**

Jack Siemiatycki, Ph.D.

15:9 64:25 74:21
129:13 192:13
193:13 230:3
243:22,24 244:5
254:16 257:20
258:25 259:3
262:5 264:15
280:17 303:4
**fan**
128:15
**far**
29:3 71:22 96:18
123:5 266:12
281:4
**faster**
248:2
**favor**
66:2
**favorable**
130:16
**FDA**
43:6
**February**
353:15
**feed**
150:19 153:6
**feel**
104:12 114:22
150:13 169:7
**feeling**
28:17 100:3 152:19
153:1 154:18
**feels**
289:1
**fees**
54:17 55:6,8,12,20
**fell**
88:23 155:22 215:9
**fellowship**
279:21
**feminine**
288:5
**fetishized**
184:2
**fibers**
96:3 97:14 102:2,8

103:7
**field**
20:7 125:19 165:11
331:19
**fields**
75:7
**fifth**
20:18 27:14 43:19
298:16
**figure**
106:8 206:25 207:4
207:19 243:4,5
255:10 314:15
**figures**
217:2
**file**
71:11 88:18
**filed**
109:3 219:5
**FileMaker**
71:19
**files**
72:4 81:5
**filing**
45:23
**fill**
107:23
**filling**
314:12
**final**
25:20 31:16 90:1
91:18 153:6,23
280:21 321:16
325:22
**find**
37:18 42:24,25
52:9,10 81:13,25
102:16 171:6
182:7 196:21
198:17 203:11
209:4,16 225:24
226:16,22 242:6
244:10 261:19
296:12 300:19
310:17 349:21
**Findeis**

3:16 11:4,4,6
**finding**
102:8,14 103:11
123:12
**findings**
21:4 132:18 133:9
240:4 248:20,21
248:21,22,23,24
248:25 262:20
273:18,19,21,24
273:25 274:1
298:8 299:9 302:2
305:3 307:9 309:7
**fine**
108:20 140:16
254:20 255:11
**fingers**
63:4
**finish**
25:2 71:12 140:18
194:17,18 199:23
282:3 338:15
347:18,19
**finished**
140:13 248:16,17
270:11
**first**
9:19 10:13 12:24
13:12 17:2 20:19
20:22 23:3 40:3
44:16 57:17 62:1
62:2,25 63:5,12
86:16 105:13
111:13,16 113:10
118:23 157:25
195:19 202:20
229:13,15 230:19
230:24 231:16
237:11,13 239:22
257:14 260:4
262:4 267:24
280:25 284:17
286:21 287:14
294:14 297:11
300:24 315:17
323:22 325:6

337:8 338:20
343:17 345:5
**first-year**
36:19
**fit**
151:18,22 262:19
**fits**
24:13
**five**
11:18,19 18:24
19:5,10 41:11,17
56:14,17,19 57:8
147:14 194:10
238:19 298:17,20
**five-year**
138:7,9
**flag**
347:21
**flaw**
67:6 182:23 188:17
**flawed**
27:9,11
**flaws**
188:20 225:11,12
225:15 226:1
**flip**
286:19
**flipping**
63:25 284:12
**Floor**
3:19
**Florham**
4:20
**Florida**
3:7
**flurry**
50:19 51:16 241:11
**FLW**
1:6
**focus**
59:2,6 283:25
**focused**
57:13 171:4 189:12
189:12 197:22
200:9 226:5
294:25

**focuses**
281:1
**focusing**
20:22 264:4 337:23
338:19
**Focussing**
93:20
**follow**
171:5 200:4 235:14
261:19 300:9
325:12
**follow-up**
171:11 206:3
226:14,25 227:1
322:11,23
**followed**
28:2
**following**
29:25 168:8 200:14
207:1 351:9
**follows**
9:20 311:6 328:17
**fondly**
275:1
**font**
108:4,5 109:8
**force**
72:21
**forcing**
31:10
**foregoing**
353:4,21 356:3
**forever**
22:3
**forget**
75:24
**forgot**
323:18
**form**
12:6 22:9,22 23:15
29:10,22 32:4
34:1 35:6,24
39:10 44:8 53:10
55:2 60:7 69:23
71:8,13 73:9
75:12 80:20 84:21

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 111 of 149
PageID: 211575
Jack Siemiatycki, Ph.D.

Page 376

85:10,20 90:2,25
94:22 95:20 99:4
103:25 104:9
116:3,14 117:3,6
118:2 119:8,18
120:13 121:19
122:10 123:10
125:4,15 129:21
130:7 131:24
132:13 133:11
137:2 150:8 151:6
151:15 152:15
154:16 156:11
161:12 165:13
167:12,15 172:24
176:13,16,23
178:9 185:6
188:18 192:5
198:25 200:12
202:25 205:3
207:25 218:17,20
220:24 223:8,22
225:9 239:7 240:5
240:13,25 241:19
246:21 247:9
249:23 250:11
251:10 252:19
253:14,17 254:3
254:11 258:17,24
260:22 261:3,25
263:7,21 264:12
265:5,8 267:16
271:15 272:14
273:5 276:17
277:4,11 278:2
281:16 283:7
284:6,24 288:17
288:23 302:6
304:16 306:4
307:12 310:5
312:18 326:6,17
330:14,24 331:14
332:1 334:8,11,14
334:15 335:1
339:12 341:2,17
344:1,20 345:15

346:14,19 347:11
349:23 350:23
351:15 356:7
**formal**
137:15,16,21 139:6
141:13,21 142:7
151:2 181:17
260:15 268:11
298:22
**formaldehyde**
162:6
**format**
15:15 76:18 135:15
**formation**
240:10
**formatting**
337:12
**formed**
69:5 127:20 128:24
194:25 241:15
256:15 261:9
291:24 315:8
320:24 321:1
**former**
95:2 151:1
**forming**
23:25 24:18 33:11
36:4 50:7,9 90:11
93:4 94:13 120:18
194:22 256:9
261:11 326:15
331:21 333:19
**forms**
121:15
**formula**
114:2 321:18
**formulaic**
277:22
**formulate**
241:9 315:11
**formulated**
292:18
**formulating**
314:1
**forth**
88:22 147:1 182:14

353:5
**forward**
108:11
**found**
32:19 81:18 88:13
91:25 105:16
160:10 176:25
196:22 203:17
223:3,3 239:15,15
242:3,4 257:12
297:23 299:6
327:5 343:24
350:14,17
**four**
11:18,19 40:9,10
40:14 53:15
106:21 126:2
152:21 160:17
248:25 298:14,15
298:15 306:25,25
307:8 309:25
319:4 349:8
**fourth**
20:14 27:14 62:3
63:1 171:1 286:22
297:14 300:24,25
**fraction**
204:10
**fragile**
204:7
**frame**
56:4
**France**
126:19 233:21
**frankly**
90:8
**free**
102:1 169:7
**frequency**
115:13 121:16
162:16 197:24
198:6,12 267:1
297:6
**friends**
135:9
**front**

14:17 33:5 47:3
48:18 50:5 61:8
84:11 91:11
109:17 112:25
192:20 211:11,22
234:5 235:25
255:19 294:8,17
294:18 295:25
312:25 337:11
**frustration**
82:23
**full**
53:19 62:2,25
76:16,17 93:17,17
165:25 196:18
201:21 206:12
219:25 300:24,25
301:1
**fully**
93:14 95:10 177:24
183:13 195:16
196:1 198:13
224:9 241:18
267:2 338:11
**fulsome**
191:11
**fumes**
350:19
**function**
150:14 258:1
**funders**
281:21
**funding**
228:4 233:10,13,16
281:21
**funds**
54:24
**funny**
112:19
**further**
36:21 135:13
157:22 258:21
301:21 305:15
306:1 322:1
351:20
**Furthermore**

80:3
**futile**
242:1

---
**G**

**G**
9:1
**G-R-E-E-N-L-A-...**
20:9
**gain**
22:7
**Gates**
200:14,18 224:13
224:16 225:2,4,7
225:21,25 227:2
227:12 228:7
**gathering**
134:20
**general**
15:25 16:14 17:2
64:15 65:18 66:2
133:22 154:7
159:16,22 160:6
161:5 190:1
310:13 320:22
321:23 334:14
337:8
**General's**
133:4,20
**generalized**
161:22
**generalizing**
133:25
**generally**
65:14 85:25 89:2
138:7 162:2
166:24 204:21
276:1
**generate**
51:19 60:24 159:6
**generated**
57:17 60:16 61:1
69:11 74:3 99:2
101:6 187:16,20
257:21 318:20
**generic**

Jack Siemiatycki, Ph.D.

58:21 66:21
**genetic**
282:10 287:3
**genital**
59:1 193:17 202:6
204:5 214:24
215:2,4,14,21
216:10 217:7
248:10 268:15
291:5,12 295:3,8
296:15 297:5,10
297:22 298:3
301:19 312:7
313:19 315:5
316:24 317:5
340:24 341:15
343:20 351:12
**genitally**
216:18
**geographic**
65:16 221:12
**GEREL**
3:11
**Gertig**
226:20
**gesture**
325:14
**getting**
39:18 124:11 147:8
173:10
**GI**
65:21
**gist**
137:5 324:1
**give**
14:25 17:13 41:4
55:11 56:3 100:24
101:9 118:23
125:1 131:1 157:4
163:9 165:25
174:4 186:16
261:16 263:13
281:23 285:24
290:4 300:11
348:23
**given**

26:18 38:18 65:8
95:19 134:3 356:5
**gives**
67:17 266:24
**giving**
32:1 148:3 274:22
**glanced**
243:7
**glasses**
46:11
**glitch**
80:11
**go**
17:15 45:12 54:19
54:20 65:8,20,21
67:20,22 75:13
77:12 80:24 83:15
89:12 104:21
107:10 121:1
131:3 148:22
155:4 165:24
170:3 194:4
199:16 214:2,4
222:2 227:16
236:7 242:11
243:3 249:9 255:9
265:11 268:2
274:6 275:4 282:5
282:20 286:21
294:13 298:19
306:11 308:14
321:10 322:14
335:25 343:8
348:14,15 350:4
**Godleski**
346:17
**goes**
36:21 48:11 213:21
216:19 283:10
287:12 301:21
303:22 337:19,20
**going**
52:14,18,23 53:17
60:19 63:24 67:23
68:1,20 72:11
89:6,17 104:16,25

105:4,8 106:4
108:11 109:13
114:15 121:23
124:16 128:16
138:8 140:14,16
140:23 141:1
145:20,25 152:5
157:21 161:2
168:5 169:13
189:6 190:13,14
194:8,9,12 210:3
210:8 211:19,23
219:10 225:3,6
234:23 242:18,23
243:8 255:12
257:1 265:14
274:4,8,11 285:5
290:1 308:4
320:12,15 321:10
322:15,18 336:1
336:13 343:10
352:3
**Golkow**
9:5
**GOLOMB**
4:3,4
**good**
9:3,23,24 18:10
27:13 30:24 34:22
34:23 52:15 67:17
79:19,20 104:14
105:6 145:16
146:3 179:17
181:2 184:15
210:1,2 226:3,4
242:9,10 274:15
274:15,17 290:20
290:21 313:2
320:10 321:3
322:5,22 349:2
**Gordon**
5:12 102:10
**government**
126:19
**governments**
138:3

**gradient**
305:6
**grams**
121:3,16
**grant**
124:14 125:8 289:2
**grants**
124:11
**grapes**
179:21
**gray**
172:5
**great**
52:17 188:8 285:23
328:24
**greater**
114:22 182:8 198:4
214:20 245:11,19
252:7 299:8
327:23
**greatly**
195:14 283:11
**green**
68:6 188:9,12,15
189:2,11,19 190:7
190:8,11 191:5
**Green's**
191:10
**Greenland**
20:8
**ground**
129:5
**group**
7:24 8:10 38:19,20
50:22 65:7 136:14
136:15,21 142:16
142:19,25 143:2,3
143:15,15 144:7
144:11,18 150:21
151:1,3,4,13
152:13,21,21,22
152:23,24,25
153:17,25 154:3,4
154:5,5,8,8,15,18
154:21 155:8
158:15 163:1

168:8,17 170:8
175:14 217:16
225:17,18 265:25
280:8 286:9
288:21 298:16
303:2,3 317:23
318:17
**groups**
138:4 166:18
182:14 213:6
298:17
**growth**
144:1
**Guadeloupe**
126:22
**guess**
11:20 15:15 25:4
51:1 54:10 57:8
59:14 68:17 69:12
72:10 88:25 96:24
97:10 98:20 99:8
147:17 149:5
166:1 168:1
178:10 183:2,9
206:1,25 246:8
257:16,18 259:6
299:3 307:14
318:4 323:13
324:18 325:21
341:3 344:22
349:24
**guesstimate**
55:16
**guidelines**
43:3,4 153:21,23
310:20 322:3
**gut**
100:3
**gynecologic**
281:5 340:8 349:22
**gynecological**
189:14

---
**H**

**H**
6:7 7:1 8:1

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 113 of 149
PageID: 211577
Jack Siemiatycki, Ph.D.

Page 378

**half**
118:10 126:1
256:14
**halfway**
296:11
**hall**
278:23
**hallmark**
133:19
**hand**
18:5 22:25 52:6
77:7,20 329:21
**handbook**
20:14 146:24
**handed**
280:11
**handwriting**
18:11
**handwritten**
7:17 44:5,7 64:2
110:14
**handwrote**
73:2
**handy**
175:23 343:4
**happen**
155:12 156:14
170:11 252:4
**happened**
106:22,23 109:1
155:18,20
**happening**
252:6
**happens**
170:15 209:14
259:12
**happy**
183:24 197:5
222:25 291:8
334:17
**hard**
86:14 88:4,7 125:6
184:8
**harder**
42:24 169:9
**Harvard**

279:22
**head**
299:9 340:12
**heading**
87:13
**health**
26:6 43:2,14 50:21
51:17 52:1 84:2
84:10,12 85:3,6
85:16,18,23,25
86:3 226:3,12
230:20 233:13
241:12 255:23,25
256:18 257:10,22
257:24 258:5,13
258:16 264:11
265:1 275:8,18,25
279:13 284:14
291:24 292:3,7,19
293:7 294:3
299:16 320:23,24
321:22 323:4
326:7,12
**healthy**
281:11 284:13
**heard**
129:10 230:19,19
244:13,17 324:16
325:15
**hearing**
68:15 69:6 172:25
**heart**
226:8
**heavy**
63:4 103:23 350:6
350:22
**heightened**
221:15
**held**
2:1 9:8 15:5 20:1
22:4 104:20 143:3
143:20 156:1
192:24 194:20
233:21 256:25
299:7 308:12
317:11

**Heller**
339:5 341:22 342:7
346:3,3,4 347:2
348:21 349:3,9,13
**help**
15:2 19:3 41:14
44:23 74:13 81:23
82:6 83:18 95:22
236:1 280:7,9
**helped**
81:9,13 125:24
**helpful**
17:3 19:11 212:23
212:25
**helpfully**
200:8
**helping**
300:9
**Henderson**
339:5 341:22 342:6
345:22 346:1
347:2
**hesitating**
60:8 71:25
**heterogeneity**
180:14,15,25 181:1
181:2,10,11,16,17
181:21 182:3,6,24
**heterogeneous**
283:13
**heuristic**
32:9
**Hi**
146:4 290:6 325:14
**hiding**
266:4
**high**
117:20 119:21
147:7 148:1,16
153:18 155:15
160:10,11 166:19
232:13 287:18
304:8 314:4
319:15,23
**higher**
129:14 144:4 215:4

259:11 319:24,25
351:12
**highfalutin**
187:21
**highlighted**
111:2 166:1
**highlighting**
44:8
**highly**
298:1,14
**Hill**
243:19,22,23,25,25
244:6,7,9,13,23
246:1,4,12,18
305:1,9,11,22
315:21
**Hill-like**
304:13
**hints**
121:9
**histologic**
204:15
**histological**
202:10 203:7
**historic**
92:12 102:14,17
**historical**
132:22
**historically**
92:11
**histories**
318:16
**history**
22:2 92:13 177:7
195:8 318:13
**hold**
131:12
**holding**
43:18 129:11
**home**
169:10
**HONIK**
4:4
**hope**
4:13 128:23 259:15
259:15

**hopefully**
290:24
**hopeless**
171:9
**Hopkins**
93:16 95:14 102:5
**horizon**
143:21
**hormonal**
125:23 226:7
282:10
**hospital**
64:22 65:8,9 66:3
**hospital-**
65:5
**hospital-based**
64:12,14 65:1,2
66:1,5,22
**hospitals**
65:12,15,18
**hotel**
136:6
**hour**
49:9 52:15 54:13
104:17
**hours**
11:18,19,20 47:13
49:2,6,22,25 51:6
51:7 53:4,5,6,21
53:22,22,23,24
125:2,14 177:21
194:10 293:10
306:12 317:17
340:13
**huge**
105:20 171:24
**human**
264:10 301:9 322:7
**humans**
144:12 237:10
250:21
**Huncharek**
202:16 235:19
**hundred**
28:3 170:9
**hundreds**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 114 of 149
PageID: 211578
Jack Siemiatycki, Ph.D.

Page 379

33:15,15 40:20,20
40:23 226:9,9
**hung**
309:18
**hygiene**
288:5
**hypotheses**
97:23 128:18
190:23 283:23
316:18
**hypothesis**
34:19,20 221:22,25
**hypothetical**
99:8 117:16 157:5
159:3 160:8
271:17,22
**hypothetically**
115:22 118:15
157:7,13 158:5

**I**

**IARC**
19:25 40:18 105:18
123:22 126:11
128:21,22 131:2
136:15,23 137:7
137:12,14,18
138:21,25 141:5
142:1,7,12,16
144:7,17,25 145:4
146:5,15 149:1
150:7,12,12,20
151:1,16,22,24
152:14,20 153:18
158:15 159:2
163:1,11,16
165:20,25 218:2
237:5 238:6 251:2
260:12 263:19
265:25 267:9
275:18 276:1
299:2,10 314:4
350:9 351:1
**idea**
64:25 148:11 227:3
267:6 269:4

**ideas**
22:2 70:6 128:18
**identical**
38:11 80:4 190:25
**identification**
14:21 15:7 16:6
17:19 44:1 46:7
46:21 48:6 58:11
61:10 110:4 194:7
214:8 266:3
278:15 285:15
309:15 317:13
**identified**
11:25 40:5 43:20
86:11 89:7 158:12
182:23 327:2
330:6
**identifies**
342:16
**identify**
10:25 13:2 17:1
19:15 35:3,9 41:9
62:22 77:22 89:3
91:23 92:17
105:13 106:13
170:8 175:9 181:6
181:10 182:12
183:24 184:9
200:3 265:21
316:21 333:17
**identifying**
74:14 175:22
218:13
**idle**
325:14
**ignore**
182:5,6
**III**
300:5,17,21
**illustrate**
174:16 176:1,18
**illustrates**
174:5,16
**illustration**
134:24
**image**

62:14
**imagine**
45:6 86:2 118:16
191:6 239:11
269:20 281:23
**imagined**
180:14
**Imerys**
5:10 101:7 274:5
274:18 323:1,9
336:7
**impact**
38:16,17 106:14,23
158:18 166:3,5
170:24 173:11
176:1 182:8 218:9
224:1 228:16,21
284:14 317:18
**impacts**
166:21,23,25
**imperative**
354:10
**implementation**
180:21
**implication**
208:24,25
**implicit**
24:22,22,23 36:7
36:15
**implicitly**
29:1
**implies**
114:22
**imply**
249:14 329:22
**implying**
208:20,20
**importance**
26:21 32:11 84:18
**important**
31:2,4,4,24 32:12
33:23,24 123:6
156:18 177:10
196:14 197:7,20
198:1 206:15
260:5 275:24

276:10,13 277:24
288:9 319:9 324:3
325:13 328:13
**improbable**
120:2
**improve**
70:13
**improving**
284:18
**inaccurate**
166:12
**include**
29:12 38:3,4 39:7,9
43:9 50:11 82:18
184:12,12,22
185:3,3,3,4,16,17
186:9,10,17
187:10 188:12
201:11,15 209:14
224:13 225:14
228:25 229:4
252:22 287:18
303:2 329:14
**included**
39:16,17 82:25
106:5 112:12
186:23,24 187:1,6
188:9 189:22
199:5,12,15
200:11 201:14,15
208:3,15 213:18
222:24 240:21
287:22 297:24
**includes**
210:22 211:8 212:6
212:7,9,10 213:14
252:2 271:2 309:6
**including**
53:11 78:7 79:23
88:11 99:24
141:13 142:22
163:20 188:15
225:15 226:6
227:18,18 228:22
229:18 270:5
278:7,8 303:3

316:15 326:3
**inclusion**
228:7
**inclusive**
213:7
**incognita**
351:7
**inconceivable**
319:25
**inconsistency**
155:14
**increase**
103:9,15 146:18
149:2 156:16
176:10 217:2,17
261:17 296:17
297:21 298:11
345:12
**increased**
35:21 120:10
127:22 202:7
297:8 299:5 327:4
**increases**
123:17
**increasing**
103:4 120:24
268:17 295:10
297:22 298:21,21
**increasingly**
102:6
**incumbent**
275:20
**independent**
97:22 107:6,15
223:5 270:20
**independently**
77:15 80:5 106:7
164:9 272:10,15
335:20
**indicate**
107:11 123:6 205:7
219:9 239:21
248:12 293:12
298:20 301:10
325:6 329:8
**indicated**

Case 3:16-md-02738-MAS-RLS   Document 33008-57   Filed 07/23/24   Page 115 of 149
PageID: 211579
Jack Siemiatycki, Ph.D.

