# EXHIBIT 56

Rebecca Smith-Bindman, M.D.

Page 245

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

                                    )
IN RE:  JOHNSON & JOHNSON TALCUM     )
POWDER PRODUCTS MARKETING, SALES     )
PRACTICES, AND PRODUCTS LIABILITY    )
LITIGATION                           )
                                     )  MDL No.
                                     )  2738 (FLW)(LHG)
                                     )
_____)


VIDEOTAPED DEPOSITION OF

REBECCA SMITH-BINDMAN, M.D.

San Francisco, California

Friday, February 8, 2019

Volume II


Reported by:
MARY J. GOFF
CSR No. 13427

Rebecca Smith-Bindman, M.D.

| Page 246 | Page 248 |
|---|---|

**Page 246**

1
2
3
4
5      Videotaped Deposition of REBECCA
6  SMITH-BINDMAN, M.D., Volume II, taken on behalf of
7  Johnson & Johnson, at Levin Simes Abrams LLP,
8  1700 Montgomery Street, Suite 250, San Francisco,
9  California 94111, beginning at 9:26 a.m. and ending
10  at 12:48 p.m., on February 8, 2019, before MARY J.
11  GOFF, California Certified Shorthand Reporter No.
12  13427.
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 248**

1  APPEARANCES (continued):
2
3  For Defendant Johnson & Johnson
4      Tucker Ellis LLP
5      BY:  MICHAEL C. ZELLERS
6      Attorney at Law
7      515 South Flower Street
8      42nd Floor
9      Los Angeles, California 90071
10      michael.zellers@tuckerellis.com
11      213-430-3301
12
13
14  For Defendant Johnson & Johnson
15      Skadden, Arps, Slate, Meagher & Flom, LLP.
16      BY:  BENJAMIN HALPERIN
17      Attorney at Law
18      4 Times Square
19      New York, New York 10036
20      benjamin.halperin@skadden.com
21      212-735-2453
22
23
24
25

**Page 247**

1  APPEARANCES:
2
3  For Plaintiffs
4      Beasley Allen Law Firm
5      BY:  P. LEIGH O'DELL
6        MARGARET M. THOMPSON, MD, JD, MPAff
7      Attorney at Law
8      218 Commerce Street
9      Montgomery, Alabama 36103
10      leigh.odell@beasleyallen.com
11      334-269-2343
12  For Plaintiffs
13      Robinson Calcagnie, Inc.
14      BY:  CYNTHIA L. GARBER
15      Attorney at Law
16      19 Corporate Plaza Drive
17      Newport Beach, California 92660
18      cgarber@robinsonfirm.com
19  For Plaintiffs
20      Wilentz, Goldman & Spitzer P.A.
21      Daniel R. Lapinski
22      Attorney at Law
23      90 Woodbridge Center Drive,
24      Suite 900 Box 10
25      Woodbridge, New Jersey 07095-0958

**Page 249**

1  APPEARANCE (continued):
2  For Defendant Imerys
3      Dykema
4      BY:  JANE BOCKUS
5      Attorney at Law
6      112 E. Pecan Street
7      Suite 1800
8      San Antonio, Texas 78205
9      jbockus@dykema.com
10      210-554-5549
11
12  For Defendant Imerys
13      Gordon & Rees LLP
14      BY:  JENNIFER A. FOSTER
15      Attorney at Law
16      816 Congress Avenue
17      Suite 1510
18      Austin, Texas 78701
19      jfoster@gordonrees.com
20      512-391-0197
21
22
23
24
25

2 (Pages 246 to 249)

Rebecca Smith-Bindman, M.D.

Page 250

```
 1    APPEARANCES (continued):
 2    For Defendant PCPC, Personal Care Products Council
 3       Seyfarth Shaw, LLP
 4       BY: JAMES R. BILLINGS-KANG
 5       Attorney at Law
 6       975 F Street, NW
 7       Washington, D.C. 20004
 8       jbillingskang@seyfarth.com
 9       202-828-5356
10
11
12
13
14    For Defendants PTI Union, LLC and PTI Royston, LLC
15       Tucker Ellis LLP
16       BY: CAROLINE M. TINSLEY
17       Attorney at Law
18       100 South 4th Street`
19       Suite 600
20       St. Louis, Missouri, 63102
21       caroline.tinsley@tuckerellis.com
22
23    Videographer:
24       Andrew Graves
25
```

Page 252

```
 1    EXHIBITS CONTINUED:                        PAGE
 2    Exhibit 34  Does Exposure to Asbestos Cause   324
                  Ovarian Cancer article
 3
 4    Exhibit 35  Occupational Exposure to Asbestos  327
                  article
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 251

```
 1                    INDEX
 2    WITNESS                        EXAMINATION
 3    REBECCA SMITH-BINDMAN, M.D.
 4    Volume II
 5
 6            BY MR. ZELLERS      254, 372
 7            BY MS. O'DELL        354
 8            BY MR. BILLINGS-KANG 347
 9            BY MS. BOCKUS       331, 369
10
11    NUMBER     DESCRIPTION            PAGE
12    Exhibit 28  6/1/17 Letter, Invoice   259
13
14    Exhibit 29  Bill, Invoice 147        261
15
16
17    Exhibit 30  Perineal Use of Talc and Risk   276
                  of Ovarian Cancer article
18
19
20    Exhibit 31  Influence of Aspirin and nonaspirin  297
                  NSAID Use article
21
22    Exhibit 32  Article, Talc            317
23
24    Exhibit 33  Invoice, Tachibana, UCSF, 10/18   319
25
```

Page 253

