# EXHIBIT 58

```
                                                          Page 231
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF NEW JERSEY
 3
 4    IN RE: JOHNSON & JOHNSON         )
      TALCUM POWDER PRODUCTS           )
 5    MARKETING, SALES PRACTICES,      ) MDL NO. 16-2738(MAS)(RLS)
      AND PRODUCTS LIABILITY           )
 6    LITIGATION,                      )
      _____  )
 7
 8
 9
10
11
12                  VIDEOCONFERENCE DEPOSITION
13                              OF
14            DANIEL CLARKE-PEARSON, M.D. (VOLUME II)
15               (Taken virtually by Defendants)
16                    Friday, March 8, 2024
17
18
19
20
             Reported by:  Christine A. Taylor, RPR
21
22
23
24            GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
25                  deps@golkow.com
```

Page 232

1  REMOTE APPEARANCES:
2
3  Representing the Plaintiffs:
4      BEASLEY ALLEN
         BY: LEIGH O'DELL, ESQ.
5        LEANNE PITTARD, ESQ.
         218 Commerce Street
6        Montgomery, Alabama  36104
         334.269.2343
7        leigh.odell@beasleyallen.com
8      and
9      GOLOMB LEGAL
         BY: RICHARD GOLOMB, ESQ.
10       1835 Market Street, Suite 2900
         Philadelphia, Pennsylvania  19103
11       215.278.4449
         rgolomb@golomblegal.com
12
13
     Representing the Defendants Johnson & Johnson and
14   Johnson & Johnson Consumer Inc.:
15     SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
         BY: JESSICA DAVIDSON, ESQ.
16       ASHER TRANGLE, ESQ.
         One Manhattan West
17       New York, New York  10001
         212.735.3000
18       jessica.davidson@skadden.com
         asher.trangle@skadden.com
19
20
21
22
23
24
25

Page 233

1          C O N T E N T S
2               PAGE
3  EXAMINATION CONTINUED BY MS. DAVIDSON      235
4  EXAMINATION BY MS. O'DELL         365
5  FURTHER EXAMINATION BY MS. DAVIDSON    378
6  FURTHER EXAMINATION BY MS. O'DELL      388
7  FURTHER EXAMINATION BY MS. DAVIDSON    389
8
9
10          * * *
11
12         E X H I B I T S
13 EXHIBIT     DESCRIPTION      PAGE
14 Exhibit 19  2/22/2024 E-mails, Subject: RE:   242
15    Ovarian Cancer and Talcum powder
16 Exhibit 20  American Cancer Society Cancer Facts   247
17    & Figures 2024
18 Exhibit 21  Materials Considered list   258
19 Exhibit 22  8/27/21 Deposition Transcript of    276
20    Daniel L. Clarke-Pearson, M.D.,
21    Volume 2
22 Exhibit 23  Hilary Converse Report    292
23 Exhibit 24  7/12/2021 Letter to David Dearing   299
24    from Dr. Godleski
25 Exhibit 25  Tamara Newsome Report    304

Page 234

1  Exhibit 26  3/22/2015 Holy Cross Health record,   311
2     Bates NewsomeT-HCHMR-00277 - 278
3  Exhibit 27  Obesity and risk of ovarian cancer   316
4     subtypes: Evidence from the Ovarian
5     Cancer Association Consortium
6  Exhibit 28  Perineal Talc Use and Ovarian    332
7     Cancer, A Systematic Review and
8     Meta-Analysis
9  Exhibit 29  Pasqualina Rausa Report    338
10 Exhibit 30  Genital powder use and risk of    348
11    epithelial ovarian cancer in the
12    Ovarian Cancer in Women of African
13    Ancestry Consortium
14 Exhibit 31  Use of personal care product    354
15    mixtures and incident
16    hormone-sensitive cancers in the
17    Sister Study: A U.S.-wide
18    prospective cohort
19 Exhibit 32  Chang 2024 Supplemental Data    360
20    spreadsheet
21
22
23
24
25

Page 235

1       On March 8, 2024, commencing at 9:21 a.m.,
2  the videoconference deposition of
3  DANIEL CLARKE-PEARSON, M.D., was taken pursuant to
4  notice and pursuant to the Federal Rules of Civil
5  Procedure, on behalf of the Defendants, remotely
6  via Zoom.
7            - - -
8         P R O C E E D I N G S
9            - - -
10      DANIEL CLARKE-PEARSON, M.D.,
11  having first been duly sworn, was examined
12     and testified as follows:
13           - - -
14      EXAMINATION CONTINUED
15 BY MS. DAVIDSON:
16      Q.  Good morning, Dr. Clarke-Pearson.  As
17 you know, we're continuing your January 20, 2024,
18 deposition in In Re: Johnson & Johnson Talcum
19 Powder Products.
20      Did you bring any materials with you
21 today?
22      A.  Yes.  I brought some journal articles
23 that I thought might be useful to discuss.
24      Q.  Are any of those articles not included
25 on your reliance list or materials considered list?

