# EXHIBIT 68

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

______________________________
)
IN RE JOHNSON & JOHNSON )
TALCUM POWDER PRODUCTS ) MDL NO. 16-2738 (MAS)(RLS)
MARKETING SALES PRACTICES, )
AND PRODUCTS LIABILITY )
LITIGATION )
______________________________)

DEPOSITION OF REBECCA SMITH-BINDMAN, M.D.
San Francisco, California
Wednesday, March 20, 2024
Volume I

Reported by:
CATHERINE A. NOLASCO, RMR, CRR, BS
CSR No. 8239
Job No. 6498236

PAGES 1 - 215

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____________________________
)
IN RE JOHNSON & JOHNSON )
TALCUM POWDER PRODUCTS ) MDL NO. 16-2738 (MAS)(RLS)
MARKETING SALES PRACTICES, )
AND PRODUCTS LIABILITY )
LITIGATION )
_____________________________)

Deposition of REBECCA SMITH-BINDMAN, M.D., Volume I, taken on behalf of Defendant, with the Witness appearing at the Omni, 505 California Street, San Francisco, California, beginning at 9:08 a.m. and ending at 2:25 p.m., on Wednesday, March 20, 2024, before CATHERINE A. NOLASCO, Certified Shorthand Reporter No. 8239.

APPEARANCES:

For Plaintiffs:
BEASLEY ALLEN LAW FIRM
BY: P. LEIGH O'DELL
Attorney at Law
218 Commerce Street
P.O. Box 4160
Montgomery, Alabama 36103-4160
800.898.2034
334.954.7555 Fax
leigh.odell@beasleyallen.com
MOTLEY RICE, LLC
BY: DANIEL R. LAPINSKI (appearing remotely)
Attorney at Law
210 Lake Drive East, Suite 101
Cherry Hill, New Jersey 08002
856.667.0500
dlapinski@motleyrice.com
(Mr. Lapinski was not present at the commencement of the deposition proceedings.)

For Defendant Johnson and Johnson:
SHOOK, HARDY & BACON L.L.P.
BY: MARK HEGARTY
Attorney at Law
2555 Grand Boulevard
Kansas City, Missouri 64108-2613
816.474.6550
816.421.5547 Fax
mhegarty@shb.com

ALSO PRESENT:
KARA FLAGEOLLET, Shook, Hardy & Bacon, L.L.P.
MARGARET THOMPSON, M.D.

INDEX

| WITNESS | EXAMINATION |
|---|---|
| REBECCA SMITH-BINDMAN, M.D. Volume I | |
| BY MR. HEGARTY | 10 |
| BY MS. O'DELL | 202 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 1 | "PLAINTIFFS' THIRD AMENDED DISCLOSURE OF EXPERT WITNESSES"; 15 pages | 11 |
| Exhibit 2 | "SECOND AMENDED EXPERT REPORT OF REBECCA SMITH-BINDMAN, MD"; 126 pages | 18 |
| Exhibit 3 | "Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: a Systematic Review and Meta-analysis"; 16 pages | 19 |
| Exhibit 4 | "JAMA, Original Investigation, Association of Powder Use in the Genital Area With Risk of Ovarian Cancer"; 18 pages | 24 |

//

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 5 | "NATIONAL CANCER INSTITUTE, Ovarian, Fallopian Tube, and Primary Peritoneal Cancers Prevention (PDQ)-Health Professional Version"; 35 pages | 30 |
| Exhibit 6 | Email series, "Subject: RE: Talc analyses - one additional sensitivity"; 3 pages | 72 |
| Exhibit 7 | "Gynecologic Oncology, Analytic comparison of talc in commercially available baby powder and in pelvic tissues resected from ovarian carcinoma patients"; 7 pages | 105 |
| Exhibit 8 | "Environmental Research, The effect of talc particles on phagocytes in co-culture with ovarian cancer cells"; 12 pages | 114 |

//

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 9 | "Taylor & Francis Group, RESEARCH PAPER, Transcriptomic and epigenomic effects of insoluble particles on J774 macrophages"; 18 pages | 122 |
| Exhibit 10 | "Talcum powder induces malignant transformation in normal human primary ovarian epithelial cells" from "Minerva Obstetrics and Gynecology 2023 April;75(2):150-7"; 8 pages | 125 |
| Exhibit 11 | "Journal of Ovarian Research, REVIEW, Investigation on factors associated with ovarian cancer: an umbrella review of systematic review and meta-analyses"; 17 pages | 137 |
| Exhibit 12 | "CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION, RESEARCH ARTICLE, Genital Powder Use and Risk of Epithelial Ovarian Cancer in the Ovarian Cancer in Women of African Ancestry Consortium"; 9 pages | 144 |

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 13 | "Environmental International, Use of personal care product mixtures and incident hormone-sensitive cancers in the Sister Study: A U.S.-wide prospective cohort"; 16 pages | 153 |
| Exhibit 14 | "INVOICE, Rebecca Smith-Bindman, MD, October 4, 2021"; 1 page | 159 |
| Exhibit 15 | "INVOICE, Rebecca Smith-Bindman, MD, November 12, 2023"; 1 page | 159 |
| Exhibit 16 | "Rebecca Smith-Bindman, Materials Considered"; 33 pages | 163 |
| Exhibit 17 | "SECOND AMENDED RULE 26 EXPERT REPORT OF JUDITH WOLF MD"; 36 pages | 164 |
| Exhibit 18 | "University of California, San Francisco, CURRICULUM VITAE, Prepared: March 9, 2024, Name: Rebecca Smith-Bindman, MD"; 68 pages | 168 |

//

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 19 | "PLAINTIFFS' STEERING COMMITTEE'S RESPONSE AND OBJECTIONS TO THE NOTICE OF ORAL DEPOSITION OF REBECCA SMITH-BINDMAN, M.D. AND DUCES TECUM"; 13 pages | 169 |
| Exhibit 20 | Handwritten notes entitled "PDQ"; 4 pages | 173 |
| Exhibit 21 | Handwritten notes from a small red notebook; 18 pages | 174 |
| Exhibit 22 | Three binders | 175 |
| Exhibit 23 | "Comments for Manuscript 'Association between the frequent use of perineal talcum powder products and ovarian cancer: A systematic review and meta-analysis.'"; 3 pages | 175 |
| Exhibit 24 | Email dated February 15, 2021, "Subject: Decision from Annals of Internal Medicine"; 1 page | 175 |

//

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGES |
|---|---|---|
| Exhibit 25 | Email dated January 13, 2022, "Subject: Fwd: Your Submission JGIM-D-21-02485R3 - [EMID:3e89167ef1fa9782]"; Bates Smith-Bindman_March 2024_000001 - Smith-Bindman_March 2024_000003 | 184 |
| Exhibit 26 | "Douching and Genital Talc Use: Patterns of Use and Reliability of Self-reported Exposure" from "Epidemiology, Volume 34, Number 3, May 2023"; 20 pages | 191 |
| Exhibit 27 | "EDITORIAL, Use of Powder in the Genital Area and Ovarian Cancer Risk, Examining the Evidence" from JAMA, January 7, 2020, Volume 323, Number 1"; 3 pages | 196 |

---o0o---

San Francisco, California; Wednesday, March 20, 2024
9:08 a.m.

REBECCA SMITH-BINDMAN, M.D.,
having been administered an oath, was examined and testified as follows:

EXAMINATION
BY MR. HEGARTY:
Q Good morning, Doctor.
A Good morning.
Q Would you please state your full name.
A Rebecca Smith-Bindman.
Q Dr. Smith-Bindman, my name is Mark Hegarty. I represent Johnson & Johnson in this case. We're here today to take your deposition in the In Re MDL case involve -- against Johnson & Johnson involving talcum powder cases, in particular as to your most recent amended report from November of 2023.
Do you understand that?
A Yes.
Q Related, we're here primarily to determine if any of your opinions have changed or are new or if you intend to refer to additional literature or materials that were not identified when you were last deposed at

your MDL deposition back in October of 2021.
Do you understand that too?
A Yes.
Q Are you also aware that you've been disclosed as an expert witness in two New Jersey talc cases: Carl and Balderrama?
A Yes.
MR. HEGARTY: I am going to mark, as the first exhibit, the disclosure in the Carl and Balderrama cases.
(Exhibit 1 was marked for identification by the court reporter.)
MS. O'DELL: Thank you.
MR. HEGARTY: Now, what I've marked as Exhibit No. 1 is "PLAINTIFFS' THIRD AMENDED DISCLOSURE OF EXPERT WITNESSES."
Q And if you would turn over to page 6 and 7.
Can you tell me -- and before we go there, can you tell me if this document is familiar to you at all?
A No.
Q Would you look at paragraph 5 on pages 6 and 7 and tell me whether you've ever seen that paragraph that begins with your name?
A Yes.
Q Can you tell me when you first reviewed or saw

the paragraph 5 in Exhibit No. 1?
A I mean, this paragraph is -- is the same as has been used in the past, so several years ago.
Q Have you had a chance to read through this paragraph?
A Yes.
Q Is everything in it accurate?
A Yes.
Q Are -- are there any necessary changes to it?
A No.
Q You can put that aside. Thank you.
Do you recall when you were initially contacted about serving as an expert in the Carl and Balderrama New Jersey state court cases?
A No.
Q Have you reviewed any medical or other materials specific to Ms. Carl?
A No.
Q Have you reviewed any medical or other material specific to Ms. Balderrama?
A No.
Q Do you know what type of cancer that Ms. Carl had?
A No.
Q Do you know what type of -- do you know

anything about any talc use by Ms. Carl?
A No.
Q Do you know what type of cancer Ms. Balderrama had?
A No.
Q Do you know anything about Ms. Balderrama's use of talc?
A No.
Q Did you prepare any type of report specific to the Carl or Balderrama cases?
A I have not.
Q Do you intend to testify as to the -- to the cause of Ms. Carl's cancer?
A My understanding is that I am just a general expert rather than a case-specific expert.
Q Do you intend to testify as to the specific cause of Ms. Balderrama's cancer?
A The same answer. No, not that I know of.
Q Are you prepared today to discuss the latest amendments to your MDL report as well as any changed or new opinions and any new literature or materials identified in your recent amended report?
A I am.
Q Did you bring any materials with you to the deposition?

A I did.
Q What materials did you bring with you?
A I brought a binder full of the references that I cite and have reviewed, a binder of my prior deposition reports, and a binder of experts from other expert witnesses and a small red book that I took notes in over the last day or two in my review of the materials.
Q And with regard to the binder of depositions of other experts, can you grab that binder and tell me whose depositions you had in it?
A Yes, of course.
Mine, Anne McTiernan, Harlow and Rothman, Sonal Singh, Dr. Moormon, Dr. Kessler, William Longo's third report, Longo's second report, and George Newman.
Q As to the deposition transcripts, besides yourself, can you tell me approximately when you first received those deposition transcripts?
MS. O'DELL: I think there may be miscommunication. I don't think she mentioned other depositions.
THE WITNESS: Just my own.
MR. HEGARTY: Oh, I'm sorry. Let me make more --
Q Oh, so you're saying that, as far as the

depositions, the only one that's in there are yours; the others are reports?
A Correct. The other --
Q Okay. I'm sorry.
A -- expert reports.
Q I'm sorry. That's my confusion.
As far as the other witnesses' reports, when did you -- approximately, did you receive those?
A In the last week or two.
Q Did you receive those from counsel for Plaintiffs?
A I did.
Q Did you make a specific request for those or any other experts' reports?
A I did.
Q Did you make a specific request for those specific expert reports?
A No, it was a generic request.
Q What was a generic request?
A Just to see the reports of the other experts.
Q When you say "other experts," other experts in the MDL?
A Yes.
Q Did you review those reports in advance of today's deposition?

A I skimmed them.
Q You also mentioned that you have a red book of notes that you've made in the last couple days.
A Yes.
Q How many pages of notes are those?
A A few dozen. Tiny pages, mostly scribbles.
Q Before we complete the deposition, I will ask to take a look at those, and then we'll -- we'll go ahead and mark, not physically, but to be copied and marked as an exhibit at the deposition.
Does that sound all right?
A Yes.
Q And before we move on to another topic, just covering the materials you brought with you, when you say notes you made in the -- in the -- this red book you brought, can you generally describe notes -- what the notes are of?
A Yes. As I'm reviewing the data on the biologic mechanisms, I write down the -- the important references that inform my opinion; or if I'm reviewing the other systematic reviews, I note down important points. It's mostly, the way I remember stuff is by writing it down, more the writing-down process than actually reviewing it at any point after that.
Q Other than the materials you've identified so

far that you brought with you, including the notes, have you prepared any other notes or materials related to your testimony in this case since your last MDL deposition in October 2021?
A No.
MR. HEGARTY: I want to mark next --
THE WITNESS: Can -- it's a mild amendment.
In addition to my red book, I also took notes on a couple of other papers as well that I can share.
BY MR. HEGARTY:
Q Are those separate from the notes in your red book?
A Yes.
Q And you have those on separate pages?
A I have them on a separate piece of paper --
Q Okay. Thank you.
A -- a bigger piece of paper. I'm not sure why some are big and some are in the red book.
Q What studies or documents did you make notes of in that second set?
A The -- the PDQ on talc, I specifically reviewed, and there's one on -- on the Chang study from 2023.
MR. HEGARTY: I'm going to mark next, as Exhibit No. 2, your November 2023 -- is that your

November 2023 -- your expert report?
THE WITNESS: I was just given the 21.
MR. HEGARTY: Twenty-one. Okay. Let me -- let's go off the record quick. That's my fault.
(Discussion Off the Record.)
(Exhibit 2 was marked for identification by the court reporter.)
MR. HEGARTY: Okay. We are back on the record.
I had marked previously, as Exhibit No. 2, Dr. Smith-Bindman -- Smith-Bindman's 2021 amended report. I meant to have marked, as Exhibit No. 2, her November 23rd, 2023, second amended report.
Q And is, now, Exhibit No. 2 your November 23rd, 2023, second amended report?
A It is.
Q And can you look through it and does it appear to be what you believe to be the entirety of your November 23rd, 2023, second amended report?
A Yes.
Q Okay. Thank you.
I'm going to mark next, as -- I'll tell you which one -- as Exhibit No. 3, your 2022 paper, "Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: a" systemic --

"Systematic Review and Meta-analysis."
I'm going to mark that as Exhibit No. 3.
(Exhibit 3 was marked for identification by the court reporter.)
MS. O'DELL: I'm just going to put that in the basket since she's going to be looking at that one.
BY MR. HEGARTY:
Q And do you have a copy of Exhibit No. 3, Dr. Smith-Bindman?
A Yes.
Q What journal was Exhibit No. 3 published in?
A JGIM, Journal of General Internal Medicine.
Q Had you ever published in that journal before?
A I think so.
Q Your 2022 -- well, first of all, I'm going to call it -- I'll refer to it as the Woolen paper; is that fair?
A Yes.
Q Your 2022 Woolen paper was based on a meta analysis that you started for litigation, correct?
A I --
MS. O'DELL: Object to form.
THE WITNESS: I wouldn't characterize it that way.
MR. HEGARTY: Let me ask in a different way,

then.
Q You generated a version of the same meta analysis you published in 2022 as part of your work as an expert for Plaintiffs in the talc litigation, correct?
A I would also say that differently. I -- I did a review, and then the Woolen review was a new review from scratch.
Q You initially set out the review along the lines of what was published that you said started from scratch in the reports you prepared for the MDL dated November 18, 2018, correct?
MS. O'DELL: Object- --
THE WITNESS: Yes.
BY MR. HEGARTY:
Q You did not start the review that you describe in your November 2018 report prior to being contacted by Plaintiffs' counsel in this litigation, correct?
A Correct.
Q You subsequently set out your meta analysis that you had done as part of your work on the talc litigation in your second amended report of July 2021, correct?
A I don't understand the question.
Q You continued to talk about the meta analysis

you had done as part of your work in the talc litigation in your first amended report --
A Yes.
Q -- correct?
A Yes.
Q And in your most recent amended report, now you talk about the Woolen 2022 paper, correct?
A That's correct.
Q And is it -- are you telling me that none of the work that went into the Woolen paper and getting it published was done as part of your work in any of the amended reports that you prepared?
A That's correct.
Q You did not include -- let me ask a different way.
Was any of the work that went into the meta analysis that eventually became the 2022 Woolen report invoiced to Plaintiffs' counsel in this litigation?
A It is correct that none of that work was paid for by Plaintiff counsel.
Q Was any percentage of thought or initiation or the genesis of the 2022 Woolen paper part of your work in this litigation?
MS. O'DELL: Object to the form.
THE WITNESS: The idea for doing a systematic

review on the topic grew out of my work as an expert, but the actual work on the new systematic review led by Woolen was deliberately and very explicitly new work led by Dr. Woolen. I helped guide him, and I was a participant, but it was very deliberately started from scratch without any of the insights that I may have learned from the prior review.

BY MR. HEGARTY:

Q Is it fair to say, though, that you would not have done the meta analysis that was published as of 2022 Woolen paper if you had not been contacted by Plaintiffs' counsel to work on the talc litigation?

A I would agree that this was a new area entirely for me. I didn't know anything about this topic area before I was approached to be an expert. Once I learned about the topic, then I became interested in -- in wanting to produce this work in the scientific literature. So in terms of a topic area, this was entirely new to me from the expert witness work that I did.

Q Would you agree that if you had never been contacted by Plaintiffs' counsel to work on this case, you would not have prepared the 2022 Woolen meta analysis?

MS. O'DELL: Object to the form. Speculation.

THE WITNESS: I have contributed or led a number of systematic reviews, probably a half dozen or so. I went down this area of investigation because I was contacted about this, but whether or not I could have gotten to that same place, I would have no idea.

MR. HEGARTY: Let me see if you can answer it this way.

Q Would you agree that it's more likely than not you would not have done the -- the meta analysis set out in the 2022 Woolen paper if you had never been contacted about serving as an expert witness for Plaintiffs in the talc litigation?

A I think that's probably true.

Q Now, with regard to the -- the manner in which you define frequency in your 2022 Woolen paper, the 2022 [sic] O'Brien study of the four cohorts looked at frequency of use as well, correct?

A In a limited number of those papers, it did look at frequency of use. I think there are four papers, and I think they were able to look at frequency in two of them.

Q The 2022 [sic] O'Brien study defined frequency as greater or equal to once a week.

Does that sound right to you?

MS. O'DELL: And if you need to see the

O'Brien paper --

THE WITNESS: I would need to see it.

MR. HEGARTY: We have a copy of the O'Brien paper in -- it should be --

MS. O'DELL: Do you want to see that?

THE WITNESS: I don't mind.

MR. HEGARTY: Yeah, it's right here.

And we'll go ahead and mark that as Exhibit No. 4. I think we're on Exhibit No. 4, aren't we?

MS. FLAGEOLLET: Yep.

(Exhibit 4 was marked for identification by the court reporter.)

BY MR. HEGARTY:

Q So I've had marked, as Exhibit No. 4, the 2020 O'Brien study that I had just referenced in my question.

Do you have a copy of that paper in front of you, Doctor?

A I do.

Q If you look at the very first page in the abstract, it -- when it talks about exposure, it looks at ever long-term greater than 20 -- greater than or equal to 20 years and frequent greater than or equal to once per week; is that correct?

A I do see that in the abstract. I'm just checking the -- yes.

Q Thank you.

The 2020 O'Brien study, as you found -- or let me start over again.

The 2022 [sic] O'Brien study, as you even state in the 2020 Woolen paper, found as its main conclusion that there was no statistically significant association between genital talc use and ovarian cancer, correct?

MS. O'DELL: Where -- where are you reading, please? Just --

MR. HEGARTY: I'm reading at the end of the first paragraph under the "INTRODUCTION" section.

MS. O'DELL: Of O'Brien?

MR. HEGARTY: No. I'm sorry. No. Of Woolen 2022.

MS. O'DELL: Thank you.

THE WITNESS: I just want to clarify something.

We cite the explicit conclusion of O'Brien that they didn't find a statistically significant association. I would not interpret their results as finding that. They did find a statistically significant association, but they do conclude that they didn't. So we cite what they concluded, but I don't agree that that was what they found.

BY MR. HEGARTY:
Q In your 2022 Woolen paper, you actually state the main conclusion was that there was no statistically significant association between genital talc use and ovarian cancer, correct?
A I would state again: We cited what they concluded, which is what they concluded. We cited that -- their main conclusion.
Q Just agree -- can you agree, though, that in the first paragraph under the "INTRODUCTION" section, when you're referring to the Woolen paper, you use the two words "main conclusion"?
A Again, in its main conclusion. So that's not my main conclusion of their study. Those are important differences.
Q Understood.
The 2022 [sic] O'Brien paper also found no association between use of talc greater or equal to once a week and ovarian cancer, correct? In other words, it found no statistically significant association between use at that amount -- that level and ovarian cancer, right?
MS. O'DELL: Object to the form.
THE WITNESS: No, I -- I would not agree with that conclusion.

BY MR. HEGARTY:
Q What's wrong -- what part of my question do you not agree with and tell me why?
A Several parts of it.
I think they had many results that show a significant association between that powder use 1 -- greater than once per week and ovarian cancer. So there are -- I'm looking specifically at Table 3 in their report. And in Table 3, they -- they look at the results, use powder, at the top part of that greater than one time per week. They show it for three individual studies, and then the pooled estimate is 1.09. It goes from 0.97 to 1.23. I think that's an important result.
And then in the bottom half of their table, they show it for the pooled estimate greater than 1 who used greater than once a week and have patent reproductive tract. They show an estimate of 1.19, 1.03 to 1.37. I think both of those show a meaningful association.
Q In epidemiologic terms, the fact that the confidence interval range was from .97 to 1.23 with regard to the 1.09 adjusted odds ratio means that you -- means that the result could be due to chance, correct?
A I believe that interpretation of epidemiology

results where if it overlaps 1, you no longer believe it's real is a little bit of an outdated interpretation. So the movement is away from considering the edge of the confidence interval, the edge of what we understand and, rather, look at the confidence interval as giving you some understanding of the precision of the estimate, but the greatest strength is in the point estimate, and that is for the 1.09.
And the fact that the confidence interval is wider, I agree with you; in the past that would have -- the language that would have been used is it's not statistically significant, but -- but there's really been a very strong shift away from that rigorous interpretation of that, is if it's aligned towards the most likely answer is, for that estimate, there's a 9 percent increase in risk and the precision is -- is wider than -- than it -- than it would be if it didn't overlap 1.
Q Having a confidence interval that crosses 1 also means you cannot reject a null hypothesis, correct?
A Again, I think historically that was often used as a cut-off, a threshold, and I think -- I think Dr. Rothman has written about this very eloquently, and it's gotten hundreds of leading biostatisticians to sign on to a statement that says: We no longer consider that

a meaningful conclusion.
Q Did you sign on to that statement?
A I'm not sure if I was at a medical school when that statement was written, but --
Q I'm talking about: Did you sign on to the 800-or-so --
A I'm saying it was --
Q -- group?
A -- it was before my time. It was before I did training. They're even older than I am.
Q You mentioned a short time ago that you took notes on the NCI PDQ?
A (Witness nods head.)
Q Is that correct?
A I did.
Q Did you review the NCI PDQ from March 6th, 2024?
A I did.
MR. HEGARTY: I'm going to mark that as my next exhibit.
MS. O'DELL: I'm sorry.
THE WITNESS: I'm not sure about the date. It was the recent PDQ.
MR. HEGARTY: Well, I'll go ahead and mark it, and we'll all get to look at the date.

Page 30

It should be the thick document. No, not that one. It would be the --

MS. O'DELL: I would state --

MR. HEGARTY: -- that one.

MS. O'DELL: -- for the record: I haven't seen the March 6th. The latest is the October 16th, so --

MR. HEGARTY: So we'll mark -- I'm going to mark it as Exhibit No. 5.

MS. O'DELL: So I'm sure Dr. Smith-Bindman was probably looking at the October version.

MR. HEGARTY: I think we'll all see that it has not changed with regard to the particular section that we're interested in.

(Exhibit 5 was marked for identification by the court reporter.)

MR. HEGARTY: So I've marked, as Exhibit No. 5, NCI PDQ for "Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention, Health Professional Version."

Q If you look over to the second-to-the-last page of that document, do you see where it was updated March 6th, 2024?

A I see the updated date, yep.

Q And that was just two weeks ago; is that

Page 31

correct?

A Yes.

Q Would you please turn over to the section of Exhibit No. 5 that talks about perineal talc exposure. The copy I gave you is not page numbered.

A Yes. No, I'm there.

Q But it's towards the latter part of it. If you could please tell me when you can find it.

A I'm there.

Q I'm really interested in asking you about the portion of Exhibit No. 5, the NCI PDQ, that talks about your study.

A Yes.

Q So if you could turn over to the next page right in the middle section where it makes reference to your study as -- as reference 10 and the O'Brien study as reference 11.

Do you see where I am referring you to?

A I do.

Q The statements that are describing your paper and your paper in reference to O'Brien are the same as the previous PD- -- NCI PDQ you reviewed, correct?

A Correct.

Q The NCI PDQ refers to your study as a meta analysis that used a highly selected subset analysis of

Page 32

one prospective cohort study, correct?

A It does say that.

Q It is referring to your use of a subset of data from the 2020 O'Brien study, correct?

MS. O'DELL: Object to form.

THE WITNESS: It's referring to my use of data from the National -- the NHS Study I.

BY MR. HEGARTY:

Q That data was included in the 2020 O'Brien study, correct?

A No. O'Brien looked at data from the NHS I. O'Brien didn't look at data on frequent talc exposure that -- as we defined it in that publication.

Q The NCI PDQ goes on to state that the subset analysis of the prospective study was inconsistent with the main findings of the original report, citing to the 2020 O'Brien study, correct?

A I'm not sure what that statement was supposed to mean. I don't know if they're trying to say it was inconsistent with the main findings of the initial report of that population, the Gertig study, or if they mean the findings that O'Brien found in -- in her analysis of the NHS I, but in either case, the results of that analysis were positive. So it's confusing to me what they were intending to communicate with that

Page 33

citation. In the -- in the O'Brien study, the results are positive for the NHS I, and the original publication in the Gertig study is positive -- the O'Brien study.

So I'm not sure which results they're referring to, but in either case, whether it's the original Gertig or the subset that O'Brien did, the results in Woolen are consistent with both of those prior publications.

Q Let's see if we can reach -- at least reach an agreement as to the following: The NCI PDQ says: "The subset analysis of the prospective study was inconsistent with the main findings of the original report."

It says that, correct?

A It does.

Q After that statement, it makes a reference to 11, which is the 2020 O'Brien study, correct?

A It does.

Q The next sentence after that citation to the 2020 O'Brien study says: "However, because of the structure of this analysis, the results should be interpreted with care."

Did I read that correctly --

A You --

Q -- and is that a correct statement from that

NCI PDQ?
A You read it --
MS. O'DELL: Object to form.
THE WITNESS: You read it correctly. That does -- I don't know what that sentence is supposed to suggest.
BY MR. HEGARTY:
Q Do you agree with that sentence?
A That the structure of the analysis -- the results should be interpreted -- I do not.
The systematic review by Woolen was done at exemplary level and laid out every step of the way and followed every guideline. So I'm not sure what they mean by that.
THE REPORTER: Counsel, I believe someone is trying to join by Zoom.
MR. HEGARTY: Okay. Let's go off the record.
(Mr. Lapinski joined the deposition proceedings.)
BY MR. HEGARTY:
Q The statements that we just went over in the March 2024 NCI PDQ have been in that NCI PDQ in the prior versions for at least a year.
Can we agree with that?
MS. O'DELL: Object to the form.

Mark, would you mind restating that?
MR. HEGARTY: Sure.
MS. O'DELL: I'm not sure I understood your question.
BY MR. HEGARTY:
Q The statements we read from the March 6th, 2024, NCI PDQ, as it relates to your paper and the comments about O'Brien, have been previously set out in other versions of the NCI PDQ, correct?
A Yes.
Q So today is not the first time you're reading those statements, correct?
A Correct.
Q When you first read those statements, did you ever reach out to the board members to discuss what they mean by those statements or their characterization of your paper or the O'Brien paper?
A I did not.
Q Why not?
A I am familiar with the PDQ process. I served on this PDQ for many years.
The quality of the review was poor. They reviewed 7 of 48 studies, and my reading is every statement or almost every statement is false on how they summarized it, and so the entire summary is just a

really shoddy piece of work.
And the way that process works is it's not a process that's peer-reviewed. It's not open for external criticism. There's no formal mechanism to say that that work is shoddy work, and it doesn't really have -- other than the context of this case, does not have much of an impact on people's thinking. So there's just no mechanism to say this is a terrible report.
Q Do you know any of the individuals on the current NCI PDQ board?
A I'm not --
Q I can bring it up if we need to.
A I think we'd have to. I'm not sure. The person who ran it when I was on it is long gone.
Q You do agree, though, that because of your involvement, you can contact NCI PDQ board members and comment on what is in an NCI PDQ, correct?
A There is nothing that would hinder me from contacting them, but there's no process for that to be formally included in their process of -- of rereviewing.
Q Do you have any intention, sitting here today, to reach out to any of the current board members about the statements in the NCI PDQ as it relates to your paper?
A I do not.

Q Yet you have, for various -- over various times in your career, with regard to various parts of your work, given interviews that have been cited in newspaper articles, correct?
A Across all topics?
Q Across whatever kind of topics you're -- that are -- let me start over again.
With regard to all topics.
A Yes, I have.
Q Across all topics.
A Yes, I have.
Q You've also done videos on YouTube, correct?
A I believe that educational meetings that I've led have been posted on YouTube, but I -- I've personally never been involved in that. So I led a meeting in the fall with a hundred lecturers, and I -- someone on my team uploaded them, but I've never done informational interviews for YouTube.
Q Do you have social media accounts?
A I -- I believe that my lab has a Twitter account. I don't think we post very much, and I personally never post on it. I can't actually tell you what we posted.
Q Did you help create any of the content on your university's website as it relates to you?

Page 38

A Yes.
Q You have commented on the potential effects of radiation and cancer in various newspaper articles, correct?
A Yes.
Q Have you ever contacted a newspaper article, ever done a video on YouTube, ever put anything on the content of your university website as it relates to the NCI PDQ's characterization of your Woolen paper?
A No.
Q Have you used any of these communication outlets in any way to discuss your Woolen paper in any respect?
A I don't believe so.
Q Have you used any of these communication outlets to discuss your opinions in the talc litigation?
A I have not.
Can -- can -- I don't know if I can clarify something that I said. I have spoken to newspapers and various outlets about research projects that I've been contacted about. I have never reached out to newspapers or any other outlet to describe my work in the absence of it being generated from them to ask about my -- about my work.
Q Now, with regard to your 2022 article, that

Page 39

is, the Woolen article, you collaborated with Sean Woolen and Ann Lazar, correct?
A Yes.
Q At the time that you began collaborating with them about the 2022 Woolen paper -- that became the 2022 Woolen paper, were they aware that you are an expert witness for Plaintiffs in talc cases?
A Absolutely.
Q Other than you and Dr. Woolen and Dr. Lazar, was anyone else involved in any aspect of the study, its preparation and publication?
MS. O'DELL: Let's make -- Mark, during Dr. Smith-Bindman's October 1nd, 2020, deposition -- if you're laying the foundation -- I'm not objecting. I'm just saying: There was a long line of questions that followed all of this.
MR. HEGARTY: Understood, and I'm -- just one question about --
MS. O'DELL: Sure.
MR. HEGARTY: -- about that.
MS. O'DELL: I just wanted to make you aware of that.
THE WITNESS: I'm hesitating because I do not remember if we had an editor who edited the manuscript or not.

Page 40

BY MR. HEGARTY:
Q Are you talking about an editor at the journal level?
A No. There's a editor that I've worked with on various papers who doesn't bring content expertise, but who has edited some of our papers before publication.
Q Who is that?
A Chris Tachibana. I don't -- I actually have no recollection if she was involved or not, but I was looking if we had thanked her. I don't remember, but that's a possibility.
Q At the time the Woolen paper was published in 2022, did either Dr. Woolen or Dr. Lazar work for you?
A No. No. No.
Q At the time of publication, were you supervising them in any way?
A No.
Q Were you filling out evaluations for them?
A No.
Q What funds paid for their time?
A I have academic funds that I can use for that kind of work. Dr. Woolen was not paid, and Dr. Lazar was paid as a biostatistical consultant from one of the funds.
Q Is there any documentation of the amount of

Page 41

cost that went into getting the Woolen paper published?
MS. O'DELL: Object to the form.
THE WITNESS: There would be a track record of having paid it. It almost certainly wouldn't have gone to Dr. Lazar. It would have gone to the statistical bio-consulting service, and so it would be possible to possibly find records of how that were paid.
BY MR. HEGARTY:
Q Are those documents you provided to counsel for Plaintiffs?
MS. O'DELL: I'll represent: No.
BY MR. HEGARTY:
Q Are there any other accounting documents that you're aware of that would relate to the work in getting -- in getting the Woolen paper published; that is, the -- where you had to itemize the -- the cost and expenses that went into the published paper?
MS. O'DELL: Object to the form.
THE WITNESS: The only cost that could exist would be the cost to pay the biostatistical consultants, and that would be findable with some digging through the financial records. Not by me, but someone at UCSF, and I don't believe that this journal has a publication cost, but if there -- if there was, there could be a cost for that.

BY MR. HEGARTY:
Q You said that you have access to funding -- funding as part of your work.
Do you have to do an accounting, that is, prepare a physical document of the accounting of use of that funds -- did you have to prepare an accounting, as far as use of that funds, for the Woolen paper?
A The amount of money was -- was not very much, and if you're spending money on the -- the -- it's called the CTSI, the biostatistical consulting, there would be no other documentation needed.
In general, I have incredible detailed records I have to provide for everything I spend, but internal UCSF money for biostatistical consulting would be just accepted as necessary.
Q So would that have been the only expense that you would have had as part of the 2022 Woolen paper?
A Yes.
Q And as you indicated, there would be no separate document accounting for what that expense would be; is that right?
A That's correct.
Q The 2022 Woolen paper focused on frequency of talcum powder use, correct?
A Yes.

Q You agree that there is more likelihood for exposure misclassification when patients provide frequency data versus "ever/never" use data, correct?
A I would not agree with that.
Q Why would you not agree with that?
A I think "ever" is a very broad category. As I state in the report, that could be once or twice. It could be a thousand or 10,000 times. It's such a broad range that I think perhaps the capacity to say ever "yes" or "no" might be easy to remember, but it wouldn't be a meaningful remember; whereas, I think asking about frequent talcum powder use is asking about a habitual activity that I think women are likely to remember.
And I think in detailed surveys the most common amount of talcum powder use is daily, and I think women who use it daily would have a good remembrance that this was part of their daily routine, like moisturizer or something like that.
Q Let me ask it in a different way, which I think tracks what you're saying.
Do you agree that there is more likelihood for misremembering the frequency of talcum powder use as compared to whether you ever use talcum powder?
A I -- I do understand the question, and I'm not sure that I would agree with that. I think I couldn't personally answer the question have I ever used it. I think that -- kind of, I've been around talcum powder, but I don't know if I ever used it; whereas, if you're asking women are they using it frequently, meaning kind of every day, I think women would remember that very clearly.

Q Let me ask it, then, still a different way.
If we're talking about not just did you use it frequently, but if you're talking about the specific number of times you used it in a month versus just if you ever used it, do you agree that there's more likelihood for misremembering the number of times you use it in a month versus ever or never using it?
A I -- I'm not sure that I agree with that. I just -- I couldn't answer the question of ever/not ever. I'd be unable to. Whereas, if your question is getting at would a woman know if she used it three or four times a week, is there lack of precision between three and four, which I think is what you're getting at, there might be. But if there's lack of precision between using it a lot versus have you ever used it, I'm not sure that "Have you ever used it?" is a reliable answer just because I couldn't answer that question.
MR. HEGARTY: Let's go off the record.
(Recess.)

MR. HEGARTY: We're back on the record after a short break. I want to leave the PDQ question, Doctor, that we just talked about, but I did have the opportunity to pull up the PDQ screen and prevention editorial board from the website.
Q Would you mind scrolling through that website on my laptop and tell me if you know any of the individuals that are listed there.
A I know Joanne Elmore from UCLA, and I think I might know Joe Wrubbel from Connecticut, but I can't remember.
Q How well --
A Not well.
Q How well do you know Dr. Elmore?
A Fairly well.
Q How would you describe her reputation-wise?
A It's good.
Q Do you have any criticisms of her capabilities as a scientist?
A I don't.
Q Any criticisms you just provided at this deposition as it relates to their review of perineal talc as set out in the NCI PDQ you're saying apply to her too, right?
A The way the reviews get done is an individual

person takes the lead on each one.
I am very confident that Joanne Elmore didn't do that particular review.
Q Every board member of the NCI PDQ signs off on every sentence in the NCI PDQ?
A No, I don't think that's true.
Q And I don't mean that in a formal way, but they put their name to the -- the NCI PDQ as being on the board, correct?
MS. O'DELL: Object to the form.
THE WITNESS: No, I don't -- I don't think it's that kind of document. I think there are documents that the NCI puts out that have that kind of weight. This does not.
This is a group of scientists who, together, help the public and other physicians understand the medical literature, but it's not a degree of every one of those scientists stands behind everything that comes out of that. There remains a lot of internal disagreements about things that get published on the PDQ. It's not a uniform, "We support this."
BY MR. HEGARTY:
Q You have no personal knowledge of Dr. Elmore's or anyone else on the board's involvement with the NCI PDQ that we marked as Exhibit No. 5 in this case,

correct?
A I do not.
Q You have no personal knowledge of what any of the board members did with regard to reviewing of the documents or preparing the NCI PDQ we've marked as Exhibit No. 5 --
A I --
Q -- correct?
A -- do not.
Q Do you feel comfortable enough with Dr. Elmore to talk with her about the NCI PDQ?
A I would, yeah.
Q If -- assume for my question -- the purpose of my question, hypothetical, that Dr. Elmore agrees with what's set out in the NCI PDQ with regard to perineal talc exposure.
Would the criticisms that you have told me today about it apply to her as well?
MS. O'DELL: Object to the form.
THE WITNESS: I don't believe I criticized a person. I criticized the quality of the work, and whoever wrote that did a very poor job.
BY MR. HEGARTY:
Q And if Dr. Elmore reviewed it and found it to be correct, would you be critical of her?

MS. O'DELL: Object to the form. Assumes facts.
THE WITNESS: I disagree with almost every statement in that PDQ. If it were Joanne's or if Joanne agreed to it, I'd be happy to have a vigorous discussion with Joanne, and if we end up being together in some location in the near future, I will, for your suggestion, raise it with her and share my views of it.
BY MR. HEGARTY:
Q But what you know about Dr. Elmore, is she capable of reviewing the studies that you reviewed, including those in the NCI PDQ, and coming to conclusions about what they mean?
A I -- I respect Joanne as an epidemiologist. I think she would be able to do such a task.
Q I want to talk about specific parts of your -- of the 2022 Woolen paper, and I'm going to cite to specific parts of it.
So do you have a copy in front of you?
A I do.
Q First of all, the study does not report on the finding -- does not report findings on any specific sub type of ovarian cancer, correct?
A That's correct.
Q If you look at the background section, the

very first section on the first page, the first sentence says (as read): "Risk of ovarian cancer in women with frequent perineal talcum powder product is not well understood."
Did I read that correctly?
MS. O'DELL: Can I just ask -- I'm sorry, Mark. I got lost. You're in Woolen --
MR. HEGARTY: I'm in the very first page, the very first sentence.
MS. O'DELL: Oh, yeah. I'm sorry.
THE WITNESS: Yeah.
MS. O'DELL: Okay. Forgive. Thank you.
THE WITNESS: Yes. And I'm sorry. You're asking me if that is what the first sentence says?
MR. HEGARTY: Yes.
THE WITNESS: Yes.
BY MR. HEGARTY:
Q That was -- that statement was true in 2022, and it's true today, correct?
A I believe our systematic review changed that sentence. I think it's much better understood since this publication came out.
Q In 2022 when you wrote that sentence, that sentence was true, correct?
A Yes.

Q Now, this study looked at frequency only, that is, frequency of talcum powder use only, correct?
A Yes.
Q It did not account for duration of use, correct?
A Correct.
Q It does not measure cumulative use, correct?
A Correct.
Q So --
A I'm hesitating. The focus was on frequency of use. For many of the included articles, they provided information on cumulative use.
Q My question, though, was: Your 2022 Woolen paper does not measure cumulative use, correct?
MS. O'DELL: Object to form.
MR. HEGARTY: Or let me say it differently.
THE WITNESS: Yeah.
BY MR. HEGARTY:
Q Your 2020 [sic] Woolen paper does not report findings as to cumulative use?
A Correct.
Q So frequency of use is an acceptable measure of exposure in an epidemiologic study involving talc, correct?
A Yes.

Q Looking at the "METHODS" section, it says that the quality assessment using a Newcastle-Ottowa Scale was performed independently by two reviewers.
Who were those two reviewers?
A Sean Woolen and myself.
Q Had you ever used a Newcastle-Ottowa Scale prior to this publication?
A I had not.
Q I'm sorry?
A I had not.
Q Okay. Thank you.
Looking at the "CONCLUSIONS" section at the bottom of the first page, left-hand column, it states: "This review suggests an increased risk of ovarian cancer associated with frequent perineal powder exposure of 31 to 65%," correct?
MS. O'DELL: You're back in the abstract?
MR. HEGARTY: I'm still in the abstract. That's what I said. First page --
THE WITNESS: Still in the abstract.
MR. HEGARTY: -- bottom left-hand corner, conclusion.
Q Did I read that conclusion correctly?
A Yes.
Q You did not include or -- let me state -- let

me restate that.
You did not state in that conclusion that frequent perineal powder exposure causes ovarian cancer, correct?
A Correct.
Q In fact, nowhere in this paper do you say that talcum powder use causes ovarian cancer, correct?
A I would have to read it more carefully, but I -- I wouldn't be surprised if what you're saying is true. I would have to read it to -- to remember that.
Q Looking over at the "INTRODUCTION" section, right-hand column, second paragraph, the first line says (as read): "The differences in conclusions between the meta analyses are at least partially due to the inconsistent talcum powder exposure questions regarding the frequency and type of exposure."
Did I read that correctly?
A Yes.
Q Can you cite for me any publication in any journal who has made a similar statement as the one I just read?
MS. O'DELL: Object to the form. Vague.
THE WITNESS: My recollection is that maybe in the Health Canada and Taher studies they might have said something about -- about this similar issue.

BY MR. HEGARTY:
Q Please turn to the next page.
Under the section "Search Strategy and Information Sources" --
A Mm-hmm.
Q -- do you see that section?
A Mm-hmm.
Q It says, in the first line (as read): "Comprehensive searches were performed by an expert health science informationist -- informationist from inception of the relevant databases" in August -- "to August 2nd, 2022 [sic]."
Who was that?
A At one of the UCSF sites at Mt. Zion they have a amazing library search team of professionals. So it would have been someone in that group.
Q Do you know who that someone was --
A No.
Q -- by name?
A No.
Q Looking under the "Eligibility Criteria and Study Selection" section, second paragraph, the first couple lines reads (as read): "Studies were screened for inclusion using prespecified selection criteria by a single author S.W. Selection criteria included

Page 54

publication of primary data, reporting on multiple times per week (greater than or equal to two times per week) perineal exposure to talcum powder including direct application of talcum powder to the perineum and rectum, application to underwear or sanitary napkins, or on birth control devices -- devices like diaphragms and risk for ovarian malignancy."

Did I read that correctly?

A Yes.

Q That described the selection criteria for the studies to include, correct?

A Yes.

Q Now, the O'Brien data did not meet that criteria, correct?

A Correct.

Q Why did you include it, then?

A We didn't include the O'Brien study. We included data from the Nurses' Health Initiative Study, and I learned about that study in -- in more detail from the O'Brien publication, but we didn't use the O'Brien publication. It didn't -- none of the -- none of the pieces that they pulled from the existing cohorts could be used. So that was a second request to get unpublished data from whichever the cohorts had relevant data. So that's described in the next paragraph.

Page 55

Q The inclusion criteria set out in the section "Eligibility Criteria and Study Selection" did not include a requirement that the women in the study had patent tubes, correct?

A Correct.

Q Carrying over still in the same eligibility criteria section to the next paragraph at the top on the right-hand column, there's a reference to the Sister Study at the very end of that section, correct?

A Yes.

Q The Sister Study actually collected data on two or more times of talc use per week, correct?

A We looked at the study protocols for all of those, and indeed the Sister Study did have questions about the number of times per week in their -- in their questionnaire.

Q Are you saying, in this part of the paper, that there were only two women who met the eligibility requirement from the Sister Study data?

A Yes. We reached out to the person who basically oversees the data for the Sister Study and the NH I [sic] study. Because they had the relevant questions in the Sister Study and in the NH -- NHS I study, we asked for those data, and what we were told is that -- they wouldn't share the data for the Sister

Page 56

Study because there were two patients who reported the high-use category, and that just wasn't enough to be meaningful. So they told us there were only two patients who reported frequent use in that study.

Q That was provided to you orally?

A I think it was probably a written document from O'Brien to Woolen explaining that.

Q So does that mean that you never got access to the Sister Study data?

A That's correct.

Q So the statement at the end of this is based on the statement that the number that met your criteria was only two?

A Yes.

Q Turning to the section "Data Extraction," in the middle it says that the reference group was "women who reported no talc exposure"; is that accurate? In other words, you compared the group with frequent use versus women who had no talc exposure?

A Yes.

Q The next line says: "When duplicate reports of the same subject were published, the publication reporting the highest talc use was selected."

Was there any duplication of study subjects included in any of the results?

Page 57

A Not that I remember. I think we were careful to try to make sure that patients were only reported once.

Q The very end of that section says: "Disagreements in data extraction were resolved by consensus."

Who were they resolved between by consensus? In other words, who was making that resolution?

A The three authors.

I want to correct something from -- the paper says the data extraction were performed by two authors, which it were -- which it was, but Dr. Lazar actually did the data extraction for all those studies as well.

Q Please turn over to the page that has Table 1 on it and Table 2.

A Yes.

Q Looking at the text, you know, on the left-hand column, it refers to the age range of included women as being between 18 and 79.

Is that at the point in time -- at what point in time is that? At the time of their reporting of talc use or at what other -- at what time?

A For the case control studies, they would report when they were enrolled in the trial. For the NHS I, I -- I don't remember if it was when they were

enrolled in the trial or at the end of follow-up. I believe it's at enrollment, but I'd have to check.
Q Carrying over to the next column, it states that the range of frequent talcum powder use was defined as four to seven times per week, correct?
A Can you say that one more time?
Q Sure.
Carrying over to the -- to the right-hand column at the text on the page we're looking at, it says the range of frequent talcum powder use was defined as four to seven times per week, correct?
A Yes.
Q Do you recall, in your prior reports in the MDL, you defined the frequency range as three or more times per week?
A Yes.
Q And with regard to what you actually report in the findings, you report yet a different number, correct?
MS. O'DELL: Object to the form.
THE WITNESS: I think there's a difference between what we set out to require for inclusion and what the articles actually found. So we set out to include use that was at least several times per week, but the articles that reported on frequent use, in fact,

had average use that was higher than we required.
BY MR. HEGARTY:
Q In the end, you reported on as frequent use two or more times per week, correct?
A Yeah.
Q But the initial eligibility requirement was four to seven times per week, correct?
MS. O'DELL: Object to the form.
THE WITNESS: No, it didn't say that. The eligibility was greater than two times per week, but the articles ended up identifying higher use than that.
BY MR. HEGARTY:
Q Looking down at Table No. 2, only four studies report actual weekly talcum powder use: Booth, Mills, Schildkraut, and O'Brien, correct?
MS. O'DELL: Object to the --
THE WITNESS: I would agree if you look in this table. Some of the numbers show times per week, and some show a lifetime exposure.
For each of those papers that had a lifetime exposure, we calculated how many years the women were followed, how many times per week that 10,000 lifetime exposure would correspond to. So we reported in the language that they use, but when you do the simple math, you end up getting a way to estimate the weekly

exposure.
BY MR. HEGARTY:
Q In your simple math, did you assume one time per day of use?
A When it said 20 times per month, we took that to mean 20 days of exposure.
Q What did you do when it said 10,000 or more lifetime uses?
A We divided it by, I believe, the age of the average person to come up with an estimate of how many times per week they would have used talc to get approximately that -- that level, but we included studies if the amount of exposure would have been at least two times per -- per week, but assuming one time per day.
Q That assumption would not account for women if they reported using -- if they reported, as far as their lifetime use, based on five times use a day, correct?
A That's correct.
Q The Cook 2000 -- or -- I'm sorry -- the Cook 1997 paper also reported use of between 5- and 10,000 lifetime uses, correct?
A Do you have the Cook paper?
Q I do not have the Cook paper.
Let's go off the record real quick.

(Discussion Off the Record.)
MR. HEGARTY: Okay. We can go back on the record.
Q When we took a short break, Doctor, I was asking you about the Cook 1997 paper, and we both had an opportunity to pull that up.
And are you looking at it now?
A I am.
Q And in particular, Table 3 provides use of talcum powder between 5,001 and 10,000 uses for lifetime days, correct?
A Yes.
Q And from that -- go ahead.
A I'm sorry. It says "lifetime days."
When you asked your question earlier about if a person had used it five times a day, in this case, it would count once for each day the way they extracted. I never thought about that -- or hadn't thought about the issue in ages, but --
Q Okay. Thank --
A -- so this would take that away.
Q But with regard to Table 3, you used the number of greater than 10,000, correct?
A Yes.
Q Cook also provides from 5,001 to 10,000 uses,

Page 62

correct?
A Yes.
Q You did not use that data, correct?
A Did not.
Q Why did you not use that data?
A As we laid out in the "METHODS," we took the highest frequency use, and so 10,000 is the highest frequency use.
Q So even though you might have had data that was greater than two times per week, you still took the highest data that was available, correct?
A Yes.
Q Why did you do that? Let me ask it a different way.
If you had additional data that would then have satisfied what you were reporting on in this paper, why did you not include it too?
A There are several reasons. First, we were trying to get at -- I think we say in the paper approximate daily use. So that would be the highest number. So if someone -- if there was a material difference between women who reported twice a week, four times a week or seven times a week, we were trying to get at seven times a week, the highest use. So that's the first.

Page 63

The second is you can't pull multiple data points from one study in a systematic review method. You have to represent each study with a single estimate. There are ways of combining data within one systematic review and then using that in a weighted way in an overall review, and I've done that for a systematic review on an unrelated topic, but in general, each study should be represented by a single reflection of the work. So you can't take multiple points. It just would -- it would make it impossible to weight the work appropriately.
Q You did that not only as to the Cook paper, but there were other papers as well that reported on frequent use that might have been in the greater than 2 times a week, but if it had a greater number, you used the greater number?
A That's correct.
Q There was one set of numbers that I could not quantify as it relates to the number of exposed cases and the number of exposed controls, and that is the Harlow 1992 paper.
Do you have the Harlow 1992 paper?
A I think you -- I think you nailed the two papers that I have to find on my computer.
MR. HEGARTY: Let's go off the record real

Page 64

quick.
(Discussion Off the Record.)
MR. HEGARTY: We can go back on the record. We took just a moment to find the Harlow 1992 paper.
Q I was looking at the relative risk number that you use for Harlow, which was the 1.8 number with a confidence interval of 1.1 to 3.0 that is shown in Table 1 for greater than 10,000.
Do you see where I'm referring to?
A I'm seeing for greater than 30 applications per month in Table 2.
Am I in the wrong table?
Q Okay. Let me come back out to Table 2.
A I'm sorry.
Q Which number did you use?
A It seems to be the same number, but let me see. Applications per month.
Q And as you're saying that -- because you reported on greater than 10,000 uses, which would more correspond -- which would correspond to what's reported in Table 3, correct?
A The point estimate is the same. So I just need to look at my paper to see what number corresponds to the number.
I think I -- I think I gave you that number

Page 65

incorrectly. I think you are correct that for Harlow 58 ...
(Pause.)
Q And what I'm asking about is --
A Yeah.
Q -- for the number greater than 10,000, I'm not seeing the numbers 58 and 41 that you report in Table 3, and I'm hoping you can explain the difference.
Let's go ahead and go off the record.
(Discussion Off the Record.)
MR. HEGARTY: Okay. Let's go back on the record.
When we took a short break, I asked Dr. Smith-Bindman to explain to me, from using Table 3, the -- the numbers reported there as far as the cases it controls versus the numbers reported in the Woolen 2022 paper in Table No. 2.
Q Are you -- are you ready to do that?
A I am.
Q Okay. Can you explain it to me?
A I can.
So the numbers that we extracted from the Harlow paper were not from Table 3, but they're from Table 2 that talk about the applications of talc per month. So the number that was actually extracted was

Page 66

greater than 30 applications per month from Table 2. That shows you the 58 cases and 41 controls that align with the numbers in both Table 2 and Figure 2.

Q Why did you use those numbers from the greater than 30 times per month from Table 2 versus the numbers from the greater than 10,000 times, which you reported in your paper, that are in Table 3?

MS. O'DELL: Object to the form.

Table 3 in Harlow?

MR. HEGARTY: In Harlow. Yes. Thank you.

THE WITNESS: In Harlow.

I think we were trying to get at the most number of applications per month, and the greater than 30 most directly reflects that question, how many times per month, and that's -- the answer is 30. That's daily.

BY MR. HEGARTY:

Q A related question is, then: Why didn't you report in this -- in Table 2 of your Woolen paper the greater-than-30-times-per-month number?

A I believe that's an error.

Q Okay. Thank you.

If you look at the bottom of this -- of the page we're looking at, the footnotes under Table 2, there's a reference in the last footnote to only using

Page 67

the -- the data from -- that O'Brien -- that Dr. O'Brien provided --

A I'm sorry.

Q I'm sorry.

A We've left --

Q The very -- the very last footnote --

A No. We're back on Woolen. We've left Harlow.

Q No, no -- yeah, we left Harlow. We're now back to your Woolen paper.

A Okay. Fantastic. Let me move. Let me move.

Q Okay. I'm glad -- now we're on Table 2 on your Woolen paper in -- at the bottom of that page in Footnote 5.

First of all, we talked earlier about you using data from the O'Brien 2020 paper that was unpublished, correct?

A Again, from the NHS I cohort that was not published.

Q That's right. Thank you.

You then report in this footnote that (as read): "We included data on women with intact fallopian tubes," correct?

A Yes.

Q And then you make the statement after that "to harmonize with other publications," correct?

Page 68

A Yes.

Q What other publications specifically called out their data as "women with intact fallopian tubes"?

A I think the other studies looked at open tubes versus closed tubes and showed the results for ovarian cancer risk as it varied by talc and whether the tubes were open or not. Of those studies that showed that patent fallopian tubes had higher risks were Kramer, Harlow, and Whittlemore. I think in terms of reporting it that way, I think -- I believe that Whittlemore reported it that way; although, it was a little bit ambiguous in that publication.

Q Do you agree that there were at least some of the -- at least some of the studies in Table 2 did not break down their figures by whether the women had intact tubes or non-intact tubes?

A Absolutely.

Q So the extent that you then used O'Brien data on women with intact tubes, that's potentially inconsistent with some of the other studies who did not report one way or the other, correct?

MS. O'DELL: Object to the form.

I think Dr. Smith-Bindman said repeatedly it's not the O'Brien data; it's the Nurses' Health Study data.

Page 69

MR. HEGARTY: Okay. That's what I meant.

Q Did you -- when I -- when I asked that question, I meant the Nurses' Health Study data.

Did -- so same question, making reference to the Nurses' Health Study data.

A I think many of the studies adjusted in the multivariate analysis for whether or not the tubes were patent or not patent. In the O'Brien study, that wasn't an available adjustment. So most consistent to get at the question, which is does talcum powder cause ovarian cancer, to be consistent with the intent of those other papers, which is to account for patent tubes, I believe choosing the representation of the cohort who had patent tubes made the most sense in terms of consistency.

Q Do you agree, though, that there -- to the extent that you're comparing a set of data with -- of women with intact fallopian tubes to a set of data that didn't distinguish it and, therefore, would include women with intact and with not intact fallopian tubes, there could be some inconsistency?

A I think there was an adjustment for that, but the degree that the results are not stratified, which I think is what you're getting at, presented separately, I think there is not perfect consistency on that issue where everyone was with open tubes or not.

Q Did you have all the Nurses' Health Study data that included women with and without intact tubes?
MS. O'DELL: Object to the form.
THE WITNESS: We did have results on all women.
BY MR. HEGARTY:
Q Could you have included all women in this analysis?
A Yes, we could have.
Q Did you do that and -- and see if it made a difference?
A At the time of doing the study, we had not done that, but I saw that that was raised by you guys, and when I saw that, I thought that was a valid point to evaluate, and at that point I did reach out, I think, in December to ask the biostatistician to do a sensitivity analysis to evaluate the impact had we made that other decision.
Q Who is the biostatistician you reached out to?
A The same. Lazar.
Q Has that sensitivity analysis been done?
A Yes.
Q Do you have documentation of that sensitivity analysis?
A Yes.

Q Is that something you brought with you today?
A I think we sent it to you. I think it's one of those documents that was recently shared. I was given these results about a week ago or so by Ann, and I forwarded them to the lawyers.
MS. O'DELL: And they were provided.
MR. HEGARTY: Is that in the email?
MS. O'DELL: Yes. It was provided in keeping with the requirements for disclosure, and they were actually put in early, was Saturday, and it was in the DropBox that was provided to you.
MR. HEGARTY: Understood. My question is more specific than that.
Is that in the email that -- that was provided in that DropBox?
MS. O'DELL: Correct. I can represent -- she doesn't know what's in the DropBox. I'll represent that it was in the DropBox.
MR. HEGARTY: I will go ahead and show you a copy of that email that we were provided. It should be just a single page. Did we not get it?
MS. O'DELL: I'm happy to provide a -- a copy if you want to mark it.
MR. HEGARTY: We may not have gotten a copy that -- oh, wait. We got it. We got it. We'll mark

that -- the email we were provided as the next exhibit, which is Exhibit --
MS. FLAGEOLLET: Six.
MR. HEGARTY: -- 6.
(Exhibit 6 was marked for identification by the court reporter.)
THE WITNESS: Thank you.
MR. HEGARTY: So I've marked, as Exhibit No. 6, a document we were provided prior to the deposition.
Q Can you tell me what this document is, what Exhibit 6 is?
A Yes.
I reached out to the biostatistician on the Woolen paper to ask her a sensitivity analysis if she would recalculate the overall results by using the number from the Nurses' Health Study of all women rather than those with open fallopian tubes.
Q Is this the only document that you have reporting on that sensitivity analysis?
A Yes.
Q Would Dr. Lazar have -- based on how you understand she works, have additional documents that would reflect the sensitivity analysis that she did?
A I suspect she could have some SAS programming code, but -- but that would be all.

Q The SAS programming code wouldn't be something -- would that be something you could print out that would show the data input and the results she got from the sensitivity analysis?
A I'm going to have to say I don't know the answer to that. There's probably some -- some documentation of her code.
Q What were the results when she -- let me back up again.
So what she did was do the same study analysis but included the entirety of the Nurses' Health Study women with and without patent tubes?
A That's correct.
Q What did she find when she did that sensitivity -- sensitivity analysis?
A And I should say she included about four sensitivity analyses in the published paper where we included all those results as supplemental materials.
For this sensitivity, she basically swapped out the numbers for O'Brien's NHS I data for all women versus just with patent tubes, and the impact was very small on the overall estimate. The overall estimate had a point estimate of 1.47 with a confidence interval of about 1.35 to 1.68. When she swapped it out, the point estimate was 1.41 with a confidence interval of 1.24 to

1.64, so a very small change.

Q Okay. You can put that aside. We may -- we may come back to it.

Had you thought about doing that sensitivity analysis since you -- before you had read some -- or understood there was some commentary about the use of patent versus tot- -- the tot- -- patent women versus the totality of women?

MS. O'DELL: Object to the form.

You may answer.

THE WITNESS: Had I thought of it, we would have done it. I didn't think of it. I thought it was a -- a valid question that was raised by -- by your team.

BY MR. HEGARTY:

Q Turning over to the next page of the Woolen paper, the page that includes the discussion part of it, you took it -- you mentioned you did several sensitivity analysis [sic] that included running -- running the analysis without the Wu paper, correct? The Wu data, I should say. And I'm looking at the top left-hand side of the page with a discussion on it on the --

A Yes.

Q -- right-hand column.

A Yes, we did. Yes, we did.

Q Did you also do that same sensitivity analysis

excluding the Schildkraut data?

A I believe we did, but let me see if I can find it.

MS. O'DELL: If you need the supplemental tables, Doctor, just let us know.

MR. HEGARTY: They should be at the back of that copy.

MS. O'DELL: Okay.

THE WITNESS: I -- I don't -- I don't see that we did that, but --

BY MR. HEGARTY:

Q The reason I ask about Schildkraut was that their definition -- that paper's definition of body powder included cornstarches, correct?

A I believe it -- I believe it did.

Q Did you consider doing a sensitivity analysis without Schildkraut because of the way they define body powder use?

A The fact that we didn't do that sensitivity analysis suggests that we didn't think about doing that sensitivity analysis.

Q Looking over in the "DISCUSSION" section, the second paragraph, the first line says: "The precise mechanism whereby talcum powder causes ovarian cancer is not fully understood."

That was a true statement in 2022, correct?

A Yes.

Q That's still a true statement, correct?

A I think we've made a lot of progress in understanding the mechanism since then. So I think the statement's true in that we don't know the precise mechanism, but we have a lot more supporting evidence of how it happens than we did at the time of this publication.

Q Talking generally about your paper as it relates to frequency, you actually state in your amended report, as you had stated previously, that with regard to the Gertig study, that -- you say a potential weakness of the Gertig study was that frequency but not duration was measured so that clear lifetime exposure was missing.

That statement applies to your study as well, right?

A I think that statement suggests that it would be good to have a combination of frequency and duration. I don't think one invalidates the other, but it would be better, particularly in a cohort study where you have the opportunity to ask questions as broadly as possible, for them to have added that other question.

Q But my question, though, is: As -- as it

relates to the statements you made about Gertig and it only reporting on frequency of data as a potential weakness, that applies to your paper too?

MS. O'DELL: Object to the form.

BY MR. HEGARTY:

Q In other words, what would be the difference in between how you characterize your reporting of frequency versus how Gertig characterized its reporting of frequency? And that's referring to the 2000 paper.

A I think in my criticism of the published work, I was talking about broadly how these papers contribute to our knowledge and how they could have been better. And so I think it doesn't invalidate what they report on frequency, which is important, but it would have also been good if they gave us a combined frequency and duration. That would have been even better.

In our review, some of the contributing papers did do frequency and duration, which was even better. I don't think it invalidates any results about frequency. It's just saying it would be better to have more detail than -- I don't think I levied those criticisms lightly. It was a cohort study that should have asked that from the very beginning.

Q So your comment about it would have been better would apply to your paper too, right?

A The -- the criticisms of a systematic review were different. I didn't have a capacity to tell the investigators what to ask. I was just pooling what they did ask, and so you wouldn't consider that a criticism of a systematic review. You pool what's been published, and what's been published is reliably on frequency and not duration. So I wouldn't levy that against our -- our paper.
Q If you look at the "Strengths and Limitations" section, you actually say in the first line that "The primary strength of our study is our focus on frequent users of perineal talcum powder," correct?
A I believe you, but I'm not sure --
Q Sure.
A -- where I say that.
Q Look at the "Strengths and Limitations" section --
A Oh.
Q -- the heading "Strengths and Limitations" --
A Oh, yes. Yes.
Q -- and the first line under that.
A Yes.
Q The first line under the "Strengths and Limitations" section says: "The primary strength of our study is our focus on frequent users of perineal talcum

powder," correct?
A Yes.
Q That would then also -- that should also apply is -- in other words, that same statement should apply to the Gertig 2000 paper, right?
MS. O'DELL: Object to the form.
THE WITNESS: I'm not sure what you're asking.
BY MR. HEGARTY:
Q Well, Gertig also focused on frequency of perineal talcum powder use, correct?
A Yes.
Q That would also mean that that's a primary strength of that study, just as you say focusing on frequency is a primary strength of your study, correct?
MS. O'DELL: Object to the form.
THE WITNESS: I think -- I mean, the primary strength of the Gertig study is it's a large cohort study that followed women for decades. That's the primary strength of that study.
To address the importance of what -- whether talcum powder is a risk factor, you need to assess frequency, and I think they did that, so I think that is a strength of the study.
BY MR. HEGARTY:
Q Turning over to the last page of your study,

the "Conflict of Interest" section. Tell me when you're there.
A Yes.
Q You disclosed that you have served as a paid expert witness for the plaintiffs in the talcum powder litigation, correct?
A Yes.
Q You agree that it's important for the reader of your Woolen 2022 paper to know that, correct?
A Yes.
Q That -- so that a reader could evaluate whether there's a conflict of interest that you have as it relates to the results of this paper in relation to your work in the talc litigation, correct?
A Yes.
Q You can put that paper aside.
I want to talk for now -- let me start over again.
I want to talk more -- in more detail about your Second Amended Expert Report. So if you could have that with you.
A I do have that. I'm just checking the time, and I'm going to have to go to the bathroom --
Q Okay.
A -- before we get to the end, if this is a good

break.
MR. HEGARTY: It's a good break because we're switching to -- to the -- another document --
THE WITNESS: Perfect.
MR. HEGARTY: -- so let's go ahead and take that break.
THE WITNESS: Great.
(Recess.)
MR. HEGARTY: We are back on the record.
Q I have one other question as it relates to Exhibit No. 6. It's the email Dr. Lazar to you dated March 4, 2024.
Do you still have that exhibit in front of you, Doctor?
A I do.
Q Can you explain to me what -- if you can, what Dr. Lazar is talking about in the first paragraph?
A Yes.
She's saying to generate the graphs that we used in the manuscript -- and she generated those graphs for each of the sensitivity analysisn [sic] -- that the program she's using, STATA, she's not sure what happens when she generates the graphs. The confidence intervals are coming out wrong. So she said if I want the graphs, she will dig in and figure it out, but, otherwise, the

Page 82

point estimate she just used with SAS. SAS is notoriously not good with graphs.

Q Had you responded to this email that is the March 4, 2024, email?

A It seems likely that I did.

MR. HEGARTY: Can we get a copy of that email? We'll follow up on it.

MS. O'DELL: (Nods head.)

BY MR. HEGARTY:

Q Do you remember what you -- what your follow-up was?

A I'm going to guess I said, "Thanks. This is great. Don't need the graphs."

Q You're saying here today you don't need the graphs.

Why don't you need the graphs?

A The change -- there's nothing I would do with those graphs. I wanted to know the impact on the results. She's giving me the impact on the results. The graphs don't inform that at all. That would just be if I was publishing them, and we're not publishing them. There's no -- there's nothing to them to publish.

Q To know what is happening with the -- the graphs with this new analysis, that is, the specifics of it, we'd have to talk to Dr. Lazar; is that correct?

Page 83

MS. O'DELL: Object to the form.

THE WITNESS: You mean what's wrong with the software?

BY MR. HEGARTY:

Q Or what she's seeing when she's doing the software, what she's running it. You would -- she would have those details and not you, correct?

A That's correct.

Q You can put that aside.

So now we're talking about Exhibit No. 1, I believe, which is your Second Amended Expert Report.

Is that, indeed, Exhibit No. 1?

MS. O'DELL: It's 2.

MR. HEGARTY: Two. I'm sorry.

Q So now we're going to talk about in more detail Exhibit No. 2, your second amended report.

If you could first turn to page 4 just before the paragraph -- I'm sorry. I need to back up.

Page 4, four lines down from the top. Tell me when you're on page 4.

A I'm there.

Q There's a line you added after the phrase "nor does it confirm the specific component in talcum powder products that make them carcinogenic." You added: "- asbestiform talc, platy talc, asbestos, heavy metals,

Page 84

and fragrances may all play a role."

Do you see where I'm reading?

A I do.

Q Now, you say they "may all play a role."

Which of these substances, in your opinion, to a reasonable degree of medical or scientific certainty, do play a role in talcum powder use causing ovarian cancer?

A I think the evidence that I have looked at the most closely is asbestiform talc and asbestos. I know less about the etiology and the mechanism of how heavy metals and fragrances may play a role. Nonetheless, in reading about the harmful effects of those in IARC reports, they have a role in carcinogenesis. I just have seen less detailed mechanistic evidence related to those.

Q Can you quantify the role of asbestiform talc and asbestos in talcum powder use causing ovarian cancer?

MS. O'DELL: Object to the form.

You may answer.

THE WITNESS: I believe strongly that those ingredients in talcum powder products causes the ovarian cancer.

MR. HEGARTY: When I say "quantify," let me be

Page 85

more clear.

Q Are you able to assign a percentage of their contribution or other -- in other- -- or otherwise quantify in some numerical fashion the extent of their contribution as it relates to -- as compared to platy talc versus heavy -- heavy metals, fragrances and everything else in -- as alleged in -- as is in talcum powder?

A The epidemiology describes the exposure. That's the -- that's the cause of avagia [phonetic]. In terms of guessing which of the components numerically, I think it's mostly the asbestos and the asbestiform talc, but I don't have a way to attach a numerical number there.

Q Have you developed any new or additional expertise on asbestos and ovarian cancer since your October 2021 deposition?

A I've read a lot more papers since then about the few lines of evidence that I think are important, the mechanism, both basic science and different sort of cellular studies that have shown the impact of asbestos and talc and on ovarian cell lines and ovarian cancer. So I've read a number of papers about that that I cite in this report.

And then I've seen a good amount of testing

data that shows more definitive and incontroversial [sic] evidence that there's asbestos in basically all talc products. So I think those two lines of evidence have informed me, more -- more importantly, since my prior deposition.

Q As to the cellular studies, are those studies that are -- that you read -- have read for the first time -- that you read for the first time since your October 2021 deposition?

A Yes.

Q As far as the -- those studies, did any of those involve asbestos or asbestiform talc in the cell study?

MS. O'DELL: Objection to the form.

THE WITNESS: I think there were studies using talcum powder products. We know talcum powder products all have asbestos and asbestiform talc, so, yes, I think they did directly study that.

BY MR. HEGARTY:

Q So your comment with regard to the cellular studies was not as to any cellular studies that applied asbestos to cells, correct?

A Correct.

MS. O'DELL: Objection to the form.

THE WITNESS: Correct.

BY MR. HEGARTY:

Q As far as the testing data, have you seen testing data for the first time -- let me restate that again.

Have you seen, since your October 2021 deposition, testing of talcum powder for asbestos that you had not seen before?

A Yes.

Q What testing data had you not seen as of your October 2021 MDL deposition?

A So I believe the information that was included in Longo's expert report, there -- his third expert report had new testing data, particularly of talcum powder from Chinese mines. I believe I hadn't seen that before, and I believe there were something like 48 new testing results, and maybe 43 of them had asbestos. I think that was new from what I had seen before.

Q Any other new testing data of talc for asbestos that you've seen since your October 2021 deposition?

A I would have to check. I don't remember if I had seen the FDA testing results that -- that confirmed that there was asbestos in talcum powder products before that deposition or not. It might have been included, but I don't remember.

Q And I will stop at your report where I -- I've identified, I think, new studies or new references, and maybe that will cover what we're talking about here.

Can you cite to any published medical or scientific literature stating that asbestiform talc in talcum powder causes ovarian cancer?

MS. O'DELL: Object to the form.

Mark, that question is -- very much goes back to what was covered in her 2021 deposition at length about asbestiform talc, talc fibers, et cetera, and -- and so if you have something in regard to anything new, that's one thing, but I think that's re- -- covering ground that previously was covered.

MR. HEGARTY: Well, let me ask it in a different way.

Q Since your October 2021 deposition, have you read any published medical or scientific literature stating that asbestiform talc in talcum powder causes ovarian cancer?

A And that -- that statement suggests a review of an entire literature, and so I'm not -- I'm not sure if you're asking me if there are papers that support that view or that state that view.

Q Yeah, the -- my question is specific -- is as specific as I asked it.

That is, since your October 2021 deposition, have you read any studies that have stated that asbestiform talc in talcum powder causes or is the cause of ovarian cancer when talcum powder -- when users use talcum powder?

MS. O'DELL: Object to the form.

THE WITNESS: I'm not understanding what you're asking.

MR. HEGARTY: Sure.

Q I'm asking if you have read any papers since your October 2021 deposition that actually calls out the asbestiform talc in talcum powder as being the cause of ovarian cancer.

MS. O'DELL: Object to the form.

THE WITNESS: There have been statements that have suggested we now know that there's asbestos and asbestiform talc in talcum powder and that it's of greater concern. IARC made a statement or -- I'm not sure before or after my deposition -- that we now see that there's asbestos. This is a problem at risk for ovarian cancer. So that sort of is what you're asking for.

Many of the mechanistic studies say this is probably the problem in -- that it's the asbestos in the talcum powder that's causing these cellular changes that

are consistent with carcinogenic changes.

MR. HEGARTY: You're going back and covering things that you had already covered at deposition, which I don't want to.

Q My question was -- my question was: Since your October 2021 deposition --

A Yeah.

Q -- so the last two and a half years, have you read anything additional to what you had read in October 2021 that states that it is -- it is the asbestiform talc in talcum powder that is the cause of ovarian cancer?

A And separate that -- separate than IARC that says this, because I think they said it before the -- so any new people who have said that?

Q Correct.

A I'm just seeing who I cited newly.

I'm not sure that, off the top of my head, I can remember a new citation of that.

Q Same question. The question only relates to something you have read for the first time since your October 2021 deposition that calls out the asbestos in talcum powder as the cause of ovarian cancer in talcum powder users.

MS. O'DELL: Object to the form.

THE WITNESS: I'm not sure that there is a new statement of that that I've read.

BY MR. HEGARTY:

Q Since your October 2021 deposition, have you read any published medical or scientific literature that reports on the level of exposure to asbestiform talc necessary to cause ovarian cancer?

A No.

Q Since your October 2021 deposition, have you read any medical or scientific literature that reports on the level of asbestos that is necessary in talcum powder to cause ovarian cancer?

A No.

Q Have you developed any new or additional expertise since your October 2021 deposition with regard to heavy metals and ovarian cancer?

A No.

Q Same question as to fragrances.

A No.

Q Staying on page 4, before the section "In summary" you added a phrase to the sentence beginning "This finding supports that local tissue response and inflammation" -- first of all, do you see where I'm reading?

A I don't.

Q The statement -- it's -- again, it's before the summary section on page 4. The sentence begins: "This finding supports that local tissue response --"

A Yes.

Q -- et cetera.

At the end of that, you added a phrase to this report, quote, "as well as cellular changes that are initiated in response to talc," closed quote.

Do you see that phrase?

A I do.

Q To what studies are you referring to?

A There were several cellular studies that were published that -- that were new. They were new since my report and that I newly read. And those were a study by Emi in 2021 that described the cascade of gene expression changes that happen in relationship to -- to talc, and so I think that really was pivotal to my understanding that there are so many different epigenetic changes that occur from the exposure to talc.

There's also the paper by Mandarino that describes on a cellular level the -- the disruption of macrophage functions that happen at the cellular level to the talc.

I think those were the -- I think there were several others, but I think those were pretty pivotal.

Q Turning to the "Qualifications" section also on page 4, you deleted from your previous report your being a professor of radiology and biomedical imaging.

Why did you take that out?

A I moved my primary department from radiology to epidemiology.

Q Okay. Please turn next to the "Background" section at Section III, page 11 under the section "Asbestos."

Please tell me when you're there.

A I'm there.

Q In the first paragraph under the section "Asbestos" about two-thirds of the way down you added a reference -- let me start -- you added a statement that says: "talcum powder products have never been free of asbestos."

Do you see where I'm reading? It's just prior to a cite to "Longo & Rigler 2019; Hopkins Dep. 2018; FDA Testing 2019."

A Yes.

Q Specifically, you added a reference to Dr. Hopkins' deposition.

When did you first receive Dr. Hopkins' deposition?

A I -- a long time ago.

Page 94

Q Had you read Dr. Hopkins' deposition as of your 2021 MDL deposition?
A I remember knowing about it before the trial that I participated in. I don't remember if I had it at the time of the deposition.
Q Do you remember, though, if you had read it as of your October 2021 deposition in the MDL?
A No.
MS. O'DELL: Object to the report -- form. I think that's just what she was answering. That was the question she just answered.
MR. HEGARTY: I wasn't exactly clear on the answer, so that's why I asked a follow-up question.
Q Do you recall if, as of your October 2021 deposition, which was after Kleiner, had you read Dr. Hopkins' deposition, his 2018 deposition?
A I believe I had.
Q Originally, did you ask for Dr. Hopkins' 2018 deposition?
A My recollection is it was referred to, and then I asked to see it.
Q Referred to in some other document or somewhere else?
A Either -- I don't remember how it was referred to, but I remember hearing about it and then asking to

Page 95

see the report.
Q Have you read the entirety of Dr. Hopkins' 2018 deposition?
MS. O'DELL: Let me just object.
So Dr. Hopkins -- her reliance on the exhibits to his deposition were covered, actually, in 2018, and -- and so to the degree you're asking any detailed questions, I think this really is -- goes very, very far back.
MR. HEGARTY: I agree. I'm not going to get into those exhibits unless to lay a foundation, but there is a new reference in the report to Dr. Hopkins' deposition in 2018 to support this statement. And so I do think it's fair -- fair game.
MS. O'DELL: Her -- Dr. Hopkins' deposition and exhibits have been on her Materials Considered list and I think were referenced in her 2018 report, but I could be mistaken about the specific reference, but they've been on her materials list for five years or more, so however long that is.
MR. HEGARTY: The next question, though, I'm sure, will clarify why I'm able to get into this.
Q You cite Dr. Hopkins' December -- Dr. Hopkins' 2018 deposition for the proposition that talcum powder products have never been free of asbestos, correct?

Page 96

A Yes.
Q And that line is new to your report, right?
A In thinking about it, I'm not sure if it's new or if it's just new in this location. So I'm not -- you're telling me it's the first time I've cited Hopkins, but I don't think that's true. I think I'm just citing it here to say there's more evidence that we know that the talcum powder products are not free from asbestos.
Q My question, though, is: The line or the phrase "talcum powder products had never been free of asbestos," that is new to your report, right?
MS. O'DELL: Object to the form. Misstates the evidence.
THE WITNESS: I -- I can't say whether that's new to this report. It's certainly not new to my thinking. So I'm guessing if I looked hard, it was in the report, just a different location before.
BY MR. HEGARTY:
Q Have you read all of Dr. Hopkins' deposition testimony and trial testimony?
A I --
MS. O'DELL: Object to the form.
THE WITNESS: I'm guessing it's in the category of information I've skimmed and there are sort

Page 97

of important tables that he has presented that I've looked at carefully, but his whole report, I'm guessing I skimmed it.
BY MR. HEGARTY:
Q Now, I'm talking about: Just his deposition testimony and trial testimony over the years, have you read at all?
MS. O'DELL: Objection to -- she's referred to, I believe, his deposition here, and you've changed the question to his trial testimony, which, as you know --
MR. HEGARTY: Right.
MS. O'DELL: -- is -- is expansive, including mesothelioma cases and other cancer cases.
MR. HEGARTY: Oh, sure.
MS. O'DELL: So I think the question is confusing and unfair and certainly is not reflected that she's seen his trial testimony in her materials list.
BY MR. HEGARTY:
Q Following up on counsel's statements, do you agree that you've not read all of Dr. Hopkins' testimony either at deposition or at trial?
A Yes, I would agree with that.
Q Have you read any other Johnson & Johnson employees' deposition or trial testimony as it relates

Page 98

to testing of Johnson & Johnson talcum powder for asbestos --
MS. O'DELL: Since --
BY MR. HEGARTY:
Q -- through today?
MS. O'DELL: Since 2021?
BY MR. HEGARTY:
Q Since 2021. I'll amend it to that.
A I have not seen anything new.
Q Have you reviewed any additional testing either done by -- let me ask a different way.
Have you read, since your October 2021 deposition, any Johnson & Johnson -- any of Johnson & Johnson's expert reports or experts' testimony as it relates to the testing of talcum powder for asbestos?
A I don't believe I have.
Q You also cite in this part of your report to FDA's testing of 2019.
Have you reviewed FDA's testing of Johnson's Baby Powder in 2009 and 2010?
A I have seen older testing results. I'm not sure if that -- those are the testing results that you're referring to, but I have seen older testing results.
Q Have you reviewed any of FDA's testing of

Page 99

talcum powder products that did not involve Johnson & Johnson talcum powder products in 2022?
A I'm not sure what the document is. If you shared it with me, I can --
Q Let me just ask it a different way.
A Yeah.
Q Are you aware of FDA reporting on testing of a number of talcum powder products in 2022? Were you -- are you aware of that?
MS. O'DELL: Object to the form.
THE WITNESS: If you showed me the document, I could confirm whether I've seen it or not. It sounds familiar that they were testing a more broad sample of products, but I don't remember the specifics of that.
BY MR. HEGARTY:
Q Do you recall if you reviewed any of the testing results of -- of FDA's testing of talcum powder products from 2022?
MS. O'DELL: Object to the form. Asked and answered.
THE WITNESS: I don't remember that, but, again, if you showed it to me, I could more easily confirm whether I had seen it or not.
BY MR. HEGARTY:
Q Based on your statement that talcum powder

Page 100

products have never been free of asbestos, is it your opinion that testing by FDA that reports no finding of asbestos are invalid?
MS. O'DELL: Object to the form.
THE WITNESS: I -- I think the way the testing is done is profoundly important. And your capacity to find asbestos would depend heavily on how you look. And we've seen from the Longo evidence and the reconsideration of using the electron microscopy TEM approach and the importance of that at finding more and the FDA's acknowledgment that this is actually the right way to look to find it. Having the lack of detection, using an insensitive test would not convince me that that was an appropriate result, or I wouldn't put trust in it.
BY MR. HEGARTY:
Q Is it your opinion that every model of Johnson's Baby Powder that has ever been sold has contained asbestos?
A Yes, that's my opinion.
Q Is it your opinion that every consumer product that contains talcum powder has some level of asbestos in it?
MS. O'DELL: Object to the form.
THE WITNESS: The general nature of that

Page 101

question encompasses so many products I've never looked at, know nothing about. That being said, I'm not sure you can take asbestos out of talcum powder. So I could venture to guess, but I have no basis for knowing the list of products you're talking about or what's in them.
BY MR. HEGARTY:
Q A related question: In your opinion, is it possible to create talcum powder that can be used in a cosmetic product that does not contain asbestos?
MS. O'DELL: Object to the form. Beyond her expertise.
BY MR. HEGARTY:
Q You can answer.
A I -- from what I've learned about the presence of asbestiform talc in talcum powder and asbestos in talcum powder, I wouldn't see how you could get it out of the product, but -- but that is outside -- I don't know if it's chemical engineering or geological expertise that -- that I don't have.
Q Please turn or look next at page 11 of your report to the paragraph just before the paragraph that begins "However, IARC explicitly stated." Please tell me if you can tell where I'm pointing to.
A On page 11?
Q On page 11.

A In the middle of the "Asbestos" paragraph or --

Q No. It is the paragraph above the paragraph that begins: "However, IARC explicitly stated that the findings in this monograph apply to all forms of asbestos."

A I don't have the "However."

Q The "However" is new. It starts -- the line starts in the -- no. Let me start over again, my question.

The line does begin: "However, IARC explicitly stated."

Is that not in your report at page 11?

A Page 11, I have four paragraphs: "Relationship," "Why Talcum Powder," "Carcinoma," and "Asbestos."

Which paragraph is it in?

Q Let me just take a quick look. Let me find my copy of the 2023 report.

MS. O'DELL: Are you talking about page 12?

MR. HEGARTY: Let's go off the record for just a second until I find mine.

(Discussion Off the Record.)

MR. HEGARTY: So we're back on the record.

Q Please turn to page 12. The paragraph just

before the paragraph that begins "However, IARC explicitly stated," et cetera.

A Yeah.

Q Are you there?

A I'm there.

Q You added the line at the end of that paragraph that says: "To the degree that we now know talcum powder products contain asbestos fibers, this study also supports that talcum powder causes ovarian cancer."

You're referring -- to what study are you referring to?

A I think the Camargo 2011 and the IARC 2012.

Q Since your October 2021 deposition, have you read any scientific or medical literature reporting that asbestos in any consumer product can cause any form of cancer?

A Anything that's new is the question?

Q Yes, ma'am.

A I don't think so.

Q Is it your opinion that any amount of asbestos in talcum powder causes ovarian cancer over the talc- -- the talcum powder alone?

MS. O'DELL: Object to the form.

THE WITNESS: Can you restate that?

MR. HEGARTY: Sure.

Q This -- this is getting at your -- the line you added.

Are you saying, by the line that you added, that it is the asbestos fibers in the talcum powder that is causing the ovarian cancer in the users of the product?

MS. O'DELL: Object to the form. And that question was asked, I believe, in 2018 and 2021.

BY MR. HEGARTY:

Q You can answer, because I'm asking specifically about this line you added.

MS. O'DELL: The question wasn't limited to that.

And so you may answer, but I'm just -- I'm noting my objection on the record. This is really going back.

THE WITNESS: I think in terms of the carcinogenicity, asbestos and asbestiform -- asbestiform talc are equivalent, and I think that's a very strong culprit of what's causing ovarian cancer from talcum powder products.

BY MR. HEGARTY:

Q Please turn next to page 13, the paragraph that begins "The female genital tract is open."

Do you see that paragraph?

A I do.

Q You added a study referenced in that paragraph to -- that is a reference to Johnson 2020.

Do you see that reference?

A I do.

MR. HEGARTY: I'm going to go ahead and mark that as our next exhibit. That's it. I'm marking as Exhibit No. --

MS. FLAGEOLLET: Seven.

MR. HEGARTY: -- 7, the 2020 Johnson paper.

(Exhibit 7 was marked for identification by the court reporter.)

BY MR. HEGARTY:

Q Do you have that paper in front of you?

A I do.

Q Did you find the 2020 Johnson paper on your own?

A I believe I did.

Q This study was available back at the time that you prepared your amended MDL report in 2021.

Why did you not cite it then?

A I think I didn't find it then.

What was the date of my prior report?

Q Your last MDL report, prior to your current

Page 106

one, was dated -- or is dated July 2nd --
A Sure.
Q -- 2021.
A Great.
Q Had you read the Johnson 2020 paper as of July 2nd, 2021?
A No.
Q Did you find it on a subsequent search that you did of the medical literature?
A I believe I did.
Q If you turn over to the second page of this study, page 528, under the section "Resected tissues from ovarian carcinoma patients."
Do you see that section?
A I'm sorry. I -- I got lost.
Q It's the second page on the right-hand column under the section 2.3, "Resected tissues from ovarian carcinoma" --
MS. O'DELL: On page 2.
BY MR. HEGARTY:
Q -- "patients." On the second page.
A On the second page. Yes.
Q About eight or -- seven or eight or line -- seven or eight lines down, there's a line that says: "All 11 patient cases were received for consultative

Page 107

purposes by JJG, each representing a patient with ovarian carcinoma and a significant known history of perineal talc use."
Do you see where I'm reading?
A Yes.
Q JJG is a -- is a reference to John Godleski.
Are you aware of that?
A Yeah.
Q And are you aware that John Godleski -- Dr. Godleski is an expert witness for Plaintiffs in the MDL as well?
A Yes.
Q Are you aware that the 11 patients he's reporting are patients that he received through his work with Plaintiffs' counsel?
A Yes.
Q Does that have any impact on your interpretation of -- and weight given to this study that it involves patients that are -- that Dr. Godleski received through lit- -- his litigation work?
A It does not.
Q If you turn over to page 532 at the bottom, looking at the right-hand column, the first carryover paragraph.
Are you with me?

Page 108

A I'm with you.
Q About halfway down, the paper makes the statement: "A substantial number of birefringent particles may be other categories, particularly silicates. These may be absorbed into the perineum through general living practices, in a manner similar to talc."
Do you agree that other particulates -- other particles, that is, can be absorbed or disseminated locally in other tissues as talc is?
A Yes.
MS. O'DELL: Object to the form.
BY MR. HEGARTY:
Q With regard to the tissue that is analyzed in this paper, that tissue was handled by the surgeon and other people as it was taken to and from the pathology department, correct?
A Yes.
Q Do you agree that surgery removed from -- that tissue removed during surgery and then taken to pathology can pick up particulates or particles along the way?
A I think very difficult to pick up particles inside. So on the edge of the surface, I think the standard sterile procedures are imperfect when you're

Page 109

removing something from the OR that's less concerned about it, but you can't get particulate matter inside the -- inside the tissue.
Q You agree, though, that with regard to these authors, they were not able to -- let me start over again.
With regard to the tissue used by the authors in these papers, these -- they were not involved in the -- in the removal or the initial review of the -- the pathology, correct?
A I'm -- I'm --
MS. O'DELL: Object to the form. Excuse me. Sorry.
THE WITNESS: I wouldn't -- I wouldn't possibly know if they were involved or not.
BY MR. HEGARTY:
Q Do you know if and how -- if and then how the author accounted for the potential for contamination in their findings?
A I -- I hear the theoretical concern of contamination. I did a year of pathology before I went into radiology and was often the person who went to the operating room to get the specimens, and often I was next to the researcher who is also getting the specimens next to me in the operating room. And then I would be

Page 110

responsible for going back to the pathology lab and slicing the specimen.

You don't look on the edge of the specimen. You look -- the specimen has millions of potential fields of views. You're not focusing on the edge.

So if you look at the photos that they're showing in Figure 1, these photos are not on the edge. They're in the center of the material. And so, no, I don't think -- that's not where you look. You don't look in -- on the edge. You look in the body, and then that's not susceptible to contamination.

Q In the work you described, there was no effort made to keep the tissue from coming into contact with other particles or particulates along the way, correct?

A No, that's not true. It's -- you try to be towards a sterile condition when you're picking up the specimen. It comes from the operating room table. It's in, you know, some kind of container that's supposed to be sterile and kept sterile, and you take it to the pathology lab, and you typically mark -- mark the edge of the specimen with blue ink, and then when you section it, you're looking interior to that.

It -- it loses the importance of it being completely sterile the way the operating room is. There's no longer a patient at risk, but you try to keep

Page 111

the specimen as clean and uncontaminated as possible. It's just standard procedure.

So I -- I don't disagree that there's a possibility for some contamination, but that would be on the surface, not in- -- inside. And every one of these images, Figure 2, Figure 3, we're looking at talcum particles inside a blood vessel that's inside the specimen. That's not from contamination.

Q You do agree, though, that in the transfer of tissue from the surgical lab to the pathology department and then putting it into the slides, it can pick up particles in the air or from the person that's carrying those or from paper it's set on along the way, at least as to the surface, correct?

MS. O'DELL: Objection. Form.

You may answer.

THE WITNESS: To the surface, absolutely.

BY MR. HEGARTY:

Q If you turn to the very last page, the "Conflict of interest statement." Please tell me when you're there.

A I'm there.

Q The first "Conflict of interest statement" refers to CEJ [sic], which is Kurt E. Johnson, and states that -- KEJ. I said "CEJ." I meant KEJ --

Page 112

worked as a paid expert medical witness for the Beasley Allen law firm in 2018 and 2019, correct?

A Yes.

Q You're represented here today by two attorneys from the Beasley Allen law firm?

A Yes.

Q The next "Conflict of interest statement" says "JJG" -- that refers to John Godleski -- "has served as a consultant and provided expert testimony in talc and other environmental litigation."

Did I read that correctly?

A Yes.

Q In your opinion, if that -- is that a sufficient conflict of interest disclosure for Dr. Godleski, knowing that he is serving in the same capacity as you are in this litigation?

MS. O'DELL: Object to the form.

THE WITNESS: I read this -- I'm not sure if it's accurate or not -- as being that JJG has been a consultant in many cases as opposed to just a single.

So that -- that doesn't seem to be less than a conflict. He's suggesting he has the potential for many such conflicts. So I think that statement is perfectly fine.

//

Page 113

BY MR. HEGARTY:

Q Would you be satisfied in your Woolen paper with a disclosure that read "Dr. Smith-Bindman has served as a consultant and provided expert testimony in talc litigation" without identifying who you were testifying for?

A I think that's a interesting question that's -- that's up for debate, how much you have to -- from my perspective, I wanted to put as much information out there for people to understand.

I'm on the university's conflict of interest committee, and it comes up quite a lot, what is required and not required. And the -- the rule at UCSF is the investigator writes what they want, and then we decide if it's adequate. So I think I wanted to be very clear who had paid me, but I don't think it's required.

Q In your disclosure in the Woolen paper, you felt it was important to the reader to know on whose side you were testifying?

A Yes.

Q Thank you.

You can put that paper aside.

If you look at page 14 at the top, you make a reference in that paragraph to the Mandarino study, which you referred to earlier; is that correct?

A Yes.
MR. HEGARTY: I want to ask you a few questions about the Mandarino study. I'll go ahead and mark that as my next exhibit.
(Exhibit 8 was marked for identification by the court reporter.)
MR. HEGARTY: And that should be Exhibit No. 8.
MS. O'DELL: Thank you.
BY MR. HEGARTY:
Q Do you have the Mandarino study in front of you, Doctor?
A I do.
Q Did you find this study on your own?
A I did.
Q Had you read the Mandarino study as of the time of your July 2021 amended expert report?
A The last report?
Q The last report.
A I believe I had not. I believe it was in the interim.
Q This study used mouse cells, correct?
A I'm not sure what the murine ovarian surface epithelial cells came from, but --
Q Doesn't "murine" --

A -- I hadn't thought to ask.
Q Doesn't "murine" refer to mouse?
A I don't know that. I'm not questioning you, but I don't know that.
Q Do -- whether it does or doesn't, do mice get ovarian cancer?
A I don't know that either, but I don't think that's the usefulness of the cells.
Q Are you an expert in the type of study that's reported in this Mandarino paper?
A I am not.
Q Have you ever done the type of study reported in the -- in the Mandarino paper?
A I have not.
Q Is the talc dose used in this study comparable to what humans would be exposed to by using talcum powder to the perineal area?
A I think that would be an impossible question for anyone to answer.
Q The cells studied in the Mandarino paper were in a petri dish.
Is it your opinion that these results can be directly translated to humans in vivo?
MS. O'DELL: Object to form.
THE WITNESS: Basic science studies like this

are meant to inform a mechanism. So it's not a direct one to one. It's rather, this elucidates on a cellular level what happens, and then that is taken to provide insights on what might happen in actual patients, but, no, it's not a direct one to one.
BY MR. HEGARTY:
Q Are you aware of any medical or scientific literature that correlates findings in murine cells to what happens in humans?
MS. O'DELL: Object to the form.
THE WITNESS: I'm not sure if that evidence existed, that I would even know it, but I'm not familiar with that.
BY MR. HEGARTY:
Q Is it your opinion that this study in any way establishes the carcinogenicity of talc in humans?
A I think my opinion about the carcinogenicity of talc is informed by a lot of studies that I've read, and I think this by no means was a paper that -- that determined my opinion by itself, but it contributes to my view that -- that we have a mechanism that -- that clearly is -- is one that would explain how the talc leads to carcinoma. It's not by itself deterministic, but it contributes to everything I've read.
Q Please turn over to page 9, the right-hand

column at the very bottom, the paragraph that begins "Our report."
Do you see that paragraph?
A Yes.
Q About five lines down, that part of the study says: "In our study we did not investigate carcinogenic properties of talc per se."
Do you agree with that?
A I do.
Q Turning over to the next page in this same section, at the very top and then left-hand column --
A Yes.
Q -- the paper says: "Further research is needed to determine whether and to what extent the effect of talc on phagocytes exists in vivo, particularly in humans; these studies were beyond the scope of our project."
Do you agree with that statement?
A Yes.
Q The next statement says (as read): "We did not investigate whether the inhibited tumor- -- tumoricidal activity" --
A "-cidal."
Q You might say it better than me.
A Tumoricidal.

Q -- "tumoricidal activity we discovered could entail an increased likelihood of tumor growth."
Do you agree with that statement?
A Yes.
Q This study measured, as you report, reactive oxygen species; is that correct?
A It was primarily the impact on macrophages, but there might also be reactive oxygen species as part of what they quantified.
Q Well, do murine macrophages function the same way as human macrophages?
A Again, you're -- you're outside my area of expertise, but typically the mouse model cell lines that are used are ones that have something in common with the -- with the particular human cancer of interest. I'm not familiar with this line to -- to address that.
Q If we stay in this paragraph on Mandarino, you write that "Co-exposure of macrophages to talc and estradiol led to increased production of reactive oxygen species (which increase carcinogenesis and inflammation) and changes in expression of macrophage genes pertinent in cancer development and immunosurveillance."
Did I read that correctly?
A I'm sorry. Did we jump back to my report?
Q Yeah. We're in your report.

A And which --
Q I'm sorry.
A -- page? 14?
Q We're still at page -- top of page 14 on the section on Mandarino.
A Okay. I'm back. Thank you.
Q Do you -- did you find the sentence I read?
A Yes, I'm there.
Q Does a finding of -- of any increase in reactive oxygen species at a single point in time equate to carcinogenesis?
A There's an association with the degree of reactive oxygen species to the likelihood of developing cancer, is our understanding. So, no, at some point in time, you can't say this is going to cause cancer or not.
Q Same question as it relates to inflammation.
Can a single-point finding in a cell study of an increase in reactive oxygen species equate to inflammation?
MS. O'DELL: Object to the form.
Would you mind repeating the question? Or I'm happy to look at it on the screen.
BY MR. HEGARTY:
Q Did you understand the question, Doctor?

A I think you're asking if it's an all or nothing. If there's inflammation, is there cancer?
Q Well, let me ask a different way.
Does a single point -- does a single finding of increased reactive oxygen species, as reported in this study, mean that inflammation will result that can -- that will lead to cancer?
A It does not.
Q Is -- did anything measured in the study constitute a measure of cell mutation?
A No.
Q The study also reports on titanium dioxide and estradiol, correct?
A Yes.
Q Do the statements that you have in your report, as it relates to talc and estradiol, also apply to titanium dioxide and estradiol?
A I think the titanium was the control group to show that it didn't lead to those same changes. So -- so the conclusions would not pertain to the control group. It was just the talc that led to those changes.
Q Well, if you turn over to page 4, Figure 2, do you see that at least in some of the reported findings, that the titanium dioxide and the estradiol also reported an increase in what they called ROX?

Do you see that?
A I do. If I look at the middle figure as an example, the talc plus estradiol has a value of 125, and the titanium has a value of 2. So -- so if you're asking if it's at zero, the control group is meant to contrast with the exposure group because you don't know what the baseline is, and so this is showing that the titanium is much lower than the talc and even lower than the talc plus estradiol.
Q If you look at the first graph, though, do you see the --
A Right. There's a -- if you compare the last two results, one is 80 and the other is 40. So it's twice as high. So the control is meant to standardize so that you wouldn't assume that the talc plus E2 is entirely causing the -- the results. Some of it is due to background, and the titanium is showing a much lower level of background activity than with the exposure that they're -- that they're testing in the -- in the active group, which is talc here.
Q Ultimately, though, the control also showed a reaction of some sort, correct?
A To a much lower degree, absolutely.
Q You also include in this part of your report a reference to the Emi paper, correct?

A Yes.
MR. HEGARTY: And I'll mark that as our next exhibit.
(Exhibit 9 was marked for identification by the court reporter.)
MR. HEGARTY: I've got this one.
So we'll mark the Emi paper as Exhibit No. 9.
Q This study looked at mouse macrophages, correct?
A Yes.
Q No ovarian cells were used, right?
A I'm going to have to remember.
I'm sorry. What was the question?
Q This paper did not look at ovarian cells, correct?
A Their cell model is the murine cell line, yes.
Q In fact, they looked at macrophages, not ovarian epithelial cells, correct?
A Correct.
Q Is it your contention that this paper shows mutations of mouse macrophages?
A My recollection is that it was both mutations and gene expression changes in the -- in those cell lines.
Q Where do you see a reference to reporting on

mutations?
A So under the page 1056, "Significant Analysis of Microarrays" describes that this approach is one of the more stringent analysis [sic] that identifies highly significant genes in microarray. It shows that ten times more genes were significantly different after talc and estrogen exposure versus titanium dioxide.
Q Is it your opinion that that's referring to mutation of cells?
A I think so. It says the "genes." I mean, they both looked at expression of the genes, but also the genes themselves.
Q Is it your opinion that a measure of gene expression in a study like this is a measure of carcinogenicity?
A This paper is telling us how activated the cells are and activated in a way that you would expect to be activated in a pathway that leads to carcinogenesis. So I think this study, just like the previous study, adds to my understanding of a possible mechanism whereby exposure to talc can lead to cancer. By itself, this is a single piece of evidence. It's not sufficient to confirm a single pathway in all patients.
Q Have there been any studies in humans reporting on the effect of talc on macrophages based --

in -- in what they're measuring here?
MS. O'DELL: Object to the form.
THE WITNESS: I believe there are studies that I've referenced in the past maybe of Saed's that measure activation -- that -- maybe -- I don't remember Saed -- that show in actual patients that there's greater -- there's been greater expression in ovarian cancer patients, but I can't remember that -- the reference.
BY MR. HEGARTY:
Q And I'm specifically referring to cell studies and macrophages, that is, a study like this using human epithelial cells -- I'm sorry -- using human macrophages.
A An in vivo study that duplicates these results?
Q No, an in vitro study that duplicates these results or shows these results.
A Not that I know of.
Q Now, are you aware of any in vivo studies that show these results?
A Not these exact results, no.
Q The next study you referenced that's new to your report is Harper 2023. That's on pages 14 and 15.
A I'm looking for Harper. Yep.
MR. HEGARTY: Yes, ma'am. I'm going to mark

that as the next exhibit.
That's it right there.
I'm going to mark Harper 2023 as Exhibit No. 10.
(Exhibit 10 was marked for identification by the court reporter.)
BY MR. HEGARTY:
Q Do you have that, Dr. Smith-Bindman?
A I do.
Q Did you find this study on your own?
A I did.
Q Do you know any of the authors?
A I do not.
Q This was published in a publication called Minerva Obstetrics and Gynecology.
Had you heard of that journal before you read this paper?
A Yes.
Q Had you ever read that journal before?
A I've read articles from that journal.
Q Have you ever cited to an article from that journal in any of your publications?
A I wouldn't remember that.
Q Have you ever performed the type of cell studies that this article reports about?

Page 126

A I have not.

Did you ask me if I knew these authors?

Q I did.

A I've seen -- I don't know Saed, but I've seen his papers before.

Q My question was whether you personally know any of the authors.

A No, I do not.

Q What from the Harper 2023 paper do you rely upon for your opinions in this case?

A The fact that you could cause cells to change the way they're organized and lead to clustering of them, sort of significant in the concept of how a cancer is formed, is a really novel and unfortunate documentation of how the cancer could -- could occur, how a malignant transformation happens.

Q This study uses an assay that measures cell proliferation, correct?

A Yes.

Q Do you equate cell proliferation with carcinogenicity?

A In general, causing a lot of cell turnover and a lot of duplication is -- is one hallmark of cancer.

Q If you cut your finger and -- in the process of repair calls -- causes a lot of cell proliferation

Page 127

and turnover, correct?

A Absolutely.

Q That does not cause cancer, right?

A Absolutely correct that there's normal process of cell turnover, cell death, cell proliferation and pathologic cell proliferation and cell death or lack of cell death.

Q Is it your contention that cell proliferation is the same as malignant transformation?

A In the context of this study, they're showing that cells treated will grow in sort of an uncontrolled way and begin to form clusters and that -- that process is one that's known to occur in cancer.

Q Understood.

But do you equate a finding of cell proliferation in the type of test that is done here generally with malignant transformation?

A Again, this is a single article that contributes to my opinion, but it's not taken by itself. So I think this is a very damning study, but --

Q I'm sorry?

A This is a damning study. To say that you can turn a single cell into a cluster of organized cells is very predictive of what you would expect in cancer, but, no, this does not prove that this proliferation means

Page 128

cancer. It's just predictive of what you'd expect to happen in the setting of developing cancer.

Q But this study didn't show that a single cell proliferated in the presence of talc, right? It did not look at a single cell, correct?

MS. O'DELL: Object to the form.

THE WITNESS: You're not asking if they studied one cell in this.

MR. HEGARTY: Correct.

THE WITNESS: They did not study a single cell.

BY MR. HEGARTY:

Q Is the amount of talc used in this cell study in any way equivalent to what you would expect a human to be exposed to, in particular a human ovary?

MS. O'DELL: Object to the form.

THE WITNESS: You asked this question before, of how much we're exposing a cell to and is that similar to what we would expect a human to. There's no way to make a direct comparison, but I will say that the amount of asbestos particles in baby powder is many, many, many orders of magnitude greater than the amount they expose these cells to. So I don't think there's a comparable amount, how many particulates that they put in a cell versus how much a woman is exposed to, but the amount

Page 129

women are exposed to is a very high number.

BY MR. HEGARTY:

Q When you look -- strike that -- strike that.

When you consider or weigh a paper like this, do you evaluate how the study was funded, in other words, who funded the study?

A You've asked this question a few times about individuals' conflicts of interest. And I think every publication needs to be taken for the details that are provided. So if a study is well designed, describes all the steps they took and seems to have tried very hard to create a meaningful scientific experiment, then I believe it, and I think the purpose of the conflict of interest statement is just to let me know that there's this potential conflict.

On the other hand, if a study is just poorly designed, seems to not have any balance, then that statement would mean something very different to me. So --

Q Is it your -- I'm sorry. You can finish.

A So in this case -- I don't mean to be an expert on this topic. I'm not, but reading through this article, it seems to be a very well-designed, thoughtful study, and the fact that -- whether it was funded by -- by the lawyers, I've got to look closely to see that,

but it's a well-designed study, so I believe the results that they're showing.

Q Do you know whether this paper was rejected by other journals before it was published in Minerva?

A No, I would have no idea.

Q Would that be of interest to you?

A I -- I know that is of interest because I've been asked so much about my paper's prior rejections, but in general, no, our papers, as scientists, get rejected all the time. That's -- I mean, if it ends up being published in a place that's not worthy, that's in a throw-away journal or a journal that you pay to have it published, then that's of interest to me. Then I'm -- I don't really give it any weight whatsoever. But if it's published in a reputable place and it had a history of being rejected but where the authors improved it based on that peer review and -- and fixed issues that were raised and it finally gets published in a reputable place, no, I -- that's not something I've ever even thought about.

Q So the fact that this paper was rejected by three other journals before it was published is not relevant to your evaluation of it; is that fair?

MS. O'DELL: Object to the form.

THE WITNESS: You're just telling me that for

the first time, so I didn't know that, but, no, that would not be relevant to my consideration of the validity of the paper.

BY MR. HEGARTY:

Q Have you been made aware that Dr. Saed, as part of this litigation, produced the reviewer comments that he received from the three journals that rejected this paper?

A I didn't know that.

Q You have not reviewed the -- you have not been provided with the reviewer comments of this Harper 2023 paper?

A I have not.

Q Would you be interested in reading those reviewer comments?

MS. O'DELL: Object to form.

THE WITNESS: I'm going to guess that reviewer comments on this journal article could be over my head. So I -- I suspect that the issues that they raised were probably quite subtle, that I would not be able to fully reflect on the importance of them.

BY MR. HEGARTY:

Q Would you -- would -- strike that.

Are reviewer comments when you're evaluating a paper, if they're accessible to you, relevant to how you

weigh a paper?

MS. O'DELL: Object to the form.

THE WITNESS: I don't believe I've ever seen reviewer comments related to a paper. I think -- I'll take that back. I have published papers in Europe. I have published papers at the BMJ, and the BMJ makes all of those reviews open, and they're not making them open at the end of the process. They're open through the whole process, meaning they're written understanding they're going to be made public as opposed to not the case (indicating).

I've never actually looked at reviewer comments for the BMJ papers, but I know they must publish them because they published the ones from my paper, but I've never looked at them for any paper.

BY MR. HEGARTY:

Q Another way to put my question is: If the -- if, in weighing it and evaluating a paper and the reviewer comments are attached or included with the paper, would you review them?

A I think, in general, no, but if it was a topic that I was particularly interested in or a topic where I was questioning why they did something or how they got away with doing that because that was such a poor thing to do, I could see for curiosity and scientific purposes

wondering if any reviewers raised that issue that I'm thinking of and why they didn't publish it that way.

So I could imagine doing that. But in general, I read papers very critically towards the study design to the degree that I'm able and don't particularly think I need to rely on other people's reviews.

Again, if it's outside my area, I'm certainly respectful that other people might have more insights, but what you are raising as a possibility is not something that's a routine practice.

Q If you turn to the very end of the paper, looking at the conflict of interest section, it reports that Dr. Saed "has served as a paid consultant and expert witness for the plaintiffs in the talcum powder litigation."

Do you see that?

A I do.

Q Under the "Funding" part it says (as read): "A portion of Dr. Saed's time conducting this research was paid for by the lawyers representing plaintiffs in the talcum powder litigation."

Do you see that?

A I do.

Q Are those two statements relevant to how this

paper should be weighed and considered?
A Again, reading this paper, it seems like a very thoughtfully designed scientific study. So it's great that he reports this conflict of interest, but, no, it doesn't reduce my interest in this paper knowing that it was funded in part by lawyers.
Q As part of your role in the 2022 paper, did you make it a point of emphasis to not include -- not include any of the work that you had been paid for as part of what you did in this study?
A I did.
Q Why did you do that?
A I think there are several reasons I did it.
First, I worked with two other investigators on this -- on this paper and did not want to have Dr. Woolen feel that I was controlling the process in any way. I wanted it to be a completely, from the get-go, new review. He was the leader. He made decisions, and if I was paid, that would, I think, create not necessarily real, but would create the appearance of a greater conflict of interest.
And so I wanted it to be incredibly clear and explicit that I was not paid for this, this was a new project, this was an academic project. That doesn't mean there would have been a conflict of interest that

altered the work had if I'd been paid, but I think we discussed a great deal on our conflict of interest committee the appearance of bias as important as bias, and so I did not want to leave any appearance of bias, whether or not I would have created any meaningful bias.
Q You agree that the -- the funding of a paper by lawyers in a litigation would give the appearance of bias, correct?
MS. O'DELL: Object to the -- object to the form.
THE WITNESS: The appearance of a potential for bias. And so in some cases -- I'm not sure this fits under that category, but I think Dr. Longo's work would fit under that category. There are no experts in testing of the kind of work he does who have not been involved in litigation. That expertise of doing testing for asbestos is a very specific expertise that people have developed in large part because of the need that's come about through litigation. And so in that context, there is no other way to do the work except by using paid experts, and I think that does not taint the work at all. That's -- that's the labs that do this work or the labs that are paid by these -- by -- by the lawyers.
In this case, he did a research study that supported his work in his lab, and the fact that it was

funded by the lawyers certainly is something to think about when you read this study and so require extra careful attention to the details of study design and the methods.
And so in reading this study, I think they did that, but I certainly want to know who's paying for it so I can say, "Wait a minute. They didn't -- they didn't have a control group. They compared talc to no exposure. That's not a valid thing to do," but that's not what happened. There was a control group.
And so I think -- again, I think the potential for conflict of interest exists in everything we do, whether or not we're paid by someone or not.
I have a potential conflict of interest to show that radiation is harmful because that's a big part of where I am drawing my professional reputation from. And even though no one is paying me to say that, someone could argue that I have a conflict of interest there because I want to keep showing this because that enhances my career.
A paid conflict of interest needs to be declared, but it doesn't mean that it really introduces a real bias or a conflict.
MR. HEGARTY: Let's go ahead and take a break. We've been going for a bit.

(Recess.)
MR. HEGARTY: Okay. We're back on the record.
We're following up on some additions to your most recent amended report. If you could turn to page 26. Go to the reference to the Tanha 2021 study.
I'm going to mark that as the next exhibit, as Exhibit No. 11.
(Exhibit 11 was marked for identification by the court reporter.)
MS. O'DELL: I'm sorry.
BY MR. HEGARTY:
Q Did you find this study on your own?
A I did.
Q Do you think it's a well-done study?
A Yeah.
Q As to talcum powder use in ovarian cancer, it looked at four studies: Penninkilampi, Berge, Huncharek 2007, and Taher.
Are those four studies sufficient in your opinion to analyze whether there's an association between talcum powder use and ovarian cancer?
A I think that's a little bit misleading summary. It's a systematic review of systematic reviews. So they looked at Taher, but Taher looked at -- what did Taher look at? Taher looked at 30 studies.

Q Understood.
But my question is: Do you think that this study looking at four is -- in particular, the four it looked at, is it sufficient analysis for reporting on whether there's an association between talcum powder use and ovarian cancer?
MS. O'DELL: Objection to form. Asked and answered.
THE WITNESS: You're suggesting they looked at four studies. They looked at four systematic reviews. The study means the research that was done. They looked at more than 30 research studies.
So, yes, I think a systematic review of several systematic reviews is very worthwhile.
BY MR. HEGARTY:
Q Okay. If you turn over to the discussion section on page 10 of 17. Please tell me when you're there.
A I'm there.
Q The study states in that section that (as read): "Coffee, egg, and fat can significantly enhance the risk of ovarian cancer."
Do you agree?
A I'm sorry. I don't -- tell me where we are.
Q Sure. On the "Discussion" section --

A Oh, the "Discussion."
Q -- about four lines down, it says that the (as read) "intake of coffee, egg, and fat can significantly enhance the risk of ovarian cancer."
Do you agree with that statement?
A I need to find it.
I see coffee is rich in antioxidants.
I'm there. Okay. I'm sorry. I -- I'm -- I'm surprised by that statement. The paragraph before that I was reading shows that the potential impact of coffee is quite low. So I'm confused why they then conclude "can enhance the risk of ovarian cancer."
So I'd have to read this more carefully, but my gut is no, I wouldn't agree.
Q And let me ask it separately.
Apart from this paper, does coffee use increase the risk of ovarian cancer, in your opinion?
A I don't have a particular opinion about that, but I don't remember seeing evidence that would suggest that, that I would be convinced by.
Q Does eating eggs increase your risk of ovarian cancer, in your opinion?
A I've seen nothing to suggest that.
Q Has a high fat diet -- or does a high fat diet increase the risk of ovarian cancer?

A The -- the -- the high fat diet -- I would not say it increases the risk, but obesity is a risk factor for ovarian cancer. So I would suspect that having a high fat diet would be a risk factor, but I haven't seen research that particularly looks at the diet as opposed to just being obese.
Q Staying in this same section in this "Discussion" section, it says (as read): "Estrogen and estrogen-progesterone therapies (generally, hormone therapy) are also associated with the elevated risk of ovarian cancer."
Do you agree with that statement?
A I believe estrogen is associated with an el- -- estrogen alone is. I'm not -- I'm not sure if estrogen-progesterone together are. I think it's mostly estrogen, but I would agree with that portion of that statement.
Q The next line says (as read): "Several diseases (for example, diabetes, endometriosis, and polycystic ovarian syndrome), as well as some genetic polymorphisms" those listed "can significantly increase the incidence of ovarian cancer."
Is it your opinion that diabetes increases the incidence of ovarian cancer?
A Again, not that I've seen explicitly, unless

we're going through the obesity approach, but I haven't seen that literature.
Q Does endometriosis significantly increase the incidence of ovarian cancer?
A I've seen a number of publications, including recent ones, that -- that suggest that, indeed, endometriosis and inflammation do increase the risk of ovarian cancer.
Q Does polycystic ovarian syndrome significantly increase the incidence of ovarian cancer?
A Again, if it's mediated through obesity, which is common in polycystic ovarian cysts [sic] perhaps, but I haven't seen specific evidence of polycystic ovarian cysts -- syndrome.
Q The last sentence of that paragraph, it refers to talc, but it also says "obesity, overweight and smoking...are also accompanied by an increased risk of ovarian cancer."
Do you agree those three -- obesity, overweight, and smoking -- are accompanied by an increased risk of ovarian cancer?
A I -- as I mentioned, I think overweight is probably a risk factor for ovarian cancer. I'm -- but I'm blanking on the smoking. I don't remember that association.

Q If you look at -- you can set that paper aside.
If you look at the section "Systematic Reviews: Summary" on page 27 of your report.
A Yes.
Q At the end of that paragraph, you say (as read): "Similarly, Woolen provides a high quality review with similar results suggesting an increased risk of ovarian cancer associated with" an increase -- "with frequent perineal exposure of 31 to 65%."
Do you see where I'm reading?
A I do.
Q Has anyone outside of experts for Plaintiffs in this litigation, to your knowledge, ever called the Woolen paper a high-quality review?
MS. O'DELL: Object to the form.
THE WITNESS: Has anyone told me that's a high-quality review?
MR. HEGARTY: Yes.
THE WITNESS: Yes.
MR. HEGARTY: Yes, ma'am.
THE WITNESS: Yes.
BY MR. HEGARTY:
Q Who is that?
A I have both a colleague who pushed me to write

the review when I described the work, and other colleagues have told me it's a great review.
Q Who are those colleagues?
A I think I was asked that when I -- I originally mentioned it, and I declined to name them, but I don't mind naming friends who told me that my review was great.
Q Are any --
A Is that what you're asking?
Q -- of those friends epidemiologists, like you?
A The person who pushed me to write the review was Nicole Lurie. She was Assistant Secretary of Health in the Obama administration, has had many very large, influential roles as an epidemiologist. She leads an international effort around COVID vaccines, and she thought the review was terrific.
Rita Redberg is the former editor of the Journal of General Internal Medicine. She thought it was a terrific review. Two people that come to mind.
And I think -- you asked me earlier if I had ever spoken to the news about that publication. I think there were a couple of newspaper articles that -- that did small coverage of the paper, and I did speak to them.
Q Who are those -- what are those articles?

A I don't remember.
MR. HEGARTY: Turn next to the bottom of page 29 of your report. I specifically want to ask you about the addition of the Davis 2021 paragraph, and I'll mark that as the next exhibit, Exhibit No. 12.
(Exhibit 12 was marked for identification by the court reporter.)
BY MR. HEGARTY:
Q Do you have it in front of you?
A I don't. I don't think I have that.
Q We have a copy here as well.
MS. O'DELL: Sorry.
THE WITNESS: Fantastic. Great.
BY MR. HEGARTY:
Q Do you have a copy of the Davis --
A I do.
Q -- 2021 paper?
Did you find that study on your own?
MS. O'DELL: Here's one.
THE WITNESS: I don't remember.
BY MR. HEGARTY:
Q Staying with -- or looking at the abstract of the study, it reported an odds ratio of 1.22, but it was not statistically significant, correct, as it relates to African-American women and ovarian cancer generally,

correct?
A It reported an odds ratio of 1.22 with a confidence interval that went from .97 to 1.53. I -- I wouldn't conclude that wasn't statistically significant, per our earlier discussion.
Q As part of your Bradford-Hill analysis in your most recent report, you consider dose response or biologic gradient, correct?
A Yes.
Q That is an important factor in a Bradford-Hill analysis, correct?
A I think it's more complicated than that, but, yes, it's certainly one of the things to consider.
Q Certainly whether there is a dose response between an exposure and a disease is a consideration of whether there is causation, correct?
A I like the way you said it. It's something to consider. You don't necessarily have to have a dose response for something to be causal, but -- but it is one of the factors to consider, and there is clear evidence of dose response in this -- in this area.
Q The Davis study we're looking at looked at whether there was a dose response between talc use and ovarian cancer, correct?
A Correct.

Page 146

Q The authors found no dose response based on frequency of use, correct?
A Based on a dichotomy of more or less than one time per week, they did not document a dose response.
Q They also found no dose response based on duration of use, correct?
A Correct.
Q And you did not add a reference to Davis in your discussion of dose response in your amended report, correct?
A I know I cite several papers as showing dose response. This would not be one that I would cite that shows dose response. It -- I think the important dose responses are the systematic reviews that have more power and go across a greater number of exposures.
Q One of the authors on this paper is Patricia Moormon.
Do you know Patricia Moormon?
A I don't.
Q Are you aware that she's also an expert witness for Plaintiffs in the talc litigation?
A Yes, I think I do know that.
Q In fact, I believe you told me you have one of her reports --
A Right. That's how I know --

Page 147

Q -- is that correct?
A -- it.
Q Would you turn to the -- the authors' disclosures on page 1667 of this study. Tell me when you're there.
A I'm there.
Q Do you see where it refers to P.G. Moormon? Do you see that reference?
A Yes.
Q That reference says (as read): "P.G. Moormon reports grants from Duke University during the conduct of the -- of the study, as well as personal fees from Law Firm outside the submitted work."
Do you see where I'm reading?
A I don't.
Q It's in the "Authors' Disclosures" --
A Oh --
Q -- section.
A -- "Disclosures." I'm sorry. I was in the wrong section. Yes. One second.
Yes.
Q Dr. Moormon has served as an expert witness for Plaintiffs dating back 2017 or 2018.
Do you think this is a sufficient disclosure for her potential conflict of interest as it relates to

Page 148

her prior work and current work as an expert witness for Plaintiffs in this paper?
MS. O'DELL: Object to the form.
THE WITNESS: Per our earlier discussion. She says she gets personal fees from the law firm. So, again, that -- I think that is -- that is sufficient disclosure. It's not as detailed as saying what side gave her the fees, but it is a sufficient disclosure. We would accept that on our conflict of interest committee as being appropriate.
BY MR. HEGARTY:
Q It also does not refer to the subject area of where she has received fees from a law firm -- from, correct?
A You know, I don't really know her, but I'm guessing she's an epidemiologist.
Is that a fair --
Q Yes, ma'am.
A So I think she gave opinions in her area, which is epidemiology.
Q Would you consider this same wording as a sufficient disclosure for you on your Woolen paper?
MS. O'DELL: Object to the form.
THE WITNESS: Again, it is a very personal decision you make a disclosure. But this is the only

Page 149

kind of thing -- well, there are only three things that I've ever had to disclose. One of them involved being a consultant. One has to do with a business I created. And so I have wanted to bend over backwards to be really explicit so there'd be no uncertainty of what that potential conflict was.
I think I probably go a little bit on the extreme side of that compared to what most people do, but for my work on the conflict of interest committee, this type of exposure is -- this type of disclosure is common and appropriate.
BY MR. HEGARTY:
Q Your university has a disclosure requirement in order to do expert witness work, correct?
A Yes.
Q You're supposed to fill that out on a yearly basis --
A Yes.
Q -- correct?
A It's not specific to expert witness. You're supposed to disclose every year any sources of income you got or travel or anything like that.
Q There's actually categories of what your disclosures are supposed to be, correct?
A Correct.

Page 150

Q This falls into category two, correct?
A I'm going to trust you, but it sounds about right. I --
MS. O'DELL: Easy --
BY MR. HEGARTY:
Q It requires an annual report, right?
A It's definitely an annual report.
Q In each of the years you've served as an expert witness for Plaintiffs in this litigation, have you filled out an annual report disclosing that work?
A I have.
Q And have you provided all the information that was requested in that report?
A It's -- the reports at the University of California are very explicit. I have to give an amount of money for what work, any paid travel, all of that. That's been disclosed every year.
Q And do you still have copies of those forms that you submitted as part of that policy?
A They're kept as a running total. So I don't possess them, but they're online, and I can go through the 50-such reports I filed over the last ten years.
MR. HEGARTY: And we will follow up, and we'll make a request for those documents. You don't have to decide about it now, but I'm just giving you a heads-up.

Page 151

MS. O'DELL: Yeah. And we'll just tell you we'll object, and we'll talk about it later.
MR. HEGARTY: Okay. I'll make a request, but we'll follow up.
Q If you would turn, next, over to page 35 of your report.
You revised the dose response section between this report and your prior report.
Do you stand behind the statement you previously made in the -- in your reports about dose response?
A Can you be more explicit about what -- what statements? I'm guessing I stand by it, but I don't know what statements.
Q Well, let me just ask it separately.
With regard to your prior statements as it relates to dose response in your initial report and your first amended report, do you stand by those statements?
A I'd have to see what those statements were.
MS. O'DELL: Can I just make an objection.
Objection to the form to the degree it's vague and it's calling her to make detailed analysis of something that's not in front of her.
But to the degree you remember and can respond, please do so.

Page 152

THE WITNESS: I mean, I remember wanting to go through the individual studies in more detail this time, but I don't remember what -- what led me to want to do that. I don't remember what the report said before.
BY MR. HEGARTY:
Q Well, with regard to the statements you made in your prior reports, is there any uncertainty that you would stand behind those statements still here today?
A I don't know what those statements are. If -- if there was an error that I cited one study as showing a dose report and it didn't and I corrected it in this report, then I would stand by this report and acknowledge I made a mistake.
If I said something in the prior report that was important to know how I changed my view, I'd need to know what it was to know how I changed it. I don't remember a meaningful change in my position on dose report [sic].
Q The -- the Woolen 2022 paper did not look at dose response, correct?
A I think, taken into context, the Woolen contributes a great deal to dose response. So if you -- if you look at the other systematic reviews, like Taher and Penninkilampi that looked at any exposure, there are several systematic reviews, and they have point

Page 153

estimates of 1.28 to 1.35 with any use, and then Woolen shows multiple, and the point estimate is higher, 1.47. I think that shows strong evidence of dose response even though within the paper itself it didn't evaluate the dose response.
MR. HEGARTY: The next paper I want to mark as an exhibit is a paper you referenced that you had read earlier or that your counsel had referenced that you read earlier, a 2024 paper by Chang. This is going to be marked as an exhibit.
MS. O'DELL: Make sure it's in your binder.
THE WITNESS: Is that the one?
MS. O'DELL: It could be. I'm not sure.
MR. HEGARTY: That is Exhibit, what, 13?
MS. FLAGEOLLET: Yeah.
(Exhibit 13 was marked for identification by the court reporter.)
BY MR. HEGARTY:
Q Do you have any comments with respect to this paper that you would add to your November 2023 report?
MS. O'DELL: Object to the form in the sense that she didn't comment on it in her November 2023 report. So you -- I'm not sure what you're asking her.
BY MR. HEGARTY:
Q Did you understand my question?

Page 154

A I think so. You're wondering if I would choose to highlight this paper if I were revising my report now?

Q Or otherwise comment on it.

A Yeah.

I think the idea of what they wanted to explore is an interesting idea, whether multiple things taken together could explain associations rather than a single. I think the data they had available to work with from the Sister Study was far too small of a study to answer a question about 40 different exposures mixed together in the sample size, and they describe in here that they've looked at the amount of exposure to each of these, but I know from -- from our prior correspondence with Katie O'Brien that the Sister Study had no patients who reported extensive talc exposure. So I don't think they had relevant data to do the analysis that they did, and so I looked at the study carefully. I don't think there's anything that I would choose to enhance my report with based on these results.

Q Do you have any comments with respect to what they reported as far as vaginal talc exposure and the relative risk that they find or reported on?

A They reported an elevated risk from hygiene products together, and then they had, I think, three

Page 155

different graphs showing the breakdown by individual products, and I had a very hard time telling them apart.

So I'd have to look at this much more carefully to see if there's something in here, but they showed the results so many different ways. It didn't feel consistent to me, and they didn't have frequent talc exposure, because I know this population doesn't have frequent --

So there's nothing in here that I took when I read it that would change my opinions particularly, but -- but I'd have to look at this paper more carefully to see if there's anything particularly about talc to report.

Q That was going to be my next question.

Would you need to look at this paper more -- in more detail and take more time to talk about the reporting of -- of its finding as it relates to talc vaginal use across the various figures that they have?

MS. O'DELL: Object to the form.

THE WITNESS: Again, they -- they show -- I quickly looked at the graphs, and some show a protective effect. Some show an increased effect. Some show counterintuitive versus underarm talc versus vaginal talc. I know they didn't have heavy uses of vaginal talc, so I think they had some measurement error, but

Page 156

the underlying study assessed exposures in a short period of time, had very few talc users, I think 14 percent versus 50 percent. They had no heavy talc users.

So I -- I question their measurement of their talc in general, meaning I can't really trust their graphs for telling me much.

And they show -- again, I looked at this quickly, and I couldn't figure out what the difference is between table -- Figure 4 and Figure 5 and Figure 3.

MR. HEGARTY: Let's go off the record just real quick.

(Discussion Off the Record.)

MR. HEGARTY: We can go back on the record.

Q Prior to today, Doctor, did you go back and review your testimony from your last deposition in October 2021?

A I didn't.

Q Prior to today, in preparation for your deposition, did you go back and review your testimony from the Kleiner case?

A No.

Q Has there been any change in your employment status since October of 2021?

A No.

Page 157

Q Are you still working full-time?

A Yes.

Q Any change in the number of hours you've worked per week?

A No.

Q Any change in the type of day-to-day work activities you do?

A Since 2021?

Q Yes, ma'am.

A I stopped doing clinical work a couple years ago, and I think that was after that testimony.

Q So does that mean you no longer have any interaction with patients?

A That's correct.

Q You don't read radiology findings for any patients?

A That's right.

Q So whatever you described previously at your depositions or at trial with regard to your clinical practice, you have not done that for the last two years?

A That's correct.

Q Why have you stopped doing that?

A I stopped during COVID I think for two reasons. I -- I had done a day a week before, and I took less joy in the clinical practice in the hospital

Page 158

when we had to be so gowned up that I couldn't really talk to patients anymore. So that's probably the main reason.

Q Have you been deposed or testified in any other litigation since October 2021?

A No.

Q To your knowledge, have you been disclosed as an expert witness in any other case not involving talcum powder --

A No.

Q -- since October 2021?

A No. I mean I have not.

MR. HEGARTY: I'm going to mark as our next exhibit Exhibit 14, the invoices we've been provided.

Are there two different ones?

MS. FLAGEOLLET: They're two pages.

MS. O'DELL: Do you want to mark --

MR. HEGARTY: How many different invoices are there?

MS. O'DELL: Two.

MR. HEGARTY: Two. I want to make --

MS. O'DELL: To my memory, one is 2021 and one is dated --

MR. HEGARTY: Which one --

MS. O'DELL: -- 2023.

Page 159

MR. HEGARTY: -- is this one?

Let's go off the record real quick just to get this clarified.

(Discussion Off the Record.)

(Exhibit 14 and Exhibit 15 were marked for identification by the court reporter.)

MR. HEGARTY: Okay. Go back on the record.

Q So I'm going to hand you, Doctor, two invoices we were provided in advance of today's deposition, which I've marked as Exhibits 14 and 15.

A Yes.

Q Are these the only invoices that you've created for your work in the talcum powder litigation since 2021?

A Yes.

Q Do they reflect all of the work that you have done with regard to the talcum powder litigation since October 2021?

A Other than work I've done in the last week or two, yes.

Q To be fair, the invoice we've marked as Exhibit No. 15 is dated November 12th, 2023, correct?

A Yes.

Q Do you have any estimate of how many hours you have worked that you intend to invoice since November

Page 160

12th, 2021 -- 23 I mean?

A Probably another 15 or 20 hours.

Q Outside of today?

A Including today.

Q So since November of -- November 12, 2023, you've worked only another 15 to 20 hours on the talc litigation?

A Yes.

Q Have you been paid for the -- the amount invoiced in Exhibits 14 and 15?

A Yes.

Q Does invoice -- do the invoices of Exhibit -- strike -- strike that.

Do -- do Exhibit 14 to 15 show that you did not do any work on the talcum powder litigation in 2022?

A Yes.

It's possible that there was an hour or two that I would not have bothered to bill until the November case. So it's included in that 25 hours in 2022.

Q What percentage of your income in 2023 was from your work in the talcum powder litigation?

A I wish it was an earlier question that I was given.

Maybe 7 percent.

Page 161

Q What percentage of your income in 2021, which goes beyond this -- I understand this is from September forward, but are you able to estimate what percentage of your total income from 2021 was from your work as an expert witness in the talc litigation?

MS. O'DELL: Object to the form.

Mark, did you mean to ask -- you meant to ask 2021?

MR. HEGARTY: 2021.

MS. O'DELL: Okay. Excuse me.

THE WITNESS: Probably a smaller percent because I was still in the radiology department. So my salary was higher. So the amount was probably a smaller percent.

BY MR. HEGARTY:

Q Since October 2021, have you worked on or drafted any other publications that mention talc or asbestos?

A No.

Q Do you have any articles that you plan to do that relate to talc or asbestos?

A No.

Q Any planned studies?

A No.

Q Since October 2021, have you given any formal

Page 162

presentations or lectures where you're standing in front of your peers and discussed talcum powder use in ovarian cancer?

A I mean, I don't think it's exactly what you're asking, but I've used it as an example when I teach the medical students.

Q How about in a forum more like standing in front of a podium?

A No.

Q Since October 2021, have you discussed, in any setting, the opinions you have in the MDL with any of your colleagues or peers besides the teaching that you just mentioned?

A The teaching context was to teach them how to do systematic reviews and how you could use it in real world. I, on a casual level, describe these results to friends and colleagues when it comes up.

Q Outside of what you've already told me about, since October 2021, have you discussed any of your opinions in the MDL with anyone other than counsel for the plaintiffs?

A Again, I -- I casually discuss the results and what I think are important results with friends and colleagues, but not in any formal context.

MR. HEGARTY: I want to mark next as an

Page 163

exhibit your updated reliance list that we were provided today.

We're going to need more, if you want to print out some more.

(Exhibit 16 was marked for identification by the court reporter.)

MR. HEGARTY: So I've had marked as Exhibit -- what is that? Exhibit 16?

MS. O'DELL: Yes.

MR. HEGARTY: -- the Materials Considered list we were provided with today.

Q Do you see that, Doctor?

A I do.

Q My understanding is, from talking to counsel for Plaintiffs -- was that there were some additions added at the end versus the version in your November 2023 expert report; is that correct?

A Yes.

Q And were these materials added something you read since -- something you have read since November of 2023?

A Some of them I've read since that time.

Q Some of those added you had previously read?

A Yes.

Q Why were they not included, the -- with the

Page 164

Materials Considered list in your November 2023 report?

MS. O'DELL: I think there might be some just confusion, so let me just comment. Since Dr. Smith-Bindman directed us to create the list, what was new and provided prior to the deposition, in keeping with the court's order, was the additional materials that she had read -- or we were aware she had read since the report. And so they occur at page 30 of the Materials Considered list, and I believe they start at 528. It could be 527, but I believe it's 528.

MR. HEGARTY: Thank you.

The next exhibit I want to show you -- I'm sorry. I only have one copy, so you guys will need to share -- is a -- is the November 15th, 2023, second amended Rule 26 report of Dr. Judith -- Judith Wolf.

(Exhibit 17 was marked for identification by the court reporter.)

BY MR. HEGARTY:

Q Have you read Dr. Wolf's expert report that is the expert report I marked as Exhibit --

MS. FLAGEOLLET: Seventeen.

BY MR. HEGARTY:

Q -- 17?

A I think I may have glanced at it.

Q Please look over at the Materials Considered

Page 165

list starting at page 26.

A Yes.

Q And also look at Exhibit 16, your Materials Considered list, also at page 26.

And tell me when you're there on both documents.

A I'm there.

Q Do you see, starting at number 441, for both documents, that the listing of materials is identical?

A Yes.

Q Do you know how those come out to be identical?

A I mean, I think they're identical for the whole page.

Q And over the next --

A Yeah.

Q -- several pages?

A I mean, I know that I have sent many materials to the lawyers, and they have generated the Materials Considered, including the materials I've sent to them, as well as the ones that they have suggested that I look at, and so I think they generated the same list for all of their experts and provided all these materials to -- to all of us. So papers that I found I suspect were shared with the other experts, and -- and vice versa.

Q Since October of 2021, have you read -- reviewed any medical records for any of the MDL workup plaintiffs, that is, the six workup plaintiffs?
A No.
Q And to be specific, since October 2021, have you reviewed any medical records or other materials concerning Ms. Judkins?
A No.
Q Have you reviewed any materials or medical records concerning Ms. Bonderand [phonetic]?
A No.
Q Since October 2021, have you reviewed any materials or medical records concerning Ms. Newsom?
A No.
Q Since October 2021, have you reviewed any materials or medical records concerning Ms. Rausa?
A No.
Q Since October 2021, have you reviewed any materials or medical records concerning Ms. Converse?
A No.
Q In terms of your preparation for today's deposition, did you have a chance to meet with counsel for Plaintiffs?
A Yes.
Q Who did you meet with?



A Margaret and Leigh.
Q How many times did you meet to prepare for today's deposition?
A We met yesterday, and then I think we met for a few hours last week to discuss what I should focus my --
Q How long did you --
A -- review --
Q -- meet -- I'm sorry to interrupt.
A Yesterday we met for a half day, and last week we met for a couple of hours.
Q Did you review any --
A By phone.
Q I'm sorry.
A By Zoom.
Q Both were by Zoom?
A No, yesterday was in person.
Q Other than what we've already been -- I've already asked you about, did you review any other materials to prepare for today's deposition, that is, things outside of what you and I have talked about over the course of today?
MS. O'DELL: Object to the form.
THE WITNESS: Are you asking if I did any other reading that I haven't highlighted?



BY MR. HEGARTY:
Q Or that we haven't talked about today.
A I -- I spent a lot of time yesterday reading about both asbestos concentration in different environments on various websites: OSHA, FDA, like that.
Q Anything else that you reviewed to prepare for today's deposition that we haven't touched upon or talked about?
A No.
Q The rate that you charged in your invoice is $1,000 an hour.
Did that rate change from October 2021?
A No.
Q Is that rate the same for depositions or for document review or for trial testimony?
A Yes.
MR. HEGARTY: The next document we'll mark as an exhibit is the -- is your current CV.
(Exhibit 18 was marked for identification by the court reporter.)
MR. HEGARTY: We were provided today -- we were provided a couple -- a few days ago with an updated version of your CV from the one that was attached to your November 2023 second amended report. This is Exhibit --



MS. FLAGEOLLET: Eighteen.
MR. HEGARTY: -- No. 18.
Q Is Exhibit No. 18 a current copy of your curriculum vitae?
A Yes.
Q Does it accurately -- accurately reflect your medical education, training, and experience?
A Yes.
Q Are there any additions that -- that you need to add that have come up since March 9th, 2024?
A No.
MR. HEGARTY: The next document that I want to mark as an exhibit, which this would be Exhibit 19 --
MS. FLAGEOLLET: Mm-hmm.
MR. HEGARTY: -- is "PLAINTIFFS' STEERING COMMITTEE'S RESPONSE AND OBJECTIONS TO THE NOTICE OF ORAL DEPOSITION OF REBECCA SMITH-BINDMAN, M.D. AND DUCES TECUM."
(Exhibit 19 was marked for identification by the court reporter.)
BY MR. HEGARTY:
Q Do you have that document in front of you?
A I do.
Q Let's just walk through the requests very quickly.

The first request starting on page 3 --
A Sorry. Just -- just --
Q I'm sorry.
A -- just to understand what this is ...
Q I'm just going to ask you the question separate, really, from what this document is.
A Okay.
Q So I'll just -- I'll just ask you the question.
A Okay.
Q I'm just using this as a reference.
MS. O'DELL: I'll just -- can I just state: We objected to certain requests or responded to certain requests in -- in the notice of the deposition, which you've seen.
THE WITNESS: Thank you.
MS. O'DELL: So this is just our pleading.
THE WITNESS: Thank you.
BY MR. HEGARTY:
Q Looking at page 3, No. 1, it asks for a complete and current copy of your curriculum vitae.
Did we just mark that as an exhibit?
A Yes.
Q No. 2, it asks for copies of materials related to your retention or payment for services as a

testifying expert in the MDL and/or the Talc Litigation since the date of your last deposition in this case as October 2021.
Do you have any such documents since October of 2021?
MS. O'DELL: Other than the ones that were produced and marked?
BY MR. HEGARTY:
Q Other than the ones that were produced or marked?
A No.
Q Part B of that question asks for (as read): "All documents reflecting work done, time spent, or expenses incurred by You, Your organization, or anyone under Your direction or control or the direction or control of Your organization in connection with this MDL and/or the Talc Litigation since the last date of your MDL deposition, and all bills, invoices, or accounts rendered to attorneys, law firms or others in connection with those activities."
Have we marked those today of those that you have prepared that fall under that description?
MS. O'DELL: So again, we've objected to certain portions of this request, and subject to those objections, we provided the responsive documents, and

those have been the documents that have been marked today.
BY MR. HEGARTY:
Q Paragraph No. 4 on page 4 asks for "All records of payments of any kind received by You since the date of your last MDL deposition from any journalist, media outlet or other third party for assistance or information related to Talc and/or Talc Products."
Are there any such documents?
A No.
Q Paragraph No. 5 asks for "A copy of all materials of any kind added since the date of your last MDL deposition to Your complete file or files related to the work done concerning this MDL or the Talc Litigation more generally."
Are there any materials that fall under that description that you have not brought with you or that we have not talked about?
A No.
MS. O'DELL: Let me just make -- I just want to qualify this. Plaintiff steering committee's response is outlined on page 6, and it includes certain objections, and Dr. Smith-Bindman's Materials Considered and file has been produced by email via a link to a

DropBox folder.
BY MR. HEGARTY:
Q Have you provided -- or let me start over.
Have you provided or brought with you today any notes you have prepared as part of your work on the talcum powder litigation since October 2021?
A Just the ones that I shared with you.
MR. HEGARTY: And we'll go and designate those notes now as exhibits. I think we're on Exhibit 19. There was a -- there was a set of three pages of notes.
Do you want me to put that on here, Leigh?
MS. O'DELL: That's fine.
MR. HEGARTY: We'll mark those notes --
MS. O'DELL: Is that okay with you?
THE WITNESS: Yeah. I -- I would love a copy back.
MS. O'DELL: Oh, of course. You'll get it back.
THE WITNESS: Okay.
BY MR. HEGARTY:
Q I've marked those three pages of notes as Exhibit No. 20; is that correct?
A Yep.
(Exhibit 20 was marked for identification by the court reporter.)

Page 174

MR. HEGARTY: We have also -- you also provided to you [sic] notes in a red book that you've shown me, and we're going to designate those notes that were created since October 2021 as it relates to your -- your work in the talcum powder litigation as Exhibit No. 21.

(Exhibit 21 was marked for identification by the court reporter.)

MR. HEGARTY: And we'll not go ahead and mark those now, but we'll designate those and copy those as an exhibit to the transcript.

MS. O'DELL: So we'll get those scanned and provide them to the court reporter.

BY MR. HEGARTY:

Q You mentioned that you have looked at -- or looked at or received additional reports from other experts since your October 2021 deposition.

Have you had any communication with any expert that you understood or understand is an expert for Plaintiffs in the MDL litigation since October 2021?

A I have not.

Q You brought with you three notebooks, or is it two notebooks?

A Three.

Q Three notebooks. I will designate those

Page 175

notebooks as Exhibit 22. And we'll make arrangements to copy those, and those notebooks are a literature notebook, a -- a report and testimony notebook. And remind me what the third notebook is.

A And my -- my own depositions.

Q Your own depositions. Thank you.

Let's go off the record real quick.

(Discussion Off the Record.)

(Exhibit 22, Exhibit 23, and Exhibit 24 were marked for identification by the court reporter.)

MR. HEGARTY: We can go back on the record.

The next documents I've marked as Exhibits 23 and 24 are additional documents produced since October 2021. And those are reviewer comments from the Annals of Internal Medicine and then the February 15, 2021, letter to Dr. Woolen from Dr. Chang regarding the acceptance of your paper.

THE WITNESS: Yep.

MS. O'DELL: Give me just a second.

MR. HEGARTY: Let's go ahead and go off the record.

(Discussion Off the Record.)

MR. HEGARTY: Okay. Let's go back on the record.

Page 176

Q First, looking at Exhibit 2023 -- I'm sorry -- Exhibit 23, these are comments you received as part of the rejection by the Annals of Internal Medicine, correct?

A They're definitely -- they're definitely comments. I think if they were together with this cover, then they're -- then they're -- then they're those comments from Annals of Internal Medicine.

Q This is a document you've seen before?

A I've seen this document, but I've just realized that -- did these two documents come together?

Q No. They are separate documents. They are not related.

A Okay. I think they are Annals of Internal Medicine comments, but ...

Q This was part -- this -- these were received as part of the -- that journal rejecting your Woolen 2022 paper?

A I think that's what you asked for, yes.

Q And it specifically refers in this -- these comments to lines -- and did you receive a lined manuscript in conn- -- in addition to these comments?

MS. O'DELL: Objection to the form.

THE WITNESS: I don't believe I did. I think I got these comments through Dr. Woolen forwarding me

Page 177

the comments, but not the actual document.

BY MR. HEGARTY:

Q Looking at the first comment, lines 132 to 137, second line, it says (as read): "It's unclear whether studies that examined talcum powder applications from both the perineum and 'other' sites/used were excluded [sic] or excluded."

What's the answer to that?

A So in the paper, we extracted information that described perineal exposure, ignoring the other site. So we didn't extract information for underarm exposure, but if it was any genital exposure, that's what we took, ignoring the other exposures.

Q The next paragraph below says (as read): "They defined genital use as 'including on underwear or sanitary napkins'" -- this is in reference to the Schildkraut study.

A Yes.

Q -- "'or on birth control devices like diaphragms,' which was apparently excluded from this analy- -- meta-analysis."

Is that correct?

A We excluded exposures that were only diaphragmatic exposure, as opposed to if there was genital exposure that also had other exposures, we kept

Page 178

them in with the understanding that there were a small percent of patients who may have had just sanitary napkin exposure, but if it was just diaphragm, we didn't include it. If it was perineal exposure plus the Schildkraut included these other exposures, they were included.

Q Looking at paragraph 3, lines 163 to 164, I believe you answered this earlier, that the reference group was nonusers of talcum powder, correct?

A As line 163 to 164?

Q Yes.

A Yes.

Q Line four -- or paragraph 4 says (as read): "Since the OR and RR are equal only when there is no effect, is it appropriate to combine them?"

Is that -- is it appropriate to combine them?

A I mean, this question is: How can you compare case control studies and cohort studies?

And yes, I think it's appropriate to combine them.

Q Looking at paragraph 5, it purported to identify an error where the number of women reported with ovarian cancer was 2,000 -- 204,377.

Was that correct?

A They're -- they're saying that an earlier

Page 179

draft we listed the number of person years of follow-up, which is the number of people times the number of years as subjects, and that's wildly off, yes. I don't see that draft in any other paper, but this was an obvious error.

Q Turning to the next page --

A In the -- in our old draft, not in the -- not in the published manuscript.

Q Turn to the next page, paragraph 7, lines 260 to 262. It says (as read): "Differential recall by cases versus controls is an important concern in case-control studies."

Do you agree with that statement?

A I think it's a -- it's an important potential control -- a -- an important potential concern.

Q And do you see where they raise the issue of including -- or any reference -- let me start over again.

It goes on to say (as read): "Do you have any references to support your claim that recall bias is unlikely to have made much of an effect on the studies included in this meta-analysis?"

Did you put such -- any such reference in the paper itself?

A We did, and we explained why we didn't think

Page 180

it was an important bias.

Q Looking down under reviewer No. 2's comments, it -- in particular the paragraph that reads -- that starts: "Misclassification of talc."

A Yes.

Q It says (as read): "Misclassification of talc as an IARC Group 1 carcinogen." Then it refers to lines 92 and 94. It goes on to say (as read): "Talc-based body power -- based body powder (perineal use of) should be classified -- should be correctly classified as 'possibly carcinogenic to humans (carcinogen group 2B)', as per -- per IARC."

Is that correct?

A That's a very incorrect statement, but one that others have shared. IARC considers talc-based products that have asbestiform talc as being a group 1 carcinogen.

Q The next line reads: "According to the IARC asbestos and talc containing asbestiform fibers are classified as group 1 carcinogens, but perineal -- perineal use of talc-based" body "powder is not."

Do you agree with that statement?

A I strongly disagree with that statement.

Q For reasons you've told me about already?

A Yes.

Page 181

Q The next paragraph says: "In the Results and Discussion, an explanation for the exclusion of duration and cumulative talc exposure should be included."

Did you provide an explanation in your Woolen 2022 paper?

A We did not. This is saying you should have done a different topic, and that's not something usually included in a paper that -- why we chose not to do a different topic.

Q The next paragraph says that at least the draft they read states (as read): "Recall bias on these studies is unlikely to be meaningful given publicity related to talc did not exist at the time these studies was completed."

Recall bias is not dependent upon publicity of an exposure versus an outcome, correct?

A I would disagree with that. There's -- you only misremember something if you think it's important. So you misremember your smoking if you have lung cancer because you know how important it is. But there's no reason to misremember something that has no material difference. So I think it's -- I think the publicity would be a potential reason to misremember, where you know that's supposed to be harmful, and so you are more likely to remember that if you have the disease.

Page 182

Q Asking in a different way, though: Recall bias isn't just exclusive to those exposures that have been publicized, correct?

A I think the issue with recall bias is a differential remembering between cases and not cases.

So if you're saying that everyone misremembers all the time, that is true. But if it's a differential misremembering, that's important to the study, and so the differential misremembering would be related to an exposure or a beneficial exposure that you want to remember. Like mammography, if you have breast cancer, there's very differential remembering because women attribute a -- a importance to that. If there's nothing important about it, then there's misremembering equally in the cases and control.

Q Did you make any revisions to your manuscript based on the reviewer comments that we marked as Exhibit 23?

A Extensively.

Q Looking at Exhibit No. 24 --

A Twenty-four.

Q -- that is the acceptance of your paper.

Did you subsequently receive galley sheets?

There's also a reference to -- in the second paragraph of the email, to receiving a line numbered

Page 183

version of your manuscript attached thereto.

Do you have any of those kinds of documents?

A No, this -- I forwarded this. This was from Dr. Woolen, so he would have those.

Q Thank you.

MS. O'DELL: And this was Exhibit -- what number was the exhibit? Because --

THE WITNESS: Actually, it's not numbered.

MR. HEGARTY: I thought it was -- I thought we put 24 on it.

THE WITNESS: I think I have this, but I don't have a number on it.

MR. HEGARTY: I think, yeah, the exhibit number is there.

THE WITNESS: Did I lose the exhibit number?

MS. FLAGEOLLET: It should be 24.

THE WITNESS: Oh, there it is. I'm sorry.

MS. O'DELL: Actually, Exhibit 24 is a February 15th, 2021, email.

MR. HEGARTY: Right. That's what I was talking about. And 23 was the Annals of Internal Medicine comments.

MS. O'DELL: Okay. So you have not marked that? Okay. Excuse me.

MR. HEGARTY: Which one have I not marked?

Page 184

Yeah, that should be 24, and this is 23.

Which -- which one have I not marked?

THE WITNESS: I was responding to a different one.

MR. HEGARTY: Oh, let me see that.

Okay. Let's go ahead and mark this one as the next exhibit, Exhibit 25.

(Exhibit 25 was marked for identification by the court reporter.)

BY MR. HEGARTY:

Q Can you tell me what Exhibit 25 is?

A Twenty-five is what you were just asking about. That's the acceptance.

Q But in terms of the Exhibit 24, there is a reference in it to saying a copy of the line-numbered version of the manuscript is attached hereto, and that's what I asked you about before.

A Okay.

Q Did you ever receive that?

A I did not.

Q Did you ever see any galley sheets?

A No.

Q Can I have that one back real quick?

A Yeah, this one is marked 25.

MR. HEGARTY: Let's go ahead and go off the

Page 185

record.

(Discussion Off the Record.)

MR. HEGARTY: Okay. We are back on the record.

I want to start by looking back at Exhibit No. 24. I think I misidentified what that was based on my questions.

Q Exhibit 24 is a copy of an email to Dr. Woolen from Ms. Chang where the Annals of Internal Medicine are rejecting publication of the -- what became the Woolen 2022 paper, correct?

A Mm-hmm.

Q "Yes"?

A Yes.

Q And this is the email that forwarded the reviewer comments that we talked about earlier, correct?

A Yes.

Q Did you consider resubmitting your paper to the Annals of Internal Medicine after the revisions -- after revisions were made?

A As opposed to taking their referral?

Q Yes.

A Again, I'm -- I'm trying to remember what happened, but in general, this letter doesn't say they didn't take it because of the flaws. They didn't take

it because it's less likely to influence clinical practice, and so that letter wouldn't suggest that fixing whatever flaws they identified would lead to it having a better chance to change practice, so I -- reading this letter, we would not have resubmitted it.

Q Okay. Thank you.

Since October of 2021, your last deposition, have you told any patient of yours that -- with ovarian cancer that it was caused by use of talcum powder?

A No.

Q Since October of 2021, have you determined that any patient's ovarian cancer was caused by either use of talcum powder or exposure to asbestos?

A No.

Q Since October of 2021, have you told anyone to stop using talcum powder?

A Yes.

Q Who have you told?

A I tell friends all the time not to use talcum powder, particularly friends who have grandchildren.

Q Since October of 2021, have you communicated with any scientific or medical organization with regard to your opinions in this litigation?

A I have not.

Q In particular, have you communicated with FDA

or any other regulatory authority since October of 2021?

A I have not.

Q Have you communicated with any medical society or organization about your opinions in this case since October of 2021?

A I have not.

Q Since October of 2021, have you become aware of any US scientific or medical group, entity, organization who has made the statement that talc use can cause ovarian cancer?

MS. O'DELL: Object to the form. Vague.

THE WITNESS: So you're excluding the Canadian --

MR. HEGARTY: Correct.

THE WITNESS: -- report?

BY MR. HEGARTY:

Q I'm talking exclusively as to the United States.

A The NCI has a statement, I believe, on talcum powder and ovarian cancer.

Q My question was specifically whether -- that you're aware of any US scientific or medical group has made the statement that talcum powder use can cause ovarian cancer.

A I believe the NCI has made that statement.

Q Where has the NCI made that statement?

A I can see if I can find it for you, but they have a statement online that I think describes that.

Q A statement online under what section of the website or what part of the website?

A I -- I can't remember exactly where I would have found that.

Q You said you could find it for me.

What would you [sic] take to find it?

A I can look in my documents.

MR. HEGARTY: Okay. Let's go ahead and go off the record.

(Discussion Off the Record.)

MR. HEGARTY: Okay. We can go back on the record.

We took a short break for Dr. Smith-Bindman to find the statement she was thinking about as it relates to NCI and whether talcum powder use can cause ovarian cancer.

Q In looking at your materials, what did you find, Dr. Smith-Bindman?

A It said asbestos causes ovarian cancer.

Q Going back to my question: Are you aware of any scientific or medical group in the United States, since your last deposition, who has made the statement

that talc use can cause ovarian cancer?

A No.

Q Are you aware of anyone as of today, March 20, 2024, outside of witnesses hired by the plaintiffs in this litigation, who has stated that talc use can cause ovarian cancer?

A I'm not sure I -- is that also in the United States?

Q No, it's worldwide.

A So, I mean, I think IARC states that the use of talcum powder can cause ovarian cancer.

Q How about we limit it to an individual, not an entity?

A I think a lot of the mechanistic studies that are shown on a cellular level get changes suggest that talcum powder can cause ovarian cancer and this is a mechanism by doing so.

Q My question, though, is: As to individuals who have made statements, are you aware of any individuals who have made statements outside of experts for Plaintiffs in this litigation?

A And outside of publications?

Q Outside of publications.

A So public statements.

No, I don't -- I'm not sure of something that

Page 190

comes to mind.
Q Since your last deposition, have you reviewed any documents produced by Johnson & Johnson that you had not had before? In other words, did you get any new documents that you understood came from Johnson & Johnson since your October 2021 deposition?
A No.
Q Are there any other materials that you intend to reference as part of your opinions in this case that are not contained in your amended report of November 2023 or that we have talked about here today?
In other words, sitting here today, do you know of other documents that you do intend to reference that are not disclosed in the materials we've looked at or talked about today?
A I -- I mentioned earlier that I had been doing some reading on OSHA and other websites about the concentration of asbestos in different exposure environments, and those references are on my disclosed list of references, but it's not something that I've discussed a lot in the report.
Q Anything else that you might -- that you think you might reference that we have not talked about or looked at here today?
A No.

Page 191

Q Does -- do you intend to have -- or let me start over again.
Does your current report need to be revised in any way to accurately -- to accurately reflect your opinions in this case?
A No.
Q You make reference in your report to an [sic] 2023 study by O'Brien called "Douching and Genital Talc Use: Patterns of Use and Reliability of Self-reported Exposure."
Do you recall that study?
A I do.
Q Do you have --
A I do.
MR. HEGARTY: I'm going to mark that as our next exhibit.
(Exhibit 26 was marked for identification by the court reporter.)
MS. O'DELL: Thank you.
THE WITNESS: I do.
BY MR. HEGARTY:
Q This study shows that the response of the women's study differed between the two time periods they looked at, correct?
A My recollection is the opposite -- was the

Page 192

conclusion was the opposite.
Q Well, if you look over at page 379, the right-hand column, first paragraph, it says (as read): "Recall of genital talc use was slightly less consistent, with 87% of women providing the same response as [sic] follow-up as they did at enrollment."
Do you see that?
A We're disagreeing whether that's good agreement or not good agreement. So 87 percent's pretty good agreement.
Q If --
A It's not a hundred percent, but it's a very high number.
Q Can a 13 percent difference in recollection in -- in a case control study have an effect on the results?
A Probably a small effect, yes, but not a big effect. It's mostly when you're looking at agreement -- something like a CAPA statistic is how much agreement is there beyond chance alone. This kind of number is in the outstanding category. This is very high agreement.
Q Look back at the first page under the abstract section. In the "Results" section, isn't that saying that, upon initial reporting, that 27 percent of women reported ever using genital talc; on the follow-up

Page 193

questionnaire, 32 percent reported ever using genital talc, correct?
A Mm-hmm.
Q "Yes"?
A Yes.
Q So the number went from 27 to 32 percent, correct?
A Yes.
Q And, again, going back to my last question, is that not a difference that could have an impact on study results?
MS. O'DELL: Object to the form.
THE WITNESS: That's -- that's a small difference, and so yes, it can have effect, but not a -- not a big effect. This is -- are predicter variables in science? We hope for this one. So this is a very good result. There's a -- there's a difference between 37 -- 27 and 32-5 percent have any impact? It does, but it's small. So if you put a confidence interval around those numbers, they would overlap.
BY MR. HEGARTY:
Q Please turn over to page 383 of this study. Right-hand column at the top, the carryover paragraph, the last sentence reads: "The observed increase in self-" --

A Wait. Wait. Wait. The carryover.
Q The carryover paragraph.
A Top right?
Q In the top right corner on page 383.
Are you there with me?
A I am.
Q Right up here (indicating).
A "However, it is unclear"? That sentence?
Q Well, I'm not at the sentence yet. I want to make sure we're -- you're focusing on the --
A They're not systematically different.
Q Okay. The sentence reads: "The observed increase" --
Do you see where I'm reading?
A Yes. Next sentence, yeah.
Q (As read): "The observed increase in self-reported genital talc use and follow-up" -- which is just what we talked about -- "relative to enrollment among ovarian cancer survivors may indicate recall bias is present and potentially driving some of the previously observed differences in effect estimates between" the "studies collecting genital powder exposure status retrospectively versus prospectively."
Did I read that correctly?
A You did.

Q Do you agree with that statement?
A I would not agree that -- that -- they're making a very large conclusion about a small difference.
Q Do you actually -- is it -- strike that.
Is it your opinion that this paper actually supports your opinions in this case?
A I do.
Q And how does it support your opinions in this case?
A It suggests that there's consistency in reporting of talc use. Even though it's an imperfect agreement, which is what you're pointing out, it's very good agreement.
Q You can set that aside.
If you could take -- find your Woolen paper, which I think is Exhibit 1 or 2.
Do you know what exhibit the Woolen paper is?
MS. O'DELL: I don't. She has her version in front of her.
THE WITNESS: Yes.
MS. FLAGEOLLET: Three.
BY MR. HEGARTY:
Q Turn over to the page that has "Strengths and Limitations." It's --
A Yep. I'm there.

Q You make reference in the left-hand column to the -- O'Brien's reporting of women with patent tube [sic] versus unpatent tubes.
Do you see that in the --
A In the "Strengths and Limitations"?
Q No, in the section on the other side that begins "The pooled odd [sic] ratio."
A Yes.
Q And there --
A Yes.
Q -- you refer to the differences between the patent and the nonpatent findings, correct?
A Yes.
Q You've seen, before, an editorial by Gossett as it relates to this article, correct?
A Yes.
MR. HEGARTY: I'm going to show you that editorial that I'll mark as Exhibit 27.
(Exhibit 27 was marked for identification by the court reporter.)
MS. O'DELL: Yeah, this has been marked before, Mark.
MR. HEGARTY: Oh, I understand, but this is now in reference to the statements made in this article.
MS. O'DELL: But you're going to ask her about

this article.
MR. HEGARTY: Well, I'm just going to ask her -- you probably want me to use my time on something that's already been covered, so you should be happy with it.
Q If you turn over to the second page, the left-hand column --
MS. O'DELL: You got four minutes, so knock yourself out.
MR. HEGARTY: I'm not sure about that part. I've got -- I think I've got about six, but --
Q Dr. Gossett -- by the way, do you know her?
A I do know her.
Q She makes a statement, in essence, that because there's -- that the P value for heterogeneity comparing these groups is 1.5. Statistically, they're no different.
Isn't that what she's saying in this editorial?
MS. O'DELL: Are you -- are you pointing her to a specific page?
MR. HEGARTY: Yeah, I'm pointing her to the second page over in the left-hand column, the line that reads (as read): "The fact that there are no significant differences in the HRs in the patent and

nonpatent subgroups (P value for heterogeneity comparing these subgroups at .15)."

Q Do you see where I'm reading?

A I do.

Q Isn't she saying that, statistically, the two groups are not different?

A I -- we haven't discussed this editorial in great length, but it's a very poorly written, poorly thought through -- this statement is consistently very poorly written and poorly thought through.

So you don't use P values for tests of heterogeneity with the power you would expect a primary test to be. So I completely disagree with the conclusion she makes. But a P value for a test of heterogeneity of .15 is a significant difference. It's very difficult to get low values for tests of heterogeneity. They're very weak statistically. So those two numbers are quite different. They have different overlapping -- nonoverlapping confidence intervals. Those are very different, and a P value of .15 for a test of heterogeneity, to me, suggests, oh, yeah, those are -- that's a big -- those are big differences.

Q But ultimately, I guess, going back to my question, is not what she -- she's arguing -- let me

start over again.

Is what she's arguing there is that statistically there are no differences between the two groups?

A She is arguing that, and she's mistaken.

Q How is she mistaken?

A The point estimates are -- are very different between those groups. One has a value of 1 -- .99 is basically 1 -- with sort of symmetry on both sides of the 1: .86 to 1.15. That's a very different number than 1.13 versus 1.01 to 1.26. Those numbers are very different. In one group, there's a 15 percent increase in risk, and the other there's no relationship. Those are, in my mind, statistically different, and a heterogeneity test of .15 could add extra weight to that.

Q Have you communicated -- or let me back up.

You have not, since October of 2021, written anything with regard to the O'Brien 2020 study beyond what you've done in this litigation --

A There were a lot of letters.

Q -- and --

A There were a lot of letters written about this. So -- so the issues -- the important issues about the O'Brien and this editorial were raised.

Q The only comments you have made about O'Brien have been in your reports and in the Woolen study in a written --

A Correct.

Q -- form, correct?

A Correct.

Yes. That's correct.

Q With regard to the cellular studies we talked about right at the very beginning -- or right at the very beginning of the deposition, as referenced in your report, have we talked about the cell study -- the new cell studies you reviewed --

A Yes.

Q -- since October of 2021?

A Yes.

Q There's another article you referenced in your most recent report by Slomovitz as it relates to asbestos and ovarian cancer.

Is that an article you've read?

A I have skimmed it.

Q Do you intend to have any comment about it if you testify in this litigation?

MS. O'DELL: Object to the form.

BY MR. HEGARTY:

Q Do you have any plans to comment, as part of

your opinions in this case, about Slomovitz 2021?

A I would answer questions to it, but it doesn't weigh heavily in my opinions, so I would not.

Q You don't intend to affirmatively talk about it as part of your opinions based on -- based on -- let me start over again.

Is it your intention to affirmatively, that is, to talk about it outside of cross-examination, during your examination in this case? That's a bad question. Let me start over again.

Do you intend to rely -- do you rely in any way on the Slomovitz 2021 article for your opinions in this case?

A I do not.

Q You made a -- added a reference in your report to Sochin [phonetic] 2004 --

MS. O'DELL: Hey, Mark, I hate to be the timekeeper, but I think you are a little over. Catherine's the official clock --

MR. HEGARTY: Yeah.

MS. O'DELL: -- but we started at 1:48.

MR. HEGARTY: Okay. Let's go ahead and go off the record.

(Discussion Off the Record.)

MR. HEGARTY: Let's go back on the record. I

understand that I've got -- I've reached my four hours.
So, Doctor Smith-Bindman, thank you. I appreciate your attention and responsiveness today.
I have no further questions for today.
MS. O'DELL: Dr. Smith-Bindman, I have a couple of follow-up questions, and I'll try to get myself organized so we can do this efficiently.
I want to make sure you have your report in front of you, so I'll grab --
THE WITNESS: I think I refiled it.
MS. O'DELL: You refiled it.
THE WITNESS: Yeah.
MS. O'DELL: Okay. So I'm going to pull that back out.
MR. HEGARTY: Just a second. We want to make sure I get a copy of the 2023 report, because I kept seeing the 2021, and my copies are a redlined version.
THE WITNESS: I don't have a redline version.
MR. HEGARTY: No, I did not mark a redline version, but I want to get a copy of it. I know I have copies here somewhere.
(Discussion Off the Record.)
EXAMINATION
BY MS. O'DELL:
Q So, Dr. Smith-Bindman, I want to direct your

attention to -- to your report, and you were asked a series of questions about -- on page 11 regarding your section on asbestos, and you were asked specifically about references that you had included in connection with the sentence reading: "While the talcum powder products have long been believed to be free from asbestos based on the voluntary guideline, this is absolutely incorrect; talcum powder products have never been free of asbestos."
First, let me ask: Do you stand by that statement?
A Yes.
Q And when writing that statement, was it your intention to -- when you said "talcum powder products," to be referring to Johnson's Baby Powder and Shower to Shower, the -- the products at issue in this case?
A Yes.
Q And I'll ask if you'll turn to page 14 of your report. And at the top of the page, you refer to the Mandarino paper --
A Yes.
Q -- is that right?
A Yes.
Q And I have it in front of you as well as Exhibit -- it was marked as Exhibit 8.

A Yes.
Q And would ask if you would please turn to page 10 of the Mandarino paper. And it's at -- at the left-hand side of the -- at the top of the page, and a number of sentences were read to you by counsel for Johnson & Johnson, including the sentence: "Further research is needed to determine whether and to what extent the effect of talc on phagocytes exist in vivo, particularly in humans; these studies were beyond the scope of the project."
He also read: "We did not investigate whether the inhibited tumori-" --
A Tumoricidal.
Q Thank you.
-- "tumoricidal activity we discovered could entail an increased likelihood of tumor growth."
You recall him reading that?
A I do.
Q Does the paragraph go on to say: "However, we believe our findings can help reconcile the presumed innocuous nature of talc with epidemiologic data on talc powder use in OC" or ovarian cancer "risk by suggesting that the effect can be mediated by the macrophages"?
A Yes.
Q And is that consistent with your opinion in

this case?
A Yes, it is.
Q And you rely on that in reaching your opinions?
A Yes, I do.
Q And it goes on further in the next paragraph. You were asked a number of questions about titanium dioxide as the control that was used. And if you'll look, the study reads (as read): "Control particles, paren, titanium dioxide, concentrated urban air particulates or diesel exhaust particles did not have the effect -- i.e. did not have the effect" --
A Right.
Q -- "as talc"; is that correct?
A That's --
MR. HEGARTY: Objection to the form.
THE WITNESS: -- correct.
BY MS. O'DELL:
Q "Exposure" -- it goes on to state (as read): "Exposure of the macrophages to talc and especially co-exposure to talc and estradiol has led to increased production of reactive oxygen species and changes in expression of macrophage gene -- genes pertinent in cancer development and immunosurveillance."
Did I read that correctly?

A Yes, you did.
Q And, in fact, is that what you include in your report?
A Yes.
Q And you were asked a number of questions about this cell study, the Mandarino study, as well as Emi and others.
As you've reviewed these cell studies that have considered the effect of talc on different cells and different cell lines, has the data been consistent -- generally consistent across studies?
A Yeah.
MR. HEGARTY: Objection to the form.
THE WITNESS: Yes, it has.
BY MS. O'DELL:
Q I want to ask you to recall the series of questions that were posed by counsel regarding testing of talcum powder products in 2022.
A Yes.
Q Do you recall that?
A I do.
Q And maybe 2021 as -- as well.
If -- if -- do you have any understanding of whether those tests included Johnson's Baby Powder?
A I believe I was asked about tests that were

more cosmetic in general that could have talcum powder rather than the specific testing that I think I was referring to, which is from a decade earlier.
Q And if the testing that was done in 2022 by the FDA was testing of cosmetics like eye shadow and other cosmetics not including Johnson's Baby Powder or Shower to Shower, would that have limited relevance to your opinions in this case?
MR. HEGARTY: Objection to the form.
THE WITNESS: It's unrelated to the case.
BY MS. O'DELL:
Q Let me ask if you would take out your paper -- the Woolen paper, which was previously marked, I believe, as Exhibit 3. And -- and then, also, we -- in relation -- so you can compare them, we had a discussion about the Harlow 1992 paper.
Do you recall that?
A I do.
Q And -- and to my memory, the Harlow paper was not marked; you just referred to it.
A Yes.
Q And so if you'll turn in the Woolen paper, Exhibit 3, to Table 2.
MR. HEGARTY: Can you give me just a second, Leigh? I don't need to go off the record. I just need

to find my copy of it. For some reason, it's hiding from me. Okay. I found it. Go ahead.
BY MS. O'DELL:
Q And -- and you were --
MR. HEGARTY: What page again? I'm sorry.
MS. O'DELL: We were -- in Woolen, we were on Table 2.
MR. HEGARTY: Okay. Thank you.
BY MS. O'DELL:
Q And specifically, I want to direct your attention to line 5 --
A Yes.
Q -- and -- which is the Harlow 1992 --
A Yes.
Q -- paper.
And you were asked a series of questions about the data that was extracted from the Harlow paper, and, if I recall, you, in response to questions, told counsel that the data that was extracted was from Harlow Table 2.
MR. HEGARTY: Object to form.
THE WITNESS: Yes.
BY MS. O'DELL:
Q And -- and -- and so, Doctor, I want to just ask you, first: Was the data that was included in the

Woolen study from the Harlow paper correct?
A Yes, it was.
Q And was the data that was extracted from the Harlow paper that was included to generate the point estimate that you report in the paper -- was that accurate?
A Yes --
MR. HEGARTY: Objection.
THE WITNESS: -- that's correct.
BY MS. O'DELL:
Q And you -- you mentioned that, you know, it's referred to in Table 2 of Woolen the Harlow specification of talc exposure use is -- is referenced as greater-than-10,000-lifetime applications.
A It does say that in the table.
Q And -- and is that some- -- is that something you would change or leave as-is?
MR. HEGARTY: Objection to the form.
THE WITNESS: The data that were extracted from the paper reflect greater-than-30-times-a-week exposure, and it's characterized as greater-than-10,000-lifetime exposures, but I'd prefer it said greater than 30 times per month because that's what we actually extracted, but the description of it is -- is inaccurate. The abstracted data is completely

Page 210

accurate.

BY MS. O'DELL:

Q And do you stand by the -- a hundred percent the results that are reported in the Woolen paper?

A Absolutely.

Can I just add: The point estimates are the same for greater-than-10,000 exposures or greater than 30 times a month, and so when we were checking the numbers, I think it was an oversight that we described it as greater than 10,000 when, in fact, it was the exact number greater than 30 times per month.

Q And when you said --

THE REPORTER: I'm sorry. You trailed off.

THE WITNESS: The numbers that were extracted are correct. The point estimate is the same for greater than 10,000 or greater than 30 times per month, and the description in Table 2 says greater-than-10,000-lifetime exposures, but, indeed, reflects greater than 30 times per month. You get the same point estimate, but the data we abstracted were greater than 30 times per month.

BY MS. O'DELL:

Q You were asked a number of -- still on Woolen. You were asked a number of studies -- "studies." Excuse me -- a number of questions about the studies that adjusted for patent versus nonpatent --

Page 211

A Yes.

Q -- but didn't report separate data for both patent and women with nonpatent --

A Yes.

Q -- tubes.

And if, in fact, some of the women that were included in the study -- studies had had hysterectomy or had had tubaligation, cutting off the flow or exposure of talcum powder applied perineally to the ovaries, would that, in fact, have depressed the point estimate for those individual studies?

MR. HEGARTY: Objection to the form.

THE WITNESS: The point estimates would be even higher and further from the null if they were limited to women who had patent tubes.

BY MS. O'DELL:

Q And so to the degree that counsel for Johnson & Johnson has tried to draw a distinction, is that a distinction, in your mind, that's meaningful?

MR. HEGARTY: Objection to the form.

THE WITNESS: I think had we had data to limit to women with open tubes based on the study results that almost uniformly showed the results were higher, there was a greater chance of cancer in women who had open tubes. Had we been able to extract that data from each

Page 212

study, the point estimate would clearly be higher than we found.

MS. O'DELL: I have nothing further. Thank you, Doctor.

I should ask --

MR. HEGARTY: Thank you. I'll just state on the record: We have some materials that need to be copied and then provided as exhibits. That would include the notebook pages, the three pages of notes, and then the notebooks we marked.

Leigh, will you take possession of those and make those copies, or do you want to do it in a different way?

MS. O'DELL: I would like to talk to Catherine, our court reporter, about taking possession of the notebooks that will stay here in -- in San Francisco. I'll take possession of the notes and make sure they're scanned and provided and, of course, returned to you, Dr. Smith-Bindman, but I will take possession of those.

MR. HEGARTY: So you'll make arrangements with the court reporter on how to get the notebooks copied and --

THE WITNESS: The notebooks will stay with the court reporter?

Page 213

MR. HEGARTY: -- included within the -- to the exhibits -- included as an exhibit and then provided to the parties?

MS. O'DELL: Yes.

MR. HEGARTY: Okay.

MS. O'DELL: Yes. I think -- I guess I want to be clear: I'm taking responsibility for the notes because some of the notes in Dr. Smith-Bindman's notebooks were not related to talc. So I want to oversee that process, but we're going to provide the notebooks --

MR. HEGARTY: Okay.

MS. O'DELL: -- to Golkow and the court reporting service and let them handle --

MR. HEGARTY: Okay.

MS. O'DELL: -- all of the details on that.

Thank you very much.

MR. HEGARTY: All right. I don't think I have anything else. Thank you.

MS. O'DELL: We're off the record.

(TIME NOTED: 2:25 p.m.)

Page 214

I, REBECCA SMITH-BINDMAN, M.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this ______ day of _____________, 2024, at ___________________, __________________.
(City) (State)

___________________________
REBECCA SMITH-BINDMAN, M.D.
VOLUME I

Page 215

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [ ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 04/03/2024

Catherine A. Nolasco
Catherine A. Nolasco, RMR, CRR, BS
CSR No. 8239

**&**

**&** 1:5 2:5 3:17 3:24 6:3,20 10:15,17 93:18 97:24 98:1,13 98:13 99:1 190:3,5 204:6 211:18

**0**

**0.97** 27:13
**000001** 9:7
**000003** 9:8
**04/03/2024** 215:20
**08002** 3:11

**1**

**1** 1:25 4:10 7:10 7:13 8:24 9:20 11:11,15 12:1 27:6,16 28:1,18 28:19 57:14 64:8 83:10,12 110:7 170:20 180:7,16,20 195:16 199:8,9 199:10
**1,000** 168:11
**1.01** 199:11
**1.03** 27:18
**1.09** 27:23
**1.09.** 27:13 28:8
**1.1** 64:7
**1.13** 199:11
**1.15.** 199:10
**1.19** 27:18
**1.22** 144:23 145:2
**1.23** 27:22
**1.23.** 27:13
**1.24** 73:25
**1.26.** 199:11
**1.28** 153:1
**1.35** 73:24 153:1
**1.37.** 27:19
**1.41** 73:25
**1.47** 73:23
**1.47.** 153:2
**1.5.** 197:16
**1.53.** 145:3
**1.64** 74:1
**1.68.** 73:24
**1.8** 64:6
**10** 4:4 6:8 31:16 125:4,5 138:17 204:3
**10,000** 43:8 59:22 60:7,21 61:10,23,25 62:7 64:8,19 65:6 66:6 209:14,22 210:7,10,16,17
**101** 3:10
**105** 5:12
**1056** 123:2
**11** 4:10 6:14 31:17 33:17 93:8 101:20,24 101:25 102:13 102:14 106:25 107:13 137:7,8 203:2
**114** 5:18
**12** 5:21 6:20 7:13 102:20,25 144:5,6 160:5
**122** 6:3
**125** 6:8 121:3
**126** 4:14
**12th** 159:22 160:1
**13** 7:3 8:7 9:3 104:24 153:14 153:16 192:14
**132** 177:3
**137** 6:14 177:4
**14** 7:9 113:23 119:3,4 124:23 156:2 158:14 159:5,10 160:10,14 203:18
**144** 6:20
**15** 4:11 7:12 8:22 124:23 159:5,10,22 160:2,6,10,14 175:16 198:2 198:15,21 199:12,15
**150-7** 6:12
**153** 7:3
**159** 7:9,12
**15th** 164:14 183:19
**16** 4:19 7:7,15 163:5,8 165:3
**16-2738** 1:5 2:5
**163** 7:15 178:7 178:10
**164** 7:17 178:7 178:10
**1667** 147:4
**168** 7:20
**169** 8:3
**16th** 30:6
**17** 6:18 7:17 138:17 164:16 164:23
**173** 8:9
**174** 8:12
**175** 8:14,16,22
**18** 4:13,24 6:6 7:20 8:13 20:12 57:19 168:19 169:2,3
**184** 9:3
**19** 4:16 8:3 169:13,19 173:9
**191** 9:10
**196** 9:16
**1992** 63:21,22 64:4 207:16 208:13
**1997** 60:21 61:5
**1:48** 201:21
**1nd** 39:13

**2**

**2** 4:13 6:12 17:25 18:6,10 18:12,14 57:15 59:13 63:14 64:11,13 65:17 65:24 66:1,3,3 66:5,19,24 67:11 68:14 83:13,16 106:19 111:6 120:22 121:4 170:24 195:16 207:23 208:7 208:20 209:12 210:17
**2's** 180:2
**2,000** 178:23
**2.3** 106:17
**20** 1:15 2:17 8:9 9:14 10:1 24:21 24:22 60:5,6 160:2,6 173:22 173:24 189:3
**2000** 60:20 77:9 79:5
**2004** 201:16
**2007** 137:18
**2009** 98:20
**2010** 98:20
**2011** 103:13
**2012** 103:13
**2017** 147:23
**2018** 20:12,17 93:18 94:16,18 95:3,6,13,17,24 104:9 112:2 147:23
**2019** 93:18,19 98:18 112:2
**202** 4:5
**2020** 9:19 24:14 25:2,5 32:4,9 32:17 33:17,20 39:13 50:19 67:15 105:4,11 105:17 106:5 199:19
**2021** 7:10 8:22 11:1 17:4 18:11 20:22 85:17 86:9 87:5,10,19 88:9,16 89:1,11 90:6,10,22 91:4 91:9,15 92:15 94:2,7,14 98:6 98:8,12 103:14 104:9 105:21 106:3,6 114:17 137:5 144:4,17 156:17,24 157:8 158:5,11 158:22 159:14 159:18 160:1 161:1,4,8,9,16 161:25 162:10 162:19 166:1,5 166:12,15,18 168:12 171:3,5 173:6 174:4,17 174:20 175:15 175:17 183:19 186:7,11,15,21 187:1,5,7 190:6 199:18 200:14 201:1,12 202:17 206:22
**2022** 9:3 18:23 19:15,19 20:3 21:7,17,22 22:11,23 23:10 23:15,15,22 25:4,15 26:2,17 38:25 39:5,5 40:13 42:17,23 48:17 49:18,23 50:13 53:12 65:16 76:1 80:9 99:2,8,18 134:7 152:19 160:15 160:20 176:18 181:5 185:11 206:18 207:4
**2023** 6:12 7:13 9:14 10:19 17:23,25 18:1 18:13,15,19 102:19 124:23 125:3 126:9 131:11 153:20 153:22 158:25 159:22 160:5 160:21 163:17 163:21 164:1 164:14 168:24 176:1 190:11 191:8 202:16
**2024** 1:15 2:17 7:22 9:7,8 10:1 29:17 30:23 34:22 35:7 81:12 82:4 153:9 169:10 189:4 214:8
**204,377** 178:23
**21** 8:12 18:2 174:6,7
**21-02485r3** 9:5
**210** 3:10
**215** 1:25
**218** 3:5
**22** 8:14 175:1,9
**23** 8:16 160:1 175:9,14 176:2 182:18 183:21 184:1
**23rd** 18:13,14 18:19
**24** 4:21 8:22 175:9,14 182:20 183:10 183:16,18 184:1,14 185:6 185:8
**25** 9:3 160:19 184:7,8,11,24
**2555** 3:18
**26** 7:17 9:10 137:5 164:15 165:1,4 191:17
**260** 179:9
**262** 179:10

**27** 9:16 142:4 192:24 193:6 193:18 196:18 196:19
**29** 144:3
**2:25** 2:17 213:21
**2b** 180:11
**2nd** 53:12 106:1,6

**3**

**3** 4:16 5:10 8:20 9:13,20 18:23 19:2,3,8,11 27:8,9 61:9,22 64:21 65:7,14 65:23 66:7,9 111:6 156:10 170:1,20 178:7 207:14,23
**3.0** 64:7
**30** 5:3 64:10 66:1,5,14,15,20 137:25 138:12 164:8 209:20 209:23 210:8 210:11,16,18 210:20
**31** 51:16 142:10
**32** 193:1,6
**32-5** 193:18
**323** 9:19
**33** 7:16
**334.954.7555** 3:7
**34** 9:13
**35** 5:6 151:5
**36** 7:18
**36103-4160** 3:6
**37** 193:17
**379** 192:2
**383** 193:22 194:4
**3e89167ef1fa...** 9:6

**4**

**4** 4:21 7:10 8:9 24:9,9,11,14 81:12 82:4 83:17,19,20 91:20 92:2 93:2 120:22 156:10 172:4,4 178:13
**40** 121:13 154:11
**41** 65:7 66:2
**4160** 3:6
**43** 87:16
**441** 165:8
**48** 35:23 87:15

**5**

**5** 5:3 11:21 12:1 30:9,15,18 31:4 31:11 46:25 47:6 60:21 67:13 156:10 172:12 178:21 208:11
**5,001** 61:10,25
**50** 150:22 156:3
**505** 2:15
**527** 164:10
**528** 106:12 164:10,10
**532** 107:22
**58** 65:2,7 66:2

**6**

**6** 5:8 11:17,21 72:4,5,9,11 81:11 172:23
**64108-2613** 3:19
**6498236** 1:23
**65** 51:16 142:10
**68** 7:23
**6th** 29:16 30:6 30:23 35:6

**7**

**7** 5:12,16 9:19 11:17,21 35:23 105:11,12 160:25 179:9
**72** 5:8
**7484** 215:22
**75** 6:12
**79** 57:19

**8**

**8** 5:18 6:12 114:5,8 203:25
**80** 121:13
**800** 29:6
**800.898.2034** 3:7
**816.421.5547** 3:20
**816.474.6550** 3:19
**8239** 1:22 2:19 215:23
**856.667.0500** 3:11
**86** 199:10
**87** 192:5,9

**9**

**9** 6:3,25 7:22 28:15 116:25 122:4,7
**92** 180:8
**94** 180:8
**97** 27:22 145:3
**99** 199:8
**9:08** 2:16 10:2
**9th** 169:10

**a**

**a.m.** 2:16 10:2
**able** 23:20 48:15 85:2 95:22 109:5 131:20 133:5 161:3 211:25
**above** 102:3
**absence** 38:22
**absolutely** 39:8 68:17 111:17 121:23 127:2,4 203:8 210:5
**absorbed** 108:5 108:9

**abstract** 24:20
24:24 51:17,18
51:20 144:22
192:22
**abstracted**
209:25 210:20
**academic** 40:21
134:24
**accept** 148:9
**acceptable**
50:22
**acceptance**
175:18 182:22
184:13
**accepted** 42:15
**access** 42:2
56:8
**accessible**
131:25
**accompanied**
141:17,20
**account** 37:21
50:4 60:16
69:12
**accounted**
109:18
**accounting**
41:13 42:4,5,6
42:20
**accounts** 37:19
171:18
**accurate** 12:7
56:17 112:19
209:6 210:1
**accurately**
169:6,6 191:4,4

**acknowledge**
152:13
**acknowledg...**
100:11
**action** 215:16
215:17
**activated**
123:16,17,18
**activation**
124:5
**active** 121:19
**activities** 157:7
171:20
**activity** 43:13
117:22 118:1
121:18 204:15
**actual** 22:2
59:14 116:4
124:6 177:1
**actually** 16:24
26:2 37:22 40:8
55:11 57:12
58:17,23 65:25
71:10 76:11
78:10 89:11
95:6 100:11
132:12 149:23
183:8,18 195:4
195:5 209:24
**add** 146:8
153:20 169:10
199:15 210:6
**added** 76:24
83:22,24 91:21
92:6 93:13,14
93:21 103:6

104:3,4,12
105:3 163:16
163:19,23
172:13 201:15
**addition** 17:8
144:4 176:22
**additional** 5:9
10:24 62:15
72:22 85:15
90:9 91:14
98:10 164:6
174:16 175:14
**additions** 137:3
163:15 169:9
**address** 79:20
118:16
**adds** 123:20
**adequate**
113:15
**adjusted** 27:23
69:6 210:25
**adjustment**
69:9,21
**administered**
10:5 215:6
**administration**
143:13
**advance** 15:24
159:9
**affirmatively**
201:4,7
**african** 6:24
144:25
**age** 57:18 60:9
**ages** 61:19

**ago** 12:3 29:11
30:25 71:4
93:25 157:11
168:22
**agree** 22:13,21
23:8 25:24 26:9
26:9,24 27:3
28:10 34:8,24
36:15 43:1,4,5
43:21,25 44:11
44:14 59:17
68:13 69:15
80:8 95:10
97:21,23 108:8
108:19 109:4
111:9 117:8,18
118:3 135:6
138:23 139:5
139:14 140:12
140:16 141:19
179:13 180:22
195:1,2
**agreed** 48:5
**agreement**
33:10 192:9,9
192:10,18,19
192:21 195:12
195:13
**agrees** 47:14
**ahead** 16:9 24:8
29:24 61:13
65:9 71:19 81:5
105:7 114:3
136:24 174:9
175:21 184:6
184:25 188:11

201:22 208:2
**air** 111:12 205:10
**alabama** 3:6
**align** 66:2
**aligned** 28:14
**alleged** 85:7
**allen** 3:4 112:2 112:5
**altered** 135:1
**amazing** 53:15
**ambiguous** 68:12
**amend** 98:8
**amended** 4:10 4:13 7:17 10:19 11:15 13:22 18:11,13,15,19 20:22 21:2,6,12 76:11 80:20 83:11,16 105:21 114:17 137:4 146:9 151:18 164:15 168:24 190:10
**amendment** 17:7
**amendments** 13:20
**american** 144:25
**amount** 26:21 40:25 42:8 43:15 60:13 85:25 103:21 128:13,20,22 128:24,25 150:15 154:13 160:9 161:13
**analy** 177:21
**analyses** 5:9 6:18 52:14 73:17
**analysis** 4:19 8:20 19:1,20 20:3,20,25 21:17 22:10,24 23:9 31:25,25 32:15,23,24 33:11,21 34:9 69:7 70:8,17,21 70:24 72:14,19 72:23 73:4,10 73:15 74:5,18 74:19,25 75:16 75:20,21 82:24 123:2,4 138:4 145:6,11 151:22 154:17 177:21 179:22
**analysisn** 81:21
**analytic** 5:12
**analyze** 137:20
**analyzed** 108:14
**ancestry** 6:24
**ann** 39:2 71:4
**annals** 8:23 175:16 176:3,8 176:14 183:21 185:9,19
**anne** 14:13
**annual** 150:6,7 150:10
**answer** 13:18 23:6 28:15 44:1 44:15,22,23 66:15 73:6 74:10 84:21 94:13 101:13 104:11,15 111:16 115:19 154:11 177:8 201:2
**answered** 94:11 99:20 138:8 178:8
**answering** 94:10
**antioxidants** 139:7
**anymore** 158:2
**apart** 139:16 155:2
**apparently** 177:20
**appear** 18:17 214:4
**appearance** 134:21 135:3,4 135:7,11
**appearances** 3:1
**appearing** 2:15 3:9
**application** 54:4,5
**applications** 64:10,17 65:24 66:1,13 177:5 209:14
**applied** 86:21 211:9
**applies** 76:17 77:3
**apply** 45:23 47:18 77:25 79:3,4 102:5 120:16
**appreciate** 202:3
**approach** 100:10 123:3 141:1
**approached** 22:15
**appropriate** 100:14 148:10 149:11 178:15 178:16,19
**appropriately** 63:11
**approximate** 62:20
**approximately** 14:17 15:8 60:12
**april** 6:12
**area** 4:23 9:17 22:13,15,18 23:3 115:17 118:12 133:8 145:21 148:12

148:19
**argue** 136:18
**arguing** 198:25 199:2,5
**arrangements** 175:1 212:21
**article** 6:21 38:6,25 39:1 125:21,25 127:18 129:23 131:18 196:15 196:24 197:1 200:16,19 201:12
**articles** 37:4 38:3 50:11 58:23,25 59:11 125:20 143:22 143:25 161:20
**asbestiform** 83:25 84:10,17 85:12 86:12,17 88:5,10,18 89:3 89:12,17 90:10 91:6 101:15 104:19,19 180:16,19
**asbestos** 83:25 84:10,18 85:12 85:16,21 86:2 86:12,17,22 87:6,16,19,23 89:16,20,24 90:22 91:11 93:9,13,16 95:25 96:9,12 98:2,15 100:1,3 100:7,19,22 101:3,9,15 102:1,6,16 103:8,16,21 104:5,19 128:21 135:17 161:18,21 168:4 180:19 186:13 188:22 190:18 200:18 203:3,7,9
**aside** 12:11 74:2 80:16 83:9 113:22 142:2 195:14
**asked** 55:24 61:15 65:13 69:2 77:22 88:25 94:13,21 99:19 104:9 128:17 129:7 130:8 138:7 143:4,20 167:19 176:19 184:17 203:1,3 205:7 206:5,25 208:16 210:22 210:23
**asking** 31:10 43:11,12 44:4 49:14 61:5 65:4 79:7 88:22 89:8 89:10,21 94:25 95:7 104:11 120:1 121:5 128:7 143:9 153:23 162:5 167:24 182:1 184:12
**asks** 170:20,24 171:12 172:4 172:12
**aspect** 39:10
**assay** 126:17
**assess** 79:21
**assessed** 156:1
**assessment** 51:2
**assign** 85:2
**assistance** 172:8
**assistant** 143:12
**associated** 6:15 51:15 140:10 140:13 142:9
**association** 4:16,22 8:16 18:24 25:7,21 25:23 26:4,18 26:20 27:6,20 119:12 137:20 138:5 141:25
**associations** 154:8
**assume** 47:13 60:3 121:15
**assumes** 48:1
**assuming** 60:14
**assumption** 60:16
**attach** 85:13
**attached** 132:19 168:23 183:1 184:16 214:4
**attention** 136:3 202:3 203:1 208:11
**attorney** 3:5,10 3:18 215:17
**attorneys** 112:4 171:19
**attribute** 182:13
**august** 53:11,12
**author** 53:25 109:18
**authority** 187:1
**authors** 57:9,11 109:5,7 125:12 126:2,7 130:16 146:1,16 147:3 147:16
**avagia** 85:10
**available** 5:14 62:11 69:9 105:20 154:9
**average** 59:1 60:10
**aware** 11:4 39:6,21 41:14 99:7,9 107:7,9 107:13 116:7 124:19 131:5 146:20 164:7 187:7,22

188:23 189:3 189:19

**b**

**b** 171:12
**baby** 5:14 98:20 100:18 128:21 203:15 206:24 207:6
**back** 11:1 18:8 45:1 51:17 61:2 64:3,13 65:11 67:7,9 73:8 74:3 75:6 81:9 83:18 88:8 90:2 95:9 102:24 104:17 105:20 110:1 118:24 119:6 132:5 137:2 147:23 156:14,15,20 159:7 173:16 173:18 175:12 175:24 184:23 185:3,5 188:14 188:23 192:22 193:9 198:24 199:17 201:25 202:14
**background** 48:25 93:7 121:17,18
**backwards** 149:4
**bacon** 3:17,24
**bad** 201:9
**balance** 129:17
**balderrama** 11:6,9 12:14,20 13:3,10
**balderrama's** 13:6,17
**based** 19:19 56:11 60:18 72:21 99:25 123:25 130:17 146:1,3,5 154:20 180:8,9 180:15,21 182:17 185:6 201:5,5 203:7 211:22
**baseline** 121:7
**basic** 85:20 115:25
**basically** 55:21 73:19 86:2 199:9
**basis** 101:4 149:17
**basket** 19:6
**bates** 9:6
**bathroom** 80:23
**beasley** 3:4 112:1,5
**beasleyallen....** 3:8
**began** 39:4
**beginning** 2:16 77:23 91:21 200:9,10
**begins** 11:23 92:2 101:22 102:4 103:1 104:25 117:1 196:7
**behalf** 2:14
**believe** 18:18 27:25 28:1 34:15 37:13,20 38:14 41:23 47:20 49:20 58:2 60:9 66:21 68:10 69:12 75:2,15,15 78:13 83:11 84:22 87:11,14 87:15 94:17 97:9 98:16 104:9 105:19 106:10 114:20 114:20 124:3 129:13 130:1 132:3 140:13 146:23 164:9 164:10 176:24 178:8 187:19 187:25 204:20 206:25 207:14
**believed** 203:6
**bend** 149:4
**beneficial** 182:10
**berge** 137:17
**better** 49:21 76:22 77:12,16 77:18,20,25 117:24 186:4
**beyond** 101:10 117:16 161:2 192:20 199:19 204:9
**bias** 135:3,3,4,5 135:8,12 136:23 179:20 180:1 181:11 181:15 182:2,4 194:19
**big** 17:18 136:15 192:17 193:15 198:22 198:22
**bigger** 17:17
**bill** 160:18
**bills** 171:18
**binder** 14:3,4,5 14:9,10 153:11
**binders** 8:14
**bindman** 1:13 2:13 4:3,14 7:9 7:12,15,23 8:6 9:7,8 10:4,13 10:14 18:11 19:9 30:10 65:14 68:23 113:3 125:8 164:4 169:17 188:16,21 202:2,5,25 212:19 214:1 214:10

**bindman's**
18:11 39:13
172:24 213:8
**bio** 41:6
**biologic** 16:19
145:8
**biomarkers**
6:20
**biomedical**
93:3
**biostatistical**
40:23 41:20
42:10,14
**biostatistician**
70:16,19 72:13
**biostatisticians**
28:24
**birefringent**
108:3
**birth** 54:6
177:19
**bit** 28:2 68:11
136:25 137:22
149:7
**blanking**
141:24
**blood** 111:7
**blue** 110:21
**bmj** 132:6,6,13
**board** 35:15
36:10,16,22
45:5 46:4,9
47:4
**board's** 46:24
**body** 75:13,17
110:10 180:9,9

180:21
**bonderand**
166:10
**book** 14:6 16:2
16:15 17:8,12
17:18 174:2
**booth** 59:14
**bothered**
160:18
**bottom** 27:15
51:13,21 66:23
67:12 107:22
117:1 144:2
**boulevard** 3:18
**box** 3:6
**bradford** 145:6
145:10
**break** 45:2 61:4
65:13 68:15
81:1,2,6 136:24
188:16
**breakdown**
155:1
**breast** 182:11
**bring** 13:24
14:2 36:12 40:5
**broad** 43:6,8
99:13
**broadly** 76:23
77:11
**brought** 14:3
16:14,16 17:1
71:1 172:18
173:4 174:22
**bs** 1:21 215:22

**business** 149:3

**c**

**calculated**
59:21
**california** 1:14
2:15,16 7:20
10:1 150:15
215:2
**call** 19:16
**called** 42:10
68:2 120:25
125:14 142:14
191:8
**calling** 151:22
**calls** 89:11
90:22 126:25
**camargo**
103:13
**canada** 52:24
**canadian**
187:13
**cancer** 4:18,24
5:3,20 6:16,20
6:23,23 8:19
9:17 12:22 13:3
13:13,17 18:25
25:7 26:5,19,21
27:7 30:19 38:3
48:23 49:2
51:15 52:3,7
68:6 69:11
75:24 84:8,19
84:24 85:16,22
88:6,19 89:4,13
89:21 90:12,23

91:7,12,16
97:14 103:10
103:17,22
104:6,21 115:6
118:15,22
119:14,15
120:2,7 123:21
124:7 126:13
126:15,23
127:3,13,24
128:1,2 137:16
137:21 138:6
138:22 139:4
139:12,17,22
139:25 140:3
140:11,22,24
141:4,8,10,18
141:21,23
142:9 144:25
145:24 162:3
178:23 181:19
182:11 186:9
186:12 187:10
187:20,24
188:19,22
189:1,6,11,16
194:19 200:18
204:22 205:24
211:24
**cancers** 5:5 7:5
**capa** 192:19
**capabilities**
45:18
**capable** 48:11
**capacity** 43:9
78:2 100:6

112:16
**carcinogen** 180:7,11,17
**carcinogenesis** 84:14 118:20 119:11 123:19
**carcinogenic** 83:24 90:1 117:6 180:11
**carcinogenicity** 104:19 116:16 116:17 123:15 126:21
**carcinogens** 180:20
**carcinoma** 5:16 102:15 106:13 106:18 107:2 116:23
**care** 7:4 33:22
**career** 37:2 136:20
**careful** 57:1 136:3
**carefully** 52:8 97:2 139:13 154:18 155:4 155:11
**carl** 11:5,9 12:13,17,22 13:1,10
**carl's** 13:13
**carrying** 55:6 58:3,8 111:12
**carryover** 107:23 193:23 194:1,2
**cascade** 92:15
**case** 10:15,16 13:15 17:3 22:22 32:23 33:5 36:6 46:25 57:23 61:16 126:10 129:21 132:11 135:24 156:21 158:8 160:19 171:2 178:18 179:12 187:4 190:9 191:5 192:15 195:6,9 201:1,9 201:13 203:16 205:1 207:8,10 215:12
**cases** 10:18 11:5,10 12:14 13:10 39:7 63:19 65:15 66:2 97:14,14 106:25 112:20 135:12 179:11 182:5,5,15
**casual** 162:16
**casually** 162:22
**categories** 108:4 149:23
**category** 43:6 56:2 96:25 135:13,14 150:1 192:21
**catherine** 1:21 2:18 212:15 215:22
**catherine's** 201:19
**causal** 145:19
**causation** 145:16
**cause** 13:13,17 69:10 85:10 89:3,12 90:11 90:23 91:7,12 103:16 119:15 126:11 127:3 187:10,23 188:18 189:1,5 189:11,16
**caused** 186:9 186:12
**causes** 52:3,7 75:24 84:23 88:6,18 89:3 103:9,22 126:25 188:22
**causing** 84:7,18 89:25 104:6,21 121:16 126:22
**cej** 111:24,25
**cell** 85:22 86:12 118:13 119:18 120:10 122:16 122:16,23 124:10 125:24 126:17,20,22 126:25 127:5,5 127:5,6,6,7,8 127:15,23 128:3,5,8,11,13 128:18,24 200:11,12 206:6,8,10
**cells** 5:20 6:10 86:22 114:22 114:24 115:8 115:20 116:8 122:11,14,18 123:9,17 124:12 126:11 127:11,23 128:23 206:9
**cellular** 85:21 86:6,20,21 89:25 92:7,12 92:21,22 116:2 189:15 200:8
**center** 110:8
**certain** 170:13 170:13 171:24 172:23
**certainly** 41:4 96:16 97:17 133:8 136:1,6 145:13,14
**certainty** 84:6
**certified** 2:18 215:1
**certify** 215:2,15
**cetera** 88:10 92:5 103:2
**chance** 12:4 27:24 166:22 186:4 192:20 211:24

**chang** 17:22 153:9 175:17 185:9
**change** 74:1 82:17 126:11 152:17 155:10 156:23 157:3,6 168:12 186:4 209:17
**changed** 10:23 13:20 30:13 49:20 97:9 152:15,16
**changes** 12:9 89:25 90:1 92:7 92:16,19 118:21 120:19 120:21 122:23 189:15 205:22
**characterizati...** 35:16 38:9
**characterize** 19:23 77:7
**characterized** 77:8 209:21
**charged** 168:10
**check** 58:2 87:21
**checking** 24:25 80:22 210:8
**chemical** 101:18
**cherry** 3:11
**chinese** 87:14
**choose** 154:2,19
**choosing** 69:13
**chose** 181:8
**chris** 40:8
**cidal** 117:23
**citation** 33:1,19 90:19
**cite** 14:4 25:19 25:24 48:17 52:19 85:23 88:4 93:18 95:23 98:17 105:22 146:11 146:12
**cited** 26:6,7 37:3 90:17 96:5 125:21 152:10
**citing** 32:16 96:7
**city** 3:19 214:8
**claim** 179:20
**clarified** 159:3
**clarify** 25:17 38:18 95:22
**classified** 180:10,10,20
**clean** 111:1
**clear** 76:15 85:1 94:12 113:15 134:22 145:20 213:7
**clearly** 44:6 116:22 212:1
**clinical** 157:10 157:19,25 186:1
**clock** 201:19
**closed** 68:5 92:8
**closely** 84:10 129:25
**cluster** 127:23
**clustering** 126:12
**clusters** 127:12
**code** 72:25 73:1 73:7
**coffee** 138:21 139:3,7,10,16
**cohort** 7:7 32:1 67:17 69:13 76:22 77:22 79:17 178:18
**cohorts** 23:16 54:22,24
**collaborated** 39:1
**collaborating** 39:4
**colleague** 142:25
**colleagues** 143:2,3 162:12 162:17,24
**collected** 55:11
**collecting** 194:22
**column** 51:13 52:12 55:8 57:18 58:3,9 74:23 106:16 107:23 117:1 117:11 192:3 193:23 196:1 197:7,23
**combination** 76:20
**combine** 178:15,16,19
**combined** 77:15
**combining** 63:4
**come** 60:10 64:13 74:3 135:19 143:19 165:11 169:10 176:11
**comes** 46:18 110:17 113:12 162:17 190:1
**comfortable** 47:10
**coming** 48:12 81:24 110:13
**commencem...** 3:13
**comment** 36:17 77:24 86:20 153:22 154:4 164:3 177:3 200:21,25
**commentary** 74:6
**commented** 38:2
**comments** 8:16 35:8 131:6,11 131:15,18,24

132:4,13,19 153:19 154:21 175:15 176:2,6 176:8,15,21,22 176:25 177:1 180:2 182:17 183:22 185:16 200:1
**commerce** 3:5
**commercially** 5:13
**committee** 113:12 135:3 148:10 149:9
**committee's** 8:3 169:16 172:22
**common** 43:15 118:14 141:12 149:11
**communicate** 32:25
**communicated** 186:21,25 187:3 199:17
**communication** 38:11,15 174:18
**comparable** 115:15 128:23
**compare** 121:12 178:17 207:15
**compared** 43:23 56:18 85:5 136:8 149:8
**comparing** 69:16 197:16 198:1
**comparison** 5:13 128:20
**complete** 16:7 170:21 172:14
**completed** 181:14
**completely** 110:24 134:17 198:13 209:25
**completion** 215:13
**complicated** 145:12
**component** 83:23
**components** 85:11
**comprehensive** 53:9
**computer** 63:24
**concentrated** 205:10
**concentration** 168:4 190:18
**concept** 126:13
**concern** 89:18 109:20 179:11 179:15
**concerned** 109:1
**concerning** 166:7,10,13,16 166:19 172:15
**conclude** 25:23 139:11 145:4
**concluded** 25:24 26:7,7
**conclusion** 25:6 25:19 26:3,8,12 26:13,14,25 29:1 51:22,23 52:2 192:1 195:3 198:14
**conclusions** 48:13 51:12 52:13 120:20
**condition** 110:16
**conduct** 147:11
**conducting** 133:20
**confidence** 27:22 28:4,5,9 28:19 64:7 73:23,25 81:23 145:3 193:19 198:19
**confident** 46:2
**confirm** 83:23 99:12,23 123:23
**confirmed** 87:22
**conflict** 80:1,12 111:20,23 112:7,14,22 113:11 129:13 129:15 133:13 134:4,21,25 135:2 136:12 136:14,18,21 136:23 147:25 148:9 149:6,9
**conflicts** 112:23 129:8
**confused** 139:11
**confusing** 32:24 97:17
**confusion** 15:6 164:3
**conn** 176:22
**connecticut** 45:10
**connection** 171:16,19 203:4
**consensus** 57:6 57:7
**consider** 28:25 75:16 78:4 129:4 145:7,13 145:18,20 148:21 185:18
**consideration** 131:2 145:15
**considered** 7:16 95:16 134:1 163:10 164:1,9,25 165:4,20 172:24 206:9

**considering** 28:3
**considers** 180:15
**consistency** 69:14,24 195:10
**consistent** 33:7 69:9,11 90:1 155:6 192:5 204:25 206:11 206:11
**consistently** 198:9
**consortium** 6:25
**constitute** 120:10
**consultant** 40:23 112:9,20 113:4 133:14 149:3
**consultants** 41:20
**consultative** 106:25
**consulting** 41:6 42:10,14
**consumer** 100:21 103:16
**contact** 36:16 110:13
**contacted** 12:13 20:17 22:11,22 23:4 23:10 38:6,21
**contacting** 36:19
**contain** 101:9 103:8
**contained** 100:19 190:10 214:5
**container** 110:18
**containing** 180:19
**contains** 100:22
**contamination** 109:18,21 110:11 111:4,8
**content** 37:24 38:8 40:5
**contention** 122:20 127:8
**context** 36:6 127:10 135:19 152:21 162:14 162:24
**continued** 5:1 6:1 7:1 8:1 9:1 20:25
**contrast** 121:6
**contribute** 77:11
**contributed** 23:1
**contributes** 116:20,24 127:19 152:22
**contributing** 77:17
**contribution** 85:3,5
**control** 54:6 57:23 120:18 120:20 121:5 121:14,21 136:8,10 171:15,16 177:19 178:18 179:12,15 182:15 192:15 205:8,9
**controlling** 134:16
**controls** 63:20 65:16 66:2 179:11
**converse** 166:19
**convince** 100:13
**convinced** 139:20
**cook** 60:20,20 60:23,24 61:5 61:25 63:12
**copied** 16:9 212:8,22
**copies** 150:18 170:24 202:17 202:21 212:12
**copy** 19:8 24:3 24:16 31:5 48:19 71:20,22 71:24 75:7 82:6 102:19 144:11 144:15 164:13 169:3 170:21 172:12 173:15 174:10 175:2 184:15 185:8 202:16,20 208:1
**corner** 51:21 194:4
**cornstarches** 75:14
**correct** 15:3 19:20 20:5,12 20:18,19,23 21:4,7,8,13,19 23:17 24:23 25:8 26:5,19 27:24 28:20 29:14 31:1,22 31:23 32:1,4,10 32:17 33:14,17 33:25 35:9,12 35:13 36:17 37:4,12 38:4 39:2 42:22,24 43:3 46:9 47:1 47:8,25 48:23 48:24 49:19,24 50:2,5,6,7,8,14 50:21,24 51:16 52:4,5,7 54:11 54:14,15 55:4,5 55:9,12 56:10 57:10 58:5,11 58:19 59:4,7,15 60:18,19,22

61:11,23 62:1,3 62:11 63:17 64:21 65:1 67:16,22,25 68:21 71:16 73:13 74:19 75:14 76:1,3 78:12 79:1,10 79:14 80:6,9,14 82:25 83:7,8 86:22,23,25 90:16 95:25 108:17 109:10 110:14 111:14 112:2 113:25 114:22 118:6 120:13 121:22 121:25 122:9 122:15,18,19 126:18 127:1,4 128:5,9 135:8 144:24 145:1,8 145:11,16,24 145:25 146:2,6 146:7,10 147:1 148:14 149:14 149:19,24,25 150:1 152:20 157:14,21 159:22 163:17 173:22 176:4 177:22 178:9 178:24 180:13 181:16 182:3 185:11,16 187:14 191:24 193:2,7 196:12 196:15 200:4,5 200:6,7 205:14 205:17 209:1,9 210:15 214:6

**corrected** 152:11 214:6

**corrections** 214:3

**correctly** 33:23 34:4 49:5 51:23 52:17 54:8 112:11 118:23 180:10 194:24 205:25

**correlates** 116:8

**correspond** 59:23 64:20,20

**correspondence** 154:14

**corresponds** 64:23

**cosmetic** 101:9 207:1

**cosmetics** 207:5 207:6

**cost** 41:1,16,19 41:20,24,25

**counsel** 15:10 20:18 21:18,20 22:12,22 34:15 41:9 107:15 153:8 162:20 163:14 166:22 204:5 206:17 208:18 211:17

**counsel's** 97:20

**count** 61:17

**counterintuitive** 155:23

**couple** 16:3 17:9 53:23 143:22 157:10 167:11 168:22 202:6

**course** 14:12 167:22 173:17 212:18

**court** 1:1 2:1 11:12 12:14 18:7 19:4 24:12 30:16 72:6 105:13 114:6 122:5 125:6 137:9 144:7 153:17 159:6 163:6 164:17 168:20 169:20 173:25 174:8 174:13 175:10 184:9 191:18 196:20 212:15 212:22,25 213:13

**court's** 164:6

**cover** 88:3 176:7

**coverage** 143:23

**covered** 88:9,13 90:3 95:6 197:4

**covering** 16:14 88:12 90:2

**covid** 143:15 157:23

**create** 37:24 101:8 129:12 134:20,20 164:4

**created** 135:5 149:3 159:13 174:4

**criteria** 53:21 53:24,25 54:10 54:14 55:1,2,7 56:12

**critical** 47:25

**critically** 133:4

**criticism** 36:4 77:10 78:4

**criticisms** 45:18,21 47:17 77:21 78:1

**criticized** 47:20 47:21

**cross** 201:8

**crosses** 28:19

**crr** 1:21 215:22

**csr** 1:22 215:23

**ctsi** 42:10

**culprit** 104:21

**culture** 5:20

**cumulative** 50:7,12,14,20 181:3

**curiosity** 132:25

**current** 36:10 36:22 105:25 148:1 168:18 169:3 170:21 191:3
**curriculum** 7:21 169:4 170:21
**cut** 28:22 126:24
**cutting** 211:8
**cv** 168:18,23
**cysts** 141:12,14

**d**

**d** 9:5
**daily** 43:15,16 43:17 62:20 66:16
**damning** 127:20,22
**daniel** 3:9
**data** 16:18 32:4 32:6,9,11,12 43:3,3 54:1,13 54:18,24,25 55:11,19,21,24 55:25 56:9,15 57:5,11,13 62:3 62:5,9,11,15 63:1,4 67:1,15 67:21 68:3,18 68:24,25 69:3,5 69:16,17 70:1 73:3,20 74:19 75:1 77:2 86:1 87:2,3,9,13,18 154:9,17 204:21 206:10 208:17,19,25 209:3,19,25 210:20 211:2 211:21,25
**databases** 53:11
**date** 29:22,25 30:24 105:24 171:2,17 172:6 172:13 215:18
**dated** 8:22 9:3 20:11 81:11 106:1,1 158:23 159:22 215:20
**dating** 147:23
**davis** 144:4,15 145:22 146:8
**day** 14:7 44:5 60:4,15,18 61:16,17 157:6 157:6,24 167:10 214:7
**days** 16:3 60:6 61:11,14 168:22
**deal** 135:2 152:22
**death** 127:5,6,7
**debate** 113:8
**decade** 207:3
**decades** 79:18
**december** 70:16 95:23
**decide** 113:14 150:25
**decision** 8:23 70:18 148:25
**decisions** 134:19
**declare** 214:2
**declared** 136:22
**declined** 143:5
**defendant** 2:14 3:16
**define** 23:15 75:17
**defined** 23:22 32:13 58:4,10 58:14 177:15
**definitely** 150:7 176:5,5
**definition** 75:13,13
**definitive** 86:1
**degree** 46:17 69:22 84:6 95:7 103:7 119:12 121:23 133:5 151:21,24 211:17
**deleted** 93:2
**deliberately** 22:3,5
**dep** 93:18
**department** 93:5 108:17 111:10 161:12
**depend** 100:7
**dependent** 181:15
**deposed** 10:25 158:4
**deposition** 1:13 2:13 3:13 8:5 10:16 11:1 13:25 14:5,16 14:18 15:25 16:7,10 17:4 34:18 39:13 45:22 72:9 85:17 86:5,9 87:6,10,20,24 88:9,16 89:1,11 89:19 90:3,6,22 91:4,9,15 93:22 93:24 94:1,2,5 94:7,15,16,16 94:19 95:3,6,13 95:15,24 96:20 97:5,9,22,25 98:13 103:14 156:16,20 159:9 164:5 166:22 167:3 167:20 168:7 169:17 170:14 171:2,18 172:6 172:14 174:17 186:7 188:25 190:2,6 200:10 215:12
**depositions** 14:9,11,21 15:1

157:19 168:14 175:5,6
**depressed** 211:10
**describe** 16:16 20:16 38:22 45:16 154:12 162:16
**described** 54:10 54:25 92:15 110:12 143:1 157:18 177:10 210:9
**describes** 85:9 92:21 123:3 129:10 188:3
**describing** 31:20
**description** 4:9 5:2 6:2 7:2 8:2 9:2 171:22 172:18 209:24 210:17
**design** 133:5 136:3
**designate** 173:8 174:3,10,25
**designed** 129:10,17,23 130:1 134:3
**detail** 54:19 77:20 80:19 83:16 152:2 155:16
**detailed** 42:12 43:14 84:15
95:7 148:7 151:22
**details** 83:7 129:9 136:3 213:16
**detection** 100:12
**determine** 10:22 117:14 204:7
**determined** 116:20 186:11
**deterministic** 116:23
**developed** 85:15 91:14 135:18
**developing** 119:13 128:2
**development** 118:22 205:24
**devices** 54:6,6 177:19
**diabetes** 140:19 140:23
**diaphragm** 178:3
**diaphragmatic** 177:24
**diaphragms** 54:6 177:20
**dichotomy** 146:3
**diesel** 205:11
**diet** 139:24,24 140:1,4,5
**differed** 191:23
**difference** 58:21 62:22 65:8 70:11 77:6 156:9 181:22 192:14 193:10 193:14,17 195:3 198:15
**differences** 26:15 52:13 194:21 196:11 197:25 198:23 199:3
**different** 19:25 21:14 43:19 44:7 58:18 62:14 78:2 85:20 88:15 92:18 96:18 98:11 99:5 120:3 123:6 129:18 154:11 155:1,5 158:15 158:18 168:4 181:7,9 182:1 184:3 190:18 194:11 197:17 198:6,18,19,20 199:7,10,12,14 206:9,10 212:13
**differential** 179:10 182:5,7 182:9,12
**differently** 20:6 50:16
**difficult** 108:23 198:16
**dig** 81:25
**digging** 41:21
**dioxide** 120:12 120:17,24 123:7 205:8,10
**direct** 54:3 116:1,5 128:20 202:25 208:10
**directed** 164:4
**direction** 171:15,15 215:8
**directly** 66:14 86:18 115:23
**disagree** 48:3 111:3 180:23 181:17 198:13
**disagreeing** 192:8
**disagreements** 46:20 57:5
**disclose** 149:2 149:21
**disclosed** 11:4 80:4 150:17 158:7 190:14 190:19
**disclosing** 150:10
**disclosure** 4:10 11:9,15 71:9 112:14 113:3 113:17 147:24 148:7,8,22,25

149:10,13
**disclosures** 147:4,16,19 149:24
**discovered** 118:1 204:15
**discuss** 13:19 35:15 38:12,16 162:22 167:5
**discussed** 135:2 162:2,10,19 190:21 198:7
**discussion** 18:5 48:5 61:1 64:2 65:10 74:16,21 75:22 102:23 138:16,25 139:1 140:8 145:5 146:9 148:4 156:13 159:4 175:8,23 181:2 185:2 188:13 201:24 202:22 207:15
**disease** 145:15 181:25
**diseases** 140:19
**dish** 115:21
**disruption** 92:21
**disseminated** 108:9
**distinction** 211:18,19
**distinguish** 69:18
**district** 1:1,2 2:1,2
**divided** 60:9
**dlapinski** 3:12
**doctor** 10:10 24:17 45:2 61:4 75:5 81:14 114:12 119:25 156:15 159:8 163:12 202:2 208:24 212:4
**document** 11:19 30:1,22 42:5,20 46:12 56:6 72:9,10,18 81:3 94:22 99:3 99:11 146:4 168:15,17 169:12,22 170:6 176:9,10 177:1
**documentation** 40:25 42:11 70:23 73:7 126:15
**documents** 17:19 41:9,13 46:12 47:5 71:3 72:22 150:24 165:6,9 171:4 171:13,25 172:1,10 175:13,14 176:11,12 183:2 188:10 190:3,5,13
**doing** 21:25 70:12 74:4 75:16,20 83:5 132:24 133:3 135:16 157:10 157:22 189:17 190:16
**dose** 115:15 145:7,14,18,21 145:23 146:1,4 146:5,9,11,13 146:13 151:7 151:10,17 152:11,17,20 152:22 153:3,5
**douching** 9:10 191:8
**dozen** 16:6 23:2
**dr** 10:14 14:14 14:14 18:11 19:9 22:4 28:23 30:10 39:9,9,13 40:13,13,22,22 41:5 45:14 46:23 47:10,14 47:24 48:10 57:12 65:14 67:1 68:23 72:21 81:11,17 82:25 93:22,23 94:1,16,18 95:2 95:5,12,15,23 95:23 96:20 97:21 107:10 107:19 112:15 113:3 125:8 131:5 133:14 133:20 134:16 135:13 147:22 164:4,15,19 172:24 175:17 175:17 176:25 183:4 185:8 188:16,21 197:12 202:5 202:25 212:19 213:8
**draft** 179:1,4,7 181:11
**drafted** 161:17
**draw** 211:18
**drawing** 136:16
**drive** 3:10
**driving** 194:20
**dropbox** 71:11 71:15,17,18 173:1
**duces** 8:6 169:17
**due** 27:24 52:14 121:16
**duke** 147:11
**duplicate** 56:21
**duplicates** 124:14,16
**duplication** 56:24 126:23
**duration** 50:4 76:15,20 77:16 77:18 78:7 146:6 181:2

**e**

**e** 111:24
**e2** 121:15
**earlier** 61:15 67:14 113:25 143:20 145:5 148:4 153:8,9 160:23 178:8 178:25 185:16 190:16 207:3
**early** 71:10
**easily** 99:22
**east** 3:10
**easy** 43:10 150:4
**eating** 139:21
**edge** 28:3,4 108:24 110:3,5 110:7,10,20
**edited** 39:24 40:6
**editor** 39:24 40:2,4 143:17
**editorial** 9:16 45:5 196:14,18 197:19 198:7 199:25
**education** 169:7
**educational** 37:13
**effect** 5:18 117:15 123:25 155:22,22 178:15 179:21 192:15,17,18 193:14,15 194:21 204:8 204:23 205:12 205:12 206:9
**effects** 6:5 38:2 84:13
**efficiently** 202:7
**effort** 110:12 143:15
**egg** 138:21 139:3
**eggs** 139:21
**eight** 106:23,23 106:24
**eighteen** 169:1
**either** 32:23 33:5 40:13 94:24 97:22 98:11 115:7 186:12
**el** 140:13
**electron** 100:9
**elevated** 140:10 154:24
**eligibility** 53:21 55:2,6,18 59:6 59:10
**elmore** 45:9,14 46:2 47:10,14 47:24 48:10
**elmore's** 46:23
**eloquently** 28:23
**elucidates** 116:2
**email** 5:8 8:22 9:3 71:7,14,20 72:1 81:11 82:3 82:4,6 172:25 182:25 183:19 185:8,15
**emi** 92:15 121:25 122:7 206:6
**emid** 9:6
**emphasis** 134:8
**employee** 215:17
**employees** 97:25
**employment** 156:23
**encompasses** 101:1
**ended** 59:11
**endometriosis** 140:19 141:3,7
**ends** 130:10
**engineering** 101:18
**enhance** 138:21 139:4,12 154:19
**enhances** 136:20
**enrolled** 57:24 58:1
**enrollment** 58:2 192:6 194:18
**entail** 118:2 204:16
**entire** 35:25 88:21
**entirely** 22:14 22:19 121:16
**entirety** 18:18 73:11 95:2
**entitled** 8:9
**entity** 187:8 189:13
**environmental** 5:18 7:3 112:10
**environments** 168:5 190:19
**epidemiologic** 27:21 50:23 204:21
**epidemiologist** 48:14 143:14 148:16
**epidemiologi...** 143:10
**epidemiology** 6:20 9:13 27:25 85:9 93:6 148:20
**epigenetic** 92:19
**epigenomic** 6:4
**epithelial** 6:10 6:22 114:24 122:18 124:12
**equal** 23:23 24:22,22 26:18

54:2 178:14
**equally** 182:14
**equate** 119:10 119:19 126:20 127:15
**equivalent** 104:20 128:14
**error** 66:21 152:10 155:25 178:22 179:5
**especially** 205:20
**essence** 197:14
**establishes** 116:16
**estimate** 27:12 27:16,18 28:6,7 28:15 59:25 60:10 63:3 64:22 73:22,22 73:23,25 82:1 153:2 159:24 161:3 209:5 210:15,19 211:10 212:1
**estimates** 153:1 194:21 199:7 210:6 211:13
**estradiol** 118:19 120:13 120:16,17,24 121:3,9 205:21
**estrogen** 123:7 140:8,9,13,14 140:15,16
**et** 88:10 92:5 103:2
**etiology** 84:11
**europe** 132:5
**evaluate** 70:15 70:17 80:11 129:5 153:4
**evaluating** 131:24 132:18
**evaluation** 130:23
**evaluations** 40:18
**eventually** 21:17
**evidence** 9:18 76:7 84:9,15 85:19 86:2,3 96:7,14 100:8 116:11 123:22 139:19 141:13 145:21 153:3
**exact** 124:21 210:11
**exactly** 94:12 162:4 188:6
**examination** 4:2 10:8 201:8 201:9 202:23
**examined** 10:5 177:5
**examining** 9:18
**example** 121:3 140:19 162:5
**except** 135:20
**excluded** 177:7 177:7,20,23
**excluding** 75:1 187:12
**exclusion** 181:2
**exclusive** 182:2
**exclusively** 187:17
**excuse** 109:12 161:10 183:24 210:23
**executed** 214:7
**exemplary** 34:12
**exhaust** 205:11
**exhibit** 4:10,13 4:16,21 5:3,8 5:12,18 6:3,8 6:14,20 7:3,9 7:12,15,17,20 8:3,9,12,14,16 8:22 9:3,10,16 11:9,11,14 12:1 16:10 17:25 18:6,10,12,14 18:23 19:2,3,8 19:11 24:8,9,11 24:14 29:20 30:9,15,17 31:4 31:11 46:25 47:6 72:1,2,5,8 72:11 81:11,13 83:10,12,16 105:8,9,12 114:4,5,7 122:3 122:4,7 125:1,3 125:5 137:6,7,8 144:5,5,6 153:7 153:10,14,16 158:14,14 159:5,5,22 160:12,14 163:1,5,7,8 164:12,16,20 165:3 168:18 168:19,25 169:3,13,13,19 170:22 173:9 173:22,24 174:5,7,11 175:1,9,9,9 176:1,2 182:17 182:20 183:6,7 183:13,15,18 184:7,7,8,11,14 185:5,8 191:16 191:17 195:16 195:17 196:18 196:19 203:25 203:25 207:14 207:23 213:2
**exhibits** 4:8 5:1 6:1 7:1 8:1 9:1 95:5,11,16 159:10 160:10 173:9 175:13 212:8 213:2
**exist** 41:19 181:13 204:8
**existed** 116:12
**existing** 54:22

**exists** 117:15 136:12
**expansive** 97:13
**expect** 123:17 127:24 128:1 128:14,19 198:12
**expense** 42:16 42:20
**expenses** 41:16 171:14
**experience** 169:7
**experiment** 129:12
**expert** 4:11,13 7:17 11:5,15 12:13 13:15,15 14:6 15:5,17 18:1 20:4 22:1 22:15,19 23:11 39:6 53:9 80:5 80:20 83:11 87:12,12 98:14 107:10 112:1,9 113:4 114:17 115:9 129:22 133:15 146:20 147:22 148:1 149:14,20 150:9 158:8 161:5 163:17 164:19,20 171:1 174:18 174:19
**expertise** 40:5 85:16 91:15 101:11,19 118:13 135:16 135:17
**experts** 14:5,10 15:14,20,21,21 98:14 135:14 135:21 142:13 165:23,25 174:17 189:20
**explain** 65:8,14 65:20 81:16 116:22 154:8
**explained** 179:25
**explaining** 56:7
**explanation** 181:2,4
**explicit** 25:19 134:23 149:5 150:15 151:12
**explicitly** 22:3 101:22 102:4 102:12 103:2 140:25
**explore** 154:7
**expose** 128:22
**exposed** 63:19 63:20 115:16 128:15,25 129:1
**exposing** 128:18
**exposure** 9:12 24:20 31:4 32:12 43:2 47:16 50:23 51:15 52:3,15 52:16 54:3 56:17,19 59:19 59:21,23 60:1,6 60:13 76:15 85:9 91:6 92:19 118:18 121:6 121:18 123:7 123:21 136:9 142:10 145:15 149:10 152:24 154:13,16,22 155:7 177:10 177:11,12,24 177:25 178:3,4 181:3,16 182:10,10 186:13 190:18 191:10 194:22 205:19,20,21 209:13,21 211:8
**exposures** 146:15 154:11 156:1 177:13 177:23,25 178:5 182:2 209:22 210:7 210:18
**expression** 92:16 118:21 122:23 123:11 123:14 124:7 205:23
**extensive** 154:16
**extensively** 182:19
**extent** 68:18 69:16 85:4 117:14 204:8
**external** 36:4
**extra** 136:2 199:15
**extract** 177:11 211:25
**extracted** 61:17 65:22,25 177:9 208:17,19 209:3,19,24 210:14
**extraction** 56:15 57:5,11 57:13
**extreme** 149:8
**eye** 207:5

**f**

**fact** 27:21 28:9 52:6 58:25 75:19 122:17 126:11 129:24 130:21 135:25 146:23 197:24 206:2 210:10 211:6,10
**factor** 79:21 140:2,4 141:23 145:10

**factors** 6:15 145:20
**facts** 48:2
**fair** 19:17 22:9 95:14,14 130:23 148:17 159:21
**fairly** 45:15
**fall** 37:16 171:22 172:17
**fallopian** 5:4 30:18 67:21 68:3,8 69:17,19 72:17
**falls** 150:1
**false** 35:24
**familiar** 11:19 35:20 99:13 116:12 118:16
**fantastic** 67:10 144:13
**far** 14:25 15:7 17:1 42:7 60:17 65:15 86:11 87:2 95:8 154:10,22
**fashion** 85:4
**fat** 138:21 139:3,24,24 140:1,4
**fault** 18:4
**fax** 3:7,20
**fda** 87:22 93:19 99:7 100:2 168:5 186:25 207:5
**fda's** 98:18,19 98:25 99:17 100:11
**february** 8:22 175:16 183:19
**federal** 215:12
**feel** 47:10 134:16 155:6
**fees** 147:12 148:5,8,13
**felt** 113:18
**female** 104:25
**fibers** 88:10 103:8 104:5 180:19
**fields** 110:5
**figure** 66:3 81:25 110:7 111:6,6 120:22 121:2 156:9,10 156:10,10
**figures** 68:15 155:18
**file** 172:14,25
**filed** 150:22
**files** 172:14
**fill** 149:16
**filled** 150:10
**filling** 40:18
**finally** 130:18
**financial** 41:22
**financially** 215:16
**find** 25:20,22 31:8 41:7 63:24 64:4 73:14 75:2 100:7,12 102:18,22 105:17,23 106:8 114:14 119:7 125:10 137:12 139:6 144:18 154:23 188:2,8,9,17,21 195:15 208:1
**findable** 41:21
**finding** 25:22 48:22 91:22 92:3 100:2,10 119:9,18 120:4 127:15 155:17
**findings** 32:16 32:20,22 33:12 48:22 50:20 58:18 102:5 109:19 116:8 120:23 157:15 196:12 204:20
**fine** 112:24 173:12
**finger** 126:24
**finish** 129:20
**firm** 3:4 112:2 112:5 147:13 148:5,13
**firms** 171:19
**first** 11:8,25 14:17 19:15 21:2 24:19 25:12 26:10 35:11,14 48:21 49:1,1,1,8,9,14 51:13,19 52:12 53:8,22 62:18 62:25 67:14 75:23 78:10,21 78:23 81:17 83:17 86:7,8 87:3 90:21 91:23 93:12,23 96:5 107:23 111:23 121:10 131:1 134:14 151:18 170:1 176:1 177:3 192:3,22 203:10 208:25
**fit** 135:14
**fits** 135:13
**five** 60:18 61:16 95:19 117:5 184:12
**fixed** 130:17
**fixing** 186:3
**flageollet** 3:24 24:10 72:3 105:10 153:15 158:16 164:21 169:1,14 183:16 195:21
**flaws** 185:25 186:3
**flow** 211:8
**focus** 50:10 78:11,25 167:5
**focused** 42:23 79:9

**focusing** 79:13 110:5 194:10
**folder** 173:1
**follow** 58:1 82:7,11 94:13 150:23 151:4 179:1 192:6,25 194:17 202:6
**followed** 34:13 39:16 59:22 79:18
**following** 33:10 97:20 137:3
**follows** 10:6
**footnote** 66:25 67:6,13,20
**footnotes** 66:24
**foregoing** 214:3 215:3,5,9,11
**forgive** 49:12
**form** 19:22 21:24 22:25 26:23 32:5 34:3 34:25 41:2,18 46:10 47:19 48:1 50:15 52:22 58:20 59:8 66:8 68:22 70:3 74:9 77:4 79:6,15 83:1 84:20 86:14,24 88:7 89:6,14 90:25 94:9 96:13,23 99:10 99:19 100:4,24 101:10 103:16 103:24 104:8 108:12 109:12 111:15 112:17 115:24 116:10 119:21 124:2 127:12 128:6 128:16 130:24 131:16 132:2 135:10 138:7 142:16 148:3 148:23 151:21 153:21 155:19 161:6 167:23 176:23 187:11 193:12 200:5 200:23 205:16 206:13 207:9 208:21 209:18 211:12,20
**formal** 36:4 46:7 161:25 162:24
**formally** 36:20
**formed** 126:14
**former** 143:17
**forms** 102:5 150:18
**forth** 215:4
**forum** 162:7
**forward** 161:3
**forwarded** 71:5 183:3 185:15
**forwarding** 176:25
**found** 25:2,5,25 26:17,20 32:22 47:24 58:23 146:1,5 165:24 188:7 208:2 212:2
**foundation** 39:14 95:11
**four** 23:16,19 44:17,19 58:5 58:11 59:7,13 62:22 73:16 83:19 102:14 137:17,19 138:3,3,10,10 139:2 178:13 182:21 197:8 202:1
**fragrances** 84:1 84:12 85:6 91:18
**francis** 6:3
**francisco** 1:14 2:16 7:21 10:1 212:17
**free** 93:15 95:25 96:8,11 100:1 203:6,9
**frequency** 23:15,17,19,20 23:22 42:23 43:3,22 50:1,2 50:10,22 52:16 58:14 62:7,8 76:11,14,20 77:2,8,9,14,15 77:18,19 78:6 79:9,14,22 146:2
**frequent** 4:16 8:17 18:24 24:22 32:12 43:12 49:3 51:15 52:3 56:4 56:18 58:4,10 58:25 59:3 63:14 78:11,25 142:10 155:6,8
**frequently** 44:4 44:9
**friends** 143:6 143:10 162:17 162:23 186:19 186:20
**front** 24:16 48:19 81:13 105:15 114:11 144:9 151:23 162:1,8 169:22 195:19 202:9 203:24
**full** 10:12 14:3 157:1
**fully** 75:25 131:20
**function** 118:10
**functions** 92:22
**funded** 129:5,6 129:24 134:6 136:1
**funding** 42:2,3 133:19 135:6
**funds** 40:20,21 40:24 42:6,7

**further** 117:13 202:4 204:6 205:6 211:14 212:3 215:11 215:15
**future** 48:7
**fwd** 9:4

**g**

**galley** 182:23 184:21
**game** 95:14
**gene** 92:15 122:23 123:13 205:23
**general** 13:14 19:12 42:12 63:7 100:25 108:6 126:22 130:9 132:21 133:4 143:18 156:6 185:24 207:1
**generally** 16:16 76:10 127:17 140:9 144:25 172:16 206:11
**generate** 81:19 209:4
**generated** 20:2 38:23 81:20 165:19,22
**generates** 81:23
**generic** 15:18 15:19
**genes** 118:21 123:5,6,10,11 123:12 205:23
**genesis** 21:22
**genetic** 140:20
**genital** 4:23 6:21 9:10,17 25:7 26:4 104:25 177:12 177:15,25 191:8 192:4,25 193:1 194:17 194:22
**geological** 101:18
**george** 14:15
**gertig** 32:21 33:3,6 76:13,14 77:1,8 79:5,9 79:17
**getting** 21:10 41:1,14,15 44:16,19 59:25 69:23 104:2 109:24
**give** 130:14 135:7 150:15 175:20 207:24
**given** 18:2 37:3 71:4 107:18 160:24 161:25 181:12 215:10
**giving** 28:5 82:19 150:25
**glad** 67:11
**glanced** 164:24
**go** 11:18 16:8 18:4 24:8 29:24 34:17 44:24 60:25 61:2,13 63:25 64:3 65:9 65:9,11 71:19 80:23 81:5 102:21 105:7 114:3 134:18 136:24 137:5 146:15 149:7 150:21 152:1 156:11,14,15 156:20 159:2,7 173:8 174:9 175:7,12,21,21 175:24 184:6 184:25,25 188:11,11,14 201:22,22,25 204:19 207:25 208:2
**godleski** 107:6 107:9,10,19 112:8,15
**goes** 27:13 32:14 88:8 95:8 161:2 179:19 180:8 205:6,19
**going** 11:8 17:24 18:22 19:2,5,6,15 29:19 30:8 48:17 73:5 80:23 82:12 83:15 90:2 95:10 104:16 105:7 110:1 119:15 122:12 124:25 125:3 131:17 132:10 136:25 137:6 141:1 150:2 153:9 155:14 158:13 159:8 163:3 170:5 174:3 188:23 191:15 193:9 196:17,25 197:2 198:24 202:13 213:10
**golkow** 213:13
**good** 10:10,11 43:16 45:17 76:20 77:15 80:25 81:2 82:2 85:25 192:8,9 192:10 193:16 195:13
**gossett** 196:14 197:12
**gotten** 23:5 28:24 71:24
**gowned** 158:1
**grab** 14:10 202:9
**gradient** 145:8
**grand** 3:18
**grandchildren** 186:20

**grants** 147:11
**graph** 121:10
**graphs** 81:19 81:20,23,24 82:2,13,15,16 82:18,20,24 155:1,21 156:7
**great** 81:7 82:13 106:4 134:4 135:2 143:2,7 144:13 152:22 198:8
**greater** 23:23 24:21,21,22 26:18 27:7,10 27:16,17 54:2 59:10 61:23 62:10 63:14,15 63:16 64:8,10 64:19 65:6 66:1 66:4,6,13,20 89:18 124:6,7 128:22 134:21 146:15 209:14 209:20,22,23 210:7,7,10,11 210:15,16,17 210:18,20 211:24
**greatest** 28:7
**grew** 22:1
**ground** 88:13
**group** 6:3 29:8 46:15 53:16 56:16,18 120:18,21 121:5,6,20 136:8,10 178:9 180:7,11,16,20 187:8,22 188:24 199:12
**groups** 197:16 198:6 199:4,8
**grow** 127:11
**growth** 118:2 204:16
**guess** 82:12 101:4 131:17 198:24 213:6
**guessing** 85:11 96:17,24 97:2 148:16 151:13
**guide** 22:4
**guideline** 34:13 203:7
**gut** 139:14
**guys** 70:13 164:13
**gynecologic** 5:12
**gynecology** 6:11 125:15

**h**

**habitual** 43:12
**half** 23:2 27:15 90:8 167:10
**halfway** 108:2
**hallmark** 126:23
**hand** 51:13,21 52:12 55:8 57:18 58:8 74:20,23 106:16 107:23 116:25 117:11 129:16 159:8 192:3 193:23 196:1 197:7,23 204:4
**handle** 213:14
**handled** 108:15
**handwritten** 8:9,12
**happen** 92:16 92:22 116:4 128:2
**happened** 136:10 185:24
**happening** 82:23
**happens** 76:8 81:22 116:3,9 126:16
**happy** 48:5 71:22 119:23 197:4
**hard** 96:17 129:11 155:2
**hardy** 3:17,24
**harlow** 14:13 63:21,22 64:4,6 65:1,23 66:9,10 66:11 67:7,8 68:9 207:16,19 208:13,17,19 209:1,4,12
**harmful** 84:13 136:15 181:24
**harmonize** 67:25
**harper** 124:23 124:24 125:3 126:9 131:11
**hate** 201:17
**head** 29:13 82:8 90:18 131:18
**heading** 78:19
**heads** 150:25
**health** 5:5 30:19 52:24 53:10 54:18 68:24 69:3,5 70:1 72:16 73:11 143:12
**hear** 109:20
**heard** 125:16
**hearing** 94:25
**heavily** 100:7 201:3
**heavy** 83:25 84:11 85:6,6 91:16 155:24 156:3
**hegarty** 3:17 4:4 10:9,14 11:8,14 14:23 17:6,10,24 18:3 18:8 19:7,25 20:15 22:8 23:6 24:3,7,13 25:11 25:14 26:1 27:1 29:19,24 30:4,8

30:12,17 32:8 34:7,17,20 35:2 35:5 39:17,20 40:1 41:8,12 42:1 44:24 45:1 46:22 47:23 48:9 49:8,15,17 50:16,18 51:18 51:21 53:1 59:2 59:12 60:2 61:2 63:25 64:3 65:11 66:10,17 69:1 70:6 71:7 71:12,19,24 72:4,8 74:14 75:6,11 77:5 79:8,24 81:2,5 81:9 82:6,9 83:4,14 84:25 86:19 87:1 88:14 89:9 90:2 91:3 94:12 95:10,21 96:19 97:4,12,15,19 98:4,7 99:15,24 100:16 101:6 101:12 102:21 102:24 104:1 104:10,23 105:7,11,14 106:20 108:13 109:16 111:18 113:1 114:2,7 114:10 116:6 116:14 119:24 122:2,6 124:9 124:25 125:7 128:9,12 129:2 131:4,22 132:16 136:24 137:2,11 138:15 142:19 142:21,23 144:2,8,14,21 148:11 149:12 150:5,23 151:3 152:5 153:6,14 153:18,24 156:11,14 158:13,18,21 158:24 159:1,7 161:9,15 162:25 163:7 163:10 164:11 164:18,22 168:1,17,21 169:2,12,15,21 170:19 171:8 172:3 173:2,8 173:13,20 174:1,9,14 175:12,21,24 177:2 183:9,13 183:20,25 184:5,10,25 185:3 187:14 187:16 188:11 188:14 191:15 191:21 193:21 195:22 196:17 196:23 197:2 197:10,22 200:24 201:20 201:22,25 202:15,19 205:16 206:13 207:9,24 208:5 208:8,21 209:8 209:18 211:12 211:20 212:6 212:21 213:1,5 213:12,15,18

**help** 37:24 46:16 204:20

**helped** 22:4

**hereto** 184:16 214:5

**hesitating** 39:23 50:10

**heterogeneity** 197:15 198:1 198:12,15,17 198:21 199:15

**hey** 201:17

**hiding** 208:1

**high** 56:2 121:14 129:1 139:24,24 140:1,4 142:7 142:15,18 192:13,21

**higher** 59:1,11 68:8 153:2 161:13 211:14 211:23 212:1

**highest** 56:23 62:7,7,11,20,24

**highlight** 154:2

**highlighted** 167:25

**highly** 31:25 123:4

**hill** 3:11 145:6 145:10

**hinder** 36:18

**hired** 189:4

**historically** 28:21

**history** 107:2 130:15

**hmm** 53:5,7 169:14 185:12 193:3

**hope** 193:16

**hoping** 65:8

**hopkins** 93:18 93:22,23 94:1 94:16,18 95:2,5 95:12,15,23,23 96:6,20 97:21

**hormone** 7:5 140:9

**hospital** 157:25

**hour** 160:17 168:11

**hours** 157:3 159:24 160:2,6 160:19 167:5 167:11 202:1

**hrs** 197:25

**human** 6:9 118:11,15 124:11,12

128:14,15,19
**humans** 115:16 115:23 116:9 116:16 117:16 123:24 180:11 204:9
**huncharek** 137:17
**hundred** 37:16 192:12 210:3
**hundreds** 28:24
**hygiene** 154:24
**hypothesis** 28:20
**hypothetical** 47:14
**hysterectomy** 211:7

**i**

**i.e.** 205:12
**iarc** 84:13 89:18 90:13 101:22 102:4 102:11 103:1 103:13 180:7 180:12,15,18 189:10
**idea** 21:25 23:5 130:5 154:6,7
**identical** 165:9 165:12,13
**identification** 11:11 18:6 19:3 24:11 30:15 72:5 105:12 114:5 122:4 125:5 137:8 144:6 153:16 159:6 163:5 164:16 168:19 169:19 173:24 174:7 175:10 184:8 191:17 196:19
**identified** 10:25 13:22 16:25 88:2 186:3
**identifies** 123:4
**identify** 178:22
**identifying** 59:11 113:5
**ignoring** 177:10,13
**iii** 93:8
**images** 111:6
**imagine** 133:3
**imaging** 93:3
**immunosurve...** 118:22 205:24
**impact** 36:7 70:17 73:21 82:18,19 85:21 107:17 118:7 139:10 193:10 193:18
**imperfect** 108:25 195:11
**importance** 79:20 100:10 110:23 131:21 182:13
**important** 16:19,21 26:14 27:14 77:14 80:8 85:19 97:1 100:6 113:18 135:3 145:10 146:13 152:15 162:23 179:11 179:14,15 180:1 181:18 181:20 182:8 182:14 199:24
**importantly** 86:4
**impossible** 63:10 115:18
**improved** 130:16
**inaccurate** 209:25
**inception** 53:11
**incidence** 140:22,24 141:4,10
**incident** 7:5
**include** 21:14 51:25 54:11,16 54:17 55:3 58:24 62:17 69:18 121:24 134:8,9 178:4 206:2 212:9
**included** 32:9 36:20 50:11 53:25 54:18 56:25 57:18 60:12 67:21 70:2,7 73:11,16 73:18 74:18 75:14 87:11,24 132:19 160:19 163:25 178:5,6 179:22 181:3,8 203:4 206:24 208:25 209:4 211:7 213:1,2
**includes** 74:16 172:23
**including** 17:1 48:12 54:3 97:13 141:5 160:4 165:20 177:15 179:17 204:6 207:6
**inclusion** 53:24 55:1 58:22
**income** 149:21 160:21 161:1,4
**inconsistency** 69:20
**inconsistent** 32:15,20 33:12 52:15 68:20
**incontroversial** 86:1
**incorrect** 180:14 203:8
**incorrectly** 65:1
**increase** 28:16 118:20 119:9 119:19 120:25

139:17,21,25
140:21 141:3,7
141:10 142:9
193:24 194:13
194:16 199:12
**increased**   51:14
118:2,19 120:5
141:17,21
142:8 155:22
204:16 205:21
**increases**   140:2
140:23
**incredible**
42:12
**incredibly**
134:22
**incurred**
171:14
**independently**
51:3
**index**   4:1
**indicate**   194:19
**indicated**   42:19
**indicating**
132:11 194:7
**individual**
27:12 45:25
152:2 155:1
189:12 211:11
**individuals**
36:9 45:8 129:8
189:18,20
**induces**   6:8
**inflammation**
91:23 118:20
119:17,20

120:2,6 141:7
**influence**   186:1
**influential**
143:14
**inform**   16:20
82:20 116:1
**information**
50:12 53:4
87:11 96:25
113:9 150:12
172:8 177:9,11
**informational**
37:18
**informationist**
53:10,10
**informed**   86:4
116:18
**ingredients**
84:23
**inhibited**
117:21 204:12
**initial**   32:20
59:6 109:9
151:17 192:24
**initialed**   214:4
**initially**   12:12
20:9
**initiated**   92:8
**initiation**   21:21
**initiative**   54:18
**ink**   110:21
214:4
**innocuous**
204:21
**input**   73:3

**insensitive**
100:13
**inside**   108:24
109:2,3 111:5,7
111:7
**insights**   22:6
116:4 133:9
**insoluble**   6:5
**institute**   5:3
**intact**   67:21
68:3,15,16,19
69:17,19,19
70:2
**intake**   139:3
**intend**   10:24
13:12,16
159:25 190:8
190:13 191:1
200:21 201:4
201:11
**intending**   32:25
**intent**   69:11
**intention**   36:21
201:7 203:14
**interaction**
157:13
**interest**   80:1,12
111:20,23
112:7,14
113:11 118:15
129:8,14 130:6
130:7,13
133:13 134:4,5
134:21,25
135:2 136:12
136:14,18,21

147:25 148:9
149:9
**interested**
22:16 30:14
31:10 131:14
132:22 215:16
**interesting**
113:7 154:7
**interim**   114:21
**interior**   110:22
**internal**   8:24
19:12 42:13
46:19 143:18
175:16 176:3,8
176:14 183:21
185:9,19
**international**
7:3 143:15
**interpret**   25:21
**interpretation**
27:25 28:2,14
107:18
**interpreted**
33:22 34:10
**interrupt**   167:9
**interval**   27:22
28:4,5,9,19
64:7 73:23,25
145:3 193:19
**intervals**   81:23
198:20
**interviews**   37:3
37:18
**introduces**
136:22

**introduction** 25:12 26:10 52:11
**invalid** 100:3
**invalidate** 77:13
**invalidates** 76:21 77:19
**investigate** 117:6,21 204:11
**investigation** 4:21 6:15 23:3
**investigator** 113:14
**investigators** 78:3 134:14
**invoice** 7:9,12 159:21,25 160:12 168:10
**invoiced** 21:18 160:10
**invoices** 158:14 158:18 159:8 159:12 160:12 171:18
**involve** 10:17 86:12 99:1
**involved** 37:15 39:10 40:9 109:8,15 135:16 149:2
**involvement** 36:16 46:24
**involves** 107:19
**involving** 10:17 50:23 158:8
**issue** 52:25 61:19 69:24 133:1 179:16 182:4 203:16
**issues** 130:17 131:19 199:24 199:24
**itemize** 41:16

**j**

**j774** 6:5
**jama** 4:21 9:18
**january** 9:3,19
**jersey** 1:2 2:2 3:11 11:5 12:14
**jgim** 9:5 19:12
**jjg** 107:1,6 112:8,19
**joanne** 45:9 46:2 48:4,6,14
**joanne's** 48:4
**job** 1:23 47:22
**joe** 45:10
**john** 107:6,9 112:8
**johnson** 1:5,5 2:5,5 3:16,16 10:15,15,17,17 97:24,24 98:1,1 98:13,13,13 99:1,2 105:4,11 105:17 106:5 111:24 190:3,3 190:5,6 204:6,6 211:17,18
**johnson's** 98:14 98:19 100:18 203:15 206:24 207:6
**join** 34:16
**joined** 34:18
**journal** 6:14 19:11,12,13 40:2 41:23 52:20 125:16 125:19,20,22 130:12,12 131:18 143:18 176:17
**journalist** 172:7
**journals** 130:4 130:22 131:7
**joy** 157:25
**judith** 7:18 164:15,15
**judkins** 166:7
**july** 20:22 106:1,5 114:17
**jump** 118:24

**k**

**kansas** 3:19
**kara** 3:24
**katie** 154:15
**keep** 110:13,25 136:19
**keeping** 71:8 164:5
**kej** 111:25,25
**kept** 110:19 150:20 177:25 202:16
**kessler** 14:14
**kind** 37:6 40:22 44:2,4 46:12,13 110:18 135:15 149:1 172:5,13 192:20
**kinds** 183:2
**kleiner** 94:15 156:21
**knew** 126:2
**knock** 197:8
**know** 12:22,25 12:25 13:3,6,18 22:14 32:19 34:5 36:9 38:18 44:3,17 45:7,9 45:10,14 48:10 53:17 57:17 71:17 73:5 75:5 76:6 80:9 82:18 82:23 84:10 86:16 89:16 96:8 97:11 101:2,18 103:7 109:15,17 110:18 113:18 115:3,4,7 116:12 121:6 124:18 125:12 126:4,6 129:14 130:3,7 131:1,9 132:13 136:6

146:11,18,22
146:25 148:15
148:15 151:14
152:9,15,16,16
154:14 155:7
155:24 165:11
165:18 181:20
181:24 190:13
195:17 197:12
197:13 202:20
209:11
**knowing** 94:3
101:4 112:15
134:5
**knowledge**
46:23 47:3
77:12 142:14
158:7
**known** 107:2
127:13
**kramer** 68:8
**kurt** 111:24

**l**

**l.l.p.** 3:17,24
**lab** 37:20 110:1
110:20 111:10
135:25
**labs** 135:22,23
**lack** 44:18,20
100:12 127:6
**laid** 34:12 62:6
**lake** 3:10
**language** 28:11
59:24

**lapinski** 3:9,13
34:18
**laptop** 45:7
**large** 79:17
135:18 143:13
195:3
**latest** 13:19
30:6
**law** 3:4,5,10,18
112:2,5 147:13
148:5,13
171:19
**lawyers** 71:5
129:25 133:21
134:6 135:7,23
136:1 165:19
**lay** 95:11
**laying** 39:14
**lazar** 39:2,9
40:13,22 41:5
57:12 70:20
72:21 81:11,17
82:25
**lead** 46:1 120:7
120:19 123:21
126:12 186:3
**leader** 134:18
**leading** 28:24
**leads** 116:23
123:18 143:14
**learned** 22:7,16
54:19 101:14
**leave** 45:2
135:4 209:17
**lecturers** 37:16

**lectures** 162:1
**led** 22:2,3 23:1
37:14,15
118:19 120:21
152:3 205:21
**left** 51:13,21
57:18 67:5,7,8
74:20 117:11
196:1 197:7,23
204:4
**leigh** 3:4 167:1
173:11 207:25
212:11
**leigh.odell** 3:8
**length** 88:9
198:8
**letter** 175:17
185:24 186:2,5
**letters** 199:21
199:23
**level** 26:21
34:12 40:3
60:12 91:6,11
92:21,22
100:22 116:3
121:18 162:16
189:15
**levied** 77:21
**levy** 78:7
**liability** 1:6 2:6
**library** 53:15
**lifetime** 59:19
59:20,22 60:8
60:18,22 61:10
61:14 76:15
209:14,22

210:17
**lightly** 77:21
**likelihood** 43:1
43:21 44:12
118:2 119:13
204:16
**likely** 23:8
28:15 43:13
82:5 181:25
186:1
**limit** 189:12
211:21
**limitations** 78:9
78:16,19,24
195:24 196:5
**limited** 23:18
104:13 207:7
211:15
**line** 39:15 52:12
53:8 56:21
75:23 78:10,21
78:23 83:22
96:2,10 102:8
102:11 103:6
104:2,4,12
106:23,24
118:16 122:16
140:18 177:4
178:10,13
180:18 182:25
184:15 197:23
208:11
**lined** 176:21
**lines** 20:10
53:23 83:19
85:19,22 86:3

106:24 117:5 118:13 122:24 139:2 176:21 177:3 178:7 179:9 180:7 206:10
**link** 172:25
**list** 95:16,19 97:18 101:5 163:1,10 164:1 164:4,9 165:1,4 165:22 190:20
**listed** 45:8 140:21 179:1
**listing** 165:9
**lit** 107:20
**literature** 10:24 13:21 22:18 46:17 88:5,17 88:21 91:5,10 103:15 106:9 116:8 141:2 175:2
**litigation** 1:7 2:7 19:20 20:4 20:18,22 21:1 21:18,23 22:12 23:12 38:16 80:6,14 107:20 112:10,16 113:5 131:6 133:16,22 135:7,16,19 142:14 146:21 150:9 158:5 159:13,17 160:7,15,22 161:5 171:1,17 172:15 173:6 174:5,20 186:23 189:5 189:21 199:20 200:22
**little** 28:2 68:11 137:22 149:7 201:18
**living** 108:6
**llc** 3:9
**local** 91:22 92:3
**locally** 108:10
**location** 48:7 96:4,18
**long** 24:21 36:14 39:15 93:25 95:20 167:7 203:6
**longer** 28:1,25 110:25 157:12
**longo** 93:18 100:8
**longo's** 14:14 14:15 87:12 135:13
**look** 11:21 16:8 18:17 23:19,20 24:19 27:9 28:5 29:25 30:21 32:12 48:25 59:17 64:23 66:23 78:9,16 100:7,12 101:20 102:18 110:3,4,6,9,10 110:10 113:23 119:23 121:2 121:10 122:14 128:5 129:3,25 137:25 142:1,3 152:19,23 155:3,11,15 164:25 165:3 165:21 188:10 192:2,22 205:9
**looked** 23:16 32:11 50:1 55:13 68:4 84:9 96:17 97:2 101:1 122:8,17 123:11 132:12 132:15 137:17 137:24,24,25 138:4,9,10,11 145:22 152:24 154:13,18 155:21 156:8 174:15,16 190:14,24 191:24
**looking** 19:6 27:8 30:11 40:10 51:1,12 52:11 53:21 57:17 58:9 59:13 61:7 64:5 66:24 74:20 75:22 107:23 110:22 111:6 124:24 133:13 138:3 144:22 145:22 170:20 176:1 177:3 178:7,21 180:2 182:20 185:5 188:20 192:18
**looks** 24:20 140:5
**lose** 183:15
**loses** 110:23
**lost** 49:7 106:15
**lot** 44:21 46:19 76:4,7 85:18 113:12 116:18 126:22,23,25 168:3 189:14 190:21 199:21 199:23
**love** 173:15
**low** 139:11 198:16
**lower** 121:8,8 121:17,23
**lung** 181:19
**lurie** 143:12

**m**

**m.d.** 1:13 2:13 3:25 4:3 8:6 10:4 169:17 214:1,10
**ma'am** 103:19 124:25 142:21 148:18 157:9
**machine** 215:7

**macrophage** 92:22 118:21 205:23
**macrophages** 6:6 118:7,10,11 118:18 122:8 122:17,21 123:25 124:11 124:13 204:23 205:20
**made** 16:3,15 52:20 69:14 70:10,17 76:4 77:1 89:18 110:13 131:5 132:10 134:18 151:10 152:6 152:13 179:21 185:20 187:9 187:23,25 188:1,25 189:19,20 196:24 200:1 201:15 214:3 215:7
**magnitude** 128:22
**main** 25:5 26:3 26:8,12,13,14 32:16,20 33:12 158:2
**make** 14:23 15:13,16 17:19 39:12,21 57:2 63:10 67:24 83:24 113:23 128:20 134:8 148:25 150:24 151:3,20,22 153:11 158:21 172:21 175:1 182:16 191:7 194:10 196:1 202:8,15 212:12,17,21
**makes** 31:15 33:16 108:2 132:6 197:14 198:14
**making** 57:8 69:4 132:7 195:3
**malignancy** 54:7
**malignant** 6:8 126:16 127:9 127:17
**mammography** 182:11
**mandarino** 92:20 113:24 114:3,11,16 115:10,13,20 118:17 119:5 203:20 204:3 206:6
**manner** 23:14 108:6
**manuscript** 8:16 39:24 81:20 176:22 179:8 182:16 183:1 184:16
**march** 1:15 2:17 7:22 9:7,8 10:1 29:16 30:6 30:23 34:22 35:6 81:12 82:4 169:10 189:3
**margaret** 3:25 167:1
**mark** 3:17 10:14 11:8 16:9 17:6,24 18:22 19:2 24:8 29:19 29:24 30:8,9 35:1 39:12 49:7 71:23,25 88:8 105:7 110:20 110:20 114:4 122:2,7 124:25 125:3 137:6 144:4 153:6 158:13,17 161:7 162:25 168:17 169:13 170:22 173:13 174:9 184:6 191:15 196:18 196:22 201:17 202:19
**marked** 11:11 11:14 16:10 18:6,10,12 19:3 24:11,14 30:15 30:17 46:25 47:5 72:5,8 105:12 114:5 122:4 125:5 137:8 144:6 153:10,16 159:5,10,21 163:5,7 164:16 164:20 168:19 169:19 171:7 171:10,21 172:1 173:21 173:24 174:7 175:10,13 182:17 183:23 183:25 184:2,8 184:24 191:17 196:19,21 203:25 207:13 207:20 212:10
**marketing** 1:6 2:6
**marking** 105:8
**mas** 1:5 2:5
**material** 12:20 62:21 110:8 181:21
**materials** 7:15 10:24 12:17 13:21,24 14:2,8 16:14,25 17:2 73:18 95:16,19 97:18 163:10 163:19 164:1,6 164:9,25 165:3 165:9,18,19,20 165:23 166:6,9 166:13,16,19 167:20 170:24

172:13,17,24 188:20 190:8 190:14 212:7
**math** 59:24 60:3
**matter** 109:2
**mctiernan** 14:13
**md** 4:14 7:9,12 7:18,23
**mdl** 1:5 2:5 10:16 11:1 13:20 15:22 17:3 20:11 58:14 87:10 94:2,7 105:21 105:25 107:11 162:11,20 166:2 171:1,16 171:18 172:6 172:14,15 174:20
**mean** 12:2 32:19,22 34:14 35:16 46:7 48:13 56:8 60:6 79:12,16 83:2 120:6 123:10 129:18,21 130:10 134:25 136:22 152:1 157:12 158:12 160:1 161:7 162:4 165:13 165:18 178:17 189:10
**meaning** 44:4 132:9 156:6
**meaningful** 27:19 29:1 43:11 56:3 129:12 135:5 152:17 181:12 211:19
**means** 27:23,24 28:20 116:19 127:25 138:11
**meant** 18:12 69:1,3 111:25 116:1 121:5,14 161:7
**measure** 50:7 50:14,22 120:10 123:13 123:14 124:4
**measured** 76:15 118:5 120:9
**measurement** 155:25 156:5
**measures** 126:17
**measuring** 124:1
**mechanism** 36:4,8 75:24 76:5,7 84:11 85:20 116:1,21 123:21 189:17
**mechanisms** 16:19
**mechanistic** 84:15 89:23 189:14
**media** 37:19 172:7
**mediated** 141:11 204:23
**medical** 12:16 12:19 29:3 46:17 84:6 88:4 88:17 91:5,10 103:15 106:9 112:1 116:7 162:6 166:2,6,9 166:13,16,19 169:7 186:22 187:3,8,22 188:24
**medicine** 8:24 19:12 143:18 175:16 176:3,8 176:15 183:22 185:9,19
**meet** 54:13 166:22,25 167:2,9
**meeting** 37:16
**meetings** 37:13
**member** 46:4
**members** 35:15 36:16,22 47:4
**memory** 158:22 207:19
**mention** 161:17
**mentioned** 14:20 16:2
29:11 74:17 141:22 143:5 162:13 174:15 190:16 209:11
**mesothelioma** 97:14
**met** 55:18 56:12 167:4,4 167:10,11
**meta** 4:19 6:18 8:20 19:1,19 20:2,20,25 21:16 22:10,23 23:9 31:24 52:14 177:21 179:22
**metals** 83:25 84:12 85:6 91:16
**method** 63:2
**methods** 51:1 62:6 136:4
**mhegarty** 3:20
**mice** 115:5
**microarray** 123:5
**microarrays** 123:3
**microscopy** 100:9
**middle** 31:15 56:16 102:1 121:2
**mild** 17:7
**millions** 110:4

**mills** 59:14
**mind** 24:6 35:1
  45:6 119:22
  143:6,19 190:1
  199:14 211:19
**mine** 14:13
  102:22
**minerva** 6:11
  125:15 130:4
**mines** 87:14
**minute** 136:7
**minutes** 197:8
**misclassificat...**
  43:2 180:4,6
**miscommuni...**
  14:20
**misidentified**
  185:6
**misleading**
  137:22
**misremember**
  181:18,19,21
  181:23
**misremembe...**
  43:22 44:12
  182:8,9,14
**misremembers**
  182:6
**missing** 76:16
**missouri** 3:19
**misstates** 96:13
**mistake** 152:13
**mistaken** 95:18
  199:5,6
**mixed** 154:11

**mixtures** 7:4
**mm** 53:5,7
  169:14 185:12
  193:3
**model** 100:17
  118:13 122:16
**moisturizer**
  43:18
**moment** 64:4
**money** 42:8,9
  42:14 150:16
**monograph**
  102:5
**montgomery**
  3:6
**month** 44:10,13
  60:5 64:11,17
  65:25 66:1,5,13
  66:15,20
  209:23 210:8
  210:11,16,19
  210:20
**moormon**
  14:14 146:17
  146:18 147:7
  147:10,22
**morning** 10:10
  10:11
**motley** 3:9
**motleyrice.com**
  3:12
**mouse** 114:22
  115:2 118:13
  122:8,21
**move** 16:13
  67:10,10

**moved** 93:5
**movement** 28:3
**mt** 53:14
**multiple** 54:1
  63:1,9 153:2
  154:7
**multivariate**
  69:7
**murine** 114:23
  114:25 115:2
  116:8 118:10
  122:16
**mutation**
  120:10 123:9
**mutations**
  122:21,22
  123:1

**n**

**nailed** 63:23
**name** 7:22
  10:12,14 11:23
  46:8 53:19
  143:5 215:19
**naming** 143:6
**napkin** 178:3
**napkins** 54:5
  177:16
**national** 5:3
  32:7
**nature** 100:25
  204:21
**nci** 29:12,16
  30:18 31:11,22
  31:24 32:14
  33:10 34:1,22

34:22 35:7,9
  36:10,16,17,23
  38:9 45:23 46:4
  46:5,8,13,24
  47:5,11,15
  48:12 187:19
  187:25 188:1
  188:18
**near** 48:7
**necessarily**
  134:20 145:18
**necessary** 12:9
  42:15 91:7,11
**need** 23:25 24:2
  36:12 64:23
  75:4 79:21
  82:13,14,16
  83:18 133:6
  135:18 139:6
  152:15 155:15
  163:3 164:13
  169:9 191:3
  207:25,25
  212:7
**needed** 42:11
  117:14 204:7
**needs** 129:9
  136:21
**neither** 215:15
**never** 22:21
  23:10 37:15,17
  37:22 38:21
  43:3 44:13 56:8
  61:18 93:15
  95:25 96:11
  100:1 101:1

132:12,15 203:8
**new** 1:2 2:2 3:11 10:23 11:5 12:14 13:21,21 20:7 22:2,3,13 22:19 82:24 85:15 87:13,15 87:17,18 88:2,2 88:11 90:15,19 91:1,14 92:13 92:13 95:12 96:2,3,4,12,16 96:16 98:9 102:8 103:18 124:22 134:18 134:23 164:5 190:4 200:11
**newcastle** 51:2 51:6
**newly** 90:17 92:14
**newman** 14:15
**news** 143:21
**newsom** 166:13
**newspaper** 37:4 38:3,6 143:22
**newspapers** 38:19,21
**nh** 55:22,23
**nhs** 32:7,11,23 33:2 55:23 57:25 67:17 73:20
**nicole** 143:12
**nods** 29:13 82:8
**nolasco** 1:21 2:18 215:22
**non** 68:16
**nonoverlapping** 198:19
**nonpatent** 196:12 198:1 210:25 211:3
**nonusers** 178:9
**normal** 6:9 127:4
**note** 16:21
**notebook** 8:13 175:3,3,4 212:9
**notebooks** 174:22,23,25 175:1,2 212:10 212:16,22,24 213:9,11
**noted** 213:21 214:4
**notes** 8:9,12 14:6 16:3,5,15 16:16,17 17:1,2 17:8,11,19 29:12 173:5,9 173:10,13,21 174:2,3 212:9 212:17 213:7,8
**notice** 8:4 169:16 170:14
**noting** 104:16
**notoriously** 82:2
**novel** 126:14
**november** 7:13 10:19 17:25 18:1,13,14,19 20:12,17 153:20,22 159:22,25 160:5,5,19 163:16,20 164:1,14 168:24 190:10
**null** 28:20 211:14
**number** 4:9 5:2 6:2 7:2 8:2 9:2 9:13,19 23:2,18 44:10,12 55:15 56:12 58:18 61:23 62:21 63:15,16,19,20 64:5,6,15,16,23 64:24,25 65:6 65:25 66:13,20 72:16 85:13,23 99:8 108:3 129:1 141:5 146:15 157:3 165:8 178:22 179:1,2,2 183:7 183:12,14,15 192:13,20 193:6 199:10 204:5 205:7 206:5 210:11 210:22,23,24
**numbered** 31:5 182:25 183:8 184:15
**numbers** 59:18 63:18 65:7,15 65:16,22 66:3,4 66:5 73:20 193:20 198:18 199:11 210:9 210:14
**numerical** 85:4 85:13
**numerically** 85:11
**nurses** 54:18 68:24 69:3,5 70:1 72:16 73:11

**o**

**o'brien** 23:16 23:22 24:1,3,15 25:2,4,13,19 26:17 31:16,21 32:4,9,11,12,17 32:22 33:1,3,6 33:17,20 35:8 35:17 54:13,17 54:20,20 56:7 59:15 67:1,1,15 68:18,24 69:8 154:15 191:8 199:19,25 200:1
**o'brien's** 73:20 196:2

**o'dell** 3:4 4:5 11:13 14:19 19:5,22 20:13 21:24 22:25 23:25 24:5 25:9 25:13,16 26:23 29:21 30:3,5,10 32:5 34:3,25 35:3 39:12,19 39:21 41:2,11 41:18 46:10 47:19 48:1 49:6 49:10,12 50:15 51:17 52:22 58:20 59:8,16 66:8 68:22 70:3 71:6,8,16,22 74:9 75:4,8 77:4 79:6,15 82:8 83:1,13 84:20 86:14,24 88:7 89:6,14 90:25 94:9 95:4 95:15 96:13,23 97:8,13,16 98:3 98:6 99:10,19 100:4,24 101:10 102:20 103:24 104:8 104:13 106:19 108:12 109:12 111:15 112:17 114:9 115:24 116:10 119:21 124:2 128:6,16 130:24 131:16 132:2 135:9 137:10 138:7 142:16 144:12 144:19 148:3 148:23 150:4 151:1,20 153:11,13,21 155:19 158:17 158:20,22,25 161:6,10 163:9 164:2 167:23 170:12,17 171:6,23 172:21 173:12 173:14,17 174:12 175:20 176:23 183:6 183:18,23 187:11 191:19 193:12 195:18 196:21,25 197:8,20 200:23 201:17 201:21 202:5 202:11,13,24 205:18 206:15 207:11 208:3,6 208:9,23 209:10 210:2 210:21 211:16 212:3,14 213:4 213:6,13,16,20

**o0o** 9:23

**oath** 10:5 215:6

**obama** 143:13

**obese** 140:6

**obesity** 140:2 141:1,11,16,19

**object** 19:22 20:13 21:24 22:25 26:23 32:5 34:3,25 41:2,18 46:10 47:19 48:1 50:15 52:22 58:20 59:8,16 66:8 68:22 70:3 74:9 77:4 79:6 79:15 83:1 84:20 88:7 89:6 89:14 90:25 94:9 95:4 96:13 96:23 99:10,19 100:4,24 101:10 103:24 104:8 108:12 109:12 112:17 115:24 116:10 119:21 124:2 128:6,16 130:24 131:16 132:2 135:9,9 142:16 148:3 148:23 151:2 153:21 155:19 161:6 167:23 187:11 193:12 200:23 208:21

**objected** 170:13 171:23

**objecting** 39:14

**objection** 86:14 86:24 97:8 104:16 111:15 138:7 151:20 151:21 176:23 205:16 206:13 207:9 209:8,18 211:12,20

**objections** 8:4 169:16 171:25 172:24

**observed** 193:24 194:12 194:16,21

**obstetrics** 6:11 125:15

**obvious** 179:4

**oc** 204:22

**occur** 92:19 126:15 127:13 164:8

**october** 7:10 11:1 17:4 30:6 30:11 39:13 85:17 86:9 87:5 87:10,19 88:16 89:1,11 90:6,9 90:22 91:4,9,15 94:7,14 98:12 103:14 156:17 156:24 158:5 158:11 159:18 161:16,25 162:10,19 166:1,5,12,15

166:18 168:12
171:3,4 173:6
174:4,17,20
175:15 186:7
186:11,15,21
187:1,5,7 190:6
199:18 200:14
**odd** 196:7
**odds** 27:23
144:23 145:2
**official** 201:19
**oh** 14:23,25
49:10 71:25
78:18,20 97:15
139:1 147:17
173:17 183:17
184:5 196:23
198:21
**okay** 15:4 17:16
18:3,8,21 34:17
49:12 51:11
61:2,20 64:13
65:11,20 66:22
67:10,11 69:1
74:2 75:8 80:24
93:7 119:6
137:2 138:16
139:8 151:3
159:7 161:10
170:7,10
173:14,19
175:24 176:14
183:23,24
184:6,18 185:3
186:6 188:11
188:14 194:12

201:22 202:13
208:2,8 213:5
213:12,15
**old** 179:7
**older** 29:10
98:21,23
**omni** 2:15
**once** 22:16
23:23 24:23
26:18 27:7,17
43:7 57:3 61:17
**oncology** 5:12
**ones** 118:14
132:14 141:6
158:15 165:21
171:6,9 173:7
**online** 150:21
188:3,4
**open** 36:3 68:4
68:7 69:25
72:17 104:25
132:7,7,8
211:22,24
**operating**
109:23,25
110:17,24
**opinion** 16:20
84:5 100:2,17
100:20,21
101:7 103:21
112:13 115:22
116:15,17,20
123:8,13
127:19 137:20
139:17,18,22
140:23 195:5

204:25
**opinions** 10:23
13:21 38:16
126:10 148:19
155:10 162:11
162:20 186:23
187:4 190:9
191:5 195:6,8
201:1,3,5,12
205:4 207:8
**opportunity**
45:4 61:6 76:23
**opposed** 112:20
132:10 140:5
177:24 185:21
**opposite** 191:25
192:1
**oral** 8:5 169:17
**orally** 56:5
**order** 149:14
164:6
**orders** 128:22
**organization**
171:14,16
186:22 187:4,9
**organized**
126:12 127:23
202:7
**original** 4:21
32:16 33:2,6,12
215:12
**originally**
94:18 143:5
**osha** 168:5
190:17

**ottowa** 51:2,6
**outcome**
181:16
**outdated** 28:2
**outlet** 38:22
172:7
**outlets** 38:12,16
38:20
**outlined** 172:23
**outside** 101:17
118:12 133:8
142:13 147:13
160:3 162:18
167:21 189:4
189:20,22,23
201:8
**outstanding**
192:21
**ovarian** 4:18,23
5:3,15,20 6:10
6:14,16,23,23
8:18 9:17 18:25
25:7 26:5,19,21
27:7 30:18
48:23 49:2
51:14 52:3,7
54:7 68:5 69:10
75:24 84:7,18
84:23 85:16,22
85:22 88:6,19
89:4,13,21
90:11,23 91:7
91:12,16 103:9
103:22 104:6
104:21 106:13
106:17 107:2

114:23 115:6 122:11,14,18 124:7 137:16 137:21 138:6 138:22 139:4 139:12,17,21 139:25 140:3 140:11,20,22 140:24 141:4,8 141:9,10,12,13 141:18,21,23 142:9 144:25 145:24 162:2 178:23 186:8 186:12 187:10 187:20,24 188:18,22 189:1,6,11,16 194:19 200:18 204:22
**ovaries** 211:9
**ovary** 128:15
**overall** 63:6 72:15 73:22,22
**overlap** 28:18 193:20
**overlapping** 198:19
**overlaps** 28:1
**oversee** 213:10
**oversees** 55:21
**oversight** 210:9
**overweight** 141:16,20,22
**own** 14:22 105:18 114:14 125:10 137:12 144:18 175:5,6
**oxygen** 118:6,8 118:19 119:10 119:13,19 120:5 205:22

**p**

**p** 3:4 197:15 198:1,11,14,20
**p.g.** 147:7,10
**p.m.** 2:17 213:21
**p.o.** 3:6
**page** 7:10,13 8:24 11:17 24:19 30:22 31:5,14 49:1,8 51:13,19 53:2 57:14 58:9 66:24 67:12 71:21 74:15,16 74:21 79:25 83:17,19,20 91:20 92:2 93:2 93:8 101:20,24 101:25 102:13 102:14,20,25 104:24 106:11 106:12,16,19 106:21,22 107:22 111:19 113:23 116:25 117:10 119:3,4 119:4 120:22 123:2 137:4 138:17 142:4 144:2 147:4 151:5 164:8 165:1,4,14 170:1,20 172:4 172:23 179:6,9 192:2,22 193:22 194:4 195:23 197:6 197:21,23 203:2,18,19 204:2,4 208:5
**pages** 1:25 4:9 4:11,14,19,24 5:2,6,10,16,21 6:2,6,12,18,25 7:2,7,16,18,23 8:2,7,10,13,20 9:2,14,20 11:21 16:5,6 17:14 124:23 158:16 165:17 173:10 173:21 212:9,9
**paid** 21:19 40:20,22,23 41:4,7 80:4 112:1 113:16 133:14,21 134:9,19,23 135:1,21,23 136:13,21 150:16 160:9
**paper** 6:4 17:15 17:17 18:23 19:16,19 21:7 21:10,22 22:11 23:10,15 24:1,4 24:16 25:5 26:2 26:11,17 31:20 31:21 35:7,17 35:17 36:24 38:9,12 39:5,6 40:12 41:1,15 41:17 42:7,17 42:23 48:17 50:14,19 52:6 55:17 57:10 60:21,23,24 61:5 62:16,19 63:12,21,22 64:4,23 65:17 65:23 66:7,19 67:9,12,15 72:14 73:17 74:16,19 76:10 77:3,9,25 78:8 79:5 80:9,13,16 92:20 105:11 105:15,17 106:5 108:2,15 111:13 113:2 113:17,22 115:10,13,20 116:19 117:13 121:25 122:7 122:14,20 123:16 125:17 126:9 129:4 130:3,21 131:3 131:8,12,25 132:1,4,15,15 132:18,20

133:12 134:1,2 134:5,7,15 135:6 139:16 142:1,15 143:23 144:17 146:16 148:2 148:22 152:19 153:4,6,7,9,20 154:2 155:11 155:15 175:18 176:18 177:9 179:4,24 181:5 181:8 182:22 185:11,18 195:5,15,17 203:20 204:3 207:12,13,16 207:19,22 208:15,17 209:1,4,5,20 210:4
**paper's** 75:13 130:8
**papers** 17:9 23:18,20 40:5,6 59:20 63:13,24 69:12 77:11,17 85:18,23 88:22 89:10 109:8 126:5 130:9 132:5,6,13 133:4 146:11 165:24
**paragraph** 11:21,22 12:1,2 12:5 25:12 26:10 52:12 53:22 54:25 55:7 75:23 81:17 83:18 93:12 101:21 101:21 102:1,3 102:3,17,25 103:1,7 104:24 105:1,3 107:24 113:24 117:1,3 118:17 139:9 141:15 142:6 144:4 172:4,12 177:14 178:7 178:13,21 179:9 180:3 181:1,10 182:25 192:3 193:23 194:2 204:19 205:6
**paragraphs** 102:14
**paren** 205:10
**part** 20:3,21 21:1,11,22 27:2 27:10 31:7 42:3 42:17 43:17 55:17 74:16 98:17 117:5 118:8 121:24 131:6 133:19 134:6,7,10 135:18 136:15 145:6 150:19 171:12 173:5 176:2,16,17 188:5 190:9 197:10 200:25 201:5
**partially** 52:14
**participant** 22:5
**participated** 94:4
**particles** 5:19 6:5 108:4,9,21 108:23 110:14 111:7,12 128:21 205:9 205:11
**particular** 10:18 30:13 46:3 61:9 118:15 128:15 138:3 139:18 180:3 186:25
**particularly** 76:22 87:13 108:4 117:16 132:22 133:6 140:5 155:10 155:12 186:20 204:9
**particulate** 109:2
**particulates** 108:8,21 110:14 128:24 205:11
**parties** 213:3
**parts** 27:4 37:2 48:16,18
**party** 172:7 215:17
**past** 12:3 28:10 124:4
**patent** 27:17 55:4 68:8 69:8 69:8,12,13 73:12,21 74:7,7 196:2,12 197:25 210:25 211:3,15
**pathologic** 127:6
**pathology** 108:16,21 109:10,21 110:1,20 111:10
**pathway** 123:18,23
**patient** 106:25 107:1 110:25 186:8
**patient's** 186:12
**patients** 5:16 43:2 56:1,4 57:2 106:13,21 107:13,14,19 116:4 123:23 124:6,8 154:15 157:13,16 158:2 178:2
**patricia** 146:16 146:18

**patterns**  9:11
191:9
**pause**  65:3
**pay**  41:20
130:12
**paying**  136:6
136:17
**payment**
170:25
**payments**
172:5
**pd**  31:22
**pdq**  5:5 8:9
17:21 29:12,16
29:23 30:18
31:11,22,24
32:14 33:10
34:1,22,22 35:7
35:9,20,21
36:10,16,17,23
45:2,4,23 46:4
46:5,8,21,25
47:5,11,15 48:4
48:12
**pdq's**  38:9
**peer**  36:3
130:17
**peers**  162:2,12
**pelvic**  5:14
**penalty**  214:2
**penninkilampi**
137:17 152:24
**people**  90:15
108:16 113:10
133:9 135:17
143:19 149:8

179:2
**people's**  36:7
133:6
**percent**  28:16
156:3,3 160:25
161:11,14
178:2 192:12
192:14,24
193:1,6,18
199:12 210:3
**percent's**  192:9
**percentage**
21:21 85:2
160:21 161:1,3
**perfect**  69:24
81:4
**perfectly**
112:23
**performed**  51:3
53:9 57:11
125:24
**perineal**  4:17
8:17 18:24 31:4
45:22 47:15
49:3 51:15 52:3
54:3 78:12,25
79:10 107:3
115:17 142:10
177:10 178:4
180:9,20,21
**perineally**
211:9
**perineum**  54:4
108:5 177:6
**period**  156:2

**periods**  191:23
**peritoneal**  5:4
30:19
**perjury**  214:2
**person**  36:14
46:1 47:21
55:20 60:10
61:16 109:22
111:12 143:11
167:17 179:1
**personal**  7:4
46:23 47:3
147:12 148:5
148:24
**personally**
37:15,22 44:1
126:6
**perspective**
113:9
**pertain**  120:20
**pertains**  215:11
**pertinent**
118:21 205:23
**petri**  115:21
**phagocytes**
5:19 117:15
204:8
**phone**  167:13
**phonetic**  85:10
166:10 201:16
**photos**  110:6,7
**phrase**  83:22
91:21 92:6,9
96:11
**physical**  42:5

**physically**  16:9
**physicians**
46:16
**pick**  108:21,23
111:11
**picking**  110:16
**piece**  17:15,17
36:1 123:22
**pieces**  54:22
**pivotal**  92:17
92:25
**place**  23:5
130:11,15,19
215:4
**plaintiff**  21:20
172:22
**plaintiffs**  3:3
4:10 8:3 11:15
15:11 20:4,18
21:18 22:12,22
23:11 39:7
41:10 80:5
107:10,15
133:15,21
142:13 146:21
147:23 148:2
150:9 162:21
163:15 166:3,3
166:23 169:15
174:20 189:4
189:21
**plan**  161:20
**planned**  161:23
**plans**  200:25
**platy**  83:25
85:5

**play** 84:1,4,7,12
**pleading** 170:17
**please** 10:12 25:10 31:3,8 53:2 57:14 93:7 93:10 101:20 101:22 102:25 104:24 111:20 116:25 138:17 151:25 164:25 193:22 204:2
**plus** 121:3,9,15 178:4
**podium** 162:8
**point** 16:24 28:7 57:20,20 64:22 70:14,15 73:23,24 82:1 119:10,14,18 120:4 134:8 152:25 153:2 199:7 209:4 210:6,15,19 211:10,13 212:1
**pointing** 101:23 195:12 197:20 197:22
**points** 16:22 63:2,9
**policy** 150:19
**polycystic** 140:20 141:9 141:12,13
**polymorphisms** 140:21
**pool** 78:5
**pooled** 27:12,16 196:7
**pooling** 78:3
**poor** 35:22 47:22 132:24
**poorly** 129:16 198:8,8,10,10
**population** 32:21 155:7
**portion** 31:11 133:20 140:16
**portions** 171:24
**posed** 206:17
**position** 152:17
**positive** 32:24 33:2,3
**possess** 150:21
**possession** 212:11,15,17 212:20
**possibility** 40:11 111:4 133:10
**possible** 41:6 76:23 101:8 111:1 123:20 160:17
**possibly** 41:7 109:15 180:11
**post** 37:21,22
**posted** 37:14,23
**potential** 38:2 76:13 77:2 109:18 110:4 112:22 129:15 135:11 136:11 136:14 139:10 147:25 149:6 179:14,15 181:23
**potentially** 68:19 194:20
**powder** 1:5 2:5 4:17,22 5:14 6:8,22 8:18 9:16 10:18 18:25 27:6,10 42:24 43:12,15 43:22,23 44:2 49:3 50:2 51:15 52:3,7,15 54:3 54:4 58:4,10 59:14 61:10 69:10 75:14,18 75:24 78:12 79:1,10,21 80:5 83:23 84:7,18 84:23 85:8 86:16,16 87:6 87:14,23 88:6 88:18 89:3,4,5 89:12,17,25 90:11,23,24 91:12 93:15 95:24 96:8,11 98:1,15,20 99:1 99:2,8,17,25 100:18,22 101:3,8,15,16 102:15 103:8,9 103:22,23 104:5,22 115:17 128:21 133:15,22 137:16,21 138:5 158:9 159:13,17 160:15,22 162:2 173:6 174:5 177:5 178:9 180:9,21 186:9,13,16,20 187:20,23 188:18 189:11 189:16 194:22 203:5,8,14,15 204:22 206:18 206:24 207:1,6 211:9
**power** 146:15 180:9 198:12
**practice** 133:11 157:20,25 186:2,4
**practices** 1:6 2:6 108:6
**precise** 75:23 76:6
**precision** 28:6 28:16 44:18,20
**predicter** 193:15
**predictive** 127:24 128:1

**prefer** 209:22
**preparation** 39:11 156:19 166:21
**prepare** 13:9 42:5,6 167:2,20 168:6
**prepared** 7:21 13:19 17:2 20:11 21:12 22:23 105:21 171:22 173:5
**preparing** 47:5
**presence** 101:14 128:4
**present** 3:13,23 194:20
**presentations** 162:1
**presented** 69:23 97:1
**prespecified** 53:24
**presumed** 204:20
**pretty** 92:25 192:9
**prevention** 5:5 6:21 30:19 45:4
**previous** 31:22 93:2 123:20
**previously** 18:10 35:8 76:12 88:13 151:10 157:18 163:23 194:21 207:13
**primarily** 10:22 118:7
**primary** 5:4 6:9 30:18 54:1 78:11,24 79:12 79:14,16,19 93:5 198:12
**print** 73:2 163:3
**prior** 14:4 20:17 22:7 33:8 34:23 51:7 58:13 72:9 86:5 93:17 105:24 105:25 130:8 148:1 151:8,16 152:7,14 154:14 156:15 156:19 164:5 215:5
**probably** 23:2 23:13 30:11 56:6 73:6 89:24 131:20 141:23 149:7 158:2 160:2 161:11 161:13 192:17 197:3
**problem** 89:20 89:24
**procedure** 111:2
**procedures** 108:25
**proceedings** 3:13 34:19 215:3,5,7,13
**process** 16:23 35:20 36:2,3,19 36:20 126:24 127:4,12 132:8 132:9 134:16 213:10
**produce** 22:17
**produced** 131:6 171:7,9 172:25 175:14 190:3
**product** 7:4 49:3 100:21 101:9,17 103:16 104:7
**production** 118:19 205:22
**products** 1:5,6 2:5,6 4:17 8:18 18:25 83:24 84:23 86:3,16 86:16 87:23 93:15 95:25 96:8,11 99:1,2 99:8,14,18 100:1 101:1,5 103:8 104:22 154:25 155:2 172:9 180:16 203:6,8,14,16 206:18
**professional** 5:6 30:19 136:16
**professionals** 53:15
**professor** 93:3
**profoundly** 100:6
**progesterone** 140:9,15
**program** 81:22
**programming** 72:24 73:1
**progress** 76:4
**project** 117:17 134:24,24 204:10
**projects** 38:20
**proliferated** 128:4
**proliferation** 126:18,20,25 127:5,6,8,16,25
**properties** 117:7
**proposition** 95:24
**prospective** 7:7 32:1,15 33:11
**prospectively** 194:23
**protective** 155:21
**protocols** 55:13
**prove** 127:25
**provide** 42:13 43:2 71:22 116:3 174:13 181:4 213:10

**provided** 41:9 45:21 50:11 56:5 67:2 71:6 71:8,11,14,20 72:1,9 112:9 113:4 129:10 131:11 150:12 158:14 159:9 163:1,11 164:5 165:23 168:21 168:22 171:25 173:3,4 174:2 212:8,18 213:2
**provides** 61:9 61:25 142:7
**providing** 192:5
**public** 46:16 132:10 189:24
**publication** 32:13 33:2 39:11 40:6,15 41:23 49:22 51:7 52:19 54:1 54:20,21 56:22 68:12 76:9 125:14 129:9 143:21 185:10
**publications** 33:8 67:25 68:2 125:22 141:5 161:17 189:22 189:23
**publicity** 181:12,15,22
**publicized** 182:3
**publish** 82:22 132:14 133:2
**published** 19:11,13 20:3 20:10 21:11 22:10 40:12 41:1,15,17 46:20 56:22 67:18 73:17 77:10 78:5,6 88:4,17 91:5 92:13 125:14 130:4,11,13,15 130:18,22 132:5,6,14 179:8
**publishing** 82:21,21
**pull** 45:4 61:6 63:1 202:13
**pulled** 54:22
**purported** 178:21
**purpose** 47:13 129:13
**purposes** 107:1 132:25
**pushed** 142:25 143:11
**put** 12:11 19:5 38:7 46:8 71:10 74:2 80:16 83:9 100:14 113:9 113:22 128:24 132:17 173:11 179:23 183:10 193:19
**puts** 46:13
**putting** 111:11

**q**

**qualifications** 93:1
**qualify** 172:22
**quality** 35:22 47:21 51:2 142:7,15,18
**quantified** 118:9
**quantify** 63:19 84:17,25 85:4
**question** 20:24 24:15 27:2 35:4 39:18 43:24 44:1,15,16,23 45:2 47:13,14 50:13 61:15 66:14,18 69:3,4 69:10 71:12 74:13 76:24,25 81:10 88:8,24 90:5,5,20,20 91:18 94:11,13 95:21 96:10 97:10,16 101:1 101:7 102:10 103:18 104:9 104:13 113:7 115:18 119:17 119:22,25 122:13 126:6 128:17 129:7 132:17 138:2 153:25 154:11 155:14 156:5 160:23 170:5,9 171:12 178:17 187:21 188:23 189:18 193:9 198:25 201:10
**questioning** 115:3 132:23
**questionnaire** 55:16 193:1
**questions** 39:15 52:15 55:14,23 76:23 95:8 114:3 185:7 201:2 202:4,6 203:2 205:7 206:5,17 208:16,18 210:24
**quick** 18:4 60:25 64:1 102:18 156:12 159:2 175:7 184:23
**quickly** 155:21 156:9 169:25
**quite** 113:12 131:20 139:11 198:18
**quote** 92:7,8

**r**

**r** 3:9
**radiation** 38:3 136:15
**radiology** 93:3 93:5 109:22 157:15 161:12
**raise** 48:8 179:16
**raised** 70:13 74:13 130:18 131:19 133:1 199:25
**raising** 133:10
**ran** 36:14
**range** 27:22 43:9 57:18 58:4 58:10,14
**rate** 168:10,12 168:14
**rather** 13:15 28:5 72:16 116:2 154:8 207:2
**ratio** 27:23 144:23 145:2 196:7
**rausa** 166:16
**reach** 33:9,9 35:15 36:22 70:15
**reached** 38:21 55:20 70:19 72:13 202:1
**reaching** 205:3
**reaction** 121:22
**reactive** 118:5 118:8,19 119:10,13,19 120:5 205:22
**read** 12:4 33:23 34:2,4 35:6,14 49:2,5 51:23 52:8,10,13,17 52:21 53:8,23 54:8 67:21 74:5 85:18,23 86:7,7 86:8 88:17 89:2 89:10 90:9,9,21 91:2,5,10 92:14 94:1,6,15 95:2 96:20 97:7,21 97:24 98:12 103:15 106:5 112:11,18 113:3 114:16 116:18,24 117:20 118:23 119:7 125:16 125:19,20 133:4,19 136:2 138:21 139:3 139:13 140:8 140:18 142:7 147:10 153:7,9 155:10 157:15 163:20,20,22 163:23 164:7,7 164:19 166:1 171:12 177:4 177:14 178:13 179:10,19 180:6,8 181:11 181:11 192:3 194:16,24 197:24 200:19 204:5,11 205:9 205:19,25 214:2
**reader** 80:8,11 113:18
**reading** 25:9,11 35:11,23 84:2 84:13 91:24 93:17 107:4 129:22 131:14 134:2 136:5 139:10 142:11 147:14 167:25 168:3 186:5 190:17 194:14 198:3 203:5 204:17
**reads** 53:23 180:3,18 193:24 194:12 197:24 205:9
**ready** 65:18
**real** 28:2 60:25 63:25 134:20 136:23 156:12 159:2 162:15 175:7 184:23
**realized** 176:11
**really** 28:12 31:10 36:1,5 92:17 95:8 104:16 126:14 130:14 136:22 148:15 149:4 156:6 158:1 170:6
**reason** 75:12 158:3 181:21 181:23 208:1
**reasonable** 84:6
**reasons** 62:18 134:13 157:24 180:24
**rebecca** 1:13 2:13 4:3,14 7:9 7:12,15,22 8:5 10:4,13 169:17 214:1,10
**recalculate** 72:15
**recall** 12:12 58:13 94:14 99:16 179:10 179:20 181:11 181:15 182:1,4 191:11 192:4 194:19 204:17 206:16,20 207:17 208:18
**receive** 15:8,10 93:23 176:21 182:23 184:19
**received** 14:18 106:25 107:14 107:20 131:7

148:13 172:5 174:16 176:2 176:16
**receiving** 182:25
**recent** 10:18 13:22 21:6 29:23 137:4 141:6 145:7 200:17
**recently** 71:3
**recess** 44:25 81:8 137:1
**recollection** 40:9 52:23 94:20 122:22 191:25 192:14
**reconcile** 204:20
**reconsideration** 100:9
**record** 18:4,5,9 30:5 34:17 41:3 44:24 45:1 60:25 61:1,3 63:25 64:2,3 65:9,10,12 81:9 102:21,23,24 104:16 137:2 156:11,13,14 159:2,4,7 175:7 175:8,12,22,23 175:25 185:1,2 185:4 188:12 188:13,15 201:23,24,25 202:22 207:25 212:7 213:20 215:6,9
**records** 41:7,22 42:12 166:2,6 166:10,13,16 166:19 172:5
**rectum** 54:4
**red** 8:12 14:6 16:2,15 17:8,11 17:18 174:2
**redberg** 143:17
**redline** 202:18 202:19
**redlined** 202:17
**reduce** 134:5
**refer** 10:24 19:16 115:2 148:12 196:11 203:19
**reference** 31:15 31:16,17,21 33:16 55:8 56:16 66:25 69:4 93:14,21 95:12,18 105:4 105:5 107:6 113:24 121:25 122:25 124:8 137:5 146:8 147:8,10 170:11 177:16 178:8 179:17 179:23 182:24 184:15 190:9 190:13,23 191:7 196:1,24 201:15
**referenced** 24:15 95:17 105:3 124:4,22 153:7,8 200:10 200:16 209:13
**references** 14:3 16:20 88:2 179:20 190:19 190:20 203:4
**referral** 185:21
**referred** 94:20 94:22,24 97:8 113:25 207:20 209:12
**referring** 26:11 31:18 32:3,6 33:5 64:9 77:9 92:11 98:23 103:11,12 123:8 124:10 203:15 207:3
**refers** 31:24 57:18 111:24 112:8 141:15 147:7 176:20 180:7
**refiled** 202:10 202:11
**reflect** 72:23 131:21 159:16 169:6 191:4 209:20
**reflected** 97:17
**reflecting** 171:13
**reflection** 63:8
**reflects** 66:14 210:18
**regard** 14:9 23:14 27:23 30:13 37:2,8 38:25 47:4,15 58:17 61:22 76:12 86:20 88:11 91:15 108:14 109:4,7 151:16 152:6 157:19 159:17 186:22 199:19 200:8
**regarding** 52:15 175:17 203:2 206:17
**regulatory** 187:1
**reject** 28:20
**rejected** 130:3 130:10,16,21 131:7
**rejecting** 176:17 185:10
**rejection** 176:3
**rejections** 130:8
**relate** 41:14 161:21
**related** 10:22 17:2 66:18 84:15 101:7

132:4 170:24 172:8,14 176:13 181:13 182:9 213:9
**relates** 35:7 36:23 37:25 38:8 45:22 63:19 76:11 77:1 80:13 81:10 85:5 90:20 97:25 98:15 119:17 120:16 144:24 147:25 151:17 155:17 174:4 188:17 196:15 200:17
**relation** 80:13 207:15
**relationship** 92:16 102:15 199:13
**relative** 64:5 154:23 194:18 215:16
**relevance** 207:7
**relevant** 53:11 54:24 55:22 130:23 131:2 131:25 133:25 154:17
**reliability** 9:11 191:9
**reliable** 44:22
**reliably** 78:6
**reliance** 95:5 163:1
**rely** 126:9 133:6 201:11 201:11 205:3
**remains** 46:19
**remember** 16:22 39:24 40:10 43:10,11 43:13 44:5 45:11 52:10 57:1,25 82:10 87:21,25 90:19 94:3,4,6,24,25 99:14,21 122:12 124:5,8 125:23 139:19 141:24 144:1 144:20 151:24 152:1,3,4,17 181:25 182:11 185:23 188:6
**remembering** 182:5,12
**remembrance** 43:16
**remind** 175:4
**remotely** 3:9
**removal** 109:9
**removed** 108:19,20
**removing** 109:1
**rendered** 171:19
**repair** 126:25
**repeatedly** 68:23
**repeating** 119:22
**report** 4:13 7:17 10:19 13:9 13:20,22 14:15 14:15 18:1,12 18:13,15,19 20:17,22 21:2,6 21:17 27:9 32:16,21 33:13 36:8 43:7 48:21 48:22 50:19 57:24 58:17,18 59:14 65:7 66:19 67:20 68:21 76:12 77:13 80:20 83:11,16 85:24 87:12,13 88:1 92:7,14 93:2 94:9 95:1,12,17 96:2,12,16,18 97:2 98:17 101:21 102:13 102:19 105:21 105:24,25 114:17,18,19 117:2 118:5,24 118:25 120:16 121:24 124:23 137:4 142:4 144:3 145:7 146:9 150:6,7 150:10,13 151:6,8,8,17,18 152:4,11,12,12 152:14,18 153:20,23 154:3,20 155:13 163:17 164:1,8,15,19 164:20 168:24 175:3 187:15 190:10,21 191:3,7 200:11 200:17 201:15 202:8,16 203:1 203:19 206:3 209:5 211:2
**reported** 1:21 9:12 56:1,4,17 57:2 58:25 59:3 59:23 60:17,17 60:21 62:22 63:13 64:19,20 65:15,16 66:6 68:11 115:10 115:12 120:5 120:23,25 144:23 145:2 154:16,22,23 154:24 178:22 191:9 192:25 193:1 194:17 210:4
**reporter** 2:18 11:12 18:7 19:4 24:12 30:16 34:15 72:6 105:13 114:6

122:5 125:6 137:9 144:7 153:17 159:6 163:6 164:17 168:20 169:20 173:25 174:8 174:13 175:11 184:9 191:18 196:20 210:13 212:15,22,25 215:1
**reporting** 54:1 56:23 57:21 62:16 68:9 72:19 77:2,7,8 99:7 103:15 107:14 122:25 123:25 138:4 155:17 192:24 195:11 196:2 213:14
**reports** 14:5 15:2,5,7,14,17 15:20,24 20:11 21:12 56:21 58:13 84:14 91:6,10 98:14 100:2 120:12 125:25 133:13 134:4 146:24 147:11 150:14 150:22 151:10 152:7 174:16 200:2
**represent** 10:15 41:11 63:3 71:16,17
**representation** 69:13
**represented** 63:8 112:4
**representing** 107:1 133:21
**reproductive** 27:18
**reputable** 130:15,18
**reputation** 45:16 136:16
**request** 15:13 15:16,18,19 54:23 150:24 151:3 170:1 171:24
**requested** 150:13 215:14
**requests** 169:24 170:13,14
**require** 58:22 136:2
**required** 59:1 113:12,13,16
**requirement** 55:3,19 59:6 149:13
**requirements** 71:9
**requires** 150:6
**rereviewing** 36:20
**research** 5:18 6:3,14,21 38:20 117:13 133:20 135:24 138:11 138:12 140:5 204:7
**researcher** 109:24
**resected** 5:15 106:12,17
**resolution** 57:8
**resolved** 57:5,7
**respect** 38:13 48:14 153:19 154:21
**respectful** 133:9
**respond** 151:25
**responded** 82:3 170:13
**responding** 184:3
**response** 8:4 91:22 92:3,8 145:7,14,19,21 145:23 146:1,4 146:5,9,12,13 151:7,11,17 152:20,22 153:3,5 169:16 172:23 191:22 192:6 208:18
**responses** 146:14
**responsibility** 213:7
**responsible** 110:1
**responsive** 171:25
**responsiveness** 202:3
**restate** 52:1 87:3 103:25
**restating** 35:1
**resubmitted** 186:5
**resubmitting** 185:18
**result** 27:14,24 100:14 120:6 193:17
**results** 25:21 27:5,10 28:1 32:23 33:1,4,7 33:21 34:10 56:25 68:5 69:22 70:4 71:4 72:15 73:3,8,18 77:19 80:13 82:19,19 87:16 87:22 98:21,22 98:24 99:17 115:22 121:13 121:16 124:15 124:17,17,20 124:21 130:1 142:8 154:20 155:5 162:16 162:22,23 181:1 192:16 192:23 193:11 210:4 211:22 211:23

**retention**
  170:25
**retrospectively**
  194:23
**returned**
  212:19
**review**  4:18
  6:14,17,17 8:19
  14:7 15:24 19:1
  20:7,7,7,9,16
  22:1,2,7 29:16
  34:11 35:22
  45:22 46:3
  49:20 51:14
  63:2,5,6,7
  77:17 78:1,5
  88:20 109:9
  130:17 132:20
  134:18 137:23
  138:13 142:8
  142:15,18
  143:1,2,7,11,16
  143:19 156:16
  156:20 167:8
  167:12,19
  168:15 215:13
**reviewed**  11:25
  12:16,19 14:4
  17:22 31:22
  35:23 36:3
  47:24 48:11
  98:10,19,25
  99:16 131:10
  166:2,6,9,12,15
  166:18 168:6
  190:2 200:12

206:8
**reviewer**  131:6
  131:11,15,17
  131:24 132:4
  132:12,19
  175:15 180:2
  182:17 185:16
**reviewers**  51:3
  51:4 133:1
**reviewing**
  16:18,20,24
  47:4 48:11
**reviews**  16:21
  23:2 45:25
  132:7 133:7
  137:24 138:10
  138:14 142:4
  146:14 152:23
  152:25 162:15
**revised**  151:7
  191:3
**revising**  154:2
**revisions**
  182:16 185:19
  185:20
**rice**  3:9
**rich**  139:7
**right**  16:11
  23:24 24:7
  26:22 31:15
  42:21 45:24
  52:12 55:8 58:8
  67:19 74:23
  76:18 77:25
  79:5 96:2,12
  97:12 100:11

106:16 107:23
116:25 121:12
122:11 125:2
127:3 128:4
146:25 150:3,6
157:17 183:20
192:3 193:23
194:3,4,7 200:9
200:9 203:22
205:13 213:18
**rigler**  93:18
**rigorous**  28:13
**risk**  4:23 6:22
  9:17 28:16 49:2
  51:14 54:7 64:5
  68:6 79:21
  89:20 110:25
  138:22 139:4
  139:12,17,21
  139:25 140:2,2
  140:4,10 141:7
  141:17,21,23
  142:8 154:23
  154:24 199:13
  204:22
**risks**  68:8
**rita**  143:17
**rls**  1:5 2:5
**rmr**  1:21
  215:22
**role**  84:1,4,7,12
  84:14,17 134:7
**roles**  143:14
**room**  109:23,25
  110:17,24

**rothman**  14:13
  28:23
**routine**  43:17
  133:11
**rox**  120:25
**rr**  178:14
**rule**  7:17
  113:13 164:15
**running**  74:18
  74:18 83:6
  150:20

**s**

**s.w.**  53:25
**saed**  124:5
  126:4 131:5
  133:14
**saed's**  124:4
  133:20
**salary**  161:13
**sales**  1:6 2:6
**sample**  99:13
  154:12
**san**  1:14 2:15
  7:20 10:1
  212:16
**sanitary**  54:5
  177:16 178:2
**sas**  72:24 73:1
  82:1,1
**satisfied**  62:16
  113:2
**saturday**  71:10
**saw**  11:25
  70:13,14

**saying** 14:25 29:7 39:15 43:20 45:23 52:9 55:17 64:18 77:20 81:19 82:14 104:4 148:7 178:25 181:6 182:6 184:15 192:23 197:18 198:5
**says** 28:25 33:10,14,20 49:2,14 51:1 52:12 53:8 56:16,21 57:4 57:11 58:9 61:14 75:23 78:24 90:14 93:15 103:7 106:24 112:7 117:6,13,20 123:10 133:19 139:2 140:8,18 141:16 147:10 148:5 177:4,14 178:13 179:10 180:6 181:1,10 192:3 210:17
**scale** 51:2,6
**scanned** 174:12 212:18
**schildkraut** 59:15 75:1,12 75:17 177:17 178:5
**school** 29:3
**science** 53:10 85:20 115:25 193:16
**scientific** 22:17 84:6 88:5,17 91:5,10 103:15 116:7 129:12 132:25 134:3 186:22 187:8 187:22 188:24
**scientist** 45:19
**scientists** 46:15 46:18 130:9
**scope** 117:17 204:10
**scratch** 20:8,11 22:6
**screen** 45:4 119:23
**screened** 53:23
**scribbles** 16:6
**scrolling** 45:6
**se** 117:7
**sean** 39:1 51:5
**search** 53:3,15 106:8
**searches** 53:9
**second** 4:13 7:17 14:15 17:20 18:13,15 18:19 20:22 30:21 52:12 53:22 54:23 63:1 75:23 80:20 83:11,16 102:22 106:11 106:16,21,22 147:20 164:14 168:24 175:20 177:4 182:24 197:6,23 202:15 207:24
**secretary** 143:12
**section** 25:12 26:10 30:13 31:3,15 48:25 49:1 51:1,12 52:11 53:3,6,22 55:1,7,9 56:15 57:4 75:22 78:10,17,24 80:1 91:20 92:2 93:1,8,8,8,12 106:12,14,17 110:21 117:11 119:5 133:13 138:17,20,25 140:7,8 142:3 147:18,20 151:7 188:4 192:23,23 196:6 203:3
**see** 15:20 23:6 23:25 24:2,5,24 30:12,22,24 31:18 33:9 53:6 64:9,17,23 70:10 75:2,9 84:2 89:19 91:23 92:9 93:17 94:21 95:1 101:16 105:1,5 106:14 107:4 117:3 120:23 121:1 121:11 122:25 129:25 132:25 133:17,23 139:7 142:11 147:7,8,14 151:19 155:4 155:12 163:12 165:8 179:3,16 184:5,21 188:2 192:7 194:14 196:4 198:3
**seeing** 64:10 65:7 83:5 90:17 139:19 202:17
**seem** 112:21
**seems** 64:16 82:5 129:11,17 129:23 134:2
**seen** 11:22 30:6 84:15 85:25 87:2,5,7,9,14 87:17,19,22 97:18 98:9,21 98:23 99:12,23 100:8 126:4,4 132:3 139:23 140:4,25 141:2 141:5,13 170:15 176:9 176:10 196:14

**selected** 31:25 56:23
**selection** 53:22 53:24,25 54:10 55:2
**self** 9:12 191:9 193:25 194:17
**sense** 69:14 153:21
**sensitive** 7:5
**sensitivity** 5:10 70:16,21,23 72:14,19,23 73:4,15,15,17 73:19 74:4,17 74:25 75:16,19 75:21 81:21
**sent** 71:2 165:18,20
**sentence** 33:19 34:5,8 46:5 49:1,9,14,21,23 49:24 91:21 92:2 119:7 141:15 193:24 194:8,9,12,15 203:5 204:6
**sentences** 204:5
**separate** 17:11 17:14,15 42:20 90:13,13 170:6 176:12 211:2
**separately** 69:23 139:15 151:15
**september** 161:2
**series** 5:8 203:2 206:16 208:16
**served** 35:20 80:4 112:8 113:4 133:14 147:22 150:8
**service** 41:6 213:14
**services** 170:25
**serving** 12:13 23:11 112:15
**set** 17:20 20:9 20:20 23:9 35:8 45:23 47:15 55:1 58:22,23 63:18 69:16,17 111:13 142:1 173:10 195:14 215:4
**setting** 128:2 162:11
**seven** 58:5,11 59:7 62:23,24 105:10 106:23 106:24
**seventeen** 164:21
**several** 12:3 27:4 58:24 62:18 74:17 92:12,25 134:13 138:14 140:18 146:11 152:25 165:17
**shadow** 207:5
**share** 17:9 48:8 55:25 164:14
**shared** 71:3 99:4 165:25 173:7 180:15
**shb.com** 3:20
**sheets** 182:23 184:21
**shift** 28:13
**shoddy** 36:1,5
**shook** 3:17,24
**short** 29:11 45:2 61:4 65:13 156:1 188:16
**shorthand** 2:18 215:1,7
**show** 27:5,11 27:16,18,19 59:18,19 71:19 73:3 120:19 124:6,20 128:3 136:15 155:20 155:21,22,22 156:8 160:14 164:12 196:17
**showed** 68:5,7 99:11,22 121:21 155:5 211:23
**shower** 203:15 203:16 207:7,7
**showing** 110:7 121:7,17 127:10 130:2 136:19 146:11 152:10 155:1
**shown** 64:7 85:21 174:3 189:15
**shows** 66:2 86:1 122:20 123:5 124:17 139:10 146:13 153:2,3 191:22
**sic** 23:16,22 25:4 26:17 50:19 53:12 55:22 74:18 81:21 86:2 111:24 123:4 141:12 152:18 174:2 177:7 188:9 191:7 192:6 196:3,7
**side** 74:20 113:19 148:7 149:8 196:6 204:4
**sides** 199:9
**sign** 28:24 29:2 29:5
**signature** 215:22
**significant** 25:6 25:20,22 26:4 26:20 27:6 28:12 107:2 123:2,5 126:13 144:24 145:4 197:25 198:15

**significantly** 123:6 138:21 139:3 140:21 141:3,9
**signs** 46:4
**silicates** 108:5
**similar** 52:20 52:25 108:6 128:18 142:8
**similarly** 142:7
**simple** 59:24 60:3
**singh** 14:14
**single** 53:25 63:3,8 71:21 112:20 119:10 119:18 120:4,4 123:22,23 127:18,23 128:3,5,10 154:9
**sister** 7:6 55:8 55:11,14,19,21 55:23,25 56:9 154:10,15
**site** 177:10
**sites** 53:14 177:6
**sitting** 36:21 190:12
**six** 72:3 166:3 197:11
**size** 154:12
**skimmed** 16:1 96:25 97:3 200:20
**slicing** 110:2
**slides** 111:11
**slightly** 192:4
**slomovitz** 200:17 201:1 201:12
**small** 8:12 14:6 73:22 74:1 143:23 154:10 178:1 192:17 193:13,19 195:3
**smaller** 161:11 161:13
**smith** 1:13 2:13 4:3,14 7:9,12 7:15,23 8:6 9:7 9:8 10:4,13,14 18:11,11 19:9 30:10 39:13 65:14 68:23 113:3 125:8 164:4 169:17 172:24 188:16 188:21 202:2,5 202:25 212:19 213:8 214:1,10
**smoking** 141:17 141:20,24 181:19
**sochin** 201:16
**social** 37:19
**society** 187:3
**software** 83:3,6
**sold** 100:18
**sonal** 14:14
**sorry** 14:23 15:4,6 25:14 29:21 49:6,10 49:13 51:9 60:20 61:14 64:14 67:3,4 83:14,18 106:15 109:13 118:24 119:2 122:13 124:12 127:21 129:20 137:10 138:24 139:8 144:12 147:19 164:13 167:9,14 170:2 170:3 176:1 183:17 208:5 210:13
**sort** 85:20 89:21 96:25 121:22 126:13 127:11 199:9
**sound** 16:11 23:24
**sounds** 99:12 150:2
**sources** 53:4 149:21
**speak** 143:23
**species** 118:6,8 118:20 119:10 119:13,19 120:5 205:22
**specific** 12:17 12:20 13:9,15 13:16 15:13,16 15:17 44:9 48:16,18,22 71:13 83:23 88:24,25 95:18 135:17 141:13 149:20 166:5 197:21 207:2
**specifically** 17:21 27:8 68:2 93:21 104:12 124:10 144:3 176:20 187:21 203:3 208:10
**specification** 209:13
**specifics** 82:24 99:14
**specimen** 110:2 110:3,4,17,21 111:1,8
**specimens** 109:23,24
**speculation** 22:25
**spend** 42:13
**spending** 42:9
**spent** 168:3 171:13
**spoken** 38:19 143:21
**stand** 151:9,13 151:18 152:8 152:12 203:10 210:3

**standard** 108:25 111:2
**standardize** 121:14
**standing** 162:1 162:7
**stands** 46:18
**start** 20:16 25:3 37:7 80:17 93:14 102:9 109:5 164:9 173:3 179:17 185:5 191:2 199:1 201:6,10
**started** 19:20 20:10 22:5 201:21
**starting** 165:1,8 170:1
**starts** 102:8,9 180:4
**stata** 81:22
**state** 10:12 12:14 25:5 26:2 26:6 30:3 32:14 43:7 51:25 52:2 76:11 88:23 170:12 205:19 212:6 214:8 215:2
**stated** 76:12 89:2 101:22 102:4,12 103:2 189:5
**statement** 28:25 29:2,4 32:18 33:16,25 35:24,24 48:4 49:18 52:20 56:11,12 67:24 76:1,3,17,19 79:4 88:20 89:18 91:2 92:1 93:14 95:13 99:25 108:3 111:20,23 112:7,23 117:18,20 118:3 129:14 129:18 139:5,9 140:12,17 151:9 179:13 180:14,22,23 187:9,19,23,25 188:1,3,4,17,25 195:1 197:14 198:9 203:11 203:13
**statement's** 76:6
**statements** 31:20 34:21 35:6,12,14,16 36:23 77:1 89:15 97:20 120:15 133:25 151:13,14,16 151:18,19 152:6,8,9 189:19,20,24 196:24
**states** 1:1 2:1 51:13 58:3 90:10 111:25 138:20 181:11 187:18 188:24 189:8,10
**stating** 88:5,18
**statistic** 192:19
**statistical** 41:5
**statistically** 25:6,20,22 26:3 26:20 28:12 144:24 145:4 197:16 198:5 198:17 199:3 199:14
**status** 156:24 194:23
**stay** 118:17 212:16,24
**staying** 91:20 140:7 144:22
**steering** 8:3 169:15 172:22
**step** 34:12
**steps** 129:11
**sterile** 108:25 110:16,19,19 110:24
**stop** 88:1 186:16
**stopped** 157:10 157:22,23
**strategy** 53:3
**stratified** 69:22
**street** 2:15 3:5
**strength** 28:7 78:11,24 79:13 79:14,17,19,23
**strengths** 78:9 78:16,19,23 195:23 196:5
**strike** 129:3,3 131:23 160:13 160:13 195:4
**stringent** 123:4
**strong** 28:13 104:20 153:3
**strongly** 84:22 180:23
**structure** 33:21 34:9
**students** 162:6
**studied** 115:20 128:8
**studies** 17:19 27:12 35:23 48:11 52:24 53:23 54:11 57:13,23 59:13 60:13 68:4,7,14 68:20 69:6 85:21 86:6,6,11 86:15,21,21 88:2 89:2,23 92:11,12 115:25 116:18 117:16 123:24 124:3,10,19 125:25 137:17 137:19,25

138:10,12 152:2 161:23 177:5 178:18 178:18 179:12 179:21 181:12 181:13 189:14 194:22 200:8 200:12 204:9 206:8,11 210:23,23,24 211:7,11
**study** 7:6 17:22 23:16,22 24:15 25:2,4 26:14 31:12,16,16,24 32:1,4,7,10,15 32:17,21 33:1,3 33:3,11,17,20 39:10 48:21 50:1,23 53:22 54:17,18,19 55:2,3,9,11,13 55:14,19,21,22 55:23,24 56:1,4 56:9,24 63:2,3 63:7 68:24 69:3 69:5,8 70:1,12 72:16 73:10,11 76:13,14,17,22 77:22 78:11,25 79:13,14,17,18 79:19,23,25 86:13,18 92:14 103:9,11 105:3 105:20 106:12 107:18 113:24 114:3,11,14,16 114:22 115:9 115:12,15 116:15 117:5,6 118:5 119:18 120:6,9,12 122:8 123:14 123:19,20 124:11,14,16 124:22 125:10 126:17 127:10 127:20,22 128:3,10,13 129:5,6,10,16 129:24 130:1 133:4 134:3,10 135:24 136:2,3 136:5 137:5,12 137:14 138:3 138:11,20 144:18,23 145:22 147:4 147:12 152:10 154:10,10,15 154:18 156:1 177:17 182:8 191:8,11,22,23 192:15 193:10 193:22 199:19 200:2,11 205:9 206:6,6 209:1 211:7,22 212:1
**stuff** 16:22
**sub** 48:22
**subgroups** 198:1,2
**subject** 5:8 8:23 9:4 56:22 148:12 171:24
**subjects** 56:24 179:3
**submission** 9:4
**submitted** 147:13 150:19
**subscribed** 215:18
**subsequent** 106:8
**subsequently** 20:20 182:23
**subset** 31:25 32:3,14 33:6,11
**substances** 84:5
**substantial** 108:3
**subtle** 131:20
**sufficient** 112:14 123:23 137:19 138:4 147:24 148:6,8 148:22
**suggest** 34:6 139:19,23 141:6 186:2 189:15
**suggested** 89:16 165:21
**suggesting** 112:22 138:9 142:8 204:22
**suggestion** 48:8
**suggests** 51:14 75:20 76:19 88:20 195:10 198:21
**suite** 3:10
**summarized** 35:25
**summary** 35:25 91:21 92:2 137:23 142:4
**supervising** 40:16
**supplemental** 73:18 75:4
**support** 46:21 88:22 95:13 179:20 195:8
**supported** 135:25
**supporting** 76:7
**supports** 91:22 92:3 103:9 195:6
**supposed** 32:18 34:5 110:18 149:16,21,24 181:24
**sure** 17:17 29:3 29:22 30:10 32:18 33:4 34:13 35:2,3 36:13 39:19 43:25 44:14,22 57:2 58:7 78:13

78:14 79:7 81:22 88:21 89:9,19 90:18 91:1 95:22 96:3 97:15 98:22 99:3 101:2 104:1 106:2 112:18 114:23 116:11 135:12 138:25 140:14 153:11,13,23 189:7,25 194:10 197:10 202:8,16 212:18
**surface** 108:24 111:5,14,17 114:23
**surgeon** 108:15
**surgery** 108:19 108:20
**surgical** 111:10
**surprised** 52:9 139:9
**surveys** 43:14
**survivors** 194:19
**susceptible** 110:11
**suspect** 72:24 131:19 140:3 165:24
**swapped** 73:19 73:24
**switching** 81:3
**symmetry** 199:9
**syndrome** 140:20 141:9 141:14
**systematic** 4:18 6:17 8:19 16:21 19:1 21:25 22:2 23:2 34:11 49:20 63:2,4,6 78:1,5 137:23 137:23 138:10 138:13,14 142:3 146:14 152:23,25 162:15
**systematically** 194:11
**systemic** 18:25

**t**

**table** 27:8,9,15 57:14,15 59:13 59:18 61:9,22 64:7,11,12,13 64:21 65:7,14 65:17,23,24 66:1,3,5,7,9,19 66:24 67:11 68:14 110:17 156:10 207:23 208:7,19 209:12,15 210:17
**tables** 75:5 97:1
**tachibana** 40:8
**taher** 52:24 137:18,24,24 137:25,25 152:23
**taint** 135:21
**take** 10:16 16:8 61:21 63:9 81:5 93:4 101:3 102:18 110:19 132:5 136:24 155:16 185:25 185:25 188:9 195:15 207:12 212:11,17,19
**taken** 2:14 108:16,20 116:3 127:19 129:9 152:21 154:8 215:3
**takes** 46:1
**talc** 5:8,13,19 9:10 11:5 13:1 13:7 17:21 20:4 20:21 21:1 22:12 23:12 25:7 26:4,18 31:4 32:12 38:16 39:7 45:23 47:16 50:23 55:12 56:17,19,23 57:21 60:11 65:24 68:6 80:14 83:25,25 84:10,17 85:6 85:12,22 86:3 86:12,17 87:18 88:5,10,10,18 89:3,12,17 90:11 91:6 92:8 92:17,19,23 101:15 103:22 104:20 107:3 108:7,10 112:9 113:5 115:15 116:16,18,22 117:7,15 118:18 120:16 120:21 121:3,8 121:9,15,20 123:6,21,25 128:4,13 136:8 141:16 145:23 146:21 154:16 154:22 155:7 155:12,17,23 155:24,25 156:2,3,6 160:6 161:5,17,21 171:1,17 172:8 172:8,15 180:4 180:6,8,15,16 180:19,21 181:3,13 187:9 189:1,5 191:8 192:4,25 193:2 194:17 195:11 204:8,21,21 205:14,20,21 206:9 209:13 213:9

**talcum** 1:5 2:5 4:17 6:8 8:18 10:17 18:24 42:24 43:12,15 43:22,23 44:2 49:3 50:2 52:7 52:15 54:3,4 58:4,10 59:14 61:10 69:10 75:24 78:12,25 79:10,21 80:5 83:23 84:7,18 84:23 85:7 86:16,16 87:6 87:13,23 88:6 88:18 89:3,4,5 89:12,17,25 90:11,23,23 91:11 93:15 95:24 96:8,11 98:1,15 99:1,2 99:8,17,25 100:22 101:3,8 101:15,16 102:15 103:8,9 103:22,23 104:5,21 111:6 115:16 133:15 133:22 137:16 137:21 138:5 158:8 159:13 159:17 160:15 160:22 162:2 173:6 174:5 177:5 178:9 186:9,13,16,19 187:19,23 188:18 189:11 189:16 203:5,8 203:14 206:18 207:1 211:9
**talk** 20:25 21:7 47:11 48:16 65:24 80:17,19 82:25 83:15 151:2 155:16 158:2 201:4,8 212:14
**talked** 45:3 67:14 167:21 168:2,8 172:19 185:16 190:11 190:15,23 194:18 200:8 200:11
**talking** 29:5 40:2 44:8,9 76:10 77:11 81:17 83:10 88:3 97:5 101:5 102:20 163:14 183:21 187:17
**talks** 24:20 31:4 31:11
**tanha** 137:5
**task** 48:15
**taylor** 6:3
**teach** 162:5,14
**teaching** 162:12,14
**team** 37:17 53:15 74:13
**tecum** 8:6 169:18
**tell** 11:18,19,22 11:25 14:10,17 18:22 27:3 31:8 37:22 45:7 72:10 78:2 80:1 83:19 93:10 101:22,23 111:20 138:17 138:24 147:4 151:1 165:5 184:11 186:19
**telling** 21:9 96:5 123:16 130:25 155:2 156:7
**tem** 100:9
**ten** 123:5 150:22
**term** 24:21
**terms** 22:18 27:21 68:9 69:14 85:11 104:18 166:21 184:14
**terrible** 36:8
**terrific** 143:16 143:19
**test** 100:13 127:16 198:13 198:14,21 199:15
**testified** 10:6 158:4
**testify** 13:12,16 200:22
**testifying** 113:6 113:19 171:1 215:6
**testimony** 17:3 96:21,21 97:6,6 97:10,18,21,25 98:14 112:9 113:4 156:16 156:20 157:11 168:15 175:3 214:5 215:9
**testing** 85:25 87:2,3,6,9,13 87:16,18,22 93:19 98:1,10 98:15,18,19,21 98:22,23,25 99:7,13,17,17 100:2,5 121:19 135:15,16 206:17 207:2,4 207:5
**tests** 198:11,16 206:24,25
**text** 57:17 58:9
**thank** 11:13 12:11 17:16 18:21 25:1,16 49:12 51:11 61:20 66:10,22 67:19 72:7 113:21 114:9 119:6 164:11 170:16,18

175:6 183:5 186:6 191:19 202:2 204:14 208:8 212:3,6 213:17,19
**thanked** 40:10
**thanks** 82:12
**theoretical** 109:20
**therapies** 140:9
**therapy** 140:10
**thereto** 183:1
**thick** 30:1
**thing** 88:12 132:24 136:9 149:1
**things** 46:20 90:3 145:13 149:1 154:7 167:21
**think** 14:19,20 19:14 23:13,19 23:20 24:9 27:5 27:13,19 28:21 28:22,22 30:12 36:13 37:21 43:6,9,11,13,14 43:15,20,25 44:2,5,19 45:9 46:6,11,12 48:15 49:21 56:6 57:1 58:21 62:19 63:23,23 64:25,25 65:1 66:12 68:4,9,10 68:23 69:6,21 69:23,24 70:15 71:2,2 74:12 75:20 76:4,5,19 76:21 77:10,13 77:19,21 79:16 79:22,22 84:9 85:12,19 86:3 86:15,17 87:17 88:2,12 90:14 92:17,24,24,25 94:10 95:8,14 95:17 96:6,6 97:16 100:5 103:13,20 104:18,20 105:23 108:23 108:24 110:9 112:23 113:7 113:15,16 115:7,18 116:17,19 120:1,18 123:10,19 127:20 128:23 129:8,13 132:4 132:21 133:6 134:13,19 135:1,13,21 136:1,5,11,11 137:14,22 138:2,13 140:15 141:22 143:4,20,21 144:10 145:12 146:13,22 147:24 148:6 148:19 149:7 152:21 153:3 154:1,6,9,16,18 154:25 155:25 156:2 157:11 157:23 162:4 162:23 164:2 164:24 165:13 165:22 167:4 173:9 176:6,14 176:19,24 178:19 179:14 179:25 181:18 181:22,22 182:4 183:11 183:13 185:6 188:3 189:10 189:14 190:22 195:16 197:11 201:18 202:10 207:2 210:9 211:21 213:6 213:18
**thinking** 36:7 96:3,17 133:2 188:17
**third** 4:10 11:15 14:15 87:12 172:7 175:4
**thirds** 93:13
**thompson** 3:25
**thought** 21:21 61:18,18 70:14 74:4,11,12 115:1 130:20 143:16,18 183:9,9 198:9 198:10
**thoughtful** 129:23
**thoughtfully** 134:3
**thousand** 43:8
**three** 8:14 27:11 44:17,18 57:9 58:14 130:22 131:7 141:19 149:1 154:25 173:10 173:21 174:22 174:24,25 195:21 212:9
**threshold** 28:22
**throw** 130:12
**time** 27:11 29:9 29:11 35:11 39:4 40:12,15 40:20 57:20,21 57:21,22 58:6 60:3,14 70:12 76:8 80:22 86:8 86:8 87:3 90:21 93:25 94:5 96:5 105:20 114:17 119:10,15 130:10 131:1 133:20 146:4 152:2 155:2,16 156:2 157:1 163:22 168:3 171:13 181:13

182:7 186:19 191:23 197:3 213:21 215:4
**timekeeper** 201:18
**times** 37:2 43:8 44:10,12,17 54:1,2 55:12,15 58:5,11,15,24 59:4,7,10,18,22 60:5,11,14,18 61:16 62:10,23 62:23,24 63:15 66:5,6,14,20 123:6 129:7 167:2 179:2 209:20,23 210:8,11,16,18 210:20
**tiny** 16:6
**tissue** 91:22 92:3 108:14,15 108:20 109:3,7 110:13 111:10
**tissues** 5:15 106:12,17 108:10
**titanium** 120:12,17,18 120:24 121:4,8 121:17 123:7 205:7,10
**today** 10:16 13:19 35:11 36:21 47:18 49:19 71:1 82:14 98:5 112:4 152:8 156:15,19 160:3,4 163:2 163:11 167:22 168:2,21 171:21 172:2 173:4 189:3 190:11,12,15 190:24 202:3,4
**today's** 15:25 159:9 166:21 167:3,20 168:7
**together** 46:15 48:6 140:15 154:8,12,25 176:6,11
**told** 47:17 55:24 56:3 142:17 143:2,6 146:23 162:18 180:24 186:8 186:15,18 208:18
**took** 14:6 17:8 29:11 60:5 61:4 62:6,10 64:4 65:13 74:17 129:11 155:9 157:25 177:12 188:16
**top** 27:10 55:7 74:20 83:19 90:18 113:23 117:11 119:4 193:23 194:3,4 203:19 204:4
**topic** 16:13 22:1,15,16,18 63:7 129:22 132:21,22 181:7,9
**topics** 37:5,6,8 37:10
**tot** 74:7,7
**total** 150:20 161:4
**totality** 74:8
**touched** 168:7
**towards** 28:14 31:7 110:16 133:4
**track** 41:3
**tracks** 43:20
**tract** 27:18 104:25
**trailed** 210:13
**training** 29:10 169:7
**transcribed** 215:8
**transcript** 174:11 214:3 215:12,14
**transcriptomic** 6:4
**transcripts** 14:16,18
**transfer** 111:9
**transformation** 6:9 126:16 127:9,17
**translated** 115:23
**travel** 149:22 150:16
**treated** 127:11
**trial** 57:24 58:1 94:3 96:21 97:6 97:10,18,22,25 157:19 168:15
**tried** 129:11 211:18
**true** 23:13 46:6 49:18,19,24 52:10 76:1,3,6 96:6 110:15 182:7 214:6 215:9
**trust** 100:14 150:2 156:6
**try** 57:2 110:15 110:25 202:6
**trying** 32:19 34:16 62:19,23 66:12 185:23
**tubaligation** 211:8
**tube** 5:4 30:18 196:2
**tubes** 55:4 67:22 68:3,4,5 68:6,8,16,16,19 69:7,12,14,17 69:19,25 70:2 72:17 73:12,21 196:3 211:5,15 211:22,25

**tumor** 117:21
118:2 204:16
**tumori** 204:12
**tumoricidal**
117:22,25
118:1 204:13
204:15
**turn** 11:17 31:3
31:14 53:2
57:14 83:17
93:7 101:20
102:25 104:24
106:11 107:22
111:19 116:25
120:22 127:23
133:12 137:4
138:16 144:2
147:3 151:5
179:9 193:22
195:23 197:6
203:18 204:2
207:22
**turning** 56:15
74:15 79:25
93:1 117:10
179:6
**turnover**
126:22 127:1,5
**twenty** 18:3
182:21 184:12
**twice** 43:7
62:22 121:14
**twitter** 37:20
**two** 11:5 14:7
15:9 23:21
26:12 30:25

51:3,4 54:2
55:12,18 56:1,3
56:13 57:11
59:4,10 60:14
62:10 63:23
83:14 86:3 90:8
93:13 112:4
121:13 133:25
134:14 143:19
150:1 157:20
157:23 158:15
158:16,20,21
159:8,20
160:17 174:23
176:11 191:23
198:5,18 199:3
**type** 12:22,25
13:3,9 48:23
52:16 115:9,12
125:24 127:16
149:10,10
157:6
**typically**
110:20 118:13

**u**

**u.s.** 7:6
**ucla** 45:9
**ucsf** 41:22
42:14 53:14
113:13
**ultimately**
121:21 198:24
**umbrella** 6:16
**unable** 44:16

**uncertainty**
149:5 152:7
**unclear** 177:4
194:8
**uncontaminat...**
111:1
**uncontrolled**
127:11
**under** 25:12
26:10 53:3,21
66:24 78:21,23
93:8,12 106:12
106:17 123:2
133:19 135:13
135:14 171:15
171:22 172:17
180:2 188:4
192:22 214:2
215:8
**underarm**
155:23 177:11
**underlying**
156:1
**undersigned**
215:1
**understand**
10:20 11:2
20:24 28:4
43:24 46:16
72:22 113:10
119:25 153:25
161:2 170:4
174:19 196:23
202:1
**understanding**
13:14 28:6 76:5

89:7 92:18
119:14 123:20
132:9 163:14
178:1 206:23
**understood**
26:16 35:3
39:17 49:4,21
71:12 74:6
75:25 127:14
138:1 174:19
190:5
**underwear**
54:5 177:15
**unfair** 97:17
**unfortunate**
126:14
**uniform** 46:21
**uniformly**
211:23
**united** 1:1 2:1
187:17 188:24
189:7
**university** 7:20
38:8 147:11
149:13 150:14
**university's**
37:25 113:11
**unpatent** 196:3
**unpublished**
54:24 67:16
**unrelated** 63:7
207:10
**updated** 30:22
30:24 163:1
168:22

**uploaded** 37:17
**urban** 205:10
**use** 4:16,22 6:22 7:3 8:17 9:10,11,16 13:1 13:7 18:24 23:17,19 25:7 26:4,11,18,21 27:6,10 32:3,6 40:21 42:5,7,24 43:3,12,15,16 43:22,23 44:8 44:13 50:2,4,7 50:11,12,14,20 50:22 52:7 54:20 55:12 56:2,4,18,23 57:22 58:4,10 58:24,25 59:1,3 59:11,14,24 60:4,18,18,21 61:9 62:3,5,7,8 62:20,24 63:14 64:6,15 66:4 74:6 75:18 79:10 84:7,18 89:4 107:3 137:16,21 138:5 139:16 145:23 146:2,6 153:1 155:18 162:2,15 177:15 180:9 180:21 186:9 186:13,19 187:9,23 188:18 189:1,5 189:10 191:9,9 192:4 194:17 195:11 197:3 198:11 204:22 209:13
**used** 12:3 27:17 28:11,22 31:25 38:11,15 44:1,3 44:10,11,17,21 44:22 51:6 54:23 60:11 61:16,22 63:15 68:18 81:20 82:1 101:8 109:7 114:22 115:15 118:14 122:11 128:13 162:5 177:6 205:8
**usefulness** 115:8
**users** 78:12,25 89:4 90:24 104:6 156:2,4
**uses** 60:8,22 61:10,25 64:19 126:17 155:24
**using** 44:4,13 44:21 51:2 53:24 60:17 63:5 65:14 66:25 67:15 72:15 81:22 86:15 100:9,13 115:16 124:11 124:12 135:20 170:11 186:16 192:25 193:1 215:7
**usually** 181:7

**V**

**vaccines** 143:15
**vaginal** 154:22 155:18,23,24
**vague** 52:22 151:21 187:11
**valid** 70:14 74:13 136:9
**validity** 131:3
**value** 121:3,4 197:15 198:1 198:14,20 199:8
**values** 198:11 198:16
**variables** 193:15
**varied** 68:6
**various** 37:1,1 37:2 38:3,20 40:5 155:18 168:5
**venture** 101:4
**versa** 165:25
**version** 5:6 20:2 30:11,20 163:16 168:23 183:1 184:16 195:18 202:17 202:18,20
**versions** 34:23 35:9
**versus** 43:3 44:10,13,21 56:19 65:16 66:5 68:5 73:21 74:7,7 77:8 85:6 123:7 128:25 155:23 155:23 156:3 163:16 179:11 181:16 194:23 196:3 199:11 210:25
**vessel** 111:7
**vice** 165:25
**video** 38:7
**videos** 37:12
**view** 88:23,23 116:21 152:15
**views** 48:8 110:5
**vigorous** 48:5
**vitae** 7:21 169:4 170:21
**vitro** 124:16
**vivo** 115:23 117:15 124:14 124:19 204:8
**volume** 1:16 2:14 4:3 9:13 9:19 214:11
**voluntary** 203:7

**w**

**wait** 71:25 136:7 194:1,1,1
**walk** 169:24
**want** 17:6 24:5 25:17 45:2 48:16 57:10 71:23 80:17,19 81:24 90:4 113:14 114:2 134:15 135:4 136:6,19 144:3 152:3 153:6 158:17,21 162:25 163:3 164:12 169:12 172:21 173:11 182:10 185:5 194:9 197:3 202:8,15,20,25 206:16 208:10 208:24 212:12 213:6,9
**wanted** 39:21 82:18 113:9,15 134:17,22 149:4 154:6
**wanting** 22:17 152:1
**way** 16:22 19:24,25 21:15 23:7 34:12 36:2 38:12 40:16 43:19 44:7 45:25 46:7 59:25 61:17 62:14 63:5 68:10,11,21 75:17 85:13 88:15 93:13 98:11 99:5 100:5,12 108:22 110:14 110:24 111:13 116:15 118:11 120:3 123:17 126:12 127:12 128:14,19 132:17 133:2 134:17 135:20 145:17 182:1 191:4 197:12 201:12 212:13
**ways** 63:4 155:5
**we've** 47:5 67:5 67:7 76:4 100:8 136:25 158:14 159:21 167:18 171:23 190:14
**weak** 198:17
**weakness** 76:14 77:3
**website** 37:25 38:8 45:5,6 188:5,5
**websites** 168:5 190:17
**wednesday** 1:15 2:17 10:1
**week** 15:9 23:23 24:23 26:19 27:7,11 27:17 44:18 54:2,2 55:12,15 58:5,11,15,24 59:4,7,10,18,22 60:11,14 62:10 62:22,23,23,24 63:15 71:4 146:4 157:4,24 159:19 167:5 167:10 209:20
**weekly** 59:14 59:25
**weeks** 30:25
**weigh** 129:4 132:1 201:3
**weighed** 134:1
**weighing** 132:18
**weight** 46:13 63:10 107:18 130:14 199:15
**weighted** 63:5
**went** 21:10,16 23:3 34:21 41:1 41:17 109:21 109:22 145:3 193:6
**whatsoever** 130:14
**whereof** 215:18
**whichever** 54:24
**whittlemore** 68:9,10
**wide** 7:6
**wider** 28:10,17
**wildly** 179:3
**william** 14:14
**wise** 45:16
**wish** 160:23
**witness** 2:14 4:2 11:5 14:22 17:7 18:2 19:23 20:14 21:25 22:19 23:1,11 24:2,6 25:17 26:24 29:13,22 32:6 34:4 39:7 39:23 41:3,19 46:11 47:20 48:3 49:11,13 49:16 50:17 51:20 52:23 58:21 59:9,17 66:11 70:4 72:7 74:11 75:9 79:7 79:16 80:5 81:4 81:7 83:2 84:22 86:15,25 89:7 89:15 91:1 96:15,24 99:11 99:21 100:5,25 103:25 104:18 107:10 109:14 111:17 112:1 112:18 115:25 116:11 124:3 128:7,10,17

130:25 131:17 132:3 133:15 135:11 138:9 142:17,20,22 144:13,20 146:21 147:22 148:1,4,24 149:14,20 150:9 152:1 153:12 155:20 158:8 161:5,11 167:24 170:16 170:18 173:15 173:19 175:19 176:24 183:8 183:11,15,17 184:3 187:12 187:15 191:20 193:13 195:20 202:10,12,18 205:17 206:14 207:10 208:22 209:9,19 210:14 211:13 211:21 212:24 215:18
**witnesses** 4:11 11:16 14:6 15:7 189:4 215:5
**wolf** 7:18 164:15
**wolf's** 164:19
**woman** 44:17 128:25
**women** 6:24 43:13,16 44:4,5 49:2 55:3,18 56:16,19 57:19 59:21 60:16 62:22 67:21 68:3,15,19 69:17,19 70:2,5 70:7 72:16 73:12,20 74:7,8 79:18 129:1 144:25 178:22 182:12 192:5 192:24 196:2 211:3,6,15,22 211:24
**women's** 191:23
**wondering** 133:1 154:1
**woolen** 19:16 19:19 20:7 21:7 21:10,17,22 22:3,4,11,23 23:10,15 25:5 25:14 26:2,11 33:7 34:11 38:9 38:12 39:1,2,5 39:6,9 40:12,13 40:22 41:1,15 42:7,17,23 48:17 49:7 50:13,19 51:5 56:7 65:16 66:19 67:7,9,12 72:14 74:15 80:9 113:2,17 134:16 142:7 142:15 148:22 152:19,21 153:1 175:17 176:17,25 181:4 183:4 185:8,10 195:15,17 200:2 207:13 207:22 208:6 209:1,12 210:4 210:22
**wording** 148:21
**words** 26:12,19 56:18 57:8 77:6 79:4 129:6 190:4,12
**work** 20:3,21 21:1,10,11,16 21:19,22 22:1,2 22:3,12,17,19 22:22 36:1,5,5 37:3 38:22,24 40:13,22 41:14 42:3 47:21 63:9 63:10 77:10 80:14 107:14 107:20 110:12 134:9 135:1,13 135:15,20,21 135:22,25 143:1 147:13 148:1,1 149:9 149:14 150:10 150:16 154:9 157:6,10 159:13,16,19 160:15,22 161:4 171:13 172:15 173:5 174:5
**worked** 40:4 112:1 134:14 157:4 159:25 160:6 161:16
**working** 157:1
**works** 36:2 72:22
**workup** 166:2,3
**world** 162:16
**worldwide** 189:9
**worthwhile** 138:14
**worthy** 130:11
**write** 16:19 118:18 142:25 143:11
**writes** 113:14
**writing** 16:23 16:23 203:13
**written** 28:23 29:4 56:6 132:9 198:8,10 199:18,23 200:3
**wrong** 27:2 64:12 81:24 83:2 147:20
**wrote** 47:22 49:23
**wrubbel** 45:10

**wu** 74:19,19

**x**

**x** 215:14

**y**

**yeah** 24:7 47:12 49:10,11 50:17 59:5 65:5 67:8 88:24 90:7 99:6 103:3 107:8 118:25 137:15 151:1 153:15 154:5 165:16 173:15 183:13 184:1,24 194:15 196:21 197:22 198:22 201:20 202:12 206:12

**year** 34:23 109:21 149:21 150:17

**yearly** 149:16

**years** 12:3 24:22 35:21 59:21 90:8 95:19 97:6 150:8,22 157:10,20 179:1,2

**yep** 24:10 30:24 124:24 173:23 175:19 195:25

**yesterday** 167:4,10,17 168:3

**youtube** 37:12 37:14,18 38:7

**z**

**zero** 121:5

**zion** 53:14

**zoom** 34:16 167:15,16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.