# Exhibit 5

Page 1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEW JERSEY

3

4    IN RE JOHNSON & JOHNSON       MDL NO. 16-2738

5    TALCUM POWDER PRODUCTS        (MAS)(RLS)

6    MARKETING, SALES PRACTICES,

7    AND PRODUCTS LIABILITY

8    LITIGATION

9    _____/

10

11

12            The In-Person, Virtual Zoom, Telephonic

13   deposition of GREGORY DIETTE, M.D., MHS was held

14   on Wednesday, June 19, 2024, commencing at 9:00

15   a.m., at the Sheraton Baltimore North Hotel, 903

16   Dulaney Valley Road, Towson, Maryland 21204,

17   before Susan Wootton, Notary Public.

18

19

20

21

22

23

24   REPORTED BY:  Susan Wootton, RPR, CLR

Page 2

```
1  APPEARANCES:
2  ON BEHALF OF THE NEW JERSEY PLAINTIFFS:
3  CHRISTOPHER V. TISI, ESQUIRE
4      (In-Person)
5  Levin Papantonio Rafferty
6  316 South Baylen St.
7  Pensacola, FL 32502
8  Telephone:  202-302-2138
9  Email:  CTISI@LEVINLAW.COM
10
11 ON BEHALF OF PLAINTIFF STEERING COMMITTEE
12 AND THE MDL:
13 MICHELLE A. PARFITT, ESQUIRE
14      (In-Person)
15   ASHCRAFT & GEREL, LLP
16   4900 Seminary Road, Suite 650
17   Alexandria, VA 22311
18   Telephone: 703-931-5500
19   Email: mparfitt@ashcraftlaw.com
20
21
22
23
24 APPEARANCES (Continued on the Next Page)
```

Page 3

```
1  Appearances CONTINUED:
2  ON BEHALF OF PLAINTIFF STEERING COMMITTEE
3  AND THE MDL:
4  RICHARD GOLOMB, ESQUIRE
5   (Via Zoom and Phone)
6   Golomb Legal
7   130 N. 18th Street
8   One Logan Square
9   Suite 1600
10  Philadelphia, Pennsylvania 19103
11  Telephone: 215.985.9177
12  Email:  rgolomb@golomblegal.com
13
14 ON BEHALF OF THE DEFENDANTS:
15 KATHRYN S. LEHMAN, ESQUIRE
16      (In-Person)
17   King & Spalding, LLP
18   1180 Peachtree Street, N.E.
19   Atlanta, GA 30309-3521
20   Telephone: 404.572.2716
21   Email: klehman@kslaw.com
22
23
24 APPEARANCES (Continued on the Next Page)
```

Page 4

```
1  Appearances CONTINUED:
2  ON BEHALF OF PERSONAL CARE
3  PRODUCTS COUNCIL:
4  BRANDY HARRIS, ESQUIRE
5   (Via Zoom and Phone)
6   REILLY, McDEVITT & HENRICH, P.C.
7   3 Executive Campus
8   Suite 310
9   Cherry Hill, New Jersey 08002
10  Telephone: 856.317.7188
11  Email: bharris@rmh-law.com
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
1          INDEX
2      Deposition of Gregory Diette, M.D.
3          June 19, 2024
4
5  Examination by:              Page
6  MS. PARFITT              9, 260, 288, 303
7  MR. TISI                 259, 272
8  MS. LEHMAN                  278, 301
9  INSTRUCTION NOT TO ANSWER:
10          Page 171 Line 1
11 Exhibit No.              Marked
12 Exhibit 1   Expert Report of Gregory Diette
13      MD, MHS For General Causation
14      Daubert Hearing          14
15 Exhibit 2   Expert Declaration of
16      Gregory Diette, MD, MHS      16
17 Exhibit  3  MDL Report of May 28th, 2024    16
18 Exhibit  4  Composite of Documents       12
19 Exhibit  5  O'Brien Study, Intimate Care
20      Products and Incidence of
21      Hormone-Related Cancers      30
22 Exhibit 6   Daubert Order of April 27th
23      of 2020              37
24 INDEX CONTINUED:
```

2 (Pages 2 - 5)

Page 6

1  INDEX CONTINUED:
2  Exhibit No.　　　　　　　　Marked
3  Exhibit 7　Deposition Notice for
4　　　Dr. Diette　　　　　　39
5  Exhibit 8　Dr.Diette's CV　　　　39
6  Exhibit 9　MDL Invoices for Dr. Diette　　48
7  Exhibit 10　MCL Invoices for Dr. Diette　　49
8  Exhibit 11　Invoices for Dr. Diette　　　50
9  Exhibit 12　Expert Testimony of Gregory
10　　　B. Diette, MD, MHS　　　　60
11  Exhibit 13　Complete Health Canada Report　78
12  Exhibit 14　Compendium for Health Canada
13　　　Screening Assessment　　　78
14  Exhibit 15　Advisory Group recommendation
15　　　on priorities for the IARC
16　　　Monographs　　　　103
17  Exhibit 16　IARC Monographs on the
18　　　Identification of Carcinogenic
19　　　Hazards to Humans　　　107
20  Exhibit 17　O'Brien article on the Association of
21　　　Powder Use in the Genital Area with
22　　　Risk of Ovarian Cancer　　　113
23
24  INDEX CONTINUED:

Page 7

1  INDEX CONTINUED:
2  Exhibit No.　　　　　　　　Marked
3  Exhibit 18　Article on Douching, Talc Use,
4　　　and Risk of Ovarian Cancer　　117
5  Exhibit 19　Letter to the Editor by
6　　　Drs. Harlow and Rothman
7　　　and Dr. Murray　　　　128
8  Exhibit 20　Article on Association between
9　　　douching, genital talc use and
10　　　incident cervical cancer　　156
11  Exhibit 21　Cohort Profile, the Ovarian
12　　　Cancer Cohort Portion 0C3　　161
13  Exhibit 22　Article by Dr. Visvanathan
14　　　entitled, Fallopian Tube Lesions
15　　　in Women at High Risk for Ovarian
16　　　Cancer, a Multicenter Study　　167
17  Exhibit 23　Study Finds Association
18　　　Between Genital Talc Use and
19　　　Increased Risk of Ovarian Cancer　195
20  Exhibit 24　Genital Talc use may be linked to
21　　　increased risk of ovarian cancer　204
22
23
24  INDEX CONTINUED:

Page 8

1  INDEX CONTINUED:
2  Exhibit No.　　　　　　　　Marked
3  Exhibit 25　Article entitled: Epidemiological
4　　　Methods to Advance our Understanding
5　　　of Ovarian Cancer Risk　　217
6  Exhibit 26　Article on Multiple Imputation: A
7　　　Flexible Tool for Handling
8　　　Missing Data　　　229
9  Exhibit 27　Article on Asthma in
10　　　Older Patients　　　230
11  Exhibit 28　MDL-Diette Reports　　　253
12  Exhibit 29　Up-dated Appendix from
13　　　Medical Science Affiliates　　263
14
15
16
17
18
19
20
21
22
23
24

Page 9

1  Whereupon:
2　　　GREGORY DIETTE, M.D.,
3  called as a witness, having been first duly sworn
4  to tell the truth, the whole truth, and nothing
5  but the truth, was examined and testified as
6  follows:
7　　　EXAMINATION BY MS. PARFITT
8  Q　Good morning, Dr. Diette, good to see
9  you again.
10  A　Good morning, Ms. Parfitt. It's nice
11  to see you as well.
12  Q　Thank you.
13　　　MS. HARRIS: I'm sorry, but we can't
14  hear anything anymore.
15　　　MR. TISI: It says the microphone
16  isn't working.
17　　(There was a break in the proceedings at
18  9:30 a.m. and testimony resumed at 9:35 a.m.)
19  BY MS. PARFITT:
20  Q　Good morning, Dr. Diette.
21  A　Good morning, Ms. Parfitt.
22  Q　Dr. Diette, would you please state
23  your name for the jury?
24  A　Sure. Gregory Bruce Diette.

Page 10

1    Q    Dr. Diette, you understand that your
2 deposition here today is being taken not only in
3 the multidistrict litigation, but also the MCL,
4 the Jersey coordinated litigation?
5    A    That's my understanding.
6    Q    All right.  Now, your last deposition,
7 or MDL deposition, was back in April, April 19th
8 of 2019; is that correct?
9    A    That sounds right.
10    Q    What have you done if anything to
11 prepare for the deposition today?
12    A    So I reviewed my -- my updated
13 reports, like the more recent ones.  I reviewed,
14 you know, some of the literature, you know,
15 particularly the -- the newer literature that's
16 new since 2019.
17       I read several -- well, portions of
18 several expert reports, both plaintiff and defense
19 experts.  I don't remember how many, but it's
20 quite a -- quite a number of the reports.
21    Q    Okay.
22    A    And I looked at their updated ones as
23 opposed to the ones that were, you know, from back
24 in 2019.

Page 11

1       I read a rough draft of Dr. Merlo's
2 deposition transcript and I'm trying to -- I
3 think -- I think that is the basics of what I did.
4    Q    All right.  Before I ask you a few
5 questions with regard to the materials that you've
6 looked at, you have quite a stack in front of you.
7       Does that stack of materials reflect
8 the items that you've just spoken about?
9    A    No.  No, these were -- so, this stack
10 is from you, right?  So, this happened -- this is
11 going to be redundant, because these are two of
12 the reports that you gave me a copy of as well.
13 Oh, and this is the third one here.
14       This is just a handful of articles
15 that were some of the newer ones that I thought
16 if, you know, if I could refer to my own copy of
17 instead; but I think they're ones that I've cited
18 in my report and so forth.
19    Q    Very good.  What we'll do -- I'm not
20 going to use the time now, what we will do at the
21 conclusion of the deposition -- is mark that stack
22 of documents as a composite exhibit and also
23 the -- make them available so we can get them
24 copied where you have the stickies --

Page 12

1    A    Yes.
2    Q    -- because I see you have stickies on
3 some and I think some highlights.
4    A    Your colleague was asking if he could
5 look at them.
6       MR. TISI:  Why don't I take a look at
7 them, Michelle?
8       MS. PARFITT:  That's fine, too.
9    A    Okay.
10    Q    But let's have the composite of
11 documents marked first as Diette Exhibit Number 1,
12 and again, it will reflect --
13       MR. TISI:  Michelle, I already
14 premarked 1, 2 and 3.  Make this number 4.
15       (Diette Exhibit 4 was marked for
16 purposes of identification.)
17       MS. PARFITT:  This can now be Exhibit
18 Number 4.  Thanks, Dr. Diette.
19       Dr. Diette, quickly, you mentioned
20 that you read some of the plaintiff's at least
21 updated expert reports.  Do you recall which
22 plaintiff's experts depositions you read?
23    A    I hope I have a list of everything I
24 received.  I won't remember all of them.  I'm

Page 13

1 sure, you know, Dr. Smith-Bindman would be one.
2       And if -- you don't have to,
3 obviously -- if you want to help and list some of
4 them, I can tell you if they're ones that I looked
5 at.  But they're -- I think there were probably
6 like a dozen or so that I looked at.
7    Q    All right.  You have quite a few
8 listed on your appendices that are attached to
9 your expert report.
10       Can I assume you looked at all of
11 those or just some of those?
12    A    Just some of them, and not completely
13 in every case either.
14    Q    All right.  And they would be
15 Dr. Singh's.  Do you remember looking
16 at Dr. Singh's?
17    A    I do.
18    Q    Do you remember looking at
19 Dr. Smith-Bindman?
20    A    Yes.
21    Q    Do you remember looking at
22 Dr. McTiernan?
23    A    Yes.
24    Q    Dr. Siemiatycki?

4 (Pages 10 - 13)

Page 14

1    A    Yes.
2    Q    Dr. Cote?
3    A    Maybe.  I can't remember that one.
4    Q    Dr. Harlow?
5    A    Yes.
6    Q    Very good.  Doctor, you have in front
7 of you what we've had marked as Exhibit Number 1.
8 I believe it's a copy of your expert report from
9 2019.  If you can get that in front of you.
10        (Diette Exhibit 1 was marked for
11 purposes of identification.)
12    A    Yes.
13    Q    All right.  Now referencing your
14 attention to page 4 of that document.  Do you see
15 that?
16    A    I do.
17    Q    All right.  And there's a subtitle of
18 "methodology."  Do you see that?
19    A    I do.
20    Q    All right.  In your 2019 expert
21 report, is it fair to say that using appropriate
22 methodology that you have opined that there's
23 insufficient evidence to support a causal
24 connection between perineal use of talc and

Page 15

1 ovarian cancer?
2        MS. LEHMAN:  I'm just going to object
3 here.  I object to any questions about the 2019
4 report.  Those questions could have been and
5 should have been asked during the 2019 deposition.
6        So, to the extent that this -- you're
7 going to ask questions about the 2019 report, we
8 object.
9        MS. PARFITT:  Objection noted.  These
10 are foundational.  I'm not going to be asking
11 anything about the 2019 report.  Two questions are
12 foundational.
13        So, did you get my -- Doctor, again,
14 in your 2019 expert report, is it fair that your
15 opinions are using appropriate methodology that
16 there was no -- or there was insufficient evidence
17 to support a causal connection between perineal
18 use of talc and ovarian cancer?
19        MS. LEHMAN:  The same objection.
20    A    Yes.
21    Q    All right.  Now if you'll look at your
22 expert report for April 25, 2024 -- and you can do
23 the MDL Report first -- one says Carl and
24 Balderrama.  That is the New Jersey report.

Page 16

1        And then there is one that is the MDL
2 Report, I believe it's Exhibit Number 2.  Is that
3 right, Chris?
4        (Diette Exhibit 2 was marked for
5 purposes of identification.)
6        MR. TISI:  Well, yes.
7    A    So, I'm just going to tell you what
8 I'm looking at, because for me Exhibit Number 2 is
9 Carl and Balderrama.  Then, Exhibit 3 is the MDL
10 with a different date on it.
11        (Diette Exhibit 3 was marked for
12 purposes of identification.)
13        MR. TISI:  A different date?
14    A    A different date than you mentioned.
15    Q    All right.  Let's look at Exhibit 3,
16 which is the MDL Report which is dated May 28th,
17 2024.  Do you have that in front of you?
18    A    I do.
19    Q    All right.  Now, those opinions
20 contained in your May 28th, '24 MDL deposition or
21 report also have a category on page 4 entitled
22 "Methodology."  If you would please turn to
23 page 4.
24    A    Yes.

Page 17

1    Q    Do you have that in front of you?
2    A    Yes.
3    Q    Very good.  Again, is it your opinion
4 that, using appropriate methodology, that you have
5 opined that "there is insufficient evidence to
6 support a causal connection between perineal Talc
7 use (inclusive of constituents those products may
8 contain in addition to talc) and ovarian cancer."
9 Have I read that correctly?
10    A    That is my opinion, but it looks a
11 little different wording-wise on page 2, and I'm
12 not sure --does that --
13    Q    Page 4.
14    A    No.  I know page 4 -- does it -- does
15 it say that on page 4?  Oh, yeah.  I'm sorry, I
16 see that now, okay.  Yes, and you read it
17 correctly.  Thank you.
18    Q    So, indeed, on May 28th, '24, and in
19 your report of 2019, the methodology that you
20 employed for purposes of your opinions that you'll
21 be sharing with the jury are the same; is that
22 correct?
23    A    That's correct.
24    Q    Okay.  Now, you state in the 2024

Page 18

1  report, the addition is a comment "inclusive of
2  constituents, those products may contain in
3  addition to Talc." Do you see that?
4      A   I do.
5      Q   All right. What was the purpose for
6  that addition?
7      A   I may of had something like that
8  somewhere else in the other report, or I mean, I
9  don't remember if I was just updating what I
10 thought.
11         It's not a new opinion for me. It's
12 just the concept is -- is that the studies that
13 look at perineal use of talcum powder, they don't
14 identify what the constituents are individually.
15         So I think that the epidemiology, by
16 and large, speaks to whatever it is that women are
17 reporting as perineal application of Talc.
18     Q   So you're referring to whatever is
19 contained in the bottle of baby powder, correct?
20     A   That's correct.
21     Q   All right. Very good. Now, there is
22 one additional report -- which I understand is
23 Exhibit Number 2 -- and that is your May 28th,
24 2024 report that was filed in the MCL, which is

Page 19

1  the New Jersey litigation. Do you see that?
2      A   I see it, but I don't see a date on
3  it.
4      Q   You are correct. There is not a date.
5  So if you could take my representation that that
6  report was filed in May -- on May 28th -- excuse
7  me, May 21st of 2024?
8      A   Yes.
9      Q   And that report was filed, the New
10 Jersey report was filed about seven days or so
11 before the multidistrict report, correct?
12     A   Did you say May 21st or May 28th?
13     Q   You know what I should have said?
14     A   Yeah.
15     Q   Your New Jersey report was filed
16 April 25th.
17     A   April 25th?
18     Q   2024.
19     A   That sounds about right. I know it --
20 I know it predated the MDL Report.
21     Q   Okay. So let's correct the record
22 that Exhibit Number 2 that you have in front of,
23 which is the New Jersey report which is not dated,
24 is a date of April 25th, 2024.

Page 20

1      A   It seems approximately right.
2      Q   Okay. Now, you if you would turn to
3  your 2024 report, and specifically page 2.
4      A   This is the MDL?
5      Q   That is the MDL Report, which I
6  understand is Number 3.
7         THE REPORTER: Which you understand is
8  what?
9         MS. PARFITT: Exhibit Number 3.
10        MS. HARRIS: I apologize for
11 interrupting, but we've lost sound in the room.
12        MR. TISI: Can you hear now at all?
13        THE WITNESS: We're getting that same
14 error message.
15        MR. TISI: Let's go off the record.
16        THE REPORTER: Sure. We are.
17 (There was a break in the proceedings at 9:37
18     and testimony resumed at 9:45 am)
19        MS. PARFITT: Dr. Diette, you have in
20 front of you what's been marked as Diette Report
21 Exhibit 3, the MDL report of May 28th, 2024.
22        You should have Exhibit 1, which is
23 your original report 2/25/19.
24     A   That's correct.

Page 21

1      Q   All right. If you would turn to the
2  section of "scope of the report," which would
3  appear on page 2 of both reports; your MDL '24
4  report and your MDL 2019 report.
5      A   In "Summary of Opinions?"
6      Q   Actually, just "scope of the report."
7      A   Oh, because it's Scope of Report on
8  the older one, but Summary of Opinions is on
9  page 2 of the newer report.
10     Q   That is correct. That is correct.
11 And your '19 report is on page 2, Scope of Report,
12 and I have on your new report, page 1 --
13     A   Got it.
14     Q   -- scope of Report.
15     A   So you would like Scope of Report for
16 both?
17     Q   Correct --
18     A   Got it.
19     Q   -- if you will.
20     A   Yes.
21     Q   All right. In reading and comparing
22 your 2019 MDL report with your 2024 report, you
23 edit the scope of your report as follows:
24         You state, "I understand that

6 (Pages 18 - 21)

Page 22

1 plaintiffs in this proceeding allege that the
2 exposure to talcum powder products containing
3 asbestos or other constituent parts poses an
4 ovarian cancer risk."
5        "I further understand that
6 Johnson & Johnson disputes that its talcum powder
7 contains asbestos or other carcinogens."
8        "It is my opinion to a reasonable
9 degree of scientific certainty that the science
10 does not support an ovarian cancer risk from
11 exposure to talcum powder products, even if those
12 products were to contain trace amount of
13 asbestos." Did I read that correctly?
14    A    Yes.
15    Q    All right. Dr. Diette, what was the
16 bases for adding that additional paragraph to your
17 2024 report?
18    A    I don't remember exactly what
19 motivated it. I can tell you that in general, you
20 know, I had a chance to read through the entire
21 old report.
22        So in some cases, I just made updates
23 based on reading it that I thought would, you
24 know, read better or be more complete.

Page 23

1        This information about what was being
2 alleged, I don't think is new, but I brought it in
3 just to be more -- more complete.
4    Q    All right. I have a question about
5 that. In the last sentence of your MDL '24
6 report, Exhibit Number 3, you state, "it is my
7 opinion to a reasonable degree of scientific
8 certainty that the science does not support an
9 ovarian cancer risk from exposure to talcum powder
10 products, even if those products were to contain
11 trace amounts of asbestos."
12        Is it your opinion that talcum powder
13 products contain trace amounts of asbestos?
14    A    No. I don't have an opinion about
15 whether they do or don't.
16    Q    So, understanding what you'll be
17 testifying in court on, is that you have no
18 opinion one way or another whether or not talcum
19 powder contains asbestos --
20        MS. LEHMAN: Objection to form.
21    Q    -- even at trace levels?
22    A    So, I think to be clear, I
23 understand --
24    Q    That's a yes or no, Dr. Diette.

Page 24

1    A    No. It's not. It's -- and
2 respectfully I just say that because I understand
3 there is a debate about that among people who have
4 the expertise, in order to identify minerals of
5 certain types.
6        And I've seen folks on both sides --
7 both for plaintiffs and defense -- articulate
8 whether there is or is not asbestos, whether it's
9 trace amounts or some other amount. But I don't
10 have the expertise to referee that.
11        So that's what I'm trying to say. But
12 I acknowledge that it might be; but I'm not the
13 person to be able to say that I know that it is
14 there or that it isn't there or ever was or never
15 was there.
16    Q    So you have seen evidence from reports
17 of individuals who are trained and have expertise
18 in that area that they have seen trace -- they
19 have seen asbestos in the talcum powder products;
20 is that fair?
21    A    I have seen that.
22    Q    All right. Now, let me unpack this a
23 little bit. You are a medical doctor, correct?
24    A    I am.

Page 25

1    Q    All right. And you are also in the
2 field of public health, correct?
3    A    That's right.
4    Q    All right. Is it your opinion,
5 sitting here today in 2024, that it safe for a
6 woman to apply and rub asbestos in her vagina?
7        MS. LEHMAN: Object to form.
8    A    So, I don't know. I mean, it would
9 depend. If you're just talking about plain old
10 asbestos -- and there was a certain quantity that,
11 for example, was a known health risk, then -- then
12 I would not expect that it was. If we're talking
13 about --
14    Q    That was what? That it was safe?
15    A    Well, no, I was talking about the
16 opposite. I was talking about the opposite.
17        So I mean, if somebody is handling
18 asbestos, of a form that is friable, for example,
19 and it's of a type and somebody can articulate
20 that there's a dose that can cause harm to
21 someone, then I would say, no, they shouldn't do
22 that. That that's not safe.
23    Q    Dr. Diette, I'm afraid that doesn't
24 answer my question. Mine is very simple. I'll

7 (Pages 22 - 25)

Page 26

1 break it down.
2          Is it your opinion as a scientist and
3 a medical doctor that it is safe for a woman to
4 take asbestos and rub it in her vagina?
5          MS. LEHMAN:  Object to form.  Asked
6 and answered.
7     A    Yeah, I can't -- I mean, I can't do
8 any better than I did, because it needs to be
9 qualified in some way the way that I did.  Because
10 it's not a yes/no.
11          If you said would it be safe, for
12 example, to put, you know, one particle of
13 chrysotile asbestos in her vagina, I don't think
14 that sounds like it has any danger to me.
15          So it has to be qualified by the, you
16 know, the dose and the fiber type and so forth;
17 and what, realistically, someone can estimate
18 would get into the person's body.
19     Q    In their vagina, in this case, into
20 their reproductive system?
21     A    Well, so, I'm not aware that asbestos
22 causes vaginal cancer.  So there would have to be
23 some dose that would reach an organ that somebody
24 thought was susceptible.

Page 27

1     Q    Well, let's talk about ovarian cancer.
2 Taking that asbestos and placing it in vagina and
3 then it reaching the ovarian cancer -- reaching
4 the ovaries.
5          That was what I was speaking of.  I
6 wasn't talking about vaginal cancer.  I was
7 talking about ovarian cancer.
8     A    Oh, yeah, no.  I understand.  But you
9 said "placed in the vagina" and I don't know of
10 any risk there would be to the vagina itself.  It
11 would have to migrate somehow to another organ.
12     Q    Would there be a potential risk to the
13 ovaries and the fallopian tubes?
14     A    I don't know.  I think that there is
15 evidence that supports -- and again, I know yours
16 is a hypothetical.  I don't know if it's a
17 realistic hypothetical --
18     Q    Actually, mine is not a hypothetical.
19 If you could just answer the question.
20          MS. LEHMAN:  Object to form.
21     A    Well, rubbing asbestos or putting
22 asbestos in one's vagina, I think is hypothetical,
23 because I've never --
24          MS. HARRIS:  We've lost the sound

Page 28

1 again.
2          THE REPORTER:  I'm sorry.  What is it?
3          (Technical interference.)
4          THE WITNESS:  I'm sorry?
5          MS. HARRIS:  We can't hear again.
6          THE WITNESS:  Can you hear me now?
7          MS. HARRIS:  I can hear you.
8     A    Okay.  Should I continue my answer?
9     Q    Well, let me be very clear about my
10 question.
11     A    Sure.
12     Q    I did not pose my question as a
13 hypothetical.  My question to you was simply this.
14          In your opinion as a medical person
15 and scientist, is it safe for a woman to take
16 asbestos and rub it in her vagina?
17          MS. LEHMAN:  Object to form.
18     A    It isn't a yes/no, but I understand --
19 and I understand that you're not qualifying it as
20 a hypothetical; but to me it is hypothetical,
21 because we're not talking about a specific
22 circumstance where someone did something.
23          I don't understand any circumstance
24 that exists in reality where a woman would have

Page 29

1 any reason to take asbestos and put it in her
2 vagina.  But assuming that, I think my
3 qualifications that I said before my answer --
4          MS. HARRIS:  My apologies, but there
5 is no volume again.
6          (There was a break in the proceedings.)
7 at 9:55 am and testimony resumed at 10:00 am)
8          MS. PARFITT:  All right.  Let's move
9 on.
10          THE REPORTER:  Okay.
11          MS. PARFITT:  All right.  Dr. Diette,
12 the purpose of this deposition, as you understand,
13 is to update your 2019 MDL Report and your Jersey
14 report with new material that perhaps had come out
15 in the literature; is that correct?
16     A    That's my understanding.
17     Q    All right.  You have done that not
18 only for the Jersey State Court Litigation in your
19 April 25th, 2024 report, correct?
20     A    That's right.
21     Q    And you also did that in your
22 May 28th, 2024 MDL report?
23     A    I did.  I just want to point out they
24 are not identical, because I think I hadn't

8 (Pages 26 - 29)

Page 30

1 finished my write-up about O'Brien 2024 in the
2 earlier submission. But I had by the May 28th.
3      Q     You anticipated my next series of
4 questions. At the time of your April 25th, 2024
5 report, you did not have access to the
6 O'Brien 2024 study; is that correct?
7      A     I don't remember the dates exactly of
8 when I got it. But whether I had it or not, I
9 certainly hadn't completed my review of it by
10 April 25th.
11     Q     All right. Let's have marked as now
12 Exhibit Number 5, the O'Brien study.
13          (Diette Exhibit 5 was marked for
14 purposes of identification.)
15     Q     Dr. Diette, what you have in front of
16 you is Exhibit 5, which I will identify for the
17 record is a study by Doctors O'Brien, et al.,
18 Wentzensen, Sandler and others, entitled,
19 "Intimate Care Products and Incidence of
20 Hormone-Related Cancers: A Quantitative Bias
21 Analysis;" is that correct?
22     A     That is correct.
23     Q     And that article was published in the
24 Journal of Clinical Oncology, correct?

Page 31

1      A     That is correct.
2      Q     All right. That was published some
3 time in -- I believe it was made available
4 May 15th, 2024?
5      A     Yeah. That's what it says on it.
6      Q     All right. Now, at the -- how did you
7 obtain a copy of O'Brien 2024, now referred to as
8 Exhibit 5?
9      A     Initially I heard about it from the
10 lawyers from Johnson & Johnson who inquired
11 whether I had seen it and read it.
12     Q     All right.
13     A     And I think I might have gotten a copy
14 from them, but I also downloaded a copy from, you
15 know, from PubMed as well.
16     Q     Who from Johnson & Johnson inquired of
17 you as to whether or not you had seen this new
18 publication?
19     A     I think it was likely Lucy Wilson.
20 And when I'm saying "Johnson & Johnson," I mean,
21 lawyers who represent them --
22     Q     Of course.
23     A     -- as opposed to the company itself.
24     Q     Of course. Okay. And you also recall

Page 32

1 downloading a copy of that as well, correct?
2      A     That's right.
3      Q     All right. And after reviewing that
4 study -- that study being Exhibit Number 5 -- you
5 incorporated in your May 28th, 2024, the O'Brien
6 works performed in 2024?
7      A     That's correct.
8      Q     All right. All right. We're going to
9 set that aside and we will come back to it in just
10 a moment.
11          Is it fair to say that the methodology
12 that you employed -- for purposes of giving all
13 the opinions you're going to be sharing with us
14 today -- are the same methodologies that you used
15 back in 2019?
16     A     Yeah. It's all fundamentally the
17 same, same methodology.
18     Q     So the methods that you employed with
19 regard to assessing causality in 2019 remain the
20 same methodology that you used in 2024?
21     A     Correct.
22     Q     All right. Now is the methodology
23 that you employed for purposes of assessing
24 causality for your report in 2024, the same

Page 33

1 methodology that you used when you testified
2 before Judge Wolfson in the Daubert proceeding
3 back in July of 2019?
4      A     Yes, yeah. The fundamentals are all
5 the same.
6      Q     All right. At the time that you
7 addressed Judge Wolfson, Chief Judge Wolfson --
8 who was overseeing the multidistrict litigation --
9 you had reviewed the literature?
10     A     Yeah, the available literature to
11 date.
12     Q     All right. You had assessed the
13 Bradford Hill factors in determining causality?
14     A     I had.
15     Q     All right. You considered the
16 influence on study findings of bias, confounding
17 and other sorts of errors, correct?
18     A     Yeah, in addition to the Bradford Hill
19 considerations.
20     Q     All right. And you also looked at the
21 different study designs, their strengths and their
22 weaknesses, correct?
23     A     Correct.
24     Q     All right. You've also had an

9 (Pages 30 - 33)

Page 34

1 opportunity to review the expert reports of some
2 of the plaintiff's experts who are testifying,
3 correct?
4     A    That is correct.
5     Q    All right. And based upon your review
6 of the updated reports of the plaintiff's
7 experts -- and comparing them to their reports
8 that they also prepared back in 2018 -- you
9 understand that those experts also employed the
10 same methodology?
11     A    It seemed -- it seemed so to me. I
12 didn't see any, you know, fundamental differences
13 in the methodology.
14     Q    So any criticisms that you may share
15 with me today about the plaintiff's experts --
16 sitting here in 2024 -- are the same criticisms
17 that you had with regard to methodology back in
18 2019; is that fair?
19        MS. LEHMAN: Object to form.
20     A    Let me just think for a moment. So, I
21 think so. I mean, the details may be different
22 because part of it is the application of the
23 methodology, which I understand is not your
24 question. I just want to make sure --

Page 35

1     Q    Sure.
2     A    -- I'm sorting the two. But I think
3 if we're talking about, for example, their
4 application of Bradford Hill considerations, if
5 that's one of them, then I have the same
6 fundamental criticism of how they applied those.
7     Q    All right. Now, do you understand
8 that -- you testified before Judge Wolfson back in
9 2019, correct?
10     A    Yes.
11     Q    All right. And back in 2019 when you
12 testified before Judge Wolfson -- on the
13 methodology that you employed for your opinions
14 and the methodology that the plaintiff's experts
15 employed for their opinions -- you also rendered
16 an opinion with regard to causality; is that
17 correct?
18     A    Yes.
19     Q    Okay. Now, do you understand that
20 Judge Wolfson -- during the Daubert proceedings --
21 also had a chance and opportunity to hear from
22 some of the plaintiff's experts on general
23 causation?
24     A    Yeah. I know that she heard from -- I

Page 36

1 don't know how many, but more than one.
2     Q    All right.
3     A    And actually, let me qualify that. I
4 actually don't know if it was more than one. I
5 think, Dr. McTiernan, I think, testified.
6        I don't recall others who may have
7 testified on -- if we're talking about
8 epidemiology.
9     Q    Correct.
10     A    Yeah. I don't know if there were
11 others, but Dr. McTiernan was one.
12     Q    Judge Wolfson, back in 2019 and then
13 more recently in 2020, had an opportunity to hear
14 from those experts for the plaintiff who testified
15 not only as to methodology, but as to their
16 opinions that talcum powder products used in the
17 genital area can cause ovarian cancer; is that
18 correct?
19        MS. LEHMAN: Object to form.
20     A    So, yeah. I mean, she had a chance to
21 hear what they expressed.
22     Q    Okay. And they expressed their
23 opinions that talcum powder products used in the
24 genital area can cause ovarian cancer?

Page 37

1     A    Yeah. I think basically that -- yes.
2     Q    Okay. Now are you or were you made
3 aware of the fact that there was a Daubert Order
4 that was issued, after the testimony, of, not only
5 you on general causation for, on behalf of
6 Johnson & Johnson, but also by those experts that
7 were testifying on behalf of the consumers, the
8 plaintiffs?
9     A    I'm aware of that.
10     Q    Okay. Did counsel make you aware of
11 the actual Daubert Decision that was rendered by
12 Judge Wolfson?
13     A    Yeah, I mean, I read the document.
14     Q    Okay. So you actually read the
15 April 27th, 2020 Daubert Order?
16     A    I don't know the date, but I assume
17 we're talking about the same thing.
18     Q    All right. Let's have marked for
19 purposes of the record the Daubert Order, which I
20 will represent to you was April 27th of 2020.
21        MR. TISI: That's Exhibit 6, right?
22        (Diette Exhibit 6 was marked for
23 purposes of identification.)
24     Q    All right. You have in front of you

10 (Pages 34 - 37)

Page 38

1 Exhibit 6, which is the Daubert Order and I
2 believe it states it's April 27th, 2020, correct?
3    A    Yeah.  It says it's filed then.  I
4 don't know if that means that is the date of the
5 document, but it says -- it says that date on the
6 top of it.
7    Q    All right.  I understand you had a
8 chance or an opportunity to read that document,
9 that order?
10    A    Yeah, back -- back in 2020.
11    Q    All right.  Do you understand that
12 Judge Wolfson -- the court overseeing this
13 litigation -- considered and accepted the
14 methodology that the experts on behalf of the
15 plaintiffs shared, as it pertains to general
16 causation, and supported their opinions and issued
17 a ruling that their general causation opinions
18 were permitted in a court of law?
19    A    Were permitted --
20        MS. LEHMAN:  Object to form.
21    A    Were permitted?
22    Q    Were permitted?
23    A    Permitted?  Yeah, that's my
24 understanding.

Page 39

1    Q    All right.  Let's go ahead and mark
2 next as Exhibit Number 7, and I believe that's
3 your Notice of Deposition.
4        (Diette Exhibit 7 was marked for
5 purposes of identification.)
6        Okay.  Dr. Diette, do you have a copy
7 of the Notice of Deposition?  Did counsel made
8 that available to you?
9    A    They did make it available, but I did
10 not bring one.
11    Q    Okay.  Well, we're going to leave a
12 placeholder until Mr. Tisi finds the notice in our
13 exhibit box and move on to your CV, which we'll
14 now have marked as, I guess that would be
15 Exhibit 8.
16        (Diette Exhibit 8 was marked for
17 purposes of identification.)
18    Q    I didn't get a copy of that.
19    A    Yeah.  I don't need one unless you
20 want me to look at something specific?
21        MR. TISI:  No.  We have to mark it,
22 though.
23        THE WITNESS:  I see.
24        MR. TISI:  Here you go.

Page 40

1    A    Thank you.
2    Q    All right.  Again, for the record,
3 Dr. Diette, I'll present you with Exhibit
4 Number 8, which we've previously now marked as
5 Diette Exhibit Number 8.  That is your CV?
6    A    It is.
7    Q    All right.  What date or dates did you
8 prepare the CV?
9    A    Oh, it wasn't one date.  It's like a
10 thousand dates between when it was first
11 created --
12    Q    Fair enough.
13    A    -- and then updated.
14    Q    All right.  Very good.  Does this
15 Exhibit 8, your CV, represent the most current
16 state of your professional and medical experience?
17    A    So, I would say my professional
18 experience is up to date on here.  I don't think
19 every publication or presentation or, you know,
20 other, sort of the more, what I would say more
21 minor things, as opposed to like what my job is.
22 It's always out of date a little bit.
23    Q    Are there any edits or changes that
24 you would like to make, sitting here today, that

Page 41

1 you would consider substantial and relevant?
2    A    No.
3    Q    Okay.  Now, included in that
4 deposition were a couple of attachments.  There
5 were -- or attached to it, were -- we had invoices
6 and I believe we also had an updated list of trial
7 experiences.
8    A    It was probably trial and deposition,
9 if I'm not mistaken.
10    Q    Fair enough.
11    A    Yeah.
12    Q    Very good.  Okay.
13        MR. TISI:  If you want it, I found the
14 response to the deposition.
15        MS. PARFITT:  All right.  Dr. Diette,
16 again, referencing your CV where you need to, do
17 you still currently hold the appointment of
18 Professor of Medicine, Division of Pulmonary and
19 Critical Care Medicine at Johns Hopkins
20 University?
21    A    Yes.
22    Q    All right.  Is it true that your
23 employer, Johns Hopkins -- not
24 Johnson & Johnson -- recognizes you as a

11 (Pages 38 - 41)

Page 42

1 pulmonologist, an expert in diagnosis and
2 treatment of patients with common conditions, such
3 as asthma, COPD, chronic pulmonary disease and
4 other types of lung conditions?
5    A    I hope so.
6    Q    Okay.  Is it fair to say that
7 Johns Hopkins -- not Johnson & Johnson -- does not
8 recognize you as a cancer specialist?
9    A    Well, yeah, they would not.
10   Q    Okay.
11   A    I mean, I just want to qualify it.  I
12 mean, I think I know what you mean by "cancer
13 specialist."
14       I mean, part of my job is to work in
15 the cancer center and to provide care to patients
16 who have cancer.  Everybody in the cancer center
17 has cancer.
18       But I think, if I understand your
19 question, I mean, I'm not the person that they
20 would expect to administer chemotherapy or
21 radiation therapy, but I am still expected to
22 provide care to patients with cancer.
23   Q    Treatment and care to patients with
24 cancer, but you are not a cancer researcher,

Page 43

1 correct, in the area of women's reproductive
2 health?
3       MS. LEHMAN:  Object to form.
4    A    I would agree with that.
5    Q    Okay.  Now, is it true today, here in
6 2024, that none of your research focuses on
7 cancer, and I quote?
8       MS. LEHMAN:  Object to form.
9    A    Was there a quote?
10   Q    That's -- that's the question.  No.
11 No.  No.  I'm quoting to you.  Is it true today
12 that none of your research focuses on cancer?
13   A    Not per se.  I mean, over time, I've
14 done some work on lung nodules, which the
15 implication is whether or not they're cancer.  But
16 I'm not doing, you know, primary cancer research.
17   Q    That's fair enough.  Would it be fair
18 to say your research and interests include
19 environmental impacts on lung disease,
20 epidemiology of airways disease and chronic
21 obstructive pulmonary disease?
22   A    Absolutely includes all of those.
23   Q    You're still board certified in
24 pulmonary medicine and internal medicine?

Page 44

1    A    Both, that's right.
2    Q    Okay.  You are not board certified in
3 gynecological or oncology medicine?
4    A    Correct.
5    Q    All right.  Since 2019, have you
6 expanded your practice in any way to consult with
7 women with gynecological diseases?
8    A    I haven't expanded it, no.
9    Q    Okay.  Since 2019, have you counseled
10 women with regard to the diagnosis, prevention and
11 treatment of ovarian cancer?
12   A    I have not.
13   Q    Since 2019, have you become current on
14 the adjuvant therapies that are recommended to
15 women who have ovarian cancer?
16   A    I mean, I may have seen occasions
17 where, you know, I saw what someone was getting
18 at; but I haven't tried to make a comprehensive
19 study of what those treatments are or, you know,
20 what the indications are.
21   Q    You certainly do not recommend chemo
22 adjuvant therapies to women with ovarian cancer?
23   A    That's a -- that's an odd question.
24 I'm not the person who makes the recommendation.

Page 45

1    Q    That's fine.
2    A    What I mean is, like, I don't even
3 recommend it.  Like if somebody else said "you
4 should get this," I don't say, "no, you
5 shouldn't ."
6    Q    All right.
7    A    But I'm not the person who prescribes
8 it.
9    Q    That's correct.
10   A    Yeah.
11   Q    Okay.  Very good.  All right.  Is it
12 true that you still have not authored or published
13 any research materials on talc and ovarian cancer?
14   A    Correct.
15   Q    Is it also true that any articles that
16 you've authored that remotely touched on cancer
17 are primary related to lung cancers, not female
18 reproductive cancers?
19   A    Correct.
20   Q    And it is also true that you've done
21 no research or independent writings on the issue
22 of talc and ovarian cancer?
23   A    Correct.
24   Q    And it is also true that you've not

12 (Pages 42 - 45)

Page 46

1  received any grant monies by any health
2  organization -- NIH, NCI, NIEHS -- to undertake
3  research on significant public health issues
4  impacting women, research on female reproductive
5  topics?
6      A    Correct.
7      Q    Now, is it true that since 2019,
8  you've not made any presentations to the medical
9  community, the regulatory community or the
10  scientific community with regard to women's
11  reproductive health and ovarian cancer?
12      A    Correct.
13      Q    Is it also true that you've not made
14  any presentations -- lectures to scientific bodies
15  or regulatory bodies -- concerning the issue of
16  perineal talc exposure and ovarian cancer?
17      A    Correct.
18      Q    Now you've co-authored -- as I look at
19  your literature, your past literature over the
20  years -- you have co-authored and contributed to a
21  number of publications that address various
22  modifiable risk factors as they deal with issues
23  of environmental dust, ambient air particles,
24  things like that, correct?

Page 47

1      A    It's included that, that's right.
2      Q    Okay.  Is it fair to say that since
3  2019, you have not co-authored or authored or
4  contributed to any publications that address
5  various modifiable risk factors that can cause
6  ovarian cancer?
7      A    Correct.
8      Q    Okay.  Do you know if douching is a
9  modifiable risk factor for ovarian cancer?
10      A    Well, it's modifiable for sure.  I
11  don't know if the science is settled about whether
12  it is a cause or not; but there's certainly some
13  evidence for that.
14          But I don't know whether that's
15  settled science yet for whether it is in fact a
16  risk.
17      Q    Is the use of talc in the genital area
18  also a modifiable event?
19      A    Of course.
20      Q    Okay.  All right.  Let's talk a little
21  bit about your invoices and we'll have that marked
22  if we can as Exhibit Number, I believe we're up
23  to 9.
24          MS. LEHMAN:  That's right.

Page 48

1          MS. PARFITT:  Thank you, Katie.  I
2  appreciate that.  Dr. Diette, you were asked in
3  your Notice of Deposition to produce -- in advance
4  of this deposition -- invoices since 2019 to the
5  present.  Do you remember reading that?
6      A    I do.
7      Q    Okay.  Counsel has been kind enough to
8  provide us with invoices, not only for the MCL
9  Litigation, but the MDL Deposition or MDL
10  Litigation.
11          What I would like to present to you
12  and have marked is -- and I'll represent -- is it
13  a composite of your invoices, one for the MCL?
14      A    Okay.
15      Q    And one for the MDL.  What we will
16  have marked first as Exhibit 9, Chris, is the
17  composite for your MDL invoices and I'll have it
18  marked 9.
19          (Diette Exhibit 9 was marked for
20  purposes of identification.)
21          MR. TISI:  I guess you don't want the
22  invoices themselves, right?
23          MS. PARFITT:  We will get to that.
24  Thank you.  And Number 10 is a composite of your

Page 49

1  invoices -- presented prior to this deposition --
2  for the MCL litigation.
3          I'll just go ahead and mark 10 and 9
4  and, Counsel, we have copies for you as well.
5          MR. TISI:  I'll get it.
6          MS. PARFITT:  But just to keep things
7  moving, Dr. Diette --
8          MR. TISI:  MCL is 9 or MDL is 9?
9          MS. PARFITT:  MDL is 9 and MCL is 10.
10          (Diette Exhibit 10 was marked for
11  purposes of identification.)
12      Q    And then while Mr. Tisi is doing that,
13  I'm also going to have marked as Exhibit
14  Number 11, a composite of the actual invoices that
15  were produced by counsel, again, in both the MCL
16  and the MDL.
17          MR. TISI:  Here, (indicating.)
18      Q    Okay.  And I'll mark this one we
19  put -- so we now have the same number --
20      A    Okay.  Thank you.
21          MR. TISI:  Nine.
22          MS. PARFITT:  That is number 9.  Okay.
23          MS. LEHMAN:  Great.  Thank you.  I
24  appreciate that.

13 (Pages 46 - 49)

Page 50

1    THE WITNESS: Thank you.
2    MS. LEHMAN: I think you gave him two.
3    MR. TISI: I don't know what this is,
4 Michelle.
5    MS. PARFITT: The MDL, I'll represent,
6 is an invoice with a total of $321,000.
7    MR. TISI: Okay. This is just a
8 different copy. Here you go.
9    MS. LEHMAN: Yeah. I've got a copy,
10 I've got a copy of this.
11    MR. TISI: Yeah. It's the same thing.
12 She just has a different font.
13    MS. PARFITT: Number 10 is the MCL.
14    MR. TISI: I've got it.
15    THE WITNESS: Do you need this?
16    MR. TISI: No. That's fine.
17    MS. PARFITT: Thank you. And, again,
18 we will have marked as Exhibit Number 11 -- and
19 that will be a total compilation of invoices that
20 were presented by counsel for -- testimony that
21 you have given over the course of time, starting
22 with 2017, and there's 2019.
23    (Diette Exhibit 11 was marked for
24 purposes of identification.)

Page 51

1    Q    So my question to you; your current
2 rate for testifying is $725?
3    A    That's right. Yes.
4    Q    Okay. How long has it been since you
5 have worked for J&J as a testifying expert?
6    A    I think I did the -- well, I don't
7 know if I testified in 2017, but I think I first
8 did some of the work related to the epidemiologic
9 research in 2017.
10    The first time I testified, I don't
11 know if it was that year or 2018, but it was one
12 or the other.
13    Q    All right. Is Johnson & Johnson still
14 your primary client for expert work in the area of
15 talc and ovarian cancer issues?
16    A    For talc and ovarian, yes.
17    Q    Are there other corporations -- other
18 than J&J -- that are also clients for expert work
19 that you do on talc and ovarian cancer since 2019?
20    A    I don't know of any others.
21    Q    All right. So they're your sole
22 client with regard to issues of expert work on
23 talc and ovarian cancer?
24    A    I think so, unless there's, like -- I

Page 52

1 know sometimes there's like co-retentions for
2 like, you know, stores and things like that, but I
3 don't -- I don't recall any of those for ovarian
4 cancer.
5    Q    All right. When you talk about
6 stores, you would be talking about CVSs and the
7 drug stores?
8    A    Correct.
9    Q    Okay. Very good. And there are times
10 where you have been co-represented or co-retained
11 by not only drug stores, suppliers, but also
12 Johnson & Johnson?
13    A    Generally speaking, that's true. But
14 I don't know if that's true for ovarian cancer,
15 which I know is what your question was about. It
16 may only be Johnson & Johnson for ovarian cancer.
17    Q    Fair enough. Since 2019, what
18 percentage of your income has been related to
19 testimony on behalf of Johnson & Johnson for talc
20 and asbestos related matters?
21    A    I don't know how to do that, because
22 it varies year to year, right. So like, so for
23 ovarian cancer, I guess most of it would have been
24 around 2019 or 2020.

Page 53

1    Then I don't know if there was
2 anything -- well, I -- I think there was maybe one
3 trial during Covid. There was -- so, I don't
4 know. I don't know how to parse it into what
5 percentage.
6    Q    All right.
7    A    But I can just tell you, like, what
8 would help me. But these don't help me, because
9 this is not the amount of money that I've earned
10 on these dates.
11    Q    Correct. And that's my question. We
12 have tallied the invoices that we received from
13 MDL testifying and that is Exhibit 9. It says
14 $321,147 between December 18 and May of 2024.
15    Is it fair to say that these numbers
16 and the invoices that they reference are not a
17 complete compilation of invoices and monies that
18 you have earned in the talcum powder/asbestos
19 litigation?
20    A    Well, so it's not even accurate,
21 right, let alone complete? These numbers that you
22 have here don't represent amounts paid to me.
23    Some of these lines may have zero
24 dollars paid to me, and some may have some of

Page 54

1 them. But the only way to figure that out is to
2 look at the individual invoices. But this does
3 not represent -- as it stands here -- payments to
4 me.
5    Q    Okay. Similarly, Exhibit Number 10,
6 which totaled about $47,000, the invoices that
7 you've presented to us would be the correct amount
8 of money that you've earned; is that correct for
9 the --
10    A    No. No. No. No. Unless -- well,
11 you can tell me if you did -- did what you need to
12 do.
13        But you need to find the line items on
14 the invoices that pertain to me and only me, and
15 then you need to subtract some from it, because
16 Medical Science Affiliates, who does this billing,
17 they add a -- an amount --
18    Q    A premium?
19    A    Yeah, to what -- to what I earn. So
20 the amount that you see on the invoice is not what
21 I receive.
22    Q    Okay. But is it fair to say that
23 Johnson & Johnson was charged by Dr. Diette and
24 MSA the amounts that are reflected in the

Page 55

1 invoices; is that correct? It's A fair statement?
2    A    Sure. MSA plus me is reflected here.
3    Q    You hire MSA to assist you with regard
4 to your work in talc and ovarian cancer and
5 asbestos and ovarian cancer, right?
6    A    I don't hire them. I mean, we don't
7 have that sort of relationship, but I do take
8 advantage of their administrative services.
9    Q    All right. And they bill J&J for it?
10    A    They do.
11    Q    Okay. Dr. Diette, is it fair to say
12 that over the course of your testifying on behalf
13 of J&J that you've earned in excess of a couple
14 million dollars?
15    A    I would doubt that, but I don't -- I
16 don't have any way to know.
17    Q    Do you remember being asked that
18 question in the Mattey trial where you testified?
19    A    I don't remember that, but I think,
20 you know -- but we're talking about with Ms.
21 O'Dell asking questions?
22    Q    Right.
23    A    Yeah, and I think -- I remember she
24 was asking questions that were about testimony,

Page 56

1 like all sorts of testimony; not just related
2 to -- to talc and ovarian cancer.
3        And if she said that I wouldn't have
4 endorsed that on purpose. I mean, if you think
5 that there's a statement there, I would have no
6 way to be able to support that statement.
7    Q    Would a fairer statement be that
8 during expert work -- during the course of doing
9 your expert work since 2017 -- you have earned in
10 excess of $2 million?
11    A    I don't know if that's true either.
12 And I -- what I recall from the trial was she was
13 asking about I think 10 years or something, and I
14 don't remember a dollar amount that came up. But
15 certainly over 10 years, that could be right.
16    Q    Okay. It could be in excess of that
17 as well, correct?
18    A    It could be. It may not be quite as
19 much, but I don't have a tally of it.
20    Q    Okay. Did you provide counsel with
21 every invoice that you have billed for up until
22 May of 2024?
23    A    Related to the?
24    Q    Talcum powder and ovarian cancer

Page 57

1 cases.
2        MS. LEHMAN: Object to form.
3    A    Yeah, as far as I know. I mean, I
4 don't know of any that are missing, other than
5 like unbilled time.
6    Q    Okay. I assume there is some unbilled
7 time?
8    A    Of course.
9    Q    All right. Approximately how much
10 time have you billed, have you billed for -- that
11 you've not yet received compensation for --
12 leading up to today, your deposition?
13    A    Is that your question? How much have
14 I billed for, but not like gotten a check?
15    Q    Yes.
16    A    Oh, I have no idea. Like, I don't --
17 I don't keep track of it. I mean, I send in the
18 invoice and then one day I get a check. But I
19 don't keep track. I mean, I may have all of it.
20 I don't know.
21    Q    Okay. Well, you last billed on
22 May 17th, 2024. Is it fair to say you've done
23 work since May 17th, 2024 for Johnson & Johnson on
24 the talcum powder and ovarian litigation?

15 (Pages 54 - 57)

Page 58

1    A    Yes.
2    Q    All right.  How many hours have you
3  worked on the talcum powder and ovarian cancer
4  litigation since May 17th, 2024?
5    A    I would estimate 30.
6    Q    Thirty hours?
7    A    Three zero.  Yes, three zero.
8    Q    Okay.  So that should be the only
9  other invoice that I should be certain to inquire
10  of counsel, following this deposition?
11    A    You should.
12    Q    Okay.  Am I also going to get a
13  statement that includes not only your 30 hours,
14  but the tax by MSA that works for you, correct?
15    A    Well, it's not a tax and I don't think
16  you'll get something specific to me, right?  And I
17  want to be very clear about this.  Let's just
18  look -- for example, you brought up May 2024, and
19  it says 34,938,61.
20        I can't tell you off the top of my
21  head how much of that is mine.  It's not a tax,
22  it's just a -- I don't -- I mean tax, I think, is
23  for the government, but there's an add-on.  I can
24  tell you exactly how much is mine if we look at

Page 59

1  the specific invoice.
2    Q    Okay.
3    A    But that's the only way to do this.
4    Q    All right.
5    A    Otherwise, we're just guessing.
6    Q    Is it fair to say you are unable
7  today, sitting here, to tell the ladies and
8  gentlemen of the jury what percentage of your time
9  is spent doing expert work for Johnson & Johnson
10  on talcum powder and ovarian cancer cases?
11        MS. LEHMAN:  Object to form.
12    A    Yeah, I don't -- I don't break it down
13  that way.  I mean, I --
14    Q    No ballpark number?
15    A    Well, I'll tell you how I can back
16  into it a little bit.  So, I'd say that in a
17  typical year lately, maybe about 20 percent of my
18  professional time is related to expert work.  So
19  it's some subset of that.
20        I think of that 20 percent, maybe
21  about a third is related to talcum powder in
22  general; but it's not all related to ovarian
23  cancer.
24        And I would say that, you know, within

Page 60

1  a given year, there are huge gaps, I mean, where I
2  do absolutely nothing because there's -- there's
3  no new literature to review, or maybe one article
4  or something like that.
5    Q    Thank you.  All right.  Let's just
6  mark for purposes of identification your Expert
7  Testimony List of Gregory Diette.  And
8  Dr. Diette --
9        MR. TISI:  That's Number 12, correct?
10        MS. PARFITT:  It's number 12, yes.
11        (Diette Exhibit 12 was marked for
12  purposes of identification.)
13    Q    While they're getting that document,
14  Dr. Diette, your expert testimony --
15        MR. TISI:  Whoever changed their
16  setting on their phone, we're getting feedback.
17        THE WITNESS:  It looks like
18  Mr. Golomb.
19        MR. TISI:  Mr. Golomb, whatever you
20  just did, we're getting feedback now.
21        MS. PARFITT:  Dr. Diette, do you have
22  Exhibit 12 in front of you?
23        MR. TISI:  We've got to fix that.
24  Richard, can you go on mute or whatever it is you

Page 61

1  do?
2        MS. PARFITT:  You have to go on mute,
3  sir.
4        THE WITNESS:  The answer is, yes.
5        MS. PARFITT:  Thank you very much.
6  All right Dr. Diette, the first date of
7  testimony --
8        (Internet issues were addressed.)
9    Q    Dr. Diette, the first date of
10  testimony on Exhibit 12 is a date of June 19th,
11  2020.  Do you see that?
12    A    I do.
13    Q    All right.  We asked for all
14  information with regard to expert testimony --
15  whether it be deposition or trial testimony --
16  from 2019 to 2020.
17        So would this be correct that this is
18  the first date since the time of your April -- it
19  would be your February 25th, 2019 report --
20    A    I'm not sure.
21    Q    -- that you've given testimony?
22    A    This represents the last four years of
23  testimony, which is what I try to maintain --
24    Q    Fair enough.

16 (Pages 58 - 61)

Page 62

1    A    -- so, yeah.  So, it may miss
2  something from 2019.
3    Q    All right.  So there could be
4  testimony trial or otherwise between 2019 and this
5  date of June 19th, 2020, fair?
6    A    There might or might not be, that's
7  right.
8    Q    Okay.  I've gone through your list and
9  it looks like in 2020 you testified for
10  Johnson & Johnson three times.  Excuse me, that
11  would be five times, excuse me.
12    A    Yeah.  I mean, they're different
13  dates.  But I mean if you're counting cases like
14  the Reyes case was one with Mr. Satterly, and I
15  think he spent three different days getting
16  through the deposition.
17        So like, you'll see two of the dates
18  on the first page are related to that, but then
19  there's another date which is the same deposition.
20    Q    All right.
21    A    Literally the same.
22    Q    All right.
23    A    So there is some double counting here,
24  just because there's, you know, there's

Page 63

1  redundancy.
2    Q    All right.  I'm not going to belabor
3  this.  We will have it as part of the record.  But
4  my question is simply this.  Does this composite
5  Exhibit Number 12 -- which represents the last
6  four years of your testimony -- does it reflect
7  any time that you gave testimony, either
8  deposition or trial, on behalf of
9  Johnson & Johnson in a talcum powder/asbestos
10  ovarian and/or mesothelioma case?
11    A    I think it does.  I think that's
12  right.
13    Q    Does this document also reflect any
14  time you gave trial testimony or deposition
15  testimony -- in a case involving talc or asbestos
16  in ovarian and/or mesothelioma cases -- for
17  companies other than Johnson & Johnson?
18    A    I would say generally, yes.  But I'm
19  not sure whether all co-retentions are necessarily
20  included in the little box there.
21        Like I see, for example, under Reyes,
22  it certainly includes some like Lucky stores and
23  Long drug stores.  But I don't -- I don't
24  necessarily try to keep track of the -- like the,

Page 64

1  I call them the more minor or smaller
2  participants --
3    Q    All right.
4    A    -- but the primary -- the primary one
5  would be on here.
6    Q    Very good.  Thank you very much.
7  Since 2019, other than Johnson & Johnson, has any
8  regulatory body ever reached out to retain your
9  services on issues of talc and ovarian cancer?
10    A    No.
11    Q    Okay.  So the EPA hasn't reached out
12  for your opinions on talc and ovarian cancer?
13    A    Correct.
14    Q    And the FDA has not reached out to
15  retain your services on the issue of talc and
16  ovarian cancer?
17    A    Correct.
18    Q    And is it fair to say CIR, which is
19  Cosmetic Industry Review Board, have they reached
20  out to you representing personal care companies?
21        Have they reached out to you and asked
22  for your professional opinion on talcum powder and
23  ovarian cancer?
24        MS. LEHMAN:  Just for -- just for

Page 65

1  clarification, Counsel, we're talking about since
2  2019?
3        MS. PARFITT:  All of these since 2019,
4  yes, Counsel?  Thank you.
5    A    Correct.
6    Q    Okay.  And since 2019, you've not been
7  asked to appear before Congress to testify with
8  regard to the safety of talcum powder application
9  and ovarian cancer; is that fair?
10    A    Correct.
11    Q    Now, IARC, International Association
12  for Research on Cancer, have they reached out to
13  you and asked to retain your opinions with regard
14  to talcum powder and ovarian cancer?
15    A    No.
16        MS. LEHMAN:  Just for clarification, I
17  object to the form unless you mean since 2019.
18        MS. PARFITT:  All of these -- let's,
19  for purposes of record and to make it flow better,
20  all of my questions, Dr. Diette, certainly attempt
21  to be inquiring since 2019.  And I'll let you know
22  if that changes.
23    A    Yeah.  What might help is I'll say
24  that going forward I'm going to try to answer

17 (Pages 62 - 65)

Page 66

1 assuming that you meant since 2019.
2    Q    That's fair.
3    A    Yeah.
4    Q    That's fair.  All right.  Now, since
5 2019, have your opinions with regard to talcum
6 powder and ovarian cancer either been solicited or
7 retained by any public health scientific
8 organizations?
9    A    No.
10    Q    So the National Institutes of Health
11 has not reached out to you since 2019 and asked
12 for you to assist them with regard to public
13 health issues, as they pertain to talcum powder
14 use and ovarian cancer?
15    A    Correct.
16    Q    It's fair that NCI has not reached out
17 to you for your services, with regard to your
18 opinions on talcum powder use in the genital area
19 in ovarian cancer?
20    A    Correct.
21    Q    Similarly, the American Cancer
22 Society, the American College of Gynecology, the
23 Society of Gynecologic Oncologists, those
24 professional groups have not reached out to you

Page 67

1 with regard to obtaining your opinions on talcum
2 powder and ovarian cancer?
3    A    Correct.
4    Q    Has NIOSH reached out to you with
5 regard to consulting with you for your opinions on
6 talcum powder and ovarian cancer?
7    A    No.
8    Q    Do you agree with NIOSH's statement,
9 "there is no safe exposure for asbestos?"
10    A    I don't know the statement, but --
11    Q    Their opinion in their reports?
12    A    Yeah.  I mean, I imagine there is
13 something that says something like that; but I
14 don't think it's true.  I think -- I think that
15 there is --
16    Q    You've answered the question, Doctor,
17 that's fine.  If your counsel wants to explore --
18        MS. LEHMAN:  Please let Dr. Diette
19 finish.  Dr. Diette, please finish your answer.
20        MS. PARFITT:  My question is very
21 simple -- and your counsel will have plenty of
22 time to do a redirect -- do you agree with NIOSH's
23 opinion that "there is no safe level of asbestos."
24 Period, end of question.

Page 68

1    A    Yeah.  No.  I get it.  But I don't
2 know whether they said "no safe" or "no known safe
3 level," you know, which is different to me.  Okay.
4    Q    Okay.
5    A    So I don't know which they said.
6    Q    If they said "no safe level of
7 asbestos," do you agree or disagree with NIOSH?
8    A    I would disagree with that statement.
9    Q    If they said "no known safe exposure
10 level," would you agree or not agree with NIOSH?
11    A    I might.  I mean, if we're talking
12 about like that it hasn't been demonstrated that
13 there's a level that they could articulate, I
14 think that would be right.
15    Q    Okay.  Let's talk a little bit more
16 about your work for Johnson & Johnson.  When I say
17 J&J, I mean Johnson & Johnson, the companies, the
18 family --
19    A    Of course.
20    Q    -- the family of Johnson & Johnson.
21 It's fair to say -- based upon your testimony here
22 that is, again, since 2019 -- your professional
23 services for Johnson & Johnson in this litigation
24 has been limited to providing expert reports and

Page 69

1 testimony in deposition and testimony in a Daubert
2 proceeding; is that fair?
3    A    Correct.
4        MS. LEHMAN:  Object to form.
5    A    Correct.
6    Q    Again, all of these are with regard to
7 talcum powder and ovarian cancer?
8    A    Correct.
9    Q    All right.  Has J&J asked that you
10 consult with them with regard to any other medical
11 or scientific issues that pertain to talcum powder
12 and ovarian cancer, outside of the litigation
13 setting?
14    A    No.
15    Q    All right.  So it's fair to say that
16 any opinions that you've shared -- with regard to
17 talcum powder use in the genital area and ovarian
18 cancer -- have been in legal cases where J&J pays
19 you as an expert, fair?
20        MS. LEHMAN:  Object to form.
21    A    Correct.  I'm sorry, I know we had
22 kind of a rambling start with the tech stuff.  If
23 I could just -- if I could just grab a glass of
24 water.  I'm just getting a little dry.

18 (Pages 66 - 69)

Page 70

1    MS. PARFITT: Of course. Of course.
2 I should have asked you that. No, that's --
3    MR. TISI: I'll get it for you.
4    MS. PARFITT: Let's take a break, if
5 we can.
6    THE REPORTER: Sure. That would be
7 great.
8  (There was a break in the proceedings at 10:40
9    a.m. and testimony resumed at 10:45 a.m.)
10 BY MS. PARFITT:
11    Q    And, Dr. Diette, I should have said at
12 the beginning, if you need to take a break at any
13 point in time, just put your hand up, and we will
14 do it, because I tend to do a marathon here, so
15 please let me know.
16    A    Thank you.
17    Q    I'm help happy to accommodate. Sure.
18 Dr. Diette, are you aware of the fact that
19 Johnson & Johnson is now in its almost third
20 attempt to try to achieve the protections of the
21 bankruptcy system?
22    MS. LEHMAN: Object to form.
23    A    I don't know the count, but I know
24 that there -- I mean I've seen in the media that

Page 71

1 there's something going on with like a bank.
2    Well, I actually I shouldn't say I
3 know that. I don't know if I saw it about
4 bankruptcy.
5    I saw something about a settlement,
6 but not about bankruptcy.
7    Q    Okay. But you are aware of the fact
8 that J&J has attempted -- on at least two
9 occasions -- to file for bankruptcy and seek the
10 protections of the bankruptcy system?
11    MS. LEHMAN: Object to form. Asked
12 and answered.
13    A    I'm aware of that.
14    Q    Okay. Has J&J reached out to you for
15 your opinions on assisting them with establishing
16 compensable histologies for ovarian cancer, for
17 purposes of a potential solicitation or
18 bankruptcy?
19    MS. LEHMAN: I would just object to
20 that, to the extent that he had been -- he was
21 contacted but not disclosed.
22    MS. PARFITT: "Objection to form" is
23 how we're going to work it.
24    MS. LEHMAN: Well, hold on. Hold on.

Page 72

1 That is not quite right because, to the extent
2 that his answer would require the disclosure of
3 any privileged or confidential information, I am
4 going to instruct him not to answer.
5    MS. PARFITT: That's fine. That's
6 fine.
7    Q    Do you need me to ask the question
8 again?
9    A    No. I heard it. I just don't
10 understand what a compensable histology is.
11    Q    Okay. Fair enough. Has
12 Johnson & Johnson -- during the course of their
13 attempt to seek bankruptcy protection -- reached
14 out to you for your scientific and medical advice
15 with regard to the types of cancers that might be
16 associated with the use of Talcum Powder Products?
17    MS. LEHMAN: The same objection.
18    A    No.
19    Q    So, is it fair to say that, with
20 regard to the bankruptcy, in general, Johnson &
21 Johnson has not reached out to you for your
22 medical or scientific expertise?
23    MS. LEHMAN: The same objection.
24    A    I am not sure if I am right. I think

Page 73

1 they may have requested a copy of my MDL report,
2 at some point during the first of those.
3    But I don't know if I remember that
4 right or not; but, other than that, like nothing,
5 like no -- no different work, you know, related to
6 it.
7    Q    Okay. Have they paid you for any
8 expertise and work related to the bankruptcy
9 proceedings?
10    MS. LEHMAN: The same objection.
11    A    No.
12    Q    Okay. Are you aware that J&J has a
13 website, Facts About Talc?
14    A    I saw one a couple of years ago. I --
15 I assume it may still be there, but I don't know
16 that.
17    Q    All right. When is the last time you
18 may have gone to that website?
19    A    Maybe two or three years ago or so.
20    Q    Okay. Nothing recent?
21    A    Nothing recent.
22    Q    I was asking you about published
23 articles that you have conducted or written.
24    Have you written or published any

Page 74

1  articles on the methodological issue of
2  contradictory data correction?
3    A   No.
4    Q   Have you written any articles --
5  published in peer-reviewed literature -- on
6  missing data imputation or multiple imputation?
7        MS. LEHMAN:  And I would just request
8  that you inject the "since 2019" into the
9  questions so the record is clear.
10   Q   Again, since 2019?
11   A   None where that's the topic.
12       There likely are articles that have
13 used the techniques but not -- but there's not an
14 article that I've, you know, authored or
15 co-authored where the topic is about the
16 technique.
17   Q   Okay.  And, similarly, since 2019,
18 have you authored any peer-reviewed literature on
19 the issue of sensitivity analysis related to
20 recall bias?
21   A   No.
22   Q   Okay.  During the break, I was looking
23 over your list of testimonies.
24       Is it fair to say that, since 2019,

Page 75

1  you may have testified for J&J or companies over
2  36 times?
3    A   J&J or other?
4    Q   Other companies who manufacture and
5  produce Talcum Powder Products; if you know?  If
6  not, we will go with this.
7    A   I don't know.  I mean, the only way I
8  could do it would be to go --
9    Q   Would be to go through each one?
10   A   Would be to go through it and then try
11 to look for the redundancies where --
12   Q   Okay.
13   A   You know, like to me, just if somebody
14 dragged something out over three days, it doesn't
15 mean that I testified three times.  It was just
16 one event.
17   Q   We won't take the time on that.
18 Perhaps I wasn't -- this might clear up some of
19 the other questions.
20       Since 2019, how much money have you
21 made from your work as a retained expert from
22 Johnson & Johnson?
23   A   I haven't counted it up that way.
24   Q   You have no backup data for how much

Page 76

1  money J&J has paid you, since 2019, for expert
2  work --
3    A   No.
4    Q   -- and retention services?
5    A   I don't.  I don't sort it out that
6  way.  I mean, I -- you know, I work for different
7  clients in the same month at times, and so I
8  don't -- I don't have a way to sort of mentally
9  keep track of, you know, who is who.
10   Q   Okay.  When you file those income tax
11 statements every year, that doesn't kind of
12 refresh your recollection as to how much money is
13 coming in from J&J as to your income?
14       MS. LEHMAN:  Object to the form.
15   A   No, because it doesn't -- I don't get
16 a check from Johnson & Johnson.
17   Q   I am sorry?
18   A   I don't get a check directly from
19 Johnson & Johnson, so I wouldn't be able to
20 recreate it that way.
21   Q   Okay.  Well, who do you get your
22 checks from?
23   A   Well, related -- related to the
24 Johnson & Johnson work, it gets issued by Medical

Page 77

1  Science Affiliates, who collects the money from --
2        I don't know whether they collect it
3  from the law firm or from Johnson & Johnson, but
4  they collect it, and then they issue a check to
5  me.
6    Q   Okay.  All right.  Let's talk a little
7  bit about Health Canada.
8        When we last spoke, we talked a bit
9  about the draft Health Canada assessment, and
10 we're not going to talk about that today.
11       What we will talk about is, since
12 2019, Health Canada has issued a final screening
13 assessment dated April 20 -- 21st.  Are you aware
14 of that?
15   A   I am.
16   Q   Okay.  Have you read it?
17   A   I have.
18   Q   Okay.  Did you read it when it came
19 out?
20   A   I don't know if I read it in April of
21 2021, but I read it, you know, some time, you
22 know, not just -- not just very recently.
23   Q   Okay.  And so, when we talked back in
24 2019, you didn't have access to that final Health

20 (Pages 74 - 77)

Page 78

1 Canada report, correct?
2    A    We had a draft only, if I remember
3 right.
4    Q    Okay. Now, let's have marked Exhibit
5 Number 13 and Exhibit 14.
6        Exhibit 13 is the complete Health
7 Canada report, and Exhibit Number 14 is a
8 compendium, which I will identify as Health Canada
9 screening assessment, the section on evaluation of
10 causation, which starts on page 29 and goes
11 through page 36, and then there's a page attached
12 to that, page 49.
13       MR. TISI: Can I ask you a question?
14       (A discussion was held off the
15 record.)
16    Q    Here we go. Dr. Diette, I am going to
17 show you what I am going to have marked as 14, and
18 it's the compendium of the Health Canada report.
19       I'll put your sticker there, so I make
20 sure I gave you that one.
21       MR. TISI: That's 14?
22       MS. PARFITT: Yes, and Exhibit 13 is
23 the full report.
24       (Diette Exhibits 13 & 14 were marked

Page 79

1 for purposes of identification.)
2    Q    There you go.
3    A    Thank you.
4       MR. TISI: To be clear, 14 is the full
5 report, and 13 is the --
6       THE REPORTER: Fourteen is what?
7       MR. TISI: You originally marked it
8 and then changed it?
9       MS. PARFITT: I have 13 as the
10 compendium, and I have 14 as the whole report.
11      MR. TISI: Right, correct.
12    Q    Okay. Dr. Diette, were you aware that
13 Health Canada was provided by your employer,
14 Johnson & Johnson, with a copy of your expert
15 report some time between the draft report and the
16 final report? Did you know that?
17    A    So I don't consider Johnson & Johnson
18 to be an employer.
19       I've learned, I've learned more
20 recently -- I think through reading through
21 Dr. Merlot's transcript -- that it went through
22 Johnson & Johnson.
23       But I don't -- I don't think I knew
24 how they got, got the report otherwise.

Page 80

1    Q    Okay. Well, did you learn -- through
2 your read of Dr. Merlo's deposition -- that his
3 report was also submitted to Health Canada by
4 Johnson & Johnson?
5    A    I think he might have -- Well, I don't
6 remember if he agreed with that or not, but I
7 just --
8       I know Mr. Tisi asked him questions
9 about that, and implied that he had, and I don't
10 have any information otherwise, that they did or
11 didn't.
12    Q    Okay. Now, Dr. Merlo is a professor
13 in your department as well, correct?
14    A    He is.
15    Q    Okay. And you are colleagues and
16 friends?
17    A    Mr. Tisi is correcting. But it's
18 incorrect. He is saying assistant, but he's an
19 associate professor.
20    Q    Okay. I am not sure that I asked you
21 that question, but --
22    A    No. Mr. Tisi was helping you. Sorry.
23    Q    We're going to stick to my questions,
24 okay. I am sorry about that.

Page 81

1    A    I'll ignore him, if he says something.
2       MR. TISI: Ignore me.
3    A    Okay. All right.
4    Q    Thank you. Thank you.
5       No, I don't want you to ignore him at
6 all, but I do want to make sure that the record is
7 correct.
8       That's the only thing. I want to make
9 sure we've got one question and answer. I don't
10 want to confuse you either.
11    A    Of course.
12    Q    So, my question is that, Dr. Merlo is
13 a professor in your department?
14    A    That is right.
15    Q    And he's a next-door neighbor in the
16 department?
17    A    So, on the one campus, our doors were
18 literally adjacent.
19    Q    That's what I understand.
20    A    Yes.
21    Q    All right. Neither one of you are
22 gynecologists or oncologists?
23    A    Correct.
24    Q    Okay. And, at the request of, or I

21 (Pages 78 - 81)

Page 82

1 guess invitation of J&J, it is your understanding
2 that now -- sitting here today in 2024 -- that J&J
3 made available, not only your expert report but
4 also Dr. Diette -- or, excuse me, Dr. Merlo's
5 expert report?
6        MS. LEHMAN:  Object to form.
7    A    If it's true.  I mean, I don't -- I
8 don't know if it's true, but I can assume it's
9 true.  I don't know how they got it.
10   Q    Okay.  Now, did you see -- having read
11 the report -- where your opinions and your
12 methodological criticisms of some of the experts
13 that were testifying on behalf of the consumers
14 were in fact considered in the Health Canada
15 report?
16   A    I did.
17   Q    Okay.  Similarly, did you see -- from
18 your read of the Health Canada final report --
19 that your opinions and methodology were also
20 considered by Health Canada?
21   A    It looked like certain of them were.
22 I don't know if all of them were, but it looked --
23 you know, they highlighted a couple, at least.
24   Q    All right.  Let's turn to the

Page 83

1 compendium, if you will.
2        And, Dr. Diette, I'll represent, your
3 compendium has some pink highlighting on it, and
4 again that's Exhibit Number 13.
5        And it has some pink where it's
6 highlighted your name.  That's for ease of our
7 discussion here today.
8    A    Okay.
9    Q    Do you have that?
10   A    I do.
11   Q    And I will let the record reflect that
12 I have put those pink highlights in there to help
13 us walk through this report.  Okay?  Fair enough?
14   A    It is.
15   Q    Okay.  Let's walk through the section
16 of the Health Canada report that is entitled,
17 "Evaluation of Causation."
18        Do you see that on the top of page 29?
19   A    I do.
20   Q    All right.  Do you see, in the report,
21 the first paragraph, that Health Canada considered
22 your arguments with regard to strength of
23 association.  Do you see that?
24        In fact, they considered your

Page 84

1 arguments with regard to strength, consistency,
2 biological gradient and also biological plausible?
3    A    Well, it's not the way that I read
4 this paragraph.
5        Maybe it comes up in the next section,
6 but I think this paragraph is about identifying
7 which are the more important -- versus, you know,
8 maybe less important -- of the Bradford Hill
9 considerations.
10   Q    That's fair.
11   A    Yes.
12   Q    That's fair.  And one of those more
13 important, or equally as important factors that
14 were considered by Bradford Hill, and by you, in
15 your assessment, was strength.  Is that correct?
16   A    That is correct.
17   Q    All right.  So, if you look at the
18 strength section of the evaluation of causation by
19 Health Canada, is it fair to say that Health
20 Canada considered your arguments on strength of
21 the association?
22        Do you see that?  Do you see your name
23 there?
24   A    I do.

Page 85

1    Q    Okay.  And do you see, at the last
2 paragraph, it starts with strength and
3 consistency, right above the consistency group?
4        Do you see that?
5    A    That is right.
6    Q    Okay.  Do you see that Health Canada
7 determined that the measured ORs, 1.22 to 1.31 are
8 modest, but they are also similar and unlikely to
9 be random.
10        Considering that ovarian cancer is
11 rare and, therefore -- that a large dataset is
12 required to detect the association -- the findings
13 in the available literature are significant.
14        Did I read that correctly?
15   A    You did.
16   Q    Okay.  Is it correct that Health
17 Canada considered your arguments with regard to
18 strength and rejected them, finding that the
19 strength of the association was significant?
20        MS. LEHMAN:  Object to the form.
21   A    So "significant" and "strong" are two
22 different things.
23        And so, I don't -- I don't think that
24 they have actually gotten to the point where

Page 86

1 they've articulated whether or not strength has
2 been met.
3        And my -- my comment, if they -- I
4 don't know what part of it they read. I wasn't
5 talking about significance.
6        Significance is already baked into
7 Bradford Hill because Bradford Hill says, you
8 know, once an association has been found, that's
9 positive, beyond, you know, where the role of
10 chance is no longer there -- which is what
11 significance is -- then you consider strength.
12        So, they've gone back and forth in
13 this particular analysis, and they've never landed
14 on whether or not they endorsed that strength has
15 been satisfied.
16    Q    Okay. Dr. Diette, you failed to
17 answer my question. I move to strike.
18 Dr. Diette, I am trying to move through this
19 deposition with some efficiency.
20        If I could ask that you answer my
21 questions, and you'll have a chance to elaborate,
22 and, counsel, I am sure, is quite skilled, and
23 will ask some follow-up.
24        So, my questions are going to be very,

Page 87

1 very focused, and the question I asked is this.
2        Health Canada considered your
3 viewpoints and opinions with regard to the
4 strength of the association, and Health Canada
5 found that -- based upon their review of the
6 totality of the literature, their findings were
7 that -- based upon the evidence and the ORs, that
8 they felt the evidence was significant.
9        At least that's what they stated in
10 their report, correct?
11        MS. LEHMAN: And I would object to the
12 lecturing, counsel. I would also object to the
13 form as asked and answered.
14    A    So, they did use the word
15 "significant."
16    Q    Okay. Similarly, let's go down to the
17 next section, which is consistency. Do you see
18 that?
19    A    I do.
20    Q    Okay. And, again, do you see your
21 name mentioned? And, when I say "your name,"
22 that's your report with all of your opinions and
23 methodology. Do you see that on page 31?
24    A    I do.

Page 88

1    Q    Okay. Similarly, Health Canada
2 considered your criticisms regarding the lack of
3 consistency in the various study designs; is that
4 correct?
5        MS. LEHMAN: Object to the form.
6    A    Well, I am sorry. I was reading it
7 while you were talking, so I didn't listen.
8    Q    Health Canada has cited to your
9 report, the Diette report of 2019; is that
10 correct?
11    A    That is correct.
12    Q    All right. And, in your report, you
13 opine with regard to whether or not the evidence
14 is consistent between study designs, correct?
15    A    Correct.
16    Q    Okay. And Health Canada had that
17 report with regard to the consistency among study
18 designs, correct, which you addressed in your
19 report?
20    A    Correct.
21    Q    Okay. And is it fair to say that
22 Health Canada also considered the O'Brien 2020
23 study?
24        Do you see that at the bottom of 20 --

Page 89

1 of page 30?
2    A    Page 30. Yes.
3    Q    Okay. You stated in your report that
4 Health Canada did not have access to O'Brien 2020.
5 Were you mistaken?
6    A    In my 2019 report?
7    Q    In your 2024 report.
8    A    So, I may not have updated it because
9 that may be a leftover from the 2019. But I think
10 that I wrote that when, when we had the draft in
11 front of us, which predated the 2020.
12    Q    Okay. But is it fair to say that you
13 would be incorrect, Health Canada did indeed have
14 O'Brien 2020, before they issued their final
15 assessment on causality?
16    A    That's right.
17    Q    Okay. Do you see, on page 33, on the
18 top of the page, that, after Health Canada had the
19 opportunity to consider not only your report but
20 also the reports of the plaintiff's experts, that
21 they determined that -- based upon the totality of
22 the literature -- that there was indeed a high
23 degree of consistency in epidemiological studies
24 across several decades, conducted in different

23 (Pages 86 - 89)

Page 90

1 parts of the world. Did you see that?
2    A    Did you direct me to 33?
3    Q    Thirty-three, at the top of the page.
4    A    I see. Yes.
5    Q    And they referenced a high degree of
6 consistency, based upon the totality of the
7 evidence they had available to review at the time
8 of issuing their final report, correct?
9    A    That's correct.
10    Q    Okay. Now, to move things along,
11 Dr. Diette, Health Canada also had an opportunity
12 to consider your expert report in their discussion
13 of biological gradient; is that correct? Do you
14 see your name there on page 33?
15    A    I do.
16    Q    Okay. Similarly, when you go down to
17 biological plausibility, do you see your -- a
18 reference to your expert report?
19    A    Yes.
20    Q    Okay. And so Health Canada also had
21 an opportunity to consider your viewpoints and
22 opinions with regard to whether or not there was
23 biological -- whether it was biologically
24 plausible for Talcum Powder to cause ovarian

Page 91

1 cancer, correct?
2    A    Correct.
3    Q    Okay. And you see on the last, about
4 three fourths down, a category, Bias and
5 Confounding, other elements for consideration.
6       Do you see that on 34?
7    A    I do.
8    Q    All right. And, at the top of 35, do
9 you see reference to your expert report of 2019?
10    A    I do.
11    Q    All right. And do you see where
12 Health Canada had -- prior to issuing their final
13 report on causality -- determined that they had
14 had an opportunity to consider and accept and/or
15 reject your opinions with regard to bias and
16 confounding or impact on study findings?
17    A    Yeah. I mean, I think accept or
18 reject is a little abrupt and maybe not exactly
19 what they did.
20       I mean, I don't know how they used the
21 report, but they certainly acknowledged that they
22 included it as a reference.
23    Q    Okay. Now, let me direct your
24 attention to Exhibit Number 14.

Page 92

1    A    I would --
2    Q    That is the actual Health Canada
3 report.
4    A    I apologize. I was looking at what's
5 marked as Exhibit 14.
6       MS. LEHMAN: The larger report?
7    A    This is it.
8       MS. LEHMAN: Yes. For him, he was
9 given, the compendium is marked as 14. And the
10 larger report was marked as 13, for what he was
11 given.
12    Q    Okay. Let's change that now, so we
13 don't have any confusion. Thank you very much.
14    A    Uh-huh.
15    Q    Dr. Diette, you should have in front
16 of you the Health Canada report, not the
17 compendium, but the full report? Do you have
18 that?
19    A    I do.
20    Q    All right. If I can direct your
21 attention to pages 43 and -- excuse me, page 43
22 and page 45, if you have those handy?
23    A    Okay.
24    Q    Do you have those in front of you?

Page 93

1    A    I do.
2    Q    Okay. First, let's go to page 45. Do
3 you have that in front of you?
4    A    I do.
5    Q    The first paragraph, down to the very
6 last sentence.
7    A    Yes.
8    Q    Okay. Where it states, "while there
9 may not be consensus within the scientific
10 community regarding the interpretation of
11 epidemiological information, after weighing the
12 available lines of evidence, the assessment
13 determined -- that is, the Health Canada
14 Assessment -- determined that the current data are
15 indicative of a causal effect."
16       Do you see that?
17    A    I do.
18    Q    Did I read that correctly?
19    A    Yes.
20    Q    All right. So, Health Canada, after
21 they determined and did their Bradford Hill and
22 looked at the totality of the evidence, they
23 concluded that -- based upon the various lines of
24 evidence, which included, not just epidemiology

24 (Pages 90 - 93)

Page 94

1 but mechanistic data pathology -- that the
2 assessment determined that the current lines of
3 data are indicative of a causal effect. Is that
4 correct?
5    A    That is their statement.
6    Q    And the opinion of Health Canada is
7 adverse to your opinion in this case; is that
8 correct?
9    A    It's different than mine.
10    Q    Okay. Well, you say there is no
11 causality, and Health Canada determined that there
12 was causality?
13        MS. LEHMAN: Object to the form.
14    A    Oh, yes. I don't know about
15 adverse -- if that is adversarial or something,
16 but it's different than my opinion.
17    Q    Okay. Health Canada says there is
18 causality?
19    A    Correct.
20    Q    And Dr. Diette says there is no
21 causality?
22        (Overlapping speakers.)
23        MS. LEHMAN: Object to form.
24    A    Correct. And just for what it's

Page 95

1 worth --
2    Q    No question pending. Dr. Diette?
3    A    I --
4    Q    No question pending.
5    A    I understand.
6    Q    No question pending.
7        MS. LEHMAN: Dr. Diette, if you need
8 to finish your answer --
9        MS. PARFITT: He has finished his
10 answer, counsel.
11    A    It's --
12    Q    Let's be fair about this. You'll have
13 a chance to go back. He clearly finished.
14    A    No. Thank you. For this one, I did
15 finish my answer.
16    Q    I appreciate that.
17    A    It was commentary -- it was
18 commentary, and I understand.
19    Q    I respect that, Dr. Diette. Thank
20 you. Okay. In addition to Health Canada, the
21 court in the multi-district litigation also opined
22 that opinions on causality -- in the use of Talcum
23 Powder Products -- could in fact be admitted in a
24 court of law, correct?

Page 96

1        MS. LEHMAN: Object to the form. The
2 document speaks for itself.
3    A    Yeah. Well, I am also not a lawyer,
4 but the way I read it was, I know that they -- I
5 didn't see that they limited any of the opinions
6 of the plaintiff's --
7    Q    On general causation?
8    A    And the defense experts, for plaintiff
9 and defense experts, they didn't limit it.
10        And I am just trying to give a full
11 answer because -- I am not sure I understand the
12 legal issues -- but I think Judge Wolfson said
13 that it was the sort of thing that could be left
14 to a jury as opposed to her.
15    Q    Okay. Very good. Thank you. I
16 appreciate that. Okay.
17        Let's leave Health Canada. Let's
18 leave Daubert. Let's leave your reports for a
19 little bit, and let's talk a little bit about the
20 epidemiological evidence since 2019, okay?
21    A    Okay.
22    Q    All right. Now, that is really the
23 purpose of this deposition, for you and I to have
24 a discussion about any and all new literature that

Page 97

1 has surfaced in the last few years since we were
2 together, correct?
3    A    I thought this stuff we did was part
4 of it, too.
5    Q    It is. It is. This will be more
6 interesting.
7    A    It took us a long time. Okay.
8    Q    This will be more interesting. Okay.
9        Now, you understand that, since your
10 last report, '19, that there have been
11 publications by scientists at the National Cancer
12 Institute and the National Institutes of Health
13 and NIEHS, who have continued to publish on
14 ovarian cancer in Talcum Powder, correct?
15    A    Yeah. And when you say NIH and NIEHS,
16 NIEHS was part of NIH, so there is redundancy,
17 but, yes. The answer is yes.
18    Q    That will save me time. I appreciate
19 that. Thank you. All right.
20    A    Yes.
21    Q    And some of these scientists that have
22 continued to publish in this area of Talcum Powder
23 and ovarian cancer include individuals like
24 Professor Katie O'Brien, correct?

25 (Pages 94 - 97)

Page 98

1    A    That is correct.
2    Q    Professor Dale Sandler?
3    A    Correct.
4    Q    And Professor Nicolas Wentzensen?
5    A    Correct.
6    Q    Do you know any of those individuals?
7    A    Not personally, but I have read -- you
8    know, I have read research reports from all three.
9    Q    Okay. And based upon the research
10   reports that you have read, would you consider
11   these -- these individuals scientists?
12        MS. LEHMAN: Objection to form.
13   A    Well, I think, I think they all have,
14   you know, letters after their names that indicate
15   that they are either Ph.D. or M.D., you know, so
16   scientists of some sort.
17   Q    Okay. All right. Well, Katie O'Brien
18   is an epidemiologist at the National Institute --
19   NIEHS. Do you understand that?
20   A    That's my understanding.
21   Q    And do you know that she was the lead,
22   one of the lead investigators on the Sister Study?
23   A    That's my understanding as well.
24   Q    Okay. And this is a paper, the Sister

Page 99

1    Study is a paper, in fact, which you rely upon for
2    your opinions in this case?
3    A    Just -- just to be correct, for me,
4    papers that come from the Sister Study are
5    included in what I rely on.
6    Q    All right. And one such paper that
7    comes -- well, we have --
8         The Sister Study is also known as the
9    Gonzalez study?
10   A    So, Gonzalez is the lead author on one
11   of the publications from the Sister Study.
12   Q    That stems from the Sister Study?
13   A    That is correct.
14   Q    And, over the course of the years,
15   there have been several publications that are
16   derived from some of the data and additional data
17   that came from the original Sister Study?
18   A    That is correct.
19   Q    And Health Canada quotes
20   Dr. O'Brien in their assessment of causality in
21   this case; is that correct?
22   A    Do they quote her or just cite her?
23   Q    That is fair. They cite to her
24   reference?

Page 100

1    A    They certainly cite -- as you pointed
2    out -- to O'Brien 2020.
3    Q    Are you aware that they cite to other
4    O'Brien publications, other than O'Brien 2020?
5    A    Health Canada?
6    Q    Yes.
7    A    I would have to go back and look.
8    Q    Okay. But, at least we can agree that
9    they, they being Health Canada, cite to the
10   O'Brien 2020 study?
11   A    Of course.
12   Q    Okay. Now, Dale Sandler is a senior
13   investigator and also chief of epidemiology at
14   NIEHS, correct?
15   A    I don't know that, but I don't doubt
16   you, if that's how he's represented somewhere.
17   Q    And Dr. Nicolas Wentzensen is a senior
18   investigator with the clinical genetics branch of
19   the Division of Cancer, Epidemiology and Genetics
20   at NIH. Do you know that?
21   A    I don't doubt it, but I don't know
22   that as a fact.
23   Q    And, again, have you been at any
24   professional meetings with any of these

Page 101

1    individuals?
2    A    Not that I am aware of.
3    Q    Okay. So, it would be fair to say,
4    any information or knowledge you have of these
5    individuals would be information you've derived
6    from reading their publications that have been in
7    the peer-reviewed literature?
8    A    That's correct.
9    Q    Okay. Would you say that, since 2019,
10   these individuals have been fairly prolific with
11   regard to their publications on Talcum Powder and
12   ovarian cancer?
13        MS. LEHMAN: Object to the form.
14   A    Yeah. I don't know where the line is
15   for "prolific," but they certainly contributed to
16   the literature.
17   Q    Okay. Now, we talked briefly about
18   IARC, when we were discussing whether or not IARC
19   had ever retained your professional services on
20   the issue of Talcum Powder in ovarian cancer.
21        Are you aware that, back in March of
22   2019, the advisory group for the IARC scientists
23   recommended a certain priority list for chemicals
24   and substances that perhaps could be considered

26 (Pages 98 - 101)

Page 102

1 for review by the IARC, and that is the
2 International Association of Research on Cancer?
3        MS. LEHMAN: I would just object to
4 any questions about the March 2019 priority list
5 because that could have been covered in the
6 April 2019 deposition.
7    Q   Do you know, Dr. Diette, whether or
8 not IARC developed a priority list back in March
9 of 2019?
10   A   I have seen a priority list. I mean I
11 have seen more than one because they do that from
12 time to time. I don't know the dates of any of
13 them.
14   Q   Okay. Then I will refresh your
15 recollection.
16       This is, frankly, a foundational
17 question that, back in March of 2019, IARC placed
18 talc as a high priority for review by the IARC
19 committee. Do you have that recollection?
20   A   I don't.
21       MS. LEHMAN: Objection.
22   A   That is what I am saying, I don't -- I
23 don't know the dates.
24       MS. LEHMAN: I would object to form

Page 103

1 and, again, object to any questions that could
2 have been covered in April of 2019.
3    Q   Dr. Diette, let me show you, and I'll
4 get a clean copy for purposes of the record, but
5 we will have it marked as -- what are we up to?
6        MR. TISI: We're up to Exhibit 15.
7        (Diette Exhibit 15 was marked for
8 purposes of identification.)
9    Q   Again, I will correct for the record
10 what I am going to show you, Dr. Diette, and I
11 will identify it as Advisory Group Recommendation
12 on Priorities for the IARC Monograph.
13       And it is -- was produced on June 2019
14 in the Lancet Oncology Paper. If I may, let me
15 show you that.
16   A   Sure.
17   Q   And we are just going to spend a
18 minute on this, just to refresh your recollection.
19       Have you ever seen that document
20 before?
21   A   I am not sure. I might have. I'm not
22 sure.
23   Q   Okay. Will you take my
24 representation -- thank you, Doctor -- that back

Page 104

1 in 2019, the advisory for the World Health
2 Organization, IARC, made the decision to re-review
3 Talcum Powder as a high priority for purposes of
4 any upcoming IARC meetings to discuss
5 classification or reclassification of carcinogens?
6        MS. LEHMAN: Same objection.
7    A   I don't doubt you, but the high
8 priority part, I didn't get a chance to read that.
9 So I just was confirming the date and whether I
10 had seen it.
11   Q   Sure. Absolutely. And I am
12 referencing, there's a box here, and it talks
13 about agents recommended for evaluation with high
14 priority?
15   A   True.
16   Q   And it lists talc?
17   A   Yes.
18   Q   Very good. Thank you. Okay. Thank
19 you. All right. Let's fast forward to 2024.
20       Are you aware that IARC is
21 convening -- even as we sit here today -- to
22 discuss the classification of Talcum Powder?
23   A   Yeah. I understand they are
24 undergoing the review now.

Page 105

1    Q   Okay. How did you learn that IARC was
2 undergoing their review of Talcum Powder?
3    A   They've published it. I mean they've
4 published like a couple of things, including that
5 they are -- that they are doing it.
6    Q   Okay. Let me show you what we will
7 have marked then as Exhibit --
8        MS. LEHMAN: 16.
9        MR. TISI: We're leaving a space for
10 15, right?
11   Q   Yes. While we're pulling up that
12 document, Dr. Diette, is it fair to say that these
13 advisory groups are periodically convened -- of
14 scientists from around the world -- to discuss the
15 current state of scientific knowledge vis-a-vis
16 agents, chemicals that may have some
17 carcinogenicity?
18   A   That's my understanding. Thank you.
19   Q   And do you have an understanding that,
20 when an agent is labeled as a "high priority,"
21 that is a classification that is based upon
22 evidence of human exposure and the extent of
23 available evidence regarding carcinogenicity?
24   A   Yeah. You said -- was human in there?

27 (Pages 102 - 105)

Page 106

1    Q    Human.
2    A    Human, yes.  Yes.
3    Q    Okay.  All right.  Now, you know from
4 our last discussion that, back in 2006, IARC
5 convened to discuss the classification of talc?
6    A    Aren't you going to object?
7         MS. LEHMAN:  Yes.  I am sorry.
8         THE WITNESS:  Sorry.
9         MS. LEHMAN:  I was coughing, and it
10 took me a second.
11        MS. PARFITT:  I was going to do it for
12 you.
13        MS. LEHMAN:  Yes.  So, I am going to
14 object to that.
15        MS. PARFITT:  Okay.
16        MS. LEHMAN:  That clearly happened
17 long before the 2018 started, the scope of this
18 deposition.
19   Q    Dr. Diette, the purpose of that
20 question is simply this.
21        Talcum Powder has not been reviewed --
22 and the current state of the literature on Talcum
23 Powder and its association with ovarian cancer -
24 since 2006; is that fair?

Page 107

1         MS. LEHMAN:  Objection.
2    A    By IARC.
3    Q    By IARC, correct.  Okay.
4         So, it's been almost 18 years since
5 IARC has had an opportunity to review the science
6 and evidence surrounding Talcum Powder exposure in
7 the genital area in ovarian cancer?
8         MS. LEHMAN:  I object to form and
9 object to the scope, as its beyond the limited
10 scope of this deposition.
11   A    Yes.
12   Q    Let me show you what we will have
13 marked, or has been marked as Exhibit 16, which
14 you have in front of you?
15   A    Yes.
16        (Diette Exhibit 16 was marked for
17 purposes of identification.)
18   Q    Okay.  What that is, Dr. Diette, for
19 the record, is IARC Monographs of the
20 Identification of Carcinogen Hazards --
21 Carcinogenic Hazards to Humans.
22        It's volume 136, Talc, and how would
23 you say the next word, acrylonitrile?
24   A    Let me just catch up to you.  Which

Page 108

1 line are we?
2    Q    At the top, it says, IARC Monographs
3 and the Identification of Carcinogenic Hazards to
4 Humans?
5    A    Yes.
6    Q    And then it talks about talc and --
7    A    Acrylonitrile.
8    Q    Okay.  And it indicates that they are
9 meeting between, in France, between June 11th and
10 June 2024, or June 18th, 2024, correct?
11   A    That is correct.
12   Q    Okay.  And the International Agency
13 for Research on Cancer is part of the World Health
14 Organization; is that fair?
15   A    That's right.
16   Q    Okay.  Did IARC request that you
17 attend and participate as an advisory member to
18 assess and review the classification of
19 carcinogenicity of Talcum Powder for this meeting?
20   A    They didn't, but I am not sure that's
21 the process they use.  I think they use a process
22 of nominations.
23   Q    Were you nominated?
24   A    I was not.

Page 109

1    Q    Okay.  Do you see where Katie
2 O'Brien -- who is one of the authors of the
3 various O'Brien papers, and is with the National
4 Institute of Environmental Health -- is invited as
5 a member to sit on the Advisory Committee to
6 evaluate the classification of carcinogenicity for
7 talc?
8    A    I do.
9    Q    Okay.  Do you also see that, on the
10 next page, Nick Wentzensen -- who is with the
11 Clinical Genetics Branch of the National Cancer
12 Institute -- was also invited to be a member and
13 to sit to review the ultimate classification level
14 for Talcum Powder?
15   A    Yes.
16   Q    Okay.  Do you know --
17        Let's look on this.  You see that
18 there is a reference to a Kenneth Mundt.
19        Do you see that?  It is under
20 "observers."
21        Mr. Mundt would not be a member of the
22 Advisory Committee, but he is listed under
23 observers.  Do you see that?
24   A    I do.

28 (Pages 106 - 109)

Page 110

1    Q    Do you know who Ken Mundt is? They
2 say he is with -- an independent consultant in
3 epidemiology at University of Mass.?
4    A    I don't know him.
5    Q    Okay. I see a footnote at the bottom,
6 number 5.
7         It says, "he's an independent
8 consultant and declares benefiting from personal
9 consultancy fees from EUROTALC and CTIS."
10        Do you know anything about EUROTALC,
11 what that is?
12    A    I don't know what that is.
13    Q    You don't know what that consulting
14 agency is?
15    A    No.
16    Q    And how about CTIS?
17    A    It's not familiar to me.
18    Q    Okay. So, other than companies that
19 work on behalf of cosmetic companies and in the
20 talc litigation, you don't have any further
21 information about what those consulting groups do?
22    A    So, I don't know. Are those
23 consulting groups? Like because it says,
24 consulting fee from EUROTALC and CTIS.

Page 111

1    Q    Huh-uh.
2    A    It suggests to me that -- I don't know
3 what those entities are.
4    Q    That is fair.
5    A    But it sounds to me like he is the
6 consultant who is receiving like funds from
7 whatever those kinds of entities are.
8    Q    Okay. Fair enough. All right. But
9 you've not engaged and had performed work for
10 those two agencies, correct?
11    A    Correct.
12    Q    Okay. Fair enough. Have you had any
13 discussions with anyone with regard to how those
14 discussions before IARC were proceeding?
15    A    No.
16    Q    You've not heard --
17    A    You mean, how they are proceeding
18 right now?
19    Q    Correct, in 2024.
20    A    No, no, no. No.
21    Q    Have you made any inquiry to any
22 potential attendees to that meeting?
23    A    I haven't, and I think it's improper,
24 but I have not.

Page 112

1    Q    In fact, IARC goes to great lengths to
2 perpetuate an independent culture of the
3 scientists and researchers that attend those
4 meetings, correct?
5        MS. LEHMAN: Object to the form.
6    A    I believe that, but I don't know the
7 facts about that.
8    Q    Okay. Let's leave that and go to some
9 studies. What I would like you to do is --
10    A    And are we at a decent breaking point?
11    Q    Actually, this is a great breakpoint.
12        (There was a break in the proceedings
13 at 11:35 a.m. and testimony resumed at 11:45 a.m.)
14        MR. TISI: This is going to be
15 Number 17.
16 BY MS. PARFITT:
17    Q    Dr. Diette, after a short break, let's
18 talk a little bit about the literature and studies
19 since 2019.
20        And I'll represent to you, as a road
21 map, we will be spending some time on the O'Brien,
22 et al. collection of studies and research.
23    A    Sure.
24    Q    The first one, we will have marked now

Page 113

1 as Exhibit Number --
2        MR. TISI: 17.
3        (Diette Exhibit 17 was marked for purposes
4 of identification.)
5    Q    Seventeen, and that is a report by
6 Drs. O'Brien, Sandler and Wentzensen, and it's
7 entitled, "Association of Powder Use in the
8 Genital Area with the Risk of Ovarian Cancer."
9 It's a JAMA publication, 2020.
10        I believe that you have that in front
11 of you?
12    A    I do.
13    Q    Okay. Have you read that study?
14    A    I have.
15    Q    All right. And this is the study that
16 we were talking about that, in your report, you
17 had misstated that Health Canada had not
18 considered this study, correct?
19        MS. LEHMAN: Object to the form.
20    A    Yeah. It was a correct statement in
21 the original, in the original report, but I didn't
22 update it so it became incorrect.
23    Q    Okay. All right. Did you personally
24 update your references for your March -- or,

29 (Pages 110 - 113)

Page 114

1  excuse me, May 28th, 2024 report?
2      A   I hope so.
3      Q   Or did someone else do that?
4      A   Oh, I mean I selected them. I mean
5  there is a person like a helper who literally like
6  types it into the -- into the list; and, you know,
7  where there is a footnote needed, makes the
8  footnote.
9      Q   Okay.
10     A   But I create the, you know, the list
11  of what they are.
12     Q   Okay. All right. And currently -- in
13  your May 2024 report -- you include O'Brien 2020?
14     A   I believe so.
15     Q   Okay. And, as I appreciate my read of
16  your report of 2024. You rely on O'Brien 2020 and
17  its full results of the prospective cohort studies
18  to confirm your opinion that the epidemiology
19  supporting a causal link between Talcum Powder and
20  ovarian cancer is weak?
21     A   I include that in that, in that
22  assessment, that's right.
23     Q   Okay. So, just to unpack that general
24  opinion, you do admit -- in your report of 2024 --

Page 115

1  that there is an association between genital use
2  of Talcum Powder and ovarian cancer, but you
3  qualify that risk as weak?
4          MS. LEHMAN: Object to the form.
5      Q   Fair?
6      A   "Admit" is a weird word for me to
7  think about it. It sounds kind of legal. But I
8  did acknowledge what their finding was, and their
9  finding is objectively weak.
10     Q   But you acknowledge that your review
11  of the epidemiological literature reveals that
12  there is evidence of an association between Talcum
13  Powder use in the genital area and ovarian cancer,
14  but you qualify it as weak?
15         MS. LEHMAN: Object to the form.
16     A   Yeah. In that one particular study.
17  I mean, not as a -- not a broad statement that
18  is true across the literature, but specifically in
19  this O'Brien 2020.
20     Q   You previously, when I asked you about
21  the authors O'Brien and Sandler and Wentzensen, I
22  asked you whether or not they were prolific
23  writers.
24         And your response, I believe, was that

Page 116

1  they -- you couldn't qualify prolific, but you
2  could say that they have made recent contributions
3  to the body of science and epidemiological
4  literature, concerning exposures to Talcum Powder
5  in the genital area and ovarian cancer; is that
6  correct?
7      A   It is.
8      Q   Okay. Now, let's unpack a little bit
9  the O'Brien study and see what we can agree upon
10  and what we can't.
11         Would you characterize it as a
12  prospective pooled study?
13     A   It's prospective, and it's a pooling
14  of cohort studies.
15     Q   In fact, it's the largest cohort study
16  to date?
17         MS. LEHMAN: Object to the form.
18     A   When it's combined -- when the
19  multiple cohort studies are combined -- it becomes
20  the largest study of that sort to date.
21     Q   Okay. And it includes -- it being
22  O'Brien 2020 -- more than 250 thousand women from
23  the collective group of the cohort studies?
24     A   That is correct.

Page 117

1      Q   And is it fair to say that those
2  cohort studies include NHS1, NHS2, WHI and the
3  Sister Study?
4      A   Absolutely.
5      Q   Dr. O'Brien and Dr. Sandler were also
6  investigators and authors of the 2016 Sister Study
7  that we've spoken of, the Gonzalez study?
8          MS. LEHMAN: Object to the form.
9  Asked and answered. This also goes back to before
10  2019.
11     A   I think I recall it. I would have to
12  look at the author list to actually confirm that.
13     Q   We will have the Gonzalez marked as
14  Exhibit Number 18.
15         (Diette Exhibit 18 was marked for
16  purposes of identification.)
17     Q   Okay. If you look at the top of the
18  2016 Gonzalez entitled, Douching, Talc Use and
19  Risk of Ovarian Cancer.
20         Do you see that Dr. O'Brien and
21  Dr. Sandler are both authors?
22         MS. LEHMAN: I object to the form.
23     A   Yes, I do.
24         MS. LEHMAN: And I object to the

Page 118

1  scope, since this relates to an article that was
2  written long before 2019.
3       A    Yes, I do.
4       Q    Okay.  Is it your understanding --
5  from your review of the 2020 O'Brien study, that,
6  as part of their undertaking -- they increased
7  their work and their research, and the data
8  produced, increased the number of cases and
9  extended the follow-up periods?
10      A    Yes.  Both of those things happened.
11      Q    Okay.  And, after pooling the results
12  of the various cohort studies -- all the cohort
13  studies, frankly, that were in existence up to
14  that period of time -- O'Brien and her colleagues
15  found that the risk for ever versus never and
16  Talcum Powder and ovarian cancer was 1.08?
17      A    1.08 and non-statistically
18  significant.
19      Q    It did show an overall increase of
20  8 percent for women, correct?
21      A    I don't know if that's the way I would
22  characterize it.  I mean it's really -- really
23  close to a null result, but it is what it is.
24           It's a 1.08.  That is not

Page 119

1  statistically significant.
2       Q    And, as I appreciate your opinions,
3  may I assume that -- sitting here today in 2024 --
4  that your opinions continue with regard to
5  statistical significance that -- unless something
6  is statistically significant -- it is not a
7  positive study?
8       A    No.  I mean, I think that, I think
9  what I've tried to express in the past is
10  statistical significance hasn't been thrown out
11  the door, which I think was the thrust of the
12  2019, you know, deposition.
13           And that it's an important part of
14  what is presented by the authors, but it's
15  something to consider when looking at the -- at
16  the reported evidence.
17      Q    Dr. Diette, the confidence intervals
18  for the O'Brien 2020 study were .99 to 1.17, which
19  you describe as not statistically significant; is
20  that correct?
21      A    That is correct.
22      Q    If the confidence intervals had been
23  1.01 to 1.17, instead of .99 to 1.17, would your
24  opinion -- sitting here today -- be that the

Page 120

1  results were statistically significant?
2       A    Yeah.  But that's what everybody says
3  about every study that is negative; what if it had
4  been something else?  But it's not.
5           The data don't support that.  They
6  support the actual findings.
7       Q    My question is simply this.
8           Would you have characterized a
9  1.08 hazard ratio with a confidence interval of
10  1.01 to 1.17 as statistically significant?
11      A    I would.
12           MS. LEHMAN:  Object to the form.
13  Asked and answered.
14      Q    Now, in addition to looking at the
15  ever-never use of Talcum Powder, the authors in
16  O'Brien '22 also included women who have patent,
17  patent tubes.  Do you see that?
18      A    Right.  They used that label.
19      Q    Okay.  And so the authors of O'Brien
20  2020 did a sub-analysis of women who had patent
21  tubes and compared it to women who did not have
22  patent tubes; is that fair?
23      A    It was one of a tremendous number of
24  subgroup analyses that they did.

Page 121

1       Q    Okay.  And, as part of the statistical
2  analysis that those authors in 2020 employed, they
3  hypothesized, a priori, that women with patent
4  productive tracts would be more susceptible to
5  exposure effects of powder use in the genital area
6  for cancer; is that correct?
7       A    That's what their paper says.
8       Q    Okay.  Would you agree that -- having
9  looked at the subset of women who had patent
10  tracts versus non-patent tracts -- that the
11  authors concluded that there was a statistically
12  significant effect between Talcum Powder in the
13  genital area and ovarian cancer, for women who had
14  patent tracts?
15      A    Not clearly, and I think they
16  expressed themselves two ways.
17           One was with the finding that you're
18  describing.  But they also compared the difference
19  between the patent and non-patent tract -- and
20  found overlap of the confidence intervals -- and
21  said that they did not find a statistically
22  significant difference between the two groups.
23      Q    That wasn't my question.  My question
24  is this.

31 (Pages 118 - 121)

Page 122

1    The authors in the O'Brien 2020, their
2 study results demonstrated that, for patent tubes,
3 the hazard ratio was 1.13 with a confidence of
4 1.01 to 1.26.
5    That is a statistically significant
6 association, correct?
7    A    So that is a statement.
8    Q    Just answer that first.
9    A    No, no, no.
10    Q    Then I'll let you explain.
11    A    No, no, no, because I already answered
12 your question, I think, appropriately, because of
13 the way that you phrased it.
14    Because I don't think that you can say
15 that the sum total of the way that they expressed
16 what they thought was significant, is only that
17 particular statement.
18    The way you phrased it, I thought,
19 invited me to also talk about the other findings
20 that they say, which is --
21    Q    No.
22    THE REPORTER:  I'm sorry, which is
23 what?
24    A    Which is that there is no

Page 123

1 statistically significant difference between the
2 groups that have patent and non-patent
3 reproductive tracts.
4    Q    Dr. Diette, is it true that, when the
5 investigators looked at women who had patent
6 reproductive tracts only, their study findings
7 revealed that there was a hazard ratio of 1.13,
8 with a confidence interval of 1.01 to 1.26, which
9 was statistically significant for the association
10 between genital use of Talcum Powder and ovarian
11 cancer, correct?
12    MS. LEHMAN:  Objection.  Asked and
13 answered.
14    A    That is correct.
15    Q    Let me direct your attention to
16 page 51 of that article.  Tell me when you're
17 there?
18    A    I am.
19    Q    Okay.  And this hypothesis -- with
20 regard to what the relative risk would be for
21 women with patent tubes -- was indeed an a priori
22 hypothesis as reflected in, I guess it's the third
23 full paragraph on page 51, because patency is
24 required for there to be a direct physical pathway

Page 124

1 between the powder application area and the
2 ovaries, we had hypothesized, apriori, that women
3 with patent reproductive tracts would be more
4 susceptible to the effects of powder use in the
5 genital area and ovarian cancer.
6    Did I read that correctly?
7    A    Yes, you did.
8    Q    All right.  So, one thing we know
9 about what the study authors did is they
10 hypothesized, a priori, that it was biologically
11 plausible for women exposed to Talcum Powder to
12 have that migrate through the reproductive system,
13 correct?
14    MS. LEHMAN:  Object to the form.
15    A    Yeah.  They were stating that the
16 tract had to be open in order for talc to reach
17 the ovaries.
18    Q    Now, you have criticized some of the
19 opinions of the plaintiff's experts for stating
20 that -- for their position that the O'Brien lacked
21 power.  Do you remember stating that in your
22 expert report from 2024?
23    A    I think so, yes.  I mean, it sounds
24 like me.

Page 125

1    Q    Okay.  Let me direct your attention to
2 page 57 of the O'Brien 2020.  Are you there?
3    A    57?  Yes.
4    Q    Okay.  And at the bottom, do you see,
5 conclusions?
6    A    Yes.
7    Q    Okay.  And it reads, "in this analysis
8 of pooled data from women in four U.S. cohorts,
9 there was not a statistically significant
10 association between self-reported use of powder in
11 the genital area and incident ovarian cancer."
12    "However, the study may have been
13 underpowered to identify a small increase in
14 risk."
15    So, the O'Brien authors also
16 considered the fact that the hazard ratio for the
17 ever-never use of Talcum Powder may have been
18 impacted by the fact that the studies were
19 underpowered, correct?  That's what they state?
20    MS. LEHMAN:  Object to the form.
21    A    Oh, yeah.  I mean that's their
22 statement.  You don't want my opinions about any
23 of this, right?
24    Q    No.

32 (Pages 122 - 125)

Page 126

1    A    Okay.
2    Q    I assume you disagree with that?
3    A    Earlier you said, we were going to try
4 to find where we agree and disagree.
5         All I'm agreeing with you, so far, is
6 just what you're reading is accurate.  I don't
7 think we're finding where we agree and disagree.
8    Q    Well, you stated in your report -- and
9 I assume that is your opinion -- that the author's
10 position with regard to the fact that the cohort
11 studies in O'Brien 2020 were not deficient, for
12 lack of better words, because they were -- they
13 lacked power, that was your opinion in your
14 report?
15        MS. LEHMAN:  Object to the form.
16        (Overlapping speakers.)
17    A    Yeah.  That's my opinion.
18    Q    All right.
19    A    And it's a throw-away --
20    Q    So that is your opinion.
21    A    Okay.
22    Q    So, the O'Brien authors addressed your
23 criticism, and they, too, stated in their study
24 that they did not agree with Dr. Diette; that they

Page 127

1 too considered the fact that the cohort studies
2 may be underpowered?  Yes or no?
3    A    I disagree with that.
4    Q    Okay.  That's -- that's --
5    A    Yes.
6    Q    -- the answer.  That's the answer?
7    A    Okay.
8    Q    You disagree with it.
9        Your counsel can ask you questions.
10    A    All right.
11    Q    Now, let me show you what we will have
12 marked, I believe now we're up to Exhibit
13 Number 19?
14    A    Can I make clear what I disagree with?
15    Q    Your counsel can ask you that.
16    A    Because I don't know if you're going
17 to know the answer to your question if I don't?
18    Q    Dr. Diette, I asked a question about
19 whether the studies were underpowered, and whether
20 or not you agreed that would impact study results,
21 and I believe you said, it would not?
22    A    What I was hearing, also, was that
23 they refuted my opinion; and that's what I
24 disagree with, that they refuted it.

Page 128

1        What I said, I think is true, is that
2 there was sufficient power based on what other --
3 other people have published.
4        But, also, this is a very weak
5 statement.  This doesn't say it was underpowered.
6 It says it may have been underpowered.
7        Every study may have been
8 underpowered.  There's not a study on earth that
9 might not have been underpowered.
10        So, I don't -- I don't think they
11 refute what I've said.  I just wanted to be clear
12 what I was answering.
13    Q    All right.  And the article will speak
14 for itself as well.
15    A    A hundred percent.
16    Q    And the authors will speak for
17 themselves.
18        MR. TISI:  Here is Exhibit 19.
19    Q    Okay.  Exhibit 19 is what we will have
20 marked as an editorial by Drs. Harlow and Rothman.
21        (Diette Exhibit 19 was marked for
22 purposes of identification.)
23    Q    Do you have that in front of you?
24    A    I don't have an editorial.  I have

Page 129

1 Letters to the Editor.
2    Q    Good point.
3        THE REPORTER:  Letters to what?
4    A    To the editor.
5    Q    And let me correct --
6        Thank you, Dr. Diette, I appreciate
7 that.  What we've had marked as Exhibit 19 is
8 indeed a letter to the editor by Drs. Harlow and
9 Rothman, along with their colleague Dr. Murray.
10 Do you see that?
11    A    I do.
12    Q    Okay.  Now, after the O'Brien 2020
13 paper was published, Drs. Harlow and Rothman and
14 Murray also published a letter to the editor in
15 JAMA, correct?
16    A    Yes.  That's correct.
17    Q    Prior to this deposition, you had a
18 chance to read those?
19    A    Yes.
20    Q    Okay.  Do you know Dr. Harlow?
21    A    No.
22    Q    Do you know Dr. Rothman?
23    A    I know of Dr. Rothman, but I don't
24 know him personally.

33 (Pages 126 - 129)

Page 130

1    Q    Okay. How do you know of Dr. Rothman?
2    A    I've seen publications of his. I've
3  heard people mention that he wrote a book, but I
4  haven't read his book.
5    Q    Okay. You are aware that he has
6  written, actually, a series of textbooks on
7  epidemiology, Modern Epidemiology by Dr. Rothman?
8    A    I don't know them. I mean, at Johns
9  Hopkins, his books aren't the ones that we used
10  when I've been either teaching or training there.
11        (Overlapping speakers.)
12    Q    But you aren't questioning that
13  Dr. Rothman is an epidemiologist who has, again,
14  published in a prolific manner --
15    A    Oh, yeah.
16    Q    -- on the field of epidemiology?
17    A    Oh, yeah. And, to be clear, I'm not
18  trying to disparage him. I just like, my
19  awareness of his work isn't as profound as it
20  might be, if we used his textbooks, for example.
21    Q    Okay. Fair enough. All right.
22        Now, you know that Dr. Rothman is --
23  you referenced in your report that, while you read
24  these Letters to the Editors, you discounted them

Page 131

1  because both Drs. Harlow and Rothman were experts
2  for the plaintiff.
3        Do you remember stating that in your
4  report?
5    A    I don't know if I used the word
6  "discount," but I may have acknowledged that they
7  are.
8    Q    They are what?
9    A    Oh, that they're paid experts.
10    Q    Okay. And, because they are --
11        One, do you know if Dr. Rothman is a
12  paid expert in this litigation?
13    A    Well, I read one of his reports. I
14  don't know if he got paid for it. But, unless he
15  donated his time, he may be just an expert, but,
16  you know, I don't know the details of his
17  finances.
18    Q    Okay. And you are also a paid expert
19  in this litigation, correct?
20    A    Correct.
21    Q    So do you feel or do you have an
22  opinion that your opinion should be disregarded,
23  because you are a paid expert?
24        MS. LEHMAN: Object to the form.

Page 132

1    A    No, I don't. Not only mine, but I'm
2  not saying he should be disregarded.
3        But I think it's an important fact
4  that should be considered when interpreting, you
5  know, what they're writing.
6    Q    Okay. Should the fact that you are an
7  expert for Johnson & Johnson be an important fact,
8  when determining what your opinions are, as
9  expressed in your report, and, frankly, your
10  testimony here today?
11        MS. LEHMAN: The same objection.
12    A    I think -- I mean, I think it's fair
13  for people to consider them because it's a fact.
14    Q    All right. So the ladies and
15  gentlemen of the jury -- when they listen to you
16  and your testimony at the trial of this case --
17  should consider the fact, when evaluating the
18  breadth and the value of your opinions, the fact
19  that you are getting paid by J&J, and you have
20  been paid by J&J over the course of --
21    A    I think they should --
22    Q    -- almost seven years?
23        MS. LEHMAN: Same objection.
24    A    I think they should consider each and

Page 133

1  every expert who has been paid by any entity and
2  factor that in.
3        I'm not saying to discount it or say
4  that it's not true, but they should be aware of it
5  and factor it into their judgment.
6    Q    And do you have knowledge as to
7  whether, at the time that these experts -- excuse
8  me, whether at the time Dr. Rothman and Dr. Harlow
9  wrote their letter to the editor that they were in
10  fact retained as experts in this litigation?
11    A    So, their statement is very vague. It
12  only refers to Dr. Harlow here, not Dr. Rothman.
13        I don't know where he was in the
14  sequence of becoming an expert for the plaintiffs;
15  but, and this is a vague statement that doesn't
16  tell me enough about what Dr. Harlow's role as a
17  consultant was.
18    Q    Okay. So, what you testified to in
19  your report -- and just a few minutes ago -- with
20  regard to taking into consideration whether
21  someone is a paid expert or not, that would not be
22  a consideration, if, in fact, at the time the
23  letter to the editors were written, neither
24  Dr. Harlow or Dr. Rothman were paid experts,

34 (Pages 130 - 133)

Page 134

1 correct?
2        MS. LEHMAN:  Object to the form.
3    A    Well, not necessarily, but -- not
4 necessarily.
5    Q    No.  Okay, that's the answer.
6    A    Okay.  Thank you.
7    Q    Okay.  Let's see what they have to
8 say.  And you've indicated that you've read this
9 before, so we can move through it pretty quickly.
10        Dr. Rothman and Dr. Harlow
11 specifically criticize the O'Brien authors for
12 concluding that there was not a statistically
13 significant association -- based on the fact that
14 the hazard ratio for ever-never use of Talcum
15 Powder use in the genital area caused ovarian
16 cancer of 1.08, with a confidence interval of .99,
17 1.17, and suggested that this viewpoint is poor
18 practice in population and clinical research.
19        Did you see where the authors wrote
20 that?
21    A    Yeah, and they are wrong, but I read
22 that.
23    Q    Okay.  So, Dr. Rothman and Dr. Harlow,
24 you disagree with their opinions?

Page 135

1    A    Oh, completely.
2    Q    Okay.
3    A    In fact, the journals require that,
4 right?  It's not up to Drs. Harlow or Rothman
5 whether people do this?
6        You know, this is a couple of people,
7 three, in fact, that have an opinion on this
8 matter.  But it's not possible to publish this
9 without such a statement, and literally presenting
10 the facts of what the actual, not the hypothetical
11 but the actual confidence interval is.
12        THE REPORTER:  The what?
13    A    The actual, and not the hypothetical
14 confidence interval is.
15    Q    You're aware that Doctor Harlow,
16 Murray and Dr. Rothman, you indicated that, just
17 because those three -- you're aware that the
18 Statistical Society and Association have taken a
19 similar view of Dr. Rothman and Dr. Harlow and
20 Dr. Murray that -- suggesting that statistical
21 significance is required is poor practice in the
22 field of statistics, correct?
23    A    So, I'm going to point out that you
24 and I had this conversation extensively in 2019,

Page 136

1 and so I don't think I should have to re-answer
2 that same question.
3    Q    You don't.  And the only reason I ask
4 you is because you inferred, Dr. Diette, that
5 there were only three people out there that might
6 ascribe to such a theory.
7    A    I didn't.  I said, "these three
8 people."  That's what a letter to the editor is,
9 right?  This is not consensus statement.  This is
10 not, you know, a guideline.
11        This is three people who took the time
12 to write an unsolicited letter to the editor, that
13 wasn't peer reviewed, and respects their opinions.
14 That's what it is.
15    Q    I just wanted to make sure the record
16 reflected the fact that these weren't the only
17 three epidemiologists and scientists and
18 biostatisticians that had taken that opinion,
19 correct.
20        You don't know that, do you?
21    A    I think whatever I said in 2019 --
22 when you asked me the same question -- I still
23 stand by.
24    Q    Okay, fair enough.  You are not a

Page 137

1 statistician?
2    A    Biostats is part of my profession, but
3 I'm not labeled as a biostatistician.
4    Q    Okay.  Do you agree with Dr. Rothman,
5 Dr. Harlow and Dr. Murray when they state that,
6 "given the 1.3 or 13 percent increase of risk of
7 ovarian cancer, among women with intact genital
8 tracts, that this should be taken as evidence of
9 an effect?"
10    A    I disagree.
11    Q    Okay.
12    A    You don't want to know why, right?
13    Q    No.
14    A    Okay.
15    Q    I do want to know if you disagree.
16    A    Okay.  I know.  I'm sorry.
17    Q    That's important.  I want to know
18 whether you agree or disagree.
19    A    I have so much to say, and I know it's
20 not the place.
21    Q    I know, and we just don't have the
22 time.
23    A    I know.  I get it.  Sorry.
24    Q    No, no, no.  We're doing fine, and I

35 (Pages 134 - 137)

Page 138

1 appreciate it.
2       Let me show you or refer your
3 attention to the second part of that letters to
4 the editors. There's a reply section. Do you see
5 that?
6    A    Yes.
7    Q    Okay. And it starts in that JAMA
8 article on page 2096. Do you see that?
9    A    I do.
10    Q    Okay. Now, let me represent, for
11 purposes of the record, that Dr. O'Brien -- who is
12 one of the authors of the O'Brien 2020 study that
13 we've been talking about -- she replies to the
14 letters of the editor, written by Drs. Harlow,
15 Rothman and Murray.
16    A    That's correct.
17    Q    Do you understand that?
18    A    That's correct.
19    Q    Okay. Now, I didn't see in your
20 report or your reference, or, excuse me, I didn't
21 see in your references where you cited to these
22 letters to the editor or the reply. Was that just
23 an omission?
24       You mentioned it in your report, but

Page 139

1 you didn't put it in your references. Is that
2 just an omission?
3    A    I think it might be in materials
4 considered, which isn't necessarily the same as
5 the list of references that's attached to the
6 report.
7    Q    Fair enough. Okay. Now, you did
8 attach to your report -- in your reference section
9 of your report -- the Gossett editorial, correct?
10    A    I -- I believe so. I would have to
11 look at it to be sure.
12    Q    We can take the time to go through
13 that, if you would like.
14    A    Well, I know --
15    Q    Do you want to take my representation?
16 I've looked at your report, and I've seen Gossett
17 mentioned in your reference section.
18    A    I believe that.
19    Q    I've looked at your report in the
20 reference section, and what I didn't see was the
21 letter to the editor by Harlow, Rothman and Murray
22 and Dr. O'Brien.
23    A    Yeah, I think that you will have to
24 look at the materials considered to find that.

Page 140

1    Q    Okay. I get that. I hear what you
2 are saying.
3       So, the letter to the editor for
4 Harlow and Rothman and Murray found its way into
5 the materials considered but did not find its way
6 in the reference material, fair?
7    A    If that's what you saw, I believe
8 that.
9    Q    But Dr. Gossett's editorial in JAMA of
10 2020, which you state in your report, gave you
11 great assurance that the O'Brien findings showed
12 no increase with ever-never use, did find it's way
13 into your reference section, correct?
14    A    Sure. It's an invited editorial that
15 is peer reviewed by the editor of the journal.
16    Q    So would I be understanding your
17 testimony that you give less credence to the
18 Harlow, Rothman critique of the O'Brien 2020 than
19 you do to the Gossett 2020 editorial?
20    A    Oh, a hundred percent. It doesn't
21 mean that one is automatically right or wrong,
22 right? You still have to read the content.
23       But you have to understand where these
24 things come from. Anybody who wants to can write

Page 141

1 a letter to the editor.
2       The editor doesn't invite them. If
3 they find them curious enough to publish them,
4 they publish them. They ask the authors of the
5 original paper to reply to it, and that's what it
6 is.
7       An editorial is an "invited by the
8 editor" exercise. There is a lot more rigor that
9 goes into it, and that also gets reviewed by the
10 editor and sometimes also by additional peer
11 reviewers. So it's a completely different type of
12 publication.
13    Q    Now, do you understand that
14 Dr. Gossett acknowledged, in her conflicts of
15 interest, that she works as a paid expert for
16 another pharmaceutical company, Bayer.
17       Did you see that?
18    A    I did at the time. I don't recall if
19 it was Bayer, but I believe you.
20    Q    Now, taking you back to the reply by
21 Dr. O'Brien to the editorial, I want to direct
22 your attention to that, on page 2096. Okay?
23    A    Yes.
24    Q    All right. Let's look and see what

36 (Pages 138 - 141)

Page 142

1 those authors have to say about -- how the author
2 of the paper, Dr. O'Brien, what she had to say
3 about her own paper, all right?
4        Let's go to the second page, which is
5 now 2097, and the first full paragraph. Are you
6 with me?
7    A   Oh, I am, yes.
8    Q   Okay. Dr. O'Brien -- who authored the
9 O'Brien 2020 paper -- responded to Dr. Harlow and
10 Doctor -- and his colleagues, and stated, we, and
11 I'll substitute, the O'Brien authors, completely
12 agree with Dr. Harlow and colleagues that our
13 results -- particularly the analysis limited to
14 women with intact reproductive tracts -- should
15 not be discounted because of the lack of
16 statistical significance.
17        For all estimates, we reported a
18 95 percent confidence interval, so readers could
19 consider effect, size and precision.
20        The qualifier -- that there was no
21 statistically significant association between ever
22 genital powder use and ovarian cancer -- is a
23 factual report of a test of no hypothesis.
24        We, O'Brien and colleagues, never

Page 143

1 equated the lack of statistical significance to
2 evidence of no association.
3        Did I read that correctly?
4    A   Yes.
5    Q   Dr. O'Brien and her colleagues
6 disagree with you, Dr. Diette, that the lack of
7 statistical significance does not equate to
8 evidence of a known association, correct?
9    A   They don't disagree with me. I mean,
10 you read the whole paragraph, right?
11   Q   I did.
12   A   So, there's a lot here, right.
13   Q   Right.
14   A   One of them is they are stating,
15 appropriately, that they accurately reported that
16 there was no statistically significant
17 association, which I think is right.
18        And they say it's a factual test,
19 factual report of a test with a known hypothesis,
20 so we're in agreement with that.
21        And they say they didn't equate the
22 lack of statistical significance to evidence of no
23 association, and, you know, I agree with that,
24 too.

Page 144

1        We talked about that particular
2 number. It's a positive number, and so I think
3 we're in agreement.
4    Q   All right. So, I just want to get it
5 clear. This is one of my chances to speak to you.
6        You agree with Dr. O'Brien and her
7 colleagues that the lack of statistical
8 significance does not equate to no association.
9        You agree to that statement?
10        MS. LEHMAN: Object to the form.
11 Asked and answered.
12   Q   Yes or no?
13   A   For this particular finding, that's
14 right.
15   Q   Okay. So you, also -- even though a
16 study may not demonstrate statistical
17 significance -- you, Dr. Diette, agree that that
18 should be interpreted as evidence of some
19 association? I just want to understand this.
20        (Overlapping speakers.)
21        MS. LEHMAN: You know, I just object
22 to this.
23        MS. PARFITT: Objection is all we do.
24        MS. LEHMAN: No.

Page 145

1        MS. PARFITT: That's all we do.
2        MS. LEHMAN: No, counsel --
3        MS. PARFITT: Thank you.
4        MS. LEHMAN: -- I am going to object
5 because the scope of this deposition is very
6 limited.
7        So, I have allowed you great latitude
8 but this idea of like general wandering
9 discussions of epidemiological principles --
10        MS. PARFITT: Okay.
11        MS. LEHMAN: -- is beyond the scope of
12 this deposition.
13        MS. PARFITT: Kate, we are talking
14 about a letter to the editor.
15        MS. LEHMAN: I understand.
16        MS. PARFITT: Let me finish. It was
17 published in 2020. I'm asking him specifically
18 about that letter to the editor.
19        MS. LEHMAN: No, you were, until this
20 last question.
21        MS. PARFITT: Right now I'm reading --
22 Look at the letter to the editor, and let's just
23 focus on the letter to the editor that was done
24 post 2019, and it's dated 2020 in the JAMA

37 (Pages 142 - 145)

Page 146

1 article.
2     A    Okay.
3     Q    My question, Dr. Diette, is,
4 Dr. O'Brien -- who wrote and authored and
5 investigated the O'Brien 2020, wrote to
6 Drs. Harlow and Dr. Rothman the following --
7          "I agree with what you all have to
8 say; and, further, the test of null hypothesis, we
9 never equated the lack of statistical significance
10 to evidence of no association."
11          Do you agree or disagree with that
12 statement by the authors of the O'Brien 2020?
13          MS. LEHMAN: Object to the form.
14 Asked and answered.
15     A    Since they say, "we never equated with
16 it," I can't disagree because they are speaking
17 for themselves.
18     Q    Do you agree with their opinion that
19 the lack of statistical significance to
20 evidence -- that the lack of statistical evidence
21 is not evidence of no association? Yes or no?
22     A    It's not a yes or no. The context for
23 this is, they have done an exploratory analysis,
24 which is not their main result.

Page 147

1          In this context, it sets up a nice
2 opportunity for somebody to take this finding and
3 to do a proper study to test the hypothesis.
4          So I think it is what it is. It's a
5 secondary analysis where they had a particular
6 finding.
7          And this statement, I think these are
8 facts, right? There is a fact that there was no
9 statistical significance, and there is a fact that
10 they never equated it with a lack of association.
11     Q    Right. And that's their opinion -- as
12 authors of this study that was peer reviewed --
13 that they do not equate the lack of statistical
14 significance as evidence of no association? Yes
15 or no, Dr. Diette? That's all I'm asking.
16          MS. LEHMAN: Objection. Asked and
17 answered.
18     A    So, I can't --
19     Q    You can't say that you agree or
20 disagree?
21     A    Your question mixes things up.
22     Q    No, Dr. Diette, I'll make it really
23 clear, and we need to move forward.
24          Listen, you are very, very good at

Page 148

1 this. You are very, very good, but just try to
2 stay with my question.
3          Your counsel is very talented. She
4 can bring you back on any of these.
5          My question is very specific.
6 Dr. O'Brien and her colleagues stated, in a
7 response to Dr. Harlow and Dr. Rothman, the
8 following:
9          "It is our opinion, as authors of a
10 peer-reviewed O'Brien 2020, that the lack of
11 statistical significance, in our ever-never
12 conclusions. Is not evidence of no association."
13          Do you agree with that or you don't
14 agree with that?
15          MS. LEHMAN: Objection. Asked and
16 answered.
17     A    So, I think you are making something
18 up because, when you asked it originally, you were
19 talking about in this peer-reviewed publication.
20          This is not a peer-reviewed
21 publication. This is a letter to the editor.
22     Q    Okay, Doctor, let's try it one more
23 time.
24          Did Dr. O'Brien -- who did author and

Page 149

1 publish a peer-reviewed publication, O'Brien 2020,
2 she states -- in response to Drs. Harlow and
3 Rothman's question, that it was important for her
4 to clarify the following.
5          "We never equated the lack of
6 statistical significance to -- as evidence of no
7 association."
8          My question to you is, do you agree or
9 disagree with this statement by Drs. O'Brien and
10 colleagues to that?
11          MS. LEHMAN: Object to the form.
12     A    So I'm going to answer you in one
13 second.
14     Q    Let's go off the record.
15          MS. LEHMAN: No, no, no, no. We are
16 staying on the record.
17          (Overlapping speakers.)
18          MS. PARFITT: I asked him --
19          MS. LEHMAN: You asked him a question.
20 He needs to look at something.
21          MS. PARFITT: -- whether he agreed or
22 disagreed with a statement. That is what it is.
23          Let the record reflect that I asked
24 the question whether or not Dr. Diette agreed or

38 (Pages 146 - 149)

Page 150

1 disagreed with a statement in a letter to the
2 editor by the authors of the O'Brien 2020, and he
3 has to consult the literature to tell me whether
4 or not he agrees or disagrees with that statement.
5        That's the time that we've been using.
6    A    So I heard a little bit different
7 question, though.
8    Q    I've asked it four times, Dr. Diette.
9 I can't really get much clearer, and I apologize
10 for that, because I would like to move on from
11 this, too.
12    A    It's not clear to me, and I've tried
13 very hard to answer all of your questions as
14 simply as I can.
15    Q    Let's answer this one.
16        MS. LEHMAN:  Then let him answer.
17        MS. PARFITT:  Dr. Diette, I don't have
18 time -- this is gamesmanship.
19        I will tell you.  Listen, I respect
20 you as a scientist.  I have limited time, and I
21 just want an answer to the question.
22        If it's, "I don't know," that's fine.
23 If it's, yes, that is fine.
24    A    At this point, you are insulting me.

Page 151

1    Q    No, I am not.  No, no, no.
2    A    Yes, you are.  That's an insult.
3    Q    No, no.  Let the record reflect that
4 it is not.
5    A    That's an insult, and I'm not playing
6 games here.  I'm literally trying to answer your
7 questions as best I can.
8    Q    Can I ask you this?  If I said to you,
9 the sky -- the earth was square, do you agree or
10 disagree?  What would you tell me?
11    A    That's an opinion.
12    Q    What is your opinion?  Is the earth
13 square or round?
14    A    I don't think it is square.
15        MS. LEHMAN:  I object to this entire
16 line of questioning.  I also object to the tone
17 and the volume of the voice.
18        MS. PARFITT:  They need to hear me,
19 which is why I've had to be louder than I usually
20 am, Kate, anyway.
21        MS. LEHMAN:  No, your tone right
22 now -- the volume while you were asking those
23 questions about the earth -- was quite different.
24 I object to that.

Page 152

1        MS. PARFITT:  All right.  Well, then,
2 Dr. Diette, I apologize.
3        MS. LEHMAN:  If you will, just let him
4 answer.
5        MS. PARFITT:  I don't mean to insult
6 you.
7        I've been trying, Kate, and I think
8 the record will reflect that, and I think the
9 court will reflect that -- note that.
10        My question is this.  I think, I'm
11 really not here, I'm really not here to quarrel
12 with you, despite what it may sound like.  I just
13 want to know what you are going to say and what
14 you aren't going to say.
15        My question is simple.  What I just
16 want to know is whether or not you agree with
17 O'Brien and colleagues that they never equated the
18 lack of statistical significance to evidence of no
19 association?
20    A    I agree that that's what they stated.
21    Q    Okay.  Do you agree with the fact that
22 the lack of statistical significance should not be
23 considered evidence of association?
24    A    I think, when you have a very weak

Page 153

1 association, and it's proximally null, I think
2 that should be very important in the
3 consideration.
4    Q    I'm trying to unpack that one a little
5 bit.  So are you requiring statistical
6 significance to be equated with evidence of an
7 association, or is it your opinion that
8 statistical significance is not required to
9 establish evidence of an association?
10        MS. LEHMAN:  Objection.  Asked and
11 answered.
12    A    Okay.  I think, if you have a relative
13 risk that's approximately one -- and it's not
14 statistically significant -- I don't think people
15 should twist that into saying that's evidence of a
16 positive association.
17    Q    All right.
18    A    Any more than I think that a .99
19 should be, you know, interpreted automatically as
20 a protective effect of something, when it's not
21 statistically significant.
22    Q    Okay.  Further down, the authors --
23 and it's in the next paragraph --
24        Dr. O'Brien states, we agree -- we

39 (Pages 150 - 153)

Page 154

1  will start with, we agree, and I inserted "we"
2  agree that the positive association among women
3  with patent reproductive tracts, HR of 1.13 with a
4  confidence interval of 1.01 to 1.26, is consistent
5  with the hypothesis that there is an association
6  between genital powder use and ovarian cancer."
7       Did I read that correctly?
8    A   You did.
9    Q   Okay.  Do you agree with that
10 statement?
11   A   I do.
12   Q   Okay.  And the next statement is, we
13 agree -- that is O'Brien, et al -- with Harlow and
14 colleagues, that methodological limitations, such
15 as non-differential exposure misclassification,
16 selection bias and misspecified confounders could
17 bias the results, and we acknowledge many of these
18 in our article.
19       Did I read that correctly?
20   A   Yes.
21   Q   All right.  Do you agree with the
22 authors there?
23   A   They did acknowledge those.
24   Q   Okay.  Do you agree, at the top of the

Page 155

1  page of 2097, the following:  "If cohort studies,
2  pooled HR, of 1.08 are likely biased towards the
3  null and case control studies meta-analysis OR
4  1.35 are likely biased away from the null, the
5  true association may lay somewhere in the middle."
6       Do you agree with the authors with
7  regard to that opinion?
8    A   I can't disagree with the word, "may,"
9  because it may or may not, so, you know, may is
10 included in the list of possibilities that are
11 true.
12       THE REPORTER:  The possibilities that
13 are what?
14   A   That are true.
15   Q   Okay.  Thank you.  Let's sit that
16 aside for a moment, and let's go to the next
17 study.
18       And it is a study done in 2021, and
19 it's entitled -- again, by the O'Brien, Sandler
20 authors -- "the Association Between Douching and
21 Genital Talc Use and the Risk of Prevalent and
22 Incident Cervical Cancer," and it was published,
23 I'll represent in the Journal of Nature, and I
24 believe we are up to --

Page 156

1       MR. TISI:  20.
2    Q   -- Exhibit 20.  Okay.
3       (Diette Exhibit 20 was marked for
4  purposes of identification.)
5    Q   I'll get you a copy of that.
6  Dr. Diette, I think that you may have that one as
7  well.
8    A   I didn't bring that one.
9    Q   Okay.  No worries.
10   A   Thank you.
11      MR. TISI:  You are welcome.
12   Q   All right.  Have you got that in front
13 of you?
14   A   And this is the cervical cancer one?
15   Q   Yes, it is.
16   A   Yes.  I do have that one.
17   Q   Okay.  Again, these are the same
18 authors that participated in the Sister Study
19 participated in the O'Brien 2020, and now they
20 look at the issue of douching, genital talc use
21 and the risk of prevalent and incidental cervical
22 cancers.
23   A   I'm sorry, and the use of?
24   Q   I'm sorry.  The use, talc use and the

Page 157

1  risk of prevalent and incidental cervical cancers.
2       Now, you have this study on your
3  reference list, correct?
4    A   I'm sorry.  I thought that you were
5  just making a statement.
6    Q   No, no.
7    A   Yes.
8    Q   Did you address this study as well in
9  your report of 2024?
10   A   I don't recall.
11   Q   This is one of the first papers by the
12 NIEHS that follows the O'Brien 2020 to look at the
13 association between genital talc use and cervical
14 cancer?
15   A   Correct.
16   Q   And you've read it before?
17   A   Oh, yeah.
18   Q   Yeah, okay.  Would you agree with me
19 that the study authors found that there was no
20 evidence of an association between cervical cancer
21 and the use of Talcum Powder products?
22   A   I don't think they were able to
23 conclude that there was.
24       They said, "we did not see evidence of

40 (Pages 154 - 157)

Page 158

1 an association," but they also reported a hazard
2 ratio that was more than one but without
3 statistical significance.
4      Q    Okay.  So let me direct your
5 attention -- thank you for that.
6           Let me direct your attention to the
7 next page, page 2, first full paragraph.  Do you
8 see that?
9      A    Yes.
10     Q    Okay.  And they start with, "talc
11 applied to underwear, sanitary napkins, diaphragms
12 or directly to the peroneal region can enter the
13 vagina and travel up the reproductive tract."
14          Do you agree or disagree with that
15 statement?
16     A    I'm not seeing that.
17     Q    I'm sorry.  Dr. Diette, right here,
18 (indicating.)  It starts with, in previous
19 studies, and it's about three fourths of the way
20 down.
21          Do you want me to help you?  I don't
22 want to lean over you.
23     A    That's okay, but I don't know if I'm
24 seeing it.

Page 159

1      Q    No worries.
2      A    Oh, it's this paragraph here.
3      Q    You've got it.  Right there.
4      A    Thank you very much.
5      Q    Of course.  Of course.  Okay.
6           The question was, again, "talc applied
7 to underwear, sanitary napkins, diaphragms or
8 directly to the peroneal region can enter the
9 vagina and travel up the reproductive tract."
10          Do you agree with that?
11     A    I don't know that that's established,
12 although I will say that, if it's applied to a
13 diaphragm, by definition, it would be, you know,
14 entering the vagina deliberately.  But, for the
15 others, I'm not sure that's has been established.
16     Q    "Talc particles may act as irritants
17 inciting an inflammatory response and potentially
18 affect the individual's accessibility and response
19 to HPV infection."
20          "Additional or more severe adverse
21 effects could occur if the talc contained
22 asbestos, a known carcinogen, sometimes mined in
23 the same locations as talc."
24          Did I read that correctly?

Page 160

1      A    Yes.
2      Q    Okay.  The epidemiological literature
3 supports a positive -- possible positive
4 association between genital talc use and ovarian
5 cancer.
6           Did I read that correctly?
7      A    Yes.
8      Q    If you turn to the back of the
9 reference section of 34 and 35, you will see at 35
10 that the author of the statement, "that the
11 epidemiological literature supports a possible
12 positive association between genital talc use and
13 ovarian cancer."  You'll see O'Brien 2020.
14          Do you see that?
15     A    I do.
16     Q    Okay.  So, in the cervical paper by
17 O'Brien, et al., Dr. O'Brien and her colleagues
18 publish the results of their O'Brien 2020 and
19 characterize it as literature that supports a
20 possible positive association between genital talc
21 use and ovarian cancer, correct?
22     A    That's right.
23     Q    Let me show you what we will have
24 marked now as Exhibit Number 21.

Page 161

1           While Mr. Tisi is looking for that,
2 let me have marked --
3           MR. TISI:  I will mark it.
4      Q    You don't have to mark it.
5           MR. TISI:  This one is 20 that you
6 just handed me.
7      Q    21 then.  Thank you.  All right.
8           (Diette Exhibit 21 was marked for
9 purposes of identification.)
10     Q    All right.  Doctor, the article is
11 described as Cohort Profile, the Ovarian Cancer
12 Cohort Consortium 0C3, and it was published in the
13 International Journal of Epidemiology on 2022.
14     A    Thank you.
15     Q    Dr. Diette, I've shown you what's been
16 marked as 21, Exhibit 21, and we will refer to it
17 as the Townsend article.
18          Have you seen this before?
19     A    I have.
20     Q    Okay.  I note, from review of your
21 report, that you do not address this in your 2024
22 report, correct?
23     A    I believe that's right.
24     Q    All right.  I also note, from a review

41 (Pages 158 - 161)

Page 162

1 of the references to your report, that you do not
2 cite Townsend 2022 as a reference for your work
3 and opinions that Talcum Powder can't -- is not
4 associated with ovarian cancer, correct?
5      A    Let's see.  That's correct.
6      Q    Okay.  Now, the International Journal
7 of Epidemiology, Cohort Profile, currently
8 represents about 1.3 million women, where there
9 have been cases identified around the world
10 involving ovarian cancer.
11           I believe they started their
12 enrollment in about 1976.  Did you see that when
13 you read it?
14      A    Yes.
15      Q    Okay.  Now, Drs. O'Brien, Sandler and
16 Wentzensen, again, once again, are contributors to
17 this paper.
18           In addition, frankly, to some others
19 like Dr. Langseth, I think you've seen the
20 Langseth articles in the past, correct?
21      A    I have.
22      Q    And you've seen the Merritt articles
23 in the past?
24      A    Yes.

Page 163

1      Q    Tworoger, you've seen her work?
2      A    I don't recall that one.
3      Q    Okay.  How about Dr. Kala Visvanathan,
4 she's from the Department of Epidemiology at Johns
5 Hopkins.  Do you know her?
6      A    I do.
7      Q    Okay.  Do you practice with her?
8      A    Only in a general sense.  We are both
9 active clinicians, and we both work at Johns
10 Hopkins Hospital.
11           And she does some of her work in the
12 cancer center, as do I, but we are not like in the
13 clinic together or that sort of thing.
14      Q    I see.  Let me direct your
15 attention -- this is going to be more difficult.
16           It's page 13, and mine is 13, but, if
17 you'll give me a moment, I'm going to assume that
18 that was not --
19      A    Yeah.  It's got E-something.
20      Q    Let me take one minute and do a --
21           We will just count, so you and I can
22 be on the same page, literally.  How about that?
23      A    Sure.
24      Q    I just want to do this, for the

Page 164

1 record.
2           MR. TISI:  It seems to be the
3 conversion.  I'll find it.  I'm going to find it
4 for you.
5           MS. PARFITT:  Yeah.  You know what --
6           MR. TISI:  Just go to the next one.
7      Q    Dr. Diette, for the moment, we will
8 substitute this.
9           It's a slightly different version than
10 the one I'm reading from.  Can I look over your
11 shoulder and we share?
12      A    Absolutely.
13      Q    Okay.  All right.  For purposes of the
14 record -- and this will be the copy -- and we will
15 have to substitute it.
16           I'm referring to the Townsend article,
17 and the section that I wanted to refer to is on
18 page 13.
19           And it's a paragraph above what the
20 main strengths and weaknesses are, and it's under
21 the section -- I just want to show you, what has
22 been found, okay?
23      A    Which is this?
24      Q    It's the same thing.  It's the

Page 165

1 Townsend cohort --
2      A    This is, I just want to be clear this
3 is the description of the cohort, right, not the
4 findings?
5      Q    Correct.  It does include -- yes,
6 that's correct.
7      A    Yes.  I mean, it's not the report of
8 the findings, where they discuss the findings?
9      Q    They discuss the findings and other
10 authors' findings.
11      A    Yes.
12      Q    If we go over to what has been found,
13 we go to this section here, right above what the
14 main strengths and weaknesses are.
15           And it says, "regarding genital powder
16 use, previous findings were primarily based on
17 case control studies that are at risk of recall
18 bias, and the few prospective studies were
19 underpowered to find weaker associations."
20           Did I read that correctly?
21      A    Yes.
22      Q    Do you agree or disagree with that?
23      A    I think that, since the way this reads
24 is "few prospective studies," I think individually

42 (Pages 162 - 165)

Page 166

1 they may have been underpowered.
2    Q    Okay.  It then goes on to say, in the
3 largest prospective study so far, the OC3 found a
4 very small positive association between genital
5 powder use and ovarian cancer risk among all
6 women.
7        And then they cited a hazard ratio of
8 1.08, with a confidence interval of .99, 1.7, as
9 well as among women with intact uterus and
10 fallopian tubes, a hazard ratio of 1.13, with a
11 confidence interval 1.01, 1.26.
12        Now, if you go to the reference?
13    A    It's got to be O'Brien 2020.
14    Q    There you go.
15    A    Those are the same numbers.
16    Q    You are correct.  Okay.  All right.
17 And it does, I'll represent to you, it does
18 represent O'Brien 2020.
19    A    Yes.  They recapitulated the numbers.
20    Q    Okay.  So, in this particular
21 publication of Townsend, the authors, which
22 include O'Brien, Sandler and Wentzensen, published
23 their findings of the O'Brien 2020 and described
24 them as, a small positive association between

Page 167

1 genital Talcum Powder and ovarian cancer, correct?
2    A    Correct.
3    Q    Okay.  And that was in '22, two years
4 later, when they were describing their paper?
5    A    Correct.
6        THE REPORTER:  When they were
7 describing what?
8    Q    When they were describing their
9 O'Brien 2020 paper.  Now, I'm going to ask you
10 about Dr. Visvanathan.  Am I saying that
11 correctly?
12    A    That's the way that I say it.
13    Q    Okay.  I'm going to go with you.  You
14 know her.  Right.
15        Let me show you what I'll have marked
16 now as Exhibit Number 22.
17        (Diette Exhibit 22 was marked for
18 purposes of identification.)
19    Q    And I'll represent to you that it is
20 an article by Dr. Visvanathan entitled, "Fallopian
21 Tube Lesions in Women at High Risk for Ovarian
22 Cancer, a Multicenter Study."
23        And it was published in Cancer
24 Prevention Research sometime in 2018, okay?

Page 168

1    A    Is this the one that describes like
2 the STIC lesions?
3    Q    Yes.
4    A    Okay.  Thank you.
5    Q    Good memory.  Okay.  I apologize.  I
6 got here and realized we didn't have four copies
7 of everything.  I've got four copies of things I
8 don't need.
9        And, counsel, if you will bear with
10 me, and I'll get you another one as well, but this
11 is the Visvanathan paper, okay?
12        MR. TISI:  You don't have an exhibit
13 sticker with you?
14    A    No.  There's nothing on here.
15        MS. PARFITT:  I'll just write on it.
16        MR. TISI:  I've got it, Michelle.
17    Q    Okay.  Now, you indicated that you've
18 not worked with Dr. Visvanathan, correct?
19    A    Not elbow to elbow, but she's in the
20 department of epi, and she's also, you know, a
21 clinician, so I mean I know of her.  She's
22 awesome.
23    Q    Sure.
24        MS. LEHMAN:  I'm sorry, I'm trying to

Page 169

1 find it on my article.  I just wanted to look.
2    Q    I'm sorry, Kate.  I apologize.  I
3 really did try to have copies for everybody.
4        MS. LEHMAN:  What's the date on that?
5    Q    It is 2022?
6    A    This says 2018 copyright.
7    Q    2018.  No, you are right.  American
8 Association for Cancer Research at the bottom.
9 This is 2018.
10        MS. LEHMAN:  We are going to object to
11 any questions about this study, since it was
12 developed in 2018.
13    Q    Now, this is one of the authors in the
14 2022 Townsend paper, and I want to direct your
15 attention over to page 699.
16    A    Okay.  Yeah.
17    Q    Under -- do you see that category,
18 "epidemiological data?"
19    A    Yes.
20    Q    Okay.  And I'll represent to you that
21 this section discusses exposures, talc potential
22 exposures, and they list -- I believe they call
23 it -- D identified data was reviewed.
24        And some of the variables that were

43 (Pages 166 - 169)

Page 170

1 considered, for purposes of doing exposure tests,
2 were things like, Ashkenazi, Jewish ancestry, BRCA
3 family history, many of the risk factors for
4 ovarian cancer. Do you see that?
5    A    I do.
6        MS. LEHMAN: I guess, counsel, perhaps
7 I wasn't clear.
8        Since this article was published
9 before the 2019 deposition -- in fact it looks
10 like it was published about a year before -- we
11 really shouldn't be talking about this.
12        (Overlapping speakers.)
13        MS. PARFITT: I'm asking one question.
14 She's an author that was referenced in the 2022,
15 so it's foundational. I'm just going to ask
16 one --
17        MS. LEHMAN: Then ask --
18        MS. PARFITT: -- question. You can
19 object.
20        MS. LEHMAN: Ask one foundational
21 question, but that will be the end --
22        MS. PARFITT: I have no other --
23        MS. LEHMAN: -- of the discussion.
24        MS. PARFITT: -- intention.

Page 171

1        MS. LEHMAN: Go ahead.
2        MS. PARFITT: Dr. Diette, does
3 Dr. Visvanathan state Talcum Powder as one of
4 those variables for exposures?
5        MS. LEHMAN: Excuse me, Doctor.
6 That's not --
7        MS. PARFITT: You can answer.
8        MS. LEHMAN: That's not a foundational
9 question, and, no.
10        MS. PARFITT: Dr. Diette, in the paper
11 published by Dr. Visvanathan, does Dr. Visvanathan
12 indicate that Talcum Powder is one of the
13 variables for exposure considered, yes or no?
14        (Overlapping speakers.)
15        MS. LEHMAN: Counsel, that's not a --
16        MS. PARFITT: Objection.
17        MS. LEHMAN: -- foundational --
18        MS. PARFITT: Objection.
19        MS. LEHMAN: -- question.
20        MS. PARFITT: Objection.
21        MS. LEHMAN: I do object.
22        MS. PARFITT: Thank you.
23        MS. LEHMAN: That is not a
24 foundational question.

Page 172

1        MR. TISI: Are you instructing him not
2 to answer?
3        MS. PARFITT: Objection.
4        MS. LEHMAN: I am instructing him not
5 to answer that question. I'm instructing him not
6 to answer about an article published in 2018.
7        MS. PARFITT: Counsel, I think at many
8 of the depositions we've unfortunately suffered
9 through countless questions.
10        I'm just being fair, Kate. It was
11 countless. I had one question. I sat through
12 countless questions.
13        MS. LEHMAN: We will take it to the
14 judge. I'm instructing him not to answer.
15        And so, you are not going to answer
16 that question, whether or not she published that
17 Talcum Powder was one of the variables and factors
18 considered.
19    A    Okay.
20        MS. PARFITT: We will just note that
21 one for the record, if you will, Sue. I
22 appreciate it. Okay. Moving on.
23    A    And I don't necessarily need a break
24 but I'm feeling a little under-caffeinated, and

Page 173

1 I'm hoping that the Starbucks people have decided
2 it's an appropriate time to open up.
3        MR. TISI: Would you like a cup of
4 coffee? I'm happy to go get it for you if that
5 makes it easier?
6        MS. PARFITT: He likes to stretch.
7    A    What should we do? Just take a
8 minute. Five minutes, please.
9        (There was a break in the proceedings
10 at 12:47 p.m. and testimony resumed at 1:10 p.m.)
11 BY MS. PARFITT:
12    Q    All right. Dr. Diette, again, after a
13 short break here, hopefully you are caffeinated
14 and ready to respond. Let's talk about
15 O'Brien 2024.
16    A    Okay.
17    Q    All right. Again, it's an Exhibit
18 previously marked as Number 5. Can we agree that
19 this is another study that was published by
20 Doctors O'Brien, Wentzensen and Sandler?
21    A    Yes.
22    Q    Okay. These are the same authors that
23 published 2020 O'Brien, which was one of the
24 largest cohort analyses that have been performed

44 (Pages 170 - 173)

Page 174

1 to date, correct?
2     A    Correct.
3     Q    Again, with regard to the issues that
4 we're speaking about today.
5     A    Of course, yes.
6     Q    Would you agree that this recent 2024
7 publication, Exhibit 5, is a reanalysis of the
8 initial Sisters Cohort Study that was published
9 back in 2016 by, again, O'Brien and Sandler,
10 referred to as the Gonzales study?
11     A    It includes reanalysis, but it also is
12 an analysis of additional data, as you know.
13     Q    Exactly.  That's a good clarification.
14 We can agree on that?
15     A    Yes.
16     Q    Okay.  And the objective of O'Brien
17 and her colleagues at NIEHS, in conducting this
18 2024, study was to reevaluate the association
19 between intimate care products -- which included
20 talcum powder -- it's use in the incidence of
21 hormone-related cancer, which in this case,
22 ovarian cancer; is that fair?
23     A    Yeah; ovarian, breast and uterine.
24     Q    That is exactly right.  Okay.  And

Page 175

1 what these authors attempted to do was to expand
2 on some of the previous analyses that were done
3 for instance, by Gonzales, and incorporate newly
4 diagnosed ovarian, uterine and breast cancers as
5 outcomes?
6     A    Right.  So they added additional --
7 additional people with outcomes, to what they had
8 from Gonzales.
9     Q    Okay.
10         THE REPORTER:  I'm sorry, they added
11 additional people what?
12         THE WITNESS:  With cancers.
13         (Reporter clarification.)
14     Q    Because, so the record is clear,
15 because Gonzales wasn't looking at breast cancers
16 and uterine cancers, correct?
17     A    Correct.
18     Q    Okay.  And another thing that the
19 authors did in the O'Brien 2024, is look at
20 lifetime use of the product, correct?
21     A    They had -- they had an estimate of
22 that, yes.
23     Q    And as to cohort studies looking at
24 lifetime use, that's one of the -- this is the

Page 176

1 first time in a cohort study that investigators
2 have looked at lifetime use?
3     A    With talc and ovarian?
4     Q    With talcum powder and ovarian cancer,
5 correct?
6     A    This is the first one I've seen.
7     Q    Okay.  Now, let me show you what I
8 believe was previously marked as Exhibit Number --
9 the Gonzales study, and it was marked earlier.
10 And I think, can I --
11         MR. TISI:  I think it's Exhibit 18.
12         MS. PARFITT:  Now, the Gonzales
13 article which is entitled, "Douching, Talc Use and
14 Risk of Ovarian Cancer," it was published in
15 Epidemiology in 2016, correct?
16     A    That's right.
17     Q    Again, I think we established that
18 this is an article that you previously referenced
19 in your reports, correct?
20     A    That's correct.
21     Q    Okay.  Before we actually addressed
22 some of your methodological concerns about
23 O'Brien 2024, let's talk a little bit about how
24 the O'Brien 2024, actually expands upon and

Page 177

1 improves some of the previous analysis done by
2 Gonzales 2016, by creating more detailed exposure
3 assessments, increasing the number of ovarian
4 cancer cases and expanding the follow-up period.
5     A    That's correct.
6     Q    Okay.  Now, can we agree that
7 O'Brien 2024 contains data from the Gonzales 2016
8 study?
9     A    Yes.
10     Q    Okay.  And the original Sister Study
11 enrolled about 50,884 women without breast cancer
12 who were enrolled at the ages of 35 to 74 --
13 between the period of time 2003 and 2009 -- and
14 they had to have a sister who was previously
15 diagnosed with breast cancer?
16     A    Yes.  And you said 50,884?
17     Q    Yes.
18     A    Yes.
19     Q    So that's an accurate description,
20 correct?
21     A    Yes, it is.
22     Q    Okay.  And the first and the initial
23 question there -- completed by the participants in
24 the Sister Study -- focused on two very specific

45 (Pages 174 - 177)

Page 178

1  time periods; the first being frequency of
2  exposure to genital talc use in the 12 months
3  before enrollment, and then exposure at 10 to
4  13 years of age; is that correct?
5      A    Ten to 13.
6      Q    Ten to 13?
7      A    Ten to 13, yes.  Yes, that's right.
8      Q    Okay.  And the frequency questions
9  that were asked of these women included the
10  following: never, sometimes or frequently used at
11  10 to 13; and whether they used never, less than
12  one time, one to three times a month, one to five
13  times a week or greater than five times a week in
14  the year before enrollment.
15      A    That's right.
16      Q    Does that sound right?
17      A    Yes.
18      Q    Okay.  Now, under the initial
19  questionnaire that was provided to respondents, is
20  it fair to say that real users may have been
21  incorrectly characterized as nonusers, simply
22  because the questionnaire failed to capture
23  lifetime use?
24      A    It's possible.

Page 179

1      Q    So one of the objectives of
2  O'Brien 2024 was to try to drill down, so to
3  speak, on what the data looked like and what the
4  results looked like when you looked at lifetime
5  use of a product, correct, in this case talcum
6  powder?
7      A    Right.  That was one of their goals.
8      Q    Okay.  Now, there is nothing
9  unscientific or improper about collecting
10  additional data in cohort studies, correct?
11      A    Well, it depends upon how you do it
12  right?  I mean, to be fair, this is the first time
13  I've seen investigators try to go backwards in
14  time and try to recreate something that they could
15  have done, had they wanted to earlier.
16          And they could have done it at
17  multiple time points between when the study
18  originated and this particular time.
19          So, I wouldn't say there's nothing
20  wrong with it.  I think that there's plenty wrong
21  with introducing what's one of the big problems
22  with case control studies -- into a cohort
23  study -- simply because you're hoping that now,
24  decades later, that people might remember what was

Page 180

1  true a long time ago.
2      Q    Okay.  But the same question.
3  Additional data was collected in the Nurse's
4  Health Study, correct?
5      A    Yeah.  But those are repeated
6  measures, right?
7      Q    Okay.
8      A    This is different.
9      Q    Okay.
10      A    And I just want to be clear about
11  that, right?  Like, repeated measures of time
12  varying exposure or outcomes is a norm in cohort
13  studies.  They keep updating.
14          Like, for example, if it's a study
15  about do you eat oranges; do you eat oranges now,
16  do you eat them two years later, do you eat them
17  four years later?  That's a typical way to update
18  a cohort study; not to wait 10 or 20 years and
19  say, "hey, by the way, did you eat oranges when
20  you were 8 years old?"  That's different.
21      Q    All right.  Well, let's look at what
22  the O'Brien authors tried to do that hadn't been
23  done in the past.
24          So, what they did is they attempted to

Page 181

1  provide another questionnaire, an updated
2  questionnaire that would ask about lifetime use of
3  talcum powder, correct?
4      A    Correct.
5      Q    Okay.  And your concern about the
6  authors gathering this additional information
7  about lifetime use was recall back -- is recall
8  bias, correct?  That's one of your concerns?
9      A    Recall at all, and then recall bias,
10  also.
11      Q    Okay.  So recall, et al., and recall
12  bias, okay?
13      A    Yes, that's at all, not et al.
14      Q    Yes.  Yes, all right.  So, that's one
15  of your criticisms.  You're not -- you're not
16  critical of investigators broadening the database
17  of participants in any particular study, correct?
18      A    Not as a general proposition, but not
19  like this.
20      Q    All right.  You would agree with me
21  that when a study is conducted -- that has a
22  longer follow-up time and expands the exposure
23  criteria -- that necessarily increases the number
24  of cases that might actually be detected in a

46 (Pages 178 - 181)

Page 182

1 study, fair?
2    A    No, I don't think so. I don't think
3 I'm disagreeing with what the study did. I
4 just -- I think the way you asked it, I don't
5 agree with that.
6    Q    Okay. Well, let me ask this. Do you
7 agree that increased numbers of incident ovarian
8 cancers -- and a longer follow-up period -- can
9 improve exposure assessment?
10   A    No.
11   Q    No.
12   A    No. I mean, exposure is one thing and
13 then you're talking about outcomes. You can
14 collect more outcomes as time goes by, but that
15 doesn't change what your exposure assessment is.
16   Q    Okay. Do you have any criticism of
17 collecting more data and gathering more cases?
18   A    More cases is good.
19   Q    More cases is good?
20   A    Yes.
21   Q    Okay. And that adds to the study
22 results' validity, correct?
23   A    Not to the validity, but it adds to
24 the robustness of the findings they can have --

Page 183

1    Q    Sure.
2    A    -- because they now have more
3 information about outcomes.
4    Q    Okay. That's fair. All right. And
5 indeed in 2024, that's exactly what the authors
6 did do. They were able to collect additional
7 cases, incident cases?
8    A    Oh, absolutely.
9    Q    All right. And you'll agree that that
10 did in fact make the data more robust, fair?
11   A    Oh, yeah. No. That was a -- it was a
12 good thing.
13   Q    Okay. We don't disagree with that?
14   A    It was a good thing.
15   Q    Okay. All right. So, the O'Brien
16 publication or the O'Brien study was published in
17 the Journal of Clinical Oncology on May 15, 2024,
18 right?
19   A    Yes.
20   Q    Take look at that. Okay. Now, the
21 Journal of Clinical Oncology is a peer reviewed
22 journal?
23   A    Yes.
24   Q    Are you aware that -- in addition to

Page 184

1 the authors undergoing peer review by the journal,
2 the Journal of Clinical Oncology -- they also have
3 to submit, as NIH researchers, their work to NIH
4 for internal peer review?
5    A    I didn't see that here, but I've
6 worked with NIH researchers and I know that that's
7 the norm, is to get internal approval also.
8    Q    Okay. So it's kind of like double
9 peer review?
10   A    Yeah. Well, I don't -- so, I'm saying
11 this because I don't know. I don't know if it's
12 always peer review in the traditional sense,
13 versus looking for statements that like a
14 particular NIH branch finds acceptable, which is a
15 little bit different than the kind of peer review
16 where it's critiquing like the methods and the
17 results and so forth.
18   Q    Well, you don't know that NIH did not
19 critique the methods of the authors?
20   A    I don't. I'm saying I don't know.
21   Q    Okay.
22   A    But I do know there is an internal
23 review process.
24   Q    Okay. But we can agree that this

Page 185

1 particular paper, O'Brien 2024, was in fact
2 reviewed by two different organizations? Not only
3 The Journal of Oncology -- Clinical Oncology, but
4 also NIH? I think we can establish that.
5    A    I think we can establish it just based
6 on what I think is generally true. I don't know
7 if I saw a statement here that said that it was
8 reviewed, but I could have easily just glossed
9 over it --
10   Q    Fair enough.
11   A    -- but I don't think I saw a statement
12 that said it was internally reviewed.
13   Q    Fair enough. But you understand from
14 your other work that you've done, that is the
15 process?
16   A    I would expect it to have happened.
17   Q    Okay. The same thing for NCI, do they
18 require that as well?
19   A    I've not done any work with them and I
20 don't know what their practices are.
21   Q    Okay. Fair enough. You've never
22 published anything in the Journal of Clinical
23 Oncology, correct?
24   A    I don't think so.

47 (Pages 182 - 185)

Page 186

1    Q    Okay. How did you actually get -- we
2 talked earlier on it -- it was a few hours ago --
3 so let me just refresh my recollection.
4         You think the attorneys for J&J may
5 have provided that to you, and then maybe shortly
6 thereafter, or perhaps contemporaneous, you also
7 pulled it up, correct?
8    A    That's right.
9    Q    Okay. Did you have any advanced
10 notice that the O'Brien 2024 article was coming
11 out, publication?
12    A    No.
13    Q    So it would be fair to say you did not
14 have access to the journal, prior to its public
15 release?
16    A    Oh, no. No, no, no.
17    Q    Okay. Now, the concerns -- and you
18 used the word concerns in your report. It seems
19 to be a word that you use?
20         Do you have concerns generally about
21 the methodology that was used in the O'Brien study
22 analysis? We will start with that.
23    A    Sure, yeah.
24    Q    You do? All right. So you've got

Page 187

1 concerns about the methodology that the authors
2 employed.
3    A    Right.
4    Q    Okay. Now, are the concerns that you
5 have, sitting here today, the ones that you raise
6 and address in your report that you filed on
7 May 28th, 2024?
8    A    Yes.
9    Q    Okay. Before you either wrote your
10 report -- and certainly before you came today --
11 did you communicate with anybody -- either in your
12 academic community or otherwise -- and discuss the
13 concerns that you had with the methodology that
14 was employed by the authors that conducted the
15 2024 O'Brien study?
16    A    No, just lawyers.
17    Q    Okay. So you did communicate with
18 lawyers about your concerns --
19    A    I did.
20    Q    -- on the methodology? Okay. How
21 soon after receiving the O'Brien article did you
22 have those discussions with your lawyers?
23         MS. LEHMAN: Object to form.
24    A    It had to be pretty soon, because

Page 188

1 it's -- there's only a little bit of time between
2 when this was published and when I wrote my --
3 because -- what is the date of my thing?
4    Q    Your report is May 28th, but initially
5 it was due May 21st.
6    A    Yeah. So, before -- before
7 May 21st -- I don't remember the dates -- but
8 obviously it's pretty tight in there.
9    Q    Right.
10    A    So early on before the original due
11 date, and then after the original due date.
12    Q    Okay. Now, you had already -- at the
13 time you got ahold of the O'Brien report on
14 May 15th of 2024 -- you had already submitted your
15 expert report in the Jersey consolidated
16 litigation, because that was due April 25th,
17 correct?
18    A    Correct.
19    Q    So that report of April 25th, 2024
20 does not contain any of your thoughts, analysis
21 criticisms of O'Brien 2024, correct?
22    A    That's correct.
23    Q    So you had a window of time between
24 April 20 -- or, excuse me, May 15th and initially

Page 189

1 May 21st to review it?
2         How much time, or on how many
3 occasions did you speak -- I don't want to know
4 your conversations -- but on how many times -- how
5 many times did you speak with lawyers for J&J,
6 specifically, about the O'Brien 2024, and
7 incorporating that in your May 28th report?
8    A    Probably twice, I would say.
9    Q    You had two different discussions with
10 them?
11    A    Yes.
12    Q    Before you had the discussions with
13 J&J's attorney about the article and what you
14 would write and say, did you -- had you committed
15 anything to writing?
16    A    No. I had read the article and, you
17 know, just made my underlines or highlights or
18 whatever, but I had not written anything yet.
19    Q    Okay. Are those underlines and
20 highlights -- on the O'Brien 2024 -- that we have
21 in your packet, that I think we marked a little
22 bit earlier?
23    A    Let me see. I actually have two
24 copies.

48 (Pages 186 - 189)

Page 190

1    Q    Okay.
2    A    And this one has highlights and this
3 one has underlines.
4    Q    Okay.
5    A    I don't know if they're the same or
6 not.
7    Q    Okay.  Well, we will get copies of
8 both --
9    A    Yes.
10    Q    -- but in those conversations that you
11 had with J&J counsel, you made some underlines or
12 some highlights, whatever the case may be,
13 correct?
14    A    I did them before I had the
15 conversations.
16    Q    Okay.  Now, did you also understand --
17 in your review of the 2024 O'Brien study -- that
18 it was one of the first NIH papers to use this
19 Quantitative Bias Analysis to assess the impact of
20 errors in reporting of data?
21    A    I don't know where it fits, you know,
22 in terms of what their experience is otherwise.
23 They may have said that, but I don't -- I don't
24 recall that.

Page 191

1    Q    Okay.  Well, is it the first time you
2 had read -- in your review of talcum powder papers
3 and ovarian cancer -- where you had read about
4 authors using a Quantitative Bias Analysis to
5 assess the impact of potential error?
6    A    I would have to look back.  I think,
7 is it Goodman?  There's another paper that I've
8 cited where they looked at the potential role of
9 recall bias -- and I may have the first author
10 wrong -- and they used the sensitivity and
11 specificity and predictive values, I think as
12 generated by O'Brien 2021 -- or 2020, I apologize,
13 and applied them to a Cramer study.  You may know
14 what I'm talking about.
15    Q    I do.  Is that the only one that you
16 think may have used some type of analytical basis
17 to -- to assess the impact of error in reporting?
18    A    On talcum powder and ovarian cancer?
19    Q    Okay.  On talcum powder and ovarian
20 cancer?
21    A    I think that's --
22         THE REPORTER:  On talcum powder and
23 what?
24         THE WITNESS:  On talcum powder and

Page 192

1 ovarian cancer.
2         MS. PARFITT:  Other than talking to
3 the lawyers at J&J, did you consult with any other
4 consultants or medical or scientific people?
5    A    No.
6    Q    Did you discuss the 2024 O'Brien with
7 Dr. Merlo?
8    A    No.  I think there was a call I had
9 with him when he was in the Middle East and I said
10 "had you read it?"  And he said "no," and that was
11 it.  So I didn't get a chance to talk to him about
12 it.
13    Q    So you all didn't talk about it
14 afterwards when he came back from the Middle East?
15    A    No, not the content.  I had just
16 wondered if he had read it.
17    Q    Okay.  Similarly, I should have asked
18 you earlier, you have a copy of Dr. Merlo's
19 transcript from his deposition last week.
20         Have you talked to Dr. Merlo about his
21 testimony last week?
22    A    Only briefly.  He called me from his
23 Uber ride home, but only to see -- I mean, the
24 main thing was, he and his wife wanted to get

Page 193

1 together that night and wanted to see if we had
2 plans.
3    Q    Okay.  You didn't talk about how that
4 went, how nice Mr. Tisi was to him?
5    A    Oh, he said that he was a peach and
6 that -- but I was more interested in how long it
7 took, which I think was like five hours or
8 something like that.  I don't know what it was.
9         But, yeah, I mean, he was on his way
10 home, so there wasn't really time.  And as it
11 turned out, we didn't -- we had other plans that
12 night, so we didn't get together.
13    Q    Okay.  So, you couldn't have a social
14 engagement with him, but you did talk briefly
15 about how long the deposition took?
16    A    That's right.
17    Q    And that Mr. Tisi was a peach?
18    A    Exactly.
19    Q    All right.  Very good.  That's the
20 important things.  How many hours did you spend
21 actually writing and analyzing 2024 O'Brien?
22    A    Well, analyzing a bunch, because it's
23 a dense, dense, dense paper.
24    Q    Tell me about it.

49 (Pages 190 - 193)

Page 194

1    A    Right, I know.  So I read it several
2  times, which took a -- took a while.  The writing
3  part, I don't know.
4         That didn't take too long, because I
5  formulated the ideas, you know, and then I had
6  enough sort of just highlights and underlines to
7  kind of know where I was going.
8         So, I don't know if that took like an
9  hour, hour and a half or something.
10    Q    Okay.  Well, whole kit and kaboodle,
11  how -- what was -- what was the time, analyzing
12  writing, what do you think you spent?
13    A    15 to 20 hours.
14    Q    Okay.  You didn't consult with any
15  biostatisticians?
16    A    None, no.  No.
17    Q    Okay.  All right.  It's solely your
18  work?
19    A    Oh, a hundred percent, yeah.  Yeah.
20    Q    All right.  Now, let me show you --
21  before we actually get into the article -- what we
22  will have marked as now Exhibit Number --
23         MR. TISI:  Just bear with me.  Tell me
24  what you want?

Page 195

1         MS. PARFITT:  It's the ASCO.
2         THE REPORTER:  You said ASCO?
3         MS. PARFITT:  It's the ASCO exhibit.
4         MR. TISI:  I will find that for you.
5  She will identify it.
6         MS. PARFITT:  For the record,
7  Dr. Diette and Counsel, I'm showing you what's
8  been marked as Exhibit, what number, Chris?
9         MR. TISI:  22, I think.
10         MS. PARFITT:  22, which is --
11         MR. TISI:  23.  Excuse me.
12         (Diette Exhibit 23 was marked for
13  purposes of identification.)
14         MS. PARFITT:  23, which is a document
15  entitled, "Study Finds Association Between Genital
16  Talc Use and Increased Risk of Ovarian Cancer."
17  Do you see that Dr. Diette?
18    A    I do.
19    Q    And the date is May 15th, 2024, which
20  corresponds with your recollection of your review,
21  correct?
22    A    Well, yeah, I think it's the
23  publication date --
24    Q    Correct.

Page 196

1    A    -- so I think it was probably timed to
2  come out with the publication.
3    Q    Okay.  All right.  Now, are you a
4  member of the society, excuse me, of the American
5  Society of Clinical Oncology?
6    A    No.
7    Q    Okay.  That is the group that actually
8  published the journal article by Dr. O'Brien in
9  2024, correct?
10    A    I know it's their journal.  I don't
11  know what it means to be the "publisher" of it.
12  And so, I mean, if it's a technicality, I'm not
13  sure, but it's the journal of that society.
14    Q    Okay.  Do you understand or have you
15  seen -- if you've reviewed the document -- that
16  this association represents about 50,000 oncology
17  professionals?
18    A    Oh, no, I don't know that.  I
19  didn't -- I didn't read that part.
20    Q    Okay.  If you go to the last page
21  under about ASCO, it talks about who they are and
22  who they represent.
23    A    I see.
24    Q    Okay.  One of ASCO's -- and there

Page 197

1  is -- one of ASCO's journals include the Journal
2  of Clinical Oncology, and that is the journal,
3  indeed, that O'Brien 2024 was published?
4    A    That's right.
5    Q    And ASCO describes, at the bottom of
6  page 4 of the document, as "the Journal of
7  Clinical Oncology offer incredible, authoritative
8  resources for peer-reviewed clinical oncology
9  research that informs high-quality patient care
10  worldwide."  Do you see that?
11    A    I see that's what they say about
12  themselves.
13    Q    Correct.  But you're not a member of
14  their society?
15    A    I am not.
16    Q    Okay.  And you don't receive their
17  journal?
18    A    I don't get journals anymore.  That's
19  just not the way that the world works.
20    Q    Okay.
21    A    Yeah.
22    Q    Well, when you did receive journals,
23  is this the kind of journal you would receive --
24    A    No.

50 (Pages 194 - 197)

Page 198

1    Q    -- oncology?
2    A    No. No.
3    Q    Okay. So, when did you first see this
4 release, this speech or release of this study?
5    A    What is today, Wednesday?
6    Q    I think.
7    A    Probably Friday-ish.
8    Q    Okay. How did you get it?
9    A    From the lawyers.
10   Q    Okay. That's the first time that you
11 had seen it, correct?
12   A    It is.
13   Q    Okay. Let's look at what ASCO's -- if
14 you look under "ASCO Perspective," do you see
15 that?
16   A    I do.
17   Q    All right. Let's examine how ASCO,
18 the American Society, describes the O'Brien,
19 et al. paper.
20        The first paragraph said, this study
21 underscores the potential risks associated with
22 intimate care products, particularly genital talc.
23        The evidence adds to a growing body of
24 literature that suggests such products could

Page 199

1 contribute to an increased risk of ovarian cancer,
2 especially among frequent users and those using
3 products in their 20s and 30s. And they have ASCO
4 expert, Fumiko Chino. Do you see that?
5    A    I do.
6    Q    Okay. Do you know Fumiko Chino?
7    A    I do not.
8    Q    Okay. She's an oncologist over at
9 Sloan Kettering, correct? Is that right? She's
10 an oncologist over at Sloan Kettering, is what it
11 says.
12   A    Oh, yeah. Yeah. I'm sorry. I didn't
13 realize it was a question.
14   Q    No. No. Okay. It probably wasn't a
15 good one.
16   A    No, no. Sometimes I just don't know
17 if somebody is just saying something, or whether
18 it's a question.
19   Q    Now, is it your understanding that
20 they feature, for the reader, several things.
21 They have a focus, a population, a main takeaway
22 and significance. Do you see that?
23   A    I do.
24   Q    Okay. Let's look down at the main

Page 200

1 takeaway. It states, "genital talc use was found
2 to be positively associated with the risk of
3 ovarian cancers across multiple scenarios, even
4 after adjusting for potential reporting biases and
5 misclassification."
6        "The association was particularly
7 strong among women who used talc frequently, or
8 especially during periods of significant hormonal
9 changes or reproductive activity." Did I read
10 that correctly?
11   A    Yes.
12   Q    Do you agree with that statement?
13   A    Well, some of these findings are what
14 was reported. It's not a, you know, a complete
15 listing of what was found, but this includes what
16 the authors of the study said.
17   Q    Okay. And does it represent that the
18 study by O'Brien 2024 showed that there was a
19 positive association to use of -- use of genital
20 talcum powder and ovarian cancer that was
21 statistically significant?
22   A    Well, it doesn't say "statistically
23 significant."
24   Q    It doesn't.

Page 201

1    A    Okay.
2    Q    But you've read the article?
3    A    Yeah. And it depends upon which
4 finding is statistically significant; but
5 regardless of statistical significance, this is
6 what -- otherwise, this is what they were saying.
7    Q    Okay. "They," being the O'Brien
8 article, or authors?
9    A    Well, I don't know. I think, I mean,
10 it looks like Naomi Hagelund is the --
11   Q    She's reporting on the study?
12   A    She's reporting, yeah. She's
13 reiterating like her -- her take on what she
14 believes the author is stating.
15   Q    Okay. Down to significance, do you
16 see that?
17   A    I do.
18   Q    Okay. It states, "these findings
19 contribute significant insights into the ongoing
20 debate about the safety of intimate care products
21 and underscore the need for further research and
22 potential reevaluation of these product's safety."
23 Do you see that?
24   A    I do.

51 (Pages 198 - 201)

Page 202

1    Q    Okay.  Do you agree that the
2 O'Brien 2024 paper provided significant insights
3 into the debate and discussion about safety of
4 inmate care products?
5    A    No.  I don't think it was very
6 helpful.
7    Q    You don't?
8    A    No.
9    Q    Okay.  We'll come back to that.
10    A    Okay.
11    Q    We'll come back.
12        Do you see on the next page, there is
13 a quote by Dr. O'Brien, and she's one of the
14 authors.  Do you see that --
15    A    I do.
16    Q    In the second paragraph?
17    A    Yes.
18    Q    "Despite challenges in assessing
19 exposure history and bias, inherent in
20 retrospective data, our findings are robust,
21 showing a consistent association between genital
22 talc use and ovarian cancer," said lead study
23 author Katie O'Brien, researcher at NIEHS.
24        Do you agree with that, with

Page 203

1 Dr. O'Brien, the study results showed robust
2 consistent association between talcum powder use
3 and ovarian cancer?
4    A    I don't.
5    Q    You disagree?  Okay.  Then it says,
6 "this study also leverages detailed lifetime
7 exposure histories -- and the unique design of the
8 Sister Study -- to provide more reliable evidence
9 that supports the potential association between
10 long-term and frequent genital talc use and
11 ovarian cancer."  Did I read that correctly?
12    A    You did.
13    Q    Do you agree with Dr. O'Brien when she
14 states that this study leveraged detailed life
15 exposures, and provided more reliable evidence of
16 association between long-term and frequent genital
17 talc use?
18    A    No.  I don't think they -- I don't
19 think they identified that it was more reliable.
20    Q    Okay.  Fair enough.  All right.  Let's
21 go to the next one.  We will have marked as
22 Exhibit Number --
23        MR. TISI:  24.
24        MS. PARFITT:  24.  And I'll represent

Page 204

1 to you that it is a release of the article, again,
2 the 2024 article by NIH and the National Institute
3 of Environmental Health Sciences, and it's dated
4 June 2024 and entitled, "Genital Talc Use May Be
5 Linked to Increased Risk of Ovarian Cancer."  Do
6 you see that?
7        (Diette Exhibit 24 was marked for
8 purposes of identification.)
9    A    I do.
10    Q    Okay.  Right underneath it -- have you
11 read this before?
12    A    I have.
13    Q    Okay.  When did you first see this?
14    A    Within the last 7 days.
15    Q    Was that also on Friday?
16    A    Well, I'm just thinking Friday, but
17 you know, somewhere in the last 7 days.
18    Q    Dr. Merlo was deposed on Friday.  Do
19 you think it was after he was deposed and these
20 documents were used with him?
21    A    No.
22    Q    Okay.
23    A    No, I think -- I mean, it might have
24 been on Friday, but not necessarily.  I don't time

Page 205

1 it with that.
2    Q    Okay.  All right.  Do you see where it
3 says, "new study by NIEHS scientist provides
4 compelling evidence that genital talc use is
5 associated with an increased risk of ovarian
6 cancer."  Do you see that?  Did I read that
7 correctly?
8    A    Yes.
9    Q    Do you agree with the NIEHS scientist
10 that actually conducted the study that their work
11 provides compelling evidence that genital talc use
12 is associated with the increased risk of ovarian
13 cancer?
14    A    No.  I don't think it's compelling
15 evidence.
16    Q    Okay.  That was a statement from the
17 NIH, correct?
18    A    That is correct.
19    Q    Okay.  If you look down there, it
20 says, "this is the first of its kind to include
21 detailed data on women's use of intimate care
22 products across their life course."  Do you see
23 that?
24    A    I don't.

52 (Pages 202 - 205)

Page 206

1    Q    I'm sorry, it's right there under --
2    A    Oh, I got it -- I got it.
3    Q    You've got it?
4    A    Yeah.
5    Q    Okay.  And, again, as it pertains to
6  ovarian cancer and talcum powder, is it your
7  understanding this is the first study, cohort
8  study, to include detailed data on women's use of
9  intimate care products across their entire life
10  course?
11        MS. LEHMAN:  Objection.  Asked and
12  answered.
13        MS. PARFITT:  I'm limiting it to
14  ovarian cancer.
15    A    Yeah, yeah.  I mean, it's the first
16  that I've seen that does that.
17    Q    Then it says "this extensive analysis
18  was conducted using data from the Sister Study."
19  Can we agree that, in fact, the analysis was
20  conducted using information that had been
21  originally collected from Sister Study?
22    A    Of course.
23    Q    Okay.  Now, there are some key -- if
24  you go to the next page, and then, it states at

Page 207

1  the top that "the authors used this quantitative
2  bias analysis to assess the impact of potential
3  errors in reporting use of intimate care
4  products." Do you see that?  It's right at the
5  top, yeah.
6    A    Am I looking at the right place?
7    Q    Right over here above the pictures.
8    A    Mine is formatted differently.
9    Q    I'm sorry.  Okay.  Okay.  Yours is on
10  the first page.
11    A    Okay.
12    Q    And it says, "despite challenges in
13  assessing exposure history and biases inherent in
14  retrospective data, our findings are robust
15  showing consistent association between genital
16  talc use and ovarian cancer."
17        We talked about that and I asked you
18  whether you agreed and you said you did not.
19        And then you said "leverages longtime,
20  detailed exposure history," and you agreed that it
21  did leverage detailed lifetime exposure history,
22  correct?
23    A    Correct.
24    Q    Okay.  And do you agree or disagree

Page 208

1  that it provides reliable evidence that supports a
2  potential association between long-term and
3  frequent genital talc use and ovarian cancer?
4    A    Again, I don't agree with that.
5    Q    Okay.  Now, the authors state -- if
6  you go down to, and I'm sorry, mine are a little
7  different here.
8        It says under "Key Findings," first,
9  "the study demonstrates persistent positive
10  association between genital talc use and ovarian
11  cancer, with the strongest associations observed
12  for frequent and long-term users and for use
13  during reproductive years." Did I read that
14  correctly?
15    A    Yes.
16    Q    Do you agree that the study
17  demonstrated persistent, positive association
18  between genital talc use and ovarian cancer, with
19  the strongest associations observed for frequent
20  and long-term users and for use during
21  reproductive years?
22    A    No.
23    Q    You disagree with that?
24    A    I disagree.

Page 209

1    Q    Next, "key finding." No significant
2  associations were found between genital talc use
3  or douching and breast or uterine cancer.  Do you
4  agree with that statement?
5    A    I think they reported some positive
6  findings for douching.  I agree with it regarding
7  breast and uterine cancer.
8    Q    Okay.  Do you see -- there is a
9  picture of two women at the top.  Do you see that?
10    A    I do.
11    Q    Okay.  To the right, it has --
12  actually, to the right of the pictures, it has a
13  statement and it shows O'Brien to the left and
14  Dr. Sandler, two of the authors.
15        And the authors are quoted as saying,
16  "there is no medical reason to use these
17  products," speaking about talc.  "If women are
18  using these products, they might want to reduce
19  their frequency of use, look for alternatives or
20  talk to their doctor about their concerns."  Do
21  you see that?
22    A    I do.
23    Q    Okay.  Do you agree with Doctors
24  Sandler and O'Brien's opinion that there is no

53 (Pages 206 - 209)

Page 210

1 medical reason to use talc?
2    A    I don't know why nonphysicians are
3 commenting on medical reasons to use anything.
4 But in -- I don't know.  There may be.
5        I mean, I know -- I think -- I can't
6 remember which one, but I think one of the
7 defense's expert reports I read mentioned that
8 talc is recommended for use after like a certain
9 surgery or something, and -- you know, I really
10 can't say.
11    Q    Okay.
12    A    I can't say that there is no medical
13 indication.
14    Q    Okay.  So, you can't really agree or
15 disagree with the statement that there is no
16 medical reason to use these talc products?
17    A    Right.  I don't disagree or agree.
18    Q    Okay.  Now, they also make some health
19 care recommendations where they suggest if you use
20 it, reduce the use.
21        Do you agree or disagree with their
22 recommendation -- regardless of their expertise to
23 do so, as you question -- do you agree or disagree
24 with their recommendation that if you use talc,

Page 211

1 reduce use?
2    A    So, I don't know.  I mean, since it's
3 an entire sentence, I do think that the idea of
4 talking to their doctor about that makes some
5 sense; and see if their doctor would endorse
6 reducing the frequency or looking for
7 alternatives?  But --
8    Q    And that's because talc is a
9 modifiable perspective, correct?  You can choose
10 to use or not use?
11    A    Yeah.  And if you're concerned about
12 it, don't use it.  But I don't know whether it's
13 important to actually limit it, but it's okay to
14 talk about it.
15    Q    Now, do you also agree with their
16 recommendation that, look for alternatives, such
17 as cornstarch?  Is that an alternative to talcum
18 powder?
19    A    I've read that it is, but I'm not sure
20 whether it's an appropriate one.  Like, I don't
21 know anything about its safety or efficacy, you
22 know, for what it's being used for.
23    Q    You know that Johnson & Johnson,
24 today, only sells cornstarch baby powder, correct?

Page 212

1    A    I read that in a press release.  I
2 don't otherwise know it as a fact.
3    Q    Okay.  You do know that since 2019,
4 when you were last deposed, that there is no
5 talcum powder products being manufactured for
6 sale?
7        There may be some left on the shelves,
8 but there is none being manufactured and sold in
9 the United States, North America, the world,
10 correct?
11        MS. LEHMAN:  Object to form.
12    A    I do understand that.
13    Q    Do you know that cornstarch baby
14 powder continues to be sold and used by consumers
15 in North America and Europe and abroad?
16    A    I don't -- I don't doubt it, but I
17 don't know that like, you know, from any
18 particular source.
19    Q    Do you know whether or not J&J
20 continues to have their patent for cornstarch?
21    A    I don't even know if they have one.
22    Q    You didn't know whether they had a
23 patent for cornstarch?
24    A    Correct.

Page 213

1    Q    J&J never informed you of that?
2    A    No.
3        MS. LEHMAN:  Object to form.
4    Q    You are a medical doctor?
5    A    I am.
6    Q    Okay.  So these recommendations --
7 strike that.  I'll move on.
8        There is a quote in the article, and
9 I'm trying to direct you to it, that says -- that
10 is fine.  Okay.  We're going to go ahead and put
11 that aside and keep moving.
12        So what I would like to do is, before
13 we get to your questions and concerns about the
14 actual study, let's talk a little bit about the
15 statistical analysis here.
16        I noticed in your report that you did
17 not identify for the reader any types of
18 references to any of the statistical methods that
19 were used by the authors, O'Brien, in the 2024,
20 did you see that?
21    A    I mean, I know that.
22    Q    Okay.  So when you were discussing
23 2024 in your report -- and I think it's around
24 pages 10, 11, 12 -- you did not footnote any

54 (Pages 210 - 213)

Page 214

1  research articles that addressed any of the
2  statistical methods that were used by the authors
3  correct?
4      A    Correct.
5      Q    Okay.  You did quote reports by some
6  of the plaintiff's experts as authorities or
7  footnotes, but you didn't site any statistical
8  reference; is that fair?
9          MS. LEHMAN:  Object to form.
10     A    Wait a minute.  I didn't -- I didn't
11  have any plaintiff expert reports about
12  O'Brien 2024.
13     Q    No.  I should be more clear.  You
14  referenced some of their statements, generally?
15     A    Oh, generally speaking, yeah.
16     Q    Yes.
17     A    But I didn't -- but I didn't -- I have
18  them now, but I didn't have them when I wrote
19  this --
20     Q    Right.
21     A    -- regarding O'Brien 2024.
22     Q    Right.  I think my point was, when you
23  were having the discussion about O'Brien 2024, any
24  references or footnotes during your discussion of

Page 215

1  O'Brien 2024 had more to do with comments that
2  were made by plaintiff's experts as opposed to any
3  authorities on statistical methods, correct?
4          MS. LEHMAN:  Object to form.
5      A    Well, it has to be, right?  Because I
6  mean, I think if I brought in, you know,
7  plaintiff's expert opinions, it would have been,
8  you know, more general opinions that I've seen;
9  opinions I've seen more generally, but not
10  specific to O'Brien 2024.
11     Q    Right.  But I'm just saying there are
12  no authorities -- in the body of your report or in
13  your references -- to talk about the various
14  methodological, statistical analyses that were
15  done, correct?
16         MS. LEHMAN:  Object to form.
17     A    So, the use of the word "authorities,"
18  just, it trips me up, because I understand --
19  that's a legal term I don't use.
20         I mean, I think the word "authority"
21  might show up in my report one time or something.
22  But I don't recognize like authoritative documents
23  for statistics or epi or medicine or anything.
24     Q    Okay.  Well, you did mention, you

Page 216

1  mentioned I think in one of your reports, Rubin.
2  Isn't that a statistics -- a statistician?
3      A    There is a statistician called Rubin
4  that links up to Rubin's Rules, but I don't -- I
5  don't recall and I don't know if it's the same
6  Rubin.  Like, I don't recall using that.
7      Q    Now, you didn't do any -- well, let me
8  ask you, did you do any statistical research
9  before writing your section on O'Brien 2024?
10     A    If by research you mean, you know,
11  learning how to conduct things, I've done it
12  throughout my career, but nothing specific for
13  O'Brien 2024.
14     Q    Okay.  Did you consult or reference
15  any articles on the various methods that were
16  employed by O'Brien 2024; and by that multiple
17  imputation, any of those methods --
18     A    No.
19     Q    -- QBA?
20     A    No.
21     Q    Okay.  All right.  We asked Dr. Merlo
22  and we asked you -- you probably saw it in the
23  transcript -- do you know Dr. Elizabeth Stuart,
24  who is chair of the Johns Hopkins Biostatistic

Page 217

1  Department?
2      A    I don't know her personally.  I mean,
3  I know her name.  I think she took over for
4  Dr. van de Roche just recently, whom I did know,
5  but I don't know the incoming chair.
6          (Overlapping speakers.)
7      Q    Okay.  So, you didn't consult her and
8  talk to her about her opinions regarding the
9  statistical analysis that was employed by the
10  authors --
11     A    I have never -- I'm sorry.  I didn't
12  meant to interrupt.
13     Q    That's all right.  No problem.
14     A    I've never consulted her about
15  anything, including, including this.
16     Q    Okay.  All right.  Let me show you
17  what we will have marked as Harris, the Harris
18  editorial.
19         And I think we are up to?  Dr. Diette,
20  we will have this marked as what Exhibit?
21         MR. TISI:  This is number 25.
22         (Diette Exhibit 25 was marked for
23  purposes of identification.)
24     Q    We will represent to you that

55 (Pages 214 - 217)

Page 218

1  Exhibit 25 is an article that is entitled,
2  "Epidemiological Methods to Advance Our
3  Understanding of Ovarian Cancer Risk."
4      A    Okay.
5      Q    And I'll represent that it was
6  authored by Holly Harris and Colette Davis and
7  Kathryn Terry, and it's dated, also, 2024 and it's
8  published in the Journal of Clinical Oncology.
9          You made a distinction a little bit
10 earlier, Doctor, about invited versus not invited
11 editorials.  Would you agree with me that this
12 editorial by Dr. Harris et al. is an invited
13 editorial?
14     A    I think it likely was; but just to
15 clarify, I wasn't talking about invited versus not
16 invited editorials.  I was saying that Letters to
17 the Editor are not invited and that editorials
18 tend to be.
19     Q    This is indeed an editorial as opposed
20 to a Letter to the Editor?
21     A    That's correct.
22     Q    You've distinguished it from our
23 earlier discussion.
24     A    That's exactly right.

Page 219

1      Q    Okay.  Have you read this editorial
2  that was published in the Journal of Clinical
3  Oncology?
4      A    I have not.
5      Q    Okay.  Do you know that this was --
6  well, this followed the O'Brien -- I'll represent
7  to you this editorial followed the O'Brien 2024
8  publication, all right?  Take my representation on
9  that?
10     A    Oh, yeah.  Yeah, I'm just -- I'm
11 seeing it looks like it was published the same
12 day.
13     Q    Correct.  Okay.  But obviously, you
14 have to publish something and then somebody do
15 their -- do their --
16     A    Yeah.  They would be writing about it.
17     Q    Correct.
18     A    After they've -- they may well be the
19 reviewers of the study, which would be common.
20     Q    Okay.  All right.  Now, this Harris
21 article is not listed in your references, correct?
22     A    I don't believe it is.
23     Q    Okay.  And I'll represent that I've
24 looked at your references and I didn't see it.

Page 220

1      A    Okay.
2      Q    Similarly, I've looked at your report
3  and I don't see the Harris editorial listed in
4  your report either; is that fair?
5      A    Oh, I think so, yeah.  I don't, I
6  mean, I haven't --
7      Q    You said you haven't read it --
8      A    Right.
9      Q    -- so I can't imagine you would have
10 listed something that you didn't read, or
11 referenced it?
12     A    Exactly.
13     Q    Okay.  Now, do you know any of those
14 authors, Harris, Davis or Kathryn Terry?
15     A    No.
16     Q    Okay.
17     A    I'm just looking to see whether --
18     Q    Let me try -- maybe this will help a
19 little bit.  Do you know that Dr. Harris and
20 Dr. Davis are authors of the largest study
21 consortiums to date to compare the association
22 between genital powder use and ovarian cancer, and
23 histotypes between African Americans and white
24 women?

Page 221

1      A    I wouldn't have recalled that if you
2  hadn't said it, but I know the study you're
3  talking about.
4      Q    Okay.  That was indeed one of the
5  largest study consortiums that compared talcum
6  powder use with -- and ovarian cancer -- with
7  women of color versus white women, correct?
8      A    That's exactly right.
9      Q    Okay.  Those authors, Harris and
10 Davis, concluded in their study, the Davis study,
11 that there was a positive association between
12 talcum powder use and ovarian cancers?
13         And that association was similar
14 across and it didn't vary by --
15     A    Race or ethnicity.
16     Q    Race or ethnicity?  Yes.
17     A    That is my understanding.
18     Q    Now, also, Katie Terry, who is
19 referenced as one of the authors, is also one of
20 the lead authors of one of the pooled studies,
21 examining the association between talcum powder
22 use and ovarian cancer entitled:
23         "Genital Powder Use and Risk of
24 Ovarian Cancer, a pooled analysis of 8 cases, 525

56 (Pages 218 - 221)

Page 222

1 cases -- excuse me, 8,525 cases and 9,849
2 controls, that was published in the American
3 Association for Cancer Research?"  Do you remember
4 reading that article?
5     A    Oh, I know the article.  Yes.
6     Q    Do you have it?
7     A    I think that's reference to my first
8 report, because that is a pre-2019.
9     Q    That's exactly right.  It was the
10 Terry study.
11     A    Yes.
12     Q    That was -- I think we've referred to
13 it as the Terry study.
14     A    Yes.
15     Q    Okay.  She was one of the lead
16 authors, correct?
17     A    I think she was the lead author.
18     Q    Correct, again.  And Dr. Terry and
19 authors concluded at that time that there was
20 indeed a positive association, statistically
21 significant, between ovarian cancer and exposure
22 to talcum powder in the genital area, correct?
23        MS. LEHMAN:  Object to form.  The
24 article speaks for itself.

Page 223

1        MS. PARFITT:  You can answer the
2 question.
3        MS. LEHMAN:  Also, excuse me, the
4 article is outside the scope of this deposition,
5 since it was published in 2013.  It was discussed
6 at length in his initial report, and in his
7 initial deposition.
8        MS. PARFITT:  Is that correct?  It was
9 a positive association, statistically significant?
10     A    I'd honestly have to look back in
11 order to see what they wrote.  The only thing I
12 recall for sure is that they -- in the abstract
13 anyway, it says that they said they did not find a
14 significant dose response.
15     Q    And then when you read the body --
16 since we're going to talk about it, and you wrote
17 that up, in the body of the report -- the actual
18 content, "the data analysis demonstrated
19 otherwise, that there was in fact a dose response
20 that was demonstrated."
21        That was not in the abstract?  That
22 was actually in, when the authors looked at the
23 data, not the abstract?
24     A    I know --

Page 224

1        MS. LEHMAN:  The same objection.
2        THE WITNESS:  Do you want me to
3 answer?
4        MS. LEHMAN:  No.  I would instruct you
5 not to answer about the 2013 article.
6        MS. PARFITT:  Okay.  That's fine.  We
7 will leave it at that.
8        So, let's look at what Dr. Harris had
9 to say.  Dr. Harris, the 1, 2, 3, 4th paragraph on
10 page 1, states, "after accounting for potential
11 biases, O'Brien, et al -- that's the 2024 study --
12 reports a significant increase in ovarian cancer
13 risk for genital powder use with effect estimates
14 that are in the range with previous studies."
15        "The association is strongest for
16 genital powder exposure, during the age ranges of
17 20s and 30s, with similar increased risks observed
18 for douching."  Did I read that correctly?
19     A    Yes.
20     Q    Do you agree with not only the O'Brien
21 authors, but Dr. Harris, who wrote an editorial
22 post publication of the O'Brien study?
23        MS. LEHMAN:  Object to form.
24     A    Well, it's impossible to disagree with

Page 225

1 saying that O'Brien reported that, because that's
2 just a fact.
3     Q    That's the question.
4     A    Yes.
5     Q    Do you agree that O'Brien -- who
6 actually did the data analysis, did the work and
7 published the report -- revealed to the world that
8 the results of her study, the study findings,
9 demonstrated a significant increase in ovarian
10 cancer risk for genital talc powder use with
11 effect estimates that were in the range with
12 previous studies?
13        MS. LEHMAN:  Object to form.
14     A    I think it's just a fact.  I think
15 they just, you know, recapitulated a fact of what
16 the O'Brien, et al. reported.
17     Q    Do you disagree with that statement
18 that is reported by the O'Brien authors and
19 followed up by Harris, Terry and Davis?
20     A    I don't see how it's followed up.
21 They're just saying that they reported it.  Like,
22 how can you disagree --
23     Q    That's's fair.
24     A    Yeah.

57 (Pages 222 - 225)

Page 226

1    Q   Do you agree or disagree with O'Brien,
2  Sandler, Wentzensen, Harris, Davis and Terry, when
3  they concluded that there was a significant
4  increase in ovarian cancer risk for genital powder
5  use -- with effect estimates that are in the range
6  with previous study -- showing the strongest HRs
7  for genital powder exposure during the age ranges
8  of 20s and 30s?
9        MS. LEHMAN:  Object to form.
10   A   So, the way this is written, it's not
11  an opinion of Harris, Davis and Terry.  They're
12  reiterating what other authors said.
13   Q   If the authors of O'Brien -- do you
14  agree or disagree with the authors of O'Brien 2024
15  that their study findings demonstrated a
16  significant increase in ovarian cancer risk for
17  genital powder use -- with the effect estimates
18  that are in the range of previous studies -- and
19  that the association was strongest for genital
20  powder exposure during the age ranges of 20s and
21  30s?
22   A   So that's multiple things, and I
23  already answered the question about whether -- I
24  can't disagree with what they reported, right?

Page 227

1  They reported what they reported.
2        I do disagree with what their findings
3  are and how they interpret it, but I can't
4  disagree with the report.  They reported what they
5  reported.
6    Q   All right.  So, your disagreement, you
7  disagree with the study findings of O'Brien 2024,
8  correct?
9    A   And the conclusions that they lead to.
10   Q   Okay.  All right.  Similarly, let's go
11  down to the bottom of that paper.  In this paper,
12  even with misreporting of the exposure, i.e.,
13  genital powder use in half the cases -- a point
14  that you addressed in your report, Dr. Diette -- a
15  significant increase in ovarian cancer risk is
16  still observed, adding support to the plausibility
17  of a true association between genital powder use
18  and ovarian cancer risk.  Did I read that
19  correctly?
20   A   Yes.
21   Q   Do you agree with the study findings
22  by O'Brien, et al., that even with misreporting of
23  the exposure, i.e. genital powder use in half the
24  cases, a significant increase in ovarian cancer

Page 228

1  risk is still observed, adding support to the
2  plausibility of a true association between genital
3  powder use and ovarian cancer?
4        MS. LEHMAN:  Objection.
5    A   Yeah.  Only the first part.  I mean, I
6  agree that that's what -- the first part again
7  recapitulates what the O'Brien and other authors
8  said in their study.  I don't think it adds
9  support to the plausibility of a true association.
10   Q   Okay.  Thank you.  On the last page of
11  that document, it says, looking forward, do you
12  see that?
13   A   I do.
14   Q   It says, "looking forward, given that
15  genital powder use and douching are modifiable
16  exposures likely associated with a highly fatal
17  disease, these data suggest that people at risk of
18  ovarian cancer, particularly those in their 20s
19  and 30s, should be made aware of the potential
20  risk; but also recognizing that the actual risk of
21  ovarian cancer remains low."
22        Do you agree or disagree, that based
23  upon the O'Brien 2024 study findings -- and in
24  light of the fact that talcum powder is a

Page 229

1  modifiable factor -- that women should be informed
2  of the risk of talcum powder use in the genital
3  area and ovarian cancer, especially those in their
4  20S and 30S?
5    A   I mean, I wouldn't fault somebody for
6  sharing information with women about anything
7  that's in the research.
8        I don't have an opinion that they --
9  that women should be; in part, because I think
10  there are enough, you know, known and established
11  risk factors for all sorts of diseases, and this
12  isn't in that realm yet.
13        And, again, as you point out with this
14  statement, that there's a very small absolute
15  risk.  So I just -- I think you have to balance
16  messaging to people.
17   Q   I appreciate that.  Thank you.  Okay.
18  Let's go to some of the statistical procedures
19  that were followed by the O'Brien authors in
20  conducting their study.  Let me show you and have
21  marked as Exhibit 27?
22        MR. TISI:  26.
23        MS. PARFITT:  Exhibit 26.
24        (Diette Exhibit 26 was marked for

58 (Pages 226 - 229)

Page 230

1 purposes of identification.)
2    Q    26, Li Peng. And then 27 --
3        THE REPORTER:  You said pink?
4        MS. PARFITT:  Peng, P-E-N-G.  And then
5 the second one, which we'll have marked now as 27,
6 is a paper by White and Royston, a 2009 paper.
7        (Diette Exhibit 27 was marked for
8 purposes of identification.)
9        THE REPORTER:  Two thousand --
10        MS. PARFITT:  2009.  And then the
11 last, we will do this, too, hopefully, and then we
12 will --
13        MR. TISI:  Here it is.
14    Q    I have Peng, Li.  All right.  First,
15 Dr. Diette, have you reviewed prior to your
16 deposition the Peng paper, it's Li Peng, along
17 with Elizabeth Stuart and David Allison, entitled
18 Multiple Imputation, A Flexible Tool for Handling
19 Missing Data?
20    A    No.
21    Q    Okay.  I will show you that for a
22 moment.
23        MR. TISI:  I'm getting my steps in
24 today.

Page 231

1        MS. PARFITT:  While you're looking at
2 that, do you know Peng, Li?
3    A    No.
4    Q    Do you know Elizabeth Stuart?
5    A    Well, it's the same Elizabeth Stuart,
6 so I don't know her personally.
7    Q    That's your Elizabeth Stuart at
8 Johns Hopkins in the biostats division?
9    A    The new chair of biostats.
10    Q    How about David Allison, do you know
11 him?
12    A    I do not.
13    Q    Okay.  First, is missing data common
14 in research?
15    A    It's very common.
16    Q    Okay.  And is multiple imputation a
17 common statistical method that's used for
18 addressing missing data, in the course of
19 research?
20    A    I would say it's common enough.  I
21 don't know how common.  But it's a, you know, it's
22 a well recognized procedure.
23    Q    Okay.  Can we agree that when missing
24 data occurs, it's important not to exclude cases

Page 232

1 with missing information?
2    A    No.  I mean, that's a decision that
3 the investigators have to make.
4    Q    Okay.  So you agree that because
5 multiple imputation is commonly used to impute
6 missing data, that it's typically a more efficient
7 way, efficient than complete case analysis and
8 regression analysis when covariates have missing
9 values?
10        MS. LEHMAN:  Object to form.
11    A    Yeah.  I've heard people talk about
12 that, but that's like missing biostats talking, and I
13 don't know what "efficiency" means in that regard.
14    Q    Okay.  So you can't really answer that
15 question?
16    A    Correct.
17    Q    Okay.  All right.  What we can
18 establish -- and I guess agree on -- that MI is a
19 commonly used statistical tool to be used when a
20 study data is missing data, fair?
21    A    It's often used.  That's right.
22    Q    Okay.  Now, there is multiple
23 imputation, and there's -- as I understand it --
24 something called single value imputation, correct?

Page 233

1    A    That is right.
2    Q    Okay.  Do you agree --
3        And single value imputation is when
4 you have -- you estimate what each missing value
5 might have been and replace it with a single value
6 in a dataset?
7    A    That's right.
8    Q    Okay.  Do you agree that single value
9 imputation is considered suboptimal to multiple
10 imputation?
11    A    Yeah, I mean, I think, generally
12 speaking, that is true.  I think multiple
13 imputation has become more valuable.
14    Q    Okay.  And multiple imputation better
15 handles missing data by estimating replacing --
16 missing values, correct?
17    A    And lots of them and also --
18    Q    Over time?
19    A    Right.  Yeah.  So iteratively doing
20 that.
21    Q    Okay.  Because, as I appreciate it, it
22 actually fills in -- you're actually filling in
23 missing values kind of en masse; is that fair?
24    A    Yeah, I mean you can.  I mean, you can

Page 234

1  replace one variable or multiple variables, and
2  you can use a number of different other variables
3  in order to predict what those should be.
4       Q    Okay.  Would you agree that multiple
5  imputation provides an accurate estimate of
6  quantities, or associations of interest, in the
7  absence of having actual data?
8       A    I would only agree that it can.  I
9  mean it's not guaranteed to.
10      Q    Okay.
11      A    And it depends upon a lot of
12 assumptions.
13      Q    Okay.  Have you, yourself, used
14 multiple imputation?
15      A    Yes.  But I'll explain what I mean.
16 Is that too loud for you?  I can get it.  Give me
17 one second?
18      Q    Okay.
19      A    Should I answer?
20      Q    Yes, please.
21      A    Yes.
22      Q    We're just trying to --
23      A    You have to understand how, you know,
24 research works.

Page 235

1          I've been the principal investigator
2  of studies, as well as programs with multiple
3  studies.  And I've also been the data core and
4  data analysis lead on large programs as well.
5          And so, to the extent that, you know,
6  every research study that we do needs a plan to
7  begin with, which can include a strategy for how
8  we're going to handle missing data.  Sometimes
9  it's created after.
10         But it's been routine for me to
11 participate in the discussions and then also make
12 decisions about, in terms of like who actually,
13 you know, types out the code.  You know, that's
14 very often like a master's level, biostats person.
15      Q    Okay.  Fair.
16      A    Just so you know.  But like I can
17 do -- like I'm trained in how to, you know, use
18 different software packages, but I don't because
19 it's tedious, and there is other people that can
20 do it.
21         Like it's hard to be a principal
22 investigator of a study, manage everything, and
23 then also do the stuff that other people can do.
24      Q    All right.  Fair enough.  Let me show

Page 236

1  you what we will have marked as Exhibit Number 28,
2  I believe?
3          MR. TISI:  No, it's 27.
4          MS. PARFITT:  I did mark it.
5          MR. TISI:  You did mark it.  So this
6  is 27.
7       Q    Dr. Diette, I will represent to you
8  that it is a paper entitled, Asthma in Older
9  Patients, Factors Associated with Hospitalization,
10 and it's authored by you, Gregory Diette, and some
11 other authors, correct?
12      A    That's right.
13      Q    Okay.  Now, this was published -- and
14 I guess it was re-published -- first in the
15 American Medical Association and then the Archives
16 of Internal Medicine.
17         Do you understand that to be correct?
18      A    I don't think so.  You said -- I guess
19 we're trying to understand where it says
20 reprinted?
21      Q    Right at the bottom.
22      A    Yeah.  I think that just means --
23 well, I'm not sure I know what it means, but it
24 was not re-published.

Page 237

1          I mean, it was published once, and
2  this was an era when people still would get like
3  boxes full of paper things to hand out.  So it may
4  refer to this being a reprint.
5       Q    Okay.
6       A    Like that somebody purchased from the
7  AMA, you know.
8       Q    Okay.  I was just trying to understand
9  that myself, so I appreciate that.
10      A    Yes.
11      Q    Now, are you familiar with this
12 article?
13      A    I mean I know of it.
14      Q    It takes you back, right?
15      A    Well, it's 22 years ago so I would
16 have to spend some time --
17      Q    Well, I'm very limited with my
18 questions on this.
19      A    Okay.
20      Q    This particular paper has nothing to
21 do with ovarian cancer and Talcum Powder, correct?
22      A    Correct.
23      Q    Okay.  Now, in fact, I believe what
24 this paper is about -- and you can tell me better

Page 238

1 than I can tell you -- but its objective was to
2 determine whether patterns of care were less
3 favorable for older than younger adults with
4 asthma, and to assess those patient
5 characteristics as to severity, and determine
6 whether there would be a higher rate of
7 hospitalization for older or younger people?
8        That is kind of my gist of it, my
9 layperson's.
10    A    That's right.
11    Q    Do I have it right?
12    A    Yes.
13    Q    Okay.  Now, if you go to page 1125,
14 under "management of missing data for independent
15 variables," do you see that?
16    A    I do.
17    Q    Okay.  So, in this research paper, you
18 were actually presented with approximately a
19 quarter of your respondents with missing data; is
20 that correct?
21    A    I don't recall.
22    Q    Look at the top.  It says, the results
23 in this article are presented with substitutions
24 made for missing values.  Approximately one

Page 239

1 quarter of the respondents had at least one
2 missing response.
3        A    Oh, had at least one missing?  Yeah,
4 which is very different than like a variable where
5 you're missing 25 percent.
6    Q    Okay.  All right.  Now, it says that,
7 "for variables with missing responses from fewer
8 than 10 percent of the respondents, the missing
9 value was replaced with the median for continuous
10 or ordinal variables and mode for nominal
11 variables."  Do you see that?
12    A    I do.
13    Q    That means that you employed a single
14 variable imputation for purposes of those missing
15 responses that were less than 10 percent; is that
16 correct?
17    A    Yeah.  For a low rate of missing-ness.
18 That's right.
19    Q    All right.
20        THE REPORTER:  Low rate of what?
21    A    Low rate of missing-ness.
22    Q    All right.  So we know, one, that
23 during the course of this study, that you were
24 involved in and you employed the use of a single

Page 240

1 value, single variable imputation.
2        Then it goes on to say, "for variables
3 with at least 10 percent of responses missing, we
4 developed a data augmentation algorithm for
5 imputation with missing data based on multiple
6 conditional imputations."
7        Did I read that correctly?
8    A    You did.
9    Q    All right.  So you, in this paper, in
10 addition to using single variable imputation, you
11 used multiple imputation as well?
12    A    Correct.
13    Q    Okay.  So, you used both?
14    A    That is correct.
15    Q    All right.  And then, after you
16 performed both your single variable imputation --
17 which has been at least referenced in some
18 articles as being suboptimal -- you did your
19 multiple variable imputation, and then did a
20 sensitivity analysis?
21    A    Well, the suboptimal thing I don't
22 think really applies here.  I mean, first of all,
23 if you look and see who the biostatistician was on
24 here --

Page 241

1    Q    I did.
2    A    -- it's Francesca Dominici, who is,
3 you know, one of the world's leaders in
4 biostatistical method.  She's brilliant.
5        And we were using, at the time -- it's
6 refreshing me because I'm seeing Francesca was
7 involved in this.
8        When there is low rate of
9 missing-ness, like less than 10 percent, it is
10 very efficient.  And I'll use that word
11 "efficient," in order to employ something that is
12 very easy to use, and in particular because those
13 kind of variables we're replacing, the stakes were
14 low.
15    Q    Okay.
16    A    Like this would have been, you know,
17 this would have been not a key variable, not like
18 whether or not somebody used Talcum Powder in an
19 analysis for ovarian cancer.
20        And I just, I would like just to point
21 something else out, if I may, as we're looking at
22 the methods.
23    Q    Doctor, can I just say one thing, and
24 only because of time?

Page 242

1    A    I won't say it.
2    Q    There is not a question pending.
3    A    I won't say it. I apologize.
4    Q    I appreciate that.
5    A    Okay.
6    Q    I'm sure your counsel can bring it up
7 a little bit later.
8    A    Yes.
9    Q    And I appreciate the courtesy on that.
10 I really do, and I'll try to extend it on your end
11 as well.
12        Okay. Other than this paper, do you
13 have any recollection -- and by this paper I mean
14 Exhibit Number 27, Asthma in Older Patients, have
15 you continued to employ either single variable
16 mutation -- imputation or multiple imputation, in
17 your study work?
18    A    It depends upon the study, but, sure,
19 yeah. We consider --
20    Q    You just do it?
21    A    -- different ways to do it.
22    Q    Okay. All right. Let's go to the
23 O'Brien paper. I keep jumping back and forth to
24 it.

Page 243

1    A    Okay.
2    Q    I have to bring you home. Now, you've
3 reviewed the paper and its contents?
4    A    I have.
5    Q    From my understanding of your
6 testimony, you have put a lot of thought and
7 analysis into your read of this paper, correct?
8    A    I have.
9    Q    Okay. Now, do you agree --
10        Let's talk about what we can still
11 agree and not agree upon. First, let's go with
12 what we agree on --
13    A    Okay.
14    Q    -- that this multiple imputation was
15 written into the study protocol, a priori?
16    A    I don't know that. I mean you can
17 point me to something, I'm sure.
18    Q    Sure.
19    A    But I'm not sure about that.
20    Q    Okay. If you look at --
21        If you look at, I believe it's
22 statistical analysis, under statistical
23 analysis --
24        Excuse me, it's on page 3, and it

Page 244

1 says, "data on intimate care product use was
2 sometimes contradictory or missing."
3        And then it talks about using the
4 quantitative bias analysis to implement different
5 approaches for imputing exposure in women who
6 initially reported never use, but did not complete
7 the follow-up questionnaire. Do you see that?
8    A    I do.
9    Q    Okay. So, do you see that the authors
10 of the O'Brien paper wrote into their article,
11 a priori, that they would deal with missing data
12 by the use of one of the techniques of multiple
13 imputation?
14    A    I don't think the word "a priori"
15 means much here.
16        I mean, everything to a certain extent
17 is a priori if you describe it a certain way,
18 right?
19        Like you can't do the analysis until
20 you plan it. This doesn't say that they planned
21 this -- when they went out and collected the new
22 data -- you know, before they knew that there were
23 missing data.
24    Q    You disagree that the authors wrote or

Page 245

1 used a priori multiple imputation? Just yes or
2 no?
3    A    I don't see the word, "a priori," and
4 I don't think that is the proper term to use for
5 this paper.
6    Q    Okay. Do you agree with the authors
7 as well, that the fact that there was missing data
8 can be overcome by tools, such as the authors
9 employed in the O'Brien study, and like you
10 employed in your asthma study?
11    A    It can be. It doesn't mean it will
12 be, but it can be.
13    Q    Okay. And by -- I think we talked
14 about this a little bit earlier.
15        But by the authors increasing the
16 number of cases, incident cases, that was intended
17 and would have the effect of increasing study
18 power?
19    A    Yes.
20    Q    Okay. Look over on page 4 under
21 statistical analysis. Are you there?
22    A    I am.
23    Q    Okay. It said, "we first compared
24 covariate distributions across categories of

62 (Pages 242 - 245)

Page 246

1 intimate care product use."
2        "After excluding women, missing key
3 covariates, and imputing missing exposure, we used
4 the multiple variable Cox proportional-hazards
5 model with age as the time scale to estimate
6 hazard ratios, HRs."
7        Does that help recollection, help
8 refresh your recollection with regard to the
9 authors planning to use imputation --
10     A    No.
11     Q    -- for substitution of missing data?
12     A    I'm sorry, no.  I didn't mean to
13 answer --
14     Q    That is all right.
15     A    No, it doesn't, and it's a misuse of
16 the concept of a priori.
17        This is borrowing something from
18 O'Brien 2020, where they're saying that their
19 patent, you know, analysis was a priori.
20        I mean every analysis is a priori.
21 They're just trying to highlight they thought that
22 was important.
23        What I'm saying here is, you can't do
24 the analysis until you plan it.  So, unless you

Page 247

1 can change time, you know, and go backwards or
2 forward at will, everything is a priori, but it's
3 a meaningless concept here.
4     Q    Okay.  Now, having worked through, and
5 by that I mean, worked through this statistical
6 analysis, which I believe they referred to as QBA,
7 which would be quantitative bias analysis -- do
8 you see that?
9     A    I do.
10     Q    -- the authors came up with four
11 different scenarios for evaluation of the data,
12 correct?
13     A    They did.
14     Q    Okay.  And one of the scenarios that
15 the authors utilized was a scenario 4, which was
16 contradictory data, plus multiple implications.
17 Do you remember reading that?
18     A    I do.
19     Q    Okay.  Let me direct your attention to
20 table 2.  Are you there?
21     A    Yes.
22     Q    Okay.  And, if you look over at the
23 far right column under scenario 4, it has ovarian
24 cancer.  Do you see that?

Page 248

1     A    I do.
2     Q    Okay.  And it says, ovarian cancer
3 never and ever used.
4        Do you see that?
5     A    I do.
6     Q    All right.  And do you see the hazard
7 ratio that the authors found for ever use or never
8 use of Talcum Powder was 1.82 with a confidence
9 interval of 1.36 to 2.43.  Do you see that?
10     A    I do.
11     Q    Okay.  And then, you understand that
12 the authors then took that hazard ratio for
13 scenario 4 and adjusted it for recall bias,
14 correct?
15     A    Yeah, if there is such a thing.  I
16 mean, you can examine scenarios with recall bias.
17 I'm not sure adjusting is actually something that
18 happens.
19     Q    Okay.  But you saw that the authors of
20 O'Brien 2024 did address and made correction for
21 recall bias and exposure misclassification.
22        You saw that in the study, correct?
23     A    I saw an attempt to account for it,
24 but I think that they provided scenarios where

Page 249

1 they looked at different assumptions and saw what
2 their estimated effect of recall bias would be.
3     Q    Okay.  And when they did do this
4 calculation to correct for recall bias error,
5 non-differential misclassification, they came up
6 with a hazard ratio of 1.41; is that correct?
7     A    I don't remember every hazard ratio.
8 I'm looking at one on figure 2 that showed --
9 which is an example -- where there was a
10 25 percent recall bias assumption which is 1.41.
11     Q    Okay.  Now, you disagree -- let me try
12 to ferret it out.
13        Do you disagree that scenario 4 is the
14 best estimate of a true association, in the
15 absence of recall or other unknown biases?
16     A    Oh, a hundred percent.
17     Q    Okay.  You disagree with that?  I just
18 want to find out where we disagree.
19     A    Yes.
20     Q    Now, you understand that the authors
21 of this study, O'Brian, Sandler, et cetera,
22 submitted their works, their analysis, their
23 statistical analyses, their sensitivity analysis
24 to two different sets of reviewers, not only the

63 (Pages 246 - 249)

Page 250

1 Journal for Clinical Oncology but also to NIH,
2 correct?
3     A    Yes, as we discussed before.
4     Q    Okay.
5         MS. LEHMAN:  Counsel, I don't mean to
6 interrupt you, but I just want to put you on
7 notice that we have 10 minutes left on the four
8 hours.
9     Q    Perfect.  So, the authors submitted
10 their study findings -- which we've just discussed
11 what they were -- to two different reviewers, one,
12 the National Institutes of Health, correct?
13    A    That's right.
14    Q    And the other, the Journal for
15 Clinical Oncology.  This study was published back
16 on May 15th, 2024.
17        Have you seen any Letters to the
18 Editor or anyone --
19        Well, first, have you seen any letters
20 to the editors in response to O'Brien 2024, other
21 than the editorial by Harris that we talked a
22 little bit earlier?
23    A    Well, it's not other than, right,
24 because it's a different format.

Page 251

1         But I haven't seen any, and I don't
2 see how you could because there isn't enough time
3 to have, you know, written one and have it been
4 published and so forth.
5     Q    Well, you're very critical, from your
6 review of your report -- in your report, of the
7 methods employed by the O'Brien authors.
8         Have you planned to write a letter to
9 the editor or have published an editorial where
10 you set forth -- as you have in your report on
11 pages 10 through 13 -- your criticisms of the
12 authors' work?
13    A    I don't write letters to the editor.
14 I mean, I'm not about to start now, but I don't.
15 There is like absolutely zero academic value, and
16 so I don't plan to.
17    Q    Okay.  All right.  So, one:  We know
18 that you do not plan to write any letter to the
19 editor?
20        Do you intend to -- other than an
21 expert report, for which you've been paid for by
22 J&J to write -- do you have any plan of writing to
23 the authors -- or any form of writing -- to set
24 forth to the scientific community that O'Brien

Page 252

1 2024, and the methodology that they employed, was
2 something that you have concerns about --
3         MS. LEHMAN:  Object to the form.
4         MS. PARFITT:  -- and are puzzled by?
5     A    No.
6     Q    Did you do any calculations that you
7 brought today, with regard to any of the study
8 data that was published in O'Brien 2024?
9     A    I don't think so.  The only thing that
10 might fit that is, I had thought you -- by asking
11 a question about one of the numbers in my report
12 where I said that it was as much as an 89 percent
13 increase, based on recall bias or something like
14 that -- I thought that you would want to know how
15 I got there?
16    Q    Did you put -- is that in some of the
17 papers that you have there?
18    A    Yes.
19    Q    I can look at that later.
20    A    I didn't do the calculation.  I just
21 literally put the table that it comes from, so
22 that I could recreate it if we need to in
23 real-time.
24    Q    Okay.

Page 253

1     A    And that is on my copy of my report.
2     Q    Okay.  That's fair enough.  Thank you.
3 I appreciate that.  Thank you.
4         MR. TISI:  Just to be clear, is that
5 in the stack of stuff?
6     A    It's in this binder.
7         MR. TISI:  Can we have that marked,
8 because I mean I only had the packet of stuff that
9 you brought as Exhibit 4, so we will make that
10 Exhibit Numbers 27 -- no, 28.
11        (Diette Exhibit 28 was marked for
12 purposes of identification.)
13    Q    Okay.  And, Dr. Diette, let me ask you
14 just a couple of questions.
15    A    Sure.
16    Q    Are you going to be giving opinions in
17 this case with regard to causation between vulva,
18 cervical, or vaginal cancers and Talcum Powder?
19    A    Vulva or cervical?  I don't -- I don't
20 plan to.  I mean, I'm not aware if there are any
21 issues there.
22    Q    And is it fair to say that you intend
23 to not give an opinion with regard to causation on
24 uterine cancer either, at the trial of this case?

64 (Pages 250 - 253)

Page 254

1    A    Yeah.  I don't know of that being an
2  issue.
3          MS. PARFITT:  All right.  I'm going to
4  step, and give my counsel -- who is representing
5  New Jersey here -- a few minutes to ask, while I
6  check my notes real quickly.
7          MR. TISI:  I just have four or five
8  questions.
9    A    Sure thing.
10         EXAMINATION BY MR. TISI
11   Q    My name is Chris Tisi.  Do you have
12  any reason to think --
13         MS. PARFITT:  Chris, you may need to
14  come closer here.
15         MR. TISI:  What?
16         MS. PARFITT:  You need to come closer.
17         MR. TISI:  I will just speak loudly.
18   A    That works for me.  It's up to you.
19   Q    Do you have any reason --
20         With respect to any of the O'Brien
21  authors of 2025, do you have any reason to
22  believe, factually, that they were in any way
23  biased or had any undue influence when they wrote
24  that paper?

Page 255

1    A    I'll answer as carefully as I can,
2  because I think the way you asked it, it implies
3  something nefarious, you know, which is, I think,
4  what you might be asking about.
5          Undue influence?  I would have no
6  idea.  Bias, you know, bias is a word that is kind
7  of loaded.
8          I think every investigator has a
9  perspective, which I would use instead of the word
10  bias.  And, you know, people have a hypothesis for
11  a study.
12          They're motivated to find what that
13  is.  So I think, you know, all investigators put a
14  lot of energy and hope into finding what it is
15  that they set out to.
16          But it wouldn't be like undo
17  influence.  It would be a normal part of doing the
18  research.
19   Q    Let me be just really clear.  Do you
20  have any reason to believe that they conducted an
21  analysis to reach a predetermined result?
22         MS. LEHMAN:  Object to the form.
23   A    I don't have any information about
24  that.

Page 256

1    Q    Okay.  We don't know how IARC is going
2  to reach their decision.  They may have reached
3  this decision while we were in here today.
4          Do you have any reason to believe that
5  the people involved in the IARC discussion are
6  biased in any way?
7    A    I would only say, again -- well, I
8  don't know of most of them.  We pointed out a
9  couple of them together that are investigators.
10   Q    Right.
11   A    And I think investigators bring a
12  perspective, and I'm not saying like an unhealthy
13  bias or an untoward one, but I think there is a
14  prospective.
15          I think investigators are motivated to
16  highlight their work and to get credit for it, so,
17  I think some of that may well filter into it.
18   Q    Do you think that -- do you think --
19          Were any of the authors for the
20  O'Brien study paid by either the plaintiff or
21  defendant in this litigation?
22   A    I've not seen any disclosures, in any
23  of the papers, that that's so.
24   Q    Did you see whether --

Page 257

1          Do you recognize any of the names in
2  the IARC list that you were provided as having
3  been people who were paid by either plaintiff or
4  defendant?
5    A    I don't, but I don't know that they
6  did or did not.
7    Q    Are you willing to accept -- if IARC
8  were to come down and say, this is a probable
9  carcinogen -- are you willing to accept that
10  result?
11         MS. LEHMAN:  Object to the form.
12   A    I would want to see the report because
13  I think the -- you know, the details matter a lot
14  in how they arrived at that.
15         MR. TISI:  I don't have any more
16  questions.  Thank you.
17   A    Sure.
18         MS. PARFITT:  Dr. Diette, let me just
19  confer with him.  I'm going to confirm whether we
20  have an extra day or not an extra day.
21         (There was a break in the proceedings
22  at 2:25 p.m/ and testimony resumed at 2:28 p.m.)
23         MR. TISI:  We are just clarifying
24  exhibit numbers.  Exhibit Number 27 is "Asthma in

65 (Pages 254 - 257)

Page 258

1 Older Adults by Diette, et al., from 2002."
2         And Exhibit Number 28 -- which we're
3 re-marking -- is the MDL Diette Report Binder.
4         MS. LEHMAN:  We can't tell exactly,
5 but this may be one of the articles that had been
6 left off and so it was added.
7         MS. PARFITT:  So we did not mark this
8 one?
9         MS. LEHMAN:  I should say in the
10 appendix.
11        MS. PARFITT:  Got you.  Okay.
12        MS. LEHMAN:  We're struggling to sort
13 of tell, but I just --
14        MS. PARFITT:  Okay.
15        MS. LEHMAN:  -- in disclosure.  And
16 that's part of the compilation that you guys
17 marked as Exhibit Number 4.
18        MS. PARFITT:  Okay.
19        MR. TISI:  Michelle, would you mind,
20 since I'm looking at this, would you mind if I
21 just ask him questions about his calculations?  Do
22 you mind?
23        MS. LEHMAN:  No.  You're New Jersey.
24        MR. TISI:  Do you mind if I just do

Page 259

1 this?
2         MS. LEHMAN:  No.  Go ahead.
3         EXAMINATION BY MR. TISI
4     Q   In your report, Exhibit Number 28,
5 your binder, you said that there were calculations
6 that you had done on your report.
7         I see a blue sticky on page 10 of your
8 2024 report, but I don't see any handwriting.  Is
9 there anything -- am I missing something?
10    A   Yes.
11    Q   Okay.
12    A   So, the sticker means nothing.  It's
13 just something that was on there for a minute when
14 I was doing something, but it doesn't represent
15 anything.
16        You need to find the text where I'm
17 discussing O'Brien 2024, and I think it's in the
18 early part of that, the early part of the O'Brien
19 stuff.  I can show you.
20    Q   Sure, if you don't mind.  This way we
21 have a record of where it is.  I just didn't see
22 any handwriting on there.
23    A   There is no calculation.  I'll tell
24 you what I wrote there.

Page 260

1     Q   I see.
2     A   So, page 11, at the very top, I said,
3 based on this study finding, the effective recall
4 bias was just -- was as much as an 89 percent
5 increase in reported talc use; and I only just
6 wrote, Table A2, because that is where the
7 information came from --
8     Q   Got you.
9     A   -- to get to the 89 percent.
10        MR. TISI:  I appreciate that.  That's
11 all that I need.  Thank you for your indulgence on
12 that, Katie.
13        EXAMINATION BY MS. PARFITT
14    Q   Dr. Diette, actually just a couple
15 cleanup here.
16        When I reviewed your report on
17 page 10, where you actually discuss O'Brien 2024,
18 I note you put "footnote," and that's page 10 in
19 your report.  That's your 2024 report.
20        I note you indicate, in footnote,
21 O'Brien, at page -- or, excuse me, footnote 38.
22 Do you see that?
23    A   I do.
24    Q   Okay.  Look at the bottom, and it

Page 261

1 says, 1 through 15, and that is how it's listed,
2 I'll represent to you in your references.
3         Did O'Brien -- it's not limited to
4 pages 1 through 15.  There are supplemental
5 tables.
6         Did you also review the supplemental
7 tables to O'Brien 2024?
8     A   I did, but I think, just to clarify,
9 if this says 00:1 to 15.
10    Q   Right.
11    A   This was probably as it was released
12 rather than the final journal page numbers.
13        So, I'm imagining that's what it was.
14 It was just what was available on whatever I could
15 print out at that time.
16    Q   I think that was a clarification.
17 You're aware that there was an appendices, and
18 there were some additional tables?
19    A   Yes.
20    Q   My question to you, I just want to
21 make sure for the record that I asked you whether
22 or not you also reviewed those tables?
23    A   A hundred percent.
24    Q   Okay.  The other item, with regard to

Page 262

1 a general causation opinion is, last night, both
2 Kate and, I guess, received an updated appendix to
3 supplement the appendix that you had previously
4 attached to your May 28th, 2024 report.
5        I have no questions to ask about it,
6 except to have it marked as the next exhibit,
7 which I believe now is 29.  And the only question
8 is, did you prepare the updated appendix?
9      A    No.
10      Q    Okay.  Who would have done that?
11      A    It would have been somebody at Medical
12 Science Affiliates.
13      Q    Okay.  No one from J&J?
14      A    Oh, no, no.  No, I mean these
15 documents come from, they're on my behalf but from
16 Medical Science Affiliates.
17      Q    Since 2019, Medical Science does not
18 work for J&J.  Is that fair?
19      A    I don't -- I'm not sure what that
20 means.
21      Q    I'm going to make it clear.
22        Since 2019, do you have any reason to
23 believe that Medical Science is a contractor for
24 Johnson & Johnson, for services?

Page 263

1      A    Oh, not that I'm aware of.
2      Q    Okay.  Do you know if they do work
3 directly for J&J?
4      A    I have no idea.
5        MS. PARFITT:  I would like to have
6 this marked as Exhibit 29.
7        (Diette Exhibit 29 was marked for purposes
8 of identification.)
9      Q    All right.  Dr. Diette, in addition to
10 the testimony this morning with regard to your
11 opinions, I'm going to direct you to your report
12 and specifically to page 3 of your report.
13        Tell me when you get there?
14      A    I'm there.
15      Q    Two additional opinion summaries
16 include bullet, the second to the last bullet
17 which says, "I have reviewed the available
18 radiology films and related records outlined in
19 Appendix B of this report."
20        "And, based on my experience as a
21 pulmonologist, there is no evidence of markers of
22 asbestos exposure, such as pleural plaques,
23 diffuse pleural thickening or asbestosis in the
24 available films for any of the six Bellwether

Page 264

1 plaintiffs."  Do you see that?
2      A    I do.
3      Q    Did I read that correctly?
4      A    Yes.
5      Q    Okay.  Are you giving case specific
6 testimony in the trial, in the MDL trial?
7      A    I think so.  I mean, well, I don't
8 know if I'll be asked to; but, if I did, it would
9 include my interpretation of those films that I
10 was describing.
11      Q    All right.  Let's spend a little bit
12 of time to talk about that.
13      A    Sure.
14      Q    And I'll represent, in your State
15 Court report as well -- that was produced on
16 May 28th, 2024 -- you also have a very similar, if
17 not the same paragraph regarding your review of
18 the available radiology films for the Carl and
19 Balderrama cases?
20      A    Correct.
21      Q    And you can check your report, if you
22 want to check my facts.
23      A    No.  No.  I know it's there.
24      Q    Okay.  So, attached to your report as

Page 265

1 an exhibit, that has a listing of radiology
2 studies in compact disks for the five, excuse me,
3 or six Bellwether cases selected in the MDL.  Did
4 you see that?
5      A    I do.
6      Q    Okay.  And they include Rausa,
7 Bondurant, Carter Jenkins, Newsome, Ilardo.
8        There is one more, if I have them
9 right, and then there are the two new Jersey cases
10 of Carl and Balderrama.  Do you see that?
11      A    I do.
12      Q    Okay.  So, from your report, it states
13 that you've reviewed the available radiology films
14 and related records outlined in Appendix B.
15        What opinion do you intend to give
16 with regard to your review of the radiology films,
17 case specific?
18      A    I think it's the same for all eight
19 plaintiffs that we're discussing, which is that I
20 could not identify any objective markers of
21 asbestos exposure on chest imaging; including, you
22 know, pleural plaques, calcified pleural plaques,
23 diffuse pleural thickening or asbestosis.
24      Q    Okay.  Have you looked at the actual

67 (Pages 262 - 265)

Page 266

1  pathology of the ovarian tissue for each one of
2  those individuals?
3      A    Not for anyone.
4      Q    All right.  Not for any of them?
5      A    Not for any.
6      Q    Okay.  So, and you're not a
7  pathologist?
8      A    Correct.
9      Q    And so, as I understand your
10 testimony, you don't have any plans of coming into
11 a court of law and testifying with regard to the
12 pathology results of the ovarian cancer specimens
13 for any of the Bellwether cases, State or Federal?
14     A    Correct.  I have nothing to say about
15 that.
16     Q    Do you know of any study which uses
17 lung radiology as a surrogate for exposure to
18 asbestos in the ovaries?
19     A    No.
20     Q    So, what you looked at were lung
21 radiology, for the purposes of simply determining
22 whether or not there was evidence of asbestos
23 exposure, such as pleural plaques, pleural
24 thickening and asbestosis, correct?

Page 267

1      A    Yeah.  I was trying to corroborate
2  with what I saw in the literature about women and
3  asbestos and ovarian cancer.
4      Q    What about the status or what about
5  the results of any ovarian pathology?  Strike
6  that.
7          From your review of lung pathology,
8  what did you expect to find about ovarian
9  pathology?
10     A    So I didn't -- I didn't see any lung
11 pathology.  Is that what you mean?  I didn't see
12 any like specimens, right, like biopsy specimens.
13     Q    Right.  But you did review films.
14         So, I guess the question is, in
15 reviewing the radiology films, what evidence did
16 you expect to find, from a review of radiology
17 films of the chest, that would -- that would
18 inform you about Talcum Powder or asbestos in the
19 tissue of the ovaries of a woman?
20     A    So, I could answer that until you
21 said, "in the tissue of," because I don't have any
22 idea whether one should expect to find asbestos in
23 the tissue in ovaries.  So that wasn't my point.
24         Do you want me to just say why I

Page 268

1  did --
2      Q    I would love to know why you looked at
3  lung films for a case that involves Talcum Powder
4  exposure --
5      A    Yeah.
6      Q    -- and ovarian cancer?
7      A    I'll explain it.
8      Q    I appreciate that.
9      A    I've gone back and looked at, for
10 example, the IARC monograph on asbestos and
11 ovarian cancer.
12         And then I've looked at the papers
13 that are the underpinnings for that particular
14 effort, and then I've also looked at some papers
15 since then.
16         And some, but not most or all, have
17 included causes of death of women in those studies
18 that not only included ovarian cancer but also
19 included asbestosis.
20         So, to me, at least in the studies
21 that have shown a potential risk of asbestos
22 exposure in ovarian cancer, it suggested to me
23 that it would be a dose that was compatible with
24 what causes asbestosis.

Page 269

1          So, I was looking primarily for
2  asbestosis.  But, since I was looking, I would
3  look for any other indicators of asbestos
4  exposure.
5      Q    All right.  So you're not offering
6  opinions here today related to whether or not any
7  changes in ovarian tissue, are as a result of
8  their exposure to asbestos and fibrous talc?
9      A    No.  It would only pertain to a
10 potential dose that one could have encountered
11 that could produce asbestosis, for example, that
12 might be indicative of a dose that is sufficient
13 to cause ovarian cancer, if it does.
14     Q    Okay.  And is it fair to say that
15 whatever you have listed in your appendices with
16 regard to your examination of studies, is the
17 entirety of what you had available to perform that
18 examination?
19     A    It's the entirety of what I've
20 received.  We're talking about like the radiology
21 disks?
22     Q    Correct.
23     A    Yes.  That is the entirety.
24     Q    And is it fair to say that you don't

68 (Pages 266 - 269)

Page 270

1 have any information concerning the exposure of
2 any of these women to asbestos in Talcum Powder;
3 is that correct?
4    A   Correct.
5    Q   So, no one provided you with that
6 information?
7    A   No.
8    Q   So, you have no information with
9 regard to the frequency or duration of Talcum
10 Powder use by any of the Bellwether women?
11   A   I don't.  But let me just clarify
12 by -- do I have information?
13       I think I saw some deposition
14 transcripts that were provided to me, but I didn't
15 read any of them.  So there may be -- I may
16 possess information, but I've chosen not to look
17 at it.
18   Q   Okay.  And so, for purposes of
19 today -- which is my opportunity to examine you
20 with regard to opinions -- it's fair to say that
21 you have not and will not be considering any
22 evidence with regard to the exposure of the
23 Bellwether women to either Talcum Powder and/or
24 asbestos, correct?

Page 271

1    A   Correct.
2    Q   And you would agree with me that
3 researchers do not look at radiology studies of
4 the lung, in order to ascertain whether or not
5 there is -- there could be the presence of talc,
6 talc fibers, asbestos, in the ovaries?
7    A   I've not seen anything at all like
8 that.
9    Q   And there is nothing in the literature
10 about that; is that right?
11   A   I would be shocked if there were.
12   Q   And, when you looked at the lung
13 pathology for these women to discern whether there
14 was evidence of pleural plaques, diffuse pleural
15 thickening, were there any other markers that you
16 were relying upon to educate you?
17       MS. LEHMAN:  Object to the form.
18   A   Well, I also meant asbestosis, so I
19 would have been looking for, you know, pulmonary
20 fibrosis, particularly in a UIP or usual
21 interstitial pneumonitis pattern.
22       MS. PARFITT:  Okay.  Let's take a
23 moment.  Let me consult with my New Jersey
24 attorney.

Page 272

1       EXAMINATION BY MR. TISI
2    Q   Let me ask you a hypothetical, kind of
3 the flip side of that.
4       Let's say that you had looked at the
5 radiology or perhaps even seen pathology of the
6 lung, and seen evidence of asbestos exposure in a
7 patient with ovarian cancer.
8       Hypothetically, if that were the case,
9 would that convince you that -- in the absence of
10 any documented exposure from any other source of
11 asbestos -- that it would be, more likely than
12 not, the talc would be the cause of the ovarian
13 cancer?
14       MS. LEHMAN:  Object to the form.
15   A   Not all by itself.
16   Q   So, if the woman -- again,
17 hypothetically, if a woman had no evidence of any
18 other exposure, other than using talc for
19 30 years, and there was evidence of pleural
20 plaques or thickening -- or even if you had biopsy
21 results of the lung that showed evidence of
22 asbestosis or mesothelioma -- but they also had
23 ovarian cancer of the type that, epithelial
24 ovarian cancer, would you put talc exposure, as a

Page 273

1 physician, in the differential as to the potential
2 cause of that woman's cancer?
3       MS. LEHMAN:  Objection to form.
4       THE REPORTER:  As to what cause?
5    Q   The potential cause as to the woman's
6 cancer, ovarian cancer?
7    A   Not based on any of the talcum-based
8 products that I'm aware of.
9    Q   So, either way, if there is no
10 evidence of any findings in the lungs, you would
11 say that there is no evidence of -- that the woman
12 would not have a contingent for ovarian cancer?
13       And, if there was evidence of problems
14 in the lungs, even by radiology, you would say the
15 woman has no -- no ovarian cancer that would be
16 related to talc?
17       So, either way, no matter what you
18 look at, it wouldn't make any difference --
19       MS. LEHMAN:  Object to the form.
20   Q   -- because you don't think that talc
21 causes ovarian cancer?
22       MS. LEHMAN:  Object to the form.
23   A   Well, there was a lot in your
24 question.  I'll try to paraphrase it and try to

69 (Pages 270 - 273)

Page 274

1  answer you.
2      Q   Yeah.
3      A   So, it wouldn't help you, right, no
4  matter what I saw.  But it could help me to
5  articulate something.
6          As an example, let's say that somebody
7  had a high amount of asbestos bodies, with long
8  fibers; there was a crocidolite finding that was
9  well above background or whatever is expected, and
10 it was clear to say, a pathologist, that this was
11 a significant, substantial, crocidolite exposure;
12 and then, especially if you had markers.
13         If you had asbestosis, it would be
14 hard to not put together the heavy crocidolite
15 findings, along with asbestosis, to say they have
16 something to do with each other.
17         I would not have the opinion that it
18 comes from talc-based products, because I haven't
19 seen any evidence that crocidolite is even one of
20 the fiber types.
21     Q   So, let's take it one step further.
22     A   Yes.
23     Q   Let's say that you had, again
24 hypothetically, that you had evidence of pleural

Page 275

1  thickening or plaques in the lungs; and then you
2  also looked at the ovaries and there was, there
3  were asbestos fibers in the ovaries, and you had
4  that as well?
5          If you added that to the hypothetical,
6  would that in any way change your view, not as to
7  cause but whether, at least, it would be
8  reasonable to include exposure to peroneal talc as
9  a -- as part of the differential for that woman's
10 ovarian cancer?
11     A   It wouldn't -- it wouldn't inform me,
12 in part because I don't know what to expect in
13 ovarian pathology, period, right?  So I don't know
14 what the expectations are.
15         I've not seen a paper or any sort of
16 scientific statement that says that, there's a
17 dose of asbestos -- if it's found in ovaries -- is
18 an indicator that that's a potential cause, in the
19 way that I've seen it, for example, for lung
20 cancer attribution, you know, and asbestos.
21     Q   Well, you do know that a single fiber
22 of asbestos can cause changes, cellular changes
23 that start the process of carcinogenesis, right?
24         MS. LEHMAN:  Object to the form.

Page 276

1          (Overlapping speakers.)
2      A   I'm aware of that.
3      Q   Right.
4      A   I just don't know if that's a dose
5  that's sufficient --
6      Q   A single --
7      A   -- to induce a tumor.
8          THE REPORTER:  Hold on.  If that's a
9  dose what?
10     A   To induce a tumor.
11     Q   A single fiber is about the lowest
12 dose you can get, right?  I mean, how much, how
13 much less asbestos could you have than a single
14 fiber?
15         MS. LEHMAN:  Object to the form.
16     A   Well, than one -- one absorbed fiber.
17 We are talking about absorbed dose, right, because
18 it's tissue -- it's in tissue.
19     Q   Right.  So, really, I mean there is no
20 amount of asbestos you could find in a woman's
21 ovary that would convince you in any way -- under
22 any circumstances that -- that exposure to talc
23 containing asbestos might be, might be in the
24 differential for that patient?

Page 277

1          MS. LEHMAN:  Object to the form.
2  Misstates testimony.
3      A   I don't have the expertise to comment
4  on ovarian pathology.
5      Q   Okay.  Or even lung pathology?  If
6  they had no --
7          If, hypothetically, they had no
8  exposure to anything else, they've lived in a
9  bubble their whole life, except that they used
10 Talcum Powder -- and you saw evidence of plaquing,
11 plaquing in the lungs, and their only exposure was
12 daily use of Talcum Powder for 30 years -- and
13 they had epithelial ovarian cancer, and they had
14 it -- you would still say, there is absolutely, no
15 way, that that case would have caused -- not even
16 "caused," but that it would be on the
17 differential?
18         MS. LEHMAN:  Object to the form.
19     A   I don't see how you get there.  There
20 is so much missing from that, to be honest, like
21 there is just a lot of factors that are missing.
22     Q   I'm totally okay with that answer.
23 Thank you very much.
24     A   Of course.

70 (Pages 274 - 277)

Page 278

1        MR. TISI:  That's it.
2        MS. PARFITT:  Well, let me check with
3 my counsel real quick.
4        (A discussion was held off the
5 record.)
6        MS. LEHMAN:  Are you done?
7        MS. PARFITT:  I'm done.  Dr. Diette,
8 let me take the opportunity.  I thank you for your
9 patience today.
10        Despite all of our other technological
11 issues, I thank you, and that completes our
12 portion of the deposition.
13    A    Thank you very much.
14        EXAMINATION BY MS. LEHMAN
15    Q    I have just few follow-up.
16        Dr. Diette, does your MDL Report set
17 out the opinions that you hold with respect to
18 uterine, cervical and other gynecologic cancers?
19    A    It includes uterine.  I don't think
20 that I created a section on cervical.
21    Q    But the opinions that you hold are
22 outlined in your report, correct?
23        MS. PARFITT:  Objection.
24    A    Regarding uterine, yes.

Page 279

1        THE REPORTER:  I'm sorry, regarding
2 what?
3    A    Uterine.
4    Q    Okay.  Exhibit Number 27 was a paper
5 on asthma that you wrote back in 2002?
6    A    Right.
7    Q    Did you use the same imputation
8 methodologies that were used in O'Brien 2024?
9    A    Not identical.  There was a very, very
10 important difference.
11        And, if you read down into it, what
12 you'll see is that we did some sensitivity
13 analyses to see what the effects were on the odds
14 ratios.  I think it was, odds ratios was our
15 measure of risk.
16        THE REPORTER:  It was what?
17    A    Our measure of risk.  I'm sorry.
18        And so, what's really important about
19 how we did it -- compared with how O'Brien and
20 company did it -- is we knew we didn't want to
21 distort the risk finding based on our imputation
22 method.
23        So, we wanted to assure that we had
24 approximately the same risk measure and that our

Page 280

1 imputation didn't create a substantial increase or
2 decrease in the risk, which is completely the
3 opposite, because O'Brien and company were
4 perfectly happy to have the risk go well in the
5 opposite direction.
6        So, it was a different approach in
7 that way.
8    Q    Okay.  And so, when you say that
9 O'Brien and company were happy to have the risk go
10 in the opposite direction, can you explain what
11 you mean by that?
12    A    Yeah.  So, when -- in their --
13        In their analysis that only looked at
14 prospective data, the hazard ratio was, I think,
15 1.02 in one of the analyses, which is basically
16 null.
17        And then, in scenario 4 that we talked
18 about here today -- as just an example -- it was
19 1.82.  So it was skewed well away from the 1.02,
20 compared with what it had.
21        And, in our work, we've tried very
22 hard not to have the imputation, all by itself, be
23 the reason for a positive finding or a negative
24 finding; that we believe that the data that we've

Page 281

1 collected are the truth of it.
2        And we're trying to actually just be
3 able to use more of it and get better precision of
4 our estimates.  We're trying to get the confidence
5 intervals in tighter.
6    Q    And is there a difference between
7 imputing data on one of many variables collected
8 for an individual case, as compared to imputing
9 the very key variable that you're trying to study?
10    A    It's a massive difference.  I mean
11 it's such a big deal.
12        And so, you know, one of the
13 discussions that we will have routinely is, how
14 important is this variable, right?
15        So, you know, if it's like, how much
16 was somebody's income?  A lot of people don't
17 answer income.
18        Well, maybe it doesn't have a big
19 influence, and so you're not going to care that
20 much.
21        You know, and if somebody ends up like
22 the median value for the income for the study, you
23 won't skew things in either direction.
24        But, you know, if in my study, for

71 (Pages 278 - 281)

Page 282

1  example, we're looking at like air pollution and
2  we're trying to figure out if air pollution is a
3  cause of like asthma exacerbations -- if we're
4  missing most of the air pollution data, and then
5  we try to make a statement about it -- it's a
6  really, really risky undertaking to try to impute
7  or correct or whatever you want to call it, the
8  air pollution data because we missed it because
9  our methods didn't allow us to have it.
10     Q     You were asked a question about talc
11  not being on the market in the United States at
12  all. I just want to be clear.
13         Dr. Diette, are you offering any
14  opinions about whether makeup, lotions, other
15  personal care products -- aside from Johnson Baby
16  Powder -- on the market in the United States,
17  whether or not they contain talc?
18     A     I'm not.
19     Q     You mentioned in your report
20  pleurodesis. Is pleurodesis a necessary medical
21  procedure that uses talc?
22         MS. PARFITT: Objection. Pleurodesis
23  was exhaustively examined in 2019 and forward, and
24  I will follow the rules counsel had set forth.

Page 283

1         We haven't talked about pleurodesis.
2  I didn't inquire about pleurodesis today. We're
3  not going to talk about pleurodesis.
4         What's good for you is good for me.
5         MS. LEHMAN: I'm happy to rephrase.
6  You were asked a question about whether there are
7  any necessary medical procedures that use talc.
8         Would pleurodesis be an example of --
9         MS. PARFITT: Objection, counsel. I
10  did not ask that question.
11         MS. LEHMAN: The record will
12  reflect --
13         MS. PARFITT: The record will reflect,
14  but we're not going to talk about pleurodesis.
15         I wasn't allowed to talk about risk
16  factors in studies done by folks that he's worked
17  with at Johns Hopkins University, where they
18  listed the fact that talc was a factor to be
19  considered.
20         (Overlapping speakers.)
21         MS. PARFITT: We're not going to talk
22  about pleurodesis. We have examined
23  pleurodesis --
24         MR. TISI: And I think the question

Page 284

1  was --
2         MS. PARFITT: -- from --
3         MR. TISI: I think the --
4         MS. PARFITT: -- before.
5         MR. TISI: -- question was --
6         I think the question was, whether or
7  not Talcum Powder, cosmetic Talcum Powder had any
8  medical benefit?
9         MS. LEHMAN: No. I don't think --
10         MS. PARFITT: That wasn't the
11  question.
12         MR. TISI: That was --
13         MS. PARFITT: Any medicinal benefit?
14         MR. TISI: That was the question.
15         MS. PARFITT: I've got it written
16  down.
17         MS. LEHMAN: Well, do we agree,
18  Doctor, that there is a medicinal benefit to using
19  talc?
20         MS. PARFITT: The question was asked
21  and answered, and he said for chafing, and I
22  believe it was something else.
23         MS. LEHMAN: Okay.
24         MS. PARFITT: We're not going to do it

Page 285

1  again, counsel.
2         MS. LEHMAN: Guys, I'm going to ask my
3  question. If you want to object to it, that is
4  fine.
5         MS. PARFITT: Counsel, I objected, and
6  I was courteous to not then to go forward with my
7  question.
8         If you get this question, we're going
9  to go back -- we must go back then -- to the
10  earlier article by his colleague, and I'll finish
11  my question on that as well.
12  BY MS. LEHMAN:
13     Q     All right. You know what, Doctor,
14  your report talks about the medical uses of talc,
15  correct?
16     A     It does.
17     Q     Now, you were not asked many questions
18  about your criticisms about O'Brien, but they're
19  set out in your report, correct?
20     A     They are.
21     Q     Okay. Now, when you were asked
22  questions about O'Brien 2020 -- I want to go back
23  to that -- what is the primary conclusion of
24  O'Brien 2020?

72 (Pages 282 - 285)

Page 286

1    A    That there is not a significantly
2 elevated risk of ovarian cancer with use of
3 peroneal talc.
4        THE REPORTER:  For what?  I'm sorry.
5    A    I'm sorry.  With use of peroneal talc.
6    Q    And what was the conclusion of O'Brien
7 2020, when they looked at the subgroup of the
8 women who had patent tube systems?
9        MS. PARFITT:  Objection.
10    A    Well, in the paper, they said that
11 there was no significant difference between women
12 with, versus without, patent tubes, so that there
13 was --
14        That was their conclusion.  There was
15 no significant difference between the two groups.
16    Q    What is your opinion -- to a
17 reasonable degree of medical certainty -- about
18 whether Talcum Powder causes ovarian cancer?
19    A    I don't think there is sufficient
20 evidence to show that it does.
21    Q    And what is your opinion -- to a
22 reasonable degree of medical certainty -- about
23 whether epidemiology has shown or not shown about
24 whether there is an association between Talcum

Page 287

1 Powder and ovarian cancer?
2        MS. PARFITT:  Objection to the form.
3    A    Well, generally speaking, there has
4 been a mixture of findings, right, with the case
5 control studies, you know, some of them showing a
6 positive association.
7        The prospective versions of the cohort
8 studies have not.  And, you know, we're debating
9 the newest study -- which has added one of the
10 weaknesses of case control studies to a cohort
11 study -- which purports to find an association.
12        But I think even that one -- if you
13 look at just the prospective data -- fails to show
14 a significant association.
15    Q    You were asked some questions about
16 your current practice.  I want to follow up on
17 that.
18        Do you currently have an appointment
19 in the department of epidemiology?
20    A    I do.
21    Q    Okay.  So, does your work in the
22 department of epidemiology include epidemiology
23 associated with cancer?
24    A    At times it has.  I mean like, so the

Page 288

1 courses that I've taught are to physicians and it
2 includes, you know, GYN, ONC and oncologists
3 and -- sorry?
4        THE REPORTER:  GYN, ONC?
5    A    Yes.  Sorry.  That's right, GYN, ONC
6 and oncologists and other kinds of physicians.
7    Q    Okay.  Just for the court reporter's
8 clarification, when you say GYN, ONC, what do you
9 mean?
10    A    Gynecologic.
11        MS. LEHMAN:  All right.  Those are my
12 questions.  Thank you, Dr. Diette.
13    A    Thank you.
14        EXAMINATION BY MS. PARFITT
15    Q    Dr. Diette, just couple of questions.
16 Dr. Diette, you just testified that there really
17 was no difference between the hazard ratios for
18 women who had patent tubes versus those who did
19 not have patent tubes, as presented by O'Brien
20 2020?
21    A    There was no statistically significant
22 difference between those two.  I forget whether
23 they were relative risks or hazard ratios,
24 whatever the risk measures were.

Page 289

1    Q    Okay.  So, help me out here a little
2 bit.  For women who did not have patent tubes, the
3 odds ratio was 1.7 with a point eight six to 3.37.
4        Now, under your theory of what is a
5 positive association and what is not, an
6 association that had a confidence interval of
7 one -- or rather .86, that crosses one, under
8 your -- under your definition of statistical
9 significance, that would not be statistically
10 significant, correct?
11        MS. LEHMAN:  Object to the form.
12    A    I don't think you're asking me about
13 the right study.
14    Q    No, no.  I'm just asking you that.
15    A    No, no.  But you're giving a specific
16 number.  And I was --
17        When I was answering the other
18 attorney's question, I thought we were talking
19 about O'Brien 2020, and I think you're asking
20 about O'Brien 2024?
21    Q    No, O'Brien 2020.  I'm looking at your
22 report.
23    A    Okay.  So, in other words, clarify.
24 So, for O'Brien 2020, and your question is, that

73 (Pages 286 - 289)

Page 290

1 it's not a statistically significant finding for
2 the non --
3    Q    Patent.
4    A    -- non-patent group, and I agree with
5 that.
6        MS. PARFITT:  What now?
7        MR. TISI:  I have to jump out.  Call
8 me when you're done.  It was nice to meet you.
9    A    Take care.
10    Q    So, if, hypothetically, a woman who
11 has studied -- whose study findings reveal that,
12 for a woman with patent tubes, the HR is 1.83 with
13 a confidence interval of 1.36 to 2.46, and you
14 compare a woman with not patent tubes, and the
15 confidence interval is 1.70, or, excuse me --
16 hazard ratio is 1.70, with a confidence interval
17 of point eight six to 3.37, that is not
18 statistically significant?
19    A    Excuse me, you're --
20    Q    Those are --
21    A    Those are numbers from O'Brien 2024?
22        MS. LEHMAN:  Yes.
23    Q    Okay.  You have them in 2020.
24        THE REPORTER:  You said they have them

Page 291

1 in 2020?
2    A    Those aren't the right numbers for
3 2020.
4    Q    Okay.  Well, I'm asking.  I said
5 "hypothetically."
6    A    Oh.  Well, I don't think it's
7 hypothetical.  I mean, I think, it's a fact,
8 right.
9        So, I'll try to, without -- I can look
10 at the exact numbers, but I'm going to say, in
11 O'Brien 2024 -- after all the different
12 manipulations of the data, including, you know,
13 adjustment, replacement, correction and all of
14 those factors -- when they then looked at the two
15 groups of women, who were identified as patent
16 versus non-patent --
17    Q    Right.
18    A    -- they found about a 1.8 hazard ratio
19 in those who were patent, that was statistically
20 significant, and a 1.7 that was not statistically
21 significant in the opposite group.
22        And so -- I lost a little of the
23 thread of your question.
24        My point in bringing that up in my

Page 292

1 report was, those are very, very similar.  Those
2 are almost the same risk, 1.7 and 1.8 are very,
3 very similar to each other.
4        The one that is 1.7 has very few
5 women, like there is hardly any.  There is like a
6 handful of women in that.
7        So, it would be hard to expect there
8 to be very tight confidence intervals.  But the
9 point I made in the report is -- because I've
10 heard from some plaintiffs' reports, some
11 plaintiffs' experts -- and we had a little bit of
12 a debate here, too, about whether statistical
13 significance is worth anything.
14        But, for the folks who only look at
15 the number, right, and don't care about
16 statistical significance, I'm just saying, there
17 is a problem with that because now suddenly,
18 unlike O'Brien 2020 and 2024, now we have it in a
19 positive direction, l.7 and 1.8, for either group.
20        So, if you are a believer in who cares
21 about statistical significance, all I care about
22 is how far away it is from zero.  You've got two
23 nearly identical numbers, which are not compatible
24 with the patent tract hypothesis.

Page 293

1    Q    Okay.  And I did understand that.  But
2 what I want to make crystal clear, when I leave
3 today --
4    A    Yes.
5    Q    -- is that your opinion today still
6 remains, that if it is not, a finding, study
7 finding is not statistically significant, it is
8 not evidence of an association?
9    A    No, no.  An association is an
10 association, but it's --
11    Q    Okay.
12    A    An association can either be
13 statistically significant or not, and taking
14 into -- I'll wait for the question.
15    Q    Go ahead.
16    A    Okay.  So, taking into account whether
17 it is or isn't statistically significant gives you
18 additional information about whether you're going
19 to believe that's like compatible with a causal,
20 you know, exposure or not.
21    Q    Okay.  That helps me.  But you will
22 testify, in a court of law, that, if a study
23 finding has a confidence interval below one, that
24 is not technically statistically significant; that

74 (Pages 290 - 293)

Page 294

1 those study findings are at least evidence of an
2 association?
3     A    They can be.
4     Q    They can be?
5     A    Yes.
6     Q    Okay.  That's fair.  I just want to
7 get that clear.  I just want to get that clear.
8 Okay.  All right.
9         We talked about -- you just talked
10 about the scenarios, being scenario 1, where they
11 did no correction in the O'Brien 2024 on Table 2.
12     Table, scenario number 2 corrected for
13 contradictory data and assumed unexposed, if
14 unexposed, and they had a 1.17.92 to 1.49.
15         Scenario 3 corrected for contradictory
16 data and assumed exposed, if unexposed, at a
17 moment, and they had a hazard ratio of 3.34 with a
18 confidence interval of 2.51 to 4.44.
19         What is the midway between those two
20 numbers, a 1.17 and a 3.34?
21     A    I don't know, a --
22         MS. LEHMAN:  Object to the form.
23     A    -- two or so.
24         THE REPORTER:  Say it again?

Page 295

1     A    Two or so.
2     Q    Okay.  The multiple imputations that
3 you performed in your Asthma in Older Patient
4 Study, what do you call it?
5         It is not multiple imputation.  What's
6 it called?
7     A    Some of it was.  I mean, you pointed
8 out correctly that we used a mixture.
9     Q    Of single, variable and multiple?
10     A    As well as multiple.  What I was
11 referring to was not something with a name.
12         It's a way to be cautious because what
13 we don't want to do -- and, by "we," I mean my
14 research group and others that I know -- we don't
15 want to suddenly come up and say, "okay, we
16 collected these data and we have one finding,
17 which is, by the way, this thing seems harmless,
18 and only because we corrected it using our
19 procedure, now we are saying it's really harmful"
20 or vice versa.
21         Because I think that lacks
22 credibility.  And it really makes one have to
23 scrutinize very, very carefully why you're
24 comfortable, that only when you add in these other

Page 296

1 imputed data to come up with this finding.
2         It's exaggerated, by the way, in
3 O'Brien 2024, because, not only is there
4 imputation but there is also then replacement for
5 data that were incorrectly -- that were incorrect.
6         And, by the way, we are only saying
7 that the women are incorrect if they were
8 inconsistent on two different time points.
9         We don't even know if the women who
10 said the same thing twice were correct, right?
11         But the ones who were incorrect, they
12 get changed.  Their value gets assigned sometimes.
13         Assuming that, for example, that a
14 woman who didn't report talc at baseline -- who
15 didn't even answer the question in follow-up --
16 some of those women are assigned to be talc users.
17         And that, to me -- it's like, how do
18 you think of that?  Like how do you think that the
19 woman is so wrong that she said, no, to begin
20 with, and now you don't even know what she says on
21 follow-up, and suddenly she's a talc user?
22         And so, it's a way to sort of like
23 exaggerate things tremendously without knowing
24 whether you are telling the truth.

Page 297

1     Q    Okay.  And so that I understand your
2 opinions that you'll share before the jury, the
3 authors of the O'Brien 2024, and the peer
4 reviewers of the study methods and analysis that
5 were performed by the O'Brien, et al. authors for
6 the 2024, were wrong, were in error when they
7 selected scenario number 4?  Is that your
8 response?
9     A    So, if -- to be very specific, I think
10 if they selected it as their favorite one, I think
11 that -- I can't --
12         THE REPORTER:  I'm sorry, their what?
13 Favorite?
14     A    As their favorite, right.  I mean I
15 can't quibble with what they think is the best one
16 because I'm not them.
17         I think it was wrong to select it as
18 the best one because it's -- it's an unbelievably
19 exquisite example of what happens when you take a
20 study that has a design that cannot be distorted
21 by recall bias, could not have, no matter what you
22 did with the original data and the prospective
23 data.
24         You introduced data after the fact

75 (Pages 294 - 297)

Page 298

1  that absolutely have the potential to introduce
2  recall bias.
3      Q    Dr. Diette, I appreciate that, but
4  that's gone well beyond what my question was. I
5  do have a question.
6          MS. LEHMAN:  Dr. Diette, please go
7  ahead and finish your answer.
8          MS. PARFITT:  I think he answered my
9  question.  I think he went on to answer other
10 questions, but I think you answered my question.
11     Q    And my question, the one question I'm
12 asking you is, the authors of O'Brien 2024 did
13 adjust for recall bias.  That was a part of their
14 study, correct?
15         (Overlapping speakers.)
16     A    They said so, but you can't --
17     Q    Wait.
18     A    No. No.
19     Q    Wait, just --
20         MS. LEHMAN:  Please let him --
21     A    No.
22         MS. LEHMAN:  -- finish.
23     A    No, no, no.  No, no, no, no, no.
24     Q    I'll let him finish.  They said so, or

Page 299

1  did they write it into the article or into the
2  publication?
3      A    Well, by "saying," I'm not talking
4  about writing.  I meant -- we're talking about a
5  written document.
6      Q    Okay.
7      A    But you can't adjust for it because
8  they don't actually know how much recall bias
9  there was.  They said that.  They do not know.
10         They don't know the truth of how bad
11 the amount of recall bias was that was introduced
12 into an otherwise prospective cohort study.
13         All they know is that they did
14 something that was almost never done.  I've never
15 seen anybody go back to ask people later, for a
16 cohort study, and say, "hey, we kind of messed up.
17 We should have asked you this 20 years ago, but we
18 forgot and we didn't."
19         So, here are some questions that we're
20 going to try to fill in this gap.  All of a sudden
21 you introduce the potential for recall bias into a
22 study designed that otherwise has zero potential
23 for it.
24     Q    And you don't know either, do you?

Page 300

1          (Overlapping speakers.)
2      A    Nobody can know.
3      Q    Wait a minute.
4      A    Myself --
5      Q    Let me ask you --
6      A    -- included.
7      Q    -- you do not know, correct?
8          MS. LEHMAN:  Objection.  Asked and
9  answered.
10     A    I can estimate.
11     Q    I don't want you to estimate.  You,
12 who did not perform the study analysis do not
13 know, correct?
14     A    Wait a minute.  Every finding in
15 O'Brien that you're referring to is an estimate,
16 right, so we are only talking about estimates.
17         And what I'm saying, if you look at
18 Schildkraut, there was a 41 percent increase in
19 the women --
20     Q    Doctor, I'm going to stop you, I
21 really am.
22         MS. LEHMAN:  Please let him finish.
23         MS. PARFITT:  No, Kate --
24         MS. LEHMAN:  Please stop interrupting.

Page 301

1          MS. PARFITT:  -- actually I'm not,
2  because, Doctor, this is something that frankly we
3  went four hours without happening; that has
4  happened in the past.
5          I have a very specific question that
6  I've asked you to answer.  If counsel wants to
7  follow up, that's fine, and I'm not being
8  disrespectful.
9          I simply asked whether or not you know
10 how the recall bias was adjusted?
11     A    I can't know what nobody on earth
12 knows.
13     Q    I'm just going to check.  He seemed to
14 have had an emergency there.  I think we can
15 release you at that point in time.
16     A    That sounds good.
17         MS. PARFITT:  I appreciate it.  I
18 don't have any further questions, and, Dr. Diette,
19 I appreciate the time that you spent today.
20         EXAMINATION BY MS. LEHMAN
21     Q    Just one follow-up.
22         Dr. Diette, why don't you, please,
23 finish your answer in explaining the importance of
24 the recall bias, that you were talking about just

76 (Pages 298 - 301)

Page 302

1 moments ago?
2        We started talking about -- we were
3 talking about O'Brien 2024, and then I think you
4 were, you went to the -- what is it, 41 percent in
5 Schildkraut?
6    A    Yeah.  I'm just saying that I can
7 estimate --
8        MS. PARFITT:  Object to the form of
9 the question.
10    A    I can estimate what -- how much has
11 been seen in another study, which is Schildkraut
12 where they -- the cases only increased their
13 reporting of talc by 41 percent, with all of a
14 sudden, like, while in the midst of there being
15 litigation, you know, news.
16        And what I put in my report was that
17 there was as much as an 89 percent increase in
18 recall bias introduced by their methods in this
19 study.
20        It may even be higher.  It may be well
21 over a hundred percent additional people, but,
22 based on that one calculation, it was 89 percent.
23        And my point there is, is they've done
24 a figure where you literally can't adjust for what

Page 303

1 you don't know, but they've shown a figure that
2 shows, from very little to a lot of recall bias.
3        And they come up with something that's
4 completely unhelpful for somebody who is trying to
5 understand the result of the study, which is
6 depending upon how much recall bias is -- and none
7 of us can say we know the truth -- there is either
8 a positive association, no association, or even a
9 protective one, depending upon the degree of
10 recall bias, which is unknowable.
11        MS. LEHMAN:  Thank you, Doctor.
12        EXAMINATION BY MS. PARFITT
13    Q    Dr. Diette, is it true that, on page 4
14 of the O'Brien study, the authors have a whole
15 section discussing recall bias, and the fact that
16 they investigated the potential impact of recall
17 bias on the association between genital talc use
18 and ovarian cancer?
19        They also generated a single recall
20 bias-corrected estimate, which also simultaneously
21 corrected cases and non-cases; is that correct?
22        MS. LEHMAN:  Object to the form.
23    Q    Is that correct?
24    A    Yes, it is.

Page 304

1        MS. LEHMAN:  All right.  He will read
2 and sign.
3        (Deposition concluded at 3:30 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 305

1        CERTIFICATE OF DEPONENT
2        I hereby certify that I have read and
3 examined the foregoing transcript, and the same is
4 a true and accurate record of the testimony given
5 by me.
6        Any additions or corrections that I
7 feel are necessary will be made on the Errata
8 Sheet.
9        (If needed, make additional copies of
10 the Errata Sheet on the next page or use a blank
11 piece of paper.)
12        ERRATA SHEET
13 Case: Johnson & Johnson Talcum Powder Products
14 Witness: Gregory Diette, M.D.
15 Date:_____
16 PAGE/LINE      SHOULD READ    REASON FOR CHANGE
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

77 (Pages 302 - 305)

Page 306

```
1  _____
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9
10
11
12      _____
13         Gregory Diette, M.D.
14
15
16         _____
17         Date
18
19
20
21
22
23
24
```

Page 307

1  State of Maryland
2  County of Baltimore, to wit:
3        I, SUSAN M. WOOTTON, a Notary Public of the
4  State of Maryland, County of Baltimore, do hereby
5  certify that the within-named witness personally
6  appeared before me at the time and place herein set
7  out, and after having been duly sworn by me, according
8  to law, was examined by counsel.
9        I further certify that the examination was
10  recorded stenographically by me and this transcript is
11  a true record of the proceedings.
12        I further certify that I am not of counsel
13  to any of the parties, nor in any way interested in the
14  outcome of this action.
15        As witness my hand and notarial seal this
16  _____ d                    , 2024.
                 *Susan M. Wootton*
17         _____
18            Susan M. Wootton, RPR
19               Notary Public
20  My Commission Expires:
21  June 12, 2027
22
23
24

Golkow Technologies,
A Veritext Division
877-370-3377                                        www.veritext.com

**[& - 19103]**                                                               Page 1

| & | | | |
|---|---|---|---|

**&**   1:4 2:15 3:17
4:6 22:6 31:10
31:16,20 37:6
41:24 42:7
51:13 52:12,16
52:19 54:23
57:23 59:9
62:10 63:9,17
64:7 68:16,17
68:20,23 70:19
72:12,20 75:22
76:16,19,24
77:3 78:24
79:14,17,22
80:4 132:7
211:23 262:24
305:13

**0**

**00:1**   261:9
**08002**   4:9
**0c3**   7:12 161:12

**1**

**1**   5:10,12 12:11
12:14 14:7,10
20:22 21:12
224:9,10 261:1
261:4 294:10
**1.01**   119:23
120:10 122:4
123:8 154:4
166:11
**1.02**   280:15,19

**1.08**   118:16,17
120:9 134:16
155:2 166:8
**1.08.**   118:24
**1.13**   122:3
123:7 154:3
166:10
**1.17**   119:18,23
119:23 120:10
134:17 294:20
**1.17.92**   294:14
**1.22**   85:7
**1.26**   123:8
154:4
**1.26.**   122:4
166:11
**1.3**   137:6 162:8
**1.31**   85:7
**1.35**   155:4
**1.36**   248:9
290:13
**1.41**   249:6
**1.41.**   249:10
**1.49.**   294:14
**1.7**   166:8 289:3
291:20 292:2,4
**1.70**   290:15,16
**1.8**   291:18
292:2,19
**1.82**   248:8
**1.82.**   280:19
**1.83**   290:12
**10**   6:7 48:24
49:3,9,10 50:13
54:5 56:13,15
178:3,11

180:18 213:24
239:8,15 240:3
241:9 250:7
251:11 259:7
260:17,18
**103**   6:16
**107**   6:19
**10:00**   29:7
**10:45**   70:9
**11**   6:8 49:14
50:18,23
213:24 260:2
**1125**   238:13
**113**   6:22
**117**   7:4
**1180**   3:18
**11:35**   112:13
**11:45**   112:13
**11th**   108:9
**12**   5:18 6:9 60:9
60:10,11,22
61:10 63:5
178:2 213:24
307:21
**128**   7:7
**12:47**   173:10
**13**   6:11 78:5,6
78:22,24 79:5,9
83:4 92:10
137:6 163:16
163:16 164:18
178:4,5,6,7,11
251:11
**130**   3:7
**136**   107:22

**14**   5:14 6:12
78:5,7,17,21,24
79:4,10 91:24
92:5,9
**15**   6:14 103:6,7
105:10 183:17
194:13 261:1,4
261:9
**156**   7:10
**15th**   31:4
188:14,24
195:19 250:16
**16**   5:16,17 6:17
105:8 107:13
107:16
**16-2738**   1:4
**1600**   3:9
**161**   7:12
**167**   7:16
**17**   6:20 112:15
113:2,3
**171**   5:10
**17840**   307:16
**17th**   57:22,23
58:4
**18**   7:3 53:14
107:4 117:14
117:15 176:11
**18th**   3:7 108:10
**19**   1:14 5:3 7:5
21:11 97:10
127:13 128:18
128:19,21
129:7
**19103**   3:10

**[195 - 2024]**                                                    Page 2

| | | | |
|---|---|---|---|
| **195** 7:19 | **2017** 50:22 51:7 | **2020** 5:23 36:13 | 16:17 17:24 |
| **1976** 162:12 | 51:9 56:9 | 37:15,20 38:2 | 18:24 19:7,18 |
| **19th** 10:7 61:10 | **2018** 34:8 51:11 | 38:10 52:24 | 19:24 20:3,21 |
| 62:5 | 106:17 167:24 | 61:11,16 62:5,9 | 21:22 22:17 |
| **1:10** 173:10 | 169:6,7,9,12 | 88:22 89:4,11 | 25:5 29:19,22 |
| **2** | 172:6 | 89:14 100:2,4 | 30:1,4,6 31:4,7 |
| **2** 5:15 12:14 | **2019** 10:8,16,24 | 100:10 113:9 | 32:5,6,20,24 |
| 16:2,4,8 17:11 | 14:9,20 15:3,5 | 114:13,16 | 34:16 43:6 |
| 18:23 19:22 | 15:7,11,14 | 115:19 116:22 | 53:14 56:22 |
| 20:3 21:3,9,11 | 17:19 21:4,22 | 118:5 119:18 | 57:22,23 58:4 |
| 56:10 158:7 | 29:13 32:15,19 | 120:20 121:2 | 58:18 82:2 89:7 |
| 224:9 247:20 | 33:3 34:18 35:9 | 122:1 125:2 | 104:19 108:10 |
| 249:8 294:11 | 35:11 36:12 | 126:11 129:12 | 108:10 111:19 |
| 294:12 | 44:5,9,13 46:7 | 138:12 140:10 | 114:1,13,16,24 |
| **2.43.** 248:9 | 47:3 48:4 50:22 | 140:18,19 | 119:3 124:22 |
| **2.46** 290:13 | 51:19 52:17,24 | 142:9 145:17 | 157:9 161:21 |
| **2.51** 294:18 | 61:16,19 62:2,4 | 145:24 146:5 | 173:15 174:6 |
| **2/25/19** 20:23 | 64:7 65:2,3,6 | 146:12 148:10 | 174:18 175:19 |
| **20** 7:8 59:17,20 | 65:17,21 66:1,5 | 149:1 150:2 | 176:23,24 |
| 77:13 88:24 | 66:11 68:22 | 156:19 157:12 | 177:7 179:2 |
| 156:1,2,3 161:5 | 74:8,10,17,24 | 160:13,18 | 183:5,17 185:1 |
| 180:18 188:24 | 75:20 76:1 | 166:13,18,23 | 186:10 187:7 |
| 194:13 299:17 | 77:12,24 88:9 | 167:9 173:23 | 187:15 188:14 |
| **2002** 258:1 | 89:6,9 91:9 | 191:12 246:18 | 188:19,21 |
| 279:5 | 96:20 101:9,22 | 285:22,24 | 189:6,20 |
| **2003** 177:13 | 102:4,6,9,17 | 286:7 288:20 | 190:17 192:6 |
| **2006** 106:4,24 | 103:2,13 104:1 | 289:19,21,24 | 193:21 195:19 |
| **2009** 177:13 | 112:19 117:10 | 290:23 291:1,3 | 196:9 197:3 |
| 230:6,10 | 118:2 119:12 | 292:18 | 200:18 202:2 |
| **2013** 223:5 | 135:24 136:21 | **2021** 77:21 | 204:2,4 213:19 |
| 224:5 | 145:24 170:9 | 155:18 191:12 | 213:23 214:12 |
| **2016** 117:6,18 | 212:3 222:8 | **2022** 161:13 | 214:21,23 |
| 174:9 176:15 | 262:17,22 | 162:2 169:5,14 | 215:1,10 216:9 |
| 177:2,7 | 282:23 | 170:14 | 216:13,16 |
| | **202-302-2138** | **2024** 1:14 5:3 | 218:7 219:7 |
| | 2:8 | 5:17 15:22 | 224:11 226:14 |

**[2024 - 45]**                                                                    Page 3

227:7 228:23
248:20 250:16
250:20 252:1,8
259:8,17
260:17,19
261:7 262:4
264:16 279:8
289:20 290:21
291:11 292:18
294:11 296:3
297:3,6 298:12
302:3 307:16
**2025**   254:21
**2027**   307:21
**204**   7:21
**2096**   138:8
141:22
**2097**   142:5
155:1
**20s**   199:3
224:17 226:8
226:20 228:18
229:4
**21**   7:11 160:24
161:7,8,16,16
**21204**   1:16
**215.985.9177**
3:11
**217**   8:5
**21st**   19:7,12
77:13 188:5,7
189:1
**22**   7:13 120:16
167:3,16,17
195:9,10
237:15

**22311**   2:17
**229**   8:8
**23**   7:17 195:11
195:12,14
**230**   8:10
**24**   7:20 16:20
17:18 21:3 23:5
203:23,24
204:7
**25**   8:3 15:22
217:21,22
218:1 239:5
249:10
**250**   116:22
**253**   8:11
**259**   5:7
**25th**   19:16,17
19:24 29:19
30:4,10 61:19
188:16,19
**26**   8:6 229:22
229:23,24
230:2
**260**   5:6
**263**   8:13
**27**   8:9 229:21
230:2,5,7 236:3
236:6 242:14
253:10 257:24
279:4
**272**   5:7
**278**   5:8
**27th**   5:22 37:15
37:20 38:2
**28**   8:11 236:1
253:10,11

258:2 259:4
**288**   5:6
**28th**   5:17 16:16
16:20 17:18
18:23 19:6,12
20:21 29:22
30:2 32:5 114:1
187:7 188:4
189:7 262:4
264:16
**29**   8:12 78:10
83:18 262:7
263:6,7
**2:25**   257:22
**2:28**   257:22

**3**

**3**   4:7 5:17 12:14
16:9,11,15 20:6
20:9,21 23:6
224:9 243:24
263:12 294:15
**3.34**   294:17,20
**3.37**   290:17
**3.37.**   289:3
**30**   5:21 58:5,13
89:1,2 272:19
277:12
**301**   5:8
**303**   5:6
**30309-3521**
3:19
**30s**   199:3
224:17 226:8
226:21 228:19
229:4

**31**   87:23
**310**   4:8
**316**   2:6
**321,000**   50:6
**321,147**   53:14
**32502**   2:7
**33**   89:17 90:2
90:14
**34**   91:6 160:9
**34,938,61**   58:19
**35**   91:8 160:9,9
177:12
**36**   75:2 78:11
**37**   5:23
**38**   260:21
**39**   6:4,5
**3:30**   304:3

**4**

**4**   5:18 12:14,15
12:18 14:14
16:21,23 17:13
17:14,15 197:6
245:20 247:15
247:23 248:13
249:13 253:9
258:17 280:17
297:7 303:13
**4.44.**   294:18
**404.572.2716**
3:20
**41**   300:18 302:4
302:13
**43**   92:21,21
**45**   92:22 93:2

**47,000** 54:6
**48** 6:6
**49** 6:7 78:12
**4900** 2:16
**4th** 224:9

**5**

**5** 5:19 30:12,13
   30:16 31:8 32:4
   110:6 173:18
   174:7
**50** 6:8
**50,000** 196:16
**50,884** 177:11
   177:16
**51** 123:16,23
**525** 221:24
**57** 125:2,3

**6**

**6** 5:22 37:21,22
   38:1
**60** 6:10
**650** 2:16
**699** 169:15

**7**

**7** 6:3 39:2,4
   204:14,17
**703-931-5500**
   2:18
**725** 51:2
**74** 177:12
**78** 6:11,13

**8**

**8** 6:5 39:15,16
   40:4,5,15
   118:20 180:20
   221:24
**8,525** 222:1
**856.317.7188**
   4:10
**86** 289:7
**89** 252:12 260:4
   260:9 302:17
   302:22

**9**

**9** 5:6 6:6 47:23
   48:16,18,19
   49:3,8,8,9,22
   53:13
**9,849** 222:1
**903** 1:15
**95** 142:18
**99** 119:18,23
   134:16 153:18
   166:8
**9:30** 9:18
**9:35** 9:18
**9:45** 20:18
**9:55** 29:7

**a**

**a.m.** 1:15 9:18
   9:18 70:9,9
   112:13,13
**a2** 260:6
**able** 24:13 56:6
   76:19 157:22

183:6 281:3
**above** 85:3
   164:19 165:13
   207:7 274:9
**abroad** 212:15
**abrupt** 91:18
**absence** 234:7
   249:15 272:9
**absolute** 229:14
**absolutely**
   43:22 60:2
   104:11 117:4
   164:12 183:8
   251:15 277:14
   298:1
**absorbed**
   276:16,17
**abstract** 223:12
   223:21,23
**academic**
   187:12 251:15
**accept** 91:14,17
   257:7,9
**acceptable**
   184:14
**accepted** 38:13
**access** 30:5
   77:24 89:4
   186:14
**accessibility**
   159:18
**accommodate**
   70:17
**account** 248:23
   293:16

**accounting**
   224:10
**accurate** 53:20
   126:6 177:19
   234:5 305:4
**accurately**
   143:15
**achieve** 70:20
**acknowledge**
   24:12 115:8,10
   154:17,23
**acknowledged**
   91:21 131:6
   141:14
**acrylonitrile**
   107:23 108:7
**act** 159:16
**action** 307:14
**active** 163:9
**activity** 200:9
**actual** 37:11
   49:14 92:2
   120:6 135:10
   135:11,13
   213:14 223:17
   228:20 234:7
   265:24
**actually** 21:6
   27:18 36:3,4
   37:14 71:2
   85:24 112:11
   117:12 130:6
   176:21,24
   181:24 186:1
   189:23 193:21
   194:21 196:7

[actually - agreement]                                                    Page 5

| | | | |
|---|---|---|---|
| 205:10 209:12 | **addressed** 33:7 | **advice** 72:14 | 148:14 149:8 |
| 211:13 223:22 | 61:8 88:18 | **advisory** 6:14 | 151:9 152:16 |
| 225:6 233:22 | 126:22 176:21 | 101:22 103:11 | 152:20,21 |
| 233:22 235:12 | 214:1 227:14 | 104:1 105:13 | 153:24 154:1,2 |
| 238:18 248:17 | **addressing** | 108:17 109:5 | 154:9,13,21,24 |
| 260:14,17 | 231:18 | 109:22 | 155:6 157:18 |
| 281:2 299:8 | **adds** 182:21,23 | **affect** 159:18 | 158:14 159:10 |
| 301:1 | 198:23 228:8 | **affiliates** 8:13 | 165:22 173:18 |
| **add** 54:17 | **adjacent** 81:18 | 54:16 77:1 | 174:6,14 177:6 |
| 58:23 295:24 | **adjust** 298:13 | 262:12,16 | 181:20 182:5,7 |
| **added** 175:6,10 | 299:7 302:24 | **afraid** 25:23 | 183:9 184:24 |
| 258:6 275:5 | **adjusted** | **african** 220:23 | 200:12 202:1 |
| 287:9 | 248:13 301:10 | **age** 178:4 | 202:24 203:13 |
| **adding** 22:16 | **adjusting** 200:4 | 224:16 226:7 | 205:9 206:19 |
| 227:16 228:1 | 248:17 | 226:20 246:5 | 207:24 208:4 |
| **addition** 17:8 | **adjustment** | **agencies** 111:10 | 208:16 209:4,6 |
| 18:1,3,6 33:18 | 291:13 | **agency** 108:12 | 209:23 210:14 |
| 95:20 120:14 | **adjuvant** 44:14 | 110:14 | 210:17,21,23 |
| 162:18 183:24 | 44:22 | **agent** 105:20 | 211:15 218:11 |
| 240:10 263:9 | **administer** | **agents** 104:13 | 224:20 225:5 |
| **additional** | 42:20 | 105:16 | 226:1,14 |
| 18:22 22:16 | **administrative** | **ages** 177:12 | 227:21 228:6 |
| 99:16 141:10 | 55:8 | **ago** 73:14,19 | 228:22 231:23 |
| 159:20 174:12 | **admit** 114:24 | 133:19 180:1 | 232:4,18 233:2 |
| 175:6,7,11 | 115:6 | 186:2 237:15 | 233:8 234:4,8 |
| 179:10 180:3 | **admitted** 95:23 | 299:17 302:1 | 243:9,11,11,12 |
| 181:6 183:6 | **adults** 238:3 | **agree** 43:4 67:8 | 245:6 271:2 |
| 261:18 263:15 | 258:1 | 67:22 68:7,10 | 284:17 290:4 |
| 293:18 302:21 | **advance** 8:4 | 68:10 100:8 | **agreed** 80:6 |
| 305:9 | 48:3 218:2 | 116:9 121:8 | 127:20 149:21 |
| **additions** 305:6 | **advanced** 186:9 | 126:4,7,24 | 149:24 207:18 |
| **address** 46:21 | **advantage** 55:8 | 137:4,18 | 207:20 |
| 47:4 157:8 | **adversarial** | 142:12 143:23 | **agreeing** 126:5 |
| 161:21 187:6 | 94:15 | 144:6,9,17 | **agreement** |
| 248:20 | **adverse** 94:7,15 | 146:7,11,18 | 143:20 144:3 |
| | 159:20 | 147:19 148:13 | |

[agrees - appendix]                                                          Page 6

**agrees**  150:4
**ahead**  39:1 49:3
  171:1 213:10
  259:2 293:15
  298:7
**ahold**  188:13
**air**  46:23 282:1
  282:2,4,8
**airways**  43:20
**al**  30:17 112:22
  154:13 160:17
  181:11,13
  198:19 218:12
  224:11 225:16
  227:22 258:1
  297:5
**alexandria**  2:17
**algorithm**
  240:4
**allege**  22:1
**alleged**  23:2
**allison**  230:17
  231:10
**allow**  282:9
**allowed**  145:7
  283:15
**alternative**
  211:17
**alternatives**
  209:19 211:7
  211:16
**ama**  237:7
**ambient**  46:23
**america**  212:9
  212:15

**american**  66:21
  66:22 169:7
  196:4 198:18
  222:2 236:15
**americans**
  220:23
**amount**  22:12
  24:9 53:9 54:7
  54:17,20 56:14
  274:7 276:20
  299:11
**amounts**  23:11
  23:13 24:9
  53:22 54:24
**analyses**  120:24
  173:24 175:2
  215:14 249:23
  279:13 280:15
**analysis**  30:21
  74:19 86:13
  120:20 121:2
  125:7 142:13
  146:23 147:5
  155:3 174:12
  177:1 186:22
  188:20 190:19
  191:4 206:17
  206:19 207:2
  213:15 217:9
  221:24 223:18
  225:6 232:7,8
  235:4 240:20
  241:19 243:7
  243:22,23
  244:4,19
  245:21 246:19

246:20,24
  247:6,7 249:22
  249:23 255:21
  280:13 297:4
  300:12
**analytical**
  191:16
**analyzing**
  193:21,22
  194:11
**ancestry**  170:2
**answer**  5:9
  25:24 27:19
  28:8 29:3 61:4
  65:24 67:19
  72:2,4 81:9
  86:17,20 95:8
  95:10,15 96:11
  97:17 122:8
  127:6,6,17
  134:5 136:1
  149:12 150:13
  150:15,16,21
  151:6 152:4
  171:7 172:2,5,6
  172:14,15
  223:1 224:3,5
  232:14 234:19
  246:13 255:1
  267:20 274:1
  277:22 281:17
  296:15 298:7,9
  301:6,23
**answered**  26:6
  67:16 71:12
  87:13 117:9

120:13 122:11
  123:13 144:11
  146:14 147:17
  148:16 153:11
  206:12 226:23
  284:21 298:8
  298:10 300:9
**answering**
  128:12 289:17
**anticipated**
  30:3
**anybody**
  140:24 187:11
  299:15
**anymore**  9:14
  197:18
**anyway**  151:20
  223:13
**apologies**  29:4
**apologize**  20:10
  92:4 150:9
  152:2 168:5
  169:2 191:12
  242:3
**appear**  21:3
  65:7
**appearances**
  2:1,24 3:1,24
  4:1
**appeared**  307:6
**appendices**
  13:8 261:17
  269:15
**appendix**  8:12
  258:10 262:2,3
  262:8 263:19

[appendix - asked]                                                                Page 7

265:14
**application**
18:17 34:22
35:4 65:8 124:1
**applied**  35:6
158:11 159:6
159:12 191:13
**applies**  240:22
**apply**  25:6
**appointment**
41:17 287:18
**appreciate**  48:2
49:24 95:16
96:16 97:18
114:15 119:2
129:6 138:1
172:22 229:17
233:21 237:9
242:4,9 253:3
260:10 268:8
298:3 301:17
301:19
**approach**  280:6
**approaches**
244:5
**appropriate**
14:21 15:15
17:4 173:2
211:20
**appropriately**
122:12 143:15
**approval**  184:7
**approximately**
20:1 57:9
153:13 238:18
238:24 279:24

**april**  5:22 10:7
10:7 15:22
19:16,17,24
29:19 30:4,10
37:15,20 38:2
61:18 77:13,20
102:6 103:2
188:16,19,24
**apriori**  124:2
**archives**  236:15
**area**  6:21 24:18
36:17,24 43:1
47:17 51:14
66:18 69:17
97:22 107:7
113:8 115:13
116:5 121:5,13
124:1,5 125:11
134:15 222:22
229:3
**arguments**
83:22 84:1,20
85:17
**arrived**  257:14
**article**  6:20 7:3
7:8,13 8:3,6,9
30:23 60:3
74:14 118:1
123:16 128:13
138:8 146:1
154:18 161:10
161:17 164:16
167:20 169:1
170:8 172:6
176:13,18
186:10 187:21

189:13,16
194:21 196:8
201:2,8 204:1,2
213:8 218:1
219:21 222:4,5
222:24 223:4
224:5 237:12
238:23 244:10
285:10 299:1
**articles**  11:14
45:15 73:23
74:1,4,12
162:20,22
214:1 216:15
240:18 258:5
**articulate**  24:7
25:19 68:13
274:5
**articulated**
86:1
**asbestos**  22:3,7
22:13 23:11,13
23:19 24:8,19
25:6,10,18 26:4
26:13,21 27:2
27:21,22 28:16
29:1 52:20
53:18 55:5 63:9
63:15 67:9,23
68:7 159:22
263:22 265:21
266:18,22
267:3,18,22
268:10,21
269:3,8 270:2
270:24 271:6

272:6,11 274:7
275:3,17,20,22
276:13,20,23
**asbestosis**
263:23 265:23
266:24 268:19
268:24 269:2
269:11 271:18
272:22 274:13
274:15
**ascertain**  271:4
**asco**  195:1,2,3
196:19 197:5
198:14,17
199:3
**asco's**  196:24
197:1 198:13
**ascribe**  136:6
**ashcraft**  2:15
**ashcraftlaw.c...**
2:19
**ashkenazi**
170:2
**aside**  32:9
155:16 213:11
282:15
**asked**  15:5 26:5
48:2 55:17
61:13 64:21
65:7,13 66:11
69:9 70:2 71:11
80:8,20 87:1,13
115:20,22
117:9 120:13
123:12 127:18
136:22 144:11

**[asked - attorney]**                                                                    Page 8

| | | | |
|---|---|---|---|
| 146:14 147:16 | 182:15 | 160:4,12,20 | **assumptions** |
| 148:15,18 | **assessments** | 166:4,24 169:8 | 234:12 249:1 |
| 149:18,19,23 | 177:3 | 174:18 195:15 | **assurance** |
| 150:8 153:10 | **assigned** 296:12 | 196:16 200:6 | 140:11 |
| 178:9 182:4 | 296:16 | 200:19 202:21 | **assure** 279:23 |
| 192:17 206:11 | **assist** 55:3 | 203:2,9,16 | **asthma** 8:9 |
| 207:17 216:21 | 66:12 | 207:15 208:2 | 42:3 236:8 |
| 216:22 255:2 | **assistant** 80:18 | 208:10,17 | 238:4 242:14 |
| 261:21 264:8 | **assisting** 71:15 | 220:21 221:11 | 245:10 257:24 |
| 282:10 283:6 | **associate** 80:19 | 221:13,21 | 279:5 282:3 |
| 284:20 285:17 | **associated** | 222:3,20 223:9 | 295:3 |
| 285:21 287:15 | 72:16 162:4 | 224:15 226:19 | **atlanta** 3:19 |
| 299:17 300:8 | 198:21 200:2 | 227:17 228:2,9 | **attach** 139:8 |
| 301:6,9 | 205:5,12 | 236:15 249:14 | **attached** 13:8 |
| **asking** 12:4 | 228:16 236:9 | 286:24 287:6 | 41:5 78:11 |
| 15:10 55:21,24 | 287:23 | 287:11,14 | 139:5 262:4 |
| 56:13 73:22 | **association** | 289:5,6 293:8,9 | 264:24 |
| 145:17 147:15 | 6:20 7:8,17 | 293:10,12 | **attachments** |
| 151:22 170:13 | 65:11 83:23 | 294:2 303:8,8 | 41:4 |
| 252:10 255:4 | 84:21 85:12,19 | 303:17 | **attempt** 65:20 |
| 289:12,14,19 | 86:8 87:4 102:2 | **associations** | 70:20 72:13 |
| 291:4 298:12 | 106:23 113:7 | 165:19 208:11 | 248:23 |
| **assess** 108:18 | 115:1,12 122:6 | 208:19 209:2 | **attempted** 71:8 |
| 190:19 191:5 | 123:9 125:10 | 234:6 | 175:1 180:24 |
| 191:17 207:2 | 134:13 135:18 | **assume** 13:10 | **attend** 108:17 |
| 238:4 | 142:21 143:2,8 | 37:16 57:6 | 112:3 |
| **assessed** 33:12 | 143:17,23 | 73:15 82:8 | **attendees** |
| **assessing** 32:19 | 144:8,19 | 119:3 126:2,9 | 111:22 |
| 32:23 202:18 | 146:10,21 | 163:17 | **attention** 14:14 |
| 207:13 | 147:10,14 | **assumed** | 91:24 92:21 |
| **assessment** | 148:12 149:7 | 294:13,16 | 123:15 125:1 |
| 6:13 77:9,13 | 152:19,23 | **assuming** 29:2 | 138:3 141:22 |
| 78:9 84:15 | 153:1,7,9,16 | 66:1 296:13 | 158:5,6 163:15 |
| 89:15 93:12,14 | 154:2,5 155:5 | **assumption** | 169:15 247:19 |
| 94:2 99:20 | 155:20 157:13 | 249:10 | **attorney** |
| 114:22 182:9 | 157:20 158:1 | | 189:13 271:24 |

**[attorney's - based]**                                                      Page 9

**attorney's**
289:18
**attorneys** 186:4
**attribution**
275:20
**augmentation**
240:4
**author** 99:10
117:12 142:1
148:24 160:10
170:14 191:9
201:14 202:23
222:17
**author's** 126:9
**authored** 45:12
45:16 46:18,20
47:3,3 74:14,15
74:18 142:8
146:4 218:6
236:10
**authoritative**
197:7 215:22
**authorities**
214:6 215:3,12
215:17
**authority**
215:20
**authors** 109:2
115:21 117:6
117:21 119:14
120:15,19
121:2,11 122:1
124:9 125:15
126:22 128:16
134:11,19
138:12 141:4

142:1,11
146:12 147:12
148:9 150:2
153:22 154:22
155:6,20
156:18 157:19
165:10 166:21
169:13 173:22
175:1,19
180:22 181:6
183:5 184:1,19
187:1,14 191:4
200:16 201:8
202:14 207:1
208:5 209:14
209:15 213:19
214:2 217:10
220:14,20
221:9,19,20
222:16,19
223:22 224:21
225:18 226:12
226:13,14
228:7 229:19
236:11 244:9
244:24 245:6,8
245:15 246:9
247:10,15
248:7,12,19
249:20 250:9
251:7,12,23
254:21 256:19
297:3,5 298:12
303:14
**automatically**
140:21 153:19

**available** 11:23
31:3 33:10 39:8
39:9 82:3 85:13
90:7 93:12
105:23 261:14
263:17,24
264:18 265:13
269:17
**aware** 26:21
37:3,9,10 70:18
71:7,13 73:12
77:13 79:12
100:3 101:2,21
104:20 130:5
133:4 135:15
135:17 183:24
228:19 253:20
261:17 263:1
273:8 276:2
**awareness**
130:19
**awesome**
168:22

**b**

**b** 6:10 263:19
265:14
**baby** 18:19
211:24 212:13
282:15
**back** 10:7,23
32:9,15 33:3
34:8,17 35:8,11
36:12 38:10,10
59:15 77:23
86:12 95:13

100:7 101:21
102:8,17
103:24 106:4
117:9 141:20
148:4 160:8
174:9 181:7
191:6 192:14
202:9,11
223:10 237:14
242:23 250:15
268:9 279:5
285:9,9,22
299:15
**background**
274:9
**backup** 75:24
**backwards**
179:13 247:1
**bad** 299:10
**baked** 86:6
**balance** 229:15
**balderrama**
15:24 16:9
264:19 265:10
**ballpark** 59:14
**baltimore** 1:15
307:2,4
**bank** 71:1
**bankruptcy**
70:21 71:4,6,9
71:10,18 72:13
72:20 73:8
**based** 22:23
34:5 68:21 87:5
87:7 89:21 90:6
93:23 98:9

105:21 128:2
134:13 165:16
185:5 228:22
240:5 252:13
260:3 263:20
273:7,7 274:18
279:21 302:22
**baseline** 296:14
**bases** 22:16
**basically** 37:1
280:15
**basics** 11:3
**basis** 191:16
**bayer** 141:16
141:19
**baylen** 2:6
**bear** 168:9
194:23
**becoming**
133:14
**beginning**
70:12
**behalf** 2:2,11
3:2,14 4:2 37:5
37:7 38:14
52:19 55:12
63:8 82:13
110:19 262:15
**belabor** 63:2
**believe** 14:8
16:2 31:3 38:2
39:2 41:6 47:22
112:6 113:10
114:14 115:24
127:12,21
139:10,18

140:7 141:19
155:24 161:23
162:11 169:22
176:8 219:22
236:2 237:23
243:21 247:6
254:22 255:20
256:4 262:7,23
280:24 284:22
293:19
**believer** 292:20
**believes** 201:14
**bellwether**
263:24 265:3
266:13 270:10
270:23
**benefit** 284:8
284:13,18
**benefiting**
110:8
**best** 151:7
249:14 297:15
297:18
**better** 22:24
26:8 65:19
126:12 233:14
237:24 281:3
**beyond** 86:9
107:9 145:11
298:4
**bharris** 4:11
**bias** 30:20
33:16 74:20
91:4,15 154:16
154:17 165:18
181:8,9,12

190:19 191:4,9
202:19 207:2
244:4 247:7
248:13,16,21
249:2,4,10
252:13 255:6,6
255:10 256:13
260:4 297:21
298:2,13 299:8
299:11,21
301:10,24
302:18 303:2,6
303:10,15,17
303:20
**biased** 155:2,4
254:23 256:6
**biases** 200:4
207:13 224:11
249:15
**big** 179:21
281:11,18
**bill** 55:9
**billed** 56:21
57:10,10,14,21
**billing** 54:16
**binder** 253:6
258:3 259:5
**bindman** 13:1
13:19
**biological** 84:2
84:2 90:13,17
90:23
**biologically**
90:23 124:10
**biopsy** 267:12
272:20

**biostatistic**
216:24
**biostatistical**
241:4
**biostatistician**
137:3 240:23
**biostatisticians**
136:18 194:15
**biostats** 137:2
231:8,9 232:12
235:14
**bit** 24:23 40:22
47:21 59:16
68:15 77:7,8
96:19,19
112:18 116:8
150:6 153:5
176:23 184:15
188:1 189:22
213:14 218:9
220:19 242:7
245:14 250:22
264:11 289:2
292:11
**blank** 305:10
**blue** 259:7
**board** 43:23
44:2 64:19
**bodies** 46:14,15
274:7
**body** 26:18
64:8 116:3
198:23 215:12
223:15,17
**bondurant**
265:7

[book - cancer]                                                          Page 11

| | | | |
|---|---|---|---|
| **book** 130:3,4 | 209:3,7 | **called** 9:3 | 55:4,5 56:2,24 |
| **books** 130:9 | **briefly** 101:17 | 192:22 216:3 | 58:3 59:10,23 |
| **borrowing** | 192:22 193:14 | 232:24 295:6 | 64:9,12,16,23 |
| 246:17 | **brilliant** 241:4 | **campus** 4:7 | 65:9,12,14 66:6 |
| **bottle** 18:19 | **bring** 39:10 | 81:17 | 66:14,19,21 |
| **bottom** 88:24 | 148:4 156:8 | **canada** 6:11,12 | 67:2,6 69:7,12 |
| 110:5 125:4 | 242:6 243:2 | 77:7,9,12 78:1 | 69:18 71:16 |
| 169:8 197:5 | 256:11 | 78:7,8,18 79:13 | 85:10 91:1 |
| 227:11 236:21 | **bringing** | 80:3 82:14,18 | 97:11,14,23 |
| 260:24 | 291:24 | 82:20 83:16,21 | 100:19 101:12 |
| **box** 39:13 63:20 | **broad** 115:17 | 84:19,20 85:6 | 101:20 102:2 |
| 104:12 | **broadening** | 85:17 87:2,4 | 106:23 107:7 |
| **boxes** 237:3 | 181:16 | 88:1,8,16,22 | 108:13 109:11 |
| **bradford** 33:13 | **brought** 23:2 | 89:4,13,18 | 113:8 114:20 |
| 33:18 35:4 84:8 | 58:18 215:6 | 90:11,20 91:12 | 115:2,13 116:5 |
| 84:14 86:7,7 | 252:7 253:9 | 92:2,16 93:13 | 117:19 118:16 |
| 93:21 | **bruce** 9:24 | 93:20 94:6,11 | 121:6,13 |
| **branch** 100:18 | **bubble** 277:9 | 94:17 95:20 | 123:11 124:5 |
| 109:11 184:14 | **bullet** 263:16 | 96:17 99:19 | 125:11 134:16 |
| **brandy** 4:4 | 263:16 | 100:5,9 113:17 | 137:7 142:22 |
| **brca** 170:2 | **bunch** 193:22 | **cancer** 6:22 7:4 | 154:6 155:22 |
| **breadth** 132:18 | **c** | 7:10,12,16,19 | 156:14 157:14 |
| **break** 9:17 | | 7:21 8:5 15:1 | 157:20 160:5 |
| 20:17 26:1 29:6 | **caffeinated** | 15:18 17:8 22:4 | 160:13,21 |
| 59:12 70:4,8,12 | 172:24 173:13 | 22:10 23:9 | 161:11 162:4 |
| 74:22 112:12 | **calcified** 265:22 | 26:22 27:1,3,6 | 162:10 163:12 |
| 112:17 172:23 | **calculation** | 27:7 36:17,24 | 166:5 167:1,22 |
| 173:9,13 | 249:4 252:20 | 42:8,12,15,16 | 167:23 169:8 |
| 257:21 | 259:23 302:22 | 42:16,17,22,24 | 170:4 174:21 |
| **breaking** | **calculations** | 42:24 43:7,12 | 174:22 176:4 |
| 112:10 | 252:6 258:21 | 43:15,16 44:11 | 176:14 177:4 |
| **breakpoint** | 259:5 | 44:15,22 45:13 | 177:11,15 |
| 112:11 | **call** 64:1 169:22 | 45:16,22 46:11 | 191:3,18,20 |
| **breast** 174:23 | 192:8 282:7 | 46:16 47:6,9 | 192:1 195:16 |
| 175:4,15 | 290:7 295:4 | 51:15,19,23 | 199:1 200:20 |
| 177:11,15 | | 52:4,14,16,23 | 202:22 203:3 |

**[cancer - certainty]**                                      Page 12

| | | | |
|---|---|---|---|
| 203:11 204:5 | **carcinogenesis** | 232:7 253:17 | **causation**   5:13 |
| 205:6,13 206:6 | 275:23 | 253:24 264:5 | 35:23 37:5 |
| 206:14 207:16 | **carcinogenic** | 265:17 268:3 | 38:16,17 78:10 |
| 208:3,11,18 | 6:18 107:21 | 272:8 277:15 | 83:17 84:18 |
| 209:3,7 218:3 | 108:3 | 281:8 287:4,10 | 96:7 253:17,23 |
| 220:22 221:6 | **carcinogenicity** | 305:13 | 262:1 |
| 221:22,24 | 105:17,23 | **cases**   22:22 | **cause**   25:20 |
| 222:3,21 | 108:19 109:6 | 57:1 59:10 | 36:17,24 47:5 |
| 224:12 225:10 | **carcinogens** | 62:13 63:16 | 47:12 90:24 |
| 226:4,16 | 22:7 104:5 | 69:18 118:8 | 269:13 272:12 |
| 227:15,18,24 | **care**   4:2 5:19 | 162:9 177:4 | 273:2,4,5 275:7 |
| 228:3,18,21 | 30:19 41:19 | 181:24 182:17 | 275:18,22 |
| 229:3 237:21 | 42:15,22,23 | 182:18,19 | 282:3 |
| 241:19 247:24 | 64:20 174:19 | 183:7,7 221:24 | **caused**   134:15 |
| 248:2 253:24 | 197:9 198:22 | 222:1,1 227:13 | 277:15,16 |
| 266:12 267:3 | 201:20 202:4 | 227:24 231:24 | **causes**   26:22 |
| 268:6,11,18,22 | 205:21 206:9 | 245:16,16 | 268:17,24 |
| 269:13 272:7 | 207:3 210:19 | 264:19 265:3,9 | 273:21 286:18 |
| 272:13,23,24 | 238:2 244:1 | 266:13 302:12 | **cautious**   295:12 |
| 273:2,6,6,12,15 | 246:1 281:19 | 303:21,21 | **cellular**   275:22 |
| 273:21 275:10 | 282:15 290:9 | **catch**   107:24 | **center**   42:15,16 |
| 275:20 277:13 | 292:15,21 | **categories** | 163:12 |
| 286:2,18 287:1 | **career**   216:12 | 245:24 | **certain**   24:5 |
| 287:23 303:18 | **carefully**   255:1 | **category**   16:21 | 25:10 58:9 |
| **cancers**   5:21 | 295:23 | 91:4 169:17 | 82:21 101:23 |
| 30:20 45:17,18 | **cares**   292:20 | **causal**   14:23 | 210:8 244:16 |
| 72:15 156:22 | **carl**   15:23 16:9 | 15:17 17:6 | 244:17 |
| 157:1 175:4,12 | 264:18 265:10 | 93:15 94:3 | **certainly**   30:9 |
| 175:15,16 | **carter**   265:7 | 114:19 293:19 | 44:21 47:12 |
| 182:8 200:3 | **case**   13:13 | **causality**   32:19 | 56:15 63:22 |
| 221:12 253:18 | 26:19 62:14 | 32:24 33:13 | 65:20 91:21 |
| 278:18 | 63:10,15 94:7 | 35:16 89:15 | 100:1 101:15 |
| **capture**   178:22 | 99:2,21 132:16 | 91:13 94:11,12 | 187:10 |
| **carcinogen** | 155:3 165:17 | 94:18,21 95:22 | **certainty**   22:9 |
| 107:20 159:22 | 174:21 179:5 | 99:20 | 23:8 286:17,22 |
| 257:9 | 179:22 190:12 | | |

[certificate - cohort]                                                    Page 13

**certificate**
  305:1
**certified**  43:23
  44:2
**certify**  305:2
  307:5,9,12
**cervical**  7:10
  155:22 156:14
  156:21 157:1
  157:13,20
  160:16 253:18
  253:19 278:18
  278:20
**cetera**  249:21
**chafing**  284:21
**chair**  216:24
  217:5 231:9
**challenges**
  202:18 207:12
**chance**  22:20
  35:21 36:20
  38:8 86:10,21
  95:13 104:8
  129:18 192:11
**chances**  144:5
**change**  92:12
  182:15 247:1
  275:6 305:16
**changed**  60:15
  79:8 296:12
**changes**  40:23
  65:22 200:9
  269:7 275:22
  275:22
**characteristics**
  238:5

**characterize**
  116:11 118:22
  160:19
**characterized**
  120:8 178:21
**charged**  54:23
**check**  57:14,18
  76:16,18 77:4
  254:6 264:21
  264:22 278:2
  301:13
**checks**  76:22
**chemicals**
  101:23 105:16
**chemo**  44:21
**chemotherapy**
  42:20
**cherry**  4:9
**chest**  265:21
  267:17
**chief**  33:7
  100:13
**chino**  199:4,6
**choose**  211:9
**chosen**  270:16
**chris**  16:3
  48:16 195:8
  254:11,13
**christopher**  2:3
**chronic**  42:3
  43:20
**chrysotile**
  26:13
**cir**  64:18
**circumstance**
  28:22,23

**circumstances**
  276:22
**cite**  99:22,23
  100:1,3,9 162:2
**cited**  11:17 88:8
  138:21 166:7
  191:8
**clarification**
  65:1,16 174:13
  175:13 261:16
  288:8
**clarify**  149:4
  218:15 261:8
  270:11 289:23
**clarifying**
  257:23
**classification**
  104:5,22
  105:21 106:5
  108:18 109:6
  109:13
**clean**  103:4
**cleanup**  260:15
**clear**  23:22
  28:9 58:17 74:9
  75:18 79:4
  127:14 128:11
  130:17 144:5
  147:23 150:12
  165:2 170:7
  175:14 180:10
  214:13 253:4
  255:19 262:21
  274:10 282:12
  293:2 294:7,7

**clearer**  150:9
**clearly**  95:13
  106:16 121:15
**client**  51:14,22
**clients**  51:18
  76:7
**clinic**  163:13
**clinical**  30:24
  100:18 109:11
  134:18 183:17
  183:21 184:2
  185:3,22 196:5
  197:2,7,8 218:8
  219:2 250:1,15
**clinician**
  168:21
**clinicians**  163:9
**close**  118:23
**closer**  254:14
  254:16
**clr**  1:24
**code**  235:13
**coffee**  173:4
**cohort**  7:11,12
  114:17 116:14
  116:15,19,23
  117:2 118:12
  118:12 126:10
  127:1 155:1
  161:11,12
  162:7 165:1,3
  173:24 174:8
  175:23 176:1
  179:10,22
  180:12,18
  206:7 287:7,10

**[cohort - concluded]**

Page 14

299:12,16
**cohorts** 125:8
**colette** 218:6
**colleague** 12:4
129:9 285:10
**colleagues**
80:15 118:14
142:10,12,24
143:5 144:7
148:6 149:10
152:17 154:14
160:17 174:17
**collect** 77:2,4
182:14 183:6
**collected** 180:3
206:21 244:21
281:1,7 295:16
**collecting** 179:9
182:17
**collection**
112:22
**collective**
116:23
**collects** 77:1
**college** 66:22
**color** 221:7
**column** 247:23
**combined**
116:18,19
**come** 29:14
32:9 99:4
140:24 196:2
202:9,11
254:14,16
257:8 262:15
295:15 296:1

303:3
**comes** 84:5
99:7 252:21
274:18
**comfortable**
295:24
**coming** 76:13
186:10 266:10
**commencing**
1:14
**comment** 18:1
86:3 277:3
**commentary**
95:17,18
**commenting**
210:3
**comments**
215:1
**commission**
307:20
**committed**
189:14
**committee** 2:11
3:2 102:19
109:5,22
**common** 42:2
219:19 231:13
231:15,17,20
231:21
**commonly**
232:5,19
**communicate**
187:11,17
**community**
46:9,9,10 93:10
187:12 251:24

**compact** 265:2
**companies**
63:17 64:20
68:17 75:1,4
110:18,19
**company** 31:23
141:16 279:20
280:3,9
**compare**
220:21 290:14
**compared**
120:21 121:18
221:5 245:23
279:19 280:20
281:8
**comparing**
21:21 34:7
**compatible**
268:23 292:23
293:19
**compelling**
205:4,11,14
**compendium**
6:12 78:8,18
79:10 83:1,3
92:9,17
**compensable**
71:16 72:10
**compensation**
57:11
**compilation**
50:19 53:17
258:16
**complete** 6:11
22:24 23:3
53:17,21 78:6

200:14 232:7
244:6
**completed** 30:9
177:23
**completely**
13:12 135:1
141:11 142:11
280:2 303:4
**completes**
278:11
**composite** 5:18
11:22 12:10
48:13,17,24
49:14 63:4
**comprehensive**
44:18
**concept** 18:12
246:16 247:3
**concern** 181:5
**concerned**
211:11
**concerning**
46:15 116:4
270:1
**concerns**
176:22 181:8
186:17,18,20
187:1,4,13,18
209:20 213:13
252:2
**conclude**
157:23
**concluded**
93:23 121:11
221:10 222:19
226:3 304:3

**[concluding - continued]**                                                          Page 15

| | | | |
|---|---|---|---|
| **concluding** | **confirm**   114:18 | 113:18 125:16 | **consultants** |
| 134:12 | 117:12 257:19 | 127:1 132:4 | 192:4 |
| **conclusion** | **confirming** | 139:4,24 140:5 | **consulted** |
| 11:21 285:23 | 104:9 | 152:23 170:1 | 217:14 |
| 286:6,14 | **conflicts**   141:14 | 171:13 172:18 | **consulting**   67:5 |
| **conclusions** | **confounders** | 233:9 283:19 | 110:13,21,23 |
| 125:5 148:12 | 154:16 | **considering** | 110:24 |
| 227:9 | **confounding** | 85:10 270:21 | **consumers**   37:7 |
| **conditional** | 33:16 91:5,16 | **consistency** | 82:13 212:14 |
| 240:6 | **confuse**   81:10 | 84:1 85:3,3 | **contacted** |
| **conditions**   42:2 | **confusion** | 87:17 88:3,17 | 71:21 |
| 42:4 | 92:13 | 89:23 90:6 | **contain**   17:8 |
| **conduct**   216:11 | **congress**   65:7 | **consistent** | 18:2 22:12 |
| **conducted** | **connection** | 88:14 154:4 | 23:10,13 |
| 73:23 89:24 | 14:24 15:17 | 202:21 203:2 | 188:20 282:17 |
| 181:21 187:14 | 17:6 | 207:15 | **contained** |
| 205:10 206:18 | **consensus**   93:9 | **consolidated** | 16:20 18:19 |
| 206:20 255:20 | 136:9 | 188:15 | 159:21 |
| **conducting** | **consider**   41:1 | **consortium** | **containing**   22:2 |
| 174:17 229:20 | 79:17 86:11 | 161:12 | 276:23 |
| **confer**   257:19 | 89:19 90:12,21 | **consortiums** | **contains**   22:7 |
| **confidence** | 91:14 98:10 | 220:21 221:5 | 23:19 177:7 |
| 119:17,22 | 119:15 132:13 | **constituent** | **contemporan...** |
| 120:9 121:20 | 132:17,24 | 22:3 | 186:6 |
| 122:3 123:8 | 142:19 242:19 | **constituents** | **content**   140:22 |
| 134:16 135:11 | **consideration** | 17:7 18:2,14 | 192:15 223:18 |
| 135:14 142:18 | 91:5 133:20,22 | **consult**   44:6 | **contents**   243:3 |
| 154:4 166:8,11 | 153:3 | 69:10 150:3 | **context**   146:22 |
| 248:8 281:4 | **considerations** | 192:3 194:14 | 147:1 |
| 289:6 290:13 | 33:19 35:4 84:9 | 216:14 217:7 | **contingent** |
| 290:15,16 | **considered** | 271:23 | 273:12 |
| 292:8 293:23 | 33:15 38:13 | **consultancy** | **continue**   28:8 |
| 294:18 | 82:14,20 83:21 | 110:9 | 119:4 |
| **confidential** | 83:24 84:14,20 | **consultant** | **continued**   2:24 |
| 72:3 | 85:17 87:2 88:2 | 110:2,8 111:6 | 3:1,24 4:1 5:24 |
| | 88:22 101:24 | 133:17 | 6:1,24 7:1,24 |

[continued - correct]                                                          Page 16

| | | | |
|---|---|---|---|
| 8:1 97:13,22 | **convince** 272:9 | 36:9,18 38:2 | 134:1 135:22 |
| 242:15 | 276:21 | 43:1 44:4 45:9 | 136:19 138:16 |
| **continues** | **coordinated** | 45:14,19,23 | 138:18 139:9 |
| 212:14,20 | 10:4 | 46:6,12,17,24 | 140:13 143:8 |
| **continuous** | **copd** 42:3 | 47:7 52:8 53:11 | 157:3,15 |
| 239:9 | **copied** 11:24 | 54:7,8 55:1 | 160:21 161:22 |
| **contractor** | **copies** 49:4 | 56:17 58:14 | 162:4,5,20 |
| 262:23 | 168:6,7 169:3 | 60:9 61:17 | 165:5,6 166:16 |
| **contradictory** | 189:24 190:7 | 64:13,17 65:5 | 167:1,2,5 |
| 74:2 244:2 | 305:9 | 65:10 66:15,20 | 168:18 174:1,2 |
| 247:16 294:13 | **copy** 11:12,16 | 67:3 69:3,5,8 | 175:16,17,20 |
| 294:15 | 14:8 31:7,13,14 | 69:21 78:1 | 176:5,15,19,20 |
| **contribute** | 32:1 39:6,18 | 79:11 80:13 | 177:5,20 178:4 |
| 199:1 201:19 | 50:8,9,10 73:1 | 81:7,23 84:15 | 179:5,10 180:4 |
| **contributed** | 79:14 103:4 | 84:16 85:16 | 181:3,4,8,17 |
| 46:20 47:4 | 156:5 164:14 | 87:10 88:4,10 | 182:22 185:23 |
| 101:15 | 192:18 253:1 | 88:11,14,15,18 | 186:7 188:17 |
| **contributions** | **copyright** | 88:20 90:8,9,13 | 188:18,21,22 |
| 116:2 | 169:6 | 91:1,2 94:4,8 | 190:13 195:21 |
| **contributors** | **core** 235:3 | 94:19,24 95:24 | 195:24 196:9 |
| 162:16 | **cornstarch** | 97:2,14,24 98:1 | 197:13 198:11 |
| **control** 155:3 | 211:17,24 | 98:3,5 99:3,13 | 199:9 205:17 |
| 165:17 179:22 | 212:13,20,23 | 99:18,21 | 205:18 207:22 |
| 287:5,10 | **corporations** | 100:14 101:8 | 207:23 211:9 |
| **controls** 222:2 | 51:17 | 103:9 107:3 | 211:24 212:10 |
| **convened** | **correct** 10:8 | 108:10,11 | 212:24 214:3,4 |
| 105:13 106:5 | 17:22,23 18:19 | 111:10,11,19 | 215:3,15 |
| **convening** | 18:20 19:4,11 | 112:4 113:18 | 218:21 219:13 |
| 104:21 | 19:21 20:24 | 113:20 116:6 | 219:17,21 |
| **conversation** | 21:10,10,17 | 116:24 118:20 | 221:7 222:16 |
| 135:24 | 24:23 25:2 | 119:20,21 | 222:18,22 |
| **conversations** | 29:15,19 30:6 | 121:6 122:6 | 223:8 227:8 |
| 189:4 190:10 | 30:21,22,24 | 123:11,14 | 232:16,24 |
| 190:15 | 31:1 32:1,7,21 | 124:13 125:19 | 233:16 236:11 |
| **conversion** | 33:17,22,23 | 129:5,15,16 | 236:17 237:21 |
| 164:3 | 34:3,4 35:9,17 | 131:19,20 | 237:22 238:20 |

[correct - culture]                                                                 Page 17

239:16 240:12
240:14 243:7
247:12 248:14
248:22 249:4,6
250:2,12
264:20 266:8
266:14,24
269:22 270:3,4
270:24 271:1
278:22 282:7
285:15,19
289:10 296:10
298:14 300:7
300:13 303:21
303:23
**corrected**
294:12,15
295:18 303:20
303:21
**correcting**
80:17
**correction** 74:2
248:20 291:13
294:11
**corrections**
305:6
**correctly** 17:9
17:17 22:13
85:14 93:18
124:6 143:3
154:7,19
159:24 160:6
165:20 167:11
200:10 203:11
205:7 208:14
224:18 227:19

240:7 264:3
295:8
**corresponds**
195:20
**corroborate**
267:1
**cosmetic** 64:19
110:19 284:7
**cote** 14:2
**coughing** 106:9
**council** 4:3
**counsel** 37:10
39:7 48:7 49:4
49:15 50:20
56:20 58:10
65:1,4 67:17,21
86:22 87:12
95:10 127:9,15
145:2 148:3
168:9 170:6
171:15 172:7
190:11 195:7
242:6 250:5
254:4 278:3
282:24 283:9
285:1,5 301:6
307:8,12
**counseled** 44:9
**count** 70:23
163:21
**counted** 75:23
**counting** 62:13
62:23
**countless** 172:9
172:11,12

**county** 307:2,4
**couple** 41:4
55:13 73:14
82:23 105:4
135:6 253:14
256:9 260:14
288:15
**course** 31:22,24
47:19 50:21
55:12 56:8 57:8
68:19 70:1,1
72:12 81:11
99:14 100:11
132:20 159:5,5
174:5 205:22
206:10,22
231:18 239:23
277:24
**courses** 288:1
**court** 1:1 23:17
29:18 38:12,18
95:21,24 152:9
264:15 266:11
288:7 293:22
**courteous**
285:6
**courtesy** 242:9
**covariate**
245:24
**covariates**
232:8 246:3
**covered** 102:5
103:2
**covid** 53:3
**cox** 246:4

**cramer** 191:13
**create** 114:10
280:1
**created** 40:11
235:9 278:20
**creating** 177:2
**credence**
140:17
**credibility**
295:22
**credit** 256:16
**criteria** 181:23
**critical** 41:19
181:16 251:5
**criticism** 35:6
126:23 182:16
**criticisms**
34:14,16 82:12
88:2 181:15
188:21 251:11
285:18
**criticize** 134:11
**criticized**
124:18
**critique** 140:18
184:19
**critiquing**
184:16
**crocidolite**
274:8,11,14,19
**crosses** 289:7
**crystal** 293:2
**ctis** 110:9,16,24
**ctisi** 2:9
**culture** 112:2

**[cup - demonstrates]**                                                    Page 18

**cup**   173:3
**curious**   141:3
**current**   40:15
    44:13 51:1
    93:14 94:2
    105:15 106:22
    287:16
**currently**   41:17
    114:12 162:7
    287:18
**cv**   6:5 39:13
    40:5,8,15 41:16
**cvss**   52:6

**d**

**d**   169:23
**daily**   277:12
**dale**   98:2
    100:12
**danger**   26:14
**data**   8:8 74:2,6
    75:24 93:14
    94:1,3 99:16,16
    118:7 120:5
    125:8 169:18
    169:23 174:12
    177:7 179:3,10
    180:3 182:17
    183:10 190:20
    202:20 205:21
    206:8,18
    207:14 223:18
    223:23 225:6
    228:17 230:19
    231:13,18,24
    232:6,20,20

233:15 234:7
235:3,4,8
238:14,19
240:4,5 244:1
244:11,22,23
245:7 246:11
247:11,16
252:8 280:14
280:24 281:7
282:4,8 287:13
291:12 294:13
294:16 295:16
296:1,5 297:22
297:23,24
**database**
    181:16
**dataset**   85:11
    233:6
**date**   16:10,13
    16:14 19:2,4,24
    33:11 37:16
    38:4,5 40:7,9
    40:18,22 61:6,9
    61:10,18 62:5
    62:19 104:9
    116:16,20
    169:4 174:1
    188:3,11,11
    195:19,23
    220:21 305:15
    306:17
**dated**   8:12
    16:16 19:23
    77:13 145:24
    204:3 218:7

**dates**   30:7 40:7
    40:10 53:10
    62:13,17
    102:12,23
    188:7
**daubert**   5:14
    5:22 33:2 35:20
    37:3,11,15,19
    38:1 69:1 96:18
**david**   230:17
    231:10
**davis**   218:6
    220:14,20
    221:10,10
    225:19 226:2
    226:11
**day**   57:18
    219:12 257:20
    257:20 307:16
**days**   19:10
    62:15 75:14
    204:14,17
**de**   217:4
**deal**   46:22
    244:11 281:11
**death**   268:17
**debate**   24:3
    201:20 202:3
    292:12
**debating**   287:8
**decades**   89:24
    179:24
**december**
    53:14
**decent**   112:10

**decided**   173:1
**decision**   37:11
    104:2 232:2
    256:2,3
**decisions**
    235:12
**declaration**
    5:15
**declares**   110:8
**decrease**   280:2
**defendant**
    256:21 257:4
**defendants**
    3:14
**defense**   10:18
    24:7 96:8,9
**defense's**   210:7
**deficient**
    126:11
**definition**
    159:13 289:8
**degree**   22:9
    23:7 89:23 90:5
    286:17,22
    303:9
**deliberately**
    159:14
**demonstrate**
    144:16
**demonstrated**
    68:12 122:2
    208:17 223:18
    223:20 225:9
    226:15
**demonstrates**
    208:9

**[dense - difference]**                                                      Page 19

**dense** 193:23
193:23,23
**department**
80:13 81:13,16
163:4 168:20
217:1 287:19
287:22
**depend** 25:9
**depending**
303:6,9
**depends** 179:11
201:3 234:11
242:18
**deponent** 305:1
**deposed** 204:18
204:19 212:4
**deposition** 1:13
5:2 6:3 10:2,6,7
10:11 11:2,21
15:5 16:20
29:12 39:3,7
41:4,8,14 48:3
48:4,9 49:1
57:12 58:10
61:15 62:16,19
63:8,14 69:1
80:2 86:19
96:23 102:6
106:18 107:10
119:12 129:17
145:5,12 170:9
192:19 193:15
223:4,7 230:16
270:13 278:12
304:3

**depositions**
12:22 172:8
**derived** 99:16
101:5
**describe** 119:19
244:17
**described**
161:11 166:23
**describes** 168:1
197:5 198:18
**describing**
121:18 167:4,7
167:8 264:10
**description**
165:3 177:19
**design** 203:7
297:20
**designed**
299:22
**designs** 33:21
88:3,14,18
**despite** 152:12
202:18 207:12
278:10
**detailed** 177:2
203:6,14
205:21 206:8
207:20,21
**details** 34:21
131:16 257:13
**detect** 85:12
**detected** 181:24
**determine**
238:2,5
**determined**
85:7 89:21

91:13 93:13,14
93:21 94:2,11
**determining**
33:13 132:8
266:21
**developed**
102:8 169:12
240:4
**diagnosed**
175:4 177:15
**diagnosis** 42:1
44:10
**diaphragm**
159:13
**diaphragms**
158:11 159:7
**diette** 1:13 5:2
5:12,16 6:4,6,7
6:8,10 8:11 9:2
9:8,20,22,24
10:1 12:11,15
12:18,19 14:10
16:4,11 20:19
20:20 22:15
23:24 25:23
29:11 30:13,15
37:22 39:4,6,16
40:3,5 41:15
48:2,19 49:7,10
50:23 54:23
55:11 60:7,8,11
60:14,21 61:6,9
65:20 67:18,19
70:11,18 78:16
78:24 79:12
82:4 83:2 86:16

86:18 88:9
90:11 92:15
94:20 95:2,7,19
102:7 103:3,7
103:10 105:12
106:19 107:16
107:18 112:17
113:3 117:15
119:17 123:4
126:24 127:18
128:21 129:6
136:4 143:6
144:17 146:3
147:15,22
149:24 150:8
150:17 152:2
156:3,6 158:17
161:8,15 164:7
167:17 171:2
171:10 173:12
195:7,12,17
204:7 217:19
217:22 227:14
229:24 230:7
230:15 236:7
236:10 253:11
253:13 257:18
258:1,3 260:14
263:7,9 278:7
278:16 282:13
288:12,15,16
298:3,6 301:18
301:22 303:13
305:14 306:13
**difference**
121:18,22

[difference - doctor]                                                                Page 20

123:1 273:18
279:10 281:6
281:10 286:11
286:15 288:17
288:22
**differences**
34:12
**different** 16:10
16:13,14 17:11
33:21 34:21
50:8,12 62:12
62:15 68:3 73:5
76:6 85:22
89:24 94:9,16
141:11 150:6
151:23 164:9
180:8,20
184:15 185:2
189:9 208:7
234:2 235:18
239:4 242:21
244:4 247:11
249:1,24
250:11,24
280:6 291:11
296:8
**differential**
154:15 249:5
273:1 275:9
276:24 277:17
**differently**
207:8
**difficult** 163:15
**diffuse** 263:23
265:23 271:14

**direct** 90:2
91:23 92:20
123:15,24
125:1 141:21
158:4,6 163:14
169:14 213:9
247:19 263:11
**direction** 280:5
280:10 281:23
292:19
**directly** 76:18
158:12 159:8
263:3
**disagree** 68:7,8
126:2,4,7 127:3
127:8,14,24
134:24 137:10
137:15,18
143:6,9 146:11
146:16 147:20
149:9 151:10
155:8 158:14
165:22 183:13
203:5 207:24
208:23,24
210:15,17,21
210:23 224:24
225:17,22
226:1,14,24
227:2,4,7
228:22 244:24
249:11,13,17
249:18
**disagreed**
149:22 150:1

**disagreeing**
182:3
**disagreement**
227:6
**disagrees** 150:4
**discern** 271:13
**disclosed** 71:21
**disclosure** 72:2
258:15
**disclosures**
256:22
**discount** 131:6
133:3
**discounted**
130:24 142:15
**discuss** 104:4
104:22 105:14
106:5 165:8,9
187:12 192:6
260:17
**discussed** 223:5
250:3,10
**discusses**
169:21
**discussing**
101:18 213:22
259:17 265:19
303:15
**discussion**
78:14 83:7
90:12 96:24
106:4 170:23
202:3 214:23
214:24 218:23
256:5 278:4

**discussions**
111:13,14
145:9 187:22
189:9,12
235:11 281:13
**disease** 42:3
43:19,20,21
228:17
**diseases** 44:7
229:11
**disks** 265:2
269:21
**disparage**
130:18
**disputes** 22:6
**disregarded**
131:22 132:2
**disrespectful**
301:8
**distinction**
218:9
**distinguished**
218:22
**distort** 279:21
**distorted**
297:20
**distributions**
245:24
**district** 1:1,2
95:21
**division** 41:18
100:19 231:8
**doctor** 14:6
15:13 24:23
26:3 67:16
103:24 135:15

| | | | |
|---|---|---|---|
| 142:10 148:22 | **doors** 81:17 | 70:11,18 78:16 | 161:15 162:19 |
| 161:10 171:5 | **dose** 25:20 | 79:12,21 80:2 | 163:3 164:7 |
| 209:20 211:4,5 | 26:16,23 | 80:12 81:12 | 167:10,20 |
| 213:4 218:10 | 223:14,19 | 82:4,4 83:2 | 168:18 171:2,3 |
| 241:23 284:18 | 268:23 269:10 | 86:16,18 90:11 | 171:10,11,11 |
| 285:13 300:20 | 269:12 275:17 | 92:15 94:20 | 173:12 192:7 |
| 301:2 303:11 | 276:4,9,12,17 | 95:2,7,19 99:20 | 192:18,20 |
| **doctors** 30:17 | **double** 62:23 | 100:17 102:7 | 195:7,17 196:8 |
| 173:20 209:23 | 184:8 | 103:3,10 | 202:13 203:1 |
| **document** | **doubt** 55:15 | 105:12 106:19 | 203:13 204:18 |
| 14:14 37:13 | 100:15,21 | 107:18 112:17 | 209:14 216:21 |
| 38:5,8 60:13 | 104:7 212:16 | 117:5,5,20,21 | 216:23 217:4 |
| 63:13 96:2 | **douching** 7:3,9 | 119:17 123:4 | 217:19 218:12 |
| 103:19 105:12 | 47:8 117:18 | 126:24 127:18 | 220:19,20 |
| 195:14 196:15 | 155:20 156:20 | 129:6,9,20,22 | 222:18 224:8,9 |
| 197:6 228:11 | 176:13 209:3,6 | 129:23 130:1,7 | 224:21 227:14 |
| 299:5 | 224:18 228:15 | 130:13,22 | 230:15 236:7 |
| **documented** | **downloaded** | 131:11 133:8,8 | 253:13 257:18 |
| 272:10 | 31:14 | 133:12,12,16 | 260:14 263:9 |
| **documents** | **downloading** | 133:24,24 | 278:7,16 |
| 5:18 11:22 | 32:1 | 134:10,10,23 | 282:13 288:12 |
| 12:11 204:20 | **dozen** 13:6 | 134:23 135:16 | 288:15,16 |
| 215:22 262:15 | **dr** 6:4,6,7,8 7:7 | 135:19,19,20 | 298:3,6 301:18 |
| **doing** 43:16 | 7:13 9:8,20,22 | 136:4 137:4,5,5 | 301:22 303:13 |
| 49:12 56:8 59:9 | 10:1 11:1 12:18 | 138:11 139:22 | **dr.diette's** 6:5 |
| 105:5 137:24 | 12:19 13:1,15 | 140:9 141:14 | **draft** 11:1 77:9 |
| 170:1 233:19 | 13:16,19,22,24 | 141:21 142:2,8 | 78:2 79:15 |
| 255:17 259:14 | 14:2,4 20:19 | 142:9,12 143:5 | 89:10 |
| **dollar** 56:14 | 22:15 23:24 | 143:6 144:6,17 | **dragged** 75:14 |
| **dollars** 53:24 | 25:23 29:11 | 146:3,4,6 | **drill** 179:2 |
| 55:14 | 30:15 36:5,11 | 147:15,22 | **drs** 7:6 113:6 |
| **dominici** 241:2 | 39:6 40:3 41:15 | 148:6,7,7,24 | 128:20 129:8 |
| **donated** 131:15 | 48:2 49:7 54:23 | 149:24 150:8 | 129:13 131:1 |
| **door** 81:15 | 55:11 60:8,14 | 150:17 152:2 | 135:4 138:14 |
| 119:11 | 60:21 61:6,9 | 153:24 156:6 | 146:6 149:2,9 |
| | 65:20 67:18,19 | 158:17 160:17 | 162:15 |

**[drug - entire]**                                                      Page 22

**drug**  52:7,11
63:23
**dry**  69:24
**due**  188:5,10,11
188:16
**dulaney**  1:16
**duly**  9:3 307:7
**duration**  270:9
**dust**  46:23

**e**

**e**  163:19 230:4
**earlier**  30:2
126:3 176:9
179:15 186:2
189:22 192:18
218:10,23
245:14 250:22
285:10
**early**  188:10
259:18,18
**earn**  54:19
**earned**  53:9,18
54:8 55:13 56:9
**earth**  128:8
151:9,12,23
301:11
**ease**  83:6
**easier**  173:5
**easily**  185:8
**east**  192:9,14
**easy**  241:12
**eat**  180:15,15
180:16,16,19
**edit**  21:23

**editor**  7:5 129:1
129:4,8,14
133:9 136:8,12
138:14,22
139:21 140:3
140:15 141:1,2
141:8,10
145:14,18,22
145:23 148:21
150:2 218:17
218:20 250:18
251:9,13,19
**editorial**  128:20
128:24 139:9
140:9,14,19
141:7,21
217:18 218:12
218:13,19
219:1,7 220:3
224:21 250:21
251:9
**editorials**
218:11,16,17
**editors**  130:24
133:23 138:4
250:20
**edits**  40:23
**educate**  271:16
**effect**  93:15
94:3 121:12
137:9 142:19
153:20 224:13
225:11 226:5
226:17 245:17
249:2

**effective**  260:3
**effects**  121:5
124:4 159:21
279:13
**efficacy**  211:21
**efficiency**
86:19 232:13
**efficient**  232:6
232:7 241:10
241:11
**effort**  268:14
**eight**  265:18
289:3 290:17
**either**  13:13
56:11 63:7 66:6
81:10 98:15
130:10 187:9
187:11 220:4
242:15 253:24
256:20 257:3
270:23 273:9
273:17 281:23
292:19 293:12
299:24 303:7
**elaborate**  86:21
**elbow**  168:19
168:19
**elements**  91:5
**elevated**  286:2
**elizabeth**
216:23 230:17
231:4,5,7
**email**  2:9,19
3:12,21 4:11
**emergency**
301:14

**employ**  241:11
242:15
**employed**
17:20 32:12,18
32:23 34:9
35:13,15 121:2
187:2,14
216:16 217:9
239:13,24
245:9,10 251:7
252:1
**employer**  41:23
79:13,18
**en**  233:23
**encountered**
269:10
**endorse**  211:5
**endorsed**  56:4
86:14
**ends**  281:21
**energy**  255:14
**engaged**  111:9
**engagement**
193:14
**enrolled**  177:11
177:12
**enrollment**
162:12 178:3
178:14
**enter**  158:12
159:8
**entering**  159:14
**entire**  22:20
151:15 206:9
211:3

[entirety - exactly]

**entirety** 269:17
269:19,23
**entities** 111:3,7
**entitled** 7:14
8:3 16:21 30:18
83:16 113:7
117:18 155:19
167:20 176:13
195:15 204:4
218:1 221:22
230:17 236:8
**entity** 133:1
**environmental**
43:19 46:23
109:4 204:3
**epa** 64:11
**epi** 168:20
215:23
**epidemiologic**
51:8
**epidemiologi...**
8:3 89:23 93:11
96:20 115:11
116:3 145:9
160:2,11
169:18 218:2
**epidemiologist**
98:18 130:13
**epidemiologi...**
136:17
**epidemiology**
18:15 36:8
43:20 93:24
100:13,19
110:3 114:18
130:7,7,16

161:13 162:7
163:4 176:15
286:23 287:19
287:22,22
**epithelial**
272:23 277:13
**equally** 84:13
**equate** 143:7,21
144:8 147:13
**equated** 143:1
146:9,15
147:10 149:5
152:17 153:6
**era** 237:2
**errata** 305:7,10
305:12
**error** 20:14
191:5,17 249:4
297:6
**errors** 33:17
190:20 207:3
**especially**
199:2 200:8
229:3 274:12
**esquire** 2:3,13
3:4,15 4:4
**establish** 153:9
185:4,5 232:18
**established**
159:11,15
176:17 229:10
**establishing**
71:15
**estimate** 26:17
58:5 175:21
233:4 234:5

246:5 249:14
300:10,11,15
302:7,10
303:20
**estimated**
249:2
**estimates**
142:17 224:13
225:11 226:5
226:17 281:4
300:16
**estimating**
233:15
**et** 30:17 112:22
154:13 160:17
181:11,13
198:19 218:12
224:11 225:16
227:22 249:21
258:1 297:5
**ethnicity**
221:15,16
**europe** 212:15
**eurotalc** 110:9
110:10,24
**evaluate** 109:6
**evaluating**
132:17
**evaluation** 78:9
83:17 84:18
104:13 247:11
**event** 47:18
75:16
**everybody**
42:16 120:2
169:3

**evidence** 14:23
15:16 17:5
24:16 27:15
47:13 87:7,8
88:13 90:7
93:12,22,24
96:20 105:22
105:23 107:6
115:12 119:16
137:8 143:2,8
143:22 144:18
146:10,20,20
146:21 147:14
148:12 149:6
152:18,23
153:6,9,15
157:20,24
198:23 203:8
203:15 205:4
205:11,15
208:1 263:21
266:22 267:15
270:22 271:14
272:6,17,19,21
273:10,11,13
274:19,24
277:10 286:20
293:8 294:1
**exacerbations**
282:3
**exact** 291:10
**exactly** 22:18
30:7 58:24
91:18 174:13
174:24 183:5
193:18 218:24

[exactly - expertise]    Page 24

220:12 221:8
222:9 258:4
**exaggerate**
296:23
**exaggerated**
296:2
**examination**
5:5 9:7 254:10
259:3 260:13
269:16,18
272:1 278:14
288:14 301:20
303:12 307:9
**examine**  198:17
248:16 270:19
**examined**  9:5
282:23 283:22
305:3 307:8
**examining**
221:21
**example**  25:11
25:18 26:12
35:3 58:18
63:21 130:20
180:14 249:9
268:10 269:11
274:6 275:19
280:18 282:1
283:8 296:13
297:19
**except**  262:6
277:9
**excess**  55:13
56:10,16
**exclude**  231:24

**excluding**  246:2
**excuse**  19:6
62:10,11 82:4
92:21 114:1
133:7 138:20
171:5 188:24
195:11 196:4
222:1 223:3
243:24 260:21
265:2 290:15
290:19
**executive**  4:7
**exercise**  141:8
**exhaustively**
282:23
**exhibit**  5:11,12
5:15,17,18,19
5:22 6:2,3,5,6,7
6:8,9,11,12,14
6:17,20 7:2,3,5
7:8,11,13,17,20
8:2,3,6,9,11,12
11:22 12:11,15
12:17 14:7,10
16:2,4,8,9,11
16:15 18:23
19:22 20:9,21
20:22 23:6
30:12,13,16
31:8 32:4 37:21
37:22 38:1 39:2
39:4,13,15,16
40:3,5,15 47:22
48:16,19 49:10
49:13 50:18,23
53:13 54:5

60:11,22 61:10
63:5 78:4,5,6,7
78:22 83:4
91:24 92:5
103:6,7 105:7
107:13,16
113:1,3 117:14
117:15 127:12
128:18,19,21
129:7 156:2,3
160:24 161:8
161:16 167:16
167:17 168:12
173:17 174:7
176:8,11
194:22 195:3,8
195:12 203:22
204:7 217:20
217:22 218:1
229:21,23,24
230:7 236:1
242:14 253:9
253:10,11
257:24,24
258:2,17 259:4
262:6 263:6,7
265:1 279:4
**exhibits**  78:24
**existence**
118:13
**exists**  28:24
**expand**  175:1
**expanded**  44:6
44:8
**expanding**
177:4

**expands**  176:24
181:22
**expect**  25:12
42:20 185:16
267:8,16,22
275:12 292:7
**expectations**
275:14
**expected**  42:21
274:9
**experience**
40:16,18
190:22 263:20
**experiences**
41:7
**expert**  5:12,15
6:9 10:18 12:21
13:9 14:8,20
15:14,22 34:1
42:1 51:5,14,18
51:22 56:8,9
59:9,18 60:6,14
61:14 68:24
69:19 75:21
76:1 79:14 82:3
82:5 90:12,18
91:9 124:22
131:12,15,18
131:23 132:7
133:1,14,21
141:15 188:15
199:4 210:7
214:11 215:7
251:21
**expertise**  24:4
24:10,17 72:22

73:8 210:22
277:3
**experts** 10:19
12:22 34:2,7,9
34:15 35:14,22
36:14 37:6
38:14 82:12
89:20 96:8,9
124:19 131:1,9
133:7,10,24
214:6 215:2
292:11
**expires** 307:20
**explain** 122:10
234:15 268:7
280:10
**explaining**
301:23
**exploratory**
146:23
**explore** 67:17
**exposed** 124:11
294:16
**exposure** 22:2
22:11 23:9
46:16 67:9 68:9
105:22 107:6
121:5 154:15
170:1 171:13
177:2 178:2,3
180:12 181:22
182:9,12,15
202:19 203:7
207:13,20,21
222:21 224:16
226:7,20

227:12,23
244:5 246:3
248:21 263:22
265:21 266:17
266:23 268:4
268:22 269:4,8
270:1,22 272:6
272:10,18,24
274:11 275:8
276:22 277:8
277:11 293:20
**exposures**
116:4 169:21
169:22 171:4
203:15 228:16
**express** 119:9
**expressed**
36:21,22
121:16 122:15
132:9
**exquisite**
297:19
**extend** 242:10
**extended** 118:9
**extensive**
206:17
**extensively**
135:24
**extent** 15:6
71:20 72:1
105:22 235:5
244:16
**extra** 257:20,20

**f**

**fact** 37:3 47:15
70:18 71:7
82:14 83:24
95:23 99:1
100:22 112:1
116:15 125:16
125:18 126:10
127:1 132:3,6,7
132:13,17,18
133:10,22
134:13 135:3,7
136:16 147:8,9
152:21 170:9
183:10 185:1
206:19 212:2
223:19 225:2
225:14,15
228:24 237:23
245:7 283:18
291:7 297:24
303:15
**factor** 47:9
133:2,5 229:1
283:18
**factors** 33:13
46:22 47:5
84:13 170:3
172:17 229:11
236:9 277:21
283:16 291:14
**facts** 73:13
112:7 135:10
147:8 264:22

**factual** 142:23
143:18,19
**factually**
254:22
**failed** 86:16
178:22
**fails** 287:13
**fair** 14:21 15:14
24:20 32:11
34:18 40:12
41:10 42:6
43:17,17 47:2
52:17 53:15
54:22 55:1,11
57:22 59:6
61:24 62:5
64:18 65:9 66:2
66:4,16 68:21
69:2,15,19
72:11,19 74:24
83:13 84:10,12
84:19 88:21
89:12 95:12
99:23 101:3
105:12 106:24
108:14 111:4,8
111:12 115:5
117:1 120:22
130:21 132:12
136:24 139:7
140:6 172:10
174:22 178:20
179:12 182:1
183:4,10
185:10,13,21
186:13 203:20

[fair - first]                                                                Page 26

| | | | |
|---|---|---|---|
| 214:8 220:4 | **fees** 110:9 | **finances** 131:17 | 287:4 290:11 |
| 225:23 232:20 | **felt** 87:8 | **find** 54:13 | 294:1 |
| 233:23 235:15 | **female** 45:17 | 121:21 126:4 | **finds** 7:17 |
| 235:24 253:2 | 46:4 | 139:24 140:5 | 39:12 184:14 |
| 253:22 262:18 | **ferret** 249:12 | 140:12 141:3 | 195:15 |
| 269:14,24 | **fewer** 239:7 | 164:3,3 165:19 | **fine** 12:8 45:1 |
| 270:20 294:6 | **fiber** 26:16 | 169:1 195:4 | 50:16 67:17 |
| **fairer** 56:7 | 274:20 275:21 | 223:13 249:18 | 72:5,6 137:24 |
| **fairly** 101:10 | 276:11,14,16 | 255:12 259:16 | 150:22,23 |
| **fallopian** 7:14 | **fibers** 271:6 | 267:8,16,22 | 213:10 224:6 |
| 27:13 166:10 | 274:8 275:3 | 276:20 287:11 | 285:4 301:7 |
| 167:20 | **fibrosis** 271:20 | **finding** 85:18 | **finish** 67:19,19 |
| **familiar** 110:17 | **fibrous** 269:8 | 115:8,9 121:17 | 95:8,15 145:16 |
| 237:11 | **field** 25:2 | 126:7 144:13 | 285:10 298:7 |
| **family** 68:18,20 | 130:16 135:22 | 147:2,6 201:4 | 298:22,24 |
| 170:3 | **figure** 54:1 | 209:1 255:14 | 300:22 301:23 |
| **far** 57:3 126:5 | 249:8 282:2 | 260:3 274:8 | **finished** 30:1 |
| 166:3 247:23 | 302:24 303:1 | 279:21 280:23 | 95:9,13 |
| 292:22 | **file** 71:9 76:10 | 280:24 290:1 | **firm** 77:3 |
| **fast** 104:19 | **filed** 18:24 19:6 | 293:6,7,23 | **first** 9:3 12:11 |
| **fatal** 228:16 | 19:9,10,15 38:3 | 295:16 296:1 | 15:23 40:10 |
| **fault** 229:5 | 187:6 | 300:14 | 48:16 51:7,10 |
| **favorable** 238:3 | **fill** 299:20 | **findings** 33:16 | 61:6,9,18 62:18 |
| **favorite** 297:10 | **filling** 233:22 | 85:12 87:6 | 73:2 83:21 93:2 |
| 297:13,14 | **fills** 233:22 | 91:16 120:6 | 93:5 112:24 |
| **fda** 64:14 | **films** 263:18,24 | 122:19 123:6 | 122:8 142:5 |
| **feature** 199:20 | 264:9,18 | 140:11 165:4,8 | 157:11 158:7 |
| **february** 61:19 | 265:13,16 | 165:8,9,10,16 | 176:1,6 177:22 |
| **federal** 266:13 | 267:13,15,17 | 166:23 182:24 | 178:1 179:12 |
| **fee** 110:24 | 268:3 | 200:13 201:18 | 190:18 191:1,9 |
| **feedback** 60:16 | **filter** 256:17 | 202:20 207:14 | 198:3,10,20 |
| 60:20 | **final** 77:12,24 | 208:8 209:6 | 204:13 205:20 |
| **feel** 131:21 | 79:16 82:18 | 225:8 226:15 | 206:7,15 |
| 305:7 | 89:14 90:8 | 227:2,7,21 | 207:10 208:8 |
| **feeling** 172:24 | 91:12 261:12 | 228:23 250:10 | 222:7 228:5,6 |
| | | 273:10 274:15 | 230:14 231:13 |

**[first - front]**                                                         Page 27

236:14 240:22
243:11 245:23
250:19
**fit** 252:10
**fits** 190:21
**five** 62:11 173:8
178:12,13
193:7 254:7
265:2
**fix** 60:23
**fl** 2:7
**flexible** 8:7
230:18
**flip** 272:3
**flow** 65:19
**focus** 145:23
199:21
**focused** 87:1
177:24
**focuses** 43:6,12
**folks** 24:6
283:16 292:14
**follow** 86:23
118:9 177:4
181:22 182:8
244:7 278:15
282:24 287:16
296:15,21
301:7,21
**followed** 219:6
219:7 225:19
225:20 229:19
**following** 58:10
146:6 148:8
149:4 155:1
178:10

**follows** 9:6
21:23 157:12
**font** 50:12
**footnote** 110:5
114:7,8 213:24
260:18,20,21
**footnotes** 214:7
214:24
**foregoing** 305:3
**forget** 288:22
**forgot** 299:18
**form** 23:20
25:7,18 26:5
27:20 28:17
34:19 36:19
38:20 43:3,8
57:2 59:11
65:17 69:4,20
70:22 71:11,22
76:14 82:6
85:20 87:13
88:5 94:13,23
96:1 98:12
101:13 102:24
107:8 112:5
113:19 115:4
115:15 116:17
117:8,22
120:12 124:14
125:20 126:15
131:24 134:2
144:10 146:13
149:11 187:23
212:11 213:3
214:9 215:4,16
222:23 224:23

225:13 226:9
232:10 251:23
252:3 255:22
257:11 271:17
272:14 273:3
273:19,22
275:24 276:15
277:1,18 287:2
289:11 294:22
302:8 303:22
**format** 250:24
**formatted**
207:8
**formulated**
194:5
**forth** 11:18
26:16 86:12
184:17 242:23
251:4,10,24
282:24
**forward** 65:24
104:19 147:23
228:11,14
247:2 282:23
285:6
**found** 41:13
86:8 87:5
118:15 121:20
140:4 157:19
164:22 165:12
166:3 200:1,15
209:2 248:7
275:17 291:18
**foundational**
15:10,12
102:16 170:15

170:20 171:8
171:17,24
**four** 61:22 63:6
125:8 150:8
168:6,7 180:17
247:10 250:7
254:7 301:3
**fourteen** 79:6
**fourths** 91:4
158:19
**france** 108:9
**francesca** 241:2
241:6
**frankly** 102:16
118:13 132:9
162:18 301:2
**frequency**
178:1,8 209:19
211:6 270:9
**frequent** 199:2
203:10,16
208:3,12,19
**frequently**
178:10 200:7
**friable** 25:18
**friday** 198:7
204:15,16,18
204:24
**friends** 80:16
**front** 11:6 14:6
14:9 16:17 17:1
19:22 20:20
30:15 37:24
60:22 89:11
92:15,24 93:3
107:14 113:10

**[front - going]**                                                    Page 28

128:23 156:12
**full** 78:23 79:4
92:17 96:10
114:17 123:23
142:5 158:7
237:3
**fumiko** 199:4,6
**fundamental**
34:12 35:6
**fundamentally**
32:16
**fundamentals**
33:4
**funds** 111:6
**further** 22:5
110:20 146:8
153:22 201:21
274:21 301:18
307:9,12

**g**

**g** 230:4
**ga** 3:19
**games** 151:6
**gamesmanship**
150:18
**gap** 299:20
**gaps** 60:1
**gathering**
181:6 182:17
**general** 5:13
22:19 35:22
37:5 38:15,17
59:22 72:20
96:7 114:23
145:8 163:8

181:18 215:8
262:1
**generally** 52:13
63:18 185:6
186:20 214:14
214:15 215:9
233:11 287:3
**generated**
191:12 303:19
**genetics** 100:18
100:19 109:11
**genital** 6:21 7:9
7:18,20 36:17
36:24 47:17
66:18 69:17
107:7 113:8
115:1,13 116:5
121:5,13
123:10 124:5
125:11 134:15
137:7 142:22
154:6 155:21
156:20 157:13
160:4,12,20
165:15 166:4
167:1 178:2
195:15 198:22
200:1,19
202:21 203:10
203:16 204:4
205:4,11
207:15 208:3
208:10,18
209:2 220:22
221:23 222:22
224:13,16

225:10 226:4,7
226:17,19
227:13,17,23
228:2,15 229:2
303:17
**gentlemen** 59:8
132:15
**gerel** 2:15
**getting** 20:13
44:17 60:13,16
60:20 62:15
69:24 132:19
230:23
**gist** 238:8
**give** 96:10
140:17 163:17
234:16 253:23
254:4 265:15
**given** 50:21
60:1 61:21 92:9
92:11 137:6
228:14 305:4
**gives** 293:17
**giving** 32:12
253:16 264:5
289:15
**glass** 69:23
**glossed** 185:8
**go** 20:15 39:1
39:24 49:3 50:8
60:24 61:2 75:6
75:8,9,10 78:16
79:2 87:16
90:16 93:2
95:13 100:7
112:8 139:12

142:4 149:14
155:16 164:6
165:12,13
166:12,14
167:13 171:1
173:4 179:13
196:20 203:21
206:24 208:6
213:10 227:10
229:18 238:13
242:22 243:11
247:1 259:2
280:4,9 285:6,9
285:9,22
293:15 298:6
299:15
**goals** 179:7
**goes** 78:10
112:1 117:9
141:9 166:2
182:14 240:2
**going** 11:11,20
15:2,7,10 16:7
32:8,13 39:11
49:13 58:12
63:2 65:24,24
71:1,23 72:4
77:10 78:16,17
80:23 86:24
103:10,17
106:6,11,13
112:14 126:3
127:16 135:23
145:4 149:12
152:13,14
163:15,17

**[going - harmless]**                                                Page 29

| | | | |
|---|---|---|---|
| 164:3 167:9,13 | 301:16 | **guess** 39:14 | **handwriting** |
| 169:10 170:15 | **goodman** 191:7 | 48:21 52:23 | 259:8,22 |
| 172:15 194:7 | **gossett** 139:9 | 82:1 123:22 | **handy** 92:22 |
| 213:10 223:16 | 139:16 140:19 | 170:6 232:18 | **happened** |
| 235:8 253:16 | 141:14 | 236:14,18 | 11:10 106:16 |
| 254:3 256:1 | **gossett's** 140:9 | 262:2 267:14 | 118:10 185:16 |
| 257:19 262:21 | **gotten** 31:13 | **guessing** 59:5 | 301:4 |
| 263:11 281:19 | 57:14 85:24 | **guideline** | **happening** |
| 283:3,14,21 | **government** | 136:10 | 301:3 |
| 284:24 285:2,8 | 58:23 | **guys** 258:16 | **happens** 248:18 |
| 291:10 293:18 | **grab** 69:23 | 285:2 | 297:19 |
| 299:20 300:20 | **gradient** 84:2 | **gyn** 288:2,4,5,8 | **happy** 70:17 |
| 301:13 | 90:13 | **gynecologic** | 173:4 280:4,9 |
| **golomb** 3:4,6 | **grant** 46:1 | 66:23 278:18 | 283:5 |
| 60:18,19 | **great** 49:23 | 288:10 | **hard** 150:13 |
| **golomblegal....** | 70:7 112:1,11 | **gynecological** | 235:21 274:14 |
| 3:12 | 140:11 145:7 | 44:3,7 | 280:22 292:7 |
| **gonzales** | **greater** 178:13 | **gynecologists** | **harlow** 7:6 14:4 |
| 174:10 175:3,8 | **gregory** 1:13 | 81:22 | 128:20 129:8 |
| 175:15 176:9 | 5:2,12,16 6:9 | **gynecology** | 129:13,20 |
| 176:12 177:2,7 | 9:2,24 60:7 | 66:22 | 131:1 133:8,12 |
| **gonzalez** 99:9 | 236:10 305:14 | | 133:24 134:10 |
| 99:10 117:7,13 | 306:13 | **h** | 134:23 135:4 |
| 117:18 | **group** 6:14 85:3 | | 135:15,19 |
| **good** 9:8,8,10 | 101:22 103:11 | **hagelund** | 137:5 138:14 |
| 9:20,21 11:19 | 116:23 196:7 | 201:10 | 139:21 140:4 |
| 14:6 17:3 18:21 | 290:4 291:21 | **half** 194:9 | 140:18 142:9 |
| 40:14 41:12 | 292:19 295:14 | 227:13,23 | 142:12 146:6 |
| 45:11 52:9 64:6 | **groups** 66:24 | **hand** 70:13 | 148:7 149:2 |
| 96:15 104:18 | 105:13 110:21 | 237:3 307:15 | 154:13 |
| 129:2 147:24 | 110:23 121:22 | **handed** 161:6 | **harlow's** |
| 148:1 168:5 | 123:2 286:15 | **handful** 11:14 | 133:16 |
| 174:13 182:18 | 291:15 | 292:6 | **harm** 25:20 |
| 182:19 183:12 | **growing** 198:23 | **handle** 235:8 | **harmful** 295:19 |
| 183:14 193:19 | **guaranteed** | **handles** 233:15 | **harmless** |
| 199:15 283:4,4 | 234:9 | **handling** 8:7 | 295:17 |
| | | 25:17 230:18 | |

**[harris - huge]**                                                          Page 30

**harris** 4:4 9:13
  20:10 27:24
  28:5,7 29:4
  217:17,17
  218:6,12
  219:20 220:3
  220:14,19
  221:9 224:8,9
  224:21 225:19
  226:2,11
  250:21
**hazard** 120:9
  122:3 123:7
  125:16 134:14
  158:1 166:7,10
  246:6 248:6,12
  249:6,7 280:14
  288:17,23
  290:16 291:18
  294:17
**hazards** 6:19
  107:20,21
  108:3 246:4
**head** 58:21
**health** 6:11,12
  25:2,11 43:2
  46:1,3,11 66:7
  66:10,13 77:7,9
  77:12,24 78:6,8
  78:18 79:13
  80:3 82:14,18
  82:20 83:16,21
  84:19,19 85:6
  85:16 87:2,4
  88:1,8,16,22
  89:4,13,18

90:11,20 91:12
  92:2,16 93:13
  93:20 94:6,11
  94:17 95:20
  96:17 97:12
  99:19 100:5,9
  104:1 108:13
  109:4 113:17
  180:4 204:3
  210:18 250:12
**hear** 9:14 20:12
  28:5,6,7 35:21
  36:13,21 140:1
  151:18
**heard** 31:9
  35:24 72:9
  111:16 130:3
  150:6 232:11
  292:10
**hearing** 5:14
  127:22
**heavy** 274:14
**held** 1:13 78:14
  278:4
**help** 13:3 53:8
  53:8 65:23
  70:17 83:12
  158:21 220:18
  246:7,7 274:3,4
  289:1
**helper** 114:5
**helpful** 202:6
**helping** 80:22
**helps** 293:21
**henrich** 4:6

**hey** 180:19
  299:16
**high** 7:15 89:22
  90:5 102:18
  104:3,7,13
  105:20 167:21
  197:9 274:7
**higher** 238:6
  302:20
**highlight**
  246:21 256:16
**highlighted**
  82:23 83:6
**highlighting**
  83:3
**highlights** 12:3
  83:12 189:17
  189:20 190:2
  190:12 194:6
**highly** 228:16
**hill** 4:9 33:13
  33:18 35:4 84:8
  84:14 86:7,7
  93:21
**hire** 55:3,6
**histologies**
  71:16
**histology** 72:10
**histories** 203:7
**history** 170:3
  202:19 207:13
  207:20,21
**histotypes**
  220:23
**hold** 41:17
  71:24,24 276:8

278:17,21
**holly** 218:6
**home** 192:23
  193:10 243:2
**honest** 277:20
**honestly** 223:10
**hope** 12:23 42:5
  114:2 255:14
**hopefully**
  173:13 230:11
**hoping** 173:1
  179:23
**hopkins** 41:19
  41:23 42:7
  130:9 163:5,10
  216:24 231:8
  283:17
**hormonal**
  200:8
**hormone** 5:21
  30:20 174:21
**hospital** 163:10
**hospitalization**
  236:9 238:7
**hotel** 1:15
**hour** 194:9,9
**hours** 58:2,6,13
  186:2 193:7,20
  194:13 250:8
  301:3
**hpv** 159:19
**hr** 154:3 155:2
  290:12
**hrs** 226:6 246:6
**huge** 60:1

[huh - incidental]                                                      Page 31

huh   92:14
  111:1
human   105:22
  105:24 106:1,2
humans   6:19
  107:21 108:4
hundred
  128:15 140:20
  194:19 249:16
  261:23 302:21
hypothesis
  123:19,22
  142:23 143:19
  146:8 147:3
  154:5 255:10
  292:24
hypothesized
  121:3 124:2,10
hypothetical
  27:16,17,18,22
  28:13,20,20
  135:10,13
  272:2 275:5
  291:7
hypothetically
  272:8,17
  274:24 277:7
  290:10 291:5

          i

i.e.   227:12,23
iarc   6:15,17
  65:11 101:18
  101:18,22
  102:1,8,17,18
  103:12 104:2,4

  104:20 105:1
  106:4 107:2,3,5
  107:19 108:2
  108:16 111:14
  112:1 256:1,5
  257:2,7 268:10
idea   57:16
  145:8 211:3
  255:6 263:4
  267:22
ideas   194:5
identical   29:24
  279:9 292:23
identification
  6:18 12:16
  14:11 16:5,12
  30:14 37:23
  39:5,17 48:20
  49:11 50:24
  60:6,12 79:1
  103:8 107:17
  107:20 108:3
  113:4 117:16
  128:22 156:4
  161:9 167:18
  195:13 204:8
  217:23 230:1,8
  253:12 263:8
identified   162:9
  169:23 203:19
  291:15
identify   18:14
  24:4 30:16 78:8
  103:11 125:13
  195:5 213:17
  265:20

identifying
  84:6
ignore   81:1,2,5
ilardo   265:7
imagine   67:12
  220:9
imaging   265:21
imagining
  261:13
impact   91:16
  127:20 190:19
  191:5,17 207:2
  303:16
impacted
  125:18
impacting   46:4
impacts   43:19
implement
  244:4
implication
  43:15
implications
  247:16
implied   80:9
implies   255:2
importance
  301:23
important   84:7
  84:8,13,13
  119:13 132:3,7
  137:17 149:3
  153:2 193:20
  211:13 231:24
  246:22 279:10
  279:18 281:14

impossible
  224:24
improper
  111:23 179:9
improve   182:9
improves   177:1
imputation   8:6
  74:6,6 216:17
  230:18 231:16
  232:5,23,24
  233:3,9,10,13
  233:14 234:5
  234:14 239:14
  240:1,5,10,11
  240:16,19
  242:16,16
  243:14 244:13
  245:1 246:9
  279:7,21 280:1
  280:22 295:5
  296:4
imputations
  240:6 295:2
impute   232:5
  282:6
imputed   296:1
imputing   244:5
  246:3 281:7,8
incidence   5:20
  30:19 174:20
incident   7:10
  125:11 155:22
  182:7 183:7
  245:16
incidental
  156:21 157:1

**[inciting - inquiry]**                                            Page 32

| | | | |
|---|---|---|---|
| **inciting** 159:17 | **incorporated** | **indicate** 98:14 | **inflammatory** |
| **include** 43:18 | 32:5 | 171:12 260:20 | 159:17 |
| 97:23 114:13 | **incorporating** | **indicated** 134:8 | **influence** 33:16 |
| 114:21 117:2 | 189:7 | 135:16 168:17 | 254:23 255:5 |
| 165:5 166:22 | **incorrect** 80:18 | **indicates** 108:8 | 255:17 281:19 |
| 197:1 205:20 | 89:13 113:22 | **indicating** | **inform** 267:18 |
| 206:8 235:7 | 296:5,7,11 | 49:17 158:18 | 275:11 |
| 263:16 264:9 | **incorrectly** | **indication** | **information** |
| 265:6 275:8 | 178:21 296:5 | 210:13 | 23:1 61:14 72:3 |
| 287:22 | **increase** 118:19 | **indications** | 80:10 93:11 |
| **included** 41:3 | 125:13 137:6 | 44:20 | 101:4,5 110:21 |
| 47:1 63:20 | 140:12 224:12 | **indicative** | 181:6 183:3 |
| 91:22 93:24 | 225:9 226:4,16 | 93:15 94:3 | 206:20 229:6 |
| 99:5 120:16 | 227:15,24 | 269:12 | 232:1 255:23 |
| 155:10 174:19 | 252:13 260:5 | **indicator** | 260:7 270:1,6,8 |
| 178:9 268:17 | 280:1 300:18 | 275:18 | 270:12,16 |
| 268:18,19 | 302:17 | **indicators** | 293:18 |
| 300:6 | **increased** 7:19 | 269:3 | **informed** 213:1 |
| **includes** 43:22 | 7:21 118:6,8 | **individual** 54:2 | 229:1 |
| 58:13 63:22 | 182:7 195:16 | 281:8 | **informs** 197:9 |
| 116:21 174:11 | 199:1 204:5 | **individual's** | **inherent** |
| 200:15 278:19 | 205:5,12 | 159:18 | 202:19 207:13 |
| 288:2 | 224:17 302:12 | **individually** | **initial** 174:8 |
| **including** 105:4 | **increases** | 18:14 165:24 | 177:22 178:18 |
| 217:15,15 | 181:23 | **individuals** | 223:6,7 |
| 265:21 291:12 | **increasing** | 24:17 97:23 | **initially** 31:9 |
| **inclusive** 17:7 | 177:3 245:15 | 98:6,11 101:1,5 | 188:4,24 244:6 |
| 18:1 | 245:17 | 101:10 266:2 | **inject** 74:8 |
| **income** 52:18 | **incredible** | **induce** 276:7,10 | **inmate** 202:4 |
| 76:10,13 | 197:7 | **indulgence** | **inquire** 58:9 |
| 281:16,17,22 | **independent** | 260:11 | 283:2 |
| **incoming** 217:5 | 45:21 110:2,7 | **industry** 64:19 | **inquired** 31:10 |
| **inconsistent** | 112:2 238:14 | **infection** | 31:16 |
| 296:8 | **index** 5:1,24 6:1 | 159:19 | **inquiring** 65:21 |
| **incorporate** | 6:24 7:1,24 8:1 | **inferred** 136:4 | **inquiry** 111:21 |
| 175:3 | | | |

[inserted - iteratively]                                                      Page 33

inserted   154:1
insights   201:19
  202:2
instance   175:3
institute   97:12
  98:18 109:4,12
  204:2
institutes   66:10
  97:12 250:12
instruct   72:4
  224:4
instructing
  172:1,4,5,14
instruction   5:9
insufficient
  14:23 15:16
  17:5
insult   151:2,5
  152:5
insulting
  150:24
intact   137:7
  142:14 166:9
intend   251:20
  253:22 265:15
intended
  245:16
intention
  170:24
interest   141:15
  234:6
interested
  193:6 307:13
interesting   97:6
  97:8

interests   43:18
interference
  28:3
internal   43:24
  184:4,7,22
  236:16
internally
  185:12
international
  65:11 102:2
  108:12 161:13
  162:6
internet   61:8
interpret   227:3
interpretation
  93:10 264:9
interpreted
  144:18 153:19
interpreting
  132:4
interrupt
  217:12 250:6
interrupting
  20:11 300:24
interstitial
  271:21
interval   120:9
  123:8 134:16
  135:11,14
  142:18 154:4
  166:8,11 248:9
  289:6 290:13
  290:15,16
  293:23 294:18
intervals
  119:17,22

121:20 281:5
  292:8
intimate   5:19
  30:19 174:19
  198:22 201:20
  205:21 206:9
  207:3 244:1
  246:1
introduce
  298:1 299:21
introduced
  297:24 299:11
  302:18
introducing
  179:21
investigated
  146:5 303:16
investigator
  100:13,18
  235:1,22 255:8
investigators
  98:22 117:6
  123:5 176:1
  179:13 181:16
  232:3 255:13
  256:9,11,15
invitation   82:1
invite   141:2
invited   109:4
  109:12 122:19
  140:14 141:7
  218:10,10,12
  218:15,16,17
invoice   50:6
  54:20 56:21
  57:18 58:9 59:1

invoices   6:6,7,8
  41:5 47:21 48:4
  48:8,13,17,22
  49:1,14 50:19
  53:12,16,17
  54:2,6,14 55:1
involved   239:24
  241:7 256:5
involves   268:3
involving   63:15
  162:10
irritants   159:16
ish   198:7
issue   45:21
  46:15 64:15
  74:1,19 77:4
  101:20 156:20
  254:2
issued   37:4
  38:16 76:24
  77:12 89:14
issues   46:3,22
  51:15,22 61:8
  64:9 66:13
  69:11 96:12
  174:3 253:21
  278:11
issuing   90:8
  91:12
item   261:24
items   11:8
  54:13
iteratively
  233:19

[j&j - know]                                                          Page 34

**j**

**j&j** 51:5,18
  55:9,13 68:17
  69:9,18 71:8,14
  73:12 75:1,3
  76:1,13 82:1,2
  132:19,20
  186:4 189:5
  190:11 192:3
  212:19 213:1
  251:22 262:13
  262:18 263:3
**j&j's** 189:13
**jama** 113:9
  129:15 138:7
  140:9 145:24
**jenkins** 265:7
**jersey** 1:2 2:2
  4:9 10:4 15:24
  19:1,10,15,23
  29:13,18
  188:15 254:5
  258:23 265:9
  271:23
**jewish** 170:2
**job** 40:21 42:14
**johns** 41:19,23
  42:7 130:8
  163:4,9 216:24
  231:8 283:17
**johnson** 1:4,4
  22:6,6 31:10,10
  31:16,16,20,20
  37:6,6 41:24,24
  42:7,7 51:13,13

52:12,12,16,16
52:19,19 54:23
54:23 57:23,23
59:9,9 62:10,10
63:9,9,17,17
64:7,7 68:16,16
68:17,17,20,20
68:23,23 70:19
70:19 72:12,12
72:20,21 75:22
75:22 76:16,16
76:19,19,24,24
77:3,3 79:14,14
79:17,17,22,22
80:4,4 132:7,7
211:23,23
262:24,24
282:15 305:13
305:13
**journal** 30:24
  140:15 155:23
  161:13 162:6
  183:17,21,22
  184:1,2 185:3
  185:22 186:14
  196:8,10,13
  197:1,2,6,17,23
  218:8 219:2
  250:1,14
  261:12
**journals** 135:3
  197:1,18,22
**judge** 33:2,7,7
  35:8,12,20
  36:12 37:12
  38:12 96:12

172:14
**judgment**
  133:5
**july** 33:3
**jump** 290:7
**jumping**
  242:23
**june** 1:14 5:3
  61:10 62:5
  103:13 108:9
  108:10,10
  204:4 307:21
**jury** 9:23 17:21
  59:8 96:14
  132:15 297:2

**k**

**kaboodle**
  194:10
**kala** 163:3
**kate** 145:13
  151:20 152:7
  169:2 172:10
  262:2 300:23
**kathryn** 3:15
  218:7 220:14
**katie** 48:1
  97:24 98:17
  109:1 202:23
  221:18 260:12
**keep** 49:6 57:17
  57:19 63:24
  76:9 180:13
  213:11 242:23
**ken** 110:1

**kenneth** 109:18
**kettering** 199:9
  199:10
**key** 206:23
  208:8 209:1
  241:17 246:2
  281:9
**kind** 48:7 69:22
  76:11 115:7
  184:8,15 194:7
  197:23 205:20
  233:23 238:8
  241:13 255:6
  272:2 299:16
**kinds** 111:7
  288:6
**king** 3:17
**kit** 194:10
**klehman** 3:21
**knew** 79:23
  244:22 279:20
**know** 10:14,14
  10:23 11:16
  13:1 17:14
  19:13,19,20
  22:20,24 24:13
  25:8 26:12,16
  27:9,14,15,16
  31:15 34:12
  35:24 36:1,4,10
  37:16 38:4
  40:19 42:12
  43:16 44:17,19
  47:8,11,14 50:3
  51:7,11,20 52:1
  52:2,14,15,21

| | | | **l** |
|---|---|---|---|
| 53:1,4,4 55:16 | 143:23 144:21 | 237:7,13 | **l.7** 292:19 |
| 55:20 56:11 | 150:22 152:13 | 239:22 241:3 | **label** 120:18 |
| 57:3,4,20 59:24 | 152:16 153:19 | 241:16 243:16 | **labeled** 105:20 |
| 62:24 65:21 | 155:9 158:23 | 244:22 246:19 | 137:3 |
| 67:10 68:2,3,5 | 159:11,13 | 247:1 251:3,17 | **lack** 88:2 |
| 69:21 70:15,23 | 163:5 164:5 | 252:14 254:1 | 126:12 142:15 |
| 70:23 71:3,3 | 167:14 168:20 | 255:3,6,10,13 | 143:1,6,22 |
| 73:3,5,15 74:14 | 168:21 174:12 | 256:1,8 257:5 | 144:7 146:9,19 |
| 75:5,7,13 76:6 | 184:6,11,11,18 | 257:13 263:2 | 146:20 147:10 |
| 76:9 77:2,20,21 | 184:20,22 | 264:8,23 | 147:13 148:10 |
| 77:22 79:16 | 185:6,20 189:3 | 265:22 266:16 | 149:5 152:18 |
| 80:8 82:8,9,22 | 189:17 190:5 | 268:2 271:19 | 152:22 |
| 82:23 84:7 86:4 | 190:21,21 | 275:12,13,20 | **lacked** 124:20 |
| 86:8,9 91:20 | 191:13 193:8 | 275:21 276:4 | 126:13 |
| 94:14 96:4 98:6 | 194:1,3,5,7,8 | 281:12,15,21 | **lacks** 295:21 |
| 98:8,14,15,21 | 196:10,11,18 | 281:24 285:13 | **ladies** 59:7 |
| 100:15,20,21 | 199:6,16 | 287:5,8 288:2 | 132:14 |
| 101:14 102:7 | 200:14 201:9 | 291:12 293:20 | **lancet** 103:14 |
| 102:12,23 | 204:17 210:2,4 | 294:21 295:14 | **landed** 86:13 |
| 106:3 109:16 | 210:5,9 211:2 | 296:9,20 299:8 | **langseth** 162:19 |
| 110:1,4,10,12 | 211:12,21,22 | 299:9,10,13,24 | 162:20 |
| 110:13,22 | 211:23 212:2,3 | 300:2,7,13 | **large** 18:16 |
| 111:2 112:6 | 212:13,17,17 | 301:9,11 | 85:11 235:4 |
| 114:6,10 | 212:19,21,22 | 302:15 303:1,7 | **larger** 92:6,10 |
| 118:21 119:12 | 213:21 215:6,8 | **knowing** | **largest** 116:15 |
| 124:8 127:16 | 216:5,10,23 | 296:23 | 116:20 166:3 |
| 127:17 129:20 | 217:2,3,4,5 | **knowledge** | 173:24 220:20 |
| 129:22,23,24 | 219:5 220:13 | 101:4 105:15 | 221:5 |
| 130:1,8,22 | 220:19 221:2 | 133:6 | **lately** 59:17 |
| 131:5,11,14,16 | 222:5 223:24 | **known** 25:11 | **latitude** 145:7 |
| 131:16 132:5 | 225:15 229:10 | 68:2,9 99:8 | **law** 38:18 77:3 |
| 133:13 135:6 | 231:2,4,6,10,21 | 143:8,19 | 95:24 266:11 |
| 136:10,20 | 231:21 232:13 | 159:22 229:10 | 293:22 307:8 |
| 137:12,15,16 | 234:23 235:5 | **knows** 301:12 | |
| 137:17,19,21 | 235:13,13,16 | **kslaw.com** 3:21 | |
| 137:23 139:14 | 235:17 236:23 | | |

**[law.com - life]**                                                    Page 36

| | | | |
|---|---|---|---|
| **law.com** 4:11 | 215:19 | 149:11,15,19 | **lengths** 112:1 |
| **lawyer** 96:3 | **lehman** 3:15 | 150:16 151:15 | **lesions** 7:14 |
| **lawyers** 31:10 | 5:8 15:2,19 | 151:21 152:3 | 167:21 168:2 |
| 31:21 187:16 | 23:20 25:7 26:5 | 153:10 168:24 | **letter** 7:5 129:8 |
| 187:18,22 | 27:20 28:17 | 169:4,10 170:6 | 129:14 133:9 |
| 189:5 192:3 | 34:19 36:19 | 170:17,20,23 | 133:23 136:8 |
| 198:9 | 38:20 43:3,8 | 171:1,5,8,15,17 | 136:12 139:21 |
| **lay** 155:5 | 47:24 49:23 | 171:19,21,23 | 140:3 141:1 |
| **layperson's** | 50:2,9 57:2 | 172:4,13 | 145:14,18,22 |
| 238:9 | 59:11 64:24 | 187:23 206:11 | 145:23 148:21 |
| **lead** 98:21,22 | 65:16 67:18 | 212:11 213:3 | 150:1 218:20 |
| 99:10 202:22 | 69:4,20 70:22 | 214:9 215:4,16 | 251:8,18 |
| 221:20 222:15 | 71:11,19,24 | 222:23 223:3 | **letters** 98:14 |
| 222:17 227:9 | 72:17,23 73:10 | 224:1,4,23 | 129:1,3 130:24 |
| 235:4 | 74:7 76:14 82:6 | 225:13 226:9 | 138:3,14,22 |
| **leaders** 241:3 | 85:20 87:11 | 228:4 232:10 | 218:16 250:17 |
| **leading** 57:12 | 88:5 92:6,8 | 250:5 252:3 | 250:19 251:13 |
| **lean** 158:22 | 94:13,23 95:7 | 255:22 257:11 | **level** 67:23 68:3 |
| **learn** 80:1 | 96:1 98:12 | 258:4,9,12,15 | 68:6,10,13 |
| 105:1 | 101:13 102:3 | 258:23 259:2 | 109:13 235:14 |
| **learned** 79:19 | 102:21,24 | 271:17 272:14 | **levels** 23:21 |
| 79:19 | 104:6 105:8 | 273:3,19,22 | **leverage** 207:21 |
| **learning** 216:11 | 106:7,9,13,16 | 275:24 276:15 | **leveraged** |
| **leave** 39:11 | 107:1,8 112:5 | 277:1,18 278:6 | 203:14 |
| 96:17,18,18 | 113:19 115:4 | 278:14 283:5 | **leverages** 203:6 |
| 112:8 224:7 | 115:15 116:17 | 283:11 284:9 | 207:19 |
| 293:2 | 117:8,22,24 | 284:17,23 | **levin** 2:5 |
| **leaving** 105:9 | 120:12 123:12 | 285:2,12 | **levinlaw.com** |
| **lectures** 46:14 | 124:14 125:20 | 288:11 289:11 | 2:9 |
| **lecturing** 87:12 | 126:15 131:24 | 290:22 294:22 | **li** 230:2,14,16 |
| **left** 96:13 | 132:11,23 | 298:6,20,22 | 231:2 |
| 209:13 212:7 | 134:2 144:10 | 300:8,22,24 | **liability** 1:7 |
| 250:7 258:6 | 144:21,24 | 301:20 303:11 | **life** 203:14 |
| **leftover** 89:9 | 145:2,4,11,15 | 303:22 304:1 | 205:22 206:9 |
| **legal** 3:6 69:18 | 145:19 146:13 | **length** 223:6 | 277:9 |
| 96:12 115:7 | 147:16 148:15 | | |

**lifetime**  175:20
  175:24 176:2
  178:23 179:4
  181:2,7 203:6
  207:21
**light**  228:24
**likely**  31:19
  74:12 155:2,4
  218:14 228:16
  272:11
**likes**  173:6
**limit**  96:9
  211:13
**limitations**
  154:14
**limited**  68:24
  96:5 107:9
  142:13 145:6
  150:20 237:17
  261:3
**limiting**  206:13
**line**  5:10 54:13
  101:14 108:1
  151:16 305:16
**lines**  53:23
  93:12,23 94:2
**link**  114:19
**linked**  7:20
  204:5
**links**  216:4
**list**  12:23 13:3
  41:6 60:7 62:8
  74:23 101:23
  102:4,8,10
  114:6,10
  117:12 139:5

155:10 157:3
  169:22 257:2
**listed**  13:8
  109:22 219:21
  220:3,10 261:1
  269:15 283:18
**listen**  88:7
  132:15 147:24
  150:19
**listing**  200:15
  265:1
**lists**  104:16
**literally**  62:21
  81:18 114:5
  135:9 151:6
  163:22 252:21
  302:24
**literature**  10:14
  10:15 29:15
  33:9,10 46:19
  46:19 60:3 74:5
  74:18 85:13
  87:6 89:22
  96:24 101:7,16
  106:22 112:18
  115:11,18
  116:4 150:3
  160:2,11,19
  198:24 267:2
  271:9
**litigation**  1:8
  10:3,4 19:1
  29:18 33:8
  38:13 48:9,10
  49:2 53:19
  57:24 58:4

68:23 69:12
  95:21 110:20
  131:12,19
  133:10 188:16
  256:21 302:15
**little**  17:11
  24:23 40:22
  47:20 59:16
  63:20 68:15
  69:24 77:6
  91:18 96:19,19
  112:18 116:8
  150:6 153:4
  172:24 176:23
  184:15 188:1
  189:21 208:6
  213:14 218:9
  220:19 242:7
  245:14 250:22
  264:11 289:1
  291:22 292:11
  303:2
**lived**  277:8
**llp**  2:15 3:17
**loaded**  255:7
**locations**
  159:23
**logan**  3:8
**long**  51:4 63:23
  97:7 106:17
  118:2 180:1
  193:6,15 194:4
  203:10,16
  208:2,12,20
  274:7

**longer**  86:10
  181:22 182:8
**longtime**
  207:19
**look**  12:5,6
  15:21 16:15
  18:13 39:20
  46:18 54:2
  58:18,24 75:11
  84:17 100:7
  109:17 117:12
  117:17 139:11
  139:24 141:24
  145:22 149:20
  156:20 157:12
  164:10 169:1
  175:19 180:21
  183:20 191:6
  198:13,14
  199:24 205:19
  209:19 211:16
  223:10 224:8
  238:22 240:23
  243:20,21
  245:20 247:22
  252:19 260:24
  269:3 270:16
  271:3 273:18
  287:13 291:9
  292:14 300:17
**looked**  10:22
  11:6 13:4,6,10
  33:20 82:21,22
  93:22 121:9
  123:5 139:16
  139:19 176:2

**[looked - marked]**                                                      Page 38

179:3,4,4 191:8
219:24 220:2
223:22 249:1
265:24 266:20
268:2,9,12,14
271:12 272:4
275:2 280:13
286:7 291:14
**looking**   13:15
13:18,21 16:8
74:22 92:4
119:15 120:14
161:1 175:15
175:23 184:13
207:6 211:6
220:17 228:11
228:14 231:1
241:21 249:8
258:20 269:1,2
271:19 282:1
289:21
**looks**   17:10
60:17 62:9
170:9 201:10
219:11
**lost**   20:11 27:24
291:22
**lot**   141:8
143:12 234:11
243:6 255:14
257:13 273:23
277:21 281:16
303:2
**lotions**   282:14
**lots**   233:17

**loud**   234:16
**louder**   151:19
**loudly**   254:17
**love**   268:2
**low**   228:21
239:17,20,21
241:8,14
**lowest**   276:11
**lucky**   63:22
**lucy**   31:19
**lung**   42:4 43:14
43:19 45:17
266:17,20
267:7,10 268:3
271:4,12 272:6
272:21 275:19
277:5
**lungs**   273:10,14
275:1 277:11

**m**

**m**   307:3,18
**m.d.**   1:13 5:2
9:2 98:15
305:14 306:13
**made**   22:22
31:3 37:2 39:7
46:8,13 75:21
82:3 104:2
111:21 116:2
189:17 190:11
215:2 218:9
228:19 238:24
248:20 292:9
305:7

**main**   146:24
164:20 165:14
192:24 199:21
199:24
**maintain**   61:23
**make**   11:23
12:14 34:24
37:10 39:9
40:24 44:18
65:19 78:19
81:6,8 127:14
136:15 147:22
183:10 210:18
232:3 235:11
253:9 261:21
262:21 273:18
282:5 293:2
305:9
**makes**   44:24
114:7 173:5
211:4 295:22
**makeup**   282:14
**making**   148:17
157:5
**manage**   235:22
**management**
238:14
**manipulations**
291:12
**manner**   130:14
**manufacture**
75:4
**manufactured**
212:5,8
**map**   112:21

**marathon**
70:14
**march**   101:21
102:4,8,17
113:24
**mark**   11:21
39:1,21 49:3,18
60:6 161:3,4
236:4,5 258:7
**marked**   5:11
6:2 7:2 8:2
12:11,15 14:7
14:10 16:4,11
20:20 30:11,13
37:18,22 39:4
39:14,16 40:4
47:21 48:12,16
48:18,19 49:10
49:13 50:18,23
60:11 78:4,17
78:24 79:7 92:5
92:9,10 103:5,7
105:7 107:13
107:13,16
112:24 113:3
117:13,15
127:12 128:20
128:21 129:7
156:3 160:24
161:2,8,16
167:15,17
173:18 176:8,9
189:21 194:22
195:8,12
203:21 204:7
217:17,20,22

**[marked - meeting]**                                                      Page 39

229:21,24
230:5,7 236:1
253:7,11
258:17 262:6
263:6,7
**markers**
263:21 265:20
271:15 274:12
**market**  282:11
282:16
**marketing**  1:6
**marking**  258:3
**maryland**  1:16
307:1,4
**mas**  1:5
**mass**  110:3
**masse**  233:23
**massive**  281:10
**master's**
235:14
**material**  29:14
140:6
**materials**  11:5
11:7 45:13
139:3,24 140:5
**matter**  135:8
257:13 273:17
274:4 297:21
**matters**  52:20
**mattey**  55:18
**mcdevitt**  4:6
**mcl**  6:7 10:3
18:24 48:8,13
49:2,8,9,15
50:13

**mctiernan**
13:22 36:5,11
**md**  5:13,16
6:10
**mdl**  1:4 2:12
3:3 5:17 6:6
8:11 10:7 15:23
16:1,9,16,20
19:20 20:4,5,21
21:3,4,22 23:5
29:13,22 48:9,9
48:15,17 49:8,9
49:16 50:5
53:13 73:1
258:3 264:6
265:3 278:16
**mean**  18:8 25:8
25:17 26:7
31:20 34:21
36:20 37:13
42:11,12,12,14
42:19 43:13
44:16 45:2 55:6
56:4 57:3,17,19
58:22 59:13
60:1 62:12,13
65:17 67:12
68:11,17 70:24
75:7,15 76:6
82:7 91:17,20
102:10 105:3
111:17 114:4,4
115:17 118:22
119:8 124:23
125:21 130:8
132:12 140:21

143:9 152:5
165:7 168:21
179:12 182:12
192:23 193:9
196:12 201:9
204:23 206:15
210:5 211:2
213:21 215:6
215:20 216:10
217:2 220:6
228:5 229:5
232:2 233:11
233:24,24
234:9,15 237:1
237:13 240:22
242:13 243:16
244:16 245:11
246:12,20
247:5 248:16
250:5 251:14
253:8,20
262:14 264:7
267:11 276:12
276:19 280:11
281:10 287:24
288:9 291:7
295:7,13
297:14
**meaningless**
247:3
**means**  38:4
196:11 232:13
236:22,23
239:13 244:15
259:12 262:20

**meant**  66:1
217:12 271:18
299:4
**measure**
279:15,17,24
**measured**  85:7
**measures**  180:6
180:11 288:24
**mechanistic**
94:1
**media**  70:24
**median**  239:9
281:22
**medical**  8:13
24:23 26:3
28:14 40:16
46:8 54:16
69:10 72:14,22
76:24 192:4
209:16 210:1,3
210:12,16
213:4 236:15
262:11,16,17
262:23 282:20
283:7 284:8
285:14 286:17
286:22
**medicinal**
284:13,18
**medicine**  41:18
41:19 43:24,24
44:3 215:23
236:16
**meet**  290:8
**meeting**  108:9
108:19 111:22

[meetings - money]                                                      Page 40

| | | | |
|---|---|---|---|
| **meetings** | 154:14 176:22 | **migrate** 27:11 | 238:19,24 |
| 100:24 104:4 | 215:14 | 124:12 | 239:2,3,5,7,8 |
| 112:4 | **methodologies** | **million** 55:14 | 239:14,17,21 |
| **member** 108:17 | 32:14 279:8 | 56:10 162:8 | 240:3,5 241:9 |
| 109:5,12,21 | **methodology** | **mind** 258:19,20 | 244:2,11,23 |
| 196:4 197:13 | 14:18,22 15:15 | 258:22,24 | 245:7 246:2,3 |
| **memory** 168:5 | 16:22 17:4,19 | 259:20 | 246:11 259:9 |
| **mentally** 76:8 | 32:11,17,20,22 | **mine** 25:24 | 277:20,21 |
| **mention** 130:3 | 33:1 34:10,13 | 27:18 58:21,24 | 282:4 |
| 215:24 | 34:17,23 35:13 | 94:9 132:1 | **misspecified** |
| **mentioned** | 35:14 36:15 | 163:16 207:8 | 154:16 |
| 12:19 16:14 | 38:14 82:19 | 208:6 | **misstated** |
| 87:21 138:24 | 87:23 186:21 | **mined** 159:22 | 113:17 |
| 139:17 210:7 | 187:1,13,20 | **minerals** 24:4 | **misstates** 277:2 |
| 216:1 282:19 | 252:1 | **minor** 40:21 | **mistaken** 41:9 |
| **merlo** 80:12 | **methods** 8:4 | 64:1 | 89:5 |
| 81:12 192:7,20 | 32:18 184:16 | **minute** 103:18 | **misuse** 246:15 |
| 204:18 216:21 | 184:19 213:18 | 163:20 173:8 | **mixes** 147:21 |
| **merlo's** 11:1 | 214:2 215:3 | 214:10 259:13 | **mixture** 287:4 |
| 80:2 82:4 | 216:15,17 | 300:3,14 | 295:8 |
| 192:18 | 218:2 241:22 | **minutes** 133:19 | **mode** 239:10 |
| **merlot's** 79:21 | 251:7 282:9 | 173:8 250:7 | **model** 246:5 |
| **merritt** 162:22 | 297:4 302:18 | 254:5 | **modern** 130:7 |
| **mesothelioma** | **mhs** 1:13 5:13 | **misclassificat...** | **modest** 85:8 |
| 63:10,16 | 5:16 6:10 | 154:15 200:5 | **modifiable** |
| 272:22 | **mi** 232:18 | 248:21 249:5 | 46:22 47:5,9,10 |
| **message** 20:14 | **michelle** 2:13 | **misreporting** | 47:18 211:9 |
| **messaging** | 12:7,13 50:4 | 227:12,22 | 228:15 229:1 |
| 229:16 | 168:16 258:19 | **missed** 282:8 | **moment** 32:10 |
| **messed** 299:16 | **microphone** | **missing** 8:8 | 34:20 155:16 |
| **met** 86:2 | 9:15 | 57:4 74:6 | 163:17 164:7 |
| **meta** 155:3 | **middle** 155:5 | 230:19 231:13 | 230:22 271:23 |
| **method** 231:17 | 192:9,14 | 231:18,23 | 294:17 |
| 241:4 279:22 | **midst** 302:14 | 232:1,6,8,20 | **moments** 302:1 |
| **methodological** | **midway** 294:19 | 233:4,15,16,23 | **money** 53:9 |
| 74:1 82:12 | | 235:8 238:14 | 54:8 75:20 76:1 |

**[money - nicolas]**                                                        Page 41

76:12 77:1
**monies**   46:1
53:17
**monograph**
103:12 268:10
**monographs**
6:16,17 107:19
108:2
**month**   76:7
178:12
**months**   178:2
**morning**   9:8,10
9:20,21 263:10
**motivated**
22:19 255:12
256:15
**move**   29:8
39:13 86:17,18
90:10 134:9
147:23 150:10
213:7
**moving**   49:7
172:22 213:11
**mparfitt**   2:19
**msa**   54:24 55:2
55:3 58:14
**multi**   95:21
**multicenter**
7:16 167:22
**multidistrict**
10:3 19:11 33:8
**multiple**   8:6
74:6 116:19
179:17 200:3
216:16 226:22
230:18 231:16

232:5,22 233:9
233:12,14
234:1,4,14
235:2 240:5,11
240:19 242:16
243:14 244:12
245:1 246:4
247:16 295:2,5
295:9,10
**mundt**   109:18
109:21 110:1
**murray**   7:7
129:9,14
135:16,20
137:5 138:15
139:21 140:4
**mutation**
242:16
**mute**   60:24
61:2

**n**

**n**   3:7 230:4
**n.e.**   3:18
**name**   9:23 83:6
84:22 87:21,21
90:14 217:3
254:11 295:11
**named**   307:5
**names**   98:14
257:1
**naomi**   201:10
**napkins**   158:11
159:7
**national**   66:10
97:11,12 98:18

109:3,11 204:2
250:12
**nature**   155:23
**nci**   46:2 66:16
185:17
**nearly**   292:23
**necessarily**
63:19,24 134:3
134:4 139:4
172:23 181:23
204:24
**necessary**
282:20 283:7
305:7
**need**   39:19
41:16 50:15
54:11,13,15
70:12 72:7 95:7
147:23 151:18
168:8 172:23
201:21 252:22
254:13,16
259:16 260:11
**needed**   114:7
305:9
**needs**   26:8
149:20 235:6
**nefarious**   255:3
**negative**   120:3
280:23
**neighbor**   81:15
**neither**   81:21
133:23
**ness**   239:17,21
241:9

**never**   24:14
27:23 86:13
118:15 120:15
125:17 134:14
140:12 142:24
146:9,15
147:10 148:11
149:5 152:17
178:10,11
185:21 213:1
217:11,14
244:6 248:3,7
299:14,14
**new**   1:2 2:2 4:9
10:16 15:24
18:11 19:1,9,15
19:23 21:12
23:2 29:14
31:17 60:3
96:24 205:3
231:9 244:21
254:5 258:23
265:9 271:23
**newer**   10:15
11:15 21:9
**newest**   287:9
**newly**   175:3
**news**   302:15
**newsome**   265:7
**nhs1**   117:2
**nhs2**   117:2
**nice**   9:10 147:1
193:4 290:8
**nick**   109:10
**nicolas**   98:4
100:17

**[niehs - o'brien]**                                                Page 42

**niehs**  46:2
  97:13,15,16
  98:19 100:14
  157:12 174:17
  202:23 205:3,9
**night**  193:1,12
  262:1
**nih**  46:2 97:15
  97:16 100:20
  184:3,3,6,14,18
  185:4 190:18
  204:2 205:17
  250:1
**nine**  49:21
**niosh**  67:4 68:7
  68:10
**niosh's**  67:8,22
**nodules**  43:14
**nominal**  239:10
**nominated**
  108:23
**nominations**
  108:22
**non**  118:17
  121:10,19
  123:2 154:15
  249:5 290:2,4
  291:16 303:21
**nonphysicians**
  210:2
**nonusers**
  178:21
**norm**  180:12
  184:7
**normal**  255:17

**north**  1:15
  212:9,15
**notarial**  307:15
**notary**  1:17
  307:3,19
**note**  152:9
  161:20,24
  172:20 260:18
  260:20
**noted**  15:9
**notes**  254:6
**notice**  6:3 39:3
  39:7,12 48:3
  186:10 250:7
**noticed**  213:16
**null**  118:23
  146:8 153:1
  155:3,4 280:16
**number**  10:20
  12:11,14,18
  14:7 16:2,8
  18:23 19:22
  20:6,9 23:6
  30:12 32:4 39:2
  40:4,5 46:21
  47:22 48:24
  49:14,19,22
  50:13,18 54:5
  59:14 60:9,10
  63:5 78:5,7
  83:4 91:24
  110:6 112:15
  113:1 117:14
  118:8 120:23
  127:13 144:2,2
  160:24 167:16

  173:18 176:8
  177:3 181:23
  194:22 195:8
  203:22 217:21
  234:2 236:1
  242:14 245:16
  257:24 258:2
  258:17 259:4
  279:4 289:16
  292:15 294:12
  297:7
**numbers**  53:15
  53:21 166:15
  166:19 182:7
  252:11 253:10
  257:24 261:12
  290:21 291:2
  291:10 292:23
  294:20
**nurse's**  180:3

**o**

**o'brian**  249:21
**o'brien**  5:19
  6:20 30:1,6,12
  30:17 31:7 32:5
  88:22 89:4,14
  97:24 98:17
  99:20 100:2,4,4
  100:10 109:2,3
  112:21 113:6
  114:13,16
  115:19,21
  116:9,22 117:5
  117:20 118:5
  118:14 119:18

  120:16,19
  122:1 124:20
  125:2,15
  126:11,22
  129:12 134:11
  138:11,12
  139:22 140:11
  140:18 141:21
  142:2,8,9,11,24
  143:5 144:6
  146:4,5,12
  148:6,10,24
  149:1,9 150:2
  152:17 153:24
  154:13 155:19
  156:19 157:12
  160:13,17,17
  160:18 162:15
  166:13,18,22
  166:23 167:9
  173:15,20,23
  174:9,16
  175:19 176:23
  176:24 177:7
  179:2 180:22
  183:15,16
  185:1 186:10
  186:21 187:15
  187:21 188:13
  188:21 189:6
  189:20 190:17
  191:12 192:6
  193:21 196:8
  197:3 198:18
  200:18 201:7
  202:2,13,23

**[o'brien - okay]** Page 43

| | | | |
|---|---|---|---|
| 203:1,13 | 43:3,8 57:2 | **objected** 285:5 | **oc3** 166:3 |
| 209:13 213:19 | 59:11 65:17 | **objection** 15:9 | **occasions** 44:16 |
| 214:12,21,23 | 69:4,20 70:22 | 15:19 23:20 | 71:9 189:3 |
| 215:1,10 216:9 | 71:11,19 76:14 | 71:22 72:17,23 | **occur** 159:21 |
| 216:13,16 | 82:6 85:20 | 73:10 98:12 | **occurs** 231:24 |
| 219:6,7 224:11 | 87:11,12 88:5 | 102:21 104:6 | **odd** 44:23 |
| 224:20,22 | 94:13,23 96:1 | 107:1 123:12 | **odds** 279:13,14 |
| 225:1,5,16,18 | 101:13 102:3 | 132:11,23 | 289:3 |
| 226:1,13,14 | 102:24 103:1 | 144:23 147:16 | **offer** 197:7 |
| 227:7,22 228:7 | 106:6,14 107:8 | 148:15 153:10 | **offering** 269:5 |
| 228:23 229:19 | 107:9 112:5 | 171:16,18,20 | 282:13 |
| 242:23 244:10 | 113:19 115:4 | 172:3 206:11 | **oh** 11:13 17:15 |
| 245:9 246:18 | 115:15 116:17 | 224:1 228:4 | 21:7 27:8 40:9 |
| 248:20 250:20 | 117:8,22,24 | 273:3 278:23 | 57:16 94:14 |
| 251:7,24 252:8 | 120:12 124:14 | 282:22 283:9 | 114:4 125:21 |
| 254:20 256:20 | 125:20 126:15 | 286:9 287:2 | 130:15,17 |
| 259:17,18 | 131:24 134:2 | 300:8 | 131:9 135:1 |
| 260:17,21 | 144:10,21 | **objective** | 140:20 142:7 |
| 261:3,7 279:8 | 145:4 146:13 | 174:16 238:1 | 157:17 159:2 |
| 279:19 280:3,9 | 149:11 151:15 | 265:20 | 183:8,11 |
| 285:18,22,24 | 151:16,24 | **objectively** | 186:16 193:5 |
| 286:6 288:19 | 169:10 170:19 | 115:9 | 194:19 196:18 |
| 289:19,20,21 | 171:21 187:23 | **objectives** | 199:12 206:2 |
| 289:24 290:21 | 212:11 213:3 | 179:1 | 214:15 219:10 |
| 291:11 292:18 | 214:9 215:4,16 | **observed** | 220:5 222:5 |
| 294:11 296:3 | 222:23 224:23 | 208:11,19 | 239:3 249:16 |
| 297:3,5 298:12 | 225:13 226:9 | 224:17 227:16 | 262:14 263:1 |
| 300:15 302:3 | 232:10 252:3 | 228:1 | 291:6 |
| 303:14 | 255:22 257:11 | **observers** | **okay** 10:21 12:9 |
| **o'brien's** | 271:17 272:14 | 109:20,23 | 17:16,24 19:21 |
| 209:24 | 273:19,22 | **obstructive** | 20:2 28:8 29:10 |
| **o'dell** 55:21 | 275:24 276:15 | 43:21 | 31:24 35:19 |
| **object** 15:2,3,8 | 277:1,18 285:3 | **obtain** 31:7 | 36:22 37:2,10 |
| 25:7 26:5 27:20 | 289:11 294:22 | **obtaining** 67:1 | 37:14 39:6,11 |
| 28:17 34:19 | 302:8 303:22 | **obviously** 13:3 | 41:3,12 42:6,10 |
| 36:19 38:20 | | 188:8 219:13 | 43:5 44:2,9 |

**[okay - okay]**                                              Page 44

| | | | |
|---|---|---|---|
| 45:11 47:2,8,20 | 110:5,18 111:8 | 169:16,20 | 209:23 210:11 |
| 48:7,14 49:18 | 111:12 112:8 | 172:19,22 | 210:14,18 |
| 49:20,22 50:7 | 113:13,23 | 173:16,22 | 211:13 212:3 |
| 51:4 52:9 54:5 | 114:9,12,15,23 | 174:16,24 | 213:6,10,22 |
| 54:22 55:11 | 116:8,21 | 175:9,18 176:7 | 214:5 215:24 |
| 56:16,20 57:6 | 117:17 118:4 | 176:21 177:6 | 216:14,21 |
| 57:21 58:8,12 | 118:11 120:19 | 177:10,22 | 217:7,16 218:4 |
| 59:2 62:8 64:11 | 121:1,8 123:19 | 178:8,18 179:8 | 219:1,5,13,20 |
| 65:6 68:4,15 | 125:1,4,7 126:1 | 180:2,7,9 181:5 | 219:23 220:1 |
| 71:7,14 72:11 | 126:21 127:4,7 | 181:11,12 | 220:13,16 |
| 73:7,12,20 | 128:19 129:12 | 182:6,16,21 | 221:4,9 222:15 |
| 74:17,22 75:12 | 129:20 130:1,5 | 183:4,13,15,20 | 224:6 227:10 |
| 76:10,21 77:6 | 130:21 131:10 | 184:8,21,24 | 228:10 229:17 |
| 77:16,18,23 | 131:18 132:6 | 185:17,21 | 230:21 231:13 |
| 78:4 79:12 80:1 | 133:18 134:5,6 | 186:1,9,17 | 231:16,23 |
| 80:12,15,20,24 | 134:7,23 135:2 | 187:4,9,17,20 | 232:4,14,17,22 |
| 81:3,24 82:10 | 136:24 137:4 | 188:12 189:19 | 233:2,8,14,21 |
| 82:17 83:8,13 | 137:11,14,16 | 190:1,4,7,16 | 234:4,10,13,18 |
| 83:15 85:1,6,16 | 138:7,10,19 | 191:1,19 | 235:15 236:13 |
| 86:16 87:16,20 | 139:7 140:1 | 192:17 193:3 | 237:5,8,19,23 |
| 88:1,16,21 89:3 | 141:22 142:8 | 193:13 194:10 | 238:13,17 |
| 89:12,17 90:10 | 144:15 145:10 | 194:14,17 | 239:6 240:13 |
| 90:16,20 91:3 | 146:2 148:22 | 196:3,7,14,20 | 241:15 242:5 |
| 91:23 92:12,23 | 152:21 153:12 | 196:24 197:16 | 242:12,22 |
| 93:2,8 94:10,17 | 153:22 154:9 | 197:20 198:3,8 | 243:1,9,13,20 |
| 95:20 96:15,16 | 154:12,24 | 198:10,13 | 244:9 245:6,13 |
| 96:20,21 97:7,8 | 155:15 156:2,9 | 199:6,8,14,24 | 245:20,23 |
| 98:9,17,24 | 156:17 157:18 | 200:17 201:1,7 | 247:4,14,19,22 |
| 99:19 100:8,12 | 158:4,10,23 | 201:15,18 | 248:2,11,19 |
| 101:3,9,17 | 159:5 160:2,16 | 202:1,9,10 | 249:3,11,17 |
| 102:14 103:23 | 161:20 162:6 | 203:5,20 | 250:4 251:17 |
| 104:18 105:1,6 | 162:15 163:3,7 | 204:10,13,22 | 252:24 253:2 |
| 106:3,15 107:3 | 164:13,22 | 205:2,16,19 | 253:13 256:1 |
| 107:18 108:8 | 166:2,16,20 | 206:5,23 207:9 | 258:11,14,18 |
| 108:12,16 | 167:3,13,24 | 207:9,11,24 | 259:11 260:24 |
| 109:1,9,16 | 168:4,5,11,17 | 208:5 209:8,11 | 261:24 262:10 |

262:13 263:2
264:5,24 265:6
265:12,24
266:6 269:14
270:18 271:22
277:5,22 279:4
280:8 284:23
285:21 287:21
288:7 289:1,23
290:23 291:4
293:1,11,16,21
294:6,8 295:2
295:15 297:1
299:6
**old** 22:21 25:9
180:20
**older** 8:10 21:8
236:8 238:3,7
242:14 258:1
295:3
**omission**
138:23 139:2
**onc** 288:2,4,5,8
**once** 86:8
162:16 237:1
**oncologist**
199:8,10
**oncologists**
66:23 81:22
288:2,6
**oncology** 30:24
44:3 103:14
183:17,21
184:2 185:3,3
185:23 196:5
196:16 197:2,7

197:8 198:1
218:8 219:3
250:1,15
**one's** 27:22
**ones** 10:13,22
10:23 11:15,17
13:4 130:9
187:5 296:11
**ongoing** 201:19
**open** 124:16
173:2
**opine** 88:13
**opined** 14:22
17:5 95:21
**opinion** 17:3,10
18:11 22:8 23:7
23:12,14,18
25:4 26:2 28:14
35:16 64:22
67:11,23 94:6,7
94:16 114:18
114:24 119:24
126:9,13,17,20
127:23 131:22
131:22 135:7
136:18 146:18
147:11 148:9
151:11,12
153:7 155:7
209:24 226:11
229:8 253:23
262:1 263:15
265:15 274:17
286:16,21
293:5

**opinions** 15:15
16:19 17:20
21:5,8 32:13
35:13,15 36:16
36:23 38:16,17
64:12 65:13
66:5,18 67:1,5
69:16 71:15
82:11,19 87:3
87:22 90:22
91:15 95:22
96:5 99:2 119:2
119:4 124:19
125:22 132:8
132:18 134:24
136:13 162:3
215:7,8,9 217:8
253:16 263:11
269:6 270:20
278:17,21
282:14 297:2
**opportunity**
34:1 35:21
36:13 38:8
89:19 90:11,21
91:14 107:5
147:2 270:19
278:8
**opposed** 10:23
31:23 40:21
96:14 215:2
218:19
**opposite** 25:16
25:16 280:3,5
280:10 291:21

**oranges** 180:15
180:15,19
**order** 5:22 24:4
37:3,15,19 38:1
38:9 124:16
223:11 234:3
241:11 271:4
**ordinal** 239:10
**organ** 26:23
27:11
**organization**
46:2 104:2
108:14
**organizations**
66:8 185:2
**original** 20:23
99:17 113:21
113:21 141:5
177:10 188:10
188:11 297:22
**originally** 79:7
148:18 206:21
**originated**
179:18
**ors** 85:7 87:7
**outcome**
307:14
**outcomes** 175:5
175:7 180:12
182:13,14
183:3
**outlined** 263:18
265:14 278:22
**outside** 69:12
223:4

[ovarian - paper]                                                        Page 46

**ovarian** 6:22
    7:4,11,15,19,21
    8:5 15:1,18
    17:8 22:4,10
    23:9 27:1,3,7
    36:17,24 44:11
    44:15,22 45:13
    45:22 46:11,16
    47:6,9 51:15,16
    51:19,23 52:3
    52:14,16,23
    55:4,5 56:2,24
    57:24 58:3
    59:10,22 63:10
    63:16 64:9,12
    64:16,23 65:9
    65:14 66:6,14
    66:19 67:2,6
    69:7,12,17
    71:16 85:10
    90:24 97:14,23
    101:12,20
    106:23 107:7
    113:8 114:20
    115:2,13 116:5
    117:19 118:16
    121:13 123:10
    124:5 125:11
    134:15 137:7
    142:22 154:6
    160:4,13,21
    161:11 162:4
    162:10 166:5
    167:1,21 170:4
    174:22,23
    175:4 176:3,4

176:14 177:3
182:7 191:3,18
191:19 192:1
195:16 199:1
200:3,20
202:22 203:3
203:11 204:5
205:5,12 206:6
206:14 207:16
208:3,10,18
218:3 220:22
221:6,12,22,24
222:21 224:12
225:9 226:4,16
227:15,18,24
228:3,18,21
229:3 237:21
241:19 247:23
248:2 266:1,12
267:3,5,8 268:6
268:11,18,22
269:7,13 272:7
272:12,23,24
273:6,12,15,21
275:10,13
277:4,13 286:2
286:18 287:1
303:18
**ovaries** 27:4,13
124:2,17
266:18 267:19
267:23 271:6
275:2,3,17
**ovary** 276:21
**overall** 118:19

**overcome**
    245:8
**overlap** 121:20
**overlapping**
    94:22 126:16
    130:11 144:20
    149:17 170:12
    171:14 217:6
    276:1 283:20
    298:15 300:1
**overseeing** 33:8
    38:12
**own** 11:16
    142:3

**p**

**p** 230:4
**p.c.** 4:6
**p.m** 257:22
**p.m.** 173:10,10
    257:22 304:3
**packages**
    235:18
**packet** 189:21
    253:8
**page** 2:24 3:24
    5:5,10 14:14
    16:21,23 17:11
    17:13,14,15
    20:3 21:3,9,11
    21:12 62:18
    78:10,11,11,12
    83:18 87:23
    89:1,2,17,18
    90:3,14 92:21
    92:22 93:2

109:10 123:16
123:23 125:2
138:8 141:22
142:4 155:1
158:7,7 163:16
163:22 164:18
169:15 196:20
197:6 202:12
206:24 207:10
224:10 228:10
238:13 243:24
245:20 259:7
260:2,17,18,21
261:12 263:12
303:13 305:10
305:16
**pages** 92:21
213:24 251:11
261:4
**paid** 53:22,24
73:7 76:1 131:9
131:12,14,18
131:23 132:19
132:20 133:1
133:21,24
141:15 251:21
256:20 257:3
**papantonio** 2:5
**paper** 98:24
99:1,6 103:14
121:7 129:13
141:5 142:2,3,9
160:16 162:17
167:4,9 168:11
169:14 171:10
185:1 191:7

**[paper - patient]**                                                                 Page 47

193:23 198:19
202:2 227:11
227:11 230:6,6
230:16 236:8
237:3,20,24
238:17 240:9
242:12,13,23
243:3,7 244:10
245:5 254:24
275:15 279:4
286:10 305:11
**papers** 99:4
109:3 157:11
190:18 191:2
252:17 256:23
268:12,14
**paragraph**
22:16 83:21
84:4,6 85:2
93:5 123:23
142:5 143:10
153:23 158:7
159:2 164:19
198:20 202:16
224:9 264:17
**paraphrase**
273:24
**parfitt** 2:13 5:6
9:7,10,19,21
12:8,17 15:9
20:9,19 29:8,11
41:15 48:1,23
49:6,9,22 50:5
50:13,17 60:10
60:21 61:2,5
65:3,18 67:20

70:1,4,10 71:22
72:5 78:22 79:9
95:9 106:11,15
112:16 144:23
145:1,3,10,13
145:16,21
149:18,21
150:17 151:18
152:1,5 164:5
168:15 170:13
170:18,22,24
171:2,7,10,16
171:18,20,22
172:3,7,20
173:6,11
176:12 192:2
195:1,3,6,10,14
203:24 206:13
223:1,8 224:6
229:23 230:4
230:10 231:1
236:4 252:4
254:3,13,16
257:18 258:7
258:11,14,18
260:13 263:5
271:22 278:2,7
278:23 282:22
283:9,13,21
284:2,4,10,13
284:15,20,24
285:5 286:9
287:2 288:14
290:6 298:8
300:23 301:1
301:17 302:8

303:12
**parse** 53:4
**part** 34:22
42:14 63:3 86:4
97:3,16 104:8
108:13 118:6
119:13 121:1
137:2 138:3
194:3 196:19
228:5,6 229:9
255:17 258:16
259:18,18
275:9,12
298:13
**participants**
64:2 177:23
181:17
**participate**
108:17 235:11
**participated**
156:18,19
**particle** 26:12
**particles** 46:23
159:16
**particular**
86:13 115:16
122:17 144:1
144:13 147:5
166:20 179:18
181:17 184:14
185:1 212:18
237:20 241:12
268:13
**particularly**
10:15 142:13
198:22 200:6

228:18 271:20
**parties** 307:13
**parts** 22:3 90:1
**past** 46:19
119:9 162:20
162:23 180:23
301:4
**patency** 123:23
**patent** 120:16
120:17,20,22
121:3,9,10,14
121:19,19
122:2 123:2,2,5
123:21 124:3
154:3 212:20
212:23 246:19
286:8,12
288:18,19
289:2 290:3,4
290:12,14
291:15,16,19
292:24
**pathologist**
266:7 274:10
**pathology** 94:1
266:1,12 267:5
267:7,9,11
271:13 272:5
275:13 277:4,5
**pathway**
123:24
**patience** 278:9
**patient** 197:9
238:4 272:7
276:24 295:3

**[patients - plaintiffs]**                                   Page 48

**patients**  8:10
  42:2,15,22,23
  236:9 242:14
**pattern**  271:21
**patterns**  238:2
**payments**  54:3
**pays**  69:18
**peach**  193:5,17
**peachtree**  3:18
**peer**  74:5,18
  101:7 136:13
  140:15 141:10
  147:12 148:10
  148:19,20
  149:1 183:21
  184:1,4,9,12,15
  197:8 297:3
**pending**  95:2,4
  95:6 242:2
**peng**  230:2,4,14
  230:16,16
  231:2
**pennsylvania**
  3:10
**pensacola**  2:7
**people**  24:3
  128:3 130:3
  132:13 135:5,6
  136:5,8,11
  153:14 173:1
  175:7,11
  179:24 192:4
  228:17 229:16
  232:11 235:19
  235:23 237:2
  238:7 255:10

  256:5 257:3
  281:16 299:15
  302:21
**percent**  59:17
  59:20 118:20
  128:15 137:6
  140:20 142:18
  194:19 239:5,8
  239:15 240:3
  241:9 249:10
  249:16 252:12
  260:4,9 261:23
  300:18 302:4
  302:13,17,21
  302:22
**percentage**
  52:18 53:5 59:8
**perfect**  250:9
**perfectly**  280:4
**perform**  269:17
  300:12
**performed**  32:6
  111:9 173:24
  240:16 295:3
  297:5
**perineal**  14:24
  15:17 17:6
  18:13,17 46:16
**period**  67:24
  118:14 177:4
  177:13 182:8
  275:13
**periodically**
  105:13
**periods**  118:9
  178:1 200:8

**permitted**
  38:18,19,21,22
  38:23
**peroneal**
  158:12 159:8
  275:8 286:3,5
**perpetuate**
  112:2
**persistent**
  208:9,17
**person**  1:12 2:4
  2:14 3:16 24:13
  28:14 42:19
  44:24 45:7
  114:5 235:14
**person's**  26:18
**personal**  4:2
  64:20 110:8
  282:15
**personally**  98:7
  113:23 129:24
  217:2 231:6
  307:5
**perspective**
  198:14 211:9
  255:9 256:12
**pertain**  54:14
  66:13 69:11
  269:9
**pertains**  38:15
  206:5
**ph.d.**  98:15
**pharmaceutical**
  141:16
**philadelphia**
  3:10

**phone**  3:5 4:5
  60:16
**phrased**  122:13
  122:18
**physical**  123:24
**physician**  273:1
**physicians**
  288:1,6
**picture**  209:9
**pictures**  207:7
  209:12
**piece**  305:11
**pink**  83:3,5,12
  230:3
**place**  137:20
  207:6 307:6
**placed**  27:9
  102:17
**placeholder**
  39:12
**placing**  27:2
**plain**  25:9
**plaintiff**  2:11
  3:2 10:18 36:14
  96:8 131:2
  214:11 256:20
  257:3
**plaintiff's**
  12:20,22 34:2,6
  34:15 35:14,22
  89:20 96:6
  124:19 214:6
  215:2,7
**plaintiffs**  2:2
  22:1 24:7 37:8
  38:15 133:14

**[plaintiffs - powder]**                                    Page 49

264:1 265:19
292:10,11
**plan**  235:6
244:20 246:24
251:16,18,22
253:20
**planned**  244:20
251:8
**planning**  246:9
**plans**  193:2,11
266:10
**plaques**  263:22
265:22,22
266:23 271:14
272:20 275:1
**plaquing**
277:10,11
**plausibility**
90:17 227:16
228:2,9
**plausible**  84:2
90:24 124:11
**playing**  151:5
**please**  9:22
16:22 67:18,19
70:15 173:8
234:20 298:6
298:20 300:22
300:24 301:22
**plenty**  67:21
179:20
**pleural**  263:22
263:23 265:22
265:22,23
266:23,23
271:14,14

272:19 274:24
**pleurodesis**
282:20,20,22
283:1,2,3,8,14
283:22,23
**plus**  55:2
247:16
**pneumonitis**
271:21
**point**  29:23
70:13 73:2
85:24 112:10
129:2 135:23
150:24 214:22
227:13 229:13
241:20 243:17
267:23 289:3
290:17 291:24
292:9 301:15
302:23
**pointed**  100:1
256:8 295:7
**points**  179:17
296:8
**pollution**  282:1
282:2,4,8
**pooled**  116:12
125:8 155:2
221:20,24
**pooling**  116:13
118:11
**poor**  134:17
135:21
**population**
134:18 199:21

**portion**  7:12
278:12
**portions**  10:17
**pose**  28:12
**poses**  22:3
**position**  124:20
126:10
**positive**  86:9
119:7 144:2
153:16 154:2
160:3,3,12,20
166:4,24
200:19 208:9
208:17 209:5
221:11 222:20
223:9 280:23
287:6 289:5
292:19 303:8
**positively**  200:2
**possess**  270:16
**possibilities**
155:10,12
**possible**  135:8
160:3,11,20
178:24
**post**  145:24
224:22
**potential**  27:12
71:17 111:22
169:21 191:5,8
198:21 200:4
201:22 203:9
207:2 208:2
224:10 228:19
268:21 269:10
273:1,5 275:18

298:1 299:21
299:22 303:16
**potentially**
159:17
**powder**  1:5
6:21 18:13,19
22:2,6,11 23:9
23:12,19 24:19
36:16,23 53:18
56:24 57:24
58:3 59:10,21
63:9 64:22 65:8
65:14 66:6,13
66:18 67:2,6
69:7,11,17
72:16 75:5
90:24 95:23
97:14,22
101:11,20
104:3,22 105:2
106:21,23
107:6 108:19
109:14 113:7
114:19 115:2
115:13 116:4
118:16 120:15
121:5,12
123:10 124:1,4
124:11 125:10
125:17 134:15
142:22 154:6
157:21 162:3
165:15 166:5
167:1 171:3,12
172:17 174:20
176:4 179:6

**[powder - products]**                                                      Page 50

181:3 191:2,18
191:19,22,24
200:20 203:2
206:6 211:18
211:24 212:5
212:14 220:22
221:6,12,21,23
222:22 224:13
224:16 225:10
226:4,7,17,20
227:13,17,23
228:3,15,24
229:2 237:21
241:18 248:8
253:18 267:18
268:3 270:2,10
270:23 277:10
277:12 282:16
284:7,7 286:18
287:1 305:13
**power**  124:21
126:13 128:2
245:18
**practice**  44:6
134:18 135:21
163:7 287:16
**practices**  1:6
185:20
**pre**  222:8
**precision**
142:19 281:3
**predated**  19:20
89:11
**predetermined**
255:21

**predict**  234:3
**predictive**
191:11
**premarked**
12:14
**premium**  54:18
**prepare**  10:11
40:8 262:8
**prepared**  34:8
**prescribes**  45:7
**presence**  271:5
**present**  40:3
48:5,11
**presentation**
40:19
**presentations**
46:8,14
**presented**  49:1
50:20 54:7
119:14 238:18
238:23 288:19
**presenting**
135:9
**press**  212:1
**pretty**  134:9
187:24 188:8
**prevalent**
155:21 156:21
157:1
**prevention**
44:10 167:24
**previous**
158:18 165:16
175:2 177:1
224:14 225:12
226:6,18

**previously**  40:4
115:20 173:18
176:8,18
177:14 262:3
**primarily**
165:16 269:1
**primary**  43:16
45:17 51:14
64:4,4 285:23
**principal**  235:1
235:21
**principles**
145:9
**print**  261:15
**prior**  49:1
91:12 129:17
186:14 230:15
**priori**  121:3
123:21 124:10
243:15 244:11
244:14,17
245:1,3 246:16
246:19,20
247:2
**priorities**  6:15
103:12
**priority**  101:23
102:4,8,10,18
104:3,8,14
105:20
**privileged**  72:3
**probable**  257:8
**probably**  13:5
41:8 189:8
196:1 198:7
199:14 216:22

261:11
**problem**
217:13 292:17
**problems**
179:21 273:13
**procedure**
231:22 282:21
295:19
**procedures**
229:18 283:7
**proceeding**
22:1 33:2 69:2
111:14,17
**proceedings**
9:17 20:17 29:6
35:20 70:8 73:9
112:12 173:9
257:21 307:11
**process**  108:21
108:21 184:23
185:15 275:23
**produce**  48:3
75:5 269:11
**produced**  49:15
103:13 118:8
264:15
**product**  175:20
179:5 244:1
246:1
**product's**
201:22
**productive**
121:4
**products**  1:5,7
4:3 5:20 17:7
18:2 22:2,11,12

[products - purposes]                                                 Page 51

| | | | |
|---|---|---|---|
| 23:10,10,13 | **proportional** | 66:12 186:14 | 219:2,11 222:2 |
| 24:19 30:19 | 246:4 | 307:3,19 | 223:5 225:7 |
| 36:16,23 72:16 | **proposition** | **publication** | 236:13,14,24 |
| 75:5 95:23 | 181:18 | 31:18 40:19 | 237:1 250:15 |
| 157:21 174:19 | **prospective** | 113:9 141:12 | 251:4,9 252:8 |
| 198:22,24 | 114:17 116:12 | 148:19,21 | **publisher** |
| 199:3 201:20 | 116:13 165:18 | 149:1 166:21 | 196:11 |
| 202:4 205:22 | 165:24 166:3 | 174:7 183:16 | **pubmed**  31:15 |
| 206:9 207:4 | 256:14 280:14 | 186:11 195:23 | **pulled**  186:7 |
| 209:17,18 | 287:7,13 | 196:2 219:8 | **pulling**  105:11 |
| 210:16 212:5 | 297:22 299:12 | 224:22 299:2 | **pulmonary** |
| 273:8 274:18 | **protection** | **publications** | 41:18 42:3 |
| 282:15 305:13 | 72:13 | 46:21 47:4 | 43:21,24 |
| **profession** | **protections** | 97:11 99:11,15 | 271:19 |
| 137:2 | 70:20 71:10 | 100:4 101:6,11 | **pulmonologist** |
| **professional** | **protective** | 130:2 | 42:1 263:21 |
| 40:16,17 59:18 | 153:20 303:9 | **publish**  97:13 | **purchased** |
| 64:22 66:24 | **protocol**  243:15 | 97:22 135:8 | 237:6 |
| 68:22 100:24 | **provide**  42:15 | 141:3,4 149:1 | **purports** |
| 101:19 | 42:22 48:8 | 160:18 219:14 | 287:11 |
| **professionals** | 56:20 181:1 | **published** | **purpose**  18:5 |
| 196:17 | 203:8 | 30:23 31:2 | 29:12 56:4 |
| **professor**  41:18 | **provided**  79:13 | 45:12 73:22,24 | 96:23 106:19 |
| 80:12,19 81:13 | 178:19 186:5 | 74:5 105:3,4 | **purposes**  12:16 |
| 97:24 98:2,4 | 202:2 203:15 | 128:3 129:13 | 14:11 16:5,12 |
| **profile**  7:11 | 248:24 257:2 | 129:14 130:14 | 17:20 30:14 |
| 161:11 162:7 | 270:5,14 | 145:17 155:22 | 32:12,23 37:19 |
| **profound** | **provides**  205:3 | 161:12 166:22 | 37:23 39:5,17 |
| 130:19 | 205:11 208:1 | 167:23 170:8 | 48:20 49:11 |
| **programs** | 234:5 | 170:10 171:11 | 50:24 60:6,12 |
| 235:2,4 | **providing** | 172:6,16 | 65:19 71:17 |
| **prolific**  101:10 | 68:24 | 173:19,23 | 79:1 103:4,8 |
| 101:15 115:22 | **proximally** | 174:8 176:14 | 104:3 107:17 |
| 116:1 130:14 | 153:1 | 183:16 185:22 | 113:3 117:16 |
| **proper**  147:3 | **public**  1:17 | 188:2 196:8 | 128:22 138:11 |
| 245:4 | 25:2 46:3 66:7 | 197:3 218:8 | 156:4 161:9 |

**[purposes - ranges]**                                                    Page 52

164:13 167:18
170:1 195:13
204:8 217:23
230:1,8 239:14
253:12 263:7
266:21 270:18
**put**  26:12 29:1
49:19 70:13
78:19 83:12
139:1 213:10
243:6 250:6
252:16,21
255:13 260:18
272:24 274:14
302:16
**putting**  27:21
**puzzled**  252:4

**q**

**qba**  216:19
247:6
**qualifications**
29:3
**qualified**  26:9
26:15
**qualifier**
142:20
**qualify**  36:3
42:11 115:3,14
116:1
**qualifying**
28:19
**quality**  197:9
**quantitative**
30:20 190:19
191:4 207:1

244:4 247:7
**quantities**
234:6
**quantity**  25:10
**quarrel**  152:11
**quarter**  238:19
239:1
**question**  23:4
25:24 27:19
28:10,12,13
34:24 42:19
43:10 44:23
51:1 52:15
53:11 55:18
57:13 63:4
67:16,20,24
72:7 78:13
80:21 81:9,12
86:17 87:1 95:2
95:4,6 102:17
106:20 120:7
121:23,23
122:12 127:17
127:18 136:2
136:22 145:20
146:3 147:21
148:2,5 149:3,8
149:19,24
150:7,21
152:10,15
159:6 170:13
170:18,21
171:9,19,24
172:5,11,16
177:23 180:2
199:13,18

210:23 223:2
225:3 226:23
232:15 242:2
252:11 261:20
262:7 267:14
273:24 282:10
283:6,10,24
284:5,6,11,14
284:20 285:3,7
285:8,11
289:18,24
291:23 293:14
296:15 298:4,5
298:9,10,11,11
301:5 302:9
**questioning**
130:12 151:16
**questionnaire**
178:19,22
181:1,2 244:7
**questions**  11:5
15:3,4,7,11
30:4 55:21,24
65:20 74:9
75:19 80:8,23
86:21,24 102:4
103:1 127:9
150:13 151:7
151:23 169:11
172:9,12 178:8
213:13 237:18
253:14 254:8
257:16 258:21
262:5 285:17
285:22 287:15
288:12,15

298:10 299:19
301:18
**quibble**  297:15
**quick**  278:3
**quickly**  12:19
134:9 254:6
**quite**  10:20,20
11:6 13:7 56:18
72:1 86:22
151:23
**quote**  43:7,9
99:22 202:13
213:8 214:5
**quoted**  209:15
**quotes**  99:19
**quoting**  43:11

**r**

**race**  221:15,16
**radiation**  42:21
**radiology**
263:18 264:18
265:1,13,16
266:17,21
267:15,16
269:20 271:3
272:5 273:14
**rafferty**  2:5
**raise**  187:5
**rambling**  69:22
**random**  85:9
**range**  224:14
225:11 226:5
226:18
**ranges**  224:16
226:7,20

**rare** 85:11
**rate** 51:2 238:6
  239:17,20,21
  241:8
**rather** 261:12
  289:7
**ratio** 120:9
  122:3 123:7
  125:16 134:14
  158:2 166:7,10
  248:7,12 249:6
  249:7 280:14
  289:3 290:16
  291:18 294:17
**ratios** 246:6
  279:14,14
  288:17,23
**rausa** 265:6
**reach** 26:23
  124:16 255:21
  256:2
**reached** 64:8
  64:11,14,19,21
  65:12 66:11,16
  66:24 67:4
  71:14 72:13,21
  256:2
**reaching** 27:3,3
**read** 10:17 11:1
  12:20,22 17:9
  17:16 22:13,20
  22:24 31:11
  37:13,14 38:8
  77:16,18,20,21
  80:2 82:10,18
  84:3 85:14 86:4

93:18 96:4 98:7
98:8,10 104:8
113:13 114:15
124:6 129:18
130:4,23
131:13 134:8
134:21 140:22
143:3,10 154:7
154:19 157:16
159:24 160:6
162:13 165:20
189:16 191:2,3
192:10,16
194:1 196:19
200:9 201:2
203:11 204:11
205:6 208:13
210:7 211:19
212:1 219:1
220:7,10
223:15 224:18
227:18 240:7
243:7 264:3
270:15 279:11
304:1 305:2,16
**reader** 199:20
  213:17
**readers** 142:18
**reading** 21:21
  22:23 48:5
  79:20 88:6
  101:6 126:6
  145:21 164:10
  222:4 247:17
**reads** 125:7
  165:23

**ready** 173:14
**real** 178:20
  252:23 254:6
  278:3
**realistic** 27:17
**realistically**
  26:17
**reality** 28:24
**realize** 199:13
**realized** 168:6
**really** 96:22
  118:22,22
  147:22 150:9
  152:11,11
  169:3 170:11
  193:10 210:9
  210:14 232:14
  240:22 242:10
  255:19 276:19
  279:18 282:6,6
  288:16 295:19
  295:22 300:21
**realm** 229:12
**reanalysis**
  174:7,11
**reason** 29:1
  136:3 209:16
  210:1,16
  254:12,19,21
  255:20 256:4
  262:22 280:23
  305:16
**reasonable**
  22:8 23:7 275:8
  286:17,22

**reasons** 210:3
**recall** 12:21
  31:24 36:6 52:3
  56:12 74:20
  117:11 141:18
  157:10 163:2
  165:17 181:7,7
  181:9,9,11,11
  190:24 191:9
  216:5,6 223:12
  238:21 248:13
  248:16,21
  249:2,4,10,15
  252:13 260:3
  297:21 298:2
  298:13 299:8
  299:11,21
  301:10,24
  302:18 303:2,6
  303:10,15,16
  303:19
**recalled** 221:1
**recapitulated**
  166:19 225:15
**recapitulates**
  228:7
**receive** 54:21
  197:16,22,23
**received** 12:24
  46:1 53:12
  57:11 262:2
  269:20
**receiving** 111:6
  187:21
**recent** 10:13
  73:20,21 116:2

174:6
**recently** 36:13
77:22 79:20
217:4
**reclassification**
104:5
**recognize** 42:8
215:22 257:1
**recognized**
231:22
**recognizes**
41:24
**recognizing**
228:20
**recollection**
76:12 102:15
102:19 103:18
186:3 195:20
242:13 246:7,8
**recommend**
44:21 45:3
**recommendat...**
6:14 44:24
103:11 210:22
210:24 211:16
**recommendat...**
210:19 213:6
**recommended**
44:14 101:23
104:13 210:8
**record** 19:21
20:15 30:17
37:19 40:2 63:3
65:19 74:9
78:15 81:6
83:11 103:4,9

107:19 136:15
138:11 149:14
149:16,23
151:3 152:8
164:1,14
172:21 175:14
195:6 259:21
261:21 278:5
283:11,13
305:4 307:11
**recorded**
307:10
**records** 263:18
265:14
**recreate** 76:20
179:14 252:22
**redirect** 67:22
**reduce** 209:18
210:20 211:1
**reducing** 211:6
**redundancies**
75:11
**redundancy**
63:1 97:16
**redundant**
11:11
**reevaluate**
174:18
**reevaluation**
201:22
**refer** 11:16
138:2 161:16
164:17 237:4
**referee** 24:10
**reference** 53:16
90:18 91:9,22

99:24 109:18
138:20 139:8
139:17,20
140:6,13 157:3
160:9 162:2
166:12 214:8
216:14 222:7
**referenced**
90:5 130:23
170:14 176:18
214:14 220:11
221:19 240:17
**references**
113:24 138:21
139:1,5 162:1
213:18 214:24
215:13 219:21
219:24 261:2
**referencing**
14:13 41:16
104:12
**referred** 31:7
174:10 222:12
247:6
**referring** 18:18
164:16 295:11
300:15
**refers** 133:12
**reflect** 11:7
12:12 63:6,13
83:11 149:23
151:3 152:8,9
283:12,13
**reflected** 54:24
55:2 123:22
136:16

**refresh** 76:12
102:14 103:18
186:3 246:8
**refreshing**
241:6
**refute** 128:11
**refuted** 127:23
127:24
**regard** 11:5
32:19 34:17
35:16 44:10
46:10 51:22
55:3 61:14 65:8
65:13 66:5,12
66:17 67:1,5
69:6,10,16
72:15,20 83:22
84:1 85:17 87:3
88:13,17 90:22
91:15 101:11
111:13 119:4
123:20 126:10
133:20 155:7
174:3 232:13
246:8 252:7
253:17,23
261:24 263:10
265:16 266:11
269:16 270:9
270:20,22
**regarding** 88:2
93:10 105:23
165:15 209:6
214:21 217:8
264:17 278:24
279:1

[regardless - reporter]                                                    Page 55

**regardless**
  201:5 210:22
**region**   158:12
  159:8
**regression**
  232:8
**regulatory**   46:9
  46:15 64:8
**reilly**   4:6
**reiterating**
  201:13 226:12
**reject**   91:15,18
**rejected**   85:18
**related**   5:21
  30:20 45:17
  51:8 52:18,20
  56:1,23 59:18
  59:21,22 62:18
  73:5,8 74:19
  76:23,23
  174:21 263:18
  265:14 269:6
  273:16
**relates**   118:1
**relationship**
  55:7
**relative**   123:20
  153:12 288:23
**release**   186:15
  198:4,4 204:1
  212:1 301:15
**released**   261:11
**relevant**   41:1
**reliable**   203:8
  203:15,19
  208:1

**rely**   99:1,5
  114:16
**relying**   271:16
**remain**   32:19
**remains**   228:21
  293:6
**remember**
  10:19 12:24
  13:15,18,21
  14:3 18:9 22:18
  30:7 48:5 55:17
  55:19,23 56:14
  73:3 78:2 80:6
  124:21 131:3
  179:24 188:7
  210:6 222:3
  247:17 249:7
**remotely**   45:16
**rendered**   35:15
  37:11
**repeated**   180:5
  180:11
**rephrase**   283:5
**replace**   233:5
  234:1
**replaced**   239:9
**replacement**
  291:13 296:4
**replacing**
  233:15 241:13
**replies**   138:13
**reply**   138:4,22
  141:5,20
**report**   5:12,17
  6:11 11:18 13:9
  14:8,21 15:4,7

15:11,14,22,23
15:24 16:2,16
16:21 17:19
18:1,8,22,24
19:6,9,10,11,15
19:20,23 20:3,5
20:20,21,23
21:2,4,4,6,7,9
21:11,11,12,14
21:15,22,22,23
22:17,21 23:6
29:13,14,19,22
30:5 32:24
61:19 73:1 78:1
78:7,18,23 79:5
79:10,15,15,16
79:24 80:3 82:3
82:5,11,15,18
83:13,16,20
87:10,22 88:9,9
88:12,17,19
89:3,6,7,19
90:8,12,18 91:9
91:13,21 92:3,6
92:10,16,17
97:10 113:5,16
113:21 114:1
114:13,16,24
124:22 126:8
126:14 130:23
131:4 132:9
133:19 138:20
138:24 139:6,8
139:9,16,19
140:10 142:23
143:19 157:9

161:21,22
162:1 165:7
186:18 187:6
187:10 188:4
188:13,15,19
189:7 213:16
213:23 215:12
215:21 220:2,4
222:8 223:6,17
225:7 227:4,14
251:6,6,10,21
252:11 253:1
257:12 258:3
259:4,6,8
260:16,19,19
262:4 263:11
263:12,19
264:15,21,24
265:12 278:16
278:22 282:19
285:14,19
289:22 292:1,9
296:14 302:16
**reported**   1:24
  119:16 125:10
  142:17 143:15
  158:1 200:14
  209:5 225:1,16
  225:18,21
  226:24 227:1,1
  227:4,5 244:6
  260:5
**reporter**   20:7
  20:16 28:2
  29:10 70:6 79:6
  122:22 129:3

135:12 155:12
167:6 175:10
175:13 191:22
195:2 230:3,9
239:20 273:4
276:8 279:1,16
286:4 288:4
290:24 294:24
297:12
**reporter's**
288:7
**reporting**  18:17
190:20 191:17
200:4 201:11
201:12 207:3
302:13
**reports**  8:11
10:13,18,20
11:12 12:21
21:3 24:16 34:1
34:6,7 67:11
68:24 89:20
96:18 98:8,10
131:13 176:19
210:7 214:5,11
216:1 224:12
292:10
**represent**  31:21
37:20 40:15
48:12 50:5
53:22 54:3 83:2
112:20 138:10
155:23 166:17
166:18 167:19
169:20 196:22
200:17 203:24

217:24 218:5
219:6,23 236:7
259:14 261:2
264:14
**representation**
19:5 103:24
139:15 219:8
**represented**
52:10 100:16
**representing**
64:20 254:4
**represents**
61:22 63:5
162:8 196:16
**reprint**  237:4
**reprinted**
236:20
**reproductive**
26:20 43:1
45:18 46:4,11
123:3,6 124:3
124:12 142:14
154:3 158:13
159:9 200:9
208:13,21
**request**  74:7
81:24 108:16
**requested**  73:1
**require**  72:2
135:3 185:18
**required**  85:12
123:24 135:21
153:8
**requiring**  153:5
**research**  43:6
43:12,16,18

45:13,21 46:3,4
51:9 65:12 98:8
98:9 102:2
108:13 112:22
118:7 134:18
167:24 169:8
197:9 201:21
214:1 216:8,10
222:3 229:7
231:14,19
234:24 235:6
238:17 255:18
295:14
**researcher**
42:24 202:23
**researchers**
112:3 184:3,6
271:3
**resources**  197:8
**respect**  95:19
150:19 254:20
278:17
**respectfully**
24:2
**respects**  136:13
**respond**  173:14
**responded**
142:9
**respondents**
178:19 238:19
239:1,8
**response**  41:14
115:24 148:7
149:2 159:17
159:18 223:14
223:19 239:2

250:20 297:8
**responses**
239:7,15 240:3
**result**  118:23
146:24 255:21
257:10 269:7
303:5
**results**  114:17
118:11 120:1
122:2 127:20
142:13 154:17
160:18 179:4
182:22 184:17
203:1 225:8
238:22 266:12
267:5 272:21
**resumed**  9:18
20:18 29:7 70:9
112:13 173:10
257:22
**retain**  64:8,15
65:13
**retained**  52:10
66:7 75:21
101:19 133:10
**retention**  76:4
**retentions**  52:1
63:19
**retrospective**
202:20 207:14
**reveal**  290:11
**revealed**  123:7
225:7
**reveals**  115:11
**review**  30:9
34:1,5 60:3

**[review - right]**

Page 57

| | | | |
|---|---|---|---|
| 64:19 87:5 90:7 | **rgolomb** 3:12 | 81:14,21 82:24 | 179:7,12 180:6 |
| 102:1,18 104:2 | **richard** 3:4 | 83:20 84:17 | 180:11,21 |
| 104:24 105:2 | 60:24 | 85:3,5 88:12 | 181:14,20 |
| 107:5 108:18 | **ride** 192:23 | 89:16 91:8,11 | 183:4,9,15,18 |
| 109:13 115:10 | **right** 10:6,9 | 92:20 93:20 | 186:8,24 187:3 |
| 118:5 161:20 | 11:4,10 13:7,14 | 96:22 97:19 | 188:9 193:16 |
| 161:24 184:1,4 | 14:13,17,20 | 98:17 99:6 | 193:19 194:1 |
| 184:9,12,15,23 | 15:21 16:3,15 | 104:19 105:10 | 194:17,20 |
| 189:1 190:17 | 16:19 18:5,21 | 106:3 108:15 | 196:3 197:4 |
| 191:2 195:20 | 19:19 20:1 21:1 | 111:8,18 | 198:17 199:9 |
| 251:6 261:6 | 21:21 22:15 | 113:15,23 | 203:20 204:10 |
| 264:17 265:16 | 23:4 24:22 25:1 | 114:12,22 | 205:2 206:1 |
| 267:7,13,16 | 25:3,4 29:8,11 | 120:18 124:8 | 207:4,6,7 |
| **reviewed** 10:12 | 29:17,20 30:11 | 125:23 126:18 | 209:11,12 |
| 10:13 33:9 74:5 | 31:2,6,12 32:2 | 127:10 128:13 | 210:17 214:20 |
| 74:18 101:7 | 32:3,8,8,22 | 130:21 132:14 | 214:22 215:5 |
| 106:21 136:13 | 33:6,12,15,20 | 135:4 136:9 | 215:11 216:21 |
| 140:15 141:9 | 33:24 34:5 35:7 | 137:12 140:21 | 217:13,16 |
| 147:12 148:10 | 35:11 36:2 | 140:22 141:24 | 218:24 219:8 |
| 148:19,20 | 37:18,21,24 | 142:3 143:10 | 219:20 220:8 |
| 149:1 169:23 | 38:7,11 39:1 | 143:12,13,17 | 221:8 222:9 |
| 183:21 185:2,8 | 40:2,7,14 41:15 | 144:4,14 | 226:24 227:6 |
| 185:12 196:15 | 41:22 44:1,5 | 145:21 147:8 | 227:10 230:14 |
| 197:8 230:15 | 45:6,11 47:1,20 | 147:11 151:21 | 232:17,21 |
| 243:3 260:16 | 47:24 48:22 | 152:1 153:17 | 233:1,7,19 |
| 261:22 263:17 | 51:3,13,21 52:5 | 154:21 156:12 | 235:24 236:12 |
| 265:13 | 52:22 53:6,21 | 158:17 159:3 | 236:21 237:14 |
| **reviewers** | 55:5,9,22 56:15 | 160:22 161:7 | 238:10,11 |
| 141:11 219:19 | 57:9 58:2,16 | 161:10,23,24 | 239:6,18,19,22 |
| 249:24 250:11 | 59:4 60:5 61:6 | 164:13 165:3 | 240:9,15 |
| 297:4 | 61:13 62:3,7,20 | 165:13 166:16 | 242:22 244:18 |
| **reviewing** 32:3 | 62:22 63:2,12 | 167:14 169:7 | 246:14 247:23 |
| 267:15 | 64:3 66:4 68:14 | 173:12,17 | 248:6 250:13 |
| **reyes** 62:14 | 69:9,15 72:1,24 | 174:24 175:6 | 250:23 251:17 |
| 63:21 | 73:4,17 77:6 | 176:16 178:7 | 254:3 256:10 |
| | 78:3 79:11 81:3 | 178:15,16 | 261:10 263:9 |

**[right - says]**                                                        Page 58

264:11 265:9
266:4 267:12
267:13 269:5
271:10 274:3
275:13,23
276:3,12,17,19
279:6 281:14
285:13 287:4
288:5,11
289:13 291:2,8
291:17 292:15
294:8 296:10
297:14 300:16
304:1
**rigor**   141:8
**risk**   6:22 7:4,15
7:19,21 8:5
22:4,10 23:9
25:11 27:10,12
46:22 47:5,9,16
113:8 115:3
117:19 118:15
123:20 125:14
137:6 153:13
155:21 156:21
157:1 165:17
166:5 167:21
170:3 176:14
195:16 199:1
200:2 204:5
205:5,12 218:3
221:23 224:13
225:10 226:4
226:16 227:15
227:18 228:1
228:17,20,20

229:2,11,15
268:21 279:15
279:17,21,24
280:2,4,9
283:15 286:2
288:24 292:2
**risks**   198:21
224:17 288:23
**risky**   282:6
**rls**   1:5
**rmh**   4:11
**road**   1:16 2:16
112:20
**robust**   183:10
202:20 203:1
207:14
**robustness**
182:24
**roche**   217:4
**role**   86:9
133:16 191:8
**room**   20:11
**rothman**   7:6
128:20 129:9
129:13,22,23
130:1,7,13,22
131:1,11 133:8
133:12,24
134:10,23
135:4,16,19
137:4 138:15
139:21 140:4
140:18 146:6
148:7
**rothman's**
149:3

**rough**   11:1
**round**   151:13
**routine**   235:10
**routinely**
281:13
**royston**   230:6
**rpr**   1:24 307:18
**rub**   25:6 26:4
28:16
**rubbing**   27:21
**rubin**   216:1,3,6
**rubin's**   216:4
**rules**   216:4
282:24
**ruling**   38:17

---
**s**
---

**s**   3:15
**safe**   25:5,14,22
26:3,11 28:15
67:9,23 68:2,2
68:6,9
**safety**   65:8
201:20,22
202:3 211:21
**sale**   212:6
**sales**   1:6
**sandler**   30:18
98:2 100:12
113:6 115:21
117:5,21
155:19 162:15
166:22 173:20
174:9 209:14
209:24 226:2
249:21

**sanitary**   158:11
159:7
**sat**   172:11
**satisfied**   86:15
**satterly**   62:14
**save**   97:18
**saw**   44:17 71:3
71:5 73:14
140:7 185:7,11
216:22 248:19
248:22,23
249:1 267:2
270:13 274:4
277:10
**saying**   31:20
80:18 102:22
132:2 133:3
140:2 153:15
167:10 184:10
184:20 199:17
201:6 209:15
215:11 218:16
225:1,21
246:18,23
256:12 292:16
295:19 296:6
299:3 300:17
302:6
**says**   9:15 15:23
31:5 38:3,5,5
53:13 58:19
67:13 81:1 86:7
94:17,20 108:2
110:7,23 120:2
121:7 128:6
165:15 169:6

199:11 203:5
205:3,20
206:17 207:12
208:8 213:9
223:13 228:11
228:14 236:19
238:22 239:6
244:1 248:2
261:1,9 263:17
275:16 296:20
**scale** 246:5
**scenario** 247:15
247:23 248:13
249:13 280:17
294:10,12,15
297:7
**scenarios** 200:3
247:11,14
248:16,24
294:10
**schildkraut**
300:18 302:5
302:11
**science** 8:13
22:9 23:8 47:11
47:15 54:16
77:1 107:5
116:3 262:12
262:16,17,23
**sciences** 204:3
**scientific** 22:9
23:7 46:10,14
66:7 69:11
72:14,22 93:9
105:15 192:4
251:24 275:16

**scientist** 26:2
28:15 150:20
205:3,9
**scientists** 97:11
97:21 98:11,16
101:22 105:14
112:3 136:17
**scope** 21:2,6,7
21:11,14,15,23
106:17 107:9
107:10 118:1
145:5,11 223:4
**screening** 6:13
77:12 78:9
**scrutinize**
295:23
**se** 43:13
**seal** 307:15
**second** 106:10
138:3 142:4
149:13 202:16
230:5 234:17
263:16
**secondary**
147:5
**section** 21:2
78:9 83:15 84:5
84:18 87:17
138:4 139:8,17
139:20 140:13
160:9 164:17
164:21 165:13
169:21 216:9
278:20 303:15
**see** 9:8,11 12:2
14:14,18 17:16

18:3 19:1,2,2
34:12 39:23
54:20 61:11
62:17 63:21
82:10,17 83:18
83:20,23 84:22
84:22 85:1,4,6
87:17,20,23
88:24 89:17
90:1,4,14,17
91:3,6,9,11
93:16 96:5
109:1,9,17,19
109:23 110:5
116:9 117:20
120:17 125:4
129:10 134:7
134:19 138:4,8
138:19,21
139:20 141:17
141:24 157:24
158:8 160:9,13
160:14 162:5
162:12 163:14
169:17 170:4
184:5 189:23
192:23 193:1
195:17 196:23
197:10,11
198:3,14 199:4
199:22 201:16
201:23 202:12
202:14 204:6
204:13 205:2,6
205:22 207:4
209:8,9,21

211:5 213:20
219:24 220:3
220:17 223:11
225:20 228:12
238:15 239:11
240:23 244:7,9
245:3 247:8,24
248:4,6,9 251:2
256:24 257:12
259:7,8,21
260:1,22 264:1
265:4,10
267:10,11
277:19 279:12
279:13
**seeing** 158:16
158:24 219:11
241:6
**seek** 71:9 72:13
**seemed** 34:11
34:11 301:13
**seems** 20:1
164:2 186:18
295:17
**seen** 24:6,16,18
24:19,21 31:11
31:17 44:16
70:24 102:10
102:11 103:19
104:10 130:2
139:16 161:18
162:19,22
163:1 176:6
179:13 196:15
198:11 206:16
215:8,9 250:17

**[seen - similarly]**                                                  Page 60

| | | | |
|---|---|---|---|
| 250:19 251:1 | **sets** 147:1 | 138:2 160:23 | 201:5,15 289:9 |
| 256:22 271:7 | 249:24 | 164:21 167:15 | 292:13,16,21 |
| 272:5,6 274:19 | **setting** 60:16 | 176:7 194:20 | **significant** 46:3 |
| 275:15,19 | 69:13 | 215:21 217:16 | 85:13,19,21 |
| 299:15 302:11 | **settled** 47:11,15 | 229:20 230:21 | 87:8,15 118:18 |
| **select** 297:17 | **settlement** 71:5 | 235:24 259:19 | 119:1,6,19 |
| **selected** 114:4 | **seven** 19:10 | 286:20 287:13 | 120:1,10 |
| 265:3 297:7,10 | 132:22 | **showed** 140:11 | 121:12,22 |
| **selection** | **seventeen** | 200:18 203:1 | 122:5,16 123:1 |
| 154:16 | 113:5 | 249:8 272:21 | 123:9 125:9 |
| **self** 125:10 | **several** 10:17 | **showing** 195:7 | 134:13 142:21 |
| **sells** 211:24 | 10:18 89:24 | 202:21 207:15 | 143:16 153:14 |
| **seminary** 2:16 | 99:15 194:1 | 226:6 287:5 | 153:21 200:8 |
| **send** 57:17 | 199:20 | **shown** 161:15 | 200:21,23 |
| **senior** 100:12 | **severe** 159:20 | 268:21 286:23 | 201:4,19 202:2 |
| 100:17 | **severity** 238:5 | 286:23 303:1 | 209:1 222:21 |
| **sense** 163:8 | **share** 34:14 | **shows** 209:13 | 223:9,14 |
| 184:12 211:5 | 164:11 297:2 | 303:2 | 224:12 225:9 |
| **sensitivity** | **shared** 38:15 | **side** 272:3 | 226:3,16 |
| 74:19 191:10 | 69:16 | **sides** 24:6 | 227:15,24 |
| 240:20 249:23 | **sharing** 17:21 | **siemiatycki** | 274:11 286:11 |
| 279:12 | 32:13 229:6 | 13:24 | 286:15 287:14 |
| **sentence** 23:5 | **sheet** 305:8,10 | **sign** 304:2 | 288:21 289:10 |
| 93:6 211:3 | 305:12 | **signature** | 290:1,18 |
| **sequence** | **shelves** 212:7 | 307:16 | 291:20,21 |
| 133:14 | **sheraton** 1:15 | **significance** | 293:7,13,17,24 |
| **series** 30:3 | **shocked** 271:11 | 86:5,6,11 119:5 | **significantly** |
| 130:6 | **short** 112:17 | 119:10 135:21 | 286:1 |
| **services** 55:8 | 173:13 | 142:16 143:1,7 | **similar** 85:8 |
| 64:9,15 66:17 | **shortly** 186:5 | 143:22 144:8 | 135:19 221:13 |
| 68:23 76:4 | **shoulder** | 144:17 146:9 | 224:17 264:16 |
| 101:19 262:24 | 164:11 | 146:19 147:9 | 292:1,3 |
| **set** 32:9 251:10 | **show** 78:17 | 147:14 148:11 | **similarly** 54:5 |
| 251:23 255:15 | 103:3,10,15 | 149:6 152:18 | 66:21 74:17 |
| 278:16 282:24 | 105:6 107:12 | 152:22 153:6,8 | 82:17 87:16 |
| 285:19 307:6 | 118:19 127:11 | 158:3 199:22 | 88:1 90:16 |

[similarly - specificity]                                                    Page 61

192:17 220:2
227:10
**simple**   25:24
67:21 152:15
**simply**   28:13
63:4 106:20
120:7 150:14
178:21 179:23
266:21 301:9
**simultaneously**
303:20
**singh's**   13:15
13:16
**single**   232:24
233:3,5,8
239:13,24
240:1,10,16
242:15 275:21
276:6,11,13
295:9 303:19
**sir**   61:3
**sister**   98:22,24
99:4,8,11,12,17
117:3,6 156:18
177:10,14,24
203:8 206:18
206:21
**sisters**   174:8
**sit**   104:21 109:5
109:13 155:15
**site**   214:7
**sitting**   25:5
34:16 40:24
59:7 82:2 119:3
119:24 187:5

**six**   263:24
265:3 289:3
290:17
**size**   142:19
**skew**   281:23
**skewed**   280:19
**skilled**   86:22
**sky**   151:9
**slightly**   164:9
**sloan**   199:9,10
**small**   125:13
166:4,24
229:14
**smaller**   64:1
**smith**   13:1,19
**social**   193:13
**society**   66:22
66:23 135:18
196:4,5,13
197:14 198:18
**software**
235:18
**sold**   212:8,14
**sole**   51:21
**solely**   194:17
**solicitation**
71:17
**solicited**   66:6
**somebody**
25:17,19 26:23
45:3 75:13
147:2 199:17
219:14 229:5
237:6 241:18
262:11 274:6
281:21 303:4

**somebody's**
281:16
**soon**   187:21,24
**sorry**   9:13
17:15 28:2,4
69:21 76:17
80:22,24 88:6
106:7,8 122:22
137:16,23
156:23,24
157:4 158:17
168:24 169:2
175:10 199:12
206:1 207:9
208:6 217:11
246:12 279:1
279:17 286:4,5
288:3,5 297:12
**sort**   40:20 55:7
76:5,8 96:13
98:16 116:20
163:13 194:6
258:12 275:15
296:22
**sorting**   35:2
**sorts**   33:17 56:1
229:11
**sound**   20:11
27:24 152:12
178:16
**sounds**   10:9
19:19 26:14
111:5 115:7
124:23 301:16
**source**   212:18
272:10

**south**   2:6
**space**   105:9
**spalding**   3:17
**speak**   128:13
128:16 144:5
179:3 189:3,5
254:17
**speakers**   94:22
126:16 130:11
144:20 149:17
170:12 171:14
217:6 276:1
283:20 298:15
300:1
**speaking**   27:5
52:13 146:16
174:4 209:17
214:15 233:12
287:3
**speaks**   18:16
96:2 222:24
**specialist**   42:8
42:13
**specific**   28:21
39:20 58:16
59:1 148:5
177:24 215:10
216:12 264:5
265:17 289:15
297:9 301:5
**specifically**
20:3 115:18
134:11 145:17
189:6 263:12
**specificity**
191:11

**[specimens - stores]**                                      Page 62

**specimens**
266:12 267:12
267:12
**speech** 198:4
**spend** 103:17
193:20 237:16
264:11
**spending**
112:21
**spent** 59:9
62:15 194:12
301:19
**spoke** 77:8
**spoken** 11:8
117:7
**square** 3:8
151:9,13,14
**st** 2:6
**stack** 11:6,7,9
11:21 253:5
**stakes** 241:13
**stand** 136:23
**stands** 54:3
**starbucks**
173:1
**start** 69:22
154:1 158:10
186:22 251:14
275:23
**started** 106:17
162:11 302:2
**starting** 50:21
**starts** 78:10
85:2 138:7
158:18

**state** 9:22 17:24
21:24 23:6
29:18 40:16
105:15 106:22
125:19 137:5
140:10 171:3
208:5 264:14
266:13 307:1,4
**stated** 87:9 89:3
126:8,23
142:10 148:6
152:20
**statement** 55:1
56:5,6,7 58:13
67:8,10 68:8
94:5 113:20
115:17 122:7
122:17 125:22
128:5 133:11
133:15 135:9
136:9 144:9
146:12 147:7
149:9,22 150:1
150:4 154:10
154:12 157:5
158:15 160:10
185:7,11
200:12 205:16
209:4,13
210:15 225:17
229:14 275:16
282:5
**statements**
76:11 184:13
214:14

**states** 1:1 38:2
93:8 149:2
153:24 200:1
201:18 203:14
206:24 212:9
224:10 265:12
282:11,16
**stating** 124:15
124:19,21
131:3 143:14
201:14
**statistical** 119:5
119:10 121:1
135:18,20
142:16 143:1,7
143:22 144:7
144:16 146:9
146:19,20
147:9,13
148:11 149:6
152:18,22
153:5,8 158:3
201:5 213:15
213:18 214:2,7
215:3,14 216:8
217:9 229:18
231:17 232:19
243:22,22
245:21 247:5
249:23 289:8
292:12,16,21
**statistically**
118:17 119:1,6
119:19 120:1
120:10 121:11
121:21 122:5

123:1,9 125:9
134:12 142:21
143:16 153:14
153:21 200:21
200:22 201:4
222:20 223:9
288:21 289:9
290:1,18
291:19,20
293:7,13,17,24
**statistician**
137:1 216:2,3
**statistics**
135:22 215:23
216:2
**status** 267:4
**stay** 148:2
**staying** 149:16
**steering** 2:11
3:2
**stems** 99:12
**stenographic...**
307:10
**step** 254:4
274:21
**steps** 230:23
**stic** 168:2
**stick** 80:23
**sticker** 78:19
168:13 259:12
**stickies** 11:24
12:2
**sticky** 259:7
**stop** 300:20,24
**stores** 52:2,6,7
52:11 63:22,23

**[strategy - sudden]**                                                    Page 63

| | | | |
|---|---|---|---|
| **strategy**  235:7 | 225:12 226:18 | 183:16 186:21 | 300:12 302:11 |
| **street**  3:7,18 | 235:2,3 265:2 | 187:15 190:17 | 302:19 303:5 |
| **strength**  83:22 | 268:17,20 | 191:13 195:15 | 303:14 |
| 84:1,15,18,20 | 269:16 271:3 | 198:4,20 | **stuff**  69:22 97:3 |
| 85:2,18,19 86:1 | 283:16 287:5,8 | 200:16,18 | 235:23 253:5,8 |
| 86:11,14 87:4 | 287:10 | 201:11 202:22 | 259:19 |
| **strengths**  33:21 | **study**  5:19 7:16 | 203:1,6,8,14 | **sub**  120:20 |
| 164:20 165:14 | 7:17 30:6,12,17 | 205:3,10 206:7 | **subgroup** |
| **stretch**  173:6 | 32:4,4 33:16,21 | 206:8,18,21 | 120:24 286:7 |
| **strike**  86:17 | 44:19 88:3,14 | 208:9,16 | **submission** |
| 213:7 267:5 | 88:17,23 91:16 | 213:14 219:19 | 30:2 |
| **strong**  85:21 | 98:22 99:1,4,8 | 220:20 221:2,5 | **submit**  184:3 |
| 200:7 | 99:9,11,12,17 | 221:10,10 | **submitted**  80:3 |
| **strongest** | 100:10 113:13 | 222:10,13 | 188:14 249:22 |
| 208:11,19 | 113:15,18 | 224:11,22 | 250:9 |
| 224:15 226:6 | 115:16 116:9 | 225:8,8 226:6 | **suboptimal** |
| 226:19 | 116:12,15,20 | 226:15 227:7 | 233:9 240:18 |
| **struggling** | 117:3,6,7 118:5 | 227:21 228:8 | 240:21 |
| 258:12 | 119:7,18 120:3 | 228:23 229:20 | **subset**  59:19 |
| **stuart**  216:23 | 122:2 123:6 | 232:20 235:6 | 121:9 |
| 230:17 231:4,5 | 124:9 125:12 | 235:22 239:23 | **substances** |
| 231:7 | 126:23 127:20 | 242:17,18 | 101:24 |
| **studied**  290:11 | 128:7,8 138:12 | 243:15 245:9 | **substantial** |
| **studies**  18:12 | 144:16 147:3 | 245:10,17 | 41:1 274:11 |
| 89:23 112:9,18 | 147:12 155:17 | 248:22 249:21 | 280:1 |
| 112:22 114:17 | 155:18 156:18 | 250:10,15 | **substitute** |
| 116:14,19,23 | 157:2,8,19 | 252:7 255:11 | 142:11 164:8 |
| 117:2 118:12 | 166:3 167:22 | 256:20 260:3 | 164:15 |
| 118:13 125:18 | 169:11 173:19 | 266:16 281:9 | **substitution** |
| 126:11 127:1 | 174:8,10,18 | 281:22,24 | 246:11 |
| 127:19 155:1,3 | 176:1,9 177:8 | 287:9,11 | **substitutions** |
| 158:19 165:17 | 177:10,24 | 289:13 290:11 | 238:23 |
| 165:18,24 | 179:17,23 | 293:6,22 294:1 | **subtitle**  14:17 |
| 175:23 179:10 | 180:4,14,18 | 295:4 297:4,20 | **subtract**  54:15 |
| 179:22 180:13 | 181:17,21 | 298:14 299:12 | **sudden**  299:20 |
| 221:20 224:14 | 182:1,3,21 | 299:16,22 | 302:14 |

**[suddenly - talc]** Page 64

**suddenly**
292:17 295:15
296:21
**sue** 172:21
**suffered** 172:8
**sufficient** 128:2
269:12 276:5
286:19
**suggest** 210:19
228:17
**suggested**
134:17 268:22
**suggesting**
135:20
**suggests** 111:2
198:24
**suite** 2:16 3:9
4:8
**sum** 122:15
**summaries**
263:15
**summary** 21:5
21:8
**supplement**
262:3
**supplemental**
261:4,6
**suppliers** 52:11
**support** 14:23
15:17 17:6
22:10 23:8 56:6
120:5,6 227:16
228:1,9
**supported**
38:16

**supporting**
114:19
**supports** 27:15
160:3,11,19
203:9 208:1
**sure** 9:24 13:1
17:12 20:16
28:11 34:24
35:1 47:10 55:2
61:20 63:19
70:6,17 72:24
78:20 80:20
81:6,9 86:22
96:11 103:16
103:21,22
104:11 108:20
112:23 136:15
139:11 140:14
159:15 163:23
168:23 183:1
186:23 196:13
211:19 223:12
236:23 242:6
242:18 243:17
243:18,19
248:17 253:15
254:9 257:17
259:20 261:21
262:19 264:13
**surfaced** 97:1
**surgery** 210:9
**surrogate**
266:17
**surrounding**
107:6

**susan** 1:17,24
307:3,18
**susceptible**
26:24 121:4
124:4
**sworn** 9:3
307:7
**system** 26:20
70:21 71:10
124:12
**systems** 286:8

**t**

**table** 247:20
252:21 260:6
294:11,12
**tables** 261:5,7
261:18,22
**take** 12:6 19:5
26:4 28:15 29:1
55:7 70:4,12
75:17 103:23
139:12,15
147:2 163:20
172:13 173:7
183:20 194:4
201:13 219:8
271:22 274:21
278:8 290:9
297:19
**takeaway**
199:21 200:1
**taken** 10:2
135:18 136:18
137:8

**takes** 237:14
**talc** 7:3,9,18,20
14:24 15:18
17:6,8 18:3,17
45:13,22 46:16
47:17 51:15,16
51:19,23 52:19
55:4 56:2 63:15
64:9,12,15
73:13 102:18
104:16 106:5
107:22 108:6
109:7 110:20
117:18 124:16
155:21 156:20
156:24 157:13
158:10 159:6
159:16,21,23
160:4,12,20
169:21 176:3
176:13 178:2
195:16 198:22
200:1,7 202:22
203:10,17
204:4 205:4,11
207:16 208:3
208:10,18
209:2,17 210:1
210:8,16,24
211:8 225:10
260:5 269:8
271:5,6 272:12
272:18,24
273:16,20
274:18 275:8
276:22 282:10

**[talc - testified]**

282:17,21
283:7,18
284:19 285:14
286:3,5 296:14
296:16,21
302:13 303:17
**talcum**   1:5
18:13 22:2,6,11
23:9,12,18
24:19 36:16,23
53:18 56:24
57:24 58:3
59:10,21 63:9
64:22 65:8,14
66:5,13,18 67:1
67:6 69:7,11,17
72:16 75:5
90:24 95:22
97:14,22
101:11,20
104:3,22 105:2
106:21,22
107:6 108:19
109:14 114:19
115:2,12 116:4
118:16 120:15
121:12 123:10
124:11 125:17
134:14 157:21
162:3 167:1
171:3,12
172:17 174:20
176:4 179:5
181:3 191:2,18
191:19,22,24
200:20 203:2

206:6 211:17
212:5 221:5,12
221:21 222:22
228:24 229:2
237:21 241:18
248:8 253:18
267:18 268:3
270:2,9,23
273:7 277:10
277:12 284:7,7
286:18,24
305:13
**talented**   148:3
**talk**   27:1 47:20
52:5 68:15 77:6
77:10,11 96:19
112:18 122:19
173:14 176:23
192:11,13
193:3,14
209:20 211:14
213:14 215:13
217:8 223:16
232:11 243:10
264:12 283:3
283:14,15,21
**talked**   77:8,23
101:17 144:1
186:2 192:20
207:17 245:13
250:21 280:17
283:1 294:9,9
**talking**   25:9,12
25:15,16 27:6,7
28:21 35:3 36:7
37:17 52:6

55:20 65:1
68:11 86:5 88:7
113:16 138:13
145:13 148:19
170:11 182:13
191:14 192:2
211:4 218:15
221:3 232:12
269:20 276:17
289:18 299:3,4
300:16 301:24
302:2,3
**talks**   104:12
108:6 196:21
244:3 285:14
**tallied**   53:12
**tally**   56:19
**taught**   288:1
**tax**   58:14,15,21
58:22 76:10
**teaching**
130:10
**tech**   69:22
**technical**   28:3
**technicality**
196:12
**technically**
293:24
**technique**
74:16
**techniques**
74:13 244:12
**technological**
278:10
**tedious**   235:19

**telephone**   2:8
2:18 3:11,20
4:10
**telephonic**   1:12
**tell**   9:4 13:4
16:7 22:19 53:7
54:11 58:20,24
59:7,15 123:16
133:16 150:3
150:19 151:10
193:24 194:23
237:24 238:1
258:4,13
259:23 263:13
**telling**   296:24
**ten**   178:5,6,7
**tend**   70:14
218:18
**term**   203:10,16
208:2,12,20
215:19 245:4
**terms**   190:22
235:12
**terry**   218:7
220:14 221:18
222:10,13,18
225:19 226:2
226:11
**test**   142:23
143:18,19
146:8 147:3
**testified**   9:5
33:1 35:8,12
36:5,7,14 51:7
51:10 55:18
62:9 75:1,15

**[testified - think]**

Page 66

| | | | |
|---|---|---|---|
| 133:18 288:16 | 81:4 92:13 | 248:15 252:9 | 122:14 124:23 |
| **testify** 65:7 | 95:14,19 96:15 | 254:9 295:17 | 126:7 128:1,10 |
| 293:22 | 97:19 103:24 | 296:10 | 132:3,12,12,21 |
| **testifying** 23:17 | 104:18,18 | **things** 40:21 | 132:24 136:1 |
| 34:2 37:7 51:2 | 105:18 129:6 | 46:24 49:6 52:2 | 136:21 139:3 |
| 51:5 53:13 | 134:6 145:3 | 85:22 90:10 | 139:23 143:17 |
| 55:12 82:13 | 155:15 156:10 | 105:4 118:10 | 144:2 147:4,7 |
| 266:11 | 158:5 159:4 | 140:24 147:21 | 148:17 151:14 |
| **testimonies** | 161:7,14 168:4 | 168:7 170:2 | 152:7,8,10,24 |
| 74:23 | 171:22 228:10 | 193:20 199:20 | 153:1,12,14,18 |
| **testimony** 6:9 | 229:17 253:2,3 | 216:11 226:22 | 156:6 157:22 |
| 9:18 20:18 29:7 | 257:16 260:11 | 237:3 281:23 | 162:19 165:23 |
| 37:4 50:20 | 277:23 278:8 | 296:23 | 165:24 172:7 |
| 52:19 55:24 | 278:11,13 | **think** 11:3,3,17 | 176:10,11,17 |
| 56:1 60:7,14 | 288:12,13 | 12:3 13:5 18:15 | 179:20 182:2,2 |
| 61:7,10,14,15 | 303:11 | 23:2,22 26:13 | 182:4 185:4,5,6 |
| 61:21,23 62:4 | **thanks** 12:18 | 27:14,22 29:2 | 185:11,24 |
| 63:6,7,14,15 | **that's** 225:23 | 29:24 31:13,19 | 186:4 189:21 |
| 68:21 69:1,1 | **theory** 136:6 | 34:20,21 35:2 | 191:6,11,16,21 |
| 70:9 112:13 | 289:4 | 36:5,5 37:1 | 192:8 193:7 |
| 132:10,16 | **therapies** 44:14 | 40:18 42:12,18 | 194:12 195:9 |
| 140:17 173:10 | 44:22 | 50:2 51:6,7,24 | 195:22 196:1 |
| 192:21 243:6 | **therapy** 42:21 | 53:2 55:19,23 | 198:6 201:9 |
| 257:22 263:10 | **thickening** | 56:4,13 58:15 | 202:5 203:18 |
| 264:6 266:10 | 263:23 265:23 | 58:22 59:20 | 203:19 204:19 |
| 277:2 305:4 | 266:24 271:15 | 62:15 63:11,11 | 204:23 205:14 |
| **tests** 170:1 | 272:20 275:1 | 67:14,14,14 | 209:5 210:5,6 |
| **text** 259:16 | **thing** 37:17 | 68:14 72:24 | 211:3 213:23 |
| **textbooks** 130:6 | 50:11 81:8 | 79:20,23 80:5 | 214:22 215:6 |
| 130:20 | 96:13 124:8 | 84:6 85:23 89:9 | 215:20 216:1 |
| **thank** 9:12 | 163:13 164:24 | 91:17 96:12 | 217:3,19 |
| 17:17 40:1 48:1 | 175:18 182:12 | 98:13,13 | 218:14 220:5 |
| 48:24 49:20,23 | 183:12,14 | 108:21 111:23 | 222:7,12,17 |
| 50:1,17 60:5 | 185:17 188:3 | 115:7 117:11 | 225:14,14 |
| 61:5 64:6 65:4 | 192:24 223:11 | 119:8,8,11 | 228:8 229:9,15 |
| 70:16 79:3 81:4 | 240:21 241:23 | 121:15 122:12 | 233:11,12 |

**[think - today]**                                                           Page 67

236:18,22
240:22 244:14
245:4,13
248:24 252:9
254:12 255:2,3
255:8,13
256:11,13,15
256:17,18,18
257:13 259:17
261:8,16 264:7
265:18 270:13
273:20 278:19
279:14 280:14
283:24 284:3,6
284:9 286:19
287:12 289:12
289:19 291:6,7
295:21 296:18
296:18 297:9
297:10,15,17
298:8,9,10
301:14 302:3
**thinking**   204:16
**third**   11:13
  59:21 70:19
  123:22
**thirty**   58:6 90:3
**thought**   11:15
  18:10 22:23
  26:24 97:3
  122:16,18
  157:4 243:6
  246:21 252:10
  252:14 289:18
**thoughts**
  188:20

**thousand**   40:10
  116:22 230:9
**thread**   291:23
**three**   58:7,7
  62:10,15 73:19
  75:14,15 90:3
  91:4 98:8 135:7
  135:17 136:5,7
  136:11,17
  158:19 178:12
**throw**   126:19
**thrown**   119:10
**thrust**   119:11
**tight**   188:8
  292:8
**tighter**   281:5
**time**   11:20 30:4
  31:3 33:6 43:13
  50:21 51:10
  57:5,7,10 59:8
  59:18 61:18
  63:7,14 67:22
  70:13 73:17
  75:17 77:21
  79:15 90:7 97:7
  97:18 102:12
  102:12 112:21
  118:14 131:15
  133:7,8,22
  136:11 137:22
  139:12 141:18
  148:23 150:5
  150:18,20
  173:2 176:1
  177:13 178:1
  178:12 179:12

179:14,17,18
180:1,11
181:22 182:14
188:1,13,23
189:2 191:1
193:10 194:11
198:10 204:24
215:21 222:19
233:18 237:16
241:5,24 246:5
247:1 251:2
252:23 261:15
264:12 296:8
301:15,19
307:6
**timed**   196:1
**times**   52:9
  62:10,11 75:2
  75:15 76:7
  150:8 178:12
  178:13,13
  189:4,5 194:2
  287:24
**tisi**   2:3 5:7 9:15
  12:6,13 16:6,13
  20:12,15 37:21
  39:12,21,24
  41:13 48:21
  49:5,8,12,17,21
  50:3,7,11,14,16
  60:9,15,19,23
  70:3 78:13,21
  79:4,7,11 80:8
  80:17,22 81:2
  103:6 105:9
  112:14 113:2

128:18 156:1
156:11 161:1,3
161:5 164:2,6
168:12,16
172:1 173:3
176:11 193:4
193:17 194:23
195:4,9,11
203:23 217:21
229:22 230:13
230:23 236:3,5
253:4,7 254:7
254:10,11,15
254:17 257:15
257:23 258:19
258:24 259:3
260:10 272:1
278:1 283:24
284:3,5,12,14
290:7
**tissue**   266:1
  267:19,21,23
  269:7 276:18
  276:18
**today**   10:2,11
  25:5 32:14
  34:15 40:24
  43:5,11 57:12
  59:7 77:10 82:2
  83:7 104:21
  119:3,24
  132:10 174:4
  187:5,10 198:5
  211:24 230:24
  252:7 256:3
  269:6 270:19

**[today - two]**                                                    Page 68

278:9 280:18
283:2 293:3,5
301:19
**together** 97:2
163:13 193:1
193:12 256:9
274:14
**tone** 151:16,21
**took** 97:7
106:10 136:11
193:7,15 194:2
194:2,8 217:3
248:12
**tool** 8:7 230:18
232:19
**tools** 245:8
**top** 38:6 58:20
83:18 89:18
90:3 91:8 108:2
117:17 154:24
207:1,5 209:9
238:22 260:2
**topic** 74:11,15
**topics** 46:5
**total** 50:6,19
122:15
**totaled** 54:6
**totality** 87:6
89:21 90:6
93:22
**totally** 277:22
**touched** 45:16
**towards** 155:2
**townsend**
161:17 162:2
164:16 165:1

166:21 169:14
**towson** 1:16
**trace** 22:12
23:11,13,21
24:9,18
**track** 57:17,19
63:24 76:9
**tract** 121:19
124:16 158:13
159:9 292:24
**tracts** 121:4,10
121:10,14
123:3,6 124:3
137:8 142:14
154:3
**traditional**
184:12
**trained** 24:17
235:17
**training** 130:10
**transcript** 11:2
79:21 192:19
216:23 305:3
307:10
**transcripts**
270:14
**travel** 158:13
159:9
**treatment** 42:2
42:23 44:11
**treatments**
44:19
**tremendous**
120:23
**tremendously**
296:23

**trial** 41:6,8
53:3 55:18
56:12 61:15
62:4 63:8,14
132:16 253:24
264:6,6
**tried** 44:18
119:9 150:12
180:22 280:21
**trips** 215:18
**true** 41:22 43:5
43:11 45:12,15
45:20,24 46:7
46:13 52:13,14
56:11 67:14
82:7,8,9 104:15
115:18 123:4
128:1 133:4
155:5,11,14
180:1 185:6
227:17 228:2,9
233:12 249:14
303:13 305:4
307:11
**truth** 9:4,4,5
281:1 296:24
299:10 303:7
**try** 61:23 63:24
65:24 70:20
75:10 126:3
148:1,22 169:3
179:2,13,14
220:18 242:10
249:11 273:24
273:24 282:5,6
291:9 299:20

**trying** 11:2
24:11 86:18
96:10 130:18
151:6 152:7
153:4 168:24
213:9 234:22
236:19 237:8
246:21 267:1
281:2,4,9 282:2
303:4
**tube** 7:14
167:21 286:8
**tubes** 27:13
120:17,21,22
122:2 123:21
166:10 286:12
288:18,19
289:2 290:12
290:14
**tumor** 276:7,10
**turn** 16:22 20:2
21:1 82:24
160:8
**turned** 193:11
**twice** 189:8
296:10
**twist** 153:15
**two** 11:11 15:11
35:2 50:2 62:17
71:8 73:19
85:21 111:10
121:16,22
167:3 177:24
180:16 185:2
189:9,23 209:9
209:14 230:9

**[two - use]**                                                                        Page 69

249:24 250:11
263:15 265:9
286:15 288:22
291:14 292:22
294:19,23
295:1 296:8
**tworoger**  163:1
**type**  25:19
26:16 141:11
191:16 272:23
**types**  24:5 42:4
72:15 114:6
213:17 235:13
274:20
**typical**  59:17
180:17
**typically**  232:6

**u**

**u.s.**  125:8
**uber**  192:23
**uh**  92:14 111:1
**uip**  271:20
**ultimate**  109:13
**unable**  59:6
**unbelievably**
297:18
**unbilled**  57:5,6
**under**  63:21
109:19,22
164:20 169:17
172:24 178:18
196:21 198:14
206:1 208:8
238:14 243:22
245:20 247:23

276:21 289:4,7
289:8
**undergoing**
104:24 105:2
184:1
**underlines**
189:17,19
190:3,11 194:6
**underneath**
204:10
**underpinnings**
268:13
**underpowered**
125:13,19
127:2,19 128:5
128:6,8,9
165:19 166:1
**underscore**
201:21
**underscores**
198:21
**understand**
10:1 18:22 20:6
20:7 21:24 22:5
23:23 24:2 27:8
28:18,19,23
29:12 34:9,23
35:7,19 38:7,11
42:18 72:10
81:19 95:5,18
96:11 97:9
98:19 104:23
138:17 140:23
141:13 144:19
145:15 185:13
190:16 196:14

212:12 215:18
232:23 234:23
236:17,19
237:8 248:11
249:20 266:9
293:1 297:1
303:5
**understanding**
8:4 10:5 23:16
29:16 38:24
82:1 98:20,23
105:18,19
118:4 140:16
199:19 206:7
218:3 221:17
243:5
**undertake**  46:2
**undertaking**
118:6 282:6
**underwear**
158:11 159:7
**undo**  255:16
**undue**  254:23
255:5
**unexposed**
294:13,14,16
**unfortunately**
172:8
**unhealthy**
256:12
**unhelpful**
303:4
**unique**  203:7
**united**  1:1
212:9 282:11
282:16

**university**
41:20 110:3
283:17
**unknowable**
303:10
**unknown**
249:15
**unpack**  24:22
114:23 116:8
153:4
**unscientific**
179:9
**unsolicited**
136:12
**untoward**
256:13
**upcoming**
104:4
**update**  29:13
113:22,24
180:17
**updated**  10:12
10:22 12:21
34:6 40:13 41:6
89:8 181:1
262:2,8
**updates**  22:22
**updating**  18:9
180:13
**use**  6:21 7:3,9
7:18,20 11:20
14:24 15:18
17:7 18:13
47:17 66:14,18
69:17 72:16
87:14 95:22

[use - versus]                                                    Page 70

| | | | |
|---|---|---|---|
| 108:21,21 | 227:13,17,23 | **using** 14:21 | **valuable** 233:13 |
| 113:7 115:1,13 | 228:3,15 229:2 | 15:15 17:4 | **value** 132:18 |
| 117:18 120:15 | 234:2 235:17 | 150:5 191:4 | 232:24 233:3,4 |
| 121:5 123:10 | 239:24 241:10 | 199:2 206:18 | 233:5,8 239:9 |
| 124:4 125:10 | 241:12 244:1,6 | 206:20 209:18 | 240:1 251:15 |
| 125:17 134:14 | 244:12 245:4 | 216:6 240:10 | 281:22 296:12 |
| 134:15 140:12 | 246:1,9 248:7,8 | 241:5 244:3 | **values** 191:11 |
| 142:22 154:6 | 255:9 260:5 | 272:18 284:18 | 232:9 233:16 |
| 155:21 156:20 | 270:10 277:12 | 295:18 | 233:23 238:24 |
| 156:23,24,24 | 279:7 281:3 | **usual** 271:20 | **van** 217:4 |
| 157:13,21 | 283:7 286:2,5 | **usually** 151:19 | **variable** 234:1 |
| 160:4,12,21 | 303:17 305:10 | **uterine** 174:23 | 239:4,14 240:1 |
| 165:16 166:5 | **used** 32:14,20 | 175:4,16 209:3 | 240:10,16,19 |
| 174:20 175:20 | 33:1 36:16,23 | 209:7 253:24 | 241:17 242:15 |
| 175:24 176:2 | 74:13 91:20 | 278:18,19,24 | 246:4 281:9,14 |
| 176:13 178:2 | 120:18 130:9 | 279:3 | 295:9 |
| 178:23 179:5 | 130:20 131:5 | **uterus** 166:9 | **variables** |
| 181:2,7 186:19 | 178:10,11 | **utilized** 247:15 | 169:24 171:4 |
| 190:18 195:16 | 186:18,21 | | 171:13 172:17 |
| 200:1,19,19 | 191:10,16 | **v** | 234:1,2 238:15 |
| 202:22 203:2 | 200:7 204:20 | **v** 2:3 | 239:7,10,11 |
| 203:10,17 | 207:1 211:22 | **va** 2:17 | 240:2 241:13 |
| 204:4 205:4,11 | 212:14 213:19 | **vagina** 25:6 | 281:7 |
| 205:21 206:8 | 214:2 231:17 | 26:4,13,19 27:2 | **varies** 52:22 |
| 207:3,16 208:3 | 232:5,19,19,21 | 27:9,10,22 | **various** 46:21 |
| 208:10,12,18 | 234:13 240:11 | 28:16 29:2 | 47:5 88:3 93:23 |
| 208:20 209:2 | 240:13 241:18 | 158:13 159:9 | 109:3 118:12 |
| 209:16,19 | 245:1 246:3 | 159:14 | 215:13 216:15 |
| 210:1,3,8,16,19 | 248:3 277:9 | **vaginal** 26:22 | **vary** 221:14 |
| 210:20,24 | 279:8 295:8 | 27:6 253:18 | **varying** 180:12 |
| 211:1,10,10,12 | **user** 296:21 | **vague** 133:11 | **verbally** 299:4 |
| 215:17,19 | **users** 178:20 | 133:15 | **versa** 295:20 |
| 220:22 221:6 | 199:2 208:12 | **validity** 182:22 | **version** 164:9 |
| 221:12,22,23 | 208:20 296:16 | 182:23 | **versions** 287:7 |
| 224:13 225:10 | **uses** 266:16 | **valley** 1:16 | **versus** 84:7 |
| 226:5,17 | 282:21 285:14 | | 118:15 121:10 |

184:13 218:10
218:15 221:7
286:12 288:18
291:16
**vice** 295:20
**view** 135:19
275:6
**viewpoint**
134:17
**viewpoints** 87:3
90:21
**virtual** 1:12
**vis** 105:15,15
**visvanathan**
7:13 163:3
167:10,20
168:11,18
171:3,11,11
**voice** 151:17
**volume** 29:5
107:22 151:17
151:22
**vulva** 253:17,19

**w**

**wait** 180:18
214:10 293:14
298:17,19
300:3,14
**walk** 83:13,15
**wandering**
145:8
**want** 13:3
29:23 34:24
39:20 41:13
42:11 48:21

58:17 81:5,6,8
81:10 125:22
137:12,15,17
139:15 141:21
144:4,19
150:21 152:13
152:16 158:21
158:22 163:24
164:21 165:2
169:14 180:10
189:3 194:24
209:18 224:2
249:18 250:6
252:14 257:12
261:20 264:22
267:24 279:20
282:7,12 285:3
285:22 287:16
293:2 294:6,7
295:13,15
300:11
**wanted** 128:11
136:15 164:17
169:1 179:15
192:24 193:1
279:23
**wants** 67:17
140:24 301:6
**water** 69:24
**way** 23:18 26:9
26:9 44:6 54:1
55:16 56:6 59:3
59:13 75:7,23
76:6,8,20 84:3
96:4 118:21
122:13,15,18

140:4,5,12
158:19 165:23
167:12 180:17
180:19 182:4
193:9 197:19
226:10 232:7
244:17 254:22
255:2 256:6
259:20 273:9
273:17 275:6
275:19 276:21
277:15 280:7
295:12,17
296:2,6,22
307:13
**ways** 121:16
242:21
**we've** 14:7
20:11 27:24
40:4 60:23 81:9
117:7 129:7
138:13 150:5
172:8 222:12
250:10 280:21
280:24
**weak** 114:20
115:3,9,14
128:4 152:24
**weaker** 165:19
**weaknesses**
33:22 164:20
165:14 287:10
**website** 73:13
73:18
**wednesday**
1:14 198:5

**week** 178:13,13
192:19,21
**weighing** 93:11
**weird** 115:6
**welcome**
156:11
**went** 79:21
193:4 244:21
298:9 301:3
302:4
**wentzensen**
30:18 98:4
100:17 109:10
113:6 115:21
162:16 166:22
173:20 226:2
**whi** 117:2
**white** 220:23
221:7 230:6
**wife** 192:24
**willing** 257:7,9
**wilson** 31:19
**window** 188:23
**wise** 17:11
**wit** 307:2
**witness** 9:3
20:13 28:4,6
39:23 50:1,15
60:17 61:4
106:8 175:12
191:24 224:2
305:14 307:5
307:15
**wolfson** 33:2,7
33:7 35:8,12,20
36:12 37:12

[wolfson - yeah]

Page 72

| | | | |
|---|---|---|---|
| 38:12 96:12 | 206:8 | **working** 9:16 | **wrong** 134:21 |
| **woman** 25:6 | **wondered** | **works** 32:6 | 140:21 179:20 |
| 26:3 28:15,24 | 192:16 | 58:14 141:15 | 179:20 191:10 |
| 267:19 272:16 | **wootton** 1:17 | 197:19 234:24 | 296:19 297:6 |
| 272:17 273:11 | 1:24 307:3,18 | 249:22 254:18 | 297:17 |
| 273:15 290:10 | **word** 87:14 | **world** 90:1 | **wrote** 89:10 |
| 290:12,14 | 107:23 115:6 | 104:1 105:14 | 130:3 133:9 |
| 296:14,19 | 131:5 155:8 | 108:13 162:9 | 134:19 146:4,5 |
| **woman's** 273:2 | 186:18,19 | 197:19 212:9 | 187:9 188:2 |
| 273:5 275:9 | 215:17,20 | 225:7 | 214:18 223:11 |
| 276:20 | 241:10 244:14 | **world's** 241:3 | 223:16 224:21 |
| **women** 7:15 | 245:3 255:6,9 | **worldwide** | 244:10,24 |
| 18:16 44:7,10 | **wording** 17:11 | 197:10 | 254:23 259:24 |
| 44:15,22 46:4 | **words** 126:12 | **worries** 156:9 | 260:6 279:5 |
| 116:22 118:20 | 289:23 | 159:1 | |
| 120:16,20,21 | **work** 42:14 | **worth** 95:1 | **y** |
| 121:3,9,13 | 43:14 51:8,14 | 292:13 | **yeah** 17:15 |
| 123:5,21 124:2 | 51:18,22 55:4 | **write** 30:1 | 19:14 26:7 27:8 |
| 124:11 125:8 | 56:8,9 57:23 | 136:12 140:24 | 31:5 32:16 33:4 |
| 137:7 142:14 | 59:9,18 68:16 | 168:15 189:14 | 33:10,18 35:24 |
| 154:2 162:8 | 71:23 73:5,8 | 251:8,13,18,22 | 36:10,20 37:1 |
| 166:6,9 167:21 | 75:21 76:2,6,24 | 299:1 | 37:13 38:3,10 |
| 177:11 178:9 | 110:19 111:9 | **writers** 115:23 | 38:23 39:19 |
| 200:7 209:9,17 | 118:7 130:19 | **writing** 132:5 | 41:11 42:9 |
| 220:24 221:7,7 | 162:2 163:1,9 | 189:15 193:21 | 45:10 50:9,11 |
| 229:1,6,9 244:5 | 163:11 184:3 | 194:2,12 216:9 | 54:19 55:23 |
| 246:2 267:2 | 185:14,19 | 219:16 251:22 | 57:3 59:12 62:1 |
| 268:17 270:2 | 194:18 205:10 | 251:23 | 62:12 65:23 |
| 270:10,23 | 225:6 242:17 | **writings** 45:21 | 66:3 67:12 68:1 |
| 271:13 286:8 | 251:12 256:16 | **written** 73:23 | 91:17 96:3 |
| 286:11 288:18 | 262:18 263:2 | 73:24 74:4 | 97:15 101:14 |
| 289:2 291:15 | 280:21 287:21 | 118:2 130:6 | 104:23 105:24 |
| 292:5,6 296:7,9 | **worked** 51:5 | 133:23 138:14 | 113:20 115:16 |
| 296:16 300:19 | 58:3 168:18 | 189:18 226:10 | 120:2 124:15 |
| **women's** 43:1 | 184:6 247:4,5 | 243:15 251:3 | 125:21 126:17 |
| 46:10 205:21 | 283:16 | 284:15 299:5 | 130:15,17 |

**[yeah - zoom]**                                              Page 73

| | |
|---|---|
| 134:21 139:23 | 208:21 237:15 |
| 157:17,18 | 272:19 277:12 |
| 163:19 164:5 | 299:17 |
| 169:16 174:23 | **younger**   238:3 |
| 180:5 183:11 | 238:7 |
| 184:10 186:23 | |
| 188:6 193:9 | **z** |
| 194:19,19 | |
| 195:22 197:21 | **zero**   53:23 58:7 |
| 199:12,12 | 58:7 251:15 |
| 201:3,12 206:4 | 292:22 299:22 |
| 206:15,15 | **zoom**   1:12 3:5 |
| 207:5 211:11 | 4:5 |
| 214:15 219:10 | |
| 219:10,16 | |
| 220:5 225:24 | |
| 228:5 232:11 | |
| 233:11,19,24 | |
| 236:22 239:3 | |
| 239:17 242:19 | |
| 248:15 254:1 | |
| 267:1 268:5 | |
| 274:2 280:12 | |
| 302:6 | |
| **year**   51:11 | |
| 52:22,22 59:17 | |
| 60:1 76:11 | |
| 170:10 178:14 | |
| **years**   46:20 | |
| 56:13,15 61:22 | |
| 63:6 73:14,19 | |
| 97:1 99:14 | |
| 107:4 132:22 | |
| 167:3 178:4 | |
| 180:16,17,18 | |
| 180:20 208:13 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.