Exhibit 6

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEW JERSEY

3                  Case No. MDL NO. 16-2738 (MAS) (RLS)

4

5      IN RE:  JOHNSON & JOHNSON

6      TALCUM POWDER PRODUCTS

7      MARKETING, SALES PRACTICES,

8      AND PRODUCTS LIABILITY

9      LITIGATION

10     ------------------------------

11

12            The deposition of CHRISTIAN MERLO, M.D. was held

13     on Friday, June 14, 2024, at 100 South Charles Street,

14     Suite 1600, Baltimore, Maryland 21201, commencing at

15     9:01 A.M., before Faith Kelchaw, Stenographic Court

16     Reporter and Notary Public.

17

18

19     REPORTED BY: Faith Kelchaw, Stenographic Reporter

20

21

Page 2

1   APPEARANCES:
2       CHRISTOPHER TISI, ESQUIRE
3       Levin Papantonio Rafferty
4       316 South Baylen Street
5       Pensacola, FL 32502
6       ctisi@levinlaw.com
7       (850) 435-7000
8           On behalf of the Plaintiffs
9
10      BRUCE BISHOP, ESQUIRE
11      Willcox & Savage, P.C.
12      440 Monticello Avenue, Suite 2200
13      Norfolk, Virginia 23510
14      (757) 628-5573
15      bbishop@wilsav.com
16          On behalf of the Defendant
17          Johnson & Johnson and the Deponent
18
19
20
21

Page 3

1   APPEARANCES CONTINUED:
2       MICHELLE PARFITT, ESQUIRE
3       Ashcraft & Gerel
4       1825 K Street NW, Suite 700
5       Washington, DC 20006
6       (202) 783-6400
7       mparfitt@ashcraftlaw.com
8           On behalf of Steering Committee and the MDL
9
10  PRESENT VIA ZOOM:
11      DAVID DEARING, ESQUIRE
12      LEIGH O'DELL, ESQUIRE
13      Beasley Allen Law Firm
14      218 Commerce Street
15      Montgomery, Alabama 36104
16
17      BRANDY HARRIS, ESQUIRE
18      Reilly, McDevitt, Henrich
19      3 Executive Campus, Suite 310
20      Cherry Hill, New Jersey 08002
21

Page 4

1       I N D E X   O F   W I T N E S S E S
2   WITNESS                          PAGE
3   CHRISTIAN MERLO, M.D.
4   By Mr. Tisi              7, 267, 269
5   By Mr. Bishop                268
6   By Ms. Parfitt               265
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 5

1       I N D E X   O F   E X H I B I T S
2   EXHIBIT                          PAGE
3   Exhibit 1    Expert Report            11
4   Exhibit 2    Expert Report            12
5   Exhibit 3    Abstract: Intimate Care
6                Products          13
7   Exhibit 4    Curriculum Vitae         18
8   Exhibit 5    Website Printout         21
9   Exhibit 6    IARC Monographs News         26
10  Exhibit 7    2024 Excerpt         28
11  Exhibit 8    2019 Excerpt         29
12  Exhibit 9    Strength of Association      36
13  Exhibit 10   Health Canada Report         43
14  Exhibit 11   Notice of Deposition         59
15  Exhibit 12   IARC Volume 136 Report       70
16  Exhibit 13   JAMA Article         72
17  Exhibit 14   Genital Powder Use
18               and Ovarian Cancer Article   89
19  Exhibit 15   Scientific Reports Article   105
20  Exhibit 16   International Journal of
21               Epidemiology Article     109

2 (Pages 2 - 5)

Page 6

1      I N D E X   O F   E X H I B I T S
2           (Continued)
3   EXHIBIT                        PAGE
4   Exhibit 17      Douching, Talc Use, and Risk
5          of Ovarian Cancer Article    118
6   Exhibit 18      ASCO Perspective Article   144
7   Exhibit 19      Environmental Factor Article 155
8   Exhibit 20      Imputing Missing Covariate
9          Values for the Cox Model    227
10  Exhibit 21      JAMA Guide to Statistics
11         and Methods Article        229
12  Exhibit 22      Epidemiologic Methods to
13         Advance Our Understanding of
14         Ovarian Cancer Risk Article   237
15  Exhibit 23      Environmental International
16         Article                241
17  Exhibit 24      National Cancer
18         Institute Article         248
19  Exhibit 25      Invoices            265
20  Exhibit 26      Fee Schedule        269
21

Page 7

1       CHRISTIAN MERLO, M.D.,
2   having first been duly sworn, testified as follows:
3       EXAMINATION BY MR. TISI:
4   Q.  Good morning, Dr. Merlo.  I am Chris Tisi.
5   I represent the MDL plaintiffs in this case.  With me is
6   Michelle Parfitt to my right here, and she represents
7   the New Jersey plaintiffs.  We're here to take your
8   supplemental deposition.
9       You understand that to be true; right?
10  A.  I do.  Good morning.
11  Q.  Good morning.
12      I am going to hand you -- mark this -- several
13  exhibits that I'm going to start out the deposition
14  today and mark them.  All right.  Let's see if we can
15  get going.
16      Just by way of foundation, you issued an expert
17  report on the issue of general causation.
18      You know what that means; right?
19  A.  Yes.
20  Q.  Yeah.  You issued a report on general causation
21  in the talcum powder litigation in February of 2019.

Page 8

1   And, actually, we were together and I deposed you on
2   that report.
3       Do you recall that?
4   A.  I do, yes.
5   Q.  Okay.  And have you reread your 2019 deposition
6   in preparation for today?
7   A.  Yes, I have.
8   Q.  Okay.  And we're here primarily to talk about
9   what changes, if anything, happened since 2019 and to
10  update your opinions today.
11      You understand that to be true; right?
12  A.  I do, yes.
13  Q.  And, generally, just to lay a foundation of
14  where we are, your report and your testimony in 2019
15  was, generally speaking, twofold: first, that applying
16  an appropriate methodology, there was no scientific
17  evidence that perineal exposure to cosmetic talc
18  products can cause epithelial gland cancer; is that
19  right?
20  A.  In general, yes.
21  Q.  Okay.  And in addition to your report and

Page 9

1   testimony in 2019 was that plaintiffs' general causation
2   experts, people like Jack Siemiatycki and Anne McTiernan
3   and Sonal Singh, Rebecca Smith-Bindman, used an improper
4   and unreliable methodology in assessing the evidence and
5   concluding that perineal use of talcum powder could
6   cause epithelial ovarian cancer; is that true?
7       MR. BISHOP:  Objection.  Vague.  Overbroad.
8       THE WITNESS:  I disagreed with their opinions
9   that there was a causal relationship between ovarian
10  cancer and cosmetic talc usage.
11  BY MR. TISI:
12  Q.  Right.  And you testified and wrote in your
13  report that you felt that they used a flawed methodology
14  to reach their opinions.
15  A.  There were methodologies that I disagreed with
16  in --
17  Q.  Okay.
18  A.  -- reaching their opinions.
19  Q.  And you still hold that opinion today?
20  A.  I do, yes.
21  Q.  Okay.  Both of those opinions?  The opinion that

3 (Pages 6 - 9)

Page 10

1  they used the flawed methodology and that talc doesn't
2  cause ovarian cancer?
3      A.   That cosmetic talc does not cause ovarian
4  cancer.
5      Q.   Now, in 2024, in April, you issued an updated
6  general causation report in the Carl and Balderrama
7  cases pending in the state of New Jersey; true?
8      A.   That's correct.
9      Q.   Okay.  And while you have some opinions on the
10 Balderrama case, the primary purpose of that report was
11 to update your opinions with regard to general causation
12 and address additional concerns of plaintiffs' experts;
13 true?
14     A.   That's correct.  I did review some case-specific
15 materials regarding them, mainly to the look for markers
16 of asbestos in radiology films.
17     Q.   Right.  But -- yes.  And we'll talk about them.
18         But, generally speaking, the vast bulk of your
19 report is basically to update your opinions both as to
20 the fact -- your opinion that talc does not cause
21 ovarian cancer and that plaintiffs' experts still do not

Page 11

1  apply an appropriate methodology; true?
2      A.   Yeah.  I think the general update to my report
3  was, is there any other evidence out there that I would
4  need to consider to -- either alter my opinion or
5  maintain my opinion.
6      Q.   Okay.
7      A.   And that is what the bulk of the difference in
8  my report is.
9      Q.   And I'm going to hand you what I'm going to have
10 marked as Exhibit Number 1, which is the Carl and
11 Balderrama report.  I've given a copy to counsel.
12         (Deposition Exhibit 1 was marked.)
13 BY MR. TISI:
14     Q.   Is this the Carl -- Exhibit 1 going to be your
15 Carl and Balderrama report?
16     A.   Yes.
17     Q.   Okay.  And on May 28th, 2024, you issued an
18 updated general causation report in the federal MDL
19 proceedings, proceeding in the federal court in
20 New Jersey as well; correct?
21     A.   That's correct.

Page 12

1      Q.   And I'd like to attach that report as
2  Exhibit Number 2.
3         (Deposition Exhibit 2 was marked.)
4         THE WITNESS:  Thanks.
5  BY MR. TISI:
6      Q.   Yeah.  I'm sorry.  I don't want to throw it at
7  you, but I don't want to trip over the --
8      A.   That's okay.
9      Q.   -- court reporter here.
10        And Exhibit Number 2 is your updated MDL report;
11 correct?
12     A.   Let me just look at one section and I'll be able
13 to tell you that.
14     Q.   Well, the cover sheet says --
15     A.   I mean, it -- yes.
16     Q.   I'll represent to you -- how about if
17 I represent to you that that is your MDL report.
18     A.   That's correct.  Yeah.
19     Q.   Okay.  And you do know that this is -- this
20 report was originally due on approximately May 21st, but
21 you were given an extra seven days to address a new

Page 13

1  study that were published by the authors from the NIEHS
2  regarding talcum powder; true?
3      A.   Is this the O'Brien 2024 study?
4      Q.   Correct.
5      A.   Yes.  That's correct.
6      Q.   Okay.  And so the primary difference, other than
7  the small case-specific issues that we'll talk about
8  later, was to address the new study which we'll call
9  O'Brien 2024; correct?
10        MR. BISHOP:  In comparison to the Carl report?
11        MR. TISI:  Yes.
12        THE WITNESS:  That -- yes.  That is correct.
13 BY MR. TISI:
14     Q.   Okay.  And I'm going to have marked -- and you
15 can keep this out as well.  This is the 2024 O'Brien
16 study; correct?  Which we marked as Exhibit Number 3.
17     A.   That's correct.
18        (Deposition Exhibit 3 was marked.)
19 BY MR. TISI:
20     Q.   All right.  So let's talk generally, if we
21 could -- would you agree that, putting aside the

4 (Pages 10 - 13)

Page 14

1  specific updated studies in your 2024 reports in the MDL
2  and Carl and Balderrama, that you applied the same
3  methodology that you applied in your 2019 report?
4      A.   The methodology that I would use in forming an
5  opinion between an exposure and an outcome is that
6  methodology, and that methodology has not changed since
7  2019.
8      Q.   Okay.  So there really are no methodologic
9  differences between your report.  It's just
10  incorporating new data that has become available since
11  2024 -- 2019?
12     A.   That's correct.
13     Q.   All right.  So, for example, you still applied
14  the same Bradford Hill considerations in considering --
15  and considering bias, confounding chance, with respect
16  to published studies.  The same methodology you did in
17  2019, you did in 2024?
18     A.   I considered the same Bradford Hill framework in
19  the update of this report --
20     Q.   Okay.
21     A.   -- when compared to 2019.

Page 15

1      Q.   Okay.  And you applied the very same kinds of
2  considerations?  Nothing's changed with respect to your
3  considerations of bias and statistical significance and
4  confounding and all the things we talked about last
5  time?
6      A.   Yeah.  Those wouldn't change in my opinion or in
7  my methodology.  Those aren't part of the Bradford Hill
8  framework, but they are part of the report and would be
9  part of my formulation of an opinion, and that has not
10  changed since 2019.
11     Q.   Now let's flip the script a little bit and talk
12  about -- you had reviewed plaintiffs' experts'
13  supplemental reports as well; correct?
14     A.   That's correct.
15     Q.   Which ones did you review?  Do you remember?
16     A.   Oh, I would have to look.  I was supplied many.
17     Q.   Yeah.  And I'm not going to ask you to name
18  every one of them.
19         But you reviewed them, particularly the ones
20  that you looked at for your 2019 reports; right?
21     A.   That's correct.

Page 16

1      Q.   You've looked at Smith-Bindman.  You've looked
2  at McTiernan.  You've looked at Siemiatycki.  You've
3  looked at the same people you looked at before?
4      A.   That's correct.
5      Q.   And, basically, they had the same methodology
6  that they used before that you considered to be flawed,
7  but they applied the same methodology as well; true?
8      A.   Well, I haven't really looked at it that way.
9  But my opinion of their -- their opinions has not
10  changed since 2019.
11     Q.   Right.
12         So from a methodologic perspective, they use the
13  same methodology which you disagree with that you
14  critiqued the first time?
15         I just want to make sure that I don't need to go
16  back and talk about methodology questions about, for
17  example, the role of statistical significance or
18  anything like that.
19         That's all the same as it was before?
20     A.   Yes.  That's correct.
21     Q.   Okay.  All right.  And your criticisms of their

Page 17

1  methodology in 2019 is the same criticisms that you hold
2  today?  In fact, if I could be so bold as to suggest
3  your report is basically an update of the -- of what you
4  did in 2019?
5         MR. BISHOP:  Objection to the form.  The report
6  speaks for itself.
7         Go ahead.
8         THE WITNESS:  I mean, my report is -- was made
9  to address the -- if there were any further
10  epidemiologic studies or any further epidemiologic
11  evidence that would alter my opinion.
12  BY MR. TISI:
13     Q.   So I just want to be clear I want because I want
14  to take something off the table; right?  I want to make
15  sure we're not talking about -- from a methodologic
16  perspective, the methodology that you used is exactly
17  the same as you used in 2019; true?
18         MR. BISHOP:  Object to the form.  Vague.
19  Overbroad.
20         THE WITNESS:  If I look at my report, it does
21  describe the methodology, and that part of the report

Page 18

1 has not changed.
2 BY MR. TISI:
3    Q.   Right.
4        And from the plaintiffs' experts' perspective,
5 you've reviewed their reports, and, generally speaking,
6 their methodology has not changed either.  They're just
7 addressing, like you did, the new and updated studies;
8 true?
9        MR. BISHOP:  Same objection.
10       THE WITNESS:  In general, that would be my --
11 BY MR. TISI:
12    Q.   Okay.
13    A.   -- my opinion.  Yes.
14    Q.   All right.  Let's switch topics a little bit.
15       Before we talk about your report, I want to talk
16 a little bit about what you've done professionally since
17 2019.
18       I'm going to attach -- provide you with
19 Exhibit Number 4, which is your updated curriculum
20 vitae.
21       (Deposition Exhibit 4 was marked.)

Page 19

1       MR. BISHOP:  Thank you.
2 BY MR. TISI:
3    Q.   You are still an associate professor at Hopkins;
4 true?
5    A.   I am, yes.
6    Q.   Okay.  Is that the same as being adjunct
7 professor?
8    A.   No.  No, it's not.
9    Q.   Okay.  And does this CV accurately reflect your
10 expert -- your education and expertise as of today?
11    A.   I would say so.  Yes.  There are likely some
12 manuscripts that are missing and need to be updated on
13 there.
14    Q.   Any on talc or ovarian cancer?
15    A.   There are not.
16    Q.   Okay.  You're not a full professor.  You weren't
17 a full professor in 2024 -- 2019.  You're not a full
18 professor now; true?
19    A.   I'm not.
20    Q.   Okay.  Are you still board certified in
21 pulmonary medicine?

Page 20

1    A.   I am, yes.
2    Q.   You're not board certified today in oncology or
3 gynecology; true?
4    A.   I am not board certified in oncology or
5 gynecology.
6    Q.   Okay.  Do you know whether or not the --
7 Johns Hopkins holds you out as an expert in either
8 gynecology or oncology?
9    A.   So I'm not a gynecologist or an oncologist.  My
10 assumption would be that Johns Hopkins would not
11 consider me either of those things.
12    Q.   All right.  Johns Hopkins considers you an
13 expert in or somebody -- as a professor in pulmonology;
14 true?
15       MR. BISHOP:  Objection to form.  Vague.
16 Overbroad.
17       THE WITNESS:  So I'm a pulmonologist.  I'm also
18 a critical care physician, and I also have expertise in
19 internal medicine as well as epidemiology.
20 BY MR. TISI:
21    Q.   I'm going to show you -- I pulled this from the

Page 21

1 website last week.  I believe we're up to Exhibit 5;
2 right?
3       (Deposition Exhibit 5 was marked.)
4 BY MR. TISI:
5    Q.   The website on Christian Merlo, M.D., transplant
6 pulmonology from the Johns Hopkins website.
7       Does that look like that -- to be true?
8    A.   That's what it looks like it's from.
9    Q.   All right.  And it indicates that "Dr. Merlo is
10 an internist who specialists in pulmonary and critical
11 care medicine.  Dr. Merlo has clinical expertise in the
12 care of patients with cystic fibrosis, as well as
13 clinical expertise in the care of patients with advanced
14 lung disease that may require" -- it actually gets cut
15 off here.
16       But that's true; right?
17    A.   Yeah.  Sure.  That's true.
18    Q.   So in looking at your current CV,
19 Exhibit Number -- I think it's 4?
20       MR. BISHOP:  4.
21

6 (Pages 18 - 21)

Page 22

1  BY MR. TISI:
2      Q.   You're still not published in the areas of talc;
3  true?
4      A.   That's correct.
5      Q.   Ovarian cancer?
6      A.   That's correct.
7      Q.   Epidemiology of ovarian cancer?
8      A.   I do have a one transplant-related paper that
9  does look at the risk of malignancy after lung
10  transplantation, and ovarian cancer is one of the
11  malignancies that has been seen after that.
12     Q.   Okay.  Asbestos?
13     A.   No.  I have no papers on asbestos.
14     Q.   Any papers on gynecology?
15     A.   Not specifically.
16     Q.   Any papers on contradictory data correction
17  methodology?
18     A.   I -- I would have to understand a little bit
19  more about --
20     Q.   Have you ever published on the methods for doing
21  contradictory data correction?  You know what that is;

Page 23

1  right?
2      A.   So it depends.  It depends on a lot of things.
3  I think if we're talking specifically about the O'Brien
4  paper where they did data correction and imputation,
5  yes.  I have performed --
6      Q.   I didn't ask you that.
7      A.   -- analysis on --
8      Q.   I asked you whether you published on it.
9          Whether you published on the methodology when
10  you use contradictory data correction --
11     A.   Yes, I have.  I have performed imputation, which
12  is a form of --
13     Q.   Okay.
14     A.   -- of working there contradictory data.
15     Q.   And I've looked, and I saw one paper on that.
16  We'll talk about that later.  It's a transplant paper;
17  is that true?
18     A.   No.  There are probably several.
19     Q.   Okay.
20     A.   I mean, there is one transplant paper but there
21  are some cystic fibrosis papers that use some imputation

Page 24

1  techniques as well.
2      Q.   Have you written or published any articles using
3  sensitivity -- doing a sensitivity analysis related to
4  recall bias?
5      A.   No.  Not -- not that I can recall of.
6      Q.   Now, we discussed -- now, as we discussed, you
7  wrote your original causation report in 2019.
8          Since 2019, have you ever submitted your report
9  or any portion of it for peer review in any way, your
10  litigation report?
11     A.   Can you ask that again?
12     Q.   Yes.
13          Have you ever submitted your litigation report
14  to be turned into a peer-reviewed paper?
15     A.   No.  I've never done that.
16     Q.   Okay.  Have you submitted your report to your
17  colleagues to ask them to take a look at your report and
18  see whether or not there are areas that you should
19  change?
20     A.   I have not.
21     Q.   Since 2019, have you submitted your report to

Page 25

1  any professional organization for consideration like
2  NIH, FDA -- that's not a professional -- SGO or ACOG or
3  anything like that?
4      A.   I have not.
5      Q.   Have you submitted to the FDA?
6      A.   I have not.
7      Q.   Have you submitted to NIH?
8      A.   I have not.
9      Q.   So other than the lawyers in this case, nobody's
10  ever seen any systematic evaluation by you of the
11  relationship between talc and ovarian cancer as of
12  today; true?
13     A.   That would be correct.  Yes.
14     Q.   And you've not submitted it to the EPA either;
15  true?
16     A.   I have not.
17     Q.   Now, as we sit here today, do you know that the
18  International Agency of Research on Cancer, or IARC, is
19  considering -- reconsidering the relationship between
20  talc and ovarian cancer?  Do you know that?
21     A.   So I've heard that.  I don't know much about the

7 (Pages 22 - 25)

Page 26

1  specifics. But, yes. I have heard that.
2  Q. Do you know that IARC actually requested that
3  talc be reconsidered on a priority basis? Do you know
4  that to be true?
5      MR. BISHOP: Objection to the form. Vague.
6  Foundation.
7      THE WITNESS: I'm not aware of that. I'm not
8  part of IARC, so I'm not aware of the requests and
9  things like that.
10 BY MR. TISI:
11 Q. Well, do you know that IARC actually reached out
12 to the epidemiology world and the toxicology world
13 and -- see whether anybody would apply to sit on any
14 of their panels to review the evidence of the
15 relationship between talc and ovarian cancer?
16 A. I'm not aware of that.
17 Q. Okay. I'm going to show you what I'd like to
18 have marked as Exhibit Number 6.
19     (Deposition Exhibit 6 was marked.)
20 BY MR. TISI:
21 Q. Do you know what I put in front of you?

Page 27

1  A. I do, yes.
2  Q. Okay. This is April 2024, about the time you
3  were actually drafting your expert report in this case;
4  right?
5  A. I was in the process of updating it. Yes.
6  Q. Okay. And there's actually a call for data.
7      Do you see that on the right-hand side by the
8  IARC committee?
9  A. I do see "call for data." Yes.
10 Q. Okay. And one of the -- in the meeting, it
11 talks about talc and -- I don't know how to pronounce
12 the second word.
13     But do you see that there's a meeting request for
14 data relating to, among other things, talc?
15 A. I do. It says that there's a call for data, and
16 then there's a call for experts, which is -- which was
17 closed on the 31st of July, 2023.
18 Q. All right. My question was: Did you ever apply
19 to IARC or submit data for them to consider your
20 opinions?
21 A. No.

Page 28

1  Q. Okay. Now, you look at Exhibit Number 2, which
2  is your expert report in the MDL case, there's a
3  conclusion section on page 73 entitled "Summaries and
4  Conclusions."
5      Do you see that?
6  A. I do, yes.
7  Q. Okay. And I have actually pulled out that page.
8  I'd like to have it marked as Exhibit Number 7. My
9  colleague here is keeping track of my exhibits, so
10 I appreciate her very much. Here is Exhibit Number 7.
11     (Deposition Exhibit 7 was marked.)
12 BY MR. TISI:
13 Q. Does that look like that's the page of the
14 summary conclusion section from 2024?
15     MR. TISI: And for the record, I wrote "2024" on
16 the top and circled some paragraphs.
17     THE WITNESS: That's correct.
18 BY MR. TISI:
19 Q. All right. And I did the same thing if you look
20 at -- I did the same thing -- and I will represent to
21 you I just didn't bring it. I pulled the same page on

Page 29

1  page 46 of your 2019 report, which I'd like to have
2  marked as number 8.
3      (Deposition Exhibit 8 was marked.)
4  BY MR. TISI:
5  Q. There's a section entitled "Summary and
6  Conclusions," assessing causality. And I'm going to ask
7  you to accept my representation that I didn't change any
8  of the words or anything like that and I did the same
9  thing.
10 A. That's correct.
11 Q. All right. So your -- just to kind of round
12 this out, both of -- in both of them, I've actually
13 circled your methodology criticisms, generally speaking,
14 and your conclusions about plaintiffs' experts using --
15 with their methodology and the problems, generally
16 speaking, that you had with the methodology that they
17 employed; is that correct?
18 A. That is correct. Yes.
19 Q. All right. And will you agree that other than a
20 few stylistic changes -- and feel free to look at
21 them -- they're exactly the same?

8 (Pages 26 - 29)

Page 30

1    A.   Yeah.  They're exactly the same because my
2    opinion hasn't changed based on the methodology of the
3    plaintiffs' experts.
4    Q.   Right.  That's my point is the methodology
5    employed by plaintiffs' experts has not, in your view,
6    changed in any -- in any fashion.  You still considered
7    it flawed.  You still considered it inappropriate.  But
8    it hasn't changed from your report in 2019 to your
9    report in 2024.  The only thing that's changed is
10   there's some additional data?
11        MR. BISHOP:  Object to the form.
12   BY MR. TISI:
13   Q.   True?
14        MR. BISHOP:  I'm sorry.  Object to form.
15   Compound.
16        THE WITNESS:  My opinion regarding the flawed
17   methodology of plaintiffs' experts has not changed.
18        What has changed in my report has been the
19   addition of a few more studies to -- to add to my
20   opinion.
21

Page 31

1    BY MR. TISI:
2    Q.   Right.  And we'll talk about that.  But I'm
3    really trying to tease out the difference between
4    methodology and the application of the methodology to
5    the data that currently exists.
6        The methodology you employed and the methodology
7    that they employed is the same as it was in 2019.  It's
8    just we have new data.
9    A.   In general --
10        MR. BISHOP:  I'm sorry.  Objection.  Asked and
11   answered.
12        Go ahead.
13        THE WITNESS:  In general, yes.
14   BY MR. TISI:
15   Q.   All right.  So, for example, in 2019, you say
16   that -- I'm sorry.  Your 2024 report, you say that
17   plaintiffs ignore the hierarchy of evidence evaluating
18   studies and rely on study designs that are inherently
19   susceptible to bias.
20        That was the same opinion you had in 2019;
21   correct?

Page 32

1    A.   That's correct.
2    Q.   All right.  And just like -- similarly, in 2024,
3    you say methodologically plaintiffs' experts play
4    particular attention to criticizing cohort studies with
5    little acknowledgement to the limitations of case
6    control studies that find weak associations; correct?
7    A.   That's correct.
8    Q.   All right.  You said that in 2019.  You still
9    believe it's true in 2024; true?
10   A.   That's still my opinion.  Yes.
11   Q.   Okay.  You say in 2024, "Plaintiffs' experts
12   generally agree that even the studies that do show an
13   association between cosmetic talc and ovarian cancer
14   have found a relative risk of 1.2 to 1.6.  This, by
15   definition, is weak association.  Plaintiffs nonetheless
16   attempt to characterize the association as strong";
17   correct?
18   A.   That is correct.
19   Q.   And that's the very same opinion you had in
20   2019; correct?
21   A.   Yeah.  I think if I could change one thing in

Page 33

1    that, I would change the 1.2 to 1.8, given the most
2    recent study.  I may have just overlooked that part of
3    it.
4    Q.   Okay.  You say, "Likewise, plaintiffs' experts
5    try to demonstrate a dose response relationship by
6    relying on methodologically flawed studies and
7    statistically insignificant trend lines."
8        That's exactly what you said you said in 2019,
9    and you still believe it to be true in 2024?
10   A.   That's correct.
11   Q.   They also claim to seek consistency where the
12   studies are inherently inconsistent.
13        That was your opinion in 2019.  It's still your
14   opinion in 2024?
15   A.   That's correct.
16   Q.   Okay.  Now, setting aside the interpretation of
17   the new evidence and studies like the post-2019 O'Brien
18   studies, which we will discuss, can you think of any
19   additional generally methodologic flaw or principle that
20   plaintiffs' experts failed to follow other than those
21   that you generally outlined in your original 2019

9 (Pages 30 - 33)

Page 34

1  report?
2      A.   So my opinion has not changed.  And that talks
3  about inconsistency.  That talks about the potential for
4  bias.  That talks about the -- the -- the disagreement
5  in the strength of association.
6          So I think those -- those opinions, in general,
7  have not changed.
8      Q.   Okay.  But -- so, I mean, again, I'm trying to
9  get you here:  Putting aside plaintiffs' experts'
10 interpretations of new studies after 2019, can you think
11 of any additional methodologic principle or method that
12 plaintiffs' experts failed to apply when assessing the
13 literature that is not captured in your criticisms from
14 2019?
15         MR. BISHOP:  Object to the form.  2024 report
16 stands on its own.
17         THE WITNESS:  I think it's contained in my 2024
18 report.
19 BY MR. TISI:
20     Q.   Right.
21         And in terms of methodology, there's no

Page 35

1  difference?
2      A.   That's my opinion.  Yes.
3      Q.   Okay.  All right.  Do you know what Daubert is?
4      A.   Not -- you'd have to explain that to me.  But --
5      Q.   Well, you know generally the question -- you
6  actually -- I think your original report was entitled
7  "Expert on General Causation for Daubert," if I remember
8  correctly; correct?
9      A.   That's correct.
10     Q.   All right.  So you had a general understanding
11 that in Daubert, the Court was to test the methodology
12 of different experts and see whether they applied an
13 appropriate scientific methodology.
14         Do you remember that?
15     A.   That sounds about right.
16     Q.   All right.  Now, do you know that the court held
17 a hearing on methodology in the federal MDL case?
18 You're aware of that; right?
19     A.   Very vaguely.  Yes.
20     Q.   And I'm going to hand to you Exhibit Number 9,
21 which I will say that I created.  And so I'm going to

Page 36

1  say -- I'm going to ask you to look at it here.
2          (Deposition Exhibit 9 was marked.)
3  BY MR. TISI:
4      Q.   And I'm sorry I'm asking you to stand up.
5  I don't --
6      A.   No.  That's okay.
7      Q.   I don't mean to do that.
8      A.   Good exercise.
9      Q.   It's just I really don't want to trip over the
10 court reporter here.
11         So number 9 are quotes from the different -- on
12 the different criticisms that you had of plaintiffs'
13 experts from the Daubert order.  And feel free to take a
14 look at that.  And I just want to see if the defense and
15 the judge actually characterized yours and other J&J
16 witnesses' methodologic criticisms correctly.
17         So if you take a look at that and we can --
18     A.   Sure.  Okay.  What was the question again?  I'm
19 sorry.
20     Q.   Yeah.  There was no question.  I'm going to ask
21 you.

Page 37

1          Having read that, did the judge, as
2  characterizing what the defendants, J&J, claimed here
3  actually -- accurately capture your criticisms of the
4  plaintiffs' experts?
5          MR. BISHOP:  Objection.  Overbroad and compound.
6          THE WITNESS:  Can you ask that again?
7  BY MR. TISI:
8      Q.   Yeah.
9          Did the judge understand the criticisms that
10 you -- that you and J&J's lawyers leveled against
11 plaintiffs' experts, as expressed in your 2019 report?
12         MR. BISHOP:  Objection.  Same -- same
13 objections, plus calls for speculation.  And it's only
14 excerpts from the order.
15         MR. TISI:  I understand.
16         THE WITNESS:  So this piece of paper has three
17 titles on it: strength of association, consistency, and
18 dose response.  They're -- these appear to be, but
19 I would only be guessing, that they're a summary of what
20 you're telling me the judge said about these different
21 parts of a Bradford Hill framework.

10 (Pages 34 - 37)

Page 38

1  BY MR. TISI:
2    Q.   Well, it's not what the judge said.  I didn't
3  give you the judge's analysis.  I gave you how the
4  defendants characterized their arguments regarding
5  methodology.
6        For example, defendants submit there is a
7  hierarchy of evidence of epidemiologic study, which
8  include a descending order of reliability --
9        COURT REPORTER:  Slow down.
10  BY MR. TISI:
11    Q.   Descending order of reliability, cohort studies,
12  case control studies, and cross-sectional studies.
13        Those are the kinds of criticisms that you made;
14  correct?
15    A.   Maybe I'm misunderstanding who wrote this.
16    Q.   This is the judge writing -- writing what she
17  understood the defendants' arguments to be.
18    A.   Got it.
19    Q.   Okay.  So did the judge accurately understand
20  what the defendants' arguments are, at least as far as
21  you're concerned?

Page 39

1        MR. BISHOP:  Object to the form.  That calls for
2  speculation.  It's overbroad to the extreme.
3        THE WITNESS:  It's impossible for me to say
4  that, because the strength of association -- there are
5  other factors that are -- that would be factored into
6  the strength of association --
7  BY MR. TISI:
8    Q.   Okay.
9    A.   -- not just the hierarchy of observation of
10  epidemiologic studies.
11        There's no talk about -- about what a point
12  estimate would be or what a strong point estimate would
13  be, what a weak point estimate would be.
14    Q.   Okay.
15    A.   So that's -- it's impossible for me to say what
16  this person was thinking.
17    Q.   Okay.  Okay.  All right.  I think the record
18  will speak for itself.
19        All right.  Let's switch topics a bit to discuss
20  your methodology, since 2012, what you've done.
21        Are you aware --

Page 40

1        MR. BISHOP:  I presume you mean 2019?
2        MR. TISI:  2019.
3        MR. BISHOP:  Okay.  You said 2012.
4        MR. TISI:  I'm sorry.
5  BY MR. TISI:
6    Q.   Are you aware that your causation report and
7  your opinions on methodology were actually sent to you
8  and considered by independent scientists by
9  Johnson & Johnson?
10    A.   Can you ask that again?
11    Q.   Yeah.
12        Are you aware that your causation report from
13  2019 and your opinions about the methodology employed by
14  you was actually reviewed by independent scientists and
15  regulators?
16        MR. BISHOP:  Object to form.
17        THE WITNESS:  I'm not aware of that.
18        MR. BISHOP:  I'm sorry.  Vague.  Foundation.
19  BY MR. TISI:
20    Q.   Prior to your 2019 deposition, you recall that
21  I asked you about a draft assessment from Health Canada

Page 41

1  from 2019.  Do you remember that?  And you said you
2  weren't aware of that.
3    A.   I vaguely remember that question.  That was a
4  long time ago.
5    Q.   Do you know that subsequent to 2019, from
6  your -- after your deposition, J&J provided your expert
7  report to Health Canada for consideration as part of a
8  comment period for their regulatory findings?
9        MR. BISHOP:  Objection.  Vague.  Overbroad.  No
10  foundation.
11        THE WITNESS:  I'm not --
12        MR. BISHOP:  Calls for speculation.
13        THE WITNESS:  I'm not aware of that.
14  BY MR. TISI:
15    Q.   Okay.  And do you know that -- I noticed that --
16  well, as part of your reliance materials, you saw a --
17  there was a big, thick document that was -- J&J had
18  actually compiled in response to Health Canada.
19        Do you remember that?
20    A.   Vaguely remember that.
21    Q.   Okay.  And you understand -- do you have any

11 (Pages 38 - 41)

Page 42

1    understanding, in addition to its own analysis, it
2    provided with the -- it provided access to Health
3    Canada, the expert reports filed in the MDL?  Are you
4    aware of that?
5        MR. BISHOP:  Objection.  Asked and answered.
6        THE WITNESS:  Can you ask that again?
7    BY MR. TISI:
8    Q.    Yeah.
9    A.    I didn't understand.
10   Q.    You're aware in addition to your own evaluation,
11   they provided expert reports like Dr. Diette and
12   Dr. Merlo and Dr. McTiernan and Dr. Siemiatycki,
13   provided those all for consideration by Health Canada?
14       MR. BISHOP:  Objection.  Foundation.  Also
15   compound.
16       THE WITNESS:  I -- I don't know what J&J
17   provided to Health Canada --
18   BY MR. TISI:
19   Q.    Okay.
20   A.    -- in whatever they were asking for
21   consideration.

Page 43

1    Q.    I'm going to show you what I have marked as
2    Exhibit Number 10.
3        (Deposition Exhibit 10 was marked.)
4    BY MR. TISI:
5    Q.    Have you seen the final report by Health Canada
6    that was published in 2021?
7    A.    I have not.
8    Q.    J&J did not provide you with their -- the
9    regulatory authority's review of the scientific
10   evidence, including your own expert report?
11       MR. BISHOP:  Object to the form.
12       THE WITNESS:  So --
13       MR. BISHOP:  Compound.  Calls for speculation.
14       THE WITNESS:  -- what I was asked to provide was
15   my opinion based on the peer-reviewed epidemiologic
16   literature.  And this Health Canada report, which I have
17   not read, would not be part of the peer-reviewed
18   published literature.
19   BY MR. TISI:
20   Q.    Well, that's really not my question, so let me
21   rephrase the question.

Page 44

1        Did J&J tell you that Health Canada actually
2    considered your opinions in reviewing the evidence as
3    part of putting together their final report on the issue
4    of causation and talc and ovarian cancer?  Did it tell
5    you that?
6    A.    I'm --
7        MR. BISHOP:  I'm sorry.  Objection.  Foundation.
8    Calls for speculation.
9        THE WITNESS:  Again, I'm not aware of J&J --
10   BY MR. TISI:
11   Q.    Okay.
12   A.    -- doing that.
13   Q.    In fact, J&J even as of today, other than their
14   lawyers, have never asked you to do anything with
15   respect to any professional epidemiology work or
16   pulmonary work or critical care work or anything.
17   You've never consulted with them in the normal course of
18   business, have you?
19   A.    The only thing that I was asked to do was to
20   provide an opinion based on the epidemiologic medical
21   literature to provide an opinion whether or not cosmetic

Page 45

1    talc has a causal association with ovarian cancer.
2    Q.    In litigation?
3    A.    In litigation, yes.
4    Q.    Okay.  Putting aside your litigation report,
5    have you ever -- has J&J ever reached out to you, even
6    as of today, and said, "We really need your expertise on
7    the wide variety of drugs and products that we've
8    produced because we need your expertise in any aspect of
9    your training and experience"?  Epidemiology, pulmonary
10   medicine, anything?
11   A.    J&J has not reached out directly to me.
12   Q.    So the only thing that they ever reached out to
13   you to do was to do a litigation report; correct?
14   A.    I don't specifically recall who reached out to
15   me in the beginning about this.
16   Q.    Okay.
17   A.    But someone did.
18   Q.    Their lawyers?
19   A.    Likely, yes.
20   Q.    Yeah.
21       J&J itself has never reached out to you for any

12 (Pages 42 - 45)

Page 46

1    professional advice or work; true?
2         MR. BISHOP: Objection. Asked and answered.
3         THE WITNESS: That's correct.
4    BY MR. TISI:
5         Q.    All right. Now, did they tell you, though, that
6    as part of the normal course of business, they submitted
7    your litigation report to the Canadian authorities?
8         MR. BISHOP: Objection. Asked and answered.
9         THE WITNESS: Yeah, I thought I answered that
10   already.
11   BY MR. TISI:
12        Q.    Okay. And the answer was no, you did not know
13   that?
14        A.    That's correct.
15        Q.    And they never told you that they -- that they
16   considered your report, Dr. Diette's report,
17   Dr. McTiernan's report, Dr. Singh's report,
18   Dr. Smith-Bindman's report, and all the expert reports
19   that were available at the time, and yet they still
20   found that talc was a likely cause of ovarian cancer.
21   They didn't tell you that, did they?

Page 47

1         MR. BISHOP: Objection. Foundation. Overbroad.
2    Calls for speculation.
3         THE WITNESS: Can you ask that again? It was a
4    complicated question.
5         MR. TISI: Yeah. Why don't you read it again,
6    please?
7    BY MR. TISI:
8         Q.    I'll ask the question again.
9         They didn't tell you that they had submitted --
10   just like they submitted to Judge Wolfson in the federal
11   MDL proceedings they submitted to Health Canada the
12   reports that were filed in the MDL in 2019, your report,
13   Dr. Diette's report, Dr. Smith-Bindman's report,
14   Dr. McTiernan's report, Dr. Siemiatycki's report. They
15   were all submitted to Health Canada.
16        Did you know that?
17        MR. BISHOP: Objection. Foundation. Calls for
18   speculation. Overbroad.
19        THE WITNESS: I think I answered that already.
20   I'm not aware of what J&J -- if they submitted anything
21   to Health Canada.

Page 48

1    BY MR. TISI:
2         Q.    Well, if you will take a look at the document
3    I put in front of you, on page 55, for example, there's
4    a list of things that they considered.
5         Do you see near the bottom, expert report of
6    Christian Merlo, expert report of Anne Mctiernan?
7         Do you see that?
8         A.    I do see that. Yes.
9         Q.    Okay. And do you also see, if you go to page --
10   page 2 of the report, it says that their report was
11   actually peer reviewed?
12        Do you see that?
13        I'll read it to you. It says, "Additionally,
14   the draft screening assessment was subject to a 60-day
15   public comment period. Additional information was
16   submitted during the public period, which was reviewed
17   and considered in the final screening assessment."
18        And if you go to the sentence before, it says,
19   "The human health portion of this assessment had
20   undergone external peer review."
21        Do you see that?

Page 49

1         A.    I don't see that second part.
2         Q.    Go up above -- mid-sentence -- beginning -- it
3    says -- right here.
4         A.    Yeah. I see where it says, "The human health
5    portion of this assessment has undergone external peer
6    review."
7         They don't describe that external peer review.
8    And they also say, "While external comments were taken
9    into consideration, the final content and outcome of the
10   screening assessment remain the responsibility of Health
11   Canada and Environmental and Climate Change Canada."
12        So, I mean, yes. There's a -- there was a draft
13   that was subject to a 60-day public comment period, but
14   that's not exactly what would happen in a peer-reviewed
15   manuscript.
16        Q.    Go to page 31 -- and I'm just going to use by
17   way of example. So if you look at page 31 -- and it
18   comes under the section of "Consistency," if you look at
19   the second -- the page before on page 30.
20        Do you see that?
21        A.    I do, yes.

Page 50

1  Q.  Okay.  And they actually cite you and the
2  experts in the case.  It says, for example -- in the
3  middle of the first full paragraph, it says, "Specific
4  to talc and ovarian cancer, some recently analyses have
5  given precedence to the results of cohort studies,
6  arguing they provide stronger evidence of an association
7  in case controls."
8       And it cites, among other things,
9  Johnson & Johnson?
10      Do you see that?
11  A.  I do.
12  Q.  Okay.  And then it says, "Other analyses support
13  the view that such generalizations cannot be made, and
14  there are many factors affecting the validity of the
15  studies regardless of design."
16      And they cite plaintiffs' experts' scientific
17  reports.
18      Do you see that?
19  A.  I do, yes.
20  Q.  Okay.  In the next sentence, it says, "The
21  available cohort studies did not demonstrate the same

Page 51

1  level of statistical significance in the case control
2  studies."
3       And, actually, it continues on and cites you and
4  Dr. Diette?
5       Do you see that?
6  A.  I do, yes.
7  Q.  And in the end of the day, if you look at the --
8  if you look at the conclusion -- go to page 45.  The end
9  of the paragraph at the top of the page, it says --
10  citing you, among other things, it then goes on to say,
11  "While there may not be consensus within the scientific
12  community regarding the interpretation of the
13  epidemiologic information, after weighing the available
14  lines of evidence, the assessment determined that
15  current data is indicative of causal effect."
16      Do you see that?
17      MR. BISHOP:  This -- I'm sorry.  This document
18  speaks for itself, and it's a document that this witness
19  is not familiar with.
20      MR. TISI:  Understood.
21      THE WITNESS:  I do read that.  Yes.

Page 52

1  BY MR. TISI:
2  Q.  All right.  And so J&J provided you with a lot
3  of information about comprehensive reviews that were
4  done in this case, but they never provided you with what
5  Health Canada did, did they?
6      MR. BISHOP:  Object to form.  Compound.
7      THE WITNESS:  Again, I'm going to go back to the
8  reason that I was asked to perform my analysis, and that
9  was to use the peer-reviewed published literature.
10  BY MR. TISI:
11  Q.  Okay.
12  A.  And this would not be included in that.
13  Q.  Okay.  Now, let's talk about -- you made some --
14  you had some opinions, for example, on the PDQ.
15      Do you remember that?  In your report.
16  A.  I did reference a recent update to the PDQ.
17  Yes.
18  Q.  And, actually, in your original report, you
19  referred to the PDQ; right?
20  A.  I believe so.  I think the update -- I did an
21  update based on when I accessed the website.  Yes.

Page 53

1  Q.  All right.  To your knowledge, is PDQ a
2  peer-reviewed, published literature?
3  A.  I'm not aware of what -- what goes into who
4  publishes the PDQ on the website.  That, actually,
5  paragraph in my report would not change my opinion --
6  Q.  Didn't ask that.
7  A.  -- either way.
8  Q.  You said you only considered -- if I'm
9  understanding you correctly, you only considered the
10  published, peer-reviewed literature.  And you actually
11  referred to, among other things, the PDQ.
12      And you -- that's not published or peer
13  reviewed, is it?
14  A.  I don't know if it is or not.
15  Q.  Okay.  Let's talk about -- I'm going to switch
16  topics a bit.
17      You've been working on talc litigation with J&J
18  lawyers for at least six years; correct?
19  A.  I believe either 2018, 2019, I was asked to
20  provide -- to look at the literature and to provide an
21  opinion.

14 (Pages 50 - 53)

Page 54

1    Q.   Okay.  And you've actually testified as an
2    expert in two cases, to the best of my knowledge;
3    correct?
4         A case in Georgia and -- actually, two cases in
5    Georgia.
6    A.   Two cases in Georgia and with you.  So three
7    depositions prior to this.
8    Q.   Oh, did you testify at trial?
9    A.   No.
10   Q.   Okay.  The two cases in Georgia, were they
11   mesothelioma cases?  Were they ovarian cancer?
12   A.   Ovarian cancer.
13   Q.   Okay.  And how much money do you -- have you
14   made over the past six years testifying on behalf of J&J
15   in connection with your work with J&J lawyers?
16   A.   So --
17   Q.   Total.
18   A.   Yeah.  I want to step back.  I'm not testifying
19   for J&J.  I'm testifying for my opinion based on the
20   medical literature and my opinion on whether or not
21   cosmetic talc is causal in the relationship with ovarian

Page 55

1    cancer.
2    Q.   Okay.  I get it.  I get it.  But they're paying
3    you for that testimony; correct?
4         MR. BISHOP:  Object to form.  Mischaracterizes.
5    BY MR. TISI:
6    Q.   They've paid you for the work that you've done
7    in this case; true?
8    A.   They're paying for my opinion.  Yes.
9    Q.   Right.  All right.
10        Now, you have -- the work that you've done over
11   the past six years, how much would you say that you've
12   made from J&J in terms of money?
13   A.   Sure.  I -- there was a pause during -- during
14   the pandemic.
15   Q.   Um-hum.
16   A.   But I think, in general -- although I would be
17   guessing, but I'm going to give my best estimate.
18   Q.   Please.
19   A.   I would say between in between 100- and $200,000
20   a year.
21   Q.   100- and $200,000 a year?

Page 56

1    A.   Yes.
2    Q.   So that would be a total -- you know, putting
3    the pandemic in there -- is how much?
4    A.   Well, in between 5- and $600,000 --
5    Q.   Okay.
6    A.   -- would be my estimate.
7    Q.   I'm going to have marked --
8         I'm going to have marked -- actually, I'm going
9    to mark these at the end because I want to take these in
10   order.
11        But you did provide us with bills; correct?
12   A.   Invoices.  Yes.
13   Q.   Invoices.
14        And we talked about VeraMedica last time.
15   They're an outside organization that helps you collect
16   documents and do administerial things; correct?
17   A.   Yes.  They help with administrative things.
18   Q.   I notice from the fee schedule you have that
19   they have an epidemiologist and on-board nurse,
20   et cetera.
21        Did you use any of them in any way in connection

Page 57

1    with your report?
2    A.   I mean, my report is based on the time that
3    I spent reviewing the medical literature and -- and
4    writing.
5    Q.   Okay.
6    A.   All those other things, I don't know what those
7    are.
8    Q.   Okay.  So you don't know what they did and what
9    they did not do in connection with your report?
10   A.   I don't.  I know that some people printed things
11   out for me and made binders, but what that costs or what
12   that --
13   Q.   No --
14   A.   I don't --
15   Q.   What I'm asking you for, Doctor, is a different
16   question.
17        My question is:  Did they do any substantive
18   work?  For example, helping you calculate odds ratios or
19   help you figure out things about multiple imputation or
20   anything like that.
21        Did they do anything technical with your

15 (Pages 54 - 57)

Page 58

1  reports?

2    A.  No.

3    Q.  Okay.  I'm going to mark this.

4      MR. TISI:  Remind me to mark this at the end.

5  BY MR. TISI:

6    Q.  You know, I see bills here in the range of

7  $237,000.  But as I think you said, over time, it's

8  closer to 5-, $600,000; is that right?

9    A.  That would be my best estimate based on the

10  number of years and what it would be for -- per year.

11  Again, there was a pause during COVID.

12    Q.  Okay.

13    A.  So it could be an overestimate.

14    Q.  Now I'm going to hand you Exhibit Number 9 [sic],

15  which is the notice of deposition.

16      I'm going to hand you -- have you had an

17  opportunity to look at the notice of deposition that was

18  filed in this case?

19    A.  Yes.

20    Q.  Okay.  And we're at number 11; right?

21      MR. BISHOP:  That's correct.

Page 59

1      (Deposition Exhibit 11 was marked.)

2      THE WITNESS:  Thanks.

3  BY MR. TISI:

4    Q.  Have you looked at -- have you looked at this in

5  order to try and comply with Exhibit Number 11?

6    A.  And this is Exhibit 11, documents reflecting

7  requests by you or offers to you --

8    Q.  Yes.

9    A.  -- of funding to study talcum powder products?

10    Q.  No.

11      I'm just asking you:  Have you seen this

12  document and looked through it?

13    A.  Oh.  I have -- Yes.  I have looked through it.

14  Yes.

15    Q.  I'm going to ask you to look -- go to number 14.

16      It says documents relating to communications

17  between you and certain entities.

18      Do you see that?

19    A.  I do, yes.

20    Q.  Exhibit A is authors of any published study

21  concerning talcum powder product and talc and ovarian

Page 60

1  cancer.

2      Do you see that?

3    A.  I do, yes.

4    Q.  Have you reached out in any way to any authors

5  of any of the published studies that are at issue in

6  this case, including the O'Brien authors?

7    A.  I have not.

8    Q.  Have you reached out or spoken to anybody who

9  publishes the PDQ?

10    A.  I have not.

11    Q.  Have you ever spoken -- you know who Dr. Diette

12  is; correct?

13    A.  Yes.

14    Q.  Have you ever spoken to Dr. Diette about your

15  opinions in this case?

16    A.  I don't specifically recall speaking about my

17  opinions, but I'm sure that we have discussed aspects

18  in, you know -- from time to time.

19    Q.  Have you spoken to any of your other colleagues

20  other than the other litigation expert in this case?

21  Any of your other epidemiology colleagues who are not

Page 61

1  participating in this case about your opinions?

2    A.  I have not.

3    Q.  Okay.  So the only person at Hopkins you

4  actually spoke to is the other litigation guy?

5    A.  Well, his office is right next to mine and we

6  are friends.  And from time to time, things may --

7  things may come up.

8    Q.  I'm sure you are -- you have other people who

9  have offices near you as well; right?

10    A.  There are.  But, you know, his -- he -- I've

11  known him for a long time, and we are closer colleagues

12  than maybe some others who are in close proximity.

13    Q.  And you are co-experts for J&J in the talcum

14  powder litigation; correct?

15    A.  So we are co-experts.  Yes, we are.

16    Q.  Okay.

17      (Recess taken.)

18      (Brandy Harris, Esq. and David Dearing, Esq.

19  joined via Zoom.)

20  BY MR. TISI:

21    Q.  Couple questions about that.  You say your

16 (Pages 58 - 61)

Page 62

1  office is right next to Dr. Diette's.
2      Did you collaborate in any fashion on your
3  supplemental 2024 reports in terms of communicating
4  ideas back and forth, for example, about the O'Brien
5  2024 study?
6  A.   Not that I recall.
7  Q.   Okay.  Have you emailed each other about the
8  specifics about the talc litigation?
9  A.   We have not.
10  Q.   On page 34 of your expert report, your MDL
11  expert report, you make the statement that you had a
12  concern that the authors had manipulated data in order
13  to demonstrate a predetermined result.
14      Do you remember that phrase?
15  A.   I do.  But if you could point me to that --
16  Q.   Yeah.
17  A.   -- that sentence, that would be great.
18  Q.   Yeah.  On page 34, right before meta-analysis,
19  it says, "Given that this model is fundamentally based
20  on the imputation of missing data, it raises concern for
21  the data manipulation in order to demonstrate a

Page 63

1  predetermined result."
2      Did I read that correctly?
3  A.   You did, yes.
4  Q.   So you had a concern about that.
5      Did you have any documents or anything that
6  would support that concern or anything about that?
7  A.   Other than the way in which this study was
8  performed --
9  Q.   Right.  So you have -- I'm sorry.  I didn't mean
10  to interrupt you.
11      So you have no evidence or documents that would
12  suggest that the authors manipulated data in order to
13  get a predetermined result?
14  A.   Other than the manuscript itself, yes.
15  Q.   Okay.  So you think that the manuscript that
16  passed peer review demonstrates that it was done for a
17  reason of trying to get a predetermined result?
18  A.   I didn't say --
19      MR. BISHOP:  Sorry.  Objection.  Argumentative.
20      THE WITNESS:  I didn't say it demonstrated.
21  I said it raises a concern.

Page 64

1  BY MR. TISI:
2  Q.   Okay.  What did you do to investigate that
3  concern?
4  A.   I looked at the data --
5  Q.   Did you contact --
6  A.   -- itself.
7  Q.   Did you contact anybody?
8  A.   I wasn't a peer reviewer on that manuscript.
9  Had I been, I would have raised that concern.
10  Q.   Did you -- you know that's there a corresponding
11  author on the study; correct?  Dr. O'Brien.
12  A.   That's correct.
13  Q.   Did you ever contact Dr. O'Brien and say,
14  "Dr. O'Brien, you know, I have some concerns here that
15  maybe you were manipulating data"?
16      Did you ever do that?
17  A.   Well, they actually did manipulate data.
18  Q.   I'm not -- to --
19  A.   And so --
20  Q.   Let me rephrase the question.  I'm withdrawing
21  the question.  I'm going to --

Page 65

1      "To get a predetermined result."  Okay?
2  I want to use your whole sentence.
3      "That manipulated data to get predetermined
4  results."
5      That's a pretty serious thing to accuse a
6  scientist of doing; correct?
7  A.   It's a concern.
8  Q.   Okay.  But if somebody -- if somebody had
9  manipulated data in order to get a predetermined result
10  in a published study, that would be a serious thing;
11  true?
12  A.   So it depends.  It depends on what kind of
13  manipulation is done.
14  Q.   Okay.
15  A.   If you're making up data, that's a serious
16  concern.  If you're -- if you're performing a thought
17  experiment -- which is what this paper is -- that's less
18  of a concern from a -- from a professional standpoint.
19  My -- that sentence there is not saying that they made
20  up data.  That sentence is saying that they have
21  employed a strategy to fill in missing data, which, when

17 (Pages 62 - 65)

Page 66

1  they do this and interpret the results, it raises the
2  concern that there was a predetermined result because
3  they failed to address any of the other models.
4      Q.   We're going to talk about that.
5          MR. BISHOP:  Let him finish.
6          MR. TISI:  I thought he was finished.  I thought
7  he was finished.
8  BY MR. TISI:
9      Q.   Are you finished?
10     A.   No.
11         They failed to address any of the other models
12  and used one of the models that is based on a lot of
13  assumptions to perform the rest of their study.  And so
14  that is why it raises the concern that there's a
15  predetermined result.
16     Q.   Okay.  So what I'm -- what I am asking you:  You
17  have a concern.  You did nothing to investigate it;
18  true?
19         You didn't contact the authors.  You didn't
20  speak to anybody.  You didn't ask them for any
21  additional information.  You didn't ask them for the

Page 67

1  study -- the study plan.  You didn't do anything to
2  investigate the concern.
3          You just threw it out there as a potential
4  concern; true?
5          MR. BISHOP:  Object.  Argumentative.  Also
6  compound.
7          THE WITNESS:  It is a potential concern.
8  BY MR. TISI:
9      Q.   Right.
10         Did you do anything to investigate it?
11     A.   No.
12     Q.   Okay.
13         (Jessica Davidson joined via Zoom.)
14         (Off the record.)
15  BY MR. TISI:
16     Q.   Okay.  All right.  Let's talk about the
17  post-2019 evidence.
18         One of the things that happens at your MDL
19  deposition in 2019 were publications by scientists at
20  the National Cancer Institute and the National Institute
21  of Environmental Health Sciences; true?

Page 68

1      A.   If you could refer to the authors' --
2      Q.   O'Brien.
3      A.   -- names, that would be great.
4      Q.   O'Brien?
5      A.   So O'Brien 2024, Chang 2024, those are the
6  main --
7      Q.   O'Brien 2020.
8      A.   O'Brien 2020.  I'm sorry.  Chang 2024 and
9  O'Brien 2024 --
10     Q.   All right.
11     A.   -- were the main studies that added to my
12  opinions.
13     Q.   And these are authors from the -- from the
14  National Institute of Environmental Health Sciences --
15  right? -- a division of the NIH?
16     A.   I don't specifically recall all of the authors
17  affiliations on those specific papers.
18     Q.   Do you know who Dale Sandler is?
19     A.   I do not.
20     Q.   Do you know who she is?
21     A.   No.

Page 69

1      Q.   Do you know she's the director of epidemiology
2  at the National -- NEIHS?
3          MR. BISHOP:  If he doesn't know whom she is,
4  he's not going to know that.  But go ahead.
5          MR. TISI:  Thank you.  I'm going to go ahead.
6  Please do not speak.
7          THE WITNESS:  I said that I didn't know who that
8  was, so I would not know that.
9  BY MR. TISI:
10     Q.   So you didn't investigate in any way the
11  credentials of the -- of the authors of these various
12  studies?
13     A.   I did not.
14     Q.   Now, J&J in its pleadings in the court have
15  called these scientists "preeminent scientists."
16         Do you know -- do you consider them to be
17  preeminent scientists?
18     A.   I don't know them at all, so I would not be
19  considering that in a -- in speaking of them.
20     Q.   You -- we talked a little bit about IARC before.
21         Do you know that these scientists have actually

Page 70

1  been asked by the International Agency For Research on
2  Cancer to actually be on the panel looking at the
3  talc/ovarian cancer connection?
4      Do you know that?
5  A.   I was not aware of that.
6  Q.   I'm going to show you what I have marked as
7  Exhibit Number 12.
8      (Deposition Exhibit 12 was marked.)
9  BY MR. TISI:
10  Q.   Which is the list of participants in the IARC
11  process, which is going on as we speak, and ask --
12      MR. TISI:  I'm sorry.  I think I only have one
13  copy, for some reason.  I thought I had several.  I'll
14  give you a copy afterwards.
15  BY MR. TISI:
16  Q.   Do you know any of these doctors?  You see where
17  Dr. O'Brien and Dr. Wentzensen are on the panel;
18  correct?
19  A.   I see both of those names.  Yes.
20  Q.   Okay.  Do you know whether or not any -- do you
21  know any of the other experts who are on the panel?

Page 71

1  A.   Do I know them?  No.
2  Q.   Do you know of them?
3  A.   I do not.
4  Q.   Do you have any -- do you see anyone on this
5  list who you have reason to believe would apply a flawed
6  or improper methodology in assessing the risk of talc
7  and ovarian cancer?
8      MR. BISHOP:  Objection.  Calls for speculation.
9      THE WITNESS:  I have no idea how to answer that.
10  I don't know any of these people.  So...
11  BY MR. TISI:
12  Q.   Do you think any of these people are biased?
13      MR. BISHOP:  Same objection.
14      THE WITNESS:  I can't answer that.  I have no
15  idea.
16  BY MR. TISI:
17  Q.   Okay.  Let's talk about the O'Brien 2020, if we
18  could.  You addressed that in your report on pages 30
19  and 31.
20      Do you see that?  You address O'Brien 2020 in
21  the -- in your report.

Page 72

1  A.   I do, yes.
2  Q.   All right.  And that is a new study from when we
3  last met in 2019; correct?
4  A.   That's my recollection.  Yes.
5  Q.   All right.  And I am going to give you and
6  counsel a copy.  I think we're 13; right?
7      (Deposition Exhibit 13 was marked.)
8  MS. PARFITT:  13.
9  MR. BISHOP:  We are.
10  THE WITNESS:  Thanks.
11  MR. BISHOP:  Thank you.
12  BY MR. TISI:
13  Q.   Okay.  And this -- and this article is called
14  "Association of Powder Use in the Genital Area with the
15  Risk of Ovarian Cancer"; correct?
16  A.   That's correct.
17  Q.   By Katie O'Brien; correct?
18  A.   And other authors.  Yes.
19  Q.   Well, and other authors including Dr. Wentzensen
20  and Dr. Sandler.
21      Do you see that?

Page 73

1  A.   Yes, I do.
2  Q.   Okay.  And the corresponding author is at the
3  O'Brien -- I asked you before, which he was.  It's the
4  epidemiology branch at the National Institute of
5  Environmental Health Sciences.
6      Do you see that?
7  A.   I do, yes.
8  Q.   And on the back, as you would -- as you would
9  expect -- of the article, there's a corresponding where
10  you could actually reach out and ask her questions about
11  this study; right?
12  A.   I don't see that.  Where is that that you're
13  referring to?
14  Q.   Actually, let's move on because I don't want to
15  look for it right now.
16      Typically speaking, there are what's called
17  "corresponding authors" where other professionals can
18  reach out and ask questions?
19  A.   Yeah.  The usual process is to have a
20  corresponding author, and you either give an address,
21  phone number, email, or something of those natures.

19 (Pages 70 - 73)

Page 74

1    Q.   Now, according to you on page 31 of your report,
2    it says that these NEIHS authors strongly rebut that
3    cosmetic talc hypothesis because they collected more
4    women, have greater statistical power, and followed
5    these women for a far longer period of time than the
6    prior study but found no association; correct?
7    A.   That's correct.
8    Q.   And you rely on this study and these authors as
9    authoritative; correct?
10   A.   I don't really know what that means.  In -- in
11   medicine, we don't typically use that.  This is a --
12   this is a paper.  There is a way that I would read it
13   and look at the study design, look at the analysis, look
14   at the interpretation of analysis, and what's written.
15       You know, I don't really understand what the
16   term "authoritative" means.
17       This is a paper that I've used to formulate an
18   opinion.
19   Q.   Okay.  Do you consider this to be a credible
20   study and a credible journal?
21   A.   Well, I think JAMA is a journal that I do go to

Page 75

1    read papers.
2    Q.   Okay.
3    A.   And the design and analysis and interpretation
4    in general, I find I agree with.
5    Q.   And this is a pooled study; correct?
6    A.   Well, this is a -- it is a pooled study of
7    cohorts.
8    Q.   Correct.
9    A.   So in essence, it is a cohort study.
10   Q.   Okay.  Well, it says -- okay.  If it was being
11   called a pooled study by the authors, would you have a
12   reason to disagree?
13   A.   Only in the fact that it is a cohort study.  So
14   it's a longitudinal study.  And I would -- if I was
15   reviewing it, I would -- I would ask for further
16   clarification in a -- in either the abstract or in the
17   abstract plus in the body to include that -- that term,
18   "longitudinal."
19   Q.   Have you ever reviewed any papers submitted by
20   these authors or any authors from the NIH?
21   A.   Have I reviewed papers that have been submitted

Page 76

1    by authors from the NIH?
2    Q.   Um-hum.
3    A.   I'm sure I have.
4    Q.   Okay.  Have you reviewed any papers by these
5    authors?
6    A.   Not that I recall.
7    Q.   Okay.  So let's talk a little bit about what
8    these study authors did and why they did it and what the
9    conclusions were, if I could do that for a moment.
10       This combines data from three studies, the
11   Women's Health Initiative, The Nurses' Health Study, and
12   the Sister Study; true?
13   A.   It's actually four studies because it includes
14   the Nurses' Health II, which is a little bit different
15   than Nurses' Health I.
16   Q.   Okay.  And before we talk about what they did
17   together, let's talk about what they talked about these
18   studies individually.
19       Were they individually -- did the authors here
20   say that any of the studies -- well, first of all, in
21   your prior report, you said that these cohort studies

Page 77

1    individually were sufficient enough to conclude that
2    there was no association.
3        Remember that?
4    A.   I would have to see.  I don't have any report
5    memorized.
6    Q.   Right.  But it says what it says; right?
7        It says -- your report -- I think previously you
8    discussed the cohort studies, and you discussed the
9    Women's Health Initiative, The Nurses' Study, and the
10   Sister Study in those prior reports because they were
11   available at that time; right?
12   A.   That's correct.
13   Q.   All right.  And your overall conclusion of those
14   studies, when looked at individually, did not show an
15   association; correct?  And you found that to be
16   compelling evidence of no association; true?
17       MR. BISHOP:  Objection.  Asked and answered.
18   And he asked to see his report, where he says it.
19       MR. TISI:  Thank you very much, but please stop.
20       MR. BISHOP:  I'm -- that's exactly how he
21   testified earlier.

20 (Pages 74 - 77)

Page 78

1    THE WITNESS:  Can you ask that again?
2  BY MR. TISI:
3    Q.  Yes.
4    In your prior report, you testified that each of
5  those studies individually were evidence that there was
6  no association; true?
7    MR. BISHOP:  Same objection.
8    THE WITNESS:  So in my report, I think I
9  summarized the -- point estimates and the confidence
10  intervals --
11  BY MR. TISI:
12    Q.  Right.
13    A.  -- investigating the potential association
14  between cosmetic talc and ovarian cancer, and I provided
15  those point estimates and confidence intervals.
16    Q.  Right.
17    And before the -- before this pooled study with
18  this longitudinal study of O'Brien 2020, you felt that
19  the individual cohort studies, as reported by Houghton
20  and Gates and Gertig and Gonzalez were sufficient to
21  concluding that there was no association based on those

Page 79

1  cohorts; true?
2    MR. BISHOP:  Same objection.
3    THE WITNESS:  So they individually did add to my
4  opinion that there was no causal association --
5  BY MR. TISI:
6    Q.  All right.
7    A.  -- between cosmetic talcum powder and ovarian
8  cancer.
9    Q.  And, overall, you felt that the cohorts --
10  individually and then looked at as a body -- were
11  inconsistent with the case control studies, and that was
12  important to you back then; correct?
13    A.  And it still is important to me today.
14    Q.  Okay.  And -- but the authors in O'Brien 2020
15  disagreed with that, did they not?
16    A.  You'd have to show me what you're referring to.
17    Q.  On page 50 -- on page 50, it says, "To date,
18  three large cohort studies have assessed the association
19  between the use of powder in the genital area and
20  ovarian cancer risk with inconsistent results.  However,
21  ovarian cancer is a rare disease -- 1.3 percent lifetime

Page 80

1  risk in the United States -- and individual cohort
2  studies are not sufficiently powered to detect modest
3  associations, particularly restricted to susceptible
4  subgroups, such as women with patent reproductive
5  tracts."
6    Do you see that?
7    A.  I do see that.
8    Q.  And so what they were saying was, look, one of
9  the reasons why they pulled it together is because the
10  individual studies didn't -- weren't really powered;
11  correct?
12    A.  Well, there's no calculation there.  And so
13  I don't know that.  That's what's written there, but
14  they don't give us that calculation.
15    And, to me, when I interpret that this is just
16  when you write a paper, you write sort of about why it's
17  important for the next paper to be done.  And
18  I interpret that sentence as, hey, you know, we're not
19  really sure, and so we're going to put all these studies
20  together because it brings in four large groups that are
21  followed longitudinally to try to get at this question.

Page 81

1    Q.  Right.
2    But they said the individual studies weren't
3  powered; true?
4    A.  That's what it says.  But there's no calculation
5  there --
6    Q.  I understand.
7    A.  -- and so I can't -- I didn't do the
8  calculations myself.  The calculations aren't there.  We
9  have no idea.  That's what they're saying, but there's
10  no calculation.
11    Q.  Right.
12    And that point was actually made by plaintiffs'
13  experts in the original thing that you criticized back
14  in 2019.  You thought that they were powered; correct?
15  And they said they weren't powered, "they" being
16  plaintiffs' experts.  And now we find that the authors
17  of those -- of these studies disagreed with you on that
18  point; true?
19    MR. BISHOP:  I'm sorry.  Objection because it
20  violates the order that this is to be only --
21    MR. TISI:  Does not.

21 (Pages 78 - 81)

Page 82

1      MR. BISHOP:  It does.

2      MR. TISI:  No.  This is a new study.

3      MR. BISHOP:  It is.  But you're now asking him

4   to comment on the prior study --

5      MR. TISI:  I'm not fighting -- I'm not fighting

6   you on that.

7      MR. BISHOP:  You may -- you can say that all you

8   want.  I can state the objection.

9      MR. TISI:  Okay.

10     MR. BISHOP:  You're not entitled to go back and

11  try to summarize his prior testimony.

12     MR. TISI:  I'm not.  I'm not.

13     THE WITNESS:  So my recollection on the power

14  calculations, in doing so, there are a lot of

15  assumptions that go into doing power calculations, and

16  one of them is looking at the incidence of ovarian

17  cancer.  And some of the power calculations, from my

18  recollection, by plaintiffs' experts used a different

19  incidence of ovarian cancer than the incidence in these

20  four studies.

21

Page 83

1   BY MR. TISI:

2      Q.   Okay.

3      A.   These studies are enriched because they're older

4   individuals.  The Sister Study is enriched because

5   there's a family history of cancer.  And so using the

6   12.1 cases of ovarian cancer per 100,000 as the

7   incidence is a flawed assumption.

8      Q.   Okay.

9      A.   And so to actually do the power calculations

10  again -- and it's a moot point, because this study,

11  putting all these --

12     Q.   I agree with you.

13     A.   -- together has plenty of people and plenty of

14  time to get at the answer.

15     Q.   I gotcha.  And we're going to talk about that.

16     But, previously, you testified that the

17  individual studies sufficiently show that there was no

18  association.  There was a dispute about that.

19     You remember that; right?

20     MR. BISHOP:  I'm sorry.  Again, that violates

21  the Court order --

Page 84

1      MR. TISI:  Keep going --

2      MR. BISHOP:  Now you're trying to go back --

3      MR. TISI:  Keep going --

4      MR. BISHOP:  -- and summarize his testimony.

5      (Indistinguishable simultaneous speaking;

6   reporter admonishment.)

7      MR. TISI:  I understand.  "Objection" is fine.

8   BY MR. TISI:

9      Q.   You may answer.

10     A.   I would have to look exactly as to what I said

11  and read my deposition.  I don't specifically recall the

12  exact numbers in the power calculation.  I know I did

13  power calculations, and I don't disagree with what

14  I said back then.

15     Q.   Okay.  But now, the authors in 2020 said the

16  individual studies were not powered, so now they're

17  combining them?

18     A.   That's what --

19     MR. BISHOP:  Objection.  Asked and answered.

20     THE WITNESS:  That's what that sentence says.

21

Page 85

1   BY MR. TISI:

2      Q.   Okay.

3      A.   But there is no calculation there.  And if

4   they're using the incidence of ovarian cancer of 12.1

5   per 100,000, which is what it was at that time, then

6   that is a flawed assumption and I would disagree with

7   that statement.

8   BY MR. TISI:

9      Q.   So -- okay.  That's fine.  That's what I wanted.

10     So, now, pulling these studies together, the

11  authors in O'Brien 2020 found the overall increased risk

12  of 80 percent for women but found it was not

13  statistically significant, i.e., the confidence interval

14  was below 1.  It started at .99 and went to 1.25;

15  correct?

16     A.   What are you referring to?

17     Q.   I'm referring to the overall results of the

18  study.

19     A.   And where are you reading that from?  In the

20  paper, if you could just point it to me, that would be

21  great.

22 (Pages 82 - 85)

Page 86

1    Q.   Yeah, yeah.
2        The overall results were 1.08 with a confidence
3    interval of .99 to 1.17.
4        Do you see that?  It's in the very -- the
5    results section of the paper.  It's actually in your
6    report.
7    A.   So I'm -- I'm reading ovarian cancer incidence
8    and then I'll skip to an estimated hazard ratio of 1.08,
9    95 percent confidence interval, .99 to 1.17.
10   Q.   Just so anybody reading this could understand,
11   if the confidence interval, hypothetically, was 1.01
12   instead of .99, it would have been statistically
13   significant, in your view?
14   A.   So, mathematically, if the confidence interval
15   did not cross over 1, it would be statistically
16   significant.
17   Q.   Right.
18       So the point -- going from .99 to 1.01 would
19   have, in your mind, changed the overall results of the
20   study and made it a true association?
21   A.   No.  Not necessarily.  Statistical significance

Page 87

1    is not the only thing.  We also have to look at the
2    strength of association and a 1.08 point estimate is a
3    very, very, very weak --
4    Q.   I'm not talking about --
5    A.   -- association.
6    Q.   -- I'm not talking about the strength of
7    association.
8        I'm talking about in terms of whether it would
9    be a statistically significant association, it would
10   have been, in your mind, if the confidence interval was
11   1.01, as opposed to .99, that would have been a
12   statistically significant association, and then we would
13   have talked about issues like strength; true?
14   A.   And I think that's what I said.
15   Q.   Okay.
16   A.   If it was -- if the confidence interval did not
17   cross 1, which it does, then mathematically, it would be
18   a statistically significant association.
19   Q.   And so mathematically, if the numbers were a
20   1.08 relative risk with a 1.01 confidence interval lower
21   bounds, that would have been a statistically significant

Page 88

1    association; correct?
2    A.   That's what I just said.
3    Q.   Okay.  Now, that overall result included both
4    women with open tubes and women who had had, for
5    example, hysterectomies and did not have an open
6    reproductive tract; true?
7    A.   It included both patent and nonpatent
8    reproductive tracts.
9    Q.   Okay.  And so if you go to page 31 of your
10   report, it says, last sentence, "In sum, O'Brien
11   strongly rebuts that the cosmetic talc/ovarian cancer
12   hypothesis because it collected more women had far
13   greater statistical power and followed these women for
14   far longer a period of time than any prior study but
15   found no association."
16   A.   That's correct.
17   Q.   Okay.  You believe that the authors believe that
18   there was no association?
19   A.   I do, yes.
20   Q.   Okay.  Have you seen statements that the authors
21   actually disagree with that?

Page 89

1    A.   I have not.
2    Q.   I'd like to show you Exhibit Number 17.
3        (Deposition Exhibit 14 was marked.)
4        MS. PARFITT:  17?  14.
5        MR. TISI:  I'm sorry.  And this will be
6    Exhibit Number 14.
7    BY MR. TISI:
8    Q.   Now, do you understand, Doctor, that in
9    typically -- particularly with papers like this, there
10   would be opportunities for people like yourself, if you
11   were so inclined, to write letters to the editor
12   regarding papers?
13   A.   Am I aware that you have the opportunity to
14   write letters to the editor?  Yes.
15   Q.   Um-hum.
16       And, oftentimes, the authors will actually
17   respond to the letters that are written about papers
18   that they write?
19   A.   Usually you have the opportunity to respond to
20   letters to the editor.  Yes.
21   Q.   And that's part of the iterative process of

23 (Pages 86 - 89)

Page 90

1   science; true?
2       A.   Sometimes.  Sometimes it's -- just becomes
3   argumentative.  But, in general, it allows someone to
4   comment and give their opinion about a paper, a
5   manuscript.
6       Q.   It actually allows authors to maybe clarify some
7   things that they might have otherwise -- might be
8   misinterpreted?
9       A.   I mean, it gives a lot of opportunities to do a
10  lot of things.  Yes.
11      Q.   Okay.  All right.  So let's see -- have you seen
12  the letters to the editor regarding the O'Brien paper?
13      A.   Yes.
14      Q.   Okay.  And you know, that, for example,
15  Drs. Harlow and Dr. Rothman wrote a letter to the editor
16  about some of the issues that were contained in the
17  paper --
18      A.   That's correct.
19      Q.   -- true?
20          All right.  And Dr. Rothman actually wrote a
21  textbook on -- that we've talked about last time

Page 91

1   relating to epidemiology; right?  He's pretty well-known
2   guy?
3          MR. BISHOP:  Objection.  Covers what was covered
4   in the prior deposition.  Let's move on.
5          THE WITNESS:  Yeah, I don't --
6   BY MR. TISI:
7       Q.   You don't know who he is?
8       A.   I don't know Dr. Harlow.
9       Q.   No.  I didn't say Dr. Harlow.  I said
10  Dr. Rothman.
11      A.   I don't --
12          MR. BISHOP:  Same objection.  Covered
13  extensively in the last deposition.
14  BY MR. TISI:
15      Q.   You never heard Dr. Rothman's name?
16      A.   I said I didn't know Dr. Rothman.
17      Q.   I didn't ask you if you know him.  Do you know
18  him by reputation?
19          MR. BISHOP:  Same objection.  Covered
20  extensively in the last deposition.
21          THE WITNESS:  No, I do not.

Page 92

1   BY MR. TISI:
2       Q.   You do not.  Okay.
3          So they wrote a letter to the editor.  And let's
4   see what doctors -- Dr. O'Brien and Wentzensen and
5   Sandler say here.
6          Now, you don't reference this letter to the
7   editor in your report, do you?  Or Dr. O'Brien's comp
8   response?
9       A.   No.  I think I reference an editorial by
10  Gossett.
11      Q.   How about -- why don't you refer to the
12  statements of the actual authors of the study made about
13  the study that they wrote?
14      A.   Can you ask that again?
15      Q.   Yes.
16          Why are you referring to an editorial by Gossett
17  when you could be looking at what the authors themselves
18  actually say about their own study in the response to
19  the letter to the editor?
20      A.   Because it was a power calculation that was
21  performed by Gossett.

Page 93

1       Q.   Okay.  So let me ask you the question.  Would it
2   be important to you to understand what the authors said
3   about their own study?
4          MR. BISHOP:  Objection.  Vague.  Overbroad.
5          THE WITNESS:  So it depends.
6   BY MR. TISI:
7       Q.   Okay.
8       A.   It really depends on what is said and in the
9   letter to an editor, which is also not peer reviewed.
10      Q.   Okay.  The letter says -- and, Doctor, let's
11  read it together.  You see where it says, "We never
12  equated the lack of statistical significance as evidence
13  of no association"?
14          Do you see where the authors say that?
15      A.   Can you show me where that is?
16      Q.   Yeah.  End of the second paragraph, starting
17  with, "We completely agree with Drs. Harlow and
18  colleagues that our results, particularly the analysis
19  limited to women with intact reproductive tracts, should
20  not be discounted because of lack of statistical
21  significance."

24 (Pages 90 - 93)

Page 94

1    Do you see that?
2    A.   I'm sorry.  Which page are you on?  I'm trying
3    to -- there are --
4    Q.   Page -- the second page.
5    A.   There are three pages here.
6    Q.   The second page, where they're responding --
7    where they, Dr. -- Drs. O'Brien, Sandler, and Wentzensen
8    are actually responding to the letter written by
9    Drs. Harlow and Rothman.
10    A.   Okay.  So the third page of this document that
11    you're showing?
12    Q.   Yes.  The third page.
13    And it says, "The first full paragraph, we
14    completely agree with Dr. Harlow and colleagues that our
15    results, particularly the analysis limited to women with
16    intact reproductive tracts, should not be discounted
17    because of lack of statistical significance."
18    Do you see that?
19    A.   I do.
20    Q.   And at the very end of the paragraph, it says,
21    "We never equated the lack of statistical significance

Page 95

1    to be evidence of no association."
2    A.   I do see that.
3    Q.   Okay.  Now, you said in your report that this
4    provided evidence of no association.
5    That's not what these authors said, is it?
6    A.   There is no statistical significance.
7    Q.   Well --
8    A.   And the point estimate is -- is very low, and so
9    I disagree with that --
10    Q.   Okay.
11    A.   -- that there is -- there is no association.
12    Q.   So you disagree with the authors of the study
13    about the interpretation of their own study?
14    A.   I do, yes.
15    Q.   Okay.  Next thing, if you go to the top, it
16    says, "If cohort studies (pooled hazard ratio 1.08) is
17    likely biased between the null and case control studies
18    (meta-analyses, odds ratio, 1.35) are likely biased away
19    from the null, the true association is likely somewhere
20    in the middle."
21    Do you see that?

Page 96

1    A.   I do.  And that is a completely hypothetical
2    statement.
3    Q.   They said -- they didn't say it's a
4    hypothetical.  They said it's likely; true?
5    A.   No.  They say "may lie somewhere in the middle."
6    Q.   It's "The true -- the true association may lie
7    somewhere -- lie somewhere in the middle."
8    Do you see that?
9    A.   I do, yes.
10    Q.   And it said -- and then they go on to say, at
11    the very bottom, it says, "We agree" -- the next
12    paragraph, beginning with, "We conducted subgroup
13    analyses."
14    They said, "Even though we stated the findings
15    from the subgroup analysis should be interpreted as
16    exploratory, we do not consider them all equally
17    important and agree that the positive association
18    amongst women with patent reproductive tracts is
19    consistent with the hypothesis that there is an
20    association between genital powder use and ovarian
21    cancer."

Page 97

1    Do you see that?
2    A.   I do see that.
3    Q.   Okay.  And I assume you disagree with the
4    authors with their study about the interpretations of
5    their own study?
6    A.   I do.  There was no difference between --
7    Q.   Okay.
8    A.   -- the hazard ratio in women with patent or
9    nonpatent reproductive tracts that was a statistically
10    nonsignificant difference.
11    So, yes, I disagree with that.
12    Q.   Okay.  So I asked you before whether or not
13    you'd seen any evidence that the authors of the O'Brien
14    2024 study disagreed with your conclusion that there was
15    no association -- their own interpretation in real-time
16    would mitigate against that; true?
17    A.   I'm sorry.  Can you just ask that again?
18    Q.   Yes.
19    A.   I didn't get what you're asking me.
20    Q.   You said that, in sum, O'Brien strongly rebuts
21    the cosmetic talc ovarian cancer hypothesis, and you

25 (Pages 94 - 97)

Page 98

1  posit that the study itself found no association; right?
2  A.  In my interpretation, yes.
3  Q.  Yeah.  And the authors of the study disagree
4  with that, based upon -- in their letter to the editor?
5  A.  Not -- not necessarily.  Point to where you're
6  seeing that.
7  Q.  Well, they said -- we went through it.
8  But you disagree with their -- with what they
9  say about their own study in the response to Dr. Harlow
10 and Dr. Rothman; true?
11 MR. BISHOP:  Object to the form.  Vague.
12 Overbroad.  Asked and answered.
13 THE WITNESS:  Can you ask that one more time?
14 BY MR. TISI:
15 Q.  Yes.
16 A.  Because I'm --
17 Q.  We went through several comments that they made
18 in response to Drs. Harlow and Rothman in their response
19 to the letter of the editor about their own study; true?
20 A.  That's correct.
21 Q.  Okay.  And you disagreed with them; true?

Page 99

1  MR. BISHOP:  Same objection.
2  THE WITNESS:  I -- I answered that I disagree
3  with the interpretation of --
4  BY MR. TISI:
5  Q.  Okay.
6  A.  -- of their results.
7  Q.  Now, in addition, the authors talked about --
8  that they explored women with reproductive tracts;
9  correct?
10 A.  Can you show me what you're referring to?
11 Q.  You don't know that they -- do you know whether
12 or not they looked at a subgroup of women with intact
13 reproductive tracts?
14 A.  There was a subgroup analysis.  Yes.
15 Q.  Okay.  And you know that that was done a priori?
16 They did it ahead of time; correct?
17 A.  I don't specifically recall if they used that
18 word.  But I know that it was a subgroup analysis.
19 Q.  Well, what's -- is a difference between
20 something you decide to do ahead of time and something
21 you do afterwards, in terms of reliability, is that

Page 100

1  important?
2  A.  I think it depends.
3  Q.  Okay.
4  A.  It depends on what you find, and it depends on
5  the, really, other factors that go into the framework of
6  Bradford Hill.
7  Q.  Okay.  Let's look at page 51 of the study.  In
8  the second column, third paragraph down.  It says,
9  "Because patency is required for there to be direct
10 physical pathway between the powder application area and
11 the ovaries, we hypothesize a priori that women with
12 patent reproductive tracts would be more susceptible to
13 the effect of powder in the genital area on ovarian
14 cancer."
15 Do you see that?
16 A.  I do, yes.
17 Q.  So they looked at it ahead of time?  They
18 decided to do this analysis ahead of time; right?
19 A.  Yes.  That's what they're saying.  Yes.
20 Q.  For good reason.  If you have a patent -- if you
21 have an intact reproductive tract, they said that would

Page 101

1  be a way in which talc would get to the ovaries; right?
2  A.  I mean, if you believe that, yes.
3  Q.  Well, okay.  Then the next thing it says,
4  "Therefore, we conducted an analysis restricted to the
5  subgroup.  When estimating the effect of duration of
6  powder on the ovarian cancer risk, we compared
7  long-term, greater than 20 years, and non-long-term
8  users with never users.  Similarly, we compared frequent
9  users and non-frequent users with never users.  We
10 conducted trend tests using the ordinal forms of these
11 values."
12 Do you see that?
13 A.  I do, yes.
14 Q.  All right.  And when they looked at that, they
15 found a statistically significant risk; correct?
16 A.  And which -- which one are you referring to?
17 Q.  Well, they -- if you go to figure 5 -- I'm
18 sorry.  Figure -- on page 54, it shows a statistically
19 significant increased risk with women with open
20 reproductive tracts of 1.13; correct?
21 A.  Yes.  1.13 with confidence interval of 1.01 to

26 (Pages 98 - 101)

Page 102

1 1.26. And when they compared that to the nonpatent
2 reproductive tracts, which had a hazard ratio of .99,
3 there was no statistically significant difference
4 between those two groups.
5     Q.   Okay. I'm going to move to strike the
6 nonresponsive portion of the question -- of your answer.
7         Then they go on to say, on page 56 of O'Brien
8 2020, it says, "by" -- on the right-hand side, "By
9 irritating epithelial ovarian tissue on fallopian tubes
10 directly, powder could influence an inflammatory
11 response, even in the absence of asbestos. This could
12 set off a cascade of increased oxidative stress level,
13 DNA damage, and cell division, all of which could
14 contribute to carcinogenesis."
15        Did I read that correctly?
16    A.   You did.
17    Q.   Okay. That -- they are giving a biologically
18 plausible mechanism for the possibility that talc could
19 cause ovarian cancer, are they not?
20        MR. BISHOP: Objection. Foundation.
21        THE WITNESS: They are -- they are

Page 103

1 hypothetically providing an explanation that has no
2 basis in epidemiology.
3 BY MR. TISI:
4     Q.   Okay. Well, no basis in epidemiology except
5 that there is an increased risk in women with patent
6 tubes; true?
7     A.   In subgroup analysis, but not when compared to
8 those who had patent -- or nonpatent reproductive
9 tracts.
10    Q.   Okay. Then it goes --
11        MR. TISI: Okay. We can take a quick break.
12        THE WITNESS: Okay.
13        (Recess taken.)
14        MR. TISI: Let's go back on the record.
15 BY MR. TISI:
16    Q.   Now, I asked you before whether you'd seen other
17 references by Drs. O'Brien, Sandler, and Wentzensen
18 where they disagreed with you that the results of their
19 2020 study showed, quote, "no association."
20        Do you remember that?
21    A.   Can you ask that one more time?

Page 104

1     Q.   Yes.
2         I asked you whether you reviewed what
3 Dr. O'Brien and Wentzensen and Sandler said about their
4 2020 study and your conclusion that the study provided
5 evidence of, quote, "no association."
6         MR. BISHOP: Object. He's answer --
7 BY MR. TISI:
8     Q.   You remember that -- you remember I asked you
9 about that?
10        MR. BISHOP: Same objection.
11        THE WITNESS: Yes.
12 BY MR. TISI:
13    Q.   Okay. And we looked at the letter that they
14 wrote to the editor. And your response was, well, you
15 disagreed with it, but it wasn't peer reviewed.
16        Do you remember that?
17        MR. BISHOP: Objection. Mischaracterizes his
18 answer.
19        THE WITNESS: I disagree with their
20 interpretation. In reading the conclusion of their
21 paper, they said that there's not a statistically

Page 105

1 significant association between use of powder in the
2 genital area and incidence of ovarian cancer.
3 BY MR. TISI:
4     Q.   Okay. Now, the next -- have you seen any
5 published peer-reviewed literature where they do not --
6 they do not say that there's no association?
7         Have you seen that?
8     A.   I don't specifically recall, but you'd have to
9 show me if there is something.
10    Q.   I will do that. Let's look at O'Brien 2021.
11        (Deposition Exhibit 15 was marked.)
12 BY MR. TISI:
13    Q.   Let me show you Exhibit Number 20 -- Exhibit 15.
14 It's entitled "Association Between Douching, Genital
15 Talc Use, and the Risk of Prevalent and Incident
16 Cervical Cancer."
17        Have you seen this article before?
18    A.   I have.
19        MR. BISHOP: Got one more?
20        MR. TISI: I'm sorry. I thought I --
21        MS. PARFITT: I'm sorry. I don't want to throw

27 (Pages 102 - 105)

Page 106

1  to you.
2  BY MR. TISI:
3      Q.  And these are by the same authors; correct?
4  Some of the same authors?
5      A.  O'Brien and Sandler are the ones I recognize.
6      Q.  Okay.  And on the next page, do they not say --
7  I'm going to read.  It says, "Talc applied to underwear,
8  sanitary napkins, diaphragms, or directly to the
9  perineal region can enter the vagina and travel up the
10 reproductive tract."
11     Do you see that on the second page?
12     A.  I do.
13     Q.  Goes on to say, "Talcum particles may act as
14 irritants, inciting an inflammatory response and
15 potentially affecting the individual susceptibility and
16 response to HPV infection."
17     Do you see that?
18     A.  I do see that.
19     Q.  It says, "Additional and more severe adverse
20 effects could occur if talc containing asbestos, a known
21 carcinogen, sometimes mined in the same location as

Page 107

1  talc."
2      Did I read that right?
3      A.  You did, yes.
4      Q.  And it says, "The epidem- -- literature supports
5  a positive association between genital talc and ovarian
6  cancer."
7      Do you see that?
8      A.  I see, "The epidemiologic literature supports a
9  possible positive association between genital talc use
10 and ovarian cancer."
11     Q.  And it cites -- if you look at the cite, it
12 cites O'Brien 2020; correct?
13     A.  I'd have to look at those references.
14     Q.  Well, look at Exhibit 34 and 35 -- footnote 34
15 and 35.
16     It cites Terry and O'Brien.
17     A.  It does.  It does.  And I don't even know what
18 that sentence means, because what it's saying is it says
19 "The epidemiologic literature supports a possible --
20 possible positive association."
21     I don't even know what "a possible positive

Page 108

1  association" is.
2      That -- that's the same thing as saying a
3  possible negative association.  It's a possibility.
4  It's a hypothesis.  It's a guess.
5      Q.  Okay.  Move to strike.
6      They are again saying -- they are not saying, as
7  you do in your expert litigation report, that their --
8  that their study supports the conclusion that there is
9  no association; true?
10     MR. BISHOP:  Object to the form.
11 Mischaracterizes.
12     THE WITNESS:  Can you say that again?
13 BY MR. TISI:
14     Q.  Yeah.
15     They are not saying that there's no association
16 in this -- based upon O'Brien 2020 and this 2021
17 article; true?  Like you do.
18     A.  They are not saying that there is no
19 association, but they're not saying that there is an
20 association either.
21     Q.  Okay.  You say that that study proves that

Page 109

1  there's no association; true?
2      A.  There's no statistical significant association
3  between cosmetic talc use and ovarian cancer in that
4  study.
5      Q.  Okay.  Next thing.  I'm going to show you an
6  article by The Ovarian Cancer Cohort Consortium.
7      MS. PARFITT:  It's number 16.
8      MR. TISI:  Number --
9      MS. PARFITT:  16.
10     (Deposition Exhibit 16 was marked.)
11 BY MR. TISI:
12     Q.  Have you seen this article before by
13 Dr. Townsend?
14     A.  I don't believe so.
15     Q.  Okay.  This is -- do you know what The Ovarian
16 Cancer Cohort Consortium is?
17     A.  Not specifically.  I've heard of it, but I don't
18 specifically know what it is.
19     Q.  Okay.  Do you see that Dr. Sandler, Dr. O'Brien,
20 and Dr. Wentzensen are coauthors?
21     A.  I do, yes.

28 (Pages 106 - 109)

1  Q.  Okay.  And this is a 2021 article as well;
2  correct?
3  A.  That's correct.
4  Q.  If you go to the page that I tagged there, there
5  is a statement -- there's no pages.  That's why I tagged
6  it.  It says, "In the largest prospective study so far,
7  the OC3 found a very small positive association between
8  genital powder use and ovarian cancer risk among all
9  women, (hazard ratio, 1.8; confidence interval, .99 to
10  1.17) as well as among women with an intact uterus and
11  fallopian tubes, (1.13; 95 percent confidence interval;
12  1.01 to 1.26.)
13      Do you see that?
14  A.  I do see that.  And those are the results from
15  the O'Brien 2020 study.  And what I'll say -- which
16  I said before -- is that that is a nonstatistically
17  significant result.  1.08 has a confidence interval that
18  goes across 1, and there was no difference between those
19  women who had intact reproductive tracts compared to
20  those who didn't.
21      And so to say that a very small positive

1  association, without talking about statistically
2  significance, is -- is an issue that I have.  And I had
3  been reviewing this, I would have pointed that out.
4  Q.  Okay.  Move to strike.  There was no question
5  that I asked you about that.
6      I asked you whether I read that right.
7  A.  And you did, and I --
8  Q.  Okay.  So let -- now let me ask you a question.
9      I asked you before whether or not the authors of
10  this study themselves have been saying -- have said that
11  there is evidence of an association that would support
12  your contention that there is no association.  And I've
13  shown you several articles now, one letter to the
14  editor, one the 2021 study, and now there's a 2021 paper
15  where they say there is a small positive association,
16  particularly among women with an intact fallopian tube
17  and uterus; right?  That's what they said; true?
18  A.  That's what it's saying.  Yes.
19  Q.  Okay.  And that -- you disagree with that?
20  A.  I see what they're saying, that there's a small
21  positive association that is a nonstatistically

1  significant association.
2  Q.  Right.  Right.
3      But they say that there is a -- they say that
4  there's a small positive association; correct?  They
5  don't say that there is no association, like you do;
6  true?
7  A.  There is no statistically significant
8  association.
9  Q.  That's not -- that's not what I'm asking you,
10  Doctor, with all due respect.
11      When they're reporting the results of this
12  study, they're saying the overall results report a small
13  positive association particularly among women with
14  intact reproductive system; right?
15      MR. BISHOP:  Objection.  Asked and answered.
16      THE WITNESS:  That's what it's saying.  I
17  disagree with the qualitative issues in that sentence.
18  BY MR. TISI:
19  Q.  Okay.  And that's fine.  You can disagree with
20  it.
21      But that's what they're saying about their own

1  study; true?
2  A.  That's what's written down.
3  Q.  Okay.  Next thing -- all right.  Let's talk
4  about O'Brien 2024 as well.  Let's see if we can move
5  forward.
6      Please get Exhibit 3 out, if you would, which is
7  your report.
8      MS. PARFITT:  It's Exhibit 2.
9      MR. TISI:  I'm sorry.  Oh, I'm sorry.  Exhibit 1
10  and 2.  I'm sorry.
11      THE WITNESS:  It's okay.
12      MR. TISI:  Oh, I'm sorry.  I'm actually wrong
13  about that.  I previously marked Exhibit 3 the study
14  itself; correct?
15      MS. PARFITT:  Yes.
16      THE WITNESS:  Yes.
17      MR. TISI:  Thank you.
18  BY MR. TISI:
19  Q.  And this is the study that caused you to have --
20  need additional time to add a section of -- in your
21  report, and that section is on pages 31 to -- 30 to 34.

29 (Pages 110 - 113)

Page 114

1  30 to 33; correct?
2  A.  I have --
3  Q.  30 to 34.
4  A.  -- 31 through 34.
5  Q.  Correct.
6  A.  That's correct.
7  Q.  Let me get my copy of that.
8     Now, just to kind of set the table, this is also
9  a study by Dr. O'Brien, Dr. Wentzensen, and Dr. Sandler,
10  among others; correct?
11  A.  That's correct.
12  Q.  Okay.  And this study is -- was published in the
13  Journal of Clinical Oncology.  Are you familiar with
14  that journal?
15  A.  I've heard of it.
16  Q.  Good journal?
17  A.  I don't know.  I've heard of it as a journal.
18  I don't really have an opinion about whether it's good
19  or not.
20  Q.  Okay.  And on page 14, there is a section they
21  described Katie O'Brien as the corresponding author.

Page 115

1  And we've talked about that before.  That's so that if
2  anybody has any questions about the study, why they did
3  what they did, when they did what they did, or any
4  questions about it, they can reach out to them and ask
5  questions, and she gives you her email address; right?
6  A.  That's correct.
7  Q.  All right.  And these are the same studies --
8  these are the same authors that published your -- the
9  paper that you relied on as being the best evidence of
10  cohort, this pooled study of 2020; correct?
11  A.  I don't know that I said it's the best evidence.
12  I said what I said about it.  It was --
13  Q.  You said it's the most powered.  In fact, I'm
14  reading it right now.  It says -- it says that it is --
15  "strongly rebuts the ovarian cancer hypothesis before --
16  because it collected more women, had greater statistical
17  power, and it followed the women far longer any other --
18  far longer a period of time than any other study";
19  right?
20     You thought that these authors did a really good
21  job in their 2020 pooled analysis; correct?

Page 116

1  MR. BISHOP:  Objection.  Compound.
2  THE WITNESS:  I don't know if -- I wouldn't say
3  I thought they did a good job.  I just thought that the
4  results of the study suggested to me and provided
5  important information in formulating my opinion that
6  cosmetic talc does not cause ovarian cancer.
7  BY MR. TISI:
8  Q.  Right.
9     Even though, as we talked about, you disagree
10  with how the study authors themselves characterized the
11  results of the association; true?
12  MR. BISHOP:  Objection.  Asked and answered.
13  THE WITNESS:  No.  I mean, I just read you their
14  conclusions, and they said that there was no a
15  statistically significant association between the use of
16  powder and incidence of ovarian cancer, and that's what
17  they concluded.
18  BY MR. TISI:
19  Q.  And then they explained what they meant by that
20  in the letter to the editor, the 2021 articles that
21  I talked about; true?

Page 117

1  MR. BISHOP:  Objection.  Asked and answered.
2  Let's move on.
3  THE WITNESS:  I did answer that.  And that's
4  what they said, that there's no statistically
5  significant association.
6  BY MR. TISI:
7  Q.  All right.  We'll go -- we will -- and they --
8  but you relied on these authorization and their results;
9  true?
10  MR. BISHOP:  Objection.  I'm sorry.  Objection.
11  Mischaracterizes.
12  THE WITNESS:  In formulating my opinion, it was
13  one paper that I did consider.
14  BY MR. TISI:
15  Q.  Okay.  And they were also the same authors as
16  the Gonzalez paper.  I think you mentioned that
17  Katie O'Brien was the second author in that paper that
18  you've relied on in 2019; correct?
19  A.  The Sister Study published in 2016, I believe
20  O'Brien was the second author on that.
21  Q.  Correct.  Let's just attach that for a moment,

30 (Pages 114 - 117)

Page 118

1 because we're going to compare it to O'Brien 2024. This
2 is 17.
3          (Deposition Exhibit 17 was marked.)
4 BY MR. TISI:
5    Q.   I'm sorry. Gotcha.
6    A.   It's okay.
7    Q.   This is the first report of the Sister Study;
8 correct?
9    A.   You know, I don't know if it's the first report
10 of the actual Sister Study. This is the first --
11   Q.   The first one you relied on?
12   A.   The first one I used to formulate an opinion.
13 Yes.
14   Q.   Okay. That's fine.
15       Now, O'Brien 2024, you would agree with me,
16 collected more data -- the Sister Study is an ongoing
17 cohort; correct?
18   A.   That is correct. Yes.
19   Q.   Okay. So the Gonzalez study had a -- 154 cases
20 and followed women for 6.6 years; correct?
21   A.   I do believe that women were followed for

Page 119

1 6.6 years.
2    Q.   And there were 154 cases; true?
3    A.   I'm just -- I'm just looking at my report to see
4 if I can see that. It looks like from the methods,
5 154 participants reported a diagnosis of ovarian cancer.
6    Q.   And O'Brien 2020, which is the second paper that
7 we've been talking about today, the second O'Brien
8 paper, it reports that in that study, they looked at
9 additional data, and there were 220 cases in the
10 Sister Study that were followed for 9.6 years; correct?
11   A.   I would have to look at the article. It sounds
12 reasonable that there would be more cases, given that it
13 was -- that it's an ongoing cohort study.
14   Q.   Okay. And then in O'Brien 2024, we have now
15 220 cases -- 292 cases, and they were followed for over
16 13 years; correct?
17   A.   I don't specifically have that memorized. I'm
18 happy to look.
19   Q.   Well, let's look at table -- on page 3 of the
20 O'Brien 2024. And it says, Sister Studies." And if you
21 look at the bottom, it says, "Ovarian cancer cases,

Page 120

1 292."
2        Do you see that?
3    A.   That's correct. Yes.
4    Q.   Okay. And if you look at the back, it talks
5 about -- I can find it for you, but I will ask you to
6 accept my representation that they were followed for
7 13 -- over 13 years. Okay?
8    A.   Sound reasonable.
9    Q.   Okay. So now we have an update on a study that
10 happened -- that -- where you have longer years and more
11 patients; true?
12   A.   Longer years, more cases. I'd have to look at
13 the actual numbers, but certainly more cases.
14   Q.   More cases?
15   A.   Yes.
16   Q.   And you know it's longer years because at least
17 O'Brien 2020 was 9.6 years, and I'm going to represent
18 this is 13 years out now.
19   A.   Sure. Longer follow-up time. It's a cohort
20 study. It makes sense.
21   Q.   And that's what cohort studies do. They follow

Page 121

1 a group of patients over time to see what happens to
2 them. So now the longer the -- particularly for a
3 latent disease like ovarian cancer, you would expect to
4 see more patients the more years -- more cases the more
5 years the study goes on; true?
6    A.   Yeah. I don't know what you mean by "latent."
7 But I -- I know that as women get older, the risk of
8 ovarian cancer goes up.
9    Q.   Okay. Now, would you agree that in all
10 respects -- putting aside your question about the
11 published analyses in O'Brien 2024 -- the Sister Study
12 data available to the O'Brien investigators when
13 drafting the 2024 article was more robust than it was
14 when the Gonzalez authors accessed the same data for its
15 prior study in Gonzalez?
16   A.   I don't -- I wouldn't use the word "robust."
17 It's more women, more cases, and longer follow-up.
18   Q.   Okay. And that --
19   A.   It's the same data.
20   Q.   And that is -- well, it's not the same data.
21 It's the same cohort; right? The data changes.

31 (Pages 118 - 121)

Page 122

1    A.    And what I mean by that is the same
2  questionnaire given in the beginning, and those women
3  are followed over time.
4    Q.    Well, we're going to talk about that.  It's not
5  unusual in cohort studies for additional questionnaires
6  to be asked of patients as you follow those patients;
7  correct?
8    A.    That's correct.
9    Q.    Okay.  In fact, as you know from our prior
10  discussion, the Women's Health Initiative and the nurses
11  study asked the questions about talc halfway through the
12  study; correct?
13    A.    I'd have to look.  There were two -- two
14  questionnaires in The Nurses' Health Study, one in
15  Nurses' Health I and one in Nurses' Health II that were
16  administered at different time periods during that --
17  that whole cohort, if you just consider The Nurses'
18  Health Study cohort.
19    Q.    Right.
20        But none of them, other than Sisters, had a
21  question about talc at the time of enrollment; true?

Page 123

1    A.    I'd have to go look back at when people were
2  enrolled in The Nurses' Health Study.
3    Q.    Um-hum.  But it's not unusual for additional
4  questionnaires to come out as a cohort continues over
5  time; true?
6        MR. BISHOP:  Objection.  Asked and answered.
7        THE WITNESS:  Yeah.  I mean, I said, yeah.
8  That's -- that can be fairly common in a cohort study
9  because people are followed over time, and different
10  questions may come up and other questionnaires may be --
11  may be created and administered.
12  BY MR. TISI:
13    Q.    And why would an investigator want to update a
14  questionnaire in a cohort study?
15    A.    Well, I mean, having performed cohort studies,
16  sometimes you begin the study with maybe a questionnaire
17  that's not fully able to answer the questions that you
18  wanted to, so you perfect that.  Or something else comes
19  up and it's a group of people that are being followed
20  that are engaged in research, and it allows for -- for
21  other questions to be answered -- or to be tried to

Page 124

1  answer.
2    Q.    Okay.  And so taking those two options, one is
3  you find out as you look at it that the questionnaire
4  was -- you needed more information from that initial
5  questionnaire.  The other way is you may query the data
6  with new information that you may want to explore; true?
7    A.    Yeah.  Or just other things come up in life and
8  you've got a group of people that are engaged and you
9  can ask them questions.
10    Q.    Okay.  So now in O'Brien 2024, they recognized
11  that the initial questionnaire did not capture use of
12  the participants; true?
13    A.    I don't know.  I know a secondary -- a second
14  questionnaire was administered in between 2017 and 2019.
15  I don't know what was involved in creating that
16  questionnaire or in the decision-making to do it.
17        So all I'm saying is there's a second
18  questionnaire.  I wasn't part of creating that, and
19  I don't know why it was created.
20    Q.    Okay.  Different question, though.  Okay?
21        If you look at figure 1 in the O'Brien 2024

Page 125

1  study, the enrollment questionnaire for the Sister Study
2  asked about frequency of use for three years during
3  adolescence between ages 12 and 13, and then in a
4  12-month period before the woman was enrolled; correct?
5    A.    That's correct.
6    Q.    Okay.  And the follow-up questionnaire after
7  Gonzalez was published, there's more detailed follow-up
8  questions relating to the lifetime use and duration of
9  use of talc; correct?
10    A.    Yeah.  They asked questions about other things
11  in that questionnaire, including douching too, but age,
12  frequency, by decade, why it was used.  And, you know,
13  at least for douching, the solution of a douche.
14    Q.    And the reason why they did that -- we'll go
15  through in this in a moment, but we'll cut out some
16  questions.
17        The reason why they did that was because they
18  realized that a woman could actually be a user of talc,
19  answer the initial question correctly, and be
20  characterized improperly as somebody who was a nonuser;
21  true?

32 (Pages 122 - 125)

Page 126

1  A.  I can't answer that.  I wasn't part of the
2  decision-making to create a new questionnaire.
3  Q.  Well, they actually say that in the study.  You
4  read the study; right?
5  A.  I did, yes.
6  Q.  Okay.  And I will find that in a moment because
7  it's not -- we'll get to that.
8     But they were concerned that the initial
9  questionnaire left out decades of potential talc use;
10 true?
11 A.  I --
12    MR. BISHOP:  Object -- I'm sorry.  Objection.
13 Calls for speculation.
14    THE WITNESS:  I would have to see where that's
15 written.
16 BY MR. TISI:
17 Q.  Well, let's -- let me ask you this:  If you
18 really want to characterize and study talc use, you want
19 to know whether or not a woman ever actually used talc;
20 right?
21 A.  That would be an important consideration.  Yes.

Page 127

1  Q.  It would be -- it would be probably the most
2  critical piece of information.  Did they use it; right?
3  A.  Did they use it, how often did they use it, and
4  other things too.
5  Q.  And the initial questionnaire didn't get to that
6  information, did it?
7  A.  The initial questionnaire asked about talc usage
8  in the previous 12 months and whether they used it in
9  between age 13 and 15.
10 Q.  And so if there was a 50-year-old woman who
11 entered the study, it would capture use potentially
12 between age 49 and 50 and at 12 and 13 -- 10, 11, 12,
13 and 13 years old; correct?
14 A.  That's what that questionnaire would get at.
15 Yes.
16 Q.  It would not get at the fact, in that
17 50-year-old woman, that she may have used talc between
18 age 13 and 49; correct?
19 A.  15; right?  I mean, isn't --
20 Q.  Yes.  13.
21 A.  I mean, I'm not -- yeah.  So there would be a

Page 128

1  period of time where --
2  Q.  Decades?
3  A.  -- it wouldn't --
4  Q.  Decades?
5  A.  -- collect that --
6  Q.  Decades?
7  A.  -- or we wouldn't know.
8  Q.  You wouldn't know because the question wasn't
9  asked, and the concern of the authors was that there
10 might be decades of talc use that wasn't captured in the
11 initial questionnaire; true?
12    MR. BISHOP:  Objection.  Calls for speculation.
13    THE WITNESS:  Yeah, again, I know that there
14 were two questionnaires.  Why the second one was
15 created, I could guess.  I mean -- but I wasn't involved
16 in creating that.
17 BY MR. TISI:
18 Q.  Well, let's talk about that in a moment.  Let's
19 talk about that in a moment.
20    When this study came out, you'd actually drafted
21 your report in Carl and Balderrama, which, obviously,

Page 129

1  did not contain any reference to the study whatsoever?
2  A.  That's correct.  Yes.
3  Q.  All right.  Now, when did you find out about the
4  this study?  And tell me how you found out about this
5  study.
6  A.  I don't specifically recall, tell you the truth.
7  Q.  You know it was widely -- it was widely reported
8  in the scientific press; true?  Even the lay press.
9  A.  I don't -- I don't know about "widely."
10 I didn't see it in the lay press.
11 Q.  How did you come to -- how did you come to
12 learn -- you were drafting a report.  You were in the
13 final stages of finalizing your report.  This study is
14 published on May 15th.  Your report is due in a couple
15 days.
16    How did you -- you don't -- you don't remember
17 how you -- it came to your attention?
18 A.  You know, I don't.  I don't specifically know.
19 I don't know if we were talking about finalizing a
20 report and someone said, "Hey, have you seen this?"  Or
21 if I was just looking up -- looking up stuff.  I really

33 (Pages 126 - 129)

Page 130

1  don't recall.

2      I just know that it came out about the time when

3  I was finalizing a report, in between April and May.

4  Q.  Now, this report -- and you notice on page 47,

5  this study reports a relative -- excuse me --

6  I apologize.

7      That this report -- this study reports a hazard

8  ratio of 1.82, with a confidence interval of 1.36 to

9  2.43; correct?

10  A.  And where are you referring to?

11      MR. BISHOP:  Where are you referring to?  I'm

12  sorry.

13  BY MR. TISI:

14  Q.  Your report.

15      MR. BISHOP:  What page?

16      THE WITNESS:  Oh, my report.

17  BY MR. TISI:

18  Q.  Your report.  On page -- page 32, third

19  paragraph down -- second paragraph down.  It says, "1.82

20  with 95 confidence interval of 1.36 to 2.43."

21      MR. BISHOP:  Mischaracterizes the sentence.

Page 131

1      Go ahead, Doctor.

2      THE WITNESS:  So what I'm reading in that second

3  paragraph is, "Recall bias analyses demonstrated a

4  decrease in risk of ovarian cancer with increasing

5  proportions of ovarian cancer cases reassigned to never

6  use, zero percent, 1.82, hazard ratio 1.36 to 2.43."

7      And then if there was 90 percent bias, that

8  hazard ratio -- because of differential

9  misclassification, that 90 percent bias would reduce the

10  hazard ratio to 0.69, which would be actually a

11  protective effect of 0.53 to 0.89.

12  BY MR. TISI:

13  Q.  Well, that's not how the authors actually

14  interpret their study, that talc has a protective

15  effect, does it?

16  A.  But that's what that table shows.

17  Q.  Okay.  But that's not what -- that's not what it

18  said -- they say; right?

19  A.  I'm just telling you what a hazard ratio means,

20  and that is their analysis and that's what it shows.

21  Q.  They say -- if you look at the conclusion --

Page 132

1  that the results support a positive association between

2  use and intimate care products, including genital talc

3  and ovarian cancer; true?

4  A.  Based on their interpretation of their analysis,

5  yes.  But, again, this is a thought experiment of four

6  different scenarios, and they choose scenario four,

7  which is based on a lot of imputations and a lot of

8  different assumptions --

9  Q.  We'll talk about that.

10      But that's what they report.  They say this

11  study supports an association; true?

12  A.  And -- I wasn't finished, actually.

13      What I was about to say is that that is what

14  they report.  However, their report is based on a lot of

15  assumptions which have no founding in creating those

16  assumptions.

17  Q.  We'll talk about that.

18      But you have, actually, a chart in your report

19  where you list out the various studies; right?

20  A.  I'm sorry.  What?

21  Q.  You have -- in your report, you have a chart

Page 133

1  where you list the studies, and you list the hazard

2  ratios or relative risks; correct?

3  A.  Are you referring to this paper or --

4  Q.  Your report.  In your report, you have a chart.

5  A.  I do.  I have a chart of --

6  Q.  What page is it on?

7      MR. BISHOP:  Page 47.

8      THE WITNESS:  That would be page 47.

9  BY MR. TISI:

10  Q.  Okay.  And on that page --

11  A.  46 and 47.

12  Q.  And on page 46 and 47, you list O'Brien 2024 as

13  having an association which is characterized as weak,

14  the reported association is 1.82 with a confidence

15  interval of 1.36 to 2.43; right?

16  A.  I'm reporting what they reported in the paper.

17  Q.  Okay.

18  A.  But what I'm saying is I disagree with the

19  interpretation and the analysis --

20  Q.  Okay.

21  A.  -- of those results.

34 (Pages 130 - 133)

Page 134

1    Q.    Okay.  Now, you raised what you call a number of
2    concerns about how they reached that number; right?
3         You used the word "concerns" on page 32.  This
4    says "Design, analysis, and interpretation of the
5    results of the study performed by O'Brien, et al., raise
6    a number of concerns"; right?
7    A.    That is correct.  Yes.
8    Q.    And you list them?
9    A.    I do.
10   Q.    Okay.  Now, what did -- I want to know exactly
11   what you did starting May 15th, when this report -- when
12   this study was published -- and the time you finalized
13   your report on May 28th.  So this is about 13 days.
14   Okay?
15        I want to know everything you did to investigate
16   your concerns to figure out why they did what they did.
17   Okay?
18        So because -- let me ask you this:  Are there
19   any citations in your report for any of the propositions
20   that you -- that you assert on O'Brien 2024, page 31,
21   32, 33, and 34?

Page 135

1    MR. BISHOP:  Objection.
2    BY MR. TISI:
3    Q.    Because I don't see any.
4    MR. BISHOP:  Objection.  Vague and overbroad.
5    BY MR. TISI:
6    Q.    Other than citing the article itself.  There's
7    nothing on multiple imputation.  There's nothing on data
8    correction.  There's nothing that you cite here for --
9    that address the concerns that you raise.
10   A.    There were --
11   MR. BISHOP:  Same objection.
12   THE WITNESS:  There wouldn't be a reason to cite
13   these things.  These concerns would be what I would
14   raise if I was a reviewer of this paper.
15   BY MR. TISI:
16   Q.    Okay.  But if you were raising these concerns --
17   first of all, you weren't a reviewer on this paper;
18   correct?
19   A.    I was not.
20   Q.    Other people were reviewers on this paper;
21   correct?

Page 136

1    A.    I assume they were.
2    Q.    Right.
3         And other people had the opportunity to ask
4    questions of the authors; true?
5    MR. BISHOP:  Objection.  Calls for speculation.
6    THE WITNESS:  Usually a reviewer has the
7    opportunity to reach out to an editor and maybe provide
8    comments to an author, but usually it's reaching out to
9    an editor.
10   BY MR. TISI:
11   Q.    Do you know that NIH studies actually have to
12   also be reviewed internally?
13   A.    I'm not -- I don't work at the NIH, so I'm not
14   familiar with that.
15   Q.    That was not my question.
16        Do you know whether or not studies that are
17   published by NIH authors have to be reviewed internally
18   other -- in addition to being peer reviewed by the
19   journal?
20   MR. BISHOP:  Objection.  Asked and answered.
21   THE WITNESS:  I'm not aware of that.

Page 137

1    BY MR. TISI:
2    Q.    Okay.  Thank you.
3         But the way in which an author -- somebody
4    reading a paper might raise -- get questions answered
5    after a paper is published is several ways; right?
6    Number one is you can contact the author; right?
7    MR. BISHOP:  Object as compound.
8    THE WITNESS:  I mean, one could -- could contact
9    the author.  Sure.
10   BY MR. TISI:
11   Q.    You didn't do that, did you?
12   A.    If I contacted authors about every time I had
13   issues with papers, I'd never be able to write papers
14   myself.
15   Q.    Well, this is a little different; right?  This
16   is an expert report that you're writing in a talc
17   litigation where you've been paid about $500,000.  And
18   this paper reports a hazard ratio of 1.82.
19   MR. BISHOP:  Objection.
20   BY MR. TISI:
21   Q.    And you have 13 days to issue your opinions in

35 (Pages 134 - 137)

Page 138

1  this case.

2      I want to know:  Did you contact or make any

3  attempt to contact the authors to find out -- to address

4  any of the concerns?

5      MR. BISHOP:  Objection.  Compound.  Move to

6  strike the comments of Counsel.

7      THE WITNESS:  I -- I did not contact the authors

8  of the paper.

9  BY MR. TISI:

10  Q.  Okay.  Did you contact any of your colleagues to

11  say, you know, "I have some questions about this paper.

12  Could you help me understand what the authors may

13  have -- may have been doing here and whether or not this

14  is appropriate?"

15      Did you do that?

16  A.  I did not.

17  Q.  Did you and have you thought about writing a

18  letter to the editor like Drs. Harlow and Rothman did

19  and say, you know, "I have some concerns about the way

20  in which you displayed and analyzed the data" and write

21  a formal letter to the editor and ask the authors to

Page 139

1  actually respond?  Have you thought about that?

2  A.  I think I answered that.  Again, if I did that

3  for every paper I had concerns about, I would never be

4  able to write papers myself.

5  Q.  And just because you have concerns doesn't mean

6  it's not scientific; right?

7      MR. BISHOP:  Object to form.  Vague.  Ambiguous.

8      THE WITNESS:  So I -- this is science.

9  BY MR. TISI:

10  Q.  Um-hum.

11  A.  I have concerns with the methods in the paper

12  and I have concerns with the analysis and I have

13  concerns with the conclusions that come from the

14  interpretation.

15  Q.  Were you aware that this study was coming out

16  before it came out?

17  A.  No.

18  Q.  How much time did you spend researching the

19  questions relating to the multiple concerns that you

20  raise on page 32 to 34 of your report?

21  A.  I actually spent a lot of time going through

Page 140

1  this paper.

2  Q.  Okay.

3  A.  Because, number one, I wanted to -- I wanted to

4  understand it, and it is a very, very complicated paper

5  with different scenarios and different assumptions based

6  on those scenarios.

7      I probably spent about 25 or 30 hours --

8  Q.  Okay.

9  A.  -- reviewing it and going over so that I -- that

10  I felt comfortable understanding what was done and felt

11  comfortable understanding if there were any limitations

12  with it.  And that's why I bring those concerns up in my

13  report.

14  Q.  Did you talk to any professional colleague about

15  what you were going to -- the concerns that you had?

16      MR. BISHOP:  Objection.  Asked and answered.

17      THE WITNESS:  No, I did not.

18  BY MR. TISI:

19  Q.  Okay.  Did you do any research on, for example,

20  contradictory data correction?

21  A.  I think I answered that before.  I have

Page 141

1  performed data correction and imputations before --

2  Q.  My bad.  I asked the question -- what I mean is

3  a different thing.

4      In connection with -- and I have this paper in

5  front of you, you have 14 days to actually -- 13 days to

6  actually finalize your report.

7      Did you do any research in connection with your

8  preparation of your expert report on contradictory data

9  correction in order to express the opinions you're

10  putting in this report?

11  A.  Other than to spend time in reading the report

12  and understanding what was -- what was potentially done

13  in the data correction and the imputation strategies, no

14  further research.

15  Q.  Did you look at any of the papers -- for

16  example, you said you spent 25 hours reading this

17  particular study.  The authors, for example, cite

18  studies for their multiple imputation calculations.

19      Did you look at those articles?

20  A.  Which ones are you referring to?

21  Q.  I'll ask you in a moment.

36 (Pages 138 - 141)

Page 142

1    Did you do anything -- did you look at the
2  footnotes, the articles footnoted on multiple data --
3  multiple imputation strategies?
4    A.    No.  Again, because in most studies that I do,
5  I have a strategy for multiple imputation which involves
6  usually four or five different -- different strategies.
7  So there are lots of different ways to impute data.
8    Q.    All right.
9    A.    And I didn't feel like I needed to do any
10  research into that.
11    Q.    But if you wanted to understand why these
12  authors did what they did and they cited literature,
13  wouldn't you want to understand why they did what they
14  did and the scientific basis for doing that?  If you're
15  going to raise concerns and be critical of them.
16    A.    Yeah.  So I understand what you're saying.  And
17  I do understand, in general, the imputation strategies
18  that they did perform.  One was an adjusted imputation
19  based on covariates, not only covariates that predict an
20  outcome but covariates that predict an exposure.
21    And they also perform an imputation that was

Page 143

1  sort of on the extreme, and they changed unexposed
2  people to exposed.  And that would be one extreme of an
3  imputation strategy.
4    So I understand those two strategies.  It's not
5  something I need to up.  They're strategies I've used in
6  my own research.
7    Q.    Okay.  Did you do any research on sensitivity
8  analysis related to recall bias?
9    A.    No.  And that's -- that's not something I feel
10  like I would need to do, because in doing a sensitivity
11  analysis, all you're doing is -- is reclassifying
12  someone and you're creating nondifferential -- sorry,
13  differential misclassification, which reduces your point
14  estimate towards the null, which is exactly what they
15  did.
16    Q.    Now, at times, you know, you publish regularly;
17  right?
18    A.    I have to.  Yes.
19    Q.    Do you -- there are -- do you ever see in your
20  research world that there are times when papers are
21  actually featured papers, either featured by the journal

Page 144

1  or featured by the institution if it's an important
2  paper?
3    A.    Yeah.  So, I mean, I've certainly had papers
4  featured.  You know, it really depends on why that is.
5  And I've never really -- I've never really questioned as
6  to what the reasons to feature something.  There are
7  lots of -- lots of factors go into that.
8    Q.    Okay.  Let's -- have you seen the press release
9  for the -- actually, not the press release.  The feature
10  from the journal that published this study?  Journal of
11  Clinical Oncology.
12    A.    I have not, but I'd be happy to look at it.
13    Q.    Sure.  Let's make it Exhibit 18.
14    (Deposition Exhibit 18 was marked.)
15  BY MR. TISI:
16    Q.    This is -- for the record, is a feature from the
17  American -- excuse me, the Journal of Clinical Oncology.
18  And it's entitled "Study Finds association between
19  Genital Talc Use and Increased Risk of Ovarian Cancer."
20    Do you see that?
21    A.    I do, yes.

Page 145

1    Q.    By the way, let me ask you this.  You keep
2  characterizing this as a thought experiment; right?
3  You've said that several times today.
4    I mean, is there anywhere in the any of the
5  papers that you've seen that addressed this where the
6  authors say, "We're going to engage in a thought
7  experiment"?
8    A.    No, but they should.
9    Q.    Oh, they should have -- okay -- in your opinion?
10    A.    Yes.  Absolutely.
11    Q.    Okay.  Next thing, it says, "ASCO perspective."
12  It says, "This study underscores the potential risk
13  associated with intimate care products, particularly
14  genital talc.  The evidence adds to a growing body of
15  literature that suggests such products could contribute
16  to an increased risk of ovarian cancer, especially among
17  frequent users and those using these products in their
18  20s and 30s."
19    Do you see that?
20    A.    I do, yes.
21    Q.    All right.  I assume you agree with that?

37 (Pages 142 - 145)

Page 146

1    A.    Well, it says that it could contribute.  It
2    doesn't say that it contributes.
3    Q.    Well, you say they can't contribute, but you say
4    there's no evidence of an association whatsoever?
5         MR. BISHOP:  Objection.  Mischaracterizes.
6         THE WITNESS:  What I've said is --
7    BY MR. TISI:
8    Q.    Well, okay.  Let's deal with that.
9         You say there is no association in your report;
10   right?
11   A.    I say -- my opinion is there is no causal
12   association --
13   Q.    Okay.
14   A.    -- between cosmetic talcum powder products --
15   Q.    All right.  And this --
16   A.    -- and ovarian cancer.
17   Q.    So I assume you would disagree with the
18   perspective of the journal that published this article;
19   correct?
20        MR. BISHOP:  Objection.  Vague.  Overbroad.
21        THE WITNESS:  You know, again, I'm not saying

Page 147

1    that -- I'm not sure what this sentence means.
2         It says, "The evidence adds to a growing body of
3    literature that suggests" -- again, not causal --
4    "suggests such products could contribute" -- that's
5    not -- that's -- these are -- this is a very vague
6    statement.
7         It suggests that it could be.  That's guessing.
8    BY MR. TISI:
9    Q.    Okay.  Well, let's take away the guessing.  Look
10   at "main takeaway," the bullet point.
11        "Genital talc was found to be positive
12   associated with the risk of ovarian cancer across
13   multiple scenarios, even after adjusting for potential
14   reporting biases and misclassification.
15        "The association was particularly strong among
16   women who used talc frequently or especially during
17   periods of significant hormonal changes and reproductive
18   activity."
19        That's much -- that's a definitive statement;
20   right?
21   A.    That is much more definitive than the above.

Page 148

1    Yes.
2    Q.    Okay.  Do you disagree with that?
3    A.    I disagree that it was positively associated
4    across multiple scenarios.  And you'd have to agree on
5    that scenario to agree on whether or not there was a
6    positive association.  And I outline this quite -- quite
7    non-vaguely in my report.
8    Q.    Okay.  And there's actually a quote from -- by
9    Dr. O'Brien here on the second page, and I'm going to
10   read it.  And, again, this is the same Dr. O'Brien
11   you've been relying on throughout your 2019 and 2024
12   reports; right?
13        And she says, "Despite challenges in assessing
14   exposure history and biases inherent in retrospective
15   data, our findings are robust, showing a consistent
16   association between talc, genital use, and ovarian
17   cancer."
18        Do you see that?
19   A.    I do see that.
20        MR. BISHOP:  Objection.  Compound.
21

Page 149

1    BY MR. TISI:
2    Q.    And she further says, "This study leverages
3    detailed lifetime exposure histories and unique design
4    of the Sister Studies to provide more reliable evidence
5    that supports a potential association between long-term
6    and frequent genital use and ovarian cancer."
7         Do you see that?
8    A.    I do see that.
9    Q.    Do you disagree with her?
10   A.    In part, yes.  I do disagree with her.
11   Q.    Okay.  And the key findings below say,
12   "Persistent positive association between genital talc
13   use and ovarian cancer with the highest risks observed
14   in frequent and long-term users."
15        Do you see that?
16   A.    I do, yes.
17   Q.    And you disagree with that?
18   A.    Again, if we look at the details of the study,
19   there are four different scenarios, and they choose
20   scenario four to look at, which involves imputation
21   and -- mainly imputation of data, and with a lot of

38 (Pages 146 - 149)

Page 150

1  assumptions that really have no founding.

2  Q.   And you choose to focus on scenario one, where a

3  questionnaire was asked prospectively, which could

4  exclude decades of use by the -- by the individual

5  women; right?

6  A.   Actually, no.  I support -- the table with the

7  most evidence is -- is in the supplemental A2 table.

8  Q.   Okay.

9  A.   Which is -- and if you look at table A2, the

10  first column, that represents women who were

11  questioned --

12  Q.   Um-hum.

13  A.   -- and followed over time, and there was no

14  imputation of data.

15  Q.   Okay.

16  A.   And then also relying on table -- on column 3,

17  that's fully prospective data, both of incident ovarian

18  cancer.  And both of those -- both of those groups of

19  women show no statistical significance in the risk of

20  ovarian cancer.

21  Q.   Well, let's talk about table A2, ovarian cancer,

Page 151

1  288 cases.

2      Do you see that?  The column of 288 cases on

3  table A2.

4  A.   Yeah.  I'm not seeing --

5  Q.   The second to last from the bottom, above

6  uterine cancer.

7      Do you see that?

8  A.   I see.  Yes.  Sorry.

9  Q.   It has a 1.02.  That's the initial -- that's

10  based on the initial questionnaire for 10 to 13 years

11  and 12 months before; correct?

12  A.   That's correct.

13  Q.   Okay.  And that would include, potentially,

14  decades of talc use; correct?

15  A.   That's correct.

16  Q.   Okay.  Now, the second -- the second column has

17  ovarian cancer, and this would mostly retrospective

18  without adjustments of a 2.65 hazard ratio; correct?

19  A.   That's correct.

20  Q.   Okay.  And the third column has a 1.84.

21      Do you see that?

Page 152

1  A.   I do, yes.

2  Q.   Okay.  And so there isn't -- there is a -- even

3  on this chart, there is a positive association; correct?

4  A.   There's a positive association which reflects --

5  this is -- this is a real word study in recall bias.

6  That is second column is labeling people -- women as

7  being exposed based on their follow-up questionnaire

8  regardless of their initial questionnaire, and that jump

9  in a hazard ratio from 1.02 to 2.65 is a clear example

10  of what happens with differential misclassification or

11  recall bias.

12      And, in particular, if you look at the percent

13  exposed, the percent exposed in the first column is

14  28 percent.  That jumps up double to 50 -- 53 percent in

15  the --

16  Q.   That's because -- that's because the --

17      MR. BISHOP:  Hold on.  Let him finish, and then

18  you can follow up.

19      THE WITNESS:  That jumps up to 53 percent in the

20  follow-up questionnaire, which was administered in

21  between 2017 and 2019, regardless of what they said

Page 153

1  before.  And then if you look at just prospective cases,

2  looking at just people based on their questionnaires and

3  then incident -- so the development of ovarian cancer --

4  that percent exposed goes back down close to the

5  28 percent to 31 percent, with no statistical

6  significance there.

7  BY MR. TISI:

8  Q.   So -- but the initial data that you were looking

9  at excludes women with decades of data, potentially use

10  data; true?

11  A.   And then in order to --

12  Q.   You got to answer my question.  Is that yes or

13  no?

14  A.   Yes.  Based on my interpretation --

15  Q.   All right.

16  A.   -- of this, but there's no --

17      MR. BISHOP:  Let him finish --

18      MR. TISI:  No.

19      (Indistinguishable simultaneous speaking;

20  reporter admonishment.)

21      MR. TISI:  If it's a yes-or-no answer --

39 (Pages 150 - 153)

Page 154

1    MS. PARFITT: Chris --
2    MR. TISI: -- it's yes or no.
3    MR. BISHOP: He can put his answer. You can
4    move to strike. That's how it works.
5    MR. TISI: Okay.
6    MR. BISHOP: So finish your answer, please.
7    MR. TISI: We're going to move on. Next
8    question.
9    MR. BISHOP: Did you finish your answer?
10    THE WITNESS: What I was going to --
11    BY MR. TISI:
12    Q.    I'm going to ask you all about this chart.
13    I promise you I will. Okay? And I'm going to give you
14    full opportunity to ask the question.
15    The initial -- the initial question I asked you
16    was: The initial questionnaire excluded potential
17    decades of data -- yes or no -- about use.
18    A.    So this is where it's difficult for me to
19    interpret this -- this aspect of it, because if you look
20    at the title of the table, it says, "Uncorrected,
21    unadjusted hazard ratios for an association between

Page 155

1    intimate care products, hormone-related cancers on the
2    basis of use reported enrollment or on the fourth
3    detailed follow-up use."
4    And so it could be an "or" there. And -- but in
5    formulating an opinion on this table, moving forward to
6    the third column where there's a similar percent exposed
7    and a nonstatistical -- a nonstatistically significant
8    hazard ratio there, that's fully prospective.
9    And so that's getting at -- that's getting at
10    the potential loss of data for people that have not been
11    followed over time.
12    BY MR. TISI:
13    Q.    Okay. Move to strike. Doesn't answer my
14    question.
15    This was also featured -- this article was also
16    featured on the NIH -- by the NIH as well.
17    Do you know that?
18    A.    No.
19    Q.    Okay. I'm going to show you what I'd like to
20    have marked as Exhibit Number 19.
21    (Deposition Exhibit 19 was marked.)

Page 156

1    BY MR. TISI:
2    Q.    Now, this is a feature by the NIH.
3    Do you see the NIH logo there?
4    A.    I do, yes.
5    Q.    Okay. And it says -- underneath the headline,
6    it says, "New study by NIEHS scientists provide
7    compelling evidence that genital talc use is associated
8    with increased risk of ovarian cancer."
9    See that?
10    A.    Yes.
11    MR. TISI: That's somewhat concerning.
12    THE WITNESS: Yeah. That's weird.
13    MR. TISI: Do you want to take a break and we
14    can -- we'll go off the record.
15    (Off the record.)
16    BY MR. TISI:
17    Q.    Let's go back on the record. Go back to
18    Exhibit Number 19. There's a quote by Dr. O'Brien
19    again. Oh, it says, "Despite challenges in assessing
20    exposure history and biases inherent in retrospective
21    data, our findings are robust, showing a consistent

Page 157

1    association between talc use and ovarian cancer."
2    That's the same quote we read before; correct?
3    A.    That's correct.
4    Q.    Okay. And you disagreed with that; right?
5    A.    Again it depends on which scenario you're
6    looking at. And, again, they're talking about the
7    results of scenario four, which has a lot of assumptions
8    that one would have to agree with because there's
9    changing of data and imputation of data. And when we
10    look at the data itself, it doesn't show that
11    association.
12    Q.    Next page. It says, "Key findings persist" --
13    on the -- from the NIH.
14    "Key findings of the study are persistent
15    positive association between genital talc use and
16    ovarian cancer with the strongest associations observed
17    with frequent and long-term users and for use during
18    reproductive years."
19    Correct?
20    A.    That's what it says. Yes.
21    Q.    And then if you look, there's pictures of the

40 (Pages 154 - 157)

Page 158

1  Dr. Sandler and Dr. O'Brien. It says -- Dr. Sandler and
2  O'Brien write, "There is no medical reason to use these
3  products. For women are using these products, they may
4  want to reduce their frequency of use, look for
5  alternatives, or talk to their doctor about the
6  concerns."
7      Do you see that?
8  A.  I do.
9  Q.  Do you have any feelings about that?
10  A.  I mean --
11      MR. BISHOP: Objection. I'm sorry. Objection.
12      THE WITNESS: That --
13  BY MR. TISI:
14  Q.  Do you have any opinions about that, whether
15  women should be using talc in light of this study?
16  A.  I have no opinion about that. Dr. O'Brien is
17  not a medical doctor.
18  Q.  Okay.
19      MR. TISI: We'll take a quick break.
20      (Recess taken.)
21      MR. TISI: Back on the record.

Page 159

1  BY MR. TISI:
2  Q.  All right. So we took a break because of some
3  disturbance outside, so I appreciate your taking a
4  break.
5      Let's talk about the paper itself and your
6  criticisms. I jumped ahead a little bit. So let's
7  go -- double back and see if we can cover some things
8  that I intended to do.
9      On page 34 of your report, if you would go to
10  that -- we talked about this briefly before. You --
11  I was curious about the phrase, and we talked about
12  "data manipulation in order to demonstrate a
13  predetermined result."
14      Do you see that?
15  A.  I do.
16  Q.  Okay. Do you feel that in any way that was an
17  unfortunate choice of words by you?
18  A.  No. It raises a concern that there was a
19  predetermined result and data manipulation to get there.
20  Q.  Okay. If that were true, don't you think that
21  the various peer reviewers and the journal and the NIH

Page 160

1  would have caught that?
2      MR. BISHOP: Objection. Calls for speculation.
3      THE WITNESS: I don't know.
4  BY MR. TISI:
5  Q.  Okay. Would it be fair to say that there are
6  few things in science more egregious than starting an
7  experiment and saying, "I know where I'm going to go and
8  I'm going to manipulate the data to get there"?
9      MR. BISHOP: Objection. Mischaracterizes.
10      THE WITNESS: I didn't say that that happened.
11  I said that it raises a concern that it happened because
12  of the imputation strategies and the strategy and the --
13  so when you do imputation strategies, it's really to
14  sort of confirm a -- an analysis where there's missing
15  data.
16  BY MR. TISI:
17  Q.  We're going to talk about that. I'm simply
18  asking you: Raising a concern that a researcher,
19  particularly of this caliber, had manipulated data to
20  get to a predetermined result is a pretty serious thing
21  if it -- pretty serious charge; right? Or a pretty

Page 161

1  serious thing to raise; true?
2      MR. BISHOP: Objection. Compound.
3      THE WITNESS: It raises a concern for me.
4  BY MR. TISI:
5  Q.  All right. And it would be particularly
6  egregious since these authors are in charge of a large
7  cohort study for the National Institutes of Health;
8  right? I mean, I will represent to you that
9  Dale Sandler is principal investigator for the
10  Sister Study, which is an important cohort; true?
11      MR. BISHOP: Objection. Compound.
12      THE WITNESS: I'm not aware who the PI of the
13  Sister Study is --
14  BY MR. TISI:
15  Q.  Well, I will represent to you that Dale Sandler
16  was the principal investigator and head of epidemiology
17  at the NEIHS and is the head -- the principal
18  investigator for the Sister Study.
19      If that were true -- and I represent to you that
20  it is -- that it would be a pretty serious thing for a
21  pretty important person in charge of a pretty important

41 (Pages 158 - 161)

Page 162

1 study; true?

2     MR. BISHOP: Objection. Vague. Ambiguous.

3 Overbroad.

4     THE WITNESS: I'm -- I'm going to stand by my

5 concern.

6 BY MR. TISI:

7     Q.   Okay.

8     A.   Because there's significant imputation and a lot

9 of assumptions to get to the conclusion that the 1.82

10 estimate would be the estimate to choose to then perform

11 a recall bias sensitivity analysis.

12     Q.   Do you know what -- have you ever had heard the

13 phrase "put your money where your mouth is"?  You've

14 heard that phrase?

15     A.   I have.  Yes.

16     Q.   Okay.  If you thought there might be scientific

17 misconduct in the conduct of an important study like

18 Sister Study, would you feel duty-bound to either

19 investigate or report it?

20     A.   So I never said there was scientific misconduct.

21 I said data manipulation which is an imputation

Page 163

1 strategy.  That's data manipulation.

2     Q.   To reach a predetermined result.  That's --

3 that's the part that would be inappropriate,

4 scientifically; correct?

5     A.   If that's what you're reporting.  And --

6     Q.   Okay.  So my question is:  If you had a concern

7 about that, don't you think that would be important to

8 either ask for an investigation or to try to seek out

9 the answers to the concerns you raise?

10     MR. BISHOP: Objection. I'm sorry. Vague.

11 Ambiguous. Overbroad.

12     THE WITNESS: So the answers are in the paper

13 themselves --

14 BY MR. TISI:

15     Q.   Okay.

16     A.   -- themselves.

17     And the reason is they're -- they're using

18 scenario four as their end-all result.

19     Q.   Okay.

20     A.   And one would have to assume or agree with all

21 the assumptions that go into scenario four.  And as

Page 164

1 I said before, had I been a reviewer of this study,

2 I would have raised those concerns.

3     Q.   Okay.  So other than litigation experts who have

4 been paid hundreds of thousands of dollars to testify on

5 behalf of J&J, do you know any scientists independent

6 who have raised the concerns that this was data

7 manipulation to reach a predetermined result?  Anybody

8 who has raised your concern here.

9     A.   I haven't spoken to anyone about it.  What I'm

10 telling you --

11     Q.   Have you seen it?  Have you seen it in the

12 literature?  Has anything that has happened since this

13 study has been published that anybody has said what

14 you've said in your litigation report?

15     A.   The study is relatively new and it does raise a

16 concern to choose that scenario.

17     Q.   But has anybody outside of litigation, to your

18 knowledge, raised that concern?

19     A.   Not that I'm aware of.

20     Q.   Okay.  Do you have any intent to bring your

21 concern to the NIH, to the ASCO journal authors, or

Page 165

1 anybody else?

2     A.   No.

3     Q.   Do you have any intent to ask for an

4 investigation?

5     A.   Again, there would be no reason to be -- to

6 investigate.  The reason is it's a concern of mine to

7 choose that scenario as the hazard ratio to then perform

8 the recall bias sensitivity analysis, when that scenario

9 is based on a lot of different assumptions and -- and

10 end imputation strategies that may or may not make

11 sense.

12     Q.   Well, I've now shown you the exhibit which is

13 the NIH feature for the world to see about the NIH's

14 view about O'Brien 2024 provides compelling evidence

15 that general talc use is associated with ovarian cancer,

16 and the data supports a persistent positive association.

17     Do you have any intent to contact the NIH and

18 say, you really ought to take that down?

19     A.   Not to this point, I haven't thought about that.

20     Q.   Do you have any evidence -- just to be

21 100 percent sure clear -- that the authors of O'Brien

42 (Pages 162 - 165)

Page 166

1  2024 intentionally manipulated data to reach a
2  conclusion that talking was associated with ovarian
3  cancer?
4      MR. BISHOP: Objection. Asked and answered.
5      THE WITNESS: So, again, I never said I had
6  evidence. I said it raises a concern.
7  BY MR. TISI:
8  Q. So you do not have evidence?
9  A. I said I have a concern, and I never said I had
10 evidence.
11 Q. I -- okay.
12     So that was just a thought experiment by you?
13     MR. BISHOP: Objection. Argumentative.
14     THE WITNESS: No, no. I just -- it's a concern
15 because there are other scenarios that use the actual
16 data.
17 BY MR. TISI:
18 Q. Okay.
19 A. And scenario four is a thought experiment, and
20 that is the result they choose, which is inconsistent
21 with the real data.

Page 167

1  Q. But you're musing about whether or not they used
2  a pre -- a methodology that would reach a predetermined
3  outcome was just a musing by you in your report, this
4  concern that you raise?
5      MR. BISHOP: Object to the form.
6  Mischaracterizes.
7      THE WITNESS: No. That's not what I said. What
8  I'm saying is -- and I'll give you a clear example.
9      When I've performed studies, cohort studies with
10 missing data and we use imputation strategies to fill in
11 the missing data and the data doesn't make sense after
12 you've imputed things -- meaning there's discord between
13 your real data and that's been imputed, that raises
14 concerns.
15 BY MR. TISI:
16 Q. Okay.
17 A. And --
18 Q. Well, good --
19 A. And that is the concern that I have, that the
20 imputed data based on the assumptions that are brought
21 forth in the paper produce a dramatically different

Page 168

1  result.
2  Q. You have a department of biostatistics at
3  Johns Hopkins, don't you?
4  A. We do, yes.
5  Q. Do you know who the chair of that department is?
6  A. It used to be Marie Dina West. I don't know who
7  the chair is now.
8  Q. Do you know who Liz Stuart is?
9  A. No.
10 Q. Dr. Stuart.
11     Do you know whether or not Dr. Stuart, the chair
12 of the department, has written about when you use
13 multiple imputation strategies?
14 A. I'm not familiar with her writing on that. I
15 know when we use them.
16 Q. Are you a professor of biostatistics?
17 A. I'm not.
18 Q. Have you spoken to any biostatistician in your
19 department about when to use multiple imputation
20 strategies?
21 A. I have, from time to time. We have a

Page 169

1  biostatistician that works with our group. And from
2  time to time I've talked about different strategies for
3  imputation and when to use it.
4  Q. Did you ask -- in connection with this study,
5  did you go to a biostatistician in your department and
6  ask -- in your school and ask them, you know, "They're
7  using this in a way that I have not seen used before.
8  Can you give me your thoughts about that?"
9  A. So I never said this is -- they're using this in
10 a way that I've never seen before.
11 Q. Okay.
12 A. I said I'm familiar with their strategies of
13 imputation, and I'm familiar with data correction,
14 because all that is doing is just reassigning exposure
15 to non-exposure or non-exposure to exposure. I'm
16 completely familiar with that.
17 Q. Okay. You --
18 A. My issue is choosing the strategy that's based
19 on a lot of different imputations and data correction
20 and using that strategy as the point estimate for the
21 recall bias --

43 (Pages 166 - 169)

Page 170

1    Q.   So you don't -- I'm sorry.  Were you finished?
2    A.   -- for the recall bias analysis.
3    Q.   So you have no problem with using multiple
4  imputation strategies to account for missing data;
5  correct?
6    A.   I didn't say that either.  I think multiple
7  imputation strategies are used when there is a certain
8  percentage of missing data to try to account --
9    Q.   What percent?
10   A.   I mean, it depends.  Usually if there's around
11  10 percent, you might try to.  But it's going to depend
12  on the factor.
13       One of the things that I study is decline in
14  lung function.  And if I have somebody who's followed
15  for ten years and they -- they're supposed to get lung
16  function every quarter for ten years but they're missing
17  a couple in between, you can pretty finely tune the
18  imputation of that lung function based on the two -- the
19  two that flank that.
20       Now, that's an easier imputation strategy than
21  something like this where they're using covariates to

Page 171

1  predict not only an outcome but predict an exposure, and
2  that's complicated.
3    Q.   It's complicated, and it would require -- well,
4  first of all, who is the biostatistician that you use
5  that you referred to that would be -- you said you would
6  consult with on multiple imputation strategies?
7    A.   So there's a biostatistician named Kevin Psoter
8  who we've worked with over the course of time.
9    Q.   Have you spoken to Kevin Psoter about this the
10  paper?
11   A.   No.
12   Q.   Have you spoken to any bio- --- and, again, you
13  don't -- are you an expert in biostatistics?
14   A.   I have expertise in epidemiology, and I also
15  have expertise in the analysis of longitudinal data.
16   Q.   Just a different question.
17       Do you consider yourself to be an expert in
18  biostatistics?
19   A.   I think part of my -- my expertise in
20  epidemiology does include biostatistics.
21   Q.   Do you consider yourself a Bayesian or

Page 172

1  frequentist when it comes to your approach to analyzing
2  data?
3    A.   I certainly have used frequency analyses before,
4  and I certainly have used Bayesian analyses before.
5    Q.   Do you know how bootstrapping is using in
6  multiple imputation strategies?
7    A.   I do, yes.
8    Q.   Do you know what multiple imputation with
9  chained equations, or MICE, is?
10   A.   Yes.
11   Q.   Okay.  What is it?
12   A.   It's a way to use other variables to use as
13  covariates to predict usually an outcome if you're
14  missing an outcome data.
15   Q.   Do you know -- I'm sorry.  Didn't mean --
16   A.   It appears that in this paper, the investigators
17  also used this to predict exposure too.  And, that,
18  I have a little bit of a difficulty in grasping whether
19  or not that's a concept I agree with.
20   Q.   Okay.  Do you know what the Benjamini-Hochberg
21  procedure control for, and how does it differ from the

Page 173

1  Bonferroni correction?
2    A.   I know what a Bonferroni correction is.  It's
3  usually a correction for multiple analyses.  The other
4  term, I'm not familiar with.
5    Q.   If I could kind of synthesize all of the
6  concerns that you raise in your report, you have
7  concerns with O'Brien's contradictory data correction
8  methodology; correct?
9    A.   I have concerns that the results contradict
10  themselves depending on the level of imputation and --
11  and what analyses were performed.
12   Q.   Do you have -- and you have concerns about the
13  missing data imputation, which you criticize; correct?
14   A.   So, again, it's a strategy to try to get at
15  missing exposure and missing outcome data.  Usually when
16  you input -- impute data, it's to gather more
17  covariates, and it's not that standard to certainly
18  impute exposure, because you're just guessing.
19   Q.   Okay.  So -- and just one other question.
20       Do you have concerns about sensitivity analysis
21  relating to recall bias methodology?

44 (Pages 170 - 173)

Page 174

1  A.  No.  I think that's -- that's done very, very
2  well.
3  Q.  Okay.  Now, we -- I asked you whether or not
4  you've done any research on these issues, the
5  methodology issue between the time you received the
6  O'Brien report and the time you issued your report, and
7  you said you didn't have to.
8      You didn't; right?
9  A.  I feel like I needed to do that because I have
10 performed imputation strategies similar to this in the
11 past using longitudinal cohort data.
12 Q.  Okay.  And I understand that you did not consult
13 with a biostatistician -- including biostatisticians in
14 your own department; correct?
15     MR. BISHOP:  Objection.  Asked and answered.
16     THE WITNESS:  I did not.
17 BY MR. TISI:
18 Q.  Okay.  And in the 13 days between the time you
19 got this report of this study, Exhibit Number 3, and the
20 time you issued your report, did you have occasion to
21 speak to J&J's lawyers?

Page 175

1  A.  In -- in finalizing my report, we did have a
2  couple meetings.  Yes.
3  Q.  Did you have meetings where the issues relating
4  to O'Brien 2024 were discussed?
5  A.  What do you mean by "issues"?
6  Q.  Did you discuss with them issues relating to
7  your concerns about 2024?
8  A.  I showed you what -- I showed them what I wrote
9  down in my report.
10 Q.  Okay.  Did they interact with you on that?
11     MR. BISHOP:  Objection.  Vague.  Overbroad.
12     THE WITNESS:  Well, we had a meeting to discuss
13 it, and we talked about my -- my opinions based on the
14 manuscript and also what I had written in the report.
15 BY MR. TISI:
16 Q.  What lawyers did you speak to?
17 A.  Ms. Davidson and Mr. Bishop.
18 Q.  Okay.  And did they provide you with any
19 information that you did not have?  In other words, did
20 they represent to you what other experts were saying?
21 Did they provide you with an expert report from any

Page 176

1  other experts about what was being said about O'Brien
2  2024?
3  A.  They did not.
4  Q.  Have you spoken to any J&J litigation
5  consultants or experts relating to O'Brien 2024?
6  A.  Okay.  Can you ask that again?
7  Q.  Yeah.
8      Have you spoken to any J&J litigation
9  consultants or experts relating to O'Brien 2024?
10 A.  Not that I can think of.
11 Q.  Now, you know, so you had -- let's go back to
12 the -- you had 13 days to draft this -- these -- and
13 address your concerns.  They are concerns.  They're not
14 really -- you don't hold opinions other than you were
15 raising concerns; right?
16     MR. BISHOP:  Objection.  Vague.  Overbroad.
17 Mischaracterizes.
18     THE WITNESS:  I mean, I think I say that in my
19 report.
20 BY MR. TISI:
21 Q.  Okay.

Page 177

1  A.  I -- the design analysis, interpretation results
2  performed by O'Brien all raise a number of concerns.
3  Q.  Right.
4  A.  And then I outline that in the report.
5  Q.  Right.
6      And raising concerns is not the same thing as
7  having an opinion to a reasonable degree of scientific
8  certainty; true?
9      MR. BISHOP:  Objection.  Argumentative
10 mischaracterizes.
11     THE WITNESS:  So that's just a statement in my
12 report and then each paragraph afterwards talks about my
13 opinion.
14 BY MR. TISI:
15 Q.  Well, you -- several times, you just raise
16 questions; right?  I mean, you just raise -- I mean,
17 we'll talk about them.  But you just raise questions,
18 why, for example, they didn't include the BRCA analysis;
19 correct?
20 A.  That's correct.
21 Q.  All right.  Raising the question is not anything

45 (Pages 174 - 177)

Page 178

1  more than raising a question. I can raise a question as
2  to whether or not it's hot outside or not looking out
3  the window, but if I'm not outside, I don't know.
4  I don't have an opinion on that.
5      My question is: Do you have an opinion that you
6  hold to a reasonable degree of medical and scientific
7  certainty relating to the concerns that you have?
8      MR. BISHOP: Objection. I'm sorry. Vague.
9  BY MR. TISI:
10  Q.  And questions you raise.
11      MR. BISHOP: Vague and overbroad.
12      THE WITNESS: So the questions that I raised,
13  I raised them and I will stand by them. My biggest
14  concern with this paper is the choice in scenario to --
15  to use as their final result because -- because of of --
16  because of what is presented.
17  BY MR. TISI:
18  Q.  Okay.
19  A.  And the strategy to get there.
20  Q.  And you don't know -- and you don't know why
21  they did what they did; right? You didn't call them.

Page 179

1  You didn't ask them. You haven't -- and you don't
2  intend to.
3      Other than reading the paper, you have no
4  additional information that would shed light on your
5  concern?
6      MR. BISHOP: Objection. Vague. Overbroad.
7  Calls for speculation.
8      THE WITNESS: I had not planned on calling any
9  of the authors. But in -- in the interpretation of the
10  data from this study, it is unclear to me as to why,
11  number one, there's a difference in when data is
12  imputed. That's usually is a red flag when there's a
13  difference --
14  BY MR. TISI:
15  Q.  What are we talking about --
16      MR. BISHOP: Let him finish.
17      MR. TISI: No. I do want to -- I am,
18  actually --
19      MR. BISHOP: He can finish his answer.
20      MR. TISI: I understand. But I am going to ask
21  you about that -- I promise you, I will ask you about

Page 180

1  that.
2      THE WITNESS: And so, number one, that is a red
3  flag. And, number two, the -- the choice of
4  scenario four, again, I have big concerns with
5  because -- because there are imputation techniques that
6  get you there, and when you use scenario one, or in
7  table A2, the people who are followed forward, those
8  results are dramatically different.
9  BY MR. TISI:
10  Q.  Now, you've called into question the integrity
11  of the authors here by raising these concerns.
12      Do you think it's also fair for an objective
13  scientist or judge or a juror to question whether you
14  are objecting -- objectively looking at O'Brien 2024 in
15  light of your accepting 4- or $500,000 to look at this
16  case and having already committed yourself to the
17  position that talc doesn't cause ovarian cancer?
18      MR. BISHOP: Object to form.
19  BY MR. TISI:
20  Q.  Do you think that's reasonable to raise that
21  question?

Page 181

1      MR. BISHOP: Object to form. Argumentative.
2  Move to strike comments of Counsel.
3      THE WITNESS: So my -- my job is to be as
4  objective as possible, and my opinion in 2019 could
5  certainly change. My opinion two years from now could
6  certainly change and I -- my job is to be as objective
7  as possible. This paper does not change my opinion.
8  BY MR. TISI:
9  Q.  Okay.
10  A.  And the reason is because using scenario one,
11  comparing it to the extreme where recall bias is into
12  that and then looking prospectively, this is -- this is
13  like three different studies in itself. It's a cohort
14  study, there's a recall, there's a -- sort of a case
15  control kind of recall thing, and then there's a
16  longitudinal component of just prospective.
17      So we learn a lot from this study from a study
18  design and epidemiologic standpoint.
19  Q.  You call O'Brien's work a thought experiment.
20      Do you think that your concerns outlined for
21  four pages in your report could also be considered a

46 (Pages 178 - 181)

Page 182

1    thought experiment?
2    A.   I don't.
3    Q.   Okay.
4    A.   Absolutely not.
5    Q.   Let's talk about some of your concerns.
6         On page 33 of your report, you say here -- one,
7    two, three, four -- page 33 -- you said here, "Every
8    scenario in table 2 involves at least some imputation.
9    Because scenario three was intended to merely illustrate
10   an extreme, I focus here on scenario four.  This study
11   does not provide any explanation to justify the
12   assumptions/selections of covariates used in
13   scenario four, and this unquestionably limits the
14   validity of the study."
15        Do you see that?
16   A.   I do, yes.
17   Q.   Okay.  Putting aside the fact this article
18   passed peer review, did you seek to investigate why --
19   the explanation for why they chose scenario four?
20        MR. BISHOP:  Objection.  Asked and answered.
21        THE WITNESS:  Well, I said to you earlier, I did

Page 183

1    not contact any of the authors about that.
2    BY MR. TISI:
3    Q.   Do you have anything further to add that's
4    beyond raising concerns?
5    A.   That it's unclear to me as to why scenario four
6    was chosen as the point estimate and confidence interval
7    for the final results of this paper.
8    Q.   Do you have any opinion to a reasonable degree
9    of scientific certainty that the covariates used in
10   scenario four were not scientifically justified?
11   A.   Can you ask that again?  I'm not sure I
12   understand.
13   Q.   Do you have any opinion to a reasonable degree
14   of scientific certainty that the covariates used in
15   scenario four were not scientifically justified?
16   A.   The covariates that were used and the analysis
17   and plan -- like, I don't know the code for it.  So --
18   Q.   Okay.
19   A.   So you don't have an opinion on that?
20        MR. BISHOP:  Let him finish his answer.
21        THE WITNESS:  So I couldn't repeat this because

Page 184

1    I don't know exactly what was done.  It's not
2    described --
3    BY MR. TISI:
4    Q.   So --
5    A.   -- and so my opinion is I have a concern about
6    it because the imputed data is very different than the
7    data by itself that's not imputed.
8    Q.   My question is very specific, so I'm going to
9    ask you to answer my question.
10        Do you have any opinion, to a reasonable degree
11   of scientific certainty, that the covariates used in
12   scenario four were not scientifically justified?  And if
13   you don't know, you don't know.
14   A.   I don't have an opinion about that.
15   Q.   Okay.  On page 33, you also say, "Of note, there
16   is no reported analysis comparing those with missing
17   data to those without missing data.  It would be
18   important to know if these -- if those with missing data
19   are different from those without missing data.  It's
20   impossible to understand the methods to determine how
21   covariates were selected to perform the imputation,

Page 185

1    which seems particularly problematic."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   Did you -- and we know you didn't contact the
5    authors.
6         If it's impossible to understand the methods
7    that pass peer reviewed, I assume you can't form another
8    opinion on that; correct?
9    A.   What I have an opinion on is that you can't
10   understand the methods --
11   Q.   Right.
12   A.   -- because they're not fully described.
13   Q.   Right.  And --
14   A.   And usually the first step in performing an
15   analysis of missing data is to really compare people
16   with a full dataset, people with some missing data, and
17   then people with a lot of missing data.  And if those
18   groups are different, then you have a problem.  And that
19   wasn't described.  And that's the first step in an
20   imputation analysis.
21   Q.   Okay.  But my question is:  Given the fact that

47 (Pages 182 - 185)

Page 186

1  you have some gaps in your understanding of the methods
2  and haven't reached out to fill those gaps, do you have
3  any opinions that you hold to a reasonable degree of
4  scientific certainty that the covariates selected were
5  incorrect?
6      A.   Which covariates are you talking about?
7      Q.   The ones used for the imputation strategy.
8      A.   Which imputation strategy?
9      Q.   Well, the ones referred to on page 33 that we
10  said it would be important to know if those missing data
11  were different for those without missing data.  You
12  raised concerns.
13      And my question is:  Since you don't know the
14  answers to those questions, you can't really formulate
15  an opinion; true?
16      MR. BISHOP:  Objection.  Vague and ambiguous.
17  Overbroad.
18      THE WITNESS:  Yeah, no.  Not necessarily.  I do
19  have an opinion that it's a problem.
20  BY MR. TISI:
21      Q.   It's a problem, but you just don't know because

Page 187

1  you don't know what they did and what they didn't
2  because they didn't describe it; right?
3      A.   When an imputation strategy gives you different
4  results than without imputation, that's usually a
5  problem.
6      Q.   Yeah.  I do want to ask you that, and I'm going
7  to get to that in a moment.
8      In addition, you also say, "It's also unclear
9  the basis -- what the basis is for the methods used to
10  correct contradictory data"; correct?
11      A.   That's correct.
12      Q.   Okay.  Since you can't discern the methods used
13  I assume you have no opinions to a reasonable degree of
14  medical and scientific certainty as to whether or not
15  this was or was not an appropriate basis for the method?
16      A.   I actually can discern it.  In the next
17  sentence, it says "In the second, third, and fourth
18  scenarios the authors classified 80 percent of the women
19  who were unexposed at enrollment but reported that they
20  were exposed during the same time period at follow-up as
21  exposed, and 90 percent of the women who claimed that

Page 188

1  they were exposed at enrollment but reported being
2  unexposed as follow-up as exposed."
3      Those are just percentages.  There's no basis
4  that is reported in this paper as to why they chose
5  those percentages.
6      Q.   Okay.
7      A.   And so that is -- that is a huge assumption that
8  one would have to accept in order to accept the results
9  of this study.  And without a basis to choose
10  80 percent, 90 percent, they could have chose 60, 50,
11  40, 30, 90, 95, just throwing anything out there without
12  any basis for it, then there's no way that you could
13  accept those assumptions.
14      Q.   Now, you've said in your report that it raises a
15  red flag -- and I'm trying to find it.  You say it
16  raises a red flag because the results after imputation
17  were different than the results before imputation;
18  correct?
19      A.   Yeah.  I'm trying to find it as well.
20      Q.   And I have it -- and I had it highlighted and I
21  wanted to give you an opportunity to explain it and I

Page 189

1  cannot find it on my -- oh, I see it.
2      On the bottom of page 32, it says, "Imputation
3  strategies are often used to help provide some
4  reassurance to support and strengthen an association
5  when association actually exists.  When the data without
6  imputation suggests no clear association, as in this
7  study, and data with imputation suggests otherwise, this
8  inconsistency is clearly a red flag."
9      Do you see that?
10      A.   I do, yes.
11      Q.   You have no citation for that; right?
12      A.   No.  But I have personal experience in doing
13  longitude 23459 studies where that has come up.  And,
14  absolutely, I have experience in that.
15      Q.   But you do not -- you don't know -- have you
16  looked up when imputation strategies are actually used
17  and whether or not it's appropriate or not appropriate?
18      A.   I think I answered that earlier.
19      Q.   Um-hum.
20      A.   I have -- my education and training, actually,
21  as to when to use imputation strategies has governed

48 (Pages 186 - 189)

Page 190

1    when that's been done in studies.
2    Q.    I'm actually going to come back to that.  Let's
3    go back to the study, Exhibit 3, if I could.  We read on
4    page 1 -- I'm sorry.  Let's start at table 2.  Scenario
5    four.
6         Now, this is the -- this is the -- this is the
7    reported results that you included in your chart as
8    being the results that the study authors claimed were
9    results of the study; correct?  You put it in your chart
10   on, I think we said --
11   A.    The scenario four.
12   Q.    Yeah.
13   A.    The 1.82 hazard ratio with a confidence interval
14   of 1.26 to 2.43.  Yes.
15   Q.    Turn to table 3, if I could.
16        Now, this -- what is the purpose of this table?
17   A.    So table 3 says, "The covariate adjusted hazard
18   ratio and 95 percent confidence intervals for the
19   association between douching and genital talc use by
20   frequency, duration, and timing of use on the basis of
21   models with contradictory data correction and multiple

Page 191

1    imputations."
2    Q.    And it looks at different outcomes, breast
3    cancer, ovarian cancer, and uterine cancer; correct?
4    A.    That's correct.
5    Q.    Okay.  And the only one that seems to be
6    affected with an increased risk is ovarian cancer;
7    correct?
8    A.    I mean, this is using the same point estimate as
9    used in the scenario four.
10   Q.    Correct.
11   A.    So that would make sense.
12   Q.    And --
13   A.    But it is, because that's scenario four.
14   Q.    But it didn't happen with breast cancer.  You
15   didn't see that increased risk with breast cancer or
16   uterine cancer; correct?
17   A.    Those are different cancers.
18   Q.    Okay.  And if recall bias was an issue, wouldn't
19   you expect to see it with both uterine cancer and breast
20   cancer?
21   A.    Not necessarily.  I mean, recall bias happens

Page 192

1    because there's potentially some preconceived notion
2    that there may be an association between disease and
3    exposure.  And, you know, certainly, if you use the
4    example of the follow-up questionnaire that was
5    administered 2017 to 2019, a lot of -- there were a lot
6    of -- there was a lot of litigation right before that,
7    and so -- and it wasn't involving breast cancer.  It
8    wasn't involving uterine cancer.
9         So just because recall bias may exist between
10   one potential association between exposure and outcome
11   doesn't mean that it's going to exist for everything
12   else.
13   Q.    Well, do you think on litigation that people
14   truly understood the difference between ovarian cancer
15   and uterine cancer?  I mean, from a realistic point of
16   view for women who are actually filing cases in
17   litigation, that they appreciate -- that they're going
18   to appreciate the distinction between talc causing
19   ovarian cancer and talc causing uterine cancer?
20        MR. BISHOP:  Objection.  Calls for speculation.
21        THE WITNESS:  I mean, they're two different

Page 193

1    organs.
2    BY MR. TISI:
3    Q.    Oh, I agree.
4         But my question is:  Do you think that women
5    will always appreciate that if it's associated with
6    ovarian cancer, it's not associated with uterine cancer?
7         MR. BISHOP:  Same objection.
8         THE WITNESS:  I don't think I can even comment
9    on that.
10   BY MR. TISI:
11   Q.    Do you think there's any evidence that talc is
12   associated with uterine cancer?
13   A.    I think the epidemiology demonstrates that
14   there's no causal association between cosmetic talcum
15   powder and uterine cancer.
16   Q.    How about talcum powder and breast cancer?
17   A.    I've not investigated that.
18   Q.    Okay.  How about talcum powder and any other
19   gynecologic cancer other than ovarian cancer?  Putting
20   that issue aside, have you seen any epidemiology
21   connecting perineal use of talc and any other

49 (Pages 190 - 193)

Page 194

1  gynecologic cancer other than ovarian cancer?
2    A.   That -- there's no epidemiologic evidence that
3  there's a causal association between cosmetic talc and
4  cervical cancer.
5    Q.   Okay.  Any other gynecologic cancers that
6  there's even an association, putting aside the question
7  as to whether or not a causal inference can be made?
8        Any other consistent association between talc
9  and any other gynecologic cancer, putting aside ovarian
10  cancer?
11    A.   The literature that I've at least reviewed has
12  involved ovarian, uterine, and cervical.
13    Q.   Now, table 3 in the O'Brien 2024 study provides
14  an adjustment for assumed recall for people who answered
15  the supplemental questionnaire; correct?  I'm sorry.
16  Table 3.  I'm looking at figure 2.
17    A.   Okay.  I have figure 2.  I'm sorry.  What was
18  the question?
19    Q.   The question is:  Even if 25 percent of the
20  cases who reported ever use were assumed to be nonuser,
21  there was a still 1.41 increased risk, statistically

Page 195

1  significant; correct?
2    A.   That's what that graph says.  If we assume the
3  1.82, which is scenario four.
4    Q.   Okay.  Even if the authors -- even if there was
5  assumption that 75 percent of infrequent or short-term
6  users were assumed to be nonusers to account for recall
7  bias, there was still an increased risk of 1.34;
8  correct?  Statistically significant.
9    A.   So if we're referring to --
10    Q.   Section B?
11    A.   -- section B on there --
12    Q.   Um-hum.
13    A.   -- where it says, "Recall bias scenario 2,
14  proportion of ovarian cancer cases reported in
15  infrequent short-term use reassigned to never use."
16        So infrequent users were assigned to never users
17  by 75 percent.  That goes to 1.34.  Again, assuming the
18  scenario four hazard ratio of 1.82.
19    Q.   Right.  And so what the authors here are doing
20  is they're taking people and saying, look, even if we
21  take a large percentage of the women and saying that

Page 196

1  people who are saying they were users are really not
2  users, they're still an increased risk?
3    A.   So here's the flip side of that.  I hear what
4  you're saying.
5    Q.   No.  That's what they are saying.  I'm not
6  saying -- what I say is not really important.
7        What they're saying is that; correct?
8    A.   That is what this graph saying, if we agree to
9  certain assumptions.  And if we are agreeing to
10  scenario four, the hazard ratio of 1.8.  However, even
11  if we agree to that, 1.82, if you look at table A -- A2.
12  So let's go to table A2 --
13    Q.   Yep.
14    A.   -- where we've got the second column there --
15    Q.   Um-hum.
16    A.   -- and we've got the percent exposed.
17    Q.   Second column.  When you say second column,
18  you're talking about --
19    A.   Second column down, ovarian cancers, 140 cases.
20  Percent exposed, 53 percent --
21    Q.   Okay.

Page 197

1    A.   -- right?
2        And so this is sort of -- getting at recall
3  bias, because most of this is retrospective.  So
4  53 percent are exposed.
5        Now, if you go to table -- sorry, column 1 or
6  column 3, that's -- that's a 28 percent exposed,
7  31 percent exposed.  That's about a 50 percent increase
8  in -- in the percent exposed.
9        And if you flip that and go back to figure 2,
10  even if we were to assume that the hazard ratio is 1.82,
11  if we differentially misclassify people as 50 percent
12  then that hazard ratio goes away to be nonstatistically
13  significant.
14        And that's exactly what this -- this is a very
15  good way of -- of looking at recall bias because it's a
16  sensitivity analysis that is increasingly creating more
17  and more differential misclassification of cases.  And
18  as there's more of that, the -- the results go away,
19  even if you were to assume that that scenario four is
20  correct.
21    Q.   But that's not the conclusion that the authors

50 (Pages 194 - 197)

Page 198

1    reached at peer review; right?

2    A.   That's what these numbers mean, though.

3    Q.   But that's not what the authors concluded;

4    right?

5    A.   But they --

6    Q.   I'm asking you -- you can disagree based upon

7    numbers.  But my -- you need to let me finish my

8    question.

9        You can disagree looking at the numbers, but the

10   authors looked at the same data you did and disagreed

11   with you; true?

12   A.   The disagreement I have is that we -- in order

13   to accept scenario four, there are a lot of assumptions

14   that go into scenario four to accept that as -- as the

15   scenario to go with.  And even if you did, the 1.82 in

16   this A part of figure 2, there is a -- there's a huge

17   discrepancy between prospective, are you using cosmetic

18   talc, or mostly prospective, are you using cosmetic

19   talc, to mostly retrospective.

20       It's a doubling of the prevalence of cosmetic

21   talc in those folks.  And if you flip that around and

Page 199

1    using the sensitivity analysis that they're using,

2    decreasing -- causing a 50 percent change goes from a

3    hard ratio of 1.82 to a hazard ratio of 1.07, which is

4    more consistent with the previous literature out there.

5    Q.   So now I'm going to actually ask you to answer

6    my question.

7        My question is -- I understand where you're

8    coming from, your interpretation of the data.  You would

9    agree with me that the authors, the NIH authors,

10   disagreed with your -- disagreed with the conclusions

11   that are drawn from the data; true?

12   A.   I -- not necessarily.  That's not exactly what

13   I'm saying.  They are not reporting everything --

14   Q.   Okay.

15   A.   -- in this -- because, again, this is a thought

16   experiment because of --

17   Q.   Okay.

18   A.   -- all of the assumptions that go into agreeing

19   to a scenario to actually perform the rest of the

20   analysis.

21   Q.   Let's go back to the study.  Exposures, on

Page 200

1    page 2.  The initial personal care product questionnaire

2    focused on two specific time frames: age 10 to 13, and

3    12 months before enrollment.

4        We have no disagreement about that; right?

5    A.   That's correct.  I've seen the initial

6    questionnaire.

7    Q.   The second thing is, "More detailed information

8    about the use of douche and genital talc was obtained in

9    the fourth follow-up questionnaire."

10       And that's on page 3, the first sentence;

11   correct?

12   A.   Yes.  Administered 2017 to 2019.

13   Q.   Okay.  And it says -- they acknowledge "data on

14   intimate care product use was sometimes contradictory or

15   missing"; correct?

16   A.   That's correct.

17   Q.   And they used quantitative bias analysis to

18   implement different approaches for imputing exposure to

19   women who initially reported never use but did not

20   complete the follow-up questionnaire.  These comparisons

21   were crucial for understanding potential biases, as

Page 201

1    women with incident cancers were overrepresented in the

2    undefined group"; correct?

3    A.   So we just looked at the quantitative bias

4    analyses and figures --

5    Q.   I'm just asking you what they said.

6    A.   That's what they say.  Yes.

7    Q.   Okay.  And sometimes the reason why they

8    couldn't do a follow-up questionnaire is because the

9    patient died; right?

10   A.   Or just didn't answer it.

11   Q.   Or didn't answer; right?

12       And so trying to figure out impute data is

13   something that is typically done.  That's what you've

14   talked about before; correct?

15   A.   It is a strategy to try to get at missing data.

16   Q.   It's not unscientific is my question.

17   A.   It is not unscientific.  It's actually very

18   scientific.

19   Q.   Okay.

20   A.   But the methods and assumptions that go into the

21   imputation of data are critical.

51 (Pages 198 - 201)

Page 202

1    Q.   Okay.  Now, under statistical analysis, it says,
2    "Estimating hazard ratios for ever verse never use we
3    considered the effects of frequent use, long-term use,
4    and used during specific time range -- specific age
5    periods."
6        You have no problem with them doing that, do
7    you?
8    A.   That seems pretty reasonable.
9    Q.   Okay.  The quantitative bias analysis,
10   category four, contradictory data correction with
11   multiple imputation or missing, undefined data.
12       Do you see that?  That's what they did.
13   A.   Well, they did four different -- four different
14   scenarios.
15   Q.   Right.
16       But the fourth one was contradictory data
17   correction with multiple imputation or -- of missing or
18   undefined data?
19   A.   That's correct.
20   Q.   Okay.  In the discussion section, it says,
21   "Using newly collected data on intimate care products

Page 203

1    used in a large cohort of U.S. women, we found evidence
2    supporting a positive association between ever genital
3    talc use and incident ovarian cancer."
4        I assume you disagree with that?
5    A.   I had a difficult time getting to the
6    discussion.  Can you just point me where that is so I
7    could look at it?
8    Q.   It's page 13.
9    A.   I know.  But what --
10   Q.   Under the first sentence under "discussion."
11       "Using newly collected data on intimate care
12   product use in a large cohort of U.S. women, we found
13   evidence supporting a positive association between
14   genital talc use and incident ovarian cancer."
15       And I assume you disagree with that?
16   A.   So the results of their scenario four suggest
17   that because there's a hazard ratio of 1.82 with a
18   confidence interval that does not go -- does not
19   cross 1.
20       However, in order to accept scenario four, there
21   are a lot of assumptions that go into that, and it's --

Page 204

1    and my opinion is that is a red flag when scenario four
2    dramatically is different than scenario one and two.
3    Q.   They go on to say on the second paragraph -- so
4    I assume you disagree with that sentence there?
5    A.   So we're probably being semantic with words.
6    They found evidence based on the scenario that they
7    chose.  That -- I'm not disagreeing with the number that
8    they're presenting.
9    Q.   You disagree that they chose that number?
10   A.   I'm disagreeing with -- I'm concerned with the
11   assumptions that go into a choosing of that number.
12   Q.   The next one I want to ask you about is it
13   says -- it says -- next column, third paragraph down,
14   "Our findings of a positive association between genital
15   talc use and ovarian cancer are consistent with previous
16   studies.  Pooled analyses or meta-analyses of case
17   control studies have reduced odds ratios of 1.2 to 1.4."
18       I assume you -- do you agree with or disagree
19   with that?
20   A.   So, I mean, if we're looking at pooled analyses,
21   you know, that number in general has landed in the 1.3

Page 205

1    range.  But, you know, those are mainly related to the
2    case control studies.
3    Q.   Well, she's -- they're saying here, "Our
4    findings in this cohort study are consistent with that."
5        And do you agree with that or disagree with
6    that?
7    A.   Again, I'm -- there are four different scenarios
8    that they -- that they're proposing, and what they're
9    referring to is scenario four --
10   Q.   Okay.
11   A.   -- which I have concern with.
12   Q.   Okay.
13   A.   And -- because of all of the things that we
14   talked about before.
15   Q.   Now, it then goes on to say -- and this goes
16   back to O'Brien 2020 -- that "the hazard ratio from a
17   pooled analysis of prospective cohort studies also
18   indicated a positive, albeit small, association.  And as
19   previously noted, this effect estimate is likely biased
20   towards the null because of nondifferential and
21   misclassification exposure."

52 (Pages 202 - 205)

Page 206

1    See that?

2    A.   I do.

3    Q.   And they're referring to O'Brien 2020; right?

4    A.   They are.  But, you know, these authors are just

5    saying a positive small association and just stating the

6    hazard ratio and not the confidence interval which

7    flanks one, which is --

8    Q.   And they're also saying it probably

9    underestimates it because of nondifferential

10   classification; correct?

11   A.   Well, I see what they're saying, but I don't

12   know how they come about that.

13   Q.   All right.  But they've been pretty consistent.

14   We looked at the letter to the editor.  We've looked at

15   the various other articles they've wrote characterizing

16   their results in O'Brien 2020.

17       And this is fully consistent with what they've

18   been saying all along; right?

19   A.   Well, nondifferential misclassification usually

20   does bias towards the null, but there's -- there's no

21   provided evidence to suggest that nondifferential

Page 207

1    misclassification is actually happening.

2    Q.   Okay.  Now, you say -- in your report, you refer

3    to the prior paragraph here.

4        It says, "These results do not establish

5    causality," and you kind of stop there.

6        When -- you see that quote that you have here?

7    MR. BISHOP:  What page are you referring to?

8    MR. TISI:  Page 13 of the report.

9    BY MR. TISI:

10   Q.   And it says -- it says, "I agree with the

11   authors.  However, the extent to which they say these

12   results do not establish causality and do not implicate

13   any specific cancer-inducing agent?"

14       Do you see?  That's the last sentence of your

15   section on O'Brien; right?

16   A.   Yes.  That's correct.

17   Q.   And that's the first sentence of that paragraph;

18   true?  The first sentence of the paragraph in O'Brien

19   2024 on the top of page 13 on the right-hand side.

20   A.   I'm sorry.  I was looking at my report.

21       Yeah.  It's the last sentence of the first

Page 208

1    paragraph on 34 on my report and the first sentence of

2    page 13, second paragraph, second column.

3    Q.   But they explained what they meant by that in

4    the next couple sentences in the report; right?  In the

5    article; correct?

6        They say, "Those reporting talc use could be

7    recalling products that contained talc, cornstarch, or a

8    mixture, and women may have used different products at

9    different times.  Some talc may have been contaminated

10   with asbestos or other potentially harmful chemicals,

11   such as phthalates or parabens.  Chronic irritation of

12   the ovaries or fallopian tubes from talc or talc-like

13   products could potentially contribute to" -- I can never

14   say that word -- "carcinogenesis"; right?

15   A.   I mean, those are all hypotheses.

16   Q.   Right.

17       And what they're saying is even though they find

18   that talc -- they're finding that cosmetic powders are

19   associated with ovarian cancer, they can't pinpoint

20   exactly which of the constituents of the powder is the

21   culprit; true?

Page 209

1    A.   No.  What they're saying is these -- the results

2    of this study do not establish causality and do not

3    implicate any specific cancer-inducing agent, regardless

4    of what's in the cosmetic talc.

5    Q.   Well, they actually say in later -- in the last

6    paragraph of the study, they reiterate that point over

7    again.

8        They say, "Overall, our findings support" --

9    last paragraph -- "the hypothesis that there is a

10   positive association between genital talc use and

11   ovarian cancer incidence, although they do not pinpoint

12   a specific cause or mechanism."

13       Do you see that?

14   A.   I do, yes.

15   Q.   Okay.  And so what -- I mean, I'm trying to

16   paraphrase here because I'm trying to understand what

17   they're saying.

18       They're saying is, look, there is an overall

19   association in our view.  We just can't tell you which

20   of the constituents might be the culprit; true?  If you

21   look at those two together.

53 (Pages 206 - 209)

Page 210

1   A.   I mean, they're saying different things.  The
2   paragraph -- second paragraph on page 13 says, "These
3   results do not establish causality and do not implicate
4   any specific cancer-inducing agent."
5       That -- I don't know how it could be any
6   clearer.  They're saying that there's no causality.
7   Q.   Okay.
8   A.   In this study.
9   Q.   Well, let's see --
10  A.   And now they're saying the last thing, "Overall,
11  our findings support a hypothesis" -- the hypothesis
12  that there's an positive association between genital
13  talc use and ovarian cancer incidence, although they do
14  not pinpoint a specific cause or mechanism.  And that's
15  only if you assume that they're scenario four is --
16  Q.   Okay.
17  A.   -- with all of its assumptions, which none of
18  them are based on anything.
19  Q.   All right.  So let's talk about your -- on
20  page 32 of your report, you say, "Table A2 represents
21  the prospective data without imputation of missing

Page 211

1   data"; correct?
2   A.   That is correct.
3   Q.   Okay.  And you say that, "This data, which is
4   fully prospective, is the most reliable"; correct?
5   A.   I didn't say that it was the most reliable.  I
6   said it's highly relevant and central to the
7   interpretation of the results of this study.
8   Q.   The fully prospective data is in the first
9   column on page -- of this table A2; right?
10  A.   There are two columns of fully prospective data.
11  One is the first column, and then the third column is
12  also fully prospective data of incident ovarian cancer
13  cases.
14  Q.   And --
15  A.   Both of which show that there is not a
16  statistically significant association between cosmetic
17  talc use and ovarian cancer.
18  Q.   That's assuming that statistical significance is
19  the cut point for an association and not?  We won't go
20  back over that.  But that is your assumption; correct?
21      MR. BISHOP:  Objection.  Mischaracterizes his

Page 212

1   prior testimony.
2       THE WITNESS:  That's not an assumption.  That
3   is -- that is -- that is practice.
4   BY MR. TISI:
5   Q.   You know that people disagree with you on that;
6   correct?  Including O'Brien.
7   A.   I think we've talked about this in the past.
8   Q.   Right.
9       But you know that people disagree with --
10  that's -- the statement you just made assumes that there
11  is a cut point on statistical significance; right?
12  A.   In order to -- for studies not to be chaotic,
13  there is a reason for statistical significance.
14  Q.   Now, would you agree with the statement that the
15  reliability of fully prospective cohort data is fully
16  dependent on whether the women in this study were
17  properly characterized as users or nonusers in the first
18  instance?
19  A.   Can you read that -- can you say that again?
20  Q.   Yeah.
21      Do you agree -- do you agree that the

Page 213

1   reliability of the fully prospective cohort data is
2   dependent upon whether the women were properly
3   characterized as users or nonusers at enrollment?
4   A.   I would say that in a cohort study, when you are
5   collecting information prospectively, it is important to
6   properly characterize someone as exposed or unexposed,
7   whatever outcome you're looking at.
8   Q.   Okay.  And so in this case, in the Sister Study,
9   the initial questionnaire that we have been talking
10  about left out, potentially, decades of potential use;
11  true?
12      MR. BISHOP:  Objection.  Asked and answered.
13      THE WITNESS:  In the original Gonzalez --
14  BY MR. TISI:
15  Q.   Yes.
16  A.   -- study, yes.  There was the possibility of
17  that.
18  Q.   All right.  And so do you fault the O'Brien
19  authors for trying to collect additional data for the
20  potentially decades of missing data between the ages
21  13 and 12 months before whatever day they enrolled?

54 (Pages 210 - 213)

Page 214

1    A.    You know, I'm not aware of whether or not
2    Dr. O'Brien is involved in the -- the putting forth the
3    questionnaires.  But -- I'm just --
4    Q.    Not to quibble with you here.  Let me --
5    A.    I'm just getting at, like, the --
6    Q.    Let me withdraw it and rephrase the question.
7          Do you quibble at all with the authors
8    recognizing that there's a big hole in the initial
9    questionnaire of trying to collect additional data about
10   what happened between age 13 and 12 months before the
11   time in which they the enrolled in the Sister Study?
12   A.    I hear what you're saying.  No, I do not.
13   And --
14   Q.    Okay.
15   A.    -- the addition -- I just don't have any
16   information on who created or who decided to have the
17   follow-up questionnaire.
18   Q.    Okay.  So if you go to the study on page 13,
19   that's why they did it; right?  That's why they did the
20   initial questionnaire -- the additional questionnaire;
21   right?

Page 215

1    A.    Where are you referring?
2    Q.    I'm looking for it.  Page 13 of the article.
3    Okay.  I can't find it in here.  I know it's in here,
4    but I'll just move on.
5          MR. BISHOP:  Is this a good time to take a lunch
6    break?  Or do you want to --
7          (Off the record.)
8    BY MR. TISI:
9    Q.    Let's kind of use a concrete example; right?
10   Because I want the record to kind of like make sense to
11   somebody who reads this, because this is heavy stuff
12   here.  Okay?
13          So if I enroll -- if a woman gets enrolled at
14   50 years old in an original -- let's call her
15   Mrs. Smith.  She gets enrolled in the study at age
16   50 years old; right?
17          The initial questionnaire asks her, "Were you
18   ever exposed to talc at ages 10 to 13 or 12 months
19   before the study?"
20          If she can answer that question truthfully,
21   she'd say no.  But there's also the possibility of her

Page 216

1    using talc in her 20s and 30s and up until 49 years old;
2    right?
3    A.    And her to answer that she never used it?
4    Q.    That she never used it.
5    A.    It's possible.
6    Q.    And getting -- and she would be characterized --
7    if, in fact, that hypothetical happened and she used
8    talc for 25 years but that wasn't captured in the
9    original questionnaire, she would be characterized as a
10   nonuser, and that would be untrue; right?
11   A.    That is a possibility.  Yes.
12   Q.    And that's why the authors asked the additional
13   questions on the supplemental questionnaire; right?
14   A.    Well, again, I don't know if the authors decided
15   to create a supplemental questionnaire or the
16   supplemental questionnaire was created and then the
17   authors said, "Hey, we've got this supplemental
18   questionnaire.  Let's try to use it now."
19   Q.    Okay.  Now, if -- on contradictory data
20   correction, if you get new information in a cohort study
21   that shows that somebody was improperly characterized as

Page 217

1    being exposed -- not exposed but you subsequently learn
2    that they are exposed, wouldn't it be scientifically
3    inappropriate not to address that question?
4    A.    So that's part of the contradictory data
5    correction that was used.
6    Q.    And you have no problem with that?
7    A.    No.  Because the issue is if in the first
8    questionnaire somebody took it when they were 30 and
9    they said, "No.  I didn't use it when I was 12 or 13 or
10   when I was 13 to 15," whatever, 13 years old and, "No.
11   I'm not using it within the 12 months prior,"
12   30-year-old, but then they're asked in the follow-up;
13   right?  And they say, "Yes.  I used it when I was in my
14   20s, my 30s, my" -- that's contradictory data.
15   Q.    Right.
16   A.    And if it is age appropriate, then --
17   Q.    Well, it's not contradictory data because it
18   doesn't contradict what they said.  It contradicts the
19   category in which they were placed; right?
20   A.    That's semantic.  I mean, that's saying the same
21   thing.

55 (Pages 214 - 217)

Page 218

1    Q.   No, it isn't.  No.  Let's be fair here.  Okay?
2        If they said that they -- if they were asked
3    specific questions about their talc use and they were
4    not -- and the study authors, the study investigators
5    characterized them as nonusers, they would not -- were
6    not nonusers if they used in their 20s, 30s, and 40s.
7    The investigator simply didn't ask the right question;
8    right?
9    A.   So I think we're talking about two different
10   things.  I'm talking about once the supplementary
11   questionnaire is used --
12   Q.   Okay.
13   A.   -- and then there's differences in what someone
14   reports in the first one and the second one.  That's --
15   Q.   But it's not different.  That's what I'm trying
16   to get at here.
17       If somebody says -- if I say I was exposed at
18   age -- I was not exposed at age -- I'm 63.  I was not
19   exposed -- between age 10 and age 13, and I wasn't
20   exposed at 62 to 63; right?  I answered those questions
21   honestly; right?

Page 219

1        If they asked a supplemental questionnaire that
2    asks me did you use the product in my 40s and 50s and I
3    answer yes, that's not contradicting my original answers
4    in the questionnaire.  That just provides supplemental
5    information that wasn't asked in the first place; right?
6    A.   But when you look at that, someone would be --
7    if you just went on the first questionnaire labeled
8    unexposed and if you just went on the follow-up
9    questionnaire labeled as exposed -- so the authors had
10   an analysis planned to deal with that potential
11   contradiction in the reporting because it's different
12   data, because someone is labeled unexposed at first and
13   then exposed.
14   Q.   Do you have any problem with them looking and
15   saying, you know, on retrospect, we now know they were
16   exposed, we're going to take them out of the unexposed
17   group and make them exposed?
18   A.   Only with the extreme.  And that's scenario
19   three where the unexposed, all of the missing data was
20   labeled as exposed.  And that -- that's actually the
21   extreme of an imputation, where you --

Page 220

1    Q.   But they did that just to see --
2    A.   As a thought experiment.
3    Q.   -- what the outer bounds are; right?
4    A.   That's right.  And that's the thought experiment
5    here.
6    Q.   Right.
7    A.   And then they designed scenario four with a lot
8    of assumptions in it to create that, whereas the bounds
9    are likely -- you've got scenario three where everyone
10   is labeled.  You've got scenario one where there's some
11   missing data and imputations.  And then you got scenario
12   two which is kind of in between.
13   Q.   And --
14   A.   And then you have A2 with column 1, and you've
15   got A2 with column 3 fully prospective in line with the
16   cohort studies from previous.
17   Q.   So -- and that's why they did number four.
18   That's why they did scenario number four was to try to
19   correct for the extremes in scenario number 3; right?
20   A.   Scenario 3 is complete differential
21   misclassification of exposure, which is why the hazard

Page 221

1    ratio is so high.
2    Q.   And that's why they did the correction in
3    number four; right?
4    A.   They did corrections in one, two, and four, and
5    my concerns with four, there are a lot of assumptions
6    that go into that to create scenario four.
7    Q.   How many women in O'Brien who are missing in
8    enrollment were missing on follow-up?
9    A.   I don't have the study memorized.  I'd have to
10   look at it.
11   Q.   How many women were identify as nonusers on the
12   initial restrictive questionnaire that did not provide
13   follow-up information or could not because they died?
14   A.   Again, I don't have -- I mean, this is a very,
15   very complicated paper.  I don't have the numbers.
16   Q.   If I told you 37, does that make sense?
17   A.   I know that there's a table.  I just don't have
18   them memorized.  And it looks like we're talking about
19   table -- not this one.  It's the supplemental table.
20   Q.   All right.
21   A.   And it would be helpful to look at.  Yeah.  It

56 (Pages 218 - 221)

Page 222

1  looks like it's supplemental table A5.
2      Q.   And this is called missingness in epidemiology;
3  right?
4      A.   I guess.  I mean, we just call it missing data.
5      Q.   And the method to deal with missingness and the
6  way to deal with this is known as is multiple
7  imputation; correct?
8      A.   That is one of the strategies to deal with
9  missing data.
10     Q.   And multiple imputation is fully described in
11  the literature; correct?
12     A.   I mean, it's described in the literature.  It's
13  taught in classes and it's --
14     Q.   In fact, it's --
15     A.   -- performed with statistical packages.
16     Q.   Right.
17        And is single imputation or multiple imputation
18  more reliable?
19        MR. BISHOP:  Objection to form.  Vague.
20  Overbroad.
21        THE WITNESS:  So it really depends.  It depends

Page 223

1  on the variables that you're trying to impute.  If we
2  use the example of lung function, you may just have to
3  just impute that one variable, and your one time doing
4  that would be a single imputation.
5  BY MR. TISI:
6      Q.   Okay.
7      A.   Multiple imputations would involve doing it a --
8  like, a whole repetition of times, 100 times, and if all
9  100 come out of, that kind of thing, or ten times.
10     Q.   In a study like this, do you quibble with the
11  use of multiple imputation to deal with the question of
12  missingness?
13     A.   In a study like this, multiple imputation would
14  be a way to try to get at missingness.
15     Q.   And just to be clear, when a statistician
16  applies multiple imputation to a missing data, a
17  statistician doesn't know ahead of time how that will
18  affect the hazard ratio, does it -- do they?  It can
19  either attenuate the risk or exaggerate the risk?
20     A.   So I'm going to say it depends because the first
21  step in performing an analysis where you're looking at

Page 224

1  missing data is to compare the groups.  And if
2  someone -- if you have a group of nonmissing data and
3  you have a group of -- with missing data, if those
4  groups are very different, then you're -- you're likely
5  to get differences in your point estimate regardless of
6  what kind of imputation strategy you use is.
7      Q.   My question is different.
8        Before the statistician applies multiple
9  imputation, do they know -- can they predict ahead of
10  time whether or not it will attenuate and exaggerate a
11  risk?
12     A.   And I'm going to answer the same way, because
13  that's not a multiple imputation.  That is a -- the
14  beginning of performing an imputation analysis.  And if
15  they're dramatically different, then there's an issue.
16  And that wasn't done in this paper.
17     Q.   I didn't mean to interrupt.  I'm sorry.
18     A.   I'm done.  Thanks.
19     Q.   Okay.  At the bottom of page 2 of your first
20  concern, you say, "Imputation strategies are often used
21  to help provide some reassurance to support and

Page 225

1  strengthen association when the association actually
2  exists," and then you talk about the red flag.
3        Are you talking about single imputation or
4  multiple imputation or both?
5      A.   I -- in general, I'm talking about an imputation
6  strategy.  When it changes things dramatically, it has
7  to cause pause for reflection.
8      Q.   Do you know -- do you have any paper or article
9  to support your position that it is only used to
10  strengthen an association when an association actually
11  exists, or is that just your experience?
12     A.   That's my experience and training.  Yes.
13     Q.   Do you know whether or not that's supported in
14  the literature?
15     A.   I don't.  But I've got 20 years of practice.
16     Q.   On page 4 of the article, it talks about why
17  they did multiple imputation and it talks about
18  footnote 4.  Footnote 4 is a study -- excuse me -- is a
19  study -- author by the name or Royston.
20        You see that?
21     A.   I don't.  You're on page what?  I'm sorry.

57 (Pages 222 - 225)

Page 226

1    Q.   I'm sorry. I'm finding it here. Hold on a
2    second. Article on page 4.
3        MR. BISHOP: While he's looking, the important
4    thing is whether the court reporter and you need a break
5    for lunch or whether you want to proceed without lunch.
6    It's really not important whether Counsel --
7        MR. TISI: Yeah, no. I agree with you. I
8    thought we were...
9        MR. BISHOP: That's fine. I asked him. And
10   the --
11       THE WITNESS: Are you okay?
12       (Recess taken.)
13   BY MR. TISI:
14   Q.   So I found what I was looking for. On the study
15   itself, it talks about -- on page 4, at the top right,
16   it says, "We did this for each, ten copies of data
17   summarizing hazard ratios using -- at 95 percent
18   confidence intervals using Rubin's rules."
19       Do you see that?
20       MR. BISHOP: I showed him where it is.
21       THE WITNESS: I do, yes.

Page 227

1    BY MR. TISI:
2    Q.   And that involves multiple imputation; correct?
3    A.   Yes. That would be considered multiple
4    imputation.
5    Q.   If you look at the back of the study, they cite
6    an article by White and Royston in support of that.
7        Do you see that? It's footnote 31.
8    A.   Yeah. Looks like it's a chapter of a book.
9    Q.   I'm going to show you that and make that
10   Exhibit Number --
11       MS. PARFITT: That is Exhibit Number 20.
12       MR. TISI: 20.
13       (Deposition Exhibit 20 was marked.)
14   BY MR. TISI:
15   Q.   Have you seen that article before? And I
16   actually highlighted the parts that I'm going to ask you
17   about.
18       Do you see the article? It's called "Imputing
19   Missing Covariate Values for the Cox Model," and they
20   used this as the -- as the authority to support what
21   they were doing?

Page 228

1    A.   Yes. But you're referring to 32; right?
2    Q.   Yes.
3    A.   Instead of 31?
4    Q.   I think it's 32. It's -- 32. Right. Right.
5    And they -- let's just talk about this article. Just
6    cite it. This is Imputing Multiple [sic] Covariant
7    Values for the Cox Model by Wright and Royston.
8        And if you look at the summary, is there any
9    limitation to using multiple imputation where there is
10   only to support evidence of an association?
11   A.   Well, number one, I've never read this article.
12   I'm not familiar with it. I am familiar with multiple
13   imputation in using the Cox model, but I would have to
14   read this article to comment on it.
15   Q.   And you had not looked at the article that they
16   actually cited in support of what they did to see
17   whether or not your assertion -- un-cited assertion that
18   it's only used to strengthen association was valid?
19   A.   Can you ask that again?
20   Q.   Yes.
21       You did not look at the article that they cited

Page 229

1    to see whether they appropriately used multiple
2    imputation to correct this particular data?
3    A.   I did not specifically look at this article.
4    I did look at this paragraph which describes how they
5    performed the multiple imputation for the fourth
6    scenario.
7    Q.   The next article that I want to ask you about is
8    number --
9        MS. PARFITT: 21.
10       MR. TISI: 21.
11       (Deposition Exhibit 21 was marked.)
12   BY MR. TISI:
13   Q.   And this is an article in JAMA by, among others,
14   Elizabeth Stuart, who is the chair of the department of
15   biostatistics.
16       Have you --
17       MR. BISHOP: Do you have one more copy?
18       MR. TISI: What?
19       MR. BISHOP: I gave him --
20       MR. TISI: Oh, I'm sorry.
21       MR. BISHOP: All right.

58 (Pages 226 - 229)

Page 230

1  BY MR. TISI:
2     Q.   Have you seen this article?
3        MR. BISHOP:  Thanks.
4        THE WITNESS:  Not to my recollection.  No.
5  BY MR. TISI:
6     Q.   I'm going to ask you -- I'm going to tell you
7  that I have tried to search as many different articles
8  as I could think of on multiple imputation, and I have
9  never seen the limitation that you placed on it that you
10 would only use it when -- to strengthen an association.
11       Are you telling me that there is such an
12 article?
13       MR. BISHOP:  I'm sorry.  I'm just going to
14 object to the comments of counsel.
15       THE WITNESS:  So --
16 BY MR. TISI:
17    Q.   Other than your experience -- I understand
18 you're experienced.
19    A.   Yeah.
20    Q.   I just want to know a textbook, an article,
21 literature, any place where anybody with expertise in

Page 231

1  biostatistics has indicated that you only use it to
2  strengthen association and if you use it any other
3  place, it raises a red flag?
4     A.   So let me just read what I said.
5        Imputation strategies are often used to provide
6  some reassurance to support and strengthen association
7  when that association actually exists.
8        That is -- I'm saying that it provides some
9  reassurance, meaning that if you have a lot of missing
10 data --
11    Q.   Well, you didn't finish what you wrote.  So
12 let's keep -- "when the data without imputation shows no
13 clear association, as in this study, and data with
14 imputation suggests otherwise, this inconsistency is a
15 clearly a red flag."
16       I haven't seen anything in the literature that
17 I've been able to find that would support that
18 statement.  You don't make a citation to it.  And other
19 than your experience, could you tell me where that is?
20       MR. BISHOP:  Same objection.
21       THE WITNESS:  I'm going to stand by my

Page 232

1  experience because --
2  BY MR. TISI:
3     Q.   Okay.
4     A.   -- because we use multiple imputation to handle
5  missing data.  And when you get two clearly different
6  results based on whether you impute or not, that is a
7  red flag.
8     Q.   Let's talk about one of the things that -- and
9  that's your opinion.  You hold that to a reasonable
10 degree of scientific certainty, even without a citation?
11    A.   Absolutely.
12    Q.   Okay.  Now, unmeasured confounding, you -- the
13 authors say that they can't rule out unmeasured
14 confounding; correct?
15    A.   That's what they say.
16    Q.   All right.  They don't think it's recall bias
17 but they say, "Risk could theoretically be the result of
18 unmeasured confounding"; true?
19    A.   Can you point to where we're looking at on the
20 paper?
21    Q.   I mean, I can go back.  It's the very last --

Page 233

1  actually, where I got that from is in the box.  On
2  page 2, the relevance in the box right here.
3        It says, "These findings support the hypothesis
4  that there is a positive association between genital
5  talc use and development of ovarian cancer, but
6  unmeasured confounding could still be present."
7        Do you see that?
8     A.   I do.  That's written by the associate editor.
9     Q.   Do you agree with that statement?  Do you think
10 confounding is a more -- let me --
11       Apart from the theoretical possibility, do you
12 think confounding is a realistic -- unmeasured
13 confounding is a realistic explanation for this data?
14    A.   Unmeasured confounding is always a concern --
15    Q.   Right.
16    A.   -- in studies.
17    Q.   How likely is it a concern here is what I'm
18 trying to say.
19       In your view, is it more likely than not that
20 this would -- that these results related to confounding?
21    A.   Which results are you talking about?

59 (Pages 230 - 233)

Page 234

1    Q.    The results of the study.

2    A.    Yeah, but which scenario?

3    Q.    I'm testing -- I'm testing that these findings

4    support the hypothesis that there's a positive

5    association between genital talc use and the development

6    of ovarian cancer, but unmeasured confounding could

7    still be present."

8        And I'm asking you:  A, do you believe that

9    unmeasured confounding could explain scenario four?  And

10    if you do, how big would that confounder have to be in

11    order to explain a relative risk -- a hazard ratio of

12    1.81?

13    A.    Could residual confounding affect any of these

14    scenarios?  Sure.

15    Q.    Okay.

16    A.    Because you're not asking these research

17    subjects every question known to humankind.

18    Q.    Right.

19        And I'm asking you how likely -- I mean, other

20    than that it's a theoretic possibility, how likely would

21    it be that there would be an unmeasured confounder that

Page 235

1    would explain these results?

2    A.    So there's no way that anyone could say a

3    percentage.

4    Q.    Okay.

5    A.    But what I can say is when the point estimate is

6    weak, like 1.8 or 1.1, the probability of unmeasured or

7    residual confounding contributing to that is very, very

8    high.  If the relative risk hazard ratio was 20, I would

9    say it's very, very unlikely.

10    Q.    How many things have a relative risk of 20?

11    A.    The pulmonary hypertension study that's in my

12    report.  I mean, that's a -- that's a case control study

13    too that --

14    Q.    You're talking about the Oppenheim study?

15    A.    I can't remember the first -- but it's the

16    Phenaphen study looking at pulmonary hypertension

17    development.  There's a clear dose response curve.

18    There's an increase in the odds ratio to 6 that goes to

19    23.  That's pretty high.  How common is that?  It's not

20    common, but when it's --

21    Q.    I wish I could have you in the Phenaphen

Page 236

1    litigation, because they would saying it was a

2    ridiculous study.  So let's -- we can move on from

3    there.

4        But let's go back to this.  How big would the

5    confounder in terms of magnitude have to be to explain

6    an 80 percent increased risk that is predicted in this

7    study on scenario four?

8    A.    It would just have to be linked to the exposure

9    and linked to the outcome and not related to the causal

10    pathway.

11    Q.    And so the magnitude -- you would not have to

12    have an assessment of the magnitude of that risk

13    provided by that confounder to explain a 1.8?  What I'm

14    trying to get at here -- had to be a pretty significant

15    confounder to explain a 1.8 relative risk, wouldn't it?

16    A.    It depends what you mean by "significant."

17        If you go back and look at the studies looking

18    at the risk of pancreatic cancer and coffee drinking,

19    and what it just turned out to be is that more coffee

20    drinkers were smokers and that was the reason for the

21    pancreatic cancer development and it had nothing to do

Page 237

1    with coffee drinking.  It's just that smoking is related

2    to pancreatic cancer, and smoking is related to coffee

3    drinkers.

4    Q.    One more study -- one more thing on O'Brien 2024

5    is an editorial by Harris.

6        Have you seen that?

7    MS. PARFITT:  22.

8    THE WITNESS:  Yes.

9        (Deposition Exhibit 22 was marked.)

10    BY MR. TISI:

11    Q.    You don't refer to it in your study.  I assume

12    that's because you don't agree with it; true?

13    A.    No.  That's not why I didn't include it.

14    Q.    Okay.  Why didn't you include it?  You included

15    Gossett you included -- a discussion of Gossett which

16    supported your opinion, but you didn't include -- you

17    didn't include Harris which does not; true?

18    A.    I may have seen this after I turned in my

19    report.

20    Q.    Okay.  The very bottom of the first page, it

21    says, "In this paper, even with misreporting of the

60 (Pages 234 - 237)

Page 238

1  exposure, i.e., genital powder use, in half the cases, a
2  significant increase in ovarian cancer risk is still
3  observed, adding support to the plausibility of a true
4  association between genital powder use and ovarian
5  cancer risk."
6      Do you disagree with that?
7  A.  Well, I mean, I don't know what they're
8  referring to, because if you look at figure 2,
9  section A, if there's a reduction by 50 percent, even if
10  you agree with the assumption of using the hazard ratio
11  of 1.82, the hazard ratios falls to be more consistent
12  with previous studies of 1.17.  So I don't know what
13  they're referring to there.
14  Q.  Okay.  Did you make any effort to figure that
15  out?
16  A.  Other than my interpretation of figure 2 and
17  what they say -- and, again, this is an editorial.
18  Q.  Next -- just like Gossett was?
19  A.  Well, I actually did further calculations than
20  in the Gossett study that -- I don't necessarily agree
21  with 100 percent sure of what's in that editorial.

Page 239

1      I think that -- that the power calculations
2  actually are more supportive of no causal association
3  than in the Gossett paper.
4  Q.  On page 2, it says on the left-hand side, the
5  lack of -- the very last sentence.  It says, "The lack
6  of an association between genital talc powder use and
7  uterine cancer provides additional support that recall
8  bias does not fully explain the genital powder and
9  ovarian cancer association."
10      I asked you that question before, looking at the
11  table.  I assume you would disagree with these authors
12  on that point?
13  A.  I'm sorry.  I just can't find the sentence that
14  you read.
15  Q.  Yeah.  Last sentence.  Last sentence on the
16  left-hand side paragraph on page 2.  It says, "The lack
17  of an association between genital powder use and uterine
18  cancer provides additional support that a recall bias
19  does not explain the genital powder and ovarian cancer
20  association."
21      Do you see that?

Page 240

1  A.  I do.
2  Q.  And I asked you about that question before
3  looking at the table with breast cancer, ovarian cancer,
4  and uterine cancer.
5      Do you disagree with what they're saying here,
6  that that mitigates against recall bias being the
7  explanation for what they saw?
8  A.  I do disagree with that.
9  Q.  Okay.
10  A.  I mean, recall bias is a -- a based on someone's
11  recollection that they were exposed to a -- to
12  something, an exposure, that they have a sense that that
13  causes an outcome.  And there's nothing in the
14  literature or in the -- or in general conversation that
15  cosmetic talc and uterine cancer are associated.
16  Q.  One other study that you referred to is Chang,
17  and I want to ask you a couple questions about Chang.
18  A.  Sure.
19  Q.  You talk about that.  Chang and supplemental
20  tables, which are -- I'm going to make this Exhibit
21  Number 23.

Page 241

1      MR. BISHOP:  23.
2      MR. TISI:  These have to be put together.  So --
3      MS. PARFITT:  Here, Chris.
4      MR. TISI:  These should be together.
5      Here's your copy.
6      THE WITNESS:  Thanks.
7      (Deposition Exhibit 23 was marked.)
8  BY MR. TISI:
9  Q.  All right.  This is a study you referred to, and
10  you indicate that there is a nonstatistically
11  significant hazard ratio of 1.06 with a confidence
12  interval of .91 to 1.24.
13      Do you see that?
14  A.  I do, yes.
15  Q.  That's taken from one of the supplemental tables
16  that's in this study?
17  A.  I would have -- I don't have it memorized,
18  but -- I'd have to find it in there.
19  Q.  I'll help you with it.
20      This is another study from the NIH researchers,
21  including Drs. O'Brien and Sandler; correct.

61 (Pages 238 - 241)

Page 242

1    MR. BISHOP:  Do you have an extra copy?
2    MR. TISI:  I'm sorry.
3    MR. BISHOP:  I thought I had one handy, but --
4    MR. TISI:  I thought I gave it to you, but --
5    MR. BISHOP:  Yeah, no problem.
6    BY MR. TISI:
7    Q.    This is another study by the NIH authors,
8    O'Brien and Sandler; right?
9    A.    Both O'Brien and Sandler are coauthors.  Yes.
10    Q.    And what was the purpose of this study?
11    A.    The title says "Use of Personal Case Product
12    Mixtures -- Personal Care Product Mixtures and Incident
13    Hormone Sensitive Cancers in the Sister Study, a
14    U.S.-wide Prospective Cohort."
15    Q.    Okay.  So this is also data from the Sister
16    Study from Dr. O'Brien and Sandler; right?
17    A.    It's an analysis of data from the Sister Study,
18    and they are coauthors.
19    Q.    Now, one of the things that you talk about here
20    in your analysis of Chang is that there was a 1.06
21    relative risk.  But that wasn't for overall use.  That

Page 243

1    was for what we call one-frequency category; right?  I
2    can point you to the table, if you -- if it makes sense.
3    A.    If you could, because I don't have it memorized.
4    Q.    Yes.  It's table S-5, and it's in the
5    supplemental tables that I provided you.
6        Do you see the table?  Are you in the right
7    place?  I just want make sure you're in the right table.
8    A.    I believe I am.  Yes.
9    Q.    And the title of the table is -- you've seen
10    this table before; right?
11    A.    S-5?
12    Q.    Yes.
13    A.    Yes.
14    Q.    Okay.  And the table says, "Scaled weights and
15    the association between one-frequency category increase
16    and the use of personal care products in breast,
17    ovarian, and uterine cancers from the underlying models
18    using quantile based G-computations."
19        Do you see that?
20    A.    I do, yes.
21    Q.    What is a one-frequency category?

Page 244

1    A.    Well, I don't have the Sister Study
2    questionnaire memorize, but it would be -- for a
3    categorical variable, it's the first category moving to
4    the next category.
5    Q.    And if one-frequency category applies --
6    involves one exposure, one use, like one use per week,
7    to get the risk of five use for week -- five days use,
8    you would have to multiply the 1.06; correct?  Across
9    five days.
10    A.    And -- I'm not following you.
11    Q.    Well, you would have to multiply 1.06 times 1.06
12    times 1.06 if you went up five frequency categories;
13    right?
14    A.    No.
15    Q.    You wouldn't?
16    A.    No.
17    Q.    Okay.
18    A.    No.  That's a -- that's a linear relationship.
19    And so if you move from category zero to category one,
20    there's a 6 percent increase.  If you move from
21    category one to category two, that's a 6 percent

Page 245

1    increase.
2    Q.    Okay.  And how do you --
3    A.    But that doesn't mean that going from
4    category zero to category two is a 12 percent.
5    Q.    Okay.  I didn't say it was 12 percent.  I didn't
6    say you add them together.  I said you multiply them?
7    A.    It certainly wouldn't be 36 percent.
8    Q.    Let's go to the study, page 7.  They say on the
9    left-hand side, "We observed a positive association for
10    hygiene mixture in relationship to incident ovarian
11    cancer with douche and genital talc use -- a genital
12    talc as the most important contributors to the mixtures,
13    which is consistent with both the Sister Study and other
14    studies."
15        Do you see that?
16    A.    I do.
17    Q.    They are not saying that this study supports
18    that there's no increased risk with ovarian cancer, are
19    they?  They're saying it's consistent with, among other
20    things, Wentzensen 2021 and Gonzalez 2016, which all
21    showed a positive increase; right?

62 (Pages 242 - 245)

Page 246

1    MR. BISHOP: Object to form. Compound.
2    THE WITNESS: Can you ask that again? I'm not
3  sure what you're asking me.
4  BY MR. TISI:
5    Q.   Yeah.
6       They are saying that this -- the results of this
7  study is consistent with an increase -- with an
8  increased -- with an association due to talc and ovarian
9  cancer, and they said when they said here on page 7.
10   A.   So I'm reading that this says, "We observed a
11  positive association for the hygiene mixture in relation
12  to incident ovarian cancer with douche and genital use
13  talc as the most important contributors to the mixture,"
14  which is consistent with the findings from both the
15  Sister Study and other studies referencing the ones that
16  you say.
17       However, when you actually look at the single
18  product versus the multiproduct, I have no idea how they
19  come across as saying that talc use is a major
20  contributor. It's clear that douching is a major
21  contributor, but all the others are right along the line

Page 247

1  and cross the line of nonstatistical significance.
2    Q.   Well, they use these -- they use these two --
3  these two as very closely associated, both talc use and
4  for perineal use and douching; true?
5    A.   Can you ask that again?
6    Q.   They're very closely correlated?
7    A.   They have been correlated in previous studies.
8  Yes. But -- however, in at least figure 4, there is --
9  looking at the B section, hygiene, there's both single
10  product and multiproduct use. And in both of those
11  figures, it's really that douching stands out as the
12  statistically significant covariate suggesting an
13  association between -- because -- suggesting an
14  association between this exposure and ovarian cancer.
15  I don't know how they get talc out of that.
16       (Leigh O'Dell, Esq. joined via Zoom.)
17  BY MR. TISI:
18    Q.   So you disagree with the author's
19  characterization of their own study again; right?
20    A.   Absolutely. I'm just looking at the figure.
21    Q.   Okay. No problem.

Page 248

1       PDQ, number -- you refer to the PDQ -- right? --
2  in your report? In the most recent one,
3  Exhibit Number 24.
4       (Deposition Exhibit 24 was marked.)
5  BY MR. TISI:
6    Q.   Just couple a couple questions on this.
7    A.   Sure.
8    Q.   This is the PDQ that you refer to in your
9  report, on page 39 of your report; correct?
10       Do you see that?
11   A.   I do, yes.
12   Q.   Am I right? Okay.
13       Just a couple questions on this. This NIH PDQ
14  was dated what -- was dated March 6, 2024. I think you
15  refer to that in your report.
16   A.   Yeah. It looks like mine is referenced as
17  October 2023.
18   Q.   Okay. Well, I got a more recent one here. It's
19  March of 2024.
20       This is before the most recent studies in both
21  Chang and O'Brien 2024; true?

Page 249

1    A.   Certainly before O'Brien. Chang, I can't
2  remember when that was actually published.
3    Q.   If there was -- you know, as somebody -- you
4  would agree with me, would you not, that whether you
5  agree with the conclusions of O'Brien 2024 or Chang 2024
6  as well, those are significant studies of -- coming from
7  cohort studies; correct?
8    A.   Both of them come from the Sister -- from data
9  from the Sister Study.
10   Q.   And they're important -- they're both NIH
11  studies; right? NIH Sister Study is an NIH cohort;
12  true?
13   A.   That's my recollection. I don't specifically
14  know what the funding is these days.
15   Q.   Do you -- you saw where the NIH actually listed,
16  you know -- announced that this study was an
17  important -- that O'Brien 2024 was an important --
18  showed -- I'm paraphrasing now, but it was a confirmed
19  association between talc and ovarian cancer; true?
20       MR. BISHOP: I'm object to the paraphrasing.
21  The document speaks for itself.

63 (Pages 246 - 249)

Page 250

1 BY MR. TISI:

2 Q. The documents speak for themselves.

3 They characterized it as an important study

4 enough that they issued a statement about it; true?

5 MR. BISHOP: Same objection. Calls for

6 speculation.

7 THE WITNESS: I mean, I don't put announcements

8 out through the NIH. I don't know what -- how they do

9 that or why they do that.

10 BY MR. TISI:

11 Q. Do you believe if you were writing a summary

12 like, for example, the PDQ or writing a summary of the

13 epidemiology for talc and ovarian cancer that you at

14 least have to include O'Brien 2024 as part of the

15 continuing evolution of the science?

16 A. If I were writing a report or a statement that,

17 you know, for an agency like the NIH or a review

18 article, I would certainly include the O'Brien study and

19 the Chang study in that.

20 Q. Okay.

21 A. But I would also describe the methods and --

Page 251

1 Q. Yeah. I'm not asking you to -- what you would

2 say. I'm just saying it's an important contribution to

3 the overall literature, so much so that you had to --

4 you had to spend 24 hours understanding the study and

5 including it in your expert report between -- before it

6 was filed; true?

7 A. Well, it's an important epidemiologic study that

8 needs to be considered.

9 Q. Right. And the -- as of now, the PDQ does not

10 include any discussion of that study or even Chang;

11 true?

12 A. I haven't read this newest PDQ. I just have

13 what's referenced on mine.

14 Q. Yeah. I mean, I can -- I'll represent to you

15 it's not referenced in here as well.

16 In order to be accurate and complete and

17 summarize the science, if it doesn't have reference to

18 those studies, this PDQ would be out of date; true?

19 A. Well, it depends. It depends if the science

20 changed. And Chang doesn't change my opinion and

21 neither does O'Brien.

Page 252

1 Q. I didn't say it changed your opinion. I'm

2 saying a discussion of those would be important to have

3 in a document like this; true?

4 MR. BISHOP: That is a different question. Go

5 ahead.

6 MR. TISI: Thank you. I appreciate that.

7 THE WITNESS: I don't create a document like the

8 PDQ. I don't know what goes in there. I've never done

9 that. So I -- I can't really comment on that.

10 BY MR. TISI:

11 Q. Okay. Just a couple questions about asbestos.

12 First of all, are you -- do you believe that all

13 forms of asbestos are carcinogens? Whether it be

14 chrysotile, tremolite, or any other form of asbestos,

15 are they carcinogens? Are they considered to be human

16 carcinogens?

17 A. Given the right -- given a significant amount of

18 exposure. Given exposure.

19 Q. Do you -- have you heard the phrase that "there

20 is no safe dose of asbestos"?

21 A. I think so.

Page 253

1 Q. Okay. Do you know that the FDA has, as recent

2 as, like, within the last month and a half, classified

3 chrysotile as an ovarian carcinogen and included

4 chrysotile that would be in talc mined from mines?

5 A. Can you ask that again?

6 Q. Yes.

7 Do you understand than even within the last

8 month or two that the EPA has categorized chrysotile as

9 an ovarian carcinogen?

10 Let's leave it at that. Do you understand that?

11 A. So I'm not aware of the EPA's -- whether or not

12 that's happened in the last month. I am aware of IARC

13 and their classification of asbestos as an ovarian

14 carcinogen.

15 Q. That's not what I asked, though. I asked you

16 about EPA.

17 A. So I'm not aware of that.

18 Q. Okay.

19 A. But I will say that it depends on the exposure.

20 Q. Okay. And would you ever allow any woman in

21 your family to use powder that you thought was

64 (Pages 250 - 253)

Page 254

1  contaminated with any dose of asbestos?
2      MR. BISHOP: Objection. I'm sorry. Beyond the
3  scope of this witness.
4      THE WITNESS: So as a physician and as a
5  pulmonologist and certainly as a father, we really don't
6  want anyone to be around asbestos. However, I do know
7  that there's -- there is an amount of asbestos in
8  ambient air, and that, in general, is felt to be
9  noncarcinogenic. We're all exposed to asbestos --
10 BY MR. TISI:
11     Q.   That was not my question.
12     MR. BISHOP: Let him finish.
13     THE WITNESS: It just depends on the dosage.
14 BY MR. TISI:
15     Q.   Would you ever -- if somebody use talcum powder
16 for 30 years every day -- if you had somebody in your
17 family that was using talcum powder every day that had
18 asbestos in it, would you ever allow them to use it?
19     MR. BISHOP: Object to form. Vague. I'm sorry.
20 Vague. Ambiguous. Overbroad.
21     THE WITNESS: So, again, it would depend on the

Page 255

1  theoretical concentration of asbestos in there. And
2  there have been -- there was an FDA analysis of this,
3  and there have been at least one paper looking at the
4  potential lifetime exposure to asbestos using Baby
5  Powder with various different scenarios over the
6  lifetime.
7      And given the FDA's worst case scenario
8  of .1 percent of asbestos over a 70-year lifetime, that
9  estimation is less than what one would be exposed to
10 asbestos from breathing air.
11 BY MR. TISI:
12     Q.   Let me ask you this: Do you think -- but the
13 numbers you --
14     You have provided opinions in this case that you
15 looked at the chest x-rays of the plaintiffs involved in
16 these bellwether trials; true?
17     A.   Radiology. Yes.
18     Q.   Radiology.
19     You understand that these are all ovarian cancer
20 cases; correct?
21     A.   That's correct.

Page 256

1      Q.   Would you necessarily expect to see pleural
2  thickening in women who had gotten ovarian cancer from
3  exposure to talc administered -- used for genital
4  dusting?
5      A.   So I would not expect to see pleural thickening
6  from someone who uses talc.
7      Q.   Talc with asbestos. Excuse me.
8      A.   So, again, what I would expect to see -- what
9  I was looking for was signs for asbestosis. And that
10 could either be in interstitial lung disease. It could
11 be pleural plaques, calcification. Could be pleural
12 thickening. Could be mesothelioma from asbestos.
13     Pleural plaques can happen -- can occur with
14 much lower doses of asbestos than, say, mesothelioma.
15     Q.   Okay. You've not looked at the ovarian tissue
16 for any of these women, have you?
17     A.   I'm not a pathologist.
18     Q.   You have not looked at even the results from
19 pathology, have you?
20     A.   I did look at the results of -- because I was
21 curious. I just can't remember which specific cases

Page 257

1  that I looked at. But just curious as to what the
2  diagnosis was.
3      Q.   Okay. But you're not going to be offering
4  opinions relating to whether or not they had changes in
5  their ovaries related to exposure to, among other
6  things, asbestos or fibrous talc or anything else; true?
7      A.   I would rely on a pathologist, because I'm not a
8  pathologist.
9      Q.   Okay. Do you have any opinions on Carl and
10 Balderrama that are case-specific?
11     A.   Other than that I don't find any markers of
12 asbestosis in the radiology.
13     Q.   I mean, is that even part of the differential
14 for ovarian cancer?
15     A.   Well, if we're talking about -- if we're talking
16 specifically about the potential for asbestos to be in
17 the cosmetic talcum powder that's been used and one can
18 develop pleural plaques with much less exposure to
19 asbestos than, say, a mesothelioma, then yes. And I'm
20 not seeing any markers of asbestos-related disease.
21     Q.   Do you ever -- in any of the studies that you

65 (Pages 254 - 257)

Page 258

1  looked at -- and you talked about the studies that you
2  looked at, the miners or millers or anything like that.
3  With respect to ovarian cancer, did they even look for
4  changes in the lung for the purpose of deciding whether
5  or not they were exposed to talc through genital
6  dusting?
7      MR. BISHOP: I'm sorry. Object. Vague.
8  Ambiguous.
9      THE WITNESS: Can you ask that -- I'm just not
10  sure I understand that question.
11  BY MR. TISI:
12  Q.  Yeah, no. That's fine. It's a confusing
13  concept.
14      Do you know of any study which used radiology
15  scans as a surrogate for exposure to talcum powder for
16  the purpose of assessing ovarian cancer relating to
17  asbestos? I meant to say asbestos. Let me rephrase the
18  question.
19      In any asbestos study that you've seen, have you
20  ever seen any of the researchers use lung radiology
21  films as a surrogate for exposure to asbestos in their

Page 259

1  ovaries?
2  A.  So in the miners and millers studies, the
3  majority of the subjects that were followed in those
4  cohorts were men. The radiology that was done in some
5  of the studies was mainly to look for -- to assess
6  whether or not one would have lung disease.
7      And so for some of the studies that did look at
8  radiology when there was a higher level exposure to
9  talc, either in the mine or the mill, those folks
10  developed pneumoconiosis, so interstitial lung disease.
11  Q.  Okay.
12  A.  And that's --
13  Q.  But my question was: Did they ever use
14  radiology of the lungs in order -- in any way to try to
15  figure out whether or not they had asbestos-induced
16  ovarian cancer?
17  A.  Well, again, the majority of the workers were
18  men --
19  Q.  Were men. Right.
20  A.  -- were men in that study.
21  Q.  So the answer to my question would be "no"?

Page 260

1  A.  But -- so --
2  Q.  I mean, yes, the answer will be "no"?
3  A.  The answer to that is no.
4  Q.  Okay. So can you think of any study that would
5  support your use of lung radiology films to determine
6  whether or not a person had been exposed to asbestos
7  genitally?
8  A.  I -- I can't think of an epidemiologic study
9  where one is having radiology of the chest done to look
10  at an exposure when the outcome is ovarian cancer.
11  Q.  That's my point.
12      And that's what you're doing here; right?
13  A.  It is. Because --
14  Q.  Okay.
15  A.  -- because the issue is whether or not there's a
16  significant amount of asbestos exposure.
17  Q.  Okay. If you give me a moment, I want to look
18  at my notes and I'm going to try to finish up here, but
19  I want to speak to my colleague here.
20  A.  Sure.
21      (Off the record.)

Page 261

1  BY MR. TISI:
2  Q.  I'd like to go back -- if we would, go back to
3  the Chang study. And I was asking you about the
4  extrapolating out using the one-frequency category and
5  using that to account for longer term or greater
6  exposure.
7      Do you remember those questions?
8  A.  That's correct.
9  Q.  The authors actually address that question in
10  the study.
11      Do you recall that?
12  A.  Not specifically in paragraphs, but perhaps you
13  could show me what you're referring to.
14  Q.  Well, they do address it in the paragraphs. If
15  you go to the last paragraph of the study.
16      MS. PARFITT: Do you have a page number, Bruce?
17      MR. TISI: Page 14.
18  BY MR. TISI:
19  Q.  If you read that paragraph.
20  A.  This -- the last paragraph of the paper?
21  Q.  Yeah. Let me read what I'm referring to and ask

66 (Pages 258 - 261)

Page 262

1  you to comment on it.
2      It says, "Although the observed effects of a
3  one-frequency level increase was modest in magnitude,
4  the impact would be more substantial when comparing the
5  most frequent users with never users. For example, in
6  8 percent higher hazard post-menopausal breast cancer
7  for a one-category level increase in the beauty mixture
8  could also -- could translate to an approximate
9  36 percent higher hazard for the most frequent users
10 compared to never users."
11     Do you see?
12 A.  I do see that.
13 Q.  And that's the concept that -- of -- that I was
14 talking about with that study -- with that chart that
15 talked about talc use. You have to multiply them to get
16 a more frequent use. Am I -- to get a more -- for
17 people who use frequent -- talc frequently; true?
18 A.  Only if there's a linear relationship.
19 Q.  Okay. So you agree or disagree with their
20 assessment here about how you deal with more frequent
21 users as opposed to casual users?

Page 263

1  A.  I mean, it says we could. It's possible but
2  it's certainly not possible and it just depends on the
3  dose relationship.
4  Q.  Okay. And you don't think that there's any?
5  A.  There's -- there's nothing presented that there
6  is.
7  Q.  Okay. All right. Can we get -- I'd like to
8  mark the invoices as an exhibit and ask you about that.
9      MR. BISHOP: I think it would be Exhibit 25.
10     MR. TISI: Yeah. Except I'm looking for them.
11 Did I give him a copy?
12     THE WITNESS: Let me look.
13     MR. BISHOP: I thought you put them down that
14 way.
15     THE WITNESS: I don't know that you gave me the
16 invoices.
17     MS. PARFITT: You are good. Bruce, you are all
18 right.
19 BY MR. TISI:
20 Q.  Oh, yeah. What is Willcox, by the way?
21 A.  Willcox Savage?

Page 264

1  Q.  Yeah?
2  A.  That's -- that's a firm.
3  Q.  Oh, is that you? Okay.
4  A.  Yeah.
5      MR. TISI: Okay. I did not know that was the
6  name of your law firm, so now I get it.
7      All right. I'm going to have marked -- are
8  these related, Michelle.
9      MS. PARFITT: Yes.
10     MR. TISI: It'll make it a lot easiest if I let
11 Michelle deal with this because she looked at this. Do
12 you mind her asking these questions?
13     MR. BISHOP: I don't mind. See how reasonable I
14 am.
15     MR. TISI: You are just a peach. You are,
16 actually.
17     (Off the record.)
18     MR. TISI: All right. I'm going to mark them.
19 And these are all copies --
20     MS. PARFITT: I was going to hand them out.
21     MR. TISI: Yeah. Why don't you do it? Because

Page 265

1  I didn't look at these.
2      (Deposition Exhibit 25 was marked.)
3      MS. PARFITT: Okay. I just have a couple
4  questions.
5      THE WITNESS: Sure.
6          EXAMINATION BY MS. PARFITT:
7  Q.  We earlier marked your invoice as -- I believe
8  they were exhibit -- or have we not done that?
9      MR. TISI: We didn't mark those.
10     MS. PARFITT: So they're now Exhibit 25.
11 BY MS. PARFITT:
12 Q.  Before I actually hand you exhibits, it appears
13 that we have a stack of exhibits and invoices for 2019,
14 and we have a stack of invoices for the period of time
15 2024.
16     Do you have and can you make them available any
17 and all invoices related to your talc-related work
18 between 2016, when I believe you first got involved in
19 this litigation, and 2019, when we first received
20 invoices?
21     MR. BISHOP: I'm just going to object. We'll be

67 (Pages 262 - 265)

Page 266

1  happy to take the request under advisement.
2        You can go ahead and answer.
3        THE WITNESS: Sure.
4  BY MS. PARFITT:
5    Q.   Well, have you made those available in any other
6  litigations, any state court litigations where you
7  testified?
8    A.   Whatever I was required to make available was
9  made available.
10       MS. PARFITT: Okay. All right. Then we'll make
11  a request for any and all invoices between 2016 and 2019
12  related to Dr. Merlo's talc-related work.
13       Similarly, there is absence of invoices between
14  2019 and 2024.
15       It looks like you picked up invoicing starting
16  on January 31, '24. Similarly, we will make a request
17  for production of invoices for talc-related work by
18  Dr. Merlo between -- the last one I have is 5/31/19
19  through January 31st, '24.
20       THE WITNESS: That's --
21

Page 267

1  BY MS. PARFITT:
2    Q.   Lastly, the last invoice we received was one for
3  4/30/24 in the amount of $8,474.14.
4        What do you estimate the number of hours that
5  you've spent in this case working on talc-related
6  matters from 4/30/24 to today, which is June 14, 2024?
7    A.   I would say 30 to 40 hours.
8        (Off the record.)
9        EXAMINATION BY MR. TISI:
10   Q.   So let me just ask one other question that I --
11  other than the case-specific opinions about your review
12  of the radiology for the lungs, do you have any other
13  testimony that you're prepared to give related to any of
14  the individual plaintiffs in the MDL case or in the
15  Carl and Balderrama cases?
16   A.   Just the case-specific radiology that I
17  reviewed.
18   Q.   Okay. And so you are not giving case-specific
19  causation opinions? In other words, you're not going to
20  say that I've reviewed this person's medical records
21  and, in my opinion, their ovarian cancer is due to this

Page 268

1  and not that, for example?
2    A.   That's correct.
3        MR. TISI: Okay. All right. I believe that --
4  unless we can finish up this exhibit with the --
5        MS. PARFITT: Well, let's straighten up the
6  exhibits. We have copies of the invoices, Bruce, for
7  you as well.
8        MR. TISI: Yeah. We'll do that as well. Okay.
9  I don't have any other questions. Thank you.
10       Do you have any questions?
11       MR. BISHOP: I just had one follow-up.
12       EXAMINATION BY MR. BISHOP:
13   Q.   Just so invoices are clear, do you have an
14  hourly rate that you charge, and is it different than
15  the hourly rate that the agency that helps you with the
16  administration --
17   A.   I charge -- I charge $450 an hour. When I see
18  the invoice, it sometimes says $540 an hour. There's an
19  administrative fee that's, my understanding, is tacked
20  on to that, but this is my -- this is my fee schedule,
21  if you'd like that.

Page 269

1        MR. TISI: Actually, you -- let's mark your fee
2  schedule. I'm sorry. Are you done?
3        MR. BISHOP: Yeah. I'm done.
4        MR. TISI: Yeah. Let me just mark your fee
5  schedule. I meant to do that before. This is
6  Exhibit Number 26.
7        (Deposition Exhibit 26 was marked.)
8        MS. PARFITT: Yes, yes.
9        MR. TISI: Because I have a question about that,
10  and I'd glad that you asked.
11       EXAMINATION BY MR. TISI:
12   Q.   Here's the fee schedule for VeraMedica
13  Institute.
14       Do they do your billing?
15   A.   I hand -- I submit an invoice of hours and --
16  just so I can keep track of it to them, and then they
17  perform the billing and send that out.
18   Q.   And I asked you -- I looked at
19  Exhibit Number 26, and there's -- and I asked you
20  before, I think, generally, but let me ask specifically.
21       Who is the staff epidemiologist? Do you know?

68 (Pages 266 - 269)

Page 270

1    A.   I have no idea.

2    Q.   Okay.  Nurse practitioner?

3    A.   I know that there are a couple nurse

4    practitioners, but I don't know them.

5    Q.   Associate scientist?

6    A.   I don't know.

7    Q.   Did any of these people, physicians' support

8    staff, help you in any way over the years other than

9    collating records and that kind of a thing?

10   A.   I've only had people help me with billing and

11   people help me personally with, say, photocopying

12   something and providing me a binder or giving me

13   radiology discs or things like that.

14   Q.   Do you know if they made additional money beyond

15   what you billed, or do you know if -- is their money

16   that they get paid incorporated in your billing?  Is

17   that what you were trying to suggest before?  In other

18   words, does your hourly rate include a cut for these

19   guys?

20   A.   My hour hourly rate is $450 an hour.

21   Q.   For you?

Page 271

1    A.   For me.  And if it's billed something more than

2    that, that's for them.  But I'm not involved in that.

3    Q.   Do you have any ownership interest in

4    VeraMedica --

5    A.   No, I don't.

6    Q.   -- institute?

7         Do you work with them in other areas of

8    research?

9    A.   Research, no.  But the administrators do help me

10   with my calendar.

11   Q.   How about -- you know, you've been involved in

12   litigation, as I saw from your litigation list.

13        Do they help you in all your litigation work, or

14   is it just talc-related litigation?

15   A.   If -- if I am introduced to a client through

16   them, then it would be with them.  But, in general,

17   they're not helping me with other aspects of litigation.

18        MR. TISI:  Okay.  I have no other questions.

19        COURT REPORTER:  Can you just place your

20   transcript orders on the record, please?

21        MR. TISI:  We're just going to order it regular

Page 272

1    delivery.  Can we get a rough, though?

2         MR. BISHOP:  Yeah.  We'd like a rough and then

3    regular delivery.

4         (Off the record.)

5         MR. BISHOP:  On the record, Dr. Merlo, you have

6    a right to read and sign the transcript or you can waive

7    that right.

8         THE WITNESS:  I would like to read and...

9         MR. BISHOP:  Okay.

10        (The deposition was concluded at 2:19 P.M.)

11

12

13

14

15

16

17

18

19

20

21

Page 273

1              CERTIFICATE FOR READING AND SIGNING

2

3         I hereby certify that I have read and

4    examined the within transcript and the same is a true

5    and accurate record of the testimony given by me.

6

7         Any additions or corrections that I feel

8    are necessary I have listed on the separate ERRATA SHEET

9    enclosed, indicating the page and line number of each

10   correction.

11

12   _____

13   WITNESS NAME

14

15   _____

16   DATE

17

18

19

20

21

69 (Pages 270 - 273)

Page 274

1       ERRATA SHEET

2  Case: Johnson & Johnson Talcum Powder Litigation

3  Witness: Christian Merlo, M.D.    Date: 6-14-24

4  PAGE/LINE    SHOULD READ    REASON FOR CHANGE

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

Page 275

1  STATE OF MARYLAND

2      I, Faith Kelchaw, a Notary Public of the

3  State of Maryland, do hereby certify that the within

4  named deponent, after having been duly sworn by me, was

5  interrogated by counsel.

6      I further certify that the examination was

7  recorded stenographically by me and that this transcript

8  is a true record of the proceedings.

9      I further certify I am not of counsel to

10  any of the parties, nor an employee of counsel, nor

11  related to any of the parties, nor in any way interested

12  in the outcome of this action as witness my hand and

13  notarial seal this 26th day of June, 2024.

14

15  _____

16      Faith Kelchaw, Notary Public

17

18  My commission expires October 1, 2027.

19

20

21

70 (Pages 274 - 275)

[& - 2]

| & |
|---|
| **&**  1:5 2:11,17 3:3 40:9 50:9 274:2 |

| 0 |
|---|
| **0.53**  131:11 |
| **0.69**  131:10 |
| **0.89.**  131:11 |
| **08002**  3:20 |

| 1 |
|---|
| **1**  5:3 11:10,12 11:14 85:14 86:15 87:17 110:18 113:9 124:21 190:4 197:5 203:19 220:14 255:8 275:18 |
| **1.01**  86:11,18 87:11,20 101:21 110:12 |
| **1.02**  152:9 |
| **1.02.**  151:9 |
| **1.06**  241:11 242:20 244:8 244:11,11,12 |
| **1.07**  199:3 |
| **1.08**  86:2,8 87:2 87:20 95:16 110:17 |
| **1.1**  235:6 |
| **1.13**  101:20,21 110:11 |

**1.17**  110:10
**1.17.**  86:3,9 238:12
**1.2**  32:14 33:1 204:17
**1.24.**  241:12
**1.25**  85:14
**1.26**  190:14
**1.26.**  102:1 110:12
**1.3**  79:21 204:21
**1.34**  195:7
**1.34.**  195:17
**1.35**  95:18
**1.36**  130:8,20 131:6 133:15
**1.4.**  204:17
**1.41**  194:21
**1.6.**  32:14
**1.8**  33:1 110:9 235:6 236:13 236:15
**1.8.**  196:10
**1.81**  234:12
**1.82**  130:8,19 131:6 133:14 162:9 190:13 195:3 196:11 197:10 198:15 199:3 203:17 238:11
**1.82.**  137:18 195:18
**1.84.**  151:20

**10**  5:13 43:2,3 127:12 151:10 170:11 200:2 215:18 218:19
**100**  1:13 55:19 55:21 165:21 223:8,9 238:21
**100,000**  83:6 85:5
**105**  5:19
**109**  5:21
**11**  5:3,14 58:20 59:1,5,6 127:12
**118**  6:5
**12**  5:4,15 70:7,8 125:3,4 127:8 127:12,12 151:11 200:3 213:21 214:10 215:18 217:9 217:11 245:4,5
**12.1**  83:6 85:4
**13**  5:6,16 72:6,7 72:8 119:16 120:7,7,18 125:3 127:9,12 127:13,18,20 134:13 137:21 141:5 151:10 174:18 176:12 200:2 203:8 207:8,19 208:2 210:2 213:21 214:10,18 215:2,18 217:9 217:10,10

218:19
**136**  5:15
**14**  1:13 5:17 59:15 89:3,4,6 114:20 141:5 261:17 267:6
**140**  196:19
**144**  6:6
**15**  5:19 105:11 105:13 127:9 127:19 217:10
**154**  118:19 119:2,5
**155**  6:7
**15th**  129:14 134:11
**16**  5:20 109:7,9 109:10
**16-2738**  1:3
**1600**  1:14
**17**  6:4 89:2,4 118:2,3
**17417**  275:14
**18**  5:7 6:6 144:13,14
**1825**  3:4
**19**  6:7 155:20 155:21 156:18

| 2 |
|---|
| **2**  5:4 12:2,3,10 28:1 48:10 113:8,10 182:8 190:4 194:16 194:17 195:13 197:9 198:16 |

**[2 - 3]**

Page 2

200:1 224:19
233:2 238:8,16
239:4,16
**2.43** 130:9
133:15
**2.43.** 130:20
131:6 190:14
**2.65** 151:18
152:9
**20** 6:8 101:7
105:13 225:15
227:11,12,13
235:8,10
**200,000** 55:19
55:21
**20006** 3:5
**2012** 39:20 40:3
**2016** 117:19
245:20 265:18
266:11
**2017** 124:14
152:21 192:5
200:12
**2018** 53:19
**2019** 5:11 7:21
8:5,9,14 9:1
14:3,7,11,17,21
15:10,20 16:10
17:1,4,17 18:17
19:17 24:7,8,21
29:1 30:8 31:7
31:15,20 32:8
32:20 33:8,13
33:17,21 34:10
34:14 37:11
40:1,2,13,20

41:1,5 47:12
53:19 67:17,19
72:3 81:14
117:18 124:14
148:11 152:21
181:4 192:5
200:12 265:13
265:19 266:11
266:14
**202** 3:6
**2020** 68:7,8
71:17,20 78:18
79:14 84:15
85:11 102:8
103:19 104:4
107:12 108:16
110:15 115:10
115:21 119:6
120:17 205:16
206:3,16
**2021** 43:6
105:10 108:16
110:1 111:14
111:14 116:20
245:20
**2023** 27:17
248:17
**2024** 1:13 5:10
10:5 11:17 13:3
13:9,15 14:1,11
14:17 19:17
27:2 28:14,15
30:9 31:16 32:2
32:9,11 33:9,14
34:15,17 62:3,5
68:5,5,8,9

97:14 113:4
118:1,15
119:14,20
121:11,13
124:10,21
133:12 134:20
148:11 165:14
166:1 175:4,7
176:2,5,9
180:14 194:13
207:19 237:4
248:14,19,21
249:5,5,17
250:14 265:15
266:14 267:6
275:13
**2027** 275:18
**20s** 145:18
216:1 217:14
218:6
**21** 5:8 6:10
229:9,10,11
**21201** 1:14
**218** 3:14
**21st** 12:20
**22** 6:12 237:7,9
**220** 119:9,15
**2200** 2:12
**227** 6:9
**229** 6:11
**23** 6:15 235:19
240:21 241:1,7
**23459** 189:13
**23510** 2:13
**237** 6:14

**237,000** 58:7
**24** 6:17 248:3,4
251:4 266:16
266:19
**241** 6:16
**248** 6:18
**25** 6:19 140:7
141:16 194:19
216:8 263:9
265:2,10
**26** 5:9 6:20
269:6,7,19
**265** 4:6 6:19
**267** 4:4
**268** 4:5
**269** 4:4 6:20
**26th** 275:13
**28** 5:10 152:14
153:5 197:6
**288** 151:1,2
**28th** 11:17
134:13
**29** 5:11
**292** 119:15
120:1
**2:19** 272:10

| 3 |
| --- |

**3** 3:19 5:5 13:16
13:18 113:6,13
119:19 150:16
174:19 190:3
190:15,17
194:13,16
197:6 200:10
220:15,19,20

[30 - a2]

**30**   49:19 71:18
113:21 114:1,3
140:7 188:11
217:8,12
254:16 267:7
**30s**   145:18
216:1 217:14
218:6
**31**   49:16,17
71:19 74:1 88:9
113:21 114:4
134:20 153:5
197:7 227:7
228:3 266:16
**310**   3:19
**316**   2:4
**31st**   27:17
266:19
**32**   130:18 134:3
134:21 139:20
189:2 210:20
228:1,4,4
**32502**   2:5
**33**   114:1 134:21
182:6,7 184:15
186:9
**34**   62:10,18
107:14,14
113:21 114:3,4
134:21 139:20
159:9 208:1
**35**   107:14,15
**36**   5:12 245:7
262:9
**36104**   3:15

**37**   221:16
**39**   248:9

**4**

**4**   5:7 18:19,21
21:19,20
180:15 225:16
225:18,18
226:2,15 247:8
**4/30/24**   267:3,6
**40**   188:11 267:7
**40s**   218:6 219:2
**43**   5:13
**435-7000**   2:7
**440**   2:12
**45**   51:8
**450**   268:17
270:20
**46**   29:1 133:11
133:12
**47**   130:4 133:7
133:8,11,12
**49**   127:12,18
216:1

**5**

**5**   5:8 21:1,3
56:4 58:8
101:17 243:4
243:11
**5/31/19**   266:18
**50**   79:17,17
127:10,12,17
152:14 188:10
197:7,11 199:2
215:14,16
238:9

**500,000**   137:17
180:15
**50s**   219:2
**51**   100:7
**53**   152:14,19
196:20 197:4
**54**   101:18
**540**   268:18
**55**   48:3
**56**   102:7
**59**   5:14

**6**

**6**   5:9 26:18,19
235:18 244:20
244:21 248:14
**6-14-24**   274:3
**6.6**   118:20
119:1
**60**   48:14 49:13
188:10
**600,000**   56:4
58:8
**62**   218:20
**628-5573**   2:14
**63**   218:18,20

**7**

**7**   4:4 5:10 28:8
28:10,11 245:8
246:9
**70**   5:15 255:8
**700**   3:4
**72**   5:16
**73**   28:3
**75**   195:5,17

**757**   2:14
**783-6400**   3:6

**8**

**8**   5:11 29:2,3
262:6
**8,474.14.**   267:3
**80**   85:12 187:18
188:10 236:6
**850**   2:7
**89**   5:18

**9**

**9**   5:12 35:20
36:2,11 58:14
**9.6**   119:10
120:17
**90**   131:7,9
187:21 188:10
188:11
**91**   241:12
**95**   86:9 110:11
130:20 188:11
190:18 226:17
**99**   85:14 86:3,9
86:12,18 87:11
102:2 110:9
**9:01**   1:15

**a**

**a.m.**   1:15
**a2**   150:7,9,21
151:3 180:7
196:11,12
210:20 211:9
220:14,15

[a5 - advance]                                                                                    Page 4

**a5**  222:1
**able**  12:12
    123:17 137:13
    139:4 231:17
**above**  49:2
    147:21 151:5
**absence**  102:11
    266:13
**absolutely**
    145:10 182:4
    189:14 232:11
    247:20
**abstract**  5:5
    75:16,17
**accept**  29:7
    120:6 188:8,8
    188:13 198:13
    198:14 203:20
**accepting**
    180:15
**access**  42:2
**accessed**  52:21
    121:14
**account**  170:4
    170:8 195:6
    261:5
**accurate**
    251:16 273:5
**accurately**  19:9
    37:3 38:19
**accuse**  65:5
**acknowledge**
    200:13
**acknowledge...**
    32:5

**acog**  25:2
**act**  106:13
**action**  275:12
**activity**  147:18
**actual**  92:12
    118:10 120:13
    166:15
**actually**  8:1
    21:14 26:2,11
    27:3,6 28:7
    29:12 35:6
    36:15 37:3 40:7
    40:14 41:18
    44:1 48:11 50:1
    51:3 52:18 53:4
    53:10 54:1,4
    56:8 61:4 64:17
    69:21 70:2
    73:10,14 76:13
    81:12 83:9 86:5
    88:21 89:16
    90:6,20 92:18
    94:8 113:12
    125:18 126:3
    126:19 128:20
    131:10,13
    132:12,18
    136:11 139:1
    139:21 141:5,6
    143:21 144:9
    148:8 150:6
    179:18 187:16
    189:5,16,20
    190:2 192:16
    199:5,19
    201:17 207:1

209:5 219:20
225:1,10
227:16 228:16
231:7 233:1
238:19 239:2
246:17 249:2
249:15 261:9
264:16 265:12
269:1
**add**  30:19 79:3
    113:20 183:3
    245:6
**added**  68:11
**adding**  238:3
**addition**  8:21
    30:19 42:1,10
    99:7 136:18
    187:8 214:15
**additional**
    10:12 30:10
    33:19 34:11
    48:15 66:21
    106:19 113:20
    119:9 122:5
    123:3 179:4
    213:19 214:9
    214:20 216:12
    239:7,18
    270:14
**additionally**
    48:13
**additions**  273:7
**address**  10:12
    12:21 13:8 17:9
    66:3,11 71:20
    73:20 115:5

135:9 138:3
176:13 217:3
261:9,14
**addressed**
    71:18 145:5
**addressing**  18:7
**adds**  145:14
    147:2
**adjunct**  19:6
**adjusted**
    142:18 190:17
**adjusting**
    147:13
**adjustment**
    194:14
**adjustments**
    151:18
**administered**
    122:16 123:11
    124:14 152:20
    192:5 200:12
    256:3
**administerial**
    56:16
**administration**
    268:16
**administrative**
    56:17 268:19
**administrators**
    271:9
**admonishment**
    84:6 153:20
**adolescence**
    125:3
**advance**  6:13

[advanced - answered]                                                    Page 5

| | | | |
|---|---|---|---|
| **advanced** 21:13 | 204:18 205:5 | **amount** 252:17 | **analyzing** |
| **adverse** 106:19 | 207:10 212:14 | 254:7 260:16 | 172:1 |
| **advice** 46:1 | 212:21,21 | 267:3 | **anne** 9:2 48:6 |
| **advisement** | 226:7 233:9 | **analyses** 50:4 | **announced** |
| 266:1 | 237:12 238:10 | 50:12 95:18 | 249:16 |
| **affect** 223:18 | 238:20 249:4,5 | 96:13 121:11 | **announcements** |
| 234:13 | 262:19 | 131:3 172:3,4 | 250:7 |
| **affected** 191:6 | **agreeing** 196:9 | 173:3,11 201:4 | **answer** 46:12 |
| **affecting** 50:14 | 199:18 | 204:16,16,20 | 71:9,14 83:14 |
| 106:15 | **ahead** 17:7 | **analysis** 23:7 | 84:9 102:6 |
| **affiliations** | 31:12 69:4,5 | 24:3 38:3 42:1 | 104:6,18 117:3 |
| 68:17 | 99:16,20 | 52:8 62:18 | 123:17 124:1 |
| **age** 125:11 | 100:17,18 | 74:13,14 75:3 | 125:19 126:1 |
| 127:9,12,18 | 131:1 159:6 | 93:18 94:15 | 153:12,21 |
| 200:2 202:4 | 223:17 224:9 | 96:15 99:14,18 | 154:3,6,9 |
| 214:10 215:15 | 252:5 266:2 | 100:18 101:4 | 155:13 179:19 |
| 217:16 218:18 | **air** 254:8 | 103:7 115:21 | 183:20 184:9 |
| 218:18,19,19 | 255:10 | 131:20 132:4 | 199:5 201:10 |
| **agency** 25:18 | **al** 134:5 | 133:19 134:4 | 201:11 215:20 |
| 70:1 250:17 | **alabama** 3:15 | 139:12 143:8 | 216:3 219:3 |
| 268:15 | **albeit** 205:18 | 143:11 160:14 | 224:12 259:21 |
| **agent** 207:13 | **allen** 3:13 | 162:11 165:8 | 260:2,3 266:2 |
| 209:3 210:4 | **allow** 253:20 | 170:2 171:15 | **answered** 31:11 |
| **ages** 125:3 | 254:18 | 173:20 177:1 | 42:5 46:2,8,9 |
| 213:20 215:18 | **allows** 90:3,6 | 177:18 183:16 | 47:19 77:17 |
| **ago** 41:4 | 123:20 | 184:16 185:15 | 84:19 98:12 |
| **agree** 13:21 | **alter** 11:4 17:11 | 185:20 197:16 | 99:2 112:15 |
| 29:19 32:12 | **alternatives** | 199:1,20 | 116:12 117:1 |
| 75:4 83:12 | 158:5 | 200:17 202:1,9 | 123:6,21 |
| 93:17 94:14 | **ambient** 254:8 | 205:17 219:10 | 136:20 137:4 |
| 96:11,17 | **ambiguous** | 223:21 224:14 | 139:2 140:16 |
| 118:15 121:9 | 139:7 162:2 | 242:17,20 | 140:21 166:4 |
| 145:21 148:4,5 | 163:11 186:16 | 255:2 | 174:15 182:20 |
| 157:8 163:20 | 254:20 258:8 | **analyzed** | 189:18 194:14 |
| 172:19 193:3 | **american** | 138:20 | 213:12 218:20 |
| 196:8,11 199:9 | 144:17 | | |

[answers - assert]                                                    Page 6

**answers**  163:9
  163:12 186:14
  219:3
**anybody**  26:13
  60:8 64:7 66:20
  86:10 115:2
  164:7,13,17
  165:1 230:21
**apart**  233:11
**apologize**  130:6
**appear**  37:18
**appearances**
  2:1 3:1
**appears**  172:16
  265:12
**application**
  31:4 100:10
**applied**  14:2,3
  14:13 15:1 16:7
  35:12 106:7
**applies**  223:16
  224:8 244:5
**apply**  11:1
  26:13 27:18
  34:12 71:5
**applying**  8:15
**appreciate**
  28:10 159:3
  192:17,18
  193:5 252:6
**approach**  172:1
**approaches**
  200:18
**appropriate**
  8:16 11:1 35:13
  138:14 187:15

189:17,17
217:16
**appropriately**
229:1
**approximate**
262:8
**approximately**
12:20
**april**  10:5 27:2
130:3
**area**  72:14
79:19 100:10
100:13 105:2
**areas**  22:2
24:18 271:7
**arguing**  50:6
**argumentative**
63:19 67:5 90:3
166:13 177:9
181:1
**arguments**  38:4
38:17,20
**article**  5:16,18
5:19,21 6:5,6,7
6:11,14,16,18
72:13 73:9
105:17 108:17
109:6,12 110:1
119:11 121:13
135:6 146:18
155:15 182:17
208:5 215:2
225:8,16 226:2
227:6,15,18
228:5,11,14,15
228:21 229:3,7

229:13 230:2
230:12,20
250:18
**articles**  24:2
111:13 116:20
141:19 142:2
206:15 230:7
**asbestos**  10:16
22:12,13
102:11 106:20
208:10 252:11
252:13,14,20
253:13 254:1,6
254:7,9,18
255:1,4,8,10
256:7,12,14
257:6,16,19,20
258:17,17,19
258:21 259:15
260:6,16
**asbestosis**
256:9 257:12
**asco**  6:6 145:11
164:21
**ashcraft**  3:3
**ashcraftlaw.c...**
3:7
**aside**  13:21
33:16 34:9 45:4
121:10 182:17
193:20 194:6,9
**asked**  23:8
31:10 40:21
42:5 43:14
44:14,19 46:2,8
52:8 53:19 70:1

73:3 77:17,18
84:19 97:12
98:12 103:16
104:2,8 111:5,6
111:9 112:15
116:12 117:1
122:6,11 123:6
125:2,10 127:7
128:9 136:20
140:16 141:2
150:3 154:15
166:4 174:3,15
182:20 213:12
216:12 217:12
218:2 219:1,5
226:9 239:10
240:2 253:15
253:15 269:10
269:18,19
**asking**  36:4
42:20 57:15
59:11 66:16
82:3 97:19
112:9 160:18
198:6 201:5
234:8,16,19
246:3 251:1
261:3 264:12
**asks**  215:17
219:2
**aspect**  45:8
154:19
**aspects**  60:17
271:17
**assert**  134:20

[assertion - authors]                                                                  Page 7

| | | | |
|---|---|---|---|
| **assertion** | 97:15 98:1 | 249:19 | **attach** 12:1 |
| 228:17,17 | 103:19 104:5 | **associations** | 18:18 117:21 |
| **assess** 259:5 | 105:1,6,14 | 32:6 80:3 | **attempt** 32:16 |
| **assessed** 79:18 | 107:5,9,20 | 157:16 | 138:3 |
| **assessing** 9:4 | 108:1,3,9,15,19 | **assume** 97:3 | **attention** 32:4 |
| 29:6 34:12 71:6 | 108:20 109:1,2 | 136:1 145:21 | 129:17 |
| 148:13 156:19 | 110:7 111:1,11 | 146:17 163:20 | **attenuate** |
| 258:16 | 111:12,15,21 | 185:7 187:13 | 223:19 224:10 |
| **assessment** | 112:1,4,5,8,13 | 195:2 197:10 | **author** 64:11 |
| 40:21 48:14,17 | 116:11,15 | 197:19 203:4 | 73:2,20 114:21 |
| 48:19 49:5,10 | 117:5 132:1,11 | 203:15 204:4 | 117:17,20 |
| 51:14 236:12 | 133:13,14 | 204:18 210:15 | 136:8 137:3,6,9 |
| 262:20 | 144:18 146:4,9 | 237:11 239:11 | 225:19 |
| **assigned** 195:16 | 146:12 147:15 | **assumed** | **author's** 247:18 |
| **associate** 19:3 | 148:6,16 149:5 | 194:14,20 | **authoritative** |
| 233:8 270:5 | 149:12 152:3,4 | 195:6 | 74:9,16 |
| **associated** | 154:21 157:1 | **assumes** 212:10 | **authorities** |
| 145:13 147:12 | 157:11,15 | **assuming** | 46:7 |
| 148:3 156:7 | 165:16 189:4,5 | 195:17 211:18 | **authority** |
| 165:15 166:2 | 189:6 190:19 | **assumption** | 227:20 |
| 193:5,6,12 | 192:2,10 | 20:10 83:7 85:6 | **authority's** |
| 208:19 240:15 | 193:14 194:3,6 | 188:7 195:5 | 43:9 |
| 247:3 | 194:8 203:2,13 | 211:20 212:2 | **authorization** |
| **association** | 204:14 205:18 | 238:10 | 117:8 |
| 5:12 32:13,15 | 206:5 209:10 | **assumptions** | **authors** 13:1 |
| 32:16 34:5 | 209:19 210:12 | 66:13 82:15 | 59:20 60:4,6 |
| 37:17 39:4,6 | 211:16,19 | 132:8,15,16 | 62:12 63:12 |
| 45:1 50:6 72:14 | 225:1,1,10,10 | 140:5 150:1 | 66:19 68:1,13 |
| 74:6 77:2,15,16 | 228:10,18 | 157:7 162:9 | 68:16 69:11 |
| 78:6,13,21 79:4 | 230:10 231:2,6 | 163:21 165:9 | 72:18,19 73:17 |
| 79:18 83:18 | 231:7,13 233:4 | 167:20 182:12 | 74:2,8 75:11,20 |
| 86:20 87:2,5,7 | 234:5 238:4 | 188:13 196:9 | 75:20 76:1,5,8 |
| 87:9,12,18 88:1 | 239:2,6,9,17,20 | 198:13 199:18 | 76:19 79:14 |
| 88:15,18 93:13 | 243:15 245:9 | 201:20 203:21 | 81:16 84:15 |
| 95:1,4,11,19 | 246:8,11 | 204:11 210:17 | 85:11 88:17,20 |
| 96:6,17,20 | 247:13,14 | 220:8 221:5 | 89:16 90:6 |

**[authors - biggest]**                                   Page 8

| | | | |
|---|---|---|---|
| 92:12,17 93:2 | 47:20 53:3 70:5 | 98:4 108:16 | 252:12 265:7 |
| 93:14 95:5,12 | 89:13 136:21 | 132:4,7,14 | 265:18 268:3 |
| 97:4,13 98:3 | 139:15 161:12 | 140:5 142:19 | **bellwether** |
| 99:7 106:3,4 | 164:19 214:1 | 151:10 152:7 | 255:16 |
| 111:9 115:8,20 | 253:11,12,17 | 153:2,14 165:9 | **benjamini** |
| 116:10 117:15 | **b** | 167:20 169:18 | 172:20 |
| 121:14 128:9 | **b** 5:1 6:1 195:10 | 170:18 175:13 | **best** 54:2 55:17 |
| 131:13 136:4 | 195:11 247:9 | 198:6 204:6 | 58:9 115:9,11 |
| 136:17 137:12 | **baby** 255:4 | 210:18 232:6 | **beyond** 183:4 |
| 138:3,7,12,21 | **back** 16:16 52:7 | 240:10 243:18 | 254:2 270:14 |
| 141:17 142:12 | 54:18 62:4 73:8 | **basically** 10:19 | **bias** 14:15 15:3 |
| 145:6 161:6 | 79:12 81:13 | 16:5 17:3 | 24:4 31:19 34:4 |
| 164:21 165:21 | 82:10 84:2,14 | **basis** 26:3 | 131:3,7,9 143:8 |
| 179:9 180:11 | 103:14 120:4 | 103:2,4 142:14 | 152:5,11 |
| 183:1 185:5 | 123:1 153:4 | 155:2 187:9,9 | 162:11 165:8 |
| 187:18 190:8 | 156:17,17 | 187:15 188:3,9 | 169:21 170:2 |
| 195:4,19 | 158:21 159:7 | 188:12 190:20 | 173:21 181:11 |
| 197:21 198:3 | 176:11 190:2,3 | **bayesian** | 191:18,21 |
| 198:10 199:9,9 | 197:9 199:21 | 171:21 172:4 | 192:9 195:7,13 |
| 206:4 207:11 | 205:16 211:20 | **baylen** 2:4 | 197:3,15 |
| 213:19 214:7 | 227:5 232:21 | **bbishop** 2:15 | 200:17 201:3 |
| 216:12,14,17 | 236:4,17 261:2 | **beasley** 3:13 | 202:9 206:20 |
| 218:4 219:9 | 261:2 | **beauty** 262:7 | 232:16 239:8 |
| 232:13 239:11 | **bad** 141:2 | **beginning** | 239:18 240:6 |
| 242:7 261:9 | **balderrama** | 45:15 49:2 | 240:10 |
| **available** 14:10 | 10:6,10 11:11 | 96:12 122:2 | **biased** 71:12 |
| 46:19 50:21 | 11:15 14:2 | 224:14 | 95:17,18 |
| 51:13 77:11 | 128:21 257:10 | **behalf** 2:8,16 | 205:19 |
| 121:12 265:16 | 267:15 | 3:8 54:14 164:5 | **biases** 147:14 |
| 266:5,8,9 | **baltimore** 1:14 | **believe** 21:1 | 148:14 156:20 |
| **avenue** 2:12 | **based** 30:2 | 32:9 33:9 52:20 | 200:21 |
| **aware** 26:7,8 | 43:15 44:20 | 53:19 71:5 | **big** 41:17 180:4 |
| 26:16 35:18 | 52:21 54:19 | 88:17,17 101:2 | 214:8 234:10 |
| 39:21 40:6,12 | 57:2 58:9 62:19 | 109:14 117:19 | 236:4 |
| 40:17 41:2,13 | 66:12 78:21 | 118:21 234:8 | **biggest** 178:13 |
| 42:4,10 44:9 | | 243:8 250:11 | |

**[billed - business]**                                                                Page 9

**billed** 270:15
271:1
**billing** 269:14
269:17 270:10
270:16
**bills** 56:11 58:6
**binder** 270:12
**binders** 57:11
**bindman** 9:3
16:1
**bindman's**
46:18 47:13
**bio** 171:12
**biologically**
102:17
**biostatistician**
168:18 169:1,5
171:4,7 174:13
**biostatisticians**
174:13
**biostatistics**
168:2,16
171:13,18,20
229:15 231:1
**bishop** 2:10 4:5
9:7 13:10 17:5
17:18 18:9 19:1
20:15 21:20
26:5 30:11,14
31:10 34:15
37:5,12 39:1
40:1,3,16,18
41:9,12 42:5,14
43:11,13 44:7
46:2,8 47:1,17
51:17 52:6 55:4

58:21 63:19
66:5 67:5 69:3
71:8,13 72:9,11
77:17,20 78:7
79:2 81:19 82:1
82:3,7,10 83:20
84:2,4,19 91:3
91:12,19 93:4
98:11 99:1
102:20 104:6
104:10,17
105:19 108:10
112:15 116:1
116:12 117:1
117:10 123:6
126:12 128:12
130:11,15,21
133:7 135:1,4
135:11 136:5
136:20 137:7
137:19 138:5
139:7 140:16
146:5,20
148:20 152:17
153:17 154:3,6
154:9 158:11
160:2,9 161:2
161:11 162:2
163:10 166:4
166:13 167:5
174:15 175:11
175:17 176:16
177:9 178:8,11
179:6,16,19
180:18 181:1
182:20 183:20

186:16 192:20
193:7 207:7
211:21 213:12
215:5 222:19
226:3,9,20
229:17,19,21
230:3,13
231:20 241:1
242:1,3,5 246:1
249:20 250:5
252:4 254:2,12
254:19 258:7
263:9,13
264:13 265:21
268:11,12
269:3 272:2,5,9
**bit** 15:11 18:14
18:16 22:18
39:19 53:16
69:20 76:7,14
159:6 172:18
**board** 19:20
20:2,4 56:19
**body** 75:17
79:10 145:14
147:2
**bold** 17:2
**bonferroni**
173:1,2
**book** 227:8
**bootstrapping**
172:5
**bottom** 48:5
96:11 119:21
151:5 189:2
224:19 237:20

**bound** 162:18
**bounds** 87:21
220:3,8
**box** 233:1,2
**bradford** 14:14
14:18 15:7
37:21 100:6
**branch** 73:4
**brandy** 3:17
61:18
**brca** 177:18
**break** 103:11
156:13 158:19
159:2,4 215:6
226:4
**breast** 191:2,14
191:15,19
192:7 193:16
240:3 243:16
262:6
**breathing**
255:10
**briefly** 159:10
**bring** 28:21
140:12 164:20
**brings** 80:20
**brought** 167:20
**bruce** 2:10
261:16 263:17
268:6
**bulk** 10:18 11:7
**bullet** 147:10
**business** 44:18
46:6

[calcification - case]                                                          Page 10

| c | canada 5:13 | 150:20,21 | capture 37:3 |
|---|---|---|---|
| **calcification** | 40:21 41:7,18 | 151:6,17 153:3 | 124:11 127:11 |
| 256:11 | 42:3,13,17 43:5 | 156:8 157:1,16 | **captured** 34:13 |
| **calculate** 57:18 | 43:16 44:1 | 165:15 166:3 | 128:10 216:8 |
| **calculation** | 47:11,15,21 | 180:17 191:3,3 | **carcinogen** |
| 80:12,14 81:4 | 49:9,11,11 52:5 | 191:3,6,14,15 | 106:21 253:3,9 |
| 81:10 84:12 | **canadian** 46:7 | 191:16,19,20 | 253:14 |
| 85:3 92:20 | **cancer** 5:18 6:5 | 192:7,8,14,15 | **carcinogenesis** |
| **calculations** | 6:14,17 8:18 | 192:19,19 | 102:14 208:14 |
| 81:8,8 82:14,15 | 9:6,10 10:2,4 | 193:6,6,12,15 | **carcinogens** |
| 82:17 83:9 | 10:21 19:14 | 193:16,19,19 | 252:13,15,16 |
| 84:13 141:18 | 22:5,7,10 25:11 | 194:1,1,4,9,10 | **care** 5:5 20:18 |
| 238:19 239:1 | 25:18,20 26:15 | 195:14 203:3 | 21:11,12,13 |
| **calendar** | 32:13 44:4 45:1 | 203:14 204:15 | 44:16 132:2 |
| 271:10 | 46:20 50:4 | 207:13 208:19 | 145:13 155:1 |
| **caliber** 160:19 | 54:11,12 55:1 | 209:3,11 210:4 | 200:1,14 |
| **call** 13:8 27:6,9 | 60:1 67:20 70:2 | 210:13 211:12 | 202:21 203:11 |
| 27:15,16 134:1 | 70:3 71:7 72:15 | 211:17 233:5 | 242:12 243:16 |
| 178:21 181:19 | 78:14 79:8,20 | 234:6 236:18 | **carl** 10:6 11:10 |
| 215:14 222:4 | 79:21 82:17,19 | 236:21 237:2 | 11:14,15 13:10 |
| 243:1 | 83:5,6 85:4 | 238:2,5 239:7,9 | 14:2 128:21 |
| **called** 69:15 | 86:7 88:11 | 239:18,19 | 257:9 267:15 |
| 72:13 73:16 | 96:21 97:21 | 240:3,3,4,15 | **cascade** 102:12 |
| 75:11 180:10 | 100:14 101:6 | 245:11,18 | **case** 1:3 7:5 |
| 222:2 227:18 | 102:19 105:2 | 246:9,12 | 10:10,14 13:7 |
| **calling** 179:8 | 105:16 107:6 | 247:14 249:19 | 25:9 27:3 28:2 |
| **calls** 37:13 39:1 | 107:10 109:3,6 | 250:13 255:19 | 32:5 35:17 |
| 41:12 43:13 | 109:16 110:8 | 256:2 257:14 | 38:12 50:2,7 |
| 44:8 47:2,17 | 115:15 116:6 | 258:3,16 | 51:1 52:4 54:4 |
| 71:8 126:13 | 116:16 119:5 | 259:16 260:10 | 55:7 58:18 60:6 |
| 128:12 136:5 | 119:21 121:3,8 | 262:6 267:21 | 60:15,20 61:1 |
| 160:2 179:7 | 131:4,5 132:3 | **cancers** 155:1 | 79:11 95:17 |
| 192:20 250:5 | 144:19 145:16 | 191:17 194:5 | 138:1 180:16 |
| **campus** 3:19 | 146:16 147:12 | 196:19 201:1 | 181:14 204:16 |
| | 148:17 149:6 | 242:13 243:17 | 205:2 213:8 |
| | 149:13 150:18 | | 235:12 242:11 |

[case - choice]                                                      Page 11

255:7,14
257:10 267:5
267:11,14,16
267:18 274:2
**cases**  10:7 54:2
54:4,6,10,11
83:6 118:19
119:2,9,12,15
119:15,21
120:12,13,14
121:4,17 131:5
151:1,2 153:1
192:16 194:20
195:14 196:19
197:17 211:13
238:1 255:20
256:21 267:15
**casual**  262:21
**categorical**
244:3
**categories**
244:12
**categorized**
253:8
**category**
202:10 217:19
243:1,15,21
244:3,4,5,19,19
244:21,21
245:4,4 261:4
262:7
**caught**  160:1
**causal**  9:9 45:1
51:15 54:21
79:4 146:11
147:3 193:14

194:3,7 236:9
239:2
**causality**  29:6
207:5,12 209:2
210:3,6
**causation**  7:17
7:20 9:1 10:6
10:11 11:18
24:7 35:7 40:6
40:12 44:4
267:19
**cause**  8:18 9:6
10:2,3,20 46:20
102:19 116:6
180:17 209:12
210:14 225:7
**caused**  113:19
**causes**  240:13
**causing**  192:18
192:19 199:2
**cell**  102:13
**central**  211:6
**certain**  59:17
170:7 196:9
**certainly**
120:13 144:3
172:3,4 173:17
181:5,6 192:3
245:7 249:1
250:18 254:5
263:2
**certainty**  177:8
178:7 183:9,14
184:11 186:4
187:14 232:10

**certificate**
273:1
**certified**  19:20
20:2,4
**certify**  273:3
275:3,6,9
**cervical**  105:16
194:4,12
**cetera**  56:20
**chained**  172:9
**chair**  168:5,7
168:11 229:14
**challenges**
148:13 156:19
**chance**  14:15
**chang**  68:5,8
240:16,17,19
242:20 248:21
249:1,5 250:19
251:10,20
261:3
**change**  15:6
24:19 29:7
32:21 33:1
49:11 53:5
181:5,6,7 199:2
251:20 274:4
**changed**  14:6
15:2,10 16:10
18:1,6 30:2,6,8
30:9,17,18 34:2
34:7 86:19
143:1 251:20
252:1
**changes**  8:9
29:20 121:21

147:17 225:6
257:4 258:4
**changing**  157:9
**chaotic**  212:12
**chapter**  227:8
**characterizati...**
247:19
**characterize**
32:16 126:18
213:6
**characterized**
36:15 38:4
116:10 125:20
133:13 212:17
213:3 216:6,9
216:21 218:5
250:3
**characterizing**
37:2 145:2
206:15
**charge**  160:21
161:6,21
268:14,17,17
**charles**  1:13
**chart**  132:18,21
133:4,5 152:3
154:12 190:7,9
262:14
**chemicals**
208:10
**cherry**  3:20
**chest**  255:15
260:9
**choice**  159:17
178:14 180:3

[choose - comment]

**choose** 132:6
149:19 150:2
162:10 164:16
165:7 166:20
188:9
**choosing**
169:18 204:11
**chose** 182:19
188:4,10 204:7
204:9
**chosen** 183:6
**chris** 7:4 154:1
241:3
**christian** 1:12
4:3 7:1 21:5
48:6 274:3
**christopher** 2:2
**chronic** 208:11
**chrysotile**
252:14 253:3,4
253:8
**circled** 28:16
29:13
**citation** 189:11
231:18 232:10
**citations**
134:19
**cite** 50:1,16
107:11 135:8
135:12 141:17
227:5 228:6
**cited** 142:12
228:16,17,21
**cites** 50:8 51:3
107:11,12,16

**citing** 51:10
135:6
**claim** 33:11
**claimed** 37:2
187:21 190:8
**clarification**
75:16
**clarify** 90:6
**classes** 222:13
**classification**
206:10 253:13
**classified**
187:18 253:2
**clear** 17:13
152:9 165:21
167:8 189:6
223:15 231:13
235:17 246:20
268:13
**clearer** 210:6
**clearly** 189:8
231:15 232:5
**client** 271:15
**climate** 49:11
**clinical** 21:11
21:13 114:13
144:11,17
**close** 61:12
153:4
**closed** 27:17
**closely** 247:3,6
**closer** 58:8
61:11
**coauthors**
109:20 242:9
242:18

**code** 183:17
**coffee** 236:18
236:19 237:1,2
**cohort** 32:4
38:11 50:5,21
75:9,13 76:21
77:8 78:19
79:18 80:1
95:16 109:6,16
115:10 118:17
119:13 120:19
120:21 121:21
122:5,17,18
123:4,8,14,15
161:7,10 167:9
174:11 181:13
203:1,12 205:4
205:17 212:15
213:1,4 216:20
220:16 242:14
249:7,11
**cohorts** 75:7
79:1,9 259:4
**collaborate**
62:2
**collating** 270:9
**colleague** 28:9
140:14 260:19
**colleagues**
24:17 60:19,21
61:11 93:18
94:14 138:10
**collect** 56:15
128:5 213:19
214:9

**collected** 74:3
88:12 115:16
118:16 202:21
203:11
**collecting** 213:5
**column** 100:8
150:10,16
151:2,16,20
152:6,13 155:6
196:14,17,17
196:19 197:5,6
204:13 208:2
211:9,11,11
220:14,15
**columns** 211:10
**combines** 76:10
**combining**
84:17
**come** 61:7
123:4,10 124:7
129:11,11
139:13 189:13
190:2 206:12
223:9 246:19
249:8
**comes** 49:18
123:18 172:1
**comfortable**
140:10,11
**coming** 139:15
199:8 249:6
**commencing**
1:14
**comment** 41:8
48:15 49:13
82:4 90:4 193:8

**[comment - confounder]**                                        Page 13

228:14 252:9
262:1
**comments**  49:8
98:17 136:8
138:6 181:2
230:14
**commerce**  3:14
**commission**
275:18
**committed**
180:16
**committee**  3:8
27:8
**common**  123:8
235:19,20
**communicating**
62:3
**communicati...**
59:16
**community**
51:12
**comp**  92:7
**compare**  118:1
185:15 224:1
**compared**
14:21 101:6,8
102:1 103:7
110:19 262:10
**comparing**
181:11 184:16
262:4
**comparison**
13:10
**comparisons**
200:20

**compelling**
77:16 156:7
165:14
**compiled**  41:18
**complete**
200:20 220:20
251:16
**completely**
93:17 94:14
96:1 169:16
**complicated**
47:4 140:4
171:2,3 221:15
**comply**  59:5
**component**
181:16
**compound**
30:15 37:5
42:15 43:13
52:6 67:6 116:1
137:7 138:5
148:20 161:2
161:11 246:1
**comprehensive**
52:3
**computations**
243:18
**concentration**
255:1
**concept**  172:19
258:13 262:13
**concern**  62:12
62:20 63:4,6,21
64:3,9 65:7,16
65:18 66:2,14
66:17 67:2,4,7

128:9 159:18
160:11,18
161:3 162:5
163:6 164:8,16
164:18,21
165:6 166:6,9
166:14 167:4
167:19 178:14
179:5 184:5
205:11 224:20
233:14,17
**concerned**
38:21 126:8
204:10
**concerning**
59:21 156:11
**concerns**  10:12
64:14 134:2,3,6
134:16 135:9
135:13,16
138:4,19 139:3
139:5,11,12,13
139:19 140:12
140:15 142:15
158:6 163:9
164:2,6 167:14
173:6,7,9,12,20
175:7 176:13
176:13,15
177:2,6 178:7
180:4,11
181:20 182:5
183:4 186:12
221:5
**conclude**  77:1

**concluded**
116:17 198:3
272:10
**concluding**  9:5
78:21
**conclusion**  28:3
28:14 51:8
77:13 97:1
104:4,20 108:8
131:21 162:9
166:2 197:21
**conclusions**
28:4 29:6,14
76:9 116:14
139:13 199:10
249:5
**concrete**  215:9
**conduct**  162:17
**conducted**
96:12 101:4,10
**confidence**  78:9
78:15 85:13
86:2,9,11,14
87:10,16,20
101:21 110:9
110:11,17
130:8,20
133:14 183:6
190:13,18
203:18 206:6
226:18 241:11
**confirm**  160:14
**confirmed**
249:18
**confounder**
234:10,21

[confounder - correct]                                    Page 14

236:5,13,15
**confounding**
14:15 15:4
232:12,14,18
233:6,10,12,13
233:14,20
234:6,9,13
235:7
**confusing**
258:12
**connecting**
193:21
**connection**
54:15 56:21
57:9 70:3 141:4
141:7 169:4
**consensus**
51:11
**consider**  11:4
20:11 27:19
69:16 74:19
96:16 117:13
122:17 171:17
171:21
**consideration**
25:1 41:7 42:13
42:21 49:9
126:21
**considerations**
14:14 15:2,3
**considered**
14:18 16:6 30:6
30:7 40:8 44:2
46:16 48:4,17
53:8,9 181:21
202:3 227:3

251:8 252:15
**considering**
14:14,15 25:19
69:19
**considers**  20:12
**consistency**
33:11 37:17
49:18
**consistent**
96:19 148:15
156:21 194:8
199:4 204:15
205:4 206:13
206:17 238:11
245:13,19
246:7,14
**consortium**
109:6,16
**constituents**
208:20 209:20
**consult**  171:6
174:12
**consultants**
176:5,9
**consulted**  44:17
**contact**  64:5,7
64:13 66:19
137:6,8 138:2,3
138:7,10
165:17 183:1
185:4
**contacted**
137:12
**contain**  129:1
**contained**
34:17 90:16

208:7
**containing**
106:20
**contaminated**
208:9 254:1
**content**  49:9
**contention**
111:12
**continued**  3:1
6:2
**continues**  51:3
123:4
**continuing**
250:15
**contradict**
173:9 217:18
**contradicting**
219:3
**contradiction**
219:11
**contradictory**
22:16,21 23:10
23:14 140:20
141:8 173:7
187:10 190:21
200:14 202:10
202:16 216:19
217:4,14,17
**contradicts**
217:18
**contribute**
102:14 145:15
146:1,3 147:4
208:13
**contributes**
146:2

**contributing**
235:7
**contribution**
251:2
**contributor**
246:20,21
**contributors**
245:12 246:13
**control**  32:6
38:12 51:1
79:11 95:17
172:21 181:15
204:17 205:2
235:12
**controls**  50:7
**conversation**
240:14
**copies**  226:16
264:19 268:6
**copy**  11:11
70:13,14 72:6
114:7 229:17
241:5 242:1
263:11
**cornstarch**
208:7
**correct**  10:8,14
11:20,21 12:11
12:18 13:4,5,9
13:12,16,17
14:12 15:13,14
15:21 16:4,20
22:4,6 25:13
28:17 29:10,17
29:18 31:21
32:1,6,7,17,18

**[correct - critical]**

32:20 33:10,15
35:8,9 38:14
45:13 46:3,14
53:18 54:3 55:3
56:11,16 58:21
60:12 61:14
64:11,12 65:6
70:18 72:3,15
72:16,17 74:6,7
74:9 75:5,8
77:12,15 79:12
80:11 81:14
85:15 88:1,16
90:18 98:20
99:9,16 101:15
101:20 106:3
107:12 110:2,3
112:4 113:14
114:1,5,6,10,11
115:6,10,21
117:18,21
118:8,17,18,20
119:10,16
120:3 122:7,8
122:12 125:4,5
125:9 127:13
127:18 129:2
130:9 133:2
134:7 135:18
135:21 146:19
151:11,12,14
151:15,18,19
152:3 157:2,3
157:19 163:4
170:5 173:8,13
174:14 177:19

177:20 185:8
187:10,10,11
188:18 190:9
191:3,4,7,10,16
194:15 195:1,8
196:7 197:20
200:5,11,15,16
201:2,14
202:19 206:10
207:16 208:5
211:1,2,4,20
212:6 220:19
222:7,11 227:2
229:2 232:14
241:21 244:8
249:7 255:20
255:21 261:8
268:2
**correction**
22:16,21 23:4
23:10 135:8
140:20 141:1,9
141:13 169:13
169:19 173:1,2
173:3,7 190:21
202:10,17
216:20 217:5
221:2 273:10
**corrections**
221:4 273:7
**correctly**   35:8
36:16 53:9 63:2
102:15 125:19
185:2
**correlated**
247:6,7

**corresponding**
64:10 73:2,9,17
73:20 114:21
**cosmetic**   8:17
9:10 10:3 32:13
44:21 54:21
74:3 78:14 79:7
88:11 97:21
109:3 116:6
146:14 193:14
194:3 198:17
198:18,20
208:18 209:4
211:16 240:15
257:17
**costs**   57:11
**counsel**   11:11
72:6 138:6
181:2 226:6
230:14 275:5,9
275:10
**couple**   61:21
129:14 170:17
175:2 208:4
240:17 248:6,6
248:13 252:11
265:3 270:3
**course**   44:17
46:6 171:8
**court**   1:1,15
11:19 12:9
35:11,16 36:10
38:9 69:14
83:21 226:4
266:6 271:19

**covariant**   228:6
**covariate**   6:8
190:17 227:19
247:12
**covariates**
142:19,19,20
170:21 172:13
173:17 182:12
183:9,14,16
184:11,21
186:4,6
**cover**   12:14
159:7
**covered**   91:3,12
91:19
**covers**   91:3
**covid**   58:11
**cox**   6:9 227:19
228:7,13
**create**   126:2
216:15 220:8
221:6 252:7
**created**   35:21
123:11 124:19
128:15 214:16
216:16
**creating**   124:15
124:18 128:16
132:15 143:12
197:16
**credentials**
69:11
**credible**   74:19
74:20
**critical**   20:18
21:10 44:16

[critical - decreasing]                                                    Page 16

127:2 142:15
201:21
**criticisms**
16:21 17:1
29:13 34:13
36:12,16 37:3,9
38:13 159:6
**criticize** 173:13
**criticized** 81:13
**criticizing** 32:4
**critiqued** 16:14
**cross** 38:12
86:15 87:17
203:19 247:1
**crucial** 200:21
**ctisi** 2:6
**culprit** 208:21
209:20
**curious** 159:11
256:21 257:1
**current** 21:18
51:15
**currently** 31:5
**curriculum** 5:7
18:19
**curve** 235:17
**cut** 21:14
125:15 211:19
212:11 270:18
**cv** 19:9 21:18
**cystic** 21:12
23:21

**d**

**d** 4:1 5:1 6:1

**dale** 68:18
161:9,15
**damage** 102:13
**data** 14:10
22:16,21 23:4
23:10,14 27:6,9
27:14,15,19
30:10 31:5,8
51:15 62:12,20
62:21 63:12
64:4,15,17 65:3
65:9,15,20,21
76:10 118:16
119:9 121:12
121:14,19,20
121:21 124:5
135:7 138:20
140:20 141:1,8
141:13 142:2,7
148:15 149:21
150:14,17
153:8,9,10
154:17 155:10
156:21 157:9,9
157:10 159:12
159:19 160:8
160:15,19
162:21 163:1
164:6 165:16
166:1,16,21
167:10,11,11
167:13,20
169:13,19
170:4,8 171:15
172:2,14 173:7
173:13,15,16

174:11 179:10
179:11 184:6,7
184:17,17,18
184:19 185:15
185:16,17
186:10,11
187:10 189:5,7
190:21 198:10
199:8,11
200:13 201:12
201:15,21
202:10,11,16
202:18,21
203:11 210:21
211:1,3,8,10,12
212:15 213:1
213:19,20
214:9 216:19
217:4,14,17
219:12,19
220:11 222:4,9
223:16 224:1,2
224:3 226:16
229:2 231:10
231:12,13
232:5 233:13
242:15,17
249:8
**dataset** 185:16
**date** 79:17
251:18 273:16
274:3
**dated** 248:14
248:14
**daubert** 35:3,7
35:11 36:13

**david** 3:11
61:18
**davidson** 67:13
175:17
**day** 48:14 49:13
51:7 213:21
254:16,17
275:13
**days** 12:21
129:15 134:13
137:21 141:5,5
174:18 176:12
244:7,9 249:14
**dc** 3:5
**deal** 146:8
219:10 222:5,6
222:8 223:11
262:20 264:11
**dearing** 3:11
61:18
**decade** 125:12
**decades** 126:9
128:2,4,6,10
150:4 151:14
153:9 154:17
213:10,20
**decide** 99:20
**decided** 100:18
214:16 216:14
**deciding** 258:4
**decision** 124:16
126:2
**decline** 170:13
**decrease** 131:4
**decreasing**
199:2

**defendant** 2:16
**defendants**
  37:2 38:4,6,17
  38:20
**defense** 36:14
**definition**
  32:15
**definitive**
  147:19,21
**degree** 177:7
  178:6 183:8,13
  184:10 186:3
  187:13 232:10
**delivery** 272:1
  272:3
**demonstrate**
  33:5 50:21
  62:13,21
  159:12
**demonstrated**
  63:20 131:3
**demonstrates**
  63:16 193:13
**department**
  168:2,5,12,19
  169:5 174:14
  229:14
**depend** 170:11
  254:21
**dependent**
  212:16 213:2
**depending**
  173:10
**depends** 23:2,2
  65:12,12 93:5,8
  100:2,4,4 144:4

157:5 170:10
222:21,21
223:20 236:16
251:19,19
253:19 254:13
263:2
**deponent** 2:17
  275:4
**deposed** 8:1
**deposition** 1:12
  5:14 7:8,13 8:5
  11:12 12:3
  13:18 18:21
  21:3 26:19
  28:11 29:3 36:2
  40:20 41:6 43:3
  58:15,17 59:1
  67:19 70:8 72:7
  84:11 89:3 91:4
  91:13,20
  105:11 109:10
  118:3 144:14
  155:21 227:13
  229:11 237:9
  241:7 248:4
  265:2 269:7
  272:10
**depositions**
  54:7
**descending**
  38:8,11
**describe** 17:21
  49:7 187:2
  250:21
**described**
  114:21 184:2

185:12,19
222:10,12
**describes** 229:4
**design** 50:15
  74:13 75:3
  134:4 149:3
  177:1 181:18
**designed** 220:7
**designs** 31:18
**despite** 148:13
  156:19
**detailed** 125:7
  149:3 155:3
  200:7
**details** 149:18
**detect** 80:2
**determine**
  184:20 260:5
**determined**
  51:14
**develop** 257:18
**developed**
  259:10
**development**
  153:3 233:5
  234:5 235:17
  236:21
**diagnose** 119:5
**diagnosis** 257:2
**diaphragms**
  106:8
**died** 201:9
  221:13
**diette** 42:11
  51:4 60:11,14

**diette's** 46:16
  47:13 62:1
**differ** 172:21
**difference** 11:7
  13:6 31:3 35:1
  97:6,10 99:19
  102:3 110:18
  179:11,13
  192:14
**differences**
  14:9 218:13
  224:5
**different** 35:12
  36:11,12 37:20
  57:15 76:14
  82:18 122:16
  123:9 124:20
  132:6,8 137:15
  140:5,5 141:3
  142:6,6,7
  149:19 165:9
  167:21 169:2
  169:19 171:16
  180:8 181:13
  184:6,19
  185:18 186:11
  187:3 188:17
  191:2,17
  192:21 200:18
  202:13,13
  204:2 205:7
  208:8,9 210:1
  218:9,15
  219:11 224:4,7
  224:15 230:7
  232:5 252:4

[different - draft]                                                                Page 18

255:5 268:14
**differential**
131:8 143:13
152:10 197:17
220:20 257:13
**differentially**
197:11
**difficult**   154:18
203:5
**difficulty**
172:18
**dina**   168:6
**direct**   100:9
**directly**   45:11
102:10 106:8
**director**   69:1
**disagree**   16:13
75:12 84:13
85:6 88:21 95:9
95:12 97:3,11
98:3,8 99:2
104:19 111:19
112:17,19
116:9 133:18
146:17 148:2,3
149:9,10,17
198:6,9 203:4
203:15 204:4,9
204:18 205:5
212:5,9 238:6
239:11 240:5,8
247:18 262:19
**disagreed**   9:8
9:15 79:15
81:17 97:14
98:21 103:18

104:15 157:4
198:10 199:10
199:10
**disagreeing**
204:7,10
**disagreement**
34:4 198:12
200:4
**discern**   187:12
187:16
**discord**   167:12
**discounted**
93:20 94:16
**discrepancy**
198:17
**discs**   270:13
**discuss**   33:18
39:19 175:6,12
**discussed**   24:6
24:6 60:17 77:8
77:8 175:4
**discussion**
122:10 202:20
203:6,10
237:15 251:10
252:2
**disease**   21:14
79:21 121:3
192:2 256:10
257:20 259:6
259:10
**displayed**
138:20
**dispute**   83:18
**distinction**
192:18

**district**   1:1,2
**disturbance**
159:3
**division**   68:15
102:13
**dna**   102:13
**doctor**   57:15
89:8 93:10
112:10 131:1
158:5,17
**doctors**   70:16
92:4
**document**
41:17 48:2
51:17,18 59:12
94:10 249:21
252:3,7
**documents**
56:16 59:6,16
63:5,11 250:2
**doing**   22:20
24:3 44:12 65:6
82:14,15
138:13 142:14
143:10,11
169:14 189:12
195:19 202:6
223:3,7 227:21
260:12
**dollars**   164:4
**dosage**   254:13
**dose**   33:5 37:18
235:17 252:20
254:1 263:3
**doses**   256:14

**double**   152:14
159:7
**doubling**
198:20
**douche**   125:13
200:8 245:11
246:12
**douching**   6:4
105:14 125:11
125:13 190:19
246:20 247:4
247:11
**dr**   7:4 21:9,11
42:11,12,12,12
46:16,17,17,18
47:13,13,14,14
51:4 60:11,14
62:1 64:11,13
64:14 70:17,17
72:19,20 90:15
90:20 91:8,9,10
91:15,16 92:4,7
94:7,14 98:9,10
104:3 109:13
109:19,19,20
114:9,9,9 148:9
148:10 156:18
158:1,1,1,16
168:10,11
214:2 242:16
266:12,18
272:5
**draft**   40:21
48:14 49:12
176:12

**[drafted - establish]**

| | | | |
|---|---|---|---|
| **drafted** 128:20 | **editor** 89:11,14 | **employed** | **epidemiologic** |
| **drafting** 27:3 | 89:20 90:12,15 | 29:17 30:5 31:6 | 6:12 17:10,10 |
| 121:13 129:12 | 92:3,7,19 93:9 | 31:7 40:13 | 38:7 39:10 |
| **dramatically** | 98:4,19 104:14 | 65:21 | 43:15 44:20 |
| 167:21 180:8 | 111:14 116:20 | **employee** | 51:13 107:8,19 |
| 204:2 224:15 | 136:7,9 138:18 | 275:10 | 181:18 194:2 |
| 225:6 | 138:21 206:14 | **enclosed** 273:9 | 251:7 260:8 |
| **drawn** 199:11 | 233:8 | **engage** 145:6 | **epidemiologist** |
| **drinkers** | **editorial** 92:9 | **engaged** 123:20 | 56:19 269:21 |
| 236:20 237:3 | 92:16 237:5 | 124:8 | **epidemiology** |
| **drinking** | 238:17,21 | **enriched** 83:3,4 | 5:21 20:19 22:7 |
| 236:18 237:1 | **education** | **enroll** 215:13 | 26:12 44:15 |
| **drs** 90:15 93:17 | 19:10 189:20 | **enrolled** 123:2 | 45:9 60:21 69:1 |
| 94:7,9 98:18 | **effect** 51:15 | 125:4 213:21 | 73:4 91:1 103:2 |
| 103:17 138:18 | 100:13 101:5 | 214:11 215:13 | 103:4 161:16 |
| 241:21 | 131:11,15 | 215:15 | 171:14,20 |
| **drugs** 45:7 | 205:19 | **enrollment** | 193:13,20 |
| **due** 12:20 | **effects** 106:20 | 122:21 125:1 | 222:2 250:13 |
| 112:10 129:14 | 202:3 262:2 | 155:2 187:19 | **epithelial** 8:18 |
| 246:8 267:21 | **effort** 238:14 | 188:1 200:3 | 9:6 102:9 |
| **duly** 7:2 275:4 | **egregious** 160:6 | 213:3 221:8 | **equally** 96:16 |
| **duration** 101:5 | 161:6 | **enter** 106:9 | **equated** 93:12 |
| 125:8 190:20 | **either** 11:4 18:6 | **entered** 127:11 | 94:21 |
| **dusting** 256:4 | 20:7,11 25:14 | **entities** 59:17 | **equations** |
| 258:6 | 53:7,19 73:20 | **entitled** 28:3 | 172:9 |
| **duty** 162:18 | 75:16 108:20 | 29:5 35:6 82:10 | **errata** 273:8 |
| **e** | 143:21 162:18 | 105:14 144:18 | 274:1 |
| **e** 4:1,1,1 5:1,1 | 163:8 170:6 | **environmental** | **especially** |
| 6:1,1 | 223:19 256:10 | 6:7,15 49:11 | 145:16 147:16 |
| **earlier** 77:21 | 259:9 | 67:21 68:14 | **esq** 61:18,18 |
| 182:21 189:18 | **elizabeth** | 73:5 | 247:16 |
| 265:7 | 229:14 | **epa** 25:14 253:8 | **esquire** 2:2,10 |
| **easier** 170:20 | **email** 73:21 | 253:16 | 3:2,11,12,17 |
| **easiest** 264:10 | 115:5 | **epa's** 253:11 | **essence** 75:9 |
| | **emailed** 62:7 | **epidem** 107:4 | **establish** 207:4 |
| | | | 207:12 209:2 |

210:3
**estimate**   39:12
39:12,13 55:17
56:6 58:9 87:2
95:8 143:14
162:10,10
169:20 183:6
191:8 205:19
224:5 235:5
267:4
**estimated**   86:8
**estimates**   78:9
78:15
**estimating**
101:5 202:2
**estimation**
255:9
**et**   56:20 134:5
**evaluating**
31:17
**evaluation**
25:10 42:10
**evidence**   8:17
9:4 11:3 17:11
26:14 31:17
33:17 38:7
43:10 44:2 50:6
51:14 63:11
67:17 77:16
78:5 93:12 95:1
95:4 97:13
104:5 111:11
115:9,11
145:14 146:4
147:2 149:4
150:7 156:7

165:14,20
166:6,8,10
193:11 194:2
203:1,13 204:6
206:21 228:10
**evolution**
250:15
**exact**   84:12
**exactly**   17:16
29:21 30:1 33:8
49:14 77:20
84:10 134:10
143:14 184:1
197:14 199:12
208:20
**exaggerate**
223:19 224:10
**examination**
7:3 265:6 267:9
268:12 269:11
275:6
**examined**   273:4
**example**   14:13
16:17 31:15
38:6 48:3 49:17
50:2 52:14
57:18 62:4 88:5
90:14 140:19
141:16,17
152:9 167:8
177:18 192:4
215:9 223:2
250:12 262:5
268:1
**except**   103:4
263:10

**excerpt**   5:10,11
**excerpts**   37:14
**exclude**   150:4
**excluded**
154:16
**excludes**   153:9
**excuse**   130:5
144:17 225:18
256:7
**executive**   3:19
**exercise**   36:8
**exhibit**   5:2,3,4
5:5,7,8,9,10,11
5:12,13,14,15
5:16,17,19,20
6:3,4,6,7,8,10
6:12,15,17,19
6:20 11:10,12
11:14 12:2,3,10
13:16,18 18:19
18:21 21:1,3,19
26:18,19 28:1,8
28:10,11 29:3
35:20 36:2 43:2
43:3 58:14 59:1
59:5,6,20 70:7
70:8 72:7 89:2
89:3,6 105:11
105:13,13
107:14 109:10
113:6,8,9,13
118:3 144:13
144:14 155:20
155:21 156:18
165:12 174:19
190:3 227:10

227:11,13
229:11 237:9
240:20 241:7
248:3,4 263:8,9
265:2,8,10
268:4 269:6,7
269:19
**exhibits**   7:13
28:9 265:12,13
268:6
**exist**   192:9,11
**exists**   31:5
189:5 225:2,11
231:7
**expect**   73:9
121:3 191:19
256:1,5,8
**experience**   45:9
189:12,14
225:11,12
230:17 231:19
232:1
**experienced**
230:18
**experiment**
65:17 132:5
145:2,7 160:7
166:12,19
181:19 182:1
199:16 220:2,4
**expert**   5:3,4
7:16 19:10 20:7
20:13 27:3 28:2
35:7 41:6 42:3
42:11 43:10
46:18 48:5,6

54:2 60:20
62:10,11 108:7
137:16 141:8
171:13,17
175:21 251:5
**expertise**  19:10
20:18 21:11,13
45:6,8 171:14
171:15,19
230:21
**experts**  9:2
10:12,21 15:12
18:4 27:16
29:14 30:3,5,17
32:3,11 33:4,20
34:9,12 35:12
36:13 37:4,11
50:2,16 61:13
61:15 70:21
81:13,16 82:18
164:3 175:20
176:1,5,9
**expires**  275:18
**explain**  35:4
188:21 234:9
234:11 235:1
236:5,13,15
239:8,19
**explained**
116:19 208:3
**explanation**
103:1 182:11
182:19 233:13
240:7
**exploratory**
96:16

**explore**  124:6
**explored**  99:8
**exposed**  143:2
152:7,13,13
153:4 155:6
187:20,21
188:1,2 196:16
196:20 197:4,6
197:7,8 213:6
215:18 217:1,1
217:2 218:17
218:18,19,20
219:9,13,16,17
219:20 240:11
254:9 255:9
258:5 260:6
**exposure**  8:17
14:5 142:20
148:14 149:3
156:20 169:14
169:15,15,15
171:1 172:17
173:15,18
192:3,10
200:18 205:21
220:21 236:8
238:1 240:12
244:6 247:14
252:18,18
253:19 255:4
256:3 257:5,18
258:15,21
259:8 260:10
260:16 261:6
**exposures**
199:21

**express**  141:9
**expressed**
37:11
**extensively**
91:13,20
**extent**  207:11
**external**  48:20
49:5,7,8
**extra**  12:21
242:1
**extrapolating**
261:4
**extreme**  39:2
143:1,2 181:11
182:10 219:18
219:21
**extremes**
220:19

**f**

**f**  4:1 5:1 6:1
**fact**  10:20 17:2
44:13 75:13
115:13 122:9
127:16 182:17
185:21 216:7
222:14
**factor**  6:7
170:12
**factored**  39:5
**factors**  39:5
50:14 100:5
144:7
**failed**  33:20
34:12 66:3,11

**fair**  160:5
180:12 218:1
**fairly**  123:8
**faith**  1:15,19
275:2,16
**fallopian**  102:9
110:11 111:16
208:12
**falls**  238:11
**familiar**  51:19
114:13 136:14
168:14 169:12
169:13,16
173:4 228:12
228:12
**family**  83:5
253:21 254:17
**far**  38:20 74:5
88:12,14 110:6
115:17,18
**fashion**  30:6
62:2
**father**  254:5
**fault**  213:18
**fda**  25:2,5
253:1 255:2
**fda's**  255:7
**feature**  144:6,9
144:16 156:2
165:13
**featured**
143:21,21
144:1,4 155:15
155:16
**february**  7:21

[federal - following]                                                    Page 22

**federal** 11:18 11:19 35:17 47:10
**fee** 6:20 56:18 268:19,20 269:1,4,12
**feel** 29:20 36:13 142:9 143:9 159:16 162:18 174:9 273:7
**feelings** 158:9
**felt** 9:13 78:18 79:9 140:10,10 254:8
**fibrosis** 21:12 23:21
**fibrous** 257:6
**fighting** 82:5,5
**figure** 57:19 101:17,18 124:21 134:16 194:16,17 197:9 198:16 201:12 238:8 238:14,16 247:8,20 259:15
**figures** 201:4 247:11
**filed** 42:3 47:12 58:18 251:6
**filing** 192:16
**fill** 65:21 167:10 186:2
**films** 10:16 258:21 260:5

**final** 43:5 44:3 48:17 49:9 129:13 178:15 183:7
**finalize** 141:6
**finalized** 134:12
**finalizing** 129:13,19 130:3 175:1
**find** 32:6 75:4 81:16 100:4 120:5 124:3 126:6 129:3 138:3 188:15 188:19 189:1 208:17 215:3 231:17 239:13 241:18 257:11
**finding** 208:18 226:1
**findings** 41:8 96:14 148:15 149:11 156:21 157:12,14 204:14 205:4 209:8 210:11 233:3 234:3 246:14
**finds** 144:18
**fine** 84:7 85:9 112:19 118:14 226:9 258:12
**finely** 170:17
**finish** 66:5 152:17 153:17

154:6,9 179:16 179:19 183:20 198:7 231:11 254:12 260:18 268:4
**finished** 66:6,7 66:9 132:12 170:1
**firm** 3:13 264:2 264:6
**first** 7:2 8:15 16:14 50:3 76:20 94:13 118:7,9,10,11 118:12 135:17 150:10 152:13 171:4 185:14 185:19 200:10 203:10 207:17 207:18,21 208:1 211:8,11 212:17 217:7 218:14 219:5,7 219:12 223:20 224:19 235:15 237:20 244:3 252:12 265:18 265:19
**five** 142:6 244:7 244:7,9,12
**fl** 2:5
**flag** 179:12 180:3 188:15 188:16 189:8 204:1 225:2 231:3,15 232:7

**flank** 170:19
**flanks** 206:7
**flaw** 33:19
**flawed** 9:13 10:1 16:6 30:7 30:16 33:6 71:5 83:7 85:6
**flip** 15:11 196:3 197:9 198:21
**focus** 150:2 182:10
**focused** 200:2
**folks** 198:21 259:9
**follow** 33:20 120:19,21 121:17 122:6 125:6,7 152:7 152:18,20 155:3 187:20 188:2 192:4 200:9,20 201:8 214:17 217:12 219:8 221:8,13 268:11
**followed** 74:4 80:21 88:13 115:17 118:20 118:21 119:10 119:15 120:6 122:3 123:9,19 150:13 155:11 170:14 180:7 259:3
**following** 244:10

**[follows - generally]**                                                                Page 23

**follows** 7:2
**footnote** 107:14
  225:18,18
  227:7
**footnoted** 142:2
**footnotes** 142:2
**form** 17:5,18
  20:15 23:12
  26:5 30:11,14
  34:15 39:1
  40:16 43:11
  52:6 55:4 98:11
  108:10 139:7
  167:5 180:18
  181:1 185:7
  222:19 246:1
  252:14 254:19
**formal** 138:21
**forming** 14:4
**forms** 101:10
  252:13
**formulate**
  74:17 118:12
  186:14
**formulating**
  116:5 117:12
  155:5
**formulation**
  15:9
**forth** 62:4
  167:21 214:2
**forward** 113:5
  155:5 180:7
**found** 32:14
  46:20 74:6
  77:15 85:11,12

88:15 98:1
101:15 110:7
129:4 147:11
203:1,12 204:6
226:14
**foundation**
  7:16 8:13 26:6
  40:18 41:10
  42:14 44:7 47:1
  47:17 102:20
**founding**
  132:15 150:1
**four** 76:13
  80:20 82:20
  132:5,6 142:6
  149:19,20
  157:7 163:18
  163:21 166:19
  180:4 181:21
  182:7,10,13,19
  183:5,10,15
  184:12 190:5
  190:11 191:9
  191:13 195:3
  195:18 196:10
  197:19 198:13
  198:14 202:10
  202:13,13
  203:16,20
  204:1 205:7,9
  210:15 220:7
  220:17,18
  221:3,4,5,6
  234:9 236:7
**fourth** 155:2
  187:17 200:9

202:16 229:5
**frames** 200:2
**framework**
  14:18 15:8
  37:21 100:5
**free** 29:20
  36:13
**frequency**
  125:2,12 158:4
  172:3 190:20
  243:1,15,21
  244:5,12 261:4
  262:3
**frequent** 101:8
  101:9 145:17
  149:6,14
  157:17 202:3
  262:5,9,16,17
  262:20
**frequentist**
  172:1
**frequently**
  147:16 262:17
**friday** 1:13
**friends** 61:6
**front** 26:21
  48:3 141:5
**full** 19:16,17,17
  50:3 94:13
  154:14 185:16
**fully** 123:17
  150:17 155:8
  185:12 206:17
  211:4,8,10,12
  212:15,15
  213:1 220:15

222:10 239:8
**function** 170:14
  170:16,18
  223:2
**fundamentally**
  62:19
**funding** 59:9
  249:14
**further** 17:9,10
  75:15 141:14
  149:2 183:3
  238:19 275:6,9

**g**

**g** 243:18
**gaps** 186:1,2
**gates** 78:20
**gather** 173:16
**general** 7:17,20
  8:20 9:1 10:6
  10:11 11:2,18
  18:10 31:9,13
  34:6 35:7,10
  55:16 75:4 90:3
  142:17 165:15
  204:21 225:5
  240:14 254:8
  271:16
**generalizations**
  50:13
**generally** 8:13
  8:15 10:18
  13:20 18:5
  29:13,15 32:12
  33:19,21 35:5
  269:20

[genital - grasping]                                                    Page 24

| | | | |
|---|---|---|---|
| **genital** 5:17 | 122:2 185:21 | 261:15 266:2 | 192:17 199:5 |
| 72:14 79:19 | 252:17,17,18 | **goes** 51:10 53:3 | 219:16 223:20 |
| 96:20 100:13 | 255:7 273:5 | 103:10 106:13 | 224:12 227:9 |
| 105:2,14 107:5 | **gives** 90:9 | 110:18 121:5,8 | 227:16 230:6,6 |
| 107:9 110:8 | 115:5 187:3 | 153:4 195:17 | 230:13 231:21 |
| 132:2 144:19 | **giving** 102:17 | 197:12 199:2 | 240:20 245:3 |
| 145:14 147:11 | 267:18 270:12 | 205:15,15 | 257:3 260:18 |
| 148:16 149:6 | **glad** 269:10 | 235:18 252:8 | 264:7,18,20 |
| 149:12 156:7 | **gland** 8:18 | **going** 7:12,13 | 265:21 267:19 |
| 157:15 190:19 | **go** 16:15 17:7 | 7:15 11:9,9,14 | 271:21 |
| 200:8 203:2,14 | 31:12 48:9,18 | 13:14 15:17 | **gonzalez** 78:20 |
| 204:14 209:10 | 49:2,16 51:8 | 18:18 20:21 | 117:16 118:19 |
| 210:12 233:4 | 52:7 59:15 69:4 | 26:17 29:6 | 121:14,15 |
| 234:5 238:1,4 | 69:5 74:21 | 35:20,21 36:1 | 125:7 213:13 |
| 239:6,8,17,19 | 82:10,15 84:2 | 36:20 43:1 | 245:20 |
| 245:11,11 | 88:9 95:15 | 49:16 52:7 | **good** 7:4,10,11 |
| 246:12 256:3 | 96:10 100:5 | 53:15 55:17 | 36:8 100:20 |
| 258:5 | 101:17 102:7 | 56:7,8,8 58:3 | 114:16,18 |
| **genitally** 260:7 | 103:14 110:4 | 58:14,16 59:15 | 115:20 116:3 |
| **georgia** 54:4,5 | 117:7 123:1 | 64:21 66:4 69:4 | 167:18 197:15 |
| 54:6,10 | 125:14 131:1 | 69:5 70:6,11 | 215:5 263:17 |
| **gerel** 3:3 | 144:7 156:14 | 72:5 80:19 | **gossett** 92:10 |
| **gertig** 78:20 | 156:17,17 | 83:15 84:1,3 | 92:16,21 |
| **getting** 155:9,9 | 159:7,9 160:7 | 86:18 102:5 | 237:15,15 |
| 197:2 203:5 | 163:21 169:5 | 106:7 109:5 | 238:18,20 |
| 214:5 216:6 | 176:11 190:3 | 118:1 120:17 | 239:3 |
| **give** 38:3 55:17 | 196:12 197:5,9 | 122:4 139:21 | **gotcha** 83:15 |
| 70:14 72:5 | 197:18 198:14 | 140:9,15 | 118:5 |
| 73:20 80:14 | 198:15 199:18 | 142:15 145:6 | **gotten** 256:2 |
| 90:4 154:13 | 199:21 201:20 | 148:9 154:7,10 | **governed** |
| 167:8 169:8 | 203:18,21 | 154:12,13 | 189:21 |
| 188:21 260:17 | 204:3,11 | 155:19 160:7,8 | **graph** 195:2 |
| 263:11 267:13 | 211:19 214:18 | 160:17 162:4 | 196:8 |
| **given** 11:11 | 221:6 232:21 | 170:11 179:20 | **grasping** |
| 12:21 33:1 50:5 | 236:4,17 245:8 | 184:8 187:6 | 172:18 |
| 62:19 119:12 | 252:4 261:2,2 | 190:2 192:11 | |

**[great - hochberg]**                                                                    Page 25

| | | | |
|---|---|---|---|
| **great** 62:17 | **hand** 7:12 11:9 | 133:1 137:18 | **hearing** 35:17 |
| 68:3 85:21 | 27:7 35:20 | 151:18 152:9 | **heavy** 215:11 |
| **greater** 74:4 | 58:14,16 102:8 | 154:21 155:8 | **held** 1:12 35:16 |
| 88:13 101:7 | 207:19 239:4 | 165:7 190:13 | **help** 56:17 |
| 115:16 261:5 | 239:16 245:9 | 190:17 195:18 | 57:19 138:12 |
| **group** 121:1 | 264:20 265:12 | 196:10 197:10 | 189:3 224:21 |
| 123:19 124:8 | 269:15 275:12 | 197:12 199:3 | 241:19 270:8 |
| 169:1 201:2 | **handle** 232:4 | 202:2 203:17 | 270:10,11 |
| 219:17 224:2,3 | **handy** 242:3 | 205:16 206:6 | 271:9,13 |
| **groups** 80:20 | **happen** 49:14 | 220:21 223:18 | **helpful** 221:21 |
| 102:4 150:18 | 191:14 256:13 | 226:17 234:11 | **helping** 57:18 |
| 185:18 224:1,4 | **happened** 8:9 | 235:8 238:10 | 271:17 |
| **growing** 145:14 | 120:10 160:10 | 238:11 241:11 | **helps** 56:15 |
| 147:2 | 160:11 164:12 | 262:6,9 | 268:15 |
| **guess** 108:4 | 214:10 216:7 | **head** 161:16,17 | **henrich** 3:18 |
| 128:15 222:4 | 253:12 | **headline** 156:5 | **hey** 80:18 |
| **guessing** 37:19 | **happening** | **health** 5:13 | 129:20 216:17 |
| 55:17 147:7,9 | 207:1 | 40:21 41:7,18 | **hierarchy** |
| 173:18 | **happens** 67:18 | 42:2,13,17 43:5 | 31:17 38:7 39:9 |
| **guide** 6:10 | 121:1 152:10 | 43:16 44:1 | **high** 221:1 |
| **guy** 61:4 91:2 | 191:21 | 47:11,15,21 | 235:8,19 |
| **guys** 270:19 | **happy** 119:18 | 48:19 49:4,10 | **higher** 259:8 |
| **gynecologic** | 144:12 266:1 | 52:5 67:21 | 262:6,9 |
| 193:19 194:1,5 | **hard** 199:3 | 68:14 73:5 | **highest** 149:13 |
| 194:9 | **harlow** 90:15 | 76:11,11,14,15 | **highlighted** |
| **gynecologist** | 91:8,9 93:17 | 77:9 122:10,14 | 188:20 227:16 |
| 20:9 | 94:9,14 98:9,18 | 122:15,15,18 | **highly** 211:6 |
| **gynecology** | 138:18 | 123:2 161:7 | **hill** 3:20 14:14 |
| 20:3,5,8 22:14 | **harmful** 208:10 | **hear** 196:3 | 14:18 15:7 |
| | **harris** 3:17 | 214:12 | 37:21 100:6 |
| **h** | 61:18 237:5,17 | **heard** 25:21 | **histories** 149:3 |
| **h** 5:1 6:1 | **hazard** 86:8 | 26:1 91:15 | **history** 83:5 |
| **half** 238:1 | 95:16 97:8 | 109:17 114:15 | 148:14 156:20 |
| 253:2 | 102:2 110:9 | 114:17 162:12 | **hochberg** |
| **halfway** 122:11 | 130:7 131:6,8 | 162:14 252:19 | 172:20 |
| | 131:10,19 | | |

**[hold - impute]**                                                                 Page 26

**hold** 9:19 17:1
   152:17 176:14
   178:6 186:3
   226:1 232:9
**holds** 20:7
**hole** 214:8
**honestly** 218:21
**hopkins** 19:3
   20:7,10,12 21:6
   61:3 168:3
**hormonal**
   147:17
**hormone** 155:1
   242:13
**hot** 178:2
**houghton** 78:19
**hour** 268:17,18
   270:20,20
**hourly** 268:14
   268:15 270:18
   270:20
**hours** 140:7
   141:16 251:4
   267:4,7 269:15
**hpv** 106:16
**huge** 188:7
   198:16
**hum** 55:15 76:2
   89:15 123:3
   139:10 150:12
   189:19 195:12
   196:15
**human** 48:19
   49:4 252:15
**humankind**
   234:17

**hundreds** 164:4
**hygiene** 245:10
   246:11 247:9
**hypertension**
   235:11,16
**hypotheses**
   208:15
**hypothesis** 74:3
   88:12 96:19
   97:21 108:4
   115:15 209:9
   210:11,11
   233:3 234:4
**hypothesize**
   100:11
**hypothetical**
   96:1,4 216:7
**hypothetically**
   86:11 103:1
**hysterectomies**
   88:5

**i**

**i.e.** 85:13 238:1
**iarc** 5:9,15
   25:18 26:2,8,11
   27:8,19 69:20
   70:10 253:12
**idea** 71:9,15
   81:9 246:18
   270:1
**ideas** 62:4
**identify** 221:11
**ignore** 31:17
**ii** 76:14 122:15

**illustrate** 182:9
**impact** 262:4
**implement**
   200:18
**implicate**
   207:12 209:3
   210:3
**important**
   79:12,13 80:17
   93:2 96:17
   100:1 116:5
   126:21 144:1
   161:10,21,21
   162:17 163:7
   184:18 186:10
   196:6 213:5
   226:3,6 245:12
   246:13 249:10
   249:17,17
   250:3 251:2,7
   252:2
**impossible** 39:3
   39:15 184:20
   185:6
**improper** 9:3
   71:6
**improperly**
   125:20 216:21
**imputation**
   23:4,11,21
   57:19 62:20
   135:7 141:13
   141:18 142:3,5
   142:17,18,21
   143:3 149:20
   149:21 150:14

157:9 160:12
   160:13 162:8
   162:21 165:10
   167:10 168:13
   168:19 169:3
   169:13 170:4,7
   170:18,20
   171:6 172:6,8
   173:10,13
   174:10 180:5
   182:8 184:21
   185:20 186:7,8
   187:3,4 188:16
   188:17 189:2,6
   189:7,16,21
   201:21 202:11
   202:17 210:21
   219:21 222:7
   222:10,17,17
   223:4,11,13,16
   224:6,9,13,14
   224:20 225:3,4
   225:5,17 227:2
   227:4 228:9,13
   229:2,5 230:8
   231:5,12,14
   232:4
**imputations**
   132:7 141:1
   169:19 191:1
   220:11 223:7
**impute** 142:7
   173:16,18
   201:12 223:1,3
   232:6

**imputed** 167:12
167:13,20
179:12 184:6,7
**imputing** 6:8
200:18 227:18
228:6
**inappropriate**
30:7 163:3
217:3
**incidence** 82:16
82:19,19 83:7
85:4 86:7 105:2
116:16 209:11
210:13
**incident** 105:15
150:17 153:3
201:1 203:3,14
211:12 242:12
245:10 246:12
**inciting** 106:14
**inclined** 89:11
**include** 38:8
75:17 151:13
171:20 177:18
237:13,14,16
237:17 250:14
250:18 251:10
270:18
**included** 52:12
88:3,7 190:7
237:14,15
253:3
**includes** 76:13
**including** 43:10
60:6 72:19
125:11 132:2

174:13 212:6
241:21 251:5
**inconsistency**
34:3 189:8
231:14
**inconsistent**
33:12 79:11,20
166:20
**incorporated**
270:16
**incorporating**
14:10
**incorrect** 186:5
**increase** 197:7
235:18 238:2
243:15 244:20
245:1,21 246:7
262:3,7
**increased** 85:11
101:19 102:12
103:5 144:19
145:16 156:8
191:6,15
194:21 195:7
196:2 236:6
245:18 246:8
**increasing**
131:4
**increasingly**
197:16
**independent**
40:8,14 164:5
**indicate** 241:10
**indicated**
205:18 231:1

**indicates** 21:9
**indicating**
273:9
**indicative**
51:15
**indistinguish...**
84:5 153:19
**individual**
78:19 80:1,10
81:2 83:17
84:16 106:15
150:4 267:14
**individually**
76:18,19 77:1
77:14 78:5 79:3
79:10
**individuals**
83:4
**induced** 259:15
**inducing**
207:13 209:3
210:4
**infection**
106:16
**inference** 194:7
**inflammatory**
102:10 106:14
**influence**
102:10
**information**
48:15 51:13
52:3 66:21
116:5 124:4,6
127:2,6 175:19
179:4 200:7
213:5 214:16

216:20 219:5
221:13
**infrequent**
195:5,15,16
**inherent**
148:14 156:20
**inherently**
31:18 33:12
**initial** 124:4,11
125:19 126:8
127:5,7 128:11
151:9,10 152:8
153:8 154:15
154:15,16
200:1,5 213:9
214:8,20
215:17 221:12
**initially** 200:19
**initiative** 76:11
77:9 122:10
**input** 173:16
**insignificant**
33:7
**instance** 212:18
**institute** 6:18
67:20,20 68:14
73:4 269:13
271:6
**institutes** 161:7
**institution**
144:1
**intact** 93:19
94:16 99:12
100:21 110:10
110:19 111:16
112:14

**[integrity - jersey]**                                                    Page 28

**integrity**
  180:10
**intend**  179:2
**intended**  159:8
  182:9
**intent**  164:20
  165:3,17
**intentionally**
  166:1
**interact**  175:10
**interest**  271:3
**interested**
  275:11
**internal**  20:19
**internally**
  136:12,17
**international**
  5:20 6:15 25:18
  70:1
**internist**  21:10
**interpret**  66:1
  80:15,18
  131:14 154:19
**interpretation**
  33:16 51:12
  74:14 75:3
  95:13 97:15
  98:2 99:3
  104:20 132:4
  133:19 134:4
  139:14 153:14
  177:1 179:9
  199:8 211:7
  238:16
**interpretations**
  34:10 97:4

**interpreted**
  96:15
**interrogated**
  275:5
**interrupt**  63:10
  224:17
**interstitial**
  256:10 259:10
**interval**  85:13
  86:3,9,11,14
  87:10,16,20
  101:21 110:9
  110:11,17
  130:8,20
  133:15 183:6
  190:13 203:18
  206:6 241:12
**intervals**  78:10
  78:15 190:18
  226:18
**intimate**  5:5
  132:2 145:13
  155:1 200:14
  202:21 203:11
**introduced**
  271:15
**investigate**  64:2
  66:17 67:2,10
  69:10 134:15
  162:19 165:6
  182:18
**investigated**
  193:17
**investigating**
  78:13

**investigation**
  163:8 165:4
**investigator**
  123:13 161:9
  161:16,18
  218:7
**investigators**
  121:12 172:16
  218:4
**invoice**  265:7
  267:2 268:18
  269:15
**invoices**  6:19
  56:12,13 263:8
  263:16 265:13
  265:14,17,20
  266:11,13,17
  268:6,13
**invoicing**
  266:15
**involve**  223:7
**involved**  124:15
  128:15 194:12
  214:2 255:15
  265:18 271:2
  271:11
**involves**  142:5
  149:20 182:8
  227:2 244:6
**involving**  192:7
  192:8
**irritants**  106:14
**irritating**  102:9
**irritation**
  208:11

**issue**  7:17 44:3
  60:5 111:2
  137:21 169:18
  174:5 191:18
  193:20 217:7
  224:15 260:15
**issued**  7:16,20
  10:5 11:17
  174:6,20 250:4
**issues**  13:7
  87:13 90:16
  112:17 137:13
  174:4 175:3,5,6
**it'll**  264:10
**iterative**  89:21

**j**

**j&j**  36:15 37:2
  41:6,17 42:16
  43:8 44:1,9,13
  45:5,11,21
  47:20 52:2
  53:17 54:14,15
  54:19 55:12
  61:13 69:14
  164:5 176:4,8
**j&j's**  37:10
  174:21
**jack**  9:2
**jama**  5:16 6:10
  74:21 229:13
**january**  266:16
  266:19
**jersey**  1:2 3:20
  7:7 10:7 11:20

[jessica - largest]                                                      Page 29

| | k | 70:4,16,20,21 | 206:4,12 210:5 |
|---|---|---|---|
| **jessica** 67:13 | | 71:1,2,10 74:10 | 212:5,9 214:1 |
| **job** 115:21 | **k** 3:4 | 74:15 80:13,18 | 215:3 216:14 |
| 116:3 181:3,6 | **katie** 72:17 | 84:12 90:14 | 219:15,15 |
| **johns** 20:7,10 | 114:21 117:17 | 91:7,8,16,17,17 | 221:17 223:17 |
| 20:12 21:6 | **keep** 13:15 84:1 | 99:11,11,15,18 | 224:9 225:8,13 |
| 168:3 | 84:3 145:1 | 107:17,21 | 230:20 238:7 |
| **johnson** 1:5,5 | 231:12 269:16 | 109:15,18 | 238:12 247:15 |
| 2:17,17 40:9,9 | **keeping** 28:9 | 114:17 115:11 | 249:3,14,16 |
| 50:9,9 274:2,2 | **kelchaw** 1:15 | 116:2 118:9,9 | 250:8,17 252:8 |
| **joined** 61:19 | 1:19 275:2,16 | 120:16 121:6,7 | 253:1 254:6 |
| 67:13 247:16 | **kevin** 171:7,9 | 122:9 124:13 | 258:14 263:15 |
| **journal** 5:20 | **key** 149:11 | 124:13,15,19 | 264:5 269:21 |
| 74:20,21 | 157:12,14 | 125:12 126:19 | 270:3,4,6,14,15 |
| 114:13,14,16 | **kind** 29:11 | 128:7,8,13 | 271:11 |
| 114:17 136:19 | 65:12 114:8 | 129:7,9,18,18 | **knowledge** 53:1 |
| 143:21 144:10 | 173:5 181:15 | 129:19 130:2 | 54:2 164:18 |
| 144:10,17 | 207:5 215:9,10 | 134:10,15 | **known** 61:11 |
| 146:18 159:21 | 220:12 223:9 | 136:11,16 | 91:1 106:20 |
| 164:21 | 224:6 270:9 | 138:2,11,19 | 222:6 234:17 |
| **judge** 36:15 | **kinds** 15:1 | 143:16 144:4 | |
| 37:1,9,20 38:2 | 38:13 | 146:21 155:17 | l |
| 38:16,19 47:10 | **know** 7:18 | 160:3,7 162:12 | **labeled** 219:7,9 |
| 180:13 | 12:19 20:6 | 164:5 168:5,6,8 | 219:12,20 |
| **judge's** 38:3 | 22:21 25:17,20 | 168:11,15 | 220:10 |
| **july** 27:17 | 25:21 26:2,3,11 | 169:6 172:5,8 | **labeling** 152:6 |
| **jump** 152:8 | 26:21 27:11 | 172:15,20 | **lack** 93:12,20 |
| **jumped** 159:6 | 35:3,5,16 41:5 | 173:2 176:11 | 94:17,21 239:5 |
| **jumps** 152:14 | 41:15 42:16 | 178:3,20,20 | 239:5,16 |
| 152:19 | 46:12 47:16 | 183:17 184:1 | **landed** 204:21 |
| **june** 1:13 267:6 | 53:14 56:2 57:6 | 184:13,13,18 | **large** 79:18 |
| 275:13 | 57:8,10 58:6 | 185:4 186:10 | 80:20 161:6 |
| **juror** 180:13 | 60:11,18 61:10 | 186:13,21 | 195:21 203:1 |
| **justified** 183:10 | 64:10,14 68:18 | 187:1 189:15 | 203:12 |
| 183:15 184:12 | 68:20 69:1,3,4 | 192:3 203:9 | **largest** 110:6 |
| **justify** 182:11 | 69:7,8,16,18,21 | 204:21 205:1 | |

[lastly - look] Page 30

**lastly** 267:2
**latent** 121:3,6
**law** 3:13 264:6
**lawyers** 25:9
 37:10 44:14
 45:18 53:18
 54:19 174:21
 175:16
**lay** 8:13 129:8
 129:10
**learn** 129:12
 181:17 217:1
**leave** 253:10
**left** 126:9
 213:10 239:4
 239:16 245:9
**leigh** 3:12
 247:16
**letter** 90:15
 92:3,6,19 93:9
 93:10 94:8 98:4
 98:19 104:13
 111:13 116:20
 138:18,21
 206:14
**letters** 89:11,14
 89:17,20 90:12
**level** 51:1
 102:12 173:10
 259:8 262:3,7
**leveled** 37:10
**leverages** 149:2
**levin** 2:3
**levinlaw.com**
 2:6

**liability** 1:8
**lie** 96:5,6,7
**life** 124:7
**lifetime** 79:21
 125:8 149:3
 255:4,6,8
**light** 158:15
 179:4 180:15
**likely** 19:11
 45:19 46:20
 95:17,18,19
 96:4 205:19
 220:9 224:4
 233:17,19
 234:19,20
**likewise** 33:4
**limitation**
 228:9 230:9
**limitations** 32:5
 140:11
**limited** 93:19
 94:15
**limits** 182:13
**line** 220:15
 246:21 247:1
 273:9 274:4
**linear** 244:18
 262:18
**lines** 33:7 51:14
**linked** 236:8,9
**list** 48:4 70:10
 71:5 132:19
 133:1,1,12
 134:8 271:12
**listed** 249:15
 273:8

**literature** 34:13
 43:16,18 44:21
 52:9 53:2,10,20
 54:20 57:3
 105:5 107:4,8
 107:19 142:12
 145:15 147:3
 164:12 194:11
 199:4 222:11
 222:12 225:14
 230:21 231:16
 240:14 251:3
**litigation** 1:9
 7:21 24:10,13
 45:2,3,4,13
 46:7 53:17
 60:20 61:4,14
 62:8 108:7
 137:17 164:3
 164:14,17
 176:4,8 192:6
 192:13,17
 236:1 265:19
 271:12,12,13
 271:14,17
 274:2
**litigations**
 266:6,6
**little** 15:11
 18:14,16 22:18
 32:5 69:20 76:7
 76:14 137:15
 159:6 172:18
**liz** 168:8
**location** 106:21

**logo** 156:3
**long** 41:4 61:11
 101:7,7 149:5
 149:14 157:17
 202:3
**longer** 74:5
 88:14 115:17
 115:18 120:10
 120:12,16,19
 121:2,17 261:5
**longitude**
 189:13
**longitudinal**
 75:14,18 78:18
 171:15 174:11
 181:16
**longitudinally**
 80:21
**look** 10:15
 12:12 15:16
 17:20 21:7 22:9
 24:17 28:1,13
 28:19 29:20
 36:1,14,17 48:2
 49:17,18 51:7,8
 53:20 58:17
 59:15 73:15
 74:13,13,13
 80:8 84:10 87:1
 100:7 105:10
 107:11,13,14
 119:11,18,19
 119:21 120:4
 120:12 122:13
 123:1 124:3,21
 131:21 141:15

141:19 142:1 144:12 147:9 149:18,20 150:9 152:12 153:1 154:19 157:10,21 158:4 180:15 195:20 196:11 203:7 209:18 209:21 219:6 221:10,21 227:5 228:8,21 229:3,4 236:17 238:8 246:17 256:20 258:3 259:5,7 260:9 260:17 263:12 265:1
**looked** 15:20 16:1,1,2,3,3,8 23:15 59:4,4,12 59:13 64:4 77:14 79:10 99:12 100:17 101:14 104:13 119:8 189:16 198:10 201:3 206:14,14 228:15 255:15 256:15,18 257:1 258:1,2 264:11 269:18
**looking** 21:18 70:2 82:16 92:17 119:3 129:21,21

153:2,8 157:6 178:2 180:14 181:12 194:16 197:15 198:9 204:20 207:20 213:7 215:2 219:14 223:21 226:3,14 232:19 235:16 236:17 239:10 240:3 247:9,20 255:3 256:9 263:10
**looks** 21:8 119:4 191:2 221:18 222:1 227:8 248:16 266:15
**loss** 155:10
**lot** 23:2 52:2 66:12 82:14 90:9,10 132:7,7 132:14 139:21 149:21 157:7 162:8 165:9 169:19 181:17 185:17 192:5,5 192:6 198:13 203:21 220:7 221:5 231:9 264:10
**lots** 142:7 144:7 144:7
**low** 95:8
**lower** 87:20 256:14

**lunch** 215:5 226:5,5
**lung** 21:14 22:9 170:14,15,18 223:2 256:10 258:4,20 259:6 259:10 260:5
**lungs** 259:14 267:12

**m**

**m.d.** 1:12 4:3 7:1 21:5 274:3
**made** 17:8 38:13 50:13 52:13 54:14 55:12 57:11 65:19 81:12 86:20 92:12 98:17 194:7 212:10 266:5,9 270:14
**magnitude** 236:5,11,12 262:3
**main** 68:6,11 147:10
**maintain** 11:5
**major** 246:19 246:20
**majority** 259:3 259:17
**make** 16:15 17:14 62:11 138:2 144:13 165:10 167:11

191:11 215:10 219:17 221:16 227:9 231:18 238:14 240:20 243:7 264:10 265:16 266:8 266:10,16
**makes** 120:20 243:2
**making** 65:15 124:16 126:2
**malignancies** 22:11
**malignancy** 22:9
**manipulate** 64:17 160:8
**manipulated** 62:12 63:12 65:3,9 160:19 166:1
**manipulating** 64:15
**manipulation** 62:21 65:13 159:12,19 162:21 163:1 164:7
**manuscript** 49:15 63:14,15 64:8 90:5 175:14
**manuscripts** 19:12
**march** 248:14 248:19

**[marie - methodology]**    Page 32

| | | | |
|---|---|---|---|
| **marie**  168:6 | **mctiernan's** | **meaning** | **merely**  182:9 |
| **mark**  7:12,14 | 46:17 47:14 | 167:12 231:9 | **merlo**  1:12 4:3 |
| 56:9 58:3,4 | **mdl**  1:3 3:8 7:5 | **means**  7:18 | 7:1,4 21:5,9,11 |
| 263:8 264:18 | 11:18 12:10,17 | 74:10,16 | 42:12 48:6 |
| 265:9 269:1,4 | 14:1 28:2 35:17 | 107:18 131:19 | 266:18 272:5 |
| **marked**  11:10 | 42:3 47:11,12 | 147:1 | 274:3 |
| 11:12 12:3 | 62:10 67:18 | **meant**  116:19 | **merlo's**  266:12 |
| 13:14,16,18 | 267:14 | 208:3 258:17 | **mesothelioma** |
| 18:21 21:3 | **mean**  12:15 | 269:5 | 54:11 256:12 |
| 26:18,19 28:8 | 17:8 23:20 34:8 | **mechanism** | 256:14 257:19 |
| 28:11 29:2,3 | 36:7 40:1 49:12 | 102:18 209:12 | **met**  72:3 |
| 36:2 43:1,3 | 57:2 63:9 90:9 | 210:14 | **meta**  62:18 |
| 56:7,8 59:1 | 101:2 116:13 | **medical**  44:20 | 95:18 204:16 |
| 70:6,8 72:7 | 121:6 122:1 | 54:20 57:3 | **method**  34:11 |
| 89:3 105:11 | 123:7,15 | 158:2,17 178:6 | 187:15 222:5 |
| 109:10 113:13 | 127:19,21 | 187:14 267:20 | **methodologic** |
| 118:3 144:14 | 128:15 137:8 | **medicine**  19:21 | 14:8 16:12 |
| 155:20,21 | 139:5 141:2 | 20:19 21:11 | 17:15 33:19 |
| 227:13 229:11 | 144:3 145:4 | 45:10 74:11 | 34:11 36:16 |
| 237:9 241:7 | 158:10 161:8 | **meeting**  27:10 | **methodologic...** |
| 248:4 264:7 | 170:10 172:15 | 27:13 175:12 | 32:3 33:6 |
| 265:2,7 269:7 | 175:5 176:18 | **meetings**  175:2 | **methodologies** |
| **markers**  10:15 | 177:16,16 | 175:3 | 9:15 |
| 257:11,20 | 191:8,21 | **memorize** | **methodology** |
| **marketing**  1:7 | 192:11,15,21 | 244:2 | 8:16 9:4,13 |
| **maryland**  1:14 | 198:2 204:20 | **memorized** | 10:1 11:1 14:3 |
| 275:1,3 | 208:15 209:15 | 77:5 119:17 | 14:4,6,6,16 |
| **mas**  1:3 | 210:1 217:20 | 221:9,18 | 15:7 16:5,7,13 |
| **materials**  10:15 | 221:14 222:4 | 241:17 243:3 | 16:16 17:1,16 |
| 41:16 | 222:12 224:17 | **men**  259:4,18 | 17:21 18:6 |
| **mathematically** | 232:21 234:19 | 259:19,20 | 22:17 23:9 |
| 86:14 87:17,19 | 235:12 236:16 | **menopausal** | 29:13,15,16 |
| **matters**  267:6 | 238:7 240:10 | 262:6 | 30:2,4,17 31:4 |
| **mcdevitt**  3:18 | 245:3 250:7 | **mentioned** | 31:4,6,6 34:21 |
| **mctiernan**  9:2 | 251:14 257:13 | 117:16 | 35:11,13,17 |
| 16:2 42:12 48:6 | 260:2 263:1 | | 38:5 39:20 40:7 |

**[methodology - multiply]**                                             Page 33

40:13 71:6
167:2 173:8,21
174:5
**methods**  6:11
6:12 22:20
119:4 139:11
184:20 185:6
185:10 186:1
187:9,12
201:20 250:21
**mice**  172:9
**michelle**  3:2
7:6 264:8,11
**mid**  49:2
**middle**  50:3
95:20 96:5,7
**mill**  259:9
**millers**  258:2
259:2
**mind**  86:19
87:10 264:12
264:13
**mine**  61:5
165:6 248:16
251:13 259:9
**mined**  106:21
253:4
**miners**  258:2
259:2
**mines**  253:4
**mischaracteri...**
55:4 104:17
108:11 117:11
130:21 146:5
160:9 167:6
176:17 177:10

211:21
**misclassificat...**
131:9 143:13
147:14 152:10
197:17 205:21
206:19 207:1
220:21
**misclassify**
197:11
**misconduct**
162:17,20
**misinterpreted**
90:8
**misreporting**
237:21
**missing**  6:8
19:12 62:20
65:21 160:14
167:10,11
170:4,8,16
172:14 173:13
173:15,15
184:16,17,18
184:19 185:15
185:16,17
186:10,11
200:15 201:15
202:11,17
210:21 213:20
219:19 220:11
221:7,8 222:4,9
223:16 224:1,3
227:19 231:9
232:5
**missingness**
222:2,5 223:12

223:14
**misunderstan...**
38:15
**mitigate**  97:16
**mitigates**  240:6
**mixture**  208:8
245:10 246:11
246:13 262:7
**mixtures**
242:12,12
245:12
**model**  6:9
62:19 227:19
228:7,13
**models**  66:3,11
66:12 190:21
243:17
**modest**  80:2
262:3
**moment**  76:9
117:21 125:15
126:6 128:18
128:19 141:21
187:7 260:17
**money**  54:13
55:12 162:13
270:14,15
**monographs**
5:9
**montgomery**
3:15
**month**  125:4
253:2,8,12
**months**  127:8
151:11 200:3
213:21 214:10

215:18 217:11
**monticello**  2:12
**moot**  83:10
**morning**  7:4,10
7:11
**mouth**  162:13
**move**  73:14
91:4 102:5
108:5 111:4
113:4 117:2
138:5 154:4,7
155:13 181:2
215:4 236:2
244:19,20
**moving**  155:5
244:3
**mparfitt**  3:7
**multiple**  57:19
135:7 139:19
141:18 142:2,3
142:5 147:13
148:4 168:13
168:19 170:3,6
171:6 172:6,8
173:3 190:21
202:11,17
222:6,10,17
223:7,11,13,16
224:8,13 225:4
225:17 227:2,3
228:6,9,12
229:1,5 230:8
232:4
**multiply**  244:8
244:11 245:6
262:15

**[multiproduct - number]** Page 34

| | | | |
|---|---|---|---|
| **multiproduct** 246:18 247:10 **musing** 167:1,3 **n** **n** 4:1,1 5:1 6:1 **name** 15:17 91:15 225:19 264:6 273:13 **named** 171:7 275:4 **names** 68:3 70:19 **napkins** 106:8 **national** 6:17 67:20,20 68:14 69:2 73:4 161:7 **natures** 73:21 **near** 48:5 61:9 **necessarily** 86:21 98:5 186:18 191:21 199:12 238:20 256:1 **necessary** 273:8 **need** 11:4 16:15 19:12 45:6,8 113:20 143:5 143:10 198:7 226:4 **needed** 124:4 142:9 174:9 **needs** 251:8 **negative** 108:3 | **neihs** 69:2 74:2 161:17 **neither** 251:21 **never** 24:15 44:14,17 45:21 46:15 52:4 91:15 93:11 94:21 101:8,9 131:5 137:13 139:3 144:5,5 162:20 166:5,9 169:9,10 195:15,16 200:19 202:2 208:13 216:3,4 228:11 230:9 252:8 262:5,10 **new** 1:2 3:20 7:7 10:7 11:20 12:21 13:8 14:10 18:7 31:8 33:17 34:10 72:2 82:2 124:6 126:2 156:6 164:15 216:20 **newest** 251:12 **newly** 202:21 203:11 **news** 5:9 **niehs** 13:1 156:6 **nih** 25:2,7 68:15 75:20 76:1 136:11,13 136:17 155:16 155:16 156:2,3 | 157:13 159:21 164:21 165:13 165:17 199:9 241:20 242:7 248:13 249:10 249:11,11,15 250:8,17 **nih's** 165:13 **nobody's** 25:9 **non** 101:7,9 148:7 169:15 169:15 **noncarcinoge...** 254:9 **nondifferential** 143:12 205:20 206:9,19,21 **nonmissing** 224:2 **nonpatent** 88:7 97:9 102:1 103:8 **nonresponsive** 102:6 **nonsignificant** 97:10 **nonstatistical** 155:7 247:1 **nonstatistically** 110:16 111:21 155:7 197:12 241:10 **nonuser** 125:20 194:20 216:10 **nonusers** 195:6 212:17 213:3 | 218:5,6 221:11 **norfolk** 2:13 **normal** 44:17 46:6 **notarial** 275:13 **notary** 1:16 275:2,16 **note** 184:15 **noted** 205:19 **notes** 260:18 **nothing's** 15:2 **notice** 5:14 56:18 58:15,17 130:4 **noticed** 41:15 **notion** 192:1 **null** 95:17,19 143:14 205:20 206:20 **number** 11:10 12:2,10 13:16 18:19 21:19 26:18 28:1,8,10 29:2 35:20 36:11 43:2 58:10,14,20 59:5,15 70:7 73:21 89:2,6 105:13 109:7,8 134:1,2,6 137:6 140:3 155:20 156:18 174:19 177:2 179:11 180:2,3 204:7,9 204:11,21 220:17,18,19 |

**[number - oftentimes]**                                                                 Page 35

221:3 227:10
227:11 228:11
229:8 240:21
248:1,3 261:16
267:4 269:6,19
273:9
**numbers**   84:12
87:19 120:13
198:2,7,9
221:15 255:13
**nurse**   56:19
270:2,3
**nurses**   76:11,14
76:15 77:9
122:10,14,15
122:15,17
123:2
**nw**   3:4

**o**

**o**   4:1 5:1 6:1
**o'brien**   13:3,9
13:15 23:3
33:17 60:6 62:4
64:11,13,14
68:2,4,5,7,8,9
70:17 71:17,20
72:17 73:3
78:18 79:14
85:11 88:10
90:12 92:4 94:7
97:13,20 102:7
103:17 104:3
105:10 106:5
107:12,16
108:16 109:19

110:15 113:4
114:9,21
117:17,20
118:1,15 119:6
119:7,14,20
120:17 121:11
121:12 124:10
124:21 133:12
134:5,20 148:9
148:10 156:18
158:1,2,16
165:14,21
174:6 175:4
176:1,5,9 177:2
180:14 194:13
205:16 206:3
206:16 207:15
207:18 212:6
213:18 214:2
221:7 237:4
241:21 242:8,9
242:16 248:21
249:1,5,17
250:14,18
251:21
**o'brien's**   92:7
173:7 181:19
**o'dell**   3:12
247:16
**object**   17:18
30:11,14 34:15
39:1 40:16
43:11 52:6 55:4
67:5 98:11
104:6 108:10
126:12 137:7

139:7 167:5
180:18 181:1
230:14 246:1
249:20 254:19
258:7 265:21
**objecting**
180:14
**objection**   9:7
17:5 18:9 20:15
26:5 31:10 37:5
37:12 41:9 42:5
42:14 44:7 46:2
46:8 47:1,17
63:19 71:8,13
77:17 78:7 79:2
81:19 82:8 84:7
84:19 91:3,12
91:19 93:4 99:1
102:20 104:10
104:17 112:15
116:1,12 117:1
117:10,10
123:6 126:12
128:12 135:1,4
135:11 136:5
136:20 137:19
138:5 140:16
146:5,20
148:20 158:11
158:11 160:2,9
161:2,11 162:2
163:10 166:4
166:13 174:15
175:11 176:16
177:9 178:8
179:6 182:20

186:16 192:20
193:7 211:21
213:12 222:19
231:20 250:5
254:2
**objections**
37:13
**objective**
180:12 181:4,6
**objectively**
180:14
**observation**
39:9
**observed**
149:13 157:16
238:3 245:9
246:10 262:2
**obtained**   200:8
**obviously**
128:21
**oc3**   110:7
**occasion**
174:20
**occur**   106:20
256:13
**october**   248:17
275:18
**odds**   57:18
95:18 204:17
235:18
**offering**   257:3
**offers**   59:7
**office**   61:5 62:1
**offices**   61:9
**oftentimes**
89:16

**[oh - opinion]**                                                                 Page 36

| | | | |
|---|---|---|---|
| **oh**   15:16 54:8 | 82:9 83:2,8 | 152:2 154:5,13 | 237:14,20 |
| 59:13 113:9,12 | 84:15 85:2,9 | 155:13,19 | 238:14 240:9 |
| 130:16 145:9 | 87:15 88:3,9,17 | 156:5 157:4 | 242:15 243:14 |
| 156:19 189:1 | 88:20 90:11,14 | 158:18 159:16 | 244:17 245:2,5 |
| 193:3 229:20 | 92:2 93:1,7,10 | 159:20 160:5 | 247:21 248:12 |
| 263:20 264:3 | 94:10 95:3,10 | 162:7,16 163:6 | 248:18 250:20 |
| **okay**   8:5,8,21 | 95:15 97:3,7,12 | 163:15,19 | 252:11 253:1 |
| 9:17,21 10:9 | 98:21 99:5,15 | 164:3,20 | 253:18,20 |
| 11:6,17 12:8,19 | 100:3,7 101:3 | 166:11,18 | 256:15 257:3,9 |
| 13:6,14 14:8,20 | 102:5,17 103:4 | 167:16 169:11 | 259:11 260:4 |
| 15:1 16:21 | 103:10,11,12 | 169:17 172:11 | 260:14,17 |
| 18:12 19:6,9,16 | 104:13 105:4 | 172:20 173:19 | 262:19 263:4,7 |
| 19:20 20:6 | 106:6 108:5,21 | 174:3,12,18 | 264:3,5 265:3 |
| 22:12 23:13,19 | 109:5,15,19 | 175:10,18 | 266:10 267:18 |
| 24:16 26:17 | 110:1 111:4,8 | 176:6,21 | 268:3,8 270:2 |
| 27:2,6,10 28:1 | 111:19 112:19 | 178:18 181:9 | 271:18 272:9 |
| 28:7 32:11 33:4 | 113:3,11 | 182:3,17 | **old**   127:10,13 |
| 33:16 34:8 35:3 | 114:12,20 | 183:18 184:15 | 127:17 215:14 |
| 36:6,18 38:19 | 117:15 118:6 | 185:21 187:12 | 215:16 216:1 |
| 39:8,14,17,17 | 118:14,19 | 188:6 191:5,18 | 217:10,12 |
| 40:3 41:15,21 | 119:14 120:4,7 | 193:18 194:5 | **older**   83:3 |
| 42:19 44:11 | 120:9 121:9,18 | 194:17 195:4 | 121:7 |
| 45:4,16 46:12 | 122:9 124:2,10 | 196:21 199:14 | **once**   218:10 |
| 48:9 50:1,12,20 | 124:20,20 | 199:17 200:13 | **oncologist**   20:9 |
| 52:11,13 53:15 | 125:6 126:6 | 201:7,19 202:1 | **oncology**   20:2,4 |
| 54:1,10,13 55:2 | 131:17 133:10 | 202:9,20 | 20:8 114:13 |
| 56:5 57:5,8 | 133:17,20 | 205:10,12 | 144:11,17 |
| 58:3,12,20 61:3 | 134:1,10,14,17 | 207:2 209:15 | **ones**   15:15,19 |
| 61:16 62:7 | 135:16 137:2 | 210:7,16 211:3 | 106:5 141:20 |
| 63:15 64:2 65:1 | 138:10 140:2,8 | 213:8 214:14 | 186:7,9 246:15 |
| 65:8,14 66:16 | 140:19 143:7 | 214:18 215:3 | **ongoing**   118:16 |
| 67:12,16 70:20 | 144:8 145:9,11 | 215:12 216:19 | 119:13 |
| 71:17 72:13 | 146:8,13 147:9 | 218:1,12 223:6 | **open**   88:4,5 |
| 73:2 74:19 75:2 | 148:2,8 149:11 | 224:19 226:11 | 101:19 |
| 75:10,10 76:4,7 | 150:8,15 | 232:3,12 | **opinion**   9:19,21 |
| 76:16 79:14 | 151:13,16,20 | 234:15 235:4 | 10:20 11:4,5 |

14:5 15:6,9
16:9 17:11
18:13 30:2,16
30:20 31:20
32:10,19 33:13
33:14 34:2 35:2
43:15 44:20,21
53:5,21 54:19
54:20 55:8
74:18 79:4 90:4
114:18 116:5
117:12 118:12
145:9 146:11
155:5 158:16
177:7,13 178:4
178:5 181:4,5,7
183:8,13,19
184:5,10,14
185:8,9 186:15
186:19 204:1
232:9 237:16
251:20 252:1
267:21
**opinions** 8:10
9:8,14,18,21
10:9,11,19 16:9
27:20 34:6 40:7
40:13 44:2
52:14 60:15,17
61:1 68:12
137:21 141:9
158:14 175:13
176:14 186:3
187:13 255:14
257:4,9 267:11
267:19

**oppenheim**
235:14
**opportunities**
89:10 90:9
**opportunity**
58:17 89:13,19
136:3,7 154:14
188:21
**opposed** 87:11
262:21
**options** 124:2
**order** 36:13
37:14 38:8,11
56:10 59:5
62:12,21 63:12
65:9 81:20
83:21 141:9
153:11 159:12
188:8 198:12
203:20 212:12
234:11 251:16
259:14 271:21
**orders** 271:20
**ordinal** 101:10
**organization**
25:1 56:15
**organs** 193:1
**original** 24:7
33:21 35:6
52:18 81:13
213:13 215:14
216:9 219:3
**originally**
12:20
**ought** 165:18

**outcome** 14:5
49:9 142:20
167:3 171:1
172:13,14
173:15 192:10
213:7 236:9
240:13 260:10
275:12
**outcomes** 191:2
**outer** 220:3
**outline** 148:6
177:4
**outlined** 33:21
181:20
**outside** 56:15
159:3 164:17
178:2,3
**ovarian** 5:18
6:5,14 9:6,9
10:2,3,21 19:14
22:5,7,10 25:11
25:20 26:15
32:13 44:4 45:1
46:20 50:4
54:11,12,21
59:21 70:3 71:7
72:15 78:14
79:7,20,21
82:16,19 83:6
85:4 86:7 88:11
96:20 97:21
100:13 101:6
102:9,19 105:2
107:5,10 109:3
109:6,15 110:8
115:15 116:6

116:16 119:5
119:21 121:3,8
131:4,5 132:3
144:19 145:16
146:16 147:12
148:16 149:6
149:13 150:17
150:20,21
151:17 153:3
156:8 157:1,16
165:15 166:2
180:17 191:3,6
192:14,19
193:6,19 194:1
194:9,12
195:14 196:19
203:3,14
204:15 208:19
209:11 210:13
211:12,17
233:5 234:6
238:2,4 239:9
239:19 240:3
243:17 245:10
245:18 246:8
246:12 247:14
249:19 250:13
253:3,9,13
255:19 256:2
256:15 257:14
258:3,16
259:16 260:10
267:21
**ovaries** 100:11
101:1 208:12
257:5 259:1

**overall**  77:13
  79:9 85:11,17
  86:2,19 88:3
  112:12 209:8
  209:18 210:10
  242:21 251:3
**overbroad**  9:7
  17:19 20:16
  37:5 39:2 41:9
  47:1,18 93:4
  98:12 135:4
  146:20 162:3
  163:11 175:11
  176:16 178:11
  179:6 186:17
  222:20 254:20
**overestimate**
  58:13
**overlooked**
  33:2
**overrepresent...**
  201:1
**own**  34:16 42:1
  42:10 43:10
  92:18 93:3
  95:13 97:5,15
  98:9,19 112:21
  143:6 174:14
  247:19
**ownership**
  271:3
**oxidative**
  102:12

**p**

**p.c.**  2:11
**p.m.**  272:10
**packages**
  222:15
**page**  4:2 5:2 6:3
  28:3,7,13,21
  29:1 48:3,9,10
  49:16,17,19,19
  51:8,9 62:10,18
  74:1 79:17,17
  88:9 94:2,4,4,6
  94:10,12 100:7
  101:18 102:7
  106:6,11 110:4
  114:20 119:19
  130:4,15,18,18
  133:6,7,8,10,12
  134:3,20
  139:20 148:9
  157:12 159:9
  182:6,7 184:15
  186:9 189:2
  190:4 200:1,10
  203:8 207:7,8
  207:19 208:2
  210:2,20 211:9
  214:18 215:2
  224:19 225:16
  225:21 226:2
  226:15 233:2
  237:20 239:4
  239:16 245:8
  246:9 248:9
  261:16,17

  273:9 274:4
**pages**  71:18
  94:5 110:5
  113:21 181:21
**paid**  55:6
  137:17 164:4
  270:16
**pancreatic**
  236:18,21
  237:2
**pandemic**
  55:14 56:3
**panel**  70:2,17
  70:21
**panels**  26:14
**papantonio**  2:3
**paper**  22:8 23:4
  23:15,16,20
  24:14 37:16
  65:17 74:12,17
  80:16,17 85:20
  86:5 90:4,12,17
  104:21 111:14
  115:9 117:13
  117:16,17
  119:6,8 133:3
  133:16 135:14
  135:17,20
  137:4,5,18
  138:8,11 139:3
  139:11 140:1,4
  141:4 144:2
  159:5 163:12
  167:21 171:10
  172:16 178:14
  179:3 181:7

  183:7 188:4
  221:15 224:16
  225:8 232:20
  237:21 239:3
  255:3 261:20
**papers**  22:13
  22:14,16 23:21
  68:17 75:1,19
  75:21 76:4 89:9
  89:12,17
  137:13,13
  139:4 141:15
  143:20,21
  144:3 145:5
**parabens**
  208:11
**paragraph**  50:3
  51:9 53:5 93:16
  94:13,20 96:12
  100:8 130:19
  130:19 131:3
  177:12 204:3
  204:13 207:3
  207:17,18
  208:1,2 209:6,9
  210:2,2 229:4
  239:16 261:15
  261:19,20
**paragraphs**
  28:16 261:12
  261:14
**paraphrase**
  209:16
**paraphrasing**
  249:18,20

**[parfitt - perineal]**                                                    Page 39

**parfitt** 3:2 4:6
7:6 72:8 89:4
105:21 109:7,9
113:8,15 154:1
227:11 229:9
237:7 241:3
261:16 263:17
264:9,20 265:3
265:6,10,11
266:4,10 267:1
268:5 269:8
**part** 15:7,8,9
17:21 26:8 33:2
41:7,16 43:17
44:3 46:6 49:1
89:21 124:18
126:1 149:10
163:3 171:19
198:16 217:4
250:14 257:13
**participants**
70:10 119:5
124:12
**participating**
61:1
**particles**
106:13
**particular** 32:4
141:17 152:12
229:2
**particularly**
15:19 80:3 89:9
93:18 94:15
111:16 112:13
121:2 145:13
147:15 160:19

161:5 185:1
**parties** 275:10
275:11
**parts** 37:21
227:16
**pass** 185:7
**passed** 63:16
182:18
**past** 54:14
55:11 174:11
212:7
**patency** 100:9
**patent** 80:4
88:7 96:18 97:8
100:12,20
103:5,8
**pathologist**
256:17 257:7,8
**pathology**
256:19
**pathway**
100:10 236:10
**patient** 201:9
**patients** 21:12
21:13 120:11
121:1,4 122:6,6
**pause** 55:13
58:11 225:7
**paying** 55:2,8
**pdq** 52:14,16
52:19 53:1,4,11
60:9 248:1,1,8
248:13 250:12
251:9,12,18
252:8

**peach** 264:15
**peer** 24:9,14
43:15,17 48:11
48:20 49:5,7,14
52:9 53:2,10,12
63:16 64:8 93:9
104:15 105:5
136:18 159:21
182:18 185:7
198:1
**pending** 10:7
**pensacola** 2:5
**people** 9:2 16:3
57:10 61:8
71:10,12 83:13
89:10 123:1,9
123:19 124:8
135:20 136:3
143:2 152:6
153:2 155:10
180:7 185:15
185:16,17
192:13 194:14
195:20 196:1
197:11 212:5,9
262:17 270:7
270:10,11
**percent** 79:21
85:12 86:9
110:11 131:6,7
131:9 152:12
152:13,14,14
152:19 153:4,5
153:5 155:6
165:21 170:9
170:11 187:18

187:21 188:10
188:10 190:18
194:19 195:5
195:17 196:16
196:20,20
197:4,6,7,7,8
197:11 199:2
226:17 236:6
238:9,21
244:20,21
245:4,5,7 255:8
262:6,9
**percentage**
170:8 195:21
235:3
**percentages**
188:3,5
**perfect** 123:18
**perform** 52:8
66:13 142:18
142:21 162:10
165:7 184:21
199:19 269:17
**performed** 23:5
23:11 63:8
92:21 123:15
134:5 141:1
167:9 173:11
174:10 177:2
222:15 229:5
**performing**
65:16 185:14
223:21 224:14
**perineal** 8:17
9:5 106:9
193:21 247:4

[period - potential]                                                        Page 40

**period**  41:8
  48:15,16 49:13
  74:5 88:14
  115:18 125:4
  128:1 187:20
  265:14
**periods**  122:16
  147:17 202:5
**persist**  157:12
**persistent**
  149:12 157:14
  165:16
**person**  39:16
  61:3 161:21
  260:6
**person's**  267:20
**personal**
  189:12 200:1
  242:11,12
  243:16
**personally**
  270:11
**perspective**  6:6
  16:12 17:16
  18:4 145:11
  146:18
**phenaphen**
  235:16,21
**phone**  73:21
**photocopying**
  270:11
**phrase**  62:14
  159:11 162:13
  162:14 252:19
**phthalates**
  208:11

**physical**  100:10
**physician**  20:18
  254:4
**physicians**
  270:7
**pi**  161:12
**picked**  266:15
**pictures**  157:21
**piece**  37:16
  127:2
**pinpoint**  208:19
  209:11 210:14
**place**  219:5
  230:21 231:3
  243:7 271:19
**placed**  217:19
  230:9
**plaintiffs**  2:8
  7:5,7 9:1 10:12
  10:21 15:12
  18:4 29:14 30:3
  30:5,17 31:17
  32:3,11,15 33:4
  33:20 34:9,12
  36:12 37:4,11
  50:16 81:12,16
  82:18 255:15
  267:14
**plan**  67:1
  183:17
**planned**  179:8
  219:10
**plaques**  256:11
  256:13 257:18
**plausibility**
  238:3

**plausible**
  102:18
**play**  32:3
**pleadings**  69:14
**please**  47:6
  55:18 69:6
  77:19 113:6
  154:6 271:20
**plenty**  83:13,13
**pleural**  256:1,5
  256:11,11,13
  257:18
**plus**  37:13
  75:17
**pneumoconio...**
  259:10
**point**  30:4
  39:11,12,13
  62:15 78:9,15
  81:12,18 83:10
  85:20 86:18
  87:2 95:8 98:5
  143:13 147:10
  165:19 169:20
  183:6 191:8
  192:15 203:6
  209:6 211:19
  212:11 224:5
  232:19 235:5
  239:12 243:2
  260:11
**pointed**  111:3
**pooled**  75:5,6
  75:11 78:17
  95:16 115:10
  115:21 204:16

  204:20 205:17
**portion**  24:9
  48:19 49:5
  102:6
**posit**  98:1
**position**  180:17
  225:9
**positive**  96:17
  107:5,9,20,21
  110:7,21
  111:15,21
  112:4,13 132:1
  147:11 148:6
  149:12 152:3,4
  157:15 165:16
  203:2,13
  204:14 205:18
  206:5 209:10
  210:12 233:4
  234:4 245:9,21
  246:11
**positively**  148:3
**possibility**
  102:18 108:3
  213:16 215:21
  216:11 233:11
  234:20
**possible**  107:9
  107:19,20,21
  108:3 181:4,7
  216:5 263:1,2
**post**  33:17
  67:17 262:6
**potential**  34:3
  67:3,7 78:13
  126:9 145:12

[potential - product]

147:13 149:5
154:16 155:10
192:10 200:21
213:10 219:10
255:4 257:16
**potentially**
106:15 127:11
141:12 151:13
153:9 192:1
208:10,13
213:10,20
**powder**  1:6
5:17 7:21 9:5
13:2 59:9,21
61:14 72:14
79:7,19 96:20
100:10,13
101:6 102:10
105:1 110:8
116:16 146:14
193:15,16,18
208:20 238:1,4
239:6,8,17,19
253:21 254:15
254:17 255:5
257:17 258:15
274:2
**powders**
208:18
**power**  74:4
82:13,15,17
83:9 84:12,13
88:13 92:20
115:17 239:1
**powered**  80:2
80:10 81:3,14

81:15 84:16
115:13
**practice**  212:3
225:15
**practices**  1:7
**practitioner**
270:2
**practitioners**
270:4
**pre**  167:2
**precedence**
50:5
**preconceived**
192:1
**predetermined**
62:13 63:1,13
63:17 65:1,3,9
66:2,15 159:13
159:19 160:20
163:2 164:7
167:2
**predict**  142:19
142:20 171:1,1
172:13,17
224:9
**predicted**  236:6
**preeminent**
69:15,17
**preparation**
8:6 141:8
**prepared**
267:13
**present**  3:10
233:6 234:7
**presented**
178:16 263:5

**presenting**
204:8
**press**  129:8,8
129:10 144:8,9
**presume**  40:1
**pretty**  65:5
91:1 160:20,21
160:21 161:20
161:21,21
170:17 202:8
206:13 235:19
236:14
**prevalence**
198:20
**prevalent**
105:15
**previous**  127:8
199:4 204:15
220:16 238:12
247:7
**previously**  77:7
83:16 113:13
205:19
**primarily**  8:8
**primary**  10:10
13:6
**principal**  161:9
161:16,17
**principle**  33:19
34:11
**printed**  57:10
**printout**  5:8
**prior**  40:20
54:7 74:6 76:21
77:10 78:4 82:4
82:11 88:14

91:4 121:15
122:9 207:3
212:1 217:11
**priori**  99:15
100:11
**priority**  26:3
**probability**
235:6
**probably**  23:18
127:1 140:7
204:5 206:8
**problem**  170:3
185:18 186:19
186:21 187:5
202:6 217:6
219:14 242:5
247:21
**problematic**
185:1
**problems**  29:15
**procedure**
172:21
**proceed**  226:5
**proceeding**
11:19
**proceedings**
11:19 47:11
275:8
**process**  27:5
70:11 73:19
89:21
**produce**  167:21
**produced**  45:8
**product**  59:21
200:1,14
203:12 219:2

**[product - question]**

Page 42

242:11,12
246:18 247:10
**production**
266:17
**products**   1:6,8
5:6 8:18 45:7
59:9 132:2
145:13,15,17
146:14 147:4
155:1 158:3,3
202:21 208:7,8
208:13 243:16
**professional**
25:1,2 44:15
46:1 65:18
140:14
**professionally**
18:16
**professionals**
73:17
**professor**   19:3
19:7,16,17,18
20:13 168:16
**promise**   154:13
179:21
**pronounce**
27:11
**properly**
212:17 213:2,6
**proportion**
195:14
**proportions**
131:5
**proposing**
205:8

**propositions**
134:19
**prospective**
110:6 150:17
153:1 155:8
181:16 198:17
198:18 205:17
210:21 211:4,8
211:10,12
212:15 213:1
220:15 242:14
**prospectively**
150:3 181:12
213:5
**protective**
131:11,14
**proves**  108:21
**provide**  18:18
43:8,14 44:20
44:21 50:6
53:20,20 56:11
136:7 149:4
156:6 175:18
175:21 182:11
189:3 221:12
224:21 231:5
**provided**  41:6
42:2,2,11,13,17
52:2,4 78:14
95:4 104:4
116:4 206:21
236:13 243:5
255:14
**provides**
165:14 194:13
219:4 231:8

239:7,18
**providing**
103:1 270:12
**proximity**
61:12
**psoter**   171:7,9
**public**   1:16
48:15,16 49:13
275:2,16
**publications**
67:19
**publish**  143:16
**published**   13:1
14:16 22:2,20
23:8,9 24:2
43:6,18 52:9
53:2,10,12
59:20 60:5
65:10 105:5
114:12 115:8
117:19 121:11
125:7 129:14
134:12 136:17
137:5 144:10
146:18 164:13
249:2
**publishes**   53:4
60:9
**pulled**   20:21
28:7,21 80:9
**pulling**   85:10
**pulmonary**
19:21 21:10
44:16 45:9
235:11,16

**pulmonologist**
20:17 254:5
**pulmonology**
20:13 21:6
**purpose**   10:10
190:16 242:10
258:4,16
**put**   26:21 48:3
80:19 154:3
162:13 190:9
241:2 250:7
263:13
**putting**   13:21
34:9 44:3 45:4
56:2 83:11
121:10 141:10
182:17 193:19
194:6,9 214:2

**q**

**qualitative**
112:17
**quantile**   243:18
**quantitative**
200:17 201:3
202:9
**quarter**   170:16
**query**   124:5
**question**   27:18
35:5 36:18,20
41:3 43:20,21
47:4,8 57:16,17
64:20,21 80:21
93:1 102:6
111:4,8 121:10
122:21 124:20

[question - reach]                                                        Page 43

| | | | |
|---|---|---|---|
| 125:19 128:8 | 200:1,6,9,20 | **quite**  148:6,6 | **raising**  135:16 |
| 136:15 141:2 | 201:8 213:9 | **quote**  103:19 | 160:18 176:15 |
| 153:12 154:8 | 214:9,17,20,20 | 104:5 148:8 | 177:6,21 178:1 |
| 154:14,15 | 215:17 216:9 | 156:18 157:2 | 180:11 183:4 |
| 155:14 163:6 | 216:13,15,16 | 207:6 | **range**  58:6 |
| 171:16 173:19 | 216:18 217:8 | **quotes**  36:11 | 202:4 205:1 |
| 177:21 178:1,1 | 218:11 219:1,4 | | **rare**  79:21 |
| 178:5 180:10 | 219:7,9 221:12 | **r** | **rate**  268:14,15 |
| 180:13,21 | 244:2 | **radiology**  10:16 | 270:18,20 |
| 184:8,9 185:21 | **questionnaires** | 255:17,18 | **ratio**  86:8 95:16 |
| 186:13 193:4 | 122:5,14 123:4 | 257:12 258:14 | 95:18 97:8 |
| 194:6,18,19 | 123:10 128:14 | 258:20 259:4,8 | 102:2 110:9 |
| 198:8 199:6,7 | 153:2 214:3 | 259:14 260:5,9 | 130:8 131:6,8 |
| 201:16 214:6 | **questions**  16:16 | 267:12,16 | 131:10,19 |
| 215:20 217:3 | 61:21 73:10,18 | 270:13 | 137:18 151:18 |
| 218:7 223:11 | 115:2,4,5 | **rafferty**  2:3 | 152:9 155:8 |
| 224:7 234:17 | 122:11 123:10 | **raise**  134:5 | 165:7 190:13 |
| 239:10 240:2 | 123:17,21 | 135:9,14 137:4 | 190:18 195:18 |
| 252:4 254:11 | 124:9 125:8,10 | 139:20 142:15 | 196:10 197:10 |
| 258:10,18 | 125:16 136:4 | 161:1 163:9 | 197:12 199:3,3 |
| 259:13,21 | 137:4 138:11 | 164:15 167:4 | 203:17 205:16 |
| 261:9 267:10 | 139:19 177:16 | 173:6 177:2,15 | 206:6 221:1 |
| 269:9 | 177:17 178:10 | 177:16,17 | 223:18 234:11 |
| **questioned** | 178:12 186:14 | 178:1,10 | 235:8,18 |
| 144:5 150:11 | 216:13 218:3 | 180:20 | 238:10 241:11 |
| **questionnaire** | 218:20 240:17 | **raised**  64:9 | **ratios**  57:18 |
| 122:2 123:14 | 248:6,13 | 134:1 164:2,6,8 | 133:2 154:21 |
| 123:16 124:3,5 | 252:11 261:7 | 164:18 178:12 | 202:2 204:17 |
| 124:11,14,16 | 264:12 265:4 | 178:13 186:12 | 226:17 238:11 |
| 124:18 125:1,6 | 268:9,10 | **raises**  62:20 | **rays**  255:15 |
| 125:11 126:2,9 | 271:18 | 63:21 66:1,14 | **reach**  9:14 |
| 127:5,7,14 | **quibble**  214:4,7 | 159:18 160:11 | 73:10,18 115:4 |
| 128:11 150:3 | 223:10 | 161:3 166:6 | 136:7 163:2 |
| 151:10 152:7,8 | **quick**  103:11 | 167:13 188:14 | 164:7 166:1 |
| 152:20 154:16 | 158:19 | 188:16 231:3 | 167:2 |
| 192:4 194:15 | | | |

[reached - reduce]                                                           Page 44

**reached**  26:11
  45:5,11,12,14
  45:21 60:4,8
  134:2 186:2
  198:1
**reaching**  9:18
  136:8
**read**  37:1 43:17
  47:5 48:13
  51:21 63:2
  74:12 75:1
  84:11 93:11
  102:15 106:7
  107:2 111:6
  116:13 126:4
  148:10 157:2
  185:2 190:3
  212:19 228:11
  228:14 231:4
  239:14 251:12
  261:19,21
  272:6,8 273:3
  274:4
**reading**  85:19
  86:7,10 104:20
  115:14 131:2
  137:4 141:11
  141:16 179:3
  246:10 273:1
**reads**  215:11
**real**  97:15
  152:5 166:21
  167:13
**realistic**  192:15
  233:12,13

**realized**  125:18
**really**  14:8 16:8
  31:3 36:9 43:20
  45:6 74:10,15
  80:10,19 93:8
  100:5 114:18
  115:20 126:18
  129:21 144:4,5
  144:5 150:1
  160:13 165:18
  176:14 185:15
  186:14 196:1,6
  222:21 226:6
  247:11 252:9
  254:5
**reason**  52:8
  63:17 70:13
  71:5 75:12
  100:20 125:14
  125:17 135:12
  158:2 163:17
  165:5,6 181:10
  201:7 212:13
  236:20 274:4
**reasonable**
  119:12 120:8
  177:7 178:6
  180:20 183:8
  183:13 184:10
  186:3 187:13
  202:8 232:9
  264:13
**reasons**  80:9
  144:6
**reassigned**
  131:5 195:15

**reassigning**
  169:14
**reassurance**
  189:4 224:21
  231:6,9
**rebecca**  9:3
**rebut**  74:2
**rebuts**  88:11
  97:20 115:15
**recall**  8:3 24:4
  24:5 40:20
  45:14 60:16
  62:6 68:16 76:6
  84:11 99:17
  105:8 129:6
  130:1 131:3
  143:8 152:5,11
  162:11 165:8
  169:21 170:2
  173:21 181:11
  181:14,15
  191:18,21
  192:9 194:14
  195:6,13 197:2
  197:15 232:16
  239:7,18 240:6
  240:10 261:11
**recalling**  208:7
**received**  174:5
  265:19 267:2
**recent**  33:2
  52:16 248:2,18
  248:20 253:1
**recently**  50:4
**recess**  61:17
  103:13 158:20

  226:12
**reclassifying**
  143:11
**recognize**  106:5
**recognized**
  124:10
**recognizing**
  214:8
**recollection**
  72:4 82:13,18
  230:4 240:11
  249:13
**reconsidered**
  26:3
**reconsidering**
  25:19
**record**  28:15
  39:17 67:14
  103:14 144:16
  156:14,15,17
  158:21 215:7
  215:10 260:21
  264:17 267:8
  271:20 272:4,5
  273:5 275:8
**recorded**  275:7
**records**  267:20
  270:9
**red**  179:12
  180:2 188:15
  188:16 189:8
  204:1 225:2
  231:3,15 232:7
**reduce**  131:9
  158:4

**[reduced - report]**

**reduced**   204:17
**reduces**   143:13
**reduction**
   238:9
**refer**   68:1
   92:11 207:2
   237:11 248:1,8
   248:15
**reference**   52:16
   92:6,9 129:1
   251:17
**referenced**
   248:16 251:13
   251:15
**references**
   103:17 107:13
**referencing**
   246:15
**referred**   52:19
   53:11 171:5
   186:9 240:16
   241:9
**referring**   73:13
   79:16 85:16,17
   92:16 99:10
   101:16 130:10
   130:11 133:3
   141:20 195:9
   205:9 206:3
   207:7 215:1
   228:1 238:8,13
   261:13,21
**reflect**   19:9
**reflecting**   59:6
**reflection**   225:7

**reflects**   152:4
**regard**   10:11
**regarding**
   10:15 13:2
   30:16 38:4
   51:12 89:12
   90:12
**regardless**
   50:15 152:8,21
   209:3 224:5
**region**   106:9
**regular**   271:21
   272:3
**regularly**
   143:16
**regulators**
   40:15
**regulatory**   41:8
   43:9
**reilly**   3:18
**reiterate**   209:6
**related**   22:8
   24:3 143:8
   155:1 205:1
   233:20 236:9
   237:1,2 257:5
   257:20 264:8
   265:17,17
   266:12,12,17
   267:5,13
   271:14 275:11
**relating**   27:14
   59:16 91:1
   125:8 139:19
   173:21 175:3,6
   176:5,9 178:7

257:4 258:16
**relation**   246:11
**relationship**
   9:9 25:11,19
   26:15 33:5
   54:21 244:18
   245:10 262:18
   263:3
**relative**   32:14
   87:20 130:5
   133:2 234:11
   235:8,10
   236:15 242:21
**relatively**
   164:15
**release**   144:8,9
**relevance**   233:2
**relevant**   211:6
**reliability**   38:8
   38:11 99:21
   212:15 213:1
**reliable**   149:4
   211:4,5 222:18
**reliance**   41:16
**relied**   115:9
   117:8,18
   118:11
**rely**   31:18 74:8
   257:7
**relying**   33:6
   148:11 150:16
**remain**   49:10
**remember**
   15:15 35:7,14
   41:1,3,19,20
   52:15 62:14

77:3 83:19
   103:20 104:8,8
   104:16 129:16
   235:15 249:2
   256:21 261:7
**remind**   58:4
**repeat**   183:21
**repetition**
   223:8
**rephrase**   43:21
   64:20 214:6
   258:17
**report**   5:3,4,13
   5:15 7:17,20
   8:2,14,21 9:13
   10:6,10,19 11:2
   11:8,11,15,18
   12:1,10,17,20
   13:10 14:3,9,19
   15:8 17:3,5,8
   17:20,21 18:15
   24:7,8,10,13,16
   24:17,21 27:3
   28:2 29:1 30:8
   30:9,18 31:16
   34:1,15,18 35:6
   37:11 40:6,12
   41:7 43:5,10,16
   44:3 45:4,13
   46:7,16,16,17
   46:17,18 47:12
   47:13,13,14,14
   48:5,6,10,10
   52:15,18 53:5
   57:1,2,9 62:10
   62:11 71:18,21

**[report - results]** Page 46

| | | | |
|---|---|---|---|
| 74:1 76:21 77:4 | 188:1,4 190:7 | 102:2 103:8 | **respond** 89:17 |
| 77:7,18 78:4,8 | 194:20 195:14 | 106:10 110:19 | 89:19 139:1 |
| 86:6 88:10 92:7 | 200:19 | 112:14 147:17 | **responding** |
| 95:3 108:7 | **reporter** 1:16 | 157:18 | 94:6,8 |
| 112:12 113:7 | 1:19 12:9 36:10 | **reputation** | **response** 33:5 |
| 113:21 118:7,9 | 38:9 84:6 | 91:18 | 37:18 41:18 |
| 119:3 128:21 | 153:20 226:4 | **request** 27:13 | 92:8,18 98:9,18 |
| 129:12,13,14 | 271:19 | 266:1,11,16 | 98:18 102:11 |
| 129:20 130:3,4 | **reporting** | **requested** 26:2 | 104:14 106:14 |
| 130:7,14,16,18 | 112:11 133:16 | **requests** 26:8 | 106:16 235:17 |
| 132:10,14,14 | 147:14 163:5 | 59:7 | **responsibility** |
| 132:18,21 | 199:13 208:6 | **require** 21:14 | 49:10 |
| 133:4,4 134:11 | 219:11 | 171:3 | **rest** 66:13 |
| 134:13,19 | **reports** 5:19 | **required** 100:9 | 199:19 |
| 137:16 139:20 | 14:1 15:13,20 | 266:8 | **restricted** 80:3 |
| 140:13 141:6,8 | 18:5 42:3,11 | **reread** 8:5 | 101:4 |
| 141:10,11 | 46:18 47:12 | **research** 25:18 | **restrictive** |
| 146:9 148:7 | 50:17 58:1 62:3 | 70:1 123:20 | 221:12 |
| 159:9 162:19 | 77:10 119:8 | 140:19 141:7 | **result** 62:13 |
| 164:14 167:3 | 130:5,7 137:18 | 141:14 142:10 | 63:1,13,17 65:1 |
| 173:6 174:6,6 | 148:12 218:14 | 143:6,7,20 | 65:9 66:2,15 |
| 174:19,20 | **represent** 7:5 | 174:4 234:16 | 88:3 110:17 |
| 175:1,9,14,21 | 12:16,17 28:20 | 271:8,9 | 159:13,19 |
| 176:19 177:4 | 120:17 161:8 | **researcher** | 160:20 163:2 |
| 177:12 181:21 | 161:15,19 | 160:18 | 163:18 164:7 |
| 182:6 188:14 | 175:20 251:14 | **researchers** | 166:20 168:1 |
| 207:2,8,20 | **representation** | 241:20 258:20 | 178:15 232:17 |
| 208:1,4 210:20 | 29:7 120:6 | **researching** | **results** 50:5 |
| 235:12 237:19 | **represents** 7:6 | 139:18 | 65:4 66:1 79:20 |
| 248:2,9,9,15 | 150:10 210:20 | **residual** 234:13 | 85:17 86:2,5,19 |
| 250:16 251:5 | **reproductive** | 235:7 | 93:18 94:15 |
| **reported** 1:19 | 80:4 88:6,8 | **respect** 14:15 | 99:6 103:18 |
| 78:19 119:5 | 93:19 94:16 | 15:2 44:15 | 110:14 112:11 |
| 129:7 133:14 | 96:18 97:9 99:8 | 112:10 258:3 | 112:12 116:4 |
| 133:16 155:2 | 99:13 100:12 | **respects** 121:10 | 116:11 117:8 |
| 184:16 187:19 | 100:21 101:20 | | 132:1 133:21 |

**[results - risk]**                                                Page 47

| | | | |
|---|---|---|---|
| 134:5 157:7 | 185:7 194:11 | 86:17 90:11,20 | 212:8,11 |
| 173:9 177:1 | 267:17,20 | 91:1 98:1 | 213:18 214:19 |
| 180:8 183:7 | **reviewer** 64:8 | 100:18 101:1 | 214:21 215:9 |
| 187:4 188:8,16 | 135:14,17 | 101:14 102:8 | 215:16 216:2 |
| 188:17 190:7,8 | 136:6 164:1 | 107:2 111:6,17 | 216:10,13 |
| 190:9 197:18 | **reviewers** | 112:2,2,14 | 217:13,15,19 |
| 203:16 206:16 | 135:20 159:21 | 113:3 115:5,7 | 218:7,8,20,21 |
| 207:4,12 209:1 | **reviewing** 44:2 | 115:14,19 | 219:5 220:3,4,6 |
| 210:3 211:7 | 57:3 75:15 | 116:8 117:7 | 220:19 221:3 |
| 232:6 233:20 | 111:3 140:9 | 121:21 122:19 | 221:20 222:3 |
| 233:21 234:1 | **reviews** 52:3 | 126:4,20 127:2 | 222:16 226:15 |
| 235:1 246:6 | **ridiculous** | 127:19 129:3 | 228:1,4,4 |
| 256:18,20 | 236:2 | 131:18 132:19 | 229:21 232:16 |
| **retrospect** | **right** 7:6,9,14 | 133:15 134:2,6 | 233:2,15 |
| 219:15 | 7:18 8:11,19 | 136:2 137:5,6 | 234:18 241:9 |
| **retrospective** | 9:12 10:17 | 137:15 139:6 | 242:8,16 243:1 |
| 148:14 151:17 | 13:20 14:13 | 142:8 143:17 | 243:6,7,10 |
| 156:20 197:3 | 15:20 16:11,21 | 145:2,21 | 244:13 245:21 |
| 198:19 | 17:14 18:3,14 | 146:10,15 | 246:21 247:19 |
| **review** 10:14 | 20:12 21:2,9,16 | 147:20 148:12 | 248:1,12 |
| 15:15 24:9 | 23:1 27:4,7,18 | 150:5 153:15 | 249:11 251:9 |
| 26:14 43:9 | 28:19 29:11,19 | 157:4 159:2 | 252:17 259:19 |
| 48:20 49:6,7 | 30:4 31:2,15 | 160:21 161:5,8 | 260:12 263:7 |
| 63:16 182:18 | 32:2,8 34:20 | 174:8 176:15 | 263:18 264:7 |
| 198:1 250:17 | 35:3,10,15,16 | 177:3,5,16,21 | 264:18 266:10 |
| 267:11 | 35:18 39:17,19 | 178:21 185:11 | 268:3 272:6,7 |
| **reviewed** 15:12 | 46:5 49:3 52:2 | 185:13 187:2 | **risk** 6:4,14 22:9 |
| 15:19 18:5 | 52:19 53:1 55:9 | 189:11 192:6 | 32:14 71:6 |
| 24:14 40:14 | 55:9 58:8,20 | 195:19 197:1 | 72:15 79:20 |
| 43:15,17 48:11 | 61:5,9 62:1,18 | 198:1,4 200:4 | 80:1 85:11 |
| 48:16 49:14 | 63:9 67:9,16 | 201:9,11 | 87:20 101:6,15 |
| 52:9 53:2,10,13 | 68:10,15 72:2,5 | 202:15 206:3 | 101:19 103:5 |
| 75:19,21 76:4 | 72:6 73:11,15 | 206:13,18 | 105:15 110:8 |
| 93:9 104:2,15 | 77:6,6,11,13 | 207:15,19 | 121:7 131:4 |
| 105:5 136:12 | 78:12,16 79:6 | 208:4,14,16 | 144:19 145:12 |
| 136:17,18 | 81:1,11 83:19 | 210:19 211:9 | 145:16 147:12 |

**[risk - scenarios]**                                                           Page 48

| | | | |
|---|---|---|---|
| 150:19 156:8 | **sales**  1:7 | 245:17,19 | 239:16 242:11 |
| 191:6,15 | **sandler**  68:18 | 246:6,19 251:2 | 243:14 246:10 |
| 194:21 195:7 | 72:20 92:5 94:7 | 252:2 | 262:2 263:1 |
| 196:2 223:19 | 103:17 104:3 | **says**  12:14 | 268:18 |
| 223:19 224:11 | 106:5 109:19 | 27:15 48:10,13 | **scaled**  243:14 |
| 232:17 234:11 | 114:9 158:1,1 | 48:18 49:3,4 | **scans**  258:15 |
| 235:8,10 236:6 | 161:9,15 | 50:2,3,12,20 | **scenario**  132:6 |
| 236:12,15,18 | 241:21 242:8,9 | 51:9 59:16 | 148:5 149:20 |
| 238:2,5 242:21 | 242:16 | 62:19 74:2 | 150:2 157:5,7 |
| 244:7 245:18 | **sanitary**  106:8 | 75:10 77:6,6,7 | 163:18,21 |
| **risks**  133:2 | **savage**  2:11 | 77:18 79:17 | 164:16 165:7,8 |
| 149:13 | 263:21 | 81:4 84:20 | 166:19 178:14 |
| **rls**  1:3 | **saw**  23:15 | 88:10 93:10,11 | 180:4,6 181:10 |
| **robust**  121:13 | 41:16 240:7 | 94:13,20 95:16 | 182:8,9,10,13 |
| 121:16 148:15 | 249:15 271:12 | 96:11 100:8 | 182:19 183:5 |
| 156:21 | **saying**  65:19,20 | 101:3 102:8 | 183:10,15 |
| **role**  16:17 | 80:8 81:9 | 106:7,19 107:4 | 184:12 190:4 |
| **rothman**  90:15 | 100:19 107:18 | 107:18 110:6 | 190:11 191:9 |
| 90:20 91:10,16 | 108:2,6,6,15,18 | 115:14,14 | 191:13 195:3 |
| 94:9 98:10,18 | 108:19 111:10 | 119:20,21 | 195:13,18 |
| 138:18 | 111:18,20 | 130:19 134:4 | 196:10 197:19 |
| **rothman's** | 112:12,16,21 | 145:11,12 | 198:13,14,15 |
| 91:15 | 124:17 133:18 | 146:1 147:2 | 199:19 203:16 |
| **rough**  272:1,2 | 142:16 146:21 | 148:13 149:2 | 203:20 204:1,2 |
| **round**  29:11 | 160:7 167:8 | 154:20 156:5,6 | 204:6 205:9 |
| **royston**  225:19 | 175:20 195:20 | 156:19 157:12 | 210:15 219:18 |
| 227:6 228:7 | 195:21 196:1,4 | 157:20 158:1 | 220:7,9,10,11 |
| **rubin's**  226:18 | 196:5,6,7,8 | 187:17 189:2 | 220:18,19,20 |
| **rule**  232:13 | 199:13 205:3 | 190:17 195:2 | 221:6 229:6 |
| **rules**  226:18 | 206:5,8,11,18 | 195:13 200:13 | 234:2,9 236:7 |
| **s** | 208:17 209:1 | 202:1,20 | 255:7 |
| **s**  4:1,1,1 5:1 6:1 | 209:17,18 | 204:13,13 | **scenarios**  132:6 |
| 243:4,11 | 210:1,6,10 | 207:4,10,10 | 140:5,6 147:13 |
| **safe**  252:20 | 214:12 217:20 | 210:2 218:17 | 148:4 149:19 |
| | 219:15 231:8 | 226:16 233:3 | 166:15 187:18 |
| | 236:1 240:5 | 237:21 239:4,5 | 202:14 205:7 |

**[scenarios - sense]**                                              Page 49

234:14 255:5
**schedule**  6:20
  56:18 268:20
  269:2,5,12
**school**  169:6
**science**  90:1
  139:8 160:6
  250:15 251:17
  251:19
**sciences**  67:21
  68:14 73:5
**scientific**  5:19
  8:16 35:13 43:9
  50:16 51:11
  129:8 139:6
  142:14 162:16
  162:20 177:7
  178:6 183:9,14
  184:11 186:4
  187:14 201:18
  232:10
**scientifically**
  163:4 183:10
  183:15 184:12
  217:2
**scientist**  65:6
  180:13 270:5
**scientists**  40:8
  40:14 67:19
  69:15,15,17,21
  156:6 164:5
**scope**  254:3
**screening**  48:14
  48:17 49:10
**script**  15:11

**seal**  275:13
**search**  230:7
**second**  27:12
  49:1,19 93:16
  94:4,6 100:8
  106:11 117:17
  117:20 119:6,7
  124:13,17
  128:14 130:19
  131:2 148:9
  151:5,16,16
  152:6 187:17
  196:14,17,17
  196:19 200:7
  204:3 208:2,2
  210:2 218:14
  226:2
**secondary**
  124:13
**section**  12:12
  28:3,14 29:5
  49:18 86:5
  113:20,21
  114:20 195:10
  195:11 202:20
  207:15 238:9
  247:9
**sectional**  38:12
**see**  7:14 24:18
  26:13 27:7,9,13
  28:5 35:12
  36:14 48:5,7,8
  48:9,12,21 49:1
  49:4,20 50:10
  50:18 51:5,16
  58:6 59:18 60:2

70:16,19 71:4
71:20 72:21
73:6,12 77:4,18
80:6,7 86:4
90:11 92:4
93:11,14 94:1
94:18 95:2,21
96:8 97:1,2
100:15 101:12
106:11,17,18
107:7,8 109:19
110:13,14
111:20 113:4
119:3,4 120:2
121:1,4 126:14
129:10 135:3
143:19 144:20
145:19 148:18
148:19 149:7,8
149:15 151:2,7
151:8,21 156:3
156:9 158:7
159:7,14
165:13 182:15
189:1,9 191:15
191:19 202:12
206:1,11 207:6
207:14 209:13
210:9 220:1
225:20 226:19
227:7,18
228:16 229:1
233:7 239:21
241:13 243:6
243:19 245:15
248:10 256:1,5

256:8 262:11
262:12 264:13
268:17
**seeing**  98:6
  151:4 257:20
**seek**  33:11
  163:8 182:18
**seems**  185:1
  191:5 202:8
**seen**  22:11
  25:10 43:5
  59:11 88:20
  90:11 97:13
  103:16 105:4,7
  105:17 109:12
  129:20 144:8
  145:5 164:11
  164:11 169:7
  169:10 193:20
  200:5 227:15
  230:2,9 231:16
  237:6,18 243:9
  258:19,20
**selected**  184:21
  186:4
**selections**
  182:12
**semantic**  204:5
  217:20
**send**  269:17
**sense**  120:20
  165:11 167:11
  191:11 215:10
  221:16 240:12
  243:2

**sensitive**
242:13
**sensitivity**  24:3
24:3 143:7,10
162:11 165:8
173:20 197:16
199:1
**sent**  40:7
**sentence**  48:18
49:2 50:20
62:17 65:2,19
65:20 80:18
84:20 88:10
107:18 112:17
130:21 147:1
187:17 200:10
203:10 204:4
207:14,17,18
207:21 208:1
239:5,13,15,15
**sentences**  208:4
**separate**  273:8
**serious**  65:5,10
65:15 160:20
160:21 161:1
161:20
**set**  102:12
114:8
**setting**  33:16
**seven**  12:21
**several**  7:12
23:18 70:13
98:17 111:13
137:5 145:3
177:15

**severe**  106:19
**sgo**  25:2
**she'd**  215:21
**shed**  179:4
**sheet**  12:14
273:8 274:1
**short**  195:5,15
**show**  20:21
26:17 32:12
43:1 70:6 77:14
79:16 83:17
89:2 93:15
99:10 105:9,13
109:5 150:19
155:19 157:10
211:15 227:9
261:13
**showed**  103:19
175:8,8 226:20
245:21 249:18
**showing**  94:11
148:15 156:21
**shown**  111:13
165:12
**shows**  101:18
131:16,20
216:21 231:12
**sic**  58:14 228:6
**side**  27:7 102:8
196:3 207:19
239:4,16 245:9
**siemiatycki**  9:2
16:2 42:12
**siemiatycki's**
47:14

**sign**  272:6
**signature**
275:14
**significance**
15:3 16:17 51:1
86:21 93:12,21
94:17,21 95:6
111:2 150:19
153:6 211:18
212:11,13
247:1
**significant**
85:13 86:13,16
87:9,12,18,21
101:15,19
102:3 105:1
109:2 110:17
112:1,7 116:15
117:5 147:17
155:7 162:8
195:1,8 197:13
211:16 236:14
236:16 238:2
241:11 247:12
249:6 252:17
260:16
**signing**  273:1
**signs**  256:9
**similar**  155:6
174:10
**similarly**  32:2
101:8 266:13
266:16
**simply**  160:17
218:7

**simultaneous**
84:5 153:19
**singh**  9:3
**singh's**  46:17
**single**  222:17
223:4 225:3
246:17 247:9
**sister**  76:12
77:10 83:4
117:19 118:7
118:10,16
119:10,20
121:11 125:1
149:4 161:10
161:13,18
162:18 213:8
214:11 242:13
242:15,17
244:1 245:13
246:15 249:8,9
249:11
**sisters**  122:20
**sit**  25:17 26:13
**six**  53:18 54:14
55:11
**skip**  86:8
**slow**  38:9
**small**  13:7
110:7,21
111:15,20
112:4,12
205:18 206:5
**smith**  9:3 16:1
46:18 47:13
215:15

**[smokers - statistically]**

Page 51

| | | | |
|---|---|---|---|
| **smokers** 236:20 | 229:20 230:13 | 45:14 60:16 | **standard** |
| **smoking** 237:1 | 239:13 242:2 | 68:16 84:11 | 173:17 |
| 237:2 | 254:2,19 258:7 | 99:17 105:8 | **standpoint** |
| **solution** 125:13 | 269:2 | 109:17,18 | 65:18 181:18 |
| **somebody** | **sort** 80:16 | 119:17 129:6 | **stands** 34:16 |
| 20:14 65:8,8 | 143:1 160:14 | 129:18 229:3 | 247:11 |
| 125:20 137:3 | 181:14 197:2 | 249:13 257:16 | **start** 7:13 190:4 |
| 170:14 215:11 | **sound** 120:8 | 261:12 269:20 | **started** 85:14 |
| 216:21 217:8 | **sounds** 35:15 | **specifics** 26:1 | **starting** 93:16 |
| 218:17 249:3 | 119:11 | 62:8 | 134:11 160:6 |
| 254:15,16 | **south** 1:13 2:4 | **speculation** | 266:15 |
| **someone's** | **speak** 39:18 | 37:13 39:2 | **state** 10:7 82:8 |
| 240:10 | 66:20 69:6 | 41:12 43:13 | 266:6 275:1,3 |
| **somewhat** | 70:11 174:21 | 44:8 47:2,18 | **stated** 96:14 |
| 156:11 | 175:16 250:2 | 71:8 126:13 | **statement** |
| **sonal** 9:3 | 260:19 | 128:12 136:5 | 62:11 85:7 96:2 |
| **sorry** 12:6 | **speaking** 8:15 | 160:2 179:7 | 110:5 147:6,19 |
| 30:14 31:10,16 | 10:18 18:5 | 192:20 250:6 | 177:11 212:10 |
| 36:4,19 40:4,18 | 29:13,16 60:16 | **spend** 139:18 | 212:14 231:18 |
| 44:7 51:17 63:9 | 69:19 73:16 | 141:11 251:4 | 233:9 250:4,16 |
| 63:19 68:8 | 84:5 153:19 | **spent** 57:3 | **statements** |
| 70:12 81:19 | **speaks** 17:6 | 139:21 140:7 | 88:20 92:12 |
| 83:20 89:5 94:2 | 51:18 249:21 | 141:16 267:5 | **states** 1:1 80:1 |
| 97:17 101:18 | **specialists** | **spoke** 61:4 | **stating** 206:5 |
| 105:20,21 | 21:10 | **spoken** 60:8,11 | **statistical** 15:3 |
| 113:9,9,10,12 | **specific** 10:14 | 60:14,19 164:9 | 16:17 51:1 74:4 |
| 117:10 118:5 | 13:7 14:1 50:3 | 168:18 171:9 | 86:21 88:13 |
| 126:12 130:12 | 68:17 184:8 | 171:12 176:4,8 | 93:12,20 94:17 |
| 132:20 143:12 | 200:2 202:4,4 | **stack** 265:13,14 | 94:21 95:6 |
| 151:8 158:11 | 207:13 209:3 | **staff** 269:21 | 109:2 115:16 |
| 163:10 170:1 | 209:12 210:4 | 270:8 | 150:19 153:5 |
| 172:15 178:8 | 210:14 218:3 | **stages** 129:13 | 202:1 211:18 |
| 190:4 194:15 | 256:21 257:10 | **stand** 36:4 | 212:11,13 |
| 194:17 197:5 | 267:11,16,18 | 162:4 178:13 | 222:15 |
| 207:20 224:17 | **specifically** | 231:21 | **statistically** |
| 225:21 226:1 | 22:15 23:3 | | 33:7 85:13 |

**[statistically - study]**                                           Page 52

| | | | |
|---|---|---|---|
| 86:12,15 87:9 | **strategy** 65:21 | 33:12,17,18 | 66:13 67:1,1 |
| 87:12,18,21 | 142:5 143:3 | 34:10 38:11,12 | 72:2 73:11 74:6 |
| 97:9 101:15,18 | 160:12 163:1 | 38:12 39:10 | 74:8,13,20 75:5 |
| 102:3 104:21 | 169:18,20 | 50:5,15,21 51:2 | 75:6,9,11,13,14 |
| 111:1 112:7 | 170:20 173:14 | 60:5 68:11 | 76:8,11,12 77:9 |
| 116:15 117:4 | 178:19 186:7,8 | 69:12 76:10,13 | 77:10 78:17,18 |
| 194:21 195:8 | 187:3 201:15 | 76:18,20,21 | 82:2,4 83:4,10 |
| 211:16 247:12 | 224:6 225:6 | 77:8,14 78:5,19 | 85:18 86:20 |
| **statistician** | **street** 1:13 2:4 | 79:11,18 80:2 | 88:14 92:12,13 |
| 223:15,17 | 3:4,14 | 80:10,19 81:2 | 92:18 93:3 |
| 224:8 | **strength** 5:12 | 81:17 82:20 | 95:12,13 97:4,5 |
| **statistics** 6:10 | 34:5 37:17 39:4 | 83:3,17 84:16 | 97:14 98:1,3,9 |
| **steering** 3:8 | 39:6 87:2,6,13 | 85:10 95:16,17 | 98:19 100:7 |
| **stenographic** | **strengthen** | 115:7 119:20 | 103:19 104:4,4 |
| 1:15,19 | 189:4 225:1,10 | 120:21 122:5 | 108:8,21 109:4 |
| **stenographic...** | 228:18 230:10 | 123:15 132:19 | 110:6,15 |
| 275:7 | 231:2,6 | 133:1 136:11 | 111:10,14 |
| **step** 54:18 | **stress** 102:12 | 136:16 141:18 | 112:12 113:1 |
| 185:14,19 | **strike** 102:5 | 142:4 149:4 | 113:13,19 |
| 223:21 | 108:5 111:4 | 167:9,9 181:13 | 114:9,12 115:2 |
| **stop** 77:19 | 138:6 154:4 | 189:13 190:1 | 115:10,18 |
| 207:5 | 155:13 181:2 | 204:16,17 | 116:4,10 |
| **straighten** | **strong** 32:16 | 205:2,17 | 117:19 118:7 |
| 268:5 | 39:12 147:15 | 212:12 220:16 | 118:10,16,19 |
| **strategies** | **stronger** 50:6 | 233:16 236:17 | 119:8,10,13 |
| 141:13 142:3,6 | **strongest** | 238:12 245:14 | 120:9,20 121:5 |
| 142:17 143:4,5 | 157:16 | 246:15 247:7 | 121:11,15 |
| 160:12,13 | **strongly** 74:2 | 248:20 249:6,7 | 122:11,12,14 |
| 165:10 167:10 | 88:11 97:20 | 249:11 251:18 | 122:18 123:2,8 |
| 168:13,20 | 115:15 | 257:21 258:1 | 123:14,16 |
| 169:2,12 170:4 | **stuart** 168:8,10 | 259:2,5,7 | 125:1,1 126:3,4 |
| 170:7 171:6 | 168:11 229:14 | **study** 13:1,3,8 | 126:18 127:11 |
| 172:6 174:10 | **studies** 14:1,16 | 13:16 31:18 | 128:20 129:1,4 |
| 189:3,16,21 | 17:10 18:7 | 33:2 38:7 59:9 | 129:5,13 130:5 |
| 222:8 224:20 | 30:19 31:18 | 59:20 62:5 63:7 | 130:7 131:14 |
| 231:5 | 32:4,6,12 33:6 | 64:11 65:10 | 132:11 134:5 |

**[study - sure]**                                          Page 53

134:12 139:15
141:17 144:10
144:18 145:12
149:2,18 152:5
156:6 157:14
158:15 161:7
161:10,13,18
162:1,17,18
164:1,13,15
169:4 170:13
174:19 179:10
181:14,17,17
182:10,14
188:9 189:7
190:3,8,9
194:13 199:21
205:4 209:2,6
210:8 211:7
212:16 213:4,8
213:16 214:11
214:18 215:15
215:19 216:20
218:4,4 221:9
223:10,13
225:18,19
226:14 227:5
231:13 234:1
235:11,12,14
235:16 236:2,7
237:4,11
238:20 240:16
241:9,16,20
242:7,10,13,16
242:17 244:1
245:8,13,17
246:7,15

247:19 249:9
249:11,16
250:3,18,19
251:4,7,10
258:14,19
259:20 260:4,8
261:3,10,15
262:14
**stuff** 129:21
215:11
**stylistic** 29:20
**subgroup** 96:12
96:15 99:12,14
99:18 101:5
103:7
**subgroups** 80:4
**subject** 48:14
49:13
**subjects** 234:17
259:3
**submit** 27:19
38:6 269:15
**submitted** 24:8
24:13,16,21
25:5,7,14 46:6
47:9,10,11,15
47:20 48:16
75:19,21
**subsequent**
41:5
**subsequently**
217:1
**substantial**
262:4
**substantive**
57:17

**sufficient** 77:1
78:20
**sufficiently**
80:2 83:17
**suggest** 17:2
63:12 203:16
206:21 270:17
**suggested**
116:4
**suggesting**
247:12,13
**suggests** 145:15
147:3,4,7 189:6
189:7 231:14
**suite** 1:14 2:12
3:4,19
**sum** 88:10
97:20
**summaries**
28:3
**summarize**
82:11 84:4
251:17
**summarized**
78:9
**summarizing**
226:17
**summary**
28:14 29:5
37:19 228:8
250:11,12
**supplemental**
7:8 15:13 62:3
150:7 194:15
216:13,15,16
216:17 219:1,4

221:19 222:1
240:19 241:15
243:5
**supplementary**
218:10
**supplied** 15:16
**support** 50:12
63:6 111:11
132:1 150:6
189:4 209:8
210:11 224:21
225:9 227:6,20
228:10,16
231:6,17 233:3
234:4 238:3
239:7,18 260:5
270:7
**supported**
225:13 237:16
**supporting**
203:2,13
**supportive**
239:2
**supports** 107:4
107:8,19 108:8
132:11 149:5
165:16 245:17
**supposed**
170:15
**sure** 16:15
17:15 21:17
36:18 55:13
60:17 61:8 76:3
80:19 120:19
137:9 144:13
147:1 165:21

[sure - talked]                                                           Page 54

183:11 234:14
238:21 240:18
243:7 246:3
248:7 258:10
260:20 265:5
266:3
**surrogate**
258:15,21
**susceptibility**
106:15
**susceptible**
31:19 80:3
100:12
**switch**   18:14
39:19 53:15
**sworn**   7:2
275:4
**synthesize**
173:5
**system**   112:14
**systematic**
25:10

**t**

**t**   4:1 5:1 6:1
**table**   17:14
114:8 119:19
131:16 150:6,7
150:9,16,21
151:3 154:20
155:5 180:7
182:8 190:4,15
190:16,17
194:13,16
196:11,12
197:5 210:20

211:9 221:17
221:19,19
222:1 239:11
240:3 243:2,4,6
243:7,9,10,14
**tables**   240:20
241:15 243:5
**tacked**   268:19
**tagged**   110:4,5
**take**   7:7 17:14
24:17 36:13,17
48:2 56:9
103:11 147:9
156:13 158:19
165:18 195:21
215:5 219:16
266:1
**takeaway**
147:10
**taken**   49:8
61:17 103:13
158:20 226:12
241:15
**talc**   6:4 8:17
9:10 10:1,3,20
19:14 22:2
25:11,20 26:3
26:15 27:11,14
32:13 44:4 45:1
46:20 50:4
53:17 54:21
59:21 62:8 70:3
71:6 74:3 78:14
88:11 97:21
101:1 102:18
105:15 106:7

106:20 107:1,5
107:9 109:3
116:6 122:11
122:21 125:9
125:18 126:9
126:18,19
127:7,17
128:10 131:14
132:2 137:16
144:19 145:14
147:11,16
148:16 149:12
151:14 156:7
157:1,15
158:15 165:15
180:17 190:19
192:18,19
193:11,21
194:3,8 198:18
198:19,21
200:8 203:3,14
204:15 208:6,7
208:9,12,12,18
209:4,10
210:13 211:17
215:18 216:1,8
218:3 233:5
234:5 239:6
240:15 245:11
245:12 246:8
246:13,19
247:3,15
249:19 250:13
253:4 256:3,6,7
257:6 258:5
259:9 262:15

262:17 265:17
266:12,17
267:5 271:14
**talcum**   1:6 7:21
9:5 13:2 59:9
59:21 61:13
79:7 106:13
146:14 193:14
193:16,18
254:15,17
257:17 258:15
274:2
**talk**   8:8 10:17
13:7,20 15:11
16:16 18:15,15
23:16 31:2
39:11 52:13
53:15 66:4
67:16 71:17
76:7,16,17
83:15 113:3
122:4 128:18
128:19 132:9
132:17 140:14
150:21 158:5
159:5 160:17
177:17 182:5
210:19 225:2
228:5 232:8
240:19 242:19
**talked**   15:4
56:14 69:20
76:17 87:13
90:21 99:7
115:1 116:9,21
159:10,11

**[talked - thought]**                                      Page 55

169:2 175:13
201:14 205:14
212:7 258:1
262:15
**talking**  17:15
23:3 87:4,6,8
111:1 119:7
129:19 157:6
166:2 179:15
186:6 196:18
213:9 218:9,10
221:18 225:3,5
233:21 235:14
257:15,15
262:14
**talks**  27:11 34:2
34:3,4 120:4
177:12 225:16
225:17 226:15
**taught**  222:13
**tease**  31:3
**technical**  57:21
**techniques**  24:1
180:5
**tell**  12:13 44:1
44:4 46:5,21
47:9 129:4,6
209:19 230:6
231:19
**telling**  37:20
131:19 164:10
230:11
**ten**  170:15,16
223:9 226:16
**term**  74:16
75:17 101:7,7

149:5,14
157:17 173:4
195:5,15 202:3
261:5
**terms**  34:21
55:12 62:3 87:8
99:21 236:5
**terry**  107:16
**test**  35:11
**testified**  7:2
9:12 54:1 77:21
78:4 83:16
266:7
**testify**  54:8
164:4
**testifying**  54:14
54:18,19
**testimony**  8:14
9:1 55:3 82:11
84:4 212:1
267:13 273:5
**testing**  234:3,3
**tests**  101:10
**textbook**  90:21
230:20
**thank**  19:1 69:5
72:11 77:19
113:17 137:2
252:6 268:9
**thanks**  12:4
59:2 72:10
224:18 230:3
241:6
**theoretic**
234:20

**theoretical**
233:11 255:1
**theoretically**
232:17
**thick**  41:17
**thickening**
256:2,5,12
**thing**  28:19,20
29:9 30:9 32:21
44:19 45:12
65:5,10 81:13
87:1 95:15
101:3 108:2
109:5 113:3
141:3 145:11
160:20 161:1
161:20 177:6
181:15 200:7
210:10 217:21
223:9 226:4
237:4 270:9
**things**  15:4
20:11 23:2 26:9
27:14 48:4 50:8
51:10 53:11
56:16,17 57:6
57:10,19 61:6,7
67:18 90:7,10
124:7 125:10
127:4 135:13
159:7 160:6
167:12 170:13
205:13 210:1
218:10 225:6
232:8 235:10
242:19 245:20

257:6 270:13
**think**  11:2
21:19 23:3
32:21 33:18
34:6,10,17 35:6
39:17 47:19
52:20 55:16
58:7 63:15
70:12 71:12
72:6 74:21 77:7
78:8 87:14 92:9
100:2 117:16
139:2 140:21
159:20 163:7
170:6 171:19
174:1 176:10
176:18 180:12
180:20 181:20
189:18 190:10
192:13 193:4,8
193:11,13
212:7 218:9
228:4 230:8
232:16 233:9
233:12 239:1
248:14 252:21
255:12 260:4,8
263:4,9 269:20
**thinking**  39:16
**third**  94:10,12
100:8 130:18
151:20 155:6
187:17 204:13
211:11
**thought**  46:9
65:16 66:6,6

**[thought - tisi]**                                                    Page 56

70:13 81:14
105:20 115:20
116:3,3 132:5
138:17 139:1
145:2,6 162:16
165:19 166:12
166:19 181:19
182:1 199:15
220:2,4 226:8
242:3,4 253:21
263:13
**thoughts** 169:8
**thousands**
164:4
**three** 37:16
54:6 76:10
79:18 94:5
125:2 181:13
182:7,9 219:19
220:9
**threw** 67:3
**throw** 12:6
105:21
**throwing**
188:11
**time** 15:5 16:14
27:2 41:4 46:19
56:14 57:2 58:7
60:18,18 61:6,6
61:11 74:5
77:11 83:14
85:5 88:14
90:21 97:15
98:13 99:16,20
100:17,18
103:21 113:20

115:18 120:19
121:1 122:3,16
122:21 123:5,9
128:1 130:2
134:12 137:12
139:18,21
141:11 150:13
155:11 168:21
168:21 169:2,2
171:8 174:5,6
174:18,20
187:20 200:2
202:4 203:5
214:11 215:5
223:3,17
224:10 265:14
**times** 143:16,20
145:3 177:15
208:9 223:8,8,9
244:11,12
**timing** 190:20
**tisi** 2:2 4:4 7:3,4
9:11 11:13 12:5
13:11,13,19
17:12 18:2,11
19:2 20:20 21:4
22:1 26:10,20
28:12,15,18
29:4 30:12 31:1
31:14 34:19
36:3 37:7,15
38:1,10 39:7
40:2,4,5,19
41:14 42:7,18
43:4,19 44:10
46:4,11 47:5,7

48:1 51:20 52:1
52:10 55:5 58:4
58:5 59:3 61:20
64:1 66:6,8
67:8,15 69:5,9
70:9,12,15
71:11,16 72:12
77:19 78:2,11
79:5 81:21 82:2
82:5,9,12 83:1
84:1,3,7,8 85:1
85:8 89:5,7
91:6,14 92:1
93:6 98:14 99:4
103:3,11,14,15
104:7,12 105:3
105:12,20
106:2 108:13
109:8,11
112:18 113:9
113:12,17,18
116:7,18 117:6
117:14 118:4
123:12 126:16
128:17 130:13
130:17 131:12
133:9 135:2,5
135:15 136:10
137:1,10,20
138:9 139:9
140:18 144:15
146:7 147:8
149:1 153:7,18
153:21 154:2,5
154:7,11
155:12 156:1

156:11,13,16
158:13,19,21
159:1 160:4,16
161:4,14 162:6
163:14 166:7
166:17 167:15
174:17 175:15
176:20 177:14
178:9,17
179:14,17,20
180:9,19 181:8
183:2 184:3
186:20 193:2
193:10 207:8,9
212:4 213:14
215:8 223:5
226:7,13 227:1
227:12,14
229:10,12,18
229:20 230:1,5
230:16 232:2
237:10 241:2,4
241:8 242:2,4,6
246:4 247:17
248:5 250:1,10
252:6,10
254:10,14
255:11 258:11
261:1,17,18
263:10,19
264:5,10,15,18
264:21 265:9
267:9 268:3,8
269:1,4,9,11
271:18,21

**[tissue - two]**                                                    Page 57

**tissue** 102:9
256:15
**title** 154:20
242:11 243:9
**titles** 37:17
**today** 7:14 8:6
8:10 9:19 17:2
19:10 20:2
25:12,17 44:13
45:6 79:13
119:7 145:3
267:6
**together** 8:1
44:3 76:17 80:9
80:20 83:13
85:10 93:11
209:21 241:2,4
245:6
**told** 46:15
221:16
**took** 159:2
217:8
**top** 28:16 51:9
95:15 207:19
226:15
**topics** 18:14
39:19 53:16
**total** 54:17 56:2
**towards** 143:14
205:20 206:20
**townsend**
109:13
**toxicology**
26:12
**track** 28:9
269:16

**tract** 88:6
100:21 106:10
**tracts** 80:5 88:8
93:19 94:16
96:18 97:9 99:8
99:13 100:12
101:20 102:2
103:9 110:19
**training** 45:9
189:20 225:12
**transcript**
271:20 272:6
273:4 275:7
**translate** 262:8
**transplant** 21:5
22:8 23:16,20
**transplantation**
22:10
**travel** 106:9
**tremolite**
252:14
**trend** 33:7
101:10
**trial** 54:8
**trials** 255:16
**tried** 123:21
230:7
**trip** 12:7 36:9
**true** 7:9 8:11
9:6 10:7,13
11:1 13:2 16:7
17:17 18:8 19:4
19:18 20:3,14
21:7,16,17 22:3
23:17 25:12,15
26:4 30:13 32:9

32:9 33:9 46:1
55:7 65:11
66:18 67:4,21
76:12 77:16
78:6 79:1 81:3
81:18 86:20
87:13 88:6 90:1
90:19 95:19
96:4,6,6 97:16
98:10,19,21
103:6 108:9,17
109:1 111:17
112:6 113:1
116:11,21
117:9 119:2
120:11 121:5
122:21 123:5
124:6,12
125:21 126:10
128:11 129:8
132:3,11 136:4
153:10 159:20
161:1,10,19
162:1 177:8
186:15 198:11
199:11 207:18
208:21 209:20
213:11 232:18
237:12,17
238:3 247:4
248:21 249:12
249:19 250:4
251:6,11,18
252:3 255:16
257:6 262:17
273:4 275:8

**truly** 192:14
**truth** 129:6
**truthfully**
215:20
**try** 33:5 59:5
80:21 82:11
163:8 170:8,11
173:14 201:15
216:18 220:18
223:14 259:14
260:18
**trying** 31:3
34:8 63:17 84:2
94:2 188:15,19
201:12 209:15
209:16 213:19
214:9 218:15
223:1 233:18
236:14 270:17
**tube** 111:16
**tubes** 88:4
102:9 103:6
110:11 208:12
**tune** 170:17
**turn** 190:15
**turned** 24:14
236:19 237:18
**two** 54:2,4,6,10
102:4 122:13
122:13 124:2
128:14 143:4
170:18,19
180:3 181:5
182:7 192:21
200:2 204:2
209:21 211:10

**[two - use]**                                                      Page 58

218:9 220:12
221:4 232:5
244:21 245:4
247:2,3 253:8
**twofold**   8:15
**typically**   73:16
74:11 89:9
201:13

**u**

**u.s.**   203:1,12
242:14
**um**   55:15 76:2
89:15 123:3
139:10 150:12
189:19 195:12
196:15
**un**   228:17
**unadjusted**
154:21
**unclear**   179:10
183:5 187:8
**uncorrected**
154:20
**undefined**
201:2 202:11
202:18
**under**   49:18
202:1 203:10
203:10 266:1
**underestimates**
206:9
**undergone**
48:20 49:5
**underlying**
243:17

**underneath**
156:5
**underscores**
145:12
**understand**   7:9
8:11 22:18 37:9
37:15 38:19
41:21 42:9
74:15 81:6 84:7
86:10 89:8 93:2
138:12 140:4
142:11,13,16
142:17 143:4
174:12 179:20
183:12 184:20
185:6,10 199:7
209:16 230:17
253:7,10
255:19 258:10
**understanding**
6:13 35:10 42:1
53:9 140:10,11
141:12 186:1
200:21 251:4
268:19
**understood**
38:17 51:20
192:14
**underwear**
106:7
**unexposed**
143:1 187:19
188:2 213:6
219:8,12,16,19
**unfortunate**
159:17

**unique**   149:3
**united**   1:1 80:1
**unmeasured**
232:12,13,18
233:6,12,14
234:6,9,21
235:6
**unquestionably**
182:13
**unreliable**   9:4
**unscientific**
201:16,17
**untrue**   216:10
**unusual**   122:5
123:3
**update**   8:10
10:11,19 11:2
14:19 17:3
52:16,20,21
120:9 123:13
**updated**   10:5
11:18 12:10
14:1 18:7,19
19:12
**updating**   27:5
**usage**   9:10
127:7
**use**   5:17 6:4 9:5
14:4 16:12
23:10,21 49:16
52:9 56:21 65:2
72:14 74:11
79:19 96:20
105:1,15 107:9
109:3 110:8
116:15 121:16

124:11 125:2,8
125:9 126:9,18
127:2,3,3,11
128:10 131:6
132:2 144:19
148:16 149:6
149:13 150:4
151:14 153:9
154:17 155:2,3
156:7 157:1,15
157:17 158:2,4
165:15 166:15
167:10 168:12
168:15,19
169:3 171:4
172:12,12
178:15 180:6
189:21 190:19
190:20 192:3
193:21 194:20
195:15,15
200:8,14,19
202:2,3,3 203:3
203:12,14
204:15 208:6
209:10 210:13
211:17 213:10
215:9 216:18
217:9 218:3
219:2 223:2,11
224:6 230:10
231:1,2 232:4
233:5 234:5
238:1,4 239:6
239:17 242:11
242:21 243:16

[use - want]                                                          Page 59

244:6,6,7,7
245:11,11
246:12,19
247:2,2,3,4,10
253:21 254:15
254:18 258:20
259:13 260:5
262:15,16,17
**used**   9:3,13
10:1 16:6 17:16
17:17 66:12
74:17 82:18
99:17 118:12
125:12 126:19
127:8,17 134:3
143:5 147:16
167:1 168:6
169:7 170:7
172:3,4,17
182:12 183:9
183:14,16
184:11 186:7
187:9,12 189:3
189:16 191:9
200:17 202:4
203:1 208:8
216:3,4,7 217:5
217:13 218:6
218:11 224:20
225:9 227:20
228:18 229:1
231:5 256:3
257:17 258:14
**user**   125:18
**users**   101:8,8,9
101:9,9 145:17

149:14 157:17
195:6,16,16
196:1,2 212:17
213:3 262:5,5,9
262:10,21,21
**uses**   256:6
**using**   24:2
29:14 83:5 85:4
101:10 145:17
158:3,15
163:17 169:7,9
169:20 170:3
170:21 172:5
174:11 181:10
191:8 198:17
198:18 199:1,1
202:21 203:11
216:1 217:11
226:17,18
228:9,13
238:10 243:18
254:17 255:4
261:4,5
**usual**   73:19
**usually**   89:19
136:6,8 142:6
170:10 172:13
173:3,15
179:12 185:14
187:4 206:19
**uterine**   151:6
191:3,16,19
192:8,15,19
193:6,12,15
194:12 239:7
239:17 240:4

240:15 243:17
**uterus**   110:10
111:17

**v**

**vagina**   106:9
**vague**   9:7 17:18
20:15 26:5
40:18 41:9 93:4
98:11 135:4
139:7 146:20
147:5 162:2
163:10 175:11
176:16 178:8
178:11 179:6
186:16 222:19
254:19,20
258:7
**vaguely**   35:19
41:3,20 148:7
**valid**   228:18
**validity**   50:14
182:14
**values**   6:9
101:11 227:19
228:7
**variable**   223:3
244:3
**variables**
172:12 223:1
**variety**   45:7
**various**   69:11
132:19 159:21
206:15 255:5
**vast**   10:18

**veramedica**
56:14 269:12
271:4
**verse**   202:2
**versus**   246:18
**view**   30:5 50:13
86:13 165:14
192:16 209:19
233:19
**violates**   81:20
83:20
**virginia**   2:13
**vitae**   5:7 18:20
**volume**   5:15

**w**

**w**   4:1
**waive**   272:6
**want**   12:6,7
16:15 17:13,13
17:13,14 18:15
36:9,14 54:18
56:9 65:2 73:14
82:8 105:21
123:13 124:6
126:18,18
134:10,15
138:2 142:13
156:13 158:4
179:17 187:6
204:12 215:6
215:10 226:5
229:7 230:20
240:17 243:7
254:6 260:17
260:19

**[wanted - women]**

wanted  85:9
123:18 140:3,3
142:11 188:21
washington  3:5
way  7:16 16:8
24:9 49:17 53:7
56:21 60:4 63:7
69:10 74:12
101:1 124:5
137:3 138:19
145:1 159:16
169:7,10
172:12 188:12
197:15 222:6
223:14 224:12
235:2 259:14
263:14,20
270:8 275:11
ways  137:5
142:7
we've  45:7
90:21 115:1
119:7 171:8
196:14,16
206:14 212:7
216:17
weak  32:6,15
39:13 87:3
133:13 235:6
website  5:8
21:1,5,6 52:21
53:4
week  21:1
244:6,7
weighing  51:13

weights  243:14
weird  156:12
went  85:14
98:7,17 219:7,8
244:12
wentzensen
70:17 72:19
92:4 94:7
103:17 104:3
109:20 114:9
245:20
west  168:6
whatsoever
129:1 146:4
white  227:6
wide  45:7
242:14
widely  129:7,7
129:9
willcox  2:11
263:20,21
wilsav.com
2:15
window  178:3
wish  235:21
withdraw
214:6
withdrawing
64:20
witness  4:2 9:8
12:4 13:12 17:8
17:20 18:10
20:17 26:7
28:17 30:16
31:13 34:17
37:6,16 39:3

40:17 41:11,13
42:6,16 43:12
43:14 44:9 46:3
46:9 47:3,19
51:18,21 52:7
59:2 63:20 67:7
69:7 71:9,14
72:10 78:1,8
79:3 82:13
84:20 91:5,21
93:5 98:13 99:2
102:21 103:12
104:11,19
108:12 112:16
113:11,16
116:2,13 117:3
117:12 123:7
126:14 128:13
130:16 131:2
133:8 135:12
136:6,21 137:8
138:7 139:8
140:17 146:6
146:21 152:19
154:10 156:12
158:12 160:3
160:10 161:3
161:12 162:4
163:12 166:5
166:14 167:7
174:16 175:12
176:18 177:11
178:12 179:8
180:2 181:3
182:21 183:21
186:18 192:21

193:8 212:2
213:13 222:21
226:11,21
230:4,15
231:21 237:8
241:6 246:2
250:7 252:7
254:3,4,13,21
258:9 263:12
263:15 265:5
266:3,20 272:8
273:13 274:3
275:12
witnesses  36:16
wolfson  47:10
woman  125:4
125:18 126:19
127:10,17
215:13 253:20
women  74:4,5
80:4 85:12 88:4
88:4,12,13
93:19 94:15
96:18 97:8 99:8
99:12 100:11
101:19 103:5
110:9,10,19
111:16 112:13
115:16,17
118:20,21
121:7,17 122:2
147:16 150:5
150:10,19
152:6 153:9
158:3,15
187:18,21

**[women - zoom]**                                                        Page 61

192:16 193:4
195:21 200:19
201:1 203:1,12
208:8 212:16
213:2 221:7,11
256:2,16
**women's** 76:11
77:9 122:10
**word** 27:12
99:18 121:16
134:3 152:5
208:14
**words** 29:8
159:17 175:19
204:5 267:19
270:18
**work** 44:15,16
44:16 46:1
54:15 55:6,10
57:18 136:13
181:19 265:17
266:12,17
271:7,13
**worked** 171:8
**workers** 259:17
**working** 23:14
53:17 267:5
**works** 154:4
169:1
**world** 26:12,12
143:20 165:13
**worst** 255:7
**wright** 228:7
**write** 80:16,16
89:11,14,18
137:13 138:20

139:4 158:2
**writing** 38:16
38:16 57:4
137:16 138:17
168:14 250:11
250:12,16
**written** 24:2
74:14 80:13
89:17 94:8
113:2 126:15
168:12 175:14
233:8
**wrong** 113:12
**wrote** 9:12 24:7
28:15 38:15
90:15,20 92:3
92:13 104:14
175:8 206:15
231:11

**x**

**x** 4:1 5:1,1 6:1,1
255:15

**y**

**yeah** 7:20 11:2
12:6,18 15:6,17
21:17 30:1
32:21 36:20
37:8 40:11 42:8
45:20 46:9 47:5
49:4 54:18
62:16,18 73:19
86:1,1 91:5
93:16 98:3
108:14 121:6
123:7,7 124:7

125:10 127:21
128:13 142:16
144:3 151:4
156:12 176:7
186:18 187:6
188:19 190:12
207:21 212:20
221:21 226:7
227:8 230:19
234:2 239:15
242:5 246:5
248:16 251:1
251:14 258:12
261:21 263:10
263:20 264:1,4
264:21 268:8
269:3,4 272:2
**year** 55:20,21
58:10 127:10
127:17 217:12
255:8
**years** 53:18
54:14 55:11
58:10 101:7
118:20 119:1
119:10,16
120:7,10,12,16
120:17,18
121:4,5 125:2
127:13 151:10
157:18 170:15
170:16 181:5
215:14,16
216:1,8 217:10
225:15 254:16
270:8

**yep** 196:13

**z**

**zero** 131:6
244:19 245:4
**zoom** 3:10
61:19 67:13
247:16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.