# Exhibit 6

Page 1

1              UNITED STATES DISTRICT COURT

                  DISTRICT OF NEW JERSEY

2

                      - - - - -

3

     IN RE:  JOHNSON & JOHNSON      MDL NO:

4    TALCUM POWDER PRODUCTS         16-2738 (MAS)(RLS)

     MARKETING, SALES PRACTICES,

5    AND PRODUCTS LIABILITY

     LITIGATION

6                     - - - - -

7

                 Monday, July 8, 2024

8

9                     - - - - -

10

11           Remote Deposition of JOHN KORNAK, PhD,

12   conducted at the location of the witness in Vienna,

13   Austria, commencing at 10:04 a.m., by and before

14   Robin L. Clark, Registered Professional Reporter and

15   Notary Public in and for the Commonwealth of

16   Pennsylvania and the State of New Jersey.

17                    - - - - -

18

19

20

21

22

23

24

Page 2

```
 1   REMOTE APPEARANCES:
 2
         LEVIN, PAPANTONIO, RAFFERTY LAW FIRM
 3       BY:  CHRISTOPHER V. TISI, ESQ.
         316 South Baylen Street, Suite 600
 4       Pensacola, Florida 32502-5996
         850-435-7176
 5       ctisi@levinlaw.com
              For the Plaintiffs
 6
 7
         BEASLEY ALLEN LAW FIRM
 8       BY:  MARGARET M. THOMPSON, ESQ.
         218 Commerce Street
 9       Montgomery, Alabama 36104
         800-898-2034
10       margaret.thompson@beasleyallen.com
              For the Plaintiffs
11
12
         ASHCRAFT & GEREL, LLP
13       BY:  MICHELLE A. PARFITT, ESQ.
         1825 K Street, N.W., Suite 700
14       Washington, D.C. 20006
         202-759-7648
15       mparfitt@ashcraftlaw.com
              For the Plaintiff Steering
16       Committee and the MDL
17
18       KING & SPALDING, LLP
         BY:  KATHRYN S. LEHMAN, ESQ.
19       1180 Peachtree Street, N.E.
         Atlanta, Georgia 30309
20       404-572-2716
         klehman@kslaw.com
21            For the Defendants
22
23
24
```

Page 3

```
 1   REMOTE APPEARANCES, continued:
 2
         LAW OFFICES OF REILLY, McDEVITT
 3       & HENRICH, P.C.
         BY:  BRANDY HARRIS, ESQ.
 4       3 Executive Campus, Suite 310
         Cherry Hill, New Jersey 08002
 5       856-317-7188
         bharris@rmh-law.com
 6            For the Personal Care Products
         Council
 7
 8
     ALSO PRESENT:
 9
         JEFFERY WRIGHT
10
             - - - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1             I N D E X
 2   WITNESS                        PAGE
 3   JOHN KORNAK, PhD
        BY MR. TISI:            7
 4      BY MS. LEHMAN:          407
 5
 6          E X H I B I T S
 7   NUMBER      DESCRIPTION          MARKED
 8   Kornak
 9   Exhibit 1    Expert Report          10
10   Exhibit 2    Curriculum Vitae       29
11   Exhibit 3    Billing Statement      19
12   Exhibit 4    Environmental Factor   173
                  Article from NIH
13
     Exhibit 5    ASCO Publication       182
14
     Exhibit 6    Harris 2024 Article    191
15
     Exhibit 7    Terry Paper 2013       193
16
     Exhibit 8    O'Brien (2024) Paper   10
17
     Exhibit 9    Katie O'Brien, PhD, Bio   129
18
     Exhibit 10   Dale Sander, PhD, Bio  125
19
     Exhibit 11   Nicolas Wentzensen, MD,   133
20                PhD, Bio
21   Exhibit 12   Clarice Weinberg, PhD, bio  130
22   Exhibit 13   OC3 Cohort Profile     136
23   Exhibit 14   IARC Monographs on the   149
                  Identification of
24                Carcinogenic Hazards to
                  Humans
```

Page 5

```
 1
     Exhibit 16   O'Brien (2023)         114
 2
     Exhibit 17   Sister Study Questionnaire   215
 3
     Exhibit 18   Gonzalez Study         112
 4
     Exhibit 20   Royston and White Paper   315
 5
     Exhibit 21   JAMA Article           299
 6
     Exhibit 22   Chang Study            115
 7
     Exhibit 23   Trabert Article        414
 8
     Exhibit 24   Publication History    165
 9
     Exhibit 25   O'Brien (2020) Study   113
10
     Exhibit 26   O'Brien Response to Letter   117
11        to the Editor
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 2 - 5)

Page 6

1          DEPOSITION SUPPORT INDEX
2
3                  - - - - -
4  Direction to Witness Not to Answer
5  Page  Line
6  406    14
7  Request for Production of Documents
8  Page  Line
9  NONE
10  Question Marked
11  Page  Line
12  NONE
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1          THE STENOGRAPHER:  All parties
2  to this deposition are appearing
3  remotely and have agreed to the
4  witness being sworn in remotely.
5  Due to the nature of the remote
6  reporting, please pause briefly
7  before speaking to ensure all
8  parties are heard completely.
9  Counsel will be noted on the
10  stenographic record.
11          - - - - -
12          JOHN KORNAK, PhD, having
13          been duly sworn, was examined and
14          testified as follows:
15          - - - - -
16  BY MR. TISI:
17      Q.    Would you please state your
18  name for the record, please?
19      A.    Yeah, John Kornak.
20      Q.    Dr. Kornak, are you a
21  biostatistician?
22      A.    I am.
23      Q.    Okay.  We have placed before
24  you or sent you -- you're actually in

Page 8

1  Austria, correct?
2      A.    That's correct.
3      Q.    I have sent you a box of
4  documents, most of which we will use, but
5  I'm not sure of all of them.  Do you have
6  that in front of you, sir?
7      A.    I do.
8      Q.    Have you opened the box?
9      A.    I've opened the box.
10      Q.    Okay.  And do you have
11  everything in front of you so that we can
12  go through things in --
13      A.    I haven't removed the tape as
14  of yet though.
15      Q.    Okay.  Why don't you go ahead
16  and do that and we can get started?
17      A.    Okay.
18          - - - - -
19    (Discussion was held off the record.)
20          - - - - .
21  BY MR. TISI:
22      Q.    Tell me when you're ready,
23  sir.
24      A.    Okay.  Ready.

Page 9

1      Q.    Have you been hired by the
2  lawyers defending Johnson & Johnson and LLT
3  to offer opinions relating to a May 24
4  study by NIH scientists called "Intimate
5  Care Products and Incidence of
6  Hormone-Related Cancers:  A Quantitative
7  Bias Analysis"?
8      A.    Yes, I was retained to give
9  an independent opinion of that -- of that
10  paper.
11      Q.    Okay.  If I call it O'Brien
12  (2024) to make it easier, would that be
13  okay?
14      A.    That's fine, yes.
15      Q.    All right.  Do you have a
16  hard copy in front of you, sir?
17      A.    Yes, I have my --
18      Q.    You have your copy and just
19  for the record, it's Exhibit No. 8 in the
20  box --
21      A.    Okay.
22      Q.    -- in the binder.  Yours
23  doesn't have any -- yours does not have any
24  markings on it, correct?

1    A.    That's correct, there's no
2  markings.
3         - - - - -
4         (O'Brien (2024) Paper marked
5         Kornak Exhibit 8 for
6         identification.)
7         - - - - -
8  BY MR. TISI:
9    Q.    Just to make it easier so you
10 don't have to go back and forth between the
11 binder, your report is going to be Exhibit
12 No. 1, which I understand you brought with
13 you and the O'Brien (2024) is Exhibit
14 No. 8.  Do you see that in your binder?
15   A.    Let me check.  Yes, Exhibit
16 No. 1 looks like my report.  And Exhibit 8
17 looks like the paper.
18        - - - - -
19        (Expert Report marked Kornak
20        Exhibit 1 for identification.)
21        - - - - -
22 BY MR. TISI:
23   Q.    Okay.  All right.  And I
24 understand, just for the record, that you

1  brought your report and O'Brien (2024) with
2  you, but they don't have any markings on
3  them, correct?
4    A.    That's correct, no markings.
5    Q.    And you didn't bring any
6  notes of any kind, correct?
7    A.    No, no notes.
8    Q.    Do you have any notes of any
9  kind related to your review of this study
10 or generating this report?
11   A.    No, I don't have any notes.
12   Q.    Okay.  All right.  Now, the
13 O'Brien (2024), which is Exhibit No. 8,
14 appeared in the peer review Journal of
15 Clinical Oncology, correct?
16   A.    Yes.
17   Q.    And it appeared less than two
18 months ago on May 15, 2024?
19   A.    It was published on May 15,
20 2024, yes.
21   Q.    And O'Brien (2024) paper you
22 stated for a large NIH cohort study called
23 the Sister Study, correct?
24   A.    They used the Sister Study.

1  I don't know that I would categorize it as
2  large, but the overall sample size was
3  large, but the number of cases was not as
4  large.
5    Q.    Okay.  But the study itself
6  is a 50,000 person study sponsored by the
7  NIH, correct?
8    A.    And I'm only pausing because
9  I'm not sure whether NIH was the sponsor.
10 I have no reason to doubt that it was,
11 but --
12   Q.    Now, using -- I'm sorry, and
13 because we're on a Zoom, if I cut you off,
14 I don't do that intentionally and if you
15 cut me off, I will also agree that you're
16 not doing it intentionally and we'll try to
17 work with each other.
18   A.    That sounds good.  I just
19 wanted to check if you wanted me to search
20 through to make sure that -- I assume they
21 have it somewhere in a footnote.
22   Q.    They do, and we'll get to
23 that.  So let's just see if we can move
24 forward.

1         Now, using statistical
2  methods that we'll be discussing in this
3  deposition, including a quantitative bias
4  analysis, multiple imputation, and other
5  recall bias scenarios, this peer-reviewed
6  study concluded that genital talc use was
7  associated with ovarian cancer,
8  particularly in women who used it
9  frequently and for longer durations,
10 correct?
11   A.    I don't fully agree with that
12 statement on a couple of levels.  I would
13 hesitate to call recall -- what they did
14 for recall bias a statistical method.
15   Q.    Okay.
16   A.    And similarly for the
17 qualitative bias analysis too.  And so can
18 you -- you mean what they said or what --
19   Q.    Yes, I'm stating what they
20 said.  That's what they concluded.  I
21 understand you have differences with their
22 conclusion, but their conclusion was, and
23 we can go to the paper itself, Exhibit 8,
24 page 2 in the box, it says "Knowledge

Page 14

1 Generated, Genital talc use was positively
2 associated with ovarian cancer for a range
3 of plausible bias-correction scenarios,
4 with higher rates seen for frequent and
5 long-term users."
6          That's what the study said,
7 correct?
8      A.   Well, that's what they -- the
9 authors say in these particular couple of
10 sentences, but they had also use words such
11 as support a positive association in the
12 conclusion in the abstract.  And the
13 relevance talks about a measure confounding
14 could still be present.  So that kind of
15 qualifies the statement a little bit, I
16 think.
17      Q.   And they also concluded that
18 the association existed even after
19 adjusting for recall bias using various
20 scenarios that they discussed in the paper,
21 correct?
22      A.   I don't know if that's the
23 precise wording.  I remember something that
24 they said like that, but I don't agree with

Page 15

1 that.
2      Q.   Okay.  I understand you don't
3 agree with it.  We're just trying to get
4 what the paper said and then we'll talk
5 about your criticisms, okay?
6      A.   Okay.  Do you want to --
7 whereabouts -- do you want to read a
8 precise statement that they said or --
9      Q.   Actually, we'll get to that.
10 I'm not going to -- I'm not going to -- if
11 you don't understand that to be the
12 conclusion of the authors, then I will move
13 on.  But do you understand that the
14 authors' general proposition was there was
15 a positive association even considering
16 recall bias and used various scenarios to
17 test that?
18          MS. LEHMAN:  Object to form.
19          Asked and answered.
20          THE WITNESS:  I would sort of
21      qualify that they would say they
22      had some evidence to support that
23      as being what they are saying.
24

Page 16

1 BY MR. TISI:
2      Q.   Correct.  Okay.  Now, from
3 what I can tell, you met with J&J's lawyers
4 to discuss preparing a litigation report
5 addressing the O'Brien (2024) study on
6 about May 20, 2024, five days after the
7 study was published, correct?
8      A.   I don't recall meeting with
9 J&J lawyers on that date.  I may have.
10 That's around the date that I was first
11 contacted about the case.
12      Q.   And the goal was to generate
13 and submit the litigation report that
14 ultimately became Exhibit No. 1, correct?
15      A.   That's not what I understood
16 the goal to be.  I understood it to be that
17 I was to provide an independent review of
18 the O'Brien (2024) paper from my
19 biostatistical perspective.
20      Q.   It's not entirely
21 independent, right?  You were actually paid
22 $50,000 to generate that report, correct?
23          MS. LEHMAN:  Object to form.
24          THE WITNESS:  It's correct

Page 17

1      that I was paid $50,000 to generate
2      that report, but I approached it
3      from an independent perspective.
4 BY MR. TISI:
5      Q.   Well, I wasn't in the room to
6 talk to you about my perspective, was I?
7      A.   You are correct that you were
8 not in the room to talk about your
9 perspective, but I was not -- I reviewed
10 the paper itself.  I took the paper, I
11 looked at it, I read it.  It's my
12 perspective.
13      Q.   Okay.  We'll talk about that
14 in a moment, if we could.  But it's fair to
15 say that you learned of this study through
16 litigation and not in the normal course of
17 your academic endeavors?
18      A.   Yes, that's fair to say.
19      Q.   Okay.  And to be clear,
20 neither J&J or any of its subsidiaries in
21 the normal course of business contacted you
22 to help them understand this study, it was
23 the lawyers, true?
24      A.   It was -- it was the lawyers

5 (Pages 14 - 17)

Page 18

1 through Cornerstone Research.
2    Q.    We'll talk about Cornerstone,
3 but the company itself, just to be clear,
4 the company never called you independently
5 and said, you know, we need to understand
6 this study, its strengths and its
7 weaknesses in our normal course of
8 business, did they?
9         MS. LEHMAN:  Object to the
10    form.
11        THE WITNESS:  J&J didn't
12    contact me.
13 BY MR. TISI:
14    Q.    It was the lawyer?
15        MS. LEHMAN:  Object to form.
16 BY MR. TISI:
17    Q.    Through Cornerstone, it was
18 the lawyers?
19    A.    Cornerstone Research
20 contacted me.
21    Q.    Right, but they were
22 operating at the direction of the lawyers,
23 true?
24    A.    I don't know what their exact

Page 19

1 relationship is with the lawyers and J&J
2 and I didn't ask.
3    Q.    Okay.  We're going to be
4 talking about Cornerstone in a moment, but
5 your initial meeting with them on your
6 billing statement states you met with J&J's
7 lawyers and Cornerstone on the first day
8 where you were retained to look at this
9 study.  Does that refresh your
10 recollection?
11    A.    I mean, if I -- I have no
12 reason to doubt it.  I would like, you
13 know, to --
14    Q.    Well, let's --
15    A.    -- take a look.
16    Q.    I'm a little bit out of
17 order, but let's take a look at it.  If you
18 would look at your statement, Exhibit No. 3
19 in your binder, which is your billing
20 statement.
21    A.    Yes.
22         - - - - -
23        (Billing Statement marked
24    Kornak Exhibit 3 for

Page 20

1    identification.)
2         - - - - -
3 BY MR. TISI:
4    Q.    Okay.  On May 20, 2024, you
5 reviewed the O'Brien (2024) quantitative
6 bias paper and meeting with Cornerstone and
7 legal team.
8         Do you see that?
9    A.    Yes.
10    Q.    Does that refresh your
11 recollection the first day you ever spoke
12 to anyone about this paper, you spoke with
13 Cornerstone and the lawyers for J&J?
14    A.    Okay.  So I certainly accept
15 what I have here in the statement.  None of
16 it refreshes my memory exactly, but I
17 remember I had a call with Cornerstone and
18 then a meeting was set up to also meet with
19 the legal team and that would have been
20 later in the day given that it was on the
21 same day.  It was a separate --
22    Q.    All right.  But my point is
23 that you said that you were going to do an
24 independent analysis of this paper, but at

Page 21

1 the time that you first got this study, you
2 met with Cornerstone and J&J's lawyers and
3 nobody else, true?
4         MS. LEHMAN:  Object to form.
5         THE WITNESS:  Can you repeat
6    that question?  It seemed a
7    little --
8 BY MR. TISI:
9    Q.    Yes.  You got a copy of the
10 paper on or about May 20, 2024, correct?
11    A.    I believe that to be true.
12    Q.    And on the same day, you
13 spoke to J&J's lawyers, true?
14    A.    Yes.
15    Q.    And there was nobody else
16 there, nobody from, for example, my side of
17 the table that would talk to you about our
18 perspective on the 2024 paper, correct?
19         MS. LEHMAN:  Objection.  Asked
20    and answered.
21        THE WITNESS:  There was
22    certainly no one -- you were not
23    there.
24

6 (Pages 18 - 21)

Page 22

1 BY MR. TISI:
2       Q.    Right.  And --
3       A.    I don't know to what extent
4 I'm allowed to talk about what was in the
5 meeting since it was -- it would be
6 privileged, but really it was more about my
7 CV.
8       Q.    Okay.  Now, you also -- all
9 right.  We'll talk about that in a moment.
10             Now, you understood that now
11 and you understood at that time that the
12 purpose of that meeting was get to you to
13 write a litigation report in this
14 litigation relating to the O'Brien (2024)
15 study, correct?
16      A.    Yeah, I was asked to
17 independently review the O'Brien (2024)
18 paper.
19      Q.    And, in fact, you produced a
20 report for J&J's lawyers supporting the
21 position that the paper is flawed and
22 unreliable on May 29, 2024, correct, less
23 than ten days after meeting with the
24 lawyers and Cornerstone, correct?

Page 23

1       A.    I would have to look at the
2 date of my report.  I don't -- I don't have
3 any reason to doubt that was the date it
4 was produced, but --
5       Q.    Well, if you take a look --
6 if you take a look at your litigation
7 report, Exhibit 1, on the front page, it
8 says report of May 28, 2024; is that
9 correct?
10      A.    Yes, but I would ask if you
11 could repeat your question, because there
12 was one part I didn't sort of agree with in
13 particular.
14      Q.    Sure.  You were retained and
15 met with the lawyers from J&J on May 20,
16 2024, with the goal of writing a litigation
17 report, correct?
18            MS. LEHMAN:  Object to the
19 form.  Asked and answered.
20            THE WITNESS:  No, my goal was
21      to review the O'Brien (2024) paper
22      and then write a report on my
23      review of that paper and that
24      review was an independent review of

Page 24

1       the paper.
2 BY MR. TISI:
3       Q.    And you knew that that report
4 would then be used in litigation, correct?
5       A.    I assumed it was for the
6 case, yes.
7       Q.    And you in fact did generate
8 a report and it was filed on May 28, eight
9 days later, correct?
10      A.    Correct.
11      Q.    All right.  And that report
12 is marked in your binder as Exhibit 1,
13 correct?
14      A.    Yes.
15      Q.    Okay.  And if you go to
16 page 2 to 4 of your report, page 2 to 4 of
17 your report, you summarize and you say that
18 even though the authors find a
19 statistically significant association
20 between genital talc use and ovarian
21 cancer, even considering potential biases,
22 O'Brien (2024) was flawed and unreliable,
23 correct?
24      A.    Sorry, I'm just trying to

Page 25

1 find the precise paragraph you're reading
2 from on page 2 to 4?
3       Q.    On -- I'm sorry.
4       A.    Is it paragraph 10?
5       Q.    Yes.  Correct.
6       A.    I'm sorry, what's the
7 statement from paragraph 10?
8       Q.    "While the authors find a
9 positive and consistently significant
10 association between genital talc use (based
11 on these adjustments)," which we will talk
12 about, "and ovarian cancer, the authors'
13 'imputations' of, 'corrections' to, and
14 assumptions regarding genital talc use
15 makes their analysis flawed and
16 unreliable."
17      A.    I'm sorry, I thought you were
18 saying paragraph 10.  You're on
19 paragraph 11 there, right?
20      Q.    Correct.
21      A.    Okay.
22      Q.    And that's what you -- that's
23 your opinion, correct?
24      A.    Yes.

7 (Pages 22 - 25)

Page 26

1    Q.    And you reached that opinion
2 in eight days or less, correct?
3    A.    Yes.
4    Q.    Okay.  Now, let's go to your
5 billing statement, Exhibit No. 3 and it
6 says you first reviewed O'Brien (2024) on
7 May 20, 2024.
8         Do you see that?
9    A.    Well, yeah, I would agree
10 that's when I started reviewing it.
11    Q.    Okay.  All right.  Well, you
12 reviewed it, did you read the whole thing
13 on May 20, 2024?
14    A.    I mean, I don't know how you
15 would exactly define it.  Did I read every
16 word in there, I don't think so.  I think,
17 you know, the way I approach reading a
18 paper to review it is not to start on
19 page 1 and read through every word all the
20 way to the end.  I often jump around and
21 then I often fill in the pieces.  So I
22 can't say whether I read every piece of
23 that paper on the first day or not.
24    Q.    Well, you did meet with the

Page 27

1 legal team on the first day, correct?
2         MS. LEHMAN:  Objection.  Asked
3      and answered.
4         THE WITNESS:  I did meet with
5      the legal team on that day.
6 BY MR. TISI:
7    Q.    Okay.  Who did you -- who on
8 the legal team did you meet?
9    A.    There was Jessica Davidson
10 and another lady that I don't recall the
11 name of, but I have not seen on matters
12 since, so.
13    Q.    Okay.  Have you met with
14 Jessica Davidson after this initial meeting
15 on May 20, 2024?
16    A.    Yes, I have.
17    Q.    How many times?
18    A.    I would estimate somewhere
19 between five and ten times.
20    Q.    Okay.  Those are not
21 reflected on your billing statement?
22    A.    Sorry, can I just -- between
23 which dates?  I didn't -- I thought --
24    Q.    Well, that was going to be my

Page 28

1 question.  Between the time that you first
2 met with Jessica Davidson on the 20th of
3 May and the time your report was filed on
4 the 28th or finalized on the 28th, how many
5 times did you meet with Ms. Davidson either
6 by phone or in person?
7    A.    I don't recall that I even
8 met with her again since that initial
9 meeting until after my report was filed.
10    Q.    Okay.  And then after --
11    A.    I'm not saying that's for
12 certain, I just don't recall.
13    Q.    Okay.
14    A.    I don't know.
15    Q.    Okay.  And we'll talk about
16 after your report in a moment.
17         Now, we've talked several
18 times about Cornerstone.  Could you tell me
19 what Cornerstone is?
20    A.    I don't know exactly.
21 They're some kind of company that supports
22 legal cases and they were made available to
23 me in an administrative support role.
24    Q.    Well, actually, in your

Page 29

1 report -- in your CV, which I have had
2 marked as -- I'm a little out of order, but
3 in your CV, which I've had marked as
4 Exhibit No. 2, you actually list
5 Cornerstone as somebody with whom you work.
6 Am I correct about that?
7    A.    Yes, I worked with them
8 previously.
9         - - - - -
10         (Curriculum Vitae marked
11         Kornak Exhibit 2 for
12         identification.)
13         - - - - -
14 BY MR. TISI:
15    Q.    Okay.  And are they a company
16 that finds experts for companies who are
17 looking for experts?
18    A.    I don't know that that's what
19 the complete -- the company completely is.
20 Like I say, they also provided me with
21 administrative support.  I don't know
22 completely what the company does.
23    Q.    Well, you listed --
24    A.    Based on experts, they found

8 (Pages 26 - 29)

Page 30

1  me, so I would go along with that, but as
2  far as I know, I haven't researched them to
3  know beyond that.
4      Q.    So you work with a company
5  that you don't know what they do?
6          MS. LEHMAN:  Object to form.
7  BY MR. TISI:
8      Q.    You list them on your CV and
9  you and work with them --
10     A.    I don't work for Cornerstone.
11 I mean, they retain me -- they, through the
12 lawyers, through them retained me to work
13 on this case. I don't work for them.
14     Q.    Well, it says on your -- and
15 you can look on your CV, which is Exhibit
16 No. 2 --
17     A.    Uh-huh.
18     Q.    -- page 14 of 77, it has that
19 you've worked with Cornerstone Research
20 from 2022 to 2023, that would be through
21 2024, correct?
22     A.    Well, the case that I was
23 working on with Cornerstone Research, 2022
24 to 2023, I'm no longer involved in.  So,

Page 31

1  you know, my CV, as you can tell, is very,
2  very long and I don't necessarily -- I am
3  not able to keep every single thing up to
4  date, but, yes, now, I would update it and
5  say I have also done work with Cornerstone
6  in 2024.
7      Q.    And we'll go through this
8  and, but you've worked with -- I'm sorry,
9  is somebody saying something?  I'm sorry.
10 You have worked with Cornerstone in another
11 case they found you as an expert for
12 another company beginning in 2022, correct?
13         MS. LEHMAN:  And let me
14     just -- let me just -- I just want
15     to caution John, because this is
16     not my client, but to the extent he
17     was a consulting litigation expert
18     who was not disclosed, I would just
19     tell him to be cautious about not
20     revealing privileged information.
21     And John would know the answer to
22     that, not me.  I'm just putting
23     that out there to the extent that
24     it is privileged, he should not

Page 32

1      reveal that information.
2          THE WITNESS:  Yeah, I don't
3      believe this part of it is
4      privileged in the sense that
5      they -- that Cornerstone did
6      contact me about that particular
7      case.
8  BY MR. TISI:
9      Q.    And it said that you were
10 identified as an expert witness, correct?
11     A.    I would say a potential
12 expert witness, but --
13     Q.    Did you generate a report?
14     A.    I'm kind of nervous now,
15 because I don't know if that's sort of
16 getting into what is privileged information
17 or not.
18     Q.    Well, I'm just asking you,
19 did you generate a report?
20         MS. LEHMAN:  So let me just
21     jump in here, John.  If you were
22     disclosed as a witness, then you
23     can talk about it.  If you were --
24     if you were purely a consulting

Page 33

1      witness so that you were not
2      disclosed, then information about
3      what you did would be privileged.
4          THE WITNESS:  Yes, so I was
5      not disclosed, so.
6  BY MR. TISI:
7      Q.    Okay.  We'll get back to that
8  in a moment, but in terms of Cornerstone,
9  okay, you have been working with a company
10 that finds experts for litigation for --
11 since at least 2022, correct?
12     A.    You say working with?
13     Q.    Yes.
14     A.    I don't know if working with
15 is right.  Again, I can't talk about the
16 previous case, but in this case, they're
17 kind of made available to me to provide
18 administrative support.  So I don't know by
19 "working with" what you would mean.
20     Q.    How did J&J find you in this
21 case?
22     A.    Cornerstone found me.
23     Q.    Okay.  Cornerstone found you.
24 You're basically an expert that puts your

9 (Pages 30 - 33)

Page 34

1  name in with Cornerstone and if Cornerstone
2  has a client that's looking for litigation
3  support and your CV matches, they connect
4  you, right?
5      A.    That's not totally correct.
6  I didn't put my name in with Cornerstone.
7      Q.    How does Cornerstone know
8  you?
9      A.    I don't know for sure, but
10 I'm a well-known professor of biostatistics
11 at a leading medical institution.  I'm on
12 the university website as a professor and
13 you see my CV, so they can look me up and
14 they can contact me and then people have
15 many -- people have done that for various
16 fields.
17     Q.    Well, and they've done it at
18 least twice, they found you in the previous
19 case and they found you in this case,
20 right?  True?
21     A.    I mean, they found me in the
22 first case and then whether they found me
23 or they had my name on record, that's
24 another question.

Page 35

1      Q.    Right.  So you basically --
2  they basically had an ability to, you were
3  on record with Cornerstone, they connected
4  with the first defendant, which you worked
5  with as a consultant, and you also were
6  recalled by them to work with Johnson &
7  Johnson and their lawyers in this case,
8  true?
9          MS. LEHMAN:  Object to form.
10         Asked and answered.
11         THE WITNESS:  Recalled, I
12         would consider recalling someone to
13         work with you being like that
14         you're their employee, I'm not
15         their employee.
16 BY MR. TISI:
17     Q.    I understand you're not their
18 employee, but they're an expert locator
19 company, true?  They find experts for
20 companies who are looking for experts for
21 litigation, true?
22     A.    Again, I don't know exactly
23 what they do.  It seems that part of what
24 they do is to try to find experts, but I

Page 36

1  don't know what their mechanism is.  I
2  don't know what their relationship is with
3  their clients.  I'm not clear on that.
4      Q.    Well, you've actually worked
5  with law firms going back many years, true?
6      A.    Yes.
7      Q.    Okay.  So Cornerstone
8  Research is kind of an extension of what
9  you were doing all along, true?
10         MS. LEHMAN:  Object to form.
11         THE WITNESS:  I find that
12         question, like, completely
13         confusing.
14 BY MR. TISI:
15     Q.    Okay.  Well, let's talk about
16 it then.  Okay.  If we can go back to the
17 prior page on your CV, you were working as
18 a statistical consultant for law firms
19 since at least 2015, correct, page 13 of
20 77?
21     A.    Yes.
22     Q.    You worked with Goodman
23 Neuman and Hamilton LLP as an expert
24 witness/statistical consultant, correct?

Page 37

1      A.    I did that, I took a case
2  that, yeah, they asked me to be a witness
3  on.
4      Q.    Well, who asked you?  Was it
5  Cornerstone or was it the law firm?
6      A.    It was the law firm.
7      Q.    Okay.  Now, the next case you
8  were involved with was a law firm of Kelley
9  Drye & Warren LLP as an expert
10 witness/statistical consultant in 2015,
11 correct?
12     A.    Yes.
13     Q.    Okay.  The next one was
14 Carlson, Caspers, Vandenburgh, Lindquist,
15 and Schuman between 2015 and 2016 as an
16 expert witness/statistical consultant,
17 correct?
18     A.    Yes.
19     Q.    And then you worked for
20 Haynes & Boone LLP from 2016 to 2017,
21 correct?
22     A.    Well, I didn't -- I mean, I
23 don't know if you can say worked for all of
24 these.  I don't -- I didn't work for them.

10 (Pages 34 - 37)

Page 38

1 I was retained as an expert witness for a
2 case that they were in.
3    Q.    In which you were paid, true?
4    A.    Oh, yeah, yeah, I was paid.
5    Q.    Okay.  Now, and you worked
6 for Latham & Watkins between 2017 and the
7 present, true?
8    A.    Yes.
9    Q.    Okay.  And you have been paid
10 by them as well?
11    A.    Yeah, I have been paid by
12 them.
13    Q.    And you worked for Winston &
14 Strawn between 2016 and the present, true?
15    A.    Again, I was retained as an
16 expert witness by them.  I don't know if
17 working for them is the right -- I don't
18 think working for them is the right
19 description.
20    Q.    Okay.  You were retained as
21 an expert witness by all of these law
22 firms, including Winston & Strawn, who is
23 a -- who is a law firm involved in this
24 case.  Do you know that?

Page 39

1    A.    I didn't know that.
2    Q.    Okay.  Do you know whether or
3 not you -- can you tell me which of the law
4 firms that are listed here where you
5 actually generated a report which was --
6 where you were designated as an expert?
7        MS. LEHMAN:  I would just,
8        John, to the extent that you were
9        disclosed as a witness, I think
10       that's fine to talk about.  To the
11       extent you were not disclosed, that
12       you were merely a consulting
13       expert, I would caution you not to
14       disclose privileged information.
15       THE WITNESS:  Okay.  So with
16       Latham & Watkins, I was, yeah,
17       disclosed as an expert witness.
18       With Haynes & Boone, I was.
19       Winston & Strawn, I was.  And then
20       the previous, if you can scroll
21       back up to the previous page, and
22       with Carlson, Caspers and Kelley
23       Drye & Warren, for both of those, I
24       was disclosed as an expert witness.

Page 40

1        It was kind of confusing, because I
2        was first with Kelley Drye & Warren
3        and I think their party dropped out
4        of the case and then I was retained
5        as an expert witness by Carlson,
6        Caspers.
7 BY MR. TISI:
8    Q.    And how many times have you
9 been identified as an expert witness in
10 litigation, sir?
11    A.    So does that mean how many
12 times have I provided deposition or
13 something else --
14    Q.    No, how many times have you
15 written a report like you have in this
16 case, which was actually -- where you were
17 actually designated, where you gave
18 permission to the lawyers to say, yes, you
19 can designate me as a witness either by
20 writing a report, in some states, you don't
21 have to write a report, so you just get
22 designated.  So if you would give me a
23 sense of how many times you have been
24 designated as an expert on behalf of these

Page 41

1 law firms.
2    A.    I believe that is four,
3 except that I'm not sure if the Kelley Drye
4 & Warren and Goodman Neuman Hamilton counts
5 as two separate or just as one.
6    Q.    And in each --
7    A.    If it's two separate, then it
8 would count as five.
9    Q.    And in each case, you were
10 called upon to provide criticisms of
11 studies or analyses done by the other side
12 in the case, correct?
13    A.    No, I don't think that's
14 totally correct.  And to the extent that I
15 can talk about them --
16    Q.    Well, tell me --
17    A.    Upon reviewing, again, like,
18 specific papers or abstracts or --
19    Q.    My point is --
20    A.    -- analyses.
21    Q.    I'm sorry, we're talking over
22 each other and I didn't mean to do that.
23 My point is this case is not the first time
24 that a law firm has called upon you to

11 (Pages 38 - 41)

Page 42

1 criticize a paper that was published by
2 somebody else, true?
3          MS. LEHMAN: Object to form.
4          THE WITNESS: No, I've never
5          heard any -- any case where I have
6          been asked to criticize something
7          and if I was asked to just do that
8          outright, I would not participate.
9 BY MR. TISI:
10    Q.    Okay. Well, so let's see
11 if -- maybe the phrase I used is incorrect.
12 This is not first time where you have been
13 called upon to provide an analysis that a
14 paper was flawed and unreliable, true?
15          MS. LEHMAN: Object to form.
16          THE WITNESS: I would still
17          not agree with that statement.
18          And, again, I would not want to
19          work in a case where it was the
20          opinion I was supposed to provide
21          was pre-assumed.
22 BY MR. TISI:
23    Q.    Well, I'm not asking you
24 whether you pre-assumed, I'm asking you

Page 43

1 what your ultimate opinion was. This is
2 not the first case in which you have
3 provided an opinion that a published paper
4 was flawed and unreliable, true?
5          MS. LEHMAN: Object to form.
6          THE WITNESS: I think it's
7          probably the first time that I've
8          used those words, but I would agree
9          that in these cases, there have
10          been papers where I've found
11          problems or issues in a paper.
12 BY MR. TISI:
13    Q.    Okay. So you've typically
14 not used the word "flawed and unreliable,"
15 except in this case where you've used it
16 over 20 times, true?
17    A.    I don't recall for certainty
18 whether I've used those words before or
19 not.
20    Q.    Well, that's --
21    A.    But I did, I will say that I
22 found this paper to be particularly flawed
23 and unreliable, yes. So there's a reason I
24 use those words.

Page 44

1    Q.    Well, and those words are
2 actually words that lawyers use all the
3 time. Was that a phrase that was given to
4 you by the lawyers in this case and asked
5 you whether or not this paper was flawed
6 and unreliable?
7          MS. LEHMAN: Object to form.
8          THE WITNESS: No, those words
9          were not given to me by the
10          lawyers.
11 BY MR. TISI:
12    Q.    Have you ever -- I'm sorry,
13 go ahead.
14    A.    I mean, unreliable is --
15 reliability is a common term in statistics.
16 Flawed is just a simple English word that
17 something has problems.
18    Q.    I'm using the phrase "flawed
19 and unreliable" together the way you used
20 it in this report. Is that a phrase that
21 you have ever used in any of your
22 publications or any of your papers or any
23 of your expert reports before you used it
24 20 times in this case?

Page 45

1          MS. LEHMAN: Object to form.
2          THE WITNESS: I mean, I don't
3          recall for sure whether I've used
4          that phrase or not.
5 BY MR. TISI:
6    Q.    Okay. Let's go back to your
7 invoice, Exhibit No. 3. So if I'm reading
8 this correctly, you met with the
9 Cornerstone team on -- with respect to
10 generating this litigation report on
11 May 20, May 21, May 22, May 26, and May 27,
12 with calls on May 28 and May 29; is that
13 right?
14    A.    Yes.
15    Q.    Okay.
16    A.    That appears to be correct.
17    Q.    I'm sorry.
18    A.    Yeah, that appears to be
19 correct based on looking here.
20    Q.    Who at Cornerstone did you
21 meet with and speak to?
22    A.    I don't recall for sure on
23 each occasion who I spoke to, but the
24 people who I met with at Cornerstone

12 (Pages 42 - 45)

Page 46

1 regularly were Greg Eastman and I'm
2 blanking right now, I'm sorry, at this
3 moment, I can't think of his name, but I
4 know it will come to me at some point.
5     Q.    That's okay.  Do you know
6 what their specialty was?  Were they
7 administrative?  Were they
8 biostatisticians?  Were they
9 epidemiologists?  What were they?
10     A.    I think they're both -- I
11 don't know in detail, I think they're kind
12 of PhDs in economic-related fields.
13     Q.    Okay.  So now you were
14 telling me before that they provided you
15 with simply administrative support.  These
16 were -- these were professional people,
17 true?
18     A.    Yeah, I would say they have
19 PhDs and they work at a company, they're
20 professional.
21     Q.    Okay.  Did they do any
22 research for you?
23     A.    In the sense that at times
24 they brought me papers that I requested.  I

Page 47

1 asked them to generate a Google trends
2 figure for me.
3     Q.    Okay.  And that's the table
4 that's in your report, correct?
5     A.    It's not a table, it's a
6 figure, it's a graph, a plot.
7     Q.    Fine.  So that wasn't your
8 graph, that was a graph that they generated
9 for you, correct?
10         MS. LEHMAN:  Object to form.
11         THE WITNESS:  I take
12         responsibility for it.  It's my
13         graph.  It was generated at my
14         request, and yeah.
15 BY MR. TISI:
16     Q.    Have you ever used a Google
17 graph like that in any of your published
18 work?
19         MS. LEHMAN:  Object to form.
20 BY MR. TISI:
21     Q.    Have you used Google trends
22 in any of your published work?
23     A.    I can't say with 100 percent
24 certainty that I haven't, but I don't

Page 48

1 recall doing so.
2     Q.    And, in fact, if you go to
3 your bibliography that you've actually used
4 to generate this report, were any of those
5 papers found by Cornerstone, Mr. Eastman,
6 or anybody else?
7     A.    I think there were papers
8 that I asked, like, them to get for me on
9 my behalf, yes.
10     Q.    Did they, for example, do a
11 research on multiple imputation and whether
12 or not including outcomes as part of the
13 imputation model was appropriate or not
14 appropriate?  Did they do things like that?
15         MS. LEHMAN:  Object to form.
16         THE WITNESS:  I mean, I don't
17         know if they did them, but not at
18         my direction.  They do -- it was
19         not in discussion with me, it was
20         not at my request, what they did.
21         What's in my report is my own words
22         and of my opinions.
23 BY MR. TISI:
24     Q.    Okay.  So now looking back on

Page 49

1 your billing statement, May 20, 2024, you
2 met with the lawyers and read the paper,
3 although you might not have read the whole
4 thing, I understand that, on the 20th.
5 When do you think you actually read the
6 whole paper cover to cover?
7         MS. LEHMAN:  Object to form.
8         THE WITNESS:  I don't know if
9         I ever read it from start to
10         finish, I mean, it's just not the
11         way people tend to approach
12         academic papers.
13 BY MR. TISI:
14     Q.    Okay.
15     A.    So but --
16     Q.    Well, when was it that you --
17     A.    By the time I had written my
18 report, I was completely familiar with the
19 paper.
20     Q.    Okay.  Well --
21     A.    Obviously, there were parts
22 that I focused on more than others.
23     Q.    So it looks like you actually
24 prepared notes for your report on the 22nd,

13 (Pages 46 - 49)

Page 50

1 do you see that, you spent ten hours?
2      A.    Right.  I spent ten hours
3 reviewing the paper preparing notes for the
4 report and meeting with the Cornerstone
5 team.
6      Q.    Right.  Ten hours on the
7 22nd.  Had you formed your opinions by then
8 that the paper was flawed and unreliable?
9      A.    I don't recall to what extent
10 I formed my opinions.  By then, I was
11 forming my opinions in the process of
12 writing the report.
13      Q.    Okay.  When do you think in
14 this continuum from May 20 through May 28,
15 when you actually filed your report, in
16 those eight days, did you finally come to
17 your opinions that you were prepared to
18 offer that are reflected in your report,
19 Exhibit 1?
20          MS. LEHMAN:  Object to form.
21          Asked and answered.
22          THE WITNESS:  I wrote my
23      report over this time and when the
24      report was written, then my

Page 51

1      opinions were completed.
2 BY MR. TISI:
3      Q.    Well, it says your report
4 was -- you were writing your report on the
5 23rd.  Do you see that?  And then you were
6 revising your report on the 25th and the
7 26th and the 27th and the 28th.  Was the
8 report actually written in a draft form on
9 the 23rd?
10      A.    I mean, I think I may have
11 been a little loose with my language here
12 between what constitutes report writing,
13 report editing, revising report.  The
14 process was preparing my report the whole
15 way through, so at times, I might be
16 writing a paragraph and I might be editing
17 another piece.
18      Q.    I understand.  I'm trying to
19 get a sense, Doctor, as to when you first
20 developed your opinion that this paper was
21 flawed and unreliable and started -- for
22 the purpose of generating your litigation
23 report?
24      A.    I mean, there are different

Page 52

1 aspects of what is flawed and unreliable
2 about this paper --
3      Q.    So, let me be clear -- so let
4 me be clear.  I understand you think that
5 multiple, they're flawed and unreliable in
6 multiple areas, true?
7      A.    Yes.
8      Q.    Okay.  The first time that
9 you have come to the conclusion that one
10 area was flawed and unreliable was when?
11          MS. LEHMAN:  Object to form.
12          THE WITNESS:  I don't recall
13      that.
14 BY MR. TISI:
15      Q.    Would it have been when you
16 started writing your report on the 23rd?
17      A.    I probably had an idea of
18 something by the time I started writing my
19 report.
20      Q.    Okay.  So just to be clear,
21 okay, you knew, you got this report, you
22 got the O'Brien (2024) from the lawyers on
23 the 20th, you met with the lawyers on the
24 20th, and you had come to conclusion that

Page 53

1 the paper was flawed and unreliable to
2 write a litigation report beginning on the
3 23rd, correct?
4          MS. LEHMAN:  Object to form.
5          Misstates testimony.
6          THE WITNESS:  I mean, again, I
7      don't recall what I wrote on
8      5/23 exactly, but between May 20
9      and May 23rd, I mean, this was, to
10      review this paper was a compressed
11      timeline, so I spent a lot of time
12      on the 21st and 22nd reviewing this
13      paper.  So I would be -- that would
14      have been plenty of time for me to
15      start -- certainly be aware of
16      problems with the paper.
17 BY MR. TISI:
18      Q.    Right.  So you spent about 18
19 hours, including meeting with the lawyers
20 and the company that actually found you for
21 the lawyers, between the 20th and starting
22 writing the paper on the 22nd.  You wrote
23 the report on the 22nd, true?
24      A.    I'm sorry, repeat that again.

14 (Pages 50 - 53)

Page 54

1    Q.    Yeah.  I said, just so that
2  we're clear, okay, you did not receive this
3  paper in the normal course of your
4  research, this paper was provided to you by
5  the lawyers and the company that was
6  retained by the lawyers to locate you on
7  the 20th, true?
8    A.    I received the paper from
9  them and I also downloaded it on the 20th.
10    Q.    Right.  And you spent about
11  18 hours, after meeting with the lawyers
12  and Cornerstone, the company that locates
13  experts for lawyers, in two days between
14  the 20th and the 22nd, true?
15        MS. LEHMAN:  Object to form.
16        THE WITNESS:  I don't want to
17        categorize what Cornerstone does as
18        part of the question.  I mean --
19  BY MR. TISI:  --
20    Q.    Fine.
21    A.    -- Cornerstone contacted me.
22  What they do --
23    Q.    So let's be clear --
24    A.    -- their business is, like,

Page 55

1  if we can leave it out of it.
2    Q.    Then I'll leave it out.  I'll
3  leave it out.  Let me rephrase the
4  question, sir.  Okay.  You were provided a
5  copy of O'Brien (2024) on the 20th.  You
6  met with the lawyers on the 20th.  And by
7  the 22nd, you had come to the conclusion in
8  some fashion that the paper was flawed and
9  unreliable?
10    A.    I don't know that I had in my
11  head the words "flawed and unreliable" on
12  the 22nd.  I don't have that strong a
13  memory.  But by the end of the 22nd, I
14  would be pretty sure that I was aware by
15  that time that there were problems with the
16  paper.
17    Q.    Okay.  You didn't do a
18  comprehensive evaluation or assessment of
19  the causation question, did you?  In other
20  words, whether or not talc was -- causes
21  ovarian cancer, did you?
22    A.    I did not do that -- I
23  didn't -- I was evaluating for a lower bar
24  of whether or not there was an association,

Page 56

1  a reliable association between talcum
2  powder use and ovarian cancer.  Getting to
3  causation is a much higher bar than that,
4  and I don't think they've reliably got to
5  the lower bar.
6    Q.    Okay.  In this one paper, you
7  haven't looked at any other papers -- I
8  know you looked at some other papers by
9  O'Brien and colleagues, but you didn't look
10  at any of the other case control or cohort
11  studies that were generated in this
12  litigation for the past 50 years, did you?
13        MS. LEHMAN:  Object to form.
14        THE WITNESS:  I did look at
15        some of them.  I looked at -- I
16        looked in particular at one or two
17        meta-analyses in particular of the
18        case controls and one that combined
19        case control and cohort.  And I
20        don't recall if I looked at any of
21        the individual studies, but I
22        looked at the meta-analyses that
23        summarized each of the studies.
24

Page 57

1  BY MR. TISI:
2    Q.    Okay.  But just to be clear,
3  okay, you have not done a comprehensive
4  review of all of the data to determine
5  whether or not as a whole talc is
6  associated with or caused by -- causes
7  ovarian cancer, correct?  You just looked
8  at this paper, true?
9        MS. LEHMAN:  Object to form.
10        THE WITNESS:  No, I didn't
11        just look at this paper.  I looked
12        at the papers by O'Brien too and I
13        also looked at meta-analyses
14        studies that considered --
15  BY MR. TISI:
16    Q.    Right, and that was a bad
17  question.  Let me rephrase the question.
18  Okay.
19        Your task in this case was
20  not to offer an opinion as to whether or
21  not talc causes ovarian cancer, your task
22  was to comment on the methods and
23  conclusions in O'Brien (2024), correct?
24        MS. LEHMAN:  Object to form.

15 (Pages 54 - 57)

Page 58

1　　　　THE WITNESS: My task was to
2　　　independently review O'Brien (2024)
3　　　and the methods used in that.
4 BY MR. TISI:
5　　Q.　Okay. And you had come, just
6 to be clear, you had come to the conclusion
7 that there were serious methodologic issues
8 in three days between the time you met the
9 lawyers and the time you started preparing
10 your report, true?
11　　　MS. LEHMAN: Object to form.
12　　　THE WITNESS: I think that
13　　　would be typical for academic
14　　　review of a paper that you would
15　　　generate your views within that
16　　　period of time, especially if you
17　　　spend the amount of hours that I
18　　　did.
19 BY MR. TISI:
20　　Q.　Okay. Now, in the three days
21 before you -- you raised numerous questions
22 about what the authors of -- the NIH
23 scientists who actually drafted this paper,
24 what they did, how they did it, throughout

Page 59

1 your report, correct? You had some
2 questions and concerns, true?
3　　　MS. LEHMAN: Object to form.
4　　　THE WITNESS: I certainly have
5　　　concerns about the methods reported
6　　　in the paper.
7 BY MR. TISI:
8　　Q.　In any of the three days
9 between the time you were contacted by the
10 lawyers and the time you started drafting
11 your report, did you reach out to any of
12 the NIH authors to ask them why they did
13 what they did?
14　　　MS. LEHMAN: Object to form.
15　　　THE WITNESS: No, I think that
16　　　would be inappropriate.
17 BY MR. TISI:
18　　Q.　Well, Dr. O'Brien is listed
19 as the corresponding author on this study,
20 correct?
21　　A.　I would have to double-check
22 that. I know she's the first author. I
23 didn't check if she's the corresponding
24 author.

Page 60

1　　Q.　Why did you think it would be
2 inappropriate to ask any of the authors, if
3 you had any questions about the methodology
4 that they used, why they did what they did,
5 why do you think it would be inappropriate
6 to actually call them and say I have some
7 questions, let me know.
8　　A.　Because I was -- it would be
9 inappropriate in the same way that if I was
10 reviewing an academic paper for a journal,
11 it would be a really terrible thing to
12 contact one of the authors to start asking
13 them questions about the paper. That would
14 be totally unacceptable.
15　　Q.　Why is that unacceptable? Tell
16 me why.
17　　A.　Because of confidentiality of
18 review, because it means that the reviewer
19 can be influenced by opinions.
20　　Q.　Well, if you look at -- if
21 you look at page 14 of Exhibit No. 8, which
22 is the O'Brien study, she lists herself as
23 the O'Brien -- as the corresponding author
24 and she gives her email address. Do you

Page 61

1 see that?
2　　A.　Okay. I think it's pretty
3 common in paper -- I'm going to page 8 now,
4 but, yeah, it's pretty common for there to
5 be a corresponding author on a paper that
6 provides their email address.
7　　Q.　And why do they do that,
8 Dr. Kornak?
9　　A.　Because if people are
10 interested in the research, they can
11 contact them.
12　　Q.　And you weren't really
13 interested in the research, were you? You
14 didn't contact them at all at any time,
15 have you?
16　　　MS. LEHMAN: Object to form.
17　　　Argumentative. Asked and answered.
18 BY MR. TISI:
19　　Q.　Let me rephrase the question.
20 Dr. Kornak, between the time the lawyers
21 met you on the 20th and today, have you
22 ever reached out to the NIH scientists to
23 ask them any questions about the research
24 that they did?

16 (Pages 58 - 61)

Page 62

1          MS. LEHMAN:  Object to form.
2          THE WITNESS:  I have not.
3      Again, I would not think it's
4      appropriate.
5  BY MR. TISI:
6      Q.    Okay.  Even though Katie
7  O'Brien lists herself as the corresponding
8  author, and you have no reason to believe
9  that she would not have answered your
10  questions, right?
11          MS. LEHMAN:  Objection.  Asked
12  and answered.
13          THE WITNESS:  I don't know
14      Katie O'Brien.  I don't know how
15      responsive she is to emails.  I
16      know that whenever I'm reviewing
17      papers, I never contact the
18      corresponding author.  I don't let
19      them know even after the fact
20      whether or not I reviewed their
21      paper.  I consider that to be
22      confidential --
23  BY MR. TISI:
24      Q.    That's a different question.

Page 63

1      A.    -- and that I reviewed this.
2      Q.    That's a different question.
3  I'm not asking you to reach out to somebody
4  during the peer-review process.  This paper
5  was published in a peer-reviewed journal on
6  May 15, right?  You had some questions
7  about this paper and why they did what they
8  did.  There is a corresponding author on
9  this paper.  Did you contact them after the
10  paper had been published, after all the
11  criticisms and all the information about
12  this study had been put out there for the
13  world to see it, did you ever contact them
14  with any of the concerns you raise in your
15  litigation report?
16          MS. LEHMAN:  Object to form.
17      Asked and answered.
18          THE WITNESS:  I did not and I
19      don't think it's appropriate if my
20      task is to independently review a
21      paper to seek out additional
22      opinions.
23  BY MR. TISI:
24      Q.    Okay.  So am I correct to say

Page 64

1  you never contacted them to ask how they
2  performed the quantitative bias analysis
3  reflected in the four scenarios in Table 2
4  of the O'Brien (2024) study, correct?
5          MS. LEHMAN:  Object to form.
6      Asked and answered.
7          THE WITNESS:  What I know of
8      about how they performed this study
9      is what they reported within their
10      paper.  And it's academically
11      expected that when you describe an
12      experiment within a paper and the
13      analysis that you performed that
14      you provide enough information for
15      that to be reproducible.
16  BY MR. TISI:
17      Q.    Do you know -- so you never
18  contacted them and asked them, for example,
19  why did you do multiple imputation as
20  opposed to individual imputation as a
21  method?  You never asked that question, did
22  you?
23          MS. LEHMAN:  Object to form.
24      Asked and answered.

Page 65

1          THE WITNESS:  I didn't ask
2      that question.  I would have no
3      interest in asking that question,
4      because I don't think it's relevant
5      to my opinions.  And -- okay --
6  BY MR. TISI:
7      Q.    I'm sorry, I didn't mean to
8  interrupt.  Finish your sentence, please.
9      A.    I'm fine stopping there.
10      Q.    Okay.  For example, at the
11  end of your report, you had questions about
12  whether or not the decision to -- some of
13  the decisions were made to do multiple
14  imputation were done a priori or whether it
15  was done after the study had begun.  Do you
16  remember those questions?
17          MS. LEHMAN:  Object to form.
18          THE WITNESS:  I would like to
19      look specifically at those
20      questions.  If you want to go to
21      that section of the report and
22      let's do that and discuss it.
23  BY MR. TISI:
24      Q.    Sure.  In your report, you

17 (Pages 62 - 65)

Page 66

1 have a section entitled "The lack of
2 prespecified analysis renders the authors'
3 conclusions flawed and unreliable."
4      Do you see that?
5      A.    Yes, I recall that, I'm just
6 going to it now, but I recall that section,
7 yes.
8      Q.    So you don't know whether or
9 not their methods were set out a priori, do
10 you, true?
11        MS. LEHMAN:  Object to form.
12        THE WITNESS:  If they had a
13      prespecified analysis plan, it
14      should be specified, they should be
15      specifying that within the paper.
16 BY MR. TISI:
17      Q.    But they -- you didn't
18 contact them, this is a criticism that you
19 made of these authors with no knowledge,
20 you didn't call them and see whether -- in
21 fact, it could have been suggested by the
22 peer reviewers, correct?
23        MS. LEHMAN:  Object to form.
24        THE WITNESS:  Okay.  I don't

Page 67

1      want to speculate as what the peer
2      reviewers may or may not have said.
3 BY MR. TISI:
4      Q.    But you are rendering an
5 opinion here about that there was not a
6 prespecified analysis and you don't know
7 the answer to that question, do you?
8        MS. LEHMAN:  Object to form.
9      Asked and answered.
10        THE WITNESS:  Well, everything
11      in this paper indicates a lack of a
12      prespecified analysis plan.  There
13      are arbitrary choices of
14      proportions that are corrected.
15      There are arbitrary levels of
16      recall bias that are performed.
17      None of those are justified within
18      the paper.  That lack of
19      justification indicates a lack of a
20      prespecified analysis plan.
21 BY MR. TISI:
22      Q.    Now, you claim, for example,
23 that they relegated, and that's your term,
24 you relegated a baseline analysis of purely

Page 68

1 specific prospective data to Appendix 2 and
2 you do that in paragraph 29 of your
3 litigation report, true?
4      A.    Yes, I recall that.  I'm
5 going to the paragraph now and I do recall
6 that and I firmly stand by that statement.
7      Q.    And you don't know why they,
8 quote, "relegated" it to the appendix, do
9 you?
10      A.    I mean, I don't know what's
11 in the authors' mind other than what
12 they've written in their paper.
13      Q.    And you didn't ask them, did
14 you?
15        MS. LEHMAN:  Object to form.
16      Asked and answered.
17        THE WITNESS:  I didn't.  I
18      don't think that would be
19      appropriate.
20 BY MR. TISI:
21      Q.    Well, there are plenty of
22 ways in which scientists actually raise
23 questions about academic papers, true?
24      A.    Sorry, repeat the question

Page 69

1 again.  I didn't catch it.
2      Q.    There are plenty of ways in
3 the world of science where scientists
4 exchange views about the relative merit --
5        MS. LEHMAN:  Chris, you broke
6      up.  I'm not sure I got the last of
7      that question.
8 BY MR. TISI:
9      Q.    Yeah.  There are plenty of
10 ways in which scientists raise questions
11 about research in the normal course of
12 scientific endeavor, true?
13      A.    Correct.
14      Q.    All right.  One of the ways
15 you can do it is like we have been
16 suggesting is contact the authors and ask
17 questions, but let's put that aside for a
18 minute.  You could write a letter to the
19 editor of this journal, true?  You've seen
20 that done.
21      A.    You could, if that was
22 something you wanted to pursue, you could
23 write a letter to the editor.  It's not
24 something that I do and I don't know of any

Golkow Technologies,
877-370-3377        A Veritext Division        www.veritext.com

Page 70

1 of -- many people that do that.
2     Q.    Well, you could write a
3 letter to the authors and ask the authors
4 formally to respond to your criticisms,
5 true?  In fact, you've seen that done in
6 this case with O'Brien (2020) where there
7 is authors including, for example, Ken
8 Rothman wrote a letter to the editor and
9 O'Brien explained herself, true?
10        MS. LEHMAN:  Object to form.
11        Object to counsel testifying.
12        THE WITNESS:  I did see a
13        letter written by those two
14        authors.  I don't know what their
15        motives were for doing that and I
16        don't want to speculate on that,
17        but --
18 BY MR. TISI:
19     Q.    Right, but --
20     A.    But as academics, we don't
21 usually go out trying to publicly denounce
22 what other people are doing in letters to
23 the editor.
24     Q.    Nobody is asking for public

Page 71

1 denouncement, okay?  If you have questions
2 about research, you could write a letter to
3 the journal and ask the authors to clarify
4 what they did, and you didn't do that here,
5 did you?
6        MS. LEHMAN:  Objection.  Asked
7        and answered.
8        THE WITNESS:  I did not write
9        a letter to the editor.  I did not
10        email the authors.  I did not think
11        those things were appropriate for
12        me to do.  I had a certain amount
13        of time that I wanted to
14        independently review the paper,
15        O'Brien (2024), and that's what I
16        did.  And my opinions about the
17        paper are what they are and if I
18        had spoken to authors about that,
19        it wouldn't change my opinions
20        about what's in the paper.
21 BY MR. TISI:
22     Q.    All right.  And the only
23 place that you have ever expressed your
24 opinions about this paper is in a

Page 72

1 litigation report for which you charged
2 over $50,000, true?
3        MS. LEHMAN:  Object to form.
4        THE WITNESS:  The only place I
5        have commented on this paper is
6        within this report.
7 BY MR. TISI:
8     Q.    Okay.  And you were paid
9 $50,000 to do it, true?
10        MS. LEHMAN:  Object to form.
11        THE WITNESS:  My invoice is
12        there, I forget the exact amount,
13        but I think that is it.
14 BY MR. TISI:
15     Q.    Let's look at it.  The number
16 is $50,000, correct?
17     A.    50,400, yeah.
18     Q.    All right.  And since that
19 time, have you also spent time with
20 Ms. Davidson, perhaps other lawyers or
21 Cornerstone working on this project?
22     A.    I have spent more time
23 reviewing materials, preparing for
24 deposition.

Page 73

1     Q.    How many hours?
2     A.    I would estimate it has been,
3 I don't know, somewhere between 50 and 100
4 hours.
5     Q.    Fifty and 100 hours in
6 addition?
7     A.    Yeah, I think so.
8     Q.    Okay.  And so at your rate of
9 $700 an hour, what would that be?
10     A.    If it was 100 hours, it would
11 be 70,000.
12     Q.    Okay.  So to be fair and just
13 to be clear, the only place you have
14 ever -- I mean, the opinions you offer here
15 as a scientist about a particular paper,
16 the opinions you offer here are pretty
17 strong opinions, true?
18     A.    Yeah, I stand by my opinions.
19     Q.    Okay.  But they're pretty
20 strong, these aren't peripheral kinds of
21 criticisms, these are really strong
22 methodologic allegations you make on these
23 authors and their methods about how they
24 conducted this study; is that true?

19 (Pages 70 - 73)

Page 74

1    A.    They are appropriate
2 criticisms.
3    Q.    Okay.  They're strong
4 criticisms.  If you got a criticism --
5    A.    No, no, I don't -- sorry, I
6 don't want to interrupt you.  Sorry, go
7 ahead.
8    Q.    Well, then let me ask you
9 this question, if you got a criticism like
10 this of one of your papers, would you
11 consider it to be a strong criticism?
12        MS. LEHMAN:  Object to form.
13        THE WITNESS:  I mean, I would
14     consider it to be a criticism.
15     What -- the way you would exactly
16     draw the line between strong and
17     not strong in academic criticism, I
18     don't know exactly how to specify,
19     but I certainly criticize and think
20     there are problems with the
21     approach.
22 BY MR. TISI:
23    Q.    Well, in this report, I'm
24 going to say you used the word, the phrase

Page 75

1 "flawed and unreliable" over 20 times.  And
2 if you go to paragraph 74 of your report,
3 you call this analysis contrived, vacuous,
4 and overstating.
5        Do you see that?
6        MS. LEHMAN:  Object to form.
7        THE WITNESS:  I think those
8     are used in the paragraph, but
9     they're not used as you stated
10     them.
11 BY MR. TISI:
12    Q.    Okay.  My point is, Doctor,
13 and I'm really trying to get to 20,000 per
14 year.  Okay.  This is a very strong report
15 where you use very strong language and very
16 strong criticisms of these NIH scientists
17 who published a paper in a peer-reviewed
18 journal, true or not true?
19    A.    I am not criticizing --
20        MS. LEHMAN:  Object to form.
21        THE WITNESS:  -- the
22     scientists.  I'm criticizing the
23     science of the paper.  I'm
24     criticizing the biostatistical

Page 76

1     analysis.  I just want to be clear,
2     I'm not criticizing individuals.
3 BY MR. TISI:
4    Q.    I understand.  So -- I'm
5 sorry -- you are making a very strong
6 criticism in very strong terms of the
7 methods used by these NIH scientists in
8 publishing this peer-reviewed paper, true?
9        MS. LEHMAN:  Object to form.
10        THE WITNESS:  I'm criticizing
11     the methods they use.  I'm not
12     going to characterize it with the
13     word "strong," that --
14 BY MR. TISI:
15    Q.    Well, you used the words
16 "flawed," "unreliable," "vacuous,"
17 "contrived," I mean, those are your words
18 in your report, true?
19    A.    But you're just taking -- the
20 words may be in my report in some way, but
21 you're taking them out of context and --
22    Q.    I understand but those are --
23 I'm sorry.  I'm talking over you.  I don't
24 mean to.  Those are words that you use to

Page 77

1 describe various aspects of their analysis,
2 true?
3        MS. LEHMAN:  Object to form.
4     Asked and answered.
5        THE WITNESS:  I would need to
6     go through each sentence one by one
7     to sort of explain to you how that
8     word is being used, and I'm happy
9     to do that if you want to walk
10     through each of the sentences --
11 BY MR. TISI:
12    Q.    We're going to.
13    A.    -- rather than your general
14 statement on those words.  So we can --
15    Q.    We're going to.  But let me
16 ask you as an overall thing.  If you had
17 received from one of your colleagues a
18 report like the one that you drafted, you
19 drafted in this case about one of your
20 papers, would you consider that to be a
21 pretty strong rebuke of your research?
22        MS. LEHMAN:  Objection.  Asked
23     and answered.
24        THE WITNESS:  I'm not going to

20 (Pages 74 - 77)

Page 78

1      use the word "strong."  I mean,
2      again --
3  BY MR. TISI:
4      Q.    Okay.  Then let's take the
5  word --
6      A.    I take criticism, sometimes
7  it hurts, but overall, it tends to be
8  constructive in academia for the positive
9  even if it hurts sometimes.
10     Q.    Okay.  But this isn't an
11 academic report, is it?  This is a
12 litigation report, true?
13     A.    I thought we were talking
14 about the paper as a report, sorry --
15     Q.    I'm asking you --
16     A.    A criticism of a report,
17 that's what we're talking about.  Like, you
18 were talking about criticism of a report
19 that I had wrote of some kind.  I assumed
20 you were talking about the paper, so I just
21 want to clarify.
22     Q.    Okay.  If you had received --
23 let's take it in ones, right?  If you had
24 received a criticism like you prepared of

Page 79

1  one of your papers, would you consider that
2  to be serious?
3          MS. LEHMAN:  Objection.  Asked
4      and answered.
5          THE WITNESS:  I mean, I don't
6      know why you're looking for a
7      qualifying word here, but if
8      there's criticism, I take
9      criticism.  Sometimes it hurts.
10     That's a feeling that you have
11     whenever you're criticized for your
12     academic work or other work.  But,
13     in general, I find that it's a
14     positive thing to learn from
15     criticism.
16 BY MR. TISI:
17     Q.    Okay.  Now, your report was
18 not intended to engage these authors in an
19 academic exercise, was it, it was a
20 litigation report, true?
21     A.    Yes, it's a litigation
22 report, yeah.
23     Q.    And it has not been presented
24 to any scientist outside of the lawyers in

Page 80

1  this case, has it?
2      A.    I don't know who has and who
3  hasn't seen my report.
4      Q.    You haven't presented it.
5  You haven't sent it to anybody outside of
6  this case, have you?
7      A.    No, I think I shouldn't from
8  a confidentiality perspective and that's
9  another reason I don't think I should have
10 contacted the authors of the paper or
11 anything like that.  I think that would be
12 inappropriate.
13     Q.    Nothing prevents you from
14 speaking to your students at UCSF and
15 saying, you know, I'm going to illustrate
16 to you the kinds of methodologic flaws that
17 can come from an improper biostatistic
18 analysis and let me use this paper as an
19 example.  You've never done that, have you?
20     A.    Well, I mean I think it's --
21 first of all, a physical impossibility,
22 because I was retained on this case on
23 May 20 and, you know, I haven't been doing
24 any teaching since then, I haven't been in

Page 81

1  touch with students.  But I would also
2  still respect the confidentiality aspect
3  that I don't know exactly where the line is
4  as to when you're breaking confidentiality
5  or not, so I err on the side of safety and,
6  yes, I don't discuss with anyone or
7  anything.  So if it's a paper -- why would
8  I choose -- why would I not just go to
9  another paper that is completely unrelated
10 and I don't take any risk of breaking
11 confidentiality.  That would be my
12 thinking.
13     Q.    And --
14         MS. LEHMAN:  And Chris, Chris,
15     I don't mean to interrupt you, but
16     when you get to a good stopping
17     point, can we take a bathroom
18     break?
19 BY MR. TISI:
20     Q.    Sure.  No problem.  So you
21 think because you were retained as an
22 expert in litigation, that removes you from
23 commenting on this paper in any scientific
24 form, is that what you're saying?

21 (Pages 78 - 81)

Page 82

1    A.    No, I'm not saying that.  I
2 think I said clearly before that I don't
3 know where the line is and so I opt to
4 respect confidentiality as much as
5 possible.
6    Q.    Did you ask?  Did you ask the
7 lawyers and say, you know, this paper is
8 particularly egregious and I want to
9 present it out there so that nobody relies
10 on this paper?  You've not done that, have
11 you?
12        MS. LEHMAN:  And I'm just
13    going to object and instruct
14    Dr. Kornak that to the extent he's
15    talking about communications with
16    the lawyers, he can talk about
17    facts and data that he considered
18    in rendering the report, but
19    otherwise, I'm going to instruct
20    that communications with the
21    lawyers are privileged and
22    confidential.
23        MR. TISI:  What they say to
24    him is privileged and confidential.

Page 83

1    Have you asked anyone if you can
2    criticize this outside of
3    litigation?
4        THE WITNESS:  I'm just going
5    to repeat my answer, I err on the
6    side of confidentiality, so I
7    was -- did not talk to additional
8    people.
9        MR. TISI:  Okay.  All right.
10    Let's take a quick break.
11        THE WITNESS:  Thank you.
12        - - - - -
13    (A recess was taken at this time.)
14        - - - - -
15 BY MR. TISI:
16    Q.    All right.  Dr. Kornak, we
17 have been provided with your CV, which I've
18 had marked as Exhibit No. 2.  If you pull
19 that out, please.
20    A.    Yes.
21    Q.    Does your CV accurately
22 reflect your professional experience?
23    A.    I would say to a large
24 extent, yes, a couple of things are out of

Page 84

1 date.
2    Q.    Is there anything that needs
3 to be added to it in order for us to fully
4 understand your professional background and
5 experience particularly as it relates to
6 the issues in this case?
7    A.    I don't think so.
8    Q.    Okay.  Are you an
9 epidemiologist?
10    A.    No, I'm a biostatistical
11 expert, but I have a lot of experience in
12 epidemiological areas.
13    Q.    What is the difference
14 between a biostatistician and an
15 epidemiologist?
16    A.    I think it's a difficult
17 question to fully answer, but the
18 biostatistician is generally more focused
19 on the computation methods for analyzing
20 data and for understanding data whereas the
21 epidemiologist tends to be more focused on
22 kind of typically a more specific clinical
23 area and have an interest there.
24    Q.    The epidemiologist is more

Page 85

1 involved with the actual interpretation of
2 the data and putting it in context with
3 what is -- with the body of medical and
4 scientific literature, true?
5    A.    I wouldn't say they're more
6 involved with the interpretation of the
7 data.  They're definitely, I would agree,
8 that within a particular clinical area, if
9 that's where they're working, they would be
10 more knowledgeable on placing the research
11 in that area, but interpretation of data is
12 very much biostatistical.
13    Q.    Let me ask you this way.  If
14 an epidemiologist and biostatistician are
15 cowriting an original epidemiologic study
16 either, for example, a case control study
17 or a cohort study, what would the typical
18 respective roles of the biostatistician be
19 in relationship to the epidemiologist?
20    A.    I would say that really
21 depends and can vary quite a lot.  I mean,
22 it varies a lot.
23    Q.    Well, give me a sense, give
24 me a sense of the range?  I mean, if you

Page 86

1 were explaining to your students, and let's
2 say you were co-teaching with an
3 epidemiologist, how would you define your
4 respective roles in writing a paper?
5     A.    So it can range from, I'm
6 being very loose here, but it can range
7 from as a biostatistician that it could be
8 a very straightforward consulting role on a
9 project where there's data that has already
10 been collected and needs to be analyzed and
11 the statistician would take that data and
12 analyze it appropriately and then help with
13 the writing of the paper maybe in the
14 results section and the methods section and
15 so on.  That's kind of down at one end.  At
16 the upper end, it can be that the
17 statistician is right there helping with
18 the experimental design, helping with
19 thinking about how to recruit individuals
20 with minimal bias.  All of those pieces
21 that I said that they would do in a
22 consulting role, but they would be much
23 more involved and interested in the
24 research on their own behalf too.

Page 87

1     Q.    So would it be fair to say
2 that, generally speaking, the
3 epidemiologist as opposed to the
4 biostatistician would be more concerned
5 with being specific to this case how to
6 deal with issues of recall bias?
7     A.    No, I don't agree.
8     Q.    Okay.  All right.  Now,
9 looking at your CV read as a whole, and I
10 did read it, I can't say I understood every
11 word, but I did read it, I would say it
12 seems the focus in your academic work is
13 with imaging; is that correct?
14     A.    I think there are multiple
15 areas that are and have been the focus of
16 my research.  Imaging has certainly always
17 been there.  Medical imaging specifically.
18 With applications, I mean, breast cancer
19 has been a sort of central theme of my
20 research over many years, in particular
21 related to medical imaging too, but also
22 beyond medical imaging and the study of
23 dementia as well.
24     Q.    Okay.

Page 88

1     A.    Imaging and non-imaging
2 perspective.
3     Q.    Right, but the primary focus,
4 and you may have touched on issues relating
5 to, for example, breast cancer, but your
6 primary focus was on imaging for tumors, et
7 cetera, correct?
8         MS. LEHMAN:  Object to form.
9         THE WITNESS:  I don't think
10     touched on is a good description of
11     sort of my involvement with breast
12     cancer.
13 BY MR. TISI:
14     Q.    Well, have you ever, for
15 example, done a study that studies risk
16 factors for -- where the primary goal of
17 the study was to discover risk factors for
18 breast cancer?
19     A.    Yes.
20     Q.    Okay.  How about ovarian
21 cancer, have you ever published in the area
22 of ovarian cancer?
23     A.    I don't recall any of my
24 publications being specifically ovarian

Page 89

1 cancer.  Just cancer in general, many
2 areas, but not ovarian cancer.
3     Q.    Have you ever designed a
4 study or helped design a study where there
5 was a focus of trying to determine whether
6 or not a particular risk factor or
7 combination of risk factors were -- are
8 responsible for ovarian cancer?
9     A.    Again, I don't recall any
10 studies I have been involved in related to
11 ovarian cancer, so, therefore, the answer
12 to your question would be no.
13     Q.    Do you have any articles
14 which in any way bear on any issue relating
15 to talc?
16     A.    I'm pretty sure I don't have
17 anything on talc.
18     Q.    Prior to this case about a
19 month ago, had you ever read literature
20 relating to talc and ovarian cancer?
21     A.    I don't recall reading that.
22     Q.    You don't recall reading any?
23     A.    Or seeing anything, yeah, no,
24 I don't.

23 (Pages 86 - 89)

Page 90

1    Q.    So the first time you ever
2 saw any article relating to talc and
3 ovarian cancer was on the 20th of May 2024
4 when the lawyers contacted you in this
5 case?
6         MS. LEHMAN: Object to form.
7         THE WITNESS: So I can't be
8     100 percent sure. I don't know if
9     I saw any news articles on it,
10    sometimes when I'm reading a
11    newspaper, but specifically an
12    academic article on the specifics
13    of talc use related to ovarian
14    cancer, I think the answer is no.
15 BY MR. TISI:
16    Q.    Okay. And so just to be
17 100 percent clear so we have a clear answer
18 to this question, before May 20, 2024, you
19 have never read an academic article
20 relating to the relationship between
21 ovarian cancer and talcum powder, true?
22    A.    I don't recall reading any
23 such paper at any time.
24    Q.    Okay. Prior to this case,

Page 91

1 have you read any literature coming out of
2 the Sister cohort study?
3    A.    I don't believe so.
4    Q.    Okay. Do you understand that
5 in terms of cohorts and the study of cancer
6 that the Sister Study is an important
7 study?
8         MS. LEHMAN: Object to form.
9 BY MR. TISI:
10    Q.    Well, let me rephrase the
11 question. Do you understand that amongst
12 people who actually study cancer risk
13 factors that the Sister Study cohort is a
14 particularly important cohort?
15        MS. LEHMAN: Object to form.
16        THE WITNESS: I don't know
17    what defines whether something is
18    particularly important versus not
19    particularly important, but there
20    are clearly multiple papers about
21    the Sister Study.
22 BY MR. TISI:
23    Q.    Right. And not just on talc
24 and ovarian cancer, it's on various other

Page 92

1 issues or do you not know?
2    A.    Well, I know from what I've
3 seen in relation to this report that
4 there's also uterine cancer and breast
5 cancer was considered for the Sister Study.
6 I believe the question there was more --
7 the questionnaires have been more extensive
8 than just looking at talc use, but I
9 wouldn't say that I'm knowledgeable on
10 everything that has come out.
11    Q.    Yeah. I mean, just to be
12 clear, you are not familiar -- other than
13 the talc and ovarian cancer papers
14 identified in your report, you have not
15 sought to familiarize yourself with the
16 papers and body of literature that have
17 come out of the Sister Study, true?
18    A.    I mean, I sought out papers
19 related to the Sister Study, because
20 they're related to O'Brien (2024) and my --
21    Q.    Right.
22    A.    And I was to independently
23 review that. So to the extent that they
24 were related to O'Brien (2024) is what I

Page 93

1 was seeking out.
2    Q.    Doctor, this isn't a trick
3 question. I'm asking you other than the
4 papers that are identified in your report,
5 have you sought to familiarize yourself
6 generally with the Sister Study and the
7 research that has come out of it?
8         MS. LEHMAN: Objection.
9         THE WITNESS: I think the
10    materials cited in my report that
11    that's my -- that was a good faith
12    attempt to representing everything
13    I reviewed. I may have gone to the
14    website for the Sister Study, but I
15    don't recall for sure.
16 BY MR. TISI:
17    Q.    Have you ever written on
18 imputation, either single or multiple, in a
19 methods paper? In other words, not as part
20 of a methods of a study, but in terms of
21 talking about that imputation as a method
22 for dealing with missingness?
23    A.    Yes.
24    Q.    Okay. Could you identify

24 (Pages 90 - 93)

Page 94

1 where you actually talk about multiple
2 imputation or single imputation as a method
3 for dealing with missingness?
4        A.    So it's in my papers related
5 to the Bayesian reconstruction of magnetic
6 resonance --
7            THE STENOGRAPHER: Wait a
8 minute, the what reconstruction?
9            THE WITNESS: Bayesian,
10 B-A-Y-E-S-I-A-N.
11 BY MR. TISI:
12       Q.    And maybe I wasn't clear
13 about my question. My question was not
14 whether or not you discussed it in the
15 context of a paper in which you were
16 looking at something else --
17       A.    No, it's developing missing
18 data, missing data approach.
19       Q.    Okay.
20       A.    It's developing a method.
21 It's not -- I'm just not implementing a
22 method.
23       Q.    And can you tell me which of
24 your articles in your CV that was? And I

Page 95

1 don't want to take forever to do it, but if
2 you can identify which one or ones, that
3 would be helpful.
4        A.    So this would be -- I'm going
5 back a ways. So publication 32 and I think
6 publication 29. So these used the idea of
7 Bayesian methods for imputing data. So
8 you're imputing data to higher resolution
9 of the image.
10       Q.    Okay. So the reason I'm
11 asking, Doctor, and I'm not playing hide
12 and seek with you here on this, you don't
13 cite any of your published literature in
14 support of the opinions you give about the
15 appropriateness of the imputation
16 methodology used by these authors. Have
17 you ever addressed in any of your published
18 work any of the issues that you are opining
19 on in this case?
20       A.    I mean, I definitely have
21 addressed questions about imputation in
22 publications. I would struggle to pinpoint
23 which ones, but this -- you're now asking a
24 completely different question, I believe.

Page 96

1 The last one was about methods and now
2 you're asking just about whether I address
3 any of the issues related to --
4        Q.    No, no, what I'm asking,
5 let's stay focused on imputation for
6 dealing with missingness. Okay. You know,
7 I looked at -- I read your report, I looked
8 at your -- the things that you've cited,
9 your footnotes, and I don't see any of your
10 own literature used to support any of the
11 general propositions about, for example,
12 missing imputation by chain equations or
13 MICE. Or missing not at random or missing
14 completely at random or missing at random,
15 MCAR, I've not seen any of your own
16 research cited in support of your opinions,
17 you've cited other people, but I have not
18 seen your own. Have you had any papers
19 which deal directly with the issues of
20 imputation that you spend the majority of
21 your report dealing with?
22       A.    Again, there are papers that
23 have something related to imputation in
24 them. I didn't choose them as -- they're

Page 97

1 not the most appropriate references to cite
2 for supporting my opinions.
3        Q.    That's what I'm trying to get
4 at here is, for the purposes of the
5 opinions you're offering in this case about
6 imputation, you have not written
7 independently in the academic literature
8 about those methods specifically?
9            MS. LEHMAN: Object to form.
10           THE WITNESS: I think
11       specifically I have written about
12       those methods, to what extent is
13       another question. And I would have
14       spend a lot of time going through
15       my papers to figure that out.
16 BY MR. TISI:
17       Q.    But none pop in your mind
18 right now?
19           MS. LEHMAN: Object to form.
20           THE WITNESS: I mean, I know
21       there are papers in there that
22       consider missing data. I mean,
23       that's just -- and these are
24       statistical methods, some of them

25 (Pages 94 - 97)

Page 98

1      have been around for a long, long
2      time and bias, as an expert
3      biostatistician, I understand those
4      methods and when they are
5      appropriate to be used in different
6      problems.
7   BY MR. TISI:
8      Q.    I'm not suggesting you don't
9   understand them, not at this point.  My
10  question is have you ever written on them
11  generally in a methods paper?
12     A.    Again --
13     Q.    I don't see any -- I don't
14  see any -- I don't see any -- the reason
15  why I'm saying that, Doctor, is I don't see
16  you citing any of your own academic
17  research in support of your opinions.  And
18  I would have assumed that if you had
19  written on the topic, you would have cited
20  your own research and you didn't.  So can
21  you explain that?
22         MS. LEHMAN:  Objection.  Asked
23     and answered.
24         THE WITNESS:  Well, I would

Page 99

1      not make that assumption of
2      somebody that just because they've
3      written on a topic that they're
4      going to prioritize writing
5      their -- referencing their paper.
6      I mean, maybe people do that, I
7      don't know, but I don't think of it
8      as being a good academic approach.
9      As an academic, I want to cite the
10     most relevant literature to what it
11     is I'm trying to explain.
12  BY MR. TISI:
13     Q.    And, for example, one of
14  the -- well, we'll talk about that later,
15  never mind.
16         You've called imputation
17  throughout this report a guess.  It's not a
18  guess, is it?
19     A.    I would like you to point me
20  to where I refer to imputation as a
21  guess --
22     Q.    Let them --
23     A.    -- it depends on what I
24  stated.

Page 100

1      Q.    It's throughout your report.
2   So let me ask you this opinion.  Is it your
3   opinion that imputation, multiple
4   imputation -- let me rephrase it another
5   way.
6          Is it multiple imputation a
7   recognized statistical method to deal with
8   missing data in an epidemiologic study?
9      A.    Multiple imputation is a
10  recognized approach to dealing with missing
11  data, but it depends on the missing data
12  itself to what extent it's appropriate to
13  use it.
14     Q.    Understood.  And we're going
15  to talk about that, but if anyone were to
16  read your report and say, yeah, that
17  multiple imputation is like voodoo where
18  people are just using fancy terms to guess
19  at data, that's not true, is it?
20         MS. LEHMAN:  Object to form.
21         THE WITNESS:  I would say in
22     general, multiple imputation when
23     applied properly, no, it's not
24     voodoo, but, however, I think how

Page 101

1      it's applied here, if you want to
2      use a pejorative term like you did,
3      you might say it is kind of voodoo,
4      because it's a level of making
5      things up here, yeah.
6   BY MR. TISI:
7      Q.    But, generally speaking, and
8   I'm going to move to strike the
9   nonresponsive part of your answer, because
10  we're going to talk about what the authors
11  did.  If anyone were to walk in court and
12  say that multiple imputation is not a
13  recognized statistical method for dealing
14  with statistical data, they would be wrong,
15  true?
16         MS. LEHMAN:  Object to form.
17     Asked and answered.
18         THE WITNESS:  Multiple
19     imputation is one recognized
20     technique for approaching what is
21     the problem of having missing data.
22  BY MR. TISI:
23     Q.    Okay.  And it is recognized
24  in the biostatistic and epidemiologic

26 (Pages 98 - 101)

Page 102

1 community as a way not to guess at data,
2 correct?
3        MS. LEHMAN: Object to form.
4 BY MR. TISI:
5    Q.    It's a method that --
6    A.    That is not -- that is not
7 correct.
8    Q.    Okay. Let me rephrase the
9 question. It's a method for using existing
10 data to predict what the answer would have
11 been had the question been answered, true?
12    A.    No.
13    Q.    Okay. Tell me what it does.
14    A.    What it does is the idea is
15 you have data, the dataset is incomplete in
16 some way, and you then have to make a
17 decision to make a trade-off between is it
18 worth trying to do some kind of imputation
19 with the data, but at the same time, you
20 want to guard that you're not doing more
21 harm than good when you do the imputation.
22    Q.    Right.
23    A.    So you were talking specific
24 -- you mentioned imputing something

Page 103

1 specific I think related to, like, the
2 primary predictor of exposure or something.
3 But here where multiple imputation can help
4 in particular is when you have variables
5 that are not providing much information
6 directly to the primary outcome, but you
7 don't want to throw the whole set of
8 information away from a subject, and so
9 you, you kind of, it becomes a trade-off
10 where you say I would risk the imputation
11 of that data point in order to get the
12 extra bit of data --
13    Q.    But you don't --
14    A.    -- of everything on that
15 individual. But that's usually the
16 thinking on multiple imputation, not on
17 trying to impute your most important
18 predictors when there's a lot of missing
19 data.
20    Q.    So is there any -- well,
21 first of all, have you ever written on how
22 to deal with missingness in epidemiologic
23 studies?
24    A.    To the extent where -- I have

Page 104

1 designed a program in health data science
2 that has a large component about missing
3 data. So in that sense, I've written about
4 it, but if you're talking about in academic
5 peer-reviewed publications, I haven't
6 provided a commentary on that.
7    Q.    Okay. Have you -- are you
8 familiar with any literature that would
9 support your position that multiple
10 imputation would not be used for the
11 primary predictor?
12    A.    I don't recall any specific
13 document offhand. This would just be sort
14 of, like, conventional sort of
15 biostatistical thinking, based on my
16 experience and knowledge as a
17 biostatistician. I'm sure it's discussed
18 in textbooks, but I can't point you to a
19 specific textbook.
20    Q.    And you can't think of a
21 textbook or an article which talks about
22 when the boundary line of when you use
23 multiple imputation with respect to the
24 variables that you're studying, true?

Page 105

1    A.    Oh, no, I can. I mean,
2 Rubin's book on multiple imputation
3 certainly talks about when, like, things
4 with respect to being missing completely,
5 at random, missing at random, missing not
6 at random, other textbooks in the field
7 surely talk about that too.
8    Q.    Right. But that book, using
9 that as an example, doesn't say that you
10 only -- you do not use multiple imputation
11 with respect to the primary outcome that
12 you're studying, true?
13    A.    I would just simply say
14 that's a qualified true, but there is no
15 sort of black and white boundary on when
16 you are overdoing these things versus not
17 overdoing these things. There is, like I
18 said originally, a trade-off between what
19 you want to impute and what the benefits
20 might be.
21        A common practice though is
22 to rerun analyses where whenever you are
23 kind of even nervous about the imputation
24 influencing your results, that you will run

27 (Pages 102 - 105)

Page 106

1 with and without imputation as a
2 sensitivity analysis and check that your
3 results have not been greatly affected by
4 your imputation approach. That's a common
5 practice and --
6    Q.   Let me just give -- I'm kind
7 of jumping ahead here, but this let me ask
8 you this. The authors were very clear up
9 front as to why they were using the
10 imputation methods to try to predict when
11 people were actually -- women were actually
12 using talc when that information was
13 missing in the follow-up questionnaire,
14 true?
15        I'm not asking you whether
16 it was right or wrong, I'm asking you, they
17 laid it out there for the whole world to
18 see, correct?
19    A.   They basically said that they
20 were going to impute exposure status, yes.
21    Q.   Correct. And that went
22 through peer review, true?
23    A.   I mean, it did. I'm amazed
24 it did. I can't understand how -- they

Page 107

1 must have not had biostatistical review,
2 because that was amazing that that got
3 through without --
4    Q.   Okay. And nobody has ever --
5 and we're going to talk about this, but to
6 your knowledge, not a single scientist
7 outside of this litigation has criticized
8 in any way the imputation used by these
9 scientists, true?
10       MS. LEHMAN: Object to form.
11       THE WITNESS: No, that's not
12       true. I mean, people have
13       criticized imputation approaches
14       being applied inappropriately
15       often.
16 BY MR. TISI:
17    Q.   Let me rephrase the question
18 and I apologize if I was unclear. I said
19 other than experts in this litigation who
20 have been hired by Johnson & Johnson, and
21 paid a lot of money, not a single scientist
22 outside of this litigation has criticized
23 the O'Brien (2024) imputation methods, have
24 they, to your knowledge?

Page 108

1        MS. LEHMAN: Objection. Asked
2    and answered.
3        THE WITNESS: Those methods
4    applied in certain situations have
5    been criticized many times over.
6 BY MR. TISI:
7    Q.   Okay. Well, you tell me who,
8 tell me who has criticized O'Brien (2024)?
9    A.   I didn't say anybody
10 criticized O'Brien (2024). I said that
11 those methods when used inappropriately
12 have been criticized many times over.
13    Q.   So listen to my question, if
14 you don't mind, okay? This paper was
15 published in the peer-reviewed journal on
16 May 15 by NIH scientists; is that true?
17       MS. LEHMAN: Object to form.
18       THE WITNESS: My understanding
19    is that the authors of the paper
20    work at the NIH. My understanding
21    is that this paper was published
22    and so -- and that it's a
23    peer-reviewed journal, so.
24

Page 109

1 BY MR. TISI:
2    Q.   So the answer to my
3 question --
4    A.   Peer reviewed is not a
5 perfect process, so --
6    Q.   The answer to my question
7 was, yes, it was published by NIH
8 scientists on May 15 in a peer-reviewed
9 journal, true?
10       MS. LEHMAN: Objection. Asked
11    and answered.
12       THE WITNESS: Yes, it was
13    published in a peer-reviewed
14    journal.
15 BY MR. TISI:
16    Q.   Okay. And from May 15, it is
17 now mid July, okay, have you seen any
18 public criticisms in the academic
19 literature other than by people hired by
20 Johnson & Johnson and made a lot of money?
21       MS. LEHMAN: Object to form.
22       THE WITNESS: I have not, but
23    I would be absolutely stunned if
24    anything made it through the

Page 110

1    peer-review process so quickly
2    between the paper being published
3    and now. Academic literature
4    doesn't tend to move that fast.
5 BY MR. TISI:
6    Q.    Okay. But so the answer to
7 the question would be no, you're not aware
8 of anybody outside of being hired by
9 Johnson & Johnson who has criticized this
10 paper in a conference, at a meeting, in a
11 conference call, in a letter to the editor,
12 in an editorial, in a paper, anywhere other
13 than Johnson & Johnson's paid experts,
14 true?
15    MS. LEHMAN: Object to form.
16    THE WITNESS: I'm just -- I
17    don't -- I have not seen anything
18    myself. I just independently
19    reviewed the paper and my opinions
20    are that it's flawed and
21    unreliable.
22 BY MR. TISI:
23    Q.    Okay. Now, let's talk about
24 those NIH authors in which you said you are

Page 111

1 not criticizing them in particular, true?
2    A.    I am not criticizing them
3 personally in any way.
4    Q.    Well, professionally, are you
5 criticizing them?
6    MS. LEHMAN: Object to form.
7    THE WITNESS: Well, I'm
8    criticizing them professionally in
9    terms of this work that -- in terms
10    of the paper that they wrote, yes.
11 BY MR. TISI:
12    Q.    All right. So let's go, if
13 you don't mind going to Exhibit No. 8,
14 which is O'Brien (2024).
15    A.    Yeah, I'm there.
16    Q.    Now, you know from reading
17 the paper that this is a study where almost
18 over 50,000 people, we talked about this,
19 over 50,000 women were enrolled and the
20 study is about 15 years old, correct?
21    A.    It seems like the study
22 started collecting data in 2003, so I would
23 say that's, like, 22 years old.
24    Q.    Okay. And several papers

Page 112

1 have been written regarding talc and
2 ovarian cancer from the Sister Study
3 cohort, correct?
4    A.    Yes.
5    Q.    And you refer to several of
6 them, one would be Gonzalez 2016, which
7 would have been about six and a half years
8 after the study was commenced and that's
9 Exhibit No. 18 in your book.
10    MS. LEHMAN: Object to form.
11    THE WITNESS: I think it's a
12    little bit longer than that, right,
13    2016 from 2003, that would be about
14    13 years later.
15    - - - - -
16    (Gonzalez Study marked
17    Kornak Exhibit 18 for
18    identification.)
19    - - - - -
20 BY MR. TISI:
21    Q.    Right. But they used, they
22 used data that was about 6.6 years in
23 follow-up, do you remember?
24    MS. LEHMAN: Object to form.

Page 113

1    THE WITNESS: Well, they had a
2    median follow-up of 6.6 years.
3 BY MR. TISI:
4    Q.    Okay. And you also --
5    A.    Something like that.
6    Q.    -- looked at a pooled
7 study by -- and O'Brien herself was part of
8 the Gonzalez study in 2016, correct?
9    A.    Yes, she's the second author
10 on that paper.
11    Q.    And there was also a pooled
12 study of cohorts, O'Brien (2020), which is
13 in your book as Exhibit 25?
14    A.    Yes, that's correct.
15    - - - - -
16    (O'Brien (2020) Study marked
17    Kornak Exhibit 25 for
18    identification.)
19    - - - - -
20 BY MR. TISI:
21    Q.    All right. O'Brien is also
22 on that study, correct?
23    A.    Yes, she's the first author
24 on that one.

29 (Pages 110 - 113)

Page 114

1    Q.    As is Dale Sandler.  Do you
2  see that?
3    A.    Yes.
4    Q.    Okay.  Nicolas Wentzensen?
5    A.    Yes.
6    Q.    And Holly Harris.  Do you see
7  her name?
8    A.    Yes.
9    Q.    Clarice Weinberg?
10   A.    Yes.
11   Q.    She's a biostatistician,
12  correct?
13   A.    I don't know.
14   Q.    Okay.  Now, there's also a
15  study on -- that touches on talc recall
16  bias, which is O'Brien (2023), correct?
17   A.    Yes.
18   Q.    And that's Exhibit No. 16.
19   A.    Yes.
20        - - - - -
21        (O'Brien (2023) marked
22        Kornak Exhibit 16 for
23        identification.)
24        - - - - -

Page 115

1  BY MR. TISI:
2    Q.    Okay.  It's entitled
3  "Douching and genital talc use:  Patterns
4  of use and reliability of self-reported
5  exposure," correct?
6    A.    Correct.
7    Q.    And the authors on that are,
8  again, Dr. O'Brien, Dr. Wentzensen, and
9  Dr. Sandler, correct?
10   A.    Yes.
11   Q.    Okay.  These are the same
12  authors who appear over and over in these
13  studies publishing the peer-reviewed
14  literature coming out of the Sister Study,
15  correct?
16   A.    Yes.
17   Q.    Okay.  The next one is a
18  study of personal care product mixtures in
19  different cancers by Chang, Exhibit 22, in
20  your book.  If you could bring up
21  Exhibit 22, Jeff.
22   A.    I have it open here.
23        - - - - -
24        (Chang Study marked Kornak

Page 116

1        Exhibit 22 for identification.)
2        - - - - -
3  BY MR. TISI:
4    Q.    Okay.  And Dale Sandler is
5  part of that study as well, correct?
6    A.    Yeah, I see his name.
7    Q.    It's actually a she.
8    A.    Sorry, she.  My bad.
9    Q.    That's okay.  And, of course,
10  there's O'Brien (2024), Exhibit No. 8 where
11  these same authors appear again, true?
12   A.    That's true.
13   Q.    Okay.  And in addition to
14  this, okay, O'Brien has written other
15  things on the talc ovarian cancer
16  association, for example, response to
17  letter to the editors that we just talked
18  about, Exhibit No. 25 in your book,
19  correct?
20   A.    The responses you said are
21  Exhibit 25 or is that a different --
22   Q.    No, Exhibit No. 25.
23   A.    I received Exhibit No. 25 as
24  a paper.

Page 117

1    Q.    I'm sorry.  I'm sorry,
2  Exhibit No. 26.  And she wrote a response
3  to letters that were written to her about
4  O'Brien (2020), correct it would be on the
5  second page of that document.  Third page,
6  I'm sorry.
7    A.    Yes.
8        - - - - -
9        (O'Brien Response to Letter
10        to the Editor marked Kornak
11        Exhibit 26 for identification.)
12        - - - - -
13  BY MR. TISI:
14   Q.    Okay.  So it's fair to say
15  that these authors from the NIH have
16  published a lot of literature of talc and
17  ovarian cancer coming out of the Sister
18  Study, true?
19        MS. LEHMAN:  Object to form.
20        THE WITNESS:  They have
21        published multiple papers that use
22        the Sister Study data.
23  BY MR. TISI:
24   Q.    And you had not seen any of

30 (Pages 114 - 117)

Page 118

1 them before May 20, 2024, true?
2      A.    I believe that is true.
3      Q.    Okay.
4      A.    But, anyway -- sorry.
5      Q.    Would you expect these
6 people, these NIH scientists, who have been
7 publishing from the Sister Study on talc
8 and ovarian cancer for going on 20 years to
9 know and understand their cohort and their
10 data?
11         MS. LEHMAN:  Object to form.
12         THE WITNESS:  Well, I don't
13      know that they have been publishing
14      for 20 years.  I know that 2016,
15      since then for sure, they have been
16      publishing on this.
17 BY MR. TISI:
18      Q.    Okay.
19      A.    So but what was the question
20 again?
21      Q.    Well, let me ask you this.
22 Would you expect them to know and
23 understand the data, they have been working
24 with this data for a long time, true?

Page 119

1      A.    They have been working with
2 the data at baseline for a while.
3      Q.    And they have been crafting
4 the follow-up questionnaires, true?
5      A.    I don't know if they were
6 involved in crafting the follow-up
7 questionnaire.  I know they're involved in
8 the Sister Study, but I don't know to what
9 extent.
10      Q.    But you don't know the roles,
11 the respective roles that they had with the
12 Sister Study, true?
13      A.    I don't know their roles
14 completely.
15      Q.    Okay.  Have you looked at
16 their qualifications on -- from the NIH
17 website in order to understand their roles
18 not only in looking at the Sister Study
19 cohort, but in looking at cohort data in
20 multiple cohorts?
21         MS. LEHMAN:  Object to form.
22         THE WITNESS:  I have not
23      looked at their qualifications.  I
24      see that they're either MDs or PhDs

Page 120

1      and I assume they are qualified
2      researchers in what they're working
3      on.
4 BY MR. TISI:
5      Q.    Well, do you have any
6 evidence, as we sit here today, Dr. Kornak,
7 that any of these NIH scientists who
8 drafted or were responsible for drafting
9 O'Brien (2024) or any of the prior studies
10 have been -- have received a penny from any
11 side in this talc litigation?
12      A.    I don't know if -- whether
13 they have or they haven't.  I don't know.
14      Q.    Well, that's actually a
15 different question.  Do you have any
16 evidence, as you sit here today, that they
17 have received --
18      A.    No.
19      Q.    -- even a penny in money from
20 lawyers involved in talc litigation?
21         MS. LEHMAN:  Object to form.
22      Asked and answered.
23         THE WITNESS:  I don't have any
24      such evidence.

Page 121

1 BY MR. TISI:
2      Q.    Okay.  Do you have any
3 information that any of these NIH
4 scientists who published O'Brien (2024)
5 have been retained as a litigation
6 consultant in any fashion?
7      A.    No.
8      Q.    Okay.  Now, you have been a
9 consultant and expert for this litigation,
10 do you have any evidence that any of these
11 NIH scientists have participated in any
12 legal matter, talc or otherwise, at any
13 time in their professional careers?
14         MS. LEHMAN:  Object to form to
15      counsel testifying.
16         THE WITNESS:  I don't have any
17      evidence on what -- whether they've
18      been involved in legal proceedings
19      in their careers.
20 BY MR. TISI:
21      Q.    Well, you don't have any
22 evidence that they have, true?
23      A.    I don't have any evidence,
24 no.

31 (Pages 118 - 121)

Page 122

1    Q.   Do you have any reason to
2  doubt their independence when drafting
3  studies that they send in for peer review
4  on the Sister Study?
5    A.   I don't have any such
6  evidence and, you know, I don't know these
7  people, so I'm not --
8    Q.   If somebody were to walk into
9  court tomorrow and say these experts had in
10 their mind to publish a paper where the
11 outcome was that talc was associated with
12 ovarian cancer as -- before they even
13 started the study, that would be -- there
14 would be no evidence for that, right?
15       MS. LEHMAN: Object to form.
16       THE WITNESS: Well, I would
17       say, no, that -- I mean, this --
18       there is kind of evidence to that
19       in a way. I mean, you're kind of
20       getting -- putting me in a
21       hypothetical position about what's
22       in the mind --
23 BY MR. TISI:
24    Q.   Well, it's not

Page 123

1  hypothetical --
2        MS. LEHMAN: Hold on. Hold
3        on. Just let him finish. Let
4        Dr. Kornak finish, please.
5  BY MR. TISI:
6    Q.   I'm asking whether you
7  have any --
8    A.   I would like to finish my
9  answer --
10    Q.   Well, I want to --
11    A.   I really want to finish what
12 I'm saying before I lose my train of
13 thought --
14    Q.   All right. Finish and I'll
15 move to strike.
16    A.   These authors have produced a
17 paper that seems to go in a different
18 direction to where they were -- their
19 previous papers. They were using flawed
20 approaches and so, you know, I don't know
21 what their exact reason is for doing this,
22 whether they just wanted to get another
23 paper out and saying the same thing doesn't
24 get you another paper out. But it's

Page 124

1  clearly here in the paper that there are
2  problems with what -- they're relying on
3  this forward retrospective analysis when
4  they have clean prospective data that they
5  could be focused on.
6    Q.   And let's talk about --
7    A.   And they mentioned, they said
8  they relegated that down into the appendix.
9    Q.   Okay. We're going to talk
10 about that. We're going to talk about what
11 they did, but I'm going to move to strike
12 your answer. Do you have any --
13       THE STENOGRAPHER: You froze.
14 BY MR. TISI:
15    Q.   I move to strike your answer
16 as nonresponsive. Do you have any evidence
17 that you can point to that these -- that
18 these NIH scientists who have never been
19 paid in litigation, to your knowledge,
20 engaged in an analysis with an intent to
21 find an association where none exists?
22       MS. LEHMAN: Object to form.
23       Asked and answered.
24       THE WITNESS: Just that,

Page 125

1        again, I don't know their motives,
2        but they produced a paper which
3        appears to do as much juggling as
4        possible to try to find a result
5        where none really exists.
6  BY MR. TISI:
7    Q.   Let's go to Exhibit No. 10,
8  if we could, in your binder. This is the
9  NIH biography of Dale Sandler. She's a
10 senior investigator in the epidemiology
11 branch, chronic disease, epidemiology group
12 at the National Institute of Environmental
13 Health Sciences of the NIH.
14       Do you see that?
15    A.   Yes.
16       - - - - -
17       (Dale Sander, PhD, Bio
18       marked Kornak Exhibit 10 for
19       identification.)
20       - - - - -
21 BY MR. TISI:
22    Q.   Okay. That's a pretty --
23 that's a pretty important position, do you
24 agree?

32 (Pages 122 - 125)

Page 126

1    A.    You know, I'm not familiar
2  with NIH internal hierarchy as to what
3  different positions mean, but I have no
4  reason to doubt her credentials.
5    Q.    Okay.  If you go to page 3,
6  it says "Dale Sandler, heads the Chronic
7  Disease Epidemiology group and has been
8  Chief of the Epidemiology Branch of the
9  Division of Intramural Research at NIEHS
10 since 2003."
11      Do you see that?
12   A.    Yes.
13   Q.    Is that, if you were to get
14 that as an application to your school, you
15 would consider that to be a pretty
16 impressive credential, true?
17      MS. LEHMAN:  Object to form.
18      THE WITNESS:  I mean, you
19    know, it seems to be a potentially
20    important position.  I don't know
21    the internal workings of, like, the
22    NIH hierarchy, but she has --
23 BY MR. TISI:
24   Q.    It further states that she --

Page 127

1  I'm sorry, go ahead.
2    A.    No, I'm just going to give
3  you an example within UCSF, you can have
4  people that head groups and it's really
5  them and a postdoc, so I don't know what
6  this means, but, again, I'm not doubting
7  this person's credentials.
8    Q.    Okay.  It says that she was a
9  past president of the American College of
10 Epidemiology.
11      Do you see that?
12   A.    Yes.
13   Q.    Are you a member of the
14 American College of Epidemiology?
15   A.    No, I'm not a member.
16   Q.    Okay.  It says she received
17 the NIH directors award in 2009 for
18 developing the Sister Study.
19      Do you see that?
20   A.    Yes.
21   Q.    Okay.  Is that something that
22 you consider to be an impressive position?
23      MS. LEHMAN:  Object to form.
24      THE WITNESS:  I think it's

Page 128

1    good for her that she got an award.
2    Again, I'm not in any way doubting
3    her credentials, but I don't know
4    the specifics of how these awards
5    are made.  But, you know, great.
6  BY MR. TISI:
7    Q.    If you had gotten her -- if
8  you had gotten an application for her
9  medical -- for your school at UCSF, would
10 you have given it a look?
11   A.    If we were hiring and, sure,
12 her CV would be considered along with all
13 CVs that were -- or all applications that
14 were made for a position.  But, yes, she
15 would receive consideration and she has,
16 presumably, she has the qualifications for
17 certain positions.
18   Q.    Let's look at Katie O'Brien,
19 Exhibit No. 8.  By the way, actually, never
20 mind.  Do you see --
21   A.    You said Exhibit No. 8.
22   Q.    Exhibit No. 9, excuse me.
23   A.    Go ahead.
24      - - - - -

Page 129

1      (Katie O'Brien, PhD, Bio
2      marked Kornak Exhibit 9 for
3      identification.)
4      - - - - -
5  BY MR. TISI:
6    Q.    She's a member of the Chronic
7  Disease Epidemiologist Group.
8      Do you see that?
9    A.    Yes.
10   Q.    And the next page, page 2,
11 its says "She's a staff scientist in the
12 Epidemiology Branch, where she helps lead
13 the Sister Study, a prospective cohort
14 study designed to identify environmental
15 and genetic risk factors for breast cancer.
16 Within the study, O'Brien's main interests
17 include how environmental and
18 hormone-related exposures are related to
19 breast, ovarian and uterine cancers."
20      Do you see that?
21   A.    Yes.
22   Q.    Okay.  Do you have any reason
23 to doubt Katie O'Brien's credentials?
24   A.    She's a PhD and I don't know

33 (Pages 126 - 129)

Page 130

1  what her PhD is in, but no, I'm not saying
2  that she's not credentialed.
3      Q.    Do you have any reason to
4  believe based upon her biography that she's
5  unqualified to methodologically construct
6  or author a study like O'Brien (2024)?
7      A.    I don't see in here that she
8  has basically the biostatistical expertise
9  to deal with the kind of methodological
10  issues that are involved in all of the
11  imputation and correction processes and
12  made up steps in O'Brien (2024).
13      Q.    Okay.  Let's talk about
14  somebody who may actually do that.  Can we
15  go to Exhibit No. 12?  This is the
16  biography, the NIH biography of Clarice
17  Weinberg, PhD, Senior Investigator
18  Biostatistics and Computational Biology
19  Branch at NIEHS.
20          Do you see that?
21      A.    Yes.
22          - - - - -
23          (Clarice Weinberg, PhD, bio
24          marked Kornak Exhibit 12 for

Page 131

1          identification.)
2          - - - - -
3  BY MR. TISI:
4      Q.    And if you go to the second
5  page, it says in her biography, okay, it
6  says she was elected fellow of the American
7  Statistical Association in 1995, awarded
8  both the Janet Norwood Award and Mantel
9  Award in 2005, and was elected to the
10  American Epidemiologic Study in 2007.
11          Do you see that?
12      A.    Yes.
13      Q.    And do you also see that she
14  is -- it says above that "After serving on
15  the faculty of the Department of
16  Biostatistics in Seattle for two years, she
17  came NIEHS in 1983, where she headed up the
18  Biostatistics Branch since 1997."
19          Do you see that?
20      A.    Yes.
21      Q.    Okay.  So she heads the
22  biostatistics branch at the National
23  Institute of Environmental Health Sciences,
24  correct?

Page 132

1      A.    Yes.
2      Q.    And she's one of the
3  coauthors on O'Brien (2024), true?
4      A.    I don't remember the list of
5  coauthor names, but I think --
6      Q.    Exhibit No. 8, she's right
7  there in the front.
8      A.    I'm not doubting you, I just
9  wanted to double-check.  Yes, she's there.
10      Q.    Okay.
11      A.    Yeah.
12      Q.    So there is a biostatistician
13  on this paper who is -- you have no reason
14  to doubt their -- who is actually the head
15  of the biostatistics branch for almost 20
16  years at the National Institute of
17  Environmental Health Sciences, correct?
18      A.    Yeah.
19      Q.    Do you have any reason to
20  believe that she doesn't understand
21  imputation methods or how to correct for
22  recall bias?
23      A.    I mean, all I can say is she
24  was a coauthor on there and that she is

Page 133

1  greatly credentialed in biostatistics and
2  I'm amazed that if she looked at this
3  closely enough that she let it go through
4  with her name on it with all of those flaws
5  that are in the paper.  I certainly would
6  not have done it and I would have asked to
7  be taken off.
8      Q.    Let's go to Exhibit No. 11.
9  This is Nicolas Wentzensen, a senior
10  investigator, the Clinical Genetics Branch
11  and National Cancer Institute and he's an
12  MD, PhD, correct?
13      A.    Where does it say that?  I
14  don't doubt -- oh, yeah, sorry, I see MD,
15  PhD, yes.
16          - - - - -
17          (Nicolas Wentzensen, MD,
18          PhD, Bio marked Kornak Exhibit 11
19          for identification.)
20          - - - - -
21  BY MR. TISI:
22      Q.    And if you go to page 3, with
23  respect to ovarian cancer specifically, it
24  says "Together with extramural researchers,

34 (Pages 130 - 133)

Page 134

1  I established the Ovarian Cancer Cohort
2  Consortium (OC3) to conduct well-powered
3  studies of risk factors and biomarkers for
4  histologic subtypes," correct?
5       A.    That is what is stated there,
6  yes.
7       Q.    Okay.  So do you have any
8  reason to believe that he doesn't
9  understand how to analyze cohort data with
10  respect to ovarian cancer and risk factors?
11      A.    Other than the fact that he
12  put his name on this paper when he's
13  clearly using flawed analysis, I can't
14  point to anything else.  I don't know the
15  professor and I don't know his history of
16  publications --
17      Q.    Let's look at it --
18      A.    I don't know his
19  biostatistical expertise.
20      Q.    Let's look at his biography
21  on the next page, page 4, he received an MD
22  in 2000 and a PhD in 2007.
23           Do you see that?
24      A.    Yes.

Page 135

1       Q.    He became, if you go down, it
2  says he became a tenure-track investigator
3  in 2009 and was awarded scientific tenure
4  by the NIH and appointed senior
5  investigator in 2013.
6            Do you see that?
7       A.    Yes.
8       Q.    And it says his "research is
9  focused on clinical epidemiology of
10  gynecological cancers.  His research has
11  been highly recognized internationally."
12           Do you see that?
13      A.    Yes.
14      Q.    Do you have any reason to
15  believe that he doesn't understand how to
16  construct a study that would look at risk
17  factors for ovarian cancer?
18      A.    Again, I don't know this
19  person individually what -- he's clearly
20  credentialed in what he knows, but I work
21  with people all the time who are clearly
22  credentialed in what they know and they
23  come to me for biostatistical advice.
24  People who are experts in all kinds of

Page 136

1  clinical areas and they suddenly do not
2  have the charts to deal with this kind of
3  problem.  So, like I said, I don't know Dr.
4  Wentzensen.  He does have an MD.  He does
5  have a PhD.  He has credentials.  But I
6  don't see evidence that he has the
7  biostatistical skills to know how to review
8  the paper.
9       Q.    Okay.  All right.  So I'm
10  going to show you Exhibit No. 13, which is
11  a report of the OC3 cohort where Dr.
12  Wentzensen is the last author.
13           Do you see that?
14      A.    Yes.
15           - - - - -
16           (OC3 Cohort Profile marked
17           Kornak Exhibit 13 for
18           identification.)
19           - - - - -
20  BY MR. TISI:
21      Q.    You see Dale Sandler up
22  there?  Three lines up.
23      A.    It will take me a little
24  while to go through here.

Page 137

1       Q.    Three lines up, right there,
2  right?
3       A.    Yes, I see Dale Sandler.
4       Q.    Okay.  Katie O'Brien is
5  there?
6       A.    I'll just watch your cursor,
7  rather than -- where is Katie O'Brien?  Oh,
8  yeah.  Yup.
9       Q.    And this is not just a Sister
10  Study, this is an Ovarian Cancer Cohort
11  Consortium published in the International
12  Journal of Epidemiology.
13           Do you see that?
14      A.    Yes.
15      Q.    And if you go down, it says
16  "The Ovarian Cancer Cohort Consortium was
17  established to facilitate prospective
18  studies of ovarian cancer risk factors,
19  biomarkers, risk prediction and outcomes
20  while accounting for ovarian cancer
21  subtypes.
22           "The consortium currently
23  includes 1.3 million women, among which
24  7,314 incidence of epithelial ovarian

35 (Pages 134 - 137)

Page 138

1 cancer have been identified."
2        Do you see that?
3    A.   Yes.
4    Q.   Okay.  And Dr. Wentzensen and
5 Dr. O'Brien, and Dr. Sandler are all part
6 of that consortium, correct?
7    A.   They're all coauthors on this
8 paper, I don't know --
9    Q.   Do you think that they would
10 be part of this consortium of 1.3 million
11 women if they didn't have any idea how to
12 analyze cohort data?
13        MS. LEHMAN:  Object to form.
14        THE WITNESS:  Well, first --
15        sorry, I'm going to, like, the
16        first part of your question, I
17        don't know that they are part of
18        this consortium.  I see they're
19        coauthors on this paper.  They may
20        well be and I have no reason to
21        doubt that they are, but I don't
22        know that for sure.  There are many
23        sort of consortium papers where
24        other people are added as coauthors

Page 139

1        that are not part of the
2        consortium, so --
3 BY MR. TISI:
4    Q.   Well, you saw that Dr.
5 Wentzensen, when I pulled up his biography,
6 he actually organized this, correct?
7    A.   I mean, yeah, I accept that
8 Dr. Wentzensen is part of the consortium.
9 I just don't know about the others.
10    Q.   Okay.
11    A.   And I have no reason to doubt
12 it, please don't get me wrong.
13    Q.   Well, you're not part of
14 anything like this, are you?  You're not
15 part of -- you have never studied or been
16 involved with any cohort data with respect
17 to any gynecologic cancer, have you?
18        MS. LEHMAN:  Object to form.
19        THE WITNESS:  Strictly
20        speaking, I think -- I mean, I
21        don't think that's the -- the point
22        is I'm a biostatistician and my
23        math is applicable across a wide
24        range of areas, but I certainly

Page 140

1        have been involved in cohort
2        studies of breast cancer, which I
3        believe count as gynecological
4        cancers.
5 BY MR. TISI:
6    Q.   You weren't even involved --
7 you weren't even aware that there was an
8 Ovarian Cancer Cohort Consortium until I
9 just showed you this paper five minutes
10 ago, true?
11        MS. LEHMAN:  Object to form.
12        THE WITNESS:  I don't know
13        whether I saw this in any of the
14        documents that I reviewed.  There
15        was a lot of materials that I've
16        reviewed.  But I certainly wouldn't
17        say I'm highly familiar with the
18        Ovarian Cancer Cohort Consortium.
19 BY MR. TISI:
20    Q.   Will you go to exhibit --
21    A.   There was your other part of
22 the question was about whether they're able
23 to analyze cohort studies, I believe, and
24 in that respect, the fact that what the

Page 141

1 authors did in O'Brien (2024) does not bode
2 well for saying that they do a good job of
3 analyzing cohort studies, because the --
4 and I'm really quite amazed, to be honest
5 here, you know, this is talking about
6 facilitating prospective studies and yet
7 O'Brien is all about retrospective
8 analysis --
9    Q.   All right.  Well, we're going
10 to talk about that in a minute, but let me
11 just ask you this question now.  In cohort
12 studies, it is not unusual at all for
13 follow-up questionnaires to be issued when
14 a research question comes up, true?
15    A.   And I'm trying to think of
16 specific analysis situations.  I mean,
17 usually in cohort studies, if you want to
18 look at things longitudinally, you decide
19 that before you start the cohort study and
20 you have a prespecified plan of what --
21 when you will be collecting data, what will
22 be in that data.  If you're going to modify
23 that in any way, that gets -- goes into the
24 protocol in some way, but -- so I think

36 (Pages 138 - 141)

Page 142

1  it's kind of unusual to just kind of
2  like --
3     Q.    Really?
4     A.    -- decide you're going to do
5  another survey or something, yeah.
6     Q.    Okay.  So let me ask you this
7  question.  Are you aware that there are
8  other cohort studies which have looked at
9  the question of talc and ovarian cancer
10  including the Women's Health Initiative,
11  the Nurses' Study?
12     A.    Yes, I mean they're in
13  O'Brien (2020) as part of their combined
14  analysis.
15     Q.    Do you know that the talc use
16  wasn't part of the original enrollment
17  questionnaire, but was only asked in a
18  subsequent questionnaire during the course
19  of those cohorts.
20        Do you know that?
21     A.    I wouldn't say -- I may have
22  seen it when I was going through the
23  O'Brien (2020) paper, if it's there.  I
24  don't recall it specifically.  But if

Page 143

1  that's the case, then that weakens my
2  perspective of that study.
3     Q.    Okay.  So if it is true,
4  okay, that cohort studies upon which J&J
5  has relied on in this litigation asked
6  questions about talc use in a subsequent
7  questionnaire, those turn those studies
8  into case-control studies, retrospective
9  case-control studies; is that your opinion?
10        MS. LEHMAN:  Objection.
11        THE WITNESS:  I mean that --
12  BY MR. TISI:
13     Q.    Let me rephrase the
14  question --
15     A.    -- was a convoluted question
16  and I couldn't follow it.
17     Q.    Let me rephrase that
18  question.  If those studies,
19  hypothetically, use --
20     A.    Are we talking about any
21  other specific studies or something --
22     Q.    Yeah, let's talk specific.
23  You said you had seen reference to the
24  Nurses' Health Study and the Women's Health

Page 144

1  Initiative cohorts, correct?
2     A.    I've seen that those were in
3  O'Brien (2020), I believe.
4     Q.    And you did not know that the
5  question about talc use wasn't asked at the
6  enrollment, you didn't know that, correct?
7     A.    I don't recall that, no.
8     Q.    Okay.
9     A.    Yeah.
10     Q.    If I am correct, and I know
11  that I am, that those questions weren't
12  asked until after the study was initiated,
13  many years after the study was initiated,
14  would that call into question the
15  reliability of those studies, in your
16  opinion?
17        MS. LEHMAN:  Object to form.
18        THE WITNESS:  It would give me
19     concern about inference from that
20     study incorporating additional
21     sources of bias, such as recall
22     bias.  I would look at specifically
23     the design and the timeline to
24     follow that, that wasn't the focus

Page 145

1     of my -- I'm not opining on that
2     study per se.
3  BY MR. TISI:
4     Q.    The lawyers didn't ask you to
5  do that, did they?
6        MS. LEHMAN:  Object to form.
7        THE WITNESS:  No, I mean, I
8     was asked to give an independent
9     review of O'Brien (2024) and to
10     that extent, I reviewed O'Brien
11     (2024) and materials associated
12     with that.  I think we have been
13     going -- I'm going to ask for a
14     break at this point.  We have been
15     going for an hour and a quarter, I
16     think, so I could do with five
17     minutes.
18        MR. TISI:  Fine.  That's okay.
19     We'll take a break now.  I'm at a
20     breaking point.
21        - - - - -
22     (A recess was taken at this time.)
23        - - - - -
24

37 (Pages 142 - 145)

Page 146

1 BY MR. TISI:
2      Q.    Back on the record.
3 Dr. Kornak, we took about a half hour break
4 and in the interim, I looked up two
5 articles that you mentioned, I believe,
6 discussing methods of imputation and they
7 were number 29 and 32 of your CV.  One
8 titled "Bayesian k-space-time
9 reconstruction of MR spectroscopic imaging
10 for enhanced resolution."
11            And the second one is
12 "K-Bayes reconstruction for perfusion MRI
13 II:  Modeling and technical development,"
14 both in 2010.  Those were the studies you
15 referred to?
16      A.    Yes, I believe so.
17      Q.    Okay.  Would it surprise you
18 that the word "imputation" isn't even used
19 in these articles?
20      A.    No, it wouldn't surprise me.
21      Q.    All right.  Let's go --
22      A.    I would say that the uses
23 of --
24      Q.    No question.

Page 147

1      A.    The use of imputation -- I
2 would need to qualify my answer --
3      Q.    No, but I asked you the
4 question before, my question was not
5 qualified.  My question is, in any of your
6 published literature, did you ever talk
7 about the appropriateness of the methods of
8 imputation to deal with missingness?
9      A.    I --
10      Q.    And your answer was -- your
11 answer was in those two studies.  The
12 record will be what the record will be --
13      A.    No, we can check the record,
14 because --
15      Q.    That's okay.
16      A.    -- what the record would say
17 was you asked me if there was any methods
18 papers that I did that involved missing
19 data and methods development.  That was the
20 answer that these two papers were for and
21 these two papers do.  If you look, the
22 approach that's taken is expectation
23 maximization.  I'm not even completely sure
24 that I used the words there, it's part of

Page 148

1 Bayesian analysis in general, but that is
2 missing data work --
3      Q.    Okay.  Well --
4      A.    The question you asked, I did
5 not do any specific papers about, they
6 appear elsewhere.  If you want to check the
7 record on that, that's fine.
8      Q.    Doctor, I'm going to check
9 the record as I do all the time.  My
10 question, I'm going to ask you again, is in
11 any of your published work, articles,
12 whatever, have you discussed the analytical
13 tool of multiple imputation or single
14 imputation as a method for dealing with
15 missingness, not whether you used it, but
16 whether you discuss when it's appropriate
17 and under what circumstances?
18      A.    Well, the answer to that is
19 going to be yes, because when you use it --
20 unfortunately, this is not what O'Brien
21 (2024) do, they don't justify why they're
22 using it in their particular situation and
23 whether it's appropriate.  But whenever
24 we -- I have been involved in using it in

Page 149

1 multiple imputation approaches or any way
2 of dealing with missing data, I want to
3 discuss those, the limitations of using
4 those approaches and wherever possible to
5 do sensitivity analysis.  Again, O'Brien
6 (2024) did not do that.
7      Q.    Okay.  Move to strike.
8            I would like to show you, we
9 were talking before the break about the
10 qualifications of the various authors to do
11 and look at the data using the kinds of
12 methods that they use in O'Brien (2024).
13 Do you remember that testimony?
14      A.    Yeah, I remember that.
15      Q.    Okay.  I would like to show
16 you Exhibit No. 14, which is a -- do you
17 know what International Agency on the
18 Research for Cancer is?
19      A.    Yes, I know of them.
20            - - - - -
21            (IARC Monographs on the
22            Identification of Carcinogenic
23            Hazards to Humans marked Kornak
24            Exhibit 14 for identification.)

38 (Pages 146 - 149)

Page 150

1          - - - - -
2  BY MR. TISI:
3      Q.    You know IARC, have you been
4  involved in IARC?  Have you ever been
5  involved with IARC in any way?
6      A.    No.  I mean, not directly.  I
7  may have been indirectly through my other
8  work in cancer research, but not directly.
9      Q.    But you have to be actually
10 asked to be a member of an IARC panel, you
11 know that, right?
12     A.    I don't know what their
13 methods are for bringing members onto the
14 panel, I don't know.
15     Q.    You would agree with me that
16 IARC is considered to be a reputable and
17 important international organization with
18 respect to the study of cancer and risk
19 factors?
20     A.    I think it's an established
21 agency in that field in terms of cancer
22 research, yes.
23     Q.    Okay.  By the way, do you
24 know in this past week -- first of all, do

Page 151

1  you know that both Dr. O'Brien and Dr.
2  Wentzensen were asked to be part of this
3  particular panel because of their
4  expertise, correct?
5          MS. LEHMAN:  Object to form.
6          THE WITNESS:  I know that
7      from -- I think you were going to
8      go start talking about the press
9      release, the recent -- that came
10     out in the last couple of days, but
11     their names were on there, so they
12     were on the panel.  I don't know if
13     they were asked to go on or whether
14     they asked if they could go on.  I
15     don't know the process for their
16     constructing panels.
17 BY MR. TISI:
18     Q.    Well, since you talked about
19 the press release that came out in the past
20 week, you do know that the panel upon which
21 these authors, who were authors of multiple
22 Sister Study publications, were part of a
23 panel that determined on talc without
24 asbestos was a probable ovarian carcinoma

Page 152

1  and with asbestos was a definite ovarian
2  carcinogen.  You understand that to be
3  true, right?
4          MS. LEHMAN:  And I'm going to
5      object.  This is beyond the scope
6      of his report.
7          MR. TISI:  Well, he said he
8      looked at it, so I'm asking him
9      that question.  You understand that
10     that -- that's what they concluded,
11     right?
12         THE WITNESS:  I think you
13     froze in the middle of the
14     question, so I didn't get it.
15 BY MR. TISI:
16     Q.    You understand that that's
17 what they concluded that talc without
18 asbestos is a probable ovarian carcinoma
19 and with asbestos was a definite ovarian
20 carcinogen.  You understand that that was
21 the conclusion of the IARC panel that was
22 asked to look at this question, true?
23         MS. LEHMAN:  And I would,
24     again, object as this is beyond the

Page 153

1      scope of his report.
2          THE WITNESS:  Yeah, I mean, I
3      would agree that -- I'm certainly
4      not -- but my understanding is that
5      from this paper that it moved from
6      2B to 2A, so from possible to
7      probable.  Although, I looked at
8      that document and I didn't see any
9      new data or information or new
10     publications that they took into
11     account to update this decision.
12     So I don't see any real reason --
13     it doesn't update my opinions --
14 BY MR. TISI:
15     Q.    Well --
16     A.    I don't see any reason -- any
17 justification for changing from the
18 previous stance.
19     Q.    So let's look at that for a
20 moment.  Would you look at -- actually,
21 this is not in your book, since it came out
22 after your book was mailed to you, but if
23 we look at what I would like to have marked
24 as Exhibit No. 28.  It's the last, if you

Page 154

1  look at page 15, can you put up Exhibit
2  No. 28, please?  It says -- and this is
3  from Lancet, the Lancet publication, "Since
4  Volume 93, more consistent positive
5  associations for ever-use versus never-use
6  have been reported in pooled cohort studies
7  and case-control studies, including
8  evidence of exposure-response relationship
9  with frequency or duration of use."
10        Do you see that?
11     A.   I see that's what it states
12  there, yes.
13     Q.   And they have footnotes
14  there, right?
15     A.    They have references
16  presumably to publications, yes.
17     Q.    And one of those footnotes is
18  O'Brien (2020), which you said showed no
19  association, true?
20     A.   So, again, like, you know,
21  that's O'Brien (2020).  It's -- I've
22  already taken that into account in my
23  opinions and it suddenly doesn't lead to
24  reliable information about an association.

Page 155

1  And I notice the clear omission of O'Brien
2  (2024) from those.
3     Q.    Well, I'm going to move to
4  strike.  My question was in your report,
5  you said repeatedly that the results that
6  show a positive association in O'Brien
7  (2024) was inconsistent with O'Brien's
8  prior work showing no association, correct?
9        MS. LEHMAN:  Object to form.
10       THE WITNESS:  I don't remember
11       having -- are you saying specific
12       words that I said or just anything
13       --
14  BY MR. TISI:
15     Q.    Yeah, it says --
16     A.    Can we go to it?  I want to
17  make sure -- I just want to make sure I
18  answer you correctly, so if we could to the
19  actual part of the report.
20     Q.    Sure.  I'm happy to do it.
21  You had said previously that one of the
22  things that, on page 12 of your report,
23  Exhibit 1, you said that O'Brien (2024)
24  which showed an association is inconsistent

Page 156

1  with O'Brien's prior work, right?
2        MS. LEHMAN:  Object to form.
3  BY MR. TISI:
4     Q.    And you refer to on page --
5  on paragraph 25B.  Do you see that?
6     A.    In 25B, I see that I'm just
7  stating that O'Brien (2020) uses data on
8  ovarian cancer incidence from 2003 through
9  September 2017 and estimates a hazard ratio
10  summarizing an association between genital
11  talc use and ovarian cancer of 1.02 for
12  their point estimate with a 95 percent
13  confidence interval spanning 0.76 through
14  1.38.  I don't see any discussion --
15     Q.    And you said that the
16  ultimate conclusions of O'Brien (2024) was
17  inconsistent with an association, true?
18  That's the whole point of paragraph 25 --
19  excuse me -- yeah, 25.
20     A.    No, I think what I'm pointing
21  out here in particular, I'm not -- I would
22  have to read here your statement to say
23  whether I agree or disagree --
24     Q.    My point is --

Page 157

1     A.    Can I just finish here?  I
2  just --
3     Q.    Sure.  I thought you were --
4     A.    What I'm saying here in 25,
5  I'm just trying to answer your question is
6  that O'Brien (2024), the prospective
7  analysis, their clean analyses is
8  prospective that avoids the risk of recall
9  bias, of making up data, of imputing data
10  or of correcting data and all of that stuff
11  gives you a hazard ratio of as close to one
12  and a 95 percent confidence interval is
13  very -- it is quite right, between .79 and
14  1.33 and that's consistent with what
15  O'Brien (2024) reports, yes.
16     Q.    And O'Brien (2024) as
17  described by O'Brien and others in the IARC
18  document printed in Lancet says that that
19  supports an association, true?
20        MS. LEHMAN:  Object to form.
21        THE WITNESS:  Let's go -- can
22        we go to that document if you want
23        me to --
24

40 (Pages 154 - 157)

Page 158

1  BY MR. TISI:
2      Q.    Yeah, sure, go back to
3  Exhibit number -- Jeff, can you go back to
4  Exhibit No. 28, please, paragraph 15.  It
5  says "Since more consistent positive
6  associations for ever-use versus never-use
7  have been reported in pooled cohort studies
8  and case-control studies including evidence
9  of exposure-response relationship with
10  frequency and duration of use."
11         And as part of that, they
12  actually cite O'Brien (2020), true?
13     A.    They do indeed cite O'Brien
14  (2020).  I disagree that O'Brien (2020)
15  demonstrates a reliable association between
16  talc use and ovarian cancer.
17     Q.    Okay.  Let's -- so let me see
18  if I can wrap this whole thing up.
19  Previously, before the O'Brien (2024) study
20  was published, the J&J lawyers in pleadings
21  in this court where this case is pending
22  have called these NIH studies preeminent.
23  Do you recall that they are preeminent in
24  their field?

Page 159

1         MS. LEHMAN:  Object to form.
2  BY MR. TISI:
3      Q.    Based upon what you've seen
4  and what we've gone over today.
5      A.    I mean, to my mind, I don't
6  know what, like, you mean by "preeminent,"
7  actually.
8      Q.    It was J&J's words.  So I'm
9  going to tell you when O'Brien (2020) was
10  out before O'Brien (2024), J&J told the
11  court that these particular authors,
12  Wentzensen, O'Brien, Sandler were
13  preeminent.  Do you agree that they are
14  preeminent in their field?
15     A.    I'm not --
16         MS. LEHMAN:  Object to form.
17         THE WITNESS:  I don't know
18     what -- I don't know for sure what
19     Johnson & Johnson said and I'm not
20     responsible for their words and I'm
21     not able to --
22  BY MR. TISI:  --
23     Q.    So you disagree?
24     A.    -- say I agree or disagree.

Page 160

1  This is --
2      Q.    Do you agree --
3         MS. LEHMAN:  Let him finish.
4     Let him finish.
5         THE WITNESS:  This is just
6     kind of a publication, a
7     commentary, I don't know what you
8     want to call it.  It's stating what
9     it says.  It doesn't seem to have
10     gone in-depth to try to really get
11     at the biostatistical issues that
12     are going on here, but it is just a
13     short a summary, so I don't know
14     what they have in mind.
15  BY MR. TISI:
16     Q.    Let's talk about the
17  peer-review process and publication of this
18  study and the reception that it got.  We
19  talked about the authors and their
20  qualifications and engagement in --
21     A.    Sorry, which paper are we
22  talking about, just so I make sure we're on
23  the same page?
24     Q.    We talked about the authors,

Page 161

1  you know which authors, okay, in the past
2  45 minutes or so, we talked about
3  Wentzensen, O'Brien, Sandler --
4      A.    Okay.  Are we talking about a
5  specific paper though or are we just --
6      Q.    We're going to in a moment --
7      A.    -- talking as a group?
8      Q.    You need to follow my
9  question, okay?  I asked you about their
10  qualifications.
11     A.    Okay.
12     Q.    I asked you about their
13  qualifications.  Now, I want to talk about
14  O'Brien (2024).  Okay?
15     A.    Okay.
16     Q.    All right.  Now, first of
17  all, we talked about this before, O'Brien
18  (2024) was published in a peer-reviewed
19  journal, correct?
20     A.    Yes.
21         MS. LEHMAN:  Asked and
22     answered.
23  BY MR. TISI:
24     Q.    What is peer review?

41 (Pages 158 - 161)

Page 162

1    A.    So peer review is a process,
2  I will admit it's an imperfect one, but
3  it's the best that we have in academia,
4  where people submit their scientific works
5  to a journal, the journal, perhaps an
6  associate editor or editor sends it out to
7  two or three reviewers particularly that
8  they think should be able to to review the
9  paper.  And then the reviewers spend some
10 time reviewing the paper.  They give their
11 opinions as to whether it should be
12 accepted or not accepted, and anything they
13 think needs correcting and then that goes
14 back to the authors and if there are
15 corrections required, the authors will try
16 and do that.  And so -- and it then goes
17 back to the reviewers and then the paper is
18 typically either accepted or rejected.
19    Q.    Okay.  So it's a process,
20 it's a scientific process that's well
21 accepted in the scientific community even
22 with its imperfections, correct?
23        MS. LEHMAN:  Object to form.
24        THE WITNESS:  I mean, again,

Page 163

1      it's kind of -- I don't know,
2      there's definitely a lot of debate
3      about whether the process should be
4      changed and should be improved, but
5      as it stands, this is the process
6      that we have for peer-reviewed
7      journals and, like I said, I think
8      it's accepted as the best we have
9      available to us right now.
10 BY MR. TISI:
11    Q.    And you would agree with me
12 that the quantitative bias analysis that
13 was conducted by these NIH scientists for
14 O'Brien (2024) was central to their
15 article, correct?  In fact, it appears in
16 the title of the article, correct?
17    A.    I agree that it appears in
18 the title of the article.  I agree that it
19 is a major component of their paper.  It's
20 kind of, let's say, the last third or
21 simply make that.  I actually disagree with
22 it calling it a quantitative bias analysis.
23 I think that's taking it a little further,
24 because really all they're doing is doing a

Page 164

1  little bit of what if.  What if it was
2  20 percent, what if it was 30 percent, or
3  whatever, they're trying out a few things
4  and saying what would change.  I would sort
5  of reserve, I wouldn't call that --
6    Q.    Well, you know, move to
7  strike your answer, because my question
8  was, the question of a quantitative bias
9  analysis was clearly set out in the
10 article.  It would be hard to miss it, it's
11 in the title, true?
12        MS. LEHMAN:  Objection to
13      form.
14        THE WITNESS:  I already agreed
15      in quantitative bias analysis is in
16      the title.  I would disagree that
17      it's really an analysis --
18 BY MR. TISI:
19    Q.    I understand.  I'm not
20 debating you right now about what they did
21 and what they didn't do.  I'm talking about
22 the peer-review process.  Is there any
23 possibility in your mind that the peer
24 reviewers could have missed the methodology

Page 165

1  point of this study, particularly since
2  it's in the title of the article?
3    A.    Oh, absolutely, I think they
4  did miss it, yeah.
5    Q.    Okay.  All right.  Now, the
6  article, so you think that the peer
7  reviewers and the journal completely missed
8  it?
9    A.    Yes, I do.  Yeah, I mean,
10 it's -- they missed it.  I don't know
11 what -- I'm surprised that a journal would
12 let that go.  I blame it probably on the
13 associate editors for not picking the right
14 range of reviewers, but nobody picked up on
15 the biostatistical problems in this paper.
16    Q.    Okay.  I pulled the
17 publication history from the article, for
18 this article, and it's Exhibit No. 24 in
19 your book.  It was received --
20    A.    I'm sorry, just give me a
21 moment, because the end is taking --
22        - - - - -
23        (Publication History marked
24      Kornak Exhibit 24 for

42 (Pages 162 - 165)

Page 166

1    identification.)
2        - - - - -
3    BY MR. TISI:
4        Q.    It's right on the screen.
5        A.    Yes, the pages through the
6    binder.
7        Q.    I'll blame that on Jeff.
8        A.    All right.
9        Q.    If you look at the very
10   bottom, it's on the screen as well, it was
11   received for publication in September of
12   2023, revised in January 2024.  Accepted
13   for publication in March of 2024 and
14   published in May of 2024.  So this whole
15   process took about eight or nine months,
16   correct?
17       A.    That's not unusual for --
18       Q.    And you claim that the
19   authors, the peer reviewers and everybody
20   involved has missed it, right?
21       A.    Sorry, what is it that you're
22   talking about specifically?
23       Q.    The methodology concerns that
24   you identify in your report, Exhibit 1.

Page 167

1        A.    They absolutely missed it,
2    yes.
3        Q.    Okay.
4        A.    Well, I don't know if there's
5    a comment and the associate editor ignored
6    it, I don't know about the inner workings,
7    but the final paper has these flaws in it.
8    I mean --
9        Q.    Do you have any reason -- I'm
10   sorry.  Sorry.  I apologize, sir, I'm not
11   intentionally talking over you.
12       A.    No problem.
13       Q.    Do you have any reason to
14   believe that these authors did not respond
15   to every one of the peer reviewer comments
16   that were made about this paper?
17       A.    I don't have any reason to
18   believe that.  What I believe is that
19   reviewers looked at the paper on the
20   surface level and did not dig in and pick
21   up on these very clear problems in the
22   biostatistical methods.
23       Q.    Now, if you go back to
24   O'Brien (2024) --

Page 168

1        A.    Remind me of which number
2    that is.
3        Q.    That is number eight.  On
4    page 14, it says that the publication was
5    "Supported by an Intramural Research
6    Program of the National Institute of
7    Environmental Health Sciences, National
8    Institutes of Health."
9            Do you see that?
10       A.    On page 14, where are we
11   looking at?  Sorry.
12       Q.    Support.
13       A.    Under support.
14       Q.    The second column at the very
15   end of the article.
16           Do you see that?
17       A.    Yes, I do.
18       Q.    All right.  And so it's
19   supported through an NIH grant, correct?
20       A.    Intramural grant, so that's
21   within the NIH.  So I don't know that it's
22   a typical NIH grant --
23       Q.    Correct.
24       A.    -- paid for by --

Page 169

1        Q.    Correct.  Do you understand
2    that intramural grants, publications that
3    are as a result of an intramural grant by
4    NIH scientists when they publish a paper,
5    in addition to undergoing peer review by
6    the journal, the article is actually
7    submitted to the NIH for their approval?
8        A.    You know, I don't know what
9    process they actually go through in the
10   NIH, but I don't know what they're looking
11   for, and I would not call it peer review.
12   Peer review is when it goes out to
13   somebody, to blinded reviewers that are
14   assigned by a journal, so that's not --
15   this is not peer review.  It may be an
16   extra stage of review.  And I don't know
17   what they're reviewing it for, just whether
18   there are things that the NIH clearly
19   doesn't agree with.  I mean, you can see,
20   there's a disclaimer here that the National
21   Institutes of Health holds -- has no role
22   in the design, conduct, or interpretation
23   of this study.  That's typical of the NIH,
24   they don't take responsibility for any

43 (Pages 166 - 169)

Page 170

1  studies that they hand out grants here.
2      Q.   I'm sorry, you froze.  Did I
3  interrupt your answer?  I apologize, you
4  froze.
5      A.   No, you didn't interrupt.
6  I'm fine.
7      Q.   My point here is this, in
8  addition to the normal peer review to
9  appear in a publication, this article had
10 to be submitted by the authors to the NIH
11 for its approval, correct?
12     A.   I mean, I understand there's
13 some kind of process, I don't know what
14 that process entails, but I would not call
15 it peer review, no, sir.
16     Q.   Okay.  But NIH clearly knew
17 about it and clearly had the ability to
18 comment on this paper, true?
19         MS. LEHMAN:  Object to form.
20         THE WITNESS:  You know, I
21         really don't know if that's
22         correct.  Because, again, I don't
23         know what -- whether they're
24         reviewing it with respect to

Page 171

1          whether it violates a condition of
2          an NIH grant that is awarded
3          intramurally, I don't know the
4          process, but --
5  BY MR. TISI:
6      Q.   Well, the NIH -- I'm sorry.
7      A.   The NIH, again, it won't take
8  responsibility for the work in there.  It
9  won't sort of -- so if it's not going to
10 take responsibility, I don't see how it's
11 kind of a real review of the science.  It
12 may be a review that they haven't broken
13 any NIH rules.
14     Q.   You're speculating --
15     A.   No, I don't know.  I don't
16 have internal mechanisms, so it's outside
17 my scope in a way.
18     Q.   But the NIH didn't have to
19 feature the article, did it, which you know
20 it did?
21     A.   What's that?
22     Q.   The NIH didn't have to
23 feature the article which you know it did,
24 true?

Page 172

1          MS. LEHMAN:  Object to form.
2          THE WITNESS:  I didn't hear --
3  BY MR. TISI:
4      Q.   Feature the article, it
5  highlighted the article and published it on
6  the NIH website for the world to see
7  because it was an important study, true?
8          MS. LEHMAN:  Object to form.
9          THE WITNESS:  I think that's a
10         stretch to make that conclusion
11         there.
12 BY MR. TISI:
13     Q.   Okay.
14     A.   Now, at UCSF, in our
15 department, people write papers and we put
16 out little sort of statements as kind of a
17 sales pitch for the research that you do.
18 And I don't know that the NIH thing was
19 anything beyond that really.
20     Q.   Okay.  Well, how many of your
21 papers have been featured by UCSF,
22 featured, put on the website and saying
23 this is what you need to pay attention to?
24     A.   I really don't know and I

Page 173

1  think there may have been one or two, I'm
2  not sure, but I tend to be -- try to be
3  modest.  So often to get -- the department
4  kind of solicits you to try and send them
5  information when you've published a paper.
6  I tend to not really want to do it.  I
7  don't think it helps my academic career and
8  I don't love to be featured on websites, to
9  be honest.
10     Q.   Let's look at what the NIH
11 actually said about the study, which it
12 didn't have to do, we agree.  Let's look at
13 Exhibit No. 4.  This is a publication on
14 the NIH website highlighting the --
15 highlighting O'Brien (2024).  And it says
16 "New study by NIEHS scientists provides
17 compelling evidence that genital talc use
18 is associated with an increased risk of
19 ovarian cancer," true?
20     A.   It's true that that is what's
21 stated there, yes.
22          - - - - -
23          (Environmental Factor
24          Article from NIH marked Kornak

44 (Pages 170 - 173)

Page 174

1        Exhibit 4 for identification.)
2              - - - - -
3  BY MR. TISI:
4      Q.    Okay.  But --
5      A.    I don't agree with the
6  statement, but it is stated there.
7      Q.    I understand, but you've
8  disagreed with the peer reviewers, you've
9  disagreed with the journal, and now you're
10 disagreeing with the NIH, correct?
11          MS. LEHMAN:  Object to form.
12          THE WITNESS:  You know, what
13          you say explicitly is correct, I'm
14          disagreeing with all of them --
15 BY MR. TISI:
16     Q.    Okay.
17     A.    -- but I believe that most of
18 them have just taken what O'Brien said on
19 their paper at face value without really
20 digging in there.  So if you don't look at
21 the paper and you don't examine the
22 analysis and you just say, oh, they did
23 recall bias, great.  Oh, they did
24 corrections, great.  But they're not great,

Page 175

1  because they're flawed and they're made up
2  and they're artificial.
3      Q.    Okay.  So now let's look at
4  what the -- the NIH in it's brief summary
5  here actually focuses on the methods, don't
6  they?
7      A.    Can you point me to where you
8  think they do?
9      Q.    Sure, it says, the third
10 paragraph down, it says "This extensive
11 analysis, conducted using information
12 collected by the Sister Study cohort,
13 revisits the association between intimate
14 care products and cancer and incorporates
15 rigorous adjustments for biases that might
16 have affected the results of earlier
17 studies.  The study analyzed data from a
18 cohort of women who were initially
19 cancer-free who reported their intimate use
20 of intimate care products like genital talc
21 and douching over time.  An especially
22 unique aspect of the study was the use of
23 quantitative bias analysis to assess --"
24     A.    I got the first sentence of

Page 176

1  what you're saying, I followed there, and
2  then I got lost, I didn't see.  I see the
3  quote --
4      Q.    Actually, it says "An
5  especially unique aspect of the study was
6  the use of quantitative bias analysis to
7  assess the impact of potential errors in
8  reporting use of intimate care products,
9  including possible differential reporting
10 related to being diagnosed or not diagnosed
11 with cancer," true?
12     A.    I'm sorry.  You were reading,
13 I thought, from the bottom paragraph and
14 you went up a bit --
15     Q.    No, I'm not.  Let's look at
16 the paragraph I've highlighted on the
17 screen.
18     A.    Sorry.
19     Q.    The highlighted paragraph on
20 the screen focuses on the quantitative bias
21 analysis performed by the authors and
22 highlights it as a particularly unique, I
23 think that is the word they use, rigorous
24 and unique feature of the study, true?

Page 177

1      A.    It's --
2          MS. LEHMAN:  Object to form.
3          THE WITNESS:  I didn't follow
4          exactly the wording you said as you
5          were reading it, but --
6  BY MR. TISI:
7      Q.    Well, let's read it together
8  --
9      A.    What is actually stated there
10 in meaning, but I do not agree that that's
11 a review of the methods that they used.
12 They're just parroting what was in the --
13 the authors said they did in the paper.
14 There's nothing in there that implies in
15 any way that these people understood what
16 these methods were, that they were really
17 just, correcting means flipping people over
18 from one side to the other, that imputation
19 means that you bring in the recall bias
20 that you found in the data you've already
21 collected and that you're making
22 assumptions about things that you don't
23 really know.
24     Q.    Okay.

45 (Pages 174 - 177)

Page 178

1    A.    So overall, no, I don't
2 believe --
3    Q.    So far --
4    A.    I don't believe that these
5 people have in any way examined the
6 analysis methods in the paper.
7    Q.    Even though they said that,
8 right, even though they said that --
9    A.    They are just parroting what
10 is there in the paper --
11    Q.    Actually, they're not
12 parroting or quoting the paper at all,
13 look, I'm not fussing with you here.  But
14 they say the cohort -- that this revisits
15 the association between intimate care
16 products and cancer and incorporates
17 rigorous adjustments for bias that might
18 have affected the results of earlier
19 studies.  And then it goes on to say,
20 especially, "An especially unique aspect of
21 the study was the use of quantitative bias
22 analysis to assess the impact of potential
23 errors in reporting use of intimate care
24 products, including possible differential

Page 179

1 reporting related to being diagnosed or not
2 diagnosed with cancer," correct?
3    A.    Again, those are the words
4 that these people write down.  They are
5 just paraphrasing what is in the O'Brien
6 paper.  You really want an analysis that
7 doesn't suffer from recall bias and so on,
8 go to the analysis in Table A2, that's
9 clear.
10    Q.    Okay.  Well, we're going to
11 talk about Table A2.  I promise you, we're
12 going to get there.  But so far, so far
13 okay, so far the peer reviewers missed it,
14 all the authors, including the
15 biostatistician, on the paper got it wrong
16 and NIH was just parroting what the authors
17 said, right?
18        MS. LEHMAN:  Object to form.
19        THE WITNESS:  I mean, I'm
20    going to -- again, when you say
21    "got it wrong," the "it" is kind of
22    some vague, nebulous thing, but
23    what they did do --
24

Page 180

1 BY MR. TISI:
2    Q.    Let me rephrase it then --
3    A.    They did not go and actually
4 examine what the analyses are.
5    Q.    Let me rephrase the
6 question --
7    A.    There's a common flaw in
8 reviewing papers where they just accept
9 that things at face value without actually
10 taking the time to see what really did go
11 on there.
12    Q.    Let me rephrase the question
13 so that we get the "it" right, okay?
14    A.    Okay.
15    Q.    The peer reviewers did not
16 understand or fully appreciate the errors
17 in the methodology.  The editors didn't
18 understand or appreciate the methodology.
19 The authors didn't understand or appreciate
20 the errors in methodology.  The NIH didn't
21 understand or appreciate the errors in the
22 methodology.  All of those people got it
23 wrong, right?
24        MS. LEHMAN:  Object to form.

Page 181

1        THE WITNESS:  So you've gone
2    back to got it wrong again --
3 BY MR. TISI:
4    Q.    They didn't appreciate the
5 errors in the methodology, correct?
6    A.    They either didn't appreciate
7 or they ignored or they didn't have the
8 time to look into it in any depth, but they
9 took what O'Brien said at face value.  All
10 I can say is that, again, I independently
11 reviewed the paper.  Those flaws are there.
12 I clearly outline why they're flaws and --
13    Q.    So let's --
14        - - - - -
15    (Stenographer clarification.)
16        - - - - -
17        THE WITNESS:  I haven't had
18    anything disputing why the flaws
19    are there --
20        MR. TISI:  We'll get there.
21        THE WITNESS:  Why there are
22    really flaws.
23 BY MR. TISI:
24    Q.    We'll get there.  One other

46 (Pages 178 - 181)

Page 182

1 group that didn't understand or appreciate
2 the errors that you've identified is the
3 American Association of Clinical
4 Oncologists, true?
5      A.   I think I would like you to
6 make the question more specific --
7      Q.   Okay.
8      A.   -- I mean, in this group,
9 there's going to be a lot of people, I
10 don't know what all these people's
11 different opinions are, so --
12      Q.   Well, let's talk about
13 somebody else who missed it.  Let's look at
14 Exhibit No. 5.
15      A.   Okay.
16           - - - - -
17           (ASCO Publication marked
18           Kornak Exhibit 5 for
19           identification.)
20           - - - - -
21 BY MR. TISI:
22      Q.   And this is a statement by
23 the American Society of Clinical Oncology.
24           Do you see that?

Page 183

1      A.   Yes, and I've seen this
2 previously.
3      Q.   All right.  And if you look
4 at page 4, "The American Society of
5 Clinical Oncology is committed to the
6 principle and the knowledge conquers
7 cancer.  Together with the Association for
8 Clinical Oncology, ASCO represents nearly
9 50,000 oncology professionals who care for
10 people living with cancer."
11           Do you see that?
12      A.   Yes.
13      Q.   Okay.  Now, if you go to the
14 front of the paper I just showed you, they
15 say this is -- go to page 1, please.  This
16 is the ASCO perspective, the perspective of
17 the organization, true?
18      A.   I mean, I don't think all
19 50,000 members of ASCO contributed to this
20 article.  I would assume there was some
21 small group or maybe even just one person,
22 I don't know.  Maybe it was just Naomi
23 Hagelund who is listed at the top that is
24 writing this in some way at the request of

Page 184

1 ASCO.
2      Q.   She gives her phone number
3 and her email address.  Did you reach out
4 to her and tell her, you don't think this
5 is a particularly good study, did you?
6      A.   No, but I think -- I didn't
7 do that and, again, I've explained that I'm
8 not reaching out to people on the basis of
9 I have been asked to independently review
10 this paper and I assume I am under sort of
11 confidentiality constraints and I don't
12 want to break those.
13      Q.   Are any of the -- are any of
14 the articles upon which you relied in
15 support of your position confidential?
16 They're all published literature, correct?
17      A.   They are all published
18 literature, but if I start talking to
19 people about them, then it becomes -- then
20 I become -- I'm talking about the case and
21 I don't -- that's where I assume I'm
22 breaking confidentiality.
23      Q.   Do you agree that, generally
24 speaking, the peer-review process and not

Page 185

1 the courtroom provides the best mechanism
2 for resolving scientific uncertainty
3 relating to methodologic analysis of
4 complex scientific issues?
5      A.   Well, it depends what you
6 mean by "best" here, because what the
7 complex -- I don't know if peer review
8 really resolves complex scientific issues.
9 Peer review kind of, like, reviews the
10 paper to see if there are problems with the
11 paper, if it's flawed, but they're not --
12 peer review doesn't try to resolve disputes
13 in science.
14      Q.   Okay.  So you would disagree
15 with that statement that the peer-review
16 process and not the courtroom is the best
17 mechanism for resolving scientific
18 uncertainties relating to methodologic
19 analysis of complex scientific data?
20      A.   I think I said it depends and
21 that's what I'm sticking with, it really
22 depends on --
23      Q.   In this case, do you --
24      A.   I mean, it's like --

47 (Pages 182 - 185)

Page 186

1    Q.    In this case --
2    A.    I don't think either is the
3 best approach --
4    Q.    Okay.
5    A.    -- of solving complex
6 scientific questions.
7    Q.    Okay.  Now, going back to
8 Exhibit No. 5, the main takeaway of the
9 article is from the perspective of ASCO,
10 the organization, is "Genital talc use was
11 found to be positively associated with the
12 risk of ovarian cancer across multiple
13 scenarios, even after adjusting for
14 potential reporting biases and
15 misclassification.  The association was
16 particularly strong among women who used
17 talc frequently or especially during
18 periods of specific hormonal changes or
19 reproductive activity."  Right?
20    A.    That is what it states, yes.
21    Q.    Okay.  And they got it wrong
22 too, they missed the methodologic flaws of
23 the study, true?
24    A.    I don't think -- I mean, I

Page 187

1 can walk you through piece by piece here if
2 you want --
3    Q.    We're going to, but they got
4 it wrong?
5    A.    Like I said, I can walk you
6 through piece by piece of what the problems
7 are with this statement --
8    Q.    We're going to talk about it,
9 sir --
10    A.    I'm not saying they're right
11 or wrong.  It's more complicated than that.
12 I can walk you through the problems with
13 the statement.  Again, I think they took
14 what's in O'Brien at face value and --
15 first of all, there is no adjusting here
16 for potential reporting biases.  Adjusting
17 in biostatistics means you include
18 variables within your modeling and you
19 adjust them within your modeling.  There
20 was no incorporation of these variables as
21 adjustments in the model.  That's not true.
22 So it's just plain false.  So, in that
23 sense, yes, it's wrong.
24       Even here, they point out

Page 188

1 quite clearly that even with their belief
2 that O'Brien (2024) was correct, when they
3 talk about the significance, they talk
4 about needing further research and
5 potential reevaluation.  These are all sort
6 of qualified statements.  So even from the
7 journal that is backing the paper that
8 they've published, they still have all
9 these qualified statements in there.
10    Q.    All right.  So with respect
11 to the methodology, which is what you're
12 here to talk about, on the next page it
13 says it "provides compelling evidence that
14 genital talc use associated with an
15 increased risk of ovarian cancer."
16       Do you see that?
17    A.    I see that's written there.
18 I don't agree with it.
19    Q.    And the last sentence says
20 "They incorporate rigorous adjustments for
21 biases that may have affected earlier
22 studies."
23       Do you see that?
24    A.    Again, I'm sorry.  Yes, I see

Page 189

1 it actually says those words there.
2    Q.    Right.  And so they --
3    A.    I don't agree with that.
4    Q.    And you disagree with it,
5 right?
6    A.    I disagree that these are
7 rigorous adjustments and I can be quite
8 clear why, because their analyses are not
9 all showing positive associations.  In
10 fact, the only ones that do are when they
11 do all of the multiple imputation and when
12 they do all -- there's a Scenario 3 where
13 they flip everyone and then there's a
14 multiple imputation where they bring in
15 recall bias, but none of the other analyses
16 have --
17    Q.    And Scenario 2 is when they
18 say everybody is negative, right?  Scenario
19 2 is where everybody is a nonuser and then
20 Scenario 3 is everybody is a user, right,
21 and they did that to restore the range of
22 the product --
23    A.    That's not correct.  That's
24 not correct.

48 (Pages 186 - 189)

Page 190

1    Q.    Okay.  Well, we're going to
2 talk about that.  But let's wrap this
3 section up.  We've gone through the peer
4 review by JCO, the review by NIH -- oh, one
5 more issue.  Actually, there is one more.
6 Let's look at Exhibit No. 6.  You don't
7 address this in your report, but it's in
8 your -- it's actually in your materials
9 that you reviewed.  There was an editorial
10 that actually accompanied this article,
11 correct?
12    A.    I mean, there is this paper
13 here, you know, I don't know what -- that
14 it's -- I read, I think I read in one
15 deposition that it isn't really an
16 editorial, it's a letter to the editor,
17 but --
18    Q.    Whose deposition are you
19 referring to?
20    A.    I think that was to Dr.
21 Diette.
22    Q.    All right.  So are you having
23 your own independent review of this
24 evidence or are you relying on Dr. Diette?

Page 191

1    A.    No, I did my own independent
2 review, I'm just -- I would like to answer
3 the question --
4         THE STENOGRAPHER:  Hold on,
5    please.  Please.
6         THE WITNESS:  Sorry.
7         THE STENOGRAPHER:  You're
8    talking over each other and we had
9    and objection.  I think there was
10    an objection.  I didn't hear the
11    objection --
12         MS. LEHMAN:  Yes, I object to
13    the form of the question.
14         - - - - -
15    (Harris 2024 Article marked
16    Kornak Exhibit 6 for
17    identification.)
18         - - - - -
19 BY MR. TISI:
20    Q.    Let's actually --
21         MS. LEHMAN:  Let him finish.
22    He hasn't answered.
23         THE WITNESS:  Yeah, I'm not --
24    I'm not taking Dr. Diette's

Page 192

1    opinion.  I'm just using -- if I
2    hadn't seen that, I would say yes,
3    this is an editorial.  All I got
4    from that is that I'm not saying
5    that it isn't, I'm just saying I
6    don't know and that just raises
7    some doubt.  But, no, I'm not
8    taking his opinion.
9 BY MR. TISI:
10    Q.    Okay.  So this is -- I will
11 suggest to you that this is an invited
12 editorial by the authors, but whether it is
13 or it is not, this is an editorial
14 submitted to the journal which published
15 the paper which talks about its relevance,
16 true?
17    A.    It's a paper that talks about
18 what the authors perceive or want to
19 perceive from reading the O'Brien paper.
20    Q.    And one of the authors is, as
21 you know, is actually and has been
22 published in the world of talc and ovarian
23 cancer, correct, Dr. Terry?
24    A.    Now, is that a name we've

Page 193

1 already come across on one of the
2 publications?
3    Q.    Yeah.  It was actually in the
4 Lancet article.
5    A.    Okay.
6    Q.    And if you go to Exhibit
7 No. 7, there is an article "Genital Powder
8 Use and Risk of Ovarian Cancer:  A pooled
9 Analysis of 8,525 Cases and 9,855
10 Controls."
11         Do you see that?
12    A.    Okay.  I'm sorry, you're
13 going to a little fast.  I thought we were
14 on the Harris paper.  We're moving to a
15 different one?
16    Q.    No, this is, one of the
17 authors in Harris is Terry, correct?
18    A.    Yes.
19         - - - - -
20    (Terry Paper 2013 marked
21    Kornak Exhibit 7 for
22    identification.)
23         - - - - -
24

49 (Pages 190 - 193)

Page 194

1 BY MR. TISI:
2    Q.    And Terry actually has
3 written in this space, this isn't somebody
4 who just parachuted in with no knowledge of
5 what the background of talc and ovarian
6 cancer was, true?
7    A.    Yeah, this person has been
8 involved in the field.
9    Q.    Okay.  And she's publishing
10 here on the behalf of the American Cancer
11 Association Consortium, do you see that, at
12 the very bottom?
13        MS. LEHMAN:  Object to form.
14        THE WITNESS:  I don't know if
15    she is -- I mean, yeah, that the
16    author list ends with on behalf of
17    the Ovarian Cancer Association
18    Consortium, but we have to be
19    careful as to what that means.  I'm
20    also part of, like, various
21    consortiums where that kind of
22    ending appears on the author list.
23    But it doesn't mean that there's
24    whatever association that we're

Page 195

1    publishing on behalf of takes
2    responsibility for the paper.
3 BY MR. TISI:
4    Q.    So let's go back to the
5 editorial that she wrote in connection --
6 that Dr. Terry wrote in connection with the
7 O'Brien (2024) paper.
8    A.    Yes.
9    Q.    Okay.  It says "In the
10 article that accompanies this editorial,"
11 the third paragraph, "O'Brien et. al. use a
12 variety of methods to address the impact of
13 bias and misclassification on the
14 association between intimate care products,
15 (i.e. genital powder use and douching) and
16 ovarian cancer in the Sister Study, a
17 prospective cohort of U.S. women.  These
18 include quantitative bias analysis to
19 examine different exposure reporting
20 scenarios, as well as reclassifying
21 exposures to address recall bias," correct?
22    A.    That is what it states.
23    Q.    Okay.  And so the authors of
24 this editorial, which accompanied the

Page 196

1 O'Brien (2024) paper, also focuses on
2 unique methods actually performed by
3 O'Brien (2024), correct?
4        MS. LEHMAN:  Object to form.
5        THE WITNESS:  I don't think it
6    does.  I think it's a -- it doesn't
7    focus on that.  It's kind of an
8    overall kind of summary thing and,
9    you know, again, they sort of kind
10    of paraphrase what the authors of
11    the paper said they do, but they
12    don't go into any detail as what
13    these reclassification exposures
14    are.  They don't talk about why is
15    80 percent a good exposure for one
16    group whereas is 90 percent a good
17    exposure for a reclassification for
18    another group.  Even the takeaway
19    here, they're very kind of vague
20    about how far they're willing to go
21    with what's stated here.  They just
22    say these data suggest that people
23    who are at risk for ovarian cancer
24    should be made aware of the

Page 197

1    potential risks.  These are, like,
2    very couched statements and, like,
3    again, doesn't point to a reliable
4    association between talc use and
5    ovarian cancer.
6 BY MR. TISI:
7    Q.    Move to strike.  That was not
8 question.
9        My question was, they
10 acknowledge the methodology used to examine
11 quantitative bias analysis and recall bias
12 scenarios, it acknowledges that in the
13 editorial, correct?
14    A.    Again, if you just mean by
15 acknowledging it, we just mean that they
16 paraphrase what was said in the O'Brien
17 description in their paper of what they
18 did, then, yes, they do paraphrase that.
19    Q.    All right.  So we've gone
20 through the peer review by JCO, the Journal
21 of Clinical Oncology, the NIH document, the
22 Harris editorial, the JSCO paper, you
23 believe that all of these different levels
24 of review that was done outside of

50 (Pages 194 - 197)

Page 198

1 litigation did not do the kind of rigor
2 analysis that you did as a paid expert for
3 Johnson & Johnson, true?
4     A.    I don't know why they didn't
5 dig into the analysis methods. I'm not
6 sitting here trying to ascribe motives or
7 anything. You know, as you see in my
8 report, I go into the details of what the
9 problems are. And I point to why they're
10 problems. And the clean analysis of the
11 paper, Table A2, clearly that prospective,
12 careful analysis, at least careful as far
13 as I can tell, is indicative of no.
14     Q.    Okay. And other than paid
15 experts like yourself and Dr. Diette,
16 nobody else has expressed the opinion that
17 you have expressed hear, true?
18     A.    I don't know --
19         MS. LEHMAN: Object to form.
20         THE WITNESS: -- what other
21     people have expressed outside of
22     what I've read and heard. I don't
23     know of anybody that's -- but I do
24     know that there are experts out

Page 199

1     there that would look at the
2     methods here and would determine
3     that they're clearly problematic,
4     because they are. It's just --
5 BY MR. TISI:
6     Q.    All right. So let me just --
7 let me just break that down. And,
8 actually, I'm going to move to strike the
9 answer as nonresponsive.
10         My question is, it is now
11 mid July, this paper was published to great
12 notoriety in May, okay. It has been
13 reviewed and commented on by the NIH, JSCO,
14 an editorial that accompanied the paper and
15 all kind of those things, and I understand
16 you think they're just parroting what the
17 author says. I got it.
18         My question is, has anybody
19 that has not been paid by J&J put their
20 name on it, either a paper or a speech or a
21 publication which in any way criticized
22 this paper --
23         MS. LEHMAN: Object to form.
24     Asked and answered.

Page 200

1 BY MR. TISI:
2     Q.    -- that you know of?
3     A.    Okay. I mean, that was a
4 really long question and there was -- you
5 said, like, notoriety I think --
6     Q.    Let me rephrase --
7     A.    Notoriety is kind of a
8 negative --
9     Q.    Let me withdraw the question.
10 I will withdraw the question. Other than
11 you and Dr. Diette and maybe Dr. Merlo who
12 are paid experts by Johnson & Johnson, have
13 you seen any scientists come forward and
14 express any concerns with this paper in a
15 public forum?
16         MS. LEHMAN: Objection. Asked
17     and answered.
18         THE WITNESS: I mean, I
19     haven't, but I would be very
20     surprised on how they would be.
21     There's been -- the paper was
22     published May 20, it has been a
23     month and two weeks. You already
24     pointed out how the peer-review

Page 201

1     process could take over a year,
2     so --
3 BY MR. TISI:
4     Q.    So the answer would be no?
5         MS. LEHMAN: Please let him
6     finish.
7         MR. TISI: He has not seen
8     any -- you have not seen anybody in
9     a speech, a commentary, a letter,
10     anywhere other than J&J's experts
11     that were paid to criticize this
12     paper; is that true or not true?
13         MS. LEHMAN: Objection. Asked
14     and answered.
15 BY MR. TISI:
16     Q.    It is true, isn't it?
17     A.    I have already said that I'm
18 not aware of anyone that's dug into this in
19 detail and picked up on the issues that
20 I've expressed.
21     Q.    All right. So let's talk
22 about O'Brien. We want to get into the
23 methods, let's get into the methods. You
24 would agree that O'Brien (2024) --

51 (Pages 198 - 201)

Page 202

1    A.    Can I ask that if we're going
2 to be starting kind of a new section that
3 maybe we take a five-minute break?
4            MR. TISI: I have no problem
5        with that. Thank you. This is a
6        good time to do it.
7            THE WITNESS: Great. Thank
8        you.
9            MR. TISI: Five minutes, if
10       you don't mind. If you want to
11       take longer, that's fine with me as
12       well.
13                - - - - -
14    (A recess was taken at this time.)
15                - - - - -
16 BY MR. TISI:
17    Q.    So I spent the time talking
18 about the peer-review process and multiple
19 levels of review and the authors
20 themselves, I really want to get into the
21 actual studies and your criticisms of them.
22 So let's kind of move to that.
23            First of all, I need to ask
24 you a couple of preliminary questions and

Page 203

1 hopefully that will frame what we're
2 talking about here. First of all, in your
3 litigation report, you discuss several
4 articles coming out of the Sister Study,
5 Gonzalez, O'Brien (2020), O'Brien (2023),
6 and O'Brien (2024), right?
7    A.    Yes.
8    Q.    Okay. And the general import
9 of all of these studies, if you kind of
10 take it to the mountaintop, is whether or
11 not genital talc use over a woman's
12 lifetime is associated with the risk of
13 ovarian cancer, true?
14    A.    Yeah. I don't know that all
15 of the papers were thinking about over a
16 woman's life, but I think it's true they're
17 all concerned with the association of talc
18 use and ovarian cancer.
19    Q.    Well, that's -- I mean, your
20 qualification kind of brings the important
21 question, what we really want to know from
22 a public health standpoint is whether or
23 not if a woman uses talcum powder over --
24 at any point in her lifetime for any

Page 204

1 particular period of time, is related to
2 the risk of ovarian cancer. That's the
3 ultimate research question, right?
4            MS. LEHMAN: Object to form.
5            THE WITNESS: You know, when
6        you say --
7 BY MR. TISI:
8    Q.    You mention it in your
9 report, so let's talk about it.
10    A.    Okay.
11    Q.    On page 7 -- on paragraph 17
12 of your report, you say the goal is to
13 estimate the association between genital
14 talc use and ovarian cancer. That's the
15 ultimate goal, you want to know whether or
16 not there is an association between genital
17 talc use and ovarian cancer. That's the
18 ultimate point of all these studies, right?
19    A.    Yeah, I don't want to go as
20 far as saying it's the ultimate point of
21 all these studies, but what I state here is
22 I think a reasonable interpretation of what
23 they were doing is that their goal was to
24 estimate the association between genital

Page 205

1 talc use and ovarian cancer.
2    Q.    Okay. And that's a worthy
3 goal, right? That's an important public
4 health issue, right?
5            MS. LEHMAN: Object to form.
6            THE WITNESS: Well --
7 BY MR. TISI:
8    Q.    It's a worthy research goal,
9 true?
10    A.    Right. It's a question you
11 might want to ask from the data, but you
12 can't decouple from asking, like, is there
13 an effect of genital talc use and ovarian
14 cancer. So, it's, obviously, part of the
15 same bucket.
16    Q.    But, ultimately, the idea of
17 science of this type is to figure out
18 whether or not a product, if used, is
19 capable of using a disease. That's what
20 epidemiology does, right?
21    A.    Now you've jumped another
22 step and brought in the word "causation,"
23 which is more than association, so --
24    Q.    Let's say association. Let

52 (Pages 202 - 205)

Page 206

1 me rephrase the question. One of the goals
2 of epidemiology is to determine whether or
3 not the use of a substance is capable of --
4 is associated with a disease, right?
5 Right?
6      A.    But now you've reversed -- so
7 here, in the statement you've highlighted,
8 we're talking about estimation.
9      Q.    I'm not talking about that.
10 Honestly, you need to answer my question --
11     A.    I am --
12     Q.    -- whether?
13     A.    I am answering your question.
14     Q.    No, I'm asking the question.
15 What are the goals of the epidemiology, I'm
16 not talking about this case, one of the
17 goals of epidemiology is to decide whether
18 or not a particular product or drug or
19 exposure is associated with a disease,
20 true?
21     A.    It's one of many possible
22 epidemiology questions.
23     Q.    Okay. And would you also
24 agree that an important question for this

Page 207

1 issue, for this case, talc and ovarian
2 cancer, is whether the women in the study
3 were actually and in fact ever in their
4 lifetime exposed to genital talc?
5      MS. LEHMAN: Object to form.
6      THE WITNESS: I don't think I
7      recall anywhere in the paper that
8      they say that's the goal of this
9      study.
10 BY MR. TISI:
11     Q.    I didn't ask that question,
12 Doctor. Honestly, you need to listen to my
13 question. My question is, an important
14 question is whether or not women in the
15 Sister Study were actually and in fact in
16 their lifetime been exposed to genital
17 talc?
18     A.    But you emphasized the
19 important question, if it's --
20     Q.    Just answer the exact --
21     A.    If it's not people in the
22 field --
23     THE STENOGRAPHER: Wait a
24     minute. I can't take you both

Page 208

1      down. I really can't.
2      THE WITNESS: I apologize.
3 BY MR. TISI:
4      Q.    Would you agree that in
5 studying the question of whether there's an
6 association between talc and ovarian
7 cancer, the important question is whether
8 or not the person actually took or was
9 exposed to genital talc?
10     A.    I don't think it's an
11 important -- it's not really a question of
12 this study.
13     Q.    Okay. Do you think it's
14 important to have reliable -- if the
15 question is whether or not genital talc is
16 associated with ovarian cancer, do you
17 think that having questions that actually
18 ask that question is an important thing to
19 have?
20     A.    I think that when you're
21 designing a study, you would try to ask
22 questions that ascertain what you're
23 interested in and, but it's just -- and you
24 want to try and collect that data in an

Page 209

1 unbiased way that avoids sort of, say, kind
2 of contamination of the data.
3      Q.    Well, in the real world,
4 okay, what you really want to do in this
5 particular study, this particular research
6 question is whether or not women actually
7 were exposed to genital talc. You want to
8 know that answer, right?
9      A.    Again, that's not a question
10 of the study. The study's question is
11 about estimating the association between
12 genital talc use and ovarian cancer.
13     Q.    Right. And center to that is
14 whether or not women actually used genital
15 talc?
16     A.    Whether or not women used
17 genital talc is the exposure variable that
18 you're looking at.
19     Q.    Now, if you go to page 5 of
20 your report, you talk about what the
21 initial enrollment questionnaire asked,
22 true?
23     A.    Correct.
24     Q.    And the initial questionnaire

53 (Pages 206 - 209)

Page 210

1 did not ask whether a study participant had
2 ever used genital talc, did it?
3     A.    No, it didn't explicitly ask
4 that, no.
5     Q.    Okay.  In fact, the
6 investigators asked whether the women
7 actually used genital talc at two very
8 specific times, from 10 to 13 years old or
9 a year before enrollment, true?
10        MS. LEHMAN:  Object to form.
11        THE WITNESS:  The
12        questionnaire did ask about talcum
13        powder use between the ages of 10
14        to 13 and in the past 12 months.
15 BY MR. TISI:
16     Q.    Now, if you go back to the
17 Gonzalez paper, you know that the average
18 range of enrollee was between 35 and 75
19 years old, correct?
20     A.    Do you want me to go back to
21 that paper?  I would have to check those
22 numbers.
23     Q.    Sure.  Let's do it.  Gonzalez
24 was Exhibit No. 18.  If you look at the

Page 211

1 methods section on page 2, see, enrollees
2 were aged between 75 -- 35 to 74 years old,
3 correct?
4     A.    Yes, that's what it states.
5     Q.    Okay.  So using the Sister
6 Study enrollees, using the youngest of the
7 Sister Study enrollees, a 35-year-old
8 woman, the enrollment questionnaire did not
9 ask her about genital talc use between the
10 ages of 13 and 30 years old, a period of 20
11 years, correct?
12     A.    It depends when -- I'm sorry,
13 because of the previous 12 months, that's
14 correct.
15     Q.    Right.  Okay.  Using the
16 oldest Sister Study enrollee, a 74-year-old
17 woman, the enrollment questionnaire did not
18 ask her about her use between the age of 14
19 and 73, a period of 49 years, true?
20     A.    Yes.
21     Q.    Okay.  Given the Sister Study
22 enrollment age range, the original Sister
23 Studies did not ask about talc use during
24 the years that they were more likely to use

Page 212

1 it, true?
2     A.    I don't know which years they
3 were more likely to use it.
4     Q.    Well, the Sister Study
5 investigators actually looked at that
6 question, didn't they?
7     A.    You would have to remind me
8 where they do that.
9     Q.    Okay.  Well, let's talk about
10 that in a moment.  You know that the NIH
11 studies and Sister Study investigators
12 found that the 20- to 50-year gap in
13 exposure created by the original enrollment
14 questionnaire created a problem when trying
15 to answer the actual research question and
16 that is whether or not genital talc use
17 during a woman's lifetime was associated
18 with ovarian cancer.  And that is because
19 the original questionnaire did not capture
20 lifetime use, true?
21     A.    I'm sorry, where are you
22 seeing this?
23     Q.    Well, let's go to -- let's go
24 to the study, Exhibit No. 16.

Page 213

1     A.    Okay, yes.
2     Q.    If you go to page 4, it says,
3 go to page 4, please.  Okay.  Slide down,
4 please.  "Because the enrollment
5 questionnaire did not collect information
6 on use between age 14 and one year prior to
7 enrollment, it was possible for a
8 participant to report never use on the
9 enrollment questionnaire and ever use on
10 the follow-up questionnaire without
11 contradicting themselves;" is that true?
12     A.    Yes, I don't disagree with
13 that statement.
14     Q.    Okay.  Now let's go back to
15 O'Brien (2024), Exhibit No. 8.  On page 14.
16 Top left corner, they say "The intimate
17 care product questions were initially
18 limited to two specific time periods; age
19 10 to 13 and the last year, and did not
20 capture lifetime exposure or use during the
21 most likely exposure period of ages 20 to
22 39 years."
23        Do you see that?
24     A.    Yes, I see that they say

54 (Pages 210 - 213)

Page 214

1 that.
2     Q.    Okay.  Well, they actually
3 have evidence to support that, right?
4     A.    They cite their 2023 paper, I
5 have no reason to dispute that, no.
6     Q.    Let's go back and look at it,
7 okay?
8     A.    Okay.
9     Q.    Let's go back to the 2023
10 study.
11     A.    Remind which --
12     Q.    First of all, just for the
13 record, if you look at Exhibit No. 17,
14 that's the supplemental questionnaire that
15 was done that you have problems with,
16 right?
17     A.    This is the -- this is a
18 follow-up one?
19     Q.    Uh-huh.  And the talc
20 questions are not until number 138 there.
21     A.    Did you say number 38 in the
22 questions?
23     Q.    It's 138 on page --
24 actually --

Page 215

1     A.    I don't see the page numbers.
2     Q.    Yeah, I'm just going to ask
3 you, this is the questionnaire that you
4 reviewed, correct?  I don't want to waste
5 time on it.
6     A.    Without checking every page,
7 I believe it looks like it's the same
8 questionnaire, yes.
9         - - - - -
10         (Sister Study Questionnaire
11         marked Kornak Exhibit 17 for
12         identification.)
13         - - - - -
14 BY MR. TISI:
15     Q.    Okay.  Now, going back to the
16 question of the appropriateness of the
17 original questionnaire to determine the
18 ages where women were more likely to use
19 talc and that original questionnaire
20 missing those dates, they referred, the
21 authors of O'Brien (2024) refer to their
22 2023 study, correct?
23     A.    So can you remind me where
24 that --

Page 216

1     Q.    Yes.
2     A.    I just want to make sure I'm
3 completely following the path.
4     Q.    Go back to Exhibit No. 8 on
5 page 14.
6     A.    Page 14.
7     Q.    Okay.  They say the initial
8 questionnaire, "the initial intimate care
9 product questions were related to two
10 specific time periods; ages 10 to 13 years
11 and the last year, and did not capture
12 lifetime exposure or use during the most
13 likely exposure periods of 20 to 39 years."
14         Do you see that?
15     A.    Yes.
16     Q.    And they cite their own study
17 coming out of the Sister Study to
18 demonstrate that, correct?
19     A.    They do cite their own study
20 for that.
21     Q.    And let's go to Exhibit
22 No. 16, which is their 2023 study.
23     A.    I'm there.
24     Q.    Okay.  And if we go to the

Page 217

1 first page, it says, this actually they
2 were using the follow-up questionnaire from
3 2017 to 2019, right?  It is up on the
4 screen.
5     A.    Okay.  That is what it
6 states.
7     Q.    Okay.  So they make a
8 distinction between the one questionnaire
9 which asks for a very specific time frame,
10 a three-year period, and the follow-up
11 questionnaire which talks about lifetime
12 use, correct?
13     A.    They do make that distinction
14 yes.
15     Q.    And this, again, the use of
16 this questionnaire passed peer review as
17 well, correct?
18     A.    I don't know whether the
19 questionnaire was reviewed or not.
20     Q.    Okay.  This is published in
21 the Journal of --
22     A.    But I can say that I think
23 it's, like, a bad design that they would
24 have different questionnaires at enrollment

55 (Pages 214 - 217)

Page 218

1 and haven't thought about what they really
2 want to ask and then recall bias is
3 introduced and they start introducing all
4 these other aspects and get all these
5 problems are, but --
6     Q.    So this is another journal
7 that got it wrong, the Journal of
8 Epidemiology, which said, you know,
9 approved a peer-reviewed literature that
10 compares the enrollment questionnaire and a
11 subsequent questionnaire in a cohort study?
12     A.    I don't believe I said the
13 journal got anything wrong. I'm just
14 saying that I don't think they were good
15 designs.
16     Q.    Okay. All right. Now, if
17 you go to O'Brien (2023), page 14, there's
18 a table, correct?
19     A.    Yes.
20     Q.    And on page -- have you seen,
21 had you looked at this table before?
22     A.    Yeah, I've seen it. I didn't
23 look at it -- I don't believe I looked at
24 it in great detail.

Page 219

1     Q.    Well, it talks about the vast
2 majority of the use were in the twenties
3 and thirties, correct?
4     A.    I don't know that the table
5 talks about anything. It provides numbers.
6     Q.    So it says self-reported, it
7 says "all." Okay. Use in the twenties,
8 8,002 people, use in the thirties, 6,416
9 people. Do you see it?
10     A.    Yes.
11     Q.    Now, if the earliest age of a
12 woman enrolling in this study was 35 years
13 old to 75 years old, the original study
14 design, the enrollment questionnaire would
15 have missed this time frame by necessity,
16 correct?
17     A.    No.
18     Q.    Tell me a circumstance under
19 which the -- a 35-year-old woman who
20 enrolled -- who answered your enrollment
21 questionnaire correctly would be answering
22 about talc use in the early twenties?
23     A.    Well, if they said that, yes,
24 I used between ages 10 to 13 and then they

Page 220

1 used it their whole lifetime, then what
2 they said between 10 and 13 agrees exactly
3 with what they used in their whole
4 lifetime. There's no disagreement. This
5 6,438 that said they used it in the teens
6 could be the same, could be 6,438 of the
7 8,002 that used it in their twenties. We
8 have no idea --
9     Q.    The enrollment
10 questionnaire --
11     A.    There's no cross tables here
12 for us to know where they agree in
13 different periods or disagree. And I think
14 O'Brien makes the statement that there is
15 good agreement between -- in their 2023
16 paper, that there's good agreement between
17 the first survey and the later survey --
18     Q.    Honestly, I'm not even
19 understanding your answer.
20     A.    I can slow it down if --
21     Q.    No, no, you don't need to
22 slow it down. My question is, did the
23 original questionnaire ask about use in
24 twenties and thirties?

Page 221

1     A.    I think I already answered
2 that, that, no, it doesn't ask specifically
3 about use in twenties and thirties, but
4 that --
5     Q.    If a woman is 35 years old
6 and only used talc in her twenties, let's
7 say from age 21 to age 34, could she answer
8 the questions on the original questionnaire
9 no and no and still have been a talc user?
10         MS. LEHMAN: Object to form.
11         THE WITNESS: She could answer
12     no for the period 10 to 13 and for
13     the past 12 months and still have
14     been a talc user in her twenties,
15     for example, yes.
16 BY MR. TISI:
17     Q.    Okay. Now, the data on the
18 supplemental questionnaire which was asked
19 was more comprehensive in terms of
20 capturing lifetime use, true? Whether you
21 think it was affected by recall bias or
22 not, it asks the question that was not
23 asked in the original survey, true?
24     A.    Well, I think it depends on

56 (Pages 218 - 221)

Page 222

1  what you exactly mean there, because, yes,
2  it asks about the specific intervals and I
3  already agreed with you it asks about these
4  intervals that are not asked about in the
5  first survey. But it gives women less
6  options into how to answer about each
7  interval. They're kind of forced into a
8  yes-or-no situation or to not answer. And
9  as such, the sort of the problems that are
10 incorporated far outweigh any potential
11 extra advantage of having the specific
12 intervals.
13     Q.   Doctor, I'm going to move to
14 strike. That's not my question.
15          My question was, does the
16 questionnaire number two ask about time
17 frames beyond that of questionnaire number
18 one?
19     A.   I've already answered your
20 question that there are specific intervals
21 in here --
22     Q.   So --
23          MS. LEHMAN: Hold on. Hold
24     on. Let him finish.

Page 223

1          THE WITNESS: -- for use in
2     the twenties and thirties that were
3     not explicitly asked in the first
4     questionnaire. But at the same
5     time, the way these questions are
6     asked gives women less options and
7     it led to differential recall
8     bias -- sorry, differential bias as
9     can be seen by the proportion of
10    cases that didn't answer compared
11    to the proportion of controls that
12    didn't answer. And that's really
13    going to outweigh any of, like,
14    what little advantage you might
15    gain by looking at extra intervals.
16          And I should say, even if
17    you look at these numbers here,
18    we're talking about pretty
19    consistent numbers across each
20    period. And so it could just be
21    that this is essentially mostly
22    the same group of people that's
23    saying they used in each period,
24    which means they would have said

Page 224

1     they used it in their teens. So
2     there is no evidence to say that
3     there's suddenly these big
4     differences in who used it in
5     their twenties versus who used it
6     in their teens and I think
7     O'Brien says that.
8  BY MR. TISI:
9     Q.   Well, O'Brien actually --
10 move to strike your answer, which is,
11 again, nonresponsive --
12    A.   I did respond, again, to your
13 question, again. Again --
14    Q.   But O'Brien --
15    A.   The interval --
16          - - - - -
17     (Simultaneous crosstalk.)
18          - - - - -
19 BY MR. TISI:
20    Q.   Doctor, I move to strike.
21 Let's move on.
22          The statement that O'Brien
23 makes, the intimate care product questions
24 were related to two time frames, the

Page 225

1  original enroll questionnaire, ages 10 to
2  13 and the last year, and did not capture
3  lifetime exposure or use during the most
4  likely exposure period of ages 20 to 30
5  years. Are they right or are they wrong?
6          MS. LEHMAN: Object to form.
7          THE WITNESS: To be honest, I
8     don't know for sure that they're
9     right or wrong, but if those, for
10    example, here those 6,438 that said
11    they used it in their teens,
12    although this is problematic
13    because it is from the second --
14    the follow-up survey, but if you
15    accepted that, then those 6,438
16    could be the same 6,416 that used
17    in their thirties, they could be
18    the same within those that used it
19    in their twenties. So it would be
20    actually just asking if that's the
21    case that -- and O'Brien seems to
22    imply that it is in 2023, then that
23    would be the same set all the way
24    through.

57 (Pages 222 - 225)

Page 226

1     So if you're asking about
2  one period, then the implication
3  is that they're very likely to
4  have used through the whole
5  period. So, yeah, the answer
6  is --
7  BY MR. TISI:
8     Q.    You're guessing, aren't you?
9  I mean, you are guessing, aren't you?
10       MS. LEHMAN: Object to form.
11       THE WITNESS: I would say that
12       it's not my responsibility -- when
13       I look at a paper and I'm reviewing
14       it, I want them to demonstrate to
15       me that there's a problem. They
16       should have given all the
17       information to be able to do that,
18       but I'm not --
19  BY MR. TISI:
20     Q.    Okay.
21     A.    -- convinced because
22  O'Brien says so.
23     Q.    So O'Brien (2023), if you go
24  to page 6, at the very top, it says "As

Page 227

1  with douching, genital talc use was most
2  common during ages 20 to 29," and then it
3  goes on to say "Average age at first use
4  was 21 years old, and while most women only
5  used prior to menopause, a 32 percent use
6  using before and after menopause."
7     Do you see that?
8     A.    Yes, I see that.
9     Q.    Okay. And so what they're
10  doing here is they're saying that when they
11  actually look at the use between the first
12  and second questionnaire, the first
13  questionnaire didn't capture large periods
14  of time, true?
15     A.    Again, I'm sort of going back
16  and reviewing myself, but I agree with you
17  that they didn't explicitly ask about those
18  intervals, but that does not mean that it
19  did not capture their usage across lifetime
20  by just asking about a snapshot. I'm not
21  saying that that's a good design. I think
22  the design is flawed on multiple levels.
23     Q.    Well, you know, I assume that
24  you agree that there are potential problems

Page 228

1  within collection of supplemental data
2  which was trying to address the question of
3  whether or not the women had lifetime use,
4  correct?
5     A.    That's kind of my impression
6  of the extension of the questions, that
7  they wanted to look at that.
8     Q.    Right.
9     A.    And my impression was that
10  their conclusions were that the perspective
11  baseline data were quite reliably
12  representative of the lifetime use.
13     Q.    Right. And, of course,
14  asking in a supplemental questionnaire
15  would raise two questions, first, would be
16  what do you do with this contradictory data
17  or potentially contradictory data and what
18  do you do, for example, if a woman dies and
19  can't fill out the supplemental
20  questionnaire, correct?
21     A.    I think those are important
22  questions to consider, yes.
23     Q.    Okay. And the authors in the
24  O'Brien (2024) addressed this data

Page 229

1  contradiction and missing data with what
2  the authors called a quantitative bias
3  analysis, which although you disagree with
4  it, are described in the paper, true?
5     A.    I disagree that it's really
6  an analysis. I think it's just an
7  imaginary what-if game.
8     Q.    Okay. But they describe
9  their what-if game in the methods section
10  of the paper, true?
11     A.    Yes.
12     Q.    Okay. And the methods that
13  they use for analyzing the data from the
14  enrollment and supplemental questionnaire,
15  the contradictory data question, and the
16  missing data imputation are disclosed and
17  passed peer review, true?
18     A.    Well, they do say that the
19  correction process, that the flipping of
20  status, they do describe that and they
21  do --
22     Q.    They describe --
23     A.    My brain is --
24     Q.    -- multiple --

58 (Pages 226 - 229)

Page 230

1     A.    I missed part of the
2  question.  Can you repeat the whole
3  question again.
4     Q.    Sure.  If you go to page 4 of
5  Exhibit No. 8, which is the O'Brien (2024)
6  article in the methods section, they
7  describe a quantitative bias analysis.
8  They described how they deal with
9  contradictory data and how they deal with
10 missing data, correct?
11    A.    On page 4, did you say?
12    Q.    Page 4.  Under quantitative
13 bias analysis.
14    A.    Okay.  Yes.
15    Q.    Okay.  And that description
16 passed peer review, true?
17    A.    No, the paper passed peer
18 review and was published.  Whether they
19 focused in on that section or not, I don't
20 know.
21    Q.    Okay.  And they put their
22 results of their methods on a chart on
23 page 7, Table 2 of the article, correct,
24 under quantitative bias analysis?

Page 231

1     A.    Yes, they put their results
2  there for their four different scenarios.
3     Q.    For all the world to see,
4  they weren't hiding anything, right?
5            MS. LEHMAN:  Object to form.
6            THE WITNESS:  Oh, well, I
7        wouldn't -- I don't know -- okay,
8        so the word "hiding" might be a
9        mischaracterization.  I don't want
10       to say that they are, again, I
11       don't want to ascribe motives to
12       what is missing from the paper or
13       not missing.  But they certainly
14       don't, for example, say why they
15       chose the 80 percent and 90 percent
16       for correction levels.  I mean,
17       they don't talk about how they got
18       to those numbers, whether they did
19       some separate analyses, whether
20       they followed up with patients to
21       try to ascertain what those
22       proportions should ideally be.
23       They just pulled them out of thin
24       air, as far as I could tell.  So I

Page 232

1        would not say it's all transparent
2        for everybody to see, because they
3        don't explain that.
4  BY MR. TISI:
5     Q.    Well, but there is a section
6  in the paper where they say they're a
7  corresponding author, if you have any
8  questions, here's my email address, email
9  me, right?
10           MS. LEHMAN:  Object to form.
11       Asked and answered.
12 BY MR. TISI:
13    Q.    And you didn't do that, true?
14    A.    I've already explained why I
15 didn't do it, because I didn't --
16    Q.    Okay.
17    A.    But when you write a paper,
18 it's accepted academic practice that you
19 describe the methods and you justify your
20 methods.  You don't just say, oh, email me
21 afterwards in case you don't know --
22    Q.    They did describe their
23 methods.  You just don't think they did it
24 well enough for you, right?  They described

Page 233

1  it, on page 4, they described the
2  quantitative bias analysis, correct?
3     A.    Well, again --
4            MS. LEHMAN:  Object to form.
5            THE WITNESS:  I don't think
6        that this is kind of any kind of
7        analysis, they just chose a
8        proportion and flipped it.
9  BY MR. TISI:
10    Q.    Okay.  And they --
11    A.    It's an equation.  It's not
12 an analysis.
13    Q.    And they found correcting for
14 missing and contradictory analysis, the
15 hazard ratio was 1.82, meaning a
16 statistically significant increase of
17 82 percent of ovarian cancer with genital
18 powder use, true?
19    A.    I'm sorry, where are you?
20    Q.    Four, at the bottom, ever
21 use, ovarian cancer.
22    A.    That's not true.  That also
23 involves more than just their correction
24 for contradictory data.  That involves

59 (Pages 230 - 233)

Page 234

1 their multiple imputation --
2     Q.    I said that.
3     A.    I'm sorry.
4     Q.    You didn't hear my question.
5 Let me read it again.  Okay.
6           And they found after they
7 corrected for missing and contradictory
8 data that the hazard ratio was 1.82,
9 meaning a statistically significant
10 82 percent increased risk of ovarian cancer
11 with genital powder use?
12    A.    I object to the term that
13 they corrected it.  I don't think this is a
14 correction.  I think this is arbitrary
15 manipulation.
16    Q.    I'm not asking if you agree,
17 I'm asking you that's what they reported,
18 right?
19    A.    They report for their
20 Scenario 4, whatever you want to call it,
21 that the point estimate that they get for
22 ever use hazard ratio is 1.82 with a
23 confidence interval ranging from 1.36 to
24 2.43 and they acknowledge that that

Page 235

1 contains recall bias.
2     Q.    Okay.  Which, of course, they
3 deal with in the paper, right?
4     A.    No, they don't deal with
5 it --
6     Q.    Okay.
7     A.    -- adequately.
8     Q.    And they also concluded that
9 women who used it more frequently for
10 greater than two decades, and people who
11 used it in their thirties, there was a
12 statistically significant increased risk of
13 greater than 2, meaning over 100 percent
14 increased risk, true?
15    A.    I'm sorry, can you -- which
16 one, what are we looking at here?
17    Q.    Look at table 3 on page -- on
18 page 10, the long-term use greater than two
19 decades for ovarian cancer, they have a
20 risk of 2.01 with a confidence interval of
21 1.39 to 2.91, correct?
22    A.    Yes, they have that estimate
23 incorporating their contradictory process
24 and there multiple imputation.

Page 236

1     Q.    And then they said women who
2 used it in their twenties, the risk was
3 1.88, statistically significant, correct?
4     A.    Okay.  Again, with the same
5 caveats, after during their manipulation
6 and multiple imputation, that's correct.
7     Q.    And when they used it in
8 their thirties, it was 2.08, correct?
9     A.    That there was their estimate
10 with their correction and imputation
11 processes.
12    Q.    Now.  You're not aware of any
13 scientist, other than those hired by
14 Johnson & Johnson, who have said that these
15 results reached by these NIH scientists and
16 appear in this peer-reviewed paper were
17 scientifically unreliable, true?
18        MS. LEHMAN:  Object to form.
19        Asked and answered.
20        THE WITNESS:  I don't know
21        that anybody has commented on these
22        specific hazard ratios area in any
23        way at all.
24

Page 237

1 BY MR. TISI:
2     Q.    Okay.  Now, let's talk about
3 recall bias, one of the things that the
4 authors were concerned about was the
5 possibility, in fact, just the possibility
6 of that some women who were given a
7 supplemental questionnaire might
8 differentially recall talc as compared to
9 women who were not diagnosed with cancer.
10 It might be the explanation for the 80 to
11 100 percent increased risk in ovarian
12 cancer in the Sister Study, true?
13        MS. LEHMAN:  Object to form.
14        THE WITNESS:  I think there's
15        quite a bit to unpack in your --
16 BY MR. TISI:
17    Q.    Then I'll rephrase the
18 question.  They were concerned about the
19 potential that these hazard ratios might be
20 affected by recall bias, true?
21    A.    Well, I think they've
22 actually previously in papers made the
23 statement that there is recall bias.
24    Q.    And they actually took that

Page 238

1 into account, didn't they?
2     A.    They did some manipulations
3 where they looked at a few scenarios where
4 they did more flipping of data and they
5 actually get sort of inconsistent.
6     Q.    Well, didn't the authors --
7     A.    But they're already starting
8 from this problematic area where they've
9 corrected their data in this arbitrary,
10 manipulative fashion that leads you towards
11 more recall bias.  They add even more in
12 through the missing imputation approach --
13     Q.    Got it --
14     A.    They do a little bit of that
15 and they just don't do enough to not quite
16 get them to be uncertain again.  But it's
17 really clear that it is uncertain.
18     Q.    Doctor, I mean, they have --
19 this isn't the only time they looked at the
20 potential for recall bias, they did it in
21 the 2023 article, correct?
22     A.    I think they discussed recall
23 bias in their 2023 article --
24     Q.    In fact, they --

Page 239

1         - - - - -
2     (Simultaneous crosstalk.)
3         - - - - -
4         THE STENOGRAPHER:  I'm not
5     getting this, because you're
6     talking over each over and Zoom
7     just cuts it out.  I don't even
8     hear it.
9 BY MR. TISI:
10     Q.    I'm sorry.  Repeat yourself,
11 Dr. Kornak.
12     A.    I don't remember exactly what
13 I said.
14     Q.    In fact, let me -- in fact,
15 they concluded that there wasn't much
16 evidence for recall bias, even using the
17 supplemental questionnaire, true?
18     A.    Where do you see that
19 conclusion?
20     Q.    Well, let's look at it.
21     A.    Yeah, but let's look at it.
22 I'm happy to look at it.
23     Q.    Let's look at page 13 of the
24 douching study, back in 2023, exhibit --

Page 240

1 because we all agree that -- before I get
2 there, the potential for recall bias is
3 just a potential, it's a theoretic concern,
4 correct?
5     A.    No, recall bias is a real
6 kind of bias.
7     Q.    Well, how much -- well, it's
8 a real kind of bias, but whether it
9 actually exists in a particular study is
10 always a question of you have to
11 acknowledge, but it's a theoretic concern,
12 correct?
13         MS. LEHMAN:  Object to form.
14         THE WITNESS:  It's not
15     theoretic.  You acknowledge it,
16     because it can be there.
17 BY MR. TISI:
18     Q.    It can be there, there's no
19 proof that it's there, it can be there,
20 right?
21     A.    But when you are trying to
22 demonstrate -- to determine that there is
23 an association, you are not -- the onus is
24 not on proving that it's there, the onus is

Page 241

1 on you to prove it's not there and it's
2 reliable --
3     Q.    Perfect.  Let's talk about
4 that, because the authors do that, don't
5 they?
6     A.    They proved they have recall
7 bias?  No, they don't do that.
8     Q.    Go to the douching study.  It
9 finds that recall of general -- page 6.
10     A.    Sorry, you're going to have
11 to take me to -- what's the --
12     Q.    Let's go to Exhibit No. 16 --
13     A.    Yup.
14     Q.    -- on page 6.  Well, first of
15 all, let's start at the beginning.  It says
16 the conclusion of this study was that
17 classification of -- and this is using both
18 the recall, the follow-up question, and the
19 initial questionnaire.  Do you see that in
20 the methods section, correct?
21     A.    Okay.  So it's --
22     Q.    In the methods section --
23     A.    Where do you see want me to
24 look first?

61 (Pages 238 - 241)

Page 242

1    Q.    In the methods section, they
2 actually acknowledge both the initial
3 questionnaire and the supplemental
4 questionnaire, correct?
5    A.    Yes.
6    Q.    Okay.  And in their
7 conclusion, they say "Classification of
8 ever use in feminine hygiene products may
9 be recalled with good consistency."
10         Do you see that?
11    A.    Okay.
12    Q.    All right.  And they actually
13 go back and they actually analyze that
14 question.  If you go to page 6, they say
15 "87 percent," on the fourth paragraph down,
16 "recall of genital talc use was slightly
17 less consistent than douching with
18 87 percent of the women providing the same
19 response at follow-up as they did
20 enrollment."
21    A.    You say fourth paragraph
22 down?
23    Q.    Yes.  Starting with "recall,"
24 it's on, recall of genital talc use was

Page 243

1 slightly less consistent when comparing it
2 to douching, okay, with 87 percent of the
3 women providing the same response in
4 follow-up as they did in enrollment,
5 correct?
6    A.    Yes.
7    Q.    Okay.  And so what they're
8 saying is at least when they compare
9 87 percent of the people provided the
10 exact -- provided totally consistent
11 answers, correct, recall bias didn't really
12 effect in almost 90 percent of the women,
13 true?
14         MS. LEHMAN:  Object to form.
15         THE WITNESS:  Well, if
16         13 percent of the women were wrong
17         and then got different answers that
18         can have a substantial effect on
19         recall bias.
20 BY MR. TISI:
21    Q.    Right, and what percentage,
22 what is the tipping point that you have
23 that -- of the amount of recall bias that
24 would have to be introduced to the O'Brien

Page 244

1 (2024) study in order to make -- go from a
2 risk to a no risk?
3    A.    Well, okay.  So, first of
4 all -- well, from a risk to a no -- from
5 what risk to what no risk, that's --
6    Q.    Actually, let me withdraw
7 that question, but this isn't the only time
8 they looked at only prospective data in
9 order to see whether or not there's a
10 potential recall bias, true?
11    A.    I don't know that, but there
12 was a lot of earlier questions, I don't
13 know if you wanted them answered or don't
14 want them answered.  You bounced around a
15 little bit.
16    Q.    Let me withdraw the question.
17 You would agree with me that the results of
18 the 23 study when they used both
19 questionnaires, they found that almost
20 90 percent of the women answered the
21 question consistently, whether or not it
22 was prospective or retrospective, true?
23    A.    I would have to remind myself
24 with that, so what question specifically

Page 245

1 are they being consistent with or less
2 consistent with?  Because I'm not sure what
3 question you could actually use from the
4 first questionnaire and the second
5 questionnaire that would allow you to
6 answer this question precisely.
7    Q.    Well, doctor, you reviewed
8 this --
9    A.    Let me finish, the role of
10 the design that they have in the first
11 questionnaire versus the second, there are
12 no intervals that match.  So how can you
13 even assess this accurately?  I don't get
14 it.
15    Q.    Well, you read the paper and
16 it was peer reviewed.  I mean, I don't know
17 what else to do, Doctor, other than redoing
18 the entire study for you.  You read the
19 paper.  They're reporting that there's a
20 consistent --
21    A.    My focus was -- I looked at
22 this paper, I'm not claiming I read this
23 paper from first word to last word.
24    Q.    Okay.  Well, let's look --

62 (Pages 242 - 245)

Page 246

1    A.    But what I am stating is,
2 what I did look at most carefully was
3 O'Brien (2024).  But I am sort of like -- I
4 can't help but ask the scientific question
5 of what question were you determining
6 whether it's less -- was consistent or not?
7 Because in the first, you've already told
8 me that, again, that in the first
9 questionnaire, they had 10 to 13 and the
10 last 12 months.  Well, where in the second
11 questionnaire, can you find the matching
12 questions to match the first?
13         Also, in the second
14 questionnaire, you don't even get the same
15 options for each question.  So I don't see
16 how you check that.  I don't see --
17    Q.    Well, you said that they did.
18 You said they did --
19         MS. LEHMAN:  Object to form.
20         THE WITNESS:  I said they did
21    they did.  I didn't say they did.
22 BY MR. TISI:
23    Q.    All right.  Doctor, you're
24 the expert here, I'm not.  So let me ask

Page 247

1 you this question.  Let's go to page 9 of
2 the douching study.
3    A.    So which one?
4    Q.    Page 9 of the douching study,
5 Exhibit 16.
6    A.    So we're still on -- okay.
7    Q.    And comparing both the
8 questionnaires, it says "We found that
9 women could recall whether they ever used
10 certain feminine products with good
11 consistency?
12         Do you see that?
13    A.    Where?
14    Q.    Third line down.
15    A.    I'm looking at the wrong page
16 again, apologies.
17    Q.    Thank you.  Look at the
18 screen, it might be easier.
19    A.    Like I said earlier, I think
20 I'm more comfortable reading the paper.
21    Q.    That's okay.  I'm just saying
22 it might be easier to find out where we
23 are.
24    A.    Yes, sometimes, I guess I'm

Page 248

1 sometimes a little slow back and forth.
2    Q.    I'm not critical.  I'm not
3 critical.  It says "We found that women
4 could recall whether they ever used
5 feminine hygiene products with good
6 consistency," and they were comparing both
7 questionnaires, right?
8    A.    Yeah, I agree that's what
9 they said.
10    Q.    All right.  But that's not
11 only the time they ever looked at that
12 question, right, they looked at it in
13 O'Brien (2024), right?
14    A.    In O'Brien -- okay, I might
15 want you to point to where, I'm not totally
16 sure which piece of O'Brien (2024) you're
17 referring to.  O'Brien (2024) is that there
18 is differential recall.  I mean, that's --
19    Q.    Well, except they looked at
20 the subgroup of people who only asked the
21 question prospectively, true, which would
22 have been fully prospective data?
23    A.    Right, yeah, so that is the
24 Table A2.  That's the one with the

Page 249

1 result --
2    Q.    Well, let's see what they say
3 in Table A2.  Look at page 12 of the study
4 and then we'll look at Table A2.
5    A.    So page 12 of the paper.
6 Okay.  I'm there.
7    Q.    They say, on the very bottom
8 of the left-hand side of the column it says
9 "ever genital talc use --"
10    A.    I thought, again, I'm
11 getting, I thought maybe you were pointing
12 to -- I thought you were talking about
13 O'Brien (2024).
14    Q.    I am.  On page 12 --
15    A.    On the screen, I'm seeing
16 what -- that doesn't look like --
17    Q.    Slide down, please.
18    A.    Now I see O'Brien (2024).
19    Q.    Okay.  You need to follow me,
20 Doctor, just hold on a second.  Go to
21 page 12.
22    A.    Yes.
23    Q.    Okay.  If you slide down and
24 slide down, please, Jeff, it says the last

63 (Pages 246 - 249)

Page 250

1 sentence on the left-hand side, "ever
2 genital talc use was positively associated
3 with ovarian cancer as a ratio of 1.82 but
4 showed no evidence of association pre- or
5 postmenopausal breast cancer or uterine
6 cancer," correct?
7     A.    That is what is stated there,
8 yes.
9     Q.    Now, if you go to Table A2,
10 the last -- you want to focus on the first
11 column. I'm going to focus on the last
12 column.
13     A.    Okay. Sorry.
14     Q.    Go to page A2 -- it's on
15 page -- Jeff, it's on page -- let's see
16 what page it is. It's I think the last --
17 the third page from the end. Go to A2,
18 that's A1, Jeff. Okay. Now, Table 3,
19 Table A2, defined by exposure status
20 reported on fourth detailed follow-up and
21 use before then and incident cases
22 occurring after the time, fully
23 prospective. Do you see that?
24     A.    Yeah, yeah.

Page 251

1     Q.    That means in the first
2 questionnaire, taking all people and on the
3 second questionnaire, only those people who
4 developed ovarian cancer after the
5 questionnaire, right?
6     A.    Correct.
7     Q.    Right. So it's fully
8 prospective, no recall bias, right?
9     A.    Oh, no, you can't guarantee
10 there's no recall bias there.
11     Q.    I'm not asking for a
12 guarantee --
13     A.    I agree, it's prospective,
14 but you said no recall bias, right --
15     Q.    Fully prospective --
16     A.    I don't think you can
17 guarantee a lack of recall bias.
18     Q.    I'm not looking for
19 guarantees, Doctor. Okay? I'm looking at
20 fully -- your position is fully prospective
21 question -- fully prospective questions
22 have indicia of reliability because they do
23 not introduce recall bias, correct?
24             MS. LEHMAN: Object to form.

Page 252

1             THE WITNESS: No, that's not
2     fully my position, but sorry to
3     interrupt.
4 BY MR. TISI:
5     Q.    Well, it does say the fully
6 prospective data you have for ovarian
7 cancer of 1.84, though not statistically
8 significant, increased risk in that
9 subgroup of people, correct? There's a
10 positive association, true?
11     A.    Well, there's, you already
12 pointed to part of it, it's not
13 statistically significant. It's based on a
14 very small effective sample size here.
15 We're talking about 29 ovarian cancer cases
16 in that part of the study. That's a tiny
17 sample that, like, even statistics 101 will
18 tell you is very, very small.
19             Furthermore, I think there
20 is potential for recall bias here, because
21 now this part, not in the same sense of --
22 it's almost like a bias by indication as
23 well here in that if you -- by this time
24 people were aware of the media stories,

Page 253

1 even though they were entering into a
2 prospective study, the only way, at the
3 beginning, we just know whether they're
4 ovarian cancer cases or not, but we don't
5 know if they have been discussing with
6 their medical doctor whether or not they
7 may be susceptible to ovarian cancer,
8 whether they're at high risk, whether they
9 may have had symptoms but were not fully
10 diagnosed --
11     Q.    You're guessing?
12     A.    Sir?
13     Q.    You're guessing, aren't you,
14 you don't know --
15     A.    My point is it's a
16 susceptibility to a bias that exists --
17     Q.    As is the fully
18 prospective --
19     A.    I wouldn't categorize it as
20 guessing.
21             - - - - -
22     (Stenographer clarification.)
23             - - - - -
24

64 (Pages 250 - 253)

Page 254

1 BY MR. TISI:
2     Q.    Let's kind of back up for a
3 second.  You said that the number of
4 participants exposed was a small sample
5 size, correct, 31?
6     A.    I'm saying that the number of
7 cases, so when you're working with a study,
8 like, in where you're looking at cases
9 versus non-cases, whether that it's in
10 survival analysis or whether that's in
11 logistic regression, the effective sample
12 size you have is the bigger of the two
13 groups, the cases versus the non-cases.
14     Q.    That wasn't --
15     A.    Twenty-nine cases, that's a
16 very small number.  It's reflected by the
17 sheer width of the confidence interval.
18     Q.    Exactly.  Exactly.
19     A.    Yes.
20     Q.    Gotcha.  Okay.  We'll looking
21 for evidence of recall bias.  Okay.  Right?
22 You have O'Brien (2023) which says --
23     A.    I'm sorry, you're going to
24 have to explain how we were looking at

Page 255

1 evidence of recall bias in O'Brien (2024).
2     Q.    Well, you're saying that only
3 the prospective data, okay, does not carry
4 the potential risk, and you can't even
5 guarantee that, but it carries less of a
6 risk of recall bias than retrospective
7 data, correct?
8     A.    I'm just trying to think if
9 that's always the case, but generally it's
10 the case.
11     Q.    All right.  And in O'Brien
12 (2023), they found that there was evidence
13 of a consistent answer between the first
14 and second questionnaire, correct?
15         MS. LEHMAN:  Object to form.
16         THE WITNESS:  That really
17     depends on how consistent you think
18     things need to be to be consistent.
19 BY MR. TISI:
20     Q.    It reported that there was --
21     A.    In terms of its -- in terms
22 of its effect on recall bias, what really
23 matters is not the kind of overall numbers
24 that are consistent, but it's really the

Page 256

1 amount of the cases, because they are
2 driving results.
3     Q.    Doctor, this isn't, honestly,
4 you're not supposed to be an advocate,
5 you're supposed to look at the data
6 independently, right?
7         MS. LEHMAN:  Object to form.
8     Argumentative.
9 BY MR. TISI:
10     Q.    Right?
11     A.    I agree, I'm talking --
12     Q.    Okay.
13     A.    All I'm doing is
14 restating what --
15     Q.    Well, you're arguing with me.
16     A.    -- what the review was in my
17 report and --
18     Q.    Well, you're arguing with me.
19 In the 2023 article, they reported that
20 there was evidence that the answer about
21 talc use in the second questionnaire was
22 consistent 90 percent of the time with
23 people who reported on the first
24 questionnaire, right, 87 percent of the

Page 257

1 time?
2         MS. LEHMAN:  I object to
3     counsel's commentary.
4         THE WITNESS:  I mean, I'm just
5     going to sort of, like, say that my
6     answer was kind of like it depends,
7     because part of it is what
8     proportion --
9 BY MR. TISI:
10     Q.    That's what they reported,
11 I'm not asking you --
12         MS. LEHMAN:  Hold on.  Let him
13     finish.  Let him finish.
14 BY MR. TISI:
15     Q.    I'm not asking you the
16 relevance, but he's not answering my
17 question.  I'm asking did they report --
18 did they report that there was good
19 correlation between the first and the
20 second questionnaire in terms of reporting
21 ever use?
22         MS. LEHMAN:  Object to form.
23 BY MR. TISI:
24     Q.    Whether you think it's

65 (Pages 254 - 257)

Page 258

1 irrelevant or not, did they report that
2 there was good correlation?
3     A.    I don't know if they used the
4 word "good," but I remember from we've just
5 looked at 87 percent was a number.
6     Q.    Okay.
7     A.    Whether you define that as
8 good or not depends on context --
9     Q.    Okay.
10     A.    In my mind it also depends on
11 number of cases. I'm going to ask, because
12 I think you're kind of talking to me in a
13 rude way that I would really like a break
14 for five minutes at this point, so --
15     Q.    I'm not being rude, Doctor,
16 but you're really not answering my
17 questions.
18         MS. LEHMAN: Well, he really
19     is answering your questions --
20         MR. TISI: Well, he's really
21     not --
22         MS. LEHMAN: So let's just
23     take a break.
24         MR. TISI: Take a break.

Page 259

1         THE WITNESS: Can we take it
2     ten minutes? That would be useful.
3         MR. TISI: Sure.
4         - - - - -
5     (A recess was taken at this time.)
6         - - - - -
7 BY MR. TISI:
8     Q.    Back on. All right. I'm
9 going to slow down. I'm told I'm going
10 fast, so I'm going to slow down and we will
11 regroup here.
12         Let me ask you these two
13 questions and I think we can move on if you
14 will agree with me that this is what the
15 authors say. Whether you agree with it or
16 not, you know, I get it. But the authors
17 in the 2023 study says that classification
18 of ever use of feminine hygiene products
19 may be recalled with good consistency, that
20 was the result of the 2023 patient study,
21 true?
22     A.    I think there was a statement
23 of something to that effect in the 2023
24 study. I'm not entirely certain that that

Page 260

1 was the result of the study, but otherwise,
2 I agree.
3     Q.    And if you turn to Exhibit
4 No. 8, which is the O'Brien (2024) study,
5 on page 13, go to page 13, please, in the
6 middle paragraph, the paragraph beginning
7 with results. The last sentence says
8 "Analysis considering person-time accrued
9 since follow-up questionnaire completion
10 were not subject to recall bias, but had a
11 reduced sample size; estimates of the
12 genital talc and ovarian cancer association
13 were consistent with a positive
14 association," correct?
15     A.    I agree that's what it says.
16     Q.    Okay. So whether you're
17 looking at the 2023 study or the 2024
18 study, they were reporting that there was
19 good recall between the first and second
20 questionnaire, true?
21     A.    I think what they're saying
22 there is that the analysis -- so I think
23 that was in your -- the table, yeah, that
24 you were previously pointing to, so that's

Page 261

1 the analysis in Table A2 on the right-hand
2 side, they say that it's not subject to
3 recall bias. They acknowledge it was a
4 reduced sample size. It's a much smaller
5 sample size and that there was their
6 estimate of the hazard ratio, the point
7 estimate was 1.84.
8     Q.    And they make the further
9 statement on page 13 that that evidence was
10 consistent with a positive association of
11 fully prospective data, correct?
12     A.    They may make that statement.
13 Do you want to highlight where it is
14 exactly?
15     Q.    Yes, on page 13. I have it
16 highlighted and if you could blow it up,
17 Jeff. Blow up the page, please. "Analyses
18 considering person-time accrued since
19 follow-up question completion is not
20 subject to recall bias, but had a reduced
21 sample size; estimates of genital talc use
22 and ovarian cancer association were
23 consistent with a positive association,"
24 true?

66 (Pages 258 - 261)

Page 262

1    A.    It is true that's what they
2 state. I don't know that I agree that they
3 can be certain that there's no recall bias
4 at all.
5    Q.    Okay. All right. So let's
6 talk a little bit about on page 14 of this
7 study, they say O'Brien (2024), they say
8 they overall, on the last paragraph,
9 "Overall, our findings support the
10 hypothesis that there is a positive between
11 genital talc use and ovarian cancer
12 incidence."
13        Do you see that?
14    A.    I do agree that's what it
15 states, yes.
16    Q.    Okay. And --
17    A.    But they do qualify that
18 within there, there is still uncertainty as
19 to how much recall bias and missing data
20 could upwardly bias effect estimates, even
21 after doing their manipulation.
22    Q.    Okay. Do you agree with the
23 Sister Study investigators that the
24 question about lifetime use in the

Page 263

1 follow-up questionnaire were effectively
2 broader than the use information inquired
3 about at enrollment?
4    A.    Not completely. I think they
5 were different. There was some ways in
6 which they, obviously, asked about the
7 additional interval, so in that sense, you
8 could argue they were broader. But in
9 other ways, they didn't offer as many
10 options for answers to questions. So
11 people could say don't know, for example,
12 so in that sense, they were narrower.
13        They also didn't
14 specifically look at the age range 10 to
15 13, which would have made sense so that
16 they could carefully evaluate whether there
17 was agreement between the first and second
18 time points.
19    Q.    Well, they did do that in the
20 original douching study, in the 2023
21 douching study, right? They found an
22 87 percent correlation, true?
23    A.    They didn't ask about ages 10
24 to 13 at follow-up.

Page 264

1    Q.    Okay. The second -- let me
2 just ask you this question. In several
3 places in your report, for example,
4 paragraph 18, but you use it other places
5 in 28 and 54, you said the NIH scientists
6 impute or assume whether a study subject
7 used genital talc for 38 percent of the
8 sample, but 54 percent of the ovarian
9 cancer cases.
10        Do you recall that
11 statistic?
12    A.    I'm sorry, I remember the
13 general sort of statement. But I just want
14 to go to my report. So you said
15 paragraph 18?
16    Q.    Yes, that's the first place
17 where it appears. Go down please a little
18 bit, keep going. Are you on page 8 of your
19 report?
20    A.    Yeah.
21    Q.    "Under each of these
22 scenarios, the authors," very bottom, very
23 bottom, "Under each of these scenarios, the
24 authors impute, assume, or randomly select

Page 265

1 whether or not a participant used genital
2 talc in 38 of the sample, but 54 percent of
3 the ovarian cancer cases."
4        Do you see that?
5    A.    Yes.
6    Q.    And you cited to Table A5 in
7 O'Brien (2024) and I cannot figure out how
8 you get those numbers, so if you would tell
9 me, I would appreciate it.
10    A.    Yeah, I can try to walk
11 through this.
12    Q.    And, Jeff, it's on the last
13 page of the document, last page of O'Brien,
14 yeah.
15    A.    Okay. So I certainly can't
16 do this by memory, but I have it in those
17 pie charts in my report that point to the
18 different rows, the header.
19    Q.    I mean, feel free to look at
20 your report. I just don't understand where
21 you get those numbers.
22    A.    Yeah. I will do. I want to
23 make sure I'm looking at the right --
24    Q.    If it makes it easier,

67 (Pages 262 - 265)

Page 266

1 it's -- you refer to the same statistic on
2 page 18 -- paragraph 18, 28, and 54.
3       A.    If you just give me a moment,
4 I'll be able to do it, I just need a
5 little -- I'm taking my glasses off because
6 the writing is small.  So the eligible for
7 imputation part comes from row 4.
8       Q.    Uh-huh.
9       A.    And that's overall 19 and 37
10 in the ovarian cancer cases.  Do you see
11 that okay?  For the -- so eligible for
12 correction, that's rows two and five.  So
13 it's three overall and five in ovarian
14 cancer cases.
15             And for the assumed, this
16 includes rows three and 12 added together.
17      Q.    Okay.  Did the authors
18 explain why they chose the 38 percent of
19 the sample?
20      A.    I'm sorry, I didn't
21 understand.
22      Q.    Let me rephrase it a
23 different way.
24      A.    We chose a percent of the

Page 267

1 sample --
2       Q.    They chose -- they chose the
3 38 percent of the sample that was genital
4 talc use based upon the states that they
5 resided in, true?  There were nine states
6 that they resided in, not on the basis of
7 ovarian cancer status.
8       A.    I'm really getting confused
9 with the question.  Is there somewhere you
10 can refer to?
11      Q.    I'm asking you, don't you
12 know that the 38 -- the authors calculated
13 the 38 percent on the basis of the nine
14 states they were in, not on their ovarian
15 cancer status?
16             MS. LEHMAN:  Object to form.
17             THE WITNESS:  Just point me
18        to, what's the 38 percent?
19 BY MR. TISI:
20      Q.    I didn't get the number.  You
21 calculated the number.  I'm using the
22 38 percent number that you calculated, but
23 the reason they chose that 38 percent was
24 not on the basis of ovarian cancer status,

Page 268

1 they chose it on the basis of the states in
2 which they resided, true?
3       A.    It's a bizarre question.  I
4 mean, the 38 percent is the sample that
5 they have that they did these manipulations
6 on.
7       Q.    Okay.
8       A.    It doesn't matter what states
9 they came from.
10      Q.    Okay.  All right.  So let's
11 talk about the kinds of --
12      A.    I want to be clear, they
13 didn't choose 38 percent.  They took the
14 sample.
15      Q.    They chose the cases that
16 comprised that 38 percent and they chose
17 them from nine states, correct?
18             MS. LEHMAN:  Object to form.
19             THE WITNESS:  I really don't
20        see how this relates to anything.
21        These are the --
22 BY MR. TISI:
23      Q.    Okay.
24      A.    -- these are the controls and

Page 269

1 they had differential recall between them
2 and they did different things in the
3 controls and they did different things in
4 the cases and that affects the analysis.
5       Q.    Let's talk about
6 contradictory data correlation correction
7 and missing data through multiple
8 imputation.  Take out -- go to page 7 of
9 the O'Brien study, Table 2, if you don't
10 mind.
11             And table -- Scenario 4
12 includes both corrected for contradictory
13 data and multiple imputation, correct?
14      A.    Well, I would argue that it's
15 not exactly, as I stated before, not really
16 correcting for contradictory data.  It's
17 artificially changing data, but it is --
18      Q.    That's what the authors say?
19      A.    It is labeled as correcting
20 contradictory data and multiple imputation.
21      Q.    What they're trying to do is
22 deal with two different categories of women
23 in this study.  The first is women who say
24 they were nonusers at enrollment, but who

Page 270

1  said they were users in the follow-up
2  questionnaire so that they were considered
3  potentially contradictory, correct?
4      A.    Yes, I mean, kind of, it's
5  correct, but I'm not -- they don't
6  explicitly state what they count as
7  contradictory or noncontradictory, but --
8  and they do have these categorizations of
9  contradictory data versus noncontradictory.
10     Q.    Okay.  And just so we
11  understand that category, that category is
12  a woman who says I am a nonuser based upon
13  the first questionnaire, which has -- which
14  asks them about use between ages 10 and 13
15  and a year before enrollment, right?
16     A.    Right.
17     Q.    And then in a subsequent, if
18  they answered that question no in the
19  original questionnaire, but in a subsequent
20  questionnaire, they say yes, that qualifies
21  as contradictory, correct?
22     A.    Here's the problem, they --
23  they don't ask the same question.  So in
24  the follow-up questionnaire, they have,

Page 271

1  like, 10 to 20.
2      Q.    Right.
3      A.    They ask about teens.  Now,
4  is it contradictory or is it not
5  contradictory if they answer differently?
6  In one way, you might argue, it's not
7  contradictory if their use had been between
8  the ages of 14 and 20.  If their use had
9  also been between 10 and 13, it would be
10  contradictory.  We can't know that because
11  they don't ask suitable questions.
12     Q.    And so -- and so --
13     A.    They don't state what -- so
14  you would have to make an assumption and
15  they don't say what that is.
16     Q.    So what they're doing is if
17  somebody says no to the first questionnaire
18  but yes to the second questionnaire, they
19  are assuming those women are, quote,
20  "contradictory," even though in point of
21  fact they might not be?
22     A.    They don't state that
23  anywhere.
24     Q.    Well, but they do.  They

Page 272

1  state, we read the sentence that says that
2  the second questionnaire, the specific
3  ages, age 10 and 13 and the last year and
4  did not capture lifetime exposure or use
5  during the most likely exposure period ages
6  20 through 39 years, right?
7           And in the previous douching
8  study, they said a woman could answer no to
9  the first question but yes to the second
10  question and really not be contradictory,
11  right?
12     A.    Oh, so I do agree that it's
13  possible to answer no to the first
14  question, yes to the second, and it be not
15  contradictory, that's correct.
16     Q.    But they're considering all
17  those women, to be careful, they're
18  considering all of those women to be
19  contradictory and then they apply their
20  analysis, which you disagree with, but
21  they're not trying to tease out which women
22  tried to answer the question consistently
23  or not.  They're assuming they're all
24  inconsistent, correct?

Page 273

1           MS. LEHMAN:  Object to form.
2           THE WITNESS:  I think that's
3      incorrect if we look, they have an
4      explicit category of nonuser at
5      enrollment, user at follow-up,
6      contradictory, and they have a
7      nonuser at enrollment, user at
8      follow-up, and whatever.  The
9      opposite of whatever, if I said
10     noncontradictory, they also have a
11     contradictory group and they also
12     have a contradictory --
13  BY MR. TISI:
14     Q.    We'll have to forgive each
15  other -- we'll have to forgive each other,
16  because it is confusing, but what they're
17  doing is they're saying, look, we're going
18  to consider all the -- and we're going to
19  employ our assumptions to the data because
20  we are -- some of them are going to be
21  noncontradictory in fact, but some of them
22  are going to be contradictory unless they
23  use the 80/20, right?
24     A.    Yeah, I'm not disputing that.

69 (Pages 270 - 273)

Page 274

1 What I'm saying is that they're not clear
2 on the definition of not contradictory.
3    Q.    Okay.
4    A.    There are assumed situations
5 where they clearly are not contradictory,
6 like, in that example of the follow-up,
7 they said 20 to 30 and in the first one
8 they said, like, that they didn't use age
9 10 to 13 and if they're 12 months prior was
10 not in their twenties, then they would be
11 contradictory data.
12    Q.    Right.
13    A.    I don't know if they looked
14 at it in that way, so that would be not
15 contradictory.  But when somebody says I
16 did use it at age 10 to 13, but then says
17 they or says I didn't -- the other way
18 around, I didn't use age 10 to 13, but I
19 used it between age ten to 20, is that
20 contradictory or not?
21    Q.    And that's why they do what
22 they do, right, they acknowledge --
23    A.    They -- sorry.
24    Q.    Right, but, again, I don't

Page 275

1 want to get to that next step.  The first
2 thing is they identify two categories of
3 potential problems, one where there's
4 potential contradiction, true?
5    A.    Yeah.
6    Q.    Okay.  And the second one is
7 where there's missing data, correct?
8    A.    Yes.
9    Q.    All right.  And that would
10 be, for example, we talked about it before,
11 a woman who dies between the first and
12 second questionnaire and can't fill out the
13 second questionnaire, correct?
14    A.    That would be one example.
15    Q.    All right.  And the authors
16 here separately tried to deal with those
17 two potential problems, right,
18 contradictory and then missing data,
19 correct?
20    A.    They did take some steps to
21 try and do that.
22    Q.    Okay.  Now, you say in
23 paragraph 29 that the only truly reliable
24 data is the baseline analysis which you say

Page 276

1 is relegated to Table 2, which is the first
2 column, which is fully prospective, right?
3    A.    Yes.
4    Q.    Okay.  And you describe that
5 in your paragraph 30 of your report, you
6 say that "O'Brien's baseline analysis has
7 two distinguishing features.  First, it
8 uses only prospective information to assign
9 women to ever or never genital talc use,"
10 and "Second that the baseline analysis
11 omits the smaller number of women who are
12 missing enrollment surveys about genital
13 talc use entirely," right?
14    A.    Correct.
15    Q.    All right.  But there's a
16 third distinguishing factor between the
17 first and second questionnaire, and the one
18 that the authors highlight in their report,
19 correct, in their study, and that is that a
20 woman can answer the second questionnaire
21 yes and the first questionnaire no, and not
22 really be contradictory about how had they
23 ever used -- whether they ever used talc,
24 correct?

Page 277

1    A.    I don't think that's -- I
2 recall that as a distinguishing feature.
3    Q.    They're two completely
4 different sets of questions, one was
5 limited and one was -- tried to capture
6 lifetime use, right?
7    A.    I think there were two
8 different sets of questions that were not
9 well aligned and -- but I wouldn't call
10 that a distinguishing feature of the
11 baseline analysis.
12    Q.    Okay.  But they are
13 different, right?  So the distinguishing
14 feature between the first and second
15 questionnaire is the second questionnaire
16 tried to get lifetime use and that's what
17 the authors said they were trying to get,
18 right?
19    A.    I don't recall exactly what
20 the authors said, but they clearly looked
21 at different -- clearly had different
22 intervals within their follow-up survey.
23 It was more limited in some respects, but
24 it was more -- it had more intervals, but

70 (Pages 274 - 277)

Page 278

1 they were different.
2      Q.    Okay.  So let's talk about
3 the contradictory data portion of the
4 analysis that they did, the bias analysis
5 that they did, okay?
6      A.    Okay.
7      Q.    All right.  How many cases
8 actually fell in that category, women that
9 reported use -- they reported no use based
10 upon the limited questionnaire 10 to 13 and
11 a year before enrollment and the subsequent
12 questionnaire which talked about use
13 various time periods in their lifetime?
14      A.    Okay.  So I would have to
15 refresh my memory, because I don't remember
16 the exact numbers.  It's probably easiest
17 to get it out.  So I'm looking at Table A5,
18 the last page of the exhibit, the O'Brien
19 paper, if you can put that up on the
20 screen.  Unfortunately, the font is a
21 little small.
22      Q.    Go to A5, please, Jeff.
23      A.    So and the relevant rows for
24 correction are rows two and row -- row 2

Page 279

1 and row 5.
2      Q.    And how many patients -- how
3 many women are there?
4      A.    I don't know the number of
5 women off the top of my head.  I would have
6 to sit and do some math.  They give the
7 proportions here and they say 8 percent
8 overall and nonusers at enrollment later
9 said used with age reports -- I'm sorry,
10 I'm looking at the wrong row, please.  My
11 error.
12           Row 2, nonuser at
13 enrollment, later said used at enrollment,
14 eligible for correction, 3 percent overall
15 versus 5 percent that were ovarian cancer
16 cases.
17           And then if we're looking
18 in -- so in row 5, 7 percent overall, these
19 are users at enrollment, never user at
20 follow-up, eligible for correction, and
21 overall 7 percent, but only 2 percent that
22 are cases.
23      Q.    Now, if you go back to
24 Table 2, Table 2 corrects contradictory

Page 280

1 data but assumes they were all unexposed,
2 correct?
3      A.    So correct contradictory
4 data, assume unexposed if unexposed at
5 enrollment plus missing at follow-up.
6      Q.    So that's the outer range of
7 contradictory data, so everybody is who
8 reported nonuse at enrollment, but use
9 later was actually nonusers, correct?
10           MS. LEHMAN:  Object to form.
11           THE WITNESS:  Maybe I'm
12 misunderstanding.
13 BY MR. TISI:
14      Q.    That's what it says, it says
15 "correct contradictory data on assumed
16 unexposed -- if unexposed at enrollment."
17 That's what the column says, right and
18 missing at follow-up?
19      A.    That's what the column says,
20 yes.
21      Q.    Okay.  And the outer limit,
22 assuming everybody is not exposed, everyone
23 did not take talc, right, where there was
24 contradictory data, the risk was 1.17,

Page 281

1 although not statistically significant,
2 right?
3      A.    I don't know if I agree with
4 your characterization of the outer risk
5 thing.
6      Q.    Genital talc, let's call it
7 genital talc, which is what you used.
8 Genital talc, assume they're all unexposed,
9 if unexposed at enrollment and missing at
10 follow-up?
11      A.    Yes, so that applies just to
12 the missing at follow-up data.  They're
13 basically saying, use the baseline value
14 that we actually do have response for, yes.
15      Q.    Okay.  And, similarly,
16 category three kind of goes the other
17 direction, right, it says assume they were
18 all users?
19      A.    Yes, even though they never
20 said at any time that they were users.
21      Q.    Right.  So you have the two
22 extremes, people who say they were never
23 users, even though they were missing at
24 follow-up and people who were, you assume,

71 (Pages 278 - 281)

Page 282

1 that they were always users and that's the
2 bracket, right, 1.17 to 3.34, that's what
3 they talked about in categories three --
4 two and three, right?
5    A.    I disagree with that on a
6 couple of levels.  So even if you accepted
7 the premise that these were extreme
8 bracketing scenarios, which I don't, and
9 I'll explain in a second, you really have
10 to look at the extremes of the confidence
11 intervals which tell you about the
12 plausible range of values.  So we're really
13 going from .92 to 4.44 if you take that
14 whole thing as an extreme.
15            But there's already the
16 contradictory data correction here that
17 already brings in some bias in the upward
18 direction.  You can see that because
19 Scenario 1 is lower with 1.07 and that in
20 turn brings in -- with its point estimate
21 and that in turn brings in some bias of its
22 own.  And if you go back even further, you
23 go to Table A2 and that's the 1.02 --
24    Q.    But doesn't --

Page 283

1    A.    The only one we can be sure
2 of, the one we can most sure of is not
3 suffering from biases and corrections and
4 manipulations and adjustments is Table A2.
5    Q.    Well, except Table A2 --
6    A.    Why ruin a perfectly good
7 analysis by throwing --
8    Q.    I'll tell you why --
9    A.    -- your calculations in?
10    Q.    I'll tell you why.  Let me
11 give you a hypothetical as to why.  We all
12 agree, I think we agreed at the outset,
13 that the original questionnaire did not ask
14 for lifetime use, right?
15        MS. LEHMAN:  Object to the
16        commentary.
17        THE WITNESS:  The original
18        questionnaire asked specifically
19        about ages 10 to 13 and the last 12
20        months.  If they wanted to look at
21        something different, it's
22        unfortunate they didn't do a good
23        job of designing their study.  So
24        it made that prospective recall

Page 284

1        bias read potential.
2 BY MR. TISI:
3    Q.    And so they asked in a
4 subsequent -- a subsequent questionnaire
5 whether they had ever used it, correct?
6    A.    And, you know --
7    Q.    I'm just asking --
8    A.    I don't think it covers the
9 complete lifespan, I think there's --
10    Q.    Okay.  But it covers --
11    A.    There's a wider lifespan I
12 would agree with.
13    Q.    All right.  Let's say that.
14 Just follow me here.  Let me ask the
15 question and then if you need to explain
16 it, we'll do that.  Okay?
17    A.    Okay.
18    Q.    You have a second
19 questionnaire which raises the possibility
20 that people who were originally classified
21 as nonusers were actually users, right?
22    A.    It does raise the
23 possibility.
24    Q.    Okay.  So how would you --

Page 285

1 just follow me, okay, how would you as a
2 scientist have dealt with that question,
3 because it raises the question as to
4 whether or not -- whether or not the
5 original Gonzalez study was actually --
6 really was ever use, right?  And so now you
7 have data which indicates that people,
8 women may have actually used talc through
9 no fault of their own, right, but not
10 reported it, because of the way the
11 questions were asked.  So what would you
12 do?  Would you just throw out the study?
13 Would you throw out the subsequent
14 questionnaires?  What would you do?
15    A.    Oh, well, I mean, what I
16 would have done as a scientist, I mean,
17 obviously, I'm sitting here in a position
18 where I can retrospectively pontificate
19 about what I would have done.  But the
20 first sort of, like, statement in response
21 to that is why you really ought to have
22 designed the study in the first place to
23 answer the questions you want to answer.
24 That's the whole point of a preeminent

72 (Pages 282 - 285)

Page 286

1  specified analysis, plan, experimental
2  design. That's why you go through all of
3  that thinking and you say we need to make
4  sure we have the questions that will answer
5  the question you want to answer.
6      Q.   Now, let's deal with reality.
7  Once you found out that the original
8  questionnaire doesn't ask the questions
9  that you thought that it answered, and you
10 find out through a subsequent questionnaire
11 that maybe a lot more people used talc than
12 originally reported, what would you have
13 done?
14     A.   Okay. So, yeah, well, I kind
15 of have difficulties with that question,
16 again, on a few levels.
17          First of all, you know,
18 unfortunately the way science works is that
19 you can only answer what you can set up for
20 your design, your study, your data to
21 answer and if you mess things up in the
22 first place and circumstances change, there
23 may not be a way to get at a clean answer
24 that you want to get to and that's just --

Page 287

1      Q.   So should they have
2  withdrawn, should the authors in your
3  opinion have withdrawn Gonzalez 2016
4  because it created a wrong impression?
5      A.   Sorry, what did I say? Did I
6  say --
7      Q.   Do you think that the authors
8  should have either withdrawn the Gonzalez
9  study or published -- retracted it or
10 published a statement that said that study
11 may not have considered the entire lifetime
12 use of women and we don't -- we don't
13 represent that as being an entire lifetime
14 use of the women in the Sister Study?
15     A.   Yeah, I don't want to -- we
16 can look at exactly what the wording is in
17 Gonzalez, but I think it very clearly
18 states what the questionnaire asks, that
19 it's asking about 10 to 13 years last year
20 of use and it's a report that analyzes the
21 difference between exposed versus not
22 exposed, I mean, exposed in the paper. So
23 I don't think scientifically that's not
24 wrong.

Page 288

1          Now, if somebody wants to
2  say, and just because you say I think
3  lifetime exposure is a more important
4  question, it's not a reason to withdraw a
5  paper.
6      Q.   Okay.
7      A.   I think there could have been
8  a better study design and that can be
9  argued, but it's not that the paper is
10 fundamentally wrong in what it's saying.
11     Q.   But what they could do is
12 what they did, right, they published a
13 subsequent paper that published the data on
14 the follow-up questionnaire and discussed
15 the pros and cons of potential recall bias,
16 right?
17     A.   They published a follow-up
18 paper and I think I'm very clear in my
19 report with what the problems are with this
20 follow-up paper. Again, you're trying to
21 solve a problem that I understand they want
22 to sort of be able to get at an analysis
23 that looks more at -- across a wider
24 lifespan, but if you just throw garbage

Page 289

1  into that to try to answer the question,
2  you're just going to get garbage out.
3  That's just the way it is.
4      Q.   Okay. So you think the
5  subsequent questionnaire, to use your
6  phrase, was just garbage?
7      A.   No, I think what's garbage --
8  I think it was not -- what's garbage is the
9  level of missing data, the level of
10 imputation, the level of this switching of
11 data, all of these manipulations, they're
12 not --
13     Q.   Let's talk about missing
14 data --
15     A.   You want good data. You
16 don't want to have to do all that to the
17 data to the level they do.
18     Q.   So you talked about
19 contradictory data and let's talk about
20 missing data and that's where they use
21 multiple imputation, correct?
22     A.   Yes.
23     Q.   Now, the missing data would
24 concern two categories, as I see it, a

73 (Pages 286 - 289)

Page 290

1 woman who said they were nonusers on
2 enrollment or were missing a baseline, but
3 who for various reasons, including death,
4 didn't respond to the second questionnaire
5 so the data on lifetime use was missing; is
6 that right?
7        A.    Well, they have, they have
8 the data from the baseline report --
9        Q.    Well, there was at least one
10 woman --
11        A.    What's missing is whatever
12 they've recorded at follow-up.
13        Q.    Well, at least one woman had
14 been missing in baseline as well, right?
15        A.    I think if they were missing
16 both at baseline and at follow-up, they
17 would just impute it at random for some
18 reason.
19        Q.    Now, the NIH authors deal
20 with this missingness in Scenario 4 of
21 Table 2 through the multiple imputation
22 method that we talked about earlier that is
23 something that is recognized in the
24 statistical literature, correct?

Page 291

1        MS. LEHMAN:  Object to form.
2        THE WITNESS:  Multiple
3    imputation as a method is in the
4    statistical literature, it's a
5    method for imputing missing data.
6    But I think you linked it with the
7    first part of the question and I'm
8    not sure what the connection is.
9 BY MR. TISI:
10       Q.    Well, you're not critical of
11 multiple imputation methodology as a
12 general matter, you're just critical of the
13 way in which the authors used it in this
14 case, right?
15       A.    I'm critical of the
16 appropriateness of extrapolating so much
17 data and with -- in coming up with and then
18 relying on those results from the --
19       Q.    I'm sorry.  You repeatedly
20 say throughout your report, and I don't
21 know how many times, but you repeatedly
22 said they guess and they assume genital
23 talc use and you use that in quotes
24 oftentimes throughout your report, correct?

Page 292

1        MS. LEHMAN:  Object to form.
2        THE WITNESS:  I mean, I don't
3    recall exact words --
4 BY MR. TISI:
5        Q.    Let's look at paragraph --
6        A.    I don't doubt it I
7 potentially did refer to it as guessing.
8 Because there's an element of it that is
9 guessing, yes.
10       Q.    Well, it's using statistical
11 methods to predict whether or not somebody
12 would be a user or a nonuser, right?  It's
13 not guessing, correct?
14       A.    If you have -- if you're
15 trying to predict something and you have
16 either very slightly related or bias --
17 bias incorporated information that you're
18 using to predict that data, that's a guess.
19       Q.    Well, wouldn't it also be a
20 guess if somebody answered on the initial
21 questionnaire that they were a nonuser
22 based upon the two limited categories, the
23 four years of a 74-year-old woman that they
24 were nonusers based upon the original

Page 293

1 questionnaire, that would be a guess,
2 right?
3        MS. LEHMAN:  Object to form.
4        THE WITNESS:  I'm sorry, are
5    you saying that --
6 BY MR. TISI:
7        Q.    Let me give you a
8 hypothetical --
9        A.    If you were trying to predict
10 whether somebody used it at age 74 based on
11 a question --
12       Q.    No, let me -- let me withdraw
13 the question and give you a hypothetical.
14       A 74-year-old woman enters
15 the study at baseline, I did not use it
16 between 10 and 13 and I did not use it at
17 age 73 to 74, right?
18       A.    Okay.
19       Q.    If you do not use multiple
20 imputation or some method to try to deal
21 with the missingness question, let's say
22 she dies, okay, aren't you guessing that
23 she was in fact a nonuser between age 13
24 and 73?

74 (Pages 290 - 293)

Page 294

1    A.    If you were doing an analysis
2  between ages 13 and 73 --
3    Q.    Right.  So --
4    A.    -- you would be --
5        MS. LEHMAN:  Hold on.  Hold
6  on.  Let me him finish.
7        THE WITNESS:  But there is no
8  analysis between those ages and
9  then the analysis at baseline is
10  very consistent across everybody.
11  It's asking the same question as
12  everybody.  It's not -- this is
13  where kind of the whole problem
14  here is they're trying to combine
15  information from Scenario 1 that
16  asks one set of questions with
17  information from Scenario 4 that
18  has a whole bunch of missing data
19  with different questions.  They're
20  trying to glue that together and
21  it's like trying to fit a square
22  peg in a round hole.  It doesn't
23  work.
24

Page 295

1  BY MR. TISI:
2    Q.    Isn't it true that the
3  statistical literature says that it is
4  simply wrong to assume somebody is, in this
5  case, for example, a nonuser, that multiple
6  imputation, for example, is a much more
7  credible way of dealing with missing data
8  in that scenario?
9    A.    I totally did not understand
10  that question.
11    Q.    Well, would you agree with
12  me, let's -- it would be arbitrary, let's
13  use this to be specific, would you agree
14  that it would be arbitrary to assign all
15  women in the Sister Study as either
16  lifetime talc nonusers as was done in
17  Scenario 2 or lifetime talc users as was
18  done by the authors in Scenario 3, just
19  assign them --
20    A.    I mean --
21    Q.    -- missing data?
22    A.    Here's my problem.  My
23  problem is that Scenarios 1, 2, 3, and 4
24  are all poor analyses.

Page 296

1    Q.    I understand.  I understand.
2    A.    You're trying to make me do a
3  comparison between --
4    Q.    No, no, no.  I'm not.  I'm
5  really not.  I'm asking a very specific
6  question.  With regard to missingness,
7  forget about all the other problems you
8  think permeated this data, let's deal with
9  missingness alone, don't you agree with me
10  that it would be arbitrary to assume in
11  category -- in Scenario 2 that all those
12  women would be nonusers as arbitrary as
13  saying in category three all the women
14  would be users?
15        MS. LEHMAN:  Object to form.
16        THE WITNESS:  No, because
17    here's the problem, what's your
18    definition of a nonuser and a user
19    here?
20  BY MR. TISI:
21    Q.    Lifetime use.  Lifetime use.
22  Somebody who uses it lifetime but we have
23  missing data.
24    A.    All right.  So what do you

Page 297

1  have here, what do you have to answer that
2  question?
3    Q.    You have multiple imputation,
4  which is what the authors did.
5    A.    No, no --
6    Q.    So -- well, let me ask you
7  this.
8    A.    You asked me a question and
9  you didn't let me answer.
10    Q.    Okay.  Well, go ahead, finish
11  the answer.
12    A.    Right, so you have a
13  baseline.  You have relatively complete
14  data, but it is only answering, as you say,
15  10 to 13 and the last year, but it's
16  relatively complete.  At follow-up, you
17  have highly incomplete data, you have so
18  much missing data, and it's not missing at
19  random, and multiple imputation is not
20  going to get you to the right answer,
21  because you do not have a completely
22  predictive model of what's going on.  You
23  do not have missing at random even, which
24  is let alone --

75 (Pages 294 - 297)

Page 298

1    Q.    We'll talk about that --
2    A.    -- random.  You do not have
3  predictors outside of your outcome that are
4  predictive of whether or not somebody is
5  missing.  And you also have in your data
6  highly differential exposures, exposure
7  missingness in cases versus controls.  That
8  should set all alarm bells ringing that you
9  can't do this.  You can't get away this and
10  have a reasonable analysis.  You can't come
11  up with reliable numbers based on that.
12    Q.    Let me --
13    A.    So I understand that you
14  don't believe that the analysis in A2 is
15  answering the question you want to answer,
16  but neither is the data that -- you can't
17  get there with this incomplete, poorly
18  acquired data that has differential
19  missingness, all kinds of biases thrown in,
20  and do these contradictory manipulations
21  and kind of solve the problem and it goes
22  away.
23    Q.    Let's look at Exhibit No. 21
24  and see if you will agree with this.  This

Page 299

1  is a "JAMA Guide to Statistics and Methods,
2  Multiple Imputation, A Flexible Tool for
3  Handling Missing Data by Li, Stewart, and
4  Allison."
5        Do you see that?
6    A.    Yes, I see the page.
7        - - - - -
8        (JAMA Article marked Kornak
9        Exhibit 21 for identification.)
10        - - - - -
11  BY MR. TISI:
12    Q.    And have you seen this paper
13  before?
14    A.    I actually don't recall
15  whether I've seen it before or not.  I
16  don't remember it.
17    Q.    Could you blow it up, please,
18  Jeff?
19        MR. WRIGHT:  It should be
20        there.
21  BY MR. TISI:
22    Q.    It's not.  I can't see it.
23  It says, if you look at Exhibit No. 21, it
24  says "Missing data are common in research."

Page 300

1  Do you agree with that?
2    A.    Yes.
3    Q.    Okay.  Now at the end of this
4  sentence, at the end of the paragraph, it
5  says "When missing data occur, it is
6  important not to exclude cases with missing
7  information (analyses after such exclusion
8  are known as complete case analyses)."
9        Do you see that?
10    A.    I see that's what it states.
11    Q.    Do you agree with that?  You
12  don't exclude them?
13    A.    I think it's important not to
14  blindly exclude them.
15    Q.    Okay.  It goes on to say --
16    A.    I do not agree with this
17  statement overall.  I think it's missing
18  that qualifier.
19    Q.    Okay.  They go on to say
20  "Single-value imputation methods are those
21  that estimate what each missing value might
22  have been and replace it with a single
23  value in the data set.
24        "Single-value imputation

Page 301

1  methods include mean imputation, last
2  observation carried forward, and random
3  imputation."
4        Do you see that?
5    A.    Yes.
6    Q.    Do you agree with that?
7    A.    Yes, I mean, there's
8  potentially other ways to do it as well,
9  but those are examples of single value
10  imputation.
11    Q.    It goes on to say "These
12  approaches can yield biased results and are
13  suboptimal.  Multiple imputation better
14  handles missing data by estimating and
15  replacing missingness -- missing values
16  many times."
17        Do you see that?
18    A.    I do see that.
19    Q.    Do you agree with that
20  generally speaking?
21    A.    Even a simplistic way, but
22  there's sort of caveats as to when that
23  completely holds.
24    Q.    Okay.  Let's go to the next

76 (Pages 298 - 301)

Page 302

1  page. It says "What are the limitations of
2  Multiple Imputation?" First of all, have
3  you ever written a paper like this where
4  you talk about the method of multiple
5  imputation?
6          MS. LEHMAN: Objection. Asked
7      and answered.
8          THE WITNESS: Well, I would
9      argue this is not really -- this is
10     kind of an opinion piece and no,
11     I'm not in the practice of writing
12     opinion pieces.
13 BY MR. TISI:
14     Q.   Okay. Well -- all right.
15 It's actually, it says it's a JAMA Guide to
16 Statistics and Methods, but we'll let it
17 stand what it is.
18     A.   No, I would say that's just
19 the journal name, right? It's not the
20 title of the paper or --
21     Q.   Okay. The paragraph on the
22 left side, says "Many nonstatisticians
23 chafe at making up data," that's what
24 you're accusing the authors here of doing,

Page 303

1  right, making up data?
2          MS. LEHMAN: Object to form.
3          THE WITNESS: What I'm
4      accusing that the -- and accusing
5      is not the right word, I'm, when
6      criticizing the paper and saying
7      that there was data manipulation,
8      improper imputation, and assumption
9      that were beyond reasonable.
10 BY MR. TISI:
11     Q.   Well, you go actually further
12 than that, Doctor, and to be clear, I mean,
13 just to be fair, you say, you know, they
14 don't trust the women on their original
15 questionnaire and that they impute data in
16 the study based upon not missingness in the
17 second questionnaire that they never filled
18 out, right?
19     A.   They kind of do, yes, some
20 kind of manipulation --
21     Q.   Okay. So you think --
22         MS. LEHMAN: Hold on. Hold
23     on. Let him finish.
24         THE WITNESS: And they do

Page 304

1      manipulate too filling these gaps
2      in the data.
3  BY MR. TISI:
4      Q.   You're basically saying they
5  didn't trust the women when they answered
6  the 10 to 13 and the year before question
7  to deal with the missingness question,
8  right?
9      A.   I don't -- I think that
10 mischaracterizes what I state. I mean, I
11 think, like, they clean data a baseline
12 that is relatively complete. They impute
13 data at follow-up and they do it in a way
14 where they're taking people that said they
15 never used at baseline and they're using an
16 imputation approach that incorporates
17 recall bias from the follow-up study that
18 they're using to build the multiple
19 imputation model and then they're kind of
20 baking that into their imputation process.
21     Q.   Right. Okay. And what
22 you're saying is they should have just
23 trusted the women who answered I didn't use
24 it at 10 to 13, and the year before, and

Page 305

1  assume that they were nonusers, right?
2      A.   I don't believe I'm even
3  saying that. I'm suggesting that the whole
4  follow-up analysis is flawed because of the
5  level of missing data, the level of bias
6  that's in there. It's just too problematic
7  to fix.
8      Q.   Okay.
9      A.   Not at missing, not at random
10 situation, that's basically where you are,
11 you're in a hole --
12     Q.   Let's read this paragraph and
13 see what you think about it. It says "Many
14 statisticians chafe at making up data as is
15 done in MI and note that the validity of
16 MI, multiple imputation, depends on an
17 assumption about which factors relate to
18 the probability that a data point is
19 missing. Because of concern this
20 assumption may be violated. It is tempting
21 to retreat to the safe haven of complete
22 case analysis, i.e., only analyze the
23 participants without missing values."
24         Isn't that what you're

77 (Pages 302 - 305)

Page 306

1 saying, just look at the women who -- just
2 look at the women who answered the
3 question --
4    A.    That's not what I'm saying.
5    Q.    Okay.  "The safe haven is
6 however, illusory.  Although rarely made
7 explicit by the users, complete case
8 analysis requires a far more restrictive
9 assumption:  That any data point missing is
10 missing completely at random.  Other common
11 strategies, mean imputation, last
12 observation carried forward and other
13 single imputation approaches underestimate
14 standard errors by ignoring or
15 underestimating the inherent uncertainty
16 created by missing data, a problem multiple
17 imputation helps overcome."
18         Do you agree with that?
19    A.    I agree there are certain
20 situations where that is true, that
21 multiple imputation certainly helps --
22    Q.    Now, you criticized --
23    A.    -- but there are real
24 problems here with using it.  I think where

Page 307

1 I think it mischaracterizes what I'm
2 suggesting is that I'm not suggesting that
3 they treat the follow-up analysis as a
4 complete case analysis, far from it, that
5 would also be terrible.  That would be like
6 Scenario 5, it would be awful.
7         Scenario 1, however, has
8 many more missing data and even though
9 O'Brien with that missing data effectively
10 treats it as if it was complete case
11 analysis for that missing data, because
12 they just basically impute based on those
13 proportions at random.  That's equivalent
14 almost to treating it as if it had been a
15 complete case analysis on those people
16 missing at both time points.
17         I'm not suggesting in any
18 way that you take the data from time point
19 four and treat that as a complete case
20 analysis.  There's just too much missing.
21 It would be terrible.
22    Q.    Missing imputation takes the
23 guesswork out of data when data is missing
24 using statistics we actually know about

Page 308

1 from the data, true?
2    A.    Only if that information is
3 explanatory about your missingness in a way
4 that's unbiased and reasonable.  If it
5 was -- if it did it as you describe
6 perfectly, we wouldn't need to collect all
7 the data, we would just collect parts of
8 data and just fill it all in with multiple
9 imputation.  Clearly, it's better to have
10 complete data.
11    Q.    Well, but you can't --
12    A.    You're always losing when you
13 have to start imputing, and when you have
14 to impute a lot, you get into a lot of
15 trouble.
16    Q.    I mean, look, in fairness,
17 most missing data was because women died as
18 a result of ovarian cancer, correct?
19    A.    I mean, I don't know what
20 proportion of the missing, the differential
21 missingness of the cases was due to people
22 dying.  I have no doubt that some
23 proportion of that at least would be
24 because of that.  It doesn't change the

Page 309

1 fact that, and that's unfortunate,
2 obviously, it's terribly unfortunate, but
3 in terms of the analysis, it still leaves
4 you in trouble.
5    Q.    So one of the big criticisms
6 you have, as I read it, for example, in
7 paragraph 44, but in your circular logic
8 section of your report, is that the authors
9 included outcome status or cancer status in
10 their imputation model; is that true?
11    A.    Yes.
12    Q.    Okay.  And --
13    A.    It says -- I'm trying to go
14 to the paragraph, I mean, I agree with
15 you --
16    Q.    For example, paragraph 44,
17 but you have a whole section on that
18 beginning on Section C, "O'Brien's Chosen
19 Imputation Method is Inappropriate for the
20 dataset used," and you talk about how they
21 used, I'm sorry, page 25 of your report,
22 Section 8, "O'Brien Relies on Circular
23 Logic to Impute Genital Talc Use," and you
24 talk about inclusion of cancer status as

78 (Pages 306 - 309)

Page 310

1 part of the model there as well.
2    A.    Right.
3    Q.    Okay.  So one of your main
4 criticisms and one repeated throughout your
5 report is that they used cancer status in
6 the model and that biases the hazard ratio
7 away from one, right?
8    A.    Right.
9    Q.    And you think that is an
10 absolutely wrong way in which to do
11 imputation and that's a fatal flaw of this
12 study, true?
13    A.    Well, I think that
14 exaggerates what I'm saying.  I think I
15 would want to qualify that.  You can in
16 multiple imputation use the outcome to do
17 some imputation.  You have to be careful,
18 but if you know that your outcome has bias
19 baked in, then you're just going to
20 reinforce it.  That's the circularity.  If
21 your outcome doesn't have any bias baked
22 in, you would be fine.  Now, whether that's
23 because of people, more cases dying or not,
24 for the purposes of it being a problem here

Page 311

1 is to some degree irrelevant, because you
2 do have the differential missingness.  It's
3 there in the data.  It's almost double in
4 the cases of what it is in the controls, so
5 your imputation process is going to bake
6 all that back into the imputation part.
7    Q.    But, Doctor, isn't it true
8 that the imputation, the multiple
9 imputation would be a fatal mistake to not
10 include outcome status in the imputation
11 model?
12    A.    Actually, I mean, no, the
13 ideal situation with multiple imputation is
14 that you have other variables, covariates
15 that could perfectly explain your
16 missingness that would not be related to
17 the outcome so that you don't risk any kind
18 of feedback error.  But it's all other
19 covariates, other examples, demographic
20 variables that could fully explain the
21 missingness.  That's the perfect scenario
22 where you would be as if you didn't have
23 missing data.  Because you would be able to
24 perfectly predict the missingness.  Of

Page 312

1 course, that never exists.  You're always
2 suboptimal to that.  But that is the kind
3 of situation where you would be more
4 comfortable with your missing imputation
5 approach.
6    Q.    Well, isn't it true that the
7 authors of the 2024 article explain why
8 they include outcome status in their model
9 and actually cite a paper for that?
10    A.    I don't recall exactly what
11 they said to justify using the outcome in
12 their model.
13    Q.    Well, let's look at it --
14    A.    Citing a paper, you can
15 always cite a paper for anything, the
16 point, but does it justify what your --
17    Q.    Well, let's look at what they
18 said.  I mean, the question is whether or
19 not their methods are reasonable, right?  I
20 mean, whether you would do it or not is
21 kind of irrelevant.  The question is did
22 they employ methods that are commonly used
23 in the statistical community, true?
24        MS. LEHMAN:  Object to form.

Page 313

1        THE WITNESS:  No, I think the
2        question is do the methods they use
3        appropriately solve the problem so
4        that they can make unbiased
5        inferences in the data that they
6        have.
7 BY MR. TISI:
8    Q.    Okay.  Well, they, on page 4
9 of their -- of their study, if you would go
10 back to Exhibit No. 8.
11    A.    Yes, I'm there.
12    Q.    They have a paragraph on the
13 right-hand side that talks about multiple
14 imputation under the methods section and
15 describes how they -- how they perform the
16 data.  Could you blow that up, just that
17 paragraph up, if you don't mind, Jeff?
18 Okay.  In the paragraph, it says "We
19 included all the previously described
20 confounders and covariates in the
21 imputation model, as well as the cancer
22 outcomes and crude cumulative hazard
23 estimates, which corresponded to the hazard
24 of the earliest of the three cancer

79 (Pages 310 - 313)

Page 314

1 events."
2          Do you see that?
3    A.    Yes.
4    Q.    Now, the three cancer events
5 they were looking at was breast cancer,
6 uterine cancer, and ovarian cancer, right?
7    A.    I believe so.
8    Q.    All right.  And so they're
9 including -- and this is something you
10 criticized them for, right?
11    A.    What's the "this" that --
12    Q.    That they're including the
13 outcome increased this feedback loop that
14 you've talked about, that including cancer
15 status as part of their imputation model
16 exaggerates the hazard ratio, right?
17    A.    Correct.
18    Q.    All right.  But they actually
19 cite a paper in support of why they did
20 what they did, right?
21    A.    You mean the citation number
22 32 there?
23    Q.    Correct.  It's the Royston
24 and White paper, correct?

Page 315

1    A.    Yes, they cite that paper.
2    Q.    Right.  And in fact, not only
3 do they cite --
4    A.    I don't -- I'm sorry.
5    Q.    And not only do they cite the
6 paper, you have it on your reliance list,
7 correct, not reliance list, but a paper you
8 considered?
9    A.    Yes.
10    Q.    All right.  And you don't
11 discuss that paper at all in your report,
12 do you?
13    A.    No.
14    Q.    No, you don't, so let's see
15 what that paper actually says.
16    A.    Do we have this?
17    Q.    We do.  I'm going to get it
18 for you.  I'm a little bit ahead of myself
19 in my outline.  Would you go to Exhibit 20,
20 please?
21    A.    Yes.
22          - - - - -
23          (Royston and White Paper
24          marked Kornak Exhibit 20 for

Page 316

1    identification.)
2          - - - - -
3 BY MR. TISI:
4    Q.    Okay.  And this is the paper
5 upon which the authors rely for including
6 cancer status in their multiple imputation
7 model, correct?
8    A.    I think they use the paper to
9 try and point out -- to kind of, like, say
10 what the method is that they're using for
11 kind of incorporating that data rather than
12 as a justification, but --
13    Q.    Well, they're basically
14 saying we applied, we applied a multiple
15 imputation methodology that was in the
16 published literature and here it is at
17 footnote 42 for the world to see, right?
18 They just didn't say it without
19 attribution, true?
20    A.    Yeah, again, they're just
21 saying this is the way they dealt with the
22 incorporating the outcome into their
23 imputation log.
24    Q.    So now let's look at whether

Page 317

1 or not -- what this paper says.
2    A.    Uh-huh.
3    Q.    Right.  And you did not
4 discuss this in your report, did you?
5          MS. LEHMAN:  Objection, asked
6      and answered.
7          THE WITNESS:  I don't believe
8      I discussed it in any way.  I just,
9      like I said, I looked at it, I saw
10      what the kind of point of the
11      referencing it was.  They use
12      software that uses this to
13      incorporate their outcomes.
14 BY MR. TISI:
15    Q.    Right.  And they -- and you
16 didn't say, well, you know, Royston and
17 White might have been correct here, but
18 maybe not there, you didn't address it in
19 any way, did you?
20    A.    I mean, White and Royston
21 here are providing a method to incorporate
22 outcomes, survival outcomes within multiple
23 imputation.  It's a methodology thing.
24    Q.    Let's see what they say.  I'm

80 (Pages 314 - 317)

Page 318

1 sorry, let's see what they say. It says
2 multiple imputation -- can you please
3 scroll up, please? "Multiple imputation is
4 commonly used to impute missing data, and
5 is typically more efficient than complete
6 cases analysis in regression analysis when
7 covariates have missing values. Imputation
8 may be performed using a regression model
9 for the incomplete covariates or other
10 covariates and, importantly, on the
11 outcome." Right? Correct?
12      A.   Yeah, the qualifier there is
13 it may be performed.
14      Q.   Well, and then it says
15 importantly, includes the outcomes, right?
16      A.   Again, linked with the word
17 "may," you may include the outcome.
18      Q.   Right. And it goes on to say
19 "We compare the methods using simulation
20 studies. We find that using log T biases
21 covariate-outcome association towards the
22 null, while the new methods have lower
23 bias."
24           Do you see that?

Page 319

1      A.   Yes.
2      Q.   And they go on to say
3 "Overall, we recommend including event
4 indicator and the Nelson-Aalen estimator in
5 the imputation model."
6           Do you see that?
7      A.   Yes.
8      Q.   Go down please, a little
9 further.
10      A.   But I'm going to qualify it,
11 they're not saying that you should do that
12 when your outcome has bias already induced
13 in it.
14      Q.   I understand, but you've
15 criticized them, you've criticized the
16 authors here for daring to include an
17 outcome in their imputation model and this
18 article says you need to. If you're going
19 to do it, you need to include the outcome,
20 correct?
21           MS. LEHMAN: Object to form.
22           THE WITNESS: I don't think it
23      says that.
24

Page 320

1 BY MR. TISI:
2      Q.   Well, let's continue. It
3 says here on page 1983. "When the
4 incomplete data are covariates in the
5 analysis model, the analysis model outcome
6 must be used to predict the missing
7 covariate values. Although this practice
8 may seem counterintuitive, it is in fact
9 essential," correct?
10      A.   I would really have to sit
11 with this and look at the context. So if
12 you want to give me a minute to read the
13 paragraph before and after, I'm happy to do
14 that, but I'm not going to --
15      Q.   Did you read this paper? I
16 mean, this is the paper upon which they
17 relied to perform the multiple imputations
18 that they did for missing data. This was
19 the only paper that they relied on. Did
20 you look at it?
21           MS. LEHMAN: Object to form.
22      Asked and answered.
23           THE WITNESS: Yes, I looked at
24      it. I didn't go through it in

Page 321

1      detail.
2 BY MR. TISI:
3      Q.   Okay.
4      A.   I looked through it just --
5 it's kind of a tangential. They are giving
6 this as a reference because it's the
7 approach that the software that they use, I
8 believe they use, they would have used as a
9 status SSR and that software uses this in
10 how it puts things together and they would
11 have used it. I don't think when they are
12 referencing this paper they're saying look
13 at this to justify our incomplete data.
14      Q.   On what basis would you
15 say -- on what basis do you say -- they
16 say, they cite this paper for including all
17 the covariates as well as the outcomes in
18 their multiple imputation model. They cite
19 it for that purpose.
20      A.   I don't believe that's what
21 they do --
22      Q.   Well, let's go back and see
23 what they say. Go back to the paper, on
24 page 4, it says "We included all of the

81 (Pages 318 - 321)

Page 322

1 previously described confounders and
2 covariates in the multiple imputation, as
3 well as each of the cancer outcomes in the
4 crude cumulative hazard estimates."
5 Citation White and Royston.
6      A.    That's for the method of
7 using the crude cumulative hazard estimate.
8      Q.    Right, for cancer --
9      A.    It doesn't say we justify our
10 use of the outcome based on this paper.  I
11 mean, like I say, I'm happy to read through
12 those paragraphs if you want me to to put
13 them into context.
14      Q.    Let's go back to the Royston
15 article, the White and Royston article.
16      A.    Yeah.
17      Q.    They say failure to include,
18 while it may be counterintuitive, failure
19 to include outcomes is essential, true?
20           MS. LEHMAN:  Objection.  The
21           article speaks for itself.
22 BY MR. TISI:
23      Q.    If you're going to do it, you
24 need to include outcomes, right?

Page 323

1           MS. LEHMAN:  Same objection.
2           THE WITNESS:  I'm going to
3           look at that, I mean, if you --
4 BY MR. TISI:
5      Q.    Great.
6      A.    Are you just reading out the
7 statement to me or are you --
8      Q.    I'm reading, I mean, it's a
9 pretty clear statement, it says, when --
10      A.    No, no, no, no --
11      Q.    Well, let's --
12      A.    -- it's not.  You cannot --
13 you cannot look at a complex, statistical
14 methodological paper and then just say, oh,
15 you can just read this and understand it
16 and interpret it.
17      Q.    That's fine.  Take a look at
18 it, but they say when incomplete data are
19 covariates in the analysis --
20      A.    I saw the piece that you
21 highlighted, but I would like to, like,
22 quietly read the previous and the
23 following.
24      Q.    Why don't we take a break

Page 324

1 now?  This is a good time to take a break.
2 Why don't you take a look at the paper at
3 the break?
4      A.    You know what, that could be
5 great.  I would appreciate that.  Thank
6 you.
7      Q.    No problem.
8           - - - - -
9      (A recess was taken at this time.)
10           - - - - -
11 BY MR. TISI:
12      Q.    Doctor, we have been talking
13 about the White and Royston article.  We
14 gave you an opportunity to go off the
15 record and read it.  Have you had an
16 opportunity to read it?
17      A.    I believe I've had an
18 opportunity to scan it, yes.
19      Q.    Yeah.  And I think before you
20 had indicated that you had not really, I
21 think, read it in detail previously, is
22 that true or had you read it in detail?
23      A.    I think I would say that
24 statement still holds, it's a deeply

Page 325

1 math -- it's a mathematically, technical
2 paper that goes into some simulation
3 studies, just from now from my quick look,
4 you know, that would be a paper that would
5 take days to carefully look at.
6      Q.    And you didn't do that before
7 you rendered your opinion about the
8 feedback loop, right?
9      A.    No, and I don't think this
10 paper is relevant to that --
11      Q.    Okay.
12      A.    -- statement.
13      Q.    So having now had an
14 opportunity to review the paper, and if you
15 put it up again, it says, the article says
16 "When the incomplete data are covariates in
17 the analysis model, the analysis model
18 outcome must be used to predict the missing
19 covariate values.  Although this practice
20 might be counterintuitive, it is in fact
21 essential."  And actually has a footnote to
22 another paper.
23           Do you see that?
24      A.    I do.

82 (Pages 322 - 325)

Page 326

1    Q.    Do you agree or disagree with
2  that statement?
3    A.    I don't know that I either
4  agree or disagree.  Well, I certainly am
5  not going to argue it, but I would say this
6  is conditional, based on what I've seen in
7  the simulation studies, quickly looking
8  through, on outcome data not incorporating
9  bias in any way.  And also that -- and as
10 is required for all multiple imputation
11 models to -- with a basic assumption that
12 you are in a missing at random situation
13 not a missing not at random situation.
14   Q.    Well, we --
15   A.    Here the problem is that the
16 second time point values being incorporated
17 into the imputation model incorporates
18 bias.  So I would stand by that statement.
19 The exact details here of what they -- why
20 they say must be and essential, I would
21 defer answering.
22   Q.    Well, I mean, if I'm
23 understanding this correctly and I'm just,
24 you know, I'm just a lawyer, right, so I'm

Page 327

1  trying to understand this, but if I
2  understand this question correctly,
3  imputation doesn't go to the question
4  about -- you always have to answer the
5  question about bias, right?  Imputation
6  just deals with the question of
7  missingness, am I right?
8    A.    Well, imputation is about
9  trying to fill in missing data as --
10   Q.    Correct.
11   A.    -- best you can in a way that
12 your analysis is as unbiased as it can be.
13 But that is separate, like, the missing
14 data approach can incorporate bias and then
15 it becomes a problem.
16   Q.    And then you always have
17 to -- you always have to account for bias,
18 right?  I mean, even whether it's a bias
19 away from the null or towards the null, you
20 always have to, when you're doing
21 statistical analysis of this type, you
22 know, question one is how did you calculate
23 the hazard ratio; and two, does it
24 incorporate bias either away from null or

Page 328

1  in favor of null, correct?
2    A.    I would agree that it's of
3  interest whether bias -- any bias is bad.
4    Q.    Right.
5    A.    We can agree to that, I
6  think.  And bias whether that's bias
7  towards the null or bias away from the
8  null, bias away from the null is the most
9  dangerous though when you are considering
10 statistical inference and whether or not to
11 reject a null hypothesis.  For example, if
12 you're trying to get a drug approved with
13 FDA, they're not going to worry too much
14 about you having bias towards the null.
15 They're going to be much more worried about
16 you having bias away from the null.
17   Q.    Right.  And it's not like the
18 authors here did not consider the potential
19 of bias.  We're going to talk about that in
20 a moment, but the question higher with the
21 multiple imputation is really just
22 calculating the hazard ratio and then after
23 that considering whether or not it's the
24 result of bias, right?  I mean, the first

Page 329

1  question is --
2    A.    No, no.
3    Q.    If I'm understanding
4  correctly -- let me rephrase the question.
5    A.    Okay.
6    Q.    If I'm understanding the
7  process, the first thing that they did was
8  do a quantitative bias analysis to
9  calculate a hazard ratio.  And the second
10 question is acknowledging the potential for
11 recall bias, how do they address that
12 question.  They're really two separate
13 questions, right?
14      MS. LEHMAN:  Object to form.
15      THE WITNESS:  I don't know
16 that they're separate.  It's like
17 bias upon bias, that one part of
18 the bias is the part that they do
19 the -- what they call a correction
20 for.  And then they do the
21 imputation incorporating that bias
22 and rolling it in and baking it in
23 and amplifying it.  And then they
24 do this, oh, but what if some of it

83 (Pages 326 - 329)

Page 330

1        is recall bias and we'll kind of
2        play around with some numbers that
3        we make up of what it might be.
4 BY MR. TISI:
5        Q.    Right.  But the first
6 question really is, and just to be, just so
7 we have a clear record, what they're doing
8 with the quantitative bias analysis is
9 accounting for contradictory missing data
10 in order to calculate a risk ratio,
11 correct?
12       A.    I don't think they're
13 accounting for anything.  I mean,
14 accounting and statistics, accounting for
15 something means incorporating it into the
16 model as something that you're estimating
17 in some way, typically, as part of the
18 modeling procedure.  They're not doing that
19 here.  They're just changing data.
20       Q.    And to be clear, Doctor, when
21 somebody does a multiple imputation, they
22 don't know ahead of time how it's going to
23 affect the hazard ratio, do they?  They
24 don't know if it's going to go towards the

Page 331

1 null or away from the null, it could go
2 either way.
3        A.    I mean, relative to what,
4 relative to if they did a complete case
5 analysis, you mean, or relative to what?
6        Q.    They don't know, what I'm
7 trying to say is there's no way to predict
8 what the results of the imputation process
9 is going to be in terms of amplifying or
10 tamping down the hazard ratio, correct?
11       A.    I don't agree with that,
12 because if you know about sources of bias,
13 then you can start to predict the
14 direction, you could have predicted the
15 direction here based on their steps.  If
16 you looked at the data that they have just
17 in the tables and you know what the steps
18 are they're going to do, you know that
19 these steps will bias you away from the
20 null.
21       Q.    Well, wouldn't not including
22 the survival status or the outcome in the
23 model have biased the results towards the
24 null?

Page 332

1        A.    I'm just going to think
2 through that.  I think if you had just --
3 yeah, in a very general sense, if you -- if
4 you have a complete -- if you just use the
5 complete case analysis like they did, we
6 can even go back to, was it Table 3 with
7 the final row that you were describing the
8 analyses that they only look after the
9 follow-up time, do you remember?
10       Q.    Yeah.
11       A.    If we go to it, yeah.
12       Q.    No --
13       A.    Go ahead.
14       Q.    No.  I mean, I guess I'm
15 trying to get at the concept that White and
16 Royston make on page 1983, it says
17 important -- they say "it is important to
18 find the right way to include the survival
19 outcome in the imputation model because,
20 otherwise, the association between the
21 covariate and the surveillance survival is
22 likely to be diluted."
23       A.    Right, but you're diluting,
24 like in that, it's -- that statement is

Page 333

1 true.  I think there's an important caveat
2 there of finding the right way to include
3 the survival outcome.
4        And then there's another
5 important aspect to this is you're diluting
6 what you have, but in the complete data
7 analysis that you're starting from that you
8 would be diluting in the O'Brien (2024)
9 paper with starting using only follow-up,
10 only -- let's say you were using that
11 example of the -- you're starting from the
12 follow-up time point and you're looking
13 prospectively, then there's only -- you
14 have limited data there because of weak --
15 well, because of -- partly possibly because
16 of whatever answer you get there, if you
17 then impute missing data that will get
18 biased, that move towards the null.  I
19 don't think bias at the right word, but it
20 will move towards the null --
21       Q.    Let me see if I can put it
22 another way.  The authors here -- I'm
23 sorry.  I'm sorry.  The authors here
24 described a method including cancer status

84 (Pages 330 - 333)

Page 334

1 in the imputation model and they cite, I
2 think I said it wrong before, I said 42, I
3 think I meant footnote 32, which is the
4 White and Royston model. Okay? You would
5 not include cancer status in the imputation
6 model because it would create this feedback
7 loop, right?
8     A.    Because you're in the kind
9 of -- you're in the missing not at random
10 situation, yeah, you have bias in that
11 data, yes.
12     Q.    So what is your authority
13 for, I mean, if I'm reading this paper
14 correctly and I'm just a lawyer, right, I'm
15 reading this saying although this practice
16 of including cancer status in an imputation
17 model, this may seem counterintuitive is in
18 fact essential, right, when I read that, I
19 need to take the opposite point of view
20 that putting cancer status would amplify
21 the risk and, therefore, should not be
22 included and I want to know, you know, your
23 authority, is there a textbook, an article
24 or something where you can say, point me to

Page 335

1 that is the counter to White and Royston?
2     A.    Well, White and Royston is
3 under the assumption that missing multiple
4 imputation is appropriate, which is the
5 missing at random situation.
6     Q.    Okay.
7     A.    Under that -- under that
8 assumption, and if your outcomes are
9 unbiased, I mean, I don't -- there is --
10 and so Rubin's book will tell you you can't
11 use multiple imputation if you're missing
12 not at random.
13     Q.    Okay.
14     A.    You can go all the way back
15 there and you can look at every textbook on
16 multiple imputation, it says if you have
17 missing not at random, multiple imputation
18 as it stands is inappropriate.
19         Then there's also -- I don't
20 know if you'll find a textbook, but there's
21 an implicit assumption that your data that
22 you have is right and not biased. And if
23 you do have biased data that you're
24 building your imputation model from, you're

Page 336

1 going to incorporate that bias into your
2 imputation. I mean, that's --
3     Q.    Would you go to --
4     A.    The simulations that they
5 have here in White and Royston do not
6 incorporate those kinds of biases, they're
7 simulations under ideal missing at random
8 situations and where they do not have bias
9 in their outcomes.
10     Q.    So I'm going to look at, and
11 can we go to your number 42 in your report,
12 please, where you talk about MICE
13 procedure. Do you see --
14     A.    I'm sorry, I'm still getting
15 there. In my 42, I don't see that, no.
16     Q.    It says -- I'm sorry?
17     A.    I say, I'm talking about
18 imputations later, but --
19     Q.    Let me ask you this, will the
20 MICE procedure classify all women as talc
21 users? The MICE procedure is a predictive
22 model that will classify women as users and
23 some women as nonusers, right?
24     A.    Clearly, it doesn't, because,

Page 337

1 otherwise, it would be the same as Scenario
2 3.
3     Q.    Well, okay. But --
4     A.    We would get exactly the same
5 answer, because you would get exactly the
6 same data as you imputed in Scenario 3.
7     Q.    To be clear, using MICE on
8 this dataset was never going to be and did
9 not in fact classify all talc -- all
10 ovarian cancer cases where there was
11 missing data as nonusers or as users?
12     A.    I'm just trying to follow the
13 logic through and there's --
14     Q.    Let me rephrase my question.
15     A.    I think most likely not, but
16 there is a bizarre scenario where you
17 classified all the cases as one thing and
18 all the non-cases were mixed up, but it
19 would be very bizarre.
20     Q.    Well, in fact, multiple
21 imputation takes the guesswork out of data
22 analysis when data is missing using data
23 that statisticians do in fact know about to
24 predict in this case use or nonuse, right?

85 (Pages 334 - 337)

Page 338

1    A.    I would qualify that, it
2  tries to.
3    Q.    Okay.
4    A.    It depends on whether you
5  have the information to do that.
6    Q.    Right.
7    A.    There are other variables.
8    Q.    And in this case, you have
9  not, to my knowledge, attacked the
10 proprietary, other than cancer outcome, of
11 the variables used by the authors to
12 predict whether or not a woman is nonuser
13 or user in the case of missingness?
14   A.    I think I do point to it, if
15 you go to paragraph, I think it's 54, going
16 on to the top of page 25.  So these are --
17 these are the variables they're using for
18 multiple imputation beyond an outcome, at
19 least some of them, and you see, like,
20 across the board, they're really small
21 correlations and so you can't predict --
22 you can't predict the missingness when
23 there's such little information in the
24 covariate.  You can't predict it well.  So

Page 339

1  you're taking a little bit of the guesswork
2  out maybe if these estimates are real and
3  not just sort of, like, noise in the data.
4  But you're only going to be predicting a
5  little bit.
6    Q.    Well, isn't it okay, and I'm
7  probably using the wrong word
8  statistically, but isn't it all right if
9  they aren't good predictors, because in
10 that circumstance, multiple imputations
11 will be variable across imputations and it
12 will just increase the uncertainty or the
13 width of the confidence interval?
14   A.    That's certainly part of it,
15 but it's not the complete story.  So you
16 can get to a point where you're adding in
17 variables and you're adding in noise into
18 the process.  Also, when you do multiple
19 imputation, if you're to have -- you have
20 to do some combination across imputations.
21 So, like, I think the others talk about
22 using Rubin's rules to do that, my
23 understanding is there are other
24 approaches, but, you know, basically taking

Page 340

1  each of your imputed datasets and you're
2  building your confidence intervals from
3  those.
4        The more uncertainty there
5  is, the more imputations you need to get a
6  representative sample of that missingness.
7    Q.    Right, so it won't cause --
8    A.    But in practice, it's very
9  hard to sort of, like, run more than, you
10 know, ten imputations.  It's an expensive
11 computational process.
12   Q.    Well, it won't cause bias
13 actually by, even if they were not good
14 predictors, the variables used, they would
15 just cause variance, for example, multiple
16 imputations will accurately convey how much
17 information there actually is in the data
18 about the relationships, true?
19   A.    I didn't say they would cause
20 bias.  These, the non-outcome related
21 predictors, if they're measured well, will
22 not cause bias.  They just won't provide
23 any information about what the missing
24 value is.

Page 341

1    Q.    And that in fact --
2    A.    It's basically just
3  simulating it completely at random.
4    Q.    And that's a big problem with
5  single imputation, since basically it
6  pretends that each value is true but is not
7  a problem with multiple imputation because
8  that's the whole kind of point of doing it,
9  right, multiple imputations --
10   A.    I'm not going to argue -- I'm
11 not arguing that single imputation is
12 better by a long way and that also has, you
13 know, the only reason that single
14 imputation gets used anymore for super
15 massive datasets, where it's just
16 computationally too expensive to do any
17 other kind of imputation.  But what I am
18 saying here is that, okay, just if you're
19 setting your bar super low and you're
20 saying we can beat that bar a little bit by
21 having these only very slightly related
22 variables to the potential for missingness,
23 that doesn't really get you very far.
24   Q.    But, again, I mean, the

86 (Pages 338 - 341)

Page 342

1  actual variables used are disclosed in the
2  paper, I think it's footnote D of the
3  table. I've got to find my copy of it.
4  It's contained in footnote D of Table 2,
5  correct?
6      A.    In footnote --
7      Q.    Two, I have it on the screen
8  as well, if it that helps locate it.
9      A.    No, I've located it, it's
10  just small writing. So it lists additional
11  variables used over and above those that
12  are used for the survival analysis, but
13  it's not completely clear what are the
14  variables that come from the survival
15  analysis. So it's not clear that we have a
16  complete list here.
17     Q.    Again, you don't know the
18  answer to that question, so it's --
19     A.    Well, no, the answer to that
20  question is that it's incomplete.
21     Q.    Okay. So my question though
22  is they've disclosed the imputation model
23  including both the variables that they used
24  and the outcome status in their article,

Page 343

1  including the reasons why they did it,
2  true, they cited White and Royston?
3      A.    They don't completely
4  disclose the predictors in the multiple
5  imputation model, because they're saying
6  they use it, what they had in the
7  multivariable analysis, which they don't
8  completely specify. In addition, those two
9  pieces, even if they were complete, would
10  not completely describe the imputation
11  process, because they don't say what kind
12  of model they use for the imputation. Are
13  they using logistic regression, probit
14  regression? There are multiple ways of
15  imputing a binary variable and they don't
16  say what --
17     Q.    Have you searched -- have you
18  searched the website for the Sister Study
19  to see whether or not that data is
20  available?
21          MS. LEHMAN: Object to form.
22          THE WITNESS: It's not data,
23      it's a model.
24

Page 344

1  BY MR. TISI:
2      Q.    Have you done that?
3      A.    Have I searched their
4  website --
5      Q.    Have you looked --
6      A.    -- as to whether they tell
7  you what imputation model they used in a
8  paper that should have included that
9  information? I did not do that, no.
10     Q.    Well, okay. You know, I
11  mean, you've written papers before and I'm
12  sure people could always say that more
13  could have been included that wasn't,
14  right, you've heard that before, right?
15     A.    Yeah, I'm not going to
16  dispute that there are papers that I have
17  been involved in that there are certain
18  aspects that are -- that some detail that
19  may have been missed. But here --
20     Q.    Right.
21     A.    -- there are just so many, on
22  so many levels, there are stuff missing
23  that it goes beyond my analysis.
24     Q.    I understand, I get it. I

Page 345

1  get it. And you've identified those -- you
2  have identified those in eight days after
3  $50,000, right?
4          MS. LEHMAN: Object to form.
5      Argumentative.
6          THE WITNESS: I identified
7      those pieces that I found within my
8      report after performing an
9      independent review of this paper.
10  BY MR. TISI:
11     Q.    And that was your charge,
12  right? Tell me what's wrong with this
13  paper.
14          MS. LEHMAN: Object to form.
15          THE WITNESS: I said before, I
16      was asked to give an independent
17      review of this paper. That's what
18      I did.
19  BY MR. TISI:
20     Q.    If you were asking for an
21  independent review, did you say, you know,
22  I'm going to do this, I'm going to do this
23  for free, because I'm interested in the
24  topic? It's not completely independent,

87 (Pages 342 - 345)

Page 346

1 let's be fair, true?
2         MS. LEHMAN:  Object to form.
3         Argumentative.  Asked and answered.
4 BY MR. TISI:
5     Q.    When you say it's
6 independent --
7     A.    I would not be doing this if
8 I was not paid.  I would not be doing my
9 work as a professor if I was not paid for
10 it.
11    Q.    All right.
12    A.    So it's not my hobby, right.
13    Q.    But your work as a professor
14 is not being paid by a company who is
15 defending their product, true?  Your work
16 as a professor is to --
17    A.    I'm actually trying to think
18 of whether there are situations in my work
19 as a professor where, I mean, so certainly
20 there are, you know, in my work in
21 dementia, we're doing things related to
22 clinical trials which are in the interest
23 of companies, so.
24    Q.    So we talked about -- we have

Page 347

1 been talking about recall bias all day in
2 the context of the bias analysis that came
3 to category four in Table 2, the 1.81
4 hazard ratio, correct?
5     A.    Well, I think there's two
6 pieces here.  What they call quantitative
7 bias analysis is really their manipulation
8 of outcomes, what they call a correction.
9 And then the recall bias is another step
10 kind of on top of that afterwards, but
11 those two things combined are indeed in
12 their Scenario 4.
13    Q.    So, right, so what I really
14 want to focus on, I spent time talking
15 about how they came up with the 1.81 hazard
16 ratio for the relationship between talc and
17 ovarian cancer --
18    A.    Just to be clear for, like,
19 do you mean the 1.82 point in Scenario 4?
20    Q.    I'm sorry, you're correct,
21 you're correct.  Actually, it's -- yes,
22 correct.  And we have been talking about
23 how they came up that number acknowledging
24 the potential for recall bias, correct?

Page 348

1     A.    We've talked about the steps
2 they took to come up with that number and
3 what they claim is an analysis of recall
4 bias.
5     Q.    Well, that's the second step
6 that they did, they acknowledged the
7 potential because they were using
8 retrospective data in the -- they used
9 prospective data from the initial
10 questionnaire and retrospective data from
11 the supplemental questionnaire and then
12 they tried -- they calculated their hazard
13 ratio, but they did more recall bias,
14 didn't they?
15    A.    At what point are you saying
16 they didn't --
17    Q.    Well, they acknowledge the
18 potential for recall bias and then tested
19 the hazard ratio to see whether or not
20 reasonably there would be a -- that the
21 risk was likely related to recall bias,
22 correct?
23    A.    I would dispute the word
24 "reasonably" there.  I think here what

Page 349

1 we're -- if we're still talking about
2 Table 2, there's no -- none of their -- the
3 recall bias step is not yet entered when
4 we're here.  This is just their
5 contradictory data manipulation plus
6 multiple imputation.  Then later on, they
7 have in Figure 2, their recall bias, what
8 they call scenarios, which is really their
9 what-if situations.
10    Q.    All right.  They say --
11    A.    What do you mean by
12 "reasonable"?
13    Q.    Well, they're saying that
14 they're basically taking their data and
15 they're saying what if there is recall
16 bias, would we still have a positive
17 association, correct?
18    A.    They are trying to do this
19 through their random flipping process.
20    Q.    Okay.  And throughout your
21 report, you talk about recall bias, but it
22 is in fact a theoretic concern, true?
23         MS. LEHMAN:  Object to form.
24         Asked and answered.

88 (Pages 346 - 349)

Page 350

BY MR. TISI:
1
2    Q.    In other words, recall bias
3  is a theoretical concern that those who
4  have the disease may differentially recall
5  an exposure compared to those who don't
6  have the disease, correct?
7         MS. LEHMAN:  Same objection.
8         THE WITNESS:  Are we talking
9      about in this situation here or --
10 BY MR. TISI:
11   Q.    I'm talking about generally.
12 Generally, recall bias is a theoretical
13 concern that those who have a disease may
14 differentially recall an exposure as
15 compared to those who do not have the
16 disease?
17   A.    I don't know that.
18        MS. LEHMAN:  Same objection.
19        THE WITNESS:  That's a theory.
20     I think it's something that exists
21     in many problems.
22 BY MR. TISI:
23   Q.    Right.  And we know that
24 there are many, many scientists who

Page 351

1  question whether or not recall bias really
2  is as significant as, for example, you are
3  saying it is, true?
4    A.    I don't know what they're
5  calling significant versus what I'm saying
6  it is.  I don't know.  I haven't argued
7  with anybody about it.  I really don't --
8  the question is just super vague.
9    Q.    Okay.  Well, in this case,
10 the authors of O'Brien (2024), these NIH
11 scientists, did not ignore the potential
12 for recall bias using the supplemental
13 questionnaire in conjunction with the
14 enrollment questionnaire, did they?
15   A.    I mean, they took these steps
16 where they did things and then they did
17 these what-if adjustments for whatever
18 proportions might be recall bias of
19 different scenarios that did they -- they
20 didn't -- I mean, it's here in the paper,
21 so they didn't, like, ignore recall bias as
22 being a thing.  I mean, they acknowledge
23 it's a problem.
24   Q.    But they also noted that the

Page 352

1  data regarding talc use in the -- it says
2  there was evidence in the Sister Study that
3  recall bias was not as significant as to
4  contaminate the data, correct?  You use the
5  word "contamination."  In fact, we talked
6  about some of the issues before.  They did
7  the recall paper in 2023 where they said it
8  was consistency in recall of talc use.
9  They looked at the subset of people whose
10 data was truly prospective and saw a
11 positive hazard ratio, although
12 statistically not significant.
13        So they had evidence that in
14 this particular population, there was not
15 the evidence of recall bias that would make
16 this data unusable, true?
17        MS. LEHMAN:  Object to form.
18        THE WITNESS:  That was a very
19     long question and I think you begun
20     by saying that there's some -- you
21     try to imply that there's some
22     level of recall bias that this is
23     below such that it doesn't
24     contaminate the data.  You know, if

Page 353

1      there's any recall bias, it's
2      contaminating the data.  It's a
3      question of what level.
4  BY MR. TISI:
5    Q.    Right.  And when they looked
6  at that question objectively, they
7  published a paper in 2023 which indicated
8  that that was not a big problem with this
9  particular dataset, true?
10   A.    I know, I accept that that's
11 their conclusion.  I mean, basically, is
12 that -- first of all, I don't see how they
13 could possibly assess a precise measure of
14 recall bias when there's no matching
15 questions between the two surveys.  They
16 don't match.  They don't align.  Even if
17 they did align, thus, pointing to
18 87 percent agreement, that's 13 percent
19 disagreement.  And that's proportionately
20 affected in the cases.  That can lead to a
21 very big amount of recall bias.
22   Q.    Have you done the math to see
23 how much -- how much -- have you done the
24 math to see how much recall bias would be

89 (Pages 350 - 353)

Page 354

1  introduced by a 13 percent mismatch?
2      A.   I don't need to, because I
3  actually have the data here in O'Brien
4  (2024) that tells us what the recall -- the
5  differential recall actually is here.  You
6  can see it in table -- in Table A5, row 4,
7  that in overall, 19 percent said nonuser at
8  enrollment, missing at follow-up.
9  Thirty-seven percent of cases, that's
10  basically kind of you double the non-cases
11  are missing at follow-up after saying they
12  were nonuser at enrollment.  That's
13  differential recall.
14      Q.   Well, they may be missing in
15  follow-up, Doctor, because they died,
16  right?
17      A.   But that's still the same
18  problem for the analysis.
19      Q.   Well, it's not, that's why
20  you use multiple imputation, correct?
21      A.   No --
22          MS. LEHMAN:  Object to form.
23  BY MR. TISI:
24      Q.   The data is missing and now

Page 355

1  you want to look and see whether or not the
2  data you have predicts them as being a user
3  or nonuser, true?
4      A.   No, this is exactly what I'm
5  saying, it introduces the missing not at
6  random.  You can't just blindly apply
7  multiple imputation.  This is your problem.
8  This is one of the problems that I talked
9  about, and then also incorporating the
10  correct and contradictory data,
11  incorporating the manipulation of data,
12  this is all in there.  It's a problem.  You
13  can't just -- you can't wave a magic wand
14  and fix this.
15      Q.   Okay.  You know that
16  epidemiologists use retrospective data all
17  the time, true?
18      A.   They use --
19      Q.   A control study is a
20  retrospect study?
21      A.   Yes, retrospective for this
22  study.  And they're also always qualified
23  by the limitations of being retrospective.
24      Q.   Sure.  Right.  Even cohort

Page 356

1  studies, and I'll represent to you that
2  both, and I talked about this before, both
3  the Nurses' Study and the Women's Health
4  Initiative used a questionnaire after the
5  study began to talk about teleques.  It
6  happens all the time, true?
7      A.   I would want to look at the
8  specifics of those questionnaires, because
9  there's two different ways you can look at
10  data after the start point of the study.
11  There is kind of like retrospective asking
12  of questions of what was or this
13  longitudinal data gathering where you're
14  updating information as you go along.
15  That's different than trying to --
16      Q.   I understand.  I get it.  I
17  get it.  But if -- what I'm trying to get
18  at here is retrospective data is used by
19  epidemiologists and statisticians all the
20  time, true?
21      A.   Well, statisticians analyze
22  retrospective data.  Epidemiologists look
23  at retrospective data.  It's generally
24  preferred to have prospective data.  It

Page 357

1  doesn't mean, like, retrospective data is
2  something you can learn from, but --
3      Q.   And prospective data --
4      A.   -- but you're facing
5  limitations when you do that.
6      Q.   Prospective data has its own
7  limitations, for example, prospectively
8  collected data can introduce differential
9  misclassification, true, misclassification?
10      A.   The same with retrospective
11  data.
12      Q.   Right.  And so you always
13  have to be careful about biases.  It's not,
14  like, one study design is better than
15  another.  You have to basically look at the
16  strengths and weaknesses of each study and
17  then look at it in the context of
18  everything else that happened, true?
19          MS. LEHMAN:  Object to form.
20          THE WITNESS:  That's true, but
21      it's also true that, you know, that
22      there's still a difference in the
23      level here.  And when you're doing
24      things prospectively, there is a

90 (Pages 354 - 357)

Page 358

1    risk of if any bias of it being
2    towards the null, but that's not
3    what you're mostly -- so all bias
4    is bad, it's better to not have
5    bias, I acknowledge that, but the
6    biggest concern is bias away from
7    the null because that's what leads
8    to spurious results.  That is the
9    big concern.  That's what the
10    reproducibility crisis is all
11    about.  It's artificial detection
12    of effects where none exist.
13   BY MR. TISI:
14    Q.    Now, looking at the O'Brien
15    study, O'Brien (2024), they did the whole
16    thing, they did -- they dealt with bias,
17    they did a bias analysis and they did their
18    recall bias analysis and they said that was
19    their main objective, true?
20    A.    I don't see that they said
21    that.
22    Q.    Look at page 2 of the O'Brien
23    study.
24    A.    I see "Key objective, are

Page 359

1   history of genital talc use and
2   douching associated with breast --"
3    Q.    Go to page 2, go down on the
4   left-hand side, "Our main objective was to
5   reevaluate the associations between
6   intimate care product use and incidence of
7   hormone-related cancers, expanding on
8   previous analyses, by incorporating newly
9   diagnosed ovarian and uterine cancers,
10   adding breast cancer as an outcome, and
11   integrating new data on lifetime use of
12   douche and genital talc.  Because the newly
13   acquired exposure data were susceptible to
14   differential missingness by cancer status,
15   we used quantitative bias analysis to
16   estimate effects under several missingness
17   assumptions.  When examining the
18   association between genital talc use and
19   ovarian cancer, we additional evaluated the
20   potential of recall bias," true?
21    A.    That's what that paragraph
22   says, but I want to just make a distinction
23   between the first sentence there, they're
24   very long sentences, but the first sentence

Page 360

1   which is about their main objective and
2   then the second sentence is what they tried
3   to do to try to deal with problems that
4   they knew they were incorporating by
5   reevaluating using the follow-up data.
6    Q.    And when we talk about
7   retrospective studies, they also talk about
8   the problems with prospective studies in
9   the sentence above, "Although not affected
10   by recall bias, prospective studies tend to
11   have small case numbers and simplified
12   exposure assessments, resulting in low
13   statistical precision and increased
14   likelihood of nondifferential exposure
15   misclassification."  That's true, right?
16    A.    I mean, that's quite a
17   generalization that isn't true always.  You
18   can have prospective studies --
19    Q.    They said tend to have.  They
20   didn't say always, they say they tend to
21   have?
22    A.    It's still a generalization.
23   I don't know.  I haven't seen this study
24   that analyzes, like, a random sample of

Page 361

1   prospective studies and a random sample of
2   retrospective studies to determine the
3   number of cases.  I just want to point out,
4   I wouldn't really try to argue too much --
5    Q.    All right.
6    A.    -- I mean, if -- there are
7   certainly situations where you have a
8   retrospective, you choose to do a
9   retrospective analysis because in that
10   situation, you might be able to get higher
11   case numbers than you could if you tried to
12   run a prospective study, because it might
13   take you 50 years to get that number of
14   cases.  And so, but I'm not going to accept
15   it in general terms.
16    Q.    Let's go to your report,
17   page 34, paragraph 71.  And you talk about
18   the different scenarios that the authors
19   chose to test their data for the potential
20   of recall bias.
21    A.    Yes.
22    Q.    And you choose a 50 percent
23   number to illustrate the potential
24   problems, correct?

91 (Pages 358 - 361)

Page 362

1    MS. LEHMAN:  Object to form.
2    THE WITNESS:  So are you
3    talking about in paragraph B where
4    I say 50 percent --
5 BY MR. TISI:
6    Q.    Correct.
7    A.    Yeah, I wouldn't say I'm
8 choosing that situation, I'm just showing
9 an example of --
10    Q.    Do you believe that a
11 50 percent recall bias number is a
12 realistic assessment of the problems in
13 O'Brien (2024)?
14    A.    I don't know exactly what is
15 a realistic assessment, but I can point you
16 to in, again, the differential recall in
17 Table A5 is really, yes, it's that big.
18 It's doubling the cases in terms of
19 missingness at follow-up than what it is in
20 controls.
21    Q.    And you would ignore -- and
22 you would ignore the conclusions of O'Brien
23 (2023) that says there is not that problem
24 of recall bias, right?

Page 363

1    A.    I don't know that I'm saying
2 that, I mean, ignoring that, this is -- I'm
3 just looking at the data that's in this
4 paper and that level of differential
5 missingness is right there and it's kind of
6 obvious.
7    Q.    Okay.  Now, in Table 2, the
8 data, tested data, the likelihood of recall
9 bias uses several recall bias scenarios,
10 all of which pass peer review, right?
11    A.    That the scenarios pass peer
12 review?
13    Q.    Yes.
14    A.    The paper went through peer
15 review.  I don't think there's a concept of
16 individual analyses passing peer review.
17    Q.    Well, if there was a problem
18 with these assumptions, wouldn't you have
19 expected that not to pass peer review?
20    A.    I am frankly stunned that the
21 peer-review process did not catch this,
22 catch the problems in this analysis.
23    Q.    The recall bias scenarios,
24 they're in a big chart on page 9, it's hard

Page 364

1 to miss them, isn't it?
2    A.    It is.  But, again, I believe
3 that the reviewers must have just taken
4 them at face value.
5    Q.    Okay.
6    A.    And I point out in my report
7 why this is -- this is one of those, this
8 is incredibly misleading.  Recall bias
9 Scenario 2 in particular is kind of -- it's
10 astounding how they present it.
11    Q.    Well, let's look at one, A,
12 and then let's look at B, and then we'll
13 look at C.
14    A.    Okay.
15    Q.    Scenario A has a positive
16 risk hazard ratio even if 50 percent of the
17 cases were switched to never use, correct?
18    A.    No, the point estimate of the
19 hazard ratio is 1.07.
20    Q.    Correct.
21    A.    It's in Table 1.  That .07
22 difference is way within sampling
23 variability when you look at the width of
24 the confidence interval there from 0.81

Page 365

1 to --
2    Q.    Right.
3    A.    -- 1.40.  And you can see the
4 line very clearly crosses 1.0 --
5    Q.    Right.
6    A.    -- which is a plausible
7 value.
8    Q.    Okay.  Now, let's look at
9 25 percent.  If they take 25 percent of the
10 cases and reassign them to never use,
11 there's still a 1.4 relative risk and that
12 is statistically significant, correct?
13    A.    The point estimate is 1.41
14 and the confidence interval in that case,
15 if all you do is take that 25 percent,
16 based on their sort of inappropriate
17 approach of just flipping people, then that
18 point -- that confidence interval, if you
19 accept all of those assumptions, all of the
20 steps they did before and the reassignment
21 of other magical steps they did, then this
22 comes out to be statistically significant,
23 but it ignores anything that also might be
24 in Scenario 3.  So they're basically say

92 (Pages 362 - 365)

Page 366

1  the recall bias of Scenario 3 is zero when
2  they come up with that estimate there.
3      Q.    Let's talk about them one at
4  a time. Okay?
5      A.    Okay.
6      Q.    What they're saying here --
7      A.    No, because these things
8  don't exist one at a time --
9      Q.    I understand. We'll talk
10  about it in --
11      A.    -- they're in combination.
12      Q.    Doctor, we'll talk about it
13  in total.
14      A.    The total here that --
15      Q.    Doctor, Doctor, we'll talk
16  about it in total, I promise you. I've
17  just got to get -- I can only ask one
18  question at one time. So give me a chance
19  to get through the whole thing and I'll ask
20  your opinions because I want to know what
21  they are. Okay?
22      A.    Okay.
23      Q.    Scenario 1, they say if you
24  take 25 percent of the cases that we

Page 367

1  computed are likely to be cases, and we're
2  going to switch them to never users, we're
3  going to take user and switch them to never
4  users, there's still a positive risk ratio
5  of 40 percent, correct, 41 percent?
6      A.    That's point estimate, it
7  ranges from -- well, the risk -- the hazard
8  ratio is 1.41, it's not quite the same
9  thing. And that ranges in a 95 percent
10  confidence interval from 1.06 to 1.87. But
11  this is conditional on you accepting
12  everything they did --
13      Q.    Understood.
14      A.    -- up until step four to in
15  their Scenario 4, which I don't --
16      Q.    I understand. We did -- we
17  took care of missingness and data
18  correction. We took care of that. We're
19  now testing it for recall bias, right?
20  They calculated the number they calculated,
21  now they're saying how likely is it that
22  this is a positive association if we
23  consider --
24      A.    What --

Page 368

1      Q.    -- if they consider recall
2  bias at various levels, right?
3      A.    Okay. So I think right now
4  you're specifically referring to the
5  25 percent recall bias level associated
6  with --
7      Q.    For example --
8      A.    -- recall bias Scenario 1,
9  but what I'm saying is that you can't --
10  this adjustment is conditional on accepting
11  Scenario 4.
12      Q.    Right. And they're saying,
13  it states even if Scenario 4 is inflated
14  and we take 25 percent of the cases and
15  throw them into never use, we still have a
16  positive risk ratio of 1.4, right?
17      A.    No, because what's in
18  Scenario 4 is more than just recall bias,
19  because as we've discussed, there's the
20  feedback loop. There's the amplification
21  of recall bias that comes from their
22  correction procedure. And so when you
23  think you're correcting 25 percent here,
24  you're not really correcting 25 percent,

Page 369

1  you're correcting less.
2      Q.    Okay. In Scenario B, they
3  say that even if you accept 75 percent of
4  the cases and you reassign them, short-term
5  users or frequent users to never use, you
6  still have an increased risk of 1.34,
7  correct?
8      A.    In this case, so the
9  75 percent of infrequent short-term users,
10  and this is really quite, quite incredible,
11  quite bizarre, and that 75 percent,
12  75 percent sounds like a lot, right? But
13  75 percent here is just five people.
14      Q.    Okay.
15      A.    So if all of this -- you
16  talked about, what did we say, there's
17  50,000 odd people in the study, five people
18  only, you change their assignment, it comes
19  all the way down from 1.82 down to 1.34.
20  Take it to six, you are no longer
21  statistically significant.
22      Q.    There were not 50,000 --
23      A.    Take it to seven and then you
24  would be around about 1.1. And totally not

93 (Pages 366 - 369)

Page 370

1 statistically significant.
2    Q.    Doctor, there were not 50,000
3 ovarian cancer --
4    A.    Seven individuals, seven.
5    Q.    There are not 50,000 ovarian
6 cancer cases in the Sister Study, are
7 there?
8    A.    I agree with you.  The 50,000
9 example was to start with --
10    Q.    Okay.  There's 250 cases --
11    A.    Right.
12    Q.    Doctor --
13    A.    All right.  Seven people out
14 of 250.  You switch their status, your
15 results are gone, it's disappeared.
16    Q.    Let's compare -- let's
17 compare apples to apples.  That statement
18 about 50,000 people compared to seven
19 people was misleading, was it not?
20       MS. LEHMAN:  Object to form.
21       Argumentative.
22 BY MR. TISI:
23    Q.    50,000 -- there were 50,000
24 people in the study, only 250 people had

Page 371

1 ovarian cancer, correct?
2    A.    I agree that I should have
3 just used the ovarian cancer number, then
4 whatever at this point.
5    Q.    Thank you.
6    A.    I'm trying to -- it's late in
7 the day --
8    Q.    I understand, me too.
9    A.    I will say that still seven
10 out of 250 is a very small proportion, such
11 that when you're running a sensitivity
12 analysis and your result disappears with
13 changing as few as a handful of your
14 participants.  I mean, this is why we do
15 sensitivity analysis, we look to see do our
16 results stand the test if we just -- how
17 much are we relying on our models, our
18 assumptions, and so on, because we really
19 don't want to make statements that are,
20 like, so easily manipulated to disappear.
21    Q.    And if you look at section --
22 if you look in Scenario 3, if they take
23 people who are non-cases and kind of test
24 them and throw them into the short-term or

Page 372

1 infrequent users, you'd have to get almost
2 between 15 or 20 percent of those to do
3 that as well, right?
4    A.    If they were the only kind of
5 recall bias, which I'm pretty sure the
6 authors are not claiming that this is the
7 major source of recall bias, I think that
8 would be Scenario A.  But if this was the
9 only source of recall bias, you would need
10 a lot to make a really big difference.  But
11 as we said earlier, these don't come on
12 their own, so like the Scenario B recall
13 bias, add that onto the Scenario B --
14 Scenario C and it's just something -- just
15 a few from Scenario B that you flip, and a
16 bit of Scenario C, a bit of Scenario A and
17 your results just more than disappeared,
18 which was doubling inflated in the first --
19 no, doubling -- again, perhaps late in the
20 day, I shouldn't use that, let's be
21 precise, it was an extra inflated hazard
22 ratio in the first place that you get from
23 Scenario 4 and now with these, you've
24 really got these different kinds of recall

Page 373

1 bias in combination and it wouldn't take
2 much to make it disappear --
3    Q.    So let me --
4    A.    Just again, my report, my --
5 the central statement in my report is that
6 they're not showing a reliable association
7 between talc use and ovarian cancer and
8 this kind of demonstrates that it's not
9 reliable.  Even if you accepted their
10 Scenario 4, you can play with these
11 scenarios and as many as they came up with
12 that retain a hazard ratio, I can come up
13 with a whole new set where the hazard ratio
14 becomes statistically insignificant and
15 disappears.
16    Q.    So in the editorial that
17 accompanied this, they address that
18 question, don't they?  Let's go back to
19 Exhibit No. 6, which is the Harris, Terry,
20 Davis editorial?
21    A.    I'm going to ask you for
22 my -- I understand we're in the middle of
23 towards the question and I'm happy to sort
24 of answer this, but then if we could have a

94 (Pages 370 - 373)

Page 374

1 break again.
2     Q.    No question, and just to give
3 you a sense, I'm kind of -- there's one
4 area I want to cover that's separate from
5 this, but I want to get through the recall
6 bias issue and so if you give me some
7 leeway here, I'll give you some leeway as
8 well. Okay?
9     A.    Okay. Then maybe can you
10 just give me 15 seconds to get some water,
11 because I feel my mouth dry --
12     Q.    Of course.
13     A.    Okay.
14     Q.    Actually, let's take it now.
15 I don't mean for you to be uncomfortable
16 for sure. I just want to get you to bed.
17     A.    Okay. Thank you.
18     Q.    It's late over there.
19     A.    Yup, much appreciated.
20        - - - - -
21     (A recess was taken at this time.)
22        - - - - -
23 BY MR. TISI:
24     Q.    Dr. Kornak, going to Exhibit

Page 375

1 No. 6, the fourth paragraph down.
2     A.    Yes.
3     Q.    Okay. It says "After
4 accounting for potential biases or O'Brien
5 et al. report a significant increase in
6 ovarian cancer for genital powder use, with
7 effect estimates that are in range of
8 previous studies."
9        Going down to the end, it
10 says "While the degree of bias is unknown,
11 the reader can make their own assessment
12 about the reasonable range of realistic
13 risks based upon the misclassification
14 scenarios provided. In this paper, even
15 with misreporting of the exposure in half
16 the cases, a significant increase in
17 ovarian cancer risk is still observed,
18 adding support to the plausibility of a
19 true association between genital powder use
20 and ovarian cancer."
21        Do you see that?
22     A.    Yeah, I see that.
23     Q.    Have you made an assessment
24 about the realistic range of realistic

Page 376

1 risks based upon the misclassification
2 scenario provided, this editorial asks that
3 the reader do that? Did you do that?
4     A.    I don't think it asks the
5 reader to do that. They say the reader can
6 do that if they want to.
7     Q.    Did you do that?
8     A.    That would be based on all of
9 the assumptions that O'Brien has taken in
10 her correction, manipulation, imputation
11 approaches --
12     Q.    Did you do that?
13     A.    -- before getting to the
14 recall bias.
15     Q.    Did you do that?
16     A.    I think I just described to
17 you examples of that, like, flipping seven
18 people would change the result and so
19 forth. I think we went through that whole
20 thing of when it would versus when it
21 wouldn't. Yeah, and again, I'm looking for
22 something that will indicate that there's
23 reliability in the result.
24     Q.    Looking at the next page, it

Page 377

1 says "Given that ovarian and uterine
2 cancers are both gynecologic cancers and
3 the reported association with one but not
4 the other may not be appreciated by the
5 general population, one could expect them
6 to be similarly affected by recall bias.
7 Thus, the lack of association between
8 genital use and uterine case provides
9 additional report that recall bias does not
10 fully explain the genital powder and
11 ovarian cancer association."
12        Do you agree or disagree
13 with that?
14     A.    I disagree with that.
15     Q.    Why?
16     A.    So if you want to go back to
17 O'Brien -- no, there's a couple of reasons.
18 I mean, in terms of the mechanism for
19 recall bias, my understanding is that the
20 stories were about -- the reporting was
21 about genital talc use and ovarian cancer.
22 I don't recall ever seeing anything about
23 douching, maybe there was. But that's not
24 my main point.

95 (Pages 374 - 377)

Page 378

1    My main point here is if you
2 look at -- actually, I have a couple of
3 main points.  Let me start with the
4 straightforward one, if you look at row 4
5 of table A5.
6    Q.    Uh-huh.
7    A.    So I'm just going to the data
8 here, I'm not relying, not ascribing the
9 mechanism or anything, but if we look at
10 the differential recall, again, in the
11 genital talc column, overall 19 percent.
12 You look at uterine cancer, the cases,
13 20 percent.  Barely any differential recall
14 there.  You look at postmenopausal breast,
15 21 percent.  Barely any differential recall
16 there.  I mean it's not nothing, but it's
17 small.
18    You look at the
19 premenopausal breast cancer, that's a
20 little bit higher at 27, but it's still
21 very small compared to the difference
22 between 37 and 19.  That differential
23 recall is massive.
24    So why -- why -- I gave you

Page 379

1 one possibility as to why there's that
2 difference, that the bigger stories were
3 about talc use and ovarian cancer rather
4 than douching, but it's here in the data.
5 The differential recall is clearly there in
6 O'Brien's own data that is much bigger in
7 ovarian cancer than the other types.
8    Q.    I'm going to ask you a couple
9 of questions related to your paragraph
10 number --
11    A.    I want to finish with, sorry,
12 it's going to take me a second to just find
13 the third piece that I wanted to -- so, for
14 example, I think Table 2, if we look at
15 uterine cancer, it goes on to the next
16 page.  No, it's not that there's no -- the
17 recall bias is definitely not there.  As
18 you go from Scenario 1 to Scenario 2, it
19 states that -- but then it does increase
20 with Scenario 3.  It's a very small
21 increase with Scenario 4 there.  I mean,
22 it's negligible.  It goes from .98 to 1.01.
23 So there may be a slight of recall bias.  I
24 don't know that it's zero there.  But,

Page 380

1 again, the main message I wanted to say is,
2 like, the differential recall is there
3 baked in the data, you see it in --
4    Q.    My question is in paragraph
5 number 25, you say that this study is
6 inconsistent with their prior work.  If you
7 would go to that page, that paragraph.
8    A.    Yeah, I'd say that's a
9 general kind of statement that --
10    Q.    Let's --
11    A.    -- the prior prospective
12 work --
13    Q.    Let's look at them, if you
14 don't mind?
15    A.    Oh, sure, yeah.
16    Q.    If you would go to the
17 Gonzalez study again.  You say Gonzalez
18 finds a hazard ratio of .73.
19    Do you see that?
20    A.    I say that they estimate a
21 hazard ratio.
22    Q.    That wasn't for lifetime use,
23 was it?
24    A.    Sorry?

Page 381

1    Q.    That wasn't for lifetime use,
2 was it?
3    A.    That was for -- I don't know
4 to the extent that -- I mean, the question
5 they asked their participants was whether
6 they used between the ages of 10 to 13 or
7 in the last 12 months.  To the extent that
8 that's representative of lifetime use,
9 that's what this hazard ratio represents.
10    Q.    They say if you go to the
11 end, the last sentence on page 7, they say
12 on page 7, it says "In this large,
13 prospective study, we did not observe an
14 association between recently talc use and
15 ovarian cancer."  Do you see that, not
16 lifetime use?
17    A.    Well, the definition includes
18 10 to 13, so I don't know that -- that may
19 or may not be recent for --
20    Q.    Well, they talk about 10 to
21 13, they didn't have a lot of data, it was
22 mostly the year, the year before that they
23 had data.  So they talked about recent use,
24 correct?

96 (Pages 378 - 381)

Page 382

1    A.    I don't recall -- I don't
2  recall them saying that they only have data
3  on the last year, but not on 10 to 13.  Can
4  you point me to where that is?
5    Q.    Well, in any event, because
6  I'm trying to wrap this up, they talk
7  about -- they talk about that this is an
8  association between recent use and, of
9  course, O'Brien (2025) [sic] talks about
10 lifetime use, right?
11   A.    In this paper, they do use
12 the term "recent talc use."  In O'Brien
13 (2024), not '25, we're not there yet.  In
14 2024, they do say they're examining
15 lifetime use.
16   Q.    The next one is O'Brien
17 (2020), that's Exhibit 25 in your book.
18   A.    Yes.
19   Q.    Okay.  In this study, they
20 make clear that looking at women with
21 patent tubes is an important subgroup to
22 look at?
23   A.    Okay.  Do you want to point
24 me to the section?

Page 383

1    Q.    Sure.  They talk about on
2  page 51, it says on the right-hand side, it
3  says "Because patency is required for there
4  to be a direct physical pathway between the
5  powder application area and the ovaries, we
6  hypothesized a priori that women with
7  patent reproductive tracts would be more
8  susceptible to the effects of powder use in
9  the genital area on ovarian cancer.  We
10 therefore conducted analyses restricted to
11 this subgroup.  When estimating the effects
12 of duration of powder on ovarian cancer
13 risk, we compared long-term, greater than
14 20 years, and non-long-term users with
15 never users."
16        Do you see that?
17   A.    Yes.
18   Q.    Okay.  And if you look at the
19 data when they looked at women with intact
20 tubes on Table 2, the overall risk ratio
21 was 1.13 with a hazard -- with a confidence
22 interval that does not cross one, correct?
23   A.    Table 2?  So in the pooled
24 estimate, yes, what you're highlighting

Page 384

1  there is an adjusted hazard ratio of 1.13
2  that goes from 1.01 at the lower end of
3  plausible values through to 1.26.  But I
4  would caution in the interpretation of that
5  is if I was working with anybody on a
6  project where their confidence interval
7  went down that low, I would want them to be
8  able to deal with does that reach a
9  clinically significant level.  Could it be
10 due to any biases or assumptions or model
11 assumptions or a reverse error results
12 robust to that lower confidence interval
13 that we really want to make the claim that
14 we have a statistically significant result.
15        And, in this case, I know I
16 already was suspicious, this is -- being a
17 combination of studies, you're always
18 subject to publication bias inflating
19 hazard ratios.  And then you in addition
20 earlier in this deposition pointed out to
21 me that one of the studies was actually
22 using retrospective information.  So then
23 there's recall bias in there.  So then I
24 would not want to rely on that 1.01 being

Page 385

1  genuinely above one.  So this is --
2    Q.    But this is in the section
3  where you say that the results of the 2024
4  were inconsistent with the results of her
5  prior studies.  We demonstrated that
6  Gonzalez was only looking at recent talc
7  use, correct?  And now we're looking at
8  O'Brien (2020), which talks about a
9  statistically significant increased risk in
10 cohort data using prospective data, which
11 in women who did not have hysterectomy,
12 true?
13   A.    I think that's not quite
14 true.  You already told me that part of
15 this is retrospective --
16   Q.    No, not this part --
17   A.    Well, the consistency should
18 be compared against the Sister Study and if
19 we look at the, you know, across the
20 studies, you can see that the hazard ratios
21 here are --
22   Q.    Doctor --
23   A.    -- far from being
24 statistically significant from one, but

97 (Pages 382 - 385)

Page 386

1 this is what I was -- it's my --
2     Q.    In your report, in your
3 report?
4     A.    -- report that I was writing
5 about, it was inconsistent.
6     Q.    I'm not fussing --
7     A.    In a hazard ratio estimate of
8 1.84 is inconsistent with one at 1.13.  In
9 fact, it's inconsistent with the whole
10 confidence interval by a factor of four.
11     Q.    You know that --
12     A.    So --
13     Q.    You know that Dr. O'Brien
14 has said, because you looked at her
15 response to the letter to the editor, she
16 has said that she thought that the actual
17 risk was greater than 1.13, correct?
18     A.    I don't recall her saying
19 that.  I don't dispute that she did.
20     Q.    Okay.  And you know that in
21 her -- in subsequent publications, she
22 agreed that there was a positive
23 association, true, even in her 2020 study?
24     A.    I'm not sure -- I've known

Page 387

1 her -- I remember seeing somewhere that
2 she's, you know, if we want to go somewhere
3 specific, I know you're concerned about
4 time.
5     Q.    Let's do that, exhibit --
6     A.    But I know she said that, you
7 know, that in her response to a statement
8 that she isn't -- wasn't ruling out that
9 there is a possible positive association --
10 I'm not making that claim that it's
11 impossible there's a positive association.
12 I'm just saying that there's no reliable
13 demonstration of a positive association.
14     Q.    Let's look, this is in a
15 section where you're talking about her
16 conclusion of a positive association in
17 O'Brien (2024) is inconsistent with her
18 prior studies.  So let's look at Exhibit
19 No. 13, if you would.  It's an exhibit we
20 looked at before and if you go to -- can
21 you go to the page, I don't know what
22 number it is, it's exhibit -- it's page 13,
23 I believe, and this document is not
24 paginated, so if you want to try to just

Page 388

1 bring it up on the screen.  Can you go to
2 where -- she's one of the authors, she and
3 Dr. Wentzensen are one of the authors of
4 this paper.  It says "In the largest
5 prospective study so far, the OC3 found a
6 very small positive association between
7 genital powder use and ovarian cancer risk
8 among all women, 1.08, as well as among
9 women with intact uterus and fallopian
10 tubes, 1.13."
11         Isn't it true, Doctor, when
12 they describe the results of 2024 -- I'm
13 sorry, 2020, they see a positive
14 association in the pooled study of cohorts?
15     A.    Well, that has a duration of
16 1.08 is a point estimate, it's not
17 statistically significant that --
18     Q.    Right, but --
19     A.    The confidence interval has a
20 plausible value of one -- and the
21 confidence interval crosses one, it has a
22 plausible value of .99 or one.
23     Q.    Right.  And then they say
24 taken into context with the ovarian cancer

Page 389

1 with the women with patent tubes, there's a
2 positive association consistent with an
3 association, true?
4     A.    So in that case, there's --
5 we're referring to the hazard ratio point
6 estimate of 1.13 there with a --
7     Q.    Yes.
8     A.    -- 5 percent confidence
9 interval of 1.01 to 1.26.  Again, I just
10 would be very cautious about whether or not
11 I wanted to say that we have a result here
12 given that the lower end is 1.01 --
13     Q.    And we will --
14     A.    -- which is entirely subject
15 to assumptions.  But I also, I'm not sure
16 what data goes into this analyses and
17 whether there's retrospective components or
18 not and the potential for recall bias, so I
19 just want to --
20     Q.    So you don't know?
21     A.    If you want to take the time
22 to walk me through it, I would probably
23 give you a better answer.
24     Q.    I understand, but you don't

98 (Pages 386 - 389)

Page 390

1 have an opinion right now? I mean, they
2 are saying, they know their own data and
3 they say there's a positive association
4 particularly in women with patent tubes and
5 that's a positive association, true?
6     A.    Yeah, but I think you
7 started -- well, it's one point --
8     Q.    That's what they say?
9     A.    As a point estimate, it's a
10 positive association. But in the same way
11 as case-control studies, if there's any
12 recall bias in there that's statistically
13 significant, it's so on the boundary. I
14 explained before, if that happened in a
15 study I was involved in, and that was, we
16 considered that to be a central result of
17 the study, I would -- I would pull all the
18 stops out to do every kind of sensitivity
19 analysis I could and question any potential
20 sources of bias that could be meaning to
21 you to have that marginal --
22     Q.    Of course, you didn't even
23 know about the ovarian --
24     A.    Again, going back to your

Page 391

1 earlier question, you were relating to
2 whether or not it was consistent with
3 O'Brien (2024). The O'Brien (2024)
4 preferred analysis, they're talking about a
5 hazard ratio of 1.84. They're not talking
6 about --
7     Q.    But they both showed a
8 positive association?
9     A.    Sorry?
10     Q.    We can talk about the
11 strength of the association, but they both
12 showed a positive association, right?
13     A.    But that's not what I mean by
14 consistency. If you're going to have
15 consistent results, you know, it's like
16 saying I have five apples or 5,000 apples
17 and saying that's the same thing, it's not
18 the same thing.
19     Q.    The next one is Chang, you
20 refer to the Chang study. Let's talk about
21 that briefly. It's Exhibit No. 22 in your
22 book. And your report says that the
23 overall hazard ratio for talc and ovarian
24 cancer was 1.06 with a confidence interval

Page 392

1 of .91 to 1.24 and you refer to the
2 appendix S4.
3     Do you see that?
4     A.    On the screen at the moment
5 is the paper itself. I'm referring to the
6 appendix.
7     Q.    Now, if you go to the 21, if
8 you don't mind, on page 21, because I have
9 that up here. It says this is the chart S4
10 and it says "Association between
11 one-frequency category increase in use of
12 single personal care product, breast,
13 ovarian, uterine cancer using Cox
14 proportional hazards models."
15     Do you see that?
16     A.    Okay, I've got the table,
17 yes.
18     Q.    And actually if you go to the
19 next page is where you see at the top, you
20 see the number that you pull out, which is
21 1.0. Talc vaginal use, I think you have
22 1.07 with a .94, 1.23.
23     Do you see that?
24     A.    Yes.

Page 393

1     Q.    Okay. But that's in
2 relationship to what they call -- that's
3 not the overall risk ratio, that is a
4 one-frequency category increase, correct?
5     A.    Yes.
6     Q.    Okay. And what is a
7 one-frequency category increase?
8     A.    I have to remind myself of
9 that.
10     Q.    Well, let me see if I can
11 help you, Doctor, because I know it's
12 getting late. Let me see that if I can
13 help you. Go to page 14 of the article in
14 the conclusion. Do you see that? Did you
15 actually read this paper?
16     A.    I don't think I read it
17 completely.
18     Q.    Okay. They say --
19     A.    I assumed I looked at the
20 paper.
21     Q.    Well, did the lawyers point
22 out to you the 1.06 confidence or relative
23 risk and say that was the overall hazard
24 ratio seen in this paper?

99 (Pages 390 - 393)

Page 394

1    A.    No.
2         MS. LEHMAN:  Object to form.
3    BY MR. TISI:
4    Q.    Well, it says "Although the
5    observed effects of a one-frequency level
6    increase was modest in magnitude, the
7    impact would be more substantial when
8    comparing the most frequent users with
9    never users.  For example, an 8 percent
10   higher hazard of postmenopausal breast
11   cancer for one-frequency level increase in
12   the beauty mixture could translate to
13   approximately a 36 percent higher hazard
14   ratio for the most frequent users compared
15   to never users."
16        Do you see that?
17   A.    I do see that.
18   Q.    Okay.  So if ours is -- you
19   talk about a 1.06, here is a one point --
20   they're using an 8 percent ratio and
21   they're talking about if you add the
22   numbers together or multiply them the way
23   you should, if it was more frequent user,
24   that number would be close to 30 percent,

Page 395

1    right, for talc users?
2    A.    Okay.  So there's quite a bit
3    to unpack there.  I still would like to
4    know what the definition is of a
5    one-frequency level change.
6    Q.    You relied on this paper, you
7    don't know?
8    A.    No, I don't recall.
9    Q.    Okay.  And so --
10   A.    I haven't read it completely,
11   if I may have misread what was meant in the
12   table.  I found the results of the table, I
13   reported it, but I obviously missed --
14   Q.    You assumed that that was the
15   overall risk ratio, didn't you?
16        MS. LEHMAN:  Object to form.
17   BY MR. TISI:
18   Q.    You assumed that was the
19   overall hazard ratio, didn't you?
20   A.    I don't recall exactly what I
21   was thinking, but I would not say that I
22   didn't -- I may have, I may have looked at
23   that and thought it was, whether I was --
24   the reason I was mistaken wasn't that I was

Page 396

1    making some big assumption, it was that I
2    didn't --
3    Q.    Well, your report --
4    A.    -- read the totality of this
5    particular paper.
6    Q.    In your report, just to be
7    clear, your report says Chang uses data
8    from the Ovarian Cancer Institute, 2003 to
9    2020, the estimate and HR summarizes the
10   association between genital talc and
11   ovarian cancer is 1.06.  That's what you
12   assumed and that's not true, is it?
13   A.    I said that's not completely
14   untrue, it's a 1.06 association.
15   Q.    It's one-level increase and
16   for more frequent users in this data, it's
17   approximately 30 percent, correct?
18        MS. LEHMAN:  Object to form.
19        THE WITNESS:  Well, okay.
20   Like I said, there was quite a bit
21   to unpack there.  That 36 percent
22   doesn't come with a confidence
23   interval.  That confidence interval
24   could be -- because there would be

Page 397

1    less data go into that, it could be
2    much wider.  An 8 percent, of
3    course, not everybody who is a user
4    is in that category.  So on
5    average, users versus nonusers
6    would likely be somewhere in
7    between those estimates.  I don't
8    know where in between those
9    estimates.
10   BY MR. TISI:
11   Q.    Okay.  But you, actually,
12   misread the --
13        MS. LEHMAN:  Hold on.  Hold
14   on.  He wasn't done.  He's still
15   answering.
16        THE WITNESS:  So all I'm
17   saying is there's a lot of
18   uncertainty.  I acknowledge that in
19   my report it would have been better
20   to say that that hazard ratio was
21   associated with a one-level
22   increase.
23   BY MR. TISI:
24   Q.    And could be higher, right?

Page 398

1  And could be as much as 30 percent, which
2  is consistent with all the other studies
3  that were out there, right?
4        MS. LEHMAN:  Object to form.
5        THE WITNESS:  No, I mean,
6     it's -- it might be consistent with
7     many case-control studies out there
8     to be around 30 percent.  But
9     certainly not consistent with
10    cohort studies and never not with
11    prospective cohort studies.
12        - - - - -
13  (Stenographer clarification.)
14        - - - - -
15        THE WITNESS:  And not
16    consistent with cohort studies and
17    certainly not consistent with
18    prospective cohort studies.  I
19    think that's my best guess at what
20    I said.
21  BY MR. TISI:
22    Q.   Can you --
23    A.   So, it's actually midnight
24  here, I mean I don't know how much

Page 399

1  longer --
2    Q.   I'm going to wrap it up.
3  I've got about four or five questions and
4  if you'll answer them directly, I'll be
5  done.
6    A.   I can't guarantee that, but
7  I'll do my best.
8    Q.   All right.  We agreed that
9  before May 20, 2024, when you met with the
10  J&J lawyers, you had never looked at the
11  issue of talc and ovarian cancer, correct?
12        MS. LEHMAN:  Object to form.
13        THE WITNESS:  If I saw it in a
14    news article somewhere, I may have
15    noted it in my brain, but I did not
16    research it and look into it.
17  BY MR. TISI:
18    Q.   And in your report, you
19  disagree and call unreliable NIH scientists
20  who not only published O'Brien (2024) in a
21  peer-reviewed journal, but multiple studies
22  over the past almost ten years from the
23  Sister Study, correct?
24    A.   I do not call NIH scientists

Page 400

1  unreliable --
2    Q.   Their study from 2024 -- I'm
3  sorry, let me rephrase the question.  You
4  disagree with the NIH scientists who
5  published in O'Brien (2024) a study that
6  appeared in the peer-reviewed literature
7  regarding the likelihood of recall bias
8  affecting the Sister Study cohort, you
9  disagree with them, true?
10    A.   I would rephrase it and say
11  that I have, as I've expressed in my
12  report, I have -- I disagree with
13  assumptions and approaches taken in O'Brien
14  (2024) and that I have problems with their
15  manipulation, correction, imputation
16  approach to --
17    Q.   And you think that the peer
18  reviewers, you think the peer reviewers who
19  looked at this paper didn't understand or
20  missed the obvious flaws in this study,
21  true?
22        MS. LEHMAN:  Object to form.
23    Asked and answered.
24        THE WITNESS:  They missed,

Page 401

1     didn't understand, didn't dig into
2     reviews, I don't know.  I can't
3     comment on what was in their minds.
4     What I can comment on is that those
5     flaws exist in the paper, these
6     problems exist in the paper, and
7     the paper did get through peer
8     review, so.
9  BY MR. TISI:
10    Q.   And you disagree with
11  scientists like Harris and Terry who were
12  invited to do an editorial, who thought
13  that recall bias does not explain the
14  genital powder and ovarian cancer
15  association, correct?
16        MS. LEHMAN:  Objection.  Asked
17    and answered.
18        THE WITNESS:  I disagree with
19    their conclusion about the O'Brien
20    (2024) paper.  I disagree with
21    their general conclusions.  I
22    believe that the paper does not
23    reliably demonstrate an association
24    between talc use and ovarian

101 (Pages 398 - 401)

Page 402

1     cancer.
2  BY MR. TISI:
3     Q.    And you disagree with the
4  American Society of Clinical Oncology who
5  said that this was a robust and good
6  analysis of the Sister data incorporating
7  rigorous adjustments for bias that may have
8  affected earlier studies?  You disagree
9  with them as well, correct?
10         MS. LEHMAN:  Objection. Asked
11      and answered.
12         THE WITNESS:  I disagree with
13      their statement.  I'm not, like,
14      looking to disagree with them as
15      individuals.  I'm not just making
16      up disagreements.  My report was
17      about the paper.  I explicitly
18      state the problems of the paper.  I
19      explicitly state why there are
20      problems.  I don't see anywhere
21      where in any of those editorials
22      that you describe that they go into
23      those details in any way.  I don't
24      see anywhere they do that.

Page 403

1  BY MR. TISI:
2     Q.    And you disagree with the
3  NIH, which said the bias analysis was
4  rigorous and the study provides compelling
5  evidence of genital talc use is associated
6  with an increased risk of ovarian cancer,
7  you disagree with them as well, right?
8         MS. LEHMAN:  Object to form.
9      Asked and answered.
10         THE WITNESS:  It's not about I
11      disagree with their conclusion,
12      but, again, there's no particular
13      aspect where they've gone into the
14      details of what I've argued with
15      they're saying there's something I
16      said that's incorrect.  They don't
17      go into the details.  So there's
18      kind of --
19  BY MR. TISI:
20     Q.    And the only -- and the only
21  place that you have ever expressed your
22  opinion was in your report that you
23  authored, that you started writing three
24  days after receiving the study from the

Page 404

1  lawyers, correct?
2         MS. LEHMAN:  Object to form.
3         THE WITNESS:  The only place I
4      have written down my opinions is in
5      the report.
6  BY MR. TISI:
7     Q.    Which you started three days
8  after meeting Johnson & Johnson's lawyers,
9  true?
10         MS. LEHMAN:  Object to form.
11         THE WITNESS:  I believe
12      that's -- that after, you know,
13      many hours of reviewing the paper,
14      I started drafting, yeah, within
15      three days.
16  BY MR. TISI:
17     Q.    And you never sought and do
18  not intend to seek to publish your findings
19  or your conclusions outside the courtroom,
20  true?
21     A.    Yeah, I have no intention of
22  doing that.
23     Q.    Okay.  And the opinions that
24  you've given in this case, you have been

Page 405

1  paid and will be paid over $100,000, true?
2         MS. LEHMAN:  Object to form.
3         THE WITNESS:  For writing my
4      report, for reading materials, for
5      preparing for deposition, for all
6      of the time I've spent in putting
7      together my independent assessment
8      of O'Brien (2024) and related
9      materials, yes, the total comes to
10      over 100,000.
11  BY MR. TISI:
12     Q.    And you were located in this
13  case through a headhunter called
14  Cornerstone, because you had been involved
15  in other cases going back almost ten years
16  as a litigation expert for law firms, true?
17         MS. LEHMAN:  Object to form.
18      Asked and answered.  And you're now
19      at seven hours and one minute, so
20      this is the last question.
21         THE WITNESS:  Cornerstone is a
22      company.  I don't know that I would
23      describe them as headhunters.  And,
24      like I say, and I've said before, I

102 (Pages 402 - 405)

Page 406

1    don't know the details of the
2    operation of the company. They did
3    approach me. I don't have any
4    relationship with them that goes
5    back ten years. They contacted me
6    and asked me about the case and
7    whether I would be willing to take
8    a look at O'Brien (2024) and
9    consider providing an independent
10   assessment.
11 BY MR. TISI:
12   Q.    And be an expert in
13 litigation?
14       MS. LEHMAN: You don't need to
15   answer that. Counsel's time is
16   over.
17       MR. TISI: I disagree. You're
18   going to instruct him not to answer
19   that question?
20       MS. LEHMAN: Counsel, you have
21   asked this question.
22       MR. TISI: You're going to
23   instruct him --
24       MS. LEHMAN: I'm telling you,

Page 407

1    your time is up.
2        MR. TISI: Because I disagree.
3    So are you going to tell him not to
4    answer that question?
5        MS. LEHMAN: I am. I am.
6        MR. TISI: Okay. Have a good
7    day, Dr. Kornak. Good evening.
8 BY MS. LEHMAN:
9    Q.    All right. Dr. Kornak, I
10 have a few questions for you. Dr. Kornak,
11 are your opinions in this case fully set
12 out in your report?
13   A.    Yes.
14   Q.    And are the opinions that you
15 express in your report, have you done and
16 performed the same types of analysis that
17 you do in your biostatistical work outside
18 of the courtroom?
19       MR. TISI: Objection.
20       THE WITNESS: These are the
21   same kind of approach I take to
22   reviewing papers that I'm involved
23   in as a coauthor. It's the same if
24   I'm asked to review a paper. I

Page 408

1        took the same approach.
2 BY MS. LEHMAN:
3    Q.    Okay. And have you used the
4 same biostatistical tools that you use in
5 your everyday work and that you teach to
6 your students?
7        MR. TISI: Objection.
8        THE WITNESS: Yes.
9 BY MS. LEHMAN:
10   Q.    I'm sorry, Dr. Kornak, I
11 think you broke up for me. What was your
12 answer?
13   A.    Yes.
14   Q.    And do you hold the opinions
15 that are set out in your report to a
16 reasonable degree of scientific certainty?
17   A.    Yes.
18   Q.    Okay. Have you used multiple
19 imputation in your publications, in the
20 studies that have been published?
21   A.    Yes, I'm sure I have, but I
22 would struggle right here right now to say
23 which ones.
24   Q.    Okay. You talked to counsel

Page 409

1 earlier about something that I think you
2 called Bayesian analysis; is that correct?
3    A.    Uh-huh.
4    Q.    Okay. And what is -- is
5 there a relationship between Bayesian
6 analysis and imputation?
7    A.    Yes, there is. Kind of like
8 a Bayesian analysis involves having -- you
9 can build in observed variables and
10 unobserved variables. And the unobserved
11 variables would be, you consider missing
12 data to be unobserved variables within a
13 Bayesian analysis. So they are very much
14 related.
15   Q.    Okay. And is Bayesian
16 analysis an approach of statistical
17 inference?
18       MR. TISI: Objection.
19       THE WITNESS: It's an approach
20   of statistical modeling and
21   inference.
22 BY MS. LEHMAN:
23   Q.    Okay. Based on your
24 education, your training, the work that

Page 410

1  you've done as a biostatistician in your
2  years as a professor, does O'Brien (2024)
3  show an association between genital talc
4  use and ovarian cancer?
5          MR. TISI:  Objection.
6          THE WITNESS:  No, they do not
7      show an association.
8  BY MS. LEHMAN:
9      Q.    Okay.  Based on your
10  education, your training, your work as a
11  biostatistician, your years as a
12  professor -- actually, strike that.  Let me
13  ask a different question.
14          Does O'Brien (2024)
15  specifically state that their results do
16  not establish causality and do not
17  implicate any specific cancer-inducing
18  agent?
19      A.    Yes.
20      Q.    All right.  Is recall bias
21  real or is that only a theoretical
22  possibility?
23          MR. TISI:  Objection.  Asked
24      and answered.

Page 411

1          THE WITNESS:  It exists.
2  BY MS. LEHMAN:
3      Q.    All right.  And does O'Brien
4  (2024) specifically state that the
5  participants reporting talc use could be
6  recalling products that contain talc,
7  cornstarch, or a mixture and women may have
8  used different products at different times?
9      A.    Yes.
10      Q.    Does O'Brien (2023)
11  acknowledge that when talking about -- that
12  there can be some evidence of recall bias
13  of genital talc use among ovarian cancer
14  survivors?
15          MR. TISI:  Objection.
16          THE WITNESS:  Yes.
17  BY MS. LEHMAN:
18      Q.    And, in fact, did O'Brien
19  (2023) call out the subgroup of ovarian
20  cancer survivors as a group for which there
21  was a proportion in which the -- those
22  reporting talc use increased from
23  enrollment and that was the only subgroup
24  for which that was true?

Page 412

1      A.    I would need to remind myself
2  of it exactly where that is.
3      Q.    Sure.  No problem.  And I
4  think you have O'Brien (2023) with you.
5  It's in the notebook at tab 16.  And if you
6  look at page 7 at the last paragraph above
7  the word "discussion."
8      A.    Yes.
9      Q.    Okay.
10      A.    Yes, so it talks about the
11  trend being reversed among those with
12  intervening ovarian cancer diagnosis with
13  28 percent self-reporting genital talc use
14  at enrollment and 33 percent reporting
15  genital talc at the follow-up
16  questionnaire.
17      Q.    And then to move on --
18      A.    This was the only subgroup
19  for which the proportion of users increased
20  between enrollment and follow-up.
21      Q.    And did they say that that
22  could indicate recall bias --
23      A.    And it could indicate, yeah,
24  it could indicate recall bias, i.e.,

Page 413

1  overreporting of talc use among those with
2  a history of ovarian cancer.
3      Q.    We looked at O'Brien (2024) a
4  lot.  And what -- the question I have there
5  is does the O'Brien (2024) article contain
6  a disclaimer that the work was funded by
7  the National Institutes of Health, but that
8  the National Institutes of Health had no
9  role in the design, conduct, or
10  interpretation of the study?
11      A.    Yes, that's there at the end.
12      Q.    Okay.  Now, you were asked a
13  couple of questions about the Ovarian
14  Cancer Cohort Consortium.  That was Exhibit
15  No. 13.
16      A.    Yes.
17      Q.    On your materials considered
18  list includes an article published in the
19  Journal of National Cancer Institute titled
20  "Analgesic use and ovarian cancer risk:
21  And analysis in the Ovarian Cancer Cohort
22  Consortium," correct?
23      A.    I need to double check that
24  one.  That is not one that --

Page 414

1        MR. TISI:  Do you have a copy
2    of that, Kate?
3        MS. LEHMAN:  Yeah, I can just
4    show it.  Do you want our copy of
5    the article or --
6        THE WITNESS:  It's --
7        MS. LEHMAN:  I'm not going to
8    ask him about the article,
9    otherwise, I would happily send it
10   to you.  It's just on the materials
11   considered list, Dr. Kornak.
12       THE WITNESS:  It's on
13   Exhibit 23, yes, I have the list
14   here and, what was the title again?
15            - - - - -
16   (Trabert Article marked
17   Kornak Exhibit 23 for
18   identification.)
19            - - - - -
20   BY MS. LEHMAN:
21       Q.   It should be "Analgesic use
22   and ovarian cancer risk:  An analysis of
23   the Ovarian Cancer Cohort Consortium."
24       MR. TISI:  What was the year?

Page 415

1        MS. LEHMAN:  2019.  It's the
2    article by Trabert.
3        THE WITNESS:  I got it, yeah.
4    BY MR. TISI:
5        Q.   And is that on your materials
6    considered list?
7        A.   Yes.
8        Q.   Okay.  And so it would be
9    inaccurate to say the first time you ever
10   heard of the Ovarian Cancer Cohort
11   Consortium was during this deposition,
12   correct?
13       A.   It would be inaccurate, yes.
14       Q.   Okay.  You were asked some
15   questions about --
16       MR. TISI:  How much longer,
17   Kate?  I mean, in all
18   seriousness --
19       MS. LEHMAN:  I have, like,
20   three minutes.
21   BY MS. LEHMAN:
22       Q.   Okay.  You were asked some
23   questions about the IARC press release and
24   you were shown the Lancet article and is it

Page 416

1    your memory, Dr. Kornak, that the IARC
2    press release stated that a causal role for
3    talc could not be fully established?
4        A.   Yes, that's correct.
5        MR. TISI:  Objection.
6    BY MS. LEHMAN:
7        Q.   Okay.  And when you were
8    asked about O'Brien (2020), is it correct
9    that O'Brien (2020) states, "However, these
10   findings may be affected by recall bias and
11   a recent surge in talc-related lawsuits and
12   media coverage has increased this
13   possibility"?
14       MR. TISI:  Objection.
15       THE WITNESS:  Yes.
16       MS. LEHMAN:  Okay.  All right.
17   Dr. Kornak, those are all the
18   questions I have at this time.
19   Thank you.
20       MR. TISI:  Have a good night.
21       MS. LEHMAN:  Robin, he will
22   read and sign.
23       MR. TISI:  Robin, I'm going to
24   request a rough --

Page 417

1        MS. LEHMAN:  I guess my
2    question is when do you think
3    you'll be able to send the rough?
4    Can you flip it over tonight?
5        THE STENOGRAPHER:  I will try.
6            - - - - -
7        (Whereupon, the deposition
8    was concluded at 6:19 p.m.)
9            - - - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

105 (Pages 414 - 417)

Page 418

C E R T I F I C A T I O N

I HEREBY CERTIFY that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me upon the foregoing matter on July 8, 2024, and that this is a correct transcript of same.

_Robin L. Clark_
_____
Robin L. Clark
Registered Professional Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

Page 419

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 420

- - - - -
E R R A T A
- - - - -
PAGE  LINE   CHANGE

Page 421

ACKNOWLEDGMENT OF DEPONENT

I, JOHN KORNAK, PhD, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

DATE              SIGNATURE

Subscribed and sworn to before me this

        day of              ,

2024.

My commission expires:

Notary Public

106 (Pages 418 - 421)

**[& - 13]**                                                                 Page 1

| & |
|---|
| **&**   1:3 2:12,18 3:3 9:2 35:6 37:9,20 38:6,13 38:22 39:16,18 39:19,23 40:2 41:4 107:20 109:20 110:9 110:13 159:19 198:3 200:12 236:14 404:8 |

| 0 |
|---|
| **0.76**   156:13 |
| **0.81**   364:24 |
| **07**   364:21 |
| **08002**   3:4 |

| 1 |
|---|
| **1**   4:9 10:12,16 10:20 16:14 23:7 24:12 26:19 50:19 155:23 166:24 183:15 282:19 294:15 295:23 307:7 364:21 366:23 368:8 379:18 |
| **1.0**   365:4 |
| **1.0.**   392:21 |
| **1.01**   384:2,24 389:9,12 |
| **1.01.**   379:22 |
| **1.02**   156:11 282:23 |

**1.06**   367:10 391:24 393:22 394:19 396:14
**1.06.**   396:11
**1.07**   282:19 392:22
**1.07.**   364:19
**1.08**   388:8,16
**1.1.**   369:24
**1.13**   383:21 384:1 386:17 389:6
**1.13.**   386:8 388:10
**1.17**   280:24 282:2
**1.23.**   392:22
**1.24**   392:1
**1.26.**   384:3 389:9
**1.3**   137:23 138:10
**1.33**   157:14
**1.34**   369:6
**1.34.**   369:19
**1.36**   234:23
**1.38.**   156:14
**1.39**   235:21
**1.4**   365:11 368:16
**1.40.**   365:3
**1.41**   365:13 367:8
**1.81**   347:3,15
**1.82**   233:15 234:8,22 250:3

347:19 369:19
**1.84**   252:7 386:8
**1.84.**   261:7 391:5
**1.87.**   367:10
**1.88**   236:3
**10**   4:9,16,18 25:4,7,18 125:7 125:18 210:8 210:13 213:19 216:10 219:24 220:2 221:12 225:1 235:18 246:9 263:14 263:23 270:14 271:1,9 272:3 274:9,16,18 278:10 283:19 287:19 293:16 297:15 304:6 304:24 381:6 381:18,20 382:3
**100**   47:23 73:3 73:5,10 90:8,17 235:13 237:11
**100,000**   405:1 405:10
**101**   252:17
**10:04**   1:13
**11**   4:19 25:19 133:8,18
**112**   5:3
**113**   5:9

**114**   5:1
**115**   5:6
**117**   5:10
**1180**   2:19
**12**   4:21 130:15 130:24 155:22 210:14 211:13 221:13 246:10 249:3,5,14,21 266:16 274:9 283:19 381:7
**125**   4:18
**129**   4:17
**13**   4:22 36:19 112:14 136:10 136:17 210:8 210:14 211:10 213:19 216:10 219:24 220:2 221:12 225:2 239:23 243:16 246:9 260:5,5 261:9,15 263:15,24 270:14 271:9 272:3 274:9,16 274:18 278:10 283:19 287:19 293:16,23 294:2 297:15 304:6,24 353:18 354:1 381:6,18,21 382:3 387:19 387:22 413:15

**[130 - 2024]**                                                    Page 2

| | | | |
|---|---|---|---|
| **130** 4:21 | 378:22 | 50:14 53:8 75:1 | **202-759-7648** |
| **133** 4:19 | **191** 4:14 | 80:23 90:18 | 2:14 |
| **136** 4:22 | **193** 4:15 | 118:1,8,14 | **2020** 5:9 70:6 |
| **138** 214:20,23 | **1983** 131:17 | 132:15 164:2 | 113:12,16 |
| **14** 4:23 6:6 | 320:3 332:16 | 200:22 211:10 | 117:4 142:13 |
| 30:18 60:21 | **1995** 131:7 | 212:12 213:21 | 142:23 144:3 |
| 149:16,24 | **1997** 131:18 | 216:13 225:4 | 154:18,21 |
| 168:4,10 | **2** | 227:2 271:1,8 | 156:7 158:12 |
| 211:18 213:6 | | 272:6 274:7,19 | 158:14,14 |
| 213:15 216:5,6 | **2** 4:10 13:24 | 315:19,24 | 159:9 203:5 |
| 218:17 262:6 | 24:16,16 25:2 | 372:2 378:13 | 382:17 385:8 |
| 271:8 393:13 | 29:4,11 30:16 | 383:14 399:9 | 386:23 388:13 |
| **149** 4:23 | 64:3 68:1 83:18 | **20,000** 75:13 | 396:9 416:8,9 |
| **15** 11:18,19 | 129:10 189:17 | **2000** 134:22 | **2022** 30:20,23 |
| 63:6 108:16 | 189:19 211:1 | **20006** 2:14 | 31:12 33:11 |
| 109:8,16 | 230:23 235:13 | **2003** 111:22 | **2023** 5:1 30:20 |
| 111:20 154:1 | 269:9 276:1 | 112:13 126:10 | 30:24 114:16 |
| 158:4 372:2 | 278:24 279:12 | 156:8 396:8 | 114:21 166:12 |
| 374:10 | 279:21,24,24 | **2005** 131:9 | 203:5 214:4,9 |
| **16** 5:1 114:18 | 290:21 295:17 | **2007** 131:10 | 215:22 216:22 |
| 114:22 212:24 | 295:23 296:11 | 134:22 | 218:17 220:15 |
| 216:22 241:12 | 342:4 347:3 | **2009** 127:17 | 225:22 226:23 |
| 247:5 412:5 | 349:2,7 358:22 | 135:3 | 238:21,23 |
| **16-2738** 1:4 | 359:3 363:7 | **2010** 146:14 | 239:24 254:22 |
| **165** 5:8 | 364:9 379:14 | **2013** 4:15 135:5 | 255:12 256:19 |
| **17** 5:2 204:11 | 379:18 383:20 | 193:20 | 259:17,20,23 |
| 214:13 215:11 | 383:23 | **2015** 36:19 | 260:17 263:20 |
| **173** 4:12 | **2.01** 235:20 | 37:10,15 | 352:7 353:7 |
| **18** 5:3 53:18 | **2.08** 236:8 | **2016** 37:15,20 | 362:23 411:10 |
| 54:11 112:9,17 | **2.43** 234:24 | 38:14 112:6,13 | 411:19 412:4 |
| 210:24 264:4 | **2.91** 235:21 | 113:8 118:14 | **2024** 1:7 4:14 |
| 264:15 266:2,2 | **20** 5:4 16:6 20:4 | 287:3 | 4:16 9:12 10:4 |
| **182** 4:13 | 21:10 23:15 | **2017** 37:20 38:6 | 10:13 11:1,13 |
| **1825** 2:13 | 26:7,13 27:15 | 156:9 217:3 | 11:18,20,21 |
| **19** 4:11 266:9 | 43:16 44:24 | **2019** 217:3 | 16:5,6,18 20:4 |
| 354:7 378:11 | 45:11 49:1 | 415:1 | 20:5 21:10,18 |

**[2024 - 36104]**                                                      Page 3

| | | | **3** |
|---|---|---|---|

22:14,17,22
23:8,16,21
24:22 26:6,7,13
27:15 30:21
31:6 49:1 52:22
55:5 57:23 58:2
64:4 71:15 90:3
90:18 92:20,24
107:23 108:8
108:10 111:14
116:10 118:1
120:9 121:4
130:6,12 132:3
141:1 145:9,11
148:21 149:6
149:12 155:2,7
155:23 156:16
157:6,15,16
158:19 159:10
161:14,18
163:14 166:12
166:13,14
167:24 173:15
188:2 191:15
195:7 196:1,3
201:24 203:6
213:15 215:21
228:24 230:5
244:1 246:3
248:13,16,17
249:13,18
255:1 260:4,17
262:7 265:7
312:7 333:8
351:10 354:4
358:15 362:13

382:13,14
385:3 387:17
388:12 391:3,3
399:9,20 400:2
400:5,14
401:20 405:8
406:8 410:2,14
411:4 413:3,5
418:7 421:14
**2025** 382:9
**20th** 28:2 49:4
52:23,24 53:21
54:7,9,14 55:5
55:6 61:21 90:3
**21** 5:5 45:11
221:7 227:4
298:23 299:9
299:23 378:15
392:7,8
**215** 5:2
**218** 2:8
**21st** 53:12
**22** 5:6 45:11
111:23 115:19
115:21 116:1
391:21
**22nd** 49:24
50:7 53:12,22
53:23 54:14
55:7,12,13
**23** 5:7 244:18
414:13,17
**23rd** 51:5,9
52:16 53:3,9
**24** 5:8 9:3
165:18,24

**25** 5:9 113:13
113:17 116:18
116:21,22,23
156:18,19
157:4 309:21
338:16 365:9,9
365:15 366:24
368:5,14,23,24
380:5 382:13
382:17
**250** 370:10,14
370:24 371:10
**25b** 156:5,6
**25th** 51:6
**26** 5:10 45:11
117:2,11
**26th** 51:7
**27** 45:11 378:20
**27th** 51:7
**28** 23:8 24:8
45:12 50:14
153:24 154:2
158:4 264:5
266:2 412:13
**28th** 28:4,4
51:7
**29** 4:10 22:22
45:12 68:2 95:6
146:7 227:2
252:15 275:23
**299** 5:5
**2a** 153:6
**2b** 153:6

**3** 3:4 4:11 19:18
19:24 26:5 45:7
126:5 133:22
189:12,20
235:17 250:18
279:14 295:18
295:23 332:6
337:2,6 365:24
366:1 371:22
379:20
**3.34** 282:2
**30** 164:2 211:10
225:4 274:7
276:5 394:24
396:17 398:1,8
419:15
**30309** 2:19
**31** 254:5
**310** 3:4
**315** 5:4
**316** 2:3
**32** 95:5 146:7
227:5 314:22
334:3
**32502-5996** 2:4
**33** 412:14
**34** 221:7 361:17
**35** 210:18 211:2
211:7 219:12
219:19 221:5
**36** 394:13
396:21
**36104** 2:9

[37 - 90]                                                                Page 4

**37**  266:9 378:22
**38**  214:21 264:7
  265:2 266:18
  267:3,12,13,18
  267:22,23
  268:4,13,16
**39**  213:22
  216:13 272:6

**4**

**4**  4:12 24:16,16
  25:2 134:21
  173:13 174:1
  183:4 213:2,3
  230:4,11,12
  233:1 234:20
  266:7 269:11
  290:20 294:17
  295:23 313:8
  321:24 347:12
  347:19 354:6
  367:15 368:11
  368:13,18
  372:23 373:10
  378:4 379:21
**4.44**  282:13
**40**  367:5
**404-572-2716**
  2:20
**406**  6:6
**407**  4:4
**41**  367:5
**414**  5:7
**42**  316:17 334:2
  336:11,15

**44**  309:7,16
**45**  161:2
**49**  211:19

**5**

**5**  4:13 182:14
  182:18 186:8
  209:19 279:1
  279:15,18
  307:6 389:8
**5,000**  391:16
**5/23**  53:8
**50**  56:12 73:3
  212:12 361:13
  361:22 362:4
  362:11 364:16
**50,000**  12:6
  16:22 17:1 72:2
  72:9,16 111:18
  111:19 183:9
  183:19 345:3
  369:17,22
  370:2,5,8,18,23
  370:23
**50,400**  72:17
**51**  383:2
**54**  264:5,8
  265:2 266:2
  338:15

**6**

**6**  4:14 190:6
  191:16 226:24
  241:9,14
  242:14 373:19
  375:1

**6,416**  219:8
  225:16
**6,438**  220:5,6
  225:10,15
**6.6**  112:22
  113:2
**600**  2:3
**6:19**  417:8

**7**

**7**  4:3,15 193:7
  193:21 204:11
  230:23 269:8
  279:18,21
  381:11,12
  412:6
**7,314**  137:24
**70,000**  73:11
**700**  2:13 73:9
**71**  361:17
**73**  211:19
  293:17,24
  294:2 380:18
**74**  75:2 211:2
  211:16 292:23
  293:10,14,17
**75**  210:18 211:2
  219:13 369:3,9
  369:11,12,13
**77**  30:18 36:20
**79**  157:13

**8**

**8**  1:7 4:16 9:19
  10:5,14,16
  11:13 13:23
  60:21 61:3

111:13 116:10
  128:19,21
  132:6 213:15
  216:4 230:5
  260:4 264:18
  279:7 309:22
  313:10 394:9
  394:20 397:2
  418:7
**8,002**  219:8
  220:7
**8,525**  193:9
**80**  196:15
  231:15 237:10
**80/20**  273:23
**800-898-2034**
  2:9
**82**  233:17
  234:10
**850-435-7176**
  2:4
**856-317-7188**
  3:5
**87**  242:15,18
  243:2,9 256:24
  258:5 263:22
  353:18

**9**

**9**  4:17 128:22
  129:2 247:1,4
  363:24
**9,855**  193:9
**90**  196:16
  231:15 243:12
  244:20 256:22

[908 - actually]                                                                    Page 5

**908**   418:13
**91**   392:1
**92**   282:13
**93**   154:4
**94**   392:22
**95**   156:12
157:12 367:9
**98**   379:22
**99**   388:22

**a**

**a.m.**   1:13
**a1**   250:18
**a2**   179:8,11
198:11 248:24
249:3,4 250:9
250:14,17,19
261:1 282:23
283:4,5 298:14
**a5**   265:6 278:17
278:22 354:6
362:17 378:5
**aalen**   319:4
**ability**   35:2
170:17
**able**   31:3
140:22 159:21
162:8 226:17
266:4 288:22
311:23 361:10
384:8 417:3
**above**   131:14
342:11 360:9
385:1 412:6
**absolutely**
109:23 165:3

167:1 310:10
**abstract**   14:12
**abstracts**   41:18
**academia**   78:8
162:3
**academic**   17:17
49:12 58:13
60:10 68:23
74:17 78:11
79:12,19 87:12
90:12,19 97:7
98:16 99:8,9
104:4 109:18
110:3 173:7
232:18
**academically**
64:10
**academics**
70:20
**accept**   20:14
139:7 180:8
353:10 361:14
365:19 369:3
**accepted**
162:12,12,18
162:21 163:8
166:12 225:15
232:18 282:6
373:9
**accepting**
367:11 368:10
**accompanied**
190:10 195:24
199:14 373:17
**accompanies**
195:10

**account**   153:11
154:22 238:1
327:17
**accounting**
137:20 330:9
330:13,14,14
375:4
**accrued**   260:8
261:18
**accurate**
419:17
**accurately**
83:21 245:13
340:16 418:5
**accusing**
302:24 303:4,4
**acknowledge**
197:10 234:24
240:11,15
242:2 261:3
274:22 348:17
351:22 358:5
397:18 411:11
**acknowledged**
348:6
**acknowledges**
197:12
**acknowledging**
197:15 329:10
347:23
**acknowledg...**
421:1
**acquired**
298:18 359:13
**activity**   186:19

**actual**   85:1
155:19 202:21
212:15 342:1
386:16
**actually**   7:24
15:9 16:21
28:24 29:4 36:4
39:5 40:16,17
44:2 48:3 49:5
49:23 50:15
51:8 53:20
58:23 60:6
68:22 91:12
94:1 106:11,11
116:7 120:14
128:19 130:14
132:14 139:6
150:9 153:20
158:12 159:7
163:21 169:6,9
173:11 175:5
176:4 177:9
178:11 180:3,9
189:1 190:5,8
190:10 191:20
192:21 193:3
194:2 196:2
199:8 207:3,15
208:8,17 209:6
209:14 210:7
212:5 214:2,24
217:1 224:9
225:20 227:11
237:22,24
238:5 240:9
242:2,12,13

[actually - ahead]                                                    Page 6

244:6 245:3
278:8 280:9
281:14 284:21
285:5,8 299:14
302:15 303:11
307:24 311:12
312:9 314:18
315:15 325:21
340:13,17
346:17 347:21
354:3,5 374:14
378:2 384:21
392:18 393:15
397:11 398:23
410:12
**add**  238:11
372:13 394:21
**added**  84:3
138:24 266:16
**adding**  339:16
339:17 359:10
375:18
**addition**  73:6
116:13 169:5
170:8 343:8
384:19
**additional**
63:21 83:7
144:20 263:7
342:10 359:19
377:9
**address**  60:24
61:6 96:2 184:3
190:7 195:12
195:21 228:2
232:8 317:18

329:11 373:17
**addressed**
95:17,21
228:24
**addressing**  16:5
**adequately**
235:7
**adjust**  187:19
**adjusted**  384:1
**adjusting**  14:19
186:13 187:15
187:16
**adjustment**
368:10
**adjustments**
25:11 175:15
178:17 187:21
188:20 189:7
283:4 351:17
402:7
**administrative**
28:23 29:21
33:18 46:7,15
**admit**  162:2
**advantage**
222:11 223:14
**advice**  135:23
**advocate**  256:4
**affect**  330:23
**affected**  106:3
175:16 178:18
188:21 221:21
237:20 353:20
360:9 377:6
402:8 416:10

**affecting**  400:8
**affects**  269:4
**age**  211:18,22
213:6,18
219:11 221:7,7
227:3 263:14
272:3 274:8,16
274:18,19
279:9 293:10
293:17,23
**aged**  211:2
**agency**  149:17
150:21
**agent**  410:18
**ages**  210:13
211:10 213:21
215:18 216:10
219:24 225:1,4
227:2 263:23
270:14 271:8
272:3,5 283:19
294:2,8 381:6
**ago**  11:18 89:19
140:10
**agree**  12:15
13:11 14:24
15:3 23:12 26:9
42:17 43:8 85:7
87:7 125:24
150:15 153:3
156:23 159:13
159:24 160:2
163:11,17,18
169:19 173:12
174:5 177:10
184:23 188:18

189:3 201:24
206:24 208:4
220:12 227:16
227:24 234:16
240:1 244:17
248:8 251:13
256:11 259:14
259:15 260:2
260:15 262:2
262:14,22
272:12 281:3
283:12 284:12
295:11,13
296:9 298:24
300:1,11,16
301:6,19
306:18,19
309:14 326:1,4
328:2,5 331:11
370:8 371:2
377:12
**agreed**  7:3
164:14 222:3
283:12 386:22
399:8
**agreement**
220:15,16
263:17 353:18
**agrees**  220:2
**ahead**  8:15
44:13 74:7
106:7 127:1
128:23 297:10
315:18 330:22
332:13

[air - answered]

| | | | |
|---|---|---|---|
| **air** 231:24 | 231:19 261:17 | 294:1,8,9 | **answer** 6:4 |
| **al** 195:11 375:5 | 295:24 300:7,8 | 298:10,14 | 31:21 67:7 83:5 |
| **alabama** 2:9 | 332:8 359:8 | 305:4,22 306:8 | 84:17 89:11 |
| **alarm** 298:8 | 363:16 383:10 | 307:3,4,11,15 | 90:14,17 101:9 |
| **align** 353:16,17 | 389:16 | 307:20 309:3 | 102:10 109:2,6 |
| **aligned** 277:9 | **analysis** 9:7 | 318:6,6 320:5,5 | 110:6 123:9 |
| **allegations** | 13:4,17 20:24 | 323:19 325:17 | 124:12,15 |
| 73:22 | 25:15 42:13 | 325:17 327:12 | 147:2,10,11,20 |
| **allen** 2:7 | 64:2,13 66:2,13 | 327:21 329:8 | 148:18 155:18 |
| **allison** 299:4 | 67:6,12,20,24 | 330:8 331:5 | 157:5 164:7 |
| **allow** 245:5 | 75:3 76:1 77:1 | 332:5 333:7 | 170:3 191:2 |
| **allowed** 22:4 | 80:18 106:2 | 337:22 342:12 | 199:9 201:4 |
| **amazed** 106:23 | 124:3,20 | 342:15 343:7 | 206:10 207:20 |
| 133:2 141:4 | 134:13 141:8 | 344:23 347:2,7 | 209:8 212:15 |
| **amazing** 107:2 | 141:16 142:14 | 348:3 354:18 | 220:19 221:7 |
| **american** 127:9 | 148:1 149:5 | 358:17,18 | 221:11 222:6,8 |
| 127:14 131:6 | 157:7 163:12 | 359:15 361:9 | 223:10,12 |
| 131:10 182:3 | 163:22 164:9 | 363:22 371:12 | 224:10 226:5 |
| 182:23 183:4 | 164:15,17 | 371:15 390:19 | 245:6 255:13 |
| 194:10 402:4 | 174:22 175:11 | 391:4 402:6 | 256:20 257:6 |
| **amount** 58:17 | 175:23 176:6 | 403:3 407:16 | 271:5 272:8,13 |
| 71:12 72:12 | 176:21 178:6 | 409:2,6,8,13,16 | 272:22 276:20 |
| 243:23 256:1 | 178:22 179:6,8 | 413:21 414:22 | 285:23,23 |
| 353:21 | 185:3,19 193:9 | **analytical** | 286:4,5,19,21 |
| **amplification** | 195:18 197:11 | 148:12 | 286:23 289:1 |
| 368:20 | 198:2,5,10,12 | **analyze** 86:12 | 297:1,9,11,20 |
| **amplify** 334:20 | 229:3,6 230:7 | 134:9 138:12 | 298:15 327:4 |
| **amplifying** | 230:13,24 | 140:23 242:13 | 333:16 337:5 |
| 329:23 331:9 | 233:2,7,12,14 | 305:22 356:21 | 342:18,19 |
| **analgesic** | 254:10 260:8 | **analyzed** 86:10 | 373:24 389:23 |
| 413:20 414:21 | 260:22 261:1 | 175:17 | 399:4 406:15 |
| **analyses** 41:11 | 269:4 272:20 | **analyzes** | 406:18 407:4 |
| 41:20 56:17,22 | 275:24 276:6 | 287:20 360:24 | 408:12 |
| 57:13 105:22 | 276:10 277:11 | **analyzing** | **answered** 15:19 |
| 157:7 180:4 | 278:4,4 283:7 | 84:19 141:3 | 21:20 23:19 |
| 189:8,15 | 286:1 288:22 | 229:13 | 27:3 35:10 |

**[answered - argue]** Page 8

| | | | |
|---|---|---|---|
| 50:21 61:17 | 236:21 351:7 | **applied** 100:23 | **appropriate** |
| 62:9,12 63:17 | 384:5 | 101:1 107:14 | 48:13,14 62:4 |
| 64:6,24 67:9 | **anymore** | 108:4 316:14 | 63:19 68:19 |
| 68:16 71:7 77:4 | 341:14 | 316:14 | 71:11 74:1 97:1 |
| 77:23 79:4 | **anyway** 118:4 | **applies** 281:11 | 98:5 100:12 |
| 98:23 101:17 | **apologies** | **apply** 272:19 | 148:16,23 |
| 102:11 108:2 | 247:16 | 355:6 418:22 | 335:4 419:5 |
| 109:11 120:22 | **apologize** | **appointed** | **appropriately** |
| 124:23 161:22 | 107:18 167:10 | 135:4 | 86:12 313:3 |
| 191:22 199:24 | 170:3 208:2 | **appreciate** | **appropriateness** |
| 200:17 201:14 | **appear** 115:12 | 180:16,18,19 | 95:15 147:7 |
| 219:20 221:1 | 116:11 148:6 | 180:21 181:4,6 | 215:16 291:16 |
| 222:19 232:11 | 170:9 236:16 | 182:1 265:9 | **approval** 169:7 |
| 236:19 244:13 | **appearances** | 324:5 | 170:11 |
| 244:14,20 | 2:1 3:1 | **appreciated** | **approved** 218:9 |
| 270:18 286:9 | **appeared** 11:14 | 374:19 377:4 | 328:12 |
| 292:20 302:7 | 11:17 400:6 | **approach** 26:17 | **approximately** |
| 304:5,23 306:2 | **appearing** 7:2 | 49:11 74:21 | 394:13 396:17 |
| 317:6 320:22 | **appears** 45:16 | 94:18 99:8 | **arbitrary** 67:13 |
| 346:3 349:24 | 45:18 125:3 | 100:10 106:4 | 67:15 234:14 |
| 400:23 401:17 | 163:15,17 | 147:22 186:3 | 238:9 295:12 |
| 402:11 403:9 | 194:22 264:17 | 238:12 304:16 | 295:14 296:10 |
| 405:18 410:24 | **appendix** 68:1 | 312:5 321:7 | 296:12 |
| **answering** | 68:8 124:8 | 327:14 365:17 | **area** 52:10 |
| 206:13 219:21 | 392:2,6 | 400:16 406:3 | 84:23 85:8,11 |
| 257:16 258:16 | **apples** 370:17 | 407:21 408:1 | 88:21 236:22 |
| 258:19 297:14 | 370:17 391:16 | 409:16,19 | 238:8 374:4 |
| 298:15 326:21 | 391:16 | **approached** | 383:5,9 |
| 397:15 | **applicable** | 17:2 | **areas** 52:6 |
| **answers** 243:11 | 139:23 | **approaches** | 84:12 87:15 |
| 243:17 263:10 | **application** | 107:13 123:20 | 89:2 136:1 |
| 421:5 | 126:14 128:8 | 149:1,4 301:12 | 139:24 |
| **anybody** 48:6 | 383:5 | 306:13 339:24 | **argue** 263:8 |
| 80:5 108:9 | **applications** | 376:11 400:13 | 269:14 271:6 |
| 110:8 198:23 | 87:18 128:13 | **approaching** | 302:9 326:5 |
| 199:18 201:8 | | 101:20 | 341:10 361:4 |

**argued** 288:9
351:6 403:14
**arguing** 256:15
256:18 341:11
**argumentative**
61:17 256:8
345:5 346:3
370:21
**article** 4:12,14
5:5,7 90:2,12
90:19 104:21
163:15,16,18
164:10 165:2,6
165:17,18
168:15 169:6
170:9 171:19
171:23 172:4,5
173:24 183:20
186:9 190:10
191:15 193:4,7
195:10 230:6
230:23 238:21
238:23 256:19
299:8 312:7
319:18 322:15
322:15,21
324:13 325:15
334:23 342:24
393:13 399:14
413:5,18 414:5
414:8,16 415:2
415:24
**articles** 89:13
90:9 94:24
146:5,19
148:11 184:14

203:4
**artificial** 175:2
358:11
**artificially**
269:17
**asbestos** 151:24
152:1,18,19
**ascertain**
208:22 231:21
**asco** 4:13
182:17 183:8
183:16,19
184:1 186:9
**ascribe** 198:6
231:11
**ascribing** 378:8
**ashcraft** 2:12
**ashcraftlaw.c...**
2:15
**aside** 69:17
**asked** 15:19
21:19 22:16
23:19 27:2
35:10 37:2,4
42:6,7 44:4
47:1 48:8 50:21
61:17 62:11
63:17 64:6,18
64:21,24 67:9
68:16 71:6 77:4
77:22 79:3 83:1
98:22 101:17
108:1 109:10
120:22 124:23
133:6 142:17
143:5 144:5,12

145:8 147:3,17
148:4 150:10
151:2,13,14
152:22 161:9
161:12,21
184:9 199:24
200:16 201:13
209:21 210:6
221:18,23
222:4 223:3,6
232:11 236:19
248:20 263:6
283:18 284:3
285:11 297:8
302:6 317:5
320:22 345:16
346:3 349:24
381:5 400:23
401:16 402:10
403:9 405:18
406:6,21
407:24 410:23
413:12 415:14
415:22 416:8
**asking** 32:18
42:23,24 60:12
63:3 65:3 70:24
78:15 93:3
95:11,23 96:2,4
106:15,16
123:6 152:8
205:12 206:14
225:20 226:1
227:20 228:14
234:16,17
251:11 257:11

257:15,17
267:11 284:7
287:19 294:11
296:5 345:20
356:11
**asks** 217:9
221:22 222:2,3
270:14 287:18
294:16 376:2,4
**aspect** 81:2
175:22 176:5
178:20 333:5
403:13
**aspects** 52:1
77:1 218:4
344:18
**assess** 175:23
176:7 178:22
245:13 353:13
**assessment**
55:18 362:12
362:15 375:11
375:23 405:7
406:10
**assessments**
360:12
**assign** 276:8
295:14,19
**assigned** 169:14
**assignment**
369:18
**associate** 162:6
165:13 167:5
**associated** 13:7
14:2 57:6
122:11 145:11

173:18 186:11
188:14 203:12
206:4,19
208:16 212:17
250:2 359:2
368:5 397:21
403:5

**association**
14:11,18 15:15
24:19 25:10
55:24 56:1
116:16 124:21
131:7 154:19
154:24 155:6,8
155:24 156:10
156:17 157:19
158:15 175:13
178:15 182:3
183:7 186:15
194:11,17,24
195:14 197:4
203:17 204:13
204:16,24
205:23,24
208:6 209:11
240:23 250:4
252:10 260:12
260:14 261:10
261:22,23
318:21 332:20
349:17 359:18
367:22 373:6
375:19 377:3,7
377:11 381:14
382:8 386:23
387:9,11,13,16

388:6,14 389:2
389:3 390:3,5
390:10 391:8
391:11,12
392:10 396:10
396:14 401:15
401:23 410:3,7

**associations**
154:5 158:6
189:9 359:5

**assume**   12:20
120:1 183:20
184:10,21
227:23 264:6
264:24 280:4
281:8,17,24
291:22 295:4
296:10 305:1

**assumed**   24:5
42:21,24 78:19
98:18 266:15
274:4 280:15
393:19 395:14
395:18 396:12

**assumes**   280:1
**assuming**
271:19 272:23
280:22

**assumption**
99:1 271:14
303:8 305:17
305:20 306:9
326:11 335:3,8
335:21 396:1

**assumptions**
25:14 177:22

273:19 359:17
363:18 365:19
371:18 376:9
384:10,11
389:15 400:13

**astounding**
364:10

**atlanta**   2:19
**attached**
419:12 421:8

**attacked**   338:9
**attempt**   93:12
**attention**
172:23

**attorney**
419:14

**attribution**
316:19

**austria**   1:13 8:1
**author**   59:19
59:22,24 60:23
61:5 62:8,18
63:8 113:9,23
130:6 136:12
194:16,22
199:17 232:7

**authored**
403:23

**authority**
334:12,23

**authors**   14:9
15:12,14 24:18
25:8,12 58:22
59:12 60:2,12
66:2,19 68:11
69:16 70:3,3,7

70:14 71:3,10
71:18 73:23
79:18 80:10
95:16 101:10
106:8 108:19
110:24 115:7
115:12 116:11
117:15 123:16
141:1 149:10
151:21,21
159:11 160:19
160:24 161:1
162:14,15
166:19 167:14
170:10 176:21
177:13 179:14
179:16 180:19
192:12,18,20
193:17 195:23
196:10 202:19
215:21 228:23
229:2 237:4
238:6 241:4
259:15,16
264:22,24
266:17 267:12
269:18 275:15
276:18 277:17
277:20 287:2,7
290:19 291:13
295:18 297:4
302:24 309:8
312:7 316:5
319:16 328:18
333:22,23
338:11 351:10

**[authors - believe]**                                Page 11

361:18 372:6
388:2,3
**available**  28:22
33:17 163:9
343:20
**average**  210:17
227:3 397:5
**avoids**  157:8
209:1
**award**  127:17
128:1 131:8,9
**awarded**  131:7
135:3 171:2
**awards**  128:4
**aware**  53:15
55:14 110:7
140:7 142:7
196:24 201:18
236:12 252:24
**awful**  307:6

**b**

**b**  4:6 94:10
362:3 364:12
369:2 372:12
372:13,15
**back**  10:10 33:7
36:5,16 39:21
45:6 48:24 95:5
146:2 158:2,3
162:14,17
167:23 181:2
186:7 195:4
210:16,20
213:14 214:6,9
215:15 216:4

227:15 239:24
242:13 248:1
254:2 259:8
279:23 282:22
311:6 313:10
321:22,23
322:14 332:6
335:14 373:18
377:16 390:24
405:15 406:5
**background**
84:4 194:5
**backing**  188:7
**bad**  57:16
116:8 217:23
328:3 358:4
**bake**  311:5
**baked**  310:19
310:21 380:3
**baking**  304:20
329:22
**bar**  55:23 56:3
56:5 341:19,20
**barely**  378:13
378:15
**based**  25:10
29:24 45:19
104:15 130:4
159:3 252:13
267:4 270:12
278:9 292:22
292:24 293:10
298:11 303:16
307:12 322:10
326:6 331:15
365:16 375:13

376:1,8 409:23
410:9
**baseline**  67:24
119:2 228:11
275:24 276:6
276:10 277:11
281:13 290:2,8
290:14,16
293:15 294:9
297:13 304:11
304:15
**basic**  326:11
**basically**  33:24
35:1,2 106:19
130:8 281:13
304:4 305:10
307:12 316:13
339:24 341:2,5
349:14 353:11
354:10 357:15
365:24
**basis**  184:8
267:6,13,24
268:1 321:14
321:15
**bathroom**
81:17
**bayes**  146:12
**bayesian**  94:5,9
95:7 146:8
148:1 409:2,5,8
409:13,15
**baylen**  2:3
**bear**  89:14
**beasley**  2:7

**beasleyallen....**
2:10
**beat**  341:20
**beauty**  394:12
**bed**  374:16
**began**  356:5
**beginning**
31:12 53:2
241:15 253:3
260:6 309:18
**begun**  65:15
352:19
**behalf**  40:24
48:9 86:24
194:10,16
195:1
**belief**  188:1
**believe**  21:11
32:3 41:2 62:8
91:3 92:6 95:24
118:2 130:4
132:20 134:8
135:15 140:3
140:23 144:3
146:5,16
167:14,18,18
174:17 178:2,4
197:23 215:7
218:12,23
298:14 305:2
314:7 317:7
321:8,20
324:17 362:10
364:2 387:23
401:22 404:11

**[bells - biostatistical]**                                          Page 12

**bells** 298:8
**benefits** 105:19
**best** 162:3
  163:8 185:1,6
  185:16 186:3
  327:11 398:19
  399:7
**better** 288:8
  301:13 308:9
  341:12 357:14
  358:4 389:23
  397:19
**beyond** 30:3
  87:22 152:5,24
  172:19 222:17
  303:9 338:18
  344:23
**bharris** 3:5
**bias** 9:7 13:3,5
  13:14,17 14:3
  14:19 15:16
  20:6 64:2 67:16
  86:20 87:6 98:2
  114:16 132:22
  144:21,22
  157:9 163:12
  163:22 164:8
  164:15 174:23
  175:23 176:6
  176:20 177:19
  178:17,21
  179:7 189:15
  195:13,18,21
  197:11,11
  218:2 221:21
  223:8,8 229:2

230:7,13,24
233:2 235:1
237:3,20,23
238:11,20,23
239:16 240:2,5
240:6,8 241:7
243:11,19,23
244:10 251:8
251:10,14,17
251:23 252:20
252:22 253:16
254:21 255:1,6
255:22 260:10
261:3,20 262:3
262:19,20
278:4 282:17
282:21 284:1
288:15 292:16
292:17 304:17
305:5 310:18
310:21 318:23
319:12 326:9
326:18 327:5
327:14,17,18
327:24 328:3,3
328:6,6,7,8,14
328:16,19,24
329:8,11,17,17
329:18,21
330:1,8 331:12
331:19 333:19
334:10 336:1,8
340:12,20,22
347:1,2,7,9,24
348:4,13,18,21
349:3,7,16,21

350:2,12 351:1
351:12,18,21
352:3,15,22
353:1,14,21,24
358:1,3,5,6,16
358:17,18
359:15,20
360:10 361:20
362:11,24
363:9,9,23
364:8 366:1
367:19 368:2,5
368:8,18,21
372:5,7,9,13
373:1 374:6
375:10 376:14
377:6,9,19
379:17,23
384:18,23
389:18 390:12
390:20 400:7
401:13 402:7
403:3 410:20
411:12 412:22
412:24 416:10
**biased** 301:12
331:23 333:18
335:22,23
**biases** 24:21
175:15 186:14
187:16 188:21
283:3 298:19
310:6 318:20
336:6 357:13
375:4 384:10

**bibliography**
48:3
**big** 224:3 309:5
341:4 353:8,21
358:9 362:17
363:24 372:10
396:1
**bigger** 254:12
379:2,6
**biggest** 358:6
**billing** 4:11
19:6,19,23 26:5
27:21 49:1
**binary** 343:15
**binder** 9:22
10:11,14 19:19
24:12 125:8
166:6
**bio** 4:17,18,20
4:21 125:17
129:1 130:23
133:18
**biography**
125:9 130:4,16
130:16 131:5
134:20 139:5
**biology** 130:18
**biomarkers**
134:3 137:19
**biostatistic**
80:17 101:24
**biostatistical**
16:19 75:24
84:10 85:12
104:15 107:1
130:8 134:19

**[biostatistical - call]** Page 13

135:23 136:7
160:11 165:15
167:22 407:17
408:4
**biostatistician**
7:21 84:14,18
85:14,18 86:7
87:4 98:3
104:17 114:11
132:12 139:22
179:15 410:1
410:11
**biostatisticians**
46:8
**biostatistics**
34:10 130:18
131:16,18,22
132:15 133:1
187:17
**bit** 14:15 19:16
103:12 112:12
164:1 176:14
237:15 238:14
244:15 262:6
264:18 315:18
339:1,5 341:20
372:16,16
378:20 395:2
396:20
**bizarre** 268:3
337:16,19
369:11
**black** 105:15
**blame** 165:12
166:7

**blanking** 46:2
**blinded** 169:13
**blindly** 300:14
355:6
**blow** 261:16,17
299:17 313:16
**board** 338:20
**bode** 141:1
**body** 85:3
92:16
**book** 105:2,8
112:9 113:13
115:20 116:18
153:21,22
165:19 335:10
382:17 391:22
**boone** 37:20
39:18
**bottom** 166:10
176:13 194:12
233:20 249:7
264:22,23
**bounced**
244:14
**boundary**
104:22 105:15
390:13
**box** 8:3,8,9 9:20
13:24
**bracket** 282:2
**bracketing**
282:8
**brain** 229:23
399:15
**branch** 125:11
126:8 129:12

130:19 131:18
131:22 132:15
133:10
**brandy** 3:3
**break** 81:18
83:10 145:14
145:19 146:3
149:9 184:12
199:7 202:3
258:13,23,24
323:24 324:1,3
374:1
**breaking** 81:4
81:10 145:20
184:22
**breast** 87:18
88:5,11,18 92:4
129:15,19
140:2 250:5
314:5 359:2,10
378:14,19
392:12 394:10
**brief** 175:4
**briefly** 7:6
391:21
**bring** 11:5
115:20 177:19
189:14 388:1
**bringing**
150:13
**brings** 203:20
282:17,20,21
**broader** 263:2
263:8
**broke** 69:5
408:11

**broken** 171:12
**brought** 10:12
11:1 46:24
205:22
**bucket** 205:15
**build** 304:18
409:9
**building** 335:24
340:2
**bunch** 294:18
**business** 17:21
18:8 54:24

**c**

**c** 309:18 364:13
372:14,16
418:1,1
**calculate**
327:22 329:9
330:10
**calculated**
267:12,21,22
348:12 367:20
367:20
**calculating**
328:22
**calculations**
283:9
**call** 9:11 13:13
20:17 60:6
66:20 75:3
110:11 144:14
160:8 164:5
169:11 170:14
234:20 277:9
281:6 329:19

[call - case]                                                                  Page 14

| | | | |
|---|---|---|---|
| 347:6,8 349:8 | 176:11 178:16 | 378:19 379:3,7 | 183:9 195:14 |
| 393:2 399:19 | 179:2 183:7,10 | 379:15 381:15 | 213:17 216:8 |
| 399:24 411:19 | 186:12 188:15 | 383:9,12 388:7 | 224:23 359:6 |
| **called**  9:4 11:22 | 192:23 193:8 | 388:24 391:24 | 367:17,18 |
| 18:4 41:10,24 | 194:6,10,17 | 392:13 394:11 | 392:12 |
| 42:13 99:16 | 195:16 196:23 | 396:8,11 | **career**  173:7 |
| 158:22 229:2 | 197:5 203:13 | 399:11 401:14 | **careers**  121:13 |
| 405:13 409:2 | 203:18 204:2 | 402:1 403:6 | 121:19 |
| **calling**  163:22 | 204:14,17 | 410:4,17 | **careful**  194:19 |
| 351:5 | 205:1,14 207:2 | 411:13,20 | 198:12,12 |
| **calls**  45:12 | 208:7,16 | 412:12 413:2 | 272:17 310:17 |
| **campus**  3:4 | 209:12 212:18 | 413:14,19,20 | 357:13 |
| **cancer**  13:7 | 233:17,21 | 413:21 414:22 | **carefully**  246:2 |
| 14:2 24:21 | 234:10 235:19 | 414:23 415:10 | 263:16 325:5 |
| 25:12 55:21 | 237:9,12 250:3 | **cancers**  9:6 | 419:3 |
| 56:2 57:7,21 | 250:5,6 251:4 | 115:19 129:19 | **carlson**  37:14 |
| 87:18 88:5,12 | 252:7,15 253:4 | 135:10 140:4 | 39:22 40:5 |
| 88:18,21,22 | 253:7 260:12 | 359:7,9 377:2,2 | **carried**  301:2 |
| 89:1,1,2,8,11 | 261:22 262:11 | **capable**  205:19 | 306:12 |
| 89:20 90:3,14 | 264:9 265:3 | 206:3 | **carries**  255:5 |
| 90:21 91:5,12 | 266:10,14 | **capture**  212:19 | **carry**  255:3 |
| 91:24 92:4,5,13 | 267:7,15,24 | 213:20 216:11 | **case**  16:11 24:6 |
| 112:2 116:15 | 279:15 308:18 | 225:2 227:13 | 30:13,22 31:11 |
| 117:17 118:8 | 309:9,24 310:5 | 227:19 272:4 | 32:7 33:16,16 |
| 122:12 129:15 | 313:21,24 | 277:5 | 33:21 34:19,19 |
| 133:11,23 | 314:4,5,6,6,14 | **capturing** | 34:22 35:7 37:1 |
| 134:1,10 | 316:6 322:3,8 | 221:20 | 37:7 38:2,24 |
| 135:17 137:10 | 333:24 334:5 | **carcinogen** | 40:4,16 41:9,12 |
| 137:16,18,20 | 334:16,20 | 151:24 152:2 | 41:23 42:5,19 |
| 138:1 139:17 | 337:10 338:10 | 152:18,20 | 43:2,15 44:4,24 |
| 140:2,8,18 | 347:17 359:10 | **carcinogenic** | 56:10,18,19 |
| 142:9 149:18 | 359:14,19 | 4:24 149:22 | 57:19 70:6 |
| 150:8,18,21 | 370:3,6 371:1,3 | **care**  3:6 9:5 | 77:19 80:1,6,22 |
| 156:8,11 | 373:7 375:6,17 | 115:18 175:14 | 84:6 85:16 87:5 |
| 158:16 173:19 | 375:20 377:11 | 175:20 176:8 | 89:18 90:5,24 |
| 175:14,19 | 377:21 378:12 | 178:15,23 | 95:19 97:5 |

**[case - check]**                                                    Page 15

143:1,8,9 154:7
158:8,21
184:20 185:23
186:1 206:16
207:1 225:21
232:21 255:9
255:10 291:14
295:5 300:8
305:22 306:7
307:4,10,15,19
331:4 332:5
337:24 338:8
338:13 351:9
360:11 361:11
365:14 369:8
377:8 384:15
389:4 390:11
398:7 404:24
405:13 406:6
407:11
**cases** 12:3
28:22 43:9
193:9 223:10
250:21 252:15
253:4 254:7,8,9
254:13,13,15
256:1 258:11
264:9 265:3
266:10,14
268:15 269:4
278:7 279:16
279:22 298:7
300:6 308:21
310:23 311:4
318:6 337:10
337:17,18

353:20 354:9
354:10 361:3
361:14 362:18
364:17 365:10
366:24 367:1
368:14 369:4
370:6,10
371:23 375:16
378:12 405:15
**caspers** 37:14
39:22 40:6
**catch** 69:1
363:21,22
**categories**
269:22 275:2
282:3 289:24
292:22
**categorizations**
270:8
**categorize** 12:1
54:17 253:19
**category**
270:11,11
273:4 278:8
281:16 296:11
296:13 347:3
392:11 393:4,7
397:4
**causal** 416:2
**causality**
410:16
**causation** 55:19
56:3 205:22
**cause** 340:7,12
340:15,19,22

**caused** 57:6
**causes** 55:20
57:6,21
**caution** 31:15
39:13 384:4
**cautious** 31:19
389:10
**caveat** 333:1
**caveats** 236:5
301:22
**center** 209:13
**central** 87:19
163:14 373:5
390:16
**certain** 28:12
71:12 108:4
128:17 247:10
259:24 262:3
306:19 344:17
**certainly** 20:14
21:22 53:15
59:4 74:19
87:16 105:3
133:5 139:24
140:16 153:3
231:13 265:15
306:21 326:4
339:14 346:19
361:7 398:9,17
**certainty** 43:17
47:24 408:16
**certification**
418:21
**certify** 418:4
421:3

**certifying**
418:24
**cetera** 88:7
**chafe** 302:23
305:14
**chain** 96:12
**chance** 366:18
**chang** 5:6
115:19,24
391:19,20
396:7
**change** 71:19
164:4 286:22
308:24 369:18
376:18 395:5
420:4
**changed** 163:4
**changes** 186:18
419:11 421:7
**changing**
153:17 269:17
330:19 371:13
**characterizati...**
281:4
**characterize**
76:12
**charge** 345:11
**charged** 72:1
**chart** 230:22
363:24 392:9
**charts** 136:2
265:17
**check** 10:15
12:19 59:21,23
106:2 132:9
147:13 148:6,8

**[check - colleagues]**

210:21 246:16
413:23
**checking** 215:6
**cherry** 3:4
**chief** 126:8
**choices** 67:13
**choose** 81:8
96:24 268:13
361:8,22
**choosing** 362:8
**chose** 231:15
233:7 266:18
266:24 267:2,2
267:23 268:1
268:15,16
361:19
**chosen** 309:18
**chris** 69:5
81:14,14
**christopher** 2:3
**chronic** 125:11
126:6 129:6
**circular** 309:7
309:22
**circularity**
310:20
**circumstance**
219:18 339:10
**circumstances**
148:17 286:22
**citation** 314:21
322:5
**cite** 95:13 97:1
99:9 158:12,13
214:4 216:16
216:19 312:9

312:15 314:19
315:1,3,5
321:16,18
334:1
**cited** 93:10 96:8
96:16,17 98:19
265:6 343:2
**citing** 98:16
312:14
**claim** 67:22
166:18 348:3
384:13 387:10
**claiming**
245:22 372:6
**clarice** 4:21
114:9 130:16
130:23
**clarification**
181:15 253:22
398:13
**clarify** 71:3
78:21
**clark** 1:14
418:15
**classification**
241:17 242:7
259:17
**classified**
284:20 337:17
**classify** 336:20
336:22 337:9
**clean** 124:4
157:7 198:10
286:23 304:11
**clear** 17:19
18:3 36:3 52:3

52:4,20 54:2,23
57:2 58:6 73:13
76:1 90:17,17
92:12 94:12
106:8 155:1
167:21 179:9
189:8 238:17
268:12 274:1
288:18 303:12
323:9 330:7,20
337:7 342:13
342:15 347:18
382:20 396:7
**clearly** 82:2
91:20 124:1
134:13 135:19
135:21 164:9
169:18 170:16
170:17 181:12
188:1 198:11
199:3 274:5
277:20,21
287:17 308:9
336:24 365:4
379:5
**client** 31:16
34:2
**clients** 36:3
**clinical** 11:15
84:22 85:8
133:10 135:9
136:1 182:3,23
183:5,8 197:21
346:22 402:4
**clinically** 384:9

**close** 157:11
394:24
**closely** 133:3
**coauthor** 132:5
132:24 407:23
**coauthors**
132:3 138:7,19
138:24
**cohort** 4:22
11:22 56:10,19
85:17 91:2,13
91:14 112:3
118:9 119:19
119:19 129:13
134:1,9 136:11
136:16 137:10
137:16 138:12
139:16 140:1,8
140:18,23
141:3,11,17,19
142:8 143:4
154:6 158:7
175:12,18
178:14 195:17
218:11 355:24
385:10 398:10
398:11,16,18
400:8 413:14
413:21 414:23
415:10
**cohorts** 91:5
113:12 119:20
142:19 144:1
388:14
**colleagues** 56:9
77:17

**[collect - complicated]**

**collect** 208:24 213:5 308:6,7
**collected** 86:10 175:12 177:21 357:8
**collecting** 111:22 141:21
**collection** 228:1
**college** 127:9 127:14
**column** 168:14 249:8 250:11 250:12 276:2 280:17,19 378:11
**combination** 89:7 339:20 366:11 373:1 384:17
**combine** 294:14
**combined** 56:18 142:13 347:11
**come** 46:4 50:16 52:9,24 55:7 58:5,6 80:17 92:10,17 93:7 135:23 193:1 200:13 298:10 342:14 348:2 366:2 372:11 373:12 396:22
**comes** 141:14 266:7 365:22

368:21 369:18 405:9
**comfortable** 247:20 312:4
**coming** 91:1 115:14 117:17 203:4 216:17 291:17
**commenced** 112:8
**commencing** 1:13
**comment** 57:22 167:5 170:18 401:3,4
**commentary** 104:6 160:7 201:9 257:3 283:16
**commented** 72:5 199:13 236:21
**commenting** 81:23
**comments** 167:15
**commerce** 2:8
**commission** 421:16
**committed** 183:5
**committee** 2:16
**common** 44:15 61:3,4 105:21 106:4 180:7 227:2 299:24

306:10
**commonly** 312:22 318:4
**commonwealth** 1:15
**communicati...** 82:15,20
**community** 102:1 162:21 312:23
**companies** 29:16 35:20 346:23
**company** 18:3 18:4 28:21 29:15,19,22 30:4 31:12 33:9 35:19 46:19 53:20 54:5,12 346:14 405:22 406:2
**compare** 243:8 318:19 370:16 370:17
**compared** 223:10 237:8 350:5,15 370:18 378:21 383:13 385:18 394:14
**compares** 218:10
**comparing** 243:1 247:7 248:6 394:8

**comparison** 296:3
**compelling** 173:17 188:13 403:4
**complete** 29:19 284:9 297:13 297:16 300:8 304:12 305:21 306:7 307:4,10 307:15,19 308:10 318:5 331:4 332:4,5 333:6 339:15 342:16 343:9
**completed** 51:1
**completely** 7:8 29:19,22 36:12 49:18 81:9 95:24 96:14 105:4 119:14 147:23 165:7 216:3 263:4 277:3 297:21 301:23 306:10 341:3 342:13 343:3,8,10 345:24 393:17 395:10 396:13
**completion** 260:9 261:19
**complex** 185:4 185:7,8,19 186:5 323:13
**complicated** 187:11

**component**
104:2 163:19
**components**
389:17
**comprehensive**
55:18 57:3
221:19
**compressed**
53:10
**comprised**
268:16
**computation**
84:19
**computational**
130:18 340:11
**computationa...**
341:16
**computed**
367:1
**concept** 332:15
363:15
**concern** 144:19
240:3,11
289:24 305:19
349:22 350:3
350:13 358:6,9
**concerned** 87:4
203:17 237:4
237:18 387:3
**concerns** 59:2,5
63:14 166:23
200:14
**concluded** 13:6
13:20 14:17
152:10,17
235:8 239:15

417:8
**conclusion**
13:22,22 14:12
15:12 52:9,24
55:7 58:6
152:21 172:10
239:19 241:16
242:7 353:11
387:16 393:14
401:19 403:11
**conclusions**
57:23 66:3
156:16 228:10
362:22 401:21
404:19
**condition** 171:1
**conditional**
326:6 367:11
368:10
**conduct** 134:2
169:22 413:9
**conducted** 1:12
73:24 163:13
175:11 383:10
**conference**
110:10,11
**confidence**
156:13 157:12
234:23 235:20
254:17 282:10
339:13 340:2
364:24 365:14
365:18 367:10
383:21 384:6
384:12 386:10
388:19,21

389:8 391:24
393:22 396:22
396:23
**confidential**
62:22 82:22,24
184:15
**confidentiality**
60:17 80:8 81:2
81:4,11 82:4
83:6 184:11,22
**confounders**
313:20 322:1
**confounding**
14:13
**confused** 267:8
**confusing**
36:13 40:1
273:16
**conjunction**
351:13
**connect** 34:3
**connected** 35:3
**connection**
195:5,6 291:8
**conquers** 183:6
**cons** 288:15
**consider** 35:12
62:21 74:11,14
77:20 79:1
97:22 126:15
127:22 228:22
273:18 328:18
367:23 368:1
406:9 409:11
**consideration**
128:15

**considered**
57:14 82:17
92:5 128:12
150:16 270:2
287:11 315:8
390:16 413:17
414:11 415:6
**considering**
15:15 24:21
260:8 261:18
272:16,18
328:9,23
**consistency**
242:9 247:11
248:6 259:19
352:8 385:17
391:14
**consistent**
154:4 157:14
158:5 223:19
242:17 243:1
243:10 245:1,2
245:20 246:6
255:13,17,18
255:24 256:22
260:13 261:10
261:23 294:10
389:2 391:2,15
398:2,6,9,16,17
**consistently**
25:9 244:21
272:22
**consortium**
134:2 137:11
137:16,22
138:6,10,18,23

[consortium - correct]                                                                Page 19

| | | | |
|---|---|---|---|
| 139:2,8 140:8 | **contained** | 280:15,24 | 30:23 31:5,10 |
| 140:18 194:11 | 342:4 418:5 | 282:16 289:19 | 32:5 33:8,22,23 |
| 194:18 413:14 | **contains** 235:1 | 298:20 330:9 | 34:1,1,6,7 35:3 |
| 413:22 414:23 | **contaminate** | 349:5 355:10 | 36:7 37:5 45:9 |
| 415:11 | 352:4,24 | **contributed** | 45:20,24 48:5 |
| **consortiums** | **contaminating** | 183:19 | 50:4 54:12,17 |
| 194:21 | 353:2 | **contrived** 75:3 | 54:21 72:21 |
| **constitutes** | **contamination** | 76:17 | 405:14,21 |
| 51:12 | 209:2 352:5 | **control** 56:10 | **cornstarch** |
| **constraints** | **context** 76:21 | 56:19 85:16 | 411:7 |
| 184:11 | 85:2 94:15 | 143:8,9 154:7 | **correct** 8:1,2 |
| **construct** 130:5 | 258:8 320:11 | 158:8 355:19 | 9:24 10:1 11:3 |
| 135:16 | 322:13 347:2 | 390:11 398:7 | 11:4,6,15,23 |
| **constructing** | 357:17 388:24 | 418:23 | 12:7 13:10 14:7 |
| 151:16 | **continue** 320:2 | **controls** 56:18 | 14:21 16:2,7,14 |
| **constructive** | **continued** 3:1 | 193:10 223:11 | 16:22,24 17:7 |
| 78:8 | **continuum** | 268:24 269:3 | 21:10,18 22:15 |
| **consultant** 35:5 | 50:14 | 298:7 311:4 | 22:22,24 23:9 |
| 36:18,24 37:10 | **contradicting** | 362:20 | 23:17 24:4,9,10 |
| 37:16 121:6,9 | 213:11 | **conventional** | 24:13,23 25:5 |
| **consulting** | **contradiction** | 104:14 | 25:20,23 26:2 |
| 31:17 32:24 | 229:1 275:4 | **convey** 340:16 | 27:1 29:6 30:21 |
| 39:12 86:8,22 | **contradictory** | **convinced** | 31:12 32:10 |
| **contact** 18:12 | 228:16,17 | 226:21 | 33:11 34:5 |
| 32:6 34:14 | 229:15 230:9 | **convoluted** | 36:19,24 37:11 |
| 60:12 61:11,14 | 233:14,24 | 143:15 | 37:17,21 41:12 |
| 62:17 63:9,13 | 234:7 235:23 | **copy** 9:16,18 | 41:14 45:16,19 |
| 66:18 69:16 | 269:6,12,16,20 | 21:9 55:5 342:3 | 47:4,9 53:3 |
| **contacted** | 270:3,7,9,21 | 414:1,4 | 57:7,23 59:1,20 |
| 16:11 17:21 | 271:4,5,7,10,20 | **corner** 213:16 | 63:24 64:4 |
| 18:20 54:21 | 272:10,15,19 | **cornerstone** | 66:22 69:13 |
| 59:9 64:1,18 | 273:6,11,12,22 | 18:1,2,17,19 | 72:16 87:13 |
| 80:10 90:4 | 274:2,5,11,15 | 19:4,7 20:6,13 | 88:7 102:2,7 |
| 406:5 | 274:20 275:18 | 20:17 21:2 | 106:18,21 |
| **contain** 411:6 | 276:22 278:3 | 22:24 28:18,19 | 111:20 112:3 |
| 413:5 | 279:24 280:3,7 | 29:5 30:10,19 | 113:8,14,22 |

**[correct - courtroom]** Page 20

| | | | |
|---|---|---|---|
| 114:12,16 | 260:14 261:11 | 269:12 | 63:8 232:7 |
| 115:5,6,9,15 | 268:17 269:13 | **correcting** | **couched**  197:2 |
| 116:5,19 117:4 | 270:3,5,21 | 157:10 162:13 | **council**  3:6 |
| 131:24 132:17 | 272:15,24 | 177:17 233:13 | **counsel**  7:9 |
| 132:21 133:12 | 275:7,13,19 | 269:16,19 | 70:11 121:15 |
| 134:4 138:6 | 276:14,19,24 | 368:23,24 | 406:20 408:24 |
| 139:6 144:1,6 | 280:2,3,9,15 | 369:1 | **counsel's**  257:3 |
| 144:10 151:4 | 284:5 289:21 | **correction**  14:3 | 406:15 |
| 155:8 161:19 | 290:24 291:24 | 130:11 229:19 | **count**  41:8 |
| 162:22 163:15 | 292:13 308:18 | 231:16 233:23 | 140:3 270:6 |
| 163:16 166:16 | 314:17,23,24 | 234:14 236:10 | **counter**  335:1 |
| 168:19,23 | 315:7 316:7 | 266:12 269:6 | **counterintuitive** |
| 169:1 170:11 | 317:17 318:11 | 278:24 279:14 | 320:8 322:18 |
| 170:22 174:10 | 319:20 320:9 | 279:20 282:16 | 325:20 334:17 |
| 174:13 179:2 | 327:10 328:1 | 329:19 347:8 | **counts**  41:4 |
| 181:5 184:16 | 330:11 331:10 | 367:18 368:22 | **couple**  13:12 |
| 188:2 189:23 | 342:5 347:4,20 | 376:10 400:15 | 14:9 83:24 |
| 189:24 190:11 | 347:21,22,24 | **corrections** | 151:10 202:24 |
| 192:23 193:17 | 348:22 349:17 | 25:13 162:15 | 282:6 377:17 |
| 195:21 196:3 | 350:6 352:4 | 174:24 283:3 | 378:2 379:8 |
| 197:13 209:23 | 354:20 355:10 | 419:4,6 421:7 | 413:13 |
| 210:19 211:3 | 361:24 362:6 | **correctly**  45:8 | **course**  17:16,21 |
| 211:11,14 | 364:17,20 | 155:18 219:21 | 18:7 54:3 69:11 |
| 215:4,22 | 365:12 367:5 | 326:23 327:2 | 116:9 142:18 |
| 216:18 217:12 | 369:7 371:1 | 329:4 334:14 | 228:13 235:2 |
| 217:17 218:18 | 381:24 383:22 | **corrects**  279:24 | 312:1 374:12 |
| 219:3,16 228:4 | 385:7 386:17 | **correlation** | 382:9 390:22 |
| 228:20 230:10 | 393:4 396:17 | 257:19 258:2 | 397:3 |
| 230:23 233:2 | 399:11,23 | 263:22 269:6 | **court**  1:1 |
| 235:21 236:3,6 | 401:15 402:9 | **correlations** | 101:11 122:9 |
| 236:8 238:21 | 404:1 409:2 | 338:21 | 158:21 159:11 |
| 240:4,12 | 413:22 415:12 | **corresponded** | 419:18 |
| 241:20 242:4 | 416:4,8 418:7 | 313:23 | **courtroom** |
| 243:5,11 250:6 | 421:4 | **corresponding** | 185:1,16 |
| 251:6,23 252:9 | **corrected**  67:14 | 59:19,23 60:23 | 404:19 407:18 |
| 254:5 255:7,14 | 234:7,13 238:9 | 61:5 62:7,18 | |

**covariate**
318:21 320:7
325:19 332:21
338:24
**covariates**
311:14,19
313:20 318:7,9
318:10 320:4
321:17 322:2
323:19 325:16
**cover** 49:6,6
374:4
**coverage**
416:12
**covers** 284:8,10
**cowriting** 85:15
**cox** 392:13
**crafting** 119:3
119:6
**create** 334:6
**created** 212:13
212:14 287:4
306:16
**credential**
126:16
**credentialed**
130:2 133:1
135:20,22
**credentials**
126:4 127:7
128:3 129:23
136:5
**credible** 295:7
**crisis** 358:10
**critical** 248:2,3
291:10,12,15

**criticism** 66:18
74:4,9,11,14,17
76:6 78:6,16,18
78:24 79:8,9,15
**criticisms** 15:5
41:10 63:11
70:4 73:21 74:2
74:4 75:16
109:18 202:21
309:5 310:4
**criticize** 42:1,6
74:19 83:2
201:11
**criticized** 79:11
107:7,13,22
108:5,8,10,12
110:9 199:21
306:22 314:10
319:15,15
**criticizing**
75:19,22,24
76:2,10 111:1,2
111:5,8 303:6
**cross** 220:11
383:22
**crosses** 365:4
388:21
**crosstalk**
224:17 239:2
**crude** 313:22
322:4,7
**ctisi** 2:5
**cumulative**
313:22 322:4,7
**currently**
137:22

**curriculum**
4:10 29:10
**cursor** 137:6
**cut** 12:13,15
**cuts** 239:7
**cv** 22:7 29:1,3
30:8,15 31:1
34:3,13 36:17
83:17,21 87:9
94:24 128:12
146:7
**cvs** 128:13

**d**

**d** 4:1 342:2,4
**d.c.** 2:14
**dale** 4:18 114:1
116:4 125:9,17
126:6 136:21
137:3
**dangerous**
328:9
**daring** 319:16
**data** 57:4 68:1
82:17 84:20,20
85:2,7,11 86:9
86:11 94:18,18
95:7,8 97:22
100:8,11,11,19
101:14,21
102:1,10,15,19
103:11,12,19
104:1,3 111:22
112:22 117:22
118:10,23,24
119:2,19 124:4

134:9 138:12
139:16 141:21
141:22 147:19
148:2 149:2,11
153:9 156:7
157:9,9,10
175:17 177:20
185:19 196:22
205:11 208:24
209:2 221:17
228:1,11,16,17
228:24 229:1
229:13,15,16
230:9,10
233:24 234:8
238:4,9 244:8
248:22 252:6
255:3,7 256:5
261:11 262:19
269:6,7,13,16
269:17,20
270:9 273:19
274:11 275:7
275:18,24
278:3 280:1,4,7
280:15,24
281:12 282:16
285:7 286:20
288:13 289:9
289:11,14,15
289:17,19,20
289:23 290:5,8
291:5,17
292:18 294:18
295:7,21 296:8
296:23 297:14

**[data - department]** Page 22

| | | | |
|---|---|---|---|
| 297:17,18 | 363:3,8,8 | 404:15 419:15 | **defending** 9:2 |
| 298:5,16,18 | 367:17 378:7 | **deal** 87:6 96:19 | 346:15 |
| 299:3,24 300:5 | 379:4,6 380:3 | 100:7 103:22 | **defer** 326:21 |
| 300:23 301:14 | 381:21,23 | 130:9 136:2 | **define** 26:15 |
| 302:23 303:1,7 | 382:2 383:19 | 147:8 230:8,9 | 86:3 258:7 |
| 303:15 304:2 | 385:10,10 | 235:3,4 269:22 | **defined** 250:19 |
| 304:11,13 | 389:16 390:2 | 275:16 286:6 | **defines** 91:17 |
| 305:5,14,18 | 396:7,16 397:1 | 290:19 293:20 | **definite** 152:1 |
| 306:9,16 307:8 | 402:6 409:12 | 296:8 304:7 | 152:19 |
| 307:9,11,18,23 | **dataset** 102:15 | 360:3 384:8 | **definitely** 85:7 |
| 307:23 308:1,7 | 309:20 337:8 | **dealing** 93:22 | 95:20 163:2 |
| 308:8,10,17 | 353:9 | 94:3 96:6,21 | 379:17 |
| 311:3,23 313:5 | **datasets** 340:1 | 100:10 101:13 | **definition** |
| 313:16 316:11 | 341:15 | 148:14 149:2 | 274:2 296:18 |
| 318:4 320:4,18 | **date** 16:9,10 | 295:7 | 381:17 395:4 |
| 321:13 323:18 | 23:2,3 31:4 | **deals** 327:6 | **degree** 311:1 |
| 325:16 326:8 | 84:1 419:9 | **dealt** 285:2 | 375:10 408:16 |
| 327:9,14 330:9 | 421:11 | 316:21 358:16 | **dementia** 87:23 |
| 330:19 331:16 | **dates** 27:23 | **death** 290:3 | 346:21 |
| 333:6,14,17 | 215:20 | **debate** 163:2 | **demographic** |
| 334:11 335:21 | **davidson** 27:9 | **debating** | 311:19 |
| 335:23 337:6 | 27:14 28:2,5 | 164:20 | **demonstrate** |
| 337:11,21,22 | 72:20 | **decades** 235:10 | 216:18 226:14 |
| 337:22 339:3 | **davis** 373:20 | 235:19 | 240:22 401:23 |
| 340:17 343:19 | **day** 19:7 20:11 | **decide** 141:18 | **demonstrated** |
| 343:22 348:8,9 | 20:20,21 21:12 | 142:4 206:17 | 385:5 |
| 348:10 349:5 | 26:23 27:1,5 | **decision** 65:12 | **demonstrates** |
| 349:14 352:1,4 | 347:1 371:7 | 102:17 153:11 | 158:15 373:8 |
| 352:10,16,24 | 372:20 407:7 | **decisions** 65:13 | **demonstration** |
| 353:2 354:3,24 | 421:13 | **decouple** | 387:13 |
| 355:2,10,11,16 | **days** 16:6 22:23 | 205:12 | **denounce** 70:21 |
| 356:10,13,18 | 24:9 26:2 50:16 | **deemed** 419:17 | **denouncement** |
| 356:22,23,24 | 54:13 58:8,20 | **deeply** 324:24 | 71:1 |
| 357:1,3,6,8,11 | 59:8 151:10 | **defendant** 35:4 | **department** |
| 359:11,13 | 325:5 345:2 | **defendants** | 131:15 172:15 |
| 360:5 361:19 | 403:24 404:7 | 2:21 | 173:3 |

[depends - digging]                                               Page 23

| | | | |
|---|---|---|---|
| **depends**  85:21 | **description**  4:7 | **determined** | 120:15 123:17 |
| 99:23 100:11 | 38:19 88:10 | 151:23 | 126:3 182:11 |
| 185:5,20,22 | 197:17 230:15 | **determining** | 193:15 195:19 |
| 211:12 221:24 | **design**  86:18 | 246:5 | 197:23 217:24 |
| 255:17 257:6 | 89:4 144:23 | **developed** | 220:13 231:2 |
| 258:8,10 | 169:22 217:23 | 51:20 251:4 | 243:17 263:5 |
| 305:16 338:4 | 219:14 227:21 | **developing** | 265:18 266:23 |
| **deponent**  421:1 | 227:22 245:10 | 94:17,20 | 269:2,3,22 |
| **deposing** | 286:2,20 288:8 | 127:18 | 277:4,8,13,21 |
| 419:14 | 357:14 413:9 | **development** | 277:21 278:1 |
| **deposition**  1:11 | **designate**  40:19 | 146:13 147:19 | 283:21 294:19 |
| 6:1 7:2 13:3 | **designated**  39:6 | **diagnosed** | 351:19 356:9 |
| 40:12 72:24 | 40:17,22,24 | 176:10,10 | 356:15 361:18 |
| 190:15,18 | **designed**  89:3 | 179:1,2 237:9 | 372:24 410:13 |
| 384:20 405:5 | 104:1 129:14 | 253:10 359:9 | 411:8,8 |
| 415:11 417:7 | 285:22 | **diagnosis** | **differential** |
| 419:3,12,15,17 | **designing** | 412:12 | 176:9 178:24 |
| **depth**  160:10 | 208:21 283:23 | **died**  308:17 | 223:7,8 248:18 |
| 181:8 | **designs**  218:15 | 354:15 | 269:1 298:6,18 |
| **describe**  64:11 | **detail**  46:11 | **dies**  228:18 | 308:20 311:2 |
| 77:1 229:8,20 | 196:12 201:19 | 275:11 293:22 | 354:5,13 357:8 |
| 229:22 230:7 | 218:24 321:1 | **diette**  190:21 | 359:14 362:16 |
| 232:19,22 | 324:21,22 | 190:24 198:15 | 363:4 378:10 |
| 276:4 308:5 | 344:18 | 200:11 | 378:13,15,22 |
| 343:10 388:12 | **detailed**  250:20 | **diette's**  191:24 | 379:5 380:2 |
| 402:22 405:23 | **details**  198:8 | **difference** | **differentially** |
| **described** | 326:19 402:23 | 84:13 287:21 | 237:8 350:4,14 |
| 157:17 229:4 | 403:14,17 | 357:22 364:22 | **differently** |
| 230:8 232:24 | 406:1 | 372:10 378:21 | 271:5 |
| 233:1 313:19 | **detection** | 379:2 | **difficult**  84:16 |
| 322:1 333:24 | 358:11 | **differences** | **difficulties** |
| 376:16 | **determine**  57:4 | 13:21 224:4 | 286:15 |
| **describes** | 89:5 199:2 | **different**  51:24 | **dig**  167:20 |
| 313:15 | 206:2 215:17 | 62:24 63:2 | 198:5 401:1 |
| **describing** | 240:22 361:2 | 95:24 98:5 | **digging**  174:20 |
| 332:7 | | 115:19 116:21 | |

**[diluted - douching]**

diluted 332:22

diluting 332:23 333:5,8

direct 383:4 418:23

direction 6:4 18:22 48:18 123:18 281:17 282:18 331:14 331:15

directly 96:19 103:6 150:6,8 399:4

directors 127:17

disagree 156:23 158:14 159:23 159:24 163:21 164:16 185:14 189:4,6 213:12 220:13 229:3,5 272:20 282:5 326:1,4 377:12 377:14 399:19 400:4,9,12 401:10,18,20 402:3,8,12,14 403:2,7,11 406:17 407:2

disagreed 174:8 174:9

disagreeing 174:10,14

disagreement 220:4 353:19

disagreements 402:16

disappear 371:20 373:2

disappeared 370:15 372:17

disappears 371:12 373:15

disclaimer 169:20 413:6

disclose 39:14 343:4

disclosed 31:18 32:22 33:2,5 39:9,11,17,24 229:16 342:1 342:22

discover 88:17

discuss 16:4 65:22 81:6 148:16 149:3 203:3 315:11 317:4

discussed 14:20 94:14 104:17 148:12 238:22 288:14 317:8 368:19

discussing 13:2 146:6 253:5

discussion 8:19 48:19 156:14 412:7

disease 125:11 126:7 129:7 205:19 206:4

206:19 350:4,6 350:13,16

dispute 214:5 344:16 348:23 386:19

disputes 185:12

disputing 181:18 273:24

distinction 217:8,13 359:22

distinguishing 276:7,16 277:2 277:10,13

district 1:1,1

division 126:9

doctor 51:19 75:12 93:2 95:11 98:15 148:8 207:12 222:13 224:20 238:18 245:7 245:17 246:23 249:20 251:19 253:6 256:3 258:15 303:12 311:7 324:12 330:20 354:15 366:12,15,15 370:2,12 385:22 388:11 393:11

document 104:13 117:5 153:8 157:18 157:22 197:21

265:13 387:23

documents 6:7 8:4 140:14

doing 12:16 36:9 48:1 70:15 70:22 80:23 102:20 123:21 163:24,24 204:23 227:10 256:13 262:21 271:16 273:17 294:1 302:24 327:20 330:7 330:18 341:8 346:7,8,21 357:23 404:22 419:8

double 59:21 132:9 311:3 354:10 413:23

doubling 362:18 372:18 372:19

doubt 12:10 19:12 23:3 122:2 126:4 129:23 132:14 133:14 138:21 139:11 192:7 292:6 308:22

doubting 127:6 128:2 132:8

douche 359:12

douching 115:3 175:21 195:15 227:1 239:24

**[douching - enhanced]**                                                          Page 25

241:8 242:17
243:2 247:2,4
263:20,21
272:7 359:2
377:23 379:4
**downloaded**
54:9
**dr**  7:20 59:18
61:8,20 82:14
83:16 115:8,8,9
120:6 123:4
136:3,11 138:4
138:5,5 139:4,8
146:3 151:1,1
190:20,24
191:24 192:23
195:6 198:15
200:11,11
239:11 374:24
386:13 388:3
407:7,9,10
408:10 414:11
416:1,17
**draft**  51:8
**drafted**  58:23
77:18,19 120:8
**drafting**  59:10
120:8 122:2
404:14
**draw**  74:16
**driving**  256:2
**dropped**  40:3
**drug**  206:18
328:12
**dry**  374:11

**drye**  37:9 39:23
40:2 41:3
**due**  7:5 308:21
384:10
**dug**  201:18
**duly**  7:13
**duration**  154:9
158:10 383:12
388:15
**durations**  13:9
**dying**  308:22
310:23

**e**

**e**  4:1,6 94:10
418:1 420:2
**earlier**  175:16
178:18 188:21
244:12 247:19
290:22 372:11
384:20 391:1
402:8 409:1
**earliest**  219:11
313:24
**early**  219:22
**easier**  9:12 10:9
247:18,22
265:24
**easiest**  278:16
**easily**  371:20
**eastman**  46:1
48:5
**economic**  46:12
**editing**  51:13
51:16

**editor**  5:11
69:19,23 70:8
70:23 71:9
110:11 117:10
162:6,6 167:5
190:16 386:15
**editorial**  110:12
190:9,16 192:3
192:12,13
195:5,10,24
197:13,22
199:14 373:16
373:20 376:2
401:12
**editorials**
402:21
**editors**  116:17
165:13 180:17
**education**
409:24 410:10
**effect**  205:13
243:12,18
255:22 259:23
262:20 375:7
**effective**
252:14 254:11
**effectively**
263:1 307:9
**effects**  358:12
359:16 383:8
383:11 394:5
**efficient**  318:5
**egregious**  82:8
**eight**  24:8 26:2
50:16 166:15
168:3 345:2

**either**  28:5
40:19 85:16
93:18 119:24
162:18 181:6
186:2 199:20
287:8 292:16
295:15 326:3
327:24 331:2
**elected**  131:6,9
**element**  292:8
**eligible**  266:6
266:11 279:14
279:20
**email**  60:24
61:6 71:10
184:3 232:8,8
232:20
**emails**  62:15
**emphasized**
207:18
**employ**  273:19
312:22
**employee**  35:14
35:15,18
**endeavor**  69:12
**endeavors**
17:17
**ends**  194:16
**engage**  79:18
**engaged**  124:20
**engagement**
160:20
**english**  44:16
**enhanced**
146:10

[enroll - everybody]                                                    Page 26

| | | | |
|---|---|---|---|
| **enroll** 225:1 | **entirely** 16:20 | **equations** | 282:20 300:21 |
| **enrolled** 111:19 | 259:24 276:13 | 96:12 | 322:7 359:16 |
| 219:20 | 389:14 | **equivalent** | 364:18 365:13 |
| **enrollee** 210:18 | **entitled** 66:1 | 307:13 | 366:2 367:6 |
| 211:16 | 115:2 | **err** 81:5 83:5 | 380:20 383:24 |
| **enrollees** 211:1 | **environmental** | **errata** 419:6,8 | 386:7 388:16 |
| 211:6,7 | 4:12 125:12 | 419:11,14 | 389:6 390:9 |
| **enrolling** | 129:14,17 | 421:9 | 396:9 |
| 219:12 | 131:23 132:17 | **error** 279:11 | **estimates** 156:9 |
| **enrollment** | 168:7 173:23 | 311:18 384:11 | 260:11 261:21 |
| 142:16 144:6 | **epidemiologic** | **errors** 176:7 | 262:20 313:23 |
| 209:21 210:9 | 85:15 100:8 | 178:23 180:16 | 322:4 339:2 |
| 211:8,17,22 | 101:24 103:22 | 180:20,21 | 375:7 397:7,9 |
| 212:13 213:4,7 | 131:10 | 181:5 182:2 | **estimating** |
| 213:9 217:24 | **epidemiologi...** | 306:14 | 209:11 301:14 |
| 218:10 219:14 | 84:12 | **especially** | 330:16 383:11 |
| 219:20 220:9 | **epidemiologist** | 58:16 175:21 | **estimation** |
| 229:14 242:20 | 84:9,15,21,24 | 176:5 178:20 | 206:8 |
| 243:4 263:3 | 85:14,19 86:3 | 178:20 186:17 | **estimator** 319:4 |
| 269:24 270:15 | 87:3 129:7 | **esq** 2:3,8,13,18 | **et** 88:6 195:11 |
| 273:5,7 276:12 | **epidemiologi...** | 3:3 | 375:5 |
| 278:11 279:8 | 46:9 355:16 | **essential** 320:9 | **evaluate** 263:16 |
| 279:13,13,19 | 356:19,22 | 322:19 325:21 | **evaluated** |
| 280:5,8,16 | **epidemiology** | 326:20 334:18 | 359:19 |
| 281:9 290:2 | 125:10,11 | **essentially** | **evaluating** |
| 351:14 354:8 | 126:7,8 127:10 | 223:21 | 55:23 |
| 354:12 411:23 | 127:14 129:12 | **establish** | **evaluation** |
| 412:14,20 | 135:9 137:12 | 410:16 | 55:18 |
| **ensure** 7:7 | 205:20 206:2 | **established** | **evening** 407:7 |
| **entails** 170:14 | 206:15,17,22 | 134:1 137:17 | **event** 319:3 |
| **entered** 349:3 | 218:8 | 150:20 416:3 | 382:5 |
| **entering** 253:1 | **epithelial** | **estimate** 27:18 | **events** 314:1,4 |
| **enters** 293:14 | 137:24 | 73:2 156:12 | **everybody** |
| **entire** 245:18 | **equation** | 204:13,24 | 166:19 189:18 |
| 287:11,13 | 233:11 | 234:21 235:22 | 189:19,20 |
| | | 236:9 261:6,7 | 232:2 280:7,22 |

**[everybody - expected]**

294:10,12
397:3
**everyday** 408:5
**evidence** 15:22
120:6,16,24
121:10,17,22
121:23 122:6
122:14,18
124:16 136:6
154:8 158:8
173:17 188:13
190:24 214:3
224:2 239:16
250:4 254:21
255:1,12
256:20 261:9
352:2,13,15
403:5 411:12
418:5
**exact** 18:24
72:12 123:21
207:20 243:10
278:16 292:3
326:19
**exactly** 20:16
26:15 28:20
35:22 53:8
74:15,18 81:3
177:4 220:2
222:1 239:12
254:18,18
261:14 269:15
277:19 287:16
312:10 337:4,5
355:4 362:14
395:20 412:2

**exaggerates**
310:14 314:16
**examine** 174:21
180:4 195:19
197:10
**examined** 7:13
178:5
**examining**
359:17 382:14
**example** 21:16
48:10 64:18
65:10 67:22
70:7 80:19
85:16 88:5,15
96:11 99:13
105:9 116:16
127:3 221:15
225:10 228:18
231:14 263:11
264:3 274:6
275:10,14
295:5,6 309:6
309:16 328:11
333:11 340:15
351:2 357:7
362:9 368:7
370:9 379:14
394:9
**examples** 301:9
311:19 376:17
**except** 41:3
43:15 248:19
283:5 421:6
**exchange** 69:4
**exclude** 300:6
300:12,14

**exclusion** 300:7
**excuse** 128:22
156:19
**executive** 3:4
**exercise** 79:19
**exhibit** 4:9,10
4:11,12,13,14
4:15,16,17,18
4:19,21,22,23
5:1,2,3,4,5,6,7
5:8,9,10 9:19
10:5,11,13,15
10:16,20 11:13
13:23 16:14
19:18,24 23:7
24:12 26:5 29:4
29:11 30:15
45:7 50:19
60:21 83:18
111:13 112:9
112:17 113:13
113:17 114:18
114:22 115:19
115:21 116:1
116:10,18,21
116:22,23
117:2,11 125:7
125:18 128:19
128:21,22
129:2 130:15
130:24 132:6
133:8,18
136:10,17
140:20 149:16
149:24 153:24
154:1 155:23

158:3,4 165:18
165:24 166:24
173:13 174:1
182:14,18
186:8 190:6
191:16 193:6
193:21 210:24
212:24 213:15
214:13 215:11
216:4,21 230:5
239:24 241:12
247:5 260:3
278:18 298:23
299:9,23
313:10 315:19
315:24 373:19
374:24 382:17
387:5,18,19,22
391:21 413:14
414:13,17
**exist** 358:12
366:8 401:5,6
**existed** 14:18
**existing** 102:9
**exists** 124:21
125:5 240:9
253:16 312:1
350:20 411:1
**expanding**
359:7
**expect** 118:5,22
377:5
**expectation**
147:22
**expected** 64:11
363:19

**expensive**
340:10 341:16
**experience**
83:22 84:5,11
104:16
**experiment**
64:12
**experimental**
86:18 286:1
**expert** 4:9
10:19 31:11,17
32:10,12 33:24
35:18 36:23
37:9,16 38:1,16
38:21 39:6,13
39:17,24 40:5,9
40:24 44:23
81:22 84:11
98:2 121:9
198:2 246:24
405:16 406:12
**expertise** 130:8
134:19 151:4
**experts** 29:16
29:17,24 33:10
35:19,20,24
54:13 107:19
110:13 122:9
135:24 198:15
198:24 200:12
201:10
**expires** 421:16
**explain** 77:7
98:21 99:11
232:3 254:24
266:18 282:9

284:15 311:15
311:20 312:7
377:10 401:13
**explained** 70:9
184:7 232:14
390:14
**explaining** 86:1
**explanation**
237:10
**explanatory**
308:3
**explicit** 273:4
306:7
**explicitly**
174:13 210:3
223:3 227:17
270:6 402:17
402:19
**exposed** 207:4
207:16 208:9
209:7 254:4
280:22 287:21
287:22,22
**exposure** 103:2
106:20 115:5
154:8 158:9
195:19 196:15
196:17 206:19
209:17 212:13
213:20,21
216:12,13
225:3,4 250:19
272:4,5 288:3
298:6 350:5,14
359:13 360:12
360:14 375:15

**exposures**
129:18 195:21
196:13 298:6
**express** 200:14
407:15
**expressed**
71:23 198:16
198:17,21
201:20 400:11
403:21
**extension** 36:8
228:6
**extensive** 92:7
175:10
**extent** 22:3
31:16,23 39:8
39:11 41:14
50:9 82:14
83:24 92:23
97:12 100:12
103:24 119:9
145:10 381:4,7
**extra** 103:12
169:16 222:11
223:15 372:21
**extramural**
133:24
**extrapolating**
291:16
**extreme** 282:7
282:14
**extremes**
281:22 282:10

**f**

**f** 418:1
**face** 174:19
180:9 181:9
187:14 364:4
**facilitate**
137:17
**facilitating**
141:6
**facing** 357:4
**fact** 22:19 24:7
48:2 62:19
66:21 70:5
134:11 140:24
163:15 189:10
207:3,15 210:5
237:5 238:24
239:14,14
271:21 273:21
293:23 309:1
315:2 320:8
325:20 334:18
337:9,20,23
341:1 349:22
352:5 386:9
411:18
**factor** 4:12
89:6 173:23
276:16 386:10
**factors** 88:16
88:17 89:7
91:13 129:15
134:3,10
135:17 137:18
150:19 305:17

**[facts - first]**                                                                                         Page 29

| | | | |
|---|---|---|---|
| **facts**  82:17 | **feature**  171:19 | **filled**  303:17 | **firm**  2:2,7 37:5 |
| **faculty**  131:15 | 171:23 172:4 | **filling**  304:1 | 37:6,8 38:23 |
| **fail**  419:16 | 176:24 277:2 | **final**  167:7 | 41:24 |
| **failure**  322:17 | 277:10,14 | 332:7 | **firmly**  68:6 |
| 322:18 | **featured** | **finalized**  28:4 | **firms**  36:5,18 |
| **fair**  17:14,18 | 172:21,22 | **finally**  50:16 | 38:22 39:4 41:1 |
| 73:12 87:1 | 173:8 | **find**  24:18 25:1 | 405:16 |
| 117:14 303:13 | **features**  276:7 | 25:8 33:20 | **first**  16:10 19:7 |
| 346:1 | **feedback** | 35:19,24 36:11 | 20:11 21:1 26:6 |
| **fairness**  308:16 | 311:18 314:13 | 79:13 124:21 | 26:23 27:1 28:1 |
| **faith**  93:11 | 325:8 334:6 | 125:4 246:11 | 34:22 35:4 40:2 |
| **fallopian**  388:9 | 368:20 | 247:22 286:10 | 41:23 42:12 |
| **false**  187:22 | **feel**  265:19 | 318:20 332:18 | 43:2,7 51:19 |
| **familiar**  49:18 | 374:11 | 335:20 342:3 | 52:8 59:22 |
| 92:12 104:8 | **feeling**  79:10 | 379:12 | 80:21 90:1 |
| 126:1 140:17 | **fell**  278:8 | **finding**  333:2 | 103:21 113:23 |
| **familiarize** | **fellow**  131:6 | **findings**  262:9 | 138:14,16 |
| 92:15 93:5 | **feminine**  242:8 | 404:18 416:10 | 150:24 161:16 |
| **fancy**  100:18 | 247:10 248:5 | **finds**  29:16 | 175:24 187:15 |
| **far**  30:2 178:3 | 259:18 | 33:10 241:9 | 202:23 203:2 |
| 179:12,12,13 | **field**  105:6 | 380:18 | 214:12 217:1 |
| 196:20 198:12 | 150:21 158:24 | **fine**  9:14 39:10 | 220:17 222:5 |
| 204:20 222:10 | 159:14 194:8 | 47:7 54:20 65:9 | 223:3 227:3,11 |
| 231:24 306:8 | 207:22 | 145:18 148:7 | 227:12 228:15 |
| 307:4 341:23 | **fields**  34:16 | 170:6 202:11 | 241:14,24 |
| 385:23 388:5 | 46:12 | 310:22 323:17 | 244:3 245:4,10 |
| **fashion**  55:8 | **fifty**  73:5 | **finish**  49:10 | 245:23 246:7,8 |
| 121:6 238:10 | **figure**  47:2,6 | 65:8 123:3,4,8 | 246:12 250:10 |
| **fast**  110:4 | 97:15 205:17 | 123:11,14 | 251:1 255:13 |
| 193:13 259:10 | 265:7 349:7 | 157:1 160:3,4 | 256:23 257:19 |
| **fatal**  310:11 | **filed**  24:8 28:3 | 191:21 201:6 | 260:19 263:17 |
| 311:9 | 28:9 50:15 | 222:24 245:9 | 264:16 269:23 |
| **fault**  285:9 | **fill**  26:21 | 257:13,13 | 270:13 271:17 |
| **favor**  328:1 | 228:19 275:12 | 294:6 297:10 | 272:9,13 274:7 |
| **fda**  328:13 | 308:8 327:9 | 303:23 379:11 | 275:1,11 276:1 |
| | | | 276:7,17,21 |

Golkow Technologies,
A Veritext Division

**[first - form]**                                            Page 30

| | | | |
|---|---|---|---|
| 277:14 285:20 | 400:20 401:5 | 280:18 281:10 | 42:15 43:5 44:7 |
| 285:22 286:17 | **flexible** 299:2 | 281:12,24 | 45:1 47:10,19 |
| 286:22 291:7 | **flip** 189:13 | 284:14 285:1 | 48:15 49:7 |
| 302:2 328:24 | 372:15 417:4 | 288:14,17,20 | 50:20 51:8 |
| 329:7 330:5 | **flipped** 233:8 | 290:12,16 | 52:11 53:4 |
| 353:12 359:23 | **flipping** 177:17 | 297:16 304:13 | 54:15 56:13 |
| 359:24 372:18 | 229:19 238:4 | 304:17 305:4 | 57:9,24 58:11 |
| 372:22 415:9 | 349:19 365:17 | 307:3 332:9 | 59:3,14 61:16 |
| **fit** 294:21 | 376:17 | 333:9,12 | 62:1 63:16 64:5 |
| **five** 16:6 27:19 | **florida** 2:4 | 337:12 354:8 | 64:23 65:17 |
| 41:8 140:9 | **focus** 87:12,15 | 354:11,15 | 66:11,23 67:8 |
| 145:16 202:3,9 | 88:3,6 89:5 | 360:5 362:19 | 68:15 70:10 |
| 258:14 266:12 | 144:24 196:7 | 412:15,20 | 72:3,10 74:12 |
| 266:13 369:13 | 245:21 250:10 | **followed** 176:1 | 75:6,20 76:9 |
| 369:17 391:16 | 250:11 347:14 | 231:20 | 77:3 81:24 88:8 |
| 399:3 | **focused** 49:22 | **following** 216:3 | 90:6 91:8,15 |
| **fix** 305:7 | 84:18,21 96:5 | 323:23 | 97:9,19 100:20 |
| 355:14 | 124:5 135:9 | **follows** 7:14 | 101:16 102:3 |
| **flaw** 180:7 | 230:19 | **font** 278:20 | 107:10 108:17 |
| 310:11 | **focuses** 175:5 | **footnote** 12:21 | 109:21 110:15 |
| **flawed** 22:21 | 176:20 196:1 | 316:17 325:21 | 111:6 112:10 |
| 24:22 25:15 | **follow** 106:13 | 334:3 342:2,4,6 | 112:24 117:19 |
| 42:14 43:4,14 | 112:23 113:2 | **footnotes** 96:9 | 118:11 119:21 |
| 43:22 44:5,16 | 119:4,6 141:13 | 154:13,17 | 120:21 121:14 |
| 44:18 50:8 | 143:16 144:24 | **forced** 222:7 | 122:15 124:22 |
| 51:21 52:1,5,10 | 161:8 177:3 | **foregoing** 418:6 | 126:17 127:23 |
| 53:1 55:8,11 | 213:10 214:18 | 418:21 421:3 | 138:13 139:18 |
| 66:3 75:1 76:16 | 217:2,10 | **forever** 95:1 | 140:11 144:17 |
| 110:20 123:19 | 225:14 241:18 | **forget** 72:12 | 145:6 151:5 |
| 134:13 175:1 | 242:19 243:4 | 296:7 | 155:9 156:2 |
| 185:11 227:22 | 249:19 250:20 | **forgive** 273:14 | 157:20 159:1 |
| 305:4 | 260:9 261:19 | 273:15 | 159:16 162:23 |
| **flaws** 80:16 | 263:1,24 270:1 | **form** 15:18 | 164:13 170:19 |
| 133:4 167:7 | 270:24 273:5,8 | 16:23 18:10,15 | 172:1,8 174:11 |
| 181:11,12,18 | 274:6 277:22 | 21:4 23:19 30:6 | 177:2 179:18 |
| 181:22 186:22 | 279:20 280:5 | 35:9 36:10 42:3 | 180:24 191:13 |

**[form - genital]**                                                                                     Page 31

| | | | |
|---|---|---|---|
| 194:13 196:4 | 301:2 306:12 | **frequently**  13:9 | **gathering** |
| 198:19 199:23 | **found**  29:24 | 186:17 235:9 | 356:13 |
| 204:4 205:5 | 31:11 33:22,23 | **front**  8:6,11 | **general**  15:14 |
| 207:5 210:10 | 34:18,19,21,22 | 9:16 23:7 106:9 | 77:13 79:13 |
| 221:10 225:6 | 43:10,22 48:5 | 132:7 183:14 | 89:1 96:11 |
| 226:10 231:5 | 53:20 177:20 | **froze**  124:13 | 100:22 148:1 |
| 232:10 233:4 | 186:11 212:12 | 152:13 170:2,4 | 203:8 241:9 |
| 236:18 237:13 | 233:13 234:6 | **fully**  13:11 84:3 | 264:13 291:12 |
| 240:13 243:14 | 244:19 247:8 | 84:17 180:16 | 332:3 361:15 |
| 246:19 251:24 | 248:3 255:12 | 248:22 250:22 | 377:5 380:9 |
| 255:15 256:7 | 263:21 286:7 | 251:7,15,20,20 | 401:21 |
| 257:22 267:16 | 345:7 388:5 | 251:21 252:2,5 | **generalization** |
| 268:18 273:1 | 395:12 | 253:9,17 | 360:17,22 |
| 280:10 291:1 | **four**  41:2 64:3 | 261:11 276:2 | **generally**  84:18 |
| 292:1 293:3 | 231:2 233:20 | 311:20 377:10 | 87:2 93:6 98:11 |
| 296:15 303:2 | 292:23 307:19 | 407:11 416:3 | 101:7 184:23 |
| 312:24 319:21 | 347:3 367:14 | 418:5 | 255:9 301:20 |
| 320:21 329:14 | 386:10 399:3 | **fundamentally** | 350:11,12 |
| 343:21 345:4 | **fourth**  242:15 | 288:10 | 356:23 |
| 345:14 346:2 | 242:21 250:20 | **funded**  413:6 | **generate**  16:12 |
| 349:23 352:17 | 375:1 | **further**  126:24 | 16:22 17:1 24:7 |
| 354:22 357:19 | **frame**  203:1 | 163:23 188:4 | 32:13,19 47:1 |
| 362:1 370:20 | 217:9 219:15 | 261:8 282:22 | 48:4 58:15 |
| 394:2 395:16 | **frames**  222:17 | 303:11 319:9 | **generated**  14:1 |
| 396:18 398:4 | 224:24 | **furthermore** | 39:5 47:8,13 |
| 399:12 400:22 | **frankly**  363:20 | 252:19 | 56:11 |
| 403:8 404:2,10 | **free**  175:19 | **fussing**  178:13 | **generating** |
| 405:2,17 421:7 | 265:19 345:23 | 386:6 | 11:10 45:10 |
| **formally**  70:4 | **frequency** | **g** | 51:22 |
| **formed**  50:7,10 | 154:9 158:10 | | **genetic**  129:15 |
| **forming**  50:11 | 392:11 393:4,7 | **gain**  223:15 | **genetics**  133:10 |
| **forth**  10:10 | 394:5,11 395:5 | **game**  229:7,9 | **genital**  13:6 |
| 248:1 376:19 | **frequent**  14:4 | **gap**  212:12 | 14:1 24:20 |
| **forum**  200:15 | 369:5 394:8,14 | **gaps**  304:1 | 25:10,14 115:3 |
| **forward**  12:24 | 394:23 396:16 | **garbage**  288:24 | 156:10 173:17 |
| 124:3 200:13 | | 289:2,6,7,8 | 175:20 186:10 |

**[genital - going]**                                                      Page 32

| | | | |
|---|---|---|---|
| 188:14 193:7 | **give** 9:8 40:22 | 136:24 137:15 | 332:13 335:14 |
| 195:15 203:11 | 85:23,23 95:14 | 140:20 146:21 | 336:3,11 |
| 204:13,16,24 | 106:6 127:2 | 151:8,13,14 | 338:15 356:14 |
| 205:13 207:4 | 144:18 145:8 | 155:16 157:21 | 359:3,3 361:16 |
| 207:16 208:9 | 162:10 165:20 | 157:22 158:2,3 | 373:18 377:16 |
| 208:15 209:7 | 266:3 279:6 | 165:12 167:23 | 379:18 380:7 |
| 209:12,14,17 | 283:11 293:7 | 169:9 179:8 | 380:16 381:10 |
| 210:2,7 211:9 | 293:13 320:12 | 180:3,10 | 387:2,20,21 |
| 212:16 227:1 | 345:16 366:18 | 183:13,15 | 388:1 392:7,18 |
| 233:17 234:11 | 374:2,6,7,10 | 193:6 195:4 | 393:13 397:1 |
| 242:16,24 | 389:23 | 196:12,20 | 402:22 403:17 |
| 249:9 250:2 | **given** 20:20 | 198:8 204:19 | **goal** 16:12,16 |
| 260:12 261:21 | 44:3,9 128:10 | 209:19 210:16 | 23:16,20 88:16 |
| 262:11 264:7 | 211:21 226:16 | 210:20 212:23 | 204:12,15,23 |
| 265:1 267:3 | 237:6 377:1 | 212:23 213:2,3 | 205:3,8 207:8 |
| 276:9,12 281:6 | 389:12 404:24 | 213:14 214:6,9 | **goals** 206:1,15 |
| 281:7,8 291:22 | 421:5 | 216:4,21,24 | 206:17 |
| 309:23 359:1 | **gives** 60:24 | 218:17 226:23 | **goes** 141:23 |
| 359:12,18 | 157:11 184:2 | 230:4 241:8,12 | 162:13,16 |
| 375:6,19 377:8 | 222:5 223:6 | 242:13,14 | 169:12 178:19 |
| 377:10,21 | **giving** 321:5 | 244:1 247:1 | 227:3 281:16 |
| 378:11 383:9 | **glasses** 266:5 | 249:20 250:9 | 298:21 300:15 |
| 388:7 396:10 | **glue** 294:20 | 250:14,17 | 301:11 318:18 |
| 401:14 403:5 | **go** 8:12,15 | 260:5 264:14 | 325:2 344:23 |
| 410:3 411:13 | 10:10 13:23 | 264:17 269:8 | 379:15,22 |
| 412:13,15 | 24:15 26:4 30:1 | 278:22 279:23 | 384:2 389:16 |
| **genuinely** | 31:7 36:16 | 282:22,23 | 406:4 |
| 385:1 | 44:13 45:6 48:2 | 286:2 297:10 | **going** 10:11 |
| **georgia** 2:19 | 65:20 70:21 | 300:19 301:24 | 15:10,10 19:3 |
| **gerel** 2:12 | 74:6 75:2 77:6 | 303:11 309:13 | 20:23 27:24 |
| **getting** 32:16 | 81:8 111:12 | 313:9 315:19 | 36:5 61:3 66:6 |
| 56:2 122:20 | 123:17 125:7 | 319:2,8 320:24 | 68:5 74:24 |
| 239:5 249:11 | 126:5 127:1 | 321:22,23 | 76:12 77:12,15 |
| 267:8 336:14 | 128:23 130:15 | 322:14 324:14 | 77:24 80:15 |
| 376:13 393:12 | 131:4 133:3,8 | 327:3 330:24 | 82:13,19 83:4 |
| | 133:22 135:1 | 331:1 332:6,11 | 95:4 97:14 99:4 |

**[going - hand]** Page 33

100:14 101:8
101:10 106:20
107:5 111:13
118:8 124:9,10
124:11 127:2
136:14 138:15
141:9,22 142:4
142:22 145:13
145:13,15
148:8,10,19
151:7 152:4
155:3 159:9
160:12 161:6
171:9 179:10
179:12,20
182:9 186:7
187:3,8 190:1
193:13 199:8
202:1 215:2,15
222:13 223:13
227:15 241:10
250:11 254:23
257:5 258:11
259:9,9,10
264:18 273:17
273:18,20,22
282:13 289:2
297:20,22
310:19 311:5
315:17 319:10
319:18 320:14
322:23 323:2
326:5 328:13
328:15,19
330:22,24
331:9,18 332:1

336:1,10 337:8
338:15 339:4
341:10 344:15
345:22,22
361:14 367:2,3
373:21 374:24
375:9 378:7
379:8,12
390:24 391:14
399:2 405:15
406:18,22
407:3 414:7
416:23
**gonzalez** 5:3
112:6,16 113:8
203:5 210:17
210:23 285:5
287:3,8,17
380:17,17
385:6
**good** 12:18
81:16 88:10
93:11 99:8
102:21 128:1
141:2 184:5
196:15,16
202:6 218:14
220:15,16
227:21 242:9
247:10 248:5
257:18 258:2,4
258:8 259:19
260:19 283:6
283:22 289:15
324:1 339:9
340:13 402:5

407:6,7 416:20
**goodman** 36:22
41:4
**google** 47:1,16
47:21
**gotcha** 254:20
**gotten** 128:7,8
**grant** 168:19,20
168:22 169:3
171:2
**grants** 169:2
170:1
**graph** 47:6,8,8
47:13,17
**great** 128:5
174:23,24,24
199:11 202:7
218:24 323:5
324:5
**greater** 235:10
235:13,18
383:13 386:17
**greatly** 106:3
133:1
**greg** 46:1
**group** 125:11
126:7 129:7
161:7 182:1,8
183:21 196:16
196:18 223:22
273:11 411:20
**groups** 127:4
254:13
**guarantee**
251:9,12,17
255:5 399:6

**guarantees**
251:19
**guard** 102:20
**guess** 99:17,18
99:21 100:18
102:1 247:24
291:22 292:18
292:20 293:1
332:14 398:19
417:1
**guessing** 226:8
226:9 253:11
253:13,20
292:7,9,13
293:22
**guesswork**
307:23 337:21
339:1
**guide** 299:1
302:15
**gynecologic**
139:17 377:2
**gynecological**
135:10 140:3

**h**

**h** 4:6
**hagelund**
183:23
**half** 112:7
146:3 375:15
**hamilton** 36:23
41:4
**hand** 170:1
249:8 250:1
261:1 313:13

**[hand - hormonal]**                                                        Page 34

| | | | |
|---|---|---|---|
| 359:4 383:2 | 348:19 352:11 | **heard**  7:8 42:5 | **highlights** |
| **handful**  371:13 | 364:16,19 | 198:22 344:14 | 176:22 |
| **handles**  301:14 | 367:7 372:21 | 415:10 | **highly**  135:11 |
| **handling**  299:3 | 373:12,13 | **held**  8:19 | 140:17 297:17 |
| **happened** | 380:18,21 | **help**  17:22 | 298:6 |
| 357:18 390:14 | 381:9 383:21 | 86:12 103:3 | **hill**  3:4 |
| **happens**  356:6 | 384:1,19 | 246:4 393:11 | **hired**  9:1 |
| **happily**  414:9 | 385:20 386:7 | 393:13 | 107:20 109:19 |
| **happy**  77:8 | 389:5 391:5,23 | **helped**  89:4 | 110:8 236:13 |
| 155:20 239:22 | 393:23 394:10 | **helpful**  95:3 | **hiring**  128:11 |
| 320:13 322:11 | 394:13 395:19 | **helping**  86:17 | **histologic**  134:4 |
| 373:23 | 397:20 | 86:18 | **history**  5:8 |
| **hard**  9:16 | **hazards**  4:24 | **helps**  129:12 | 134:15 165:17 |
| 164:10 340:9 | 149:23 392:14 | 173:7 306:17 | 165:23 359:1 |
| 363:24 | **head**  55:11 | 306:21 342:8 | 413:2 |
| **harm**  102:21 | 127:4 132:14 | **henrich**  3:3 | **hobby**  346:12 |
| **harris**  3:3 4:14 | 279:5 | **hesitate**  13:13 | **hold**  123:2,2 |
| 114:6 191:15 | **headed**  131:17 | **hide**  95:11 | 191:4 222:23 |
| 193:14,17 | **header**  265:18 | **hiding**  231:4,8 | 222:23 249:20 |
| 197:22 373:19 | **headhunter** | **hierarchy** | 257:12 294:5,5 |
| 401:11 | 405:13 | 126:2,22 | 303:22,22 |
| **haven**  305:21 | **headhunters** | **high**  253:8 | 397:13,13 |
| 306:5 | 405:23 | **higher**  14:4 | 408:14 |
| **haynes**  37:20 | **heads**  126:6 | 56:3 95:8 | **holds**  169:21 |
| 39:18 | 131:21 | 328:20 361:10 | 301:23 324:24 |
| **hazard**  156:9 | **health**  104:1 | 378:20 394:10 | **hole**  294:22 |
| 157:11 233:15 | 125:13 131:23 | 394:13 397:24 | 305:11 |
| 234:8,22 | 132:17 142:10 | **highlight** | **holly**  114:6 |
| 236:22 237:19 | 143:24,24 | 261:13 276:18 | **honest**  141:4 |
| 261:6 310:6 | 168:7,8 169:21 | **highlighted** | 173:9 225:7 |
| 313:22,23 | 203:22 205:4 | 172:5 176:16 | **honestly**  206:10 |
| 314:16 322:4,7 | 356:3 413:7,8 | 176:19 206:7 | 207:12 220:18 |
| 327:23 328:22 | **hear**  172:2 | 261:16 323:21 | 256:3 |
| 329:9 330:23 | 191:10 198:17 | **highlighting** | **hopefully**  203:1 |
| 331:10 347:4 | 234:4 239:8 | 173:14,15 | **hormonal** |
| 347:15 348:12 | | 383:24 | 186:18 |

[hormone - imputation]                                                      Page 35

**hormone** 9:6
129:18 359:7
**hour** 73:9
145:15 146:3
**hours** 50:1,2,6
53:19 54:11
58:17 73:1,4,5
73:10 404:13
405:19
**hr** 396:9
**huh** 30:17
214:19 266:8
317:2 378:6
409:3
**humans** 4:24
149:23
**hurts** 78:7,9
79:9
**hygiene** 242:8
248:5 259:18
**hypothesis**
262:10 328:11
**hypothesized**
383:6
**hypothetical**
122:21 123:1
283:11 293:8
293:13
**hypothetically**
143:19
**hysterectomy**
385:11

**i**

**i.e.** 195:15
305:22 412:24

**iarc** 4:23
149:21 150:3,4
150:5,10,16
152:21 157:17
415:23 416:1
**idea** 52:17 95:6
102:14 138:11
205:16 220:8
**ideal** 311:13
336:7
**ideally** 231:22
**identification**
4:23 10:6,20
20:1 29:12
112:18 113:18
114:23 116:1
117:11 125:19
129:3 131:1
133:19 136:18
149:22,24
166:1 174:1
182:19 191:17
193:22 215:12
299:9 316:1
414:18
**identified** 32:10
40:9 92:14 93:4
138:1 182:2
345:1,2,6
**identify** 93:24
95:2 129:14
166:24 275:2
**ignore** 351:11
351:21 362:21
362:22

**ignored** 167:5
181:7
**ignores** 365:23
**ignoring**
306:14 363:2
**ii** 146:13
**illusory** 306:6
**illustrate** 80:15
361:23
**image** 95:9
**imaginary**
229:7
**imaging** 87:13
87:16,17,21,22
88:1,1,6 146:9
**impact** 176:7
178:22 195:12
394:7
**imperative**
419:13
**imperfect**
162:2
**imperfections**
162:22
**implementing**
94:21
**implicate**
410:17
**implication**
226:2
**implicit** 335:21
**implies** 177:14
**imply** 225:22
352:21
**import** 203:8

**important** 91:6
91:14,18,19
103:17 125:23
126:20 150:17
172:7 203:20
205:3 206:24
207:13,19
208:7,11,14,18
228:21 288:3
300:6,13
332:17,17
333:1,5 382:21
**importantly**
318:10,15
**impossibility**
80:21
**impossible**
387:11
**impression**
228:5,9 287:4
**impressive**
126:16 127:22
**improper** 80:17
303:8
**improved**
163:4
**imputation**
13:4 48:11,13
64:19,20 65:14
93:18,21 94:2,2
95:15,21 96:5
96:12,20,23
97:6 99:16,20
100:3,4,6,9,17
100:22 101:12
101:19 102:18

**[imputation - incorporating]**                                Page 36

102:21 103:3
103:10,16
104:10,23
105:2,10,23
106:1,4,10
107:8,13,23
130:11 132:21
146:6,18 147:1
147:8 148:13
148:14 149:1
177:18 189:11
189:14 229:16
234:1 235:24
236:6,10
238:12 266:7
269:8,13,20
289:10,21
290:21 291:3
291:11 293:20
295:6 297:3,19
299:2 300:20
300:24 301:1,3
301:10,13
302:2,5 303:8
304:16,19,20
305:16 306:11
306:13,17,21
307:22 308:9
309:10,19
310:11,16,17
311:5,6,8,9,10
311:13 312:4
313:14,21
314:15 316:6
316:15,23
317:23 318:2,3

318:7 319:5,17
321:18 322:2
326:10,17
327:3,5,8
328:21 329:21
330:21 331:8
332:19 334:1,5
334:16 335:4
335:11,16,17
335:24 336:2
337:21 338:18
339:19 341:5,7
341:11,14,17
342:22 343:5
343:10,12
344:7 349:6
354:20 355:7
376:10 400:15
408:19 409:6
**imputations**
25:13 320:17
336:18 339:10
339:11,20
340:5,10,16
341:9
**impute** 103:17
105:19 106:20
264:6,24
290:17 303:15
304:12 307:12
308:14 309:23
318:4 333:17
**imputed** 337:6
340:1
**imputing** 95:7
95:8 102:24

157:9 291:5
308:13 343:15
**inaccurate**
415:9,13
**inappropriate**
59:16 60:2,5,9
80:12 309:19
335:18 365:16
**inappropriately**
107:14 108:11
**incidence** 9:5
137:24 156:8
262:12 359:6
**incident** 250:21
**include** 129:17
187:17 195:18
301:1 311:10
312:8 318:17
319:16,19
322:17,19,24
332:18 333:2
334:5
**included** 309:9
313:19 321:24
334:22 344:8
344:13
**includes** 137:23
266:16 269:12
318:15 381:17
413:18
**including** 13:3
38:22 48:12
53:19 70:7
142:10 154:7
158:8 176:9
178:24 179:14

290:3 314:9,12
314:14 316:5
319:3 321:16
331:21 333:24
334:16 342:23
343:1
**inclusion**
309:24
**incomplete**
102:15 297:17
298:17 318:9
320:4 321:13
323:18 325:16
342:20
**inconsistent**
155:7,24
156:17 238:5
272:24 380:6
385:4 386:5,8,9
387:17
**incorporate**
188:20 317:13
317:21 327:14
327:24 336:1,6
**incorporated**
222:10 292:17
326:16
**incorporates**
175:14 178:16
304:16 326:17
**incorporating**
144:20 235:23
316:11,22
326:8 329:21
330:15 355:9
355:11 359:8

360:4 402:6
**incorporation**
187:20
**incorrect** 42:11
273:3 403:16
**increase** 233:16
339:12 375:5
375:16 379:19
379:21 392:11
393:4,7 394:6
394:11 396:15
397:22
**increased**
173:18 188:15
234:10 235:12
235:14 237:11
252:8 314:13
360:13 369:6
385:9 403:6
411:22 412:19
416:12
**incredible**
369:10
**incredibly**
364:8
**independence**
122:2
**independent**
9:9 16:17,21
17:3 20:24
23:24 145:8
190:23 191:1
345:9,16,21,24
346:6 405:7
406:9

**independently**
18:4 22:17 58:2
63:20 71:14
92:22 97:7
110:18 181:10
184:9 256:6
**index** 6:1
**indicate** 376:22
412:22,23,24
**indicated**
324:20 353:7
**indicates** 67:11
67:19 285:7
**indication**
252:22
**indicative**
198:13
**indicator** 319:4
**indicia** 251:22
**indirectly**
150:7
**individual**
56:21 64:20
103:15 363:16
**individually**
135:19
**individuals**
76:2 86:19
370:4 402:15
**induced** 319:12
**inducing**
410:17
**inference**
144:19 328:10
409:17,21

**inferences**
313:5
**inflated** 368:13
372:18,21
**inflating**
384:18
**influenced**
60:19
**influencing**
105:24
**information**
31:20 32:1,16
33:2 39:14
63:11 64:14
103:5,8 106:12
121:3 153:9
154:24 173:5
175:11 213:5
226:17 263:2
276:8 292:17
294:15,17
300:7 308:2
338:5,23
340:17,23
344:9 356:14
384:22
**infrequent**
369:9 372:1
**inherent**
306:15
**initial** 19:5
27:14 28:8
209:21,24
216:7,8 241:19
242:2 292:20
348:9

**initially** 175:18
213:17
**initiated** 144:12
144:13
**initiative**
142:10 144:1
356:4
**inner** 167:6
**inquired** 263:2
**insignificant**
373:14
**institute** 125:12
131:23 132:16
133:11 168:6
396:8 413:19
**institutes** 168:8
169:21 413:7,8
**institution**
34:11
**instruct** 82:13
82:19 406:18
406:23
**instructions**
419:1
**intact** 383:19
388:9
**integrating**
359:11
**intend** 404:18
**intended** 79:18
**intent** 124:20
**intention**
404:21
**intentionally**
12:14,16
167:11

**[interest - johnson]**

**interest** 65:3
84:23 328:3
346:22
**interested**
61:10,13 86:23
208:23 345:23
**interests**
129:16
**interim** 146:4
**internal** 126:2
126:21 171:16
**international**
137:11 149:17
150:17
**internationally**
135:11
**interpret**
323:16
**interpretation**
85:1,6,11
169:22 204:22
384:4 413:10
**interrupt** 65:8
74:6 81:15
170:3,5 252:3
**interval** 156:13
157:12 222:7
224:15 234:23
235:20 254:17
263:7 339:13
364:24 365:14
365:18 367:10
383:22 384:6
384:12 386:10
388:19,21
389:9 391:24

396:23,23
**intervals** 222:2
222:4,12,20
223:15 227:18
245:12 277:22
277:24 282:11
340:2
**intervening**
412:12
**intimate** 9:4
175:13,19,20
176:8 178:15
178:23 195:14
213:16 216:8
224:23 359:6
**intramural**
126:9 168:5,20
169:2,3
**intramurally**
171:3
**introduce**
251:23 357:8
**introduced**
218:3 243:24
354:1
**introduces**
355:5
**introducing**
218:3
**investigator**
125:10 130:17
133:10 135:2,5
**investigators**
210:6 212:5,11
262:23

**invited** 192:11
401:12
**invoice** 45:7
72:11
**involved** 30:24
37:8 38:23 85:1
85:6 86:23
89:10 119:6,7
120:20 121:18
130:10 139:16
140:1,6 147:18
148:24 150:4,5
166:20 194:8
344:17 390:15
405:14 407:22
**involvement**
88:11
**involves** 233:23
233:24 409:8
**irrelevant**
258:1 311:1
312:21
**issue** 89:14
190:5 205:4
207:1 374:6
399:11
**issued** 141:13
**issues** 43:11
58:7 84:6 87:6
88:4 92:1 95:18
96:3,19 130:10
160:11 185:4,8
201:19 352:6

**j**

**j&j** 16:9 17:20
18:11 19:1
20:13 23:15
33:20 143:4
158:20 159:10
199:19 399:10
**j&j's** 16:3 19:6
21:2,13 22:20
159:8 201:10
**jama** 5:5 299:1
299:8 302:15
**janet** 131:8
**january** 166:12
**jco** 190:4
197:20
**jeff** 115:21
158:3 166:7
249:24 250:15
250:18 261:17
265:12 278:22
299:18 313:17
**jeffery** 3:9
**jersey** 1:1,16
3:4
**jessica** 27:9,14
28:2
**job** 141:2
283:23
**john** 1:11 4:3
7:12,19 31:15
31:21 32:21
39:8 421:2
**johnson** 1:3,3
9:2,2 35:6,7

| | | | |
|---|---|---|---|
| 107:20,20<br>109:20,20<br>110:9,9,13<br>159:19,19<br>198:3,3 200:12<br>200:12 236:14<br>236:14 404:8<br>**johnson's**<br>110:13 404:8<br>**journal** 11:14<br>60:10 63:5<br>69:19 71:3<br>75:18 108:15<br>108:23 109:9<br>109:14 137:12<br>161:19 162:5,5<br>165:7,11 169:6<br>169:14 174:9<br>188:7 192:14<br>197:20 217:21<br>218:6,7,13<br>302:19 399:21<br>413:19<br>**journals** 163:7<br>**jsco** 197:22<br>199:13<br>**juggling** 125:3<br>**july** 1:7 109:17<br>199:11 418:7<br>**jump** 26:20<br>32:21<br>**jumped** 205:21<br>**jumping** 106:7<br>**justification**<br>67:19 153:17<br>316:12 | **justified** 67:17<br>**justify** 148:21<br>232:19 312:11<br>312:16 321:13<br>322:9<br>**k**<br>**k** 2:13 146:8,12<br>**kate** 414:2<br>415:17<br>**kathryn** 2:18<br>**katie** 4:17 62:6<br>62:14 128:18<br>129:1,23 137:4<br>137:7<br>**keep** 31:3<br>264:18<br>**kelley** 37:8<br>39:22 40:2 41:3<br>**ken** 70:7<br>**key** 358:24<br>**kind** 11:6,9<br>14:14 28:21<br>32:14 33:17<br>36:8 40:1 46:11<br>78:19 84:22<br>86:15 101:3<br>102:18 103:9<br>105:23 106:6<br>122:18,19<br>130:9 136:2<br>142:1,1 160:6<br>163:1,20<br>170:13 171:11<br>172:16 173:4<br>179:21 185:9 | 194:21 196:7,8<br>196:9,19 198:1<br>199:15 200:7<br>202:2,22 203:9<br>203:20 209:1<br>222:7 228:5<br>233:6,6 240:6,8<br>254:2 255:23<br>257:6 258:12<br>270:4 281:16<br>286:14 294:13<br>298:21 302:10<br>303:19,20<br>304:19 311:17<br>312:2,21 316:9<br>316:11 317:10<br>321:5 330:1<br>334:8 341:8,17<br>343:11 347:10<br>354:10 356:11<br>363:5 364:9<br>371:23 372:4<br>373:8 374:3<br>380:9 390:18<br>403:18 407:21<br>409:7<br>**kinds** 73:20<br>80:16 135:24<br>149:11 268:11<br>298:19 336:6<br>372:24<br>**king** 2:18<br>**klehman** 2:20<br>**knew** 24:3<br>52:21 170:16<br>360:4 | **know** 12:1<br>14:22 18:5,24<br>19:13 22:3<br>26:14,17 28:14<br>28:20 29:18,21<br>30:2,3,5 31:1<br>31:21 32:15<br>33:14,18 34:7,9<br>35:22 36:1,2<br>37:23 38:16,24<br>39:1,2 46:4,5<br>46:11 48:17<br>49:8 55:10 56:8<br>59:22 60:7<br>62:13,14,16,19<br>64:7,17 66:8<br>67:6 68:7,10<br>69:24 70:14<br>73:3 74:18 79:6<br>80:2,15,23 81:3<br>82:3,7 90:8<br>91:16 92:1,2<br>96:6 97:20 99:7<br>111:16 114:13<br>118:9,13,14,22<br>119:5,7,8,10,13<br>120:12,13<br>122:6,6 123:20<br>123:20 125:1<br>126:1,19,20<br>127:5 128:3,5<br>129:24 134:14<br>134:15,18<br>135:18,22<br>136:3,7 138:8<br>138:17,22 |

**[know - lawyers]**                                                                    Page 40

| | | | **l** |
|---|---|---|---|
| 139:9 140:12 | 244:13 245:16 | 405:22 406:1 | **l** 1:14 418:15 |
| 141:5 142:15 | 253:3,5,14 | **knowledge** | **labeled** 269:19 |
| 142:20 144:4,6 | 258:3 259:16 | 13:24 66:19 | **lack** 66:1 67:11 |
| 144:10 149:17 | 262:2 263:11 | 104:16 107:6 | 67:18,19 |
| 149:19 150:3 | 267:12 271:10 | 107:24 124:19 | 251:17 377:7 |
| 150:11,12,14 | 274:13 279:4 | 183:6 194:4 | **lady** 27:10 |
| 150:24 151:1,6 | 281:3 284:6 | 338:9 | **laid** 106:17 |
| 151:12,15,20 | 286:17 291:21 | **knowledgeable** | **lancet** 154:3,3 |
| 154:20 159:6 | 303:13 307:24 | 85:10 92:9 | 157:18 193:4 |
| 159:17,18 | 308:19 310:18 | **known** 34:10 | 415:24 |
| 160:7,13 161:1 | 317:16 324:4 | 300:8 386:24 | **language** 51:11 |
| 163:1 164:6 | 325:4 326:3,24 | **knows** 135:20 | 75:15 |
| 165:10 167:4,6 | 327:22 329:15 | **kornak** 1:11 4:3 | **large** 11:22 |
| 168:21 169:8,8 | 330:22,24 | 4:8 7:12,19,20 | 12:2,3,4 83:23 |
| 169:10,16 | 331:6,12,17,18 | 10:5,19 19:24 | 104:2 227:13 |
| 170:13,20,21 | 334:22,22 | 29:11 61:8,20 | 381:12 |
| 170:23 171:3 | 335:20 337:23 | 82:14 83:16 | **largest** 388:4 |
| 171:15,19,23 | 339:24 340:10 | 112:17 113:17 | **late** 371:6 |
| 172:18,24 | 341:13 342:17 | 114:22 115:24 | 372:19 374:18 |
| 174:12 177:23 | 344:10 345:21 | 117:10 120:6 | 393:12 |
| 182:10 183:22 | 346:20 350:17 | 123:4 125:18 | **latham** 38:6 |
| 185:7 190:13 | 350:23 351:4,6 | 129:2 130:24 | 39:16 |
| 190:13 192:6 | 352:24 353:10 | 133:18 136:17 | **law** 2:2,7 3:2 |
| 192:21 194:14 | 355:15 357:21 | 146:3 149:23 | 36:5,18 37:5,6 |
| 196:9 198:4,7 | 360:23 362:14 | 165:24 173:24 | 37:8 38:21,23 |
| 198:18,23,24 | 363:1 366:20 | 182:18 191:16 | 39:3 41:1,24 |
| 200:2 203:14 | 379:24 381:3 | 193:21 215:11 | 405:16 |
| 203:21 204:5 | 381:18 384:15 | 239:11 299:8 | **law.com** 3:5 |
| 204:15 209:8 | 385:19 386:11 | 315:24 374:24 | **lawsuits** 416:11 |
| 210:17 212:2 | 386:13,20 | 407:7,9,10 | **lawyer** 18:14 |
| 212:10 217:18 | 387:2,3,6,7,21 | 408:10 414:11 | 326:24 334:14 |
| 218:8 219:4 | 389:20 390:2 | 414:17 416:1 | **lawyers** 9:2 |
| 220:12 225:8 | 390:23 391:15 | 416:17 421:2 | 16:3,9 17:23,24 |
| 227:23 230:20 | 393:11 395:4,7 | **kslaw.com** 2:20 | 18:18,22 19:1,7 |
| 231:7 232:21 | 397:8 398:24 | | |
| 236:20 244:11 | 401:2 404:12 | | |

**[lawyers - level]**                                                   Page 41

| | | | |
|---|---|---|---|
| 20:13 21:2,13 | 31:13 32:20 | 151:5 152:4,23 | 350:18 352:17 |
| 22:20,24 23:15 | 35:9 36:10 39:7 | 155:9 156:2 | 354:22 357:19 |
| 30:12 35:7 | 42:3,15 43:5 | 157:20 159:1 | 362:1 370:20 |
| 40:18 44:2,4,10 | 44:7 45:1 47:10 | 159:16 160:3 | 394:2 395:16 |
| 49:2 52:22,23 | 47:19 48:15 | 161:21 162:23 | 396:18 397:13 |
| 53:19,21 54:5,6 | 49:7 50:20 | 164:12 170:19 | 398:4 399:12 |
| 54:11,13 55:6 | 52:11 53:4 | 172:1,8 174:11 | 400:22 401:16 |
| 58:9 59:10 | 54:15 56:13 | 177:2 179:18 | 402:10 403:8 |
| 61:20 72:20 | 57:9,24 58:11 | 180:24 191:12 | 404:2,10 405:2 |
| 79:24 82:7,16 | 59:3,14 61:16 | 191:21 194:13 | 405:17 406:14 |
| 82:21 90:4 | 62:1,11 63:16 | 196:4 198:19 | 406:20,24 |
| 120:20 145:4 | 64:5,23 65:17 | 199:23 200:16 | 407:5,8 408:2,9 |
| 158:20 393:21 | 66:11,23 67:8 | 201:5,13 204:4 | 409:22 410:8 |
| 399:10 404:1,8 | 68:15 69:5 | 205:5 207:5 | 411:2,17 414:3 |
| **lead**   129:12 | 70:10 71:6 72:3 | 210:10 221:10 | 414:7,20 415:1 |
| 154:23 353:20 | 72:10 74:12 | 222:23 225:6 | 415:19,21 |
| **leading**   34:11 | 75:6,20 76:9 | 226:10 231:5 | 416:6,16,21 |
| **leads**   238:10 | 77:3,22 79:3 | 232:10 233:4 | 417:1 |
| 358:7 | 81:14 82:12 | 236:18 237:13 | **letter**   5:10 |
| **learn**   79:14 | 88:8 90:6 91:8 | 240:13 243:14 | 69:18,23 70:3,8 |
| 357:2 | 91:15 93:8 97:9 | 246:19 251:24 | 70:13 71:2,9 |
| **learned**   17:15 | 97:19 98:22 | 255:15 256:7 | 110:11 116:17 |
| **leave**   55:1,2,3 | 100:20 101:16 | 257:2,12,22 | 117:9 190:16 |
| **leaves**   309:3 | 102:3 107:10 | 258:18,22 | 201:9 386:15 |
| **led**   223:7 | 108:1,17 | 267:16 268:18 | **letters**   70:22 |
| **leeway**   374:7,7 | 109:10,21 | 273:1 280:10 | 117:3 |
| **left**   213:16 | 110:15 111:6 | 283:15 291:1 | **level**   101:4 |
| 249:8 250:1 | 112:10,24 | 292:1 293:3 | 167:20 289:9,9 |
| 302:22 359:4 | 117:19 118:11 | 294:5 296:15 | 289:10,17 |
| **legal**   20:7,19 | 119:21 120:21 | 302:6 303:2,22 | 305:5,5 352:22 |
| 27:1,5,8 28:22 | 121:14 122:15 | 312:24 317:5 | 353:3 357:23 |
| 121:12,18 | 123:2 124:22 | 319:21 320:21 | 363:4 368:5 |
| **lehman**   2:18 | 126:17 127:23 | 322:20 323:1 | 384:9 394:5,11 |
| 4:4 15:18 16:23 | 138:13 139:18 | 329:14 343:21 | 395:5 396:15 |
| 18:9,15 21:4,19 | 140:11 143:10 | 345:4,14 346:2 | 397:21 |
| 23:18 27:2 30:6 | 144:17 145:6 | 349:23 350:7 | |

**[levels - longer]**                                                    Page 42

**levels** 13:12
67:15 197:23
202:19 227:22
231:16 282:6
286:16 344:22
368:2
**levin** 2:2
**levinlaw.com**
2:5
**li** 299:3
**liability** 1:5
**life** 203:16
**lifespan** 284:9
284:11 288:24
**lifetime** 203:12
203:24 207:4
207:16 212:17
212:20 213:20
216:12 217:11
220:1,4 221:20
225:3 227:19
228:3,12
262:24 272:4
277:6,16
278:13 283:14
287:11,13
288:3 290:5
295:16,17
296:21,21,22
359:11 380:22
381:1,8,16
382:10,15
**likelihood**
360:14 363:8
400:7

**likely** 211:24
212:3 213:21
215:18 216:13
225:4 226:3
272:5 332:22
337:15 348:21
367:1,21 397:6
**limit** 280:21
**limitations**
149:3 302:1
355:23 357:5,7
**limited** 213:18
277:5,23
278:10 292:22
333:14
**lindquist** 37:14
**line** 6:5,8,11
74:16 81:3 82:3
104:22 247:14
365:4 420:4
**lines** 136:22
137:1
**linked** 291:6
318:16
**list** 29:4 30:8
132:4 194:16
194:22 315:6,7
342:16 413:18
414:11,13
415:6
**listed** 29:23
39:4 59:18
183:23
**listen** 108:13
207:12

**lists** 60:22 62:7
342:10
**literature** 85:4
89:19 91:1
92:16 95:13
96:10 97:7
99:10 104:8
109:19 110:3
115:14 117:16
147:6 184:16
184:18 218:9
290:24 291:4
295:3 316:16
400:6
**litigation** 1:5
16:4,13 17:16
22:13,14 23:6
23:16 24:4
31:17 33:10
34:2 35:21
40:10 45:10
51:22 53:2
56:12 63:15
68:3 72:1 78:12
79:20,21 81:22
83:3 107:7,19
107:22 120:11
120:20 121:5,9
124:19 143:5
198:1 203:3
405:16 406:13
**little** 14:15
19:16 21:7 29:2
51:11 112:12
136:23 163:23
164:1 172:16

193:13 223:14
238:14 244:15
248:1 262:6
264:17 266:5
278:21 315:18
319:8 338:23
339:1,5 341:20
378:20
**living** 183:10
**llp** 2:12,18
36:23 37:9,20
**llt** 9:2
**locate** 54:6
342:8
**located** 342:9
405:12
**locates** 54:12
**location** 1:12
**locator** 35:18
**log** 316:23
318:20
**logic** 309:7,23
337:13
**logistic** 254:11
343:13
**long** 14:5 31:2
98:1,1 118:24
200:4 235:18
341:12 352:19
359:24 383:13
383:14
**longer** 13:9
30:24 112:12
202:11 369:20
399:1 415:16

**longitudinal**
356:13
**longitudinally**
141:18
**look**   19:8,15,17
19:18 23:1,5,6
30:15 34:13
56:9,14 57:11
60:20,21 65:19
72:15 128:10
128:18 134:17
134:20 135:16
141:18 144:22
147:21 149:11
152:22 153:19
153:20,23
154:1 166:9
173:10,12
174:20 175:3
176:15 178:13
181:8 182:13
183:3 190:6
199:1 210:24
214:6,13
218:23 223:17
226:13 227:11
228:7 235:17
239:20,21,22
239:23 241:24
245:24 246:2
247:17 249:3,4
249:16 256:5
263:14 265:19
273:3,17
282:10 283:20
287:16 292:5

298:23 299:23
306:1,2 308:16
312:13,17
316:24 320:11
320:20 321:12
323:3,13,17
324:2 325:3,5
332:8 335:15
336:10 355:1
356:7,9,22
357:15,17
358:22 364:11
364:12,13,23
365:8 371:15
371:21,22
378:2,4,9,12,14
378:18 379:14
380:13 382:22
383:18 385:19
387:14,18
399:16 406:8
412:6
**looked**   17:11
56:7,8,15,16,20
56:22 57:7,11
57:13 96:7,7
113:6 119:15
119:23 133:2
142:8 146:4
152:8 153:7
167:19 212:5
218:21,23
238:3,19 244:8
245:21 248:11
248:12,19
258:5 274:13

277:20 317:9
320:23 321:4
331:16 344:5
352:9 353:5
383:19 386:14
387:20 393:19
395:22 399:10
400:19 413:3
**looking**   29:17
34:2 35:20
45:19 48:24
79:6 87:9 92:8
94:16 119:18
119:19 168:11
169:10 209:18
223:15 235:16
247:15 251:18
251:19 254:8
254:20,24
260:17 265:23
278:17 279:10
279:17 314:5
326:7 333:12
358:14 363:3
376:21,24
382:20 385:6,7
402:14
**looks**   10:16,17
49:23 215:7
288:23
**loop**   314:13
325:8 334:7
368:20
**loose**   51:11
86:6

**lose**   123:12
**losing**   308:12
**lost**   176:2
**lot**   53:11 84:11
85:21,22 97:14
103:18 107:21
109:20 117:16
140:15 163:2
182:9 244:12
286:11 308:14
308:14 369:12
372:10 381:21
397:17 413:4
**love**   173:8
**low**   341:19
360:12 384:7
**lower**   55:23
56:5 282:19
318:22 384:2
384:12 389:12

| m |
|---|

**m**   2:8
**made**   28:22
33:17 65:13
66:19 109:20
109:24 128:5
128:14 130:12
167:16 175:1
196:24 237:22
263:15 283:24
306:6 375:23
419:7
**magic**   355:13
**magical**   365:21

[magnetic - mean]                                                    Page 44

| | | | |
|---|---|---|---|
| **magnetic** 94:5 | 387:10 396:1 | 182:17 191:15 | 134:21 136:4 |
| **magnitude** | 402:15 | 193:20 215:11 | **mdl** 1:3 2:16 |
| 394:6 | **manipulate** | 299:8 315:24 | **mds** 119:24 |
| **mailed** 153:22 | 304:1 | 414:16 | **mean** 13:18 |
| **main** 129:16 | **manipulated** | **marketing** 1:4 | 19:11 26:14 |
| 186:8 310:3 | 371:20 | **markings** 9:24 | 30:11 33:19 |
| 358:19 359:4 | **manipulation** | 10:2 11:2,4 | 34:21 37:22 |
| 360:1 377:24 | 234:15 236:5 | **mas** 1:4 | 40:11 41:22 |
| 378:1,3 380:1 | 262:21 303:7 | **massive** 341:15 | 44:14 45:2 |
| **major** 163:19 | 303:20 347:7 | 378:23 | 48:16 49:10 |
| 372:7 | 349:5 355:11 | **match** 245:12 | 51:10,24 53:6,9 |
| **majority** 96:20 | 376:10 400:15 | 246:12 353:16 | 54:18 65:7 |
| 219:2 | **manipulations** | **matches** 34:3 | 68:10 73:14 |
| **make** 9:12 10:9 | 238:2 268:5 | **matching** | 74:13 76:17,24 |
| 12:20 73:22 | 283:4 289:11 | 246:11 353:14 | 78:1 79:5 80:20 |
| 99:1 102:16,17 | 298:20 | **materials** 72:23 | 81:15 85:21,24 |
| 155:17,17 | **manipulative** | 93:10 140:15 | 87:18 92:11,18 |
| 160:22 163:21 | 238:10 | 145:11 190:8 | 95:20 97:20,22 |
| 172:10 182:6 | **mantel** 131:8 | 405:4,9 413:17 | 99:6 105:1 |
| 216:2 217:7,13 | **march** 166:13 | 414:10 415:5 | 106:23 107:12 |
| 244:1 261:8,12 | **margaret** 2:8 | **math** 139:23 | 122:17,19 |
| 265:23 271:14 | **margaret.tho...** | 279:6 325:1 | 126:3,18 |
| 286:3 296:2 | 2:10 | 353:22,24 | 132:23 139:7 |
| 313:4 330:3 | **marginal** | **mathematically** | 139:20 141:16 |
| 332:16 352:15 | 390:21 | 325:1 | 142:12 143:11 |
| 359:22 371:19 | **marked** 4:7 | **matter** 121:12 | 145:7 150:6 |
| 372:10 373:2 | 6:10 10:4,19 | 268:8 291:12 | 153:2 159:5,6 |
| 375:11 382:20 | 19:23 24:12 | 418:7 | 162:24 165:9 |
| 384:13 419:4 | 29:2,3,10 83:18 | **matters** 27:11 | 167:8 169:19 |
| **makes** 25:15 | 112:16 113:16 | 255:23 | 170:12 179:19 |
| 220:14 224:23 | 114:21 115:24 | **maximization** | 182:8 183:18 |
| 265:24 | 117:10 125:18 | 147:23 | 185:6,24 |
| **making** 76:5 | 129:2 130:24 | **mcar** 96:15 | 186:24 190:12 |
| 101:4 157:9 | 133:18 136:16 | **mcdevitt** 3:2 | 194:15,23 |
| 177:21 302:23 | 149:23 153:23 | **md** 4:19 133:12 | 197:14,15 |
| 303:1 305:14 | 165:23 173:24 | 133:14,17 | 200:3,18 |

| | | | |
|---|---|---|---|
| 203:19 222:1 | **means**   60:18 | **members** | 80:16 185:3,18 |
| 226:9 227:18 | 127:6 177:17 | 150:13 183:19 | 186:22 |
| 231:16 238:18 | 177:19 187:17 | **memory**   20:16 | **methodological** |
| 245:16 248:18 | 194:19 223:24 | 55:13 265:16 | 130:9 323:14 |
| 257:4 265:19 | 251:1 330:15 | 278:15 416:1 | **methodologic...** |
| 268:4 270:4 | 418:23 | **menopause** | 130:5 |
| 285:15,16 | **meant**   334:3 | 227:5,6 | **methodology** |
| 287:22 292:2 | 395:11 | **mention**   204:8 | 60:3 95:16 |
| 295:20 301:1,7 | **measure**   14:13 | **mentioned** | 164:24 166:23 |
| 303:12 304:10 | 353:13 | 102:24 124:7 | 180:17,18,20 |
| 306:11 308:16 | **measured** | 146:5 | 180:22 181:5 |
| 308:19 309:14 | 340:21 | **merely**   39:12 | 188:11 197:10 |
| 311:12 312:18 | **mechanism** | **merit**   69:4 | 291:11 316:15 |
| 312:20 314:21 | 36:1 185:1,17 | **merlo**   200:11 | 317:23 |
| 317:20 320:16 | 377:18 378:9 | **mess**   286:21 | **methods**   13:2 |
| 322:11 323:3,8 | **mechanisms** | **message**   380:1 | 57:22 58:3 59:5 |
| 326:22 327:18 | 171:16 | **met**   16:3 19:6 | 66:9 73:23 76:7 |
| 328:24 330:13 | **media**   252:24 | 21:2 23:15 | 76:11 84:19 |
| 331:3,5 332:14 | 416:12 | 27:13 28:2,8 | 86:14 93:19,20 |
| 334:13 335:9 | **median**   113:2 | 45:8,24 49:2 | 95:7 96:1 97:8 |
| 336:2 341:24 | **medical**   34:11 | 52:23 55:6 58:8 | 97:12,24 98:4 |
| 344:11 346:19 | 85:3 87:17,21 | 61:21 399:9 | 98:11 106:10 |
| 347:19 349:11 | 87:22 128:9 | **meta**   56:17,22 | 107:23 108:3 |
| 351:15,20,22 | 253:6 | 57:13 | 108:11 132:21 |
| 353:11 357:1 | **meet**   20:18 | **method**   13:14 | 146:6 147:7,17 |
| 360:16 361:6 | 26:24 27:4,8 | 64:21 93:21 | 147:19 149:12 |
| 363:2 371:14 | 28:5 45:21 | 94:2,20,22 | 150:13 167:22 |
| 374:15 377:18 | **meeting**   16:8 | 100:7 101:13 | 175:5 177:11 |
| 378:16 379:21 | 19:5 20:6,18 | 102:5,9 148:14 | 177:16 178:6 |
| 381:4 390:1 | 22:5,12,23 | 290:22 291:3,5 | 195:12 196:2 |
| 391:13 398:5 | 27:14 28:9 50:4 | 293:20 302:4 | 198:5 199:2 |
| 398:24 415:17 | 53:19 54:11 | 309:19 316:10 | 201:23,23 |
| **meaning** | 110:10 404:8 | 317:21 322:6 | 211:1 229:9,12 |
| 177:10 233:15 | **member**   127:13 | 333:24 | 230:6,22 |
| 234:9 235:13 | 127:15 129:6 | **methodologic** | 232:19,20,23 |
| 390:20 | 150:10 | 58:7 73:22 | 241:20,22 |

| | | | |
|---|---|---|---|
| 242:1 292:11 | 202:9 258:14 | 231:12,13 | 148:15 290:20 |
| 299:1 300:20 | 259:2 415:20 | 233:14 234:7 | 293:21 296:6,9 |
| 301:1 302:16 | **mischaracteri...** | 238:12 262:19 | 298:7,19 |
| 312:19,22 | 231:9 | 269:7 275:7,18 | 301:15 303:16 |
| 313:2,14 | **mischaracteri...** | 276:12 280:5 | 304:7 308:3,21 |
| 318:19,22 | 304:10 307:1 | 280:18 281:9 | 311:2,16,21,24 |
| **mi** 305:15,16 | **misclassificat...** | 281:12,23 | 327:7 338:13 |
| **mice** 96:13 | 186:15 195:13 | 289:9,13,20,23 | 338:22 340:6 |
| 336:12,20,21 | 357:9,9 360:15 | 290:2,5,11,14 | 341:22 359:14 |
| 337:7 | 375:13 376:1 | 290:15 291:5 | 359:16 362:19 |
| **michelle** 2:13 | **misleading** | 294:18 295:7 | 363:5 367:17 |
| **mid** 109:17 | 364:8 370:19 | 295:21 296:23 | **misstates** 53:5 |
| 199:11 | **mismatch** | 297:18,18,23 | **mistake** 311:9 |
| **middle** 152:13 | 354:1 | 298:5 299:3,24 | **mistaken** |
| 260:6 373:22 | **misread** 395:11 | 300:5,6,17,21 | 395:24 |
| **midnight** | 397:12 | 301:14,15 | **misunderstan...** |
| 398:23 | **misreporting** | 305:5,9,19,23 | 280:12 |
| **million** 137:23 | 375:15 | 306:9,10,16 | **mixed** 337:18 |
| 138:10 | **missed** 164:24 | 307:8,9,11,16 | **mixture** 394:12 |
| **mind** 68:11 | 165:7,10 | 307:20,22,23 | 411:7 |
| 97:17 99:15 | 166:20 167:1 | 308:17,20 | **mixtures** |
| 108:14 111:13 | 179:13 182:13 | 311:23 312:4 | 115:18 |
| 122:10,22 | 186:22 219:15 | 318:4,7 320:6 | **model** 48:13 |
| 128:20 159:5 | 230:1 344:19 | 320:18 325:18 | 187:21 297:22 |
| 160:14 164:23 | 395:13 400:20 | 326:12,13 | 304:19 309:10 |
| 202:10 258:10 | 400:24 | 327:9,13 330:9 | 310:1,6 311:11 |
| 269:10 313:17 | **missing** 94:17 | 333:17 334:9 | 312:8,12 |
| 380:14 392:8 | 94:18 96:12,13 | 335:3,5,11,17 | 313:21 314:15 |
| **minds** 401:3 | 96:13,14 97:22 | 336:7 337:11 | 316:7 318:8 |
| **minimal** 86:20 | 100:8,10,11 | 337:22 340:23 | 319:5,17 320:5 |
| **minute** 69:18 | 101:21 103:18 | 344:22 354:8 | 320:5 321:18 |
| 94:8 141:10 | 104:2 105:4,5,5 | 354:11,14,24 | 325:17,17 |
| 202:3 207:24 | 106:13 147:18 | 355:5 409:11 | 326:17 330:16 |
| 320:12 405:19 | 148:2 149:2 | **missingness** | 331:23 332:19 |
| **minutes** 140:9 | 215:20 229:1 | 93:22 94:3 96:6 | 334:1,4,6,17 |
| 145:17 161:2 | 229:16 230:10 | 103:22 147:8 | 335:24 336:22 |

342:22 343:5
343:12,23
344:7 384:10
**modeling**
146:13 187:18
187:19 330:18
409:20
**models**  326:11
371:17 392:14
**modest**  173:3
394:6
**modify**  141:22
**moment**  17:14
19:4 22:9 28:16
33:8 46:3
153:20 161:6
165:21 212:10
266:3 328:20
392:4
**monday**  1:7
**money**  107:21
109:20 120:19
**monographs**
4:23 149:21
**montgomery**
2:9
**month**  89:19
200:23
**months**  11:18
166:15 210:14
211:13 221:13
246:10 274:9
283:20 381:7
**motives**  70:15
125:1 198:6
231:11

**mountaintop**
203:10
**mouth**  374:11
**move**  12:23
15:12 101:8
110:4 123:15
124:11,15
149:7 155:3
164:6 197:7
199:8 202:22
222:13 224:10
224:20,21
259:13 333:18
333:20 412:17
**moved**  153:5
**moving**  193:14
**mparfitt**  2:15
**mri**  146:12
**multiple**  13:4
48:11 52:5,6
64:19 65:13
87:14 91:20
93:18 94:1
100:3,6,9,17,22
101:12,18
103:3,16 104:9
104:23 105:2
105:10 117:21
119:20 148:13
149:1 151:21
186:12 189:11
189:14 202:18
227:22 229:24
234:1 235:24
236:6 269:7,13
269:20 289:21

290:21 291:2
291:11 293:19
295:5 297:3,19
299:2 301:13
302:2,4 304:18
305:16 306:16
306:21 308:8
310:16 311:8
311:13 313:13
316:6,14
317:22 318:2,3
320:17 321:18
322:2 326:10
328:21 330:21
335:3,11,16,17
337:20 338:18
339:10,18
340:15 341:7,9
343:4,14 349:6
354:20 355:7
399:21 408:18
**multiply**
394:22
**multivariable**
343:7

**n**

**n**  4:1 94:10
418:1
**n.e.**  2:19
**n.w.**  2:13
**name**  7:18
27:11 34:1,6,23
46:3 114:7
116:6 133:4
134:12 192:24

199:20 302:19
**names**  132:5
151:11
**naomi**  183:22
**narrower**
263:12
**national**  125:12
131:22 132:16
133:11 168:6,7
169:20 413:7,8
413:19
**nature**  7:5
**nearly**  183:8
**nebulous**
179:22
**necessarily**
31:2
**necessary**
419:4
**necessity**
219:15
**need**  18:5 77:5
147:2 161:8
172:23 202:23
206:10 207:12
220:21 249:19
255:18 266:4
284:15 286:3
308:6 319:18
319:19 322:24
334:19 340:5
354:2 372:9
406:14 412:1
413:23
**needing**  188:4

**[needs - number]** Page 48

**needs** 84:2
86:10 162:13
**negative** 189:18
200:8
**negligible**
379:22
**neither** 17:20
298:16
**nelson** 319:4
**nervous** 32:14
105:23
**neuman** 36:23
41:4
**never** 18:4 42:4
62:17 64:1,17
64:21 80:19
90:19 99:15
124:18 128:19
139:15 154:5
158:6 213:8
276:9 279:19
281:19,22
303:17 304:15
312:1 337:8
364:17 365:10
367:2,3 368:15
369:5 383:15
394:9,15
398:10 399:10
404:17
**new** 1:1,16 3:4
153:9,9 173:16
202:2 318:22
359:11 373:13
**newly** 359:8,12

**news** 90:9
399:14
**newspaper**
90:11
**nicolas** 4:19
114:4 133:9,17
**niehs** 126:9
130:19 131:17
173:16
**night** 416:20
**nih** 4:12 9:4
11:22 12:7,9
58:22 59:12
61:22 75:16
76:7 108:16,20
109:7 110:24
117:15 118:6
119:16 120:7
121:3,11
124:18 125:9
125:13 126:2
126:22 127:17
130:16 135:4
158:22 163:13
168:19,21,22
169:4,7,10,18
169:23 170:10
170:16 171:2,6
171:7,13,18,22
172:6,18
173:10,14,24
174:10 175:4
179:16 180:20
190:4 197:21
199:13 212:10
236:15 264:5

290:19 351:10
399:19,24
400:4 403:3
**nine** 166:15
254:15 267:5
267:13 268:17
**noise** 339:3,17
**non** 88:1 254:9
254:13 337:18
340:20 354:10
371:23 383:14
**noncontradict...**
270:7,9 273:10
273:21
**nondifferential**
360:14
**nonresponsive**
101:9 124:16
199:9 224:11
**nonstatisticians**
302:22
**nonuse** 280:8
337:24
**nonuser** 189:19
270:12 273:4,7
279:12 292:12
292:21 293:23
295:5 296:18
338:12 354:7
354:12 355:3
**nonusers**
269:24 279:8
280:9 284:21
290:1 292:24
295:16 296:12
305:1 336:23

337:11 397:5
**normal** 17:16
17:21 18:7 54:3
69:11 170:8
**norwood** 131:8
**notary** 1:15
421:20
**note** 305:15
**notebook** 412:5
**noted** 7:9
351:24 399:15
419:11 421:8
**notes** 11:6,7,8
11:11 49:24
50:3 418:6
**notice** 155:1
**notoriety**
199:12 200:5,7
**null** 318:22
327:19,19,24
328:1,7,8,8,11
328:14,16
331:1,1,20,24
333:18,20
358:2,7
**number** 4:7
12:3 72:15
146:7 158:3
168:1,3 184:2
214:20,21
222:16,17
254:3,6,16
258:5,11
267:20,21,22
276:11 279:4
314:21 336:11

**[number - object]**                                                    Page 49

| | | | |
|---|---|---|---|
| 347:23 348:2 | 108:10 111:14 | 230:5 243:24 | 48:15 49:7 |
| 361:3,13,23 | 113:7,12,16,21 | 246:3 248:13 | 50:20 52:11 |
| 362:11 367:20 | 114:16,21 | 248:14,16,17 | 53:4 54:15 |
| 371:3 379:10 | 115:8 116:10 | 249:13,18 | 56:13 57:9,24 |
| 380:5 387:22 | 116:14 117:4,9 | 254:22 255:1 | 58:11 59:3,14 |
| 392:20 394:24 | 120:9 121:4 | 255:11 260:4 | 61:16 62:1 |
| **numbers** | 128:18 129:1 | 262:7 265:7,13 | 63:16 64:5,23 |
| 210:22 215:1 | 130:6,12 132:3 | 269:9 278:18 | 65:17 66:11,23 |
| 219:5 223:17 | 137:4,7 138:5 | 307:9 309:22 | 67:8 68:15 |
| 223:19 231:18 | 141:1,7 142:13 | 333:8 351:10 | 70:10,11 72:3 |
| 255:23 265:8 | 142:23 144:3 | 354:3 358:14 | 72:10 74:12 |
| 265:21 278:16 | 145:9,10 | 358:15,22 | 75:6,20 76:9 |
| 298:11 330:2 | 148:20 149:5 | 362:13,22 | 77:3 82:13 88:8 |
| 360:11 361:11 | 149:12 151:1 | 375:4 376:9 | 90:6 91:8,15 |
| 394:22 | 154:18,21 | 377:17 382:9 | 97:9,19 100:20 |
| **numerous** | 155:1,6,23 | 382:12,16 | 101:16 102:3 |
| 58:21 | 156:7,16 157:6 | 385:8 386:13 | 107:10 108:17 |
| **nurses**   142:11 | 157:15,16,17 | 387:17 391:3,3 | 109:21 110:15 |
| 143:24 356:3 | 158:12,13,14 | 399:20 400:5 | 111:6 112:10 |
| | 158:19 159:9 | 400:13 401:19 | 112:24 117:19 |
| **o** | 159:10,12 | 405:8 406:8 | 118:11 119:21 |
| | 161:3,14,17 | 410:2,14 411:3 | 120:21 121:14 |
| **o**   418:1 | 163:14 167:24 | 411:10,18 | 122:15 124:22 |
| **o'brien**   4:16,17 | 173:15 174:18 | 412:4 413:3,5 | 126:17 127:23 |
| 5:1,9,10 9:11 | 179:5 181:9 | 416:8,9 | 138:13 139:18 |
| 10:4,13 11:1,13 | 187:14 188:2 | **o'brien's** | 140:11 144:17 |
| 11:21 16:5,18 | 192:19 195:7 | 129:16,23 | 145:6 151:5 |
| 20:5 22:14,17 | 195:11 196:1,3 | 155:7 156:1 | 152:5,24 155:9 |
| 23:21 24:22 | 197:16 201:22 | 276:6 309:18 | 156:2 157:20 |
| 26:6 52:22 55:5 | 201:24 203:5,5 | 379:6 | 159:1,16 |
| 56:9 57:12,23 | 203:6 213:15 | **object**   15:18 | 162:23 170:19 |
| 58:2 59:18 | 215:21 218:17 | 16:23 18:9,15 | 172:1,8 174:11 |
| 60:22,23 62:7 | 220:14 224:7,9 | 21:4 23:18 30:6 | 177:2 179:18 |
| 62:14 64:4 70:6 | 224:14,22 | 35:9 36:10 42:3 | 180:24 191:12 |
| 70:9 71:15 | 225:21 226:22 | 42:15 43:5 44:7 | 194:13 196:4 |
| 92:20,24 | 226:23 228:24 | 45:1 47:10,19 | 198:19 199:23 |
| 107:23 108:8 | | | |

204:4 205:5
207:5 210:10
221:10 225:6
226:10 231:5
232:10 233:4
234:12 236:18
237:13 240:13
243:14 246:19
251:24 255:15
256:7 257:2,22
267:16 268:18
273:1 280:10
283:15 291:1
292:1 293:3
296:15 303:2
312:24 319:21
320:21 329:14
343:21 345:4
345:14 346:2
349:23 352:17
354:22 357:19
362:1 370:20
394:2 395:16
396:18 398:4
399:12 400:22
403:8 404:2,10
405:2,17
**objection** 21:19
27:2 62:11 71:6
77:22 79:3 93:8
98:22 108:1
109:10 143:10
164:12 191:9
191:10,11
200:16 201:13
302:6 317:5

322:20 323:1
350:7,18
401:16 402:10
407:19 408:7
409:18 410:5
410:23 411:15
416:5,14
**objective**
358:19,24
359:4 360:1
**objectively**
353:6
**observation**
301:2 306:12
**observe** 381:13
**observed**
375:17 394:5
409:9
**obvious** 363:6
400:20
**obviously** 49:21
205:14 263:6
285:17 309:2
395:13
**oc3** 4:22 134:2
136:11,16
388:5
**occasion** 45:23
**occur** 300:5
**occurring**
250:22
**odd** 369:17
**offer** 9:3 50:18
57:20 73:14,16
263:9

**offering** 97:5
**offhand** 104:13
**offices** 3:2
**oftentimes**
291:24
**oh** 38:4 105:1
133:14 137:7
165:3 174:22
174:23 190:4
231:6 232:20
251:9 272:12
285:15 323:14
329:24 380:15
**okay** 7:23 8:10
8:15,17,24 9:11
9:13,21 10:23
11:12 12:5
13:15 15:2,5,6
16:2 17:13,19
19:3 20:4,14
22:8 24:15
25:21 26:4,11
27:7,13,20
28:10,13,15
29:15 33:7,9,23
36:7,15,16 37:7
37:13 38:5,9,20
39:2,15 42:10
43:13 45:6,15
46:5,13,21 47:3
48:24 49:14,20
50:13 52:8,20
52:21 54:2 55:4
55:17 56:6 57:2
57:3,18 58:5,20
61:2 62:6 63:24

65:5,10 66:24
71:1 72:8 73:8
73:12,19 74:3
75:12,14 78:4
78:10,22 79:17
83:9 84:8 87:8
87:24 88:20
90:16,24 91:4
93:24 94:19
95:10 96:6
101:23 102:8
102:13 104:7
107:4 108:7,14
109:16,17
110:6,23
111:24 113:4
114:4,14 115:2
115:11,17
116:4,9,13,14
117:14 118:3
118:18 119:15
121:2,8 124:9
125:22 126:5
127:8,16,21
129:22 130:13
131:5,21
132:10 134:7
136:9 137:4
138:4 139:10
142:6 143:3,4
144:8 145:18
146:17 147:15
148:3 149:7,15
150:23 158:17
161:1,4,9,11,14
161:15 162:19

**[okay - opportunity]**                                                    Page 51

| | | | |
|---|---|---|---|
| 165:5,16 167:3 | 247:21 248:14 | 366:4,5,21,22 | **onus**  240:23,24 |
| 170:16 172:13 | 249:6,19,23 | 368:3 369:2,14 | **open**  115:22 |
| 172:20 174:4 | 250:13,18 | 370:10 374:8,9 | **opened**  8:8,9 |
| 174:16 175:3 | 251:19 254:20 | 374:13,17 | **operating** |
| 177:24 179:10 | 254:21 255:3 | 375:3 382:19 | 18:22 |
| 179:13 180:13 | 256:12 258:6,9 | 382:23 383:18 | **operation** |
| 180:14 182:7 | 260:16 262:5 | 386:20 392:16 | 406:2 |
| 182:15 183:13 | 262:16,22 | 393:1,6,18 | **opining**  95:18 |
| 185:14 186:4,7 | 264:1 265:15 | 394:18 395:2,9 | 145:1 |
| 186:21 190:1 | 266:11,17 | 396:19 397:11 | **opinion**  9:9 |
| 192:10 193:5 | 268:7,10,23 | 404:23 407:6 | 25:23 26:1 |
| 193:12 194:9 | 270:10 274:3 | 408:3,18,24 | 42:20 43:1,3 |
| 195:9,23 | 275:6,22 276:4 | 409:4,15,23 | 51:20 57:20 |
| 198:14 199:12 | 277:12 278:2,5 | 410:9 412:9 | 67:5 100:2,3 |
| 200:3 203:8 | 278:6,14 | 413:12 415:8 | 143:9 144:16 |
| 204:10 205:2 | 280:21 281:15 | 415:14,22 | 192:1,8 198:16 |
| 206:23 208:13 | 284:10,16,17 | 416:7,16 | 287:3 302:10 |
| 209:4 210:5 | 284:24 285:1 | **old**  111:20,23 | 302:12 325:7 |
| 211:5,15,21 | 286:14 288:6 | 210:8,19 211:2 | 390:1 403:22 |
| 212:9 213:1,3 | 289:4 293:18 | 211:7,10,16 | **opinions**  9:3 |
| 213:14 214:2,7 | 293:22 297:10 | 219:13,13,19 | 48:22 50:7,10 |
| 214:8 215:15 | 300:3,15,19 | 221:5 227:4 | 50:11,17 51:1 |
| 216:7,24 217:5 | 301:24 302:14 | 292:23 293:14 | 60:19 63:22 |
| 217:7,20 | 302:21 303:21 | **oldest**  211:16 | 65:5 71:16,19 |
| 218:16 219:7 | 304:21 305:8 | **omission**  155:1 | 71:24 73:14,16 |
| 221:17 226:20 | 306:5 309:12 | **omits**  276:11 | 73:17,18 95:14 |
| 227:9 228:23 | 310:3 313:8,18 | **once**  286:7 | 96:16 97:2,5 |
| 229:8,12 | 316:4 321:3 | **oncologists** | 98:17 110:19 |
| 230:14,15,21 | 325:11 329:5 | 182:4 | 153:13 154:23 |
| 231:7 232:16 | 334:4 335:6,13 | **oncology**  11:15 | 162:11 182:11 |
| 233:10 234:5 | 337:3 338:3 | 182:23 183:5,8 | 366:20 404:4 |
| 235:2,6 236:4 | 339:6 341:18 | 183:9 197:21 | 404:23 407:11 |
| 237:2 241:21 | 342:21 344:10 | 402:4 | 407:14 408:14 |
| 242:6,11 243:2 | 349:20 351:9 | **ones**  78:23 95:2 | **opportunity** |
| 243:7 244:3 | 355:15 363:7 | 95:23 189:10 | 324:14,16,18 |
| 245:24 247:6 | 364:5,14 365:8 | 408:23 | 325:14 |

**[opposed - overreporting]**                                                    Page 52

| | | | |
|---|---|---|---|
| **opposed** 64:20 | 311:10,17 | 88:20,22,24 | 314:6 337:10 |
| 87:3 | 312:8,11 | 89:2,8,11,20 | 347:17 359:9 |
| **opposite** 273:9 | 314:13 316:22 | 90:3,13,21 | 359:19 370:3,5 |
| 334:19 | 318:11,17,21 | 91:24 92:13 | 371:1,3 373:7 |
| **opt** 82:3 | 319:12,17,19 | 112:2 116:15 | 375:6,17,20 |
| **options** 222:6 | 320:5 322:10 | 117:17 118:8 | 377:1,11,21 |
| 223:6 246:15 | 325:18 326:8 | 122:12 129:19 | 379:3,7 381:15 |
| 263:10 | 331:22 332:19 | 133:23 134:1 | 383:9,12 388:7 |
| **order** 19:17 | 333:3 338:10 | 134:10 135:17 | 388:24 390:23 |
| 29:2 84:3 | 338:18 340:20 | 137:10,16,18 | 391:23 392:13 |
| 103:11 119:17 | 342:24 359:10 | 137:20,24 | 396:8,11 |
| 244:1,9 330:10 | **outcomes** 48:12 | 140:8,18 142:9 | 399:11 401:14 |
| **organization** | 137:19 313:22 | 151:24 152:1 | 401:24 403:6 |
| 150:17 183:17 | 317:13,22,22 | 152:18,19 | 410:4 411:13 |
| 186:10 | 318:15 321:17 | 156:8,11 | 411:19 412:12 |
| **organized** | 322:3,19,24 | 158:16 173:19 | 413:2,13,20,21 |
| 139:6 | 335:8 336:9 | 186:12 188:15 | 414:22,23 |
| **original** 85:15 | 347:8 | 192:22 193:8 | 415:10 |
| 142:16 211:22 | **outer** 280:6,21 | 194:5,17 | **ovaries** 383:5 |
| 212:13,19 | 281:4 | 195:16 196:23 | **overall** 12:2 |
| 215:17,19 | **outline** 181:12 | 197:5 203:13 | 77:16 78:7 |
| 219:13 220:23 | 315:19 | 203:18 204:2 | 178:1 196:8 |
| 221:8,23 225:1 | **outright** 42:8 | 204:14,17 | 255:23 262:8,9 |
| 263:20 270:19 | **outset** 283:12 | 205:1,13 207:1 | 266:9,13 279:8 |
| 283:13,17 | **outside** 79:24 | 208:6,16 | 279:14,18,21 |
| 285:5 286:7 | 80:5 83:2 107:7 | 209:12 212:18 | 300:17 319:3 |
| 292:24 303:14 | 107:22 110:8 | 233:17,21 | 354:7 378:11 |
| 419:14 | 171:16 197:24 | 234:10 235:19 | 383:20 391:23 |
| **originally** | 198:21 298:3 | 237:11 250:3 | 393:3,23 |
| 105:18 284:20 | 404:19 407:17 | 251:4 252:6,15 | 395:15,19 |
| 286:12 | **outweigh** | 253:4,7 260:12 | **overcome** |
| **ought** 285:21 | 222:10 223:13 | 261:22 262:11 | 306:17 |
| **outcome** 103:6 | **ovarian** 13:7 | 264:8 265:3 | **overdoing** |
| 105:11 122:11 | 14:2 24:20 | 266:10,13 | 105:16,17 |
| 298:3 309:9 | 25:12 55:21 | 267:7,14,24 | **overreporting** |
| 310:16,18,21 | 56:2 57:7,21 | 279:15 308:18 | 413:1 |

**overstating**
75:4
**own** 48:21
86:24 96:10,15
96:18 98:16,20
190:23 191:1
216:16,19
282:22 285:9
357:6 372:12
375:11 379:6
390:2

**p**

**p.c.** 3:3
**p.m.** 417:8
**page** 4:2 6:5,8
6:11 13:24 23:7
24:16,16 25:2
26:19 30:18
36:17,19 39:21
60:21 61:3
117:5,5 126:5
129:10,10
131:5 133:22
134:21,21
154:1 155:22
156:4 160:23
168:4,10 183:4
183:15 188:12
204:11 209:19
211:1 213:2,3
213:15 214:23
215:1,6 216:5,6
217:1 218:17
218:20 226:24
230:4,11,12,23

233:1 235:17
235:18 239:23
241:9,14
242:14 247:1,4
247:15 249:3,5
249:14,21
250:14,15,15
250:16,17
260:5,5 261:9
261:15,17
262:6 264:18
265:13,13
266:2 269:8
278:18 299:6
302:1 309:21
313:8 320:3
321:24 332:16
338:16 358:22
359:3 361:17
363:24 376:24
379:16 380:7
381:11,12
383:2 387:21
387:22 392:8
392:19 393:13
412:6 420:4
**pages** 166:5
421:3
**paginated**
387:24
**paid** 16:21 17:1
38:3,4,9,11
72:8 107:21
110:13 124:19
168:24 198:2
198:14 199:19

200:12 201:11
346:8,9,14
405:1,1
**panel** 150:10,14
151:3,12,20,23
152:21
**panels** 151:16
**papantonio** 2:2
**paper** 4:15,16
5:4 9:10 10:4
10:17 11:21
13:23 14:20
15:4 16:18
17:10,10 20:6
20:12,24 21:10
21:18 22:18,21
23:21,23 24:1
26:18,23 42:1
42:14 43:3,11
43:22 44:5 49:2
49:6,19 50:3,8
51:20 52:2 53:1
53:10,13,16,22
54:3,4,8 55:8
55:16 56:6 57:8
57:11 58:14,23
59:6 60:10,13
61:3,5 62:21
63:4,7,9,10,21
64:10,12 66:15
67:11,18 68:12
71:14,17,20,24
72:5 73:15
75:17,23 76:8
78:14,20 80:10
80:18 81:7,9,23

82:7,10 86:4,13
90:23 93:19
94:15 98:11
99:5 108:14,19
108:21 110:2
110:10,12,19
111:10,17
113:10 116:24
122:10 123:17
123:23,24
124:1 125:2
132:13 133:5
134:12 136:8
138:8,19 140:9
142:23 153:5
160:21 161:5
162:9,10,17
163:19 165:15
167:7,16,19
169:4 170:18
173:5 174:19
174:21 177:13
178:6,10,12
179:6,15
181:11 183:14
184:10 185:10
185:11 188:7
190:12 192:15
192:17,19
193:14,20
195:2,7 196:1
196:11 197:17
197:22 198:11
199:11,14,20
199:22 200:14
200:21 201:12

**[paper - parts]**                                                    Page 54

207:7 210:17
210:21 214:4
220:16 226:13
229:4,10
230:17 231:12
232:6,17 235:3
236:16 245:15
245:19,22,23
247:20 249:5
278:19 287:22
288:5,9,13,18
288:20 299:12
302:3,20 303:6
312:9,14,15
314:19,24
315:1,6,7,11,15
315:23 316:4,8
317:1 320:15
320:16,19
321:12,16,23
322:10 323:14
324:2 325:2,4
325:10,14,22
333:9 334:13
342:2 344:8
345:9,13,17
351:20 352:7
353:7 363:4,14
375:14 382:11
388:4 392:5
393:15,20,24
395:6 396:5
400:19 401:5,6
401:7,20,22
402:17,18
404:13 407:24

**papers**  41:18
43:10 44:22
46:24 48:5,7
49:12 56:7,8
57:12 62:17
68:23 74:10
77:20 79:1
91:20 92:13,16
92:18 93:4 94:4
96:18,22 97:15
97:21 111:24
117:21 123:19
138:23 147:18
147:20,21
148:5 172:15
172:21 180:8
203:15 237:22
344:11,16
407:22
**parachuted**
194:4
**paragraph**  25:1
25:4,7,18,19
51:16 68:2,5
75:2,8 156:5,18
158:4 175:10
176:13,16,19
195:11 204:11
242:15,21
260:6,6 262:8
264:4,15 266:2
275:23 276:5
292:5 300:4
302:21 305:12
309:7,14,16
313:12,17,18

320:13 338:15
359:21 361:17
362:3 375:1
379:9 380:4,7
412:6
**paragraphs**
322:12
**paraphrase**
196:10 197:16
197:18
**paraphrasing**
179:5
**parfitt**  2:13
**parroting**
177:12 178:9
178:12 179:16
199:16
**part**  23:12 32:3
35:23 48:12
54:18 93:19
101:9 113:7
116:5 138:5,10
138:16,17
139:1,8,13,15
140:21 142:13
142:16 147:24
151:2,22
155:19 158:11
194:20 205:14
230:1 252:12
252:16,21
257:7 266:7
291:7 310:1
311:6 314:15
329:17,18
330:17 339:14

385:14,16
**participant**
210:1 213:8
265:1
**participants**
254:4 305:23
371:14 381:5
411:5
**participate**
42:8
**participated**
121:11
**particular**  14:9
23:13 32:6
56:16,17 73:15
85:8 87:20 89:6
103:4 111:1
148:22 151:3
156:21 159:11
204:1 206:18
209:5,5 240:9
352:14 353:9
364:9 396:5
403:12
**particularly**
13:8 43:22 82:8
84:5 91:14,18
91:19 162:7
165:1 176:22
184:5 186:16
390:4
**parties**  7:1,8
**partly**  333:15
**parts**  49:21
308:7

[party - perfectly]                                                   Page 55

| | | | |
|---|---|---|---|
| **party** 40:3 | 164:22,23 | 118:6 122:7 | 242:18 243:2,9 |
| **pass** 363:10,11 | 165:6 166:19 | 127:4 135:21 | 243:12,16 |
| 363:19 | 167:15 169:5 | 135:24 138:24 | 244:20 256:22 |
| **passed** 217:16 | 169:11,12,15 | 162:4 172:15 | 256:24 258:5 |
| 229:17 230:16 | 170:8,15 174:8 | 177:15,17 | 263:22 264:7,8 |
| 230:17 | 179:13 180:15 | 178:5 179:4 | 265:2 266:18 |
| **passing** 363:16 | 184:24 185:7,9 | 180:22 182:9 | 266:24 267:3 |
| **past** 56:12 | 185:12,15 | 183:10 184:8 | 267:13,18,22 |
| 127:9 150:24 | 190:3 197:20 | 184:19 196:22 | 267:23 268:4 |
| 151:19 161:1 | 200:24 202:18 | 198:21 207:21 | 268:13,16 |
| 210:14 221:13 | 217:16 218:9 | 219:8,9 223:22 | 279:7,14,15,18 |
| 399:22 | 229:17 230:16 | 235:10 243:9 | 279:21,21 |
| **patency** 383:3 | 230:17 236:16 | 248:20 251:2,3 | 353:18,18 |
| **patent** 382:21 | 245:16 363:10 | 252:9,24 | 354:1,7,9 |
| 383:7 389:1 | 363:11,14,16 | 256:23 263:11 | 361:22 362:4 |
| 390:4 | 363:19,21 | 281:22,24 | 362:11 364:16 |
| **path** 216:3 | 399:21 400:6 | 284:20 285:7 | 365:9,9,15 |
| **pathway** 383:4 | 400:17,18 | 286:11 304:14 | 366:24 367:5,5 |
| **patient** 259:20 | 401:7 | 307:15 308:21 | 367:9 368:5,14 |
| **patients** 231:20 | **peg** 294:22 | 310:23 344:12 | 368:23,24 |
| 279:2 | **pejorative** | 352:9 365:17 | 369:3,9,11,12 |
| **patterns** 115:3 | 101:2 | 369:13,17,17 | 369:13 372:2 |
| **pause** 7:6 | **pending** 158:21 | 370:13,18,19 | 378:11,13,15 |
| **pausing** 12:8 | **pennsylvania** | 370:24,24 | 389:8 394:9,13 |
| **pay** 172:23 | 1:16 | 371:23 376:18 | 394:20,24 |
| **peachtree** 2:19 | **penny** 120:10 | **people's** 182:10 | 396:17,21 |
| **peer** 11:14 13:5 | 120:19 | **perceive** 192:18 | 397:2 398:1,8 |
| 63:4,5 66:22 | **pensacola** 2:4 | 192:19 | 412:13,14 |
| 67:1 75:17 76:8 | **people** 34:14,15 | **percent** 47:23 | **percentage** |
| 104:5 106:22 | 45:24 46:16 | 90:8,17 156:12 | 243:21 |
| 108:15,23 | 49:11 61:9 70:1 | 157:12 164:2,2 | **perfect** 109:5 |
| 109:4,8,13 | 70:22 83:8 | 196:15,16 | 241:3 311:21 |
| 110:1 115:13 | 91:12 96:17 | 227:5 231:15 | **perfectly** 283:6 |
| 122:3 160:17 | 99:6 100:18 | 231:15 233:17 | 308:6 311:15 |
| 161:18,24 | 106:11 107:12 | 234:10 235:13 | 311:24 |
| 162:1 163:6 | 109:19 111:18 | 237:11 242:15 | |

**[perform - point]**                                                    Page 56

**perform**  313:15
320:17
**performed**  64:2
64:8,13 67:16
176:21 196:2
318:8,13
407:16
**performing**
345:8
**perfusion**
146:12
**period**  58:16
204:1 211:10
211:19 213:21
217:10 221:12
223:20,23
225:4 226:2,5
272:5
**periods**  186:18
213:18 216:10
216:13 220:13
227:13 278:13
**peripheral**
73:20
**permeated**
296:8
**permission**
40:18
**person**  12:6
28:6 135:19
183:21 194:7
208:8 260:8
261:18
**person's**  127:7
**personal**  3:6
115:18 392:12

**personally**
111:3
**perspective**
16:19 17:3,6,9
17:12 21:18
80:8 88:2 143:2
183:16,16
186:9 228:10
**phd**  1:11 4:3,17
4:18,20,21 7:12
125:17 129:1
129:24 130:1
130:17,23
133:12,15,18
134:22 136:5
421:2
**phds**  46:12,19
119:24
**phone**  28:6
184:2
**phrase**  42:11
44:3,18,20 45:4
74:24 289:6
**physical**  80:21
383:4
**pick**  167:20
**picked**  165:14
201:19
**picking**  165:13
**pie**  265:17
**piece**  26:22
51:17 187:1,1,6
187:6 248:16
302:10 323:20
379:13

**pieces**  26:21
86:20 302:12
343:9 345:7
347:6
**pinpoint**  95:22
**pitch**  172:17
**place**  71:23
72:4 73:13
264:16 285:22
286:22 372:22
403:21 404:3
**placed**  7:23
**places**  264:3,4
**placing**  85:10
**plain**  187:22
**plaintiff**  2:15
**plaintiffs**  2:5
2:10
**plan**  66:13
67:12,20
141:20 286:1
**plausibility**
375:18
**plausible**  14:3
282:12 365:6
384:3 388:20
388:22
**play**  330:2
373:10
**playing**  95:11
**pleadings**
158:20
**please**  7:6,17
7:18 65:8 83:19
123:4 139:12
154:2 158:4

183:15 191:5,5
201:5 213:3,4
249:17,24
260:5 261:17
264:17 278:22
279:10 299:17
315:20 318:2,3
319:8 336:12
419:3,8
**plenty**  53:14
68:21 69:2,9
**plot**  47:6
**plus**  280:5
349:5
**point**  20:22
41:19,23 46:4
75:12 81:17
98:9 99:19
103:11 104:18
124:17 134:14
139:21 145:14
145:20 156:12
156:18,24
165:1 170:7
175:7 187:24
197:3 198:9
203:24 204:18
204:20 234:21
243:22 248:15
253:15 258:14
261:6 265:17
267:17 271:20
282:20 285:24
305:18 306:9
307:18 312:16
316:9 317:10

**[point - predictors]**

326:16 333:12
334:19,24
338:14 339:16
341:8 347:19
348:15 356:10
361:3 362:15
364:6,18
365:13,18
367:6 371:4
377:24 378:1
382:4,23
388:16 389:5
390:7,9 393:21
394:19
**pointed**   200:24
252:12 384:20
**pointing**   156:20
249:11 260:24
353:17
**points**   263:18
307:16 378:3
**pontificate**
285:18
**pooled**   113:6,11
154:6 158:7
193:8 383:23
388:14
**poor**   295:24
**poorly**   298:17
**pop**   97:17
**population**
352:14 377:5
**portion**   278:3
**position**   22:21
104:9 122:21
125:23 126:20

127:22 128:14
184:15 251:20
252:2 285:17
**positions**   126:3
128:17
**positive**   14:11
15:15 25:9 78:8
79:14 154:4
155:6 158:5
189:9 252:10
260:13 261:10
261:23 262:10
349:16 352:11
364:15 367:4
367:22 368:16
386:22 387:9
387:11,13,16
388:6,13 389:2
390:3,5,10
391:8,12
**positively**   14:1
186:11 250:2
**possibility**
164:23 237:5,5
284:19,23
379:1 410:22
416:13
**possible**   82:5
125:4 149:4
153:6 176:9
178:24 206:21
213:7 272:13
387:9
**possibly**   333:15
353:13

**postdoc**   127:5
**postmenopau...**
250:5 378:14
394:10
**potential**   24:21
32:11 176:7
178:22 186:14
187:16 188:5
197:1 222:10
227:24 237:19
238:20 240:2,3
244:10 252:20
255:4 275:3,4
275:17 284:1
288:15 328:18
329:10 341:22
347:24 348:7
348:18 351:11
359:20 361:19
361:23 375:4
389:18 390:19
**potentially**
126:19 228:17
270:3 292:7
301:8
**powder**   1:4
56:2 90:21
193:7 195:15
203:23 210:13
233:18 234:11
375:6,19
377:10 383:5,8
383:12 388:7
401:14
**powered**   134:2

**practice**   105:21
106:5 232:18
302:11 320:7
325:19 334:15
340:8
**practices**   1:4
**pre**   42:21,24
250:4
**precise**   14:23
15:8 25:1
353:13 372:21
**precisely**   245:6
**precision**
360:13
**predict**   102:10
106:10 292:11
292:15,18
293:9 311:24
320:6 325:18
331:7,13
337:24 338:12
338:21,22,24
**predicted**
331:14
**predicting**
339:4
**prediction**
137:19
**predictive**
297:22 298:4
336:21
**predictor**   103:2
104:11
**predictors**
103:18 298:3
339:9 340:14

**[predictors - product]** Page 58

340:21 343:4
**predicts** 355:2
**preeminent**
158:22,23
159:6,13,14
285:24
**preferred**
356:24 391:4
**preliminary**
202:24
**premenopausal**
378:19
**premise** 282:7
**prepared** 49:24
50:17 78:24
**preparing** 16:4
50:3 51:14 58:9
72:23 405:5
**present** 3:8
14:14 38:7,14
82:9 364:10
**presented**
79:23 80:4
**president** 127:9
**prespecified**
66:2,13 67:6,12
67:20 141:20
**press** 151:8,19
415:23 416:2
**presumably**
128:16 154:16
**pretends** 341:6
**pretty** 55:14
61:2,4 73:16,19
77:21 89:16
125:22,23

126:15 223:18
323:9 372:5
**prevents** 80:13
**previous** 33:16
34:18 39:20,21
123:19 153:18
211:13 272:7
323:22 359:8
375:8
**previously** 29:8
155:21 158:19
183:2 237:22
260:24 313:19
322:1 324:21
**primary** 88:3,6
88:16 103:2,6
104:11 105:11
**principle** 183:6
**printed** 157:18
**prior** 36:17
89:18 90:24
120:9 155:8
156:1 213:6
227:5 274:9
380:6,11 385:5
387:18
**priori** 65:14
66:9 383:6
**prioritize** 99:4
**privileged** 22:6
31:20,24 32:4
32:16 33:3
39:14 82:21,24
**probability**
305:18

**probable**
151:24 152:18
153:7
**probably** 43:7
52:17 165:12
278:16 339:7
389:22
**probit** 343:13
**problem** 81:20
101:21 136:3
167:12 202:4
212:14 226:15
270:22 288:21
294:13 295:22
295:23 296:17
298:21 306:16
310:24 313:3
324:7 326:15
327:15 341:4,7
351:23 353:8
354:18 355:7
355:12 362:23
363:17 412:3
**problematic**
199:3 225:12
238:8 305:6
**problems** 43:11
44:17 53:16
55:15 74:20
98:6 124:2
165:15 167:21
185:10 187:6
187:12 198:9
198:10 214:15
218:5 222:9
227:24 275:3

275:17 288:19
296:7 306:24
350:21 355:8
360:3,8 361:24
362:12 363:22
400:14 401:6
402:18,20
**procedure**
330:18 336:13
336:20,21
368:22
**proceedings**
121:18 418:4
**process** 50:11
51:14 63:4
109:5 110:1
151:15 160:17
162:1,19,20
163:3,5 164:22
166:15 169:9
170:13,14
171:4 184:24
185:16 201:1
202:18 229:19
235:23 304:20
311:5 329:7
331:8 339:18
340:11 343:11
349:19 363:21
**processes**
130:11 236:11
**produced** 22:19
23:4 123:16
125:2
**product** 115:18
189:22 205:18

**[product - published]**                                                      Page 59

206:18 213:17
216:9 224:23
346:15 359:6
392:12
**production**  6:7
**products**  1:4,5
3:6 9:5 175:14
175:20 176:8
178:16,24
195:14 242:8
247:10 248:5
259:18 411:6,8
**professional**
1:14 46:16,20
83:22 84:4
121:13 418:15
**professionally**
111:4,8
**professionals**
183:9
**professor**  34:10
34:12 134:15
346:9,13,16,19
410:2,12
**profile**  4:22
136:16
**program**  104:1
168:6
**project**  72:21
86:9 384:6
**promise**  179:11
366:16
**proof**  240:19
**properly**
100:23

**proportion**
223:9,11 233:8
257:8 308:20
308:23 371:10
411:21 412:19
**proportional**
392:14
**proportionately**
353:19
**proportions**
67:14 231:22
279:7 307:13
351:18
**proposition**
15:14
**propositions**
96:11
**propounded**
421:6
**proprietary**
338:10
**pros**  288:15
**prospective**
68:1 124:4
129:13 137:17
141:6 157:6,8
195:17 198:11
244:8,22
248:22 250:23
251:8,13,15,20
251:21 252:6
253:2,18 255:3
261:11 276:2,8
283:24 348:9
352:10 356:24
357:3,6 360:8

360:10,18
361:1,12
380:11 381:13
385:10 388:5
398:11,18
**prospectively**
248:21 333:13
357:7,24
**protocol**  141:24
**prove**  241:1
**proved**  241:6
**provide**  16:17
33:17 41:10
42:13,20 64:14
340:22
**provided**  29:20
40:12 43:3
46:14 54:4 55:4
83:17 104:6
243:9,10
375:14 376:2
**provides**  61:6
173:16 185:1
188:13 219:5
377:8 403:4
**providing**
103:5 242:18
243:3 317:21
406:9
**proving**  240:24
**public**  1:15
70:24 109:18
200:15 203:22
205:3 421:20
**publication**
4:13 5:8 95:5,6

154:3 160:6,17
165:17,23
166:11,13
168:4 170:9
173:13 182:17
199:21 384:18
**publications**
44:22 88:24
95:22 104:5
134:16 151:22
153:10 154:16
169:2 193:2
386:21 408:19
**publicly**  70:21
**publish**  122:10
169:4 404:18
**published**
11:19 16:7 42:1
43:3 47:17,22
63:5,10 75:17
88:21 95:13,17
108:15,21
109:7,13 110:2
117:16,21
121:4 137:11
147:6 148:11
158:20 161:18
166:14 172:5
173:5 184:16
184:17 188:8
192:14,22
199:11 200:22
217:20 230:18
287:9,10
288:12,13,17
316:16 353:7

**[published - question]**                                    Page 60

| | | | |
|---|---|---|---|
| 399:20 400:5 | 160:20 161:10 | 67:7 68:24 69:7 | 224:13 228:2 |
| 408:20 413:18 | 161:13 | 74:9 84:17 | 229:15 230:2,3 |
| **publishing**  76:8 | **qualified** | 89:12 90:18 | 234:4 237:18 |
| 115:13 118:7 | 105:14 120:1 | 91:11 92:6 93:3 | 240:10 241:18 |
| 118:13,16 | 147:5 188:6,9 | 94:13,13 95:24 | 242:14 244:7 |
| 194:9 195:1 | 355:22 | 97:13 98:10 | 244:16,21,24 |
| **pull**  83:18 | **qualifier** | 102:9,11 | 245:3,6 246:4,5 |
| 390:17 392:20 | 300:18 318:12 | 107:17 108:13 | 246:15 247:1 |
| **pulled**  139:5 | **qualifies**  14:15 | 109:3,6 110:7 | 248:12,21 |
| 165:16 231:23 | 270:20 | 118:19 120:15 | 251:21 257:17 |
| **purely**  32:24 | **qualify**  15:21 | 138:16 140:22 | 261:19 262:24 |
| 67:24 | 147:2 262:17 | 141:11,14 | 264:2 267:9 |
| **purpose**  22:12 | 310:15 319:10 | 142:7,9 143:14 | 268:3 270:18 |
| 51:22 321:19 | 338:1 | 143:15,18 | 270:23 272:9 |
| **purposes**  97:4 | **qualifying**  79:7 | 144:5,14 | 272:10,14,22 |
| 310:24 | **qualitative** | 146:24 147:4,4 | 284:15 285:2,3 |
| **pursue**  69:22 | 13:17 | 147:5 148:4,10 | 286:5,15 288:4 |
| **put**  34:6 63:12 | **quantitative** | 152:9,14,22 | 289:1 291:7 |
| 69:17 134:12 | 9:6 13:3 20:5 | 155:4 157:5 | 293:11,13,21 |
| 154:1 172:15 | 64:2 163:12,22 | 161:9 164:7,8 | 294:11 295:10 |
| 172:22 199:19 | 164:8,15 | 180:6,12 182:6 | 296:6 297:2,8 |
| 230:21 231:1 | 175:23 176:6 | 191:3,13 197:8 | 298:15 304:6,7 |
| 278:19 322:12 | 176:20 178:21 | 197:9 199:10 | 306:3 312:18 |
| 325:15 333:21 | 195:18 197:11 | 199:18 200:4,9 | 312:21 313:2 |
| **puts**  33:24 | 229:2 230:7,12 | 200:10 203:21 | 327:2,3,5,6,22 |
| 321:10 | 230:24 233:2 | 204:3 205:10 | 328:20 329:1,4 |
| **putting**  31:22 | 329:8 330:8 | 206:1,10,13,14 | 329:10,12 |
| 85:2 122:20 | 347:6 359:15 | 206:24 207:11 | 330:6 337:14 |
| 334:20 405:6 | **quarter**  145:15 | 207:13,13,14 | 342:18,20,21 |
| **q** | **question**  6:10 | 207:19 208:5,7 | 351:1,8 352:19 |
| **qualification** | 21:6 23:11 28:1 | 208:11,15,18 | 353:3,6 366:18 |
| 203:20 | 34:24 36:12 | 209:6,9,10 | 373:18,23 |
| **qualifications** | 54:18 55:4,19 | 212:6,15 | 374:2 380:4 |
| 119:16,23 | 57:17,17 61:19 | 215:16 220:22 | 381:4 390:19 |
| 128:16 149:10 | 62:24 63:2 | 221:22 222:14 | 391:1 400:3 |
| | 64:21 65:2,3 | 222:15,20 | 405:20 406:19 |

406:21 407:4
410:13 413:4
417:2
**questionnaire**
5:2 106:13
119:7 142:17
142:18 143:7
209:21,24
210:12 211:8
211:17 212:14
212:19 213:5,9
213:10 214:14
215:3,8,10,17
215:19 216:8
217:2,8,11,16
217:19 218:10
218:11 219:14
219:21 220:10
220:23 221:8
221:18 222:16
222:17 223:4
225:1 227:12
227:13 228:14
228:20 229:14
237:7 239:17
241:19 242:3,4
245:4,5,11
246:9,11,14
251:2,3,5
255:14 256:21
256:24 257:20
260:9,20 263:1
270:2,13,19,20
270:24 271:17
271:18 272:2
275:12,13

276:17,20,21
277:15,15
278:10,12
283:13,18
284:4,19 286:8
286:10 287:18
288:14 289:5
290:4 292:21
293:1 303:15
303:17 348:10
348:11 351:13
351:14 356:4
412:16
**questionnaires**
92:7 119:4
141:13 217:24
244:19 247:8
248:7 285:14
356:8
**questions**  58:21
59:2 60:3,7,13
61:23 62:10
63:6 65:11,16
65:20 68:23
69:10,17 71:1
95:21 143:6
144:11 186:6
202:24 206:22
208:17,22
213:17 214:20
214:22 216:9
221:8 223:5
224:23 228:6
228:15,22
232:8 244:12
246:12 251:21

258:17,19
259:13 263:10
271:11 277:4,8
285:11,23
286:4,8 294:16
294:19 329:13
353:15 356:12
379:9 399:3
407:10 413:13
415:15,23
416:18 421:6
**quick**  83:10
325:3
**quickly**  110:1
326:7
**quietly**  323:22
**quite**  85:21
141:4 157:13
188:1 189:7
228:11 237:15
238:15 360:16
367:8 369:10
369:10,11
385:13 395:2
396:20
**quote**  68:8
176:3 271:19
**quotes**  291:23
**quoting**  178:12

**r**

**r**  418:1 420:2,2
**rafferty**  2:2
**raise**  63:14
68:22 69:10
228:15 284:22

**raised**  58:21
**raises**  192:6
284:19 285:3
**random**  96:13
96:14,14 105:5
105:5,6 290:17
297:19,23
298:2 301:2
305:9 306:10
307:13 326:12
326:13 334:9
335:5,12,17
336:7 341:3
349:19 355:6
360:24 361:1
**randomly**
264:24
**range**  14:2
85:24 86:5,6
139:24 165:14
189:21 210:18
211:22 263:14
280:6 282:12
375:7,12,24
**ranges**  367:7,9
**ranging**  234:23
**rarely**  306:6
**rate**  73:8
**rates**  14:4
**rather**  77:13
137:7 316:11
379:3
**ratio**  156:9
157:11 233:15
234:8,22 250:3
261:6 310:6

**[ratio - recall]**                                                                 Page 62

314:16 327:23
328:22 329:9
330:10,23
331:10 347:4
347:16 348:13
348:19 352:11
364:16,19
367:4,8 368:16
372:22 373:12
373:13 380:18
380:21 381:9
383:20 384:1
386:7 389:5
391:5,23 393:3
393:24 394:14
394:20 395:15
395:19 397:20
**ratios** 236:22
237:19 384:19
385:20
**reach** 59:11
63:3 184:3
384:8
**reached** 26:1
61:22 236:15
**reaching** 184:8
**read** 15:7 17:11
26:12,15,19,22
49:2,3,5,9 87:9
87:10,11 89:19
90:19 91:1 96:7
100:16 156:22
177:7 190:14
190:14 198:22
234:5 245:15
245:18,22

272:1 284:1
305:12 309:6
320:12,15
322:11 323:15
323:22 324:15
324:16,21,22
334:18 393:15
393:16 395:10
396:4 416:22
419:3 421:3
**reader** 375:11
376:3,5,5
**reading** 25:1
26:17 45:7
89:21,22 90:10
90:22 111:16
176:12 177:5
192:19 247:20
323:6,8 334:13
334:15 405:4
**ready** 8:22,24
**real** 153:12
171:11 209:3
240:5,8 306:23
339:2 410:21
**realistic** 362:12
362:15 375:12
375:24,24
**reality** 286:6
**really** 22:6
60:11 61:12
73:21 75:13
85:20 123:11
125:5 127:4
141:4 142:3
160:10 163:24

164:17 170:21
172:19,24
173:6 174:19
177:16,23
179:6 180:10
181:22 185:8
185:21 190:15
200:4 202:20
203:21 208:1
208:11 209:4
218:1 223:12
229:5 238:17
243:11 255:16
255:22,24
258:13,16,18
258:20 267:8
268:19 269:15
272:10 276:22
282:9,12 285:6
285:21 296:5
302:9 320:10
324:20 328:21
329:12 330:6
338:20 341:23
347:7,13 349:8
351:1,7 361:4
362:17 368:24
369:10 371:18
372:10,24
384:13
**reason** 12:10
19:12 23:3
43:23 62:8 80:9
95:10 98:14
122:1 123:21
126:4 129:22

130:3 132:13
132:19 134:8
135:14 138:20
139:11 153:12
153:16 167:9
167:13,17
214:5 267:23
288:4 290:18
341:13 395:24
419:5
**reasonable**
204:22 298:10
303:9 308:4
312:19 349:12
375:12 408:16
**reasonably**
348:20,24
**reasons** 290:3
343:1 377:17
**reassign** 365:10
369:4
**reassignment**
365:20
**rebuke** 77:21
**recall** 13:5,13
13:14 14:19
15:16 16:8
27:10 28:7,12
43:17 45:3,22
48:1 50:9 52:12
53:7 56:20 66:5
66:6 67:16 68:4
68:5 87:6 88:23
89:9,21,22
90:22 93:15
104:12 114:15

**[recall - regard]**                                                                     Page 63

132:22 142:24
144:7,21 157:8
158:23 174:23
177:19 179:7
189:15 195:21
197:11 207:7
218:2 221:21
223:7 235:1
237:3,8,20,23
238:11,20,22
239:16 240:2,5
241:6,9,18
242:16,23,24
243:11,19,23
244:10 247:9
248:4,18 251:8
251:10,14,17
251:23 252:20
254:21 255:1,6
255:22 260:10
260:19 261:3
261:20 262:3
262:19 264:10
269:1 277:2,19
283:24 288:15
292:3 299:14
304:17 312:10
329:11 330:1
347:1,9,24
348:3,13,18,21
349:3,7,15,21
350:2,4,12,14
351:1,12,18,21
352:3,7,8,15,22
353:1,14,21,24
354:4,5,13

358:18 359:20
360:10 361:20
362:11,16,24
363:8,9,23
364:8 366:1
367:19 368:1,5
368:8,18,21
372:5,7,9,12,24
374:5 376:14
377:6,9,19,22
378:10,13,15
378:23 379:5
379:17,23
380:2 382:1,2
384:23 386:18
389:18 390:12
395:8,20 400:7
401:13 410:20
411:12 412:22
412:24 416:10
**recalled** 35:6
35:11 242:9
259:19
**recalling** 35:12
411:6
**receipt** 419:15
**receive** 54:2
128:15
**received** 54:8
77:17 78:22,24
116:23 120:10
120:17 127:16
134:21 165:19
166:11
**receiving**
403:24

**recent** 151:9
381:19,23
382:8,12 385:6
416:11
**recently** 381:14
**reception**
160:18
**recess** 83:13
145:22 202:14
259:5 324:9
374:21
**reclassification**
196:13,17
**reclassifying**
195:20
**recognized**
100:7,10
101:13,19,23
135:11 290:23
**recollection**
19:10 20:11
**recommend**
319:3
**reconstruction**
94:5,8 146:9,12
**record** 7:10,18
8:19 9:19 10:24
34:23 35:3
146:2 147:12
147:12,13,16
148:7,9 214:13
324:15 330:7
**recorded**
290:12
**recruit** 86:19

**redoing** 245:17
**reduced** 260:11
261:4,20
**reevaluate**
359:5
**reevaluating**
360:5
**reevaluation**
188:5
**refer** 99:20
112:5 156:4
215:21 266:1
267:10 292:7
391:20 392:1
**reference**
143:23 321:6
**references** 97:1
154:15
**referencing**
99:5 317:11
321:12
**referred** 146:15
215:20
**referring**
190:19 248:17
368:4 389:5
392:5
**reflect** 83:22
**reflected** 27:21
50:18 64:3
254:16
**refresh** 19:9
20:10 278:15
**refreshes** 20:16
**regard** 296:6

**regarding**
25:14 112:1
352:1 400:7
**registered** 1:14
418:15
**regression**
254:11 318:6,8
343:13,14
**regroup** 259:11
**regularly** 46:1
**reilly** 3:2
**reinforce**
310:20
**reject** 328:11
**rejected** 162:18
**relate** 305:17
**related** 9:6 11:9
46:12 87:21
89:10 90:13
92:19,20,24
94:4 96:3,23
103:1 129:18
129:18 176:10
179:1 204:1
216:9 224:24
292:16 311:16
340:20 341:21
346:21 348:21
359:7 379:9
405:8 409:14
416:11
**relates** 84:5
268:20
**relating** 9:3
22:14 88:4
89:14,20 90:2

90:20 185:3,18
391:1
**relation** 92:3
**relationship**
19:1 36:2 85:19
90:20 154:8
158:9 347:16
393:2 406:4
409:5
**relationships**
340:18
**relative** 69:4
331:3,4,5
365:11 393:22
**relatively**
297:13,16
304:12
**release** 151:9
151:19 415:23
416:2
**relegated** 67:23
67:24 68:8
124:8 276:1
**relevance** 14:13
192:15 257:16
**relevant** 65:4
99:10 278:23
325:10
**reliability**
44:15 115:4
144:15 251:22
376:23
**reliable** 56:1
154:24 158:15
197:3 208:14
241:2 275:23

298:11 373:6,9
387:12
**reliably** 56:4
228:11 401:23
**reliance** 315:6
315:7
**relied** 143:5
184:14 320:17
320:19 395:6
**relies** 82:9
309:22
**rely** 316:5
384:24
**relying** 124:2
190:24 291:18
371:17 378:8
**remember**
14:23 20:17
65:16 112:23
132:4 149:13
149:14 155:10
239:12 258:4
264:12 278:15
299:16 332:9
387:1
**remind** 168:1
212:7 214:11
215:23 244:23
393:8 412:1
**remote** 1:11 2:1
3:1 7:5
**remotely** 7:3,4
**removed** 8:13
**removes** 81:22
**rendered** 325:7

**rendering** 67:4
82:18
**renders** 66:2
**repeat** 21:5
23:11 53:24
68:24 83:5
230:2 239:10
**repeated** 310:4
**repeatedly**
155:5 291:19
291:21
**rephrase** 55:3
57:17 61:19
91:10 100:4
102:8 107:17
143:13,17
180:2,5,12
200:6 206:1
237:17 266:22
329:4 337:14
400:3,10
**replace** 300:22
**replacing**
301:15
**report** 4:9
10:11,16,19
11:1,10 16:4,13
16:22 17:2
22:13,20 23:2,7
23:8,17,22 24:3
24:8,11,16,17
28:3,9,16 29:1
32:13,19 39:5
40:15,20,21
44:20 45:10
47:4 48:4,21

**[report - response]**                                                    Page 65

49:18,24 50:4
50:12,15,18,23
50:24 51:3,4,6
51:8,12,13,13
51:14,23 52:16
52:19,21 53:2
53:23 58:10
59:1,11 63:15
65:11,21,24
68:3 72:1,6
74:23 75:2,14
76:18,20 77:18
78:11,12,14,16
78:18 79:17,20
79:22 80:3
82:18 92:3,14
93:4,10 96:7,21
99:17 100:1,16
136:11 152:6
153:1 155:4,19
155:22 166:24
190:7 198:8
203:3 204:9,12
209:20 213:8
234:19 256:17
257:17,18
258:1 264:3,14
264:19 265:17
265:20 276:5
276:18 287:20
288:19 290:8
291:20,24
309:8,21 310:5
315:11 317:4
336:11 345:8
349:21 361:16

364:6 373:4,5
375:5 377:9
386:2,3,4
391:22 396:3,6
396:7 397:19
399:18 400:12
402:16 403:22
404:5 405:4
407:12,15
408:15
**reported** 59:5
64:9 115:4
154:6 158:7
175:19 219:6
234:17 250:20
255:20 256:19
256:23 257:10
278:9,9 280:8
285:10 286:12
377:3 395:13
**reporter** 1:14
418:15,24
**reporting** 7:6
176:8,9 178:23
179:1 186:14
187:16 195:19
245:19 257:20
260:18 377:20
411:5,22
412:13,14
**reports** 44:23
157:15 279:9
**represent**
287:13 356:1
**representative**
228:12 340:6

381:8
**representing**
93:12
**represents**
183:8 381:9
**reproducibility**
358:10
**reproducible**
64:15
**reproduction**
418:22
**reproductive**
186:19 383:7
**reputable**
150:16
**request** 6:7
47:14 48:20
183:24 416:24
**requested**
46:24
**required**
162:15 326:10
383:3
**requires** 306:8
**rerun** 105:22
**research** 18:1
18:19 30:19,23
36:8 46:22
48:11 54:4
61:10,13,23
69:11 71:2
77:21 85:10
86:24 87:16,20
93:7 96:16
98:17,20 126:9
135:8,10

141:14 149:18
150:8,22 168:5
172:17 188:4
204:3 205:8
209:5 212:15
299:24 399:16
**researched**
30:2
**researchers**
120:2 133:24
**reserve** 164:5
**resided** 267:5,6
268:2
**resolution** 95:8
146:10
**resolve** 185:12
**resolves** 185:8
**resolving** 185:2
185:17
**resonance** 94:6
**respect** 45:9
81:2 82:4
104:23 105:4
105:11 133:23
134:10 139:16
140:24 150:18
170:24 188:10
**respective**
85:18 86:4
119:11
**respects** 277:23
**respond** 70:4
167:14 224:12
290:4
**response** 5:10
116:16 117:2,9

**[response - reviewing]**                                                    Page 66

154:8 158:9
242:19 243:3
281:14 285:20
386:15 387:7
**responses**
116:20
**responsibility**
47:12 169:24
171:8,10 195:2
226:12
**responsible**
89:8 120:8
159:20
**responsive**
62:15
**restating**
256:14
**restore** 189:21
**restricted**
383:10
**restrictive**
306:8
**result** 125:4
169:3 249:1
259:20 260:1
308:18 328:24
371:12 376:18
376:23 384:14
389:11 390:16
**resulting**
360:12
**results** 86:14
105:24 106:3
155:5 175:16
178:18 230:22
231:1 236:15

244:17 256:2
260:7 291:18
301:12 331:8
331:23 358:8
370:15 371:16
372:17 384:11
385:3,4 388:12
391:15 395:12
410:15
**retain** 30:11
373:12
**retained** 9:8
19:8 23:14
30:12 38:1,15
38:20 40:4 54:6
80:22 81:21
121:5
**retracted** 287:9
**retreat** 305:21
**retrospect**
355:20
**retrospective**
124:3 141:7
143:8 244:22
255:6 348:8,10
355:16,21,23
356:11,18,22
356:23 357:1
357:10 360:7
361:2,8,9
384:22 385:15
389:17
**retrospectively**
285:18
**return** 419:13

**reveal** 32:1
**revealing** 31:20
**reverse** 384:11
**reversed** 206:6
412:11
**review** 11:9,14
16:17 22:17
23:21,23,24,24
26:18 53:10
57:4 58:2,14
60:18 63:4,20
71:14 92:23
106:22 107:1
110:1 122:3
136:7 145:9
160:17 161:24
162:1,8 164:22
169:5,11,12,15
169:16 170:8
170:15 171:11
171:12 177:11
184:9,24 185:7
185:9,12,15
190:4,4,23
191:2 197:20
197:24 200:24
202:18,19
217:16 229:17
230:16,18
256:16 325:14
345:9,17,21
363:10,12,15
363:16,19,21
401:8 407:24
**reviewed** 13:5
17:9 20:5 26:6

26:12 62:20
63:1,5 75:17
76:8 93:13
104:5 108:15
108:23 109:4,8
109:13 110:19
115:13 140:14
140:16 145:10
161:18 163:6
181:11 190:9
199:13 215:4
217:19 218:9
236:16 245:7
245:16 399:21
400:6
**reviewer** 60:18
167:15
**reviewers**
66:22 67:2
162:7,9,17
164:24 165:7
165:14 166:19
167:19 169:13
174:8 179:13
180:15 364:3
400:18,18
**reviewing**
26:10 41:17
50:3 53:12
60:10 62:16
72:23 162:10
169:17 170:24
180:8 226:13
227:16 404:13
407:22

**[reviews - risk]**                                    Page 67

| | | | |
|---|---|---|---|
| **reviews** 185:9 | 165:13 166:4,8 | 280:23 281:2 | 346:11,12 |
| 401:2 | 166:20 168:18 | 281:17,21 | 347:13 349:10 |
| **revised** 166:12 | 178:8 179:17 | 282:2,4 283:14 | 350:23 353:5 |
| **revising** 51:6 | 180:13,23 | 284:13,21 | 354:16 355:24 |
| 51:13 | 183:3 186:19 | 285:6,9 288:12 | 357:12 360:15 |
| **revisits** 175:13 | 187:10 188:10 | 288:16 290:6 | 361:5 362:24 |
| 178:14 | 189:2,5,18,20 | 290:14 291:14 | 363:5,10 365:2 |
| **right** 9:15 | 190:22 197:19 | 292:12 293:2 | 365:5 367:19 |
| 10:23 11:12 | 199:6 201:21 | 293:17 294:3 | 368:2,3,12,16 |
| 16:21 18:21 | 203:6 204:3,18 | 296:24 297:12 | 369:12 370:11 |
| 20:22 22:2,9 | 205:3,4,10,20 | 297:20 302:14 | 370:13 372:3 |
| 24:11 25:19 | 206:4,5 209:8 | 302:19 303:1,5 | 382:10 383:2 |
| 26:11 33:15 | 209:13 211:15 | 303:18 304:8 | 388:18,23 |
| 34:4,20 35:1 | 214:3,16 217:3 | 304:21 305:1 | 390:1 391:12 |
| 38:17,18 45:13 | 218:16 225:5,9 | 310:2,7,8 | 395:1 397:24 |
| 46:2 50:2,6 | 228:8,13 231:4 | 312:19 313:13 | 398:3 399:8 |
| 53:18 54:10 | 232:9,24 | 314:6,8,10,16 | 403:7 407:9 |
| 57:16 62:10 | 234:18 235:3 | 314:18,20 | 408:22,22 |
| 63:6 69:14 | 240:20 242:12 | 315:2,10 | 410:20 411:3 |
| 70:19 71:22 | 243:21 246:23 | 316:17 317:3 | 416:16 |
| 72:18 78:23 | 248:7,10,12,13 | 317:15 318:11 | **rigor** 198:1 |
| 83:9,16 86:17 | 248:23 251:5,7 | 318:15,18 | **rigorous** |
| 87:8 88:3 91:23 | 251:8,14 | 322:8,24 325:8 | 175:15 176:23 |
| 92:21 97:18 | 254:21 255:11 | 326:24 327:5,7 | 178:17 188:20 |
| 102:22 105:8 | 256:6,10,24 | 327:18 328:4 | 189:7 402:7 |
| 106:16 111:12 | 259:8 261:1 | 328:17,24 | 403:4 |
| 112:12,21 | 262:5 263:21 | 329:13 330:5 | **ringing** 298:8 |
| 113:21 122:14 | 265:23 268:10 | 332:18,23 | **risk** 81:10 |
| 123:14 132:6 | 270:15,16 | 333:2,19 334:7 | 88:15,17 89:6,7 |
| 136:9 137:1,2 | 271:2 272:6,11 | 334:14,18 | 91:12 103:10 |
| 141:9 146:21 | 273:23 274:12 | 335:22 336:23 | 129:15 134:3 |
| 150:11 152:3 | 274:22,24 | 337:24 338:6 | 134:10 135:16 |
| 152:11 154:14 | 275:9,15,17 | 339:8 340:7 | 137:18,19 |
| 156:1 157:13 | 276:2,13,15 | 341:9 344:14 | 150:18 157:8 |
| 161:16 163:9 | 277:6,13,18 | 344:14,20 | 173:18 186:12 |
| 164:20 165:5 | 278:7 280:17 | 345:3,12 | 188:15 193:8 |

**[risk - says]**                                                    Page 68

196:23 203:12
204:2 234:10
235:12,14,20
236:2 237:11
244:2,2,4,5,5
252:8 253:8
255:4,6 280:24
281:4 311:17
330:10 334:21
348:21 358:1
364:16 365:11
367:4,7 368:16
369:6 375:17
383:13,20
385:9 386:17
388:7 393:3,23
395:15 403:6
413:20 414:22
**risks**  197:1
375:13 376:1
**rls**  1:4
**rmh**  3:5
**robin**  1:14
416:21,23
418:15
**robust**  384:12
402:5
**role**  28:23 86:8
86:22 169:21
245:9 413:9
416:2
**roles**  85:18 86:4
119:10,11,13
119:17
**rolling**  329:22

**room**  17:5,8
**rothman**  70:8
**rough**  416:24
417:3
**round**  294:22
**row**  266:7
278:24,24
279:1,10,12,18
332:7 354:6
378:4
**rows**  265:18
266:12,16
278:23,24
**royston**  5:4
314:23 315:23
317:16,20
322:5,14,15
324:13 332:16
334:4 335:1,2
336:5 343:2
**rubin's**  105:2
335:10 339:22
**rude**  258:13,15
**ruin**  283:6
**rules**  171:13
339:22
**ruling**  387:8
**run**  105:24
340:9 361:12
**running**  371:11

| s |
|---|

**s**  2:18 4:6 94:10
**s4**  392:2,9
**safe**  305:21
306:5

**safety**  81:5
**sales**  1:4 172:17
**sample**  12:2
252:14,17
254:4,11
260:11 261:4,5
261:21 264:8
265:2 266:19
267:1,3 268:4
268:14 340:6
360:24 361:1
**sampling**
364:22
**sander**  4:18
125:17
**sandler**  114:1
115:9 116:4
125:9 126:6
136:21 137:3
138:5 159:12
161:3
**saw**  90:2,9
139:4 140:13
317:9 323:20
352:10 399:13
**saying**  15:23
25:18 28:11
31:9 80:15
81:24 82:1
98:15 123:12
123:23 130:1
141:2 155:11
157:4 164:4
172:22 176:1
187:10 192:4,5
204:20 218:14

223:23 227:10
227:21 243:8
247:21 254:6
255:2 260:21
273:17 274:1
281:13 288:10
293:5 296:13
303:6 304:4,22
305:3 306:1,4
310:14 316:14
316:21 319:11
321:12 334:15
341:18,20
343:5 348:15
349:13,15
351:3,5 352:20
354:11 355:5
363:1 366:6
367:21 368:9
368:12 382:2
386:18 387:12
390:2 391:16
391:17 397:17
403:15
**says**  13:24 23:8
26:6 30:14 51:3
126:6 127:8,16
129:11 131:5,6
131:14 133:24
135:2,8 137:15
154:2 155:15
157:18 158:5
160:9 168:4
173:15 175:9
175:10 176:4
188:13,19

**[says - section]**

189:1 195:9
199:17 213:2
217:1 219:6,7
224:7 226:22
226:24 241:15
247:8 248:3
249:8,24
254:22 259:17
260:7,15
270:12 271:17
272:1 274:15
274:16,17
280:14,14,17
280:19 281:17
295:3 299:23
299:24 300:5
302:1,15,22
305:13 309:13
313:18 315:15
317:1 318:1,14
319:18,23
320:3 321:24
323:9 325:15
325:15 332:16
335:16 336:16
352:1 359:22
362:23 375:3
375:10 377:1
381:12 383:2,3
388:4 391:22
392:9,10 394:4
396:7
**scan**   324:18
**scenario**   189:12
189:17,18,20
234:20 269:11

282:19 290:20
294:15,17
295:8,17,18
296:11 307:6,7
311:21 337:1,6
337:16 347:12
347:19 364:9
364:15 365:24
366:1,23
367:15 368:8
368:11,13,18
369:2 371:22
372:8,12,13,14
372:15,16,16
372:23 373:10
376:2 379:18
379:18,20,21
**scenarios**   13:5
14:3,20 15:16
64:3 186:13
195:20 197:12
231:2 238:3
264:22,23
282:8 295:23
349:8 351:19
361:18 363:9
363:11,23
373:11 375:14
**school**   126:14
128:9
**schuman**   37:15
**science**   69:3
75:23 104:1
171:11 185:13
205:17 286:18

**sciences**   125:13
131:23 132:17
168:7
**scientific**   69:12
81:23 85:4
135:3 162:4,20
162:21 185:2,4
185:8,17,19
186:6 246:4
408:16
**scientifically**
236:17 287:23
**scientist**   73:15
79:24 107:6,21
129:11 236:13
285:2,16
**scientists**   9:4
58:23 61:22
68:22 69:3,10
75:16,22 76:7
107:9 108:16
109:8 118:6
120:7 121:4,11
124:18 163:13
169:4 173:16
200:13 236:15
264:5 350:24
351:11 399:19
399:24 400:4
401:11
**scope**   152:5
153:1 171:17
**screen**   166:4,10
176:17,20
217:4 247:18
249:15 278:20

342:7 388:1
392:4
**scroll**   39:20
318:3
**se**   145:2
**search**   12:19
**searched**
343:17,18
344:3
**seattle**   131:16
**second**   113:9
117:5 131:4
146:11 168:14
225:13 227:12
245:4,11
246:10,13
249:20 251:3
254:3 255:14
256:21 257:20
260:19 263:17
264:1 271:18
272:2,9,14
275:6,12,13
276:10,17,20
277:14,15
282:9 284:18
290:4 303:17
326:16 329:9
348:5 360:2
379:12
**seconds**   374:10
**section**   65:21
66:1,6 86:14,14
190:3 202:2
211:1 229:9
230:6,19 232:5

**[section - serious]**                                      Page 70

241:20,22
242:1 309:8,17
309:18,22
313:14 371:21
382:24 385:2
387:15
**see**    10:14 12:23
20:8 26:8 34:13
42:10 50:1 51:5
61:1 63:13 66:4
66:20 70:12
75:5 96:9 98:13
98:14,14,15
106:18 114:2,6
116:6 119:24
125:14 126:11
127:11,19
128:20 129:8
129:20 130:7
130:20 131:11
131:13,19
133:14 134:23
135:6,12 136:6
136:13,21
137:3,13 138:2
138:18 153:8
153:12,16
154:10,11
156:5,6,14
158:17 168:9
168:16 169:19
171:10 172:6
176:2,2 180:10
182:24 183:11
185:10 188:16
188:17,23,24

193:11 194:11
198:7 211:1
213:23,24
215:1 216:14
219:9 227:7,8
231:3 232:2
239:18 241:19
241:23 242:10
244:9 246:15
246:16 247:12
249:2,18
250:15,23
262:13 265:4
266:10 268:20
282:18 289:24
298:24 299:5,6
299:22 300:9
300:10 301:4
301:17,18
305:13 314:2
315:14 316:17
317:24 318:1
318:24 319:6
321:22 325:23
333:21 336:13
336:15 338:19
343:19 348:19
353:12,22,24
354:6 355:1
358:20,24
365:3 371:15
375:21,22
380:3,19
381:15 383:16
385:20 388:13
392:3,15,19,20

392:23 393:10
393:12,14
394:16,17
402:20,24
**seeing**  89:23
212:22 249:15
377:22 387:1
**seek**   63:21
95:12 404:18
**seeking**  93:1
**seem**   160:9
320:8 334:17
**seemed**   21:6
**seems**   35:23
87:12 111:21
123:17 126:19
225:21
**seen**    14:4 27:11
69:19 70:5 80:3
92:3 96:15,18
109:17 110:17
117:24 142:22
143:23 144:2
159:3 183:1
192:2 200:13
201:7,8 218:20
218:22 223:9
299:12,15
326:6 360:23
393:24
**select**   264:24
**self**   115:4 219:6
412:13
**send**   122:3
173:4 414:9
417:3

**sends**    162:6
**senior**   125:10
130:17 133:9
135:4
**sense**    32:4
40:23 46:23
51:19 85:23,24
104:3 187:23
252:21 263:7
263:12,15
332:3 374:3
**sensitivity**
106:2 149:5
371:11,15
390:18
**sent**    7:24 8:3
80:5
**sentence**   65:8
77:6 175:24
188:19 250:1
260:7 272:1
300:4 359:23
359:24 360:2,9
381:11
**sentences**   14:10
77:10 359:24
**separate**   20:21
41:5,7 231:19
327:13 329:12
329:16 374:4
**separately**
275:16
**september**
156:9 166:11
**serious**   58:7
79:2

**[seriousness - slight]**                                    Page 71

**seriousness**
  415:18
**serving**  131:14
**set**  20:18 66:9
  103:7 164:9
  225:23 286:19
  294:16 298:8
  300:23 373:13
  407:11 408:15
**sets**  277:4,8
**setting**  341:19
**seven**  354:9
  369:23 370:4,4
  370:13,18
  371:9 376:17
  405:19
**several**  28:17
  111:24 112:5
  203:3 264:2
  359:16 363:9
**sheer**  254:17
**sheet**  419:6,9
  419:11,14
  421:9
**short**  160:13
  369:4,9 371:24
**show**  136:10
  149:8,15 155:6
  410:3,7 414:4
**showed**  140:9
  154:18 155:24
  183:14 250:4
  391:7,12
**showing**  155:8
  189:9 362:8
  373:6

**shown**  415:24
**sic**  382:9
**side**  21:16
  41:11 81:5 83:6
  120:11 177:18
  249:8 250:1
  261:2 302:22
  313:13 359:4
  383:2
**sign**  416:22
  419:8
**signature**
  418:13 421:11
**significance**
  188:3
**significant**
  24:19 25:9
  233:16 234:9
  235:12 236:3
  252:8,13 281:1
  351:2,5 352:3
  352:12 365:12
  365:22 369:21
  370:1 375:5,16
  384:9,14 385:9
  385:24 388:17
  390:13
**signing**  419:10
**similarly**  13:16
  281:15 377:6
**simple**  44:16
**simplified**
  360:11
**simplistic**
  301:21

**simply**  46:15
  105:13 163:21
  295:4
**simulating**
  341:3
**simulation**
  318:19 325:2
  326:7
**simulations**
  336:4,7
**simultaneous**
  224:17 239:2
**single**  31:3
  93:18 94:2
  107:6,21
  148:13 300:20
  300:22,24
  301:9 306:13
  341:5,11,13
  392:12
**sir**  8:6,23 9:16
  40:10 55:4
  167:10 170:15
  187:9 253:12
**sister**  5:2 11:23
  11:24 91:2,6,13
  91:21 92:5,17
  92:19 93:6,14
  112:2 115:14
  117:17,22
  118:7 119:8,12
  119:18 122:4
  127:18 129:13
  137:9 151:22
  175:12 195:16
  203:4 207:15

**211**:5,7,16,21
  211:22 212:4
  212:11 215:10
  216:17 237:12
  262:23 287:14
  295:15 343:18
  352:2 370:6
  385:18 399:23
  400:8 402:6
**sit**  120:6,16
  279:6 320:10
**sitting**  198:6
  285:17
**situation**
  148:22 222:8
  305:10 311:13
  312:3 326:12
  326:13 334:10
  335:5 350:9
  361:10 362:8
**situations**
  108:4 141:16
  274:4 306:20
  336:8 346:18
  349:9 361:7
**six**  112:7
  369:20
**size**  12:2 252:14
  254:5,12
  260:11 261:4,5
  261:21
**skills**  136:7
**slide**  213:3
  249:17,23,24
**slight**  379:23

**[slightly - speculating]**                                    Page 72

| | | | |
|---|---|---|---|
| **slightly** 242:16 | **sorry** 12:12 | 77:7 87:19 | 102:23 103:1 |
| 243:1 292:16 | 24:24 25:3,6,17 | 88:11 104:13 | 104:12,19 |
| 341:21 | 27:22 31:8,9 | 104:14 105:15 | 141:16 143:21 |
| **slow** 220:20,22 | 41:21 44:12 | 138:23 164:4 | 143:22 148:5 |
| 248:1 259:9,10 | 45:17 46:2 | 171:9 172:16 | 155:11 161:5 |
| **small** 183:21 | 53:24 65:7 | 184:10 188:5 | 182:6 186:18 |
| 252:14,18 | 68:24 74:5,6 | 196:9 209:1 | 210:8 213:18 |
| 254:4,16 266:6 | 76:5,23 78:14 | 222:9 227:15 | 216:10 217:9 |
| 278:21 338:20 | 116:8 117:1,1,6 | 238:5 246:3 | 222:2,11,20 |
| 342:10 360:11 | 118:4 127:1 | 257:5 264:13 | 236:22 272:2 |
| 371:10 378:17 | 133:14 138:15 | 285:20 288:22 | 295:13 296:5 |
| 378:21 379:20 | 160:21 165:20 | 301:22 339:3 | 387:3 410:17 |
| 388:6 | 166:21 167:10 | 340:9 365:16 | **specifically** |
| **smaller** 261:4 | 167:10 168:11 | 373:23 | 65:19 87:17 |
| 276:11 | 170:2 171:6 | **sought** 92:15,18 | 88:24 90:11 |
| **snapshot** | 176:12,18 | 93:5 404:17 | 97:8,11 133:23 |
| 227:20 | 188:24 191:6 | **sounds** 12:18 | 142:24 144:22 |
| **society** 182:23 | 193:12 211:12 | 369:12 | 166:22 221:2 |
| 183:4 402:4 | 212:21 223:8 | **source** 372:7,9 | 244:24 263:14 |
| **software** | 233:19 234:3 | **sources** 144:21 | 283:18 368:4 |
| 317:12 321:7,9 | 235:15 239:10 | 331:12 390:20 | 410:15 411:4 |
| **solicits** 173:4 | 241:10 250:13 | **south** 2:3 | **specifics** 90:12 |
| **solve** 288:21 | 252:2 254:23 | **space** 146:8 | 128:4 356:8 |
| 298:21 313:3 | 264:12 266:20 | 194:3 419:6 | **specified** 66:14 |
| **solving** 186:5 | 274:23 279:9 | **spalding** 2:18 | 286:1 |
| **somebody** 29:5 | 287:5 291:19 | **spanning** | **specify** 74:18 |
| 31:9 42:2 63:3 | 293:4 309:21 | 156:13 | 343:8 |
| 99:2 122:8 | 315:4 318:1 | **speak** 45:21 | **specifying** |
| 130:14 169:13 | 333:23,23 | **speaking** 7:7 | 66:15 |
| 182:13 194:3 | 336:14,16 | 80:14 87:2 | **spectroscopic** |
| 271:17 274:15 | 347:20 379:11 | 101:7 139:20 | 146:9 |
| 288:1 292:11 | 380:24 388:13 | 184:24 301:20 | **speculate** 67:1 |
| 292:20 293:10 | 391:9 400:3 | **speaks** 322:21 | 70:16 |
| 295:4 296:22 | 408:10 | **specialty** 46:6 | **speculating** |
| 298:4 330:21 | **sort** 15:20 | **specific** 41:18 | 171:14 |
| | 23:12 32:15 | 68:1 84:22 87:5 | |

**[speech - stay]**

| | | | |
|---|---|---|---|
| **speech** 199:20 201:9 | 370:9 378:3 | 224:22 237:23 | 327:21 328:10 |
| **spend** 58:17 | **started** 8:16 | 259:22 261:9 | 360:13 409:16 |
| 96:20 97:14 | 26:10 51:21 | 261:12 264:13 | 409:20 |
| 162:9 | 52:16,18 58:9 | 285:20 287:10 | **statistically** |
| **spent** 50:1,2 | 59:10 111:22 | 300:17 323:7,9 | 24:19 233:16 |
| 53:11,18 54:10 | 122:13 390:7 | 324:24 325:12 | 234:9 235:12 |
| 72:19,22 | 403:23 404:7 | 326:2,18 | 236:3 252:7,13 |
| 202:17 347:14 | 404:14 | 332:24 370:17 | 281:1 339:8 |
| 405:6 | **starting** 53:21 | 373:5 380:9 | 352:12 365:12 |
| **spoke** 20:11,12 | 202:2 238:7 | 387:7 402:13 | 365:22 369:21 |
| 21:13 45:23 | 242:23 333:7,9 | **statements** | 370:1 373:14 |
| **spoken** 71:18 | 333:11 | 172:16 188:6,9 | 384:14 385:9 |
| **sponsor** 12:9 | **state** 1:16 7:17 | 197:2 371:19 | 385:24 388:17 |
| **sponsored** 12:6 | 204:21 262:2 | **states** 1:1 19:6 | 390:12 |
| **spurious** 358:8 | 270:6 271:13 | 40:20 126:24 | **statistician** |
| **square** 294:21 | 271:22 272:1 | 154:11 186:20 | 86:11,17 |
| **ssr** 321:9 | 304:10 402:18 | 195:22 211:4 | **statisticians** |
| **staff** 129:11 | 402:19 410:15 | 217:6 262:15 | 305:14 337:23 |
| **stage** 169:16 | 411:4 419:5 | 267:4,5,14 | 356:19,21 |
| **stance** 153:18 | **stated** 11:22 | 268:1,8,17 | **statistics** 44:15 |
| **stand** 68:6 | 75:9 99:24 | 287:18 300:10 | 252:17 299:1 |
| 73:18 302:17 | 134:5 173:21 | 368:13 379:19 | 302:16 307:24 |
| 326:18 371:16 | 174:6 177:9 | 416:9 | 330:14 |
| **standard** | 196:21 250:7 | **stating** 13:19 | **status** 106:20 |
| 306:14 | 269:15 416:2 | 156:7 160:8 | 229:20 250:19 |
| **standpoint** | **statement** 4:11 | 246:1 | 267:7,15,24 |
| 203:22 | 13:12 14:15 | **statistic** 264:11 | 309:9,9,24 |
| **stands** 163:5 | 15:8 19:6,18,20 | 266:1 | 310:5 311:10 |
| 335:18 | 19:23 20:15 | **statistical** 13:1 | 312:8 314:15 |
| **start** 26:18 49:9 | 25:7 26:5 27:21 | 13:14 36:18,24 | 316:6 321:9 |
| 53:15 60:12 | 42:17 49:1 68:6 | 37:10,16 97:24 | 331:22 333:24 |
| 141:19 151:8 | 77:14 156:22 | 100:7 101:13 | 334:5,16,20 |
| 184:18 218:3 | 174:6 182:22 | 101:14 131:7 | 342:24 359:14 |
| 241:15 308:13 | 185:15 187:7 | 290:24 291:4 | 370:14 |
| 331:13 356:10 | 187:13 206:7 | 292:10 295:3 | **stay** 96:5 |
| | 213:13 220:14 | 312:23 323:13 | |

**[steering - study]**

| | | | |
|---|---|---|---|
| **steering** 2:15 | **strengths** 18:6 | 170:1 175:17 | 115:14,18,24 |
| **stenographer** | 357:16 | 178:19 188:22 | 116:5 117:18 |
| 7:1 94:7 124:13 | **stretch** 172:10 | 202:21 203:9 | 117:22 118:7 |
| 181:15 191:4,7 | **strictly** 139:19 | 204:18,21 | 119:8,12,18 |
| 207:23 239:4 | **strike** 101:8 | 211:23 212:11 | 122:4,13 |
| 253:22 398:13 | 123:15 124:11 | 318:20 325:3 | 127:18 129:13 |
| 417:5 | 124:15 149:7 | 326:7 356:1 | 129:14,16 |
| **stenographic** | 155:4 164:7 | 360:7,8,10,18 | 130:6 131:10 |
| 7:10 418:6 | 197:7 199:8 | 361:1,2 375:8 | 135:16 137:10 |
| **step** 205:22 | 222:14 224:10 | 384:17,21 | 141:19 142:11 |
| 275:1 347:9 | 224:20 410:12 | 385:5,20 | 143:2,24 |
| 348:5 349:3 | **strong** 55:12 | 387:18 390:11 | 144:12,13,20 |
| 367:14 | 73:17,20,21 | 398:2,7,10,11 | 145:2 150:18 |
| **steps** 130:12 | 74:3,11,16,17 | 398:16,18 | 151:22 158:19 |
| 275:20 331:15 | 75:14,15,16 | 399:21 402:8 | 160:18 165:1 |
| 331:17,19 | 76:5,6,13 77:21 | 408:20 | 169:23 172:7 |
| 348:1 351:15 | 78:1 186:16 | **study** 5:2,3,6,9 | 173:11,16 |
| 365:20,21 | **struggle** 95:22 | 9:4 11:9,22,23 | 175:12,17,22 |
| **stewart** 299:3 | 408:22 | 11:24 12:5,6 | 176:5,24 |
| **sticking** 185:21 | **students** 80:14 | 13:6 14:6 16:5 | 178:21 184:5 |
| **stopping** 65:9 | 81:1 86:1 408:6 | 16:7 17:15,22 | 186:23 195:16 |
| 81:16 | **studied** 139:15 | 18:6 19:9 21:1 | 203:4 207:2,9 |
| **stops** 390:18 | **studies** 41:11 | 22:15 59:19 | 207:15 208:12 |
| **stories** 252:24 | 56:11,21,23 | 60:22 63:12 | 208:21 209:5 |
| 377:20 379:2 | 57:14 88:15 | 64:4,8 65:15 | 209:10 210:1 |
| **story** 339:15 | 89:10 103:23 | 73:24 85:15,16 | 211:6,7,16,21 |
| **straightforward** | 115:13 120:9 | 85:17 87:22 | 212:4,11,24 |
| 86:8 378:4 | 122:3 134:3 | 88:15,17 89:4,4 | 214:10 215:10 |
| **strategies** | 137:18 140:2 | 91:2,5,6,7,12 | 215:22 216:16 |
| 306:11 | 140:23 141:3,6 | 91:13,21 92:5 | 216:17,19,22 |
| **strawn** 38:14 | 141:12,17 | 92:17,19 93:6 | 218:11 219:12 |
| 38:22 39:19 | 142:8 143:4,7,8 | 93:14,20 100:8 | 219:13 237:12 |
| **street** 2:3,8,13 | 143:9,18,21 | 111:17,20,21 | 239:24 240:9 |
| 2:19 | 144:15 146:14 | 112:2,8,16 | 241:8,16 244:1 |
| **strength** 391:11 | 147:11 154:6,7 | 113:7,8,12,16 | 244:18 245:18 |
| | 158:7,8,22 | 113:22 114:15 | 247:2,4 249:3 |

**[study - sure]**                                                                       Page 75

252:16 253:2
254:7 259:17
259:20,24
260:1,4,17,18
262:7,23
263:20,21
264:6 269:9,23
272:8 276:19
283:23 285:5
285:12,22
286:20 287:9
287:10,14
288:8 293:15
295:15 303:16
304:17 310:12
313:9 343:18
352:2 355:19
355:20,22
356:3,5,10
357:14,16
358:15,23
360:23 361:12
369:17 370:6
370:24 380:5
380:17 381:13
382:19 385:18
386:23 388:5
388:14 390:15
390:17 391:20
399:23 400:2,5
400:8,20 403:4
403:24 413:10
**study's**   209:10
**studying**
104:24 105:12
208:5

**stuff**   157:10
344:22
**stunned**   109:23
363:20
**subgroup**
248:20 252:9
382:21 383:11
411:19,23
412:18
**subject**   103:8
260:10 261:2
261:20 264:6
384:18 389:14
419:10
**submit**   16:13
162:4
**submitted**
169:7 170:10
192:14
**suboptimal**
301:13 312:2
**subscribed**
421:12
**subsequent**
142:18 143:6
218:11 270:17
270:19 278:11
284:4,4 285:13
286:10 288:13
289:5 386:21
**subset**   352:9
**subsidiaries**
17:20
**substance**
206:3 421:8

**substantial**
243:18 394:7
**subtypes**   134:4
137:21
**suddenly**   136:1
154:23 224:3
**suffer**   179:7
**suffering**   283:3
**suggest**   192:11
196:22
**suggested**
66:21
**suggesting**
69:16 98:8
305:3 307:2,2
307:17
**suitable**   271:11
**suite**   2:3,13 3:4
**summarize**
24:17
**summarized**
56:23
**summarizes**
396:9
**summarizing**
156:10
**summary**
160:13 175:4
196:8
**super**   341:14
341:19 351:8
**supervision**
418:24
**supplemental**
214:14 221:18
228:1,14,19

229:14 237:7
239:17 242:3
348:11 351:12
**support**   6:1
14:11 15:22
28:23 29:21
33:18 34:3
46:15 95:14
96:10,16 98:17
104:9 168:12
168:13 184:15
214:3 262:9
314:19 375:18
**supported**
168:5,19
**supporting**
22:20 97:2
**supports**   28:21
157:19
**supposed**   42:20
256:4,5
**sure**   8:5 12:9
12:20 23:14
34:9 41:3 45:3
45:22 55:14
65:24 69:6
81:20 89:16
90:8 93:15
104:17 118:15
128:11 138:22
147:23 155:17
155:17,20
157:3 158:2
159:18 160:22
173:2 175:9
210:23 216:2

225:8 230:4
245:2 248:16
259:3 265:23
283:1,2 286:4
291:8 344:12
355:24 372:5
374:16 380:15
383:1 386:24
389:15 408:21
412:3
**surely** 105:7
**surface** 167:20
**surge** 416:11
**surprise** 146:17
146:20
**surprised**
165:11 200:20
**surveillance**
332:21
**survey** 142:5
220:17,17
221:23 222:5
225:14 277:22
**surveys** 276:12
353:15
**survival** 254:10
317:22 331:22
332:18,21
333:3 342:12
342:14
**survivors**
411:14,20
**susceptibility**
253:16
**susceptible**
253:7 359:13

383:8
**suspicious**
384:16
**switch** 367:2,3
370:14
**switched**
364:17
**switching**
289:10
**sworn** 7:4,13
421:12
**symptoms**
253:9

**t**

**t** 4:6 318:20
418:1,1 420:2
**tab** 412:5
**table** 21:17
47:3,5 64:3
179:8,11
198:11 218:18
218:21 219:4
230:23 235:17
248:24 249:3,4
250:9,18,19
260:23 261:1
265:6 269:9,11
276:1 278:17
279:24,24
282:23 283:4,5
290:21 332:6
342:3,4 347:3
349:2 354:6,6
362:17 363:7
364:21 378:5

379:14 383:20
383:23 392:16
395:12,12
**tables** 220:11
331:17
**take** 19:15,17
23:5,6 47:11
78:4,6,23 79:8
81:10,17 83:10
86:11 95:1
136:23 145:19
169:24 171:7
171:10 201:1
202:3,11
203:10 207:24
241:11 258:23
258:24 259:1
269:8 275:20
280:23 282:13
307:18 323:17
323:24 324:1,2
325:5 334:19
361:13 365:9
365:15 366:24
367:3 368:14
369:20,23
371:22 373:1
374:14 379:12
389:21 406:7
407:21
**takeaway** 186:8
196:18
**taken** 83:13
133:7 145:22
147:22 154:22
174:18 202:14

259:5 324:9
364:3 374:21
376:9 388:24
400:13 418:6
**takes** 195:1
307:22 337:21
**talc** 13:6 14:1
24:20 25:10,14
55:20 57:5,21
89:15,17,20
90:2,13 91:23
92:8,13 106:12
112:1 114:15
115:3 116:15
117:16 118:7
120:11,20
121:12 122:11
142:9,15 143:6
144:5 151:23
152:17 156:11
158:16 173:17
175:20 186:10
186:17 188:14
192:22 194:5
197:4 203:11
203:17 204:14
204:17 205:1
205:13 207:1,4
207:17 208:6,9
208:15 209:7
209:12,15,17
210:2,7 211:9
211:23 212:16
214:19 215:19
219:22 221:6,9
221:14 227:1

**[talc - ten]**

Page 77

237:8 242:16
242:24 249:9
250:2 256:21
260:12 261:21
262:11 264:7
265:2 267:4
276:9,13,23
280:23 281:6,7
281:8 285:8
286:11 291:23
295:16,17
309:23 336:20
337:9 347:16
352:1,8 359:1
359:12,18
373:7 377:21
378:11 379:3
381:14 382:12
385:6 391:23
392:21 395:1
396:10 399:11
401:24 403:5
410:3 411:5,6
411:13,22
412:13,15
413:1 416:3,11
**talcum**   1:4 56:1
90:21 203:23
210:12
**talk**   15:4 17:6,8
17:13 18:2
21:17 22:4,9
25:11 28:15
32:23 33:15
36:15 39:10
41:15 82:16

83:7 94:1 99:14
100:15 101:10
105:7 107:5
110:23 124:6,9
124:10 130:13
141:10 143:22
147:6 160:16
161:13 179:11
182:12 187:8
188:3,3,12
190:2 196:14
201:21 204:9
209:20 212:9
231:17 237:2
241:3 262:6
268:11 269:5
278:2 289:13
289:19 298:1
302:4 309:20
309:24 328:19
336:12 339:21
349:21 356:5
360:6,7 361:17
366:3,9,12,15
381:20 382:6,7
383:1 391:10
391:20 394:19
**talked**   28:17
111:18 116:17
151:18 160:19
160:24 161:2
161:17 275:10
278:12 282:3
289:18 290:22
314:14 346:24
348:1 352:5

355:8 356:2
369:16 381:23
408:24
**talking**   19:4
41:21 76:23
78:13,17,18,20
82:15 93:21
102:23 104:4
141:5 143:20
149:9 151:8
160:22 161:4,7
164:21 166:22
167:11 184:18
184:20 191:8
202:17 203:2
206:8,9,16
223:18 239:6
249:12 252:15
256:11 258:12
324:12 336:17
347:1,14,22
349:1 350:8,11
362:3 387:15
391:4,5 394:21
411:11
**talks**   14:13
104:21 105:3
192:15,17
217:11 219:1,5
313:13 382:9
385:8 412:10
**tamping**   331:10
**tangential**
321:5
**tape**   8:13

**task**   57:19,21
58:1 63:20
**teach**   408:5
**teaching**   80:24
86:2
**team**   20:7,19
27:1,5,8 45:9
50:5
**tease**   272:21
**technical**
146:13 325:1
**technique**
101:20
**teens**   220:5
224:1,6 225:11
271:3
**telecues**   356:5
**tell**   8:22 16:3
28:18 31:1,19
39:3 41:16
60:16 94:23
102:13 108:7,8
159:9 184:4
198:13 219:18
231:24 252:18
265:8 282:11
283:8,10
335:10 344:6
345:12 407:3
**telling**   46:14
406:24
**tells**   354:4
**tempting**
305:20
**ten**   22:23 27:19
50:1,2,6 259:2

274:19 340:10
399:22 405:15
406:5
**tend** 49:11
110:4 173:2,6
360:10,19,20
**tends** 78:7
84:21
**tenure** 135:2,3
**term** 14:5
44:15 67:23
101:2 234:12
235:18 369:4,9
371:24 382:12
383:13,14
**terms** 33:8 76:6
91:5 93:20
100:18 111:9,9
150:21 221:19
255:21,21
257:20 309:3
331:9 361:15
362:18 377:18
**terrible** 60:11
307:5,21
**terribly** 309:2
**terry** 4:15
192:23 193:17
193:20 194:2
195:6 373:19
401:11
**test** 15:17
361:19 371:16
371:23
**tested** 348:18
363:8

**testified** 7:14
**testifying** 70:11
121:15
**testimony** 53:5
149:13
**testing** 367:19
**textbook**
104:19,21
334:23 335:15
335:20
**textbooks**
104:18 105:6
**thank** 83:11
202:5,7 247:17
324:5 371:5
374:17 416:19
**theme** 87:19
**theoretic** 240:3
240:11,15
349:22
**theoretical**
350:3,12
410:21
**theory** 350:19
**thin** 231:23
**thing** 26:12
31:3 49:4 60:11
77:16 79:14
123:23 158:18
172:18 179:22
196:8 208:18
275:2 281:5
282:14 317:23
329:7 337:17
351:22 358:16
366:19 367:9

376:20 391:17
391:18
**things** 8:12
48:14 71:11
83:24 96:8
101:5 105:3,16
105:17 116:15
141:18 155:22
164:3 169:18
177:22 180:9
199:15 237:3
255:18 269:2,3
286:21 321:10
346:21 347:11
351:16 357:24
366:7
**think** 14:16
26:16,16 38:18
39:9 40:3 41:13
43:6 46:3,10,11
48:7 49:5 50:13
51:10 52:4 56:4
58:12 59:15
60:1,5 61:2
62:3 63:19 65:4
68:18 71:10
72:13 73:7
74:19 75:7 80:7
80:9,11,20
81:21 82:2 84:7
84:16 87:14
88:9 90:14 93:9
95:5 97:10 99:7
100:24 103:1
104:20 112:11
127:24 132:5

138:9 139:20
139:21 141:15
141:24 145:12
145:16 150:20
151:7 152:12
156:20 162:8
162:13 163:7
163:23 165:3,6
172:9 173:1,7
175:8 176:23
182:5 183:18
184:4,6 185:20
186:2,24
187:13 190:14
190:20 191:9
196:5,6 199:16
200:5 203:16
204:22 207:6
208:10,13,17
208:20 217:22
218:14 220:13
221:1,21,24
224:6 227:21
228:21 229:6
232:23 233:5
234:13,14
237:14,21
238:22 247:19
250:16 251:16
252:19 255:8
255:17 257:24
258:12 259:13
259:22 260:21
260:22 263:4
273:2 277:1,7
283:12 284:8,9

**[think - tisi]**

Page 79

| | | | |
|---|---|---|---|
| 287:7,17,23 | 195:11 247:14 | 49:17 50:23 | 415:9 416:18 |
| 288:2,7,18 | 250:17 276:16 | 52:8,18 53:11 | **timeline** 53:11 |
| 289:4,7,8 | 379:13 | 53:14 55:15 | 144:23 |
| 290:15 291:6 | **thirties** 219:3,8 | 58:8,9,16 59:9 | **times** 27:17,19 |
| 296:8 300:13 | 220:24 221:3 | 59:10 61:14,20 | 28:5,18 40:8,12 |
| 300:17 303:21 | 223:2 225:17 | 71:13 72:19,19 | 40:14,23 43:16 |
| 304:9,11 | 235:11 236:8 | 72:22 83:13 | 44:24 46:23 |
| 305:13 306:24 | **thirty** 354:9 | 90:1,23 97:14 | 51:15 75:1 |
| 307:1 310:9,13 | 419:15 | 98:2 102:19 | 108:5,12 210:8 |
| 310:14 313:1 | **thompson** 2:8 | 118:24 121:13 | 291:21 301:16 |
| 316:8 319:22 | **thought** 25:17 | 135:21 145:22 | 411:8 |
| 321:11 324:19 | 27:23 78:13 | 146:8 148:9 | **tiny** 252:16 |
| 324:21,23 | 123:13 157:3 | 162:10 175:21 | **tipping** 243:22 |
| 325:9 328:6 | 176:13 193:13 | 180:10 181:8 | **tisi** 2:3 4:3 7:16 |
| 330:12 332:1,2 | 218:1 249:10 | 202:6,14,17 | 8:21 10:8,22 |
| 333:1,19 334:2 | 249:11,12 | 204:1 213:18 | 16:1 17:4 18:13 |
| 334:3 337:15 | 286:9 386:16 | 215:5 216:10 | 18:16 20:3 21:8 |
| 338:14,15 | 395:23 401:12 | 217:9 219:15 | 22:1 24:2 27:6 |
| 339:21 342:2 | **three** 58:8,20 | 222:16 223:5 | 29:14 30:7 32:8 |
| 346:17 347:5 | 59:8 136:22 | 224:24 227:14 | 33:6 35:16 |
| 348:24 350:20 | 137:1 162:7 | 238:19 244:7 | 36:14 40:7 42:9 |
| 352:19 363:15 | 217:10 266:13 | 248:11 250:22 | 42:22 43:12 |
| 368:3,23 372:7 | 266:16 281:16 | 252:23 256:22 | 44:11 45:5 |
| 376:4,16,19 | 282:3,4 296:13 | 257:1 259:5 | 47:15,20 48:23 |
| 379:14 385:13 | 313:24 314:4 | 260:8 261:18 | 49:13 51:2 |
| 390:6 392:21 | 403:23 404:7 | 263:18 278:13 | 52:14 53:17 |
| 393:16 398:19 | 404:15 415:20 | 281:20 307:16 | 54:19 57:1,15 |
| 400:17,18 | **throw** 103:7 | 307:18 324:1,9 | 58:4,19 59:7,17 |
| 408:11 409:1 | 285:12,13 | 326:16 330:22 | 61:18 62:5,23 |
| 412:4 417:2 | 288:24 368:15 | 332:9 333:12 | 63:23 64:16 |
| **thinking** 81:12 | 371:24 | 347:14 355:17 | 65:6,23 66:16 |
| 86:19 103:16 | **throwing** 283:7 | 356:6,20 366:4 | 67:3,21 68:20 |
| 104:15 203:15 | **thrown** 298:19 | 366:8,18 | 69:8 70:18 |
| 286:3 395:21 | **time** 21:1 22:11 | 374:21 387:4 | 71:21 72:7,14 |
| **third** 117:5 | 28:1,3 41:23 | 389:21 405:6 | 74:22 75:11 |
| 163:20 175:9 | 42:12 43:7 44:3 | 406:15 407:1 | 76:3,14 77:11 |

| | | | |
|---|---|---|---|
| 78:3 79:16 | 191:19 192:9 | 370:22 374:23 | 166:15 181:9 |
| 81:19 82:23 | 194:1 195:3 | 394:3 395:17 | 187:13 208:8 |
| 83:9,15 88:13 | 197:6 199:5 | 397:10,23 | 237:24 268:13 |
| 90:15 91:9,22 | 200:1 201:3,7 | 398:21 399:17 | 348:2 351:15 |
| 93:16 94:11 | 201:15 202:4,9 | 401:9 402:2 | 367:17,18 |
| 97:16 98:7 | 202:16 204:7 | 403:1,19 404:6 | 408:1 |
| 99:12 101:6,22 | 205:7 207:10 | 404:16 405:11 | **tool** 148:13 |
| 102:4 107:16 | 208:3 210:15 | 406:11,17,22 | 299:2 |
| 108:6 109:1,15 | 215:14 221:16 | 407:2,6,19 | **tools** 408:4 |
| 110:5,22 | 224:8,19 226:7 | 408:7 409:18 | **top** 183:23 |
| 111:11 112:20 | 226:19 232:4 | 410:5,23 | 213:16 226:24 |
| 113:3,20 115:1 | 232:12 233:9 | 411:15 414:1 | 279:5 338:16 |
| 116:3 117:13 | 237:1,16 239:9 | 414:24 415:4 | 347:10 392:19 |
| 117:23 118:17 | 240:17 243:20 | 415:16 416:5 | **topic** 98:19 |
| 120:4 121:1,20 | 246:22 252:4 | 416:14,20,23 | 99:3 345:24 |
| 122:23 123:5 | 254:1 255:19 | **title** 163:16,18 | **total** 366:13,14 |
| 124:14 125:6 | 256:9 257:9,14 | 164:11,16 | 366:16 405:9 |
| 125:21 126:23 | 257:23 258:20 | 165:2 302:20 | **totality** 396:4 |
| 128:6 129:5 | 258:24 259:3,7 | 414:14 | **totally** 34:5 |
| 131:3 133:21 | 267:19 268:22 | **titled** 146:8 | 41:14 60:14 |
| 136:20 139:3 | 273:13 280:13 | 413:19 | 243:10 248:15 |
| 140:5,19 | 284:2 291:9 | **today** 61:21 | 295:9 369:24 |
| 143:12 145:3 | 292:4 293:6 | 120:6,16 159:4 | **touch** 81:1 |
| 145:18 146:1 | 295:1 296:20 | **together** 44:19 | **touched** 88:4 |
| 150:2 151:17 | 299:11,21 | 133:24 177:7 | 88:10 |
| 152:7,15 | 302:13 303:10 | 183:7 266:16 | **touches** 114:15 |
| 153:14 155:14 | 304:3 313:7 | 294:20 321:10 | **towards** 238:10 |
| 156:3 158:1 | 316:3 317:14 | 394:22 405:7 | 318:21 327:19 |
| 159:2,22 | 320:1 321:2 | **told** 159:10 | 328:7,14 |
| 160:15 161:23 | 322:22 323:4 | 246:7 259:9 | 330:24 331:23 |
| 163:10 164:18 | 324:11 330:4 | 385:14 | 333:18,20 |
| 166:3 171:5 | 344:1 345:10 | **tomorrow** | 358:2 373:23 |
| 172:3,12 174:3 | 345:19 346:4 | 122:9 | **trabert** 5:7 |
| 174:15 177:6 | 350:1,10,22 | **tonight** 417:4 | 414:16 415:2 |
| 180:1 181:3,20 | 353:4 354:23 | **took** 17:10 37:1 | **track** 135:2 |
| 181:23 182:21 | 358:13 362:5 | 146:3 153:10 | |

| | | | |
|---|---|---|---|
| **tracts**  383:7 | 53:23 54:7,14 | 205:9 206:20 | 390:5 396:12 |
| **trade**  102:17 | 57:8 58:10 59:2 | 209:22 210:9 | 400:9,21 404:9 |
| 103:9 105:18 | 66:10 68:3,23 | 211:19 212:1 | 404:20 405:1 |
| **train**  123:12 | 69:12,19 70:5,9 | 212:20 213:11 | 405:16 411:24 |
| **training**  409:24 | 72:2,9 73:17,24 | 221:20,23 | **truly**  275:23 |
| 410:10 | 75:18,18 76:8 | 227:14 229:4 | 352:10 |
| **transcript** | 76:18 77:2 | 229:10,17 | **trust**  303:14 |
| 418:8,22 | 78:12 79:20 | 230:16 232:13 | 304:5 |
| 419:16,17 | 85:4 90:21 | 233:18,22 | **trusted**  304:23 |
| **transcription** | 92:17 100:19 | 235:14 236:17 | **try**  12:16 35:24 |
| 421:5 | 101:15 102:11 | 237:12,20 | 106:10 125:4 |
| **translate** | 104:24 105:12 | 239:17 243:13 | 160:10 162:15 |
| 394:12 | 105:14 106:14 | 244:10,22 | 173:2,4 185:12 |
| **transparent** | 106:22 107:9 | 248:21 252:10 | 208:21,24 |
| 232:1 | 107:12 108:16 | 259:21 260:20 | 231:21 265:10 |
| **treat**  307:3,19 | 109:9 110:14 | 261:24 262:1 | 275:21 289:1 |
| **treating**  307:14 | 111:1 116:11 | 263:22 267:5 | 293:20 316:9 |
| **treats**  307:10 | 116:12 117:18 | 268:2 275:4 | 352:21 360:3 |
| **trend**  412:11 | 118:1,2,24 | 295:2 306:20 | 361:4 387:24 |
| **trends**  47:1,21 | 119:4,12 | 308:1 309:10 | 417:5 |
| **trials**  346:22 | 121:22 126:16 | 310:12 311:7 | **trying**  15:3 |
| **trick**  93:2 | 132:3 140:10 | 312:6,23 | 24:24 51:18 |
| **tried**  272:22 | 141:14 143:3 | 316:19 322:19 | 70:21 75:13 |
| 275:16 277:5 | 152:3,22 | 324:22 333:1 | 89:5 97:3 99:11 |
| 277:16 348:12 | 154:19 156:17 | 340:18 341:6 | 102:18 103:17 |
| 360:2 361:11 | 157:19 158:12 | 343:2 346:1,15 | 141:15 157:5 |
| **tries**  338:2 | 164:11 170:18 | 349:22 351:3 | 164:3 198:6 |
| **trouble**  308:15 | 171:24 172:7 | 352:16 353:9 | 212:14 228:2 |
| 309:4 | 173:19,20 | 355:3,17 356:6 | 240:21 255:8 |
| **true**  17:23 | 176:11,24 | 356:20 357:9 | 269:21 272:21 |
| 18:23 21:3,11 | 182:4 183:17 | 357:18,20,21 | 277:17 288:20 |
| 21:13 34:20 | 186:23 187:21 | 358:19 359:20 | 292:15 293:9 |
| 35:8,19,21 36:5 | 192:16 194:6 | 360:15,17 | 294:14,20,21 |
| 36:9 38:3,7,14 | 198:3,17 | 375:19 385:12 | 296:2 309:13 |
| 42:2,14 43:4,16 | 201:12,12,16 | 385:14 386:23 | 327:1,9 328:12 |
| 46:17 52:6 | 203:13,16 | 388:11 389:3 | 331:7 332:15 |

**[trying - unique]**                                                    Page 82

337:12 346:17
349:18 356:15
356:17 371:6
382:6
**tubes**  382:21
383:20 388:10
389:1 390:4
**tumors**  88:6
**turn**  143:7
260:3 282:20
282:21
**twenties**  219:2
219:7,22 220:7
220:24 221:3,6
221:14 223:2
224:5 225:19
236:2 274:10
**twenty**  254:15
**twice**  34:18
**two**  11:17 41:5
41:7 54:13
56:16 70:13
131:16 146:4
147:11,20,21
162:7 173:1
200:23 210:7
213:18 216:9
222:16 224:24
228:15 235:10
235:18 254:12
259:12 266:12
269:22 275:2
275:17 276:7
277:3,7 278:24
281:21 282:4
289:24 292:22

327:23 329:12
342:7 343:8
347:5,11
353:15 356:9
**type**  205:17
327:21
**types**  379:7
407:16
**typical**  58:13
85:17 168:22
169:23
**typically**  43:13
84:22 162:18
318:5 330:17

**u**

**u.s.**  195:17
**ucsf**  80:14
127:3 128:9
172:14,21
**uh**  30:17
214:19 266:8
317:2 378:6
409:3
**ultimate**  43:1
156:16 204:3
204:15,18,20
**ultimately**
16:14 205:16
**unacceptable**
60:14,15
**unbiased**  209:1
308:4 313:4
327:12 335:9
**uncertain**
238:16,17

**uncertainties**
185:18
**uncertainty**
185:2 262:18
306:15 339:12
340:4 397:18
**unclear**  107:18
**uncomfortable**
374:15
**under**  148:17
168:13 184:10
219:18 230:12
230:24 264:21
264:23 313:14
335:3,7,7 336:7
359:16 418:23
**underestimate**
306:13
**underestimati...**
306:15
**undergoing**
169:5
**understand**
10:12,24 13:21
15:2,11,13
17:22 18:5
35:17 49:4
51:18 52:4 76:4
76:22 84:4 91:4
91:11 98:3,9
106:24 118:9
118:23 119:17
132:20 134:9
135:15 152:2,9
152:16,20
164:19 169:1

170:12 174:7
180:16,18,19
180:21 182:1
199:15 265:20
266:21 270:11
288:21 295:9
296:1,1 298:13
319:14 323:15
327:1,2 344:24
356:16 366:9
367:16 371:8
373:22 389:24
400:19 401:1
**understanding**
84:20 108:18
108:20 153:4
220:19 326:23
329:3,6 339:23
377:19
**understood**
16:15,16 22:10
22:11 87:10
100:14 177:15
367:13
**unexposed**
280:1,4,4,16,16
281:8,9
**unfortunate**
283:22 309:1,2
**unfortunately**
148:20 278:20
286:18
**unique**  175:22
176:5,22,24
178:20 196:2

| | | | |
|---|---|---|---|
| **united**  1:1 | **usage**  227:19 | 227:11 228:3 | 364:17 365:10 |
| **university** | **use**  8:4 13:6 | 228:12 229:13 | 368:15 369:5 |
| 34:12 | 14:1,10 24:20 | 233:18,21 | 372:20 373:7 |
| **unknown** | 25:10,14 43:24 | 234:11,22 | 375:6,19 377:8 |
| 375:10 | 44:2 56:2 75:15 | 235:18 242:8 | 377:21 379:3 |
| **unobserved** | 76:11,24 78:1 | 242:16,24 | 380:22 381:1,8 |
| 409:10,10,12 | 80:18 90:13 | 245:3 249:9 | 381:14,16,23 |
| **unpack**  237:15 | 92:8 100:13 | 250:2,21 | 382:8,10,11,12 |
| 395:3 396:21 | 101:2 104:22 | 256:21 257:21 | 382:15 383:8 |
| **unqualified** | 105:10 115:3,4 | 259:18 261:21 | 385:7 388:7 |
| 130:5 | 117:21 142:15 | 262:11,24 | 392:11,21 |
| **unrelated**  81:9 | 143:6,19 144:5 | 263:2 264:4 | 401:24 403:5 |
| **unreliable** | 147:1 148:19 | 267:4 270:14 | 408:4 410:4 |
| 22:22 24:22 | 149:12 154:5,5 | 271:7,8 272:4 | 411:5,13,22 |
| 25:16 42:14 | 154:9 156:11 | 273:23 274:8 | 412:13 413:1 |
| 43:4,14,23 44:6 | 158:6,6,10,16 | 274:16,18 | 413:20 414:21 |
| 44:14,19 50:8 | 173:17 175:19 | 276:9,13 277:6 | **used**  11:24 13:8 |
| 51:21 52:1,5,10 | 175:22 176:6,8 | 277:16 278:9,9 | 15:16 24:4 |
| 53:1 55:9,11 | 176:23 178:21 | 278:12 280:8 | 42:11 43:8,14 |
| 66:3 75:1 76:16 | 178:23 186:10 | 281:13 283:14 | 43:15,18 44:19 |
| 110:21 236:17 | 188:14 193:8 | 285:6 287:12 | 44:21,23 45:3 |
| 399:19 400:1 | 195:11,15 | 287:14,20 | 47:16,21 48:3 |
| **untrue**  396:14 | 197:4 203:11 | 289:5,20 290:5 | 58:3 60:4 74:24 |
| **unusable** | 203:18 204:14 | 291:23,23 | 75:8,9 76:7,15 |
| 352:16 | 204:17 205:1 | 293:15,16,19 | 77:8 95:6,16 |
| **unusual**  141:12 | 205:13 206:3 | 295:13 296:21 | 96:10 98:5 |
| 142:1 166:17 | 209:12 210:13 | 296:21 304:23 | 104:10 107:8 |
| **update**  31:4 | 211:9,18,23,24 | 309:23 310:16 | 108:11 112:21 |
| 153:11,13 | 212:3,16,20 | 313:2 316:8 | 112:22 146:18 |
| **updating** | 213:6,8,9,20 | 317:11 321:7,8 | 147:24 148:15 |
| 356:14 | 215:18 216:12 | 322:10 332:4 | 177:11 186:16 |
| **upper**  86:16 | 217:12,15 | 335:11 337:24 | 197:10 205:18 |
| **upward**  282:17 | 219:2,7,8,22 | 343:6,12 352:1 | 209:14,16 |
| **upwardly** | 220:23 221:3 | 352:4,8 354:20 | 210:2,7 219:24 |
| 262:20 | 221:20 223:1 | 355:16,18 | 220:1,3,5,7 |
| | 225:3 227:1,3,5 | 359:1,6,11,18 | 221:6 223:23 |

**[used - versus]**

Page 84

224:1,4,5
225:11,16,18
226:4 227:5
235:9,11 236:2
236:7 244:18
247:9 248:4
258:3 264:7
265:1 274:19
276:23,23
279:9,13 281:7
284:5 285:8
286:11 291:13
293:10 304:15
309:20,21
310:5 312:22
318:4 320:6
321:8,11
325:18 338:11
340:14 341:14
342:1,11,12,23
344:7 348:8
356:4,18
359:15 371:3
381:6 408:3,18
411:8 419:18
**useful**  259:2
**user**  189:20
221:9,14 273:5
273:7 279:19
292:12 296:18
338:13 355:2
367:3 394:23
397:3
**users**  14:5
270:1 279:19
281:18,20,23

282:1 284:21
295:17 296:14
306:7 336:21
336:22 337:11
367:2,4 369:5,5
369:9 372:1
383:14,15
394:8,9,14,15
395:1 396:16
397:5 412:19
**uses**  146:22
156:7 203:23
276:8 296:22
317:12 321:9
363:9 396:7
**using**  12:12
13:1 14:19
44:18 100:18
102:9 105:8
106:9,12
123:19 134:13
148:22,24
149:3,11
175:11 192:1
205:19 211:5,6
211:15 217:2
227:6 239:16
241:17 267:21
292:10,18
304:15,18
306:24 307:24
312:11 316:10
318:8,19,20
322:7 333:9,10
337:7,22
338:17 339:7

339:22 343:13
348:7 351:12
360:5 384:22
385:10 392:13
394:20
**usually**  70:21
103:15 141:17
**uterine**  92:4
129:19 250:5
314:6 359:9
377:1,8 378:12
379:15 392:13
**uterus**  388:9

**v**

**v**  2:3
**vacuous**  75:3
76:16
**vaginal**  392:21
**vague**  179:22
196:19 351:8
**validity**  305:15
**value**  174:19
180:9 181:9
187:14 281:13
300:20,21,23
300:24 301:9
340:24 341:6
364:4 365:7
388:20,22
**values**  282:12
301:15 305:23
318:7 320:7
325:19 326:16
384:3

**vandenburgh**
37:14
**variability**
364:23
**variable**  209:17
339:11 343:15
**variables**  103:4
104:24 187:18
187:20 311:14
311:20 338:7
338:11,17
339:17 340:14
341:22 342:1
342:11,14,23
409:9,10,11,12
**variance**
340:15
**varies**  85:22
**variety**  195:12
**various**  14:19
15:16 34:15
77:1 91:24
149:10 194:20
278:13 290:3
368:2
**vary**  85:21
**vast**  219:1
**versus**  91:18
105:16 154:5
158:6 224:5
245:11 254:9
254:13 270:9
279:15 287:19
287:21 298:7
351:5 376:20
397:5

**[vienna - went]**                                                        Page 85

**vienna**  1:12
**view**  334:19
**views**  58:15
  69:4
**violated**  305:20
**violates**  171:1
**vitae**  4:10 29:10
**volume**  154:4
**voodoo**  100:17
  100:24 101:3

**w**

**wait**  94:7
  207:23
**walk**  77:9
  101:11 122:8
  187:1,5,12
  265:10 389:22
**wand**  355:13
**want**  15:6,7
  31:14 42:18
  54:16 65:20
  67:1 70:16 74:6
  76:1 77:9 78:21
  82:8 95:1 99:9
  101:1 102:20
  103:7 105:19
  123:10,11
  141:17 148:6
  149:2 155:16
  155:17 157:22
  160:8 161:13
  173:6 179:6
  184:12 187:2
  192:18 201:22
  202:10,20

203:21 204:15
204:19 205:11
208:24 209:4,7
210:20 215:4
216:2 218:2
226:14 231:9
231:11 234:20
241:23 244:14
248:15 250:10
261:13 264:13
265:22 268:12
275:1 285:23
286:5,24
287:15 288:21
289:15,16
298:15 310:15
320:12 322:12
334:22 347:14
355:1 356:7
359:22 361:3
366:20 371:19
374:4,5,16
376:6 377:16
379:11 382:23
384:7,13,24
387:2,24
389:19,21
414:4
**wanted**  12:19
  12:19 69:22
  71:13 123:22
  132:9 228:7
  244:13 283:20
  379:13 380:1
  389:11

**wants**  288:1
**warren**  37:9
  39:23 40:2 41:4
**washington**
  2:14
**waste**  215:4
**watch**  137:6
**water**  374:10
**watkins**  38:6
  39:16
**wave**  355:13
**way**  26:17,20
  44:19 49:11
  51:15 60:9
  74:15 76:20
  85:13 89:14
  100:5 102:1,16
  107:8 111:3
  122:19 128:2
  128:19 141:23
  141:24 149:1
  150:5,23
  171:17 177:15
  178:5 183:24
  199:21 209:1
  223:5 225:23
  236:23 253:2
  258:13 266:23
  271:6 274:14
  274:17 285:10
  286:18,23
  289:3 291:13
  295:7 301:21
  304:13 307:18
  308:3 310:10
  316:21 317:8

317:19 326:9
327:11 330:17
331:2,7 332:18
333:2,22
335:14 341:12
364:22 369:19
390:10 394:22
402:23
**ways**  68:22
  69:2,10,14 95:5
  263:5,9 301:8
  343:14 356:9
**we've**  28:17
  159:4 190:3
  192:24 197:19
  258:4 348:1
  368:19
**weak**  333:14
**weakens**  143:1
**weaknesses**
  18:7 357:16
**website**  34:12
  93:14 119:17
  172:6,22
  173:14 343:18
  344:4
**websites**  173:8
**week**  150:24
  151:20
**weeks**  200:23
**weinberg**  4:21
  114:9 130:17
  130:23
**went**  106:21
  176:14 363:14
  376:19 384:7

| | | | |
|---|---|---|---|
| **wentzensen** | 23:20 27:4 32:2 | 138:14 139:19 | 357:20 362:2 |
| 4:19 114:4 | 32:10,12,22 | 140:12 143:11 | 396:19 397:16 |
| 115:8 133:9,17 | 33:1,4 35:11 | 144:18 145:7 | 398:5,15 |
| 136:4,12 138:4 | 36:11,24 37:2 | 151:6 152:12 | 399:13 400:24 |
| 139:5,8 151:2 | 37:10,16 38:1 | 153:2 155:10 | 401:18 402:12 |
| 159:12 161:3 | 38:16,21 39:9 | 157:21 159:17 | 403:10 404:3 |
| 388:3 | 39:15,17,24 | 160:5 162:24 | 404:11 405:3 |
| **whereabouts** | 40:5,9,19 42:4 | 164:14 170:20 | 405:21 407:20 |
| 15:7 | 42:16,21 43:6 44:8 | 172:2,9 174:12 | 408:8 409:19 |
| **white**  5:4 | 45:2 47:11 | 177:3 179:19 | 410:6 411:1,16 |
| 105:15 314:24 | 48:16 49:8 | 181:1,17,21 | 414:6,12 415:3 |
| 315:23 317:17 | 50:22 52:12 | 191:6,23 | 416:15 419:1 |
| 317:20 322:5 | 53:6 54:16 | 194:14 196:5 | **woman**   203:23 |
| 322:15 324:13 | 56:14 57:10 | 198:20 200:18 | 211:8,17 |
| 332:15 334:4 | 58:1,12 59:4,15 | 202:7 204:5 | 219:12,19 |
| 335:1,2 336:5 | 62:2,13 63:18 | 205:6 207:6 | 221:5 228:18 |
| 343:2 | 64:7 65:1,18 | 208:2 210:11 | 270:12 272:8 |
| **wide**   139:23 | 66:12,24 67:10 | 221:11 223:1 | 275:11 276:20 |
| **wider**   284:11 | 68:17 70:12 | 225:7 226:11 | 290:1,10,13 |
| 288:23 397:2 | 71:8 72:4,11 | 231:6 233:5 | 292:23 293:14 |
| **width**   254:17 | 74:13 75:7,21 | 236:20 237:14 | 338:12 |
| 339:13 364:23 | 76:10 77:5,24 | 240:14 243:15 | **woman's** |
| **willing**   196:20 | 79:5 83:4,11 | 246:20 252:1 | 203:11,16 |
| 406:7 | 88:9 90:7 91:16 | 255:16 257:4 | 212:17 |
| **winston**   38:13 | 93:9 94:9 97:10 | 259:1 267:17 | **women**   13:8 |
| 38:22 39:19 | 97:20 98:24 | 268:19 273:2 | 106:11 111:19 |
| **withdraw** | 100:21 101:18 | 280:11 283:17 | 137:23 138:11 |
| 200:9,10 244:6 | 107:11 108:3 | 291:2 292:2 | 175:18 186:16 |
| 244:16 288:4 | 108:18 109:12 | 293:4 294:7 | 195:17 207:2 |
| 293:12 | 109:22 110:16 | 296:16 302:8 | 207:14 209:6 |
| **withdrawn** | 111:7 112:11 | 303:3,24 313:1 | 209:14,16 |
| 287:2,3,8 | 113:1 117:20 | 317:7 319:22 | 210:6 215:18 |
| **witness**   1:12 | 118:12 119:22 | 320:23 323:2 | 222:5 223:6 |
| 4:2 6:4 7:4 | 120:23 121:16 | 329:15 343:22 | 227:4 228:3 |
| 15:20 16:24 | 122:16 124:24 | 345:6,15 350:8 | 235:9 236:1 |
| 18:11 21:5,21 | 126:18 127:24 | 350:19 352:18 | 237:6,9 242:18 |

| | | | |
|---|---|---|---|
| 243:3,12,16 | 44:2,8 48:21 | 384:5 | 51:8 68:12 |
| 244:20 247:9 | 55:11,20 76:15 | **workings** | 70:13 93:17 |
| 248:3 269:22 | 76:17,20,24 | 126:21 167:6 | 97:6,11 98:10 |
| 269:23 271:19 | 77:14 93:19 | **works** 162:4 | 98:19 99:3 |
| 272:17,18,21 | 147:24 155:12 | 286:18 | 103:21 104:3 |
| 276:9,11 278:8 | 159:8,20 179:3 | **world** 63:13 | 112:1 116:14 |
| 279:3,5 285:8 | 189:1 292:3 | 69:3 106:17 | 117:3 188:17 |
| 287:12,14 | 350:2 | 172:6 192:22 | 194:3 302:3 |
| 295:15 296:12 | **work** 12:17 | 209:3 231:3 | 344:11 404:4 |
| 296:13 303:14 | 29:5 30:4,9,10 | 316:17 | **wrong** 101:14 |
| 304:5,23 306:1 | 30:12,13 31:5 | **worried** 328:15 | 106:16 139:12 |
| 306:2 308:17 | 35:6,13 37:24 | **worry** 328:13 | 179:15,21 |
| 336:20,22,23 | 42:19 46:19 | **worth** 102:18 | 180:23 181:2 |
| 382:20 383:6 | 47:18,22 79:12 | **worthy** 205:2,8 | 186:21 187:4 |
| 383:19 385:11 | 79:12 87:12 | **wrap** 158:18 | 187:11,23 |
| 388:8,9 389:1 | 95:18 108:20 | 190:2 382:6 | 218:7,13 225:5 |
| 390:4 411:7 | 111:9 135:20 | 399:2 | 225:9 243:16 |
| **women's** | 148:2,11 150:8 | **wright** 3:9 | 247:15 279:10 |
| 142:10 143:24 | 155:8 156:1 | 299:19 | 287:4,24 |
| 356:3 | 171:8 294:23 | **write** 22:13 | 288:10 295:4 |
| **word** 26:16,19 | 346:9,13,15,18 | 23:22 40:21 | 310:10 334:2 |
| 43:14 44:16 | 346:20 380:6 | 53:2 69:18,23 | 339:7 345:12 |
| 74:24 76:13 | 380:12 407:17 | 70:2 71:2,8 | **wrote** 50:22 |
| 77:8 78:1,5 | 408:5 409:24 | 172:15 179:4 | 53:7,22 70:8 |
| 79:7 87:11 | 410:10 413:6 | 232:17 | 78:19 111:10 |
| 146:18 176:23 | **worked** 29:7 | **writing** 23:16 | 117:2 195:5,6 |
| 205:22 231:8 | 30:19 31:8,10 | 40:20 50:12 | **x** |
| 245:23,23 | 35:4 36:4,22 | 51:4,12,16 | **x** 4:1,6 |
| 258:4 303:5 | 37:19,23 38:5 | 52:16,18 53:22 | **y** |
| 318:16 333:19 | 38:13 | 86:4,13 99:4 | **y** 94:10 |
| 339:7 348:23 | **working** 30:23 | 183:24 266:6 | **yeah** 7:19 22:16 |
| 352:5 412:7 | 33:9,12,14,19 | 302:11 342:10 | 26:9 32:2 37:2 |
| **wording** 14:23 | 36:17 38:17,18 | 386:4 403:23 | 38:4,4,11 39:16 |
| 177:4 287:16 | 72:21 85:9 | 405:3 | 45:18 46:18 |
| **words** 14:10 | 118:23 119:1 | **written** 40:15 | 47:14 54:1 61:4 |
| 43:8,18,24 44:1 | 120:2 254:7 | 49:17 50:24 | |

**[yeah - zoom]**                                                    Page 88

| | | |
|---|---|---|
| 69:9 72:17 73:7 | 212:12 213:6 | **zoom** 12:13 |
| 73:18 79:22 | 213:19 216:11 | 239:6 |
| 89:23 92:11 | 217:10 219:19 | |
| 100:16 101:5 | 225:2 270:15 | |
| 111:15 116:6 | 272:3 278:11 | |
| 132:11,18 | 287:19 292:23 | |
| 133:14 137:8 | 293:14 297:15 | |
| 139:7 142:5 | 304:6,24 | |
| 143:22 144:9 | 381:22,22 | |
| 149:14 153:2 | 382:3 414:24 | |
| 155:15 156:19 | **years** 36:5 | |
| 158:2 165:4,9 | 56:12 87:20 | |
| 191:23 193:3 | 111:20,23 | |
| 194:7,15 | 112:7,14,22 | |
| 203:14 204:19 | 113:2 118:8,14 | |
| 215:2 218:22 | 131:16 132:16 | |
| 226:5 239:21 | 144:13 210:8 | |
| 248:8,23 | 210:19 211:2 | |
| 250:24,24 | 211:10,11,19 | |
| 260:23 264:20 | 211:24 212:2 | |
| 265:10,14,22 | 213:22 216:10 | |
| 273:24 275:5 | 216:13 219:12 | |
| 286:14 287:15 | 219:13 221:5 | |
| 316:20 318:12 | 225:5 227:4 | |
| 322:16 324:19 | 272:6 292:23 | |
| 332:3,10,11 | 361:13 383:14 | |
| 334:10 344:15 | 399:22 405:15 | |
| 362:7 375:22 | 406:5 410:2,11 | |
| 376:21 380:8 | **yield** 301:12 | |
| 380:15 390:6 | **youngest** 211:6 | |
| 404:14,21 | **yup** 137:8 | |
| 412:23 414:3 | 241:13 374:19 | |
| 415:3 | | |
| **year** 75:14 | **z** | |
| 201:1 210:9 | **zero** 366:1 | |
| 211:7,16 | 379:24 | |

New Jersey Rules Governing Civil Practice

Part IV, Rule 4:14

Depositions Upon Oral Examination


4:14-5. Submission to Witness; Changes; Signing

If the officer at the taking of the deposition is a
certified shorthand reporter, the witness shall not
sign the deposition. If the officer is not a
certified shorthand reporter, then unless reading
and signing of the deposition are waived by
stipulation of the parties, the officer shall
request the deponent to appear at a stated time for
the purpose of reading and signing it. At that time
or at such later time as the officer and witness
agree upon, the deposition shall be submitted to
the witness for examination and shall be read to or
by the witness, and any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness. If the witness fails to appear at the
time stated or if the deposition is not signed by
the witness, the officer shall sign it and state on
the record the fact of the witness' failure or

refusal to sign, together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under R. 4:16-4(d) the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.


Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.