# EXHIBIT 5

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3

_____

4

5    IN RE:  JOHNSON & JOHNSON          )

6    TALCUM POWER PRODUCTS MARKETING,) MDL NO.

7    SALES PRACTICES, AND PRODUCTS    ) 16-2738(MAS)(RLS)

8    LIABILITY LITIGATION             )

9

10

11                     DEPOSITION

12                        OF

13             PATRICIA G. MOORMAN, Ph.D.

14

15            Tuesday, February 13, 2024

16

17

18

19        GOLKOW LITIGATION SERVICES, INC.
       877.370.3377 ph | 917.591.5672 fax
20              deps@golkow.com

21

22

23

24

25

Patricia G. Moorman, Ph.D.

Page 2

1    DEPOSITION of PATRICIA G. MOORMAN,
2  Ph.D., a witness in the above-entitled action,
3  taken pursuant to notice, pursuant to the Federal
4  Rules of Civil Procedure before CINDY A. HAYDEN,
5  RMR, CRR, a Certified Shorthand Reporter, at The
6  Carolina Inn, 211 Pittsboro Street, Chapel Hill,
7  North Carolina, on the 13th day of February, 2024,
8  at 9:05 a.m.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1  APPEARANCES:
2
   ASHCRAFT & GEREL, LLP
3  BY: MICHELLE A. PARFITT, ESQ.
       PATRICK LYONS, ESQ. (Remotely)
4  1825 K Street, N.W.
   Washington, D.C. 20006
5  202.783.6400
   mparfitt@ashcraftlaw.com
6  Counsel for Plaintiffs
7       ~ And ~
8  LEVIN PAPANTONIO RAFFERTY
   CHRISTOPHER V. TISI, ESQ. (Remotely)
9  316 South Baylen St.
   Pensacola, FL 32502
10 850.435.7000
   ctisi@levinlaw.com
11
        ~ And ~
12
   GOLOMB & HONIK, P.C.
13 RICHARD GOLOMB, ESQ. (Remotely)
   1835 Market Street, Suite 2900
14 Philadelphia, PA 19103
   215.985.9177
15 rgolomb@golombhonik.com
16
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
17 BY: JESSICA DAVIDSON, ESQ.
       ASHER TRANGLE, ESQ.
18 One Manhattan West
   New York, NY 10001-8602
19 212.735.2588
   jessica.davidson@skadden.com
20 asher.trangle@skadden.com
   Counsel for Defendant
21
22
23
24
25

Page 4

1         I N D E X
                            PAGE
2
3  EXAMINATION BY MS. DAVIDSON .................   6
4  EXAMINATION BY MS. PARFITT .................. 244
5  EXAMINATION BY MS. DAVIDSON ................. 245
6  EXAMINATION BY MS. PARFITT .................. 247
7
8        E X H I B I T S
9
   MOORMAN
10 NUMBER         DESCRIPTION          PAGE
11 EXHIBIT 1   Document titled Ovarian      25
               Cancer Risk Factors
12
13 EXHIBIT 2   JAMA - Association of Powder   58
               Use in the Genital Area With
14             Risk of Ovarian Cancer
15 EXHIBIT 3   Addendum to Rule 26 Expert    69
               Report of Patricia G.
16             Moorman, MSPH, Ph.D. dated
               11/16/18, Date:  April 21,
17             2021
18 EXHIBIT 4   JAMA - Use of Powder in the   83
               Genital Area and Ovarian
19             Cancer Risk, Examining the
               Evidence
20 EXHIBIT 5   Reproductive Toxicology -     90
               Critical review of the
21             association between perineal
               use of talc powder and risk
22             of ovarian cancer
23 EXHIBIT 6   Supplemental Expert Report of 104
               Patricia G. Moorman, MSPH,
24             Ph.D., dated 11/15/23
25

Page 5

1  EXHIBIT 7   AACR - Genital Powder Use and  115
               Risk of Epithelial Ovarian
2              Cancer in the Ovarian Cancer
               in Women of African Ancestry
3              Consortium
4  EXHIBIT 8   Effects of risk factors for   120
               ovarian cancer in women with
5              and without endometriosis
6  EXHIBIT 9   Supplemental Table 1 and 2    127
               Phung
7
   EXHIBIT 10  Association Between the       134
8              Frequent Use of Perineal
               Talcum Powder Products and
9              Ovarian Cancer: a Systematic
               Review and Meta-analysis
10
11 EXHIBIT 11  Supplementary Table 1         153
12 EXHIBIT 12  Markers of inflammation and   161
               risk of ovarian cancer in
13             Los Angeles County
14 EXHIBIT 13  Douching and Genital Talc     171
               Use:  Patterns of Use and
15             Reliability of Self-reported
               Exposure
16 EXHIBIT 14  The Association Between Talc   173
               Use and Ovarian Cancer:  A
17             Retrospective Case-Control
               Study In Two US States
18
19 EXHIBIT 15  Supplemental eTable 6         189
20 EXHIBIT 16  Gynecologic Oncology - Talc,  211
               body powder, and ovarian
21             cancer:  A summary of the
               epidemiologic evidence
22 EXHIBIT 17  Dr. Harlow's letter in        245
               response to the O'Brien paper
23
24
25

Patricia G. Moorman, Ph.D.

Page 6

P R O C E E D I N G S

* * *

PATRICIA G. MOORMAN, Ph.D.,
having been first duly sworn, was examined and
testified as follows:

* * *

EXAMINATION

BY MS. DAVIDSON:

Q.  Dr. Moorman, please state your full
name for the record.

A.  My name is Patricia Gripka Moorman.

Q.  What's the middle name?

A.  Gripka, G-R-I-P-K-A.

Q.  Is that your maiden name?

A.  Yes, it is.

Q.  You've been deposed before.  I know
that because I've read your depositions.  So I'm
going to forgo all the deposition rules.  The main
thing is to make sure that I finish my question,
okay, and Michelle has enough time to object
before you answer.  Although that seems so easy,
everyone messes it up.  Okay.  Other than that,
I'm just going to go straight into the
questioning.

I assume you met with Ms. Parfitt to

Page 7

prepare for this deposition?

A.  I did.

Q.  When was that?

A.  I met with her yesterday afternoon.  I
met with her for the originally scheduled
deposition last month.  Those two times.

Q.  And did she show you any documents
that you hadn't previously reviewed or listed as
materials you considered?

A.  No, I don't believe so.

Q.  Do you have any notes that you've
taken in this litigation?

A.  No, I do not.

Q.  Are you offering an opinion that
Johnson's Baby Powder contains asbestos?

A.  My understanding is that there are
other experts who are testifying to that.  I have
read documents that have indicated such.  But my
opinion is that Johnson's Baby Powder causes
ovarian cancer regardless of the substances in it.

Q.  Have you reviewed defendant's experts'
reports with respect to testing of Johnson's Baby
Powder for asbestos?

MS. PARFITT:  Objection.  Can you be
more specific?  Which reports?

Page 8

MS. DAVIDSON:  Any.

MS. PARFITT:  Thank you.

THE WITNESS:  I don't recall any -- I
don't recall reviewing any other.

BY MS. DAVIDSON:

Q.  As a scientist, you'd agree that it's
important to evaluate all available evidence,
right?

A.  Yes, it is important to review all the
evidence.

Q.  Do you know how much money you've
earned thus far in talc litigation?

A.  Well, it's -- as you know, I -- I did
work back starting probably about 2018 or so, and
I believe that I have submitted all of the
invoices.  I -- I don't recall the total amount.

Q.  Do you know if it's over or under
$200,000?

A.  Over how much?

Q.  200.

MS. PARFITT:  Objection.

THE WITNESS:  I -- I really --

MS. PARFITT:  The -- objection.  The
invoices have been submitted.

MS. DAVIDSON:  I'm sorry.  Let's just

Page 9

go off the record for one second because I
may be mistaken.

* * *

(Whereupon, there was a recess in the
proceedings from 9:09 a.m. to 9:10 a.m.)

* * *

MS. PARFITT:  We have available for
you the invoices that have been submitted
to the MDL for her federal cases.  The most
recent ones -- you should have everything
at the last deposition.

BY MS. DAVIDSON:

Q.  We have all the MDL stuff.  But my
question was:  What's the total you've billed for
talc litigation?

MS. PARFITT:  If she knows.  We don't
have any other invoices here.

Trish, if you know.  If you don't
know, don't guess.

THE WITNESS:  I -- I don't know the
total.  You know, you have the invoices for
the MDL litigation, the amount for the 2021
report.  It was probably 40-ish hours that
I billed.  I would -- but -- but that is an
estimate definitely.

Page 10

1  BY MS. DAVIDSON:
2     Q.  Okay.  Who did you invoice for the
3  2021 report?
4     A.  Steve Faries, who was at Mueller law
5  firm in Texas had asked me to do that.
6     Q.  Okay.
7     A.  And I had submitted it to --
8     Q.  Oh, so that wasn't through Michelle.
9  I didn't understand that.  And then other than
10  Kleiner, Ingham and MDL?
11     A.  Kleiner?
12     Q.  Kleiner is Philadelphia.
13     A.  Yeah.
14     Q.  Ingham is Missouri.
15     MS. PARFITT:  Okay.  Just for the
16  record, she has not submitted Kleiner or
17  Ingham to the MDL, so we don't have --
18     MS. DAVIDSON:  That wasn't my
19  question.
20     MS. PARFITT:  Well, we don't have the
21  invoices, and she doesn't either.
22     MS. DAVIDSON:  I know, but that wasn't
23  my question.  You interrupted my question.
24  You broke the one rule I made.
25     MS. PARFITT:  I'm sorry.  I'm -- I'm

Page 11

1  trying to clarify.
2     MS. DAVIDSON:  My one rule.
3     MS. PARFITT:  I know.  I'm trying to
4  clarify, Jessica.
5     MS. DAVIDSON:  I know.  Michelle and I
6  are going to get along today.
7  BY MS. DAVIDSON:
8     Q.  Other than Kleiner, Philadelphia;
9  Ingham, Missouri; and the MDL, have you -- have
10  you provided any testimony or reports in any other
11  talc cases?
12     A.  The Kleiner -- I'm -- I do not recall
13  that name.  The name for the 2021 report was
14  Guthrie.
15     MS. DAVIDSON:  Okay.  I thought you
16  had told me it was Kleiner.
17     MS. PARFITT:  No.
18     MS. DAVIDSON:  You said it was for
19  Philadelphia.
20     MS. PARFITT:  No.  It is Philadelphia.
21  I have no idea which case it is.
22     MS. DAVIDSON:  Oh, it's another
23  Philadelphia case.
24     MS. PARFITT:  So I don't know that
25  case.

Page 12

1     MS. DAVIDSON:  Okay.
2     MS. PARFITT:  And so I don't know --
3     MS. DAVIDSON:  Okay.  I'm sorry.
4  BY MS. DAVIDSON:
5     Q.  When you said -- did you -- were you
6  deposed in that case?
7     A.  No, I was not.
8     Q.  Okay.  So other than Guthrie, Ingham
9  and the MDL, have you provided a report or been
10  deposed in any other talc case?
11     A.  No, I have not.
12     Q.  Okay.  Perfect.  We can move on.
13     So our records show about 102,000 plus
14  the 40 hours to get us to about 125,000?
15     MR. TRANGLE:  118,000.
16  BY MS. DAVIDSON:
17     Q.  Does that sound about right, $120,000?
18     MS. PARFITT:  Objection.
19     You can answer.
20     THE WITNESS:  You know, again, you --
21  I have submitted those invoices.  They're
22  accurate to the best of my knowledge, but I
23  do not recall the total sum.  It does not
24  sound, like, wildly out of whack, so -- but
25  I -- I don't know how close it is.

Page 13

1  BY MS. DAVIDSON:
2     Q.  What percentage of your income over
3  the last several years has come from talc
4  litigation?
5     A.  Well, as you -- as you probably know
6  if you looked at my CV, I retired from Duke
7  University in summer of 2021.  And so in terms of
8  earned income, I have no income from talc in 2023,
9  2022 -- I'm sorry.  I misspoke a little bit.  I
10  think -- let's see.  What was the invoice for?  It
11  was like 17,000?
12     MS. PARFITT:  And just so you know,
13  Jessica, I'm showing her the two invoices,
14  so --
15     THE WITNESS:  Right.  Yeah.
16  BY MS. DAVIDSON:
17     Q.  Uh-huh.
18     MS. PARFITT:  So --
19  BY MS. DAVIDSON:
20     Q.  Let's just introduce this as a
21  demonstrative, which is, we put your invoices on
22  one page.  That will make your life easier.  This
23  is all we've got.
24     A.  Okay.  So, in 2023, it was $17,000.
25  And in terms of my earned income, that was the

Patricia G. Moorman, Ph.D.

Page 14

1 bulk of it. But at this point, my income is
2 basically my retirement income. And this
3 represents, the 17,000, I would say probably
4 10 percent or less of my -- my -- our income.
5      Q.  When you say "our income," you're
6 including your spouse's income?
7      A.  Yes.
8      Q.  Do you get a pension from Duke?
9           MS. PARFITT:  Objection.  Relevance.
10      And I'm going to object with regard to any
11      question regarding her pension.  That's not
12      relevant.
13           MS. DAVIDSON:  Okay.  But I -- I have
14      a right to ask it.  She said she has
15      unearned income.
16 BY MS. DAVIDSON:
17      Q.  I'm just trying to understand.  Is
18 that a pension from Duke that you're talking
19 about?
20      A.  There is not a pension from Duke.
21 There was -- you know, throughout my career, I
22 contributed to 403(b) --
23      Q.  Got it.
24      A.  -- or whatever, and so there is some
25 income from that.

Page 15

1      Q.  Got it.
2           And is the only other litigation that
3 you've been involved in the last few years Zantac?
4      A.  Yes, it is.
5      Q.  And do you know how much you've made
6 in the Zantac litigation?
7      A.  Again, I do not recall the exact
8 amount.  I know that I billed for several hundred
9 hours.
10      Q.  You billed for several hundred hours?
11      A.  Uh-huh.
12      Q.  And was your rate 400 an hour?
13      A.  Yes, it was.
14      Q.  Are you still involved in Zantac
15 litigation?
16      A.  No, I am not.
17      Q.  When did you stop being involved?
18      A.  The last -- I gave a deposition.  I
19 think it was in October of 2022.
20      Q.  Uh-huh.
21      A.  And that was the last work that I did
22 with that.
23      Q.  Are you aware that the federal court
24 excluded your testimony there?
25      A.  I am aware that the testimony -- my

Page 16

1 testimony as well as the testimony of all of the
2 plaintiffs' experts were excluded, which I clearly
3 disagreed with, because the methodology that I
4 used is the same methodology that I've used in
5 this case, which has been approved by the court.
6 It's the same methodology that I used throughout
7 my career when I'm writing papers, writing grants,
8 reviewing papers, reviewing grants.
9      Q.  And you've read that opinion?
10      A.  I read -- yeah, a couple of years ago
11 I did read --
12      Q.  The parts about you.  It's a long
13 opinion, I understand.
14      A.  Yeah.
15      Q.  Is that what you're saying?  You
16 focused in on --
17      A.  Yeah, I read it a couple of years ago,
18 and I -- I can't say that I read every single word
19 of the opinion.
20      Q.  I'm a lawyer.  I thought the opinion
21 was long.  Very thorough, but long.
22           Okay.  So do you have any remaining
23 activities with UNC or Duke?
24      A.  I am professor emerita in the
25 Department of Community -- yeah -- Family Medicine

Page 17

1 and Community Health.  They changed their -- the
2 department name a few years ago.  And -- so I have
3 some privileges in that regard.
4           I am included on e-mails and so
5 departmental meetings, seminars and such like
6 that.  I have access to the Duke library.  Since I
7 have retired, once in a while, not too often, I
8 will be asked could I review something.  But
9 that's about it.
10      Q.  Do you know Katie O'Brien?
11      A.  I have never met her, to my knowledge.
12 I obviously have read several of her papers.
13      Q.  She lives in the Research Triangle.
14 That's why I asked.
15      A.  Right.  Yeah.
16      Q.  But you've never come across her
17 professionally?
18      A.  No.  I believe that she works at
19 NIEHS.  I know some of the people in that group,
20 but I don't believe that I have ever met her.
21      Q.  Have you ever spoken to her,
22 communicated with her by email?
23      A.  No, I have not.
24      Q.  Did you reach out to her with any
25 questions about any of her papers?

Patricia G. Moorman, Ph.D.

Page 18

1    A.  No, I did not.
2    Q.  Are you still an adjunct professor at
3  UNC?
4    A.  When I retired, I had stopped that as
5  well.
6    Q.  So your CV says adjunct associate
7  professor 2005 till present at UNC.  That just
8  needs to be updated?
9    A.  Yes, it does.
10    Q.  When did you stop doing that?
11    A.  The last time that I actually did any
12  work related to that adjunct appointment was when
13  I was on a dissertation committee that -- I want
14  to say that it was probably like 2019 when she
15  defended.  It was pre-COVID.
16    Q.  When was the last time you taught a
17  course?
18    A.  It's -- I'm not remembering the exact
19  year.  I -- probably about 2018, '19, something
20  like that.
21    Q.  And what was that course?
22    A.  The course was called Evidence-Based
23  Practice, and I actually taught Evidence-Based
24  Practice 1 and 2.  They -- these were courses for
25  the physician assistant students.  The physician

Page 19

1  assistant program was in my department, and so the
2  first-year students took Evidence-Based Practice
3  1, and the second-year students took EBP 2.
4    Q.  Did you mention talc in that course?
5    A.  I don't recall if I did.  I certainly
6  didn't emphasize it in any way.
7    Q.  Have you authored any publications
8  concerning talc and ovarian cancer since January
9  2019?
10    A.  Have I authored?  Yes.  I am a
11  co-author on a paper.  Colette Davis was the first
12  author.  And that was part of the Ovarian Cancer
13  in Women of African Ancestry Consortium.  And so I
14  was a co-author on that paper.
15    Q.  Any other papers?
16    A.  Related to talc, no, I don't believe
17  so.
18    Q.  Do you have any planned papers or
19  papers under way with regard to talc?
20    A.  There is nothing in progress, no.
21    Q.  Have you ever published any papers
22  about asbestos and ovarian cancer?
23    A.  No, I have not.
24    Q.  Do you have any plans to do so?
25    A.  Nothing that's in progress, no.

Page 20

1    Q.  Have you spoken in any public forum
2  about talc and ovarian cancer since 2019?
3    A.  No, I have not.
4    Q.  Do you recall what the judge in Zantac
5  said as to why she was excluding your opinions?
6    A.  It has been a couple of years since
7  I've read that opinion.  Right off the top of my
8  head, I -- I can't remember a lot of the details.
9    Q.  Do you remember any of the details?
10    A.  Some of it was -- I cited some data
11  related to the indium A in food products, and
12  despite nutritional epidemiology being a
13  well-respected field, I think that the judge did
14  not like that we were using that as part of the --
15  or that I was using that as part of my arguments.
16       But generally, I -- the methodology,
17  as I said before, is what I have used throughout
18  my career, and I did not think that it was -- I
19  didn't agree with that decision.
20    Q.  Have you reached out to any public
21  health organizations about talc and ovarian cancer
22  since 2019?
23    A.  To the extent that I speak through the
24  publications, and so my -- as being a part of a
25  co-author on another paper with talc, that was

Page 21

1  certainly considered by public health
2  organizations.  But have I directly addressed
3  public -- a public health organization?  No, I
4  have not.
5    Q.  And when you say through your papers,
6  you're talking about the Davis paper?
7    A.  Correct.
8    Q.  When was the last time you went on the
9  ACOG website?
10    A.  I don't recall.
11    Q.  Have you ever been on the ACOG
12  website?
13    A.  I'm sure I have over the course of my
14  career.
15    Q.  Have you ever looked at what ACOG has
16  to say about risk factors for ovarian cancer?
17    A.  I am sure I have at some point.  I
18  don't recall when I did that.
19    Q.  Are you aware they updated their FAQ
20  for ovarian cancer in 2022?
21    A.  I don't recall seeing that, no.
22    Q.  Do you know whether they list talc as
23  a risk factor for ovarian cancer?
24    A.  Like I said, I haven't -- I don't
25  recall the last time I looked at their website.

Patricia G. Moorman, Ph.D.

Page 22

1    So I -- I don't know what it says currently.

2        Q.   Are you aware that ACOG has a section

3    on their FAQ with recommendations on how to reduce

4    the risk for ovarian cancer?

5        A.   Again, it has been so long since I've

6    looked at that website that I just -- I -- I don't

7    know.

8        Q.   I believe you testified in 2019 that

9    you disagreed with ACOG on the -- on its list of

10   risk factors for ovarian cancer.  Have you ever

11   reached out to ACOG to express your view that you

12   disagree with ACOG's views on ovarian cancer?

13       A.   I have not.

14       Q.   Does either Duke or UNC advise women

15   not to use talc?

16       MS. PARFITT:  Objection.

17       THE WITNESS:  You're talking about

18       universities, and I am not aware of

19       anything at either university -- that I

20       don't know what individual physicians tell

21       their patients.

22   BY MS. DAVIDSON:

23       Q.   Have you ever looked to see if either

24   Duke Hospital or UNC Hospital has on their website

25   a list of risk factors for ovarian cancer?

Page 23

1        A.   I am not aware of that at -- at Duke.

2    I have never looked at UNC.

3        Q.   Just to be clear, you don't know

4    whether Duke or UNC has a web -- either one has a

5    website on which either hospital lists risk

6    factors for ovarian cancer?

7        A.   I am not aware of any.

8        Q.   Have you ever contacted Duke or

9    UNC Hospital and suggested that they add talc as a

10   potential risk factor on their websites --

11       A.   I have not.

12       Q.   I was in the middle of my question.

13   That's no big deal.

14       A.   I'm sorry.

15       Q.   Let's just try to make sure that I

16   finish my question, just for the court reporter.

17   So did you get the full question?

18       I mean, you had -- you guessed

19       correctly what the question was.  I'm just

20       worried about a clear record.

21       A.   I'm sorry.  I thought that you were

22       finished.

23       MS. PARFITT:  I did, too, Jessica.

24   BY MS. DAVIDSON:

25       Q.   I just said "as a risk factor," and

Page 24

1    then I was going to say "for ovarian cancer."  So

2    just let's give ten seconds.  It's better for

3    Michelle, too, because then she can object.

4        MS. PARFITT:  She's a New Yorker.  She

5        speaks fast.

6        THE WITNESS:  Okay.  Could you please

7        restate it?

8    BY MS. DAVIDSON:

9        Q.   No, it's fine.  I think you got it.

10       What I had said was:  Have you ever

11   reached out to either Duke Hospital or UNC

12   Hospital to suggest that they add talc as a

13   potential risk factor for ovarian cancer on their

14   website?

15       A.   No, I have not.

16       Q.   Now we have a clear record.

17       Okay.  Are you familiar with SGO?

18       A.   Yes, I am.

19       Q.   Have you ever been on their website?

20       A.   I might have at some point.  I don't

21   recall.

22       Q.   Do you know if they list risk factors

23   for ovarian cancer?

24       A.   As I said, I don't recall when I have

25   been on their website.

Page 25

1        Q.   Well, why don't we take a look at it,

2    then.

3        MS. DAVIDSON:  Let's mark that as

4        Exhibit 1.

5        (MOORMAN EXHIBIT 1, Document titled

6        Ovarian Cancer Risk Factors, was marked for

7        identification.)

8        MS. PARFITT:  Jessica, I don't see a

9        date on this.  I may have missed it.

10       MR. TRANGLE:  There's not on the

11       website.

12       MS. PARFITT:  So if we could just have

13       a representation of what date.

14       MR. TRANGLE:  It's in January 2024.

15       MS. PARFITT:  January 2024.  Is there

16       a specific date in January 2024?  You knew

17       I was going to ask you that.

18       MR. TRANGLE:  Yeah.

19       MS. DAVIDSON:  You can access it now.

20       Make sure it hasn't changed, Asher, while

21       we're talking about it.

22       MR. TRANGLE:  I can do that as well.

23   BY MS. DAVIDSON:

24       Q.   Do you see talc on the list of risk

25   factors?

Patricia G. Moorman, Ph.D.

Page 26

1    A.  Let me look through.
2        MS. PARFITT:  What exhibit is this?
3        THE REPORTER:  1.
4        MS. DAVIDSON:  Asher has just
5    represented that it has not changed as of
6    today, which is February 13, 2024.
7        MS. PARFITT:  All right.  So Exhibit 1
8    is a reflection of what appears on the
9    website for SGO as of --
10       MR. TRANGLE:  February --
11       MS. PARFITT:  -- February 13th --
12   thank you -- 2024.  Thank you.
13       THE WITNESS:  No, this list of risk
14   factors does not include talc.
15  BY MS. DAVIDSON:
16       Q.  Do you disagree with the SGO's
17  decision not to list talc here?
18       A.  I don't know what their process is for
19  making these determinations.  I -- I agree with
20  Health Canada, which went through a very thorough
21  systematic review of the literature and came to
22  the conclusion that it was a risk factor.  I don't
23  know that they have gone through a similar process
24  to arrive at that.
25       Q.  Have you -- have you contacted SGO to

Page 27

1   find out what process they did go through?
2        A.  No, I have not.
3        Q.  Have you contacted SGO to tell them
4   you disagree with them?
5        A.  No, I have not.
6        Q.  We've talked about the NCI PDQ with
7   you before.  When I say "we," that's a collective
8   royal "we."  Whoever deposed you in 2019 -- I
9   believe it was Scott James at Shook Hardy -- you
10  guys talked about NCI's PDQ.  Do you recall that?
11       A.  Vaguely.  Yes, I do vaguely recall.
12       Q.  And you're aware that that PDQ was
13  updated in 2023?
14       MS. PARFITT:  Objection.
15       THE WITNESS:  I am.  And I'm aware
16   that it has been updated.  I don't know the
17   exact date when it was updated.
18  BY MS. DAVIDSON:
19       Q.  And you're aware that as of that
20  update, which was October 2023, the NCI PDQ says
21  there's inadequate evidence of an association,
22  correct?
23       A.  Could we bring up that document since
24  you brought it up?
25       Q.  Yeah, I don't have any other -- I

Page 28

1   mean, we'll bring it up later.  I'm just -- I'm
2   just wondering if you have reached out to the NCI
3   PDQ to suggest that they revise what they have
4   written about talc.
5        A.  I have not.  You know, I hope that we
6   will talk about that more, because I think that
7   their description of what they've put in their
8   report I think is not a thorough review of the
9   evidence.  I think that there is some
10  contradictory information, not only within the
11  talc statement, but also I think that there is
12  some contradiction or some inconsistency in the --
13  what they consider adequate evidence for other
14  risk factors as compared to talc.
15       Q.  Have you ever reached out to anyone
16  involved in the NCI PDQ to share this opinion?
17       A.  No, I have not.
18       Q.  When you talk about other risk
19  factors, are you talking about breastfeeding?
20       MS. PARFITT:  Objection to form.
21       THE WITNESS:  That is one of the --
22   well, it's actually a protective factor.
23   That is not particularly what I had in
24   mind.
25  BY MS. DAVIDSON:

Page 29

1        Q.  At your last deposition, you mentioned
2   breastfeeding as -- you're right, it's a
3   protective factor, but as a factor -- let's say,
4   as a factor which you thought there was equal
5   evidence.  Are there other factors you have in
6   mind?
7        MS. PARFITT:  Objection.  Form.
8        THE WITNESS:  Yes, there are at least
9    two other factors that I can think of.
10  BY MS. DAVIDSON:
11       Q.  What are those two factors?
12       A.  The -- again, it would be very helpful
13  if we could --
14       MS. DAVIDSON:  We're going to look at
15   the PDQ later.  She said she has two
16   factors in mind.  I want to know what those
17   are, and then we'll look at the --
18       MS. PARFITT:  Okay.
19       MS. DAVIDSON:  -- PDQ later.
20       MS. PARFITT:  Jessica, we can do it --
21   your deposition.  Believe me --
22       MS. DAVIDSON:  Correct.
23       MS. PARFITT:  -- I'm not trying to
24   control it.  But if you're going to talk
25   about that -- it was fine to ask the

Page 30

1  question about whether or not she has
2  complained to them about --
3      MS. DAVIDSON: I understand.
4      MS. PARFITT: -- her opinion --
5      MS. DAVIDSON: But she just said, I
6  have two factors in mind.
7      MS. PARFITT: She can identify them --
8      MS. DAVIDSON: Yeah.
9      MS. PARFITT: -- but that's all she'll
10  do.
11      MS. DAVIDSON: And that's all I want.
12      MS. PARFITT: If there's any further
13  explanation --
14      MS. DAVIDSON: Yeah. I'm not --
15      MS. PARFITT: -- we'll wait till you
16  have the document --
17      MS. DAVIDSON: Correct.
18      MS. PARFITT: -- in front of you.
19      MS. DAVIDSON: I completely agree.
20  We're on the same page.
21      THE WITNESS: Okay. One of them is
22  the DMPA, the depot medroxyprogesterone
23  acetate.
24  BY MS. DAVIDSON:
25      Q. Uh-huh. And the other?

Page 31

1      A. The other one is obesity --
2      Q. Okay. Got it.
3      A. -- or body mass index.
4      Q. Thanks. Those were all my questions.
5  Are you familiar with the CDC?
6      A. Yes, I am.
7      Q. Is that a highly respected
8  organization?
9      A. Generally, yes.
10      Q. Is ACOG a highly respected
11  organization?
12      A. Yes. Generally, it is.
13      Q. Is SGO a highly respected
14  organization?
15      A. I would say, generally, it is, yes.
16      Q. The CDC is considered a respected
17  authority on public health issues, right?
18      A. Please repeat that.
19      MS. DAVIDSON: Did you get it?
20      THE REPORTER: Yes.
21      (The following question was read back:
22      Q: The CDC is considered a respected
23  authority on public health issues, right?)
24      THE WITNESS: Generally, yes.
25  BY MS. DAVIDSON:

Page 32

1      Q. Have you taken a look at the CDC
2  website to see the list of risk factors they have
3  for ovarian cancer?
4      A. I have. I don't remember the last
5  time I looked at it.
6      Q. The last time you looked, was talc on
7  the list?
8      MS. PARFITT: Objection.
9      THE WITNESS: I don't remember
10      specifically. I just don't remember.
11  BY MS. DAVIDSON:
12      Q. Do you believe the CDC should have
13  talc listed as a risk factor for ovarian cancer?
14      A. It is my opinion that talc is a risk
15  factor for ovarian cancer. And, yes, I would -- I
16  think that it would be a good thing to include.
17      Q. Have you ever reached out to the CDC
18  and told them that?
19      A. I have not.
20      Q. So just to make sure I've got your
21  testimony right, you've never reached out to ACOG,
22  SGO, NCI PDQ, CDC, Duke or North Carolina to
23  suggest that any of them add talc as a risk factor
24  for ovarian cancer, correct?
25      A. I have not. I feel like my -- my work

Page 33

1  speaks for itself.
2      Q. And when you say your work, you're
3  referring to the Davis paper?
4      A. I'm referring not only to that --
5  that's the most recent one -- but also the
6  previous papers published related to talc.
7      Q. And what are those previous papers?
8      A. The -- Schildkraut was the first
9  author. That was 2016-ish. And then also
10  published a paper from the North Carolina ovarian
11  cancer study much earlier that also provided data
12  on talc and ovarian cancer. That was probably, I
13  don't know, 2009-ish.
14      Q. In the Schildkraut paper, in the
15  conclusions, did you guys state that talc causes
16  ovarian cancer?
17      MS. PARFITT: Can she have a copy?
18      MS. DAVIDSON: She wrote it.
19      MS. PARFITT: Jessica, she may have
20      written it, but it was back in 2016.
21      MS. DAVIDSON: Okay.
22      MS. PARFITT: Do you think it's
23  fair --
24  BY MS. DAVIDSON:
25      Q. Do you recall -- do you recall whether

Patricia G. Moorman, Ph.D.

Page 34

1 the Schildkraut paper states that talc causes
2 ovarian cancer?
3       MS. PARFITT:  Let's get the paper.
4       MS. DAVIDSON:  Michelle, it's my
5 deposition.  I will give her the article if
6 we're asking any further --
7       THE WITNESS:  May I --
8       MS. DAVIDSON:  -- questions beyond
9 this one.
10       THE WITNESS:  May I see?
11       MS. DAVIDSON:  I'm just asking if she
12 recalls.
13       MS. PARFITT:  She's asking for it.
14 BY MS. DAVIDSON:
15       Q.  Do you recall, sitting here,
16 whether --
17       A.  I would like to --
18       MS. PARFITT:  She's asked for the
19 paper, Jessica.
20       THE WITNESS:  I would just like to --
21       MS. DAVIDSON:  I just want to know if
22 she recalls.  If the answer is no, we'll
23 move on, and we can look at the paper
24 later.
25       MS. PARFITT:  The other response could

Page 35

1 be that I can't respond to your question
2 because you won't give me the paper.
3       MS. DAVIDSON:  That -- that's called
4 coaching the witness.
5       MS. PARFITT:  Well --
6 BY MS. DAVIDSON:
7       Q.  Do you recall, sitting here today,
8 without looking at the paper whether it states
9 that talc causes ovarian cancer?
10       MS. PARFITT:  The witness has asked
11 for the paper.
12       MS. DAVIDSON:  I understand.
13       MS. PARFITT:  Counsel, as a
14 courtesy --
15       MS. DAVIDSON:  Okay.
16       MS. PARFITT:  -- could you please give
17 her the paper, and she'll give you a
18 response to your question.  I assure she
19 will.
20       MS. DAVIDSON:  And then if I ask any
21 further questions about the paper beyond
22 this one, I will show her the paper.
23       MS. PARFITT:  No.
24 BY MS. DAVIDSON:
25       Q.  I would just like to know whether

Page 36

1 sitting here today --
2       MS. DAVIDSON:  Are you instructing her
3 not to answer?
4       MS. PARFITT:  I am instructing her to
5 answer a question when the witness has said
6 to you, Counsel, I would like to have a
7 copy of the paper and I'll answer --
8       MS. DAVIDSON:  I understand.
9       MS. PARFITT:  -- your one question,
10 and you refuse to give it to her.
11       MS. DAVIDSON:  Because I just --
12       MS. PARFITT:  Just hand her the paper.
13       MS. DAVIDSON:  I wanted to know what
14 she recalls.
15 BY MS. DAVIDSON:
16       Q.  Do you recall whether the
17 Schildkraut --
18       MS. PARFITT:  It's not a memory test.
19       MS. DAVIDSON:  Okay.  Thank you.
20       MS. PARFITT:  It's not a memory test.
21 BY MS. DAVIDSON:
22       Q.  Do you recall whether the Schildkraut
23 paper says in its conclusion that talc causes
24 ovarian cancer?
25       MS. PARFITT:  If you can answer that

Page 37

1 question.
2       THE WITNESS:  I do not recall the
3 exact phrasing that we used.  I -- I
4 believe that we certainly -- the conclusion
5 indicated that we found increased risk of
6 ovarian cancer.  The exact phrasing, I
7 don't recall.  It's a paper, as we know,
8 that was published seven years ago.
9 BY MS. DAVIDSON:
10       Q.  The same question as to Davis:  Do you
11 recall in Davis, a much more recent paper, whether
12 you said in the conclusion that talc causes
13 ovarian cancer?
14       MS. PARFITT:  Jessica, I am going to
15 object.  I really want --
16       MS. DAVIDSON:  These --
17       MS. PARFITT:  -- this to go in a
18 conciliatory manner.
19       MS. DAVIDSON:  Okay.
20       MS. PARFITT:  I really do.  This is --
21 why don't you just show her the paper.
22       MS. DAVIDSON:  Okay, Michelle.  I will
23 when we get into these topics with more
24 detail.  Right now, I'm just asking a very
25 general question --

Page 38

1    MS. PARFITT:  It's --
2    MS. DAVIDSON:  -- whether you recall
3  whether Davis concludes that talc causes
4  ovarian cancer --
5    MS. PARFITT:  I'm going to object --
6    MS. DAVIDSON:  -- and the simple
7  answer is "no" if she doesn't recall,
8  Michelle.
9    MS. PARFITT:  It's not a question --
10    MS. DAVIDSON:  Michelle --
11    MS. PARFITT:  -- of whether she
12  recalls, Jessica.
13    MS. DAVIDSON:  But that's my question.
14    MS. PARFITT:  But she's telling you --
15    MS. DAVIDSON:  Okay.
16    MS. PARFITT:  -- she can answer the
17  question accurately if you give her --
18    MS. DAVIDSON:  Okay.
19    MS. PARFITT:  -- the paper.  Isn't
20  that what you want?
21  BY MS. DAVIDSON:
22    Q.  My question is whether you recall that
23  about Davis.
24    MS. PARFITT:  If you can't answer
25  without the paper, tell her.

Page 39

1    MS. DAVIDSON:  That's the question,
2  "Do you recall?"  If she can't recall
3  without the paper, the answer is "no."
4    MS. PARFITT:  There's -- don't even
5  ask the question.
6    MS. DAVIDSON:  Okay.
7  BY MS. DAVIDSON:
8    Q.  Okay.  Do you recall in the Davis
9  paper, which is quite recent, whether the authors,
10  including you, conclude that talc causes ovarian
11  cancer?
12    MS. PARFITT:  I am going to instruct
13  you not to answer the question.
14    If you want to take that one to the
15  judge, I'll be happy to do that, too, and
16  indicated to counsel she asked for the
17  paper; you won't give it to her.  How do
18  you want to go?
19  BY MS. DAVIDSON:
20    Q.  Are you refusing to answer that
21  question, whether you recall that?
22    MS. PARFITT:  I'm telling her not to
23  answer the question if you won't give her
24  the document.
25    Don't answer.  Put it down.  We can

Page 40

1  take it to the judge.
2    MS. DAVIDSON:  We will do so.
3    Let's take a break.
4    MS. PARFITT:  Yes.
5    * * *
6    (Whereupon, there was a recess in the
7  proceedings from 9:43 a.m. to 9:50 a.m.)
8    * * *
9  BY MS. DAVIDSON:
10    Q.  Dr. Moorman, can you recall, sitting
11  here today, any paper you have ever published
12  outside the litigation in which you state that
13  talc causes ovarian cancer?
14    MS. PARFITT:  Objection.
15    THE WITNESS:  I -- what is more
16  typical in papers -- in the papers that we
17  write, we describe what is -- whether talc
18  shows increased risk and so on.
19    There is actually quite a literature
20  about using the word "cause."  Sometimes
21  people will object to using the word
22  "cause" if it does not come from a
23  randomized control trial.
24    The literature -- one author who
25  discussed this -- I believe his last name

Page 41

1  was Hernan -- talked about that is a
2  disservice, because, of course, when we are
3  doing observational epidemiology, when
4  we're looking at risk factors, we are
5  trying to identify causes of disease.
6  And -- so this literature actually
7  advocated more use of what he termed as the
8  "C-word."
9    But generally, it is more common
10  that -- described we observed increased
11  risk, for example, with talc use in ovarian
12  cancer.
13  BY MS. DAVIDSON:
14    Q.  So that's a "no," you have never
15  actually published a paper outside this litigation
16  that states talc causes ovarian cancer --
17    MS. PARFITT:  Objection.
18  BY MS. DAVIDSON:
19    Q.  -- correct?
20    MS. PARFITT:  She's answered the
21  question.
22    MS. DAVIDSON:  You -- you interrupted
23  me.
24    MS. PARFITT:  Sorry about that.  Are
25  you done?  Object --

Page 42

1  BY MS. DAVIDSON:
2      Q.  Do you need me to repeat the question
3  since it was interrupted?
4      A.  Please repeat the question.
5          MS. DAVIDSON:  Can you repeat it?
6          (The following question was read back:
7          Q:  So that's a "no," you have never
8      actually published a paper outside this
9      litigation that states talc causes ovarian
10     cancer, correct?)
11         MS. PARFITT:  Objection.  Asked and
12     answered.
13         THE WITNESS:  I -- I believe that I
14     did answer the question that I --
15  BY MS. DAVIDSON:
16     Q.  Okay.  So Michelle's objections are
17  for the record.  They're not intended to coach --
18  they are not supposed to coach you in your answer.
19  I'm -- I'm allowed to ask the question
20  differently, and I want to make sure I have your
21  testimony clear.  So can you please answer the
22  question?
23     A.  Okay.
24         MS. PARFITT:  Objection.
25         THE WITNESS:  I do not recall writing

Page 43

1      a paper outside of this litigation where I
2      said that talc causes ovarian cancer.
3  BY MS. DAVIDSON:
4      Q.  Thank you.  We can move on, then.
5          Could you remind me the name of the
6  lawyer who you worked with on your 2021 report?
7      A.  His name was Steve Faries, spelled
8  F-A-R-I-E-S.
9      Q.  And were the MDL lawyers involved at
10  all in that report?
11     A.  The only person I recall speaking with
12  on that was Mr. Faries.
13     Q.  Did you share that report with MDL
14  lawyers in 2021?
15     A.  I did not.
16     Q.  When did you first share that report
17  to MDL lawyers?
18     A.  Probably sometime in 2023.  I had
19  essentially no contact with the MDL lawyers while
20  all the bankruptcy stuff was going on.
21     Q.  Did you follow the bankruptcy in the
22  class?
23     A.  I read some news articles about it.
24  Yes, I did.
25     Q.  So your first MDL report was dated

Page 44

1  2018, I think; is that right?  2018?
2          MS. PARFITT:  November 16th, 2018.
3          THE WITNESS:  That sounds right.
4  BY MS. DAVIDSON:
5      Q.  Have you conducted a new Bradford Hill
6  analysis since then?
7          MS. PARFITT:  Objection.  Form.
8          You can answer.
9          THE WITNESS:  No.  I -- there has been
10     some additions to the data, but generally,
11     I think that the new data support the
12     conclusions that I -- that I made from that
13     original Bradford Hill analysis.
14  BY MS. DAVIDSON:
15     Q.  But there's nowhere I can go to see a
16  revised or updated Bradford Hill analysis, right?
17     A.  No.
18         MS. PARFITT:  Objection.  Form.
19  BY MS. DAVIDSON:
20     Q.  Okay.  I see you brought two binders
21  today.
22     A.  Yes.
23     Q.  What are those binders?
24     A.  These binders contain the updated
25  reports, the one from 2021, the one from 2023 and

Page 45

1  the -- largely, the articles that were cited or
2  some papers that I was aware of that had been
3  published since 2019.
4      Q.  And who put those binders together?
5      A.  They were put together by Michelle's
6  office.  You know, I had provided largely -- you
7  know, these were the articles, and they -- they
8  assembled the binders.
9      Q.  And do you have notes in there?
10     A.  No, I do not.
11     Q.  Do you have an updated list of
12  materials considered?
13     A.  A complete merging what -- from
14  everything from the --
15     Q.  Everything you've considered in the
16  MDL proceeding.
17     A.  I have this list of references that
18  are in these binders.  It is not combined into a
19  single list with what I had -- had previously been
20  submitted back when I have been deposed
21  previously.
22         MS. PARFITT:  And for the record,
23     Jessica, there were probably two Dropboxes.
24     One back in 2018, when she was deposed in
25     2019, we provided a very complete Dropbox

Patricia G. Moorman, Ph.D.

Page 46

1   of all the articles.  And then again in
2   2023, we've also provided you with a
3   Dropbox of all the articles --
4        MS. DAVIDSON:  But you don't have a
5   list?  You never put them on a list.
6        MS. PARFITT:  It is a list.  It is a
7   list.  If you go to your -- if you go to --
8        MS. DAVIDSON:  It's not a list.  It's
9   just a bunch of articles, according to
10  Asher.
11       MS. PARFITT:  Well, it's --
12       MS. DAVIDSON:  I mean, we made our own
13  list.
14       MS. PARFITT:  Well, it's -- it's -- I
15  would call it a list.  Our office put
16  together a list.  What you have in that
17  Dropbox is a collection of articles.
18       MS. DAVIDSON:  But you don't have a
19  piece of paper that says "Materials
20  Reviewed" like we usually do for an expert.
21       MS. PARFITT:  It was a Dropbox.  I
22  didn't prepare it.  It was a Dropbox of all
23  the articles.  Maybe it didn't have perfect
24  titles to -- I mean, didn't have a specific
25  title --

Page 47

1        MS. DAVIDSON:  We couldn't find, like,
2   a materials reviewed list.
3        MS. PARFITT:  Gotcha.  Okay.  I
4   think --
5        MS. DAVIDSON:  If there was one,
6   that's what I'm asking.
7        MS. PARFITT:  Yeah, I don't believe
8   there was.
9        MS. DAVIDSON:  Okay.
10       MS. PARFITT:  It was just a Dropbox of
11  all the materials.  I think that's what we
12  received from you-all as well, not always
13  an assembly of a list of them in addition
14  to the documents.
15  BY MS. DAVIDSON:
16       Q.  Do you agree that whenever you're
17  reviewing scientific literature it's important to
18  know potential sources of bias?
19       A.  Yes, it is important to consider
20  potential sources of bias.  Yes.
21       Q.  Are conflicts of interest a potential
22  source of bias?
23       A.  A potential source of bias, yes.
24       Q.  All things being equal, would you have
25  fewer bias concerns with a paper published by a

Page 48

1   neutral author than one published by a defense
2   expert?
3        MS. PARFITT:  Objection.
4        THE WITNESS:  I will tell you what I
5   taught my students when I would teach them
6   how to read a paper and going through the
7   various parts of the paper, including the
8   acknowledgments, the funding sources.
9        I said, if there is some mention of,
10  like, a drug study funded by Big Pharma or
11  someone working as a consultant, it is
12  important to note that, but they should not
13  disregard the findings of that paper just
14  on that basis.
15       They should do -- just look at it like
16  any other paper, the methodology, how they
17  report the findings, their interpretation
18  of the findings.  And if there is anything
19  that seems concerning, they should take
20  that into account, but it's not a reason to
21  discount the findings from a paper.
22  BY MS. DAVIDSON:
23       Q.  Do you give any more weight when
24  you're reviewing a study to one where the authors
25  don't have any ties to litigation?

Page 49

1        A.  I think that I look at the
2   methodology.  I -- I just look at -- that weighs
3   more than any of the -- you know, who it's funded
4   by or anything.  Is their methodology, their
5   interpretation appropriate?  That's what I give
6   weight to.
7        Q.  Did you numerically assign grades to
8   the various epidemiological studies on talc?
9        A.  Did I assign grades to --
10       Q.  What grades or weights -- like, is --
11  is there a way for me to know how you weighed each
12  study, like a quantitative weighing?
13       A.  No.  I -- I did not.
14       Q.  So someone reading your report -- is
15  there a way for someone reading your report to
16  know which studies you assigned more weight to and
17  which studies you assigned less weight to?
18       MS. PARFITT:  Objection.
19       THE WITNESS:  I provided a narrative
20  of what I considered strengths and
21  limitations of the studies, and if I had
22  concerns about a study, I tried to use -- I
23  tried to explain why I had concerns about a
24  given study.
25  BY MS. DAVIDSON:

Patricia G. Moorman, Ph.D.

Page 50

1    Q.  Are you aware of any letter to the
2  editor of any scientific journal about talc and
3  ovarian cancer written by somebody who's not
4  plaintiff's expert?
5         MS. PARFITT:  Objection.
6         THE WITNESS:  I have seen some letters
7    to the editor like that, yes.
8  BY MS. DAVIDSON:
9    Q.  And can you recall what they are?
10    A.  Right offhand, I can't recall the
11  authors, no, not off the top of my head.
12    Q.  When do you recall seeing a letter to
13  the editor of a journal involving talc and ovarian
14  cancer that was not written by a plaintiff's
15  expert?
16         MS. PARFITT:  Asked and answered.
17         THE WITNESS:  I'm -- you're asking me
18    to recall when and -- I mean, I read the
19    literature on a routine basis.  When did
20    I -- I see it?  I -- I don't know.  I can't
21    give an answer to that.
22  BY MS. DAVIDSON:
23    Q.  But you're confident that such a
24  letter exists?
25    A.  I feel like I have read letters to the

Page 51

1  editor, yes, yeah.
2    Q.  You feel like you have read letters to
3  the editor that were not by a plaintiff's expert?
4    A.  Yes.
5    Q.  Do you recall whether any of the
6  letters involving the O'Brien paper involved
7  plaintiffs' experts?  I'm sorry.  That was not a
8  good question.
9         Do you recall whether anyone who is
10  not a plaintiff's expert has written a letter to
11  the editor regarding O'Brien?
12    A.  I -- I don't -- I don't recall.  I
13  just -- I don't know.  And, you know -- and, also,
14  there are numerous -- more than one paper by
15  O'Brien, and so I don't know --
16    Q.  Any O'Brien paper.  Do you know
17  whether anybody has ever written a letter to an
18  editor with respect to any O'Brien paper who is
19  not a plaintiff's expert?
20         MS. PARFITT:  Objection.
21         THE WITNESS:  I don't know the answer
22    to that.
23  BY MS. DAVIDSON:
24    Q.  Is O'Brien an expert in this
25  litigation?

Page 52

1    A.  O'Brien?  I truly do not know the full
2  list of experts.  I don't -- to my knowledge, she
3  is not, but I don't know.
4    Q.  When you read the O'Brien, Wentzensen
5  papers, did you look to see whether they had any
6  conflicts of interest?
7    A.  I probably did when I read the paper.
8  That's part of what I typically do.  I don't
9  recall whether they reported any conflicts of
10  interest.  At this moment, I don't recall.
11    Q.  Would that have weighed into your
12  evaluation of the O'Brien, Wentzensen papers?
13         MS. PARFITT:  Objection.  Form.
14         THE WITNESS:  It is just -- as I
15    stated before, that is a factor that is
16    considered, but it is not -- if it's a good
17    paper, it doesn't matter.  I mean, if, you
18    know, there -- I would, again, review the
19    methodology, how they described results,
20    their interpretation of it, and that would
21    be -- drive my opinion more so than who
22    might be supporting any of the work or any
23    potential conflicts of interest.
24  BY MS. DAVIDSON:
25    Q.  Had you heard of Dr. O'Brien before

Page 53

1  this litigation?
2    A.  If I'm not mistaken, she might have
3  done her Ph.D. work at UNC.  I'm not absolutely
4  sure.  And so I think I might have seen her name
5  sometime along -- along the way as, like, a
6  doctoral student.  But I can't -- I'm not --
7    Q.  Do you have any reason to think she's
8  biased?
9         MS. PARFITT:  Objection.
10         THE WITNESS:  Do I have any reason to
11    think she's biased?  I have never met her,
12    talked about -- I've only seen her --
13    what -- I only know her through the work
14    that she has published.
15  BY MS. DAVIDSON:
16    Q.  So you have no basis to doubt her
17  credibility?
18         MS. PARFITT:  Objection.
19         THE WITNESS:  I said I -- I don't know
20    her personally.  I only know some of the
21    papers that she has written, so...
22  BY MS. DAVIDSON:
23    Q.  Are you familiar with Dr. Wentzensen?
24    A.  I -- again, I might have met him at
25  some meeting years ago, but I don't know him

Patricia G. Moorman, Ph.D.

Page 54

¹ personally.  I know some of his work.  I've read
² his papers over the years.
³     Q.  Do you have any reason to believe that
⁴ Dr. Wentzensen is biased?
⁵     A.  Again, I do not know him personally.
⁶ I only know him for his work.  I have no basis to
⁷ make that judgment.
⁸     Q.  Are you familiar with JAMA?
⁹     A.  I'm sorry?
¹⁰     Q.  Are you familiar with JAMA?
¹¹     A.  JAMA, the journal?
¹²     Q.  (Nods head.)
¹³     A.  Yes.
¹⁴     Q.  Is JAMA considered a prestigious
¹⁵ publication?
¹⁶     A.  Yes, it's a very well-regarded
¹⁷ journal.
¹⁸     Q.  Are you offering any opinions in this
¹⁹ litigation about subtypes of ovarian cancer?
²⁰     A.  My -- my opinion is to -- related to
²¹ ovarian cancer overall.  I certainly am aware of
²² some data on subtypes that has been published, but
²³ my opinion is related to ovarian cancer overall.
²⁴     Q.  So are you offering opinions
²⁵ specifically, for example, about clear cell?

Page 55

¹     A.  I -- I said my opinion is related to
² epithelial ovarian cancer overall.
³     Q.  Do you have an opinion as to whether
⁴ there's sufficient data to conclude that talc use
⁵ can cause clear cell cancer?
⁶         MS. PARFITT:  Objection.  This was
⁷     addressed -- you tell me if it wasn't,
⁸     Jessica; and I'm going to try to limit
⁹     these objections as well -- back at the
¹⁰     time of her original deposition where she
¹¹     was exhaustively, another eight-hour
¹²     deposition, asked about risk factors.  And
¹³     I've let you talk about those.  You made
¹⁴     them relevant, but certainly about the
¹⁵     subtypes.
¹⁶         MS. DAVIDSON:  There's been four
¹⁷     years --
¹⁸         MS. PARFITT:  So I'm not sure where
¹⁹     you're going.
²⁰         MS. DAVIDSON:  I'm going to the fact
²¹     that there's been four years of litigation.
²² BY MS. DAVIDSON:
²³     Q.  So sitting here in 2024 --
²⁴         MS. DAVIDSON:  I'm sorry.  Of science.
²⁵ BY MS. DAVIDSON:

Page 56

¹     Q.  Sitting here in 2024, do you believe
² there is sufficient scientific data from which to
³ conclude that talc use can cause clear cell
⁴ carcinoma?
⁵     A.  Most of the papers addressed ovarian
⁶ cancer overall, epithelial ovarian cancer as a
⁷ whole.  And that is what my opinion is based on.
⁸         MS. DAVIDSON:  Can you repeat the
⁹     question?
¹⁰ BY MS. DAVIDSON:
¹¹     Q.  I don't think you answered the
¹² question as asked.
¹³         MS. PARFITT:  Disagree.
¹⁴         (The following question was read back:
¹⁵         Q:  Sitting here in 2024, do you
¹⁶         believe there is sufficient scientific data
¹⁷         from which to conclude that talc use can
¹⁸         cause clear cell carcinoma?)
¹⁹         THE WITNESS:  I believe that there is
²⁰         sufficient evidence that talc can cause
²¹         ovarian cancer.  What has been reported in
²²         the literature is mostly focused on
²³         epithelial ovarian cancer as a whole.
²⁴         The -- that's -- I mean, that's what I have
²⁵         based my opinion on.  I have not expressed

Page 57

¹ an opinion specifically about clear cell.
² BY MS. DAVIDSON:
³     Q.  Do you know how many bellwether
⁴ plaintiffs there are --
⁵         MS. PARFITT:  I'm sorry.  I didn't --
⁶ BY MS. DAVIDSON:
⁷     Q.  -- in this litigation?
⁸     A.  Please --
⁹         MS. PARFITT:  I -- I didn't hear you,
¹⁰     Jessica.
¹¹         THE WITNESS:  Your --
¹² BY MS. DAVIDSON:
¹³     Q.  Do you know how many bellwether
¹⁴ plaintiffs there are in this litigation?
¹⁵     A.  I'm not sure.  I really don't know for
¹⁶ sure.
¹⁷     Q.  Have you reviewed any materials
¹⁸ regarding the actual plaintiffs in this
¹⁹ litigation?
²⁰     A.  No, I have -- I have not.
²¹     Q.  Do you know what subtypes of ovarian
²² cancer the -- the six bellwether plaintiffs --
²³ there are six -- have been diagnosed with?
²⁴     A.  Okay.  I just told you that I have not
²⁵ received -- or I have not reviewed any of the

Page 58

1  individual information on those, you now tell me,
2  six women.  So, obviously, I do not know what type
3  of ovarian cancer they had.
4      Q.  And you also don't know how long they
5  claim to have used Johnson's Baby Powder?
6      A.  Once again, I have not reviewed any
7  specific information about those patients.
8      Q.  All right.  Let's look at O'Brien
9  2020, which we're going to mark as Exhibit 2.
10         (MOORMAN EXHIBIT 2, JAMA - Association
11     of Powder Use in the Genital Area With Risk
12     of Ovarian Cancer, was marked for
13     identification.)
14  BY MS. DAVIDSON:
15      Q.  Why don't you just use the one that
16  we're --
17      A.  Okay.
18      Q.  -- for the record.
19      A.  All right.  I'm happy to do so.
20         MS. DAVIDSON:  Michelle, do you want
21     one, or you've got your own?
22         MS. PARFITT:  I'm just keeping a
23     little collection here.
24         (Off-the-record conference.)
25  BY MS. DAVIDSON:

Page 59

1      Q.  How many women in total were included
2  in the O'Brien paper?
3      A.  How many people in total?
4      Q.  A cohort sample?
5      A.  The total size of the cohort, that's
6  reported in Table 1, and it was 257,044 women.
7      Q.  And if we could look at Table 2.  What
8  was the adjusted hazard ratio for exposure to talc
9  and the development of ovarian cancer?
10      A.  For all women, it was -- the hazard
11  ratio was 1.08.  For women with a patent
12  reproductive tract, 1.13.
13      Q.  And if we're looking at the top half
14  of Table 2, "Ever Use Powder in the Genital Area,"
15  are any of those adjusted hazard ratios
16  statistically significant?
17      A.  No, they are not.
18      Q.  Did you include this breakdown by
19  cohort in your report?
20      A.  I did not report it for each cohort,
21  no.  I -- I reported the overall.
22      Q.  Did the authors find a significant
23  association between long-term talc use and ovarian
24  cancer for patent women?
25      A.  They reported an adjusted relative

Page 60

1  risk of 1.0.
2      Q.  So that's not an association?
3         MS. PARFITT:  Objection.
4         THE WITNESS:  Correct.
5  BY MS. DAVIDSON:
6      Q.  You would agree that there's no
7  association in this paper between long-term talc
8  use and ovarian cancer for patent women only,
9  right?
10      A.  As we have pointed out many times in
11  reports, long-term use can reflect a variety of
12  patterns of use.  It could be a couple of times a
13  year on really hot summer days over 20 years.  But
14  it doesn't tell you how frequently they used it.
15         And so, ideally, you would like to
16  have some measure that was a measure of the total
17  exposure, which would be a combination of the
18  years of use and the frequency of use.
19      Q.  Do you recall my question?
20      A.  I -- you answered -- I believe that I
21  answered that it showed --
22         MS. DAVIDSON:  What was my question?
23     Can you repeat it, because the answer
24     didn't relate to the question?
25         MS. PARFITT:  Objection.

Page 61

1         (The following question was read back:
2         Q:  You would agree that there's no
3     association in this paper between long-term
4     talc use and ovarian cancer for patent
5     women only, right?)
6         THE WITNESS:  Okay.  I already --
7         MS. PARFITT:  Asked and answered.
8         THE WITNESS:  I answered the question
9     that the relative risk was 1, which was no
10     association.
11  BY MS. DAVIDSON:
12      Q.  Thank you.
13         MS. PARFITT:  Wait.  Have you
14     finished?
15  BY MS. DAVIDSON:
16      Q.  Did you include that in your report?
17      A.  I don't believe that I did.
18      Q.  Okay.  Have you looked at Table 4 of
19  O'Brien?
20      A.  I have.
21      Q.  I'm sorry?
22      A.  I have looked at it.
23      Q.  And what does Table 4 address?
24      A.  This addresses the relationship
25  between talc use and ovarian cancer by various

Patricia G. Moorman, Ph.D.

Page 62

1  subcategories of ovarian cancer.  And they limited
2  it to all medically confirmed cases.  And so they
3  looked at it by invasiveness, by tumor location,
4  histotype and then another categorization of
5  histotype.
6      Q.  If you looked at all medically
7  confirmed cases, what was the hazard ratio for
8  frequent use?
9      A.  It was 1.05.
10     Q.  With a confidence interval of?
11     A.  .92 to 1.20.
12     Q.  Is that statistically significant?
13     A.  It is not.
14     Q.  Did you include in your report any
15  discussion of Table 4?
16     A.  I don't believe that I did.
17     Q.  And did you include in your report any
18  discussion of O'Brien's subset analysis with
19  respect to histotypes?
20     A.  I don't believe that I did in that
21  report.
22     Q.  Does O'Brien find a statistically
23  significant hazard ratio for any histological
24  subtype?
25     A.  Within the subtypes, they found

Page 63

1  relative risk greater than 1 for serous,
2  endometrioid, mucinous, and clear cell, but the
3  confidence intervals for each of those included 1.
4  So they were not statistically significant.
5      Q.  Fair to say there isn't a single
6  statistically significant hazard ratio in Table 4?
7      A.  No.  All of the confidence intervals
8  in this table include 1.
9      Q.  Do you believe that larger sample
10  sizes make a study more reliable?
11     A.  In and of itself, sample size alone
12  does not make a reliable study.  You can have a
13  very good large study.  You can have a really poor
14  large study.  It's just one --
15         MS. PARFITT:  Please let her finish.
16         THE WITNESS:  It's just one
17     consideration in evaluating the study.
18  BY MS. DAVIDSON:
19     Q.  I totally understand.  But is larger
20  sample size a strength that you would note when
21  you're discussing a study?
22     A.  It's something that would be
23  considered.  And larger sample sizes are
24  generally -- generally desirable.  But, again,
25  in -- you have to consider -- you have to consider

Page 64

1  not only the sample size, but also the number of
2  cases.  That's a very important consideration when
3  considering cohort studies.
4      Q.  How many cases were there in O'Brien?
5      A.  Overall, there were 2,213 cases.  The
6  number of cases by cohort varied considerably.  In
7  the Nurses' Health Study II, despite having 61,000
8  women in the cohort, there were only 76 cases.
9  The bulk of the cases came from the Nurses' Health
10  Study.  It was 1,258.
11     Q.  Have you conducted a power analysis of
12  this paper?
13     A.  I have not.
14     Q.  Do you recall in your 2018 report that
15  you criticized some of the cohort studies for
16  having what you believe to be was insufficient
17  follow-up time?
18     A.  I think that that was a comment that I
19  made, yes.
20     Q.  Did you, in your updated report,
21  address the fact that O'Brien added several years
22  of follow-up time for each of those cohort
23  studies?
24     A.  I did not specifically address that in
25  my report, no.

Page 65

1      Q.  Do you consider the longer follow-up
2  time to be a strength of the O'Brien paper?
3      A.  In general, longer follow-up is more
4  desirable.  It's one factor that is considered in
5  evaluating cohort studies.
6      Q.  So is that a strength of the O'Brien
7  paper, that it has longer follow-up for each of
8  the cohort studies?
9      A.  As compared to the original reports,
10  it could be a strength, yes.
11     Q.  How many years of follow-up does
12  O'Brien have, for example, for NHSI?
13         MS. DAVIDSON:  For you, "NHSI,"
14     Nurses' Health Study I.
15         THE WITNESS:  For the Nurses' Health
16     Study, they report a median follow-up time
17     of 33 years.
18  BY MS. DAVIDSON:
19     Q.  How about for WHI, Women's Health
20  Initiative?
21     A.  Yes, "WHI" is Women's Health
22  Initiative.  They report median follow-up time of
23  17 years.
24     Q.  How much weight do you give findings
25  that are slightly above 1.0 if the confidence

Page 66

1 interval crosses 1.0.
2     A.  I apologize.  It is --
3     Q.  Do you want to take a minute, or are
4 you okay?
5     A.  If you don't mind, just --
6     MS. PARFITT:  You want to do that just
7 get your voice.
8     THE WITNESS:  Yeah.
9 BY MS. DAVIDSON:
10    Q.  Yes.  Do you want to answer this
11 question and then take a minute, just because we
12 have a question pending?
13    A.  Okay.  So please repeat the question.
14    Q.  Okay.  If you don't remember the
15 question, we can take a break and then do it.
16    A.  Okay.  Thank you.
17    MS. DAVIDSON:  No problem.
18        * * *
19    (Whereupon, there was a recess in the
20    proceedings from 10:29 a.m. to 10:52 a.m.)
21        * * *
22 BY MS. DAVIDSON:
23    Q.  Do you know Dr. Clarke-Pearson?
24    A.  Only by reputation.  I might have met
25 him many years ago, but I don't know him

Page 67

1 personally.
2     Q.  I guess this is a bigger town than I
3 think.
4     MS. DAVIDSON:  I forgot the question I
5     had asked that was pending when we took our
6     break for the coughing.  Can you repeat the
7     question?
8     (The following question was read back:
9     Q: How much weight do you give
10    findings that are slightly above 1.0 if the
11    confidence interval crosses 1.0?)
12    THE WITNESS:  I think that
13    primarily --
14    (Brief interruption.)
15    (Off-the-record conference.)
16    THE WITNESS:  So when I look at
17    findings, it is -- I look at the point
18    estimate, the hazard ratio, relative risk,
19    odds ratio, and that tells the association
20    in that study.
21    Statistical significance is something
22    that I look at.  But I certainly do not
23    fall into the dichotomy that something is
24    statistically significant, that's an
25    association, and if it's not statistically

Page 68

1     significant, there is no association.
2 BY MS. DAVIDSON:
3     Q.  Are you aware of any medical journal
4 that does not require authors to include a
5 confidence interval in their epidemiological
6 studies?
7     A.  Some journals -- and, again, right off
8 the top of my head, I can't name which -- what are
9 the standards for each journal.  Some will report
10 only P values, but it is pretty common that
11 either -- that some measure of statistical
12 significance is included.
13    Q.  You're not aware of any paper that
14 doesn't require authors to indicate statistical
15 significance?
16    A.  You know, again, you're asking me
17 about the universe of journals, and I -- I just
18 don't know exactly what all their requirements
19 are.  I have stated that the most common thing is
20 that confidence intervals or sometimes P values
21 are reported.
22    Q.  I'm just getting at the fact that you
23 said the most common.  So I wasn't sure if you
24 were aware of anybody -- of any journal that
25 operates differently.

Page 69

1     A.  I can't think of any journal right
2 offhand.
3     Q.  Okay.  Why don't we mark your 2023
4 report as Exhibit 3.
5     All right.  Asher has corrected me,
6 and he thinks I want to mark as Exhibit 3 your
7 2021 supplemental report.  He's convenient to have
8 around.
9     (MOORMAN EXHIBIT 3, Addendum to Rule
10    26 Expert Report of Patricia G. Moorman,
11    MSPH, Ph.D. dated 11/16/18, Date:
12    April 21, 2021, was marked for
13    identification.)
14 BY MS. DAVIDSON:
15    Q.  We're marking as Exhibit 3 a 2021
16 report addendum to Rule 26 expert report of
17 Patricia Moorman.
18    In your 2021 paper, you have a
19 statement that the result of nondifferential
20 misclassification is generally a bias toward the
21 null.  Can you explain what you meant by that?
22    A.  Okay.  So nondifferential
23 misclassification usually refers to an error in
24 classifying, for example, an exposure.  But it is
25 not different between people who -- like in a

Patricia G. Moorman, Ph.D.

Page 70

1  cohort study, it's not different between women --
2  people who go on to develop the disease of
3  interest and those who do not.  And so it's --
4  just kind of reflects that there's going to be
5  errors in recall.
6       If I ask anybody about something that
7  happened 10 years ago, 5 years ago or 20 years
8  ago, they will not have perfect recall.  And so
9  there will be some misclassification of the
10  exposure.  But if it's not different, you know,
11  between people who ultimately go on to develop --
12  who become a case versus people who do not become
13  a case, that's considered nondifferential.
14  BY MS. DAVIDSON:
15     Q.  And why would that bias toward the
16  null?
17     A.  Just mathematically you can show that
18  if it is.
19     Q.  Because there's more case -- there's
20  more -- because there's fewer people with cases;
21  is that what you're saying?
22     A.  No, that's really not it.  It's kind
23  of like if you were -- I'm trying to think how to
24  do -- it's kind of putting people in the wrong
25  category.

Page 71

1       So you have -- it's a little bit of a
2  mixing of effect.  Some people who were truly
3  exposed are in the nonexposed category and
4  possibly vice versa.  And so long as that does
5  not -- so long as that is not differential between
6  cases and controls, it could be shown
7  mathematically that when it is a dichotomous
8  outcome, that is usually a -- rather, a
9  dichotomous exposure, it is biased towards the
10  null.
11     Q.  But what is the math that results in
12  that?  Like, what is the reason?
13     A.  It's basic -- I have seen it.  I'm
14  having a hard time explaining.  I didn't expect to
15  have to explain this.
16       But just, basically, it shows that it
17  is a mixing of effect, and it can be demonstrated
18  mathematically that it will result in a bias
19  towards the null.  I'm sorry that I'm not
20  explaining that better.  But it has been
21  demonstrated.  It's been in pretty much every epi
22  textbook you would look at.
23     Q.  Do you believe that misreporting of
24  exposure was a concern in O'Brien 2020?
25     A.  Yes, I -- I do.  If we -- so the

Page 72

1  misreporting of exposure or misclassification of
2  exposure can occur for a number of reasons.  And
3  I'll give a couple of examples from the various
4  studies.
5       The sister study, their questionnaire
6  asked about use in the previous 12 months when
7  they were enrolled into the study and also when
8  they were -- the women were young.  I think it was
9  10 to 13.  And I believe that's the measure that
10  they used in this.
11       So anyone who had used talc starting
12  after they were 13 but discontinued it before they
13  enrolled in the study, that would not have been
14  captured.
15     Q.  And when you say "that would not have
16  been captured," that -- that would not have been
17  captured in O'Brien, that would not have been
18  captioned in Gonzalez, or did O'Brien and Gonzalez
19  use the same metric?
20     A.  I was talking about the sister study,
21  specifically.  So that was -- I -- if I'm
22  recalling correctly, the data that they used in
23  this -- the data that they used in the O'Brien
24  study used both the age 10 to 13 and the age -- in
25  the 12 months before enrollment into the cohort.

Page 73

1  The Gonzalez paper, their analysis was based on
2  use of talc only in the 12 months before
3  enrollment.
4     Q.  So -- so O'Brien --
5     A.  I --
6     Q.  Just if I could continue.
7       The -- so the O'Brien paper included a
8  broader definition of exposure for the sister
9  study than Gonzalez did, correct?
10     A.  That is my understanding, yes.
11     Q.  Did the hazard ratio change as a
12  result?
13     A.  Well, the hazard ratio that they
14  reported here was --
15       MS. PARFITT:  And you're referring to
16  what table?
17       THE WITNESS:  Okay.  I am referring to
18  Table 2.
19       MS. PARFITT:  Thank you.
20       MS. DAVIDSON:  Please don't interrupt
21  her.
22       MS. PARFITT:  I just needed some
23  guidance myself.
24       MS. DAVIDSON:  After she's done with
25  her answer.

Patricia G. Moorman, Ph.D.

Page 74

1    THE WITNESS:  Okay.
2    MS. PARFITT:  I think it's appropriate
3 to get some clarification.
4    MS. DAVIDSON:  No, it's not.
5    THE WITNESS:  Okay.  So in the
6 Gonzalez paper, as I recall, the hazard
7 ratio was a real outlier.  It was like .73,
8 .74, something like that, and here it is
9 1.02.  So it was a change.
10 BY MS. DAVIDSON:
11    Q.  Do you consider 1.02 to be a positive
12 association?
13    A.  It is greater than 1.  And so in that
14 sense, it is a positive association.  It's -- it's
15 very close to the null value, obviously.
16    Q.  Do you believe that O'Brien found an
17 increased risk with talc use and ovarian cancer in
18 the sister study?
19    A.  They reported only a very slight
20 increase, 1.02.
21    Q.  And do you consider 1.02 to be a
22 slight increase in risk?
23    A.  That's what the point estimate says --
24    Q.  Even if it's -- even if it's not
25 statistically significant?

Page 75

1    A.  As I said before, the point estimate
2 is what those data show in that study.  You had
3 asked about misclassification in the O'Brien
4 study --
5    Q.  We'll go back to that.  I just want --
6    A.  Okay.
7    Q.  -- to continue with this.
8    A.  All right.  I just wanted to --
9    Q.  Have you --
10    A.  -- let you know that I was not
11 finished with that answer.
12    Q.  Understood.
13    Have you ever published a paper in
14 which you said that 1.02 was an increased risk?
15    A.  I -- what is typical is that I will
16 report the -- the odds ratio and the confidence
17 interval and just what it -- what it is.  It's
18 like -- as I might describe it as:  It was
19 not a statistically significant increase in risk.
20    Q.  My question is different.  Have you
21 ever characterized, outside of this litigation, a
22 1.02 nonstatistically significant risk ratio as an
23 increased risk?
24    MS. PARFITT:  Objection.  Asked and
25 answered.

Page 76

1    THE WITNESS:  I -- I think that I have
2 answered it.  You -- when we look at odds
3 ratios, 1 means no increase or no decrease
4 in risk.  Any values below 1 indicates a
5 decrease in risk.  1.02 is above 1.  It is
6 a very slight increase in risk.
7 BY MS. DAVIDSON:
8    Q.  I understand what you're saying, but
9 my question was:  Have you ever in a paper stated
10 that a 1.02 risk ratio nonstatistically
11 significant reflected an increased risk for an
12 exposure in a disease?
13    A.  And I think that I answered it.  It's,
14 like, I would typically just describe it as, you
15 know, this was the odds ratio or risk ratio and
16 the confidence interval and indicate, you know, it
17 was not a statistically significant increased
18 risk.
19    Q.  Have you read the Gossett editorial in
20 JAMA regarding O'Brien?
21    A.  The Gossett?
22    Q.  Dana Gossett editorial that came out
23 in the same version -- in the same edition of JAMA
24 as the O'Brien paper?
25    A.  I believe that I did read it.  It's

Page 77

1 been quite a while since I have looked at that
2 paper.
3    Q.  That was not, that I could see, on
4 your reliance list.  Do you know why?
5    A.  I don't.  I mean, I don't remember --
6 I mean, I might have overlooked it at the time.  I
7 just -- I don't remember.
8    Q.  Okay.  Did the O'Brien study find an
9 overlap in confidence intervals for the patent and
10 nonpatent subgroups?
11    A.  Let me go to -- for the overall
12 adjusted odds ratio that are reported in Table 2
13 for all women, it was 1.08 confidence interval.
14 .99 to 1.17 for women with patent reproductive
15 tracts.  It was 1.13 with a confidence interval of
16 1.01 to 1.26.  So, yes, there is overlap in those
17 confidence intervals.
18    Q.  Does the stratification of women into
19 exposed -- does the stratification of women into
20 patent and nonpatent groups, is that the same as
21 stratifying women into exposed and nonexposed
22 categories?
23    A.  Well, in this case, the main exposure
24 of interest is talc.  That is the exposure of
25 interest here.  The patent and not patent are --

Page 78

1 it's a subgroup. They're subgroups and so a
2 subgroup analysis. It's not the exposure that
3 you're looking at.
4        It's -- if you were thinking of the
5 patency of the reproductive tract as a risk factor
6 for ovarian -- as an exposure, you would say: Are
7 women with patent reproductive tracts at higher
8 risk than those with nonpatent reproductive
9 tracts?
10      Q.  That's not my question. My question
11 is: When you stratify women into patent and
12 nonpatent groups, would the nonpatent women --
13 does that mean none of them were exposed to talc?
14      A.  Oh, okay. No, it does not, because
15 it -- the patency is defined as having one of
16 these surgeries, so a tubal ligation or a
17 hysterectomy. And so women have those at
18 different points in their lives.
19       I think that women are typically in
20 their 30s when they have tubal ligations. That's
21 the most common age. And most common age for
22 hysterectomy is in their 40s. So anyone who had
23 used talc before their surgery, they had exposure.
24 They likely had exposure.
25      Q.  Have any of the papers addressed when

Page 79

1 women who use talc in their perineal area
2 typically start, at what age?
3      A.  At what age they begin using it? In
4 O'Brien's 2023 paper, they asked about use in --
5 at various points in their age. Again, if we
6 could pull that up, I can demonstrate what -- what
7 I'm talking about. But as I --
8        MS. PARFITT: Look at your report.
9        THE WITNESS: Okay.
10 BY MS. DAVIDSON:
11      Q.  Wait. Can you just finish your
12 answer?
13      A.  Okay.
14       MS. PARFITT: If you can. If you need
15 the report --
16       MS. DAVIDSON: She was saying
17 something.
18       MS. PARFITT: I --
19       MS. DAVIDSON: And you keep
20 interrupting her.
21       MS. PARFITT: No, no, no. Jessica --
22       MS. DAVIDSON: She said, "as I."
23 That's the middle of the sentence, and you
24 interrupted her.
25 BY MS. DAVIDSON:

Page 80

1      Q.  I'm just asking you --
2        MS. PARFITT: Okay. Jessica --
3 BY MS. DAVIDSON:
4      Q.  Can you finish your answer?
5        MS. PARFITT: -- I've done very well
6 so far.
7        MS. DAVIDSON: Okay. So let's
8 continue.
9        MS. PARFITT: No, no. Let me just
10 say, if she needs the paper, though --
11 again, we just don't need to have this
12 ruckus.
13       MS. DAVIDSON: Okay. I'm not asking a
14 question about that paper. I'm asking
15 whether --
16       MS. PARFITT: She said --
17       MS. DAVIDSON: -- she's aware of any
18 papers that discuss at what age women start
19 using talc.
20       MS. PARFITT: And as she said, "if I
21 could see the paper." If you need the
22 court reporter to read that back, she said,
23 "if I could see the paper."
24       MS. DAVIDSON: Michelle --
25       MS. PARFITT: Yes.

Page 81

1        MS. DAVIDSON: -- please don't
2 testify.
3        MS. PARFITT: Jessica, I'm not
4 testifying. I want an accurate record --
5        MS. DAVIDSON: Okay.
6        MS. PARFITT: -- and I think you do,
7 too. I know the judge does. So that's
8 what we'll ask her. Do you need the paper?
9        MS. DAVIDSON: That's not --
10 BY MS. DAVIDSON:
11      Q.  I'm asking whether you are aware of
12 any papers that address when -- the age at which
13 women start using talcum powder, those women who
14 use it. That's all I'm asking.
15      A.  Okay. I am relying on my memory
16 here --
17      Q.  Uh-huh.
18      A.  -- of the O'Brien 2023 paper.
19      Q.  Okay.
20      A.  And I believe that they did question
21 women about their use at various ages. And if I
22 am recalling the paper correctly, and if I could
23 look at the paper, we could confirm that my memory
24 is accurate. Do you mind if I look at that paper?
25      Q.  I don't mind at all, but I want to get

Page 82

1  a list. Like, I have a way of questions that I'm
2  asking. And I'd like to know -- I'd like the full
3  list of papers you recall that address, if any,
4  the ages at which women start using ovarian cancer
5  [sic]. So I don't want to in the middle of a
6  question move on.
7        So can you just tell me the full
8  list -- that was my question -- full list of
9  papers you recall that address the age at which
10 women start using ovarian -- using talcum powder
11 in their perineal area.
12    A.  Okay. I recall that the O'Brien 2023
13 paper addressed that in the sister study. I can't
14 recall specifically whether other studies asked
15 about age at first use. It seems like there have
16 been some, but I can't remember specifically which
17 ones.
18        MS. DAVIDSON: Okay. If we could pull
19   up the Gossett editorial, which we're going
20   to mark as Exhibit 3.
21        THE REPORTER: We're on 4.
22        MS. DAVIDSON: 4? Sorry.
23        MR. TRANGLE: 4.
24        MS. DAVIDSON: Oh, right, because as
25   Exhibit 3 we marked the 2021 paper. I

Page 83

1    forgot to write that down. I was engrossed
2    in the conversation.
3        (MOORMAN EXHIBIT 4, JAMA - Use of
4    Powder in the Genital Area and Ovarian
5    Cancer Risk, Examining the Evidence, was
6    marked for identification.)
7  BY MS. DAVIDSON:
8    Q.  Exhibit 4 is an editorial entitled
9  "Use of Powder in the Genital Area and Ovarian
10 Cancer Risk, Examining the Evidence." Do you
11 recall reading this paper?
12    A.  I -- yeah, I -- I believe that I have
13 looked at this editorial.
14    Q.  Is there a reason why your report
15 discusses Dr. Cramer's letter about the O'Brien
16 2020 paper but doesn't discuss this editorial?
17    A.  I -- I don't -- I mean, like I've
18 said, I read this. I -- I -- there was no
19 particular reason why I did not include it.
20 Just -- no particular reason.
21    Q.  If you could turn to Page 30.
22    A.  Okay.
23    Q.  Halfway down the page that starts with
24 the word "Given." Do you see the paragraph that
25 starts with the word "Given" in the left column?

Page 84

1    A.  Yes.
2    Q.  Do you see halfway down that paragraph
3  there's a sentence "Thus"?
4    A.  Uh-huh.
5    Q.  Can you read that sentence?
6    A.  Wait. I'm sorry.
7    Q.  Can you read aloud the sentence that
8  begins with the word "Thus?"
9        MS. PARFITT: Give her a moment,
10   please.
11        THE WITNESS: Well, I just want to
12   read the context of the paragraph.
13 BY MS. DAVIDSON:
14    Q.  It's the fourth sentence.
15    A.  Yes, I'm just -- I just want it in the
16 context.
17        MS. PARFITT: Jessica, she's asked for
18   a moment to read it.
19        MS. DAVIDSON: You've told her to ask
20   for a moment to read it, Michelle.
21        MS. PARFITT: No. Actually, I didn't.
22   I didn't.
23 BY MS. DAVIDSON:
24    Q.  Are you planning to read the whole
25 paper? Because if so, we'll go off the record.

Page 85

1    A.  No. I just -- you asked about one
2  specific paragraph, and I just wanted to read that
3  paragraph. Okay. And so you asked me to read the
4  sentence beginning with "Thus."
5        Thus, the stratification of the groups
6  as patent and nonpatent does not clearly group
7  women into exposed and nonexposed categories.
8    Q.  Do you agree with that?
9    A.  I -- yes, I -- my previous answer
10 discussed how women with -- who have had these
11 surgeries could have had exposure before the
12 surgeries, yes.
13    Q.  Can you read the next sentence?
14    A.  The fact that there are no significant
15 differences in the hazard ratios in the patent
16 (HR, 1.13 [95 percent confidence interval, 1.01 to
17 1.26]) and nonpatent subgroups (hazard ratio .99,
18 [95 percent confidence interval, 0.86 to 1.15];
19 P value for heterogeneity comparing these
20 subgroups of 1 -- .15) confirms the overall
21 conclusion that there is no demonstrable
22 statistically significant association between use
23 of the powder in the genital area and ovarian
24 cancer risk.
25    Q.  Do you agree with that statement?

Page 86

1    A.   That statement is -- it's stating the
2   data that's presented in the -- the table -- or in
3   the paper that the P value for interaction was
4   .15.  And so it is not a statistically
5   significant -- wait.  "Confirms the overall
6   conclusion that" --
7         You know, I don't -- I have to say
8   that I don't agree with -- with that statement.
9   They did find a significant association with women
10  who have the patent reproductive tract.  And so I
11  don't -- I don't agree with that statement because
12  there is -- there is a statistical significant
13  association with that one subgroup of women.
14       Q.   Is she saying there isn't?
15       A.   It says there is no demonstrable
16  statistically significant association between use
17  of powder in the genital area and ovarian cancer
18  risk.  And so I -- I disagree with that.  It's --
19  I think --
20       Q.   But what's the reason she gives for
21  that statement?
22       A.   She's saying that there's no
23  significant difference between the two groups,
24  which in terms of a statistically significant
25  interaction between the two groups, the P value

Page 87

1   of .15, that is an accurate statement.
2         But the fact that you are seeing a
3   statistically significant increased risk in the --
4   the one group, the women with the patent
5   reproductive tract, I think that does not
6   demonstrate -- there's no demonstrable
7   statistically significant association between use
8   of powder in the genital tract -- or genital area
9   and ovarian cancer risk.
10       Q.   Again, you discussed letters to the
11  editor about O'Brien from Drs. Cramer and
12  Dr. Harlow, correct, in your 2023 supplement?
13       A.   I did.
14       Q.   And you didn't discuss this, correct?
15       A.   That is correct.
16       Q.   And you're aware that Dr. Cramer and
17  Dr. Harlow are plaintiff's experts, right?
18       A.   I am aware of that.
19       Q.   Do you know whether Dr. O'Brien is an
20  expert in this litigation?
21       A.   You have already asked me that and
22  I --
23       Q.   I'm sorry.  I meant Dr. Gossett.
24       A.   I do not know who Dr. Gossett is.  No,
25  I have -- I don't know if she -- she or he is an

Page 88

1   expert in litigation or not.
2        Q.   She doesn't disclose any conflict of
3   interest suggesting any involvement in litigation,
4   correct?
5        A.   She doesn't describe -- disclose
6   conflict of interest related to talc.  It's -- she
7   does disclose other funding.
8        Q.   Do you give more weight to Dr. Cramer
9   and Dr. Harlow's letters than you do to the
10  Gossett editorial?
11       A.   As I have stated repeatedly today, I
12  consider what is -- what is reported in the paper.
13  And, you know, certainly, knowing any potential
14  conflicts of interest, it's -- it doesn't mean
15  that that -- what they're saying is -- is wrong or
16  right.  It's -- I just evaluate it on the comments
17  that they made, the points that they made.
18       Q.   And so based on the points that were
19  made in this editorial, you didn't think it
20  merited inclusion in your expert report?
21            MS. PARFITT:  Objection.  Misstates
22        her testimony.
23            THE WITNESS:  As I said, I -- it was,
24        perhaps, an oversight that I -- I didn't
25        include that in my reference list.  I -- I

Page 89

1   read it.  I -- I obviously -- I -- I didn't
2   comment on it.
3   BY MS. DAVIDSON:
4        Q.   Do you recall testifying at your last
5   deposition that you did not believe the cohort
6   studies had sufficient power and citing a paper by
7   Narod for that proposition?
8        A.   I recall making some statement.  I
9   don't recall exactly what I stated, but that --
10       Q.   Did you go back to the Narod paper
11  after O'Brien was published in 2020 to see whether
12  the O'Brien paper satisfied what Narod had listed
13  as how many women would be needed to establish
14  sufficient power?
15       A.   I did not go back to the Narod paper.
16       Q.   You recall in 2019 testifying about
17  the Berg -- B-E-R-G-E-N -- Berga because I think
18  it's a European paper, which had done a power
19  analysis of the cohort studies.  Do you recall
20  that?
21       A.   I -- I don't recall.  I recall
22  mentioning -- or probably addressing, you know,
23  the -- the systematic review's meta-analysis,
24  including the Berg or Berga study.  I don't recall
25  exactly the point that you're making.

Patricia G. Moorman, Ph.D.

Page 90

1    Q.  Okay.  And I believe you testified
2  earlier that you haven't done any sort of power
3  analysis with respect to O'Brien 2020, right?
4    A.  No, I did not do any --
5    Q.  Okay.
6    A.  -- power analysis.
7    Q.  We can move on now.
8    MS. DAVIDSON:  Okay.  So let's mark as
9  Exhibit 5 Taher 2019.
10    (MOORMAN EXHIBIT 5, Reproductive
11  Toxicology - Critical review of the
12  association between perineal use of talc
13  powder and risk of ovarian cancer, was
14  marked for identification.)
15  BY MS. DAVIDSON:
16    Q.  We're marking as Exhibit 5 a paper
17  entitled "Critical review of the association
18  between perineal use of talc powder and risk of
19  ovarian cancer."  First author, Mohamed Kadry
20  Taher.
21      Are you relying on this paper to
22  support your opinions in this case?
23    A.  It is one of the articles that I
24  considered, yes.
25    Q.  If we could turn to Table 2.  Do the

Page 91

1  authors here identify an increased risk between
2  talc use and the development of clear cell
3  carcinoma?
4    A.  They report -- and based on one study,
5  they report an effect estimate of 0.63 with a
6  confidence interval that goes from .15 to 2.65.
7  So based on this one study, they do not report an
8  increased risk among women with clear cell.
9    Q.  And we just discussed and looked at
10  the O'Brien paper, which found no significant
11  association between talc use and clear cell as
12  well.  Do you recall that?
13    A.  Again, let me -- would you mind
14  restating your question?
15    MS. DAVIDSON:  Court Reporter, could
16  you repeat it?
17    (The following question was read back:
18    Q.  And we just discussed and looked
19    at the O'Brien paper, which found no
20    significant association between talc use
21    and clear cell as well.  Do you recall
22    that?)
23    THE WITNESS:  Was that -- I'm sorry.
24  I -- if you don't mind repeating your
25  question because what she read back was not

Page 92

1  what I thought that I heard from you, so...
2    MS. DAVIDSON:  I think it was.
3    Can you repeat again?
4    (The reporter read the requested
5  material.)
6    THE WITNESS:  Okay.  Looking at what
7  the O'Brien paper reported in Table 4 is
8  they reported a -- for ever use of talc,
9  they reported a hazard ratio of 1.17 with
10  confidence interval from .73 to 1.89.  So
11  it was not -- it was a non --
12  nonstatistically significant increased
13  risk.
14  BY MS. DAVIDSON:
15    Q.  Thank you.
16      Now, Taher found that 13 out of 24
17  case-control studies showed a statistically
18  significant association, right?  If you'd like, I
19  can read that to you.
20      It's on the last sentence of 94, first
21  sentence of 95.  13 out of 24 case-control studies
22  showed a statistically significant association.
23      Do you see that?  Did I read that
24  correctly?
25    A.  Yes, you did read that.

Page 93

1    Q.  So that means 11 out of 24
2  case-control studies did not show a significant
3  association, right?
4    A.  Not a statistically significant
5  increased risk, yes.  Although, it is important to
6  look at the point estimates overall, which are --
7  nearly all of them report point estimates greater
8  than 1.
9    Q.  So you consider those studies to be
10  consistent despite the fact that 11 did not show a
11  statistically significant association?
12    MS. PARFITT:  Objection.  Form.
13    THE WITNESS:  As I stated earlier, I
14  do not use statistical significance as a
15  way to dichotomize, yes, there is an
16  association; no, there is not.
17      Look at the point estimate, and from
18  the standpoint that the vast majority of
19  studies show reported point estimates
20  greater than 1 with a majority of them
21  being statistically significant, I would
22  say, yes, the findings are quite
23  consistent.
24  BY MS. DAVIDSON:
25    Q.  If you look at Table 2 of Taher.  For

Patricia G. Moorman, Ph.D.

Page 94

1 people who used talc 20-plus years, there is --
2 there is no statistically significant association
3 with ovarian cancer risk, correct?
4 A. What they report is overall risk of
5 1.19, the confidence interval from .71 to 1.98.
6 So, once again, it's an increased risk that was
7 not statistically significant.
8 Q. And is that higher or lower than the
9 risk ratio reported for women who use talc between
10 10 and 20 years?
11 A. What they report for women who had
12 used it for 10 to 20 years was 1.42. So 1.02 to
13 1.99. So statistically significant increased
14 risk, and it was a higher point estimate than
15 women who had used it for 20-plus years.
16 Q. Did you -- did you address that in
17 your report?
18 MS. PARFITT: Objection. Form.
19 THE WITNESS: In my discussion of this
20 article --
21 BY MS. DAVIDSON:
22 Q. I can fix my question, because
23 Michelle is right, it wasn't very well stated.
24 Did you address in your report that
25 women who used talc for 20-plus years did not have

Page 95

1 a statistically significant association with the
2 development of ovarian cancer, whereas women who
3 used talc for 10 to 20 years had a higher risk
4 ratio and that was statistically significant?
5 A. I'm looking at how I stated it in my
6 report. What I stated in my report was that they
7 noted a possible increasing trend in ovarian
8 cancer with risks with increasing cumulative
9 exposure to talc, albeit with a high degree of
10 uncertainty.
11 Q. My question was: Did you report --
12 did you state in your report that 20-plus years of
13 use had a lower effect estimate and one that is
14 not statistically significant as compared to 10 to
15 20 years?
16 A. And I told you what -- what I did
17 report in my report. I didn't repeat every --
18 every odds or hazard ratio or whatever -- relative
19 risk that was reported. I read to you what I
20 reported. I did not specifically say that it was
21 the odds -- the relative risks for greater than 20
22 years was less than what was reported for 10 to 20
23 years.
24 Q. Do you know what the GRADE framework
25 is? G-R-A-D-E, all caps.

Page 96

1 A. Yes.
2 Q. What is it?
3 A. It is a framework for evaluating some
4 of the strength of the evidence related -- you
5 know, I believe that it's commonly used when doing
6 meta-analysis and just combining all of the data
7 and looking at the strength of the evidence.
8 Q. Did -- have you ever used a GRADE
9 framework in your work?
10 A. If I'm not mistaken, in some of the
11 systematic reviews that I've worked on over the
12 years, we might have addressed -- we -- I'm pretty
13 sure that we did use the GRADE framework.
14 Q. How did Taher classify the talc epi
15 under the GRADE framework? Page 98 to make your
16 life easier.
17 A. Okay. In Table 4, the certainty of
18 the evidence, they put it as very low.
19 Q. Thanks.
20 On Page 98, the author states that one
21 reason for that is that they deem the findings to
22 be subject to an appreciable risk of bias. Do you
23 see that?
24 A. Yes, I do see it.
25 Q. Do you disagree with them?

Page 97

1 A. I acknowledge that the -- there is
2 potential for recall bias. There is potential for
3 bias in recalling -- so the nondifferential
4 misclassification of the exposure. I think that
5 there is the potential. I think that, as has been
6 addressed in several papers, there is some
7 evidence to suggest that it's probably not as much
8 of a problem as some people suggest.
9 Q. Did you address in your paper -- in
10 your expert report the fact that the Taher
11 meta-analysis finds the quality of the evidence --
12 the certainty of the evidence to be very low?
13 A. I did not put that in my report.
14 Q. Why not?
15 A. Basically, I did not restate
16 everything that was in the papers I was asked
17 to -- you know, it was a rather brief summary.
18 Q. Do you think that the fact that the
19 authors of this meta-analysis found the certainty
20 of the evidence to be very low is relevant to
21 analyzing the paper?
22 A. It's one aspect of looking at the
23 paper.
24 Q. But you didn't discuss it?
25 A. I did not discuss it.

Patricia G. Moorman, Ph.D.

Page 98

1    Q.  And are any of the authors of Taher
2  plaintiff's experts in this litigation?
3    A.  I do not know any of the authors on
4  this paper.  And -- so I don't -- and I have never
5  heard their names mentioned as being a plaintiff's
6  expert.
7    Q.  And if you look at their conflict of
8  interest disclosure, none of them references any
9  conflict of interest related to this litigation,
10  correct?
11    A.  No, I don't -- I don't see that.  They
12  report no conflict of interest.
13    Q.  Can we look at -- this is -- Michelle
14  likes to say it's not a memory test, but this is a
15  vision test.
16    MS. PARFITT:  I have extra glasses.
17  BY MS. DAVIDSON:
18    Q.  Could we look at Footnote A.
19    A.  What page are you on?
20    Q.  Footnote A, Page 98 of Taher.
21    A.  Okay.
22    Q.  Do you see that?
23    A.  Yes, I do.
24    Q.  Can you tell me how they describe what
25  "very low certainty" means?

Page 99

1    A.  We have very little confidence in the
2  effect estimate.  The true effect is likely to be
3  substantially different from the estimate of
4  effect.
5    Q.  Again, you didn't mention that in your
6  report, correct?
7    A.  No, I did not.
8    Q.  Have you seen the unpublished Taher
9  manuscript, the one that was attached to the
10  original Health Canada draft?
11    A.  I believe that I saw it several years
12  ago.
13    Q.  Did you compare it to the final
14  published version?
15    A.  I did not.
16    Q.  Do you recall that the unpublished
17  draft had a Bradford Hill analysis in it?
18    A.  I don't recall specifically.  It's
19  been a long time since I read that paper.
20    Q.  Fair.  I don't recall what I did last
21  week, so...
22       Are you qualified to identify asbestos
23  in a product?
24    A.  Am I qualified to identify asbestos in
25  a product?  No.  That's not my specialty.

Page 100

1    Q.  Do you know what XRD is?
2    A.  I believe that one meaning of it --
3  I'm not sure if this is what you're getting at --
4  is X-ray diffraction.
5    Q.  That was good.  Have you ever done
6  X-ray diffraction?
7    A.  No, I have not.
8    Q.  Do you know what PLM is?
9    A.  I do not.  No, I do not know what
10  that --
11    Q.  Since you don't know what it is, can
12  I -- is it fair to conclude that you've never done
13  it?
14    A.  Just, please, if you wouldn't mind
15  just stating what it is, and I can --
16    Q.  Polar light microscopy.
17    A.  Okay.
18    Q.  Have you ever done polar light
19  microscopy?
20    A.  No, I have not done PLM.
21    Q.  Are you familiar with the term "TEM"?
22    A.  Let's see.  Again, I think that it's
23  some type of electron microscopy.  And I don't
24  remember what the "T" is, but --
25    MS. PARFITT:  Transmission --

Page 101

1    MR. TRANGLE:  Electron --
2    MS. PARFITT:  -- electron spectro --
3    (Simultaneous talking.)
4  BY MS. DAVIDSON:
5    Q.  Transmission.  Y'all -- we -- the
6  three of us all seem to agree that the "T" stands
7  for "transmission."
8    A.  Okay.
9    Q.  And none of us has ever done it
10  either.
11    A.  I have not done TEM.
12    Q.  Okay.  I just wanted you to get a full
13  sentence out there.
14    A.  Okay.
15    Q.  Do you have an opinion as to what
16  percentage of the Johnson's Baby Powder sold in
17  the United States has asbestos?
18    A.  I know that there will be people who
19  are mineral experts who will address that.  I have
20  seen some of their reports, but I cannot state an
21  opinion on what proportion of containers have
22  asbestos in them.
23    Q.  Have you ever asked plaintiff's
24  counsel to see the defense expert reports about
25  asbestos testing?

Page 102

1    A.  I have not.

2    Q.  Does your biological plausibility

3  opinion turn on whether talc contains asbestos?

4    A.  My biologic plausibility considered

5  asbestos in the talc products as part of the

6  biological plausibility, not the sole biologically

7  plausible mechanism.

8    Q.  Do you believe that talc that does not

9  contain asbestos can cause ovarian cancer?

10   A.  My opinion is based on talc products,

11 whatever is contained in them.  And it -- as far

12 as I know, there is no way to determine whether or

13 not the women -- the talc they reported, whether

14 it contained asbestos or not and -- just because

15 there's no way to -- to test all the products that

16 they used over the years.  My opinion, again, to

17 restate, is just based on talc products, whatever

18 they contain.

19   Q.  Are you relying on a paper called

20 Harper 2023?

21   A.  I have read Harper.  That's one of --

22 if -- if you're going to ask me questions about

23 it, could we just bring it up or --

24   Q.  Yeah, I'm -- all I've asked is:  Are

25 you relying on it?

Page 103

1    A.  I have read it.  And, you know,

2  it's -- as I recall, it's a laboratory study.  And

3  since my opinion is based primarily on the

4  epidemiologic data, it's -- like, at a high level,

5  I considered it.  It was just part of what I read

6  in forming my opinion.

7    Q.  But I can't find a discussion of it

8  anywhere in your reports.

9    A.  No, I did -- my reports are focused

10 primarily on the epidemiologic data, which is

11 where my expertise is.

12   Q.  Are you aware that the peer-reviewed

13 comments on Harper 2023 were produced in this

14 litigation?

15   A.  I was not aware of that.

16   Q.  And you're also, presumably, not aware

17 that some of the peer reviewers referred to that

18 paper as outrageous?

19       MS. PARFITT:  Objection.

20       THE WITNESS:  I told you I have not

21    seen any of that.  I am unaware of any of

22    that.

23 BY MS. DAVIDSON:

24   Q.  In connection with this litigation,

25 have you seen peer review comments for any papers?

Page 104

1    A.  As -- the only peer review comments

2  that I would have seen are those from the papers

3  on which I was a co-author.

4    Q.  And have you seen any correspondence

5  or other materials related to the Woolen

6  meta-analysis?

7    A.  Any correspondence?  I don't recall

8  seeing any.

9    Q.  I'll mark your 2023 report as

10 Exhibit 6.

11       (MOORMAN EXHIBIT 6, Supplemental

12    Expert Report of Patricia G. Moorman, MSPH,

13    Ph.D., dated 11/15/23, was marked for

14    identification.)

15 BY MS. DAVIDSON:

16   Q.  I'm marking as Exhibit 6 a

17 supplemental expert report of Patricia G. Moorman,

18 dated November 15th, 2023.

19       So on Page 1 of your supplemental

20 report dated November 2023, you say you considered

21 the possible biases of -- of the various studies.

22   A.  Yes.

23   Q.  Where can I find your analysis of the

24 possible biases of the various studies?

25   A.  I -- I think that throughout the

Page 105

1  report, I did address, you know, some of the

2  potential biases.  For example, in the O'Brien

3  2023, I talked about how the underrepresentation

4  of talc exposure in the Gonzalez paper, which was

5  quantified in the O'Brien 2023 paper, really cast

6  serious concerns about the Gonzalez paper.

7       I -- in talking about the -- our own

8  paper, the Davis paper, noted that the available

9  data didn't allow for consideration of both

10 frequency and duration.

11       So throughout the report I think that

12 there are numerous places where I did address some

13 of the biases.

14   Q.  Is frequency and duration a bias or a

15 limitation?

16   A.  Well, I would consider it more a

17 limitation of the study.

18   Q.  So when you refer to bias here, you

19 mean recall bias?

20   A.  It was not just recall bias, but

21 misclassification bias as well.

22   Q.  And is misclassification a bias or a

23 limitation?

24   A.  It -- it can be a bias, yes.

25   Q.  And when you say possible biases here,

Patricia G. Moorman, Ph.D.

1  did you -- are you referring at all to author
2  bias?
3      A.  My comment there was more in relation
4  to methodologic biases.
5      Q.  I wasn't sure.
6          Are you familiar with the term
7  "cleavage fragment"?
8      A.  I'm sorry?
9      Q.  Are you familiar with the term
10 "cleavage fragment."
11     A.  "Cleavage fragment."  Again, I believe
12 that I have seen that term in relation to some of
13 the talc analyses.  But, again, that is not my
14 area of expertise.
15     Q.  So can we agree you're not offering an
16 opinion about cleavage fragments?
17     A.  That is correct.
18     Q.  That can save us a bunch of questions.
19     A.  Okay.
20     Q.  Are you offering an opinion as to
21 whether nonasbestiform tremolite can cause ovarian
22 cancer?
23     A.  I have already stated that my opinion
24 is based on the talc products, whatever is
25 contained in them.

1      Q.  Do you believe that background levels
2  of asbestos can cause ovarian cancer?
3          MS. PARFITT:  Objection.
4          THE WITNESS:  How do you define
5          "background levels"?
6  BY MS. DAVIDSON:
7      Q.  Do you have an opinion as to whether
8  nonoccupational exposure to asbestos can cause
9  ovarian cancer?
10         MS. PARFITT:  Objection.
11         THE WITNESS:  I did not specifically
12         offer that opinion.  I am aware of
13         organizations, such as IARC, that have
14         concluded that occupational exposure can
15         cause -- to asbestos can cause ovarian
16         cancer.
17 BY MS. DAVIDSON:
18     Q.  My question was about nonoccupational
19 exposure.
20     A.  Oh, I'm sorry.  I'm sorry.  I
21 misunderstood you.  Nonoccupational exposure to
22 asbestos?  I did not offer an opinion about that
23 from the standpoint that numerous organizations
24 have stated that asbestos is a carcinogen and that
25 there is no safe level.  It seems plausible, but I

1  have not offered an opinion about that.
2      Q.  Are you familiar with any scientific
3  papers that address amount of exposure to asbestos
4  that's needed to cause ovarian cancer?
5          MS. PARFITT:  Objection.  Asked and
6          answered.
7          MS. DAVIDSON:  Slightly different
8          question.
9          THE WITNESS:  Okay.  In -- in general,
10         as I've stated previously, there is
11         considered -- asbestos is not considered to
12         have any safe level of exposure.
13             I do not recall a paper that
14         specifically addressed the minimum level.
15         But in theory, it could be any level of
16         exposure to asbestos could cause ovarian
17         cancer.
18 BY MS. DAVIDSON:
19     Q.  Well, are you familiar with the term
20 "fibrous talc"?
21     A.  Yes, I have heard that term.
22     Q.  Are you aware of any literature
23 linking exposure to fibrous talc to the
24 development of ovarian cancer?
25     A.  The epidemiologic literature is

1  addressing talc products.  So whatever those
2  products contain, fibrous talc or any -- anything
3  else in those products, that is what is addressed
4  in the studies, and that's what informed my
5  opinions.
6      Q.  Do you know what fibrous talc is?
7      A.  Again, you're getting more into the --
8  the area of the people who are specialists in
9  minerals.  I have read papers that have described
10 it, but it's certainly not my area of expertise.
11     Q.  I'm just asking, do you know what it
12 is?
13         MS. PARFITT:  I'm just going to object
14         to the extent this was thoroughly examined
15         at the time of her 2019 deposition.
16 BY MS. DAVIDSON:
17     Q.  Do you know what --
18         (Simultaneous talking.)
19         MS. PARFITT:  Okay.  So answer that,
20         what the definition is of fibrous talc.
21         (Reporter clarification.)
22 BY MS. DAVIDSON:
23     Q.  Do you know what the -- what fibrous
24 talc is?  That's simply my question.  Do you know
25 what it is or not?

Page 110

1    MS. PARFITT:  Asked and answered.

2    MS. DAVIDSON:  It wasn't answered.

3    MS. PARFITT:  Objection.  Asked and

4  answered.

5    THE WITNESS:  Again, it is -- I have

6  read some of the papers describing some of

7  the mineral analyses, and I have seen that

8  term repeatedly.  I cannot actually

9  describe, you know, fibrous talc from talc

10  generally.

11 BY MS. DAVIDSON:

12    Q.  Have you published any papers on

13 asbestos?

14    A.  No, I don't -- I don't believe I ever

15 have.

16    Q.  Have you ever made any presentations,

17 university, scientific groups, about asbestos?

18    A.  No, I have not.

19    Q.  Can you identify asbestos on a slide?

20    A.  No, I am not a laboratory scientist.

21 That's just not -- that's outside my area of

22 expertise.

23    Q.  Have you reviewed any J&J internal

24 documents?

25    A.  Before my, I guess, 2019 deposition, I

Page 111

1 did see some documents that were shared with me,

2 some of it discussing some analyses of asbestos --

3 asbestos in the talc products.

4    Q.  Those are documents shared with you by

5 plaintiff's counsel?

6    MS. PARFITT:  Actually, they were J&J

7  documents, but --

8    MS. DAVIDSON:  Yeah.

9    MS. PARFITT:  -- I believe so.

10    MS. DAVIDSON:  Yeah.

11    MS. PARFITT:  And they're listed,

12  again, on her 20 --

13    MS. DAVIDSON:  On the original --

14    THE WITNESS:  Yeah.

15    MS. PARFITT:  -- 2018 report --

16    MS. DAVIDSON:  Okay.

17    MS. PARFITT:  -- and examined --

18    THE WITNESS:  Yeah.

19    MS. PARFITT:  -- in 2019.

20 BY MS. DAVIDSON:

21    Q.  All right.  So maybe a better way to

22 just move on past this whole topic is:  Since your

23 deposition in 2019, have you looked at any J&J

24 company documents?

25    A.  No, I don't believe I have.

Page 112

1    Q.  I'm able to skip a whole page.  Who

2 drafted your 2023 report?

3    A.  Who drafted it?  I did.

4    Q.  Did the plaintiff's lawyer send you

5 any of the scientific materials or you found them

6 all yourself?

7    A.  I think that it was probably a

8 combination.  I think that nearly all of them I

9 probably found myself.  I believe that a report by

10 Longo on asbestos -- his analysis of asbestos and

11 talc, I believe that was one that was shared by

12 counsel.

13    Q.  I assume you're familiar with a paper

14 called "Davis 2021"?

15    A.  Yes.

16    Q.  Did you disclose that you were a

17 plaintiff's expert in conjunction with that paper?

18    A.  I disclosed that I was being paid --

19 that I was involved in talc litigation and was

20 being paid for that -- talc -- talc --

21    Q.  Why didn't you disclose which side

22 you're on?

23    A.  When I first started -- became

24 involved in this, this was the first time I've

25 ever had to disclose anything.  The phrasing that

Page 113

1 I typically use has something along the lines of:

2 I have received compensation from law firms in

3 relation to the talc and ovarian cancer

4 litigation.  I have submitted that to the journal.

5 And I have never had any pushback from the journal

6 editors about that phrasing, and so that's what I

7 have stuck with.

8    Q.  So does the disclosure to Davis make

9 clear that you've received money in connection

10 with the talc litigation?

11    A.  Yes, it does.

12    Q.  Did you tell the journal that you were

13 a paid plaintiff's expert in talc litigation?

14    A.  I used the phrasing that I said, that

15 I have received -- something to the effect that I

16 have received compensation for work in relation to

17 the talc and ovarian cancer litigation.

18    I was not asked by the journal editors

19 to be more explicit.  That's what I -- and so I

20 assume that that was an acceptable disclosure from

21 the standpoint of the editors.

22    Q.  And who wrote the author's

23 disclosures, you or the paper -- or the journal?

24    A.  We -- I -- there are two versions of

25 the paper, and I -- in the published version, that

Patricia G. Moorman, Ph.D.

Page 114

1  was what the journal wrote.  And then there is the
2  HHS public access version, which is the final
3  submitted manuscript, and that one is -- has the
4  phrasing that I believe that I submitted with this
5  article.
6       Q.  So you're saying there's two different
7  author disclosures in two different versions of
8  this article?
9       A.  Yeah.  So if you -- I mean, I don't
10 know that we have both versions of it, but I know
11 that the -- the phrasing in the published --
12 published version is not phrasing that I have ever
13 used.  And going back to the HHS public access
14 version, it has the phrasing that I typically
15 used.
16      Q.  Understood.
17          Do you think that the fact that you're
18 a paid plaintiff's expert should affect the
19 grading or weight assigned to your study?
20      A.  As I explained earlier, the -- an
21 informed reader of that paper would look at it and
22 they should evaluate, as they would no matter who
23 the authors are, are there any issues with
24 methodology, interpretation or whatever.
25          I also think that an informed reader

Page 115

1  would look at this particular paper and would see
2  that 1 of approximately 15 authors had this
3  disclosure.  I was neither the first author nor
4  the senior author on this paper.  So I would think
5  that an informed reader would say that it probably
6  had little to no effect on how the data were
7  analyzed and interpreted.
8       Q.  The Davis paper did not find a
9  statistically significant association between talc
10 use by African-American women and the development
11 of ovarian cancer, right?
12      A.  Once again, let me just pull that
13 paper up.
14      Q.  Sure.
15          MS. DAVIDSON:  We can mark -- let's
16 mark Davis as Exhibit 7.
17          (MOORMAN EXHIBIT 7, AACR - Genital
18      Powder Use and Risk of Epithelial Ovarian
19      Cancer in the Ovarian Cancer in Women of
20      African Ancestry Consortium, was marked for
21      identification.)
22 BY MS. DAVIDSON:
23      Q.  Let me just read the full title for
24 the record.  We're marking as Exhibit 7 a 2021
25 paper.  First author, C.P. Davis.  Title of the

Page 116

1  paper, "Genital Powder Use and Risk of Epithelial
2  Ovarian Cancer in the Ovarian Cancer in Women of
3  African Ancestry Consortium."
4          And if you look at Table 3, the OR --
5       A.  Okay.  I'm going to -- let's see.
6  This -- I have --
7       Q.  We just need to put a sticker on it.
8  This is 7.
9       A.  Okay.  I want to -- if you're looking
10 at that version, I want to look at it because the
11 one I have in my notebook is the public access
12 version.  Okay.  So...
13      Q.  Let's just finish this question, and
14 then we'll take a break.
15      A.  Okay.
16      Q.  I think where we were was that the --
17 according to Table 3, right?
18      A.  Uh-huh.
19      Q.  The OR.
20      A.  Right.  Go ahead with your question,
21 please.
22      Q.  For African-American women who had
23 ever used a body powder in genital areas and the
24 development of ovarian cancer is not statistically
25 significant, correct?

Page 117

1       A.  They report -- we reported an odds
2  ratio of 1.22 with a confidence interval from
3  1. -- or, rather, .97 to 1.53.  So it was elevated
4  risk that was not statistically significant.
5       Q.  Do you state in your 2023 expert
6  report that Davis did not find a statistically
7  significant association for African-American
8  women?
9       A.  I recorded the values as reported.
10 Increased risk of ovarian cancer among the entire
11 studied population for African-American women and
12 for white women, and the confidence intervals are
13 reported there.  So, yes, an informed reader will
14 know whether or not those were statistically
15 significant or not.
16      Q.  Do African-American women use genital
17 talc more frequently than white women?
18      A.  That has been recorded in a number of
19 studies, yes, that --
20      Q.  Did Davis find a dose-response?
21      A.  As I stated in my report, based on
22 broad categorizations of either frequency or
23 duration, they did not -- we did not report a
24 dose-response.  However, in the paper, we did note
25 that we did not -- because of the availability of

Page 118

1  data from the various studies, we did not have a
2  measure of both frequency and duration that would
3  allow the most accurate measure of dose.
4      Q.  But just to be clear, there was no
5  dose-response either for duration or for
6  frequency, right?
7          MS. PARFITT:  Objection.  Asked and
8      answered.
9          THE WITNESS:  I -- I just answered
10     that for you.  I mean, maybe you could read
11     back my response.  I --
12 BY MS. DAVIDSON:
13     Q.  You agree that there was no finding of
14 a dose-response either for duration or frequency,
15 correct?
16         MS. PARFITT:  Objection.  Asked and
17     answered.
18         THE WITNESS:  Like I said, I did -- I
19     did state that in my previous answer.
20 BY MS. DAVIDSON:
21     Q.  It was lost in the long answer.  So I
22 just want to make sure I have the record clear.
23     A.  Okay.  Once again, we did not find a
24 dose-response for frequency or duration as I noted
25 in my report based on broad categorizations.

Page 119

1          MS. DAVIDSON:  Okay.  Let's go off the
2      record.
3              * * *
4          (Whereupon, there was a luncheon
5      recess in the proceedings from 12:10 p.m.
6      to 12:59 p.m.)
7              * * *
8  BY MS. DAVIDSON:
9      Q.  So we're going to go to your 2023
10 report, which is Exhibit 6, and we had started
11 talking about that.  And I believe we talked about
12 Davis.
13     A.  Uh-huh.
14     Q.  And just to reorient us, I had a few
15 questions about a paper called Phung 2022.
16     A.  Uh-huh.
17     Q.  We can mark that, M.T. Phung, et
18 al. --
19         MS. PARFITT:  I believe it's
20     Exhibit 8.
21         MS. DAVIDSON:  Yeah.  I'm about to say
22     that, 8.  "Effects of risk factors for
23     ovarian cancer in women with and without
24     endometriosis."  I'm going to mark it as
25     Exhibit 8.  Our court reporter can't type

Page 120

1  and stamp at the same time.  So that's why
2  I did the title first.
3          (MOORMAN EXHIBIT 8, Effects of risk
4      factors for ovarian cancer in women with
5      and without endometriosis, was marked for
6      identification.)
7  BY MS. DAVIDSON:
8      Q.  Dr. Moorman, you're familiar with this
9  paper, correct?
10     A.  Yes, I am.
11     Q.  Are you familiar with any of the
12 authors on here?
13     A.  I have met many of them over the
14 years.
15     Q.  Who is Daniel Cramer?
16     A.  Daniel Cramer, he's an ovarian cancer
17 epidemiologist.  He's also a medical doctor.  He
18 was the one who published probably the first
19 epidemiologic study noting an association --
20 increased risk of ovarian cancer with talc use.
21 And I understand that he is also a plaintiff
22 witness.
23     Q.  Does this paper indicate somewhere
24 that Dr. Cramer is a plaintiff expert?
25     A.  Yes.  In the acknowledgments.

Page 121

1      Q.  What does it say?
2      A.  Wait.  I'm sorry.  He reports payment
3  for expert testimony from Ferraro Law Firm and
4  Ashbrook [sic] -- Ashcraft & Gerel law firm in
5  grant funding.
6      Q.  And does this paper indicate that that
7  payment involves talc litigation?
8      A.  No, it does not.
9      Q.  And does it indicate whether he is an
10 expert for the plaintiff side or the defense side?
11     A.  No, it does not state that in that
12 disclosure.
13     Q.  So the average person reading this
14 paper wouldn't know that Dr. Cramer is a
15 plaintiff's expert, correct?
16     A.  No, they would not know that from that
17 statement.
18     Q.  And what's an open access article?
19     A.  An open access --
20     Q.  Uh-huh.
21     A.  -- article?  Just as the name implies,
22 that it is available to -- to anyone, that it does
23 not require a subscription to the journal.
24     Q.  Is there a difference between open
25 access journals and other journals?

Page 122

1    A.  Well, getting into a bit of it, for
2  some journals that are not open access, if you
3  want to access one of their articles, you either
4  have to be a subscriber or you have to pay a fee
5  for the article.
6          There is an NIH requirement that if --
7  work that is funded by NIH funding has to be
8  available in this -- as they describe here, the
9  HHS public access, meaning that it's freely
10 available.
11   Q.  Do open access journals have the same
12 publication standards as other journals?
13   A.  I mean, you're talking about a whole
14 range of journals, and there's a range of
15 standards with -- within every journal.  But
16 generally, open access journals, speaking in very
17 general terms, they would go through a peer review
18 process, just like a non-open access journal.
19   Q.  Got it.  I just didn't know.
20       Have you ever spoken with Dr. Cramer?
21   A.  Yeah, I have.  Not in quite a few
22 years, but I have spoken to him in the past.
23   Q.  About this litigation?
24   A.  Never about this litigation.
25   Q.  Have you ever spoken to any of

Page 123

1  plaintiff's experts about this litigation?
2    A.  No.  Not to my knowledge, no.
3    Q.  Have you ever spoken to any of your
4  professional colleagues about this litigation?
5    A.  I have spoken to several of my
6  colleagues that I am involved in it.  I have not
7  discussed really any of the specifics of it, you
8  know, like not going through articles and
9  expressing my opinion or asking their opinion
10 about any articles.  It's always been in very
11 general terms of this is something that I am
12 doing.
13   Q.  And is the involvement of a
14 plaintiff's expert one factor that you consider in
15 weighing the reliability of an article?
16   A.  Again, as we discussed, when looking
17 at whether or not there is any potential conflicts
18 of interest, it's like, sure, it's something that
19 you might consider.  But what really drives it is
20 that -- the same thing that drives any evaluation
21 of an article, mainly just looking at the
22 methodology and -- and the interpretations.
23   Q.  Is family history a risk factor for
24 ovarian cancer?
25   A.  You need to be more specific.

Page 124

1    Q.  Is a family history of ovarian cancer
2  considered to be a risk factor for ovarian cancer?
3    A.  Yes.  You asked only about family
4  history, but a family history of ovarian cancer is
5  a risk factor --  is considered a risk factor.
6    Q.  If you look at Table 2 of the Phung
7  paper, what's the reported odds ratio for
8  first-degree family history of ovarian cancer with
9  endometriosis?
10   A.  So -- okay.  The printing on this
11 version of it is a little wonky.  That's why
12 it's taking a minute.
13       So among women with endometriosis,
14 those that have a first-degree family history of
15 ovarian cancer, the odds ratio is 1.58.
16   Q.  And what about for first-degree
17 history of ovarian cancer without endometriosis?
18   A.  For them, the odds ratio is 2.20.
19   Q.  So just to make sure I understand,
20 does this paper report a higher odds ratio for
21 family history without endometriosis?
22   A.  Yes.  The -- the point estimate is
23 among women without a -- who did not report a
24 history of endometriosis, the odds ratio for a
25 family -- first-degree family history of ovarian

Page 125

1  cancer was 2.20.  And for women with
2  endometriosis, they reported 1.58.  And you can
3  see there's considerable overlap in the confidence
4  intervals --
5    Q.  Why is the overlap in the confidence
6  intervals relevant?
7    A.  It's -- so their best estimate of that
8  association is what's reported in the point
9  estimate, the odds ratio.  And then the confidence
10 intervals gives a range of values with which the
11 data are statistically compatible.
12       And so one way to think about it is,
13 like, if you repeated the experiment many times,
14 you might come up with a slightly higher estimate
15 or a slightly lower estimate.  But you can see
16 that the confidence intervals overlap.  So there's
17 a lot of overlap in the range of values for which
18 the data are statistically compatible.
19   Q.  Got it.
20       And that's the same thing we found in
21 O'Brien for the hazard ratio for patent and
22 nonpatent women, right?
23   A.  That there was -- yes, I did
24 acknowledge that there was considerable overlap in
25 those odds ratios.

Page 126

1    Q.  Is there any reason why having
2  endometriosis would cause the known risk factor of
3  first-degree family history for ovarian cancer to
4  become attenuated?
5        MS. PARFITT:  Objection.
6        THE WITNESS:  One could -- I think --
7    let me start again.
8        I cannot think of a reason of that --
9    why that would be the case, but I think
10   that this is just possibly reflecting
11   some -- a little bit of random variation.
12   It's -- you know, in this particular study,
13   they found an odds ratio of 1.58 among
14   women who had a history of endometriosis.
15   In other studies, it might be a bit lower
16   or a bit higher.
17  BY MS. DAVIDSON:
18   Q.  So you're saying, rather than
19  endometriosis protecting you from ovarian cancer
20  when you have a family risk, this may just be a
21  numbers issue?
22   A.  It may be a numbers issue.  It may be
23  some biological mechanism of which I am unaware.
24   Q.  Could you turn to Table 1?  Are you
25  looking at Supplementary Table 1?

Page 127

1    A.  I didn't realize you said
2  "supplementary."
3    Q.  I probably screwed up.  I apologize.
4    A.  Okay.  This -- the version that you
5  provided to me does not -- does not have
6  Supplemental Table --
7        MS. DAVIDSON:  Asher, can we mark
8    Supplemental Table 1 of Phung as -- as our
9    next exhibit.  I didn't realize it wasn't
10   stapled to the back.
11       THE WITNESS:  Okay.
12       MS. DAVIDSON:  So we're marking
13   Supplemental Tables 2 Phung as Exhibit
14   Number --
15       MS. PARFITT:  9.
16       MS. DAVIDSON:  -- as Exhibit Number 9.
17       (MOORMAN EXHIBIT 9, Supplemental Table
18   1 and 2 Phung, was marked for
19   identification.)
20  BY MS. DAVIDSON:
21   Q.  Did you look at these supplementary
22  tables when you reviewed Phung?
23   A.  I did.
24   Q.  You did?
25   A.  Yes, I did.

Page 128

1    Q.  Is it your typical practice to look at
2  supplemental tables when you review a study?
3    A.  I often do, yes.
4    Q.  Okay.  I'm looking at these
5  supplemental tables.  And if you go down to
6  "Talc use," Page 2, it shows talc use, genital
7  use, never, nongenital use, and then it says
8  missing, right?
9    A.  Correct.
10   Q.  And as I read it, there's a lot of
11  data missing on talc use, right?
12   A.  Correct.
13   Q.  In every column, it's somewhere around
14  40 percent, right?
15   A.  That is correct.
16   Q.  So both for cases/controls with
17  endometriosis, without endometriosis, there's a
18  lot of missing information there, right?
19       MS. PARFITT:  Objection.  Form.
20       THE WITNESS:  They report -- yes, they
21   report missing values of roughly 40
22   percent.
23  BY MS. DAVIDSON:
24   Q.  And if you look at the supplemental
25  table -- they call it "Supplementary Table" -- for

Page 129

1  each characteristic, they tell you how much data
2  are missing, right?
3    A.  Uh-huh.
4    Q.  And there's a percentage for each
5  characteristic.  And talc is, by far, the one with
6  the highest amount of missing data; is that
7  correct?
8        MS. PARFITT:  Objection.  Form.
9        THE WITNESS:  Yes.
10  BY MS. DAVIDSON:
11   Q.  Do you know why so much data are
12  missing?
13   A.  I would presume that there may have
14  been some of the included studies that did not
15  include that question on their questionnaire.
16   Q.  Did -- did the volume of missing data
17  affect in any way your analysis of this paper?
18   A.  It -- it really did not because it
19  would -- within that subset of women who had
20  missing data, it would not have differed; like,
21  you know, the cases were reporting it, and the
22  controls were not.  I don't think that there was
23  any difference.  I think that is -- there just
24  might have been some studies that did not ask
25  about --

Patricia G. Moorman, Ph.D.

Page 130

1    Q.  So -- so when you discussed Phung in
2  your paper -- in your report -- in your 2023
3  supplemental report, you don't mention that
4  there's -- approximately 40 percent of the data
5  were missing, right?
6    A.  No.  I think that's a
7  mischaracterization.  It's not missing -- not a
8  huge amount of missing data from a single study,
9  which might raise some different concerns.
10  It's -- apparently, there were just some studies
11  that did not have that data available or -- or
12  perhaps in a form that was compatible with how the
13  others collected it.
14    Q.  My question was just simply:  You
15  don't address Supplemental Table 1 and the missing
16  data in your report, correct?
17    A.  No, I do not.
18    MS. PARFITT:  Objection.
19  BY MS. DAVIDSON:
20    Q.  Thank you.
21    Can we go back to O'Brien 2020, which
22  I believe is Exhibit 2.  You mentioned in your
23  paper -- in your report that women who had ovarian
24  cancer prior to baseline were excluded, right?  Do
25  you recall discussing that in your report?

Page 131

1    A.  I did.
2    Q.  And you state in your report:  If talc
3  use is more strongly associated with ovarian
4  cancer diagnosed at younger ages, the use of
5  cohorts of older women would be less able to
6  detect such an association.
7    Do you recall saying that?
8    A.  I do.
9    Q.  Can you point to any studies that show
10  that talc is more strongly associated with ovarian
11  cancer diagnosed at younger ages?
12    A.  I believe that -- just one moment.  I
13  recall that one of the papers that Dan Cramer was
14  a co-author on -- and I'm not sure exactly which
15  one it was, but -- did report a stronger
16  association for premenopausal women.
17    Q.  Are you offering an opinion in this
18  litigation that talc use is more strongly
19  associated with ovarian cancer diagnosed at
20  younger ages?
21    A.  I am not offering any opinion in that
22  regard.
23    Q.  Okay.  Then we don't have to talk
24  about it anymore.
25    A.  Okay.

Page 132

1    Q.  So is it fair to say that was just --
2  that sentence was just -- was that sentence
3  speculative?
4    MS. PARFITT:  Objection.  Form.
5    THE WITNESS:  What I was pointing out
6  with that statement is that -- potential
7  limitations of studies.  And a potential
8  limitation of this study, the Women's
9  Health Initiative, the -- the women were 63
10  years old on average when they were
11  enrolled in the cohort.  And so it is a
12  potential concern.  That's what I was
13  pointing out.
14  BY MS. DAVIDSON:
15    Q.  And is that a potential concern for
16  the NHS studies or the sister study?
17    A.  It's actually a concern for -- for --
18  for all of them.  I mean, that's across the board.
19  It's like, you know, from the point that -- you
20  know, as we often do, we have some concerns about
21  potential limitations of the study and all of
22  these -- and to some -- I mean, the Women's Health
23  Initiative is the most extreme where the -- the
24  age of the cohort was the oldest.  But it's a
25  concern with -- with all of them to some extent.

Page 133

1    Q.  What are the strengths of the O'Brien
2  paper?
3    A.  So some of the strengths of it are
4  that it does have a pretty large sample size.
5  It's generally the -- the studies were
6  well-conducted studies by, you know, strong
7  investigators, although none of them were actually
8  designed specifically to address ovarian cancer.
9    And so as in cohort studies in
10  general, they're able to address a lot of
11  different risk factors.  But in general, they tend
12  to get -- have less detail on some of the
13  exposures.
14    So like any cohort studies, there are
15  some strengths in terms of the sample size, the
16  fact that the data were collected before the
17  diagnosis of -- of ovarian cancer.  But then those
18  are balanced with some of the limitations of any
19  cohort study as well.
20    Q.  Do you list in your report any -- do
21  you have a section in your report where you list
22  the strengths of the O'Brien paper?
23    A.  I did not specifically.
24    MS. DAVIDSON:  Okay.  Let's talk about
25  Woolen 2022.  Let's mark that paper as

Page 134

1  Exhibit 10.  Exhibit 10.  And the title of
2  the paper is S.A. Woolen, et al.,
3  "Association Between the Frequent Use of
4  Perineal Talcum Powder Products and Ovarian
5  Cancer:  a Systematic Review and
6  Meta-analysis.  2022.
7       (MOORMAN EXHIBIT 10, Association
8       Between the Frequent Use of Perineal Talcum
9       Powder Products and Ovarian Cancer:  a
10      Systematic Review and Meta-analysis, was
11      marked for identification.)
12  BY MS. DAVIDSON:
13      Q.  Are you familiar with any of the
14  authors of the Woolen paper?
15      A.  I don't believe that I've ever met any
16  of them in person.
17      Q.  Who is the senior author?
18      A.  The last author is Rebecca
19  Smith-Bindman.
20      Q.  And have you heard her name before you
21  read this paper?
22      A.  I believe that I have read some of her
23  other work, and I understand that she is an expert
24  in this litigation.
25      Q.  Have you read her expert -- any of her

Page 135

1  expert reports in this litigation?
2      A.  Not that I recall.
3      Q.  Are you aware that this meta-analysis
4  stemmed from her expert report?
5      MS. PARFITT:  Objection.
6      THE WITNESS:  I do not.  I mean, all I
7      know about this report is what's in the
8      paper.  There's no mention of that, to my
9      knowledge, in the paper.  I don't recall
10     that being mentioned.
11  BY MS. DAVIDSON:
12     Q.  So you didn't know she did a
13  meta-analysis for the litigation?
14     A.  I don't recall reading a report -- her
15  report, so I don't know what she did or did not
16  do.
17     Q.  So I take it you didn't compare the
18  Woolen paper to the meta-analysis she did in the
19  litigation?
20     A.  No, I don't.  I -- I don't recall
21  reading a report from her.
22     Q.  Do you know that Dr. Woolen received
23  Dr. Smith-Bindman's litigation report before
24  beginning this paper?
25     MS. PARFITT:  Objection.  Form.

Page 136

1      THE WITNESS:  Again, what I know about
2      it is what's in this article, and I don't
3      believe there was any mention of that.
4  BY MS. DAVIDSON:
5      Q.  Would the fact that Dr. Woolen
6  received Dr. Smith-Bindman's litigation report
7  before setting out to do this study affect your
8  grading or weighting of the study's quality?
9      A.  Again, it's -- knowing that one of the
10  authors was a plaintiff's expert, certainly what
11  it does is it just makes me evaluate the
12  methodology, and was there anything that I found
13  particularly concerning about the methodology or
14  the interpretation.  That's how I would take that
15  knowledge into consideration.
16      Q.  At the top of this paper, the
17  background says:  Risk of ovarian cancer in women
18  with frequent perineal talcum powder product use
19  is not well understood.
20      Do you agree with that?
21      MS. PARFITT:  You're referencing the
22      background?
23      MS. DAVIDSON:  The very first
24      sentence.
25      MS. PARFITT:  She's looking at that.

Page 137

1  Thank you.
2      THE WITNESS:  I think that the
3  modifier the -- frequent perineal talcum
4  powder use, the "frequent" is the modifier.
5  And I think that that's what they were
6  trying to get at, that there has not been a
7  systematic review that focused on frequent
8  use.
9      So from the standpoint that it's not
10  well understood, there have not been a lot
11  of data.  At least they have not been
12  combined into a systematic review like
13  that.
14      So I -- I can see where they're coming
15  from, and I think that it's a fair
16  statement for what they're getting at.
17  BY MS. DAVIDSON:
18     Q.  How did the authors decide to define
19  "frequent use" as 2 times -- at least 2 times per
20  week?
21     A.  They do not describe their reasoning
22  for it.  They define what they, you know -- like
23  any paper, you make decisions about what you're
24  going to analyze, and you just need to be -- just
25  lay it out.  This is what she did.  And they

1 didn't explain why they set that cut point.
2     Q.  Are you aware of any papers prior to
3 Woolen that defined frequent powder use
4 differently than at least 2 times per week?
5         MS. PARFITT: Objection. Form.
6         THE WITNESS:  Generally, papers would
7     have some -- if they had some measure of
8     frequency, they would just lay out the
9     categories what they had, you know, if it
10    was once a week or how many times per
11    month, you know, one time a month, you
12    know, five to ten times a month or
13    whatever.  I don't think that it's typical
14    to say -- to say this is frequent; this is
15    infrequent.
16 BY MS. DAVIDSON:
17    Q.  Well, this paper says that more than 2
18 times a week is frequent, right?
19    A.  That's how they defined it.  And like
20 I said, when you do an analysis, they are just
21 saying how they defined this exposure.  Frequent
22 use defined as.
23        And, you know, another person might
24 disagree with, no, that's infrequent or that's not
25 frequent enough.  But as long as the authors are

1 clear on what -- what they're defining it as, it's
2 easy to interpret the data, and it's fair to
3 interpret the data like that.
4     Q.  I think you didn't understand my
5 question, which was:  Are you familiar with any
6 other talc literature in this body of literature
7 that we're discussing here today that defined
8 "frequent use" differently?
9         MS. PARFITT: Objection. Excuse me.
10    Objection.  Form.
11        THE WITNESS:  I believe that I've
12    answered your question.  They don't
13    typically say this is frequent; this is
14    infrequent.  They just put the categories
15    of use when they're talking about
16    frequency.
17 BY MS. DAVIDSON:
18    Q.  These authors say frequent, right?
19 Frequent is at least 2 times per week, right?
20    A.  And that is the decision that they
21 made.  They wanted to look at women who were using
22 it more frequently, what -- and they delineated
23 the cut point that they used and -- so, again,
24 it's -- a different set of investigators might
25 have defined it differently.  But they're being

1 transparent, I think, about what they -- what they
2 defined.
3     Q.  Right.  But my question simply is
4 just:  Are you aware of any papers that have a
5 different cut point for frequency?
6         MS. PARFITT: Objection.  Asked and
7     answered.
8         MS. DAVIDSON:  No, it hasn't been
9     answered.
10        MS. PARFITT:  I believe it has.
11        THE WITNESS:  I don't -- I -- what I
12    have answered repeatedly is that,
13    typically, when they talk about frequency,
14    they give the categories that they used.  I
15    don't -- I don't think that it is very
16    common to say frequent or infrequent.  They
17    just report the categories they used.
18 BY MS. DAVIDSON:
19    Q.  But this paper reports frequent or
20 infrequent, right?
21    A.  They -- they are -- they describe what
22 they hoped to do, to look at use among more
23 frequent users.  Then they had to set a cut
24 point --
25    Q.  Right.

1     A.  -- because there would be -- and so
2 they -- they put it out there that what they
3 wanted to look at are those women who had used it
4 2 or more times per week.
5     Q.  Right.  Totally agree.  And I'm
6 asking:  Are there any other papers in this whole
7 body of literature that also defined "frequent"
8 with a cut point but use a different cut point?
9 That's all I'm asking.
10    A.  I don't recall --
11    Q.  Okay.
12    A.  -- anyone -- I -- I just don't recall
13 any people -- I don't recall people defining
14 frequent, infrequent, like -- they just report the
15 categories of frequency of use.  That's what I
16 recall from the papers.
17    Q.  So this is the only paper that you can
18 think of that has a cut point for the use of the
19 word "frequent"?
20        MS. PARFITT:  Objection.  Misstates
21    her testimony.
22        THE WITNESS:  What they were doing
23    there is they wanted to set, basically, a
24    minimum level --
25 BY MS. DAVIDSON:

Patricia G. Moorman, Ph.D.

Page 142

1    Q.  Right.
2    A.  -- of frequency of use.
3    Q.  Right.
4    A.  And they just put it out there.  And I
5  think -- I think it's fine.  It's -- it's --
6    Q.  No, I know you think it's fine.  I'm
7  just asking whether you know whether any other
8  papers define "frequent" with a different cut
9  point.  That's all I'm asking.
10       MS. PARFITT:  Again, objection.  It's
11    been asked, and it's been answered
12    exhaustively.  I'm not sure she can answer
13    better.
14       THE WITNESS:  I -- I truly do not -- I
15    think I've answered the question about
16    three times already.
17  BY MS. DAVIDSON:
18    Q.  And the answer is, no, you don't know
19  of another paper that uses the term "frequent"
20  with a different cut point?
21       MS. PARFITT:  Objection.  That's not
22    her testimony.  Misstates.
23  BY MS. DAVIDSON:
24    Q.  So it's a "yes" or "no."
25    A.  What I --

Page 143

1       MS. PARFITT:  It's neither.
2       THE WITNESS:  What I have stated is,
3    what I typically recall from the papers is
4    they report the categories of frequency.
5    And I don't recall papers saying this is
6    frequent; this is infrequent.  This is
7    basically their inclusion criteria for the
8    studies that they wanted to include for the
9    purpose of looking at women who had used
10    talc more frequently.
11  BY MS. DAVIDSON:
12    Q.  Is the reliability of a meta-analysis
13  contingent on proper selection of studies and
14  datasets?
15    A.  Yes.
16    Q.  And fair to say that the authors of a
17  meta-analysis can skew the results based on
18  selection of studies -- right?
19       MS. PARFITT:  Objection.
20  BY MS. DAVIDSON:
21    Q.  -- based on how they select studies?
22    A.  It is important for authors to be
23  transparent about the inclusion criteria that they
24  set out.  They go through and they describe what
25  they did, and it's a pretty typical description of

Page 144

1  what you do with a meta-analysis.
2       And with selection of studies, a
3  different investigator might make a different
4  decision.  But it's -- these -- the results
5  they're presenting here are the results from
6  studies that reported frequent use defined as that
7  minimum level.
8       And, you know, so the results should
9  be appropriate for studies that met that inclusion
10  criteria.  And I wouldn't consider that skewing
11  the results.
12    Q.  My question simply was:  Is there a
13  risk that authors of a meta-analysis can skew the
14  results based on how they define inclusion
15  criteria --
16       MS. PARFITT:  Objection.  Form.
17  BY MS. DAVIDSON:
18    Q.  -- generally?
19       MS. PARFITT:  Objection.  Form.
20       THE WITNESS:  If someone did not do a
21    meta-analysis according to typical
22    standards, and they did some very
23    outrageous exclusion or inclusion of
24    studies, they could skew the results.
25       But when it's laid out how they did

Page 145

1    it, and you might disagree with some of the
2    decisions, but I don't think the results
3    would be skewed if they clearly lay out
4    their inclusion criteria and how they
5    selected their studies.
6  BY MS. DAVIDSON:
7    Q.  So is it your testimony that as long
8  as the authors state their inclusion criteria,
9  there's no concern that they are skewing results
10  based on the decisions they're making?
11    A.  What I am saying is, I don't really
12  like the phrasing "skewing the results."  Like,
13  they're making a decision to define "frequency" as
14  at least 2 times -- 2 or more times per week.
15  Someone else might disagree with that and say, no,
16  frequent use has to be at least 5 times a week.
17  And that's not skewing the results.  It's just,
18  like -- it's making a decision.
19       And then it's -- if they're following
20  the normal, standard procedures for doing a
21  meta-analysis, then the results are what they are
22  for that set of articles.  And as long as they're
23  transparent, I would not consider the results to
24  be skewed.  It's the results for that set of
25  studies.

Patricia G. Moorman, Ph.D.

Page 146

1    Q.  What's the Newcastle-Ottawa Scale?
2    A.  It is one of several scales that --
3  that are sometimes used in meta-analyses to rate
4  the quality of studies.  There are a number of
5  criteria that can be applied.  And basically, it
6  gives you -- can give you an idea of some of the
7  studies that are perhaps stronger and some that
8  are weaker by the criteria they lay out.
9    Q.  Is that -- is it objective or
10 subjective?
11   A.  It is -- it's truly both.  You come up
12 with a number, but it is -- which sounds
13 subjective.  But along the way it's sometimes
14 difficult to say, you know, did they do a good job
15 on selection, or did they adequately control for
16 confounding?
17       And so, you know, someone might say,
18 well, they controlled for confounding, but they
19 didn't control for all the possible confounders.
20 So there is some subjectivity in the -- applying
21 the criteria.  And so you use a somewhat
22 subjective criteria, and you wind up with a number
23 that is somewhat objective.
24   Q.  If you look at Table 1, which study
25 receives the highest score?

Page 147

1    A.  It was the data from the Nurses'
2  Health Study.
3    Q.  Do you agree with that assessment?
4    A.  I -- I'm -- you know, I have never --
5  I think that the Nurses' Health Study is a
6  well-designed study overall.  I think that it's
7  generally a strong study, but it does have
8  limitations.  And then the difference between that
9  9 and then the 8s for most of the case-control
10 studies, all of that means they're pretty --
11 they're good studies.
12   Q.  Do you recall any other paper that you
13 reviewed in this litigation that also used
14 Newcastle-Ottawa Scale?
15   A.  I'm not -- I mean, the
16 Newcastle-Ottawa Scale is one of several scales
17 that are -- have been used in meta-analysis to
18 assess study quality.
19       And, you know, I have reviewed several
20 meta-analyses in the course of reviewing all of
21 this.  And I do not recall which used
22 Newcastle-Ottawa's Scale, which used maybe the
23 Cochrane Scale, and I think there are several
24 others.  So I just --
25   Q.  So you don't recall that Taher 2019

Page 148

1  also used the Newcastle-Ottawa Scale?
2    A.  I didn't recall that specifically, no.
3    Q.  And did you compare the scores that
4  Woolen gave to these studies versus the scores
5  that Taher gave these studies?
6    A.  I did not.
7    Q.  If you look at the Whittenmore paper
8  here, you can see that Woolen and Smith-Bindman
9  give the Whittenmore study a score of 8 -- a 7,
10 correct?
11   A.  Yes, I do see that.
12   Q.  Does that 7 connote a strong study?
13   A.  I mean, it's -- I think that it
14 connotes a study that is overall pretty good, but
15 some limitations as well.  There's no perfect
16 study.
17   Q.  Do you know why Woolen would have
18 assigned higher ratings to most of the
19 case-control studies than Taher did?
20   A.  I wouldn't know that.  As I said,
21 there is some subjectivity in applying each of the
22 criteria scores, and so it would not be completely
23 out of question that different evaluators might be
24 more rigid or more lenient.
25   Q.  Do you have a view as to whether these

Page 149

1  scores provided by Woolen under the
2  Newcastle-Ottawa Scale are more or less reliable
3  than the very different scores that are in the
4  Taher paper?
5        MS. PARFITT:  Objection.  Form.
6        THE WITNESS:  I -- I don't know what
7    the thought process was for either set of
8    investigators.  You know, I -- I do know
9    from using similar scales that there is
10   some subjectivity in it, and it's not
11   necessarily reflecting any bias on the part
12   of the investigator.  But it's -- sometimes
13   it's just hard to get the information
14   because it might not be well reported in
15   some paper.  I don't know what their
16   thought processes were.
17 BY MS. DAVIDSON:
18   Q.  If we could turn to Page 2531.  At the
19 bottom of Page 2531, the Woolen paper states that
20 the studies were of high quality.  Do you see
21 that?  Right at the end of Page 2531.  Almost at
22 the end of that page.  2531.  Right at the bottom.
23 Under "Strengths."
24   A.  Yes.
25   Q.  The author states:  the included

Page 150

1 studies were of high quality.
2       Do you see that?
3       A.  Yes.
4       Q.  That's very different from what Taher
5 said, correct?
6       MS. PARFITT:  Objection.  Form.
7       THE WITNESS:  I'm not sure exactly
8    what statement you're referring to in the
9    Taher report.
10 BY MS. DAVIDSON:
11      Q.  Have you forgotten that we discussed
12 right before lunch that Taher said the quality of
13 the evidence was very low?
14      A.  You're talking about two different
15 things here.  This is -- that is not talking to
16 the quality of individual studies.
17      Q.  You don't think Taher was talking
18 about the quality of the individual studies?
19      A.  I think that he was talking about some
20 of the limitations in the -- but I think that it's
21 not a direct apples-to-apples comparison.  I think
22 that it is possible to have high-quality studies
23 that still have some limitations.
24      Q.  But Taher gave lower points on the
25 Newcastle-Ottawa Scale to all these studies.  Is

Page 151

1 that also not an apples-to-apples comparison?
2       MS. PARFITT:  Objection.  Form.
3    Misstates the evidence.
4       THE WITNESS:  You know, again, I do
5    not recall the -- the scores right off that
6    he gave on this scale.  I already stated
7    that I didn't do a comparison.  And I've
8    explained that there is some subjectivity
9    in assigning the scores, and I don't know
10    what their thought processes were.
11 BY MS. DAVIDSON:
12      Q.  Did the authors of Woolen use all
13 women from the NHSI study with frequent use in
14 their meta-analysis?
15      A.  Okay.  They indicate that they
16 included women with intact fallopian tubes.
17      Q.  Where are you reading from?
18      A.  It is in the footnote to Table 2.
19      Q.  Uh-huh.  Footnote 5?
20      A.  Yes.
21      Q.  And why do they say they did that?
22      A.  They said to harmonize with other
23 publications.
24      Q.  Are there any other publications
25 listed in Table 2 that are limited to patent

Page 152

1 women?
2       A.  Right offhand, I don't know -- I don't
3 know.
4       Q.  So you don't know what, if any,
5 publications they were trying to harmonize to,
6 correct?
7       A.  No, I do not.
8       Q.  Did O'Brien provide data for all
9 women?
10      MS. PARFITT:  Objection.  Form.
11 BY MS. DAVIDSON:
12      Q.  To Woolen?
13      A.  They -- they say data -- the data from
14 NHSI were provided and described in Supplemental
15 Table 1.  But it is not entirely clear to me did
16 they provide it for all women in the study or only
17 those -- I don't know -- they don't specify.
18      Q.  Did you look at Supplemental Table 1?
19      A.  I -- I don't have it here.  Do you --
20      Q.  Do you recall if you looked at it in
21 evaluating the paper?
22      A.  I know that I looked at the
23 supplemental data just trying --
24      MS. PARFITT:  I'm going to get it to
25    you, yep.

Page 153

1       MS. DAVIDSON:  We're going to mark it
2    as an exhibit.
3       THE WITNESS:  Okay.
4       MS. PARFITT:  Mine is marked up.  I
5    don't think you're going to approve of
6    that.  Mine has marks on it, so let's get a
7    clean one.
8       MS. DAVIDSON:  Exhibit 11.  I'm sorry?
9       MS. PARFITT:  I said, mine has marks
10    on it, so let's get a clean one.
11      MS. DAVIDSON:  Yeah, let's not use
12    that.
13      MS. PARFITT:  I'm sure you won't like
14    mine.
15      MS. DAVIDSON:  We're going to mark as
16    Exhibit 11 Supplementary Table 1.
17      (MOORMAN EXHIBIT 11, Supplementary
18    Table 1, was marked for identification.)
19      THE WITNESS:  Okay.  In
20    Supplemental -- Supplementary Table 1 --
21    let's see.  Yeah, they -- they report that
22    they got data from all women.  And then
23    they separate out the data for the women
24    with patent, have fallopian tubes.
25 BY MS. DAVIDSON:

Patricia G. Moorman, Ph.D.

Page 154

1    Q.   Would there have been more ovarian
2  cancer cases if Woolen had done its analysis with
3  all women?
4    A.   Yes, there would have been.
5    Q.   Have you done any analysis as to how
6  that might change the -- might have changed the
7  reported OR for this paper?
8    A.   I have not done any analysis in that
9  regard, no.
10    Q.   Do you know if it would have been
11  lower?
12        MS. PARFITT:  Objection.  Form.
13        THE WITNESS:  The adjusted hazard
14    ratio for all women was 1.27.  Again,
15    statistically significantly increase, but
16    it was lower than what they observed for
17    the women -- or what they reported for the
18    women with the patent fallopian tubes,
19    which was 1.40.
20  BY MS. DAVIDSON:
21    Q.   That was for daily users?
22    A.   Right.
23    Q.   And what are the criteria for this
24  paper?
25    A.   Okay.  The criteria for including a

Page 155

1  study was that it had to be 2 or more times per
2  week.  And then in Table 2 of the main paper, they
3  specify the talc exposure that they apparently
4  considered frequent use, and it was daily in the
5  O'Brien study.
6    Q.   While we're looking at Table 2, under
7  specification of talc exposure, are any of those
8  frequencies listed there less than 4 times a week?
9    A.   No.  The -- Mills reports their
10  highest category of exposure was 4 to 7 times per
11  week.  And I believe that's what they did, that
12  they -- I believe that they were looking at the
13  women in the highest category of use.
14    Q.   Do you know why it says on Page 1 that
15  they looked at 2 times per week or more use, when
16  Table 2 shows that, actually, they only used data
17  for 4 times or more per week use?
18        MS. PARFITT:  Objection.  Form.
19        THE WITNESS:  Once again, it was --
20    they established that criteria that a study
21    had to -- apparently, that's the criteria
22    they established; that to be included in
23    their analysis, they had to have this
24    exposure of at least 2 times a week.
25        And then I believe they went on to --

Page 156

1  to say but what they actually analyzed were
2  the most frequent -- the highest level of
3  exposure reported in the study.  And it
4  just would be, in this case, among those
5  studies that met their criteria of
6  reporting on use at least 2 times a week,
7  all of the studies had 4 times a week or
8  more that --
9  BY MS. DAVIDSON:
10    Q.   Would it have been more accurate to
11  state in the background that they actually did a
12  meta-analysis of data for 4 times or more per week
13  use?
14        MS. PARFITT:  Objection.
15        THE WITNESS:  So, once again, it's
16    like they set out these criteria.  "A study
17    would be included if," and so if they
18    reported use on at least 2 times a week.
19    So that was -- this is the cut point they
20    used for including the study or not.
21        Then they went through looking at all
22    the studies.  And it's like these 11
23    studies met that criteria of having at
24    least 2 times a week, but they actually had
25    greater than 2 times a week.

Page 157

1        So it's kind of like the distinction
2    between what is the minimum level to be
3    included as one of the studies versus what
4    was actually done in that study.
5  BY MS. DAVIDSON:
6    Q.   Do you know how many of the papers
7  listed here as 1 through 11 provide hazard ratios
8  for 2 or more times per week of use?
9    A.   No, I have not gone through them
10  individually to look at that.
11    Q.   Do you know whether the risk ratios
12  reported in these papers for 2 times per week or
13  more of use differ from those set forth in Table
14  2?
15        MS. PARFITT:  Objection.
16        THE WITNESS:  Please repeat that
17    question.  I didn't catch it.
18        MS. DAVIDSON:  Can you repeat it?
19        (The following question was read back:
20        Q:  Do you know whether the risk
21    ratios reported in these papers for 2 times
22    per week or more of use differ from those
23    set forth in Table 2?)
24        THE WITNESS:  As I said, I don't
25    recall specifically from these studies

Page 158

1  which, if any, reported an odds ratio for
2  specifically 2 times a week or more.  I
3  don't know what the categories were --
4  which were -- off the top of my head, I
5  don't know the categories of frequency of
6  use that each of these studies reported on.
7  BY MS. DAVIDSON:
8     Q.  So you don't know how using data for 2
9  times more per week of use would have changed the
10 results of this paper?
11    MS. PARFITT:  Objection.  Misstates
12 her testimony.
13    THE WITNESS:  I just want to make sure
14 that my recollection is correct, that
15 they --
16    Okay.  As they describe in the title
17 to Table 2, they -- it's the most frequent
18 perineal talcum powder use reported for
19 each study was abstracted.
20 BY MS. DAVIDSON:
21    Q.  Correct.  And my question was --
22    MS. PARFITT:  Wait.  I think she was
23 in the midst of answering the question.
24    THE WITNESS:  And --
25    MS. PARFITT:  Give her a moment.

Page 159

1     THE WITNESS:  -- again, this is the
2  decision they made about how they wanted to
3  analyze the data, because my understanding
4  is they thought that it would be useful
5  what to look at, what is the risk among
6  women who use it most frequently.
7     And it was, you know, the purpose of
8  their paper to look at the -- the
9  highest-frequency users.  And so I don't
10 know if they would have had the data to
11 look specifically at greater than 2 times
12 per week.  I expect that the
13 categorizations in many of the studies
14 were -- would not have lent itself to that.
15 BY MS. DAVIDSON:
16    Q.  My question simply is:  Do you know
17 whether the reported hazard ratio would have
18 changed in this meta-analysis if they had used the
19 data from these papers that involved 2 times per
20 more of use as opposed to using the most frequent
21 perineal talcum powder use reported for each
22 study?
23    MS. PARFITT:  Objection.  Asked and
24 answered.
25    THE WITNESS:  They did not present

Page 160

1  that analysis.  So I can't say that I know
2  what it would be.
3  BY MS. DAVIDSON:
4     Q.  You didn't go back to the papers and
5  do your own analysis?
6     A.  No, I did not.
7     THE WITNESS:  Would you mind if -- I
8  mean, I don't know if you're mostly
9  finished with this paper or not, but we've
10 been going for quite a while.  Would you
11 mind taking a break?
12    MS. DAVIDSON:  Do you want to take a
13 break?  What time is it?
14    MS. PARFITT:  It's 2:00.
15    MR. TRANGLE:  It's 2:00.
16    MS. DAVIDSON:  The thing is, at 2:30 I
17 need to take a break.  So you want --
18    THE WITNESS:  I understand.
19    MS. DAVIDSON:  -- to take one now and
20 then again?
21    MS. PARFITT:  Take a short one.  Yeah,
22 let's take a short one.
23    THE WITNESS:  Just to get up and
24 stretch.
25    MS. PARFITT:  We'll come back in five

Page 161

1  minutes.
2     MS. DAVIDSON:  Absolutely.
3          * * *
4     (Whereupon, there was a recess in the
5  proceedings from 2:01 p.m. to 2:07 p.m.)
6          * * *
7  BY MS. DAVIDSON:
8     Q.  Dr. Moorman, at the front of the
9  Woolen paper on the author's list of
10 inclusion/exclusion criteria, do they say that
11 they are going to include only studies involving
12 women with patent tubes?
13    A.  They did not specify that, that I see.
14    MS. DAVIDSON:  Okay.  Let's mark as
15 Exhibit 12 -- let's mark as Exhibit 12 Wu
16 2009.
17    (MOORMAN EXHIBIT 12, Markers of
18 inflammation and risk of ovarian cancer in
19 Los Angeles County, was marked for
20 identification.)
21 BY MS. DAVIDSON:
22    Q.  Are you familiar with that paper?
23    A.  I'm sorry.  Wu --
24    Q.  Wu 2009.
25    MR. TRANGLE:  Wu 2009.

Patricia G. Moorman, Ph.D.

Page 162

1    THE WITNESS: Wu. Wu.
2    MS. PARFITT: It's W-U.
3  BY MS. DAVIDSON:
4    Q. We're getting it for you.
5    A. Okay. All right.
6    Q. This is going to be Exhibit 12 as soon
7  as we put a sticker on it.
8    A. Okay.
9    Q. Anna Wu, et al., "Markers of
10  inflammation and risk of ovarian cancer in
11  Los Angeles County."
12    A. Yeah.
13    Q. Okay.
14    A. Uh-huh.
15    Q. This -- this paper is on your reliance
16  list, right?
17    A. Yes.
18    Q. If we go down to Table 2, there's a
19  section entitled "Frequency and duration of talc
20  use," correct?
21    A. Yes.
22    Q. And for greater than 10 times per
23  month but less than 30 times per month; do you see
24  that?
25    A. So --

Page 163

1    MS. PARFITT: It starts with the
2    years.
3    THE WITNESS: Okay. So --
4    MR. TRANGLE: The years.
5    MS. DAVIDSON: Yeah.
6  BY MS. DAVIDSON:
7    Q. So let's look at -- let's look at 10
8  to 20 years of use.
9    A. I'm sorry. I'm not seeing 20 to --
10    MS. PARFITT: And I'm not seeing it
11    on --
12    THE WITNESS: -- 10 to 20 years of
13    use.
14  BY MS. DAVIDSON:
15    Q. This is really hard on my eyes, but I
16  thought it says less than 20 years and greater
17  than 10 years. Am I reading that wrong?
18    MS. PARFITT: No, no. Less than 20
19    years and less than or equal to 10 times
20    per month.
21    (Off-the-record conference.)
22  BY MS. DAVIDSON:
23    Q. So apologies for my bad eyesight, but
24  what I'm trying to look at is for less than or
25  equal to 20 years and greater than 10 to less than

Page 164

1  30 times per month. Do you see that?
2    A. I --
3    MS. PARFITT: So that's the second
4    column.
5    THE WITNESS: The second --
6  BY MS. DAVIDSON:
7    Q. Row.
8    A. -- second row under --
9    Q. Not column.
10    A. -- that category. Okay.
11    MS. DAVIDSON: I'm getting you back
12    because you made fun of my eyes.
13  BY MS. DAVIDSON:
14    Q. Okay. So what is the risk ratio
15  there?
16    A. It is 1.16.
17    Q. Is it statistically significant?
18    A. The confidence interval goes from .63
19  to 2.12, so it is not statistically significant.
20    Q. Is 10 times per month at least 2 times
21  per week?
22    A. At least -- is 10 times per month at
23  least 2 times per week? Yes. You could -- you
24  could quibble someone used it in a different
25  manner. But, yeah, we'll -- we'll go with that.

Page 165

1    Q. Okay. So that metric would satisfy
2  the definition of at least 2 times per week,
3  correct?
4    MS. PARFITT: Objection. Form.
5    THE WITNESS: Yes. And it met the
6    metric for including the study in -- in
7    there, in the analysis.
8  BY MS. DAVIDSON:
9    Q. And if you look at less than 20 years
10  and greater than 30 times per month, we can all
11  agree that -- I hope -- that greater than 30 times
12  per month is more than 2 times a week?
13    A. Yes.
14    Q. And what's the risk ratio of that?
15    A. 1.23.
16    Q. And is that statistically significant?
17    A. The confidence interval is 0.63 to
18  2.41. So it is not statistically significant.
19    Q. And Woolen chose not to use that
20  either, right?
21    A. As Woolen described in their paper,
22  they opted to go with the most frequent powder use
23  reported.
24    Q. I understand.
25    A. So they did not --

Page 166

1     MS. PARFITT:  Let her finish.
2     THE WITNESS:  They did not
3 specifically use that.  They went with the
4 criteria that they laid out in their paper
5 for the analysis they performed.
6 BY MS. DAVIDSON:
7     Q.   And if you look at frequency and
8 duration of talc use, in fact, the -- the data
9 that they use for their meta-analysis is actually
10 the only statistically significant increased risk
11 reported in this table, correct?
12     A.   In this table, they report a number
13 of --
14     Q.   I'm talking about for frequency and
15 duration of talc use.
16     A.   Okay.  Just that one section of the
17 table.  That is the only one that is statistically
18 significant.  And, of course, as you well know,
19 statistical significance is driven in part by
20 sample size.  And when you look at these
21 categories, the numbers within the individual
22 categories are -- are pretty small.  So it's not
23 too surprising that some of these are not
24 statistically significant.
25     Q.   I have a question.  Has anyone done a

Page 167

1 study as to whether recall bias affects
2 recollections of frequency of use?
3     A.   I am not aware of such a study, and
4 without having kind of a gold standard of how much
5 was really used and how frequently, I don't know
6 how such a study could actually be done.
7     Q.   In Schildkraut, you looked at recall
8 bias based on ever use and never use, right?
9     A.   We did that in relation to a
10 certain -- a certain time point, yeah, a certain
11 time frame.
12     Q.   Did you also look at reports of
13 frequency?
14     A.   I don't recall if we did that or not.
15     Q.   I'd like to go back to the Davis
16 paper.
17     MR. TRANGLE:  Exhibit 7.
18     MS. DAVIDSON:  Huh?
19     MR. TRANGLE:  Exhibit 7.
20 BY MS. DAVIDSON:
21     Q.   I have to find it first before we can
22 go back to it.  Do you have it in front of you?
23     We talked a little bit earlier about
24 whether any papers have defined "frequent genital
25 powder use" differently from -- differently from

Page 168

1 Woolen, and you couldn't recall any such papers.
2 Do you remember that conversation?
3     A.   Frequent?
4     Q.   Yes.
5     A.   Yeah, I recall that conversation.
6     Q.   And had you forgotten that the Davis
7 paper actually has a definition for "frequent
8 genital powder use"?
9     A.   Are you getting -- I know that we had
10 frequency of use and we had some categories.
11     Q.   If you look at Table 1, doesn't the
12 Davis paper define "frequent genital powder use"
13 as greater than monthly?
14     A.   Yeah.  I mean, that was the definition
15 guided by the availability of the data.
16     Q.   You hadn't recalled that when we
17 discussed papers defining --
18     A.   I didn't recall -- I recall that we
19 used those categorizations of frequency.  I didn't
20 recall the actual frequent genital powder use, the
21 heading that was used here.  I was well aware that
22 we had categorized it by less than once a week or
23 greater than once a week.
24     Q.   So you and your co-authors defined
25 "frequent genital powder use" differently from

Page 169

1 Woolen, correct?
2     A.   The definition that we used was based
3 on the availability of the data from the
4 individual studies.  As you're aware of, this was
5 a consortium that used data from five different
6 studies.  And we had to harmonize the data,
7 because some of the studies collected the data
8 in -- in different manners, different
9 categorizations and so on.
10     And so that was the decision that was
11 driven by the -- how the data were put together in
12 the individual studies and how we could harmonize
13 it to do the analysis.
14     Q.   Is it your testimony that you picked
15 once per week and not twice per week because these
16 studies would not have allowed you to do a
17 twice-per-week analysis?
18     A.   Yeah.  They -- each of the studies
19 used slightly different phrasing in terms of
20 relation to frequency.  And so I don't recall all
21 of the, you know, specific details as to how we
22 settled on that cut point.  But I know that it was
23 based -- you know, as it typically is when you're
24 trying to harmonize data from different studies,
25 how you can combine the data from the various

Page 170

1 studies.

2    Q.   Are you testifying here today that the
3 exposure assessments in the underlying studies for
4 the Davis paper would not have enabled you to
5 choose 2 times per week?

6    A.   I'm really not -- not sure.  Some of
7 them, it looks like the number of days per week.
8 Some -- some it was reported a bit differently.
9 And like I said, I'm just -- I don't recall the
10 particular discussion that led to that.

11    Q.   So sitting here today, you don't know
12 why Davis defines "frequent use" differently from
13 Woolen, correct?

14       MS. PARFITT:  Objection.  Misstates
15       her testimony.

16       THE WITNESS:  Just -- give me just a
17       moment.  I just don't recall that
18       discussion as to why that -- that
19       particular cut point was used.

20 BY MS. DAVIDSON:

21    Q.   Do you recall if you were part of the
22 decision to define "frequent genital powder use"
23 as more than once per week?

24    A.   I -- the way that these -- these
25 papers worked, the lead authors, they typically

Page 171

1 would do the work.  They would share it with the
2 other authors -- the lead authors would take the
3 lead on the analysis.  They would share it with
4 the co-authors during our monthly or biweekly
5 meetings, and so not every decision was discussed
6 in great detail.

7       I -- I just don't remember
8 specifically.  This is one of many papers from
9 this consortium, and I don't recall the particular
10 discussion.

11       (Off-the-record conference.)

12 BY MS. DAVIDSON:

13    Q.   Let's look at O'Brien 2023 --

14    A.   Okay.

15    Q.   -- which we will mark -- here, we'll
16 mark it as Exhibit 13.

17       (MOORMAN EXHIBIT 13, Douching and
18       Genital Talc Use:  Patterns of Use and
19       Reliability of Self-reported Exposure, was
20       marked for identification.)

21 BY MS. DAVIDSON:

22    Q.   Exhibit 13 is "Douching and Genital
23 Talc Use:  Patterns of Use and Reliability of
24 Self-reported Exposure," O'Brien, 2023.

25    A.   Yes.  I have a detached version in

Page 172

1 here.

2    Q.   And you've agreed that none of the
3 authors of this paper, O'Brien, Ogunsina,
4 Wentzensen or Sandler, are experts in this
5 litigation?

6    A.   To my knowledge, none of them are.

7    Q.   And, in fact, O'Brien and
8 Wentzensen -- right? -- they work for NIH, right?

9    A.   Correct.  Well, I know --

10    Q.   Unclear if you can even -- if they
11 would even be allowed to be experts in litigation.
12 I don't know the answer to that question, do you?

13    A.   I think that -- I think that I have
14 heard that government employees cannot be, but --

15    Q.   Got it.

16    A.   -- I don't know.

17    Q.   Okay.

18    A.   I have heard that, but I don't know
19 that that's to be -- that's true or not.

20    Q.   Okay.  Do you have a copy of this that
21 Asher gave you?

22    A.   I do.

23    Q.   Okay.  Great.

24       You had said something earlier today
25 that there was language in O'Brien 2023 about

Page 173

1 average age when women start using talc powder
2 products, so you wanted to see the paper.

3    A.   Uh-huh.

4    Q.   So here it is.  Do you want to just go
5 back and let me know what O'Brien 2023 says about
6 the average age of initiation of talc use.

7    A.   Okay.  I am looking at Table 2, and
8 they reported the age at first use, the mean in
9 standard deviation across a number of categories,
10 race ethnicity and by educational level.  And for
11 the women -- the total group of women, the average
12 age of first use is 21 years.

13    Q.   And let's introduce as
14 Exhibit 14 a paper by Dr. Cramer, which I believe
15 you've also relied on in the past, "The
16 Association Between Talc Use and Ovarian Cancer:
17 A Retrospective Case-Control Study in Two US
18 States.  Lead author, Daniel Cramer, May 2016.
19 That's Exhibit 14.

20       (MOORMAN EXHIBIT 14, The Association
21       Between Talc Use and Ovarian Cancer:  A
22       Retrospective Case-Control Study in Two US
23       States, was marked for identification.)

24 BY MS. DAVIDSON:

25    Q.   Do you recall whether Dr. Cramer's

Page 174

1 paper -- do you recall whether Dr. Cramer's paper
2 addresses first age of use of ovarian cancer
3 [sic]?
4     A.  I didn't recall the specific details
5 of this particular paper, but I do see here in
6 Table 1 that they report age at first use of
7 genital powder.
8     Q.  Uh-huh.
9     A.  And -- okay.  And among the women who
10 had used it -- let's see.  So those percentages
11 don't lend itself to how I'd like to do this.
12         So there are roughly 550 control
13 subjects who reported use of talc, and 343 of them
14 reported that they were younger than 20 at first
15 use.  And the proportions are not very different
16 among the case subjects -- yeah.  Did you follow
17 what I said?
18     Q.  Yes.  But my math isn't as good as
19 yours, and I would call something more
20 straightforward in here that provides that
21 information.
22         In any event, does this paper more or
23 less comport with O'Brien in terms of when women
24 start using talcum powder?
25     A.  Yeah.  It's not too far off.  They

Page 175

1 report it a little bit differently, and it's
2 like -- a mean age in the O'Brien study was around
3 21.  And they report it in categories here but --
4 of women who have used talc, the majority of them
5 certainly start using it before age 20.  So they
6 seem to be in the same ballpark.
7     Q.  And we can all agree that that's a
8 good decade before?
9     MS. PARFITT:  Before what?
10 BY MS. DAVIDSON:
11     Q.  At least a decade --
12     A.  I'm -- I'm not --
13     MS. PARFITT:  You said "before."
14     THE WITNESS:  -- following your
15 question.
16     MS. PARFITT:  I didn't follow you.
17     MS. DAVIDSON:  You said, "Before
18 what?"  I wasn't done with my question.
19     MS. PARFITT:  Oh, oh, oh, oh, I'm
20 sorry.
21     THE WITNESS:  I'm so sorry.
22     MS. PARFITT:  Okay.  I thought you
23 were, like, done.  Okay.
24     MS. DAVIDSON:  You were just, like,
25 ready to pounce on me.

Page 176

1     MS. PARFITT:  No, I am not.  I was
2 anxiously --
3     MS. DAVIDSON:  I was in the middle of
4 a question.  That's --
5     MS. PARFITT:  -- holding onto each one
6 of your questions.
7     MS. DAVIDSON:  I see.
8 BY MS. DAVIDSON:
9     Q.  You had testified earlier that tubal
10 ligation typically would take place in women 30s
11 or 40s, correct?
12     A.  Yes.  I think that the -- I believe
13 that I have read data that indicates it around
14 30 -- in the 30s sometime is the typical age of
15 tubal ligation.  Average age, you know.
16     Q.  So the average age for the beginning
17 of talc use is long before the average age for
18 tubal ligation or other surgeries that would
19 result in a woman not having patent tubes,
20 correct?
21     MS. PARFITT:  Objection.  Form.
22     THE WITNESS:  Okay.  That the average
23 age of the tubal ligation is -- is ten
24 years or so than the average age of
25 initiation of talc use from these studies.

Page 177

1 BY MS. DAVIDSON:
2     Q.  More than ten years because 31 is your
3 early 30s, right?
4     A.  You know, you're asking me to recall
5 things -- some data that I'm not sure when I would
6 have read it.  So I can't say exactly.
7     MS. DAVIDSON:  Okay.  I need to take a
8 break.
9             * * *
10     (Whereupon, there was a recess in the
11 proceedings from 2:31 p.m. to 3:16 p.m.)
12             * * *
13     MS. DAVIDSON:  Apologizing for those
14 on Zoom as well for the break, and I
15 appreciate your courtesy.
16 BY MS. DAVIDSON:
17     Q.  When we went off the record, I think
18 we were talking about O'Brien 2023.  And O'Brien
19 2023 looks into the reliability of self-reported
20 exposure, correct?
21     A.  Among other things, yes.
22     Q.  And the author states in the
23 introduction that if historic use cannot be
24 accurately recalled, measurement error can bias
25 effect estimates, especially if recall reliability

Page 178

1  differs by outcome status.  Do you agree with
2  that?
3      A.  That is his theoretic concern, yes.
4      Q.  When you say it's a theoretic concern,
5  what do you mean by "theoretic"?
6      A.  It doesn't necessarily mean that it is
7  biased, but it is a potential bias.
8      Q.  Well, if people can't remember how
9  frequently they used a product, and if the recall
10  reliability differs by outcome status, then you're
11  going to have a bias problem, right?
12          MS. PARFITT:  Objection.  Form.
13          THE WITNESS:  That's what I'm saying,
14      that it is a theoretical concern.  And
15      we're not disagreeing here.  I'm saying,
16      yes, I agree that it is a potential
17      concern.
18  BY MS. DAVIDSON:
19      Q.  And did O'Brien look at the question
20  of accuracy in reports of frequency of use?
21      A.  I don't recall them reporting that.
22  I -- I see in -- I can -- I see in the table that
23  they're comparing ever use of the talc at the
24  different time points, but --
25      Q.  I did not find in O'Brien 2023 any

Page 179

1  discussion about any analysis of whether frequency
2  of use had been reported accurately, did you?
3      A.  I don't recall seeing that.  I don't
4  know if there's any sentence in there or not
5  that -- that addresses it.  I just don't recall
6  that.
7      Q.  Okay.  And O'Brien found that women
8  who -- among women with intervening ovarian cancer
9  diagnoses, 28 percent had originally reported talc
10  powder use, but that figure increased to
11  33 percent at follow-up, correct?
12      A.  No, I do not think that is correct at
13  all.  Okay.
14      Q.  That's what O'Brien stated, right?
15      A.  They stated it, and as I stated in my
16  report, using the data that they have here, it is
17  an obvious error.
18      Q.  Okay.  And why don't you tell me what
19  you think that error is.
20      A.  Okay.  So they were comparing ever use
21  of genital talc, how it was reported at two time
22  points.
23      Q.  Uh-huh.
24      A.  And it was based on ever use, 12
25  months before enrollment.  And so in Table 3, ever

Page 180

1  use in the 12 months prior to enrollment was 14
2  percent.
3      Q.  Uh-huh.
4      A.  And they're supposed to be comparing
5  what was reported at enrollment to what was
6  reported for that same time period in the
7  follow-up.
8          And so it can't be 27 percent, because
9  it was 14 percent at the original baseline.  If we
10  can look at the Supplemental Table 6, I can point
11  out what I think is the error.
12      Q.  Did you consider that the possibility
13  was that 14 percent was 12 months prior and 27
14  percent was the women who were 12 months prior and
15  who reported use in adolescence?
16          MS. PARFITT:  Objection.  Form.
17          THE WITNESS:  But that's not what
18      they're reporting on.  Okay.  Let's --
19  BY MS. DAVIDSON:
20      Q.  What do you mean by that?
21      A.  Okay.
22      Q.  If you look at Table 3 --
23          MS. PARFITT:  Wait.  She's in the
24      middle of something, Jessica.  Hold on.
25          THE WITNESS:  Yeah.  Just -- and it is

Page 181

1      really very critical to look at --
2  BY MS. DAVIDSON:
3      Q.  Uh-huh.
4      A.  -- the table -- supplemental -- I
5  think it's Supplemental Table 6.  Okay.  So what
6  they state --
7          MS. DAVIDSON:  We can mark
8      Supplemental Table 6 as an exhibit as well.
9      I was going to be marking it later, but...
10          THE WITNESS:  Okay.  But anyhow...
11  BY MS. DAVIDSON:
12      Q.  Uh-huh.
13      A.  Okay.  What they are stating on
14  Page 383 -- it's the paragraph above the
15  discussion --
16      Q.  Uh-huh.
17      A.  -- it said -- and the reliability
18  measures for genital talc use were similar for
19  ovarian cancer compared to the full sample.
20  However, while self-reported use in the 12 months
21  before enrollment, it was more commonly reported
22  on the enrollment questionnaire relative to the
23  fourth detailed questionnaire.  And then they go
24  on to say that --
25      Q.  Uh-huh.

Patricia G. Moorman, Ph.D.

Page 182

1    A.  -- that was --
2    Q.  Right.
3    A.  They go on.  But self-reported use of
4  talc in the 12 months before enrollment was not 27
5  percent, according to what they reported.  It
6  was --
7    Q.  Correct.
8    A.  -- 14 percent.
9    Q.  Right.  So that was just a
10  typographical error here --
11    A.  No.
12    Q.  -- and they meant -- because 27
13  percent and 21 percent do correlate to 12 months
14  prior and use in adolescence, correct?
15    A.  That's not what they're -- they're
16  saying --
17    Q.  But --
18    A.  -- there.  They --
19    MS. PARFITT:  Let her finish, please.
20  BY MS. DAVIDSON:
21    Q.  And, again --
22    MS. PARFITT:  Let her finish, Jessica.
23    THE WITNESS:  -- I think that if we
24    look at the supplemental table --
25  BY MS. DAVIDSON:

Page 183

1    Q.  Uh-huh.
2    A.  -- it becomes much more clear.  And I
3  believe the typo and then the description of the
4  typo arises from this table.  So when you look up
5  here, under douching, it said:  Percent use in 12
6  months prior to enrollment --
7    Q.  Uh-huh.
8    A.  -- 14 percent.
9    Q.  Uh-huh.
10    A.  That's not what was reported for
11  douching.  27 percent was the prevalence of
12  douching in the 12 months prior to enrollment.
13    What I believe happened is that they
14  just switched the headings because this is
15  consistent with the data that's reported in the
16  body of the paper.  This, I think, they just made
17  a rather significant mistake.
18    Q.  If you look at the top -- right?
19    A.  Yeah.
20    Q.  -- eTable 6, it says:  self-report
21  ever use of douche or genital talc.  Correct?
22    A.  I'm looking at what's the heading
23  directly above -- above this here.
24    Q.  Right.
25    A.  "% used in 12 months prior to

Page 184

1  enrollment."
2    Q.  But the typo is the heading, not the
3  percentage, right?
4    A.  The typo is here.  These are switched.
5  The percent use of talc in the 12 months prior to
6  enrollment was 14 percent.
7    And then the percent douching -- let's
8  see.  Okay.  It's -- I'm just trying -- what they
9  are saying here certainly makes -- is more
10  consistent with what is reported in the rest of
11  the paper with the exception of that paragraph.
12    MS. PARFITT:  And for the record, your
13    "here" is Supplemental Table 6?
14    THE WITNESS:  Yes.
15    MS. PARFITT:  Thank you.
16  BY MS. DAVIDSON:
17    Q.  Can I ask you a question?  If you look
18  at Table 2 --
19    A.  Uh-huh.
20    Q.  -- on ever use of talc --
21    A.  Yeah.
22    Q.  -- what's the percentage reported
23  there?  Table 2, O'Brien 2023 --
24    A.  Yeah.
25    Q.  -- ever use of talc, what's the

Page 185

1  percentage reported?
2    A.  It's 27 percent, but what they are --
3    Q.  That's the same 27 --
4    MS. PARFITT:  Wait.
5  BY MS. DAVIDSON:
6    Q.  And that's the same number as there is
7  in Supplemental eTable 6, right?
8    A.  But what -- that's not what they're
9  describing.  They're describing the comparison of
10  the 12 months prior to enrollment --
11    Q.  Correct.
12    A.  -- in their --
13    MS. PARFITT:  Please let her finish.
14    THE WITNESS:  -- in their -- yeah, in
15    the discussion, they are saying
16    self-reported use in the 12 months -- 12
17    months before enrollment.  And that was --
18    that's not what they present in other parts
19    of their paper and --
20  BY MS. DAVIDSON:
21    Q.  But my question is:  If you look at
22  eTable 6 and it says ever use of talc, that 27
23  percent would be accurate but for that heading on
24  top of it, if -- if --
25    A.  I mean --

Patricia G. Moorman, Ph.D.

Page 186

1    Q.  27 percent is the correct figure for
2  ever use of talc, correct?
3    A.  Well, again, what's labeled here is
4  not --
5       MS. PARFITT:  And if you can identify
6  "here" -- I'm sorry --
7       THE WITNESS:  Yeah.
8       MS. PARFITT:  -- so we can have it
9  correct.
10       THE WITNESS:  What's labeled -- where
11  it says "Genital Talc Use," I'm just
12  looking at percent used in 12 months prior
13  to enrollment and then the follow-up, and
14  that 12 months prior to enrollment and
15  follow-up is what they're describing in the
16  text, and it just doesn't match up.
17  BY MS. DAVIDSON:
18    Q.  But -- but I'm asking you a different
19  question, and my question is:  It does match up,
20  that 27 percent, to the heading for eTable 6,
21  correct?
22    A.  Again, but, you know, there -- there's
23  an error here.  And so when there's an obvious
24  error, I mean, it matches up, the 20 percent ever,
25  but it's not what they're describing in the paper.

Page 187

1       And so we know that there's an error.
2  We don't know exactly what it is.  But -- but it
3  certainly reduces the confidence in what they're
4  reporting in their paper.
5    Q.  So 14 percent is the correct number
6  for ever use of douching, right?
7    A.  I -- that's what they report in
8  Table 1.
9    Q.  So really what's going on is that
10  eTable 6 is reporting ever use instead of last
11  12-month use, correct?
12    A.  We don't know.
13    Q.  What do you mean "We don't know"?  The
14  numbers match.
15    A.  Well, we know that there's an error
16  and --
17    Q.  There's a typo, right?
18       MS. PARFITT:  Wait.  Jessica, we --
19  honestly, I --
20       THE WITNESS:  Yeah.
21       MS. PARFITT:  Just one person at a --
22  BY MS. DAVIDSON:
23    Q.  Okay.
24       MS. PARFITT:  -- time will be helpful.
25       THE WITNESS:  Yeah, we know that --

Page 188

1  BY MS. DAVIDSON:
2    Q.  There's a typo.
3    A.  Well, I mean, it's -- what they're
4  describing in the text is not matching up with the
5  table, and so it raises concerns.
6    Q.  But wait a minute.  The 14 percent and
7  27 percent in eTable 6 match up perfectly with
8  ever use in the article; is that correct?  Can we
9  agree on that?
10    A.  It matches up with ever -- their ever
11  use, but that's not what the authors are
12  describing here.
13    Q.  But -- but the heading of the table
14  says "ever use," correct?
15    A.  We -- there are inconsistencies; we
16  can agree on all of that.  And when there are
17  inconsistencies, we --
18    Q.  That's not what I'm asking you.  I'm
19  asking you:  Does the heading of this table say
20  "ever use," eTable 6?
21    A.  It -- it does.
22    Q.  Okay.  And are 14 percent and
23  27 percent accurate for ever use?  That's all I'm
24  asking.
25    A.  Yes.

Page 189

1    Q.  Okay.  We can move on.
2       THE REPORTER:  Did we want that
3  marked?
4       MR. TRANGLE:  Yeah.
5       MS. DAVIDSON:  Yeah.  We can mark
6  eTable 6.  I'm sorry.
7       (MOORMAN EXHIBIT 15, Supplemental
8  eTable 6, was marked for identification.)
9       MS. DAVIDSON:  Okay.  We're marking as
10  Exhibit 15, after we discussed it,
11  Supplemental Table 6 from O'Brien 2023 as
12  Exhibit 15.
13  BY MS. DAVIDSON:
14    Q.  Since you were concerned about the
15  headings on eTable 6, did you send a letter to
16  Dr. O'Brien asking her about it?
17    A.  I have thought about it, but I have
18  not done it.
19    Q.  Got it.
20       Okay.  When Gonzalez reported on the
21  sister study, it used the 14 percent number that
22  was just use in the prior 12 months, correct?
23    A.  That is correct.
24    Q.  And when --
25    A.  12 months prior to enrollment, yes.

Patricia G. Moorman, Ph.D.

Page 190

1    Q.   And when O'Brien looked at the sister
2   study, it used the higher 27 percent ever use
3   number from the sister study, right?
4    A.   Let me just double-check that.  I
5   believe that is correct.  Yes, that is correct.
6    Q.   So O'Brien addressed one of your
7   criticisms of Gonzalez, correct?
8    A.   Yes.  To some degree, yes.
9    Q.   Well, that -- that criticism of
10  Gonzalez was addressed?
11   A.   I said, to some degree --
12   Q.   Why only to some degree?
13   A.   Because they addressed use from -- I
14  think it was age 10 to 13 and use from one year
15  prior to enrollment.  So any use between age 13
16  and their age at enrollment was not captured.
17   Q.   Do you know, on average, for women who
18  have used talcum powder in their genital area how
19  many years they usually use it?
20   A.   O'Brien did report some of that.  I'm
21  sorry.  I'm -- and I thought that it was in here,
22  but I don't see where they reported how long they
23  had used it on average.
24   Q.   Do you recall any papers by Cramer or
25  otherwise that address the typical length of time

Page 191

1   women who have used perineal talc use it for?
2    MS. PARFITT:  Objection.  Form.
3    THE WITNESS:  Many papers have
4    reported on the duration of talc use.  And
5    many of them reported in categories rather
6    than a mean duration of use.  And I'm --
7    again, you know, all of the little details,
8    it's hard to remember across all of the
9    studies.
10  BY MS. DAVIDSON:
11   Q.   Do you know if the typical woman who
12  uses talc uses it for more or less than ten years?
13   A.   I mean, there's a wide variation in
14  patterns of talc use.  There are certainly many,
15  many long-term users and some that -- you know, as
16  we have seen in our studies, some that report
17  short-term use.
18   Q.   On average, do women who use talc use
19  it for more or less than ten years?
20   A.   I -- I can't give an average.  I'm
21  sorry.
22   Q.   Okay.  So in your report, when you say
23  that O'Brien 2023 casts serious doubt on Gonzalez,
24  that's actually addressed by O'Brien 2020, right?
25   MS. PARFITT:  Objection.  Misstates

Page 192

1   her testimony.
2    THE WITNESS:  What I said in my
3    report, the -- I think it was in relation
4    to the O'Brien study -- I said that it did
5    somewhat address it.  But as I just stated
6    a few minutes ago, any use between age 13
7    and a year before enrollment into the
8    cohort would not have been captured.  And,
9    you know, we -- so it helped, but it didn't
10   completely address it.
11  BY MS. DAVIDSON:
12   Q.   How come in your report when you said
13  that O'Brien 2023 cast serious doubts on Gonzalez,
14  you didn't mention that O'Brien 2020 helps to
15  address that?
16   A.   I -- I think that I made -- I know
17  that I made a true statement there.  What we
18  learned from Gonzalez -- or from the O'Brien in
19  relation to the Gonzalez is that the exposure
20  measurement used in Gonzalez misclassified over
21  half of the talc users.
22    So there were around 30 percent ever
23  talc users, and they said 14 percent.  That was
24  the prevalence of use in the Gonzalez study.  So
25  it was, like, even worse than a coin flip in terms

Page 193

1   of classifying talc exposure among the women who
2   had used it.
3    And the reason why I think that it's
4   important is that many of the meta-analyses report
5   the Gonzalez relative risk -- that was -- like,
6   the .73, that was what they reported.  And it's
7   always been an outlier.  It's one of the most
8   extreme values reported.  And this -- given the
9   information we have about the level of exposure
10  misclassification, it does cast doubt on the
11  Gonzalez study.
12   Q.   Do you remember my question?
13   A.   Well, I asked -- you know, I'm -- I'm
14  explaining why I thought it was important to
15  mention that, and I think that the statement is
16  true.
17    I did also put in my report, when
18  describing the O'Brien study, that -- the O'Brien
19  study combining the four cohorts, that they did do
20  a better job, but there was still limitations.
21   Q.   But when you say there's serious doubt
22  in the Gonzalez study, you don't mention that
23  O'Brien nearly doubled the prevalence of talc use
24  and still found no significantly -- statistically
25  significant association, correct?

Page 194

1    MS. PARFITT:  Objection.  Asked and
2  answered.
3    THE WITNESS:  Please, would you repeat
4  the question?
5    MS. DAVIDSON:  Would you repeat it?  I
6  can't remember it.
7    (The following question was read back:
8    Q:  But when you say there's serious
9  doubt in the Gonzalez study, you don't
10  mention that O'Brien nearly doubled the
11  prevalence of talc use and still found no
12  significantly -- statistically significant
13  association, correct?)
14    THE WITNESS:  We have already
15  discussed what was found.  It was a
16  considerable change in the odds ratio, and
17  it went from .73 to just slightly above 1
18  in the sister study.
19  BY MS. DAVIDSON:
20    Q.  But not statistically significant,
21  correct?
22    A.  It was not statistically significant,
23  no.
24    Q.  Okay.  Great.  Let's move on.
25    Have you ever cited in a published

Page 195

1  paper a -- the regulatory findings of an
2  organization as support for your epidemiological
3  opinions?
4    A.  I'm just trying to think.  I cannot
5  come up with an example off the top of my head.
6  It's very likely, very possible that I did, but I
7  can't come up with a specific example.
8    Q.  Do you think there's enough
9  information in the ovarian cancer talc literature
10  to permit a fulsome assessment of biological
11  gradient/dose-response?
12    A.  That has been addressed in several
13  reports.  Like, notably in the Health Canada
14  report, they talked about that and noted some of
15  the limitations in assessing the dose-response.
16  And it's recognized as an area where more complete
17  data would be desirable.
18    Q.  My question was:  Do you agree with
19  the statement -- do you, Dr. Moorman, agree with
20  the statement that there is significant exposure
21  information lacking to permit a fulsome assessment
22  of biological gradient/dose-response?
23    A.  There are a lot of qualifiers in
24  there, and I -- I don't think that I would
25  necessarily agree with that statement.

Page 196

1    Q.  Okay.  Did Health Canada, to your
2  recollection -- and if you don't recall, that's
3  fine.  But do you recall if they did an assessment
4  of subtypes of ovarian cancer?
5    A.  Again, I -- off the top of my head,
6  I -- I -- you know, I want to be correct.  And off
7  the top of my head, I -- I can't remember.  There
8  are a lot of papers we have been talking about and
9  I have read recently, so...
10    Q.  Okay.  Do you think there's sufficient
11  data to assess any potential association or causal
12  relationship between cosmetic talc and each
13  individual subtype of epithelial ovarian cancer?
14    MS. PARFITT:  Objection.  Asked and
15  answered quite a few hours ago.
16    MS. DAVIDSON:  I didn't ask it.
17    THE WITNESS:  That's -- that's exactly
18  what I was going to --
19    MS. DAVIDSON:  Well, then let's repeat
20  the question because I didn't ask the
21  question, so maybe you didn't hear it
22  right.  Can you repeat the question?
23    (The following question was read back:
24    Q:  Do you think there's sufficient
25    data to assess any potential association or

Page 197

1    causal relationship between cosmetic talc
2    and each individual subtype of epithelial
3    ovarian cancer?)
4    MS. PARFITT:  Same objection.  Asked
5    and answered.
6    THE WITNESS:  You asked me earlier
7    today about certain subtypes, and my
8    response to that question was that most of
9    the studies reported on ovarian cancer as a
10    whole.  Some studies did subtype analysis,
11    but most of it was based on ovarian cancer
12    across all subtypes.
13  BY MS. DAVIDSON:
14    Q.  And that's why I'm asking you, do you
15  think that there's enough studies that address
16  subtypes in particular to reach a causal
17  conclusion about subtypes?
18    MS. PARFITT:  Objection.
19  BY MS. DAVIDSON:
20    Q.  That's exactly what I'm asking.
21  That's not what I asked before.
22    MS. PARFITT:  Objection.  Broad.
23  Form.  Asked and answered.
24    THE WITNESS:  I -- you know, I have
25  stated what I believe the data show, that

Patricia G. Moorman, Ph.D.

Page 198

1  we can -- that the bulk of the evidence is
2  based on ovarian cancer as a whole.  And
3  I'm -- I -- I'm just -- I don't -- I think
4  that there -- there is some good subtype
5  data.  It would certainly be desirable to
6  have more.
7  BY MS. DAVIDSON:
8      Q.  What -- do you think there's good
9  subtype data on clear cell carcinoma?
10     MS. PARFITT:  Objection.  Asked and
11  answered.  That was asked and specifically
12  answered.
13     THE WITNESS:  I believe the question
14  you asked earlier today was -- was very
15  similar to that, and I -- you know, I did
16  reply.  It's, like, the -- the data has
17  been reported in some studies by subtypes,
18  but the -- the most studies are -- have
19  been reporting by epithelial ovarian cancer
20  overall.
21  BY MS. DAVIDSON:
22     Q.  I'm sorry.  You said that there was
23  some science on subtypes.  I'm asking you:  What,
24  if any, science is there on the subtype of clear
25  cell cancer?

Page 199

1      MS. PARFITT:  Objection.  Asked and
2  answered.
3      THE WITNESS:  I believe that there
4  have been some studies that have report --
5  reported on the subtypes.  I'm having
6  difficulty recalling right off the top of
7  my head all of the results for all of the
8  individual subtypes, including clear cell.
9  BY MS. DAVIDSON:
10     Q.  Can you recall any, any studies on
11  clear cell that you think show an association
12  between talc use and the development of ovarian
13  cancer?
14     A.  Right off the top of my head, I just
15  can't remember the results for the individual
16  subtypes.
17     Q.  Okay.  Can you tell me what papers
18  you're relying on for your biological plausibility
19  opinion since 2019?
20     MS. PARFITT:  Thank you.
21     MS. DAVIDSON:  I knew Michelle would
22  love that.
23     THE WITNESS:  There have been several
24  papers that I have read since then that
25  address some of -- some of the -- mostly at

Page 200

1  the cellular level.  And I fully
2  acknowledge I am not a laboratory
3  scientist, and so I looked at them from a
4  rather high level.  But let's see.  Let me
5  just --
6  BY MS. DAVIDSON:
7      Q.  So just to narrow it down, I don't
8  need all the studies you read.  I just need to
9  know, what studies since 2019 do you -- are you
10  relying on to support your opinion that biological
11  plausibility is satisfied?  And maybe the answer
12  is none.  I don't know.
13     MS. PARFITT:  And, Jessica, I do think
14  you made it clear, and I appreciate that.
15  And that would be:  If you talked about it
16  pre-'19, you don't have to talk about it.
17  Jessica is asking specifically --
18     THE WITNESS:  Uh-huh.
19     MS. PARFITT:  -- since 2019.  And I
20  appreciate that, Jessica.
21  BY MS. DAVIDSON:
22     Q.  Since you didn't do a new Bradford
23  Hill analysis, I --
24     (Reporter clarification.)
25     THE WITNESS:  Yeah.  Yeah.  Among

Page 201

1  other things, there have been several,
2  like, papers at the cellular level that I
3  looked at at a high level.  You know,
4  Fletcher has reported some.  Mandarino.  I
5  believe it's "Emu" [sic].  Another thing
6  that I considered as part of the biological
7  plausibility was --
8  BY MS. DAVIDSON:
9      Q.  You said "Emu"?  I think you meant
10  "Emi."
11     A.  I'm sorry.
12     Q.  E-M-I.  Emu is an animal.  Yeah.
13     A.  Thank you.  I know that.
14     And among other things that I think I
15  relied on in contributing to the biological
16  plausibility was some of the FDA analysis and the
17  finding of the asbestos in the talc products.  And
18  then, you know, that, again, just kind of supports
19  another biological pathway.
20     Q.  Do you know how many times the FDA has
21  analyzed J&J talc and not found asbestos?
22     A.  I do not know that.  But I would say
23  that in a product that many women used for many
24  years, if they find it in 1 out of 10, 1 out of
25  100, you certainly don't want to be that woman

Page 202

1  using that 1 out of 100 container, so any --
2      Q.  We're talking about biological
3  plausibility --
4          MS. PARFITT:  Please let her finish,
5      please.
6          THE WITNESS:  And, again, that -- so
7      the fact that you have some -- any exposure
8      to asbestos, which numerous -- several
9      regulatory and scientific bodies have said
10     there is no safe level, I would say that it
11     does contribute to the biological
12     plausibility.  I don't know how common it
13     is, but I would wager that most women would
14     not want to take the risk of 1 out of 100
15     containers has asbestos in it.
16  BY MS. DAVIDSON:
17     Q.  We're talking about biological
18  plausibility in that risk, right?
19     A.  We're talking about biological
20  plausibility and its exposure to an agent that
21  there is no safe level of exposure to.
22     Q.  Okay.  Can you explain to me the
23  biological mechanism by which you think talc
24  causes ovarian cancer based on your review of the
25  Fletcher, Mandarino and Emi papers?

Page 203

1      A.  As I have stated, I am not a
2  laboratory scientist, and I looked at them at a
3  very high level.  Some of the things that they
4  reported on were that it increases some redox --
5  rather, some measures of oxidative stress and
6  measure of inflammation.
7      Q.  Which paper is that?
8      A.  Again, if I can pull the papers out,
9  it's -- I looked at them at a very high level
10  and --
11     Q.  When you say you looked at them at a
12  very high level, did you evaluate the reliability
13  of the Fletcher and Harper papers?
14     A.  What -- what I have stated is that I'm
15  an epidemiologist.  I am not a laboratory
16  scientist.  And so when I go through and read
17  those papers, it is outside my area of expertise
18  to say if the experiments were done correctly,
19  reliably.  I -- you know, there's some assumption
20  that, you know, it has gone through peer review by
21  people who know the field.  And so I'm just really
22  not in a position -- I just don't have the
23  expertise to judge all the specifics of the
24  laboratory studies.
25     Q.  Are you familiar with the journal

Page 204

1  called "Minerva"?
2      A.  I have heard of it.  I wouldn't say
3  that I'm very familiar with it.
4      Q.  Do you know how many journals rejected
5  Harper 2023 before they finally were able to
6  publish in "Minerva"?
7      A.  I -- I don't know.  Of course I don't
8  know.
9      Q.  Are you aware that plaintiff's counsel
10  have all the rejections from Harper 2023?
11         MS. PARFITT:  Objection.  Form.
12         THE WITNESS:  I am not aware --
13         MS. PARFITT:  Relevance.
14         THE WITNESS:  -- of that.
15  BY MS. DAVIDSON:
16     Q.  So plaintiff's counsel didn't share
17  with you the many journals that rejected Harper
18  2023, correct?
19         MS. PARFITT:  Objection.
20         THE WITNESS:  I already told you I do
21     not -- do not have any of that.
22  BY MS. DAVIDSON:
23     Q.  If it's outside your area of expertise
24  to analyze the reliability of papers like
25  Fletcher, Mandarino and Emi, how can you offer an

Page 205

1  opinion about biological plausibility?
2          MS. PARFITT:  Objection.  Your
3      question was additional studies since 2019.
4      As you know, she has testified on the issue
5      of biological plausibility prior to 2019
6      exhaustively in her deposition.  I let you
7      go forward because there were some studies
8      that came out since that point.
9          MS. DAVIDSON:  Can you repeat the
10     question?
11         (The following question was read back:
12     Q:  If it's outside your area of
13     expertise to analyze the reliability of
14     papers like Fletcher, Mandarino and Emi,
15     how can you offer an opinion about
16     biological plausibility?)
17         MS. PARFITT:  Objection.  It does
18     misstate her testimony.
19     Please.
20         THE WITNESS:  My opinion on biological
21     plausibility was based on a number of
22     factors, including the movement of talc up
23     the genital talc -- up the genital tract;
24     the presence of a carcinogen, asbestos, in
25     talc products; and then some other

Page 206

1 potential mechanisms by which -- you know,
2 for example, inflammation and all, which is
3 a well-established mechanism of
4 carcinogenesis.
5     So for those reasons, I think that
6 there are reasons why I can make a judgment
7 about biological plausibility.
8 BY MS. DAVIDSON:
9     Q.  Does ovarian cancer typically
10 originate in the ovaries?
11     A.  There is data to suggest that some
12 ovarian cancers actually originate in the
13 fallopian tubes.
14     Q.  Do you know what percent?
15     A.  I don't think that anybody would be
16 able to say that.  That would mean being able to
17 determine there is an ovarian cancer from the
18 very -- very origin of the carcinogenic
19 transformation.
20     Q.  Sitting here in 2024, does the
21 scientific community generally believe that
22 ovarian cancer is caused by inflammation?
23     MS. PARFITT:  Objection as to what the
24 scientific community believes or doesn't
25 believe.  What does that mean?  That's so

Page 207

1 broad.
2     MS. DAVIDSON:  Thank you.  That's -- I
3 think you meant "Objection to form."
4     THE WITNESS:  So please repeat the
5 question.  Whenever the objections come in,
6 I kind of lose my train of thought.
7     MS. DAVIDSON:  Yeah, they lose --
8 that's their purpose.
9     (The following question was read back:
10     Q:  Sitting here in 2024, does the
11 scientific community generally believe that
12 ovarian cancer is caused by inflammation?)
13     MS. PARFITT:  Objection.
14     THE WITNESS:  Again, I don't -- I
15 can't speak for the entire scientific
16 community.  I think that it is well
17 established that inflammation is one of the
18 hallmarks of cancer, one of the pathways
19 to -- to cancer.
20 BY MS. DAVIDSON:
21     Q.  Is it one of the hallmarks of ovarian
22 cancer?
23     A.  Just in general, inflammation is
24 considered a hallmark of -- of cancer development,
25 and so ovarian cancer, I would group within --

Page 208

1 with that.
2     Q.  So just to be clear, is it your
3 opinion that inflammation is involved in the
4 development of all cancers?
5     MS. PARFITT:  Objection.  Relevancy.
6 Form.
7     THE WITNESS:  I believe that the
8 general consensus is that inflammation is a
9 pathway involved in many cancer types.
10 Whether or not it is all cancers or not, I
11 don't -- I don't know.  But I think that it
12 is a general consensus that inflammation is
13 part of the carcinogenic pathway.
14 BY MS. DAVIDSON:
15     Q.  Can you point to any papers outside of
16 the context of talc stating that inflammation
17 causes ovarian cancer?
18     MS. PARFITT:  Objection.  Form.
19     MS. DAVIDSON:  Okay.
20     MS. PARFITT:  If you can understand
21 that.
22     And I would also object based upon the
23 fact that during the deposition of
24 January 25, '19, she was examined with
25 regard to mechanism -- in particular,

Page 209

1 inflammatory effects of talc --
2     MS. DAVIDSON:  Uh-huh.
3     MS. PARFITT:  -- as it pertains to
4 ovarian cancer.  So I think we've been down
5 this road --
6     MS. DAVIDSON:  That wasn't my
7 question.
8 BY MS. DAVIDSON:
9     Q.  We're sitting here in 2024.  Can you
10 point to any paper that's been published in the
11 literature, that does not involve talc, suggesting
12 that inflammation leads to ovarian cancer?
13     MS. PARFITT:  Objection.
14     THE WITNESS:  Off the top of my head,
15 I could not point to -- to one.  But,
16 again, there is a very large literature.
17 Inflammation in cancer is a topic that has
18 a huge literature.
19 BY MS. DAVIDSON:
20     Q.  Do you think it was inappropriate that
21 the authors of Taher assigned lower value to
22 case-control studies based on concerns of recall
23 bias?
24     A.  I think that it is -- as I have stated
25 previously, every study has strengths and

Page 210

1 limitations, and I would not make a judgment about
2 the quality of a study just based on the study
3 design. There can be very good case-control
4 studies; there can be very good cohort studies;
5 and conversely, there can be very poor ones.
6       I think it is important to point out
7 that these case-control studies, if you look
8 through any textbook, any epidemiology textbook,
9 it will describe case-control studies as a --
10 ideally designed to address diseases that are
11 relatively uncommon and have a long latency
12 period.
13       So case-control studies are extremely
14 appropriate for the question at hand. And -- I'm
15 sorry. And so I wouldn't --
16       Oh, the other point I was going to
17 make is that all or virtually all of the
18 case-control studies, they've gone -- undergone
19 peer review for funding. Many of them were funded
20 by the National Cancer Institute.
21       So they are an appropriate design for
22 studying talc in ovarian cancer. And so I would
23 not give them a lower quality score just on that
24 basis that recall bias is a potential limitation
25 of case-control studies.

Page 211

1       Q. My question was simply: Do you agree
2 or disagree with Taher?
3       A. And so if he is giving a study a lower
4 quality score just because it's a case-control
5 study, I would disagree with that.
6       MS. DAVIDSON: Okay. Let's move along
7 to Exhibit -- let's mark as Exhibit 16
8 Wentzensen and O'Brien 2021.
9       (MOORMAN EXHIBIT 16, Gynecologic
10 Oncology - Talc, body powder, and ovarian
11 cancer: A summary of the epidemiologic
12 evidence, was marked for identification.)
13 BY MS. DAVIDSON:
14       Q. Again, Exhibit 16 will be "Talc, body
15 powder, and ovarian cancer: A summary of
16 epidemiologic evidence," Nicolas Wentzensen,
17 Katie M. O'Brien. I think it's 2021.
18       If you could turn to Page 9. You
19 discussed this paper in your most recent report in
20 2023, right?
21       A. I believe I did, yes.
22       Q. Yes. Thank you.
23       And where is this paper published?
24       A. It's published in "Gynecologic
25 Oncology."

Page 212

1       Q. Is that a reputable journal?
2       A. Overall, it's a pretty well-respected
3 journal, yes.
4       Q. Have you ever published there?
5       A. I don't believe I have as a first
6 author. I might have as a co-author. I don't --
7 don't recall exactly.
8       Q. And as we discussed earlier, you're
9 not aware of any biases to the authors, correct?
10       A. Any?
11       Q. Bias.
12       A. Any bias?
13       Q. That these two authors have, are you?
14       A. I don't -- I don't know of anything
15 that would -- would lead me to make that
16 conclusion.
17       Q. They don't have any -- they don't
18 report conflicts of interest, correct?
19       A. Well, conflicts of interest and bias
20 are not synonymous, but --
21       Q. I'm asking another question.
22       A. -- but they do not report conflicts of
23 interest.
24       Q. And I take it from our prior
25 conversation, you're not aware that "Gynecologic

Page 213

1 Oncology" is one of the many papers that rejected
2 Dr. Fletcher, Harper, Saed's 2023 paper, right?
3       A. I already told you I'm unaware of the
4 publication history of that paper.
5       Q. Okay. If we could turn to Page 9 of
6 this report, the authors state at the top of
7 Page 9: Given the inability to attribute a clear
8 causal factor to the observed associations, the
9 lack of a good experimental model, the lack of a
10 specific biomarker for powder-related
11 carcinogenesis, and the inability to rule out
12 confounding by indication, it is difficult to
13 conclude that the observed associations are
14 causal.
15       Do you see that?
16       A. I do see that.
17       Q. Did you include that discussion -- did
18 you reference that statement in your report?
19       A. I did not reference that specific
20 statement, no.
21       Q. Do you agree with the authors that any
22 association is, quote, "small"?
23       A. I -- I'd prefer not to use adjectives
24 like "small." I think it's much more helpful just
25 to report what the relative risk is. It's a

Patricia G. Moorman, Ph.D.

Page 214

1  relative risk of 1.25, 1.3, whatever. I think
2  that that is a more accurate and preferable way to
3  do it.
4          I would further state that in terms of
5  the public health impact, it is dependent both on
6  the -- the size of the relative risk and the --
7  the prevalence of use of the exposure.
8      Q.  So you're -- just to be clear, you're
9  refusing to agree with these authors that the
10  association is small?
11         MS. PARFITT:  Objection.  Form.
12         THE WITNESS:  I would not agree with
13     that because I don't like to -- I would not
14     describe it with that adjective.  I would
15     just report what the association is,
16     quantify it.
17  BY MS. DAVIDSON:
18     Q.  Drs. Wentzensen and O'Brien state,
19  quote:  We currently do not understand the causal
20  factors that underlie the observed weak
21  associations between genital powder use and
22  ovarian cancer risk.
23         Do you disagree with that statement?
24     A.  Where are you reading from?
25     Q.  You're challenging my eyes again.

Page 215

1  Further down the same paragraph, or maybe it's --
2         MS. DAVIDSON:  Can you point to where
3     the sentence is?
4         All right.  I'm going to have to give
5     in to Michelle and get reading glasses.  I
6     usually read the papers online where you
7     can make them bigger.
8         MR. TRANGLE:  It's on Page 8.
9         MS. DAVIDSON:  Oh, the prior page.
10     That's why.
11         MR. TRANGLE:  At the very, very end.
12         MS. DAVIDSON:  Yeah.  Yeah.
13  BY MS. DAVIDSON:
14     Q.  In summary -- sorry about that.
15         MR. TRANGLE:  Page 8 at the very end.
16  BY MS. DAVIDSON:
17     Q.  Bottom of Page 8.  In summary, we
18  currently do not understand the causal factors
19  that underlie the observed weak association
20  between genital powder use and ovarian cancer
21  risk.
22         MS. DAVIDSON:  Sorry you had to type
23     that twice.  I shouldn't have repeated it.
24  BY MS. DAVIDSON:
25     Q.  Anyway, do you agree or disagree with

Page 216

1  that statement?
2      A.  I mean, I -- I think that I would say
3  that we -- I neither totally agree nor totally
4  disagree with that in that our understanding of
5  most risk factors and cancer is not complete.
6          But I think that we do have some
7  understanding of potential causal factors, like,
8  namely that asbestos is found in many talc
9  products.  It's a carcinogen.  So I kind of -- I
10  don't completely disagree nor agree with that
11  statement.
12     Q.  You just said that asbestos is found
13  in many talc products.  What do you mean by
14  "many"?
15     A.  Based on analyses that I have seen,
16  analyses done by the plaintiff's expert, I have --
17  back in the -- as we discussed earlier, I have
18  seen internal documents -- internal documents from J&J
19  that noted that talc was found in some samples.
20  And the FDA also found talc in some samples, so...
21     Q.  Did the FDA find talc in many -- did
22  the FDA find asbestos in many batches of Johnson's
23  Baby Powder?
24         MS. PARFITT:  And, Jessica, if I
25     can -- she said "talc" in the product.  Did

Page 217

1  you mean "asbestos" in the product?
2  Everybody is getting tired.
3         THE WITNESS:  Yeah, I did mean --
4         MS. DAVIDSON:  We can take a break in
5     a few minutes.
6  BY MS. DAVIDSON:
7     Q.  Did --
8         MS. PARFITT:  Yeah, please.  So could
9     we -- maybe could you ask --
10  BY MS. DAVIDSON:
11     Q.  Can you answer my question?
12         MS. PARFITT:  I just want to get it
13     clear.
14         THE WITNESS:  Again, I -- I know that
15     they -- they did find -- you know, their
16     report from 2020.  The exact numbers, I am
17     not recalling off the top of my head.
18  BY MS. DAVIDSON:
19     Q.  Of all the lots that J&J has ever
20  tested of Johnson's Baby Powder, how many times
21  have they found asbestos?
22     A.  Of course that's an impossible
23  question to answer.
24     Q.  What do you mean?  Of all the times
25  that the FDA has reported on testing of

Page 218

1  Johnson's --
2      A.  Oh, you --
3      Q.  -- Baby Powder, how many times have
4  they reported finding --
5      A.  I don't -- I already answered it.  I
6  said, I don't recall the exact numbers.
7      Q.  And are you -- do you consider
8  yourself qualified to analyze the reliability of
9  the work done by plaintiff's asbestos expert?
10      MS. PARFITT:  Objection.  Form.
11      THE WITNESS:  I have already stated
12      that I am not an expert in the mineral
13      science, and so I know that that will be
14      discussed further, and --
15  BY MS. DAVIDSON:
16      Q.  But you did say you're relying on his
17  work?
18      A.  I am saying that that is part of what
19  I was considering.
20      Q.  In reaching the conclusion that
21  asbestos is found in many talc products?
22      A.  I mean -- yes.  Yes.
23      Q.  Other than J&J internal products, the
24  FDA's finding in 2020, and plaintiff's expert's
25  opinions, is there anything else you're relying on

Page 219

1  for your opinion that asbestos is found in, quote,
2  "many talc products"?
3      MS. PARFITT:  I'm going to object.
4  This was examined exhaustively in 2019.
5  This is a total redo.  She answered those
6  questions --
7      MS. DAVIDSON:  She answered a
8  question.  I'm asking a follow-up.
9  Michelle, that's ridiculous.
10      MS. PARFITT:  You know what, Jessica?
11  Nothing I'm going to say is going to be
12  ridiculous.  I'm making my objection.  I'm
13  permitted to do so and --
14      MS. DAVIDSON:  The FDA thing happened
15  after her last deposition.
16      MS. PARFITT:  Beg your pardon?
17      MS. DAVIDSON:  The FDA thing happened
18  after her last deposition.  We've never
19  discussed this.
20      MS. PARFITT:  Did the others occur
21  before the last deposition?
22      MS. DAVIDSON:  What does that matter?
23  You can't parse it like that.  She made a
24  statement.  I'm allowed to ask a follow-up
25  question.

Page 220

1      MS. PARFITT:  I can object --
2      MS. DAVIDSON:  Okay.
3      MS. PARFITT:  -- to anything --
4      MS. DAVIDSON:  Object all you want.
5      MS. PARFITT:  -- I find objectionable.
6      MS. DAVIDSON:  Let's object all you
7  want.
8      Can you repeat the question?
9      MS. PARFITT:  I will do that --
10      MS. DAVIDSON:  Okay.
11      MS. PARFITT:  -- Jessica --
12      MS. DAVIDSON:  Please do.
13      MS. PARFITT:  -- as you will do --
14      MS. DAVIDSON:  Can you repeat the
15  question?
16      MS. PARFITT:  -- when we take your
17  experts.  Believe me, you will.
18      (The following question was read back:
19      Q:  Other than J&J internal products,
20  the FDA's finding in 2020, and plaintiff's
21  expert's opinions, is there anything else
22  you're relying on for your opinion that
23  asbestos is found in, quote, "many talc
24  products"?)
25      MS. PARFITT:  Objection.  Previously

Page 221

1  examined during the deposition 2019.
2      It's not funny, Jessica.  None of this
3  is funny.  My ladies are dying that I
4  represent, so I find nothing funny about
5  this deposition, I must tell you.
6      THE WITNESS:  I think that from the
7  standpoint of it is not -- okay.  Yes, I am
8  relying on those three sources of data
9  that -- that were described in the
10  question.
11  BY MS. DAVIDSON:
12      Q.  Okay.  We can move on, then.  I just
13  wanted to make sure there was nothing else.
14      The authors of O'Brien and Wentzensen
15  state:  The low relative risk translates to a very
16  low absolute risk increase, given the rarity of
17  ovarian cancer.
18      Do you disagree with that statement?
19      A.  I disagree with what it conveys.  We
20  know that in -- ovarian cancer is a relatively low
21  incidence of cancer.  But as several -- and there
22  have been some studies that have calculated the
23  population attributable risk for talc use and
24  ovarian cancer.  And I -- if I'm recalling, some
25  of -- some reports have calculated the population

Page 222

1 attributable risk as about 12 to 15 percent of
2 ovarian cancers, you know -- as you would
3 interpret the population attributable risk, if all
4 other factors were kept equal and you would
5 eliminate talc, you would be able to, in theory,
6 eliminate 12 to 15 percent of ovarian cancers.
7        And so among the 20-some-thousand
8 ovarian cancers each year, eliminating 2,000,
9 3,000 of them by no talc use, I would say that
10 that is not a small absolute risk.  You can
11 interpret the numbers in different ways, but I
12 think that the public health importance is -- is
13 quite large, and I think that that statement does
14 not convey that.  It conveys that it's a
15 negligible impact, and I think that it's a big
16 impact.
17    Q.  Dr. Wentzensen and O'Brien have
18 devoted their careers to public health and cancer,
19 right?
20    A.  Yes, as far as I know.  I --
21    Q.  Have you --
22    A.  I --
23    Q.  Have you done any study of historical
24 patterns of talc use and whether they match
25 historical patterns of ovarian cancer?

Page 223

1    A.  I have not done such a study.  And it
2 is -- it really would not be particularly
3 informative because of all the other risk factors
4 and how they might have changed over time as well.
5        And so it's not like you could look
6 at -- keep all other risk factors static and then
7 talc went up or went down and how did it affect
8 it.  I don't think that study would be
9 particularly informative.
10    Q.  What studies were you referring to in
11 terms of your testimony that some studies have
12 found an absolute percentage of talc cases that
13 they believe are caused by ovarian cancer [sic]?
14    A.  Let's see.  Let me just double-check
15 that my -- I believe that the study by Wu might
16 have reported it.  But, again, many studies and
17 all the specific details -- my eyes are so tired
18 that it's hard to read.
19        I'm happy to take a couple -- I'm not
20 seeing it right in here.  But I know that there
21 have been studies that have calculated the
22 population attributable risk.
23    Q.  But you're not sure whether or not
24 that's Wu?
25    A.  Again, you know, trying to remember

Page 224

1 this many details from many studies, I can't swear
2 that it was there.  That was the name that was
3 sticking in my mind, but --
4    Q.  In -- in their 2021 paper, Wentzensen
5 and O'Brien discuss the Schildkraut paper, right?
6    A.  I believe the Schildkraut paper was
7 certainly included in there.  Was there a
8 specific -- I'm -- right off, I know that the
9 Schildkraut paper was one of the studies included
10 in here in the text.
11        I'm -- I'm not putting my fingers on
12 any discussion of the Schildkraut paper.  And I
13 just don't recall specifically whether -- how it
14 was mentioned, if it was mentioned in here.
15    Q.  It's mentioned on Page 5 under their
16 discussion of recall bias, wasn't it?
17    A.  Okay.  Yes.  Yes, I see.
18    Q.  Do you disagree with their analysis of
19 Schildkraut?
20    A.  They are recording the -- exactly what
21 we reported in our -- our papers, that, yes, there
22 was an attenuation of the odds ratio when the
23 analysis was limited to women who had completed
24 the questionnaire prior to 2014's.  So --
25    Q.  Okay.

Page 225

1    A.  -- they're just stating what we stated
2 in our paper, basically.
3    Q.  At the top of Page 4, Wentzensen and
4 O'Brien say:  The data suggests that there are
5 several etiologically distinct types of cancers
6 that manifest in the ovaries.
7        Do you disagree with that statement?
8    A.  No.  I think that -- I think that
9 their statement is accurate.
10    Q.  And "etiologically distinct types of
11 cancers" means cancers with different
12 pathogenesis?
13    A.  What I believe that they're referring
14 to is that some associations vary a bit by
15 subtype.  So associations with risk factors vary
16 by subtype a bit.
17    Q.  Uh-huh.
18    A.  So, you know, if it's -- for example,
19 smoking is associated more strongly with some
20 ovarian cancer subtypes than others --
21    Q.  And they say:  It's been proposed that
22 a majority of high-grade serous carcinomas arise
23 from the fallopian tubes, while endometrioid
24 carcinomas may arise from the orthotopic or
25 ectopic endometrial tissue.

Page 226

1    Do you agree with that statement?
2    A.   The -- the statement that that has
3 been proposed, yes.  That -- that has indeed been
4 proposed.
5    Q.   And is there now a general view in the
6 ovarian cancer science community that most
7 high-grade serous carcinoma originates in the
8 fallopian tubes?
9    MS. PARFITT:  Objection to form.
10    THE WITNESS:  I -- I know that that is
11    frequently reported in the literature, that
12    many ovarian cancers, particularly the
13    high-grade serous, arise in the fallopian
14    tubes.  Whether there is a consensus, I
15    can't speak for the entire body of ovarian
16    cancer scientists.
17 BY MS. DAVIDSON:
18    Q.   So you don't know whether there's a
19 consensus right now on that topic?
20    MS. PARFITT:  Objection.  Asked and
21    answered.
22    THE WITNESS:  I know that that's
23    frequently mentioned.  But whether it could
24    be characterized as a consensus, I -- I
25    don't know.

Page 227

1 BY MS. DAVIDSON:
2    Q.   Do you agree that many ovarian cancer
3 risk factors and exposures are specific to certain
4 subtypes?
5    A.   I'm not sure that I would agree with
6 that adjective, "many."  There are some
7 differences by subtypes, but I don't know that I
8 would agree with the "many."
9    MS. DAVIDSON:  All right.  We've been
10    going about an hour.  Let's take a break.
11    You seem tired.
12    THE WITNESS:  I am tired.
13    * * *
14    (Whereupon, there was a recess in the
15    proceedings from 4:26 p.m. to 4:46 p.m.)
16    * * *
17 BY MS. DAVIDSON:
18    Q.   Are you offering an opinion in this
19 litigation that the inhalation of talc can cause
20 ovarian cancer?
21    A.   The opinion that I offered was related
22 to talc exposure, and nearly all of the data are
23 related to perineal exposure.  And so that's where
24 my opinion lies.
25    Q.   I'm not sure I understand the answer

Page 228

1 to this question.  And it's kind of important.
2    Will you be testifying at trial that
3 inhaling talc can cause ovarian cancer?
4    A.   Well, at this point, I don't even know
5 that I -- I will be testifying at trial.  As far
6 as I know, there's no trial date set.  I have not
7 been asked at this point to testify at any trial.
8 So I don't know what I would be testifying to.
9    Q.   Well, if you're offering an opinion
10 about --
11    MS. DAVIDSON:  Can we go off the
12    record.
13    (Off-the-record conference.)
14 BY MS. DAVIDSON:
15    Q.   As of today, February 2024, are you
16 offering an opinion in this litigation that the
17 inhalation of talc can lead to the development of
18 ovarian cancer?
19    A.   I have offered an opinion about
20 exposure to talc generally and ovarian cancer.  I
21 am focusing on the epidemiologic studies, and I'm
22 not aware of any large-scale epidemiologic study
23 that has reported on inhalation of talc in ovarian
24 cancer.
25    Q.   Have there been any occupational

Page 229

1 studies that have looked at occupational exposure
2 to talc and the development of ovarian cancer?
3    MS. PARFITT:  That was asked and
4    answered earlier.
5    MS. DAVIDSON:  Asked and answered
6    when?
7    MS. PARFITT:  It was early on in the
8    deposition when you were talking about
9    occupational and nonoccupational exposure.
10    MS. DAVIDSON:  That was asbestos.  We
11    were talking about asbestos exposure.  I'm
12    talking about talc exposure.
13    Michelle, please don't interrupt my
14    questions when -- when what you're saying
15    isn't even true.  Try to listen carefully
16    to the question.
17    MS. PARFITT:  Whoa, whoa, whoa, whoa,
18    whoa, whoa, whoa.
19 BY MS. DAVIDSON:
20    Q.   My question is --
21    MS. PARFITT:  Don't say it isn't true.
22    Some of your questions, Jessica, with all
23    due respect, haven't been all that clear.
24    MS. DAVIDSON:  Thank you so much.  I'm
25    sure you would do better.

Patricia G. Moorman, Ph.D.

Page 230

1    MS. PARFITT:  I -- I'm not saying I
2  would do better.
3        MS. DAVIDSON:  Can -- can you
4  reread -- can you reread the question?  Can
5  you read the question?
6        MS. PARFITT:  I just want a clear
7  record, Jessica.  I'm sure you do, too.
8        MS. DAVIDSON:  We have a clear record.
9  Can you read the question?
10       MS. PARFITT:  Well, let's get one.
11       (The following question was read back:
12       Q:  Have there been any occupational
13   studies that have looked at occupational
14   exposure to talc and the development of
15   ovarian cancer?)
16       MS. PARFITT:  Objection.  Asked and
17   answered.
18       THE WITNESS:  Again, the occupational
19   literature, I have not reviewed that in
20   quite a while.  As -- I do recall -- I
21   believe that there have been studies of
22   occupational exposure to talc and ovarian
23   cancer, but I'm -- I haven't looked at
24   those -- those studies.  And I'm trying --
25   it's not clear in my mind right now what

Page 231

1  the studies were, you know.
2       I looked at, I believe, both
3  occupational studies of talc, occupational
4  studies of asbestos.  And because I haven't
5  looked at them in so long, I just can't
6  recall at this moment what was reported in
7  those studies.
8  BY MS. DAVIDSON:
9       Q.  Have you reviewed a paper from July
10  2023 titled Lisa Leung, "Occupational environment
11  and ovarian cancer risk"?
12       A.  I'm sorry.  The author, again?
13       Q.  Lisa L-E-U-N-G.
14       A.  I am not recalling that paper
15  specifically.
16       Q.  Have you reviewed any literature since
17  2019 that you believe would support an opinion
18  that inhalation of talc can cause ovarian cancer?
19       MS. PARFITT:  Objection.  Asked and
20   answered.
21       THE WITNESS:  I recall reading papers
22   that discussed that inhalation of talc and
23   movement through the body is possible.
24   I -- I just don't recall specifically where
25   I read that at this point in time.

Page 232

1  BY MS. DAVIDSON:
2       Q.  And you don't recall if that was
3  before or after your 2019 deposition?
4       A.  No, I don't recall.
5       Q.  Do you know whether ovarian cancer
6  diagnoses have fallen in the last three decades?
7       A.  Whether ovarian cancer diagnoses --
8       Q.  -- diagnoses have dropped in the last
9  three decades?
10       MS. PARFITT:  Objection.  Form.
11       THE WITNESS:  Again, you're asking me
12   to recall some data that I have looked at,
13   but the specific numbers I am not recalling
14   at this point.
15  BY MS. DAVIDSON:
16       Q.  As an epidemiologist in this area, I'm
17  asking whether you know whether ovarian cancer
18  rates have fallen in the last three decades.
19       MS. PARFITT:  Objection.  Form.
20       THE WITNESS:  And I -- I have answered
21   it, that I just don't -- I mean, I
22   certainly have looked at those numbers.
23   I'm just not recalling at this point
24   exactly what the -- the trends are.
25  BY MS. DAVIDSON:

Page 233

1       Q.  In your report, you mention multiple
2  letters to the editor by Dr. Egilman, correct, in
3  your two reports?
4       A.  I -- I know that I mentioned at least
5  one of them.  I don't know that it was multiple
6  letters.
7       Q.  Do you recall how many times
8  Dr. Egilman has written letters to the editor that
9  you've cited in your various reports?
10      A.  No, I do not recall that.
11      Q.  Do you know whether plaintiff's
12  counsel asked Dr. Egilman to write those letters?
13      A.  No, I do not know that.
14      Q.  How did you come to be retained in the
15  Zantac litigation?
16      A.  I was approached by Steve Rotman, an
17  attorney out of Boston, and I -- I don't know
18  precisely how he got my name or information.  And
19  he talked to me about would I be interested in
20  reviewing the literature on this topic.
21      And as it was at a time point where I
22  was close to retiring from Duke but we were still
23  pretty heavily in the midst of COVID in early
24  2021, that I agreed to look at the literature in
25  relation to that.  So that's how it came about.

Patricia G. Moorman, Ph.D.

Page 234

1    Q.  When you did your expert report in
2  Zantac, did you explicitly assign different
3  weights to different studies?
4    A.  I discussed some of the studies that I
5  found more persuasive.  I think you probably used
6  some phrasing that I weighted it more heavily or
7  not.
8    Q.  In fact, you used the terms "strong"
9  and "moderate" in terms of the weight you provided
10  to various studies, correct?
11    A.  Yes, I -- I believe that I did.
12    Q.  Why didn't you do that here?
13    A.  I had not done that in the -- the
14  previous report, and so I was kind of keeping it
15  consistent with what I had done previously.
16    Q.  What previous report?
17    A.  In my previous report on talc.
18    Q.  I guess my question is:  Why did you
19  do that in the Zantac litigation and not the talc
20  litigation?
21        MS. PARFITT:  Objection.  Form.
22        THE WITNESS:  I don't recall exactly
23        what the rationale was.  I -- I just don't
24        recall the exact rationale for it.
25  BY MS. DAVIDSON:

Page 235

1    Q.  Okay.  The Zantac court criticized
2  your methodology on the ground that some of the
3  stated reasons for your analysis, such as length
4  of time, sample sizes, ascertainment of exposure,
5  were, quote, "inconsistently applied."  Do you
6  think that was a fair criticism?
7    A.  No.  I already told you that I did
8  not -- I did not agree with that decision, and I
9  think that I pretty explicitly provided my
10  rationale for decisions that I made about each of
11  the studies.
12    Q.  The Zantac court was also concerned
13  that you ignored the authors' conclusions in some
14  of the studies that you cited.  Was that a fair
15  criticism?
16    A.  I don't think that I ignored any of
17  the authors' conclusions.  I think that there were
18  instances where I disagreed.  And, again, I think
19  disagreed with the conclusion, and I tried to explain
20  why I disagreed with that conclusion.
21    Q.  The Zantac court felt that you
22  selected data from studies that fit with your
23  ultimate opinion while simultaneously ignoring
24  data in the very same studies that did not fit
25  with your opinions.  Was that a fair criticism?

Page 236

1    A.  I don't think that was fair.  I don't
2  think that I -- I did that.
3    Q.  Have you been asked to provide expert
4  opinions in the state court litigation of Zantac?
5    A.  I'm not aware of any state court
6  litigation.  I have not been approached.
7    Q.  Are you aware of any paper by an
8  independent scientist not associated with this
9  litigation that has concluded that talc use can
10  cause ovarian cancer?
11        MS. PARFITT:  Objection.  Form.
12        MS. DAVIDSON:  Do you want the
13        question repeated?
14        THE WITNESS:  Yes, please repeat it
15        for me.
16        (The following question was read back:
17        Q:  Are you aware of any paper by an
18        independent scientist not associated with
19        this litigation that has concluded that
20        talc use can cause ovarian cancer?)
21        MS. PARFITT:  Objection.  Form.
22        THE WITNESS:  The Health Canada
23        report, I think they made the conclusion
24        that --
25  BY MS. DAVIDSON:

Page 237

1    Q.  Is the Health Canada report --
2        MS. PARFITT:  Wait.  She's --
3  BY MS. DAVIDSON:
4    Q.  -- a published paper in the scientific
5  literature?
6        MS. PARFITT:  -- she's in the middle
7        of -- she's in the middle of her response.
8        Please let her finish.
9  BY MS. DAVIDSON:
10    Q.  I think you might have misheard the
11  question.
12        MS. PARFITT:  No.  Let her finish what
13        she was saying, and then you can say she
14        didn't hear your question.
15        THE WITNESS:  Yeah.  What I was
16        stating, I said, the Health Canada report
17        stated the available data are indicative of
18        a causal relationship.
19  BY MS. DAVIDSON:
20    Q.  Do you remember my question?
21    A.  Please repeat it for me, please.
22    Q.  Are you aware of any published paper
23  in the scientific literature by an independent
24  scientist who is not a paid expert in this
25  litigation concluding that talc can cause ovarian

Page 238

1  cancer?

2      A.  Well, I would argue that this is in

3  the scientific literature, that this was not done

4  by a plaintiff expert, and it concluded that there

5  was a causal relationship.  They don't -- I don't

6  recall if they specified who actually wrote the

7  paper, but I would argue this is part of the

8  scientific literature.

9      Q.  Do you know who wrote the Health

10  Canada report?

11      A.  I just stated that I don't remember

12  the -- if they -- I just don't remember

13  specifically if they named the specific authors or

14  not.  I just don't remember that.

15      Q.  Did Health Canada -- was that Health

16  Canada published in any peer-reviewed literature?

17      A.  I don't know that it was published in

18  the peer-reviewed literature.

19      Q.  Does the Health Canada report rely in

20  part on litigation reports by plaintiffs' experts?

21      MS. PARFITT:  Objection.  Form.

22      THE WITNESS:  My understanding is that

23  they considered some of the plaintiffs'

24  expert reports as well as some of the -- I

25  think also some of the defendant expert --

Page 239

1  or some of what came from the defendants as

2  well.

3  BY MS. DAVIDSON:

4      Q.  Have you ever read a paper in the

5  peer-reviewed scientific literature that relies on

6  litigation expert reports?

7      MS. PARFITT:  Objection.  Misstates

8  her testimony.

9      You can answer the question.

10      MS. DAVIDSON:  It's not misstating any

11  testimony.  I'm asking.

12      THE WITNESS:  I'm sorry.

13      MS. DAVIDSON:  That's just -- can you

14  repeat the question?

15      Could you stop obstructing?

16      MS. PARFITT:  Jessica --

17      MS. DAVIDSON:  Go ahead.

18      MS. PARFITT:  -- please.  We made it

19  through a whole day.  Don't characterize my

20  objections, and I won't characterize your

21  questions.

22      MS. DAVIDSON:  You just characterized

23  the question -- mischaracterized it,

24  actually.

25      Go ahead.

Page 240

1      (The following question was read back:

2      Q:  Have you ever read a paper in the

3  peer-reviewed scientific literature that

4  relies on litigation expert reports?)

5      MS. PARFITT:  Object to the form.

6  Broad.

7      THE WITNESS:  I cannot recall that.

8  I -- when I was reading that in the Health

9  Canada report, it struck me as a little bit

10  unusual.  But I also thought that it was

11  actually -- they were considering arguments

12  made by scientists on either side of the

13  question.

14      So I thought that it was a bit

15  unusual, but I thought that it was perhaps

16  the strength of their evaluation of all of

17  the literature.

18  BY MS. DAVIDSON:

19      Q.  Do you recall the Zantac court saying

20  that no independent scientist or publication has

21  concluded that ranitidine causes cancer?

22      A.  I -- I mean, that was a very long

23  document, as you acknowledged.  And do I recall

24  that specific statement?  I don't recall it.

25  It's -- it might have been in there.

Page 241

1      Q.  Are you aware of a single scientific

2  body in the United States that has concluded that

3  talc can cause ovarian cancer?

4      A.  I am not aware of that.

5      Q.  Has anyone who is not a plaintiff's

6  expert written a letter criticizing either O'Brien

7  2020 or O'Brien, Wentzensen 2021?

8      A.  I don't recall all the letters to the

9  editor.  I -- I am not aware of them other than

10  the letters that I referenced in my report.

11      Q.  And the ones you referenced in your

12  report were by plaintiffs' experts, correct?

13      A.  Correct.

14      Q.  If a study asks women about talc use

15  after the women have gone through menopause, that

16  doesn't mean that the women did not use talc

17  before menopause, correct?

18      A.  If they asked about talc use after

19  menopause --

20      Q.  Uh-huh.

21      A.  -- it doesn't mean they didn't use it

22  before menopause?  Lots of negatives.

23      No, it does not mean that.  If they

24  reported it after menopause, they could have used

25  it -- depending on how the question was phrased,

Page 242

1  they could have used it anytime throughout
2  their -- their life.
3      MS. DAVIDSON:  Let's go off the
4  record.
5          *  *  *
6      (Whereupon, there was a recess in the
7  proceedings from 5:09 p.m. to 5:11 p.m.)
8          *  *  *
9  BY MS. DAVIDSON:
10     Q.  I just have one other question,
11 subject to any questions from Michelle.  If we
12 could go back to O'Brien 2020, which is Exhibit 2,
13 if I -- yeah, it's Exhibit 2.  I'm not having a
14 senior moment today despite my blindness.
15         If you can just look at the abstract
16 for O'Brien 2020, does this refresh your
17 recollection as to whether O'Brien 2020 had a
18 definition for "frequent talc use"?  Under
19 "Exposures."
20     A.  Let's see.
21     Q.  I'm reading the abstract under
22 "Exposures."
23     A.  Long-term -- rather, "frequent," they
24 defined it as greater or equal to 1 time per week.
25     Q.  And O'Brien was published before

Page 243

1  Woolen, correct?
2      A.  This was 2020, and Woolen was -- was
3  later, yeah.
4      Q.  So both O'Brien and Davis define
5  "frequent" differently from Woolen, correct?
6      A.  What -- I -- we have talked about this
7  repeatedly and --
8      Q.  Well, we haven't talked about this at
9  all, actually.
10     A.  No.  No.  What I'm saying is, Woolen
11 was -- they used that cut point for a criteria
12 for including a study in their meta-analysis.
13     Q.  Uh-huh.
14     A.  And from there, the purpose of their
15 analysis was to -- what was -- to examine what was
16 the risk with the highest level of exposure.
17         I don't think it was ever necessarily
18 their intention to look at 2 times a week or
19 greater.  Their intent was to look at the highest
20 level of exposure in the studies.
21         And so what -- this definition of
22 "frequent" in O'Brien, it is different than the
23 definition of what they considered the minimum
24 level of use for frequent use to be included in
25 their meta-analysis.

Page 244

1      MS. DAVIDSON:  Okay.  Michelle.
2      MS. PARFITT:  Thank you.
3          *  *  *
4          EXAMINATION
5  BY MS. PARFITT:
6      Q.  Just a couple, Doctor.
7         Dr. Moorman, do you have knowledge
8  whether at the time that Dr. Harlow and
9  Dr. Rothman wrote their letters -- editorial
10 letters in response to the O'Brien paper, whether
11 or not they were retained plaintiffs' experts?
12     A.  I do not know when they were retained
13 as experts.  So I can't say at that point whether
14 they were or -- or not.
15     Q.  All right.  Also, did you have an
16 opportunity to review the reply by Katie O'Brien
17 to the letters to the editor written by Dr. Harlow
18 and Dr. Rothman?
19     A.  I did.
20     Q.  What was the nature of the reply by
21 Dr. O'Brien to the criticisms that were registered
22 by Dr. Harlow and Dr. Rothman?
23     A.  There were several points on which
24 Dr. O'Brien acknowledged that the -- the
25 criticisms raised by Dr. Harlow, Rothman and

Page 245

1  Cramer were valid.  In particular, noted that the
2  misclassification in the cohort studies could have
3  resulted in an underestimate of the true relative
4  risk.  And -- let's see.  And they also addressed
5  the point about the -- reporting on the point
6  estimate and not relying just on the statistical
7  significance.
8      MS. PARFITT:  I don't have any further
9  questions.  Thank you, Dr. Moorman.
10     MS. DAVIDSON:  Let's just mark
11 Dr. Harlow's letter as Exhibit --
12     THE REPORTER:  17.
13     MS. DAVIDSON:  -- Exhibit 17.
14     (MOORMAN EXHIBIT 17, Dr. Harlow's
15 letter in response to the O'Brien paper,
16 was marked for identification.)
17         *  *  *
18         EXAMINATION
19 BY MS. DAVIDSON:
20     Q.  I just marked the letter from -- I
21 just marked as Exhibit -- 17?
22     MR. TRANGLE:  17.
23 BY MS. DAVIDSON:
24     Q.  -- the letter that Dr. Harlow wrote
25 to -- in response to the O'Brien paper.  And you

Page 246

1  were just asked a minute ago by Ms. Parfitt
2  whether Dr. Harlow had yet been serving as a
3  litigation expert. Can you read the conflict of
4  interest disclosure for Dr. Harlow?
5      A.  It says:  Dr. Harlow reported
6  publishing research and serving as a consultant on
7  the topic of talc and ovarian cancer.  No other
8  disclosures were reported.
9      Q.  Does this indicate who Dr. Harlow was
10  serving as a consultant to?
11      A.  No, it does not.
12      MS. DAVIDSON:  Let's go off the record
13  for a minute.
14          * * *
15      (Whereupon, there was a recess in the
16  proceedings from 5:17 p.m. to 5:19 p.m.)
17          * * *
18  BY MS. DAVIDSON:
19      Q.  When -- when Drs. O'Brien and
20  Wentzensen published their paper in 2021, right,
21  that we talked about earlier today --
22      A.  Okay.
23      Q.  -- in which they stated that it is
24  difficult to conclude that the observed
25  associations are causal, that was after they had

Page 247

1  received these letters to the editor and responded
2  to them, correct?
3      A.  Let's see.  Yeah.  Yes.
4      MS. DAVIDSON:  Okay.  I don't have any
5  further questions.
6      THE WITNESS:  Okay.
7          * * *
8      EXAMINATION
9  BY MS. PARFITT:
10      Q.  Dr. Moorman, if you would kindly refer
11  to Exhibit Number 17 again.  It was the letter to
12  the editor by Dr. Harlow and Dr. Rothman.
13      A.  Uh-huh.
14      Q.  Do you have that in front of you?
15      A.  Yes.
16      Q.  All right.  You were asked by counsel
17  with regard to the disclosures of conflicts of
18  interest.  Would you read that into the record,
19  please?
20      A.  Okay.  Dr. Harlow reported publishing
21  research and serving as a consultant on the topic
22  of talc and ovarian cancer risk.  No other
23  disclosures were reported.
24      Q.  Okay.  Does that reflect which side
25  Dr. Harlow was reporting a conflict of interest

Page 248

1  on?
2      A.  It does not.
3      Q.  Does the conflict of interest noted in
4  the letters to the editor mention any conflict of
5  interest by Kenneth Rothman?
6      A.  It does not.
7      Q.  Does the letter to the editor,
8  Exhibit 17, reflect any conflict of interest by
9  Eleanor Murray?
10      A.  It does not.
11      MS. PARFITT:  I don't have any further
12  questions.
13      (WHEREUPON, the deposition was
14  concluded at 5:21 p.m.)
15      (Signature Reserved.)

Page 249

1          DEPOSITION ERRATA SHEET
2
3  Case Caption:  In Re:  Johnson & Johnson Talcum
   Power Products Marketing, Sales Practices, and
   Products Liability Litigation
4      DECLARATION UNDER PENALTY OF PERJURY
5
6      I declare under penalty of perjury
7  that I have read the entire transcript of
8  my deposition taken in the captioned matter
9  or the same has been read to me, and the
10  same is true and accurate, save and except
11  for changes and/or corrections, if any, as
12  indicated by me on the DEPOSITION ERRATA
13  SHEET hereof, with the understanding that I
14  offer these changes as if still under oath.
15
16
17      Signed on the _____ day of
18  _____, 20___.
19
20
21      _____
22      PATRICIA G. MOORMAN, Ph.D.
23
24
25

Page 250

DEPOSITION ERRATA SHEET

1
2 Page No._____Line No._____Change to:_____
3 _____
4 Reason for change:_____
5 Page No._____Line No._____Change to:_____
6 _____
7 Reason for change:_____
8 Page No._____Line No._____Change to:_____
9 _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23 SIGNATURE:_____DATE:_____
24     PATRICIA G. MOORMAN, Ph.D.
25

Page 251

DEPOSITION ERRATA SHEET

1
2 Page No._____Line No._____Change to:_____
3 _____
4 Reason for change:_____
5 Page No._____Line No._____Change to:_____
6 _____
7 Reason for change:_____
8 Page No._____Line No._____Change to:_____
9 _____
10 Reason for change:_____
11 Page No._____Line No._____Change to:_____
12 _____
13 Reason for change:_____
14 Page No._____Line No._____Change to:_____
15 _____
16 Reason for change:_____
17 Page No._____Line No._____Change to:_____
18 _____
19 Reason for change:_____
20 Page No._____Line No._____Change to:_____
21 _____
22 Reason for change:_____
23 SIGNATURE:_____DATE:_____
24     PATRICIA G. MOORMAN, Ph.D.
25

Page 252

1 STATE OF NORTH CAROLINA
2 COUNTY OF CABARRUS
3       REPORTER'S CERTIFICATE
4     I, Cindy A. Hayden, RMR, CRR, a Notary
5 Public, do hereby certify that there came before
6 me on February 13, 2024, the person hereinbefore
7 named who was by me duly sworn to testify to the
8 truth and nothing but the truth of his or her
9 knowledge concerning the matters in controversy in
10 this cause; that the witness was thereupon
11 examined under oath, the examination reduced to
12 typewriting under my direction, and the deposition
13 is a true record of the testimony given by the
14 witness.
15       I further certify that I am neither
16 attorney or counsel for, nor related to, or
17 employed by any attorney or counsel employed by
18 the parties hereto or financially interested in
19 the action.
20       IN WITNESS WHEREOF, I have hereto set
21 my hand this 26th day of February, 2024.
22
23 _____
24    Cindy A. Hayden, Notary Public
25    Notary Public Number 20020910053

Patricia G. Moorman, Ph.D.

**WORD INDEX**

< $ >
**$120,000**
 12:17
**$17,000**
 13:24
**$200,000**
 8:18

< 0 >
**0.63** 91:5
 165:17
**0.86** 85:18

< 1 >
**1** 4:11  5:6,
9  18:24
 19:3  25:4,
5  26:3, 7
 59:6  61:9
 63:1, 3, 8
 74:13  76:3,
4, 5  85:20
 93:8, 20
 104:19
 115:2
 117:3
 126:24, 25
 127:8, 18
 130:15
 146:24
 152:15, 18
 153:16, 18,
20  155:14
 157:7
 168:11
 174:6
 187:8
 194:17
 201:24
 202:1, 14

242:24
**1,258** 64:10
**1.0** 60:1
 65:25  66:1
 67:10, 11
**1.01** 77:16
 85:16
**1.02** 74:9,
11, 20, 21
 75:14, 22
 76:5, 10
 94:12
**1.05** 62:9
**1.08** 59:11
 77:13
**1.13** 59:12
 77:15  85:16
**1.15** 85:18
**1.16** 164:16
**1.17** 77:14
 92:9
**1.19** 94:5
**1.20** 62:11
**1.22** 117:2
**1.23** 165:15
**1.25** 214:1
**1.26** 77:16
 85:17
**1.27** 154:14
**1.3** 214:1
**1.40** 154:19
**1.42** 94:12
**1.53** 117:3
**1.58** 124:15
 125:2
 126:13
**1.89** 92:10
**1.98** 94:5
**1.99** 94:13
**10** 5:6
 14:4  70:7
 72:9, 24
 94:10, 12
 95:3, 14, 22

134:1, 7
162:22
163:7, 12, 17,
19, 25
164:20, 22
190:14
201:24
**10:29** 66:20
**10:52** 66:20
**100** 201:25
 202:1, 14
**10001-8602**
 3:18
**102,000**
 12:13
**104** 4:23
**11** 5:9
 93:1, 10
153:8, 16, 17
156:22
157:7
**11/15/23**
 4:24  104:13
**11/16/18**
 4:16  69:11
**115** 5:1
**118,000**
 12:15
**12** 5:9
 72:6, 25
 73:2
161:15, 17
162:6
179:24
180:1, 13, 14
181:20
182:4, 13
183:5, 12, 25
184:5
185:10, 16
186:12, 14
189:22, 25
222:1, 6

**12:10** 119:5
**12:59** 119:6
**120** 5:4
**125,000**
 12:14
**127** 5:6
**12-month**
 187:11
**13** 1:15
 5:12  26:6
 72:9, 12, 24
 92:16, 21
 171:16, 17,
22  190:14,
15  192:6
 252:6
**134** 5:6
**13th** 2:7
 26:11
**14** 5:16
 173:14, 19,
20  180:1, 9,
13  182:8
 183:8
 184:6
 187:5
 188:6, 22
 189:21
 192:23
**15** 5:17
 85:20  86:4
 87:1  91:6
 115:2
 189:7, 10, 12
 222:1, 6
**153** 5:9
**15th** 104:18
**16** 5:17
 211:7, 9, 14
**161** 5:9
**16-
2738(MAS)(
RLS** 1:7
**16th** 44:2

**17** 5:22
 65:23
 245:12, 13,
14, 21, 22
 247:11
 248:8
**17,000**
 13:11  14:3
**171** 5:12
**173** 5:16
**1825** 3:3
**1835** 3:13
**189** 5:17
**19** 18:19
 208:24
**19103** 3:14

< 2 >
**2** 4:11  5:6
 18:24  19:3
 58:9, 10
 59:7, 14
 73:18
 77:12
 90:25
 93:25
 124:6
 127:13, 18
 128:6
 130:22
 137:19
 138:4, 17
 139:19
 141:4
 145:14
 151:18, 25
 155:1, 2, 6,
15, 16, 24
 156:6, 18, 24,
25  157:8, 12,
14, 21, 23
 158:2, 8, 17
 159:11, 19
 162:18

164:*20, 23*
165:2, *12*
170:*5*
173:7
184:*18, 23*
242:*12, 13*
243:*18*
**2,000**  222:8
**2,213**  64:5
**2.12**  164:*19*
**2.20**  124:*18*
125:*1*
**2.41**  165:*18*
**2.65**  91:6
**2:00**  160:*14, 15*
**2:01**  161:5
**2:07**  161:5
**2:30**  160:*16*
**2:31**  177:*11*
**20**  60:*13*
70:7  94:*10, 12*  95:3, *15, 21, 22*
111:*12*
163:*8, 9, 12, 16, 18, 25*
165:9
174:*14*
175:5
186:*24*
249:*18*
**200**  8:*20*
**20006**  3:4
**20020910053**
252:25
**2005**  18:7
**2009**  161:*16, 24, 25*
**2009-ish**
33:*13*
**2014's**
224:*24*

**2016**  33:*20*
173:*18*
**2016-ish**
33:9
**2018**  8:*14*
18:*19*  44:*1, 2*  45:*24*
64:*14*
111:*15*
**2019**  18:*14*
19:9  20:2, *22*  22:8
27:8  45:*3, 25*  89:*16*
90:9
109:*15*
110:25
111:*19, 23*
147:25
199:*19*
200:9, *19*
205:3, *5*
219:4
221:*1*
231:*17*
232:*3*
**202.783.6400**
3:4
**2020**  58:9
71:24
83:*16*
89:*11*  90:*3*
130:*21*
191:24
192:*14*
217:*16*
218:*24*
220:*20*
241:7
242:*12, 16, 17*  243:2
**2021**  4:*16*
9:22  10:*3*
11:*13*  13:7

43:*6, 14*
44:25  69:7, *12, 15, 18*
82:25
112:*14*
115:*24*
211:*8, 17*
224:*4*
233:*24*
241:7
246:*20*
**2022**  13:9
15:*19*
21:20
119:*15*
133:*25*
134:6
**2023**  13:*8, 24*  27:*13, 20*
43:*18*
44:25  46:2
69:*3*  79:4
81:*18*
82:*12*
87:*12*
102:*20*
103:*13*
104:*9, 18, 20*
105:3, *5*
112:2
117:5
119:9
130:2
171:*13, 24*
172:25
173:5
177:*18, 19*
178:25
184:*23*
189:*11*
191:*23*
192:*13*
204:5, *10, 18*
211:*20*

213:2
231:*10*
**2024**  1:*15*
2:7  25:*14, 15, 16*  26:*6, 12*  55:23
56:*1, 15*
206:*20*
207:*10*
209:9
228:*15*
252:6, *21*
**20-plus**
94:*1, 15, 25*
95:*12*
**20-some-
thousand**
222:7
**21**  4:*16*
69:*12*
173:*12*
175:3
182:*13*
**211**  2:6
5:*17*
**212.735.2588**
3:*19*
**215.985.9177**
3:*14*
**24**  92:*16, 21*
93:*1*
**244**  4:4
**245**  4:5
5:22
**247**  4:6
**25**  4:*11*
208:*24*
**2531**  149:*18, 19, 21, 22*
**257,044**  59:6
**26**  4:*13*
69:*10, 16*
**26th**  252:*21*

**27**  180:*8, 13*
182:4, *12*
183:*11*
185:2, *3, 22*
186:*1, 20*
188:7, *23*
190:2
**28**  179:9
**2900**  3:*13*

**< 3 >**
**3**  4:*13*
69:*4, 6, 9, 15*
82:*20, 25*
116:*4, 17*
179:*25*
180:22
**3,000**  222:9
**3:16**  177:*11*
**30**  83:*21*
162:*23*
164:*1*
165:*10, 11*
176:*14*
192:22
**30s**  78:*20*
176:*10, 14*
177:*3*
**31**  177:2
**316**  3:8
**32502**  3:9
**33**  65:*17*
179:*11*
**343**  174:*13*
**383**  181:*14*

**< 4 >**
**4**  4:*16*
61:*18, 23*
62:*15*  63:6
82:*21, 22, 23*
83:*3, 8*
92:7  96:*17*
155:*8, 10, 17*

Patricia G. Moorman, Ph.D.

156:7, *12*
225:*3*
**4:26**  227:*15*
**4:46**  227:*15*
**40**  12:*14*
128:*14*, *21*
130:*4*
**400**  15:*12*
**403(b**  14:*22*
**40-ish**  9:*23*
**40s**  78:22
176:*11*

**< 5 >**
**5**  4:*20*
70:7  90:*9,*
*10*, *16*
145:*16*
151:*19*
224:*15*
**5:09**  242:7
**5:11**  242:7
**5:17**  246:*16*
**5:19**  246:*16*
**5:21**  248:*14*
**550**  174:*12*
**58**  4:*11*

**< 6 >**
**6**  4:*3*, *23*
5:*17*
104:*10*, *11,*
*16*  119:*10*
180:*10*
181:*5*, *8*
183:*20*
184:*13*
185:7, *22*
186:*20*
187:*10*
188:7, *20*
189:*6*, *8*, *11,*
*15*
**61,000**  64:7

**63**  132:*9*
164:*18*
**69**  4:*13*

**< 7 >**
**7**  5:*1*
115:*16*, *17,*
*24*  116:8
148:*9*, *12*
155:*10*
167:*17*, *19*
**71**  94:5
**73**  74:7
92:*10*
193:*6*
194:*17*
**74**  74:8
**76**  64:8

**< 8 >**
**8**  5:*4*
119:*20*, *22,*
*25*  120:*3*
148:*9*
215:*8*, *15*, *17*
**83**  4:*16*
**850.435.7000**
3:*9*
**877.370.3377**
1:*19*
**8s**  147:*9*

**< 9 >**
**9**  5:*6*
127:*15*, *16,*
*17*  147:*9*
211:*18*
213:*5*, *7*
**9:05**  2:*8*
**9:09**  9:*5*
**9:10**  9:*5*
**9:43**  40:*7*
**9:50**  40:*7*
**90**  4:*20*

**917.591.5672**
1:*19*
**92**  62:*11*
**94**  92:20
**95**  85:*16*, *18*
92:*21*
**97**  117:*3*
**98**  96:*15*, *20*
98:*20*
**99**  77:*14*
85:*17*

**< A >**
**a.m**  2:*8*
9:*5*  40:7
66:*20*
**AACR**  5:*1*
115:*17*
**able**  112:*1*
131:*5*
133:*10*
204:*5*
206:*16*
222:*5*
**above-**
**entitled**  2:*2*
**absolute**
221:*16*
222:*10*
223:*12*
**absolutely**
53:*3*  161:*2*
**abstract**
242:*15*, *21*
**abstracted**
158:*19*
**acceptable**
113:*20*
**access**  17:*6*
25:*19*
114:*2*, *13*
116:*11*
121:*18*, *19,*

**25**  122:*2*, *3,*
*9*, *11*, *16*, *18*
**account**
48:*20*
**accuracy**
178:*20*
**accurate**
12:*22*  81:*4,*
*24*  87:*1*
118:*3*
156:*10*
185:*23*
188:*23*
214:*2*
225:*9*
249:*10*
**accurately**
38:*17*
177:*24*
179:*2*
**acetate**
30:*23*
**acknowledge**
97:*1*
125:*24*
200:*2*
**acknowledge**
**d**  240:*23*
244:*24*
**acknowledg**
**ments**  48:8
120:*25*
**ACOG**  21:*9,*
*11*, *15*  22:*2,*
*9*, *11*  31:*10*
32:*21*
**ACOG's**
22:*12*
**action**  2:*2*
252:*19*
**activities**
16:*23*

**actual**
57:*18*
168:*20*
**add**  23:*9*
24:*12*  32:*23*
**added**  64:*21*
**Addendum**
4:*13*  69:*9,*
*16*
**addition**
47:*13*
**additional**
205:*3*
**additions**
44:*10*
**address**
61:*23*
64:*21*, *24*
81:*12*  82:*3,*
*9*  94:*16*, *24*
97:*9*
101:*19*
105:*1*, *12*
108:*3*
130:*15*
133:*8*, *10*
190:*25*
192:*5*, *10*, *15*
197:*15*
199:*25*
210:*10*
**addressed**
21:*2*  55:7
56:*5*  78:*25*
82:*13*
96:*12*  97:*6*
108:*14*
109:*3*
190:*6*, *10*, *13*
191:*24*
195:*12*
245:*4*

Patricia G. Moorman, Ph.D.

addresses
61:*24*
174:2  179:*5*
**addressing**
89:*22*  109:*1*
**adequate**
28:*13*
**adequately**
146:*15*
**adjective**
214:*14*
227:*6*
**adjectives**
213:*23*
**adjunct**
18:2, *6, 12*
**adjusted**
59:*8, 15, 25*
77:*12*
154:*13*
**adolescence**
180:*15*
182:*14*
**advise**  22:*14*
**advocated**
41:*7*
**affect**
114:*18*
129:*17*
136:7  223:*7*
**African**  5:2
19:*13*
115:*20*
116:*3*
**African-
American**
115:*10*
116:*22*
117:*7, 11, 16*
**afternoon**
7:*4*
**age**  72:*24*
78:*21*  79:*2,
3, 5*  80:*18*

81:*12*  82:*9,
15*  132:*24*
173:*1, 6, 8,
12*  174:2, *6*
175:2, *5*
176:*14, 15,
16, 17, 23, 24*
190:*14, 15,
16*  192:*6*
**agent**
202:*20*
**ages**  81:*21*
82:*4*  131:*4,
11, 20*
**ago**  16:*10,
17*  17:2
37:*8*  53:*25*
66:*25*  70:*7,
8*  99:*12*
192:*6*
196:*15*
246:*1*
**agree**  8:*6*
20:*19*
26:*19*
30:*19*
47:*16*  60:*6*
61:2  85:*8,
25*  86:*8, 11*
101:*6*
106:*15*
118:*13*
136:*20*
141:*5*
147:*3*
165:*11*
175:*7*
178:*1, 16*
188:*9, 16*
195:*18, 19,
25*  211:*1*
213:*21*
214:*9, 12*
215:*25*

216:*3, 10*
226:*1*
227:2, *5, 8*
235:*8*
**agreed**
172:2
233:*24*
**ahead**
116:*20*
239:*17, 25*
**al**  119:*18*
134:2  162:*9*
**albeit**  95:*9*
**allow**  105:*9*
118:*3*
**allowed**
42:*19*
169:*16*
172:*11*
219:*24*
**aloud**  84:*7*
**amount**
8:*16*  9:*22*
15:*8*  108:*3*
129:*6*  130:*8*
**analyses**
106:*13*
110:*7*
111:*2*
216:*15, 16*
**analysis**
44:*6, 13, 16*
62:*18*
64:*11*  73:*1*
78:2  89:*19*
90:*3, 6*
99:*17*
104:*23*
112:*10*
129:*17*
138:*20*
154:2, *5, 8*
155:*23*
160:*1, 5*

165:*7*
166:*5*
169:*13, 17*
171:*3*
179:*1*
197:*10*
200:*23*
201:*16*
224:*18, 23*
235:*3*
243:*15*
**analyze**
137:*24*
159:*3*
204:*24*
205:*13*
218:*8*
**analyzed**
115:*7*
156:*1*
201:*21*
**analyzing**
97:*21*
**Ancestry**
5:2  19:*13*
115:*20*
116:*3*
**and/or**
249:*11*
**Angeles**
5:*12*
161:*19*
162:*11*
**animal**
201:*12*
**Anna**  162:*9*
**answer**
6:*21*  12:*19*
34:*22*  36:*3,
5, 7, 25*  38:*7,
16, 24*  39:*3,
13, 20, 23, 25*
42:*14, 18, 21*
44:*8*  50:*21*

51:*21*
60:*23*
66:*10*
73:*25*
75:*11*
79:*12*  80:*4*
85:*9*
109:*19*
118:*19, 21*
142:*12, 18*
172:*12*
200:*11*
217:*11, 23*
227:*25*
239:*9*
**answered**
41:*20*
42:*12*
50:*16*
56:*11*
60:*20, 21*
61:*7, 8*
75:*25*  76:*2,
13*  108:*6*
110:*1, 2, 4*
118:*8, 9, 17*
139:*12*
140:*7, 9, 12*
142:*11, 15*
159:*24*
194:*2*
196:*15*
197:*5, 23*
198:*11, 12*
199:*2*
218:*5*
219:*5, 7*
226:*21*
229:*4, 5*
230:*17*
231:*20*
232:*20*
**answering**
158:*23*

Patricia G. Moorman, Ph.D.

anxiously
176:2
anybody
51:17
68:24  70:6
206:15
anymore
131:24
anytime
242:1
Anyway
215:25
apologies
163:23
apologize
66:2  127:3
Apologizing
177:13
apparently
130:10
155:3, 21
APPEARAN
CES  3:1
appears
26:8
apples-to-
apples
150:21
151:1
applied
146:5  235:5
applying
146:20
148:21
appointment
18:12
appreciable
96:22
appreciate
177:15
200:14, 20
approached
233:16
236:6

appropriate
49:5  74:2
144:9
210:14, 21
approve
153:5
approved
16:5
approximatel
y  115:2
130:4
April  4:16
69:12
Area  4:13,
18  58:11
59:14  79:1
82:11  83:4,
9  85:23
86:17  87:8
106:14
109:8, 10
110:21
190:18
195:16
203:17
204:23
205:12
232:16
areas
116:23
argue  238:2,
7
arguments
20:15
240:11
arises  183:4
ARPS  3:15
arrive  26:24
article  34:5
94:20
114:5, 8
121:18, 21
122:5

123:15, 21
136:2  188:8
articles
43:23  45:1,
7  46:1, 3, 9,
17, 23  90:23
122:3
123:8, 10
145:22
asbestos
7:15, 23
19:22
99:22, 24
101:17, 22,
25  102:3, 5,
9, 14  107:2,
8, 15, 22, 24
108:3, 11, 16
110:13, 17,
19  111:2, 3
112:10
201:17, 21
202:8, 15
205:24
216:8, 12, 22
217:1, 21
218:9, 21
219:1
220:23
229:10, 11
231:4
ascertainmen
t  235:4
Ashbrook
121:4
ASHCRAFT
3:2  121:4
ASHER
3:17  25:20
26:4  46:10
69:5  127:7
172:21

asher.trangle
@skadden.co
m  3:20
asked  10:5
17:8, 14
34:18
35:10
39:16
42:11
50:16
55:12
56:12  61:7
67:5  72:6
75:3, 24
79:4  82:14
84:17  85:1,
3  87:21
97:16
101:23
102:24
108:5
110:1, 3
113:18
118:7, 16
124:3
140:6
142:11
159:23
193:13
194:1
196:14
197:4, 6, 21,
23  198:10,
11, 14  199:1
226:20
228:7
229:3, 5
230:16
231:19
233:12
236:3
241:18
246:1
247:16

asking  34:6,
11, 13  37:24
47:6  50:17
68:16  80:1,
13, 14  81:11,
14  82:2
109:11
123:9
141:6, 9
142:7, 9
177:4
186:18
188:18, 19,
24  189:16
197:14, 20
198:23
200:17
212:21
219:8
232:11, 17
239:11
asks  241:14
aspect  97:22
assembled
45:8
assembly
47:13
assess
147:18
196:11, 25
assessing
195:15
assessment
147:3
195:10, 21
196:3
assessments
170:3
assign  49:7,
9  234:2
assigned
49:16, 17
114:19

148:*18*
209:*21*
**assigning**
151:*9*
**assistant**
18:*25* 19:*1*
**associate**
18:*6*
**associated**
131:*3, 10, 19*
225:*19*
236:*8, 18*
**Association**
4:*11, 21*
5:*6, 16*
27:*21*
58:*10*
59:*23* 60:*2,*
*7* 61:*3, 10*
67:*19, 25*
68:*1* 74:*12,*
*14* 85:*22*
86:*9, 13, 16*
87:*7* 90:*12,*
*17* 91:*11, 20*
92:*18, 22*
93:*3, 11, 16*
94:*2* 95:*1*
115:*9*
117:*7*
120:*19*
125:*8*
131:*6, 16*
134:*3, 7*
173:*16, 20*
193:*25*
194:*13*
196:*11, 25*
199:*11*
213:*22*
214:*10, 15*
215:*19*
**associations**
213:*8, 13*

214:*21*
225:*14, 15*
246:*25*
**assume**
6:*25*
112:*13*
113:*20*
**assumption**
203:*19*
**assure** 35:*18*
**attached**
99:*9*
**attenuated**
126:*4*
**attenuation**
224:*22*
**attorney**
233:*17*
252:*16, 17*
**attributable**
221:*23*
222:*1, 3*
223:*22*
**attribute**
213:*7*
**author**
19:*12* 33:*9*
40:*24* 48:*1*
90:*19*
96:*20*
106:*1*
114:*7*
115:*3, 4, 25*
134:*17, 18*
149:*25*
173:*18*
177:*22*
212:*6*
231:*12*
**authored**
19:*7, 10*
**authority**
31:*17, 23*

**authors**
39:*9* 48:*24*
50:*11*
59:*22* 68:*4,*
*14* 91:*1*
97:*19* 98:*1,*
*3* 114:*23*
115:*2*
120:*12*
134:*14*
136:*10*
137:*18*
138:*25*
139:*18*
143:*16, 22*
144:*13*
145:*8*
151:*12*
170:*25*
171:*2*
172:*3*
188:*11*
209:*21*
212:*9, 13*
213:*6, 21*
214:*9*
221:*14*
235:*13, 17*
238:*13*
**author's**
113:*22*
161:*9*
**availability**
117:*25*
168:*15*
169:*3*
**available**
8:*7* 9:*7*
105:*8*
121:*22*
122:*8, 10*
130:*11*
237:*17*

**average**
121:*13*
132:*10*
173:*1, 6, 11*
176:*15, 16,*
*17, 22, 24*
190:*17, 23*
191:*18, 20*
**aware**
15:*23, 25*
21:*19* 22:*2,*
*18* 23:*1, 7*
27:*12, 15, 19*
45:*2* 50:*1*
54:*21* 68:*3,*
*13, 24* 80:*17*
81:*11*
87:*16, 18*
103:*12, 15,*
*16* 107:*12*
108:*22*
135:*3*
138:*2*
140:*4*
167:*3*
168:*21*
169:*4*
204:*9, 12*
212:*9, 25*
228:*22*
236:*5, 7, 17*
237:*22*
241:*1, 4, 9*

**< B >**
**Baby** 7:*15,*
*19, 22* 58:*5*
101:*16*
216:*23*
217:*20*
218:*3*
**back** 8:*14*
31:*21*
33:*20* 42:*6*

45:*20, 24*
55:*9* 56:*14*
61:*1* 67:*8*
75:*5* 80:*22*
89:*10, 15*
91:*17, 25*
114:*13*
118:*11*
127:*10*
130:*21*
157:*19*
160:*4, 25*
164:*11*
167:*15, 22*
173:*5*
194:*7*
196:*23*
205:*11*
207:*9*
216:*17*
220:*18*
230:*11*
236:*16*
240:*1*
242:*12*
**background**
107:*1, 5*
136:*17, 22*
156:*11*
**bad** 163:*23*
**balanced**
133:*18*
**ballpark**
175:*6*
**bankruptcy**
43:*20, 21*
**based** 56:*7,*
*25* 73:*1*
88:*18* 91:*4,*
*7* 102:*10, 17*
103:*3*
106:*24*
117:*21*
118:*25*

143:*17, 21*
144:*14*
145:*10*
167:*8*
169:2, *23*
179:*24*
197:*11*
198:*2*
202:*24*
205:*21*
208:*22*
209:*22*
210:*2*
216:*15*
**baseline**
130:*24*
180:*9*
**basic** 71:*13*
**basically**
14:*2* 71:*16*
97:*15*
141:*23*
143:*7*
146:*5* 225:*2*
**basis** 48:*14*
50:*19*
53:*16* 54:*6*
210:*24*
**batches**
216:*22*
**Baylen** 3:*8*
**Beg** 219:*16*
**beginning**
85:*4*
135:*24*
176:*16*
**begins** 84:*8*
**believe** 7:*10*
8:*15* 17:*18,*
*20* 19:*16*
22:*8* 27:*9*
29:*21*
32:*12* 37:*4*
40:*25*

42:*13* 47:*7*
54:*3* 56:*1,*
*16, 19* 60:*20*
61:*17*
62:*16, 20*
63:*9* 64:*16*
71:*23* 72:*9*
74:*16*
76:*25*
81:*20*
83:*12* 89:*5*
90:*1* 96:*5*
99:*11*
100:*2*
102:*8*
106:*11*
107:*1*
110:*14*
111:*9, 25*
112:*9, 11*
114:*4*
119:*11, 19*
130:*22*
131:*12*
134:*15, 22*
136:*3*
139:*11*
140:*10*
155:*11, 12,*
*25* 173:*14*
176:*12*
183:*3, 13*
190:*5*
197:*25*
198:*13*
199:*3*
201:*5*
206:*21, 25*
207:*11*
208:*7*
211:*21*
212:*5*
220:*17*
223:*13, 15*

224:*6*
225:*13*
230:*21*
231:2, *17*
234:*11*
**believes**
206:*24*
**bellwether**
57:*3, 13, 22*
**Berg** 89:*17,*
*24*
**Berga**
89:*17, 24*
**B-E-R-G-E-**
**N** 89:*17*
**best** 12:*22*
125:*7*
**better** 24:*2*
71:*20*
111:*21*
142:*13*
193:*20*
229:*25*
230:*2*
**beyond**
34:*8* 35:*21*
**bias** 47:*18,*
*20, 22, 23, 25*
69:*20*
70:*15*
71:*18*
96:*22* 97:*2,*
*3* 105:*14, 18,*
*19, 20, 21, 22,*
*24* 106:*2*
149:*11*
167:*1, 8*
177:*24*
178:*7, 11*
209:*23*
210:*24*
212:*11, 12,*
*19* 224:*16*

**biased** 53:*8,*
*11* 54:*4*
71:*9* 178:*7*
**biases**
104:*21, 24*
105:*2, 13, 25*
106:*4* 212:*9*
**big** 23:*13*
48:*10*
222:*15*
**bigger** 67:*2*
215:*7*
**billed** 9:*14,*
*24* 15:*8, 10*
**binders**
44:*20, 23, 24*
45:*4, 8, 18*
**biologic**
102:*4*
**biological**
102:2, *6*
126:*23*
195:*10, 22*
199:*18*
200:*10*
201:6, *15, 19*
202:2, *11, 17,*
*19, 23* 205:*1,*
*5, 16, 20*
206:*7*
**biologically**
102:*6*
**biomarker**
213:*10*
**bit** 13:*9*
71:*1* 122:*1*
126:*11, 15,*
*16* 167:*23*
170:*8*
175:*1*
225:*14, 16*
240:*9, 14*
**biweekly**
171:*4*

**blindness**
242:*14*
**board**
132:*18*
**bodies** 202:*9*
**body** 5:*20*
31:*3*
116:*23*
139:*6*
141:*7*
183:*16*
211:*10, 14*
226:*15*
231:*23*
241:*2*
**Boston**
233:*17*
**bottom**
149:*19, 22*
215:*17*
**Bradford**
44:*5, 13, 16*
99:*17*
200:*22*
**break** 40:*3*
66:*15* 67:*6*
116:*14*
160:*11, 13,*
*17* 177:*8, 14*
217:*4*
227:*10*
**breakdown**
59:*18*
**breastfeeding**
28:*19* 29:*2*
**Brief** 67:*14*
97:*17*
**bring** 27:*23*
28:*1* 102:*23*
**broad**
117:*22*
118:*25*

Patricia G. Moorman, Ph.D.

197:22
207:1 240:6
**broader**
73:8
**broke** 10:24
**brought**
27:24 44:20
**bulk** 14:1
64:9 198:1
**bunch** 46:9
106:18

< C >
**C.P** 115:25

**CABARRUS**
252:2
**calculated**
221:22, 25
223:21
**call** 46:15
128:25
174:19
**called** 18:22
35:3
102:19
112:14
119:15
204:1
**Canada**
26:20
99:10
195:13
196:1
236:22
237:1, 16
238:10, 15,
16, 19 240:9
**Cancer**
4:11, 13, 18,
22 5:2, 4, 9,
12, 16, 20
7:20 19:8,
12, 22 20:2,

21 21:16, 20,
23 22:4, 10,
12, 25 23:6
24:1, 13, 23
25:6 32:3,
13, 15, 24
33:11, 12, 16
34:2 35:9
36:24 37:6,
13 38:4
39:11
40:13
41:12, 16
42:10 43:2
50:3, 14
54:19, 21, 23
55:2, 5
56:6, 21, 23
57:22 58:3,
12 59:9, 24
60:8 61:4,
25 62:1
74:17 82:4
83:5, 10
85:24
86:17 87:9
90:13, 19
94:3 95:2,
8 102:9
106:22
107:2, 9, 16
108:4, 17, 24
113:3, 17
115:11, 19
116:2, 24
117:10
119:23
120:4, 16, 20
123:24
124:1, 2, 4, 8,
15, 17 125:1
126:3, 19
130:24
131:4, 11, 19

133:8, 17
134:5, 9
136:17
154:2
161:18
162:10
173:16, 21
174:2
179:8
181:19
195:9
196:4, 13
197:3, 9, 11
198:2, 19, 25
199:13
202:24
206:9, 17, 22
207:12, 18,
19, 22, 24, 25
208:9, 17
209:4, 12, 17
210:20, 22
211:11, 15
214:22
215:20
216:5
221:17, 20,
21, 24
222:18, 25
223:13
225:20
226:6, 16
227:2, 20
228:3, 18, 20,
24 229:2
230:15, 23
231:11, 18
232:5, 7, 17
236:10, 20
238:1
240:21
241:3
246:7
247:22

**cancers**
206:12
208:4, 10
222:2, 6, 8
225:5, 11
226:12
**caps** 95:25
**Caption**
249:1
**captioned**
72:18 249:8
**captured**
72:14, 16, 17
190:16
192:8
**carcinogen**
107:24
205:24
216:9
**carcinogenesis** 206:4
213:11
**carcinogenic**
206:18
208:13
**carcinoma**
56:4, 18
91:3 198:9
226:7
**carcinomas**
225:22, 24
**career**
14:21 16:7
20:18 21:14
**careers**
222:18
**carefully**
229:15
**Carolina**
2:6, 7
32:22
33:10 252:1
**case** 11:21,
23, 25 12:6,

10 16:5
70:12, 13, 19
77:23
90:22
126:9
156:4
174:16
249:1
**Case-
Control**
5:17 92:17,
21 93:2
147:9
148:19
173:17, 22
209:22
210:3, 7, 9,
13, 18, 25
211:4
**cases** 9:9
11:11 62:2,
7 64:2, 4, 5,
6, 8, 9 70:20
71:6
129:21
154:2
223:12
**cases/control
s** 128:16
**cast** 105:5
192:13
193:10
**casts** 191:23
**catch**
157:17
**categories**
77:22 85:7
138:9
139:14
140:14, 17
141:15
143:4
158:3, 5
166:21, 22

Patricia G. Moorman, Ph.D.

168:*10*
173:*9*
175:*3* 191:*5*
**categorizatio
n** 62:*4*
**categorizatio
ns** 117:*22*
118:*25*
159:*13*
168:*19*
169:*9*
**categorized**
168:*22*
**category**
70:*25* 71:*3*
155:*10, 13*
164:*10*
**causal**
196:*11*
197:*1, 16*
213:*8, 14*
214:*19*
215:*18*
216:*7*
237:*18*
238:*5*
246:*25*
**cause** 40:*20,*
*22* 55:*5*
56:*3, 18, 20*
102:*9*
106:*21*
107:*2, 8, 15*
108:*4, 16*
126:*2*
227:*19*
228:*3*
231:*18*
236:*10, 20*
237:*25*
241:*3*
252:*10*
**caused**
206:*22*

207:*12*
223:*13*
**causes** 7:*19*
33:*15* 34:*1*
35:*9* 36:*23*
37:*12* 38:*3*
39:*10*
40:*13* 41:*5,*
*16* 42:*9*
43:*2*
202:*24*
208:*17*
240:*21*
**CDC** 31:*5,*
*16, 22* 32:*1,*
*12, 17, 22*
**cell** 54:*25*
55:*5* 56:*3,*
*18* 57:*1*
63:*2* 91:*2,*
*8, 11, 21*
198:*9, 25*
199:*8, 11*
**cellular**
200:*1* 201:*2*
**certain**
167:*10*
197:*7* 227:*3*
**certainly**
19:*5* 21:*1*
37:*4* 54:*21*
55:*14*
67:*22*
88:*13*
109:*10*
136:*10*
175:*5*
184:*9*
187:*3*
191:*14*
198:*5*
201:*25*
224:*7*
232:*22*

**certainty**
96:*17*
97:*12, 19*
98:*25*
**CERTIFICA
TE** 252:*3*
**Certified**
2:*5*
**certify**
252:*5, 15*
**challenging**
214:*25*
**change**
73:*11* 74:*9*
154:*6*
194:*16*
250:*4, 7, 10,*
*13, 16, 19, 22*
251:*4, 7, 10,*
*13, 16, 19, 22*
**changed**
17:*1* 25:*20*
26:*5* 154:*6*
158:*9*
159:*18*
223:*4*
**changes**
249:*11, 14*
**Chapel** 2:*6*
**characteristi
c** 129:*1, 5*
**characterize**
239:*19, 20*
**characterize
d** 75:*21*
226:*24*
239:*22*
**choose**
170:*5*
**chose**
165:*19*
**CHRISTOP
HER** 3:*8*

**CINDY** 2:*4*
252:*4, 24*
**cited** 20:*10*
45:*1*
194:*25*
233:*9*
235:*14*
**citing** 89:*6*
**Civil** 2:*4*
**claim** 58:*5*
**clarification**
74:*3*
109:*21*
200:*24*
**clarify** 11:*1,*
*4*
**Clarke-
Pearson**
66:*23*
**class** 43:*22*
**classify**
96:*14*
**classifying**
69:*24* 193:*1*
**clean** 153:*7,*
*10*
**clear** 23:*3,*
*20* 24:*16*
42:*21*
54:*25* 55:*5*
56:*3, 18*
57:*1* 63:*2*
91:*2, 8, 11,*
*21* 113:*9*
118:*4, 22*
139:*1*
152:*15*
183:*2*
198:*9, 24*
199:*8, 11*
200:*14*
208:*2*
213:*7*
214:*8*

217:*13*
229:*23*
230:6, *8*, 25
**clearly** 16:*2*
85:*6* 145:*3*
**cleavage**
106:*7, 10, 11,*
*16*
**close** 12:*25*
74:*15*
233:*22*
**coach** 42:*17,*
*18*
**coaching**
35:*4*
**co-author**
19:*11, 14*
20:*25*
104:*3*
131:*14*
212:*6*
**co-authors**
168:*24*
171:*4*
**Cochrane**
147:*23*
**cohort** 59:*4,*
*5, 19, 20*
64:*3, 6, 8, 15,*
*22* 65:*5, 8*
70:*1* 72:*25*
89:*5, 19*
132:*11, 24*
133:*9, 14, 19*
192:*8*
210:*4* 245:*2*
**cohorts**
131:*5*
193:*19*
**coin** 192:*25*
**Colette**
19:*11*
**colleagues**
123:*4, 6*

collected
130:*13*
133:*16*
169:*7*
collection
46:*17*  58:*23*
collective
27:*7*
column
83:*25*
128:*13*
164:*4, 9*
combination
60:*17*  112:*8*
combine
169:*25*
combined
45:*18*
137:*12*
combining
96:*6*  193:*19*
come  13:*3*
17:*16*
40:*22*
125:*14*
146:*11*
160:*25*
192:*12*
195:*5, 7*
207:*5*
233:*14*
coming
137:*14*
comment
64:*18*  89:*2*
106:*3*
commented
130:*22*
comments
88:*16*
103:*13, 25*
104:*1*
committee
18:*13*

common
41:*9*  68:*10,*
*19, 23*  78:*21*
140:*16*
202:*12*
commonly
96:*5*  181:*21*
communicate
d  17:*22*
Community
16:*25*  17:*1*
206:*21, 24*
207:*11, 16*
226:*6*
company
111:*24*
compare
99:*13*
135:*17*
148:*3*
compared
28:*14*  65:*9*
95:*14*
181:*19*
comparing
85:*19*
178:*23*
179:*20*
180:*4*
comparison
150:*21*
151:*1, 7*
185:*9*
compatible
125:*11, 18*
130:*12*
compensatio
n  113:*2, 16*
complained
30:*2*
complete
45:*13, 25*
195:*16*
216:*5*

completed
224:*23*
completely
30:*19*
148:*22*
192:*10*
216:*10*
comport
174:*23*
concern
71:*24*
132:*12, 15,*
*17, 25*  145:*9*
178:*3, 4, 14,*
*17*
concerned
189:*14*
235:*12*
concerning
19:*8*  48:*19*
136:*13*
252:*9*
concerns
47:*25*
49:*22, 23*
105:*6*
130:*9*
132:*20*
188:*5*
209:*22*
conciliatory
37:*18*
conclude
39:*10*  55:*4*
56:*3, 17*
100:*12*
213:*13*
246:*24*
concluded
107:*14*
236:*9, 19*
238:*4*
240:*21*

241:*2*
248:*14*
concludes
38:*3*
concluding
237:*25*
conclusion
26:*22*
36:*23*  37:*4,*
*12*  85:*21*
86:*6*
197:*17*
212:*16*
218:*20*
235:*19, 20*
236:*23*
conclusions
33:*15*
44:*12*
235:*13, 17*
conducted
44:*5*  64:*11*
conference
58:*24*
67:*15*
163:*21*
171:*11*
228:*13*
confidence
62:*10*  63:*3,*
*7*  65:*25*
67:*11*  68:*5,*
*20*  75:*16*
76:*16*  77:*9,*
*13, 15, 17*
85:*16, 18*
91:*6*  92:*10*
94:*5*  99:*1*
117:*2, 12*
125:*3, 5, 9,*
*16*  164:*18*
165:*17*
187:*3*

confident
50:*23*
confirm
81:*23*
confirmed
62:*2, 7*
confirms
85:*20*  86:*5*
conflict
88:*2, 6*
98:*7, 9, 12*
246:*3*
247:*25*
248:*3, 4, 8*
conflicts
47:*21*  52:*6,*
*9, 23*  88:*14*
123:*17*
212:*18, 19,*
*22*  247:*17*
confounders
146:*19*
confounding
146:*16, 18*
213:*12*
conjunction
112:*17*
connection
103:*24*
113:*9*
connote
148:*12*
connotes
148:*14*
consensus
208:*8, 12*
226:*14, 19,*
*24*
consider
28:*13*
47:*19*
63:*25*  65:*1*
74:*11, 21*
88:*12*  93:*9*

105:*16*
123:*14*, *19*
144:*10*
145:*23*
180:*12*
218:7
**considerable**
125:*3*, *24*
194:*16*
**considerably**
64:*6*

**consideration**
63:*17*  64:*2*
105:9
136:*15*
**considered**
7:9  21:*1*
31:*16*, *22*
45:*12*, *15*
49:*20*
52:*16*
54:*14*
63:*23*  65:*4*
70:*13*
90:*24*
102:*4*
103:*5*
104:*20*
108:*11*
124:*2*, *5*
155:*4*
201:*6*
207:*24*
238:*23*
243:*23*
**considering**
64:*3*
218:*19*
240:*11*
**consistent**
93:*10*, *23*
183:*15*

184:*10*
234:*15*
**Consortium**
5:*3*  19:*13*
115:*20*
116:*3*
169:*5*  171:*9*
**consultant**
48:*11*
246:*6*, *10*
247:*21*
**contact**
43:*19*
**contacted**
23:*8*  26:*25*
27:*3*
**contain**
44:*24*
102:*9*, *18*
109:*2*
**contained**
102:*11*, *14*
106:*25*
**container**
202:*1*
**containers**
101:*21*
202:*15*
**contains**
7:*15*  102:*3*
**context**
84:*12*, *16*
208:*16*
**contingent**
143:*13*
**continue**
73:*6*  75:*7*
80:*8*

**contradiction**
28:*12*
**contradictory** 28:*10*

**contribute**
202:*11*
**contributed**
14:*22*
**contributing**
201:*15*
**control**
29:*24*
40:*23*
146:*15*, *19*
174:*12*
**controlled**
146:*18*
**controls**
71:*6*  129:*22*
**controversy**
252:*9*
**convenient**
69:*7*
**conversation**
83:*2*  168:*2*,
*5*  212:*25*
**conversely**
210:*5*
**convey**
222:*14*
**conveys**
221:*19*
222:*14*
**copy**  33:*17*
36:*7*  172:*20*
**Correct**
21:*7*  27:*22*
29:*22*
30:*17*
32:*24*
41:*19*
42:*10*  60:*4*
73:*9*  87:*12*,
*14*, *15*  88:*4*
94:*3*  98:*10*
99:*6*
106:*17*
116:*25*

118:*15*
120:9
121:*15*
128:*9*, *12*, *15*
129:7
130:*16*
148:*10*
150:*5*
152:*6*
158:*14*, *21*
162:*20*
165:*3*
166:*11*
169:*1*
170:*13*
172:9
176:*11*, *20*
177:*20*
179:*11*, *12*
182:*7*, *14*
183:*21*
185:*11*
186:*1*, *2*, *9*,
*21*  187:*5*, *11*
188:*8*, *14*
189:*22*, *23*
190:*5*, *7*
193:*25*
194:*13*, *21*
196:*6*
204:*18*
212:*9*, *18*
233:*2*
234:*10*
241:*12*, *13*,
*17*  243:*1*, *5*
247:*2*
**corrected**
69:*5*
**corrections**
249:*11*
**correctly**
23:*19*
72:*22*

81:*22*
92:*24*
203:*18*
**correlate**
182:*13*
**corresponde
nce**  104:*4*, *7*
**cosmetic**
196:*12*
197:*1*
**coughing**
67:*6*
**Counsel**  3:*5*,
*20*  35:*13*
36:*6*  39:*16*
101:*24*
111:*5*
112:*12*
204:*9*, *16*
233:*12*
247:*16*
252:*16*, *17*
**County**
5:*12*
161:*19*
162:*11*
252:*2*
**couple**
16:*10*, *17*
20:*6*  60:*12*
72:*3*
223:*19*
244:*6*
**course**
18:*17*, *21*, *22*
19:*4*  21:*13*
41:*2*
147:*20*
166:*18*
204:*7*
217:*22*
**courses**
18:*24*

**COURT**
1:1  15:23
16:5  23:16
80:22
91:15
119:25
235:1, 12, 21
236:4, 5
240:19
**courtesy**
35:14
177:15
**COVID**
233:23
**Cramer**
87:11, 16
88:8
120:15, 16,
24  121:14
122:20
131:13
173:14, 18
190:24
245:1
**Cramer's**
83:15
173:25
174:1
**credibility**
53:17
**criteria**
143:7, 23
144:10, 15
145:4, 8
146:5, 8, 21,
22  148:22
154:23, 25
155:20, 21
156:5, 16, 23
161:10
166:4
243:11

**Critical**
4:20  90:11,
17  181:1
**criticism**
190:9
235:6, 15, 25
**criticisms**
190:7
244:21, 25
**criticized**
64:15  235:1
**criticizing**
241:6
**crosses**  66:1
67:11
**CRR**  2:5
252:4
**ctisi@levinla
w.com**  3:10
**cumulative**
95:8
**currently**
22:1
214:19
215:18
**cut**  138:1
139:23
140:5, 23
141:8, 18
142:8, 20
156:19
169:22
170:19
243:11
**CV**  13:6
18:6
**C-word**
41:8

**< D >**
**D.C**  3:4
**daily**
154:21

155:4
**Dan**  131:13
**Dana**  76:22
**Daniel**
120:15, 16
173:18
**data**  20:10
33:11
44:10, 11
54:22  55:4
56:2, 16
72:23  75:2
86:2  96:6
103:4, 10
105:9
115:6
118:1
125:11, 18
128:11
129:1, 6, 11,
16, 20  130:4,
8, 11, 16
133:16
137:11
139:2, 3
147:1
152:8, 13, 23
153:22, 23
155:16
156:12
158:8
159:3, 10, 19
166:8
168:15
169:3, 5, 6, 7,
11, 24, 25
176:13
177:5
179:16
183:15
195:17
196:11, 25
197:25
198:5, 9, 16

206:11
221:8
225:4
227:22
232:12
235:22, 24
237:17
**datasets**
143:14
**Date**  4:16
25:9, 13, 16
27:17
69:11  228:6
**dated**  4:15,
24  43:25
69:11
104:13, 18,
20
**DAVIDSON**
3:17  4:3, 5
6:8  8:1, 5,
25  9:12
10:1, 18, 22
11:2, 5, 7, 15,
18, 22  12:1,
3, 4, 16  13:1,
16, 19  14:13,
16  22:22
23:24  24:8
25:3, 19, 23
26:4, 15
27:18
28:25
29:10, 14, 19,
22  30:3, 5, 8,
11, 14, 17, 19,
24  31:19, 25
32:11
33:18, 21, 24
34:4, 8, 11,
14, 21  35:3,
6, 12, 15, 20,
24  36:2, 8,
11, 13, 15, 19,

21  37:9, 16,
19, 22  38:2,
6, 10, 13, 15,
18, 21  39:1,
6, 7, 19  40:2,
9  41:13, 18,
22  42:1, 5,
15  43:3
44:4, 14, 19
46:4, 8, 12,
18  47:1, 5, 9,
15  48:22
49:25  50:8,
22  51:23
52:24
53:15, 22
55:16, 20, 22,
24, 25  56:8,
10  57:2, 6,
12  58:14, 20,
25  60:5, 22
61:11, 15
63:18
65:13, 18
66:9, 17, 22
67:4  68:2
69:14
70:14
73:20, 24
74:4, 10
76:7  79:10,
16, 19, 22, 25
80:3, 7, 13,
17, 24  81:1,
5, 9, 10
82:18, 22, 24
83:7  84:13,
19, 23  89:3
90:8, 15
91:15  92:2,
14  93:24
94:21
98:17
101:4

Patricia G. Moorman, Ph.D.

| | | | | |
|---|---|---|---|---|
| 103:*23* | *14*, *21*  162:*3* | *18*  218:*15* | 170:7 | 142:*8* |
| 104:*15* | 163:*5*, *6*, *14*, | 219:*7*, *14*, *17*, | **deal**  23:*13* | 144:*14* |
| 107:*6*, *17* | *22*  164:*6*, *11*, | *22*  220:*2*, *4*, | **decade** | 145:*13* |
| 108:*7*, *18* | *13*  165:*8* | *6*, *10*, *12*, *14* | 175:*8*, *11* | 168:*12* |
| 109:*16*, *22* | 166:*6* | 221:*11* | **decades** | 170:*22* |
| 110:*2*, *11* | 167:*18*, *20* | 226:*17* | 232:*6*, *9*, *18* | 243:*4* |
| 111:*8*, *10*, *13*, | 170:*20* | 227:*1*, *9*, *17* | **decide** | **defined** |
| *16*, *20* | 171:*12*, *21* | 228:*11*, *14* | 137:*18* | 78:*15* |
| 115:*15*, *22* | 173:*24* | 229:*5*, *10*, *19*, | **decision** | 138:*3*, *19*, *21*, |
| 118:*12*, *20* | 175:*10*, *17*, | *24*  230:*3*, *8* | 20:*19* | *22*  139:*7*, *25* |
| 119:*1*, *8*, *21* | *24*  176:*3*, *7*, | 231:*8* | 26:*17* | 140:*2* |
| 120:*7* | *8*  177:*1*, *7*, | 232:*1*, *15*, *25* | 139:*20* | 141:*7* |
| 126:*17* | *13*, *16* | 234:*25* | 144:*4* | 144:*6* |
| 127:*7*, *12*, *16*, | 178:*18* | 236:*12*, *25* | 145:*13*, *18* | 167:*24* |
| *20*  128:*23* | 180:*19* | 237:*3*, *9*, *19* | 159:*2* | 168:*24* |
| 129:*10* | 181:*2*, *7*, *11* | 239:*3*, *10*, *13*, | 169:*10* | 242:*24* |
| 130:*19* | 182:*20*, *25* | *17*, *22* | 170:*22* | **defines** |
| 132:*14* | 184:*16* | 240:*18* | 171:*5*  235:*8* | 170:*12* |
| 133:*24* | 185:*5*, *20* | 242:*3*, *9* | **decisions** | **defining** |
| 134:*12* | 186:*17* | 244:*1* | 137:*23* | 139:*1* |
| 135:*11* | 187:*22* | 245:*10*, *13*, | 145:*2*, *10* | 141:*13* |
| 136:*4*, *23* | 188:*1* | *19*, *23* | 235:*10* | 168:*17* |
| 137:*17* | 189:*5*, *9*, *13* | 246:*12*, *18* | **DECLARAT** | **definitely** |
| 138:*16* | 191:*10* | 247:*4* | **ION**  249:*3* | 9:*25* |
| 139:*17* | 192:*11* | **Davis**  19:*11* | **declare** | **definition** |
| 140:*8*, *18* | 194:*5*, *19* | 21:*6*  33:*3* | 249:*6* | 73:*8* |
| 141:*25* | 196:*16*, *19* | 37:*10*, *11* | **decrease** | 109:*20* |
| 142:*17*, *23* | 197:*13*, *19* | 38:*3*, *23* | 76:*3*, *5* | 165:*2* |
| 143:*11*, *20* | 198:*7*, *21* | 39:*8*  105:*8* | **deem**  96:*21* | 168:*7*, *14* |
| 144:*17* | 199:*9*, *21* | 112:*14* | **Defendant** | 169:*2* |
| 145:*6* | 200:*6*, *21* | 113:*8* | 3:*20*  238:*25* | 242:*18* |
| 149:*17* | 201:*8* | 115:*8*, *16*, *25* | **defendants** | 243:*21*, *23* |
| 150:*10* | 202:*16* | 117:*6*, *20* | 239:*1* | **degree**  95:*9* |
| 151:*11* | 204:*15*, *22* | 119:*12* | **defendant's** | 190:*8*, *11*, *12* |
| 152:*11* | 205:*9* | 167:*15* | 7:*21* | **delineated** |
| 153:*1*, *8*, *11*, | 206:*8* | 168:*6*, *12* | **defended** | 139:*22* |
| *15*, *25* | 207:*2*, *7*, *20* | 170:*4*, *12* | 18:*15* | **demonstrabl** |
| 154:*20* | 208:*14*, *19* | 243:*4* | **defense** | **e**  85:*21* |
| 156:*9* | 209:*2*, *6*, *8*, | **day**  2:*7* | 48:*1* | 86:*15*  87:*6* |
| 157:*5*, *18* | *19*  211:*6*, *13* | 239:*19* | 101:*24* | **demonstrate** |
| 158:*7*, *20* | 214:*17* | 249:*17* | 121:*10* | 79:*6*  87:*6* |
| 159:*15* | 215:*2*, *9*, *12*, | 252:*21* | **define** | **demonstrate** |
| 160:*3*, *12*, *16*, | *13*, *16*, *22*, *24* | **days**  60:*13* | 107:*4* | **d**  71:*17*, *21* |
| *19*  161:*2*, *7*, | 217:*4*, *6*, *10*, | | 137:*18*, *22* | |

Patricia G. Moorman, Ph.D.

demonstrativ
e 13:*21*
**Department**
16:*25* 17:*2*
19:*1*

**departmental**
17:*5*
**dependent**
214:*5*
**depending**
241:*25*
**deposed**
6:*16* 12:*6,*
*10* 27:*8*
45:*20, 24*
**DEPOSITIO**
**N** 1:*11* 2:*1*
6:*18* 7:*1, 6*
9:*11* 15:*18*
29:*1, 21*
34:*5* 55:*10,*
*12* 89:*5*
109:*15*
110:*25*
111:*23*
205:*6*
208:*23*
219:*15, 18,*
*21* 221:*1, 5*
229:*8*
232:*3*
248:*13*
249:*1, 8, 12*
250:*1*
251:*1*
252:*12*
**depositions**
6:*17*
**depot** 30:*22*
**deps@golko**
**w.com** 1:*20*
**describe**
40:*17*

75:*18*
76:*14* 88:*5*
98:*24*
110:*9*
122:*8*
137:*21*
140:*21*
143:*24*
158:*16*
210:*9*
214:*14*
**described**
41:*10*
52:*19*
109:*9*
152:*14*
165:*21*
221:*9* 235:*9*
**describing**
110:*6*
185:*9*
186:*15, 25*
188:*4, 12*
193:*18*
**DESCRIPTI**
**ON** 4:*10*
28:*7*
143:*25*
183:*3*
**design**
210:*3, 21*
**designed**
133:*8*
210:*10*
**desirable**
63:*24* 65:*4*
195:*17*
198:*5*
**despite**
20:*12* 64:*7*
93:*10*
242:*14*
**detached**
171:*25*

**detail** 37:*24*
133:*12*
171:*6*
**detailed**
181:*23*
**details** 20:*8,*
*9* 169:*21*
174:*4*
191:*7*
223:*17*
224:*1*
**detect** 131:*6*
**determinatio**
**ns** 26:*19*
**determine**
102:*12*
206:*17*
**develop**
70:*2, 11*
**development**
59:*9* 91:*2*
95:*2*
108:*24*
115:*10*
116:*24*
199:*12*
207:*24*
208:*4*
228:*17*
229:*2*
230:*14*
**deviation**
173:*9*
**devoted**
222:*18*
**diagnosed**
57:*23*
131:*4, 11, 19*
**diagnoses**
179:*9*
232:*6, 7, 8*
**diagnosis**
133:*17*

**dichotomize**
93:*15*
**dichotomous**
71:*7, 9*
**dichotomy**
67:*23*
**differ**
157:*13, 22*
**differed**
129:*20*
**difference**
86:*23*
121:*24*
129:*23*
147:*8*
**differences**
85:*15* 227:*7*
**different**
69:*25* 70:*1,*
*10* 75:*20*
78:*18* 99:*3*
108:*7*
114:*6, 7*
130:*9*
133:*11*
139:*24*
140:*5*
141:*8*
142:*8, 20*
144:*3*
148:*23*
149:*3*
150:*4, 14*
164:*24*
169:*5, 8, 19,*
*24* 174:*15*
178:*24*
186:*18*
222:*11*
225:*11*
234:*2, 3*
243:*22*
**differential**
71:*5*

**differently**
42:*20*
68:*25*
138:*4*
139:*8, 25*
167:*25*
168:*25*
170:*8, 12*
175:*1* 243:*5*
**differs**
178:*1, 10*
**difficult**
146:*14*
213:*12*
246:*24*
**difficulty**
199:*6*
**diffraction**
100:*4, 6*
**direct**
150:*21*
**direction**
252:*12*
**directly**
21:*2* 183:*23*
**disagree**
22:*12*
26:*16* 27:*4*
56:*13*
86:*18*
96:*25*
138:*24*
145:*1, 15*
211:*2, 5*
214:*23*
215:*25*
216:*4, 10*
221:*18, 19*
224:*18*
225:*7*
**disagreed**
16:*3* 22:*9*
235:*18, 19,*
*20*

Patricia G. Moorman, Ph.D.

| | | | | |
|---|---|---|---|---|
| **disagreeing** | 231:*22* | **Document** | 52:*25* | **dropped** |
| 178:*15* | 234:*4* | 4:*11*  25:*5* | 53:*23*  54:*4* | 232:*8* |
| **disclose** | **discusses** | 27:*23* | 66:*23* | **Drs** 87:*11* |
| 88:2, *5, 7* | 83:*15* | 30:*16* | 83:*15* | 214:*18* |
| 112:*16, 21,* | **discussing** | 39:*24* | 87:*12, 16, 17,* | 246:*19* |
| *25* | 63:*21* | 240:*23* | *19, 23, 24* | **drug** 48:*10* |
| **disclosed** | 111:*2* | **documents** | 88:*8, 9* | **due** 229:*23* |
| 112:*18* | 130:*25* | 7:*7, 18* | 120:*8, 24* | **Duke** 13:*6* |
| **disclosure** | 139:*7* | 47:*14* | 121:*14* | 14:*8, 18, 20* |
| 98:*8*  113:*8,* | **discussion** | 110:*24* | 122:*20* | 16:*23*  17:*6* |
| *20*  115:*3* | 62:*15, 18* | 111:*1, 4, 7,* | 135:*22, 23* | 22:*14, 24* |
| 121:*12* | 94:*19* | *24*  216:*18* | 136:*5, 6* | 23:*1, 4, 8* |
| 246:*4* | 103:*7* | **doing**  18:*10* | 161:*8* | 24:*11* |
| **disclosures** | 170:*10, 18* | 41:*3*  96:*5* | 173:*14, 25* | 32:*22* |
| 113:*23* | 171:*10* | 123:*12* | 174:*1* | 233:*22* |
| 114:*7* | 179:*1* | 141:*22* | 189:*16* | **duly** 6:*4* |
| 246:*8* | 181:*15* | 145:*20* | 195:*19* | 252:*7* |
| 247:*17, 23* | 185:*15* | **dose**  118:*3* | 213:*2* | **duration** |
| **discontinued** | 213:*17* | **dose-** | 222:*17* | 105:*10, 14* |
| 72:*12* | 224:*12, 16* | **response** | 233:*2, 8, 12* | 117:*23* |
| **discount** | **disease**  41:*5* | 117:*20, 24* | 244:*7, 8, 9,* | 118:2, *5, 14,* |
| 48:*21* | 70:2  76:*12* | 118:*5, 14, 24* | *17, 18, 21, 22,* | *24*  162:*19* |
| **discuss** | **diseases** | 195:*15* | *24, 25*  245:*9,* | 166:*8, 15* |
| 80:*18* | 210:*10* | **double-** | *11, 14, 24* | 191:*4, 6* |
| 83:*16* | **disregard** | **check**  190:*4* | 246:*2, 4, 5, 9* | **dying**  221:*3* |
| 87:*14* | 48:*13* | 223:*14* | *247:10, 12,* | |
| 97:*24, 25* | **dissertation** | **doubled** | *20, 25* | < **E** > |
| 224:*5* | 18:*13* | 193:*23* | **draft**  99:*10,* | **earlier** |
| **discussed** | **disservice** | 194:*10* | *17* | 33:*11*  90:2 |
| 40:*25* | 41:*2* | **doubt**  53:*16* | **drafted** | 93:*13* |
| 85:*10* | **distinct** | 191:*23* | 112:2, *3* | 114:*20* |
| 87:*10*  91:*9,* | 225:5, *10* | 193:*10, 21* | **drive**  52:*21* | 167:*23* |
| *18*  123:*7, 16* | **distinction** | 194:*9* | **driven** | 172:*24* |
| 130:*1* | 157:*1* | **doubts** | 166:*19* | 176:*9* |
| 150:*11* | **DISTRICT** | 192:*13* | 169:*11* | 197:*6* |
| 168:*17* | 1:*1, 2* | **douche** | **drives** | 198:*14* |
| 171:*5* | **DMPA** | 183:*21* | 123:*19, 20* | 212:*8* |
| 189:*10* | 30:*22* | **Douching** | **Dropbox** | 216:*17* |
| 194:*15* | **doctor** | 5:*12* | 45:*25*  46:*3,* | 229:*4* |
| 211:*19* | 120:*17* | 171:*17, 22* | *17, 21, 22* | 246:*21* |
| 212:*8* | 244:*6* | 183:5, *11, 12* | 47:*10* | **early**  177:*3* |
| 216:*17* | **doctoral** | 184:*7*  187:*6* | **Dropboxes** | 229:*7* |
| 218:*14* | 53:*6* | **Dr**  5:*22* | 45:*23* | 233:*23* |
| 219:*19* | | 6:*9*  40:*10* | | |

Patricia G. Moorman, Ph.D.

earned 8:12
13:8, 25
easier 13:22
96:16
easy 6:21
139:2
EBP 19:3
ectopic
225:25
edition
76:23
editor 50:2,
7, 13 51:1, 3,
11, 18 87:11
233:2, 8
241:9
244:17
247:1, 12
248:4, 7
editorial
76:19, 22
82:19 83:8,
13, 16 88:10,
19 244:9
editors
113:6, 18, 21
educational
173:10
effect 71:2,
17 91:5
95:13 99:2,
4 113:15
115:6
177:25
Effects 5:4
119:22
120:3 209:1
Egilman
233:2, 8, 12
eight-hour
55:11
either 10:21
22:14, 19, 23
23:4, 5

24:11
68:11
101:10
117:22
118:5, 14
122:3
149:7
165:20
240:12
241:6
Eleanor
248:9
electron
100:23
101:1, 2
elevated
117:3
eliminate
222:5, 6
eliminating
222:8
email 17:22
e-mails 17:4
emerita
16:24
Emi 201:10
202:25
204:25
205:14
E-M-I
201:12
emphasize
19:6
employed
252:17
employees
172:14
Emu 201:5,
9, 12
enabled
170:4
endometrial
225:25

endometrioid
63:2 225:23
endometriosi
s 5:5
119:24
120:5
124:9, 13, 17,
21, 24 125:2
126:2, 14, 19
128:17
engrossed
83:1
enrolled
72:7, 13
132:11
enrollment
72:25 73:3
179:25
180:1, 5
181:21, 22
182:4
183:6, 12
184:1, 6
185:10, 17
186:13, 14
189:25
190:15, 16
192:7
entire
117:10
207:15
226:15
249:7
entirely
152:15
entitled
83:8 90:17
162:19
environment
231:10
epi 71:21
96:14

epidemiologi
c 5:21
103:4, 10
108:25
120:19
211:11, 16
228:21, 22
epidemiologi
cal 49:8
68:5 195:2
epidemiologi
st 120:17
203:15
232:16

epidemiology
20:12 41:3
210:8
Epithelial
5:1 55:2
56:6, 23
115:18
116:1
196:13
197:2
198:19
equal 29:4
47:24
163:19, 25
222:4
242:24
ERRATA
249:1, 12
250:1 251:1
error 69:23
177:24
179:17, 19
180:11
182:10
186:23, 24
187:1, 15
errors 70:5
especially
177:25

ESQ 3:2, 3,
8, 13, 17
essentially
43:19
establish
89:13
established
155:20, 22
207:17
estimate
9:25 67:18
74:23 75:1
91:5 93:17
94:14
95:13 99:2,
3 124:22
125:7, 9, 14,
15 245:6
estimates
93:6, 7, 19
177:25
et 119:17
134:2 162:9
eTable 5:17
183:20
185:7, 22
186:20
187:10
188:7, 20
189:6, 8, 15
ethnicity
173:10
etiologically
225:5, 10
European
89:18
evaluate
8:7 88:16
114:22
136:11
203:12
evaluating
63:17 65:5
96:3 152:21

Patricia G. Moorman, Ph.D.

| | | | | |
|---|---|---|---|---|
| evaluation | 232:*24* | **exhaustively** | | 16:2  51:7 |
| 52:*12* | 234:*22* | 55:*11* | **experimental** | 52:2  87:*17* |
| 123:*20* | **EXAMINAT** | 142:*12* | 213:*9* | 98:2 |
| 240:*16* | **ION**  4:*3, 4,* | 205:*6*  219:*4* | **experiments** | 101:*19* |
| **evaluators** | *5, 6*  6:*7* | **EXHIBIT** | 203:*18* | 123:*1* |
| 148:*23* | 244:*4* | 4:*11, 13, 16,* | **Expert**  4:*13,* | 172:*4, 11* |
| **event** | 245:*18* | *20, 23*  5:*1, 4,* | *23*  46:*20* | 220:*17* |
| 174:*22* | 247:*8* | *6, 9, 12, 16,* | 48:2  50:*4,* | 238:*20* |
| **Everybody** | 252:*11* | *17, 22*  25:*4,* | *15*  51:*3, 10,* | 241:*12* |
| 217:2 | **examine** | *5*  26:*2, 7* | *19, 24*  69:*10,* | 244:*11, 13* |
| **Evidence** | 243:*15* | 58:*9, 10* | *16*  87:*20* | **expert's** |
| 4:*19*  5:*21* | **examined** | 69:*4, 6, 9, 15* | 88:*1, 20* | 218:*24* |
| 8:7, *10* | 6:*4*  109:*14* | 82:*20, 25* | 97:*10*  98:*6* | 220:*21* |
| 27:*21*  28:*9,* | 111:*17* | 83:*3, 8* | 101:*24* | **explain** |
| *13*  29:*5* | 208:*24* | 90:*9, 10, 16* | 104:*12, 17* | 49:*23* |
| 56:*20*  83:*5,* | 219:*4* | 104:*10, 11,* | 112:*17* | 69:*21* |
| *10*  96:*4, 7,* | 221:*1* | *16*  115:*16,* | 113:*13* | 71:*15* |
| *18*  97:*7, 11,* | 252:*11* | *17, 24* | 114:*18* | 138:*1* |
| *12, 20* | **Examining** | 119:*10, 20,* | 117:*5* | 202:*22* |
| 150:*13* | 4:*18*  83:*5,* | *25*  120:*3* | 120:*24* | 235:*19* |
| 151:*3* | *10* | 127:*9, 13, 16,* | 121:*3, 10, 15* | **explained** |
| 198:*1* | **example** | *17*  130:*22* | 123:*14* | 114:*20* |
| 211:*12, 16* | 41:*11* | 134:*1, 7* | 134:*23, 25* | 151:*8* |
| **Evidence-** | 54:*25* | 153:2, *8, 16,* | 135:*1, 4* | **explaining** |
| **Based** | 65:*12* | *17*  161:*15,* | 136:*10* | 71:*14, 20* |
| 18:*22, 23* | 69:*24* | *17*  162:*6* | 216:*16* | 193:*14* |
| 19:2 | 105:2 | 167:*17, 19* | 218:*9, 12* | **explanation** |
| **exact**  15:*7* | 195:*5, 7* | 171:*16, 17,* | 234:*1* | 30:*13* |
| 18:*18* | 206:2 | *22*  173:*14,* | 236:*3* | **explicit** |
| 27:*17*  37:*3,* | 225:*18* | *19, 20*  181:*8* | 237:*24* | 113:*19* |
| *6*  217:*16* | **examples** | 189:*7, 10, 12* | 238:*4, 24, 25* | **explicitly** |
| 218:*6* | 72:*3* | 211:*7, 9, 14* | 239:*6* | 234:2  235:*9* |
| 234:*24* | **exception** | 242:*12, 13* | 240:*4* | **exposed** |
| **exactly** | 184:*11* | 245:*11, 13,* | 241:*6*  246:*3* | 71:*3*  77:*19,* |
| 68:*18*  89:*9,* | **excluded** | *14, 21* | **expertise** | *21*  78:*13* |
| *25*  131:*14* | 15:*24*  16:2 | 247:*11* | 103:*11* | 85:*7* |
| 150:*7* | 130:*24* | 248:*8* | 106:*14* | **Exposure** |
| 177:*6* | **excluding** | **exists**  50:*24* | 109:*10* | 5:*15*  59:*8* |
| 187:2 | 20:*5* | **expect** | 110:*22* | 60:*17* |
| 196:*17* | **exclusion** | 71:*14* | 203:*17, 23* | 69:*24* |
| 197:*20* | 144:*23* | 159:*12* | 204:*23* | 70:*10*  71:*9,* |
| 212:*7* | **Excuse** | **experiment** | 205:*13* | *24*  72:*1, 2* |
| 224:*20* | 139:*9* | 125:*13* | **experts** | 73:*8*  76:*12* |
| | | | 7:*17, 21* | 77:*23, 24* |

78:2, 6, 23, 24   85:11
95:9   97:4
105:4
107:8, 14, 19, 21   108:3, 12, 16, 23
138:21
155:3, 7, 10, 24   156:3
170:3
171:19, 24
177:20
192:19
193:1, 9
195:20
202:7, 20, 21
214:7
227:22, 23
228:20
229:1, 9, 11, 12   230:14, 22   235:4
243:16, 20
**exposures**
133:13
227:3
242:19, 22
**express**
22:11
**expressed**
56:25
**expressing**
123:9
**extent**
20:23
109:14
132:25
**extra**   98:16
**extreme**
132:23
193:8
**extremely**
210:13

**eyes**   163:15
164:12
214:25
223:17
**eyesight**
163:23

**< F >**
**fact**   55:20
64:21
68:22
85:14   87:2
93:10
97:10, 18
114:17
133:16
136:5
166:8
172:7
202:7
208:23
234:8
**factor**
21:23
23:10, 25
24:13
26:22
28:22   29:3, 4   32:13, 15, 23   52:15
65:4   78:5
123:14, 23
124:2, 5
126:2   213:8
**Factors**
4:11   5:4
21:16
22:10, 25
23:6   24:22
25:6, 25
26:14
28:14, 19
29:5, 9, 11, 16   30:6

32:2   41:4
55:12
119:22
120:4
133:11
205:22
214:20
215:18
216:5, 7
222:4
223:3, 6
225:15
227:3
**fair**   33:23
63:5   99:20
100:12
132:1
137:15
139:2
143:16
235:6, 14, 25
236:1
**fall**   67:23
**fallen**   232:6, 18
**fallopian**
151:16
153:24
154:18
206:13
225:23
226:8, 13
**familiar**
24:17   31:5
53:23   54:8, 10   100:21
106:6, 9
108:2, 19
112:13
120:8, 11
134:13
139:5
161:22

203:25
204:3
**Family**
16:25
123:23
124:1, 3, 4, 8, 14, 21, 25
126:3, 20
**FAQ**   21:19
22:3
**far**   8:12
80:6
102:11
129:5
174:25
222:20
228:5
**Faries**   10:4
43:7, 12
**F-A-R-I-E-S**
43:8
**fast**   24:5
**fax**   1:19
**FDA**
201:16, 20
216:20, 21, 22   217:25
219:14, 17
**FDA's**
218:24
220:20
**February**
1:15   2:7
26:6, 10, 11
228:15
252:6, 21
**Federal**   2:3
9:9   15:23
**fee**   122:4
**feel**   32:25
50:25   51:2
**felt**   235:21
**Ferraro**
121:3

**fewer**   47:25
70:20
**fibrous**
108:20, 23
109:2, 6, 20, 23   110:9
**field**   20:13
203:21
**figure**
179:10
186:1
**final**   99:13
114:2
**finally**   204:5
**financially**
252:18
**find**   27:1
47:1   59:22
62:22   77:8
86:9   103:7
104:23
115:8
117:6, 20
118:23
167:21
178:25
201:24
216:21, 22
217:15
220:5   221:4
**finding**
118:13
201:17
218:4, 24
220:20
**findings**
48:13, 17, 18, 21   65:24
67:10, 17
93:22
96:21   195:1
**finds**   97:11
**fine**   24:9
29:25

142:5, 6
196:3
**fingers**
224:11
**finish** 6:19
23:16
63:15
79:11 80:4
116:13
166:1
182:19, 22
185:13
202:4
237:8, 12
**finished**
23:22
61:14
75:11 160:9
**firm** 10:5
121:3, 4
**firms** 113:2
**first** 6:4
19:11 33:8
43:16, 25
82:15
90:19
92:20
112:23, 24
115:3, 25
120:2, 18
136:23
167:21
173:8, 12
174:2, 6, 14
212:5
**first-degree**
124:8, 14, 16, 25 126:3
**first-year**
19:2
**fit** 235:22, 24

**five** 138:12
160:25
169:5
**fix** 94:22
**FL** 3:9
**Fletcher**
201:4
202:25
203:13
204:25
205:14
213:2
**flip** 192:25
**FLOM** 3:15
**focused**
16:16
56:22
103:9 137:7
**focusing**
228:21
**follow**
43:21
174:16
175:16
**following**
31:21 42:6
56:14 61:1
67:8 91:17
145:19
157:19
175:14
194:7
196:23
205:11
207:9
220:18
230:11
236:16
240:1
**follows** 6:5
**follow-up**
64:17, 22
65:1, 3, 7, 11, 16, 22

179:11
180:7
186:13, 15
219:8, 24
**food** 20:11
**Footnote**
98:18, 20
151:18, 19
**forgo** 6:18
**forgot** 67:4
83:1
**forgotten**
150:11
168:6
**form** 28:20
29:7 44:7,
18 52:13
93:12
94:18
128:19
129:8
130:12
132:4
135:25
138:5
139:10
144:16, 19
149:5
150:6
151:2
152:10
154:12
155:18
165:4
176:21
178:12
180:16
191:2
197:23
204:11
207:3
208:6, 18
214:11
218:10

226:9
232:10, 19
234:21
236:11, 21
238:21
240:5
**forming**
103:6
**forth**
157:13, 23
**forum** 20:1
**forward**
205:7
**found** 37:5
62:25
74:16
91:10, 19
92:16
97:19
112:5, 9
125:20
126:13
136:12
179:7
193:24
194:11, 15
201:21
216:8, 12, 19,
20 217:21
218:21
219:1
220:23
223:12
234:5
**four** 55:16,
21 193:19
**fourth**
84:14
181:23
**fragment**
106:7, 10, 11
**fragments**
106:16

**frame**
167:11
**framework**
95:24 96:3,
9, 13, 15
**freely** 122:9
**frequencies**
155:8
**frequency**
60:18
105:10, 14
117:22
118:2, 6, 14,
24 138:8
139:16
140:5, 13
141:15
142:2
143:4
145:13
158:5
162:19
166:7, 14
167:2, 13
168:10, 19
169:20
178:20
179:1
**Frequent**
5:8 62:8
134:3, 8
136:18
137:3, 4, 7,
19 138:3, 14,
18, 21, 25
139:8, 13, 18,
19 140:16,
19, 23 141:7,
14, 19 142:8,
19 143:6
144:6
145:16
151:13
155:4

Patricia G. Moorman, Ph.D.

156:2
158:*17*
159:*20*
165:22
167:24
168:*3, 7, 12, 20, 25*
170:*12, 22*
242:*18, 23*
243:*5, 22, 24*
**frequently**
60:*14*
117:*17*
139:22
143:*10*
159:6
167:5
178:9
226:*11, 23*
**front** 30:*18*
161:8
167:22
247:*14*
**full** 6:9
23:*17* 52:*1*
82:2, 7, 8
101:*12*
115:23
181:*19*
**fully** 200:*1*
**fulsome**
195:*10, 21*
**fun** 164:*12*
**funded**
48:*10* 49:*3*
122:7
210:*19*
**funding**
48:8 88:7
121:5
122:7
210:*19*
**funny** 221:2, 3, 4

**further**
30:*12* 34:6
35:*21*
214:4
215:*1*
218:*14*
245:8
247:5
248:*11*
252:*15*

< G >
**general**
37:*25* 65:*3*
108:9
122:*17*
123:*11*
133:*10, 11*
207:*23*
208:8, *12*
226:5
**generally**
20:*16* 31:9,
*12, 15, 24*
41:9 44:*10*
63:24
69:20
110:*10*
122:*16*
133:5
138:6
144:*18*
147:7
206:*21*
207:*11*
228:20
**Genital**
4:*13, 18*
5:*1, 12*
58:*11*
59:*14* 83:4,
9 85:23
86:*17* 87:8
115:*17*

116:*1, 23*
117:*16*
128:6
167:24
168:8, *12, 20, 25* 170:22
171:*18, 22*
174:7
179:*21*
181:*18*
183:*21*
186:*11*
190:*18*
205:*23*
214:*21*
215:20
**GEREL** 3:2
121:4
**getting**
68:22
100:*3*
109:7
122:*1*
137:*16*
162:4
164:*11*
168:9 217:2
**give** 24:2
34:5 35:2,
*16, 17* 36:*10*
38:*17*
39:*17, 23*
48:*23* 49:5
50:*21*
65:24 67:9
72:3 84:9
88:8
140:*14*
146:6
148:9
158:25
170:*16*
191:20

210:23
215:4
**given** 49:*24*
83:*24, 25*
193:8
213:7
221:*16*
252:*13*
**gives** 86:20
125:*10*
146:6
**giving** 211:*3*
**glasses**
98:*16* 215:5
**go** 6:*23*
9:*1* 27:*1*
37:*17*
39:*18*
44:*15* 46:7
70:2, *11*
75:5 77:*11*
84:25
89:*10, 15*
116:20
119:*1, 9*
122:*17*
128:5
130:*21*
143:24
160:4
162:*18*
164:25
165:22
167:*15, 22*
173:4
181:*23*
182:*3*
203:*16*
205:7
228:*11*
239:*17, 25*
242:*3, 12*
246:*12*

**goes** 91:6
164:*18*
**going** 6:*18,
23* 11:6
14:*10* 24:*1*
25:*17*
29:*14, 24*
37:*14* 38:5
39:*12*
43:*20* 48:6
55:8, *19, 20*
58:9 70:4
82:*19*
102:22
109:*13*
114:*13*
116:5
119:9, *24*
123:8
137:24
152:24
153:*1, 5, 15*
160:*10*
161:*11*
162:6
178:*11*
181:9
187:9
196:*18*
210:*16*
215:4
219:*3, 11*
227:*10*
**gold** 167:*4*
**GOLKOW**
1:*19*
**GOLOMB**
3:*10, 13*
**Gonzalez**
72:*18* 73:*1,
9* 74:6
105:4, 6
189:*20*
190:7, *10*

Patricia G. Moorman, Ph.D.

191:*23*
192:*13, 18,*
*19, 20, 24*
193:*5, 11, 22*
194:*9*
**good**   32:*16*
51:*8*   52:*16*
63:*13*
100:*5*
146:*14*
147:*11*
148:*14*
174:*18*
175:*8*
198:*4, 8*
210:*3, 4*
213:*9*
**Gossett**
76:*19, 21, 22*
82:*19*
87:*23, 24*
88:*10*
**Gotcha**   47:*3*
**government**
172:*14*
**GRADE**
95:*24*   96:*8,*
*13, 15*
**G-R-A-D-E**
95:*25*
**grades**   49:*7,*
*9, 10*
**gradient/dose**
**-response**
195:*11, 22*
**grading**
114:*19*
136:*8*
**grant**   121:*5*
**grants**   16:*7,*
*8*
**great**   171:*6*
172:*23*
194:*24*

**greater**
63:*1*   74:*13*
93:*7, 20*
95:*21*
156:*25*
159:*11*
162:*22*
163:*16, 25*
165:*10, 11*
168:*13, 23*
242:*24*
243:*19*
**Gripka**
6:*11, 13*
**G-R-I-P-K-**
**A**   6:*13*
**ground**
235:*2*
**group**
17:*19*   85:*6*
87:*4*
173:*11*
207:*25*
**groups**
77:*20*
78:*12*   85:*5*
86:*23, 25*
110:*17*
**guess**   9:*19*
67:*2*
110:*25*
234:*18*
**guessed**
23:*18*
**guidance**
73:*23*
**guided**
168:*15*
**Guthrie**
11:*14*   12:*8*
**guys**   27:*10*
33:*15*

**Gynecologic**
5:*17*   211:*9,*
*24*   212:*25*

**< H >**
**half**   59:*13*
192:*21*
**Halfway**
83:*23*   84:*2*
**hallmark**
207:*24*
**hallmarks**
207:*18, 21*
**hand**   36:*12*
210:*14*
252:*21*
**happened**
70:*7*
183:*13*
219:*14, 17*
**happy**
39:*15*
58:*19*
223:*19*
**hard**   71:*14*
149:*13*
163:*15*
191:*8*
223:*18*
**Hardy**   27:*9*
**Harlow**
87:*12, 17*
244:*8, 17, 22,*
*25*   245:*24*
246:*2, 4, 5, 9*
247:*12, 20,*
*25*
**Harlow's**
5:*22*   88:*9*
245:*11, 14*
**harmonize**
151:*22*
152:*5*
169:*6, 12, 24*

**Harper**
102:*20, 21*
103:*13*
203:*13*
204:*5, 10, 17*
213:*2*
**HAYDEN**
2:*4*   252:*4,*
*24*
**hazard**   59:*8,*
*10, 15*   62:*7,*
*23*   63:*6*
67:*18*
73:*11, 13*
74:*6*   85:*15,*
*17*   92:*9*
95:*18*
125:*21*
154:*13*
157:*7*
159:*17*
**head**   20:*8*
50:*11*
54:*12*   68:*8*
158:*4*
195:*5*
196:*5, 7*
199:*7, 14*
209:*14*
217:*17*
**heading**
168:*21*
183:*22*
184:*2*
185:*23*
186:*20*
188:*13, 19*
**headings**
183:*14*
189:*15*
**Health**   17:*1*
20:*21*   21:*1,*
*3*   26:*20*
31:*17, 23*

64:*7, 9*
65:*14, 15, 19,*
*21*   99:*10*
132:*9, 22*
147:*2, 5*
195:*13*
196:*1*
214:*5*
222:*12, 18*
236:*22*
237:*1, 16*
238:*9, 15, 19*
240:*8*
**hear**   57:*9*
196:*21*
237:*14*
**heard**   52:*25*
92:*1*   98:*5*
108:*21*
134:*20*
172:*14, 18*
204:*2*
**heavily**
233:*23*
234:*6*
**helped**
192:*9*
**helpful**
29:*12*
187:*24*
213:*24*
**helps**   192:*14*
**hereinbefore**
252:*6*
**hereof**
249:*13*
**hereto**
252:*18, 20*
**Hernan**
41:*1*

**heterogeneity**
85:*19*

Patricia G. Moorman, Ph.D.

**HHS** 114:2, 13 122:9
**high** 95:9 103:4 149:20 150:1 200:4 201:3 203:3, 9, 12
**higher** 78:7 94:8, 14 95:3 124:20 125:14 126:16 148:18 190:2
**highest** 129:6 146:25 155:10, 13 156:2 243:16, 19
**highest-frequency** 159:9
**high-grade** 225:22 226:7, 13
**highly** 31:7, 10, 13
**high-quality** 150:22
**Hill** 2:6 44:5, 13, 16 99:17 200:23
**histological** 62:23
**historic** 177:23
**historical** 222:23, 25

**history** 123:23 124:1, 4, 8, 14, 17, 21, 24, 25 126:3, 14 213:4
**histotype** 62:4, 5
**histotypes** 62:19
**Hold** 180:24
**holding** 176:5
**honestly** 187:19
**HONIK** 3:10
**hope** 28:5 165:11
**hoped** 140:22
**Hospital** 22:24 23:5, 9 24:11, 12
**hot** 60:13
**hour** 15:12 227:10
**hours** 9:23 12:14 15:9, 10 196:15
**HR** 85:16
**huge** 130:8 209:18
**Huh** 167:18
**hundred** 15:8, 10
**hysterectomy** 78:17, 22

**< I >**
**IARC** 107:13

**idea** 11:21 146:6
**ideally** 60:15 210:10

**identification** 25:7 58:13 69:13 83:6 90:14 104:14 115:21 120:6 127:19 134:11 153:18 161:20 171:20 173:23 189:8 211:12 245:16
**identify** 30:7 41:5 91:1 99:22, 24 110:19 186:5
**ignored** 235:13, 16
**ignoring** 235:23
**II** 64:7
**impact** 214:5 222:15, 16
**implies** 121:21
**importance** 222:12
**important** 8:7, 9 47:17, 19 48:12 64:2 93:5

143:22 193:4, 14 210:6 228:1
**impossible** 217:22
**inability** 213:7, 11
**inadequate** 27:21
**inappropriate** 209:20
**incidence** 221:21
**include** 26:14 32:16 59:18 61:16 62:14, 17 63:8 68:4 83:19 88:25 129:15 143:8 161:11 213:17
**included** 17:4 59:1 63:3 68:12 73:7 129:14 149:25 151:16 155:22 156:17 157:3 224:7, 9 243:24
**including** 14:6 39:10 48:7 89:24 154:25 156:20 165:6

199:8 205:22 243:12
**inclusion** 88:20 143:7, 23 144:9, 14, 23 145:4, 8
**inclusion/exclusion** 161:10
**income** 13:2, 8, 25 14:1, 2, 4, 5, 6, 15, 25
**inconsistencies** 188:15, 17
**inconsistency** 28:12
**inconsistently** 235:5
**increase** 74:20, 22 75:19 76:3, 6 154:15 221:16
**increased** 37:5 40:18 41:10 74:17 75:14, 23 76:11, 17 87:3 91:1, 8 92:12 93:5 94:6, 13 117:10 120:20 166:10 179:10
**increases** 203:4

Patricia G. Moorman, Ph.D.

increasing 95:7, 8
independent 236:8, 18 237:23 240:20
index 31:3
indicate 68:14 76:16 120:23 121:6, 9 151:15 246:9
indicated 7:18 37:5 39:16 249:12
indicates 76:4 176:13
indication 213:12
indicative 237:17
indium 20:11
individual 22:20 58:1 150:16, 18 166:21 169:4, 12 196:13 197:2 199:8, 15
individually 157:10

inflammation 5:9 161:18 162:10 203:6 206:2, 22 207:12, 17, 23 208:3, 8,

12, 16 209:12, 17
inflammatory 209:1
information 28:10 58:1, 7 128:18 149:13 174:21 193:9 195:9, 21 233:18
informative 223:3, 9
informed 109:4 114:21, 25 115:5 117:13
infrequent 138:15, 24 139:14 140:16, 20 141:14 143:6
Ingham 10:10, 14, 17 11:9 12:8
inhalation 227:19 228:17, 23 231:18, 22
inhaling 228:3
initiation 173:6 176:25
Initiative 65:20, 22 132:9, 23
Inn 2:6
instances 235:18

Institute 210:20
instruct 39:12
instructing 36:2, 4
insufficient 64:16
intact 151:16
intended 42:17
intent 243:19
intention 243:18
interaction 86:3, 25
interest 47:21 52:6, 10, 23 70:3 77:24, 25 88:3, 6, 14 98:8, 9, 12 123:18 212:18, 19, 23 246:4 247:18, 25 248:3, 5, 8
interested 233:19 252:18
internal 110:23 216:18 218:23 220:19
interpret 139:2, 3 222:3, 11
interpretation 48:17 49:5 52:20

114:24 136:14
interpretations 123:22
interpreted 115:7
interrupt 73:20 229:13
interrupted 10:23 41:22 42:3 79:24
interrupting 79:20
interruption 67:14
interval 62:10 66:1 67:11 68:5 75:17 76:16 77:13, 15 85:16, 18 91:6 92:10 94:5 117:2 164:18 165:17
intervals 63:3, 7 68:20 77:9, 17 117:12 125:4, 6, 10, 16
intervening 179:8
introduce 13:20 173:13
introduction 177:23
invasiveness 62:3

investigator 144:3 149:12
investigators 133:7 139:24 149:8
invoice 10:2 13:10
invoices 8:16, 24 9:8, 17, 21 10:21 12:21 13:13, 21
involve 209:11
involved 15:3, 14, 17 28:16 43:9 51:6 112:19, 24 123:6 159:19 208:3, 9
involvement 88:3 123:13
involves 121:7
involving 50:13 51:6 161:11
issue 126:21, 22 205:4
issues 31:17, 23 114:23
its 22:9 36:23 154:2 202:20

< J >

**J&J** 110:*23*
111:*6, 23*
201:*21*
216:*18*
217:*19*
218:*23*
220:*19*
**JAMA** 4:*11,
16* 54:*8, 10,
11, 14* 58:*10*
76:*20, 23*
83:*3*
**James** 27:*9*
**January**
19:*8* 25:*14,
15, 16*
208:*24*
**JERSEY**
1:*2*
**JESSICA**
3:*17* 11:*4*
13:*13*
23:23 25:*8*
29:*20*
33:*19*
34:*19*
37:*14*
38:*12*
45:*23* 55:*8*
57:*10*
79:*21* 80:*2*
81:*3* 84:*17*
180:*24*
182:*22*
187:*18*
200:*13, 17,
20* 216:*24*
219:*10*
220:*11*
221:*2*
229:*22*
230:*7*
239:*16*

jessica.david
son@skadde
n.com 3:*19*
**job** 146:*14*
193:*20*
**JOHNSON**
1:*5* 249:*1*
**Johnson's**
7:*15, 19, 22*
58:*5*
101:*16*
216:*22*
217:*20*
218:*1*
**journal**
50:*2, 13*
54:*11, 17*
68:*3, 9, 24*
69:*1* 113:*4,
5, 12, 18, 23*
114:*1*
121:*23*
122:*15, 18*
203:*25*
212:*1, 3*
**journals**
68:*7, 17*
121:*25*
122:*2, 11, 12,
14, 16* 204:*4,
17*
**judge** 20:*4,
13* 39:*15*
40:*1* 81:*7*
203:*23*
**judgment**
54:*7* 206:*6*
210:*1*
**July** 231:*9*

**< K >**
**Kadry**
90:*19*

**Katie** 17:*10*
211:*17*
244:*16*
**keep** 79:*19*
223:*6*
**keeping**
58:*22*
234:*14*
**Kenneth**
248:*5*
**kept** 222:*4*
**kind** 70:*4,
22, 24* 157:*1*
167:*4*
201:*18*
207:*6*
216:*9*
228:*1*
234:*14*
**kindly**
247:*10*
**Kleiner**
10:*10, 11, 12,
16* 11:*8, 12,
16*
**knew** 25:*16*
199:*21*
**know** 6:*16*
8:*11, 13, 17*
9:*18, 19, 20,
21* 10:*22*
11:*3, 5, 24*
12:*2, 20, 25*
13:*5, 12*
14:*21* 15:*5,
8* 17:*10, 19*
21:*22* 22:*1,
7, 20* 23:*3*
24:*22*
26:*18, 23*
27:*16* 28:*5*
29:*16*
33:*13*
34:*21*

35:*25*
36:*13* 37:*7*
45:*6, 7*
47:*18* 49:*3,
11, 16* 50:*20*
51:*13, 15, 16,
21* 52:*1, 3,
18* 53:*13, 19,
20, 25* 54:*1,
5, 6* 57:*3, 13,
15, 21* 58:*2,
4* 66:*23, 25*
68:*16, 18*
70:*10*
75:*10*
76:*15, 16*
77:*4* 81:*7*
82:*2* 86:*7*
87:*19, 24, 25*
88:*13*
89:*22*
95:*24* 96:*5*
97:*17* 98:*3*
100:*1, 8, 9,
11* 101:*18*
102:*12*
103:*1*
105:*1*
109:*6, 11, 17,
23, 24* 110:*9*
114:*10*
117:*14*
121:*14, 16*
122:*19*
123:*8*
126:*12*
129:*11, 21*
132:*19, 20*
133:*6*
135:*7, 12, 15,
22* 136:*1*
137:*22*
138:*9, 11, 12,
23* 142:*6, 7,*

18 144:*8*
146:*14, 17*
147:*4, 19*
148:*17, 20*
149:*6, 8, 15*
151:*4, 9*
152:*2, 3, 4,
17, 22*
154:*10*
155:*14*
157:*6, 11, 20*
158:*3, 5, 8*
159:*7, 10, 16*
160:*1, 8*
166:*18*
167:*5*
168:*9*
169:*21, 22,
23* 170:*11*
172:*9, 12, 16,
18* 173:*5*
176:*15*
177:*4*
179:*4*
186:*22*
187:*1, 2, 12,
13, 15, 25*
190:*17*
191:*7, 11, 15*
192:*9, 16*
193:*13*
196:*6*
197:*24*
198:*15*
200:*9, 12*
201:*3, 13, 18,
20, 22*
202:*12*
203:*19, 20,
21* 204:*4, 7,
8* 205:*4*
206:*1, 14*
208:*11*
212:*14*

217:*14*, *15*
218:*13*
219:*10*
221:*20*
222:2, *20*
223:*20*, 25
224:8
225:*18*
226:*10*, *18*, 22, 25  227:7
228:*4*, *6*, 8
231:*1*
232:5, *17*
233:*4*, *5*, *11*, *13*, *17*  238:*9*, *17*  244:*12*
**knowing**
88:*13*  136:*9*
**knowledge**
12:22
17:*11*  52:2
123:2
135:9
136:*15*
172:6
244:7  252:*9*
**known**
126:2
**knows**  9:*16*

**< L >**
**labeled**
186:*3*, *10*
**laboratory**
103:2
110:*20*
200:2
203:2, *15*, 24
**lack**  213:*9*
**lacking**
195:*21*
**ladies**  221:*3*
**laid**  144:*25*
166:*4*

**language**
172:25
**large**  63:*13*, *14*  133:4
209:*16*
222:*13*
**largely**  45:*1*, 6
**larger**  63:*9*, *19*, 23
**large-scale**
228:22
**latency**
210:*11*
**law**  10:*4*
113:2
121:*3*, *4*
**lawyer**
16:*20*  43:6
112:*4*
**lawyers**
43:*9*, *14*, *17*, *19*
**lay**  137:25
138:8
145:*3*  146:8
**lead**  170:25
171:2, *3*
173:*18*
212:*15*
228:*17*
**leads**  209:*12*
**learned**
192:*18*
**led**  170:*10*
**left**  83:25
**lend**  174:*11*
**length**
190:25
235:*3*
**lenient**
148:*24*
**lent**  159:*14*

**letter**  5:22
50:*1*, *12*, 24
51:*10*, *17*
83:*15*
189:*15*
241:6
245:*11*, *15*, *20*, 24
247:*11*
248:7
**letters**  50:*6*, 25  51:2, *6*
87:*10*  88:*9*
233:2, *6*, 8, *12*  241:8, *10*
244:*9*, *10*, *17*
247:*1*  248:*4*
**Leung**
231:*10*
**L-E-U-N-G**
231:*13*
**level**  103:*4*
107:25
108:*12*, *14*, *15*  141:*24*
144:7
156:2
157:2
173:*10*
193:9
200:*1*, *4*
201:2, *3*
202:*10*, 21
203:3, *9*, *12*
243:*16*, *20*, 24
**levels**  107:*1*, 5
**LEVIN**  3:*5*
**LIABILITY**
1:*8*  249:*3*
**library**  17:*6*
**lies**  227:*24*

**life**  13:22
96:*16*  242:2
**ligation**
78:*16*
176:*10*, *15*, *18*, 23
**ligations**
78:*20*
**light**  100:*16*, *18*
**likes**  98:*14*
**limit**  55:*8*
**limitation**
105:*15*, *17*, 23  132:8
210:*24*
**limitations**
49:*21*
132:7, *21*
133:*18*
147:8
148:*15*
150:*20*, 23
193:*20*
195:*15*
210:*1*
**limited**  62:*1*
151:*25*
224:*23*
**lines**  113:*1*
**linking**
108:*23*
**Lisa**  231:*10*, *13*
**list**  21:22
22:*9*, 25
24:22
25:24
26:*13*, *17*
32:2, *7*
45:*11*, *17*, *19*
46:5, *6*, *7*, *8*, *13*, *15*, *16*
47:2, *13*

52:2  77:*4*
82:*1*, *3*, *8*
88:25
133:*20*, *21*
161:9
162:*16*
**listed**  7:*8*
32:*13*
89:*12*
111:*11*
151:25
155:*8*  157:7
**listen**
229:*15*
**lists**  23:*5*
**literature**
26:*21*
40:*19*, 24
41:*6*  47:*17*
50:*19*
56:22
108:22, 25
139:6
141:7
195:9
209:*11*, *16*, *18*  226:*11*
230:*19*
231:*16*
233:*20*, 24
237:5, *23*
238:*3*, 8, *16*, *18*  239:5
240:*3*, *17*
**LITIGATIO**
**N**  1:*8*, *19*
7:*12*  8:*12*
9:*15*, 22
13:*4*  15:2, *6*, *15*  40:*12*
41:*15*  42:9
43:*1*  48:25
51:25  53:*1*
54:*19*

Patricia G. Moorman, Ph.D.

55:*21* 57:*7,*
*14, 19* 75:*21*
87:*20* 88:*1,*
*3* 98:*2, 9*
103:*14, 24*
112:*19*
113:*4, 10, 13,*
*17* 121:*7*
122:*23, 24*
123:*1, 4*
131:*18*
134:*24*
135:*1, 13, 19,*
*23* 136:*6*
147:*13*
172:*5, 11*
227:*19*
228:*16*
233:*15*
234:*19, 20*
236:*4, 6, 9,*
*19* 237:*25*
238:*20*
239:*6*
240:*4*
246:*3* 249:*3*
**little** 13:*9*
58:*23* 71:*1*
99:*1* 115:*6*
124:*11*
126:*11*
167:*23*
175:*1*
191:*7* 240:*9*
**lives** 17:*13*
78:*18*
**LLP** 3:*2, 15*
**location**
62:*3*
**long** 16:*12,*
*21* 22:*5*
58:*4* 71:*4,*
*5* 99:*19*
118:*21*

138:*25*
145:*7, 22*
176:*17*
190:*22*
210:*11*
231:*5*
240:*22*
**longer** 65:*1,*
*3, 7*
**Longo**
112:*10*
**long-term**
59:*23* 60:*7,*
*11* 61:*3*
191:*15*
242:*23*
**look** 25:*1*
26:*1* 29:*14,*
*17* 32:*1*
34:*23*
48:*15* 49:*1,*
*2* 52:*5*
58:*8* 59:*7*
67:*16, 17, 22*
71:*22* 76:*2*
79:*8* 81:*23,*
*24* 93:*6, 17,*
*25* 98:*7, 13,*
*18* 114:*21*
115:*1*
116:*4, 10*
124:*6*
127:*21*
128:*1, 24*
139:*21*
140:*22*
141:*3*
146:*24*
148:*7*
152:*18*
157:*10*
159:*5, 8, 11*
163:*7, 24*
165:*9*

166:*7, 20*
167:*12*
168:*11*
171:*13*
178:*19*
180:*10, 22*
181:*1*
182:*24*
183:*4, 18*
184:*17*
185:*21*
210:*7*
223:*5*
233:*24*
242:*15*
243:*18, 19*
**looked** 13:*6*
21:*15, 25*
22:*6, 23*
23:*2* 32:*5,*
*6* 61:*18, 22*
62:*3, 6*
77:*1* 83:*13*
91:*9, 18*
111:*23*
152:*20, 22*
155:*15*
167:*7*
190:*1*
200:*3*
201:*3*
203:*2, 9, 11*
229:*1*
230:*13, 23*
231:*2, 5*
232:*12, 22*
**looking**
35:*8* 41:*4*
59:*13* 78:*3*
92:*6* 95:*5*
96:*7* 97:*22*
116:*9*
123:*16, 21*
126:*25*

128:*4*
136:*25*
143:*9*
155:*6, 12*
156:*21*
173:*7*
183:*22*
186:*12*
**looks** 170:*7*
177:*19*
**Los** 5:*12*
161:*19*
162:*11*
**lose** 207:*6, 7*
**lost** 118:*21*
**lot** 20:*8*
125:*17*
128:*10, 18*
133:*10*
137:*10*
195:*23*
196:*8*
**lots** 217:*19*
241:*22*
**love** 199:*22*
**low** 96:*18*
97:*12, 20*
98:*25*
150:*13*
221:*15, 16,*
*20*
**lower** 94:*8*
95:*13*
125:*15*
126:*15*
150:*24*
154:*11, 16*
209:*21*
210:*23*
211:*3*
**lunch**
150:*12*
**luncheon**

119:*4*
**LYONS** 3:*3*

**< M >**
**M.T** 119:*17*
**maiden** 6:*14*
**main** 6:*18*
77:*23* 155:*2*
**majority**
93:*18, 20*
175:*4*
225:*22*
**making**
26:*19* 89:*8,*
*25* 145:*10,*
*13, 18*
219:*12*
**Mandarino**
201:*4*
202:*25*
204:*25*
205:*14*
**Manhattan**
3:*18*
**manifest**
225:*6*
**manner**
37:*18*
164:*25*
**manners**
169:*8*
**manuscript**
99:*9* 114:*3*
**mark** 25:*3*
58:*9* 69:*3,*
*6* 82:*20*
90:*8* 104:*9*
115:*15, 16*
119:*17, 24*
127:*7*
133:*25*
153:*1, 15*
161:*14, 15*
171:*15, 16*

181:*7*
189:*5*
211:*7*
245:*10*
**marked**
25:6  58:*12*
69:*12*
82:25  83:6
90:*14*
104:*13*
115:*20*
120:5
127:*18*
134:*11*
153:*4, 18*
161:*19*
171:20
173:23
189:*3, 8*
211:*12*
245:*16, 20,
21*
**Markers**
5:9  161:*17*
162:9
**Market**  3:*13*
**MARKETIN
G**  1:*6*
249:*3*
**marking**
69:*15*
90:*16*
104:*16*
115:*24*
127:*12*
181:9  189:9
**marks**
153:6, 9
**mass**  31:*3*
**match**
186:*16, 19*
187:*14*
188:7
222:24

**matches**
186:*24*
188:*10*
**matching**
188:*4*
**material**
92:5
**materials**
7:9  45:*12*
46:*19*  47:2,
*11*  57:*17*
104:*5*  112:*5*
**math**  71:*11*
174:*18*
**mathematica
lly**  70:*17*
71:7, *18*
**matter**
52:*17*
114:22
219:22
249:8
**matters**
252:9
**MDL**  1:6
9:9, *13, 22*
10:*10, 17*
11:9  12:9
43:9, *13, 17,
19, 25*  45:*16*
52:*17*
56:24  77:5,
6  78:*13*
83:*17*
88:*14*
105:*19*
114:9
118:*10*
122:*13*

132:*18, 22*
135:6
147:*15*
148:*13*
160:8
168:*14*
173:8
175:2
178:5, 6
180:*20*
185:25
186:*24*
187:*13*
188:*3*
191:6, *13*
206:*16, 25*
216:2, *13*
217:*1, 3, 24*
218:22
232:*21*
240:22
241:*16, 21,
23*
**meaning**
100:2  122:9
**means**  76:*3*
93:*1*  98:25
147:*10*
225:*11*
**meant**
69:*21*
87:23
182:*12*
201:9  207:*3*
**measure**
60:*16*
68:*11*  72:9,
22  118:2, *3*
138:7  203:6

**measurement**
177:*24*
192:20

**measures**
181:*18*
203:5
**mechanism**
102:7
126:23
202:23
206:*3*
208:25
**mechanisms**
206:*1*
**median**
65:*16, 22*
**medical**
68:*3*  120:*17*
**medically**
62:2, 6
**Medicine**
16:25
**medroxyprog
esterone**
30:22
**meeting**
53:25
**meetings**
17:5  171:*5*
**memory**
36:*18, 20*
81:*15, 23*
98:*14*
**menopause**
241:*15, 17,
19, 22, 24*
**mention**
19:*4*  48:9
99:*5*  130:*3*
135:8
136:*3*
192:*14*
193:*15, 22*
194:*10*
233:*1*  248:4
**mentioned**
29:*1*  98:5

135:*10*
224:*14, 15*
226:23
233:4
**mentioning**
89:22
**merging**
45:*13*
**merited**
88:*20*
**messes**  6:22
**met**  6:25
7:4, 5
17:*11, 20*
53:*11, 24*
66:24
120:*13*
134:*15*
144:9
156:5, *23*
165:5
**meta-
analyses**
146:*3*
147:*20*
193:*4*
**Meta-
analysis**  5:9
89:*23*  96:6
97:*11, 19*
104:6
134:6, *10*
135:*3, 13, 18*
143:*12, 17*
144:*1, 13, 21*
145:*21*
147:*17*
151:*14*
156:*12*
159:*18*
166:9
243:*12, 25*

methodologic 106:4
methodology 16:3, 4, 6 20:16 48:16 49:2, 4 52:19 114:24 123:22 136:12, 13 235:2
metric 72:19 165:1, 6
MICHELLE 3:2 6:20 10:8 11:5 24:3 34:4 37:22 38:8, 10 58:20 80:24 84:20 94:23 98:13 199:21 215:5 219:9 229:13 242:11 244:1
Michelle's 42:16 45:5
microscopy 100:16, 19, 23
middle 6:12 23:12 79:23 82:5 176:3 180:24 237:6, 7

midst 158:23 233:23
Mills 155:9
mind 28:24 29:6, 16 30:6 66:5 81:24, 25 91:13, 24 100:14 160:7, 11 224:3 230:25
Mine 153:4, 6, 9, 14
mineral 101:19 110:7 218:12
minerals 109:9
Minerva 204:1, 6
minimum 108:14 141:24 144:7 157:2 243:23
minute 66:3, 11 124:12 188:6 246:1, 13
minutes 161:1 192:6 217:5
mischaracterization 130:7
mischaracterized 239:23
misclassification 69:20, 23 70:9

72:1 75:3 97:4 105:21, 22 193:10 245:2
misclassified 192:20
misheard 237:10
misreporting 71:23 72:1
missed 25:9
missing 128:8, 11, 18, 21 129:2, 6, 12, 16, 20 130:5, 7, 8, 15
Missouri 10:14 11:9
misspoke 13:9
misstate 205:18
Misstates 88:21 141:20 142:22 151:3 158:11 170:14 191:25 239:7
misstating 239:10
mistake 183:17
mistaken 9:2 53:2 96:10
misunderstood 107:21

mixing 71:2, 17
model 213:9
moderate 234:9
modifier 137:3, 4
Mohamed 90:19
moment 52:10 84:9, 18, 20 131:12 158:25 170:17 231:6 242:14
money 8:11 113:9
month 7:6 138:11, 12 162:23 163:20 164:1, 20, 22 165:10, 12
monthly 168:13 171:4
months 72:6, 25 73:2 179:25 180:1, 13, 14 181:20 182:4, 13 183:6, 12, 25 184:5 185:10, 16, 17 186:12, 14 189:22, 25
MOORMAN 1:13 2:1

4:8, 15, 23 6:3, 9, 11 25:5 40:10 58:10 69:9, 10, 17 83:3 90:10 104:11, 12, 17 115:17 120:3, 8 127:17 134:7 153:17 161:8, 17 171:17 173:20 189:7 195:19 211:9 244:7 245:9, 14 247:10 249:22 250:24 251:24
move 12:12 34:23 43:4 82:6 90:7 111:22 189:1 194:24 211:6 221:12
movement 205:22 231:23
mparfitt@ashcraftlaw.com 3:5
MSPH 4:15, 23 69:11 104:12
mucinous 63:2

Mueller
10:*4*
multiple
233:*1*, *5*
Murray
248:*9*

< N >
N.W  3:*3*
name  6:*10*,
*11*, *12*, *14*
11:*13*  17:*2*
40:*25*  43:*5*,
*7*  53:*4*
68:*8*
121:*21*
134:*20*
224:*2*
233:*18*
named
238:*13*
252:*7*
names  98:*5*
Narod  89:*7*,
*10*, *12*, *15*
narrative
49:*19*
narrow
200:*7*
National
210:*20*
nature
244:*20*
NCI  27:*6*,
*20*  28:*2*, *16*
32:*22*
NCI's  27:*10*
nearly  93:*7*
112:*8*
193:*23*
194:*10*
227:*22*
necessarily
149:*11*

178:*6*
195:*25*
243:*17*
need  42:*2*
79:*14*
80:*11*, *21*
81:*8*  116:*7*
123:*25*
137:*24*
160:*17*
177:*7*  200:*8*
needed
73:*22*
89:*13*  108:*4*
needs  18:*8*
80:*10*
negatives
241:*22*
negligible
222:*15*
neither
115:*3*
143:*1*
216:*3*
252:*15*
neutral  48:*1*
never  17:*11*,
*16*  23:*2*
32:*21*
41:*14*  42:*7*
46:*5*  53:*11*
98:*4*
100:*12*
113:*5*
122:*24*
128:*7*
147:*4*
167:*8*
219:*18*
NEW  1:*2*
3:*18*  24:*4*
44:*5*, *11*
200:*22*

Newcastle-
Ottawa
146:*1*
147:*14*, *16*
148:*1*
149:*2*
150:*25*
Newcastle-
Ottawa's
147:*22*
news  43:*23*
NHS  132:*16*
NHSI  65:*12*,
*13*  151:*13*
152:*14*
Nicolas
211:*16*
NIEHS
17:*19*
NIH  122:*6*,
*7*  172:*8*
No._____Cha
nge  250:*2*, *5*,
*8*, *11*, *14*, *17*,
*20*  251:*2*, *5*,
*8*, *11*, *14*, *17*,
*20*
No._____Lin
e  250:*2*, *5*, *8*,
*11*, *14*, *17*, *20*
251:*2*, *5*, *8*,
*11*, *14*, *17*, *20*
Nods  54:*12*
non  92:*11*
nonasbestifor
m  106:*21*
nondifferenti
al  69:*19*, *22*
70:*13*  97:*3*
nonexposed
71:*3*  77:*21*
85:*7*
nongenital
128:*7*

nonoccupatio
nal  107:*8*,
*18*, *21*  229:*9*
non-open
122:*18*
nonpatent
77:*10*, *20*
78:*8*, *12*
85:*6*, *17*
125:*22*
nonstatistical
ly  75:*22*
76:*10*  92:*12*
normal
145:*20*
North  2:*7*
32:*22*
33:*10*  252:*1*
notably
195:*13*
Notary
252:*4*, *24*, *25*
note  48:*12*
63:*20*
117:*24*
notebook
116:*11*
noted  95:*7*
105:*8*
118:*24*
195:*14*
216:*19*
245:*1*  248:*3*
notes  7:*11*
45:*9*
notice  2:*3*
noting
120:*19*
November
44:*2*
104:*18*, *20*
null  69:*21*
70:*16*

71:*10*, *19*
74:*15*
NUMBER
4:*10*  64:*1*,
*6*  72:*2*
117:*18*
127:*14*, *16*
146:*4*, *12*, *22*
166:*12*
170:*7*
173:*9*
185:*6*
187:*5*
189:*21*
190:*3*
205:*21*
247:*11*
252:*25*
numbers
126:*21*, *22*
166:*21*
187:*14*
217:*16*
218:*6*
222:*11*
232:*13*, *22*
numerically
49:*7*
numerous
51:*14*
105:*12*
107:*23*
202:*8*
Nurses  64:*7*,
*9*  65:*14*, *15*
147:*1*, *5*
nutritional
20:*12*
NY  3:*18*

< O >
oath  249:*14*
252:*11*
obesity  31:*1*

Patricia G. Moorman, Ph.D.

object 6:20 14:10 24:3 37:15 38:5 40:21 41:25 109:13 208:22 219:3 220:1, 4, 6 240:5

Objection 7:24 8:21, 23 12:18 14:9 22:16 27:14 28:20 29:7 32:8 40:14 41:17 42:11, 24 44:7, 18 48:3 49:18 50:5 51:20 52:13 53:9, 18 55:6 60:3, 25 75:24 88:21 93:12 94:18 103:19 107:3, 10 108:5 110:3 118:7, 16 126:5 128:19 129:8 130:18 132:4 135:5, 25 138:5 139:9, 10 140:6 141:20

142:10, 21 143:19 144:16, 19 149:5 150:6 151:2 152:10 154:12 155:18 156:14 157:15 158:11 159:23 165:4 170:14 176:21 178:12 180:16 191:2, 25 194:1 196:14 197:4, 18, 22 198:10 199:1 204:11, 19 205:2, 17 206:23 207:3, 13 208:5, 18 209:13 214:11 218:10 219:12 220:25 226:9, 20 230:16 231:19 232:10, 19 234:21 236:11, 21 238:21 239:7

objectionable 220:5

objections 42:16 55:9 207:5 239:20

objective 146:9, 23

O'Brien 5:22 17:10 51:6, 11, 15, 16, 18, 24 52:1, 4, 12, 25 58:8 59:2 61:19 62:22 64:4, 21 65:2, 6, 12 71:24 72:17, 18, 23 73:4, 7 74:16 75:3 76:20, 24 77:8 81:18 82:12 83:15 87:11, 19 89:11, 12 90:3 91:10, 19 92:7 105:2, 5 125:21 130:21 133:1, 22 152:8 155:5 171:13, 24 172:3, 7, 25 173:5 174:23 175:2 177:18 178:19, 25 179:7, 14

184:23 189:11, 16 190:1, 6, 20 191:23, 24 192:4, 13, 14, 18 193:18, 23 194:10 211:8, 17 214:18 221:14 222:17 224:5 225:4 241:6, 7 242:12, 16, 17, 25 243:4, 22 244:10, 16, 21, 24 245:15, 25 246:19

O'Brien's 62:18 79:4

observational 41:3

observed 41:10 154:16 213:8, 13 214:20 215:19 246:24

obstructing 239:15

obvious 179:17 186:23

obviously 17:12 58:2 74:15 89:1

occupational 107:14 228:25 229:1, 9

230:12, 13, 18, 22 231:3, 10

occur 72:2 219:20

October 15:19 27:20

odds 67:19 75:16 76:2, 15 77:12 95:18, 21 117:1 124:7, 15, 18, 20, 24 125:9, 25 126:13 158:1 194:16 224:22

offer 107:12, 22 204:25 205:15 249:14

offered 108:1 227:21 228:19

offering 7:14 54:18, 24 106:15, 20 131:17, 21 227:18 228:9, 16

offhand 50:10 69:2 152:2

office 45:6 46:15

Off-the-record 58:24 67:15 163:21

171:*11*
228:*13*
**Ogunsina**
172:*3*
**Oh** 10:*8*
11:*22*
78:*14*
82:*24*
107:*20*
175:*19*
210:*16*
215:*9* 218:*2*
**okay** 6:*20*,
*22* 10:*2, 6*,
*15* 11:*15*
12:*1, 3, 8, 12*
13:*24*
14:*13*
16:*22* 24:*6*,
*17* 29:*18*
30:*21* 31:*2*
33:*21*
35:*15*
36:*19*
37:*19, 22*
38:*15, 18*
39:*6, 8*
42:*16, 23*
44:*20* 47:*3*,
*9* 57:*24*
58:*17* 61:*6*,
*18* 66:*4, 13*,
*14, 16* 69:*3*,
*22* 73:*17*
74:*1, 5*
75:*6* 77:*8*
78:*14* 79:*9*,
*13* 80:*2, 7*,
*13* 81:*5, 15*,
*19* 82:*12, 18*
83:*22* 85:*3*
90:*1, 5, 8*
92:*6* 96:*17*
98:*21*

100:*17*
101:*8, 12, 14*
106:*19*
108:*9*
109:*19*
111:*16*
116:*5, 9, 12*,
*15* 118:*23*
119:*1*
124:*10*
127:*4, 11*
128:*4*
131:*23, 25*
133:*24*
141:*11*
151:*15*
153:*3, 19*
154:*25*
158:*16*
161:*14*
162:*5, 8, 13*
163:*3*
164:*10, 14*
165:*1*
166:*16*
171:*14*
172:*17, 20*,
*23* 173:*7, 13*
174:*9*
175:*22, 23*
176:*22*
177:*7*
179:*7, 13, 18*,
*20* 180:*18*,
*21* 181:*5, 10*,
*13* 184:*8*
187:*23*
188:*22*
189:*1, 9, 20*
191:*22*
194:*24*
196:*1, 10*
199:*17*
202:*22*

208:*19*
211:*6*
213:*5*
220:*2, 10*
221:*7, 12*
224:*17, 25*
235:*1*
244:*1*
246:*22*
247:*4, 6, 20*,
*24*
**old** 132:*10*
**older** 131:*5*
**oldest**
132:*24*
**once** 17:*7*
58:*6* 94:*6*
115:*12*
118:*23*
138:*10*
155:*19*
156:*15*
168:*22, 23*
169:*15*
170:*23*
**Oncology**
5:*17*
211:*10, 25*
213:*1*
**ones** 9:*10*
82:*17*
210:*5*
241:*11*
**online** 215:*6*
**open**
121:*18, 19*,
*24* 122:*2, 11*,
*16*
**operates**
68:*25*
**opinion**
7:*14, 19*
16:*9, 13, 19*,
*20* 20:*7*

28:*16* 30:*4*
32:*14*
52:*21*
54:*20, 23*
55:*1, 3*
56:*7, 25*
57:*1*
101:*15, 21*
102:*3, 10, 16*
103:*3, 6*
106:*16, 20*,
*23* 107:*7, 12*,
*22* 108:*1*
123:*9*
131:*17, 21*
199:*19*
200:*10*
205:*1, 15, 20*
208:*3*
219:*1*
220:*22*
227:*18, 21*,
*24* 228:*9, 16*,
*19* 231:*17*
235:*23*
**opinions**
20:*5* 54:*18*,
*24* 90:*22*
109:*5*
195:*3*
218:*25*
220:*21*
235:*25*
236:*4*
**opportunity**
244:*16*
**opposed**
159:*20*
**opted**
165:*22*
**organization**
21:*3* 31:*8*,
*11, 14* 195:*2*

**organizations**
20:*21* 21:*2*
107:*13, 23*
**origin**
206:*18*
**original**
44:*13*
55:*10* 65:*9*
99:*10*
111:*13*
180:*9*
**originally**
7:*5* 179:*9*
**originate**
206:*10, 12*
**originates**
226:*7*
**orthotopic**
225:*24*
**outcome**
71:*8* 178:*1*,
*10*
**outlier** 74:*7*
193:*7*
**outrageous**
103:*18*
144:*23*
**outside**
40:*12*
41:*15* 42:*8*
43:*1* 75:*21*
110:*21*
203:*17*
204:*23*
205:*12*
208:*15*
**Ovarian**
4:*11, 13, 18*,
*22* 5:*1, 2, 4*,
*9, 12, 16, 20*
7:*20* 19:*8*,
*12, 22* 20:*2*,
*21* 21:*16, 20*,

23  22:4, 10,
12, 25  23:6
24:1, 13, 23
25:6  32:3,
13, 15, 24
33:10, 12, 16
34:2  35:9
36:24  37:6,
13  38:4
39:10
40:13
41:11, 16
42:9  43:2
50:3, 13
54:19, 21, 23
55:2  56:5,
6, 21, 23
57:21  58:3,
12  59:9, 23
60:8  61:4,
25  62:1
74:17  78:6
82:4, 10
83:4, 9
85:23
86:17  87:9
90:13, 19
94:3  95:2,
7  102:9
106:21
107:2, 9, 15
108:4, 16, 24
113:3, 17
115:11, 18,
19  116:2, 24
117:10
119:23
120:4, 16, 20
123:24
124:1, 2, 4, 8,
15, 17, 25
126:3, 19
130:23
131:3, 10, 19

133:8, 17
134:4, 9
136:17
154:1
161:18
162:10
173:16, 21
174:2
179:8
181:19
195:9
196:4, 13
197:3, 9, 11
198:2, 19
199:12
202:24
206:9, 12, 17,
22  207:12,
21, 25
208:17
209:4, 12
210:22
211:10, 15
214:22
215:20
221:17, 20,
24  222:2, 6,
8, 25  223:13
225:20
226:6, 12, 15
227:2, 20
228:3, 18, 20,
23  229:2
230:15, 22
231:11, 18
232:5, 7, 17
236:10, 20
237:25
241:3
246:7
247:22
**ovaries**
206:10
225:6

**overall**
54:21, 23
55:2  56:6
59:21  64:5
77:11
85:20  86:5
93:6  94:4
147:6
148:14
198:20
212:2
**overlap**
77:9, 16
125:3, 5, 16,
17, 24
**overlooked**
77:6
**oversight**
88:24
**oxidative**
203:5

**< P >**
**P.C**  3:10
**p.m**  119:5,
6  161:5
177:11
227:15
242:7
246:16
248:14
**PA**  3:14
**PAGE**  4:1,
10  13:22
30:20
83:21, 23
96:15, 20
98:19, 20
104:19
112:1
128:6
149:18, 19,
21, 22
155:14

181:14
211:18
213:5, 7
215:8, 9, 15,
17  224:15
225:3
250:2, 5, 8,
11, 14, 17, 20
251:2, 5, 8,
11, 14, 17, 20
**paid**  112:18,
20  113:13
114:18
237:24
**PAPANTON
IO**  3:5
**paper**  5:22
19:11, 14
20:25  21:6
33:3, 10, 14
34:1, 3, 19,
23  35:2, 8,
11, 17, 21, 22
36:7, 12, 23
37:7, 11, 21
38:19, 25
39:3, 9, 17
40:11
41:15  42:8
43:1  46:19
47:25  48:6,
7, 13, 16, 21
51:6, 14, 16,
18  52:7, 17
59:2  60:7
61:3  64:12
65:2, 7
68:13
69:18  73:1,
7  74:6
75:13  76:9,
24  77:2
79:4  80:10,
14, 21, 23

81:8, 18, 22,
23, 24  82:13,
25  83:11, 16
84:25  86:3
88:12  89:6,
10, 12, 15, 18
90:16, 21
91:10, 19
92:7  97:9,
21, 23  98:4
99:19
102:19
103:18
105:4, 5, 6, 8
108:13
112:13, 17
113:23, 25
114:21
115:1, 4, 8,
13, 25  116:1
117:24
119:15
120:9, 23
121:6, 14
124:7, 20
129:17
130:2, 23
133:2, 22, 25
134:2, 14, 21
135:8, 9, 18,
24  136:16
137:23
138:17
140:19
141:17
142:19
147:12
148:7
149:4, 15, 19
152:21
154:7, 24
155:2
158:10
159:8

160:9
161:9, 22
162:15
165:21
166:4
167:16
168:7, 12
170:4
172:3
173:2, 14
174:1, 5, 22
183:16
184:11
185:19
186:25
187:4
195:1
203:7
209:10
211:19, 23
213:2, 4
224:4, 5, 6, 9,
12  225:2
231:9, 14
236:7, 17
237:4, 22
238:7
239:4
240:2
244:10
245:15, 25
246:20
**papers**  16:7,
8  17:12, 25
19:15, 18, 19,
21  21:5
33:6, 7
40:16  45:2
52:5, 12
53:21  54:2
56:5  78:25
80:18
81:12  82:3,
9  97:6, 16

103:25
104:2
108:3
109:9
110:6, 12
131:13
138:2, 6
140:4
141:6, 16
142:8
143:3, 5
157:6, 12, 21
159:19
160:4
167:24
168:1, 17
170:25
171:8
190:24
191:3
196:8
199:17, 24
201:2
202:25
203:8, 13, 17
204:24
205:14
208:15
213:1
215:6
224:21
231:21
**paragraph**
83:24  84:2,
12  85:2, 3
181:14
184:11
215:1
**pardon**
219:16
**PARFITT**
3:2  4:4, 6
6:25  7:24
8:2, 21, 23

9:7, 16
10:15, 20, 25
11:3, 17, 20,
24  12:2, 18
13:12, 18
14:9  22:16
23:23  24:4
25:8, 12, 15
26:2, 7, 11
27:14
28:20  29:7,
18, 20, 23
30:4, 7, 9, 12,
15, 18  32:8
33:17, 19, 22
34:3, 13, 18,
25  35:5, 10,
13, 16, 23
36:4, 9, 12,
18, 20, 25
37:14, 17, 20
38:1, 5, 9, 11,
14, 16, 19, 24
39:4, 12, 22
40:4, 14
41:17, 20, 24
42:11, 24
44:2, 7, 18
45:22  46:6,
11, 14, 21
47:3, 7, 10
48:3  49:18
50:5, 16
51:20
52:13  53:9,
18  55:6, 18
56:13  57:5,
9  58:22
60:3, 25
61:7, 13
63:15  66:6
73:15, 19, 22
74:2  75:24
79:8, 14, 18,

21  80:2, 5, 9,
16, 20, 25
81:3, 6
84:9, 17, 21
88:21
93:12
94:18
98:16
100:25
101:2
103:19
107:3, 10
108:5
109:13, 19
110:1, 3
111:6, 9, 11,
15, 17, 19
118:7, 16
119:19
126:5
127:15
128:19
129:8
130:18
132:4
135:5, 25
136:21, 25
138:5
139:9
140:6, 10
141:20
142:10, 21
143:1, 19
144:16, 19
149:5
150:6
151:2
152:10, 24
153:4, 9, 13
154:12
155:18
156:14
157:15
158:11, 22,

25  159:23
160:14, 21,
25  162:2
163:1, 10, 18
164:3
165:4
166:1
170:14
175:9, 13, 16,
19, 22  176:1,
5, 21  178:12
180:16, 23
182:19, 22
184:12, 15
185:4, 13
186:5, 8
187:18, 21,
24  191:2, 25
194:1
196:14
197:4, 18, 22
198:10
199:1, 20
200:13, 19
202:4
204:11, 13,
19  205:2, 17
206:23
207:13
208:5, 18, 20
209:3, 13
214:11
216:24
217:8, 12
218:10
219:3, 10, 16,
20  220:1, 3,
5, 9, 11, 13,
16, 25  226:9,
20  229:3, 7,
17, 21  230:1,
6, 10, 16
231:19
232:10, 19

Patricia G. Moorman, Ph.D.

234:*21*
236:*11, 21*
237:2, *6, 12*
238:*21*
239:*7, 16, 18*
240:*5*
244:2, *5*
245:*8*
246:*1*
247:*9*
248:*11*
**parse**
219:*23*
**part** 19:*12*
20:*14, 15, 24*
52:8 102:*5*
103:*5*
149:*11*
166:*19*
170:*21*
201:*6*
208:*13*
218:*18*
238:*7, 20*
**particular**
83:*19, 20*
115:*1*
126:*12*
170:*10, 19*
171:*9*
174:*5*
197:*16*
208:*25*
245:*1*
**particularly**
28:*23*
136:*13*
223:2, *9*
226:*12*
**parties**
252:*18*
**parts** 16:*12*
48:7 185:*18*

**patency**
78:*5, 15*
**patent**
59:*11, 24*
60:8 61:*4*
77:*9, 14, 20,*
*25* 78:*7, 11*
85:*6, 15*
86:*10* 87:*4*
125:*21*
151:*25*
153:*24*
154:*18*
161:*12*
176:*19*
**pathogenesis**
225:*12*
**pathway**
201:*19*
208:*9, 13*
**pathways**
207:*18*
**patients**
22:*21* 58:*7*
**PATRICIA**
1:*13* 2:*1*
4:*15, 21*
6:*3, 11*
69:*10, 17*
104:*12, 17*
249:*22*
250:*24*
251:*24*
**PATRICK**
3:*3*
**Patterns**
5:*14* 60:*12*
171:*18, 23*
191:*14*
222:*24, 25*
**pay** 122:*4*
**payment**
121:*2, 7*

**PDQ** 27:*6,*
*10, 12, 20*
28:*3, 16*
29:*15, 19*
32:22
**peer** 103:*17,*
*25* 104:*1*
122:*17*
203:*20*
210:*19*
**peer-**
**reviewed**
103:*12*
238:*16, 18*
239:*5* 240:*3*
**PENALTY**
249:*3, 6*
**pending**
66:*12* 67:*5*
**Pensacola**
3:*9*
**pension**
14:*8, 11, 18,*
20
**people**
17:*19*
40:*21* 59:*3*
69:*25* 70:*2,*
*11, 12, 20, 24*
71:2 94:*1*
97:*8*
101:*18*
109:*8*
141:*13*
178:*8*
203:*21*
**percent**
14:4 85:*16,*
*18* 128:*14,*
*22* 130:*4*
179:*9, 11*
180:2, *8, 9,*
*13, 14* 182:*5,*
*8, 13* 183:*5,*

*8, 11* 184:*5,*
*6, 7* 185:*2,*
*23* 186:*1, 12,*
*20, 24* 187:*5*
188:*6, 7, 22,*
*23* 189:*21*
190:*2*
192:*22, 23*
206:*14*
222:*1, 6*
**percentage**
13:*2*
101:*16*
129:*4*
184:*3, 22*
185:*1*
223:*12*
**percentages**
174:*10*
**Perfect**
12:*12*
46:*23* 70:*8*
148:*15*
**perfectly**
188:*7*
**performed**
166:*5*
**perineal**
4:*21* 5:*8*
79:*1* 82:*11*
90:*12, 18*
134:*4, 8*
136:*18*
137:*3*
158:*18*
159:*21*
191:*1*
227:*23*
**period**
180:*6*
210:*12*
**PERJURY**
249:*3, 6*

**permit**
195:*10, 21*
**permitted**
219:*13*
**person**
43:*11*
121:*13*
134:*16*
138:*23*
187:*21*
252:*6*
**personally**
53:*20* 54:*1,*
*5* 67:*1*
**persuasive**
234:*5*
**pertains**
209:*3*
**ph** 1:*19*
**Ph.D** 1:*13*
2:*2* 4:*15,*
*24* 6:*3*
53:*3* 69:*11*
104:*13*
249:*22*
250:*24*
251:*24*
**Pharma**
48:*10*
**Philadelphia**
3:*14* 10:*12*
11:*8, 19, 20,*
*23*
**phrased**
241:*25*
**phrasing**
37:*3, 6*
112:*25*
113:*6, 14*
114:*4, 11, 12,*
*14* 145:*12*
169:*19*
234:*6*

Patricia G. Moorman, Ph.D.

**Phung** 5:6
119:15, 17
124:6
127:8, 13, 18,
22   130:1
**physician**
18:25
**physicians**
22:20
**picked**
169:14
**piece** 46:19
**Pittsboro**
2:6
**place** 176:10
**places**
105:12
**plaintiff**
120:21, 24
121:10
238:4
**Plaintiffs**
3:5   16:2
51:7   57:4,
14, 18, 22
238:20, 23
241:12
244:11
**plaintiff's**
50:4, 14
51:3, 10, 19
87:17   98:2,
5   101:23
111:5
112:4, 17
113:13
114:18
121:15
123:1, 14
136:10
204:9, 16
216:16
218:9, 24
220:20

233:11
241:5
**planned**
19:18
**planning**
84:24
**plans** 19:24
**plausibility**
102:2, 4, 6
199:18
200:11
201:7, 16
202:3, 12, 18,
20   205:1, 5,
16, 21   206:7
**plausible**
102:7
107:25
**please** 6:9
24:6   31:18
35:16   42:4,
21   57:8
63:15
66:13
73:20   81:1
84:10
100:14
116:21
157:16
182:19
185:13
194:3
202:4, 5
205:19
207:4
217:8
220:12
229:13
236:14
237:8, 21
239:18
247:19
**PLM** 100:8,

20
**plus** 12:13
**point** 14:1
21:17
24:20
67:17
74:23   75:1
89:25   93:6,
7, 17, 19
94:14
124:22
125:8
131:9
132:19
138:1
139:23
140:5, 24
141:8, 18
142:9, 20
156:19
167:10
169:22
170:19
180:10
205:8
208:15
209:10, 15
210:6, 16
215:2
228:4, 7
231:25
232:14, 23
233:21
243:11
244:13
245:5
**pointed**
60:10
**pointing**
132:5, 13
**points**
78:18   79:5
88:17, 18
150:24

178:24
179:22
244:23
**Polar**
100:16, 18
**poor** 63:13
210:5
**population**
117:11
221:23, 25
222:3
223:22
**position**
203:22
**positive**
74:11, 14
**possibility**
180:12
**possible**
95:7
104:21, 24
105:25
146:19
150:22
195:6
231:23
**possibly**
71:4   126:10
**potential**
23:10
24:13
47:18, 20, 21,
23   52:23
88:13   97:2,
5   105:2
123:17
132:6, 7, 12,
15, 21   178:7,
16   196:11,
25   206:1
210:24
216:7
**pounce**
175:25

**Powder**
4:11, 16, 21
5:1, 8, 20
7:15, 19, 23
58:5, 11
59:14
81:13
82:10   83:4,
9   85:23
86:17   87:8
90:13, 18
101:16
115:18
116:1, 23
134:4, 9
136:18
137:4
138:3
158:18
159:21
165:22
167:25
168:8, 12, 20,
25   170:22
173:1
174:7, 24
179:10
190:18
211:10, 15
214:21
215:20
216:23
217:20
218:3
**powder-
related**
213:10
**POWER**
1:6   64:11
89:6, 14, 18
90:2, 6
249:3

Patricia G. Moorman, Ph.D.

**Practice**
18:23, 24
19:2  128:1

**PRACTICES**
1:7  249:3
**pre-'19**
200:16
**precisely**
233:18
**pre-COVID**
18:15
**prefer**
213:23
**preferable**
214:2
**premenopaus
al** 131:16
**prepare**  7:1
46:22
**presence**
205:24
**present**
18:7
159:25
185:18

**presentations**
110:16
**presented**
86:2
**presenting**
144:5
**prestigious**
54:14
**presumably**
103:16
**presume**
129:13
**pretty**
68:10
71:21
96:12
133:4

143:25
147:10
148:14
166:22
212:2
233:23
235:9
**prevalence**
183:11
192:24
193:23
194:11
214:7
**previous**
33:6, 7
72:6  85:9
118:19
234:14, 16,
17
**previously**
7:8  45:19,
21  108:10
209:25
220:25
234:15
**primarily**
67:13
103:3, 10
**printing**
124:10
**prior**
130:24
138:2
180:1, 13, 14
182:14
183:6, 12, 25
184:5
185:10
186:12, 14
189:22, 25
190:15
205:5
212:24

215:9
224:24
**privileges**
17:3
**probably**
8:14  9:23
13:5  14:3
18:14, 19
33:12
43:18
45:23  52:7
89:22  97:7
112:7, 9
115:5
120:18
127:3  234:5
**problem**
66:17  97:8
178:11
**Procedure**
2:4
**procedures**
145:20
**proceeding**
45:16
**proceedings**
9:5  40:7
66:20
119:5
161:5
177:11
227:15
242:7
246:16
**process**
26:18, 23
27:1
122:18
149:7
**processes**
149:16
151:10
**produced**
103:13

**product**
99:23, 25
136:18
178:9
201:23
216:25
217:1
**PRODUCTS**
1:6, 7  5:8
20:11
102:5, 10, 15,
17  106:24
109:1, 2, 3
111:3
134:4, 9
173:2
201:17
205:25
216:9, 13
218:21, 23
219:2
220:19, 24
249:3
**professional**
123:4
**professionall
y** 17:17
**professor**
16:24  18:2,
7
**program**
19:1
**progress**
19:20, 25
**proper**
143:13
**proportion**
101:21
**proportions**
174:15
**proposed**
225:21
226:3, 4

**proposition**
89:7
**protecting**
126:19
**protective**
28:22  29:3
**provide**
152:8, 16
157:7  236:3
**provided**
11:10  12:9
33:11  45:6,
25  46:2
49:19
127:5
149:1
152:14
234:9
**provides**
174:20
**public**  20:1,
20  21:1, 3
31:17, 23
114:2, 13
116:11
122:9
214:5
222:12, 18
252:5, 24, 25
**publication**
54:15
122:12
213:4
240:20
**publications**
19:7  20:24
151:23, 24
152:5
**publish**
204:6
**published**
19:21  33:6,
10  37:8
40:11

Patricia G. Moorman, Ph.D.

41:*15*  42:8
45:*3*  47:*25*
48:*1*  53:*14*
54:22
75:*13*
89:*11*
99:*14*
110:*12*
113:*25*
114:*11, 12*
120:*18*
194:*25*
209:*10*
211:*23, 24*
212:*4*
237:*4, 22*
238:*16, 17*
242:*25*
246:*20*
**publishing**
246:*6*
247:*20*
**pull**  79:*6*
82:*18*
115:*12*
203:*8*
**purpose**
143:*9*
159:*7*
207:*8*
243:*14*
**pursuant**
2:*3*
**pushback**
113:*5*
**put**  13:*21*
28:*7*  39:*25*
45:*4, 5*
46:*5, 15*
96:*18*
97:*13*
116:*7*
139:*14*
141:*2*

142:*4*
162:*7*
169:*11*
193:*17*
**putting**
70:*24*
224:*11*

**< Q >**
**qualified**
99:*22, 24*
218:*8*
**qualifiers**
195:*23*
**quality**
97:*11*
136:*8*
146:*4*
147:*18*
149:*20*
150:*1, 12, 16,
18*  210:*2, 23*
211:*4*
**quantified**
105:*5*
**quantify**
214:*16*
**quantitative**
49:*12*
**question**
6:*19*  9:*14*
10:*19, 23*
14:*11*
23:*12, 16, 17,
19*  30:*1*
31:*21*  35:*1,
18*  36:*5, 9*
37:*1, 10, 25*
38:*9, 13, 17,
22*  39:*1, 5,
13, 21, 23*
41:*21*  42:*2,
4, 6, 14, 19,
22*  51:*8*

56:*9, 12, 14*
60:*19, 22, 24*
61:*1, 8*
66:*11, 12, 13,
15*  67:*4, 7, 8*
75:*20*  76:*9*
78:*10*
80:*14*
81:*20*  82:*6,
8*  91:*14, 17,
25*  94:*22*
95:*11*
107:*18*
108:8
109:*24*
116:*13, 20*
129:*15*
130:*14*
139:*5, 12*
140:*3*
142:*15*
144:*12*
148:*23*
157:*17, 19*
158:*21, 23*
159:*16*
166:*25*
172:*12*
175:*15, 18*
176:*4*
178:*19*
184:*17*
185:*21*
186:*19*
193:*12*
194:*4, 7*
195:*18*
196:*20, 21,
22, 23*  197:*8*
198:*13*
205:*3, 10, 11*
207:*5, 9*
209:*7*
210:*14*

211:*1*
212:*21*
217:*11, 23*
219:8, 25
220:8, *15, 18*
221:*10*
228:*1*
229:*16, 20*
230:*4, 5, 9,
11*  234:*18*
236:*13, 16*
237:*11, 14,
20*  239:*9, 14,
23*  240:*1, 13*
241:*25*
242:*10*
**questioning**
6:*24*
**questionnair
e**  72:*5*
129:*15*
181:*22, 23*
224:*24*
**questions**
17:*25*  31:*4*
34:*8*  35:*21*
82:*1*
102:*22*
106:*18*
119:*15*
176:*6*
219:*6*
229:*14, 22*
239:*21*
242:*11*
245:*9*
247:*5*
248:*12*
**quibble**
164:*24*
**quite**  39:*9*
40:*19*  77:*1*
93:*22*
122:*21*

160:*10*
196:*15*
222:*13*
230:*20*
**quote**
213:*22*
214:*19*
219:*1*
220:*23*
235:*5*

**< R >**
**race**  173:*10*
**RAFFERTY**
3:*5*
**raise**  130:*9*
**raised**
244:*25*
**raises**  188:*5*
**random**
126:*11*
**randomized**
40:*23*
**range**
122:*14*
125:*10, 17*
**ranitidine**
240:*21*
**rarity**
221:*16*
**rate**  15:*12*
146:*3*
**rates**  232:*18*
**ratings**
148:*18*
**ratio**  59:8,
*11*  62:*7, 23*
63:*6*  67:*18,
19*  73:*11, 13*
74:*7*  75:*16,
22*  76:*10, 15*
77:*12*
85:*17*  92:*9*
94:*9*  95:*4,*

*18* 117:2
124:*7, 15, 18,*
*20, 24* 125:*9,*
*21* 126:*13*
154:*14*
158:*1*
159:*17*
164:*14*
165:*14*
194:*16*
224:22
**rationale**
234:*23, 24*
235:*10*
**ratios** 59:*15*
76:*3* 85:*15*
125:25
157:*7, 11, 21*
**reach** 17:*24*
197:*16*
**reached**
20:*20*
22:*11*
24:*11* 28:2,
*15* 32:*17, 21*
**reaching**
218:*20*
**read** 6:*17*
7:*18* 16:*9,*
*10, 11, 17, 18*
17:*12* 20:7
31:*21* 42:6
43:*23* 48:6
50:*18, 25*
51:2 52:*4,*
*7* 54:*1*
56:*14* 61:*1*
67:8 76:*19,*
*25* 80:22
83:*18* 84:*5,*
*7, 12, 18, 20,*
*24* 85:2, *3,*
*13* 89:*1*
91:*17, 25*

92:*4, 19, 23,*
*25* 95:*19*
99:*19*
102:*21*
103:*1, 5*
109:9
110:6
115:*23*
118:*10*
128:*10*
134:*21, 22,*
*25* 157:*19*
176:*13*
177:6
194:7
196:*9, 23*
199:*24*
200:8
203:*16*
205:*11*
207:9
215:6
220:*18*
223:*18*
230:*5, 9, 11*
231:*25*
236:*16*
239:*4*
240:*1, 2*
246:*3*
247:*18*
249:*7, 9*
**reader**
114:*21, 25*
115:*5*
117:*13*
**reading**
49:*14, 15*
83:*11*
121:*13*
135:*14, 21*
151:*17*
163:*17*
214:*24*

215:*5*
231:*21*
240:8
242:*21*
**ready**
175:*25*
**real** 74:7
**realize**
127:*1, 9*
**really** 8:*22*
37:*15, 20*
57:*15*
60:*13*
63:*13*
70:22
105:*5*
123:*7, 19*
129:*18*
145:*11*
163:*15*
167:*5*
170:*6*
181:*1*
187:9
203:*21*
223:2
**reason**
48:*20* 53:*7,*
*10* 54:*3*
71:*12*
83:*14, 19, 20*
86:*20*
96:*21*
126:*1, 8*
193:*3*
250:*4, 7, 10,*
*13, 16, 19, 22*
251:*4, 7, 10,*
*13, 16, 19, 22*
**reasoning**
137:*21*
**reasons**
72:2 206:*5,*
*6* 235:*3*

**Rebecca**
134:*18*
**recall** 8:*3, 4,*
*16* 11:*12*
12:*23* 15:7
19:*5* 20:*4*
21:*10, 18, 21,*
*25* 24:*21, 24*
27:*10, 11*
33:*25*
34:*15* 35:7
36:*16, 22*
37:*2, 7, 11*
38:*2, 7, 22*
39:*2, 8, 21*
40:*10*
42:*25*
43:*11* 50:*9,*
*10, 12, 18*
51:*5, 9, 12*
52:*9, 10*
60:*19*
64:*14* 70:*5,*
*8* 74:6
82:*3, 9, 12,*
*14* 83:*11*
89:*4, 8, 9, 16,*
*19, 21, 24*
91:*12, 21*
97:*2* 99:*16,*
*18, 20* 103:2
104:7
105:*19, 20*
108:*13*
130:*25*
131:*7, 13*
135:*2, 9, 14,*
*20* 141:*10,*
*12, 13, 16*
143:*3, 5*
147:*12, 21,*
*25* 148:2
151:*5*
152:*20*

157:*25*
167:*1, 7, 14*
168:*1, 5, 18,*
*20* 169:*20*
170:*9, 17, 21*
171:9
173:*25*
174:*1, 4*
177:*4, 25*
178:*9, 21*
179:*3, 5*
190:*24*
196:*2, 3*
199:*10*
209:22
210:*24*
212:7
218:6
224:*13, 16*
230:*20*
231:*6, 21, 24*
232:*2, 4, 12*
233:*7, 10*
234:*22, 24*
238:6
240:*7, 19, 23,*
*24* 241:*8*
**recalled**
168:*16*
177:*24*
**recalling**
72:22
81:*22* 97:*3*
199:*6*
217:*17*
221:*24*
231:*14*
232:*13, 23*
**recalls**
34:*12, 22*
36:*14* 38:*12*
**received**
47:*12*
57:*25*

Patricia G. Moorman, Ph.D.

113:2, *9, 15,*
*16* 135:22
136:*6* 247:*1*
**receives**
146:*25*
**recess** 9:*4*
40:*6* 66:*19*
119:*5*
161:*4*
177:*10*
227:*14*
242:*6*
246:*15*
**recognized**
195:*16*
**recollection**
158:*14*
196:*2*
242:*17*
**recollections**
167:*2*
**recommenda**
**tions** 22:*3*
**record** 6:*10*
9:*1* 10:*16*
23:*20*
24:*16*
42:*17*
45:*22*
58:*18* 81:*4*
84:*25*
115:*24*
118:*22*
119:*2*
177:*17*
184:*12*
228:*12*
230:*7, 8*
242:*4*
246:*12*
247:*18*
252:*13*
**recorded**
117:*9, 18*

**recording**
224:*20*
**records**
12:*13*
**redo** 219:*5*
**redox** 203:*4*
**reduce** 22:*3*
**reduced**
252:*11*
**reduces**
187:*3*
**refer**
105:*18*
247:*10*
**reference**
88:*25*
213:*18, 19*
**referenced**
241:*10, 11*
**references**
45:*17* 98:*8*
**referencing**
136:*21*
**referred**
103:*17*
**referring**
33:*3, 4*
73:*15, 17*
106:*1*
150:*8*
223:*10*
225:*13*
**refers** 69:*23*
**reflect**
60:*11*
247:*24*
248:*8*
**reflected**
76:*11*
**reflecting**
126:*10*
149:*11*
**reflection**

26:*8*
**reflects** 70:*4*
**refresh**
242:*16*
**refuse** 36:*10*
**refusing**
39:*20* 214:*9*
**regard**
14:*10* 17:*3*
19:*19*
131:*22*
154:*9*
208:*25*
247:*17*
**regarding**
14:*11*
51:*11*
57:*18* 76:*20*
**regardless**
7:*20*
**registered**
244:*21*
**regulatory**
195:*1* 202:*9*
**rejected**
204:*4, 17*
213:*1*
**rejections**
204:*10*
**relate** 60:*24*
**related**
18:*12*
19:*16*
20:*11* 33:*6*
54:*20, 23*
55:*1* 88:*6*
96:*4* 98:*9*
104:*5*
227:*21, 23*
252:*16*
**relation**
106:*3, 12*
113:*3, 16*
167:*9*

169:*20*
192:*3, 19*
233:*25*
**relationship**
61:*24*
196:*12*
197:*1*
237:*18*
238:*5*
**relative**
59:*25* 61:*9*
63:*1* 67:*18*
95:*18, 21*
181:*22*
193:*5*
213:*25*
214:*1, 6*
221:*15*
245:*3*
**relatively**
210:*11*
221:*20*
**Relevance**
14:*9* 204:*13*
**Relevancy**
208:*5*
**relevant**
14:*12*
55:*14*
97:*20* 125:*6*
**Reliability**
5:*14*
123:*15*
143:*12*
171:*19, 23*
177:*19, 25*
178:*10*
181:*17*
203:*12*
204:*24*
205:*13*
218:*8*

**reliable**
63:*10, 12*
149:*2*
**reliably**
203:*19*
**reliance**
77:*4* 162:*15*
**relied**
173:*15*
201:*15*
**relies** 239:*5*
240:*4*
**rely** 238:*19*
**relying**
81:*15*
90:*21*
102:*19, 25*
199:*18*
200:*10*
218:*16, 25*
220:*22*
221:*8* 245:*6*
**remaining**
16:*22*
**remember**
20:*8, 9*
32:*4, 9, 10*
66:*14* 77:*5,*
*7* 82:*16*
100:*24*
168:*2*
171:*7*
178:*8*
191:*8*
193:*12*
194:*6*
196:*7*
199:*15*
223:*25*
237:*20*
238:*11, 12,*
*14*

Patricia G. Moormann, Ph.D.

**remembering**
18:*18*
**remind** 43:*5*
**Remotely**
3:*3, 8, 13*
**reorient**
119:*14*
**repeat**
31:*18* 42:*2,
4, 5* 56:*8*
60:*23*
66:*13* 67:*6*
91:*16* 92:*3*
95:*17*
157:*16, 18*
194:*3, 5*
196:*19, 22*
205:*9*
207:*4*
220:*8, 14*
236:*14*
237:*21*
239:*14*
**repeated**
125:*13*
215:*23*
236:*13*
**repeatedly**
88:*11*
110:*8*
140:*12*
243:*7*
**repeating**
91:*24*
**reply**
198:*16*
244:*16, 20*
**Report** 4:*15,
23* 9:*23*
10:*3* 11:*13*
12:*9* 28:*8*
43:*6, 10, 13,
16, 25* 48:*17*

49:*14, 15*
59:*19, 20*
61:*16*
62:*14, 17, 21*
64:*14, 20, 25*
65:*16, 22*
68:*9* 69:*4,
7, 10, 16*
75:*16* 79:*8,
15* 83:*14*
88:*20* 91:*4,
5, 7* 93:*7*
94:*4, 11, 17,
24* 95:*6, 11,
12, 17* 97:*10,
13* 98:*12*
99:*6* 104:*9,
12, 17, 20*
105:*1, 11*
111:*15*
112:*2, 9*
117:*1, 6, 21,
23* 118:*25*
119:*10*
124:*20, 23*
128:*20, 21*
130:*2, 3, 16,
23, 25* 131:*2,
15* 133:*20,
21* 135:*4, 7,
14, 15, 21, 23*
136:*6*
140:*17*
141:*14*
143:*4*
150:*9*
153:*21*
166:*12*
174:*6*
175:*1, 3*
179:*16*
187:*7*
190:*20*
191:*16, 22*

192:*3, 12*
193:*4, 17*
195:*14*
199:*4*
211:*19*
212:*18, 22*
213:*6, 18, 25*
214:*15*
217:*16*
233:*1*
234:*1, 14, 16,
17* 236:*23*
237:*1, 16*
238:*10, 19*
240:*9*
241:*10, 12*
**reported**
52:*9* 56:*21*
59:*6, 21, 25*
68:*21*
73:*14*
74:*19*
77:*12*
88:*12* 92:*7,
8, 9* 93:*19*
94:*9* 95:*19,
20, 22*
102:*13*
117:*1, 9, 13*
124:*7*
125:*2, 8*
144:*6*
149:*14*
154:*7, 17*
156:*3, 18*
157:*12, 21*
158:*1, 6, 18*
159:*17, 21*
165:*23*
166:*11*
170:*8*
173:*8*
174:*13, 14*
179:*2, 9, 21*

180:*5, 6, 15*
181:*21*
182:*5*
183:*10, 15*
184:*10, 22*
185:*1*
189:*20*
190:*22*
191:*4, 5*
193:*6, 8*
197:*9*
198:*17*
199:*5*
201:*4*
203:*4*
217:*25*
218:*4*
223:*16*
224:*21*
226:*11*
228:*23*
231:*6*
241:*24*
246:*5, 8*
247:*20, 23*
**Reporter**
2:*5* 23:*16*
26:*3* 31:*20*
80:*22*
82:*21*
91:*15* 92:*4*
109:*21*
119:*25*
189:*2*
200:*24*
245:*12*

**REPORTER'
S** 252:*3*
**reporting**
129:*21*
156:*6*
178:*21*
180:*18*

187:*4, 10*
198:*19*
245:*5*
247:*25*
**reports**
7:*22, 25*
11:*10*
44:*25*
60:*11* 65:*9*
101:*20, 24*
103:*8, 9*
121:*2*
135:*1*
140:*19*
155:*9*
167:*12*
178:*20*
195:*13*
221:*25*
233:*3, 9*
238:*20, 24*
239:*6* 240:*4*
**represent**
221:*4*
**representatio
n** 25:*13*
**represented**
26:*5*
**represents**
14:*3*

**Reproductive**
4:*20* 59:*12*
77:*14* 78:*5,
7, 8* 86:*10*
87:*5* 90:*10*
**reputable**
212:*1*
**reputation**
66:*24*
**requested**
92:*4*

**require**
68:*4*, *14*
121:*23*
**requirement**
122:6
**requirements**
68:*18*
**reread**
230:*4*
**Research**
17:*13*
246:6
247:*21*
**Reserved**
248:*15*
**respect**
7:*22*  51:*18*
62:*19*  90:*3*
229:*23*
**respected**
31:*7*, *10*, *13*,
*16*, *22*
**respond**
35:*1*
**responded**
247:*1*
**response**
5:*22*  34:*25*
35:*18*
118:*11*
197:*8*
237:7
244:*10*
245:*15*, *25*
**rest**  184:*10*
**restate**  24:7
97:*15*
102:*17*
**restating**
91:*14*
**result**  69:*19*
71:*18*

73:*12*
176:*19*
**resulted**
245:*3*
**results**
52:*19*
71:*11*
143:*17*
144:*4*, *5*, *8*,
*11*, *14*, *24*
145:*2*, *9*, *12*,
*17*, *21*, *23*, *24*
158:*10*
199:*7*, *15*
**retained**
233:*14*
244:*11*, *12*
**retired**  13:*6*
17:7  18:*4*
**retirement**
14:*2*
**retiring**
233:*22*
**Retrospectiv**
**e**  5:*17*
173:*17*, *22*
**review**  4:*20*
5:*9*  8:*9*
17:*8*  26:*21*
28:*8*  52:*18*
90:*11*, *17*
103:*25*
104:*1*
122:*17*
128:*2*
134:*5*, *10*
137:*7*, *12*
202:*24*
203:*20*
210:*19*
244:*16*
**reviewed**
7:*8*, *21*
46:*20*  47:*2*

57:*17*, *25*
58:6
110:*23*
127:*22*
147:*13*, *19*
230:*19*
231:*9*, *16*
**reviewers**
103:*17*
**reviewing**
8:*4*  16:*8*
47:*17*
48:*24*
147:*20*
233:*20*
**reviews**
96:*11*
142:*1*, *3*
143:*18*
149:*21*, *22*
150:*12*
151:*5*
152:2
154:*22*
162:*5*, *16*
165:*20*
167:*8*
172:*8*
177:*3*
178:*11*
179:*14*
182:*2*, *9*
183:*18*, *24*
184:*3*
185:*7*
187:*6*, *17*
190:*3*
191:*24*
196:*22*
199:*6*, *14*
202:*18*
211:*20*
213:2
215:*4*
222:*19*

87:*17*
88:*16*  90:*3*
92:*18*  93:*3*
94:*23*
111:*21*
115:*11*
116:*17*, *20*
118:6
125:*22*
128:*8*, *11*, *14*,
*18*  129:*2*
130:*5*, *24*
138:*18*
139:*18*, *19*
140:*3*, *20*, *25*
141:*5*
142:*1*, *3*
143:*18*
149:*21*, *22*
150:*12*
151:*5*
152:2
154:*22*
162:*5*, *16*
165:*20*
167:*8*
172:*8*
177:*3*
178:*11*
179:*14*
182:*2*, *9*
183:*18*, *24*
184:*3*
185:*7*
187:*6*, *17*
190:*3*
191:*24*
196:*22*
199:*6*, *14*
202:*18*
211:*20*
213:2
215:*4*
222:*19*

**review's**
89:*23*
**revise**  28:*3*
**revised**
44:*16*
**rgolomb@go**
**lombhonik.c**
**om**  3:*15*
**RICHARD**
3:*13*
**ridiculous**
219:*9*, *12*
**right**  8:*8*
12:*17*
13:*15*
14:*14*
17:*15*  20:*7*
26:7  29:*2*
31:*17*, *23*
32:*21*
37:*24*  44:*1*,
*3*, *16*  50:*10*
58:*8*, *19*
60:*9*  61:*5*
68:7  69:*1*,
*5*  75:*8*
82:*24*

223:*20*
224:*5*, *8*
226:*19*
227:*9*
230:*25*
244:*15*
246:*20*
247:*16*
**rigid**  148:*24*
**Risk**  4:*11*,
*13*, *18*, *21*
5:*1*, *4*, *12*
21:*16*, *23*
22:*4*, *10*, *25*
23:*5*, *10*, *25*
24:*13*, *22*
25:*6*, *24*
26:*13*, *22*
28:*14*, *18*
32:*2*, *13*, *14*,
*23*  37:*5*
40:*18*  41:*4*,
*11*  55:*12*
58:*11*  60:*1*
61:*9*  63:*1*
67:*18*
74:*17*, *22*
75:*14*, *19*, *22*,
*23*  76:*4*, *5*, *6*,
*10*, *11*, *15*, *18*
78:*5*, *8*
83:*5*, *10*
85:*24*
86:*18*  87:*3*,
*9*  90:*13*, *18*
91:*1*, *8*
92:*13*  93:*5*
94:*3*, *4*, *6*, *9*,
*14*  95:*3*, *19*
96:*22*
115:*18*
116:*1*
117:*4*, *10*
119:*22*

Patricia G. Moorman, Ph.D.

120:*3, 20*
123:*23*
124:*2, 5*
126:*2, 20*
133:*11*
136:*17*
144:*13*
157:*11, 20*
159:*5*
161:*18*
162:*10*
164:*14*
165:*14*
166:*10*
193:*5*
202:*14, 18*
213:*25*
214:*1, 6, 22*
215:*21*
216:*5*
221:*15, 16, 23*  222:*1, 3, 10*  223:*3, 6, 22*  225:*15*
227:*3*
231:*11*
243:*16*
245:*4*
247:*22*
**risks**  95:*8, 21*
**RMR**  2:*5*
252:*4*
**road**  209:*5*
**Rothman**
244:*9, 18, 22, 25*  247:*12*
248:*5*
**Rotman**
233:*16*
**roughly**
128:*21*
174:*12*

**routine**
50:*19*
**Row**  164:*7, 8*
**royal**  27:*8*
**ruckus**
80:*12*
**Rule**  4:*13*
10:*24*  11:*2*
69:*9, 16*
213:*11*
**Rules**  2:*4*
6:*18*

**< S >**
**S.A**  134:*2*
**Saed's**  213:*2*
**safe**  107:*25*
108:*12*
202:*10, 21*
**SALES**  1:*7*
249:*3*
**sample**  59:*4*
63:*9, 11, 20, 23*  64:*1*
133:*4, 15*
166:*20*
181:*19*
235:*4*
**samples**
216:*19, 20*
**Sandler**
172:*4*
**satisfied**
89:*12*
200:*11*
**satisfy**  165:*1*
**save**  106:*18*
249:*10*
**saw**  99:*11*
**saying**
16:*15*
70:*21*  76:*8*
79:*16*

86:*14, 22*
88:*15*
114:*6*
126:*18*
131:*7*
138:*21*
143:*5*
145:*11*
178:*13, 15*
182:*16*
184:*9*
185:*15*
218:*18*
229:*14*
230:*1*
237:*13*
240:*19*
243:*10*
**says**  18:*6*
22:*1*  27:*20*
36:*23*
46:*19*
74:*23*
86:*15*
128:*7*
136:*17*
138:*17*
155:*14*
163:*16*
173:*5*
183:*20*
185:*22*
186:*11*
188:*14*
246:*5*
**Scale**  146:*1*
147:*14, 16, 22, 23*  148:*1*
149:*2*
150:*25*
151:*6*
**scales**  146:*2*
147:*16*
149:*9*

**scheduled**
7:*5*
**Schildkraut**
33:*8, 14*
34:*1*  36:*17, 22*  167:*7*
224:*5, 6, 9, 12, 19*
**science**
55:*24*
198:*23, 24*
218:*13*
226:*6*
**scientific**
47:*17*  50:*2*
56:*2, 16*
108:*2*
110:*17*
112:*5*
202:*9*
206:*21, 24*
207:*11, 15*
237:*4, 23*
238:*3, 8*
239:*5*
240:*3*  241:*1*
**scientist**  8:*6*
110:*20*
200:*3*
203:*2, 16*
236:*8, 18*
237:*24*
240:*20*
**scientists**
226:*16*
240:*12*
**score**
146:*25*
148:*9*
210:*23*
211:*4*
**scores**
148:*3, 4, 22*

149:*1, 3*
151:*5, 9*
**Scott**  27:*9*
**screwed**
127:*3*
**second**  9:*1*
164:*3, 5, 8*
**seconds**
24:*2*
**second-year**
19:*3*
**section**  22:*2*
133:*21*
162:*19*
166:*16*
**see**  13:*10*
22:*23*  25:*8, 24*  32:*2*
34:*10*
44:*15, 20*
50:*20*  52:*5*
77:*3*  80:*21, 23*  83:*24*
84:*2*  89:*11*
92:*23*
96:*23, 24*
98:*11, 22*
100:*22*
101:*24*
111:*1*
115:*1*
116:*5*
125:*3, 15*
137:*14*
148:*8, 11*
149:*20*
150:*2*
153:*21*
161:*13*
162:*23*
164:*1*
173:*2*
174:*5, 10*
176:*7*

Patricia G. Moorman, Ph.D.

178:22
184:8
190:22
200:4
213:15, 16
223:14
224:17
242:20
245:4  247:3
seeing
21:21
50:12  87:2
104:8
163:9, 10
179:3
223:20
seen  50:6
53:4, 12
71:13  99:8
101:20
103:21, 25
104:2, 4
106:12
110:7
191:16
216:15, 18
select
143:21
selected
145:5
235:22
selection
143:13, 18
144:2
146:15
self-report
183:20
Self-
reported
5:14
171:19, 24
177:19
181:20

182:3
185:16
seminars
17:5
send  112:4
189:15
senior
115:4
134:17
242:14
sense  74:14
sentence
79:23  84:3,
5, 7, 14  85:4,
13  92:20, 21
101:13
132:2
136:24
179:4  215:3
separate
153:23
serious
105:6
191:23
192:13
193:21
194:8
serous  63:1
225:22
226:7, 13
SERVICES
1:19
serving
246:2, 6, 10
247:21
set  138:1
139:24
140:23
141:23
143:24
145:22, 24
149:7
156:16
157:13, 23

228:6
252:20
setting
136:7
settled
169:22
seven  37:8
SGO  24:17
26:9, 25
27:3  31:13
32:22
SGO's
26:16
share  28:16
43:13, 16
171:1, 3
204:16
shared
111:1, 4
112:11
SHEET
249:1, 13
250:1  251:1
she'll  30:9
35:17
Shook  27:9
short
160:21, 22
Shorthand
2:5
short-term
191:17
show  7:7
12:13
35:22
37:21
70:17  75:2
93:2, 10, 19
131:9
197:25
199:11
showed
60:21
92:17, 22

showing
13:13
shown  71:6
shows
40:18
71:16
128:6
155:16
sic  82:5
121:4
174:3
201:5
223:13
side  112:21
121:10
240:12
247:24
Signature
248:15
SIGNATUR
E:_____
_____
___DATE
250:23
251:23
Signed
249:17
significance
67:21
68:12, 15
93:14
166:19
245:7
significant
59:16, 22
62:12, 23
63:4, 6
67:24  68:1
74:25
75:19, 22
76:11, 17
85:14, 22
86:5, 9, 12,
16, 23, 24

87:3, 7
91:10, 20
92:12, 18, 22
93:2, 4, 11,
21  94:2, 7,
13  95:1, 4,
14  115:9
116:25
117:4, 7, 15
164:17, 19
165:16, 18
166:10, 18,
24  183:17
193:25
194:12, 20,
22  195:20
significantly
154:15
193:24
194:12
similar
26:23
149:9
181:18
198:15
simple  38:6
simply
109:24
130:14
140:3
144:12
159:16
211:1

Simultaneous
101:3
109:18
simultaneous
ly  235:23
single  16:18
45:19  63:5
130:8  241:1
sister  72:5,
20  73:8

Patricia G. Moorman, Ph.D.

74:*18*
82:*13*
132:*16*
189:*21*
190:*1, 3*
194:*18*
**sitting**
34:*15*  35:7
36:*1*  40:*10*
55:*23*  56:*1,
15*  170:*11*
206:*20*
207:*10*
209:9
**six**  57:*22,
23*  58:2
**size**  59:5
63:*11, 20*
64:*1*  133:*4,
15*  166:*20*
214:6
**sizes**  63:*10,
23*  235:4
**SKADDEN**
3:*15*
**skew**
143:*17*
144:*13, 24*
**skewed**
145:*3, 24*
**skewing**
144:*10*
145:*9, 12, 17*
**skip**  112:*1*
**SLATE**
3:*15*
**slide**  110:*19*
**slight**  74:*19,
22*  76:6
**slightly**
65:*25*
67:*10*
108:7
125:*14, 15*

169:*19*
194:*17*
**small**
166:22
213:*22, 24*
214:*10*
222:*10*
**Smith-
Bindman**
134:*19*
148:8
**Smith-
Bindman's**
135:*23*
136:6
**smoking**
225:*19*
**sold**  101:*16*
**sole**  102:6
**somebody**
50:*3*
**somewhat**
146:*21, 23*
192:5
**soon**  162:6
**sorry**  8:25
10:*25*  12:*3*
13:9  23:*14,
21*  41:*24*
51:7  54:9
55:*24*  57:5
61:*21*
71:*19*
82:22  84:6
87:*23*
91:*23*
106:8
107:*20*
121:2
153:8
161:*23*
163:9
175:*20, 21*
186:6

189:*6*
190:*21*
191:*21*
198:22
201:*11*
210:*15*
215:*14, 22*
231:*12*
239:*12*
**sort**  90:2
**sound**
12:*17, 24*
**sounds**  44:*3*
146:*12*
**source**
47:22, 23
**sources**
47:*18, 20*
48:8  221:8
**South**  3:8
**speak**  20:*23*
207:*15*
226:*15*
**speaking**
43:*11*
122:*16*
**speaks**  24:5
33:*1*
**specialists**
109:8
**specialty**
99:*25*
**specific**
7:*25*  25:*16*
46:*24*  58:7
85:2
123:*25*
169:*21*
174:*4*
195:7
213:*10, 19*
223:*17*
224:8
227:*3*

232:*13*
238:*13*
240:*24*
**specifically**
32:*10*
54:*25*  57:*1*
64:*24*
72:*21*
82:*14, 16*
95:*20*
99:*18*
107:*11*
108:*14*
133:*8, 23*
148:2
157:*25*
158:2
159:*11*
166:*3*
171:8
198:*11*
200:*17*
224:*13*
231:*15, 24*
238:*13*
**specification**
155:7
**specifics**
123:7
203:*23*
**specified**
238:6
**specify**
152:*17*
155:*3*
161:*13*
**spectro**
101:2
**speculative**
132:*3*
**spelled**  43:7
**spoken**
17:*21*  20:*1*

122:*20, 22,
25*  123:*3, 5*
**spouse's**
14:6
**St**  3:8
**stamp**  120:*1*
**standard**
145:*20*
167:*4*  173:9
**standards**
68:9
122:*12, 15*
144:22
**standpoint**
93:*18*
107:*23*
113:*21*
137:9  221:7
**stands**  101:6
**stapled**
127:*10*
**start**  79:2
80:*18*
81:*13*  82:*4,
10*  126:7
173:*1*
174:*24*
175:5
**started**
112:*23*
119:*10*
**starting**
8:*14*  72:*11*
**starts**  83:*23,
25*  163:*1*
**state**  6:9
33:*15*
40:*12*
95:*12*
101:*20*
117:5
118:*19*
121:*11*
131:2

145:8
156:*11*
181:*6*
213:6
214:*4, 18*
221:*15*
236:*4, 5*
252:*1*
**stated**
52:*15*
68:*19* 76:*9*
88:*11* 89:*9*
93:*13*
94:*23* 95:*5,*
*6* 106:*23*
107:*24*
108:*10*
117:*21*
143:2
151:*6*
179:*14, 15*
192:5
197:*25*
203:*1, 14*
209:*24*
218:*11*
225:*1*
235:*3*
237:*17*
238:*11*
246:*23*
**statement**
28:*11*
69:*19*
85:*25* 86:*1,*
*8, 11, 21*
87:*1* 89:*8*
121:*17*
132:6
137:*16*
150:*8*
192:*17*
193:*15*
195:*19, 20,*

*25* 213:*18,*
*20* 214:*23*
216:*1, 11*
219:*24*
221:*18*
222:*13*
225:*7, 9*
226:*1, 2*
240:*24*
**STATES**
1:*1* 5:*17*
34:*1* 35:*8*
41:*16* 42:*9*
96:*20*
101:*17*
149:*19, 25*
173:*18, 23*
177:*22*
241:*2*
**static** 223:*6*
**stating** 86:*1*
100:*15*
181:*13*
208:*16*
225:*1*
237:*16*
**Statistical**
67:*21*
68:*11, 14*
86:*12*
93:*14*
166:*19*
245:*6*
**statistically**
59:*16*
62:*12, 22*
63:*4, 6*
67:*24, 25*
74:*25*
75:*19*
76:*17*
85:*22* 86:*4,*
*16, 24* 87:*3,*
*7* 92:*17, 22*

93:*4, 11, 21*
94:*2, 7, 13*
95:*1, 4, 14*
115:*9*
116:*24*
117:*4, 6, 14*
125:*11, 18*
154:*15*
164:*17, 19*
165:*16, 18*
166:*10, 17,*
*24* 193:*24*
194:*12, 20,*
*22*
**status** 178:*1,*
*10*
**stemmed**
135:*4*
**Steve** 10:*4*
43:*7* 233:*16*
**sticker**
116:*7* 162:*7*
**sticking**
224:*3*
**stop** 15:*17*
18:*10*
239:*15*
**stopped**
18:*4*
**straight**
6:*23*
**straightforw**
**ard** 174:*20*
**stratification**
77:*18, 19*
85:*5*
**stratify**
78:*11*
**stratifying**
77:*21*
**Street** 2:*6*
3:*3, 13*
**strength**
63:*20* 65:*2,*

*6, 10* 96:*4, 7*
240:*16*
**strengths**
49:*20*
133:*1, 3, 15,*
*22* 149:*23*
209:*25*
**stress** 203:*5*
**stretch**
160:*24*
**strong**
133:*6*
147:*7*
148:*12*
234:*8*
**stronger**
131:*15*
146:*7*
**strongly**
131:*3, 10, 18*
225:*19*
**struck** 240:*9*
**stuck** 113:*7*
**student** 53:*6*
**students**
18:*25* 19:*2,*
*3* 48:*5*
**studied**
117:*11*
**studies** 49:*8,*
*16, 17, 21*
64:*3, 15, 23*
65:*5, 8*
68:*6* 72:*4*
82:*14* 89:*6,*
*19* 92:*17, 21*
93:*2, 9, 19*
104:*21, 24*
109:*4*
117:*19*
118:*1*
126:*15*
129:*14, 24*
130:*10*

131:*9*
132:*7, 16*
133:*5, 6, 9,*
*14* 143:*8, 13,*
*18, 21* 144:*2,*
*6, 9, 24*
145:*5, 25*
146:*4, 7*
147:*10, 11*
148:*4, 5, 19*
149:*20*
150:*1, 16, 18,*
*22, 25* 156:*5,*
*7, 22, 23*
157:*3, 25*
158:*6*
159:*13*
161:*11*
169:*4, 6, 7,*
*12, 16, 18, 24*
170:*1, 3*
176:*25*
191:*9, 16*
197:*9, 10, 15*
198:*17, 18*
199:*4, 10*
200:*8, 9*
203:*24*
205:*3, 7*
209:*22*
210:*4, 7, 9,*
*13, 18, 25*
221:*22*
223:*10, 11,*
*16, 21* 224:*1,*
*9* 228:*21*
229:*1*
230:*13, 21,*
*24* 231:*1, 3,*
*4, 7* 234:*3, 4,*
*10* 235:*11,*
*14, 22, 24*
243:*20*
245:*2*

**Study** 5:17 33:*11* 48:*10, 24* 49:*12, 22, 24* 63:*10, 12, 13, 14, 17, 21* 64:*7, 10* 65:*14, 16* 67:*20* 70:*1* 72:*5, 7, 13, 20, 24* 73:*9* 74:*18* 75:*2, 4* 77:*8* 82:*13* 89:*24* 91:*4, 7* 103:*2* 105:*17* 114:*19* 120:*19* 126:*12* 128:*2* 130:*8* 132:*8, 16, 21* 133:*19* 136:*7* 146:*24* 147:*2, 5, 6, 7, 18* 148:*9, 12, 14, 16* 151:*13* 152:*16* 155:*1, 5, 20* 156:*3, 16, 20* 157:*4* 158:*19* 159:*22* 165:*6* 167:*1, 3, 6* 173:*17, 22* 175:*2* 189:*21* 190:*2, 3* 192:*4, 24* 193:*11, 18,*

*19, 22* 194:*9, 18* 209:*25* 210:*2* 211:*3, 5* 222:*23* 223:*1, 8, 15* 228:*22* 241:*14* 243:*12*
**studying** 210:*22*
**study's** 136:*8*
**stuff** 9:*13* 43:*20*

**subcategories** 62:*1*
**subgroup** 78:*1, 2* 86:*13*
**subgroups** 77:*10* 78:*1* 85:*17, 20*
**subject** 96:*22* 242:*11*
**subjective** 146:*10, 13, 22*
**subjectivity** 146:*20* 148:*21* 149:*10* 151:*8*
**subjects** 174:*13, 16*
**submitted** 8:*15, 24* 9:*8* 10:*7, 16* 12:*21* 45:*20* 113:*4* 114:*3, 4*

**subscriber** 122:*4*
**subscription** 121:*23*
**subset** 62:*18* 129:*19*
**substances** 7:*20*
**substantially** 99:*3*
**subtype** 62:*24* 196:*13* 197:*2, 10* 198:*4, 9, 24* 225:*15, 16*
**subtypes** 54:*19, 22* 55:*15* 57:*21* 62:*25* 196:*4* 197:*7, 12, 16, 17* 198:*17, 23* 199:*5, 8, 16* 225:*20* 227:*4, 7*
**sufficient** 55:*4* 56:*2, 16, 20* 89:*6, 14* 196:*10, 24*
**suggest** 24:*12* 28:*3* 32:*23* 97:*7, 8* 206:*11*
**suggested** 23:*9*
**suggesting** 88:*3* 209:*11*
**suggests** 225:*4*

**Suite** 3:*13*
**sum** 12:*23*
**summary** 5:*20* 97:*17* 211:*11, 15* 215:*14, 17*
**summer** 13:*7* 60:*13*
**supplement** 87:*12*
**Supplemental** 4:*23* 5:*6, 17* 69:*7* 104:*11, 17, 19* 127:*6, 8, 13, 17* 128:*2, 5, 24* 130:*3, 15* 152:*14, 18, 23* 153:*20* 180:*10* 181:*4, 5, 8* 182:*24* 184:*13* 185:*7* 189:*7, 11*
**Supplementary** 5:*9* 126:*25* 127:*2, 21* 128:*25* 153:*16, 17, 20*
**support** 44:*11* 90:*22* 195:*2* 200:*10* 231:*17*
**supporting** 52:*22*
**supports** 201:*18*

**supposed** 42:*18* 180:*4*
**sure** 6:*19* 21:*13, 17* 23:*15* 25:*20* 32:*20* 42:*20* 53:*4* 55:*18* 57:*15, 16* 68:*23* 96:*13* 100:*3* 106:*5* 115:*14* 118:*22* 123:*18* 124:*19* 131:*14* 142:*12* 150:*7* 153:*13* 158:*13* 170:*6* 177:*5* 221:*13* 223:*23* 227:*5, 25* 229:*25* 230:*7*
**surgeries** 78:*16* 85:*11, 12* 176:*18*
**surgery** 78:*23*
**surprising** 166:*23*
**swear** 224:*1*
**switched** 183:*14* 184:*4*
**sworn** 6:*4* 252:*7*

**synonymous**
212:*20*
**Systematic**
5:*9*  26:*21*
89:*23*
96:*11*
134:*5, 10*
137:*7, 12*

**< T >**
**Table**  5:*6, 9*
59:*6, 7, 14*
61:*18, 23*
62:*15*  63:*6,*
*8*  73:*16, 18*
77:*12*  86:*2*
90:*25*  92:*7*
93:*25*
96:*17*
116:*4, 17*
124:*6*
126:*24, 25*
127:*6, 8, 17*
128:*25*
130:*15*
146:*24*
151:*18, 25*
152:*15, 18*
153:*16, 18,*
*20*  155:*2, 6,*
*16*  157:*13,*
*23*  158:*17*
162:*18*
166:*11, 12,*
*17*  168:*11*
173:*7*
174:*6*
178:*22*
179:*25*
180:*10, 22*
181:*4, 5, 8*
182:*24*
183:*4*
184:*13, 18,*

*23*  187:*8*
188:*5, 13, 19*
189:*11*
**Tables**
127:*13, 22*
128:*2, 5*
**Taher**  90:*9,*
*20*  92:*16*
93:*25*
96:*14*
97:*10*  98:*1,*
*20*  99:*8*
147:*25*
148:*5, 19*
149:*4*
150:*4, 9, 12,*
*17, 24*
209:*21*
211:*2*
**take**  25:*1*
39:*14*  40:*1,*
*3*  48:*19*
66:*3, 11, 15*
116:*14*
135:*17*
136:*14*
160:*12, 17,*
*19, 21, 22*
171:*2*
176:*10*
177:*7*
202:*14*
212:*24*
217:*4*
220:*16*
223:*19*
227:*10*
**taken**  2:*3*
7:*12*  32:*1*
249:*8*
**talc**  4:*21*
5:*12, 16, 17*
8:*12*  9:*15*
11:*11*

12:*10*  13:*3,*
*8*  19:*4, 8, 16,*
*19*  20:*2, 21,*
*25*  21:*22*
22:*15*  23:*9*
24:*12*
25:*24*
26:*14, 17*
28:*4, 11, 14*
32:*6, 13, 14,*
*23*  33:*6, 12,*
*15*  34:*1*
35:*9*  36:*23*
37:*12*  38:*3*
39:*10*
40:*13, 17*
41:*11, 16*
42:*9*  43:*2*
49:*8*  50:*2,*
*13*  55:*4*
56:*3, 17, 20*
59:*8, 23*
60:*7*  61:*4,*
*25*  72:*11*
73:*2*  74:*17*
77:*24*
78:*13, 23*
79:*1*  80:*19*
88:*6*  90:*12,*
*18*  91:*2, 11,*
*20*  92:*8*
94:*1, 9, 25*
95:*3, 9*
96:*14*
102:*3, 5, 8,*
*10, 13, 17*
105:*4*
106:*13, 24*
108:*20, 23*
109:*1, 2, 6,*
*20, 24*  110:*9*
111:*3*
112:*11, 19,*
*20*  113:*3, 10,*

*13, 17*  115:*9*
117:*17*
120:*20*
121:*7*
128:*6, 11*
129:*5*
131:*2, 10, 18*
139:*6*
143:*10*
155:*3, 7*
162:*19*
166:*8, 15*
171:*18, 23*
173:*1, 6, 16,*
*21*  174:*13*
175:*4*
176:*17, 25*
178:*23*
179:*9, 21*
181:*18*
182:*4*
183:*21*
184:*5, 20, 25*
185:*22*
186:*2, 11*
191:*1, 4, 12,*
*14, 18*
192:*21, 23*
193:*1, 23*
194:*11*
195:*9*
196:*12*
197:*1*
199:*12*
201:*17, 21*
202:*23*
205:*22, 23,*
*25*  208:*16*
209:*1, 11*
210:*22*
211:*10, 14*
216:*8, 13, 19,*
*20, 21, 25*
218:*21*

219:*2*
220:*23*
221:*23*
222:*5, 9, 24*
223:*7, 12*
227:*19, 22*
228:*3, 17, 20,*
*23*  229:*2, 12*
230:*14, 22*
231:*3, 18, 22*
234:*17, 19*
236:*9, 20*
237:*25*
241:*3, 14, 16,*
*18*  242:*18*
246:*7*
247:*22*
**TALCUM**
1:*6*  5:*8*
81:*13*
82:*10*
134:*4, 8*
136:*18*
137:*3*
158:*18*
159:*21*
174:*24*
190:*18*
249:*1*
**talk**  28:*6,*
*18*  29:*24*
55:*13*
131:*23*
133:*24*
140:*13*
200:*16*
**talked**  27:*6,*
*10*  41:*1*
53:*12*
105:*3*
119:*11*
167:*23*
195:*14*
200:*15*

Patricia G. Moorman, Ph.D.

233:*19*
243:*6, 8*
246:*21*
**talking**
14:*18*  21:*6*
22:*17*
25:*21*
28:*19*
72:*20*  79:*7*
101:*3*
105:*7*
109:*18*
119:*11*
122:*13*
139:*15*
150:*14, 15,*
*17, 19*
166:*14*
177:*18*
196:*8*
202:*2, 17, 19*
229:*8, 11, 12*
**taught**
18:*16, 23*
48:*5*
**teach** 48:*5*
**tell** 22:*20*
27:*3*  38:*25*
48:*4*  55:*7*
58:*1*  60:*14*
82:*7*  98:*24*
113:*12*
129:*1*
179:*18*
199:*17*
221:*5*
**telling**
38:*14*  39:*22*
**tells** 67:*19*
**TEM**
100:*21*
101:*11*
**ten** 24:*2*
138:*12*

176:*23*
177:*2*
191:*12, 19*
**tend** 133:*11*
**term**
100:*21*
106:*6, 9, 12*
108:*19, 21*
110:*8*
142:*19*
**termed** 41:*7*
**terms** 13:*7,*
*25*  86:*24*
122:*17*
123:*11*
133:*15*
169:*19*
174:*23*
192:*25*
214:*4*
223:*11*
234:*8, 9*
**test** 36:*18,*
*20*  98:*14, 15*
102:*15*
**tested**
217:*20*
**testified** 6:*5*
22:*8*  90:*1*
176:*9*  205:*4*
**testify** 81:*2*
228:*7*  252:*7*
**testifying**
7:*17*  81:*4*
89:*4, 16*
170:*2*
228:*2, 5, 8*
**testimony**
11:*10*
15:*24, 25*
16:*1*  32:*21*
42:*21*
88:*22*
121:*3*

141:*21*
142:*22*
145:*7*
158:*12*
169:*14*
170:*15*
192:*1*
205:*18*
223:*11*
239:*8, 11*
252:*13*
**testing** 7:*22*
101:*25*
217:*25*
**Texas** 10:*5*
**text** 186:*16*
188:*4*
224:*10*
**textbook**
71:*22*  210:*8*
**Thank** 8:*2*
26:*12*
36:*19*  43:*4*
61:*12*
66:*16*
73:*19*
92:*15*
130:*20*
137:*1*
184:*15*
199:*20*
201:*13*
207:*2*
211:*22*
229:*24*
244:*2*  245:*9*
**Thanks**
31:*4*  96:*19*
**theoretic**
178:*3, 4, 5*
**theoretical**
178:*14*

**theory**
108:*15*
222:*5*
**thing** 6:*19*
32:*16*
68:*19*
123:*20*
125:*20*
160:*16*
201:*5*
219:*14, 17*
**things**
47:*24*
150:*15*
177:*5, 21*
201:*1, 14*
203:*3*
**think** 13:*10*
15:*19*
20:*13, 18*
24:*9*  28:*6,*
*8, 9, 11*  29:*9*
32:*16*
33:*22*  44:*1,*
*11*  47:*4, 11*
49:*1*  53:*4,*
*7, 11*  56:*11*
64:*18*  67:*3,*
*12*  69:*1*
70:*23*  72:*8*
74:*2*  76:*1,*
*13*  78:*19*
81:*6*  86:*19*
87:*5*  88:*19*
89:*17*  92:*2*
97:*4, 5, 18*
100:*22*
104:*25*
105:*11*
112:*7, 8*
114:*17, 25*
115:*4*
116:*16*
125:*12*

126:*6, 8, 9*
129:*22, 23*
130:*6*
137:*2, 5, 15*
138:*13*
139:*4*
140:*1, 15*
141:*18*
142:*5, 6, 15*
145:*2*
147:*5, 6, 23*
148:*13*
150:*17, 19,*
*20, 21*  153:*5*
158:*22*
172:*13*
176:*12*
177:*17*
179:*12, 19*
180:*11*
181:*5*
182:*23*
183:*16*
190:*14*
192:*3, 16*
193:*3, 15*
195:*4, 8, 24*
196:*10, 24*
197:*15*
198:*3, 8*
199:*11*
200:*13*
201:*9, 14*
202:*23*
206:*5, 15*
207:*3, 16*
208:*11*
209:*4, 20, 24*
210:*6*
211:*17*
213:*24*
214:*1*
216:*2, 6*
221:*6*

222:*12, 13, 15* 223:8
225:8
234:*5*
235:*6, 9, 16, 17* 236:*1, 2, 23* 237:*10*
238:*25*
243:*17*
**thinking**
78:*4*
**thinks** 69:*6*
**thorough**
16:*21*
26:*20* 28:8
**thoroughly**
109:*14*
**thought**
11:*15*
16:*20*
23:*21* 29:*4*
92:*1* 149:*7, 16* 151:*10*
159:*4*
163:*16*
175:*22*
189:*17*
190:*21*
193:*14*
207:*6*
240:*10, 14, 15*
**three** 101:*6*
142:*16*
221:8
232:*6, 9, 18*
**ties** 48:*25*
**till** 18:*7*
30:*15*
**time** 6:*20*
18:*11, 16*
21:8, *25*
32:*5, 6*
55:*10*

64:*17, 22*
65:*2, 16, 22*
71:*14* 77:*6*
99:*19*
109:*15*
112:*24*
120:*1*
138:*11*
160:*13*
167:*10, 11*
178:*24*
179:*21*
180:*6*
187:*24*
190:*25*
223:*4*
231:*25*
233:*21*
235:*4*
242:*24*
244:*8*
**times** 7:*6*
60:*10, 12*
125:*13*
137:*19*
138:*4, 10, 12, 18* 139:*19*
141:*4*
142:*16*
145:*14, 16*
155:*1, 8, 10, 15, 17, 24*
156:*6, 7, 12, 18, 24, 25*
157:*8, 12, 21*
158:*2, 9*
159:*11, 19*
162:*22, 23*
163:*19*
164:*1, 20, 22, 23* 165:*2, 10, 11, 12* 170:*5*
201:*20*
217:*20, 24*

218:*3*
233:*7*
243:*18*
**tired** 217:*2*
223:*17*
227:*11, 12*
**TISI** 3:*8*
**tissue**
225:*25*
**title** 46:*25*
115:*23, 25*
120:*2*
134:*1*
158:*16*
**titled** 4:*11*
25:*5* 231:*10*
**titles** 46:*24*
**today** 11:*6*
26:*6* 35:*7*
36:*1* 40:*11*
44:*21*
88:*11*
139:*7*
170:*2, 11*
172:*24*
197:*7*
198:*14*
228:*15*
242:*14*
246:*21*
**told** 11:*16*
32:*18*
57:*24*
84:*19*
95:*16*
103:*20*
204:*20*
213:*3* 235:*7*
**top** 20:*7*
50:*11*
59:*13* 68:*8*
136:*16*
158:*4*
183:*18*

185:*24*
195:*5*
196:*5, 7*
199:*6, 14*
209:*14*
213:*6*
217:*17*
225:*3*
**topic**
111:*22*
209:*17*
226:*19*
233:*20*
246:*7*
247:*21*
**topics** 37:*23*
**total** 8:*16*
9:*14, 21*
12:*23* 59:*1, 3, 5* 60:*16*
173:*11*
219:*5*
**totally**
63:*19*
141:*5* 216:*3*
**town** 67:*2*
**Toxicology**
4:*20* 90:*11*
**tract** 59:*12*
78:*5* 86:*10*
87:*5, 8*
205:*23*
**tracts** 77:*15*
78:*7, 9*
**train** 207:*6*
**TRANGLE**
3:*17* 12:*15*
25:*10, 14, 18, 22* 26:*10*
82:*23*
101:*1*
160:*15*
161:*25*
163:*4*

167:*17, 19*
189:*4*
215:*8, 11, 15*
245:*22*
**transcript**
249:*7*
**transformati
on** 206:*19*
**translates**
221:*15*

**Transmission**
100:*25*
101:*5, 7*
**transparent**
140:*1*
143:*23*
145:*23*
**tremolite**
106:*21*
**trend** 95:*7*
**trends**
232:*24*
**trial** 40:*23*
228:*2, 5, 6, 7*
**Triangle**
17:*13*
**tried** 49:*22, 23* 235:*19*
**Trish** 9:*18*
**true** 99:*2*
172:*19*
192:*17*
193:*16*
229:*15, 21*
245:*3*
249:*10*
252:*13*
**truly** 52:*1*
71:*2*
142:*14*
146:*11*
**truth** 252:*8*

Patricia G. Moorman, Ph.D.

try 23:*15*
55:*8* 229:*15*
trying 11:*1,*
*3* 14:*17*
29:*23* 41:*5*
70:*23*
137:*6*
152:*5, 23*
163:*24*
169:*24*
184:*8*
195:*4*
223:*25*
230:*24*
tubal 78:*16,*
*20* 176:*9, 15,*
*18, 23*
tubes
151:*16*
153:*24*
154:*18*
161:*12*
176:*19*
206:*13*
225:*23*
226:*8, 14*
Tuesday
1:*15*
tumor 62:*3*
turn 83:*21*
90:*25*
102:*3*
126:*24*
149:*18*
211:*18*
213:*5*
twice
169:*15*
215:*23*
twice-per-
week 169:*17*
Two 5:*17*
7:*6* 13:*13*
29:*9, 11, 15*

30:*6* 44:*20*
45:*23*
86:*23, 25*
113:*24*
114:*6, 7*
150:*14*
173:*17, 22*
179:*21*
212:*13*
233:*3*
type 58:*2*
100:*23*
119:*25*
215:*22*
types 208:*9*
225:*5, 10*
typewriting
252:*12*
typical
40:*16*
75:*15*
128:*1*
138:*13*
143:*25*
144:*21*
176:*14*
190:*25*
191:*11*
typically
52:*8* 76:*14*
78:*19* 79:*2*
113:*1*
114:*14*
139:*13*
140:*13*
143:*3*
169:*23*
170:*25*
176:*10*
206:*9*
typo 183:*3,*
*4* 184:*2, 4*
187:*17*
188:*2*

typographica
l 182:*10*

< U >
Uh-huh
13:*17*
15:*11, 20*
30:*25*
81:*17* 84:*4*
116:*18*
119:*13, 16*
121:*20*
129:*3*
151:*19*
162:*14*
173:*3*
174:*8*
179:*23*
180:*3*
181:*3, 12, 16,*
*25* 183:*1, 7,*
*9* 184:*19*
200:*18*
209:*2*
225:*17*
241:*20*
243:*13*
247:*13*
ultimate
235:*23*
ultimately
70:*11*
unaware
103:*21*
126:*23*
213:*3*
UNC 16:*23*
18:*3, 7*
22:*14, 24*
23:*2, 4, 9*
24:*11* 53:*3*
uncertainty
95:*10*

Unclear
172:*10*
uncommon
210:*11*
underestimat
e 245:*3*
undergone
210:*18*
underlie
214:*20*
215:*19*
underlying
170:*3*
underreprese
ntation
105:*3*
understand
10:*9* 14:*17*
16:*13* 30:*3*
35:*12* 36:*8*
63:*19* 76:*8*
120:*21*
124:*19*
134:*23*
139:*4*
160:*18*
165:*24*
208:*20*
214:*19*
215:*18*
227:*25*
understandin
g 7:*16*
73:*10*
159:*3*
216:*4, 7*
238:*22*
249:*13*
Understood
75:*12*
114:*16*
136:*19*
137:*10*

unearned
14:*15*
UNITED
1:*1* 101:*17*
241:*2*
universe
68:*17*
universities
22:*18*
University
13:*7* 22:*19*
110:*17*
unpublished
99:*8, 16*
unusual
240:*10, 15*
update
27:*20*
updated
18:*8* 21:*19*
27:*13, 16, 17*
44:*16, 24*
45:*11* 64:*20*
Use 4:*13,*
*16, 21* 5:*1, 8,*
*14, 16* 22:*15*
41:*7, 11*
49:*22* 55:*4*
56:*3, 17*
58:*11, 15*
59:*14, 23*
60:*8, 11, 12,*
*18* 61:*4, 25*
62:*8* 72:*6,*
*19* 73:*2*
74:*17* 79:*1,*
*4* 81:*14, 21*
82:*15* 83:*3,*
*9* 85:*22*
86:*16* 87:*7*
90:*12, 18*
91:*2, 11, 20*
92:*8* 93:*14*
94:*9* 95:*13*

96:*13*
113:*1*
115:*10*, *18*
116:*1*
117:*16*
120:*20*
128:*6, 7, 11*
131:*3, 4, 18*
134:*3, 8*
136:*18*
137:*4, 8, 19*
138:*3, 22*
139:*8, 15*
140:*22*
141:*8, 15, 18*
142:*2*
144:*6*
145:*16*
146:*21*
151:*12, 13*
153:*11*
155:*4, 13, 15, 17*  156:*6, 13, 18*  157:*8, 13, 22*  158:*6, 9, 18*  159:*6, 20, 21*  162:*20*
163:*8, 13*
165:*19, 22*
166:*3, 8, 9, 15*  167:*2, 8, 25*  168:*8, 10, 12, 20, 25*
170:*12, 22*
171:*18, 23*
173:*6, 8, 12, 16, 21*  174:*2, 6, 13, 15*
176:*17, 25*
177:*23*
178:*20, 23*
179:*2, 10, 20, 24*  180:*1, 15*
181:*18, 20*

182:*3, 14*
183:*5, 21*
184:*5, 20, 25*
185:*16, 22*
186:2, *11*
187:*6, 10, 11*
188:*8, 11, 14, 20, 23*
189:*22*
190:*2, 13, 14, 15, 19*  191:*1, 4, 6, 14, 17, 18*  192:*6, 24*
193:*23*
194:*11*
199:*12*
213:*23*
214:*7, 21*
215:*20*
221:*23*
222:*9, 24*
236:*9, 20*
241:*14, 16, 18, 21*
242:*18*
243:*24*
**useful** 159:*4*
**users**
140:*23*
154:*21*
159:*9*
191:*15*
192:*21, 23*
**uses** 142:*19*
191:*12*
**usually**
46:*20*
69:*23*  71:*8*
190:*19*
215:*6*

**< V >**
**Vaguely**

27:*11*
**valid** 245:*1*
**value** 74:*15*
85:*19*  86:*3, 25*  209:*21*
**values**
68:*10, 20*
76:*4*  117:*9*
125:*10, 17*
128:*21*
193:*8*
**variation**
126:*11*
191:*13*
**varied** 64:*6*
**variety**
60:*11*
**various**
48:*7*  49:*8*
61:*25*  72:*3*
79:*5*  81:*21*
104:*21, 24*
118:*1*
169:*25*
233:*9*
234:*10*
**vary** 225:*14, 15*
**vast** 93:*18*
**versa** 71:*4*
**version**
76:*23*
99:*14*
113:*25*
114:*2, 12, 14*
116:*10, 12*
124:*11*
127:*4*
171:*25*
**versions**
113:*24*
114:*7, 10*

**versus**
70:*12*
148:*4*  157:*3*
**vice** 71:*4*
**view** 22:*11*
148:*25*
226:*5*
**views** 22:*12*
**virtually**
210:*17*
**vision** 98:*15*
**voice** 66:7
**volume**
129:*16*

**< W >**
**wager**
202:*13*
**wait** 30:*15*
61:*13*
79:*11*  84:*6*
86:*5*  121:*2*
158:*22*
180:*23*
185:*4*
187:*18*
188:*6*  237:*2*
**want** 18:*13*
29:*16*
30:*11*
34:*21*
37:*15*
38:*20*
39:*14, 18*
42:*20*
58:*20*  66:*3, 6, 10*  69:*6*
75:*5*  81:*4, 25*  82:*5*
84:*11, 15*
116:*9, 10*
118:*22*
122:*3*
158:*13*

160:*12, 17*
173:*4*
189:*2*
196:*6*
201:*25*
202:*14*
217:*12*
220:*4, 7*
230:*6*
236:*12*
**wanted**
36:*13*  75:*8*
85:*2*
101:*12*
139:*21*
141:*3, 23*
143:*8*
159:*2*
173:*2*
221:*13*
**Washington**
3:*4*
**way** 19:*6, 19*  49:*11, 15*
53:*5*  82:*1*
93:*15*
102:*12, 15*
111:*21*
125:*12*
129:*17*
146:*13*
170:*24*
214:*2*
**ways** 222:*11*
**weak**
214:*20*
215:*19*
**weaker**
146:*8*
**web** 23:*4*
**website**
21:*9, 12, 25*
22:*6, 24*
23:*5*  24:*14,*

Patricia G. Moormann, Ph.D.

19, 25   25:11
26:9   32:2
**websites**
23:10
**week**  99:21
137:20
138:4, 10, 18
139:19
141:4
145:14, 16
155:2, 8, 11,
15, 17, 24
156:6, 7, 12,
18, 24, 25
157:8, 12, 22
158:2, 9
159:12
164:21, 23
165:2, 12
168:22, 23
169:15
170:5, 7, 23
242:24
243:18
**weighed**
49:11   52:11
**weighing**
49:12
123:15
**weighs**  49:2
**weight**
48:23   49:6,
16, 17   65:24
67:9   88:8
114:19
234:9
**weighted**
234:6
**weighting**
136:8
**weights**
49:10   234:3
**Well**  8:13
10:20   13:5

16:1   18:5
25:1, 22
28:22   35:5
46:11, 14
47:12   55:9
73:13
77:23   80:5
84:11
91:12, 21
94:23
105:16, 21
108:19
122:1
133:19
136:19
137:10
138:17
146:18
148:15
149:14
166:18
168:21
172:9
177:14
178:8
181:8
186:3
187:15
188:3
190:9
193:13
196:19
207:16
212:19
223:4
228:4, 9
230:10
238:2, 24
239:2   243:8
**well-
conducted**
133:6

**well-
designed**
147:6
**well-
established**
206:3
**well-
regarded**
54:16
**well-
respected**
20:13   212:2
**went**  21:8
26:20
155:25
156:21
166:3
177:17
194:17
223:7
**Wentzensen**
52:4, 12
53:23   54:4
172:4, 8
211:8, 16
214:18
221:14
222:17
224:4
225:3
241:7
246:20
**we're**  25:21
29:14
30:20   34:6
41:4   58:9,
16   59:13
69:15
82:19, 21
90:16
115:24
119:9
127:12
139:7

153:1, 15
155:6
162:4
178:15
189:9
202:2, 17, 19
209:9
**West**  3:18
**we've**  13:23
27:6   46:2
160:9
209:4
219:18
227:9
**whack**
12:24
**WHEREOF**
252:20
**WHI**  65:19,
21
**white**
117:12, 17

**Whittenmore**
148:7, 9
**Whoa**
229:17, 18
**wide**  191:13
**wildly**  12:24
**wind**  146:22
**witness**  2:2
8:3, 22
9:20   12:20
13:15
22:17   24:6
26:13
27:15
28:21   29:8
30:21
31:24   32:9
34:7, 10, 20
35:4, 10
36:5   37:2
40:15

42:13, 25
44:3, 9
48:4   49:19
50:6, 17
51:21
52:14
53:10, 19
56:19
57:11   60:4
61:6, 8
63:16
65:15   66:8
67:12, 16
73:17   74:1,
5   76:1
79:9   84:11
88:23
91:23   92:6
93:13
94:19
103:20
107:4, 11
108:9
110:5
111:14, 18
118:9, 18
120:22
126:6
127:11
128:20
129:9
132:5
135:6
136:1
137:2
138:6
139:11
140:11
141:22
142:14
143:2
144:20
149:6
150:7

Patricia G. Moorman, Ph.D.

| | | | | |
|---|---|---|---|---|
| 151:*4* | 227:*12* | 125:*1, 22* | 138:*3* | **written** |
| 153:*3, 19* | 230:*18* | 126:*14* | 148:*4, 8, 17* | 28:*4*  33:*20* |
| 154:*13* | 231:*21* | 129:*19* | 149:*1, 19* | 50:*3, 14* |
| 155:*19* | 232:*11, 20* | 130:*23* | 151:*12* | 51:*10, 17* |
| 156:*15* | 234:*22* | 131:*5, 16* | 152:*12* | 53:*21* |
| 157:*16, 24* | 236:*14, 22* | 132:*9* | 154:*2* | 233:*8* |
| 158:*13, 24* | 237:*15* | 136:*17* | 161:*9* | 241:*6* |
| 159:*1, 25* | 238:*22* | 139:*21* | 165:*19, 21* | 244:*17* |
| 160:*7, 18, 23* | 239:*12* | 141:*3* | 168:*1* | **wrong** |
| 162:*1* | 240:*7* | 143:*9* | 169:*1* | 70:*24* |
| 163:*3, 12* | 247:*6* | 151:*13, 16* | 170:*13* | 88:*15* |
| 164:*5* | 252:*10, 14,* | 152:*1, 9, 16* | 243:*1, 2, 5,* | 163:*17* |
| 165:*5* | *20* | 153:*22, 23* | *10* | **wrote**  33:*18* |
| 166:*2* | **woman** | 154:*3, 14, 17,* | **word**  16:*18* | 113:*22* |
| 170:*16* | 176:*19* | *18*  155:*13* | 40:*20, 21* | 114:*1* |
| 175:*14, 21* | 191:*11* | 159:*6* | 83:*24, 25* | 238:*6, 9* |
| 176:*22* | 201:*25* | 161:*12* | 84:*8*  141:*19* | 244:*9* |
| 178:*13* | **Women**  5:*2,* | 173:*1, 11* | **work**  8:*14* | 245:*24* |
| 180:*17, 25* | *4*  19:*13* | 174:*9, 23* | 15:*21* | **Wu**  161:*15,* |
| 181:*10* | 22:*14*  58:*2* | 175:*4* | 18:*12* | *23, 24, 25* |
| 182:*23* | 59:*1, 6, 10,* | 176:*10* | 32:*25*  33:*2* | 162:*1, 9* |
| 184:*14* | *11, 24*  60:*8* | 179:*7, 8* | 52:*22*  53:*3,* | 223:*15, 24* |
| 185:*14* | 61:*5*  64:*8* | 180:*14* | *13*  54:*1, 6* | **W-U**  162:*2* |
| 186:*7, 10* | 70:*1*  72:*8* | 190:*17* | 96:*9* | |
| 187:*20, 25* | 77:*13, 14, 18,* | 191:*1, 18* | 113:*16* | **< X >** |
| 191:*3* | *19, 21*  78:*7,* | 193:*1* | 122:*7* | **X-ray**  100:*4,* |
| 192:*2* | *11, 12, 17, 19* | 201:*23* | 134:*23* | *6* |
| 194:*3, 14* | 79:*1*  80:*18* | 202:*13* | 171:*1* | **XRD**  100:*1* |
| 196:*17* | 81:*13, 21* | 224:*23* | 172:*8* | |
| 197:*6, 24* | 82:*4, 10* | 241:*14, 15,* | 218:*9, 17* | **< Y >** |
| 198:*13* | 85:*7, 10* | *16* | **worked** | **Y'all**  101:*5* |
| 199:*3, 23* | 86:*9, 13* | **Women's** | 43:*6*  96:*11* | **Yeah**  10:*13* |
| 200:*18, 25* | 87:*4*  89:*13* | 65:*19, 21* | 170:*25* | 13:*15* |
| 202:*6* | 91:*8*  94:*9,* | 132:*8, 22* | **working** | 16:*10, 14, 17,* |
| 204:*12, 14,* | *11, 15, 25* | **wondering** | 48:*11* | *25*  17:*15* |
| *20*  205:*20* | 95:*2* | 28:*2* | **works**  17:*18* | 25:*18* |
| 207:*4, 14* | 102:*13* | **wonky** | **worried** | 27:*25*  30:*8,* |
| 208:*7* | 115:*10, 19* | 124:*11* | 23:*20* | *14*  47:*7* |
| 209:*14* | 116:*2, 22* | **Woolen** | **worse** | 51:*1*  66:*8* |
| 214:*12* | 117:*8, 11, 12,* | 104:*5* | 192:*25* | 83:*12* |
| 217:*3, 14* | *16, 17* | 133:*25* | **write**  40:*17* | 102:*24* |
| 218:*11* | 119:*23* | 134:*2, 14* | 83:*1*  233:*12* | 111:*8, 10, 14,* |
| 221:*6* | 120:*4* | 135:*18, 22* | **writing** | *18*  114:*9* |
| 226:*10, 22* | 124:*13, 23* | 136:*5* | 16:*7*  42:*25* | 119:*21* |

Patricia G. Moorman, Ph.D.

| | |
|---|---|
| 122:*21* | 102:*16* |
| 153:*11, 21* | 120:*14* |
| 160:*21* | 122:22 |
| 162:*12* | 132:*10* |
| 163:*5* | 163:*2, 4, 8,* |
| 164:25 | *12, 16, 17, 19,* |
| 167:*10* | *25*  165:*9* |
| 168:*5, 14* | 173:*12* |
| 169:*18* | 176:*24* |
| 174:*16, 25* | 177:2 |
| 180:25 | 190:*19* |
| 183:*19* | 191:*12, 19* |
| 184:*21, 24* | 201:*24* |
| 185:*14* | **yep**  152:25 |
| 186:7 | **yesterday** |
| 187:*20, 25* | *7:4* |
| 189:*4, 5* | **York**  3:*18* |
| 200:25 | **Yorker**  24:*4* |
| 201:*12* | **you-all** |
| 207:7 | *47:12* |
| 215:*12* | **young**  72:8 |
| 217:*3, 8* | **younger** |
| 237:*15* | *131:4, 11, 20* |
| 242:*13* | *174:14* |
| 243:*3*  247:*3* | |
| **year**  18:*19* | **< Z >** |
| 60:*13* | **Zantac**  15:*3,* |
| 190:*14* | *6, 14*  20:*4* |
| 192:7  222:*8* | *233:15* |
| **years**  13:*3* | *234:2, 19* |
| *15:3*  16:*10,* | *235:1, 12, 21* |
| *17*  17:2 | *236:4* |
| *20:6*  37:*8* | *240:19* |
| 53:25  54:2 | **Zoom** |
| *55:17, 21* | *177:14* |
| *60:13, 18* | |
| *64:21* | |
| *65:11, 17, 23* | |
| *66:25*  70:7 | |
| *94:1, 10, 12,* | |
| *15, 25*  95:*3,* | |
| *12, 15, 22, 23* | |
| *96:12* | |
| *99:11* | |