# EXHIBIT 9

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF NEW JERSEY

 3                        --o0o--

 4   IN RE:  JOHNSON & JOHNSON TALCUM

     POWDER PRODUCTS MARKETING, SALES   MDL NO. 16-2738

 5   PRACTICES, AND PRODUCTS LIABILITY  (FLW) (LHG)

     LITIGATION

 6   -------------------------------

 7   This Document Relates to All

     Cases and Also to:                 Case No.

 8                                       1422-CC09326-03

     Valerie Swann v. Johnson &         Division 10

 9   Johnson, et al.,

10   _____/

11

12              ATTORNEYS EYES ONLY DESIGNATION


                        --  -- --
13

                   FRIDAY, OCTOBER 1, 2021
14

                        --  --  --
15          In-Person Stenographic Deposition of REBECCA

     SMITH-BINDMAN, M.D., conducted at the La Meridian

16   Hotel, 333 Battery Street, San Francisco, California,

     beginning at 9:40 a.m. Pacific Time, before Sandra

17   Bunch VanderPol, FAPR, RMR, CRR, CSR #3032

18                      --  --  --

19

20

21

22   _____

23            GOLKOW LITIGATION SERVICES

               877.370.3377 ph/917.591.5672
24               Deps@golkow.com

25
```

Attorneys' Eyes Only

Page 2

1  APPEARANCES:
2
   For the Plaintiffs:
3
      LEIGH O'DELL, ESQUIRE
4     MARGARET THOMPSON, ESQUIRE (Via Zoom)
      Beasley, Allen, Crow, Methvin, Portis &
5     Miles, P.C.
      218 Commerce Street
6     Montgomery, Alabama 36104
      (800) 898-2034
7     Leigh.Odell@BeasleyAllen.com
8  -and-
9     DANIEL R. LAPINSKI, ESQUIRE (Via Zoom)
      Motley Rice LLC
10    210 Lake Drive East, Site 101
      Cherry Hill, New Jersey 08002
11    (856) 667-0500
      Dlapinski@motleyrice.com
12
13  For the Defendant Johnson & Johnson:
14    MICHAEL C. ZELLERS, ESQUIRE
      Tucker Ellis LLP
15    515 South Flower Street, 42nd Floor
      Los Angeles, California 90071
16    (213) 430-3420
      Michael.Zellers@tuckerellis.com
17
      -and-
18
      JESSICA BRENNAN, ESQUIRE (Via Zoom)
19    Faegre Drinker Biddle & Realth LLP
      600 Campus Drive
20    Florham Park, New Jersey 07932-1047
      (973) 549-7164
21    jessica.brennan@faegredrinker.com
22
23  Also Appearing Via Zoom:  Christine Haas, Principal
    Campus Counsel UCSF
24
25              --o0o--

Page 3

1              I N D E X
2  Examination by:                    Page
3  MR. ZELLERS                         6
   MS. O'DELL                          202
4  MR. ZELLERS                         226
5              --o0o--
6
7          E X H I B I T S
8  Exhibit #     Description      Page
9  Exhibit 1   Defendants Johnson & Johnson    7
               Consumer Inc. And Johnson &
10             Johnson's First Set of Requests
               for the Production of Documents to
11             Rebecca Smith-Bindman, MD; 7 pages
12  Exhibit 2   MDL Notice of Oral and Videotaped   9
               Deposition of Rebecca
13             Smith-Bindman, MD and Duces Tecum;
               9 pages
14  Exhibit 3   Defendants Johnson & Johnson and   9
               Johnson & Johnson Consumer
15             Companies, Inc.'s Notice With
               Subpoena Duces Tecum of Deposition
16             of Rebecca Smith-Bindman, MD;
               7 pages
17
   Exhibit 4   September 22, 2021 Production,    12
18             multiple documents
19  Exhibit 5   September 27, 2021 Production,    13
               multiple documents
20
   Exhibit 6   September 29, 2021 Production,    13
21             multiple documents
22  Exhibit 7   Unredacted Production; 10 pages   13
23  Exhibit 8   Dr. Smith-Bindman's Invoices,    17
               dated June 2017 through September
24             2021, multiple pages
25  ///

Page 4

1              E X H I B I T S
2  Exhibit #     Description          Page
3  Exhibit 9   Amended Expert Report of Rebecca   18
               Smith-Bindman, MD; 123 pages
4
   Exhibit 10  Rule 26 Expert Report of Rebecca   19
5              Smith-Bindman, MD; 113 pages
6  Exhibit 11  Redline - Amended Expert Report of  19
               Rebecca Smith-Bindman, MD;
7              206 pages
8  Exhibit 12  Exhibit A:  Curriculum Vitae of   20
               Rebecca Smith-Bindman, MD;
9              35 pages
10  Exhibit 13  Exhibit B:  Scientific Literature   21
               and Other Sources List; 29 pages
11
   Exhibit 14  Exhibit C:  Rebecca Smith-Bindman,  23
12             MD, Medical/Legal Testimony in
               last 5 years; 2 pages
13
   Exhibit 15  Updated and current Curriculum    21
14             Vitae of Rebecca Smith-Bindman, MD
               (to be proved by Plaintiffs'
15             Counsel to court reporter)
16  Exhibit 16  Dropbox Production, multiple pages  25
17  Exhibit 17  2016 Cramer article titled, "The   162
18             Association Between Talc Use and
               Ovarian Cancer," A Retrospective
19             Case-Control Study in Two US
               States," published in
20             "Epidemiology"; 36 pages
21  Exhibit 18  2004 Mills publication titled,    162
               "Perineal Talc Exposure and
22             Epithelial Ovarian Cancer Risk In
               the Central Valley of California,"
23             published in "Cancer"; 7 pages
24  Exhibit 19  1997 Chang publication titled,    166
               "Perineal Talc Exposure and Risk
25             of Ovarian Carcinoma"; 6 pages

Page 5

1              E X H I B I T S
2  Exhibit #     Description          Page
3  Exhibit 20  1997 Cook publication titled,     167
               "Perineal Powder Exposure and the
4              Risk of Ovarian Cancer," published
               in "American Journal of
5              Epidemiology"; 7 pages
6  Exhibit 21  2000 Gertig article titled,     168
               "Prospective Study of Talc Use and
7              Ovarian Cancer" published in the
               "Journal of the National Cancer
8              Institute"; 4 pages
9  Exhibit 22  2021 Health Canada Screening      173
               Assessment; 71 pages
10
   Exhibit 23  O'Brien publication, "Association  202
11             of Powder Use in the Genital Area
               With Risk of Ovarian Cancer,"
12             published in JAMA; 11 pages
13
14
15
              --o0o--
16
17
18
19
20
21
22
23
24
25

Attorneys' Eyes Only

Page 6

1    BE IT REMEMBERED that on Friday, the 1st
2  day of October, 2021, commencing at the hour of
3  9:40 a.m. Pacific Time, conducted at the Le Meridian
4  Hotel, 333 Battery Street, San Francisco, California,
5  before me, Sandra Bunch VanderPol, a Certified
6  Shorthand Reporter in and for the State of
7  California, personally appeared.
8        REBECCA SMITH-BINDMAN, M.D.,
9      Expert witness herein, who, having been duly
10 sworn, was thereupon examined and interrogated as
11 hereinafter set forth.
12           --o0o--
13    THE REPORTER:  Raise your right hand,
14 please.
15    Do you solemnly swear or affirm that the
16 testimony you are about to give in this proceeding
17 will be the truth, the whole truth, and nothing but
18 the truth, so help you God?
19    THE WITNESS:  I do.
20           EXAMINATION
21 BY MR. ZELLERS:
22 Q.    Can you state your name for the record,
23 please.
24 A.    Rebecca Smith-Bindman.
25 Q.    Dr. Smith-Bindman, my name is Michael

Page 7

1  Zellers, and I am here today on behalf of the
2  Johnson & Johnson defendants, both in the MDL talc
3  ovarian cancer MDL proceeding and also for the
4  Missouri State Court of Swann.
5    I have got some questions for you.  Any
6  reason that we cannot proceed?
7  A.    No.
8           (Exhibit No. 1 was marked.)
9  BY MR. ZELLERS:
10 Q.    I have placed in front of you a number of
11 documents, which are exhibits to this deposition.  So
12 what I would like to do with you at the outset is go
13 through those documents and just ask you some
14 questions and have you confirm what those documents
15 are.
16    Deposition Exhibit 1 is the request for
17 production relating to your unpublished study; is
18 that correct?
19 A.    Yes.
20 Q.    You will see that that document request --
21 withdraw that.
22    The deposition notice includes a document
23 request, and you have seen that request for
24 production before; correct?
25 A.    I have, yes.

Page 8

1  Q.    And have you worked with counsel for the
2  plaintiffs to respond to that request for production?
3  A.    Yes, I have.
4    MS. O'DELL:  I will just state for the
5  record, we have worked with Dr. Smith-Bindman
6  consistent with Judge Schneider's rulings in this
7  case to produce all of the materials in her custody
8  and control in response.
9  BY MR. ZELLERS:
10 Q.    Dr. Smith-Bindman, you understand when I use
11 the word "unpublished study," that we're referring to
12 the study that's referenced in the request for
13 production of documents that have been marked as
14 Exhibit 1; correct?
15 A.    Yes.
16 Q.    Have you, to the best of your knowledge,
17 produced all documents that are responsive to the
18 request for production relating to your unpublished
19 study?
20 A.    Yes.
21 Q.    Are there any additional documents that you
22 believe need to be produced or may be produced at
23 some later time?
24 A.    No.
25 Q.    Any other searches you need to make for

Page 9

1  documents responsive to Deposition Exhibit 1?
2  A.    No.
3           (Exhibit No. 2 was marked.)
4           (Exhibit No. 3 was marked.)
5  BY MR. ZELLERS:
6  Q.    Deposition Exhibit 2 is the MDL Notice of
7  Deposition for today.  And Deposition Exhibit 3 is
8  the deposition notice in the Swann case; is that
9  correct?
10 A.    Yes.
11 Q.    Both Deposition Exhibit 2 and 3 request that
12 you bring certain documents or produce certain
13 documents in connection with this deposition.  Do you
14 see that?
15 A.    I do.  I'm not sure that I saw the notice
16 about the Swann case.
17 Q.    I received the notice of the Swann case
18 yesterday evening.  So --
19    MS. O'DELL:  I'm not sure I have seen the
20 notice to the Swann case either.  But there may be
21 some objections on the requests.  I need to make the
22 objection on the record.  I can do that now and you
23 could ask Dr. Smith-Bindman questions.
24    MR. ZELLERS:  You are reserving all your
25 rights to objections to the deposition notice, which

Page 10

1  we marked as Exhibit 3.
2  Q.      Dr. Smith-Bindman, is it correct that you
3  did see the deposition notice for the MDL deposition,
4  which we marked as Exhibit 2?
5  A.      Yes, I did.
6  Q.      Through counsel for plaintiffs, have you
7  responded to that deposition notice and request for
8  documents?
9  A.      I have.
10 Q.      Have you produced all responsive documents
11 to the deposition notice, Exhibit 2?
12 A.      I did.
13     MS. O'DELL:  Sorry.  I'm just going to have
14 to cite that Dr. Smith-Bindman has brought with her
15 all documents responsive or that have been produced
16 in advance of the deposition, other than those
17 subject to work product privilege or other -- or
18 other privilege.
19 BY MR. ZELLERS:
20 Q.      Dr. Smith-Bindman, have you brought any
21 documents to the deposition, in terms of hard copies?
22 A.      I have a copy of my expert report.
23 Q.      All right.  What else?
24 A.      I have a copy of what I'm calling my
25 subsequent research, the research that you've asked

Page 11

1  about.
2  Q.      And excuse me for interrupting.  When you
3  say "subsequent research," is that a copy of your
4  unpublished study?
5  A.      Yes.
6  Q.      Anything else that you have brought with you
7  today?
8  A.      And I happen to have a copy of an article.
9  Q.      What article did you bring with you?
10 A.      It was one I was reading -- actually, I have
11 two articles.  One is Wentzensen, and the other is by
12 O'Brien.
13 Q.      The O'Brien paper, is that her paper that
14 was published in JAMA --
15 A.      Yes.
16 Q.      -- in 2020?
17 A.      Yes.
18 Q.      The Wentzensen paper, that is a paper that
19 was published this year; is that right?
20 A.      That's right.  O'Brien is also in that paper
21 as an author.  It was published after the systematic
22 review.
23 Q.      Any other documents that you have brought
24 here with you today?
25 A.      No.

Page 12

1  Q.      Is there a reason that you brought hard
2  copies of the Wentzensen 2021 and O'Brien 2020
3  articles with you?
4  A.      The O'Brien was one of the articles that was
5  used when I updated my Amended Expert Report.  And
6  the Wentzensen, no, I was just in the middle of
7  reading it, so I have it with me.
8             (Exhibit No. 4 was marked.)
9  BY MR. ZELLERS:
10 Q.      Deposition Exhibit 4 is the first group of
11 documents that were produced in response to the
12 request for production relating to your unpublished
13 study, which we marked as Deposition Exhibit 1; is
14 that right?
15 A.      Could you say that one more time?
16 Q.      Sure.
17     We have received a total of four productions
18 from counsel for plaintiffs responsive to the request
19 for production for unpublished study, which we have
20 marked as Deposition Exhibit 1.  The exhibit that you
21 have in front of you is a hard copy of the first
22 production relating to your unpublished study, and it
23 runs from pages 1 to 818.
24     MS. O'DELL:  Object to the form of the
25 question.  May I --

Page 13

1     MR. ZELLERS:  Do you have a question or --
2     MS. O'DELL:  Yes.  Dr. Smith-Bindman wasn't
3  on the emails that had the first production.  She
4  might not have an appreciation if it was the first,
5  the second batch, et cetera.  So just making that
6  statement.
7     MR. ZELLERS:  Understood.
8             (Exhibit No. 5 was marked.)
9             (Exhibit No. 6 was marked.)
10            (Exhibit No. 7 was marked.)
11 BY MR. ZELLERS:
12 Q.      For the record, Dr. Smith-Bindman, we have
13 received various productions through counsel for
14 plaintiffs in response to the request for production
15 relating to your unpublished study.  The total of
16 those pages go from Bates stamp 1 through 1,391.
17     In addition, we have received a fourth
18 production, which relate to some unredacted pages
19 from your production.  So why don't you just get in
20 front of you all four of those exhibits so -- let's
21 look at Deposition Exhibit 4.
22 A.      Yep.
23 Q.      Deposition Exhibit 5.
24 A.      Yes.
25 Q.      Deposition Exhibit 6.

Attorneys' Eyes Only

Page 14

1  A.    Yes.
2  Q.    And Deposition Exhibit 7.
3  A.    Yes.
4  Q.    All right.  Are, to the best of your
5  understanding --
6       MS. O'DELL:  I'm sorry to -- I can't -- I'm
7  just trying to follow here on my copies.  Is this
8  Exhibit 5?
9       MR. ZELLERS:  Yes.  So Exhibit 5 are the
10  document production Bates Nos. 819 through 1366.
11      Deposition Exhibit 6 are the production
12  Bates stamp pages 1367 to 1391.
13      MS. O'DELL:  Thank you.
14      MR. ZELLERS:  Deposition Exhibit 7 are the
15  unredacted pages from the production, and
16  specifically pages 46 to 49.
17      MS. O'DELL:  Thank you.
18      MR. ZELLERS:  100 to 101, 812, 814, 843, and
19  1,119.
20      MS. O'DELL:  Thank you very much.
21  BY MR. ZELLERS:
22  Q.    Doctor, included within the production --
23  and I marked it separately -- is a very large, it
24  looks like Excel spreadsheet that was identified as
25  page 962.  Is that your understanding?

Page 15

1  A.    I believe you're right.
2  Q.    I don't worry about the page number, but
3  were there several Excel spreadsheets contained in
4  your production?
5  A.    Yes.
6  Q.    All right.  I will note for the record that
7  page 962 is a large Excel spreadsheet.  I am not
8  going to mark it separately here today because we
9  would all have to then take it home with us.  We will
10  provide whatever documents in electronic form are
11  necessary to complete the record, and we will work
12  with the court reporter and counsel for plaintiffs on
13  that.
14      MR. LAPINSKI:  Counsel, good morning.  This
15  is Dan Lapinski, from the Motley Rice law firm.
16      I don't know whether it was said at the
17  beginning of the deposition, but I do just want to
18  note that all of the documents that were just marked
19  as exhibits are for attorneys' eyes only, and that
20  the entire deposition should be marked as for
21  attorneys' eyes only where these exhibits are used.
22      MR. ZELLERS:  Mr. Lapinski, thank you.  I
23  don't object for the time -- certainly I don't
24  object, and I believe all of the hard copy documents
25  that have been provided to counsel this morning and

Page 16

1  to Dr. Smith-Bindman are marked attorneys' eyes only,
2  to the extent that they relate to a response to the
3  request for production for the unpublished study.
4       I also do not object at this stage to
5  marking the transcript attorneys' eyes only, but only
6  those portions of the transcript that relate to
7  questions about the production and about documents
8  within the production.  If we have any issues with
9  respect to that, then I suggest that at the
10  conclusion of the deposition, counsel for plaintiffs
11  and counsel for the defendants will work together to
12  figure out how to appropriately mark the transcript.
13      Is that agreeable, Mr. Lapinski?
14      MR. LAPINSKI:  That's agreeable with me.
15      Leigh, how about with you?
16      MS. O'DELL:  Yes, we will do that.
17      MR. LAPINSKI:  That's fine.  I'm sorry --
18  I'm sorry for the interruption.
19      MS. O'DELL:  Thank you.
20  BY MR. ZELLERS:
21  Q.    Dr. Smith-Bindman, to the best of your
22  understanding, are all of the responsive documents
23  that you have to Deposition Exhibit 1, the request
24  for production relating to your unpublished study,
25  have those been marked as Deposition Exhibit 4, 5,

Page 17

1  and 6, which in total go from pages 1 through 1,391?
2  A.    Yes.  Yes.
3  Q.    And as I have noted for the record,
4  Deposition Exhibit 7 are just the previously
5  identified page numbers from your production that
6  have been now produced in unredacted form.
7       I will ask you, Dr. Smith, to keep, you
8  know, those documents in front of you, Deposition
9  Exhibits 4, 5, and 6 and 7, as I will have some
10  questions for you.  But before I ask you those
11  questions, let's finish identifying the rest of the
12  exhibits to this deposition.
13      (Exhibit No. 8 was marked.)
14  BY MR. ZELLERS:
15  Q.    Deposition Exhibit 8 is a hard copy of your
16  invoices in this matter; is that right?
17  A.    Yes.
18  Q.    Are those all of the invoices that you've
19  generated to the plaintiffs in the ovarian cancer
20  litigation, or are these just invoices since you were
21  deposed originally in the MDL back in 2019?
22  A.    No.  This appears to be the entirety of
23  them.
24  Q.    Have you billed any counsel or anyone else
25  for any of the services that you have provided as an

Page 18

1  expert witness in the ovarian cancer talc litigation?
2  A.    Are there other invoices, are you asking
3  about?
4  Q.    No.  My question to you is -- some experts
5  have been involved in different cases, some experts
6  have been involved in working with different
7  plaintiff law firms, some experts have been involved
8  in terms of working, you know, on different products.
9  So my question to you is:  Do the invoices that we've
10  marked as Deposition Exhibit 8, do those reflect all
11  of the work that you've done as an expert witness in
12  the ovarian cancer litigation?
13  A.    Yes, they do.
14  Q.    I understand that you testified recently in
15  a trial in Philadelphia, the Kleiner case; is that
16  right?
17  A.    Yes.
18  Q.    Any time that you would have related to that
19  matter would be included within these invoices?
20  A.    Yes, that's correct.
21  Q.    Are you involved as an expert in any other
22  ovarian cancer litigation, other than the litigation
23  that involves Johnson's Baby Powder?
24  A.    No, I'm not.
25        (Exhibit No. 9 was marked.)

Page 19

1  BY MR. ZELLERS:
2  Q.    Deposition Exhibit 9 is your Amended Expert
3  Report, dated July 2nd, 2021; is that correct?
4  A.    Yes.
5        (Exhibit No. 10 was marked.)
6  BY MR. ZELLERS:
7  Q.    Deposition Exhibit 10 is your initial expert
8  report dated November 15th of 2018; is that right?
9  A.    Yes.
10        (Exhibit No. 11 was marked.)
11  BY MR. ZELLERS:
12  Q.    Deposition Exhibit 11, I will represent to
13  you, is a redlined version of your expert report,
14  which compares any changes from your original report
15  in November of 2018 to your amended report in July of
16  2021.
17        Without going through each page, does that
18  generally appear to be what that document is?  Does
19  it appear to be a redlined document?
20  A.    Yes, a redlined document.
21  Q.    Does the title state that it is a redlined
22  version of your July 2nd, 2021, Amended Expert
23  Report?
24        MS. O'DELL:  I don't see that.
25        MR. ZELLERS:  Well, let me get it in front

Page 20

1  of us.  I don't think we have an issue with what the
2  document is.
3  Q.    Dr. Smith-Bindman --
4  A.    Yes.
5  Q.    -- Deposition Exhibit 11 --
6  A.    Yes.
7  Q.    -- it's a redlined document; correct?
8  A.    Yes.  Yes.
9  Q.    And on the first title -- the title of the
10  page it says, "Rule 26 Amended Expert Report of," and
11  there are redline markings; is that right?
12  A.    Yes.
13        (Exhibit No. 12 was marked.)
14  BY MR. ZELLERS:
15  Q.    Deposition Exhibit 12 is what was marked as
16  Exhibit A to your Amended Expert Report.  It's your
17  curriculum vitae; is that right?
18  A.    Yes.
19  Q.    Is Deposition Exhibit 12 an up-to-date
20  curriculum vitae?
21  A.    It's not the most up to date, but it's --
22  I'm just looking.  It has publications through the
23  beginning of 2019.
24  Q.    So you do have a more up-to-date curriculum
25  vitae; is that right?

Page 21

1  A.    Yes.
2  Q.    Could you send that to Ms. O'Dell?
3        MS. O'DELL:  Yes, we will provide it.
4        MR. ZELLERS:  And if you will produce it.
5  And we will put a placeholder as Deposition
6  Exhibit 15 for your most up-to-date curriculum vitae.
7        (Exhibit No. 15 was reserved.)
8  BY MR. ZELLERS:
9  Q.    Doctor, when we get a chance to look at your
10  CV that is the most current, are there any
11  substantive additions or changes you would need to
12  make to that?
13  A.    I think there are probably additional
14  publications, is the main thing.
15  Q.    Are there any publications on your CV that
16  are relevant to your review and analysis of this
17  case?
18  A.    No, there are not.
19        (Exhibit No. 13 was marked.)
20  BY MR. ZELLERS:
21  Q.    Deposition Exhibit 13 is what was attached
22  as Exhibit B to your Amended Expert Report, and that
23  you call your "Scientific Literature and Other
24  Sources Listing"; is that right?
25  A.    Yes.

Page 22

1  Q.     Can I call that a "Reliance List" or would
2  that be improper?
3          MS. O'DELL:  Object to the form.
4          THE WITNESS:  It includes a large list of
5  publications, documents that I looked at, some I
6  relied on, some I may have read in -- in less detail
7  if they were not on the topics that I was focused on.
8  BY MR. ZELLERS:
9  Q.     Are there some documents contained on your
10 "Scientific Literature and Other Sources List" that
11 you never got around to reviewing?
12 A.     Yes, I think that's true.
13 Q.     All right.  Can you categorize for me what
14 some of those are, or would we have to go item by
15 item?
16 A.     I think any publications that relate to
17 epidemiology I would have read in great detail.
18        Publications related to mechanism, I have
19 read some in great detail, some I will have skimmed.
20        Some publications related to constituent
21 components, I would have looked at for a particular
22 piece of information but wouldn't have read in detail
23 cover to cover.
24 Q.     Your "Scientific Literature and Other
25 Sources List" is very similar to the lists that have

Page 23

1  been provided by other experts in the litigation.  Do
2  I understand correctly that that document, that we're
3  looking at here, Exhibit 13, is a document that was
4  put together for you by counsel for plaintiffs?
5  A.     I don't know what the document looks like
6  for other people, so I don't -- but I would have
7  generated a list of articles that I have read or that
8  I wanted to read.  I asked the lawyers to help me
9  find some.  So I believe this list includes all of
10 those, the ones that I relied on, the ones that I
11 asked for, the ones that I saw but didn't go into
12 detail on.
13 Q.     Let me ask my question a little more
14 directly.
15        Deposition Exhibit 13, the list of
16 "Scientific Literature and Other Sources," is that a
17 list that was put together by counsel with input from
18 you?
19 A.     Yes.
20        (Exhibit No. 14 was marked.)
21 BY MR. ZELLERS:
22 Q.     Deposition Exhibit 14 is simply your
23 Medical/Legal Testimony List that was attached as
24 Exhibit C to your amended report.  The only testimony
25 that you had on that list was your MDL deposition

Page 24

1  testimony.
2          In addition, you would now add the Kleiner
3  trial testimony; is that right?
4  A.     So just Exhibit C doesn't have anything in
5  it.  It's just a single piece of paper.
6  Q.     Look on the back.
7  A.     Thank you.
8          MS. O'DELL:  Would you mind repeating your
9  question, Mike.
10         THE WITNESS:  It doesn't mention the Kleiner
11 case on here.
12         MR. ZELLERS:  Understood.
13 Q.     In order to make Exhibit C accurate and
14 complete, we would need to add your Kleiner
15 testimony; is that right?
16 A.     That's correct.  There's nothing else.
17 Q.     Is there any other testimony that you've
18 provided --
19 A.     No.
20 Q.     -- in the last four years?
21 A.     No.
22         MS. O'DELL:  I would just note for the
23 record, it was correct at the time the report was
24 disclosed.  I would just --
25         MR. ZELLERS:  Well, I'm not fighting.  I

Page 25

1  will object to any of your objections other than to
2  form.  But understood.
3          (Exhibit No. 16 was marked.)
4          MR. ZELLERS:  Let's then mark as Deposition
5  Exhibit 16 what will be a Dropbox link that we will
6  provide to the court reporter, which will be the
7  documents that were produced on September 29th, by
8  counsel for plaintiffs to the defendants, which are
9  the documents responsive to Deposition Exhibit 2, the
10 MDL notice.
11         And specifically what's included in that
12 production, which will be marked electronically as
13 Deposition Exhibit 16, are your invoices, which we
14 have marked separately as Exhibit 8, a folder
15 labeled, "Materials Considered," with 533 documents,
16 and a folder labeled, "Reports/Testimony," with 23
17 documents, all of which are represented to be
18 responsive to Deposition Exhibit 2 to the MDL
19 deposition notice.
20 Q.     Does that sound right to you,
21 Dr. Smith-Bindman without going through the
22 production?
23 A.     Yes, that sounds right.
24 Q.     Your unpublished study, you refer to that on
25 page 17 of your amended report, and then also, I

Attorneys' Eyes Only

Page 26

1 believe, in Deposition Exhibit 4, pages 15 to 45, are
2 your unpublished study; is that right?
3 A.    On page 17, yes.
4 Q.    On page 17 of the amended report --
5 A.    Yes.
6 Q.    -- you talk about following a completion of
7 the analysis that you had done in the MDL --
8 A.    Yes.
9 Q.    -- at least the preliminary analysis --
10 A.    Yes.
11 Q.    -- that you decided to publish a
12 meta-analysis and systematic review that focused on
13 the frequent use of talcum powder?
14 A.    Yes.
15       MS. O'DELL:  Object to the form.
16 BY MR. ZELLERS:
17 Q.    That's correct?
18 A.    Yes.
19 Q.    You have worked on that meta-analysis and
20 systematic review and have at least begun the process
21 of attempting to publish that document; correct?
22 A.    Yes.
23 Q.    This unpublished study is included in the
24 documents that have been produced, Deposition
25 Exhibit 4, pages 15 to 45; is that correct?

Page 27

1       MS. O'DELL:  I need to catch up with you.
2 I'm sorry.
3 BY MR. ZELLERS:
4 Q.    So, Dr. Smith-Bindman, do you have
5 Deposition Exhibit 4 in front of you?
6 A.    I do.
7 Q.    All right.
8 A.    And, yes, that, and the pages that you've
9 just described is -- is that -- is that draft of that
10 unpublished paper as of the date of August 21st,
11 2021.
12 Q.    A coauthor on that paper with you is
13 Dr. Sean Woolen; is that right?
14 A.    Yes.
15 Q.    From reviewing the correspondence, it
16 appears that Dr. Woolen reached out to you in
17 September of 2019 and told you that he would like to
18 work with you on a research project; is that right?
19 A.    Yes.
20 Q.    Dr. Woolen was a fellow in the Department of
21 Radiology at UCSF; is that right?
22 A.    Yes.
23 Q.    To your knowledge, when Dr. Woolen reached
24 out to you in September of 2019, did he have any
25 experience in terms of preparing a meta-analysis or a

Page 28

1 systematic review?
2 A.    He had research experience but had not been
3 involved in that kind of research, that I remember.
4 Q.    He reached out to you, you suggested several
5 different projects, one of which was that he could
6 help you with respect to putting together a
7 publication, which we now see as your draft
8 unpublished study; is that right?
9 A.    He definitely reached out.  He threw around
10 a bunch of research ideas, asked me for research
11 ideas.
12       I would just say it was the other way
13 around.  He wanted me to help him on a research
14 project rather than that he was going to help me on a
15 research project.  He was looking for a project to
16 lead.
17 Q.    He was a young doctor, he was getting near
18 the end of or just finishing his training, and he
19 wanted to be involved in a research project with you;
20 is that right?
21 A.    That's correct.
22 Q.    You made some suggestions, and one of the
23 suggestions was this meta-analysis, the unpublished
24 study, and that was a suggestion you made to
25 Dr. Woolen --

Page 29

1 A.    Yes.
2 Q.    -- is that right?
3 A.    Yes.
4 Q.    Dr. Woolen's background and his training is
5 as a radiologist; is that right?
6 A.    Yes.
7 Q.    He has no expertise substantively in the
8 area of talcum powder or ovarian cancer or any of
9 those medical issues; correct?
10 A.    He was a fellow with me doing ultrasound.
11 So he finished his radiology training, then he did, I
12 think, fellowship training.  So he does a lot of work
13 with ovarian cancer patients, in terms of diagnosing
14 them, but had no experience with or knew nothing
15 about the relationship between talc and ovarian
16 cancer, except perhaps having read about it in the
17 published literature.
18 Q.    Well, the plan was, back in September 2019,
19 that Dr. Woolen was going to brainstorm with you on
20 what would be an appropriate project; fair?
21 A.    Yes.  I don't remember the date, but I think
22 you probably have a better -- but that sounds about
23 right.  It was the fall of 2019.
24 Q.    Yes.  And if we need to check, you know, any
25 facts or parts of my questions, of course we can do

Attorneys Eyes Only

Page 30

1  that. But we have got the documents in front of us,
2  and they are a part of the record.
3      There was, you know, correspondence between
4  you and Dr. Woolen back in the beginning, back in
5  September of 2019, as you were brainstorming what
6  research project he may help you with. And you made
7  a comment that, "Assuming this is creepy, do you have
8  a topic that you think would be of interest to you?"
9      And to give you context, you were
10 discussing, and you were suggesting possibly having
11 Dr. Woolen help you to do the meta-analysis, looking
12 at the relationship between talc and ovarian cancer.
13     MS. O'DELL: Object to form. And I would
14 just request if you're referring to a specific
15 communication, if you would direct Dr. Smith-Bindman
16 to that page.
17     MR. ZELLERS: And as we go along,
18 Ms. O'Dell, please let Dr. Smith-Bindman tell me if
19 she needs to refer to a page. Some of these will
20 just be foundational-type questions. But I
21 understand your objection.
22 Q.    And, Dr. Smith-Bindman, as we go along, if
23 there are any documents that you need to look at, you
24 need to review, you know, please let me know.
25     I'm looking specifically at page 815 in

Page 31

1  Deposition Exhibit 4. And so all of the documents
2  have numbers at the bottom.
3      So do you see that correspondence, that
4  September 16th, 2019 --
5  A.    You said 814? I must have misheard.
6  Q.    815.
7  A.    815. I would -- I see the document. You
8  see a -- I'm not sure what the question was.
9  Q.    So the question is, if we see the email
10 before, Dr. Woolen said he looks forward to
11 brainstorming with you. By this time he had decided
12 that he would like to work with you on a
13 meta-analysis.
14     And then you tell him on September 16th of
15 2019, about your planned meta-analysis, looking at
16 the relationship between talc exposure and ovarian
17 cancer. And then you state, "But I am thinking from
18 your note that this would not be of interest as not
19 radiology focused."
20 A.    Uh-huh.
21 Q.    Was it your understanding at that time that
22 Dr. Woolen was looking to do some research that would
23 be in the field of radiology?
24 A.    I -- yes.
25 Q.    All right. Then your next sentence to

Page 32

1  Dr. Woolen, "Assuming this is creepy, do you have a
2  topic you think would be interesting to review?"
3      What did you mean when you stated to
4  Dr. Woolen, "Assuming this is creepy"?
5  A.    I mean that's an auto correct. So I did not
6  intend to say, "Assuming this was creepy." So that's
7  not something I would say. So auto correct inserted
8  "creepy," and I can't -- I'm not sure what I
9  intended.
10     But the rest of that sentence says, "Do you
11 have a topic you think would be interesting to
12 review?"
13     So my -- my email to him said, I don't think
14 you're interested in this topic, I think a systematic
15 review is a great way to learn how to do research.
16     On the prior discussion, on the page before,
17 we said a search for meta-analysis, systematic
18 reviews on hepatocellular carcinoma screening, that
19 is a more radiology focus.
20     So this was just saying, if this is not what
21 you want to do, do you have some ideas that you do
22 want to do? The "creepy" --
23 Q.    Do you have --
24 A.    -- was just an unfortunate error.
25 Q.    Well, do you have a recollection today as to

Page 33

