# EXHIBIT 10

```
                                                    Page 1

 1                          Volume I   Pages 1-293

 2                          Exhibits 1-32

 3          IN THE UNITED STATES DISTRICT COURT

 4            FOR THE DISTRICT OF NEW JERSEY

 5   _____

 6   IN RE JOHNSON & JOHNSON TALCUM

 7   POWDER PRODUCTS MARKETING,              MDL NO.

 8   SALES PRACTICES, AND PRODUCTS     16-2738(MAS)(RLS)

 9   LIABILITY LITIGATION

10   _____

11

12

13

14

15

16          VIDEOCONFERENCE DEPOSITION OF

17              SONAL SINGH, M.D., M.P.H

18          Thursday, April 4, 2024, 9:03 a.m.

19                  BEECHWOOD HOTEL

20               363 Plantation Street

21          Worcester, Massachusetts  01605

22

23

24       -----REPORTER:  Sonya Lopes, RPR, CSR-----

25
```

Page 2

1 APPEARANCES:
2
3 Ashcraft & Gerel, LLP
4     Michelle A. Parfitt, Esq.
5     1825 K Street, N.W., Suite 700
6     Washington, D.C.  20006
7     202.783.6400
8     mparfitt@ashcraftlaw.com
9     for Plaintiffs
10
11 Levin Papantonio Rafferty
12     Christopher V. Tisi, Esq.
13     316 South Baylen Street
14     Pensacola, Florida  35202
15     850.435.7000
16     ctisi@levinlaw.com
17     for plaintiffs
18
19 Skadden, Arps, Slate, Meagher & Flom LLP
20     Zachary W. Martin, Esq.
21     500 Boylston Street
22     Boston, Massachusetts  02116
23     617.573.4862
24     zachary.martin@skadden.com
25     for Defendants

Page 3

1 APPEARANCES:
2
3 Also present:  Luis Chu (via Zoom)
4                Patrick Lyons (via Zoom)
5                Tracy Finken (via Zoom)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2
3 WITNESS:     SONAL SINGH, M.D., M.P.H
4
5 EXAMINATION BY:              PAGE
6 Mr. Martin                8
7 Ms. Parfitt               275
8
9 EXHIBIT                    PAGE
10 Exhibit 1, deposition notice..............9
11 Exhibit 2, invoice......................14
12 Exhibit 3, curriculum vitae..............18
13 Exhibit 4, list of testimony.............31
14 Exhibit 5, supplemental expert report of
15      Sonal Singh, M.D., M.P.H.......34
16 Exhibit 6, ACOG printout.................37
17 Exhibit 7, National Cancer Institute
18      PDQ printout...................41
19 Exhibit 8, January 16, 2019 transcript of
20      Sonal Singh, M.D., M.P.H.......42
21 Exhibit 9, American Cancer Society
22      printout.....................47
23 Exhibit 10, order from Court in Viagra
24      case.........................52
25

Page 5

1              I N D E X
2
3 EXHIBIT                       PAGE
4 Exhibit 11, February 2, 2023 transcript
5      of Sonal Singh, M.D., M.P.H...57
6 Exhibit 12, 2021 article by Nicolas
7      Wentzensen, et al............86
8 Exhibit 13, 2023 article by Katie M.
9      O'Brien, et al...............104
10 Exhibit 14, 2019 article by Iwona M.
11      Gabriel, et al..............117
12 Exhibit 15, 2016 article by Daniel W.
13      Cramer, et al...............127
14 Exhibit 16, 2024 article by Julie E.
15      Goodman, et al..............133
16 Exhibit 17, 2020 article by Katie M.
17      O'Brien, et al..............138
18 Exhibit 18, 2018 report of Sonal
19      Singh, M.D., M.P.H..........154
20 Exhibit 19, 2020 Dana R. Gossett, M.D.
21      editorial...................170
22 Exhibit 20, 2016 study by Steven A.
23      Narod.......................179
24 Exhibit 21, 2018 article by Wera
25      Berge, et al................187

2 (Pages 2 - 5)

Page 6

1            I N D E X
2
3  EXHIBIT                    PAGE
4  Exhibit 22, 2019 article by Mohamed
5        Kadry Taher, et al..........191
6  Exhibit 23, 2021 article by Colette P.
7        Davis, et al................207
8  Exhibit 24, 2021 article by Kiarash
9        Tanha, et al................219
10  Exhibit 25, April 2021 Health Canada
11        document....................227
12  Exhibit 26, 2022 article by Sean A.
13        Woolen, et al...............230
14  Exhibit 27, supplementary table..........230
15  Exhibit 28, 2008 article by Anna H.
16        Wu, et al...................248
17  Exhibit 29, 2019 article by Amy K.
18        Harper, et al...............269
19  Exhibit 30, "EPA Asbestos Part 1;
20        chrysotile asbestos;
21        regulation of certain
22        conditions of use under the
23        Toxic Substance Control Act,
24        TSCA," document..............276
25

Page 7

1            I N D E X
2
3  EXHIBIT                    PAGE
4  Exhibit 31, article by Kemi
5        Ogunsina, M.D., et al........283
6  Exhibit 32, article by Katie M.
7        O'Brien, et al...............285
8
9  *Exhibits returned to Mr. Martin
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1          SONAL SINGH, M.D., M.P.H,
2        was duly sworn by the notary public,
3          examined, and testified as follows:
4              EXAMINATION
5  BY MR. MARTIN:
6      Q.  Good morning, Dr.Singh.  My name is Zachary
7  Martin.  I'm here on behalf of Johnson & Johnson and
8  LLC management.  You understand you're here to
9  discuss your opinions in your supplemental expert
10  report in the In re Johnson & Johnson talcum powder
11  MDL?
12      A.  That is correct.
13      Q.  And you're also offering the same opinions
14  in the New Jersey multicounty litigation; is that
15  correct?
16      A.  Yes.  That is correct.
17      Q.  Okay.  So I know you've been deposed
18  before, including in this case.  So I will not
19  belabor the rules.  But just please give verbal
20  answers -- like, not a shake of the head or nod of
21  the head -- to make it easy for your court reporter
22  here.
23          Let me finish questions.  I'll do my best
24  to let you finish your answers.  You may want to
25  take a beat in case Ms. Parfitt wants to object.  If

Page 9

1  she does object, please still answer the question
2  anyway, unless she instructs you not to.
3          And if you want to take a break at any
4  time, just let me know.  Just try not to take a
5  break while a question's pending.  If you can answer
6  the question, then we'll take a break.
7          (Deposition notice, Exhibit 1, marked)
8      Q.  Doctor, have you seen this document before?
9      A.  That is correct.
10      Q.  Okay.  And have you seen exhibit --
11  Schedule A -- I'm sorry -- to the document, just on
12  the next page?
13      A.  That is correct.
14      Q.  Okay.  And that schedule requests that you
15  produce certain documents.  To the best of your
16  knowledge, are all the -- were all the documents in
17  Schedule A produced to us in advance of this
18  deposition?
19      A.  That is correct.
20      Q.  Okay.
21          MS. PARFITT:  Zack, if I may, we also
22  filed objections to the notice of deposition and
23  requested documents.  So I'm not sure whether you're
24  going to mark that as part of the file, but for the
25  record.

3 (Pages 6 - 9)

Page 10

1    MR. MARTIN: I am aware of the
2 objections.
3    MS. PARFITT: Thank you.
4    MR. MARTIN: I'm not going to mark that
5 as part of the file, but I'm aware of those.
6    Q. But to the extent not barred by the
7 objections of counsel, you've produced everything
8 requested?
9    A. That is correct.
10    Q. Okay. Did you bring any additional
11 materials with you today?
12    A. Those are references -- those are all in my
13 -- but, you know, I've scribbled on them. That's
14 what it is.
15    Q. But there's no documents in there --
16 there's nothing in there that is not either in your
17 reference list or in the Dropbox that Ms. Parfitt
18 produced on Monday?
19    A. No, as far as I know.
20    Q. How did you prepare for the deposition
21 today?
22    A. I read my report, and I reviewed my report.
23 I read my previous report. And where I had
24 questions for myself, I went through those
25 references and I, you know -- then yesterday

Page 11

1 evening, I met with the counsel for two, three hours
2 to discuss, prepare.
3    Q. And when you say "counsel," is that the two
4 counsel here in the room?
5    A. That is correct.
6    Q. And did you do that in person or over the
7 phone?
8    A. In person.
9    Q. Okay. Did they give you any additional
10 materials at that meeting?
11    A. I don't recall.
12    Q. Okay. You said you reviewed your two
13 reports in this case. Did you review your prior
14 deposition?
15    A. I did not.
16    Q. Okay. Have you at any point reviewed any
17 of the depositions given by other experts in this
18 litigation?
19    A. I have.
20    Q. Okay. Which experts?
21    A. I think at the time of the initial
22 deposition, I reviewed Dr. Diette.
23    Q. Diette, I believe, yeah.
24    A. Diette. Yeah. Sorry. His. And then for
25 this deposition, I was provided Dr. Moorman. And

Page 12

1 Dr. Cote, I was provided that. I skimmed through
2 it, you know, to the extent I reviewed -- yes -- and
3 have it.
4    Q. I know you said you hadn't looked at your
5 previous deposition in advance of today. Have you
6 looked at that deposition since you gave it in
7 January 2019?
8    A. No.
9    Q. Okay. To the extent you remember what you
10 said in that deposition, is there anything you would
11 change or that you don't stand by?
12    MS. PARFITT: Objection. Form.
13    A. I think you'd have to, you know, point what
14 specifics you're asking for. But in terms of the
15 causal opinion, it is reflected in my expert report
16 -- supplemental report.
17    Q. Okay. We will -- we might look at specific
18 parts --
19    A. Sure.
20    Q. -- later this morning. Beyond your two
21 expert reports, are there any writings in which you
22 set out opinions related to the purported
23 relationship between talcum powder and ovarian
24 cancer?
25    A. No.

Page 13

1    Q. In 2018 and '19, you were charging $600 an
2 hour. Is that still how much you charge?
3    A. A little bit more. 650.
4    Q. 650. Okay.
5    A. Inflation.
6    Q. Understood. Understood. And beyond your
7 hourly rate, are there any other charges that you
8 have charged plaintiffs' counsel?
9    A. No.
10    Q. No retainer?
11    A. No.
12    Q. Okay. Have you traveled at all for this
13 litigation?
14    A. Yesterday I had to travel because of the
15 weather. So that wasn't preplanned. I stayed in
16 the hotel so that I could make it in time for you.
17 That's all.
18    Q. Okay.
19    A. I live a little bit out of town.
20    Q. Never traveled outside of Massachusetts
21 for --
22    A. No. No.
23    Q. -- for the case. Okay. I have Exhibit 2
24 here. This is something that was produced to us on
25 Monday by Ms. Parfitt.

4 (Pages 10 - 13)

Page 14

1    (Invoice, Exhibit 2, marked)
2    Q.  Does this invoice reflect all of the work
3  that you have done on this case since your last
4  deposition in January of 2024 (verbatim)?
5        MR. TISI:  I'm sorry.  I didn't realize
6  --
7        MR. MARTIN:  I'm sorry.  This is two-
8  sided, for anyone who hasn't seen that.
9    A.  Yeah.  This reflects the invoice I
10  submitted at that time.  I haven't submitted any
11  other invoices.
12    Q.  That wasn't quite my question.
13        Does that reflect all the work you've
14  done --
15    A.  No.
16    Q.  -- since -- okay.  Does it reflect all the
17  work you had done from January of 2019 through the
18  date of this invoice?
19    A.  Yeah.
20    Q.  Okay.  So you didn't do any work after your
21  deposition and before September of last year?
22    A.  No.
23    Q.  Okay.  Can you estimate approximately how
24  many hours you've spent on this case since the date
25  of this invoice, which is November 15th of 2023?

Page 15

1    A.  I would say 40, 45 hours.  I don't have an
2  exact number.
3    Q.  That's fine.  That's ballpark.  So if I
4  were -- if I could do mental math, I probably
5  wouldn't be a lawyer.  But that reflects
6  approximately -- 650 times 45 -- $29,000 worth of
7  work since then.  Does that seem right?
8        Okay.  So plus approximately 42, $43,000,
9  that brings the grand total to somewhere in the
10  neighborhood of $70,000 of work since your past
11  deposition.
12    A.  That is correct.
13    Q.  Okay.  Have you done work related to talc
14  litigation outside of the MDL?
15    A.  No.
16    Q.  Okay.  So what we just talked about in this
17  invoice reflects the entirety of your work on any
18  litigation related to talc since your last
19  deposition.
20    A.  That is correct.
21    Q.  Okay.  What about litigation generally?
22  Can you estimate how much you've received in money
23  -- how much money you've received for litigation
24  work since your last deposition in 2019?
25        MS. PARFITT:  Objection.

Page 16

1    A.  I cannot.  I mean, it's -- what -- 2018,
2  2019?  Yeah.
3    Q.  Your last deposition was January of 2019.
4    A.  I cannot estimate.
5    Q.  Okay.  Not even a ballpark number?
6        MS. PARFITT:  Objection.  Form.
7    A.  No, not really.
8    Q.  Do you know if it was more or less than a
9  hundred thousand dollars?
10        MS. PARFITT:  Objection.  Form.
11    A.  Probably more.
12    Q.  Do you know if it's more or less than
13  $200,000?
14        MS. PARFITT:  Objection.  Form.
15    A.  I don't know that.
16    Q.  Approximately what percentage of your
17  income last year came from litigation work?
18        MS. PARFITT:  Objection.  Form.
19    A.  Last year?
20    Q.  The year 2023.
21        MS. PARFITT:  Same objection.
22    A.  I can't recall the specifics of it.
23    Q.  Okay.  Again, more or less than 30 percent?
24        MS. PARFITT:  Objection.  Form.
25    A.  You know, I have other sources of income.

Page 17

1  You know, I do trading.  I do other work.  So I
2  don't keep track of -- I mean, I produced the
3  invoices that you asked for.
4    Q.  What is your salary from the University of
5  Massachusetts?
6        MS. PARFITT:  Objection.  Form.  What's
7  the relevance?  Relevancy.  That has no relevancy.
8        MR. MARTIN:  It's relevant to
9  credibility to get approximately what percentage of
10  his income comes from litigation.
11        MS. PARFITT:  I object.  You can ask the
12  question with regard to the percentage of his
13  income, if he knows that.  I object to asking him
14  what his salary is from the university.  I instruct
15  you not to answer that.
16        MR. MARTIN:  He didn't answer the
17  question about percentage, which is why I was trying
18  to get at it from a different angle.  If you're
19  instructing him not to answer, he can not --
20        MS. PARFITT:  I instruct him not to
21  answer.
22    Q.  Do you have an estimation of your non-
23  litigation income last year?
24        MS. PARFITT:  Objection.  Form.  It's
25  the same question.  Non-litigation income would

5 (Pages 14 - 17)

Page 18

1 include salary.
2    A. I didn't prepare for sort of, you know,
3 monetary, which income from where. I produced what
4 was here, and that's what I was prepared to answer.
5        MR. MARTIN: I think it's relevant to
6 credibility, but we'll move on.
7        MS. PARFITT: Thank you.
8        MR. MARTIN: Let's look at your CV.
9        (Curriculum vitae, Exhibit 3, marked)
10    Q. So this is the CV that was produced to us
11 on Monday. And I believe it's current as of this
12 month. Is there anything that looks not current to
13 you in that?
14    A. No.
15    Q. Okay. So there are a couple of changes
16 since the time of your last deposition that I want
17 to talk about. The first is on page 1. And it's
18 your role as associate professor in the division of
19 health systems sciences. Okay. You started that
20 role in October of 2022?
21    A. Yeah. It was more, you know -- we were at
22 Meyers. And it was more an incorporation than an
23 institute into the school of medicine.
24    Q. Okay. So just so I'm clear, it was more
25 the creation of a formal division of health systems

Page 19

1 sciences?
2    A. Exactly. Yes. It's very new. It's, you
3 know.
4    Q. It incorporates work you'd previously been
5 doing at the university?
6    A. Yeah.
7    Q. Okay. Does it incorporate work from the
8 Department of Family Medicine & Community Health,
9 the Department of Quantitative Health Sciences, or
10 both?
11    A. So, you know, the way it was, we -- there
12 was Meyers Health Institute maybe at that time that
13 I was deposed. And the institute -- medical school
14 brought in people who do health systems research
15 into one institute. And that's why it's reflected
16 there.
17    Q. Actually, it's on the same page.
18    A. Sure.
19    Q. I'm sorry. No. It's not. It's on page 3,
20 teaching and classroom activities. It looks like
21 you started to teach a course at the medical school
22 since your last deposition.
23    A. That is correct.
24    Q. And is "Clinical epidemiology for medical
25 students" the name of that course?

Page 20

1    A. Yes.
2    Q. Okay. What did that course entail,
3 generally?
4    A. It entails starting out with first years,
5 usually teaching them about study designs, how to
6 review a case control study, cohort study,
7 randomized trials, and, you know, bias, confounding.
8 So it's -- yeah.
9    Q. Just to be clear, when you say first-year
10 students, you mean first-year medical students, not
11 first-year residents.
12    A. No. These are medical students. They
13 could be nursing students as well.
14    Q. Okay. Approximately how many students were
15 in that class?
16    A. I don't recall. You know, usually --
17 sometimes it's 15.
18    Q. And is there a reason that you stopped
19 teaching the class in 2022?
20    A. Yeah, there is. Because the class
21 coincided with my clinical days so that it was sort
22 of -- I had to choose between teaching.
23    Q. The class is still existing. It's just
24 taught by someone else?
25    A. It is.

Page 21

1    Q. Can you guys flip to page 7, please?
2        MR. TISI: Can I just say I'm getting a
3 note that your voice is really muffled.
4        MR. MARTIN: Off the record.
5        (A break was taken)
6        MR. MARTIN: Back on the record. So
7 while we were off the record, Ms. Finken asked that
8 Ms. Parfitt's objections be for all plaintiffs'
9 counsel. So just memorializing that now that we're
10 on the record.
11    Q. We were on page 7 of your CV, and at the
12 top of page 7 it asks for submitted grants. First
13 of all, can you explain what you mean by "submitted
14 grants"?
15    A. Sure. So grants submitted are those that
16 are being reviewed at the NIH, so these were
17 submitted for NIH consideration. You see at the top
18 "National Institute of Aging." So these have not
19 been funded yet. They will be reviewed probably in
20 April sometime. Then we'll know. So a department
21 likes to know, you know "Are you working? Are you
22 submitting new grants?"
23    Q. Fair to say, these aren't things -- well,
24 beyond submitting the funding proposal, these aren't
25 things on which you're doing active research.

6 (Pages 18 - 21)

Page 22

1  A. Yeah. No. No. The ones that are active
2  are listed right below that.
3  Q. We'll get to those. So is this submitted
4  grant related to talc at all?
5  A. No.
6  Q. Is it related to ovarian cancer at all?
7  A. No.
8  Q. Okay. As you mentioned, below the
9  submitted grant, there are three active grants, all
10 of which postdate your last deposition. Are any of
11 those active grants related to talc --
12 A. No.
13 Q. -- to ovarian cancer or cancer more
14 generally?
15 A. No.
16 Q. All right. And then on "completed grants
17 and contracts," going from page 7 and into page 8, I
18 believe there are three or four that postdate your
19 last deposition. I think three that started after
20 your last deposition, those would be the three that
21 are on page 7 or begin on page 7. Do you see that?
22 A. Yes.
23 Q. And do any of those grants have to do with
24 talc?
25 A. No.

Page 23

1  Q. Okay. Cancer?
2  A. No.
3  Q. Okay. Let's turn to page 10. Since your
4  last deposition in 2016 (verbatim), it looks like
5  you've joined the editorial board of two journals:
6  Frontiers in Drug Safety and Frontiers in Primary
7  Care and Family Medicine. Is that correct?
8  A. That is correct.
9  Q. And you've left the editorial board of
10 Evidence-Based Medicine?
11 A. That is correct.
12 Q. Okay. Since you joined the editorial board
13 of Frontiers in Drug Safety, are you aware of
14 whether they've published any articles related to
15 talc?
16 A. I'm not aware of a specific journal, but
17 I'm aware that Frontiers had a publication on that.
18 I'm not sure if it's on drug safety, but the group
19 of journals has it.
20 Q. Can you explain that a little bit more?
21 Frontiers is a group of journals of which there are
22 several topical journals. Is that more or less
23 correct?
24 A. Yes. Yes.
25 Q. You're not aware of whether the two topical

Page 24

1  journals for which you were an editor published
2  anything on talcum powder?
3  A. Yeah. Yeah.
4  Q. Okay. Do you know if the two -- if either
5  of the journals for which you're an editor have
6  published anything on asbestos since you joined?
7  A. No. I don't keep track of all the articles
8  in the journal. I'm on the editorial board. So I
9  get asked to review certain articles every year, at
10 least six. That's sort of the mandate, so.
11 Q. So just so I understand the process, your
12 job is essentially when someone submits an article
13 for publication, you're one of the peer reviewers
14 for the journal?
15 A. No. I'm the handling editor. So I get to
16 ask, you know, if it's, you know -- the editor-in-
17 chief looks at the editorial board and -- so I'm not
18 the editor-in-chief. I'm an editorial board member.
19 And they send it to me, say "Okay. You are the
20 handling editor." And you send it out for review,
21 comes back. And I may be asked to review, too, so
22 there's two sort of aspects of the job.
23 Q. That's helpful. Thank you. Assume you
24 haven't personally seen any articles --
25 A. No.

Page 25

1  Q. -- related to talc or asbestos. Okay. I
2  want to look at your publications since 2019. Do
3  you recall approximately how many things you've
4  published since 2019?
5  A. Not really.
6  Q. Okay. So I went through your CV. Let's
7  turn to page 26 first. Is it correct there have
8  been no books or monographs since 2019?
9      MS. PARFITT: Objection. Form.
10 Q. Have you published any books or monographs
11 since 2019?
12 A. No.
13 Q. Okay. Turning to page 28. First of all,
14 can you explain what the difference between a peer-
15 reviewed educational publication and a what we might
16 call traditional peer-reviewed publication is?
17 A. Yeah. So for us, you know, in the academic
18 world, we try to make a distinguish (verbatim)
19 between, you know, research articles that are based
20 on original data, so that, you'll see that in the
21 original research section.
22     Others are editorials. We'll try to place
23 into the editorial section. And then educational
24 articles are if -- say I'm the expert, you know, I
25 have an article on, say, COVID drugs and kidney

7 (Pages 22 - 25)

Page 26

1 disease. Then, you know, it might be -- so there's
2 some distinction. It might be in the editorial
3 section.
4       It might be -- I think it's also --
5 original research carries -- at least for academic
6 promotion, it carries more weight. It's not that
7 educational publications are not important, but they
8 are distinct.
9    Q. So as I'm sure you can predict, we're going
10 to talk a lot about meta-analyses and pooled
11 analyses later today. Those you consider original
12 research, even though they're not collecting the
13 data originally.
14    A. Yes.
15    Q. Okay. So back to your CV. Have you
16 published any educational publications since 2019?
17    A. I'd have to go back and look at it. Don't
18 recall.
19    Q. If I said there were none listed there,
20 would you believe me?
21       MS. PARFITT: Objection. Form. If you
22 need to look, Doctor.
23    A. That is correct.
24    Q. Okay. Next page, page 29, peer-reviewed
25 case reports. First of all, again, can you explain

Page 27

1 to me the difference between a case report and what
2 we might call a traditional peer-reviewed
3 publication?
4    A. Yeah. I mean, again, this is, you know --
5 these distinctions are more in our realm. In
6 academic world, you want to make a distinction on
7 the different type of scientific output that is
8 coming out of, you know, lab or a person's record.
9       You know, in terms of distinction, case
10 report is usually just one report that talks about,
11 say, something that's really important or novel that
12 gets across a point. So that's why it's in a
13 distinct section.
14    Q. It usually deals with one case?
15    A. Yeah. Usually. Sometimes case reports are
16 combined with case reports and reviews of the
17 literature. So, you know, they could be in a
18 different section.
19    Q. Are the results from case reports generally
20 considered less reliable than the results from what
21 we might call multicase literature?
22       MS. PARFITT: Objection. Form.
23    A. You know, that goes to the question at
24 hand. Sometimes, you know, if the question is --
25 outcome is rare, usually, sometimes -- if you can

Page 28

1 look at some of my reports, some of them -- for
2 example, we describe the report of Wernicke --
3 W-e-r-n-i-c-k-e -- encephalopathy. Yeah. Case
4 reports can be informative in the -- but, obviously,
5 if it's a common disease, then they're not as
6 informative as other study designs.
7    Q. Would you agree with me that, holding the
8 disease at issue constant, a case report is less
9 informative than other study designs?
10       MS. PARFITT: Objection. Form.
11 Misstates the testimony.
12    A. I want to understand the question.
13    Q. Sure. Holding the disease at -- you
14 mentioned rare diseases versus common diseases. If
15 it's the same disease, is a case report less
16 informative than another type of literature?
17       MS. PARFITT: Objection. Form.
18    A. Yeah. If you had a more comprehensive
19 study design.
20    Q. Let's look at correspondence on the next
21 page. Do you see any correspondence there since
22 2019?
23    A. No.
24    Q. Okay. Can we flip back to 16? So these
25 are peer-reviewed original research publications.

Page 29

1 And I count 33 since your last deposition.
2    A. Yeah. I don't remember the exact time, but
3 yes.
4       MS. PARFITT: Why don't you take a look
5 at your CV, Doctor.
6    A. I'm going with 33. December '19, so.
7    Q. Do any of the publications listed since
8 January of 2019 address talc?
9    A. No.
10    Q. Okay. What about asbestos?
11    A. No.
12    Q. What about ovarian cancer?
13    A. No.
14    Q. Have you conducted any studies outside of
15 litigation related to ovarian cancer since 2019 that
16 are not listed here as publications?
17    A. No.
18    Q. Okay. Do you have any forthcoming
19 publications related to ovarian cancer?
20    A. No.
21    Q. Okay. Are you working on any non-
22 litigation research related to ovarian cancer
23 currently?
24    A. No.
25    Q. Okay. Have you submitted the substance of

8 (Pages 26 - 29)

Page 30

1 your opinions in this case for peer review?
2    A. No.
3    Q. Okay. Outside of the statements you've
4 given in litigation, have you given any public
5 statements concerning talc and ovarian cancer since
6 2019?
7       MS. PARFITT: Objection. Form.
8    A. I've not spoken in the public, no.
9    Q. Any statements about asbestos?
10    A. No.
11    Q. Okay. Let's look at page 13. These are
12 presentations you've given?
13    A. Yeah. This is a team. I mean, I have been
14 on some. Others, I've presented. I'm not
15 necessarily the first presenter.
16    Q. Understood. Fair to say, based on your
17 answer to the last question, that none of the
18 presentations since 2019 relate to talc or ovarian
19 cancer?
20    A. No.
21    Q. Okay. Any forthcoming presentations
22 related to talc or ovarian cancer?
23    A. No.
24       MR. MARTIN: Okay. Let's move to
25 Exhibit 4.

Page 31

1       (List of testimony, Exhibit 4, marked)
2    Q. This is Exhibit B to your expert report.
3 Is this exhibit a complete list of the testimony
4 you've given in the last four years?
5    A. That's as much as I can recall.
6    Q. Okay. Do you think you would give
7 testimony at a deposition and not remember the case?
8    A. I mean, after you received my -- I mean,
9 after I received this, I tried to list as much as I
10 can recall. And I did go back and look at --
11    Q. Okay.
12    A. It's not like I'm trying to hide anything.
13    Q. What was the nature of your opinions in
14 Coates versus United States?
15    A. I don't recall the specifics of the
16 opinion. I'd have to -- I didn't review.
17    Q. Do you recall the -- do you recall the
18 general issue in the case?
19    A. Let me just look at it.
20    Q. Okay.
21    A. I think it related to prostate cancer -- I
22 don't remember. Again, I don't want to guess.
23    Q. Okay. Do you remember how much you were
24 paid for your testimony in that case?
25       MS. PARFITT: Objection. Form.

Page 32

1    A. I don't.
2    Q. Do you remember if it was more or less than
3 $30,000?
4       MS. PARFITT: Objection. Form.
5    A. I don't recall.
6    Q. What about In re Tasigna Products Liability
7 Litigation?
8    A. Yeah. This was a recent litigation. That,
9 I recall. And I provided expert report and
10 deposition that was admitted under Daubert recently.
11 I recall that. Yeah.
12    Q. And what was the nature of your opinion in
13 that case?
14    A. Yeah. That Tasigna is causally related to
15 the development of atherosclerosis and peripheral
16 artery disease.
17    Q. What does the drug Tasigna do?
18    A. It is an anticancer drug.
19    Q. Okay.
20    A. CML for -- chronic myeloid leukemia.
21    Q. Do you remember approximately how much you
22 were paid in that case?
23       MS. PARFITT: Objection. Form.
24    A. I don't recall.
25    Q. Okay.

Page 33

1    A. But it was more than 30,000.
2    Q. Okay. There you go.
3    A. I can tell you.
4    Q. Thank you. More than a hundred thousand?
5       MS. PARFITT: Objection. Form.
6    A. I don't recall.
7    Q. Okay. Foutch versus Wilks and OU Medical
8 Center?
9    A. Yes. I recall. This was a recent
10 testimony.
11    Q. Okay. And do you recall how much you
12 received for that?
13    A. I don't recall that.
14    Q. Again, more or less than $30,000?
15       MS. PARFITT: Objection. Form.
16    A. I cannot tell you that.
17    Q. Okay. Have you served as an expert but not
18 testified in any cases in the last four years other
19 than those three listed here?
20       MS. PARFITT: Objection to the extent --
21 he can answer a yes or no to that. But not any
22 inquiry as to the lawyers or the litigation --
23    A. Yes.
24       MS. PARFITT: -- where he's not been
25 declared an expert.

9 (Pages 30 - 33)

Page 34

1   Q.  You have?
2   A.  Yes.
3   Q.  Okay.
4   A.  I have.  You know, I get inquiries about --
5   Q.  Have you submitted an expert report in any
6  of those cases?
7   A.  I don't recall.  I mean, this is my listing
8  of deposition, as far as I can recall.
9   Q.  Right.  But, I mean, you'd agree with me
10 that there are cases in which you may submit an
11 expert report.  It may settle.  You may never be
12 deposed.
13   A.  I don't recall that.  May have.  Yeah.
14   Q.  Okay.
15       MR. MARTIN:  Can we mark this as Exhibit
16 5?
17       (Supplemental expert report of Sonal
18 Singh, M.D., M.P.H, Exhibit 5, marked)
19   Q.  If you can keep this towards the front of
20 your pile.  We'll probably be referring back to this
21 several times.  And this is your expert report in
22 this case -- your supplemental expert report in this
23 case.
24       So let's look at the first sentence.  "I
25 have been asked to supplement my previous expert

Page 35

1 report submitted on November 16, 2018 on whether the
2 genital use of talcum powder products -- i.e.,
3 Johnson's Baby Powder and Shower to Shower -- are
4 causally related to an increased risk of ovarian
5 cancer."  Are you offering an opinion related to any
6 non-ovarian types of cancer?
7   A.  No.
8   Q.  Okay.  So not mesothelioma?
9   A.  No.
10   Q.  Not uterine cancer?
11   A.  No.
12   Q.  Okay.  Are you offering an opinion related
13 to all ovarian cancers?
14   A.  Epithelial.
15   Q.  Epithelial ovarian cancer.  Okay.  Thank
16 you.
17       Does the histological subtype of epithelial
18 ovarian cancer matter?
19       MS. PARFITT:  Objection.  Form.
20   A.  My work and opinions in this case are
21 focused on epithelial ovarian cancer.  To the extent
22 that histologic types, you know, are included within
23 that, it does matter.
24   Q.  So your opinion would be that talc causes,
25 for instance, clear-cell cancer.

Page 36

1       MS. PARFITT:  Objection.  Misstates his
2 testimony.
3   A.  My opinion would be that talc causes
4 epithelial ovarian cancer.  And your interpretation
5 could be that, since, you know, clear-cell is
6 epithelial ovarian cancer, then it increases that.
7 But my testimony is that talc causes epithelial.
8   Q.  So your testimony is not broken down by
9 histological subtype of cancer.
10   A.  That is correct.
11   Q.  Okay.  And, again, just to be clear, it's
12 related to both invasive and borderline cancer.
13   A.  Yes.  You know, all epithelial cancers.
14   Q.  Have you done any outreach to any public
15 health organizations related to talc use and ovarian
16 cancer?
17       MS. PARFITT:  Objection.  Form.
18   A.  No, I have not.
19   Q.  Let's talk about the American College of
20 Gynecology.  Would you agree it's generally a
21 reputable organization?
22       MS. PARFITT:  Objection.  Form.
23   A.  That is correct.
24   Q.  Okay.  Have you looked at any statements
25 made by the American College of Gynecology since

Page 37

1 your last deposition?
2   A.  I don't recall.
3   Q.  Okay.  Are you aware that they have updated
4 their Website's "frequently asked questions" on
5 ovarian cancer since your last deposition?
6       MS. PARFITT:  Objection.  Just testified
7 he had not looked at it.
8   A.  Yeah.  I don't recall.  I mean, if you show
9 me, I can --
10   Q.  Well, we can do that.
11       MR. MARTIN:  This will be Exhibit 6.
12       (ACOG printout, Exhibit 6, marked)
13   Q.  Can we turn to -- they're not paginated --
14 but the second page of this document.
15   A.  Sure.
16   Q.  Actually, I apologize.  Let's turn back to
17 -- let's start with page -- let's start with the
18 final page of substantive text.
19       Do you see that it's -- it says last
20 reviewed November 2021 and last updated May 2022?
21   A.  That is correct.
22   Q.  Okay.  Now we can turn to the second page.
23 Can you review the section "What are the risk
24 factors for ovarian cancer?"
25   A.  Sure.

10 (Pages 34 - 37)

Page 38

1    Q. I'll give you a minute.
2         MS. PARFITT: Thank you.
3    A. Yes.
4    Q. Okay. Thank you. Agree with me that
5  talcum powder use -- genital talcum powder use is
6  not listed there?
7    A. That is correct.
8    Q. Do you disagree with ACOG's decision not to
9  list genital talcum powder use as a risk factor for
10 ovarian cancer?
11   A. Yes.
12   Q. You do. Okay. Have you told anyone at the
13 organization that?
14   A. No.
15   Q. Okay.
16   A. I don't -- I'm not an OB-GYN person.
17   Q. Understood. Let's flip a few pages forward
18 to "reducing risk." Do you see that section?
19   A. Yes.
20   Q. Okay. And can you just take a second to
21 review that section?
22   A. Yes.
23   Q. Okay. Thank you. Agree that there are
24 some lifestyle recommendations there, such as using
25 hormonal birth control pills?

Page 39

1    A. Yes.
2    Q. Okay. But, again, agree there's no
3  recommendation to stop using talcum powder?
4    A. Yes. But there's no recommendation to lose
5  weight as well. So it's not a full, comprehensive
6  list of recommendations. Similarly, the risk
7  factors don't capture all the risk factors, such as
8  height (verbatim). And so, you know, there's other
9  things -- smoking, we don't have it in the -- so
10 it's not a comprehensive list. Obviously does not
11 include talc but also does not include other things.
12   Q. Do you think this section should be more
13 comprehensive?
14   A. Exactly.
15   Q. Okay.
16        MS. PARFITT: "This section" meaning the
17 risk factors and --
18        MR. MARTIN: I apologize.
19   Q. Do you think this Website should be more
20 comprehensive?
21   A. I agree.
22   Q. Okay. At your last deposition, I believe
23 you said that you counsel your female patients to
24 avoid genital talcum powder use. Do you recall that
25 testimony?

Page 40

1    A. I don't recall. But if I said that, you
2  know, we can look at it, and --
3    Q. We don't need to look at it. Do you
4  currently counsel your female patients to avoid
5  genital talcum powder use?
6    A. I think, you know, if -- particularly as it
7  relates to ovarian cancer, yes.
8    Q. Yes. Do you do that only if they ask, or
9  is that something you affirmatively say to them?
10        MS. PARFITT: Objection. Form.
11   A. I mean, you know, there's so much going on
12 at a clinic visit that, you know, I'm not asking
13 everyone about -- but when, you know, the decision
14 goes about modifiable risk factors, I do ask.
15   Q. Is it fair to say it's not one of your
16 highest priorities in an ordinary patient visit?
17        MS. PARFITT: Objection. Form.
18   A. So it's, you know, you -- for example, I'll
19 use example of lung cancer. You know, you see a
20 patient or -- who is at risk. You're talking about
21 smoking. It's modifiable. You know, the risks for
22 family histories are higher. But then that's not
23 modifiable. You start thinking about weight
24 reduction, things that are modifiable.
25   Q. Do you believe that the risk of ovarian

Page 41

1  cancer associated with talc use is comparable to the
2  risk of lung cancer associated with smoking?
3        MS. PARFITT: Objection.
4    A. No. I was just using that as an example to
5  explain how one discusses modifiable risk factors.
6    Q. I understand. It wasn't meant to be a
7  gotcha question. It was just a question.
8        MR. MARTIN: Can we have this marked as
9  well? Luis, this is not Tab 7. This is Tab 8, just
10 if you're following along. This is the PDQ. I'm
11 sorry, Luis. It's actually Tab 9.
12        MR. CHU: Okay. Got it. Thanks.
13        MR. MARTIN: But it's Exhibit 7 here at
14 the deposition.
15        (National Cancer Institute PDQ printout,
16 Exhibit 7, marked)
17        THE WITNESS: Can we take a break after
18 this question?
19        MR. MARTIN: Sure. If you'd like, we
20 can take a break now.
21        THE WITNESS: Yeah.
22        MR. MARTIN: Let's go off the record.
23        (A break was taken)
24        MR. MARTIN: Back on the record.
25   Q. Do you remember talking about the National

11 (Pages 38 - 41)

Page 42

1 Cancer Institute PDQ at your previous deposition?
2    A. I don't recall, but I have seen this
3 document that you presented.
4    Q. Okay. Let's look at -- let's actually look
5 at your deposition, which I can mark as whatever the
6 next exhibit is.
7        (January 16, 2019 transcript of Sonal
8 Singh, M.D., M.P.H, Exhibit 8, marked)
9    Q. Can we look at the beginning of page 94 of
10 your deposition, traditional page 94, which is page
11 25 of the mini document?
12       MS. PARFITT: He's talking about the
13 actual page number.
14    A. Yeah.
15    Q. Begins "All right. This document." "This
16 document that we're looking at from the National
17 Cancer Institute, Exhibit 15, was updated in January
18 of 2019." And your answer is "Yeah. But it doesn't
19 mean the review is updated because it has no recent
20 citations of studies that have been conducted."
21       So fair to say that one of your criticisms
22 of the PDQ at your last deposition was whether it
23 was updated based on the most recent research?
24    A. That is correct.
25    Q. Okay. Let's go back to the PDQ -- the new

Page 43

1 PDQ that I just circulated.
2    A. 7?
3    Q. Yeah. There's a lot to keep track of.
4    A. Okay.
5    Q. Let's turn to the final page right at the
6 bottom.
7       MS. PARFITT: Zack, if you could kind of
8 give us a category.
9    Q. It's the last page of the document. It's
10 not a category. It's, like, "Disclaimer," "Contact
11 us," that stuff.
12       MS. PARFITT: Perfect. Thank you.
13    Q. Unfortunately, none of these Web pages are
14 paginated, which makes it difficult. But you see
15 "Updated October 16, 2023"?
16    A. That is correct.
17    Q. Okay. But I recall that one of your
18 criticisms last time was that, even if it says it's
19 been updated recently, it doesn't necessarily take
20 into account all the scholarship. Was that correct?
21    A. Yeah. And that is sort of the methodology
22 applied, what are the studies they have evaluated.
23 And so even here, we can see that they have 13
24 references in the talc section.
25    Q. 14, I believe. But yes, I see that.

Page 44

1    A. Yeah. 13, 14. So the question is "What is
2 the methodology they've applied," you know, before
3 concluding anything in looking at, you know, all the
4 ratios, study designs. So yes, obviously, if it is
5 comprehensive, then yes, you know, it is relevant.
6    Q. So let's look at the talc section, which is
7 a few pages back, not that many pages back. If we
8 can look at the first short paragraph.
9       You agree that PDQ still believes the data
10 are inadequate to support an association between
11 perineal talc exposure --
12       MS. PARFITT: Objection. Form.
13    Q. -- and increased risk of ovarian cancer?
14       MS. PARFITT: Objection. Form.
15 Misstates testimony.
16    A. Right. That is what PDQ states. I don't
17 agree with their statement there, but that's what
18 the PDQ --
19    Q. Understood. Okay. Can we look at the
20 reference list?
21    A. Sure.
22    Q. Particularly 10 and 11 on the reference
23 list. Can you read what 10 and 11 are for me?
24    A. Yeah. The meta-analysis and the pooled
25 analysis by O'Brien -- meta-analysis by Dr. Woolen

Page 45

1 and the pooled analysis by O'Brien.
2    Q. Do you agree that those are two of the most
3 up-to-date studies on the relationship between talc
4 and ovarian cancer?
5    A. They are some of the most up-to-date, not
6 necessarily the most updated. I mean, you know,
7 there's meta-analysis by Penninkilampi. There's
8 meta-analysis by Health Canada. So, you know,
9 there's a causality assessment.
10       So there, you know -- there's all these
11 OCAC consortium studies. There's OCWAA consortium
12 studies. So there's many other studies that they
13 could have looked at.
14    Q. Understood. Do you know of a meta-analysis
15 more recent than Woolen's meta-analysis?
16    A. Yeah. But, you know, Woolen's meta-
17 analysis is relevant. But it is relevant to the
18 frequency. But, you know, the overall body of
19 evidence -- case and control and cohort -- was Taher
20 and Penninkilampi.
21    Q. Understood. Can you try to answer the
22 question I asked, though, which is are you aware of
23 a meta-analysis that's more recent than the Woolen
24 meta-analysis?
25       MS. PARFITT: Objection. Asked and

12 (Pages 42 - 45)

Page 46

1 answered.
2     A.  I don't follow the dates.  I mean, whatever
3 is in my report includes the relevant analysis from
4 the date of previous report.  There may be some --
5 you know, whether you're referring to Lynch, which
6 is more updated or -- I don't know the exact date
7 when it was published.  But it is in my report.
8     Q.  Okay.  You'd agree that Lynch also
9 concludes that talc does not cause ovarian cancer;
10 is that correct?
11         MS. PARFITT:  Objection.  Form.
12     A.  Yeah.  Lynch concludes -- to be more
13 precise, Lynch does not conduct a meta-analysis.
14 They're only a systematic review.  But yes, the
15 inference is that it does not.  And we can discuss
16 why it concludes that and what are my concerns about
17 it.
18     Q.  I think we might get to that this
19 afternoon.
20     A.  Okay.
21     Q.  On O'Brien, are you aware of any pooled
22 analysis of cohort studies more recent than O'Brien?
23         MS. PARFITT:  Objection.  Form.  Asked
24 and answered.
25     A.  Yeah, there are.  I mean, the OCAC

Page 47

1 consortium, the OCWAA consortium.  Not of cohort
2 studies but case control studies.
3     Q.  The answer with cohort studies is no?
4     A.  No.
5     Q.  Okay.  So would it be fair to say that you
6 don't believe that the references cited by the PDQ
7 are comprehensive?
8     A.  That is correct.
9     Q.  Okay.  Separate from whether they are
10 comprehensive, do you believe they're up to date?
11         MS. PARFITT:  Objection.  Form.
12     A.  I mean, if they're not comprehensive enough
13 and they don't consider the whole body of evidence
14 and don't do a causality assessment, as I have done,
15 I don't know -- when they say "up to date," I really
16 don't know, you know, did they consider everything
17 and then decide to exclude Lynch or for some reason
18 others?  It's unclear why they excluded and included
19 certain studies.
20         MR. MARTIN:  Okay.  Next exhibit, Luis,
21 this is Tab 11 in our binders.  This is 9.
22         (American Cancer Society printout,
23 Exhibit 9, marked)
24     Q.  You're familiar with the American Cancer
25 Society, I assume.

Page 48

1     A.  That is correct.
2     Q.  Okay.  Do you think it's generally a
3 reputable organization?
4     A.  It is a reputable organization, not
5 "generally."
6     Q.  Okay.  Are you aware that they put out a
7 "Cancer Facts & Figures" document every year?
8     A.  Yes.  I refer to it, you know, at times.
9     Q.  And what we have in front of us is the one
10 from 2024.  This document is long, but it's
11 mercifully paginated this time.  Can we turn to
12 page 22?
13     A.  Yes.
14     Q.  Okay.  Can you review the two paragraphs
15 there on page 22 under "Ovary"?
16     A.  Yes.
17     Q.  Okay.  Do you agree with what it says here,
18 that the incidence rate has declined by somewhere
19 between 1 and 3 percent a year over the last 30
20 years or so?
21     A.  Yes.
22     Q.  Okay.  Do you agree that that can be
23 attributed to increased oral contraceptive use and
24 decreased postmenopausal hormone therapy?
25         MS. PARFITT:  Objection.  Form.

Page 49

1     A.  Those are one of the causes.  There could
2 be others.  I mean, I think one of the others is,
3 you know, better ascertainment.  We are becoming
4 much more aware of it, so.
5     Q.  Can I ask you why better ascertainment
6 would influence -- would impact the case rate?
7     A.  Yeah.  I mean, we are diagnosing it more,
8 but the incident rate is declining.
9     Q.  Okay.  Can we turn to page 23, which is the
10 next page.  And can you review the paragraph for
11 "Risk factors"?
12     A.  Sure.  Yes.
13     Q.  Okay.  So the first sentence there, "The
14 most important risk factor other than age is family
15 history of breast or ovarian cancer."  Agree with
16 the implication that the most important risk factor
17 of all is age?
18         MS. PARFITT:  Objection.  Misstates
19 testimony.
20     A.  I mean, I don't know if I would say -- the
21 most important other than age, they're saying, is
22 breast or family history of cancer.
23     Q.  Right.  Would you agree that, by saying
24 "other than age," that implies that age is the
25 number 1 most important?

13 (Pages 46 - 49)

Page 50

1          MS. PARFITT: Objection. Form.
2     A. Okay. Yeah.
3     Q. Okay. And would you agree that the next
4 most important is history of breast or -- family
5 history of breast or ovarian cancer?
6          MS. PARFITT: Objection. Misstates his
7 testimony.
8     A. Yes.
9     Q. Okay. Also lists a number of protective
10 and additional risk factors below there.
11    A. That is correct.
12    Q. Okay. And the last sentence, "The weight
13 of the evidence does not support an association
14 between ovarian cancer and genital exposure to talc-
15 based powder." Assume you disagree with the
16 American Cancer Society about this.
17    A. Yes. Again, you know, partly because I
18 don't see any references in how they came to that
19 weight-of-evidence conclusion. Did they do a
20 causality assessment? What are the studies that
21 they evaluated to come to that conclusion?
22    Q. Have you ever told anyone at the American
23 Cancer Society you disagree with them?
24          MS. PARFITT: Objection. Form.
25    A. Many times with CDC, with the American --

Page 51

1 lot of people disagreed with the CDC in COVID. So
2 yeah.
3     Q. I understand you disagree. I'm asking if
4 you've ever told anyone at the American Cancer
5 Society that.
6          MS. PARFITT: Objection.
7     A. About this particular --
8     Q. About this particular issue.
9     A. No.
10    Q. Okay. You can put that aside. Do you
11 recall giving an expert opinion in In re Viagra?
12    A. Yes.
13    Q. Okay. Did you testify in that case?
14    A. That is correct.
15    Q. Okay. I assume it wasn't in the last four
16 years, though. That's why it wasn't on the list we
17 went over earlier today?
18    A. That's correct. I think it was in my
19 previous list.
20    Q. Okay. Understood.
21    A. If I recall, I mean, it was in my previous.
22    Q. Understood. Are you aware that, in 2020
23 after your most recent deposition, your opinion was
24 excluded in that case?
25    A. I am aware.

Page 52

1     Q. Have you read the order that excluded your
2 opinion?
3     A. I haven't read the full order, but I did
4 read the portions of it relevant to my -- yeah.
5     Q. Makes sense.
6          MR. MARTIN: Could I have this -- which,
7 Luis, is Tab 13 in our binders -- marked as
8 Exhibit 10?
9          (Order from Court in Viagra case,
10 Exhibit 10, marked)
11    Q. Let's turn to federal supplement page 796,
12 97, which is WestLaw page 14.
13    A. Yes.
14    Q. Last sentence of the first paragraph in the
15 second column, "As Li 2014 was one of the smallest
16 studies and its results have not been duplicated,
17 Dr. Singh has not provided a persuasive reason to
18 rely more heavily on it."
19    A. Where?
20    Q. Last sentence of the first paragraph on the
21 second column. So agree that the Court excluded
22 your opinion, in part, for placing undue emphasis on
23 a smaller study?
24    A. That is correct.
25          MS. PARFITT: Objection. Form.

Page 53

1     Q. Okay. Do you believe you've done that in
2 this case?
3     A. No. I mean, there's -- the evidence has
4 been, you know -- that was one study. I mean, here
5 we've had, what, four decades of -- not four. I
6 don't know the exact time -- but several decades and
7 several case control studies and, you know, overall
8 body of evidence that provides for a causal opinion.
9 And I've not emphasized one study as opposed to
10 other, suggesting that, well, Li is, you know --
11 I've looked at the cumulative body of evidence.
12    Q. You do weight some studies more heavily
13 than others?
14    A. Yeah. Strengths and limitations. Exactly.
15    Q. Can we go back to the end of the previous
16 column?
17    A. Which is on --
18    Q. It's the same page, previous column here,
19 "At the hearing Dr. Singh."
20    A. Yeah.
21    Q. "At the hearing, Dr. Singh candidly
22 admitted that the Bradford Hill criteria are
23 susceptible to an outcome-driven analysis, though he
24 contends he did not take such an approach here." Do
25 you still agree that the Bradford Hill criteria are

14 (Pages 50 - 53)

Page 54

1 susceptible to an outcome-driven analysis?
2         MS. PARFITT: Objection. Form.
3    A.  That is correct.
4    Q.  Still agree that you're not taking that
5 approach here?
6    A.  No.
7    Q.  Okay.  Next sentence, "Dr. Singh testified
8 that the criteria are not ranked in any order of
9 importance, which is contrary to the position he has
10 taken in prior litigation and contrary to how it
11 appears they are usually applied."
12        Do you believe there's any particular order
13 of importance associated with the Bradford Hill
14 criteria?
15    A.  So, I mean, this sort of comes out of
16 Dr. Bradford Hill's paper, which, prior to getting
17 into the viewpoints, not even criteria -- so I,
18 again, have -- it says "ranked in order of
19 importance."  So that's sort of his -- so when we
20 use his viewpoints, you know, that's what his
21 assessment was and -- yeah.
22    Q.  So sorry.  Just to make a clear record.  Do
23 you agree -- I think there's two questions here.
24        Do you agree, first, that Dr. Hill was --
25 ranked those viewpoints in order of importance?

Page 55

1         MS. PARFITT: Objection. Form.
2    A.  I mean, the -- his article talks about
3 these viewpoints in order of importance.
4    Q.  Okay.  Do you, Dr. Singh, believe that they
5 can be ranked in order of importance?
6    A.  They can.
7    Q.  Okay.  Which would you find to be the most
8 important?
9    A.  I mean, just go by, you know, strength of
10 association.  I have to look at the list.
11    Q.  Understood.  Do you believe that the same
12 -- whether you want to call them viewpoints or
13 criteria, are most important in every case?  Or do
14 you believe that -- you know what?  Let's ignore
15 that question.
16    A.  So I can clarify, since you asked that.
17    Q.  Yeah.
18    A.  So while he listed the viewpoints, ranked
19 them in order of importance, each criteria
20 necessarily will not be important in each case, you
21 know, taking it out of talc or -- you know, could be
22 X associated with Y.  In some cases, consistently
23 and biologic plausibility may be enough to
24 contribute to causation.
25    Q.  So it depends on the particular

Page 56

1 relationship -- the particular association that
2 you're looking at?
3    A.  Exactly.
4    Q.  Okay.  How do you make that decision when
5 you're looking at an association?
6    A.  So you'd have to still rank them.  But, you
7 know, you're finally making a causal determination.
8 And whoever is, they'd have to either make a
9 rational argument that biologic, say -- I'm just
10 using example of biologic plausibility -- is the --
11 is, you know, driving the causal assessment.
12    Q.  Is that decision a subjective process,
13 objective process, or partially subjective and
14 partially objective?
15        MS. PARFITT: Just objection. Form.
16    A.  No.  Yeah --
17    Q.  Can I redo the question?
18    A.  I can answer that.  Yeah.
19    Q.  Is that a subjective or objective process?
20    A.  So it, you know -- there is no quantitative
21 way to weigh the Bradford Hill viewpoints.  He never
22 stated it that way, that you give 10 points to
23 strength, 2 points to consistency, and 1 point to
24 biologic plausibility.
25        It is not a subjective.  I would say it is

Page 57

1 a scientific opinion based on, most of the time,
2 there is quantitative data either to support or
3 refute that opinion.  In certain cases, there is no
4 evidence.
5         MR. MARTIN:  Can we have this marked as
6 the next exhibit?  This is, Luis, Tab 15 in our
7 binders.  It's Exhibit 11.
8         (February 2, 2023 transcript of Sonal
9 Singh, M.D., M.P.H, Exhibit 11, marked)
10    Q.  This is the deposition in the Tasigna case
11 we talked about.
12    A.  This is the recent deposition or --
13    Q.  Let me look at the date on it.
14        MR. TISI:  Just a question.  Is this
15 covered by any kind of confidentiality order?  I'm
16 not sure we would have access to it.  Do you know --
17        THE WITNESS:  No.  This was admitted
18 under Daubert.
19        MR. MARTIN:  No.  I understand the
20 question.
21        MR. TISI:  If it's covered by a
22 confidentiality order, we didn't --
23        THE WITNESS:  I don't have access to it
24 either.
25        MR. MARTIN:  I understand.  I don't -- I

15 (Pages 54 - 57)

Page 58

1  don't believe so.  But can we go off the record for
2  a second and confirm that?
3          (A break was taken)
4          MR. MARTIN:  Back on the record.  So to
5  follow up on the issue that was raised before, my
6  understanding now is that we received these from a
7  public records source.  So I'm comfortable using
8  them.  So I'll redistribute these, which, again, are
9  the depositions you gave in the Tasigna -- I'm sure
10 I'm pronouncing that wrong -- MDL.
11         THE WITNESS:  That's correct.
12         MR. TISI:  Again, for clarification,
13 these have redactions in it.  I'm assuming --
14         MR. MARTIN:  Those aren't redactions.
15 Those are highlights.
16         MR. TISI:  Okay.  I got you.  Okay.  I
17 didn't get a chance to look through it.  Sorry.
18         MR. MARTIN:  No problem.  It does look
19 exactly like sometimes things are redacted.
20         MR. TISI:  Are those highlights your
21 office did?
22         MR. MARTIN:  Yes.
23         MR. TISI:  So these were not in the
24 filing --
25         MR. MARTIN:  Correct.  I was just trying

Page 59

1  to bring attention to myself and to Dr. Singh.
2          MR. TISI:  I just want to understand
3  what the highlighting's for.
4          THE WITNESS:  Just so you know, I have
5  not reviewed this.
6          MR. MARTIN:  Understood.  I'm just going
7  to touch on it very briefly.
8          THE WITNESS:  Sure.
9     Q.  So if you can turn to deposition page 283,
10 which is page 72 of the document.  So if you can
11 review where the highlighting begins down to the end
12 of the page.
13         MS. PARFITT:  That would be Line 11 down
14 to 25?
15         MR. MARTIN:  Correct.
16         MS. PARFITT:  Continuing onto the top
17 of.
18         MR. MARTIN:  You do not need to continue
19 onto the top of the page.
20    A.  "Which of the"?  Is that the question?
21    Q.  Yes.  The question and the answer to that.
22    A.  The answers is "Temporality is important,
23 strength of association, consistency, plausible" --
24 now you're listing all of them.  Yeah.
25    Q.  So my question with this document is

Page 60

1  whether you still believe that they're all
2  important, you have to apply them qualitatively?
3          MS. PARFITT:  Actually, that misstates
4  his testimony.
5     A.  Yeah.  And you have to look at the report.
6  I mean, all of them were applied, and all of them
7  are important.  But, obviously, in certain contexts,
8  some of them may be more relevant than others.
9          So I don't see any -- you have to look at
10 the report.  I mean, you can't look at this document
11 in isolation.  We should bring that -- you know, if
12 you pull that off, you could have -- I'm sure you
13 have the report.
14    Q.  I do.
15    A.  Let's look at the report and see.
16    Q.  No.  Again, it's not intended to be a
17 gotcha question.  I'm trying to understand the scope
18 of your opinion.
19    A.  Yeah.  You have to look at all of that.
20 And then, you know, you have to decide, you know,
21 which in certain cases -- for example, dose
22 response.  It may not apply.  If a drug is given at
23 one dose, how will that apply?  I mean, you look at
24 it, but it may not be relevant.
25    Q.  If a drug is given in multiple doses, do

Page 61

1  you believe dose response is an --
2     A.  Yes.
3     Q.  -- important criteria?
4     A.  Yes.
5     Q.  Can we look back at your report in this
6  case?
7          MS. PARFITT:  Just for the record, it's
8  Exhibit No. 5.
9     A.  5.
10    Q.  Okay.  Does the November 2013 (verbatim)
11 report contain all of the opinions that you plan to
12 give in this case that are not included in your
13 previous 2019 report?
14    A.  2023, to correct.  It was not 2013.
15    Q.  Thank you for fixing that.
16    A.  No.  I think, you know, these are linked
17 reports.  I mean, it's not that I'm -- I think I'm
18 providing testimony on the update between the 19th
19 and 23rd in this report.  Maybe you can restate the
20 question.  I'll try to answer it.
21    Q.  Understood.
22         MR. TISI:  You said "the 19th."
23         MS. PARFITT:  Let's redo dates here.
24         MR. MARTIN:  Yes.
25    Q.  Do the 2018 report and 2023 report together

16 (Pages 58 - 61)

Page 62

1  define the full scope of the opinions you plan to
2  offer?
3      A.  That is correct.
4      Q.  Okay.
5      A.  Sorry about dates.
6      Q.  No.  Understood.  Can we turn to page 4 of
7  the 2023 report.  So you say in page 4 that you use
8  the weight-of-the-evidence approach in examining the
9  causal relationship.  Can you define for me what you
10 mean by weight-of-the-evidence approach?
11     A.  The weight of evidence is, you know,
12 gathering all the relevant body of evidence to the
13 specific scenario and the cumulative body of
14 scientific and medical evidence for a systematic
15 review based on animal studies, in vitro studies,
16 human studies -- including epidemiologic studies --
17 and then -- including published, most of the time,
18 you know, peer-reviewed documents, other documents
19 which -- then examining them for whether they are
20 relevant and reliable to the present -- the context
21 and then examining them through the lens of the
22 Bradford Hill viewpoints.
23     And, obviously, these are -- there is no
24 quantitative way to say that strength of evidence
25 gets 7 points and, you know, biologic plausibility

Page 63

1  gets 1 and dose response gets 2.
2      Q.  To the extent you draw causal conclusions
3  in your professional work, is this the same
4  methodology that you use in your professional work?
5      A.  So my professional work is clinical; right?
6  So I see patients.  So we use the differential
7  diagnosis as -- we don't necessarily -- we don't
8  have to make causal determinations when I see
9  patients.
10     Q.  Understood.  But I guess I was referring to
11 your published academic work.  To the extent you
12 draw causal conclusions in your publications, is it
13 the same methodology that you use?
14     A.  Yeah.  I mean, if you are going to draw
15 causal conclusion, you would use -- I mean, Health
16 Canada has used the same approach.  They've used a
17 weight-of-evidence approach.  So they may have
18 defined it differently, but they have used a weight-
19 of-evidence approach.
20     There are other approaches.  I mean, you
21 know, it's not, like, the only approach.  I'm being
22 transparent about what I've gathered, what I've
23 used, and how I rate it.  I've rated certain
24 viewpoints more than others.  And that's, you know,
25 that's my approach.

Page 64

1      MS. PARFITT:  Zack, I'm not sure exactly
2  where you're going.  I've giving you a little
3  runway.  I think, you know, from 2018, we talked
4  quite a bit about how to make a causal inference
5  using Bradford Hill criteria.
6      MR. MARTIN:  Understood.
7      MS. PARFITT:  So, again, giving you some
8  pretext but --
9      MR. MARTIN:  Understood.  Understood.
10 Yeah.  I don't want to rehash things we've already
11 done.
12     MS. PARFITT:  Right.  I'm looking at his
13 prior deposition, so.
14     Q.  Do you believe the methodology you used in
15 this 2023 report is the same as the methodology that
16 Health Canada used in their report?
17     MS. PARFITT:  Objection.  Form.
18     A.  In general, yes.  I mean, I'm not -- you
19 know, I didn't do exactly the same thing.  I
20 actually relied on Health Canada so I didn't have to
21 redo what they had to do.  So in a lot -- in the
22 majority of, you know, bodies of evidence that they
23 appraised, you know, they appraised, you know, the
24 O'Brien study.  They appraised a lot of the
25 mechanistic studies.  So I relied on them.

Page 65

1      But their -- in terms of assessment, yes.
2  I, you know -- to my best knowledge, I was, you
3  know, applying the weight-of-evidence approach.
4      Q.  You mentioned that you conducted a Bradford
5  Hill analysis in your 2023 report.  You also
6  conducted one in your 2018 report.  And your opinion
7  in 2018 was that the evidence was sufficient to
8  reach a causal conclusion.  Why did you feel the
9  need to conduct an additional Bradford Hill analysis
10 in 2023?
11     MS. PARFITT:  Objection.  Form.
12     A.  So evidence was sufficient to reach a
13 causal conclusion at that time.  But when I was
14 asked to update my report, I -- this is not
15 something of my own choosing.  I was asked to do it.
16     And so I could not just look at the body of
17 evidence and, you know, at the end of -- say "Well,
18 you know, I agree with what I said then."  So I had
19 to look at it through the lens of what is known in
20 the previous time, what is here.  So I would have to
21 do the Bradford Hill analysis.
22     Q.  So is it fair to say that your opinion is
23 that, given the intervening new science, you felt it
24 important to do a new Bradford Hill analysis?
25     MS. PARFITT:  Objection.  Misstates his

17 (Pages 62 - 65)

Page 66

1 testimony.
2     A.  No.  I think that whatever I evaluated from
3 2019 -- let's get the dates right -- until, you
4 know -- 2018 was my report -- then 2023, this new
5 search, I felt that, since I was going to provide a
6 causal opinion, updated causal opinion, while at
7 that time, you know, the opinion, you know, body of
8 evidence was sufficient -- if you're looking at a
9 body of evidence and, again, arriving at a causal
10 opinion -- then, you know, I had to be transparent
11 in my assessment.  I could not, for example, end at
12 page 2 - 17 and just give you a one-line
13 conclusion.
14     Q.  Can we look at page --
15     A.  This is my report; right?
16     Q.  Yes, it is.
17     A.  Which page is it?
18     Q.  Well, I guess I'll ask a general question.
19 You can look through your report.
20         Do you agree that, in your 2023 report, you
21 assigned less weight to the factor of dose response
22 or biological gradient than some of the other
23 factors?
24     A.  Let me just look at the wording that I
25 used.

Page 67

1     Q.  Yes.  It's on page 21.
2     A.  Yes.
3     Q.  Okay.  And can you point to any literature
4 suggesting that it's appropriate to weight the dose
5 response factor less than the other factors?
6         MS. PARFITT:  Objection.  Form.
7     A.  So it is not that -- it is -- I'm trying to
8 be transparent on -- for example, there's no
9 literature to suggest that experiments should be --
10 you're not going to get experimental data on this
11 question.
12         So, of course, I weighed -- it's my
13 weighting of the factors.  Does not mean that those
14 dose response is not -- I evaluated dose response.
15 There were some -- you know, several studies which
16 provided dose response; some studies did not.
17         So I weighed -- so my -- I think I have to
18 be clear that my assessment -- the factors driving
19 my assessment are consistency and strength of
20 evidence, temporality, plausibility, and coherence.
21         So dose response is also there but to a
22 lesser -- so it's my assessment of the viewpoints.
23 It's not necessarily, you know -- you're right.
24 There's not literature suggesting that dose response
25 should not be used in assessment.

Page 68

1     Q.  All right.  Thank you.  Are you offering
2 the opinion that cosmetic talcum powder contains
3 asbestos?
4     A.  So my causality opinion's not predicated on
5 presence of asbestos in talc.  But as was noted in
6 my previous report and in my present report, I'm
7 aware of studies that provide evidence that talc may
8 contain asbestos.
9     Q.  Which studies are you relying on for that?
10         MS. PARFITT:  I guess I'll give a bit of
11 leeway.  Again, this area was examined at his prior
12 deposition, 2019.
13         THE WITNESS:  Let me answer.
14         MS. PARFITT:  I'm giving you context --
15 I'm giving you a little leeway.  Go ahead,
16 Dr. Singh.
17         THE WITNESS:  I have to find it now.
18         MS. PARFITT:  Take your time.
19     Q.  It's on page 13, I think.
20     A.  Let's see.  I just want to be precise by my
21 language.  Yeah.  So the studies I'm relying on are
22 the FDA testing, testing by -- that was cited in the
23 previous report, I think, Johnson & Johnson testing,
24 and then obviously the testing by Dr. Longo and
25 Rigler and now, subsequent to this, the EPA

Page 69

1 conclusions about the presence of asbestos in talc.
2         Again, I'm not a mineralogist, but several
3 lines of evidence -- in fact, even epidemiologists
4 have at least acknowledged and are starting to
5 interpret the evidence that -- for example, O'Brien
6 in a recent paper on fibroids said that, you know,
7 talc may be contaminated with asbestos.
8     Q.  Let's break that down --
9     A.  Sure.
10     Q.  -- one by one.  You mentioned an EPA study
11 that you said was subsequent to -- do you mean
12 subsequent to your report or subsequent to your
13 previous deposition?
14     A.  No.  Subsequent to my report.  Like, this
15 EPA -- not study.  It's an EPA ruling.
16         MR. MARTIN:  Was that in the materials
17 that you gave us Monday?
18         MS. PARFITT:  Yes, it was.
19         THE WITNESS:  That's the EPA ruling.  I
20 mean, it just came out -- what -- a couple of weeks
21 ago?
22         MS. PARFITT:  Yes.
23         THE WITNESS:  But we have to bring it
24 out.  I don't remember.
25         MR. TISI:  If you want a copy, I can get

18 (Pages 66 - 69)

Page 70

1  a copy.
2        MR. MARTIN:  If you have one handy, I'll
3  take a quick look at it and review it over the
4  break.
5        MR. TISI:  Sure.
6        THE WITNESS:  Yeah.  This was not
7  included in my citations.
8        MS. PARFITT:  For the record, it was, in
9  fact, provided in the Dropbox, just for the record.
10  And we will give you a copy.
11        MR. TISI:  I'd appreciate if you are
12  able to give it back because it's my only copy.
13        MR. MARTIN:  No problem.  I can probably
14  get it from the Dropbox.
15        MR. TISI:  Can I just check something,
16  make sure I don't have writing on it?
17    Q.  Let's talk about the FDA.  Are you
18  referring to the 2019 FDA findings that prompted a
19  recall?
20    A.  Yes.
21    Q.  Okay.  Do you know how many samples the FDA
22  tested in 2019?
23    A.  I don't remember, off the top of my head.
24  But it was something bot -- so there's a distinction
25  between samples and bottles.

Page 71

1    Q.  Understood.
2    A.  You're asking about samples or bottles?
3    Q.  I will ask about samples first.
4    A.  Yeah.  I don't recall exactly.  But it was
5  something about -- it's approximate -- I don't like
6  approximations.  It was 52 or -- yeah.  I don't want
7  to approximate.
8    Q.  Okay.  Understood.  If the answer is "no,"
9  that can be the answer.
10    A.  Yeah.  Yeah.  I don't --
11    Q.  Do you know what percentage of those
12  samples tested positive?
13    A.  No.  I can't recall.
14    Q.  Okay.  And do you know how many samples of
15  J&J baby powder have been tested by the FDA in
16  history?
17        MS. PARFITT:  Objection.  Form.
18    A.  No, I don't.  I don't.  I know that there
19  have been many.
20    Q.  You don't know how many of those tested
21  positive in history?
22    A.  No.
23        MS. PARFITT:  Objection.  Asked and
24  answered.
25    Q.  Okay.

Page 72

1    A.  And I will not be testifying to testing of
2  talc and presence.
3    Q.  Understood.
4    A.  And quantity of -- sorry -- quantity of
5  asbestos and --
6    Q.  Understood.  Have you personally reviewed
7  the testing done by Drs. Longo and Rigler?
8    A.  Yes.  I reviewed the report.
9    Q.  You reviewed the report?
10    A.  Yeah.  I -- you know, I reviewed the
11  methods.  And to the extent I can understand it, I
12  understood it.  But I'm not expert in that area.
13    Q.  Have you reviewed any testing -- asbestos
14  testing performed by defense experts?
15    A.  Yeah.  I've seen their -- I don't know if
16  it's exhibits.  I don't know if I've seen their
17  testing.
18    Q.  Have you seen their reports?
19        MS. PARFITT:  Again, if you could be a
20  little more --
21    Q.  Have you seen the report of any defense
22  expert who performed asbestos testing?
23    A.  No, I have not.
24    Q.  Okay.  Do you believe that you're qualified
25  to weigh -- let's strike that question.  Start over.

Page 73

1        Do you know what X-ray diffraction is?
2    A.  No, I don't.
3    Q.  Okay.
4    A.  I think we should stop at that line of
5  questioning.  I mean, you can ask.  You can ask.
6    Q.  I just like to get a record.  Polarized
7  light microscopy?
8    A.  I mean, I know the name.  I can tell you
9  what TEM was.  But how is that performed?  No, I
10  don't.
11    Q.  That was -- the question is do you feel
12  like you're qualified to weigh the strengths and
13  weaknesses of those forms of asbestos testing?
14    A.  No.
15    Q.  Okay.
16    A.  I know TEM is better.  I mean, I read.
17    Q.  What do you read that says TEM is better?
18    A.  The FDA's, you know, moving towards TEM.
19  Again, I don't want to get into that area of
20  testing.  Yeah.
21    Q.  Well, I think it's important, if you're
22  going to offer an opinion about whether talc takes
23  -- contains asbestos, that we understand what that
24  opinion is based on.
25    A.  Yeah.  I mean, the opinion is based on, you

19 (Pages 70 - 73)

Page 74

1  know, these citations, the EPA report and their, you
2  know -- they would be the experts to answer whether,
3  you know, the methodology was appropriate. I mean,
4  I -- on my reading, it appears to be appropriate.
5      Q. When you say "they," are you referring to
6  Drs. Longo and Rigler?
7      A. Yes.
8          MS. PARFITT: He mentioned IARC. He
9  mentioned EPA.
10     Q. Let me ask it as an open-ended question.
11  When you said "they" in that question, what were you
12  referring to?
13     A. Yeah. When -- obviously, the evidence I
14  cite is from the FDA. I mean, so you can go to the
15  FDA. You can go to Longo and Rigler. You can go
16  to, you know, the EPA and look at their methodology
17  and provide -- yeah.
18     Q. Let's turn to page 14 of your report.
19     A. Sure.
20     Q. The final paragraph before Section 8, so
21  final paragraph of Section 7, beginning with
22  "Vimercati, et al."
23     A. Yeah.
24     Q. You say that Vimercati is a case series
25  with four cases: Two with talc exposure, and one

Page 75

1  with an identified amphibole fiber of tremolite. Is
2  it your standard practice to draw causal conclusions
3  from a single case report?
4          MS. PARFITT: Objection. Asked and
5  answered.
6      A. No. I'm not drawing any causal conclusion
7  from that single -- I mean, again, the causality
8  assessment is based on the whole body of evidence.
9  You know, I did a supplement. I found studies. So
10  I noted it. So, you know, that one study or case
11  series is not going to drive the causal assessment.
12     Q. So the answer to the question is no; but,
13  also, you didn't do that here.
14          MS. PARFITT: Objection. Misstates his
15  testimony.
16     A. What do you mean by -- ask the question.
17  Ask the question. Of course, I have to cite. If
18  the studies are there, you have to cite the study.
19  But the causality assessment is not based on this.
20  It is not even predicated on the presence of
21  asbestos, you know.
22     Q. Understood. At your last deposition, you
23  said you were not familiar with the term "cleavage
24  fragments." Is that still the case?
25     A. Yes.

Page 76

1      Q. Okay. At your last deposition, you said
2  that you would not be offering an opinion on the
3  quantity of asbestos exposure necessary to cause
4  ovarian cancer. Is that still the case?
5      A. That is correct.
6      Q. Okay. You mention here "retrograde
7  migration of talc." Are you going to be offering an
8  opinion that talc can reach the ovaries through
9  inhalation?
10     A. I mean, I -- some have suggested that.
11  Like, for example, Schildkraut suggests that in her
12  paper, the AACES study. I am, you know -- that's
13  one biologic plausibility opinion that I, you know,
14  included in my 2018 report -- 2018? Yeah.
15          MS. PARFITT: 2018.
16     A. That's one plausible mechanism.
17     Q. Do you have an opinion related to fibrous
18  talc?
19     A. I mean, I have an opinion related to
20  whatever's in the bot -- you know, I was examining
21  the association. I was not disaggregating talc,
22  talc containing asbestos, fibrous talc. You know,
23  what's in that bottle, whatever's -- the studies
24  reported, I'm not going to be able to disaggregate
25  those components of talc.

Page 77

1      Q. Who drafted your 2023 supplemental expert
2  report?
3      A. Me, me, and only me.
4      Q. You wrote every word in it?
5      A. Every single word in it.
6      Q. Okay. Did you have any discussions with
7  lawyers before you drafted it?
8          MS. PARFITT: Objection to any
9  discussions with counsel as to the content.
10     Q. Okay. Can you answer that as a yes-or-no
11  question without telling me the content of those
12  discussions, if they exist?
13          MS. PARFITT: Just so I understand,
14  Mr. Martin -- I'm not being difficult -- but have we
15  talked to him since his 2018 report when we asked --
16  advised him that the Court required an updated
17  report? Help me out here. Of course we've talked
18  to him.
19     Q. Okay.
20     A. Yeah, I did have a discussion. Yeah.
21     Q. Okay.
22          MS. PARFITT: We talked to him about
23  coming to this deposition.
24          MR. MARTIN: I'm sorry. I meant in
25  advance of drafting the 2023 report.

20 (Pages 74 - 77)

Page 78

1    A.  Yeah.  They had to -- because if I hadn't
2  known it, I wouldn't have drafted it.  There would
3  have to be a discussion.
4    Q.  Do you remember approximately how many
5  discussions you had?
6    A.  It was -- that should have been noted in my
7  thing because --
8    Q.  Fair point.  If you had a discussion, it
9  would be noted on the invoice?
10    A.  I noted discussion separately and my review
11  separately, I think.
12    Q.  Let me just check and make sure that's
13  right.
14    A.  I hope I did.
15    Q.  Sounds right but -- telephonic
16  consultation?
17    A.  Yes.  So that's the discussion.
18    Q.  Understood.  Did you personally identify
19  all of the documents included in your -- all of the
20  documents on the reference list of your 2023 report?
21    A.  The majority.  They did provide some
22  additional documents, for example, you know, the
23  depositions and, you know, Longo's testing so -- and
24  the EPA testing.  I mean, I had heard about the EPA
25  test, and I had it.  But I didn't have the full text

Page 79

1  of it.
2    Q.  When you received materials from counsel,
3  did you ask for those?  Or were they provided to you
4  without asking?
5    A.  Some of them, like, I asked them to source
6  the references because, you know, I didn't have it
7  in my library.  So I may have asked one or two
8  references for them to source it.  Like, I had
9  identified it, but in some cases they did provide
10  it.
11    Q.  Let's look back at your report, page 3.  In
12  that box there, that contains the search terms that
13  you used to identify new articles for your
14  deposition?
15    A.  Yes.
16    Q.  Okay.  And all the articles that were
17  responsive to those search terms are included in
18  Appendix A to your report; is that right?
19    A.  Yeah.  And the ones that I excluded are --
20  there's two lists; right?  There's an included and
21  relevant list.  And there is a potentially, you
22  know, excluded is -- the, you know -- the -- some of
23  them may have been cited for context.  But the ones
24  in the references are the main articles that are
25  relevant to this report.

Page 80

1    Q.  Understood.  So can we turn to Appendix A?
2    A.  Which is?
3      MS. PARFITT:  We're referencing the '23
4  report?
5    Q.  Right.  Appendix A of the 2023 report,
6  which follows the reference list.
7    A.  Okay.  Yes.
8    Q.  Were any studies -- let me back up.
9      There are no rows for which I see multiple
10  Xs under -- let me back up further.
11      The chart includes two columns under
12  "include" and several columns under "exclude."  The
13  "exclude" columns would be reasons for which you
14  excluded literature that you identified in your
15  search; right?
16    A.  Sure.
17    Q.  Okay.  And if you listed an article and
18  there was an X under an "exclude" category, that was
19  the reason you excluded it?
20    A.  Yeah.  So just to be clear -- and I think I
21  explained that -- article could be -- have been
22  excluded for multiple reasons.  But that Appendix A
23  just denotes one reason.
24      For example, article could have been a
25  duplicate and not have original data as well.  But,

Page 81

1  you know, that is as transparent as I could be in
2  terms of that.
3    Q.  You anticipated my next question.  So thank
4  you.  What was your basis for excluding an article
5  as nonrelevant?
6    A.  Well, so I state that in the report.  So we
7  should look at that.  So, I mean, in the section on
8  "eligibility criteria," I included epidemiologic
9  studies --
10      MS. PARFITT:  That's page 3.
11    Q.  Yes.
12    A.  -- which provided data, so they had to
13  provide data on association.  I included study
14  designs.  I included, you know, the cohort studies,
15  case control studies, umbrella reviews, systematic
16  reviews, meta-analysis, pooled analysis.
17      I examined the references to find
18  additional articles which provided data.  I also
19  included studies that reported on biological
20  mechanisms and causal pathways that either supported
21  or refuted the role of talc.  And this could include
22  different study design.
23      When I say, after consideration, I excluded
24  narrative reviews or opinion articles that did not
25  provide original articles -- original data that are

21 (Pages 78 - 81)

Page 82

1 not deemed relevant, some of them were cited for
2 context, so -- but in terms of the -- you know, my
3 opinion, I am focusing on, you know, systematic
4 review that have studies that provide data.
5    Q. How do you define "cited for context"?
6 What exactly do you mean by that?
7    A. Well, they are cited. You know, they are
8 cited in the report. Yeah.
9    Q. But you seem to be drawing a distinction
10 between "cited for context" and "cited
11 substantively"?
12    A. Yeah.
13    Q. Can you explain what you mean by the
14 distinction?
15    A. Sure. For example -- and I have to, you
16 know -- I don't want to make sort of assumptions
17 about anything. But, for example, let's see -- I
18 don't -- I can't come up with -- but, you know, it
19 will be, like, response to an article which
20 explains, you know, the underlying -- yeah. So, for
21 example, if you look at -- let's see if I can
22 explain this better. For example -- I can't find
23 that.
24    Q. We can --
25       MS. PARFITT: Just give him a moment.

Page 83

1 He doesn't mind.
2    A. Yeah. I mean, there are -- I'm trying to
3 look through the list of excluded articles.
4    Q. I'll withdraw the question.
5    A. No. No.
6    Q. I don't want to spend time on this. I
7 don't want to spend time on this. I'll withdraw the
8 question.
9       MR. MARTIN: Can we take a break? Off
10 the record.
11       (A break was taken)
12       MR. MARTIN: Back on the record.
13    Q. We were looking at Appendix A to your 2023
14 report when we broke. And can we look at Row 29 of
15 this?
16       MS. PARFITT: Row 29 of Appendix A?
17       MR. MARTIN: Yes. Which should be
18 Goodman, et al.
19       THE WITNESS: Yeah.
20       MS. PARFITT: For the record, if you
21 don't mind, since there's two Goodmans. Goodman
22 '23?
23       MR. MARTIN: No. Goodman 2020.
24       MS. PARFITT: 2020. Thank you.
25    Q. It's entitled "A critical review of talc

Page 84

1 and ovarian cancer."
2    A. Sure. Sure.
3    Q. You have this marked as not relevant
4 because it is not a systematic review or
5 meta-analysis; is that correct?
6    A. That is correct. And does not provide
7 original data. Yeah.
8    Q. Okay. Let me ask you about original data.
9 So -- okay. Yes. So it would be relevant if it
10 provided original data, on the one hand, or if it
11 was a systematic review or meta-analysis on the
12 other hand.
13    A. Yes. Exactly. So, for example, I mean, in
14 terms of context, you know, if you look at 62 -- I'm
15 trying to answer -- your question is -- where is
16 that Rosner -- 77, Row 77. It's also excluded. It
17 does not have original data. But that is, like, a
18 citation for context. I'm trying to explain why,
19 you know, because, you know, it was excluded.
20    Q. So going back to 29, Goodman 2020, it's
21 entitled "A systematic review." Can you explain to
22 me the difference between a systematic review and a
23 -- I'm sorry. It's entitled "A critical review."
24 Can you explain to me the difference between a
25 critical review and systematic review?

Page 85

1    A. Sure. You know, a systematic review would
2 provide search dates, would provide what are the
3 studies they included -- you know, similar to what I
4 have here -- would provide criteria for inclusion,
5 exclusion and, in many cases, assessment of bias
6 and, if the data are appropriate, do a pooled
7 analysis or -- meta-analysis. Sorry.
8    Q. Let's look at Row 27. This is one that you
9 did include as relevant; right? This is Gabriel, et
10 al., "Douching, talc use, and risk for ovarian
11 cancer and conditions related to genital tract
12 inflammation," 2019.
13    A. Which is --
14       MS. PARFITT: 27, Gabriel.
15       MR. MARTIN: Let's introduce this as an
16 exhibit.
17    Q. Sorry. So let's just look at your report,
18 again, page 12.
19    A. Okay.
20    Q. So this is the same document, just going
21 back to the body of it. You described this as a
22 case control study in the body of your report, so
23 not a systematic review or meta-analysis; right?
24    A. That's what I state here.
25    Q. Okay. But it's included because it

22 (Pages 82 - 85)

Page 86

1 contains original data?
2    A. Yeah.
3    Q. Just wanted to --
4    A. Sure.
5    Q. -- put a finer point.
6    A. I have to look at -- I want to make sure I
7 have it in front of me if you're going to ask
8 specific questions.
9    Q. Understood. We will probably return to it
10 later today, but that was the only question I had at
11 this point. Let's go back to Appendix A, Row 92.
12 Sorry. There's a lot of flipping through paper
13 today.
14    A. That's okay, as long as I have it in front
15 of me.
16       (2021 article by Nicolas Wentzensen, et
17 al., Exhibit 12, marked)
18    Q. This is Wentzensen, O'Brien, "Talc, body
19 powder, and ovarian cancer: A summary of the
20 epidemiological evidence" from 2021 --
21    A. Yes.
22    Q. -- published in Gynecologic Oncology.
23    A. That is correct.
24    Q. Do you think Gynecologic Oncology is a
25 reputable journal?

Page 87

1    A. Yes.
2    Q. Have you cited things from it?
3    A. Yes.
4    Q. I think you cited some things from it in
5 your expert report.
6    A. Yes.
7    Q. Do you know by -- the reputation of either
8 Dr. Wentzensen or Dr. O'Brien?
9    A. No. But I've read a lot of the articles.
10    Q. Do you have any reason to believe that
11 they'd be biased one way or another?
12       MS. PARFITT: Objection. Form.
13    A. I mean, biased in the terms of, you know,
14 what kind of bias? You know, bias works in
15 different forms. Financially? No. They work at,
16 as far as where, you know, NCI.
17       But there are other sources of bias, like
18 confirmation bias. You know, researchers publish
19 findings. And then there are subsequent study --
20 they pattern these findings.
21       So, you know, I'm not saying that's what
22 they have. But there are different kinds of biases
23 operational in the literature. And I'm not saying
24 something totally out of the ordinary. That's well
25 established in the scientific literature. Yes. So

Page 88

1 depending on bias --
2    Q. Let's talk about financial bias
3 specifically. Are you aware of any financial bias
4 they have?
5       MS. PARFITT: Objection. Form.
6    A. No.
7    Q. Okay.
8       MR. MARTIN: Let's mark this as an
9 exhibit. This is the Wentzensen, O'Brien article I
10 just mentioned. I have a wrongly paginated version
11 of this, unfortunately.
12       THE WITNESS: I read it. So you can
13 point --
14       MR. MARTIN: I understand. I need to
15 find my place in it because I have it paginated
16 differently in my outline than it is here.
17       MS. PARFITT: Sure.
18    Q. If you can look at page 8 of the document,
19 halfway through the second paragraph of the
20 conclusion.
21    A. Give me a second.
22       MS. PARFITT: Page 8.
23    Q. Specifically the sentence that starts
24 "Taken together, the epidemiological data from case
25 control studies and cohort studies" --

Page 89

1    A. I'm sorry. I'm not there.
2    Q. Let me know when you get there.
3    A. Page 8 where? Second paragraph?
4    Q. Second paragraph of the "conclusion"
5 section.
6    A. Second paragraph. "Taken together." Okay.
7 Got it.
8    Q. "Taken together, the epidemiological data
9 from case control studies and cohort studies suggest
10 that there may be a small positive association
11 between genital powder use and ovarian cancer, which
12 may be limited to women with patent reproductive
13 tracts."
14       Do you agree with Wentzensen that there's a
15 small association between genital powder use and
16 ovarian cancer?
17       MS. PARFITT: Objection. Form.
18    A. I mean, I'm not going to qualify it. But,
19 you know, they provided and other studies have
20 provided evidence that, based on the biological
21 mechanisms, there is a positive association between
22 genital powder use and ovarian cancer in women with
23 patent tracts.
24    Q. You mentioned in that answer "biological
25 mechanism." Is biological mechanism relevant to

23 (Pages 86 - 89)

Page 90

1  consideration of an association, or is it relevant
2  to consideration of causation?
3      A.  I mean, yeah, causation.
4      Q.  Okay.  Do you agree with the statement that
5  it may be limited to women with patent reproductive
6  tracts?
7      A.  I mean, that is one possible biological
8  mechanism.  But, you know, if -- and, again, we went
9  through this before.  But if the other -- there are
10 other biological mechanisms such as inhalation,
11 then, you know, it may not be limited.
12     Q.  I guess I'm not asking at this point for a
13 discussion of biological mechanism.  Do you believe
14 that the associations shown in the literature are
15 limited to women with patent reproductive tracts?
16         MS. PARFITT:  Objection.  Form.
17     A.  Not necessarily.  I mean, her study broke
18 it down, and some of the more recent studies have.
19 And that is probably the most likely biological
20 mechanism.  But other studies have shown in, you
21 know -- the earlier studies did not adjust for
22 patent tracts.  And they still showed -- so if we
23 would rely on those studies, then yes.
24     Q.  Presumably, those studies would include
25 women both who have had tubal ligation or

Page 91

1  hysterectomy and those who have not.
2      A.  Exactly.
3      Q.  And you just used a pronoun in the last
4  answer.  You said "she."  I assume you mean
5  Dr. O'Brien, one of the co-authors in this paper.
6      A.  I think she's a "she."
7      Q.  Her name is Katie.  I'm going to make that
8  guess.
9      A.  I also made a guess.  I have not met her.
10     Q.  In the same paragraph, the sentence that
11 follows, "Data from a large case control study
12 suggested that associations between talc use and
13 ovarian cancer were largely confined to
14 premenopausal women and postmenopausal women who
15 used hormone therapy."  And the citation is 39,
16 which is Cramer 2016.
17     I believe you may have said this in your
18 report.  But do you agree with Cramer and Wentzensen
19 that the association is limited to premenopausal
20 women and postmenopausal women with hormone therapy?
21         MS. PARFITT:  Objection.  Form.
22     A.  You have to point me where I wrote that.
23 But, I mean, I see that study and I -- you know,
24 this was -- this study was cited in my previous
25 report.  But I want to make sure that -- what is the

Page 92

1  statement that I'm being asked to comment on.
2      Q.  Let's just move on.  I don't need to dig
3  through your report for it.
4      Next paragraph of this "conclusion"
5  section, the second sentence which -- the third
6  sentence, actually, "However, the experimental and
7  animal carcinogenicity data for talc are limited and
8  inconclusive.  There are currently no good animal or
9  experimental models of ovarian carcinogenesis that
10 could be used to more directly test biological
11 effects of talc."
12     A.  Where are you?
13     Q.  I apologize.  It's two sentences down.
14     A.  Got it.  Yeah.
15     Q.  You see where it is --
16     A.  Yes.
17     Q.  Okay.  The question I have is whether you
18 agree that there are currently no good animal or
19 experimental models of ovarian carcinogenesis.
20         MS. PARFITT:  Objection.  Form.
21 Misstates his testimony.
22         MR. MARTIN:  The question is whether he
23 agrees.
24     A.  So I think, you know, assessment of
25 causality is, you know -- she -- she's making a

Page 93

1  statement.  Does not make a -- you have to examine
2  animal models.  You have to examine experimental
3  models, but it is really about biologic
4  plausibility.
5      And she, actually, in a recent paper on
6  fibroids provides the best example of an
7  experimental model where she talks about migration,
8  inflammation and epithelial cells.  And we can
9  initiate a series of mutagenic events that can lead
10 to cancer as well as -- and if -- which is even
11 worse with asbestos.
12     So in my mind, that's an experimental
13 model.  I'm not sure what experimental model -- that
14 term means.  Is it some -- you know, I don't know if
15 she is thinking about every step in the carcinogenic
16 process.  I don't really know what the term means.
17     Q.  Let's focus on -- do you agree that there
18 are no good animal models of ovarian carcinogenesis?
19         MS. PARFITT:  Object.  Objection.
20 Misstates the prior testimony.
21     A.  Yeah.  I'm not aware of good animal models.
22     Q.  Halfway down the same paragraph -- and I'll
23 slow down this time to make sure everyone is
24 there --
25         MS. PARFITT:  Thank you.

24 (Pages 90 - 93)

Page 94

1  Q. -- it's the sentence starting "Other
2  components."
3  A. Yes. I have it.
4  Q. Okay. "Other components of body powder,
5  including cornstarch, could also possibly play a
6  role in carcinogenesis by inducing inflammation in
7  the reproductive tract. But carcinogenicity data
8  are lacking." Do you have an opinion about the
9  carcinogenicity of non-talc components of body
10 powder?
11 A. I have not evaluated that.
12 Q. And body powder that is not -- cornstarch
13 body powder you have not evaluated.
14 A. I've used "genital talc," yeah.
15 Q. So there's a different product that is
16 cornstarch body powder. You haven't evaluated that?
17 A. No. I mean, some of the studies talk about
18 it. But I haven't eval -- my opinion is limited to
19 genital talcum powder use.
20 Q. The next sentence -- the next two
21 sentences, "Confounding by indication may explain
22 some of the observed associations. This would occur
23 if women with hormonal or inflammatory exposures or
24 conditions that are associated with ovarian cancer
25 were also more likely to use body powder in the

Page 95

1  genital area."
2  The first question is whether you agree
3  that confounding by association is a possibility to
4  be considered.
5  MS. PARFITT: Objection.
6  Q. Excuse me. That confounding by indication
7  is a possibility to be considered.
8  A. Yeah. And, you know, A, you have to
9  consider it in epidemiologic studies of association,
10 any kind of confounding. And you have to consider
11 confounding by indication.
12 I'm not sure this would be operational
13 because we are talking about exposure outcome
14 relationship that takes years. We're not talking
15 about you use it, you know, today and you have
16 cancer tomorrow.
17 So, you know, if women had irritation in
18 something and they had the first symptoms of -- so
19 it's really about -- "confounding by indication" is
20 a very specific term. And it means that you are
21 using it for indication for that disease.
22 And, in fact, there's good studies to
23 suggest that, you know, it is more operational when
24 you're thinking about drugs and efficacy, you know,
25 like, ACE inhibitors and stroke and something that

Page 96

1  provides benefit. It is less operational when
2  you're thinking about harmful effects.
3  So I don't think confounding by indication
4  is a consideration. There could be a consideration
5  about confounding, per se, but not necessarily
6  confounding by indication; or if it is, it's very
7  low.
8  Q. Do you think it's possible that obese women
9  are more likely to use talcum powder than nonobese
10 women?
11 MS. PARFITT: Objection to form.
12 A. You would have to have data showing that,
13 you know, it is -- you know, that -- you know,
14 obesity is a risk factor for -- you know, we know
15 that. But the question then would be is -- are
16 women that are obese -- you'd have to fulfill the
17 criteria for confounding.
18 You have to have obesity association with
19 cancer -- we know it is, several studies -- obesity
20 association with exposure, in this case, and then
21 obesity not mediating the pathway. You'd have to go
22 to specifics. But that is not confounding by
23 indication. That's not an indication for ovarian
24 cancer. That's confounding, yes, but -- and you
25 have several studies have adjusted for that.

Page 97

1  But I disagree with her about confounding
2  by -- I think she's using the term very generally
3  but not specifically. She could have been more
4  specific about confounding.
5  Q. Okay. Can you -- and I appreciate the
6  context. But can you just try to give a yes-or-no
7  answer to the question of whether you believe it's
8  possible -- not established but possible -- that
9  obese women are more likely to use talcum powder?
10 MS. PARFITT: Objection. Asked and
11 answered.
12 A. I don't -- I have to look at the data and
13 say.
14 MS. PARFITT: You've answered the
15 question.
16 Q. Can you review the first paragraph on the
17 next page -- just let me know when you've reviewed
18 it -- beginning "Independent of the underlying
19 cause"?
20 A. Yeah. Yes. First paragraph. Okay.
21 Q. Yeah. Second sentence, "The low relative
22 risk translates to a very low absolute risk
23 increase, given the rarity of ovarian cancer" and
24 then later down the page, "Given the widespread use
25 of powders and the rarity of ovarian cancer, the

25 (Pages 94 - 97)

Page 98

1  case for public health relevance is limited." Do
2  you agree or disagree with the statement that the
3  case for public health relevance is limited?
4      A. I disagree because that's, you know -- the
5  reason I disagree is, you know, it's not just about
6  relative risk. And it's not just about the
7  prevalence of exposure. And as you know, we've seen
8  studies, many studies, where they talk about give or
9  take there are 20,000 incident ovarian cancers in
10  the US and -- annually and the PAR.
11         So at least at the population level, you
12  are getting -- Davis and Wu provide an estimate.
13  And I don't recall the specifics, but we can look at
14  that. So that means there is a preventible cause of
15  risk factors. Why would that -- why wouldn't it be
16  relevant for public health?
17         MR. MARTIN: Can we go off the record
18  for just a moment while I go through my notes?
19         (A break was taken)
20         MR. MARTIN: Back on the record.
21      Q. Can you turn to page 4 of the Wentzensen
22  article we were discussing before the break? The
23  First sentence of 4.1, "Ovarian cancer is
24  characterized by profound heterogeneity that can be
25  observed in site of origin, genetic susceptibility,

Page 99

1  somatic mutations, molecular pathways, risk factor
2  associations, and morphologic differences." Do you
3  agree with that statement?
4      A. Yes.
5      Q. Do you agree that that statement is true
6  for epithelial ovarian cancer specifically?
7      A. I mean, that's what I think she's talking
8  about; right? She's talking about --
9      Q. But we talked earlier about your opinion
10  that talc causes all epithelial ovarian cancers.
11      A. Yeah. Because that's what I evaluated.
12      Q. And did you consider this heterogeneous
13  nature of ovarian cancer as part of your opinion?
14      A. My -- you know, so my overall opinion was
15  based on whatever the studies reported on and --
16  which included these various cancers. When notable,
17  I did note -- for example, if you go back to my
18  previous report, I did note what specific cancers
19  they were reporting on. But I did not disaggregate
20  that particular -- that talc only is associated with
21  X and Y.
22      Q. Would you agree with me that the
23  overwhelming majority of epithelial ovarian cancers
24  are serous?
25      A. Yes. By, you know -- just by prevalence.

Page 100

1      Q. Okay. Does the fact that talc is
2  associated with various subtypes of cancer affect
3  your analysis of the specificity criterion of the
4  Bradford Hill analysis?
5         MS. PARFITT: Objection. Form.
6      A. Can you restate? Sorry.
7      Q. Sure. One of the viewpoints that Dr. Hill
8  talks about is specificity; right?
9      A. Yeah.
10      Q. Okay. And we just talked about the fact
11  that epithelial ovarian cancer contains several
12  subtypes.
13      A. Sure.
14      Q. Does the fact that it contains several
15  subtypes -- let me start that one over.
16         Did you consider the fact that it contains
17  several subtypes when you were evaluating the
18  specificity viewpoint?
19      A. I don't think that that is, you know, the
20  relevance of -- if you -- and we should pull the
21  Bradford Hill article. I don't know what the
22  reference -- can we pull it out?
23         The reason I'm saying that is I don't think
24  that is the consideration there. It's more the
25  consideration of "Is that etiology the only cause of

Page 101

1  that cancer or whatever outcome?" So it's that --
2  just because it's etiologic heterogeneity I don't
3  think -- and in any way, you know, I did not weigh
4  specificity very heavily, because, in fact, I don't
5  -- I can look at the exact words -- because ovarian
6  cancer has multicausal, you know, risk factors so --
7  but it's not because of the fact that it is
8  etiologic, you know, heterogeneity. It's just that
9  there are different causes.
10      Q. Okay. Can you explain to me the difference
11  between different causes and etiologic
12  heterogeneity?
13      A. Yeah. I mean, different causes are, like,
14  you know -- like, say if you say -- I don't know --
15  "What are the established risk factors?" You know,
16  we could go back and look at a list and say, you
17  know, "Obesity increases the risk of causes of
18  ovarian cancer." Those are causes.
19         For a moment let's, you know, think that
20  obesity -- but that does not get into etiologic
21  heterogeneity. Here, we are talking about different
22  types of cancer. That's etiologic heterogeneity.
23      Q. Okay. So this Wentzensen and O'Brien
24  article, you exclude it because it's not a meta-
25  analysis or original data; right?

Page 102

1    A.  Yeah.  I mean, you know, it is important.
2  It's, you know, included in my list of -- I reviewed
3  it.  But it did not provide original data.  I mean,
4  most of the opinions are, you know, derived from the
5  previous publication that are included and
6  considered, you know.  So it's not excluded in that
7  sense.  But it is in my list of reviewed documents.
8    Q.  Are you aware of a different article by
9  O'Brien, Wentzensen along with Ogunsina and Sandler
10  entitled "Douching and genital talc use:  Patterns
11  of use and reliability of self-reported exposure"?
12    A.  Yes.
13    Q.  Okay.  I did not see that on your reliance
14  list.  Did you review it in drafting your expert
15  report?
16    A.  I know I'm aware of it.  I don't know when
17  I reviewed it.  But yeah, I did review it.  Yeah.
18    Q.  Okay.  Is there a reason it wouldn't be on
19  your reliance list?
20    A.  You know, it could -- I'll have to look at
21  it and see why not but -- what was the year of
22  publication?
23    Q.  2023.
24    A.  Okay.  When in '23?
25      MR. TISI:  I think it was December 2023,

Page 103

1  if I'm not mistaken.
2      THE WITNESS:  It could be earlier.
3      MR. TISI:  But I think it is December.
4      MR. MARTIN:  It says "May 2023" here.
5      MR. TISI:  Maybe I'm wrong.  I
6  apologize.
7      THE WITNESS:  Yeah.  Let me just -- May
8  2023 -- what is the title?
9      MR. MARTIN:  "Douching and genital talc
10  use:  Patterns of use and reliability of self-
11  reported exposure."
12      MS. PARFITT:  This was one of the
13  articles that was put in the Dropbox on Monday, just
14  so you're aware of it.  We put it in the Dropbox.
15      THE WITNESS:  No.  But I reviewed it.
16  Let me just go through -- give me one second.
17      MR. TISI:  You want a copy?
18      MR. MARTIN:  I have a copy of it or
19  should.
20      THE WITNESS:  I have it.  I have it.
21      MR. MARTIN:  Can you just mark this?
22      MR. TISI:  Are you done with the review
23  paper?
24      MR. MARTIN:  I am.
25      MR. TISI:  Thank you.

Page 104

1      (2023 article by Katie M. O'Brien, et
2  al., Exhibit 13, marked)
3    Q.  Can you look at the O'Brien 2023 article
4  that was marked as Exhibit 13?
5    A.  Sure.
6    Q.  In particular, can you look at the end of
7  the second body paragraph, the last sentence of that
8  paragraph, "However, if historic use cannot be
9  accurately recalled, measurement error can bias
10  effect estimates, especially if recall reliability
11  differs by outcome status."
12    A.  Which page?  I'm sorry.  I missed it.
13    Q.  It's the first page, page 376, of the
14  journal pagination.  But it's the first page of the
15  article.
16    A.  Where are we?
17    Q.  It's the second paragraph of the body.
18    A.  Okay.
19    Q.  It's the final sentence beginning
20  "However."
21    A.  Yeah.
22    Q.  Okay.  That's talking about the concept of
23  recall bias; right?
24    A.  Uh-huh.
25    Q.  And do you agree that recall bias can pose

Page 105

1  a problem in a retrospective epidemiological study?
2    A.  That is correct.
3    Q.  Okay.  If you look at the next sentence,
4  which is the beginning of the following paragraph,
5  "Using data from the Sister Study, we examined
6  patterns of use and reliability of recall for two
7  feminine hygiene products thought to be associated
8  with gynecological (verbatim) cancers."  And the end
9  of that sentence says "powder applied to the genital
10  area" is one of those two.  Do you see that?
11    A.  Yes.
12    Q.  Okay.  We'll skip the part on douching and
13  turn to page 383, which gets to some of the results
14  about ovarian cancer.  Let's look beginning with
15  "The reliability," which is about the fourth line of
16  the page.
17    A.  Which page?  I'm sorry.
18      MS. PARFITT:  383.
19      MR. MARTIN:  383.
20      MS. PARFITT:  I'm sorry.  Are you under
21  "discussion"?
22      MR. MARTIN:  No.  I'm sorry.  I'm in the
23  paragraph that precedes "discussion."
24      THE WITNESS:  Okay.
25      MS. PARFITT:  How far down?

27 (Pages 102 - 105)

Page 106

1    MR. MARTIN: Four lines. Starts with
2 "The reliability."
3    THE WITNESS: Yeah.
4    Q. "The reliability measures for genital talc
5 use were similar for ovarian cancer compared to the
6 full sample. However, while self-reported use in
7 the 12 months before enrollment was more commonly
8 reported on the enrollment questionnaire -- 27
9 percent -- relative to the fourth detailed follow-up
10 questionnaire -- 21 percent -- in the full sample,
11 the trend was reversed among those with intervening
12 ovarian cancer diagnoses, with 28 percent
13 self-reporting genital talc use at enrollment and 33
14 percent self-reporting genital talc use on the
15 follow-up questionnaire." Let's unpack this a
16 little bit.
17    For the full sample, it looks like self-
18 reported talc use was higher at the beginning than
19 it was in a later follow-up questionnaire, 27 to 21.
20    A. Give me a second to read.
21    Q. No problem.
22    A. There's so many different things here.
23 Yeah. So self-reported use in the 12 months before
24 enrollment was more commonly reported in the -- 27
25 to -- okay. Yeah. Got it.

Page 107

1    Q. So does that suggest that some women may
2 have underreported their exposures in the later
3 questionnaire?
4    MS. PARFITT: Objection. Form.
5    A. I'm not sure that's what it suggests.
6    Q. What else could it suggest?
7    A. Well, you know, there's -- is it the same
8 sample? For example, if you look at the same --
9 paragraph down, I mean, half of the women diagnosed
10 with ovarian cancer expired. So are we looking at
11 the same sample? Before we can even interpret these
12 numbers -- so if you had women with -- if you are
13 losing the sample, I can't compare the estimates --
14    Q. Well, this is the full sample; right? It's
15 not the sample limited to ovarian cancer-diagnosed
16 women.
17    A. Yeah. But it is following -- it is the
18 full sample. Then you have to get to the fourth
19 questionnaire; right? You have to get to the fourth
20 questionnaire. Between the enrollment and the
21 fourth questionnaire -- that's what they're saying
22 -- half of the women diagnosed -- so at least
23 relevant to the ovarian cancer, I don't know how to
24 interpret these numbers as being decreased reporting
25 or increased reporting.

Page 108

1    I mean, it's probably not increased. But,
2 you know, it's not the same sample that began and
3 the same sample that reported at the end.
4    Q. Do you have any reason to believe that the
5 people who dropped --
6    MS. PARFITT: No. Please. Go ahead.
7    Q. Do you have any reason to believe that the
8 people who dropped out between the first and fourth
9 questionnaire would be systematically as opposed to
10 randomly different than the group as a whole?
11    A. I mean, we'll have to look at, you know,
12 who are the dropouts; what are their
13 characteristics; how much was the dropout. And
14 we'll have to look at that.
15    And, you know, particularly if dropout is
16 related to something with talc, such as ovarian
17 cancer, then these estimates become, you know --
18 were people taking it, getting ovarian cancer, and
19 then dropping out? I don't know.
20    Q. Let's look at the subgroup that does
21 involve intervening ovarian cancer diagnoses, which
22 is the second half of that sentence. "The trend was
23 reversed among those with intervening ovarian cancer
24 diagnoses, with 28 percent self-reporting genital
25 talc in enrollment and 33 percent self-reporting

Page 109

1 genital talc use on the follow-up questionnaire."
2    So in that group that had an intervening
3 ovarian cancer diagnosis, more people reported talc
4 use after the diagnosis than before. Is that your
5 understanding?
6    A. No.
7    Q. No, it's not?
8    A. I think you can't compare the samples. I
9 mean, you know, they are comparing. That's fine.
10 But to interpret these numbers, you'd have to know
11 attrition, attrition by talc, and their
12 characteristics. I can't really -- I can't affirm
13 the conclusions that 28 increased with 33 is
14 consistent.
15    Q. Let's look at what the authors of this
16 article said about those numbers, and let me try to
17 point you in the right direction.
18    A. Can you give me one minute to read this?
19    Q. Sure.
20    MS. PARFITT: Thank you.
21    Q. Happy to have you read it briefly on the
22 record. If you're going to take a long time, I'd
23 like to go off the record.
24    A. No. No.
25    MS. PARFITT: Finish. Are you done?

28 (Pages 106 - 109)

Page 110

1    A. One more. Yeah. Ask the question, if
2    there's a question. I'll --
3    Q. Let's look at the next sentence. "This was
4    the only subgroup for which the proportion of users
5    increased between enrollment and follow-up and could
6    indicate recall bias, i.e., over-reporting of talc
7    use among those with a history of ovarian cancer."
8    That's, I think, what we were talking about earlier.
9    Do you disagree with that statement there?
10    A. Yeah. I mean, I don't think that that's
11    what the results, you know, can be interpreted as.
12    I mean, for example, if you go back to the methods,
13    they say that, because the enrollment questionnaire
14    did not collect information between age 14 and one
15    year, it was impossible for a participant to report
16    never use on the enrollment and ever use on follow-
17    up without contradicting themselves.
18    Q. But in the full -- well, I'll put that
19    aside. Let's look at the next column, the end of
20    the first paragraph, "The observed increase."
21        MS. PARFITT: Page? I'm sorry.
22        MR. MARTIN: Again, page 383, the same
23    page.
24        MS. PARFITT: I appreciate that.
25    A. The second column?

Page 111

1    Q. Second column beginning "The observed."
2    A. Beginning the -- which -- second paragraph?
3    Q. The first paragraph, the paragraph that
4    carries over from the previous.
5    A. Yeah.
6    Q. "The observed increase."
7    A. Yeah.
8    Q. "The observed increase in self-reported
9    genital talc use at follow-up relative to enrollment
10    among ovarian cancer survivors may indicate recall
11    bias is present and potentially driving some of the
12    previously observed differences in effect estimates
13    between studies collecting genital powder exposure
14    status retrospectively versus prospectively."
15    A. It's interesting. That line is very
16    interesting, I mean, because, A, you did not collect
17    as they -- I'll restate it. They did not collect
18    between 14 and one year before enrollment. So
19    that's one.
20        And they're talking about ovarian cancer
21    survivors. Well, what happens to women who get
22    ovarian cancer? How many survive? So we have a
23    highly lethal cancer. So the sample -- you know,
24    you'd have to look at all people -- survivor,
25    non-survivors -- to really make a judgment about

Page 112

1    recall bias here.
2    Q. Do you have a reason that the amount of
3    recall bias would be different in the surviving
4    group than the non-surviving group?
5    A. It could be. Yeah. I mean, without
6    looking at the characteristics, you -- and, you
7    know, I mean, it's not a small number as
8    approximately half the women diagnosed with ovarian
9    cancer expire.
10    Q. I just want to follow up. You said "it
11    could be different." Do you have any bases here
12    today for why it would be different?
13        MS. PARFITT: Objection. Asked and
14    answered.
15    A. Yeah. I mean, you know, I don't -- I don't
16    have that data because they don't provide the data
17    on the women who expired and what are their
18    characteristics.
19    Q. Even if you disagree with some of the
20    conclusions drawn by the authors of this article, do
21    you think the article is relevant to your
22    supplemental report?
23    A. Yeah. So the question about relevance and
24    the reason now I recall is -- I obviously included
25    it in the list. And this is a discussion -- it does

Page 113

1    not provide direct data on talc and ovarian cancer.
2    But it discusses recall bias in the Sister Study.
3        But there's no data on talc and ovarian
4    cancer, per se, in this article, that it decreases
5    ovarian cancer or increases. Either way, it does
6    not refute. That's not the focus of this article.
7    I mean, is there somewhere that I didn't miss?
8    Q. No.
9    A. Yeah. So it does not provide any -- as I
10    outlined in the methods, I was looking at original
11    data on talc and ovarian cancer.
12    Q. Is this article in your Appendix A under
13    the excluded articles?
14    A. No. I don't think so.
15    Q. Okay.
16    A. Yeah.
17    Q. There a reason why it wasn't even in the
18    excluded list in Appendix A?
19    A. Yeah. I don't recall -- I mean, there were
20    so many references that, you know, I examined. So
21    -- but, again, it does not provide the data on talc
22    and ovarian cancer. But it's not that it's not --
23    you know, there's -- we discussed it and, you know,
24    addressed as issues around recall bias.
25    Q. Generally, do you believe that everything

29 (Pages 110 - 113)

1 responsive to your Scopus and PubMed search queries
2 should be in Exhibit A?
3      A.  Yeah.  Yeah.
4      Q.  Okay.  You can put that aside.  Is it
5 standard practice in your experience for authors of
6 scientific literature to disclose conflicts of
7 interest if they're serving as a litigation expert?
8      A.  Any kind of -- you know, either litigation
9 expert or consulting for the company or doing
10 something else.  I mean, it's standard practice.
11 Journals require it.  It's not an optional thing.
12     Q.  Have you published on talc and ovarian
13 cancer --
14     A.  No.
15     Q.  -- since becoming an expert?  If you were
16 to do so, though, you would note your --
17     A.  For sure.
18     Q.  -- conflict of interest.  Okay.  And as a
19 reader of scientific literature, is it something you
20 consider important when you're evaluating a
21 scientific study?
22     A.  I mean, it is a factor among other factors,
23 bias.  I mean, the predominant factor is
24 methodology.  I mean, that is the driving factor.
25 But, yes, bias --funding bias, you know, whether

1 it's manufacturer, whether it's expert witnesses or
2 testimony, consultants.
3      It is a factor.  And the way it is a factor
4 is interpretation, you know.  One has to rely that
5 the findings in the peer-reviewed literature, at
6 least to the extent that they've been undergoing
7 peer review, are, you know, rigorous.  And, you
8 know, obviously one has to examine the methods.  But
9 disclosure is important.
10     Q.  Is there a way -- did you perform -- did
11 you quantitatively weigh the importance of the
12 studies included in your 2023 expert report?
13     A.  No.
14     Q.  Okay.  Is there a way we could tell from
15 reviewing your report whether one study was more
16 important than another in the formation of your
17 opinion?
18     A.  I mean, you'd have to look at the
19 description about strength and limitations.  But,
20 again, that's not a numerical value.
21     Q.  Is the fact that an author is --
22         MR. MARTIN:  Can we take a break here?
23 Go off the record.
24         (A break was taken)
25         MR. MARTIN:  Back on the record.

1      Q.  When you were performing your qualitative
2 evaluation of the studies in your expert report, did
3 you consider whether an article author was a paid
4 litigation expert?
5         MS. PARFITT:  Objection.  Form.
6      A.  I mean --
7         MS. PARFITT:  Please answer.
8      A.  Yeah.  I mean, I considered it.  But,
9 again, I think I answered the question -- is that
10 the primary consideration was, A, what is the
11 methodology they're talking about?  What are the
12 issues at stake?  And, you know, obviously whether
13 they are experts is a consideration.
14     Q.  All else being equal, would you have fewer
15 bias concerns with a paper published by a neutral
16 author than by a defense expert?
17         MS. PARFITT:  Objection.
18     A.  I mean, I think that, to me -- I hate to
19 say it -- but in this realm, I mean, there have been
20 so many papers published by defense experts as well
21 as, you know, some papers by experts in plaintiffs
22 that if one were to start excluding all those, then,
23 you know, the body of literature would be, like --
24 why -- you have to -- I mean, if it comes up peer-
25 reviewed literature, I have to evaluate.

1      And if the methodology is sound, then, you
2 know, you have to acknowledge that yes, they are.
3 And -- but you have to go by the methodology really.
4      Q.  So it is something you acknowledge?
5         MS. PARFITT:  Objection.  Form.
6      A.  Yeah.  I mean, I may not have stated it
7 explicitly.  But that is important to acknowledge.
8         MR. MARTIN:  Let's break for lunch.  Off
9 the record.
10        (A break was taken)
11        MR. MARTIN:  Back on the record.  So
12 let's mark as Exhibit 14 Gabriel 2019, "Douching,
13 talc use, and risk for ovarian cancer."
14        (2019 article by Iwona M. Gabriel, et
15 al., Exhibit 14, marked)
16     Q.  You've seen this document before; right?
17     A.  Yes.
18     Q.  You cite it in your 2023 report; right?
19     A.  That is correct.
20     Q.  And this is a case control study from 2019;
21 right?
22     A.  That's correct.
23     Q.  And it's the same data that were previously
24 reported in Cramer 2016?
25     A.  I'm not sure entirely.  I mean, I didn't

Page 118

1 duplicate, you know -- this was a new study,
2 provided data on association between talc and
3 ovarian cancer. Yeah. But it did include, you
4 know, the eastern Massachusetts and New Hampshire
5 cohort, you know -- cohort.
6    Q. If you look at 1835, which is the first
7 page, under "materials and methods," you'll see
8 "Details regarding enrollment are described
9 elsewhere." Then it's Reference 10. Then
10 Reference 10 is to the Cramer 2016 article. Do you
11 see that?
12    A. Yes.
13    Q. Okay. In fact, Dr. Cramer is also a
14 co-author on this article; right?
15    A. Yes.
16    Q. Okay. We talked a little bit before lunch
17 about litigation conflicts. So let's check the
18 second-to-last page, "Disclosure of potential
19 conflicts of interest." Do you see that? 1843.
20    A. Uh-huh.
21    Q. "A.F. Vitonis has provided statistical
22 programming to support expert testimony for Beasley
23 Allen law firm. D.W. Cramer has provided expert
24 testimony for Beasley Allen law firm." Does this
25 say what the subject of Dr. Cramer's expert

Page 119

1 testimony was?
2    A. No.
3    Q. Does it say who Beasley Allen represented?
4    A. No.
5    Q. Okay. You're aware that Dr. Cramer is a
6 plaintiffs' expert in talc litigation; right?
7    A. I'm not sure he is, but he was at some
8 point.
9    Q. I'm sorry. Yes. You're aware that he was.
10    A. Yeah. At some point in time.
11    Q. Would the fact that the litigation
12 referenced in the conflicts of interest disclosure
13 involved talc be something that would be relevant to
14 you as a reader?
15       MS. PARFITT: Objection. Form.
16    A. Can you restate the question?
17    Q. Sure. Do you understand this testimony
18 that Dr. Cramer provided for Beasley Allen to be
19 related to talc?
20    A. Yes.
21    Q. Okay. Do you think that a reader who is
22 not involved in the litigation would understand
23 that?
24       MS. PARFITT: Objection as to what
25 another reader would understand or not.

Page 120

1       MR. MARTIN: Understood.
2    A. I mean, they would go through -- if they
3 went through Beasley Allen, yes, they could. But I
4 don't -- I can't put myself in their situation.
5    Q. Okay. You'd agree it doesn't explicitly
6 say that.
7    A. Exactly.
8    Q. Is the fact that it involves talc something
9 that would be relevant for you to know?
10       MS. PARFITT: Objection. Form.
11    A. Right. For me, it doesn't because -- so
12 when I look at articles and the disclosure, when I
13 look at a disclosure section, I'm assuming that
14 disclosure is relevant. That's why they're making
15 the disclosure. I mean, it's either funding or --
16 you know, it's NIH, NCI, we do disclose. FDA, I
17 disclose. And/or if it's expert testimony, then
18 it's relevant to the subject matter at hand. But,
19 obviously, it's not explicit here.
20    Q. Would you as a reader want to know whether
21 he consulted for defendants or plaintiffs?
22       MS. PARFITT: Objection. Form.
23    A. I can't tell the reader -- I mean, I know
24 and, you know -- potential reader would want to
25 know, yes, I mean.

Page 121

1       MS. PARFITT: Objection to "potential
2 reader would want to know."
3    Q. Did you consider Dr. Cramer and
4 Dr. Vitonis's conflict of interest when you were
5 evaluating this paper for your expert report?
6    A. As I stated earlier, I think my answer to
7 that question will be sort of consistent, and, you
8 know, I -- I'm aware of it. But, you know, it's the
9 methodological issues.
10       This is a supplemental report of -- what --
11 17, 20 pages. I'm aware of those conflicts, and I
12 consider it. But I don't think that was the major
13 consideration. It's the methodologic issues. The
14 fact they provided new data and the fact that they
15 reported an increased risk, those are the
16 considerations.
17    Q. You don't note that fact in your report?
18    A. No, I don't.
19    Q. You'd agree with me?
20    A. But I did consider it.
21    Q. Can we turn to the next page, 1844,
22 "Acknowledgments," second column, "The costs of
23 publication of this article were defrayed in part by
24 the payment of page charges. The article must,
25 therefore, be hereby marked 'advertisement' in

31 (Pages 118 - 121)

Page 122

1 accordance with 18 USC, Section 1734 solely to
2 indicate this fact." Did you notice this disclaimer
3 when you initially read the Gabriel article?
4    A. Yeah. I mean, I focused on the
5 acknowledgments, and I focused on the disclosure. I
6 did not notice that in the disclaimer as an
7 advertisement.
8    Q. Have you seen a disclaimer like that in the
9 scientific literature before?
10    A. I mean, I've not gone and looked for it,
11 but.
12    Q. So the answer to the question is "no"?
13    A. No.
14    Q. Okay. Let's --
15        MS. PARFITT: I object to that.
16 Misstates what he said. He said he's not looked for
17 it.
18    A. To clarify that -- since we are on the
19 topic -- to the disclaimer part, yes, the cost of
20 publication was defrayed. I mean, we also put it.
21 But the second part, you know, I have not seen.
22    Q. Understood. So it's the second sentence --
23    A. About advertisement.
24    Q. Okay.
25    A. But the costs, yes, we -- in fact, my

Page 123

1 recent article has that.
2    Q. Can you look at Table 1 in the body of the
3 report, which is on page 1837? Towards the bottom,
4 you can look at "tubal ligation." Just tell me when
5 you've gotten there.
6    A. Yes.
7    Q. Okay. So you look at the cases -- which
8 would be the women with ovarian cancer; correct?
9    A. Uh-huh.
10    Q. Okay.
11    A. Yes. Yes.
12    Q. And you see that 30.7 percent of them --
13 looking at the women -- I'm sorry. Looking at the
14 women who have not undergone tubal ligation, you see
15 that 30.7 percent of the cases had used genital
16 talc.
17    A. Yes.
18    Q. And 26.2 percent of the controls?
19    A. Yes.
20    Q. And that would be consistent with what
21 you'd expect if talc were associated with a slight
22 increase in risk; correct?
23        MS. PARFITT: Objection. Form.
24    A. Let me just get back to the numbers. Give
25 me a second.

Page 124

1    Q. Can I refocus the question?
2    A. Sure.
3    Q. The fact that slightly more cases than
4 controls had reported exposure to genital talc would
5 be consistent with an increase in risk; correct?
6    A. Yes.
7    Q. Okay. Let's look at the next row, women
8 who have had a tubal ligation. Okay?
9    A. Yes.
10    Q. 36.5 percent of cases and 26 percent of
11 controls reported using genital talc; correct?
12    A. Yes.
13    Q. Okay. You'd agree with me that's a larger
14 difference than the difference for women who
15 reported tubal ligation?
16    A. Yeah. But the overall numbers are so
17 small. I mean, if you look at the sample size, we
18 are talking about 541 cases versus 440 controls and
19 then 101 versus, you know, 310. So it's -- sorry --
20    Q. Okay.
21        MS. PARFITT: Let him finish.
22        MR. MARTIN: I'll let you finish.
23    A. 101 versus 310, those are not comparable.
24 But the magnitude of the difference is higher.
25    Q. Okay. How do you explain the fact the

Page 125

1 magnitude of the difference is higher among women
2 who have had a tubal ligation than among women who
3 have intact genital tracts?
4    A. I mean, their primary analysis focused on,
5 you know, reporting risks based on adjustment
6 factors and the reported increased risk. It is
7 entirely plausible that it is even increased in
8 those who have tubal ligation. So that, you know --
9 it's not that those findings are incompatible with
10 biological plausibility.
11    Q. I guess I'm asking why the difference in
12 risk would be larger among women with tubal ligation
13 than among women without.
14    A. First of all, none of the tests that -- if
15 you look at the -- if you're looking at the --
16 difference is not -- is not -- I would say 30.7,
17 26.2 -- and, you know, tests for interactions there
18 are not significant. So I don't see that as being
19 any materially different.
20    Q. So do you think it's just maybe statistical
21 noise?
22    A. Could be statistical noise.
23    Q. Okay.
24    A. I mean, not noise. I would say, I mean, it
25 is a finding. So you have to go by what they

32 (Pages 122 - 125)

Page 126

1 reported. But it is entirely plausible that women
2 who had tubal ligation also had an increase. The
3 magnitude of -- I think the magnitude of risk is
4 sort of not a relevant -- very relevant
5 consideration right here.
6 Q. You mentioned that the -- strike that.
7     You'd agree that the authors of Gabriel
8 2019 did not calculate separate odds ratios for
9 women with intact tubes and women without?
10 A. They adjusted for it.
11 Q. Correct. But they did not calculate
12 separate ratios.
13 A. No.
14 Q. Okay. So we talked about this involving
15 some of the same cases and controls as Cramer. So I
16 do want to look at the Cramer study, Cramer 2016.
17     MS. PARFITT: I will just note that, on
18 pages 194 all the way through, there's a significant
19 discussion of the Cramer 2016 article in the first
20 deposition in 2019.
21     MR. MARTIN: I am aware it was discussed
22 in the first deposition. I will keep this very
23 short. I want to talk about specifically one
24 sentence that is in the 2023 expert report.
25     MS. PARFITT: Very good. I appreciate

Page 127

1 that. Thank you.
2     (2016 article by Daniel W. Cramer, et
3 al., Exhibit 15, marked)
4     MR. TISI: Remind me the exhibit. I
5 apologize.
6     MR. MARTIN: 15.
7     MR. TISI: Thank you.
8 A. Which page?
9 Q. Let's look at 12, page 12 of your
10 supplemental expert report.
11 A. Yes.
12 Q. In that list of bullets, it's the fourth
13 bullet --
14 A. Yeah.
15 Q. -- "Cramer, et al. included an 18 percent
16 buffer to account for recall bias before nullifying
17 their study results." When you say "included an 18
18 percent buffer," do you mean -- well, what do you
19 mean by that?
20 A. Yeah. So they have a "discussion" section
21 where they talk about -- let's go to the
22 "discussion" section. Starting from 341, addressing
23 recall bias, we conducted sensitivity of the
24 analysis, and then the odds ratio of 133 -- 1.33
25 would be nullified if the sensitivity of correctly

Page 128

1 classified controls fell to 82 percent or 18
2 percent.
3 Q. I guess my question is about your
4 understanding of the term "nullified." Does it mean
5 the risk ratio would be 1.0, or does it mean the
6 risk ratio would be statistically insignificant? Or
7 does it mean something else?
8 A. I mean, it means an odds ratio would be
9 statistically insignificant.
10 Q. But it could still be elevated over 1.0?
11     MS. PARFITT: Objection. Form.
12 A. Let me just --
13 Q. I'll strike the question.
14     So let's look at the portion of Cramer that
15 you just quoted, which is beginning on page 341, the
16 final paragraph.
17 A. 341. Yes.
18 Q. Okay. "Addressing recall bias, we
19 conducted a sensitivity analysis that assumed truly
20 nonexposed cases and controls were accurately
21 classified as unexposed, i.e., specificity 99
22 percent."
23     Do you know whether that assumption, that
24 all truly nonexposed cases were correctly
25 classified, is a realistic one?

Page 129

1     MS. PARFITT: Objection. Form.
2 A. Yeah. I mean, it is to the extent that why
3 would nonexposed people recall talc exposure. It is
4 a reasonable assumption.
5 Q. Okay. Do you know if it's empirically
6 realistic?
7     MS. PARFITT: Objection. Form.
8 A. I don't understand that word. My English
9 is poor. What is "empirically realistic"? Is it
10 reasonable, unreasonable?
11 Q. Do you know if there are any data on the
12 reliability of recall?
13 A. Yeah. We were looking at that data, and we
14 just looked at Exhibit 13. And they said, you know
15 --
16     MS. PARFITT: Could you identify the
17 article? O'Brien?
18 A. O'Brien. And they said classification of
19 ever use of feminine genital products may be
20 recalled with good -- I mean, I don't know the
21 numbers there, but they can recall with good
22 consistence. I have no reason to suspect that the
23 assumption that Dr. Cramer makes is suspect.
24     MS. PARFITT: Dr. Singh, if I can just
25 ask one thing -- and Mr. Martin. For the court

33 (Pages 126 - 129)

Page 130

1  reporter, when you start talking fast when you're
2  reading an article, she may not catch the words
3  you're reading from the article.
4       MR. MARTIN:  Please, if anyone is
5  talking too quickly and you're not getting it down,
6  please let me know.
7    Q.  Well, let's look at the next clause in the
8  Cramer article.
9    A.  Sure.
10   Q.  The next assumption that Dr. Cramer makes
11  is "Truly exposed cases were also correctly
12  classified, sensitivity 99 percent."  Do you assume
13  -- do you know whether that's a realistic
14  assumption?
15      MS. PARFITT:  Objection.  Form.
16   A.  I mean, I don't see data elsewhere to
17  support that it is otherwise.
18   Q.  Okay.
19   A.  I mean, you know, it -- 99 percent, 98
20  percent, I don't see data elsewhere.
21   Q.  So you don't know one way or another?
22   A.  Yeah.  I mean, that's an assumption.  And,
23  you know, it's a reasonable assumption.
24   Q.  Okay.  Next sentence, "The OR of 1.33 in
25  our study would be nullified if the sensitivity of

Page 131

1  correctly classified controls fell to 82 percent or
2  18 percent misclassification."  That's what you're
3  basing your 18 percent buffer on?
4    A.  Exactly.
5    Q.  Okay.  Do you know if 18 percent is a
6  reasonable estimate of misclassification?
7    A.  I think they cite, you know -- they go to
8  other studies of -- at that time at least.  You
9  know, they go to other studies and say "Well, let's
10  look at, you know, assumptions about control
11  classification."
12      And I think they have it about -- they talk
13  about they found an age-adjusted OR for breast
14  cancer -- just below that line -- of 1.42 associated
15  with 30 or more grams from the prospective data
16  compared to 1.33.
17      So I think, they're using that, this change
18  would occur if the sensitivity of controls correctly
19  used drop to 1 percent or 9 percent; this suggests
20  some degree of misclassification but not as great as
21  80 percent required to nullify.
22   Q.  That section that you just read is about
23  the relationship between breast cancer and alcohol?
24   A.  Yes.
25   Q.  Okay.

Page 132

1    A.  A lifestyle variable and cancer.
2    Q.  But to be clear, it's about alcohol, not
3  about cosmetic use.
4    A.  That is correct.
5    Q.  Okay.  And to go in between where you read
6  and I read, the sentence starting with
7  "Unfortunately," "Unfortunately, there are no
8  external records to validate talc use reported by
9  study participants to assess whether this degree of
10  misclassification is reasonable."  Are you aware of
11  any external records that -- any such external
12  records?
13      MS. PARFITT:  Used by the investigators
14  in this study?
15      MR. MARTIN:  No.
16   Q.  Are you aware of any such external records
17  that have come into existence since 2016?
18      MS. PARFITT:  Objection.
19   A.  Well, yeah.  I mean, we discussed the
20  Sister Study that, you know, assessed.  But it
21  doesn't assess whether this degree of --
22   Q.  Okay.
23   A.  I mean, I saw the other Goodman study,
24  which talks about different misclassifications.  But
25  I'm not sure that, you know -- we can discuss it --

Page 133

1  whether that's reasonable.  It has two, you know --
2    Q.  You can probably conduct this deposition by
3  yourself because that's what I want to get at right
4  now.
5       MR. MARTIN:  If we can mark Goodman
6  2024.
7       (2024 article by Julie E. Goodman, et
8  al., Exhibit 16, marked)
9    Q.  All right.  So I have had marked as Exhibit
10  16 Julie Goodman, et al., "Quantitative recall bias
11  analysis of the talc and ovarian cancer
12  association."  This study was published in 2024.
13      So I assume -- well, so it was not,
14  obviously, in your expert report.  But it was
15  produced to us on Monday by your lawyers or by
16  plaintiffs' lawyers.  You've -- you're familiar with
17  this article?
18   A.  Yes.  I have had a chance to read it.
19   Q.  And one of the things that -- well, the
20  thing this article does is to evaluate the possible
21  effects of recall bias on the Cramer study we just
22  looked at.  Right?
23   A.  Sure.
24   Q.  If you can turn to page 2 -- and I'll try
25  to get there.  If you could look at the second

34 (Pages 130 - 133)

Page 134

1  column of page 2 beginning "Of these studies." And
2  if you can read down there for the next two
3  paragraphs, and I'll ask you some questions about
4  it.
5      A.  Which one?  The second column?
6      Q.  Second column, the first two paragraphs of
7  the second column.
8      A.  "In the published case control studies on
9  talc"?
10     Q.  Yes.  Correct.
11     A.  Okay.  Of these studies, only Cramer
12  conducted a recall bias and so did (verbatim) using
13  point estimates of sensitivities and specificity
14  rather than distribution.  The investigators
15  recalculated the ORs assuming 99 percent recall in
16  cases and 99 -- and 82 percent recall specificity
17  and sensitivity in controls using the assumptions
18  the OR was 1.
19     Q.  Would you agree with me that what the
20  authors are saying here is that, using different
21  assumptions than Dr. Cramer, that they produced
22  further attenuated results?
23     A.  I haven't even read that.  Yeah.  But in
24  this analysis -- but I have my, you know -- since I
25  reviewed it and it came out in '24, I have my

Page 135

1  opinions on it.
2      Q.  So let me ask you.  How does this paper
3  affect your opinions of Cramer 2016?
4      A.  Yeah.  I will provide those opinions.
5  First of all, you know, I reviewed it.  There are
6  several considerations in this paper.  So the
7  question is, when they are doing these recall bias
8  analysis, where are they getting the numbers from?
9  They're getting it from the Sister Study,
10  sensitivity, spes -- that's one.  And we discussed
11  the issues with that.
12         Then they are quite explicit that all their
13  Analysis D, Scenario 3, Scenario 4, Scenario 5 are
14  -- none of them adjust for any confounders.  So this
15  is all unadjusted analysis.  So, again, if
16  confounding is an issue in case control studies, I
17  don't know what weight to put on the analysis when
18  they are all unadjusted.
19     Q.  Do you know whether adjustment for
20  confounding would increase or decrease the
21  association?
22     A.  I don't know here.  You know, I don't know.
23  So they state that these are unadjusted.  And
24  perhaps, even more importantly, the method that they
25  use is known as a triangular distribution.  We chose

Page 136

1  a triangular distribution.  In the first column in
2  that page, they talk about a triangular distribution
3  because it is an ideal distribution where the only
4  data on hand are the maximal, minimal values and the
5  most likely outcome.
6         That is not entirely correct.  You have
7  maximal and minimal.  But you also have median or
8  mode.  And in this case, you know, if you use a
9  triangular distribution versus other distributions
10  like port (verbatim) or others, triangular
11  distributions give weights to the tails.  So that's
12  why their confidence was wider.
13         Other ways to analyze this data using other
14  distributions would give much more curve than --
15  give weight to the shoulders.  So I don't agree with
16  their analysis.
17     Q.  You said it would give different confidence
18  intervals.  Would it give a different point
19  estimate?
20     A.  Yes.  Yeah.  I mean, the shapes are
21  different.
22     Q.  Okay.  Let's move on to the next exhibit,
23  which is O'Brien 2020.
24         MR. MARTIN:  Actually, before we do
25  that, can we look at the Cramer study one more time?

Page 137

1         MS. PARFITT:  Cramer '16?
2         THE WITNESS:  Which is what number?
3         MS. PARFITT:  15.  It's No. 15.
4      Q.  Can we look at Table 2?
5      A.  Yes.
6      Q.  Do you see that they -- in this case, they
7  separately calculated odds ratios for hysterectomy,
8  for intact or nonintact genital tracts?
9      A.  Yes.
10     Q.  Okay.  And do you see that the point
11  estimate for women who have had hysterectomy or
12  tubal ligation is higher than the point estimate for
13  women who have not?
14         MS. PARFITT:  I'm going to object.  This
15  specific exact question was asked on page 196 of his
16  2019 deposition, I mean, down to the page number,
17  carrying over from the bottom of page 337 over to
18  338.
19         And the question was about tubal
20  ligation and hysterectomy.  The question was about
21  the protective or lack thereof nature of those
22  diseases -- of that process.
23         MR. MARTIN:  Can we go off the record
24  for a moment?
25         MS. PARFITT:  Yes.

35 (Pages 134 - 137)

Page 138

1        (A break was taken)
2        MR. MARTIN:  Back on the record.  Let's
3  move on to O'Brien 2020, which postdates your most
4  recent deposition and report, and which we can mark
5  as Exhibit 17.
6        (2020 article by Katie M. O'Brien, et
7  al., Exhibit 17, marked)
8    A.  Do you have the supplement tables for this?
9    Q.  Not in this document.  I believe I have
10  them elsewhere.
11   A.  Can I use my copy of supplements?
12   Q.  Sure.
13       MS. PARFITT:  Yes.
14       MR. MARTIN:  Yes.  So this --
15       MS. PARFITT:  Give him one second here.
16  Okay.  Good.  Thank you.
17   Q.  We talked about Dr. O'Brien and
18  Dr. Wentzensen earlier.  You agree that they're
19  well-regarded?
20   A.  I don't know if they are well-regarded.  We
21  talked about that they worked for, you know, NIEHS.
22  Yeah.  I have nothing against scientists, you know,
23  whether -- Dr. Cramer is well-regarded too.  He's
24  done tons of studies on ovarian cancer.
25   Q.  This article was published in JAMA.  Are

Page 139

1  you familiar with that journal?
2    A.  I've published in it.  So I'm quite
3  familiar with it as you can see in my --
4    Q.  And I hope you would agree with me it's a
5  prestigious journal.
6    A.  Yes, it is.
7    Q.  You've published in it, you said.
8    A.  Yes.  Many times.
9    Q.  Do you read it?
10   A.  Yeah.  I read it every week.
11   Q.  Would you agree with me that none of the
12  authors here, to your knowledge, are experts on
13  either side of this litigation?
14   A.  No.  They're government -- I mean, as far
15  as I'm aware, they are, you know, employees --
16       MS. PARFITT:  I didn't get to interpose
17  an objection.  I'm going to object.  You may
18  certainly answer.
19   A.  I'm not aware of their involvement.  That's
20  all.
21   Q.  Okay.
22       MS. PARFITT:  Zack, I'm not being
23  difficult.  I just don't know who you all are going
24  to be submitting in May.  Many of these people could
25  show up.

Page 140

1        MR. MARTIN:  Understood.
2    Q.  Can you look at the first sentence of the
3  "results" section in the abstract on the first page.
4  What's the sample size for this study in terms of
5  number of women?
6    A.  252, 745.
7    Q.  Okay.  And it talks about something called
8  "person years."  You understand that to be -- well,
9  what do you understand person years to be?
10   A.  Yeah.  It's exposure time, you know,
11  follow-up during that study period.
12   Q.  What is the number of person years at issue
13  in this study?
14   A.  3.8 million.
15   Q.  Okay.  Can we turn to Table 2, which is on
16  page 53?
17   A.  Sure.
18       MS. PARFITT:  Just to be clear, not the
19  supplemental table but --
20       MR. MARTIN:  Correct.  On page 53 of the
21  primary article.
22       MS. PARFITT:  I'm sorry about that.  I'm
23  sorry.  Okay.
24   Q.  At the bottom of the first half of this
25  table, they have a pooled estimate for all women.

Page 141

1  Do you see that?
2    A.  That is correct.
3    Q.  What's the confidence interval on that
4  pooled estimate?
5    A.  .99 to 1.17.
6    Q.  Would you agree with me that, as
7  traditionally understood, that is not statistically
8  significant?
9        MS. PARFITT:  Objection.  Misstates the
10  evidence and his testimony.
11   A.  Well, Dr. O'Brien herself in subsequent
12  interpretations has concluded that there's a
13  positive association between talc and ovarian cancer
14  without any qualifications about patent or nonpatent
15  tubes.
16   Q.  If you could just focus on the question I
17  asked --
18   A.  Sure.
19   Q.  -- which is would you agree that a
20  confidence interval that crosses 1 at a 95 percent
21  value is not, as traditionally understood,
22  statistically significant?
23       MS. PARFITT:  Objection.  Completely
24  misstates the state of science and his expert
25  opinions.

36 (Pages 138 - 141)

Page 142

1    A. Yeah. Can you repeat it? I'm sorry. I'm
2 trying to understand and answer.
3    Q. What do you understand -- you'd agree this
4 confidence interval -- this 95 percent confidence
5 interval crosses 1.0.
6    A. That is correct.
7    Q. Okay. You'd also agree that all of the --
8 in each -- the confidence interval for each of the
9 individual cohorts crosses 1.0.
10    A. That is correct.
11    Q. You'd also agree that, for one of
12 the individual cohorts, the point estimate is below
13 1.0.
14    A. We should discuss that cohort because the
15 median follow-up time in that is 3.8 years, which is
16 not etiologically relevant for ovarian cancer. We
17 discussed person years. But we have 2168 with
18 ovarian cancer, where in the case control we have
19 15,000. So, yes, we should look at that. But we
20 also need to look at where are those numbers coming
21 from.
22    Q. Dr. Singh, I appreciate that you need to
23 give context. I'd appreciate it if you could focus
24 on the answer to my question because we have limited
25 time.

Page 143

1    A. Right. I have to give context. I cannot
2 answer questions without context.
3    Q. Would the limited follow-up explain why the
4 point estimate is below 1.0?
5    A. Yes.
6    Q. How so?
7    A. Because they would not have sufficient
8 number of cases. You know, we -- they don't have
9 etiologically relevant exposure periods. You know,
10 three years of follow-up to really detect ovarian
11 cancer?
12    I mean, I don't think -- in my analysis,
13 this study should not have been -- you know, is not
14 really informative on the association. And,
15 actually, if you look at the ones that you were
16 pointing out -- the pooled hazard ratios -- the
17 confidence intervals for that are so wide that it's
18 just contributing very little information and weight
19 to the analysis.
20    These results that you see here, they are
21 driven by the NHS and WHI-OS. I can examine the
22 confidence, then tell you. The NHSII and VI are not
23 driving any of these results.
24    Q. The study with a 3.8-year follow-up is the
25 NHSII?

Page 144

1    A. That is correct.
2    Q. That study is not driving the pooled
3 estimate?
4    A. That is correct.
5    Q. Can we turn to page 3 on Table 55? Looking
6 at the top of Table 3, you can see that the authors
7 here looked at different levels of use.
8    A. Yeah. They looked at, you know, frequency
9 and duration of use.
10    Q. Okay. Looking at long-term use for the
11 "all women" group, can you tell me what the adjusted
12 hazard ratio and confidence interval is?
13    A. Yeah. I'll provide that and also provide
14 what they mean by "long-term use." So the hazard
15 ratio -- adjusted hazard ratio, if I'm correct, is
16 1.01, .82 to 1.25. So, again, NHS has no data on
17 long-term use.
18    The only three studies that provide data on
19 long-term use are -- NHSII, VI, and WHI-OS define
20 very differently. "Long-term use" is defined in
21 NHSII as at least weekly for 20 years. In the
22 Sister Study, "long-term use" is defined as perineal
23 use at ages 10 to 13 and in the last 12 months.
24    And in the WHI study, "long-term use" is
25 defined as 20 or more years for any of the three

Page 145

1 questions. So what is long-term use?
2    Q. Two of the three studies you mentioned
3 defined it as 20 or more years.
4    A. Yeah. But they ask different sets of
5 questions. One of them even asked questions about
6 -- if you look at the Sister Study questionnaire, it
7 asks about, during the ages of 10 to 13, how often
8 did you apply. And the options were "sometimes,"
9 "frequently," "don't know." And then they had a
10 second about in the past 12 months.
11    In fact, they are incorrect in their
12 exposure classification because they say "more than
13 five times per month." If you look at Chang and the
14 original Sister Study, it was more than five times
15 per week, if I'm correct.
16    Q. The question was not about frequency. It
17 was about length of use. There is a frequency
18 number later, but let's focus on the length of use
19 number now.
20    A. Sure.
21    Q. Point estimate is 1.01. Do you believe
22 that shows an association?
23    A. I just don't -- I believe that analysis of
24 long-term use is flawed because of the way long-term
25 use data was collected. And I mean, for example,

Page 146

1 let's look at Sister. Long-term use, perineal use
2 at age 10 to 13 years, last 12 months. What
3 happened to that whole --
4     Q. You've made your opinion clear. I'm simply
5 asking whether you believe a 1.01 hazard ratio
6 represents an association.
7     A. Not in this context.
8     Q. Okay. Thank you. You'd agree that the
9 1.01 point estimate here is lower than the point
10 estimate for all users that we discussed earlier.
11       MS. PARFITT: Objection to form.
12     A. Which was one -- which one? The overall?
13     Q. The overall.
14     A. Yeah. It would be. I mean, you know,
15 you're selecting a subsample. You have wider
16 confidence intervals. You've lost a study already,
17 which didn't collect data, which was, you know, a
18 study that was driving the estimates. So I don't
19 see it as any -- I think it's more about how
20 exposure was defined and measured and --
21     Q. Let's look at talc use for greater than one
22 week. What's the pooled estimate and confidence
23 interval there?
24       MS. PARFITT: I'm sorry. Where are you?
25       MR. MARTIN: I apologize. That's the

Page 147

1 end of the first half of Table 3.
2     A. Yeah. 1.09, .97 to 1.23.
3     Q. Let's look at the bottom half of the table,
4 which is women with patent reproductive tracts.
5     A. Sure.
6     Q. Again, let's look at long-term use. What
7 is the adjusted hazard ratio there?
8     A. 1.
9     Q. Okay.
10     A. .76 to 1.32.
11     Q. So there's no association reported there;
12 correct?
13       MS. PARFITT: Objection. Form.
14     A. Yeah. But the frequent users report an
15 association 1.19, 1.03 to 1.37.
16     Q. Correct. But the long-term users, there's
17 no association reported.
18     A. Yeah.
19       MS. PARFITT: Objection.
20     Q. That's a lower point estimate, again, than
21 the long-term users -- than "all women" long-term
22 users?
23     A. I mean, I think we are talking about dose,
24 you know. We have to talk about what is an
25 appropriate measure of dose. It is, you know --

Page 148

1 total number of applications is probably the best
2 number.
3     And we know from several studies --
4 Penninkilampi, others -- that total number is a
5 better measure. Forget about the results. What is
6 a better measure? You can't separate use and
7 frequency. I mean, they have it. And even that,
8 they have mis-specified in how they have measured
9 it.
10     Q. Again, if you could just answer the
11 questions that I'm asking. Ms. Parfitt will have an
12 opportunity to ask you questions if you want to
13 clarify anything later.
14     You would agree that the long-term use
15 point estimate is lower among women with patent
16 reproductive tracts.
17       MS. PARFITT: Objection. Asked and
18 answered.
19     A. How is that lower? Is it 1.01 and 1?
20     Q. Yes.
21     A. I don't think that makes any material
22 difference, I mean.
23     Q. Okay. So Dr. O'Brien and colleagues did
24 not initially look at only medically confirmed
25 cases; is that correct?

Page 149

1     A. Yeah. Show me the section. I have vague
2 recollection, but you have to point me out where.
3     Q. Well, I'll point you to Table 4, which is
4 on the next page, which is a subset of medically
5 confirmed cases. Do you see that?
6     A. Yes.
7     Q. Okay. Let's look at all medically
8 confirmed cases, ever use, top left column. What's
9 the hazard ratio there?
10     A. Hazard ratio -- I mean, if you want to just
11 have me read things, yes, it is 1.05, .96 to 1.16.
12     Q. Would you agree that -- do you believe a
13 1.05, 0.96 to 1.16 confidence interval demonstrates
14 an association?
15       MS. PARFITT: Objection. Asked and
16 answered.
17     A. Depends on the context. You know, we have
18 many associations, that, you know, maybe 5 percent
19 is a protective effect, you know, diets, fruits,
20 vegetables, you know, and even a 10 percent
21 increased risk is -- so it really depends on the
22 context of, you know, and what else do we know about
23 that.
24     Q. So a few moments ago, you said you didn't
25 think there was a material difference between 1.01

38 (Pages 146 - 149)

Page 150

1 and 1.0.
2     A.  Yeah.
3     Q.  There may be a material difference between
4 1.05 and 1.0.  How do I know where you draw the line
5 here?
6         MS. PARFITT:  Objection.  Misstates the
7 testimony.
8     A.  I'm not parsing out 1 and 2 and 3.  I mean,
9 that's not what I'm saying.  I'm saying that to the
10 -- in terms of a material difference, it is, like,
11 what is the question you're trying to answer right
12 there.  And remember, there are different set of
13 adjustments.  So the sample size has changed.
14 Obviously, the point estimates will change.
15     Q.  Okay.
16     A.  Exposure metrics have changed.  You have
17 "ever," "long-term," "frequent."
18     Q.  But you would agree with me that the hazard
19 ratio among medically confirmed cases was attenuated
20 from the 1.09 we talked about earlier.
21     A.  Yeah.  Because --
22         MS. PARFITT:  Objection.
23     A.  -- the numbers of cases declined.  Number
24 of cases declined.  So it went from already low,
25 2,168, to now even lower, 1800 cases.  Of course,

Page 151

1 you know, these could be attenuated.
2     Q.  Why would a smaller number of cases reduce
3 the hazard ratio?
4     A.  Because of power.
5     Q.  Okay.  Power would increase the size of the
6 confidence interval?
7     A.  And can lower the point estimates because
8 you are unable to detect an association.  Either
9 way.
10     Q.  Okay.  Could it also raise the point
11 estimate?
12     A.  Lower power?
13     Q.  Yes.
14     A.  How would it raise the point estimate?
15     Q.  Is your testimony that it is impossible for
16 lower power to raise the point estimate?
17         MS. PARFITT:  Objection.  Asked and
18 answered.
19     A.  If a study is statistically under power,
20 what it does, it gives you a more imprecise
21 confidence interval.
22     Q.  Let's look at the "discussion" section.
23 Let's look at page 58.
24     A.  The reference?
25     Q.  This is the last paragraph before

Page 152

1 "limitations," so "The strengths of this study."
2     A.  That's 57.
3     Q.  You're correct, and I'm wrong.  Thank you.
4 Do you see where I intend to be?
5     A.  Yes.
6     Q.  Okay.  "The strengths of the study were
7 long" -- excuse me -- "large sample size and long
8 follow-up time."  Do you agree that those are
9 strengths of the study?
10     A.  I think as compared to the previous cohort
11 studies, yes, but not sufficient enough to detect
12 cancer like ovarian cancer related to talc.  Yes,
13 compared to the initial cohorts, they have increased
14 the sample size.
15     Q.  Did you mention that in your expert report?
16     A.  I don't recall what I mentioned.  But,
17 yeah, I mean, I did talk about their -- I'll have to
18 go and look at it.
19     Q.  Okay.
20     A.  Give me one second.  I did not mention that
21 specific strength.  But I also mentioned that
22 strengths are noted, they're less prone to recall
23 and recall bias remains a concern.  But I did not
24 mention that specific strength.
25     Q.  Okay.  Would you agree with me that one of

Page 153

1 your criticisms of the cohort studies that preceded
2 O'Brien was insufficient statistical power?
3     A.  That is correct.
4     Q.  And another criticism was insufficient
5 follow-up time?
6     A.  That is correct.
7     Q.  Okay.  Let's look at page 50 of O'Brien.
8     A.  58?
9     Q.  50.  I apologize.
10         MS. PARFITT:  Let us know if you need to
11 take a break.  Not in the middle of a question,
12 though.
13     Q.  Do you see the last paragraph of the
14 introduction -- last sentence of the introduction?
15     A.  Yeah.
16     Q.  "Incorporate additional data, including
17 additional cases and longer follow-up time."
18     A.  Yes.
19     Q.  Do you know how many years of follow-up
20 time were added for each of the underlying cohorts
21 in the O'Brien 2020 data?
22     A.  I mean, not specifically.  But I think
23 Table 1 provides that, you know.
24     Q.  Yeah.
25     A.  If we can go there and talk about it.

39 (Pages 150 - 153)

Page 154

1      MR. MARTIN: Can we take a break and
2 then go there and talk about it? Off the record.
3      (A break was taken)
4      MR. MARTIN: Let's go back on the record
5 and mark a new exhibit, which is your 2018 expert
6 report.
7      (2018 report of Sonal Singh, M.D.,
8 M.P.H., Exhibit 18, marked)
9   A. Back with O'Brien later?
10   Q. We're going to go back and forth. So if
11 you can keep O'Brien up, that would be great.
12   A. Sure.
13      MR. TISI: You mean old report, new
14 report or --
15      MR. MARTIN: Potentially all three. I'm
16 sorry the table is so small.
17      MR. TISI: No. It's okay. You had
18 nothing to do with the table. I just wanted to make
19 sure --
20      MR. MARTIN: I did not, no.
21   Q. Look at page 49 of your 2018 report.
22   A. Yeah.
23   Q. So this is the Women's Health Initiative
24 study reported in Houghton. Do you see where you
25 noted that the study had only 429 ovarian cancer

Page 155

1 cases?
2   A. Yes.
3   Q. Do you see at the beginning of the second
4 paragraph on page 50 where you noted it as 12 --
5 there were 12.4 mean years of follow-up?
6   A. Where is that? I'm sorry.
7   Q. The beginning of the first paragraph on
8 page 50 of your 2018 report.
9   A. Okay. 50. Right?
10   Q. 50.
11   A. Yeah.
12   Q. Okay. So let's compare that to the nurses
13 -- excuse me -- the Women's Health Initiative study
14 in O'Brien Table 1.
15   A. Sure.
16   Q. Now, 659 cases and 17.4 average years of
17 follow-up. Do you see that?
18   A. That is correct.
19   Q. Okay. So substantially more on both --
20 substantially more cases and longer follow-up.
21   A. Yes. The number of cases has increased.
22 Follow-up has increased. But there is, you know,
23 obviously -- if you only look at the Women's Health
24 Initiatives, that's true.
25      But NHS is, you know -- NHSII has very

Page 156

1 limited follow-up. And then even for WHI, if you
2 look at the footnote to that table, they say that
3 pool's baseline oophorectomies were not recorded.
4      So we don't know what happened to women who
5 got an oophorectomy after exposure and developed
6 ovarian cancer so -- because they were not
7 collecting data on ovarian cancer -- oophorectomy.
8   Q. They were collecting data on ovarian
9 cancer.
10   A. Yeah. But some of these oophorectomies
11 could be due to ovarian cancer. That is the same
12 case with NHSII.
13   Q. Okay.
14   A. Because data were reported in two-year
15 cycles, we did not sense for oophorectomy that
16 occurred after 2013, whereas NHS and Sister did
17 sense it.
18   Q. So let's talk about NHSII. That's entirely
19 new data reported for the first time in O'Brien.
20   A. Yes.
21   Q. Okay. And then NHSI, which you talked
22 about in your initial report on pages 47 and 48 --
23   A. Yes.
24   Q. Okay. Initially, there were 307 cases of
25 ovarian cancer.

Page 157

1   A. Yeah.
2   Q. And now there are 1,258.
3   A. That is correct.
4   Q. So about -- more than triple -- more than
5 quadruple, actually.
6   A. Yeah. That is correct. But we have to
7 examine that. The analysis in that study, 2000,
8 page 47 -- if you go to page 48, they report there
9 was an increase -- all the analyses adjusted for
10 tubal ligation. Now here, we have analysis which
11 interact by, you know, age adjusted for -- after
12 adjusting for co-variants.
13      So tubal ligation, if you look at page 40
14 in the first line, tubal ligation and parity were
15 confounders in that analysis.
16      MR. MARTIN: Let's go off the record.
17 There's a knock at the door.
18      (A break was taken)
19      MR. MARTIN: Back on the record.
20   Q. I believe I asked you about the increased
21 sample size in the Nurses' Health Study reported in
22 O'Brien. And you agreed that it was more than
23 quadruple the size of the initial Nurses' Health
24 Study in terms of cases.
25   A. Yes. And I also pointed out the specific

40 (Pages 154 - 157)

Page 158

1 issue that the first Nurses' Health Study adjusted
2 for the confounder of tubal ligation, whereas here,
3 now they have started to look at -- in fact, all the
4 three studies -- Sister and WHI also -- adjusted it
5 as a confounder. So now, you know, there's a
6 separate analysis. So it's something to note, that
7 when we are looking at these numbers, what are the
8 implications of that.
9    Q. Those numbers wouldn't -- the -- I'm trying
10 to get at the power of the study. Whether it
11 adjusted for tubal ligation would not address the
12 power of the study, would it?
13    MS. PARFITT: Objection.
14    A. It would. It would. Because -- why?
15 Because power also depends on confounders. Right?
16 Power is -- you're talking about unadjusted power
17 versus adjusted power. Powers is -- numbers is one
18 issue. But what are the other issues?
19    You know, we've talked about confounding
20 and recall bias. So power is just you -- obviously
21 -- number is one issue. The other is etiologic
22 follow-up time. For example, NHSII, you add this to
23 million-year follow-up time. I'm not sure any of it
24 has etiologic relevance. 3 .8 years of follow-up,
25 you present that to an ovarian cancer researcher and

Page 159

1 -- it's not relevant. So it's not just the years.
2 It's -- the question is what is relevant years?
3    And I said, you know, NHS and WHI are
4 informative. NHSII is really not informative. I'm
5 not even sure why one would include a study of
6 limited follow-up in the same analysis.
7    Q. You mentioned earlier that you thought
8 NHSII was not a major contributor to the pooled
9 estimate.
10    A. Yes.
11    Q. Okay.
12    A. It isn't.
13    Q. Okay. Did you note the increased follow-up
14 time in these studies anywhere in your 2023 report?
15    A. Let me take a look. Please give me one
16 second.
17    MS. PARFITT: Can I direct him to pages?
18    MR. MARTIN: Yes.
19    MS. PARFITT: Page 16, you're talking
20 about your cohort studies, Doctor, if that helps
21 you, page 16.
22    THE WITNESS: No.
23    MS. PARFITT: I think the question was
24 follow-up time. Is that right?
25    MR. MARTIN: Whether you noted the

Page 160

1 increased follow-up time.
2    MS. PARFITT: Right. If you look at
3 page 16 of your report.
4    A. Yeah. So, I mean, not specifically for
5 each of the studies. But if you go to page 16, I do
6 talk about follow-up in the context of discussion of
7 these studies, not specifically in that section on
8 O'Brien.
9    But this is where I'm discussing in the
10 section on the Health Canada reports assessment of
11 these studies where they talk about follow-up time.
12 Only four years of follow-up -- the NHSII was added
13 to the O'Brien analysis, and only four years of
14 follow-up was added.
15    Q. When you're talking about these studies --
16 when you're talking about the Gonzalez study in the
17 second paragraph under "cohort studies" --
18    A. Sure.
19    Q. -- and you note a median of 6.6 years of
20 follow-up, that's the initial Gonzalez study;
21 correct?
22    A. That is true.
23    Q. Not the updated version, O'Brien?
24    A. No.
25    Q. Similarly, when you talk about Houghton in

Page 161

1 the next paragraph, 12.4 --
2    A. That's the initial. And I think those are
3 the references cited there.
4    Q. Okay. Can we skip back to page 11 of your
5 report?
6    MS. PARFITT: '23 report?
7    MR. MARTIN: '23 report.
8    MS. PARFITT: Thank you.
9    Q. This gets back to what we were talking
10 about earlier about statistical significance in
11 P-values. It's the second-to-last paragraph of
12 page 11. "The authors interpreted an HR of 1.08
13 with a lower bound of 0.99 as being no evidence of
14 an association, which is inconsistent with the
15 American Statistical Association statement."
16    So I take it that you consider a 1.08 HR
17 with a lower bound of .99 to represent an
18 association?
19    A. Not only I do. They do, too, in their
20 subsequent -- you know, in the response to the
21 letter. They just state that this -- and I'm going
22 to read it --
23    MS. PARFITT: "They," you mean?
24    A. Dr. O'Brien, et al. Obviously, I do but --
25    Q. We're going to get to the responses to the

41 (Pages 158 - 161)

Page 162

1 letter by both Dr. O'Brien as well as Drs. Cramer
2 and Harlow in a little bit.
3        My question is whether you consider an HR
4 of 1.08 to be a strong association.
5        MS. PARFITT: Objection. Form.
6    A. Yeah. So, again, I think of strength not,
7 you know -- and I know some people -- and I may have
8 used terms like "moderate" and "strong" in the past.
9 But, you know, "strong" is more in the appropriate
10 context. I mean, is it in the appropriate public
11 health context and for an individual patient?
12        If there is a preventible risk factors --
13 for example, let's say reducing cancer by eating
14 fruits and vegetables -- 1.09 would be very strong.
15    Q. In terms of evaluating whether an observed
16 association is causal in the first instance, do you
17 consider a 1.08 hazard ratio to be strong?
18        MS. PARFITT: Objection. Form.
19    A. I wouldn't even -- I wouldn't even, you
20 know -- I don't -- I wouldn't say that that's what
21 -- I wouldn't start -- I would just interpret it in
22 the context of other data, you know. I can't look
23 at just one piece of information, 1.09. What's the
24 other context? Is there a biologic plausibility?
25 Is there dose response? I don't think you can look

Page 163

1 at association and say "Well, it's strong or not
2 strong" and consistency or inconsistency.
3    Q. Let's go back to page 10. This is your
4 discussion of the O'Brien subset involving women
5 with intact tubes. "However, they conducted a
6 prespecified analysis evaluating the risk of ovarian
7 cancer among women with patent reproductive tracts.
8 The analysis showed a statistically significant
9 excess risk for ever users and never users, even
10 after adjustment for various risk factors."
11        First of all, is access risk for ever users
12 and never users a typo there?
13        MS. PARFITT: Objection. Form.
14    A. Should be "versus."
15    Q. That's what I thought.
16    A. Yeah. "Versus never users." Yeah.
17    Q. How do you balance that result with the
18 result we talked about earlier from Cramer that
19 showed a higher odds ratio for women with a tubal
20 ligation or hysterectomy?
21        MS. PARFITT: Objection. Asked and
22 answered and covered in his 2018. But you may
23 answer.
24    A. Yeah. So, I mean, again, those are two
25 different populations. You know, Cramer's

Page 164

1 population is different. We have -- you know, if
2 you look at NHSII and Sister Study, these are
3 younger -- you know, younger women. You know, some
4 of the recruitment was for oral contraceptive use.
5        Tubal ligation occurs at different ages.
6 Hysterectomy occurs at different ages. So the --
7 where they impact hazard ratios, you know, you can't
8 compare one study to the other.
9    Q. Okay. So let's flip to page 11, the first
10 full sentence, "Other epidemiologic studies have
11 noted a significantly increased risk of ovarian
12 cancer with no tubal ligation compared to those with
13 tubal ligation." Would you agree that some studies
14 have noted the opposite of that?
15    A. That is correct.
16    Q. Let's turn back to page 52 of the O'Brien
17 study. When you get there, it's going to be the
18 final paragraph of page -- of the first column.
19    A. Is it, like, a text or --
20    Q. Yes. It's text. It should start with the
21 words "Statistical tests."
22    A. The "results" section?
23    Q. No. It's right before the "results"
24 section.
25    A. Okay.

Page 165

1    Q. "Statistical tests were two-sided, and the
2 P-value of less than .05 was considered
3 statistically significant. Because of the potential
4 for Type 1 errors due to multiple comparisons,
5 finding from subgroup and sensitivity analyses
6 should be interpreted as exploratory. All analyses
7 were conducted in SAS9.4."
8        What do you -- can you explain the concept
9 of multiple comparison testing?
10    A. Sure. Multiple testing is if, you know,
11 you conduct a study and you have or -- somehow you
12 have different questions you're trying to answer and
13 you do more than one analysis or 10 analysis or 15
14 analysis or 20, then you may want to do a correction
15 for that.
16    Q. Is that because running more analyses
17 increases the possibility that one of them will
18 appear statistically significant by chance?
19    A. Yes. But in this case, the analysis that
20 -- was etiologically relevant and was prespecified
21 is not -- I know they talk about exploratory. But
22 they even emphasize importance -- and, again, I know
23 we're going to discuss in the letter -- is not
24 necessarily just a subgroup analysis.
25    Q. So let's actually turn to what you said,

42 (Pages 162 - 165)

Page 166

1 the exploratory discussion, which is on page 56.
2     A.  Yeah.
3     Q.  It's the middle paragraph of the second
4 column beginning "When restricted."
5     A.  So it's the second text; right?
6     Q.  Yes.  It is text, but I actually may have
7 the wrong place.  I'm sorry.  I guess I'm wrong.  On
8 page 56.  It's in text.
9         MS. PARFITT:  I'm sorry, Zack.  I'm not
10 seeing it.
11        MR. MARTIN:  It's halfway through the
12 first for -- the final paragraph of page 56.
13        THE WITNESS:  Give me a second.
14        MR. MARTIN:  Begins "In this analysis."
15        MS. PARFITT:  Do you have it now?
16        THE WITNESS:  Yeah.  Yeah.  I have it.
17     Q.  That sentence is what you mentioned
18 earlier.  Says "This finding should be considered
19 only exploratory and hypothesis generating."  That's
20 referring to the finding among women with intact
21 tubes; correct?
22     A.  Yeah.  No.  I'm not mentioning that.  I'm
23 going to her letter, page 2097, where she states --
24 Dr. O'Brien states that "Therefore, even though we
25 stated that findings from subgroup analysis should

Page 167

1 be interpreted as exploratory, we do not consider
2 them all equally important and agree that the
3 positive association among women with patent tubes
4 is consistent with the hypothesis that there's an
5 association between genital powder use and ovarian
6 cancer."  That's in the letter that --
7     Q.  Correct.
8         MS. PARFITT:  Finish.  That's in the
9 letter that what?
10     A.  That she responded to Drs. Harlow and
11 others who had pointed out that.
12     Q.  Do you believe that you are using the
13 subgroup analysis for patent tubes in an exploratory
14 and hypothesis-generating way?
15        MS. PARFITT:  Objection.  Misstates his
16 testimony.
17     A.  I am or she is?
18     Q.  Do you believe that you are in your expert
19 report?
20        MS. PARFITT:  Objection.
21     A.  No.  I'm looking at etiologically relevant
22 exposure.  And as was done in the first three, you
23 know -- if you look at NHSI and, you know, WHI and
24 Sister, they were adjusting for these tubes.  So
25 they were considering them as confounders.

Page 168

1         And now we know that the mechanisms --
2 these are the mechanisms of retrograde migration of
3 talc.  So these are prespecified exploratory.  And I
4 stress the word "prespecified" because they were
5 looking for specific mechanism.
6     Q.  Just, again, to get a clear record on my
7 question, you do not believe that you are using the
8 subgroup analysis in an exploratory or hypothesis-
9 generating way in your report.
10     A.  I mean, I think it is a causal -- I'm not
11 using it as an exploratory.  I'm using it as a
12 causal, you know, hypothesis -- causal statement
13 about talc and ovarian cancer.  It's not
14 exploratory.
15     Q.  Let's look back at your report, page 11.
16     A.  New report; right?
17     Q.  New report.  I'm sorry.  Yes.
18     A.  Yeah.
19     Q.  Two thirds of the way down, it says
20 "Inability to assess tests for patency."  "The
21 authors acknowledged they did not perform tests for
22 patency, so women reported as being patent in this
23 analysis may not have patent reproductive tracts."
24 That's a concern about misclassification; right?
25     A.  Give me a second.  Okay.

Page 169

1     Q.  Do you know how -- do you know how the data
2 were collected with respect to women's patency in
3 the underlying studies?
4     A.  Self-reported.
5     Q.  Self-reported.  Do you believe most women
6 know whether they have fallopian tubes or not --
7 intact fallopian tubes or not?
8         MS. PARFITT:  Objection.  Form.  You can
9 answer that.
10     Q.  If you don't know the answer, that's fine.
11     A.  I mean, women would know that.  Yeah.  But
12 do they report it accurately?  That's two different
13 questions, you know.  "Do they know it?"  Is one
14 thing.  "Do they report it accurately?"  It's two,
15 you know -- two levels of questions.
16     Q.  Let's look at Gossett 2020.  Are you
17 familiar with this?  This is an editorial that
18 accompanied O'Brien in JAMA.
19     A.  Yes.
20        MR. MARTIN:  Okay.  We'll mark this as
21 an exhibit.  Can we go off the record for less than
22 a minute while I look at my notes.
23        (A break was taken)
24        MR. MARTIN:  Back on the record.  Let's
25 mark this as Exhibit 19.

43 (Pages 166 - 169)

Page 170

1    (2020 Dana R. Gossett, M.D. editorial,
2 Exhibit 19, marked)
3    Q. This is the Gossett editorial we were
4 talking about before the break. All right. Can we
5 look at the second page of the editorial, which is
6 page 30 of JAMA, first full paragraph?
7    Do you see the second sentence of that
8 paragraph, "It is not possible to equate a patent
9 reproductive tract with exposure and a nonpatent
10 reproductive tract with non-exposure"?
11    And they go on and explain that the reason
12 is because women who undergo tubal ligation or
13 hysterectomy and use powders in the genital area
14 cannot be assumed to have started using the product
15 only after their surgery. Do you agree with that,
16 generally?
17    A. Let me read it. Which part did you
18 mention? "Given this" -- second paragraph?
19    Q. I will just ask it as a general question.
20 Do you agree that women may undergo a tubal ligation
21 or hysterectomy after having already used talcum
22 powder?
23    A. Yes.
24    Q. So as a result, there may be women with
25 nonintact genital tracts who nevertheless have

Page 171

1 exposure to talcum powder.
2    A. Yes.
3    Q. Because they had that exposure before they
4 had surgery. Okay. If we can go down to the
5 sentence starting "The fact that."
6    A. Yes.
7    Q. "The fact that there are no significant
8 differences in the HRs in the patent," parentheses,
9 "HR, 1.13, 1.01 to 1.26, and nonpatent subgroups,
10 .99, .86 to 1.5, confirms the overall conclusion
11 that there is no demonstrable statistically
12 significant association between the use of powder in
13 the genital area and ovarian cancer risk." Do you
14 agree with that statement?
15    A. I disagree because the authors in the
16 response to letters also disagree with that. And,
17 you know, one interpretation of their tests of
18 interaction would be that the nonpatent subgroups
19 also have an increased risk because there is no
20 difference.
21    So why are we assigning the patent to be
22 nonsignificant and saying that the nonpatent is
23 driving the results? But it could be, if there's no
24 difference between the two groups -- what it could
25 mean, that the nonpatent subgroups are also

Page 172

1 elevated. So there's different ways to interpret
2 the subgroup analysis.
3    Q. Just to be clear --
4    A. Sure.
5    Q. -- is what you're saying that it could be
6 that both groups are at risk, or it could be that
7 neither group is at risk?
8    A. No. I'm saying that they -- what they're
9 interpreting is, because there is no test for
10 interaction that's different, the hazard ratio, that
11 is statistically significantly higher for the
12 patent. And, you know, the hazard ratio for
13 nonpatent is lower and not significant. They are
14 interpreting -- this is overall conclusion, that
15 there is no demonstrable (verbatim).
16    My interpretation is it is entirely plausible
17 that the nonpatent subgroups' hazard ratios and, you
18 know, the hazard ratios in the patent are similar.
19 So I have a -- not completely -- yes, it is a
20 completely different interpretation. If there's no
21 difference, .99 -- the group in .99 is the same as
22 the group in the patent.
23    Q. Okay. And would you interpret from that
24 that both groups are at risk?
25    A. Yes. I mean, that's one plausible

Page 173

1 interpretation.
2    Q. Okay.
3    A. I'm, you know -- I'm not saying that the
4 non -- but when you do tests for interaction, you
5 have to keep both plausible interpretations in mind.
6    Q. Is it also plausible that neither group is
7 at risk?
8    MS. PARFITT: Objection. Form.
9    A. I mean, we already know that the patent is
10 -- patent group was increased. It is plausible that
11 there are no differences between the groups.
12    The only -- the test for interaction only
13 tell us, because the numbers are so reduced, that
14 there are no differences. The question is now you
15 have to bring in your understanding of biology,
16 retrograde migration, other studies to interpret
17 this. You cannot just look at P of .15 and
18 interpret that.
19    How do we interpret this data? She's -- I
20 don't know he or she. But Dr. Gossett is providing
21 one interpretation. I'm bringing another
22 interpretation based on biology, based on other
23 studies, that it is entirely plausible -- I am, you
24 know -- I think the association between talcum
25 powder products and ovarian cancer in the patent

44 (Pages 170 - 173)

Page 174

1 group is causal. It's also entirely plausible that
2 the nonpatent groups have similar risks.
3    Q. Is it plausible, or has it been
4 established?
5        MS. PARFITT: Objection. Asked and
6 answered.
7    A. It is plausible. I wouldn't say that for
8 --
9    Q. Okay.
10        MR. TISI: For what? I'm sorry.
11 Continue.
12    A. I would say in this study the -- you know,
13 they don't establish that the nonpatent subgroups
14 are -- they do say that the overall risk is
15 increased. They don't establish that for nonpatent.
16    Q. Okay. The sentence that runs -- that
17 begins the end of the first column and runs into the
18 second column, "The subgroup analysis suggesting
19 that women with intact reproductive tracts who used
20 powder in the perineal area developed ovarian cancer
21 more frequently than nonusers is below the effect
22 size that epidemiologists generally consider
23 important and should not be selectively highlighted
24 by the statistically unsophisticated reader as
25 evidence of a relationship."

Page 175

1    A. I'm sorry. Where are you? First page?
2        MS. PARFITT: Go to the next page.
3    Q. This is the second page. It's the sentence
4 that spans the end of the first --
5        MS. PARFITT: Back. I'm sorry. If you
6 don't mind.
7        MR. MARTIN: No, please.
8        THE WITNESS: Sorry. I misunderstood
9 the directions.
10        MS. PARFITT: No. No. No. You're
11 right here. Right here. Starts here.
12        THE WITNESS: Okay.
13        MS. PARFITT: Then it goes up over here.
14        THE WITNESS: Got it. Sorry.
15        MS. PARFITT: Thank you.
16        MR. MARTIN: No problem.
17    Q. Do you agree --
18    A. What is the question?
19    Q. Do you agree that the effect size -- let me
20 start that over.
21      Do you agree that the difference between women
22 with intact reproductive tracts and women who did
23 not have intact reproductive tracts is below the
24 effect size that epidemiologists generally consider
25 important?

Page 176

1        MS. PARFITT: Objection. Form.
2    A. Give me one second to read this. No. I
3 disagree with that.
4    Q. Do you agree that there ever is an effect
5 size below what an epidemiologist should consider
6 important?
7        MS. PARFITT: Objection. Form.
8    A. Epidemiologists, you know, not only
9 consider effect size, they need to consider bias,
10 confounding, you know, possibility of power and
11 sample size issues.
12      So, I mean, effect size is just one aspect
13 of causal assessment. But, you know, is it a .991?
14 Is it a point -- is it 1.1? I don't have an opinion
15 on that. But I have examples in my report of very
16 small effect sizes -- I'm not going to be wedded to
17 1.09 or 1.1 -- small effect sizes that are causal.
18    Q. Can we look back at your report, page 11?
19        MS. PARFITT: Just for the record,
20 that's the '23 report.
21        MR. MARTIN: The '23 report.
22        MS. PARFITT: Thank you.
23        MR. MARTIN: If I say "report" without
24 qualification, I mean the 2023 report.
25        MS. PARFITT: Thank you. Okay. page

Page 177

1 11?
2        MR. MARTIN: Yes. "Limited statistical
3 power."
4    Q. "The number of cases of ovarian cancer in
5 24 case control studies -- N equals 13,421 -- is
6 more than sixfold higher than the number of cases of
7 ovarian cancer reported by O'Brien, et al. -- N
8 equals 2,168 -- demonstrating the limited power of
9 cohort studies to detect a significant increase in
10 risk of ovarian cancer."
11      So your position is that the lack of power
12 could be a reason that Dr. O'Brien's top-line
13 results were not statistically significant?
14    A. Yeah. And I'll explain it a little bit
15 more. So power is one aspect. But why did she get
16 their -- the numbers, she got more cancer -- there
17 were more cancers in NHSI, more follow-up time.
18 There were more cancers in NHSII and some follow-up
19 time -- but that was etiologically irrelevant --
20 then some more follow-up in WHI in follow-up time.
21      But she did not get etiologically relevant
22 exposure periods sufficient enough that, even though
23 the person years was million, she had enough power
24 to detect a, you know, significant risk.
25    Q. What do you think is a sufficient --

45 (Pages 174 - 177)

Page 178

1        MR. TISI: I'm sorry. He wasn't
2 finished.
3    Q. I'm sorry. Please finish.
4    A. I'm sorry. I would have had to calculate
5 that. Post hoc power calculations are not
6 appropriate now that we have results of the study.
7    Q. Do you recall citing in your initial report
8 an article by Narod, "Talc and ovarian cancer,"
9 2016?
10    A. Yes. And I remember the numbers they
11 quoted about power.
12    Q. Great. So let's look back -- let's look at
13 your supplemental report, paragraph 7 or -- page 7,
14 which also sites Narod, first full sentence.
15    A. Give me a second. I'm not there.
16    Q. Are you there?
17    A. Yes.
18    Q. Narod, et al. estimate that upward of
19 200,000 women would have to be enrolled in a cohort
20 study to detect an effect size of 1.2.
21    A. Sure.
22    Q. Do you agree that more than 200,000 women
23 were included in the O'Brien study?
24    A. O'Brien is not a single cohort study.
25 O'Brien is a pooled analysis of four different

Page 179

1 cohorts, each with different etiologically relevant
2 exposure period.
3        This assumes that these 2,000 (verbatim) --
4 you know, you're following these -- it's just not a
5 number. Right? It's, like, how much follow-up time
6 you're going to have. Power is not just about a
7 cohort. It's, like, how much cancer you're going to
8 have or what duration of time you're going to follow
9 them up. Yes, it has more than 200,000. But it's
10 not a single cohort study. Didn't follow them for
11 enough time.
12    Q. Let's talk about length of time followed.
13 And let's talk about the Narod article, which I will
14 mark as Exhibit 20.
15        (2016 study by Steven A. Narod,
16 Exhibit 20, marked)
17    Q. Let's look at the first -- the last
18 sentence of the first full paragraph on page 2, "In
19 order to achieve."
20    A. Page 2, last sentence of the --
21    Q. First full paragraph.
22    A. "Prospective observational studies"?
23    Q. "In order to achieve statistical
24 significance in a prospective observational
25 (verbatim) study, we need a much larger cohort,

Page 180

1 e.g., we will need to study upwards of 200,000 women
2 for ten years."
3        So the Narod article didn't just talk about
4 number of women. It also discussed follow-up time;
5 correct?
6    A. Where are you, just so that I know?
7        MS. PARFITT: Yeah. I've lost you, too,
8 Zack. I'm sorry.
9        MR. MARTIN: It's page 2.
10        MS. PARFITT: Got it.
11        MR. MARTIN: The first full paragraph.
12        MS. PARFITT: First full.
13        MR. MARTIN: I'm sorry. It's the final
14 sentence of that. Begins "In order to achieve."
15        MS. PARFITT: Right there. I was
16 looking at the second paragraph. I'm sorry. I'm
17 sorry.
18    Q. "In order it achieve statistical
19 significance in a prospective cohort study, we need
20 a much larger cohort, e.g., we will need a study of
21 upwards of 200,000 women for ten years." So Narod
22 did talk about follow-up time in addition to time;
23 correct?
24    A. Sure.
25    Q. Do you know the average follow-up time in

Page 181

1 the O'Brien pooled analysis?
2    A. Yeah. Exactly. So what you're doing in
3 O'Brien is you are adding etiologically irrelevant
4 follow-up time from NHSII and even short follow-up
5 in Sist to some of the relevant time. Obviously,
6 the time will look big, but you're not following the
7 cohorts for ten years. Where is Sist follow-up for
8 ten years? Where is NHSII follow-up for ten years
9 -- I'm sorry -- about NHSII.
10    Q. NHSI did have a follow-up of well over ten
11 years.
12    A. Yeah. I'm talking about NHSII. You're
13 adding time just to inflate the denominator, but you
14 don't have what they're asking for. And then it's
15 also a question of "Where did they come up with this
16 1.2?" That's just their, you know -- I mean, I cite
17 it. But they said "Well, say we want to estimate
18 this 1.2 risk." That's, you know -- somebody might
19 want to do 1.1. Others we've seen in case control,
20 they may be 1.3. So you may need, you know,
21 different numbers. So that's one.
22        The main thing is etiologically relevant
23 exposure. It's not just ten years of follow-up.
24 What kind of follow-up are you getting? If you add
25 NHSII follow-up, it's very early follow-up. So you

46 (Pages 178 - 181)

Page 182

1  mish and mash early with late.
2     Q.  Again, you mentioned earlier today you
3  don't believe the NHSII results influenced the
4  pooled --
5     A.  It is a minor influence.
6     Q.  Minor influence.
7     A.  Yeah.  Yeah.
8     Q.  Okay.
9     A.  But, you know, in the pooled hazard ratio,
10  because the point estimates are .81, you know, it
11  appears that there's a decrease.  But most of it is
12  because the follow-up time is limited.
13     Q.  You would agree that the average follow-up
14  time across the cohorts pooled in O'Brien is greater
15  than ten years.
16     A.  Yeah.  But, you know, the question is "What
17  -- is that follow-up time etiologically relevant?"
18  Yes, based on the Narod article, they said if you
19  want to detect 1.2, you would need 200,000 women.
20  But did they follow these 200,000 women?  And when
21  they did the etiologically relevant -- that is the
22  patent tract -- they saw it.
23     See, the Narod article doesn't talk about
24  any confounder adjustment.  So you have to follow up
25  the susceptible group for that period of time to see

Page 183

1  the risk.
2     Q.  So let's go back to your statement that the
3  -- none of the individual cohorts evaluated 200,000
4  women.  Had you looked at -- did you look at
5  individual cohorts because you do not believe that
6  the various cohorts can be productively pooled?
7     A.  No.  They can be pooled, and they did it.
8  But you have to look at the limitations of such
9  pooling.
10     Q.  Okay.
11     A.  They were pooled.  I mean, there had been
12  pooled case control studies as well.  But when you
13  harmonize data as -- we understood how they had to
14  make some choices about exposure and duration and
15  frequency, the similar thing about follow-up.  They
16  pooled it together.  But they pooled etiologically
17  irrelevant -- I use that term -- versus -- with
18  relevant, you know, that ten-year time they're
19  talking about.  And that inflates denominator.
20     Q.  Well, I'm glad you mentioned case control
21  studies because there are meta-analyses of case
22  control studies that also combine different
23  samples --
24     A.  Yeah.
25     Q.  -- correct?  And you cite some of those

Page 184

1  meta-analyses in your report; right?
2     A.  Most of them were already discussed in the
3  prior deposition.  I mean, I'm happy to discuss
4  this --
5     Q.  Not all of them, but yes.
6     A.  We can talk about it.  I have to go to my
7  report.
8        MR. MARTIN:  Can we go off the record
9  very briefly?
10        (A break was taken)
11        MR. MARTIN:  Back on the record.
12     Q.  We were discussing before the break your
13  comment that none of the individual cohorts had more
14  than -- had anywhere near 200,000 women; right?
15     A.  That's correct.
16     Q.  Okay.  Let's look at limited statistical
17  power in -- towards the bottom of page 11 of your
18  2023 report.
19        MS. PARFITT:  I'm sorry, Zack.  What
20  page?
21        MR. MARTIN:  11.
22        MS. PARFITT:  Thank you.
23     Q.  "The number of cases of ovarian cancer
24  studies in 24 case control studies, N equals
25  13,421."  So in this case, with the case control

Page 185

1  studies, you are pooling or adding together the
2  different studies to come up with the sample size;
3  right?
4     A.  No.  So, again, I'm not making comment
5  about sample size.  I'm just saying there is a --
6  the number of cases in the case control studies
7  significantly exceeds the cases even with the
8  largest pooled analysis.  That's all.
9        It's not -- power calculation for case
10  control study is not the same as -- so what Narod
11  points out is, in the context of cohort study, you
12  start out with exposure and measure outcomes.  When
13  you do a power calculation -- in fact, that is the
14  efficiency of case control studies -- is their power
15  to detect associations between exposure such as talc
16  and -- so the power calculation -- I'm not doing a
17  power calculation.  I just pointing out a
18  statement of fact, that the number of cases is more.
19     Q.  My initial question was just whether the N
20  equals 13,421 is pooling all 24 case control studies
21  that you discuss there.
22     A.  Yeah.  I mean, I have to look at which
23  reference that is.  Penninkilampi --
24     Q.  Penninkilampi?
25     A.  -- total, name of case, number.  That's

47 (Pages 182 - 185)

Page 186

1 all.
2    Q.  Does power increase linearly with sample
3 size?
4    A.  Power is not only a function of, you know,
5 sample size.  It's a function of, A, which group are
6 you talking about.  Have you -- are you going to
7 adjust for confounders?  Are there strata that
8 you're -- are etiologically relevant?  So it's not
9 just about sample size.  Power is relevant to other
10 kind of questions you set up.
11    Q.  To the extent sample size influences power,
12 is that relationship linear?
13    A.  When you say "linear," what do you mean?
14 Can you give an example?
15    Q.  Sure.  Is a six-times-larger sample six
16 times more powerful than a sample one sixth of the
17 size?
18    A.  Six times more -- no.  But case control
19 studies are more powerful in terms of power in
20 detecting association.  I mean, that is irrespective
21 of -- this number could have been only 3,000.  It
22 didn't have to be 13,000.  This is just an
23 observation of numbers.
24       This is not about -- but the comment about
25 power of case control studies is in the first report

Page 187

1 when I talk about study designs.  Case control
2 studies are more powered to detect the associations.
3    Q.  Is a -- even holding constant the number of
4 cases, in other words, is a case control study that
5 has 2,000 cases of ovarian cancer more powerful than
6 a cohort study with 2,000 cases of ovarian cancer?
7    A.  Again, you have to do confounding, bias,
8 other things.  But yes.  I mean, you could -- in
9 general, case control studies are more adequately
10 powered, you know, holding other things constant.
11    Q.  And the increased power in case control
12 studies is not only a function of the increased
13 number of cases they generally have.
14    A.  No.  Because they -- partly is a function
15 of the fact that they already start out with cases.
16 So they can, you know, recall exposure.
17    Q.  Do you recall citing a study by Berge, 2018
18 in your initial report?
19    A.  Yes.
20       MR. MARTIN:  Can that be marked as
21 Exhibit 21?
22       (2018 article by Wera Berge, et al.,
23 Exhibit 21, marked)
24    Q.  You're familiar with the Berge article,
25 2018?

Page 188

1    A.  Yeah.
2    Q.  Can we look at page 253?
3       MS. PARFITT:  If I can have a copy,
4 please.
5       THE WITNESS:  Sorry.
6       MS. PARFITT:  No.  It's okay.
7    A.  253.
8    Q.  Can we look at the first paragraph of the
9 second column beginning -- well, first of all, Berge
10 2018 was a meta-analysis of the case controlled and
11 cohort studies that were existing at that time; is
12 that right?
13    A.  It's 2016; right?
14    Q.  2018.
15       MS. PARFITT:  The bottom, 2018.
16    A.  Copyright but accepted 2016 was -- I'm just
17 trying to -- I don't have a problem --
18    Q.  It's copyright 2018.
19    A.  Okay.  That's fine.
20    Q.  But it was a -- but you are correct.  It
21 looks like it was accepted in 2016.
22    A.  Yeah.
23    Q.  So my question is this is a meta-analysis
24 of the case control and cohort studies probably that
25 were, as you said, existing as of 2016.  Right?

Page 189

1    A.  Sure.
2    Q.  Okay.  And looking at that paragraph I was
3 pointing to earlier, beginning with "It should be
4 noted," "It should be noted that the cohort studies
5 included in the meta-analysis comprised a total of
6 429 cases of ovarian" -- "cases of ovarian cases,"
7 which I assume is a typo.
8    A.  I'm sorry.  Where are you?
9    Q.  Sure.  Middle of the first paragraph?
10    A.  Got it.
11    Q.  "It should be noted that the cohort studies
12 included in the meta-analysis comprised a total of
13 429 cases of ovarian cancer (verbatim) exposed to
14 genital talc and 943 unexposed cases.  The
15 statistical power of the meta-analysis of this" --
16 "of these cohort studies to detect a RR of 1.25,
17 similar to the result of the meta-analysis of the
18 case controlled studies, was 0.99.  Thus, low power
19 of cohort studies cannot be invoked as explanation
20 of the heterogeneity of the results."  Do you
21 disagree with that statement by --
22    A.  Let me read it first a little bit.  I
23 completely disagree with them.  I think they are
24 conflating two different issues.  They are saying
25 that there are 429 cases in the -- it should be

48 (Pages 186 - 189)

Page 190

1 noted that cohort studies included in the
2 meta-analysis comprise a total of 400 cases and 940
3 unexposed cases. What is unexposed cases? Is it
4 controls?
5    Q. I believe they mean cases of ovarian cancer
6 who are not -- who are not exposed to talcum powder.
7    A. The statistical -- I'm just trying to
8 unpack what are they trying to say. The statistical
9 power of the meta-analysis to detect an RR similar
10 to the results of the meta-analysis -- okay. So
11 they are saying "We want to do a power calculation
12 for 1.25." Was .99? I don't know how they come up
13 with that number.
14    Q. But you have not done a formal power
15 calculation of this type of your own; right?
16       MS. PARFITT: Objection. Form.
17    A. I don't know -- I have to go back and look
18 at my previous report if I -- I know I talked about
19 power. I don't know if I did a power calculation.
20    Q. You did not do one in your 2023 report.
21    A. No. And the reason is post hoc power
22 calculations are, in fact, you know, frowned upon
23 and not statistically appropriate. Even in this
24 case, once they have completed the analysis, trying
25 to invoke power as an explanation for the

Page 191

1 calculation, as in, like, .99 -- "Oh, they have a
2 lot of power." No. It's a design issue. You begin
3 -- you start to think about power before you design
4 the study.
5    Q. So is your testimony that the statistical
6 analysis done in this Berge study is inappropriate?
7       MS. PARFITT: Objection.
8    A. It is flawed. It's methodologically flawed
9 because this power calculation is post hoc.
10    Q. Let's look at Exhibit 22, Taher, et al.,
11 2019.
12       (2019 article by Mohamed Kadry Taher, et
13 al., Exhibit 22, marked)
14    Q. So you talk about Berge or -- excuse me.
15       You talk about Taher on page 5 of your 2023
16 report --
17    A. Sure.
18    Q. -- Paragraph 2.
19    A. Let me get there. Yeah.
20    Q. You talk about the odds ratio and
21 confidence interval reported in this study. Let's
22 go and look at Table 2 of the Taher study, which is
23 all of page 93.
24       Let's go to Bullet 4 in that table -- which
25 candidly is not the most clear presentation of data

Page 192

1 I've ever seen -- to tumor histology. Do you see
2 where I am?
3    A. Yes. Okay.
4    Q. Okay.
5       MS. PARFITT: Are you there?
6       THE WITNESS: Yes. I can see it.
7    Q. What's the effect estimate for mucinous
8 cancer?
9    A. 05 with wide confidence intervals, .85 to
10 1.29. Is that -- I mean, I'm looking at the rows
11 across.
12    Q. That's correct. That's what I see as well.
13    A. It's not very easy to.
14    Q. That's what I see as well. Do you consider
15 that to be data that supports an association between
16 mucinous cancer and talcum powder exposure?
17       MS. PARFITT: Objection.
18    A. You know, I've evaluated -- again, sort of
19 going back to my assessment of epithelial ovarian
20 cancer. I mean, here, there are data suggest --
21 pointing out to increase endometrial. The numbers
22 when you go to mucinous are so low that it is not --
23 you know, that the fact that they see only 1.05 is
24 reasonable. But my assessment is on epithelial
25 ovarian cancer, of which mucinous is a subtype.

Page 193

1    Q. So my next -- I'd like you to look at
2 clear-cell. You see the effect estimate there is
3 0.63 with a very wide confidence interval?
4    A. Yeah. But other studies have reported
5 elsewhere. You know, Terry's pooled analysis, you
6 know, provided an increased risk of -- yes. In this
7 analysis, they don't report it. But I'm not going
8 to disaggregate -- I mean, it is relevant that these
9 are different histologic subtypes of cancer. But my
10 causality assessment applies to epithelial ovarian
11 cancer.
12    Q. Did you say -- did you mention an article
13 that you think shows an association between clear-
14 cell cancer and talc specifically?
15    A. Terry.
16    Q. Terry.
17    A. Yeah.
18    Q. That's Terry 2013?
19    A. Yes. We can look it up.
20       MS. PARFITT: No. We talked quite a bit
21 about Terry in the last deposition.
22    Q. But just to, again, be clear, your analysis
23 is not broken down by histological subtype.
24    A. No. I'm just focusing on -- I'm pointing
25 out where data suggests this or that.

49 (Pages 190 - 193)

1    Q.  Okay.  Let's look at the "duration of use"
2  bullet, which is about halfway up the page in the
3  same --
4    A.  Table?
5    Q.  -- table.
6    A.  They have to do better tables.
7    Q.  Some lines would be helpful, really.
8    A.  Okay.  Got it.
9    Q.  Okay.  Do you see that 20-plus years
10  produces the lowest point estimate and the only one
11  that's not statistically significant?
12    A.  Yeah.  But that's only one -- that's one
13  aspect of exposure.  We've discussed, I think, in
14  the past report and -- that exposure is not just
15  duration.  It's intensity.  It's frequency,
16  application.  And then if you extend to the Table 4,
17  it provides several studies that provide --
18  Table 3 -- sorry -- several studies that provide,
19  you know, the right metric for those estimations,
20  not all of them, you know.  There are some studies
21  that do not.
22       But there are some studies that provide,
23  based on the appropriate metric, such as Cramer,
24  Harlow, Mills, Whitmore, Wu, and Schildkraut.  I
25  don't know how you spell that.  It depends on the

1  metric and the specific study.
2    Q.  Would you agree that, to the extent studies
3  are able to estimate total lifetime applications,
4  some of them demonstrate a dose response and some of
5  them do not?
6       MS. PARFITT:  Objection.  Form.
7    A.  I mean, I talked about in general, you
8  know, the whole body of evidence in dose response.
9  Some studies provide evidence of dose response.
10  And, you know, I have to go back and look at the
11  references in my previous report because that
12  clearly outlines which is frequency, which is
13  duration, which is frequency and duration.  And, you
14  know, you can bring it up, and we can go through
15  study by study.
16       Taher, what he does is he -- I presume --
17  is he identifies five studies in the positive trend
18  with frequency.  Two studies suggested there might
19  be an exposure response.  Then there are other
20  studies that did not.
21       So there's, you know -- that's why in my
22  causality assessment, you know, I provided that
23  context in assessing dose response.
24    Q.  Let's look at -- let's go one page back or
25  -- two pages back.  I apologize.  Three pages back.

1    A.  Table 2 again?
2    Q.  No.  I'm sorry.  All the way back to
3  page 91, Section 3.1.  First sentence of the final
4  paragraph, "63 percent -- N equals 19 -- of the
5  studies concluded the presence of a positive
6  association between perineal" --
7       MS. PARFITT:  Do you see that?
8       THE WITNESS:  Where is that?
9       MS. PARFITT:  Page 91.  He's on the
10  wrong page.
11       THE WITNESS:  I'm on the wrong page.
12       MS. PARFITT:  91.  Here at the bottom.
13  63.
14       THE WITNESS:  Got it.
15    Q.  Do you see "63 percent -- N equals 19 -- of
16  the studies concluded the presence of a positive
17  association between perineal talc -- exposure to
18  talc -- perineal exposure to talc powder and ovarian
19  cancer risk.  10 studies concluded the absence of an
20  association.  Only one study could not reach a clear
21  conclusion"?  Do you believe that shows consistent
22  literature?
23    A.  Yeah.  To go to consistency, it's not just
24  about "This study showed this," you know, showed a
25  positive -- I mean, you'd have to actually read my

1  section on consistency.
2       Consistency is about, you know -- there's
3  going to be different point estimates because
4  different study designs and populations and whether
5  it's case controlled or cohort, even within case
6  controlled.  But are there confidence intervals
7  overlap?  When they pool these estimates in the same
8  Table 2, they don't find evidence of statistical
9  heterogeneity, if you look at the I squares for case
10  control or cohort.
11       So consistency involves examining study
12  design.  What does Bradford Hill talk about?
13  Person, place, and time.  We have different persons
14  conducting these studies in different parts of the
15  world across several decades.  We have no stat --
16  not no but very minimal statistical heterogeneity
17  and confidence intervals that overlap.
18       So yes, I agree there's consistency in this
19  literature.  And actually, my opinion, there's
20  strong evidence of consistency.
21    Q.  So let me ask you about little evidence of
22  heterogeneity in the literature.  Do you believe
23  that there's little evidence of heterogeneity
24  between the case control studies as a group and the
25  cohort studies as a group?

50 (Pages 194 - 197)

Page 198

1    A. You misconstrued what I said. Little
2 evidence? Statistical heterogeneity in the
3 meta-analysis and then a specific measure of that
4 known as I square.
5        And so if you look at the I squares at --
6 in the hospital base or population base, usually,
7 you know, 50 to 70 percent are considered
8 significant. And all the meta-analysis never reach
9 that. So it's, like, 22 percent in the case
10 controls. And even Penninkilampi doesn't get there.
11       So that's an evidence of statistical, you
12 know -- lack of statistical heterogenic -- that
13 answer to the question that there's evidence of --
14 there's evidence of consistency, despite differences
15 in point estimates, despite differences in study
16 design. So Penninkilampi, at least at that time,
17 had, you know, included those.
18    Q. When you look at the 22 percent I-squared
19 statistic for case control studies in Table 2 --
20    A. Sure.
21    Q. -- do you understand that to be a statistic
22 referring to comparing case control studies to each
23 other or case control studies to other types of
24 study design?
25    A. No. Those are pooled estimates for the

Page 199

1 case control studies.
2    Q. Okay.
3    A. Yeah.
4    Q. 22 percent number there doesn't address
5 heterogeneity between case control and cohort
6 studies; right?
7    A. No. And that we can look at in the
8 Penninkilampi meta-analysis. We should look at
9 that.
10    Q. That was published in 2018. And I think I
11 will get in trouble if I look at that. So let's --
12    A. No. But there are other -- when you pool
13 them, you still don't reach that level of concern
14 about statistical heterogeneity.
15    Q. Let's look -- well, do you know what the
16 GRADE framework -- all capital letters -- is?
17    A. Yeah. I've written chapters for the --
18    Q. Can you explain it to me?
19    A. GRADE frameworks is not one thing, you
20 know. GRADE framework is a way to provide, you
21 know, decision-makers evidence on use of
22 interventions that usually apply -- you know, you
23 have a body of evidence. You conducted a systematic
24 review. Now you want to make guidelines or some
25 other decisions about using that product or using it

Page 200

1 in practice.
2        Then you have to look at risk of bias, look
3 at how that evidence is direct to your question, how
4 precise is it, is it a publication bias. And then
5 you can make a conclusion.
6        Usually, GRADE is -- just by the fact that
7 data here are observational, it assigns a low GRADE
8 to observational studies because it doesn't matter
9 in this context or any other.
10       It starts out with low for observational
11 studies. An observational study can only be
12 up-coded for, you know, directness or if there's a
13 confounder that actually bias them towards an
14 amount.
15       So yes, I'm very familiar with the GRADE
16 framework. Actually, there's a publication on GRADE
17 in my CV.
18    Q. If you look at 4.4, Section 4.4, which is
19 page 98 of this.
20    A. Section 4.4. Yeah.
21    Q. You can see that Taher did this GRADE
22 analysis here.
23    A. They did.
24    Q. And you agree they graded the evidence very
25 low?

Page 201

1    A. Yes. Because they were looking at
2 observational data. But despite that, you know,
3 they rated the studies in that Table 2 we were
4 looking at as, you know -- between the high and low
5 risk of bias as, you know -- a lot of them as low
6 risk of bias, which provided an increase.
7        But here, they say that. But, you know,
8 they use the same data that -- when they go to the
9 full report -- which, you know, you'll probably
10 bring out some point in time -- they provide that
11 this data indicative of a causal association.
12       So GRADE is not necessarily a decision-
13 maker here. You know, GRADE is providing evidence
14 for decision-makers. But here, when we are making
15 causal determinations based on epidemiology -- which
16 is the only thing we have here. We're not going to
17 have trials.
18    Q. Well, let's look at what they say "very
19 low" means. In Footnote A to this Table 4, they
20 define "very low" as --
21    A. Yeah.
22    Q. -- "We have very little confidence in the
23 effect estimate. The true effect is likely to be
24 substantially different from the estimate of
25 effect." Do you agree with that understanding of a

51 (Pages 198 - 201)

Page 202

1  very low GRADE?
2      A.  No.  I don't think so.  And I don't think
3  -- if that was what they had interpreted, then why
4  would -- why wouldn't they have said that "We
5  maintain our conclusion that talc is a possible
6  cause of human cancer in humans based on the
7  totality of evidence" and then gone on to write a
8  report that says that "We are confident in our
9  conclusion which that there's a causal association" based
10 off the same data?
11     Q.  So let's look at the -- what you just
12 mentioned, which I believe is on the next page.  I'm
13 trying to --
14     A.  No.  It's in the same -- up line -- second
15 paragraph.
16     Q.  No.  I'm looking at the following paragraph
17 at the beginning of page 99 halfway through.  I
18 thought that's what you were --
19     A.  No, I'm not.
20     Q.  -- looking at as well because it says
21 "Despite the very low certainty assigned by the
22 GRADE evaluation, which heavily favors RCTs" --
23 which you mentioned earlier, randomized control
24 trials --
25     A.  Yeah.

Page 203

1      Q.  -- "we maintain our conclusion that talc is
2  a possible cause of human cancer in humans, based on
3  a totality of the evidence."  That's what I thought
4  you were referring to earlier.
5      A.  I was.  But then I also -- they use largely
6  the same data.  They update it in the Health Canada
7  report and go further and say that "We are confident
8  that there is indicative of a causal association."
9  So I have done lots of grading myself.  And I'm just
10 trying to explain how it works.
11         You know, most of the observational
12 literature we do, we start out with low.  And you
13 are sort of stuck with the framework.  It was really
14 designed to assess interventions, like drug
15 pharmaceutical trials and randomized control trials.
16 It wasn't designed for this particular --
17     Q.  So I just want to focus on the "talc is a
18 possible cause of human cancer" that you brought up
19 here in this passage.  Then we can talk about Health
20 Canada.
21         Is it your opinion that talc is a possible
22 cause of human cancer, or is it your opinion that
23 talc is a cause of human cancer?
24     A.  No.  I'm just quoting the statement they
25 state here, despite all the limitations.  I believe

Page 204

1  -- I'm of the opinion that talc is, you know, causal
2  and relates to the -- is a causal risk factor in the
3  development of ovarian cancer.
4      Q.  Would you agree with me that that's a step
5  further than the statement here in this paragraph?
6      A.  Yes.  Which is the same statement they made
7  in Health Canada.  Yeah.
8      Q.  You would agree with me, also, that it's --
9  that what -- the statement in this paragraph is
10 consistent with IARC's classification of talc.
11     A.  Yeah.  But that was in 2006.  There was
12 hardly any -- there were some studies at that time.
13 But they didn't have all the data that they had or I
14 have now.
15     Q.  I'm just trying to understand the meaning
16 of "possible" here.
17     A.  Yeah.  But remember, you know -- so let's
18 unpack that a little bit.  When you say "possible"
19 and "probable" in that context -- IARC context --
20 it's not the same as here, Taher.  "Possible" and
21 "probable" in the IARC context could mean Group 2B
22 to Group 2A.  We're not talking about that here.
23         I mean, they don't even explicate are you
24 talking about mechanistic data, are you talking
25 about animal data, have you ruled out bias,

Page 205

1  confounding.  So you can't just use terms "possible"
2  and "probable" in the same sentence and equate this
3  to IARC.
4      Q.  Okay.
5      A.  IARC is different.  And I've done the work
6  for IARC too.
7      Q.  You mentioned Health Canada, which includes
8  some of the same --
9      A.  Yeah.
10     Q.  -- scientists as this and, you suggested,
11 reached a stronger conclusion about the
12 carcinogenicity of talc than this article did?
13         MS. PARFITT:  Objection.  Misstates the
14 testimony and the evidence.
15     A.  I just -- my -- I'm just going to say what
16 conclusion they read.  You interpret it as stronger.
17 They interpret it as confidently evidence of a
18 causal -- indicative of a causal association.
19 That's all I mean.  It is strong.
20     Q.  So we may get to the Health Canada report
21 later this afternoon, but I just want to ask you
22 now.  Do you know the standard of review which
23 Health Canada uses under Canadian law?
24     A.  I mean --
25         MS. PARFITT:  Objection.

52 (Pages 202 - 205)

Page 206

1  A. -- they are a regulatory body. I mean, I
2  don't know all the specifics of -- yeah. But, I
3  mean, they have a 350-page supplement. I was trying
4  to review it. They are very detailed, very
5  meticulous. I am very impressed with their work.
6  Q. Do you understand the standard applied in
7  regulatory law to be the same as the standard
8  applied in tort law?
9       MS. PARFITT: Objection. Form.
10  A. I mean --
11       MS. PARFITT: He's not a lawyer.
12  Q. If the answer is you don't know, that's
13  fine.
14  A. I'm not a lawyer. I mean, I provide an
15  epidemiologic assessment on causation. I'm familiar
16  with IARC. I'm familiar with GRADE. You can ask me
17  all questions you want about how IARC comes to
18  probable and possible or, you know, sufficient
19  evidence.
20      The only thing I review is the details and
21  the methods and how did they come to that
22  conclusion. And they evaluate O'Brien. In fact,
23  several studies have been published after Health
24  Canada published their report.
25  Q. Are you familiar with Davis 2021?

Page 207

1  A. Yes.
2       MR. MARTIN: Okay. Let's mark this as
3  the next exhibit.
4       (2021 article by Colette P. Davis, et
5  al., Exhibit 23, marked)
6  Q. You talk about this in pages 8 and 9 of
7  your expert report, I believe.
8  A. Give me one second. Let me give it to
9  them. You said which page?
10  Q. I haven't said a page yet.
11  A. Okay. You said some page of your report.
12  Q. Yes. I'm sorry. It's -- I was just saying
13  you talk about Davis on pages 8 and 9 of your
14  report.
15  A. Okay. That's all.
16  Q. I believe.
17       MS. PARFITT: Do you have the Davis?
18  May I have one copy of that?
19  Q. So you see Dr. Moorman's name in the list
20  of authors on page 1660 of the Davis article?
21  A. Yeah.
22  Q. It's the list of authors.
23  A. Yeah. I didn't go through all the list,
24  but I see it now. Yes.
25  Q. Are you aware that Dr. Moorman is a

Page 208

1  plaintiffs' expert in this litigation?
2  A. Yeah. I skimmed through her deposition.
3  Q. We've asked this a couple of times. Did
4  that affect the way you evaluated the Davis paper in
5  your expert report?
6       MS. PARFITT: Objection. Asked and
7  answered.
8  A. You know, it's the same. I looked at the
9  methodology. I looked at disclosures. But, you
10  know, this is a, you know, consortium of
11  researchers, ovarian cancer -- they've published
12  many studies, not only these studies -- well-reputed
13  scientists, not just Dr. Moorman but others as well.
14      So, you know, it's not just her study.
15  Right? It's all these people. Schildkraut has
16  conducted many studies. So I have to look at the
17  methodology.
18  Q. You understand one of the purposes of this
19  study or the primary purpose of this study was to
20  examine talc use specifically in the African
21  American population; correct?
22  A. Yeah.
23  Q. Okay. And would you agree with me that
24  some studies show a greater use of talcum powder
25  among African American women than white women?

Page 209

1       MS. PARFITT: Objection. Form.
2  A. That is correct.
3  Q. Can we turn to page 1663, first paragraph,
4  the sentence that begins "Across most study sites"?
5  A. 66?
6  Q. 63.
7  A. I'm sorry.
8  Q. "Across most study sites, AA cases and
9  controls had a higher prevalence of ever use,
10  frequent use, and long-term use of genital powder
11  than white cases and controls."
12      So would you agree with me that African
13  American women not only used talcum powder at a
14  higher rate but use it more frequently on average
15  and for longer term on average?
16  A. Based on this study, yes.
17  Q. Okay. Let's turn to Table 3. It's 1665.
18  It's the top of 1665. Okay. And the all-case point
19  estimate for African American women is 1.22 with a
20  confidence interval that crosses 1. Do you see
21  that?
22  A. Yes.
23  Q. You see that, among white women, it's 1.36,
24  a higher point estimate and statistically
25  significant confidence interval? Do you see that?

53 (Pages 206 - 209)

Page 210

1  A. Give me -- yes.
2  Q. Okay. Do you have a theory for why the
3  risk would be lower among African American users,
4  despite using the product more frequently and for a
5  longer period of time?
6  A. I don't think it's lower. It's -- those
7  two estimates are -- the authors conclude that they
8  are no different. The tests of interaction were not
9  significant. The confidence intervals are not --
10 you know, overlapping. So I don't think they are
11 lower. I mean, those are -- the point estimates
12 appear to be lower, but.
13 Q. You mentioned the confidence intervals are
14 overlapping, despite the fact that the point
15 estimates are different.
16 A. Are lower.
17 Q. The point estimate for African American
18 women is lower. When we were talking about the top-
19 line results in O'Brien, you told me that it didn't
20 matter that the confidence interval overlapped 1.0.
21 So I'm just trying to understand --
22 A. Sure.
23 Q. -- when you look at point estimates and
24 when you look at confidence intervals.
25 A. I look at both. There's no, like,

Page 211

1  selective looking. It's, like, when you're trying
2  to compare the confidence intervals to examine
3  consistency. So it's not like you're making a
4  statement about strength. It's more about "Are the
5  two findings consistent?" And we should say what
6  they stated. Give me a second, and let me see what
7  they state about the results.
8       In this study, ever use was associated with
9  higher odds in both AA and white women. And the
10 population was similar in those groups, was --
11 that's it. So there's no difference between the two
12 groups. No evidence of heterogeneity by race was
13 observed.
14 Q. What I'm struggling with is, if the white
15 results and the African American results are
16 consistent because their confidence intervals
17 overlap, why wouldn't that mean that the O'Brien
18 results are consistent with 1.0 because the
19 confidence interval overlaps that? What's the
20 difference?
21 A. With whom?
22      MS. PARFITT: Objection. Form.
23 A. So the question is these -- I'm comparing
24 two different studies. You know, not even -- two
25 different analysis. And here, you have a test of

Page 212

1  interaction that is not significant.
2       So you have two where they state that both
3  are elevated and test of interaction was not
4  significant. And there's, you know, there's a lot
5  of overlap. They're the ones --
6  Q. Can you point me to the test of
7  interaction, please? I'm not seeing it.
8  A. Yeah. So you go to the second paragraph of
9  the results -- okay -- "Ever use of genital powder"
10 -- in page 1663.
11 Q. Yes.
12 A. Second paragraph, ever use was associated
13 with 32 percent higher risk. Then they provide a
14 confidence interval. When stratified by race among
15 -- the 36 percent among white women pooled also
16 shows significant, and nonsignificant higher risk
17 among African American women. So, you know, again,
18 36, 22 (verbatim) but no evidence of heterogenic.
19 So that is a test of interaction. That's what I'm
20 basing -- it's not just confidence intervals.
21 There's a test of interaction.
22 Q. Is it your position that, when a point
23 estimate is elevated and P equals 0.33, that does
24 not show a difference?
25 A. Where is P 0.33?

Page 213

1       MS. PARFITT: Objection. Form.
2  Q. "No evidence of heterogeneity by race
3  observed," parentheses, "P equals 0.33."
4  A. Yeah. So that is their conclusion. It's
5  not just my conclusion. There's no evidence of --
6  that's a test of interaction, P-value. That's not a
7  test -- that's not a stratum-specific P-value.
8  That's, when they compare the two groups, what is
9  the P-value? It's a stratum, you know. It's for
10 the test.
11 Q. Understood. Understood.
12 A. And I do agree with the authors that
13 there's no evidence of heterogeneity by race.
14 Q. You pushed back strongly this morning on
15 drawing a firm line at P equals 0.05; correct?
16 A. Sure.
17 Q. You do in your report as well.
18      MS. PARFITT: Object to the form. You
19 may continue.
20 Q. At what P-value do you draw the line to say
21 that two values are different from one another?
22 A. So I wouldn't draw the line. I'm just, you
23 know, interpreting what they said in terms of tests
24 of interaction, which are notoriously underpowered.
25 So even though they're underpowered, there are no

54 (Pages 210 - 213)

Page 214

1 difference.
2        I don't have a P-value which I can say
3 that, you know -- and sometimes authors, you know --
4 it depends on the context.  You know, is a P of .051
5 not significant or P of .049 not -- P-value is just
6 a statement that the data you have, you know, is --
7 the probability of having a data as a more extreme
8 under the hypothesis being two.  It has no direct
9 relevance to clinical significance other than
10 interpretation.  You know, it's a statement of the
11 null hypothesis.
12     Q.  Do you have to draw the line somewhere?
13     A.  Yeah.  I mean, you have to draw the line in
14 the context of what other data you have.
15     Q.  Can we turn to 1667?  Last sentence of the
16 article, "Furthermore, there was not a dose-response
17 relationship between frequency or duration of
18 genital powder use in ovarian cancer risk or any
19 significant differences in association by
20 histotype."  Did you consider this in your dose
21 response section of your report?
22     A.  Yeah.  I mean, it's in the -- noted.  I'll
23 read it for you.  There was no differences.  I have
24 the exact statement:  "By frequency of" -- page 9 --
25 "By frequency of genital powders" -- if you go to

Page 215

1 page 9 of my report, it talks about "There was no
2 difference in the association by frequency of
3 genital powder use, although both reported an
4 increased risk."
5     Q.  My question was about the section of your
6 report where you discuss -- you know what?  Strike
7 that question.
8        Can we move back to the previous column on
9 the same page?
10     A.  I didn't finish answering the question.
11 You asked me a question.
12     Q.  I'm sorry.  I thought you were done.
13     A.  No.  You asked me a question, "Did you
14 discuss the data of no dose response relationship in
15 your report?"  And I want to point out page 9 of my
16 report, second-to-last paragraph explicitly
17 discusses that.
18     Q.  Okay.  Thank you.  If you move to the
19 previous column on page 1667 of Davis.  Right.
20 First full paragraph, second paragraph -- and this
21 is, again, talking about dose response.  Do you see
22 where it says "We observed"?
23     A.  Sorry.  Second column?
24     Q.  First column, second paragraph, "We
25 observed."

Page 216

1     A.  Yeah.
2     Q.  "We observed no clear dose-response trends.
3 In contrast, AACES" --
4        MS. PARFITT:  No.  No.  Read the whole
5 sentence.  Says "We observed no clear dose-response
6 trends for frequency or" --
7     Q.  "Frequency or duration of genital powder
8 use and ovarian cancer risk among AA women or white
9 women.  In contrast, AACES reported significant
10 trends for both frequency -- less than 30 times per
11 month," comma, "daily use, and duration, less than
12 20 years, greater than or equal to 20 years of
13 genital powder use respectively.
14        "While different than AACES's, our results"
15 -- meaning the no-dose-response results -- "are
16 consistent with most prior studies that report no
17 significant dose response association between
18 genital powder use and ovarian cancer risk."  Do you
19 agree with Davis's summary of, quote, "most prior
20 studies"?
21     A.  No.  And you can go back to my previous
22 testimony, cites the studies that have, cites the
23 studies that don't.  And when they say "most," you
24 can look at the references.  They have, you know, 21
25 to 25.  So that's five, you know -- five -- 21 --

Page 217

1 that's six studies.
2        We already saw, in Taher, he presented data
3 from seven studies.  You know, five are consistent
4 and then two suggest.  So I don't know what
5 interpretation they provide.  But in their study,
6 they did not find.  And that, I have included in my
7 report.
8     Q.  Yeah.
9     A.  And most importantly, they did not
10 ascertain the duration and frequency -- the lifetime
11 applications, which is appropriate way to address
12 dose.
13     Q.  You would agree that some of the studies on
14 which you relied for showing of dose response also
15 do not ascertain --
16     A.  Yes.
17     Q.  -- the exact lifetime use.
18     A.  Yes.
19     Q.  Okay.  Can we flip back to page 1663?
20     A.  Yes.
21     Q.  Second paragraph, "When restricted to" --
22 in the middle of the paragraph.  Do you see that?
23     A.  Give me a second.  First column or second?
24     Q.  First column.  Thank you.
25        MR. TISI:  Where are you?

55 (Pages 214 - 217)

Page 218

1        MR. MARTIN: Page 1663, second
2 paragraph.
3    A. Yes.
4    Q. "When restricted to women with patent
5 reproductive tracts, the OR among all women was
6 1.27, 1.09 to 1.48. Among women without patent
7 reproductive tracts, the corresponding OR was 1.42,
8 1.17 to 1.72." Did you consider this study in your
9 evaluation of O'Brien's patent reproductive tract
10 data?
11    A. When you say "this study" and "that data,"
12 I mean, you look at the P for heterogeneity. It's,
13 again, nonsignificant. So it is -- I'm going to go
14 to my section and see what I commented or not.
15 Yeah. I did not comment on that.
16        But when they did the stratum-specific
17 analysis, while they report a higher risk with --
18 without tracts, again, they are not different. And
19 that actually goes to my counterargument for
20 Gossett, that it is entirely plausible that women
21 without patent tracts have risks similar to women
22 with patent tracts. That's what you're seeing here.
23        So yes, if we consider this, then --
24 although these are not different. I don't think
25 they are different estimates. These are overlapping

Page 219

1 estimates. Test of interactions are not
2 significant, but interpretation could be that women
3 with patent and nonpatent have similar estimates.
4    Q. Let's look at Perez 2018.
5        THE WITNESS: If you have several
6 questions, I'll take a break.
7        MR. MARTIN: Yes. We can take a break
8 now. Off the record.
9        (A break was taken)
10        MR. MARTIN: Back on the record. Before
11 we went off the record, I shared with you a Perez
12 study but --
13        THE WITNESS: I don't have it.
14        MR. MARTIN: -- we're not going to do
15 it. Instead, we're going to move on to Tanha 2021,
16 which I'd like to have marked in place of the
17 previous exhibit.
18        (2021 article by Kiarash Tanha, et al.,
19 Exhibit 24, marked)
20    Q. This is cited in page 6 and 7 of your
21 supplemental expert report.
22    A. Yeah. It's a brief reference to that.
23    Q. Yeah. And what you say in your
24 supplemental -- I'm sorry. I really shouldn't --
25 it's page 6 of your expert report, Paragraph 3.

Page 220

1 "Tanha, et al. conducted an umbrella review of two
2 systematic reviews and reported that perineal talc
3 use was associated with a statistically significant
4 increase in ovarian cancer, OR 1.279" -- excuse
5 me -- "297, 95 percent CI, 1.242 to 1.355, P less
6 than .001. Without any evidence of statistical
7 heterogeneity among studies, I squared equals 0
8 percent."
9        Can we look at the Tanha study we just had
10 marked, page 14, Table 2. Let me know when you're
11 there.
12        So perineal talc in Table 2, it says "OR
13 1.297." And for that row, there's an I squared of
14 0.0. Says there's two studies. Then it says "RR
15 1.250, I squared 38.11," two studies. So would you
16 agree with me there's four total talc studies
17 included in the Tanha article?
18    A. Not really. I mean, I don't understand
19 when you say "RR."
20    Q. I count four?
21    A. Which are the four?
22    Q. No. 6 -- turning back to Table 1, page 3.
23    A. Okay.
24    Q. No. 6 is Penninkilampi. Do you see that?
25    A. Table 1 -- okay. Table 1. Yeah.

Page 221

1    Q. Then continuing in Table 1, No. 13, the
2 Berge talc use study. Do you see that?
3    A. Sure.
4    Q. Okay. And continuing in Table 1 -- I had
5 these marked in my previous copy. But on page 8,
6 No. 247, the Taher study of perineal talc use.
7    A. Yeah.
8    Q. Okay. And on page 5, No. 124, the
9 Huncharek study of cosmetic talc use.
10    A. Yeah.
11    Q. Okay. Now, turning back to -- so you'd
12 agree with me there are four talc studies included
13 in Table 1 here --
14    A. Table 1, yeah.
15    Q. -- that we just went over.
16    A. Four meta-analysis.
17    Q. Yes. If we go back to Table 2, you see two
18 meta-analyses that reported odds ratios and two that
19 reported risk ratios.
20    A. I don't -- so that's the question I have.
21 Let's figure out which -- how could these meta-
22 analyses report risk ratios, because these are case
23 control studies. Let's find out which meta-analysis
24 reported -- let's bring out the four meta-analysis
25 and see if they reported risk ratios.

56 (Pages 218 - 221)

Page 222

1    Q. This is the article you cited in your
2 expert report. I'm asking you if you know, based on
3 what you put in your expert report, what they're
4 citing here for the odds ratio and what they're
5 citing for the risk ratio.
6    A. Yeah. I'm aware of that. Yeah. And I
7 think odds ratio estimate is more appropriate when
8 that -- when the -- when you are pooling case
9 control studies and cohort studies. I mean, I don't
10 -- risk ratios are not appropriate -- not -- not
11 appropriate.
12       But odds ratios are more appropriate for
13 case control studies. And I'm -- I would have to go
14 back and look at those four citations because Taher,
15 I know, reports on odds ratios. Penninkilampi also
16 reports on odds ratio. Let's see. You know, let's
17 bring out the other two. You said Berge. And what
18 else was it?
19       MS. PARFITT: Huncharek.
20    Q. We're not going to do it for the sake of
21 time.
22    A. No. But you're right.
23    Q. I'm going to ask why you chose to include
24 the odds ratio but not the risk ratio in your expert
25 report.

Page 223

1    A. Odds ratio is much more relevant for rare
2 outcome. I don't see any difference between the
3 two. I mean, it's still, you know, 1.25, still
4 significant. The estimates are -- I squared is
5 38.1, still not a concern when you think about
6 statistical heterogeneity.
7       So it doesn't make -- you know, both are
8 similar. I don't know how they would even estimate
9 risk ratios. Maybe those studies had. But then
10 what is -- because lot of, you know -- most of them
11 are case control studies. So they are using odds
12 ratios.
13    Q. So would you agree that all four of these
14 studies -- Penninkilampi, Berge, Huncharek, and
15 Taher -- were included individually either in your
16 2018 or 2023 report?
17    A. Yes.
18    Q. Okay. So what, if anything, does the Tanha
19 study add to what those studies already provided?
20    A. I'm just updating my review. I'm adding,
21 you know, whatever other people have evaluated.
22 It's a different study design. It's an umbrella
23 review. So they have looked at other reviews.
24       So, again, this is not -- this is not sort
25 of driving my -- as you asked, you know, that, okay,

Page 224

1 you know, is this -- how would we know which studies
2 you're basing your opinion on. This is one review.
3 I found it and reported it.
4    Q. This is not -- this Tanha article is not
5 just about talc; right?
6    A. Yeah. There's other risk factors, multiple
7 -- in fact, talc is a small portion.
8    Q. Right. So can we look at the first
9 paragraph of the "discussion" section on page 10?
10    A. Page?
11    Q. 10. Can you just review that paragraph?
12 And then we'll break it down sentence by sentence,
13 but can you take a moment to read all of it first.
14    A. Yes.
15    Q. So the first thing they say is -- well,
16 they say "As regards nutritional factors, intake of
17 coffee, egg, and fat can significantly enhance the
18 risk of OC." Do you see that?
19    A. Yes.
20    Q. And then they say "Estrogen and
21 progesterone therapies are also associated with
22 elevated risk of OC. Several diseases, as well as
23 some genetic polymorphisms, can significantly
24 increase the risk of OC. And other factors, like
25 obesity, overweight, smoking, and the use of

Page 225

1 perineal talc, are also accompanied by an increased
2 risk of OC."
3    A. That is correct.
4    Q. Do you see that, with regards to coffee,
5 eggs, and fat, they say "can significantly enhance
6 the risk," and with regards to "obesity, overweight,
7 smoking, and talc," they say "are also accompanied
8 by an increased risk"?
9       MS. PARFITT: You're referring now to
10 the very last sentence.
11       MR. MARTIN: Yes. Correct.
12    A. Yeah. Yeah. I did not disentangled
13 coffee, egg, or fat and get into the minutia of, you
14 know, significantly or not. I mean --
15    Q. I'm sorry. I didn't want to cut you off.
16    A. Yeah. I just want to say that, you know,
17 this was an umbrella review relevant to the
18 question. Was just cited. As you can see, I
19 devoted two lines to it.
20    Q. So you don't have an opinion on whether
21 there's a difference in meaning between
22 "significantly enhanced the risk" and "accompanied
23 by an increased risk."
24       MS. PARFITT: Objection. Form.
25    A. First of all, you'd have to do a causal

57 (Pages 222 - 225)

Page 226

1 analysis of coffee, ovarian cancer. I don't -- then
2 I would be worried about it. I'm drinking a lot of
3 coffee. So, I mean, that's a different, you know --
4 you'd have to look at it. I don't know what the
5 results on coffee are.
6    Q. Well, that was my next question. You don't
7 have an opinion on eggs, coffee, or fat, do you?
8    A. No. Obesity, yes, but not on eggs, coffee,
9 and fat.
10    Q. And your opinion is obesity can increase
11 the risk of ovarian cancer.
12    A. That is correct.
13    Q. Let's look at page 15 of this study, final
14 paragraph before the conclusion, so the second
15 column, "The ovarian carcinogenesis mechanism of
16 perineal talc use has remained unclear." Do you
17 agree with that statement?
18    A. No. No.
19    Q. No. And why don't you agree with that
20 statement?
21    A. I mean, I think the evidence for that is
22 becoming much more, you know -- is as solid as
23 Health Canada says, and Dr. O'Brien states that in,
24 you know, in one of her articles, that there's, you
25 know -- talc is an insoluble particle and has --

Page 227

1 there's evidence of retrograde migration of talc.
2       And in animal studies, when applied, it can
3 cause epithelial reaction and trigger a chronic
4 inflammation which can lead to a series of mutagenic
5 changes and lead to carcinogenesis, which is further
6 aggravated if it contains asbestos.
7    Q. So you mentioned Health Canada. Let's take
8 a look at that.
9    A. Which number is that?
10    Q. I don't think we introduced it yet. I have
11 a marked-up version of Health Canada. Where is
12 that?
13       MS. PARFITT: Hold on.
14       (April 2021 Health Canada document,
15 Exhibit 25, marked)
16    Q. I gave you a version. Are you looking for
17 yours with notes?
18    A. Yeah.
19    Q. So because we were talking about
20 plausibility and migration, I want to turn to
21 page 19 of the Health Canada report.
22       In fact, you do, in your report, as well as
23 in your testimony here, rely on Health Canada for
24 the idea of retrograde migration; right?
25    A. Yes.

Page 228

1    Q. Okay. Want to look at what Health Canada
2 says specifically. Second to last -- well, first
3 full paragraph on page 19, second-to-last sentence,
4 "Studies specifically assessing potential movement
5 of talc particles through the human body were not
6 identified in the literature."
7    A. Where is this?
8    Q. Second-to-last sentence.
9    A. Page 19?
10    Q. Page 19, yes.
11       MS. PARFITT: Wait until you find it.
12    A. "Translocation," blah, blah, blah. Where
13 is that?
14    Q. It's about two thirds of the way through
15 the first full paragraph, "Studies specifically
16 assessing."
17    A. Yeah. Yeah. Got it.
18    Q. "Studies specifically assessing potential
19 movement of talc particles through the human body
20 were not identified in the literature." Are you
21 aware of any such studies that assess the movement
22 of talc particles through the human body?
23    A. Yes. Indirectly. I mean, and I note in
24 the, you know -- in my section on -- I mean, that --
25 the fact that talc has been found in ovaries, talc

Page 229

1 has been found in lymph nodes -- I mean, when you
2 say "study specifically is assessing," if you're
3 talking about study putting a peroneal talc and
4 going up the, you know, vagina, cervix, uterus, no,
5 there is no study like that in humans.
6       But there are studies which find talc in
7 ovarian tissues, talc in -- which provide indirect
8 evidence of retrograde migration of talc. And the
9 FDA concludes that they -- the findings that
10 potential particles do migrate is indisputable.
11 It's not just me. It's FDA, other researchers as
12 well, Dr. O'Brien as well.
13    Q. Well, you'd agree that there are animal
14 studies, talc in -- which talc has not migrated to the
15 ovaries; correct?
16    A. Yeah.
17       MS. PARFITT: Objection. Form.
18    Q. Well, let's look specifically at paragraph
19 -- the following paragraph on page 19. You'd agree
20 that the Henderson study cited here introduced talc
21 into the cervical canal and did not find it in the
22 ovaries of rats; correct?
23    A. Which Henderson?
24       MS. PARFITT: '77, '79?
25    Q. Sorry. 1986. It's the one that's

58 (Pages 226 - 229)

Page 230

1 discussed in Paragraph 19.
2    A. Give me a second. This is an animal study,
3 but it says talc particles were detected in ovaries
4 of all rats that received intrauterine installation
5 as well as rats that received intravaginal treatment
6 -- I mean, all of this was discussed in biologic
7 plausibility last time. And I'm happy to discuss
8 it, but it seems like --
9    Q. The only thing I want to establish, that
10 you'd agree there are animal studies going both ways
11 on this issue.
12    A. Yes.
13        MS. PARFITT: Objection. Asked and
14 answered.
15    Q. Just wanted to address that very briefly.
16 We may return to Health Canada later today, but I
17 just wanted to address the issue while we were on
18 it. Now I want to turn to Woolen 2022.
19        MS. PARFITT: Going to Woolen.
20        MR. MARTIN: Can I introduce both Woolen
21 as Exhibit 26 and a supplemental table to that as
22 Exhibit 27?
23        (2022 article by Sean A. Woolen, et al.,
24 Exhibit 26, marked)
25        (Supplementary table, Exhibit 27,

Page 231

1 marked)
2    Q. So you discussed Woolen in Paragraph 1 on
3 page 5, the first sentence of that page of your
4 report, your 2023 report. "Woolen, et al. conducted
5 a systematic review and meta-analysis of case
6 control and cohort studies and examined the
7 relationship between frequent perineal exposure to
8 talcum powder, defined as multiple applications
9 greater than or equal to two times per week, and the
10 risk of ovarian cancer."
11        Let's look at this study. Let's look first
12 at the list of authors of this study. Woolen,
13 Lazar, and Rebecca Smith-Bindman. Do you know that
14 Dr. Smith-Bindman is an expert for plaintiffs in
15 this litigation?
16    A. That has been disclosed, yes.
17    Q. Yes. And it is, in fact, listed in the
18 conflict of interest at the end. Are you aware that
19 this article grew out of a meta-analysis that she
20 performed for this litigation?
21        MS. PARFITT: Objection.
22    A. I have no knowledge --
23        MS. PARFITT: Misstates the evidence.
24    A. -- of that meta-analysis.
25    Q. You agree that that's not mentioned in this

Page 232

1 paper; right?
2        MS. PARFITT: Objection.
3    A. How do I know --
4        MS. PARFITT: Form.
5    A. -- if that is even correct? Like, that's
6 not my, you know, determination. I'm looking at the
7 paper disclosures. That's as much as I get into it.
8    Q. Would you agree it's not disclosed in the
9 paper?
10        MS. PARFITT: Objection. Misstates the
11 evidence in the case.
12    A. If it occurred, it could have. I don't
13 know if it occurred; right? I have not looked at
14 her report or previous meta-analysis. I'm just
15 looking at this published peer-reviewed manuscript,
16 her disclosure, and her analysis.
17    Q. You agree it doesn't say it in this
18 publication.
19        MS. PARFITT: Objection. Asked and
20 answered.
21    A. No, it doesn't.
22        MS. PARFITT: He already answered the
23 question. Move on.
24        THE WITNESS: Move on.
25    Q. You've never read Dr. Smith-Bindman's

Page 233

1 litigation reports?
2    A. No.
3    Q. You never talked to her?
4    A. I don't know her.
5    Q. Okay. If this article grew out of
6 litigation work, would that affect your view of its
7 reliability?
8        MS. PARFITT: Objection.
9    A. I've already evaluated that. And the
10 disclosure is a -- complete. We know that she's,
11 you know, an expert. So, as this question has been
12 answered several times, examine the methodology,
13 acknowledge the funding sources, bias and do that
14 for the same studies for, you know, Lynch and other
15 interpretations and others.
16        So it's not just you -- you know -- it's
17 okay to -- I mean, I'm not saying it's -- as long as
18 they're disclosed, it makes it easier for the reader
19 to interpret the studies and understand. That's
20 all. And I'm not sure what you mean by the term
21 "grew out of litigation."
22    Q. We don't have time to go through and
23 compare this to Dr. Smith-Bindman's report. But
24 let's look at the first line of the "background"
25 section here. Let's look at the full "background"

59 (Pages 230 - 233)

Page 234

1 section.
2    A. "Introduction"?
3    Q. No. "Background."
4    A. In the abstract.
5    Q. In the abstract.
6    A. Okay.
7    Q. Okay. "Risk of ovarian cancer in women
8 with frequent perineal talcum powder product is not
9 well understood." Do you agree with that as a
10 starting point?
11        MS. PARFITT: Objection.
12    A. I mean, that is her context. There are
13 studies prior to her that suggest that, you know --
14 increased risk with frequent use, some. So I think
15 the question is, like, you know -- I think it's a
16 context to begin a review.
17    Q. Okay. And then the final sentence of the
18 "background," "The purpose of this study is to
19 estimate the association between frequent -- at
20 least two times per week -- perineal talcum powder
21 use and ovarian cancer." Do you see that?
22    A. Yes.
23    Q. Okay. Would you agree with me generally
24 that the reliability of a meta-analysis is
25 contingent on the selection of studies that it

Page 235

1 includes?
2    A. Why a meta-analysis? A pooled analysis
3 like O'Brien's and any study is dependent on the
4 data they decided to include, the analysis they set
5 up, what was the primary hypothesis. So it's not
6 really either -- Woolen and it's Penninkilampi and
7 everybody.
8    Q. The reason why a meta-analysis is because
9 we happen to be looking at one right now. So you
10 would agree it's true of meta-analyses, as well as
11 other things.
12        MS. PARFITT: Objection. Form.
13    A. Yes.
14    Q. Can we look at page 2527, the first full
15 paragraph on the second column, "The four
16 prospective."
17    A. Yeah.
18    Q. Can you just review that paragraph quickly?
19 Then I'll ask you some questions.
20    A. Yes.
21    Q. So I think you may have noted this in your
22 report, but they did not include the pooled analysis
23 in O'Brien. But they did -- correct?
24    A. Yeah. So they had an etiologic question
25 about, you know, frequent use. And so they

Page 236

1 contacted the authors -- actually went a step ahead
2 -- and got the data to conduct their analysis.
3    Q. I was trying to avoid a compound question.
4 But the second question was they did include some of
5 the data from O'Brien's study that came out of the
6 Nurses' Health Study.
7        MS. PARFITT: Objection to the
8 characterization of O'Brien.
9    A. They included the data that was relevant to
10 the question at hand.
11    Q. Which was some of the data reported in
12 O'Brien.
13    A. Yes.
14    Q. Okay. Can we look at page 2529, Table 1?
15    A. Table 1, yeah.
16    Q. Okay. What are they doing in this table?
17    A. They're providing an assessment of --
18 Table 1; right?
19    Q. Yes.
20    A. Quality assessment. Yeah.
21    Q. Okay. Using the Newcastle-Ottawa scale?
22    A. Yes.
23    Q. Is the Newcastle-Ottawa scale objective or
24 subjective?
25    A. I mean, any assessment is, you know -- is

Page 237

1 susceptible to interpretation. But here, too,
2 they've included studies that are, you know, low
3 quality, medium quality, high quality. So
4 obviously, anything is subject to interpretation.
5        And we can go through the questions and say
6 -- for example, the question on the Newcastle --
7 I'll give you an example why it is subject to
8 interpretation -- is adjusted for most reasonable
9 confounder. So I could say "Well, age or parity."
10 And someone else would say "No. I want age, parity,
11 or oral contraceptive." So that's subject to
12 interpretation.
13    Q. Dr. Singh, I'd appreciate it. I'm just
14 running short on time. I appreciate if you focus on
15 the question asked.
16        What study received the highest
17 Newcastle-Ottawa score here?
18    A. O'Brien.
19    Q. Okay. Do you agree with the assessment of
20 giving O'Brien a higher quality score than the case
21 control studies?
22    A. Yes.
23    Q. Okay.
24    A. And it also provides a significantly
25 increased risk. Independent of the whole analysis,

60 (Pages 234 - 237)

Page 238

1  it reports a 40 percent risk for these.
2      Q. Again, we'll get to that. Again, I'd
3  appreciate if you just answer the questions.
4      The -- can you look back at the Taher
5  article that we talked about earlier, Taher 2019?
6      A. What's the number?
7      MS. PARFITT: It's number 24.
8      Q. When you get there, can you look at
9  Table 1, which spans page 89 and 90?
10     A. Table 2. Yeah.
11     Q. Table 1 on page 90.
12     A. Yeah.
13     Q. Whittemore -- well, first of all, this
14 table also evaluated studies using NOS. That stands
15 for Newcastle-Ottawa score?
16     A. Sure.
17     Q. Look at Whittemore, which is maybe a third
18 of the way down on page 90. What's the score there,
19 the Newcastle-Ottawa score they give it?
20     A. 4.
21     Q. Let's flip back to the Woolen article. You
22 can see they also GRADE the Whittemore article. Can
23 you see what they gave it there?
24     A. 7. Yeah.
25     Q. Okay. Do you know why it was given such a

Page 239

1  higher rating in Woolen than the Taher article?
2      MS. PARFITT: Objection. Form.
3      A. I mean, they provide the reasons, you know,
4  selection, comparatively, and outcome -- exposure;
5  right? And that adds up to 7.
6      Q. Okay. Can you look at Wu, the Newcastle-
7  Ottawa score in that one in Woolen?
8      A. Yes.
9      Q. It's an 8?
10     A. Yeah.
11     Q. Can we flip back to Taher and --
12     MS. PARFITT: Again, the page?
13     MR. MARTIN: Page 90, again.
14     Q. What did they give that same article?
15     A. 7.
16     Q. Okay.
17     A. So, I mean, those ratings, as we discussed
18 -- I was trying to explain -- and more important is
19 the analysis, which excluded the low-quality
20 studies, particularly Booth. And then even after
21 they excluded Whittemore, their estimates did not
22 change.
23     So I think this issue of rating is
24 important. But perhaps even more important is
25 addressing what happens when you exclude the low-

Page 240

1  quality studies, which they've done. So yes, rating
2  you can have -- I don't know if, you know, if I went
3  through what Taher did, I don't know if I would
4  exactly replicate their ratings. It may be 1 point
5  above or 1 point below.
6      Q. That was my next question. Have you
7  attempted to grade the qualities of the studies on
8  which you rely using the Newcastle-Ottawa scale?
9      MS. PARFITT: Objection. That question
10 was asked several hours ago, quantitative --
11     A. No. I did not do a Newcastle qualitative
12 because several of -- for example, if you go to
13 Penninkilampi, they graded all the studies are high
14 quality. So they didn't exclude any studies.
15     Q. Let's move to Table 2.
16     A. Of Taher --
17     Q. Of Woolen. You can put Taher away. We can
18 do that exercise for several more studies but --
19     A. This is done?
20     Q. Yes. We're done with that. Table 2,
21 Footnote 5.
22     A. Yeah.
23     Q. So you see that Dr. O'Brien provided
24 additional data that are included only in the
25 supplementary tables; right?

Page 241

1      MS. PARFITT: Let's read what it says.
2  Let's read it into the record.
3      Q. "O'Brien did not publish on daily exposure
4  for the National Health study participants.
5  However, these data were available, and O'Brien
6  provided these data for inclusion. The entirety of
7  these data were provided and are shared in the
8  supplementary table. We include data on women with
9  intact fallopian tubes to harmonize with other
10 publications."
11     MS. PARFITT: Thank you.
12     Q. Can we look at Supplemental Table 1, which
13 is in the next exhibit?
14     A. Yes.
15     Q. So you can see here that, as the footnote
16 suggested, there are data for all women and data for
17 women with patent fallopian tubes; right?
18     A. That is correct.
19     Q. Okay. In both cases, they're broken down
20 into nonusers, less frequent users, and daily users;
21 right?
22     A. That is correct.
23     Q. And so Woolen could have used the "daily
24 user" category among all women, which would have had
25 somewhere around 1200 ovarian cancer cases; right?

61 (Pages 238 - 241)

Page 242

1    MS. PARFITT: Objection to form.
2    A. Where is that number?
3    Q. I'm adding 706 plus 302 plus 216.
4    A. Yeah.
5    Q. Instead, they used, as we discussed, the
6 women with patent fallopian tubes; right?
7    A. That's correct.
8    Q. Okay. And both -- looking at daily users,
9 you'd agree that the both crude and adjusted hazard
10 ratios for daily users are higher among women with
11 patent fallopian tubes; right?
12    A. That is what O'Brien reported.
13    Q. Okay. And so by using the women with
14 patent fallop -- by using data only from women with
15 patent fallopian tubes, Woolen used a number that
16 was a higher risk ratio; right?
17    MS. PARFITT: Objection to the form.
18 Misstates what Woolen did.
19    A. Yeah. I mean, they selected what, you
20 know -- based on the question about frequency, they
21 selected one of the ratios that they felt was
22 etiologically relevant -- not felt, but --
23    Q. They selected the higher of the two
24 available odds ratios.
25    MS. PARFITT: Objection. Misstates.

Page 243

1    A. That was what was available.
2    Q. So the answer is yes?
3    MS. PARFITT: Objection.
4    A. They selected the data that was
5 etiologically relevant to the question at hand.
6    Q. It is the higher of the two odds ratios;
7 correct?
8    MS. PARFITT: Objection. He's answered
9 the question. Please.
10    Q. Let's look back at that table.
11    A. Same table?
12    Q. Same table.
13    A. Yeah.
14    Q. Let's look at less frequent users, hazard
15 ratio for all women of 0.96 and a hazard ratio for
16 patent tubes of 1.04. Do you see that? "Less
17 frequent users"?
18    A. Okay. Yeah.
19    Q. Okay. You'd agree that, if the next
20 category up was "daily users," some women in the
21 "less frequent users" category would have met the
22 greater-than-twice-a-week inclusion criteria?
23    MS. PARFITT: Objection. Form.
24    A. I don't -- I would have to go back and look
25 at how they define this. Give me a second.

Page 244

1    Q. We don't have time to read all the studies.
2 Let's just strike that question.
3    A. I didn't really understand that.
4    Q. Okay. It was not meant to be critical. I
5 was just trying to move on.
6    A. I tried to understand it too.
7    Q. So turning back to the Footnote No. 5 in
8 Woolen that we read into the record a moment ago.
9 "We include data on women with intact fallopian
10 tubes to harmonize with other publications."
11    Can we look at the "methodology" section of
12 the abstract? And can you point me anywhere that
13 references patency in the inclusion criteria?
14    MS. PARFITT: And you're limiting him
15 just to the abstract? There's a "methods" section
16 on the next page as well.
17    A. Give me one second. Let me just read it.
18 Yeah. So, I mean, to answer your question, you'd
19 have to go and look at the methods and publication
20 of primary data reporting on multiple times -- I'm
21 at "eligibility criteria and study selection,"
22 second paragraph.
23    Q. Yes.
24    A. So their criteria were --
25    MS. PARFITT: Go slowly. She's having a

Page 245

1 hard time.
2    A. "Selection criteria included publication of
3 primary data, reporting on multiple times per week
4 -- greater than two times per week -- perineal
5 exposure to talcum powder, including direct
6 application to the perineum, application to
7 underwear or sanitary napkins or on birth control
8 devices like diaphragms, at risk for malignancy.
9    "And studies were also selected for
10 baseline quality, requiring a multi-value risk
11 adjustment, study-size cancers, and defined
12 researched methods."
13    Q. Is there anything in what you just said
14 that references patency or tubal ligation?
15    A. But -- yeah. I mean, it doesn't explicitly
16 mention that. But multi-value risk adjustment, you
17 know -- it doesn't even explicitly mention parity.
18 Doesn't mention oral contraception.
19    When we do meta-analysis -- and I've done
20 65 of them -- you have to explicate your inclusion,
21 exclusion. All studies do not have the same
22 confounders they control for. So their etiologic
23 question was more than twice a week. And then once
24 they found that data, they have to choose.
25    Penninkilampi excluded many studies that,

62 (Pages 242 - 245)

Page 246

1 you know, didn't meet the criteria or had different
2 ratios of adjustment. We wouldn't exclude
3 Penninkilampi just because all the studies did not
4 adjust for the same confounder.
5     Q. I'm asking what I think is a simple
6 question. Do you see anything in the inclusion
7 criteria related to patency or tubal ligation?
8         MS. PARFITT: Objection. He's answered
9 the question.
10    A. I see it because I see multi-value
11 adjustment as not explicitly and implicitly looking
12 at the risk factors and -- which includes patency
13 and hysterectomy.
14    Q. So do you know if the other studies other
15 than O'Brien that are included in this meta-analysis
16 were limited to women with intact genital tracts?
17    A. Let's discuss the studies. I went and
18 reviewed that.
19    Q. Okay. We don't have time --
20        MS. PARFITT: Let him -- you asked a
21 question. Let him --
22    A. I'll tell you which ones did, which ones
23 didn't. This goes to the -- again, the science is
24 evolving. Some of the newer studies -- for example,
25 Schildkraut did assess for patency. Cramer reported

Page 247

1 data by patency. Some of the older studies did not.
2     So, first of all, they have to find the
3 etiologically relevant exposure category. Then if
4 that study reported data adjusting for patency, they
5 harmonize. It they can't harmonize based on
6 patency, the primary question is exposure category.
7     Q. So, again, the answer to the question is
8 that no, not all of the case control designs were
9 limited to women with patent reproductive tracts?
10        MS. PARFITT: Objection.
11    A. Yeah. That is correct. Some studies did
12 not adjust for it, especially the earlier studies
13 did not. But even excluding those earlier, low-
14 quality studies, the ratios are similar.
15    Q. Again, the answer was yes?
16    A. Yes. But because the -- that is typical of
17 a meta-analysis; not all studies will have the same
18 multi-value adjustment.
19    Q. One of the studies they look at is Wu;
20 correct?
21    A. That is correct.
22    Q. Okay. And this study is also individually
23 on your reliance list; right?
24    A. I think I discussed this last time, but I
25 probably may have -- I mean, we can look at it, if

Page 248

1 you have specific questions.
2     Q. I appreciate that, and the reason I'm doing
3 that is --
4         MR. MARTIN: Can we go off the record
5 again?
6         (A break was taken)
7         MR. MARTIN: All right. Before the
8 break, we were talking about Woolen and talking
9 about -- one of the studies that is included in the
10 Woolen meta-analysis is a 2008 study by Wu, et al.
11 So I'd like to mark that as the next exhibit.
12        (2008 article by Anna H. Wu, et al.,
13 Exhibit 28, marked)
14    Q. Let's look at Table 2, which is on
15 page 1411.
16    A. Yes.
17    Q. And you can see that frequency and duration
18 of talc use is broken down into several categories.
19    A. Sure.
20    Q. The first is -- well, the first is less
21 than 20 years -- excuse me -- less than or equal to
22 20 years and less than or equal to 10 times a month.
23 We'd all agree that that does not qualify for the
24 selection criteria in Woolen; right?
25    A. That is correct.

Page 249

1     Q. Okay. The next one is less than or equal
2 to 20 years and between 10 and 30 times a month.
3     A. So it would be twice a week and --
4     Q. Does that qualify for the selection
5 criteria in Woolen?
6     A. It's one of the estimates that qualify.
7 There are others.
8     Q. Let's go to the -- what is the RR for that
9 one?
10    A. 16 -- 1.16 and 0.63 and 2.12.
11    Q. So there are others. Let's go to the next
12 one, less than 20 years and greater than 30 times a
13 month. That qualifies as well; right?
14    A. That is correct.
15    Q. And next one doesn't qualify -- right --
16 greater than 20 years but less than or equal to 10
17 times a month?
18    A. That is correct.
19    Q. Greater than 20 years and between 10 and 30
20 times a month?
21    A. That is correct.
22    Q. Does that qualify?
23    A. Which one? Second-to-last; right?
24    Q. Second to last.
25    A. Greater than 20 years, greater than ten --

63 (Pages 246 - 249)

Page 250

1  yes.  If it is greater than 10, yes.
2      Q.  What's the risk ratio for that one?
3      A.  1.57, .99 to 2.5.
4      Q.  In the final category here, greater than 20
5  years and greater than 30 times a month, that one
6  qualifies?
7      A.  That is correct.
8      Q.  Okay.
9      A.  And that is the one they selected.
10     Q.  You've preempted several of my questions,
11 but yes.  The -- and that is the only one in which
12 the confidence interval does not cross 1 of the
13 various categories here.  Do you agree with that?
14     A.  Yes.
15     Q.  Okay.  And that is the only one that Woolen
16 selected; correct?
17     A.  Yeah.  And again, you know, this goes back
18 to the question.  Is that the answer at hand?
19 Because meta-analysis -- Woolen, me, others,
20 Penninkilampi -- we have to make analytic choices.
21 When they say twice, you know -- more than twice a
22 week, that is a -- they are looking at any -- my
23 understanding is they are looking at any etiologic
24 relevant human exposure levels.  So that's one.
25     The second point is -- and I'll -- let me

Page 251

1  explain this.  So, yes, these are eligible.  They
2  select one.  The second is, even, you know, if you
3  look at their meta-analysis forest plot, you will
4  see that the boxes for Woolen are -- the confidence
5  intervals are Y.  It's a very small black box.  The
6  biggest boxes are for NHS 2020 and Cramer.
7      So what -- again, that goes to the issue:
8  What is driving the estimates?  It's Cramer and
9  O'Brien.  So if -- even if they had selected, you
10 know -- say they selected a category, 1.57, this
11 would have only a minimal influence on their
12 meta-analytic estimate.  And they further went ahead
13 and excluded Wu -- Wu, which they note in their --
14 you know, in the results, when excluding Wu, et al.,
15 which combined perineal administration of talc with
16 other methods, the summary pool ratio was 1.44, 95
17 percent CI, 29 -- 1.29 to 1.6.
18     So what this means is all analysts have to
19 make a choice.  When I do a meta-analysis, I'm
20 comparing X drug to B.  Sometimes there will be two
21 arms.  I have to make a choice.  And they made --
22 you're right.  They selected the highest dose.  But
23 that was etiologically relevant to human exposure.
24 And Wu is not contributing significant weight to
25 this analysis.  Even if they chose -- went down, it

Page 252

1  still will only be slightly attenuated.
2      Q.  Let's unpack that a little bit.  So first
3  of all, you'd agree with me they could have included
4  all four estimates that met their inclusion
5  criteria?
6          MS. PARFITT:  Objection.  Misstates the
7  testimony.
8      A.  How could they have included all four?  I
9  don't understand.  Just because there are four
10 categories?  Is that the understanding?
11     Q.  Well, each of those categories represents a
12 different set of women; correct?
13     A.  No.
14         MS. PARFITT:  Objection.  Form.
15     A.  You cannot -- I'll explain why.  Let me
16 explain.  Yeah.  I mean, if they wanted, they could
17 have, you know, done analysis by each category.  But
18 you never -- you would never include, like, Wu A, B,
19 C, D, four different categories in one analysis
20 because there is correlation, you know.  All these
21 studies are -- data are coming from the same
22 analysis.  You can't pool them together.
23     You have to select -- so they could have
24 done -- and we've talked that -- say 1.57 is
25 relevant.  They could have done that.  But my answer

Page 253

1  is that it wouldn't have -- they couldn't have
2  pooled all of them in that same analysis.
3      Q.  Let's turn back to Wu -- to Table 2 in Wu.
4      A.  Sure.
5      Q.  And let's take, for example, the two
6  qualifying subsets for greater than 20 years.
7      A.  Yeah.
8      Q.  You see that?  So the first one has 51
9  cases, 43 controls.  Second one has 67 cases and 45
10 controls.  They couldn't have pooled those two
11 numbers together and done 117 cases and 98 controls?
12     A.  No.  The reason is -- if you go to the
13 footnote -- one adjusted for race, ethnic -- so
14 these are the hazard ratios or adjusted hazard
15 ratios.
16     So, you know, within a study, if -- you try
17 to pool, you know, your sort of correlated data.
18 Across studies, you can pool from -- but within that
19 study what could have, you know -- one approach
20 would have been look at different categories of
21 exposure, you know, in the main meta-analysis, not
22 pool these two categories together in that main
23 meta-analysis.
24     Q.  They could have asked Dr. Wu for the
25 underlying data.

64 (Pages 250 - 253)

Page 254

1    MS. PARFITT: Objection. Form.
2    A. I don't -- yeah.
3    Q. Could they have asked Dr. Wu for the
4 underlying data?
5    MS. PARFITT: Objection. Form.
6    A. I mean, I don't know if that was the
7 approach they took. They were approaching it one
8 study. They want to look at one exposure category.
9 I don't think they were trying to disaggregate
10 exposure categories.
11    Q. Well, they did ask Dr. O'Brien for her
12 underlying data.
13    A. Yeah. Because -- they asked her because
14 she did not report it. Did not report it by that
15 exposure category. Here, they already reported.
16 They chose one. If they had gone one step further
17 and said "I'm not sure that Dr. Wu would have" --
18 they would have to give primary data. Then each of
19 them would have to be adjusted to be included in
20 that analysis. But looking at this table, you could
21 not include that.
22    Q. Let's -- okay.
23    A. No. I do this for a living, I mean.
24    Q. Let's look back at the -- let's look back
25 at the Woolen forest plot. And when you mentioned

Page 255

1 the forest plot, you mean Figure 2 on page 2530?
2    A. That is correct.
3    Q. Okay. And just so I understand your
4 opinion -- your basis for saying that Cramer and
5 O'Brien are the most important studies -- no. I'm
6 sorry.
7    MS. PARFITT: Objection.
8    Q. Let me -- for saying that Cramer and
9 O'Brien contribute the most to the pooled estimate
10 is the size of the black box?
11    A. No. Yeah. That is because that is a
12 reflection of the underlying weight of the
13 meta-analysis, but it's not only that. You can get
14 even more precise because you can look at the
15 difference in the confidence interval.
16    For example, if you look at Wu, you're
17 talking about 1.34 to 3.23. So that's a wide, you
18 know, confidence interval as reflected in the, you
19 know, small box as well as -- but if you look at
20 Cramer, you see it's 78 minus 20. That would be .58
21 difference. If you look at O'Brien, it's 1.68 minus
22 17. So it's a little more than that.
23    So that's how weighting occurs. So the
24 ones that have wider confidence intervals are
25 contributing less weight, even though this is, as I

Page 256

1 understand, a random meta-analysis. So the weight
2 is being driven by these larger studies with precise
3 confidence intervals. I would have liked to see
4 weights. You know, when I do the meta-analysis, I
5 report weights.
6    Q. And by "weights," you mean a quantitative
7 assignment to each study?
8    A. Exactly. How much weight was this in the
9 analysis.
10    Q. Okay.
11    A. But I can tell you, looking at it, doing
12 this all the time, that that's what it is.
13    Q. Can we turn back to the PDQ?
14    A. Sure.
15    Q. It is Exhibit 7, just for your reference.
16    A. I got to find it now.
17    Q. Unsurprisingly, I'm going to ask you to
18 turn to the perineal talc exposure section of the
19 PDQ.
20    A. Let me find it. I'm going to find it.
21 What is it? 7?
22    Q. Exhibit 7.
23    A. Got it. What is the page number for that?
24    Q. It is not paginated.
25    A. Okay.

Page 257

1    Q. It's towards the end.
2    A. Endometriosis -- hormonal replacement
3 therapy, blah, blah, blah. Where is talc?
4    Q. Two pages behind that.
5    A. Got it.
6    Q. Okay. Thank you. Can we look at the
7 second paragraph of perineal talc exposure and
8 particularly the sentence beginning "A meta-analysis
9 of ten case control studies"?
10    A. Yes.
11    Q. Okay. "A meta-analysis of 10 case control
12 studies and a highly selected subset analysis of one
13 prospective cohort study found an association -- OR
14 1.47, 95 percent confidence interval, 1.31 to 1.65
15 -- among women who used perineal talc at least twice
16 a week." And you see that the -- that is to
17 Citation 10, which is the Woolen study; right?
18    A. That is correct.
19    Q. Okay. And you understand the highly
20 selected subset analysis of one prospective cohort
21 study to refer to the subset of O'Brien they used?
22    A. That is correct.
23    Q. Okay. Next sentence, "The subset analysis
24 of the prospective study was inconsistent with the
25 main finding of the initial report." Do you agree

65 (Pages 254 - 257)

Page 258

1  with that statement?
2      A.  No.  And let me explain why.  So, you know,
3  the first statement is just statement of results and
4  includes -- talks about O'Brien.
5          The second statement is "The subset was
6  inconsistent with the main findings of the original
7  report."  Well, the subset analysis of the
8  prospective study was the only one which actually
9  provided data on frequency by more than two times
10  per week.  The original analysis provided data --
11  they define "frequency" as weekly.  So you can't
12  compare twice a week versus weekly.
13          So, you know, there's, like, apples to
14  oranges.  O'Brien did not provide this data at the
15  time of the publication.  So this is a different set
16  of data.  So what are they comparing?  When they say
17  "The subset analysis of this prospective study was
18  inconsistent with the main" -- I mean, this whole --
19  this issue is about frequency.  And the frequency as
20  defined here is twice a week, which was not the
21  analysis in O'Brien.
22      Q.  So let me ask two questions to follow up on
23  that.  You said in your answer, I believe, that the
24  subset used in the Woolen meta-analysis was the only
25  one that satisfied the frequency inclusion criteria.

Page 259

1      A.  Two of them.  Sister did.  And Sister
2  had -- you know, they provided that Sister had,
3  like, what, two cases.
4      Q.  I'm sorry.  Yes.  That's true.  But -- that
5  is true.  But in addition, Dr. O'Brien provided the
6  all-women data that also met the inclusion criteria;
7  right?
8      A.  Which one?  Where did you see that?
9          MS. PARFITT:  Let's go back to that.
10      Q.  The all-women data we talked about earlier
11  as opposed to the women with intact tubes data?
12      A.  Yes.  Yes.  Yeah.  But -- let me clarify.
13  I don't think that this interpretation,
14  Reference 11, when they're talking about -- I think
15  they are referring to -- they have -- I don't think
16  this refers to that table of the Woolen report.
17          I think this refers to the subset analysis
18  of the prospective cohort study was inconsistent
19  with the main findings of the original report, which
20  is when they go back to O'Brien.
21      Q.  Right.
22      A.  But O'Brien's frequency is weekly.  So how
23  are you going to compare?
24      Q.  I was simply asking a follow-up question to
25  something you said in your answer.

Page 260

1      Q.  Do you know what percentage of the O'Brien
2  sample was ultimately included in Woolen?
3      A.  I didn't calculate the percentage.  I mean,
4  whatever the sample was, you know, frequency was
5  relevant.
6      Q.  Can we turn back to your report?
7      A.  Page?
8      Q.  6.  Final full paragraph, starting about
9  half to two thirds of the way through that
10  paragraph, "Among the five."
11      A.  Final -- Woolen?
12      Q.  No.  It's page 6.
13      A.  Okay.  6.  Yeah.  My report, new report?
14      Q.  Of your new report?
15      A.  Yeah.  Go ahead.
16      Q.  Okay.  "Among the five cohort studies
17  included in Health Canada's review, they reported no
18  statistically significant associations between
19  genital talcum powder use and risk of epithelial
20  ovarian cancer.  But the majority of cohort studies
21  also reported an elevated risk consistent with the
22  case control studies."  By "elevated risk," do you
23  mean a point estimate above 1.0?
24      A.  That is correct.
25      Q.  Okay.  Do you consider any point estimate

Page 261

1  above 1.0 to represent an elevated risk?
2          MS. PARFITT:  Objection.  Asked and
3  answered many hours ago exhaustively.
4      A.  I think we had this discussion.  Is it 1.2,
5  1.3?  I don't have -- you know, I think I sort of
6  take an opinion on what the American Statistical
7  Association has said.  It's really explained in
8  detail in my previous report.
9      Q.  You're on the editorial board of two new
10  journals since your previous report, Frontiers in
11  Drug Safety and Frontiers in Primary Care and Family
12  Medicine.
13      A.  That is correct.
14      Q.  Do you know if those journals require
15  submissions of P values or confidence intervals?
16      A.  All journals require.
17      Q.  Okay.
18      A.  Submission does not mean, you know -- they
19  also require cautious interpretation.  And so
20  submission of P-values is -- what does that P-value
21  mean?  And P-values are just a statement that your
22  data -- the probability of obtaining data as a more
23  extreme when your null hypothesis is true.
24      Q.  Just to be clear, the answer to my question
25  is yes, they do?

66 (Pages 258 - 261)

Page 262

1    A. Yes.
2    Q. Can we turn back to Health Canada?
3    A. Which one is that?  25.
4        MS. PARFITT:  Absolutely.  Right.
5    Q. Let's look at the biological plausibility
6  discussion in Health Canada.  Which is on page --
7        MR. MARTIN:  Can we go off the record
8  for a moment.
9        (A break was taken)
10       MR. MARTIN:  Back on the record.
11    Q. Do you see the final -- well, do you see
12  the final paragraph of that section, the second of
13  two, "Collectively, there is significant exposure
14  information lacking to permit a fulsome assessment
15  of biological gradient"?
16    A. Yes.  But in the Taher report, they already
17  provided the studies that provide evidence of, you
18  know --
19    Q. So do you agree --
20       MS. PARFITT:  Wait.  Wait.  Please let
21  him finish.
22    Q. I apologize.
23    A. That is why my weight on dose response was,
24  you know, was qualified.  It doesn't mean there
25  cannot be an assessment.  You have -- in fact, if

Page 263

1  one had not performed a fulsome assessment, then I
2  would not -- you know, I think that report should
3  not -- you know, report would be improper because
4  you have to perform -- so there is enough data to
5  perform an assessment.  But whether you have a
6  gradient or not, you have to explain.
7        You know, there are some studies that
8  provide exposure response based on how these are
9  measured, other studies that don't.  So I think this
10  sentence is not incompatible with their own, you
11  know, report -- I mean, in the study.
12    Q. I'd like to move to the previous paragraph
13  and, in particular, draw your attention to several
14  of the citations there, particularly in the first
15  parenthetical, Ballman 2019, Diette 2019, and -- in
16  the last large parenthetical -- Moorman 2018,
17  Siemiatycki 2018, Singh 2018, Smith-Bindman 2018,
18  Wolf 2018.  Do you know what those citations are?
19    A. Yeah.  They are citations to expert reports
20  in previous -- some of them.  I mean, I don't know
21  if all of them are.  Seems like it is.
22    Q. That is correct.  Are you -- is it typical
23  in scientific literature to cite litigation expert
24  reports?
25       MS. PARFITT:  Objection.  Form.

Page 264

1    A. I will provide you examples.  I mean, if
2  you look at a tobacco litigation, that has produced
3  hundreds of manuscripts.  If you look at the opioid
4  litigation, there's an archive at UCSF that has
5  produced at least -- I wouldn't say "hundreds."
6        So, you know, I would recommend that J&J
7  come to agreement with -- whenever this matter is
8  settled to make these documents available.  And I'm
9  happy to facilitate that.  Exactly.
10    Q. My question is not related to
11  confidentiality.  My question is have you in your
12  academic work cited litigation reports as support
13  for -- as scientific support?
14       MS. PARFITT:  Objection.  Different
15  question.
16    A. Not me personally.  You asked is there --
17  you know, the first question prior to that -- maybe
18  you can read that -- the question.
19    Q. I agree.  It's a different question.  It is
20  a different question.
21    A. You asked, you know, "Are there citations
22  to litigation?"  And I provided you many examples:
23  Vioxx, of, you know, tobacco, of opioids.  So as
24  long as -- you know, again, you have to evaluate.
25  Both reports were considered.

Page 265

1    Q. So can you answer the question that I
2  asked?
3    A. Me?  No, I have not.  No.  But, you know,
4  in this report I have.  In my report I have.
5    Q. Correct.  But in your academic work you
6  have not.
7    A. No.
8    Q. Can we turn to page 17?
9       MS. PARFITT:  Health Canada?
10       MR. MARTIN:  Health Canada.
11    A. Okay.  Health Canada.  Yeah.  I'm there.
12    Q. Second half of the page.
13    A. Yes.
14    Q. Second sentence of the second-to-last
15  paragraph, "There are a number of different tumor
16  types with characteristic histological (verbatim)
17  features, distinctive molecular signatures, and
18  disease trajectories.  Moreover, these tumors are
19  heterogeneous and can arise from different tissues
20  of the female reproductive tract, including the
21  fallopian tube epithelium."
22        Do you agree that different subtypes of
23  ovarian cancers have different molecular signatures?
24    A. Right.  I'm not a molecular scientist.  I
25  know that different -- what I know is that different

67 (Pages 262 - 265)

Page 266

1 types of epithelial ovarian cancer can arise. For
2 example, endometrioid can arise from different;
3 clear-cell can arise from different; mesotheliomas
4 can arise from different; you know, serous ovarian
5 cancers can arise from different.
6       I don't know what they mean by "molecular
7 signatures." I don't really understand. That's not
8 my area of expertise.
9   Q. Can we turn to page 45 of Health Canada?
10  A. Yes.
11  Q. Final sentence of the first paragraph --
12 this is sort of where they sum things up -- "While
13 there may not be consensus within the scientific
14 community regarding the" --
15      MS. PARFITT:  One second.
16  A. Where is that?  Page 45; right?
17  Q. Yes.
18  A. Final sentence of the --
19  Q. First paragraph.
20      MS. PARFITT:  Up here.
21  A. Okay.  Yeah.  Go ahead.
22  Q. "While there may not be consensus within
23 the scientific community regarding the
24 interpretation of the epidemiological information,
25 after weighing the available lines of evidence, the

Page 267

1 assessment determined that the current data are
2 indicative of a causal effect."  Is that sentence
3 consistent with your conclusion?
4   A. Yes.
5   Q. Do you agree that there is not consensus
6 within the scientific community?
7       MS. PARFITT:  Objection.  Form.
8   A. Well, that's what they, you know,
9 interpreted.  But after reviewing the whole body of
10 evidence, they conclude and I conclude that the
11 current data are indicative.  There's, you know,
12 different scientific consensus about lots of
13 different things.  But that's what they state.
14  Q. Understood.  I'm just trying to get your
15 opinion on the state of scientific opinion.  Do you
16 believe there's a scientific consensus about these
17 issues?
18  A. The scientific -- I don't really -- I mean,
19 you know, everybody has their opinions.  I think
20 that -- why make it specific to talc and ovarian
21 cancer?  It could be talc and endometrial cancer.  I
22 think that's not relevant to causality.
23      I mean, talc and -- you know, if it's
24 smoking, a lung cancer -- obviously, it's not to
25 that level.  But, you know, there is enough

Page 268

1 established scientific consensus.  I mean, you look
2 at the OCAC consortiums.  You look at, you know, the
3 studies published.
4       So it's like "What is the threshold" when
5 you say there's scientific consensus.  How many
6 scientists do you need?  Hundred?  Five hundred?
7 We've had 30 studies.  Do you need a hundred?  I
8 don't know.  I don't have a level when I can say
9 there's scientific consensus.
10  Q. Are you aware of any -- are you aware of
11 any regulator in the United States that has found
12 talc -- peroneal talc use to constitute -- cause
13 ovarian cancer?
14      MS. PARFITT:  Objection.  Form.
15  A. Yes.
16  Q. Which one?
17  A. The EPA.
18  Q. Is that --
19  A. Not -- yeah.  EPA.  The recent update.
20  Q. Your opinion is that this document
21 represents the EPA's opinion that talc use causes
22 ovarian cancer?
23  A. Yes.
24  Q. Okay.
25  A. And we can read that if you want.

Page 269

1   Q. We have 12 minutes left.  I don't think we
2 can.
3   A. You asked a question.
4   Q. I understand.
5   A. Got to get it in the record.
6   Q. Let's talk about Fletcher 2019.  We have to
7 mark it.
8       MR. MARTIN:  It's Harper, Harper 2019.
9       MS. PARFITT:  As we're going on the
10 track here, final track, you're picking up speed.
11 She is going to be losing speed.  We'll have a
12 disconnect here.  You're fired up.
13      THE WITNESS:  I'm trying to --
14      MS. PARFITT:  I know.  It's hard for her
15 to get your words.
16      (2019 article by Amy K. Harper, et al.,
17 Exhibit 29, marked)
18  Q. This is published in a journal called
19 Edizioni Minerva Medica.  Do you see that?
20  A. Yes.
21  Q. Prior to including this article in your
22 expert report, had you ever heard of that journal?
23  A. Actually, I've heard of the Minerva
24 journals.  I don't know about this Edizioni Minerva
25 Medica, but I know about the Minerva group of

Page 270

1 journals. I don't know specifically this journal.
2    Q. Can we look at the final page?
3    A. Okay.
4    Q. "Funding" section, "A portion of Ghassan M.
5 Saed's time conducting this research was paid for by
6 the lawyers representing plaintiffs in the talcum
7 powder litigation." We've talked about this a lot.
8 That doesn't affect your view of the reliability of
9 the article?
10        MS. PARFITT: Objection.
11    A. You know, to the extent that I talked about
12 it, I didn't say that it doesn't. I said it's an
13 issue of interpretation. Obviously, I have to look
14 at the methods. And, you know, I'm aware that they
15 were the authors in this.
16    Q. Can we look back on the first page in the
17 abstract? Do you see where it says "72 hours of
18 treatment"?
19    A. Yes.
20    Q. Okay. And do you see where it says that
21 "exposure to talcum powder induces malignant
22 transformation" in the "conclusion" section?
23    A. In the abstract?
24    Q. In the "conclusion" section of the
25 abstract. Yes.

Page 271

1    A. Yes.
2    Q. Okay. Does 72 hours strike you as a short
3 period of time in which to observe malignant
4 transformation?
5        MS. PARFITT: Objection. Form.
6    A. Yeah. So, again, I'm not, you know -- I
7 can interpret the studies. And I have, you know,
8 looked at them. And they are -- experiments seem
9 reasonable. And whether these occur -- malignant
10 transformations occur in 72 hours or takes 400
11 hours, I don't know that. I mean, it seems, you
12 know, reasonable on the surface. And I relied on
13 that to make my assessment.
14    Q. But it's not your area of expertise?
15    A. Yeah. I wouldn't say that this, you know
16 -- how long does it take to induce malignant
17 transformation.
18    Q. I just want to do some final housekeeping
19 the last few minutes. Can you look at your new
20 reliance list at the end of your 2023 report?
21    A. Yeah.
22    Q. Okay.
23    A. Which is which page? Yeah.
24    Q. Are the 75 articles on this reliance list
25 everything that you -- do the 75 articles on this

Page 272

1 reliance list reflect everything that you relied
2 upon in the drafting of your 2023 report?
3    A. Drafting, yes. But then I have
4 subsequently reviewed other things that was provided
5 to -- you know, since November.
6    Q. Those were the documents that were provided
7 to us on Monday?
8    A. Yeah.
9    Q. Okay. Is every document that you have
10 reviewed in forming your opinions included in one of
11 the following three places: The 2019 reliance list
12 -- excuse me -- the 2018 reliance list, the 2023
13 reliance list, and the documents produced on Monday?
14    A. Yeah. I cannot think of any other
15 document.
16    Q. Can we return to the Narod paper very
17 briefly?
18    A. Which is number?
19    Q. That is -- I can give you an unmarked copy
20 if you can't find it.
21        MS. PARFITT: It's 22.
22    A. It's probably there somewhere.
23    Q. Do you mind just referencing my copy?
24        MS. PARFITT: I've got it right here.
25    Q. Great. Thank you. Can you look at the

Page 273

1 last paragraph?
2    A. Taher or Narod?
3    Q. Narod.
4        MS. PARFITT: I'm sorry.
5    Q. I got it here. Can you just look at the
6 last paragraph there?
7    A. Last -- second page, last paragraph?
8    Q. Second page, last paragraph. Do you see
9 the third sentence, "I don't think we should try to
10 ascribe any particular case of ovarian cancer to
11 prior talc use"? See that sentence?
12    A. Yes.
13    Q. Do you agree with that sentence?
14    A. I mean, just --
15        MS. PARFITT: Objection to the form.
16 Please go ahead.
17    A. Just prior to that, they say "In the
18 interest of public health, I believe we should
19 caution women against using genital talcum powder."
20 But then they, you know -- so I -- that, to me,
21 means that they're ascribing risk to genital talcum
22 powder so -- but then they get into this particular
23 case -- any particular case.
24        So that would depend on how you -- what is
25 in that case, what is the age, what is the sex, what

69 (Pages 270 - 273)

Page 274

1 is oral contraceptive use, what is the family
2 history, what is the genetic markers.
3      I mean, blanket, you cannot say that --
4 this case. But I think someone with more experience
5 as a gynecologic oncologist could look at the data
6 and can ascribe or can refute that. This does not
7 occur.
8    Q. So you don't agree with that sentence?
9    A. Yeah.
10    Q. As a --
11    A. I don't think we should to ascribe -- I
12 think they are -- you know, they should have been
13 much more nuanced in this, that this requires
14 contextual considerations.
15    Q. Do you know who any of the bellwether
16 plaintiffs in the federal MDL are?
17    A. No.
18    Q. Do you know who any of the trial plaintiffs
19 in the New Jersey MCL are?
20    A. I don't know.
21    Q. The New Jersey state court proceedings.
22    A. No, I don't. I don't think so.
23    Q. You're not offering an opinion on the
24 causation of any individual person's ovarian cancer?
25    A. No. That's not my area of expertise.

Page 275

1    Q. You don't intend to do so in this
2 litigation?
3    A. No. That's not my area of expertise.
4       MR. MARTIN: Can we go off the record?
5 I'll review my notes.
6       (A break was taken)
7       MR. MARTIN: Back on the record.
8 Nothing further from me at this point, Dr. Singh.
9       THE WITNESS: Thank you.
10       MS. PARFITT: Dr. Singh, I just have a
11 few questions as part of the follow-up.
12             EXAMINATION
13 BY MS. PARFITT:
14    Q. Dr. Singh, you were asked questions within
15 the last hour with regard to any regulatory body
16 here in the United States that has addressed the
17 issue of asbestos in talc and ovarian cancer. Do
18 you remember that series of questions?
19    A. That is correct.
20    Q. All right. And I believe you referenced
21 the EPA; is that correct?
22    A. That is correct.
23    Q. Let me show you what we will have marked as
24 Exhibit No. 30.
25       ("EPA Asbestos Part 1; chrysotile

Page 276

1 asbestos; regulation of certain conditions of use
2 under the Toxic Substance Control Act, TSCA,"
3 document, Exhibit 30, marked)
4    Q. It's entitled "EPA Asbestos Part 1;
5 chrysotile asbestos; regulation of certain
6 conditions of use under the Toxic Substance Control
7 Act, TSCA." Do you see that?
8    A. Yes.
9    Q. The agency is the Environmental Protection
10 Agency. Do you see?
11    A. Yes.
12    Q. You see it says "Final rule" at the top?
13    A. Yes.
14    Q. Okay. Want you to turn first to the
15 summary. I'm going to reference a couple of
16 sections here. Go to the summary on page 1.
17    A. That is correct.
18    Q. It states "The Environmental Protection
19 Agency -- EPA or the agency -- is issuing this final
20 rule under the Toxic Substance Control Act to
21 address to the extent necessary the unreasonable
22 risk of injury to health presented by chrysotile
23 asbestos based on the risks posed by certain
24 conditions of use.
25       "The injuries to human health include

Page 277

1 mesothelioma and lung, ovarian, laryngeal cancers
2 resulting from chronic inhalation exposure to
3 chrysotile asbestos."
4       Is this the -- one of the sections of the
5 EPA report that you were referring to earlier when
6 counsel asked you what you were relying on for
7 purposes of your opinion that the EPA had made a
8 final rule regarding causation and asbestos and
9 talc?
10       MR. MARTIN: Objection.
11    A. No. Yeah. That was one of the segments
12 but sort of another pertinent section is on page 14.
13    Q. Tell us about that.
14    A. The last -- at the bottom of page 14 we
15 have -- so the first one you presented is summary.
16 Talks about asbestos as a cause of, you know, risk
17 factors, various cancers including mesothelioma,
18 lung, and ovarian.
19       But here at the end of page 14, the EPA
20 says, additionally, some talc deposits and articles
21 containing talc have been shown to contain asbestos.
22 Thus, EPA recognizes that use of talc may present
23 the potential for asbestos exposure.
24    Q. What significance, if any, does that have
25 to your opinions in this case?

70 (Pages 274 - 277)

Page 278

1    A. Well, it's, you know -- my opinions are --
2 overall causal opinion is that, you know, talc is --
3 talc is causally related to development of ovarian
4 cancer, not predicated on -- necessarily on the
5 basis of asbestos. But now, more and more evidence
6 is emerging such as -- you know, this was published
7 after I submitted my report -- that further enhances
8 the evidence on biologic plausibility segment on --
9 as one more further in the chain of evidence about
10 talc and ovarian cancer.
11    Q. All right. If you would turn as well to
12 page 20 of the report.
13    A. My report?
14    Q. The EPA report.
15    A. Okay. Yes.
16    Q. Subsection 1, it's called "Description of
17 unreasonable risk."
18    A. Yes.
19    Q. If you would read -- let me just ask the
20 question -- read to yourself the first half of that
21 paragraph?
22    A. Yes. "The health endpoint driving EPA's
23 assessment" -- "determination" -- I'm sorry -- "of
24 unreasonable risk for chrysotile asbestos under the
25 conditions of use is cancer from inhalation

Page 279

1 exposure. Unreasonable risk includes the risk of
2 mesothelioma and lung, ovarian, and laryngeal
3 cancers from chronic inhalation exposure."
4    Q. Similarly, what, if any, significance do
5 you attach to that ruling by the EPA as to the
6 opinions you've given in this case?
7    A. Yeah. So, as I stated in my earlier report
8 in '18, that this is one other, you know, one --
9 another pathway -- a plausible pathway. If talc
10 contaminated with asbestos is inhaled, that may be
11 another potential pathway by which there's an
12 increased causal risk of ovarian cancer.
13    Q. Okay. And lastly, if you'll turn to
14 page 92 and 93 of the EPA report that you've
15 referenced earlier as a source supporting your
16 statement that a governmental regulatory agency has
17 opined on these issues. If you go to the bottom of
18 that page, if you will.
19    A. Yes.
20    Q. Bottom of 92, it starts "EPA believes that
21 the benefits" -- "EPA believes the benefits of
22 removing chrysotile asbestos, a known human
23 carcinogen that causes cancer, mesothelioma, lung,
24 ovarian, and laryngeal cancer, from continued use in
25 the United States are significant enough to outweigh

Page 280

1 the potential additional exposure to PFAS that might
2 result from this action."
3       Do you have an opinion to a reasonable
4 degree of scientific certainty that indeed
5 chrysotile asbestos is a known human carcinogen that
6 causes mesothelioma, lung, ovarian, and laryngeal
7 cancers?
8    A. I mean, I think that is indisputable, that,
9 you know, asbestos is a carcinogen and specifically
10 for ovarian cancer. I mean, you know, did I do the
11 causal assessment? No. But IARC has done it. EPA
12 has done it. Others have found it. I would say the
13 fact that asbestos is an ovarian carcinogen is, you
14 know -- as we were talking about scientific
15 consensus, I mean, that is beyond dispute.
16    Q. And your opinions today with regard to
17 talcum powder, do they consider the fact -- are they
18 based upon the fact that talc contains asbestos?
19    A. Yeah. I mean, as I noted in my report --
20 earlier report that, you know, studies have
21 described that, you know, investigators have found
22 and FDA has found and testing by Drs. Longo and
23 others have found the presence, that talc, you know,
24 contains asbestos.
25    Q. But your opinion in this case is that

Page 281

1 talcum powder can cause ovarian cancer based upon
2 the fact that talc can contain asbestos or may not
3 contain asbestos; correct?
4    A. Yeah. My causal opinion is, you know, I --
5 to the extent I did, I mirrored that I'm not
6 predicating my opinion on the presence of asbestos.
7 But I'm, you know -- there are studies that -- and I
8 cited those studies. But now with the EPA ruling
9 and -- it is becoming more and more likely that that
10 is one more pathway that, you know, is suggesting
11 causal risk between talc and ovarian cancer.
12    Q. All right, Dr. Singh. You were -- let me
13 show you, if I will, Exhibit No. 24, the Tanha
14 article entitled "Investigation on factors
15 associated with ovarian cancer: An umbrella review
16 of systematic review and meta-analysis." That
17 was --
18       MR. MARTIN: Which exhibit is this? I'm
19 sorry.
20       MS. PARFITT: Exhibit 24.
21    Q. Let's pull yours here. Tanha?
22    A. That's the umbrella review?
23    Q. Yes. Here we go? Let me show you Exhibit
24 No. 24, Tanha. If I can direct your attention,
25 please, to page 15 of 17. Let me know when you get

71 (Pages 278 - 281)

Page 282

1  there.
2    A.  Yes.
3    Q.  All right.  You'll recall that counsel
4  asked you a question with regard to whether or not
5  you agreed or disagreed with the statement that
6  states "The ovarian carcinogenesis mechanism of
7  perineal talc use has remained unclear."  Do you
8  remember being asked that question?
9    A.  Yes.
10    Q.  What counsel did not read to you is the
11  following:  "Based on a hypothesis, however, as an
12  external stimulus, talc can ascend from the vagina
13  to the uterine tubes and trigger a chronic
14  inflammatory response, further promoting the OC" --
15  ovarian cancer -- "development, cellular injuries,
16  and oxidative stress, and local elevation of
17  inflammatory mediators -- for example, cytokines and
18  prostaglandins -- could be mutagenic, thus
19  encouraging carcinogenesis."  Do you agree or
20  disagree with that statement?
21    A.  Yeah.  And I have cited a slight different
22  version in my testimony about Dr. O'Brien providing
23  exactly -- if it's a slight difference on nuance,
24  you know -- the same suggestion of mechanism of
25  carcinogenesis.

Page 283

1    Q.  Let me show you that.  I'm not sure it was
2  marked.  It's Ogunsina and O'Brien.
3    MS. PARFITT:  If it was not marked,
4  we'll mark it as Exhibit 31.
5    (Article by Kemi Ogunsina, M.D., et al.,
6  Exhibit 31, marked)
7    MR. MARTIN:  Do you have a copy of it?
8    MS. PARFITT:  We do.  I think we have
9  three.
10    Q.  Let me show you what we've marked
11  Exhibit 31.  It's the Ogunsina and Dr. Katie O'Brien
12  article and some others.
13    A.  Yeah.
14    Q.  You referenced in speaking about the Tanha
15  article that -- the position that the Tanha editors
16  had taken as it relates to how talc can migrate and
17  cause this chronic inflammatory response, promoting
18  these cellular injuries, oxidative stress, and local
19  reason of inflammatory mediators.  What is the
20  position of the O'Brien and Ogunsina article with
21  regard to that same opinion?
22    A.  They cannot be more explicit than they are
23  here in page 1 -- 665 E1:  "Talc is a poorly soluble
24  particle" --
25    MR. MARTIN:  What page?

Page 284

1    A.  It's the first page, "introduction."
2  "Introduction," third column, third line, "Talc is a
3  poorly soluble particle.  And animal models have
4  shown that, once deposited onto epithelial cells, it
5  can cause chronic inflammation, leading to a series
6  of mutagenic events" -- exactly the same that we
7  were seeing in the other -- "and this effect is
8  worse in talc contaminated with asbestos, a known
9  carcinogen" and the cite reference 19, which is the
10  IARC working group.
11    Not only that, you know, we had a
12  discussion earlier about "Well, you know, there's no
13  evidence of migration in Health Canada."  But that
14  is not entirely correct, because if you look at
15  page 22 of -- going to page 22 of --
16    Q.  Health Canada?
17    A.  -- Health Canada, the first paragraph they
18  discuss the studies.  And they say that "This lends
19  support to the idea that externally applied talc can
20  migrate from the perineal and, therefore, the
21  Johnson study."  So it's not that Health Canada is
22  saying it cannot migrate.
23    MR. MARTIN:  Was this produced to us on
24  Monday?
25    MS. PARFITT:  It was.

Page 285

1    MR. MARTIN:  I do not see it anywhere.
2    MS. PARFITT:  Should be in the Dropbox.
3    A.  The Health Canada, I'm sure, is there.
4    MS. PARFITT:  What I'd like to do next
5  is have marked as Exhibit No. 32 an article entitled
6  "The association between douching, genital talc use,
7  and the risk of prevalent and incident cervical
8  cancer" by Katie O'Brien, Weinberg, D'Aloisio --
9  D-a-l-o-i-s-i-o -- Moore, and Sandler.  Counsel,
10  here's a copy.
11    (Article by Katie M. O'Brien, et al.,
12  Exhibit 32, marked)
13    Q.  All right, Dr. Singh.  Is Exhibit 32 an
14  article that you've previously reviewed for purposes
15  of your opinions in this case?
16    A.  Yes.
17    Q.  Okay.  And what, if any, significance does
18  this article, O'Brien, Sandler, et al., have on your
19  opinions of your -- excuse me -- talcum powder
20  exposure can cause ovarian cancer?
21    A.  So if you go to the second page of the
22  article, 2211114836, they are write in the top just
23  above the methods, "Genital talc use could also
24  plausibly contribute to cervical cancer risk.  Talc
25  applied to underwear, sanitary napkins, diaphragms,

72 (Pages 282 - 285)

Page 286

1 directly" -- "can enter the vagina and travel up the
2 reproductive tract. Talc particles may act as
3 irritants, inciting an inflammatory response and
4 potentially affect individuals' susceptibility and
5 response to HPV. Additionally, more severe
6 effects" --
7    Q. Excuse me. You missed a word.
8    A. "Or more severe effects could occur" --
9    Q. I'm sorry. You missed another word. Just
10 so the record's correct, did you say "adverse"?
11    A. Yeah. "Adverse affects could occur through
12 the talc containing asbestos, a known carcinogen
13 sometimes mined in the same locations."
14    Q. Continue.
15    A. And the epidemiological literature supports
16 a possible positive association between genital talc
17 use and ovarian cancer, in which they cite their own
18 study without any qualification about patent or
19 nonpatent tubes. So that's -- Reference 35 is
20 O'Brien, et al., the pooled analysis we've been
21 discussing.
22    Q. The 2020 article?
23    A. Yes.
24    Q. I believe I asked you what the
25 significance, if any, of this article was to your

Page 287

1 opinions.
2    A. Yeah. The significance is, first of all,
3 Dr. O'Brien, you know -- I was shown an article.
4 She talks about an experimental model. She has in
5 multiple places, you know, mechanisms and models of
6 how talc migrates, causes -- we're talking about
7 migration, inflammation, contamination with asbestos
8 causing -- she has a real outline of the model.
9       She couldn't have described it better than
10 myself and also interprets her own article without
11 any qualification for patent tubes as a possible
12 positive association.
13       MS. PARFITT: I don't have any further
14 questions, subject to counsel.
15       MR. MARTIN: Let me just review a couple
16 of things. I'll see if I have another question.
17       (A break was taken)
18       MR. MARTIN: Back on the record.
19    Q. Can I direct your attention to Ogunsina,
20 Exhibit 31?
21       MR. MARTIN: And I do just want to put
22 on the record that, as a result of a syncing error,
23 that was not produced to us on Monday. So I have
24 read it during a break.
25    Q. The outcome of interest in that study is

Page 288

1 fibroids; correct?
2    A. Yes.
3    Q. It does not evaluate the relationship -- it
4 does not directly evaluate the relationship between
5 genital talc use and cancer; correct?
6    A. Yeah. And this is a contextual study. And
7 partly why I looked at it and -- I looked at it was
8 I was interested in Dr. O'Brien's interpretation of
9 statistical significance. In fact, one of his other
10 studies, which was the Sister Study in which he
11 thought -- you know, she interprets positive
12 associations for hazard ratios that are not
13 significant, you know, the update of the Sister
14 Study by Chang.
15       So I wanted to -- I was interested in how
16 does she think about other cancers. So here, I see,
17 you know -- in fact, this goes to uterine fibroids.
18 There's knowing that -- it is not specific to talc
19 and ovarian cancer. But it provides context.
20 That's all.
21    Q. It does not measure cancer outcomes.
22    A. No.
23    Q. Okay. Can we look at the EPA document,
24 Exhibit 30, and can we look at the first page?
25    A. Page?

Page 289

1    Q. Page 1, title. Do you see where it says
2 "Asbestos Part 1; chrysotile asbestos; regulation of
3 certain conditions of use"?
4    A. Yeah.
5    Q. Okay. Can we flip down to page 15? And I
6 think this might be a -- excuse me -- the end of
7 page 14. I think this might be a passage that you
8 read with Michelle earlier. Let me know when you're
9 there.
10       MS. PARFITT: Bottom of 14.
11    A. Yes.
12    Q. And I think this is the passage that you
13 read: "Additionally, some talc deposits and
14 articles containing talc has been shown to contain
15 asbestos. The EPA recommends that certain uses of
16 talc may present the potential for asbestos
17 exposure. Where EPA identifies reasonably available
18 information demonstrating the presence of asbestos
19 in talc and where such talc applications fall under
20 Toxic Substances Control Act authority, those
21 applications of asbestos-containing talc conditions
22 will be evaluated in Part 2 of the risk evaluation
23 for asbestos."
24       So would you agree with me this Part 1 of
25 the risk evaluation was not focused on talc that may

73 (Pages 286 - 289)

Page 290

1  contain asbestos?
2      MS. PARFITT: Objection. Form.
3      A. No. They, you know -- they say they'll do
4  future evaluations. But they also say that talc,
5  you know, as they state here -- some talc deposits
6  and particles containing talc have been shown to
7  contain asbestos.
8      Q. Would you agree with me that exposure to
9  talcum powder was not the focus of this portion of
10  the EPA's review?
11     A. No.
12         MS. PARFITT: Objection.
13     Q. You would not agree with that?
14     A. No. I'm saying that this EPA review is
15  focusing on asbestos and ovarian cancer and noting
16  when that talc can occur. But they're not
17  specifically looking at peroneal talc and cosmetic
18  talc.
19         MR. MARTIN: I don't have anything
20  further.
21         MS. PARFITT: Nothing. Thank you very
22  much. We would ask to read and sign.
23     (Deposition concluded at 5:45 p.m.)
24
25

Page 291

1          REPORTER'S CERTIFICATE
2
3      I, SONYA LOPES, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, certify;
6      That the foregoing proceedings were taken
7  before me at the time and place therein set forth,
8  at which time the witness was properly identified
9  and put under oath by me;
10     That the testimony of the witness, the
11  questions propounded, and all objections and
12  statements made at the time of the examination were
13  recorded stenographically by me and were thereafter
14  transcribed;
15     That the foregoing is a true and correct
16  transcript of my shorthand notes so taken.
17     I further certify that I am not a relative or
18  employee of any attorney of the parties, nor
19  financially interested in the action.
20     I declare under penalty of perjury that the
21  foregoing is true and correct.
22                     April, 2024.
23
24  Sonya Lopes          My Commission Expires:
25  Notary Public         October 28, 2027

Page 292

1  WITNESS: Sonal Sing, M.D., M.P.H      [Volume I]
2  DATE:    April 4, 2024
3  CASE:    IN RE JOHNSON & JOHNSON TALCUM POWDER
4        PRODUCTS MARKETING, SALES PRACTICES, AND
5        PRODUCTS LIABILITY LITIGATION
6
7
8  DISTRIBUTION TO COUNSEL  The original signature
9  page/errata sheet was sent to Michelle A. Parfitt,
10  Esq., to obtain signature from the deponent. When
11  signed, please send original to Zachary W. Martin,
12  Esq., who will supply a copy of the signed errata
13  sheet to other counsel present at the deposition.
14
15  WITNESS INSTRUCTIONS  After reading the transcript
16  of your deposition, please note any change or
17  correction and the reason for it on the errata
18  sheet. DO NOT make any notations on the transcript
19  itself. Use additional sheets if necessary.
20
21  SIGN AND DATE THE ERRATA SHEET under the pains and
22  penalties of perjury and return it, along with the
23  transcript, to your counsel.
24
25

Page 293

1      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF NEW JERSEY
2  _____
   IN RE JOHNSON & JOHNSON TALCUM
3  POWDER PRODUCTS MARKETING,        MDL NO.
   SALES PRACTICES, AND PRODUCTS     16-2738(MAS)(RLS)
4  LIABILITY LITIGATION
   _____
5
       I, SONAL SINGH, M.D., M.P.H., do hereby
6  certify, under the pains and penalties of perjury,
   that the foregoing testimony is true and accurate,
7  to the best of my knowledge and belief, with the
   addition of the following changes/corrections:
8
9  Page/ Line/  Change/Correction
10  ____/____/_____
11  ____/____/_____
12  ____/____/_____
13  ____/____/_____
14  ____/____/_____
15  ____/____/_____
16  ____/____/_____
17  ____/____/_____
18  ____/____/_____
19  WITNESS MY HAND, this   day of       , 2024.
20
21
22                 _____
23                 SONAL SINGH, M.D., M.P.H
24
25  Cc: Zachary W. Martin, Esq.

74 (Pages 290 - 293)

[& - 12]                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  1:6 2:3,19 8:7,10 19:8 48:7 68:23 292:3 293:2 | 221:1,4,13,14 231:2 236:14 236:15,18 238:9,11 240:4 240:5 241:12 250:12 275:25 276:4,16 278:16 283:23 289:1,2,24 | **1.16.**  149:11 **1.17**  218:8 **1.17.**  141:5 **1.19**  147:15 **1.2**  181:16,18 182:19 261:4 **1.2.**  178:20 **1.22**  209:19 **1.23.**  147:2 | **1.47**  257:14 **1.48.**  218:6 **1.5**  171:10 **1.57**  250:3 251:10 252:24 **1.6.**  251:17 **1.65**  257:14 **1.68**  255:21 **1.72.**  218:8 |

**0**

**0**  220:7
**0.0.**  220:14
**0.05**  213:15
**0.33**  212:23,25
**0.33.**  213:3
**0.63**  193:3 249:10
**0.96**  149:13 243:15
**0.99**  161:13
**0.99.**  189:18
**001**  220:6
**01605**  1:21
**02116**  2:22
**049**  214:5
**05**  165:2 192:9
**051**  214:4

**1**

**1**  4:10 6:19 9:7 18:17 48:19 49:25 56:23 63:1 123:2 131:19 134:18 141:20 147:8 148:19 150:8 153:23 155:14 165:4 209:20 220:22,25,25

**1,258**  157:2
**1-293**  1:1
**1-32**  1:2
**1.0**  128:5,10 143:4 211:18 260:23 261:1
**1.0.**  142:5,9,13 150:1,4 210:20
**1.01**  144:16 146:5,9 148:19 149:25 171:9
**1.01.**  145:21
**1.03**  147:15
**1.04.**  243:16
**1.05**  149:11,13 150:4 192:23
**1.08**  161:12,16 162:4,17
**1.09**  147:2 150:20 162:14 176:17 218:6
**1.09.**  162:23
**1.1**  176:14,17
**1.1.**  181:19
**1.13**  171:9
**1.16**  149:13 249:10

**1.242**  220:5
**1.25**  189:16 223:3
**1.25.**  144:16 190:12
**1.250**  220:15
**1.26**  171:9
**1.27**  218:6
**1.279**  220:4
**1.29**  251:17
**1.29.**  192:10
**1.297.**  220:13
**1.3**  261:5
**1.3.**  181:20
**1.31**  257:14
**1.32.**  147:10
**1.33**  127:24 130:24
**1.33.**  131:16
**1.34**  255:17
**1.355**  220:5
**1.36**  209:23
**1.37.**  147:15
**1.42**  131:14 218:7
**1.44**  251:16

**10**  4:23 23:3 44:22,23 52:8 52:10 56:22 118:9,10 144:23 145:7 146:2 149:20 163:3 165:13 196:19 224:9 224:11 248:22 249:2,16,19 250:1 257:11 257:17
**101**  124:19,23
**104**  5:9
**11**  5:4 44:22,23 47:21 57:7,9 59:13 161:4,12 164:9 168:15 176:18 177:1 184:17,21 259:14
**11353**  291:23
**117**  5:11 253:11
**12**  5:6 85:18 86:17 106:7,23 127:9,9 144:23 145:10 146:2

[12 - 2018]                                                    Page 2

155:4 269:1
**12.4**   155:5
161:1
**1200**   241:25
**124**   221:8
**127**   5:13
**13**   5:8 30:11
43:23 44:1 52:7
68:19 104:2,4
129:14 144:23
145:7 146:2
221:1
**13,000**   186:22
**13,421**   177:5
184:25 185:20
**133**   5:15 127:24
**138**   5:17
**14**   4:11 5:10
43:25 44:1
52:12 74:18
110:14 111:18
117:12,15
220:10 277:12
277:14,19
289:7,10
**1411**   248:15
**15**   5:12 20:17
42:17 57:6
127:3,6 137:3,3
165:13 173:17
226:13 281:25
289:5
**15,000**   142:19
**15th**   14:25
**16**   4:19 5:14
28:24 35:1 42:7

43:15 133:8,10
137:1 159:19
159:21 160:3,5
249:10
**16-2738**   1:8
293:3
**1660**   207:20
**1663**   209:3
212:10 217:19
218:1
**1665**   209:17,18
**1667**   214:15
215:19
**17**   5:16 66:12
121:11 138:5,7
255:22 265:8
281:25
**17.4**   155:16
**170**   5:21
**1734**   122:1
**179**   5:23
**17th**   291:22
**18**   4:12 5:18
122:1 127:15
127:17 128:1
131:2,3,5 154:8
279:8
**1800**   150:25
**1825**   2:5
**1835**   118:6
**1837**   123:3
**1843**   118:19
**1844**   121:21
**187**   5:25
**19**   5:20 13:1
29:6 169:25

170:2 196:4,15
227:21 228:3,9
228:10 229:19
230:1 284:9
**191**   6:5
**194**   126:18
**196**   137:15
**1986**   229:25
**19th**   61:18,22

---

**2**

**2**   4:11 5:4 13:23
14:1 56:23 57:8
63:1 66:12
133:24 134:1
137:4 140:15
150:8 179:18
179:20 180:9
191:18,22
196:1 197:8
198:19 201:3
220:10,12
221:17 238:10
240:15,20
248:14 253:3
255:1 289:22
**2,000**   179:3
187:5,6
**2,168**   150:25
177:8
**2.12.**   249:10
**2.5.**   250:3
**20**   5:22 121:11
144:21,25
145:3 165:14
179:14,16

194:9 216:12
216:12 248:21
248:22 249:2
249:12,16,19
249:25 250:4
253:6 255:20
278:12
**20,000**   98:9
**200,000**   16:13
178:19,22
179:9 180:1,21
182:19,20
183:3 184:14
**2000**   157:7
**20006**   2:6
**2006**   204:11
**2008**   6:15
248:10,12
**2013**   61:10,14
156:16 193:18
**2014**   52:15
**2016**   5:12,22
23:4 91:16
117:24 118:10
126:16,19
127:2 132:17
135:3 178:9
179:15 188:13
188:16,21,25
**2018**   5:18,24
13:1 16:1 35:1
61:25 64:3 65:6
65:7 66:4 76:14
76:14,15 77:15
154:5,7,21
155:8 163:22

**[2018 - 30]**

Page 3

187:17,22,25
188:10,14,15
188:18 199:10
219:4 223:16
263:16,17,17
263:17,18
272:12
**2019**   4:19 5:10
6:4,17 12:7
14:17 15:24
16:2,3 25:2,4,8
25:11 26:16
28:22 29:8,15
30:6,18 42:7,18
61:13 66:3
68:12 70:18,22
85:12 117:12
117:14,20
126:8,20
137:16 191:11
191:12 238:5
263:15,15
269:6,8,16
272:11
**202.783.6400**
2:7
**2020**   5:16,20
51:22 83:23,24
84:20 136:23
138:3,6 153:21
169:16 170:1
251:6 286:22
**2021**   5:6 6:6,8
6:10 37:20
86:16,20
206:25 207:4

219:15,18
227:14
**2022**   6:12 18:20
20:19 37:20
230:18,23
**2023**   5:4,8
14:25 16:20
43:15 57:8
61:14,25 62:7
64:15 65:5,10
66:4,20 77:1,25
78:20 80:5
83:13 102:23
102:25 103:4,8
104:1,3 115:12
117:18 126:24
159:14 176:24
184:18 190:20
191:15 223:16
231:4 271:20
272:2,12
**2024**   1:18 5:14
14:4 48:10
133:6,7,12
291:22 292:2
293:19
**2027**   291:25
**207**   6:7
**2097**   166:23
**21**   5:24 67:1
106:10,19
187:21,23
216:24,25
**216**   242:3
**2168**   142:17

**219**   6:9
**22**   6:4 48:12,15
191:10,13
198:9,18 199:4
212:18 272:21
284:15,15
**2211114836**
285:22
**227**   6:11
**23**   6:6 49:9 80:3
83:22 102:24
161:6,7 176:20
176:21 207:5
**230**   6:13,14
**23rd**   61:19
**24**   6:8 134:25
177:5 184:24
185:20 219:19
238:7 281:13
281:20,24
**247**   221:6
**248**   6:16
**25**   6:10 42:11
59:14 216:25
227:15 262:3
**252**   140:6
**2527**   235:14
**2529**   236:14
**253**   188:2,7
**2530**   255:1
**26**   6:12 25:7
124:10 230:21
230:24
**26.2**   123:18
125:17

**269**   6:18
**27**   6:14 85:8,14
106:8,19,24
230:22,25
**275**   4:7
**276**   6:24
**28**   6:15 25:13
106:12 108:24
109:13 248:13
291:25
**283**   7:5 59:9
**285**   7:7
**29**   6:17 26:24
83:14,16 84:20
251:17 269:17
**29,000**   15:6
**297**   220:5
**2a**   204:22
**2b**   204:21

| 3 |
| --- |

**3**   4:12 18:9
19:19 48:19
79:11 81:10
135:13 144:5,6
147:1 150:8
158:24 194:18
209:17 219:25
220:22
**3,000**   186:21
**3.1.**   196:3
**3.23.**   255:17
**3.8**   140:14
142:15 143:24
**30**   6:19 16:23
48:19 131:15

**[30 - 81]**

170:6 216:10 249:2,12,19 250:5 268:7 275:24 276:3 288:24
**30,000**  32:3 33:1,14
**30.7**  123:12,15 125:16
**302**  242:3
**307**  156:24
**31**  4:13 7:4 283:4,6,11 287:20
**310**  124:19,23
**316**  2:13
**32**  7:6 212:13 285:5,12,13
**33**  29:1,6 106:13 108:25 109:13
**337**  137:17
**338**  137:18
**341**  127:22 128:15,17
**35**  286:19
**350**  206:3
**35202**  2:14
**36**  212:15,18
**36.5**  124:10
**363**  1:20
**37**  4:16
**376**  104:13
**38.1**  223:5
**38.11**  220:15

**383**  105:13,18 105:19 110:22
**39**  91:15

**4**

**4**  1:18 4:13 30:25 31:1 62:6 62:7 98:21 135:13 149:3 191:24 194:16 201:19 238:20 292:2
**4.1**  98:23
**4.4**  200:18,18
**4.4.**  200:20
**40**  15:1 157:13 238:1
**400**  190:2 271:10
**41**  4:18
**42**  15:8
**429**  154:25 189:6,13,25
**43**  253:9
**43,000**  15:8
**440**  124:18
**45**  15:1,6 253:9 266:9,16
**47**  4:22 156:22 157:8
**48**  156:22 157:8
**49**  154:21

**5**

**5**  4:14 34:16,18 61:8,9 135:13 149:18 191:15

221:8 231:3 240:21 244:7
**50**  153:7,9 155:4,8,9,10 198:7
**500**  2:21
**51**  253:8
**52**  4:24 71:6 164:16
**53**  140:16,20
**541**  124:18
**55**  144:5
**56**  166:1,8,12
**57**  152:2
**58**  151:23 153:8 255:20
**5:45**  290:23

**6**

**6**  4:16 37:11,12 219:20,25 220:22,24 260:8,12,13
**6.6**  160:19
**600**  13:1
**617.573.4862**  2:23
**62**  84:14
**63**  196:4,13,15 209:6
**65**  245:20
**650**  13:3,4 15:6
**659**  155:16
**66**  209:5
**665**  283:23

**67**  253:9

**7**

**7**  4:17 21:1,11 21:12 22:17,21 22:21 41:9,13 41:16 43:2 62:25 74:21 178:13,13 219:20 238:24 239:5,15 256:15,21,22
**70**  198:7
**70,000**  15:10
**700**  2:5
**706**  242:3
**72**  59:10 270:17 271:2,10
**745**  140:6
**75**  271:24,25
**76**  147:10
**77**  84:16,16 229:24
**78**  255:20
**79**  229:24
**796**  52:11

**8**

**8**  4:6,19 22:17 41:9 42:8 74:20 88:18,22 89:3 158:24 207:6 207:13 221:5 239:9
**80**  131:21
**81**  182:10

**[82 - adds]**                                                                      Page 5

| | | | |
|---|---|---|---|
| **82**  128:1 131:1 | 172:21 190:12 | 225:22 | 157:5 165:25 |
| 134:16 144:16 | 191:1 202:17 | **accordance** | 166:6 196:25 |
| **85**  192:9 | 250:3 | 122:1 | 197:19 200:13 |
| **850.435.7000** | **991**  176:13 | **account**  43:20 | 200:16 218:19 |
| 2:15 | **9:03**  1:18 | 127:16 | 236:1 258:8 |
| **86**  5:7 171:10 | | **accurate**  293:6 | 269:23 |
| **89**  238:9 | **a** | **accurately** | **add**  158:22 |

**9**

| | | | |
|---|---|---|---|
| **9**  4:10,21 41:11 | **a.f.**  118:21 | 104:9 128:20 | 181:24 223:19 |
| 47:21,23 | **a.m.**  1:18 | 169:12,14 | **added**  153:20 |
| 131:19 207:6 | **aa**  209:8 211:9 | **ace**  95:25 | 160:12,14 |
| 207:13 214:24 | 216:8 | **achieve**  179:19 | **adding**  181:3 |
| 215:1,15 | **aaces**  76:12 | 179:23 180:14 | 181:13 185:1 |
| **90**  238:9,11,18 | 216:3,9 | 180:18 | 223:20 242:3 |
| 239:13 | **aaces's**  216:14 | **acknowledge** | **addition**  180:22 |
| **91**  196:3,9,12 | **able**  70:12 | 117:2,4,7 | 259:5 293:7 |
| **92**  86:11 279:14 | 76:24 195:3 | 233:13 | **additional** |
| 279:20 | **above**  240:5 | **acknowledged** | 10:10 11:9 |
| **93**  191:23 | 260:23 261:1 | 69:4 168:21 | 50:10 65:9 |
| 279:14 | 285:23 | **acknowledg...** | 78:22 81:18 |
| **94**  42:9,10 | **absence**  196:19 | 121:22 122:5 | 153:16,17 |
| **940**  190:2 | **absolute**  97:22 | **acog**  4:16 37:12 | 240:24 280:1 |
| **943**  189:14 | **absolutely** | **acog's**  38:8 | 292:19 |
| **95**  141:20 142:4 | 262:4 | **act**  6:23 276:2,7 | **additionally** |
| 220:5 251:16 | **abstract**  140:3 | 276:20 286:2 | 277:20 286:5 |
| 257:14 | 234:4,5 244:12 | 289:20 | 289:13 |
| **96**  149:11 | 244:15 270:17 | **action**  280:2 | **address**  29:8 |
| **97**  52:12 147:2 | 270:23,25 | 291:19 | 158:11 199:4 |
| **98**  130:19 | **academic**  25:17 | **active**  21:25 | 217:11 230:15 |
| 200:19 253:11 | 26:5 27:6 63:11 | 22:1,9 | 230:17 276:21 |
| **99**  128:21 | 264:12 265:5 | **activities**  19:20 | **addressed** |
| 130:12,19 | **accepted** | **actual**  42:13 | 113:24 275:16 |
| 134:15,16 | 188:16,21 | **actually**  19:17 | **addressing** |
| 141:5 161:17 | **access**  57:16,23 | 37:16 41:11 | 127:22 128:18 |
| 171:10 172:21 | 163:11 | 42:4 60:3 64:20 | 239:25 |
| | **accompanied** | 92:6 93:5 | **adds**  239:5 |
| | 169:18 225:1,7 | 136:24 143:15 | |

[adequately - al]                                                          Page 6

| | | | |
|---|---|---|---|
| **adequately** 187:9 | **advised** 77:16 | 45:2 46:8 48:17 | 237:19 242:9 |
| **adjust** 90:21 | **affect** 100:2 | 48:22 49:15,23 | 243:19 248:23 |
| 135:14 186:7 | 135:3 208:4 | 50:3 52:21 | 250:13 252:3 |
| 246:4 247:12 | 233:6 270:8 | 53:25 54:4,23 | 257:25 262:19 |
| **adjusted** 96:25 | 286:4 | 54:24 65:18 | 264:19 265:22 |
| 126:10 131:13 | **affects** 286:11 | 66:20 89:14 | 267:5 273:13 |
| 144:11,15 | **affirm** 109:12 | 90:4 91:18 | 274:8 282:19 |
| 147:7 157:9,11 | **affirmatively** | 92:18 93:17 | 289:24 290:8 |
| 158:1,4,11,17 | 40:9 | 95:2 98:2 99:3 | 290:13 |
| 237:8 242:9 | **african** 208:20 | 99:5,22 104:25 | **agreed** 157:22 |
| 253:13,14 | 208:25 209:12 | 120:5 121:19 | 282:5 |
| 254:19 | 209:19 210:3 | 124:13 126:7 | **agreement** |
| **adjusting** | 210:17 211:15 | 134:19 136:15 | 264:7 |
| 157:12 167:24 | 212:17 | 138:18 139:4 | **agrees** 92:23 |
| 247:4 | **afternoon** | 139:11 141:6 | **ahead** 68:15 |
| **adjustment** | 46:19 205:21 | 141:19 142:3,7 | 108:6 236:1 |
| 125:5 135:19 | **age** 49:14,17,21 | 142:11 146:8 | 251:12 260:15 |
| 163:10 182:24 | 49:24,24 | 148:14 149:12 | 266:21 273:16 |
| 245:11,16 | 110:14 131:13 | 150:18 152:8 | **al** 5:7,9,11,13 |
| 246:2,11 | 146:2 157:11 | 152:25 164:13 | 5:15,17,25 6:5 |
| 247:18 | 237:9,10 | 167:2 170:15 | 6:7,9,13,16,18 |
| **adjustments** | 273:25 | 170:20 171:14 | 7:5,7 74:22 |
| 150:13 | **agency** 276:9 | 175:17,19,21 | 83:18 85:10 |
| **administration** | 276:10,19,19 | 176:4 178:22 | 86:17 104:2 |
| 251:15 | 279:16 | 182:13 195:2 | 117:15 127:3 |
| **admitted** 32:10 | **ages** 144:23 | 197:18 200:24 | 127:15 133:8 |
| 53:22 57:17 | 145:7 164:5,6 | 201:25 204:4,8 | 133:10 138:7 |
| **advance** 9:17 | **aggravated** | 208:23 209:12 | 161:24 177:7 |
| 12:5 77:25 | 227:6 | 213:12 216:19 | 178:18 187:22 |
| **adverse** 286:10 | **aging** 21:18 | 217:13 220:16 | 191:10,13 |
| 286:11 | **ago** 69:21 | 221:12 223:13 | 207:5 219:18 |
| **advertisement** | 149:24 240:10 | 226:17,19 | 220:1 230:23 |
| 121:25 122:7 | 244:8 261:3 | 229:13,19 | 231:4 248:10 |
| 122:23 | **agree** 28:7 34:9 | 230:10 231:25 | 248:12 251:14 |
| | 36:20 38:4,23 | 232:8,17 234:9 | 269:16 283:5 |
| | 39:2,21 44:9,17 | 234:23 235:10 | 285:11,18 |

[al - appears]

286:20

**alcohol** 131:23
132:2

**allen** 118:23,24
119:3,18 120:3

**american** 4:21
36:19,25 47:22
47:24 50:16,22
50:25 51:4
161:15 208:21
208:25 209:13
209:19 210:3
210:17 211:15
212:17 261:6

**amount** 112:2
200:14

**amphibole** 75:1

**amy** 6:17
269:16

**analyses** 26:10
26:11 157:9
165:5,6,16
183:21 184:1
221:18,22
235:10

**analysis** 44:24
44:25,25 45:1,7
45:8,14,15,17
45:23,24 46:3
46:13,22 53:23
54:1 65:5,9,21
65:24 81:16,16
84:5,11 85:7,7
85:23 100:3,4
101:25 125:4
127:24 128:19

133:11 134:24
135:8,13,15,17
136:16 143:12
143:19 145:23
157:7,10,15
158:6 159:6
160:13 163:6,8
165:13,13,14
165:19,24
166:14,25
167:13 168:8
168:23 172:2
174:18 178:25
181:1 185:8
188:10,23
189:5,12,15,17
190:2,9,10,24
191:6 193:5,7
193:22 198:3,8
199:8 200:22
211:25 218:17
221:16,23,24
226:1 231:5,19
231:24 232:14
232:16 234:24
235:2,2,4,8,22
236:2 237:25
239:19 245:19
246:15 247:17
248:10 250:19
251:3,19,25
252:17,19,22
253:2,21,23
254:20 255:13
256:1,4,9 257:8
257:11,12,20

257:23 258:7
258:10,17,21
258:24 259:17
281:16 286:20

**analysts** 251:18

**analytic** 250:20
251:12

**analyze** 136:13

**angle** 17:18

**animal** 62:15
92:7,8,18 93:2
93:18,21
204:25 227:2
229:13 230:2
230:10 284:3

**anna** 6:15
248:12

**annually** 98:10

**answer** 9:1,5
17:15,16,19,21
18:4 30:17
33:21 42:18
45:21 47:3
56:18 59:21
61:20 68:13
71:8,9 74:2
75:12 77:10
84:15 89:24
91:4 97:7 116:7
121:6 122:12
139:18 142:2
142:24 143:2
148:10 150:11
163:23 165:12
169:9,10
198:13 206:12

238:3 243:2
244:18 247:7
247:15 252:25
258:23 259:25
261:24 265:1

**answered** 46:1
46:24 71:24
75:5 97:11,14
112:14 116:9
148:18 149:16
151:18 163:22
174:6 208:7
230:14 232:20
232:22 233:12
243:8 246:8
261:3

**answering**
215:10

**answers** 8:20
8:24 59:22

**anticancer**
32:18

**anticipated**
81:3

**anyway** 9:2

**apologize** 37:16
39:18 92:13
103:6 127:5
146:25 153:9
195:25 262:22

**appear** 165:18
210:12

**appearances**
2:1 3:1

**appears** 54:11
74:4 182:11

[appendix - asbestos]                                                    Page 8

**appendix**  79:18
80:1,5,22 83:13
83:16 86:11
113:12,18
**apples**  258:13
**application**
194:16 245:6,6
**applications**
148:1 195:3
217:11 231:8
289:19,21
**applied**  43:22
44:2 54:11 60:6
105:9 206:6,8
227:2 284:19
285:25
**applies**  193:10
**apply**  60:2,22
60:23 145:8
199:22
**applying**  65:3
**appraised**
64:23,23,24
**appreciate**
70:11 97:5
110:24 126:25
142:22,23
237:13,14
238:3 248:2
**approach**  53:24
54:5 62:8,10
63:16,17,19,21
63:25 65:3
253:19 254:7
**approaches**
63:20

**approaching**
254:7
**appropriate**
67:4 74:3,4
85:6 147:25
162:9,10 178:6
190:23 194:23
217:11 222:7
222:10,11,12
**approximate**
71:5,7
**approximately**
14:23 15:6,8
16:16 17:9
20:14 25:3
32:21 78:4
112:8
**approximations**
71:6
**april**  1:18 6:10
21:20 227:14
291:22 292:2
**archive**  264:4
**area**  68:11
72:12 73:19
95:1 105:10
170:13 171:13
174:20 266:8
271:14 274:25
275:3
**argument**  56:9
**arms**  251:21
**arps**  2:19
**arriving**  66:9
**artery**  32:16

**article**  5:6,8,10
5:12,14,16,24
6:4,6,8,12,15
6:17 7:4,6
24:12 25:25
55:2 80:17,21
80:24 81:4
82:19 86:16
88:9 98:22
100:21 101:24
102:8 104:1,3
104:15 109:16
112:20,21
113:4,6,12
116:3 117:14
118:10,14
121:23,24
122:3 123:1
126:19 127:2
129:17 130:2,3
130:8 133:7,17
133:20 138:6
138:25 140:21
178:8 179:13
180:3 182:18
182:23 187:22
187:24 191:12
193:12 205:12
207:4,20
214:16 219:18
220:17 222:1
224:4 230:23
231:19 233:5
238:5,21,22
239:1,14
248:12 269:16

269:21 270:9
281:14 283:5
283:12,15,20
285:5,11,14,18
285:22 286:22
286:25 287:3
287:10
**articles**  23:14
24:7,9,24 25:19
25:24 79:13,16
79:24 81:18,24
81:25 83:3 87:9
103:13 113:13
120:12 226:24
271:24,25
277:20 289:14
**asbestos**  6:19
6:20 24:6 25:1
29:10 30:9 68:3
68:5,8 69:1,7
72:5,13,22
73:13,23 75:21
76:3,22 93:11
227:6 275:17
275:25 276:1,4
276:5,23 277:3
277:8,16,21,23
278:5,24
279:10,22
280:5,9,13,18
280:24 281:2,3
281:6 284:8
286:12 287:7
289:2,2,15,16
289:18,21,23
290:1,7,15

**[ascend - attention]**                                    Page 9

| | | | |
|---|---|---|---|
| **ascend** 282:12 | **asking** 12:14 | **assigned** 66:21 | 203:8 205:18 |
| **ascertain** | 17:13 40:12 | 202:21 | 214:19 215:2 |
| 217:10,15 | 51:3 71:2 79:4 | **assigning** | 216:17 234:19 |
| **ascertainment** | 90:12 125:11 | 171:21 | 257:13 261:7 |
| 49:3,5 | 146:5 148:11 | **assignment** | 285:6 286:16 |
| **ascribe** 273:10 | 181:14 222:2 | 256:7 | 287:12 |
| 274:6,11 | 246:5 259:24 | **assigns** 200:7 | **associations** |
| **ascribing** | **asks** 21:12 | **associate** 18:18 | 90:14 91:12 |
| 273:21 | 145:7 | **associated** 41:1 | 94:22 99:2 |
| **ashcraft** 2:3 | **aspect** 176:12 | 41:2 54:13 | 149:18 185:15 |
| **ashcraftlaw.c...** | 177:15 194:13 | 55:22 94:24 | 187:2 260:18 |
| 2:8 | **aspects** 24:22 | 99:20 100:2 | 288:12 |
| **aside** 51:10 | **assess** 132:9,21 | 105:7 123:21 | **assume** 24:23 |
| 110:19 114:4 | 168:20 203:14 | 131:14 211:8 | 47:25 50:15 |
| **asked** 17:3 21:7 | 228:21 246:25 | 212:12 220:3 | 51:15 91:4 |
| 24:9,21 34:25 | **assessed** 132:20 | 224:21 281:15 | 130:12 133:13 |
| 37:4 45:22,25 | **assessing** | **association** | 189:7 |
| 46:23 55:16 | 195:23 228:4 | 44:10 50:13 | **assumed** |
| 65:14,15 71:23 | 228:16,18 | 55:10 56:1,5 | 128:19 170:14 |
| 75:4 77:15 79:5 | 229:2 | 59:23 76:21 | **assumes** 179:3 |
| 79:7 92:1 97:10 | **assessment** | 81:13 89:10,15 | **assuming** 58:13 |
| 112:13 137:15 | 45:9 47:14 | 89:21 90:1 | 120:13 134:15 |
| 141:17 145:5 | 50:20 54:21 | 91:19 95:3,9 | **assumption** |
| 148:17 149:15 | 56:11 65:1 | 96:18,20 118:2 | 128:23 129:4 |
| 151:17 157:20 | 66:11 67:18,19 | 133:12 135:21 | 129:23 130:10 |
| 163:21 174:5 | 67:22,25 75:8 | 141:13 143:14 | 130:14,22,23 |
| 208:3,6 215:11 | 75:11,19 85:5 | 145:22 146:6 | **assumptions** |
| 215:13 223:25 | 92:24 160:10 | 147:11,15,17 | 82:16 131:10 |
| 230:13 232:19 | 176:13 192:19 | 149:14 151:8 | 134:17,21 |
| 237:15 240:10 | 192:24 193:10 | 161:14,15,18 | **atherosclerosis** |
| 246:20 253:24 | 195:22 206:15 | 162:4,16 163:1 | 32:15 |
| 254:3,13 261:2 | 236:17,20,25 | 167:3,5 171:12 | **attach** 279:5 |
| 264:16,21 | 237:19 262:14 | 173:24 186:20 | **attempted** |
| 265:2 269:3 | 262:25 263:1,5 | 192:15 193:13 | 240:7 |
| 275:14 277:6 | 267:1 271:13 | 196:6,17,20 | **attention** 59:1 |
| 282:4,8 286:24 | 278:23 280:11 | 201:11 202:9 | 263:13 281:24 |

**[attention - beginning]**                                    Page 10

287:19

**attenuated**
134:22 150:19
151:1 252:1

**attorney**
291:18

**attributed**
48:23

**attrition**  109:11
109:11

**author**  115:21
116:3,16
118:14

**authority**
289:20

**authors**  91:5
109:15 112:20
114:5 126:7
134:20 139:12
144:6 161:12
168:21 171:15
207:20,22
210:7 213:12
214:3 231:12
236:1 270:15

**available**  241:5
242:24 243:1
264:8 266:25
289:17

**average**  155:16
180:25 182:13
209:14,15

**avoid**  39:24
40:4 236:3

**aware**  10:1,5
23:13,16,17,25

37:3 45:22
46:21 48:6 49:4
51:22,25 68:7
88:3 93:21
102:8,16
103:14 119:5,9
121:8,11
126:21 132:10
132:16 139:15
139:19 207:25
222:6 228:21
231:18 268:10
268:10 270:14

**b**

**b**  31:2 251:20
252:18

**baby**  35:3
71:15

**back**  21:6 24:21
26:15,17 28:24
31:10 34:20
37:16 41:24
42:25 44:7,7
53:15 58:4 61:5
70:12 79:11
80:8,10 83:12
84:20 85:21
86:11 98:20
99:17 101:16
110:12 115:25
117:11 123:24
138:2 154:4,9
154:10 157:19
161:4,9 163:3
164:16 168:15

169:24 175:5
176:18 178:12
183:2 184:11
190:17 192:19
195:10,24,25
195:25 196:2
213:14 215:8
216:21 217:19
219:10 220:22
221:11,17
222:14 238:4
238:21 239:11
243:10,24
244:7 250:17
253:3 254:24
254:24 256:13
259:9,20 260:6
262:2,10
270:16 275:7
287:18

**background**
233:24,25
234:3,18

**balance**  163:17

**ballman**  263:15

**ballpark**  15:3
16:5

**barred**  10:6

**base**  198:6,6

**based**  23:10
25:19 30:16
42:23 50:15
57:1 62:15
73:24,25 75:8
75:19 89:20
99:15 125:5

173:22,22

182:18 194:23
201:15 202:6,9
203:2 209:16
222:2 242:20
247:5 263:8
276:23 280:18
281:1 282:11

**baseline**  156:3
245:10

**bases**  112:11

**basing**  131:3
212:20 224:2

**basis**  81:4
255:4 278:5

**baylen**  2:13

**beasley**  118:22
118:24 119:3
119:18 120:3

**beat**  8:25

**becoming**  49:3
114:15 226:22
281:9

**beechwood**
1:19

**began**  108:2

**beginning**  42:9
74:21 97:18
104:19 105:4
105:14 106:18
111:1,2 128:15
134:1 155:3,7
166:4 188:9
189:3 202:17
257:8

**[begins - bottom]**

| | | | |
|---|---|---|---|
| **begins** 42:15 | **benefit** 96:1 | **biased** 87:11,13 | **blah** 228:12,12 |
| 59:11 166:14 | **benefits** 279:21 | **biases** 87:22 | 228:12 257:3,3 |
| 174:17 180:14 | 279:21 | **big** 181:6 | 257:3 |
| 209:4 | **berge** 5:25 | **biggest** 251:6 | **blanket** 274:3 |
| **behalf** 8:7 | 187:17,22,24 | **binders** 47:21 | **board** 23:5,9,12 |
| **belabor** 8:19 | 188:9 191:6,14 | 52:7 57:7 | 24:8,17,18 |
| **belief** 293:7 | 221:2 222:17 | **bindman** | 261:9 |
| **believe** 11:23 | 223:14 | 231:13,14 | **bodies** 64:22 |
| 18:11 22:18 | **best** 8:23 9:15 | 263:17 | **body** 45:18 |
| 26:20 39:22 | 65:2 93:6 148:1 | **bindman's** | 47:13 53:8,11 |
| 40:25 43:25 | 293:7 | 232:25 233:23 | 62:12,13 65:16 |
| 47:6,10 53:1 | **better** 49:3,5 | **biologic** 55:23 | 66:7,9 75:8 |
| 54:12 55:4,11 | 73:16,17 82:22 | 56:9,10,24 | 85:21,22 86:18 |
| 55:14 58:1 60:1 | 148:5,6 194:6 | 62:25 76:13 | 94:4,9,12,13,16 |
| 61:1 64:14 | 287:9 | 93:3 162:24 | 94:25 104:7,17 |
| 72:24 87:10 | **beyond** 12:20 | 230:6 278:8 | 116:23 123:2 |
| 90:13 91:17 | 13:6 21:24 | **biological** 66:22 | 195:8 199:23 |
| 97:7 108:4,7 | 280:15 | 81:19 89:20,24 | 206:1 228:5,19 |
| 113:25 138:9 | **bias** 20:7 85:5 | 89:25 90:7,10 | 228:22 267:9 |
| 145:21,23 | 87:14,14,17,18 | 90:13,19 92:10 | 275:15 |
| 146:5 149:12 | 88:1,2,3 104:9 | 125:10 262:5 | **books** 25:8,10 |
| 157:20 167:12 | 104:23,25 | 262:15 | **booth** 239:20 |
| 167:18 168:7 | 110:6 111:11 | **biology** 173:15 | **borderline** |
| 169:5 182:3 | 112:1,3 113:2 | 173:22 | 36:12 |
| 183:5 190:5 | 113:24 114:23 | **birth** 38:25 | **boston** 2:22 |
| 196:21 197:22 | 114:25,25 | 245:7 | **bot** 70:24 76:20 |
| 202:12 203:25 | 116:15 127:16 | **bit** 13:3,19 | **bottle** 76:23 |
| 207:7,16 | 127:23 128:18 | 23:20 64:4 | **bottles** 70:25 |
| 258:23 267:16 | 133:10,21 | 68:10 106:16 | 71:2 |
| 273:18 275:20 | 134:12 135:7 | 118:16 162:2 | **bottom** 43:6 |
| 286:24 | 152:23 158:20 | 177:14 189:22 | 123:3 137:17 |
| **believes** 44:9 | 176:9 187:7 | 193:20 204:18 | 140:24 147:3 |
| 279:20,21 | 200:2,4,13 | 252:2 | 184:17 188:15 |
| **bellwether** | 201:5,6 204:25 | **black** 251:5 | 196:12 277:14 |
| 274:15 | 233:13 | 255:10 | 279:17,20 |
| | | | 289:10 |

**[bound - cancer]**                                                        Page 12

**bound** 161:13
161:17
**box** 79:12 251:5
255:10,19
**boxes** 251:4,6
**boylston** 2:21
**bradford** 53:22
53:25 54:13,16
56:21 62:22
64:5 65:4,9,21
65:24 100:4,21
197:12
**break** 9:3,5,6
21:5 41:17,20
41:23 58:3 69:8
70:4 83:9,11
98:19,22
115:22,24
117:8,10 138:1
153:11 154:1,3
157:18 169:23
170:4 184:10
184:12 219:6,7
219:9 224:12
248:6,8 262:9
275:6 287:17
287:24
**breast** 49:15,22
50:4,5 131:13
131:23
**brief** 219:22
**briefly** 59:7
109:21 184:9
230:15 272:17
**bring** 10:10
59:1 60:11

69:23 173:15
195:14 201:10
221:24 222:17
**bringing**
173:21
**brings** 15:9
**broke** 83:14
90:17
**broken** 36:8
193:23 241:19
248:18
**brought** 19:14
203:18
**buffer** 127:16
127:18 131:3
**bullet** 127:13
191:24 194:2
**bullets** 127:12

---

**c**

---

**c** 28:3 252:19
**calculate** 126:8
126:11 178:4
260:3
**calculated**
137:7
**calculation**
185:9,13,16,17
190:11,15,19
191:1,9
**calculations**
178:5 190:22
**call** 25:16 27:2
27:21 55:12
**called** 140:7
269:18 278:16

**canada** 6:10
45:8 63:16
64:16,20
160:10 203:6
203:20 204:7
205:7,20,23
206:24 226:23
227:7,11,14,21
227:23 228:1
230:16 262:2,6
265:9,10,11
266:9 284:13
284:16,17,21
285:3
**canada's**
260:17
**canadian**
205:23
**canal** 229:21
**cancer** 4:17,21
12:24 22:6,13
22:13 23:1
29:12,15,19,22
30:5,19,22
31:21 35:5,6,10
35:15,18,21,25
36:4,6,9,12,16
37:5,24 38:10
40:7,19 41:1,2
41:15 42:1,17
44:13 45:4 46:9
47:22,24 48:7
49:15,22 50:5
50:14,16,23
51:4 76:4 84:1
85:11 86:19

89:11,16,22
91:13 93:10
94:24 95:16
96:19,24 97:23
97:25 98:23
99:6,13 100:2
100:11 101:1,6
101:18,22
105:14 106:5
106:12 107:10
107:15,23
108:17,18,21
108:23 109:3
110:7 111:10
111:20,22,23
112:9 113:1,4,5
113:11,22
114:13 117:13
118:3 123:8
131:14,23
132:1 133:11
138:24 141:13
142:16,18
143:11 152:12
152:12 154:25
156:6,7,9,11,25
158:25 162:13
163:7 164:12
167:6 168:13
171:13 173:25
174:20 177:4,7
177:10,16
178:8 179:7
184:23 187:5,6
189:13 190:5
192:8,16,20,25

193:9,11,14
196:19 202:6
203:2,18,22,23
204:3 208:11
214:18 216:8
216:18 220:4
226:1,11
231:10 234:7
234:21 241:25
260:20 266:1
267:21,21,24
268:13,22
273:10 274:24
275:17 278:4
278:10,25
279:12,23,24
280:10 281:1
281:11,15
282:15 285:8
285:20,24
286:17 288:5
288:19,21
290:15
**cancers**   35:13
36:13 98:9
99:10,16,18,23
105:8 177:17
177:18 245:11
265:23 266:5
277:1,17 279:3
280:7 288:16
**candidly**   53:21
191:25
**capital**   199:16
**capture**   39:7

**carcinogen**
279:23 280:5,9
280:13 284:9
286:12
**carcinogenesis**
92:9,19 93:18
94:6 226:15
227:5 282:6,19
282:25
**carcinogenic**
93:15
**carcinogenicity**
92:7 94:7,9
205:12
**care**   23:7
261:11
**carries**   26:5,6
111:4
**carrying**
137:17
**case**   4:24 8:18
8:25 11:13
13:23 14:3,24
20:6 26:25 27:1
27:9,14,15,16
27:19 28:3,8,15
30:1 31:7,18,24
32:13,22 34:22
34:23 35:20
45:19 47:2 49:6
51:13,24 52:9
53:2,7 55:13,20
57:10 61:6,12
74:24 75:3,10
75:24 76:4
81:15 85:22

88:24 89:9
91:11 96:20
98:1,3 117:20
134:8 135:16
136:8 137:6
142:18 156:12
165:19 177:5
181:19 183:12
183:20,21
184:24,25,25
185:6,9,14,20
185:25 186:18
186:25 187:1,4
187:9,11
188:10,24
189:18 190:24
197:5,5,9,24
198:9,19,22,23
199:1,5 209:18
221:22 222:8
222:13 223:11
231:5 232:11
237:20 247:8
257:9,11
260:22 273:10
273:23,23,25
274:4 277:25
279:6 280:25
285:15 292:3
**cases**   33:18
34:6,10 55:22
57:3 60:21
74:25 79:9 85:5
123:7,15 124:3
124:10,18
126:15 128:20

128:24 130:11
134:16 143:8
148:25 149:5,8
150:19,23,24
150:25 151:2
153:17 155:1
155:16,20,21
156:24 157:24
177:4,6 184:23
185:6,7,18
187:4,5,6,13,15
189:6,6,6,13,14
189:25 190:2,3
190:3,5 209:8
209:11 241:19
241:25 253:9,9
253:11 259:3
**catch**   130:2
**categories**
248:18 250:13
252:10,11,19
253:20,22
254:10
**category**   43:8
43:10 80:18
241:24 243:20
243:21 247:3,6
250:4 251:10
252:17 254:8
254:15
**causal**   12:15
53:8 56:7,11
62:9 63:2,8,12
63:15 64:4 65:8
65:13 66:6,6,9
75:2,6,11 81:20

[causal - cites]                                                     Page 14

162:16 168:10
168:12,12
174:1 176:13
176:17 201:11
201:15 202:9
203:8 204:1,2
205:18,18
225:25 267:2
278:2 279:12
280:11 281:4
281:11
**causality**  45:9
47:14 50:20
68:4 75:7,19
92:25 193:10
195:22 267:22
**causally**  32:14
35:4 278:3
**causation**  55:24
90:2,3 206:15
274:24 277:8
**cause**  46:9 76:3
97:19 98:14
100:25 202:6
203:2,18,22,23
227:3 268:12
277:16 281:1
283:17 284:5
285:20
**causes**  35:24
36:3,7 49:1
99:10 101:9,11
101:13,17,18
268:21 279:23
280:6 287:6

**causing**  287:8
**caution**  273:19
**cautious**  261:19
**cc**  293:25
**cdc**  50:25 51:1
**cell**  35:25 36:5
193:2,14 266:3
**cells**  93:8 284:4
**cellular**  282:15
283:18
**center**  33:8
**certain**  6:21
9:15 24:9 47:19
57:3 60:7,21
63:23 276:1,5
276:23 289:3
289:15
**certainly**
139:18
**certainty**
202:21 280:4
**certificate**
291:1
**certify**  291:5,17
293:6
**cervical**  229:21
285:7,24
**cervix**  229:4
**chain**  278:9
**chance**  58:17
133:18 165:18
**chang**  145:13
288:14
**change**  12:11
131:17 150:14
239:22 292:16

293:9
**changed**  150:13
150:16
**changes**  18:15
227:5 293:7
**chapters**
199:17
**characteristic**
265:16
**characteristics**
108:13 109:12
112:6,18
**characterizati...**
236:8
**characterized**
98:24
**charge**  13:2
**charged**  13:8
**charges**  13:7
121:24
**charging**  13:1
**chart**  80:11
**check**  70:15
78:12 118:17
**chief**  24:17,18
**choice**  251:19
251:21
**choices**  183:14
250:20
**choose**  20:22
245:24
**choosing**  65:15
**chose**  135:25
222:23 251:25
254:16

**christopher**
2:12
**chronic**  32:20
227:3 277:2
279:3 282:13
283:17 284:5
**chrysotile**  6:20
275:25 276:5
276:22 277:3
278:24 279:22
280:5 289:2
**chu**  3:3 41:12
**ci**  220:5 251:17
**circulated**  43:1
**citation**  84:18
91:15 257:17
**citations**  42:20
70:7 74:1
222:14 263:14
263:18,19
264:21
**cite**  74:14 75:17
75:18 117:18
131:7 181:16
183:25 263:23
284:9 286:17
**cited**  47:6 68:22
79:23 82:1,5,7
82:8,10,10 87:2
87:4 91:24
161:3 219:20
222:1 225:18
229:20 264:12
281:8 282:21
**cites**  216:22,22

**[citing - compare]**                                                    Page 15

citing   178:7
  187:17 222:4,5
clarification
  58:12
clarify   55:16
  122:18 148:13
  259:12
class   20:15,19
  20:20,23
classification
  129:18 131:11
  145:12 204:10
classified   128:1
  128:21,25
  130:12 131:1
classroom
  19:20
clause   130:7
clear   18:24
  20:9 35:25 36:5
  36:11 54:22
  67:18 80:20
  132:2 140:18
  146:4 168:6
  172:3 191:25
  193:2,13,22
  196:20 216:2,5
  261:24 266:3
clearly   195:12
cleavage   75:23
clinic   40:12
clinical   19:24
  20:21 63:5
  214:9
cml   32:20

coates   31:14
coded   200:12
coffee   224:17
  225:4,13 226:1
  226:3,5,7,8
coherence
  67:20
cohort   20:6
  45:19 46:22
  47:1,3 81:14
  88:25 89:9
  118:5,5 142:14
  152:10 153:1
  159:20 160:17
  177:9 178:19
  178:24 179:7
  179:10,25
  180:19,20
  185:11 187:6
  188:11,24
  189:4,11,16,19
  190:1 197:5,10
  197:25 199:5
  222:9 231:6
  257:13,20
  259:18 260:16
  260:20
cohorts   142:9
  142:12 152:13
  153:20 179:1
  181:7 182:14
  183:3,5,6
  184:13
coincided   20:21
colette   6:6
  207:4

colleagues
  148:23
collect   110:14
  111:16,17
  146:17
collected
  145:25 169:2
collecting   26:12
  111:13 156:7,8
collectively
  262:13
college   36:19
  36:25
column   52:15
  52:21 53:16,18
  110:19,25
  111:1 121:22
  134:1,5,6,7
  136:1 149:8
  164:18 166:4
  174:17,18
  188:9 215:8,19
  215:23,24
  217:23,24
  226:15 235:15
  284:2
columns   80:11
  80:12,13
combine
  183:22
combined
  27:16 251:15
come   50:21
  82:18 132:17
  181:15 185:2
  190:12 206:21

264:7
comes   17:10
  24:21 54:15
  116:24 206:17
comfortable
  58:7
coming   27:8
  77:23 142:20
  252:21
comma   216:11
comment   92:1
  184:13 185:4
  186:24 218:15
commented
  218:14
commission
  291:24
common   28:5
  28:14
commonly
  106:7,24
commonwealth
  291:5
community
  19:8 266:14,23
  267:6
company   114:9
comparable
  41:1 124:23
comparatively
  239:4
compare
  107:13 109:8
  155:12 164:8
  211:2 213:8
  233:23 258:12

**[compare - consensus]**                                         Page 16

259:23
**compared**
106:5 131:16
152:10,13
164:12
**comparing**
109:9 198:22
211:23 251:20
258:16
**comparison**
165:9
**comparisons**
165:4
**complete**   31:3
233:10
**completed**
22:16 190:24
**completely**
141:23 172:19
172:20 189:23
**components**
76:25 94:2,4,9
**compound**
236:3
**comprehensive**
28:18 39:5,10
39:13,20 44:5
47:7,10,12
**comprise**   190:2
**comprised**
189:5,12
**concept**   104:22
165:8
**concern**   152:23
168:24 199:13
223:5

**concerning**
30:5
**concerns**   46:16
116:15
**conclude**   210:7
267:10,10
**concluded**
141:12 196:5
196:16,19
290:23
**concludes**   46:9
46:12,16 229:9
**concluding**
44:3
**conclusion**
50:19,21 63:15
65:8,13 66:13
75:6 88:20 89:4
92:4 171:10
172:14 196:21
200:5 202:5,9
203:1 205:11
205:16 206:22
213:4,5 226:14
267:3 270:22
270:24
**conclusions**
63:2,12 69:1
75:2 109:13
112:20
**conditions**   6:22
85:11 94:24
276:1,6,24
278:25 289:3
289:21

**conduct**   46:13
65:9 133:2
165:11 236:2
**conducted**
29:14 42:20
65:4,6 127:23
128:19 134:12
163:5 165:7
199:23 208:16
220:1 231:4
**conducting**
197:14 270:5
**confidence**
136:12,17
141:3,20 142:4
142:4,8 143:17
143:22 144:12
146:16,22
149:13 151:6
151:21 191:21
192:9 193:3
197:6,17
201:22 209:20
209:25 210:9
210:13,20,24
211:2,16,19
212:14,20
250:12 251:4
255:15,18,24
256:3 257:14
261:15
**confident**   202:8
203:7
**confidentiality**
57:15,22
264:11

**confidently**
205:17
**confined**   91:13
**confirm**   58:2
**confirmation**
87:18
**confirmed**
148:24 149:5,8
150:19
**confirms**
171:10
**conflating**
189:24
**conflict**   114:18
121:4 231:18
**conflicts**   114:6
118:17,19
119:12 121:11
**confounder**
158:2,5 182:24
200:13 237:9
246:4
**confounders**
135:14 157:15
158:15 167:25
186:7 245:22
**confounding**
20:7 94:21 95:3
95:6,10,11,19
96:3,5,6,17,22
96:24 97:1,4
135:16,20
158:19 176:10
187:7 205:1
**consensus**
266:13,22

[consensus - control]                                        Page 17

267:5,12,16
268:1,5,9
280:15
**consider**  26:11
47:13,16 95:9
95:10 99:12
100:16 114:20
116:3 121:3,12
121:20 161:16
162:3,17 167:1
174:22 175:24
176:5,9,9
192:14 214:20
218:8,23
260:25 280:17
**consideration**
21:17 81:23
90:1,2 96:4,4
100:24,25
116:10,13
121:13 126:5
**considerations**
121:16 135:6
274:14
**considered**
27:20 95:4,7
102:6 116:8
165:2 166:18
198:7 264:25
**considering**
167:25
**consistence**
129:22
**consistency**
56:23 59:23
67:19 163:2

196:23 197:1,2
197:11,18,20
198:14 211:3
**consistent**
109:14 121:7
123:20 124:5
167:4 196:21
204:10 211:5
211:16,18
216:16 217:3
260:21 267:3
**consistently**
55:22
**consortium**
45:11,11 47:1,1
208:10
**consortiums**
268:2
**constant**  28:8
187:3,10
**constitute**
268:12
**consultants**
115:2
**consultation**
78:16
**consulted**
120:21
**consulting**
114:9
**contact**  43:10
**contacted**
236:1
**contain**  61:11
68:8 277:21
281:2,3 289:14

290:1,7
**containing**
76:22 277:21
286:12 289:14
289:21 290:6
**contains**  68:2
73:23 79:12
86:1 100:11,14
100:16 227:6
280:18,24
**contaminated**
69:7 279:10
284:8
**contamination**
287:7
**contends**  53:24
**content**  77:9,11
**context**  62:20
68:14 79:23
82:2,5,10 84:14
84:18 97:6
142:23 143:1,2
146:7 149:17
149:22 160:6
162:10,11,22
162:24 185:11
195:23 200:9
204:19,19,21
214:4,14
234:12,16
288:19
**contexts**  60:7
**contextual**
274:14 288:6
**contingent**
234:25

**continue**  59:18
174:11 213:19
286:14
**continued**
279:24
**continuing**
59:16 221:1,4
**contraception**
245:18
**contraceptive**
48:23 164:4
237:11 274:1
**contracts**  22:17
**contradicting**
110:17
**contrary**  54:9
54:10
**contrast**  216:3
216:9
**contribute**
55:24 255:9
285:24
**contributing**
143:18 251:24
255:25
**contributor**
159:8
**control**  6:23
20:6 38:25
45:19 47:2 53:7
81:15 85:22
88:25 89:9
91:11 117:20
131:10 134:8
135:16 142:18
177:5 181:19

183:12,20,22
184:24,25
185:6,10,14,20
186:18,25
187:1,4,9,11
188:24 197:10
197:24 198:19
198:22,23
199:1,5 202:23
203:15 221:23
222:9,13
223:11 231:6
237:21 245:7
245:22 247:8
257:9,11
260:22 276:2,6
276:20 289:20
**controlled**
188:10 189:18
197:5,6
**controls** 123:18
124:4,11,18
126:15 128:1
128:20 131:1
131:18 134:17
190:4 198:10
209:9,11 253:9
253:10,11
**copy** 69:25 70:1
70:10,12
103:17,18
138:11 188:3
207:18 221:5
272:19,23
283:7 285:10
292:12

**copyright**
188:16,18
**cornstarch**
94:5,12,16
**correct** 8:12,15
8:16 9:9,13,19
10:9 11:5 15:12
15:20 19:23
23:7,8,11,23
25:7 26:23
36:10,23 37:21
38:7 42:24
43:16,20 46:10
47:8 48:1 50:11
51:14,18 52:24
54:3 58:11,25
59:15 61:14
62:3 76:5 84:5
84:6 86:23
105:2 117:19
117:22 123:8
123:22 124:5
124:11 126:11
132:4 134:10
136:6 140:20
141:2 142:6,10
144:1,4,15
145:15 147:12
147:16 148:25
152:3 153:3,6
155:18 157:3,6
160:21 164:15
166:21 167:7
180:5,23
183:25 184:15
188:20 192:12

208:21 209:2
213:15 225:3
225:11 226:12
229:15,22
232:5 235:23
241:18,22
242:7 243:7
247:11,20,21
248:25 249:14
249:18,21
250:7,16
252:12 255:2
257:18,22
260:24 261:13
263:22 265:5
275:19,21,22
276:17 281:3
284:14 286:10
288:1,5 291:15
291:21
**correction**
165:14 292:17
293:9
**corrections**
293:7
**correctly**
127:25 128:24
130:11 131:1
131:18
**correlated**
253:17
**correlation**
252:20
**correspondence**
28:20,21

**corresponding**
218:7
**cosmetic** 68:2
132:3 221:9
290:17
**cost** 122:19
**costs** 121:22
122:25
**cote** 12:1
**counsel** 10:7
11:1,3,4 13:8
21:9 39:23 40:4
77:9 79:2 277:6
282:3,10 285:9
287:14 292:8
292:13,23
**count** 29:1
220:20
**counterargu...**
218:19
**couple** 18:15
69:20 208:3
276:15 287:15
**course** 19:21,25
20:2 67:12
75:17 77:17
150:25
**court** 1:3 4:23
8:21 52:9,21
77:16 129:25
274:21 293:1
**covered** 57:15
57:21 163:22
**covid** 25:25
51:1

cramer 5:13
91:16,18
117:24 118:10
118:13,23
119:5,18 121:3
126:15,16,16
126:19 127:2
127:15 128:14
129:23 130:8
130:10 133:21
134:11,21
135:3 136:25
137:1 138:23
162:1 163:18
194:23 246:25
251:6,8 255:4,8
255:20
cramer's
118:25 163:25
creation 18:25
credibility 17:9
18:6
criteria 53:22
53:25 54:8,14
54:17 55:13,19
61:3 64:5 81:8
85:4 96:17
243:22 244:13
244:21,24
245:2 246:1,7
248:24 249:5
252:5 258:25
259:6
criterion 100:3
critical 83:25
84:23,25 244:4

criticism 153:4
criticisms
42:21 43:18
153:1
cross 250:12
crosses 141:20
142:5,9 209:20
crude 242:9
csr 1:24
ctisi 2:16
cumulative
53:11 62:13
current 18:11
18:12 267:1,11
currently 29:23
40:4 92:8,18
curriculum
4:12 18:9
curve 136:14
cut 225:15
cv 18:8,10
21:11 25:6
26:15 29:5
200:17
cycles 156:15
cytokines
282:17

d

d 4:1 5:1 6:1
7:1 135:13
252:19 285:9
d'aloisio 285:8
d.c. 2:6
d.w. 118:23

daily 216:11
241:3,20,23
242:8,10
243:20
dana 5:20
170:1
daniel 5:12
127:2
data 25:20
26:13 44:9 57:2
67:10 80:25
81:12,13,18,25
82:4 84:7,8,10
84:17 85:6 86:1
88:24 89:8
91:11 92:7 94:7
96:12 97:12
101:25 102:3
105:5 112:16
112:16 113:1,3
113:11,21
117:23 118:2
121:14 129:11
129:13 130:16
130:20 131:15
136:4,13
144:16,18
145:25 146:17
153:16,21
156:7,8,14,19
162:22 169:1
173:19 183:13
191:25 192:15
192:20 193:25
200:7 201:2,8
201:11 202:10

203:6 204:13
204:24,25
214:6,7,14
215:14 217:2
218:10,11
235:4 236:2,5,9
236:11 240:24
241:5,6,7,8,16
241:16 242:14
243:4 244:9,20
245:3,24 247:1
247:4 252:21
253:17,25
254:4,12,18
258:9,10,14,16
259:6,10,11
261:22,22
263:4 267:1,11
274:5
date 14:18,24
45:3,5 46:4,6
47:10,15 57:13
292:2,21
dated 291:22
dates 46:2
61:23 62:5 66:3
85:2
daubert 32:10
57:18
davis 6:7 98:12
206:25 207:4
207:13,17,20
208:4 215:19
davis's 216:19
day 291:22
293:19

**[days - determined]** Page 20

**days** 20:21
**deals** 27:14
**decades** 53:5,6
  197:15
**december** 29:6
  102:25 103:3
**decide** 47:17
  60:20
**decided** 235:4
**decision** 38:8
  40:13 56:4,12
  199:21 201:12
  201:14
**decisions**
  199:25
**declare** 291:20
**declared** 33:25
**declined** 48:18
  150:23,24
**declining** 49:8
**decrease**
  135:20 182:11
**decreased**
  48:24 107:24
**decreases** 113:4
**deemed** 82:1
**defendants**
  2:25 120:21
**defense** 72:14
  72:21 116:16
  116:20
**define** 62:1,9
  82:5 144:19
  201:20 243:25
  258:11

**defined** 63:18
  144:20,22,25
  145:3 146:20
  231:8 245:11
  258:20
**defrayed**
  121:23 122:20
**degree** 131:20
  132:9,21 280:4
**demonstrable**
  171:11 172:15
**demonstrate**
  195:4
**demonstrates**
  149:13
**demonstrating**
  177:8 289:18
**denominator**
  181:13 183:19
**denotes** 80:23
**department**
  19:8,9 21:20
**depend** 273:24
**dependent**
  235:3
**depending** 88:1
**depends** 55:25
  149:17,21
  158:15 194:25
  214:4
**deponent**
  292:10
**deposed** 8:17
  19:13 34:12
**deposited** 284:4

**deposition** 1:16
  4:10 9:7,18,22
  10:20 11:14,22
  11:25 12:5,6,10
  14:4,21 15:11
  15:19,24 16:3
  18:16 19:22
  22:10,19,20
  23:4 29:1 31:7
  37:5 39:22
  41:14 42:1,5,10
  42:22 51:23
  57:10,12 59:9
  64:13 68:12
  69:13 75:22
  76:1 77:23
  79:14 126:20
  126:22 133:2
  137:16 138:4
  184:3 193:21
  208:2 290:23
  292:13,16
**depositions**
  11:17 58:9
  78:23
**deposits** 277:20
  289:13 290:5
**derived** 102:4
**describe** 28:2
**described** 85:21
  118:8 280:21
  287:9
**description**
  115:19 278:16

**design** 28:19
  81:22 191:2,3
  197:12 198:16
  198:24 223:22
**designed**
  203:14,16
**designs** 20:5
  28:6,9 44:4
  81:14 187:1
  197:4 247:8
**despite** 198:14
  198:15 201:2
  202:21 203:25
  210:4,14
**detail** 261:8
**detailed** 106:9
  206:4
**details** 118:8
  206:20
**detect** 143:10
  151:8 152:11
  177:9,24
  178:20 182:19
  185:15 187:2
  189:16 190:9
**detected** 230:3
**detecting**
  186:20
**determination**
  56:7 232:6
  278:23
**determinations**
  63:8 201:15
**determined**
  267:1

[developed - discussed]                                                    Page 21

**developed**
  156:5 174:20
**development**
  32:15 204:3
  278:3 282:15
**devices** 245:8
**devoted** 225:19
**diagnosed**
  107:9,15,22
  112:8
**diagnoses**
  106:12 108:21
  108:24
**diagnosing** 49:7
**diagnosis** 63:7
  109:3,4
**diaphragms**
  245:8 285:25
**diets** 149:19
**diette** 11:22,23
  11:24 263:15
**difference**
  25:14 27:1
  84:22,24
  101:10 124:14
  124:14,24
  125:1,11,16
  148:22 149:25
  150:3,10
  171:20,24
  172:21 175:21
  211:11,20
  212:24 214:1
  215:2 223:2
  225:21 255:15
  255:21 282:23

**differences**
  99:2 111:12
  171:8 173:11
  173:14 198:14
  198:15 214:19
  214:23
**different** 17:18
  27:7,18 81:22
  87:15,22 94:15
  101:9,11,13,21
  102:8 106:22
  108:10 112:3
  112:11,12
  125:19 132:24
  134:20 136:17
  136:18,21
  144:7 145:4
  150:12 163:25
  164:1,5,6
  165:12 169:12
  172:1,10,20
  178:25 179:1
  181:21 183:22
  185:2 189:24
  193:9 197:3,4
  197:13,14
  201:24 205:5
  210:8,15
  211:24,25
  213:21 216:14
  218:18,24,25
  223:22 226:3
  246:1 252:12
  252:19 253:20
  258:15 264:14
  264:19,20

  265:15,19,22
  265:23,25,25
  266:2,3,4,5
  267:12,13
  282:21
**differential**
  63:6
**differently**
  63:18 88:16
  144:20
**differs** 104:11
**difficult** 43:14
  77:14 139:23
**diffraction** 73:1
**dig** 92:2
**direct** 113:1
  159:17 200:3
  214:8 245:5
  281:24 287:19
**direction**
  109:17
**directions**
  175:9
**directly** 92:10
  286:1 288:4
**directness**
  200:12
**disaggregate**
  76:24 99:19
  193:8 254:9
**disaggregating**
  76:21
**disagree** 38:8
  50:15,23 51:3
  97:1 98:2,4,5
  110:9 112:19

  171:15,16
  176:3 189:21
  189:23 282:20
**disagreed** 51:1
  282:5
**disclaimer**
  43:10 122:2,6,8
  122:19
**disclose** 114:6
  120:16,17
**disclosed**
  231:16 232:8
  233:18
**disclosure**
  115:9 118:18
  119:12 120:12
  120:13,14,15
  122:5 232:16
  233:10
**disclosures**
  208:9 232:7
**disconnect**
  269:12
**discuss** 8:9 11:2
  46:15 132:25
  142:14 165:23
  184:3 185:21
  215:6,14 230:7
  246:17 284:18
**discussed**
  113:23 126:21
  132:19 135:10
  142:17 146:10
  180:4 184:2
  194:13 230:1,6
  231:2 239:17

[discussed - driving]                                    Page 22

242:5 247:24
**discusses** 41:5
113:2 215:17
**discussing**
98:22 160:9
184:12 286:21
**discussion**
77:20 78:3,8,10
78:17 90:13
105:21,23
112:25 126:19
127:20,22
151:22 160:6
163:4 166:1
224:9 261:4
262:6 284:12
**discussions**
77:6,9,12 78:5
**disease** 26:1
28:5,8,13,15
32:16 95:21
265:18
**diseases** 28:14
28:14 137:22
224:22
**disentangled**
225:12
**dispute** 280:15
**distinct** 26:8
27:13
**distinction** 26:2
27:6,9 70:24
82:9,14
**distinctions**
27:5

**distinctive**
265:17
**distinguish**
25:18
**distribution**
134:14 135:25
136:1,2,3,9
292:8
**distributions**
136:9,11,14
**district** 1:3,4
293:1,1
**division** 18:18
18:25
**doctor** 9:8
26:22 29:5
159:20
**document** 6:11
6:24 9:8,11
37:14 42:3,11
42:15,16 43:9
48:7,10 59:10
59:25 60:10
85:20 88:18
117:16 138:9
227:14 268:20
272:9,15 276:3
288:23
**documents**
9:15,16,23
10:15 62:18,18
78:19,20,22
102:7 264:8
272:6,13
**doing** 19:5
21:25 114:9

135:7 181:2
185:16 236:16
248:2 256:11
**dollars** 16:9
**door** 157:17
**dose** 60:21,23
61:1 63:1 66:21
67:4,14,14,16
67:21,24
147:23,25
162:25 195:4,8
195:9,23
214:16,20
215:14,21
216:2,5,15,17
217:12,14
251:22 262:23
**doses** 60:25
**douching** 85:10
102:10 103:9
105:12 117:12
285:6
**dr** 11:22,25
12:1 44:25
52:17 53:19,21
54:7,16,24 55:4
59:1 68:16,24
87:8,8 91:5
100:7 118:13
118:25 119:5
119:18 121:3,4
129:23,24
130:10 134:21
138:17,18,23
141:11 142:22
148:23 161:24

162:1 166:24
173:20 177:12
207:19,25
208:13 226:23
229:12 231:14
232:25 233:23
237:13 240:23
253:24 254:3
254:11,17
259:5 275:8,10
275:14 281:12
282:22 283:11
285:13 287:3
288:8
**dr.singh.** 8:6
**drafted** 77:1,7
78:2
**drafting** 77:25
102:14 272:2,3
**draw** 63:2,12
63:14 75:2
150:4 213:20
213:22 214:12
214:13 263:13
**drawing** 75:6
82:9 213:15
**drawn** 112:20
**drinking** 226:2
**drive** 75:11
**driven** 53:23
54:1 143:21
256:2
**driving** 56:11
67:18 111:11
114:24 143:23
144:2 146:18

**[driving - enhanced]**                                                      Page 23

171:23 223:25
251:8 278:22
**drop** 131:19
**dropbox** 10:17
70:9,14 103:13
103:14 285:2
**dropout** 108:13
108:15
**dropouts**
108:12
**dropped** 108:5
108:8
**dropping**
108:19
**drs** 72:7 74:6
162:1 167:10
280:22
**drug** 23:6,13,18
32:17,18 60:22
60:25 203:14
251:20 261:11
**drugs** 25:25
95:24
**due** 156:11
165:4
**duly** 8:2
**duplicate** 80:25
118:1
**duplicated**
52:16
**duration** 144:9
179:8 183:14
194:1,15
195:13,13
214:17 216:7
216:11 217:10

248:17

**e**

**e** 4:1 5:1,14 6:1
7:1 28:3,3
133:7
**e.g.** 180:1,20
**e1** 283:23
**earlier** 51:17
90:21 99:9
103:2 110:8
121:6 138:18
146:10 150:20
159:7 161:10
163:18 166:18
182:2 189:3
202:23 203:4
238:5 247:12
247:13 259:10
277:5 279:7,15
280:20 284:12
289:8
**early** 181:25
182:1
**easier** 233:18
**eastern** 118:4
**easy** 8:21
192:13
**eating** 162:13
**editor** 24:1,5,15
24:16,18,20
**editorial** 5:21
23:5,9,12 24:8
24:17,18 25:23
26:2 169:17
170:1,3,5 261:9

**editorials** 25:22
**editors** 283:15
**edizioni** 269:19
269:24
**educational**
25:15,23 26:7
26:16
**effect** 104:10
111:12 149:10
174:21 175:19
175:24 176:4,9
176:12,16,17
178:20 192:7
193:2 201:23
201:23,25
267:2 284:7
**effects** 92:11
96:2 133:21
286:6,8
**efficacy** 95:24
**efficiency**
185:14
**egg** 224:17
225:13
**eggs** 225:5
226:7,8
**either** 10:16
24:4 56:8 57:2
57:24 81:20
87:7 113:5
114:8 120:15
139:13 151:8
223:15 235:6
**elevated** 128:10
172:1 212:3,23
224:22 260:21

260:22 261:1
**elevation**
282:16
**eligibility** 81:8
244:21
**eligible** 251:1
**emerging** 278:6
**emphasis** 52:22
**emphasize**
165:22
**emphasized**
53:9
**empirically**
129:5,9
**employee**
291:18
**employees**
139:15
**encephalopathy**
28:3
**encouraging**
282:19
**ended** 74:10
**endometrial**
192:21 267:21
**endometrioid**
266:2
**endometriosis**
257:2
**endpoint**
278:22
**english** 129:8
**enhance** 224:17
225:5
**enhanced**
225:22

[enhances - et]                                                    Page 24

| | | | |
|---|---|---|---|
| **enhances** 278:7 | 289:17 290:14 | 213:15 220:7 | 195:3 201:23 |
| **enrolled** 178:19 | **epa's** 268:21 | **equate** 170:8 | 201:24 209:19 |
| **enrollment** | 278:22 290:10 | 205:2 | 209:24 210:17 |
| 106:7,8,13,24 | **epidemiologic** | **errata** 292:9,12 | 212:23 222:7 |
| 107:20 108:25 | 62:16 81:8 95:9 | 292:17,21 | 223:8 234:19 |
| 110:5,13,16 | 164:10 206:15 | **error** 104:9 | 251:12 255:9 |
| 111:9,18 118:8 | **epidemiologi...** | 287:22 | 260:23,25 |
| **entail** 20:2 | 86:20 88:24 | **errors** 165:4 | **estimates** |
| **entails** 20:4 | 89:8 105:1 | **especially** | 104:10 107:13 |
| **enter** 286:1 | 266:24 286:15 | 104:10 247:12 | 108:17 111:12 |
| **entirely** 117:25 | **epidemiologist** | **esq** 2:4,12,20 | 134:13 146:18 |
| 125:7 126:1 | 176:5 | 292:10,12 | 150:14 151:7 |
| 136:6 156:18 | **epidemiologi...** | 293:25 | 182:10 197:3,7 |
| 172:16 173:23 | 69:3 174:22 | **essentially** | 198:15,25 |
| 174:1 218:20 | 175:24 176:8 | 24:12 | 210:7,11,15,23 |
| 284:14 | **epidemiology** | **establish** | 218:25 219:1,3 |
| **entirety** 15:17 | 19:24 201:15 | 174:13,15 | 223:4 239:21 |
| 241:6 | **epithelial** 35:14 | 230:9 | 249:6 251:8 |
| **entitled** 83:25 | 35:15,17,21 | **established** | 252:4 |
| 84:21,23 | 36:4,6,7,13 | 87:25 97:8 | **estimation** |
| 102:10 276:4 | 93:8 99:6,10,23 | 101:15 174:4 | 17:22 |
| 281:14 285:5 | 100:11 192:19 | 268:1 | **estimations** |
| **environmental** | 192:24 193:10 | **estimate** 14:23 | 194:19 |
| 276:9,18 | 227:3 260:19 | 15:22 16:4 | **estrogen** |
| **epa** 6:19 68:25 | 266:1 284:4 | 98:12 131:6 | 224:20 |
| 69:10,15,15,19 | **epithelium** | 136:19 137:11 | **et** 5:7,9,11,13 |
| 74:1,9,16 78:24 | 265:21 | 137:12 140:25 | 5:15,17,25 6:5 |
| 78:24 268:17 | **equal** 116:14 | 141:4 142:12 | 6:7,9,13,16,18 |
| 268:19 275:21 | 216:12 231:9 | 143:4 144:3 | 7:5,7 74:22 |
| 275:25 276:4 | 248:21,22 | 145:21 146:9 | 83:18 85:9 |
| 276:19 277:5,7 | 249:1,16 | 146:10,22 | 86:16 104:1 |
| 277:19,22 | **equally** 167:2 | 147:20 148:15 | 117:14 127:2 |
| 278:14 279:5 | **equals** 177:5,8 | 151:11,14,16 | 127:15 133:7 |
| 279:14,20,21 | 184:24 185:20 | 159:9 178:18 | 133:10 138:6 |
| 280:11 281:8 | 196:4,15 | 181:17 192:7 | 161:24 177:7 |
| 288:23 289:15 | 212:23 213:3 | 193:2 194:10 | 178:18 187:22 |

**[et - excluding]** Page 25

191:10,12
207:4 219:18
220:1 230:23
231:4 248:10
248:12 251:14
269:16 283:5
285:11,18
286:20
**ethnic** 253:13
**etiologic** 101:2
101:8,11,20,22
158:21,24
235:24 245:22
250:23
**etiologically**
142:16 143:9
165:20 167:21
177:19,21
179:1 181:3,22
182:17,21
183:16 186:8
242:22 243:5
247:3 251:23
**etiology** 100:25
**eval** 94:18
**evaluate** 116:25
133:20 206:22
264:24 288:3,4
**evaluated**
43:22 50:21
66:2 67:14
94:11,13,16
99:11 183:3
192:18 208:4
223:21 233:9
238:14 289:22

**evaluating**
100:17 114:20
121:5 162:15
163:6
**evaluation**
116:2 202:22
218:9 289:22
289:25
**evaluations**
290:4
**evening** 11:1
**events** 93:9
284:6
**everybody**
235:7 267:19
**evidence** 23:10
45:19 47:13
50:13,19 53:3,8
53:11 57:4 62:8
62:10,11,12,14
62:24 63:17,19
64:22 65:3,7,12
65:17 66:8,9
67:20 68:7 69:3
69:5 74:13 75:8
86:20 89:20
141:10 161:13
174:25 195:8,9
197:8,20,21,23
198:2,11,13,14
199:21,23
200:3,24
201:13 202:7
203:3 205:14
205:17 206:19
211:12 212:18

213:2,5,13
220:6 226:21
227:1 229:8
231:23 232:11
262:17 266:25
267:10 278:5,8
278:9 284:13
**evolving** 246:24
**exact** 15:2 29:2
46:6 53:6 101:5
137:15 214:24
217:17
**exactly** 19:2
39:14 53:14
56:3 58:19 64:1
64:19 71:4 82:6
84:13 91:2
120:7 131:4
181:2 240:4
256:8 264:9
282:23 284:6
**examination**
4:5 8:4 275:12
291:12
**examine** 93:1,2
115:8 143:21
157:7 208:20
211:2 233:12
**examined** 8:3
68:11 81:17
105:5 113:20
231:6
**examining** 62:8
62:19,21 76:20
197:11

**example** 28:2
40:18,19 41:4
56:10 60:21
66:11 67:8 69:5
76:11 78:22
80:24 82:15,17
82:21,22 84:13
93:6 99:17
107:8 110:12
145:25 158:22
162:13 186:14
237:6,7 240:12
246:24 253:5
255:16 266:2
282:17
**examples**
176:15 264:1
264:22
**exceeds** 185:7
**excess** 163:9
**exclude** 47:17
80:12,13,18
101:24 239:25
240:14 246:2
**excluded** 47:18
51:24 52:1,21
79:19,22 80:14
80:19,22 81:23
83:3 84:16,19
102:6 113:13
113:18 239:19
239:21 245:25
251:13
**excluding** 81:4
116:22 247:13
251:14

| | | | |
|---|---|---|---|
| **exclusion** 85:5 | 187:21,23 | 77:1 87:5 | 199:18 203:10 |
| 245:21 | 191:10,13 | 102:14 114:7,9 | 239:18 251:1 |
| **excuse** 95:6 | 207:3,5 219:17 | 114:15 115:1 | 252:15,16 |
| 152:7 155:13 | 219:19 227:15 | 115:12 116:2,4 | 258:2 263:6 |
| 191:14 220:4 | 230:21,22,24 | 116:16 118:22 | **explained** 80:21 |
| 248:21 272:12 | 230:25 241:13 | 118:23,25 | 261:7 |
| 285:19 286:7 | 248:11,13 | 119:6 120:17 | **explains** 82:20 |
| 289:6 | 256:15,22 | 121:5 126:24 | **explanation** |
| **exercise** 240:18 | 269:17 275:24 | 127:10 133:14 | 189:19 190:25 |
| **exhaustively** | 276:3 281:13 | 141:24 152:15 | **explicate** |
| 261:3 | 281:18,20,23 | 154:5 167:18 | 204:23 245:20 |
| **exhibit** 4:9,10 | 283:4,6,11 | 207:7 208:1,5 | **explicit** 120:19 |
| 4:11,12,13,14 | 285:5,12,13 | 219:21,25 | 135:12 283:22 |
| 4:16,17,19,21 | 287:20 288:24 | 222:2,3,24 | **explicitly** 117:7 |
| 4:23 5:3,4,6,8 | **exhibits** 1:2 7:9 | 231:14 233:11 | 120:5 215:16 |
| 5:10,12,14,16 | 72:16 | 263:19,23 | 245:15,17 |
| 5:18,20,22,24 | **exist** 77:12 | 269:22 | 246:11 |
| 6:3,4,6,8,10,12 | **existence** | **expertise** 266:8 | **exploratory** |
| 6:14,15,17,19 | 132:17 | 271:14 274:25 | 165:6,21 166:1 |
| 7:3,4,6 9:7,10 | **existing** 20:23 | 275:3 | 166:19 167:1 |
| 13:23 14:1 18:9 | 188:11,25 | **experts** 11:17 | 167:13 168:3,8 |
| 30:25 31:1,2,3 | **expect** 123:21 | 11:20 72:14 | 168:11,14 |
| 34:15,18 37:11 | **experience** | 74:2 116:13,20 | **exposed** 130:11 |
| 37:12 41:13,16 | 114:5 274:4 | 116:21 139:12 | 189:13 190:6 |
| 42:6,8,17 47:20 | **experimental** | **expire** 112:9 | **exposure** 44:11 |
| 47:23 52:8,10 | 67:10 92:6,9,19 | **expired** 107:10 | 50:14 74:25 |
| 57:6,7,9 61:8 | 93:2,7,12,13 | 112:17 | 76:3 95:13 |
| 85:16 86:17 | 287:4 | **expires** 291:24 | 96:20 98:7 |
| 88:9 104:2,4 | **experiments** | **explain** 21:13 | 102:11 103:11 |
| 114:2 117:12 | 67:9 271:8 | 23:20 25:14 | 111:13 124:4 |
| 117:15 127:3,4 | **expert** 4:14 8:9 | 26:25 41:5 | 129:3 140:10 |
| 129:14 133:8,9 | 12:15,21 25:24 | 82:13,22 84:18 | 143:9 145:12 |
| 136:22 138:5,7 | 31:2 32:9 33:17 | 84:21,24 94:21 | 146:20 150:16 |
| 154:5,8 169:21 | 33:25 34:5,11 | 101:10 124:25 | 156:5 167:22 |
| 169:25 170:2 | 34:17,21,22,25 | 143:3 165:8 | 170:9,10 171:1 |
| 179:14,16 | 51:11 72:12,22 | 170:11 177:14 | 171:3 177:22 |

**[exposure - final]**                                                                Page 27

179:2 181:23
183:14 185:12
185:15 187:16
192:16 194:13
194:14 195:19
196:17,18
231:7 239:4
241:3 245:5
247:3,6 250:24
251:23 253:21
254:8,10,15
256:18 257:7
262:13 263:8
270:21 277:2
277:23 279:1,3
280:1 285:20
289:17 290:8
**exposures**
94:23 107:2
**extend** 194:16
**extent** 10:6
12:2,9 33:20
35:21 63:2,11
72:11 115:6
129:2 186:11
195:2 270:11
276:21 281:5
**external** 132:8
132:11,11,16
282:12
**externally**
284:19
**extreme** 214:7
261:23

**f**

**facilitate** 264:9
**fact** 69:3 70:9
95:22 100:1,10
100:14,16
101:4,7 115:21
118:13 119:11
120:8 121:14
121:14,17
122:2,25 124:3
124:25 145:11
158:3 171:5,7
185:13,18
187:15 190:22
192:23 200:6
206:22 210:14
224:7 227:22
228:25 231:17
262:25 280:13
280:17,18
281:2 288:9,17
**factor** 38:9
49:14,16 66:21
67:5 96:14 99:1
114:22,23,24
115:3,3 204:2
**factors** 37:24
39:7,7,17 40:14
41:5 49:11
50:10 66:23
67:5,13,18
98:15 101:6,15
114:22 125:6
162:12 163:10
224:6,16,24

246:12 277:17
281:14
**facts** 48:7
**fair** 21:23 30:16
40:15 42:21
47:5 65:22 78:8
**fall** 289:19
**fallop** 242:14
**fallopian** 169:6
169:7 241:9,17
242:6,11,15
244:9 265:21
**familiar** 47:24
75:23 133:16
139:1,3 169:17
187:24 200:15
206:15,16,25
**family** 19:8
23:7 40:22
49:14,22 50:4
261:11 274:1
**far** 10:19 34:8
87:16 105:25
139:14
**fast** 130:1
**fat** 224:17
225:5,13 226:7
226:9
**favors** 202:22
**fda** 68:22 70:17
70:18,21 71:15
74:14,15
120:16 229:9
229:11 280:22
**fda's** 73:18

**features** 265:17
**february** 5:4
57:8
**federal** 52:11
274:16
**feel** 65:8 73:11
**fell** 128:1 131:1
**felt** 65:23 66:5
242:21,22
**female** 39:23
40:4 265:20
**feminine** 105:7
129:19
**fewer** 116:14
**fiber** 75:1
**fibroids** 69:6
93:6 288:1,17
**fibrous** 76:17
76:22
**figure** 221:21
255:1
**figures** 48:7
**file** 9:24 10:5
**filed** 9:22
**filing** 58:24
**final** 37:18 43:5
74:20,21
104:19 128:16
164:18 166:12
180:13 196:3
226:13 234:17
250:4 260:8,11
262:11,12
266:11,18
269:10 270:2
271:18 276:12

**[final - footnote]**                                                Page 28

| | | | |
|---|---|---|---|
| 276:19 277:8 | **first**  18:17 20:4 | 248:20 252:2 | 106:19 109:1 |
| **finally**  56:7 | 20:9,10,11 | 253:8 258:3 | 110:5,16 111:9 |
| **financial**  88:2,3 | 21:12 25:7,13 | 263:14 264:17 | 112:10 140:11 |
| **financially** | 26:25 30:15 | 266:11,19 | 142:15 143:3 |
| 87:15 291:19 | 34:24 44:8 | 270:16 276:14 | 143:10,24 |
| **find**  55:7 68:17 | 49:13 52:14,20 | 277:15 278:20 | 152:8 153:5,17 |
| 81:17 82:22 | 54:24 71:3 95:2 | 284:1,17 287:2 | 153:19 155:5 |
| 88:15 197:8 | 95:18 97:16,20 | 288:24 | 155:17,20,22 |
| 217:6 221:23 | 98:23 104:13 | **five**  145:13,14 | 156:1 158:22 |
| 228:11 229:6 | 104:14 108:8 | 195:17 216:25 | 158:23,24 |
| 229:21 247:2 | 110:20 111:3 | 216:25 217:3 | 159:6,13,24 |
| 256:16,20,20 | 118:6 125:14 | 260:10,16 | 160:1,6,11,12 |
| 272:20 | 126:19,22 | 268:6 | 160:14,20 |
| **finding**  125:25 | 134:6 135:5 | **fixing**  61:15 | 177:17,18,20 |
| 165:5 166:18 | 136:1 140:2,3 | **flawed**  145:24 | 177:20 179:5,8 |
| 166:20 257:25 | 140:24 147:1 | 191:8,8 | 179:10 180:4 |
| **findings**  70:18 | 155:7 156:19 | **fletcher**  269:6 | 180:22,25 |
| 87:19,20 115:5 | 157:14 158:1 | **flip**  21:1 28:24 | 181:4,4,7,8,10 |
| 125:9 166:25 | 162:16 163:11 | 38:17 164:9 | 181:23,24,25 |
| 211:5 229:9 | 164:9,18 | 217:19 238:21 | 181:25 182:12 |
| 258:6 259:19 | 166:12 167:22 | 239:11 289:5 | 182:13,17,20 |
| **fine**  15:3 109:9 | 170:6 174:17 | **flipping**  86:12 | 182:24 183:15 |
| 169:10 188:19 | 175:1,4 178:14 | **flom**  2:19 | 258:22 259:24 |
| 206:13 | 179:17,18,21 | **florida**  2:14 | 275:11 |
| **finer**  86:5 | 180:11,12 | **focus**  93:17 | **followed** |
| **finish**  8:23,24 | 186:25 188:8,9 | 113:6 141:16 | 179:12 |
| 109:25 124:21 | 189:9,22 196:3 | 142:23 145:18 | **following**  41:10 |
| 124:22 167:8 | 209:3 215:20 | 203:17 237:14 | 105:4 107:17 |
| 178:3 215:10 | 215:24 217:23 | 290:9 | 179:4 181:6 |
| 262:21 | 217:24 224:8 | **focused**  35:21 | 202:16 229:19 |
| **finished**  178:2 | 224:13,15 | 122:4,5 125:4 | 272:11 282:11 |
| **finken**  3:5 21:7 | 225:25 228:2 | 289:25 | 293:7 |
| **fired**  269:12 | 228:15 231:3 | **focusing**  82:3 | **follows**  8:3 80:6 |
| **firm**  118:23,24 | 231:11 233:24 | 193:24 290:15 | 91:11 |
| 213:15 | 235:14 238:13 | **follow**  46:2 | **footnote**  156:2 |
| | 247:2 248:20 | 58:5 106:9,15 | 201:19 240:21 |

**[footnote - further]**                                                      Page 29

| | | | |
|---|---|---|---|
| 241:15 244:7 | 190:16 195:6 | 221:12,16,24 | **frequently**   37:4 |
| 253:13 | 206:9 209:1 | 222:14 223:13 | 145:9 174:21 |
| **foregoing**   291:6 | 211:22 213:1 | 235:15 252:4,8 | 209:14 210:4 |
| 291:15,21 | 213:18 225:24 | 252:9,19 | **front**   34:19 |
| 293:6 | 229:17 232:4 | **fourth**   105:15 | 48:9 86:7,14 |
| **forest**   251:3 | 235:12 239:2 | 106:9 107:18 | **frontiers**   23:6,6 |
| 254:25 255:1 | 242:1,17 | 107:19,21 | 23:13,17,21 |
| **forget**   148:5 | 243:23 252:14 | 108:8 127:12 | 261:10,11 |
| **form**   12:12 | 254:1,5 263:25 | **foutch**   33:7 | **frowned**   190:22 |
| 16:6,10,14,18 | 267:7 268:14 | **fragments** | **fruits**   149:19 |
| 16:24 17:6,24 | 271:5 273:15 | 75:24 | 162:14 |
| 25:9 26:21 | 290:2 | **framework** | **fulfill**   96:16 |
| 27:22 28:10,17 | **formal**   18:25 | 199:16,20 | **full**   39:5 52:3 |
| 30:7 31:25 32:4 | 190:14 | 200:16 203:13 | 62:1 78:25 |
| 32:23 33:5,15 | **formation** | **frameworks** | 106:6,10,17 |
| 35:19 36:17,22 | 115:16 | 199:19 | 107:14,18 |
| 40:10,17 44:12 | **forming**   272:10 | **frequency** | 110:18 164:10 |
| 44:14 46:11,23 | **forms**   73:13 | 45:18 144:8 | 170:6 178:14 |
| 47:11 48:25 | 87:15 | 145:16,17 | 179:18,21 |
| 50:1,24 52:25 | **forth**   154:10 | 148:7 183:15 | 180:11,12 |
| 54:2 55:1 56:15 | 291:7 | 194:15 195:12 | 201:9 215:20 |
| 64:17 65:11 | **forthcoming** | 195:13,18 | 228:3,15 |
| 67:6 71:17 | 29:18 30:21 | 214:17,24,25 | 233:25 235:14 |
| 87:12 88:5 | **forward**   38:17 | 215:2 216:6,7 | 260:8 |
| 89:17 90:16 | **found**   75:9 | 216:10 217:10 | **fulsome**   262:14 |
| 91:21 92:20 | 131:13 224:3 | 242:20 248:17 | 263:1 |
| 96:11 100:5 | 228:25 229:1 | 258:9,11,19,19 | **function**   186:4 |
| 107:4 116:5 | 245:24 257:13 | 258:25 259:22 | 186:5 187:12 |
| 117:5 119:15 | 268:11 280:12 | 260:4 | 187:14 |
| 120:10,22 | 280:21,22,23 | **frequent** | **funded**   21:19 |
| 123:23 128:11 | **four**   22:18 31:4 | 147:14 150:17 | **funding**   21:24 |
| 129:1,7 130:15 | 33:18 51:15 | 209:10 231:7 | 114:25 120:15 |
| 146:11 147:13 | 53:5,5 74:25 | 234:8,14,19 | 233:13 270:4 |
| 162:5,18 | 106:1 160:12 | 235:25 241:20 | **further**   80:10 |
| 163:13 169:8 | 160:13 178:25 | 243:14,17,21 | 134:22 203:7 |
| 173:8 176:1,7 | 220:16,20,21 | | 204:5 227:5 |

**[further - going]**                                                          Page 30

| | | | |
|---|---|---|---|
| 251:12 254:16 | 89:22 94:14,19 | 143:1 152:20 | 154:10 157:8 |
| 275:8 278:7,9 | 95:1 102:10 | 159:15 166:13 | 157:16 160:5 |
| 282:14 287:13 | 103:9 105:9 | 168:25 176:2 | 163:3 169:21 |
| 290:20 291:17 | 106:4,13,14 | 178:15 186:14 | 170:11 171:4 |
| **furthermore** | 108:24 109:1 | 207:8,8 210:1 | 175:2 183:2 |
| 214:16 | 111:9,13 | 211:6 217:23 | 184:6,8 190:17 |
| **future** 290:4 | 123:15 124:4 | 230:2 237:7 | 191:22,24 |
| | 124:11 125:3 | 238:19 239:14 | 192:22 195:10 |
| **g** | 129:19 137:8 | 243:25 244:17 | 195:14,24 |
| **gabriel** 5:11 | 167:5 170:13 | 254:18 272:19 | 196:23 201:8 |
| 85:9,14 117:12 | 170:25 171:13 | **given** 11:17 | 203:7 207:23 |
| 117:14 122:3 | 189:14 209:10 | 30:4,4,12 31:4 | 212:8 214:25 |
| 126:7 | 212:9 214:18 | 60:22,25 65:23 | 216:21 218:13 |
| **gathered** 63:22 | 214:25 215:3 | 97:23,24 | 221:17 222:13 |
| **gathering** | 216:7,13,18 | 170:18 238:25 | 233:22 237:5 |
| 62:12 | 246:16 260:19 | 279:6 | 240:12 243:24 |
| **general** 31:18 | 273:19,21 | **gives** 151:20 | 244:19,25 |
| 64:18 66:18 | 285:6,23 | **giving** 51:11 | 248:4 249:8,11 |
| 170:19 187:9 | 286:16 288:5 | 64:2,7 68:14,15 | 253:12 259:9 |
| 195:7 | **gerel** 2:3 | 237:20 | 259:20 260:15 |
| **generally** 15:21 | **getting** 21:2 | **glad** 183:20 | 262:7 266:21 |
| 20:3 22:14 | 54:16 98:12 | **go** 26:17 31:10 | 273:16 275:4 |
| 27:19 36:20 | 108:18 130:5 | 33:2 41:22 | 276:16 279:17 |
| 48:2,5 97:2 | 135:8,9 181:24 | 42:25 53:15 | 281:23 285:21 |
| 113:25 170:16 | **ghassan** 270:4 | 55:9 58:1 68:15 | **goes** 27:23 |
| 174:22 175:24 | **give** 8:19 11:9 | 74:14,15,15 | 40:14 175:13 |
| 187:13 234:23 | 31:6 38:1 43:8 | 86:11 96:21 | 218:19 246:23 |
| **generating** | 56:22 61:12 | 98:17,18 99:17 | 250:17 251:7 |
| 166:19 167:14 | 66:12 68:10 | 101:16 103:16 | 288:17 |
| 168:9 | 70:10,12 82:25 | 108:6 109:23 | **going** 9:24 10:4 |
| **genetic** 98:25 | 88:21 97:6 98:8 | 110:12 115:23 | 22:17 26:9 29:6 |
| 224:23 274:2 | 103:16 106:20 | 117:3 120:2 | 40:11 59:6 |
| **genital** 35:2 | 109:18 123:24 | 125:25 127:21 | 63:14 64:2 66:5 |
| 38:5,9 39:24 | 136:11,14,15 | 131:7,9 132:5 | 67:10 73:22 |
| 40:5 50:14 | 136:17,18 | 137:23 152:18 | 75:11 76:7,24 |
| 85:11 89:11,15 | 138:15 142:23 | 153:25 154:2,4 | 84:20 85:20 |

**[going - hazard]**                                                    Page 31

| | | | |
|---|---|---|---|
| 86:7 89:18 91:7 109:22 137:14 139:17,23 154:10 161:21 161:25 164:17 165:23 166:23 176:16 179:6,7 179:8 186:6 192:19 193:7 197:3 201:16 205:15 218:13 219:14,15 222:20,23 229:4 230:10 230:19 256:17 256:20 259:23 269:9,11 276:15 284:15 **gonzalez** 160:16,20 **good** 8:6 92:8 92:18 93:18,21 95:22 126:25 129:20,21 138:16 **goodman** 5:15 83:18,21,23 84:20 132:23 133:5,7,10 **goodmans** 83:21 **gossett** 5:20 169:16 170:1,3 173:20 218:20 **gotcha** 41:7 60:17 | **gotten** 123:5 **government** 139:14 **governmental** 279:16 **grade** 199:16 199:19,20 200:6,7,15,16 200:21 201:12 201:13 202:1 202:22 206:16 238:22 240:7 **graded** 200:24 240:13 **gradient** 66:22 262:15 263:6 **grading** 203:9 **grams** 131:15 **grand** 15:9 **grant** 22:4,9 **grants** 21:12,14 21:15,22 22:9 22:16,23 **great** 131:20 154:11 178:12 272:25 **greater** 146:21 182:14 208:24 216:12 231:9 243:22 245:4 249:12,16,19 249:25,25 250:1,4,5 253:6 **grew** 231:19 233:5,21 | **group** 23:18,21 108:10 109:2 112:4,4 144:11 172:7,21,22 173:6,10 174:1 182:25 186:5 197:24,25 204:21,22 269:25 284:10 **groups** 171:24 172:6,24 173:11 174:2 211:10,12 213:8 **guess** 31:22 63:10 66:18 68:10 90:12 91:8,9 125:11 128:3 166:7 **guidelines** 199:24 **guys** 21:1 **gyn** 38:16 **gynecologic** 86:22,24 274:5 **gynecological** 105:8 **gynecology** 36:20,25 | 278:20 **halfway** 88:19 93:22 166:11 194:2 202:17 **hampshire** 118:4 **hand** 27:24 84:10,12 120:18 136:4 236:10 243:5 250:18 293:19 **handling** 24:15 24:20 **handy** 70:2 **happen** 235:9 **happened** 146:3 156:4 **happens** 111:21 239:25 **happy** 109:21 184:3 230:7 264:9 **hard** 245:1 269:14 **harlow** 162:2 167:10 194:24 **harmful** 96:2 **harmonize** 183:13 241:9 244:10 247:5,5 **harper** 6:18 269:8,8,16 **hate** 116:18 **hazard** 143:16 144:12,14,15 146:5 147:7 |
| | | **h** | |
| | | **h** 6:15 248:12 **half** 107:9,22 108:22 112:8 140:24 147:1,3 260:9 265:12 | |

**[hazard - human]**                                                                 Page 32

149:9,10
150:18 151:3
162:17 164:7
172:10,12,17
172:18 182:9
242:9 243:14
243:15 253:14
253:14 288:12
**head** 8:20,21
70:23
**health** 6:10
18:19,25 19:8,9
19:12,14 36:15
45:8 63:15
64:16,20 98:1,3
98:16 154:23
155:13,23
157:21,23
158:1 160:10
162:11 203:6
203:19 204:7
205:7,20,23
206:23 226:23
227:7,11,14,21
227:23 228:1
230:16 236:6
241:4 260:17
262:2,6 265:9
265:10,11
266:9 273:18
276:22,25
278:22 284:13
284:16,17,21
285:3
**heard** 78:24
269:22,23

**hearing** 53:19
53:21
**heavily** 52:18
53:12 101:4
202:22
**height** 39:8
**help** 77:17
**helpful** 24:23
194:7
**helps** 159:20
**henderson**
229:20,23
**heterogeneity**
98:24 101:2,8
101:12,21,22
189:20 197:9
197:16,22,23
198:2 199:5,14
211:12 213:2
213:13 218:12
220:7 223:6
**heterogeneous**
99:12 265:19
**heterogenic**
198:12 212:18
**hide** 31:12
**high** 201:4
237:3 240:13
**higher** 40:22
106:18 124:24
125:1 137:12
163:19 172:11
177:6 209:9,14
209:24 211:9
212:13,16
218:17 237:20

239:1 242:10
242:16,23
243:6
**highest** 40:16
237:16 251:22
**highlighted**
174:23
**highlighting**
59:11
**highlighting's**
59:3
**highlights**
58:15,20
**highly** 111:23
257:12,19
**hill** 53:22,25
54:13,24 56:21
62:22 64:5 65:5
65:9,21,24
100:4,7,21
197:12
**hill's** 54:16
**histologic** 35:22
193:9
**histological**
35:17 36:9
193:23 265:16
**histology** 192:1
**historic** 104:8
**histories** 40:22
**history** 49:15
49:22 50:4,5
71:16,21 110:7
274:2
**histotype**
214:20

**hoc** 178:5
190:21 191:9
**hold** 227:13
**holding** 28:7,13
187:3,10
**hope** 78:14
139:4
**hormonal**
38:25 94:23
257:2
**hormone** 48:24
91:15,20
**hospital** 198:6
**hotel** 1:19
13:16
**houghton**
154:24 160:25
**hour** 13:2
275:15
**hourly** 13:7
**hours** 11:1
14:24 15:1
240:10 261:3
270:17 271:2
271:10,11
**housekeeping**
271:18
**hpv** 286:5
**hr** 161:12,16
162:3 171:9
**hrs** 171:8
**huh** 104:24
118:20 123:9
**human** 62:16
202:6 203:2,18
203:22,23

**[human - inconsistent]**

Page 33

228:5,19,22
250:24 251:23
276:25 279:22
280:5
**humans**  202:6
203:2 229:5
**huncharek**
221:9 222:19
223:14
**hundred**  16:9
33:4 268:6,6,7
**hundreds**  264:3
264:5
**hygiene**  105:7
**hypothesis**
166:19 167:4
167:14 168:8
168:12 214:8
214:11 235:5
261:23 282:11
**hysterectomy**
91:1 137:7,11
137:20 163:20
164:6 170:13
170:21 246:13

**i**

**i.e.**  35:2 110:6
128:21
**iarc**  74:8
204:19,21
205:3,5,6
206:16,17
280:11 284:10
**iarc's**  204:10

**idea**  227:24
284:19
**ideal**  136:3
**identified**  75:1
79:9 80:14
228:6,20 291:8
**identifies**
195:17 289:17
**identify**  78:18
79:13 129:16
**ignore**  55:14
**impact**  49:6
164:7
**implication**
49:16
**implications**
158:8
**implicitly**
246:11
**implies**  49:24
**importance**
54:9,13,19,25
55:3,5,19
115:11 165:22
**important**  26:7
27:11 49:14,16
49:21,25 50:4
55:8,13,20
59:22 60:2,7
61:3 65:24
73:21 102:1
114:20 115:9
115:16 117:7
167:2 174:23
175:25 176:6
239:18,24,24

255:5
**importantly**
135:24 217:9
**impossible**
110:15 151:15
**imprecise**
151:20
**impressed**
206:5
**improper**  263:3
**inability**  168:20
**inadequate**
44:10
**inappropriate**
191:6
**incidence**  48:18
**incident**  49:8
98:9 285:7
**inciting**  286:3
**include**  18:1
39:11,11 80:12
81:21 85:9
90:24 118:3
159:5 222:23
235:4,22 236:4
241:8 244:9
252:18 254:21
276:25
**included**  35:22
47:18 61:12
70:7 76:14
78:19 79:17,20
81:8,13,14,19
85:3,25 99:16
102:2,5 112:24
115:12 127:15

127:17 178:23
189:5,12 190:1
198:17 217:6
220:17 221:12
223:15 236:9
237:2 240:24
245:2 246:15
248:9 252:3,8
254:19 260:2
260:17 272:10
**includes**  46:3
80:11 205:7
235:1 246:12
258:4 279:1
**including**  8:18
62:16,17 94:5
153:16 245:5
265:20 269:21
277:17
**inclusion**  85:4
241:6 243:22
244:13 245:20
246:6 252:4
258:25 259:6
**income**  16:17
16:25 17:10,13
17:23,25 18:3
**incompatible**
125:9 263:10
**inconclusive**
92:8
**inconsistency**
163:2
**inconsistent**
161:14 257:24
258:6,18

[inconsistent - intact]                                                    Page 34

259:18
**incorporate**
19:7 153:16
**incorporates**
19:4
**incorporation**
18:22
**incorrect**
145:11
**increase** 97:23
110:20 111:6,8
123:22 124:5
126:2 135:20
151:5 157:9
177:9 186:2
192:21 201:6
220:4 224:24
226:10
**increased** 35:4
44:13 48:23
107:25 108:1
109:13 110:5
121:15 125:6,7
149:21 152:13
155:21,22
157:20 159:13
160:1 164:11
171:19 173:10
174:15 187:11
187:12 193:6
215:4 225:1,8
225:23 234:14
237:25 279:12
**increases** 36:6
101:17 113:5
165:17

**independent**
97:18 237:25
**indicate** 110:6
111:10 122:2
**indication**
94:21 95:6,11
95:19,21 96:3,6
96:23,23
**indicative**
201:11 203:8
205:18 267:2
267:11
**indirect** 229:7
**indirectly**
228:23
**indisputable**
229:10 280:8
**individual**
142:9,12
162:11 183:3,5
184:13 274:24
**individually**
223:15 247:22
**individuals**
286:4
**induce** 271:16
**induces** 270:21
**inducing** 94:6
**inference** 46:15
64:4
**inflammation**
85:12 93:8 94:6
227:4 284:5
287:7
**inflammatory**
94:23 282:14

282:17 283:17
283:19 286:3
**inflate** 181:13
**inflates** 183:19
**inflation** 13:5
**influence** 49:6
182:5,6 251:11
**influenced**
182:3
**influences**
186:11
**information**
110:14 143:18
162:23 262:14
266:24 289:18
**informative**
28:4,6,9,16
143:14 159:4,4
**inhalation** 76:9
90:10 277:2
278:25 279:3
**inhaled** 279:10
**inhibitors**
95:25
**initial** 11:21
152:13 156:22
157:23 160:20
161:2 178:7
185:19 187:18
257:25
**initially** 122:3
148:24 156:24
**initiate** 93:9
**initiative**
154:23 155:13

**initiatives**
155:24
**injuries** 276:25
282:15 283:18
**injury** 276:22
**inquiries** 34:4
**inquiry** 33:22
**insignificant**
128:6,9
**insoluble**
226:25
**installation**
230:4
**instance** 35:25
162:16
**institute** 4:17
18:23 19:12,13
19:15 21:18
41:15 42:1,17
**instruct** 17:14
17:20
**instructing**
17:19
**instructions**
292:15
**instructs** 9:2
**insufficient**
153:2,4
**intact** 125:3
126:9 137:8
163:5 166:20
169:7 174:19
175:22,23
241:9 244:9
246:16 259:11

intake   224:16
intend   152:4
  275:1
intended   60:16
intensity
  194:15
interact   157:11
interaction
  171:18 172:10
  173:4,12 210:8
  212:1,3,7,19,21
  213:6,24
interactions
  125:17 219:1
interest   114:7
  114:18 118:19
  119:12 121:4
  231:18 273:18
  287:25
interested
  288:8,15
  291:19
interesting
  111:15,16
interpose
  139:16
interpret   69:5
  107:11,24
  109:10 162:21
  172:1,23
  173:16,18,19
  205:16,17
  233:19 271:7
interpretation
  36:4 115:4
  171:17 172:16

172:20 173:1
173:21,22
214:10 217:5
219:2 237:1,4,8
237:12 259:13
261:19 266:24
270:13 288:8
interpretations
  141:12 173:5
  233:15
interpreted
  110:11 161:12
  165:6 167:1
  202:3 267:9
interpreting
  172:9,14
  213:23
interprets
  287:10 288:11
interval   141:3
  141:20 142:4,5
  142:8 144:12
  146:23 149:13
  151:6,21
  191:21 193:3
  209:20,25
  210:20 211:19
  212:14 250:12
  255:15,18
  257:14
intervals
  136:18 143:17
  146:16 192:9
  197:6,17 210:9
  210:13,24
  211:2,16

212:20 251:5
255:24 256:3
261:15
intervening
  65:23 106:11
  108:21,23
  109:2
interventions
  199:22 203:14
intrauterine
  230:4
intravaginal
  230:5
introduce
  85:15 230:20
introduced
  227:10 229:20
introduction
  153:14,14
  234:2 284:1,2
invasive   36:12
investigation
  281:14
investigators
  132:13 134:14
  280:21
invoice   4:11
  14:1,2,9,18,25
  15:17 78:9
invoices   14:11
  17:3
invoke   190:25
invoked   189:19
involve   108:21
involved   119:13
  119:22

involvement
  139:19
involves   120:8
  197:11
involving
  126:14 163:4
irrelevant
  177:19 181:3
  183:17
irrespective
  186:20
irritants   286:3
irritation   95:17
isolation   60:11
issue   28:8 31:18
  51:8 58:5
  135:16 140:12
  158:1,18,21
  191:2 230:11
  230:17 239:23
  251:7 258:19
  270:13 275:17
issues   113:24
  116:12 121:9
  121:13 135:11
  158:18 176:11
  189:24 267:17
  279:17
issuing   276:19
iwona   5:10
  117:14

**j**

j&j   71:15 264:6
jama   138:25
  169:18 170:6

**[january - know]** Page 36

| | | | |
|---|---|---|---|
| **january** 4:19 12:7 14:4,17 16:3 29:8 42:7 42:17 | **katie** 5:8,16 7:6 91:7 104:1 138:6 283:11 285:8,11 | 47:16 48:8 49:3 49:20 50:17 53:4,6,7,10 54:20 55:9,14 | 99:25 100:19 100:21 101:3,6 101:8,14,14,15 101:17,19 |
| **jersey** 1:4 8:14 274:19,21 293:1 | **keep** 17:2 24:7 34:19 43:3 126:22 154:11 173:5 | 55:21,21 56:7 56:11,20 57:16 59:4 60:11,20 60:20 61:16 | 102:1,2,4,6,16 102:16,20 107:7,23 108:2 108:11,15,17 |
| **job** 24:12,22 | **kemi** 7:4 283:5 | 62:11,18,25 | 108:19 109:9 |
| **johnson** 1:6,6 8:7,7,10,10 68:23,23 284:21 292:3,3 293:2,2 | **kiarash** 6:8 219:18 | 63:21,24 64:3 64:19,22,23,23 65:2,3,17,18 | 109:10 110:11 111:23 112:7 112:15 113:20 113:23,23 |
| | **kidney** 25:25 | 66:4,7,7,10 | |
| **johnson's** 35:3 | **kind** 43:7 57:15 87:14 95:10 114:8 181:24 186:10 | 67:15,23 69:6 70:21 71:11,14 71:18,20 72:10 | 114:8,25 115:4 115:7,8 116:12 116:21,23 |
| **joined** 23:5,12 24:6 | | 72:15,16 73:1,8 | 117:2 118:1,4,5 |
| **journal** 23:16 24:8,14 86:25 104:14 139:1,5 269:18,22 270:1 | **kinds** 87:22 | 73:16,18 74:1,2 | 120:9,16,20,23 |
| | **knock** 157:17 | 74:3,16 75:9,10 | 120:24,25 |
| | **know** 8:17 9:4 10:13,19,25 12:2,4,13 16:8 16:12,15,25 17:1 18:2,21 19:3,11 20:7,16 21:20,21,21 24:4,16,16 25:17,19,24 26:1 27:4,8,9 27:17,23,24 34:4 35:22 36:5 36:13 39:8 40:2 40:6,11,12,13 40:18,19,21 44:2,3,5 45:6,8 45:10,14,16,18 46:5,6 47:15,16 | 75:21 76:12,13 76:20,22 78:22 78:23 79:6,22 79:22 81:1,14 82:2,3,7,16,18 82:20 84:14,19 84:19 85:1,3 87:7,13,14,16 87:18,21 89:2 89:19 90:8,11 90:21 91:23 92:24,25 93:14 93:14,16 95:8 95:15,17,23,24 96:13,13,13,14 96:14,19 97:17 98:4,5,7 99:14 | 121:2,8,8 122:21 124:19 125:5,8,17 128:23 129:5 129:11,14,20 130:6,13,19,21 130:23 131:5,7 131:9,10 132:20,25 133:1 134:24 135:5,17,19,22 135:22,22 136:8 138:20 138:21,22 139:15,23 140:10 143:8,9 143:13 144:8 |
| **journals** 23:5 23:19,21,22 24:1,5 114:11 261:10,14,16 269:24 270:1 | | | |
| **judgment** 111:25 | | | |
| **julie** 5:14 133:7 133:10 | | | |
| **k** | | | |
| **k** 2:5 6:17 28:3 269:16 | | | |
| **kadry** 6:5 191:12 | | | |

**[know - lawyers]**                                                                 Page 37

| | | | |
|---|---|---|---|
| 145:9 146:14 | 195:22 196:24 | 253:16,17,19 | **known** 65:19 |
| 146:17 147:24 | 197:2 198:7,12 | 253:21 254:6 | 78:2 135:25 |
| 147:25 148:3 | 198:17 199:15 | 255:18,19 | 198:4 279:22 |
| 149:17,18,19 | 199:20,21,22 | 256:4 258:2,13 | 280:5 284:8 |
| 149:20,22,22 | 200:12 201:2,4 | 259:2 260:1,4 | 286:12 |
| 150:4 151:1 | 201:5,7,9,13 | 261:5,14,18 | **knows** 17:13 |
| 153:10,19,23 | 203:11 204:1 | 262:18,24 | |
| 155:22,25 | 204:17 205:22 | 263:2,3,7,11,18 | **l** |
| 156:4 157:11 | 206:2,12,18 | 263:20 264:6 | |
| 158:5,19 159:3 | 208:8,10,10,14 | 264:17,21,23 | **l** 285:9 |
| 161:20 162:7,7 | 210:10 211:24 | 264:24 265:3 | **lab** 27:8 |
| 162:9,20,22 | 212:4,17 213:9 | 265:25,25 | **lack** 137:21 |
| 163:25 164:1,3 | 213:23 214:3,3 | 266:4,6 267:8 | 177:11 198:12 |
| 164:3,7 165:10 | 214:4,6,10 | 267:11,19,23 | **lacking** 94:8 |
| 165:21,22 | 215:6 216:24 | 267:25 268:2,8 | 262:14 |
| 167:23,23 | 216:25 217:3,4 | 269:14,24,25 | **language** 68:21 |
| 168:1,12 169:1 | 220:10 222:2 | 270:1,11,14 | **large** 91:11 |
| 169:1,6,10,11 | 222:15,16 | 271:6,7,11,12 | 152:7 263:16 |
| 169:13,13,15 | 223:3,7,8,10,21 | 271:15 272:5 | **largely** 91:13 |
| 171:17 172:12 | 223:25 224:1,1 | 273:20 274:12 | 203:5 |
| 172:18 173:3,9 | 225:14,16 | 274:15,18,20 | **larger** 124:13 |
| 173:20,24 | 226:3,4,22,24 | 277:16 278:1,2 | 125:12 179:25 |
| 174:12 176:8 | 226:25 228:24 | 278:6 279:8 | 180:20 186:15 |
| 176:10,13 | 229:4 231:13 | 280:9,10,14,20 | 256:2 |
| 177:24 179:4 | 232:3,6,13 | 280:21,23 | **largest** 185:8 |
| 180:6,25 | 233:4,10,11,14 | 281:4,7,10,25 | **laryngeal** 277:1 |
| 181:16,18,20 | 233:16 234:13 | 282:24 284:11 | 279:2,24 280:6 |
| 182:9,10,16 | 234:15 235:25 | 284:12 287:3,5 | **lastly** 279:13 |
| 183:18 186:4 | 236:25 237:2 | 288:11,13,17 | **late** 182:1 |
| 187:10,16 | 238:25 239:3 | 289:8 290:3,5 | **law** 118:23,24 |
| 190:12,17,18 | 240:2,2,3 | **knowing** | 205:23 206:7,8 |
| 190:19,22 | 242:20 245:17 | 288:18 | **lawyer** 15:5 |
| 192:18,23 | 246:1,14 | **knowledge** 9:16 | 206:11,14 |
| 193:5,6 194:19 | 250:17,21 | 65:2 139:12 | **lawyers** 33:22 |
| 194:20,25 | 251:2,10,14 | 231:22 293:7 | 77:7 133:15,16 |
| 195:8,10,14,21 | 252:17,20 | | 270:6 |

**lazar** 231:13
**lead** 93:9 227:4
  227:5
**leading** 284:5
**leeway** 68:11
  68:15
**left** 23:9 149:8
  269:1
**lends** 284:18
**length** 145:17
  145:18 179:12
**lens** 62:21
  65:19
**lesser** 67:22
**lethal** 111:23
**letter** 161:21
  162:1 165:23
  166:23 167:6,9
**letters** 171:16
  199:16
**leukemia** 32:20
**level** 98:11
  199:13 267:25
  268:8
**levels** 144:7
  169:15 250:24
**levin** 2:11
**levinlaw.com**
  2:16
**li** 52:15 53:10
**liability** 1:9
  32:6 292:5
  293:4
**library** 79:7
**lifestyle** 38:24
  132:1

**lifetime** 195:3
  217:10,17
**ligation** 90:25
  123:4,14 124:8
  124:15 125:2,8
  125:12 126:2
  137:12,20
  157:10,13,14
  158:2,11
  163:20 164:5
  164:12,13
  170:12,20
  245:14 246:7
**light** 73:7
**liked** 256:3
**likely** 90:19
  94:25 96:9 97:9
  136:5 201:23
  281:9
**likes** 21:21
**limitations**
  53:14 115:19
  152:1 183:8
  203:25
**limited** 89:12
  90:5,11,15
  91:19 92:7
  94:18 98:1,3
  107:15 142:24
  143:3 156:1
  159:6 177:2,8
  182:12 184:16
  246:16 247:9
**limiting** 244:14
**line** 59:13 66:12
  73:4 105:15

  111:15 131:14
  150:4 157:14
  177:12 202:14
  210:19 213:15
  213:20,22
  214:12,13
  233:24 284:2
  293:9
**linear** 186:12
  186:13
**linearly** 186:2
**lines** 69:3 106:1
  194:7 225:19
  266:25
**linked** 61:16
**list** 4:13 10:17
  31:1,3,9 38:9
  39:6,10 44:20
  44:23 51:16,19
  55:10 78:20
  79:21 80:6 83:3
  101:16 102:2,7
  102:14,19
  112:25 113:18
  127:12 207:19
  207:22,23
  231:12 247:23
  271:20,24
  272:1,11,12,13
**listed** 22:2
  26:19 29:7,16
  33:19 38:6
  55:18 80:17
  231:17
**listing** 34:7
  59:24

**lists** 50:9 79:20
**literature** 27:17
  27:21 28:16
  67:3,9,24 80:14
  87:23,25 90:14
  114:6,19 115:5
  116:23,25
  122:9 196:22
  197:19,22
  203:12 228:6
  228:20 263:23
  286:15
**litigation** 1:9
  8:14 11:18
  13:13 15:14,18
  15:21,23 16:17
  17:10,23,25
  29:15,22 30:4
  32:7,8 33:22
  54:10 114:7,8
  116:4 118:17
  119:6,11,22
  139:13 208:1
  231:15,20
  233:1,6,21
  263:23 264:2,4
  264:12,22
  270:7 275:2
  292:5 293:4
**little** 13:3,19
  23:20 64:2
  68:15 72:20
  106:16 118:16
  143:18 162:2
  177:14 189:22
  197:21,23

**[little - looks]** Page 39

| | | | |
|---|---|---|---|
| 198:1 201:22 | 44:19 55:10 | 162:25 164:2 | 262:5 264:2,3 |
| 204:18 252:2 | 57:13 58:17,18 | 167:23 168:15 | 268:1,2 270:2 |
| 255:22 | 60:5,9,10,15,19 | 169:16,22 | 270:13,16 |
| **live** 13:19 | 60:23 61:5 | 170:5 173:17 | 271:19 272:25 |
| **living** 254:23 | 65:16,19 66:14 | 176:18 178:12 | 273:5 274:5 |
| **llc** 8:8 | 66:19,24 70:3 | 178:12 179:17 | 284:14 288:23 |
| **llp** 2:3,19 | 74:16 79:11 | 181:6 183:4,8 | 288:24 |
| **local** 282:16 | 81:7 82:21 83:3 | 184:16 185:22 | **looked** 12:4,6 |
| 283:18 | 83:14 84:14 | 188:2,8 190:17 | 36:24 37:7 |
| **locations** | 85:8,17 86:6 | 191:10,22 | 45:13 53:11 |
| 286:13 | 88:18 97:12 | 193:1,19 194:1 | 122:10,16 |
| **long** 48:10 | 98:13 101:5,16 | 195:10,24 | 129:14 133:22 |
| 86:14 109:22 | 102:20 104:3,6 | 197:9 198:5,18 | 144:7,8 183:4 |
| 144:10,14,17 | 105:3,14 107:8 | 199:7,8,11,15 | 208:8,9 223:23 |
| 144:19,20,22 | 108:11,14,20 | 200:2,2,18 | 232:13 271:8 |
| 144:24 145:1 | 109:15 110:3 | 201:18 202:11 | 288:7,7 |
| 145:24,24 | 110:19 111:24 | 208:16 210:23 | **looking** 42:16 |
| 146:1 147:6,16 | 115:18 118:6 | 210:24,25 | 44:3 56:2,5 |
| 147:21,21 | 120:12,13 | 216:24 218:12 | 64:12 66:8 |
| 148:14 150:17 | 123:2,4,7 124:7 | 219:4 220:9 | 83:13 107:10 |
| 152:7,7 209:10 | 124:17 125:15 | 222:14 224:8 | 112:6 113:10 |
| 233:17 264:24 | 126:16 127:9 | 226:4,13 227:8 | 123:13,13 |
| 271:16 | 128:14 130:7 | 228:1 229:18 | 125:15 129:13 |
| **longer** 153:17 | 131:10 133:25 | 231:11,11 | 144:5,10 158:7 |
| 155:20 209:15 | 136:25 137:4 | 233:24,25 | 167:21 168:5 |
| 210:5 | 140:2 142:19 | 235:14 236:14 | 180:16 189:2 |
| **longo** 68:24 | 142:20 143:15 | 238:4,8,17 | 192:10 201:1,4 |
| 72:7 74:6,15 | 145:6,13 146:1 | 239:6 241:12 | 202:16,20 |
| 280:22 | 146:21 147:3,6 | 243:10,14,24 | 211:1 227:16 |
| **longo's** 78:23 | 148:24 149:7 | 244:11,19 | 232:6,15 235:9 |
| **look** 12:17 18:8 | 151:22,23 | 247:19,25 | 242:8 246:11 |
| 25:2 26:17,22 | 152:18 153:7 | 248:14 251:3 | 250:22,23 |
| 28:1,20 29:4 | 154:21 155:23 | 253:20 254:8 | 254:20 256:11 |
| 30:11 31:10,19 | 156:2 157:13 | 254:24,24 | 290:17 |
| 34:24 40:2,3 | 158:3 159:15 | 255:14,16,19 | **looks** 18:12 |
| 42:4,4,9 44:6,8 | 160:2 162:22 | 255:21 257:6 | 19:20 23:4 |

**[looks - marked]**                                                Page 40

24:17 106:17
188:21
**lopes**  1:24
291:3,24
**lose**  39:4
**losing**  107:13
269:11
**lost**  146:16
180:7
**lot**  26:10 43:3
51:1 64:21,24
86:12 87:9
191:2 201:5
212:4 223:10
226:2 270:7
**lots**  203:9
267:12
**low**  96:7 97:21
97:22 150:24
189:18 192:22
200:7,10,25
201:4,5,19,20
202:1,21
203:12 237:2
239:19,25
247:13
**lower**  146:9
147:20 148:15
148:19 150:25
151:7,12,16
161:13,17
172:13 210:3,6
210:11,12,16
210:18
**lowest**  194:10

**luis**  3:3 41:9,11
47:20 52:7 57:6
**lunch**  117:8
118:16
**lung**  40:19 41:2
267:24 277:1
277:18 279:2
279:23 280:6
**lymph**  229:1
**lynch**  46:5,8,12
46:13 47:17
233:14
**lyons**  3:4

**m**

**m**  5:8,10,16 7:6
104:1 117:14
138:6 270:4
285:11
**m.d.**  1:17 4:3
4:15,20 5:5,19
5:20 7:5 8:1
34:18 42:8 57:9
154:7 170:1
283:5 292:1
293:5,23
**m.p.h**  1:17 4:3
8:1 34:18 42:8
57:9 292:1
293:23
**m.p.h.**  154:8
293:5
**m.p.h..............**
5:19
**m.p.h.......34**
4:15

**m.p.h.......42**
4:20
**m.p.h...57**  5:5
**made**  36:25
91:9 146:4
204:6 251:21
277:7 291:12
**magnitude**
124:24 125:1
126:3,3
**main**  79:24
181:22 253:21
253:22 257:25
258:6,18
259:19
**maintain**  202:5
203:1
**major**  121:12
159:8
**majority**  64:22
78:21 99:23
260:20
**make**  8:21
13:16 25:18
27:6 54:22 56:4
56:8 63:8 64:4
70:16 78:12
82:16 86:6 91:7
91:25 93:1,23
111:25 154:18
183:14 199:24
200:5 223:7
250:20 251:19
251:21 264:8
267:20 271:13
292:18

**maker**  201:13
**makers**  199:21
201:14
**makes**  43:14
52:5 129:23
130:10 148:21
233:18
**making**  56:7
92:25 120:14
185:4 201:14
211:3
**malignancy**
245:8
**malignant**
270:21 271:3,9
271:16
**management**
8:8
**mandate**  24:10
**manufacturer**
115:1
**manuscript**
232:15
**manuscripts**
264:3
**mark**  9:24 10:4
34:15 42:5 88:8
103:21 117:12
133:5 138:4
154:5 169:20
169:25 179:14
207:2 248:11
269:7 283:4
**marked**  9:7
14:1 18:9 31:1
34:18 37:12

**[marked - mean]**                                         Page 41

| | | | |
|---|---|---|---|
| 41:8,16 42:8 | 83:17,23 85:15 | 290:19 292:11 | 53:3,4 54:15 |
| 47:23 52:7,10 | 88:8,14 92:22 | 293:25 | 55:2,9 60:6,10 |
| 57:5,9 84:3 | 98:17,20 103:4 | **mas**    1:8 293:3 | 60:23 61:17 |
| 86:17 104:2,4 | 103:9,18,21,24 | **mash**   182:1 | 62:10 63:14,15 |
| 117:15 121:25 | 105:19,22 | **massachusetts** | 63:20 64:18 |
| 127:23 133:8,9 | 106:1 110:22 | 1:21 2:22 13:20 | 67:13 69:11,20 |
| 138:7 154:8 | 115:22,25 | 17:5 118:4 | 73:5,8,16,25 |
| 170:2 179:16 | 117:8,11 120:1 | 291:5 | 74:3,14 75:7,16 |
| 187:20,23 | 124:22 126:21 | **material** | 76:10,19 78:24 |
| 191:13 207:5 | 127:6 129:25 | 148:21 149:25 | 81:7 82:6,13 |
| 219:16,19 | 130:4 132:15 | 150:3,10 | 83:2 84:13 |
| 220:10 221:5 | 133:5 136:24 | **materially** | 87:13 89:18 |
| 227:11,15 | 137:23 138:2 | 125:19 | 90:3,7,17 91:4 |
| 230:24 231:1 | 138:14 140:1 | **materials**   10:11 | 91:23 94:17 |
| 248:13 269:17 | 140:20 146:25 | 11:10 69:16 | 99:7 101:13 |
| 275:23 276:3 | 154:1,4,15,20 | 79:2 118:7 | 102:1,3 107:9 |
| 283:2,3,6,10 | 157:16,19 | **math**   15:4 | 108:1,11 109:9 |
| 285:5,12 | 159:18,25 | **matter**   35:18 | 110:10,12 |
| **markers**   274:2 | 161:7 166:11 | 35:23 120:18 | 111:16 112:5,7 |
| **marketing**   1:7 | 166:14 169:20 | 200:8 210:20 | 112:15 113:7 |
| 292:4 293:3 | 169:24 175:7 | 264:7 | 113:19 114:10 |
| **martin**   2:20 4:6 | 175:16 176:21 | **maximal**   136:4 | 114:22,23,24 |
| 7:9 8:5,7 10:1,4 | 176:23 177:2 | 136:7 | 115:18 116:6,8 |
| 14:7 17:8,16 | 180:9,11,13 | **mcl**   274:19 | 116:18,19,24 |
| 18:5,8 21:4,6 | 184:8,11,21 | **mdl**   1:7 8:11 | 117:6,25 120:2 |
| 30:24 34:15 | 187:20 207:2 | 15:14 58:10 | 120:15,23,25 |
| 37:11 39:18 | 218:1 219:7,10 | 274:16 293:3 | 122:4,10,20 |
| 41:8,13,19,22 | 219:14 225:11 | **meagher**   2:19 | 124:17 125:4 |
| 41:24 47:20 | 230:20 239:13 | **mean**   16:1 17:2 | 125:24,24 |
| 52:6 57:5,19,25 | 248:4,7 262:7 | 20:10 21:13 | 127:18,19 |
| 58:4,14,18,22 | 262:10 265:10 | 27:4 30:13 31:8 | 128:4,5,7,8 |
| 58:25 59:6,15 | 269:8 275:4,7 | 31:8 34:7,9 | 129:2,20 |
| 59:18 61:24 | 277:10 281:18 | 37:8 40:11 | 130:16,19,22 |
| 64:6,9 69:16 | 283:7,25 | 42:19 45:6 46:2 | 132:19,23 |
| 70:2,13 77:14 | 284:23 285:1 | 46:25 47:12 | 136:20 137:16 |
| 77:24 83:9,12 | 287:15,18,21 | 49:2,7,20 51:21 | 139:14 143:12 |

**[mean - meta]**                                                    Page 42

| | | | |
|---|---|---|---|
| 144:14 145:25 | 260:3,23 | 287:5 | 126:6 145:2 |
| 146:14 147:23 | 261:18,21 | **mechanistic** | 152:16,21 |
| 148:7,22 | 262:24 263:11 | 64:25 204:24 | 159:7 166:17 |
| 149:10 150:8 | 263:20 264:1 | **median** 136:7 | 182:2 183:20 |
| 152:17 153:22 | 266:6 267:18 | 142:15 160:19 | 202:12,23 |
| 154:13 155:5 | 267:23 268:1 | **mediating** | 205:7 210:13 |
| 160:4 161:23 | 271:11 273:14 | 96:21 | 227:7 231:25 |
| 162:10 163:24 | 274:3 280:8,10 | **mediators** | 254:25 |
| 168:10 169:11 | 280:15,19 | 282:17 283:19 | **mentioning** |
| 171:25 172:25 | **meaning** 39:16 | **medica** 269:19 | 166:22 |
| 173:9 176:12 | 204:15 216:15 | 269:25 | **mercifully** |
| 176:24 181:16 | 225:21 | **medical** 19:13 | 48:11 |
| 183:11 184:3 | **means** 93:14,16 | 19:21,24 20:10 | **mesothelioma** |
| 185:22 186:13 | 95:20 98:14 | 20:12 33:7 | 35:8 277:1,17 |
| 186:20 187:8 | 128:8 201:19 | 62:14 | 279:2,23 280:6 |
| 190:5 192:10 | 251:18 273:21 | **medically** | **mesotheliomas** |
| 192:20 193:8 | **meant** 41:6 | 148:24 149:4,7 | 266:3 |
| 195:7 196:25 | 77:24 244:4 | 150:19 | **met** 11:1 91:9 |
| 204:21,23 | **measure** | **medicine** 18:23 | 243:21 252:4 |
| 205:19,24 | 147:25 148:5,6 | 19:8 23:7,10 | 259:6 |
| 206:1,3,10,14 | 185:12 198:3 | 261:12 | **meta** 26:10 |
| 210:11 211:17 | 288:21 | **medium** 237:3 | 44:24,25 45:7,8 |
| 214:13,22 | **measured** | **meet** 246:1 | 45:14,15,16,23 |
| 218:12 220:18 | 146:20 148:8 | **meeting** 11:10 | 45:24 46:13 |
| 222:9 223:3 | 263:9 | **member** 24:18 | 81:16 84:5,11 |
| 225:14 226:3 | **measurement** | **memorializing** | 85:7,23 101:24 |
| 226:21 228:23 | 104:9 | 21:9 | 183:21 184:1 |
| 228:24 229:1 | **measures** 106:4 | **mental** 15:4 | 188:10,23 |
| 230:6 233:17 | **mechanism** | **mention** 76:6 | 189:5,12,15,17 |
| 233:20 234:12 | 76:16 89:25,25 | 152:15,20,24 | 190:2,9,10 |
| 236:25 239:3 | 90:8,13,20 | 170:18 193:12 | 198:3,8 199:8 |
| 239:17 242:19 | 168:5 226:15 | 245:16,17,18 | 221:16,18,21 |
| 244:18 245:15 | 282:6,24 | **mentioned** 22:8 | 221:23,24 |
| 247:25 252:16 | **mechanisms** | 28:14 65:4 | 231:5,19,24 |
| 254:6,23 255:1 | 81:20 89:21 | 69:10 74:8,9 | 232:14 234:24 |
| 256:6 258:18 | 90:10 168:1,2 | 88:10 89:24 | 235:2,8,10 |

[meta - months]                                                    Page 43

245:19 246:15
247:17 248:10
250:19 251:3
251:12,19
253:21,23
255:13 256:1,4
257:8,11
258:24 281:16
**method** 135:24
**methodologic**
121:13
**methodological**
121:9
**methodologic...**
191:8
**methodology**
43:21 44:2 63:4
63:13 64:14,15
74:3,16 114:24
116:11 117:1,3
208:9,17
233:12 244:11
**methods** 72:11
110:12 113:10
115:8 118:7
206:21 244:15
244:19 245:12
251:16 270:14
285:23
**meticulous**
206:5
**metric** 194:19
194:23 195:1
**metrics** 150:16
**meyers** 18:22
19:12

**michelle** 2:4
289:8 292:9
**microscopy**
73:7
**middle** 153:11
166:3 189:9
217:22
**migrate** 229:10
283:16 284:20
284:22
**migrated**
229:14
**migrates** 287:6
**migration** 76:7
93:7 168:2
173:16 227:1
227:20,24
229:8 284:13
287:7
**million** 140:14
158:23 177:23
**mills** 194:24
**mind** 83:1,21
93:12 173:5
175:6 272:23
**mined** 286:13
**mineralogist**
69:2
**minerva** 269:19
269:23,24,25
**mini** 42:11
**minimal** 136:4
136:7 197:16
251:11
**minor** 182:5,6

**minus** 255:20
255:21
**minute** 38:1
109:18 169:22
**minutes** 269:1
271:19
**minutia** 225:13
**mirrored** 281:5
**mis** 148:8
**misclassificat...**
131:2,6,20
132:10 168:24
**misclassificat...**
132:24
**misconstrued**
198:1
**mish** 182:1
**missed** 104:12
286:7,9
**misstates** 28:11
36:1 44:15
49:18 50:6 60:3
65:25 75:14
92:21 93:20
122:16 141:9
141:24 150:6
167:15 205:13
231:23 232:10
242:18,25
252:6
**mistaken** 103:1
**misunderstood**
175:8
**mode** 136:8
**model** 93:7,13
93:13 287:4,8

**models** 92:9,19
93:2,3,18,21
284:3 287:5
**moderate** 162:8
**modifiable**
40:14,21,23,24
41:5
**mohamed** 6:4
191:12
**molecular** 99:1
265:17,23,24
266:6
**moment** 82:25
98:18 101:19
137:24 224:13
244:8 262:8
**moments**
149:24
**monday** 10:18
13:25 18:11
69:17 103:13
133:15 272:7
272:13 284:24
287:23
**monetary** 18:3
**money** 15:22
15:23
**monographs**
25:8,10
**month** 18:12
145:13 216:11
248:22 249:2
249:13,17,20
250:5
**months** 106:7
106:23 144:23

145:10 146:2
**moore** 285:9
**moorman**
11:25 207:25
208:13 263:16
**moorman's**
207:19
**morning** 8:6
12:20 213:14
**morphologic**
99:2
**move** 18:6
30:24 92:2
136:22 138:3
215:8,18
219:15 232:23
232:24 240:15
244:5 263:12
**movement**
228:4,19,21
**moving** 73:18
**mparfitt** 2:8
**mucinous**
192:7,16,22,25
**muffled** 21:3
**multi** 245:10,16
246:10 247:18
**multicase** 27:21
**multicausal**
101:6
**multicounty**
8:14
**multiple** 60:25
80:9,22 165:4,9
165:10 224:6
231:8 244:20

245:3 287:5
**mutagenic** 93:9
227:4 282:18
284:6
**mutations** 99:1
**myeloid** 32:20

## n

**n** 4:1 5:1 6:1
7:1 28:3 177:5
177:7 184:24
185:19 196:4
196:15
**n.w.** 2:5
**name** 8:6 19:25
73:8 91:7
185:25 207:19
**napkins** 245:7
285:25
**narod** 5:23
178:8,14,18
179:13,15
180:3,21
182:18,23
185:10 272:16
273:2,3
**narrative** 81:24
**national** 4:17
21:18 41:15,25
42:16 241:4
**nature** 31:13
32:12 99:13
137:21
**nci** 87:16
120:16

**near** 184:14
**necessarily**
30:15 43:19
45:6 55:20 63:7
67:23 90:17
96:5 165:24
201:12 278:4
**necessary** 76:3
276:21 292:19
**need** 26:22 40:3
59:18 65:9
88:14 92:2
142:20,22
153:10 176:9
179:25 180:1
180:19,20
181:20 182:19
268:6,7
**neighborhood**
15:10
**neither** 172:7
173:6
**neutral** 116:15
**never** 13:20
34:11 56:21
110:16 163:9
163:12,16
198:8 232:25
233:3 252:18
252:18
**nevertheless**
170:25
**new** 1:4 8:14
19:2 21:22
42:25 65:23,24
66:4 79:13

118:1,4 121:14
154:5,13
156:19 168:16
168:17 260:13
260:14 261:9
271:19 274:19
274:21 293:1
**newcastle**
236:21,23
237:6,17
238:15,19
239:6 240:8,11
**newer** 246:24
**nhs** 143:21
144:16 155:25
156:16 159:3
251:6
**nhsi** 156:21
167:23 177:17
181:10
**nhsii** 143:22,25
144:19,21
155:25 156:12
156:18 158:22
159:4,8 160:12
164:2 177:18
181:4,8,9,12,25
182:3
**nicolas** 5:6
86:16
**niehs** 138:21
**nih** 21:16,17
120:16
**nod** 8:20
**nodes** 229:1

**[noise - o'brien]**                                          Page 45

| | | | |
|---|---|---|---|
| **noise** 125:21,22 | 251:13 292:16 | 140:5,12 143:8 | **o** |
| 125:24 | **noted** 68:5 | 145:18,19 | |
| **non** 17:22,25 | 75:10 78:6,9,10 | 148:1,2,4 | **o** 285:9,9 |
| 29:21 35:6 94:9 | 152:22 154:25 | 150:23 151:2 | **o'brien** 5:9,17 |
| 111:25 112:4 | 155:4 159:25 | 155:21 158:21 | 7:7 44:25 45:1 |
| 170:10 173:4 | 164:11,14 | 177:4,6 179:5 | 46:21,22 64:24 |
| **nonexposed** | 189:4,4,11 | 180:4 184:23 | 69:5 86:18 87:8 |
| 128:20,24 | 190:1 214:22 | 185:6,18,25 | 88:9 91:5 |
| 129:3 | 235:21 280:19 | 186:21 187:3 | 101:23 102:9 |
| **nonintact** 137:8 | **notes** 98:18 | 187:13 190:13 | 104:1,3 129:17 |
| 170:25 | 169:22 227:17 | 199:4 227:9 | 129:18 136:23 |
| **nonobese** 96:9 | 275:5 291:16 | 238:6,7 242:2 | 138:3,6,17 |
| **nonpatent** | **notice** 4:10 9:7 | 242:15 256:23 | 141:11 148:23 |
| 141:14 170:9 | 9:22 122:2,6 | 265:15 272:18 | 153:2,7,21 |
| 171:9,18,22,25 | **noting** 290:15 | **numbers** | 154:9,11 |
| 172:13,17 | **notoriously** | 107:12,24 | 155:14 156:19 |
| 174:2,13,15 | 213:24 | 109:10,16 | 157:22 160:8 |
| 219:3 286:19 | **novel** 27:11 | 123:24 124:16 | 160:13,23 |
| **nonrelevant** | **november** | 129:21 135:8 | 161:24 162:1 |
| 81:5 | 14:25 35:1 | 142:20 150:23 | 163:4 164:16 |
| **nonsignificant** | 37:20 61:10 | 158:7,9,17 | 166:24 169:18 |
| 171:22 212:16 | 272:5 | 173:13 177:16 | 177:7 178:23 |
| 218:13 | **nuance** 282:23 | 178:10 181:21 | 178:24,25 |
| **nonusers** | **nuanced** | 186:23 192:21 | 181:1,3 182:14 |
| 174:21 241:20 | 274:13 | 253:11 | 206:22 210:19 |
| **nos** 238:14 | **null** 214:11 | **numerical** | 211:17 226:23 |
| **notable** 99:16 | 261:23 | 115:20 | 229:12 235:23 |
| **notary** 8:2 | **nullified** 127:25 | **nurses** 155:12 | 236:8,12 |
| 291:4,25 | 128:4 130:25 | 157:21,23 | 237:18,20 |
| **notations** | **nullify** 131:21 | 158:1 236:6 | 240:23 241:3,5 |
| 292:18 | **nullifying** | **nursing** 20:13 | 242:12 246:15 |
| **note** 21:3 99:17 | 127:16 | **nutritional** | 251:9 254:11 |
| 99:18 114:16 | **number** 15:2 | 224:16 | 255:5,9,21 |
| 121:17 126:17 | 16:5 42:13 | | 257:21 258:4 |
| 158:6 159:13 | 49:25 50:9 | | 258:14,21 |
| 160:19 228:23 | 112:7 137:2,16 | | 259:5,20 260:1 |

282:22 283:2
283:11,20
285:8,11,18
286:20 287:3
**o'brien's**
177:12 218:9
235:3 236:5
259:22 288:8
**oath** 291:9
**ob** 38:16
**obese** 96:8,16
97:9
**obesity** 96:14
96:18,19,21
101:17,20
224:25 225:6
226:8,10
**object** 8:25 9:1
17:11,13 93:19
122:15 137:14
139:17 213:18
**objection** 12:12
15:25 16:6,10
16:14,18,21,24
17:6,24 25:9
26:21 27:22
28:10,17 30:7
31:25 32:4,23
33:5,15,20
35:19 36:1,17
36:22 37:6
40:10,17 41:3
44:12,14 45:25
46:11,23 47:11
48:25 49:18
50:1,6,24 51:6

52:25 54:2 55:1
56:15 64:17
65:11,25 67:6
71:17,23 75:4
75:14 77:8
87:12 88:5
89:17 90:16
91:21 92:20
93:19 95:5
96:11 97:10
100:5 107:4
112:13 116:5
116:17 117:5
119:15,24
120:10,22
121:1 123:23
128:11 129:1,7
130:15 132:18
139:17 141:9
141:23 146:11
147:13,19
148:17 149:15
150:6,22
151:17 158:13
162:5,18
163:13,21
167:15,20
169:8 173:8
174:5 176:1,7
190:16 191:7
192:17 195:6
205:13,25
206:9 208:6
209:1 211:22
213:1 225:24
229:17 230:13

231:21 232:2
232:10,19
233:8 234:11
235:12 236:7
239:2 240:9
242:1,17,25
243:3,8,23
246:8 247:10
252:6,14 254:1
254:5 255:7
261:2 263:25
264:14 267:7
268:14 270:10
271:5 273:15
277:10 290:2
290:12
**objections** 9:22
10:2,7 21:8
291:11
**objective** 56:13
56:14,19
236:23
**observation**
186:23
**observational**
179:22,24
200:7,8,10,11
201:2 203:11
**observe** 271:3
**observed** 94:22
98:25 110:20
111:1,6,8,12
162:15 211:13
213:3 215:22
215:25 216:2,5

**obtain** 292:10
**obtaining**
261:22
**obviously** 28:4
39:10 44:4 60:7
62:23 68:24
74:13 112:24
115:8 116:12
120:19 133:14
150:14 155:23
158:20 161:24
181:5 237:4
267:24 270:13
**oc** 224:18,22,24
225:2 282:14
**ocac** 45:11
46:25 268:2
**occur** 94:22
131:18 271:9
271:10 274:7
286:8,11
290:16
**occurred**
156:16 232:12
232:13
**occurs** 164:5,6
255:23
**october** 18:20
43:15 291:25
**ocwaa** 45:11
47:1
**odds** 126:8
127:24 128:8
137:7 163:19
191:20 211:9
221:18 222:4,7

**[odds - oophorectomies]**                                    Page 47

| | | | |
|---|---|---|---|
| 222:12,15,16 | 38:12,15,20,23 | 128:18 129:5 | 234:6,7,17,23 |
| 222:24 223:1 | 39:2,15,22 | 130:18,24 | 236:14,16,21 |
| 223:11 242:24 | 41:12 42:4,25 | 131:5,25 132:5 | 237:19,23 |
| 243:6 | 43:4,17 44:19 | 132:22 134:11 | 238:25 239:6 |
| **offer** 62:2 | 46:8,20 47:5,9 | 136:22 137:10 | 239:16 241:19 |
| 73:22 | 47:20 48:2,6,14 | 138:16 139:21 | 242:8,13 |
| **offering** 8:13 | 48:17,22 49:9 | 140:7,15,23 | 243:18,19 |
| 35:5,12 68:1 | 49:13 50:2,3,9 | 142:7,11 | 244:4 246:19 |
| 76:2,7 274:23 | 50:12 51:10,13 | 144:10 146:8 | 247:22 249:1 |
| **office** 58:21 | 51:15,20 53:1 | 147:9 148:23 | 250:8,15 |
| **ogunsina** 7:5 | 54:7 55:4,7 | 149:7 150:15 | 254:22 255:3 |
| 102:9 283:2,5 | 56:4 58:16,16 | 151:5,10 152:6 | 256:10,25 |
| 283:11,20 | 61:10 62:4 67:3 | 152:19,25 | 257:6,11,19,23 |
| 287:19 | 70:21 71:8,14 | 153:7 154:17 | 260:13,16,25 |
| **oh** 191:1 | 71:25 72:24 | 155:9,12,19 | 261:17 265:11 |
| **okay** 8:17 9:10 | 73:3,15 76:1,6 | 156:13,21,24 | 266:21 268:24 |
| 9:14,20 10:10 | 77:6,10,19,21 | 159:11,13 | 270:3,20 271:2 |
| 11:9,12,16,20 | 79:16 80:7,17 | 161:4 164:9,25 | 271:22 272:9 |
| 12:9,17 13:4,12 | 84:8,9 85:19,25 | 168:25 169:20 | 276:14 278:15 |
| 13:18,23 14:16 | 86:14 88:7 89:6 | 171:4 172:23 | 279:13 285:17 |
| 14:20,23 15:8 | 90:4 92:17 94:4 | 173:2 174:9,16 | 288:23 289:5 |
| 15:13,16,21 | 97:5,20 100:1 | 175:12 176:25 | **old** 154:13 |
| 16:5,23 18:15 | 100:10 101:10 | 182:8 183:10 | **older** 247:1 |
| 18:19,24 19:7 | 101:23 102:13 | 184:16 188:6 | **once** 190:24 |
| 20:2,14 22:8 | 102:18,24 | 188:19 189:2 | 245:23 284:4 |
| 23:1,3,12 24:4 | 104:18,22 | 190:10 192:3,4 | **oncologist** |
| 24:19 25:1,6,13 | 105:3,12,24 | 194:1,8,9 199:2 | 274:5 |
| 26:15,24 28:24 | 106:25 113:15 | 205:4 207:2,11 | **oncology** 86:22 |
| 29:10,18,21,25 | 114:4,18 | 207:15 208:23 | 86:24 |
| 30:3,11,21,24 | 115:14 118:13 | 209:17,18 | **ones** 22:1 79:19 |
| 31:6,11,20,23 | 118:16 119:5 | 210:2 212:9 | 79:23 143:15 |
| 32:19,25 33:2,7 | 119:21 120:5 | 215:18 217:19 | 212:5 246:22 |
| 33:11,17 34:3 | 122:14,24 | 220:23,25 | 246:22 255:24 |
| 34:14 35:8,12 | 123:7,10 124:7 | 221:4,8,11 | **oophorectom...** |
| 35:15 36:11,24 | 124:8,13,20,25 | 223:18,25 | 156:3,10 |
| 37:3,10,22 38:4 | 125:23 126:14 | 228:1 233:5,17 | |

[oophorectomy - ovarian]                                        Page 48

**oophorectomy**
  156:5,7,15
**open**  74:10
**operational**
  87:23 95:12,23
  96:1
**opined**  279:17
**opinion**  12:15
  31:16 32:12
  35:5,12,24 36:3
  51:11,23 52:2
  52:22 53:8 57:1
  57:3 60:18 65:6
  65:22 66:6,6,7
  66:10 68:2
  73:22,24,25
  76:2,8,13,17,19
  81:24 82:3 94:8
  94:18 99:9,13
  99:14 115:17
  146:4 176:14
  197:19 203:21
  203:22 204:1
  224:2 225:20
  226:7,10 255:4
  261:6 267:15
  267:15 268:20
  268:21 274:23
  277:7 278:2
  280:3,25 281:4
  281:6 283:21
**opinion's**  68:4
**opinions**  8:9,13
  12:22 30:1
  31:13 35:20
  61:11 62:1

102:4 135:1,3,4
141:25 267:19
272:10 277:25
278:1 279:6
280:16 285:15
285:19 287:1
**opioid**  264:3
**opioids**  264:23
**opportunity**
  148:12
**opposed**  53:9
  108:9 259:11
**opposite**  164:14
**optional**  114:11
**options**  145:8
**oral**  48:23
  164:4 237:11
  245:18 274:1
**oranges**  258:14
**order**  4:23 52:1
  52:3,9 54:8,12
  54:18,25 55:3,5
  55:19 57:15,22
  179:19,23
  180:14,18
**ordinary**  40:16
  87:24
**organization**
  36:21 38:13
  48:3,4
**organizations**
  36:15
**origin**  98:25
**original**  25:20
  25:21 26:5,11
  28:25 80:25

81:25,25 84:7,8
84:10,17 86:1
101:25 102:3
113:10 145:14
258:6,10
259:19 292:8
292:11
**originally**
  26:13
**ors**  134:15
**os**  143:21
  144:19
**ottawa**  236:21
  236:23 237:17
  238:15,19
  239:7 240:8
**ou**  33:7
**outcome**  27:25
  53:23 54:1
  95:13 101:1
  104:11 136:5
  223:2 239:4
  287:25
**outcomes**
  185:12 288:21
**outline**  88:16
  287:8
**outlined**  113:10
**outlines**  195:12
**output**  27:7
**outreach**  36:14
**outside**  13:20
  15:14 29:14
  30:3
**outweigh**
  279:25

**ovarian**  12:23
22:6,13 29:12
29:15,19,22
30:5,18,22 35:4
35:6,13,15,18
35:21 36:4,6,15
37:5,24 38:10
40:7,25 44:13
45:4 46:9 49:15
50:5,14 76:4
84:1 85:10
86:19 89:11,16
89:22 91:13
92:9,19 93:18
94:24 96:23
97:23,25 98:9
98:23 99:6,10
99:13,23
100:11 101:5
101:18 105:14
106:5,12
107:10,15,23
108:16,18,21
108:23 109:3
110:7 111:10
111:20,22
112:8 113:1,3,5
113:11,22
114:12 117:13
118:3 123:8
133:11 138:24
141:13 142:16
142:18 143:10
152:12 154:25
156:6,7,8,11,25
158:25 163:6

**[ovarian - page]**                                                      Page 49

164:11 167:5
168:13 171:13
173:25 174:20
177:4,7,10
178:8 184:23
187:5,6 189:6,6
189:13 190:5
192:19,25
193:10 196:18
204:3 208:11
214:18 216:8
216:18 220:4
226:1,11,15
229:7 231:10
234:7,21
241:25 260:20
265:23 266:1,4
267:20 268:13
268:22 273:10
274:24 275:17
277:1,18 278:3
278:10 279:2
279:12,24
280:6,10,13
281:1,11,15
282:6,15
285:20 286:17
288:19 290:15
**ovaries** 76:8
228:25 229:15
229:22 230:3
**ovary** 48:15
**overall** 45:18
53:7 99:14
124:16 146:12
146:13 171:10

172:14 174:14
278:2
**overlap** 197:7
197:17 211:17
212:5
**overlapped**
210:20
**overlapping**
210:10,14
218:25
**overlaps** 211:19
**overweight**
224:25 225:6
**overwhelming**
99:23
**own** 65:15
190:15 263:10
286:17 287:10
**oxidative**
282:16 283:18

**p**

**p** 6:6 161:11
165:2 173:17
207:4 212:23
212:25 213:3,6
213:7,9,15,20
214:2,4,5,5
218:12 220:5
261:15,20,20
261:21
**p.m.** 290:23
**page** 4:5,9 5:3
6:3 7:3 9:12
18:17 19:17,19
21:1,11,12

22:17,17,21,21
23:3 25:7,13
26:24,24 28:21
30:11 37:14,17
37:18,22 42:9
42:10,10,13
43:5,9 48:12,15
49:9,10 52:11
52:12 53:18
59:9,10,12,19
62:6,7 66:12,14
66:17 67:1
68:19 74:18
79:11 81:10
85:18 88:18,22
89:3 97:17,24
98:21 104:12
104:13,13,14
105:13,16,17
110:21,22,23
118:7,18
121:21,24
123:3 127:8,9
128:15 133:24
134:1 136:2
137:15,16,17
140:3,16,20
144:5 149:4
151:23 153:7
154:21 155:4,8
157:8,8,13
159:19,21
160:3,5 161:4
161:12 163:3
164:9,16,18
166:1,8,12,23

168:15 170:5,6
175:1,2,3
176:18,25
178:13 179:18
179:20 180:9
184:17,20
188:2 191:15
191:23 194:2
195:24 196:3,9
196:10,11
200:19 202:12
202:17 206:3
207:9,10,11,20
209:3 212:10
214:24 215:1,9
215:15,19
217:19 218:1
219:20,25
220:10,22
221:5,8 224:9
224:10 226:13
227:21 228:3,9
228:10 229:19
231:3,3 235:14
236:14 238:9
238:11,18
239:12,13
244:16 248:15
255:1 256:23
260:7,12 262:6
265:8,12 266:9
266:16 270:2
270:16 271:23
273:7,8 276:16
277:12,14,19
278:12 279:14

**[page - parfitt]**                                                                 Page 50

| | | | |
|---|---|---|---|
| 279:18 281:25 | **par** 98:10 | 265:15 266:11 | 69:18,22 70:8 |
| 283:23,25 | **paragraph** 44:8 | 266:19 273:1,6 | 71:17,23 72:19 |
| 284:1,15,15 | 49:10 52:14,20 | 273:7,8 278:21 | 74:8 75:4,14 |
| 285:21 288:24 | 74:20,21 88:19 | 284:17 | 76:15 77:8,13 |
| 288:25 289:1,5 | 89:3,4,6 91:10 | **paragraphs** | 77:22 80:3 |
| 289:7 292:9 | 92:4 93:22 | 48:14 134:3,6 | 81:10 82:25 |
| 293:9 | 97:16,20 104:7 | **parentheses** | 83:16,20,24 |
| **pages** 1:1 38:17 | 104:8,17 105:4 | 171:8 213:3 | 85:14 87:12 |
| 43:13 44:7,7 | 105:23 107:9 | **parenthetical** | 88:5,17,22 |
| 121:11 126:18 | 110:20 111:2,3 | 263:15,16 | 89:17 90:16 |
| 156:22 159:17 | 111:3 128:16 | **parfitt** 2:4 4:7 | 91:21 92:20 |
| 195:25,25 | 151:25 153:13 | 8:25 9:21 10:3 | 93:19,25 95:5 |
| 207:6,13 257:4 | 155:4,7 160:17 | 10:17 12:12 | 96:11 97:10,14 |
| **paginated** | 161:1,11 | 13:25 15:25 | 100:5 103:12 |
| 37:13 43:14 | 164:18 166:3 | 16:6,10,14,18 | 105:18,20,25 |
| 48:11 88:10,15 | 166:12 170:6,8 | 16:21,24 17:6 | 107:4 108:6 |
| 256:24 | 170:18 178:13 | 17:11,20,24 | 109:20,25 |
| **pagination** | 179:18,21 | 18:7 25:9 26:21 | 110:21,24 |
| 104:14 | 180:11,16 | 27:22 28:10,17 | 112:13 116:5,7 |
| **paid** 31:24 | 188:8 189:2,9 | 29:4 30:7 31:25 | 116:17 117:5 |
| 32:22 116:3 | 191:18 196:4 | 32:4,23 33:5,15 | 119:15,24 |
| 270:5 | 202:15,16 | 33:20,24 35:19 | 120:10,22 |
| **pains** 292:21 | 204:5,9 209:3 | 36:1,17,22 37:6 | 121:1 122:15 |
| 293:6 | 212:8,12 | 38:2 39:16 | 123:23 124:21 |
| **papantonio** | 215:16,20,20 | 40:10,17 41:3 | 126:17,25 |
| 2:11 | 215:24 217:21 | 42:12 43:7,12 | 128:11 129:1,7 |
| **paper** 54:16 | 217:22 218:2 | 44:12,14 45:25 | 129:16,24 |
| 69:6 76:12 | 219:25 224:9 | 46:11,23 47:11 | 130:15 132:13 |
| 86:12 91:5 93:5 | 224:11 226:14 | 48:25 49:18 | 132:18 137:1,3 |
| 103:23 116:15 | 228:3,15 | 50:1,6,24 51:6 | 137:14,25 |
| 121:5 135:2,6 | 229:18,19 | 52:25 54:2 55:1 | 138:13,15 |
| 208:4 232:1,7,9 | 230:1 231:2 | 56:15 59:13,16 | 139:16,22 |
| 272:16 | 235:15,18 | 60:3 61:7,23 | 140:18,22 |
| **papers** 116:20 | 244:22 257:7 | 64:1,7,12,17 | 141:9,23 |
| 116:21 | 260:8,10 | 65:11,25 67:6 | 146:11,24 |
| | 262:12 263:12 | 68:10,14,18 | 147:13,19 |

**[parfitt - pdq]**                                                                 Page 51

148:11,17
149:15 150:6
150:22 151:17
153:10 158:13
159:17,19,23
160:2 161:6,8
161:23 162:5
162:18 163:13
163:21 166:9
166:15 167:8
167:15,20
169:8 173:8
174:5 175:2,5
175:10,13,15
176:1,7,19,22
176:25 180:7
180:10,12,15
184:19,22
188:3,6,15
190:16 191:7
192:5,17
193:20 195:6
196:7,9,12
205:13,25
206:9,11
207:17 208:6
209:1 211:22
213:1,18 216:4
222:19 225:9
225:24 227:13
228:11 229:17
229:24 230:13
230:19 231:21
231:23 232:2,4
232:10,19,22
233:8 234:11

235:12 236:7
238:7 239:2,12
240:9 241:1,11
242:1,17,25
243:3,8,23
244:14,25
246:8,20
247:10 252:6
252:14 254:1,5
255:7 259:9
261:2 262:4,20
263:25 264:14
265:9 266:15
266:20 267:7
268:14 269:9
269:14 270:10
271:5 272:21
272:24 273:4
273:15 275:10
275:13 281:20
283:3,8 284:25
285:2,4 287:13
289:10 290:2
290:12,21
292:9
**parfitt's** 21:8
**parity** 157:14
237:9,10
245:17
**parsing** 150:8
**part** 6:19 9:24
10:5 52:22
99:13 105:12
121:23 122:19
122:21 170:17
275:11,25

276:4 289:2,22
289:24
**partially** 56:13
56:14
**participant**
110:15
**participants**
132:9 241:4
**particle** 226:25
283:24 284:3
**particles** 228:5
228:19,22
229:10 230:3
286:2 290:6
**particular** 51:7
51:8 54:12
55:25 56:1
99:20 104:6
203:16 263:13
273:10,22,23
**particularly**
40:6 44:22
108:15 239:20
257:8 263:14
**parties** 291:18
**partly** 50:17
187:14 288:7
**parts** 12:18
197:14
**passage** 203:19
289:7,12
**past** 15:10
145:10 162:8
194:14
**patency** 168:20
168:22 169:2

244:13 245:14
246:7,12,25
247:1,4,6
**patent** 89:12,23
90:5,15,22
141:14 147:4
148:15 163:7
167:3,13
168:22,23
170:8 171:8,21
172:12,18,22
173:9,10,25
182:22 218:4,6
218:9,21,22
219:3 241:17
242:6,11,14,15
243:16 247:9
286:18 287:11
**pathway** 96:21
279:9,9,11
281:10
**pathways** 81:20
99:1
**patient** 40:16
40:20 162:11
**patients** 39:23
40:4 63:6,9
**patrick** 3:4
**pattern** 87:20
**patterns** 102:10
103:10 105:6
**payment**
121:24
**pdq** 4:18 41:10
41:15 42:1,22
42:25 43:1 44:9

**[pdq - please]**

Page 52

44:16,18 47:6
256:13,19
**peer** 24:13
25:14,16 26:24
27:2 28:25 30:1
62:18 115:5,7
116:24 232:15
**penalties**
292:22 293:6
**penalty** 291:20
**pending** 9:5
**penninkilampi**
45:7,20 148:4
185:23,24
198:10,16
199:8 220:24
222:15 223:14
235:6 240:13
245:25 246:3
250:20
**pensacola** 2:14
**people** 19:14
51:1 108:5,8,18
109:3 111:24
129:3 139:24
162:7 208:15
223:21
**percent** 16:23
48:19 106:9,10
106:12,14
108:24,25
123:12,15,18
124:10,10
127:15,18
128:1,2,22
130:12,19,20

131:1,2,3,5,19
131:19,21
134:15,16
141:20 142:4
149:18,20
196:4,15 198:7
198:9,18 199:4
212:13,15
220:5,8 238:1
251:17 257:14
**percentage**
16:16 17:9,12
17:17 71:11
260:1,3
**perez** 219:4,11
**perfect** 43:12
**perform** 115:10
168:21 263:4,5
**performed**
72:14,22 73:9
231:20 263:1
**performing**
116:1
**perineal** 44:11
144:22 146:1
174:20 196:6
196:17,18
220:2,12 221:6
225:1 226:16
231:7 234:8,20
245:4 251:15
256:18 257:7
257:15 282:7
284:20
**perineum**
245:6

**period** 140:11
179:2 182:25
210:5 271:3
**periods** 143:9
177:22
**peripheral**
32:15
**perjury** 291:20
292:22 293:6
**permit** 262:14
**peroneal** 229:3
268:12 290:17
**person** 11:6,8
38:16 140:8,9
140:12 142:17
177:23 197:13
**person's** 27:8
274:24
**personally**
24:24 72:6
78:18 264:16
**persons** 197:13
**persuasive**
52:17
**pertinent**
277:12
**pfas** 280:1
**pharmaceutical**
203:15
**phone** 11:7
**picking** 269:10
**piece** 162:23
**pile** 34:20
**pills** 38:25
**place** 25:22
88:15 166:7

197:13 219:16
291:7
**places** 272:11
287:5
**placing** 52:22
**plaintiffs** 2:9
2:17 13:8 21:8
116:21 119:6
120:21 133:16
208:1 231:14
270:6 274:16
274:18
**plan** 61:11 62:1
**plantation** 1:20
**plausibility**
55:23 56:10,24
62:25 67:20
76:13 93:4
125:10 162:24
227:20 230:7
262:5 278:8
**plausible** 59:23
76:16 125:7
126:1 172:16
172:25 173:5,6
173:10,23
174:1,3,7
218:20 279:9
**plausibly**
285:24
**play** 94:5
**please** 8:19 9:1
21:1 108:6
116:7 130:4,6
159:15 175:7
178:3 188:4

**[please - powder]**                                                    Page 53

| | | | |
|---|---|---|---|
| 212:7 243:9 | **pointing**  143:16 | 198:6 208:21 | **postdate**  22:10 |
| 262:20 273:16 | 185:17 189:3 | 211:10 | 22:18 |
| 281:25 292:11 | 192:21 193:24 | **populations** | **postdates**  138:3 |
| 292:16 | **points**  56:22,23 | 163:25 197:4 | **postmenopau...** |
| **plot**  251:3 | 62:25 185:11 | **port**  136:10 | 48:24 91:14,20 |
| 254:25 255:1 | **polarized**  73:6 | **portion**  128:14 | **potential** |
| **plus**  15:8 194:9 | **polymorphisms** | 224:7 270:4 | 118:18 120:24 |
| 242:3,3 | 224:23 | 290:9 | 121:1 165:3 |
| **point**  11:16 | **pool**  197:7 | **portions**  52:4 | 228:4,18 |
| 12:13 27:12 | 199:12 251:16 | **pose**  104:25 | 229:10 277:23 |
| 56:23 67:3 78:8 | 252:22 253:17 | **posed**  276:23 | 279:11 280:1 |
| 86:5,11 88:13 | 253:18,22 | **position**  54:9 | 289:16 |
| 90:12 91:22 | **pool's**  156:3 | 177:11 212:22 | **potentially** |
| 109:17 119:8 | **pooled**  26:10 | 283:15,20 | 79:21 111:11 |
| 119:10 134:13 | 44:24 45:1 | **positive**  71:12 | 154:15 286:4 |
| 136:18 137:10 | 46:21 81:16 | 71:21 89:10,21 | **powder**  1:7 |
| 137:12 142:12 | 85:6 140:25 | 141:13 167:3 | 8:10 12:23 24:2 |
| 143:4 145:21 | 141:4 143:16 | 195:17 196:5 | 35:2,3 38:5,5,9 |
| 146:9,9 147:20 | 144:2 146:22 | 196:16,25 | 39:3,24 40:5 |
| 148:15 149:2,3 | 159:8 178:25 | 286:16 287:12 | 50:15 68:2 |
| 150:14 151:7 | 181:1 182:4,9 | 288:11 | 71:15 86:19 |
| 151:10,14,16 | 182:14 183:6,7 | **possibility**  95:3 | 89:11,15,22 |
| 176:14 182:10 | 183:11,12,16 | 95:7 165:17 | 94:4,10,12,13 |
| 194:10 197:3 | 183:16 185:8 | 176:10 | 94:16,19,25 |
| 198:15 201:10 | 193:5 198:25 | **possible**  90:7 | 96:9 97:9 105:9 |
| 209:18,24 | 212:15 235:2 | 96:8 97:8,8 | 111:13 167:5 |
| 210:11,14,17 | 235:22 253:2 | 133:20 170:8 | 170:22 171:1 |
| 210:23 212:6 | 253:10 255:9 | 202:5 203:2,18 | 171:12 173:25 |
| 212:22 215:15 | 286:20 | 203:21 204:16 | 174:20 190:6 |
| 234:10 240:4,5 | **pooling**  183:9 | 204:18,20 | 192:16 196:18 |
| 244:12 250:25 | 185:1,20 222:8 | 205:1 206:18 | 208:24 209:10 |
| 260:23,25 | **poor**  129:9 | 286:16 287:11 | 209:13 212:9 |
| 275:8 | **poorly**  283:23 | **possibly**  94:5 | 214:18 215:3 |
| **pointed**  157:25 | 284:3 | **post**  178:5 | 216:7,13,18 |
| 167:11 | **population** | 190:21 191:9 | 231:8 234:8,20 |
| | 98:11 164:1 | | 245:5 260:19 |

**[powder - problem]**                                                Page 54

270:7,21
273:19,22
280:17 281:1
285:19 290:9
292:3 293:3
**powders** 97:25
170:13 214:25
**power** 151:4,5
151:12,16,19
153:2 158:10
158:12,15,16
158:16,17,20
176:10 177:3,8
177:11,15,23
178:5,11 179:6
184:17 185:9
185:13,14,16
185:17 186:2,4
186:9,11,19,25
187:11 189:15
189:18 190:9
190:11,14,19
190:19,21,25
191:2,3,9
**powered** 187:2
187:10
**powerful**
186:16,19
187:5
**powers** 158:17
**practice** 75:2
114:5,10 200:1
**practices** 1:8
292:4 293:3
**preceded** 153:1

**precedes**
105:23
**precise** 46:13
68:20 200:4
255:14 256:2
**predicated** 68:4
75:20 278:4
**predicating**
281:6
**predict** 26:9
**predominant**
114:23
**preempted**
250:10
**premenopausal**
91:14,19
**prepare** 10:20
11:2 18:2
**prepared** 18:4
**preplanned**
13:15
**presence** 68:5
69:1 72:2 75:20
196:5,16
280:23 281:6
289:18
**present** 3:3
62:20 68:6
111:11 158:25
277:22 289:16
292:13
**presentation**
191:25
**presentations**
30:12,18,21

**presented**
30:14 42:3
217:2 276:22
277:15
**presenter** 30:15
**prespecified**
163:6 165:20
168:3,4
**prestigious**
139:5
**presumably**
90:24
**presume**
195:16
**pretext** 64:8
**prevalence**
98:7 99:25
209:9
**prevalent** 285:7
**preventible**
98:14 162:12
**previous** 10:23
12:5 34:25 42:1
46:4 51:19,21
53:15,18 61:13
65:20 68:6,23
69:13 91:24
99:18 102:5
111:4 152:10
190:18 195:11
215:8,19
216:21 219:17
221:5 232:14
261:8,10
263:12,20

**previously** 19:4
111:12 117:23
285:14
**primary** 23:6
116:10 125:4
140:21 208:19
235:5 244:20
245:3 247:6
254:18 261:11
**printout** 4:16
4:18,22 37:12
41:15 47:22
**prior** 11:13
54:10,16 64:13
68:11 93:20
184:3 216:16
216:19 234:13
264:17 269:21
273:11,17
**priorities** 40:16
**probability**
214:7 261:22
**probable**
204:19,21
205:2 206:18
**probably** 15:4
16:11 21:19
34:20 70:13
86:9 90:19
108:1 133:2
148:1 188:24
201:9 247:25
272:22
**problem** 58:18
70:13 105:1
106:21 175:16

**[problem - purposes]**                                                      Page 55

188:17
**proceedings**
274:21 291:6
**process** 24:11
56:12,13,19
93:16 137:22
**produce** 9:15
**produced** 9:17
10:7,18 13:24
17:2 18:3,10
133:15 134:21
264:2,5 272:13
284:23 287:23
**produces**
194:10
**product** 94:15
170:14 199:25
210:4 234:8
**productively**
183:6
**products** 1:7,8
32:6 35:2 105:7
129:19 173:25
292:4,5 293:3,3
**professional**
63:3,4,5 291:3
**professor** 18:18
**profound** 98:24
**progesterone**
224:21
**programming**
118:22
**promoting**
282:14 283:17
**promotion** 26:6

**prompted**
70:18
**prone** 152:22
**pronoun** 91:3
**pronouncing**
58:10
**properly** 291:8
**proportion**
110:4
**proposal** 21:24
**propounded**
291:11
**prospective**
131:15 179:22
179:24 180:19
235:16 257:13
257:20,24
258:8,17
259:18
**prospectively**
111:14
**prostaglandins**
282:18
**prostate** 31:21
**protection**
276:9,18
**protective** 50:9
137:21 149:19
**provide** 66:5
68:7 74:17
78:21 79:9
81:13,25 82:4
84:6 85:2,2,4
98:12 102:3
112:16 113:1,9
113:21 135:4

144:13,13,18
194:17,18,22
195:9 199:20
201:10 206:14
212:13 217:5
229:7 239:3
258:14 262:17
263:8 264:1
**provided** 11:25
12:1 32:9 52:17
67:16 70:9 79:3
81:12,18 84:10
89:19,20 118:2
118:21,23
119:18 121:14
193:6 195:22
201:6 223:19
240:23 241:6,7
258:9,10 259:2
259:5 262:17
264:22 272:4,6
**provides** 53:8
93:6 96:1
153:23 194:17
237:24 288:19
**providing**
61:18 173:20
201:13 236:17
282:22
**public** 8:2 30:4
30:8 36:14 58:7
98:1,3,16
162:10 273:18
291:4,25
**publication**
23:17 24:13

25:15,16 27:3
102:5,22
121:23 122:20
200:4,16
232:18 244:19
245:2 258:15
**publications**
25:2 26:7,16
28:25 29:7,16
29:19 63:12
241:10 244:10
**publish** 87:18
241:3
**published**
23:14 24:1,6
25:4,10 26:16
46:7 62:17
63:11 86:22
114:12 116:15
116:20 133:12
134:8 138:25
139:2,7 199:10
206:23,24
208:11 232:15
268:3 269:18
278:6
**pubmed** 114:1
**pull** 60:12
100:20,22
281:21
**purported**
12:22
**purpose** 208:19
234:18
**purposes**
208:18 277:7

285:14
**pushed**  213:14
**put**  48:6 51:10
86:5 103:13,14
110:18 114:4
120:4 122:20
135:17 222:3
240:17 287:21
291:9
**putting**  229:3

**q**

**quadruple**
157:5,23
**qualification**
176:24 286:18
287:11
**qualifications**
141:14
**qualified**  72:24
73:12 262:24
**qualifies**
249:13 250:6
**qualify**  89:18
248:23 249:4,6
249:15,22
**qualifying**
253:6
**qualitative**
116:1 240:11
**qualitatively**
60:2
**qualities**  240:7
**quality**  236:20
237:3,3,3,20
239:19 240:1

240:14 245:10
247:14
**quantitative**
19:9 56:20 57:2
62:24 133:10
240:10 256:6
**quantitatively**
115:11
**quantity**  72:4,4
76:3
**queries**  114:1
**question**  9:1,6
14:12 17:12,17
17:25 27:23,24
28:12 30:17
41:7,7,18 44:1
45:22 55:15
56:17 57:14,20
59:20,21,25
60:17 61:20
66:18 67:11
72:25 73:11
74:10,11 75:12
75:16,17 77:11
81:3 83:4,8
84:15 86:10
92:17,22 95:2
96:15 97:7,15
110:1,2 112:23
116:9 119:16
121:7 122:12
124:1 128:3,13
135:7 137:15
137:19,20
141:16 142:24
145:16 150:11

153:11 159:2
159:23 162:3
168:7 170:19
173:14 175:18
181:15 182:16
185:19 188:23
198:13 200:3
211:23 215:5,7
215:10,11,13
221:20 225:18
226:6 232:23
233:11 234:15
235:24 236:3,4
236:10 237:6
237:15 240:6,9
242:20 243:5,9
244:2,18
245:23 246:6,9
246:21 247:6,7
250:18,18
259:24 261:24
264:10,11,15
264:17,18,19
264:20 265:1
269:3 278:20
282:4,8 287:16
**question's**  9:5
**questioning**
73:5
**questionnaire**
106:8,10,15,19
107:3,19,20,21
108:9 109:1
110:13 145:6
**questions**  8:23
10:24 37:4

54:23 86:8
134:3 143:2
145:1,5,5
148:11,12
165:12 169:13
169:15 186:10
206:17 219:6
235:19 237:5
238:3 248:1
250:10 258:22
275:11,14,18
287:14 291:11
**quick**  70:3
**quickly**  130:5
235:18
**quite**  14:12
64:4 135:12
139:2 193:20
**quote**  216:19
**quoted**  128:15
178:11
**quoting**  203:24

**r**

**r**  5:20 28:3
170:1
**race**  211:12
212:14 213:2
213:13 253:13
**rafferty**  2:11
**raise**  151:10,14
151:16
**raised**  58:5
**random**  256:1
**randomized**
20:7 202:23

**[randomized - recall]**                                                                 Page 57

203:15
**randomly**
108:10
**rank** 56:6
**ranked** 54:8,18
54:25 55:5,18
**rare** 27:25
28:14 223:1
**rarity** 97:23,25
**rate** 13:7 48:18
49:6,8 63:23
209:14
**rated** 63:23
201:3
**rather** 134:14
**rating** 239:1,23
240:1
**ratings** 239:17
240:4
**ratio** 127:24
128:5,6,8
144:12,15,15
146:5 147:7
149:9,10
150:19 151:3
162:17 163:19
172:10,12
182:9 191:20
222:4,5,7,16,24
222:24 223:1
242:16 243:15
243:15 250:2
251:16
**rational** 56:9
**ratios** 44:4
126:8,12 137:7

143:16 164:7
172:17,18
221:18,19,22
221:25 222:10
222:12,15
223:9,12
242:10,21,24
243:6 246:2
247:14 253:14
253:15 288:12
**rats** 229:22
230:4,5
**ray** 73:1
**rcts** 202:22
**reach** 65:8,12
76:8 196:20
198:8 199:13
**reached** 205:11
**reaction** 227:3
**read** 10:22,23
44:23 52:1,3,4
73:16,17 87:9
88:12 106:20
109:18,21
122:3 131:22
132:5,6 133:18
134:2,23 139:9
139:10 149:11
161:22 170:17
176:2 189:22
196:25 205:16
214:23 216:4
224:13 232:25
241:1,2 244:1,8
244:17 264:18
268:25 278:19

278:20 282:10
287:24 289:8
289:13 290:22
**reader** 114:19
119:14,21,25
120:20,23,24
121:2 174:24
233:18
**reading** 74:4
130:2,3 292:15
**real** 287:8
**realistic** 128:25
129:6,9 130:13
**realize** 14:5
**really** 16:7 21:3
25:5 27:11
47:15 93:3,16
95:19 109:12
111:25 117:3
143:10,14
149:21 159:4
194:7 203:13
219:24 220:18
235:6 244:3
261:7 266:7
267:18
**realm** 27:5
116:19
**reason** 20:18
47:17 52:17
80:19,23 87:10
98:5 100:23
102:18 108:4,7
112:2,24
113:17 129:22
170:11 177:12

190:21 235:8
248:2 253:12
283:19 292:17
**reasonable**
129:4,10
130:23 131:6
132:10 133:1
192:24 237:8
271:9,12 280:3
**reasonably**
289:17
**reasons** 80:13
80:22 239:3
**rebecca** 231:13
**recalculated**
134:15
**recall** 11:11
16:22 20:16
25:3 26:18 31:5
31:10,15,17,17
32:5,9,11,24
33:6,9,11,13
34:7,8,13 37:2
37:8 39:24 40:1
42:2 43:17
51:11,21 70:19
71:4,13 98:13
104:10,23,25
105:6 110:6
111:10 112:1,3
112:24 113:2
113:19,24
127:16,23
128:18 129:3
129:12,21
133:10,21

134:12,15,16
135:7 152:16
152:22,23
158:20 178:7
187:16,17
282:3
**recalled**  104:9
129:20
**received**  15:22
15:23 31:8,9
33:12 58:6 79:2
230:4,5 237:16
**recent**  32:8
33:9 42:19,23
45:15,23 46:22
51:23 57:12
69:6 90:18 93:5
123:1 138:4
268:19
**recently**  32:10
43:19
**recognizes**
277:22
**recollection**
149:2
**recommend**
264:6
**recommendat...**
39:3,4
**recommendat...**
38:24 39:6
**recommends**
289:15
**record**  9:25
21:4,6,7,10
27:8 41:22,24

54:22 58:1,4
61:7 70:8,9
73:6 83:10,12
83:20 98:17,20
109:22,23
115:23,25
117:9,11
137:23 138:2
154:2,4 157:16
157:19 168:6
169:21,24
176:19 184:8
184:11 219:8
219:10,11
241:2 244:8
248:4 262:7,10
269:5 275:4,7
287:18,22
**record's**  286:10
**recorded**  156:3
291:13
**records**  58:7
132:8,11,12,16
**recruitment**
164:4
**redacted**  58:19
**redactions**
58:13,14
**redistribute**
58:8
**redo**  56:17
61:23 64:21
**reduce**  151:2
**reduced**  173:13
**reducing**  38:18
162:13

**reduction**
40:24
**refer**  48:8
257:21
**reference**  10:17
44:20,22 78:20
80:6 100:22
118:9,10
151:24 185:23
219:22 256:15
259:14 276:15
284:9 286:19
**referenced**
119:12 275:20
279:15 283:14
**references**
10:12,25 43:24
47:6 50:18 79:6
79:8,24 81:17
113:20 161:3
195:11 216:24
244:13 245:14
**referencing**
80:3 272:23
**referring**  34:20
46:5 63:10
70:18 74:5,12
166:20 198:22
203:4 225:9
259:15 277:5
**refers**  259:16
259:17
**reflect**  14:2,13
14:16 272:1
**reflected**  12:15
19:15 255:18

**reflection**
255:12
**reflects**  14:9
15:5,17
**refocus**  124:1
**refute**  57:3
113:6 274:6
**refuted**  81:21
**regard**  17:12
275:15 280:16
282:4 283:21
**regarded**
138:19,20,23
**regarding**
118:8 266:14
266:23 277:8
**regards**  224:16
225:4,6
**registered**
291:3
**regulation**  6:21
276:1,5 289:2
**regulator**
268:11
**regulatory**
206:1,7 275:15
279:16
**rehash**  64:10
**relate**  30:18
**related**  12:22
15:13,18 22:4,6
22:11 23:14
25:1 29:15,19
29:22 30:22
31:21 32:14
35:4,5,12 36:12

**[related - report]** Page 59

| | | | |
|---|---|---|---|
| 36:15 76:17,19 | 177:21 179:1 | 69:24 70:23 | 110:15 112:22 |
| 85:11 108:16 | 181:5,22 | 78:4 150:12 | 115:12,15 |
| 119:19 152:12 | 182:17,21 | 178:10 204:17 | 116:2 117:18 |
| 246:7 264:10 | 183:18 186:8,9 | 275:18 282:8 | 121:5,10,17 |
| 278:3 | 193:8 223:1 | **remind** 127:4 | 123:3 126:24 |
| **relates** 40:7 | 225:17 236:9 | **removing** | 127:10 133:14 |
| 204:2 283:16 | 242:22 243:5 | 279:22 | 138:4 147:14 |
| **relationship** | 247:3 250:24 | **repeat** 142:1 | 152:15 154:6,7 |
| 12:23 45:3 56:1 | 251:23 252:25 | **replacement** | 154:13,14,21 |
| 62:9 95:14 | 260:5 267:22 | 257:2 | 155:8 156:22 |
| 131:23 174:25 | **reliability** | **replicate** 240:4 | 157:8 159:14 |
| 186:12 214:17 | 102:11 103:10 | **report** 4:14 | 160:3 161:5,6,7 |
| 215:14 231:7 | 104:10 105:6 | 5:18 8:10 10:22 | 167:19 168:9 |
| 288:3,4 | 105:15 106:2,4 | 10:22,23 12:15 | 168:15,16,17 |
| **relative** 97:21 | 129:12 233:7 | 12:16 27:1,10 | 169:12,14 |
| 98:6 106:9 | 234:24 270:8 | 27:10 28:2,8,15 | 176:15,18,20 |
| 111:9 291:17 | **reliable** 27:20 | 31:2 32:9 34:5 | 176:21,23,24 |
| **relevance** 17:7 | 62:20 | 34:11,17,21,22 | 178:7,13 184:1 |
| 98:1,3 100:20 | **reliance** 102:13 | 35:1 46:3,4,7 | 184:7,18 |
| 112:23 158:24 | 102:19 247:23 | 60:5,10,13,15 | 186:25 187:18 |
| 214:9 | 271:20,24 | 61:5,11,13,19 | 190:18,20 |
| **relevancy** 17:7 | 272:1,11,12,13 | 61:25,25 62:7 | 191:16 193:7 |
| 17:7 | **relied** 64:20,25 | 64:15,16 65:5,6 | 194:14 195:11 |
| **relevant** 17:8 | 217:14 271:12 | 65:14 66:4,15 | 201:9 202:8 |
| 18:5 44:5 45:17 | 272:1 | 66:19,20 68:6,6 | 203:7 205:20 |
| 45:17 46:3 52:4 | **rely** 52:18 | 68:23 69:12,14 | 206:24 207:7 |
| 60:8,24 62:12 | 90:23 115:4 | 72:8,9,21 74:1 | 207:11,14 |
| 62:20 79:21,25 | 227:23 240:8 | 74:18 75:3 | 208:5 213:17 |
| 82:1 84:3,9 | **relying** 68:9,21 | 76:14 77:2,15 | 214:21 215:1,6 |
| 85:9 89:25 90:1 | 277:6 | 77:17,25 78:20 | 215:15,16 |
| 98:16 107:23 | **remained** | 79:11,18,25 | 216:16 217:7 |
| 112:21 119:13 | 226:16 282:7 | 80:4,5 81:6 | 218:17 219:21 |
| 120:9,14,18 | **remains** 152:23 | 82:8 83:14 | 219:25 221:22 |
| 126:4,4 142:16 | **remember** 12:9 | 85:17,22 87:5 | 222:2,3,25 |
| 143:9 159:1,2 | 29:2 31:7,22,23 | 91:18,25 92:3 | 223:16 227:21 |
| 165:20 167:21 | 32:2,21 41:25 | 99:18 102:15 | 227:22 231:4,4 |

**[report - results]** Page 60

| | | | |
|---|---|---|---|
| 232:14 233:23 | **reporter** 1:24 | 218:5,7,9 247:9 | **response** 60:22 |
| 235:22 254:14 | 8:21 130:1 | 265:20 286:2 | 61:1 63:1 66:21 |
| 254:14 256:5 | 291:4 | **reputable** | 67:5,14,14,16 |
| 257:25 258:7 | **reporter's** | 36:21 48:3,4 | 67:21,24 82:19 |
| 259:16,19 | 291:1 | 86:25 | 161:20 162:25 |
| 260:6,13,13,14 | **reporting** 99:19 | **reputation** 87:7 | 171:16 195:4,8 |
| 261:8,10 | 106:13,14 | **reputed** 208:12 | 195:9,19,23 |
| 262:16 263:2,3 | 107:24,25 | **requested** 9:23 | 214:16,21 |
| 263:11 265:4,4 | 108:24,25 | 10:8 | 215:14,21 |
| 269:22 271:20 | 110:6 125:5 | **requests** 9:14 | 216:2,5,15,17 |
| 272:2 277:5 | 244:20 245:3 | **require** 114:11 | 217:14 262:23 |
| 278:7,12,13,14 | **reports** 11:13 | 261:14,16,19 | 263:8 282:14 |
| 279:7,14 | 12:21 26:25 | **required** 77:16 | 283:17 286:3,5 |
| 280:19,20 | 27:15,16,19 | 131:21 | **responses** |
| **reported** 76:24 | 28:1,4 61:17 | **requires** 274:13 | 161:25 |
| 81:19 99:15 | 72:18 160:10 | **requiring** | **responsive** |
| 102:11 103:11 | 222:15,16 | 245:10 | 79:17 114:1 |
| 106:6,8,18,23 | 233:1 238:1 | **research** 19:14 | **restate** 61:19 |
| 106:24 108:3 | 263:19,24 | 21:25 25:19,21 | 100:6 111:17 |
| 109:3 111:8 | 264:12,25 | 26:5,12 28:25 | 119:16 |
| 117:24 121:15 | **represent** | 29:22 42:23 | **restricted** |
| 124:4,11,15 | 161:17 261:1 | 270:5 | 166:4 217:21 |
| 125:6 126:1 | **represented** | **researched** | 218:4 |
| 132:8 147:11 | 119:3 | 245:12 | **result** 163:17 |
| 147:17 154:24 | **representing** | **researcher** | 163:18 170:24 |
| 156:14,19 | 270:6 | 158:25 | 189:17 280:2 |
| 157:21 168:22 | **represents** | **researchers** | 287:22 |
| 169:4,5 177:7 | 146:6 252:11 | 87:18 208:11 | **resulting** 277:2 |
| 191:21 193:4 | 268:21 | 229:11 | **results** 27:19,20 |
| 215:3 216:9 | **reproductive** | **residents** 20:11 | 52:16 105:13 |
| 220:2 221:18 | 89:12 90:5,15 | **respect** 169:2 | 110:11 127:17 |
| 221:19,24,25 | 94:7 147:4 | **respectively** | 134:22 140:3 |
| 224:3 236:11 | 148:16 163:7 | 216:13 | 143:20,23 |
| 242:12 246:25 | 168:23 170:9 | **responded** | 148:5 164:22 |
| 247:4 254:15 | 170:10 174:19 | 167:10 | 164:23 171:23 |
| 260:17,21 | 175:22,23 | | 177:13 178:6 |

**[results - risk]**                                                      Page 61

| | | | |
|---|---|---|---|
| 182:3 189:20 | 206:20 220:1 | 68:1 78:13,15 | 272:24 275:20 |
| 190:10 210:19 | 223:20,23 | 79:18,20 80:5 | 278:11 281:12 |
| 211:7,15,15,18 | 224:2,11 | 80:15 85:9,23 | 282:3 285:13 |
| 212:9 216:14 | 225:17 231:5 | 99:8 100:8 | **rigler**  68:25 |
| 216:15 226:5 | 234:16 235:18 | 101:25 104:23 | 72:7 74:6,15 |
| 251:14 258:3 | 260:17 275:5 | 107:14,19 | **rigorous**  115:7 |
| **retainer**  13:10 | 281:15,16,22 | 109:17 117:16 | **risk**  35:4 37:23 |
| **retrograde** | 287:15 290:10 | 117:18,21 | 38:9,18 39:6,7 |
| 76:6 168:2 | 290:14 | 118:14 119:6 | 39:17 40:14,20 |
| 173:16 227:1 | **reviewed**  10:22 | 120:11 126:5 | 40:25 41:2,5 |
| 227:24 229:8 | 11:12,16,22 | 133:3,9,22 | 44:13 49:11,14 |
| **retrospective** | 12:2 21:16,19 | 143:1 150:11 | 49:16 50:10 |
| 105:1 | 25:15,16 26:24 | 155:9 158:15 | 85:10 96:14 |
| **retrospectively** | 27:2 28:25 | 159:24 160:2 | 97:22,22 98:6 |
| 111:14 | 37:20 59:5 | 164:23 166:5 | 98:15 99:1 |
| **return**  86:9 | 62:18 72:6,8,9 | 168:16,24 | 101:6,15,17 |
| 230:16 272:16 | 72:10,13 97:17 | 170:4 175:11 | 117:13 121:15 |
| 292:22 | 102:2,7,17 | 175:11 179:5 | 123:22 124:5 |
| **returned**  7:9 | 103:15 115:5 | 180:15 184:1 | 125:6,12 126:3 |
| **reversed** | 116:25 134:25 | 184:14 185:3 | 128:5,6 149:21 |
| 106:11 108:23 | 135:5 232:15 | 188:12,13,25 | 162:12 163:6,9 |
| **review**  11:13 | 246:18 272:4 | 190:15 194:19 | 163:10,11 |
| 20:6 24:9,20,21 | 272:10 285:14 | 199:6 208:15 | 164:11 171:13 |
| 30:1 31:16 | **reviewers** | 215:19 222:22 | 171:19 172:6,7 |
| 37:23 38:21 | 24:13 | 224:5,8 227:24 | 172:24 173:7 |
| 42:19 46:14 | **reviewing** | 232:1,13 235:9 | 174:14 177:10 |
| 48:14 49:10 | 115:15 267:9 | 236:18 239:5 | 177:24 181:18 |
| 59:11 62:15 | **reviews**  27:16 | 240:25 241:17 | 183:1 193:6 |
| 70:3 78:10 82:4 | 81:15,16,24 | 241:21,25 | 196:19 200:2 |
| 83:25 84:4,11 | 220:2 223:23 | 242:6,11,16 | 201:5,6 204:2 |
| 84:21,22,23,25 | **right**  15:7 22:2 | 247:23 248:7 | 210:3 212:13 |
| 84:25 85:1,23 | 22:16 34:9 | 248:24 249:13 | 212:16 214:18 |
| 97:16 102:14 | 42:15 43:5 | 249:15,23 | 215:4 216:8,18 |
| 102:17 103:22 | 44:16 49:23 | 251:22 257:17 | 218:17 221:19 |
| 115:7 199:24 | 63:5 64:12 66:3 | 259:7,21 262:4 | 221:22,25 |
| 205:22 206:4 | 66:15 67:23 | 265:24 266:16 | 222:5,10,24 |

**[risk - sean]**                                                                  Page 62

223:9 224:6,18
224:22,24
225:2,6,8,22,23
226:11 231:10
234:7,14
237:25 238:1
242:16 245:8
245:10,16
246:12 250:2
260:19,21,22
261:1 273:21
276:22 277:16
278:17,24
279:1,1,12
281:11 285:7
285:24 289:22
289:25
**risks**  40:21
125:5 174:2
218:21 276:23
**rls**  1:8 293:3
**role**  18:18,20
81:21 94:6
**room**  11:4
**rosner**  84:16
**row**  83:14,16
84:16 85:8
86:11 124:7
220:13
**rows**  80:9
192:10
**rpr**  1:24
**rr**  189:16 190:9
220:14,19
249:8

**rule**  276:12,20
277:8
**ruled**  204:25
**rules**  8:19
**ruling**  69:15,19
279:5 281:8
**running**  165:16
237:14
**runs**  174:16,17
**runway**  64:3

**s**

**s**  285:9
**saed's**  270:5
**safety**  23:6,13
23:18 261:11
**sake**  222:20
**salary**  17:4,14
18:1
**sales**  1:8 292:4
293:3
**sample**  106:6
106:10,17
107:8,11,13,14
107:15,18
108:2,3 111:23
124:17 140:4
150:13 152:7
152:14 157:21
176:11 185:2,5
186:2,5,9,11,15
186:16 260:2,4
**samples**  70:21
70:25 71:2,3,12
71:14 109:8
183:23

**sandler**  102:9
285:9,18
**sanitary**  245:7
285:25
**sas9.4.**  165:7
**satisfied**  258:25
**saw**  132:23
182:22 217:2
**saying**  49:21,23
87:21,23
100:23 107:21
134:20 150:9,9
171:22 172:5,8
173:3 185:5
189:24 190:11
207:12 233:17
255:4,8 284:22
290:14
**says**  37:19
43:18 48:17
54:18 73:17
103:4 105:9
166:18 168:19
202:8,20
215:22 216:5
220:12,14,14
226:23 228:2
230:3 241:1
270:17,20
276:12 277:20
289:1
**scale**  236:21,23
240:8
**scenario**  62:13
135:13,13,13

**schedule**  9:11
9:14,17
**schildkraut**
76:11 194:24
208:15 246:25
**scholarship**
43:20
**school**  18:23
19:13,21
**science**  65:23
141:24 246:23
**sciences**  18:19
19:1,9
**scientific**  27:7
57:1 62:14
87:25 114:6,19
114:21 122:9
263:23 264:13
266:13,23
267:6,12,15,16
267:18 268:1,5
268:9 280:4,14
**scientist**  265:24
**scientists**
138:22 205:10
208:13 268:6
**scope**  60:17
62:1
**scopus**  114:1
**score**  237:17,20
238:15,18,19
239:7
**scribbled**  10:13
**se**  96:5 113:4
**sean**  6:12
230:23

| | | | |
|---|---|---|---|
| **search** 66:5 | 251:2 253:9 | 60:9,15 63:6,8 | 259:8 262:11 |
| 79:12,17 80:15 | 257:7 258:5 | 68:20 80:9 | 262:11 269:19 |
| 85:2 114:1 | 262:12 265:12 | 82:17,21 91:23 | 270:17,20 |
| **second** 37:14 | 265:14,14 | 92:15 102:13 | 273:8,11 276:7 |
| 37:22 38:20 | 266:15 273:7,8 | 102:21 105:10 | 276:10,12 |
| 52:15,21 58:2 | 285:21 | 118:7,11,19 | 285:1 287:16 |
| 88:19,21 89:3,4 | **section** 25:21 | 123:12,14 | 288:16 289:1 |
| 89:6 92:5 97:21 | 25:23 26:3 | 125:18 130:16 | **seeing** 166:10 |
| 103:16 104:7 | 27:13,18 37:23 | 130:20 137:6 | 212:7 218:22 |
| 104:17 106:20 | 38:18,21 39:12 | 137:10 139:3 | 284:7 |
| 108:22 110:25 | 39:16 43:24 | 141:1 143:20 | **seem** 15:7 82:9 |
| 111:1,2 118:18 | 44:6 74:20,21 | 144:6 146:19 | 271:8 |
| 121:22 122:21 | 81:7 89:5 92:5 | 149:5 152:4 | **seems** 230:8 |
| 122:22 123:25 | 120:13 122:1 | 153:13 154:24 | 263:21 271:11 |
| 133:25 134:5,6 | 127:20,22 | 155:3,17 170:7 | **seen** 9:8,10 |
| 134:7 138:15 | 131:22 140:3 | 182:23,25 | 14:8 24:24 42:2 |
| 145:10 152:20 | 149:1 151:22 | 192:1,6,12,14 | 72:15,16,18,21 |
| 155:3 159:16 | 160:7,10 | 192:23 193:2 | 98:7 117:16 |
| 160:17 161:11 | 164:22,24 | 194:9 196:7,15 | 122:8,21 |
| 166:3,5,13 | 196:3 197:1 | 200:21 207:19 | 181:19 192:1 |
| 168:25 170:5,7 | 200:18,20 | 207:24 209:20 | **segment** 278:8 |
| 170:18 174:18 | 214:21 215:5 | 209:23,25 | **segments** |
| 175:3 176:2 | 218:14 224:9 | 211:6 215:21 | 277:11 |
| 178:15 180:16 | 228:24 233:25 | 217:22 218:14 | **select** 251:2 |
| 188:9 202:14 | 234:1 244:11 | 220:24 221:2 | 252:23 |
| 207:8 211:6 | 244:15 256:18 | 221:17,25 | **selected** 242:19 |
| 212:8,12 | 262:12 270:4 | 222:16 223:2 | 242:21,23 |
| 215:16,20,23 | 270:22,24 | 224:18 225:4 | 243:4 245:9 |
| 215:24 217:21 | 277:12 | 225:18 234:21 | 250:9,16 251:9 |
| 217:23,23 | **sections** 276:16 | 238:22,23 | 251:10,22 |
| 218:1 226:14 | 277:4 | 240:23 241:15 | 257:12,20 |
| 228:2,3,8 230:2 | **see** 21:17 22:21 | 243:16 246:6 | **selecting** |
| 235:15 236:4 | 25:20 28:21 | 246:10,10 | 146:15 |
| 243:25 244:17 | 37:19 38:18 | 248:17 251:4 | **selection** |
| 244:22 249:23 | 40:19 43:14,23 | 253:8 255:20 | 234:25 239:4 |
| 249:24 250:25 | 43:25 50:18 | 256:3 257:16 | 244:21 245:2 |

248:24 249:4
**selective** 211:1
**selectively**
174:23
**self** 102:11
103:10 106:6
106:13,14,17
106:23 108:24
108:25 111:8
169:4,5
**send** 24:19,20
292:11
**sense** 52:5
102:7 156:15
156:17
**sensitivities**
134:13
**sensitivity**
127:23,25
128:19 130:12
130:25 131:18
134:17 135:10
165:5
**sent** 292:9
**sentence** 34:24
49:13 50:12
52:14,20 54:7
88:23 91:10
92:5,6 94:1,20
97:21 98:23
104:7,19 105:3
105:9 108:22
110:3 122:22
126:24 130:24
132:6 140:2
153:14 164:10

166:17 170:7
171:5 174:16
175:3 178:14
179:18,20
180:14 196:3
205:2 209:4
214:15 216:5
224:12,12
225:10 228:3,8
231:3 234:17
257:8,23
263:10 265:14
266:11,18
267:2 273:9,11
273:13 274:8
**sentences** 92:13
94:21
**separate** 47:9
126:8,12 148:6
158:6
**separately**
78:10,11 137:7
**september**
14:21
**series** 74:24
75:11 93:9
227:4 275:18
284:5
**serous** 99:24
266:4
**served** 33:17
**serving** 114:7
**set** 12:22
150:12 186:10
235:4 252:12
258:15 291:7

**sets** 145:4
**settle** 34:11
**settled** 264:8
**seven** 217:3
**several** 23:22
34:21 53:6,7
67:15 69:2
80:12 96:19,25
100:11,14,17
135:6 148:3
194:17,18
197:15 206:23
219:5 224:22
233:12 240:10
240:12,18
248:18 250:10
263:13
**severe** 286:5,8
**sex** 273:25
**shake** 8:20
**shapes** 136:20
**shared** 219:11
241:7
**sheet** 292:9,13
292:18,21
**sheets** 292:19
**short** 44:8
126:23 181:4
237:14 271:2
**shorthand**
291:16
**shoulders**
136:15
**show** 37:8
139:25 149:1
208:24 212:24

275:23 281:13
281:23 283:1
283:10
**showed** 90:22
163:8,19
196:24,24
**shower** 35:3,3
**showing** 96:12
217:14
**shown** 90:14,20
277:21 284:4
287:3 289:14
290:6
**shows** 145:22
193:13 196:21
212:16
**side** 139:13
**sided** 14:8
165:1
**siemiatycki**
263:17
**sign** 290:22
292:21
**signature**
291:23 292:8
292:10
**signatures**
265:17,23
266:7
**signed** 292:11
292:12
**significance**
161:10 179:24
180:19 214:9
277:24 279:4
285:17 286:25

**[significance - sorry]**                                                        Page 65

| | | | |
|---|---|---|---|
| 287:2 288:9 | **singh** 1:17 4:3 | 157:21,23 | 267:24 |
| **significant** | 4:15,20 5:5,19 | 174:22 175:19 | **society** 4:21 |
| 125:18 126:18 | 8:1 34:18 42:8 | 175:24 176:5,9 | 47:22,25 50:16 |
| 141:8,22 163:8 | 52:17 53:19,21 | 176:11,12 | 50:23 51:5 |
| 165:3,18 171:7 | 54:7 55:4 57:9 | 178:20 185:2,5 | **solely** 122:1 |
| 171:12 172:13 | 59:1 68:16 | 186:3,5,9,11,15 | **solid** 226:22 |
| 177:9,13,24 | 129:24 142:22 | 245:11 255:10 | **soluble** 283:23 |
| 194:11 198:8 | 154:7 237:13 | **sizes** 176:16,17 | 284:3 |
| 209:25 210:9 | 263:17 275:8 | **skadden** 2:19 | **somatic** 99:1 |
| 212:1,4,16 | 275:10,14 | **skadden.com** | **somebody** |
| 214:5,19 216:9 | 281:12 285:13 | 2:24 | 181:18 |
| 216:17 219:2 | 293:5,23 | **skimmed** 12:1 | **sonal** 1:17 4:3 |
| 220:3 223:4 | **single** 75:3,7 | 208:2 | 4:15,20 5:5,18 |
| 251:24 260:18 | 77:5 178:24 | **skip** 105:12 | 8:1 34:17 42:7 |
| 262:13 279:25 | 179:10 | 161:4 | 57:8 154:7 |
| 288:13 | **sist** 181:5,7 | **slate** 2:19 | 292:1 293:5,23 |
| **significantly** | **sister** 105:5 | **slight** 123:21 | **sonya** 1:24 |
| 164:11 172:11 | 113:2 132:20 | 282:21,23 | 291:3,24 |
| 185:7 224:17 | 135:9 144:22 | **slightly** 124:3 | **sorry** 9:11 |
| 224:23 225:5 | 145:6,14 146:1 | 252:1 | 11:24 14:5,7 |
| 225:14,22 | 156:16 158:4 | **slow** 93:23 | 19:19 41:11 |
| 237:24 | 164:2 167:24 | **slowly** 244:25 | 54:22 58:17 |
| **similar** 85:3 | 259:1,1,2 | **small** 89:10,15 | 62:5 72:4 77:24 |
| 106:5 172:18 | 288:10,13 | 112:7 124:17 | 84:23 85:7,17 |
| 174:2 183:15 | **site** 98:25 | 154:16 176:16 | 86:12 89:1 |
| 189:17 190:9 | **sites** 178:14 | 176:17 224:7 | 100:6 104:12 |
| 211:10 218:21 | 209:4,8 | 251:5 255:19 | 105:17,20,22 |
| 219:3 223:8 | **situation** 120:4 | **smaller** 52:23 | 110:21 119:9 |
| 247:14 | **six** 24:10 | 151:2 | 123:13 124:19 |
| **similarly** 39:6 | 186:15,15,18 | **smallest** 52:15 | 140:22,23 |
| 160:25 279:4 | 217:1 | **smith** 231:13 | 142:1 146:24 |
| **simple** 246:5 | **sixfold** 177:6 | 231:14 232:25 | 154:16 155:6 |
| **simply** 146:4 | **sixth** 186:16 | 233:23 263:17 | 166:7,9 168:17 |
| 259:24 | **size** 124:17 | **smoking** 39:9 | 174:10 175:1,5 |
| **sing** 292:1 | 140:4 150:13 | 40:21 41:2 | 175:8,14 178:1 |
| | 151:5 152:7,14 | 224:25 225:7 | 178:3,4 180:8 |

**[sorry - statistical]**                                              Page 66

180:13,16,17
181:9 184:19
188:5 189:8
194:18 196:2
207:12 209:7
215:12,23
219:24 225:15
229:25 255:6
259:4 273:4
278:23 281:19
286:9
**sort**   18:2 20:21
24:10,22 43:21
54:15,19 82:16
121:7 126:4
192:18 203:13
223:24 253:17
261:5 266:12
277:12
**sound**   117:1
**sounds**   78:15
**source**   58:7
79:5,8 279:15
**sources**   16:25
87:17 233:13
**south**   2:13
**spans**   175:4
238:9
**speaking**
283:14
**specific**   12:17
23:16 62:13
86:8 95:20 97:4
99:18 137:15
152:21,24
157:25 168:5

195:1 198:3
213:7 218:16
248:1 267:20
288:18
**specifically**
88:3,23 97:3
99:6 126:23
153:22 160:4,7
193:14 208:20
228:2,4,15,18
229:2,18 270:1
280:9 290:17
**specificity**
100:3,8,18
101:4 128:21
134:13,16
**specifics**   12:14
16:22 31:15
96:22 98:13
206:2
**specified**   148:8
**speed**   269:10
269:11
**spell**   194:25
**spend**   83:6,7
**spent**   14:24
**spes**   135:10
**spoken**   30:8
**square**   198:4
**squared**   198:18
220:7,13,15
223:4
**squares**   197:9
198:5
**stake**   116:12

**stand**   12:11
**standard**   75:2
114:5,10
205:22 206:6,7
**stands**   238:14
**start**   37:17,17
40:23 72:25
100:15 116:22
130:1 162:21
164:20 175:20
185:12 187:15
191:3 203:12
**started**   18:19
19:21 22:19
158:3 170:14
**starting**   20:4
69:4 94:1
127:22 132:6
171:5 234:10
260:8
**starts**   88:23
106:1 175:11
200:10 279:20
**stat**   197:15
**state**   81:6 85:24
135:23 141:24
161:21 203:25
211:7 212:2
267:13,15
274:21 290:5
**stated**   56:22
117:6 121:6
166:25 211:6
279:7
**statement**
44:17 90:4 92:1

93:1 98:2 99:3
99:5 110:9
161:15 168:12
171:14 183:2
185:18 189:21
203:24 204:5,6
204:9 211:4
214:6,10,24
226:17,20
258:1,3,3,5
261:21 279:16
282:5,20
**statements**   30:3
30:5,9 36:24
291:12
**states**   1:3 31:14
44:16 166:23
166:24 226:23
268:11 275:16
276:18 279:25
282:6 293:1
**statistic**   198:19
198:21
**statistical**
118:21 125:20
125:22 153:2
161:10,15
164:21 165:1
177:2 179:23
180:18 184:16
189:15 190:7,8
191:5 197:8,16
198:2,11,12
199:14 220:6
223:6 261:6
288:9

**[statistically - study]**                                    Page 67

| | | | |
|---|---|---|---|
| **statistically** | **strengths** 53:14 | 89:19 90:18,20 | 208:12,12,16 |
| 128:6,9 141:7 | 73:12 152:1,6,9 | 90:21,23,24 | 208:24 211:24 |
| 141:22 151:19 | 152:22 | 94:17 95:9,22 | 216:16,20,22 |
| 163:8 165:3,18 | **stress** 168:4 | 96:19,25 98:8,8 | 216:23 217:1,3 |
| 171:11 172:11 | 282:16 283:18 | 99:15 111:13 | 217:13 220:7 |
| 174:24 177:13 | **strike** 72:25 | 115:12 116:2 | 220:14,15,16 |
| 190:23 194:11 | 126:6 128:13 | 131:8,9 134:1,8 | 221:12,23 |
| 209:24 220:3 | 215:6 244:2 | 134:11 135:16 | 222:9,9,13 |
| 260:18 | 271:2 | 138:24 144:18 | 223:9,11,14,19 |
| **status** 104:11 | **stroke** 95:25 | 145:2 148:3 | 224:1 227:2 |
| 111:14 | **strong** 162:4,8 | 152:11 153:1 | 228:4,15,18,21 |
| **stayed** 13:15 | 162:9,14,17 | 158:4 159:14 | 229:6,14 |
| **stenographic...** | 163:1,2 197:20 | 159:20 160:5,7 | 230:10 231:6 |
| 291:13 | 205:19 | 160:11,15,17 | 233:14,19 |
| **step** 93:15 | **stronger** | 164:10,13 | 234:13,25 |
| 204:4 236:1 | 205:11,16 | 169:3 173:16 | 237:2,21 |
| 254:16 | **strongly** 213:14 | 173:23 177:5,9 | 238:14 239:20 |
| **steven** 5:22 | **struggling** | 179:22 183:12 | 240:1,7,13,14 |
| 179:15 | 211:14 | 183:21,22 | 240:18 244:1 |
| **stimulus** | **stuck** 203:13 | 184:24,24 | 245:9,21,25 |
| 282:12 | **students** 19:25 | 185:1,2,6,14,20 | 246:3,14,17,24 |
| **stop** 39:3 73:4 | 20:10,10,12,13 | 186:19,25 | 247:1,11,12,14 |
| **stopped** 20:18 | 20:14 | 187:2,9,12 | 247:17,19 |
| **strata** 186:7 | **studies** 29:14 | 188:11,24 | 248:9 252:21 |
| **stratified** | 42:20 43:22 | 189:4,11,16,18 | 253:18 255:5 |
| 212:14 | 45:3,11,12,12 | 189:19 190:1 | 256:2 257:9,12 |
| **stratum** 213:7 | 46:22 47:2,2,3 | 193:4 194:17 | 260:16,20,22 |
| 213:9 218:16 | 47:19 50:20 | 194:18,20,22 | 262:17 263:7,9 |
| **street** 1:20 2:5 | 52:16 53:7,12 | 195:2,9,17,18 | 268:3,7 271:7 |
| 2:13,21 | 62:15,15,16,16 | 195:20 196:5 | 280:20 281:7,8 |
| **strength** 55:9 | 64:25 67:15,16 | 196:16,19 | 284:18 288:10 |
| 56:23 59:23 | 68:7,9,21 75:9 | 197:14,24,25 | **study** 5:22 20:5 |
| 62:24 67:19 | 75:18 76:23 | 198:19,22,23 | 20:6,6 28:6,9 |
| 115:19 152:21 | 80:8 81:9,14,15 | 199:1,6 200:8 | 28:19 44:4 |
| 152:24 162:6 | 81:19 82:4 85:3 | 200:11 201:3 | 52:23 53:4,9 |
| 211:4 | 88:25,25 89:9,9 | 204:12 206:23 | 64:24 69:10,15 |

| | | | |
|---|---|---|---|
| 75:10,18 76:12 | 200:11 208:14 | 237:11 287:14 | 276:20 |
| 81:13,22 85:22 | 208:19,19 | **subjective** | **substances** |
| 87:19 90:17 | 209:4,8,16 | 56:12,13,19,25 | 289:20 |
| 91:11,23,24 | 211:8 217:5 | 236:24 | **substantially** |
| 105:1,5 113:2 | 218:8,11 | **submission** | 155:19,20 |
| 114:21 115:15 | 219:12 220:9 | 261:18,20 | 201:24 |
| 117:20 118:1 | 221:2,6,9 | **submissions** | **substantive** |
| 126:16 127:17 | 223:19,22 | 261:15 | 37:18 |
| 130:25 132:9 | 226:13 229:2,3 | **submit** 34:10 | **substantively** |
| 132:14,20,23 | 229:5,20 230:2 | **submits** 24:12 | 82:11 |
| 133:12,21 | 231:11,12 | **submitted** | **subtype** 35:17 |
| 135:9 136:25 | 234:18 235:3 | 14:10,10 21:12 | 36:9 192:25 |
| 140:4,11,13 | 236:5,6 237:16 | 21:13,15,17 | 193:23 |
| 143:13,24 | 241:4 244:21 | 22:3,9 29:25 | **subtypes** 100:2 |
| 144:2,22,24 | 245:11 247:4 | 34:5 35:1 278:7 | 100:12,15,17 |
| 145:6,14 | 247:22 248:10 | **submitting** | 193:9 265:22 |
| 146:16,18 | 253:16,19 | 21:22,24 | **sufficient** 65:7 |
| 151:19 152:1,6 | 254:8 256:7 | 139:24 | 65:12 66:8 |
| 152:9 154:24 | 257:13,17,21 | **subsample** | 143:7 152:11 |
| 154:25 155:13 | 257:24 258:8 | 146:15 | 177:22,25 |
| 157:7,21,24 | 258:17 259:18 | **subsection** | 206:18 |
| 158:1,10,12 | 263:11 284:21 | 278:16 | **suggest** 67:9 |
| 159:5 160:16 | 286:18 287:25 | **subsequent** | 89:9 95:23 |
| 160:20 164:2,8 | 288:6,10,14 | 68:25 69:11,12 | 107:1,6 192:20 |
| 164:17 165:11 | **stuff** 43:11 | 69:12,14 87:19 | 217:4 234:13 |
| 174:12 178:6 | **subgroup** | 141:11 161:20 | **suggested** |
| 178:20,23,24 | 108:20 110:4 | **subsequently** | 76:10 91:12 |
| 179:10,15,25 | 165:5,24 | 272:4 | 195:18 205:10 |
| 180:1,19,20 | 166:25 167:13 | **subset** 149:4 | 241:16 |
| 185:10,11 | 168:8 172:2 | 163:4 257:12 | **suggesting** |
| 187:1,4,6,17 | 174:18 | 257:20,21,23 | 53:10 67:4,24 |
| 191:4,6,21,22 | **subgroups** | 258:5,7,17,24 | 174:18 281:10 |
| 195:1,15,15 | 171:9,18,25 | 259:17 | **suggestion** |
| 196:20,24 | 172:17 174:13 | **subsets** 253:6 | 282:24 |
| 197:4,11 | **subject** 118:25 | **substance** 6:23 | **suggests** 76:11 |
| 198:15,24 | 120:18 237:4,7 | 29:25 276:2,6 | 107:5 131:19 |

193:25

**suite** 2:5

**sum** 266:12

**summary**
86:19 216:19
251:16 276:15
276:16 277:15

**supplement**
34:25 52:11
75:9 138:8
206:3

**supplemental**
4:14 8:9 12:16
34:17,22 77:1
112:22 121:10
127:10 140:19
178:13 219:21
219:24 230:21
241:12

**supplementary**
6:14 230:25
240:25 241:8

**supplements**
138:11

**supply** 292:12

**support** 44:10
50:13 57:2
118:22 130:17
264:12,13
284:19

**supported**
81:20

**supporting**
279:15

**supports**
192:15 286:15

**sure** 9:23 12:19
19:18 21:15
23:18 26:9
28:13 37:15,25
41:19 44:21
49:12 57:16
58:9 59:8 60:12
64:1 69:9 70:5
70:16 74:19
78:12 80:16
82:15 84:2,2
85:1 86:4,6
88:17 91:25
93:13,23 95:12
100:7,13 104:5
107:5 109:19
114:17 117:25
119:7,17 124:2
130:9 132:25
133:23 138:12
140:17 141:18
145:20 147:5
154:12,19
155:15 158:23
159:5 160:18
165:10 172:4
178:21 180:24
186:15 189:1,9
191:17 198:20
210:22 213:16
221:3 233:20
238:16 248:19
253:4 254:17
256:14 283:1
285:3

**surface** 271:12

**surgery** 170:15
171:4

**survive** 111:22

**surviving** 112:3
112:4

**survivor**
111:24

**survivors**
111:10,21,25

**susceptibility**
98:25 286:4

**susceptible**
53:23 54:1
182:25 237:1

**suspect** 129:22
129:23

**sworn** 8:2

**symptoms**
95:18

**syncing** 287:22

**systematic**
46:14 62:14
81:15 82:3 84:4
84:11,21,22,25
85:1,23 199:23
220:2 231:5
281:16

**systematically**
108:9

**systems** 18:19
18:25 19:14

---
**t**
---

**tab** 41:9,9,11
47:21 52:7 57:6

**table** 6:14
123:2 137:4
140:15,19,25
144:5,6 147:1,3
149:3 153:23
154:16,18
155:14 156:2
191:22,24
194:4,5,16,18
196:1 197:8
198:19 201:3
201:19 209:17
220:10,12,22
220:25,25
221:1,4,13,14
221:17 230:21
230:25 236:14
236:15,16,18
238:9,10,11,14
240:15,20
241:8,12
243:10,11,12
248:14 253:3
254:20 259:16

**tables** 138:8
194:6 240:25

**taher** 6:5 45:19
191:10,12,15
191:22 195:16
200:21 204:20
217:2 221:6
222:14 223:15
238:4,5 239:1
239:11 240:3
240:16,17
262:16 273:2

**[tails - talking]**

| | | | |
|---|---|---|---|
| **tails** 136:11 | 73:22 74:25 | 229:20 230:3 | 290:9 292:3 |
| **take** 8:25 9:3,4 | 76:7,8,18,21,22 | 248:18 251:15 | 293:2 |
| 9:6 29:4 38:20 | 76:22,25 81:21 | 256:18 257:3,7 | **talk** 18:17 |
| 41:17,20 43:19 | 83:25 85:10 | 257:15 267:20 | 26:10 36:19 |
| 53:24 68:18 | 86:18 91:12 | 267:21,23 | 70:17 88:2 |
| 70:3 83:9 98:9 | 92:7,11 94:9,14 | 268:12,12,21 | 94:17 98:8 |
| 109:22 115:22 | 99:10,20 100:1 | 273:11 275:17 | 126:23 127:21 |
| 153:11 154:1 | 102:10 103:9 | 277:9,20,21,22 | 131:12 136:2 |
| 159:15 161:16 | 106:4,13,14,18 | 278:2,3,10 | 147:24 152:17 |
| 219:6,7 224:13 | 108:16,25 | 279:9 280:18 | 153:25 154:2 |
| 227:7 253:5 | 109:1,3,11 | 280:23 281:2 | 156:18 160:6 |
| 261:6 271:16 | 110:6 111:9 | 281:11 282:7 | 160:11,25 |
| **taken** 21:5 | 113:1,3,11,21 | 282:12 283:16 | 165:21 179:12 |
| 41:23 54:10 | 114:12 117:13 | 283:23 284:2,8 | 179:13 180:3 |
| 58:3 83:11 | 118:2 119:6,13 | 284:19 285:6 | 180:22 182:23 |
| 88:24 89:6,8 | 119:19 120:8 | 285:23,24 | 184:6 187:1 |
| 98:19 115:24 | 123:16,21 | 286:2,12,16 | 191:14,15,20 |
| 117:10 138:1 | 124:4,11 129:3 | 287:6 288:5,18 | 197:12 203:19 |
| 154:3 157:18 | 132:8 133:11 | 289:13,14,16 | 207:6,13 269:6 |
| 169:23 184:10 | 134:9 141:13 | 289:19,19,21 | **talked** 15:16 |
| 219:9 248:6 | 146:21 152:12 | 289:25 290:4,5 | 57:11 64:3 |
| 262:9 275:6 | 168:3,13 178:8 | 290:6,16,17,18 | 77:15,17,22 |
| 283:16 287:17 | 185:15 189:14 | **talcum** 1:6 8:10 | 99:9 100:10 |
| 291:6,16 | 193:14 196:17 | 12:23 24:2 35:2 | 118:16 126:14 |
| **takes** 73:22 | 196:18,18 | 38:5,5,9 39:3 | 138:17,21 |
| 95:14 271:10 | 202:5 203:1,17 | 39:24 40:5 68:2 | 150:20 156:21 |
| **talc** 15:13,18 | 203:21,23 | 94:19 96:9 97:9 | 158:19 163:18 |
| 22:4,11,24 | 204:1,10 | 170:21 171:1 | 190:18 193:20 |
| 23:15 25:1 29:8 | 205:12 208:20 | 173:24 190:6 | 195:7 233:3 |
| 30:5,18,22 | 220:2,12,16 | 192:16 208:24 | 238:5 252:24 |
| 35:24 36:3,7,15 | 221:2,6,9,12 | 209:13 231:8 | 259:10 270:7 |
| 39:11 41:1 | 224:5,7 225:1,7 | 234:8,20 245:5 | 270:11 |
| 43:24 44:6,11 | 226:16,25 | 260:19 270:6 | **talking** 40:20 |
| 45:3 46:9 50:14 | 227:1 228:5,19 | 270:21 273:19 | 41:25 42:12 |
| 55:21 68:5,7 | 228:22,25,25 | 273:21 280:17 | 95:13,14 99:7,8 |
| 69:1,7 72:2 | 229:3,6,7,8,14 | 281:1 285:19 | 101:21 104:22 |

**[talking - thing]**                                                    Page 71

110:8 111:20
116:11 124:18
130:1,5 147:23
158:16 159:19
160:15,16
161:9 170:4
181:12 183:19
186:6 204:22
204:24,24
210:18 215:21
227:19 229:3
248:8,8 255:17
259:14 280:14
287:6
**talks**  27:10 55:2
93:7 100:8
132:24 140:7
215:1 258:4
277:16 287:4
**tanha**  6:9
219:15,18
220:1,9,17
223:18 224:4
281:13,21,24
283:14,15
**tasigna**  32:6,14
32:17 57:10
58:9
**taught**  20:24
**teach**  19:21
**teaching**  19:20
20:5,19,22
**team**  30:13
**telephonic**
78:15

**tell**  33:3,16
73:8 115:14
120:23 123:4
143:22 144:11
173:13 246:22
256:11 277:13
**telling**  77:11
**tem**  73:9,16,17
73:18
**temporality**
59:22 67:20
**ten**  180:2,21
181:7,8,8,10,23
182:15 183:18
249:25 257:9
**term**  75:23
93:14,16 95:20
97:2 128:4
144:10,14,17
144:19,20,22
144:24 145:1
145:24,24
146:1 147:6,16
147:21,21
148:14 150:17
183:17 209:10
209:15 233:20
**terms**  12:14
27:9 65:1 79:12
79:17 81:2 82:2
84:14 87:13
140:4 150:10
157:24 162:8
162:15 186:19
205:1 213:23

**terry**  193:15,16
193:18,21
**terry's**  193:5
**test**  78:25 92:10
172:9 173:12
211:25 212:3,6
212:19,21
213:6,7,10
219:1
**tested**  70:22
71:12,15,20
**testified**  8:3
33:18 37:6 54:7
**testify**  51:13
**testifying**  72:1
**testimony**  4:13
28:11 31:1,3,7
31:24 33:10
36:2,7,8 39:25
44:15 49:19
50:7 60:4 61:18
66:1 75:15
92:21 93:20
115:2 118:22
118:24 119:1
119:17 120:17
141:10 150:7
151:15 167:16
191:5 205:14
216:22 227:23
252:7 282:22
291:10 293:6
**testing**  68:22,22
68:23,24 72:1,7
72:13,14,17,22
73:13,20 78:23

78:24 165:9,10
280:22
**tests**  125:14,17
164:21 165:1
168:20,21
171:17 173:4
210:8 213:23
**text**  37:18
78:25 164:19
164:20 166:5,6
166:8
**thank**  10:3 18:7
24:23 33:4
35:15 38:2,4,23
43:12 61:15
68:1 81:3 83:24
93:25 103:25
109:20 127:1,7
138:16 146:8
152:3 161:8
175:15 176:22
176:25 184:22
215:18 217:24
241:11 257:6
272:25 275:9
290:21
**thanks**  41:12
**theory**  210:2
**therapies**
224:21
**therapy**  48:24
91:15,20 257:3
**thereof**  137:21
**thing**  64:19
78:7 114:11
129:25 133:20

**[thing - tissues]**                                                Page 72

| | | | |
|---|---|---|---|
| 169:14 181:22 | 146:19 147:23 | 202:18 203:3 | 182:25 183:18 |
| 183:15 199:19 | 148:21 149:25 | 215:12 288:11 | 188:11 197:13 |
| 201:16 206:20 | 152:10 153:22 | **thousand**  16:9 | 198:16 201:10 |
| 224:15 230:9 | 159:23 161:2 | 33:4 | 204:12 210:5 |
| **things**  21:23,25 | 162:6,25 | **three**  11:1 22:9 | 222:21 230:7 |
| 25:3 39:9,11 | 168:10 173:24 | 22:18,19,20 | 233:22 237:14 |
| 40:24 58:19 | 177:25 189:23 | 33:19 143:10 | 244:1 245:1 |
| 64:10 87:2,4 | 191:3 193:13 | 144:18,25 | 246:19 247:24 |
| 106:22 133:19 | 194:13 199:10 | 145:2 154:15 | 256:12 258:15 |
| 149:11 187:8 | 202:2,2 210:6 | 158:4 167:22 | 270:5 271:3 |
| 187:10 235:11 | 210:10 218:24 | 195:25 272:11 | 291:7,8,12 |
| 266:12 267:13 | 222:7 223:5 | 283:9 | **times**  15:6 |
| 272:4 287:16 | 226:21 227:10 | **threshold**  268:4 | 34:21 48:8 |
| **think**  11:21 | 234:14,15 | **thursday**  1:18 | 50:25 139:8 |
| 12:13 18:5 | 235:21 239:23 | **time**  9:4 11:21 | 145:13,14 |
| 22:19 26:4 31:6 | 246:5 247:24 | 13:16 14:10 | 186:15,16,18 |
| 31:21 39:12,19 | 254:9 259:13 | 18:16 19:12 | 208:3 216:10 |
| 40:6 46:18 48:2 | 259:14,15,17 | 29:2 43:18 | 231:9 233:12 |
| 49:2 51:18 | 261:4,5 263:2,9 | 48:11 53:6 57:1 | 234:20 244:20 |
| 54:23 61:16,17 | 267:19,22 | 62:17 65:13,20 | 245:3,4 248:22 |
| 64:3 66:2 67:17 | 269:1 272:14 | 66:7 68:18 83:6 | 249:2,12,17,20 |
| 68:19,23 73:4 | 273:9 274:4,11 | 83:7 93:23 | 250:5 258:9 |
| 73:21 78:11 | 274:12,22 | 109:22 119:10 | **tisi**  2:12 14:5 |
| 80:20 86:24 | 280:8 283:8 | 131:8 136:25 | 21:2 57:14,21 |
| 87:4 91:6 92:24 | 288:16 289:6,7 | 140:10 142:15 | 58:12,16,20,23 |
| 96:3,8 97:2 | 289:12 | 142:25 152:8 | 59:2 61:22 |
| 99:7 100:19,23 | **thinking**  40:23 | 153:5,17,20 | 69:25 70:5,11 |
| 101:3,19 | 93:15 95:24 | 156:19 158:22 | 70:15 102:25 |
| 102:25 103:3 | 96:2 | 158:23 159:14 | 103:3,5,17,22 |
| 109:8 110:8,10 | **third**  92:5 | 159:24 160:1 | 103:25 127:4,7 |
| 112:21 113:14 | 238:17 273:9 | 160:11 177:17 | 154:13,17 |
| 116:9,18 | 284:2,2 | 177:19,20 | 174:10 178:1 |
| 119:21 121:6 | **thirds**  168:19 | 179:5,8,11,12 | 217:25 |
| 121:12 125:20 | 228:14 260:9 | 180:4,22,22,25 | **tissues**  229:7 |
| 126:3 131:7,12 | **thought**  105:7 | 181:4,5,6,13 | 265:19 |
| 131:17 143:12 | 159:7 163:15 | 182:12,14,17 | |

**[title - tsca]**

**title** 103:8
289:1
**tobacco** 264:2
264:23
**today** 10:11,21
12:5 26:11
51:17 86:10,13
95:15 112:12
182:2 230:16
280:16
**together** 61:25
88:24 89:6,8
183:16 185:1
252:22 253:11
253:22
**told** 38:12
50:22 51:4
210:19
**tomorrow**
95:16
**tons** 138:24
**took** 254:7
**top** 21:12,17
59:16,19 70:23
144:6 149:8
177:12 209:18
210:18 276:12
285:22
**topic** 122:19
**topical** 23:22
23:25
**tort** 206:8
**total** 15:9 148:1
148:4 185:25
189:5,12 190:2
195:3 220:16

**totality** 202:7
203:3
**totally** 87:24
**touch** 59:7
**towards** 34:19
73:18 123:3
184:17 200:13
257:1
**town** 13:19
**toxic** 6:23 276:2
276:6,20
289:20
**track** 17:2 24:7
43:3 269:10,10
**tract** 85:11 94:7
170:9,10
182:22 218:9
265:20 286:2
**tracts** 89:13,23
90:6,15,22
125:3 137:8
147:4 148:16
163:7 168:23
170:25 174:19
175:22,23
218:5,7,18,21
218:22 246:16
247:9
**tracy** 3:5
**trading** 17:1
**traditional**
25:16 27:2
42:10
**traditionally**
141:7,21

**trajectories**
265:18
**transcribed**
291:14
**transcript** 4:19
5:4 42:7 57:8
291:16 292:15
292:18,23
**transformation**
270:22 271:4
271:17
**transformatio...**
271:10
**translates**
97:22
**translocation**
228:12
**transparent**
63:22 66:10
67:8 81:1
**travel** 13:14
286:1
**traveled** 13:12
13:20
**treatment**
230:5 270:18
**tremolite** 75:1
**trend** 106:11
108:22 195:17
**trends** 216:2,6
216:10
**trial** 274:18
**trials** 20:7
201:17 202:24
203:15,15

**triangular**
135:25 136:1,2
136:9,10
**tried** 31:9 244:6
**trigger** 227:3
282:13
**triple** 157:4
**trouble** 199:11
**true** 99:5
155:24 160:22
201:23 235:10
259:4,5 261:23
291:15,21
293:6
**truly** 128:19,24
130:11
**try** 9:4 25:18,22
45:21 61:20
97:6 109:16
133:24 253:16
273:9
**trying** 17:17
31:12 58:25
60:17 67:7 83:2
84:15,18 142:2
150:11 158:9
165:12 188:17
190:7,8,24
202:13 203:10
204:15 206:3
210:21 211:1
236:3 239:18
244:5 254:9
267:14 269:13
**tsca** 6:24 276:2
276:7

[tubal - understand]

**tubal**  90:25
   123:4,14 124:8
   124:15 125:2,8
   125:12 126:2
   137:12,19
   157:10,13,14
   158:2,11
   163:19 164:5
   164:12,13
   170:12,20
   245:14 246:7
**tube**  265:21
**tubes**  126:9
   141:15 163:5
   166:21 167:3
   167:13,24
   169:6,7 241:9
   241:17 242:6
   242:11,15
   243:16 244:10
   259:11 282:13
   286:19 287:11
**tumor**  192:1
   265:15
**tumors**  265:18
**turn**  23:3 25:7
   37:13,16,22
   43:5 48:11 49:9
   52:11 59:9 62:6
   74:18 80:1
   98:21 105:13
   121:21 133:24
   140:15 144:5
   164:16 165:25
   209:3,17
   214:15 227:20

230:18 253:3
   256:13,18
   260:6 262:2
   265:8 266:9
   276:14 278:11
   279:13
**turning**  25:13
   220:22 221:11
   244:7
**twice**  243:22
   245:23 249:3
   250:21,21
   257:15 258:12
   258:20
**two**  11:1,3,12
   12:20 14:7 23:5
   23:25 24:4,22
   45:2 48:14
   54:23 74:25
   79:7,20 80:11
   83:21 92:13
   94:20 105:6,10
   133:1 134:2,6
   145:2 156:14
   163:24 165:1
   168:19 169:12
   169:14,15
   171:24 189:24
   195:18,25
   210:7 211:5,11
   211:24,24
   212:2 213:8,21
   214:8 217:4
   220:1,14,15
   221:17,18
   222:17 223:3

225:19 228:14
   231:9 234:20
   242:23 243:6
   245:4 251:20
   253:5,10,22
   257:4 258:9,22
   259:1,3 260:9
   261:9 262:13
**type**  27:7 28:16
   165:4 190:15
**types**  35:6,22
   101:22 198:23
   265:16 266:1
**typical**  247:16
   263:22
**typo**  163:12
   189:7

## u

**ucsf**  264:4
**uh**  104:24
   118:20 123:9
**ultimately**
   260:2
**umbrella**  81:15
   220:1 223:22
   225:17 281:15
   281:22
**unable**  151:8
**unadjusted**
   135:15,18,23
   158:16
**unclear**  47:18
   226:16 282:7
**under**  6:22
   32:10 48:15

57:18 80:10,11
   80:12,18
   105:20 113:12
   118:7 151:19
   160:17 205:23
   214:8 276:2,6
   276:20 278:24
   289:19 291:9
   291:20 292:21
   293:6
**undergo**  170:12
   170:20
**undergoing**
   115:6
**undergone**
   123:14
**underlying**
   82:20 97:18
   153:20 169:3
   253:25 254:4
   254:12 255:12
**underpowered**
   213:24,25
**underreported**
   107:2
**understand**  8:8
   24:11 28:12
   41:6 51:3 57:19
   57:25 59:2
   60:17 72:11
   73:23 77:13
   88:14 119:17
   119:22,25
   129:8 140:8,9
   142:2,3 198:21
   204:15 206:6

**[understand - uses]**                                        Page 75

208:18 210:21
220:18 233:19
244:3,6 252:9
255:3 256:1
257:19 266:7
269:4
**understanding**
58:6 109:5
128:4 173:15
201:25 250:23
252:10
**understood**
13:6,6 30:16
38:17 44:19
45:14,21 51:20
51:22 55:11
59:6 61:21 62:6
63:10 64:6,9,9
71:1,8 72:3,6
72:12 75:22
78:18 80:1 86:9
120:1 122:22
140:1 141:7,21
183:13 213:11
213:11 234:9
267:14
**underwear**
245:7 285:25
**undue** 52:22
**unexposed**
128:21 189:14
190:3,3
**unfortunately**
43:13 88:11
132:7,7

**united** 1:3
31:14 268:11
275:16 279:25
293:1
**university** 17:4
17:14 19:5
**unmarked**
272:19
**unpack** 106:15
190:8 204:18
252:2
**unreasonable**
129:10 276:21
278:17,24
279:1
**unsophisticated**
174:24
**unsurprisingly**
256:17
**update** 61:18
65:14 203:6
268:19 288:13
**updated** 37:3
37:20 42:17,19
42:23 43:15,19
45:6 46:6 66:6
77:16 160:23
**updating**
223:20
**upward** 178:18
**upwards** 180:1
180:21
**usc** 122:1
**use** 6:22 35:2
36:15 38:5,5,9
39:24 40:5,19

41:1 48:23
54:20 62:7 63:4
63:6,13,15
85:10 89:11,15
89:22 91:12
94:19,25 95:15
96:9 97:9,24
102:10,11
103:10,10
104:8 105:6
106:5,6,13,14
106:18,23
109:1,4 110:7
110:16,16
111:9 117:13
129:19 132:3,8
135:25 136:8
138:11 144:7,9
144:10,14,17
144:19,20,22
144:23,24
145:1,17,18,24
145:25 146:1,1
146:21 147:6
148:6,14 149:8
164:4 167:5
170:13 171:12
183:17 194:1
199:21 201:8
203:5 205:1
208:20,24
209:9,10,10,14
211:8 212:9,12
214:18 215:3
216:8,11,13,18
217:17 220:3

221:2,6,9
224:25 226:16
234:14,21
235:25 248:18
260:19 268:12
268:21 273:11
274:1 276:1,6
276:24 277:22
278:25 279:24
282:7 285:6,23
286:17 288:5
289:3 292:19
**used** 63:16,16
63:18,23 64:14
64:16 66:25
67:25 79:13
91:3,15 92:10
94:14 123:15
131:19 132:13
162:8 170:21
174:19 209:13
241:23 242:5
242:15 257:15
257:21 258:24
**user** 241:24
**users** 110:4
146:10 147:14
147:16,21,22
163:9,9,11,12
163:16 210:3
241:20,20
242:8,10
243:14,17,20
243:21
**uses** 205:23
289:15

**[using - we've]**                                                                 Page 76

**using**  38:24
  39:3 41:4 56:10
  58:7 64:5 95:21
  97:2 105:5
  124:11 131:17
  134:12,17,20
  136:13 167:12
  168:7,11,11
  170:14 199:25
  199:25 210:4
  223:11 236:21
  238:14 240:8
  242:13,14
  273:19
**usually**  20:5,16
  27:10,14,15,25
  54:11 198:6
  199:22 200:6
**uterine**  35:10
  282:13 288:17
**uterus**  229:4

**v**

**v**  2:12
**vagina**  229:4
  282:12 286:1
**vague**  149:1
**validate**  132:8
**value**  115:20
  141:21 165:2
  213:6,7,9,20
  214:2,5 245:10
  245:16 246:10
  247:18 261:20
**values**  136:4
  161:11 213:21

261:15,20,21
**variable**  132:1
**variants**  157:12
**various**  99:16
  100:2 163:10
  183:6 250:13
  277:17
**vegetables**
  149:20 162:14
**verbal**  8:19
**verbatim**  14:4
  23:4 25:18 39:8
  61:10 105:8
  134:12 136:10
  172:15 179:3
  179:25 189:13
  212:18 265:16
**version**  88:10
  160:23 227:11
  227:16 282:22
**versus**  28:14
  31:14 33:7
  111:14 124:18
  124:19,23
  136:9 158:17
  163:14,16
  183:17 258:12
**vi**  143:22
  144:19
**viagra**  4:23
  51:11 52:9
**videoconfere...**
  1:16
**view**  233:6
  270:8

**viewpoint**
  100:18
**viewpoints**
  54:17,20,25
  55:3,12,18
  56:21 62:22
  63:24 67:22
  100:7
**vimercati**  74:22
  74:24
**vioxx**  264:23
**visit**  40:12,16
**vitae**  4:12 18:9
**vitonis**  118:21
**vitonis's**  121:4
**vitro**  62:15
**voice**  21:3
**volume**  1:1
  292:1

**w**

**w**  2:20 5:12
  28:3 127:2
  292:11 293:25
**wait**  228:11
  262:20,20
**want**  8:24 9:3
  18:16 25:2 27:6
  28:12 31:22
  55:12 59:2
  64:10 68:20
  69:25 71:6
  73:19 82:16
  83:6,7 86:6
  91:25 103:17
  112:10 120:20

120:24 121:2
  126:16,23
  133:3 148:12
  149:10 165:14
  181:17,19
  182:19 190:11
  199:24 203:17
  205:21 206:17
  215:15 225:15
  225:16 227:20
  228:1 230:9,18
  237:10 254:8
  268:25 271:18
  276:14 287:21
**wanted**  86:3
  154:18 230:15
  230:17 252:16
  288:15
**wants**  8:25
**washington**  2:6
**way**  19:11
  56:21,22 62:24
  87:11 101:3
  113:5 115:3,10
  115:14 126:18
  130:21 145:24
  151:9 167:14
  168:9,19 196:2
  199:20 208:4
  217:11 228:14
  238:18 260:9
**ways**  136:13
  172:1 230:10
**we've**  53:5
  64:10 77:17
  98:7 158:19

**[we've - women]**                                                    Page 77

181:19 194:13
208:3 252:24
268:7 270:7
283:10 286:20
**weaknesses**
73:13
**weather** 13:15
**web** 43:13
**website** 39:19
**website's** 37:4
**wedded** 176:16
**week** 139:10
145:15 146:22
231:9 234:20
243:22 245:3,4
245:23 249:3
250:22 257:16
258:10,12,20
**weekly** 144:21
258:11,12
259:22
**weeks** 69:20
**weigh** 56:21
72:25 73:12
101:3 115:11
**weighed** 67:12
67:17
**weighing**
266:25
**weight** 26:6
39:5 40:23
50:12,19 53:12
62:8,10,11
63:17,18 65:3
66:21 67:4
135:17 136:15

143:18 251:24
255:12,25
256:1,8 262:23
**weighting**
67:13 255:23
**weights** 136:11
256:4,5,6
**weinberg** 285:8
**went** 10:24
25:6 51:17 90:8
120:3 150:24
219:11 221:15
236:1 240:2
246:17 251:12
251:25
**wentzensen** 5:7
86:16,18 87:8
88:9 89:14
91:18 98:21
101:23 102:9
138:18
**wera** 5:24
187:22
**wernicke** 28:2
**westlaw** 52:12
**whatever's**
76:20,23
**whi** 143:21
144:19,24
156:1 158:4
159:3 167:23
177:20
**white** 208:25
209:11,23
211:9,14
212:15 216:8

**whitmore**
194:24
**whittemore**
238:13,17,22
239:21
**wide** 143:17
192:9 193:3
255:17
**wider** 136:12
146:15 255:24
**widespread**
97:24
**wilks** 33:7
**withdraw** 83:4
83:7
**witness** 4:3
41:17,21 57:17
57:23 58:11
59:4,8 68:13,17
69:19,23 70:6
83:19 88:12
103:2,7,15,20
105:24 106:3
137:2 159:22
166:13,16
175:8,12,14
188:5 192:6
196:8,11,14
219:5,13
232:24 269:13
275:9 291:8,10
292:1,15
293:19
**witnesses** 115:1
**wolf** 263:18

**women** 89:12
89:22 90:5,15
90:25 91:14,14
91:20,20 94:23
95:17 96:8,10
96:16 97:9
107:1,9,12,16
107:22 111:21
112:8,17 123:8
123:13,14
124:7,14 125:1
125:2,12,13
126:1,9,9
137:11,13
140:5,25
144:11 147:4
147:21 148:15
156:4 163:4,7
163:19 164:3
166:20 167:3
168:22 169:5
169:11 170:12
170:20,24
174:19 175:21
175:22 178:19
178:22 180:1,4
180:21 182:19
182:20 183:4
184:14 208:25
208:25 209:13
209:19,23
210:18 211:9
212:15,17
216:8,9 218:4,5
218:6,20,21
219:2 234:7

**[women - yeah]**

241:8,16,17,24
242:6,10,13,14
243:15,20
244:9 246:16
247:9 252:12
257:15 259:6
259:10,11
273:19
**women's**
154:23 155:13
155:23 169:2
**woolen** 6:13
44:25 45:23
230:18,19,20
230:23 231:2,4
231:12 235:6
238:21 239:1,7
240:17 241:23
242:15,18
244:8 248:8,10
248:24 249:5
250:15,19
251:4 254:25
257:17 258:24
259:16 260:2
260:11
**woolen's** 45:15
45:16
**worcester** 1:21
**word** 77:4,5
129:8 168:4
286:7,9
**wording** 66:24
**words** 101:5
130:2 164:21
187:4 269:15

**work** 14:2,13
14:17,20 15:7
15:10,13,17,24
16:17 17:1 19:4
19:7 35:20 63:3
63:4,5,11 87:15
205:5 206:5
233:6 264:12
265:5
**worked** 138:21
**working** 21:21
29:21 284:10
**works** 87:14
203:10
**world** 25:18
27:6 197:15
**worried** 226:2
**worse** 93:11
284:8
**worth** 15:6
**write** 202:7
285:22
**writing** 70:16
**writings** 12:21
**written** 199:17
**wrong** 58:10
103:5 152:3
166:7,7 196:10
196:11
**wrongly** 88:10
**wrote** 77:4
91:22
**wu** 6:16 98:12
194:24 239:6
247:19 248:10
248:12 251:13

251:13,14,24
252:18 253:3,3
253:24 254:3
254:17 255:16

| x |
|---|

**x** 4:1 5:1 6:1 7:1
55:22 73:1
80:18 99:21
251:20
**xs** 80:10

| y |
|---|

**y** 55:22 99:21
251:5
**yeah** 11:23,24
14:9,19 16:2
18:21 19:6 20:8
20:20 22:1 24:3
24:3 25:17 27:4
27:15 28:3,18
29:2 30:13 32:8
32:11,14 34:13
37:8 41:21
42:14,18 43:3
43:21 44:1,24
45:16 46:12,25
49:7 50:2 51:2
52:4 53:14,20
54:21 55:17
56:16,18 59:24
60:5,19 63:14
64:10 68:21
70:6 71:4,6,10
71:10 72:10,15
73:20,25 74:13
74:17,23 76:14

77:20,20 78:1
79:19 80:20
82:8,12,20 83:2
83:19 84:7 86:2
90:3 92:14
93:21 94:14
95:8 97:20,21
99:11 100:9
101:13 102:1
102:17,17
103:7 104:21
106:3,23,25
107:17 110:1
110:10 111:5,7
112:5,15,23
113:9,16,19
114:3,3 116:8
117:6 118:3
119:10 122:4
124:16 127:14
127:20 129:2
129:13 130:22
132:19 134:23
135:4 136:20
138:22 139:10
140:10 142:1
144:8,13 145:4
146:14 147:2
147:14,18
149:1 150:2,21
152:17 153:15
153:24 154:22
155:11 156:10
157:1,6 160:4
162:6 163:16
163:16,24

| | | |
|---|---|---|
| 166:2,16,16,22 | 255:11 259:12 | 249:2,12,16,19 |
| 168:18 169:11 | 260:13,15 | 249:25 250:5 |
| 177:14 180:7 | 263:19 265:11 | 253:6 |
| 181:2,12 182:7 | 266:21 268:19 | **yesterday** |
| 182:7,16 | 271:6,15,21,23 | 10:25 13:14 |
| 183:24 185:22 | 272:8,14 274:9 | **younger** 164:3 |
| 188:1,22 | 277:11 279:7 | 164:3 |
| 191:19 193:4 | 280:19 281:4 | |
| 193:17 194:12 | 282:21 283:13 | **z** |
| 196:23 199:3 | 286:11 287:2 | **zachary** 2:20 |
| 199:17 200:20 | 288:6 289:4 | 8:6 292:11 |
| 201:21 202:25 | **year** 14:21 | 293:25 |
| 204:7,11,17 | 16:17,19,20 | **zachary.martin** |
| 205:9 206:2 | 17:23 20:9,10 | 2:24 |
| 207:21,23 | 20:11 24:9 48:7 | **zack** 9:21 43:7 |
| 208:2,22 212:8 | 48:19 102:21 | 64:1 139:22 |
| 213:4 214:13 | 110:15 111:18 | 166:9 180:8 |
| 214:22 216:1 | 143:24 156:14 | 184:19 |
| 217:8 218:15 | 158:23 183:18 | **zoom** 3:3,4,5 |
| 219:22,23 | **years** 20:4 31:4 | |
| 220:25 221:7 | 33:18 48:20 | |
| 221:10,14 | 51:16 95:14 | |
| 222:6,6 224:6 | 140:8,9,12 | |
| 225:12,12,16 | 142:15,17 | |
| 227:18 228:17 | 143:10 144:21 | |
| 228:17 229:16 | 144:25 145:3 | |
| 235:17,24 | 146:2 153:19 | |
| 236:15,20 | 155:5,16 | |
| 238:10,12,24 | 158:24 159:1,2 | |
| 239:10 240:22 | 160:12,13,19 | |
| 242:4,19 | 177:23 180:2 | |
| 243:13,18 | 180:21 181:7,8 | |
| 244:18 245:15 | 181:8,11,23 | |
| 247:11 250:17 | 182:15 194:9 | |
| 252:16 253:7 | 216:12,12 | |
| 254:2,13 | 248:21,22 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.