Page 380

30:7 32:15 145:6
292:22 299:4
328:8 332:4,9
**indicates**
154:10,13 237:8
250:19 273:16
**indication**
219:12
**indicative**
301:22 302:3
305:15 306:1
**indirectly**
350:25
**individual**
37:10 128:15
172:10 228:22
237:6 238:10
321:15
**individuals**
10:25 55:7 117:1
119:5 132:8
212:15 215:3,5,9
216:3,14,16,23,25
217:18,22 326:4
**induce**
336:18
**induced**
213:10
**industrial**
351:3
**industry**
96:19 97:6 101:25
126:22
**infect**
156:9
**infects**
159:17
**infer**
251:13
**inference**
115:17 299:7
**inferences**
21:6,8 117:21
180:8 204:8 205:4
248:20 249:1
261:17,18,20

273:10 304:10
310:19 335:5
**inferred**
114:2
**inflammation**
143:12 288:4 314:9
**inflated**
167:14
**inflation**
222:5
**influence**
75:20 143:10,14
184:10 205:8
209:11 261:5
**influenced**
147:4 219:7 266:20
**influences**
180:23
**inform**
96:2 141:6
**informal**
74:1
**information**
7:21 22:7 23:4,5
24:4,10,24 25:10
25:11,17 26:18,19
27:22 31:14 43:7
43:15 50:23 51:17
75:15 76:16,17
84:7 92:9 93:2
95:22 96:2 98:2
99:14 102:21
103:1 118:21
126:7,17 134:20
142:25 143:4
144:1 162:20
171:5 177:5,7
184:17 188:22,25
189:22,23 226:12
228:3 229:17
230:2 231:3,6
233:11 241:12
245:24 269:25
270:6,18,19 271:1
292:18 305:3
310:24 314:13

318:21 326:2
332:10
**informative**
91:9 92:1
**informed**
222:13
**inhalation**
59:4 123:17
**inherent**
159:21
**initial**
70:5 334:15
**initially**
12:22 152:22
**initiate**
137:21
**initiated**
72:13
**Initiation**
171:15
**injected**
339:24 340:11
**injuries**
65:17
**input**
77:24 80:25 150:11
151:25
**Insofar**
337:25
**instance**
33:23 76:22,23
77:7 85:16
**instances**
85:6 86:2
**Institute**
43:10 233:21
**institution**
289:6
**institutional**
289:7
**instruction**
82:20 96:20
**instructions**
82:21 90:1,11,20
91:14,18 354:1
**intake**

282:25 284:1
**integrate**
25:4 74:22
**integrated**
25:20 82:13 196:1
321:16
**integrating**
28:6
**integrity**
197:12
**intellectual**
22:2
**intend**
68:15 69:6 84:16
84:22 259:13,17
259:23
**intended**
293:23
**intending**
139:6
**intensive**
196:16,17
**intention**
142:7
**interact**
275:17
**interest**
131:20 260:11
275:21 276:9,24
**interested**
92:13,24 124:6
138:14
**interesting**
140:5 178:2
**internal**
79:20 92:19,19
138:5
**internally**
92:7 259:12
**international**
13:13 19:25 26:5
**internet**
256:19 257:12
**interpret**
273:17,23 311:24
**interpretation**

67:7 83:16 134:13
161:20 172:15
205:10 273:19
298:12 309:7
345:3 347:25
**interpreted**
246:14 274:1 322:7
328:24
**interpreting**
183:16 249:1
273:20,21,25
310:12
**interrupt**
157:15
**interval**
236:15,19,21
**intervals**
190:3 207:2,3
223:19 297:12,15
297:16
**interview**
214:19,20 215:20
**interviewed**
180:22 200:25
209:19 211:6,9
212:8,15 213:15
213:18,19 215:3,5
215:15 216:10,15
216:23 217:1,18
217:23
**interviewing**
159:18,19
**intimately**
264:14
**introduced**
239:13 349:14,17
**Introduction**
20:19
**invented**
209:18
**investigated**
119:22 161:10
**investigator**
124:20 209:20
279:24 283:14
**investigators**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 116 of 149
PageID: 211580
Jack Siemiatycki, Ph.D.

Page 381

100:1 237:6
238:11
**involve**
121:23 156:25
341:9,10
**involved**
26:4 53:12 82:14
138:17 159:11
161:15,17 189:2
257:23,25 258:12
276:11 277:8
282:19 324:7
**involvement**
12:11 88:10 124:22
127:16 135:12
233:3 258:3 260:5
278:5 282:17
**involves**
25:21 31:6
**involving**
59:17 141:8 218:15
259:24 260:13
276:12 302:23
324:12 325:3
**irrelevant**
245:16
**irrespective**
166:13
**issue**
22:24 31:5 41:24
59:7,25 66:21
74:16 84:11,12
92:7 95:23,24
96:13 104:12
122:14 129:10
131:21 133:23
135:5 136:10
176:2 199:7
247:25 261:5
275:19 298:24
313:23 314:21,23
315:19 317:17
325:13 331:18
**issues**
12:23 95:23 129:13
157:3 189:14

191:2 334:18
**italics**
64:10
**item**
160:4 256:6,7
285:12
**items**
95:15

————————

**J**

**J.M**
3:16
**Jack**
1:17 2:1 6:2,11,16
6:19 7:10,12,15
8:6 9:14,18 52:22
104:24 105:3
145:24 210:7
242:22 287:9
288:14 306:18
308:21 309:5
352:2,5 356:11
**January**
1:19 9:6
**jargon**
114:12
**Jersey**
1:2 4:20 9:12 109:5
**JESSICA**
4:17
**jessica.brennan...**
4:22
**jogs**
135:21
**Johnson**
1:5,5 4:10,10 9:10
9:10 10:3,3,7,8
89:20,20 91:20,20
101:7,7,15,15
103:23
**Johnson's**
59:17 103:23
**join**
309:16
**journal**
8:13 127:11 277:21

277:22
**journals**
159:14
**JS**
7:4,7
**judgment**
24:13 25:3,7,12,21
26:8 31:6,9,11
36:13 39:6 82:18
83:6,12 90:1
153:20 184:13,20
185:2,8,9,23
186:1 188:20
227:23 321:17
322:8
**judgments**
30:5 31:7,15,18
39:13 184:13
185:12 186:11
209:7 223:1
227:17
**Julie**
95:14
**July**
7:8 47:14,16,20,21
48:4 49:5 233:22
**jumping**
290:23
**jury**
90:1,11,20 91:14
91:18
**justified**
184:4
**justify**
144:2
**juxtaposed**
24:10

————————

**K**

**keep**
86:14,15 88:5
108:11 140:14,15
140:16,20 189:6
236:5 266:4
290:24
**kept**

40:25 41:1 71:19
72:5 81:5 92:6
195:11
**key**
142:17
**Kimberly**
4:11 10:1
**kimberly.bransc...**
4:16
**kind**
15:15 20:14,16
57:8 66:21 77:19
83:4 85:22 121:7
121:10 124:9
126:24 128:8
132:17 133:22
135:15 147:16
148:19 152:1
158:20 167:16
187:20 245:15
273:10 281:19,19
325:14 331:9
**kinds**
179:22 180:11
204:22,23 226:7
314:17
**Kingston**
279:15
**KIRKLAND**
4:12
**Klatt**
5:11 6:4 20:10
140:10 252:11
253:21 274:6,14
274:18 276:22
277:6,13 278:6,11
278:16 279:7
280:12,15 281:25
282:4,15 283:9
284:11 285:1,3,21
285:25 286:4,6
288:20 289:10,18
289:21,23 290:4
293:3 300:13
302:6 304:16
306:4 309:1

336:10 337:22
338:18 339:15
341:7,14,20 342:8
342:12,21,24
343:8,15 344:13
344:18 345:1,16
346:8,15,25
347:13 348:3,13
348:18 349:5
350:3 351:8,18
**knew**
73:17 81:25 117:16
222:13
**knocked**
155:25
**know**
18:10 29:2,4 32:12
36:12 38:2 40:13
40:22 46:17 52:8
68:20 77:16 78:3
78:5 83:21,23
85:23 86:5 88:9
91:13,14 92:3,13
93:24 98:3,13
99:6,13 100:1,5
102:23 104:2
107:24 114:8
121:8 124:16
126:1,18,18
127:12 129:6
130:14,17,18
132:1,2,4,20
135:10 136:5,8,11
137:21,24 140:1,3
140:12 142:22
147:13 148:5
151:20 152:20
153:9 155:17
157:20 158:19
159:3 160:1 161:1
162:4 170:13
174:5 177:5
183:24 184:3
187:25,25 188:22
190:11,13 196:2,3
196:3 197:13

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 117 of 149
PageID: 211581
Jack Siemiatycki, Ph.D.

Page 382

208:18,19,21
219:19 227:25
228:3,18 229:22
230:12 231:5,23
231:25 232:1
233:5,7,9 237:24
239:10 240:17
242:4,14 245:14
248:1 250:7
251:22 254:25
257:25 259:9,12
260:11 261:20
262:19,22 272:4
274:20 276:1
277:25 281:13,22
282:23 284:15
290:10,17,22
293:1 303:18
312:2 319:8 324:6
325:9,11,14
332:17 344:22
**knowing**
73:23 194:25
**knowledge**
85:4 98:10,12
99:24 117:17
218:14 233:15
240:23
**known**
37:22 67:9,9
147:10,25 148:15
173:8 324:5
**knows**
219:12 231:2
**Koushik**
7:21 124:25 278:18
278:21 280:24
282:16 284:13
286:23 287:7,8
**Koushik's**
280:16
**Krewski**
232:2,4,16,20
233:2 275:11
292:21 293:1,13
293:22 323:11,20

324:10,20,24
326:10
**Kurt**
139:11

### L

**L-A-S-H**
20:9
**LA**
53:16
**label**
213:25 214:4
**labeled**
47:19 255:19
**labs**
102:7
**lack**
288:8
**lactation**
287:19
**lag**
85:3 132:17 133:8
**Langseth**
42:8 123:22 126:12
149:18,20 202:16
235:22 299:3
**language**
130:24 219:1
221:14 333:15
**large**
14:16 161:17
172:21 197:14
204:19 224:2
318:19 335:14
**largely**
188:4 298:5
**larger**
108:5 327:24
**largest**
266:13
**Lash**
20:9
**late**
212:24 245:8
**latest**
247:24 266:21

**Laura**
14:11
**law**
262:21,23
**lawsuits**
213:9 218:14 219:5
219:19 220:10
221:11,16 277:17
**lawyers**
10:21 73:21 88:12
89:5
**lawyers'**
40:9
**lead**
68:25 115:16
127:17 138:11
193:16 280:6
327:18
**leading**
281:6
**leads**
180:13 320:2
**learn**
188:25
**learned**
188:21 230:25
293:21 323:22
324:6
**leave**
206:2,3 225:8
227:12
**leaving**
136:6
**lecture**
134:3
**led**
175:22 230:1 320:3
**left-hand**
206:10 329:19
**legal**
90:15 114:1,3,12
251:25
**legislation**
263:12
**legitimate**
185:9

**lengthy**
196:19
**Lesley**
82:11
**Leslie**
1:25 2:12 9:16
351:24 353:18
**let's**
12:13 17:15,15
45:12 53:22 56:7
65:7 67:18 83:15
105:13 154:9
157:7 160:23
174:11 182:9
194:4,17,17
232:15 242:11
280:24 282:20
285:1 286:15,15
286:20,20,20
308:15 313:9
342:10,18,19,19
348:14,15
**level**
103:9 116:22
122:15 129:14
147:24 153:18
155:15 187:1
261:17 268:12,13
269:17 304:8
314:4 329:4
**levels**
106:21 121:10
270:4 327:21
351:12
**LEVIN**
3:5
**lexicon**
37:8
**Lexington**
3:18
**LHG**
1:6
**LIABILITY**
1:8
**life**
264:10 284:19

**lifestyle**
281:11 282:25
283:23 284:13
291:5
**lifetime**
268:18 295:10
**ligation**
287:20
**light**
109:5 235:24
256:22 283:11
**lights**
257:8
**likelihood**
141:17 319:18
327:3
**limitation**
179:13
**limitations**
178:15,22 179:6,11
**limited**
118:7 144:12 153:4
202:9 203:7
205:19 220:9,22
221:11 233:17
281:7 288:1,7
330:10,21 331:2
**line**
26:3 62:3 63:1,9
70:14 80:1 111:20
148:17 181:18
186:6 196:20,24
197:14,16 199:2
207:19 224:1,9
228:8 303:11
309:17 355:4
**lines**
32:25 139:7 151:4
219:4 321:14,15
**lingering**
190:6,7
**link**
57:18 118:12 126:5
135:18
**linked**
118:24 168:10

Jack Siemiatycki, Ph.D.

350:14
**list**
14:4 86:11 93:4
135:21 138:13
140:6 170:1
287:22 332:19
**listed**
76:4 87:16 88:3
170:19 187:21,22
232:17 287:24
292:24 345:7
**literal**
63:3
**literally**
29:5 160:15
**literature**
12:18,19 13:7
37:17 38:25 39:21
65:4 73:15,17
74:9,10,14 81:23
85:8 99:18 122:21
132:9,15 133:10
162:25 163:19
164:3,18,23
172:18 173:25
196:16 222:22
241:3 261:24
262:2 263:5 301:9
301:17 331:17
332:12
**litigation**
1:9 9:5 10:8,15
13:15 22:1 48:22
53:9 54:8,15,19
55:1,15,22 56:2
56:10,13,16,18
57:1,2,4,5,12,22
58:6 92:8 98:17
98:21 99:3,7,12
99:15 100:13
123:24 124:23
127:25 135:2
141:7 161:11
196:10 222:12,17
233:3 259:24
260:6,13 276:4,12

276:16 277:9,25
282:18 302:23
307:10 324:12
325:3 332:6
**litigation-related**
218:1,9
**litigations**
316:16
**little**
52:15 112:19
135:13 140:21
171:25 222:19
234:13
**lives**
226:6
**LLP**
3:5,11 4:4,12,18
5:5,12,19
**local**
219:18,21
**localized**
218:22 219:15
220:17
**located**
193:14 254:11
**logical**
321:12
**long**
11:17 17:9 29:16
104:15 108:23
194:8,9,11 196:19
279:1 287:19
290:22 325:25
**long-term**
343:19
**longer**
82:9 145:10,11
**Longo**
97:13,24 98:8,15
100:12 102:10
**Longo's**
100:5 101:7
**longwinded**
182:15
**look**
14:12 25:5 34:17

37:16,20 41:20
51:8 52:9 60:19
63:18 65:9 77:25
81:17 83:22 89:10
89:25 96:10 105:7
107:19 142:10
144:5 154:3
156:18 159:9
169:7 182:19
184:17 188:5
195:19 201:22
207:3 211:20
212:1 216:13
219:10 223:12
229:11 232:10
243:9,14,15
245:20 247:20,21
247:22 286:10
332:18 337:1
343:3 345:5
**looked**
12:23 72:17 79:18
79:19 93:10 95:7
95:8 107:21 161:8
162:10,19 183:14
198:15 219:13
243:5 250:17
262:16 289:8,15
316:14 318:11
**looking**
49:24 53:1 58:25
62:5,10 77:4,21
78:12 79:20 99:10
100:16 118:16
119:4 131:20
143:15 156:10
157:11 169:11
173:22 175:2
177:11 179:8
192:9 198:5,6
200:3,5,7 201:20
203:9 208:2
209:13 215:12,24
225:1 238:14
256:3 266:2
267:24 281:20

285:5 286:13
305:9 307:13,22
313:23 314:11,14
314:18 343:9
348:20 349:3
**looks**
18:23 62:10 83:14
83:15 122:1
**loosely**
92:6
**Los**
4:14 136:5
**lost**
37:14 152:3
**lot**
12:21 16:24 38:14
38:25 73:23
138:11,12,14
148:8 150:10
153:19 160:18
161:3 162:3
176:20 177:9
229:21 281:22
289:4
**loud**
63:12 169:8,10
297:3
**Louis**
5:21
**low**
320:1 329:22
**lower**
148:9 149:17
192:17 199:2
202:14,18 206:23
206:24 313:9
**lowering**
167:1
**lumping**
168:24
**lunch**
63:22 78:13,15
104:18 105:1,9
107:20
**lunchtime**
63:19 78:1

**lung**
130:14,15 132:21
133:21 147:4,8,22
147:24 177:2,3,11
177:12,15 181:20
182:1 204:14,15
204:19,23,23
281:2 318:9
329:23 350:18
351:2
**lymph**
339:5 343:18,24
344:11,12,24
**Lyon**
20:2 139:15 233:21

**M**

**M**
5:18
**M-E-N-G-T-I-N-G**
79:4
**magical**
184:3
**magnitude**
147:20 159:5
**mailed**
226:14
**main**
42:5 56:17 88:4
112:12 159:1
166:1 200:16,17
200:18 201:7,11
201:12,12,18
213:13 228:25
235:20 256:16
307:14 310:16
**maintain**
86:10 88:3
**maintained**
82:12 197:11
**major**
227:8
**majority**
129:7 321:11
**making**
25:12 26:8,9 29:25

Jack Siemiatycki, Ph.D.

**males**
52:8 62:23 117:21
185:21 204:25
207:17 227:17
249:1 304:10
351:3
**managed**
97:6
**Management**
43:13
**MANSUKHANI**
5:12
**Manual**
105:19,24
**manufactured**
101:15 118:8,10,12
**manufacturer**
115:3,18 116:18
**manufacturers**
115:14
**manuscript**
41:23 51:25 84:3
125:16,25 193:25
230:10,18 231:20
231:24 232:24
233:5,10,12,17,18
233:24 234:20
235:2 239:1
240:12 241:13,15
243:1,6,10,18
244:22 250:18
268:4 277:22
325:24 326:2
**manuscripts**
254:8
**margin**
107:11
**margins**
44:15
**mark**
14:21 15:1,25 16:3
17:16 18:12 43:23
45:13 46:1,15
48:2 58:8 61:6
108:13 112:18
178:17 194:4

213:23 234:15
278:11 285:1
**marked**
15:6,10,19 16:5,13
17:12,18,22 43:25
45:1 46:6,20 47:4
48:5,24 49:12
53:2 58:10,13,20
58:24 60:5 61:7,9
61:19,24 68:9
69:3 70:3 72:9
94:8 110:3,12
149:16 194:6,23
214:7 234:16
235:14 243:2
256:4 278:14
285:3,14 286:2
308:9,15,24
309:14 312:23
317:8,12,21
**market**
4:5 92:23 118:21
119:2,7,16,20
120:5,15
**MARKETING**
1:7
**markets**
115:16 117:18
118:22
**marking**
14:13 41:17 61:13
108:16 308:19
309:3
**marks**
112:14,16,16,19,20
112:20
**Martinique**
126:22,24
**Master's**
279:13
**match**
88:6
**matched**
223:15
**material**
12:22 18:16 19:12

40:8,24,25 88:16
89:1,2,4 96:5 98:7
260:20 314:6
**materials**
13:1 16:22 17:3
37:4 39:19 40:4
40:16 42:9 43:21
44:6 51:21,24
52:3 80:16 82:7
84:2 87:19 88:8
88:12,13 89:3,7
92:15 94:6
**mathematical**
114:21 321:18
**matter**
9:10 69:7 109:3
182:2,6 214:5
**Matthew**
101:11
**maximum**
319:13
**McGill**
279:18
**McTiernan**
14:11 93:13,22
94:17 95:8
**MDL**
1:5 10:8,14,21
11:10 12:11 13:4
13:8,23 14:2,6
16:2 17:24 22:8
22:21 23:13,21
24:2,19 25:14
26:14 36:5 37:20
40:6 47:11 50:8
55:14 57:16 60:16
61:14,23 62:23
64:7 66:15,25
68:11,16 70:3
71:5 84:7 93:5,9
93:21 94:7,14
95:6 96:6 110:8
110:12 127:4
136:12 150:1
175:19 186:3
236:22 240:11

333:5,20
**mean**
11:15 12:10,12
13:9 23:16,17,22
28:11 29:23,24
30:4,4,12,19 32:5
32:6,9,16 34:2
35:7 37:7 56:4,5
57:7 64:18,24
68:17,23 71:16
77:18 79:20 80:14
84:23 85:22 86:14
92:18 96:15 99:6
101:19,21 109:25
114:6,16 121:2,3
125:7 127:24
128:13,17,21
130:2 131:14,17
133:13,24 134:8
146:20 162:2
166:7 172:3
179:13 188:4
192:2 193:23
196:11 209:10
223:9 226:18
229:8 239:9 244:9
246:11 251:22
263:22 272:16
279:5 316:13
333:10 334:13
347:22
**meaning**
50:8 114:25 167:17
216:3,16 269:7
**meaningful**
102:16 207:8
266:25
**meaningless**
245:23
**means**
101:20 137:4
145:12 229:22
252:3 281:18
282:1 315:18
353:23
**meant**

32:20,21 33:9
106:18,19 198:6
252:17,21 324:17
324:18 347:22
**measured**
158:20
**measurement**
166:2,4,7,8,10,12
167:7 169:21
288:8
**measuring**
179:24
**mechanics**
138:16
**mechanism**
75:9 115:22 116:7
117:19 143:6
155:9,10 156:19
156:25 157:3
165:3,12 312:7,11
312:12,13 313:18
313:18,24 315:24
316:5,12 330:13
330:23 331:6
334:7,23 335:5
**mechanisms**
75:3 152:24
**mechanistic**
74:16 155:16
163:22 302:2
316:9
**media**
230:22
**medical**
129:8
**medication**
38:12 181:13 288:4
**Medicine**
127:12
**Medicine/Volume**
8:14
**mediocre**
27:13
**medium**
146:22 147:16
166:20

Jack Siemiatycki, Ph.D.