```
 1              San Francisco, California
 2                February 8, 2019
 3                  9:26 a.m.
 4
 5         THE VIDEOGRAPHER:  We are now on the
 6    record.  My name is Andrew Graves.  I'm a
 7    videographer for Golkow Litigation Services.
 8    Today's date is February 8, 2019.  The time is
 9    9:26 a.m.
10         This video deposition is being held at
11    1700 Montgomery Street, Suite 250, San Francisco,
12    California, In the Matter of In Re: Johnson &
13    Johnson Talcum Powder Products Marketing, Sales
14    Practices, and Products Liability Litigation, for
15    the United States District Court, District of
16    New Jersey.
17         The deponent is Rebecca Smith-Bindman,
18    Ph.D., Volume II.
19         Would counsel please identify yourselves.
20         MR. ZELLERS:  Can we waive that since we
21    were all here yesterday?
22         THE VIDEOGRAPHER:  Okay.  The court
23    reporter is Mary Goff, and she will now swear in the
24    witness.
25
```

3 (Pages 250 to 253)

Rebecca Smith-Bindman, M.D.

Page 254

1         REBECCA SMITH-BINDMAN, M.D., VOLUME II,
2    being first duly sworn or affirmed to testify to the
3    truth, the whole truth, and nothing but the truth,
4    was examined and testified as follows:
5         EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6    BY MR. ZELLERS:
7         Q   Good morning.
8         A   Good morning.
9         Q   Dr. Smith-Bindman, did you do anything to
10   prepare -- or further prepare for your deposition
11   since the time we concluded yesterday and this
12   morning?
13        A   I did two things. I reviewed my report
14   again, and I called the biostatistician who worked
15   on my meta-analysis to review a few of the details.
16        Q   You called Dr. Hall?
17        A   I did.
18        Q   When was the last time that you had talked
19   with Dr. Hall before yesterday?
20        A   Speaking to her at the time of -- that she
21   did the analysis. And I -- I think there was an
22   e-mail or two over the last several weeks asking for
23   her CV or something like that, but not any
24   meaningful conversation.
25        Q   Have you produced the e-mails -- the

Page 255

1    recent e-mails with Dr. Hall?
2         A   I -- I'm not sure if I produced the one
3    asking for her CV, but the -- and actually, I don't
4    remember when I asked her for that. I might have
5    presented --
6             MS. O'DELL: I think that's part of the
7    production --
8         Q   (BY MR. ZELLERS) How --
9             MS. O'DELL: -- but -- excuse me.
10        Q   (BY MR. ZELLERS) How long did you speak
11   with Dr. Hall yesterday?
12        A   About 15 -- 10-15 minutes.
13        Q   Did you make any written notes?
14        A   I -- I think I scribbled in my usual
15   scribble place.
16        Q   What notes did you make from your
17   conversation with Dr. Hall yesterday after the first
18   session of your deposition?
19        A   So -- so I did -- I did -- I did jot some
20   notes on my meta-analysis. But mostly I asked her
21   to clarify how she did the calculations of the
22   numbers that are shown in the figures.
23             I was struggling to understand why the
24   numbers and the figures were not exactly the same as
25   the ones that you showed me in the published

Page 256

1    manuscript.
2             I was quite surprised that they weren't
3    exactly the same. They were not meaningfully
4    different, but there was a very slight shift in
5    the ones that are in my report.
6             I mean, I asked Dr. Jane why that was the
7    case. And in fact, the numbers are calculated using
8    the standard errors in the confidence intervals and
9    the sample size which very slightly shifts it from
10   the reported numbers.
11            So you were correct when you said the
12   numbers are not exactly the same, and she explained
13   that that's why that's the case.
14        Q   Are the numbers that were contained in
15   Figure -- Figures 2 and 3 in your report, estimates?
16            MS. O'DELL: Object to the form.
17        A   The numbers are calculated. So I -- I
18   think by that, you mean estimates.
19        Q   (BY MR. ZELLERS) Did you do the
20   calculations?
21        A   No. She -- she did them.
22        Q   Do we --
23            THE COURT REPORTER: Can you raise your
24   voice for me, please?
25        A   Yes, I can. I apologize.

Page 257

1         Q   (BY MR. ZELLERS) Do we have her work
2    product as to the calculations that were made?
3         A   In the documents that I shared, she
4    specified the -- the software that she used, the
5    program that she used.
6             In fact, the way of estimating it, it's
7    actually in my report as well. And so yes, it's
8    explained there, and it's in all of the documents
9    that I shared with you.
10        Q   Her calculations are contained in the
11   documents that are shared; is that right?
12        A   Yes.
13        Q   The numbers that you got from the Terry
14   study, those came from the Terry publication; is
15   that right?
16        A   Yes.
17        Q   Any additional notes you made from your
18   discussion with Dr. Hall, other than what you have
19   generally told us about?
20        A   No. Just that.
21        Q   The notes that you added to your annotated
22   report from your discussion with Dr. Hall, which we
23   marked as Exhibit 17, those notes are on which page
24   or pages?
25        A   Page 33 and 34.

4 (Pages 254 to 257)

Rebecca Smith-Bindman, M.D.

Page 258

1    Q   It looks like you made those notes in an
2  aqua pen is -- is that right, or --
3    A   Yes.
4    Q   -- I --
5    A   Yes.
6    Q   Okay.
7    A   Yes, absolutely.
8    Q   Any --
9    A   I would say teal, but...
10   Q   Well, I think you're probably more correct
11 than I am.
12       Any other notes that you had from your
13 discussion with Dr. Hall?
14   A   No.
15   Q   Any other communications that you had with
16 Dr. Hall, other than your 10- or 15-minute phone
17 conversation yesterday afternoon or evening?
18   A   No.
19   Q   Did you communicate with Dr. Hall via
20 e-mail or any way other than just the phone call?
21   A   No.
22   Q   Did you communicate with anyone else
23 between the time we finished yesterday and this
24 morning about the subject matter that we're here to
25 talk about?

Page 259

1    A   No.
2    Q   At the start of the session today, counsel
3  for Plaintiffs, Ms. O'Dell, provided me with copies
4  of your invoices.
5        I'm going to hand you what we have marked
6  as Exhibit 28.  It is a five-page exhibit.
7        The first page is a cover letter.  It
8  looks like an engagement or general engagement
9  letter from you to -- you say Mr. Carmen Scott.
10      Is it a Ms. Carmen Scott?
11       (Exhibit 28 was marked for identification
12 and is attached to the transcript.)
13   A   It is.
14   Q   All right.  That was on June 1 of 2017.
15 The last invoice is November 13 of 2018; is that
16 right?
17   A   I'm sorry.  What was the question?  Is
18 this --
19   Q   The question is:  Are those all of our
20 invoices that you have generated thus far in the
21 talcum powder MDL litigation?
22   A   I -- I think I mentioned that there are --
23 I haven't submitted anything beyond this, but that
24 there are additional hours that I recorded after
25 this.

Page 260

1    Q   What do you -- well, I will take that as a
2  yes, that at least through November 13, 2018, that
3  Deposition Exhibit 28 are all of your invoices --
4    A   Yeah.
5    Q   -- is that right?
6    A   Yes.
7    Q   Those invoices total approximately
8  160 hours.  Does that sound right?
9    A   160?
10   Q   160.
11   A   I'm -- I'm going to believe you.
12   Q   Well, and anyone can go and check my math.
13       How many hours do you estimate that you
14 have spent up until today on this matter both doing
15 additional work, reviewing those additional studies
16 and materials we talked about yesterday, preparing
17 for the deposition, meeting with counsel for
18 Plaintiffs?
19       MS. O'DELL:  Since the last invoice?
20       MR. ZELLERS:  Since the last invoice is
21 what I had intended to ask.
22       MS. O'DELL:  Yeah.  Thank you.
23   A   I -- I think approximately 25 hours.
24   Q   (BY MR. ZELLERS) In addition, we were
25 provided with a two-page exhibit which are two

Page 261

1  invoices from Jane Hall, which total around $3,000.
2        (Exhibit 29 was marked for identification
3  and is attached to the transcript.)
4    Q   (BY MR. ZELLERS) Can you look at
5  Exhibit 29 and verify for us that those are the
6  e-mails -- strike that -- that those are the
7  invoices for the work that was done by Dr. Hall?
8    A   I -- I -- I believe so.
9    Q   Are you aware of any additional invoices
10 beyond that?
11   A   I'm not.
12   Q   Do you have any invoices from your copy
13 editor, Ms. Tachibana?
14   A   She sent me an invoice, which I forwarded
15 to counsel.
16   Q   All right.  How much was that invoice for?
17   A   I think it was about $1,500.
18   Q   How much an hour does Ms. Tachibana
19 charge?
20   A   I think it's about a hundred dollars an
21 hour.
22   Q   Was that for all of the work that she did
23 with respect to your report?
24   A   Yes.  There was no other work other than
25 that 15 -- it might have been $1,700.

5 (Pages 258 to 261)

Rebecca Smith-Bindman, M.D.

1      MS. O'DELL:  Excuse me.  I'm sorry, Mike.
2  I apologize for not copying that.  We're going to
3  make a copy, and I will provide it to your
4  momentarily at --
5      MR. ZELLERS:  Very good.  We'll mark it
6  before the conclusion of the deposition.  Thank you.
7      Q    (BY MR. ZELLERS) Do you have your report
8  in front of you?  You can use your annotated
9  version, No. -- Exhibit 17.  We also marked your
10  report as Exhibit 2.
11     A    Yes.
12     Q    Do you have that in front of you?
13     A    I do.
14     Q    Go to page 17, if you will, please.
15     MR. LAPINSKI:  Counsel, you said page 17?
16     MR. ZELLERS:  Yes, page 17.
17     A    Yes.
18     Q    (BY MR. ZELLERS) On page 17, you make a
19  number of general statements about the advantages
20  and disadvantages of case control and cohort
21  studies; is that right?
22     A    Yes.
23     Q    There are no citations there.  Is this
24  based and those statements based on your general
25  knowledge?

1      A    Yes.  This is based on Epi 101, sort of...
2      Q    You make a statement in the middle
3  paragraph on page 17 where you talk about "cohort
4  studies."
5          And you state that they rarely focus on a
6  single narrowly defined question and that that's an
7  important limitation of cohort studies.
8          Do you see that?
9      A    I do.
10     Q    Can you cite to any other epidemiologists
11  who agree with you on that point?
12     A    So it's very well known the cost of doing
13  a cohort study is often very large, and so the topic
14  that's often the central focus of the cohort study
15  is very, very well done.
16          It's the ancillary topics that often get
17  short shrift.  And so that -- I -- I could probably
18  find this explained in any basic textbook.
19          And -- and I -- I apologize for not citing
20  it.  This is sort of just very well-known general
21  concepts of study design.
22     Q    Can you cite to any published literature
23  that states that cohort studies are unlikely to
24  detect real associations for this reason?
25     MS. O'DELL:  Are you reading a particular

1  paragraph, Mike?  I have lost track.
2      MR. ZELLERS:  I was asking about the
3  specific statement in the middle paragraph of
4  page 17 relating to cohort studies and the
5  limitation that they rarely focus on a single
6  narrowly defined question.
7      MS. O'DELL:  Yes.  Thank you.
8      Q    (BY MR. ZELLERS) But my question now is --
9      A    Yes.
10     Q    -- whether or not Dr. Smith-Bindman, as
11  you sit here, can cite any published literature that
12  states the cohort studies are unlikely to detect a
13  real association -- or unlikely to detect real
14  associations for this reason.
15     A    I --
16     MS. O'DELL:  Excuse me.  Are you
17  quoting -- when you say "unlikely to detect real
18  associations for this reason," is that reading --
19  are you reading from her report or is that just --
20     MR. ZELLERS:  No.  That's my question.
21     MS. O'DELL:  -- okay.  Sorry.
22     MR. ZELLERS:  And if it's not very
23  articulate --
24     A    I -- I think cohort -- cohort studies are
25  able to detect real associations, if they ask about

1  those associations.
2          If they don't ask about it, then it
3  can't -- then -- then it doesn't have an ability to
4  measure it.
5          So what I am saying here is that cohort
6  studies don't have the capacity to go in depth and
7  ask.
8          I think all of the cohort studies that I
9  reviewed for -- for this review discuss the lack of
10  detail in the cohort question, meaning that it's not
11  that the study design was the problem.  It was that
12  they just didn't have the right predicter
13  information being assessed.
14     Q    Despite this limitation -- or in your
15  view, limitation of cohort studies, you did include
16  the Gertig 2000 cohort study in your systematic
17  review; is that right?
18     A    I did.  I just want to clarify the answer.
19  Cohort studies are a very strong study design that I
20  like very much and that I have used and currently
21  I'm -- I'm using in study designs.
22          It's rather if the study design uses a
23  cohort, which is a good design, doesn't have enough
24  detail, because that's not the focus, that
25  doesn't -- it can't be used to answer other

Rebecca Smith-Bindman, M.D.

Page 266

1  questions easily.
2       So I think in general I like cohort
3  designs very much, and I think it's a very powerful
4  study design. But if you haven't asked the right
5  questions, it's hard to the expand it.
6       So I did -- I read all of the cohorts on
7  this topic.
8       Q   And you concluded that the Gertig cohort
9  study, you know, asked the right information or had
10  sufficient information for you to include it both in
11  your general systematic review and in your more
12  focused systematic review which you set forth as
13  Figures 2 and 3 in your report, correct?
14       A   That's correct. That -- those -- those
15  were looking at regular use, and I thought the
16  Gertig was the cohort that allowed me to understand
17  regular use of perineal talc.
18       Q   Gertig was based on the Nurses' Health
19  Study; is that right?
20       A   Yes.
21       Q   Gertig and the authors do recognize that
22  the biologic evidence for the association of talc
23  and ovarian cancer is incomplete, correct?
24       MS. O'DELL: Object to the form.
25       A   I -- I don't have it in front of me, but

Page 267

1  it may be that they reported as of 2000, they didn't
2  have evidence of the biologic mechanism. I --
3       Q   And I will ask you about biologic
4  mechanism before we conclude here today.
5       You did not, though -- well, let me
6  withdraw that.
7       There was a follow-up cohort study to
8  Gertig 2000, and that was the Gates 2010 cohort
9  study; is that right?
10       A   Yes.
11       Q   That had a longer follow-up than Gertig;
12  is that right?
13       A   Yes.
14       Q   It was an analysis of the data collected
15  in the Nurses' Health Study; is that right?
16       MS. O'DELL: Object to the form.
17       A   It was analysis of some of the data
18  collected in the -- in the Nurses' Health Study, but
19  they did not report the variable in such a way that
20  would allow you to understand or to quantify the
21  exposure as opposed to the first cohort study which
22  did.
23       So the latter study, they -- they had the
24  data, which is why I'm answering it this way. They
25  clearly had it, because the data hadn't change, and

Page 268

1  yet they didn't report it that way.
2       They only reported on any exposure to talc
3  powder products. And that is a very vague
4  definition as opposed to the frequency of use.
5       And for that reason, I couldn't tell in --
6  in nearly the same detail as I could for the earlier
7  study, the -- the exposure. They just chose not to
8  present it that way.
9       Q   The Gates 2010 cohort study did include
10  over a hundred thousand women; is that right?
11       A   The Gates?
12       Q   Yes.
13       A   It was large, but I need to check the
14  actual numbers.
15       Q   Here. Let me hand it to --
16       A   I have it. I have it.
17       Q   Do you have it?
18       A   Yeah.
19       Q   Okay. And I am looking at page 47. And
20  it's quoting the Nurses' Health Study as involving
21  close to 109,000 --
22       A   I'm not sure.
23       Q   -- women?
24       A   I'm not sure. I'm looking at the -- the
25  Gates -- are you asking about Gates or Gertig?

Page 269

1       Q   I'm asking about Gates 2010.
2       A   In mine it says $221,000 woman with 924
3  epithelial ovarian cancer.
4       Am I looking in the wrong place?
5       Q   No. I -- and then if you look further, it
6  talks about -- at least in the Nurses' Health Study,
7  there being 108,870 women; is that right?
8       A   Yes.
9       Q   The women in the national health study,
10  which was the basis for both the Gertig 2000 cohort
11  study and Gates 2010 cohort study, those women were
12  followed from 1976 to 2006, so for 30 years --
13       A   Yes.
14       Q   -- is that right?
15       A   Yes.
16       Q   And -- and after following these hundred
17  thousand women -- or over hundred thousand women for
18  three decades, the authors in Gates 2010 concluded
19  that the data did not show a statistically
20  significant relationship between talcum powder use
21  and any type of epithelial ovarian cancer; is -- is
22  that right?
23       A   The Gates authors concluded that there was
24  no association between any talcum powder product
25  use, and it was not significant in ovarian cancer,

Rebecca Smith-Bindman, M.D.

Page 270

1    yes.
2        Q    Another short study that you did not
3    include in your systematic review was the Houghton
4    study; is that right?
5        MS. O'DELL:  Object to form.
6        A    Yes, that is true.
7        Q    (BY MR. ZELLERS) The Houghton study was
8    based on -- or is also called the Women's Health
9    Initiative Study; is that right?
10       A    Yes, it is.
11       Q    That involved 61,000 women; is that right?
12       A    That is correct.
13       Q    Houghton 2014 did not find a statistically
14    significant relationship between perineal talc use
15    and ovarian cancer among women who had ever used
16    talc; is that right?
17       A    That is what they concluded.
18       Q    Or among women who had fewer than nine
19    years of perineal talc use, correct?
20       A    Correct.
21       Q    Or among women who had more than 10 years
22    of perineal talc use, correct?
23       A    Can you say that last part?
24       Q    Sure.
25       A    Sorry.

Page 271

1        Q    Houghton 2014, that cohort study --
2        A    Okay.  No.  I -- yes, that is correct.
3        Q    And also, they did not find a
4    statistically significant relationship between
5    perineal talc use -- strike that.
6        They also did not find a statistically
7    significant relationship between the use of talcum
8    powder on sanitary napkins or diaphragms on -- and
9    ovarian cancer; is that right?
10       A    That's correct.
11       Q    Houghton does report on duration of use at
12    least more than 10 years of use; is that right?
13       A    Yes.
14       Q    But would you consider women who use
15    talcum powder for more than 10 years to be frequent
16    talc users?
17       MS. O'DELL:  Object to form.
18       A    So you're asking if duration of use can be
19    equated with frequency of use, and -- and I would
20    very strongly disagree that those are equivalent.
21    And that is the primary reason that I
22    discount the results of the Gonzalez and Houghton
23    and Gates studies.
24        Because frequency of use, meaning to use
25    it once a month or once a year, is not the same as

Page 272

1    using it on a -- on a frequent basis, so I think the
2    duration is very different measure.
3        Q    We talked yesterday about your definition
4    of "regular use," and you pointed me to your report
5    where you give an extensive discussion of that.
6        Do you remember?
7        A    I do.
8        Q    Did -- your definition of "regular use,"
9    was that every psychometrically tested to
10    demonstrate any validity or reliability?
11       MS. O'DELL:  Object to the form.
12       A    Of -- are you asking about the reliability
13    of the way we defined it --
14       Q    (BY MR. ZELLERS) Yes.
15       A    -- or about the concept?
16       Q    No.  About the way you defined it.
17       A    I believe we explained in the report that
18    we tried to approximate regular use, frequency use
19    by being at least three times a week and as close to
20    daily as possible.
21        But in terms of -- if that is -- I -- I'm
22    not -- we have not validated that in different
23    studies or --
24       Q    That's something that you came up with; is
25    that right?

Page 273

1        A    Yeah.
2        MS. O'DELL:  Object to the form.
3        A    Yes, it is.
4        Q    (BY MR. ZELLERS) Gonzalez.  You criticize
5    Gonzalez in your report for combining various types
6    of use.  Do you recall that generally?  So that's
7    page 21 where --
8        A    No.  I'm -- I'm on my report.  My -- my
9    hesitation is it's not so much that I'm criticizing
10    the study.  It's rather it doesn't contribute to
11    answering the question that I was asking, which was:
12    Does regular perineal talc exposure increase the
13    risk?
14        It doesn't mean that the questions they
15    have asked are not interesting questions.  They were
16    just not the ones I was focusing on.
17       Q    Why would combining various types of use,
18    bias the results in favor of not detecting an
19    association?
20        I guess from your statement it -- it may
21    well not bias the results; is that right?  It just
22    was just a different question --
23       A    It's just a different question.
24       Q    -- than what --
25       A    I --

8 (Pages 270 to 273)

Rebecca Smith-Bindman, M.D.

Page 274

1     Q   -- you were looking at?
2     A   -- I believe that you want to have as
3  narrow a definition, in my belief, of meta-analysis
4  as possible to understand when you're pooling
5  results, make sure -- something you said -- you're
6  combining apples to apples.
7         And I think one would expect that any
8  potential -- potential exposure to talcum powder
9  would matter what skin or surface or cell line or
10 tissue you're putting against, and you wouldn't
11 necessarily expect the same result in a cervical
12 exposure or a diaphragm exposure or a vaginal
13 exposure.
14        You -- you might have an association of
15 those places.  You might not.  I just think it's a
16 different question.
17    Q   All of the cohort studies were prospective
18 as opposed to retrospective; is that right?
19    A   Yes.
20    Q   Prospective studies are not subject to
21 recall bias like retrospective studies, correct?
22    A   Yes, that's true.
23    Q   They're also not subject to the same
24 selection bias as retrospective studies, correct?
25        MS. O'DELL:  Object to the form.

Page 275

1     A   In general, case-control studies are often
2  plagued with selection bias, but they don't have to
3  be.
4     Q   (BY MR. ZELLERS) Well, recall bias can
5  distort a scientific evaluation of whether an
6  exposure is actually related to a disease, correct?
7     A   Yes.
8     Q   So for example, recall bias could distort
9  results if women with ovarian cancer were more
10 likely to remember their exposure to talcum than women
11 without ovarian cancer; is that right?
12    A   That is a theoretical risk.
13    Q   In fact, in your report on page 17, you
14 acknowledge that the risk of bias is greater for
15 case-control studies as opposed to cohort studies;
16 is that right?
17    A   Yes.
18    Q   Recall bias could explain the fact that
19 some retrospective case-control studies have found a
20 statistically significant relationship between
21 talcum powder and ovarian cancer, but the cohort
22 studies have not, correct?
23    A   That is a theoretical risk.  To do that
24 you would need to have some knowledge in the
25 population that influenced that recall bias, but

Page 276

1  absolutely that's a possibility.
2     Q   You also looked at both the hospital-based
3  and the population-based case-control studies; is
4  that right?
5     A   I did.
6     Q   None of the hospital-based case-control
7  studies show a statistically significant association
8  between talc use and ovarian cancer, correct?
9     A   I -- I'm not sure --
10    Q   Take a look at --
11    A   -- where you're getting that from.
12    Q   I will show you the Langseth paper from
13 2008, which you cite and we talked about yesterday.
14 Let's mark this as Exhibit 30.
15        (Exhibit 30 was marked for identification
16 and is attached to the transcript.)
17    A   I have it.  I have it.
18    Q   (BY MR. ZELLERS) All right.  Now -- and
19 let me just -- I'll put it in the record there.
20        MS. O'DELL:  Thank you.
21    Q   (BY MR. ZELLERS) If you look at the
22 Langseth paper, on the second page, Figure 1, they
23 list out all of the population -- or at least a
24 great number of the population-based and
25 case-control studies and the hospital-based

Page 277

1  case-control studies; is that right?
2     A   Yes, they do.
3     Q   (BY MR. ZELLERS) At least among the
4  hospital-based case-control studies that are
5  identified by Langseth in Figure 1, it appears that
6  there's six hospital-based case-control studies.
7         None of those hospital-based case-control
8  studies show a statistically significant
9  association, correct?
10        MS. O'DELL:  Object to the form.
11    A   We discussed this yesterday.  But if
12 you're asking if the individual hospital-based
13 studies overlap one, then they overlap one.
14    Q   (BY MR. ZELLERS) They do not overlap one?
15    A   The -- the hospital-based studies do
16 overlap one.
17    Q   Okay.  The population-based case-control
18 studies, which are up above in our
19 Langseth Figure 1, some of those -- if we look at
20 the individual studies -- show statistical
21 significance, and some of those do not; is that
22 right?
23    A   I'm -- I'm hesitant to be as definitive
24 about using the confidence interval that are
25 presented here as being a reflection of statistical

9 (Pages 274 to 277)

Rebecca Smith-Bindman, M.D.

1  significance.
2       All of them are shifted to the right.  All
3  of them have a positive association.  And the
4  confidence interval for some of them overlap one.
5       But taken as a group, there's statistical
6  significance for the entirety of the population --
7  of the population of studies that he looked at.
8       Q   As we did discuss yesterday, if you look
9  at the population-based studies individually, at
10 least based upon what's reported by Langseth in his
11 Figure 1, some demonstrate statistical significance
12 and some do not; is that right?
13      A   I -- again, it's -- they're slightly --
14 it's -- it's not the only -- the confidence interval
15 overlapping one is sort of what I consider a
16 quick-and-dirty way to answer statistical
17 significance.
18      It's not exactly that way.  But some of
19 them clearly suggest statistical significance.  I
20 think ten of them.  And four of them suggest not
21 statistical significance.  So the individual
22 studies.  But it's a little more complicated than
23 that.
24      Q   Would you agree that if a study does not
25 show statistical significance, that it could mean

1  that no risk exists?
2       A   If --
3           MS. O'DELL:  Object to the form.
4       A   -- an individual study shows no
5  statistical significance, it means -- with all
6  research -- that the most likely truth is the point
7  estimate, which is whatever that point estimate is,
8  but that you could not exclude chance as one of the
9  possible causes for the results.
10      Q   (BY MR. ZELLERS) If we looked just at the
11 population-based case-control studies and the
12 hospital-based case-control studies that are shown
13 by Langseth in Figure 1, there is an inconsistency
14 between the two in that each of the individual
15 hospital-based case-control studies have confidence
16 intervals which overlap one, and many of the
17 population-based or at least some of the
18 population-based studies do not, correct?
19      A   I -- I do not believe there is
20 inconsistency between the pooled odds ratio for
21 population-based studies, which has a confidence
22 interval that overlaps the confidence intervals for
23 the pooled odd ratio for the hospital-based studies.
24      So using the approach that you are
25 suggesting of using confidence intervals, the way to

1  tell if things are different or the -- or
2  indistinguishable, the confidence interval for the
3  pooled odds ratio for the population-based studies
4  goes from 1.29 to 1.52, so the truth is likely in
5  that range, where the truth for the hospital-based
6  studies is 0.92 to 1.63.  They overlap.
7       And so I would interpret that using this
8  sort of quick approach is that there's not a
9  statistical difference between the summary of the
10 pooled odd ratio based on the type of populations
11 that were recruited.
12      Again, the point estimates are a little
13 bit different for sure, 1.4 versus 1.12.  But the
14 confidence intervals overlap, suggesting that
15 they're not -- they're not different.
16      Q   You are familiar with selection bias; is
17 that right?
18      A   I am.
19      Q   Would you agree that the hospital-based
20 case-control studies may be less susceptible to
21 selection bias than population-based case-control
22 studies?
23          MS. O'DELL:  Object to the form.
24      A   I -- I would not agree with that.  In
25 general, you think about hospital-based studies as

1  being potentially a great deal more bias.
2       Now, that -- with that caveat, it depends
3  on how you found your cases and your controls.
4       But in general, you want to find
5  population-based cases and controls, I believe,
6  rather than hospital-based.  But it matters how they
7  are recruited.
8       Q   Hospital-based control studies are
9  comparing hospitalized patients to hospitalized
10 patients; is that right?
11      A   I -- I -- in this case, yes, I think
12 that's --
13      Q   And --
14      A   -- how they define it.
15      Q   -- in population based studies, you're
16 more likely to be comparing ill people to healthy
17 people; is that right?
18      A   Again, it -- it depends on how you're
19 selecting.  If you're selecting patients who are
20 sick in the hospital and comparing that to healthy
21 patients who are outpatient population based, that
22 would be the kind of bias that you are describing.
23 That would be the worst.
24      But if you're, in fact, comparing
25 relatively comparable population-based cases and

Rebecca Smith-Bindman, M.D.

Page 282

1    controls, then I don't agree that hospital-based
2    controls are -- are better.
3        Q   Penninkilampi.  One of the studies that
4    you talked to us about yesterday was Penninkilampi
5    2018; is that right?
6        A   Yes.
7        Q   Penninkilampi 2018 did not include the
8    Gates 2010 cohort study; is that right?
9        A   That's correct.
10       Q   Did you verify that the data that
11   Penninkilampi reports is accurate?
12       A   I did not.  Did I go back and validate
13   their individual abstracted data?
14       Q   Yeah.
15       A   I did not.
16       Q   In determining that a study is of high
17   quality, would it be important to you that the
18   authors are accurately reporting the odds ratios and
19   confidence intervals?
20       A   Data accuracy is important to me.  And --
21   and I would look towards the journal peer review
22   process to have done that, yes.
23       Q   If -- if there were errors in reporting of
24   the odds ratios or the confidence intervals, that
25   could call into question the reliability of the

Page 283

1    study; is that right?
2            MS. O'DELL:  Object to the form.
3        A   Yes, that's definitely possible.
4        Q   (BY MR. ZELLERS) Penninkilampi 2018, that
5    study specifically states that a certain causal link
6    between talc use and ovarian cancer has not been
7    established, correct?
8            MS. O'DELL:  Object to the form.
9        A   I don't remember them concluding that.
10   But if you tell me where --
11       Q   (BY MR. ZELLERS) Sure.
12       A   -- it is --
13       Q   Look at page 42, at the end of first
14   paragraph.
15       A   Well, perineal talc use has not been shown
16   to be safe.  In a similar regard, a certain causal
17   link between the use and ovarian cancer has not been
18   established --
19       Q   And you --
20       A   -- is what --
21       Q   -- okay.
22       A   -- Penninkilampi says.
23       Q   And I think you omitted the word "talc."
24   But their specific statement is, A certain causal
25   link between talc use and ovarian cancer has not yet

Page 284

1    been established; is that right?
2        A   That is what they say.
3        Q   Meta-analyses or systematic analyses, that
4    can combine the work of other published studies into
5    one study; is that right?
6        A   Yes.
7        Q   If there are biases and confounding in the
8    underlying studies, the meta-analysis or the
9    systematic review or analysis will reflect the
10   biases and confounding; is that right?
11           MS. O'DELL:  Object to the form.
12       A   Any biases in the papers will not go away
13   by combining them.  I'm not sure what you mean by
14   "the confounding."  If -- if a paper has an
15   accounting for confounding?
16       Q   (BY MR. ZELLERS) Let me ask you another
17   question.  A proper meta-analysis or systematic
18   review must analyze the sources of heterogeneity
19   across the studies; is that right?
20       A   Yes.
21       Q   And a proper meta-analysis or systematic
22   review must examine the methodology of each of the
23   underlying studies, correct?
24       A   Yes.
25       Q   You have given some opinions -- or at

Page 285

1    least you state some opinions relating to the
2    biological mechanisms of cancer; is that right?
3        A   Yes.
4        Q   The biological mechanisms of cancer are
5    not your area of expertise; is that correct?
6            MS. O'DELL:  Object to the form.
7        A   I'm knowledgeable about the biological
8    mechanism of cancer as a scientist, as a physician,
9    as a cancer epidemiologist.
10       Q   (BY MR. ZELLERS) Would you agree that
11   there are others who are more closely involved in
12   the area of biologic plausibility as it relates to
13   the perineal use of talcum powder and ovarian
14   cancer?
15           MS. O'DELL:  Object to the form.
16       A   I believe there are others who have more
17   expertise directly in that area than I do.
18       Q   (BY MR. ZELLERS) Your opinion is that
19   talcum powder travels from the perineal region to
20   the ovaries through the women's reproductive tract;
21   is that right?
22       A   Yes.
23       Q   If talcum powder can make this migration,
24   can other substances make the same migration?
25       A   Yes.

11 (Pages 282 to 285)

Rebecca Smith-Bindman, M.D.

Page 286

1    Q   Sand from the beach?
2    A   I don't know if there's evidence of sand
3  from the beach.
4    Q   Toilet paper particles?
5    A   I -- I -- I do not know if there's
6  evidence of that.
7    Q   There are no human studies that
8  demonstrate the migration of any particulate matter
9  from outside the peri -- peritoneum to the ovaries,
10  correct?
11       MS. O'DELL:  Object to the form.
12    A   When you say "demonstrate," do you mean
13  active demonstration or a suggestion that it has
14  gone that route?
15    Q   (BY MR. ZELLERS) Active -- active
16  demonstration.
17    A   So there are no studies that I know of
18  that have taken talcum powder and then documented
19  its movement through -- to the ovaries.
20    Q   Or any particulate from outside the
21  perineum to the ovaries, correct?
22       MS. O'DELL: Object to the form.
23    A   I -- I don't know of any sort of active
24  studies that have watched it moved.  It's rather the
25  studies have found the particulate matter at its

Page 287

1  destination and then have supposed it had to travel
2  there in some way.
3    Q   (BY MR. ZELLERS) None of the studies that
4  you cite in your report actually looked at whether
5  talcum powder can migrate from perineal application
6  through the fallopian tubes to the ovaries, correct?
7    A   Correct.
8       MS. O'DELL:  Object to the form.
9    Q   (BY MR. ZELLERS) You also cannot cite any
10  article that shows granulomas, fibrosis, or
11  adhesions anywhere up the reproductive tract of a
12  women as result of her external genital talc
13  application; is -- is that right?
14    A   Yes.
15    Q   If talcum powder migrates from the
16  perineal region to the ovaries, shouldn't exposure
17  to talc be far greater in concentration in the
18  rectal, vulvar, vaginal, cervical, and uterine
19  tissues which are closer to the area of initial
20  exposure?
21       MS. O'DELL:  Object to the form.
22    A   I think that assumes that proximity and
23  concentration, which you would expect which would
24  fall off with more distance, is the only factor that
25  would determine concentrations when, in fact, there

Page 288

1  are a lot of other factors such as sphincters or the
2  type of mucosa that it is or mucous barriers that
3  might have a very strong relationship to the
4  concentration of talc.
5       So the rectum and the bladder have
6  sphincters, and the mucosa and the vagina and the
7  bladder and rectum are very different than the
8  mucosa of the ovary.  The endometrium has different
9  tissue.
10       So I agree with you that you would expert
11  proximity would be one factor that might affect
12  concentration.  But the characteristics of the
13  tissue, the barriers, the physical or mucosal could
14  be expected to have a much bigger impact.
15    Q   No studies that you're aware of show
16  inflammation as a result of genital talc use in the
17  rectal, vulvar, vaginal, cervical, and uterine
18  tissues; is that right?
19    A   I do not know of those studies.
20    Q   And no studies show a link between
21  external genital talc use and rectal, vulvar,
22  vaginal, cervical, or uterine cancer; is that right?
23       MS. O'DELL:  Object to the form.
24    A   That is correct.
25    Q   (BY MR. ZELLERS) You have not done an

Page 289

1  expert review of the inflammation evidence yourself;
2  is that fair?
3       MS. O'DELL:  Object to the form.
4    A   I -- I have done a lot of reading of the
5  inflammation literature.  I'm not sure how I would
6  define it as an expert or not an expert -- expert
7  review.
8    Q   (BY MR. ZELLERS) You do know that not all
9  inflammatory conditions lead to cancer, correct?
10    A   There's a lot of literature about certain
11  inflammation that causes chronic -- in particular a
12  lot of different kind of cancers, more publications
13  about acute inflammation that does not lead to
14  cancer.
15       But yes, there are both cancers that are
16  very susceptible to inflammation or caused by it and
17  some that are not.
18    Q   Chronic inflammation.  There are many
19  chronic inflammatory conditions that do not lead to
20  cancer; is that right?
21    A   Yes.
22    Q   Do you agree that an agent can be a
23  carcinogenic for one type of cancer, but not for
24  others?
25    A   Yes.

12 (Pages 286 to 289)

Rebecca Smith-Bindman, M.D.

Page 290

1      Q   Rheumatoid arthritis, that is a chronic
2   inflammation condition, but it does not increase the
3   risk of my ovarian cancer, correct?
4      A   Correct.
5      Q   The same with psoriasis; is that right?
6      A   Not that I know of.
7      Q   Page 41 of your report, you conclude that,
8   Regular exposure to talcum powder products causes
9   ovarian cancer in some women.
10          Do you see that?
11      A   I do.
12      Q   Is there a certain amount of talcum powder
13   that a product must contain to cause inflammation?
14          MS. O'DELL:  Object to the form.
15      A   I -- I -- I do not know of evidence that
16   quantifies the amount of exposure that's necessary
17   that a published literature supports the amount
18   women use is an amount that leads to cancer, but
19   I -- I don't know if there's a minimum threshold
20   or...
21      Q   (BY MR. ZELLERS) Do you consider
22   cornstarch to be a talcum powder product that causes
23   inflammation?
24          MS. O'DELL:  Object to the form.
25      A   Talcum powder -- cornstarch -- talcum

Page 291

1   powder causes inflammation.  Cornstarch can also
2   cause inflammation.
3          I believe cornstarch tends to be an acute
4   inflammatory process rather than a chronic
5   inflammation process.  But --
6      Q   (BY MR. ZELLERS) You --
7      A   -- I -- I wouldn't consider cornstarch to
8   be a talcum powder --
9      Q   Is --
10      A   -- product.
11      Q   -- is there a study that you can point me
12   to that states that any inflammation from cornstarch
13   is acute and not chronic?
14          MS. O'DELL:  Object to the form.
15      A   There's a literature about cornstarch
16   leading to acute inflammation, for example, in the
17   surgical literature when it was on surgical gloves