Page 248

1  MS. DAVIDSON: If it doesn't go in the
2  chat, yeah, it doesn't go to Richard.
3  MR. GOLOMB: It doesn't go to Richard?
4  MS. DAVIDSON: No. I said if it
5  doesn't go in the chat, you're not getting
6  it. That's a good point. That's what I'm
7  saying, I hadn't focused on that issue.
8  MR. GOLOMB: Okay. Thank you.
9  MR. TRANGLE: So sorry, yeah, I just
10 sent it to Leigh, but I can send you the
11 link as well.
12 MR. GOLOMB: Do you have my e-mail
13 address?
14 MR. TRANGLE: No, I don't.
15 MR. GOLOMB: It's
16 RGolomb@GolombLegal.com. Thanks very much.
17 MR. TRANGLE: Leigh, the e-mail should
18 have already have been sent to you.
19 MS. O'DELL: I've just refreshed and
20 not yet, but --
21 MS. DAVIDSON: I got it.
22 MR. TRANGLE: Rich, I'm going to send
23 you both exhibits right now.
24 RGolomb@GolombLegal.com; right?
25 MR. GOLOMB: Yes.

Page 249

1  MS. O'DELL: Nothing yet.
2  MS. DAVIDSON: I don't understand --
3  can we go off the record for a second.
4  (Recess taken from 9:54 a.m. until 10:00 a.m.)
5  BY MS. DAVIDSON:
6  Q.  Dr. Clarke-Pearson, have you seen this
7  document before?
8  A.  No. I don't think I've seen this
9  document.
10 Q.  Were you aware that the American Cancer
11 Society puts out cancer facts and figures?
12 A.  Yes.
13 Q.  If you look at page -- do you consider
14 the American Cancer Society to be an accurate
15 source of information about cancer?
16 MS. O'DELL: Objection.
17 THE WITNESS: It usually has good
18 information.
19 BY MS. DAVIDSON:
20 Q.  If you look at page 22 under "Incidence
21 trends," it says, "The ovarian cancer incidence
22 rate declined by 1 to 2 percent per year from 1990
23 to the mid 2010s and by almost 3 percent per year
24 from 2015 to 2019. This trend is likely due at
25 least in part to increased oral contraceptive use

Page 250

1  in the latter half of the past century and
2  decreased menopausal hormonal therapy use during
3  the 2000s, both of which are associated with lower
4  risk."
5  Do you see that?
6  A.  Yes.
7  Q.  Are those statistics accurate to your
8  knowledge?
9  A.  To my knowledge, I think they're
10 reasonable. I'm not sure I have references that
11 I've read that -- specifically in the general
12 concept. So I think they're reasonable.
13 Q.  Are you surprised to see ovarian cancer
14 rates dropping so significantly?
15 MS. O'DELL: Object to the form.
16 THE WITNESS: 1 to 2 percent is not so
17 significantly, but it is a decline.
18 BY MS. DAVIDSON:
19 Q.  3 percent per year is pretty
20 significant; right?
21 MS. O'DELL: Object to the form.
22 THE WITNESS: Yes, I mean, we're happy
23 with that trend.
24 BY MS. DAVIDSON:
25 Q.  And the decrease in ovarian cancer of

Page 251

1  3 percent per year occurred while talcum powder was
2  still on the US market; right?
3  A.  Yes.
4  Q.  And if you turn to page 23, "risk
5  factors" for ovarian cancer, the American Cancer
6  Society says, "The most important risk factor other
7  than age is a family history of breast or ovarian
8  cancer."
9  Do you agree with that statement?
10 A.  It's an important risk factor for women
11 who have BRCA mutations. I'm not sure it's the
12 most important risk factor. There's lots of risk
13 factors. Most women with a BRCA mutation don't
14 have ovarian cancer. It's important for the women
15 that have BRCA mutations. It's not important for
16 anybody else.
17 Q.  Did you say most women with a BRCA
18 mutation won't get ovarian cancer?
19 A.  That's correct.
20 Q.  What percentage of women with a BRCA1
21 mutation will get ovarian cancer?
22 A.  Approximately 30 percent.
23 Q.  What percentage of women with a BRCA2
24 mutation will get ovarian cancer?
25 A.  It's less than that. I don't know the