1  what you typed that you believe was auto corrected
2  to, "Assuming this was creepy"?
3  A.    No.
4  Q.    The page right before, page 814 from
5  Deposition Exhibit 4, Dr. Woolen said, "I'm not
6  scared of a challenge but realize it will likely
7  require more thoughtfulness and troubleshooting to
8  come up with the design."
9      What was your understanding of what
10 Dr. Woolen was saying?
11 A.    So if you go back, I think he is saying that
12 he's not afraid of a challenge but realized it would
13 likely take more thoughtfulness and troubleshooting
14 to come up with the design, was about doing a design
15 around hepatocellular carcinoma.
16 Q.    So you believe that comment was unrelated to
17 the --
18 A.    Yes.
19 Q.    -- talc meta-analysis that you were planning
20 to do?
21 A.    Yes, that's correct.
22 Q.    If you --
23 A.    Yeah.
24 Q.    You had follow-up discussions with
25 Dr. Woolen; is that right?

Attorneys Eyes Only

Page 34

1  A.    Yes.
2  Q.    And one of the things that you did is that
3  you promised him if he did work with you on the talc
4  meta-analysis, and that if he was involved in the
5  writing, that he could be the first author; is that
6  right?
7       MS. O'DELL:  Objection to form.
8  BY MR. ZELLERS:
9  Q.    Take a look, Dr. Smith-Bindman, at page 812,
10  also Deposition Exhibit 4.  Do you see that email at
11  the bottom, September 21st, 2019 --
12  A.    Yes.
13  Q.    -- "Sounds like a plan"?
14  A.    Yes.
15  Q.    "If you work on the talc paper and write,
16  you are first author, but, oh, need to tell you a
17  little more about politics."
18       First off, that "O" should be an "I"; is
19  that right?
20  A.    That's correct.
21  Q.    So it should read, "But I need to tell you a
22  little more about politics"?
23  A.    Yes.
24  Q.    That was an email that you sent -- is this
25  an email or a text message?

Page 35

1  A.    It would be an email.
2  Q.    So an email that you sent to Dr. Woolen on
3  September 21st?
4  A.    Yes.
5  Q.    What did you mean when you said, "I need to
6  tell you a little more about politics"?
7  A.    I would not have wanted Sean to work on that
8  without knowing that I am a paid expert in the talc
9  litigation.  So that would be something I would want
10  him to go into a project with me on with eyes open,
11  knowing that.
12  Q.    Was there some other politics involved, or
13  that you were referencing there?
14  A.    Just the politics that I am a paid expert in
15  the -- in the talc litigation.
16  Q.    Why would that potentially be a concern for
17  Dr. Woolen?
18  A.    Because I think that I don't actually have
19  experience of being an expert that's paid related to
20  any of my other work, and so I just don't -- I didn't
21  really know if that could potentially interfere with
22  the ability to have work published, because you have
23  to acknowledge that, and I just didn't want that to
24  be a surprise to Sean.
25  Q.    Did you tell Dr. Woolen that you, in fact,

Page 36

1  were a paid expert?
2  A.    Yes.
3  Q.    And, in fact, you provided Dr. Woolen with
4  your expert report from the MDL litigation; is that
5  right?
6  A.    I believe that is correct.
7  Q.    Did you send Dr. Woolen any other legal
8  documents, or documents that have been generated from
9  your work as an expert for the plaintiffs in the
10  ovarian cancer litigation?
11  A.    Can I go back to my last affirmation.
12       I don't exactly remember that I gave him my
13  expert report, but I wouldn't be surprised if I gave
14  it.  So if you have a copy of it --
15  Q.    Sure.  Take a look, Dr. Smith-Bindman, same
16  deposition exhibit --
17  A.    Yes.
18  Q.    -- so it's Exhibit 4, but take a look at
19  page 49.  And, actually, what I'm going to ask you to
20  do is let's look at Deposition Exhibit 7, which is
21  the small grouping of documents that have been
22  unredacted.
23       Do you have Deposition Exhibit 7 in front of
24  you?
25  A.    Yes.  I see on page 49 that I said,

Page 37

1  "Enclosed is the report I wrote on talc."  So I think
2  that confirms I sent him my report.
3       And then you asked me a question about, I
4  think, document 7.
5  Q.    Well, do you see at the bottom of page 49 of
6  Deposition Exhibit 7, that Margaret Thompson, from
7  the Beasley Allen firm, had forwarded you a copy of
8  the report on the evening of Friday, September 27; is
9  that right?
10  A.    Can you tell me what page that is?
11  Q.    49.  Do you see it there?
12  A.    I see an email from Margaret.  The subject
13  says, "Report in Word."  I don't see any attachment.
14  Q.    Margaret Thompson is one of the lawyers that
15  you've worked with --
16  A.    Yes.
17  Q.    -- as a plaintiff lawyer in the MDL
18  litigation; is that right?
19  A.    Yes.
20  Q.    Then at least the next email that we have in
21  the chain, Deposition Exhibit 7, page 49, is you
22  sending your MDL litigation report to Dr. Woolen; is
23  that right?
24  A.    Yes.
25  Q.    Have you sent any other documents related --

Attorneys' Eyes Only

Page 38

1  let me withdraw that.
2       Have you sent any other documents that you
3  received from the lawyers in the MDL litigation to
4  Dr. Woolen?
5  A.    No.
6  Q.    Have you ever had discussions with
7  Dr. Woolen about things you discussed with the
8  lawyers, their strengths, their weaknesses in either
9  your study or your report or any of your opinions?
10 A.    I had discussions with Sean recently about
11 my sharing all of the documents with the lawyers.
12 But you're asking if I had content discussions that I
13 had with my lawyer that I shared with Sean?
14 Q.    Well, that was my first question. Let me
15 follow up, though.
16      What discussions have you had with
17 Dr. Woolen at any time that relate to conversations
18 that you've had with the plaintiffs' counsel in this
19 litigation?
20 A.    Other than my letting him know that I was
21 going to be sharing our correspondence, I don't
22 recall any other discussions that we had.
23 Q.    You advised Dr. Woolen that you had received
24 a request for production of documents relating to the
25 unpublished study; is that right?

Page 39

1  A.    Yes.
2  Q.    You let him know that you would be producing
3  those documents in connection with your medical/legal
4  expert work; is that right?
5  A.    That's correct.
6  Q.    What was Dr. Woolen's response to that?
7  A.    He was -- he said that was okay. He hoped
8  it didn't interfere with our publishing, but he was
9  fine with my doing that.
10 Q.    To your knowledge, does Dr. Woolen have
11 documents that would be responsive to the request for
12 production, other than documents that you are privy
13 to?
14      MS. O'DELL: I'm sorry. Would you repeat
15 that. I think I missed a word there.
16      MR. ZELLERS: Sure.
17 Q.    To your knowledge, does Dr. Woolen have
18 documents that may be responsive to Deposition
19 Exhibit 1, the request for production of documents,
20 relating to your unpublished study, that would be
21 other than the documents that were in your
22 possession?
23 A.    I don't know of other materials that he has
24 that would be relevant.
25 Q.    Do you see on page 48 -- and we can continue

Page 40

1  to look at the unredacted pages, which are
2  Exhibit 7 -- that on October 1st of 2019, Dr. Woolen
3  wrote that the review team --
4  A.    I'm sorry. Which page?
5  Q.    Page 48.
6  A.    Yes.
7  Q.    Dr. Woolen wrote to you on October 1st,
8  2019; is that right?
9  A.    Yes.
10 Q.    And he was proposing to you what the review
11 team would consist of?
12 A.    Yes.
13 Q.    And that Dr. Woolen would be the review
14 leader; is that right?
15 A.    Yes.
16 Q.    There's a reference to a health
17 informationalist or informationist. Would that be a
18 librarian?
19 A.    Yes. Librarian with expertise in searches.
20 Q.    Dr. Woolen suggested including a content
21 expert on the review team. What did you understand
22 that to reference?
23 A.    I'm not sure exactly what he meant. I know
24 in my response, at some point I suggested I don't
25 think we have a content expert. So -- but I think

Page 41

1  perhaps he was thinking an expert in the relationship
2  between ovarian cancer and talc exposure.
3  Q.    You responded that and offered to reach out
4  to faculty who had access to women's health fellows;
5  is that right?
6  A.    Yes.
7  Q.    Why did you think it might be important to
8  have women's health fellows involved in this project
9  with you and Dr. Woolen?
10 A.    I think that Sean and I both had expertise
11 in the diagnosis of ovarian cancer, but the patients
12 who would be treated for ovarian cancer would be
13 users of Johnson & Johnson Baby Powder, are more
14 likely to be gynecologists.
15 Q.    On January 10th of 2020, you communicated
16 with Dr. Woolen and told him that, "The editor of
17 JAMA reluctantly agreed to read our review." Do you
18 recall that communication and that discussion with
19 Dr. Woolen?
20      Take a look at page 801 --
21 A.    Of which --
22 Q.    -- in Deposition Exhibit 4.
23 A.    Yes, I do remember that email and the
24 discussion.
25 Q.    You state on January 10th, 2020, to

Page 42

1    Dr. Woolen, "The editor of JAMA reluctantly agreed to
2    read our review."  And then in parens, "I suggested
3    we could include our Reference List as one of our two
4    tables as a research letter."
5        Is the Reference List, that you are
6    referring to, similar to what we marked to this
7    deposition as Exhibit 13?
8    A.    No.
9    Q.    What are you referring to, when you say,
10   "Reference List"?
11   A.    So as a little bit of background --
12   Q.    Well, I only have four hours.  That's my
13   problem.  So --
14   A.    I think I need to clarify what this is.
15       I produced documents related to the research
16   that we've done that you've been describing.
17   Q.    The unpublished study.
18   A.    The unpublished.
19       Before that was done, this reflects
20   something before that time.  And so it's a different
21   piece of analysis.
22   Q.    Is that analysis something that you did in
23   connection with your initial MDL review and report?
24   A.    No.  There was -- there was an extra piece
25   of research in between my initial, that you have seen

Page 43

1    as part of my MDL report, the one that we are working
2    on publishing now.
3        This email reflects when the O'Brien paper
4    was published as a summary of the cohort studies in
5    JAMA.  We were already beginning our process.  And I
6    raised with Sean the possibility of not doing a
7    complete systematic review but doing a research
8    letter.  It's a different beast altogether.  It's
9    much shorter.
10       And I thought potentially JAMA would be
11   interested in it because they had just published.
12   They would not publish a new systematic review, but
13   they might do a research letter.
14       The problem with research letters is you're
15   only allowed seven references.  And since our
16   research would include at least 11 publications that
17   we were looking at, and at least a response to
18   O'Brien is 12, it would be asking JAMA to go against
19   their rules for only allowing research letters that
20   have seven references.
21       So that was saying -- the editor is not sure
22   about breaking that rule.  That's the reluctance.
23   But I proposed that instead of having a long
24   Reference List, we could use one of the two spots to
25   show our references.

Page 44

1    Q.    The Reference List that you're referring to
2    on page 801 --
3    A.    Yes.
4    Q.    -- of Exhibit 4 --
5    A.    Yes.
6    Q.    -- that relates to a separate research
7    project in which you were considering responding to
8    the O'Brien paper?
9    A.    That's correct.
10   Q.    The O'Brien paper, just for your reference,
11   was published in JAMA on January 7th of 2020; is that
12   right?
13   A.    That sounds -- that sounds -- that sounds
14   correct.
15   Q.    Again, if I misstate any dates, we've got
16   the documents --
17   A.    Yes.
18   Q.    -- that are here, and they are a part of the
19   record.
20   A.    Yes.
21   Q.    So this email to Dr. Woolen is three days
22   later, and you were hoping to use this other research
23   in order to do a response to the O'Brien paper or
24   article; is that right?
25   A.    Yes.

Page 45

1    Q.    Describe for me what this research was.  You
2    say it was not the research related to the
3    unpublished study, but it was something separate;
4    correct?
5    A.    That's correct.
6    Q.    Was it a part of your work for the lawyers
7    in the litigation?
8    A.    It was while we were in the process of
9    planning our systematic review, which by its design
10   has a lot of steps.  As we were doing that, this
11   publication in JAMA came out.  And so I thought,
12   could we do a research letter, basically a short
13   version -- we would still publish the longer
14   version -- but could we do a short version where it
15   would really be focused on more responding to the
16   O'Brien paper.
17   Q.    I'm going to call that research regarding
18   responding to the O'Brien paper.
19   A.    Yes.
20   Q.    And was that research, in terms of
21   responding to the O'Brien paper, it's not something
22   you've included in your response to Deposition
23   Exhibit 1, the production related to the unpublished
24   study?
25   A.    I did include it.  I included all of it.

Attorneys Eyes Only

Page 46

1   Q.    Is your testimony now that any research you
2   did relating to responding to the O'Brien paper, or
3   any other documents or materials you may have in
4   responding to the O'Brien paper, were included in
5   your response to Deposition Exhibit 1?
6   A.    Yes.
7   Q.    Are there any materials, correspondence,
8   emails, research, that you have relating to
9   responding to or potentially responding to the
10  O'Brien paper that you have not produced?
11  A.    There are no additional documents.
12  Q.    You talked to Dr. Woolen, and you state:
13        (Reading) So we need to get moving.
14        It remains a very high bar.  Would
15        be good to make a plan for how to
16        get the analysis done and written
17        in a month, and we need to divide
18        and conquer (end of reading).
19        That's what you wrote; is that right?
20  A.    Yes.
21  Q.    All right.  Who is Howard Bauchner?
22  A.    Bauchner.  He at the time was the editor of
23  JAMA.
24  Q.    And did you know Dr. Bauchner?
25  A.    I did.

Page 47

1   Q.    And how do you know Dr. Bauchner?
2   A.    I published a large number of papers in
3   JAMA.  And the most recent one he was my actual -- I
4   worked with him closely as the editor on my paper.
5   Q.    Did you have discussions with Dr. Bauchner
6   that are not included in the production here?
7   A.    I just --
8         MS. O'DELL:  Object to the form.
9         THE WITNESS:  If there was an email, it's in
10  here.  I don't remember if it was all by email or if
11  we had a conversation.
12  BY MR. ZELLERS:
13  Q.    Obviously you communicated with
14  Dr. Bauchner; correct?
15  A.    That's correct.  That's correct.
16  Q.    And what did you understand him to mean when
17  he reluctantly agreed to read your letter?
18  A.    Just that they had a very clear rule in JAMA
19  that research letters could not have more than seven
20  references, and that ours would need more for that.
21  So my possible solution was to include a Reference
22  List as one of the two tables allowed in the
23  document.  So it would be, you know, potentially
24  stretching the rules, but be possible.
25        And his response was, basically, to talk to

Page 48

1   their letter editor, of which there is correspondence
2   that you've received.
3   Q.    What was the hurry to get the analysis and
4   the writing done in a month?
5   A.    There's a limit of how long you have after a
6   paper is published during when those responses can be
7   considered.  And that timing is -- was very short.
8   Q.    Did the lawyers in the talcum powder
9   litigation, the plaintiff lawyers that you're working
10  with, did they make a request to you to submit a
11  response to the O'Brien paper?
12  A.    No.
13  Q.    Have you -- well, let me withdraw that.
14        On January 16th of 2020, you emailed
15  Dr. Woolen a list of inclusion/exclusion criteria.
16  And I'm looking at page 791.
17        Number one, is that correct?
18  A.    Yes.  I see the -- I see the -- I don't --
19  that -- that summary looks like it's from me, where
20  it says, "Five," and then "Inclusion."  But in
21  reading it, I see that it was written by Sean.
22  Q.    So this is an email from you to Sean, dated
23  January 16, 2020.  It sets forth inclusion and
24  exclusion criteria; is that right?
25  A.    So it's -- you can see that the alignment

Page 49

1   left is not consistent.  So the inclusion is what
2   Sean wrote -- this was his plan -- and then I think
3   to the left is where I added a comment, "I think we
4   should include all ovarian cancer."
5   Q.    And then you -- you continue and say, "If we
6   can, limit to serous."  Is that correct, what you
7   wrote?
8   A.    Yes.  I think what I intended to say is we
9   should do it two ways.  So Sean above had wrote
10  "Inclusion."  His third bullet was, "Invasive serous
11  ovarian cancer risk, include subtype or all ovarian
12  cancer, question mark."
13        So I said, I think we should do it both
14  ways, include all ovarian cancer.  And then, if we
15  can, limit to serous.  So I was commenting on his
16  question and said let's do it both ways, all and
17  serous.
18  Q.    Why would you want to limit it to invasive
19  serous ovarian cancer risk?
20  A.    That was Sean's idea.  So Sean said, "Let's
21  do invasive serous ovarian cancer risk, include
22  subtype or all?"
23        And I was saying, well, let's look at all,
24  and we can limit to serous as well.
25        So I think he was saying serous.  I was

Page 50

1  saying, let's do it both ways.
2  Q.    Well, in fact, in -- I will ask you some
3  questions about this later.  In your original MDL
4  report, the systematic review that you did, that was
5  focused on invasive serous ovarian cancer risk;
6  correct?
7  A.    I believe I did it both ways, looking at all
8  or serous.  In my initial draft, I focused a little
9  more on serous, but I also did it all.
10  Q.    In your amended report, the July 2021
11  report, you've changed your systematic review, the
12  one that you did for the MDL plaintiff lawyers, from
13  looking at or focusing on invasive serous ovarian
14  cancer to looking at or including all ovarian
15  cancer --
16       MS. O'DELL:  Object to the form.
17  BY MR. ZELLERS:
18  Q.    -- is that correct?
19  A.    No, I don't think that's correct.  I think
20  in both cases I looked at it both ways.  In the
21  subsequent report, I focused a little more on all,
22  and on the initial I focused a little more on serous.
23  Q.    Well, I've got some questions for you, and
24  so when we get to that, then I will ask those
25  questions.

Page 51

1       The communication that we're looking at
2  here, page 791, Exhibit 4, this was intended to be a
3  list of inclusion/exclusion criteria for your
4  unpublished study; correct?
5  A.    Technically, this was a list of that
6  research letter, which you have made a distinction
7  between the research letter and the unpublished
8  study.  So this is from January 16th, we were working
9  on the research letter.
10  Q.    Did this become the inclusion/exclusion
11  criteria for your unpublished study?
12  A.    I think this would have been the first draft
13  of that.  But in looking at it, there are -- those
14  have changed a little bit over time.
15  Q.    Can I find, if I look to your draft report,
16  your draft unpublished study, can I see what you
17  eventually arrived at for inclusion and exclusion
18  criteria?
19  A.    I think you can find it there.  I think you
20  also can find it in the published protocol.
21  Q.    Why were you focused on frequency of talcum
22  powder usage?
23  A.    So that is something that has not changed.
24  I think that's the most consistent group of
25  assessment, that women who use talcum powder daily is

Page 52

1  the group that I think you would have the most
2  consistent exposure, and it's the group that I think
3  would have the highest risk of ovarian cancer.  So,
4  in my mind, that was the most precise exposure.
5       And one of the criticism that I have of a
6  lot of publications, is they use ever exposure, and I
7  think that's very nonspecific.  So focusing on daily
8  users was something I thought was very important.
9  Q.    You were trying to find a set of criteria
10  that you could fit studies that had been done into
11  for the purpose of doing your unpublished study
12  meta-analysis?
13       MS. O'DELL:  Object to the form.
14       THE WITNESS:  I wanted to summarize what's
15  been published on frequent users.
16  BY MR. ZELLERS:
17  Q.    You believe that there were a group of
18  studies that looked at frequent use, and that was at
19  least part of your thinking for using that as a
20  criterion for your study; correct?
21  A.    Yes, that's correct.
22  Q.    Why many times a week?
23  A.    My understanding is that, I think from
24  papers that Cramer has published, is that the most
25  frequent use is daily talcum powder.

Page 53

1       Some women use talcum powder only during
2  some months of the year, and other women might use it
3  only during certain days of their menstrual cycle,
4  but the most common group is using it daily.  I was
5  trying to approximate the group that used it daily.
6  I thought users who used it several times a week
7  would be the way to distinguish women who were
8  occasional users from women who were regular,
9  habitual users.
10  Q.    Why limit it to perineal use?
11  A.    I think that, again, I wanted to get a group
12  that we were studying that was the most consistently
13  described, and perineal was probably the most
14  consistent definition.
15       It also seemed to me to be a group that both
16  is consistent, but I'd expect that to have the most
17  data points and the most studies and for it to be a
18  relatively intense exposure, and, therefore, was
19  likely the group that would have the greatest risk of
20  cancer.
21  Q.    Looking at, again, 791 and your statement,
22  "I think we should include all ovarian cancer and, if
23  we can, limit to serous," would you agree that it is
24  important to look at, in evaluating this issue,
25  different subtypes of ovarian cancer?

Attorneys Eyes Only

Page 54

1  A.    I'm not so much sure it's focused on whether
2  it's important to as much as what data are available.
3       And serous is the most common cancer type,
4  and so it just, by the nature of how you find enough
5  women to study, it would be easiest to study serous.
6  Q.    There's less data on some of the ovarian
7  cancer subtypes, such as clear cell or mucinous or
8  endometroid; correct?
9  A.    I think partly it's that, absolutely.  I
10  think partly mucinous in particular is -- is an area
11  of diagnosis that's changed a bit over time.  Our
12  understanding of what's the histology of mucinous, it
13  may be in some cases ovarian cancer called mucinous
14  really reflect GI cancers that are miscalled
15  mucinous.
16       So I think mucinous is a type that is
17  particularly problematic, and the other types are
18  particularly uncommon.
19  Q.    Are you expressing any expert opinions in
20  this case as to a causal relationship between genital
21  talcum powder use and mucinous ovarian cancer?
22  A.    I think the publications are most compelling
23  for serous, and that's how I start my expert report.
24       I think the data for other cancer types, I
25  have less precision about my estimate, but I think

Page 55

1  they are associated with ovarian cancer, and probably
2  the association is slightly less.
3  Q.    And you're making a distinction, as I
4  understand it, between an association and causation,
5  correct, at least in terms of the data available?
6  A.    No.  I think that for ovarian cancer,
7  there's a distinction between the association, which
8  has to do with the epidemiologic data, and causation,
9  which takes a whole lot of other factors into
10  account.
11  Q.    I do want to ask you about that, and
12  particularly in relationship to your amended report,
13  but let me ask you a few more questions here about
14  the document production.
15       MS. O'DELL:  Can we have a quick bathroom
16  break?  You can finish this question, or whenever you
17  want to stop --
18       MR. ZELLERS:  Let's go off the record.
19       THE REPORTER:  We are off the record.
20       (Off the record at 10:47 a.m.  Back on the
21  record at 10:52 a.m.)
22  BY MR. ZELLERS:
23  Q.    Dr. Smith-Bindman, there's some mention in
24  the document productions of various researchers you
25  contacted during the course of your work.  Do you

Page 56

1  recall generally contacting other researchers in this
2  area?
3  A.    Yes, I do.
4  Q.    You contacted Dr. Cramer in connection with
5  your work on the unpublished study; is that right?
6  A.    Yes.
7  Q.    How did you communicate with Dr. Cramer?
8  A.    I sent an email.
9  Q.    Did he respond?
10  A.    He did.
11  Q.    What did you ask of Dr. Cramer?
12  A.    He has published a lot on this topic.  We
13  wanted to include his publications.  And for most of
14  them I could.  But one of his early publications he
15  didn't publish on frequent users, and so I asked him
16  if he had any unpublished data to share.
17  Q.    What was his response?
18  A.    That he didn't.  He didn't have access to
19  those data any longer.
20  Q.    Do you recall any other discussions with
21  Dr. Cramer relating to your work on the unpublished
22  study?
23  A.    I do not remember any other -- any other
24  topics of conversation.
25  Q.    Were your communications by email, by text,

Page 57

1  by phone, or some combination?
2  A.    By email.
3  Q.    Did you have any phone conversations with
4  Dr. Cramer?
5  A.    No, I did not.
6  Q.    Did you contact Dr. Schildkraut in
7  connection with your work on the unpublished study?
8  A.    I believe I did.
9  Q.    Did she respond?
10  A.    I -- I don't believe she did.  There were
11  two women I reached out to, I think Anne Wu and
12  Dr. Schildkraut, and one of them responded and one of
13  them didn't.
14  Q.    Do you recall what you asked
15  Dr. Schildkraut?
16  A.    I would have asked each of those authors for
17  data on frequent users that wasn't published and
18  included in their work.
19  Q.    Any phone call with Dr. Schildkraut?
20  A.    No.
21  Q.    Any phone call with Dr. Wu?
22  A.    No.
23  Q.    Were your communications with Dr. Wu via
24  email?
25  A.    Yes.

Page 58

1  Q.    Did Dr. Wu respond to your request?
2  A.    My recollection is one of them responded.  I
3  think it was Dr. Wu, who suggested that they thought
4  they had data, but that they were not able to send
5  it.
6  Q.    Why was Dr. Wu not able to send the data
7  that she had, if you recall?
8  A.    I believe I requested at the time that we
9  needed it within the time to respond for the research
10 letter in response to O'Brien.  So I think she said
11 she couldn't respond that quickly.
12       But I believe I also reached out to her
13 later, and she also didn't provide the data.  I think
14 she didn't respond at that point.
15 Q.    Were all of your communications with Dr. Wu
16 by email?
17 A.    Yes.
18 Q.    Any other researchers in this area that you
19 communicated with?
20 A.    Yes.  We reached out to Dr. O'Brien.
21 Q.    Anyone else?
22 A.    I believe I reached out to someone else, but
23 we were referred to Dr. O'Brien.  So I don't remember
24 who the original person was.  But I think it was a
25 researcher related to the sister study, and that we

Page 59

1  were referred to Dr. O'Brien, who basically oversaw
2  those data as well.
3  Q.    All of these requests, to the best of your
4  recollection, related to any unpublished data
5  regarding frequent users; correct?
6  A.    Yes.
7  Q.    In early February of 2020, you and
8  Dr. Woolen discussed the O'Brien paper and whether to
9  use the data from all women or for patent
10 reproductive tract; is that your recollection?
11 A.    Yes.
12 Q.    How did you end up on that?
13 A.    I remember raising the question, and Sean
14 decided to use it for women with openly productive
15 tracts.  And his argument was that many of the
16 studies we have read only included women with open
17 reproductive tracts, so that definition would be most
18 consistent with and harmonious with the other studies
19 that we included.
20 Q.    Is that what ultimately you did with respect
21 to the unpublished study?
22 A.    That is what we used as our primary data
23 point.  But we show the data in the unpublished paper
24 so people can see the difference.
25 Q.    You would agree that women with a patent

Page 60

1  reproductive tract, that was a subgroup in the
2  O'Brien paper; correct?
3  A.    Yes.
4  Q.    Take a look at pages 769 to 770, but
5  particularly page 769 of Exhibit 4.
6  A.    Yes.
7  Q.    This, on page 769 --
8  A.    Yes.
9  Q.    -- describes your communication with Sean on
10 this; is that right?
11 A.    Yes.
12 Q.    So February 5th, 2020, Sean is suggesting or
13 asking you, "Should we use all women or only with
14 open tubes from the O'Brien paper"; is that right?
15 A.    Yes.
16 Q.    You then -- or strike that.
17       Sean states, "Women with patent reproductive
18 tracts," and you responded, "I took all women."
19       What did you mean when you said, "I took all
20 women."
21 A.    I believe what this correspondence had to do
22 with is both a definition of what to use but also
23 comparing the data that we extracted.
24       So Sean up top says, "I used patent
25 reproductive tracts," that most of our studies

Page 61

1  excluded the visual tubal litigation.  And then what
2  was implicit somewhere else in this discussion is
3  that there was some disagreement with our numbers,
4  and I said I took all women.
5  Q.    Do you recall in the unpublished study what
6  the -- well, strike that.
7       Do you recall in the unpublished study that
8  when you looked at and considered women from O'Brien
9  with patent reproductive tract, that subgroup, that
10 you got a higher relative risk of the association
11 between talcum powder use and ovarian cancer than if
12 you had used the entire data set from O'Brien
13 relating to all women?
14 A.    So in the published O'Brien paper -- that is
15 the location of that information, is in the published
16 O'Brien paper, open tubes or not open tubes.
17       In our unpublished systematic review, which
18 is what I think you're asking about, we got data that
19 was not published in O'Brien.  And for those data, I
20 don't know that I know the difference between whether
21 it's open or all.
22       So I know in the published paper that women
23 who had open reproductive tracts have a higher odds
24 than women, all women.  In the unpublished data,
25 where we got new data, I'm not sure that I know what

Attorneys' Eyes Only

---

Page 62

1   that result is.  By that time we had decided to use
2   women with open reproductive tracts.
3   Q.    If that calculation had been done from the
4   unpublished data, would it be contained within the
5   documents that were produced in response to
6   Deposition Exhibit 1?
7   A.    Yes.
8   Q.    In your amended MDL report, you cite the
9   patent data from O'Brien; is that right?
10  A.    Yes.
11  Q.    Do you recall in early February that you
12  emailed Dr. Woolen a draft of the research letter?
13        Take a look, if you will, at Deposition
14  Exhibit 5, and specifically pages 1021 to 1023.
15  A.    Yes.
16  Q.    On February 10th of 2020, you send --
17  A.    Yes.
18  Q.    -- to Dr. Woolen a draft of the research
19  letter; is that right?
20  A.    Yes.
21  Q.    If we look at page 1022, from Deposition
22  Exhibit 5 --
23  A.    Yes --
24        MS. O'DELL:  Dr. Smith-Bindman, would you
25  let him finish his questions instead of saying "Yes."

---

Page 63

1        THE WITNESS:  Sorry.  I apologize.
2   BY MR. ZELLERS:
3   Q.    The first sentence of the research letter
4   states:
5        (Reading) There is growing interest
6        in understanding the association
7        between talcum powder products and
8        ovarian cancer driven by several
9        multi-litigant lawsuits,
10       billion-dollar jury settlements,
11       paren, New York Times, closed
12       paren, and growing evidence that
13       most samples of talcum powder,
14       paren, testimony, closed paren,
15       including samples from 2018, paren,
16       FDA, closed paren, contain
17       asbestos, a Group 1 carcinogen,
18       paren, IRAC (end of reading) --
19       But I assume you meant IARC; correct?
20  A.    IARC.
21       MS. O'DELL:  Object to form.
22  BY MR. ZELLERS:
23  Q.    IARC, yes.  Is that right?
24  A.    Yes.
25  Q.    Who drafted that language?

---

Page 64

1   A.    So when I commented on to Sean that this
2   draft is very -- I made some edits.  I apologize, I
3   didn't use track changes.  So the initial draft was
4   made by Sean, and I made some edits to it.
5        I don't remember, that sentence that you're
6   asking about, if it was originally written by Sean or
7   by me.
8   Q.    Could it have been written by counsel for
9   the plaintiffs in the MDL litigation?
10  A.    Absolutely not.
11  Q.    Did -- strike that.
12       You're -- withdraw that.
13       Did the counsel for the plaintiffs in the
14  talcum powder litigation review any draft of this
15  research letter?
16  A.    They did not.
17  Q.    Did you ask for any comments from any of
18  plaintiffs' counsel?
19  A.    I did not.
20  Q.    When you or Sean refer to testimony in
21  brackets, what testimony are you referring to?
22  A.    I believe that was testimony from Longo,
23  that I was familiar with as part of my work in talc,
24  that showed the prevalence of fibrous talc and
25  asbestos in the talc samples.

---

Page 65

1   Q.    Have you ever, in any research publications,
2   cited the testimony from a paid expert in litigation?
3   A.    I have not.
4   Q.    And you understood in the beginning that
5   that might be problematic, both for Sean, Dr. Woolen,