Page 385

**meet**
9:24 140:3 191:17
**meeting**
11:17,21 20:1
137:17 139:16
143:19 152:20
233:21
**meetings**
10:22 11:9,13 12:1
**meets**
264:6
**member**
293:19
**members**
136:20 278:22
294:3
**memory**
155:19 219:14
323:18
**Mengting**
79:4 81:5 82:1
**mention**
18:3 165:7 187:5
219:2 269:21
284:22 349:9
**mentioned**
19:19 34:9 39:20
70:19 81:8 84:1
105:17 180:2
184:19 305:1
**mentor**
124:10,10
**merely**
276:10,11
**merits**
66:22 228:20
**mesothelioma**
168:4,22
**mesotheliomas**
168:9,19,25
**message**
231:2 323:16 324:4
324:20 325:6
**met**
9:25 11:1 136:16
139:14 274:21

**meta**
42:5 235:19
**meta-analyses**
6:25 29:1,4 42:5
44:11,12 46:4
76:10,12 77:13,24
79:22 80:6 82:19
83:1 127:2 128:8
142:24 162:21
180:3 181:5,20
183:17 208:4,6,22
209:2,6 235:18,20
239:14 247:2,3
247:4,7,11 248:22
248:23,24 251:7
253:9
**meta-analysis**
20:19 36:25 37:3,8
37:8,19,21 38:6,7
38:9,21 39:2,7,11
41:24 42:10,19
67:16 72:12 76:1
76:3,4,19 77:5
78:7,23 79:10,13
79:16 106:5
112:12 127:3
149:15,21 150:2
162:9,17 178:16
178:23 179:11,14
179:16,18,21
180:4,9 181:2,3,5
181:21 183:21,22
183:25 184:4,7,16
184:23 185:17
186:3,4 187:2,3
187:17,18 188:10
188:13 193:18
194:1 195:4
196:25 199:8,13
200:11 202:6,15
202:17 206:18,23
208:5,6,9,23
209:15,17 210:11
210:17 213:13,21
222:24 223:10,21
224:9 225:8

227:13 228:9,25
230:5 233:25
238:22,23 240:15
240:16,22 241:7
275:13 291:23
292:8,15,17
293:20 301:2,3,6
301:8 305:21
327:5
**meta-analyze**
203:14
**meta-estimate**
182:25 247:11
**meta-estimates**
207:4
**meta-relative**
199:2 203:15
209:24
**metadata**
191:12
**metals**
103:23 350:6,22
**method**
28:6 36:15 37:2,19
134:24 198:15
**methodological**
21:11 182:22
**methodologies**
36:22 179:2
**methodology**
22:8,19 23:12,18
23:20,23,24 24:17
27:11 29:20 30:9
31:3 36:4,8,11
134:12 185:14
302:17,19 303:23
304:4,8 306:23
307:7 309:24
**methods**
134:10,18 181:13
**metric**
198:1
**metrics**
121:6
**Michael**
5:11 341:16 343:6

347:19
**Michelle**
3:10 16:8 44:22
46:17 300:8
**microphone**
155:22,25
**microspheres**
339:17,24 340:11
**mid**
257:18,18
**mid-December**
257:18
**mid-November**
53:7
**middle**
64:9 169:9
**migrate**
331:12 339:3
340:24 344:24
**migrating**
343:23
**migration**
143:8 314:8 341:23
342:16 344:15
346:23 347:3
**Mike**
274:18 282:6
285:19 289:12,12
289:16,19 337:19
**mind**
30:17 63:18 78:1
78:12 130:5
144:21 169:8
170:3 187:25
195:23 240:3
251:2 273:16
300:8
**mine**
39:16 77:15 100:8
108:12 112:13
174:18 201:14
237:21 254:18
337:17
**minimal**
228:23
**minimize**

221:22
**minimum**
122:15
**minor**
80:8 199:4 223:2
**minority**
129:7
**minus**
53:23
**minute**
41:4 67:19 76:15
275:16
**minutes**
104:17 135:25
229:10 274:7
**misaligned**
110:15
**misconception**
64:10 67:3
**misdiagnoses**
167:8,10
**misdiagnosis**
168:3
**misnomer**
244:18
**misread**
328:11
**missed**
12:24 198:7
**Missouri**
5:21
**misstates**
104:10 125:5
133:12,16 153:14
208:1 241:19
244:15 250:12
265:6 269:13
273:6 330:25
335:12 344:16,21
346:13 347:12
**misunderstanding**
276:7
**miswritten**
63:16
**mix**
88:6 209:23

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 121 of 149
PageID: 211585
Jack Siemiatycki, Ph.D.

Page 386

mklatt@grsm.com
5:16
**Mm-hmm**
89:12 281:3 304:6
**models**
153:23
**moderate**
147:1,2 148:18
149:7 229:21
**modest**
146:17,21 149:3
**modifiable**
287:3 288:2 291:6
291:10
**modifications**
70:20,23
**modified**
258:23
**modify**
109:10 287:25
**Mohamed**
230:4
**molecular**
163:21 164:23
**moment**
62:4 79:8 104:8
163:8 271:10
290:2 348:23
**money**
281:23
**monitor**
30:16 32:18 133:18
**monograph**
19:25 136:16
137:10 138:1,25
139:4,10 140:4
141:5 163:11
**monographs**
105:18
**month**
11:11 47:14 48:4
53:18 57:7,7
82:10 256:13,14
332:22
**months**
56:8 95:24 96:14

139:4,9,17 191:7
256:14
**Montreal**
1:18 2:6 9:9 11:15
11:16 279:19
**morbidity**
287:16
**morning**
9:3,23,24 160:15
**mortality**
287:16
**motivated**
185:10 272:17
**motivation**
289:4 325:18
**motive**
325:19
**move**
103:12,13 291:1
**moved**
140:8
**moving**
25:22 103:3 205:12
338:9 344:10
**MParfitt@ashcr...**
3:15
**MSc**
6:19 7:13,16
**multidisciplinary**
150:21 303:2
**multifactorial**
130:17
**multiple**
67:11 151:4 195:18
283:23
**mutagenicity**
311:21
**mutually**
251:4

_____
**N**

**N**
3:1 6:1,1 9:1
**N.W**
5:6
**name**

9:4 10:1 75:25 79:3
82:11 91:8 93:25
101:9 124:24
353:14
**named**
200:22
**names**
289:6 332:14,21
333:23
**napkins**
83:9
**NAPOLI**
3:17
**narrative**
149:8 273:10
321:13
**nasal**
350:17
**national**
26:5 43:9 233:20
**nature**
34:7 179:20 223:23
278:5
**near**
337:6
**nearby**
278:24
**nearly**
53:16 160:17
**necessarily**
31:17 84:25 199:9
261:19
**necessary**
30:23 32:8 81:14
315:25 335:4
354:3
**need**
16:3 31:19 36:17
39:1,12 40:19
83:6 86:8 142:16
150:21 151:4
176:22 194:14
208:17 211:15
227:19 250:22
264:15 281:22
285:22 291:7

296:20 306:8
322:12 342:2,4
**needed**
120:21 121:14
283:11
**needs**
184:20
**negligible**
106:16
**neither**
221:10 315:21
350:13
**networks**
74:11
**never**
33:14 52:7 90:16
126:22,23 127:9
129:6,10 136:3,9
149:6 162:11
170:13 193:24
209:19 225:18
226:25 229:20
244:13 258:14
289:8,14 298:6
323:16 335:3
336:17 351:4,14
**never-used-it**
77:4
**new**
1:2 3:20,20 4:20
9:12 21:25 56:22
70:7,18 73:15,21
73:22 74:17 97:12
108:17 109:4
127:11 143:4,13
143:14,15 165:6
198:14 257:17
285:12
**newer**
191:25
**news**
230:23
**Nice**
9:24
**nickel**
350:6,10 351:6,13

**node**
343:25
**nodes**
339:6 343:19
344:11,12,24
**noise**
140:11
**non-experimental**
328:19
**non-human**
311:20
**nondifferential**
170:22
**nonissue**
97:21
**nonmucinous**
297:8,23
**nonparticipation**
170:7
**nonquantitative**
158:17
**nonresponse**
170:6,16
**Nonresponsive**
252:11 253:21
**nonsmokers**
147:8
**nonuse**
297:10
**nonusers**
297:24 298:13,16
**North**
219:21
**Nos**
46:6
**Notary**
2:13 356:19
**notation**
107:11,16
**notations**
7:18 64:6
**note**
64:16 75:15 78:16
78:20 101:16
107:8 198:9 199:1
199:9 213:2

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 122 of 149
PageID: 211586
Jack Siemiatycki, Ph.D.

Page 387

221:24 225:14
**notebook**
299:19
**noted**
9:15 354:9 356:7
**notes**
44:7,12,14 51:23
353:11
**noteworthy**
209:4
**notice**
2:12 6:10,15 14:14
14:23 15:16,19
16:15
**noticed**
63:25 89:18 144:23
**notify**
260:12 324:25
**notion**
34:18 35:4 84:11
122:23 148:19
259:20 315:20
**notwithstanding**
29:13
**November**
7:6 47:9,10,18
48:11 49:1 50:16
51:3 61:2 62:24
69:21 139:16
332:25 333:1
**number**
9:13 17:13 32:7
33:22 45:15,16
48:10 52:22 63:6
67:4,12 102:7
104:23 105:3
112:5 121:4,4,11
142:21 145:7,24
210:7 215:8,21
216:8 220:2
242:22 268:17
280:13 294:10
297:22 300:4,19
306:9 311:7,10,13
311:16,18 323:17
326:13 333:21

**numbering**
87:6
**numbers**
45:15,20,22 63:2
76:20 77:9 92:17
108:6 109:7
110:15 187:7
217:5 266:18
295:10
**numeral**
300:4,17,21
**Nurses'**
226:3,12
**nutritional**
226:6

**O**
**O**
6:1 9:1
**oath**
2:15
**Object**
54:1 161:12 252:11
253:21 307:12
310:2,5 312:18
332:1
**objecting**
133:15
**Objection**
12:6 22:9,22 23:15
29:22 32:4 34:1
35:6,24 39:10
53:10 55:2 60:7
69:23 71:1,8,13
73:9 75:12 80:20
84:21 85:10,20
90:14,25 94:21
95:20 99:4 103:25
104:9 116:3,14
117:3,6 118:2
119:8,18 120:13
121:19 122:10
123:10 125:4,15
129:20 130:7
131:24 132:13
133:11 137:2

150:8 151:6,15
152:15 153:14
154:16 156:11
165:13 167:15
172:24 176:13,16
176:23 178:9
185:6 188:18
192:5 198:25
200:12 202:25
205:3 207:25
218:17,20 220:24
222:8 223:8,22
225:9 239:7 240:5
240:13,25 241:18
244:15 246:21
247:9 249:23
250:11 251:10
252:19 253:14,17
254:3,11 258:17
258:24 260:22
261:3,25 263:7,21
264:12 265:5
267:13 269:11
271:15 272:14
273:5 276:17
277:4,11 278:2
279:4 281:16
283:7 284:6,24
288:17,23 291:15
292:1,10 293:14
302:5,6,25 304:2
304:16 306:4
307:3 314:2,24
315:7 326:17
330:14,24 331:14
334:8,11 335:1,12
339:12 341:2,13
341:17 344:1,16
344:20 345:15
346:13,19 347:11
348:7 349:23
350:23 351:15
**objections**
6:14 15:25 16:14
353:7
**objective**

34:25
**objectives**
181:6
**obscure**
92:17 162:4
**observable**
121:12
**observation**
209:4 316:5
**observational**
30:22 38:22 39:4
180:10 181:15
184:8
**observations**
298:4
**observe**
159:22 176:4
341:24
**observed**
160:12,13 268:5,16
295:8 297:7 311:8
311:14 320:4
**observes**
343:24
**obtain**
118:19 256:17
257:9
**obtained**
80:4,5 93:3 257:14
**obviously**
325:24
**occasion**
127:9 139:12
**occasionally**
225:19
**occasions**
13:12
**occupation**
8:13,14 175:16
177:3,12 317:24
318:12 329:10
**occupational**
19:22 162:3 174:19
306:10 311:5
**occupations**
177:2,6,13,15

318:9,19
**occur**
83:1
**occurred**
106:14,15 152:19
**occurring**
284:16
**October**
7:11 57:22 58:5
61:1 69:22 127:23
**odds**
76:17,24 77:10,23
106:7,24 160:15
177:13 185:16
214:24 215:2,4
222:5 223:19
225:16 228:10,19
245:10,19 319:1
319:12,13
**offer**
60:11 68:15,24
84:16 263:3
302:22
**offered**
13:4 60:10 97:17
**offering**
60:4 68:20 75:8
101:13 123:16
164:9,13 165:1,2
183:7 265:3
302:21
**offers**
287:15
**offhand**
95:12 100:16
**office**
40:9 73:4 342:23
343:7
**officer**
249:8
**offices**
2:2 278:24
**officiated**
2:14
**offline**
191:18

Page 388

**oh**
20:12 56:24,24
62:11 63:7 67:3
75:24 86:25 101:1
110:18 111:10,14
112:2 155:23
161:1 175:10
183:3,3 193:6
220:3 232:12
234:6 235:17
241:1 242:16
251:21 266:7
285:10 290:15
300:10,18 308:7
317:19 326:25
339:18 348:19
350:8
**okay**
18:13 19:17 29:15
32:22 33:4 37:2
39:15,25 41:20
42:14 45:9,21
48:1 49:19 58:18
59:9 60:15 61:17
62:11,17,19 63:6
66:24 68:9 81:22
83:17 84:1 86:16
87:7,11,25 89:10
91:22 92:4 93:20
95:13 98:8,14
99:17,22 100:23
105:11 110:17
112:24 116:7
120:7,18 131:18
132:7 133:17
134:3 136:2 137:7
139:8 145:3 152:5
154:24 155:24
156:14 157:4,7,9
158:6,10 162:18
162:23 164:7
165:16,22 167:22
174:23 176:6
177:22 178:1,15
179:4,8,12 182:9
183:19 184:19

185:25 186:21
187:5 188:3,8
191:22 194:19
196:5 200:1,13
201:20 205:14
209:25 210:16,23
211:25 212:6,20
212:22 213:13
214:5 215:24
217:13,21 218:1
220:13 221:19
223:5 225:24
230:3,9 231:9,12
234:18 235:12
236:6,8 237:13
238:4,25 239:19
241:6 242:8,10
246:25 247:22
248:7,8,14 249:20
250:17 254:14
256:2 264:25
265:10 266:6
267:5,24 268:2,22
269:6 270:10
272:10,20,25
273:13 274:3,25
275:15 278:10
285:17,23 286:15
290:2,3,16,21
293:18 294:5,19
296:22,25 298:7
299:22 300:3,7
306:11,12 308:18
312:14,21,21
313:2,7,11,13,22
315:16 324:16
327:8 328:6,12
331:10 334:5
335:17,24 336:14
336:20 337:14
340:5 342:10,18
348:14
**old**
72:17
**older**
42:7,8

**OLVEY**
4:11
**one-to-one**
152:1
**ones**
34:21 35:11 42:7,8
67:12 92:16 94:24
95:1 123:4 165:19
170:11,12 187:22
197:3 224:5,5,8
237:19 272:6
305:2 332:11
**onset**
281:14 282:23
**Ontario**
279:15
**open**
205:10 242:25
**operation**
82:22
**opine**
127:9 165:9 252:14
315:25 320:3
331:11
**opining**
127:13 314:21
317:4
**opinion**
28:12,24 29:13
32:13 33:12 34:22
36:5 67:15 68:21
83:13 90:11 93:5
100:7,9 101:13
103:20 104:3,6
113:6,13,17 115:1
118:5 120:9,18,20
123:16,19 127:7
127:19,20 128:24
129:12 131:5,12
134:25 150:4
159:2 164:9,14
165:1,2,5 174:1
178:5 200:10
223:21 224:20
225:7 232:19,22
241:16 243:10

253:25 256:16
259:20 260:21,23
261:5,9,11 263:3
263:17 265:8,23
271:11 288:24
291:3 301:15,25
315:3,8,12 330:8
330:18 331:18,21
333:19 334:14
**opinions**
11:10 12:15 13:3,5
13:8,25 23:21,25
24:18 50:7,9 53:8
60:4 68:11,12,13
68:14 69:4 75:6,8
75:20 84:6,16
92:1 94:12,14
97:17,21 102:22
102:24 114:1
128:12,16 141:16
173:17 194:22,25
222:12,13 240:10
241:22 256:10
261:19 265:3
302:21 307:9
314:1 316:23
318:5 326:16
332:6
**opportunity**
128:5 137:18 198:7
259:6 295:13
**opposed**
164:10
**opposite**
221:23
**opposition**
35:11,12
**optimal**
70:12,21
**options**
186:13
**oral**
6:10,15 287:19
293:6
**oranges**
179:21

**order**
28:19 29:19 55:17
147:20 151:2,18
178:6,11 228:15
259:11 292:3
303:25
**ordered**
24:6 292:2
**organization**
26:6 289:11
**organize**
124:7 138:11
**organized**
139:16 274:7
**origin**
266:23
**original**
6:23 42:17 44:17
46:2 70:10 106:11
112:15 126:12
304:9 319:13
333:14 353:12
354:11
**ostensibly**
266:24
**Oules**
59:13 274:22
**outcome**
155:11 156:20
**outcomes**
179:25
**outline**
21:12
**outlining**
199:17
**output**
80:14 81:1 128:9
**outside**
90:15 107:4 135:2
154:2 334:13
338:12
**outstanding**
111:1
**ovarian**
6:20 7:14,17 12:18
13:11,15 24:16

Jack Siemiatycki, Ph.D.

33:13 38:23 56:18
57:19 58:23 65:7
65:10,20 66:11
69:15 75:4,10
78:11 81:17 84:19
88:11 89:25 90:23
97:18 103:16
113:9,15 115:2,23
116:8 117:2 118:6
119:5,14 120:1,10
120:19,21,25
121:15 122:8,20
123:18,23 124:1,6
124:8,22 125:24
126:6,14 127:8,22
128:4 129:1,18
130:2 131:8,16,22
132:11 133:23
134:6,10,23 135:1
135:6,19 137:1
141:9,18 146:8
148:7 150:6
151:12 152:12
153:11 155:1
157:14 164:5
165:4 167:11
168:4,11,14,18,23
168:25 171:16,18
171:19 172:8,11
172:23 173:8
174:13 176:2,8
189:8,14,17
190:16 192:4
193:18 202:8
203:16 204:6,11
204:13 205:1,1,9
205:25 213:9
215:14 216:4,9,17
216:24 218:4,15
227:9 230:7,21
232:20,23 237:10
243:13 247:8
248:11 250:10,20
251:9 252:8
253:12 259:22
261:2 267:9,22

268:7 271:13
272:12 273:3
275:19 276:3,12
277:8 279:25
281:2,4,14 282:9
282:17,24 283:12
283:15,24 284:14
284:16 287:2,4,18
288:6,15,22
296:15 297:9,24
301:12,18 302:10
302:23 305:14,25
307:11 312:8,16
314:22 315:5,14
316:25 317:5
319:19 330:10,21
331:7 335:9
343:19 345:12
349:21 350:14
351:5
**ovaries**
331:12 338:22
339:4 341:1
346:12
**ovary**
122:8 232:20
**overall**
29:13 34:2,7 77:3
77:10 115:16
180:20 182:24
192:17 202:18
234:2 236:11,18
236:20 269:22
270:7,8 298:13
**overlapped**
188:4
**overlapping**
270:6
**overreport**
160:25 161:6,7
**overwhelming**
88:16 125:11
281:10
**oxidative**
143:12 314:9

| **P** |
| --- |

**p**
3:1,1 9:1 268:17
295:9
**P-O-R-T-A**
20:16
**p-value**
270:16,19,23 271:2
297:25
**p.m**
104:25 105:4
140:24 141:2
145:21 146:1
210:4,8 242:19,23
255:13,16 257:2,5
265:15,18 274:9
274:12 320:13,16
322:16,19 336:2,5
343:11,14 352:3,6
**pace**
290:24
**pack**
105:20
**package**
26:23 77:19 79:15
80:24 184:16
271:1
**packages**
79:12
**pad**
169:4
**page**
6:2,9 7:3 8:3 32:25
62:1,5,25 63:8
64:9,10,14 67:1
68:7,7 76:5 86:8
86:20,23 87:1,2,3
87:4,6 89:18
100:21 101:23
107:21 108:1,3,5
108:6,12,12 109:2
109:7 110:14
111:6,8,12,14,16
111:20 112:3,6
113:2 131:3
144:24 145:7

163:5 165:18
169:11,12,13
170:5 182:19,20
200:6 201:22
207:1 213:2
214:12 219:3,24
221:4,7 226:21
229:17 236:25
238:15 243:4,15
248:5,6 250:23
254:2,19 258:19
262:9,13 280:20
280:21,25 284:12
286:16,21,21,22
286:22 295:23
296:11 300:14,18
303:16,21,22
304:24 307:22
313:4 316:20
321:9 327:9
329:17,18 337:2,7
345:5 348:21
349:6,10 355:4
**pages**
7:23 32:25 40:20
40:23,25 41:1
63:8 105:16,21
238:14 280:16
286:8 304:17
309:7 313:5 349:8
349:8 356:3
**pagination**
107:22
**paid**
55:12 134:11,12
276:2,14 277:15
**panel**
123:22 126:11
159:2 165:20
**Paoletti**
102:10
**PAPANTONIO**
3:5
**paper**
46:13 47:24 52:1
88:14,15,19

126:12 149:20
169:4 175:11,13
185:20 187:21,24
189:7,11,18,19,21
189:23 192:14,16
195:20,22 196:2
197:8,9 199:24
201:23 202:5
207:12 208:6,11
209:20 211:21
212:2 219:1
223:20 226:20
229:11 230:4,24
231:14,17 236:20
237:1,3,14 243:14
243:16 246:12
247:23,25 248:4
249:17 266:10,22
267:19,25 268:3
268:15 269:9
271:18,19 292:23
294:12,12,13,20
295:1,7,20,21
296:12 299:4
323:4,4,12,21
324:1,25 325:7
326:9 330:5
348:21
**papers**
135:17 190:14
196:21,22 232:3,8
232:16 239:13
251:8 253:11
266:3 332:17
**paragraph**
62:2 63:1 73:5
113:4 202:4,24
203:2 205:13
206:6,13 219:3,25
219:25 221:20
239:21 264:5,7,17
296:24 297:1
298:9 300:24
305:11 321:10
327:10 329:18,20
337:9,24 338:6

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 125 of 149
PageID: 211589
Jack Siemiatycki, Ph.D.