18   or on physical exams which has led to its being
19   removed so -- so as to reproduce acute inflammatory
20   processes.
21      Q   (BY MR. ZELLERS) My question to you is:
22   Are you aware of any literature that states that
23   cornstarch is not associated with a chronic
24   inflammatory condition?
25          MS. O'DELL:  Object to the form.

Page 292

1      A   In a few of the papers I reviewed -- not
2   very many of them, but a few of them had a small
3   proportion of women who were exposed to cornstarch
4   rather than talc powder products.
5          I -- I think it -- they had negative
6   results, but they were small -- a small number of
7   women, so I wouldn't use that to prove that it's
8   safe.
9          But I don't know of any literature that
10   suggests cornstarch is carcinogenic.
11      Q   Your opinion that talcum powder products
12   cause inflammation is not based on the determination
13   that there is a threshold amount of talcum powder
14   that will be required to be in the product before
15   you can conclude that the product will cause chronic
16   inflammation; is -- is that right?
17          MS. O'DELL:  Object to the form.
18      A   I -- I -- I think I would like to agree.
19   I'm just not sure exactly of -- what I am agreeing
20   to.  So I -- I don't know any level --
21          MS. O'DELL:  That's always --
22      A   -- of --
23          MS. O'DELL:  -- a good sign you should --
24      A   -- I -- I can't --
25          MS. O'DELL:  -- be --

Page 293

1      A   -- I can't tell exactly what the -- what
2   the question is.
3          I -- there -- I don't know -- I don't know
4   an amount of talcum powder that would make a product
5   safe.
6      Q   (BY MR. ZELLERS) Do you believe that
7   cornstarch is a superior alternative to talc?
8      A   I believe that talcum powder products will
9   increase women's risk of cancer, and I would avoid
10   using it as a woman or as a doctor counseling my
11   patients.
12      Q   Well --
13      A   I don't have views that cornstarch is a
14   carcinogenic product.  So in terms of any potential
15   risk-benefit relationship of cornstarch has the same
16   value in terms of absorbency and much fewer risk of
17   harm, then if that's the question, then I think
18   cornstarch is preferable.
19      Q   There are no reports in the literature of
20   externally applied talc leading to inflammation,
21   granulomas, fibrosis, or adhesions anywhere along a
22   women's reproductive tract, correct?
23          MS. O'DELL:  Objection, asked and
24   answered.
25      A   Not that I know of.

13 (Pages 290 to 293)

Rebecca Smith-Bindman, M.D.

Page 294

1    Q    (BY MR. ZELLERS) On page 12 of your report
2  you state, The most widely accepted mechanism for
3  initiation, promotion, and progression of ovarian
4  cancer is tissue inflammation, leading to a series
5  of responses that result in cancer.
6         Do you see that statement?
7    A  I do.
8    Q    You do not cite any support in your report
9  for that proposition, correct?
10       MS. O'DELL:  Object to the form.
11   A  I -- I think my -- that first paragraph
12 was sort of an introduction to that section.  So
13 then I go on to cite, I -- I think, the supporting
14 evidence within the next few paragraphs.
15   Q    (BY MR. ZELLERS) You would agree that
16 research regarding whether chronic inflammation can
17 cause ovarian cancer is ongoing, correct?
18   A  It's an active area of research.
19   Q    Are you familiar with a paper published by
20 Melissa Merritt in 2008, entitled "Talcum Powder
21 Chronic Pelvic Inflammation and NSAIDS in Relation
22 to Risk of Epithelial Ovarian Cancer"?
23   A  I am.
24   Q    It's included in your reliance materials
25 on page 17; is that right?

Page 295

1    A    Can you tell me the title again?  Yeah.
2  Okay.
3    Q    Sure.  Do you have that or I can --
4    A  No.
5    Q    -- mark it?
6    A  No, I have it.
7    Q    If you go to page 174 of the Merritt
8  paper -- and tell me when you're --
9    A  I'm there.
10   Q    -- there -- at the bottom of the first
11 paragraph of the discussion, the authors conclude,
12 These results, in combination with previous studies,
13 suggest that chronic inflammation is unlikely to
14 play a major role in the development of ovarian
15 cancer.
16       Is that right?  Did I read that correctly?
17   A    Using the results that they had available
18 on the data in 2007, that is what Dr. Merritt
19 concluded.
20   Q    You also discuss in your report -- well,
21 let me withdraw that.
22       You're familiar with NSAIDS, nonsteroidal
23 antiinflammatory agents; is that right --
24   A  Yes, I am.
25   Q    -- and aspirin?  Those medicines reduce

Page 296

1  inflammation; is that right?
2    A  Yes, they do.
3    Q    If inflammation is a mechanism for ovarian
4  cancer, you would expect women who use NSAIDS or
5  aspirin to have a lower risk of ovarian cancer,
6  correct?
7         MS. O'DELL:  Object to the form.
8    A    Other things being equal, you might expect
9  that if you could measure inflammation or influence
10 it by using NSAIDS, that that might be associated.
11 That is true.
12   Q    (BY MR. ZELLERS) The literature, though,
13 is mixed in terms of whether or not the use of
14 NSAIDS or aspirin actually reduce the risk of
15 ovarian cancer; is that right, or the incidence of
16 --
17   A  So --
18   Q    -- ovarian cancer?
19   A  -- I have reviewed those papers and would
20 agree with you that some seem to suggest one
21 direction, some others.  I haven't quantified them
22 together or tried to summarize them.
23       But I would agree.  There doesn't seem to
24 be a consistent message in that literature.
25   Q    One of those papers is -- that's included

Page 297

1  in your reliance list is the Verdoodt 2017 paper; is
2  that right?  That's V E R D O O D T.
3    A  I am going to have to defer to seeing
4  that.
5    Q    Okay.  Let me --
6    A  I believe --
7    Q    -- show you --
8    A  -- it's on my list.
9    Q    -- I will mark that paper as Exhibit 31.
10       (Exhibit 31 was marked for identification
11 and is attached to the transcript.)
12   A    Thank you.
13   Q    (BY MR. ZELLERS) And turn, if you will, to
14 page 5 under "Discussion" on the first paragraph.
15   A    And just to confirm, this is -- I -- I
16 have read this.  This is a review article, right?
17   Q    Yes.
18   A    Okay.
19   Q    So on page 5 under "Discussion," the first
20 sentence, the authors state, The sparse and
21 equivocal results for the association between NSAID
22 use and mortality among ovarian and endometrial
23 cancer patients preclude any firm conclusions at
24 this point.
25       Is that right?

14 (Pages 294 to 297)

Rebecca Smith-Bindman, M.D.

Page 298

1  A   That is what this author concludes.  I'm
2  trying to see what references he used for that, but
3  that is what he concludes.
4  Q   Okay.  And this is an article that was
5  published in 2017, correct?
6  A   Yes.
7  Q   Yesterday counsel for plaintiffs indicated
8  that you have -- in addition to the materials in
9  your report -- reviewed a 2018 chapter by Saed and
10 the Harper and Saed 2019 abstract; is that right?
11 A   I -- I reviewed several of his abstracts
12 and -- and a recent paper, yes.
13 Q   Do you know that Dr. Saed is a paid expert
14 for the Plaintiffs in this litigation?
15 A   I know he's a very well-respected
16 scientist that they have supported in his research.
17 Q   Is that a yes?
18    MS. BOCKUS:  I object.  Nonresponsive.
19    MS. O'DELL:  Mike, excuse me.
20    MR. ZELLERS:  Sure.
21    MS. O'DELL:  You said the 2019 abstract.
22 Did you mean the abstract or the manuscript, just to
23 make sure I'm following the conversation?
24    MR. ZELLERS:  I -- I believe I mean the
25 abstract.  But we mean whatever the doctor has in

Page 299

1  her file that we marked yesterday.
2     THE COURT REPORTER:  Who objected down
3  there?
4     MS. BOCKUS:  Jane Bockus.
5     MS. O'DELL:  I think what she had in her
6  file was the manuscript.  So I think that's what you
7  marked as an exhibit, but I don't want there to be
8  confusion.
9  Q   (BY MR. ZELLERS) You have reviewed several
10 publications within the last year or two from
11 Dr. Saed --
12 A   Yes.
13 Q   -- is that right?
14 A   Yes, I have.
15    THE COURT REPORTER:  Wait.
16    MR. ZELLERS:  All right.  Are you okay,
17 Ms. Court Reporter?
18    THE COURT REPORTER:  Yes.  I just have to
19 have you wait until the end of the question, please.
20 Q   (BY MR. ZELLERS) Let me re-ask my --
21 A   Please.
22 Q   -- question.  Did you know that Dr. Saed
23 is a paid expert for the Plaintiffs in this
24 litigation?
25 A   Yes, I do.

Page 300

1  Q   Have you spoken with Dr. Saed?
2  A   I have not.
3  Q   Have you requested any information from
4  Dr. Saed?
5  A   I have not.
6  Q   The Saed study just looked at immortalized
7  cell lines; is that right?
8  A   Yes, I believe that's how the cell lines
9  were --
10 Q   Are --
11 A   -- defined.
12 Q   -- are you -- are you aware that Dr. Saed
13 testified that the cells were modified with a virus
14 to make them keep undergoing division in vitro?
15 A   I -- I'm aware that that's what happens to
16 cell lines.  I -- I don't believe I saw his
17 deposition to say that.
18 Q   Are you aware that Dr. Saed testified that
19 the P53 gene was turned off in those cells?
20 A   No, I'm not aware.
21 Q   Are you aware based upon your reading that
22 the loss of the P53 protein contributes to
23 unrestrained cellular proliferation?
24    MS. O'DELL:  Object to the form.
25 A   I -- I believe that the reason you have

Page 301

1  controls in experiment is to account for the
2  underlying expression in turnover cells so you can
3  compare something you do to the cell versus the
4  baseline in order to account for the baseline,
5  whatever it is, proliferation of the cell or
6  apoptosis levels or expression of oxidants or
7  antioxidants.
8     So I -- I -- the way you're asking the
9  question is -- is:  Are you comparing this cell line
10 to living cells in context?
11    And I would agree with you that this cell
12 line is different than living cells in context.
13    But if you're asking if it's a valid
14 comparison to do the experiment in this cell line,
15 it is because you are doing an intervention to those
16 cells that has a control group.
17    And so this cell line has a different
18 behavior than a -- a living cell does, but provides
19 a comparison group.
20 Q   (BY MR. ZELLERS) What methodology did you
21 use to apply Dr. Saed's results to normal cells in
22 actual organs?
23 A   So --
24    MS. O'DELL:  Object to the form.
25 A   -- in some of the work that I do around a

Rebecca Smith-Bindman, M.D.

Page 302

1  different environmental carcinogen -- radiation, for
2  example -- we look at changes of expression, certain
3  enzymes in cells to radiation to understand what
4  that damage does in terms of expression of relevant
5  genes, cell proliferation, and things like that.
6          So I take his research to mean that I can
7  understand the changes to pro oxidants to
8  antioxidants to apoptosis to gene expression in the
9  cell.  Not that I can come up with the exact
10  quantification in a patient that would correspond to
11  it, but rather, what mechanisms will be stimulated
12  by the talc.
13          So to answer your question, I -- it tells
14  me what parts of the cell are sensitive to it, but
15  not the quantity that might lead to that
16  sensitivity.
17      Q   (BY MR. ZELLERS) Can you cite any data
18  showing that the concentrations of exposure used in
19  the Saed study are the same as would be encountered
20  with the use of cosmetic talc in the perineal
21  region?
22      A   I cannot.  That's what I was trying to
23  express.
24      Q   Can you cite any data showing that the
25  level of concentration of exposure used in the Saed

Page 303

1  study has ever occurred in women with perineal talc
2  use?
3          MS. O'DELL:  Object to the form.
4      A   I want to clarify my answer.  I don't know
5  those data.
6      Q   (BY MR. ZELLERS) Would you agree that
7  reactive oxygen species are a normal part of cell
8  physiology?
9      A   Yes.
10      Q   Do all substances that cause oxidative
11  stress also cause cancer?
12      A   I think you care about the balance of
13  oxidative, pro oxidative, antioxidative levels.
14          That being said, I do not know that every
15  instance where you have more pro oxidative leads to
16  cancer.  I know of some where it does.  I don't know
17  if it always does.
18      Q   Does the presence of oxidative stress in a
19  tissue indicate that cancer will develop in that
20  tissue?
21      A   I think I mentioned this yesterday, that
22  there's a sense of a probability.  So the
23  probability will likely increase.
24          But most cells, thankfully, will repair
25  and -- that damage, and so most cells will not

Page 304

1  develop enough mutations to develop into cancer.
2          But the greater the oxidative stress for
3  cancer like ovarian cancer, the greater the chance
4  of inducing cancer.
5      Q   Can you cite me to any study that says
6  that?
7          MS. O'DELL:  Object to the form.
8      A   Any study that says that there's a dose
9  response related to the amount of stress and the
10  member -- numbers of cancers?
11      Q   (BY MR. ZELLERS) That supports, yes, your
12  statement and your position.
13      A   I -- the data that I am thinking of -- and
14  I'm not sure if it's quite the same as the question
15  that you're asking -- is the number of gene
16  mutations is higher in cancer cells than it is in
17  noncancer cells.  So --
18          THE COURT REPORTER:  In noncancer?
19      A   In non -- cancer cells have many more
20  genetic mutations than noncancer cells.
21          Both have generic mutations.  And the
22  environment of having more oxidative stress is
23  associated with getting more mutations --
24      Q   (BY MR. ZELLERS) If -- if it's --
25      A   -- but --

Page 305

1      Q   -- are you finished?
2      A   -- I -- I am.
3      Q   Okay.  If -- if exposure to a substance
4  causes oxidative stress in certain tissue, does that
5  mean that the substance will cause oxidative stress
6  in all types of tissues?
7      A   No.
8      Q   Does the body have a protective mechanism
9  that can limit tissue damage from oxidative stress?
10      A   Yes.
11      Q   Are there any publications that you are
12  aware of that indicate that oxidative stress is
13  involved in the development of ovarian cancer?
14      A   We discussed earlier that inflammation
15  increases oxidative stress such as pelvic
16  inflammatory disease leads to oxidative stress.
17          And pelvic inflammatory disease is
18  associated and leads to ovarian cancer.  But I'm not
19  sure if that's answers the question that you are...
20      Q   Well, if I had more time, we would discuss
21  that at greater length.  You're familiar with the
22  term "confounding" is that right?
23      A   I -- I -- Yes, I'm --
24      Q   All right.
25      A   -- familiar with that term.

16 (Pages 302 to 305)

Rebecca Smith-Bindman, M.D.

1    Q   Confounding is where the presence of
2  another association confuses the relationship
3  between the exposure and the disease being studied;
4  is -- is that right?
5    A   Yes.
6    Q   Confounding can distort results in
7  epidemiological studies; is that right?
8    A   Yes.
9    Q   Would you agree that residual confounding
10  is possible in every observational study?
11    A   Yes.
12    Q   It's also -- strike that.
13        It's possible that unmeasured confounders
14  may be present in every observational study,
15  correct?
16    A   Yes.
17    Q   It's impossible to say that all known and
18  unknown confounding factors have been controlled for
19  in any given study; is that right?
20    A   Yes.
21    Q   Would you agree that there are new factors
22  that are being discussed that are possibly involved
23  with ovarian cancer that are just being published in
24  the literature such as a history of chlamydia
25  infection and a history of weight gain during

1  adolescence?
2    MS. O'DELL:  Object to the form.
3    A   Chlamydia infection would be the most
4  common infection of PID, and so that's something
5  that I just mentioned.  I'm not sure that that's
6  such a new one.
7        And weight gain during adolescence is
8  something that's of interest across a range of
9  cancers, like breast cancer.  I don't know it
10  personally around ovarian cancer, but...
11    Q   (BY MR. ZELLERS) Those factors that we
12  just talked about generally have not been controlled
13  for in any of the published talcum powder ovarian
14  cancer studies; is that right?
15    A   I -- the PID, I -- I think, has it in a
16  paper or two.  And -- and the weight gain, I -- I
17  don't -- I have never seen that one.
18    Q   We talked yesterday about the Berge study.
19  Do you remember that?
20    A   I do.
21    Q   And you talk about Berge on page 25 of
22  your report.
23        What do you mean when you say, A second
24  limitation of Berge is that the included studies
25  adjusted for a variety of covariates, although this

1  is unavoidable in this type of summary.  The large
2  difference in general between adjusted and crude
3  results emphasizes the importance of adjustments
4  when estimating particular risk?
5    THE COURT REPORTER:  When estimating?
6    MR. ZELLERS:  Particular risk.
7    A   Are you asking what I meant by that?
8    Q   (BY MR. ZELLERS) Yes.  What did you mean
9  by that?
10    A   Okay.  I -- I would say my sentence is not
11  as clear as it should have been.  What I mean -- and
12  I'm not really sure why I pointed this out just for
13  Berge -- it's really a general -- is that the
14  studies they included, adjusted for different
15  covariants.
16        They didn't all adjust for the same
17  covariates.  So a variety of covariates, meaning
18  they didn't all adjust for the exact same
19  covariates.
20        But this is unavoidable in this type of
21  study.  So I was just saying that some of the
22  included studies adjusted for A, B and C; and others
23  were adjusted for B, C, and D; and others D, E, and
24  F.
25    Q   Huncharek, page 26.  Do you see that

1  reference where you talk about that study?
2    A   Yes.
3    Q   You say that the difference between a
4  relative risk of 1.19 and 1.38 is small; is that
5  right?
6    MS. O'DELL:  You're talking about 2007 or
7  2003?
8    Q   (BY MR. ZELLERS) Whichever --
9    A   Which page?
10    Q   -- so page 26 --
11    MS. O'DELL:  They're both on the same
12  page.
13    Q   (BY MR. ZELLERS) I think I'm looking at
14  the one at the bottom.
15    MS. O'DELL:  Okay.  All right.  2003?
16    MR. ZELLERS:  Yes.
17    Q   (BY MR. ZELLERS) So are you with me?  Are
18  you looking at your last couple of lines there on
19  page 26?
20    A   Yes.
21    Q   And you do say that the difference between
22  a relative risk of 1.19 and 1.38 is small; is that
23  right?
24    A   It -- odds ratios --
25    Q   Yeah.

17 (Pages 306 to 309)

Rebecca Smith-Bindman, M.D.

1    A  -- but yes.
2    Q   All right.  And -- and so a difference in
3    odds ratios of .19, you would consider that to be a
4    small difference?
5        MS. O'DELL:  Object to the form.
6    A   You're asking why I said those differences
7    are small?
8    Q   (BY MR. ZELLERS) No.  Well, what I guess
9    what I want to know is:  Would you agree that the
10   difference between an odds ratio of 1.0 and 1.2 is
11   small?
12       MS. O'DELL:  Object to the form.
13   A   I think the question of whether or not you
14   have a difference of absolute odds of .2 along
15   different values means the same thing.  And I would
16   say it doesn't mean the same thing.
17       So if you have an odds ratio as an example
18   of 4.7 versus 4.9, they're kind of the same number.
19   If you have a number that's 1.0 versus 1.2, those
20   are not the same number.
21       So I don't think you would want to assume
22   the shift in the absolute magnitude of the
23   difference in odds.  I often published difference in
24   odds ratios of .2 stable.
25       But I think is -- your point is well taken

1    that that's not a trivial difference.  I was just
2    saying in the context of a systematic review, those
3    are both very strong, positive associations, and
4    that's a relatively minor difference.
5    Q   (BY MR. ZELLERS) An odds ratio range of
6    1.19 to 1.38 is much closer to an odds ratio of 1.0
7    to 1.2 than it is to an odds ratio of 4.5 to 4.7,
8    correct?
9    A   I -- I think that's a valid -- a valid
10   comparison.
11   Q   On page 26, 27, there's a carryover there,
12   but you state that the population controls are more
13   likely relevant and valid than hospital controls.
14       What's your support for that?
15   A   It's what we discussed earlier.  I -- I
16   think population-based controls are -- are better
17   than hospital-based controls.
18   Q   With respect to your systematic review,
19   did you attempt to identify gaps or flaws in the
20   underlying studies?
21   A   I reviewed the individual studies and set
22   forth criteria that I thought were required for
23   inclusion.
24   Q   What were those criteria?  Are those
25   contained in your forms that we talked about --

1    A   Yeah.
2    Q   -- yesterday?
3    A   So the most important -- as it points out
4    here in -- in Huncharek, the next sentence of where
5    we are, is that this review looked at any exposure
6    rather than quantifying.
7        And I think the primary concern that I had
8    was that any exposure is a very vague definition.
9    And I thought it was much more important to have a
10   meaningful measure of exposure.
11       So the studies that I primarily included
12   were ones that had quantification of the exposure,
13   but also had some other requirements.
14       I -- I -- I want to say that my systematic
15   review was one piece of the information that I
16   considered, but my summary estimate in the
17   systematic review that I completed had the same
18   conclusion as all these other systematic reviews.
19       In the ballpark, it just gave me greater
20   confidence that we were truly looking at regular
21   exposure rather than any exposure.
22       Now, we know that the most common exposure
23   is regular exposure.  That's the -- the more
24   important -- most common.
25   Q   Take a look at page 39 in your report

1    where you discuss temporality; is that right?
2    A   Yes.
3    Q   You say that women may use talc when
4    undergoing ovarian cancer treatment.
5        Do you see that?
6    A   Yes.
7    Q   What is your support for that or what is
8    that statement based on?
9    A   I -- I think it's based on my clinical
10   experience that postop patients often will use
11   talcum powder products for systematic relief of
12   symptoms that could be related to the surgical
13   procedure itself.
14   Q   All right.  Asbestos.  Are your opinions
15   in this case dependent on talcum powder containing
16   asbestos?
17   A   No, they're not.
18   Q   Are your opinions in this case dependent
19   on talcum powder containing trace amounts of metals?
20       MS. O'DELL:  Object to the form.
21   A   No, they're not.
22   Q   (BY MR. ZELLERS) Are your opinions in this
23   case dependent upon talcum powder containing any
24   particular fragrance chemical?
25   A   No, they're not.

18 (Pages 310 to 313)

Rebecca Smith-Bindman, M.D.

Page 314

1      Q   Do you believe that talcum powder, which
2   does not contain asbestos, causes ovarian cancer?
3      A   I don't have any data on which to conclude
4   based on epidemiologic evidence that there is such a
5   product, so I don't know that there is any product
6   that has been studied that doesn't contain asbestos
7   and fibrous talc.
8         I think in a laboratory setting, people
9   have studied products that they describe as being
10  asbestos free, and those products do cause cellular
11  damage.
12        But from an epidemiologic perspective,
13  which is primarily the data I looked at, all of the
14  products that have been studied, I believe contain
15  asbestos and fibrous talc.
16     Q   You have made an assumption or it is your
17  belief that all talcum powder products contain
18  asbestos; is that right?
19        MS. O'DELL:  Object to the form.
20     A   My belief is that many talcum powder
21  products contain asbestos or --
22     Q   (BY MR. ZELLERS) If --
23     A   -- fibrous.
24     Q   -- if your assumption about contamination
25  of talcum powder products with asbestos were not

Page 315

1   true, would that change your opinions in this case?
2         MS. O'DELL:  Object to the form.
3      A   In -- in this case, it would not.  I --
4   I -- the epidemiologic evidence is very strong that
5   exposure to talcum powder products, whatever it
6   contains, is carcinogenic.
7      Q   (BY MR. ZELLERS) You have looked at
8   several reports from Dr. Longo; is that right?
9      A   I have.
10     Q   You're aware he is a paid litigation
11  expert; is that right?
12     A   Yes, I am.
13     Q   You're aware he wrote his reports for the
14  purpose of this litigation and that those reports
15  have not been published; is that right?
16     A   I -- I know that he has generated a report
17  for this, yes.
18     Q   Do you know if any defense ex -- strike
19  that.
20        Do you know if any defense experts have
21  addressed or responded to Dr. Longo's litigation
22  reports?
23        MS. O'DELL:  I would object to the form.
24  There's been no defense reports in this case, as you
25  know.

Page 316

1      A   I -- I haven't seen any.
2      Q   (BY MR. ZELLERS) Have you requested any?
3         MS. O'DELL:  Object to the form.  There
4   have been no defense expert reports in this case.
5         MR. ZELLERS:  Counsel, please object to
6   form.  There have been many defense expert reports
7   in the talcum powder litigation generally.
8         But my question was whether or not she has
9   seen anything, so she can -- I think she has already
10  answered.
11     Q   (BY MR. ZELLERS) Is that right?  Have you
12  answered the question?
13        MS. O'DELL:  Object to the form.
14     A   I have asked to seen reports.  No.  I have
15  asked to seen testing results.  I have not asked to
16  seen reports.
17     Q   (BY MR. ZELLERS) Have you seen testing
18  results from the FDA and its testing of talcum
19  powder?
20     A   I have.
21     Q   The FDA did some testing in 2010.  Did you
22  see those results?
23     A   I did.
24        MS. O'DELL:  Do you need a break or are
25  you good or --

Page 317

1      A   I actually would love a -- a break.  I
2   don't mind going a few more minutes, if that would
3   be good or -- but otherwise, I would love a break.
4         MS. O'DELL:  Whenever is a good time.
5         MR. ZELLERS:  Sure.  I'll just finish
6   this.
7      Q   (BY MR. ZELLERS) I'll hand you the
8   exhibit, Exhibit 32.
9         (Exhibit 32 was marked for identification
10  and is attached to the transcript.)
11     Q   (BY MR. ZELLERS) Is that --
12     A   Thank you.
13     Q   -- the -- at least some of the testing by
14  the FDA that you have seen?
15     A   Yes, it is.
16     Q   That testing was done by an independent
17  laboratory; is that right?
18     A   I -- I -- I don't know that, but I believe
19  you.
20     Q   Take --
21        MS. O'DELL:  Do you have a copy for me?
22        MR. ZELLERS:  Oh, I'm so sorry.  I have
23  that, yes.  Sorry.
24        MS. O'DELL:  Thanks.
25     Q   (BY MR. ZELLERS) If you go to the second

19 (Pages 314 to 317)

Rebecca Smith-Bindman, M.D.

Page 318

1   page, the second paragraph, We contracted with AMA
2   Analytical Services of Lanham, Maryland, to conduct
3   this laboratory service -- or strike that -- survey.
4        Do you see that?
5    A   I don't.  I'm on the right page.
6    Q   On the second page.
7    A   The second page.
8    Q   The second paragraph, the second --
9    A   Yes.
10   Q   -- sentence --
11   A   -- yes.  Yes.  Thank you.
12   Q   All right.
13   A   Yes.
14   Q   And at least based upon this report, no
15   asbestos was detected in the talcum powder that was
16   tested; is that right?
17   A   In the reports that they show, which
18   might -- my understanding is that they had two
19   samples of baby powder, talcum powder in this.  And
20   that in those two specimens using the testing method
21   they used, they didn't find evidence of asbestos.
22        MR. ZELLERS:  All right.  Let's take a
23   break.
24        THE VIDEOGRAPHER:  The time is 10:47 a.m.
25   We are now off the record.

Page 319

1        (A break was taken from 10:47 a.m. to 1
2   11:00.)
3        THE VIDEOGRAPHER:  It's 11:00 a.m.  We are
4   now back on the record.  Here begins Media No. 2 of
5   the deposition of Dr. Rebecca Smith-Bindman, Ph.D.,
6   Volume II.
7    Q   (BY MR. ZELLERS) Dr. Smith-Bindman, I was
8   handed the invoice for Chris Tachibana, which we
9   have marked as Exhibit 33.
10       (Exhibit 33 was marked for identification
11   and is attached to the transcript.)
12   Q   (BY MR. ZELLERS) Is that the invoice that
13   your copy editor provided to you?
14   A   Yes.
15   Q   Are there any other invoices that you have
16   received from her?
17   A   No.
18   Q   Do you expect there to be any other work
19   that Ms. Tachibana does with respect to your report?
20   A   Not with respect to my report.
21       If I move ahead to publish these results,
22   then I would likely reach out to her to help -- as
23   well.
24       THE COURT REPORTER:  To help?
25   A   If we choose to publish the results, I

Page 320

1   would like -- she edits all of my publications
2   before I submit them.
3    Q   (BY MR. ZELLERS) When we left the last
4   session, I asked you about asbestos and whether or
5   not asbestos is contained in talcum powder.
6        Is there any amount of asbestos that would
7   be safe in talcum powder products?
8    A   And the simple answer would be no, I don't
9   think there's any amount that would be safe in
10   talcum powder products.
11   Q   All right.  Is there any amount of trace
12   metals that would be safe in talcum powder products?
13       MS. O'DELL:  Object to the form.
14   A   I believe there would be amounts of trace
15   metals that would be acceptable.
16   Q   (BY MR. ZELLERS) Are there any amounts of
17   fragrance chemicals that would be safe in talcum
18   powder products?
19   A   I believe there would be in certain
20   categories.  And in others, there would not.
21   Q   There have been no fragrance chemicals, to
22   your knowledge, that have been found in a study to
23   be associated with ovarian cancer, correct?
24       MS. O'DELL:  Object to the form.
25   A   I -- I know of no -- no such exploration.

Page 321

1    Q   (BY MR. ZELLERS) Do you have an opinion on
2   what type of asbestos is in talcum powder products?
3    A   I believe asbestos is sort of a family of
4   chemicals.  I think there are six that kind of get
5   grouped together.  I think all of them have been
6   identified in talcum powder products, but I don't
7   know the distribution of the different kinds.
8    Q   What type of asbestos is associated with
9   ovarian cancer?  And by that question, you believe
10   that there's six subtypes of asbestos --
11       MS. O'DELL:  Object to the form.
12   Q   (BY MR. ZELLERS) -- is that generally your
13   understanding?
14   A   It's generally my understanding.
15   Q   Are -- are you able to give us any
16   opinions with respect to what type or types of
17   asbestos is associated with ovarian cancer?
18   A   The -- the strongest summary of the
19   relationship that I know about is in the IARC 2012
20   reports.
21       And those are from a number of different
22   studies, including some cohort studies and case
23   control studies.
24       To my knowledge, I don't know that they
25   have divided them by the type of mineral silicate

20 (Pages 318 to 321)

Rebecca Smith-Bindman, M.D.

Page 322

1  fibers that were in those studies.
2      Q  What amount of asbestos exposure is
3  associated with ovarian cancer?
4          MS. O'DELL:  Object to the form.
5      A  To the best of my knowledge, the amount
6  that's contained within talc powder products is
7  probably associated with -- the amount that's in
8  there is probably the -- cancer.
9      Q  (BY MR. ZELLERS) Can you be any more
10 definitive?
11     A  The talcum powder products that women have
12 used is associated with ovarian cancer.  And I
13 believe that to know how much asbestos it takes to
14 cause cancer, the easiest way to answer that is to
15 quantify how much asbestos is within the --
16 the powder products.
17         So I'm not in any way an expert on this.
18 But in the Longo report, it talked about an average
19 of 50,000 particles of asbestos being in each
20 gram of -- on average in each gram of baby powder
21 products.
22         And he estimates that in a container, that
23 would be millions of particles, which seems like a
24 large number to me, but -- so I don't know the
25 amount that would be required to be carcinogenic,

Page 323

1  but that's the amount that they were exposed to that
2  was carcinogenic.
3      Q  What type of ovarian cancer is asbestos
4  associated with?
5          MS. O'DELL:  Object to the form.
6      A  I think the most stable estimate of the
7  association of talcum powder products with ovarian
8  cancer is for all ovarian cancer and the
9  meta-analysis that others did.  And my summary
10 estimate was for all ovarian cancer -- epithelial
11 ovarian cancer, I should say.
12         In my more limited review, I focused on
13 serous cancer, because I think as the most common
14 cancer -- the most common invasive cancer, it's the
15 one where there's enough statistical power to
16 quantify the association, so I think the data are
17 the most compelling for serous ovarian cancer.
18         But the overall meta-analysis looks at any
19 ovarian cancer, and that's what we did as well.
20     Q  You -- you looked at talcum powder,
21 correct?
22     A  Talcum powder products, yes.
23     Q  You did not undertake a Bradford Hill
24 analysis of the literature on asbestos and ovarian
25 cancer, correct?

Page 324

1      A  I did not.
2      Q  Would you agree that research on the
3  potential relationship between asbestos and ovarian
4  cancer has only considered a small number of cases?
5          MS. O'DELL:  Object to the form.
6      A  I think the IARC review on the
7  occupational exposures to asbestos had quite a
8  number of cancers, but I would have to go back to
9  those studies to remember the number.
10     Q  (BY MR. ZELLERS) Did you review the Reid
11 2011 study?
12     A  I believe that's one that I -- I reviewed.
13     Q  Do you need me to hand that to you if --
14     A  Yes --
15     Q  -- ask you a couple of questions about it?
16     A  -- please.
17     Q  Now, in the Reid 2011 paper, which we will
18 mark as Exhibit 34 --
19     A  And is that one of the studies that
20 Camargo included in -- I think it is -- in his
21 systematic review?  Yeah.  So this is a different
22 systematic review.
23         (Exhibit 34 was marked for identification
24 and is attached to the transcript.)
25     Q  (BY MR. ZELLERS) Do you recognize

Page 325

1  Exhibit 34?
2      A  No.
3      Q  Okay.  Well, Exhibit 34 is a study and --
4  and a review by the first named author, Allison
5  Reid.
6          "Does Exposure to Asbestos Cause Ovarian
7  Cancer?"
8      A  I -- I have seen this paper.
9      Q  All right.
10     A  I'm sorry.  I didn't remember.  So sorry.
11     Q  If you look at her conclusions -- or the
12 author's conclusions on the right-hand side of the
13 first page -- so I'm --
14     A  Yes.
15     Q  -- looking right here --
16     A  Yes.
17     Q  -- the relationship between asbestos
18 exposure and ovarian cancer is not well
19 understood -- is not as well understood as -- as
20 that of asbestos-related diseases.  Studies that
21 have examined this issue have been limited for two
22 major reasons.
23         No. 1, there's a small number of cases.
24 And No. 2, there's difficulties with diagnosis and
25 specifically distinguishing between peritoneal

21 (Pages 322 to 325)

Rebecca Smith-Bindman, M.D.

Page 326

1  mesothelioma and ovarian cancer; is -- is that
2  right?
3      MS. O'DELL:  Object to the form.
4      A  So this -- those are the conclusions that
5  she makes.  But I -- I want just to explain what she
6  means by "small number of cases."
7      She's comparing it to the number of men
8  exposed to asbestos.  Just there -- there are many
9  more men exposed to asbestos than -- than women
10 exposed to asbestos.
11     So I think -- I mean, I -- I think it's a
12 challenge, but I -- wouldn't say that there are a
13 small number of cases.
14     MR. ZELLERS:  Move to strike as
15 nonresponsive.
16     Q  (BY MR. ZELLERS) Would you agree that most
17 of the studies that have been done and the data that
18 exists relates to occupational exposure of asbestos
19 and ovarian cancer?
20     A  Yes.  I --
21     Q  All right.
22     A  -- yes.
23     Q  You looked at the Camargo paper 2011; is
24 that right?
25     A  Yes.

Page 327

1      Q  That study points out that there's an
2  inability to account for nonoccupational risk
3  factors for ovarian cancer in these studies other
4  than age; is that right?
5      MS. O'DELL:  If -- if you remember.  If
6  you need to see --
7      A  I -- I don't remember.
8      Q  (BY MR. ZELLERS) All right.  Do you have
9  the Camargo paper in front --
10     A  I --
11     Q  -- of you or would you like me to give it
12 to you?
13     A  -- please.
14     Q  Camargo 2011, we will mark as deposition
15 Exhibit 35.
16     (Exhibit 35 was marked for identification
17 and is attached to the transcript.)
18     A  Thank you.
19     Q  (BY MR. ZELLERS) Do you have that in front
20 of you now?
21     MS. O'DELL:  Thank you.
22     A  Yes, I do.
23     Q  (BY MR. ZELLERS) Camargo.  Take a look, if
24 you will, you know, on page 1216.  The second
25 paragraph above "Conclusion," does Camargo and the

Page 328

1  author state, Further limitation of our analysis was
2  its inability to account for nonoccupational risk
3  factors for ovarian cancer other than age?
4      A  Yes, I do see that.
5      Q  On page 25 -- I'm sorry -- 1215.  So the
6  page before the second paragraph under "Discussion,"
7  they talk about Edelman 1992; is that right?
8      A  Yes.
9      Q  And the authors state, They concluded,
10 however, that despite the positive and significant
11 association, there was insufficient information to
12 infer that ovarian cancers were caused by
13 occupational exposure to asbestos --
14     A  I -- I'm sorry.  I --
15     Q  Sure.
16     A  -- I -- I'm lost.  Where are we?
17     Q  Okay.  So do you see under "Discussion" --
18     A  Yes.
19     Q  -- the second paragraph --
20     A  Yes.
21     Q  -- I believe the second sentence?  It
22 says, They concluded.
23     Are you with me?
24     A  Yes.  They are describing another
25 meta-analysis --

Page 329

1      Q  Yes.
2      A  -- they concluded, yes.
3      Q  This -- this is a review of different meta
4  --
5      A  Yeah.
6      Q  -- analyses; is that right?
7      A  Yes.
8      Q  And they're describing Edelman 1992.  And
9  they state, They concluded, however, that despite
10 the positive and significant association, there was
11 insufficient information to infer that ovarian
12 cancers were caused by occupational exposure to
13 asbestos because of concerns about tumor
14 misclassification, inappropriate comparison
15 populations, and the failure to take into account
16 for known risk factors.
17     Is that right?
18     A  You're reading from Camargo, who is
19 quoting from a discussion by Edelman, so that --
20 that's what it says.  I -- I don't -- I don't know
21 that that's what Edelman says, but -- but yes,
22 that's the...
23     Q  Wouldn't you expect to find higher rates
24 of other cancers in women using talc, like
25 mesothelioma, if they are being exposed to

22 (Pages 326 to 329)

Rebecca Smith-Bindman, M.D.

Page 330

1  substantial amounts of asbestos?
2         MS. O'DELL:  Object to the form.
3      A  I -- I'm confused.  I'm confused.  Are you
4  saying women exposed to asbestos are not getting
5  mesothelioma?
6      Q   (BY MR. ZELLERS) Well, let me ask it this
7  way:  Are -- are women who use talc in the perineal
8  region at greater risk of mesothelioma?
9      A  I do not know studies that have said that.
10     Q   Are women who use talc in the perineal
11  region at greater risk of asbestosis?
12     A  In the lungs?
13     Q  Yes.
14     A  I -- I do not know those studies.
15     Q  With respect to fragrance chemicals, you
16  have no evidence that the blood or tissue levels of
17  any trace metals are higher in genital talc users
18  compared to nonusers, correct?
19     A  I -- I don't know that literature at all.
20     Q  And you have no knowledge as to either the
21  amount or concentration of different fragrance
22  chemicals in the baby powder, correct?
23     A  I -- I do not.
24         MR. ZELLERS:  Okay.  I have no further
25  questions.  My colleagues may have some questions.

Page 331

1         MS. BOCKUS:  Could we go off the record
2  for just a minute to move the microphone down?
3         THE VIDEOGRAPHER:  The time is 11:16 a.m.
4  We are off the record.
5         (A break was taken from 1:16 a.m. to 11:17
6  a.m.)
7         THE VIDEOGRAPHER:  The time is 11:17 a.m
8  we are now back on the record.
9     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10  BY MS. BOCKUS:
11     Q  Good morning, Doctor.  I introduced myself
12  yesterday, I hope.  I'm not sure I did.  I'm Jane
13  Bockus.  I represent Imerys in this matter.