Page 340

1  cancer -- scratch that.
2       Is there any literature that addresses
3  the potential association between genital talc use
4  and ovarian cancer for women who had their tubes
5  tied three decades before their diagnosis?
6       MS. O'DELL: Object to form.
7       THE WITNESS: I'm not aware of any
8    literature that specifically looks at that
9    issue.
10 BY MS. DAVIDSON:
11    Q. Is there any literature addressing a
12 potential association between talc use and ovarian
13 cancer for women whose talc use ended three decades
14 before their diagnosis?
15      MS. O'DELL: Object to the form.
16      THE WITNESS: Not that I'm aware of.
17 BY MS. DAVIDSON:
18    Q. Is it your opinion that asbestos is a
19 cause of Ms. Rausa's ovarian cancer?
20    A. It's my opinion that talcum powder
21 increased -- was causative in her developing
22 ovarian cancer and that talcum powder has asbestos
23 in it. So yes.
24    Q. Is that your opinion with respect to
25 fibrous talc as well?

Page 341

1     A. Yes.
2     Q. Do you believe that ovarian cancer has
3  a latency period of more than 30 years?
4        MS. O'DELL: Jessica, he's testified to
5     this in 2019. I can check the 2021
6     depositions. But he's testified at length
7     about latency. I believe it's in his report
8     as well for which he was deposed. So this
9     is --
10       MS. DAVIDSON: I've got one question on
11    this topic, Leigh. Then we can move on.
12 BY MS. DAVIDSON:
13    Q. Dr. Clarke-Pearson, do you believe that
14 ovarian cancer has a latency period of more than
15 30 years?
16    A. It can have a latency period. It can
17 have a shorter period than 30 years too.
18    Q. Can it have a latency period of more
19 than 30 years?
20    A. Yes.
21    Q. And what literature can I -- can you
22 point to to support that opinion?
23       MS. O'DELL: He's -- you said one
24    question. You had three questions.
25       MS. DAVIDSON: No. I repeated the

Page 342

1  question, and now I'm just asking what
2  literature supports that opinion.
3       MS. O'DELL: He's already testified to
4    the literature on latency. It's in his
5    report.
6       MS. DAVIDSON: We have not had a
7    30-year latency period before, Leigh. We
8    are talking about a plaintiff who had a
9    tubal ligation 30 years ago. I just don't
10   want to get into these arguments over and
11   over. You know what, this is an expert
12   who's testifying at trial. If you didn't
13   want him to testify, find another expert.
14 BY MS. DAVIDSON:
15    Q. Doctor, is there any literature --
16      MS. O'DELL: Hey, Jessica --
17 BY MS. DAVIDSON:
18    Q. -- to support --
19      MS. O'DELL: Forgive me. Let me just
20   respond to the objection. So let me --
21      MS. DAVIDSON: Okay. Sure.
22      MS. O'DELL: Your pejorative comments
23   are, one, disrespectful to
24   Dr. Clarke-Pearson and the process. Second,
25   he has testified to latency in the past and

Page 343

1  including what he said here previously
2  today. And so, I mean, I just -- we
3  wouldn't have to have these discussions if
4  you would stay within the confines of the
5  rules. And so he's already testified to
6  latency. You've got his opinion --
7       MS. DAVIDSON: Your expert changed his
8    opinion in the middle of the deposition,
9    Leigh.
10      MS. O'DELL: He did not.
11      MS. DAVIDSON: I don't know how you can
12   make these sanctimonious with an expert who
13   purportedly went to the bathroom and changed
14   his opinions.
15      MS. O'DELL: He did not change his
16   opinion. So -- which is clear from the
17   record.
18      So if you have a question about
19   Ms. Rausa that relates to new information
20   since 2021, Dr. Clarke-Pearson is here and
21   ready to answer your questions.
22      He is not here to go through all of his
23   previous 25 hours of deposition testimony.
24   That's not what we're here for.
25      MS. DAVIDSON: Are you done?