6   and for JAMA, or any of the publications you may
7   submit this research letter to?
8        MS. O'DELL:  Object to the form.
9        THE WITNESS:  They are public documents, and
10  so I -- I don't think there's a problem citing public
11  documents.  I have cited public documents that are
12  unpublished, often called grey literature, by
13  scientists before.  I had never cited testimony, but
14  I have cited unpublished work that I thought would be
15  okay to cite.
16  BY MR. ZELLERS:
17  Q.    Have you cited in any research publication,
18  that you have prepared, reports or testimony from
19  paid experts in litigation?
20  A.    I have not.
21  Q.    On February 18th of 2020, you emailed
22  Dr. Bauchner, the Editor-in-Chief of JAMA, a copy of
23  your research letter; is that right?
24  A.    I'm sorry.  You told me the date but not the
25  page number.

---

Attorneys' Eyes Only

Page 66

1  Q.     Well, go back, if you will, to Exhibit 4,
2  and take a look at page 715.
3  A.     Yes.
4  Q.     You told him you were sending your short
5  research letter.  And then you continued and told
6  Dr. Bauchner:
7        (Reading) Something that O'Brien
8        said in her systematic review on
9        talc was wrong.  About in her
10        introduction was that asbestos has
11        been removed from talc since the
12        1970s.  In fact, most current
13        samples of baby powder are
14        contaminated with asbestos,
15        including samples tested by the FDA
16        last year that resulted in a recall
17        (end of reading).
18        That's your language; is that right?
19  A.     Yes, it is.
20  Q.     What's the basis for that statement?
21  A.     Which part of the statement?
22  Q.     Well, all of the statement, so specifically
23  "that asbestos has been removed from talc since the
24  1970s, and that Dr. O'Brien was wrong about that."
25  A.     So Dr. O'Brien cited something that people

Page 67

1  cite frequently, that says the manufacturers have
2  created a talcum powder product that doesn't have
3  asbestos.  That's cited a lot.  And I had seen a lot
4  of testing that shows that that's not true.
5  Q.     Have you seen the testing that shows an
6  absence of asbestos from the Johnson's Baby Powder?
7        MS. O'DELL:  Object to the form.
8        THE WITNESS:  I have seen a lot of testing
9  results.  Some shows there's asbestos in some
10  samples, some shows there's not asbestos in some
11  samples.
12  BY MR. ZELLERS:
13  Q.     You are not an expert in terms of looking at
14  a sample of talcum powder and determining whether or
15  not asbestos is present; correct?
16  A.     No, I'm not an expert.
17  Q.     You're relying, at least in part, on
18  Dr. Longo and his litigation reports that are
19  referenced in your Materials Considered List?
20  A.     Yes.
21  Q.     Have you looked at or reviewed the defense
22  experts that respond to Dr. Longo and take the other
23  side, in terms of stating that there is no asbestos
24  contamination in the Johnson's Baby Powder?
25        MS. O'DELL:  Object to the form.

Page 68

1        THE WITNESS:  I have seen testing results
2  from the Johnson & Johnson side.
3  BY MR. ZELLERS:
4  Q.     My question, though, is, have you seen --
5  withdraw that.
6        Do you understand Dr. Longo and Dr. Rigler,
7  they are paid experts for the plaintiffs in
8  litigation; correct?
9  A.     Yes.
10  Q.     Have you seen the experts who have analyzed
11  these issues and who are opining in response or on
12  behalf of defendants to Drs. Longo and Rigler?
13        MS. O'DELL:  Object to form.
14        THE WITNESS:  Yes.
15  BY MR. ZELLERS:
16  Q.     What expert reports have you seen?
17  A.     I don't remember the names of them, but I
18  asked early on for the lawyers to show me information
19  that shows that specimens are negative.
20  BY MR. ZELLERS:
21  Q.     My question, though, is what expert reports
22  for defense asbestos experts have you seen and
23  reviewed?
24        MS. O'DELL:  Objection.  I think the doctor
25  was cut off on her answer.

Page 69

1        THE WITNESS:  I don't remember the names of
2  those reports.  I have seen reports that were for
3  Johnson & Johnson that showed that specimens are not
4  contaminated with asbestos.
5  BY MR. ZELLERS:
6  Q.     My question, though, is:  Have you seen
7  litigation reports from the defense experts relating
8  to whether or not there is asbestos in the Johnson's
9  Baby Powder?
10        MS. O'DELL:  Objection.  Asked and answered.
11        THE WITNESS:  I have seen reports of --
12  BY MR. ZELLERS:
13  Q.     Would those expert litigation reports be on
14  your Reliance List or your Sources Considered List?
15  A.     I believe they would be, yes.
16  Q.     You would expect them to be; correct?
17  A.     Yes.
18  Q.     All right.  Is it fair that you, from a
19  substantive expert standpoint, cannot opine on
20  whether the defense experts are correct or the
21  plaintiff experts are correct as to whether or not
22  asbestos has been found in samples of Johnson's Baby
23  Powder?
24        MS. O'DELL:  Objection to form.
25        THE WITNESS:  I'm not sure of what the

Attorneys' Eyes Only

Page 70

1 question is. I have seen a lot of information about
2 testing, including from the FDA, from experts on both
3 sides, and have an opinion about whether that
4 evidence shows that there is talc fibers and asbestos
5 in Johnson & Johnson.
6 BY MR. ZELLERS:
7 Q.     Do you believe that you have sufficient
8 expertise to make that decision as to whether the
9 plaintiff experts are correct or the defense experts
10 are correct, as to whether or not there is or has --
11 asbestos has been found in samples of Johnson's Baby
12 Powder?
13     MS. O'DELL: Objection to form.
14     THE WITNESS: I am not a geologist, but I
15 have read and seen a lot of evidence, including from
16 the FDA, that samples, recent samples, that has
17 weighed heavily on my opinion, that there is
18 contamination in current Johnson & Johnson products.
19 BY MR. ZELLERS:
20 Q.     What information did you have as to samples
21 tested by the FDA as of February 18th of 2020?
22 A.     I know that they sampled, and that there was
23 enough evidence of fibers in asbestos that they
24 recalled some Johnson & Johnson lots of samples.
25 Q.     And you believe that had occurred by

Page 71

1 February 18th of 2020?
2 A.     I do. I don't remember the dates exactly,
3 but I do.
4 Q.     Where did you see the information about what
5 testing the FDA had done? Is that information that
6 was provided to you by plaintiffs' counsel, or is it
7 information you obtained from some other source?
8 A.     My recollection is that that made it to the
9 popular press. So --
10 Q.     Thank you.
11     In May of 2021, you and Dr. Woolen had a
12 discussion about journals that may be contacted for
13 purposes of submitting your unpublished study for
14 publication. Do you generally recall discussions
15 with Dr. Woolen about that?
16 A.     Yes.
17 Q.     Let me be specific. Go to page 342 in
18 Deposition Exhibit 4.
19 A.     342, yes.
20 Q.     Do you see that?
21     So on May 14th of 2021, you emailed
22 Dr. Woolen stating:
23     (Reading) The OBI contact had
24     suggested either obstetric/oncology
25     or obstetrics and gynecology, the

Page 72

1     Green Journal, as the next two (end
2     of reading).
3     Do you see that?
4 A.     Yes.
5 Q.     Who is the OB that you contacted?
6 A.     I believe that I got that recommendation
7 from a faculty member at UCSF named Sawaya.
8 Q.     And I understand -- strike that.
9     Who, though, was the OB that you contacted
10 or communicated with, if you recall?
11 A.     Sawaya is an obstetric/gynecologist at UCSF.
12 Q.     You went to him and asked for suggestions as
13 to journals that might be interested in the
14 publication; is that right?
15 A.     Yes.
16 Q.     And I have seen from the document production
17 that you had submitted the paper to other
18 publications, but at least as of May 2021 had not
19 been successful in publishing it; is that right?
20 A.     Yes.
21 Q.     Today have you been successful in publishing
22 your unpublished study?
23     MS. O'DELL: Object to the form.
24     THE WITNESS: It has not been published.
25     ///

Page 73

1 BY MR. ZELLERS:
2 Q.     Is it currently under submission to a
3 journal?
4 A.     Yes, it is.
5 Q.     More than one journal or just one journal?
6 A.     Just one.
7 Q.     What journal is the publication under
8 submission to?
9 A.     The "Journal of General Internal Medicine."
10 Q.     When was the paper submitted to the "Journal
11 of General Internal Medicine"?
12 A.     Relatively recently. In the last couple of
13 weeks.
14 Q.     Whose suggestion was it that you submit the
15 journal to the -- did you say --
16 A.     JGIM, J-G-I-M. JGIM, "Journal of General
17 Internal Medicine." That was my idea.
18 Q.     You had actually submitted it to the
19 "Journal of General Internal Medicine" previously; is
20 that right?
21 A.     It was referred to that journal, which is
22 not quite the same as submitting it to that directly.
23 But yes.
24 Q.     Had your unpublished study been rejected
25 initially by the "Journal of General Internal

Page 74

1  Medicine"?
2  A.      Yes.
3  Q.      Do you recall receiving a letter with
4  respect to that?
5  A.      Yes.
6  Q.      Were there comments from the journal or
7  reviewers at the journal as to why they were not
8  accepting your paper?
9  A.      So the paper had been submitted to a
10 different journal called, "Annals of Internal
11 Medicine." I don't know the relationship between the
12 "Annals of Internal Medicine." But "Annals of
13 Internal Medicine" sent the paper out for review. It
14 was reviewed, rejected.
15     We got copies of those reviews, and it said,
16 and "We're forwarding it to the "Journal of General
17 Internal Medicine."
18     We then basically heard, very soon
19 thereafter, from the "Journal of General Internal
20 Medicine" that they weren't interested in the paper.
21 They had gotten the reviews.
22     But I thought what they said was that if the
23 paper would be revised, they would be willing to look
24 at a revision. And I took that as -- as meaning it
25 might be worth sending it there, given the revisions

Page 75

1  we did, in response to the "Annals of Internal
2  Medicine" critique.
3  Q.      Do you recall when your unpublished study
4  was sent to the "Journal of General Internal
5  Medicine" the second time?
6  A.      Recently. Within the last two weeks.
7  Q.      Have you received any response?
8  A.      Not yet.
9  Q.      If you -- do you recall having a discussion
10 with Dr. Woolen back in April of 2020 about needing
11 to assess the quality of the studies that were being
12 included, either in your research letter or by now --
13 so April of 2020, you were on to your -- preparing
14 your unpublished study; is that right?
15 A.      I don't remember the date, but we discussed
16 doing a quality assessment of the included studies.
17 Q.      Take a look, if you will, at page 618 from
18 Deposition Exhibit 4.
19 A.      Yes.
20 Q.      This is a communication between Dr. Woolen
21 and yourself; is that right? And then below that is
22 an email that you sent to Dr. Woolen.
23 A.      Yes.
24 Q.      And you state -- well, withdraw.
25     Dr. Woolen said that it will be important to

Page 76

1  assess the quality of the studies that would be
2  included in your unpublished study; is that right?
3  A.      I'm sorry. What page are you on?
4  Q.      I'm on page 618.
5  A.      I'm not sure what you are referring to. I'm
6  sorry.
7  Q.      Well, did you write to Dr. Woolen on
8  April 9th of 2020:
9          (Reading) I can work on assessing
10         study quality. I printed out all
11         articles, but can obviously do
12         online (end of reading)?
13 A.      Yes.
14 Q.      And those related to the quality of the
15 studies included or to be included in your
16 unpublished study; correct?
17 A.      I was saying that I could do -- I could fill
18 out the forms for the Ottawa-Newcastle score, which
19 is a quality assessment. I was saying that I can do
20 that work, yes.
21 Q.      You told Dr. Woolen:
22         (Reading) That being said, I have
23         never abstracted data for this.
24         Should we have a call to make sure
25         I am doing correctly (end of

Page 77

1          reading)?
2  A.      Yes.
3  Q.      Do I understand that you had never used the
4  Newcastle-Ottawa Scale previously?
5  A.      That's correct.
6  Q.      And -- withdraw.
7      Dr. Woolen showed you or walked you through
8  how to use it?
9  A.      Yes.
10 Q.      Had you ever assessed a study quality using
11 a tool like the Newcastle-Ottawa Scale before April
12 of 2020?
13 A.      I have done a bunch of systematic reviews
14 and have assessed study quality, where I basically
15 lay out a checklist of things I'm going to require
16 for the study to be included, and I require only
17 inclusion of studies that meet those inclusion or
18 exclusion criteria. So that had a complete
19 ascertainment of outcomes on the checkmark. They had
20 to have two years of description of the cohorts.
21     So I had done that work. I had never used a
22 quantitative scale which assigns points for each of
23 those features before.
24 Q.      Previously what you had done --
25     MS. O'DELL: Excuse me. Would you let

Attorneys' Eyes Only

Page 78

1    Mr. Lapinski back into the Zoom, please.
2         (Discussion held off the record.)
3         MR. ZELLERS:  Back on.
4    Q.    Dr. Smith-Bindman, my understanding is
5    before April of 2020, you had your own formula -- and
6    formula is my word -- but your own way of assessing
7    the quality of studies; is that right?
8    A.    That's correct.
9    Q.    This is the first time that you used an
10   outside tool, such as the Newcastle-Ottawa Scale; is
11   that fair?
12   A.    That is correct.
13   Q.    What did you do or how did you assess the
14   quality of studies that you evaluated in your Amended
15   Expert Report?  And let me withdraw.
16        Did you assess the quality of the studies
17   that you evaluated in your Amended Expert Report?
18   A.    I required studies to describe explicitly
19   the focus on the frequency of talcum powder use.  I
20   did not explicitly score the study qualities, from my
21   own review, in the amended report.
22   Q.    In May of 2021 -- so we're now moving
23   ahead -- Dr. Woolen emailed you stating that he had
24   updated the Excel spreadsheet and noted that some
25   studies included non-perineal talc use, such as

Page 79

1    sanitary napkins, diaphragms, et cetera, in the
2    frequency calculation, and that Dr. Wu appears to
3    have averaged genital and non-genital use in the
4    frequency information.
5         Do you recall that generally?
6    A.    I don't.  But --
7    Q.    Well, take a look, then, at pages 308 and
8    309 in Deposition Exhibit 4.
9    A.    Okay.
10   Q.    So do you see that general discussion?
11        And specifically I'm looking at the May 26,
12   2021, email from Dr. Woolen to you, talking about:
13        (Reading) A few of the studies
14        include forms of non-perineal talc,
15        and then also that who appears to
16        have genital and non-genital use
17        averaged in with the frequency
18        information.  Author did not
19        separate out genital, slash,
20        perineal only (end of reading).
21   A.    Yes.
22   Q.    You responded that:
23        (Reading) It's okay to have
24        inclusion of a case or two that
25        don't belong (end of reading).

Page 80

1         And then your email says "is," but it should
2    be, "if we explain."
3    A.    Yes.
4    Q.    All right.  And that was, you know, your
5    response; is that right?
6    A.    Yes.
7    Q.    You write:
8         (Reading) Wu doesn't specify in the
9         high-use category whether that is
10        perineal or non-perineal or both,
11        but I think I would include it
12        anyway and like your idea of a
13        sensitivity analysis (end of
14        reading).
15        Is that what you told Dr. Woolen?
16        MS. O'DELL:  What page are you on?
17        THE WITNESS:  Yeah, I don't see that.
18        MR. ZELLERS:  Look on page 307.
19        MS. O'DELL:  Excuse me.
20        MR. ZELLERS:  Sure.
21   Q.    Do you see that?
22   A.    I do.
23   Q.    That was your response to Dr. Woolen; is
24   that right?
25   A.    So what Sean says above is that we would

Page 81

1    basically do a sensitivity analysis, excluding Wu
2    from the results.  So we would do it both ways,
3    including and excluding Wu, to show the impact of
4    that.  And I said that I thought that was reasonable.
5         "After-bath," it was defined as "After-bath
6    substance to peritoneum" as a different choice, so I
7    thought it was reasonable.  So I liked his idea of
8    doing the analysis both ways, including and
9    excluding.  I believe that's how we ended up doing
10   it.
11   Q.    Your understanding is you did do a
12   sensitivity analysis; is that right?
13   A.    I believe so.
14   Q.    If a sensitivity analysis was done, then you
15   would expect it to be included in the documents that
16   were produced in response to Exhibit 1; right?
17   A.    Yes.
18   Q.    Take a look at page 791, on page -- strike
19   that.  Page 791 of Exhibit 4.
20   A.    Yes.
21   Q.    So one of your inclusion criteria, or at
22   least in this discussion with Dr. Woolen, was
23   perineal type of exposure reported separately from
24   other exposures; is that right?
25   A.    Yes.  We discussed that this was the

Attorneys' Eyes Only

Page 82

1  inclusion for the research letter. But yes.
2  Q.      And I believe that we also established that,
3  at least this was the start of the inclusion and
4  exclusion of criteria for the study itself, the
5  unpublished study?
6  A.      Yes.
7  Q.      In fact, was perineal type of exposure
8  reported separately from other exposures, was that an
9  inclusion criteria ultimately for the unpublished
10  study?
11  A.      Yes.
12  Q.      The Wu paper, that we just referenced,
13  doesn't meet that inclusion criterion; correct?
14  A.      No. I disagree. I think it meets it for
15  almost all the patients, but in one group you
16  couldn't tell. And it seemed that it was including
17  it in perineal, but, you know, some part of it was
18  not certain. So there was -- it seemed to me, by
19  that exchange, that there was a patient or two where
20  it was ambiguous, but that the vast majority were
21  well described.
22      So I think that was the discussion, that it
23  looks like perineal, but there's a little bit of
24  overlap. Let's not -- let's explain that and then
25  include the sensitivity analysis, that seems -- if

Page 83

1  that makes a difference. It looks like mostly that
2  should be included.
3  Q.      Dr. Woolen, as we looked at before, said:
4      (Reading) Wu appears to have
5      genital and nongenital use averaged
6      in with the frequency information.
7      Author did not separate out
8      genital, slash, perineal only (end
9      of reading).
10      At least that's what Dr. Woolen told you; is
11  that right?
12  A.      I believe you just read it. I don't have
13  that in front of me.
14  Q.      Out of the -- well, let me withdraw.
15      Out of the studies in your unpublished
16  study, the studies that you looked at for that
17  meta-analysis, there were 11 studies, as I recall?
18  Does that seem right?
19  A.      Uh-huh.
20  Q.      The study with the highest risk ratio of 2.8
21  was the Wu study; is that right?
22  A.      I do not remember, but I'm looking now.
23  Q.      Well --
24  A.      You said 2.8?
25  Q.      I'm sorry. I misspoke.

Page 84

1      The Wu paper had the highest risk ratio of
2  2.08 --
3  A.      Yes.
4  Q.      -- of all the studies you included in your
5  unpublished study; is that right?
6  A.      Yes.
7  Q.      In August of 2021 -- so a couple of months
8  ago -- Dr. Woolen emailed you stating:
9      (Reading) I removed all content
10      from the litigation and news media
11      because I think we will get called
12      out from our litigation bias (end
13      of reading).
14      And that probably should be "for our
15  litigation bias."
16      (Reading) I tried to stick to the
17      science as much as possible.
18      Luckily, a newer basic science
19      paper found talc and asbestosis in
20      some ovarian cancer cases, so I
21      highlighted that in the discussion
22      (end of reading).
23      MS. O'DELL: What page are you on?
24      MR. ZELLERS: Well, if you need to look at
25  it, and for the record, it's page 227.

Page 85

1  Q.      Do you generally recall having that
2  discussion with Dr. Woolen?
3  A.      Yes.
4  Q.      And one of the problems, at least perceived
5  problems with getting your paper published, is the
6  litigation bias, or at least perceived litigation
7  bias; is that right?
8      MS. O'DELL: Object to the form.
9      THE WITNESS: Yes, that is what Sean said.
10  BY MR. ZELLERS:
11  Q.      In both your original MDL report and your
12  amended MDL report, your opinion is that talcum
13  powder causes ovarian cancer; is that right?
14  A.      Yes.
15  Q.      And you've done a systematic review both in
16  the MDL proceedings, the litigation proceedings, and
17  also with respect to your unpublished study; is that
18  right?
19  A.      I'm sorry. Is there a question?
20  Q.      Yes.
21  A.      What was the question?
22  Q.      You did a systematic review, both originally
23  in your MDL report and also, at least repeated it
24  with some changes in the description, in your amended
25  MDL report; correct?

Page 86

1    MS. O'DELL: Object to the form.
2    THE WITNESS: I don't understand the
3 distinction you're making. I don't --
4 BY MR. ZELLERS:
5 Q.    I'm asking if you did a systematic review as
6 part of your litigation analysis in this case?
7 A.    I did a systematic review that I describe in
8 my expert report. And I worked on a separate piece
9 of research with Sean.
10 Q.    Which you also describe and explain in your
11 Amended Expert Report; correct?
12 A.    I don't describe it except to say that it
13 exists. I haven't described it, the content of it.
14    MR. ZELLERS: Let's go off the record.
15    (Off the record at 11:35 a.m. Back on the
16 record at 11:45 a.m.
17 BY MR. ZELLERS:
18 Q.    Dr. Smith-Bindman, are you ready to
19 continue?
20 A.    Yes, I am.
21 Q.    Your opinion is that there's an association
22 between genital talc use and ovarian cancer; is that
23 right?
24 A.    Yes.
25 Q.    In support of your opinion, you've done your

Page 87

1 systematic review that's described in your MDL
2 original report and the amended report; is that
3 right?
4 A.    Yes.
5 Q.    And you've also done this unpublished study,
6 and the analysis that goes into that; correct?
7 A.    Yes.
8 Q.    The systematic review, that's referred to
9 generally on pages 33 to 37 of your amended report;
10 is that right? The amended report we marked as
11 Deposition Exhibit 9.
12 A.    Yes.
13 Q.    You changed from your original report, that
14 we marked as Exhibit 10, to your amended report, the
15 description from "systematic review" to "new review";
16 is that right?
17    So I'm looking at the title.
18    MS. O'DELL: Page 34 of the amended report?
19 I'm just making sure.
20    THE WITNESS: Yes.
21 BY MR. ZELLERS:
22 Q.    Page 34, subsection 6, you state, "New
23 review." And that's a change from "systematic
24 review"; is that right?
25    MS. O'DELL: Object to the form.

Page 88

1 BY MR. ZELLERS:
2 Q.    If you want, Doctor, go to the redline
3 version.
4 A.    Correct.
5 Q.    So that is Deposition Exhibit 11.
6 A.    I'm not entirely sure what you're asking me
7 to confirm.
8 Q.    All I'm asking you to say is you changed the
9 name from "systematic review" in the original report
10 to simply "new review" in the amended report; is that
11 right?
12    MS. O'DELL: Objection to the form. There
13 are additional words there.
14    MR. ZELLERS: Well, of course.
15    I will withdraw the question.
16 Q.    Doctor, do you have a memory of changing the
17 terminology in your amended report from "systematic
18 review" to "new review"?
19 A.    I do not believe that I did that. I'm
20 looking at -- I understand there's a different
21 section. But on page 33, 5, it says:
22    (Reading) Rationale for and
23    explanation of the new systematic
24    review (end of reading).
25    And then the next section has:

Page 89

1    (Reading) New review quantifying
2    association between regular use of
3    general talcum powder and
4    epithelial ovarian cancer (end of
5    reading).
6 Q.    Doctor, go to page 31 of your original
7 report. So you're looking at your original report,
8 which we marked as Exhibit 10. Go to page 31.
9    Are you on page 31?
10 A.    At page 31 it says, "New systematic review."
11 Q.    Exactly. That's your Section 6 heading --
12 A.    Yes.
13 Q.    -- "New Systematic Review of Literature
14 Quantifying Association Between Regular Frequent
15 Genital, paren, Perineal, closed Paren, Talcum Powder
16 Products Application and Ovarian Epithelial Cancer
17 Risk, With a Focus on Invasive Serous Cancer."
18    Did I read that correctly?
19 A.    I --
20 Q.    You can't say if I read the title of
21 Section 6 on page 31 correctly?
22 A.    Yes, you read the title correctly.
23 Q.    All right. Then if we go to your amended
24 report --
25 A.    Yes.

Attorneys' Eyes Only

Page 90

1  Q.    -- Exhibit 9, page 34, you change the
2  description of section 7, "New Review Quantifying
3  Association Between Regular Use of Genital Talcum
4  Powder Products and Ovarian Epithelial Cancer"; is
5  that correct?
6  A.    Yes, you read that correctly.
7  Q.    My understanding is that you did not change
8  the meta-analysis itself, and by that I mean the
9  systematic review that you performed and that you
10  describe in your first deposition, and you describe
11  in your original report.  You have not done a further
12  or updated or different meta-analysis for purposes of
13  your amended report; is that right?
14  A.    Correct.  It did not change.
15  Q.    The only new meta-analysis that you've done
16  between your original report and your amended report
17  was whatever work you and Dr. Woolen did on your
18  unpublished study; correct?
19  A.    Yes.
20  Q.    On page 35 -- well, let me foundationally
21  say, on page 34 of your amended report, you explain
22  that:
23        (Reading) For the systematic review
24        below of studies on the
25        relationship between perennial

Page 91

1        exposure to talcum powder products
2        and ovarian cancer, I focused on
3        whether regular use of perineal or
4        genital talc increases the risk of
5        ovarian cancer (end of reading).
6        Is that correct?
7  A.    I don't know where you are.  Sorry.
8  Q.    Well, is that generally what you did?
9  A.    Yes.
10  Q.    Then on page 35 of your amended report,
11  Exhibit 9, you state in the second subsection under
12  "Defining Talcum Powder's Use":
13        (Reading) Regular use was defined
14        as at least three times per week or
15        where the total number of lifetime
16        applications correspond to
17        approximately daily exposure (end
18        of reading).
19        Is that correct?
20  A.    Yes.
21  Q.    The review you performed, in both your
22  original report and your amended report, included ten
23  studies; is that right?
24  A.    Yes, that's correct.
25  Q.    And if you take a look at page 36 of the

Page 92

1  amended report, Exhibit 9, those ten studies are
2  listed on figure 2, on page 36; is that right?
3  A.    Yes.
4  Q.    (Reading) These ten studies reported
5        on regular talc powder products'
6        use and the risk of ovarian cancer,
7        these studies were homogeneous, and
8        the odds of ovarian cancer
9        associated with regular use was
10        1.43 percent with a 95 percent
11        confidence interval of 1.15 to 1.71
12        (end of reading).
13        That's what you state in your amended report
14  under, "Results"; is that right?
15  A.    Yes.  It's an odds of 1.43.  But yes.
16        MS. O'DELL:  Mike, this material is the same
17  as in her original report, and I understand --
18        MR. ZELLERS:  I've got -- this is just
19  foundational.  And what I'm trying to understand is
20  the differences.  Because there are differences
21  between the amended report and the original report
22  with respect to the meta-analysis, or at least the
23  description of the meta-analysis.  So I'm trying to
24  understand what the differences are.
25  Q.    I do -- I believe, Dr. Smith-Bindman, that

Page 93

1  your conclusion, that I just read here, is the same
2  conclusion that you put in your original report; is
3  that right?
4        THE WITNESS:  Yes.
5        MR. ZELLERS:  And, Ms. O'Dell, so you
6  understand where I'm going, there are changes here,
7  and particularly a change from a focus on serous to a
8  general opinion that I'm going to ask about.
9        MS. O'DELL:  We don't have any objection to
10  any changes that you explore with Dr. Smith-Bindman.
11  But I understand Judge Wolfson has made clear that
12  there's no going back to previous -- excuse me,
13  previous retreading of topics that she covered in the
14  first deposition.
15        And I understand what you're doing now.  I
16  just wanted to let you know that we object to that
17  type of examination.
18        MR. ZELLERS:  Understood.
19  Q.    Dr. Smith-Bindman, your unpublished study
20  follows a similar methodology but not necessarily
21  identical methodology, is as the systematic review
22  that is described in your Amended Expert Report; is
23  that right?
24        And I'm looking at page 17, if you need to
25  read the words.

Attorneys Eyes Only

Page 94

1  A.    No, I -- you're asking if what I'm referring
2  to is the unpublished results?
3  Q.    What I'm asking you is:  Do you agree that
4  your unpublished study follows a similar methodology
5  but not necessarily identical as the systematic
6  review that's contained in both your original report
7  and then, you know, with some variations, in your
8  amended report?
9  A.    Yes.
10 Q.    In order to publish or attempt to publish
11 your systematic review, you had to include greater
12 details about the methodology so that other
13 investigators could duplicate your work; is that
14 right?
15 A.    Yes.
16 Q.    In order to publish the results in a
17 high-impact journal, you had to register your study
18 protocol; is that right?
19 A.    Yes.
20 Q.    You and Drs. Woolen and Lazar -- and
21 Dr. Lazar is a statistician?
22 A.    Uh-huh.
23 Q.    -- set out to follow the strict rules for
24 systematic reviews, that are outlined by the Cochrane
25 collaboration, in order to attempt to get your

Page 95

1  unpublished study published?
2  A.    Yes.
3  Q.    You did a search of the literature with
4  respect to your unpublished study; correct?
5  A.    Uh-huh.
6  Q.    You -- is that a "Yes"?
7  A.    Yes.
8  Q.    You hired a library informationist to
9  conduct a search?
10 A.    I don't think it was hiring.  But we asked.
11 Q.    All right.  Someone was provided to you --
12 A.    Yes.
13 Q.    -- is that right?
14 A.    Yes.
15 Q.    Dr. Woolen set the guidelines for pooling
16 data, for analyzing data, and for developing the
17 protocol; correct?
18 A.    Anne contributed to that as well, but, yes,
19 Sean led that effort.
20 Q.    Dr. Woolen created the steps for analyzing
21 the data, checking for consistency; is that correct?
22 A.    Yes.
23 Q.    The purpose of your unpublished study is to
24 estimate the association between frequent, at least
25 two times per week, perineal talcum powder use and

Page 96

1  ovarian cancer; is that right?
2  A.    Yes.
3  Q.    This definition of frequent use, of two
4  times a week, is similar to regular use of three
5  times a week in your MDL systematic review; is that
6  right?
7  A.    Yes.
8  Q.    There's a difference of a day, but
9  essentially are you looking at the same groups?
10 A.    The inclusion is different by a day, but the
11 women who were included are mostly daily users.  So,
12 in large part, it results in a similar identification
13 of frequent users.
14 Q.    There was a database search that was done;
15 it returned 761 citations.  And after a review of
16 those potential studies, you and Dr. Woolen got down
17 to 11 studies; fair?
18 A.    Yes.
19 Q.    The only difference between the 10 studies
20 in your MDL systematic review and the 11 in the
21 unpublished study is that you include the Rosenblatt
22 study in your unpublished study; is that right?
23 A.    There is another important difference.
24 Q.    What is that?
25 A.    In the review that I did as part of my

Page 97

1  systematic review for the MDL, I included Gertik as a
2  reflection of the Nurses' Health Study, NHS.
3  Q.    Gertig is the --
4        MS. O'DELL:  Excuse me.  Were you finished,
5  Dr. Smith-Bindman?
6        THE WITNESS:  No.
7        MR. ZELLERS:  Oh, I'm sorry.  Go ahead.
8        THE WITNESS:  So as part of the review we
9  did, we used the publication from Gertig from 2000.
10 Since -- after I had written my -- and done the
11 review, there was a much longer period of follow-up
12 published in O'Brien from the Nurses' Health Study.
13       Further, in addition to that longer period
14 of follow-up, we reached out to O'Brien to include
15 unpublished data from the Nurses' Health Study.  So
16 in the systematic review that's unpublished, we have
17 a much longer period of follow-up from the Nurses'
18 Health Study.
19 BY MR. ZELLERS:
20 Q.    Do I understand correctly that the
21 differences, in terms of at least study inclusion or
22 data inclusion, between the systematic review that
23 you describe in your MDL and amended MDL report, and
24 your unpublished study, which you also reference in
25 your report, is that the unpublished study includes

Attorneys Eyes Only

Page 98

1  Rosenblatt; correct?
2  A.    Yes.
3  Q.    Rosenblatt was excluded from your systematic
4  review that you did for purposes of the MDL lawyers?
5      MS. O'DELL:  Object to the form.
6      THE WITNESS:  I believe the initial draft
7  did the analysis with and without that author, and it
8  didn't have any impact because it's a very small
9  study.