Page 390

350:5
**paragraphs**
73:2 309:20 310:12
**parallel**
72:10
**parameters**
184:9
**paraphrased**
311:5
**parentheses**
63:2 202:15 268:18
**Parfitt**
3:10 6:5 10:19,23
11:1,6 12:6 14:25
16:9,17 17:8,11
18:18 19:6,8 22:9
22:22 23:15 29:22
32:4 34:1 35:6,24
39:10 44:24 45:2
45:10,14,21 46:19
46:22 47:9,17,21
48:7 53:10 54:1
54:10 55:2 60:7
62:15,18 67:18,22
69:23 71:1,8,13
73:9 75:12 78:20
80:20 84:21 85:10
85:20 89:12 90:14
90:25 94:21 95:20
96:7 99:4 100:24
102:4 103:25
104:9,18 107:23
107:25 108:9,15
108:20,23,25
109:12,19,23
110:2 111:4,6,8
111:14 112:4
116:3,14 117:3,6
117:8 118:2 119:8
119:18 120:13
121:19 122:10
123:10 125:4,15
129:20 130:7
131:24 132:13
133:11,15 137:2
140:14,20 145:18

150:8 151:6,15
152:15 153:14
154:16 156:11
161:12 165:13
167:15 172:24
173:2 174:25
175:2 176:13,16
176:23 178:9
185:6 188:18
191:20 192:5,19
192:22,25 193:7
193:10 194:16,19
198:25 199:18,21
200:12 201:24
202:25 203:21,25
205:3 206:9,14
207:25 210:2
211:10,16 212:4
214:2 218:17,20
220:24 222:7
223:8,22 224:21
224:25 225:9,23
231:1,2,7,10,13
231:17 234:4,7,10
234:13,21,25
235:21,23 236:3,7
239:7 240:5,13,25
241:18 242:10,16
244:15 246:21
247:9 248:16
249:23 250:11
251:10 252:19
253:14,17 254:3
254:11,23,25
255:6,11 257:11
258:17,24 260:22
261:3,25 263:7,21
263:24 264:12
265:5,13 266:6
267:13,15 269:11
269:13 271:15
272:14 273:5
276:17 277:4,11
278:2,13 279:4
281:16 282:2,6
283:7 284:6,24

285:2,4,8,11,16
285:23 286:3,5
288:17 289:12,16
289:19,24 290:7
290:10,16,19
291:16 292:5,12
293:17 300:10,12
300:16,20,22
302:13 303:14
304:5,11,19 306:5
307:4,16 308:5,8
308:11,13,18
309:2,11,21 310:3
310:8 312:20
314:19 315:1,10
317:14 320:8,10
320:17,18 321:25
322:5,9,14 326:17
328:2 330:14,24
331:14 332:1
334:8,11 335:1,12
336:8 337:15,18
338:15 339:12
341:2,13,16 342:2
342:6,10,18 343:5
344:1,7,16,20
345:15 346:6,13
346:19 347:11,17
348:7,10,17,23
349:1,23 350:23
351:15,20
**parity**
287:18
**Park**
4:20
**parse**
35:8 115:18 116:1
116:17
**part**
13:1 18:16 36:14
38:5,7 78:23
83:12 88:21 89:1
89:4,8 91:24 93:1
93:3 99:14 116:5
117:16 120:3,14
128:13,14 130:17

130:19 134:17
140:7 149:8 160:6
161:10 173:4,13
175:21 177:10
180:18 184:16,16
198:14,19 222:7,8
226:14 256:16
266:20 270:25
276:9 281:23
291:24 292:18,19
294:9 313:9
314:10 315:17
320:2,24 321:1
335:14,14,18
**participants**
326:7
**participate**
170:10,10,11
**participation**
27:19 56:16 123:21
**particles**
143:9 314:8 331:12
340:23 341:9,23
341:24 342:16
**particular**
20:11 24:8 31:25
33:25 58:14 66:16
75:7 115:18 116:9
116:17,18 118:13
120:11,11 153:16
156:9,10 161:24
172:10 195:14
203:18 209:12
294:7 302:18
310:14 318:4
**particularities**
38:24
**particularity**
153:17
**particularly**
128:15 254:10
**parties**
138:1,14
**partly**
37:7 43:11,12
73:19 123:3

333:21
**parts**
25:22 26:22 201:16
323:14
**pass**
274:4 336:6
**passed**
46:24
**paste**
289:1
**pathology**
349:25
**paths**
136:4
**pathway**
288:3,4
**patients**
65:12 66:8 281:5
318:14
**pattern**
65:12 79:25 174:2
**pause**
62:4 67:25 140:18
140:22,25 255:14
257:3 265:16
274:10 336:3
343:12
**paused**
140:20 257:7
**pay**
54:23 55:4,6
**PCPC**
5:3
**PDF**
112:18
**peak**
203:18
**pecking**
259:11
**peer**
99:19
**peer-**
127:6
**peer-reviewed**
301:9
**pelvic**

Jack Siemiatycki, Ph.D.

| | | | | |
|---|---|---|---|---|
| 339:5 343:18 | 50:2,2 55:17,17,20 | 146:7 150:5 | 261:14 | 249:17 |
| 344:11,12,24 | 55:25 56:8,11 | 151:11 152:11 | **persuaded** | **physical** |
| **pelvis** | 57:9,10 114:23 | 153:10 154:25 | 316:4 330:12,23 | 159:25 283:1 284:1 |
| 345:14 347:10 | 119:23,23 120:4 | 158:8 162:25 | 332:5,11 | **physiological** |
| **pen** | 215:16 216:8,19 | 164:5 165:3 192:3 | **pertain** | 205:7 |
| 52:6 | 216:20 217:2,4,9 | 218:3 230:6 237:8 | 36:22 | **physiology** |
| **pencil** | 217:10,11 252:7 | 243:12 250:9,19 | **pertained** | 349:25 |
| 163:8 | 318:25 319:1,4,4 | 251:8 253:12 | 83:7 | **pick** |
| **Penninkilampi** | 319:5,5,17,18 | 259:21 267:8,21 | **pertains** | 222:20 |
| 42:7 74:7 77:14 | **percentage** | 268:6 271:12 | 118:9 296:13 | **picked** |
| 200:8 222:11,15 | 56:12,23 215:13,21 | 272:12 273:3 | 298:10 | 18:4 63:24 222:21 |
| 223:6,13,20 | 216:15 | 301:11 303:17 | **pertinent** | **picking** |
| 224:12,17 227:12 | **percentages** | 305:14,25 330:10 | 73:18 90:5,6 | 35:16 65:23 77:9 |
| 228:1,5 235:19 | 216:14 217:18 | 330:20 331:6,13 | **peruses** | **picture** |
| 237:20 238:19 | **perception** | 335:9 339:23 | 30:15 32:18 33:8 | 173:14 |
| 239:5,24 247:3 | 133:23 | 340:7 | 89:13 117:12 | **piece** |
| 248:14,23 249:8 | **perennial** | **perineally** | 133:18 136:1 | 26:16 37:16 46:13 |
| 249:16 250:9 | 24:15 | 120:24 | 169:10 219:15 | 174:4 187:21 |
| 251:7 253:10 | **perfectly** | **period** | 249:10 262:18 | 245:23 266:9 |
| **Pennsylvania** | 80:1 83:5 151:22 | 48:25 49:4 118:8 | 332:19 344:3 | 269:24 |
| 4:7 | **perform** | 118:13 119:12 | **pesticide** | **pieces** |
| **Pensacola** | 36:24 37:19 76:7 | 120:11 132:17 | 126:21,23 | 25:15 29:12 32:1 |
| 3:7 | 76:10 81:23 | 133:8,8 138:9 | **Ph.D** | 33:10 47:24 |
| **people** | 304:13 | 207:10 212:8 | 1:17 2:1 6:2 9:14 | 100:20 142:17 |
| 26:8 28:13,15 | **performance** | 259:7,14 277:1 | 9:18 79:7 279:17 | 263:5,9,12 265:21 |
| 38:18 66:10 73:24 | 304:14 | **periods** | 352:5 356:11 | 266:8 267:5 |
| 74:11 81:13 100:1 | **performed** | 171:12 | **pharmacology** | **Pier** |
| 129:2,12 132:2 | 78:23 79:17 80:19 | **peritoneal** | 279:10 | 93:16 102:5,11 |
| 146:12 147:20 | 127:3 198:22 | 168:19,21 192:2 | **PhD** | **Pier's** |
| 148:24 159:18,19 | 302:17,20 | **peritoneally** | 6:19 7:16 | 95:15 |
| 159:19,24 160:22 | **performing** | 169:25 | **PhDn** | **pink** |
| 161:6 162:4 | 56:1,9 178:16,22 | **permeates** | 7:13 | 45:15 |
| 166:19 171:8,8 | **peri-** | 167:4 | **phenomenon** | **place** |
| 180:21 184:2 | 128:25 137:9 | **person** | 159:9,15,16 160:7 | 11:13,21 99:18 |
| 185:10 208:5 | **perineal** | 30:1 150:13 | 161:6,8,22 | 154:25 210:1 |
| 219:18 243:25 | 59:1 69:14 78:11 | **personal** | **Philadelphia** | 239:12 284:17 |
| 246:14 249:25 | 83:8 89:25 90:24 | 45:23 50:1 71:20 | 4:7 | 353:5 |
| 250:1 261:18 | 113:8,14 115:1 | **personally** | **phone** | **placed** |
| 269:23,24 275:25 | 118:5 120:19 | 54:19 55:23 72:24 | 46:11 161:17,23 | 47:3 |
| 276:1,25 277:7 | 122:7,19 126:5,13 | 78:22 83:19 | 310:10 | **places** |
| 324:4 332:21 | 127:7,21 128:3,25 | 136:11 161:13 | **phones** | 72:2 120:16 |
| 333:24 334:13 | 129:18 131:8,15 | 227:25 231:23 | 161:16,19,20 | **plaintiffs** |
| 350:18 | 131:22 132:11 | 333:8 | **phrase** | 3:3 13:23 14:2,5 |
| **people's** | 134:6,25 135:5,18 | **perspective** | 60:10 113:21,25 | 141:7 177:24 |
| 177:6 | 136:25 137:9 | 159:10 | 114:7,9 130:1 | 326:14 |
| **percent** | 141:17 144:6,19 | **persuade** | 193:21 244:8,10 | **plaintiffs'** |

Jack Siemiatycki, Ph.D.

6:13 15:24 16:1
16:14 40:16 49:20
51:9 55:8,13,21
70:24 74:2 89:8
89:15 90:3 91:2
92:4 94:19 95:16
97:11 98:18
100:14 105:15
136:12 276:3,15
277:16 322:25
324:12 325:2
332:5
**plane**
73:3
**platform**
127:14
**plausibility**
75:18 143:10 305:7
313:8,10,14
314:23 315:4,13
315:18,20,23
316:2,22,24 317:2
330:9,19 332:7
333:6,18 334:3
337:3,6 338:3
348:16 350:5
**plausible**
205:2 311:8,14,17
316:7,12,13,17,18
335:22 341:6
350:1,2
**play**
178:6 288:5
**played**
32:13
**plays**
102:22 148:5
**pleasantries**
324:4
**please**
19:15 41:19 58:3
61:22 64:4,20
105:12 175:8
214:11 282:2
296:24 297:2,20
301:5 307:21

310:4 324:23
337:1 347:19
354:2,6
**plethora**
159:22
**PLLC**
3:17
**plots**
80:22
**plugging**
82:16
**Plunkett**
14:11 93:13,22
94:17 95:3,7
332:16
**plural**
324:15
**plus**
41:24 53:23 241:23
**point**
20:7 30:9 45:17
60:22 66:19 72:13
76:15 86:16 87:6
88:15 96:1 97:3
98:3,7 110:22
114:21 132:5
133:19 142:21
149:14,17 150:1
163:2 183:11
187:23 188:7
195:25 196:13
203:24 207:6,16
207:17 216:18
220:17 223:24
226:17,25 228:10
228:18 245:17
249:14 298:24
314:14 316:6,11
329:7,9
**pointed**
74:5
**points**
143:5 176:17 209:2
237:18
**policies**
25:9 85:3,7 86:4

**policy**
85:16,23
**polled**
321:16
**pooled**
142:24 197:12,22
238:24 239:1
**poor**
281:7
**population**
27:20 181:8
**population-**
66:22
**population-based**
64:13,15 66:3,4
283:16
**populations**
65:24 180:17 181:6
181:12 182:8,10
182:11
**Porta**
20:16
**portions**
29:18 93:15 105:24
205:15 220:20
**portrait**
35:1
**positing**
272:1
**position**
340:13
**positions**
84:17,25
**positive**
10:17 202:8 203:6
205:18 245:8
301:11 305:13,24
**positively**
284:14
**positives**
119:14
**possibilities**
252:1
**possibility**
117:22 122:6
141:13 154:14

158:25 159:4
160:8 168:6
173:19 213:8
222:4 252:5
271:23
**possible**
24:5 50:24 122:12
126:20 136:24
143:8,11 155:6
156:8,12 165:17
165:22 166:5
168:3 169:20
170:2,17 171:16
218:2 219:6 237:9
250:20,25 251:15
251:17,21 252:1,3
252:8,16,25 253:2
277:20 338:21
**possibly**
96:24,25 183:23
303:3
**post-2006**
272:9
**postdate**
272:4
**postdoctoral**
279:21
**potential**
57:18 75:3 84:19
89:24 126:5
135:18 142:2
146:7 156:17,18
158:11,18 169:23
171:22,24 172:22
173:11 176:1
183:20 220:9
221:3,3 260:10
261:1 272:11
275:24 323:11
330:20 349:17
**potentially**
143:5 158:7 258:12
258:23 267:11,16
349:21
**potted**
145:11

**powder**
1:6 6:20 7:13,16
9:10 57:22 58:6
58:23 59:18 69:14
74:15 78:10 92:10
92:14 95:25 96:3
96:18 97:15 98:9
101:14 102:8,15
102:17 103:2,15
103:23 113:8,14
115:2,4,10,23,25
116:8,10,11,25
118:6,7 119:3,6
119:12,12 120:20
120:23 121:5,14
126:14 127:8,21
131:8,15,22
132:11 134:6
135:1,6 141:8
146:8 170:12
172:13 176:12
202:6 205:8
216:10 217:7
218:15 219:7
237:9 250:20
259:25 260:13
268:16 291:4,12
295:3,8 296:15
297:5,10,22 298:3
301:17,18 302:9
302:23 307:10
312:8,15 313:19
314:14,21 315:4
315:14 316:25
317:4 324:13
325:3 338:4,21
339:1 351:11
**powdering**
83:9 92:21 115:14
171:15,18,21
178:13
**powders**
101:3 102:1
**powerful**
123:4 184:15 319:7
319:8

24:25 310:21
**PRACTICES**
1:7
**praise**
241:9
**precaution**
85:9
**precautionary**
86:4
**preceded**
269:21
**precedence**
114:12
**precious**
241:25
**precise**
50:24 53:20 118:20
 220:10
**preclude**
250:25 253:19
**preconceived**
34:18 35:4
**predate**
347:5
**predict**
242:3,7
**predominantly**
226:6
**preface**
195:7
**prefer**
88:14,14 156:5
 197:11 224:17
 244:19
**preference**
212:1
**premise**
116:5
**premised**
97:18
**preparation**
13:2,7,14,17 38:21
 51:1
**prepare**
11:10 12:8,16 82:6
**prepared**

57:16 263:3 340:8
**preparing**
50:12,15,18 302:20
**prerogative**
153:3
**presence**
96:2 343:18
**present**
5:24 11:3 12:1,4
 97:14 103:8
 116:25 167:5
 229:23 237:7
 336:17
**presented**
71:18 134:5,25
 186:8
**presenting**
134:22
**presently**
56:3
**presents**
122:8 123:17
**press**
128:16 256:22
 325:7
**pressure**
38:17,18
**presumably**
51:12 179:4
**presume**
51:15 56:4
**presumptuous**
150:13
**pretend**
331:8
**pretended**
335:3
**pretty**
37:11,12 38:14
 74:10 77:8 81:4,4
 89:1 171:9 187:23
 228:23 242:3
**prevent**
281:13 282:23
 284:16
**preventable**

291:11,12
**prevention**
279:25 283:14
 284:18 287:1,15
**preventive**
287:17,23
**previous**
42:20,20 44:11
 53:11 70:16 88:10
 118:15 121:1
 197:17 202:14
 237:4 333:22
 337:7
**previously**
44:4 195:21 256:4
**primarily**
350:18
**primary**
70:17 266:8,9
 287:14
**principal**
124:19 279:24
 283:14
**principle**
85:8 152:18 183:12
**principles**
21:11 320:22
 321:23
**print**
52:11 82:2 132:20
**printed**
62:6,9 254:19
 308:2,10
**printouts**
43:12
**prior**
44:18 45:1,7
 108:19 109:5
 133:16 246:5
**priori**
25:23
**priorities**
143:21 144:3,4
**privileged**
233:11
**probability**

114:23 252:6 320:1
**probable**
131:9,16,23 132:12
 247:8,13,16
 248:11 249:4,5,13
 249:13,15,21
 250:5,10,25 251:9
 251:14 252:2,17
 252:22 253:1,3,13
 253:20,25 254:6
**probably**
20:6 44:11 72:14
 95:1 129:18,24
 130:6,8,9,11
 134:19 140:6
 143:20 145:14
 147:4 177:4
 196:14 228:8
 259:19 271:12
 321:3 337:19
**problem**
63:21 96:21 97:5
 126:20 159:21
 170:14 171:2
 179:22 203:8
 311:3
**problems**
65:5 127:1 138:6
 180:12
**procedure**
27:4,5 37:9,11
 196:17,18 198:10
**procedures**
37:24
**proceeding**
353:4
**proceedings**
255:14 257:3
 265:16 274:10
 336:3 343:12
**process**
21:5 23:2 25:18
 26:7 29:20 72:8
 74:1 99:7 128:20
 133:25 137:25
 138:18 142:10

143:11 153:18
257:20 258:22
310:23 314:9,10
323:15,15
**processes**
31:20 153:19
**processing**
349:15,17
**proclaiming**
128:19
**produce**
30:18 34:25 51:19
 106:24 150:11
 224:10 258:1
**produced**
57:21 69:21,22
 80:17 99:12
 108:14 119:23
 120:4 128:10
**produces**
122:16
**producing**
273:25
**product**
51:20 90:12 115:25
 116:8,10,18
 119:12,13,24
 120:2 307:10
 315:5
**production**
84:5 132:18 133:8
 191:19 273:18
**products**
1:6,8 9:11 58:23
 69:14 74:15 92:11
 92:14,21,21,22
 95:25 96:3,18
 97:15 98:10
 101:14 102:9
 103:3,15,24 113:8
 115:2,11,12,23
 116:11 117:1,18
 118:1,6,7,10,12
 118:21,24 119:4
 141:8 176:12
 259:25 260:13

Jack Siemiatycki, Ph.D.

291:12 312:8,15
313:20 314:14,22
315:14 316:25
317:4 338:4,22
339:1
**professional**
7:5,8 24:13 25:7,21
28:12 39:12 46:14
48:3,21 49:11
53:2 55:25 56:8
131:4 278:20
321:17
**professionally**
136:11
**prognosis**
281:7 284:18
**program**
80:23 138:1,8
139:4,10 140:4
141:5 281:1
**progresses**
31:12
**project**
124:19
**projects**
21:4 278:25 283:24
**promise**
96:19
**promising**
287:15
**prompting**
71:6
**pronounce**
104:12
**pronounced**
336:16
**proof**
298:23 315:21,24
345:13 346:11
347:9,20,22 348:1
348:2,6,9
**proper**
227:11 318:21
**properly**
173:13 198:7,19
266:14

**proportion**
132:4
**proposal**
262:5,7 263:17,22
264:1
**proposed**
264:5
**proposition**
150:19
**propounded**
356:6
**prospective**
226:4
**Protection**
262:22
**protective**
85:17
**protocols**
180:6
**PROVAQ**
280:1 283:15
286:23 287:2,13
**proven**
316:10,13
**provide**
24:7 74:2,17 76:16
76:17,19 78:9
95:22 98:2 186:13
186:15,18 305:2
307:23 316:22
317:1 318:5
321:12 334:2
**provided**
16:18 17:7 18:18
24:12 26:13 40:16
46:12 75:15 76:24
82:14 88:12 95:16
96:1 100:14,17
101:5,10,17
105:14 162:20
189:16 197:23
203:10 231:19
332:23 333:12
**provides**
283:21,22 310:20
**provoke**

160:5
**prudent**
204:12
**PTI**
5:17,18
**public**
2:13 51:18 84:12
84:18 85:3,6,15
85:18,23,25 86:3
137:25,25 161:10
221:3 230:22
259:5,8,14 260:7
276:1 288:13
356:19
**publication**
113:22 125:17
127:10,17 128:6,9
138:24 174:17,18
189:3 193:17,25
195:9 203:9 228:1
233:6,8 238:6
261:23 293:23
323:12 324:2
325:8,10,17,25
**publications**
85:2 97:1,2 133:20
142:22 143:13
164:25 226:10
240:8
**publicity**
213:8 218:22,23
219:15 220:9,16
220:21 221:4,17
**publicly**
89:2,4 128:3 241:3
**publish**
127:18,19 128:18
228:11
**published**
20:2 28:9 37:18
43:13 50:22 73:18
98:11 99:12 106:8
106:10 127:2,6,23
127:24 133:1
136:15,17 137:10
141:15 160:18

189:18,24 195:10
230:15,16 232:3,8
261:24 272:6,9
311:23 339:1
**PubMed**
73:20 81:9,14
**pull**
294:12 342:13
**pulled**
343:17
**punch**
80:25 128:9 193:21
**purchase**
115:12
**purchased**
119:6
**Purdie**
189:3,7
**purely**
252:14
**purportedly**
262:24
**purpose**
181:4 245:23
247:10 310:16
329:8
**purposes**
99:2 162:9 210:16
302:20 313:25
314:20 317:3
**Pursuant**
2:12
**put**
15:3 17:13 33:16
41:1 43:8 68:8
80:25 97:13
106:19 108:5
109:2,9 114:24
140:6 184:2 214:4
223:10 267:1
271:25 276:24
285:12 289:7
**putative**
310:22
**putting**
108:17 179:20

289:5

---

**Q**

---

**qualification**
124:2
**qualifications**
79:9 100:6
**qualified**
204:24 331:11
334:5,24 335:20
335:21
**qualifiers**
336:24
**qualify**
206:1 271:5
**qualitative**
32:10 182:1
**quality**
28:25 29:5,13
99:25 100:3,7
184:10 227:24
284:19
**quantify**
121:24 158:18
**quantitative**
26:21 30:9 32:7
33:22 114:24
**quantity**
264:8
**quartile**
297:11,12,13,14
**quartiles**
268:19 295:11
297:10,17 298:15
**Quebec**
279:25 283:15
287:2
**Queen's**
279:14
**question**
21:24 22:11 26:11
26:12 28:20 31:1
33:18 35:8 36:3
37:15 56:21 58:19
58:21,21 66:11
68:17,19,23 69:9

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 130 of 149
PageID: 211594
Jack Siemiatycki, Ph.D.