14         How are you feeling today?
15     A  I'm good.  Thank you.
16     Q  Have you gone back to work full time since
17  your skiing accident?
18     A  I am primarily a researcher, so I get to
19  choose my own hours.  So I have gone back to work
20  full time, but I often leave work a little earlier
21  and take a rest.
22     Q  Has your injury from your skiing accident
23  affected your ability to answer all the questions
24  you have been asked in the last day and a half?
25     A  It has not.

Page 332

1      Q  Okay.  So when -- if you answered a
2  question, is it because you believe you understood
3  it and that you felt able to answer it?
4      A  Yes.
5         MS. O'DELL:  Object to the form.
6      Q   (BY MS. BOCKUS) Okay.  So before being
7  hired in this case, you had not really looked at the
8  association between talc and ovarian cancer; is that
9  fair?
10     A  That's correct.
11     Q  The person who wrote to you first, do you
12  remember if it was a male or a female, the attorney?
13     A  I think it was a woman.
14     Q  Okay.  And have you -- tell me what search
15  you have done to locate that person's name.
16     A  I could probably search some more.  I --
17  I -- my correspondence with these lawyers that I
18  have a document of on my computer is from July.
19         But Mike reminded me that I must have met
20  with them in June.  So I could go through -- there
21  are ways I can access older e-mails to look if
22  that's important to you.  I'm happy to try and find
23  that person.
24     Q  I just was curious.  There -- because you
25  have nothing in the published literature about the

Page 333

1  etiology of ovarian cancer, correct?
2      A  I do not.  And I will tell you I asked the
3  person who contacted me what the case was about, was
4  it an area of my expertise.
5         And the person who contacted me, I think,
6  was someone who knew of me from another case.  And
7  it was my researching abilities, not my content
8  expertise, that led her to reach out to me.
9      Q  Okay.  So it was with the understanding
10  that you would start a whole new area of research in
11  order to answer the question; is that correct?
12         MS. O'DELL:  Object to the form.
13     A  Yes.
14     Q   (BY MS. BOCKUS) Okay.  In fact, when you
15  appeared before congress, you stated that you're a
16  clinical radiologist and you conduct research
17  focusing on -- or focused on assessing the risk and
18  benefits of medical imaging, correct?
19     A  If -- if you have my testimony there, I'm
20  going to believe you.
21     Q  And when you have given interviews or have
22  written opinion pieces, you identify yourself as
23  primarily a radiologist who focuses on evaluating
24  the risks and benefits of medical imaging, correct?
25         MS. O'DELL:  Object to the form.

23 (Pages 330 to 333)

Rebecca Smith-Bindman, M.D.

Page 334

1    A   So I have given a lot of interviews, and I
2   often identify as a professor of epidemiology and
3   biostatistics. I'm not sure what interview that you
4   are looking at.
5         I often -- often introduce myself as a
6   professor of obstetrics, gynecology, and
7   reproductive sciences.
8         And my guess is that whomever is
9   publishing the interview will choose to present me
10   in a way that they think highlights my skill.
11        But -- but my -- I'm a professor in
12   radiology and epidemiology and biostatistics,
13   obstetrics, gynecology, and a member of the Philip
14   R. Lee Institute for Health Policies Studies.
15        So I -- I get presented with whichever of
16   those first the presenter thinks might highlight my
17   expertise.
18        Q   Are you board-certified in obstetrics and
19   gynecology?
20        A   I'm not.
21        Q   The Bradford Hill criteria, the first
22   consideration is the "strength of the association";
23   is that correct?
24        A   First criteria?  Yes.
25        Q   What do you consider to be a strong

Page 335

1   association?
2        A   So it overlaps a little bit with the
3   second concept of Bradford Hill in the consistency
4   of -- of the data.
5         But where the association is meaningfully
6   and legitimately documented across study designs and
7   patient populations such that the association is
8   believable and meaningful, not necessarily
9   associated with a particular point estimate of
10   association, if that's the question.
11        I don't have any particular number.  It's
12   rather the entirety of the relationship, that it's a
13   meaningful quantifiable association.
14        Q   Do you teach epidemiology?
15        A   I do.
16        Q   Can you identify textbooks that you find
17   reliable on the subject of epidemiology?
18        A   The textbook that I often use to teach
19   epidemiology is a book -- I -- I'm not sure if the
20   authorship has changed over the years, but by holly
21   Cummings that talks about principles of
22   epidemiology. It's sort of the clearest version
23   that I know.
24        And -- and they -- and I haven't looked
25   this particular question up, but they wouldn't talk

Page 336

1   about a quantitative association, but rather, the
2   biases and legitimacy of the association.
3        Q   Are you familiar with the text "Analysis
4   of Case-Control Studies" by Breslow and Day?
5        A   I -- I -- yes.
6        Q   Do you find that to be a reliable text on
7   the subject of the analysis of case-control studies?
8        MS. O'DELL:  Object to the form.
9        A   I -- I don't know that chapter or section
10   enough to answer that question without looking at
11   it.
12        Q   (BY MS. BOCKUS) But you're familiar with
13   their work?
14        A   Yes.
15        Q   And they're well-respected
16   epidemiologists?
17        A   Yes.
18        MS. O'DELL:  Object to the form.
19        Q   (BY MS. BOCKUS) You make a statement in
20   your report on page 12 that the most widely accepted
21   mechanism for initiation, promotion, and progression
22   of ovarian cancer is tissue inflammation leading to
23   a series of responses that result in cancer.
24        And you have talked about that sentence a
25   bit with Mr. Zellers already.

Page 337

1        Did you do a survey of the literature to
2   determine what was the most widely accepted
3   mechanism for initiation of ovarian cancer?
4        A   I did.
5        Q   And did you do a survey of the cancer
6   biology literature?
7        MS. O'DELL:  Object to the form.
8        A   What was the first literature you asked me
9   about?
10        Q   (BY MS. BOCKUS) The literature that
11   supported your statement that the most widely
12   accepted mechanism was inflammation.
13        And you said you did a survey on the
14   inflammation literature -- or I mean on the
15   etiology -- let me start all over again.
16        Have you done a survey on articles that
17   discuss the likely mechanism for the etiology of
18   ovarian cancer?
19        A   Yes, I have .
20        Q   Have you -- have you -- did your survey
21   include the literature on the cancer biology --
22        A   Yes.
23        Q   -- of --
24        A   Yes, it did.
25        Q   -- of ovarian cancer?

24 (Pages 334 to 337)

Rebecca Smith-Bindman, M.D.

Page 338

1    A  Yes, it did.
2    Q  And did you find that as the issue of
3  inflammation as an initiator of ovarian cancer is
4  not a settled question?
5        MS. O'DELL:  Object to the form.
6    A  I -- I would acknowledge that -- that none
7  of it is settled.  It's just the most widely
8  accepted, most widely supported, most wide -- widely
9  enhanced view supported by the data, but I don't
10 think the issue is settled.
11   Q  (BY MS. BOCKUS) In fact, there's still
12 considerable research going on on the subject --
13   A  Yes --
14   Q  -- correct?
15   A  -- I think there is.
16   Q  In the next paragraph you talk about, for
17 example, this is the middle -- there are
18 well-described and accepted causal pathways
19 linking in -- linking inflammation to bladder
20 cancer, gastric cancer, colon cancer, et cetera.
21       You would agree and you identify the
22 inflammatory sometimes virus or whatever that's --
23 that's well described and accepted for all of the
24 different cancers that you list there, correct?
25       For example, you identify toxic chemicals

Page 339

1  for the etiology of bladder cancer, correct?
2        MS. O'DELL:  Object to the form.
3    Q  (BY MS. BOCKUS) Do you see where I'm
4  reading?
5    A  I -- I don't see where you're reading
6  exactly, but -- but I agree with you that I have
7  given examples where we know the cause of the
8  inflammation for many of those cancers.
9    Q  (BY MS. BOCKUS) You would agree that there
10 is no equivalent literature linking ovarian cancer
11 to talcum powder use, correct?
12       MS. O'DELL:  Object to the form.
13   A  I think there's a strong literature on
14 components of the analysis.  But I think for several
15 of the examples I have given, the data are a little
16 bit clearer and further along.
17       So path -- HPV and cervical cancer has a
18 longer historical data collection period when we
19 have them --
20   Q  (BY MS. BOCKUS) And --
21   A  -- identified.  So I think that's your
22 question.
23   Q  -- so the strength of the association
24 between HPV virus and cervical cancer is much, much
25 stronger than any association that's been reported

Page 340

1  with body powder use and ovarian cancer, correct?
2        MS. O'DELL:  Object to the form.
3    A  I -- I'm going to go back to say that I --
4  I don't know what the strength of the association is
5  with -- with these individual cancers.
6        I -- I don't know if it's a 20 percent
7  increase or a 500 percent increase, except for the
8  one that I gave the example of bladder cancer.
9        So for bladder cancer, I gave two examples
10 that cause inflammation of the bladder.  One being
11 toxic chemicals and the second being cigarette
12 smoking.
13       The toxic chemicals have a very strong
14 relative risk of 200 or 300, where I think smoking
15 has a relative risk of more like 1.3.
16       And so I -- I -- I don't know it for these
17 other cancers.  But at least for bladder cancer,
18 which I think is -- I think the second most common
19 cancer and cigarette smoke is -- I think the
20 association in the ballpark of 1.3.
21       I think I have it in here.  But -- so for
22 most of these, I don't know what that number is.
23       MS. BOCKUS:  I'm going to object as
24 nonresponsive.
25   Q  (BY MS. BOCKUS) Because the question I

Page 341

1  asked was about the HPV virus and cervical cancer --
2    A  I don't --
3    Q  -- correct?
4    A  -- know the -- the relative --
5    Q  All right.
6    A  -- risk for that.  But I -- I thought I
7  said the only one I do know is the bladder cancer
8  numbers.
9    Q  Has your methodology in determining what
10 studies to include and what studies to exclude been
11 peer reviewed in any way, shape, or form?
12   A  It has not.
13   Q  Has your math --
14   A  Oh, I'm sorry.  Has my methodology been
15 peer reviewed?
16   Q  In -- in this particular case, the method
17 --
18   A  Okay.  The method has been peer reviewed.
19 But in this particular case, it has not.
20   Q  So no one has looked over your report and
21 determined whether your decision -- and as I
22 understand it, it was your decision alone, correct,
23 as to whether to include data from a particular
24 study or not --
25   A  Again --

25 (Pages 338 to 341)

Rebecca Smith-Bindman, M.D.

1    Q   -- and --
2    A   -- it was a decision between myself and
3  the -- and -- and -- and Dr. Hall --
4    Q   So --
5    A   -- just the two of us.
6    Q   -- okay.  So did Dr. Hall participate in
7  the decision-making process as to which of the
8  case-control studies and the cohort studies to
9  include and which to exclude?
10    A   It -- so it's -- it's a -- the answer is
11  partly and partly not.
12       So in terms of whether the studies were
13  included in the final analysis, Dr. Hall was
14  involved in that decision.
15       But in terms of setting up the question to
16  begin with, she was not involved in that.  I -- I
17  set that up.
18    Q   So other than you and Dr. Hall, has anyone
19  been involved in the process of determining which
20  studies were going to be involved -- in -- were
21  going to be included in your systematic review and
22  which were not?
23    A   Nobody else.
24    Q   Okay.  And has anyone other than you and
25  Dr. Hall even checked your work for transcription

1  errors?
2       MS. O'DELL:  Object to the form.
3    A   No.
4    Q   (BY MS. BOCKUS) And has anyone other than
5  you and Dr. Hall checked your work for mathematical
6  errors?
7    A   No.
8    Q   You excluded all of the data from the
9  cohort studies with the exception of the earliest
10  reported data from the Nurses' Health Study; is that
11  correct?
12    A   Yes.
13       MS. O'DELL:  Object to the form.
14    Q   (BY MS. BOCKUS) Did you run the -- the --
15  the numbers to determine if there would be a
16  difference if you included the data from all the
17  cohort studies and if you excluded them?
18    A   So the requirement to be in our review was
19  to have a measure of regular use of talcum powder
20  products, and those other studies didn't have
21  something to plug into that equation.
22       So -- so I didn't have a number from those
23  studies to include in a sensitivity analysis.  They
24  -- they didn't report regular use, so I -- I
25  couldn't do what you were asking me to have done.

1    Q   Would you agree that you're -- at this
2  point in time your report is not yet ready to be
3  submitted for peer review?
4       MS. O'DELL:  Object to the form.
5    A   I would agree that the description in this
6  report needs more detail, more -- to submit it to
7  peer review.  Not necessarily different work, but
8  definitely different detail and description.
9    Q   (BY MS. BOCKUS) Have you satisfied
10  yourself that the studies that you did include do
11  not overlap with regard to patients; that you
12  haven't counted the same patients multiple times?
13    A   I -- I am comfortable that I did my best
14  to do that.  But I know there were some cases where
15  I felt like I wasn't 100 percent sure.
16    Q   And you would agree that by -- including
17  the same cases and controls multiple times could
18  skew the -- the data?
19       MS. O'DELL:  Object to the form.
20    A   I think that that theoretically is a
21  concern of mine, which is why I try to you exclude
22  them if there was overlap.
23       On a practical level, the benefit of
24  pooling data from multiple sources is that the final
25  summary is less sensitive to any individual result,

1  let alone some patients that might overlap.
2       But I agree with you that you want to
3  avoid that because of that concern.
4    Q   (BY MS. BOCKUS) All right.  Would you turn
5  to page 35 of your study.  And I am looking at
6  the -- right in the middle of the page, the
7  paragraph that starts with the word, Further talc
8  particles.
9       But I'm going to the last sentence in the
10  paragraph.
11       "The greater frequency at which talc
12  particles are discovered in ovarian cancerous tissue
13  than in normal ovarian tissue further supports that
14  these target -- particles may be causing cancer."
15       You don't have a source for that.  You
16  don't cite to any study.  And I would like to know
17  where you got that information.
18       MS. O'DELL:  Objection to the form.
19    A   I would have to review Heller and
20  Henderson.  No.  Henderson is just cancer.
21       So I would have to review -- review
22  Heller, but that -- I -- I -- I don't remember what
23  the -- cite of it.  I would have to look at the
24  articles that I cite in that paragraph and see if I
25  could remember.

Rebecca Smith-Bindman, M.D.

Page 346

1    Q   (BY MS. BOCKUS) The next statement has to
2  do with the reduction in incidence of ovarian cancer
3  after tubal ligation or hysterectomy?
4    A   Yes.
5    Q   Is it not correct that that statement is
6  true for both women who have used talcum powder
7  product and who -- let me ask a better question.
8       Here you're talking about that the
9  elevated -- that studies that look at the risk of
10 ovarian cancer associated with powder products
11 report a reduction in risk after hysterectomy or
12 tubal ligation, correct?
13   A   Yes.
14   Q   Isn't that also true in the general
15 population for all women, that there -- whether they
16 have used talcum powder products or not, that their
17 risk of ovarian cancer is reduced by hysterectomy or
18 oophorectomy --
19   A   Yes.
20   Q   -- or tubal ligation?  I'm sorry.
21   A   Yes.  It's even more reduced by
22 oophorectomy.
23   Q   Well, sure.  I misspoke.
24      MS. BOCKUS:  I believe that's all the
25 questions I have.  Thank you.

Page 347

1       MS. O'DELL:  Why don't we go off the
2  record.  I'm sorry.  Do you --
3       MR. ZELLERS:  No.
4       MR. BILLINGS-KANG:  I may have two or
5  three questions.
6       MS. O'DELL:  Oh, sorry, James.  Yeah,
7  please.
8       THE VIDEOGRAPHER:  We are still on?
9       MS. O'DELL:  Yes.
10      THE VIDEOGRAPHER:  Do we want to go off?
11      MR. BILLINGS-KANG:  Yeah.
12      MS. BOCKUS:  We need to go off to move the
13 mic.
14      THE VIDEOGRAPHER:  The time is 11:37 a.m.
15 We are going off the record.
16      (A break was taken from 11:37 a.m. to
17 11:40 a.m.)
18      THE VIDEOGRAPHER:  The time is 11:40 a.m.
19 We are now back on the record.
20      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21 BY MR. BILLINGS-KANG:
22   Q   Good morning, Dr. Smith-Bindman.  How are
23 you?
24   A   Good.
25   Q   My name is James Billings-Kang.  I'm an

Page 348

1  attorney who represents Defendant Personal Care
2  Products Council.
3       So for purposes of this deposition when I
4  reference "Personal Care Products Council," I mean
5  PCPC or CPFA or any of its predecessors.  Is that
6  okay?
7    A   Yes.
8    Q   So I want to turn to Exhibit 15, which is
9  your reference list.  And that reference list is
10 Exhibit B of your expert report; is that correct?
11   A   Yes.
12   Q   And if you can turn to page 19 of that
13 reference list.  And just let me know when you're
14 there.
15   A   I am there.
16   Q   And if you go about 75 percent of the way
17 down, there's a reference to a PCPC document.
18      Do you see that?
19   A   Yes.
20   Q   Do you happen to know what that document
21 is?
22   A   I do not.
23   Q   Did you rely on this document --
24   A   You would have to --
25      MS. O'DELL:  Object to the form.  Excuse

Page 349

1  me.  Object to the form.  If -- if --
2    A   -- you would have to tell me what it is to
3  know if --
4       MS. O'DELL:  -- or show it to her if
5  you --
6       MR. BILLINGS-KANG:  Sure.
7       MS. O'DELL:  -- have a question about it.
8    Q   (BY MR. BILLINGS-KANG) But for purposes of
9  formulating your opinion in the expert report, did
10 you rely on any PCPC-produced documents?
11      MS. O'DELL:  Object to the form.
12   A   You would have to show --
13      MS. O'DELL:  Put --
14   A   -- it in to me.
15      MS. O'DELL:  -- just put it in front of
16 her if you're going to ask her a question about it
17 so she can --
18   Q   (BY MR. BILLINGS-KANG) I'm just asking:
19 Based on your memory, do you recall using any
20 PCPC-produced document to formulate your opinion.
21      MS. O'DELL:  I would -- I would just
22 object to the form.
23   Q   (BY MR. BILLINGS-KANG) That's --
24      MS. O'DELL:  None of --
25   Q   (BY MR. BILLINGS-KANG) -- that's fine.

Rebecca Smith-Bindman, M.D.

Page 350

1 You can answer --
2         MS. O'DELL:  None of that --
3     Q   (BY MR. BILLINGS-KANG) -- yes or no, if
4 you remember.
5         MS. O'DELL:  -- none of us would be
6 expected to remember a document based on a Bates
7 number.
8     Q   (BY MR. BILLINGS-KANG) Well, I'm asking
9 her just generally PCPC-produced documents, if she
10 relied on any of those --
11        MS. O'DELL:  Objection.
12    Q   (BY MR. BILLINGS-KANG) -- to formulate her
13 opinion?
14        MS. O'DELL:  Object to the form.  I'm
15 putting that --
16        MR. BILLINGS-KANG:  Sure.
17        MS. O'DELL:  -- that Bates number in front
18 of her.  And if you --
19        MR. BILLINGS-KANG:  Sure.
20        MS. O'DELL:  -- remember, you remember.
21    A   This is a document that lists different
22 research studies that have been done over time.  Is
23 that the document that we're --
24    Q   (BY MR. BILLINGS-KANG) Well, I -- I'm not
25 too sure.  This is a document you listed in the

Page 351

1 reference list.
2     A   I -- I'm just trying to make sure that I'm
3 looking at the document that you are --
4     Q   According to your counsel, this is what's
5 been identified on page 19 of the reference list.
6     A   I -- I do not remember this document.
7 This --
8     Q   Okay.
9     A   -- document is just a list of studies.
10    Q   So you do not recall whether you relied on
11 this document in formulating your opinion?
12    A   My --
13        MS. O'DELL:  Object to the form.
14    A   -- opinion is not based on the -- on a --
15 a list of studies.
16    Q   (BY MR. BILLINGS-KANG) Okay.  So that's --
17 that's a -- that's a yes, you do not -- you did not
18 rely on this document in formulating your opinion?
19    A   I -- I don't remember seeing this
20 document.  As I'm going through this document, there
21 are a lot of studies that I reviewed that I did rely
22 on.
23        So I don't know if you're asking me if I
24 relied specifically on some of the items in here
25 that I have relied on or the -- this document

Page 352

1 itself.
2     Q   Just --
3     A   I don't remember --
4     Q   -- the document --
5     A   -- seeing --
6     Q   -- itself.
7     A   -- this -- I don't remember seeing this
8 document.
9     Q   Okay.  You can -- you can put that away.
10 And I will go to your expert report that's
11 Exhibit 2, page 14.  Just let me know when --
12    A   I'm there.
13    Q   -- you're there.  And this -- the first
14 paragraph under "Asbestos," it's about halfway in
15 that first paragraph beginning with, Because of
16 concern that asbestos was present in talcum powder
17 products in the known carcinogenicity of asbestos,
18 it has been reported that voluntarily guidelines
19 were established by the cosmetic industry in 1976 to
20 limit the content of asbestos fibers in commercial
21 talc preparations.
22        Did I read that correctly?
23    A   You did.
24    Q   And these are your words, correct?
25    A   Yes, they are.

Page 353

1     Q   And what did you mean by "voluntarily
2 guidelines"?
3     A   I -- I have read a lot about the
4 guidelines.  And it -- the idea was that the
5 industry decided to self-regulate and to do what
6 they could to remove the asbestos, is my
7 understanding of what that was as opposed to being
8 required to submit testing to document that they had
9 done so.
10    Q   And -- and what did you rely upon for this
11 particular sentence?
12    A   This particular sentence is repeated in --
13 in at least half of the papers that I have read that
14 are epidemiology papers.
15        It's repeated in all of the news studies.
16 It's repeated in reports by consumer organizations,
17 by the FDA, by the recent Canadian report, which I
18 didn't have in hand.
19        But it's something that I -- I have read a
20 lot -- a great deal, that there were voluntarily
21 standards that were established by the industry.
22    Q   And so did you read any publication or
23 whatever reliance materials that you had that
24 described these guidelines as anything else other
25 than voluntarily guidelines?

Rebecca Smith-Bindman, M.D.

Page 354

1    A   I -- I -- I did not.  I looked for
2  documents like that.  I was not able to find them.
3  Required -- requirements, I was not able to find.
4        MR. BILLINGS-KANG:  Okay.  That's all I
5  have.
6        MS. O'DELL:  Why don't we take a short
7  break.
8        THE VIDEOGRAPHER:  The time is 11:45 a.m.
9  We are now off the record.
10        (A break was taken from 11:45 a.m. to
11  12:15 p.m.)
12        THE VIDEOGRAPHER:  The time is 12:15 p.m.
13  We are now back on the record.
14        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
15  BY MS. O'DELL:
16    Q   Dr. Smith-Bindman, I have just a few
17  questions for you.  First, during all of your work
18  in this case, was it your understanding that you
19  were serving as an expert consultant?
20    A   Yes.
21    Q   And you know, throughout the early
22  meetings in June, I believe, of 2017, where you met
23  with Plaintiffs' counsel, did Plaintiffs' counsel
24  provide information regarding their theories of the
25  talcum powder litigation?

Page 355

1    A   Yes.
2    Q   And have you been paid by Plaintiffs'
3  counsel for all the work that you have billed in
4  this case?
5    A   Yes, I have.
6    Q   Okay.  You have been asked a number of
7  questions about the meta-analysis, the systematic
8  review that you performed on the regular use of --
9  of talcum powder.
10        Would you have reached your opinions in
11  this case without having performed that analysis?
12    A   My systematic review ended up with the
13  same estimates as essentially all of the other
14  well-done systematic reviews.
15        And it was very helpful for me to confirm
16  the results.  But yes, it's the same as the other
17  studies, and so my -- my conclusion about the
18  causality of talcum powder products and ovarian
19  cancer would be exactly the same, even without mine.
20        It just made me a little more comfortable
21  that I was certain about the -- the results
22  presented by other people.
23    Q   And in a sense, the analysis that you did
24  replicated the work that had been published in the
25  -- in the literature?

Page 356

1        MR. ZELLERS:  Objection, form.
2    Q   (BY MS. O'DELL)  Let me strike that and
3  start again.  Did your meta-analysis replicate what
4  had been published in the literature?
5    A   The --
6        MR. ZELLERS:  Form.
7    A   -- the results of my meta-analysis and the
8  previous ones are nearly identical.  So yes, it was
9  a very close replication.
10    Q   (BY MS. O'DELL)  And you have mentioned
11  your intent to publish your -- your meta-analysis,
12  your systematic review.  And I believe you testified
13  that in the published version, you would add
14  additional detail.
15        What did you mean by that?
16    A   So the analysis that I have done is
17  complete.  But the presentation of the results in a
18  paper would require more beautiful graphics, would
19  require explaining our inclusion and exclusion
20  criteria more fully than I did in this published
21  report.  Things like that.
22        And that actually is a substantial part of
23  the writing of a scientific paper, sort of
24  explaining every step of what you did, and so I
25  would have to do more of that to publish this study.

Page 357

1    Q   Is there sufficient detail in the -- in
2  your report regarding your methodology, as well as
3  in the documentation provided in the spreadsheets
4  to -- for someone to replicate the work that you
5  have done?
6        MR. ZELLERS:  Objection, form.
7    A   I believe that if someone used the
8  software that we said and had the inclusion criteria
9  that we led out -- set out, that they would get the
10  -- the same results as we got.
11        And I think the fact that our review
12  provides the same results as other systematic
13  reviews sort of, you know, also supports that.  But
14  yes, I think someone could easily replicate our --
15  our analysis.
16    Q   (BY MS. O'DELL)  Okay.  You were asked a
17  number of -- before I do that, let me ask you:  Can
18  there be multiple causes of ovarian cancer?
19    A   Absolutely.  I -- I describe in the
20  report, a whole number of different risk factors for
21  ovarian cancer.
22    Q   And in a -- in a patient -- hypothetically
23  in a patient who has a BRCA1 mutation, possibly has
24  other risk factors for ovarian cancer, and also uses
25  talcum powder products, under those circumstances,

29 (Pages 354 to 357)

Rebecca Smith-Bindman, M.D.

1   would talcum powder products be a contributing cause
2   of her cancer?
3         MR. ZELLERS:  Objection, form.
4      A   I think patients can have multiple risk
5   factors and causes of -- of cancer.  Some causes,
6   you would imagine, would be quite synergistic.
7        So having both together would be worse
8   than twice having either of those alone.  So it
9   would be worse than having -- it -- it would be more
10  than double the initial, because they would be
11  basically enhancing.
12        So if -- if some risk factors caused lots
13  of oxidative stress and another enhanced that
14  oxidative stress and prevented repair or cell
15  apoptosis, you would get even more impact.
16        So yes, I would say multiple risk factors
17  for most diseases occur concurrently, and sometimes
18  they enhance or are synergistic.
19    Q   (BY MS. O'DELL) Can asbestos be inhaled
20  and cause ovarian cancer?
21        MR. ZELLERS:  Objection, form; foundation.
22      A   Absolutely.  The -- the IARC 2012 report
23  was primarily on the basis of inhalation of
24  asbestos.
25    Q   (BY MS. O'DELL) Can fibrous talc be

1   inhaled and cause ovarian cancer?
2    A   I --
3        MR. ZELLERS:  Objection, form; foundation.
4      A   -- yes.
5    Q   (BY MS. O'DELL) And what's your basis for
6   that statement?
7        MR. ZELLERS:  Same objections.  None of
8   this was in her report.  None of this has been in
9   her opinions.
10        These are all new opinions.  So inhalation
11  has not been any part of her testimony or her
12  opinion.
13        MS. O'DELL:  Inhalation is mentioned in
14  her report.
15    A   I -- I -- you know, the -- the chapter on
16  asbestos and occupational exposure and IARC report
17  is -- is about inhalation.
18        I'm not sure if I -- I was explicit about
19  the route, but that is where the data come from for
20  asbestos, as well as fibrous talc.
21        And those articles talk about the fact
22  that there might be other exposures in addition, but
23  they're primarily inhalation studies.
24        MR. ZELLERS:  Again, object to what the
25  defense views as a completely new opinion that was

1   not disclosed in Dr. Smith-Bindman's expert report.
2    A   Can I read?  Just on page 14, The results
3  were consistent, significant, and documented a
4  strong and compelling causal association between
5  exposure to asbestos and ovarian cancer largely
6  result in the association from cohort studies of
7  women with substantial occupational exposures.
8        That -- that was the --
9    Q   (BY MS. O'DELL) Okay.  Let me -- let me
10  ask you to -- to turn, Dr. Smith-Bindman, to the
11  Langseth paper that was marked as Exhibit 30 by
12  counsel for J&J.
13        And specifically to turn to page 2 of the
14  paper to Figure 1.
15    A   Yes.
16    Q   You were asked a number of questions about
17  whether the studies that had confidence intervals
18  that cross one were essentially by chance.  In other
19  words, they -- they did not speak to a potential
20  increased risk in ovarian cancer as a result of
21  talcum powder use.
22        Are the -- what's your analysis of those
23  studies and whether, as counsel put it, it was
24  equivalent to a coin toss?
25    A   So if there was no relationship between

1   ovarian cancer and exposure to talcum powder
2   products, you would expect the forest plot in
3  Figure 1 to have half of the point estimates be
4  above one, saying there's a risk; and half of the
5  point estimates being below one, saying there isn't
6  a risk.
7        In fact, every one of the studies on this
8  table is at or above one.  It's to the right.  So to
9  get that by chance is highly, highly, highly
10  unlikely.
11        The best estimate is -- the point estimate
12  in all of those are very different than one.
13        And so to call that by chance doesn't make
14  sense.  The fact that for an individual study, the
15  confidence interval overlap one doesn't mean it's by
16  chance.
17        So again, by chance would mean half the
18  studies have a positive association, half have a
19  protective.
20        And in fact, every one of the studies has
21  a value that's either substantially greater than one
22  or just a little greater than one.
23    Q   Okay.  You were asked questions about
24  starting -- in reference to the Langseth paper you
25  were asked questions about the -- the pooled odds

Rebecca Smith-Bindman, M.D.

Page 362

1  ratio for hospital-based studies and the focus on
2  that finding being that it was not a statistically
3  significant increased risk.
4         Did the Berge paper also look at a pooled
5  analysis of the hospital-based studies?
6    A   She did.  If you look at Table 2, Table 2
7  shows the results of the case-control studies that
8  were hospital based versus community based.
9         And those individual group of
10 hospital-based studies are statistically
11 significant.
12        But I would point out that in this case
13 the -- they report the relative risk of a hospital
14 based versus community based.  They're relatively
15 similar.  They're both significant, and they're
16 relatively similar, which is what I concluded from
17 Langseth.  They're very similar.
18   Q   Okay.  You were asked about studies
19 relating to migration.  And the specific -- the
20 specific question, as I wrote it down was:  Is there
21 a study that demonstrates talc on the -- applied to
22 the perineum, traveling to the -- or migrating to
23 the ovary, and you said, No.
24        What evidence are you relying on to
25 support your opinion that talcum powder can migrate

Page 363

1  when applied -- applied to the genital area to the
2  ovary?
3    A   So I was asked a very narrow question, is
4  there a study that talks about transport from the
5  perineum.
6         But in fact, there is extensive evidence
7  that particles from the perineum could get to the
8  ovary and do get to the ovary.
9         And part of that is the perineum is
10 basically equivalent to the vagina.  It is one open
11 system to the ovary.
12        And so my evidence for that is
13 several-fold.  First, I'm a clinical radiologist,
14 and I do a lot of procedures in women where I am
15 putting catheters in the vagina and injecting fluid
16 that goes to the uterus, to the tubes.  I watch the
17 fluid spill.  It's a wide-open system.
18        Occasionally patients have complications
19 that don't let me do that, and I might inject fluid
20 literally on the perineum to get a backlash to the
21 ovaries.  And it's a wide-open connected system.
22        All of our textbooks talk about it being a
23 bi-directional system.  You know, infection goes
24 both directions.  Retrograde menstruation and
25 menstruation go both directions.

Page 364

1         There have been studies of sperm, both
2  living and dead, going in both directions.  So it's
3  not just the mobile sperm, but the dead sperm.
4         Carbon particles -- you know, a tiny
5  study -- but have been shown to move -- radioactive
6  material has been seen to move.  Material on gloves
7  has been seen.
8         So it's a wide-open system.  The idea that
9  we think of that as being a barrier system is just
10 false.
11        Now, I don't know of an individual study
12 that has put talc on the perineum.  I think that's,
13 unfortunately, not an ethical study to do.  And I
14 don't know of such a study or why you would do such
15 a study.
16        But to think that there's any barrier
17 between the perineum and the vagina makes no sense
18 whatsoever.
19   Q   Let me transition to talk about
20 inflammation for a moment, and specifically
21 inflammation as a cause of ovarian cancer first.
22        What evidence are you relying on to
23 support your opinion that inflammation -- chronic
24 inflammation causes ovarian cancer?
25   A   Okay.  So there's an enormous amount of

Page 365

1  literature that understands what we see when there's
2  inflammation, what kind of changes you see on a
3  cellular level.
4         So you see increase in pro oxidation, a
5  reduction in antioxidation.  You see increase in
6  cell turnover, reduction in cell death, expression
7  of inflammatory agents, cellular changes at the DNA
8  level that leads to greater expression.
9         We -- we understand those pathways.  And
10 those pathways occur both with talc exposure and in
11 the setting of things that cause ovarian cancer.
12        So I -- in my reference list, I reference
13 a whole bunch of references -- Saed references,
14 Shawn (phonetic) references, Ness references.
15 There's really enormous numbers of references.
16        I -- in my documents I have Shukla
17 references, BuzZard references, Hamilton references
18 that talk away sort of these inflammatory pathways
19 and biologic mechanisms that lead to changes that go
20 along with inflammation.
21   Q   I know you have reviewed Dr. Saed's
22 research in regard to whether talcum powder causes
23 inflammation in vitro.
24        First, let me ask you this:  Does
25 Dr. Saed's work support the conclusion that

31 (Pages 362 to 365)

Rebecca Smith-Bindman, M.D.

Page 366

1    Johnson's baby powder causes inflammation?
2        MR. ZELLERS:  Objection, form.
3        A    So Saed specifically looked at Johnson
4    baby powder, so his results specifically pertained
5    to Johnson baby powder.
6            He looked at several different measures
7    that -- I have just mentioned inflammation.  So he
8    looked specifically at oxidative stress, the up
9    regulation or down regulation of --
10           THE COURT REPORTER:  The?
11       A    -- up regulation or pro oxidants, down
12   regulation of antioxidants.  He looked at cell
13   proliferation.  He looked at SNPS point mutations
14   that are associated with this.
15           THE COURT REPORTER:  Snips?
16       A    S N P S, SNPS.
17           THE COURT REPORTER:  Because you're facing
18   that way, and the mic is here.  Thanks.
19       A    And showed substantial changes to talcum
20   powder to all of these.  I -- I was really quite
21   impressed with the consistency in these markers of
22   inflammation.
23           Some of them overlap clinical markers we
24   use.  Like CA125 went up very strongly just like it
25   goes up for ovarian cancer.

Page 367

1            So he very clearly showed this.  And the
2    results he showed were not different than those that
3    Shukla showed, that Buz'Zard showed, that -- the
4    expression in genes.
5            He -- he just had it in a very compelling
6    experiment where he showed dose response, where he
7    showed the control didn't have the changes, but that
8    the talc powder products did have the changes.
9            And so he identified, in this cellular
10   cell line model, all of the changes that you would
11   expect from inflammation.  So I think the results
12   were very compelling.
13           I -- I was asked if kind of that
14   experiment has any relevance in humans.  And I would
15   say it would be nice to do that experiment in
16   humans.
17           But you can't do that experiment in
18   humans.  And that's what --
19           THE COURT REPORTER:  Wait.
20       A    -- you can't do such an experiment in
21   humans.  So -- so that is what sort of cellular
22   studies are -- are meant to approximate.
23           There's no direct translation, so how much
24   you put in the cell versus how much you put in the
25   patient, I -- you know, I don't know how you would

Page 368

1    do that.  That's beyond me.  But that's what this
2    whole model is, to try to help you understand what
3    the effect mechanistically is from these changes.
4        Q    (BY MS. O'DELL) And is the use of that
5    model in scientific research generally accepted?
6        A    Highly.
7            MR. ZELLERS:  Objection, form.
8        A    My understanding is that is the basis for
9    much of the research that comes -- that happens at
10   my research institution.
11       Q    (BY MS. O'DELL) Just to make sure that the
12   record is clear, Dr. Smith-Bindman, in -- I asked
13   the question:  Is the use of that model in
14   scientific research generally accepted?  I'm not
15   sure your answer came through.  What's your answer?
16           MR. ZELLERS:  For your -- just objection,
17   form.  Go ahead.
18       A    Yes.  I -- I said that that's a very
19   common model at UCSF.
20       Q    Okay.
21           MS. O'DELL:  I have nothing further.
22   Thank you.
23           MR. ZELLERS:  Let's take a break for a
24   couple of minutes.
25           THE VIDEOGRAPHER:  The time is 12:34 p.m.

Page 369

1    We are now off the record.
2            (A break was taken from 12:34 p.m. to
3    12:41 p.m.)
4            THE VIDEOGRAPHER:  The time is 12:41 p.m.
5    We are now back on the record.
6        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7    BY MS. BOCKUS:
8        Q    Doctor, you made a comment about the fact
9    that there can be a synergistic effect between
10   different risk factors; is that correct?
11       A    Yes.
12       Q    That is something that can be studied,
13   correct?
14       A    Yes.
15       Q    There are studies that can be designed to
16   determine whether there's a synergistic effect
17   between, say, BRCA mutation carriers and women who
18   have regularly used talcum powder --
19       A    Yes.
20       Q    -- correct?
21           That study has not been done, correct?
22       A    Not that I know of.
23       Q    In fact, are you familiar or aware of any
24   studies that have looked for a synergistic effect
25   between regular talc use and any other risk factors

32 (Pages 366 to 369)

Rebecca Smith-Bindman, M.D.

Page 370