Page 380

1    A.  Yeah, I -- I didn't read the thing
2  thoroughly.  I don't think I read anything about a
3  latency period in that -- in that study.
4    Q.  Okay.  You may --
5    A.  I'm sorry.  I did mention, yes, that
6  the -- that the period of that study was asking the
7  question, as I recall, of just a year prior to
8  starting the study.  Did you use a personal care
9  product of some sort within the last year, which my
10 comment then was that doesn't allow much of a
11 latency period.  In fact, it's not a latency period
12 for just one year.  So we really didn't allow those
13 women to have enough time whether they were
14 actually going to develop cancer from those
15 personal care products.
16    Q.  But, in fact, it followed women for
17 much more than 12 months, you know that; right?
18    A.  I don't -- I don't know that paper that
19 well.  What I saw was 12 months.
20    Q.  Okay.  If we can pull up the paper, I
21 can show you that, in fact -- so, Leigh, you shook
22 your head, but he did testify to that.  So maybe
23 you owe me an apology.
24        MS. O'DELL:  No, I think the question I
25    asked was about the --

Page 381

1        MS. DAVIDSON:  It wasn't your question.
2    It was his testimony, Leigh.  And he just
3    said very nicely and honestly that is what
4    he testified to.
5        Asher, can you pull up the paper so we
6    can show Dr. Clarke-Pearson and clarify the
7    record as to what the latency period
8    actually was.
9        MS. O'DELL:  I think you asked me if I
10   asked about latency and I just said I
11   didn't.
12       MS. DAVIDSON:  That was not my
13   question, Leigh, if you'd listen to the
14   question carefully.  Asher, anyway, can you
15   just pull it up.
16       MR. TRANGLE:  Yeah, isn't it being
17   shared?
18       MS. DAVIDSON:  Oh, sorry.  You need to
19   make it bigger, Asher.  Okay.
20 BY MS. DAVIDSON:
21   Q.  How many years of follow-up was there,
22 Doctor?
23   A.  Right there in the results it says
24 after 11.6 years of follow-up.
25   Q.  Okay.  Thank you.  If we could go to

Page 382

1  Table S8.  You mentioned Table S8, and I thought we
2  should put it up.
3        You were talking about how table S8 --
4  I think what your point was that if you took all
5  the hygiene products together, it showed an
6  increased risk.  Is that what you were trying to
7  say?
8    A.  That's what it shows, yes.
9    Q.  That was driven by the increase for
10 douching; right?
11   A.  I'm not sure whether driven is the
12 right word.  But douching certainly weighed in to
13 contribute to that.
14       Again, I'm sorry -- if I can just
15 finish.  I'm sorry I don't know this study because
16 I just saw it within the last hour.  And when I saw
17 S8, it talked about hygiene.  And I know talcum
18 powder fell into that category.
19   Q.  But douching had a much higher hazard
20 ratio than anything else.  So douching primarily
21 drove that risk ratio and the authors say as much
22 in their study; right?
23       MS. O'DELL:  Object to form.
24       THE WITNESS:  I don't know what the
25   authors said in the study.  I didn't have

Page 383

1    time to read it.
2  BY MS. DAVIDSON:
3    Q.  Okay.  Do you have any reason to
4  believe that it was not douching that drove this
5  hazard ratio?
6    A.  I would put it another way and say from
7  what you showed on the other table, douching
8  contributed significantly to the overall hazard
9  ratio in this table.
10   Q.  Can we look at the Davis paper.  You
11 testified multiple times that Davis did not look at
12 frequency and duration.  I think that was a
13 misstatement on your part.
14       If we could pull up Davis.
15       MS. O'DELL:  Object to the form.
16   Misstates his testimony.
17       MS. DAVIDSON:  Asher, putting it up?
18       MR. TRANGLE:  Yes, one second.
19 BY MS. DAVIDSON:
20   Q.  Both you and Ms. O'Dell pointed to a
21 sentence in Davis -- if you could yellow it, Asher,
22 that would be great -- that talks about that says
23 did not examine associations by frequency or
24 duration.  But that sentence is talking about a
25 different paper, not this paper; right?

### Page 392

**CERTIFICATE OF REPORTER**

I, Christine A. Taylor, Registered Professional Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location as stated in this transcript; that the deponent was located in Orange County, North Carolina; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 11th of March, 2024.

_[signature: Christine A. Taylor]_

_____
Christine A. Taylor,
Registered Professional Reporter
Notary Public 19960530077
State of North Carolina

### Page 393

**DEPOSITION ERRATA SHEET**

Our Assignment No: 6453284
Case Caption: Talcum Powder Litigation MDL 2738

**DECLARATION UNDER PENALTY OF PERJURY**

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 20 __.

_____
DANIEL CLARKE-PEARSON, M.D.

### Page 394

**DEPOSITION ERRATA SHEET**

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

SIGNATURE: _____ DATE: _____
     DANIEL CLARKE-PEARSON, M.D.

### Page 395

**DEPOSITION ERRATA SHEET**

Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____
Page No. _____ Line No. _____ Change to: _____
_____
Reason for Change: _____

SIGNATURE: _____ DATE: _____
     DANIEL CLARKE-PEARSON, M.D.