10     And so in the amended report, I didn't
11 include both versions with and without because it
12 didn't have an impact.  So it was not included in the
13 amended report.  I think it was -- it might have been
14 in the first, and it is included in the unpublished
15 review.
16     MR. ZELLERS:  All right.  Move to strike as
17 nonresponsive.
18 Q.    My question is:  In the systematic review
19 that you did for the MDL lawyers, that systematic
20 review excluded Rosenblatt?
21     And I believe we had a discussion about that
22 when I took your deposition back in 2019.
23     If you don't recall, it's okay to say you
24 don't recall, and we can look at your documents at a
25 later time.

Page 99

1  A.    I don't fully recall.
2  Q.    All right.  And, again, I do believe that I
3  asked you questions about Rosenblatt and the
4  exclusion, and why the study was excluded from the
5  MDL systematic review back when we talked in 2019.
6      My new question is:  Your unpublished study
7  includes Rosenblatt --
8  A.    Yes.
9  Q.    -- and it includes the unpublished
10 information from O'Brien relating to the Nurses'
11 Health Study 1; is that right?
12 A.    Yes.
13 Q.    Your paper -- well, let me back up.
14     So you contacted Dr. O'Brien, and you
15 requested primary data from the Nurses' Health Study
16 1 for the highest frequency talc exposure group;
17 correct?
18 A.    Yes.
19 Q.    Your paper then, your unpublished paper,
20 used this unpublished data from the Nurses' Health
21 Study 1, which also was published in Gertig 2000, for
22 only those women in the highest frequency talc
23 exposure group; correct?
24 A.    Yes.
25 Q.    So your unpublished study includes updated

Page 100

1  information with a longer period of follow-up and a
2  greater number of incident cancers from the Nurses'
3  Health Study 1; correct?
4  A.    Yes.
5  Q.    And you describe that in your amended
6  report, deposition Exhibit 9, at page 17.  I don't
7  need you to confirm that, other than does that sound
8  right?
9  A.    Yes.
10     MS. O'DELL:  Object to the form.
11     THE WITNESS:  Yes.
12 BY MR. ZELLERS:
13 Q.    Do you consider Rosenblatt to be a
14 high-quality study?
15 A.    I do not.  I don't remember it in detail,
16 but I know I did not think it was a high quality
17 study.
18 Q.    And why do you not think Rosenblatt is a
19 high-quality study?
20 A.    My recollection is that it just didn't
21 provide a lot of detail.  Not so much that it was a
22 poor study, but just that I -- there was a lot I
23 didn't know about the study.
24 Q.    In your unpublished study, you use the
25 confidence intervals that were cited in the original

Page 101

1  studies; is that right?
2  A.    I am not a hundred percent sure about that.
3  Q.    All right.
4  A.    I -- yeah.
5  Q.    Take a look at page 38 at Deposition
6  Exhibit 4.
7  A.    Yes.
8  Q.    Does it appear that at least in your draft
9  of the unpublished study, that you use the confidence
10 intervals that were cited in the original studies?
11 A.    I know the confidence intervals are not
12 exactly the same as the ones in my report.  I am not
13 positive that these confidence intervals reflect the
14 published numbers.  I believe they do, but I'm not
15 sure about that.
16 Q.    There's a difference in the confidence
17 intervals reported for the studies between your MDL
18 systematic review and your unpublished study;
19 correct?
20 A.    Yes.  Correct.
21 Q.    As we sit here today, you're not able to
22 explain to me the difference between those confidence
23 intervals; correct?
24     MS. O'DELL:  Object to the form.
25     THE WITNESS:  No.  The biostatistician,

Attorneys' Eyes Only

Page 102

1    Anne, used a different approach for calculating the
2    confidence interval.  So I know they changed a little
3    bit.  They shifted a little bit from the ones we had
4    used, that Jane had calculated for me in the MDL
5    report systematic review.
6    BY MR. ZELLERS:
7    Q.    Jane Hall calculated confidence intervals
8    for the MDL systematic review; correct?
9    A.    Yes.
10    Q.    Anne Lazar calculated the confidence
11    intervals for your unpublished study; correct?
12    A.    That's correct.
13    Q.    You're not able to tell me what Anne Lazar
14    did or how she went about calculating the confidence
15    intervals for the unpublished study; is that right?
16        MS. O'DELL:  Object to the form.
17        THE WITNESS:  So in the unpublished
18    manuscript, it explained how those numbers were
19    calculated.
20    BY MR. ZELLERS:
21    Q.    That's where you would go to understand how
22    the numbers were calculated; correct?
23    A.    Yes.
24    Q.    All right.
25    A.    Yes.

Page 103

1    Q.    You've submitted the unpublished study to a
2    number of different journals for publication; is that
3    right?
4    A.    Yes.
5    Q.    I believe I counted, and the journal [sic]
6    has been submitted and rejected by at least eight
7    peer-review publications; correct?
8    A.    I need to count.  Would you like me to
9    count?
10    Q.    Let's go through it.  I'm going to ask you
11    some questions about the submissions --
12    A.    Yes.
13    Q.    -- and at the end we can read the record and
14    see --
15    A.    Great.
16    Q.    -- what we have.
17        Back in early February of 2020 -- so this, I
18    believe, is during the period of time you were still
19    considering a response to the O'Brien paper -- you
20    reached out to Dr. Wu, and you requested her data on
21    regular frequent daily use, and if she would be
22    willing to share that data; correct?
23    A.    Yes.
24    Q.    And Dr. Wu responded -- and I think this is
25    consistent with your earlier testimony -- that she

Page 104

1    had the data but was concerned about your timing and
2    replied, "I hesitate to commit because of our
3    deadlines."  Is that your recollection?
4    A.    Yes.
5    Q.    You responded, "I am not sure if it would
6    help, but I would be happy to contribute dollars to
7    pay for someone from your team to try to put time in
8    trying to retrieve these data."  Do you recall that?
9    A.    Yes.
10    Q.    Did you ever follow up after that, or did
11    you ever hear back from Dr. Wu?
12    A.    I don't remember specifically if she
13    responded to that email, but she wasn't able to
14    provide the data.
15    Q.    Any response would have been by email;
16    correct?
17    A.    Yes.
18    Q.    And any response would have been included in
19    your response to the request for production of
20    documents relating to the unpublished study; is that
21    right?
22    A.    Yes.
23    Q.    Who was going to pay for someone on Dr. Wu's
24    team to try to retrieve the data?
25    A.    I'm sure I didn't exactly know at the time I

Page 105

1    offered.  But I have small amounts of faculty
2    research funding that I was probably imagining to
3    use.
4    Q.    On February 4th of 2020, you and Dr. Woolen
5    were discussing the Excel sheet and how you both
6    included different control and cancer numbers; do you
7    recall that?
8    A.    I recall that we discussed disagreements in
9    data extraction, if that's what you're referring to.
10    Q.    Do you recall telling Dr. Woolen that, "At
11    some point I got lazy about entering age and
12    enrollment period"?
13    A.    I do remember saying that.
14    Q.    And do you remember around this same time,
15    February of 2020, telling Dr. Woolen, "I have
16    definitely never worked quite so fast"?
17    A.    I don't remember that, but I'm not
18    surprised, if you're reading it, that I would have
19    said that.
20    Q.    So --
21    A.    And this was -- this was for the research
22    letter, I believe, not the review that you keep
23    referring to.  This was the research letter where we
24    only had a month when it could be considered in
25    response to O'Brien.  So I don't know what you're

Page 106

1 reading, but --
2 Q.    Well, I'm reading your emails.  But in terms
3 of timing, the emails are February 4th and
4 February 14th of 2020, and I believe that was before
5 you submitted the research letter.
6         We identified earlier that you submitted the
7 research letter to Dr. Bauchner on February 18th of
8 2020?
9         MS. O'DELL:  Excuse me.  Object to the form
10 and just request that you direct Dr. Smith-Bindman to
11 the -- to the page so she can get herself oriented as
12 to time.
13        MR. ZELLERS:  Well, I don't think we need to
14 do that.
15        I will note, for the record, that the first
16 statement was on page 974, the second statement was
17 on page 1054 of Deposition Exhibit 5, but the doctor
18 said that sounds right, and explained the context.
19        MS. O'DELL:  There are 1380-something pages,
20 and I'm sure that we don't expect Dr. Smith-Bindman
21 to have them committed to memory.  And we want to
22 make sure it is accurate.
23        MR. ZELLERS:  You have objected to form.
24 Q.    Dr. Smith-Bindman, so now going forward in
25 time, do you recall in June of this year having a

Page 107

1 discussion where Dr. Woolen suggested, "We will have
2 to rerun some of the stats based on the values
3 changing in the Excel document"?  Do you recall that
4 at all?
5 A.    Not -- I don't know what it's referring to.
6 Q.    Take a look at page 1131, Deposition
7 Exhibit 5.  Do you see that page?
8 A.    Yes.
9 Q.    And do you see the statement from
10 Dr. Woolen, "We will have to rerun some of the stats
11 based on the values changing in the Excel document"?
12 A.    For the sensitivity analysis.
13 Q.    And this relates to the journals and the
14 attempts to have your unpublished study published; is
15 that right?
16        MS. O'DELL:  Object to the form.
17        THE WITNESS:  I do not remember what this
18 was a revision to, but I'm looking back a little bit.
19        So I see what it's referring to a few pages
20 back.
21 BY MR. ZELLERS:
22 Q.    All right.  Your response to Dr. Woolen was,
23 "Not sure about relooking at numbers.  Seems too much
24 work."
25        Did I read that correctly?  Did I read your

Page 108

1 statement correctly?
2 A.    You read the statement correctly, yes.
3 Q.    All right.  The timing of this was around
4 the time that your unpublished study was rejected
5 from "JAMA Internal Medicine," "JAMA Oncology," "JAMA
6 Open Network," "BMJ," "Annals of Internal Medicine,"
7 and "Journal of General Internal Medicine"; is that
8 right?
9         MS. O'DELL:  Object to the form.
10        THE WITNESS:  Several of those rejections
11 were not actually paper submissions that we did.  We
12 submitted the paper to "JAMA Internal Medicine."
13 They then referred it to other journals.  We were
14 sort of not really involved in that.  And the other
15 journals passed on them.  But we hadn't actually
16 submitted it to those other journals.
17 BY MR. ZELLERS:
18 Q.    I will ask you a few questions about that.
19        Do you recall back in September of 2021 --
20 so just last month, because we're now on
21 October 1st --
22 A.    Yes.
23 Q.    -- that you submitted the unpublished study
24 to the "American Journal of Obstetrics and
25 Gynecology"?

Page 109

1 A.    Yes.
2 Q.    And have you heard back from the "American
3 Journal of Obstetrics and Gynecology"?
4 A.    Yes, we heard back a few days later.  They
5 decided not to review it at all.
6 Q.    Did you get a letter to that effect?
7 A.    Sean would have gotten the letter.
8 Q.    All right.  Did he share the letter with
9 you?  Did you see the letter?
10 A.    I think I saw the letter.
11 Q.    Were there comments, reviewer comments?
12 A.    No.  They didn't review the paper.
13 Q.    Did they state why they were not accepting
14 the paper for publication?
15 A.    They said they had -- you know, that they
16 accept fewer than five percent of submitted
17 manuscripts.
18 Q.    Did they give any substantive reasons as to
19 why they were not accepting?
20 A.    Not that I remember.  They didn't send it
21 out for review.
22 Q.    If I understand your testimony, that since
23 that time, since receiving that rejection, that you
24 and Dr. Woolen have submitted the unpublished study
25 to the "Journal of General Internal Medicine"; is

Attorneys' Eyes Only

Page 110

1  that right?
2  A.    Yes.
3  Q.    On February 26 of 2020 -- so early February
4  of 2020 -- let me check that date.  I will restart my
5  question.
6       On February 26, 2020, Dr. Bauchner said,
7  "Jody mentioned meta-analysis not possible as a RL."
8  So can you take a look, please, at page 706,
9  Deposition Exhibit 4.  Do you have that?
10 A.    I have page 706.  Yes.
11 Q.    And Dr. Bauchner is telling you at the end
12 of February 2020, "Jody mentioned meta-analysis not
13 possible as a RL."  Who is Jody?
14 A.    Jody is the editor of the research letters.
15 Q.    Dr. Bauchner continues, "Do think it will be
16 a stretch at JAMA for various reasons.  Think JAMA IM
17 a better first stop."
18      JAMA IM is "JAMA Internal Medicine"; is that
19 right?
20 A.    Yes.
21 Q.    Then in February -- strike that.
22      In September of 2020, you submitted your
23 unpublished study to "JAMA Internal Medicine"; is
24 that right?
25 A.    It was about that time.

Page 111

1  Q.    All right.  In December of 2020, the study
2  was rejected.  Do you recall that?
3  A.    I remember it was rejected, but, again, the
4  timing I don't have.
5  Q.    Take a look, if you will, at Exhibit 4,
6  page 434.
7  A.    Yes.
8       MS. O'DELL:  Excuse me, Dr. Smith-Bindman.
9  Is your answer to the question "Yes," or you're at
10 the right page?
11      THE WITNESS:  I am at the right page.
12      MS. O'DELL:  Please make sure because it
13 might be confusing on the record.
14 BY MR. ZELLERS:
15 Q.    On December 7, 2020, your unpublished study
16 was rejected by "JAMA Internal Medicine"; is that
17 right?
18 A.    Yes.
19 Q.    You received reviewer comments back from
20 "JAMA Internal Medicine"?
21 A.    Yes.
22 Q.    You thought the "JAMA Internal Medicine"
23 reviewers make some good points, I am afraid, and
24 were -- you were not optimistic, given the reviews,
25 that "JAMA Oncology" would accept the study for

Page 112

1  publication; is that right?
2  A.    Yes.
3  Q.    If you look on page 435, this is at least
4  some of the communications between Dr. Woolen and
5  Richard Grant, who is the reviewing editor for "JAMA
6  Internal Medicine"; is that right?
7  A.    Yes.
8  Q.    So I see reviewer comments here from
9  Reviewer 3 and Reviewer 4.  Did you receive other
10 reviewer comments other than from Reviewer 3 and 4 --
11 and also I see Reviewer 5 provided some comments.
12 A.    Yes, just those three.
13 Q.    Do you recall seeing any other comments from
14 any of the other reviewers at "JAMA Internal
15 Medicine"?
16 A.    I did not.  And I reached out to Sean to
17 make sure that there were no other comments that
18 somehow I just didn't have.  And there were no other
19 comments provided.
20 Q.    Well, if we look at page 435, Reviewer 3 was
21 critical of the lack of consideration given to
22 specific histological types; is that right?
23      And I'm looking at the last paragraph on the
24 page:
25      (Reading) No consideration is given

Page 113

1       to other epidemiologic aspects of
2       the association between talc use
3       and risk of ovarian cancer, such as
4       dose-response, specificity, paren,
5       i.e., risk of specific histological
6       types of ovarian cancer, latency,
7       et cetera.  In general, the
8       important issue of recall bias in
9       case-control studies is downplayed
10      (end of reading).
11      Those were comments made by at least one of
12 the reviewers from "JAMA Internal Medicine"; is that
13 right?
14 A.    Yes.
15 Q.    That reviewer was also critical about
16 comparing the risk of talc use and ovarian cancer to
17 high occupational exposure to asbestos; is that
18 right?
19      And specifically, Dr. Smith-Bindman, I'm
20 looking at the top of page 436, the comment from?
21 Reviewer No. 3:
22      (Reading) Nonepidemiologic
23      consideration are ignored to
24      conclude on causality solely on the
25      basis of a pooled, paren, and

Attorneys' Eyes Only

Page 114

1    biased, see above, closed paren,
2    estimate of relative risk is
3    inappropriate. In particular,
4    assuming the association between
5    perineal talc use and ovarian
6    cancer, risk is real, how could the
7    relative risk be comparable to that
8    of women with high sustained
9    occupational exposure to asbestos,
10   paren, see Carmargo, et al., 2011,
11   closed paren, given that in the
12   worst-case asbestos was present as
13   impurity in some talc products (end
14   of reading).
15       Was that the criticism, or at least the
16   review from Reviewer 3?
17   A.    That was the review for -- I don't think
18   there was anything about any of the occupational
19   exposure or Combargo in the paper. I think they were
20   just comparing what we found for talcum powder. In
21   their mind they compared it to occupational
22   exposures. I don't think that was anything in our
23   paper.
24   Q.    Reviewer 4 questioned the need for another
25   meta-analysis; is that right?

Page 115

1        And I'm looking at -- you see the Reviewer 4
2    comments on page 436?
3    A.    Yes.
4    Q.    And I'm looking partway through the first
5    paragraph:
6        (Reading) There are a few
7        fundamental issues, particularly
8        the need to conduct a meta-analysis
9        for frequent talc use.
10       Additionally, there are some
11       instances where the authors
12       overstate prior literature, and
13       epidemiologic concepts are
14       misrepresented or not appropriately
15       discussed throughout the manuscript
16       (end of reading).
17       That was, at least in part, the comment by
18   Reviewer No. 4; is that right?
19   A.    That is correct.
20   Q.    That reviewer also questioned your
21   definition of regular use; is that right?
22       So I'm looking at his or her comment 1:
23       (Reading) The entire rationale of
24       this meta-analysis is the need to
25       look at frequent perineal powder

Page 116

1    use as the ever, slash, never use
2    association is diluted by the
3    one-time user. However, there are
4    two main fallacies with this
5    argument. First, in the majority
6    of these studies and, quote, ever
7    user, closed quote, of talc/body
8    powder is specifically specified as
9    a quote, regular, closed quote,
10   talc, slash, body powder user with
11   different quantifications for,
12   quote, regular use, closed quote,
13   paren, use of talc, slash, body
14   powder for at least once a month
15   for six months or longer, closed
16   paren (end of reading).
17       Did I read that correctly?
18   A.    Yes.
19   Q.    So then he continues:
20       (Reading) So the association for
21       ever/never use is generally
22       reflected of regular talc/body
23       powder users, not one-time use (end
24       of reading).
25       So that was the comment from Reviewer 4; is

Page 117

1    that right?
2    A.    Yes.
3    Q.    And so what that reviewer is saying is that
4    the association for ever/never is generally
5    reflective of regular use; is that right?
6    A.    That is what the reviewer says.
7    Q.    All right. That Reviewer No. 4, on page 436
8    of Exhibit 4, was also critical of quantifying
9    frequent use due to recall, misclassification, and
10   measurement error; is that right?
11   A.    Yes.
12   Q.    And I won't read it, but I was specifically
13   looking at his comment also on No. 1, where he goes
14   on to state, "Second, the authors failed to
15   acknowledge."
16       He or she continues, and also was critical
17   regarding duration of use from the unpublished study;
18   is that right?
19       MS. O'DELL: Object to the form.
20   BY MR. ZELLERS:
21   Q.    Well, take a look at his comment or her
22   comment under, "Major comments No. 2," page 436.
23       (Reading) It is unclear whether the
24       reported frequent use of at least
25       two times weekly occurs within a

Attorneys' Eyes Only

Page 118

1    set duration, the lifespan,
2    et cetera.  There is a missed
3    opportunity to examine duration of
4    use as well as lifetime number of
5    applications (end of reading).
6        Is that the statement by Reviewer No. 4?
7    A.    Yes.
8    Q.    Reviewer No. 4 states that the studies that
9    you include in your unpublished study include women
10   who use other powders, including corn starch and
11   deodorizing powders and was critical that you did not
12   include an analysis of these other powders in your
13   study; is that right?
14   A.    Yes.
15   Q.    The reviewer further thought that the
16   references in the unpublished study to asbestos were
17   misleading; correct?
18   A.    Yes.
19   Q.    The author stated, "While the publicity" --
20   strike that.
21       The reviewer stated:
22       (Reading) While the publicity
23       related to talc and how it could
24       affect reporting of talc use is
25       briefly mentioned in lines 274 to

Page 119

1    275, the authors did not address
2    the reporting bias due to the
3    lawsuits that was observed in
4    Schildkraut, et al., and additional
5    sensitivity analysis excluding
6    Schildkraut, et al. should be
7    conducted (end of reading).
8        Was that another comment that the reviewers
9    made?
10   A.    Yes.
11   Q.    You reviewed these comments with Dr. Woolen;
12   is that right?
13   A.    Yes.
14   Q.    You tried, or at least then, and then
15   subsequently, have attempted to address the concerns
16   and the comments of the reviewers; is that right?
17   A.    I think we carefully considered each of the
18   comments.  And the ones that we thought were
19   insightful and that we thought would strengthen the
20   paper, we made those changes.  And the ones that we
21   didn't agree with, we didn't make those changes.
22   Q.    Well, you did agree generally with these
23   "JAMA Internal Medicine" reviewers that they made
24   some good points; correct?
25   A.    Yes.

Page 120

1    Q.    And that given their reviews, that you were
2    not optimistic that "JAMA Oncology" would accept the
3    study; is that right?
4    A.    I did not believe that without making the
5    suggested changes, that the "JAMA Oncology" was even
6    going to review the paper.
7    Q.    The paper was eventually submitted to "JAMA
8    Oncology"; is that right?
9    A.    We did not submit the paper, but "JAMA
10   Internal Medicine" did an internal referral.
11   Q.    Do you have any email communications, or any
12   documentations, about the submission of your
13   unpublished study to "JAMA Oncology"?
14   A.    We did not submit the paper to "JAMA
15   Oncology," so we -- it was referred internally.  And
16   I know they decided not to review it.
17   Q.    All right.  Take a look at page 95, if you
18   will.  And that's Deposition Exhibit 4.
19       MS. O'DELL:  95, did you say?
20       MR. ZELLERS:  Yes.
21       THE WITNESS:  Yes, I'm on page 95.
22   BY MR. ZELLERS:
23   Q.    And if we look at page 95, we see some
24   communication here relating to, "The paper is now
25   with "JAMA Oncology," fingers crossed for a quick

Page 121

1    turnaround time."
2        And Dr. Woolen wrote that to you on December
3    15th of 2020; is that right?
4    A.    Yes.
5    Q.    Do you -- this is a "yes" or "no" question.
6        Do you have any knowledge or understanding
7    of what the redaction is underneath Dr. Woolen's
8    email to you of December 15th, 2020?
9    A.    I do not.
10   Q.    Did your team ever receive reviewer comments
11   from "JAMA Oncology"?
12   A.    It was never sent for review for "JAMA
13   Oncology."
14   Q.    I understand.  But you -- you've testified,
15   and you know and you're aware, that it was rejected
16   by "JAMA Oncology"?
17   A.    Yes.
18   Q.    How do you know that?
19   A.    Sean must have told me that it was.
20   Q.    Do you know whether or not "JAMA Oncology"
21   communicated with Sean to advise him that the paper
22   had been rejected by "JAMA Oncology"?
23   A.    I don't know how they communicated that to
24   him.
25   Q.    Have you seen any written documents from

Attorneys Eyes Only

Page 122

1  "JAMA Oncology" relating to either the submission or
2  the rejection of your unpublished study?
3  A.    I don't remember anything.  And if there
4  were no emails about it, then -- then, no, I didn't
5  receive anything.  I don't remember seeing anything.
6  Q.    Do you recall seeing any reviewer comments
7  or any summary of reviewer comments from "JAMA
8  Oncology"?
9  A.    I know there were no reviewer comments,
10 because it wasn't sent for review.
11 Q.    If you look at the next page, page 96,
12 apparently your unpublished study was also then
13 submitted to "JAMA Open Network"; is that right?
14 A.    Yes.
15 Q.    And there is a $3,000 fee for publication
16 with "JAMA Open Network"?
17 A.    Yes.
18 Q.    Was your unpublished study submitted to
19 "JAMA Open Network"?
20 A.    Again, the same way for "JAMA Oncology."  It
21 was forwarded by the editor to JAMA Open, I believe.
22 Q.    Who paid the $3,000 fee for publication?
23 A.    You only pay that fee if it's accepted for
24 publication.  It's not an evaluation fee.
25 Q.    What was your understanding of who or how

Page 123

1  that fee would have been paid, had the paper been
2  accepted by "JAMA Open Network"?
3  A.    I have a small faculty amount of funding
4  that I could use for this kind of thing.
5  Q.    That never came to be because "JAMA Open
6  Network" rejected the paper; is that right?
7  A.    That's correct.
8  Q.    And you found out about that in
9  mid-December, on or about December 22nd of 2020?
10 A.    I don't remember exactly when it was, but
11 that sounds --
12 Q.    I'm looking at page 100 at the bottom, when
13 Dr. Woolen wrote to you and said:
14       (Reading) "JAMA Open Network"
15       rejected the paper.  The rejection
16       is not completely surprising given
17       the editor saw the same reviews
18       (end of reading).
19       Did I read that correctly?
20 A.    Yes.
21 Q.    Your understanding of the "same reviews"
22 were the "JAMA Internal Medicine" reviews?
23 A.    Yes.
24 Q.    Did your -- strike that.
25       Did you or Dr. Woolen, to your knowledge,

Page 124

1  receive any reviewer comments from "JAMA Open
2  Network"?
3  A.    It didn't send the paper out for review, so
4  there were no other reviews.  And so, no, I did not
5  see them.  They didn't exist.
6  Q.    In January of 2021, your unpublished study
7  was submitted to the "British Medical Journal"; is
8  that right?
9  A.    Yes.
10 Q.    Within two days you received a rejection
11 from the "British Medical Journal"?
12 A.    Yes.
13 Q.    The "British Medical Journal" rejection
14 suggested that you might want to submit your
15 unpublished paper to the "Journal of Epidemiology and
16 Community Health."  Do you recall that?
17 A.    I do.
18 Q.    And was your unpublished study submitted to
19 the "Journal of Epidemiology and Community Health"?
20 A.    It was not.
21 Q.    Why not?
22 A.    At the time, when I looked up those -- the
23 journal they suggested, I thought we would have a
24 possible publication in a higher-impact journal.
25 Q.    Did you receive any reviewer comments from

Page 125

1  the "British Medical Journal"?
2  A.    No.  They decided not to send it out for
3  review, so there were no reviews.
4  Q.    Did the "British Medical Journal" explain to
5  either you or Dr. Woolen, if you're aware, why they
6  rejected publication or even to submit your
7  publication to reviewers?
8  A.    They said that they only send out a very
9  small proportion, less than five percent of papers
10 for review, and this didn't meet the content area
11 that they thought would be important enough for them
12 to focus on.
13 Q.    "Annals of Internal Medicine," you and your
14 team submitted your unpublished study to that journal
15 in January of 2021; is that your recollection?
16 A.    The timing sounds about right.
17 Q.    The unpublished study was rejected by the
18 "Annals of Internal Medicine"; is that right?
19 A.    Yes.
20 Q.    Did you or Dr. Woolen, to your knowledge,
21 receive reviewer comments for the study?
22 A.    Yes, we did.
23 Q.    What do you recall were the major comments
24 or concerns from the reviewers of "Annals of Internal
25 Medicine"?

Attorneys' Eyes Only

Page 126

1  A.     My recollection is they had a lot of
2  comments.  Some of the comments were very important,
3  and it was helpful to have those.  Some of them I
4  don't believe we agreed with.  But there were quite a
5  number of comments.
6  Q.     The Annals reviewers raised significant
7  methodology concerns.  Do you have a recollection of
8  that?
9       MS. O'DELL:  Object to the form.
10      THE WITNESS:  I don't remember that
11 sentence, but I'm not surprised, if you're reading
12 it, that's what it says.
13 BY MR. ZELLERS:
14 Q.     Do you have any documents or do you recall
15 seeing any documents regarding the submission of the
16 paper, unpublished study, to the "Annals of Internal
17 Medicine" and the rejection of the paper for
18 publication?
19 A.     Yes.
20 Q.     Those documents you would expect to be
21 included in the response to request for production
22 No. 1; is that right?
23 A.     Yes.
24 Q.     Do you recall in May of 2021, Dr. Woolen
25 sending you an email regarding certain comments from

Page 127

1  the reviewers?  Take a look at pages 98 and 99, if
2  you have those in front of you.
3  A.     Yes, I do.
4  Q.     Those are the reviewer comments that were
5  sent by the "Annals of Internal Medicine," at least
6  the ones that were forwarded to you by Dr. Woolen; is
7  that right?
8  A.     Yes.
9  Q.     There's a statement in the second paragraph,
10 on page 98, from Reviewer 1:
11      (Reading) I am also somewhat
12      concerned about the fidelity of the
13      ascertainment of this exposure from
14      the source manuscripts (end of
15      reading).
16      What did you understand that to mean?
17 A.     This author was questioning some of the
18 numbers that were included in our paper.
19 Q.     He states at the bottom of page 98,
20 Deposition Exhibit 4:
21      (Reading) This discordance between
22      the Schildkraut study and the
23      stated methods for this
24      meta-analysis causes me to
25      seriously question the reported

Page 128

1  degree of homogeneity among the
2  studies included in this analysis
3  (end of reading).
4  Is that correct?
5  A.     Yes.
6  Q.     What was your understanding of that concern?
7  A.     So this author questioned our summary of the
8  Schildkraut paper in our systematic review.  It's not
9  totally clear in this comment, I think it's in a
10 different comment, that the numbers for Schildkraut
11 were not in the analysis.  But in the listing of the
12 studies it was reversed between cancers and controls.
13 So they were flipped.  I think that was one of his
14 concerns or her concerns.
15      And then was also unsure about whether or
16 not some of Schillkraut's numbers were extracted
17 correctly in terms of who the numbers were
18 describing.
19 Q.     The reviewer is at least questioning
20 whether, in the unpublished study, the exposures were
21 accurately reported?
22 A.     Yes.
23 Q.     The "Journal of General Internal Medicine,"
24 it appears that your unpublished study was first
25 submitted to that journal March 22nd of 2021.  I'm

Page 129

1  looking at page 132 of Deposition Exhibit 4.
2  A.     Yes.
3  Q.     This submission was made by Dr. Woolen to
4  Carol Bates, the Co-Editor-in-Chief of that journal;
5  is that right?
6  A.     Are you on page 132 or 133?
7  Q.     I was looking at 132.
8       MS. O'DELL:  I'm sorry, Mike.  This is 132
9  right here.
10 BY MR. ZELLERS:
11 Q.     Yes.  So 133 is Dr. Woolen's letter or
12 email, and then the response from Dr. Bates is on
13 page 132; is that right?
14 A.     No.  The letter from Dr. Bates on 132 is a
15 letter from March 22nd, 2021.  And the letter from
16 Dr. Woolen to the journal was from just a week or two
17 ago.  So those two letters are not -- it looks like
18 they are next to each other, but they are not from
19 the same time.
20 Q.     All right.  Let's -- thank you for that
21 clarification.
22      So we know that sometime before March 22nd
23 of 2021, Dr. Woolen or yourself or your team
24 submitted your unpublished study to the "Journal of
25 General Internal Medicine"; correct?

Attorneys' Eyes Only

1 A.     No.  So, no, that was another example of the
2 manuscript was forwarded by the "Annals of Internal
3 Medicine" to the "Journal of General Internal
4 Medicine," and they didn't send it out to review or
5 consider it, they just looked at the reviews from the
6 Annals and said that, you know, they are not going to
7 even review it.  But they went on to say that we
8 could revise the manuscript, and then it would be
9 reconsidered.
10         And so on the next page, the letter to the
11 journal several weeks ago, Sean was sending in a
12 substantially revised draft.
13 Q.     All right.  So if I understand correctly, on
14 March 22nd of 2021, the "Journal of General Internal
15 Medicine" rejected the unpublished study; correct?
16 A.     Yes.
17 Q.     And looking at Dr. Bates's letter, again, on
18 page 132 of Exhibit 4:
19         (Reading) Ultimately the decision
20         to reject is based on the
21         significant methodologic concerns
22         raised by Annals reviewers.  A
23         revision of your original
24         manuscript guided by these reviews
25         would require such substantial

1         change that it would essentially be
2         a new submission (end of reading).
3 A.     Yes.
4 Q.     Do I -- well, and strike that.
5         So my understanding is there were
6 substantial changes and revisions to the manuscript
7 that had been submitted to the "Annals of Internal
8 Medicine" and then also to the "Journal of General
9 Internal Medicine"; correct?
10 A.     Yes, that's correct.
11 Q.     And those substantial revisions were done to
12 respond to the reviewers from the "Annals of Internal
13 Medicine" and also, you know, the original reviewers
14 back with "JAMA Internal Medicine"?
15 A.     That's correct.
16 Q.     Did you produce in the documents, in
17 response for production 1, you know, the