Page 395

69:16,17 72:3,5
72:23 84:14 85:12
87:25 90:22 91:16
96:8 97:14 99:1,8
104:4,7 107:13
108:12 111:11
112:14,16,19
114:16 116:5,19
118:14 121:2
123:5 124:1,3
128:14 129:23
133:18 144:2
149:1,13 150:10
152:6 162:10,24
163:14 164:4
167:20 178:4
181:25 182:1,4,16
183:9 191:1 196:5
196:10 201:21
206:21,21 219:23
226:15,16,23,24
229:12 236:10
247:15 249:25
250:13 251:5
252:24 253:7,8
257:8 271:22
291:7 293:12
309:22,22 311:23
313:16 320:19
324:14,22 333:15
335:17 336:21
342:14,19 343:22
344:23 347:1
348:4
**questioning**
323:9,9 336:7
**questionnaire**
27:22,23 126:8
226:13,15,21
**questionnaires**
160:4 226:18
**questions**
10:2 18:25 19:2
27:21 41:15 67:14
68:24 89:7 108:19
163:4 173:17

177:21 180:22
195:23 206:4
211:18,24 226:17
244:20 275:3
289:19,20 290:23
291:19 294:6
306:7,13 307:1
312:6,10,17 322:1
322:23,24 323:5,6
326:13 332:4
336:11 351:19,21
356:5
**quick**
138:10 139:3
219:17
**quicker**
234:14
**quickly**
18:6 63:15 89:11
131:1 135:20,23
188:5 198:15
201:20 242:3
262:16 344:4
**quite**
65:24 86:12 155:15
210:19 229:4,9
237:24 248:18
256:1 257:13
270:11 274:1
277:20 315:19
328:18
**quote**
64:18 67:2,16
131:9,16 136:24
146:17 148:12
149:2 185:23
249:17 330:1
**quote/un-**
148:12
**quoted**
226:20
**quotes**
276:25
**quoting**
340:18

**R**

**R**
3:1 5:11 9:1 355:2
355:2
**R-O-T-H-M-A-N**
20:8
**random**
170:22
**range**
53:24 146:25 252:1
329:7,9
**ranges**
145:4
**rank**
33:10
**ranking**
33:20 34:6
**rapidly**
132:23
**rappel@seyfarth...**
5:9
**rarely**
181:16
**rate**
27:19 32:16 144:25
**rated**
27:17 33:9
**rating**
131:2 145:3 151:14
**ratio**
76:24 77:10,23
106:7,24 160:16
185:16 215:2,4
228:10,19 245:10
319:2
**ratios**
76:17 177:14
214:24 222:5
223:19 225:16
245:19 319:12,14
**re-**
40:11 77:9
**reach**
41:20 120:20 126:4
204:4 240:2 306:8
338:22

**reached**
35:20 129:17
131:18,21 132:3
195:3 196:10
248:9 293:4,19
326:4 330:5
**reaches**
345:13 346:12
347:10
**reaching**
15:2 23:21 32:2
**reaction**
162:5
**read**
30:15 32:17 88:15
96:24 97:7 101:20
102:4 104:3
113:10 117:7
131:10 133:17
137:4 159:13
175:4 183:1,2
202:11,12,20,21
226:18 229:14
230:9,11,12
237:11 238:5
250:3 254:6
262:17 268:20
271:6 288:11
295:14,15 296:20
296:24 297:3,15
298:9 301:13,23
302:15 308:4
309:19 310:6,11
314:6,7 318:22
321:19 327:15
328:1,10,20 329:1
329:11 330:2
331:19 332:15,22
333:3 334:13
336:13 338:9,11
338:17 341:5
344:2,4 351:23
354:2 356:3
**reader**
81:3 107:4
**readers**

31:21 277:25
**reading**
15:13 44:13 52:6
91:18,21 95:10
175:12 185:18,19
239:20 254:2
283:21 301:6
307:20 313:10
331:17 339:21
**ready**
290:8
**real**
74:22 168:13 207:8
**reality**
35:1 99:9
**realized**
70:9
**really**
28:17 30:23 36:17
36:20 45:11 63:3
65:3 73:10 84:9
106:12 128:5
148:14 158:18
167:2 168:9
179:24 180:6
182:2,6 184:9
249:11 257:23
258:1 281:18
289:4
**reanalyses**
72:12
**reanalysis**
271:22
**reason**
59:6 73:12 82:23
87:15 90:20 91:9
127:18 160:3
172:12 192:7
213:5 225:13
241:14 260:17
262:25 303:12
323:8 354:4 355:6
355:8,10,12,14,16
355:18,20,22,24
**reasonable**
103:21 113:7,18

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 131 of 149
PageID: 211595
Jack Siemiatycki, Ph.D.

Page 396

114:5 131:6
208:12 316:4
329:9
**reasonableness**
204:25
**reasonably**
118:20 316:16
**reasons**
30:8 65:11 66:2
143:17 190:21
**reassured**
196:23
**reassures**
222:21
**REATH**
4:18
**rebut**
101:7
**recalculating**
77:10
**recall**
52:8 59:5,7,15
91:17,21 93:19
95:12 101:12,12
157:8,17 158:1,3
158:6,22,25 159:9
159:15 160:5,7
161:9 166:5,9,10
166:13,15,18
169:22 170:19
217:22,25 218:1
218:11 219:7
221:22 222:4
223:16 233:12
274:20,23,24
294:21 299:2
306:15 307:1
312:5 317:16
323:4,6,10 324:2
324:14 325:4
339:9,19,20,21
**receipt**
354:13
**received**
40:10 54:24 97:10
97:11 326:5

**receiving**
83:18
**receptivity**
129:15
**recess**
52:20 105:1 145:22
210:5 242:20
320:14 322:17
**recipe**
25:1
**recognition**
328:18
**recognize**
37:23 47:2 91:12
188:5 222:3
**recognized**
226:4
**recognizing**
133:25
**recollection**
54:3 323:25 340:20
**recommendation**
291:25 320:24
321:2
**recommendations**
259:8
**record**
9:4,16 11:25 15:5
16:18 17:22 19:18
47:6 48:10 52:19
52:23 61:13 67:21
67:22,24 68:2
104:20,22,25
105:4 108:11
109:1 111:15
140:15,23 141:2
145:21,25 156:1
157:21 175:21
192:24 194:20
200:3,4,21 210:4
210:8 226:19
235:13 236:8
242:11,19,23
255:9,13,16
256:24,25 257:2,5
265:12,15,18

274:6,9,12 275:4
307:17 308:12,19
317:11 320:8,9,12
320:16 322:16,19
324:19 328:14
335:25 336:2,5
343:11,14 344:8
352:3
**recorded**
353:8
**recreate**
41:5
**recreational**
284:1
**red**
347:21
**REDIRECT**
322:20 336:9
**redrafting**
72:22
**reduce**
281:11
**reducing**
168:13 287:16
**reduction**
169:1
**REES**
5:12
**reevaluated**
137:13
**reevaluation**
137:15,16
**refer**
13:20 19:12 58:16
69:12 86:9 87:19
92:6 100:20
108:21 111:11
112:4 147:21
157:16,19 165:23
206:9 218:22,25
219:20 224:17
225:22 245:3
262:8 263:13
303:16 304:23
312:22 333:9
**reference**

43:20 86:17 87:18
88:4 89:19 91:24
93:4 105:19,24
111:21 175:18
211:15 213:1
219:8,9,18,20
220:22 225:15
230:23 238:6,9,11
238:14,16,21,25
239:1 250:22
267:15 341:4,5,25
**referenced**
23:14 45:17 50:17
51:16 178:25
185:1 239:10
**references**
18:17,21 39:23
40:4 86:7 87:4,9
87:13,22 88:21
102:3,9 219:1
240:17 329:13
332:19 333:12
**referral**
65:11
**referred**
40:3 87:17 98:15
163:24 244:6
294:20
**referring**
35:15 62:13 63:19
71:14 98:16,19,23
156:25 198:23
219:15 246:15
254:23 262:7
269:20 296:16,23
300:23 304:7
305:17 313:4
**refers**
166:10,12 202:15
206:25 262:19
**refinements**
37:13
**reflect**
49:22 84:25 133:22
324:19 327:25
**reflected**

133:4
**reflecting**
333:2
**reflection**
70:12 180:15,16,18
**reflects**
50:1 132:9,16
200:4 298:5
**regard**
294:6 313:17
315:12
**regarding**
10:21 13:15 43:7
229:5,9 275:8,13
275:19 306:13
338:3 350:10
**region**
69:14 220:10
221:12
**regression**
207:14
**regular**
298:6
**regulations**
146:23
**reimburse**
49:17
**reinforces**
84:10
**rejected**
133:2
**relate**
263:5,8
**related**
8:9 18:21 51:17,25
57:1 58:5 115:24
126:21 157:10
165:11 166:8
167:7 175:14
189:13 226:2
259:22 310:14
317:22 326:24
333:6,18 350:17
**relates**
1:11 263:19 296:14
**relation**

Jack Siemiatycki, Ph.D.

Page 397

124:8 125:23
189:14 195:24
318:9 351:5
**relationship**
24:15 58:22 78:10
103:5 114:14
115:9 121:10,23
121:24 122:1,19
122:24 123:7,9
131:7,15,21
132:10 136:25
152:2 156:10
157:11 174:8
176:8 243:12
261:1 265:24
267:8,21 268:6
269:10 272:12,23
273:2 278:21
302:9 311:12
**relationships**
314:16
**relative**
23:9 26:20,21
32:10 33:20 76:18
77:23 84:18 106:7
146:24 147:6,13
147:19,24 148:2,9
148:17 149:22
150:1 159:6
166:22,24 167:1
167:14 169:2
170:25 174:10
178:7 181:23,23
182:2,10,11
185:15 191:25
192:1 204:17,21
213:20 225:16
234:3 236:11,18
236:20 245:10
247:12 298:17,18
298:18 319:10,21
319:24 320:5
321:13 327:21
328:22 329:4,22
**relevance**
22:24 89:23

**relevant**
40:24 66:14 90:21
91:13,25 94:25
105:16,23 118:20
164:4 196:21
237:8,15 253:6
311:3,18 350:25
350:25
**reliability**
158:2 223:21
**reliable**
118:20 179:14,17
204:9 260:20
**relied**
90:3 191:9
**relieve**
171:20
**reluctant**
150:9
**rely**
93:2 94:12 158:3
194:3,22 261:12
265:8 267:18
**relying**
221:19 222:11
265:2 272:20
331:22
**remain**
13:5 165:18
**remainder**
291:1
**remained**
190:6
**remains**
182:24 283:2
**remember**
41:3 54:9,11 68:8
90:8,8 100:18,19
141:22 156:3
190:19 207:14
218:7,8 246:7
257:13,14 259:5
269:2,4,18 273:10
274:2 291:19
293:8,9,15 312:9
312:16 313:20

324:8 332:14
340:18,19
**remove**
40:15
**removed**
40:18,21
**render**
100:6,9
**rendered**
318:6
**RENEE**
5:4
**repeat**
22:11 173:3 276:6
330:15
**repeated**
97:8
**replicability**
31:5
**replicable**
30:11,13,14,19
31:3,17
**replicatable**
28:6 80:24
**replicate**
25:14 26:14 80:18
272:16
**replicated**
29:21,24 42:11
**report**
6:18 7:10,12,15,19
7:20 12:20 13:4
13:17 17:5,6,16
17:24 18:5,11,17
18:20,21 21:20
25:14 26:13,18
28:21 39:24 40:5
40:22 42:1 43:20
44:4 50:9 57:15
57:15,17,21 58:5
58:13,20,24 59:3
59:25 60:3,10,11
60:13,16,21,24,25
61:2,6,14,24
62:23 64:1,7
66:15,20,25 67:10

68:5,9,18,21,25
69:3,10,13,17,20
69:21 70:2,4,4,10
70:16,21 71:5,5
71:12 72:9,20
73:16 74:4 76:5,8
76:12 77:22 78:24
80:17,22 82:7
83:19,20 84:5,8
84:10,14,15,23
86:8,21 87:17,20
91:8,23 94:8,11
95:7,9 96:6,11
100:20 101:8
106:8,11 107:4
108:2,7,14,22
109:3,5 110:7,13
110:25 112:7,22
127:23 130:22
131:4 133:4,21
135:18 144:23
145:7 149:16,25
163:3,15 165:16
165:25 166:19
169:6 170:2
175:18 182:18
186:3,5,7 188:16
190:6,8,10 199:16
199:17,18,19,20
200:5,15 213:1,3
229:4,8 230:23
236:16,21 241:22
245:6,19 256:15
261:23 268:22
269:3,19 270:16
293:22 302:21
303:1 305:20
312:22,25 314:4
316:20 320:3
325:12 326:20
332:18 333:6,20
337:1 338:20
342:11,11 348:15
**reported**
1:25 102:7,14
149:18 211:1

215:13,14 216:4,8
216:9,17,24 217:7
223:13 229:3
236:19 245:8
268:8 272:21
**reporter**
2:13 9:16 309:18
353:1,2,25
**reporter's**
353:13
**reporting**
161:23 166:13
170:20,23 213:11
217:17 223:18
**reports**
31:22 40:18 50:21
58:16 92:20 94:2
94:3 95:5,11
97:11,24 98:19
99:2,7,11 101:6
101:10 102:16
185:19 186:20
190:2 223:6 258:2
316:15,15 321:12
332:13,15,21,24
333:2,4,18,22
334:2,6,13,16,17
**represent**
16:17 45:4,8 66:9
109:3 274:18
**representation**
191:10
**representatives**
101:25
**represented**
333:20
**representing**
217:4,6
**represents**
237:14
**reproduced**
80:21
**reproduction**
353:23
**reproductive**
125:23 226:7

Jack Siemiatycki, Ph.D.

282:10 288:1

**reputation**
99:25

**request**
15:24 94:18,23
95:18 108:10
138:20,25 139:6
142:11 191:18
231:16 343:16

**requested**
95:21

**requests**
15:20 56:16 138:3
138:4

**require**
119:5 155:15
319:22

**required**
83:12

**requires**
83:11 184:13 208:2

**requisites**
66:7

**rereview**
13:20

**rereviewed**
12:17 13:6,9

**research**
2:5 7:24 9:9 20:1
21:3,3,6 23:6 24:4
24:9 49:16,19
73:20 74:16 81:9
81:10 82:8 124:7
126:13 127:15
132:18 133:9
159:10,13 160:13
160:17 161:14
174:19 177:25
180:5,6 266:12
273:19 280:25
281:1 283:11
286:9 288:6 292:7
310:13 331:16

**researcher**
289:8

**researchers**

129:9

**resolved**
104:13

**respect**
33:12 35:21 57:18
90:12 94:7 98:9
126:5,10 127:21
137:9 141:16
142:12 150:6
153:10 162:25
164:19,22 165:2
187:10 197:7,9
218:14 233:16
246:17 262:5
263:18 323:11
324:25 326:10
327:5 330:8,18
332:7

**respected**
20:7

**respectfully**
26:10 148:25
177:20

**respective**
215:9

**respond**
166:12

**responded**
323:16

**response**
6:14 218:9 222:1
243:12 268:6
293:11,25 326:5
332:4

**responses**
159:20

**responsibility**
120:3

**responsible**
115:19

**rest**
41:1 272:8 337:8

**restricted**
298:2

**result**
38:16 80:8 82:16

83:7 152:13
167:13 171:15
174:7 181:18
184:4 186:6,10,23
189:16 190:15,16
196:25 200:23
208:11 209:16
221:16 224:1
228:8

**resulted**
149:22

**results**
37:10 38:3 67:4,5
70:14 79:18,25
80:3,4,9,12 82:13
82:25 83:3 128:11
128:12 161:21
174:2 177:17
180:8,23 181:22
181:22 184:5
190:9,24 197:1,16
197:23 208:4,16
209:3 210:18
211:1,2,5,8,21
212:14 217:21
223:10 224:6,10
237:23 240:3
241:21 266:22
296:4,11 329:8,21

**retain**
52:12 105:25 191:4

**retained**
78:4,6 101:6
105:22 276:2,14
277:15 325:2
334:1

**retired**
81:16,22 82:10

**return**
19:18 105:8 354:11

**review**
13:1,3,13 28:15
33:6 51:21 67:7
73:15 74:7 77:12
93:17 96:5 125:24
126:17 163:16

220:7 229:11
230:5 240:9
241:23 259:10
262:17 264:15
273:7,9 301:16
303:20 313:25
321:6 334:17

**reviewed**
12:17 13:10,10
50:22 52:4 72:18
75:14 84:5 93:12
94:6 95:5 99:19
127:7 129:2,4,13
158:24 159:14
195:21 241:15
242:5 253:10
262:15 282:14
314:6 326:15,19
326:19 333:19

**reviewer's**
32:13

**reviewing**
25:13 26:13 51:23
82:15 84:1 91:23
116:23 125:9
248:8 250:7

**reviews**
163:12

**revise**
125:24

**revising**
70:17 125:9

**revision**
51:8

**revisit**
97:16

**rgolomb@golom...**
4:9

**rich**
283:22

**RICHARD**
4:3

**Richardson**
82:11,17

**rid**
96:20

**right**
10:4,6 15:23 16:21
18:2,7 20:22
39:18 57:2 61:5
62:21,25 67:2
78:12 86:23 88:17
93:19 97:3 105:17
106:3 107:19
111:13 130:5
163:9,10,14,18
164:13 188:23
191:3,16 200:5
202:4 205:12
210:19,25 211:12
211:20 214:10,23
216:2,22 224:21
235:23 249:7
250:14 256:6
273:23,23 287:11
289:23 290:1
291:17,18,22
292:6,17,21
293:10 294:1
295:6,13,19,25
296:10 297:20
299:14,15,21
300:1 301:15,21
301:25 303:15,20
306:6,17,21 307:5
309:3 312:4 313:3
315:2 316:19
317:7,15,20 318:3
320:6,25 321:4,5
321:8,25 326:22
327:1 335:24
340:4 347:4,4
348:17

**right-hand**
327:9

**rigueur**
114:3

**risk**
8:5 19:20 20:24
21:12 24:16,20
33:12 35:21 36:6
43:12 59:4 77:24

Jack Siemiatycki, Ph.D.