```
 1  for ovarian cancer?
 2       MS. O'DELL:  Object to the form.
 3       A   I would have to look through my papers
 4  with that question in mind.  I know some of the
 5  papers have looked at BRCA, but I can't remember if
 6  they sort of stratified the results by -- with or
 7  without BRCA, so I -- I'm not sure of the answer to
 8  that.
 9       I was more speaking about, from work that
10  I do, the idea of synergy between risk factors.  And
11  one of those is BRCA and radiation exposure.  So
12  I -- I -- I meant generally it can be the case.  I
13  didn't mean to suggest we know what it is for this.
14       Q   (BY MS. BOCKUS) Okay.  Then you spoke
15  about the female reproductive system being a
16  wide-open system.
17       What procedure are you doing when you are
18  putting fluid on a women's perineum to see if it
19  goes to the ovaries?
20       A   I apologize.  So the primary procedures
21  would be a hysterosonogram, which we're putting
22  water into the uterus and the tubes mostly to look
23  for patency.
24       But it turns out we end up needing to do
25  procedures in postop patients, not infrequently,
```

Page 371

```
 1  where we might be looking for connections between
 2  different structures, preop or postop.
 3       In the ballpark of 10 percent of women to
 4  20 percent have cervical stenosis, and you can't
 5  catheterize.
 6       Or there might be some reason we don't
 7  want to catheterize or put the tubes in the vagina.
 8  We might put the tube directly on the perineum and
 9  see if we can create kind of a -- a way to keep,
10  let's say, a balloon in place and then inject in a
11  retrograde fashion.
12       So it feels like it comes out probably
13  every couple of months.  But we're actually pretty
14  far from the cervix.  And we're injecting usually
15  water or sometimes contrast and then looking mostly
16  with ultrasound, but sometimes with fluoroscopy.
17       Q   And when you say "inject," that means with
18  some degree of pressure, you're putting the water or
19  other fluid into the vagina?
20       A   There is some degree of pressure, yes.
21       Q   And when you do that, is the patient's
22  head lower than her hips?
23       A   Not -- not usually, no.
24       Q   Is she on her back?
25       A   Yes.
```

Page 372