18 different drafts of your manuscript?
19 A.     Yes.
20 Q.     So I would be able to go and take a look in
21 that production at what the manuscript looked like
22 when it was submitted to the journal of internal --
23 to the "JAMA Internal Medicine"; correct?
24 A.     Yes.
25 Q.     I'd be able to look at the paper as it was

1 submitted to the "Annals of Internal Medicine"?
2 A.     Yes.
3 Q.     And I would be able to look at the paper
4 that was recently resubmitted to the "Journal of
5 General Internal Medicine"; is that right?
6 A.     Yes.
7 Q.     We talked about, and I believe you
8 testified, that the "American Journal of Obstetrics
9 and Gynecology" reviewed your paper -- or looked at
10 your paper.  It was submitted on September 8th, 2021,
11 and then was rejected on September 13th of 2021;
12 correct?
13         MS. O'DELL:  Object to the form.
14         THE WITNESS:  I don't remember the dates,
15 but they sound plausible.
16 BY MR. ZELLERS:
17 Q.     And, for the record, I was referencing
18 pages 142 and 137.  It appears, Dr. Smith-Bindman,
19 that on September 14th of 2021 -- so about two weeks
20 ago -- you resubmitted -- or you submitted the
21 revised unpublished study to the "Journal of General
22 Internal Medicine"; correct?
23 A.     Did you tell me where to find that?
24 Q.     Well, I can.  But do you remember two weeks
25 ago --

1 A.     Yes.
2 Q.     -- submitting it?
3 A.     Yes.
4 Q.     All right.  That's all --
5 A.     Yes.
6 Q.     Very good.  And you have not yet received a
7 response; is that right?
8 A.     Correct.
9 Q.     Has your unpublished study been submitted to
10 "Obstetric Oncology"?
11 A.     No.
12 Q.     Has it been submitted to "obstetrics and
13 Gynecology"?
14 A.     No.
15 Q.     Has it been submitted to "Cancer"?
16 A.     No.
17 Q.     Was the revised unpublished study
18 resubmitted to "JAMA Open Network"?
19 A.     No.
20 Q.     Dr. Woolen wrote you and said that "JAMA
21 Open Network" may be interested in a highly revised
22 manuscript.  Do you recall him telling you that?
23 A.     Yes.
24 Q.     And is there a reason you, you know, have
25 not resubmitted the manuscript to "JAMA Open

Attorneys' Eyes Only

Page 134

1  Network"?
2  A.     No.
3  Q.     Are there any other journals that your
4  unpublished study has been submitted to?
5  A.     No.
6       MR. ZELLERS:  Why don't we go off the
7  record.
8       THE REPORTER:  Off the record at 12:52 p.m.
9  Back on the record at 1:02 p.m. )
10 BY MR. ZELLERS:
11 Q.     Dr. Smith-Bindman, are you ready to
12 continue?
13 A.     I am ready.
14 Q.     All right.  Let me ask you just a few
15 general questions here.
16      Other than the Wentzensen article, have you
17 reviewed any additional materials that are relevant
18 to your opinions since you prepared your amended
19 report July 2nd, 2021?
20 A.     I read a number of other materials in
21 preparation for testifying in the Kleiner case.
22 Q.     If you -- and let me withdraw.
23      The Kleiner case involved the same issues
24 that we're talking about today; is that right?
25 A.     Yes.

Page 135

1  Q.     If you could provide to Ms. O'Dell or to the
2  plaintiffs' counsel just a list -- an updated list --
3  and it doesn't have to be a new list, but just the
4  additional materials that you have considered
5  relating to your opinions since you prepared your
6  July 2nd, 2021, expert report.  Can you do that?
7  A.     Yes.
8  Q.     Were there any fees paid with respect to any
9  of these journal submissions that I have asked you
10 about?
11 A.     No.
12 Q.     Have you communicated with any other
13 plaintiff expert in the ovarian cancer talc
14 litigation?
15 A.     So not in a meaningful way, but we were
16 together waiting for our turn to testify at the
17 Kleiner case.
18 Q.     Dr. Wolf was there; is that right?
19 A.     Yes.
20 Q.     There may have been other plaintiff experts
21 there?
22 A.     Yes.
23 Q.     Aside from any discussions that you may have
24 had at the Kleiner trial with plaintiff experts, have
25 you communicated with any plaintiff expert in the MDL

Page 136

1  or other ovarian cancer talc litigations?
2  A.     I have not.
3  Q.     Have you reviewed any transcripts from other
4  plaintiff experts, other than what may be reflected
5  on your Materials Considered List that we marked as
6  Exhibit 13 to this deposition?
7  A.     I believe I reviewed testimony from one of
8  the epidemiologists for the defense lawyers as part
9  of the Kleiner case.
10 Q.     Do you remember who that was?
11 A.     I think Dr. Deac.
12 Q.     Other than -- well, strike that.
13      Did you review or have you reviewed any
14 testimony from plaintiff experts, other than as it
15 may be reflected on your scientific literature and
16 Other Sources List?
17 A.     I don't think so, no.
18 Q.     Same question with respect to expert reports
19 from other experts in this litigation, to the extent
20 that you reviewed any such expert reports, they would
21 be on your Scientific Literature and Other Sources
22 List, Exhibit 13 to the deposition?
23 A.     Yes.
24 Q.     Are you familiar with UCSF Form 700-U?
25 A.     Yes.

Page 137

1  Q.     All right.  UCSF requires the filing of a
2  Form 700-U by all persons employed by UC or CSU who
3  have principal responsibility for a research project
4  if the project is to be funded or supported in whole
5  or in part by a contract or grant; is that your
6  understanding generally?
7  A.     Yes.
8  Q.     Are you aware UCSF has guidelines for the
9  disclosure and review of financial interest in
10 private sponsors of research?
11 A.     Yes.
12 Q.     Are you aware of APM, dash, 028 guidelines
13 for disclosure and review of financial interest in
14 private sponsors of research?
15 A.     Yes.
16 Q.     Are you aware UCSF has, under their
17 consulting agreements Web page, a provision that the
18 consulting activities should not use any UCSF
19 resources, such as personnel or space?
20 A.     Yes.
21 Q.     Has a Form 700-U been completed and
22 submitted with respect to any of your activities
23 relating to the unpublished study?
24 A.     No.
25 Q.     And why is that?

Page 138

1  A.    That rule is if research is sponsored, that
2  you have to file that form.  The research that I did
3  is not sponsored by an external entity, so the form
4  is not required.
5  Q.    Who is sponsoring the research that you've
6  done?
7  A.    It's just being done by UCSF faculty
8  members, several in addition to myself, without
9  external sponsorship.
10 Q.    Are the plaintiff lawyers in any of the
11 talcum powder proceedings contributing in any way to
12 the research that you have done as it relates to your
13 unpublished study?
14 A.    No, they haven't funded any portion of it.
15 Q.    Do you believe that the APM-028 guidelines
16 for disclosure and review of financial interest and
17 private sponsors of research, do those guidelines
18 apply to the work that you're doing?
19 A.    No, they don't.
20 Q.    And why?  Is this the same reason?
21 A.    It's not funded by anyone.
22 Q.    Are plaintiffs' counsel in any of the
23 ovarian cancer talc litigation paying you for work on
24 the unpublished study?
25 A.    No, they are not.

Page 139

1  Q.    Are they paying or supporting or
2  contributing to either Dr. Woolen or Dr. Lazar's
3  work?
4  A.    No, they are not.
5  Q.    Have you submitted or has anyone submitted
6  any invoices to plaintiffs' counsel for your work or
7  any member of your team's work on the unpublished
8  study?
9  A.    No.
10 Q.    You made a request, an external
11 collaboration request, for the sister study data; do
12 you remember that?
13 A.    Yes.
14 Q.    And in there you state that you had funding
15 to cover your study.  Do you recall making that
16 statement?
17 A.    Funding to cover data extraction that they
18 would do for my study, yes, I do.
19 Q.    Where -- well, strike that.
20      Did you have to pay any of those funds?
21 A.    No.
22 Q.    Where were you going to get those funds to
23 pay for the data extraction relating to any sister
24 study data?
25 A.    I would have --

Page 140

1  MS. O'DELL:  Objection.  Asked and answered.
2  Go ahead, you may answer.
3  THE WITNESS:  I have a faculty allowance
4  that I would have used to pay that.
5  BY MR. ZELLERS:
6  Q.    Is UCSF funding your unpublished study?
7  MS. O'DELL:  Object to the form.
8  THE WITNESS:  So I am a faculty member at
9  UCSF.  I have a certain amount of discretionary
10 funding through my department, if I needed to, to pay
11 for data extractions.  I would have used that
12 funding.  I think some people would consider that as
13 being paid for by UCSF because it's my faculty
14 allowance.
15 BY MR. ZELLERS:
16 Q.    My understanding is that has not occurred;
17 is that correct?
18 A.    I'm sorry.  I don't understand the question.
19 Q.    Sure.  My question was, is UCSF funding the
20 study?  And I understood your response to be, well,
21 if I needed money to pay for sister study data, or if
22 I needed money to pay for the Open JAMA publication,
23 they might, but at least not as of today?
24 A.    So you're correct.  None of those things
25 were -- no money was taken for that.

Page 141

1  But some people would suggest that I'm a
2  faculty member at UCSF, I am allowed to use my
3  faculty time to do work like this, which is how I did
4  that work.  Some people would say, well, UCSF is
5  funding you as part of your regular position to have
6  time to do this kind of research.  So that you could
7  think of it as UCSF is funding.  There was no
8  explicit request or giving of money for this study.
9  Q.    Do you consider and believe that UCSF is
10 funding your unpublished study?
11 A.    Yes.
12 Q.    Do you believe that UCSF has an interest in
13 your study?
14 A.    To the degree that I am a UCSF faculty
15 member, and they care about the kind of research that
16 faculty members do because they think it's in the
17 public good, so I think they have that kind of
18 interest in the study.  I don't think they have a
19 particular interest in the particular topic that I'm
20 researching.
21 Q.    Did you request approval to do your
22 unpublished study?
23 A.    No.  No such approval was needed.
24 Q.    Did you request approval to have Dr. Woolen
25 or Dr. Lazar, or anyone else involved from UCSF,

Page 142

1  assist you in the study?
2  A.    No.  There's no such process, whereby -- as
3  a faculty member, I get to choose what research I
4  want to perform, and so I chose to do this, and the
5  same thing for the other physicians.
6  Q.    There are no forms or approvals that you
7  needed to go through in order to be able to do that
8  research --
9  A.    No.
10  Q.    -- is that right?
11  A.    That's correct.
12  Q.    Did you apply for an individual investigator
13  grant with UCSF for your study?
14  A.    I did not.
15  Q.    Dr. Woolen is currently funded by a UCSF
16  Department of Radiology and Biomedical Imaging seed
17  grant and a Seamen's grant; is that your
18  understanding?
19  A.    Yes.
20  Q.    Other than being an Assistant Professor at
21  UCSF, is Dr. Woolen being paid for his time working
22  on the unpublished study?
23  A.    No.
24  Q.    Dr. Lazar, the statistician, she became
25  involved in the unpublished study around January 30th

Page 143

1  of 2020?
2  A.    I -- I don't remember exactly, but that
3  sounds about right.
4  Q.    Generally, do you recall going to CTSI
5  Consultation Services and saying we need immediately
6  the help of a biostatistician?
7  A.    Yes.
8  Q.    Dr. Lazar responded; is that right?
9  A.    Yes.
10  Q.    And she has done the statistical analyses
11  with respect to the unpublished study; is that right?
12  A.    Yes.
13  Q.    Does either Anne Lazar or CTSI bill for
14  their work on the unpublished study?
15  A.    Yes.
16  Q.    And who did they bill?
17  A.    I have paid for the consulting through my
18  discretionary account at UCSF.
19  Q.    Other than Dr. Lazar and CTSI, have you paid
20  anyone else with respect to the unpublished study
21  from your discretionary fund?
22  A.    No.
23  Q.    Have plaintiff lawyers reimbursed you in any
24  manner for the services of Dr. Lazar or a CTSI?
25  A.    No, they have not paid any part of the

Page 144

1  unpublished work.
2  Q.    Susannah McIntyre, she's a research
3  assistant?
4  A.    Yes.
5  Q.    Has she been paid with respect to her work,
6  in terms of searching and obtaining studies?
7  A.    No.  That's part of her job.
8  Q.    Same question with respect to Evans
9  Whittaker.  He's a health informationist?
10  A.    No.  It's part of his job in the library.
11  Q.    So he has not been paid separately from just
12  the salary that he makes at UCSF; is that right?
13  A.    Correct.
14  Q.    You've listed in your amended report, and
15  specifically on your Scientific Literature and Other
16  Sources, Exhibit 13, a number of reports and testing
17  by Dr. Longo and Dr. Rigler; is that right?
18  A.    Yes.
19  Q.    I believe we covered before, but you don't
20  hold yourself out to be a geologist or a mineralogist
21  or an expert that looks at a sample, be it a sample
22  of talc or some other sample, to try to identify
23  asbestos?
24  A.    No.
25  Q.    Have you ever met Dr. Longo or Dr. Rigler?

Page 145

1  A.    I have not.
2  Q.    Ever spoken to Dr. Longo or Dr. Rigler?
3  A.    No, I have not.
4  Q.    Your amended report -- let me withdraw.
5       You amended your report to include a number
6  of references to fibrous talc.  Do you recall making
7  that change?
8       MS. O'DELL:  Object to the form.
9  BY MR. ZELLERS:
10  Q.    Take a look at the redlined amended report.
11  So we marked that as Deposition Exhibit 11 --
12  A.    Yes.
13  Q.    -- and specifically look at pages 24 and 25.
14       MS. O'DELL:  Dr. Smith-Bindman is "Yes," a
15  response that you're looking at it in answer to the
16  question.
17       THE WITNESS:  I'm sorry.  Yes, I am looking
18  for page --
19       MR. ZELLERS:  24 to 25.
20       THE WITNESS:  And I think one of the reasons
21  I get confused with this document is the numbers can
22  be from the first further revised.  So when you say
23  page 24 --
24       MR. ZELLERS:  There's a page number at the
25  bottom, it says 24, and then there's a page number at

Attorneys' Eyes Only

Page 146

1  the bottom, and 25 it actually shows a strikethrough.
2      THE WITNESS:  Yes, I'm on page 24.  Thank
3  you.
4  BY MR. ZELLERS:
5  Q.     If you look here, you can see -- withdraw.
6      You're familiar with redlined documents;
7  right?
8  A.     Yes.
9  Q.     And you can see that on those pages you have
10 inserted reference to fibrous talc, to that term?
11     MS. O'DELL:  Object to the form.
12     THE WITNESS:  I'm sorry.  I'm not sure what
13 your question is.
14 BY MR. ZELLERS:
15 Q.     My question is, did you add the term
16 "fibrous talc" to your amended report?
17     MS. O'DELL:  Object to the form.
18     THE WITNESS:  So what I'm looking at is I
19 moved the word from one part of the sentence to the
20 end of the sentence.
21 BY MR. ZELLERS:
22 Q.     Where are you looking, Doctor?
23 A.     The only redline I see on page 24 is -- one,
24 two, three, four -- five rows -- five lines from the
25 bottom.  I said:

Page 147

1      (Reading) IARC also included that
2      that categorization to all forms of
3      asbestos and to talc-containing
4      asbestiform fibers, in parenthesis,
5      talc and a fibrous cutout, delete
6      it, and asbestiform added or
7      fibrous talc (end of reading).
8  BY MR. ZELLERS:
9  Q.     You then go on and say:
10     (Reading)IARC concluded that
11     fibrous talc is a Group 1
12     carcinogen (end of reading).
13     Is that right?
14 A.     Yes.
15 Q.     And that appears to be a new statement; is
16 that right?
17     MS. O'DELL:  Object to the form.
18     THE WITNESS:  I remember spending a lot of
19 time at my first deposition discussing this issue
20 with you.  So I think that's how it got added
21 afterwards.
22 BY MR. ZELLERS:
23 Q.     So here's my question --
24 A.     I can't tell if this sentence is new or old.
25 Q.     All right.  I will represent to you --

Page 148

1  A.     Yes.
2  Q.     -- that in your amended report --
3  A.     Yes.
4  Q.     -- you use the term "fibrous talc."  Do you
5  agree with that?
6  A.     Yes.
7      MS. O'DELL:  Object to the form.
8  BY MR. ZELLERS:
9  Q.     What is fibrous talc?
10 A.     Talc can come in very -- in a range of
11 appearances.  The most common is what's called platy
12 talc.  It has a sheet form.
13     Fibrous talc is defined by a size criteria.
14 It's long and thin, and it has an appearance that
15 looks like a fiber, in a very similar appearance to
16 asbestos.  So it's a characterization of the
17 appearance of talc as distinct from platy talc that's
18 been associated with greater harm/risk.
19 Q.     Where did you learn that?
20 A.     I think mostly by reading IARC reports from
21 2010, maybe, and 2012, and over the years.
22 Q.     Are you aware the IARC report of 2012, that
23 deals with asbestos and asbestiform; correct?
24     MS. O'DELL:  Object to the form.
25     THE WITNESS:  I know that report includes a

Page 149

1  characterization of both asbestos and fibrous talc as
2  Group 1 carcinogens.
3  BY MR. ZELLERS:
4  Q.     And I'm going to represent to you that
5  nowhere in IARC 2012 is the term "fibrous talc" used.
6  Do you believe you have seen "fibrous talc" in that
7  IARC monogram?
8  A.     Yes.
9  Q.     Did anyone request, and specifically
10 plaintiff lawyers, that you include the term "fibrous
11 talc" in your amended report?
12     MS. O'DELL:  Object to the form.  Don't
13 answer that question.  It's protected by the
14 attorney-client work product privilege.
15     MR. ZELLERS:  I disagree, but I'm going to
16 move on.
17     THE WITNESS:  Can I just state, your
18 question assumes that that word was not in the
19 unamended report.  Is that what you're saying?
20 BY MR. ZELLERS:
21 Q.     I've asked if you included "fibrous talc" in
22 your amended report.  I think you have agreed that
23 you did.
24 A.     Yes.
25 Q.     I asked if you accept or agree that the term

Attorneys' Eyes Only

Page 150

1  "fibrous talc" was never used in IARC 2012. You have
2  answered that question.
3      I asked if anyone suggested to you,
4  specifically plaintiff lawyers, to put the word
5  "fibrous talc" into your report. Ms. O'Dell has
6  objected. So I'm ready to move on.
7      Are you okay, Doctor?
8  A.    Yes.
9  Q.    Have you ever looked at information from the
10 Bureau of Mines regarding mineralogy, like
11 asbestiform and fibrous, and things like that?
12     MS. O'DELL: US Bureau of Mines?
13     MR. ZELLERS: Yeah.
14     THE WITNESS: I'm going to say I have seen a
15 bunch of documents, but I have to see it to be able
16 to say whether that's one I've seen or not.
17 BY MR. ZELLERS:
18 Q.    Is fibrous talc the same as talc fibers and
19 talc-containing asbestos fibers?
20     MS. O'DELL: Object to the form.
21 Would you mind repeating your question?
22     MR. ZELLERS: Sure.
23 Q.    Is fibrous talc the same as talc fibers and
24 talc-containing asbestos fibers?
25     MS. O'DELL: Objection to the form.

Page 151

1      THE WITNESS: I think that you're -- I think
2  the way you phrase that question, as asked, conflates
3  two different concepts. I'm not sure if you're
4  asking me if they are the same thing or different.
5  But I think there are two concepts in there.
6      MR. ZELLERS: Well, my --
7      MS. O'DELL: Excuse me. Please finish. If
8  you are finished, great. I just didn't know if you
9  were.
10     THE WITNESS: I wasn't quite finished.
11     MR. ZELLERS: Go ahead, finish.
12     THE WITNESS: I think one question that was
13 asked was are fibrous talc and talc fibers the same.
14 If that's part of the question, to me that's the
15 same. That's separate from asbestiform fibers.
16 BY MR. ZELLERS:
17 Q.    You believe, or at least it's your
18 understanding, that fibrous talc is synonymous with
19 talc fibers and talc-containing asbestiform fibers?
20 A.    That's not my understanding.
21 Q.    That's not your understanding?
22 A.    No.
23 Q.    All right. Talc -- withdraw.
24     Fibrous talc is synonymous with talc fibers?
25 A.    Yes.

Page 152

1  Q.    Fibrous talc is --
2      MS. O'DELL: Excuse me. Did you say
3  "fibrous talc" or just "talc"?
4      MR. ZELLERS: No. I said, "Fibrous talc is
5  synonymous with talc fibers."
6  Q.    That's your understanding?
7  A.    I mean, fibrous talc is one appearance of
8  talc that reflects talc fibers. Those two things are
9  the same. I'm not saying that they are always the
10 same. But "fibers," if you put it before the word
11 "talc" or after the word "talc," my understanding is
12 that's the same thing, and it's different than
13 asbestos fibers.
14 BY MR. ZELLERS:
15 Q.    You would agree those are not terms you use
16 every day in terms of your professional work?
17 A.    That's correct.
18 Q.    These are terms that you've learned about
19 with respect to the work you've done in the ovarian
20 cancer talc litigation; is that right?
21 A.    Yes.
22 Q.    In terms of a precise definition of each of
23 those terms, you would look to a geologist or a
24 mineralologists or an expert in those particular
25 areas?

Page 153

1      MS. O'DELL: Object to the form.
2      THE WITNESS: If you're asking if I could
3  look at an electron microscope and make a
4  determination if a fiber is -- has the right
5  proportion to be a reflection of fibrous talc, I
6  don't have the expertise to do that.
7  BY MR. ZELLERS:
8  Q.    And specifically my question was: In order
9  to distinguish -- or if I ask you to distinguish
10 between and among fibrous talc, talc fibers,
11 talc-containing asbestos fibers, you've answered my
12 questions to the best of your ability; correct?
13     MS. O'DELL: Objection to the form.
14     THE WITNESS: Yes.
15 BY MR. ZELLERS:
16 Q.    And you would agree that there are other
17 experts that deal with those terms every day;
18 correct?
19 A.    So I am not an expert geologist. When I
20 have read the literature, I understand the
21 conclusions that IARC has made, based on what is the
22 risk of platy talc versus what is the risk of fibrous
23 talc or talc-containing fibers.
24 Q.    Do you understand that since your first
25 deposition, that at least in the MDL, the parties are

Page 154

1 conducting discovery in a small number of potential
2 cases to go to trial?
3 A.    I don't have a deep understanding, but I
4 know they are doing something like that.
5 Q.    All right.  Are you aware of any of the
6 specific plaintiffs or the names of any of the
7 plaintiffs that are in the smaller potential trial
8 pool?
9 A.    I am not.
10 Q.    Have you reviewed any medical records for
11 any of the plaintiffs in the pool of potential trial
12 cases?
13 A.    I have not.
14 Q.    Have you requested the opportunity to look
15 at any medical records of any of the plaintiffs in
16 the set of potential trial cases?
17 A.    I have not.
18 Q.    Are you aware of the types of ovarian
19 cancers that any of the plaintiffs in the pool of
20 potential trial cases have?
21 A.    I believe I was told that there are
22 different kinds, but not -- but I don't know more
23 than that about the cases.
24 Q.    Are you aware of any of the specific risk
25 factors that any of the plaintiffs in the pool of

Page 155

1 potential trial cases have?
2 A.    No.
3 Q.    With respect to your -- any amendments to
4 the systematic meta-analysis, in your updated or
5 amended MDL report, you removed the Forrest Plot that
6 showed the odds of ovarian cancer associated with
7 regular use of talcum powder products and invasive
8 serous cancer; is that right?
9 A.    I believe that is correct.
10 Q.    Do you want to look at -- why don't you take
11 a look at the redline amended report, page 65.
12 A.    Yes.
13 Q.    Why did you delete that Forrest Plot from
14 your amended report?  The Forrest Plot that --
15 MS. O'DELL:  I'm sorry.
16 MR. ZELLERS:  Ms. O'Dell, page 65,
17 Deposition Exhibit 11, the redline expert report.
18 Q.    The Forrest Plot dealt with invasive serous
19 cancer; correct?
20 A.    Yes.
21 Q.    You removed that from your amended report;
22 correct?
23 A.    Yes.
24 Q.    Why did you do that?
25 A.    I wanted -- the amended report was an

Page 156

1 opportunity for me to think about some of these
2 issues more, and I wanted to focus more broadly on
3 ovarian cancer, which is what I thought the
4 literature supported, and not focus quite as much on
5 serous.
6 I wanted to make it a more general opinion,
7 and so I thought the strongest way to support that
8 was to show the graph with all cancer types.
9 Q.    And then you amended or changed your
10 conclusion -- and I'm looking now on page 65 of the
11 redline -- "New Systematic Meta-Analysis Review:
12 Summary."  Do you see that?
13 A.    Yes.
14 Q.    You amended your conclusion to state:
15 (Reading) The results of the more
16 focused review of studies on
17 regular talcum powder use and
18 ovarian cancer risk were consistent
19 and indicate an approximate
20 43 percent increase in risk of
21 cancer related to routine talcum
22 powder exposure compared to no
23 exposure (end of reading).
24 Is that correct?
25 A.    Yes.

Page 157

1 Q.    This 43 percent increase in risk, you're now
2 including all epithelial ovarian cancer subtypes, and
3 you've dropped the focus on invasive serous cancer;
4 is that right?
5 A.    I think the 43 percent is in the figure that
6 was in both -- both versions of it.  So I just
7 summarized -- I chose to highlight the 43 percent
8 increase in all cancer in this section rather than
9 the 50 percent increase in serous cancer.
10 Q.    You agree that understanding ovarian cancer
11 histological types is important because the risk
12 factors, etiology and genetics of ovarian cancer, can
13 vary by histological type; is that right?
14 A.    Yes.
15 Q.    You agree that the importance of talcum
16 powder products as a risk factor or a cause can also
17 vary by type?
18 MS. O'DELL:  Object to the form.
19 BY MR. ZELLERS:
20 Q.    I'm reading from your report --
21 A.    Yes.
22 Q.    -- your amended report, page 8?
23 A.    Yes.
24 Q.    And you agree that epidemiological studies
25 will have the greatest ability to document a clear

Attorneys' Eyes Only

Page 158

1  association between serous ovarian cancer types and
2  talcum powder products if a connection exists?
3  A.    Yes.
4  Q.    You did not a separate Bradford Hill
5  analysis regarding ovarian cancer subtypes, such as
6  clear cell, endometrioid or mucinous; correct?
7  A.    Correct, I did not.
8  Q.    You have not done any analysis of the
9  epidemiology on clear cell, endometrioid or mucinous
10 cancer as it relates to talcum powder; correct?
11     MS. O'DELL:  Object to the form.
12     THE WITNESS:  Correct.
13 BY MR. ZELLERS:
14 Q.    And your opinion is -- and I'm reading
15 amended report page 11:
16     (Reading) When assessing the
17     carcinogenicity of talcum powder
18     products, this should focus on
19     invasive serous carcinoma as the
20     most important cancer, based on
21     prognosis, and the most reliable
22     cancer to identify, based on the
23     histology and understanding of
24     cancer behavior (end of reading).
25     Is that correct?

Page 159

1  A.    I'm sorry.  You said you were reading from
2  page 11?
3  Q.    Yes.
4  A.    And my page 11 is essentially blank.
5  There's just one word on that page.
6  Q.    I'm sorry, Doctor, let me take a look.  I'm
7  looking at your amended report.
8  A.    The redline version or the --
9  Q.    No, I'm sorry.  Take a look, if you will, at
10 your amended, non-redline version --
11 A.    Yes.
12 Q.    -- that we marked as Exhibit 9.
13 A.    Yes.  I'm there.
14 Q.    And if you see what I read was the second
15 paragraph in your report.
16 A.    The second paragraph under, "Risk Factors,"
17 at the bottom of page 7?
18 Q.    No.  The first full paragraph on page 11 of
19 your amended report, where you state:
20     (Reading) In summary, when
21     assessing the carcinogenicity of
22     talcum powder products, this should
23     focus on invasive serous carcinoma
24     as the most important cancer, based
25     on prognosis, and the most reliable

Page 160

1  cancer to identify, based on
2  histology and understanding of
3  cancer behavior (end of reading).
4  Did I read that correctly?
5  A.    Yes.
6  Q.    All right.  You would agree that three of
7  the ten studies -- I guess it's 11 studies -- let me
8  withdraw.
9  So now we're looking at your MDL systematic
10 review; is that right?
11 A.    It's your question.
12 Q.    All right.  That's what I'm looking at.  And
13 in that review there's ten studies; is that right?
14 A.    Yes.
15 Q.    Would you agree that three of the ten
16 studies in your MDL systematic review don't provide
17 data for mucinous, endometrioid, or clear cell
18 subtypes?
19     MS. O'DELL:  Object to the form.
20 BY MR. ZELLERS:
21 Q.    And, Doctor, for these questions -- and I
22 don't have a lot of time remaining here, so you can
23 either say "Yes," "No," or "I don't recall."
24 A.    I don't remember.
25     MS. O'DELL:  Or "I need to look at the

Page 161

1  study."
2  THE WITNESS:  I don't remember without
3  having the study in front of me.
4  BY MR. ZELLERS:
5  Q.    Do you know whether or not Booth 1989,
6  Whitmore 1988, or Wu 2009 do not provide data on
7  ovarian cancer subtypes?
8  A.    I don't know that without looking at the
9  paper.
10 Q.    Do you know that Schildkraut 2016 only
11 reports data for serous versus nonserous?
12 A.    I don't know that either offhand.
13 Q.    Clear cell, are you aware only two of the
14 ten studies you include in your meta-analysis
15 provides data for clear cell cancers?
16 A.    I don't know that offhand.
17 Q.    Are you aware those two studies are Cramer
18 2016 and Mills 2004?  You would need to look at the
19 studies to confirm that; is that right?
20 A.    Yes.
21     MS. O'DELL:  Object to the form.
22 BY MR. ZELLERS:
23 Q.    Do you recall that Cramer 2016 found that
24 talc was not associated with clear cell cancers?
25 A.    I don't recall that.

Attorneys' Eyes Only

Page 162

1    MR. ZELLERS: Let's go off the record.
2    THE REPORTER: Off the record at 1:36 p.m.
3    (Recess taken.)
4    THE REPORTER: Back on the record at
5  1:39 p.m.
6    MR. ZELLERS: Dr. Smith-Bindman, let me hand
7  you what we will mark as Deposition Exhibit 17, the
8  Cramer 2016 paper.
9    (Exhibit No. 17 was marked.)
10    MR. ZELLERS: I will hand you what we will
11  mark as Deposition Exhibit 18, the Mills 2004 paper.
12    (Exhibit No. 18 was marked.)
13  BY MR. ZELLERS:
14  Q.    Is it your recollection, Dr. Smith-Bindman,
15  that these are two of the ten studies that you
16  included --
17  A.    Yes.
18  Q.    -- in your meta-analysis?
19  A.    Yes.
20  Q.    Go to Deposition Exhibit 17, the Cramer
21  paper, and specifically on page 340. And you're free
22  to look at anything you want, but --
23  A.    Yes.
24  Q.    -- I'm looking at page 340. And I'm looking
25  down at the bottom of the right-hand column, oh,

Page 163

1  about 12, 14 lines from the bottom, where the authors
2  state:
3    (Reading) Talc use was not
4    associated with clear cell or
5    mucinous invasive epithelial
6    ovarian cancer regardless of
7    menopausal status (end of reading).
8    Did I read that correctly?
9  A.    Yes.
10  Q.    Does that refresh your recollection, at
11  least of Dr. Cramer's findings in that particular
12  paper?
13  A.    Yes.
14  Q.    Take a look, if you will, then, at
15  Deposition Exhibit 18. This is the Mills 2004 paper.
16  A.    Yes.
17  Q.    And I'm looking on page 460, at the bottom
18  of the right-hand column.
19  A.    Yes.
20  Q.    The last --
21  A.    I'm sorry. I have the document.
22  Q.    Understood.
23  A.    Sorry.
24    MR. ZELLERS: And Ms. O'Dell will be happy
25  that I have not asked a question.

Page 164

1    MS. O'DELL: Yes. I just want to make sure
2  the record is clear they are not yeses where --
3    MR. ZELLERS: I like our rhythm, though,
4  Dr. Smith-Bindman.
5    MS. O'DELL: We don't want "Yes" where they
6  are unintended.
7  BY MR. ZELLERS:
8  Q.    All right. So page 460, right-hand column,
9  last full paragraph, Dr. Mills and the authors state:
10    (Reading) The multi-variant
11    adjusted odds ratio were evaluated
12    primarily among those with a serous
13    or mucinous invasive tumor and were
14    lower among women with other cell
15    types or with borderline tumors
16    (end of reading).
17    And then there's a reference to Table 3. Do
18  you see that?
19  A.    I do.
20  Q.    And I won't take the time to go through each
21  of the findings on Table 3, but there's a specific
22  data set for endometrioid and for clear cell cancers,
23  is that right, listed, in -- and mucinous in Table 3?
24  A.    In Table 3 they show the numbers of cancer.
25  So for some of the categories they had very few

Page 165

1  cancers.
2    So the point estimates, I'm not sure I would
3  agree with their conclusions. There's definitely the
4  most data for all, and there's the most data for
5  serous because it's the most common. But some of the
6  other point estimates have a very broad range, where
7  some of the risks are quite high.
8    You know, there's just 12 cases, for
9  example, of clear cell. So it's hard to know because
10  there were so few. The confidence interval actually
11  goes higher than serous, but also goes lower than
12  serous. It goes across a broad range.
13  Q.    And that, in essence, is the problem with
14  the subgroups, is that there's just a small number
15  reported in the studies that even address and break
16  out the subgroups; is that true?
17  A.    That's true.
18    MS. O'DELL: Object to the form.
19    MR. ZELLERS: That's okay.
20  Q.    Did you answer?
21  A.    Yes.
22  Q.    Doctor, for mucinous, are you aware,
23  similarly, that a number of the studies did not find
24  an association, in terms of an increase in risk with
25  respect to a mucinous ovarian cancer and talcum

Page 166

1  powder use?
2  A.    I mean, you're asking a general question,
3  and I can't answer it generally.  But I can answer
4  for the paper that's in front of me, and that has a
5  higher association with mucinous cancer.
6  Q.    So you're looking at Mills; is that right?
7  A.    Table 3, mucinous has a multi-variant odds