89:24 90:12,23
103:16 106:8
119:25 120:10,24
122:8 123:18
127:22 130:3,12
143:1 146:16,18
146:19,25 147:7
147:24 149:2,22
150:1 154:10,13
156:16 159:7
166:22,24 167:1
167:14 168:13,14
169:2 170:25
174:8,9,10 178:7
181:23,23 182:3
185:15 191:25
192:1,17 193:17
199:2 202:7,18
203:15,19 204:17
204:21 207:21
209:24 213:20
225:17 230:6
234:3 236:11,18
236:20 245:10,10
247:12 268:17
269:23 281:12
282:7 287:4 288:6
295:9 297:21
298:17,18,18,21
306:13 308:20
309:4 310:22
319:22,24 321:11
321:15 327:4,21
329:4,22 345:12
**risks**
76:18 121:12
126:20 144:18
147:6,13,19 148:2
148:9,17 159:23
160:10,11 176:3
180:16 182:10,12
184:18 189:12
208:25 297:8
299:6 319:10
320:5 328:22
351:2,5

**road**
3:12 29:8 133:22
227:16
**robot**
25:19
**rocket**
79:14
**role**
24:25 98:24 102:21
128:22 143:11
178:7 259:24
260:12 288:6
**roles**
143:11
**Roman**
300:4,4,16,21
**room**
117:20
**Rothman**
20:8
**rough**
33:6
**roughly**
13:19 118:11
136:20 138:18
169:14
**routes**
338:21
**routine**
81:24
**routinely**
65:23
**RPR**
353:18
**rubric**
25:5
**rule**
122:6
**ruled**
123:14
**run**
215:17 329:24
**run-up**
39:1
**running**
320:11

**S**

**S**
3:1 6:1,7 7:1 8:1
9:1
**S-T-R-A-I-F**
139:11
**Saed**
332:17,18
**sake**
168:24 174:11
**SALES**
1:7
**Sally**
81:20 82:10
**sample**
266:13 288:7
**samples**
102:15,17
**sampling**
311:7
**Sanchez**
101:11
**sanctions**
310:20
**sanitary**
83:9
**satisfaction**
316:14
**satisfy**
153:12
**save**
73:7,12 80:12 81:3
135:24 224:23
**saw**
97:24 139:15
230:23 325:23
348:20 349:3
**saying**
53:12 67:13 98:3
123:13 163:23
186:6 195:7
221:24 233:13
244:12,18 276:8
282:22 293:15
304:17 338:20
340:17,21 342:17

346:11 347:8
**says**
63:2 69:13 146:24
163:11 206:22
236:13 258:18
264:5 280:24,25
281:10 282:20,24
283:13 284:13
287:1,7,9,13,14
287:21 288:10
328:4 338:25
343:23 344:14
345:9,17 347:15
349:16,18
**scale**
150:7 151:23
154:24 161:10
**scanned**
349:7
**scanning**
219:17 348:20
**scenario**
35:15
**scenarios**
186:9
**Schildkraut**
7:20 123:3 200:21
200:21,23,24
201:4 210:12,17
211:4,7,11 212:7
212:9,14,16,17
213:2,14,17,19,24
214:15 218:12
220:21 266:16
267:11 294:6
**science**
31:10,12 34:22,23
79:14 85:1,1,2,17
186:2 279:10
322:4 346:14
**sciences**
36:16
**scientific**
12:19 13:7 25:17
36:14 37:6,17
39:21 85:4,7 99:1

99:17 103:21
104:7 105:20,25
113:7,18,22 114:6
122:21 128:20
131:6,19 132:8,9
132:14 138:5
153:19,20 162:25
163:19 164:3,18
164:22 172:20
184:20 240:8
245:22 254:8
261:24 262:2
264:14 316:11
**scientist**
31:25 35:2,9,18,20
90:10 91:7,10
116:1
**scientists**
31:6,13,15,18
36:17 128:16
129:3 133:2 134:4
135:4 138:4 303:4
310:24 314:5
316:3,9 330:12,22
**scope**
43:13 68:10,12
303:8
**score**
25:25 27:10 28:3
33:16 67:15
**scored**
28:14
**scores**
27:7
**scoring**
26:24 28:8,9,10
31:11
**screen**
140:21 323:18
**screening**
255:1,19,22 256:8
256:18 257:9,15
257:21 258:5,9,12
260:19 261:8,22
263:4,18 265:1
299:17,24 300:1

Jack Siemiatycki, Ph.D.

Page 400

300:25 304:15
326:8,12
**scribble**
44:12
**scribbled**
18:5 44:14
**scroll**
135:20
**SCULLY**
5:12
**search**
73:20 196:15
222:22
**searches**
81:10,14,23
**second**
23:3,4 42:10 63:9
113:4 140:23
163:9 170:19
193:5 196:24,25
202:4 206:12
219:3,25 221:6,20
256:24 264:4
266:16 286:21
297:12 300:24
343:8
**secondary**
298:24
**secretary**
286:12
**section**
64:13,17 66:20
86:7,18 87:4,9,14
87:18 88:4,21
91:24 101:2,24
106:1,2 113:1,5
163:10 169:12
198:15 202:1,24
206:7,13 219:11
219:20 221:9
237:1,4 249:3,18
250:8 254:10
262:14 273:8
295:7,21,23 296:4
296:11 300:19
303:21 313:6

316:19 333:5,9,15
346:18,21
**sections**
88:20 221:10
**see**
14:16,20 17:15
41:24 45:2 54:21
69:18 73:11 78:1
86:18,25 89:21,22
94:20,24 107:10
107:21 116:13
130:23 135:21
145:1,2 156:15,19
160:8 161:5
163:12 169:13
174:3,10 175:2
183:4 187:14
188:5 192:9
195:20 198:15
200:14,19 202:1
203:10 212:20
214:13,18,22,23
215:1 217:1,16
219:2,11,18
223:15 228:15
237:1 238:4,12,13
238:22,24 243:17
243:20,21 245:21
247:24 248:7
249:13 258:18
261:18,23 272:17
280:21,24 282:20
286:13,20,20
287:6 295:4,5,12
296:8 306:10
313:8,9 318:19
325:15,22 327:9
338:6,23 342:2,4
342:10,20 344:5,9
344:19 345:6
348:14,22 349:9
349:11,12,16
**seeing**
259:5 263:11
**seek**
212:21

**seen**
15:12,14,17,17
16:12 93:15
113:25 114:1
118:25 139:17
226:21 333:22
**seldom**
229:20
**selected**
28:1,1 80:9 208:8,9
**selecting**
82:18
**selection**
39:6
**selectively**
35:2
**self-evident**
89:1
**semantic**
249:24
**Seminary**
3:12
**sending**
325:16
**sense**
26:14 31:16 60:11
72:5 92:25 148:13
164:11 167:11
252:23 303:5,7,23
334:15
**sensitive**
208:7 209:7
**sensitivity**
79:25 80:13,18
81:2 186:19
200:16 201:8,10
228:12
**sent**
15:16 40:8 47:8
91:3 92:9,16 95:2
98:6 105:21 231:1
231:13 257:11
293:12,21 323:10
323:15
**sentence**
30:15 63:10,16

101:20,22 111:11
111:21 140:1
149:5 183:3
206:22 219:4
222:8 238:5 269:2
281:18,19 295:1,2
296:16 302:12
329:20 336:25
338:19,25 347:21
347:25
**sentences**
104:3 114:16 175:4
205:15,16 262:24
287:14 302:10
318:23 329:13
**separate**
71:16 98:24 210:21
270:21 273:18
**separated**
213:6
**separation**
213:2
**sequence**
72:1
**series**
65:7,19 67:8
312:17
**serious**
65:13,14
**seriously**
329:6
**serous**
202:9 203:7,11,15
203:19,24 204:11
**service**
186:15
**services**
7:5,8 9:6 46:14
47:8 48:3,21
49:12 53:2
**serving**
10:14 141:6 324:11
325:1
**set**
17:9 25:23 37:10
40:3,15 42:9,11

82:11 186:18
211:2 271:10
310:15 318:14
353:5
**sets**
210:18 211:1,1
**setting**
124:11,15 132:7
135:6
**seven**
177:21 219:4
**SEYFARTH**
5:5
**shape**
121:25
**share**
92:23 94:1 119:3,7
119:16,20 120:5
120:15
**shares**
118:21
**SHAW**
5:5
**sheet**
308:20 354:5,6,9
354:11 356:8
**shift**
283:25
**SHKOLNIK**
3:17
**short**
171:11
**short-circuit**
342:25 343:2
**shorten**
304:20
**shorthand**
353:1,2,11
**show**
22:1 160:18 215:17
317:20
**showed**
160:14 203:14
209:3
**showing**
176:25 285:18

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 136 of 149
PageID: 211600
Jack Siemiatycki, Ph.D.

Page 401

286:1
**shown**
103:8,10
**shows**
156:15 211:5
212:14 215:8
298:10
**Shushan**
201:9,9 228:24
**sick**
159:19
**side**
44:13 100:19,19
206:10 277:25
278:7,8
**side-by-side**
187:11,16 208:14
**sides**
334:21
**Siemiatycki**
1:17 2:1 6:2,9,11
6:16,19 7:3,10,12
7:15 8:3,6 9:14,18
9:23 14:16 15:9
16:12,19,22 17:21
20:10 26:10 29:15
30:7 31:2 33:19
39:18 44:3 47:2
47:25 48:17 52:22
53:1 62:5,22 88:2
91:25 102:21
103:20 104:24
105:3,6 109:13
110:6,23 111:19
140:12 145:25
146:3 148:25
175:8 177:20
193:13 196:6
200:2 210:7
212:13 214:11
219:24 231:8
236:10 242:22,25
244:13 251:5
253:7 254:9
255:18 257:7
265:20 274:16

278:17 286:1
287:9 288:14
290:1,20,21 291:3
300:23 301:16
302:15 303:15
306:18 307:19
308:21 309:5
312:5 315:11
317:7,15 320:19
322:10,22 324:22
327:1 329:15
336:11 339:9
343:16 348:5
351:22 352:2,5
356:11
**Siemiatycki's**
14:23 18:20 234:17
235:2
**sign**
351:23 354:6
**signature**
108:1,3,4 109:2
**significance**
60:9 245:9 268:9
268:12 269:17
270:7 298:8,24
327:22
**significant**
67:4,12 178:7
182:22 218:13
225:7,10 266:25
268:5,10,13,16
273:2 295:9
296:17 297:18,21
298:1,4,14 299:13
301:11 305:13,24
328:23 330:1
**significantly**
160:11
**signing**
354:8
**similar**
22:20 62:10 77:17
80:10 165:19
197:2,16 203:15
217:16,17 236:20

297:7
**similarly**
176:11
**simple**
82:21 241:25
**simply**
95:19 119:16 151:9
152:7 173:15
214:14 215:12
225:6 341:24
342:16 343:22,24
348:5
**Singh**
14:11 93:13 94:18
95:8
**Singh's**
93:23
**single**
27:11 38:16 46:13
81:2 82:15 108:9
115:3
**single-digit**
27:7
**singular**
324:17,18
**sinus**
350:18
**sir**
276:5 336:12 337:2
338:7
**sit**
69:1 90:19 91:17
103:19 120:7
153:8 198:20
203:20 220:8
244:12 263:2,16
**situation**
38:8 39:3 76:23
147:5 150:16
155:6 168:7
169:18 181:9
341:11,12
**situations**
158:10 161:15
169:3
**six**

51:3 53:15 139:17
245:8,19
**sixth**
27:15
**size**
266:13
**sizes**
288:7
**skepticism**
328:25
**skill**
99:25
**skilled**
79:11
**skimmed**
344:4
**skip**
287:13
**slightly**
33:18 108:5 110:15
167:24 187:7
195:15 209:3
337:12
**slowly**
290:25
**small**
110:21 195:16
202:7 204:19
213:3 288:7
297:25 305:12,23
328:22 329:5
335:18
**smaller**
42:4 204:10 266:17
327:25
**smokers**
147:7
**smoking**
8:10 130:14 132:21
133:21 147:4,22
147:24 159:24
161:4 175:14
177:7,12,16,16,17
177:18 181:20
182:1,8 204:15,17
204:21,22 283:1

317:23 318:13,15
319:7 326:24
**smoking-lung**
147:17 148:13
**so-called**
246:18
**so-so**
27:14
**social**
65:16
**socioeconomic**
8:11 175:15 177:8
317:23 318:16
319:9
**software**
37:22 71:19 75:25
76:6,9 79:17
80:15 82:16 199:7
199:8
**sold**
101:15
**solution**
340:10
**Someone's**
63:4
**somewhat**
161:21 202:14
206:23 208:7
**soon**
134:19 315:19
**sorry**
22:10 32:17 37:14
42:16 44:21 47:16
47:24 53:20 56:21
57:15 62:8 63:7
78:4 85:11 100:15
106:10,18 123:25
133:17 149:12
152:3 155:23
156:5 163:8,23
172:25 173:2
174:21 183:4
189:4 195:18
212:16 220:25
224:24 249:9
252:12 262:11

Jack Siemiatycki, Ph.D.

270:11 281:17
290:14 292:11
299:24 330:16
332:20 341:16
342:8 344:5
348:25
**sort**
21:25 22:2 28:19
32:9 38:4,6 40:3
43:15 70:7 73:25
74:5 85:8 108:6
114:3,11 122:15
124:12 127:14
128:17 129:3
132:21 136:6
138:7 151:21
159:16 162:1,23
163:2 166:21
180:15 184:3
223:25 281:24
289:5 304:8
323:14
**sorts**
126:25
**sounded**
341:6
**sounds**
178:2
**source**
70:17 171:12 228:4
233:9,16 283:22
**sources**
137:24 228:4
233:10,16
**South**
3:6 4:13 5:20 340:3
**sovereign**
153:25
**space**
354:4
**speak**
139:9 251:23
290:25
**speaking**
13:19 87:18 118:11
138:18 139:13

204:21 251:25
**specialized**
65:15
**specially**
175:22
**specific**
22:5,18 23:20,22
33:22 36:22 44:25
55:4 58:17 59:12
60:1,16 62:13
81:25 92:5 115:3
117:15 157:5
163:2 185:14
204:6 211:21
220:22 221:12
244:3 313:15
325:19 338:2
**specifically**
12:15 14:10 21:16
21:22 39:8 40:5
58:24,25 79:14
83:3 93:20,22
94:18,25 95:18
96:1 98:1 100:13
120:9 137:8 139:8
139:23 142:11,15
161:9 184:21
200:9 202:16
206:25 219:14
228:13 243:3
259:17 262:8
264:4 265:21
276:13 295:20
296:10,21 299:17
300:3 303:16
308:22 309:6
310:14 313:3,16
320:21 321:8
323:2,24
**specificity**
305:5
**specify**
247:15
**specimens**
349:15
**speculate**

91:2
**speculating**
19:2 252:14 254:1
**spend**
51:13 56:1,25
192:8
**spending**
125:20
**spent**
50:12,14 53:6,8,16
56:9,12 125:2,13
126:1
**spilled**
262:10
**spirit**
19:10
**spoke**
41:10 141:4
**spoken**
135:4,8,16 136:3,9
233:1 251:23
**spring**
10:16 144:21
**squamous**
204:18
**St**
5:21
**stable**
227:7
**staff**
138:5 257:12
**stage**
124:21
**stages**
171:20 281:6
**stand**
83:19,24
**standard**
15:15 37:11,12
38:14 131:2
**standardized**
180:6
**start**
14:13 17:2 25:1
57:5 62:21 71:12
101:22,22 105:13

134:17 168:17
171:21 186:25
286:20 296:25
**started**
10:1 72:17,22
92:23 124:4,17
134:20 190:5
201:22 284:8,9
295:2 314:3,11
**starting**
121:8 124:10
125:21 129:5
170:4
**starts**
128:17 206:14
296:6 321:11
337:16,17,18,20
**state**
109:6 113:4,17
130:22 131:4
165:16 237:3
268:15 301:5
327:12 354:3
**stated**
182:20 196:8
212:19
**statement**
52:1 137:12 152:19
183:5 202:23
205:17 248:17
249:12,14 268:24
269:21 271:5
321:21 336:13,22
341:5
**statements**
19:4 21:19 25:9
203:2 333:13
**states**
1:1 9:11 86:1 109:4
202:5 220:4,5
**statistical**
30:3 37:9,24 71:15
71:17 72:12,16
76:1,7,13 77:19
79:11 171:17
198:10,21 205:5

207:6,8 239:12
245:9,16 268:9,12
268:25 269:7,16
269:16 298:23
327:22
**statistically**
67:4 207:8 268:5
273:1 297:17
301:10 305:13,24
328:23 330:1
**statistics**
38:5 106:2 244:11
**status**
8:11 175:15 177:8
227:7 317:23
318:16 319:9
325:11
**stay**
290:1
**Steering**
6:13
**stenographic**
9:16
**stenographically**
353:9
**step**
25:21 38:6
**steps**
29:25 258:21
**stickers**
15:3 285:5
**sticky**
68:6,8
**stock**
281:19
**stomach**
318:10 329:24
**stop**
67:18 189:5 290:13
298:7 311:22
**Straif**
139:11
**straight**
80:22
**straightforward**
77:8

Case 3:16-md-02738-MAS-RLS   Document 33008-57   Filed 07/23/24   Page 138 of 149
PageID: 211602
Jack Siemiatycki, Ph.D.

Page 403

**strand**
86:3
**strands**
270:21
**strategy**
66:1 186:14 197:6
    197:15,15
**stratified**
162:15
**Street**
3:6 4:5,13 5:6,20
**strength**
75:20 102:25
    146:21 147:3
    173:22 207:23
    245:3 261:15
    305:4 313:11
    327:14
**strengths**
165:9 179:5,9
    321:13
**stress**
143:12 314:10
**strictly**
38:5 114:21 222:1
    238:2
**strikes**
229:13,16
**strong**
146:22,22 147:9,15
    147:21,22 148:13
    148:14,16,18
    149:7 174:7,14
    176:22 178:5
    204:3 207:18
    311:10 319:10
**stronger**
174:14,15 176:9,19
    176:20
**strongly**
207:18 318:18
**structure**
226:16
**student**
79:2,7 82:1
**student's**

79:3
**students**
36:19 134:4,8,9,15
    134:22 135:7
    284:9
**studied**
126:23 162:2
    318:24
**studies**
6:22,24 23:7,8 24:4
    24:5 27:1,7 28:14
    28:22,24 29:3,5,9
    30:24 32:16,21
    34:11,20 35:3,9
    37:10 38:3,4 39:6
    39:8 42:18,23
    44:10,17 45:5
    46:3 64:12,13,15
    65:2,6 66:3,4,5,6
    66:14,23 67:6,8
    67:12 74:3 76:14
    77:22 78:6 79:24
    79:24 80:7 82:24
    93:1 97:12 98:4
    102:13 106:5
    107:5 118:17
    119:1 121:8 125:8
    132:23 142:23,23
    146:6,17 156:23
    158:3,8 159:11,12
    159:12,18 160:10
    162:20 163:19,22
    170:18 171:3,12
    171:13 173:23
    179:15 180:13
    181:12,14 184:5
    184:11,21,22
    185:2,16 186:9,10
    186:17,23,24
    187:1,6,10,19
    188:6 192:1 197:2
    197:22 198:5,5
    199:5,12 200:9
    202:10 203:9,10
    205:18,19,22
    208:3,7,15 209:8

209:14,17,23
222:20,24 223:14
224:4,7 225:13
227:17 228:15,21
228:24 237:17,22
238:12 239:6
240:1,16,21 241:2
242:5 245:7,13,21
266:11,14 271:18
271:21,23 272:3,8
273:22 301:9
310:15 311:19
319:21 329:9
333:9,11 345:11
**study**
27:8,12,16,20 28:4
    28:25 29:14 33:17
    33:22,24,24 34:3
    38:12,16 41:23
    65:1 66:9 78:5
    80:8 98:15 99:19
    107:10 118:17
    123:2,3,5 124:8
    124:11,15 125:3
    125:14,18,18
    126:4,10 149:18
    161:18,21,24
    167:18,19,25
    168:8,16 170:8
    171:4 175:6 180:7
    180:11,19,23,24
    180:24 184:10,12
    184:15 185:18
    189:1 190:2,7
    195:2 196:9 197:4
    198:14 200:22,24
    201:17 208:8
    209:15,21 210:12
    211:6 213:6
    214:16 222:16
    224:12,13 225:7
    225:10,11,22
    226:3,5,12 227:9
    227:21,24 228:16
    228:17,22 237:18
    237:23 248:15,20

266:16,17 271:8
272:7 280:1,3
283:15,16,19,21
283:22,23 286:23
287:2,3,13 292:7
292:13,14 294:3,6
298:10 304:14
310:14 317:18
318:8 328:19
340:3 345:18,22
349:14
**studying**
126:25 181:8
    263:10
**stuff**
74:13 308:10
**stumbling**
159:1
**subdivided**
152:21
**subgroup**
314:5
**subgroups**
152:22
**subject**
51:7 107:6 354:8
**subjective**
310:23
**subjects**
27:25 105:8 211:5
    211:8 213:14,18
    213:19 318:14
**submission**
259:23 260:3
    277:21 325:25
**submit**
139:6 142:7 193:25
    259:13,18,20
    260:6
**submitted**
13:18 16:1 110:8
    112:15 138:20,25
    175:19 233:7
    260:14 324:2
    325:10,22
**submitting**

326:20
**subscribe**
132:5
**subscribed**
353:14 356:14
**subsequent**
141:14 237:5
    238:10
**subsequently**
136:17 147:19,23
    231:13
**subset**
211:7
**substance**
356:7
**substantially**
165:19
**substantive**
136:7
**substituted**
213:17
**substitutes**
314:17
**subtitle**
316:21
**subtly**
167:17
**subtopic**
34:7
**subtype**
205:1
**subtypes**
204:6 297:8
**sufficient**
144:1,13 150:17
    151:13 152:12
    153:4,12 154:22
    155:10 199:6
    277:1,9 282:13
**sufficiently**
31:20 74:21 179:17
    179:19
**suggest**
45:16 220:1 250:4
    260:14 298:4
    305:23 345:11

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 139 of 149
PageID: 211603
Jack Siemiatycki, Ph.D.