```
 1       Q   Do you know if anything about what you
 2  just described has any correlation to the way in
 3  which women use talcum powder in their perineal
 4  region?
 5       MS. O'DELL:  Object to the form.
 6       A   I -- I don't know what -- how women use
 7  talcum powder on their perineum.
 8       Q   (BY MS. BOCKUS) Do you know what
 9  percentage of sperm that are placed in a women's
10  vagina make it to the ovaries?
11       A   Only from child cartoons that make it seem
12  like it's a competitive race.  But percentagewise, I
13  don't know.
14       Q   Do you have any reason to believe that
15  talc makes it from the vagina to the ovaries in
16  greater percentage than sperm?
17       A   I -- I -- I would guess that that's not
18  the case.
19       MS. BOCKUS:  That's all I have.
20       MR. ZELLERS:  I have just a couple.
21       EXAMINATION BY COUNSEL FOR THE DEFENDANTS
22  BY MR. ZELLERS:
23       Q   Dr. Smith-Bindman, did you discuss with
24  Plaintiffs' counsel, calling Dr. Hall on our break
25  between yesterday's first session and today's
```

Page 373

```
 1  session?
 2       MS. O'DELL:  I'm going to ask -- ask
 3  you -- instruct you not to answer questions
 4  regarding discussions with counsel.
 5       MR. ZELLERS:  The defense agreed to split
 6  this deposition of Dr. Smith-Bindman over two days
 7  on the expressed condition that the extended break
 8  not be used for preparation.
 9       The witness and Plaintiffs' counsel
10  violated that understanding.  Further, it's entirely
11  inappropriate for an expert witness to consult with
12  a consulting expert during a break.
13       We move to strike all of
14  Dr. Smith-Bindman's testimony and will take the
15  issue to court.
16       MS. O'DELL:  The record is clear that
17  counsel did not speak with Dr. Smith-Bindman last
18  night.  There was no preparation done between the
19  conclusion of the deposition yesterday and the
20  beginning of the deposition this morning.  I think
21  the record has been clear on that.
22       That was -- we agreed to do that.  We had
23  not -- we were not compelled to do that.  Because as
24  counsel is aware, the deposition protocol allows
25  both parties, when they're putting up their
```

33 (Pages 370 to 373)

Rebecca Smith-Bindman, M.D.

Page 374

1  respective witnesses, to confer with the witness.
2       And we did confer with Dr. Smith-Bindman
3  prior to the deposition this morning for about
4  10 minutes, and that's perfectly within our rights,
5  and so we would oppose any such motion.
6       MR. ZELLERS:  Done?  We are concluded.
7       THE VIDEOGRAPHER:  The time is 12:48 p.m.
8  We are now off the record.
9       (TIME NOTED:  12:48 p.m..)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 376

1       I, MARY J. GOFF, CSR No. 13427, Certified
2  Shorthand Reporter of the State of California,
3  certify;
4       That the foregoing proceedings were taken
5  before me at the time and place herein set forth, at
6  which time the witness declared under penalty of
7  perjury; that the testimony of the witness and all
8  objections made at the time of the examination were
9  recorded stenographically by me and were thereafter
10 transcribed under my direction and supervision; that
11 the foregoing is a full, true, and correct
12 transcript of my shorthand notes so taken and of the
13 testimony so given;
14      That before completion of the deposition,
15 review of the transcript ( ) was (XX) was not
16 requested:  ( ) that the witness has failed or
17 refused to approve the transcript.
18      I further certify that I am not financially
19 interested in the action, and I am not a relative or
20 employee of any attorney of the parties, nor of any
21 of the parties.
22      I declare under penalty of perjury under the
23 laws of California that the foregoing is true and
24 correct, dated this   day of      , 2019.
25      _____

Page 375

1
2
3
4       I, REBECCA SMITH-BINDMAN, M.D., do hereby
5  declare under penalty of perjury that I have read
6  the foregoing transcript; that I have made any
7  corrections as appear noted, in ink, initialed by
8  me, or attached hereto; that my testimony as
9  contained herein, as corrected, is true and correct.
10      EXECUTED this_____ day of_____,
11 20____, at_____ , _____.
              (City)         (State)
12
13
14      _____
        REBECCA SMITH-BINDMAN, M.D.
15      VOLUME II
16
17
18
19
20
21
22
23
24
25

Page 377

1              ERRATA SHEET
2           Golkow Litigation Services
3      1650 Market Street, One Liberty Plaza, 51st Floor
4          Philadelphia, Pennsylvania 19103
5                877-370-3377
6         CASE:  Talcum Powder Litigation
7  PAGE LINE FROM              TO
8  ___|____|_____|_____
9  ___|____|_____|_____
10 ___|____|_____|_____
11 ___|____|_____|_____
12 ___|____|_____|_____
13 ___|____|_____|_____
14 ___|____|_____|_____
15 ___|____|_____|_____
16 ___|____|_____|_____
17 ___|____|_____|_____
18 ___|____|_____|_____
19 ___|____|_____|_____
20 _____
21      REBECCA SMITH-BINDMAN, M.D., VOLUME II
22 Subscribed and sworn to before me
23 this _____ day of _____, 2019.
24 _____
25      Notary Public

34 (Pages 374 to 377)

Rebecca Smith-Bindman, M.D.

Page 378

**A**

**a.m**
246:9 253:3,9
318:24 319:1,3
331:3,5,6,7
347:14,16,17,18
354:8,10
**abilities**
333:7
**ability**
265:3 331:23
**able**
264:25 321:15
332:3 354:2,3
**Abrams**
246:7
**absolute**
310:14,22
**absolutely**
258:7 276:1 357:19
358:22
**absorbency**
293:16
**abstract**
298:10,21,22,25
**abstracted**
282:13
**abstracts**
298:11
**acceptable**
320:15
**accepted**
294:2 336:20 337:2
337:12 338:8,18
338:23 368:5,14
**access**
332:21
**accident**
331:17,22
**account**
301:1,4 327:2
328:2 329:15
**accounting**
284:15
**accuracy**
282:20

**accurate**
282:11
**accurately**
282:18
**acknowledge**
275:14 338:6
**action**
376:19
**active**
286:13,15,15,23
294:18
**actual**
268:14 301:22
**acute**
289:13 291:3,13,16
291:19
**add**
356:13
**added**
257:21
**addition**
260:24 298:8
359:22
**additional**
257:17 259:24
260:15,15 261:9
356:14
**addressed**
315:21
**adhesions**
287:11 293:21
**adjust**
308:16,18
**adjusted**
307:25 308:2,14,22
308:23
**adjustments**
308:3
**adolescence**
307:1,7
**advantages**
262:19
**affect**
288:11
**affirmed**
254:2
**afternoon**

258:17
**age**
327:4 328:3
**agent**
289:22
**agents**
295:23 365:7
**agree**
263:11 278:24
280:19,24 282:1
285:10 288:10
289:22 292:18
294:15 296:20,23
301:11 303:6
306:9,21 310:9
324:2 326:16
338:21 339:6,9
344:1,5,16 345:2
**agreed**
373:5,22
**agreeing**
292:19
**ahead**
319:21 368:17
**Alabama**
247:9
**Allen**
247:4
**Allison**
325:4
**allow**
267:20
**allowed**
266:16
**allows**
373:24
**alternative**
293:7
**AMA**
318:1
**amount**
290:12,16,17,18
292:13 293:4
304:9 320:6,9,11
322:2,5,7,25
323:1 330:21
364:25

**amounts**
313:19 320:14,16
330:1
**analyses**
284:3 329:6
**analysis**
254:21 267:14,17
284:9 323:24
328:1 336:3,7
339:14 342:13
343:23 355:11,23
356:16 357:15
360:22 362:5
**Analytical**
318:2
**analyze**
284:18
**ancillary**
263:16
**Andrew**
250:24 253:6
**Angeles**
248:9
**annotated**
257:21 262:8
**answer**
265:18,25 278:16
302:13 303:4
320:8 322:14
331:23 332:3
333:11 336:10
342:10 350:1
368:15,15 370:7
373:3
**answered**
293:24 316:10,12
332:1
**answering**
267:24 273:11
**answers**
305:19
**antiinflammatory**
295:23
**antioxidants**
301:7 302:8 366:12
**antioxidation**
365:5

**antioxidative**
303:13
**Antonio**
249:8
**apologize**
256:25 262:2
263:19 370:20
**apoptosis**
301:6 302:8 358:15
**appear**
375:7
**APPEARANCE**
249:1
**APPEARANCES**
247:1 248:1 250:1
**appeared**
333:15
**appears**
277:5
**apples**
274:6,6
**application**
287:5,13
**applied**
293:20 362:21
363:1,1
**apply**
301:21
**approach**
279:24 280:8
**approve**
376:17
**approximate**
272:18 367:22
**approximately**
260:7,23
**aqua**
258:2
**area**
285:5,12,17 287:19
294:18 333:4,10
363:1
**Arps**
248:15
**arthritis**
290:1
**article**

Rebecca Smith-Bindman, M.D.

Page 379

251:17,20,22
252:2,4 287:10
297:16 298:4
**articles**
337:16 345:24
359:21
**articulate**
264:23
**asbestos**
252:2,4 313:14,16
314:2,6,10,15,18
314:21,25 318:15
318:21 320:4,5,6
321:2,3,8,10,17
322:2,13,15,19
323:3,24 324:3,7
325:6,17 326:8,9
326:10,18 328:13
329:13 330:1,4
352:14,16,17,20
353:6 358:19,24
359:16,20 360:5
**asbestos-related**
325:20
**asbestosis**
330:11
**asked**
255:4,20 256:6
266:4,9 273:15
293:23 316:14,15
316:15 320:4
331:24 333:2
337:8 341:1 355:6
357:16 360:16
361:23,25 362:18
363:3 367:13
368:12
**asking**
254:22 255:3 264:2
268:25 269:1
271:18 272:12
273:11 277:12
301:8,13 304:15
308:7 310:6
343:25 349:18
350:8 351:23
**aspirin**

251:20 295:25
296:5,14
**assessed**
265:13
**assessing**
333:17
**associated**
291:23 296:10
304:23 305:18
320:23 321:8,17
322:3,7,12 323:4
335:9 346:10
366:14
**association**
264:13 266:22
269:24 273:19
274:14 276:7
277:9 278:3
297:21 306:2
323:7,16 328:11
329:10 332:8
334:22 335:1,5,7
335:10,13 336:1,2
339:23,25 340:4
340:20 360:4,6
361:18
**associations**
263:24 264:14,18
264:25 265:1
311:3
**assume**
310:21
**assumes**
287:22
**assumption**
314:16,24
**attached**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:8
**attempt**
311:19
**attorney**
247:7,15,22 248:6
248:17 249:5,15

250:5,17 332:12
348:1 376:20
**Austin**
249:18
**author**
298:1 325:4 328:1
**author's**
325:12
**authors**
266:21 269:18,23
282:18 295:11
297:20 328:9
**authorship**
335:20
**available**
295:17
**Avenue**
249:16
**average**
322:18,20
**avoid**
293:9 345:3
**aware**
261:9 288:15
291:22 300:12,15
300:18,20,21
305:12 315:10,13
369:23 373:24

---
**B**

**B**
308:22,23 348:10
**baby**
318:19 322:20
330:22 366:1,4,5
**back**
282:12 319:4 324:8
331:8,16,19 340:3
347:19 354:13
369:5 371:24
**backlash**
363:20
**balance**
303:12
**balloon**
371:10
**ballpark**

312:19 340:20
371:3
**barrier**
364:9,16
**barriers**
288:2,13
**based**
262:24,24 263:1
266:18 270:8
278:10 280:10
281:15,21 292:12
300:21 313:8,9
314:4 318:14
349:19 350:6
351:14 362:8,8,14
362:14
**baseline**
301:4,4
**basic**
263:18
**basically**
358:11 363:10
**basis**
269:10 272:1
358:23 359:5
368:8
**Bates**
350:6,17
**beach**
247:17 286:1,3
**Beasley**
247:4
**beautiful**
356:18
**beginning**
246:9 352:15
373:20
**begins**
319:4
**behalf**
246:6
**behavior**
301:18
**belief**
274:3 314:17,20
**believable**
335:8

**believe**
260:11 261:8
272:17 274:2
279:19 281:5
285:16 291:3
293:6,8 297:6
298:24 300:8,16
300:25 314:1,14
317:18 320:14,19
321:3,9 322:13
324:12 328:21
332:2 333:20
346:24 354:22
356:12 357:7
372:14
**benefit**
344:23
**benefits**
333:18,24
**BENJAMIN**
248:16
**benjamin.halper...**
248:20
**Berge**
307:18,21,24
308:13 362:4
**best**
322:5 344:13
361:11
**better**
282:2 311:16 346:7
**beyond**
259:23 261:10
368:1
**bi-directional**
363:23
**bias**
273:18,21 274:21
274:24 275:2,4,8
275:14,18,25
280:16,21 281:1
281:22
**biases**
284:7,10,12 336:2
**bigger**
288:14
**Bill**

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 38 of 60
PageID: 211657
Rebecca Smith-Bindman, M.D.

Page 380

251:14
**billed**
355:3
**Billings-Kang**
250:4 251:8 347:4
347:11,21,25
349:6,8,18,23,25
350:3,8,12,16,19
350:24 351:16
354:4
**biologic**
266:22 267:2,3
285:12 365:19
**biological**
285:2,4,7
**biology**
337:6,21
**biostatistician**
254:14
**biostatistics**
334:3,12
**bit**
280:13 335:2
336:25 339:16
**bladder**
288:5,7 338:19
339:1 340:8,9,10
340:17 341:7
**blood**
330:16
**board-certified**
334:18
**Bockus**
249:4 251:9 298:18
299:4,4 331:1,10
331:13 332:6
333:14 336:12,19
337:10 338:11
339:3,9,20 340:23
340:25 343:4,14
344:9 345:4 346:1
346:24 347:12
369:7 370:14
372:8,19
**body**
305:8 340:1
**book**

335:19
**bottom**
295:10 309:14
**Box**
247:24
**Bradford**
323:23 334:21
335:3
**BRCA**
369:17 370:5,7,11
**BRCA1**
357:23
**break**
316:24 317:1,3
318:23 319:1
331:5 347:16
354:7,10 368:23
369:2 372:24
373:7,12
**breast**
307:9
**Breslow**
336:4
**bunch**
365:13
**Buz'Zard**
365:17 367:3

--- C ---

**C**
248:5 308:22,23
**CA125**
366:24
**Calcagnie**
247:13
**calculated**
256:7,17
**calculations**
255:21 256:20
257:2,10
**California**
245:15 246:9,11
247:17 248:9
253:1,12 376:2,23
**call**
258:20 282:25
361:13

**called**
254:14,16 270:8
**calling**
372:24
**Camargo**
324:20 326:23
327:9,14,23,25
329:18
**Canadian**
353:17
**cancer**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:2,4,8,9,14
288:22 289:9,14
289:20,23 290:3,9
290:18 293:9
294:4,5,17,22
295:15 296:4,5,15
296:18 297:23
303:11,16,19
304:1,3,3,4,16,19
305:13,18 306:23
307:9,10,14 313:4
314:2 320:23
321:9,17 322:3,8
322:12,14 323:3,8
323:8,10,11,13,14
323:14,17,19,25
324:4 325:7,18
326:1,19 327:3
328:3 332:8 333:1
336:22,23 337:3,5
337:18,21,25
338:3,20,20,20
339:1,10,17,24
340:1,8,9,17,19
341:1,7 345:14,20
346:2,10,17
355:19 357:18,21
357:24 358:2,5,20
359:1 360:5,20
361:1 364:21,24
365:11 366:25

370:1
**cancerous**
345:12
**cancers**
289:12,15 304:10
307:9 324:8
328:12 329:12,24
338:24 339:8
340:5,17
**capacity**
265:6
**Carbon**
364:4
**carcinogen**
302:1
**carcinogenic**
289:23 292:10
293:14 315:6
322:25 323:2
**carcinogenicity**
352:17
**care**
250:2 303:12 348:1
348:4
**Carmen**
259:9,10
**CAROLINE**
250:16
**caroline.tinsley...**
250:21
**carriers**
369:17
**carryover**
311:11
**cartoons**
372:11
**case**
256:7,13 262:20
281:11 313:15,18
313:23 315:1,3,24
316:4 321:22
332:7 333:3,6
341:16,19 354:18
355:4,11 362:12
370:12 372:18
377:6
**case-control**

275:1,15,19 276:3
276:6,25 277:1,4
277:6,7,17 279:11
279:12,15 280:20
280:21 336:4,7
342:8 362:7
**cases**
281:3,5,25 324:4
325:23 326:6,13
344:14,17
**categories**
320:20
**catheterize**
371:5,7
**catheters**
363:15
**causal**
283:5,16,24 338:18
360:4
**causality**
355:18
**cause**
252:2 290:13 291:2
292:12,15 294:17
303:10,11 305:5
314:10 322:14
325:6 339:7
340:10 358:1,20
359:1 364:21
365:11
**caused**
289:16 328:12
329:12 358:12
**causes**
279:9 289:11 290:8
290:22 291:1
305:4 314:2
357:18 358:5,5
364:24 365:22
366:1
**causing**
345:14
**caveat**
281:2
**cell**
274:9 300:7,8,16
301:3,5,9,11,14

Rebecca Smith-Bindman, M.D.

301:17,18 302:5,9
302:14 303:7
358:14 365:6,6
366:12 367:10,24
**cells**
300:13,19 301:2,10
301:12,16,21
302:3 303:24,25
304:16,17,19,20
**cellular**
300:23 314:10
365:3,7 367:9,21
**Center**
247:23
**central**
263:14
**certain**
283:5,16,24 289:10
290:12 302:2
305:4 320:19
355:21
**Certified**
246:11 376:1
**certify**
376:3,18
**cervical**
274:11 287:18
288:17,22 339:17
339:24 341:1
371:4
**cervix**
371:14
**cetera**
338:20
**cgarber@robins...**
247:18
**challenge**
326:12
**chance**
279:8 304:3 360:18
361:9,13,16,17
**change**
267:25 315:1
**changed**
335:20
**changes**
302:2,7 365:2,7,19

366:19 367:7,8,10
368:3
**chapter**
298:9 336:9 359:15
**characteristics**
288:12
**charge**
261:19
**check**
260:12 268:13
**checked**
342:25 343:5
**chemical**
313:24
**chemicals**
320:17,21 321:4
330:15,22 338:25
340:11,13
**child**
372:11
**chlamydia**
306:24 307:3
**choose**
319:25 331:19
334:9
**chose**
268:7
**Chris**
319:8
**chronic**
289:11,18,19 290:1
291:4,13,23
292:15 294:16,21
295:13 364:23
**cigarette**
340:11,19
**circumstances**
357:25
**citations**
262:23
**cite**
263:10,22 264:11
276:13 287:4,9
294:8,13 302:17
302:24 304:5
345:16,23,24
**citing**

263:19
**City**
375:11
**clarify**
255:21 265:18
303:4
**clear**
308:11 368:12
373:16,21
**clearer**
339:16
**clearest**
335:22
**clearly**
267:25 278:19
367:1
**clinical**
313:9 333:16
363:13 366:23
**close**
268:21 272:19
356:9
**closely**
285:11
**closer**
287:19 311:6
**cohort**
262:20 263:3,7,13
263:14,23 264:4
264:12,24,24
265:5,8,10,15,16
265:19,23 266:2,8
266:16 267:7,8,21
268:9 269:10,11
271:1 274:17
275:15,21 282:8
321:22 342:8
343:9,17 360:6
**cohorts**
266:6
**coin**
360:24
**colleagues**
330:25
**collected**
267:14,18
**collection**

339:18
**colon**
338:20
**combination**
295:12
**combine**
284:4
**combining**
273:5,17 274:6
284:13
**come**
302:9 359:19
**comes**
368:9 371:12
**comfortable**
344:13 355:20
**comment**
369:8
**Commerce**
247:8
**commercial**
352:20
**common**
307:4 312:22,24
323:13,14 340:18
368:19
**communicate**
258:19,22
**communications**
258:15
**community**
362:8,14
**comparable**
281:25
**compare**
301:3
**compared**
330:18
**comparing**
281:9,16,20,24
301:9 326:7
**comparison**
301:14,19 311:10
329:14
**compelled**
373:23
**compelling**

323:17 360:4 367:5
367:12
**competitive**
372:12
**complete**
356:17
**completed**
312:17
**completely**
359:25
**completion**
376:14
**complicated**
278:22
**complications**
363:18
**components**
339:14
**computer**
332:18
**concentration**
287:17,23 288:4,12
302:25 330:21
**concentrations**
287:25 302:18
**concept**
272:15 335:3
**concepts**
263:21
**concern**
312:7 344:21 345:3
352:16
**concerns**
329:13
**conclude**
267:4 290:7 292:15
295:11 314:3
**concluded**
254:11 266:8
269:18,23 270:17
295:19 328:9,22
329:2,9 362:16
374:6
**concludes**
298:1,3
**concluding**
283:9

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 40 of 60
PageID: 211659
Rebecca Smith-Bindman, M.D.

Page 382

conclusion
262:6 312:18
  327:25 355:17
  365:25 373:19
conclusions
297:23 325:11,12
  326:4
concurrently
358:17
condition
290:2 291:24 373:7
conditions
289:9,19
conduct
318:2 333:16
confer
374:1,2
confidence
256:8 277:24 278:4
  278:14 279:15,21
  279:22,25 280:2
  280:14 282:19,24
  312:20 360:17
  361:15
confirm
297:15 355:15
confounders
306:13
confounding
284:7,10,14,15
  305:22 306:1,6,9
  306:18
confused
330:3,3
confuses
306:2
confusion
299:8
congress
249:16 333:15
connected
363:21
connections
371:1
consider
271:14 278:15
  290:21 291:7

310:3 334:25
considerable
338:12
consideration
334:22
considered
312:16 324:4
consistency
335:3 366:21
consistent
296:24 360:3
consult
373:11
consultant
354:19
consulting
373:12
consumer
353:16
contacted
333:3,5
contain
290:13 314:2,6,14
  314:17,21
contained
256:14 257:10
  311:25 320:5
  322:6 375:9
container
322:22
containing
313:15,19,23
contains
315:6
contamination
314:24
content
333:7 352:20
context
301:10,12 311:2
continued
248:1 249:1 250:1
  252:1
contracted
318:1
contrast
371:15

contribute
273:10
contributes
300:22
contributing
358:1
control
262:20 281:8
  301:16 321:23
  367:7
controlled
306:18 307:12
controls
281:3,5 282:1,2
  301:1 311:12,13
  311:16,17 344:17
conversation
254:24 255:17
  258:17 298:23
copies
259:3
copy
261:12 262:3
  317:21 319:13
copying
262:2
cornstarch
290:22,25 291:1,3
  291:7,12,15,23
  292:3,10 293:7,13
  293:15,18
Corporate
247:16
correct
256:11 258:10
  266:13,14,23
  270:12,19,20,22
  271:2,10 274:21
  274:24 275:6,22
  276:8 277:9
  279:18 282:9
  283:7 284:23
  285:5 286:10,21
  287:6,7 288:24
  289:9 290:3,4
  293:22 294:9,17
  296:6 298:5

306:15 311:8
  320:23 323:21,25
  330:18,22 332:10
  333:1,11,18,24
  334:23 338:14,24
  339:1,11 340:1
  341:3,22 343:11
  346:5,12 348:10
  352:24 369:10,13
  369:20,21 375:9
  376:11,24
corrected
375:9
corrections
375:7
correctly
295:16 352:22
correlation
372:2
correspond
302:10
correspondence
332:17
cosmetic
302:20 352:19
cost
263:12
Council
250:2 348:2,4
counsel
253:19 254:5 259:2
  260:17 261:15
  262:15 298:7
  316:5 331:9
  347:20 351:4
  354:14,23,23
  355:3 360:12,23
  369:6 372:21,24
  373:4,9,17,24
counseling
293:10
counted
344:12
couple
309:18 324:15
  368:24 371:13
  372:20

court
245:2 253:15,22
  256:23 299:2,15
  299:17,18 304:18
  308:5 319:24
  366:10,15,17
  367:19 373:15
covariants
308:15
covariates
307:25 308:17,17
  308:19
cover
259:7
CPFA
348:5
create
371:9
criteria
311:22,24 334:21
  334:24 356:20
  357:8
criticize
273:4
criticizing
273:9
cross
360:18
crude
308:2
CSR
245:24 376:1
Cummings
335:21
curious
332:24
currently
265:20
CV
254:23 255:3
CYNTHIA
247:14

D

D
297:2,2 308:23,23
D.C

Rebecca Smith-Bindman, M.D.

250:7
**daily**
272:20
**damage**
302:4 303:25 305:9
    314:11
**Daniel**
247:21
**data**
267:14,17,24,25
    269:19 282:10,13
    282:20 295:18
    302:17,24 303:5
    304:13 314:3,13
    323:16 326:17
    335:4 338:9
    339:15,18 341:23
    343:8,10,16
    344:18,24 359:19
**date**
253:8
**dated**
376:24
**day**
331:24 336:4
    375:10 376:24
    377:23
**days**
373:6
**dead**
364:2,3
**deal**
281:1 353:20
**death**
365:6
**decades**
269:18
**decided**
353:5
**decision**
341:21,22 342:2,14
**decision-making**
342:7
**declare**
375:5 376:22
**declared**
376:6

**Defendant**
248:3,14 249:2,12
    250:2 348:1
**Defendants**
250:14 254:5 331:9
    347:20 369:6
    372:21
**defense**
315:18,20,24 316:4
    316:6 359:25
    373:5
**defer**
297:3
**define**
281:14 289:6
**defined**
263:6 264:6 272:13
    272:16 300:11
**definitely**
283:3 344:8
**definition**
268:4 272:3,8
    274:3 312:8
**definitive**
277:23 322:10
**degree**
371:18,20
**demonstrate**
272:10 278:11
    286:8,12
**demonstrates**
362:21
**demonstration**
286:13,16
**dependent**
313:15,18,23
**depends**
281:2,18
**deponent**
253:17
**deposition**
245:13 246:5
    253:10 254:10
    255:18 260:3,17
    262:6 300:17
    319:5 327:14
    348:3 373:6,19,20

373:24 374:3
    376:14
**depth**
265:6
**describe**
314:9 357:19
**described**
338:23 353:24
    372:2
**describing**
281:22 328:24
    329:8
**description**
251:11 344:5,8
**design**
263:21 265:11,19
    265:22,23 266:4
**designed**
369:15
**designs**
265:21 266:3 335:6
**despite**
265:14 328:10
    329:9
**destination**
287:1
**detail**
265:10,24 268:6
    344:6,8 356:14
    357:1
**details**
254:15
**detect**
263:24 264:12,13
    264:17,25
**detected**
318:15
**detecting**
273:18
**determination**
292:12
**determine**
287:25 337:2
    343:15 369:16
**determined**
341:21
**determining**

282:16 341:9
    342:19
**develop**
303:19 304:1,1
**development**
295:14 305:13
**diagnosis**
325:24
**diaphragm**
274:12
**diaphragms**
271:8
**difference**
280:9 308:2 309:3
    309:21 310:2,4,10
    310:14,23,23
    311:1,4 343:16
**differences**
310:6
**different**
256:4 272:2,22
    273:22,23 274:16
    280:1,13,15 288:7
    288:8 289:12
    301:12,17 302:1
    308:14 310:15
    321:7,21 324:21
    329:3 330:21
    338:24 344:7,8
    350:21 357:20
    361:12 366:6
    367:2 369:10
    371:2
**difficulties**
325:24
**direct**
367:23
**direction**
296:21 376:10
**directions**
363:24,25 364:2
**directly**
285:17 371:8
**disadvantages**
262:20
**disagree**
271:20

**disclosed**
360:1
**discount**
271:22
**discovered**
345:12
**discuss**
265:9 278:8 295:20
    305:20 313:1
    337:17 372:23
**discussed**
277:11 305:14
    306:22 311:15
**discussion**
257:18,22 258:13
    272:5 295:11
    297:14,19 328:6
    328:17 329:19
**discussions**
373:4
**disease**
275:6 305:16,17
    306:3
**diseases**
325:20 358:17
**distance**
287:24
**distinguishing**
325:25
**distort**
275:5,8 306:6
**distribution**
321:7
**District**
245:2,3 253:15,15
**divided**
321:25
**division**
300:14
**DNA**
365:7
**doctor**
293:10 298:25
    331:11 369:8
**document**
332:18 348:17,20
    348:23 349:20

Case 3:16-md-02738-MAS-RLS     Document 33008-59     Filed 07/23/24     Page 42 of 60
PageID: 211661
Rebecca Smith-Bindman, M.D.

Page 384

350:6,21,23,25
351:3,6,9,11,18
351:20,20,25
352:4,8 353:8
**documentation**
357:3
**documented**
286:18 335:6 360:3
**documents**
257:3,8,11 349:10
350:9 354:2
365:16
**doing**
260:14 263:12
301:15 370:17
**dollars**
261:20
**dose**
304:8 367:6
**double**
358:10
**Dr**
254:9,16,19 255:1
255:11,17 256:6
257:18,22 258:13
258:16,19 261:7
264:10 295:18
298:13 299:11,22
300:1,4,12,18
301:21 315:8,21
319:5,7 342:3,6
342:13,18,25
343:5 347:22
354:16 360:1,10
365:21,25 368:12
372:23,24 373:6
373:14,17 374:2
**Drive**
247:16,23
**duly**
254:2
**duration**
271:11,18 272:2
**Dykema**
249:3

**E**

**E**
249:6 297:2 308:23
**e-mail**
254:22 258:20
**e-mails**
254:25 255:1 261:6
332:21
**earlier**
268:6 305:14
311:15 331:20
**earliest**
343:9
**early**
354:21
**easiest**
322:14
**easily**
266:1 357:14
**Edelman**
328:7 329:8,19,21
**editor**
261:13 319:13
**edits**
320:1
**effect**
368:3 369:9,16,24
**either**
330:20 358:8
361:21
**elevated**
346:9
**Ellis**
248:4 250:15
**emphasizes**
308:3
**employee**
376:20
**encountered**
302:19
**ended**
355:12
**endometrial**
297:22
**endometrium**
288:8
**engagement**
259:8,8

**enhance**
358:18
**enhanced**
338:9 358:13
**enhancing**
358:11
**enormous**
364:25 365:15
**entirely**
373:10
**entirety**
278:6 335:12
**entitled**
294:20
**environment**
304:22
**environmental**
302:1
**enzymes**
302:3
**Epi**
263:1
**epidemiologic**
314:4,12 315:4
**epidemiological**
306:7
**epidemiologist**
285:9
**epidemiologists**
263:10 336:16
**epidemiology**
334:2,12 335:14,17
335:19,22 353:14
**epithelial**
269:3,21 294:22
323:10
**equal**
296:8
**equated**
271:19
**equation**
343:21
**equivalent**
271:20 339:10
360:24 363:10
**equivocal**
297:21

**ERRATA**
377:1
**errors**
256:8 282:23 343:1
343:6
**essentially**
355:13 360:18
**established**
283:7,18 284:1
352:19 353:21
**estimate**
260:13 279:7,7
312:16 323:6,10
335:9 361:11,11
**estimates**
256:15,18 280:12
322:22 355:13
361:3,5
**estimating**
257:6 308:4,5
**et**
338:20
**ethical**
364:13
**etiology**
333:1 337:15,17
339:1
**evaluating**
333:23
**evaluation**
275:5
**evening**
258:17
**evidence**
266:22 267:2 286:2
286:6 289:1
290:15 294:14
314:4 315:4
318:21 330:16
362:24 363:6,12
364:22
**ex**
315:18
**exact**
302:9 308:18
**exactly**
255:24 256:3,12

278:18 292:19
293:1 339:6
355:19
**examination**
251:2 254:5 331:9
347:20 354:14
369:6 372:21
376:8
**examine**
284:22
**examined**
254:4 325:21
**example**
275:8 291:16 302:2
310:17 338:17,25
340:8
**examples**
339:7,15 340:9
**exams**
291:18
**exception**
343:9
**exclude**
279:8 341:10 342:9
344:21
**excluded**
343:8,17
**exclusion**
356:19
**excuse**
255:9 262:1 264:16
298:19 348:25
**EXECUTED**
375:10
**exhibit**
251:12,14,17,20,22
251:24 252:2,4
257:23 259:6,6,11
260:3,25 261:2,5
262:9,10 276:14
276:15 297:9,10
299:7 317:8,8,9
319:9,10 324:18
324:23 325:1,3
327:15,16 348:8
348:10 352:11
360:11

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 43 of 60
PageID: 211662
Rebecca Smith-Bindman, M.D.

Page 385

**EXHIBITS**
252:1