8  ratio of 2.56, which is the highest one on that
9  table.  It has a quite high confidence interval for
10 sure.  It goes from 0.9 to 7.4.  But I wouldn't look
11 at that number and conclude that that's associated.
12 Q.    That's a huge confidence interval?
13 A.    A huge confidence.
14 Q.    And you would agree with me that that's not
15 a statistically significant finding; is that right?
16 A.    In this case, it tells me that we don't have
17 enough mucinous cancers to know what the -- what the
18 association is.
19 Q.    All right.  Do you recall the Chang study?
20 A.    I don't.
21 Q.    And the findings of Chang?
22 A.    I don't.
23       MR. ZELLERS:  Take a look at the Chang
24 study.  We will mark that as Exhibit 19.
25       (Exhibit No. 19 was marked.)

Page 167

1       THE WITNESS:  I have the paper.
2  BY MR. ZELLERS:
3  Q.    And the Chang study is another study that is
4  included in your meta-analysis; is that right?
5  A.    Yes, it is.
6  Q.    Go to, if you will, to page 2398.  Do you
7  see on the right column, second to last paragraph?
8  A.    Yes.
9  Q.    Dr. Chang and the authors make the
10 statement:
11       (Reading) Only the risk for
12       invasive carcinoma was
13       statistically significant.  No
14       differences in risk with respect to
15       serous, mucinous, or endometrioid
16       tumors were observed in our data
17       (end of reading).
18       Is that the conclusion?
19 A.    That is the conclusion.
20 Q.    The Cook study -- Cook is another paper that
21 was included in your meta-analysis; is that right?
22 A.    Yes.
23       MR. ZELLERS:  And we will mark that as 20,
24 Deposition Exhibit 20.
25       (Exhibit No. 20 was marked.)

Page 168

1  BY MR. ZELLERS:
2  Q.    And my specific question to you,
3  Dr. Smith-Bindman, goes to page 462, the left column,
4  first paragraph, and where the authors state:
5       (Reading) Whereas, no elevation in
6       risk was noted for the small number
7       of women with mucinous tumors or
8       endometrioid tumors (end of
9       reading).
10       And I have not read the relative risk or the
11 confidence intervals.  But did I read that correctly?
12       MS. O'DELL:  Object to the form.
13       THE WITNESS:  You have read that correctly.
14       (Exhibit No. 21 was marked.)
15 BY MR. ZELLERS:
16 Q.    All right.  Gertig 2000.  We have talked
17 earlier about Gertig 2000.  That's the publication
18 relating to the Nurses' Health Study, the first one;
19 is that right?
20 A.    Yes.
21 Q.    And this is where you communicated with
22 Dr. O'Brien, and Dr. O'Brien sent you some updated
23 information; is that right?
24 A.    Yes.
25 Q.    If we look, though, at Gertig, the

Page 169

1  publication, on page 250, the middle column,
2  Dr. Gertig states, and the authors:
3       (Reading) We observed a modest
4       increase in risk for ever talc use
5       for serous invasive cancers --
6       relative risk equals 1.40;
7       95 percent confidence interval,
8       10.02 to 1.91 -- but not for all
9       serous cancers, paren, including
10       borderline cancers, closed paren,
11       endometrioid cancers or mucinous
12       cancers (end of reading).
13       Did I read that conclusion correctly?
14 A.    You're just asking me if you're reading it
15 correctly, not if I agree with it?
16 Q.    Well, do you agree with that?
17 A.    I think all of these comments that there
18 isn't an elevated risk, I would not agree, looking at
19 the results, that the risks are -- that we know the
20 risks are not elevated.
21 Q.    Well, they are not statistically --
22       MS. O'DELL:  Sorry.  Please finish.
23       THE WITNESS:  So I don't consider whether or
24 not it crosses a p-value of 0.05 or 1.0 to be a black
25 or white, it's associated or not, which is sort of

Attorneys Eyes Only

Page 170

1  what I think you're suggesting, what the authors are
2  suggesting.
3        I think that these have a wide confidence
4  interval, meaning we don't know the exact.  But the
5  point, I submit, is that this gives us the best
6  understanding of risk, but it goes some lower than
7  1.0 and some, you know, 1.6, 1.9.
8        So I don't -- I think -- I think it is a
9  challenging question because there are not a lot of
10 cancers of these rare types.  But this doesn't show
11 there's not an association.  That's the only thing I
12 wanted to say.
13 Q.    Gertig 2000, the study you have in front of
14 you, what we marked as Exhibit 21, that's one of the
15 studies you included in your meta-analysis; is that
16 right?
17 A.    For the one that's in the report, yes.
18 Q.    All right.  And at least in Gertig 2000,
19 that we're looking at, they did not find
20 statistically significant association or increased
21 risk for all serous cancers, endometrial cancers, or
22 mucinous cancers; is that correct?
23       MS. O'DELL:  Object to the form.
24       THE WITNESS:  They did not find the
25 statistical significance, if we use a 0.05 as a

Page 171

1  threshold to call it statistically significant.
2        It shows for the first entry all serous
3  cancers as a point estimate and the multi-variant
4  risk estimate of 1.26.  So the most likely
5  explanation is that there's a 26 percent increase in
6  risk, and the truth lies somewhere between 0.94 and
7  1.7.  So I wouldn't conclude that that's evidence
8  that there isn't disassociation.
9  BY MR. ZELLERS:
10 Q.    It's a nonstatistical finding; can we agree
11 on that?
12 A.    Yes.
13 Q.    All right.  Same set of questions with
14 respect to endometrioid.  I don't need to go through
15 all the studies, I don't think.
16       But would you agree that only six of the ten
17 studies that you included in your meta-analysis even
18 provided data for endometrioid cancers?
19       MS. O'DELL:  Object to the form.
20       THE WITNESS:  I told you, I wouldn't be able
21 to answer that without looking at the studies.  I
22 just don't remember if they included them or don't.
23 BY MR. ZELLERS:
24 Q.    You recall, I asked you questions about
25 Chang and had you read a particular paragraph from

Page 172

1  Chang, which stated:
2        (Reading) Only the risks for
3        invasive carcinoma was
4        statistically significant, no
5        differences in risk with respect to
6        serous, mucinous or endometrioid
7        tumors were observed in our data
8        (end of reading).
9        And I'm looking back on page 2398.
10 A.    I do remember you reading that.  But if you
11 look at the table in that paper, it shows an adjusted
12 odds ratio for mucinous of 1.585, with a confidence
13 interval that goes from 0.97 to 2.6.  So almost
14 certainly that is a positive association.  They just
15 needed a few more patients.  But the p-value, if we
16 use the p-value of 0.07, it would be statistically
17 significant.
18       The same thing with endometrioid.
19 Endometrioid has an odds ratio of 1.67 with an
20 adjusted confidence interval of 1.0 to 2.79.  So that
21 one I think is statistically significant.
22       So I think it's -- these do not confirm
23 there is not an association.
24 Q.    They neither confirm there's an association
25 or, at least in your opinion, refute an association;

Page 173

1  correct?
2  A.    I think they do more than that.  I think
3  they suggest an association.  They don't prove an
4  association if we use a very hard line view of the
5  p-values.  But I think the most likely result,
6  looking at Chang, is that there is an association.
7  Q.    And you're looking at the endometrioid
8  category; correct?
9  A.    Endometrioid and mucinous and serous,
10 borderline, not so sure, and invasive, yes.
11 Q.    You would agree, though, that you did not,
12 as part of your meta-analysis, do separate analyses
13 for clear cell, for mucinous, or for endometrioid; is
14 that right?
15 A.    That is correct.
16       (Exhibit No. 22 was marked.)
17 BY MR. ZELLERS:
18 Q.    You're familiar with Health Canada; is that
19 right?
20 A.    Yes.
21 Q.    Were you familiar with -- well, let me
22 withdraw.
23       You're aware they've issued a final
24 assessment; is that right?
25 A.    Yes.

1  Q.    Were you aware of that before the lawyers
2  told you, or did you find that out on your own, if
3  you remember?
4  A.    When the final report came out now, I knew
5  about it from earlier drafts from last year.  And so
6  I think I knew about the earlier drafts.  It might
7  have been from the lawyers, I don't remember.  But it
8  got some publicity when this final report was
9  published.
10  Q.    And I guess my question is, did the lawyers
11  tell you that there was a final assessment or did you
12  learn that on your own?
13      MS. O'DELL:  Object to the question.
14  Communications with the lawyers, you know, are
15  privileged, and so to the degree they are -- you're
16  asking about a communication --
17      MR. ZELLERS:  No, I'm asking --
18      MS. O'DELL:  You asked about a
19  communication.  To the degree you're asking about
20  that, I'm going to object and instruct
21  Dr. Smith-Bindman not to answer.
22      MR. ZELLERS:  I believe that it is proper to
23  ask what materials were provided by the lawyers to
24  the doctor.
25      MS. O'DELL:  I don't think that's what you

1  asked, Mike.  You asked for communications.
2      MR. ZELLERS:  And that's fine.
3      MS. O'DELL:  I'm not trying to give you a
4  hard time; you know that.  I'm just saying that's
5  what you asked.
6      MR. ZELLERS:  I understand you need to
7  protect your rights, and I understand that.
8  Q.    Dr. Smith-Bindman, are you aware your
9  litigation report is cited as authority in the Health
10  Canada risk assessment?
11  A.    I do know that.
12  Q.    Did that surprise you?
13  A.    That surprised me.
14  Q.    Is it unusual to see in a scientific
15  publication a source as being expert litigation
16  reports?
17  A.    That I don't know.  I was surprised to see
18  it, but I don't know if that's typical or not
19  typical.
20  Q.    In your experience, would that be unusual?
21  A.    Again, I -- I'm not sure I know anything
22  about a topic that's been in the press the way this
23  has or in the courts the way this has.  There have
24  been some -- absolutely some very well-known cases
25  that involve health care devices or exposures, I just

1  happen not to have been involved in any of them.
2  Q.    Did you at any time communicate with Health
3  Canada?
4  A.    No, I did not.
5  Q.    Did you communicate -- strike that.
6      Do you know how it was that your expert
7  litigation report was submitted to Health Canada?
8  A.    I have no idea.
9  Q.    Have you ever read of a public health agency
10  citing to litigation expert reports?
11      MS. O'DELL:  Object to the form.
12      THE WITNESS:  I don't know that I have any
13  experience to contribute to that question.
14  BY MR. ZELLERS:
15  Q.    Well, my question is:  Have you ever seen
16  it?
17  A.    No, I haven't.  But I'm not sure where I
18  would have seen that.
19  Q.    You understand -- well, let me withdraw.
20      You've read the Health Canada final
21  assessment; is that right?
22  A.    I have.
23  Q.    And do you recall that Health Canada did not
24  find a clear dose-response for ovarian cancer?
25      MS. O'DELL:  Object to the form.  And just

1  specific questions, if you wouldn't just mind putting
2  a copy in front of Dr. Smith-Bindman.
3  BY MR. ZELLERS:
4  Q.    Do you need a copy, Dr. Smith-Bindman?
5  A.    I would, if you want me to answer that
6  particular question.
7  Q.    Take a look at Deposition Exhibit 22.  Is
8  this the screening assessment for Health Canada?
9  A.    Yes.
10  Q.    Take a look at page 33, the second
11  paragraph.
12  A.    Yes.
13      MS. O'DELL:  Yes, you're there.
14      THE WITNESS:  Yes, I'm on page 33.
15  BY MR. ZELLERS:
16  Q.    Health Canada, the authors state at the
17  bottom, underneath "Biological Gradient:
18      (Reading) Collectively there is
19      significant exposure information
20      lacking to permit a fulsome
21      assessment of biological gradient
22      (end of reading).
23      Did I read that correctly?
24  A.    I'm not there yet.  So I didn't -- I see --
25  I think you read that sentence.  I don't have any

Page 178

1  idea what that sentence means.
2  Q.     Well, biological gradient is the same as
3  dose-response; is that right?
4  A.     I got that part of the sentence.  There is
5  significant --
6  Q.     Hold on.
7  A.     Yes, I got that part.
8  Q.     Do you agree with me that biological
9  gradient is the same as dose-response?
10  A.     I do agree.
11  Q.     Have you done any analysis or considered the
12  findings of Health Canada as it relates to
13  dose-response?
14  A.     I have read this paragraph before, and I
15  think a lot of studies showed some dose-response.  So
16  I think Health Canada is suggesting that there are
17  some differences of opinion.
18      So the first group of citations, some
19  authors suggest that there is no evidence of a
20  dose-response, and for that they have cited the
21  defense lawyers, Johnson & Johnson.  I don't know
22  about names.
23      Then they go on to cite the data.  Several
24  studies, Harlow, Terry, Cramer, Schildkraut, Gabriel
25  do suggest a trend of increased OR with increased

Page 179

1  cumulative exposure.
2      And then with meta-analysis, and I think
3  there are two that are cited, report there is a trend
4  with duration and frequency of genital talc use and a
5  slight association with respect to lengths of talc
6  use.
7  Q.     All right.  So do you agree, at least that
8  the conclusion, collectively there is significant
9  exposure information lacking to permit a fulsome
10  assessment of biological gradient?  That was the
11  conclusion, at least in this section of Health
12  Canada.
13  A.     I -- I'm sorry.  I don't actually understand
14  that sentence.
15  Q.     Okay.  Then I --
16  A.     It's a weird sentence.
17  Q.     Then I will move on.
18  A.     Okay.
19  Q.     You have communicated to Drs. Woolen and
20  Lazar that you do not believe that you have
21  meaningful data to get at a dose-response; do you
22  recall communicating that to them?
23  A.     Yes.
24  Q.     And take a look at page 184.  That's
25  Deposition Exhibit 4.

Page 180

1  A.     I am on page 184.
2  Q.     If you look at the bottom, you wrote an
3  email to Dr. Woolen and to Dr. Lazar:
4      (Reading) Hi, my two cents is that
5      we do not have any meaningful data
6      to get at dose-response (end of
7      reading).
8      Is that what you wrote?
9  A.     Yes.  Essentially all exposures are
10  essentially daily.
11  Q.     (Reading) I would prefer not to
12      explore something that we are using
13      as a measure for dose-response
14      where we think -- think it's a
15      terrible measure, then get negative
16      results and conclude we didn't have
17      a good measure, so that is why is
18      negative.  If a terrible measure,
19      we should not have looked (end of
20      reading).
21      Is that what you wrote?
22  A.     Other than the grammatical errors in my own
23  sentences, yes, that's what I wrote.
24  Q.     All right.  That means if you used daily
25  exposure as a measure for dose-response, you were

Page 181

1  concerned you might get a negative result; correct?
2  A.     Yes.
3  Q.     You did read the Health Canada concern about
4  the epidemiology for subtypes, and specifically that
5  that epidemiology is inconsistent and underpowered?
6  Do you recall reading that in the Health Canada
7  report?
8      MS. O'DELL:  Object to the form.
9      What page?
10      MR. ZELLERS:  Well, generally page 17.
11      THE WITNESS:  Yes, I do see that, and I have
12  read that.
13  BY MR. ZELLERS:
14  Q.     (Reading) Health Canada was concerned
15      that there are a number of
16      different tumor types with
17      characteristic histological
18      features, distinct different
19      molecular signatures and disease
20      trajectories.  Moreover, these
21      tumors are heterogeneous and can
22      arise from different tissues of the
23      female reproductive tract,
24      including the fallopian tube
25      epithelium (end of reading).

Attorneys' Eyes Only

Page 182

1    Do you agree with that?
2  A.    Yes.
3  Q.    Health Canada then goes on to say that:
4    (Reading) Ovarian tumors can be
5    grouped into categories, epithelial
6    ovarian cancer, germ cell tumors,
7    gonadal, stromal tumors, and
8    metastatic neoplasm.  Epithelial
9    variant cancers are often
10    designated as Type I or Type II,
11    with further subdivision within
12    each type.  Type I tumors have
13    characteristics quite distinct from
14    Type II tumors, and research
15    supports that they have different
16    molecular pathways and may not be
17    ovarian in origin (end of reading).
18    Do you agree with that?
19  A.    Yes.
20  Q.    Highgrade serous is a Type II ovarian cancer
21  tumor; correct?
22  A.    Highgrade serous?
23  Q.    Yes.
24  A.    It's not an area I know a lot about, but I
25  believe that is correct.

Page 183

1  Q.    Clear cell, endometrioid, and mucinous and
2  low-grade serous carcinoma ovarian cancer are Type I;
3  is that right?
4  A.    That I -- that I don't know.  I'm sorry.
5    Could you just tell me where you're reading.
6  Q.    Well, that was a question.
7  A.    Oh, okay.  So I remember that high-grade
8  serous is a Grade II, but I don't actually know the
9  other -- I don't know where low-grade serous or any
10  of those other cancers fall.
11  Q.    I want to read one other section from the
12  Health Canada paper, at the bottom of 17, "Tumor
13  subtypes."  Are you with me?
14  A.    Yes.
15  Q.    (Reading) Tumor subtypes are one
16    of the many subgroup analyses
17    conducted in several of the
18    epidemiology studies and reviews.
19    However, there was very little
20    consistency in whether or how these
21    subgroup analyses were conducted
22    across the available studies,
23    thereby leaving the analyses
24    limited and likely underpowered
25    (low sample sizes).  Furthermore,

Page 184

1    there is considerable uncertainty
2    for how subgroup data should be
3    examined, in particular, for the
4    tumor subtypes (end of reading).
5    Do you agree with that?
6  A.    Yes, I agree with that.
7    MR. ZELLERS:  Let's go off the record.
8    THE REPORTER:  Off the record at 2:06 p.m.
9    (Recess taken.)
10    THE REPORTER:  Back on the record at
11  2:16 p.m.
12  BY MR. ZELLERS:
13  Q.    Dr. Smith-Bindman, you published a paper in
14  2019 in JAMA since our last deposition.  I think
15  maybe you had a draft when I asked you questions
16  earlier.
17    But this -- you refer to it on page 9 of
18  your amended report, and it's your paper, "Risk of
19  Malignant Ovarian Cancer Based on Ultra Stenography
20  Findings in a Large, Unselected Population."
21  A.    I am sorry.  I got a little bit shuffled.
22  Q.    All right.  You remember the paper; right?
23  A.    I remember the paper.
24  Q.    All right.  The paper is about ovarian
25  cancer; is that right?

Page 185

1  A.    Yes.
2  Q.    And you thought it was important enough to
3  dedicate a paragraph in your amended report talking
4  about the paper; is that right?
5  A.    That seems to be the case.
6  Q.    You were familiar with JAMA's internal
7  medicines conflict of interest and financial
8  disclosures?
9  A.    Yes.
10  Q.    Do you agree that JAMA's conflict of
11  interest policy is broad and requires a complete
12  disclosure of any other relationship or activities
13  that readers could perceive to have influenced or
14  that give the appearance of potentially influencing
15  what is written in the submitted work?
16  A.    Yes.
17  Q.    And that authors should err on the side of
18  full disclosure?
19  A.    Yes.  What I'm hesitating about is you told
20  me this was published after the report, and I'm going
21  to admit I don't remember when it was published.
22  Q.    Well, go to -- so we're looking at your
23  Amended Expert Report; is that right?
24  A.    Yes.
25  Q.    And on page 9 --

Attorneys Eyes Only

Page 186

1  A.    Yep --
2  Q.    -- you make reference to your paper; is that
3  right?
4  A.    Yes.
5  Q.    And do you give the publication date?
6  A.    Yes.
7  Q.    What's the publication date?
8  A.    In the References it's January 1st, 2019.
9  Q.    All right.  Do you agree that serving as an
10 expert in epidemiology in ovarian cancer and the
11 litigation about ovarian cancer may be a potential
12 conflict of interest that would require disclosure?
13      MS. O'DELL:  Object to the form.
14      THE WITNESS:  I don't think that this paper
15 had anything to do with the litigation.  So, no, I
16 don't agree that it would have to be disclosed.  I
17 don't even remember if I did or didn't disclose it,
18 but I don't think it would have to be disclosed.
19 BY MR. ZELLERS:
20 Q.    The article is a nested case-control study
21 that finds that simple cysts are not associated with
22 an increased risk of ovarian cancer; is that right?
23 A.    Yes.
24 Q.    And that means that simple cyst should be
25 considered normal findings and do not need

Page 187

1  surveillance; is that right?
2  A.    Yes.
3  Q.    In your opinion, and as you state in the
4  article, it does more harm than good to monitor
5  simple cyst; is that right?
6  A.    Yes.
7  Q.    The paper found that complex cyst or solid
8  masses are less common but are associated with a
9  significantly increased risk of developing malignant
10 cancer?
11 A.    Yes.
12 Q.    Do you have an opinion that talc can cause
13 complex cyst or ovarian masses?
14 A.    Talc could cause ovarian cancer, and that is
15 what ovarian cancer looks like.
16 Q.    You believe that talc can cause complex cyst
17 and ovarian masses; is that right?
18 A.    Yes.
19 Q.    What research or articles are you relying on
20 for that statement?
21      MS. O'DELL:  Would you repeat the question,
22 please?
23      MR. ZELLERS:  Sure.
24 Q.    What articles or research are you relying on
25 for your opinion that talc use can cause complex cyst

Page 188

1  or ovarian masses, such as you describe in your
2  paper?
3  A.    So what ovarian cancer typically looks like,
4  which I know from my clinical work of diagnosing
5  ovarian cancer, is the appearance of ovarian cancer
6  is complicated cystic mass.  That is what most
7  ovarian cancer -- not all, but most ovarian cancer
8  looks like.
9        So if I believe talc can cause ovarian
10 cancer, which is what I had said, then it would cause
11 things that look like ovarian cancer, that turn out
12 to be cancer, which are solid and cystic complex
13 masses.
14 Q.    So even though you have an opinion that talc
15 can cause the complex cyst or the ovarian masses
16 referred to in your published article, you don't
17 believe that any type of disclosure of your work as a
18 plaintiff expert in this litigation was warranted or
19 needed?
20 A.    The paper -- that is what I said, I agree.
21       The paper is about not risk factors for
22 cancer but the diagnosis by imaging for cancers, and
23 I don't think there's any potential overlap there.
24 Q.    You are familiar with the O'Brien paper?
25 You actually brought that with you here today; is

Page 189

1  that right?
2  A.    Yes.
3  Q.    In the O'Brien paper, are you aware none of
4  the authors are experts in the talc litigation?
5  A.    I -- I have no idea.
6  Q.    All right.  Let me ask the question
7  differently.
8        Do you have any knowledge or belief that any
9  of the authors on the O'Brien paper are experts in
10 the talc litigation?
11 A.    My answer would be the same, I have no idea
12 if they are or not.
13 Q.    In O'Brien the authors pooled data from the
14 four cohort studies; is that right?
15 A.    Yes.
16 Q.    A pooled study means taking data from the
17 cohort studies and analyzing it collectively rather
18 than individually; is that right?
19 A.    It -- they -- they pooled the data from four
20 studies and then actually analyzed the individual
21 data from those four studies, as opposed to analyzing
22 them by contributing to a summary estimate from each
23 of the four contributing cohorts.
24 Q.    O'Brien was published in JAMA?
25 A.    Yes.

Page 190

1  Q.    JAMA is one of the world's most prestigious
2  and authoritative medical journals?
3  A.    Yes.
4  Q.    The pooled study included 252,745 women?
5  A.    Yes.
6  Q.    The total number of person years studied in
7  this pooled analysis was 3.8 million?
8  A.    I'm checking, but that number sounds kind of
9  right.
10  Q.    Well, you can look either at page 49 under
11  "Results," or the Table 2 on page 53.
12  A.    I will go to 53.  Yes.  Uh-huh.
13  Q.    At Table 2 the authors list the four cohort
14  studies, is that right, NHS, NHS-II, SIS and WHIOS;
15  is that right?
16  A.    Yes.
17  Q.    And you're familiar with each of those
18  cohort studies; correct?
19  A.    Yes, I am.
20  Q.    So if you go to Table 2, and go to the
21  right, in the last column, the adjusted hazard ratio
22  is 1.08 with a confidence interval of 0.99 to 1.17;
23  is that right?
24      MS. O'DELL:  Are you on Table 2?
25      MR. ZELLERS:  Let me make sure that I'm

Page 191

1  looking at the right place.
2  Q.    So you have Table 2; is that right?
3  A.    I do.
4  Q.    All right.  And Table 2 has person years of
5  3,765,706; is that right?
6  A.    Yes.
7  Q.    And the result for ever used powder in the
8  genital area for all women is 1.08, with a confidence
9  interval of 0.99 to 1.17; is that right?
10  A.    Yes, that's correct.
11  Q.    And you reference that on page 32 of your
12  amended report where you state O'Brien reports a
13  hazard ratio of 1.08, and then you provide the
14  confidence intervals, who have "ever" versus "never
15  used" a powder?
16  A.    Yes.
17  Q.    And you're critical of how O'Brien looked at
18  exposure.  You state on page 32 of your amended
19  report:
20      (Reading) The primary limitation of
21      O'Brien, et al., is the focus on
22      any talcum powder use, a
23      nonspecific exposure that combines
24      women across a very broad range of
25      exposures (end of reading).

Page 192

1      Is that what you wrote?
2  A.    Yes.
3  Q.    But your criticism was addressed by the JAMA
4  reviewers when they responded to your study; right?
5  Remember when we looked at that?
6      MS. O'DELL:  Objection.
7      THE WITNESS:  The JAMA reviewers didn't
8  respond to my study.
9  BY MR. ZELLERS:
10  Q.    Well, yes, they did -- I mean -- and I don't
11  mean that to be argumentative.
12      So you received comments from reviewers from
13  "JAMA Internal Medicine"; is that right?
14  A.    Yes.
15  Q.    And at least one of the reviewers -- and we
16  can go back and look at it, if we need to -- said
17  that:
18      (Reading) The association for
19      ever/never use is generally
20      reflective of regular talc/body
21      powder users not one-time use (end
22      of reading).
23      MS. O'DELL:  What page are you reading from,
24  please?
25      MR. ZELLERS:  Well, I'm reading from

Page 193

1  page 434 of Exhibit 4.
2  Q.    But you recall that, right,
3  Dr. Smith-Bindman?
4  A.    Yes.  I didn't say I agreed with that
5  person's review.  But, yes, we discussed that
6  earlier.
7  Q.    At least the JAMA reviewer disagrees with
8  your statement with respect to the primary limitation
9  of O'Brien, as set forth on page 32 of your amended
10  report; correct?
11      MS. O'DELL:  Object to the form.
12      THE WITNESS:  So you're -- you're pulling
13  one data point out of O'Brien.  I have not said that I
14  didn't think there was valuable information in
15  O'Brien.
16      So the negative -- the remainder of that
17  paragraph discusses them showing in that same table
18  that the relative risk of women with patent
19  reproductive tracts of 1.13, and that the risk of
20  women who use talcum powder greater than one time a
21  week, is 1.19.  So I think O'Brien has important
22  information.
23      I think, I believe that you want to get at,
24  a measure that's more descriptive of a specific type
25  of use, which I think is daily use.  So I think it

Attorneys' Eyes Only

Page 194

1 has the opportunity to go a lot further than they
2 did. But I'm not dismissing their -- her work.
3 BY MR. ZELLERS:
4 Q.     Well, what you have done for -- with O'Brien
5 is to go and pick out particular subtypes, and at
6 least for purposes of your unpublished study have
7 decided to use a portion of the data from O'Brien
8 rather than the overall set of data?
9 A.     Yes.
10 Q.     Are you aware O'Brien's overall finding was
11 not based on medically confirmed cases of ovarian
12 cancer, where the outcome was limited to -- well, let
13 me ask that question first.
14     Are you aware in O'Brien that the overall
15 finding was not based on medically confirmed cases of
16 ovarian cancer?
17 A.     I'd have to read about the contributory
18 study, but I believe they had subcancers that were
19 self-reported as opposed to based on medical review
20 of their charts. But I don't know which of the
21 cohorts had it written down, but I wouldn't remember
22 without looking up which one did what.
23 Q.     O'Brien concluded that when the outcome was
24 limited to medically confirmed cases, the hazard
25 ratio was weaker. And I'm looking on page 56, the

Page 195

1 first new paragraph.
2 A.     In this pooled -- oh.
3 Q.     "When the outcome was limited to medically
4 confirmed cases," do you see that?
5 A.     Yes, I do see that.
6 Q.     And you have not done that analysis, to look
7 specifically at the medically confirmed cases; is
8 that right?
9 A.     I have not.
10 Q.     In forming your opinions regarding O'Brien,
11 why did you not use the medically confirmed cases?
12     MS. O'DELL: Object to the form.
13     THE WITNESS: I actually don't know if that
14 variable is available for women who participated in
15 the Nurses' Health Study. So we used Nurses' Health
16 Study. I don't remember if there was a variable that
17 distinguished some women who had confirmed cases and
18 some who didn't.
19 BY MR. ZELLERS:
20 Q.     What O'Brien states is that when the outcome
21 was limited to medically confirmed cases, the hazard
22 ratio was attenuated, or weaker, with a hazard ratio
23 of 1.05, 95 percent confidence interval of 0.96 to
24 1.16 for the ever use versus never use; is that
25 right?

Page 196

1 A.     I just want to -- yes, I -- so I -- most of
2 the cases were medically confirmed. I was just -- I
3 don't think I knew that, 2200, 1800 and 84. Most are
4 medically confirmed.
5 Q.     Well, wouldn't the medically confirmed cases
6 be more reliable than the analysis that is not
7 limited to medically confirmed cases?
8 A.     I think, in general, using medically
9 confirmed cases would be preferable. I don't know
10 how it would influence their sample size or their
11 missing data.
12     And so I think I would be very interested to
13 see O'Brien's results, which might be in the
14 supplement, that looks at regular use with women who
15 had patent reproductive tracts who are medically
16 confirmed cases. I think that would be very
17 interesting to look at.
18     I think that paragraph that you're reading
19 from only talks about one analysis that is "ever use"
20 rather than all the analysis that they did.
21 Q.     Well, the authors in O'Brien conclude -- and
22 I'm looking at discussion on page 56 --
23 A.     Yes.
24 Q.     -- (Reading) In this pooled analysis
25     of four large US cohorts, there was

Page 197

1     no statistically significant
2     association between self-reported
3     use of powder in the genital area
4     and risk of ovarian cancer. There
5     were no clear dose-response trends
6     for duration and frequency of
7     powder use in the genital area in
8     relation to ovarian cancer risk
9     (end of reading).
10     Do you agree with that?
11 A.     So two things. I don't agree with that, but
12 she did conclude that it wasn't statistically
13 significant.
14 Q.     And let me --
15 A.     In that paper --
16 Q.     And I want you to finish, but you agree that
17 I read it correctly, that's what the author
18 concluded, but you disagree with her conclusion?
19 A.     Yes.
20 Q.     All right. Please go ahead and explain.
21 A.     Thank you.
22     I just wanted to -- I had said when you -- I
23 did not particularly focus on medically confirmed
24 cases when I read the paper. Thank you for pointing
25 that out.

Page 198

1    But I said what I would like to see is how
2  do the results look for medically confirmed cases
3  overall.  And for frequent use for all medically
4  confirmed cases, the point estimate is 1.17; 1.0 to
5  1.38.  So almost identical.  The point estimates for
6  invasive is 1.21.
7    So I think that was a good point that you
8  made.  But, indeed, the results are statistically
9  significant for all medically confirmed cases.
10    Getting to the question you asked.  I think
11  given many of the O'Brien statistically significant
12  associations with women who regularly use talc, I
13  don't agree, and I was surprised that she concluded
14  it wasn't statistically significant.
15    It was the same point that several of the
16  letters to the editor about her report made.  And
17  even though she said in her follow-up publication,
18  which said, oh, there is a statistically significant
19  association, it's just not that large.  So I think
20  she even sort of softened their conclusion that there
21  was no statistical significance.
22  Q.    Do you know Dana Gossett?
23  A.    I have heard of her, but I don't know her.
24  Q.    Was she at one time on the UCSF faculty, if
25  you know?

Page 199

1  A.    At the San Francisco General Hospital
2  faculty, I think.
3  Q.    Do you know anything about her reputation or
4  her credentials?
5  A.    She's not a researcher, as far as I know.
6  She's a clinician.
7  Q.    She did a response to the O'Brien paper that
8  was published in JAMA at the same time, or shortly
9  after?
10  A.    I think it was a letter -- it was an
11  editorial that went along with it, not a response to
12  it.
13  Q.    Is this similar to the type of letter that
14  you were going to submit?
15  A.    No.  She was presumably, or her coauthor,
16  was invited to write an editorial at the same time.
17  It's a different category.
18  Q.    Does JAMA have high standards in terms of
19  who they will accept letters from, based on your