Page 404

**suggested**
139:5
**suggesting**
253:24 349:13
**suggestion**
70:24
**suggestions**
138:2
**suggestive**
249:17,20 250:3
283:1 288:2
**suggests**
202:6 206:19
305:12
**Suite**
3:12 4:6 5:13,20
**summarize**
77:2 104:3 113:13
307:14
**summarized**
27:7 333:8,10,11
**summarizes**
101:21
**summarizing**
37:9
**summary**
243:18
**summer**
10:16 12:11 139:20
139:21 141:5,25
**summer/fall**
13:16
**sun**
288:3
**Sunday**
209:20
**supervision**
353:25
**supplemental**
231:20 235:3,10
**supplied**
61:2
**support**
19:4 34:20 55:7
85:17 151:11
152:10 179:17

183:12 220:18
221:23 243:10
265:22 267:6
272:22 316:22
318:3
**supported**
207:18
**supporting**
259:20 311:18
**supportive**
35:3,10 155:7
267:7
**supports**
115:8 132:15 195:3
196:9,12 222:16
**suppose**
252:24
**supposition**
271:17
**sure**
14:8 15:13 16:16
18:2,7,12 23:16
23:17 30:17 33:8
36:11 40:10 41:8
41:8 44:24 48:7
52:5,10 54:3
56:22 58:16 60:9
62:6 64:21 66:18
68:22 72:15,23
79:13 81:4,4,24
85:11,14 86:5
88:17 90:3 91:16
94:4,23 98:12
101:10 106:11,13
107:12 108:20
109:9,12 116:4
117:11 132:15
141:10 146:11
148:22 155:20
168:2 169:7
178:24 182:16
187:23,24 199:3
203:5 208:19
210:25 211:13,16
212:10,25 215:19
223:17 237:25

239:9 241:3
242:10 246:10
255:11 256:1
259:19 261:14
275:4 276:19
279:5 300:10,12
303:5 304:7
308:16 317:8
321:1 344:2
347:21
**Surgeon**
133:3,20
**surgery**
65:22 340:8
**surprised**
232:12
**surprising**
236:24
**surrounding**
213:8 241:11
**survey**
85:22 129:6 132:2
132:7
**survivors**
284:15
**susceptibility**
172:23
**susceptible**
129:11 173:7
**suspect**
35:23,25
**suspected**
162:2
**suspicious**
209:21
**Swan**
274:22
**swear**
9:17
**Sweden**
85:23
**sweep**
91:15
**swell**
129:5
**switching**

108:17 242:12
**sworn**
9:19 353:6 356:14
**symptoms**
171:20
**synonym**
32:20 130:3
**synonymous**
315:20
**synthesis**
25:17
**synthesize**
24:7,24 25:3 67:11
**synthesized**
25:20
**synthesizing**
25:9 134:20
**system**
26:25 28:10 30:9
30:19 31:11 45:24
82:12 145:3 251:3
**systematic**
29:6 230:5
**systematically**
73:11
**systemic**
159:21
**systems**
28:8 311:20

————————
**T**
**T**
6:1,1,7 7:1 8:1 20:8
355:2
**tab**
14:18,22 58:1,4
109:16 110:1,2
192:23,25 193:1,3
193:4,14 195:20
212:2 224:18
234:9 236:2,4
247:23 254:14,17
267:25 342:20
**table**
15:3 17:8 62:3,14
83:4 93:16 95:14

106:20 112:7,7
165:18 189:16
198:12 199:17
200:14 214:11,18
229:16,16,20
244:25 266:23
308:22 309:6
315:19
**tables**
77:10 185:19
223:13 231:21
235:3,10
**Taher**
41:23 42:6 50:22
51:25 84:3 230:4
230:9,14,17,24,24
231:14,17,19,24
232:24 233:5,10
233:17,24 234:2
235:2 236:11,19
237:1,3,13 238:25
239:4,22 240:12
240:24 241:7,12
241:15 243:1,6,9
243:16,18 244:22
245:6,25 247:3
248:24 250:18,18
251:7 252:15
253:10 275:12
291:19,23 292:13
292:17,22 293:19
294:2 299:24
305:22 323:3,12
323:21 324:25
326:8
**take**
11:13,21 12:13
51:23 52:15 65:19
97:9 101:16
105:11 107:9
128:22 132:20
135:25 140:10
145:18 150:14
154:1 169:7
187:13 191:20
193:7,8 194:13

Jack Siemiatycki, Ph.D.

Page 405

199:23 203:3
209:22,23 210:1
225:14 229:10
242:9 261:13
322:13 338:22
**taken**
40:11 59:9 79:13
93:9 94:17 172:17
201:4 224:7,8,8
258:22 298:3
302:11 329:5
353:4
**takes**
42:2 150:10 171:10
**talc**
10:8,21 12:18
13:11,15 20:3
24:15 33:12 43:9
43:13 53:9 54:7
54:15,19 55:1,15
55:22 57:4,13,18
59:1,4 74:25 75:9
76:25 83:4,8
84:19 88:11 89:25
90:24 92:20,21
97:18,23 118:1
120:19 122:8,19
123:17,23,25,25
124:22 126:6,7
128:4,25 129:18
131:8,15,22
132:11 133:23
134:11,23 135:19
136:16,25 137:8,9
137:13,17,22
138:22 139:2
140:5 141:13,17
141:21 142:1,12
144:6,19 146:8
148:6 150:6 151:2
151:3,11 152:11
153:10 155:1
157:14 158:8
160:3 162:11,11
163:1 164:5 165:4
166:3 168:10,14

168:21 169:25
176:2,10 178:12
189:8,12,17 190:9
190:16,22 192:3
193:17 204:5,5
213:9,11 215:15
216:18 218:4
225:19 226:11
227:8 229:5,18,19
230:6,21 232:19
232:22 237:9
243:12 247:7
248:10 250:10,19
251:8 253:12
258:13 259:21
260:15 261:2
262:6 263:19,20
264:6 267:8,10,21
268:7 271:12
272:12 273:3
274:18 275:8,13
275:19 276:3
282:12,17 283:4
283:19 284:4,22
287:22 288:5,15
288:21 301:12,17
302:9 303:17
305:15 306:1
312:7 314:12,16
314:17 327:6
330:10,20 331:7
331:11,13 335:9
339:10 340:7,23
341:9,12,23,24
343:18,20,23,24
344:10,12 345:12
345:13 346:12
347:9 349:21
350:22 351:14
**talc/ovarian**
134:14 276:15
277:16
**talcum**
1:6 6:20 7:13,16
9:10 57:22 58:6
58:23 69:14 74:15

78:10 92:10,14
95:25 96:3,18
97:15 98:9 101:14
102:1,8,14,17
103:2,15,23 113:8
113:14 115:2,4,10
115:23,24 116:8
116:10,11,25
118:6,7 119:3,6
119:11,12 120:20
120:23 121:14
126:14 127:8,21
134:6 135:1,5
141:8 170:12
172:12 176:11
205:8 216:10
217:7 218:15
259:24 260:13
291:4,11 301:18
302:23 307:10
312:8,15 313:19
314:13,21 315:4
315:13 316:25
317:4 324:12
325:3 338:4,21
339:1 351:11
**talk**
25:10 36:19 84:3
131:1 163:18
164:7 221:10
310:12 326:22
**talked**
169:21 183:19
282:16 286:24
**talking**
36:18 51:2 64:12
74:8 85:24 86:1
115:21 141:12
172:2 240:14,15
240:17 287:8
**tangentially**
258:4
**tape**
320:11
**target**
181:11

**tasks**
55:4,7
**teach**
134:9,10,11,12
179:1,4
**teaching**
134:17
**team**
12:3 81:13 97:13
189:2 197:10
**team's**
45:23
**teams**
266:12
**tease**
30:23
**technical**
157:20
**technicality**
68:23
**technically**
87:18 137:11
**Tecum**
6:12,17
**Telephonically**
5:4
**tell**
18:6 19:13 45:4,14
88:16 92:16
100:16 141:15
161:2 175:5
286:10 290:7
307:17 310:4
313:6 320:11
340:22
**tells**
25:25
**template**
151:18 154:2,3
**temporality**
305:6
**ten**
11:20 51:3 56:11
125:7 129:15
147:6,6,13,20
148:10 266:11

271:21 272:3
279:2
**ten-hour**
11:21
**tenable**
148:14
**tend**
44:12 52:11 65:15
85:3 123:6 162:3
250:2
**tendency**
207:11 298:21
**tenuous**
117:22
**term**
92:5 147:2 149:11
244:23 246:11
252:16 253:16,19
**terminological**
157:16 172:5
**terminology**
146:20 147:3 148:4
151:20 244:19
**terms**
49:25 51:6 53:21
121:11 147:15
151:19 191:24
205:2 247:12
266:18 268:11
**terra**
351:6
**Terry**
63:10,12,13,16
111:12,13,21
123:2,5 142:25
197:8,9,21 198:2
201:14,15,16
238:22,23 239:1,6
239:24 266:10,17
267:10,24 268:3
268:15 269:8
270:15 271:7,17
271:19,22 272:16
272:21 294:12,13
294:15,16,17,20
295:1,7 296:12

299:9
**tertiary**
284:17
**test**
268:25 269:7 298:5
299:13,13 311:20
**tested**
160:9
**testified**
9:20 42:21 44:5
59:16,22 60:12
241:10 246:19
292:25
**testify**
69:6
**testifying**
10:10 164:17,21
313:17
**testimonies**
332:21 333:3
**testimony**
104:10 125:5
133:12,16 153:15
208:1 220:16
241:19 244:16
246:5,5 250:12
265:6 269:13
275:6 330:25
335:13 344:17,21
346:14 353:7
**tests**
311:21
**Texas**
5:14
**text**
70:16 71:15,22
87:17 93:17,17
189:15,16 207:12
311:23
**textbook**
20:5 24:19 36:9
67:16 244:11
**textbooks**
19:9 36:9
**texts**
19:8

**thank**
10:5 11:7 20:13
48:9,14 78:14
145:19 157:24
178:3 191:21
192:22 193:9,11
199:25 203:25
210:2,15 212:4,5
225:23 236:3,8
246:25 275:2
285:16,24 289:24
291:17 299:14
300:14 306:6
307:22 309:2
312:4 320:6,17
322:1,9 336:8,20
346:4 347:19
351:24,25
**Thanks**
282:6
**theirs**
77:16 197:10
200:15,20 201:19
237:20,21
**theoretical**
158:20
**theoretically**
158:9
**theories**
316:17 317:2
**theory**
316:9 335:22,23
**thereof**
93:15 353:11,14
**thesis**
114:23 115:8
129:15 346:22
**thick**
42:23 43:16
**thing**
28:21 31:9 38:4
81:18 86:16 97:16
107:7 114:4
124:12 136:7
140:5 151:21
157:16 158:21

166:9,21 179:25
181:3 186:12
191:3 196:24,25
204:12 223:3,25
229:13,15 235:16
235:18 239:15
252:6 307:14
309:10 325:6,16
348:19
**things**
12:24 19:11 28:2
39:13 40:11,12
44:15 45:24 52:11
65:17 70:7,20
72:11,19,20 73:12
74:6 81:14 83:3
83:11,13,23 91:15
96:24 138:10
140:2,8 144:4
147:18 158:16
160:1,22 162:2
166:1 170:4 173:1
183:20 185:8,12
188:20 195:25
241:24 266:5
271:4 273:18
283:18 314:18
**think**
17:6 23:4 26:17
27:6,9 28:13,20
30:20 32:19,20
36:12 37:23 41:25
43:5,18 46:24
50:20,23 53:16,25
62:15 66:16 71:23
71:25 74:5,7 76:2
76:11,21 77:6,13
77:16 84:24 85:1
86:2 89:5,14,14
91:8 94:1,15 95:1
95:8,25 96:10
97:1,25 98:20
101:21 104:19
105:17,18 106:1
106:22 107:23
108:1 109:7,12

112:13 113:23
114:8,12 117:13
118:3,11 122:3,11
122:12 123:3,13
124:17 128:21
129:2,4,13 130:12
132:14 135:14,20
136:1,7,22 137:23
139:20,25 140:5
141:19 142:5,15
142:18 143:17,25
144:21 145:18
150:17,22 154:13
155:18,19 159:4
161:14,25 169:4
169:16 174:6,17
175:20 177:13
183:10,25 186:8
187:4,12,13 189:3
189:7 195:5
197:10,20,24
199:14 200:25
204:3,7,11 206:2
206:16 207:17
209:25 211:19
212:3 217:11
218:21 221:18
224:16 227:16
229:25 230:16,22
231:4,18 234:10
244:10 247:13,24
249:12,15 250:1,4
251:13,24 253:1
254:5,18 256:19
256:20 260:4,8,20
270:13 272:5,8
276:5 281:18
289:13,20 291:9
292:2 299:4 303:2
306:10 308:11
312:23 317:1,8
321:3 322:12
332:9 337:5 340:1
342:4 343:2
348:24 351:18
**thinking**

63:12 75:17 108:18
128:10 142:9
169:8,10 175:25
**third**
20:13 27:13 105:19
111:20 170:21
266:19,19 286:21
297:13 300:24
346:4
**thirty**
354:12
**thought**
18:25 21:10 40:23
42:21 62:13 63:15
67:14 70:12 72:18
90:4,6 94:24
105:22 186:12,15
195:9,10 208:12
231:4 241:20
246:9 290:15
308:5 325:5 349:6
**thousands**
40:22 160:15
**thread**
37:14 152:3
**three**
11:12 18:15 39:20
39:23 40:2,2,12
40:14 42:11
106:21 111:2
126:2 134:21
135:25 247:1,7
251:6 253:9
295:17 318:12
319:3
**threshold**
122:2,7
**thrown**
109:6
**throws**
108:6
**thumb**
18:19 62:18 109:15
**THURSDAY**
1:19
**tick**

112:16,18,18,20
**tied**
120:10
**tilted**
340:12
**time**
9:7 12:24 13:12
  15:16 18:2,7
  45:18 49:5,8,13
  49:18,20,22 50:1
  50:11,14,16 51:10
  51:13 52:15,17
  53:7,18,19 55:25
  56:3,8,12,23 57:9
  57:10 60:25 71:25
  72:15 74:6 83:22
  104:14 105:11
  106:12 110:25
  111:13 112:1,23
  118:8,13,20
  119:12 120:11
  125:13 126:2
  127:22 138:11
  139:5 141:10
  142:10,12 145:16
  166:2 187:3,14
  192:1,8 198:18
  207:22 209:1,3
  216:19 218:10
  224:23 226:25
  241:23,25 242:9
  259:7 270:3 274:5
  289:17 314:16
  320:10 333:4
  336:6 353:5,6,8
**timely**
143:18
**times**
118:22 120:16
  139:17 147:7
  295:17
**TINSLEY**
5:18
**Tisi**
3:4 11:3 48:10,14
  104:16 109:21

111:7 178:17
194:8,11,15
234:15,18,23
235:7,16 242:12
254:22,24 255:3,5
262:10 280:14
288:23 290:11,15
300:11 307:25
308:9,17,24
**tissue**
341:24 342:17
  349:15 351:12
**tissues**
349:22
**title**
100:25
**titled**
87:9 193:17
**titles**
170:3
**today**
10:2,7 12:9 13:2
  16:23 17:4 18:1
  18:14 21:14 36:10
  37:5 39:20 44:7
  44:21 46:10 50:17
  51:13 56:4 61:18
  69:1,5 90:19
  91:17 103:19
  110:13 116:1,13
  116:16,22 118:9
  120:7 123:8
  143:19 149:11
  153:8 155:1
  175:23 194:1
  198:20 203:20
  204:3 220:8
  244:12 263:2,6,16
  264:21,22 307:9
  335:13
**today's**
9:6 50:12,15
**Todd**
1:25 2:12 9:17
  353:18
**told**

11:20 141:10,11
  275:16 325:21
**top**
182:20 214:5
  329:18 337:21
  339:24 340:11
  345:6
**topic**
13:14 24:9 33:25
  34:18 36:23 73:21
  124:6 158:25
  225:8 287:1 314:1
  318:6
**topics**
7:24 74:18 80:6
  126:18 163:20
  286:9
**total**
54:11 55:14,18
  125:2
**totality**
113:6 131:5 154:5
  301:17 302:1
  303:8
**toxicologic**
303:12
**toxicologists**
303:3 314:5
**toxicology**
74:15,20 75:8
  163:21 164:19
**trace**
350:6,21
**traffic**
65:16
**train**
73:3
**trained**
185:11
**training**
331:16
**transcribed**
353:10
**transcript**
6:8 7:2 8:2 33:3
  93:18 95:13,14

328:5 353:10,12
  353:22 354:13,14
**transcription**
356:4
**transcripts**
93:8,11,14,21,23
  94:2,20
**translation**
112:17
**treat**
210:12
**treated**
65:17
**trend**
191:24 192:17
  202:18 206:24
  207:15,19,21,24
  208:17,21 268:10
  268:16,25 269:7
  270:6,16 295:9
  298:1,3,5,14
  336:18,18
**trendline**
207:9
**trends**
122:24 266:24
**trial**
59:16,22 60:12,12
  68:15 69:6 88:10
  246:4,20 333:3,22
**trials**
38:10 180:3,5
**tricky**
184:13
**tried**
24:7 29:8 50:23
**trivial**
125:10
**true**
114:24 119:19
  177:4 180:11
  183:18 249:7
  327:13,25 331:10
  353:10
**truth**
168:18

**try**
29:16 37:16 41:4
  127:19 167:6,19
  181:10 254:12,12
  290:24,25 314:15
**trying**
35:8 41:17 71:25
  76:11 102:20
  121:24 129:23
  140:15,18 155:18
  182:7 272:16
  281:17,21 291:9
  332:14
**tubal**
287:20
**tubes**
339:4 341:1
**TUCKER**
5:19
**turn**
57:25 86:20,23
  112:24 113:1
  163:5 214:11
  236:25 254:14
  280:20 286:15
  299:9 329:17
**turned**
147:23 257:8
**two**
11:2,23 13:19
  14:16 22:24 48:17
  49:11 50:4,18
  53:1,16 56:20
  57:11 59:12 72:10
  73:5 76:22 93:18
  102:18 105:18
  106:21 114:16
  125:19 134:19,21
  134:21 147:14
  160:21 166:18
  171:6,10 173:1,1
  186:20 187:14
  189:24 190:14,24
  197:25 210:18,25
  213:6,8 217:5
  219:5,19 220:20

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 143 of 149
PageID: 211607
Jack Siemiatycki, Ph.D.

Page 408

220:25 221:10,16
224:22 229:18
238:3 241:24
251:3 256:14,15
268:8 272:7
273:17 274:21
302:10 313:5
323:13,17 327:20
332:22 334:25
337:9 338:21
339:21 340:13
341:21 350:5
**two-by-two**
106:20
**two-way**
323:14,15
**type**
26:24 34:6 38:20
51:19 72:24 73:4
117:15 119:11,13
128:9 157:19
167:3 202:10
203:8,11 204:11
205:8 228:11
260:20 261:22
302:19
**typed**
44:8
**types**
19:2 23:8 24:6
54:14 65:2 75:16
92:20 115:10,14
115:16 179:6,10
180:2 203:19,19
204:8,9,15,19
205:1 318:13
**typical**
154:3
**typically**
28:14,16 52:5
76:21 82:1 90:10
91:13 99:1 157:16
158:16
**typo**
63:3 223:25
**typos**

18:4 83:21
_____
**U**
**U.S**
279:22
**Uh-huh**
279:16
**ulterior**
325:19
**ultimate**
32:2 35:19
**ultimately**
78:8 258:8
**umpteen**
227:21 246:13
**unadjusted**
319:2
**unclear**
283:2
**under-**
261:7
**undergo**
340:8
**underlined**
44:15 52:7
**underlying**
27:1 223:14 271:18
271:21 312:7
**underpin**
292:3
**undersigned**
353:2
**understand**
15:18 26:15 31:22
31:25 46:14 61:17
85:12 95:23 96:7
102:20 115:7
116:4,19 117:11
130:1,4 140:11
143:6 151:24
198:13 205:20
266:23 267:2
276:20 322:4
328:7 333:25
338:17 348:4
**understandable**

31:19,21
**understanding**
10:9 22:13 24:14
32:10 33:5 34:14
34:16 94:16 96:16
96:23 114:11,19
131:19 151:25
155:16 185:20
220:15 239:18
244:3 261:7
291:22 292:20
293:11 338:12
**understood**
172:21
**unexposed**
76:21 225:17 269:1
269:8,24 270:3,5
270:23 271:3
**unfortunately**
289:17
**unilaterally**
326:4
**uninterested**
242:2
**unique**
38:7 39:5
**United**
1:1 9:11 86:1 109:4
220:4
**universal**
86:5
**University**
279:11,14,19
**unknown**
172:9 173:12,20
178:13 319:19,23
**unpack**
29:16
**unusually**
146:9,10,11
**up-to-date**
84:25 85:1 142:14
189:23
**updated**
190:9
**updating**

73:19 74:1
**usable**
28:5 30:11,20
**usage**
76:25
**use**
6:20 7:13,16 23:1
23:24 24:15 25:2
30:14,18 34:19
38:18 58:23 59:1
62:9 72:1 77:4
83:4,8 89:25
90:12,24 113:8,14
113:24 115:1
118:6 120:19
121:11 122:7
126:6,14 127:7,21
128:3,25 129:18
134:6,25 135:5,19
136:25 137:9
141:17 144:6,19
147:15 149:10
150:5 151:11,24
152:11 153:10
155:1 157:14
158:8 161:18,20
161:23 162:25
164:5 165:4
166:20,20 169:25
171:21 172:12
176:10,11 179:15
179:16 185:22
191:11 192:2,3
193:17 202:6
204:6 213:14
214:24 215:2,4,14
215:21 216:10
217:7 218:4
221:15 224:22
225:3 230:6
243:12 244:22
246:17 248:10
249:17 250:2,9
251:8,12 252:24
253:12,16,18
259:21 267:22

268:1,6 271:3,12
272:12 273:3
287:20 288:5,5,15
291:4,11 296:15
297:7 298:1,6,6
301:18 302:23
311:25 312:8
313:19 315:5,13
315:22 316:24,24
327:6 329:7
330:10,20 331:6
331:12 335:9
336:17 341:3
345:12
**useful**
18:25 28:5 30:11
30:20 76:18
181:17 261:20
**users**
119:3,15 268:16
295:3,8 298:2,13
**uses**
145:4
**USNCI**
26:6
**usually**
99:6 181:18
**uterus**
340:25
**utterly**
38:7
_____
**V**
**v**
3:4 89:20 91:20
**vacation**
257:17
**vagina**
340:25 344:10
**vaginal**
339:3,25 340:12
**vague**
69:23 148:19
219:14
**valid**
13:5 27:4,5 28:11

Jack Siemiatycki, Ph.D.