**exists**
279:1 326:18
**expand**
266:5
**expect**
274:7,11 287:23
296:4,8 319:18
329:23 361:2
367:11
**expected**
288:14 350:6
**experience**
313:10
**experiment**
301:1,14 367:6,14
367:15,17,20
**expert**
288:10 289:1,6,6,6
298:13 299:23
315:11 316:4,6
322:17 348:10
349:9 352:10
354:19 360:1
373:11,12
**expertise**
285:5,17 333:4,8
334:17
**experts**
315:20
**explain**
275:18 326:5
**explained**
256:12 257:8
263:18 272:17
**explaining**
356:19,24
**explicit**
359:18
**exploration**
320:25
**exposed**
292:3 323:1 326:8
326:9,10 329:25
330:4
**exposure**

252:2,4 267:21
268:2,7 273:12
274:8,12,12,13
275:6,10 287:16
287:20 290:8,16
302:18,25 305:3
306:3 312:5,8,10
312:12,21,21,22
312:23 315:5
322:2 325:6,18
326:18 328:13
329:12 359:16
360:5 361:1
365:10 370:11
**exposures**
324:7 359:22 360:7
**express**
302:23
**expressed**
373:7
**expression**
301:2,6 302:2,4,8
365:6,8 367:4
**extended**
373:7
**extensive**
272:5 363:6
**external**
287:12 288:21
**externally**
293:20

**F**

**F**
250:6 308:24
**facing**
366:17
**fact**
256:7 257:6 275:13
275:18 281:24
287:25 333:14
338:11 357:11
359:21 361:7,14
361:20 363:6
369:8,23
**factor**
287:24 288:11

**factors**
288:1 306:18,21
307:11 327:3
328:3 329:16
357:20,24 358:5
358:12,16 369:10
369:25 370:10
**failed**
376:16
**failure**
329:15
**fair**
289:2 332:9
**fall**
287:24
**fallopian**
287:6
**false**
364:10
**familiar**
280:16 294:19
295:22 305:21,25
336:3,12 369:23
**family**
321:3
**far**
259:20 287:17
371:14
**fashion**
371:11
**favor**
273:18
**FDA**
316:18,21 317:14
353:17
**February**
245:16 246:10
253:2,8
**feeling**
331:14
**feels**
371:12
**felt**
332:3 344:15
**female**
332:12 370:15
**fewer**

270:18 293:16
**fibers**
322:1 352:20
**fibrosis**
287:10 293:21
**fibrous**
314:7,15,23 358:25
359:20
**Figure**
256:15 276:22
277:5,19 278:11
279:13 360:14
361:3
**figures**
255:22,24 256:15
266:13
**file**
299:1,6
**final**
342:13 344:24
**financially**
376:18
**find**
263:18 270:13
271:3,6 281:4
318:21 329:23
332:22 335:16
336:6 338:2 354:2
354:3
**finding**
362:2
**fine**
349:25
**finish**
317:5
**finished**
258:23 305:1
**firm**
247:4 297:23
**first**
254:2 255:17 259:7
267:21 283:13
294:11 295:10
297:14,19 325:4
325:13 332:11
334:16,21,24
337:8 352:13,15

354:17 363:13
364:21 365:24
372:25
**five-page**
259:6
**flaws**
311:19
**Flom**
248:15
**Floor**
248:8 377:3
**Flower**
248:7
**fluid**
363:15,17,19
370:18 371:19
**fluoroscopy**
371:16
**FLW**
245:9
**focus**
263:5,14 264:5
265:24 362:1
**focused**
266:12 323:12
333:17
**focuses**
333:23
**focusing**
273:16 333:17
**follow-up**
267:7,11
**followed**
269:12
**following**
269:16 298:23
**follows**
254:4
**foregoing**
375:6 376:4,11,23
**forest**
361:2
**form**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 44 of 60
PageID: 211663
Rebecca Smith-Bindman, M.D.

Page 386

277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
294:10 296:7
300:24 301:24
303:3 304:7 307:2
310:5,12 313:20
314:19 315:2,23
316:3,6,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 341:11
343:2,13 344:4,19
345:18 348:25
349:1,11,22
350:14 351:1
356:1,6 357:6
358:3,21 359:3
366:2 368:7,17
370:2 372:5
**forms**
311:25
**formulate**
349:20 350:12
**formulating**
349:9 351:11,18
**forth**
266:12 311:22
376:5
**forwarded**
261:14
**FOSTER**
249:14
**found**
275:19 281:3
286:25 320:22
**foundation**
358:21 359:3
**four**

278:20
**fragrance**
313:24 320:17,21
330:15,21
**Francisco**
245:15 246:8 253:1
253:11
**free**
314:10
**frequency**
268:4 271:19,24
272:18 345:11
**frequent**
271:15 272:1
**Friday**
245:16
**front**
262:8,12 266:25
327:9,19 349:15
350:17
**full**
331:16,20 376:11
**fully**
356:20
**further**
254:10 269:5 328:1
330:24 339:16
345:7,13 368:21
373:10 376:18

**G**
**gain**
306:25 307:7,16
**gaps**
311:19
**GARBER**
247:14
**gastric**
338:20
**Gates**
267:8 268:9,11,25
268:25 269:1,11
269:18,23 271:23
282:8
**gene**
300:19 302:8
304:15

**general**
259:8 262:19,24
263:20 266:2,11
275:1 280:25
281:4 308:2,13
346:14
**generally**
257:19 273:6
307:12 316:7
321:12,14 350:9
368:5,14 370:12
**generated**
259:20 315:16
**generic**
304:21
**genes**
302:5 367:4
**genetic**
304:20
**genital**
287:12 288:16,21
330:17 363:1
**Gertig**
265:16 266:8,16,18
266:21 267:8,11
268:25 269:10
**getting**
276:11 304:23
330:4
**give**
272:5 321:15
327:11
**given**
284:25 306:19
333:21 334:1
339:7,15 376:13
**gloves**
291:17 364:6
**go**
260:12 262:14
265:6 282:12
284:12 294:13
295:7 317:25
324:8 331:1
332:20 340:3
347:1,10,12
348:16 352:10

363:25 365:19
368:17
**goes**
280:4 363:16,23
366:25 370:19
**Goff**
245:23 246:11
253:23 376:1
**going**
259:5 260:11 262:2
297:3 317:2
333:20 338:12
340:3,23 342:20
342:21 345:9
347:15 349:16
351:20 364:2
373:2
**Goldman**
247:20
**Golkow**
253:7 377:2
**Gonzalez**
271:22 273:4,5
**good**
254:7,8 262:5
265:23 292:23
316:25 317:3,4
331:11,15 347:22
347:24
**Gordon**
249:13
**gram**
322:20,20
**granulomas**
287:10 293:21
**graphics**
356:18
**Graves**
250:24 253:6
**great**
276:24 281:1
353:20
**greater**
275:14 287:17
304:2,3 305:21
312:19 330:8,11
345:11 361:21,22

365:8 372:16
**group**
278:5 301:16,19
362:9
**grouped**
321:5
**guess**
273:20 310:8 334:8
372:17
**guidelines**
352:18 353:2,4,24
353:25
**gynecology**
334:6,13,19

**H**
**half**
331:24 353:13
361:3,4,17,18
**halfway**
352:14
**Hall**
254:16,19 255:1,11
255:17 257:18,22
258:13,16,19
261:1,7 342:3,6
342:13,18,25
343:5 372:24
**HALPERIN**
248:16
**Hamilton**
365:17
**hand**
259:5 268:15 317:7
324:13 353:18
**handed**
319:8
**happen**
348:20
**happens**
300:15 368:9
**happy**
332:22
**hard**
266:5
**harm**
293:17

Rebecca Smith-Bindman, M.D.

Page 387

**Harper**
298:10
**head**
371:22
**health**
266:18 267:15,18
268:20 269:6,9
270:8 334:14
343:10
**healthy**
281:16,20
**held**
253:10
**Heller**
345:19,22
**help**
319:22,24 368:2
**helpful**
355:15
**Henderson**
345:20,20
**hereto**
375:8
**hesitant**
277:23
**hesitation**
273:9
**heterogeneity**
284:18
**high**
282:16
**higher**
304:16 329:23
330:17
**highlight**
334:16
**highlights**
334:10
**highly**
361:9,9,9 368:6
**Hill**
323:23 334:21
335:3
**hips**
371:22
**hired**
332:7

**historical**
339:18
**history**
306:24,25
**holly**
335:20
**hope**
331:12
**hospital**
281:20 311:13
362:8,13
**hospital-based**
276:2,6,25 277:4,6
277:7,12,15
279:12,15,23
280:5,19,25 281:6
281:8 282:1
311:17 362:1,5,10
**hospitalized**
281:9,9
**Houghton**
270:3,7,13 271:1
271:11,22
**hour**
261:18,21
**hours**
259:24 260:8,13,23
331:19
**HPV**
339:17,24 341:1
**human**
286:7
**humans**
367:14,16,18,21
**Huncharek**
308:25 312:4
**hundred**
261:20 268:10
269:16,17
**hypothetically**
357:22
**hysterectomy**
346:3,11,17
**hysterosonogram**
370:21

───── **I** ─────

**IARC**
321:19 324:6
358:22 359:16
**idea**
353:4 364:8 370:10
**identical**
356:8
**identification**
259:11 261:2
276:15 297:10
317:9 319:10
324:23 327:16
**identified**
277:5 321:6 339:21
351:5 367:9
**identify**
253:19 311:19
333:22 334:2
335:16 338:21,25
**II**
245:17 246:6 251:4
253:18 254:1
319:6 375:15
377:21
**ill**
281:16
**imagine**
358:6
**imaging**
333:18,24
**Imerys**
249:2,12 331:13
**immortalized**
300:6
**impact**
288:14 358:15
**importance**
308:3
**important**
263:7 282:17,20
312:3,9,24 332:22
**impossible**
306:17
**impressed**
366:21
**inability**
327:2 328:2

**inappropriate**
329:14 373:11
**incidence**
296:15 346:2
**include**
265:15 266:10
268:9 270:3 282:7
337:21 341:10,23
342:9 343:23
344:10
**included**
294:24 296:25
307:24 308:14,22
312:11 324:20
342:13,21 343:16
**including**
321:22 344:16
**inclusion**
311:23 356:19
357:8
**incomplete**
266:23
**inconsistency**
279:13,20
**increase**
273:12 290:2 293:9
303:23 340:7,7
365:4,5
**increased**
360:20 362:3
**increases**
305:15
**independent**
317:16
**INDEX**
251:1
**indicate**
303:19 305:12
**indicated**
298:7
**indistinguishable**
280:2
**individual**
277:12,20 278:21
279:4,14 282:13
311:21 340:5
344:25 361:14

362:9 364:11
**individually**
278:9
**inducing**
304:4
**industry**
352:19 353:5,21
**infection**
306:25 307:3,4
363:23
**infer**
328:12 329:11
**inflammation**
288:16 289:1,5,11
289:13,16,18
290:2,13,23 291:1
291:2,5,12,16
292:12,16 293:20
294:4,16,21
295:13 296:1,3,9
305:14 336:22
337:12,14 338:3
338:19 339:8
340:10 364:20,21
364:23,24 365:2
365:20,23 366:1,7
366:22 367:11
**inflammatory**
289:9,19 291:4,19
291:24 305:16,17
338:22 365:7,18
**influence**
251:20 296:9
**influenced**
275:25
**information**
265:13 266:9,10
300:3 312:15
328:11 329:11
345:17 354:24
**infrequently**
370:25
**inhalation**
358:23 359:10,13
359:17,23
**inhaled**
358:19 359:1

Case 3:16-md-02738-MAS-RLS   Document 33008-59   Filed 07/23/24   Page 46 of 60
PageID: 211665
Rebecca Smith-Bindman, M.D.

Page 388

initial
287:19 358:10
initialed
375:7
initiation
294:3 336:21 337:3
Initiative
270:9
initiator
338:3
inject
363:19 371:10,17
injecting
363:15 371:14
injury
331:22
ink
375:7
instance
303:15
Institute
334:14
institution
368:10
instruct
373:3
insufficient
328:11 329:11
intended
260:21
intent
356:11
interest
307:8
interested
376:19
interesting
273:15
interpret
280:7
interval
277:24 278:4,14
279:22 280:2
361:15
intervals
256:8 279:16,22,25
280:14 282:19,24

360:17
intervention
301:15
interview
334:3,9
interviews
333:21 334:1
introduce
334:5
introduced
331:11
introduction
294:12
invasive
323:14
invoice
251:12,14,24
259:15 260:19,20
261:14,16 319:8
319:12
invoices
259:4,20 260:3,7
261:1,7,9,12
319:15
involved
270:11 285:11
305:13 306:22
342:14,16,19,20
involving
268:20
issue
325:21 338:2,10
373:15
items
351:24

**J**

J
245:23 246:10
376:1
J&J
360:12
James
250:4 347:6,25
Jane
249:4 256:6 261:1
299:4 331:12

jbillingskang@se...
250:8
jbockus@dykem...
249:9
JD
247:6
JENNIFER
249:14
Jersey
245:3 247:25
253:16
jfoster@gordonr...
249:19
Johnson
245:6,6 246:7,7
248:3,3,14,14
253:12,13 366:3,5
Johnson's
366:1
jot
255:19
journal
282:21
July
332:18
June
259:14 332:20
354:22

**K**

keep
300:14 371:9
kind
281:22 289:12
310:18 321:4
365:2 367:13
371:9
kinds
321:7
knew
333:6
know
266:9 286:2,5,17
286:23 288:19
289:8 290:6,15,19
292:9,20 293:3,3
293:25 298:13,15

299:22 303:4,14
303:16,16 307:9
310:9 312:22
314:5 315:16,18
315:20,25 317:18
320:25 321:7,19
321:24 322:13,24
327:24 329:20
330:9,14,19
335:23 336:9
339:7 340:4,6,16
340:22 341:4,7
344:14 345:16
348:13,20 349:3
351:23 352:11
354:21 357:13
359:15 363:23
364:4,11,14
365:21 367:25,25
369:22 370:4,13
372:1,6,8,13
knowledge
262:25 275:24
320:22 321:24
322:5 330:20
knowledgeable
285:7
known
263:12 306:17
329:16 352:17

**L**

L
247:14
laboratory
314:8 317:17 318:3
lack
265:9
Langseth
276:12,22 277:5,19
278:10 279:13
360:11 361:24
362:17
Lanham
318:2
Lapinski
247:21 262:15

large
263:13 268:13
308:1 322:24
largely
360:5
Law
247:4,7,15,22
248:6,17 249:5,15
250:5,17
laws
376:23
lawyers
332:17
lead
289:9,13,19 302:15
365:19
leading
291:16 293:20
294:4 336:22
leads
290:18 303:15
305:16,18 365:8
leave
331:20
led
291:18 333:8 357:9
Lee
334:14
left
320:3
legitimacy
336:2
legitimately
335:6
LEIGH
247:5
leigh.odell@beas...
247:10
length
305:21
let's
276:14 318:22
368:23 371:10
letter
251:12 259:7,9
level
292:20 302:25

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 47 of 60
PageID: 211666
Rebecca Smith-Bindman, M.D.

Page 389

344:23 365:3,8
**levels**
301:6 303:13
330:16
**Levin**
246:7
**LHG**
245:9
**Liability**
245:7 253:14
**Liberty**
377:3
**ligation**
346:3,12,20
**limit**
305:9 352:20
**limitation**
263:7 264:5 265:14
265:15 307:24
328:1
**limited**
323:12 325:21
**line**
274:9 301:9,12,14
301:17 367:10
377:7
**lines**
300:7,8,16 309:18
**link**
283:5,17,25 288:20
**linking**
338:19,19 339:10
**list**
276:23 297:1,8
338:24 348:9,9,13
351:1,5,9,15
365:12
**listed**
350:25
**lists**
350:21
**literally**
363:20
**literature**
263:22 264:11
289:5,10 290:17
291:15,17,22

292:9 293:19
296:12,24 306:24
323:24 330:19
332:25 337:1,6,8
337:10,14,21
339:10,13 355:25
356:4 365:1
**litigation**
245:8 253:7,14
259:21 298:14
299:24 315:10,14
315:21 316:7
354:25 377:2,6
**little**
278:22 280:12
331:20 335:2
339:15 355:20
361:22
**living**
301:10,12,18 364:2
**LLC**
250:14,14
**LLP**
246:7 248:4,15
249:13 250:3,15
**locate**
332:15
**long**
255:10
**longer**
267:11 339:18
**Longo**
315:8 322:18
**Longo's**
315:21
**look**
261:4 269:5 276:10
276:21 277:19
278:8 282:21
283:13 302:2
312:25 325:11
327:23 332:21
345:23 346:9
362:4,6 370:3,22
**looked**
276:2 278:7 279:10
287:4 300:6 312:5

314:13 315:7
323:20 326:23
332:7 335:24
341:20 354:1
366:3,6,8,12,13
369:24 370:5
**looking**
266:5 268:19,24
269:4 274:1
309:13,18 312:20
325:15 334:4
336:10 345:5
351:3 371:1,15
**looks**
258:1 259:8 323:18
**Los**
248:9
**loss**
300:22
**lost**
264:1 328:16
**lot**
288:1 289:4,10,12
334:1 351:21
353:3,20 363:14
**lots**
358:12
**Louis**
250:20
**love**
317:1,3
**lower**
296:5 371:22
**lungs**
330:12

**M**

**M**
247:6 250:16
**M.D**
245:14 246:6 251:3
254:1 375:4,14
377:21
**magnitude**
310:22
**major**
295:14 325:22

**male**
332:12
**manuscript**
256:1 298:22 299:6
**MARGARET**
247:6
**mark**
262:5 276:14 295:5
297:9 324:18
327:14
**marked**
257:23 259:5,11
261:2 262:9
276:15 297:10
299:1,7 317:9
319:9,10 324:23
327:16 360:11
**markers**
366:21,23
**Market**
377:3
**Marketing**
245:7 253:13
**Mary**
245:23 246:10
253:23 376:1
**Maryland**
318:2
**material**
364:6,6
**materials**
260:16 294:24
298:8 353:23
**math**
260:12 341:13
**mathematical**
343:5
**matter**
253:12 258:24
260:14 274:9
286:8,25 331:13
**matters**
281:6
**MD**
247:6
**MDL**
245:8 259:21

**Meagher**
248:15
**mean**
256:6,18 273:14
278:25 284:13
286:12 298:22,24
298:25 302:6
305:5 307:23
308:8,11 310:16
326:11 337:14
348:4 353:1
356:15 361:15,17
370:13
**meaning**
265:10 271:24
308:17
**meaningful**
254:24 312:10
335:8,13
**meaningfully**
256:3 335:5
**means**
279:5 310:15 326:6
371:17
**meant**
308:7 367:22
370:12
**measure**
265:4 272:2 296:9
312:10 343:19
**measures**
366:6
**mechanism**
267:2,4 285:8
294:2 296:3 305:8
336:21 337:3,12
337:17
**mechanisms**
285:2,4 302:11
365:19
**mechanistically**
368:3
**Media**
319:4
**medical**
333:18,24
**medicines**

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 48 of 60
PageID: 211667
Rebecca Smith-Bindman, M.D.

Page 390

295:25
**meeting**
260:17
**meetings**
354:22
**Melissa**
294:20
**member**
304:10 334:13
**memory**
349:19
**men**
326:7,9
**menstruation**
363:24,25
**mentioned**
259:22 303:21
   307:5 356:10
   359:13 366:7
**Merritt**
294:20 295:7,18
**mesothelioma**
326:1 329:25 330:5
   330:8
**message**
296:24
**met**
332:19 354:22
**meta**
329:3
**Meta-analyses**
284:3
**meta-analysis**
254:15 255:20
   274:3 284:8,17,21
   323:9,18 328:25
   355:7 356:3,7,11
**metals**
313:19 320:12,15
   330:17
**method**
318:20 341:16,18
**methodology**
284:22 301:20
   341:9,14 357:2
**mic**
347:13 366:18

**MICHAEL**
248:5
**michael.zellers@...**
248:10
**microphone**
331:2
**middle**
263:2 264:3 338:17
   345:6
**migrate**
287:5 362:25
**migrates**
287:15
**migrating**
362:22
**migration**
285:23,24 286:8
   362:19
**Mike**
262:1 264:1 298:19
   332:19
**millions**
322:23
**mind**
317:2 370:4
**mine**
269:2 344:21
   355:19
**mineral**
321:25
**minimum**
290:19
**minor**
311:4
**minute**
331:2
**minutes**
255:12 317:2
   368:24 374:4
**misclassification**
329:14
**Missouri**
250:20
**misspoke**
346:23
**mixed**
296:13

**mobile**
364:3
**model**
367:10 368:2,5,13
   368:19
**modified**
300:13
**moment**
364:20
**momentarily**
262:4
**Montgomery**
246:8 247:9 253:11
**month**
271:25
**months**
371:13
**morning**
254:7,8,12 258:24
   331:11 347:22
   373:20 374:3
**mortality**
297:22
**motion**
374:5
**move**
319:21 326:14
   331:2 347:12
   364:5,6 373:13
**moved**
286:24
**movement**
286:19
**MPAff**
247:6
**mucosa**
288:2,6,8
**mucosal**
288:13
**mucous**
288:2
**multiple**
344:12,17,24
   357:18 358:4,16
**mutation**
357:23 369:17
**mutations**

304:1,16,20,21,23
   366:13

**N**

**N**
366:16
**name**
253:6 332:15
   347:25
**named**
325:4
**napkins**
271:8
**narrow**
274:3 363:3
**narrowly**
263:6 264:6
**national**
269:9
**nearly**
268:6 356:8
**necessarily**
274:11 335:8 344:7
**necessary**
290:16
**need**
268:13 275:24
   316:24 324:13
   327:6 347:12
**needing**
370:24
**needs**
344:6
**negative**
292:5
**Ness**
365:14
**never**
307:17
**new**
245:3 247:25
   248:19,19 253:16
   306:21 307:6
   333:10 359:10,25
**Newport**
247:17
**news**

353:15
**nice**
367:15
**night**
373:18
**nine**
270:18
**non**
304:19
**nonaspirin**
251:20
**noncancer**
304:17,18,20
**nonoccupational**
327:2 328:2
**nonresponsive**
298:18 326:15
   340:24
**nonsteroidal**
295:22
**nonusers**
330:18
**normal**
301:21 303:7
   345:13
**Notary**
377:25
**noted**
374:9 375:7
**notes**
255:13,16,20
   257:17,21,23
   258:1,12 376:12
**November**
259:15 260:2
**NSAID**
251:20 297:21
**NSAIDS**
294:21 295:22
   296:4,10,14
**number**
251:11 262:19
   276:24 292:6
   304:15 310:18,19
   310:20 321:21
   322:24 324:4,8,9
   325:23 326:6,7,13

Rebecca Smith-Bindman, M.D.

335:11 340:22
343:22 350:7,17
355:6 357:17,20
360:16
**numbers**
255:22,24 256:7,10
256:12,14,17
257:13 268:14
304:10 341:8
343:15 365:15
**Nurses'**
266:18 267:15,18
268:20 269:6
343:10
**NW**
250:6

**O**

**O**
297:2,2
**O'Dell**
247:5 251:7 255:6
255:9 256:16
259:3 260:19,22
262:1 263:25
264:7,16,21
266:24 267:16
270:5 271:17
272:11 273:2
274:25 276:20
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
292:21,23,25
293:23 294:10
296:7 298:19,21
299:5 300:24
301:24 303:3
304:7 307:2 309:6
309:11,15 310:5
310:12 313:20
314:19 315:2,23
316:3,13,24 317:4

317:21,24 320:13
320:24 321:11
322:4 323:5 324:5
326:3 327:5,21
330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2 343:2,13
344:4,19 345:18
347:1,6,9 348:25
349:4,7,11,13,15
349:21,24 350:2,5
350:11,14,17,20
351:13 354:6,15
356:2,10 357:16
358:19,25 359:5
359:13 360:9
368:4,11,21 370:2
372:5 373:2,16
**object**
256:16 266:24
267:16 270:5
271:17 272:11
273:2 274:25
277:10 279:3
280:23 283:2,8
284:11 285:6,15
286:11,22 287:8
287:21 288:23
289:3 290:14,24
291:14,25 292:17
294:10 296:7
298:18 300:24
301:24 303:3
304:7 307:2 310:5
310:12 313:20
314:19 315:2,23
316:3,5,13 320:13
320:24 321:11
322:4 323:5 324:5
326:3 330:2 332:5
333:12,25 336:8
336:18 337:7
338:5 339:2,12
340:2,23 343:2,13
344:4,19 348:25

349:1,11,22
350:14 351:13
359:24 370:2
372:5
**objected**
299:2
**objection**
293:23 347:18
350:11 356:1
357:6 358:3,21
359:3 366:2 368:7
368:16
**objections**
359:7 376:8
**observational**
306:10,14
**obstetrics**
334:6,13,18
**Occasionally**
363:18
**occupational**
252:4 324:7 326:18
328:13 329:12
359:16 360:7
**occur**
358:17 365:10
**occurred**
303:1
**odd**
279:23 280:10
**odds**
279:20 280:3
282:18,24 309:24
310:3,10,14,17,23
310:24 311:5,6,7
361:25
**Oh**
317:22 341:14
347:6
**okay**
253:22 258:6
264:21 268:19
271:2 277:17
283:21 295:2
297:5,18 298:4
299:16 305:3
308:10 309:15

325:3 328:17
330:24 332:1,6,14
333:9,14 341:18
342:6,24 348:6
351:8,16 352:9
354:4 355:6
357:16 360:9
361:23 362:18
364:25 368:20
370:14
**older**
332:21
**omitted**
283:23
**once**
271:25,25
**ones**
255:25 256:5
273:16 312:12
356:8
**ongoing**
294:17
**oophorectomy**
346:18,22
**open**
363:10
**opinion**
285:18 292:11
321:1 333:22
349:9,20 350:13
351:11,14,18
359:12,25 362:25
364:23
**opinions**
284:25 285:1
313:14,18,22
315:1 321:16
355:10 359:9,10
**oppose**
374:5
**opposed**
267:21 268:4
274:18 275:15
353:7
**order**
301:4 333:11
**organizations**

353:16
**organs**
301:22
**outpatient**
281:21
**outside**
286:9,20
**ovarian**
251:17 252:2
266:23 269:3,21
269:25 270:15
271:9 275:9,11,21
276:8 283:6,17,25
285:13 290:3,9
294:3,17,22
295:14 296:3,5,15
296:18 297:22
304:3 305:13,18
306:23 307:10,13
313:4 314:2
320:23 321:9,17
322:3,12 323:3,7
323:8,10,11,17,24
324:3 325:6,18
326:1,19 327:3
328:3,12 329:11
332:8 333:1
336:22 337:3,18
337:25 338:3
339:10 340:1
345:12,13 346:2
346:10,17 355:18
357:18,21,24
358:20 359:1
360:5,20 361:1
364:21,24 365:11
366:25 370:1
**ovaries**
285:20 286:9,19,21
287:6,16 363:21
370:19 372:10,15
**ovary**
288:8 362:23 363:2
363:8,8,11
**overall**
323:18
**overlap**

Rebecca Smith-Bindman, M.D.

277:13,13,14,16
278:4 279:16
280:6,14 344:11
344:22 345:1
361:15 366:23
**overlapping**
278:15
**overlaps**
279:22 335:2
**oxidants**
301:6 302:7 366:11
**oxidation**
365:4
**oxidative**
303:10,13,13,15,18
304:2,22 305:4,5
305:9,12,15,16
358:13,14 366:8
**oxygen**
303:7

**P**

**P**
247:5 366:16
**P.A**
247:20
**p.m**
246:10 354:11,12
368:25 369:2,3,4
374:7,9
**P53**
300:19,22
**page**
251:11 252:1
257:23,25 259:7
262:14,15,16,18
263:3 264:4
268:19 273:7
275:13 276:22
283:13 290:7
294:1,25 295:7
297:14,19 307:21
308:25 309:9,10
309:12,19 311:11
312:25 318:1,5,6
318:7 325:13
327:24 328:5,6

336:20 345:5,6
348:12 351:5
352:11 360:2,13
377:7
**pages**
257:24
**paid**
298:13 299:23
315:10 355:2
**paper**
276:12,22 284:14
286:4 294:19
295:8 297:1,9
298:12 307:16
324:17 325:8
326:23 327:9
356:18,23 360:11
360:14 361:24
362:4
**papers**
284:12 292:1
296:19,25 353:13
353:14 370:3,5
**paragraph**
263:3 264:1,3
283:14 294:11
295:11 297:14
318:1,8 327:25
328:6,19 338:16
345:7,10,24
352:14,15
**paragraphs**
294:14
**part**
255:6 270:23 303:7
356:22 359:11
363:9
**participate**
342:6
**particles**
286:4 322:19,23
345:8,12,14 363:7
364:4
**particular**
263:25 289:11
308:4,6 313:24
335:9,11,25

341:16,19,23
353:11,12
**particulate**
286:8,20,25
**parties**
373:25 376:20,21
**partly**
342:11,11
**parts**
302:14
**patency**
370:23
**path**
339:17
**pathways**
338:18 365:9,10,18
**patient**
302:10 335:7
357:22,23 367:25
**patient's**
371:21
**patients**
281:9,10,19,21
293:11 297:23
313:10 344:11,12
345:1 358:4
363:18 370:25
**PCPC**
250:2 348:5,17
**PCPC-produced**
349:10,20 350:9
**Pecan**
249:6
**peer**
282:21 341:11,15
341:18 344:3,7
**pelvic**
294:21 305:15,17
**pen**
258:2
**penalty**
375:5 376:6,22
**Penninkilampi**
282:3,4,7,11 283:4
283:22
**Pennsylvania**
377:4

**people**
281:16,17 314:8
355:22
**percent**
340:6,7 344:15
348:16 371:3,4
**percentage**
372:9,16
**percentagewise**
372:12
**perfectly**
374:4
**performed**
355:8,11
**peri**
286:9
**perineal**
251:17 266:17
270:14,19,22
271:5 273:12
283:15 285:13,19
287:5,16 302:20
303:1 330:7,10
372:3
**perineum**
286:21 362:22
363:5,7,9,20
364:12,17 370:18
371:8 372:7
**period**
339:18
**peritoneal**
325:25
**peritoneum**
286:9
**perjury**
375:5 376:7,22
**person**
332:11,23 333:3,5
**person's**
332:15
**Personal**
250:2 348:1,4
**personally**
307:10
**perspective**
314:12

**pertained**
366:4
**Ph.D**
253:18 319:5
**Philadelphia**
377:4
**Philip**
334:13
**phone**
258:16,20
**phonetic**
365:14
**physical**
288:13 291:18
**physician**
285:8
**physiology**
303:8
**PID**
307:4,15
**piece**
312:15
**pieces**
333:22
**place**
255:15 269:4
371:10 376:5
**placed**
372:9
**places**
274:15
**plagued**
275:2
**plaintiffs**
247:3,12,19 259:3
260:18 298:7,14
299:23 354:14
**Plaintiffs'**
354:23,23 355:2
372:24 373:9
**plausibility**
285:12
**play**
295:14
**Plaza**
247:16 377:3
**please**

Case 3:16-md-02738-MAS-RLS     Document 33008-59     Filed 07/23/24     Page 51 of 60
PageID: 211670
Rebecca Smith-Bindman, M.D.

Page 393

253:19 256:24
262:14 299:19,21
316:5 324:16
327:13 347:7
**plot**
361:2
**plug**
343:21
**point**
263:11 279:6,7
280:12 291:11
297:24 310:25
335:9 344:2 361:3
361:5,11 362:12
366:13
**pointed**
272:4 308:12
**points**
312:3 327:1
**Policies**
334:14
**pooled**
279:20,23 280:3,10
361:25 362:4
**pooling**
274:4 344:24
**population**
275:25 276:23
278:6,7 281:15,21
311:12 346:15
**population-based**
276:3,24 277:17
278:9 279:11,17
279:18,21 280:3
280:21 281:5,25
311:16
**populations**
280:10 329:15
335:7
**position**
304:12
**positive**
278:3 311:3 328:10
329:10 361:18
**possibility**
276:1
**possible**

272:20 274:4 279:9
283:3 306:10,13
**possibly**
306:22 357:23
**postop**
313:10 370:25
371:2
**potential**
274:8,8 293:14
324:3 360:19
**potentially**
281:1
**powder**
245:7 253:13
259:21 268:3
269:20,24 271:8
271:15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25 291:1,8
292:4,11,13 293:4
293:8 294:20
307:13 313:11,15
313:19,23 314:1
314:17,20,25
315:5 316:7,19
318:15,19,19
320:5,7,10,12,18
321:2,6 322:6,11
322:16,20 323:7
323:20,22 330:22
339:11 340:1
343:19 346:6,10
346:16 352:16
354:25 355:9,18
357:25 358:1
360:21 361:1
362:25 365:22
366:1,4,5,20
367:8 369:18
372:3,7 377:6
**power**
323:15
**powerful**
266:3
**practical**

344:23
**Practices**
245:7 253:14
**preclude**
297:23
**predecessors**
348:5
**predicter**
265:12
**preferable**
293:18
**preop**
371:2
**preparation**
373:8,18
**preparations**
352:21
**prepare**
254:10,10
**preparing**
260:16
**presence**
303:18 306:1
**present**
268:8 306:14 334:9
352:16
**presentation**
356:17
**presented**
255:5 277:25
334:15 355:22
**presenter**
334:16
**pressure**
371:18,20
**pretty**
371:13
**prevented**
358:14
**previous**
295:12 356:8
**primarily**
312:11 314:13
331:18 333:23
358:23 359:23
**primary**
271:21 312:7

370:20
**principles**
335:21
**prior**
374:3
**pro**
302:7 303:13,15
365:4 366:11
**probability**
303:22,23
**probably**
258:10 263:17
322:7,8 332:16
371:12
**problem**
265:11
**procedure**
313:13 370:17
**procedures**
363:14 370:20,25
**proceedings**
376:4
**process**
282:22 291:4,5
342:7,19
**processes**
291:20
**produced**
254:25 255:2
**product**
257:2 269:24
290:13,22 291:10
292:14,15 293:4
293:14 314:5,5
346:7
**production**
255:7
**products**
245:7,7 250:2
253:13,14 268:3
290:8 292:4,11
293:14 313:11
314:9,10,14,17,21
314:25 315:5
320:7,10,12,18
321:2,6 322:6,11
322:16,21 323:7

323:22 343:20
346:10,16 348:2,4
352:17 355:18
357:25 358:1
361:2 367:8
**professor**
334:2,6,11
**program**
257:5
**progression**
294:3 336:21
**proliferation**
300:23 301:5 302:5
366:13
**promotion**
294:3 336:21
**proper**
284:17,21
**proportion**
292:3
**proposition**
294:9
**prospective**
274:17,20
**protective**
305:8 361:19
**protein**
300:22
**protocol**
373:24
**prove**
292:7
**provide**
262:3 354:24
**provided**
259:3 260:25
319:13 357:3
**provides**
301:18 357:12
**proximity**
287:22 288:11
**psoriasis**
290:5
**psychometrically**
272:9
**PTI**
250:14,14