20  experience?
21  A.    So I both had letters -- editorials written
22  about my papers several times, and I have written
23  those many times.  I think I have one coming out this
24  week.
25    They are often people who are commenting

Page 200

1  about the clinical implication of the results rather
2  than about the science.  It's not always the case,
3  but it's more to answer the question, "So what does
4  this mean for us?"
5  Q.    My only question was, based upon your
6  experience, does JAMA have, you know, a rigorous
7  process in terms of who they accept editorials from,
8  letters from, things that they put in the
9  publication?
10  A.    So I was making a distinction.  I just
11  wasn't making it clearly enough.
12    There are scientific standards for the
13  papers that get published at JAMA.  Those go through
14  pretty rigorous peer review.  And kind of in some way
15  everyone can write those papers, but they have to go
16  through the hurdles of being critically reviewed by
17  the reviewers and by the editor and by the
18  biostatistical editor.  So you have to go through
19  those.  And that's the rigorous review process.
20    The editorials are a completely different
21  process.  And those are to understand the clinical
22  implications but not to rigorously assess the
23  methods.  So they are -- they don't go through peer
24  review.  They have a very different focus.  They are
25  meant to let the clinicians reading the papers know

Page 201

1  how, what should we do with this information.  I'm
2  not saying they are not rigorous.  It's just they are
3  not rigorously scientifically evaluated.  They are
4  usually evaluated by clinicians who said, hey, should
5  we care about this or not.
6  Q.    Last question:  Is it your understanding,
7  though, you need to be a reputable physician in order
8  to submit and have published an editorial to JAMA?
9  A.    Yes.
10    MR. ZELLERS:  I have reached the end of my
11  time, sadly.  Ms. O'Dell, I do have more questions.
12  I'd like to continue, and I would like to try to
13  finish with some additional time.  We talked about
14  that off the record, and I -- you can certainly speak
15  for yourself, but I think your position is the
16  deposition is concluded at four hours.
17    MS. O'DELL:  That is the understanding of
18  the Court's order, that it's four hours.  And so we
19  do not agree to go beyond four, and we're going to
20  abide by the Court's order.
21    I do have a limited number of questions on
22  redirect, and so --
23    MR. ZELLERS:  So that's fine.  Let
24  me finish.
25  Q.    Doctor, you've given us today, through

Attorneys' Eyes Only

Page 202

1 answers to my questions and through your amended
2 report, the opinions, at least as of today, that you
3 would expect to give in any trial or hearing in this
4 matter; is that right?
5 A.     Yes.
6        MS. O'DELL:  Let's go off the record.
7        THE REPORTER:  Off the record at 2:40 p.m.
8        (Off the record.)
9        MR. ZELLERS:  We will mark as Deposition
10 Exhibit 23 the O'Brien 2020 paper.
11            (Exhibit No. 23 was marked.)
12        MR. ZELLERS:  Off the record.
13        (Recess taken.)
14        THE REPORTER:  Back on the record at
15 2:55 p.m.
16            EXAMINATION
17 BY MS. O'DELL:
18 Q.     So, Dr. Smith, I have a few questions to
19 follow up on and ask you.
20        You were asked about a number of documents
21 from your production prior to your deposition.  I
22 want to direct you to a specific page in Exhibit 5,
23 and it's Bates number ending -1131.  - 1131 at the
24 top of the page.
25 A.     Yes.

Page 203

1 Q.     You were asked about an email from you to
2 Dr. Woolen dated June 10th, 2021.
3 A.     Yes.
4 Q.     And specifically you were pointed to
5 comments about relooking at numbers, and "it seems
6 like too much work" or "seems too much work."
7 A.     Yes.
8 Q.     What did you mean by that?
9 A.     So one of the reviewers for the paper
10 suggested that not how we analyze the data or which
11 patients to include, but in Table 1 how we described
12 the patients in terms of the whole cohort, meaning
13 everyone who had no exposure, low, medium, high
14 exposure, or whether we just described the cohort as
15 no exposure versus high exposure.  Because we were
16 describing high exposure, frequent exposures.
17        So whether or not in Table 1 we put the
18 whole cohort, meaning all the patients with cancer,
19 all the patients without cancer, or whether we limit
20 Table 1 to the patients that contributed to the
21 quantification of the risk, which is really high
22 exposure versus no exposure.
23        We had in our first draft put all the
24 patients in.  And one of the reviewers suggested that
25 maybe it's more appropriate to put only the patients

Page 204

1 who contributed to the numbers in Table 1, basically
2 to tell people how you get the results.
3        So we decided to follow the recommendation
4 of the reviewer and show more limited numbers in
5 Table 1, but the question was whether or not we
6 should re-extract the numbers from the papers or just
7 use the data that we have.  And if we re-extract the
8 numbers, if we both had to do the re-extraction
9 separately, or to get the "N."
10        Again, it had nothing to do with the
11 quantification of the risk, that was from the point
12 estimate in the paper, but, rather, how to present it
13 in Table 1, whether Sean should just do that.
14        And I think my recollection of that email is
15 who should be putting the numbers in the paper, and I
16 believe that Sean extracted those numbers by himself.
17 Q.     In your answer you used the term, the "N."
18 A.     The 'N' just means the number of -- the
19 sample size.  "N" is the sample size.
20 Q.     So I want to now direct you to Exhibit 4,
21 page Bates number ending -184.
22 A.     -184?
23 Q.     -184. -184.
24 A.     Sorry.
25 Q.     -184.

Page 205

1 A.     Yes, -184.
2 Q.     Okay.  And I want to direct your attention
3 to the bottom of the page, to an email that defense
4 counsel asked you about, dated August 17th, 2021.
5 A.     Yes.
6 Q.     It's an email from you to Dr. Woolen and
7 Dr. Lazar.
8 A.     Yes.
9 Q.     And specifically you were asked about your
10 comments in regard to dose-response.  And I think you
11 used the words, "a terrible measure," then "get
12 negative results," and "conclude we didn't have a
13 good measure, so that's why it's negative, paren, if
14 a terrible measure, we should not have looked."
15        What did you mean by those comments?
16 A.     I wish I wasn't quite so casual.
17        But Sean, in response to one of the
18 reviewers, was considering doing a dose-response.
19 And the dose-response would mean looking at a little
20 bit of exposure, a medium amount, a lot, and a very
21 lot, to see if there was a change in risk with the
22 change of exposure, a dose-response.
23        Our paper is entirely focused on one risk
24 group, women who use talcum powder daily.  And so we
25 don't have the gradient in risk to look at, with

1  respect to a gradient of exposure.  We only looked at
2  a single exposure daily use.  So I didn't think we
3  had any measure of gradient of exposure.  So that's
4  what I meant by a "terrible measure."
5      If we don't have a meaningful measure of
6  exposure and we try to see if it's associated with an
7  outcome, we wouldn't be able to see an association
8  because our measure is not a real measure.  So I
9  would say we shouldn't move forward, meaning we
10  didn't have a good measure of gradient of exposure,
11  and then probably not find an association because we
12  don't have a good measure and then conclude, oh, we
13  didn't find, if we looked.  Part of truth in research
14  is if you look at something, you have to publish it.
15      So we wouldn't want to do the analysis not
16  expecting to have good results if we don't have a
17  good measure, then find no results.  And then we
18  would have to explain, well, we didn't see a result
19  because we didn't have a good measure.
20      And so I was suggesting, listen, if we don't
21  have a good measure, let's not go forward with an
22  analysis because it's not going to be fruitful.
23  Q.     Why did you not have a good measure?
24  A.     Because we have already only included women
25  who use talcum powder exposure.  So if you look at

1  the table in that unpublished results, women report
2  four times a week to seven times a week, or 10,000
3  uses over a lifetime, which is the same thing as
4  daily use for 30 years.  Those are measuring the same
5  thing.  So we didn't have any differential
6  measurement of exposure.  Everyone was the most
7  frequent daily users.
8  Q.     So, in other words, would it be fair to say
9  that in a dose-response, you would have to have low
10  use, or lower use, and then some incremental use --
11  A.     Yes.
12  Q.     -- up to sort of a maximum or daily use?
13  A.     That's right.  And we just didn't have that.
14  We didn't -- that wasn't what we chose to include in
15  our paper.  We included only one use case, and that
16  was as close to daily use as possible.
17  Q.     Let me ask you now to turn your attention to
18  Exhibit 4, page 436.
19  A.     Yes.
20  Q.     And these are reviewer comments that were
21  received from "JAMA Internal Medicine."
22  A.     Okay.
23  Q.     First, I want to just make the record clear.
24  JAMA itself, the JAMA publication, did not issue
25  comments on your submitted manuscript; is that fair?

1      MR. ZELLERS:  Objection.  Form.
2      THE WITNESS:  These comments are from
3  reviewers.
4      MS. O'DELL:  Yes.
5      THE WITNESS:  So when you send in a
6  publication to a journal, they then find reviewers
7  who are willing to review that.
8      MS. O'DELL:  Right.
9      THE WITNESS:  And so these don't reflect an
10  official opinion of "JAMA Internal Medicine."  They
11  are reviewers who they recruited to review the
12  manuscript.
13  BY MS. O'DELL:
14  Q.     Okay.  Let's take a look at comments made by
15  Reviewer No. 3 first.  And I guess we will go to the
16  top of the page.
17      You were asked specifically about the
18  comments in the top paragraph on page 436 that
19  related to asbestos exposure to asbestos, cites the
20  Cambargo paper, and then discusses high sustained
21  occupational exposure to asbestos.
22      Were those -- did you find those comments to
23  be relevant to your publication?
24  A.     No.  They had nothing to do with our
25  publication.  We don't discuss occupational exposure

1  to talc or asbestos.  We don't make a comparison to
2  asbestos from those other exposures.  We don't cite
3  Camargo.  So it was a funny comment that appeared in
4  this person's review.
5  Q.     Looking at Reviewer No. 4, and specifically
6  the major comment No. 1, there is a discussion
7  regarding regular talcum powder use/ever use.  And
8  the reviewer was critical of -- of the decision to
9  focus on daily use.
10      First, is -- is ever use essentially the
11  same as daily use?  Give us your reaction to that --
12  that comment?
13      MR. ZELLERS:  Objection.  Form.
14      Go ahead.
15      THE WITNESS:  So to begin with, women use
16  talcum powder in different -- different frequencies.
17  I said that earlier.  Some use it just a couple of
18  days a month.  Some women just use it in the
19  summertime.  Some women use it daily, and probably
20  everything in between.  I agree with what this
21  reviewer is getting at, which is that there probably
22  aren't a lot of women who use talcum powder once in
23  their lives.
24      So I think what this reviewer is saying --
25  is saying that everyone who uses talcum powder, they

Page 210

1 use talcum powder regularly.  But I would strongly
2 disagree that regular use -- and he gives a
3 particular example, use of talc powder at least once
4 a month for six months or longer.  I would strongly
5 disagree that once a month for six months or longer,
6 which is six times, is the same thing as daily use,
7 which is in that six months would be 165 times.  And
8 I don't think 6 and 165 are the same.
9     So I think he makes a good point that once
10 in a lifetime is probably not what most women use.
11 But I think the exposure that you care about is one
12 that you want to plot.
13     Part of the difficulties in these studies is
14 there's no real way to quantify the amount women are
15 exposed to in different settings.  I think a daily
16 use group seems like a very clean group.  It's the
17 women who remember that they used talcum powder as
18 part of their daily ritual.  I think it describes a
19 group that we can understand across different
20 studies, and it's a relatively high exposure compared
21 to people who use it once every six months.
22     So I stand by looking at daily use as a
23 really important category that is really very
24 different than ever use.  Ever use probably doesn't
25 have a lot of people -- women who use it once, but it

Page 211

1 might have women who use it once a month, once every
2 few months, a few times a year.  That to me is
3 diluting what would I expect the association to be
4 for women who use it daily.
5 BY MS. O'DELL:
6 Q.    You just testified that this reviewer made
7 some good points.  Do you -- did you agree with all
8 the points that were made?
9 A.    My recollection is that when we got this
10 first review, this was a first review we got, that
11 there were a lot of good points.  And so we then set
12 about improving the paper to respond to each of those
13 points, which is why it took us time between this
14 paper to sort of our next submission, because we
15 basically did a lot of revision based on comments.
16     We had two reviews that were detailed
17 reviews, and we improved the paper substantially.  I
18 didn't take all of the comments, to get at your
19 point, but I took the ones that I agreed with.  I
20 considered all the comments.  And I think the paper
21 has improved considerably.
22 Q.    And is that, you know, what you all have
23 done in this process, is that the -- the point and
24 the purpose of reviewer's peer review?
25 A.    I think peer review has one purpose, which

Page 212

1 is to decide what gets published in the particular
2 journal that the manuscript is submitted for.  But
3 really, more importantly, it's a way to get more
4 knowledgeable eyes on a piece of scientific work, and
5 it gets improved along the way, and that's expected.
6     So when I do reviews, they take me a long
7 time, and I contribute a lot of free advice to the
8 writers.  This is what you've done, that's great.
9 This is what I don't -- I don't see what I want to
10 see.  And this is how you could make it better.
11 That's what I do as a writer.  And as an author,
12 that's what I look for in a review, whether or not
13 they accept it or not.
14     I have had papers at "Annals of Internal
15 Medicine" where, from the time I submitted it to the
16 time it was accepted for publication, was two years.
17 And it just went to a lot of reviewers who kept
18 basically improving the paper.  And I was very
19 frustrated by how long it took.  But just from the
20 time they were sitting on it till they accepted it,
21 was two years.  But I had lots of comments, and the
22 paper just kept getting stronger as a result.
23 Q.    And for purposes of the unpublished work
24 that you're seeking to have published now, do you
25 embrace the peer review process?

Page 213

1 A.    I do.  What I hope is it doesn't take two
2 years.  But, yes, I do.  I think the paper has been
3 substantially improved through the process.
4 Q.    Let me ask you to clarify something that was
5 discussed at length several times today, and that is
6 referrals of your manuscript to a particular
7 publication versus an actual submission to a
8 publication.
9     Please explain what the differences are and
10 what occurred in this situation.
11 A.    So the primary submission is you write a
12 cover letter to the journal, you explain why the
13 topic is important, maybe something about what you
14 did, or strengths of what you did, or sometimes
15 limitations of what you did, or why it's important.
16 And we did that -- we did that for several journals
17 that we discussed today.
18     Having the paper referred by a journal is a
19 different process.  And that -- I don't know the -- I
20 don't know the details of it, but different journals
21 have different relationships with each other.  So for
22 the JAMA network, they are all under one publisher,
23 and so the -- true, the most prestigious JAMA is the
24 primary JAMA, in this case I asked the editor to
25 submit.  And he said, it just doesn't meet the

Attorneys Eyes Only

Page 214

1  requirements of that type of journal.  So he
2  suggested submitting it to "JAMA Internal Medicine."
3  And we did submit it to "JAMA Internal Medicine" with
4  a letter.
5       When they rejected it and they offered to
6  forward it to another journal, we didn't have a cover
7  letter.  We didn't have the opportunity to fix the
8  issues that were raised by the -- by the peer review.
9  And so if it was a critical review, as ours was,
10 there was no chance anyone else was going to accept
11 it.  They wouldn't accept it until they had a chance
12 to look at a version that might have fixed any errors
13 or areas of weakness.
14      And so I think we did submit -- our paper
15 was considered by a large number of journals, but
16 most of those were referrals.  And I mean -- I can't
17 say they accepted them.  They didn't accept them, but
18 I wouldn't have expected it.
19      So in the example with the journal, "General
20 Journal of Medicine," I don't know the relationship
21 between Annals and "JAMA General Internal Medicine."
22 I was, quite frankly, a little surprised by that
23 referral.  But they were not going to accept it with
24 the reviews that Annals have already turned it down.
25      I mean, there are cases where they do.

Page 215

1  Those cases are usually -- the topics were not just
2  interesting.  The methods were great, but the topic
3  wasn't that great, so maybe our sister journal might
4  need that topic focused on.
5       So in our case they were critical of the
6  methods.  And so if it was rejected, it was not going
7  to be accepted by those other referrals until those
8  errors were fixed.
9       So, yes, it was referred from "Annals of
10 Internal Medicine" to "General Internal Medicine,"
11 and they rejected it.  But we then took those
12 reviews, we modified, we fixed the numbers, as you've
13 asked me about, and that's why we felt it was
14 reasonable to actually submit it to them with a cover
15 letter and explanation of what we were doing.
16 Q.     You were also asked some questions about
17 your amended report, and specifically the section
18 regarding, "Constituents:  Asbestos Fibrous Talc."
19 And I want to just -- I think there was some
20 confusion in that discussion, and I want to clarify
21 the record.
22      Is it your opinion that talc fibers -- let
23 me strike that and start again.
24      Talc fibers and asbestiform talc and fibrous
25 talc, in your understanding, is that equivalent or

Page 216

1  not?
2  A.     Let's go through the words again.
3  Q.     Yes.
4  A.     Fibrous talc --
5       MR. ZELLERS:  Let me just interpose an
6  objection to form.
7       Go ahead, Doctor.
8       THE WITNESS:  Fibrous talc, talc fibers, and
9  asbestiform fibers, all of those describe the shape
10 of talc fibers as being -- I don't remember the
11 number, but maybe it's 5 microns by 1 micron.  It's
12 the shape of the talc.
13      Those three descriptions are all
14 descriptions of the way talc looks when it takes on
15 an asbestiform shape.  It's a long, thin shape.  And
16 apparently that shape has a capacity to cause damage.
17 So talc in that shape is considered the same as
18 asbestos in terms of a Group 1 carcinogen by IARC.
19 BY MS. O'DELL:
20 Q.     You were asked some questions about the
21 specific subtypes of ovarian cancer, and specifically
22 whether you have looked at the epidemiology of all
23 subtypes of ovarian cancer.
24      And let me ask you the question:  Have you
25 looked at the literature describing the association

Page 217

1  between general use of talc and ovarian cancer, and
2  did that include analyses of certain subtypes?
3  A.     Yes.  So I reviewed the epidemiology of
4  ovarian cancer in its entirety, and whatever papers
5  have been published about whatever subtypes
6  contribute to that.
7       What I was trying to explain is that there's
8  just a lot more literature about the serous cancer
9  than there is about other subtypes.  But my opinion
10 expressed in the first report and the amended report
11 is that all of ovarian cancer taken as a group has an
12 association and is caused by exposure to talcum
13 powder.
14 Q.     And when you're saying "ovarian cancer"
15 there, you're referring to epithelial ovarian cancer?
16 A.     Yes, that's correct.  There are types that
17 would not count.  Like metastatic cancer of the
18 stomach to the ovary is not what I'm talking about.
19 Q.     You were asked a number of questions about
20 Health Canada.  And let me just direct you to page 17
21 of Health Canada, which was marked as Exhibit 22 by
22 defense counsel.  And looking at -- let me just ask
23 some general questions.
24      Do you have it in front of you, by chance?
25 A.     I'm up to 21.  22.

Attorneys' Eyes Only

Page 218

1  Q.    Page 17.  And first let me ask you
2  generally, does the Health Canada assessment exclude
3  any subtypes from its causation conclusions?
4        Let me strike that and say:  Does Health
5  Canada exclude any subtypes of epithelial ovarian
6  cancer in their conclusion that perineal use of talc
7  has caused it?
8  A.    No.
9        MR. ZELLERS:  Objection.  Form.
10 BY MS. O'DELL:
11 Q.    Specifically, does Health Canada exclude in
12 its conclusion that the genital use of talc is -- can
13 cause ovarian cancer?  Does it exclude endometrio --
14 endometrioid ovarian cancer?
15 A.    No.
16       MR. ZELLERS:  Objection.  Form.
17       THE WITNESS:  It does not.
18 BY MS. O'DELL:
19 Q.    Similarly, does Health Canada in its
20 conclusions exclude clear cell ovarian cancer in part
21 of its conclusions?
22       MR. ZELLERS:  Objection.  Form.
23       THE WITNESS:  It does not.
24 BY MS. O'DELL:
25 Q.    You were also asked about the dose-response

Page 219

1  discussion in Health Canada, on page 33.
2  A.    Yes.
3  Q.    And you were directed, I believe, to the --
4  to the summary sentence but didn't have the chance to
5  discuss sort of the what had been cited by Health
6  Canada and really what their analysis was.
7        You know, what -- when Health Canada reached
8  its conclusion that -- that exposure information
9  is -- was lacking to permit a fulsome assessment,
10 what were they talking about?  And what's your
11 opinion regarding dose-response?
12 A.    I think they cite a large number of
13 publications that have found dose-response.  They
14 also cite that some of the studies just don't have
15 enough data, kind of the way we didn't in our review,
16 across a whole range of dose levels to be able to
17 conclude there's a dose-response.
18       As ours only looks at heavy users, many of
19 the studies only looked at any users, meaning there
20 wasn't a gradient of exposure measured that would
21 allow looking at a gradient of risk.
22       Nonetheless, they describe a whole lot of
23 papers and systematic reviews and interpretations
24 that do support a dose-response.  So I think they
25 just would like to see more information across the

Page 220

1  entire dose range to particularly get at whether we
2  have a quantified dose-response.
3        But I think they also acknowledge that we
4  don't necessarily need a dose-response to determine
5  whether talc is causal.  It's one of the areas they
6  cite in my review, because that's not -- that's not a
7  substantial requirement for causality to work in a
8  linearly predictable way.
9  Q.    I want to ask you to --
10 A.    Can I just --
11 Q.    Yes.
12 A.    It's an example of an absence of evidence
13 rather than an evidence of absence.  So there isn't
14 enough information, not that they have information
15 that there's not a dose-response.
16 Q.    In other words, they had limited data?
17 A.    That's what that means.
18 Q.    Let me ask you to turn to the O'Brien study.
19 I think it's been marked now as Exhibit?
20       MR. ZELLERS:  23.
21       THE WITNESS:  I have got it now.  Someone
22 snuck it into my pile.
23       MS. O'DELL:  Is that O'Brien there?
24       THE WITNESS:  Yes.
25       ///

Page 221

1  BY MS. O'DELL:
2  Q.    And I'd like, if you would, please -- would
3  it be okay if I borrowed that version --
4  A.    I have mine.
5  Q.    -- and you can use yours because I don't
6  have a printed version.
7  A.    The supplement or the main?
8  Q.    The main.  So Exhibit 23, which is the main
9  O'Brien --
10 A.    Yes.
11 Q.    -- article.  And if you will turn to
12 page 56.  Defense counsel asked you about the first
13 two sentences in the "Discussion" section.
14 A.    Yes.
15 Q.    In the second sentence there, it says:
16       (Reading) There were no clear
17       dose-response trends for duration
18       and frequency of powder use in the
19       genital area in relation to ovarian
20       cancer risk (end of reading).
21       And I don't think you had an opportunity to
22 respond to that specific sentence when counsel asked
23 you questions.
24       Why -- is it surprising that you do not see
25 a dose-response in a cohort; and if so, why?

Attorneys' Eyes Only

Page 222

1    MR. ZELLERS:  Objection.  Form.
2    THE WITNESS:  So of the -- of the cohorts,
3    they didn't have detailed information about use
4    except for one of the four studies.  So the Nurses'
5    Health Study asked women how much and how often they
6    used talc, daily, one to six times a week, and so
7    forth.  The other studies -- the Nurses' Health Study
8    too, which only asked the question a few years before
9    publication, so it didn't contribute anything.
10    The other two studies didn't have a lot of
11    information.  So the Women's Health Study only had
12    information about did you ever use talc.  And so the
13    SIS study, they asked the question a little bit oddly
14    about the year before that, the survey, or when they
15    were 13, so they had no information except for one
16    study on quantification of the amount of use.
17    Nonetheless, when they looked at the data
18    they did have on the quantification of use, they
19    showed a very strong relationship in a dose-response
20    where women who were frequent users had a risk --
21    women who had open tubes had a risk of 1.21.  That
22    was statistically significant.  So a 21 percent
23    increased risk of cancer.
24    So I was surprised that that's how they
25    concluded.  They had, in my words in my email, they

Page 223

1    had a terrible measure.  It was only there for one of
2    the four studies.  But even so, they showed a
3    statistically significant result.  So I was surprised
4    they concluded that there was none.  They had a
5    terrible measure, and they still showed a
6    dose-response.
7    BY MS. O'DELL:
8    Q.    Let me ask you to set that aside and turn to
9    page 34 of your amended report, which is the section
10    beginning with your systematic review within the MDL
11    report.
12    A.    Yes.
13    Q.    And specifically in relation to the
14    systematic review, let me ask you first, did I, or
15    any lawyer on behalf of plaintiffs, have any input in
16    the design or the execution of that analysis?
17    MR. ZELLERS:  And I'm sorry, just for
18    clarification.  Are we talking about the systematic
19    review in her original report or the unpublished
20    study?
21    MS. O'DELL:  This is page -- this is in the
22    new report I'm looking at, Exhibit 9.  And it's --
23    you asked her some questions about this review -- let
24    me strike that and start again.
25    You asked questions about her systematic

Page 224

1    review in her amended report, and I'm just following
2    up.
3    Q.    In relation to the new review, beginning on
4    page 34 of your amended report, did I or any lawyer
5    for a plaintiff have any input into the design of
6    your work?
7    A.    You had no input on the design.  You didn't
8    see this review or the other review in any state.
9    The only thing I was clarifying -- it starts
10    on page 33.  So I did understand that the changes in
11    the word of -- I took out the "systematic review."  I
12    didn't take it out.  It just changed the indexing.
13    But the systematic review is described starting on
14    page 33.
15    No, there was no input from any lawyers for
16    any of the work.
17    Q.    Did you use the same methodology in carrying
18    out your review for your MDL report that you would
19    use in the study you're publishing?
20    A.    Yes.  I think the review I did was on my
21    own.  And there were some details that you have to
22    include with publishing a result, such as registering
23    the trial.  But in terms of the scientific rigor, I
24    followed what I consider very rigorous scientific
25    methods for conducting that review.

Page 225

1    MS. O'DELL:  Let me just check my notes.
2    Q.    Early on in the discussion of the emails and
3    other documents produced in relation to this
4    deposition, there was a description by Dr. Woolen,
5    and it referred to the different individuals that
6    would be involved in your unpublished work.  And in
7    one instance it referred to a content expert, and you
8    were talking about that might have been a
9    gynecologist.  Do you remember that testimony?
10    A.    Yes.
11    Q.    Are you a content expert when it comes to
12    diagnosing ovarian cancer?
13    A.    Yes.
14    Q.    Are you a content expert when it comes to
15    the epidemiologic literature looking at the
16    association between talc use and ovarian cancer?
17    A.    Yes.
18    Q.    Just so the record is clear, in relation to
19    your unpublished study, have I or lawyers for any
20    plaintiffs had -- have we had input in any way into
21    the design, execution, you know, publishing of that
22    manuscript?
23    A.    No, you haven't.
24    MS. O'DELL:  I think that's all I have.
25    MR. ZELLERS:  Doctor, I have just a few

Attorneys Eyes Only

Page 226

1  follow-ups.
2         FURTHER EXAMINATION
3  BY MR. ZELLERS:
4  Q.    The unpublished study, you believe, is
5  supportive of your opinions in this case; is that
6  right?
7  A.    Yes.
8  Q.    And you reference the unpublished study in
9  your amended report, on page 17; is that correct?
10 A.    I don't reference the results, but I mention
11 that we're doing this separate analysis.
12 Q.    And you state that you thought it was
13 important to publish a meta-analysis and systematic
14 review that focuses on frequent use of talcum powder?
15 A.    Yes.
16 Q.    I saw that you were questioned, you know,
17 about your unpublished study in the Philadelphia
18 trial.
19 A.    It was referenced.
20       MS. O'DELL: Object to the form.
21       THE WITNESS: I wasn't asked any questions
22 about it. It was just referenced.
23 BY MR. ZELLERS:
24 Q.    Well, so my question is: Do you intend to
25 offer opinions or talk about your unpublished study,

Page 227

1  you know, at any trial or hearing? I mean, what you
2  did, what your findings were?
3        MS. O'DELL: Object to the form.
4        THE WITNESS: If I'm asked about it, I would
5  be happy to talk about it.
6  BY MR. ZELLERS:
7  Q.    Same question: If the study is published, I
8  assume you'll talk about it; is that right?
9  A.    If I'm asked about it, I'm happy to talk
10 about it.
11 Q.    All right. Just a couple of other
12 questions.
13       You decided, with respect to your
14 unpublished study, not to do any analysis of
15 dose-response; is that right?
16 A.    Yes.
17       MS. O'DELL: So, Mike, your time is up. I'm
18 happy to let you go back to clarify, but your time is
19 up. You could have saved time for redirect. So if
20 you're going to go into different questions --
21       MR. ZELLERS: That's not a different
22 question.
23       MS. O'DELL: It is a different area of
24 inquiry for --
25       MR. ZELLERS: You asked her specifically

Page 228

1  about dose-response, and whether it was part of her
2  study and whether it was a bad measure.
3        MS. O'DELL: Well, I asked -- I followed up
4  on the email that you asked about. So you had time
5  to inquire about that, and you could have, but you
6  didn't. So I will give you a couple minutes' leeway.
7  But this is not a whole half hour.
8        MR. ZELLERS: I disagree.
9        MS. O'DELL: That's fine.
10       MR. ZELLERS: But I appreciate your
11 comments. Just one other -- couple of questions.
12 Q.    Health Canada decided that there was so
13 little information about subgroups, that they
14 couldn't consider and study it; correct?
15       MS. O'DELL: Object to the form.
16       THE WITNESS: Are you asking about
17 histology --
18 BY MR. ZELLERS:
19 Q.    Well, take a look --
20 A.    -- or dose-response?
21 Q.    Take a look -- Ms. O'Dell directed you to
22 page 17 in her questions.
23 A.    Yes. I'm on page 17.
24 Q.    And if you look at the bottom and the
25 carryover sentence:

Page 229

1        (Reading) Furthermore there's
2        considerable uncertainty for how
3        subgroup data should be examined in
4        particular for the tumor subtypes,
5        therefore, subgroup analyses will
6        not be examined -- will not be
7        further examined in this assessment
8        (end of reading).
9  A.    Yes. For histology they decided they
10 couldn't do specific results. It was all ovarian
11 cancer they were speaking about, not different
12 results for different types.
13 Q.    Well, but "subgroup analysis" is referring
14 to clear cell, mucinous, endometrioid; correct?
15       MS. O'DELL: Object to the form.
16       THE WITNESS: I believe so, yes.
17       MR. ZELLERS: I have more questions. I
18 appreciate that our time is up, and so, you know, we
19 can talk at some later point about whether or not any
20 additional time is required or can be granted. But
21 for today we're finished.
22       MS. O'DELL: Okay. Thank you,
23 Mr. Smith-Bindman.
24       MR. ZELLERS: And before we go off the
25 record, we have agreed that I will take custody of

Attorneys' Eyes Only