Page 409

28:17 29:20 30:20
31:5 35:5,22 67:5
**validity**
37:24 213:10
303:12 310:18
**valuable**
184:6,6
**value**
31:7 184:3 227:17
245:10
**values**
298:20
**variability**
82:24 180:13
204:16,20 207:6
311:7
**variable**
56:15 57:6 156:8
156:17 158:11
172:8 173:20
176:7 178:6 229:6
297:6 327:3
**variables**
229:18
**variations**
223:2
**varies**
180:23
**variety**
163:20
**various**
6:22 26:25 79:18
92:7 97:1 101:17
102:13 105:8
115:15 124:9
142:23,24 143:7
165:17,22 169:19
197:8 229:17
235:18 262:20
278:25 304:25
305:9 314:7
321:14 332:15
333:2,4,9 334:16
**vault**
339:25 340:12
**veers**

68:18
**Venter**
339:4,10,16,22
340:22 341:8
346:1 347:1
**verbal**
293:6
**verbatim**
218:7
**verdict**
90:2
**verification**
223:6
**verify**
63:19 79:16
**version**
62:8 76:4 108:13
111:17 112:3,13
145:11,12 190:9
195:10,11,14,24
197:17 266:21
325:23,23 337:11
337:11
**versions**
73:7,12 107:23
**versus**
38:19 64:14 66:22
77:3 314:16
**video**
9:8
**videographer**
5:25 9:3,5 52:18,21
67:23 68:1 104:23
105:2 140:22
141:1 145:20,23
155:21 174:21
210:3,6 242:18,21
255:12,15 257:1,4
265:14,17 274:8
274:11 289:22
290:13 320:7,9,12
320:15 322:15,18
336:1,4 343:10,13
344:8 352:1
**Videotaped**
1:16 6:10,15

**view**
21:14 66:19 114:22
122:18,22 128:3
132:5 134:5
142:21 143:2,3,5
196:13 197:18
198:6 207:6
225:11 226:17
227:11 245:17
250:9 252:4,5
282:13 298:24
316:6,11
**viewed**
93:7
**views**
22:4 244:4 246:17
**Virginia**
3:13
**vis-à-vis**
143:2
**visceral**
162:5
**vitamin**
288:3
**vivo**
302:3
**void**
353:13
**volition**
87:11
**voluminous**
64:5,8 86:12

**W**

**wait**
222:7 282:2,2
289:12 338:15
342:18 347:17,17
347:17,17
**walk**
61:22 64:4
**walked**
134:15
**want**
14:25 15:1 17:12
21:16 33:6 34:11

41:7 45:3 50:25
64:18 70:7 109:10
110:22 127:12
148:22 161:1
163:2 167:19
176:18 178:17
181:1,9,10 182:9
182:19 189:5
192:8 194:16
195:19 199:18
203:3 211:20
223:17 224:25
234:15 238:2
245:20 270:12,20
273:9,15 275:4
300:13 325:9
326:22 327:8
328:13 342:13
346:20
**wanted**
22:1 39:25 52:12
70:10,19 81:25
87:21 124:7 164:7
187:25 195:24
212:21 213:3
312:2 318:19
325:11,22
**ward**
65:9
**Washington**
5:7
**wasn't**
45:6 51:1 59:5
191:2,2 200:15
258:10 308:9
325:13 326:1
349:4
**way**
24:24 26:21 27:21
27:22,24 28:14,17
34:21 38:11 44:19
45:10 58:18 60:15
62:7 67:5,11 72:7
72:19 73:8 75:19
80:16 81:24 83:24
91:22 92:2 107:3

114:9,10 115:17
118:12 121:13
128:6 130:13
138:12 140:5
156:7 158:17
159:8,17 166:11
172:4 183:16,17
188:1,2 195:6
204:13,14 232:15
247:20 250:4,8
251:1 264:13
265:2 267:18
277:22 296:7
303:22 326:19
337:19,20 350:21
**ways**
24:14 36:24 70:11
79:18 103:15
128:11 196:12
227:22 246:13,13
268:8 281:13
282:23
**we'll**
48:12,12 62:21
84:3 105:11
140:14,20 157:12
191:20 199:23
294:13 309:11
**we're**
9:3 51:1 52:23
62:15 67:23 68:1
74:8 99:7 104:24
105:4 109:12
115:21 121:8
131:19 139:14
140:23 141:1
145:25 157:21
210:3,8 223:3
242:18 255:12,15
265:14,17 289:13
289:20 308:16,17
317:9 320:15
322:15 336:4
343:10 344:8
**we've**
52:14 94:8 104:16

108:1 111:2
170:20 171:14
238:7 263:5
276:23,23 277:7
287:8
**weak**
146:21,25 147:16
148:18 149:7
207:15 226:13,16
**weaken**
181:3
**weakness**
179:12 227:8
321:14 349:18
**weaknesses**
72:19 165:9 179:9
179:10,13 183:21
183:22 184:1
**web**
280:16 286:8
**website**
7:22,23 280:17,18
286:7,8,11 288:13
288:14,19 289:7
**websites**
43:8,12
**week**
13:19
**weeks**
11:12 53:15,16
**weeks'**
51:2
**weigh**
25:6 99:24 209:10
**weighing**
25:11 304:9
**weight**
25:5,15 26:15,20
31:25 32:6,6 43:3
43:4 99:19 197:19
267:2 320:22
321:22
**weighted**
165:10
**welcome**
267:25

**went**
12:20 13:19 29:8
187:19 240:16
257:16
**whatsoever**
275:7,11
**Whew**
53:15
**who've**
324:5 351:13
**whoops**
142:3
**wide**
161:10,10
**wider**
65:15
**widespread**
218:14,23
**willing**
238:3
**wine**
161:3
**wish**
17:12
**witness**
2:15 9:17 10:14
11:5,7 17:9 18:22
19:7,9 20:12
22:10,23 23:16
29:23 32:5 34:2
35:7,25 39:11
45:19,22 47:19
48:15 52:17 53:11
54:2,11,18 55:3
60:8 62:17,19
69:24 71:2,9,14
73:10 75:14 78:16
80:21 84:22 85:11
85:21 89:13 90:15
91:1 94:23 95:21
96:9 98:25 99:5
101:1 102:5 104:2
104:11 109:10
111:5,10,17 112:6
116:4,15 117:7
118:3 119:9,19

120:14 121:20
122:11 123:11
125:6,16 129:22
130:8 132:1,14
133:13,17 137:3
141:7 150:9 151:7
151:16 153:16
154:17 155:23
156:12 161:13
165:14 167:16
172:25 173:3
174:22 175:1,3
176:17,24 178:10
178:20 185:7
188:19 192:6
193:1,9,11 194:17
199:1,19 200:13
203:1,23 205:4
206:16 208:2
212:5 213:25
218:21 220:25
222:9 223:9,23
224:24 225:1,10
225:24 231:9,12
234:12 235:9,17
235:22 236:6
239:8 240:6,14
241:1,20 244:17
246:22 247:10
248:18 249:24
250:14 251:12
252:20 253:18
254:4,12 255:1,4
255:8 256:21
258:18,25 260:23
261:4 262:1 263:8
263:22,25 264:13
265:7 266:7
267:14 269:12,14
271:16 272:15
273:7 276:19
277:5,12 278:4
279:5 281:17
282:7 283:8 284:7
284:25 285:7,10
288:18,24 289:14

290:6,9 292:2,11
293:15 302:7
303:1 304:3,17
307:13 308:7
309:19 310:6
312:19 314:3,25
315:9 322:2,6
325:2 326:18
328:7 330:15
331:1,15 332:2
334:12 335:2,14
337:17 338:16
339:13 341:3,18
342:4,23 343:7
344:3,9,22 346:20
347:20 348:8,11
348:25 349:2,24
350:24 351:16
353:6,7,14 354:1
**witnesses**
94:13
**woman**
81:11 343:19
**women**
92:25 101:2 115:10
168:8,10,17,20
170:9 171:16,19
208:23,25 209:19
215:13 216:9
225:18,19 226:22
227:3,3 340:6,6,7
340:12 341:12
351:6,10,13
**women's**
226:6 227:6
**wonder**
199:6
**word**
30:12,14,18 87:3
87:12,22 111:22
112:15,18 139:3
146:11,13 147:17
149:5 179:12
187:21 210:19,24
210:25 230:21
239:18 250:3

251:13,17,25
252:25 253:2
254:9 283:4 284:4
291:10 328:11
347:20
**wording**
130:13 137:4
145:10 269:19
**words**
72:24 123:12
185:22 329:14
**work**
10:21 24:23 47:10
47:14 48:21,25
49:13,15 50:6
51:2,20 54:7,14
54:18,25 55:8,21
56:1,9,13,25
57:12 71:11 73:24
88:14 94:12 98:8
98:16 100:2,4,7
100:12 123:23,25
126:11 143:7,23
150:21,25 169:4
283:25 324:7
**worked**
124:14 126:18
193:25 278:18,24
**workers**
350:19
**working**
56:20 124:4 136:14
136:15,21 142:16
142:19 143:2,3,14
143:15,22 144:17
151:1,3 152:20
153:17,25 154:3
155:8 158:15
163:1 223:4
265:25 280:3,5
**workplace**
8:6 19:21 21:1,13
24:21 36:7 159:25
306:14 308:21
309:5
**works**

10:23 49:22

**world**
26:6 85:25

**worry**
16:9

**wouldn't**
78:12 90:16 99:13
103:13 114:24
129:11 197:13
207:16 209:24
242:7 277:1,9,24
325:5 326:18
331:8 334:12

**wrapping**
290:23

**write**
36:17 52:13 125:8
127:12 138:1
146:12 169:5
190:12 254:8

**write-up**
83:10 251:14,15

**writing**
13:17 84:23 206:1

**writings**
309:23

**written**
51:20 52:12 68:7
83:22 183:15
233:18 293:7

**wrong**
67:17 184:14 191:2
209:18 211:4
245:16

**wrote**
12:19 19:22 36:6
64:19 67:2 190:11
190:17 209:20
231:1,4 246:12
318:4 337:24
338:20

**X**

**x**
1:4,13 6:7 7:1 8:1

**X-U**

79:4

**Xu**
79:4,6 82:4,5

**Y**

**yeah**
17:15 20:12,12
24:1 33:17 41:8
41:12,19,22 44:24
52:13 64:3 71:23
73:13 88:1,1 95:3
95:10 96:9 108:25
135:8,22 139:22
146:20 149:10
152:9 162:13
164:1 173:6,18
183:2 188:9
192:15,15 196:7
199:19 203:23
206:20,20 212:22
221:5 222:9,9
224:19 225:25
251:21 254:25
255:8 256:21
259:15 264:2
268:23 286:14,18
291:9 294:18
299:20 308:25
320:10 323:8
324:23 326:25
334:4 336:20
339:18 345:10
349:1 350:8

**year**
56:5 73:23 81:16
125:20,25 218:13
286:17 339:21

**years**
19:22 22:4 45:6
56:6,14,17,19
57:8,11 77:11
81:12 88:8 97:4
124:5 125:7,19
129:16 132:25
134:19,21 163:15
171:6,10 189:10

189:24 208:22,23
227:7 246:23
256:15 257:17,24
274:21 279:2
295:18 311:23
324:5

**Yep**
268:2 301:3

**yesterday**
11:11 63:14

**Yesterday's**
11:18

**York**
3:20,20

**Z**

**zones**
172:5

**0**

**0.01**
228:9,18

**0.05**
268:11 269:16

**0.17**
268:17 295:9

**07932**
4:20

**1**

**1**
6:10 7:8 14:15,18
14:22,23 15:6,11
15:19 145:4 154:4
154:8,15,21
228:18 311:7
327:23,24

**1.0**
63:3,5 298:17,19

**1.1**
329:23

**1.15**
63:6

**1.18**
297:11 298:19

**1.2**
236:16 329:7,22

**1.22**
297:13,13 298:19
298:19

**1.25**
63:2

**1.27**
213:22

**1.28**
150:2 213:22 234:3
236:12

**1.3**
174:10,11,14,15
176:9,10,19,20
178:7 298:19
319:22

**1.35**
149:22

**1.36**
63:6

**1.37**
236:16 297:14

**1.4**
319:2,13

**1.5**
245:10,19 329:7

**1:00**
104:18

**1:46**
105:4

**10**
7:12 45:15 56:6
57:9,9 61:7,9,14
61:19,25 68:10
69:4 70:3 72:9,25
94:9 97:4 108:18
108:24 109:18,25
110:2,7 111:20
112:25 120:4
149:16,25 163:6
181:23 279:2
312:24,24 319:15
319:17

**10:55**
52:19

**100**
5:20

**10017**
3:20

**103**
200:6

**107**
108:12

**108**
87:2,4 108:12

**109**
86:8,20

**11**
7:15 108:15,17
109:14,20,21,25
110:2,3,12 112:5
112:6

**11:15**
52:23

**11:39**
67:24

**11:41**
68:2

**110**
7:18

**11th**
3:19 233:22

**12**
7:19 56:7 124:5
181:24 182:3,12
194:5,6,24 217:2
217:4,10 279:2

**12:42**
104:25

**128**
215:21

**13**
7:20 195:20 213:24
214:6,7,12,15

**134**
89:19

**135**
89:19

**136**
49:1 53:5

**13th**
233:22

**14**

Jack Siemiatycki, Ph.D.

Page 412

7:21 45:16 217:11
267:25 278:13,14
280:14,16 308:25
**1412**
219:3,24 221:4
**1414**
214:12
**1416**
221:7
**1436**
214:4
**15**
6:12 7:23 177:13
177:14 212:2
229:17 285:2,14
286:3,4 303:16,21
304:18
**1510**
5:13
**15th**
59:10 332:25 333:1
**16**
6:17 7:6 8:4 13:14
87:4,9 210:14
308:23 309:1,2,2
309:4,14
**16-2738**
1:6 9:13
**16th**
49:1 59:10
**17**
6:21 8:8 13:14
96:17 97:17,22
182:19 298:3
317:10,12,21
326:23 327:2
330:6 348:24,25
**18**
47:9 50:16 192:25
308:17,17,18
**1835**
4:5
**19**
32:25 33:2
**19103**
4:7

**194**
7:19
**1950s**
132:23,24
**1960s**
132:24
**1964**
132:25
**1965**
246:12
**1970s**
96:19 97:6,20,21
151:17
**1979**
339:4,10,16 341:9
**1980s**
37:12 102:2
**1982**
226:13 227:1,4
**1986**
339:5 341:22
**1988**
8:15 207:4 318:5
**1990**
227:5
**1990s**
37:12
**1995**
189:3,7,21,23
346:5
**1996**
228:24 339:5
341:22 346:6,9
**1997**
188:9,12,15 189:19
**1st**
49:5

**2**

**2**
6:13 7:9 15:25 16:5
16:13 52:22 55:17
55:17 58:1,4
112:7,7 214:11,18
229:16 244:25
311:10 319:24

**2:41**
140:23
**2:43**
141:2
**2:51**
145:21
**20**
40:25 41:1 56:11
57:10 97:4 105:16
136:20 146:12
224:18 232:11
304:24 319:5,17
356:16
**200**
53:23,24 54:2
240:17
**2000**
189:19,20 210:13
227:5
**20004**
5:7
**2004**
208:9
**2005**
227:5
**2006**
13:12 20:2,4
123:22 136:16,17
136:23 137:13,17
141:15 142:14,17
142:22 143:3
144:19 159:2
163:1 164:25
165:25 210:12
218:5 265:25
272:4,7 299:2
314:4
**2007**
227:1 339:6 342:13
343:3,5,17 345:20
346:10,18,23
347:5,9 348:20
349:12
**2008**
123:23 149:18,20
200:14

**2009**
288:25 289:2
**2010**
20:2 124:17 136:17
137:10 138:25
141:15 211:6
213:15,20 224:13
224:16 225:2,4,7
225:22,25 227:12
228:8 237:5 238:6
288:25 289:2
**2011**
283:17
**2012**
7:19 288:25
**2013**
63:10,16 102:18
111:21 239:2
267:25 268:3
269:9 271:7
272:21
**2014**
102:10 200:25
211:9 212:9,10,15
213:4,10,19
214:19,21 215:3,6
215:15,20 216:11
216:15,23 217:1
217:19,19,23
218:13 219:6
**2015**
13:14 211:6 213:15
213:20
**2016**
7:11 57:23 58:5
59:3,10 61:1
69:17,22 70:4,21
71:5 73:18 74:4
96:16 97:17,22
127:23 128:2
186:4,7 187:3,17
188:10,22 190:1,9
190:10 200:1
201:4 207:5 208:9
210:17 268:22
269:3,19 283:17

**2016-A**
211:5
**2016-B**
211:7 212:14,17
**2017**
59:23 98:20 102:10
102:18 195:10,15
238:17
**2018**
7:6,9 10:17 13:16
47:9,11,15 49:1,5
51:25 53:7 60:22
61:3,6,23 62:24
63:17 69:11,21
71:6,12 72:9,14
73:16 78:24 82:7
83:19 84:5 98:1
98:20 102:5,5,11
102:11,12 107:3
111:12,23 131:3
139:21 149:15
150:1,3 186:14
187:2,18 188:13
190:5 191:12
192:13 194:3
195:2 196:9
199:13 200:5,10
206:7 222:11,16
223:20 228:1
230:3,9,14 231:18
233:10,22,24
234:2 236:11,19
237:14 241:7
243:6 255:20
267:19 299:18
305:20,22
**2019**
1:19 9:6 133:7
280:22 286:16
353:15
**202**
5:8
**2022**
143:20
**2023**
143:20

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 148 of 149
PageID: 211612
Jack Siemiatycki, Ph.D.

Page 413

**21**
303:22 304:21
**212**
3:21
**213**
4:15
**214**
7:20
**215**
4:8
**22311**
3:13
**24**
144:24 145:7
**25**
104:17 227:7
 243:15 318:9
**253**
201:22,24
**274**
6:4
**278**
7:22
**278-4449**
4:8
**285**
7:24
**29**
101:23 262:13
**290**
6:5
**2900**
4:6
**297**
309:7
**298**
307:22
**2A**
144:11 151:3,13
 152:13 154:5,8
**2B**
144:7 154:5 267:10
 299:8
**2nd**
47:15 49:5

---

**3**
6:18 17:17,18,23
 55:17 76:4 105:3
 109:16,23,23
 110:1,2 178:11
 198:12 238:12,16
 243:4,5 311:13
 319:25
**3:27**
146:1
**30**
8:14 19:22 22:3
 53:23 81:11
 100:21 245:7
 257:24 311:23
 319:4,5 324:5
 354:12
**30-odd**
118:17
**300**
240:17
**308**
309:8
**309**
8:7
**31**
1:19 236:2,4
**314**
5:22
**316**
3:6
**317**
8:15
**31st**
9:6
**322**
6:3
**32502**
3:7
**33**
254:14,17
**333**
4:13
**336**
6:4

---

**34**
76:5 216:8
**34.4**
216:20
**36.5**
215:16,21 217:8
**360**
3:18
**39**
243:4
**391-0183**
5:15
**397-1000**
3:21

---

**4**
6:22 43:24,25
 55:17 145:4,7,9
 145:24 206:25
 207:4 256:4
 294:10 299:19
 311:16 319:25
 320:21 353:15
**40**
51:7 53:6,23
 246:23 318:25
 319:1,4
**400**
53:23 54:4
**43**
6:22
**435-7184**
3:8
**45**
63:8 111:4,6,7,8,14
 111:16,20
**450**
49:8 54:13
**46**
6:24,25 7:6
**47**
62:1,5,25 111:7,9
 111:15
**48**
7:9 64:14 192:23

---

193:1,3,4,14
 248:1
**49**
64:9 67:1 236:25
 250:23
**4900**
3:12
**4th**
5:20 7:11 57:22
 58:5

---

**5**
6:23 46:3,6 120:4
 178:11 181:23
 182:3,11 210:7
 238:12 242:22
 311:18
**5.3.2**
101:2,24
**5:07**
210:4
**5:36**
210:8
**50**
114:23 170:10,12
 252:7
**500**
349:10
**50s**
147:5
**51**
238:15
**51.5**
216:19 217:9
**512**
5:15
**5129**
353:19
**53**
170:5
**540-1000**
4:21
**56**
47:13 49:6 53:4
**57**

---

169:11
**571-4965**
5:22
**58**
7:11

---

**6**
6:25 32:25 46:5,6
 181:23 213:2
 234:21,22,25
 235:1,8,13,25
 243:3 299:20
**6:22**
242:19
**6:40**
242:23
**6:58**
255:13
**60**
51:7 53:6 337:16
**600**
4:19 5:20 53:24
 54:4
**60s**
147:5
**61**
7:14
**623**
327:9
**624**
329:18
**63102**
5:21
**64**
313:4 316:20 337:7
 337:8,20
**64(c)**
264:7,17
**65**
313:4 337:2,9,18
**650**
3:12
**66**
316:20 337:19,21
**67**

Case 3:16-md-02738-MAS-RLS    Document 33008-57    Filed 07/23/24    Page 149 of 149
PageID: 211613
Jack Siemiatycki, Ph.D.

Page 414

68:7 131:3 163:5
165:18
**680-8370**
4:15
**69**
113:2 238:12,21
239:1

---

**7**

**7**
7:4 46:16,20 47:4
48:10,18,24 49:12
49:24 50:5 53:3,5
298:20 309:7
321:9
**7.2.5**
169:12
**7:01**
255:16
**7:03**
257:2,5
**7:15**
265:15
**7:16**
265:18
**7:31**
274:9
**7:32**
274:12
**703**
3:14
**70s**
96:18
**72**
112:3,6
**74**
213:2
**75**
318:8,24 319:6
**78701**
5:14

---

**8**

**8**
7:7 33:1 48:2,5,19
49:4,12,25 50:5

53:3,5
**8/August**
8:15
**8:27**
320:13
**8:31**
320:16
**8:33**
322:16
**8:46**
322:19
**815**
296:6
**816**
5:13
**817**
295:23 296:11
**828-5371**
5:8
**84**
102:10
**85**
119:23
**850**
3:8

---

**9**

**9**
6:3 7:5,10 58:9,10
58:13,20,25 60:5
62:3,14 163:10
248:5,6
**9:05**
336:2
**9:06**
336:5
**9:15**
343:11
**9:17**
343:14
**9:28**
352:3,6
**9:49**
1:20 9:7
**90**
119:23

**90071**
4:14
**91**
102:9
**95**
50:2
**96**
55:20 201:9
**973**
4:21
**975**
5:6
**98**
50:2 55:20
**997-1774**
3:14
**9th**
48:25