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 52 of 60
PageID: 211671
Rebecca Smith-Bindman, M.D.

Page 394

**Public**
377:25
**publication**
257:14 353:22
**publications**
289:12 299:10
305:11 320:1
**publish**
319:21,25 356:11
356:25
**published**
255:25 263:22
264:11 284:4
290:17 294:19
298:5 306:23
307:13 310:23
315:15 332:25
355:24 356:4,13
356:20
**publishing**
334:9
**purpose**
315:14
**purposes**
348:3 349:8
**put**
276:19 349:13,15
352:9 360:23
364:12 367:24,24
371:7,8
**putting**
274:10 350:15
363:15 370:18,21
371:18 373:25

————————
**Q**

**quality**
282:17
**quantifiable**
335:13
**quantification**
302:10 312:12
**quantified**
296:21
**quantifies**
290:16
**quantify**

267:20 322:15
323:16
**quantifying**
312:6
**quantitative**
336:1
**quantity**
302:15
**question**
259:17,19 263:6
264:6,8,20 265:10
273:11,22,23
274:16 282:25
284:17 291:21
293:2,17 299:19
299:22 301:9
302:13 304:14
305:19 310:13
316:8,12 321:9
332:2 333:11
335:10,25 336:10
338:4 339:22
340:25 342:15
346:7 349:7,16
362:20 363:3
368:13 370:4
**questions**
266:1,5 273:14,15
324:15 330:25,25
331:23 346:25
347:5 354:17
355:7 360:16
361:23,25 373:3
**quick**
280:8
**quick-and-dirty**
278:16
**quite**
256:2 304:14 324:7
358:6 366:20
**quoting**
264:17 268:20
329:19

————————
**R**

**R**
247:21 250:4 297:2

334:14
**race**
372:12
**radiation**
302:1,3 370:11
**radioactive**
364:5
**radiologist**
333:16,23 363:13
**radiology**
334:12
**raise**
256:23
**range**
280:5 307:8 311:5
**rarely**
263:5 264:5
**rates**
329:23
**ratio**
279:20,23 280:3,10
310:10,17 311:5,6
311:7 362:1
**ratios**
282:18,24 309:24
310:3,24
**re-ask**
299:20
**reach**
319:22 333:8
**reached**
355:10
**reactive**
303:7
**read**
266:6 295:16
297:16 352:22
353:3,13,19,22
360:2 375:5
**reading**
263:25 264:18,19
289:4 300:21
329:18 339:4,5
**ready**
344:2
**real**
263:24 264:13,13

264:17,25
**really**
308:12,13 332:7
365:15 366:20
**reason**
263:24 264:14,18
268:5 271:21
300:25 371:6
372:14
**reasons**
325:22
**Rebecca**
245:14 246:5 251:3
253:17 254:1
319:5 375:4,14
377:21
**recall**
273:6 274:21 275:4
275:8,18,25
349:19 351:10
**received**
319:16
**recognize**
266:21 324:25
**record**
253:6 276:19
318:25 319:4
331:1,4,8 347:2
347:15,19 354:9
354:13 368:12
369:1,5 373:16,21
374:8
**recorded**
259:24 376:9
**recruited**
280:11 281:7
**rectal**
287:18 288:17,21
**rectum**
288:5,7
**reduce**
295:25 296:14
**reduced**
346:17,21
**reduction**
346:2,11 365:5,6
**Rees**

249:13
**reference**
309:1 348:4,9,9,13
348:17 351:1,5
361:24 365:12,12
**references**
298:2 365:13,13,14
365:14,15,17,17
365:17
**reflect**
284:9
**reflection**
277:25
**refused**
376:17
**regard**
283:16 344:11
365:22
**regarding**
294:16 354:24
357:2 373:4
**region**
285:19 287:16
302:21 330:8,11
372:4
**regular**
266:15,17 272:4,8
272:18 273:12
290:8 312:20,23
343:19,24 355:8
369:25
**regularly**
369:18
**regulation**
366:9,9,11,12
**Reid**
324:10,17 325:5
**related**
275:6 304:9 313:12
**relates**
285:12 326:18
**relating**
264:4 285:1 362:19
**Relation**
294:21
**relationship**
269:20 270:14

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 53 of 60
PageID: 211672
Rebecca Smith-Bindman, M.D.

Page 395

271:4,7 275:20
288:3 293:15
306:2 321:19
324:3 325:17
335:12 360:25
**relative**
309:4,22 340:14,15
341:4 362:13
376:19
**relatively**
281:25 311:4
362:14,16
**relevance**
367:14
**relevant**
302:4 311:13
**reliability**
272:10,12 282:25
**reliable**
335:17 336:6
**reliance**
294:24 297:1
353:23
**relied**
350:10 351:10,24
351:25
**relief**
313:11
**rely**
348:23 349:10
351:18,21 353:10
**relying**
362:24 364:22
**remember**
255:4 272:6 275:10
283:9 307:19
324:9 325:10
327:5,7 332:12
345:22,25 350:4,6
350:20,20 351:6
351:19 352:3,7
370:5
**reminded**
332:19
**remove**
353:6
**removed**

291:19
**repair**
303:24 358:14
**repeated**
353:12,15,16
**replicate**
356:3 357:4,14
**replicated**
355:24
**replication**
356:9
**report**
254:13 256:5,15
257:7,22 261:23
262:7,10 264:19
266:13 267:19
268:1 271:11
272:4,17 273:5,8
275:13 287:4
290:7 294:1,8
295:20 298:9
307:22 312:25
315:16 318:14
319:19,20 322:18
336:20 341:20
343:24 344:2,6
346:11 348:10
349:9 352:10
353:17 356:21
357:2,20 358:22
359:8,14,16 360:1
362:13
**reported**
245:23 256:10
267:1 268:2
278:10 339:25
343:10 352:18
**reporter**
246:11 253:23
256:23 299:2,15
299:17,18 304:18
308:5 319:24
366:10,15,17
367:19 376:2
**reporting**
282:18,23
**reports**

282:11 293:19
315:8,13,14,22,24
316:4,6,14,16
318:17 321:20
353:16
**represent**
331:13
**represents**
348:1
**reproduce**
291:19
**reproductive**
285:20 287:11
293:22 334:7
370:15
**requested**
300:3 316:2 376:16
**require**
356:18,19
**required**
292:14 311:22
322:25 353:8
354:3
**requirement**
343:18
**requirements**
312:13 354:3
**research**
279:6 294:16,18
298:16 302:6
324:2 333:10,16
338:12 350:22
365:22 368:5,9,10
368:14
**researcher**
331:18
**researching**
333:7
**residual**
306:9
**respect**
261:23 311:18
319:19,20 321:16
330:15
**respective**
374:1
**responded**

315:21
**response**
304:9 367:6
**responses**
294:5 336:23
**rest**
331:21
**result**
274:11 287:12
288:16 294:5
336:23 344:25
360:6,20
**results**
271:22 273:18,21
274:5 275:9 279:9
292:6 295:12,17
297:21 301:21
306:6 308:3
316:15,18,22
319:21,25 355:16
355:21 356:7,17
357:10,12 360:2
362:7 366:4 367:2
367:11 370:6
**retrograde**
363:24 371:11
**retrospective**
274:18,21,24
275:19
**review**
254:15 265:9,17
266:11,12 270:3
282:21 284:9,18
284:22 289:1,7
297:16 311:2,18
312:5,15,17
323:12 324:6,10
324:21,22 325:4
329:3 342:21
343:18 344:3,7
345:19,21,21
355:8,12 356:12
357:11 376:15
**reviewed**
254:13 265:9 292:1
296:19 298:9,11
299:9 311:21

324:12 341:11,15
341:18 351:21
365:21
**reviewing**
260:15
**reviews**
312:18 355:14
357:13
**Rheumatoid**
290:1
**right**
257:11,15 258:2
259:14,16 260:5,8
261:16 262:21
265:12,17 266:4,9
266:19 267:9,12
267:15 268:10
269:7,14,22 270:4
270:9,11,16 271:9
271:12 272:25
273:21 274:18
275:11,16 276:4
276:18 277:1,22
278:2,12 280:17
281:10,17 282:5,8
283:1 284:1,5,10
284:19 285:2,21
287:13 288:18,22
289:20 290:5
292:16 294:25
295:16,23 296:1
296:15 297:2,16
297:25 298:10
299:13,16 300:7
305:22,24 306:4,7
306:19 307:14
309:5,15,23 310:2
313:1,14 314:18
315:8,11,15
316:11 317:17
318:5,12,16,22
320:11 325:9,15
326:2,21,24 327:4
327:8 328:7 329:6
329:17 341:5
345:4,6 361:8
**right-hand**

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 54 of 60
PageID: 211673
Rebecca Smith-Bindman, M.D.

Page 396

325:12
**rights**
374:4
**risk**
251:17 273:13
275:12,14,23
279:1 290:3 293:9
293:16 294:22
296:5,14 308:4,6
309:4,22 327:2
328:2 329:16
330:8,11 333:17
340:14,15 341:6
346:9,11,17
357:20,24 358:4
358:12,16 360:20
361:4,6 362:3,13
369:10,25 370:10
**risk-benefit**
293:15
**risks**
333:24
**Robinson**
247:13
**role**
295:14
**route**
286:14 359:19
**Royston**
250:14
**run**
343:14

─────── S ───────

**S**
366:16,16
**Saed**
298:9,10,13 299:11
299:22 300:1,4,6
300:12,18 302:19
302:25 365:13
366:3
**Saed's**
301:21 365:21,25
**safe**
283:16 292:8 293:5
320:7,9,12,17

**Sales**
245:7 253:13
**sample**
256:9
**samples**
318:19
**San**
245:15 246:8 249:8
253:1,11
**sand**
286:1,2
**sanitary**
271:8
**satisfied**
344:9
**saw**
300:16
**saying**
265:5 308:21 311:2
330:4 361:4,5
**says**
269:2 283:22 304:5
304:8 328:22
329:20,21
**sciences**
334:7
**scientific**
275:5 356:23 368:5
368:14
**scientist**
285:8 298:16
**Scott**
259:9,10
**scribble**
255:15
**scribbled**
255:14
**search**
332:14,16
**second**
276:22 307:23
317:25 318:1,6,7
318:8,8 327:24
328:6,19,21 335:3
340:11,18
**section**
294:12 336:9

**see**
263:8 290:10 294:6
298:2 308:25
313:5 316:22
318:4 327:6 328:4
328:17 339:3,5
345:24 348:18
365:1,2,4,5
370:18 371:9
**seeing**
297:3 351:19 352:5
352:7
**seen**
307:17 316:1,9,14
316:15,16,17
317:14 325:8
364:6,7
**selecting**
281:19,19
**selection**
274:24 275:2
280:16,21
**self-regulate**
353:5
**sense**
303:22 355:23
361:14 364:17
**sensitive**
302:14 344:25
**sensitivity**
302:16 343:23
**sent**
261:14
**sentence**
297:20 308:10
312:4 318:10
328:21 336:24
345:9 353:11,12
**series**
294:4 336:23
**serous**
323:13,17
**service**
318:3
**Services**
253:7 318:2 377:2
**serving**

354:19
**session**
255:18 259:2 320:4
372:25 373:1
**set**
266:12 311:21
342:17 357:9
376:5
**setting**
314:8 342:15
365:11
**settled**
338:4,7,10
**several-fold**
363:13
**Seyfarth**
250:3
**shape**
341:11
**shared**
257:3,9,11
**Shaw**
250:3
**Shawn**
365:14
**SHEET**
377:1
**shift**
256:4 310:22
**shifted**
278:2
**shifts**
256:9
**short**
263:17 270:2 354:6
**shorthand**
246:11 376:2,12
**show**
269:19 276:7,12
277:8,20 278:25
288:15,20 297:7
318:17 349:4,12
**showed**
255:25 366:19
367:1,2,3,6,7
**showing**
302:18,24

**shown**
255:22 279:12
283:15 364:5
**shows**
279:4 287:10 362:7
**shrift**
263:17
**Shukla**
365:16 367:3
**sick**
281:20
**side**
325:12
**sign**
292:23
**significance**
277:21 278:1,6,11
278:17,19,21,25
279:5
**significant**
269:20,25 270:14
271:4,7 275:20
276:7 277:8
328:10 329:10
360:3 362:3,11,15
**silicate**
321:25
**Simes**
246:7
**similar**
283:16 362:15,16
362:17
**simple**
320:8
**single**
263:6 264:5
**sit**
264:11
**six**
277:6 321:4,10
**size**
256:9
**Skadden**
248:15
**skew**
344:18
**skiing**

Rebecca Smith-Bindman, M.D.

Page 397

331:17,22
**skill**
334:10
**skin**
274:9
**Slate**
248:15
**slight**
256:4
**slightly**
256:9 278:13
**small**
292:2,6,6 309:4,22
310:4,7,11 324:4
325:23 326:6,13
**Smith-Bindman**
245:14 246:6 251:3
253:17 254:1,9
264:10 319:5,7
347:22 354:16
360:10 368:12
372:23 373:6,17
374:2 375:4,14
377:21
**Smith-Bindman's**
360:1 373:14
**smoke**
340:19
**smoking**
340:12,14
**Snips**
366:15
**SNPS**
366:13,16
**software**
257:4 357:8
**sorry**
259:17 262:1
264:21 270:25
317:22,23 325:10
325:10 328:5,14
341:14 346:20
347:2,6
**sort**
263:1,20 278:15
280:8 286:23
294:12 321:3

335:22 356:23
357:13 365:18
367:21 370:6
**sound**
260:8
**source**
345:15
**sources**
284:18 344:24
**South**
248:7 250:18
**sparse**
297:20
**speak**
255:10 360:19
373:17
**speaking**
254:20 370:9
**species**
303:7
**specific**
264:3 283:24
362:19,20
**specifically**
283:5 325:25
351:24 360:13
364:20 366:3,4,8
**specified**
257:4
**specimens**
318:20
**spent**
260:14
**sperm**
364:1,3,3 372:9,16
**sphincters**
288:1,6
**spill**
363:17
**Spitzer**
247:20
**split**
373:5
**spoke**
370:14
**spoken**
300:1

**spreadsheets**
357:3
**Square**
248:18
**St**
250:20
**stable**
310:24 323:6
**standard**
256:8
**standards**
353:21
**start**
259:2 333:10
337:15 356:3
**starting**
361:24
**starts**
345:7
**state**
263:5 285:1 294:2
297:20 311:12
328:1,9 329:9
375:11 376:2
**stated**
333:15
**statement**
263:2 264:3 273:20
283:24 294:6
304:12 313:8
336:19 337:11
346:1,5 359:6
**statements**
262:19,24
**states**
245:2 253:15
263:23 264:12
283:5 291:12,22
**statistical**
277:20,25 278:5,11
278:16,19,21,25
279:5 280:9
323:15
**statistically**
269:19 270:13
271:4,6 275:20
276:7 277:8 362:2

362:10
**stenographically**
376:9
**stenosis**
371:4
**step**
356:24
**stimulated**
302:11
**stratified**
370:6
**Street**
246:8 247:8 248:7
249:6 250:6,18
253:11 377:3
**strength**
334:22 339:23
340:4
**stress**
303:11,18 304:2,9
304:22 305:4,5,9
305:12,15,16
358:13,14 366:8
**strike**
261:6 271:5 306:12
315:18 318:3
326:14 356:2
373:13
**strong**
265:19 288:3 311:3
315:4 334:25
339:13 340:13
360:4
**stronger**
339:25
**strongest**
321:18
**strongly**
271:20 366:24
**structures**
371:2
**struggling**
255:23
**studied**
306:3 314:6,9,14
369:12
**studies**

260:15 262:21
263:4,7,23 264:4
264:12,24 265:6,8
265:15,19 271:23
272:23 274:17,20
274:21,24 275:1
275:15,15,19,22
276:3,7,25 277:1
277:4,6,8,13,15
277:18,20 278:7,9
278:22 279:11,12
279:15,18,21,23
280:3,6,20,22,25
281:8,15 282:3
284:4,8,19,23
286:7,17,24,25
287:3 288:15,19
288:20 295:12
306:7 307:14,24
308:14,22 311:20
311:21 312:11
321:22,22,23
322:1 324:9,19
325:20 326:17
327:3 330:9,14
334:14 336:4,7
341:10,10 342:8,8
342:12,20 343:9
343:17,20,23
344:10 346:9
350:22 351:9,15
351:21 353:15
355:17 359:23
360:6,17,23 361:7
361:18,20 362:1,5
362:7,10,18 364:1
367:22 369:15,24
**study**
257:14 263:13,14
263:21 265:11,16
265:19,21,22
266:4,9,19 267:7
267:9,15,18,21,23
268:7,9,20 269:6
269:9,11,11 270:2
270:4,7,9 271:1
273:10 278:24

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 56 of 60
PageID: 211675
Rebecca Smith-Bindman, M.D.

Page 398

279:4 282:8,16
283:1,5 284:5
291:11 300:6
302:19 303:1
304:5,8 306:10,14
306:19 307:18
308:21 309:1
320:22 324:11
325:3 327:1 335:6
341:24 343:10
345:5,16 356:25
361:14 362:21
363:4 364:5,11,13
364:14,15 369:21
**subject**
258:24 274:20,23
335:17 336:7
338:12
**submit**
320:2 344:6 353:8
**submitted**
259:23 344:3
**Subscribed**
377:22
**substance**
305:3,5
**substances**
285:24 303:10
**substantial**
330:1 356:22 360:7
366:19
**substantially**
361:21
**subtypes**
321:10
**sufficient**
266:10 357:1
**suggest**
278:19,20 295:13
296:20 370:13
**suggesting**
279:25 280:14
**suggestion**
286:13
**suggests**
292:10
**Suite**

246:8 247:24 249:7
249:17 250:19
253:11
**summarize**
296:22
**summary**
280:9 308:1 312:16
321:18 323:9
344:25
**superior**
293:7
**supervision**
376:10
**support**
294:8 311:14 313:7
362:25 364:23
365:25
**supported**
298:16 337:11
338:8,9
**supporting**
294:13
**supports**
290:17 304:11
345:13 357:13
**supposed**
287:1
**sure**
255:2 268:22,24
270:24 274:5
276:9 280:13
283:11 284:13
289:5 292:19
295:3 298:20,23
304:14 305:19
307:5 308:12
317:5 328:15
331:12 334:3
335:19 344:15
346:23 349:6
350:16,19,25
351:2 359:18
368:11,15 370:7
**surface**
274:9
**surgical**
291:17,17 313:12

**surprised**
256:2
**survey**
318:3 337:1,5,13
337:16,20
**susceptible**
280:20 289:16
**swear**
253:23
**sworn**
254:2 377:22
**symptoms**
313:12
**synergistic**
358:6,18 369:9,16
369:24
**synergy**
370:10
**system**
363:11,17,21,23
364:8,9 370:15,16
**systematic**
265:16 266:11,12
270:3 284:3,9,17
284:21 311:2,18
312:14,17,18
313:11 324:21,22
342:21 355:7,12
355:14 356:12
357:12

---

**T**

**T**
297:2
**table**
361:8 362:6,6
**Tachibana**
251:24 261:13,18
319:8,19
**take**
260:1 276:10 302:6
312:25 317:20
318:22 327:23
329:15 331:21
354:6 368:23
373:14
**taken**

246:6 278:5 286:18
310:25 319:1
331:5 347:16
354:10 369:2
376:4,12
**takes**
322:13
**talc**
251:17,22 266:17
266:22 268:2
270:14,16,19,22
271:5,16 273:12
275:10 276:8
283:6,15,23,25
287:12,17 288:4
288:16,21 292:4
293:7,20 302:12
302:20 303:1
313:3 314:7,15
322:6 329:24
330:7,10,17 332:8
345:7,11 352:21
358:25 359:20
362:21 364:12
365:10 367:8
369:25 372:15
**talcum**
245:6 253:13
259:21 269:20,24
271:7,15 274:8
275:21 285:13,19
285:23 286:18
287:5,15 290:8,12
290:22,25,25
291:8 292:11,13
293:4,8 294:20
307:13 313:11,15
313:19,23 314:1
314:17,20,25
315:5 316:7,18
318:15,19 320:5,7
320:10,12,17
321:2,6 322:11
323:7,20,22
339:11 343:19
346:6,16 352:16
354:25 355:9,18

357:25 358:1
360:21 361:1
362:25 365:22
366:19 369:18
372:3,7 377:6
**talk**
258:25 263:3
307:21 309:1
328:7 335:25
338:16 359:21
363:22 364:19
365:18
**talked**
254:18 260:16
272:3 276:13
282:4 307:12,18
311:25 322:18
336:24
**talking**
309:6 346:8
**talks**
269:6 335:21 363:4
**target**
345:14
**teach**
335:14,18
**teal**
258:9
**tell**
268:5 280:1 283:10
293:1 295:1,8
332:14 333:2
349:2
**tells**
302:13
**temporality**
313:1
**ten**
278:20
**tends**
291:3
**term**
305:22,25
**terms**
272:21 293:14,16
296:13 302:4
342:12,15

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 57 of 60
PageID: 211676
Rebecca Smith-Bindman, M.D.

Page 399

**Terry**
257:13,14
**tested**
272:9 318:16
**testified**
254:4 300:13,18
356:12
**testify**
254:2
**testimony**
333:19 359:11
373:14 375:8
376:7,13
**testing**
316:15,17,18,21
317:13,16 318:20
353:8
**Texas**
249:8,18
**text**
336:3,6
**textbook**
263:18 335:18
**textbooks**
335:16 363:22
**Thank**
260:22 262:6 264:7
276:20 297:12
317:12 318:11
327:18,21 331:15
346:25 368:22
**thankfully**
303:24
**Thanks**
317:24 366:18
**theoretical**
275:12,23
**theoretically**
344:20
**theories**
354:24
**thing**
310:15,16
**things**
254:13 280:1 296:8
302:5 356:21
365:11

**think**
254:21 255:6,14
256:18 258:10
259:22 260:23
261:17,20 264:24
265:8 266:2,3
272:1 274:7,15
278:20 280:25
281:11 283:23
287:22 292:5,18
293:17 294:11,13
299:5,6 303:12,21
307:15 309:13
310:13,21,25
311:9,16 312:7
313:9 314:8 316:9
320:9 321:4,5
323:6,13,16 324:6
324:20 326:11,11
332:13 333:5
334:10 338:10,15
339:13,14,21
340:14,18,18,19
340:21 344:20
357:11,14 358:4
364:9,12,16
367:11 373:20
**thinking**
304:13
**thinks**
334:16
**THOMPSON**
247:6
**thought**
266:15 311:22
312:9 341:6
**thousand**
268:10 269:17,17
**three**
269:18 272:19
347:5
**threshold**
290:19 292:13
**time**
253:8 254:11,18,20
258:23 305:20
317:4 318:24

331:3,7,16,20
344:2 347:14,18
350:22 354:8,12
368:25 369:4
374:7,9 376:5,6,8
**times**
248:18 272:19
344:12,17
**TINSLEY**
250:16
**tiny**
364:4
**tissue**
274:10 288:9,13
294:4 303:19,20
305:4,9 330:16
336:22 345:12,13
**tissues**
287:19 288:18
305:6
**title**
295:1
**today**
259:2 260:14 267:4
331:14
**today's**
253:8 372:25
**Toilet**
286:4
**told**
257:19
**topic**
263:13 266:7
**topics**
263:16
**toss**
360:24
**total**
260:7 261:1
**toxic**
338:25 340:11,13
**trace**
313:19 320:11,14
330:17
**track**
264:1
**tract**

285:20 287:11
293:22
**transcribed**
376:10
**transcript**
259:12 261:3
276:16 297:11
317:10 319:11
324:24 327:17
375:6 376:12,15
376:17
**transcription**
342:25
**transition**
364:19
**translation**
367:23
**transport**
363:4
**travel**
287:1
**traveling**
362:22
**travels**
285:19
**treatment**
313:4
**tried**
272:18 296:22
**trivial**
311:1
**true**
270:6 274:22
296:11 315:1
346:6,14 375:9
376:11,23
**truly**
312:20
**truth**
254:3,3,3 279:6
280:4,5
**try**
332:22 344:21
368:2
**trying**
298:2 302:22 351:2
**tubal**

346:3,12,20
**tube**
371:8
**tubes**
287:6 363:16
370:22 371:7
**Tucker**
248:4 250:15
**tumor**
329:13
**turn**
297:13 345:4 348:8
348:12 360:10,13
**turned**
300:19
**turnover**
301:2 365:6
**turns**
370:24
**twice**
358:8
**two**
254:13,22 260:25
279:14 299:10
307:16 318:18,20
325:21 340:9
342:5 347:4 373:6
**two-page**
260:25
**type**
269:21 280:10
288:2 289:23
308:1,20 321:2,8
321:16,25 323:3
**types**
273:5,17 305:6
321:16

---

**U**

**UCSF**
251:24 368:19
**ultrasound**
371:16
**unavoidable**
308:1,20
**undergoing**
300:14 313:4

Rebecca Smith-Bindman, M.D.

**underlying**
284:8,23 301:2
  311:20
**understand**
255:23 266:16
  267:20 274:4
  302:3,7 341:22
  365:9 368:2
**understanding**
318:18 321:13,14
  333:9 353:7
  354:18 368:8
  373:10
**understands**
365:1
**understood**
325:19,19 332:2
**undertake**
323:23
**unfortunately**
364:13
**Union**
250:14
**United**
245:2 253:15
**unknown**
306:18
**unmeasured**
306:13
**unrestrained**
300:23
**use**
251:17,20 262:8
  266:15,17 268:4
  269:20,25 270:14
  270:19,22 271:5,7
  271:11,12,14,18
  271:19,24,24
  272:4,8,18,18
  273:6,17 276:8
  283:6,15,17,25
  285:13 288:16,21
  290:18 292:7
  296:4,13 297:22
  301:21 302:20
  303:2 313:3,10
  330:7,10 335:18

339:11 340:1
343:19,24 355:8
360:21 366:24
368:4,13 369:25
372:3,6
**users**
271:16 330:17
**uses**
265:22 357:24
**usual**
255:14
**usually**
371:14,23
**uterine**
287:18 288:17,22
**uterus**
363:16 370:22

――――――――――
**V**
――――――――――
**V**
297:2
**vagina**
288:6 363:10,15
  364:17 371:7,19
  372:10,15
**vaginal**
274:12 287:18
  288:17,22
**vague**
268:3 312:8
**valid**
301:13 311:9,9,13
**validate**
282:12
**validated**
272:22
**validity**
272:10
**value**
293:16 361:21
**values**
310:15
**variable**
267:19
**variety**
307:25 308:17
**various**

273:5,17
**Verdoodt**
297:1
**verify**
261:5 282:10
**version**
262:9 335:22
  356:13
**versus**
280:13 301:3
  310:18,19 362:8
  362:14 367:24
**video**
253:10
**videographer**
250:23 253:5,7,22
  318:24 319:3
  331:3,7 347:8,10
  347:14,18 354:8
  354:12 368:25
  369:4 374:7
**Videotaped**
245:13 246:5
**view**
265:15 338:9
**views**
293:13 359:25
**violated**
373:10
**virus**
300:13 338:22
  339:24 341:1
**vitro**
300:14 365:23
**voice**
256:24
**Volume**
245:17 246:6 251:4
  253:18 254:1
  319:6 375:15
  377:21
**voluntarily**
352:18 353:1,20,25
**vulvar**
287:18 288:17,21

――――――――――
**W**
――――――――――

**wait**
299:15,19 367:19
**waive**
253:20
**want**
265:18 274:2 281:4
  299:7 303:4 310:9
  310:21 312:14
  326:5 345:2
  347:10 348:8
  371:7
**Washington**
250:7
**wasn't**
344:15
**watch**
363:16
**watched**
286:24
**water**
370:22 371:15,18
**way**
257:6 258:20
  267:19,24 268:1,8
  272:13,16 278:16
  278:18 279:25
  287:2 301:8
  322:14,17 330:7
  334:10 341:11
  348:16 366:18
  371:9 372:2
**ways**
332:21
**We'll**
262:5
**we're**
258:24 262:2
  350:23 370:21
  371:13,14
**week**
272:19
**weeks**
254:22
**weight**
306:25 307:7,16
**well-described**
338:18

**well-done**
355:14
**well-known**
263:20
**well-respected**
298:15 336:15
**went**
366:24
**weren't**
256:2
**whatsoever**
364:18
**whichever**
309:8 334:15
**wide**
338:8
**wide-open**
363:17,21 364:8
  370:16
**widely**
294:2 336:20 337:2
  337:11 338:7,8,8
**Wilentz**
247:20
**withdraw**
267:6 295:21
**witness**
251:2 253:24 373:9
  373:11 374:1
  376:6,7,16
**witnesses**
374:1
**woman**
269:2 293:10
**women**
268:10,23 269:7,9
  269:11,17,17
  270:11,15,18,21
  271:14 275:9,10
  287:12 290:9,18
  292:3,7 296:4
  303:1 313:3
  322:11 326:9
  329:24 330:4,7,10
  332:13 346:6,15
  360:7 363:14
  369:17 371:3

Rebecca Smith-Bindman, M.D.

Page 401

372:3,6
**women's**
270:8 285:20 293:9
293:22 370:18
372:9
**Woodbridge**
247:23,25
**word**
283:23 345:7
**words**
352:24 360:19
**work**
257:1 260:15 261:7
261:22,24 284:4
301:25 319:18
331:16,19,20
336:13 342:25
343:5 344:7
354:17 355:3,24
357:4 365:25
370:9
**worked**
254:14
**worse**
358:7,9
**worst**
281:23
**wouldn't**
274:10 291:7 292:7
326:12 329:23
335:25
**writing**
356:23
**written**
255:13 333:22
**wrong**
269:4
**wrote**
315:13 332:11
362:20

---

**X**

**XX**
376:15

---

**Y**

**Yeah**

260:4,22 268:18
273:1 282:14
295:1 309:25
312:1 324:21
329:5 347:6,11
**year**
271:25 299:10
**years**
269:12 270:19,21
271:12,15 335:20
**yesterday**
253:21 254:11,19
255:11,17 258:17
258:23 260:16
272:3 276:13
277:11 278:8
282:4 298:7 299:1
303:21 307:18
312:2 331:12
373:19
**yesterday's**
372:25
**York**
248:19,19

---

**Z**

**Zellers**
248:5 251:6 253:20
254:6 255:8,10
256:19 257:1
260:20,24 261:4
262:5,7,16,18
264:2,8,20,22
270:7 272:14
273:4 275:4
276:18,21 277:3
277:14 279:10
283:4,11 284:16
285:10,18 286:15
287:3,9 288:25
289:8 290:21
291:6,21 293:6
294:1,15 296:12
297:13 298:20,24
299:9,16,20
301:20 302:17
303:6 304:11,24

307:11 308:6,8
309:8,13,16,17
310:8 311:5
313:22 314:22
315:7 316:2,5,11
316:17 317:5,7,11
317:22,25 318:22
319:7,12 320:3,16
321:1,12 322:9
324:10,25 326:14
326:16 327:8,19
327:23 330:6,24
336:25 347:3
356:1,6 357:6
358:3,21 359:3,7
359:24 366:2
368:7,16,23
372:20,22 373:5
374:6

---

**0**

**0.92**
280:6
**07095-0958**
247:25

---

**1**

**1**
259:14 276:22
277:5,19 278:11
279:13 319:1
325:23 360:14
361:3
**1,500**
261:17
**1,700**
261:25
**1.0**
310:10,19 311:6
**1.12**
280:13
**1.19**
309:4,22 311:6
**1.2**
310:10,19 311:7
**1.29**
280:4

**1.3**
340:15,20
**1.38**
309:4,22 311:6
**1.4**
280:13
**1.52**
280:4
**1.63**
280:6
**1:16**
331:5
**10**
247:24 270:21
271:12,15 371:3
374:4
**10-**
258:16
**10-15**
255:12
**10/18**
251:24
**10:47**
318:24 319:1
**100**
250:18 344:15
**10036**
248:19
**101**
263:1
**108,870**
269:7
**109,000**
268:21
**11:00**
319:2,3
**11:16**
331:3
**11:17**
331:5,7
**11:37**
347:14,16
**11:40**
347:17,18
**11:45**
354:8,10
**112**

249:6
**12**
294:1 336:20
**12:15**
354:11,12
**12:34**
368:25 369:2
**12:41**
369:3,4
**12:48**
246:10 374:7,9
**1215**
328:5
**1216**
327:24
**13**
259:15 260:2
**13427**
245:24 246:12
376:1
**14**
352:11 360:2
**147**
251:14
**15**
255:12 261:25
348:8
**15-minute**
258:16
**1510**
249:17
**160**
260:8,9,10
**1650**
377:3
**17**
257:23 262:9,14,15
262:16,18 263:3
264:4 275:13
294:25
**1700**
246:8 253:11
**174**
295:7
**1800**
249:7
**19**

Case 3:16-md-02738-MAS-RLS    Document 33008-59    Filed 07/23/24    Page 60 of 60
PageID: 211679
Rebecca Smith-Bindman, M.D.

Page 402

247:16 310:3
348:12 351:5
**19103**
377:4
**1976**
269:12 352:19
**1992**
328:7 329:8

---
**2**

2
256:15 262:10
266:13 310:14,24
319:4 325:24
352:11 360:13
362:6,6
**20**
340:6 371:4 375:11
**200**
340:14
**2000**
265:16 267:1,8
269:10
**20004**
250:7
**2003**
309:7,15
**2006**
269:12
**2007**
295:18 309:6
**2008**
276:13 294:20
**2010**
267:8 268:9 269:1
269:11,18 282:8
316:21
**2011**
324:11,17 326:23
327:14
**2012**
321:19 358:22
**2014**
270:13 271:1
**2017**
259:14 297:1 298:5
354:22

**2018**
259:15 260:2 282:5
282:7 283:4 298:9
**2019**
245:16 246:10
253:2,8 298:10,21
376:24 377:23
**202-828-5356**
250:9
**21**
273:7
**210-554-5549**
249:10
**212-735-2453**
248:21
**213-430-3301**
248:11
**218**
247:8
**221,000**
269:2
**25**
260:23 307:21
328:5
**250**
246:8 253:11
**254**
251:6
**259**
251:12
**26**
308:25 309:10,19
311:11
**261**
251:14
**27**
311:11
**2738**
245:9
**276**
251:17
**28**
251:12 259:6,11
260:3
**29**
251:14 261:2,5
**297**

251:20

---
**3**

3
256:15 266:13
**3,000**
261:1
**30**
251:17 269:12
276:14,15 360:11
**300**
340:14
**31**
251:20 297:9,10
**317**
251:22
**319**
251:24
**32**
251:22 317:8,9
**324**
252:2
**327**
252:4
**33**
251:24 257:25
319:9,10
**331**
251:9
**334-269-2343**
247:11
**34**
252:2 257:25
324:18,23 325:1,3
**347**
251:8
**35**
252:4 327:15,16
345:5
**354**
251:7
**36103**
247:9
**369**
251:9
**372**
251:6

**39**
312:25

---
**4**

4
248:18
**4.5**
311:7
**4.7**
310:18 311:7
**4.9**
310:18
**41**
290:7
**42**
283:13
**42nd**
248:8
**47**
268:19
**4th**
250:18

---
**5**

5
297:14,19
**50,000**
322:19
**500**
340:7
**512-391-0197**
249:20
**515**
248:7
**51st**
377:3

---
**6**

**6/1/17**
251:12
**600**
250:19
**61,000**
270:11
**63102**
250:20

---
**7**

**75**
348:16
**78205**
249:8
**78701**
249:18

---
**8**

8
245:16 246:10
253:2,8
**816**
249:16
**877-370-3377**
377:5

---
**9**

**9:26**
246:9 253:3,9
**90**
247:23
**900**
247:24
**90071**
248:9
**924**
269:2
**92660**
247:17
**94111**
246:9
**975**
250:6