```
                                    Page 230
 1   the original hard copy deposition exhibits;
 2   will transmit electronic copies of all of the
 3   exhibits to the court reporter, with the exception of
 4   Exhibit 15, which is the amended -- or the updated CV
 5   for Dr. Smith-Bindman.  And, Ms. O'Dell, you will
 6   communicate that to the court reporter?
 7          MS. O'DELL:  I sure will.
 8          MR. ZELLERS:  All right.  Thank you.
 9          (Whereupon, the deposition was concluded at
10   3:34 p.m.)
11              --o0o--
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 231
 1          CERTIFICATE OF REPORTER
 2          I, SANDRA BUNCH VANDER POL, a Certified
 3   Shorthand Reporter, hereby certify that the witness
 4   in the foregoing deposition was by me duly sworn to
 5   tell the truth, the whole truth and nothing but the
 6   truth in the within-entitled cause;
 7          That said deposition was taken down in
 8   shorthand by me, a disinterested person, at the time
 9   and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13          That before completion of the deposition,
14   review of the transcript was NOT requested.  If
15   requested, any changes made by the deponent (and
16   provided to the reporter) during the period allowed
17   are appended hereto.
18          I further certify that I am not of counsel or
19   attorney for either or any of the parties to the said
20   deposition, nor in any way interested in the event of
21   this cause, and that I am not related to any of the
22   parties thereto.
23   DATED:  October 11, 2021
24          _____
25          SANDRA BUNCH VANDER POL, CSR #3032
```