# EXHIBIT 53

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3

4    --------------------------

5    IN RE:  JOHNSON & JOHNSON     MDL NO.:

6    TALCUM POWDER PRODUCTS        16-2738 (MAS)(RLS)

7    MARKETING, SALES PRACTICES,

8    AND PRODUCTS LIABILITY

9    LITIGATION

10   --------------------------

11

12                  EXPERT DEPOSITION OF

13                  BERNARD L. HARLOW, PHD

14

15                  Tuesday, April 9, 2024

16                  9:27 a.m. Eastern Time

17

18

19

20

21

22

23   Reported by:  Denise Dobner Vickery, CRR, RMR

24   JOB NO.: 6474272

Page 2

```
1
2
3
4
5
6
7
8                    Tuesday, April 9, 2024
9                    9:27 a.m. Eastern Time
10
11           Expert Deposition of BERNARD L.
12   HARLOW, PHD, held at the offices of:
13
14           ASHCRAFT & GEREL LLP
15           1825 K Street NW
16           Suite 700
17           Washington, DC 20006
18
19
20           Pursuant to notice, before Denise
21   Dobner Vickery, Certified Realtime Reporter,
22   Registered Merit Reporter, and Notary Public in
23   and for the District of Columbia.
24
```

Page 3

```
1    APPEARANCES:
2
3    For Plaintiffs:
4        LEVIN PAPATONIO RAFFERTY PROCTOR
5        BUCHANAN O'BRIEN BARR & MOUGEY, PA
6        BY:  CHRISTOPHER V. TISI, ESQ.
7        316 South Baylen Street, Suite 600
8        Pensacola, FL 32502-5996
9        850.435.7999
10       ctisi@levinlaw.com
11
12
13   For MDL Plaintiffs:
14       ASHCRAFT & GEREL LLP
15       BY:  MICHELLE A. PARFITT, ESQ.
16       1825 K Street NW, Suite 700
17       Washington, DC 20006
18       202.759.7648
19       mparfitt@ashcraftlaw.com
20
21
22
23
24
```

Page 4

```
1    APPEARANCES:
2
3    For New Jersey Plaintiffs:
4        ANAPOL WEISS
5        BY:  TRACY A. FINKEN, ESQ.
6        One Logan Square
7        130 N. 18th Street, Suite 1600
8        Philadelphia, PA 19103
9        215.735.0773
10       tfinken@anapolweiss.com
11
12
13
14   For Defendants Johnson & Johnson and Johnson &
15   Johnson Consumer Inc.:
16       SHOOK HARDY & BACON LLP
17       BY:  MARK C. HEGARTY, ESQ.
18       2555 Grand Blvd.
19       Kansas City, MO 64108
20       816.474.6550
21       mhegarty@shb.com
22
23
24
```

Page 5

```
1                    INDEX
2    EXAMINATION OF BERNARD L. HARLOW, PHD     PAGE
3    BY MR. HEGARTY                    12
4    AFTERNOON SESSION                 218
5    BY MR. TISI                       418
6    FURTHER BY MR. HEGARTY            500
7
8            HARLOW DEPOSITION EXHIBITS
9    NUMBER    DESCRIPTION              PAGE
10   EXHIBIT 1  Harlow's 2 Binders of Documents   15
11   EXHIBIT 2  Harlow Invoices No. 1 - 3      20
12   EXHIBIT 3  Harlow Curriculum Vitae March 2024 42
13   EXHIBIT 4  Plaintiff's Designation of     60
14       Affirmative Experts
15   EXHIBIT 5  Expert Report of Bernard L.    76
16       Harlow, Ph.D. and Kenneth J.
17       Rothman, Dr.P.H. November 15, 2023
18   EXHIBIT 6  Genital Talc Exposure and Risk    83
19       Of Ovarian Cancer, Cramer et al 1998
20   EXHIBIT 7  The International Society of    92
21       Regulatory Toxicology and
22       Pharmacology and the US FDA
23       A Workshop, Talc: Consumer Uses and
24       Health Perspectives, January 31, 1994
```

2 (Pages 2 - 5)

Page 6

1  EXHIBIT 8  Talc: Consumer Uses and Health    94
2      Perspectives, C. Jelleff Carr,
3      Executive Summary, October 1, 1994
4  EXHIBIT 9  Interpretation of Epidemiologic    98
5      Studies on Talc and Ovarian Cancer
6      Rothman et al, November 28, 2000
7  EXHIBIT 10  Association between Body Powder  161
8      Use and Ovarian Cancer: The
9      African American Cancer Epidemiology
10      Study (AACES), Schildkraut et al 2016
11  EXHIBIT 11  Genital Powder Use and Risk of  166
12      Epithelial Ovarian Cancer in the
13      Ovarian Cancer in Women of African
14      Ancestry Consortium, Davis et al 2021
15  EXHIBIT 12  A Review of Perineal Talc    171
16      Exposure and Risk of Ovarian Cancer
17      Harlow and Hartge, October 1, 1994
18  EXHIBIT 13  Prospective Study of Talc Use    180
19      and Ovarian Cancer, Gertig et al
20      February 2, 2000
21  EXHIBIT 14  Serous Ovarian Cancer Caused by  194
22      Exposure to Asbestos and Fibrous
23      Talc in Cosmetic Talc Powders -
24      A Case Series, Steffen et al Feb 2000

Page 7

1  EXHIBIT 15  Talc/FDA Website.  What's New    245
2      December 7, 2022
3  EXHIBIT 16  DHHS Letter of April 1, 2014 to  249
4      Cancer Prevention Coalition re
5      Denial of Citizen Petitions of
6      November 17, 1994 and May 13, 2008
7  EXHIBIT 17  NCI Ovarian, Fallopian Tube, and  270
8      Primary Peritoneal Cancers
9      Prevention (PDQ®) - Health
10      Professional Version, March 6, 2024
11  EXHIBIT 18  NCI PDQ® Screening and Prevention 276
12      Editorial Board, February 28, 2024
13  EXHIBIT 19  Association Between the Frequent  285
14      Use of Perineal Talcum Powder
15      Products and Ovarian Cancer: a
16      Systematic Review and Meta-analysis
17      Woolen et al, February 2, 2022
18  EXHIBIT 20  Risk Factors of Epithelial    296
19      Ovarian Cancer by Histologic
20      Subtype, Gates et al, 2010
21  EXHIBIT 21  Perineal use of talc and risk of  326
22      ovarian cancer, Langseth et al
23      15 October 2007
24

Page 8

1  EXHIBIT 22  Genital powder exposure and the  332
2      risk of epithelial ovarian cancer,
3      Rosenblatt et al, 12 February 2011
4  EXHIBIT 23  Genital Powder Use and Risk of  341
5      Ovarian Cancer: A Pooled Analysis of
6      8,525 Cases and 9,859 Controls,
7      Terry et al, August 2013
8  EXHIBIT 24  Migration of Talc From the    349
9      Perineum to Multiple Pelvic Organ
10      Sites, Five Case Studies With
11      Correlative Light and Scanning
12      Electron Microscopy, McDonald et al
13      November 2019
14  EXHIBIT 25  President's Task Force Statement  361
15      on Statistical Significance and
16      Replicability, 1 August 2021, ASA
17  EXHIBIT 26  JAMA 2020, Association of Powder  368
18      Use in the Genital Area With Risk of
19      Ovarian Cancer, O'Brien et al
20  EXHIBIT 27  Use of Powder in the Genital Area 373
21      and Ovarian Cancer Risk, Examining
22      the Evidence, Gossett and del Carmen
23      JAMA January 7, 2020
24

Page 9

1  EXHIBIT 28  Comment & Response, Genital    379
2      Powder Use and Ovarian Cancer
3      JAMA May 26, 2020
4  EXHIBIT 29  Data on systematic review and    398
5      meta-analysis of epidemiologic
6      evidence on the association between
7      perineal use of talc powder and risk
8      of ovarian cancer, Taher et al,
9      5 February 2020
10  EXHIBIT 30  Critical review of the    398
11      association between perineal use
12      of talc powder and risk of ovarian
13      cancer, Taher et al, 23 August 2019
14
15
16
17
18
19
20
21
22
23
24

Golkow Technologies,
A Veritext Division

877-370-3377                                        www.veritext.com

Page 10

1        PLAINTIFF'S DEPOSITION EXHIBITS
2    NUMBER      DESCRIPTION            PAGE
3    EXHIBIT P1  The association between douching, 421
4            genital talc use, and the risk of
5            prevalent and incident cervical
6            cancer, O'Brien et al, 2021
7    EXHIBIT P2  A Case-Control Study of      429
8            Borderline Ovarian Tumors:
9            The Influence of Perineal
10           Exposure to Talc, Harlow
11           and Weiss, February 28, 1989
12   EXHIBIT P3  Perineal Exposure to Talc and    432
13           Ovarian Cancer Risk, Harlow et al
14           July 1992
15   EXHIBIT P4  Talc: Consumer Uses and Health   437
16           Perspectives, C. Jelleff Carr
17           October 1, 1994
18   EXHIBIT P5  A Review of Perineal Talc      443
19           Exposure and Risk of Ovarian Cancer,
20           Harlow and Hartge, October 1, 1994
21   EXHIBIT P6  Genital Talc Exposure and Risk   454
22           of Ovarian Cancer,
23           Cramer et al, 1999
24

Page 11

1    EXHIBIT P7  Interpretation of Epidemiologic   467
2            Studies on Talc and Ovarian Cancer,
3            Rothman et al, November 28, 2000
4    EXHIBIT P8  Association of genital talc and    477
5            douche use in early adolescence or
6            adulthood with uterine fibroids
7            diagnoses, Ogunsina et al,
8            December 2023
9    EXHIBIT P9  Federal Register, 40 CFR      482
10           Part 751 Asbestos Part 1;
11           Chrysotile Asbestos; Regulation of
12           Certain Conditions of Use Under
13           the Toxic Substances Control Act
14           (TSCA), March 28, 2024
15
16
17
18
19
20
21
22
23
24

Page 12

```
1        P R O C E E D I N G S
2              - - -
3        BERNARD L. HARLOW, PHD
4    called for examination, and, after having been
5    duly sworn, was examined and testified as
6    follows:
7              - - -
8           EXAMINATION
9              - - -
10   BY MR. HEGARTY:
11       Q.   Good morning, Dr. Harlow.
12       A.   Good morning.
13       Q.   Would you please tell us your full
14   name?
15       A.   Bernard L. Harlow.
16       Q.   Have you ever given a deposition
17   before?
18       A.   I have not.
19       Q.   Have you ever read any deposition
20   transcript?
21       A.   Yes.
22       Q.   How many deposition transcripts have
23   you read prior to today?
24       A.   Maybe three.
```

Page 13

```
1        Q.   Do you recall the deponents in those
2    transcripts?
3        A.   I believe I read -- I read more
4    Moor --
5        Q.   You can't look at him.
6        A.   Okay.  I'm just -- I'm just --
7    Moorman I believe I read.
8        Q.   Patricia Moorman?
9        A.   Patricia Moorman.  I can't remember
10   her name.
11       Q.   It's okay if you cannot remember.
12       A.   I can't remember.  I can't remember
13   the names.
14       Q.   You can only recall Dr. Moorman's?
15       A.   I recall Dr. Moorman, and there was
16   one that was more recent.  I mean, I could -- I
17   just -- I can't remember the name.
18           MR. TISI:  Can I just and let
19   me just say this because this is the
20   first time you have testified, and I just
21   want to make sure.
22           He's going to be asking
23   questions.  Normally we kind of
24   anticipate questions and we talk over
```

4 (Pages 10 - 13)

Page 14

1  each other.
2          It makes the record a lot
3  easier for -- for Denise here if you
4  allow -- allow Mr. Hegarty to finish his
5  question and then give an answer, and I
6  will make sure that Mr. Hegarty lets you
7  finish your answer before he starts his
8  next question.
9          THE WITNESS:  Sure.
10         MR. HEGARTY:  And I will cover
11  that, too, but thank you.
12         THE WITNESS:  I'm sorry that
13  I forgot the name.
14  BY MR. HEGARTY:
15     Q.    When did you read Dr. Moorman's
16  deposition transcript?
17     A.    Probably within the last month.
18     Q.    Who did you receive that transcript
19  and the other two transcripts from?
20     A.    From Dr. -- I mean, Mr. Tisi.
21     Q.    Did you make a request for those
22  transcripts?
23     A.    I believe I indicated that it would
24  be helpful, since I had never been deposed before,

Page 15

1  to have a sense of the process.
2     Q.    What Mr. Tisi just said and as you
3  just mentioned the process, it's important that
4  you and I speak one at a time, that we speak
5  audibly, and that you understand the questions
6  that I ask before you answer.
7          Are you good with all of those sort
8  of ground rules?
9     A.    Yes.
10     Q.    Did you bring any documents with you
11  to today's deposition?
12     A.    Yes.
13     Q.    What documents did you bring?
14     A.    Manuscripts of previously published
15  papers and a few other publicly available
16  information.
17     Q.    Are those materials contained in the
18  two notebooks sitting in front of you?
19     A.    Yes.
20         MR. HEGARTY:  I will designate
21  those two notebooks as Exhibit Number 1.
22         (2 Notebooks marked for
23  identification as Harlow Exhibit 1.)
24  BY MR. HEGARTY:

Page 16

1     Q.    Other than those two notebooks, did
2  you bring any other materials with you to today's
3  deposition?
4     A.    No.
5     Q.    Did you prepare any notes in
6  connection with your work on this case?
7     A.    No, I did not.
8     Q.    Did you prepare any other
9  documents -- or let me start over.
10         Did you prepare any documents
11  besides your expert report for purposes of your
12  work on this case?
13     A.    No, I did not.
14     Q.    Who is your current employer?
15     A.    Boston University School of Public
16  Health.
17     Q.    Do you have a separate personal
18  consulting business for litigation like an LLC?
19     A.    I do have an LLC.
20     Q.    Do you run your expert witness work
21  through that LLC?
22     A.    I -- I must.  I must.
23     Q.    What is the name of that LLC?
24     A.    Bernard L. Harlow.

Page 17

1     Q.    How long have you had that LLC?
2     A.    About six months.
3     Q.    Did you set that LLC up in
4  connection with your work on this litigation?
5     A.    Yes.
6     Q.    Do the fees that you earn as an
7  expert witness go directly to you?
8     A.    Yes.
9     Q.    Do you have any other sources of
10  income besides the salary you get from Boston
11  University and whatever you earn as an expert
12  witness?
13     A.    No.
14     Q.    You are charging Mr. Tisi and other
15  attorneys representing plaintiffs $600 an hour for
16  your time; is that correct?
17     A.    That's correct.
18     Q.    Do you charge a different rate for
19  testimony versus your review of materials?
20     A.    No.  I've never been -- I've never
21  had to testify.  So, but as of right now, no, I
22  have not.
23     Q.    What did you base the $600 an hour
24  figure on?  In other words, where did you come up

5 (Pages 14 - 17)

Page 18

1  with that number?
2      A.    Through colleagues of mine who are
3  attorneys, and I asked what was an appropriate
4  amount.
5      Q.    What's a -- who's a colleague of
6  yours that's an attorney that you had that
7  discussion with?
8          MR. TISI:  Well, let me object
9      to the extent he was asking any advice
10     from -- from other lawyers about -- about
11     what he should charge.
12         You can give a general -- a
13     general idea.
14         MR. HEGARTY:  All I'm asking
15     for is a name.
16         MR. TISI:  Yeah, I understand.
17         THE WITNESS:   His name is
18     Robert Adelman.  He's an attorney in
19     Connecticut.
20 BY MR. HEGARTY:
21     Q.    And with regard to this -- this $600
22  an hour figure, you don't make that much as a
23  professor at Boston University, do you?
24     A.    No.

Page 19

1      Q.    Did you receive a retainer in
2  connection with your work in this litigation?
3      A.    No.
4      Q.    Have you invoiced to the lawyers
5  representing plaintiffs the time that you have
6  spent working on this litigation?
7      A.    Yes.
8      Q.    Do you invoice as well expenses that
9  you've incurred associated with your work on this
10 litigation?
11     A.    Yes.
12     Q.    For example, you flew down here from
13 Boston, correct?
14     A.    Yes.
15     Q.    Did you fly first class?
16     A.    No.
17     Q.    Do you intend to invoice the cost of
18 that flight to the attorneys representing
19 plaintiffs in this case?
20     A.    Yes.
21         Just looking for my water.
22         MR. TISI:  I'll get it.
23         MR. HEGARTY:  I'm going to
24     mark as Exhibit Number 2 the invoices we

Page 20

1      have been provided for you.
2          (Document marked for
3      identification as Harlow Exhibit 2.)
4          MR. TISI:  I assume this is
5      Exhibit 2?
6          MR. HEGARTY:  Yes.  As I said,
7      I'm marking that as Exhibit Number 2.
8          MR. HEGARTY:  Okay.  I'm sorry.
9  BY MR. HEGARTY:
10     Q.    Please look at Exhibit Number 2,
11 Dr. Harlow, and tell us whether those are the
12 invoices that you have issued in connection with
13 your work in this case.
14     A.    Well, these are -- these are copies
15 of the same invoice.
16     Q.    There are three separate invoices,
17 correct?
18     A.    No.  These all appear to be the same
19 invoice.
20         MR. TISI:  Let me see.  Maybe
21     they collated them differently.
22         I think -- I think I know what
23     happened.  Here you go.  I think
24     they're --

Page 21

1          MR. HEGARTY:  Okay.
2          MR. TISI:  I think they
3      printed them.
4          MR. HEGARTY:  So do you have 1
5      as well in your group?
6          MR. TISI:  I think you
7      probably.  I have --
8  BY MR. HEGARTY:
9      Q.    There's 3.
10     A.    2, 3.  We're missing 1.
11         MR. HEGARTY:  Okay.  Let's go
12     off the record real quick.
13         (Recess:  9:34 a.m. -
14         9:36 a.m.)
15 BY MR. HEGARTY:
16     Q.    Does Boston University have
17 disclosure policies for consulting outside of your
18 work at the university?
19     A.    I believe it's only if it exceeds a
20 certain amount.
21     Q.    Have you disclosed the work you are
22 doing in this litigation pursuant to any
23 disclosure policy at Boston University?
24     A.    No.

6 (Pages 18 - 21)

Page 22

1  Q.  You have not filled out any type of
2  form disclosing that you're -- you have consulted
3  with and are a designated expert witness for
4  plaintiffs in this litigation?
5  A.  Not at this point.  We do that at
6  the end of the year.  So if they ask about events
7  that happened in the past year, I will evaluate.
8  I look will look at the form that they provide and
9  complete it accordingly.
10  Q.  You started working with the
11  attorneys representing the plaintiffs in this case
12  back in 2023, correct?
13  A.  Yes.
14  Q.  Did you prepare any type of
15  disclosure form for Boston University at the end
16  of 2023?
17  A.  No, I did not.
18  Q.  You needed to do so, didn't you?
19  A.  I would have to check on that.
20  Q.  I've looked at the policies online,
21  and from my review, it appears that you would need
22  to fill out a disclosure form for your work on
23  this case.
24  Is that not your understanding?

Page 23

1  A.  I will check on that when I get
2  back.
3  Q.  Have you orally or in any other type
4  of writing advised anyone at Boston University
5  about your work on this case?
6  A.  Only Dr. Rothman, who I had done
7  work with.
8  Q.  Other than Dr. Rothman, did you
9  advise anyone else at Boston University about your
10  work on this litigation?
11  A.  No.
12  Q.  What do you consider your occupation
13  to be?
14  A.  A professor of epidemiology.
15  Q.  What is your current area of
16  expertise in epidemiology?
17  A.  Women's reproductive and gynecologic
18  health.
19  Q.  Is there a particular subtype of
20  those two categories that you're focused on
21  currently?
22  A.  I'm currently focusing on benign
23  gynecologic disorders.
24  Q.  Are you currently involved in any

Page 24

1  research activities at Boston University?
2  A.  Yes.
3  Q.  What is the focus of your research
4  currently?
5  A.  I'm currently studying unexplained
6  vulvar pain.  I'm also studying the impact of --
7  of factors that influence women's urological
8  health.
9  Q.  What percentage of your work time do
10  you devote to this research?
11  A.  This year, about 50 percent.
12  Q.  Are you currently teaching students?
13  A.  This year, yes, I taught a class.  I
14  taught.
15  Q.  What class did you teach this year?
16  A.  This year I taught Guided
17  Epidemiology Research.
18  Q.  Have you always taught classes while
19  you've been at Boston University?
20  A.  Yes.
21  Q.  Besides teaching and research, what
22  other activities do you do at Boston University
23  work-wise?
24  A.  I sit on the -- I sit on committees.

Page 25

1  I have -- I currently sit on the appointment and
2  promotions committee for the -- for the school.  I
3  directed the master's of public health -- I
4  codirected the master's of public health program
5  in epidemiology and biostatistics.  Those are the
6  most recent.
7  Q.  What percentage of your work time do
8  you spend on committees?
9  A.  10 percent.
10  Q.  You told me that 50 percent goes to
11  research, 10 percent to committees.
12  Is then 40 percent devoted to
13  teaching?
14  A.  About that, yes.
15  Q.  Are you affiliated in any way still
16  with the University of Minnesota?
17  A.  I have an adjunct appointment, that
18  my work on women's urological condition is a
19  subcontract through the University of Minnesota.
20  And as you know from my CV, I chaired the
21  Department of Epidemiology there for 10 years.
22  Q.  How many hours a week do you
23  typically put in at Boston University?
24  A.  Well, how many hours I put in?

7 (Pages 22 - 25)

Page 26

1 Probably 40 to 50. (Laugh).
2    Q.   Okay. Have you taught courses at
3 the medical school at Boston University?
4    A.   No.
5    Q.   You don't teach gynecologic
6 oncologists, correct?
7    A.   No.
8    Q.   You don't teach oncologists,
9 correct?
10    A.   No.
11    Q.   Prior to this case, have you ever
12 been, to your knowledge, designated as an expert
13 witness in a legal proceeding?
14    A.   No.
15    Q.   What percentage of your work time in
16 2023 was spent on litigation matters?
17    A.   10 percent, maybe less.
18    Q.   What percentage of your work time in
19 2024 has been spent on litigation matters?
20    A.   About the same.
21    Q.   In 2023, what percentage of your
22 total income was from work on litigation matters?
23    A.   I would say less than 10 percent.
24    Q.   Are you consulting with regard to

Page 27

1 litigation on any matters other than matters
2 involving talcum powder and ovarian cancer?
3    A.   Currently, no.
4    Q.   Have you ever consulted on any
5 litigation matters besides cases involving talcum
6 powder use and claims of ovarian cancer?
7    A.   Could you just repeat that, please?
8    Q.   Sure.
9        Have you ever consulted on a
10 litigation matter other than in cases involving
11 talcum powder use and ovarian cancer claims?
12        MR. TISI: And the answer is
13    yes or no, just to be clear. He's not
14    asking you what you did, just whether you
15    did.
16        MR. HEGARTY: That's right.
17        THE WITNESS: I'm not sure
18    what "litigation matter" means. If you
19    could define that for me?
20 BY MR. HEGARTY:
21    Q.   Sure.
22        Have you ever consulted on what you
23 understood was a legal proceeding or a lawsuit,
24 besides what we're here to talk about today, a

Page 28

1 case or cases involving talcum powder use and
2 ovarian cancer?
3    A.   Yeah. I did provide consultation on
4 an area of acetaminophen use in pregnant women and
5 its association with neurodevelopmental disorders.
6    Q.   That --
7    A.   I was not an expert.
8    Q.   That consultation has been
9 publicized in the press and on the internet,
10 correct?
11    A.   That is correct.
12    Q.   In fact, there is an article that
13 reports that you serve on a lawyer-sponsored
14 Autism Justice's team of experts?
15    A.   I had, correct. I don't know if I'm
16 still involved.
17    Q.   That team includes Erin Brockovich,
18 correct?
19    A.   That is correct.
20    Q.   And with regard to that
21 consultation, again, those are -- that
22 consultation has been related to claims that
23 acetaminophen use during pregnancy causes autism?
24    A.   Correct.

Page 29

1    Q.   Also that acetaminophen use during
2 pregnancy causes ADHD; is that correct?
3    A.   It's the entire spectrum of
4 neurodevelopmental disorders.
5    Q.   Have you been paid anything for your
6 consultation work as to that subject area?
7    A.   Yes.
8    Q.   How much have you been paid?
9    A.   I would have to -- to go back, but
10 it was -- I would be surprised if it was more than
11 $5,000. It may have been less. I just -- I don't
12 remember.
13    Q.   Is that consultation work still
14 ongoing?
15    A.   Not that I'm aware of.
16    Q.   When did you last, as you understand
17 it serve, as a consult -- as a consultant in that
18 litigation -- in that subject area?
19    A.   Probably I would think earlier,
20 prior to my work on this, in I believe it was
21 2023.
22    Q.   Is it your opinion that
23 acetaminophen use during pregnancy causes autism?
24        MR. TISI: Objection.

8 (Pages 26 - 29)

Page 30

1    Objection to the extent to which you
2    develop that in the course of your
3    consultation.  He can ask you about your
4    published work, but -- but anything you
5    developed in the course of your
6    consultation with those attorneys, I
7    instruct you not to answer.
8        MR. HEGARTY:  Wait.  Let me
9    clarify.  I'm asking him without regard
10   to consultation.
11       MR. TISI:  If you develop --
12 BY MR. HEGARTY:
13   Q.    Is it your opinion?
14       MR. TISI:  If you develop that
15   opinion in connection with your
16   consultation work, I instruct you not to
17   answer that question.
18 BY MR. HEGARTY:
19   Q.    Are you going to follow Mr. Tisi's
20 instructions?
21   A.    Yes.
22       MR. HEGARTY:  What's the basis
23   of that objection?
24       MR. TISI: He developed -- he

Page 31

1    developed an opinion.  Unless he
2    expressed it publicly.  Okay?  You can
3    ask him about his public statements, but
4    if he expressed it -- if he developed an
5    opinion and he expressed it to lawyers,
6    he developed it during consultation.
7        And if you -- if you disagree
8    with me, I'm more than happy --
9        MR. HEGARTY:  That's all
10   right.  We're not -- I do disagree with
11   you, but we're not going to be -- it's
12   not going to be resolved here.
13       MR. TISI:  Okay.
14 BY MR. HEGARTY:
15   Q.    Have you ever made any public
16 statement that acetaminophen use during pregnancy
17 causes autism or any other neurologic disorder?
18   A.    I made a public statement that there
19 was evidence of an association.  I do not believe
20 I ever used the word "cause."
21   Q.    Did you make the statement that
22 there was evidence of an association based on your
23 review of all the epidemiologic studies looking at
24 acetaminophen use and neurologic disorders?

Page 32

1    A.    Yes.
2    Q.    What was the relative risk or odds
3 ratio that you came up -- came away with from your
4 review of that literature?
5        MR. TISI:  Again, I'm going to
6    instruct you if you developed that --
7        THE WITNESS:  I just --
8        MR. TISI:  Wait.  Let me
9    finish.
10       If you developed that in the
11   context of your consultation with lawyers
12   to advise lawyers about pending
13   litigation in legal matters, then I
14   instruct you not to answer that question.
15   If you did it otherwise, then feel free
16   to answer the question.
17       THE WITNESS:  I did not.
18       I'm sorry.  Repeat the
19   question, please.
20 BY MR. HEGARTY:
21   Q.    Sure.
22       Did you develop an opinion as to the
23 odds ratio of relative risk of neurologic
24 disorders, including autism, from acetaminophen

Page 33

1 use during pregnancy?
2    A.    I did not develop an opinion.  I
3 reviewed the literature as to what had been
4 published.
5    Q.    Did you come away with an opinion as
6 to whether the studies showed a dose response?
7    A.    I don't recall.
8    Q.    Did you look at any animal studies
9 related to acetaminophen use during pregnancy and
10 autism or neurologic disorders?
11   A.    I looked at biological, yes.  Yes.
12   Q.    You looked at biologic plausibility
13 studies?
14   A.    Yes.
15   Q.    Those included animal studies?
16   A.    Again, I don't recall.  I would have
17 to go back.
18   Q.    Do you remember if you looked at any
19 cell studies?
20   A.    I don't recall.
21   Q.    Did you compare competing
22 explanations for any positive increase in risk
23 from acetaminophen use during pregnancy and
24 autism?

9 (Pages 30 - 33)

Page 34

1     A.     Absolutely.  That is the way in
2  which I usually evaluate scientific literature.
3     Q.     Did those competing risks include
4  genetics or -- just leave it at that.
5     A.     I don't recall.
6            MR. TISI:  I don't want to
7        interrupt you, but it looks like we're on
8        mute and for some reason Tracy can't hear
9        us.
10           MR. HEGARTY:  Okay.  Let's go
11       off the record.
12           MS. FINKEN:  No, I can hear.
13           MR. TISI:  You can hear now?
14           MS. FINKEN:  Yes.
15           MR. TISI:  Okay.  Sorry.
16  BY MR. HEGARTY:
17     Q.     Sounds like from your last response
18  you applied the same methodology in looking at the
19  epidemiologic studies on acetaminophen use during
20  pregnancy and autism as you did for this case?
21     A.     That's correct.
22     Q.     Have you ever been hired by a
23  company to consult regarding a cosmetic product?
24     A.     No.

Page 35

1     Q.     Has any cosmetic pharmaceutical or
2  chemical company ever hired you as a consultant on
3  any matter?
4     A.     No.
5     Q.     Have you ever been employed by a
6  pharmaceutical medical device consumer product or
7  chemical company in any capacity?
8     A.     No.
9     Q.     Have you ever been involved in a
10  company's analysis of safety data regarding a
11  cosmetic?
12     A.     No.
13     Q.     You have never worked for FDA,
14  correct?
15     A.     Correct.
16     Q.     Have you ever worked for any
17  governmental agency, that is, been employed by a
18  governmental agency?
19     A.     Yes.  Oh, employed by a government
20  agency.  No.
21     Q.     Have you ever communicated directly
22  with anyone at FDA regarding a cosmetic including
23  talcum powder?
24     A.     No.

Page 36

1     Q.     Have you ever served on an FDA
2  committee?
3     A.     Only the conference that was held in
4  1994, I believe, that was sponsored by the FDA.  I
5  was an invited participant.
6     Q.     And we'll talk about that here in a
7  moment.
8     A.     Yeah.
9     Q.     Other than that, other than your
10  participation in that 1994 FDA workshop --
11     A.     Yes.
12     Q.     -- have you ever otherwise served on
13  any FDA committee or been otherwise involved in
14  FDA with regard to a cosmetic including talcum
15  powder?
16     A.     Yeah.  No.
17     Q.     FDA has never contacted you about
18  talcum powder, correct?
19     A.     No.
20     Q.     You have never worked for Health
21  Canada, correct?
22     A.     Correct.
23     Q.     You have never worked for any
24  foreign regulatory agency, correct?

Page 37

1     A.     Correct.
2     Q.     You have never communicated with
3  Health Canada?
4     A.     Correct.
5     Q.     Have you ever referenced in any
6  publication of yours a finding by Health Canada?
7     A.     No.
8     Q.     Have you ever referenced in any
9  publication of yours a Health Canada risk
10  assessment?
11     A.     Only the report that I currently
12  wrote.
13     Q.     My question was specifically as to a
14  publication.
15            Your report has not been published,
16  correct?
17     A.     Correct.
18     Q.     So have you ever referenced in any
19  publication of yours a Health Canada risk
20  assessment?
21     A.     No.
22     Q.     Do you claim to be an expert in
23  Health Canada's risk assessment process?
24     A.     Yes.

10 (Pages 34 - 37)

Page 38

1    Q.    What is the basis of your expertise?
2    A.    I believe I'm an accomplished
3 epidemiologist that's able to evaluate the
4 strengths and limitations of the evaluation of
5 scientific literature.
6    Q.    My question might be a little bit
7 different.
8        My question is: Are you an expert
9 in the process by which Health Canada goes about
10 doing its risk assessments?
11   A.    No.
12       MR. TISI: Objection. Vague.
13       THE WITNESS: Sorry.
14 BY MR. HEGARTY:
15   Q.    You have read Health Canada's
16 screening assessment for talc, correct?
17   A.    Yes.
18   Q.    Did you have any dealings with
19 Health Canada as it relates to that screening
20 assessment?
21   A.    No.
22   Q.    Did you read Health Canada's
23 screening assessment for talc prior to being
24 contacted by plaintiffs' counsel about testifying

Page 39

1 as an expert for them in this litigation?
2    A.    I did not.
3    Q.    Do you know who the authors of
4 Health Canada's screening assessment are?
5    A.    I do not.
6    Q.    Do you know anyone involved in
7 analyzing the data and putting that screening
8 assessment together?
9    A.    No.
10   Q.    Do you know the expertise of anyone
11 involved in putting the screening assessment
12 together for talc?
13   A.    In the Health Canada report?
14   Q.    Yes, sir.
15   A.    No.
16   Q.    Did you review any of the materials
17 submitted to Health Canada as part of that
18 process?
19   A.    No.
20   Q.    You did not submit any material to
21 Health Canada as part of the screening assessment
22 process, correct?
23   A.    Correct.
24   Q.    Did you know that Health Canada was

Page 40

1 doing its screening assessment? In other words,
2 had you heard about it before you were contacted
3 by plaintiffs' counsel for this litigation?
4    A.    No, I was not.
5    Q.    You have reviewed the screening
6 assessment, and from your review, did you note
7 that it does reference or include as references
8 plaintiff expert reports from U.S. litigation?
9        MR. TISI: Objection.
10       Incomplete.
11       THE WITNESS: In my review, I
12       did not -- I only looked at the studies
13       and the evaluation that they did. I did
14       not consider who did it, who was paid by
15       whom to do what, or anything really
16       regarding litigation.
17 BY MR. HEGARTY:
18   Q.    Have you ever cited to litigation
19 reports in any peer-reviewed publication of yours?
20   A.    No, not that I'm aware of.
21   Q.    Have you ever cited to any expert
22 litigation testimony in any peer-reviewed
23 publication of yours?
24   A.    No.

Page 41

1    Q.    Do you know whether FDA has ever
2 cited to any litigation expert reports or
3 testimony in making any safety findings or
4 conclusions?
5        MR. TISI: Objection.
6        Only if you know.
7        THE WITNESS: No.
8 BY MR. HEGARTY:
9    Q.    Have you ever cited to exhibits from
10 depositions in any peer-reviewed publication of
11 yours?
12   A.    No.
13   Q.    Do you think it's appropriate for an
14 entity such as Health Canada to rely on litigation
15 reports for purposes of putting together that
16 screening assessment?
17       MR. TISI: Again, let me
18       object. Assuming facts not in evidence.
19       Go ahead.
20       THE WITNESS: I have -- I
21       don't -- I have no opinion on that.
22 BY MR. HEGARTY:
23   Q.    I asked you earlier about your
24 consulting work.

11 (Pages 38 - 41)

Page 42

1          Are you currently consulting,
2 outside of what we're here to talk about today,
3 cases involving talcum powder use and ovarian
4 cancer?
5    A.    No.
6          MR. HEGARTY:  The next exhibit
7    I'm going to mark, Dr. Harlow, is a copy
8    of the CV we were provided in advance of
9    your deposition.  It's dated at the top
10   March 2024.
11         THE WITNESS:  Uh-huh.
12         MR. HEGARTY:  I'm going to
13   mark that document as Exhibit 3.
14         (Document marked for
15   identification as Harlow Exhibit 3.)
16         THE WITNESS:  Uh-huh.
17 BY MR. HEGARTY:
18   Q.    Is Exhibit 3 your March 2024
19 curriculum vitae?
20   A.    Yes.
21   Q.    Does it accurately describe your
22 education, training, and experience?
23   A.    Yes.
24   Q.    Are there any changes or revisions

Page 43

1 necessary to make it current for today?
2    A.    I don't believe so.
3    Q.    Are your publications list up to
4 date?
5    A.    I believe so, though things are
6 fluid with papers that are currently under review,
7 but this is largely correct.
8    Q.    We are here today to take your
9 deposition in the case of In re Johnson & Johnson
10 Talc Litigation MDL, et al.
11         Are you aware that you are
12 designated as a testifying expert in this case?
13   A.    I know that I am a testifying expert
14 in -- in this litigation.  I don't know who the
15 plaintiffs are.
16   Q.    And we'll cover that here in a
17 moment, but when were you first contacted about
18 serving as an expert in this case?
19   A.    In 2023.
20   Q.    Do you recall the exact month and
21 date?
22   A.    I would say perhaps August or
23 September or somewhere in that realm.  I could
24 certainly look on my invoices to see when I

Page 44

1 first --
2          MR. HEGARTY:  That's what I
3    was going to say.  Let's go off the
4    record.
5          (Recess:  9:57 a.m. -
6    10:01 a.m.)
7 BY MR. HEGARTY:
8    Q.    Dr. Harlow, we took a short break
9 after you and I discussed when you were first
10 being -- when you were first contacted about
11 serving as an expert witness in this litigation,
12 and in doing so, I want to circle back to your
13 invoices that we marked as Exhibit Number 2.
14         Do you have the three invoices that
15 we have been provided dated October 2023, January
16 2024 and February -- and January/February 2024?
17   A.    Yes.
18   Q.    Those have all been marked as
19 Exhibit Number 2 --
20   A.    Yes.
21   Q.    -- is that correct?
22   A.    Yes.
23   Q.    And looking at Exhibit Number 2 and
24 the dates shown on it, can you tell when it was

Page 45

1 that you were first contacted about serving as an
2 expert witness in this litigation?
3    A.    Well, it looks like I didn't start
4 doing work until toward the latter part of
5 September, but I may have been contacted before.
6 I was probably contacted before and didn't get
7 started on doing the work until -- until then.
8    Q.    Are you able to recall how long it
9 was?
10         MR. TISI:  I'm sorry.  I don't
11   think he was finished.
12 BY MR. HEGARTY:
13   Q.    Oh, I'm sorry.
14   A.    No.  Probably perhaps in August.
15   Q.    Looking at Exhibit Number 2, the
16 first entry for the October 2023 invoice, it says
17 "Review of documents provided."
18         Who provided documents to you?
19   A.    Mr. Tisi.
20   Q.    What documents were you provided?
21         MR. TISI:  Objection.  I
22   instruct you not to answer what you were
23   provided.
24 BY MR. HEGARTY:

Page 46

1    Q.    Did you ask Mr. Tisi for any
2  documents in connection with your work on this
3  litigation?
4           MR. TISI:  You can answer that
5      question, but no further questions on
6      that.
7           THE WITNESS:   Only to the
8      extent that -- that it would be more
9      efficient with my time if they had the
10     list of -- a list of references of -- of
11     articles so that I wouldn't have to spend
12     my time doing a Medline search and having
13     to pull them all out on my own.
14          Even though I did a Medline
15     search on the literature, I tried to be
16     efficient with my time.
17  BY MR. HEGARTY:
18    Q.    How many documents were you provided
19  by Mr. Tisi's office?
20    A.    I don't recall, but certainly no --
21  not -- no more than what I've already -- what I
22  already have here.  So.
23    Q.    You say what you already have here.
24          You're referring to the two

Page 47

1  notebooks we've marked as Exhibit Number 2?
2    A.    The two notebooks, yes.
3    Q.    If you had the time, could you go
4  through the notebooks and identify which documents
5  that Mr. Tisi provided to you and which you
6  obtained on your own?
7    A.    I don't believe I'd be able to make
8  that separation.
9    Q.    The next two entries -- well, first
10  of all, before I go there, did you read all the
11  documents that Mr. Tisi's office provided to you?
12    A.    I read all the literature that he
13  provided, yes.
14    Q.    The next couple entries refer to
15  "Review of current epi studies."
16          How many epi studies does that refer
17  to?
18    A.    I don't recall.
19    Q.    The next one says "Review of current
20  literature."
21          Is that different than epi studies?
22    A.    It's a combination of both, of both
23  epi studies and other articles in the scientific
24  literature that are relevant.

Page 48

1    Q.    Looking down at the entries for
2  October 8th and 9th, it says "Review edits by KJR
3  and modify report."
4           KJR is Ken Rothman?
5    A.    Correct.
6    Q.    How were those edits communicated to
7  you?
8    A.    We -- we worked together
9  collaboratively.  We were either in person, but
10  most of the time it was on Zoom.
11    Q.    Were there drafts prepared that you
12  still have of your report?
13    A.    No.  We -- we would modify existing
14  drafts and we would not keep the old ones.
15    Q.    The entry for October 10, 2023 says
16  "Met with KJR and then modified report."
17          Did you meet with him in person?
18    A.    I don't recall.
19    Q.    Looking at the bottom, under Total
20  it says "Total received: 9,000.  Balance due:
21  4500."
22          Is that 9,000 not a retainer?
23    A.    No, it is not a retainer.
24    Q.    Where is that -- where did that

Page 49

1  9,000 come from?
2    A.    It was the first installment.  I
3  originally was charging $400 an hour and after
4  discussion realized that I was underestimating my
5  expert -- my expertise, and so I raised my hourly
6  rate to $600.
7    Q.    What does it mean on the first page
8  of Exhibit Number 2 where it says "Total received:
9  9,000.  Balance due: 4500"?
10    A.    The 9,000 was equated to these hours
11  at a rate of $400 per hour, and then when we
12  changed it to 600, that's what was added in.
13    Q.    Please turn to your January 2024
14  invoice, invoice number 2.
15    A.    Yes.
16    Q.    At the top, the entry dated
17  October 23, 2023, it says "Discussion of Draft
18  Report Submitted."
19          Who was that discussion with?
20    A.    With Mr. Tisi and his colleagues.
21    Q.    What other -- who -- what colleagues
22  besides Mr. Tisi?
23    A.    I believe Michelle.  I believe it
24  was only Michelle.  Maybe Leigh O'Dell as well.  I

Page 50

1 just -- I don't exactly recall.
2    Q.    The next several entries say "Report
3 Modification."
4        What does "report modification"
5 mean?
6    A.    We -- we modified based on other
7 review of our report by Mr. Tisi and his
8 colleagues. Not to change our opinions about
9 anything but to elaborate in certain areas.
10    Q.    With regard to the "Discussion of
11 Draft Report Submitted," was Dr. Rothman involved
12 in that discussion, too?
13    A.    Yes.
14    Q.    The next several entries regarding
15 revisions and modifications of your report, did
16 you do this, those revisions and modifications,
17 using the same process you told me a moment ago
18 where you were working with a living document?
19    A.    Yes.
20    Q.    The 11/8/2023 entry says "Meeting
21 with Ken and additional revisions."
22        Was that an in-person meeting?
23    A.    I don't recall.
24    Q.    The November 10, 2023 entry says

Page 51

1 "Legal team meeting and additional revisions."
2        Who is "legal team"?
3    A.    Mr. Tisi and his colleagues.
4    Q.    Do you recall the names of any of
5 his colleagues?
6    A.    Again, it would -- it would -- I
7 don't -- I mean, it would possibly be Ms. --
8 Ms. O'Dell and Michelle. There might have been
9 other people on the call with us.
10    Q.    That was what I was going to ask you
11 next.
12        Was that legal team meeting in
13 person or on the phone?
14    A.    Zoom.
15    Q.    The final entry on that invoice says
16 "Deposition preparation."
17        Was that deposition preparation with
18 someone else --
19    A.    Yes.
20    Q.    -- or was that on your own?
21    A.    No, no. Yes. That would -- I'm
22 sorry. That was not on my own. It was with
23 Mr. Tisi and colleagues.
24    Q.    Do you recall the names of any of

Page 52

1 the colleagues involved in that deposition
2 preparation meeting?
3    A.    I'm sorry. I'm not that good with
4 names. (Laugh.)
5    Q.    Was that deposition preparation
6 meeting in person or by phone?
7    A.    By -- by Zoom.
8    Q.    Please turn to your invoice
9 number 3, January/February 2024.
10    A.    Uh-huh.
11    Q.    At the top, the entry for January 8,
12 2024 says "Meeting to discuss deposition."
13        Was that again with Mr. Tisi and
14 colleagues?
15    A.    Yes.
16    Q.    Was that in person or on Zoom?
17    A.    On Zoom. All of our meetings have
18 been on Zoom, other than when I came down to DC.
19    Q.    With regard to your coming down to
20 DC, when did you come down to DC?
21    A.    Actually, may I correct that
22 response?
23    Q.    Sure.
24    A.    I did have an in-person meeting the

Page 53

1 week before I came down in Boston with Mr. Tisi
2 and Michelle, and then -- and then this week when
3 I came down.
4    Q.    How long was that the meeting last
5 week?
6    A.    About seven hours.
7    Q.    You said you came down from Boston
8 to DC yesterday; is that correct?
9    A.    On Monday.
10    Q.    On Monday.
11        Did you meet with Mr. Tisi and
12 Ms. Parfitt yesterday?
13    A.    Yesterday evening, yes.
14    Q.    How long did you meet yesterday
15 evening?
16    A.    About one to two hours.
17    Q.    The meeting yesterday and the
18 meeting last week were the only in-person meetings
19 you had with Mr. Tisi and Ms. Parfitt?
20    A.    That's correct.
21    Q.    The other entries here with regard
22 to deposition preparation with lawyers, for
23 example, that was again by Zoom?
24    A.    Correct.

14 (Pages 50 - 53)

Page 54

1    Q.    The depo prep meeting with lawyers,
2  that was by Zoom?
3    A.    That's correct.
4        Oh, there's the name of the other
5  deposition that I had reviewed.
6    Q.    Who is that?
7    A.    Dr. Osan.
8    Q.    This invoice also refers to you
9  reviewing Dr. Osan's report, correct?
10    A.    That's correct.
11    Q.    Did you review her expert report for
12  this litigation?
13    A.    I believe I reviewed the deposition.
14    Q.    So where it says "report," it should
15  be deposition?
16    A.    I think it should be, actually.
17    Q.    The entry of February 28, 2024
18  refers to your review of Dr. Moorman's deposition,
19  which you talked about earlier, right?
20    A.    Yes.
21    Q.    There's also the last entry -- or
22  let me start over.
23        The last entry refers to "Deposition
24  preparation with lawyers."

Page 55

1        Was that again Mr. Tisi and
2  colleagues?
3    A.    Yes.
4    Q.    Again by Zoom?
5    A.    Yes.
6    Q.    With regard to Dr. Osan, was she the
7  only defense expert's testimony that you have
8  reviewed for your work on this case?
9    A.    Yes.
10    Q.    With regard to the invoices that
11  we've been looking at, have you been paid for the
12  amounts shown in the invoices?
13    A.    Yes.
14    Q.    Have you prepared any additional
15  invoices for further work you have done since the
16  date of this last invoice?
17    A.    I have not submitted any invoices.
18    Q.    Have you recorded the number of
19  hours you have spent working on this litigation
20  since September -- I'm sorry -- since February 29,
21  2024?
22    A.    Yes.
23    Q.    Do you know approximately how many
24  hours you have spent working on this litigation

Page 56

1  since February 29, 2024?
2    A.    Maybe 20.  It might be more because
3  of the long session that we had last week and,
4  obviously, what is occurring today.  So, but other
5  than that, I would say it is less than 20 hours.
6    Q.    Going back to when you were first
7  contacted about serving as an expert witness in
8  this case, who contacted you?
9    A.    Dr. Rothman.
10    Q.    Did he tell you who had contacted
11  him about serving as an expert witness in this
12  litigation?
13    A.    I believe he must have mentioned --
14  he mentioned the name of the people he was working
15  with.
16    Q.    Do you recall whose name he
17  mentioned, or names?
18    A.    I really -- I really don't recall
19  that, until we had our first meeting, and then I
20  was introduced to Mr. Tisi.
21    Q.    Was your first meeting prior to this
22  November -- this September 26, 2023 date on your
23  first invoice?
24    A.    No, it would not have been because I

Page 57

1  would have invoiced for it.
2    Q.    What did Dr. Rothman initially tell
3  you about potentially serving as an expert witness
4  in this litigation?
5    A.    He didn't specifically ask me to be
6  an expert witness.  He asked me to work with him
7  on preparing a report on the current scientific
8  evidence.
9    Q.    When did you become aware that that
10  report would be an expert report for litigation
11  purposes?
12    A.    After discussion with Mr. Tisi and
13  others.
14    Q.    What did you understand prior to the
15  discussion with Mr. Tisi and others about why you
16  and Dr. Rothman were writing a report about talcum
17  powder and ovarian cancer?
18    A.    Oh, I knew it was with respect to
19  litigation.
20    Q.    There was never an understanding
21  that this would be for publication in a
22  peer-reviewed journal, correct?
23    A.    That is correct.
24    Q.    Prior to Dr. Rothman contacting you

15 (Pages 54 - 57)

Page 58

1  about potentially serving as an expert witness in
2  this litigation, or what ultimately became serving
3  as an expert witness in this litigation, had you
4  ever been contacted by any plaintiff's lawyer
5  about serving as an expert witness in a case
6  involving talcum powder use?
7      A.    Not as an expert witness.
8      Q.    Had you ever been contacted by any
9  lawyer about cases involving talcum powder use to
10  serve in any capacity?
11     A.    Yes.
12     Q.    Who contacted you about serving in
13  any capacity in cases involving talcum powder use?
14     A.    I --
15          MR. TISI:  I'm sorry.  What
16     was the question?  I'm sorry.  The phone
17     went off so I missed it.
18          MR. HEGARTY:  Sure.
19  BY MR. HEGARTY:
20     Q.    Who contacted you initially -- or
21  strike that.
22          Who contacted you about serving in
23  the capacity as a consultant in cases involving
24  talcum powder use?

Page 59

1          MR. TISI:  You may answer that
2     question.
3          THE WITNESS:  Members of
4     certain law firms, and I would have to
5     pull up to tell you exactly who those
6     individuals were because I just don't
7     recall their names.
8  BY MR. HEGARTY:
9      Q.    When you say "pull up," what would
10  you have to look at?
11     A.    I would -- I would look at invoices
12  that I -- that I provide -- I submitted to them
13  and that would -- yeah.
14     Q.    Do you recall the names of any of
15  the law firms?
16     A.    Sorry.  I'm not that good with
17  names.  I would have to go back and look,
18  especially law firms.  (Laugh.)
19     Q.    Do you remember when it was you were
20  initially contacted about serving as a consultant
21  by these law firms?
22     A.    Yes.  It was, I think, I believe it
23  was around 2015 or 2016, and I believe it was over
24  a two-year period collectively, maybe three years.

Page 60

1  And then I had not done any work as after, I
2  believe, 2017.
3      Q.    Do you recall how much you invoiced
4  as part of that work?
5      A.    I would say it was less than
6  $20,000.
7      Q.    How much were you charging an hour
8  for that consultation work?
9      A.    I would have to go back and look,
10  but it was less than 400.  It might have been 200.
11  I don't recall.  It was probably in that range of
12  2 to 400.
13     Q.    To your knowledge, were you ever
14  disclosed as a testifying expert by these lawyers
15  or other lawyers prior to your disclosure in this
16  case?
17     A.    Not that I'm aware of.
18          MR. HEGARTY:  I'm going to
19     show you what I'm marking as Exhibit
20     Number 4.
21          (Document marked for
22     identification as Harlow Exhibit 4.)
23  BY MR. HEGARTY:
24     Q.    This is a designation of -- well,

Page 61

1  this is called -- this is a document titled
2  "Plaintiff's Designation of Affirmative Experts"
3  in the case of Chakalos versus Johnson & Johnson.
4      A.    Uh-huh.
5      Q.    Please turn over to the second page,
6  and do you see where you're listed?
7      A.    Yes.
8      Q.    Have you ever seen this designation
9  or this document before today?
10     A.    No, I don't -- I don't believe so.
11          I'm looking to make sure I didn't
12  sign anything.  (Laugh.)  No.
13     Q.    Please look at the last page.
14          Do you recognize -- last two pages.
15          Do you recognize any of those names?
16     A.    Oh, right.
17          Yes.  Yes.  Carmen Scott from Motley
18  Rice, yes.
19     Q.    Do you recognize any other names?
20     A.    Well, Meghan Carter, I believe, yes.
21  I don't believe I know -- I remember the others,
22  any others.
23          Oh, wait.  You mean on the last page
24  here?

16 (Pages 58 - 61)

Page 62

1    Q.    Yes, Doctor.
2    A.    Oh, I'm sorry.
3          I believe the only two that I recall
4 are Meghan Carter and Carmen Scott.
5    Q.    Do you have any recollection of a
6 case called Chakalos versus Johnson & Johnson?
7    A.    I do.
8    Q.    Did you review Ms. Chakalos's
9 medical records?
10   A.    I did.
11   Q.    To your knowledge, though, you were
12 unaware that you had been designated as a
13 testifying expert in that case; is that correct?
14   A.    That's correct.
15   Q.    Did you prepare an expert report on
16 the Chakalos case?
17         MR. TISI:  Let me just go
18    though this.  You can go off the record.
19         MR. HEGARTY:  Sure.  Go off
20    the record.
21         (Recess:  10:19 a.m. -
22    10:28 a.m.)
23         MR. HEGARTY:  We are back on
24    the record.

Page 63

1          I think there was a discussion
2    prior to us starting about making a
3    statement as it relates to the New Jersey
4    litigation?
5         MR. TISI:  Yes.  First of all,
6    we have agreed that an objection by one
7    is an objection by all.  So that Tracy's
8    objections would be preserved.
9         And I don't know if there was
10    a question pending at the time that we
11    took a break.
12         MR. HEGARTY:  Was there a
13    question pending?
14         (The reporter read the record
15    on page 62 lines 15-16.)
16         MR. HEGARTY:  Okay.  Okay.
17 BY MR. HEGARTY:
18    Q.    You can answer that question.
19    A.    Yeah.  I don't believe I prepared an
20 expert report on that case.
21    Q.    Did you form an opinion as to the
22 cause of Ms. Chakalos's ovarian cancer?
23         MR. TISI:  That's a yes or no
24    question.

Page 64

1         THE WITNESS:  Yes.
2 BY MR. HEGARTY:
3    Q.    What was that opinion?
4    A.    I don't --
5         MR. TISI:  Objection.
6         Whatever -- yeah.
7         THE WITNESS:  I don't recall.
8         MR. TISI:  You may answer.
9         THE WITNESS:  I don't recall.
10         MR. TISI:  Then that's fine.
11         Let me just object because I
12    don't know that he knows he was
13    designated as an expert.  You asked him
14    that question, but he -- I would object,
15    obviously, to any communications that he
16    had with the lawyer on the basis of
17    whatever Rule 26 privilege is.
18         Because I don't want to put
19    words in his mouth, but I believe he
20    thought he was a consultant, but go
21    ahead.
22 BY MR. HEGARTY:
23    Q.    This can be a yes or no answer.
24         Do you recall if you reviewed any

Page 65

1 other patient's medical records when you served in
2 this consulting capacity besides Ms. Chakalos's
3 medical records?
4    A.    I believe I did.
5    Q.    Do you recall the number of other
6 women's records you reviewed?
7    A.    I would say it's no more than two or
8 three.
9    Q.    Was it your understanding when you
10 reviewed their records that you had the totality
11 of their medical records?
12    A.    Yes.
13    Q.    With regard to those review of those
14 two or three other women's records, was that also
15 back in 2015 and 2016?
16    A.    It was during that time period, yes.
17    Q.    Since your consultation back in that
18 time period of 2015-2016, have you reviewed the
19 medical records of any other woman who you
20 understood is claiming ovarian cancer from talcum
21 powder use?
22    A.    Yeah.  No.
23    Q.    Do you still serve in a consulting
24 capacity, as you understand it, with the lawyers

17 (Pages 62 - 65)

Page 66

1 that are shown in the document I've marked as
2 Exhibit Number 4?
3    A.    Not that I'm aware of.
4    Q.    When did you understand that
5 consulting relationship ended?
6    A.    At the time of my last submission of
7 information. I just never received any further
8 communication from them.
9    Q.    Was the last submission you made
10 before the COVID shutdown in 2020?
11    A.    Oh, well before that. Well before
12 that.
13    Q.    Do you recall how long, how much
14 before?
15    A.    Again, it was all during this period
16 of time, 2015 to 2017, something like that. I
17 don't believe we shut down on COVID until 2019 was
18 it?
19    Q.    2020.
20    A.    2020, yeah.
21    Q.    Going back to your initial contact
22 with Dr. Rothman about serving as an expert
23 witness in this case --
24         MR. TISI: Are you done with

Page 67

1    this?
2         MR. HEGARTY: I'm done with
3    that.
4         THE WITNESS: Should I give
5    this back to you?
6 BY MR. HEGARTY:
7    Q.    You can keep those over on that
8 side.
9         MR. TISI: Let me kind of keep
10    track of your exhibits.
11         THE WITNESS: Okay.
12 BY MR. HEGARTY:
13    Q.    Going back to your initial contact
14 with Dr. Rothman about serving as an expert
15 witness in this litigation, did he encourage you
16 to serve as an expert witness?
17    A.    No.
18    Q.    How did -- let me strike that.
19         Apart from anything that you were
20 told by attorneys, do you know how Dr. Rothman
21 came to be contacted in the first place?
22    A.    No.
23    Q.    Do you have any social or business
24 relationship to any lawyer for the plaintiffs in

Page 68

1 this case besides in your capacity as a consultant
2 and expert witness?
3    A.    No.
4    Q.    You know Dr. Daniel Cramer, correct?
5    A.    Yes.
6    Q.    Do you know him socially as well as
7 professionally?
8    A.    Not recently.
9    Q.    Not recently socially?
10    A.    Correct. When we worked together,
11 we ran an office together, and there were times
12 when we would have social events with our staff
13 and colleagues.
14    Q.    Are you aware that he has served as
15 an expert witness for plaintiffs' lawyers in cases
16 involving talcum powder use?
17    A.    Yes.
18    Q.    Did you know that because of what he
19 told you?
20    A.    Yes.
21    Q.    You also know Dr. John Godleski,
22 correct?
23    A.    The name doesn't ring a bell.
24    Q.    I'm going to read you a list of

Page 69

1 other plaintiffs' experts that have been
2 designated in this case. Tell me if you know them
3 personally.
4         Dr. McTiernan?
5    A.    I know of her, and she and I trained
6 at the same time as the University of Washington.
7    Q.    Do you know Dr. Siemiatycki?
8    A.    I do not know him. I know of him.
9    Q.    Do you know Dr. Moorman?
10    A.    I do not know her.
11    Q.    Do you know Dr. Clarke-Pearson?
12    A.    No.
13    Q.    He's a gynecologic oncologist.
14    A.    No.
15    Q.    Do you know Dr. Cote?
16    A.    No.
17    Q.    Do you know Dr. Sonal Singh?
18    A.    No.
19    Q.    Do you know Dr. Smith-Bindman?
20    A.    No.
21    Q.    Do you Dr. Roberta Ness?
22    A.    Yes.
23    Q.    Do you know her personally and
24 professionally?

18 (Pages 66 - 69)

Page 70

1    A.    I know her professionally. We sat
2 on committees. We have attended the same meetings
3 often. And so when I see her in those capacity,
4 we're very cordial professionally, but never had
5 any kind of social event with her.
6    Q.    Do you know that Dr. Ness serves as
7 an expert witness for plaintiffs in talcum powder
8 cases?
9    A.    Yes.
10    Q.    How do you know that?
11    A.    I was told.
12    Q.    Were you told that by Dr. Ness?
13    A.    No.
14    Q.    Were you told that by attorneys in
15 this case?
16    A.    Yes.
17    Q.    Have you ever talked to --
18          MR. TISI: I let that one slip
19    by the way. Go ahead.
20 BY MR. HEGARTY:
21    Q.    Have you ever talked to Dr. Ness
22 about her or you serving as an expert witness in
23 cases involving talcum powder use?
24    A.    No.

Page 71

1    Q.    Have you ever talked to Dr. Cramer
2 about his experiences in serving as an expert
3 witness in talcum powder cases?
4    A.    No.
5    Q.    Has Dr. Cramer or Dr. Ness or any
6 other colleague of yours, or someone who's in the
7 same profession, ever encouraged you to
8 participate in this litigation as an expert
9 witness?
10    A.    No.
11    Q.    Did you consult with anyone outside
12 of attorneys prior to agreeing to serve as an
13 expert witness in this litigation?
14    A.    Only to the extent of knowing what I
15 should charge, as I indicated before.
16    Q.    You mentioned Mr. Tisi and you
17 mentioned Ms. Parfitt. You mentioned perhaps
18 Ms. O'Dell.
19          Do you recall the names of any other
20 lawyers that you have worked with as part of your
21 involvement in the talcum powder litigation that
22 we're here to talk about today?
23    A.    Only those that are aligned with
24 this group of attorneys here. There are more that

Page 72

1 have been involved, and my main contact is with
2 Mr. Tisi and Ms. Parfitt.
3    Q.    During that initial discussion you
4 had with Dr. Rothman, did you agree to serve as or
5 participate as an expert witness in this
6 litigation?
7          MR. TISI: Objection.
8    Mischaracterizes his prior testimony. He
9    said he was requested to write a report.
10 BY MR. HEGARTY:
11    Q.    You can answer.
12    A.    No, I was not asked by Dr. Rothman
13 to serve as an expert witness.
14    Q.    At what point in time did you agree
15 relative to your invoice dates to serve as an
16 expert witness for plaintiffs in this litigation?
17    A.    After Dr. Rothman and I had
18 completed our report.
19    Q.    What -- when from the invoices we
20 looked at did you complete your report?
21    A.    Can I refer back to the invoices?
22    Q.    Sure.
23          MR. TISI: I got them right
24    here. I've given you my copy but...

Page 73

1          THE WITNESS: No, no. That's
2    okay.
3          (Reviews document.)
4          I would -- yeah, I would say
5    by the end of November 2023.
6 BY MR. HEGARTY:
7    Q.    How was it that it was till the end
8 of November 2023 that you agreed to serve as an
9 expert witness for plaintiffs in this litigation?
10    A.    Because that's when we completed the
11 report and it was I was asked to be in that
12 capacity.
13    Q.    What did you understand your work to
14 be prior to being asked to serve as an expert
15 witness in this litigation?
16    A.    Prior to being asked is to prepare a
17 report on the state of the evidence.
18    Q.    What did you understand your
19 capacity to be in preserving -- in preparing that
20 report? As a consultant, as an expert, retained
21 expert witness, or something else?
22    A.    I didn't really think of it in that
23 way. I was asked to prepare the report. I was
24 interested in doing it and -- but I didn't think

19 (Pages 70 - 73)

Page 74

1 about how I would be classified one way or
2 another.
3    Q.    Now, with regard to what we've been
4 talking about here today and recently in just the
5 last few moments, you did review materials that
6 plaintiffs' counsel provided and that you obtained
7 yourself and prepared an expert report, correct?
8    A.    That's correct.
9    Q.    That expert report is dated
10 November 15, 2023?
11    A.    It's dated November on my copy.
12    Q.    I'm sorry.  I may have misspoke.
13        Your expert report is dated
14 November 15, 2023?
15    A.    Again, on my copy it just says
16 November 2023.
17    Q.    Is there a date at the end with your
18 signature?
19    A.    Ah.  Quite likely.  Let me see.
20        MR. TISI:  I think that was
21    the date it was submitted.
22        THE WITNESS:  No, there isn't
23    a date.
24 BY MR. HEGARTY:

Page 75

1    Q.    You were compensated for the work
2 you did on your expert report; is that correct?
3    A.    That's correct.
4    Q.    You wrote your expert report with
5 Dr. Rothman, correct?
6    A.    Yes.
7    Q.    Are you aware that plaintiffs'
8 counsel in this case has withdrawn Dr. Rothman as
9 an expert?
10    A.    Yes.
11    Q.    Did you discuss Dr. Rothman's
12 withdrawal with Dr. Rothman?
13    A.    No.
14    Q.    Apart from any discussions you had
15 with counsel for plaintiffs, do you know why he
16 has been withdrawn as an expert witness?
17    A.    I do not.
18    Q.    Do you know that your report is the
19 only coauthored report in this litigation?
20    A.    I believe I was told that.
21    Q.    Why did you prepare a coauthored
22 report?
23    A.    Because Dr. Rothman asked for me to
24 do it collaboratively with him because he had been

Page 76

1 asked first by Mr. Tisi and others to be involved.
2        MR. HEGARTY:  We'll go ahead
3    for purposes of the record to mark your
4    report.  We are on Exhibit Number 6.  So
5    I'm going to mark -- I'm sorry.  Exhibit
6    Number 5.  We're going to mark your
7    report -- I want to make clear.
8        I'm on Exhibit Number 5?
9        MS. PARFITT:  I have 5.  4 was
10    the designation.
11        MR. HEGARTY:  Okay.  I'm
12    marking as Exhibit Number 5 a copy of the
13    expert report we've been provided for you
14    for this case.
15        (Document marked for
16    identification as Harlow Exhibit 5.)
17 BY MR. HEGARTY:
18    Q.    It does have a cover page which you
19 might not have seen before.
20    A.    It also looks a lot thicker.
21        MR. TISI:  Was Number 3 his
22    CV?
23        THE WITNESS:  Oh, this is --
24    it has my CV in here as well.

Page 77

1        MS. PARFITT:  Number 3 is his
2    CV.  CV is separate.
3 BY MR. HEGARTY:
4    Q.    So Dr. Harlow -- I'm sorry,
5 Dr. Rothman -- Harlow, with regard to your expert
6 report that we're looking at, Exhibit Number 5 --
7    A.    Oh, right.  Yeah.
8    Q.    -- is the first part of these pages
9 specifically 1 through 24 your expert report?
10    A.    Yes, it is.
11    Q.    It also includes as exhibits your
12 curriculum vitae, the curriculum vitae of -- and
13 the curriculum vitae of Dr. Harlow, as well as a
14 list at the end which is a Materials Considered
15 list, Exhibit C.
16        Do you see that?
17    A.    I -- I believe I do.  Oh, actually
18 -- oh, yeah, Exhibit C, Materials Considered.
19 Yes.  Uh-huh.
20    Q.    How was the work on your report
21 divided between you and Dr. Rothman?
22    A.    It was collaborative.
23    Q.    Did you and/or Dr. Rothman write
24 particular sections of your report?

Page 78

1    A.    There were some sections we wrote
2 together.  There were some sections that
3 Dr. Rothman took the lead on.  There were some
4 sessions that I took the lead on.
5    Q.    Which sections did you take the lead
6 on and which sections did Dr. Rothman take the
7 lead on?
8    A.    Dr. Rothman clarified the
9 methodologic approach that we did, I wrote the
10 initial drafts of the reviews of most of the
11 scientific literature that is documented in there,
12 and then together we wrote the Executive Summary
13 and I believe our concluding thoughts.
14       But it was an iterative process
15 where we were back and forth on modifying each
16 other's sections that we had initially written.
17    Q.    So did you and Dr. Rothman write
18 initial sections separate and then combine them?
19    A.    We would write our sections and we
20 would discuss it.  And as I indicated on my
21 invoices, when we were meeting, we would be
22 modifying our sections based on joint input on the
23 appropriate wording to be used.
24    Q.    Do the invoices we looked at reflect

Page 79

1 the hours that you spent with Dr. Rothman in
2 preparing this report?
3    A.    I believe it does.
4    Q.    Does it show all the hours that you
5 spent with Dr. Rothman in writing your report?
6    A.    Yes.
7    Q.    Does it also reflect all the hours
8 you spent working on your report?
9    A.    I believe it does.
10    Q.    In the process of preparing your
11 report, did you communicate with Dr. Rothman by
12 e-mail?
13    A.    Yes.
14    Q.    Do you still have those e-mails?
15    A.    No.
16    Q.    With regard to the final report, did
17 you read and approve each statement in the report?
18    A.    Yes.
19    Q.    Was there any disagreement on
20 statements as you were preparing the report?
21    A.    I wouldn't say we had disagreements.
22 I think we -- we came to consensus on the
23 appropriate wording.
24    Q.    How long have you known Dr. Rothman?

Page 80

1    A.    Well, I got to know him better when
2 I came to Boston University.  I, obviously, have
3 known of him and I believe I had met him once.  I
4 met him at scientific meetings.  And he was a very
5 close friend and colleague of my mentor at the
6 University of Washington, Dr. Noel Weiss, who I
7 coauthored one of my papers with.
8    Q.    Do you know Dr. Rothman socially as
9 well as professionally?
10    A.    Now I do.
11    Q.    Have you read all of his
12 publications?
13    A.    What, 600 or so?  (Laugh).  No, I
14 can't believe -- I don't believe I've read all of
15 him, but I've read certainly the seminal
16 publications that he's written.
17    Q.    Have you read any of his textbooks?
18    A.    I use his textbook.
19    Q.    Which textbook do you use?
20    A.    "Modern Epidemiology."
21    Q.    Are all the hours you have spent
22 working on this litigation reflected in the
23 invoices we marked as an exhibit and then what you
24 told me what you have done since that time?

Page 81

1    A.    That's correct.
2    Q.    Have you done any other work on this
3 litigation that's not reflected in your invoices
4 or what you told me about so far today?
5    A.    No.
6    Q.    Looking at your report over on page
7 20, you state at the bottom that:
8       "It is our opinion that talcum
9 powder products, including Johnson's Baby Powder
10 and Shower to Shower, applied to the genital area
11 of women, can cause ovarian cancer."
12       Do you see where I'm reading?
13    A.    Yes, I do.
14    Q.    Does your opinion apply to corn
15 starch products?
16    A.    No, it does not.
17    Q.    Does your opinion apply to body
18 powders generally?
19    A.    Only to the extent that they include
20 talc.
21    Q.    With regard to the opinion statement
22 that I just read at the bottom of page 20 --
23    A.    Uh-huh.
24    Q.    -- you have never made that

21 (Pages 78 - 81)

Page 82

1 statement in any published peer-reviewed
2 publication, correct?
3    A.    I have not. Not -- not the word
4 "cause."
5    Q.    You have never made the statement
6 that I just read to you in anything you have
7 written before November 2023, correct?
8    A.    In any public statement, no.
9    Q.    Have you made this statement in
10 anything other than this report since November
11 2023?
12    A.    No.
13    Q.    On page 2 of your report --
14    A.    Uh-huh.
15    Q.    -- you identify your publications on
16 talc use and ovarian cancer, correct?
17    A.    Yes.
18    Q.    There are four published articles
19 and one letter to the editor?
20    A.    Correct.
21    Q.    Your last published peer-reviewed
22 article was in 1999, 25 years ago, right?
23    A.    Yes, but I don't know to what extent
24 the editors at JAMA peer review letters to the

Page 83

1 editor.
2    Q.    Fair.
3          You don't know one way or the other?
4    A.    I don't know one way or the other.
5    Q.    You do not state in any of your
6 published articles that talc use can cause ovarian
7 cancer, correct?
8    A.    I don't recall that I use that
9 particular term, but I would have to look and see.
10    Q.    With regard to your 1999
11 publication, I'm going to show that to you.
12    A.    Yes.
13          MR. HEGARTY: I have marked it
14    as Exhibit Number 6.
15          THE WITNESS: Yes.
16          (Document marked for
17    identification as Harlow Exhibit 6.)
18 BY MR. HEGARTY:
19    Q.    Is Exhibit Number 6 your 1999
20 publication?
21    A.    That's correct.
22    Q.    If you can look at the first
23 paragraph under the abstract section on page 1,
24 you wrote --

Page 84

1    A.    I'm sorry. Under the what section?
2    Q.    The abstract section.
3    A.    Oh, the abstract. Yes, yes, yes.
4    Q.    The end of the first paragraph below
5 that.
6    A.    Yes.
7    Q.    You note in this article that:
8          "Despite this consistency, the
9 association is still viewed with skepticism based
10 upon weak odds ratios, poor dose-response
11 relationships and an incomplete understanding of
12 the biological mechanism by which talc might lead
13 to ovarian cancer."
14          Do you see where I'm reading?
15    A.    No, I'm not sure I do.
16    Q.    (Indicates).
17    A.    Oh, oh, oh. It's not in the
18 abstract.
19          MR. TISI: It's not in the
20    abstract. You said the abstract.
21 BY MR. HEGARTY:
22    Q.    I said the paragraph below the
23 abstract.
24    A.    Oh, I'm sorry. I'm sorry.

Page 85

1          Okay.
2    Q.    Do you see where I read in the --
3    A.    Could you please reread it so I can
4 see what it is?
5    Q.    The sentence is.
6          "Despite this consistency, the
7 association is still viewed with skepticism --
8    A.    Yes.
9    Q.    -- based upon weak odds ratios, poor
10 dose-response relationships and an incomplete
11 understanding of biological mechanism by which
12 talc might lead to ovarian cancer."
13          Those were true statements in 1999
14 when you published this article, correct?
15    A.    Yes. Yes, there was definitely --
16 there was skepticism.
17    Q.    Please turn over to page 354 of this
18 article, bottom left-hand paragraph.
19    A.    Yes.
20    Q.    You wrote:
21          "Despite the consistency noted
22 above, the relatively weak odds ratios observed
23 could reflect potential biases, especially recall
24 and confounding. Recall bias is possible because

22 (Pages 82 - 85)

Page 86

1 talc exposure in these studies is based on
2 personal recollection."
3      That's a true statement, correct?
4    A.    Except that if you look at the
5 sentence following that, it seems that recall bias
6 seems more likely to affect exposures that have
7 occurred over a short period of time.
8    Q.    As far as the sentence I just read
9 to you, though, you stand by that sentence,
10 correct?
11    A.    I stand by recall bias is a possible
12 -- could have a possible effect in those who have
13 used it sporadically over their lifetime.
14    Q.    But in terms of all the statements
15 in this article, you still stand by them, correct?
16    A.    Yes, I believe so.  I mean, yes, I
17 stand by everything I've written.
18    Q.    Please turn over to page 355.
19    A.    Uh-huh.
20    Q.    Left-hand side, end of the paragraph
21 -- end of the left-hand side.
22        MR. TISI:  Let me get there,
23    Mark.
24 BY MR. HEGARTY:

Page 87

1    Q.    That paragraph reads:
2        "The most obvious weakness in the
3 argument for biologic credibility of the talc and
4 ovarian cancer association is the lack of a clear
5 dose response.  Most talc and ovarian cancer
6 studies that have addressed dose response,
7 including this one, have failed to demonstrate
8 consistent dose response relationships with
9 measures of the intensity of the exposure,
10 especially when the trend is examined among users
11 only."
12        Do you stand by that statement?
13        MR. TISI:  Objection.
14    Incomplete based upon the entirety of the
15    article.
16        Go ahead.
17        THE WITNESS:  Yeah.  Again, I
18    am -- I am -- this paragraph reflects the
19    fact that very few articles have had the
20    capacity to be able to accurately and
21    appropriately have the data to be able to
22    show the dose response.
23        However, this particular paper
24    does have data to be able to show the

Page 88

1      dose response.
2 BY MR. HEGARTY:
3    Q.    What I read to you was a true
4 statement as of the time you published this
5 article, correct?
6    A.    Yes.
7    Q.    IARC published its monograph
8 regarding talc use --
9        MR. TISI:  Are you done with
10    this?
11        MR. HEGARTY:  I'm done with it
12    for now.
13        MR. TISI:  Okay.
14 BY MR. HEGARTY:
15    Q.    IARC published its monograph
16 regarding talc use and ovarian cancer in 2010
17 where it designated talc as to be possibly
18 carcinogenic.
19        Did you read that monograph when it
20 came out?
21    A.    I can't say that I read it when it
22 came out.
23    Q.    Do you recall when it was when you
24 did read that IARC Monograph, if you did?

Page 89

1    A.    I looked at that monograph and other
2 IARC statements during the process of reviewing
3 the evidence.
4    Q.    "During the process of reviewing the
5 evidence."
6        Are you talking about during the
7 process of reviewing the evidence in connection
8 with preparing your expert report?
9    A.    Yes.
10    Q.    Prior to you starting to work on
11 your expert report, had you ever reviewed the 2010
12 IARC Monograph on talc?
13    A.    I don't believe I did.
14    Q.    Did you come to the opinion in your
15 report that talc applied to the genital area can
16 cause ovarian cancer before being contacted by
17 plaintiffs' counsel back in 2023?
18    A.    I have always in my written
19 publications believed that the association with
20 respect to genital application of talc and its
21 risk of ovarian cancer was a true association.
22    Q.    My question, though, is a little bit
23 different.
24        My question is:  With regard to the

23 (Pages 86 - 89)

Page 90

1 opinion that you've said in your report that talc
2 applied to the genital area can cause ovarian
3 cancer, did you come to that opinion prior to
4 being contacted by plaintiffs' counsel about
5 serving as an expert witness in this litigation?
6     A.    I believe in my -- in my 1992
7 article, I basically indicated that I believed
8 that about 10 percent of the incidence of ovarian
9 cancer could be or was attributable to talc
10 exposure.
11     Q.    My question still is a little
12 different than what you're answering.
13          You just -- you told me about what
14 you believed as to the association being a true
15 association.  You told me what you wrote in your
16 1992 article about 10 percent of cases
17 involving --
18     A.    10 percent of the incidence.
19     Q.    10 percent of the incidence.
20          My question is specifically as to
21 the causal statement you made in your expert
22 report.
23          When did you come to that causal
24 opinion?

Page 91

1     A.    I came to that causal opinion in
2 doing this report.
3     Q.    Now, as you mentioned a short time
4 ago, you attended the 1994 workshop on talc that
5 was cosponsored by FDA, correct?
6     A.    Yes.
7     Q.    In fact, you spoke at that
8 conference?
9     A.    Yes.
10     Q.    Do you still have the slides or
11 materials you used at that conference?
12     A.    No.  I'm not sure they even had
13 slides.  It may have been transparencies.  I don't
14 remember.
15     Q.    You did not tell the audience that
16 talc use in the genital area can cause ovarian
17 cancer, correct?
18     A.    I did not use that term.
19     Q.    And you did not believe that at the
20 time, correct?
21     A.    I did not use that term.
22     Q.    Well, did you believe at the time
23 that you presented to the FDA workshop that talc
24 use in the genital area can cause ovarian cancer?

Page 92

1     A.    I believed in the research that I
2 had done and the associations that I observed as
3 being -- as not being explained by biases to my --
4 based on my evaluation.
5          I certainly -- yeah.
6     Q.    Go ahead.
7          Have you reviewed the transcript of
8 the proceedings?
9     A.    I have.  I have.
10     Q.    When did you review the transcript
11 of the proceedings?
12     A.    Recently, actually.
13          MR. HEGARTY:  I'm going to
14     mark as the next exhibit, Exhibit
15     Number 7, the transcript of the FDA
16     workshop proceeding.
17          (Document marked for
18     identification as Harlow Exhibit 7.)
19          THE WITNESS:   Yep.
20 BY MR. HEGARTY:
21     Q.    Is the transcript that I marked as
22 Exhibit Number 7 what you reviewed recently?
23     A.    Yes.
24     Q.    Please turn over to page 272.  They

Page 93

1 are numbered at the top.
2     A.    Yep.
3          I'm going to take the clip off.  If
4 that's okay?
5     Q.    That is fine.
6     A.    Okay.
7     Q.    In the last paragraph on 272, you
8 stated at that conference:
9          "In summary, these results suggest
10 that if an association of talc exposure and
11 ovarian cancer truly exists, it is probably weak
12 and does not explain a large proportion of the
13 overall incidence of ovarian cancer."
14          That's what you said at that
15 conference?
16     A.    That's right, and that's what I just
17 said to you as well.
18     Q.    That's what you believed at the
19 time?
20     A.    Yes.
21     Q.    That was a true statement, correct?
22     A.    Yes.
23          MR. HEGARTY:  You can put that
24     document aside.

24 (Pages 90 - 93)

Page 94

1          The next document I'm going to
2    show you, which I'm marking as Exhibit
3    Number 8, is the publication by Carr that
4    came out of that FDA workshop.
5          (Document marked for
6    identification as Harlow Exhibit 8.)
7 BY MR. HEGARTY:
8    Q.    Have you seen the publication I
9 marked as Exhibit Number 8 before today?
10   A.    Oh, yes.
11   Q.    And did you review that recently?
12   A.    Yes.
13   Q.    It shows on page 2 that you were a
14 participant?
15   A.    That's correct.
16   Q.    Please turn to page 214 of the Carr
17 paper.
18          First of all, before we go there.
19          Did you review the Carr paper when
20 it came out back in 1995?
21   A.    I did not -- I don't recall.  I did
22 not -- I was not involved in the preparation or
23 review of this.  I might have seen it before it
24 came in print.  I just -- I don't recall.

Page 95

1    Q.    Had you read it in some context
2 prior to being contacted by plaintiffs' counsel in
3 this litigation?
4    A.    Oh, prior to this litigation?
5    Q.    Yes, sir.
6    A.    I'm sure I did back in the '90s, but
7 not since then.
8    Q.    And in looking at page 214 --
9    A.    Yes.
10   Q.    -- in the lower right-hand corner,
11 if you look sort of in the middle of that very
12 last paragraph, the sentence beginning "To
13 reasonable people."
14          Do you see that sentence?
15   A.    In which paragraph?
16   Q.    (Indicates).
17   A.    Oh, right around there.
18          Yes, I see it.  Uh-huh.
19   Q.    That article reads:
20          "To reasonable people -- even armed
21 with reasonable concern for prudence -- these
22 clues suggest that the probability of human risk
23 is likely nonexistent under customary conditions
24 of use."

Page 96

1          That was a statement made at the
2 conference.
3          Are you aware of that?
4    A.    I'm not aware of that.
5    Q.    Turn over to page 215, the next
6 page.
7    A.    Uh-huh.
8    Q.    Look at the very bottom of the
9 left-hand column carrying over to the right-hand
10 column.
11   A.    Uh-huh.
12   Q.    The sentence at the very bottom
13 reads:
14          "Following the many issues raised by
15 all presenters, the ensuing discussion generally
16 agreed that while some weak association between
17 talc exposure and ovarian tumors has been
18 reported, it was not sufficient warning for
19 concern."
20          First of all, did I read it
21 correctly?
22   A.    You did read it correctly.
23   Q.    Do you dispute that statement?
24   A.    Yes, I do.

Page 97

1    Q.    Back when you reviewed Carr, did you
2 write a letter to the editor or contact the
3 authors -- let me start over again.
4          Back when you reviewed the Carr
5 study back in the 1990s, did you contact Carr or
6 any of those involved in this publication and
7 express concern about any of the language used in
8 the article?
9    A.    No.
10          MR. TISI:  Objection.  Wait.
11     Let me place an objection to the
12     characterization of this article as a
13     study.  It's not a study.
14          You may answer.
15          THE WITNESS:  No.  Instead, I
16     wrote an entire review article that was
17     published in that issue, which summarized
18     what we had presented at the conference.
19 BY MR. HEGARTY:
20   Q.    Have you ever in any published --
21 any publication of yours specifically addressed
22 any of the statements in the Carr article?
23   A.    No.
24   Q.    Have you publicly in any forum,

25 (Pages 94 - 97)

Page 98

1 whether published or otherwise, taken issue with
2 any of the statements contained in the Carr
3 article, including the statements I read to you?
4     A.    No, not in any public -- no, not
5 publicly at all.
6           MR. HEGARTY:  You can put that
7     document aside for the moment.
8           The next document I want to
9     talk to you about, which I'll mark as
10     Exhibit Number 9, is Dr. Rothman et al.'s
11     document "Interpretation of Epidemiologic
12     Studies on Talc and Ovarian Cancer."
13           (Document marked for
14     identification as Harlow Exhibit 9.)
15           THE WITNESS:  Uh-huh.
16           MR. TISI:  Are you talking
17     about --
18           MR. HEGARTY:  The one I just
19     handed to you.
20           MR. TISI:  Okay.
21           THE WITNESS:  Uh-huh.
22 BY MR. HEGARTY:
23     Q.    When did you first see Exhibit
24 Number 9?

Page 99

1     A.    I first saw it after I had started
2 doing work in preparation for our report that
3 Dr. Rothman and I did.
4     Q.    The conclusion of this analysis is
5 set on page 1.
6     A.    Yes.
7     Q.    And that conclusion --
8     A.    Oh, the Executive Summary?
9     Q.    In the Executive Summary.
10     A.    Yep.
11     Q.    At the end, it says:
12           "Based on these considerations, we
13 suggest that the evidence to date does not
14 indicate that talc can be 'reasonably anticipated
15 to be a human carcinogen.'"
16           Did I read that correctly?
17     A.    Yes, you did.
18     Q.    And you did not cite that conclusion
19 anywhere in your report, correct?
20     A.    No, because I don't believe it to be
21 true.
22     Q.    Did you talk with Dr. Rothman about
23 this analysis?
24     A.    Yes.

Page 100

1     Q.    Does he stand by what he wrote back
2 in 2000?
3     A.    He stands by what he signed his name
4 to in the report that we wrote together.
5     Q.    My question, though, is:  Does he
6 stand by, from what he has told you, what I marked
7 as Exhibit Number 9?
8           MS. PARFITT:  Objection.
9           THE WITNESS:  I have no idea
10     whether he does or not.
11 BY MR. HEGARTY:
12     Q.    Turning to page 2, in the
13 "Introduction" section, Dr. Rothman wrote that he
14 analyzed 23 case-control studies involving talc
15 and ovarian cancer.
16           These included your studies as well,
17 correct?
18     A.    Uh-huh.
19     Q.    Yes, sir?
20     A.    Yes.
21           MR. TISI:  Say "yes."
22           THE WITNESS:  I'm sorry.
23     Yes.
24 BY MR. HEGARTY:

Page 101

1     Q.    The "Introduction" section above
2 Figure 1, just above Figure 1 --
3     A.    Yes.
4     Q.    -- states or notes that the relative
5 risk concluded from that review is 1.31.  That is
6 characterized or called as a "slight positive
7 association."
8           Do you see where I'm reading?
9     A.    Yes.
10     Q.    Do you agree that the relative risk
11 that Dr. Rothman reported of 1.31 was a slight
12 positive association?
13     A.    It's a positive association.
14     Q.    You would not characterize it as
15 slight?
16     A.    No.  That's a term that we would not
17 normally use.
18     Q.    In your report for this litigation,
19 you did not do a strength of association analysis,
20 correct?
21           MR. TISI:  Objection.
22           THE WITNESS:  I'm not sure
23     what you mean by a "strength of
24     association analysis."

26 (Pages 98 - 101)

Page 102

1 BY MR. HEGARTY:
2    Q.    Let me ask in a different way.
3          Do you state anywhere in your report
4 that the relative risks or odds ratios reported
5 for talc use and ovarian cancer are strong?
6    A.    I don't believe we used "strong" as
7 a word. I believe we used "consistently seen"
8 across multiple studies and --
9    Q.    Did you -- I'm sorry. Go ahead.
10    A.    -- and meta-analyses show a
11 consistent association with narrow confidence
12 intervals.
13    Q.    Is it your opinion in this
14 litigation that the relative risks and odds ratios
15 that are reported for talc use and ovarian cancer
16 are strong?
17          MR. TISI: Objection.
18          THE WITNESS: Yeah. I would
19    say they are clinically relevant and
20    important.
21 BY MR. HEGARTY:
22    Q.    Have you ever characterized in any
23 publication of yours relative risks in the range
24 of 1.2, 1.3, 1.4 as weak?

Page 103

1    A.    I'm sure I have.
2    Q.    In fact, we looked at your 1999
3 publication where you characterized the reported
4 relative risks at the time as weak odds ratios,
5 correct?
6    A.    That's correct.
7    Q.    Back in 1999, based on the odds
8 ratios you had reviewed at the time, you
9 considered those to be weak odds ratios, correct?
10          MR. TISI: Objection.
11          THE WITNESS: No. Well, weak
12    odds ratios merely means that -- it
13    doesn't mean that it's clinically
14    important. It means that it's not 3.0,
15    4.0, 5.0. It happened to be around 1.3,
16    1.4.
17 BY MR. HEGARTY:
18    Q.    Looking at page 2 of your report.
19    A.    Of my report?
20    Q.    Of your report.
21          I'm sorry. It is -- it is page 7.
22    A.    Yes.
23    Q.    You state at the bottom -- or, first
24 of all, before I go there.

Page 104

1          You actually refer to the 1.31
2 finding from Dr. Rothman's 2000 study, correct?
3    A.    That's correct.
4    Q.    And you actually show --
5    A.    And we cite it.
6    Q.    And you cite to it?
7    A.    Yes.
8    Q.    You show Figure 1 from the 2000
9 paper of Dr. Rothman?
10    A.    That's correct.
11    Q.    You note at the bottom of page 7
12 that:
13          As regards to the 1.31 estimated
14 risk ratio that if valid, it would apply a 31
15 percent greater risk of ovarian cancer among talc
16 users.
17          Correct?
18    A.    That's correct.
19    Q.    Now, Dr. Rothman in this, in his
20 analysis in Exhibit Number 9 --
21    A.    Yes.
22    Q.    -- his 2000 analysis, did not
23 believe it was valid, correct?
24          MR. TISI: Objection.

Page 105

1          THE WITNESS: I don't know
2    whether he believed it was valid or not.
3    He -- well, I'm looking for where he
4    might have -- where he specifically said
5    that.
6 BY MR. HEGARTY:
7    Q.    Well, based on the conclusion --
8    A.    Yeah.
9    Q.    -- at the bottom of the Executive
10 Summary, wouldn't you agree that he did not
11 believe that 1.31 relative risk --
12          MR. TISI: Objection.
13 BY MR. HEGARTY:
14    Q.    -- or risk ratio -- let me finish my
15 question -- risk ratio was valid?
16          MR. TISI: Object. Let me
17    just object.
18          You referred to the Executive
19    Summary as a conclusion. As you know,
20    counsel, there is actually a Conclusion
21    in the report that is not the Executive
22    Summary.
23          So if you want him to look at
24    the Conclusion, look at the Conclusion,

27 (Pages 102 - 105)

Page 106

1    but don't characterize the Executive
2        Summary as a conclusion.
3   BY MR. HEGARTY:
4       Q.    You can answer.
5       A.    I guess I would agree with counsel
6   that his ultimate opinion came in the summary of
7   the -- of the report.
8       Q.    Well, the conclusion --
9       A.    Let's look at that.
10      Q.    -- on page 8, the very bottom it
11  says:
12             "Based on these considerations" --
13  referring to what he described above -- again,
14  this is page 8.
15      A.    Oh, page 8.
16      Q.    The "Conclusion" section.
17      A.    Yeah. Hold on. Yes. Uh-huh.
18      Q.    He writes:
19             "Based on these considerations, we
20  suggest that the evidence to date does not
21  indicate that talc can be 'reasonably anticipated
22  to be a human carcinogen.'"
23            Correct?
24            MR. TISI:  Please, you're free

Page 107

1        to read the entire Conclusion.
2            THE WITNESS:   Yeah, yeah.
3            (Reviews document.)
4            Yes, he states that.
5   BY MR. HEGARTY:
6       Q.    So do you disagree that Dr. Rothman
7   back in 2000 did not find valid that the -- that
8   there was a 31 percent greater risk for ovarian
9   cancer among talc users?
10            MR. TISI:  Objection.
11            THE WITNESS:  I believe --
12            MR. TISI:  That misstates --
13       states what he said.
14            Go ahead.
15  BY MR. HEGARTY:
16      Q.    You can answer.
17      A.    Well, I believe that's what he
18  thought at the time. Obviously, given that he
19  coauthored my report, he does not believe that
20  now.
21      Q.    When you read the 2000 summary, did
22  you agree that it was accurate at the time it was
23  prepared?
24      A.    No.

Page 108

1            MR. TISI:  Objection.
2   BY MR. HEGARTY:
3       Q.    You would not have wrote -- you
4   would not have authored the statements contained
5   in Dr. Rothman's 2000 report?
6       A.    Absolutely not. Especially given
7   that he specifically stated that there was no
8   biological plausibly -- plausible explanation for
9   it, and there was ample evidence at that time of
10  this report.
11      Q.    Did Dr. Rothman tell you what he
12  thought had changed since 2000 --
13      A.    No.
14      Q.    -- that would change his opinions?
15      A.    No.
16      Q.    If you look over on page 3?
17      A.    Of his report?
18      Q.    Of his 2000 publication.
19      A.    2000 report. Okay. Hold on.
20            MR. TISI:  Objection to
21      calling it a publication.
22            THE WITNESS:  Okay.
23  BY MR. HEGARTY:
24      Q.    Look under the section "Issues

Page 109

1   Affecting Causal Inference" section.
2            Do you see that?
3       A.    Yes.
4       Q.    This describes a methodology
5   Dr. Rothman performed back in 2000, correct?
6       A.    Yes.
7       Q.    As to dose --
8            MR. TISI:  Actually, if you're
9       going to refer to the section and ask you
10      about the methodology, please read it,
11      sir.
12            THE WITNESS:  Yeah, yeah.
13  BY MR. HEGARTY:
14      Q.    As to dose response --
15            MR. TISI:  Give him a chance
16      to read it, Mark.
17            MR. HEGARTY:  Okay, but he
18      didn't ask he needed to read it.
19            THE WITNESS:  No, I don't.
20      You can ask the question.
21            MR. TISI:  You can't -- ask
22      the question, but he does need to read it
23      if you want to ask him about the
24      methodology.

28 (Pages 106 - 109)

Page 110

1         MR. HEGARTY: Chris, I think
2    the doctor needs to tell me if he needs
3    to read it first. Please don't instruct
4    him to read it.
5         MR. TISI: I'm objecting. I'm
6    going to instruct him. If you're going
7    to ask him about a section of the report,
8    he needs to take a look at it.
9         MR. HEGARTY: Understood,
10   but -- and I'm fine with that.
11        MR. TISI: Thank you.
12        MR. HEGARTY: But if he needs
13   to read it, he needs to tell me so we can
14   go off the record so I'm not taking up
15   time with him reading.
16        MR. TISI: Well, I'm not going
17   to go off the record. If you're going to
18   ask him about a section of the report,
19   he's going to read the section of the
20   report.
21        MR. HEGARTY: Fine.
22        MR. TISI: If you ask him
23   about a sentence, that's fine, but go
24   ahead.

Page 111

1 BY MR. HEGARTY:
2    Q.    Are you there --
3    A.    Yes.
4    Q.    -- with me?
5    A.    Please ask your question.
6    Q.    Dr. Rothman writes in that section
7 as it relates to dose response:
8         "With rare exception, every causal
9 relation in epidemiologic research shows a
10 progressive relation between various measures of
11 increasing exposure."
12   A.    Uh-huh.
13   Q.    That is a true statement, correct?
14        MR. TISI: Objection.
15        THE WITNESS: Yes.
16 BY MR. HEGARTY:
17   Q.    His methodology then lists five
18 factors: exposure misclassification, recall bias,
19 confounding, dose-response trends, and biologic
20 mechanism, correct?
21   A.    Yes.
22   Q.    Nowhere in your report do you
23 analyze exposure misclassification, correct?
24   A.    Not correct.

Page 112

1    Q.    Where in your report do you report
2 exposure misclassification?
3    A.    In the review of the cohort studies.
4    Q.    Nowhere in your report do you do an
5 analysis of confounding, correct?
6    A.    That's not true.
7    Q.    Show me in your report where you do
8 an analysis of confounding.
9    A.    By we discuss the potential for
10 confounding. I'm not sure what you mean by "an
11 analysis of confounding."
12   Q.    Well, where do you discuss the
13 potential for confounding in your report?
14   A.    My report?
15        (Reviews document.)
16        In the overall approach and
17 methodological review.
18   Q.    On what page?
19   A.    On page 4. The paragraph that
20 begins:
21        "If no checklist for causal
22 inference exists, then how does causal inference
23 proceed?"
24        And then the sentence was:

Page 113

1         "Or, was the association
2 attributable to some other factor that causes the
3 disease and is associated with the exposure under
4 study?"
5         That is the definition of
6 confounding.
7    Q.    Do you do analysis of potential
8 confounding factors with regard to talc and
9 ovarian cancer in your report?
10   A.    In the evaluation of the articles,
11 we looked to see whether confounders were taken
12 into consideration in the assessments.
13   Q.    Nowhere in your report do you
14 discuss the potential confounding factor of BMI,
15 correct?
16   A.    Not -- not that I'm aware of. But,
17 remember, a confounder has to have preceded the
18 use of a particular exposure.
19   Q.    Nowhere in your report do you
20 discuss the potential confounder of hormone
21 replacement therapy, correct?
22   A.    Again, it's not considered a
23 confounder if it doesn't -- if it's not antecedent
24 to the risk -- to the use of the exposure.

29 (Pages 110 - 113)

Page 114

1    Q.    My question is different, though.
2        Nowhere in your report do you
3  discuss hormone replacement therapy as a potential
4  confounder for the talcum powder and ovarian
5  cancer studies, correct?
6    A.    That's correct, because it's
7  unlikely to be a confounder.
8    Q.    Nowhere in your report do you
9  discuss smoking as a potential confounder,
10  correct?
11    A.    I don't believe that smoking is a
12  strong risk factor for ovarian cancer.
13    Q.    My question is different, Doctor.
14        My question is:  Do you anywhere in
15  your report discuss smoking --
16    A.    No.
17    Q.    -- as a potential confounder?
18    A.    No.
19    Q.    Do you discuss anywhere in your
20  report any of the potential confounders that are
21  listed in the studies that you reviewed looking at
22  talcum powder use and ovarian cancer?
23    A.    I don't believe I discussed it in
24  the report because the studies that were done and

Page 115

1  also combined together in meta-analyses had done
2  their best job at trying to control for known risk
3  factors for ovarian cancer.
4    Q.    Nowhere in your report do you
5  analyze dose-response trends, correct?
6    A.    I believe that's not true.
7        I believe at the end of my report --
8        (Reviews document).
9    Q.    Let me ask a different way.  Let me
10  withdraw that question.
11    A.    Okay.
12    Q.    Nowhere in your report do you do an
13  analysis of the various dose-response findings
14  from the studies and report on what the trends are
15  as to those studies, correct?
16    A.    I believe I could state in
17  "Considering the preponderance of the evidence,
18  including after controlling for known risk and
19  protective factors for ovarian cancer, evidence of
20  a trend of increasing risk of ovarian cancer with
21  increasing talc applications" -- and that was
22  evident from the 1999 publication and the 2012
23  publication that I had done -- "especially when
24  the vaginal tract is open to the ovaries."

Page 116

1        So I do state that in the
2  conclusions.
3    Q.    Please look back over to Exhibit
4  Number 9, Dr. Rothman's 2000 document.
5    A.    Yes.
6    Q.    Report.
7    A.    Yes.
8    Q.    Over on page 6.
9    A.    Yes.
10    Q.    He does an analysis of dose response
11  and actually has two figures there where he's
12  analyzing the trend from the data, correct?
13    A.    It appears that is what he is doing,
14  yes.  I don't know what data he is using to derive
15  that.
16    Q.    You did not do an analysis like
17  it --
18    A.    No, I did not.
19    Q.    -- in your report --
20    A.    I did not.
21    Q.    -- like what is shown on page 6?
22    A.    No.
23        MR. TISI:  One at a time.  One
24    at a time.  Sorry.

Page 117

1        THE WITNESS:  No, and
2    Dr. Rothman did not recommend that we do
3    that.
4  BY MR. HEGARTY:
5    Q.    Did you actually have a discussion
6  with him about it?
7    A.    I don't recall.
8    Q.    With regard to dose response, you
9  only cite a single study that found a
10  dose-response trend.
11        That's Cramer on page 8, correct?
12        MR. TISI:  Objection.
13    Misstates.
14        THE WITNESS:   In my report?
15  BY MR. HEGARTY:
16    Q.    In your report, Doctor.
17        MR. TISI:  Misstates the
18    evidence and his report.
19        THE WITNESS:  Where?  Where
20    is that located?
21  BY MR. HEGARTY:
22    Q.    In the middle paragraph of page 8
23  above the "Cohort Studies."
24    A.    That's right.  Most recent study,

30 (Pages 114 - 117)

Page 118

1  yes.
2      Q.    You don't cite any other study in
3  your report that discusses a dose-response trend,
4  correct?
5          MR. TISI:  Objection.
6      Misstates his report.
7          THE WITNESS:   Again, I
8      selected Cramer's study as a -- as the
9      most recent relevant article that shows a
10     dose response.
11 BY MR. HEGARTY:
12     Q.    Going back to my question.
13         You don't discuss anywhere else in
14 your report any other study that reported on a
15 dose-response -- that reported a dose-response
16 trend, correct?
17     A.    It's not specifically stated here in
18 the report.
19         MR. TISI:  And, again,
20     objection.  There are other discussions
21     in the report.
22         MR. HEGARTY:  Chris, come on.
23     Let's limit your objections to --
24         MR. TISI:  Okay.  I'm happy to

Page 119

1      do that.
2          MR. HEGARTY:  -- form, and you
3      know that that was an improper objection,
4      and you were coaching the witness.
5          MR. TISI:  You know -- you
6      know that you're misstating his report.
7          MR. HEGARTY:  Then it's up for
8      the doctor to tell me I'm misstating his
9      report.
10         MR. TISI:  No, it's up to you
11     to ask fair questions.
12         MR. HEGARTY:  You know how
13     that works.
14         MR. TISI:  It's up to you to
15     ask fair questions.
16         MR. HEGARTY:  It is a fair
17     question.
18 BY MR. HEGARTY:
19     Q.    Doctor, you do actually --
20     A.    Actually -- actually, if I may, I
21 believe also I cite Schildkraut's study --
22     Q.    Do you report on what Schildkraut --
23     A.    -- and the trend of increasing risk
24 with increasing years and frequency of exposure.

Page 120

1      Q.    Other than -- fair point.  Let's add
2  Schildkraut.
3          Other than Cramer and Schildkraut,
4  you don't report an increasing trend with
5  increasing frequency, duration, or cumulative
6  exposure from any other study, correct?
7          MR. TISI:  Objection.
8      Misstates his report.
9          THE WITNESS:   Okay.  So, as
10     you know, the Cramer study was the New
11     England case-control study that was
12     continued to build cases and controls,
13     and so the 1992 report that we published
14     was from that same data set with much
15     fewer cases and controls showing a dose
16     response.
17         As you add more cases and
18     controls to that particular -- that
19     particular case and control series, you
20     continue to see a dose response.  And as
21     you even continue to add more in the
22     2016, it continues to show that kind of
23     trend.
24         So, no, I did not -- I did not

Page 121

1      specifically talk about the 1992 and the
2      1999 papers because the 2016 paper was
3      the most recent one.
4  BY MR. HEGARTY:
5      Q.    You are not an author on Cramer's
6  2016 paper?
7      A.    I am not, but it is from that data
8  set.
9      Q.    You're not an author on the
10 Schildkraut paper?
11     A.    I am not.
12     Q.    Going back to my question.
13         The only two studies you report on
14 as showing an increasing trend with increasing
15 dose in your report are the Cramer and Schildkraut
16 study, correct?
17         MR. TISI:  Objection.
18     Misstates his report.
19         THE WITNESS:  Yeah, those --
20     those are what was stated in the report
21     as what I thought ample evidence to
22     suggest that dose response is present.
23 BY MR. HEGARTY:
24     Q.    You actually cite to two studies

31 (Pages 118 - 121)

Page 122

1 that reported no dose response, the Davis study on
2 page 14 and the Taher study on pages 13 and 14,
3 correct?
4    A.    The Davis study on page 13.
5    Q.    14.
6    A.    Oh, 14. I'm sorry.
7          Yes.
8    Q.    And then the Taher study you also
9 report did not find an increasing trend or dose
10 response, correct?
11   A.    However, in the Davis article, they
12 did not lump together frequency and duration of
13 use to get a cumulative exposure measure. So it
14 was they did not. For whatever reason, they chose
15 not to do that.
16         And with the Taher study, it was --
17 again, it was not what I would consider to be an
18 appropriate -- a complete ascertainment of
19 exposure.
20   Q.    You mentioned your '92 and '99
21 study.
22         Your -- actually your '99 study, as
23 we looked at a short time ago, found no dose
24 response, correct?

Page 123

1          MR. TISI: Objection.
2          THE WITNESS: No, that's not
3    true. The 1999 article with Cramer?
4 BY MR. HEGARTY:
5    Q.    Well, let me go back over what you
6 said.
7    A.    Well, let me go look at the data.
8 Let me pull up the article.
9    Q.    I got to ask my question.
10         MR. TISI: Well, no. You said
11   his article does not show a dose
12   response. He says he wants to look at
13   his table.
14         MR. HEGARTY: Withdraw my --
15   withdraw my question. Let me ask another
16   question.
17         MR. TISI: You can't do that.
18   No, you can't do that.
19         MR. HEGARTY: Yes, I can.
20         MR. TISI: You can't do that.
21         MR. HEGARTY: Let me ask a
22   different question.
23         MR. TISI: No. I want to show
24   him the study.

Page 124

1          MR. HEGARTY: You can show it
2    him when you do your questioning, Chris.
3    You know how that works.
4          MR. TISI: No. You know how
5    it works. You can't ask him about a
6    study and not show him the study.
7          MR. HEGARTY: I can withdraw
8    the question. That's absolutely
9    permitted.
10         MR. TISI: Well...
11 BY MR. HEGARTY:
12   Q.    Look over on page 355 of your
13 article.
14   A.    Uh-huh. Hold on a second. Let
15 me -- let me just get the article.
16   Q.    It's one of the exhibits.
17   A.    Yeah.
18         MR. TISI: He's going to
19   his -- his ones.
20         THE WITNESS: Okay.
21 BY MR. HEGARTY:
22   Q.    355. Lower left-hand corner at the
23 bottom. Tell me when you're there.
24   A.    Yep. There.

Page 125

1    Q.    No. This part. This page.
2 (Indicates).
3    A.    355?
4    Q.    355.
5    A.    Oh, I'm sorry. Yep. I'm here.
6    Q.    You wrote:
7          "Most talc and ovarian cancer
8 studies" --
9    A.    I'm sorry. On which? On which?
10   Q.    Lower left-hand corner.
11   A.    Okay. Got it. Yep.
12   Q.    "Most talc and ovarian cancer
13 studies that have addressed dose response,
14 including this one, have failed to demonstrate
15 consistent dose response relationships with
16 measures of the intensity of the exposure,
17 especially when the trend is examined among users
18 only."
19         And you agreed with me that was a
20 true statement back then, correct?
21   A.    Yeah, and that is a true statement.
22 If you look at the table by which this comes and
23 that is -- that is if you just look at -- if you
24 just look at total applications, then you don't

32 (Pages 122 - 125)

Page 126

1 see that dose response.
2        But when you start to take into
3 account the time periods when women were exposed,
4 excluding times when subsequent to a tubal
5 ligation or a hysterectomy, and then in addition,
6 excluding times when there was not ovulation, you
7 see a significant dose response going forward.
8 Well, you see a dose response. I don't like the
9 word "significant," but you can see that it goes
10 from 1.0 to 1.8.
11        So there is a dose response when you
12 take into account a refinement of the -- an
13 appropriate refinement of the exposure.
14    Q.    Please turn back over to Exhibit
15 Number 9, Dr. Rothman's November 28, 2000 report.
16    A.    Yep. Yep. I have it.
17    Q.    Please turn over to page 4.
18    A.    Uh-huh.
19    Q.    In the second full paragraph on the
20 top, about the middle of that paragraph,
21 Dr. Rothman writes --
22        MR. TISI: Give him a chance
23    to get there.
24        THE WITNESS: No, no. I'm

Page 127

1     fine.
2        MR. TISI: No, I need to get
3    you. We all need to get there.
4        THE WITNESS: Okay.
5        MR. TISI: He's
6    freight-training you here on this. So
7    let's get the documents out so you can
8    compare what is said.
9        THE WITNESS: Okay.
10 BY MR. HEGARTY:
11    Q.    Dr. Rothman writes:
12        "Ideally one would wish to have a
13 measure of talc dose within the upper reproductive
14 tract."
15        Do you see where I'm reading?
16    A.    No, I don't. I'm sorry.
17    Q.    (Indicates).
18    A.    Oh, yeah. Got it. Okay.
19    Q.    Do you agree with that statement?
20    A.    Well, it's ideally. I don't think
21 it's feasible or can possibly be done.
22    Q.    Please look at the next section on
23 "Recall Bias."
24    A.    Yes.

Page 128

1    Q.    Dr. Rothman writes in the first
2 sentence:
3        "Cohort studies do not suffer from
4 recall bias, but recall bias is an issue for
5 case-control studies that obtain exposure
6 information from subject interviews."
7        Do you agree with that statement?
8    A.    No, and neither does he because we
9 specifically talked about the fact that cohort
10 studies can indeed have recall bias in our report.
11    Q.    Did he agree with that statement
12 when he wrote it back in 2000?
13    A.    I have no idea what -- what -- I
14 think -- I have no idea what he -- I only know
15 what he agreed to with respect to our report.
16        And I think in his 2000 report, he
17 was making a general conclusion about cohort
18 studies being designed specifically to look at the
19 exposure and unexposed, and actually recruiting
20 participants as -- as being unexposed or not
21 exposed and then following them forward in time.
22        So, ideally, you're right. He's
23 right. They would not suffer from recall bias if
24 you are able to identify them prior to the outcome

Page 129

1 of interest and to be able to capture all of the
2 exposure that occurred over a period of time.
3    Q.    Please look at the third line of
4 that same paragraph. Dr. Rothman writes:
5        "Recall bias can readily introduce
6 enough bias to produce the modestly-sized overall
7 effect (relative risk equals 1.3) that emerges
8 from these studies."
9        Do you agree with that statement?
10    A.    I think it's not a yes or no. I
11 think in some situations if there is the -- if the
12 recall bias is applicable to the exposure being
13 assessed, and I believe there are many studies
14 that and many comments even during the conference
15 in 2000 -- I mean, in 1994 where Dr. Hartge
16 specifically said those who were exposed to an
17 event in their lifetime that was daily over
18 decades are unlikely to have an issue related to
19 recall bias.
20    Q.    Please turn over to page 5 of that
21 document.
22    A.    Yes.
23    Q.    The section on "Confounding."
24    A.    Yes.

33 (Pages 126 - 129)

Page 130

1    Q.    Tell me when you're there.
2    A.    Uh-huh.  I'm there.
3    Q.    Look at the very end of that
4    section.  Dr. Rothman writes:
5          "Of course, it remains possible that
6    yet unidentified risk factors for ovarian cancer
7    could be important confounders, and several such
8    factors in the aggregate could give rise to an
9    overall association as weak as the one between
10    talc and ovarian cancer."
11          Do you agree with that statement?
12    A.    I think it's conceivable but not
13    likely in this situation because any unmeasured
14    confounder would have to have preceded the use of
15    talc, and women have been -- the women who are
16    greatest risk, in my view, with respect to talc
17    have been using it for decades, even as early as
18    their -- during -- during childhood.
19          So to think of an unmeasured
20    confounder that would have preceded that are -- I
21    don't know what it could possibly be.
22          And when people talk about obesity
23    or hormone replacement therapy, or any of the
24    other things, they would serve -- and if you were

Page 131

1    to adjust for them, they would serve as mediators
2    and would attenuate the relative risk.
3    Q.    Please turn to the next section on
4    "Dose-response trends."
5    A.    Yes.
6          MR. TISI:  When you get to a
7       stopping point, we've been going for a
8       while.
9    BY MR. HEGARTY:
10    Q.    Dr. Rothman writes in the first
11    sentence:
12          "A nearly constant feature of causal
13    relations in epidemiology and in the pathogenesis
14    cancer in particular is a monotonically increasing
15    relation between measures of exposure and disease
16    risk."
17          Do you agree with that statement?
18    A.    I would say in most situations
19    that's what we are looking for.
20    Q.    Please turn to the next page,
21    page 6.
22          At the very top, Dr. Rothman writes:
23          "Thus, the observed pattern, whether
24    based on individual studies or from the combined

Page 132

1    meta-analyses -- meta-regression analysis, is not
2    consistent with a causal interpretation for talc
3    exposure.  Instead it suggests that some as yet
4    unidentified bias accounts for overall modest --
5    the overall modest relation between talc exposure
6    and ovarian cancer risk."
7          First of all, did I read that
8    correctly?
9    A.    You did.
10    Q.    Do you agree with those statements
11    based on the data that Dr. Rothman reports in this
12    part of this report?
13          MR. TISI:  Again -- again, you
14       know, in fairness to the witness, you
15       have picked out sentences and skipped
16       sentences.  If you're going to ask him
17       about -- about things, let him read --
18       let him read the paragraph and he can
19       answer your question.
20    BY MR. HEGARTY:
21    Q.    You can answer.
22          MR. TISI:  No.  He can answer
23       when he's had -- when he feels
24       comfortable reading it.

Page 133

1          Do not feel compelled to
2       answer questions about picked-apart
3       sentences.
4          THE WITNESS:  Yeah.  I'm ready
5       to answer.
6          I do not know what estimates
7       he used for calculating these -- these
8       curves.
9          The other thing that I don't
10       know is how dose was assessed in his
11       making of these curves.
12          So I can't really comment on
13       that.
14    BY MR. HEGARTY:
15    Q.    Please turn next over to the section
16    of "Biologic Mechanism."
17          MR. TISI:  Wait.  Since we're
18       going to a new one, let's take a break.
19          MR. HEGARTY:  Okay.  Off the
20       record.
21          (Recess:  11:31 a.m. -
22       11:32 a.m.)
23    BY MR. HEGARTY:
24    Q.    I'll finish with this document.

34 (Pages 130 - 133)

Page 134

1  Please turn to the "Biologic Mechanism" section.
2      A.    Yes.
3      Q.    Please look towards the bottom of
4  that paragraph.
5          First of all, are you familiar with
6  this section?
7      A.    Yes, I am.
8      Q.    Dr. Rothman writes towards the
9  bottom of that section:
10          "Without a clear biologic mechanism
11  for talc to cause ovarian cancer, an inference
12  that talc does cause ovarian cancer would be an
13  example of a 'black-box' inference, meaning that
14  the inference lacks a biologic foundation."
15          Do you agree with that statement?
16      A.    No, I don't, and, in fact,
17  Dr. Rothman cited our 1999 article.  And if you go
18  to read our 1999 article, there was a discussion
19  of the biological plausibility and the fact that
20  there was much evidence to suggest that.
21          So I do not know why he made that
22  conclusion.
23      Q.    You don't say anywhere in your
24  report that there is a clear biologic mechanism

Page 135

1  for talc to cause ovarian cancer, correct?
2          MR. TISI:  Objection.
3          THE WITNESS:  Well, I don't
4      believe that's true.
5          I believe we actually at the
6      under report -- and I'll tell you where
7      it is.  Under -- there is lack of -- on
8      page 19, there's a section on this.
9          There's a lack of evidence
10      regarding the biologic plausibility of
11      talc.  That's the interpretation that
12      others have made, and we specifically
13      talk about a number of -- of ways in
14      which there is a biological plausibility.
15          It's a short section, but it
16      certainly does not agree with what
17      Dr. Rothman has indicated in his earlier
18      report.
19  BY MR. HEGARTY:
20      Q.    Staying with that section in your
21  report, at the very end of page 19 before the
22  "Summary," you state:
23          "Although the exact pathogenic
24  mechanism by which talc may incur carcinogenesis

Page 136

1  is unknown, plausible mechanisms may involve
2  inflammation."
3          Did I read that correctly?
4      A.    You did.
5      Q.    You are not citing in your report
6  that there is -- let me start over again.
7          You're not claiming in your report
8  that there is a clear biologic mechanism by which
9  talc causes ovarian cancer, correct?
10          MS. PARFITT:  Objection.
11          MR. TISI:  Objection.
12      Misstates the standard.
13          THE WITNESS:  No, I don't
14      believe I'm making -- I don't believe
15      that is inferred from this statement.
16  BY MR. HEGARTY:
17      Q.    To make it clear because I'm not
18  sure I understand your answer.
19          You're not saying in your report
20  anywhere that there is a clear biologic mechanism
21  by which talc causes ovarian cancer, correct?
22      A.    That --
23          MR. TISI:  Objection.
24          MS. PARFITT:  Objection.

Page 137

1          THE WITNESS:  I am stating
2      that there are many possible mechanisms
3      that could be in play, but we do not know
4      what that exact biological mechanism is.
5  BY MR. HEGARTY:
6      Q.    Is it your opinion that there is a
7  clear biologic mechanism by which talc causes
8  ovarian cancer?
9          MR. TISI:  Objection.
10          THE WITNESS:  I believe there
11      is.
12  BY MR. HEGARTY:
13      Q.    What is that clear biologic
14  mechanism and where is that referenced in your
15  report?
16      A.    I -- well, you're asking me if I
17  believe there is a clear biological mechanism, and
18  the biological mechanism is summarized by evidence
19  to show transvaginal migration of top particulates
20  by the potential for talc particulates to embed in
21  inclusion cysts that has been shown to be able to
22  induce inflammation.
23          Those are all plausible biological
24  processes that could explain the carcinogenic or

35 (Pages 134 - 137)

Page 138

1 underlie the carcinogenic process.
2    Q.    Are you equating plausibility of
3 these mechanisms with clear biologic mechanisms?
4           MS. PARFITT: Objection.
5           THE WITNESS: No. My -- my
6    job as an epidemiologist is to be able to
7    show biological plausibility, and I
8    believe that has been effectively shown.
9 BY MR. HEGARTY:
10    Q.    Well, have you shown in your report
11 a clear biologic mechanism for talc to cause
12 ovarian cancer?
13           MR. TISI: Objection. This is
14    now about the fifth time you've asked the
15    question.
16           THE WITNESS: Yeah.
17           MR. TISI: He's talked about
18    plausibility.
19         Go ahead.
20           THE WITNESS: Well, I've -- I
21    don't believe we -- for even cigarette
22    smoking and lung cancer that we can't
23    specifically say what that clear
24    pathological mechanism might be, or what

Page 139

1    the chemical component in the cigarettes
2    are that are specifically inducing the
3    cancer.
4         We know, but I believe it's
5    indisputable that people believe that
6    cigarettes cause -- cause lung cancer.
7 BY MR. HEGARTY:
8    Q.    Can you then translate that to talc
9 and ovarian cancer?
10    A.    Yes. I don't believe we know what
11 the actual clear pathogenic mechanism is, but
12 there are multiple possibilities that would make
13 it a biologically plausible explanation for the
14 association that we see.
15           MR. HEGARTY: We can take that
16    break. Go off the record.
17           MR. TISI: Thank you so much.
18         (Recess: 11:37 a.m. -
19    11:48 a.m.)
20           MR. HEGARTY: We're back on
21    the record.
22 BY MR. HEGARTY:
23    Q.    Doctor, looking at page 6 of your
24 report, it also has your conclusion that:

Page 140

1         "Causation is the most reasonable
2 explanation for the association between perineal
3 exposure to talc and ovarian cancer."
4         As to that opinion, does it apply to
5 all subtypes of ovarian cancer?
6    A.    We evaluated it based on the
7 totality of epithelial ovarian cancer.
8    Q.    Well, does it -- does that statement
9 apply to mucinous ovarian cancer in talcum powder
10 exposure?
11    A.    It was not an analysis specific to
12 histologic subtypes. It was based on all
13 epithelial ovarian tumors.
14    Q.    Understood.
15         But sitting here today, is it your
16 opinion that talcum powder use in the genital area
17 causes mucinous adenocarcinoma?
18    A.    I can't respond to that because
19 there are -- the studies that are in the
20 literature were not designed to specifically
21 target, for example, a case-control study of
22 mucinous ovarian cancer.
23         They did a case-control study of
24 epithelial ovarian cancer, and then based on

Page 141

1 however many cases they had of the various
2 subtypes, they looked at those, but those studies
3 were not designed specifically to look at the
4 specific risk factors for that particular
5 histologic subtype.
6         And I think the approach that's been
7 used throughout the literature is to keep
8 epithelial ovarian tumors lumped together.
9    Q.    Understanding that, but is it your
10 opinion that talcum powder use in the genital area
11 causes clear cell adenocarcinoma?
12           MS. PARFITT: Objection.
13           THE WITNESS: I believe I
14    answered that.
15         I believe my statement refers
16    to all -- to epithelial ovarian cancer as
17    a whole, knowing that 90 percent of
18    epithelial ovarian cancers are serous.
19 BY MR. HEGARTY:
20    Q.    Is it your opinion that talcum
21 powder use in the genital area causes clear cell
22 adenocarcinoma?
23    A.    This was -- again, my same response
24 is 90 percent of epithelial ovarian tumors are

36 (Pages 138 - 141)

Page 142

1 serous, and all the other histologic subtypes are
2 much smaller in terms of numbers that are found in
3 the studies and, therefore, I cannot make that
4 kind of conclusion.
5    Q.    Is it your opinion that genital talc
6 use in the -- start over again.
7        Is it your opinion that talc use in
8 the genital area causes serous adenocarcinoma?
9    A.    Given that serous talc makes up
10 about 90 percent of the incidents, I would say
11 yes.
12    Q.    In your report in the Executive
13 Summary, second paragraph about four lines down,
14 when you're referring to talc and ovarian cancer
15 you say:
16        "An association that is stronger and
17 more consistent for the subtype" --
18    A.    I'm sorry. I didn't mean to
19 interrupt. Show me where exactly in the Executive
20 Summary.
21        MR. TISI: Do you mind me
22    showing him?
23        THE WITNESS: "An association
24    that is stronger."

Page 143

1        I have it. Thanks. Go ahead.
2 BY MR. HEGARTY:
3    Q.    Let me go back to my question.
4        In your report, you state in the
5 second paragraph as it relates to frequent talc
6 use and ovarian cancer:
7        "An association that is stronger and
8 more consistent for the subtype of serous ovarian
9 cancer."
10        First of all, did I read that
11 correctly?
12    A.    Well, you only read part of the
13 sentence.
14        "The principal finding from the
15 literature is a consistent association between
16 frequent talc use and ovarian cancer."
17        That's the first part, and then it
18 says:
19        "An association that is stronger and
20 more consistent for the subtype of serous ovarian
21 cancer."
22    Q.    Did you do an analysis as it relates
23 to the strength and consistency of the other
24 subtypes, clear cell, endometrioid, and mucinous,

Page 144

1 and serous ovarian cancer?
2    A.    No, because the studies, as I
3 indicated before, were not designed to be able to
4 look at those subtypes. And the reason we could
5 look at it with serous is because they make up the
6 majority of the cases.
7    Q.    Without doing that analysis, how can
8 you say in your report that the association is
9 stronger and more consistent for the subtype of
10 serous ovarian cancer?
11        In other words, wouldn't you have to
12 do an analysis between serous and the other
13 subtypes to make that statement?
14    A.    Well, others have looked at
15 specifically the serous tumors and found the
16 association to be more strongly when it's
17 restricted to that particular ones, and it doesn't
18 necessarily suggest that the others -- that there
19 isn't an association with the others.
20        I believe it suggests that that
21 particular histologic subtype seems to show an
22 association consistently.
23    Q.    But to be clear, you did not do a
24 separate analysis of comparing the risk ratios or

Page 145

1 odds ratios between clear cell, endometrioid, and
2 mucinous to serous?
3    A.    Not in my evaluation. Not in this
4 particular report. Though, in my earlier
5 publications, I have stratified it out.
6    Q.    Does your overall opinion as it
7 relates to epithelial ovarian cancer and talc use
8 apply to borderline tumors?
9    A.    I think my -- as I recall, my study
10 in 1999 may have been the few studies to look at
11 borderline ovarian tumors and given that -- yeah.
12        So I don't believe that there is --
13 besides my article, there haven't been a lot of
14 any other studies I'm aware of that are
15 specifically focusing on borderline ovarian
16 tumors.
17    Q.    Understood, but going back to my
18 question.
19        Does your opinion as it relates to
20 epithelial ovarian cancer and talc use apply to
21 borderline tumors?
22    A.    Yes, I believe it does.
23    Q.    And did you do any particular
24 analysis in your report as it relates to

37 (Pages 142 - 145)

Page 146

1 borderline tumors and talcum powder exposure?
2     A.    I don't believe we specifically
3 stated that in the report.
4     Q.    Is it your opinion that healthy
5 women who have used talc in the genital area
6 should have their tubes and ovaries removed?
7     A.    I don't believe I --
8         MR. TISI:  Objection.
9         THE WITNESS:  That's not --
10     that's a clinical decision.  I'm not a
11     clinician.
12 BY MR. HEGARTY:
13     Q.    Is it your opinion that talc used in
14 the genital area causes vaginal cancer?
15     A.    I didn't review that literature.
16     Q.    Same question as to cervical cancer.
17     A.    I did not review that literature.
18     Q.    So you don't have an opinion?
19     A.    I don't have an opinion on that.
20     Q.    Do you have an opinion one way or
21 the other as to talcum powder causes endometrial
22 cancer?
23     A.    I don't have an opinion on that.
24     Q.    Do you have an opinion as to whether

Page 147

1 talcum powder use causes uterine cancer?
2     A.    I didn't do a review of the uterine
3 cancer literature.
4     Q.    You have been an author on other
5 studies reporting positive findings on certain
6 exposures and ovarian cancer.
7         Is it your opinion that these --
8 from these studies that psychotropic medications
9 that include antidepressants cause ovarian cancer?
10     A.    I didn't review the literature on
11 psychotropic medication and its association with
12 ovarian cancer.  I -- we found a particular
13 association in our own research, but in order for
14 me to have a view on that, I would need to see
15 what others have done and whether they were able
16 to replicate my findings or dispute my findings.
17     Q.    Would your answer be the same if I
18 ask you about your studies on coffee and caffeine
19 and dairy products?
20     A.    Yes, my -- my answer would be the
21 same.
22         And if I -- if I may?
23         Ovarian -- there are so few
24 modifiable factors that we know about ovarian

Page 148

1 cancer that the approach, as an epidemiologist and
2 those who are scientists in that area, are to come
3 up with hypotheses and to test them and to see if
4 they might help us identify other factors that we
5 can intervene on, and that's why some of those
6 papers that you're citing were done to be able to
7 try to open up new avenues of potential
8 etiological predictors.  Because that's what we
9 really need to do to create interventions for this
10 problem.
11     Q.    Regarding your causation opinions on
12 talc use and epithelial ovarian cancers, do you
13 have an opinion as to the level of increased risk
14 the talcum powder use causes?
15         MR. TISI:  Objection.
16     Incomplete.
17         THE WITNESS:  Well, I've
18     stated multiple times that I believe the
19     risk -- and I believe I said this in my
20     view article in 1994 -- that the risk
21     falls somewhere between 1.0 and 1.8 and
22     that it's quite likely that it falls in
23     the middle.
24 BY MR. HEGARTY:

Page 149

1     Q.    Is that still your opinion today?
2     A.    Yes.
3     Q.    You --
4     A.    Overall.  Overall.
5     Q.    You agree that not everyone then who
6 has used talcum powder on the genital area will
7 get ovarian cancer?
8     A.    Absolutely, just like I believe that
9 everybody -- not everybody who smokes cigarettes
10 will get lung cancer.
11     Q.    All women are at some level of risk
12 of developing ovarian cancer in their life
13 sometime, correct?
14         MS. PARFITT:  Objection.
15     Form.
16         THE WITNESS:  All women who
17     have ovaries.
18 BY MR. HEGARTY:
19     Q.    Women who have been talcum powder
20 users in the genital area can get ovarian cancer
21 unrelated to their talcum powder use, correct?
22     A.    Yes, I believe that to be the case.
23     Q.    With regard to the phrase you used
24 in your report "talcum powder applied to the

38 (Pages 146 - 149)

Page 150

1 genital area of women," is it your opinion that
2 there is causation for a woman who has had a
3 single application of talc to the genital area?
4    A.    I think the causation that I've
5 indicated is predicated on exposure for a long
6 period of time over decades.
7    Q.    Hopefully, that was where I was
8 going to start with that question.
9        What is the necessary exposure level
10 of talcum powder use in the genital area to get to
11 your causation opinion?
12        MR. TISI:  Objection.
13    Objection --
14        THE WITNESS:  I don't --
15        MR. TISI:  -- to form.
16        THE WITNESS:  I don't believe
17    there is a known dose that needs to be
18    present for there to be a risk, and I
19    would expect that other factors that are
20    present that might promote ovarian cancer
21    might work with the exposure of talc.  We
22    just -- we just don't know.
23 BY MR. HEGARTY:
24    Q.    Do you have an opinion, sitting here

Page 151

1 today, as to the necessary frequency and duration
2 of talcum powder use for it to be causal with
3 regard to ovarian cancer?
4        MR. TISI:  Objection to form.
5        THE WITNESS:  No, I don't.
6    It's quite possible that somebody who
7    smokes one or two cigarettes a day can be
8    at risk of lung cancer, just as somebody
9    who applies talc only once a week could
10    be at increased risk, but the greatest
11    risk, as in cigarette smoking and lung
12    cancer, is with the greatest amount of
13    exposure during vulnerable periods of
14    time.
15 BY MR. HEGARTY:
16    Q.    Understanding you may not have an
17 opinion.
18        My question is:  Do you have an
19 opinion, sitting here today, as to whether there
20 is a minimum level of duration and frequency that
21 is necessary for talcum powder use to be causal?
22        MR. TISI:  Objection.  He just
23    answered that question.
24        You may answer it again if you

Page 152

1    wish.
2        THE WITNESS:  I do not have
3    an opinion that there is a particular
4    amount of exposure that is necessary to
5    put a woman at greater risk of ovarian
6    cancer, but that the risk increases with
7    greater amount of exposure.
8 BY MR. HEGARTY:
9    Q.    You mentioned earlier that the use
10 has to be decades.
11        Do you remember telling me that?
12        MR. TISI:  Objection.
13        THE WITNESS:  In my -- my
14    view, that -- that decades of use would
15    -- are certainly those that are at the
16    highest risk, in my opinion.
17 BY MR. HEGARTY:
18    Q.    When you say "decades of use," how
19 many decades?
20    A.    I don't have a particular number,
21 but -- I don't have a particular number, but
22 decades implies regular use for a long period of
23 time directly applied to the perineal area.
24    Q.    In fact, in your report, you do talk

Page 153

1 about in relation to your opinions that the use
2 must be frequent, correct, to be causal?
3    A.    And where do I state that, please?
4    Q.    Well, you state that -- well, I can
5 ask in a different way.
6        Look over to page 20.
7    A.    Yes.
8    Q.    The second full paragraph that
9 begins:
10        "It appears to us that the most
11 plausible interpretation of the existing data is
12 that women exposed to talc for a long period of
13 time are at greater risk of developing ovarian
14 cancer than women who were never exposed, as a
15 result of their talc exposure."
16        How do you define for purpose of
17 your report a long period of time?
18    A.    You're asking me to make a
19 dichotomous answer that 20 years is.  If somebody
20 -- it's just like -- it's just like a p-value.
21 Just because it's more than 20 -- somebody -- if
22 you use 20 years as a cut point, then one would
23 infer that, okay, it's okay to use it for 19
24 years, and that's just not the case.

39 (Pages 150 - 153)

Page 154

1    The frequency is more of a linear
2 kind of an assessment, in my view.  There isn't a
3 cut point by which you can then define somebody as
4 saying, It's okay to use it for this number of
5 years, but not that number of years.  That
6 information is just not known.
7    Q.    My question is a little bit
8 different than that.
9        When you wrote the phrase "A long
10 period of time," what were you meaning by that
11 phrase?
12    A.    The counterfactual to that that would
13 be a short period of time.  So not a short period
14 of time but a long period of time.
15    Q.    So when you wrote the phrase "A long
16 period of time," you did not have a particular
17 frequency or duration in mind; is that fair?
18    A.    That -- I think that's fair, and in
19 the publications that I've authored, we actually
20 use applications as the exposure as opposed to 20
21 years.  Because somebody could have used talc for
22 20 years but only applied it once a week or only
23 on diaphragms and, therefore, using that kind of
24 frequent -- frequency in terms of years is not --

Page 155

1 is not accurate.
2    Q.    And going back to the Executive
3 Summary section on page 6.
4    A.    Yes.
5    Q.    Going back to that phrase we were
6 talking about with regard to serous ovarian
7 cancer.
8    A.    Uh-huh.
9    Q.    You use a phrase "is a consistent
10 association between frequent talc use and ovarian
11 cancer."
12        What were you meaning when you said
13 "frequent" in that sentence?
14    A.    Applications.
15    Q.    Did you have a particular number in
16 mind either by week or by month or by total?
17    A.    Well, the only number that I can
18 look at is that which was cited in our papers, and
19 I believe that was more than 10,000 applications
20 is where we saw the greatest risk.  I believe that
21 to be the case.
22    Q.    Do you agree that the cause of most
23 ovarian cancers is unknown?
24        MR. TISI:  Objection.

Page 156

1        THE WITNESS:   Do I believe
2    the cause of most ovarian cancers is
3    unknown.
4        I would say it is more likely
5    that the cause of ovarian cancer -- that
6    there are causes of ovarian cancers that
7    are unknown than that are known.
8 BY MR. HEGARTY:
9    Q.    With regard to risks for ovarian
10 cancer generally, do gene mutation such as BRCA1
11 or BRCA2 cause ovarian cancer?
12    A.    Yes.
13    Q.    Do the Lynch syndrome genes cause
14 ovarian cancer?
15    A.    I believe so.
16    Q.    Does endometriosis cause
17 endometrioid ovarian cancer?
18    A.    I'm not sure of that literature.
19    Q.    Does endometriosis cause clear cell
20 adenocarcinoma?
21    A.    I'm not -- I'm not familiar with
22 that literature.
23    Q.    Does HRT use -- hormone replacement
24 therapy use cause ovarian cancer?

Page 157

1    A.    Again, I didn't review the extent of
2 that literature for the purpose of this meeting.
3    Q.    Does obesity cause ovarian cancer?
4    A.    I have not reviewed that literature
5 either.
6    Q.    Does polycystic ovarian syndrome
7 cause ovarian cancer?
8    A.    I have not reviewed those -- those
9 items either.
10    Q.    My questions all included the word
11 "cause."
12        Do you know whether any of those
13 subject areas, any of those exposures are risk
14 factors for ovarian cancer?  Can you say that?
15    A.    Yes, I think that there is evidence.
16 Certainly there have been studies that have shown
17 that obesity seems to be associated with ovarian
18 cancer in some studies.
19        I don't remember all the other ones
20 that you mentioned.
21    Q.    Let me go back over them then.
22        Is endometriosis a risk factor for
23 endometrioid ovarian adenocarcinoma?
24    A.    Yeah.  I'm not familiar with that

40 (Pages 154 - 157)

Page 158

1 literature.
2    Q.    Is hormone replacement therapy use a
3 risk factor for ovarian cancer?
4    A.    I believe hormone replacement
5 therapy has been shown to be associated with most
6 of the estrogen-related cancers.
7    Q.    Is polycystic ovarian syndrome a
8 risk factor for ovarian cancer?
9    A.    I'm not familiar with that
10 literature.
11    Q.    Is incessant ovulation a risk factor
12 for ovarian cancer?
13    A.    It's a hypothesis that Dr. Cramer
14 has put forward as a potential mechanism by which
15 ovarian cancer might occur.
16    Q.    Is douching a risk factor for
17 ovarian cancer, in your opinion?
18    A.    I'm not familiar with the extent of
19 that literature.
20    Q.    Is smoking a risk factor for ovarian
21 cancer, in your opinion?
22    A.    Again, I'm not -- I'm not up to date
23 on that literature.
24    Q.    Is Ashkenazi Jewish heritage a risk

Page 159

1 factor for ovarian cancer?
2    A.    I believe it is.
3    Q.    Does a family history of ovarian
4 cancer increase the risk of ovarian cancer?
5    A.    Yes, it does.
6    Q.    Does a family history of breast
7 cancer increase the risk of ovarian cancer?
8    A.    Yes, it does.
9    Q.    Does a woman's risk of ovarian
10 cancer go up with age?
11    A.    Yes, as do most cancers.
12    Q.    Are you aware of any established
13 medical -- let me start over again.
14        Are you aware of any established
15 reliable methodology for determining whether a
16 specific patient's use of talc in the genital area
17 caused her ovarian cancer?
18        MR. TISI:  Objection.
19        THE WITNESS:  I don't believe
20    there is any documented checklist, if you
21    may -- if I may.
22        It's more of a qualitative
23    assessment of looking at competing risk
24    factors associated -- competing risk

Page 160

1    factors that are present in a particular
2    person and making a qualitative opinion
3    as to whether it is more likely than not
4    that the ovarian cancer could have been
5    attributed to one factor versus another.
6 BY MR. HEGARTY:
7    Q.    Do you know of any publication where
8 that methodology has been set out?
9        MR. TISI:  Objection.  He's
10    not case-specific person.
11        THE WITNESS:  I don't believe
12    I'm aware of that.
13 BY MR. HEGARTY:
14    Q.    Do you agree that case-control
15 studies are more subject to recall bias than
16 cohort studies?
17        MR. TISI:  Objection.
18        THE WITNESS:  I think
19    correctly done case-control studies and
20    correctly done cohort studies are -- let
21    me rephrase that answer.
22        I think it depends on the
23    particular exposure that's being
24    measured.  I think that both case-control

Page 161

1    studies and cohort studies can be subject
2    -- can be subject to a certain amount of
3    recall bias.
4        So it really depends on what
5    the exposure is that you're looking at
6    and how the study was designed.
7 BY MR. HEGARTY:
8    Q.    With regard to your discussion about
9 recall bias, did you discuss the Schildkraut
10 paper's analysis of recall bias in its study?
11    A.    In my report?
12    Q.    In your report, Doctor.
13    A.    (Reviews document.)
14        In my report, I do not refer to
15 Schildkraut.
16        MR. HEGARTY:  Let me show you
17    Schildkraut 2016 I marked as Exhibit
18    Number 10.
19        (Document marked for
20    identification as Harlow Exhibit 10.)
21        THE WITNESS:  Yep.
22 BY MR. HEGARTY:
23    Q.    Are you familiar with this study?
24    A.    I am.

41 (Pages 158 - 161)

Page 162

1     Q.     In fact, you do cite to it in your
2  expert report, correct?
3     A.     Yes, I do.
4     Q.     Please turn over to page 412 in this
5  document.
6     A.     Okay.  I just wanted -- I'm sorry.
7  Page 12?
8     Q.     412.
9     A.     412.
10          MR. TISI:  I'm sorry.  Did you
11    say 412?  It's 14.
12          MR. HEGARTY:  1412.  I'm
13    sorry.  1412.
14          THE WITNESS:  Hmm.  The
15    numbers -- the numbers in mine don't go
16    that way.
17          MR. TISI:  Oh, you have a
18    different.
19          THE WITNESS:  I have a
20    different copy, but that's okay.
21          MR. TISI:  I'd like you to
22    look if you have it.
23          THE WITNESS:  Well, let me.
24    I'll see.  412?

Page 163

1          MR. TISI:  1412.
2          THE WITNESS:  1412.  Okay.
3    The "Materials and Method" section.
4  BY MR. HEGARTY:
5     Q.     I'm looking at the "Statistical
6  analysis" section at the very bottom on the
7  right-hand column.
8     A.     Yep.
9     Q.     The authors at the end of the
10 right-hand column recognize that lawsuits were
11 filed in 2014 regarding the possible carcinogenic
12 effect of -- of talc and ovarian cancer, and then
13 they analyzed the data pre- and post-2014,
14 correct?
15    A.     Let me just take a read of that.  If
16 that's okay.
17          (Reviews document.)
18          Yes, I see that.
19    Q.     Please turn over to the next page
20 under the "Results" section, left-hand column
21 towards the bottom.
22    A.     Uh-huh.
23    Q.     Do you see where I'm focusing you
24 on?

Page 164

1     A.     I believe so, yes.
2     Q.     There they reported that with regard
3  to interviews pre-2014, their point estimate was
4  1.19 with a confidence interval of .87 to 1.63;
5  and their point estimate for post-2014 interviews
6  was 2.91 with a confidence interval of 1.7 to
7  4.97.
8          Correct?
9     A.     Yeah.  I'm just looking to see if
10 it's in the tables.
11    Q.     It is over in the table over on
12 Table 4 -- Table 2 on page 1414.
13    A.     Yeah.  Oh, there it is.  Interview
14 date created on '14.  Okay.
15    Q.     Are you with me?
16    A.     I will be in a second.
17          MR. TISI:  Take your time and
18    look at it.
19          THE WITNESS:  Confidence
20    interval greater than '14, less than '14.
21    Yes, I now see that.  Okay.
22 BY MR. HEGARTY:
23    Q.     The authors found an effect for
24 modification by year that was statistically

Page 165

1  significant, correct?
2     A.     They found a -- they found an
3  association of -- of 2.91 for any genital use in
4  those whose interview date was greater than 2014.
5     Q.     I understand, but they also did a
6  statistical analysis between the 1.19 --
7     A.     Oh, right.
8     Q.     -- and the 2.91 and found that --
9     A.     Yes.
10    Q.     -- found the effect by modification
11 by year of interview was statistically
12 significant, correct?
13          And if you want to look, it's in the
14 "Results" section.
15    A.     No, no, no.  I understand.
16          Yes, they reported that.  They
17 reported that.  That is correct.
18    Q.     That analysis indicates that recall
19 bias had an effect based on year of interview,
20 correct?
21    A.     No, it doesn't.
22    Q.     How does it not show that?
23    A.     It doesn't because we don't know
24 whether women were recalling after 2014 because of

42 (Pages 162 - 165)

Page 166

1 litigation, and we also don't know anything about
2 the dose that those were using in before 2014 or
3 after 2014.
4      Q.    You would not conclude that that
5 analysis that I just went through is any evidence
6 at all of recall bias; is that correct?
7           MR. TISI:  Objection.
8           THE WITNESS:  I think it
9      could be explained by a lot of things.
10     And I'm not suggesting that recall bias
11     doesn't play a role, but I'm certainly
12     not -- I'm not considering that recall
13     bias is the explanation for it.
14 BY MR. HEGARTY:
15     Q.    You also cite in your report to the
16 Davis study; is that correct?
17     A.    I do.
18           MR. TISI:  I'm sorry.  What
19     was this marked?  I apologize.
20           MR. HEGARTY:  10.
21           I'm going to mark as Exhibit
22     Number 11 the 2021 Davis study.
23           (Document marked for
24     identification as Harlow Exhibit 11.)

Page 167

1           THE WITNESS:  Uh-huh.  Thank
2      you.
3 BY MR. HEGARTY:
4      Q.    Do you have that in front of you,
5 Doctor?
6      A.    I do.
7           MS. PARFITT:  Mark, I don't
8      know if you have it up there.  I have a
9      clarification.  Do you have a public
10     access one published online for Davis?
11          MR. HEGARTY:  Well, it's the
12     one that I marked as an exhibit.
13          MS. PARFITT:  I can't see.
14          MR. HEGARTY:  It's published
15     first June 21, 2021.
16          MS. PARFITT:  I didn't see
17     that.  Thank you.
18 BY MR. HEGARTY:
19     Q.    Please turn over to page 1665.
20     A.    Uh-huh.
21     Q.    The text begins on that page:
22          "In AACES, women who ever used
23 genital powder had a 44% higher risk of ovarian
24 cancer (odds ratio 1.44; 95% confidence interval

Page 168

1 1.11 to 1.86) compared with those who did not
2 report any powder use.  When the time period was
3 limited to women who were interviewed prior to
4 2014, (i.e., before ongoing lawsuits about genital
5 powder use which had extensive media coverage),
6 the results were attenuated and no longer
7 significant (odds ratios equals 1.19; 95%
8 confidence interval .87 to 1.63).  In contrast, a
9 significant positive association was observed
10 among those interviewed after 2014 (odds ratio of
11 2.91; 95% confidence interval 1.70 to 4.91;
12 reference 11).  These results highlight the
13 potential for recall bias in case-control studies,
14 especially those conducted after 2013."
15     Q.    Do you dispute any of the statements
16 that I just read to you?
17     A.    I don't dispute any of the
18 statements, but I want -- I would like to be
19 recognized as saying that recall bias is -- in
20 this situation is based on any use and, therefore,
21 those women who perhaps were using it infrequently
22 might have been more influenced by the knowledge
23 about litigation than -- than or not.
24          I mean, I don't -- I don't believe

Page 169

1 -- let me just say this.
2           The recall bias does not take into
3 account those who used it consistently for a long
4 period of time.  I don't know in this analysis to
5 what extent those before 2014 versus those after
6 2014 had varying levels of exposure.
7           And so you're making -- there's an
8 assumption being made that the reason for the
9 recall bias is because of the knowledge of
10 litigation, and there's no evidence here to show
11 that that is, in fact, the truth.
12          These women were not asked whether
13 or not they knew about the litigation in these --
14 in these studies.
15     Q.    The authors in the paper we're
16 looking at, the Davis paper, did indicate that
17 that could be a possible driver of the difference
18 between the two relative risks; is that correct?
19     A.    That is -- well, I don't see it
20 specifically where they stated it, but I'm not --
21 yes to -- yes, with the restriction of cases in
22 control.
23     Q.    Are you aware of any other
24 case-control or cohort study involving talc or

43 (Pages 166 - 169)

Page 170

1  ovarian cancer that stratified results as
2  Schildkraut did by date of interview or otherwise
3  to try to assess recall bias?
4      A.    Yes.  There was a recent article by
5  Goodman, I believe, that looked at -- at a
6  quantitative bias analysis to see whether or not
7  recall bias could influence -- could be explaining
8  the association that was observed --
9      Q.    My question was not a review
10 article.
11     A.    -- in this study.
12     Q.    My question was:  Are you aware of
13 any case-control or cohort studies that where the
14 authors themselves tried to stratify the results
15 by interview date or otherwise to assess the
16 potential for recall bias as Schildkraut did?
17     A.    Off the top of my head, I can't
18 remember if there were.
19     Q.    Let's look at your review paper that
20 you did with Dr. Hartge.
21           Is that how you say her name?
22     A.    Hartge.
23     Q.    Hartge?
24     A.    Yes.

Page 171

1           MR. HEGARTY:  I'm going to
2      mark this review paper, which is from
3      1995, as Exhibit 12.
4           (Document marked for
5      identification as Harlow Exhibit 12.)
6           THE WITNESS:  Yes.
7  BY MR. HEGARTY:
8      Q.    Is Exhibit 12 your review paper with
9  Dr. Hartge?
10     A.    It is.
11     Q.    Do you have that paper in front of
12 you?
13     A.    I do.
14     Q.    Please turn over to page 256.
15     A.    Yep.
16     Q.    In the section "Limitations and
17 Biases in Results From Epidemiological Study."
18           Do you see that section?
19     A.    I do.
20     Q.    In that section, you make note that
21 the current data on talc use and ovarian cancer is
22 all from case-control studies.
23           You say that "their limitations stem
24 from three primary sources."  The third being

Page 172

1  "errors in the data collected, principally because
2  of errors in recollection or reporting of talc
3  exposure."
4           That's what you wrote, correct?
5      A.    That's correct.
6      Q.    Turning over to pages 257 and 258,
7  starting at the bottom under the section
8  "Recollection of Talc Exposures."
9      A.    Yes.
10     Q.    Are you with me?
11     A.    Yes.
12     Q.    You wrote there:
13           "If exposures to talc were recalled
14 differently by cases and controls, relative risk
15 estimates would be distorted."
16           That's a true statement, correct?
17     A.    That is what I said.
18     Q.    That's also true?
19     A.    No, it's not necessarily because
20 there have been new studies since here that have
21 evaluated whether or not there is substantial
22 differential or differential misclassification
23 by -- in case-control studies showing that it had
24 very little effect.

Page 173

1           One was done by -- I believe I cited
2  them in my report.  One was done by Sandra
3  Greenland, and another was done by another person,
4  and I believe it was around fetal -- fetal death
5  syndrome.
6      Q.    But with regard to the statement
7  we're looking at --
8      A.    Yes.
9      Q.    -- in a general sense, "if exposures
10 to talc were recalled differently by cases and
11 controls, relative risk estimates would be
12 distorted."
13           That is a correct statement?
14     A.    I guess it would be.  I guess it
15 would be a correct statement.
16           I guess the extent to which it's
17 distorted -- and, again, this was a correct
18 statement written in 1994.  There has been a lot
19 of work that has been done to refine the extent to
20 which differential misclassification impacts risk
21 estimates.
22     Q.    But that statement just standing by
23 itself is a correct statement?
24     A.    It's what was written in this

44 (Pages 170 - 173)

Page 174

1 article at -- in 1994.
2    Q.    It was correct at that time?
3    A.    At that time, it was what we knew.
4    Q.    Please turn to the next page.  You
5 wrote:
6         "Cases could overreport talc use if
7 they were anxious to assign a cause to their
8 cancer or underreport it if they were anxious to
9 avoid providing this information."
10        That is also a true statement,
11 correct?
12    A.    It is a statement that is written.
13 Correct.
14    Q.    Is it a true statement?
15    A.    It's possible because it says
16 "could."
17    Q.    You certainly believed that at the
18 time you wrote it?
19    A.    It's not that I believe it.  I am
20 postulating potential non-causal explanations for
21 associations.
22    Q.    You then go on to state in the next
23 paragraph that "recollection bias should not be
24 regarded as a likely explanation for the talc

Page 175

1 effect."
2    A.    Hold on a second.  The one that says
3 "In the nine studies, the questions"?  Is it that
4 paragraph?
5    Q.    No.  "In the nine studies," the very
6 end of that paragraph.
7         You wrote "recollection bias --
8    A.    Yes.
9    Q.    -- should not be regarded as a
10 likely explanation for this talc effect."
11    A.    Yes.
12    Q.    Then related to the rest of that
13 paragraph pending the results of "the Nurses
14 Health Study, a prospective cohort analysis,"
15 correct?
16         MS. PARFITT:  Objection.
17    Misstates the article.
18         THE WITNESS:  I believe it
19    says --
20         MR. HEGARTY:  Michelle, can we
21    limit it to one person objecting?
22         MS. PARFITT:  No, no.  That's
23    okay.
24         MR. HEGARTY:  I think that's

Page 176

1    what we decided on doing.
2         MS. PARFITT:  That is true.
3         THE WITNESS:  Forthcoming
4    data -- it says:
5         "Forthcoming data from the
6    Nurses Health Study, a prospective cohort
7    analysis, will relate ovarian cancer to
8    talc habits queried before diagnosis.
9    Until then, recollection bias should not
10   be regarded as a likely explanation for
11   the talc effect."
12 BY MR. HEGARTY:
13    Q.    So what I read was a statement that
14 was pending "forthcoming data from the Nurses
15 Health Study," correct?
16    A.    I think the -- I think the idea here
17 is there had never been a cohort study that had
18 evaluated it, and there was the belief that --
19 because at this -- when I wrote this, I didn't
20 know what -- how the Nurses' Health Study had
21 collected talc at that point.
22        All we knew was that they were
23 planning to do an analysis, and certainly we were
24 all excited to see what that would find because it

Page 177

1 was a cohort study.
2    Q.    Please look at the abstract on
3 page 1.
4    A.    For my?  Yes.
5    Q.    Of your 1995 publication.
6    A.    Yes.
7         1990 -- oh, right.  1995.  Yes.  Got
8 it.
9    Q.    If you look in the middle paragraph.
10   A.    Wait.  Are we talking of the
11 abstract or?
12   Q.    The abstract, yes.
13   A.    Okay.  Yes.  Uh-huh.
14   Q.    You do call that the abstract,
15 right?
16   A.    Yes, yes, yes, yes.  Sorry.
17   Q.    Okay.  I'm just trying to use the
18 term right.
19   A.    No, no, no.  No.
20   Q.    You wrote:
21        "The authors conclude that the range
22 of relative risk estimates from epidemiology, 1 to
23 1.8, is plausible, but that additional
24 epidemiologic studies, especially prospective

45 (Pages 174 - 177)

Page 178

1  investigations are needed."
2         Did I read that correctly?
3     A.    You did.
4     Q.    Do you stand behind what you said
5  back then?
6     A.    I do, with the caveat that they are
7  prospective studies that are specifically designed
8  to look at this particular exposure.
9     Q.    Back in 1995 when you wrote this,
10  you wrote that prospective investigations are
11  needed to assess this relative risk of 1.0 to 1.8,
12  correct?
13    A.    Yes.
14    Q.    You made that statement in part
15  because of concern about recall bias, correct?
16        MR. TISI:  Objection.
17        THE WITNESS:  Well, that's not
18     the -- that's not the only reason.
19        If -- if we have the
20     opportunity to look at incidence as
21     opposed to estimating to actually
22     calculate incidence and incidence rate
23     ratios as opposed to estimating the rate
24     ratio with odds ratios, we always want to

Page 179

1     be able to do that under the assumption
2     that the study is designed appropriately.
3  BY MR. HEGARTY:
4     Q.    Understand, but my question was
5  limited to that you made that statement at least
6  in part because of the concern for recall bias,
7  correct?
8        MR. TISI:  Objection.  Asked
9     and answered.
10        THE WITNESS:  Yeah.  For a
11     number of reasons, recall bias could be
12     one of many reasons, and particularly for
13     those who are more subject to recall bias
14     such as less frequent exposure.
15        MR. HEGARTY:  Let's go off the
16     record for a second.
17        (Recess:  12:30 p.m. -
18        12:31 p.m.)
19  BY MR. HEGARTY:
20    Q.    The study that you reference, that
21  being the Nurses' Health Study, was ultimately
22  published in what we call the 2000 Gertig study;
23  is that right?
24        THE WITNESS:  That's correct.

Page 180

1         MR. HEGARTY:  I'm going to
2     mark as Exhibit 13 the 2000 Gertig study.
3         (Document marked for
4      identification as Harlow Exhibit 13.)
5  BY MR. HEGARTY:
6     Q.    Are you familiar with that study?
7     A.    I am.
8     Q.    One of the authors was your -- was
9  also a plaintiffs' expert, as you are, and one of
10  your prior colleagues, Dr. Daniel Cramer, correct?
11        MR. TISI:  Objection.
12        THE WITNESS:  Well --
13        MR. TISI:  Objection.  He was
14     not an expert at this time.
15        Go ahead.
16        THE WITNESS:  Yeah, I have no
17     idea what his subject --
18        MR. TISI:  Objection to the
19     preamble.
20        THE WITNESS:  Yeah.
21        MR. TISI:  Just ask the
22     question, counsel.
23        THE WITNESS:  Yeah.  Yes,
24     Dr. Cramer is an author on this paper.

Page 181

1  BY MR. HEGARTY:
2     Q.    Looking at the abstract.
3     A.    Yes.
4     Q.    About two-thirds down, that study
5  reported or says:
6         "We observed no overall association
7  with ever use -- with ever talc use and epithelial
8  ovarian cancer (multivariate relative risk 1.09;
9  95% confidence interval 0.86 to 1.37) and no
10  increase in risk of ovarian cancer with increasing
11  frequency of use."
12         Correct?
13        MR. TISI:  Objection.
14        THE WITNESS:  That's what
15     they state.
16  BY MR. HEGARTY:
17    Q.    Okay.  Turn over to page --
18        MR. TISI:  Feel free to read
19     the entire thing.
20        THE WITNESS:  No.  I know this
21     article very well.
22        MR. TISI:  Okay.
23  BY MR. HEGARTY:
24    Q.    Please turn over to page 251.

46 (Pages 178 - 181)

Page 182

1    A.    Yes.
2    Q.    Under the section "Discussion."
3    A.    Yes.
4    Q.    First paragraph, second sentence,
5 the authors write:
6        "Because we ascertained talc
7 exposure prior to case diagnosis, the possibility
8 for recall bias, which has been raised as a
9 potential explanation for previous positive
10 findings in case-control studies, is eliminated,
11 and selection bias is reduced."
12       That was a correct statement,
13 correct?
14   A.    No, I don't necessarily believe that
15 it was completely eliminated. The Nurses' Health
16 Study was not designed specifically to look at
17 women -- they were not enrolled into the study
18 based on exposed or not exposed to talc and,
19 therefore, all women in that study were required
20 to recall their talc exposure.
21   Q.    You said you're familiar with this
22 study?
23   A.    Yes.
24   Q.    You cannot conclude just by this

Page 183

1 study that there is an association between talc
2 use and ovarian cancer, correct?
3        MR. TISI: Objection.
4        THE WITNESS: No, that's
5    not -- that's not true at all.
6        Because as I stated, as I
7    stated in my report, that they also
8    reported an estimated risk ratio of 1.4
9    for evasive serous ovarian tumors, which
10   we know account for the large majority of
11   ovarian cancer; and that when the
12   analysis was restricted to women who are
13   45 years of age or older in 1992, they
14   might represent those who are more highly
15   exposed and maybe possibly have something
16   to do with asbestos contamination, the
17   association was -- was present.
18 BY MR. HEGARTY:
19   Q.    My question was limited to ovarian
20 cancer. So let me restate it.
21       You cannot conclude on this study
22 that there is an association -- let me start over
23 again.
24       You cannot conclude from the results

Page 184

1 of just this study that there is an association
2 between talc use and epithelial ovarian cancer --
3        MR. TISI: Objection.
4 BY MR. HEGARTY:
5    Q.    -- correct?
6        MR. TISI: Objection.
7    Misstates testimony. Asked and answered.
8        THE WITNESS: Well, actually,
9    once they limited it to those who had not
10   had a tubal ligation or hysterectomy, the
11   overall association was 1.15 with a
12   confidence interval of 0.9 to 1.5.
13 BY MR. HEGARTY:
14   Q.    With regard to that answer, staying
15 with page 251.
16   A.    Yes.
17   Q.    Right-hand column, middle paragraph.
18   A.    Yes.
19   Q.    The authors write:
20       "The potential effect of talc on the
21 ovaries depends on migration of talc fibers
22 through a patent genital tract, and we would,
23 therefore, expect a stronger association among
24 women without a tubal ligation who had used talc.

Page 185

1 However, no effect modification was seen by
2 history of tubal ligation."
3        That's what they concluded, correct?
4    A.    Well, then it goes on to say:
5        "Because we did not have the date of
6 tubal ligation, some women may have begun talc use
7 only after tubal ligation, potentially resulting
8 in misclassification of talc use and attenuation
9 of the relative risks."
10   Q.    But ultimately in their study, as
11 they report here, when comparing women with tubal
12 ligation and without tubal ligation, they found no
13 statistically different results, correct?
14       MR. TISI: Objection.
15       THE WITNESS: Well, they did
16   not find a statistically significant
17   difference, but it doesn't -- but that
18   doesn't take into account the amount of
19   exposure that they had prior to or after
20   the tubal ligation.
21       So it's -- it doesn't -- if
22   you're getting at whether -- if you're
23   getting at the issue of patency, it
24   doesn't adequately assess that.

47 (Pages 182 - 185)

Page 186

1 BY MR. HEGARTY:
2    Q.    Look back again at the abstract.
3    A.    Yes.
4    Q.    Particularly the part that I read to
5 you that begins "We observed no overall
6 association."
7        Do you remember that part I read?
8    A.    Yes. Yes.
9    Q.    Is it your opinion that this study
10 does show an overall association with ever talc
11 use and epithelial ovarian cancer?
12    A.    It all depends on how you define an
13 association. There is an elevated risk. It has a
14 confidence interval that does include 1.
15    Q.    Understood.
16        My question, though, is: Is it your
17 opinion that this study does show an association
18 with ever talc use and epithelial ovarian cancer?
19    A.    I would say, yes, it does when you
20 take into account the refinement of the exposure
21 assessment.
22    Q.    So in your opinion, the statement
23 they make, "We observed no overall association
24 with ever talc use and epithelial ovarian cancer,"

Page 187

1 is not correct?
2        MR. TISI:  Objection.
3        THE WITNESS:  It's not a yes
4    or no type of response. It's how one
5    might interpret it.
6        They interpreted it as showing
7    no association based on a statistical cut
8    point.
9        My view is to look at the
10    entire body of the article to try to get
11    a sense of whether or not there is an
12    association under the appropriate exposed
13    situations.
14 BY MR. HEGARTY:
15    Q.    For purposes of your report and your
16 testimony in this case, how are you defining the
17 phrase "an association"? What's your definition?
18    A.    An association in my -- would be my
19 definition that shows that the risk estimate is
20 more likely to be positive than not.
21        When the odds -- when the odds ratio
22 or relative risk does not include 1, then there is
23 a much more certainty that the true association is
24 greater than 1.

Page 188

1        But just because the -- the odd --
2 just because the 95 percent confidence interval
3 includes 1 does not preclude that the association
4 is going to be 1 or less. It all really depends
5 on the -- on the -- on the width of the confidence
6 interval to get a better sense of where the
7 estimate likely falls.
8    Q.    Please turn over to page 18 of your
9 expert report.
10    A.    18 of my expert report.
11    Q.    What we marked as Exhibit Number 5.
12    A.    Yes.
13    Q.    At the end of that carryover
14 paragraph just before the "Case-control studies
15 are inferior to cohort study" section.
16        Are you with me?
17    A.    Yeah. Let me just see. This is
18 recall bias. Uh-huh.
19    Q.    It is in the recall bias section,
20 correct?
21    A.    Yes, uh-huh. Uh-huh.
22    Q.    You say at the end of that section:
23        "In our opinion, daily use of talc
24 over long periods or decades is unlikely to be

Page 189

1 recalled inaccurately."
2        Do you see where I'm reading?
3    A.    Actually, hold on a second.
4        (Reviews document.)
5        Yes. Okay. "In our opinion." Yes.
6 Go ahead.
7    Q.    Is it your opinion that reporting of
8 two times a week is also unlikely to be recalled
9 inaccurately?
10    A.    Again, you're trying to make a
11 dichotomy here.
12        Certainly daily use of talc over
13 long periods of time is not likely to be recalled
14 inaccurately.
15        I cannot speak to one -- to once a
16 week or -- or once a month, but certainly the
17 amount of recall bias, in my view, would increase
18 with the -- with a decrease in frequency of using
19 it.
20    Q.    Have you spoken with any of your
21 colleagues at Boston University about your work on
22 this litigation?
23    A.    No.
24    Q.    Have you told any of your colleagues

48 (Pages 186 - 189)

Page 190

1  at Boston University your opinions in this
2  litigation as set out in your report?
3      A.    No, I have not.
4      Q.    Have you gone over to talk to any of
5  the gynecologists and gynecologic oncologists at
6  the Boston University Chobanian & Avedisian --
7      A.    (Laugh).  Avedisian.
8      Q.    -- Medical School of your opinions
9  in your report?
10     A.    No, I have not.
11     Q.    Have you talked to anyone at the
12 Boston University BMC Cancer Center about your
13 opinions in this report?
14     A.    No, I have not.
15     Q.    Have you told --
16         MR. TISI:  I assume other than
17     Dr. Rothman, right?
18         MR. HEGARTY:  Well, I'll let
19     him answer.
20         MR. TISI:  Well, I mean, I'm
21     assuming that that's --
22 BY MR. HEGARTY:
23     Q.    Well, Dr. Rothman, is he at the BU
24 BMC Cancer Center?

Page 191

1      A.    No.  He's in the School of Public
2  Health with me.
3          MR. HEGARTY:  My question was
4      very specific.  I said Boston University
5      BMC Cancer Center.
6          MR. TISI:  Okay.  Yeah.  Got
7      it.  Yeah.
8  BY MR. HEGARTY:
9      Q.    Have you told any doctor treating
10 patients for ovarian cancer about your opinions in
11 this litigation?
12     A.    I have not.
13     Q.    Have you communicated with anyone
14 outside of plaintiffs' lawyers and Dr. Rothman
15 about your opinions in this case?
16     A.    No.
17     Q.    Have you talked to any scientific
18 body or group about your opinions in your report?
19     A.    No.
20     Q.    Has any regulatory authority or
21 scientific body reached out to you about your
22 opinions in the last 30 years?
23     A.    No.
24     Q.    Have you contacted any medical

Page 192

1  organizations or societies about your opinions in
2  this case?
3      A.    I have not.
4      Q.    Have you shared your opinions in
5  your report as to talc and ovarian cancer in any
6  written peer-reviewed publication?
7          MR. TISI:  Objection.
8          THE WITNESS:  Yeah.  I don't
9      believe I have.
10 BY MR. HEGARTY:
11     Q.    Have you shared your opinions set
12 out in your report at any symposia or conference?
13     A.    No.
14     Q.    And as I mentioned just a moment
15 ago, your report has not been peer-reviewed,
16 correct?
17     A.    That is correct.
18     Q.    Has any medical society or
19 organization reached out to you about talc and
20 ovarian cancer?
21     A.    No.
22     Q.    Can you cite to any U.S. scientific
23 or medical group, entity, or organization who has
24 made the statement that talc use can cause ovarian

Page 193

1  cancer?
2          MR. TISI:  Objection.
3          THE WITNESS:   I am not aware
4      of a -- of a society or organization, as
5      you said, that specifically said talc
6      will cause ovarian cancer that I'm aware
7      of.
8  BY MR. HEGARTY:
9      Q.    Are you aware of any gynecologic
10 oncologist, outside of any witness hired by the
11 plaintiffs in this litigation, who has stated that
12 talc use can cause ovarian cancer?
13     A.    I wouldn't be able.  I would have no
14 idea.
15     Q.    Have you discussed your report or
16 your opinions in this case with any other experts
17 retained by plaintiffs' counsel in this
18 litigation --
19     A.    As I --
20     Q.    -- other than Dr. Rothman?
21     A.    Yeah, I have not.
22     Q.    Your list of Materials Considered
23 includes a reference to Dr. Longo's and Rigler's
24 February 2019 expert report.

49 (Pages 190 - 193)

Page 194

1        Do you recall that?
2    A.    Yes, I do.
3    Q.    You also cite in your report to a
4 study or -- sorry -- to a -- to a study or article
5 by Steffen from 2020.
6        Do you recall that article?
7    A.    Where do I cite that?
8    Q.    You include it in your references in
9 the back and you cite to it in your report.
10        Do you see that?
11    A.    Oh.  Oh, right.  Yes.  Yes, yes,
12 yes.
13    Q.    Particularly in your report on
14 page 9.
15    A.    Yeah, yeah, yeah.  Yes.
16        I'm just looking where I cited it.
17 Yes.
18        MR. HEGARTY:  And just so you
19    can familiarize yourself with what I'm
20    asking you, I'll mark as Exhibit 14 the
21    Steffen article.
22        (Document marked for
23    identification as Harlow Exhibit 14.)
24 BY MR. HEGARTY:

Page 195

1    Q.    That's the article --
2    A.    Yeah.
3    Q.    -- you reference in your report,
4 correct?
5    A.    Just trying to see where I reference
6 this article.
7    Q.    Please look over on page 9 in
8 reference 7 at the top.
9    A.    Do I have it as reference 9 on my --
10 let me -- let me just take a second.  Hold on.  Is
11 it 7 or is it 9?
12    Q.    I'm looking at page 9 at the top.
13    A.    Oh, yeah.  It's 7.  Oh, yeah.  Okay.
14 Got it.  Got it.  Yes.
15    Q.    And reference 7 is Steffen's?
16    A.    Yes.  Yes, yes, yes.
17    Q.    And I'm --
18    A.    Right.  Right, right, right.  Got
19 it.
20    Q.    I marked as Exhibit Number 14 the
21 Steffen's article.
22    A.    Yes.
23    Q.    Did you read this article?
24    A.    Yes.

Page 196

1    Q.    Did you note when you read it the
2 disclosure or declaration of conflict of interest
3 at the bottom of the first page?
4    A.    No, I didn't.
5    Q.    If you look at the bottom on the
6 left-hand side, do you see where it says as it
7 relates to certain of the authors, including
8 Dr. Egilman -- well, let me start over again.
9        As it relates to Dr. Egilman, that
10 he serves as an expert witness in litigation at
11 the request of people who are injured as a result
12 of using talcum powder?
13    A.    Right.
14    Q.    Have you seen that before right now?
15    A.    Yeah.  Right.  Yes.
16    Q.    Had you seen that before right now?
17    A.    Oh, I probably saw it, but I don't
18 necessarily evaluate literature based on -- based
19 on this.
20    Q.    Do you see just below that part
21 where it says:
22        "Dr. Egilman, Dr. Rigler and
23 Dr. Longo report payments from lawyers --
24    A.    Yes, I see it.

Page 197

1    Q.    -- related to the submitted work"?
2    A.    Yes, I see it.
3    Q.    Did you consider that funding
4 statement in evaluating this paper?
5    A.    No, I didn't.
6    Q.    Is it appropriate when you consider
7 a paper like this to consider the source of
8 funding and whether they're -- the authors are
9 expert witnesses in litigation?
10    A.    I think it is important to consider
11 it as one consideration, but I believe in this
12 situation where -- where basically they are doing
13 a laboratory assessment, I'm less concerned about
14 whether or not that would have influenced the
15 fundings.
16    Q.    The only authorities that you cite
17 for the statements in your report that talcum
18 powder contains asbestos are Dr. Longo and
19 Rigler's report and the Steffen's article,
20 correct?
21        MR. TISI:  Objection.
22        THE WITNESS:  Well, it's in my
23    report, but in all my writings that I've
24    published, I've -- I've referenced many

50 (Pages 194 - 197)

Page 198

1    other articles.
2  BY MR. HEGARTY:
3    Q.    And I'm not asking about your other
4  writings.
5    A.    I understand that.
6    Q.    My question is specific --
7  specifically limited to your report.
8        In your report --
9    A.    Yes.
10   Q.    -- the only authorities that you
11 cite to for your statements that talcum powder,
12 including Johnson & Johnson talcum powder,
13 contains asbestos are the Rigler and Longo
14 materials and the Steffen's article, correct?
15       MR. TISI:  Objection.
16    Misstates.
17       THE WITNESS:  So I would have
18    to look.  In this particular paragraph,
19    but there might be other locations in the
20    report where I had referred to that, and
21    I would have to look carefully about
22    that.
23 BY MR. HEGARTY:
24   Q.    How long would that take you to

Page 199

1  look?
2    A.    Just give me a minute.  Let me see
3  if they're listed, if I had things.
4    Okay.  I'll -- I'll -- I'll agree
5  that that's -- these are the -- this is the
6  report.
7       MR. TISI:  Objection.
8       THE WITNESS:  This is the
9    evidence.
10       MR. TISI:  Actually -- all
11    right.  I don't want you to feel rushed.
12    Okay?  If you need to look, I mean, there
13    is -- fine.  I'll clean it up.
14       THE WITNESS:  No, that's
15    fine.
16       MR. TISI:  I mean, you know
17    that that's --
18       MR. HEGARTY:  You can ask that
19    question.
20       MR. TISI:  You know that
21    that's not true.  You can't --
22       MR. HEGARTY:  I don't know
23    that that's not true.
24       MR. TISI:  Really?

Page 200

1       MR. HEGARTY:  But let's not
2    get into discussion.
3       MR. TISI:  Okay.
4  BY MR. HEGARTY:
5    Q.    How much time?  Do you need more
6  time?
7    A.    I would need more time to look
8  specifically at every word that I wrote to see if
9  there are other locations -- other places where I
10 cited the issue of talc -- the issue of asbestos
11 being seen in talc examples.
12   Q.    And if we have time, we can go back
13 to this question.
14    A.    Okay.
15   Q.    With regard to your citation to the
16 report by Dr. Longo and Rigler, did you read the
17 entirety of that report?
18    A.    I would hope I read the most salient
19 components of it.  (Laugh).
20   Q.    Well, can you tell me today --
21    A.    Yeah.
22   Q.    -- if you read the entirety of it
23 from page to page?
24    A.    Yes.

Page 201

1    Q.    As to Dr. Longo and Rigler's report,
2  did you make a request for that report or was that
3  sent to you?
4    A.    That was sent to me.
5    Q.    Are you aware that there are more --
6  there are other experts who have issued reports
7  and who have testified with regard to the testing
8  of talcum powder for asbestos?
9       MR. TISI:  In the MDL and New
10    Jersey, or no?
11 BY MR. HEGARTY:
12   Q.    We'll limit it to the MDL and New
13 Jersey cases.
14    A.    Yeah.  No, I'm not aware of that.
15 Except that I'm aware of articles in the
16 scientific literature that have been published
17 that have shown the contamination of talc with
18 asbestos in each decade for the last 40 years.
19   Q.    Did you ask or make a request for
20 defense expert reports addressing the issues of
21 asbestos testing for talc and asbestos in talc?
22       MR. TISI:  Objection.  In the
23    MDL or in New Jersey where he's
24    designated?

51 (Pages 198 - 201)

Page 202

1          MR. HEGARTY:  Or anywhere in
2     any situation.
3          MR. TISI:  Well, there have
4     been none in any case in which he's
5     involved.  So until you name them, you
6     can't expect him to know them.
7          MR. HEGARTY:  I didn't ask him
8     that.  I just asked him --
9          MR. TISI:  Well, no.  I mean,
10    come on.
11         MR. HEGARTY:  Chris, listen to
12    my question.  I'll ask the question
13    again.
14         MR. TISI:  That's totally
15    unfair.
16         MR. HEGARTY:  Listen to my
17    question.
18 BY MR. HEGARTY:
19    Q.    My question is:  Did you ask for any
20 expert reports that have been issued from
21 attorney -- from experts representing or
22 testifying on behalf of Johnson & Johnson that
23 respond or address the issues of asbestos in talc
24 in particular as it relates to testing of talc for

Page 203

1 asbestos?
2          MR. TISI:  Your question
3     assumes facts not in evidence in this MDL
4     or in New Jersey.  So I object.
5 BY MR. HEGARTY:
6     Q.    You can answer.
7     A.    I would not have known whether those
8 existed or not.  So I would not have known to ask.
9     Q.    If such reports and testimony exist,
10 are you interested in reviewing them?
11    A.    Yes.
12         MR. TISI:  When they become
13    available.
14 BY MR. HEGARTY:
15    Q.    Have you reviewed Dr. Longo or
16 Dr. Rigler's testimony in any case involving
17 talcum powder and either ovarian cancer or
18 mesothelioma?
19    A.    No.
20    Q.    Do you agree that you have not done
21 a comprehensive analysis of all the expert reports
22 and expert witness testimony on the issue of
23 asbestos in talcum powder?
24         MR. TISI:  Objection to the

Page 204

1     extent that there's been any reports by
2     the defendant in this litigation.
3 BY MR. HEGARTY:
4     Q.    You can answer.
5          MR. TISI:  You can answer.
6          THE WITNESS:  No, I have not.
7 BY MR. HEGARTY:
8     Q.    As to Dr. Longo's report, it was not
9 a peer-reviewed document, correct?
10    A.    I'm not sure whether it was
11 peer-reviewed or not.
12    Q.    Do you -- have you ever met
13 Dr. Longo or Dr. Rigler?
14    A.    No.
15    Q.    Do you know anything about their
16 training, education, and experience?
17    A.    I do not.
18    Q.    Do you know how much money Dr. Longo
19 has made testifying for plaintiffs in talcum
20 powder litigation?
21    A.    I do not.
22    Q.    Is that something you're interested
23 in knowing?
24    A.    No.

Page 205

1     Q.    Do you know how many times that
2 Dr. Longo has testified for plaintiffs that
3 products contain asbestos, that is, talcum powder
4 products contain asbestos based on his testing?
5     A.    No, I do not know.  I do not know.
6     Q.    Have you ever visited Dr. Longo's
7 labs?
8     A.    No.
9     Q.    Is it true, Doctor, that you're not
10 knowledgeable about -- let me start over again.
11         It is true, Doctor, that you are not
12 knowledgeable about the reasonableness of the
13 processes and procedures of any of the tests that
14 Dr. Longo and Rigler conducted on any talc
15 product, correct?
16    A.    I do not know what their parameters
17 were in their laboratory testing.
18    Q.    You have no --
19    A.    Other than what was written in the
20 document.
21    Q.    Besides what you read, you have no
22 ability to say that Dr. Longo's methods in looking
23 for and identifying asbestos are reliable,
24 correct?

52 (Pages 202 - 205)

Page 206

1    A.    Actually, reliable means that it is
2 -- means it's been shown over and over again.
3 That's what reliability means, and the fact that
4 there have been a number of articles in the
5 scientific literature by well before any of the
6 litigation began showing that there is the
7 potential for asbestos contamination, to me that
8 suggests that the work that's done by Longo is --
9 is reliable.
10    Q.    Do you know what a cleavage fragment
11 is?
12    A.    No.
13    Q.    Can tremolite come in an asbestiform
14 and non-asbestiform mineral type?
15    A.    I am not an expert in that area.
16    Q.    You're not an expert in asbestos?
17    A.    I would not call -- I am an expert
18 in reviewing epidemiologic research, and I have
19 the ability to look at research that has been in
20 the peer-reviewed literature and make conclusions
21 as to whether I believe they are scientifically
22 strong or not.
23    Q.    Do you have an opinion as to whether
24 non-asbestiform tremolite can cause ovarian

Page 207

1 cancer?
2    A.    I don't have an opinion.
3    Q.    Sitting here today, can you name the
4 six types of asbestos?
5    A.    No.
6    Q.    Do you know the most common -- the
7 most commonest asbestos that was used
8 commercially?
9    A.    That's not where I spend my time
10 reviewing the scientific literature.
11      The whole idea behind my review of
12 the scientific literature was to determine whether
13 there was a biologically plausible explanation for
14 the epidemiologic association, and the fact that
15 there is evidence that there could be asbestos
16 contamination makes -- adds one more source of
17 biological plausibility to it.
18    Q.    Is asbestos contamination of talc
19 necessary for your causation opinions in this
20 case?
21    A.    I don't believe so.
22    Q.    What -- I'm sorry.
23    A.    Certainly fibrous -- certainly
24 fibrous talc could have -- could have an impact.

Page 208

1 So, and talc itself has been shown to cause an
2 inflammatory process.
3    Q.    Do your causation opinions in this
4 litigation change at all if you concluded that
5 there was no asbestos in talc?
6    A.    No, not necessarily.
7    Q.    Are you able to -- strike that.
8      Do you have an opinion as to whether
9 you can parse out what the effect is of asbestos
10 in talc as relate to your causation opinions?
11    A.    No.  For one thing, you just don't
12 know.
13    Q.    There are six plaintiffs whose cases
14 we are working up in the MDL and two plaintiffs in
15 the -- in the New Jersey litigation.
16      Let me give you their names and tell
17 me after I'm finished whether you know any of
18 these women.
19      Lynda Bondurant, Escalina Roussa,
20 Hilary Converse, Carter Judkins, Tamara Newsome,
21 Anna Gallardo.  And I'm not sure of the first
22 names.  I can look them up.  Ms. Karl and
23 Ms. Moldurano.
24      Are any of those names familiar to

Page 209

1 you?
2    A.    Not that I'm aware of, no.
3    Q.    Do you have any information about
4 any of those women with regard to the type of
5 ovarian cancer that they have?
6    A.    No.
7    Q.    Do you know where they live?
8    A.    No.
9    Q.    Do you know -- do you have any
10 knowledge of any of the women whose names I just
11 mentioned use of talcum powder?
12    A.    No.
13    Q.    In particular, do you know how long
14 any of them used talcum powder?
15    A.    No.
16    Q.    Do you know the frequency that they
17 used talcum powder?
18    A.    No.
19    Q.    Do you know the volume of talcum
20 powder that they used?
21    A.    No.
22    Q.    Do you know if they used talcum
23 powder in the genital area?
24    A.    No.

53 (Pages 206 - 209)

Page 210

1    Q.    Do you know of any testing for
2 asbestos that was done as to any talcum powder
3 product they claim to have used?
4    A.    No.
5    Q.    Are you going to tell the judge and
6 jury in the cases we're talking about today that
7 you know the cause of each of these women's
8 ovarian cancer?
9         MR. TISI:  Objection.  Can I
10    help you out and say he's not going to be
11    asked any questions about case-specific.
12    I'm not going to ask him.
13         MR. HEGARTY:  Let him answer.
14         THE WITNESS:  I can't answer
15    that.  I have no idea what I'm going to
16    say.  I have no idea at that point with
17    respect to that issue.
18 BY MR. HEGARTY:
19    Q.    Well, let me ask it.
20         MR. TISI:  He has not been
21    designated as a case-specific expert.
22         MR. HEGARTY:  Let me re-ask
23    the question.
24 BY MR. HEGARTY:

Page 211

1    Q.    Sitting here today, is it your
2 intent to tell the judge and the jury in this case
3 that you know what caused each of the women's
4 ovarian cancer whose names I read to you?
5    A.    No.  I -- all of -- what my
6 expertise is at the population level.  I cannot --
7 I cannot definitive -- I will not definitively
8 state that -- I don't know anything about these
9 women.  I just don't know anything about these
10 women.
11    Q.    Sitting here today, you don't
12 represent Boston University, correct?
13    A.    That's correct.
14    Q.    You don't speak for Boston
15 University or any entity in this case, correct?
16    A.    I do not.
17    Q.    You're not speaking for any
18 scientific organization or body?
19    A.    No, I am not.
20    Q.    You're not speaking for any
21 regulatory group or agency?
22    A.    No.
23    Q.    You're not speaking for anyone but
24 yourself?

Page 212

1    A.    That is correct.
2    Q.    Do you have any forthcoming
3 publications regarding talcum powder use and
4 ovarian cancer?
5    A.    No.
6    Q.    If you had any such publications or
7 if you have any such -- let me start over again.
8         If you have any publications in the
9 future, would you disclose as a conflict of
10 interest your work in this litigation?
11    A.    Yes, I would if it was relevant to
12 this particular exposure and outcome.
13    Q.    Are you working on any articles or
14 studies that pertain to talcum powder use and
15 ovarian cancer?
16    A.    I am not.
17    Q.    Are you working on any articles or
18 studies about asbestos and ovarian cancer?
19    A.    No.
20    Q.    Now, with regard to the report that
21 you and Dr. Rothman prepared in this litigation,
22 which we have been talking about this morning that
23 I marked as Exhibit Number 5 --
24    A.    Uh-huh.

Page 213

1    Q.    -- is it correct that all the
2 opinions that you intend to offer in this
3 litigation are set out in this report?
4    A.    I believe so.  Pending I believe at
5 the end of the report we had the -- we have the
6 right to look at additional information that
7 becomes available or provided to us.  But barring
8 that, my opinions are in this report.
9    Q.    Well, and you note at the end:
10    "We reserve the right to amend this
11 report."
12         You have not issued an amended
13 report, correct?
14    A.    I have not.
15    Q.    Have any of your opinions set out in
16 this report changed or modified since November
17 2023?
18    A.    No.
19    Q.    All the materials on which you
20 rely -- let me start over again.
21         All the materials on which you
22 intend to reference in providing your opinions are
23 set out in your report or in the Materials
24 Considered list, correct?

54 (Pages 210 - 213)

Page 214

1          MR. TISI:  Object.  Objection.
2     They may become.
3          THE WITNESS:  Well, I mean,
4     again --
5          MR. TISI:  Additional --
6     additional information -- one second.
7          MR. HEGARTY:  Please let him
8     answer the question.
9          MR. TISI:  No, let me.
10          Objection.  He reserves the
11     right and we reserve the right to ask him
12     not only to comment on any expert report
13     by the defendants, which has not been --
14     they have not been provided yet, but also
15     to respond to information that becomes
16     available and have become available since
17     the time of his report including, for
18     example -- I mean, there are things like
19     the recent EPA rule, for example.
20          There are things that have
21     become available and will continue to
22     become available, and I expect him to be
23     able to give opinions based upon those.
24 BY MR. HEGARTY:

Page 215

1     Q.     Let me ask my question.
2          Sitting here today, are all the
3 materials you intend to refer to in providing your
4 opinions in this case set out in your report
5 either at the end of the report or in the
6 Materials Considered list?
7     A.     No, I can't say that that's the case
8 and --
9     Q.     Well, what materials -- I'm sorry.
10 Go ahead.
11     A.     Well, the recent EPA report that
12 came out that specified talc -- asbestos as being
13 a cause for ovarian cancer is something that I
14 might refer to, and I don't know what other
15 information might come out from the scientific
16 literature.
17          So I can't affirmatively say that
18 the only information that I might say in the
19 future would come from articles and content in
20 this report.
21     Q.     Other than the EPA report you
22 referenced, do you know, sitting here today, of
23 any other authority, publication, or otherwise you
24 intend to refer to as of today in discussing or

Page 216

1 communicating your opinions in this case?
2     A.     Again, I don't know.
3          MR. TISI:  Let me just object.
4     I gave you an example, but I didn't mean
5     that to be exclusive.  There are things
6     that we have provided to him or he's
7     gotten on his own since the date of his
8     report and now, and I can go through each
9     and every one of them.
10          I doubt you want me to do
11     that, but I do not want that to --
12     anything to be seen as we are limiting
13     him to November of 2023, and I'm not
14     going to do that.
15          And there are going to be
16     plenty.  I mean, using your expert
17     reports as an example.  I reserve the
18     right to ask him questions about things
19     that are said in your expert reports, and
20     I'm going to provide them to him.
21 BY MR. HEGARTY:
22     Q.     Can you answer my question?
23     A.     Would you repeat the question,
24 please?

Page 217

1     Q.     Sure.
2          Sitting here today, other than the
3 recent EPA report you referenced, do you know of
4 any other references that you're going to refer to
5 in providing your opinions in this case?
6          MR. TISI:  Objection for the
7     reasons I stated.
8          You may answer.
9          THE WITNESS:  I don't know
10     what other references or documents that
11     might become available at the time.  So I
12     can't say that I know of something as of
13     right now.
14          MR. HEGARTY:  Let's go off the
15     record.
16          (Whereupon, at 1:04 p.m., a
17     luncheon recess was taken.)
18
19
20
21
22
23
24

55 (Pages 214 - 217)

Page 218

1    AFTERNOON SESSION
2         (1:40 p.m.)
3      BERNARD L. HARLOW, PHD
4  called for continued examination and, having been
5  previously duly sworn, was examined and testified
6  further as follows:
7       EXAMINATION (CONTINUED)
8     MR. HEGARTY:  We are back on
9   the record after a short lunch break.
10 BY MR. HEGARTY:
11    Q.   Doctor, do you agree that before
12 offering opinions in a case like this, where you
13 will be heard by and relied upon by a judge and a
14 jury, you should have completed a comprehensive
15 analysis of the literature that was available to
16 you about the subject matter of your opinions?
17    A.   Yes.
18    Q.   Have you ever offered in any public
19 published opinions -- let me start over again.
20         Have you ever offered in any
21 publication opinions on any subject matter that
22 would be read and relied upon by your peers and
23 others that was not based on a comprehensive
24 analysis of the literature that was available to

Page 219

1  you on the subject matter of the whatever you were
2  discussing?
3     A.   No.
4     Q.   With regard to what you reviewed for
5  your opinions in your report, did you do a
6  comprehensive analysis of all the animal studies
7  involving talcum powder?
8       MR. TISI:  Objection.  Vague.
9       THE WITNESS:  I reviewed some
10   of the animal models, but the problem is
11   that it's -- it's difficult because most
12   of the studies have been done in mice and
13   rats, and they have different anatomical
14   features that are dissimilar from that
15   with women, such as a bursa sac that
16   encloses the ovaries.
17 BY MR. HEGARTY:
18    Q.   In connection with preparing your
19 report in this case, did you review the studies of
20 those animal models?
21    A.   No, I didn't.
22    Q.   So any review of the animal studies
23 that you referenced was before you were contacted
24 by plaintiffs' counsel?

Page 220

1    A.   I reviewed -- yes, there are reviews
2  that I -- I cited in my previous publications
3  and -- but, again, I was -- I was focusing on the
4  epidemiologic human studies with respect to coming
5  up with my opinions.
6     Q.   Do you agree that you did not
7  specifically cite to any animal study in your
8  report?
9     A.   I --
10         MR. TISI:  Objection.
11         THE WITNESS:  I -- I can't be
12     certain of that, but it certainly did not
13     weigh in on my conclusions.
14 BY MR. HEGARTY:
15    Q.   Did you do a comprehensive review of
16 all the cell study literature involving talcum
17 powder?
18    A.   No.
19    Q.   You did not refer to any cell
20 studies where cells are or talc has been applied
21 to cells in your report, correct?
22    A.   That's correct.
23    Q.   Did you do a comprehensive analysis
24 of all the publications that have discussed

Page 221

1  asbestos and ovarian cancer?
2     A.   No, I did not.
3     Q.   As to the IARC 2012 Monograph, which
4  you do reference in your report --
5     A.   Uh-huh.
6     Q.   -- did you read that monograph when
7  it came out initially?
8     A.   No.
9     Q.   Did you read that monograph before
10 you started working on your expert report?
11    A.   No.
12    Q.   Did you read the entirety of that
13 monograph in connection with preparing your expert
14 report?
15    A.   I read parts of it.
16    Q.   That monograph referred to a number
17 of studies that looked at asbestos exposure and
18 ovarian cancer.
19         Did you pull the individual studies
20 and read them --
21    A.   I didn't.
22    Q.   -- that were referenced in the
23 monograph?
24    A.   No, I didn't.  Again, that goes

Page 222

1 toward biological plausibility, and I felt there
2 was a lot of evidence already for biological
3 plausibility that I didn't need to do an
4 exhaustive literature search on the association
5 between asbestos and ovarian cancer.
6    Q.    Do you have an opinion for purposes
7 of this case as to the level of exposure to
8 asbestos that is necessary to cause ovarian
9 cancer?
10          MR. TISI:  Objection.
11          THE WITNESS:  I think any
12    exposure to asbestos is important.
13 BY MR. HEGARTY:
14    Q.    Is it your opinion that any level of
15 exposure to asbestos can cause ovarian cancer?
16    A.    I'm not -- I didn't do a causal
17 analysis around that, but I would certainly be
18 worried about any asbestos contaminant -- any
19 asbestos exposure and risk of ovarian cancer.
20    Q.    Do you have an opinion as to the
21 types of asbestos that have been shown to cause
22 ovarian cancer?
23    A.    No, I don't have an opinion there.
24          MR. TISI:  Sorry.  Again, keep

Page 223

1    your voice up.
2          THE WITNESS:  Sorry.  Let me
3    know if you're not hearing me.
4 BY MR. HEGARTY:
5    Q.    Are you aware of any literature --
6 published literature that has stated that asbestos
7 in talc applied to the genital area can cause
8 ovarian cancer, that the route of delivery of
9 asbestos via talc can cause ovarian cancer?
10          MR. TISI:  Objection.
11          THE WITNESS:  Yeah.  I have
12    not seen those words used, but I have
13    seen many articles where it is
14    hypothesized that asbestos contamination
15    of talc is a biological mechanism by
16    which ovarian cancer -- by which ovarian
17    cancer could occur.
18 BY MR. HEGARTY:
19    Q.    Have you ever read studies or become
20 aware of studies reporting that there are
21 background rates of asbestos in certain areas of
22 this country?
23          MR. TISI:  I'm sorry.
24    Rephrase.  I mean, repeat it.

Page 224

1 BY MR. HEGARTY:
2    Q.    Yeah.  My question is:  Are you
3 aware of either from your own reading or from
4 other sources hearing that there are background
5 rates of asbestos in certain parts of the United
6 States?
7    A.    I have not read that.
8    Q.    Do you have any opinion as to
9 whether background rates of asbestos just in the
10 air are capable of causing ovarian cancer?
11    A.    I don't have an opinion around that.
12    Q.    Do you agree that there are exposure
13 levels to asbestos where no harm has been shown?
14    A.    I'm not aware of that.
15          And I certainly have not heard any
16 regulatory body suggesting that there is a certain
17 acceptable level of asbestos.
18    Q.    Did you do any analysis in your
19 report as to the biologic plausibility of asbestos
20 fibers causing ovarian cancer?
21    A.    Could you repeat that, please?
22    Q.    Sure.
23          Did you do any analysis as set out
24 in your report of the biologic plausibility of

Page 225

1 asbestos fibers causing ovarian cancer?
2    A.    In my report, I did not dissociate
3 whether my view on the cause of ovarian cancer is
4 limited to that exposure which is contaminated
5 with asbestos.
6    Q.    Do you have any opinion as to the
7 exposure levels or dose of asbestos necessary to
8 be biologically plausible -- to be a biologically
9 plausible cause of ovarian cancer?
10          MR. TISI:  Objection.  Let me
11    just put my objection on the record.
12          Biologically plausible cause
13    are inconsistent.
14          THE WITNESS:  Could you
15    please repeat?
16 BY MR. HEGARTY:
17    Q.    Sure.
18          Do you have any opinion as to what
19 exposure levels or dose of asbestos is necessary
20 to have biologic plausibility between ovarian
21 cancer and asbestos exposure?
22          MR. TISI:  Objection.
23          THE WITNESS:  Yeah.  In my
24    view, any amount of asbestos

57 (Pages 222 - 225)

Page 226

1    contamination is of concern to me.
2 BY MR. HEGARTY:
3    Q.    Do you have any opinion as to the
4 volume of asbestos that's been -- that has been in
5 Johnson's Baby Powder or Shower to Shower over the
6 years?
7    A.    Could you repeat the question again?
8    Q.    Sure.
9         Do you have any opinion as to the
10 volume of asbestos fibers in Johnson's Baby Powder
11 or Shower to Shower over the last 70 years?
12   A.    Yeah.  Only -- only that over many
13 decades asbestiform fibers have been observed in
14 the talc products.  The volume is -- I don't know
15 how -- well, it's -- I have not -- I have no
16 opinion about what volume is necessary to make it
17 a risk factor.  Only that it has consistently been
18 shown to be present.
19   Q.    Do you know what percentage --
20 strike that.
21        Do you have an opinion as to what
22 percentage of Johnson's Baby Powder and Shower to
23 Shower bottles manufactured over the years have
24 contained any amount of asbestos?

Page 227

1    A.    I don't have any opinion on what
2 proportion of products did and did not have
3 contamination.  Only that there is evidence to
4 show that many did.
5    Q.    For purposes of your biologic
6 plausibility opinion --
7    A.    Yes.
8    Q.    -- is it necessary for a talcum
9 powder product to reach the ovaries?
10   A.    No.  It could cause a carcinogenic
11 process in the fallopian tubes.  So it doesn't
12 necessarily have to have been -- have to have
13 reached the ovaries.
14        And there's new evidence to suggest
15 that certain epithelial ovarian cancers actually
16 arise in the fallopian tubes.
17   Q.    Can you cite for me any studies that
18 have commented on biologic plausibility as it
19 relates to talc and ovarian cancer with regard to
20 the ovarian -- with regard to the fallopian tubes
21 versus the ovaries?
22   A.    I have read that some histologic
23 subtypes may be more likely to initiate in the
24 fallopian tubes as opposed to the ovaries.

Page 228

1        But I do want to just clarify that
2 talc particulates have been observed both in the
3 fallopian tubes and in the ovaries.
4    Q.    My question is a little bit
5 different.
6        Can you cite for me any studies that
7 have focused on the fallopian tube with regard to
8 talc when discussing biologic plausibility?
9    A.    Only to the extent that -- only to
10 the extent that exposure in the fallopian tubes is
11 sufficient to, along -- along with -- with actual
12 exposure within the ovaries, is sufficient to
13 warrant biological plausibility.
14   Q.    You recall the authors on any of --
15 any such study that have talked about that?
16   A.    I believe it's possible that
17 Silkraut might have talked about that.
18   Q.    You mean Schildkraut?
19   A.    Yeah, Schildkraut.
20   Q.    The study we talked about today?
21   A.    Yes.  Yes.  I believe that to be the
22 case, as I recall.
23   Q.    With regard to your methodology for
24 preparing the report --

Page 229

1    A.    Yes.
2    Q.    -- at the time you started this
3 process, did you and Dr. Rothman share the same
4 methodology?
5    A.    Yes.  I have always used the
6 criteria pointed out by Hill as factors to be
7 considered but not solely determinant for making a
8 causation assessment.
9    Q.    Can you cite for me any instances
10 where you have set out in the published literature
11 the methodology you employed in this case for
12 analyzing whether talcum powder use can cause
13 ovarian cancer?
14   A.    Well, I think in my earlier
15 publications I followed a similar approach,
16 looking at issues related to strength and
17 consistency of the association, dose response when
18 available, biological plausibility.  But always
19 taking into consideration biases that could
20 explain the findings that we see with respect to
21 confounding, misclassification, temporality.
22 So -- even recall bias.
23        So I would like to think that I have
24 taken -- and, frankly, in reading my older

Page 230

1  articles, I'm actually quite impressed that I
2  followed those guidelines throughout my career.
3     Q.    When you're talking about your
4  article, are you talking about the articles that
5  you have been author on about talc and ovarian
6  cancer?
7     A.    Yes.  Yes.
8     Q.    Other than those articles, can you
9  tell me any other publications of yours where you
10 apply the same methodology as you applied in your
11 report?
12    A.    Oh, virtually all of my articles
13 that relate to the etiology of -- etiology of a
14 particular adverse outcome.
15    Q.    Please look at page 4 of your
16 report.
17        The section "Overall Approach and
18 Methodology of This Review" sets out your
19 methodology for your analysis of the literature
20 regarding talcum powder use and ovarian cancer,
21 correct?
22    A.    Yes.
23    Q.    This part of your report refers to
24 the Bradford-Hill analysis or criteria, but at the

Page 231

1  end of the first paragraph you write:
2        "Unfortunately, despite the fact
3  that purported lists of causal criteria have been
4  proposed and implemented, a valid set of such
5  criteria does not exist."
6        You see where I'm reading?
7     A.    Yes, I do.
8        MR. TISI:  Let me just object
9     to your characterization as a criteria,
10    but go ahead.
11 BY MR. HEGARTY:
12    Q.    You then go on in the next two
13 paragraphs to essentially say there is no
14 checklist for causal inference, correct?
15    A.    Alone.  (Nods head).
16    Q.    I read this summary as rejecting --
17 or let me start over again.
18        My interpretation of this section is
19 that you are not applying the Bradford-Hill
20 criteria but a criteria that, as you say, is
21 focused on posing non-causal explanations to
22 account for the association.
23        Are you saying that you did apply in
24 this report the Bradford-Hill criteria?

Page 232

1        MR. TISI:  Let me just object
2     to the word "criteria" because that's not
3     what it says.
4        THE WITNESS:    There I believe
5     what we tried to say is that there is no
6     checklist alone that can be used for
7     causal inference, and that's the first
8     sentence of the -- of the next paragraph.
9        "If no checklist for causal
10    inference exists, then how does causal
11    inference proceed?"
12        And the way I believe we talk
13    about it throughout the report is, we
14    look at the components that are indicated
15    as Bradford-Hill components, but always
16    look at them in the context of how they
17    could have been influenced by
18    bias-related issues, and that's what we
19    tried to -- to lay out here.  So, yeah.
20 BY MR. HEGARTY:
21    Q.    So in this part of your report,
22 you're not -- you're not saying that the
23 Bradford-Hill analysis, factors, or criteria,
24 however you want to characterize it, leads to an

Page 233

1  unreliable result?
2     A.    I think if you only do a checklist
3  without taking into account how that data was
4  obtained, then, yes, I believe the Bradford
5  criteria do not in and of itself allow for a
6  causal -- allow for causal inference.
7     Q.    So as an example, if you only talk
8  about strength of association there being a
9  relative risk or odds ratio that is considered to
10 satisfy that analysis to be strong or without
11 identifying or comparing the literature on whether
12 that can be explained by other reasons, that would
13 not be a valid result?
14    A.    That's correct.  If I believe that a
15 risk estimate of 1.5 could potentially be
16 explained by confounding that was not considered
17 or misclassification of the exposure that was
18 being used to assess that and to calculate that
19 particular estimate of risk, then I would not --
20 just because it's a 1.5 with a confidence interval
21 that includes 1.0 doesn't necessarily mean that I
22 would believe that it meets the criteria for
23 causation.
24        I would have to have determined that

59 (Pages 230 - 233)

Page 234

1  I can't come up with any other explanation for why
2  we see this association for me to then believe
3  that the magnitude of the association is
4  believable.
5      Q.    In your report, you don't walk
6  through and discuss each of the nine Bradford-Hill
7  factors or criteria, or however you called it,
8  that he set out in his statement, correct?
9      A.    That's correct.
10     Q.    For example, you don't talk about
11 temporality or experiment.  All those other -- all
12 the factors, correct?
13     A.    I -- well, I don't talk about the
14 ones that are obviously in place.  For example, I
15 don't think anybody would believe that ovarian
16 cancer leads one to initiate exposure to talc and
17 so, therefore, temporality I think seems
18 reasonably obvious.
19          So we chose to focus on the ones
20 that were most contested by colleagues.
21     Q.    What are the ones that are most
22 contested that you focused on?
23     A.    Well, certainly the -- the magnitude
24 of the association, dose response where it could

Page 235

1  be occurred -- would occur, the biological
2  plausibility, the consistency of the findings
3  across studies.  Those are certainly the ones that
4  we focused on mostly and, in particular, how the
5  assessment of the exposure could have influenced
6  all of those factors.
7      Q.    You mentioned early on in the
8  deposition that you did your own literature
9  search, correct?
10     A.    Yes.
11     Q.    Did anyone assist you in doing that?
12     A.    No.
13     Q.    What literature engines or tools did
14 you use?
15     A.    I used PubMed, Medline.
16     Q.    Did you prepare in advance a
17 protocol for how you were going to research the
18 literature?
19     A.    No, but I've been researching
20 literature for an awful long time.  (Laugh.)  I
21 don't think I need a protocol at this point.
22     Q.    With regard to the materials you
23 identified from that literature search, did you
24 read them all in their entirety?

Page 236

1      A.    I read the ones that I thought were
2  most appropriate.  So, for example, case series I
3  did not put a lot of stock into.  I looked at
4  certain commentaries to see whether or not they
5  were specifically addressing the issue of talc.
6          So I was selective in looking at all
7  observational studies and, frankly, there hasn't
8  been any new data collection -- new primary data
9  collection from what I could tell since 2016.  So
10 most of the literature that's been published since
11 then has been meta-analyses or reanalyses of
12 existing data.
13     Q.    In evaluating the studies either
14 from your own search or from what you otherwise
15 had or been provided, did you assess the strengths
16 and weaknesses in each paper?
17     A.    I believe I did.
18     Q.    Did you assign a weight or a
19 numerical value to the -- to each paper?
20     A.    No.  No, I did not.  I -- unless --
21 well, I looked at each paper as its own
22 contribution and what the strengths and
23 limitations were and made a decision on its
24 scientific validity.

Page 237

1          I didn't say this one gets ranked as
2  a 10; this one gets ranked as a 5.  Instead, I
3  looked at those that were obviously flawed in my
4  view versus those that, after an extensive review
5  of the data that was available, I felt that the
6  findings were believable.
7      Q.    As of the time you started this
8  process in preparing your report, had you read all
9  of the case-control studies on talc and ovarian
10 cancer?
11     A.    No, I hadn't.
12     Q.    At the time you started this process
13 of preparing your expert report, had you read all
14 the cohort studies on talc and ovarian cancer?
15     A.    I believe I had read the Gertig one
16 in the past, but the one from the Sister Study and
17 the one from the WHI I hadn't read.
18     Q.    Had you read the O'Brien 2020
19 meta-analysis or pooled analysis of the four
20 cohorts before you were contacted by plaintiffs'
21 counsel -- by plaintiffs' counsel about
22 participating in this litigation as an expert?
23     A.    Yes, I did.
24     Q.    Had you read all the meta-analyses

60 (Pages 234 - 237)

Page 238

1 regarding talc and ovarian cancer prior to
2 starting this process of preparing your expert
3 report?
4    A.    No, I did not.
5    Q.    In particular, had you read
6 Penninkilampi before you started this process?
7    A.    Yeah.  No.
8    Q.    Had you read Taher before you
9 started this process?
10    A.    No.
11    Q.    Had you read Berge before you
12 started this process?
13    A.    No, I hadn't.
14    Q.    As part of your work on this case,
15 have you reviewed any documents, that is internal
16 documents, produced by Johnson & Johnson?
17    A.    No, not that I'm aware of.
18    Q.    In particular as to the documents
19 produced by Johnson & Johnson, have you reviewed
20 -- have you reviewed any of the asbestos testing
21 documents that Johnson & Johnson has produced in
22 this case?
23    A.    I -- I don't recall.  I don't -- I
24 don't -- I don't recall.

Page 239

1            MR. TISI:  Let me just clarify
2    this so you know.  He was provided with
3    the Rothman report which came from the
4    litigation in this case, which was not
5    published.  I just wanted to be clear on
6    that.  That was -- that was a J&J or PCPC
7    report.
8            MR. HEGARTY:  I understand.
9    My question --
10            THE WITNESS:  Oh.
11            MR. HEGARTY:  My question is
12    of the laboratory testing results.
13            MR. TISI:  No, it was the
14    question before you asked.
15            MR. HEGARTY:  Okay.
16            MR. TISI:  Any documents
17    provided in the litigation.  I just
18    wanted to.
19            MR. HEGARTY:  Okay.  I
20    apologize.
21            THE WITNESS:  I -- yeah.
22 BY MR. HEGARTY:
23    Q.    With regard to the talcum powder
24 testing documents, that is, for asbestos that

Page 240

1 Johnson & Johnson has produced as part of this
2 case, have you reviewed any of them?
3    A.    I have not that I'm aware of and I'd
4 love to.
5    Q.    So would it be a fair statement
6 that, as of today, you have not done a
7 comprehensive analysis of the available asbestos
8 testing documents that have been provided in this
9 litigation?
10            MR. TISI:  Objection.
11    Misstates his report.
12            THE WITNESS:  Yeah, I've
13    reviewed.  Anything that's been in the
14    scientific literature I've seen and the
15    Longo report that was provided to me.
16 BY MR. HEGARTY:
17    Q.    But as far as the asbestos testing
18 documents that Johnson & Johnson has produced in
19 this case, you have not reviewed?
20    A.    No.
21            MR. TISI:  Objection.
22    Let me just --
23            THE WITNESS:  Yeah.
24            MR. TISI:  Let me just place

Page 241

1    an objection.
2            Misstates his report.
3 BY MR. HEGARTY:
4    Q.    You can answer.
5    A.    To my knowledge, I have not seen
6 testing that was specifically done by Johnson &
7 Johnson.
8    Q.    You said you would like to see that.
9            Why would you like to see it?
10    A.    Well, I'd like to see the methods
11 that they used.  I'd like to compare them to the
12 way in which it was done by other -- by others.
13 I'd like to know whether the -- the limit of
14 detection was the same.  I mean, I would want to
15 just basically evaluate it like any other
16 epidemiologist might.
17    Q.    The testing that has been done with
18 regard to talc and asbestos includes such methods
19 as TEM, XRD, PLM.
20            Are you an expert in any of those
21 methods?
22    A.    No, I'm not.
23    Q.    Now, you reference in your report,
24 you make reference in your report to IARC and

61 (Pages 238 - 241)

Page 242

1 Health Canada, correct?
2     A.   Yes, uh-huh.
3     Q.   Do you reference anywhere in your
4 report any findings as -- by FDA as it relates to
5 talc and ovarian cancer?
6         MR. TISI:  Objection.
7     Objection.
8         THE WITNESS:  I don't believe
9     I -- let me just think about this.
10    Not --
11        MR. TISI:  If you need to look
12    at your report --
13        THE WITNESS:  Yeah.
14        MR. TISI:  -- feel free to do
15    that.
16        THE WITNESS:  (Reviews
17    document.)
18        MR. TISI:  I mean, do you mind
19    if -- so I could move it along and help
20    you with this?
21        MR. HEGARTY:  Well, my
22    question --
23        MR. TISI:  He does cite it in
24    Section B.

Page 243

1 BY MR. HEGARTY:
2     Q.   My question is:  Do you do any
3 analysis, that is, a written analysis in your
4 report yourself of any FDA findings as relates to
5 talc and ovarian cancer?
6         MR. TISI:  Okay.  That's a
7     different question.  Referring to it as
8     it's referred in Footnote B, but his --
9     his analysis is a different question than
10    you asked.
11        THE WITNESS:  Yeah.  No, I did
12    not.  I did not do an analysis, but I did
13    see the FDA response to a citizens
14    committee that was made available to me.
15 BY MR. HEGARTY:
16    Q.   So was it your methodology to refer
17 to Health Canada and IARC but not to FDA as it
18 relates to talc and ovarian cancer?
19        MR. TISI:  Objection.
20    Misstates.
21        THE WITNESS:  No, it was not
22    my intent.
23 BY MR. HEGARTY:
24    Q.   Why did you not refer to what FDA

Page 244

1 has said with regard to talcum powder use and
2 ovarian cancer in your report?
3     A.   I don't know if it was -- if I had
4 that available at the time of writing the report.
5     Q.   When you say you had "that," you're
6 talking about the FDA denial of the Citizen
7 Petition letter?
8     A.   Correct.
9     Q.   Sitting here today, do you know if
10 you had it when you prepared your report?
11    A.   Honestly, I don't -- I don't recall,
12 but the problem is, is that was not a scientific
13 process.  It was merely stating certain -- certain
14 -- making certain statements that were not
15 referenced or was not peer-reviewed or I had no
16 idea how that response was determined, and all --
17 everything that I have reviewed in here has some
18 scientific basis behind it.
19        So even if I had it, I'm not sure I
20 would have included it as evidence one way or
21 another.  Because in the report, in the response,
22 they say this has not been found, or this has not
23 been found, or this is the case of something; but
24 there is no evidence behind those statements.

Page 245

1         So I'm not sure it would have met
2 the inclusion criteria for the work -- the work
3 that I evaluated.
4     Q.   For purposes of your methodology,
5 what was the inclusion criteria for you to comment
6 on something in your report?
7     A.   Scientifically reviewed evidence in
8 the scientific literature or -- or the Health
9 Canada report which I included because that had
10 been peer-reviewed by externally.  And things such
11 as the IARC work that had been done.
12        MR. HEGARTY:  Let's look at a
13    couple of things that FDA has said with
14    regard to talc and ovarian cancer, one of
15    which you already mentioned, and I'll
16    mark that next.
17        But first I wanted to mark as
18    Exhibit 15 a printout from FDA's website
19    as it relates to talc and ovarian cancer.
20        (Document marked for
21    identification as Harlow Exhibit 15.)
22 BY MR. HEGARTY:
23    Q.   And, first of all, I'll just ask
24 you:  Have you ever looked on FDA's website and

Page 246

1 determined what FDA says about talc and ovarian
2 cancer?
3    A.    I haven't.
4        MR. TISI:  I'm sorry.  What
5    did you say this is?  What are we up to?
6        MR. HEGARTY:  We're at 15.
7 BY MR. HEGARTY:
8    Q.    Please turn over to the next page of
9 this document.
10        Do you see the second paragraph
11 beginning "Published scientific literature"?
12    A.    I'm sorry.  On page 2?  Yes,
13 "Published scientific literature."  Yes.
14    Q.    This printout from FDA's website of
15 April 3, 2024 says:
16        "Published scientific literature
17 going back to the 1960s has suggested a possible
18 association between the use of powders containing
19 talc in the genital area and the incidence of
20 ovarian cancer.  However, these studies have not
21 conclusively demonstrated such a link, or if such
22 a link existed, what risk factors might be
23 involved."
24        Did I read that correctly?

Page 247

1    A.    That's what's written, yes.
2    Q.    That is a statement that does make
3 reference to FDA reviewing the scientific
4 literature, correct?
5    A.    I have no idea what they base that
6 statement on.
7        MR. TISI:  Can we take -- I've
8    got to make sure --
9        MR. HEGARTY:  I'm sorry?  You
10    want to go off the record?
11        MR. TISI:  Yeah, I've got
12    to --
13        MR. HEGARTY:  Let's go off the
14    record.
15        (Recess:  2:13 p.m. -
16        2:14 p.m.)
17        MR. HEGARTY:  Let's go back on
18    the record.
19 BY MR. HEGARTY:
20    Q.    We left off by talking about Exhibit
21 Number 15.  You can put that exhibit -- first of
22 all, did you finish your answer to my question?
23        My question was as it relates to
24 what FDA said in that it refers specifically to

Page 248

1 reviewing scientific literature and why.  Now I'll
2 add to my question.
3        Is that not worth referencing in
4 your report?
5    A.    I have no -- there's no evidence as
6 to how are they made that evaluation.  So I -- no.
7        My report was based on the
8 scientific literature, not what somebody says
9 about the scientific literature.
10    Q.    You do make reference in your report
11 to review articles, though, correct?
12    A.    But those are -- yes.  Well, yes,
13 review articles, but those review articles are
14 peer-reviewed in the scientific literature.
15        MR. HEGARTY:  Let me show
16    you --
17        THE WITNESS:  Are we done
18    with this?
19        MR. HEGARTY:  We're done with
20    that document.
21        THE WITNESS:  Okay.
22        MR. HEGARTY:  Let me show you
23    next the FDA rejection letter of the
24    Citizen Petitions that we talked about

Page 249

1    just a moment ago.
2        THE WITNESS:  Yeah.
3        MR. HEGARTY:  I marked it as
4    Exhibit 16.
5        (Document marked for
6    identification as Harlow Exhibit 16.)
7        THE WITNESS:  Right.
8        MR. TISI:  I'm not sure I've
9    seen this before.
10 BY MR. HEGARTY:
11    Q.    Have you read before right now,
12 Doctor, Exhibit 16?
13    A.    I have.
14    Q.    And now looking at it, do you
15 remember when you first read Exhibit 16 in
16 relation to today?
17    A.    I did not -- I do not believe I
18 looked -- I used this.  I'm not sure if I had this
19 or referred to it in generating my report.
20    Q.    You mentioned a moment ago that you
21 were aware that this was a letter issued in
22 response to a Citizen Petition.
23    A.    I believe that's what it was.
24    Q.    And as you can see in the first

63 (Pages 246 - 249)

Page 250

1  paragraph, it actually refers to two Citizen
2  Petitions.
3      A.    Okay.
4      Q.    Do you see that?
5      A.    Yes.
6      Q.    Those Citizen Petitions were seeking
7  warnings with regard to talcum powder use and
8  ovarian cancer, correct?
9              MR. TISI:  Objection.
10        Mischaracterizes.  Seeking to make FDA
11        require a warning, which is different.
12  BY MR. HEGARTY:
13      Q.    You can answer.
14      A.    Well, this is what it specifically
15  says, for the FDA to require a cancer warning on
16  cosmetic talc products.
17      Q.    Looking at the first page of
18  Exhibit 16, the third paragraph, FDA says in this
19  letter:
20            "After careful review" --
21      A.    This is right here?  This paragraph?
22      Q.    Yes, right here.
23      A.    Got it.
24      Q.    "After careful review and

Page 251

1  consideration of the information submitted in your
2  Petitions, the comments received in response to
3  the Petitions, and review of additional scientific
4  information, this letter is to advise you that FDA
5  is denying your Petitions.  FDA did not find that
6  the data submitted presented conclusive evidence
7  of a causal association between talc use in the
8  perineal area and ovarian cancer."
9            First of all, did I read that
10  correctly?
11      A.    That is what it is said.
12      Q.    Did you review the Citizen Petitions
13  themselves and see what they provided to FDA in
14  support of those petitions?
15      A.    I did not.
16      Q.    Do you understand, sitting here
17  today, that those are available and you can
18  determine what they provided to FDA?
19      A.    I didn't know that they were
20  available.
21      Q.    Please turn over next -- first of
22  all, before we go there.
23            How did you obtain for purposes of
24  your review the letter we're looking at, Exhibit

Page 252

1  Number 16?
2      A.    From Mr. Tisi.
3      Q.    Were you aware back in 2014 that FDA
4  had issued this letter?
5      A.    No.
6      Q.    Prior to your understanding -- let
7  me start -- ask a different way.
8            Were you aware of this letter prior
9  to being contacted by plaintiffs' counsel about
10  serving as an expert witness in this litigation?
11      A.    I was not aware.
12      Q.    Please turn over in Exhibit 16 to
13  page 4.  Actually, it starts at page 3 and then
14  carries over to page 4.
15      A.    Uh-huh.
16      Q.    Do you see on those two pages where
17  FDA is describing the findings of the NTP animal
18  study that was in 1993?
19      A.    Uh-huh.
20      Q.    Yes, Doctor?
21      A.    Yes.  Yes.
22      Q.    Have you read the 1993 NTP animal
23  study?
24      A.    I have not.

Page 253

1      Q.    Do you see where, after talking
2  about that study, on page 4 FDA says that:
3            "In light of these shortcomings, a
4  panel of experts at the 1994 ISRTP/FDA workshop
5  declared that the 1993 NTP study had no relevance
6  to human risk."
7            Do you see where I'm reading?
8      A.    I do.
9      Q.    Do you recall from your
10  participation in that 1994 ISRTP FDA workshop what
11  was said about the 1993 NTP study?
12      A.    I don't recall, but I would have to
13  look at the minutes of the excerpt from the --
14  from the meeting itself to see specifically what
15  was stated.
16      Q.    Looking at the next paragraph, the
17  letter says:
18            "In addition, we reviewed relevant
19  toxicity literature (consisting of 15 articles
20  from 1980 to 2008), not cited in your Petitions,
21  to determine if there was additional support at
22  this point in time to for your suggested warning
23  label."
24            Does this statement from FDA of

64 (Pages 250 - 253)

Page 254

1 their reviewing 15 articles from 1980 to 2008 not
2 satisfy your criteria for including a reference to
3 this letter in your report?
4      A.     Well, I don't know.  They basically
5 said, we reviewed 15 articles that were not cited
6 in the committee's petition "to determine if there
7 was additional support at this time to for your
8 suggested" scientific literature studies of acute
9 exposure effects.  "FDA did not find enough
10 additional support at this point in time for your
11 suggested warning label."
12            I don't know how they made that
13 decision that there was not -- not enough evidence
14 to come to this conclusion because I don't know
15 what the 15 articles are, and they're not cited in
16 this report.
17            So I would love to be able to look
18 at those and to be able to determine whether they
19 made a decision that was based on -- on reliable
20 and scientifically valid evidence in those 15
21 articles.
22      Q.     For purposes of your report, did you
23 do a comprehensive review of the toxicity
24 literature with regard to talcum powder exposure?

Page 255

1      A.     I didn't need to do that in order to
2 be able to assess biological plausibility.
3      Q.     So you did not do that?
4      A.     Correct.
5      Q.     Look under the section "Epidemiology
6 and Etiology Findings."
7            MR. TISI:  If you need to read
8      it, just take the time.
9 BY MR. HEGARTY:
10      Q.     The first paragraph notes --
11            MR. TISI:  Just a second.
12            MR. HEGARTY:  Well, I'm
13      reading it for him.
14            MR. TISI:  Well, no.  You're
15      very selectively reading.  You're
16      particularly good at it.  If he needs to
17      read it, he needs to read it.
18            MR. HEGARTY:  I'm not holding
19      him back.
20            MR. TISI:  Okay.  Well, I am
21      not either.  I'm encouraging if he wants
22      to do it, to do it.
23 BY MR. HEGARTY:
24      Q.     First of all, Doctor, had you read

Page 256

1 this section before today?
2      A.     I have.
3      Q.     This section begins:
4            "Your third major point is that
5 epidemiological studies confirm the causal
6 relation between genital application of talc and
7 ovarian cancer, and the protective effect of tubal
8 ligation or hysterectomy, preventing the
9 translocation of talc to the ovary."
10            Did I read that correctly?
11      A.     You did.
12      Q.     The letter goes on to say:
13            "After consideration of the
14 scientific literature submitted in support of both
15 Citizen Petitions" --
16            MR. TISI:  You know, honestly,
17      you're going really fast.  Can you just
18      slow down?  Read it.
19            And he's actually in the
20      process of reading while you're asking a
21      question.  Read what you want to read and
22      then allow him to ask the question, but
23      don't just speed read to him and ask him
24      if he agrees with it.

Page 257

1 BY MR. HEGARTY:
2      Q.     Doctor, was I reading too fast for
3 you?
4      A.     You can read at whatever speed, and
5 I will take as much time as I need to be able to
6 make sure that I digest the information.
7            MR. TISI:  And he's reading.
8      I'm watching him.
9 BY MR. HEGARTY:
10      Q.     And you will tell me if you need
11 more time?
12            MR. TISI:  And the record will
13      reflect he's reading as you're quoting to
14      him.  He's got the paper in front of him
15      as he's reading the document.  So let him
16      read it or quote to him, but don't do it
17      at the same time, please.
18 BY MR. HEGARTY:
19      Q.     FDA on this page we're looking at,
20 page 4 --
21            MR. TISI:  You're still doing
22      it.  Objection.
23            MR. HEGARTY:  Fine.  He'll
24      tell me if he needs more time.

65 (Pages 254 - 257)

Page 258

1        MR. TISI:  No.
2        Are you reading the document,
3    sir?
4        THE WITNESS:  I'm waiting.
5    I'm waiting to see what the question is.
6        MR. TISI:  Okay.
7 BY MR. HEGARTY:
8    Q.    Look at paragraph 2 on page 4.  FDA
9 writes:
10        "Several of the studies acknowledge
11 biases in the study design and no single study has
12 considered all the factors that potentially
13 contribute to ovarian cancer, including selection
14 bias and/or uncontrolled confounding that result
15 in spurious positive association between talc use
16 and ovarian cancer risk."
17        Did I read that correctly?
18    A.    You read that correctly.
19    Q.    Do you agree that several studies
20 acknowledge the biases that are commented in that
21 paragraph?
22    A.    I have no idea of what studies they
23 are referring to, so I can't comment on that.  If
24 they had cited what those studies were, then I

Page 259

1 would be able to comment on it.
2    Q.    The next paragraph says:
3        "Results of case-control studies do
4 not demonstrate a consistent positive association
5 across studies."
6        Do you agree with that statement?
7    A.    No, I do not.
8    Q.    The next statement says:
9        "Some studies have found small
10 positive associations between talc and ovarian
11 cancer but the lower confidence limits are often
12 close to 1.0."
13        First, do you agree with that part
14 of that sentence?
15    A.    That the lower confidence limits are
16 often close to 1.0?  Yes.
17    Q.    The next part of that paragraph 3
18 says "and dose-response evidence is lacking."
19        Do you agree that as of 2014,
20 dose-response evidence was lacking?
21    A.    No, I do not agree with that.
22        We showed dose response in 1992.
23 They showed dose response in 1999.  So I know for
24 sure there some of the biggest and I think most

Page 260

1 scientifically valid studies did show a dose
2 response.
3        And just if I may?
4    Q.    And -- I'm sorry.
5    A.    With respect to lower confidence
6 intervals of 1.0, that does not mean that the risk
7 estimate is going to be 1.0.  It just means 95
8 percent of the time it's going to be somewhere
9 between 1.0 and something greater, and so there is
10 no reason to make the assumption that the
11 association is null.
12    Q.    The next paragraph, paragraph 4,
13 says:
14        "A cogent biologic mechanism --
15 biological mechanism by which talc might lead to
16 ovarian cancer is lacking."
17        Do you agree that that was an
18 accurate statement as of 2014?
19    A.    No, I do not.
20    Q.    Please turn over to the next page,
21 page 6.
22    A.    Oh, not page 5?
23    Q.    I'm sorry.  Page 5.  Paragraph 6
24 starts out by referring to the IARC finding.

Page 261

1    A.    Yeah.
2    Q.    Do you see that?
3    A.    I do.
4    Q.    The letter then goes on to say:
5        "But the results of the Nurses'
6 Health Study, a large prospective cohort study,
7 revealed no overall association with ever talc use
8 and epithelial ovarian cancer."
9        That's a correct characterization of
10 the Gertig study, correct?
11    A.    I think -- I think it is a
12 selected -- a selected component from the study
13 that misleads the public as to what the
14 association truly was across different --
15 different variations of exposure assessment.
16    Q.    With regard to this letter, do you
17 have any experience with FDA response -- FDA's
18 responses to Citizen Petitions?
19    A.    No, I have no idea.
20    Q.    Have you ever been involved in an
21 FDA review of a Citizen Petition?
22    A.    I have not.
23    Q.    Have you ever discussed with anyone
24 at FDA or otherwise how it handles Citizen

66 (Pages 258 - 261)

Page 262

1 Petitions?
2    A.    I have not.
3    Q.    This letter was authored by Steve
4 Musser.
5          Do you know Steve Musser?
6    A.    I do not.
7    Q.    Is it your opinion that the doctors
8 and scientists at FDA involved in responding to
9 the Citizen Petition were not qualified to assess
10 the safety data?
11   A.    I can't speak to whether they were
12 qualified or not.  I just believe that what they
13 put forward here is -- is inaccurate.
14   Q.    Is it your belief that the -- that
15 those involved in putting together this FDA
16 response did not do a proper job?
17   A.    Yes.
18   Q.    Is it your contention that FDA
19 failed to do its job with regard to the safety of
20 talc?
21          MR. TISI:  Objection.  It's
22    not his medical --
23          THE WITNESS:  I can't -- I
24    can't speak --

Page 263

1          MR. TISI:  Objection.  Outside
2    the scope of the report, but you may
3    answer.
4          THE WITNESS:  I can't speak
5    as to what their responsibility is in
6    this situation.
7 BY MR. HEGARTY:
8    Q.    Is it your contention that FDA
9 believes that there is a risk of ovarian cancer
10 with talc use and has chosen to do nothing about
11 it?
12   A.    I --
13          MR. TISI:  Objection.  Calls
14    for speculation.
15          THE WITNESS:  Yeah.  Again, I
16    cannot speculate on that.
17 BY MR. HEGARTY:
18   Q.    Is it your opinion or your belief
19 that FDA believes there is a warning that's
20 necessary on talcum powder products for ovarian
21 cancer, but they're just not going to require it?
22          MR. TISI:  Objection.  Calls
23    for speculation.
24          THE WITNESS:  Yeah.  I don't

Page 264

1    know, but they specifically say that "the
2    potential for particulates to migrate
3    from the perineum and vagina to the
4    peritoneal cavity is indisputable."
5 BY MR. HEGARTY:
6    Q.    What is -- what does it mean to say
7 the potential for that to happen is
8 "indisputable"?  What's your interpretation of
9 that phrase -- of that terminology?
10   A.    That it is plausible --
11   Q.    Phraseology.
12   A.    That it is plausible that the
13 particulates will migrate.
14   Q.    I'm finished with that document for
15 now, Doctor.
16          You're familiar with the NIH,
17 correct?
18   A.    I am.
19   Q.    In fact, your report and your CV
20 refers to work you've done through the NIH,
21 correct?
22   A.    Yes.
23   Q.    Including you have one grant that
24 you're working from from NIH, correct?

Page 265

1    A.    I have two.
2    Q.    You also have another grant pending?
3    A.    No.  No.  I have a grant that I'm
4 the PI of looking at Swedish national registry
5 data and its -- and factors that influence
6 unexplained vulvar pain, and I'm the PI of a
7 subcontract with the Prevention of Lower Urinary
8 Tract Symptoms Research Consortium on women's
9 urological health.  Those are both NIH grants.
10   Q.    You have also served on NIH
11 committees, correct?
12   A.    I have.
13   Q.    You agree with me that the NIH is
14 the federal government's primary health agency on
15 cancer research in the U.S., correct?
16   A.    That's correct.
17   Q.    Do you agree that the NCI is a
18 capable and reliable resource in this country for
19 information on cancer?
20          MR. TISI:  Objection.
21          THE WITNESS:  Yeah.  I think
22    the -- I can't speak to their decisions
23    on what to have as outward-facing to the
24    public.

67 (Pages 262 - 265)

Page 266

1  BY MR. HEGARTY:
2      Q.    Do you agree that NCI is a reliable
3  resource for doctors with regard to cancer
4  research?
5          MR. TISI:  Objection.
6      Objection.  Vague.
7          THE WITNESS:  I think -- no.
8          MR. TISI:  Depending upon the
9      issue.  Go ahead.
10         THE WITNESS:  Yeah.  No, I
11     think a reliable resource for -- for
12     doctors and everyone should be evidence
13     from the scientific literature.  If it is
14     accurately evaluated, then it can be a
15     resource in the external-facing website
16     of the NCI.
17 BY MR. HEGARTY:
18     Q.    You have served on NCI committees,
19 correct?
20     A.    I served on the Board of Scientific
21 Counselors.  No.  Board -- board of -- I think
22 it's the Board of Scientific Counselors for the
23 NCI which evaluates intramural research, which is
24 research that is done by investigators at NCI that

Page 267

1  work out of NCI itself.
2      Q.    Was the work you did and reported
3  out of that committee reliable?
4          MR. TISI:  Objection.
5          THE WITNESS:  Well, that --
6      that committee evaluates the scientific
7      approach and scientific rigor of research
8      that is being done by NCI internal
9      investigators, and they publish their
10     research in the scientific literature,
11     just like those of us who are outside of
12     the NCI and any other government
13     organization.
14 BY MR. HEGARTY:
15     Q.    So is it your testimony that
16 anything NCI puts out with regard to cancer is not
17 necessarily a reliable authority that doctors can
18 rely on?
19         MR. TISI:  Objection.
20         THE WITNESS:  Yeah.
21         MR. TISI:  Form.
22         THE WITNESS:  Could you
23     repeat that question?
24 BY MR. HEGARTY:

Page 268

1      Q.    Sure.
2          Is it your contention that documents
3  put out by NCI with regard to cancer are not
4  necessarily reliable and can be relied upon by
5  doctors who are treating patients for cancer?
6      A.    I can't say that that's the case
7  across the board.  I think it depends on what --
8  what they are putting out and whether they're
9  putting out is -- is indisputable or is accurate
10 in terms of representing the view of the
11 scientific community.
12     Q.    Starting on page 16 of your report,
13 you make reference to the NCI's Physician Data
14 Query, or PDQ, correct?
15     A.    That's correct.
16         Hold on.  Let me just.  I'll pull
17 that up.
18     Q.    And I'll --
19     A.    Oh, in my report.
20     Q.    I'm going to mark it as an exhibit.
21     A.    Okay.
22     Q.    My reference was simply to --
23     A.    Okay.
24     Q.    -- page 16 of your report.

Page 269

1      A.    Yeah.  Yeah.
2      Q.    Prior to being contacted by
3  plaintiffs' counsel about serving as an expert
4  witness in this litigation, had you ever read an
5  NCI PDQ on ovarian cancer?
6      A.    I had not.
7      Q.    Since being contacted by plaintiffs'
8  counsel about serving as an expert witness in this
9  case, have you reviewed all the NCI PDQs on
10 ovarian cancer that NCI has put out over the
11 years?
12     A.    I have reviewed many of them.
13     Q.    With regard to those you reviewed,
14 did you get them from counsel for plaintiffs?
15     A.    I -- I went -- some I got from the
16 counsel and some I went onto the PDQ site myself
17 and pulled off.
18     Q.    Your report on page 17 refers to the
19 2023 NCI PDQ?
20     A.    That's correct.
21     Q.    When did you first review the NCI
22 PDQ you refer to on page 17 of your report?
23     A.    Yeah, in the process of preparing
24 the report.

68 (Pages 266 - 269)

Page 270

1    MR. HEGARTY: I'm going to
2  mark as the next exhibit, which is
3  Exhibit 17, the current version of the
4  NCI PDQ that is on NCI's website.
5    (Document marked for
6  identification as Harlow Exhibit 17.)
7    THE WITNESS:  Is this 2023?
8 BY MR. HEGARTY:
9    Q.    If you look over on page 25 of 27,
10 at the top, do you see where this refers to the
11 latest update as being from March 6, 2024?
12   A.    Yeah.  Ah.  Yes.  Yes, yes, yes.
13   Q.    Have you -- have you reviewed the
14 March 6, 2024 NCI --
15   A.    I have.
16   Q.    -- PDQ?
17   A.    I have.
18   Q.    When did you review it --
19   A.    Recently.
20   Q.    -- first time?
21   A.    Recently, but it was not available
22 in my report.
23   Q.    Please turn over to page 25 of 27.
24   A.    That's where we were before, right?

Page 271

1    Q.    That's right.
2    A.    "About This PDQ Summary"?
3    Q.    Yes.  Under the section "Purpose of
4  This Summary."
5      Do you see where I'm pointing to?
6    A.    Yes, uh-huh.
7    Q.    It states that:
8      "This PDQ cancer information summary
9  for health professionals provides comprehensive
10 peer-reviewed, evidence-based information about
11 ovarian fallopian tube, and primary peritoneal
12 cancers prevention."
13     Do you dispute that that's what this
14 NCI PDQ does?
15   A.    That's what they indicate it does.
16   Q.    My question, though, is:  Do you
17 dispute that that's what this NCI PDQ does?
18     MR. TISI:  Objection.  Asked
19   and answered.
20     THE WITNESS:  That's what
21   they specifically say it does.
22 BY MR. HEGARTY:
23   Q.    Do you dispute that that's what this
24 NCI PDQ does?

Page 272

1    A.    No, I don't -- I don't dispute that
2  that's what they are intending to do.
3    Q.    Looking at the -- well, let me
4  before I go there.
5      You said that that's not -- you
6  don't dispute that that's what they intended to
7  do.
8      You've read this document, correct?
9    A.    Uh-huh.
10   Q.    Yes?
11   A.    Yes.
12   Q.    Did the NCI PDQ board that put this
13 out provide "an information summary for health
14 professionals that provides comprehensive,
15 peer-reviewed, evidence-based information about
16 ovarian, fallopian tube, and primary peritoneal
17 cancers prevention"?
18     MR. TISI:  Objection.  Asked
19   and answered.
20     THE WITNESS:   It is what they
21   intended to do, and that's -- that's the
22   answer.
23 BY MR. HEGARTY:
24   Q.    Do you agree that they did do that,

Page 273

1 not that they intended to do it?
2    A.    No, I agree that they did it.
3    Q.    Okay.  Under the section "Reviewers
4 and Updates," do you see where --
5    A.    Where is that?
6    Q.    It's in the same page just below
7 where we were reading.
8    A.    Same page?
9    Q.    Still page 25 of 27.
10   A.    Oh.  I'm sorry.  25 of 27.  No, I
11 was -- oh, okay.  I'm sorry.  Where on 25 again?
12   Q.    Under the section "Reviewers and
13 Updates."
14     MR. TISI:  Right here.
15     THE WITNESS:  Got it.
16 BY MR. HEGARTY:
17   Q.    The second paragraph says:
18     "Board members review recently
19 published articles each month to determine whether
20 an article should: be discussed at a meeting, be
21 cited with text, or" -- turn the page.
22   A.    Uh-huh.
23   Q.    "Replace or update an existing
24 article that is already cited."

69 (Pages 270 - 273)

Page 274

1    Did I read that correctly?
2         MR. TISI: He just read the
3    second paragraph. Please read the whole
4    thing, sir.
5         MR. HEGARTY: Chris, can you
6    wait until you ask your questions?
7         MR. TISI: No. Honestly,
8    you --
9         MR. HEGARTY: That rule does
10   not apply at depositions.
11        MR. TISI: All right.
12        MR. HEGARTY: You know that.
13        MR. TISI: You know, you
14   know -- you know what you are doing. You
15   are cherry-picking. You are
16   cherry-picking sentences out of context,
17   and I want him to have the opportunity to
18   read the documents that you put in front
19   of him.
20        MR. HEGARTY: You will have
21   your turn at the end of my examination to
22   ask him that.
23        MR. TISI: I understand, but,
24   you know, honestly, it's unfair to ask a

Page 275

1    witness without giving the opportunity to
2    read. You're not asking him: Do you
3    need to read this? Do you need to read
4    the entire sentence?
5         You're just reading sentences
6    and ask him: Did I read this correctly?
7         MR. HEGARTY: Please limit
8    your objections --
9         MR. TISI: No, I'm not going
10   to.
11        MR. HEGARTY: -- to what the
12   court has asked us all to do, which is to
13   form of the question.
14        MR. TISI: I have been doing.
15   I have almost made no objections.
16        I do object to you taking
17   documents, reading sentences out of
18   context and ask if you read them
19   correctly. Objection to form.
20        MR. HEGARTY: Doctor, I'm
21   going to mark next as Exhibit 18 the PDQ
22   Screening and Prevention Editorial Board.
23        MR. TISI: So there's no
24   question? You're not going to let him

Page 276

1    answer the question you just gave him?
2         (Document marked for
3         identification as Harlow Exhibit 18.)
4         MR. TISI: Go ahead. Next
5    one.
6   BY MR. HEGARTY:
7    Q.   I marked this document as
8    Exhibit 19.
9    A.   I believe it says 18.
10   Q.   I'm sorry. Thank you for correcting
11   me. Exhibit 18. I don't want to mess up the
12   exhibits.
13   A.   Uh-huh.
14   Q.   Have you reviewed the list of PDQ
15   Screening and Prevention Editorial Board Members
16   Report right now?
17   A.   I have, actually.
18   Q.   Do you know any of the board
19   members?
20   A.   I do not.
21   Q.   There is a board member from
22   University of Washington.
23        Do you know her?
24   A.   I don't.

Page 277

1    Q.   There's also a board member from
2    Harvard Medical School, Lydia Pace.
3         Do you know her?
4    A.   I don't.
5    Q.   Do you contend that the members of
6    the NCI PDQ board that are responsible for the NCI
7    PDQ on ovarian cancer are not experts in their
8    fields?
9         MR. TISI: Objection.
10        THE WITNESS: I don't know
11        what their fields are. I don't know
12        whether they are experts on evaluating
13        talc and ovarian cancer risk.
14   BY MR. HEGARTY:
15   Q.   Do you contend that the members of
16   the NCI PDQ Board that we're looking at in
17   Exhibit 18 did not review the pertinent literature
18   on talcum powder and ovarian cancer in preparing
19   Exhibit Number 17?
20   A.   No, I don't dispute that they didn't
21   review the literature.
22   Q.   Do you contend that they do not
23   stand behind the statements in the PDQ about talc
24   and ovarian cancer that we marked as Exhibit 17?

70 (Pages 274 - 277)

Page 278

1    A.    I would assume that they do.
2    Q.    Do you contend that the statements
3 that they make in the NCI PDQ on ovarian cancer
4 and talc are false?
5         MR. TISI:  Take a look at it
6    before.
7         THE WITNESS:   What particular
8    statements are we referring to?
9 BY MR. HEGARTY:
10   Q.    In Exhibit 17, the statements on
11 talc and ovarian cancer over on page 21 of 27
12 carrying over to page 22 of 27.
13   A.    Right.  There we go.
14   Q.    First of all, before I ask, I'll go
15 back to that question.
16        You have read before today the
17 section on "Perineal Talc Exposure" on pages 21
18 and 22?
19   A.    Yes.
20   Q.    You're familiar with what that says,
21 correct?
22   A.    I am.
23   Q.    Going back to my question:  Do you
24 contend that the statements in the section on

Page 279

1 "Perineal Talc Exposure" are false?
2         MR. TISI:  Objection.  Take a
3    look if you need to.
4         THE WITNESS:  (Reviews
5    document.)
6         There are some statements here
7    that I believe are false.
8 BY MR. HEGARTY:
9    Q.    Which statements do you believe are
10 false?
11   A.    The first sentence.
12   Q.    Any other statements?
13   A.    "Results from case" --
14   Q.    I'm sorry.  Go ahead.
15   A.    "Results from case-control and
16 cohort studies are inconsistent, so the data are
17 inadequate to support an association between
18 perineal talc exposure and an increased risk of
19 ovarian cancer."
20   Q.    What other statements do you contend
21 in that section are false?
22   A.    Hang on a second.  Right.
23        I take issue with the next sentence
24 that cited the study by Huncharek as -- as the

Page 280

1 fact that meta-analyses did not show any kind of a
2 dose-response relationship, but the overall
3 association cited I agree with.
4         Oh, and also in their citation of
5 the -- of the pooled analysis from the Ovarian
6 Cancer Association Consortium, I agree with their
7 citation of what the overall association.  But
8 their -- their -- their contention that lifetime
9 numbers of applications was not -- was not
10 statistically significant, making an assumption
11 that there was no increase in risk with increasing
12 numbers of exposure, was simply based on
13 statistical significance.
14        Whereas, as I recall when going back
15 and looking at that, and you look at the lower and
16 upper 95 percent confidence bounds, you see a
17 shifting of increased risk over increasing
18 exposure.
19        So the way in which they
20 characterize that I felt was not accurate.
21        They cite -- they cite that the
22 subset analysis of the prospective study -- I
23 believe that was by Woolen; is that correct?  Is
24 that the citation?

Page 281

1    Q.    Yes.
2    A.    Yeah.  They -- they -- they said --
3 yeah, they -- yeah, they -- they were -- let's
4 see.
5         The subset analysis of the
6 prospective study was essentially made by the
7 original report.
8         Right.  First of all, I think they
9 made an incorrect -- they made an incorrect
10 citation in this.
11        But in any case, I believe that they
12 were stating something about the approach of
13 excluding two of the three cohort studies was sort
14 of cherry-picking, and I believe that it was not,
15 and that the other two cohort studies are -- are
16 very much flawed in terms of selection bias and
17 exposure assessment.
18        (Reviews document.)
19        Again, I feel that the first
20 sentence of the next paragraph where they chose to
21 only discuss the overall association of 1.09 and
22 not the fact that there was stronger associations
23 observed when more appropriately assessing the
24 exposure that was -- was left out.

71 (Pages 278 - 281)

Page 282

1    And I think any reference to the
2  Women's Health Initiative is flawed because they
3  didn't start recruiting women until after the age
4  of 50, when many women who would have already been
5  diagnosed with ovarian cancer could not have been
6  included, and so I find that to be a poor example
7  of a cohort study to be used to assess this
8  association.
9        I think that's plenty.
10    Q.    You make the statement in your
11  expert report at page 17 --
12    A.    Yes.
13    Q.    -- that the -- that with regard to
14  the comment on the Woolen study that they
15  "incorrectly cited in the PDQ report as O'Brien et
16  al."
17        Do you see where I'm referring you
18  to?
19    A.    Yes, I do.
20    Q.    What do you mean when you say
21  "incorrectly cited in the PDQ report as O'Brien et
22  al."?
23    A.    I believe they -- they made an error
24  in which study they were citing.  So.

Page 283

1    Q.    Why do you believe they made an
2  error?
3    A.    Because I thought that they cited
4  the wrong -- they made the wrong citation.
5        So what's inconsistent with the
6  meaning of this statement is unclear, but the PDQ
7  goes on to cite the Gertig analysis.
8        So in -- let's see.  When they talk
9  about the Gertig analysis, which is the 1.09,
10  reference 13 -- no, that wasn't it.  There was
11  another location I thought.
12    Q.    And the reason I ask you --
13    A.    Yeah.
14    Q.    -- is because at the end of that
15  sentence that you're referring to, it says:
16        "The subset analysis" -- that same.
17    A.    Oh.
18    Q.    "The subset analysis of the
19  prospective study was inconsistent with the main
20  findings of the original report" refers to the
21  O'Brien study, correct?
22    A.    Yeah.
23    Q.    So do you still say that their
24  reference at the end of that sentence was

Page 284

1  incorrect?
2    A.    Hold on a second.  I might have made
3  a mistake, which can happen.
4        (Reviews document.)
5        "Was inconsistent with the main
6  findings."  The meaning of the statement is
7  unclear.  The PDQ goes on to cite the Gertig
8  analysis.
9        That might have been an error in the
10  citation there.
11    Q.    You've read the Woolen paper,
12  correct?
13    A.    I have.
14    Q.    And you saw where they used a subset
15  of data from the Nurses' Health Study 1, correct?
16    A.    Yes.
17    Q.    That subset of data was unpublished
18  data, correct?
19    A.    I believe they actually got it from
20  the Nurses' Health Study.  That's my -- that's my
21  understanding.
22        MR. HEGARTY:  I'll mark so you
23    can look at it --
24        THE WITNESS:  Yeah.

Page 285

1        MR. HEGARTY:  -- as Exhibit
2    Number 19 the Woolen paper.
3        (Document marked for
4    identification as Harlow Exhibit 19.)
5        THE WITNESS:  Yeah.
6  BY MR. HEGARTY:
7    Q.    This is a paper you've read,
8  correct?
9    A.    Yes.
10    Q.    If you look over on the second page,
11  in the upper right-hand corner, it describes that
12  the -- it describes the data that they got from
13  the Nurses' Health Study, correct?
14        In particular, if you look at the
15  very last couple of sentences, it says:
16        "The data from NHS 1" --
17        MS. PARFITT:  Mark, I'm sorry.
18    Where are you?
19        MR. HEGARTY:  I'm on page --
20        THE WITNESS:  2527.
21        MR. HEGARTY:  -- 2527 in the
22    upper right-hand corner.
23        MS. PARFITT:  Thank you.
24  BY MR. HEGARTY:

72 (Pages 282 - 285)

Page 286

1    Q.    It says:
2        "The data from NHS 1 were provided
3  and described in the Supplemental Table 1 and are
4  included in the systematic review.  The data from
5  the SIS study were not provided to us due to the
6  small sample size of exposed individuals in the
7  highest exposure category."
8        What that section is saying is that
9  they got the data from the NHS 1 study, correct?
10   A.    That's correct.
11   Q.    And do you understand that that was
12  unpublished data?
13   A.    I don't know whether it was
14  unpublished.  They just got the actual data
15  itself.  It may have been part of the Gertig
16  analysis.
17   Q.    Please look over to page 2569 -- I'm
18  sorry -- 2529.
19        At the very bottom where the
20  footnote is referring to, that is Footnote 5
21  referring to O'Brien?
22   A.    Yes.
23   Q.    The NHS data.
24        Do you see where it says:

Page 287

1        "O'Brien did not publish on daily
2  exposure for the National Health Study
3  participants.  However, these data were available
4  and O'Brien provided these data for inclusion"?
5   A.    Yes, I see that.
6   Q.    Is that telling you that the data
7  that's reported as to -- as to Study 11 in the
8  table above was unpublished data?
9   A.    (Reviews document.)
10        It may have been.  I just don't
11  know.
12   Q.    And going back to your report, what
13  NCI is saying in this PDQ is that the findings in
14  Woolen, which represent a subset analysis, was
15  inconsistent with the main findings of the
16  original report, and they refer to O'Brien.
17        So what they're saying there is that
18  the Woolen findings were inconsistent with the
19  overall findings of what O'Brien reported in their
20  2020 report.
21        Do you see that?
22        MR. TISI:  Objection.
23    Misstates.
24        THE WITNESS:  So show -- show

Page 288

1  me exactly where that is.
2  BY MR. HEGARTY:
3   Q.    Sure.  I'm looking now back at the
4  NCI PDQ.
5   A.    Okay.  Let me just go back to the
6  NCI PDQ.
7   Q.    Back to the section that you called
8  out in your report.
9   A.    Yes.
10   Q.    And do you see where in the NCI PDQ
11  it says:
12        "The subset analysis of the
13  prospective study" -- that's the NHS study -- "was
14  inconsistent with the main findings of the
15  original report" citing to O'Brien.
16        So they're saying there is that
17  the subset analysis in Woolen was inconsistent
18  with the overall reported findings from O'Brien,
19  correct?
20        MR. TISI:  Objection.
21        THE WITNESS:  (Reviews
22    document.)
23        Yes, it appears that they --
24    that they have additional -- they had

Page 289

1        additional information that was not part
2        of it.  That's correct.
3  BY MR. HEGARTY:
4   Q.    So what they say or what they cite
5  to for the statement that you called out in your
6  report is accurate, correct?
7        MS. PARFITT:  Objection.
8    Sorry.
9        MR. TISI:  Objection.
10        THE WITNESS:  Yeah, I may have
11    -- I may have misinterpreted the
12    I was -- when I was looking at
13    this, my concern was that people felt
14    that the exclusion of the sisters health
15    study -- the Sister Study and the Women's
16    Health Initiative were a concern on the
17    part of the PDQ, and my belief was that
18    it was an appropriate exclusion from
19    their analyses.
20  BY MR. HEGARTY:
21   Q.    Ultimately, in the NCI PDQ, the
22  document itself says that:
23        "Results from case-control and
24  cohort studies are inconsistent, so the data are

73 (Pages 286 - 289)

Page 290

1 inadequate to support an association between
2 perineal talc exposure and an increased risk of
3 ovarian cancer."
4        That's what they say, correct?
5    A.    The first sentence there, which is
6 what I disputed.
7    Q.    You disagree with that?
8    A.    I -- correct.
9    Q.    And with regard to the Gertig study,
10 which you thought they intended to reference, that
11 study, as we looked at earlier, reported no
12 overall association between epithelial ovarian
13 cancer and ever use of talc, correct?
14    A.    They reported a 1.09 relative risk
15 with a confidence interval of 0.86 to 1.37, which
16 suggests that the risk falls somewhere between
17 there.
18    Q.    Going back to the Board that we
19 talked about earlier, the NCI PDQ Board.
20    A.    Yes.
21    Q.    Is it your contention that they
22 failed in their responsibility to doctors to put
23 out accurate statements about the risk factors for
24 ovarian cancer, in particular perineal talc

Page 291

1 exposure?
2    A.    I --
3        MR. TISI:  Objection.
4        THE WITNESS:  Well, I believe
5    I went through the error -- besides the
6    issue that I may have misinterpreted,
7    there were several other statements that
8    I indicated that I felt were misleading.
9 BY MR. HEGARTY:
10    Q.    My question, though, is a little bit
11 different than that.
12        Is it your contention that the PDQ
13 Board members failed in their responsibilities to
14 doctors to put out accurate statements about
15 perineal talc use and ovarian cancer?
16    A.    I guess by looking at that first
17 sentence of "results from case-control and cohort
18 studies are inconsistent, so the data are
19 inadequate to support an association between
20 perineal talc exposure and an increased risk of
21 ovarian cancer" is a -- I would say, yes, they
22 failed in their duty to accurately -- accurately
23 explain the results.
24    Q.    Is it your contention that the

Page 292

1 doctors reading this NCI PDQ should not rely on it
2 in treating their patients?
3    A.    What doctors?
4    Q.    Doctors treating patients for
5 ovarian cancer.
6    A.    Well, if they're already treating
7 them for ovarian cancer, it doesn't -- this
8 doesn't relate to that.  This doesn't provide
9 guidance on treatment approaches for it.
10    Q.    Is it your opinion that the summary
11 that is in the NCI PDQ about perineal talc
12 exposure and ovarian cancer is not a reliable
13 summary?
14    A.    Yes, I would agree with that.
15    Q.    You can put that document aside for
16 the moment.
17        You make reference in your report --
18        MR. TISI:  How long have we
19    been on the record?
20        MR. HEGARTY:  You want to take
21    a break?
22        MR. TISI:  I just want to take
23    every hour or so.
24        MR. HEGARTY:  Sure.  Let's go

Page 293

1    off the record.
2        (Recess:  2:58 p.m. -
3        3:10 p.m.)
4        MR. HEGARTY:  We are back on
5    the record.
6 BY MR. HEGARTY:
7    Q.    Doctor, I want to shift gears a
8 little bit.  Unless you got something else you
9 wanted to say?
10    A.    No, I'll wait till later.
11    Q.    Okay.
12        MR. TISI:  Well, if you do
13    have something else to say, go ahead.
14        THE WITNESS:  Well --
15 BY MR. HEGARTY:
16    Q.    You have something you want to say
17 with regard to the subject we were talking about,
18 the NCI PDQ?
19    A.    Yes.  Just the fact that in this
20 sentence where it says "The subset analysis of the
21 prospective study was inconsistent with the main
22 findings of the original report," when I think
23 about the original report of the Nurses' Health
24 Study, which is what that prospective study is, I

74 (Pages 290 - 293)

Page 294

1 was assuming they were referring to Gertig because
2 that was the original.
3          I didn't -- but, in fact, in this,
4 which is very confusing, they talk about the
5 original report as being O'Brien.  But that wasn't
6 the original report.  Because the sentence before
7 that was talking about Woolen.
8          So they talk about Woolen finding
9 the 1.47, but then they say "The subset analysis
10 of the prospective study," which they say was --
11 was done by -- which was -- the prospective --
12 "The subset analysis of the prospective study was
13 inconsistent with the main findings of the
14 original report."
15          Well, when you talk about the
16 original report, there's no reference to O'Brien's
17 report here.  The reference should be to -- maybe
18 they didn't mean it to be original report, but
19 that's the reason why I thought it should have
20 been Gertig and not O'Brien.
21     Q.    Okay.
22     A.    And that was my -- that was the
23 confusion there.
24     Q.    Okay.  Thank you.

Page 295

1          You make reference in your report at
2 several places to the finding from the Gertig
3 study about the relative risk or, I should say,
4 odds ratios reported for serous cancer, correct?
5     A.    Yes.
6     Q.    The authors, as you know, reported
7 an odds ratio of 1.40 from that 2000 Gertig study,
8 correct?
9     A.    Let me just -- just give me a moment
10 to -- to get the Gertig study open and take a
11 look.
12          Okay.  So now can you repeat the
13 question?
14     Q.    Sure.
15          You make reference in your report --
16     A.    Oh, in my report.
17     Q.    -- to the finding from Gertig of
18 1.04 odds ratio for serous adenocarcinoma.
19     A.    Oh.  I believe so.
20          Again, let me just go to that.  That
21 was with the Nurses' Health Study.
22          1.40 they report odds ratio for
23 invasive serous ovarian cancer.  Yes, that's
24 correct.

Page 296

1     Q.    Are you aware, though, that there
2 was a follow-up study --
3          MR. TISI:  Do you need the
4     article?
5          THE WITNESS:  No, I have it.
6 BY MR. HEGARTY:
7     Q.    Are you aware that there was a
8 follow-up study done reported with the first
9 author of Gates in 2010 that had 10 more years of
10 data from the Nurses' Health Study?
11     A.    Yes.
12     Q.    Have you read the Gertig -- I'm
13 sorry -- the Gates 2010 study?
14     A.    I believe I did.
15          MR. HEGARTY:  I've marked as
16     Exhibit Number 20 that study.
17          THE WITNESS:  Yeah.
18          (Document marked for
19     identification as Harlow Exhibit 20.)
20 BY MR. HEGARTY:
21     Q.    Have you read Exhibit Number 10, the
22 Gates 2010 study?
23     A.    Yes.
24     Q.    Exhibit 20.  I'm sorry.

Page 297

1     A.    Yes, I know that I had reviewed
2 this.
3     Q.    So have you read Exhibit Number 20,
4 the Gates 2010 study?
5     A.    Yeah, I have it in front of me.
6 Yes.
7          Yes, I had read that.
8     Q.    Please turn over to Table 4 on page
9 50 of that study.
10          Tell me when you're there.
11     A.    I'm there.
12     Q.    The authors reported that as to talc
13 and serous invasive ovarian cancer, the relative
14 risk they found 10 years later with 10 years
15 additional data was 1.06 with a confidence
16 interval of .84 to 1.35, correct?
17     A.    That is correct, but it's only for
18 dichotomous of exposure, greater than once per
19 week or less than once per week.
20     Q.    Did you do any analysis as to
21 whether that is a different result than ever
22 never?
23     A.    I didn't do an analysis, no, but it
24 is a different.  And what's -- what's interesting

75 (Pages 294 - 297)

Page 298

1  about that, greater than -- let me just see. Let
2  me look.
3         "Estimates were adjusted for all
4  variables."
5         Well, I don't know whether the less
6  than once per week includes those who were
7  unexposed as well.
8         I'm just looking to see if that's
9  the case.
10        Because if it does not, if it -- if
11 it mixes together those who were unexposed with
12 those who were exposed less than once a week, then
13 it would naturally attenuate the association.
14    Q.   In preparing your report, you did
15 not make reference to this finding from Gates,
16 correct?
17    A.   No, I didn't. I don't believe I
18 did.
19    Q.   Did you consciously make a decision
20 not to refer to this finding from the Gates 2010
21 study?
22    A.   I did not consciously make that
23 decision. It's there's no new data. All it was
24 was additional -- it was additional follow-up

Page 299

1  period of time.
2     Q.   Isn't this, though, at least some
3  data that is contrary to the 1.4 odds ratio
4  finding from the Gertig 2000 paper as it relates
5  to serous invasive tumors?
6     A.   Let me look at the Gertig.
7         It's actually -- again, it's -- it's
8  quite different. Because in the Gertig paper,
9  they left those who were completely unexposed as
10 unexposed as the reference, and then they looked
11 at those who were exposed.
12        Here you have a mixing of unexposed
13 and exposed in the reference category.
14    Q.   Going back to my question, though,
15 is that it is at least some data that -- (voice
16 speaking on phone) -- relates to the odds ratio or
17 point estimate for serous invasive ovarian cancer
18 and talcum powder use from that Gertig data,
19 correct?
20    A.   I'm sorry. Repeat. Repeat the
21 question.
22    Q.   Sure. I apologize.
23    A.   No worries.
24    Q.   You do agree it is data reporting on

Page 300

1  the exposures that they -- that they chose to look
2  at with regard to talcum powder use and serous
3  invasive ovarian cancer, correct?
4     A.   Yes. Yes.
5     Q.   That number is quite different than
6  the 1.40 number that you reference in your report
7  from Gertig 2000, correct?
8         MR. TISI: Objection.
9         THE WITNESS: Well, it's --
10        again, it's -- it's different, but it's a
11        shifting down of the association because
12        of the mixing of the effects of exposed
13        and unexposed in the -- in the reference
14        grouping.
15 BY MR. HEGARTY:
16    Q.   Have you done any analysis as to
17 what that mixing effect had on the overall number?
18    A.   I don't need to do that. Because if
19 you believe that -- that -- and as it's been shown
20 in a number of studies -- that any use of talc is
21 associated with about 1.3 excess risk, if you take
22 some of those people who were exposed and put them
23 into the reference group, it's going to attenuate
24 the association.

Page 301

1     Q.   There are a number of studies that
2  you don't cite that found as far as for serous
3  adenocarcinoma, serous invasive adenocarcinoma, no
4  statistically significant increase in risk. Those
5  include Houghton. They include the O'Brien study.
6         Are you aware of that?
7         MR. TISI: Objection.
8         THE WITNESS: I guess I'd
9        like to look at those. I mean, the --
10        I'd like to just take a quick look, but
11        not every study is going to show exactly
12        the same figures.
13 BY MR. HEGARTY:
14    Q.   Let me ask this in a very general
15 way.
16        MR. TISI: While he's doing
17        that, I really have something.
18        MR. HEGARTY: That's fine.
19        Off the record.
20        (Recess: 3:19 p.m. -
21        3:22 p.m.)
22        MR. HEGARTY: So we are back
23        on the record.
24 BY MR. HEGARTY:

76 (Pages 298 - 301)

Page 302

1  Q.    When we interrupted -- when we broke
2  very quickly, I had a question pending.  Let me
3  restate that.
4      A.    Please.
5      Q.    Are you aware that some studies have
6  reported odds ratios of relative risk for talcum
7  powder use and serous invasive ovarian cancer that
8  were not statistically significant?
9      A.    Oh.  Yes.
10     Q.    Those included the WHI Houghton
11 study, correct?
12     A.    Yes, but I might want to point out
13 that their association was pretty much consistent
14 with what we've seen in the other studies, being
15 1.13 as an association with a confidence interval
16 of 0.84 to 1.51 and in the -- and that's in the
17 WHI, which in and of itself I've already suggested
18 underestimates the association because of the fact
19 that they only include women 50 years of age and
20 older.
21         And then in the O'Brien study,
22 actually, if you look at the serous for frequent
23 users, it's got a confidence interval of 0.9 to
24 1.28.  So, again, that's also -- that's also

Page 303

1  comparable given that they're mixing in in this
2  study, the WHI and the Sister Study, which have
3  significant exposure assessment flaws.
4      Q.    Both of those point estimates that
5  you cite to are not statistically significant,
6  correct?
7      A.    They -- the confidence interval
8  includes 1, but it doesn't mean that it's a null
9  association.
10     Q.    Where a confidence interval
11 includes 1, the result could be due to chance,
12 correct?
13     A.    Well, even a confidence interval
14 that doesn't include 1 could be due to chance.
15     Q.    But a confidence interval that
16 includes 1 means that the real point estimate
17 could be 1.0?
18     A.    It could be 1.0, but it's not likely
19 to be skewed toward the lower end.  It's likely to
20 be somewhere in the middle.
21     Q.    You don't reference anywhere --
22 anywhere in your report the serous invasive
23 findings from Houghton or from O'Brien, correct?
24     A.    I'd have to look in -- I'd have to

Page 304

1  look in my report for those particular reviews,
2  but let me just quickly do that if I may.
3         So for the Women's Health
4  Initiative, yes, I do.  Multivariate adjusted
5  hazard ratio for serous ovarian tumors was 1.16
6  with a confidence interval of 0.88 to 1.53.
7         And for -- I'm sorry.  What was the
8  other one?
9      Q.    O'Brien 2020.
10     A.    Oh, yeah.
11         And for O'Brien, I don't believe I
12 -- I don't talk about that one in my summary in
13 the report.
14     Q.    Let me ask you some basic
15 information, or let me ask you about some basic
16 information.
17     A.    Yeah.
18     Q.    The cancer at issue, as we've been
19 talking about, is ovarian cancer, correct?
20     A.    The cancer at issue is the ovarian
21 cancer, yes.
22     Q.    You have not been involved in the
23 care and treatment of any patient who has had
24 ovarian cancer, correct?

Page 305

1      A.    I am not a physician.
2      Q.    You have no medical training in
3  gynecologic oncology, correct?
4      A.    That is correct.
5      Q.    You have no expertise in diagnosing
6  ovarian cancer, correct?
7      A.    I am not a clinician.
8      Q.    You have no expertise in diagnosing
9  mesothelioma, correct?
10     A.    Correct.
11     Q.    You have no expertise in analyzing a
12 patient's risk factors for ovarian cancer,
13 correct?
14         Let me ask it a different way.
15         You have never analyzed a patient's
16 risk factors for ovarian cancer outside of work
17 you've done for litigation, correct?
18     A.    Correct.
19         MR. TISI:  Object.
20 BY MR. HEGARTY:
21     Q.    Outside of litigation, you've never
22 attempted to look at a particular patient's
23 various risk factors and identify which, if any,
24 may have contributed to the development of her

77 (Pages 302 - 305)

Page 306

1 ovarian cancer, correct?
2     A.    I've always worked at the population
3 level.
4     Q.    Outside of perhaps the cases you've
5 consulted on for litigation, you never came to the
6 opinion that talc caused any woman's ovarian
7 cancer, correct?
8          MR. TISI:  Objection.
9          THE WITNESS:  I have not
10       published any or made any kind of
11       statement regarding that.
12 BY MR. HEGARTY:
13     Q.    And regardless of publishing or
14 making any statement, you have not concluded, even
15 where you have not shared it with anyone, that any
16 particular patient's ovarian cancer was caused by
17 talcum powder use, correct?
18     A.    No, because I would not have been in
19 position to do that.
20     Q.    You also never came to the opinion
21 that any woman's exposure to asbestos caused her
22 ovarian cancer, correct?
23     A.    I have not been in position to do
24 that.

Page 307

1     Q.    And you've never told a patient that
2 her talc use caused her ovarian cancer, correct?
3     A.    I am not a clinician.
4     Q.    You've never told a woman not to use
5 talc, correct?
6     A.    Correct.  Well, my daughter.
7 (Laugh).
8     Q.    You have told your daughter not to
9 use talc?
10     A.    Yes.
11     Q.    When did you tell her that?
12     A.    I don't know.  Growing up, when I've
13 been doing this work for a long time.
14     Q.    Other than your daughter, have you
15 ever told a woman not to use talc?
16     A.    No.
17     Q.    Have you ever recommended to any
18 physician that they tell their patients not to use
19 talcum powder --
20     A.    No.
21     Q.    -- in the genital area?
22     A.    No.
23     Q.    You are not an expert in toxicology;
24 is that a fair statement?

Page 308

1     A.    That is a fair statement.
2     Q.    You're also not an expert on animal
3 studies, true?
4     A.    That's true.
5     Q.    You're not an expert on cell
6 studies, correct?
7     A.    That's true.
8     Q.    Do you consider yourself an expert
9 on talc as a mineral?
10     A.    I consider myself an expert on the
11 epidemiologic data looking at the association
12 between talc and ovarian cancer.
13     Q.    Do you consider yourself an expert
14 to be -- to be -- do you consider yourself to be
15 an expert on the mineralogy of talc?
16     A.    No, I do not.
17     Q.    You are not a geneticist, correct?
18     A.    That is correct.
19     Q.    You're not a mineralogist, correct?
20     A.    That is correct.
21     Q.    You're not an industrial hygienist,
22 correct?
23     A.    That's correct.
24     Q.    You're not an expert in geology,

Page 309

1 correct?
2     A.    No.
3     Q.    You have not studied where you can
4 say you're an expert on Johnson's Baby Powder,
5 that is, where it's mined from, how it's
6 processed, how it's tested, things like that?
7     A.    No, only what I've read in the
8 literature.
9     Q.    Have you read in the literature the
10 details of where Johnson & Johnson has -- has had
11 its talc mined from, what the processes are for
12 mining and processing the talc, what tests have
13 been done for asbestos?  Have you read that in the
14 literature?
15     A.    I don't think so.
16     Q.    With regard to the methodology that
17 you set out in your report, have you ever taught
18 that methodology to any students?
19     A.    Yes.
20     Q.    In what class have you taught that
21 methodology and when was the last time you taught
22 it?
23     A.    I just finished teaching it this
24 spring.  "Guided Epidemiology Research."

78 (Pages 306 - 309)

Page 310

1    Q.    And in that course on "Guided
2 Epidemiology Research," did you go through the
3 methodology you describe in your report?
4    A.    Yes.  The students come up, develop
5 a research question, analyze data for a particular
6 hypothesis, analyze the data, and then interpret
7 the findings.  And during the interpretation of
8 the findings, they go through the process of
9 determining whether or not they believe the
10 findings to be true or spurious based on the same
11 criteria that I used in determining the -- the
12 scientific integrity of the talc and ovarian
13 cancer association.
14    Q.    What level of student did you teach
15 that to?
16    A.    These are master's level students.
17    Q.    Outside of your presentation to FDA
18 at the workshop back in 1994, have you ever
19 lectured to your peers with regard to your
20 opinions on talc and ovarian cancer?
21    A.    I may have given a seminar on the
22 research because I have a body of research that I
23 had done at that time, but certainly not recently.
24    Q.    You say --

Page 311

1    A.    And I can't think of any, and you
2 can look -- we can look in my CV and see if there
3 are any invited presentations that were specific
4 about ovarian cancer risk factors.  If -- if
5 they're not in the CV, then I didn't do it.
6    Q.    Sitting here today, outside of the
7 presentation you gave at FDA, do you recall giving
8 that kind of presentation or a similar
9 presentation on talc and ovarian cancer to any
10 other group or set of your peers or colleagues?
11    A.    I -- unless it's in my CV, I have
12 not, and anything -- and I would not have done
13 that in a -- in a nonscientific setting.
14    Q.    With regard to the methodology you
15 applied in this case, is there any ability to test
16 whether it is a reliable methodology for reaching
17 causation conclusions?
18         MR. TISI:  Objection.
19         THE WITNESS:  I don't think
20    there is a test.  It is the way that we
21    in epidemiology teach and carry out our
22    research.  It is the standard of
23    practice.
24 BY MR. HEGARTY:

Page 312

1    Q.    We've talked a little bit about
2 statistical significance.
3         You agree that statistical
4 significance using a p-value of .05 is an
5 important evaluation in an epidemiologic study?
6    A.    No, I do not agree with that.
7         It is an arbitrary dichotomous cut
8 point that merely represents that the risk
9 estimate 95 percent of the time will fall between
10 a lower confidence bound and an upper confidence
11 bound.  And if that lower confidence bound is 0.99
12 and the upper confidence bound is 1.45, then to
13 deem it not statistically significant is
14 inappropriate.
15    Q.    Is a p-value of .05 still the
16 standard for determining whether a study shows an
17 association between an exposure and a disease?
18    A.    It is a tool that is used, but not
19 one that is relied upon for assessing causation.
20    Q.    Going back to my question, though.
21         From your standpoint, is it still an
22 industry standard for showing whether there's an
23 association between an exposure and a disease?
24         MR. TISI:  Objection to the

Page 313

1    term "industry standard."  This is a
2    profession, not an industry, but go
3    ahead.
4         THE WITNESS:  The standard is
5    to be able to show the point estimate and
6    what the 95 percent confidence interval
7    is.  That is the standard in
8    epidemiologic research.  Not to show a
9    point estimate and then to indicate that
10    it happens to be greater than or less
11    than P 0.05.
12 BY MR. HEGARTY:
13    Q.    In looking at relative risk, one is
14 considered the null value, indicating no
15 association, correct?
16    A.    Correct.
17    Q.    If a study is not statistically
18 significant, it means the result could be due to
19 random chance, correct?
20         MR. TISI:  Objection.
21         THE WITNESS:  I think I
22    believe I stated before that any result,
23    regardless of statistical significance,
24    could be due to chance or bias.

79 (Pages 310 - 313)

Page 314

1 BY MR. HEGARTY:
2    Q.    Going back to the null value of 1.
3 If the confidence interval contains the value of
4 1, then the true finding, as I mentioned earlier,
5 could be 1.0, correct?
6    A.    The true value could be anywhere
7 from the lowest confidence bound to the highest
8 confidence bound.
9    Q.    Do you agree that there are
10 generally three categories of phenomena that could
11 result in an association finding in a study to be
12 erroneous: chance, bias, and confounding?
13    A.    Well, confounding is bias.  So
14 chance is certainly one.  Confounding is certainly
15 one.  But within the category of bias, there are a
16 number of different components that are there,
17 such as misclassification, selection bias, things
18 like that.
19    Q.    Is there any way to account for
20 chance in an epidemiologic study besides
21 statistical significance?
22         MR. TISI:  In an individual
23    study or in studies overall?
24 BY MR. HEGARTY:

Page 315

1    Q.    Well, did you understand my
2 question?
3    A.    Why don't --
4         MR. TISI:  I need to
5    understand it.  It needs to be clear.  So
6    is it --
7 BY MR. HEGARTY:
8    Q.    Is there any way in an epidemiologic
9 study to account for chance other than through
10 statistical significance?
11         MR. TISI:  Objection.
12         THE WITNESS:  Accounting for
13    -- statistical significance is not a way
14    to determine whether chance is the
15    explanation for the finding.
16         The way to determine whether
17    chance is the explanation for the finding
18    is to look at other known factors that
19    could be influencing the association.
20 BY MR. HEGARTY:
21    Q.    Confounding is where there could be
22 another association present within the study that
23 confuses the relationship between the agent of
24 interest and the outcome of interest, correct?

Page 316

1    A.    With the exposure, yes.  The
2 exposure of interest and the outcome, yes.
3    Q.    In every study there exists the
4 potential for unknown confounders, correct?
5    A.    Yes, possibly.
6    Q.    When considering bias and
7 confounders, the weaker the association, that is,
8 the closer it is to 1.0, the greater the concern
9 is that bias or confounding could be the reason
10 for that association, correct?
11    A.    Yes, certainly greater -- I mean,
12 attention should be paid regardless of whether it
13 is an association of 1.3, 2.0, 3.0.  We always use
14 the same method to determine how reliable that
15 estimate is based on potential sources of bias --
16    Q.    And association --
17    A.    -- and confounding.
18    Q.    Finding association does not mean
19 causation, correct?
20    A.    That is correct.
21    Q.    A risk factor is not necessarily a
22 causal factor, correct?
23    A.    That is correct.
24    Q.    Going back to your methodology

Page 317

1 section in your report.
2    A.    Uh-huh.
3    Q.    What is the objective criteria that
4 you apply for this methodology?
5         MR. TISI:  Objection.  Asked
6    and answered a couple times.
7         You may answer it again.
8 BY MR. HEGARTY:
9    Q.    Let me put -- let me ask a different
10 way because that may be unclear.
11         Isn't your methodology subjective
12 based on the person who's conducting it?  And if
13 so -- if not, why not?
14         MR. TISI:  Objection.  Asked
15    and answered a couple times.
16         THE WITNESS:  I wouldn't -- I
17    wouldn't say it's subjective.
18         I would say it's objective.
19    There's no qualitative process.  I mean,
20    it's -- it's evaluation of quantitative
21    data.
22         So looking at the strength of
23    the association in terms of the -- the
24    range in which the confidence interval,

Page 318

1  the estimate falls; looking at the extent
2  possible whether there's an increasing
3  association with increasing levels of
4  exposure, whether there's biological
5  plausibility and potential for explaining
6  the association, whether there's a
7  temporal issue, and whether there is
8  consistency across multiple studies is
9  certainly a standard that we do, in
10  conjunction with trying to explain other
11  non-causal explanations for all of those
12  findings.
13        So I believe that's -- that's
14  my response to your question.
15  BY MR. HEGARTY:
16  Q.    Turn over to page 5 of your report.
17  A.    Yes.
18  Q.    At the very top.
19  A.    Yes.
20  Q.    You write that:
21        "The point is that epidemiologists
22  make their inferences by pitting alternative
23  explanations against one another.  This approach
24  amounts to pitting non-causal theories against a

Page 319

1  causal theory.  Epidemiologists ask, 'Is there
2  some systematic error in the data from a study?
3  Then let's control that problem to see what
4  association if any remains between exposure and
5  disease.'"
6        Did I read that correctly?
7  A.    You did.
8  Q.    So is it -- so are you saying there
9  that there is an association -- that an
10  association is causal unless it can be explained
11  by some systematic error?
12  A.    It may very well be causal if after
13  all -- well, it may be assumed to be causal after
14  explaining all of the potential explanations for
15  the association, and that includes systematic
16  error in the data.
17  Q.    Is that how you reached your
18  opinions in this case, by controlling or
19  accounting for systematic error?
20  A.    We -- we didn't quantitatively do
21  that.  We looked to see if it had been done in the
22  studies and made our assessments based on issues
23  related to -- to misclassification of the exposure
24  and confounding and other sources of bias that

Page 320

1  could have been present, and even those that may
2  be unrecognized.
3  Q.    You told me that you applied this
4  methodology in your studies on talc and ovarian
5  cancer?
6  A.    Yes.
7  Q.    Let me ask in a different way.
8        Have you ever described the process
9  of this methodology, without regard to the
10  exposure and the disease you're looking at, in any
11  written publication of yours?
12  A.    No.
13        MR. TISI:  Objection.
14        THE WITNESS:  No, I haven't,
15  but it is a standard of practice that's
16  indicated in epidemiology methods
17  textbooks in the approach.
18        It is the foundation of
19  epidemiologic research.
20  BY MR. HEGARTY:
21  Q.    Is this methodology, as you can
22  recall, described in Dr. Rothman's textbook?
23  A.    Yes.  Certainly all these components
24  related to the biases.

Page 321

1  Q.    Please turn over to paragraph 20 --
2  I'm sorry -- to page 20 of your report.
3  A.    Yes.
4  Q.    Do you cite at the top the factors
5  that you rely upon for reaching your opinions in
6  this case?
7  A.    Uh-huh.
8  Q.    Yes?
9  A.    Yes.
10  Q.    We talked about this a little bit
11  earlier, but at the top of page 20 you say that
12  "Considering the preponderance of the evidence,
13  including" and then you cite prepared at B --
14  A.    I'm sorry.  Where is this?  The
15  sentence?
16  Q.    Yeah.  Very top.
17  A.    Oh, "Considering."  Yes, yes, yes.
18  Yes.
19  Q.    "Including" and then going to
20  paragraph B.
21        "After controlling for known risk
22  and protective factors for ovarian cancer,
23  evidence of a trend of increasing risk of ovarian
24  cancer with increasing talc applications,

81 (Pages 318 - 321)

Page 322

1  especially when the vaginal tract is open to the
2  ovaries."
3        You see where I'm reading?
4   A.   Yes, I do.
5   Q.   And that evidence of a trend that
6  you specifically refer to in your report is from
7  the Cramer 2016 study, correct?
8        MR. TISI:  Objection.
9        THE WITNESS:  Close.  It's
10       from multiple studies.  There is the
11       Cramer study.  There's my 1992 study.
12       There's Schildkraut study.  There's a
13       number of studies that have shown this.
14  BY MR. HEGARTY:
15   Q.   And you mentioned Schildkraut.  Let
16  me clarify my question.
17   A.   Yeah.
18   Q.   The only two studies you actually
19  specifically refer to in your report as shown as
20  being a preponderance of the evidence are the
21  Cramer and Schildkraut studies, correct?
22   A.   That's what's listed in the report.
23  Although in the description of the meta-analyses,
24  there may have been some discussion of dose

Page 323

1  response.  But those are not new data, and this is
2  new data.  The other ones are meta-analyses.
3   Q.   Please turn over to the Executive
4  Summary section of your report, which is on
5  page 6.
6   A.   Uh-huh.
7   Q.   Second paragraph, the middle of that
8  paragraph you make the sentence -- you make the
9  statement:
10       "We note that there is also an
11  association between talc use and ovarian cancer in
12  cohort studies."
13       Do you see where I'm reading?
14   A.   I do.
15   Q.   Do any of the cohort studies
16  themselves say that there is an association
17  between talc use and ovarian cancer?
18   A.   Yes, the Nurses' Health Study shows
19  it.
20   Q.   My question, though, is very
21  specific.
22       My question is:  Do the authors
23  state in their studies that they show an
24  association between talc use and ovarian cancer?

Page 324

1   A.   Well, in the O'Brien study that
2  looked at all the cohort studies together, they
3  recognized that the association was, in their
4  view, statistically significant in those with
5  patent genital tracts, and that's a compilation of
6  all three of the cohort studies, despite the fact
7  that the cohort studies are flawed in terms of
8  exposure assessment.
9   Q.   If we look at the findings in the
10  cohort studies as to ovarian cancer and talc use
11  overall, none of those studies reported a
12  statistically significant association between talc
13  use ever never and ovarian cancer, correct?
14       MR. TISI:  Objection.
15       THE WITNESS:  Well, that's
16       correct, but it's largely because the
17       associations that as we talked about in
18       our report are attenuated because of the
19       issue of misclassification.
20       And particularly the issue
21       of -- of selection bias, such as in the
22       Sister Study where 160 or so women with
23       ovarian cancer were excluded from the
24       analyses because they already had ovarian

Page 325

1       cancer, and they only followed up those
2       who hadn't already had ovarian cancer
3       and, therefore, you have a depletion of
4       susceptibles in that and so you wouldn't
5       -- you would already be underestimating
6       the risk.
7       And the WHI, as I indicated,
8       had women who weren't enrolled in the
9       study until after age 50.  About half of
10       ovarian cancers occur before the age of
11       50.
12       So, so I'm not surprised that
13       the associations are attenuated in the
14       cohort studies.
15  BY MR. HEGARTY:
16   Q.   Can you cite for me any author in
17  any published literature who has said that the
18  cohort studies showed an association between talc
19  use and ovarian cancer?
20   A.   Other than in the Gertig article
21  where they did say for those -- those with a --
22  with serous tumors had an association they thought
23  was statistically significant, I believe.  Yeah.
24   Q.   Anywhere else besides Gertig as to

82 (Pages 322 - 325)

Page 326

1  serous invasive ovarian cancer?
2      A.    And the joint analysis that O'Brien
3  did with respect to patent -- open patent tracts.
4      Q.    In your "Case-control studies"
5  section at page 8, you talk about the lengths --
6  length of study, correct?  Lengths of study.
7      A.    Under "Case-control studies"?
8      Q.    Yes, page 8.
9      A.    Oh, I'm sorry.
10     Q.    At the top.
11     A.    Yes.
12            MR. HEGARTY:  I'm going to
13        show you the Langseth 2008 study, which I
14        marked as Exhibit 21.
15            (Document marked for
16        identification as Harlow Exhibit 21.)
17            THE WITNESS:  Yeah.  Yep.
18  BY MR. HEGARTY:
19     Q.    In this study, the authors reported
20  heterogeneity between the hospital and the
21  population-based studies, correct?
22     A.    Yes.
23     Q.    That means that the combined results
24  of those studies were different from a statistical

Page 327

1  standpoint, correct?
2      A.    Oh, can I see the -- exhibit?
3  Oh, here we go.
4      Q.    Take a look at Figure 1.
5      A.    Yeah, here we go.
6            Right.  Right.  So the question?
7      Q.    Let me start -- ask it a different
8  way.
9            None of the hospital studies showed
10  a statistically significant increase in risk
11  between talc use and ovarian cancer, correct?
12            MR. TISI:  Objection.
13            THE WITNESS:  Well, the pooled
14        analysis for the hospital-based study was
15        1.12 with a confidence interval of 0.92
16        to 1.36, which means that falls somewhere
17        in between there.  So that's what their
18        finding was there.
19            And then for the pooled odds
20        ratios for the case -- for the
21        population-based studies, it was 1.4 with
22        a confidence interval of 1.29 to 1.52.
23  BY MR. HEGARTY:
24     Q.    The hospital-based pooled analysis

Page 328

1  was not statistically significant, correct?
2      A.    The confidence interval did include
3  1.0, but there -- but it should be noted that
4  hospital control -- use of hospital controls can
5  often attenuate the association because the reason
6  for them being in the hospital could be related or
7  could be a confounding factor on things that
8  influence women's gynecologic cancers.
9            So, you know, I'm not surprised
10  that -- that we see a little bit of a difference
11  there.
12     Q.    You had done hospital-control
13  studies yourself, correct?  Hospital-based control
14  studies?
15     A.    Most of my research has been
16  population-based.  I'm trying to think about my
17  study in 1989.  I know that was cancer
18  population-based cases.  Did I use?
19            Because all my other research
20  outside of ovarian cancer has been
21  population-based, but let me just see in the --
22  those tumors.  Let me see.
23            (Reviews document.)
24            Yeah, population-based.

Page 329

1      Q.    Okay.
2      A.    So I've really done all
3  population-based research.
4      Q.    Did you read the Langseth article
5  when it came out in 2008?
6      A.    Not in 2008.
7      Q.    Had you read it prior to being
8  contacted by plaintiffs' counsel in this case
9  about serving as an expert witness?
10     A.    No, I had not.
11     Q.    Please look at the section under
12  "Proposal to Research Community."
13     A.    Yes.
14     Q.    That proposal says that:
15            "The current body of experimental
16  and epidemiological evidence is insufficient to
17  establish a causal association between perineal
18  use of talc and ovarian cancer risk."
19            Was that a fair conclusion from the
20  data they reported here back in 2008?
21            MS. PARFITT:  Objection.
22            THE WITNESS:  Yeah.  Well, no,
23        I'm not sure I agree with that.
24            When you look at all of the

83 (Pages 326 - 329)

Page 330

1    studies, particularly the
2    population-based studies, which are the
3    ones that are more of a gold standard
4    approach for epidemiological research,
5    every one of the estimates are above 1
6    with a very narrow confidence interval of
7    1.3 to 1.5.
8         So to say that the current
9    body of epidemiologic evidence is
10   insufficient is not, in my view, correct.
11   The experimental I can't -- I can't, you
12   know, make a comment on.
13   BY MR. HEGARTY:
14   Q.    If you look over at the left-hand
15   side of page 359.
16   A.    Yes.
17   Q.    The middle paragraph.
18   A.    Yes.
19   Q.    Towards the bottom.  They make the
20   statement that:
21        "The main epidemiological evidence
22   against the association is the absence of clear
23   exposure-response associations in most study, as
24   well as the absence of an overall excess risk in

Page 331

1    the cohort study."
2         Were those true statements back in
3    2008?
4    A.    I'm not sure what they mean by
5    "exposure-response," which I think they mean is
6    with increasing exposure, you see a greater risk
7    of the disease.
8         And, again, my article in 1992, in
9    1999, other articles that have shown a dose
10   response are not -- were present.
11        So could we have more?  Yes, I'd
12   love there to have been more.  But is there enough
13   for us to be concerned about this exposure?  Yes.
14        And then -- and then the absence of
15   an overall excess risk in the cohort study, I've
16   talked about that.
17   Q.    Have you done an analysis of when
18   you believe the evidence was sufficient over the
19   years to say that there was -- there is -- was a
20   causal relationship or there is a causal
21   relationship between talc use and ovarian cancer?
22   A.    I did not do a causal inference
23   analysis; but in my papers, particularly 1992, I
24   believe I recommended that women should be warned

Page 332

1    about this or should be told to look for
2    alternative methods.
3         I believe in 1999 I may have made
4    the same recommendations.  I even raised concerns
5    in 1989.
6         So have I -- do we need to have
7    definitively determined causation in order for us
8    to have informed women of the risk, potential risk
9    of using a product that had no reasonable --
10   that -- that was not therapeutic or necessary with
11   an alternative available?  I think I did my best
12   to try to provide that warning.
13        MR. HEGARTY:  I want to next
14   show you a study with a first author
15   Rosenblatt dated from 2011 I marked as
16   Exhibit Number 22.
17        (Document marked for
18   identification as Harlow Exhibit 22.)
19        THE WITNESS:  Yes, thank you.
20   Let me see if I have
21   Rosenblatt in here.  Yeah.
22   BY MR. HEGARTY:
23   Q.    You read the Rosenblatt study as
24   part of your work on this case; is that correct?

Page 333

1    A.    I did, but I'm trying to see if it's
2    cited.  I don't know that it was cited in my
3    report.  So let's just see if it was.
4         No.  I'm aware of this study.  I'm
5    aware of this study, but I did not -- it was not
6    in my -- in my report.
7    Q.    One of the authors of the study is
8    Noel Weiss?
9    A.    That's correct.
10   Q.    He is your primary mentor, correct?
11   A.    He was, correct.
12   Q.    He was your primary mentor, correct?
13   A.    Yes, he was.
14   Q.    How would you characterize his
15   capabilities as an epidemiologist?
16   A.    Outstanding.
17   Q.    Is he a reliable -- was he a
18   reliable authority with regard to epidemiology?
19   A.    With respect to epidemiology?  Yes.
20   Q.    Did you read the Rosenblatt study at
21   the time it came out in 2011?
22   A.    I can't recall if I did.
23   Q.    You said he was your mentor.
24        Was he one of your teachers?

84 (Pages 330 - 333)

Page 334

1    A.    Yes, and he was my dissertation
2    advisor.
3    Q.    So you had great respect for him?
4    A.    Yes, I do.
5    Q.    Looking in the "Abstract" of this
6    paper, that looked at genital powder exposure and
7    the risk of epithelial ovarian cancer.
8    A.    Uh-huh.
9    Q.    Towards the bottom.
10    A.    Uh-huh.
11    Q.    The authors, including Dr. Weiss,
12    say:
13         "We noted no clear pattern of risk
14    increase on the basis of the extent of use,
15    assessed as years in which powder was used, or as
16    lifetime number of applications for invasive or
17    borderline tumors, or their histologic subtypes."
18         That's a correct statement from what
19    their data showed, correct?
20    A.    Actually --
21         MR. TISI:  Objection.  Please
22    take a moment and look at the study.
23         THE WITNESS:  No, I'm looking
24    at it, and I can tell you that for all

Page 335

1    tumors, those who used powder after
2    bathing had a 1.27 excess risk after
3    adjustment for, you know, the most
4    important risk factors with a confidence
5    interval of 0.97 to 1.66.
6    BY MR. HEGARTY:
7    Q.    The part of the abstract I read to
8    you, though, was in regards to dose response,
9    correct?
10    A.    (Reviews document.)
11         Right, but they didn't take it --
12    yes, but they did not take into account times when
13    the genital tract was open.  They did not consider
14    issues with respect to ovulation.  They did not
15    consider whether or not they had -- whether
16    exposures occurred before or after a tubal
17    ligation or hysterectomy.
18    Q.    Please look at the "Conclusions"
19    section in the abstract on page 1.
20    A.    Uh-huh.
21    Q.    The authors write, including
22    Dr. Weiss, that:
23         "A modest association of ovarian
24    cancer with this exposure was seen in our study

Page 336

1    and in some previous ones, but that association
2    generally has not been consistent within or among
3    studies.  Therefore, no stronger adjective than
4    'possible' appears warranted at this time."
5         Do you disagree with those
6    conclusion statements?
7    A.    Oh, not -- I don't necessarily
8    disagree with it, but this was in 2011 and there
9    have been a number of studies and meta-analyses
10    that have been done since then.
11    Q.    Were these true statements back in
12    2011?
13    A.    In terms of saying that "possible
14    appears warranted at this time"?  I would have
15    been a little bit stronger in my term.
16    Q.    What stronger term would you have
17    used?
18    A.    Feasible, but I'm okay with that.
19    Q.    Turning over to page 739.
20    A.    Yes.
21    Q.    In the "Results" section on the
22    right-hand column, first full paragraph.  The
23    authors write:
24         "We noted no evidence that risk of

Page 337

1    ovarian cancer increased in association with
2    increasing extent of the use of perineal dusting
3    powder (assessed as years in which powder was used
4    or as lifetime number of applications) for either
5    invasive or borderline tumors."
6         Did I read that correctly?
7    A.    Yes, you did.
8    Q.    Is that an accurate summary of their
9    evidence with regard to increasing -- with regard
10    to whether an association increased with the
11    increasing extent of use?
12    A.    Yes, based on their data.  Uh-huh.
13    Q.    Please turn over to the "Discussion"
14    section on page 741.
15    A.    Well, but if you also look in that
16    paragraph, risk was increased among women who
17    first reported the regular use of perineal dusting
18    powders at age 30 years or older.  Odds ratio for
19    invasive borderline tumors of 1.69 on women whose
20    first regular use was in 1980 or later, and there
21    they also showed a very strong association with
22    borderline ovarian tumors.
23         So I think it's important to look at
24    the -- at all of the findings in the context here.

85 (Pages 334 - 337)

Page 338

1    Q.    Those statements you described do
2  not pertain to dose response, correct?
3    A.    Well, not -- not in the way in which
4  they did it, but it could indicate longer periods
5  of time of exposure.
6    Q.    Please look over to the "Discussion"
7  section.
8    A.    Uh-huh.
9    Q.    The first paragraph, the authors
10  write:
11        "A number of case-control studies of
12  ovarian cancer, in addition to ours, have examined
13  the issue of genital powder exposure as a
14  potential risk factor.  The validity of all of
15  these studies, including ours, may be influenced
16  by the level of non-response among cases and
17  controls, and by the potential for
18  misclassification (differential and
19  non-differential) of exposure status."
20        Are those two accurate statements?
21    A.    They're always possible.
22    Q.    Please turn over to the next page.
23    A.    But I think it's important to point
24  out that when you make a statement like that, you

Page 339

1  should probably provide a little more information
2  as to what those potential -- what potential
3  examples might be.
4    Q.    Please turn over to the next page.
5        The first full paragraph beginning
6  "In support of."
7    A.    Yeah.
8    Q.    You see that paragraph?
9    A.    Yes.
10    Q.    The second sentence says:
11        "However, a non-causal
12  interpretation may be consistent with the absence
13  of an overall association in the one cohort study
14  of the question, along with the absence in most
15  studies (including the current study) of a trend
16  of increasing risk with increasing duration of
17  exposure."
18        Do you agree with those statements?
19        MR. TISI:  Again, why don't
20    you take a look at the whole paragraph.
21    I mean, he's just picking out sentences.
22        THE WITNESS:  I know.  We're
23    talking about the Gertig study.
24        MR. TISI:  No, but feel free

Page 340

1  to look at the whole paragraph.
2        THE WITNESS:  Yes.  Yeah,
3    yeah.
4        (Reviews document.)
5        Okay.  Could you repeat the
6    question?
7  BY MR. HEGARTY:
8    Q.    Sure.
9        The two statements or the statement
10  I read beginning:
11        "However, a non-causal
12  interpretation."
13    A.    Uh-huh.
14    Q.    Are those accurate statements?
15    A.    Well, no, not in terms of -- it's --
16  it's -- sorry, Noel, but I'm not sure I agree with
17  focusing on the overall association, when in that
18  same article they provide exposure assessments in
19  different ways and more appropriate ways.  So I
20  think that is a bit incomplete.
21        And then when they talk about the
22  absence in most studies, including the current
23  study, of the trend with increasing duration of
24  exposure, they cite Langseth and they don't cite

Page 341

1  the multiple studies -- mine in particular in
2  1992, 1999 -- as fact evidence.
3        So are we to make our decision on
4  causality based on one study?  I don't believe so.
5  We look at it in the package of all studies that
6  have been done because there are a lot of issues
7  that could be at play as to why one study seems to
8  be somewhat different from another.
9    Q.    I'm finished with that study.
10    A.    Okay.
11        MR. HEGARTY:  The next study I
12    want to refer to is one you also
13    discussed in your expert report.
14        THE WITNESS:  Uh-huh.
15        MR. HEGARTY:  The 2013 study
16    by Terry --
17        THE WITNESS:  Yes.  The pooled
18    analysis, yes.
19        MR. HEGARTY:  -- which I
20    marked as Exhibit Number 23.
21        (Document marked for
22    identification as Harlow Exhibit 23.)
23  BY MR. HEGARTY:
24    Q.    This is a study you comment on in

Page 342

1 your expert report?
2    A.    Yes.  Uh-huh.
3    Q.    This is a pooled study of
4 case-control data; is that correct?
5    A.    Yes.
6    Q.    Please turn to page 820.
7    A.    Uh-huh.
8          While you're getting that together,
9 could we go off the record?
10          MR. HEGARTY:  Yes, we can.
11          (Recess:  4:07 p.m. -
12          4:21 p.m.)
13          MR. HEGARTY:  We are back on
14    the record.
15 BY MR. HEGARTY:
16    Q.    Doctor, I had asked you previously
17 about presentations that you may have talked about
18 talcum powder use and ovarian cancer.
19          Did you look at your CV to see if
20 you found a presentation where that might have
21 come up?
22    A.    Yes.  Yes, I did.
23    Q.    What did you find?
24    A.    In 1998 I believe.  It was open a

Page 343

1 second ago.  But 1998 at the Dana Farber Cancer
2 Institute on the epidemiology of ovarian cancer.
3    Q.    Was that the last time you discussed
4 risk factors for ovarian cancer?
5    A.    Yes.
6    Q.    That is in a public forum?
7    A.    That's correct.
8    Q.    Do you recall if you talked about
9 talcum powder use and ovarian cancer at that
10 presentation?
11    A.    I don't recall, but I'm sure that I
12 did because it was certainly one of them.
13          Yes, 1998, Dana Farber Cancer
14 Institute.
15    Q.    Please look at the Terry study and,
16 rather than 820 where I directed you before, go to
17 819 of that study.
18    A.    Uh-huh.
19    Q.    Left-hand column, first paragraph.
20          MR. TISI:  I can't find my
21    copy of it.  I apologize.
22          THE WITNESS:  819?
23 BY MR. HEGARTY:
24    Q.    Page 819.

Page 344

1    A.    Am I in the right study?  Hold on.
2    Q.    Terry.
3    A.    Yeah, 819 is just graphs.  Oh, no,
4 819.  Yes, I'm sorry.  Yeah.  Left-hand column.
5 Sorry.
6    Q.    They note that with regard to
7 restricting their analysis to genital powder
8 applications that occurred before tubal ligation
9 or hysterectomy made no substantive difference in
10 the results, correct?
11    A.    (Reviews document.)
12          "That occurred before tubal ligation
13 or hysterectomy made no substantive difference in
14 the results."
15          And I'd like to see that data for
16 studies that collected data on timing.
17          This was -- if you'll excuse me, I
18 just wanted to make sure.
19    Q.    How long is that going to take you
20 to look at that?
21    A.    What?
22    Q.    How long will it take you to look at
23 that?
24    A.    Not long but...

Page 345

1          (Reviews document.)
2          I'm sorry.  I need to see where it
3 is.
4          (Reviews document.)
5          I don't see it in the table.
6    Q.    You need to look at it before you
7 can answer?
8    A.    No, I can -- I can go ahead and
9 answer.
10          They -- they -- yes, that's what
11 they -- that's what they said.  I don't know
12 whether or not they looked at that with respect to
13 taking it into account, taking into account
14 applications.  So Table 3.
15          (Reviews document.)
16    Q.    Do you need longer to look at it?
17 Let's go off the record.
18    A.    Yeah, let's go off the record.  That
19 will be fine.  I'm okay with that.  I just want to
20 make sure that --
21          MR. TISI:  I'm actually not.
22          THE WITNESS:  Sorry.
23          MR. TISI:  I want you to stay
24    on the record.

87 (Pages 342 - 345)

Page 346

1      MR. HEGARTY: We're off the
2  record.
3           MR. TISI: No, we're on the
4  record.
5           MR. HEGARTY: No, we're off
6  the record. Chris, come on. We've
7  always done this. If somebody needs more
8  time, we've always gone off the record.
9      (Recess: 4:25 p.m. -
10      4:26 p.m.)
11      MR. HEGARTY: We're back on
12  the record.
13 BY MR. HEGARTY:
14  Q.   I pointed you to the statement on no
15 difference in between in patients that had a tubal
16 ligation or hysterectomy.
17      That's what they found; is that
18 correct?
19  A.   I'm sorry. Repeat the question.
20  Q.   The statement I read to you earlier
21 is an accurate statement, correct?
22  A.   Oh. That "Restricting our exposure
23 to genital powder applications that occurred
24 before tubal ligation or hysterectomy made no

Page 347

1  substantive difference in the results"?
2  Q.   Correct.
3      That's a correct statement?
4  A.   Well, that's what they report.
5  Q.   Did you make reference to that in
6 your report or comment on that statement in your
7 report?
8  A.   I don't believe I did. However,
9 there is some suggestion that talc use could be
10 inhaled and have a deleterious effect in some
11 women who are still applying it after -- after
12 closure of the genital tract.
13      So I suppose there's -- there's
14 possible explanations, but the findings are about
15 the same and positive in both situations,
16 according to the data.
17  Q.   The Terry study also found no
18 increasing trend with increasing dosage, correct?
19  A.   Actually, that's not true.
20      If you look at Table 5 and you look
21 at the lower confidence interval, it goes from 1.0
22 up to 1.16 and the upper confidence interval
23 continues to go up as well. So in my view -- and
24 the rates go from 1.14 to 1.23, 1.22 ended up to

Page 348

1  1.32 in the highest -- in the highest level.
2  Q.   The authors, though, in the
3  "Abstract" make the statement on page 1 that:
4      "Among genital powder users, we
5  observed no significant trend in risk with
6  increasing number of lifetime applications."
7      Do you see where I'm reading?
8  A.   On the "Abstract."
9  Q.   Isn't that the same thing as saying
10 they found no dose response?
11  A.   Well, they're -- again, they're
12 doing it based on statistical significance, and I
13 disagree with that approach to make the
14 interpretation.
15      All of the confidence intervals are
16 relatively narrow. All of them are at 1.0 or
17 higher on the lower bound, and at the highest
18 quartile you see at minimum a 16 percent excessive
19 risk, which is very consistent from anywhere 16
20 percent to 52 percent, which is very consistent
21 with those who are the highest exposed component
22 of the population.
23  Q.   Please turn to page 19 of your
24 report.

Page 349

1  A.   Page 19 of my report.
2  Q.   In your section on biologic
3 plausibility at the bottom.
4      Do you see that section?
5  A.   I do.
6  Q.   You cite at that part of your report
7 a single study discussing talc and the ovaries of
8 2019, study by McDonald, correct?
9  A.   Yes.
10      MR. HEGARTY: I'm going to
11  mark that as an exhibit.
12      Let's go off the record real
13  quick.
14      (Recess: 4:30 p.m. -
15      4:31 p.m.)
16 BY MR. HEGARTY:
17  Q.   As I asked you just before we took a
18 quick break, you do cite in that part of your
19 report a single study by McDonald from 2019,
20 correct?
21  A.   Yes, that's correct.
22      MR. HEGARTY: I'll mark that
23  study as our next exhibit, which is
24  Exhibit 24.

88 (Pages 346 - 349)

Page 350

1          (Document marked for
2      identification as Harlow Exhibit 24.)
3          THE WITNESS:  Uh-huh.
4  BY MR. HEGARTY:
5      Q.    This is the study you rely upon for
6  biologic plausibility between talc use and ovarian
7  cancer, correct?
8      A.    It's one of the studies, yes.
9      Q.    You state at the end of the
10 paragraph when discussing McDonald, that is, the
11 end of your first paragraph under Section 4 on
12 page 19 that with regard to the patients in the
13 study and talc particles -- just tell me when
14 you're there.
15     A.    Yeah, I'm here.
16     Q.    With regard to the control patients
17 in the study that none was found and then that no
18 talc was found --
19         Let me restate that.
20     A.    Yeah.
21     Q.    You make -- in the last statement of
22 the first paragraph under Section 4, you make the
23 statement that "None" meaning none, no talc
24 particles "were found in the negative exposure

Page 351

1  controls," correct?
2      A.    That's correct.
3      Q.    That's not a true statement, is it?
4      A.    Well, unless I misread it.  I'm
5  happy to re-look at that.
6      Q.    Sure.  Please look over at
7  Exhibit 24, page 598.
8          MR. TISI:  Do you have a copy
9      for me?
10         MR. HEGARTY:  Right there.
11         THE WITNESS:  Page 598.
12         MR. TISI:  That's his.  I'm
13     sorry.  Did you give him a copy?
14         THE WITNESS:  Oh, you may.
15     Yes, this is it.
16         MR. TISI:  No, it isn't.
17         MR. HEGARTY:  I gave you two
18     copies.
19         THE WITNESS:  Oh, I'm sorry.
20         MR. TISI:  Did you?  All
21     right.
22         MR. HEGARTY:  I handed over
23     two copies.
24         THE WITNESS:  Okay.

Page 352

1          MR. TISI:  Do you mind me
2      looking over?
3          MR. HEGARTY:  No.  Please.
4  BY MR. HEGARTY:
5      Q.    598.
6      A.    Yeah.
7      Q.    In the bottom left-hand corner, it
8  says:
9          "Correlative SEM/EDX of the control
10 tissue blocks showed a total of four talc
11 particles across all patients: two in patient 2
12 and two in patient 3."
13         Do you see where I'm reading?
14     A.    I do.
15     Q.    That shows that the McDonald study
16 found talc particles in two of the six control
17 patients, correct?
18     A.    Yes.
19     Q.    So the statement that you made on
20 paragraph 19 under Section 4 that "None was found
21 in the negative exposure controls" is not
22 accurate, correct?
23     A.    (Reviews document.)
24     Q.    How much time do you need to review

Page 353

1  the paper, Doctor?
2      A.    (Reads document.)
3          I must have -- I must have
4  misquoted.
5      Q.    So the McDonald paper actually shows
6  a finding of talc particles in women who had never
7  reported using talcum powder in their ovaries,
8  correct?
9      A.    (Reviews document.)
10     Q.    I'm sorry.  Is that correct, Doctor?
11     A.    (Reviews document.)
12     Q.    How much time do you need to review
13 the document?
14     A.    Just a second, please.
15         (Reviews document.)
16         Well, it appears that they were
17 found in -- in both.  Those with and without talc
18 or those with and without exposure to perineal
19 exposure to talc.
20     Q.    If studies like this do show talc in
21 the ovaries of women who had never used talcum
22 powder, does that go against a clear finding of
23 biologic plausibility between talcum powder use
24 and ovarian cancer?

89 (Pages 350 - 353)

Page 354

1    A.    I don't think so.  Not necessarily.
2 Particularly given that --
3         (Reviews document.)
4         Particularly given the fact that
5 women who have actually applied it to the genital
6 area have applied it, and those who I believe to
7 be at increased risk have applied it regularly,
8 and there have been -- there's substantial
9 evidence to suggest that the talc has some
10 asbestiform, asbestos contamination.
11         (Reviews document.)
12    Q.    Are you finished with your answer?
13    A.    I am.  I am.  I'm just checking to
14 make sure that this is, in fact, the article that
15 I cited.
16         I'm done with mine.
17    Q.    Okay.  We haven't agreed upon a lot
18 today, Dr. Harlow.
19    A.    Yeah.
20    Q.    But you do agree that your statement
21 with regard to the McDonald study that "None was
22 found in the negative exposure controls" is
23 incorrect?
24         MR. TISI:  Objection.  If you

Page 355

1     need time to review the paper, feel free
2     to go off the record and we can do that.
3         THE WITNESS:  I would like to
4     go off the record.  It's going to --
5         MR. HEGARTY:  Okay.  Let's go
6     off the record.  Sure.
7         THE WITNESS:  -- take another
8     short look.
9         (Recess:  4:37 p.m. -
10         4:44 p.m.)
11         MR. HEGARTY:  We are back on
12     the record.
13 BY MR. HEGARTY:
14    Q.    We took a break.
15         Doctor, I commented that you and I
16 have not agreed on a lot of things here today, but
17 can we agree that your statement that "None was
18 found in the negative exposure controls" in
19 reference to the McDonald 2019 study is an
20 inaccurate statement?
21         MR. TISI:  Objection.
22         THE WITNESS:  Yeah.  I think
23     it's important to point out.
24         I probably -- I should have

Page 356

1 not said "none," and I appreciate you
2 giving me a chance to take a look more
3 closely at the article.
4         There was talc found in two of
5 the six controls, but those two had
6 undergone pelvic surgery 30 years before,
7 and the authors suggest that the talc on
8 the surgical gloves could have been
9 responsible for that.
10         And they specifically say that
11 the six control cases supported the
12 contention that talc is rarely found in
13 surgically resected pelvic tissues from
14 patients with no prior perineal or body
15 use exposure.
16         The four talc particles found
17 by the SEM/EDX were in only two patients,
18 both of whom had undergone pelvic surgery
19 procedures more than 30 years ago.  And
20 given that history and timeline, the talc
21 could have been introduced from the
22 ambient environment.
23         So I agree that I misspoke
24 when I said none of the controls, but

Page 357

1    clearly this would not provide evidence
2    against the biological plausibility.
3 BY MR. HEGARTY:
4    Q.    At the end of this section on
5 biologic plausibility in your report -- I'm
6 looking at the bottom of page 19.
7    A.    Uh-huh.
8    Q.    You make the statement that:
9         "Although the exact mechanism --
10 exact pathogenic mechanism by which talc may incur
11 carcinogenesis is unknown, plausible mechanisms
12 may involve inflammation."
13         Do you see where I'm reading?
14    A.    I do.
15    Q.    You don't cite in this part of your
16 report, or anywhere else within the body of your
17 report, any studies that talk about talc and
18 inflammation, correct?
19    A.    Well, in my -- in my review of talc
20 of the association in the 1994 review article, we
21 do talk about inflammation, and there are a number
22 of -- of articles that have suggested that
23 inflammation is a plausible mechanism by which
24 talc could induce ovarian cancer, particularly

90 (Pages 354 - 357)

Page 358

1 when talc is embedded in the -- in the inclusion
2 cysts after ovulation and basically remain there
3 and lead to an inflammatory process.
4    Q.    Listen to my question, though,
5 Doctor.
6        In the body of your report for this
7 case, you don't cite to any studies that comment
8 on talc and inflammation, correct?
9        MR. TISI:  Objection.
10    Misstates.  He says he relies on his own
11    studies.
12        MR. HEGARTY:  Please, don't
13    answer for him, Chris.
14        MR. TISI:  No, I'm not
15    answering for him.
16        MR. HEGARTY:  Come on.  It's
17    not a proper objection and you know it.
18        MR. TISI:  It is.  It is
19    because it's misleading.
20 BY MR. HEGARTY:
21    Q.    You can answer, Doctor.
22        MR. TISI:  To the extent you
23    rely on your prior studies, which are
24    clearly outlined in your report, you

Page 359

1    clearly incorporate, you're entitled to
2    that.  Word piece is not appropriate.
3        MR. HEGARTY:  Chris, I think
4    I'm going -- we're going to have an issue
5    with the judge.  We'll just swear you in.
6    You just gave him an answer to give back
7    to me.
8        MR. TISI:  No, I didn't.
9        MR. HEGARTY:  Yes, you did.
10        MR. TISI:  It's so unfair what
11    you're doing.
12        MR. HEGARTY:  Well --
13        MR. TISI:  When he says --
14    when he says he --
15        MR. HEGARTY:  -- we'll let the
16    judge decide if that was unfair.
17        MR. TISI:  When he says --
18    when he says he incorporates by reference
19    his own studies and his own studies
20    discuss it.
21        MR. HEGARTY:  We're not going
22    to reach an agreement on this.
23 BY MR. HEGARTY:
24    Q.    Doctor, do you cite anywhere in the

Page 360

1 body of your report any studies that talk about
2 talc and inflammation?
3    A.    I have not, but I have done so in my
4 previous report, as I said before your discussion
5 with counsel here.
6    Q.    As part of your work in preparing
7 your report, did you do a comprehensive medical
8 literature search with regard to inflammation and
9 ovarian cancer?
10    A.    No, I didn't.  Again, I didn't need
11 to do that in order to come to the conclusion that
12 there was a biologically plausible mechanism by
13 which ovarian -- by which talc could influence
14 ovarian cancer.
15    Q.    Is it your opinion in this case that
16 inflammation is the cause of ovarian cancer?
17        MR. TISI:  Objection.
18        THE WITNESS:  I -- I cannot
19    state any one particular pathogenic
20    mechanism is responsible for the path --
21    for the carcinogenic process.  There are
22    several that have been proposed.
23 BY MR. HEGARTY:
24    Q.    Please turn to page 19 of your

Page 361

1 report, if you're not there already.
2    A.    I am there.
3    Q.    In the upper part of that page of
4 your report, you make reference to a statement by
5 the American Statistical Association, correct?
6    A.    Yes.
7    Q.    And that statement you make is in
8 support of the statements you make in that
9 paragraph that:
10        "A consensus is slowly building
11 among scientists that statistical significant
12 testing has been a source of many errors in
13 interpretation, and should be avoided."
14        Correct?
15    A.    That's correct.
16        MR. HEGARTY:  I'm going to
17    mark as our next exhibit, Exhibit 25, a
18    document entitled "ASA President's Task
19    Force Statement on Statistical
20    Significance and Replicability."
21        (Document marked for
22    identification as Harlow Exhibit 25.)
23 BY MR. HEGARTY:
24    Q.    Please excuse the highlighting.

91 (Pages 358 - 361)

Page 362

1 They copied my highlighting when they weren't
2 supposed to.
3      A.    Uh-huh.
4      Q.    Have you read this before right now?
5      A.    I don't believe I have since this
6 was not in the scientific literature, and my
7 reference is by Amrhein, Greenland, and McShane.
8      Q.    I'm talking about the reference you
9 make on page 19 --
10     A.    I understand.
11     Q.    -- of the American Statistical
12 Association.
13     A.    I understand, and it comes from --
14 oh. It is -- it is a quote that was stated in the
15 article by Amrhein.
16           One recent commentary in "Nature"
17 and endorsed by 800 signatories stated this.
18           Oh, and then you're talking about
19 the consensus statement from the American
20 Statistical Association above.
21     Q.    Right. That's what I'm referring
22 to.
23     A.    "A p-value, or statistical
24 significance, does not measure." Yes.

Page 363

1      Q.    Please look at Exhibit Number 25.
2      A.    I'm looking.
3      Q.    It says in the first full
4 paragraph --
5      A.    On what page?
6      Q.    First paragraph.
7      A.    Yes.
8      Q.    First page.
9      A.    Yes.
10     Q.    Second sentence.
11           "In 2019, the president of the
12 American Statistical Association established a
13 task force to address concerns a 2019 editorial in
14 'The American Statistician' (an ASA journal) might
15 be mistakenly interpreted as official ASA policy.
16 (The editorial recommended eliminating the use of
17 'p less than .05' and 'statistically significant'
18 in statistical analysis.) This document is the
19 statement of the task force, and the ASA invited
20 us to publicize it. Its purpose is two-fold: to
21 clarify that the use of p-values and significance
22 testing, properly applied and interpreted, are
23 important tools that should not be abandoned and
24 to briefly set out some principles of sound

Page 364

1 statistical inference that may be useful to the
2 scientific community."
3           Did I read that correctly?
4      A.    Yes, you did.
5      Q.    Do you disagree with that last
6 statement that I just read?
7      A.    I've never disagreed that p-values
8 are not a tool in determining -- in determining a
9 strength of an association, but you don't need a
10 p-value. You can look at the confidence intervals
11 to determine whether or not the confidence
12 interval includes or doesn't include 1.0 and, by
13 definition, that is essentially showing what the
14 p-value might be.
15     Q.    Please look at the very last
16 sentence on page 1.
17     A.    Yes.
18     Q.    It reads:
19           "P-values are valid statistical
20 measures that provide convenient conventions for
21 communicating the uncertainty inherited --
22 inherent in quantitative results. Indeed,
23 p-values and significance tests are among the most
24 studied and best understood statistical procedures

Page 365

1 in the statistics literature."
2           Do you agree with those two
3 statements?
4      A.    Sure.
5      Q.    Carrying on in that paragraph, it
6 goes on to say:
7           "They are important tools that have
8 advanced science through their proper
9 application."
10           Do you agree with that statement?
11     A.    "Through their proper application,"
12 yes.
13     Q.    Please look at the very last line
14 the middle of that page that begins "In summary."
15           MR. TISI: Feel free to take a
16      look at the document.
17           THE WITNESS: Yeah. I'm just
18      not seeing where it says "In summary."
19 BY MR. HEGARTY:
20     Q.    Right in the middle. Right there.
21           MR. TISI: I know, but feel
22      free to look at it if you have not seen
23      it.
24           THE WITNESS: Oh, yeah, I can

92 (Pages 362 - 365)

Page 366

1    see.
2         MR. TISI:  If you have not
3    seen this recently, please take a look at
4    it.
5 BY MR. HEGARTY:
6    Q.    It reads:
7         "In summary, p-values and
8 significance tests, when properly applied and
9 interpreted, increase the rigor of the conclusions
10 drawn from data.  Analyzing data and summarizing
11 results are often more complex than is sometimes
12 popularly conveyed.  Although all scientific
13 methods have limitations, the proper application
14 of statistical methods is essential for
15 interpreting the results of data analyses and
16 enhancing the replicability of scientific
17 results."
18        Do you agree with all those
19 statements?
20   A.    I do, but that does not talk about
21 the use of statistical significance for making
22 inferences about causation.  It is one of many
23 tools that we use to assess the precision of risk
24 estimates.

Page 367

1    Q.    You make the statement in your
2 report that you found that there is reasonable
3 consistency between case-control and cohort
4 studies.
5         What did you mean by "reasonable
6 consistency"?
7    A.    Under the assumption that based on
8 the limitations of the cohort study in terms of
9 the way in which they assessed exposure, we can
10 expect that those overall risk estimates are
11 attenuated because of that.
12        Thus, given that there is an
13 attenuation of the cohort study estimates in the
14 one cohort study I believe to be the best in terms
15 of approximating the true risk, which is the
16 Nurses' Health Study, I see that -- I see that the
17 association on all not all that different.
18        Even if you take the likely
19 attenuated association of 1.09, which you continue
20 to refer to as the overall association, even
21 though in further analyses in that paper it's
22 substantially higher, it's not unreasonable -- and
23 you look at the confidence interval that's
24 probably around -- I don't know.  I don't have it

Page 368

1 in front of me.  But probably like 0.8 or 0.9 to
2 about 1.3 or 1.4.
3         If you assume that that is an
4 attenuation of the true effect and that the
5 multiple, multiple case-control studies have all
6 shown an association of about 1.3, to me that
7 seems fairly comparable.
8         So that's the way I would interpret
9 it, and that's the way both Dr. Rothman and I
10 interpreted that, and we tried to explain that
11 rationale.
12   Q.    We talked somewhat today about the
13 O'Brien 2020 study, and you talk about it in your
14 expert report, correct?
15   A.    That's correct.
16        MR. HEGARTY:  I've marked as
17    Exhibit Number 26 the 2020 O'Brien study.
18        (Document marked for
19    identification as Harlow Exhibit 26.)
20        THE WITNESS:  Yes.
21 BY MR. HEGARTY:
22   Q.    You have read that study; is that
23 correct?
24   A.    Not only have I read it, I've

Page 369

1 written a letter to the editor.
2    Q.    Which we'll talk about as well here
3 in a moment.
4         Please turn over to page 56 of this
5 paper.  Under the "Discussion" section.
6    A.    Uh-huh.
7    Q.    The very first line reads:
8         "In this pooled of analysis of 4
9 large U.S. cohorts, there was no statistically
10 significant association between self-reported use
11 of powder in the genital area and risk of ovarian
12 cancer."
13        That's a correct statement, true?
14   A.    Well, I believe that I took issue
15 with that particular statement because other
16 findings in this particular paper showed a
17 different association in those with patent genital
18 tracts.
19   Q.    The next line says:
20        "There were no clear dose-response
21 transfer for duration and frequency of powder use
22 in the genital area in relation to ovarian cancer
23 risk."
24        Those are -- those are also true

Page 370

1 statements, correct?
2     A.     Those -- that's what they said, but,
3 again, as I pointed out in the report and even in
4 my letter to the editor, exposure assessment in
5 two of these three -- I mean, really all of them,
6 but particularly in two of the three -- were not
7 -- were -- were incomplete in terms of being able
8 to truly obtain the kind of exposure assessment
9 that we're actually able to do in case-control
10 studies.
11         And the issue -- well, I'll just
12 stop there.  Go ahead and ask another question.
13     Q.     As you mentioned just a moment ago,
14 you do make reference to the study's findings with
15 regard to the data as to women with patent genital
16 tracts, correct?
17     A.     Yes.
18     Q.     As the authors note, though --
19     A.     Uh-huh.
20     Q.     -- they found no statistical
21 difference between -- in the data between women
22 with patent tubes and women who did not have
23 patent tubes, correct?
24     A.     And where do they specifically say

Page 371

1 that?
2     Q.     Please look at the abstract.
3     A.     Well, I'm looking at on page 54
4 where they say in the second column:
5         "When restricted to women with
6 patent reproductive tracts at baseline, the hazard
7 ratio was 1.13 and the estimated
8 covariate-adjusted risk difference was 0.15.
9 Among women without patent reproductive tracts,
10 the estimated hazard ratio was 0.99."
11     Q.     Then they go on to say:
12         "And the P value for heterogeneity
13 comparing the results for women with patency
14 versus without was .15."
15     Correct?
16     A.     That's what they say, but one
17 doesn't need to do a statistical test of
18 differences to recognize that the association
19 seems to be much strongly observed in those with a
20 patent -- patent tract.
21         And as I believe Dr. Rothman and
22 Murray and I commented in our letter to the editor
23 that it's -- it's -- you don't need to do a
24 statistical test to show that women who don't have

Page 372

1 a patent open genital tract are going to be at
2 lower risk if not null risk for -- for this
3 association.
4     Q.     Dr. Harlow, statistically, there was
5 no difference between women with patent and
6 without patent tubes, correct?
7         MR. TISI:  Objection.  Asked
8     and answered.
9         THE WITNESS:  Well, no.  I'm
10     sorry.
11         MR. TISI:  You got to let me
12     object.
13         THE WITNESS:   Sorry.
14         MR. TISI:  Objection.  Asked
15     and answered.
16         You may answer.
17         THE WITNESS:   Sorry.
18         MR. TISI:  No, that's okay.
19         THE WITNESS:   Just because
20     there the difference between 1.0 -- 1.0
21     with a confidence interval with a -- with
22     a confidence interval of .86 to 1.15,
23     which is almost directly, directly,
24     estimated as null with a hazard of 0.99,

Page 373

1     to have to say that that is statistically
2     different from a hazard ratio of 1.13
3     with a confidence interval of 1.01 to
4     1.26 would -- does it make sense to then
5     say, oh, because they're not
6     statistically different, then we don't
7     believe -- then we should just ignore
8     that association that we see in women
9     with patent genital tracts.
10         It is ludicrous to apply a
11     statistical test in this situation to
12     diminish or ignore an association, in my
13     view.
14         MR. HEGARTY:  Let me show you
15     what I've marked as Exhibit Number 27.
16         (Document marked for
17     identification as Harlow Exhibit 27.)
18 BY MR. HEGARTY:
19     Q.     Exhibit Number 27 is an editorial --
20     A.     Yes.
21     Q.     -- that was written --
22     A.     Yeah.
23     Q.     -- with regard to the 2020 O'Brien
24 study by Drs. Gossett and del Carmen.

94 (Pages 370 - 373)

Page 374

1    Have you read this before today?
2    A.   I have.
3    Q.   Do you know either of these two
4 doctors?
5    A.   I don't know them.
6    Q.   Please turn over to page 30.
7    A.   Uh-huh.
8    Q.   Towards the bottom of the left-hand
9 column.
10   A.   Uh-huh.
11   Q.   Beginning with "The fact that."
12   Do you see where I'm reading?
13   A.   Is it in the left-hand column?
14   Q.   Left-hand column.
15   A.   Hold on.
16   Q.   Right here.  Very bottom paragraph.
17   A.   In fact.
18   Q.   "The fact that."  That's the
19 beginning of the sentence.
20   A.   Oh, got it.  Thank you.
21   Q.   It reads:
22   "The fact that there was -- there
23 are no significant differences in the HRs in the
24 patent (HR, 1.13 [95% confidence interval, 1.01 to

Page 375

1 1.26]) and nonpatent subgroups (HR, .99 [95%
2 confidence interval, 0.86 to 1.15]; P value for
3 heterogeneity comparing these subgroups of .15)
4 confirms the overall conclusion that there is no
5 demonstrable statistically significant association
6 between use of powder in the genital area and
7 ovarian cancer risk."
8    First of all, did I read that
9 correctly?
10   A.   You read what was written there,
11 yes, correctly.
12   Q.   Carrying over to the next paragraph
13 from the bottom.
14   A.   Yeah.
15   Q.   "The subgroup analysis suggesting
16 that women with intact reproductive tracts who
17 used powder in the perineal area developed ovarian
18 cancer more frequently than nonusers is below the
19 effect size that epidemiologists generally
20 consider important and should not be selectively
21 highlighted by the statistically unsophisticated
22 reader as evidence of a relationship."
23   Did I read that correctly?
24   A.   You did read it correctly.

Page 376

1    Q.   She's talking about you, right?
2    MR. TISI:  Objection.  Come
3 on.
4    THE WITNESS:  What do you
5 mean she's talking about me?
6 BY MR. HEGARTY:
7    Q.   Well, she --
8    MR. TISI:  Are you suggesting
9 with all his background?  Honestly, that
10 is insulting.
11   MR. HEGARTY:  Please.  Please.
12   MR. TISI:  Do not insult my
13 witness ever.
14   MR. HEGARTY:  Please.  Chris,
15 Make an objection.   Make an objection.
16   MR. TISI:  You are suggesting
17 he's epidemiologically unsophisticated?
18 That's beneath you.
19   MR. HEGARTY:  I asked if she
20 was talking about you.
21   MR. TISI:  Oh, you think so?
22 BY MR. HEGARTY:
23   Q.   You can answer.
24   A.   Well, first of all --

Page 377

1    MR. TISI:  Ask her about the
2 statement.
3 BY MR. HEGARTY:
4    Q.   You can answer the question.
5    MR. TISI:  Ask her about --
6 ask him about the statement.
7    MR. HEGARTY:  Are you
8 instructing him not to answer my
9 question?
10   MR. TISI:  I'm telling you to
11 ask a nonridiculous question.
12   MR. HEGARTY:  I'm not going to
13 listen to what you tell me, Chris.
14 Please be quiet and let him answer the
15 question.
16   MR. TISI:  Don't ever do that
17 to one of my witnesses again.
18   MR. HEGARTY:  I'm not
19 listening to what you say.  My
20 question is appropriate.
21   MR. TISI:  You better listen.
22 BY MR. HEGARTY:
23   Q.   Was that statement talking about
24 your -- what you just told me about why you reject

95 (Pages 374 - 377)

Page 378

1  statistical significance between the patent and
2  nonpatent groups in this study?
3      A.    First of all, they couldn't be
4  talking about me because I wrote my letter to the
5  editor about this after this commentary had been
6  written.  So I don't know how they could possibly
7  be directing this comment to me.
8      Q.    Okay.  Is this not addressing the
9  issue you and I have been talking about about
10  statistical significance between the patent and
11  nonpatent tubes to patients?
12     A.    It is, and I don't know who this
13  person is, but I don't see that they have a
14  doctoral degree in epidemiology.  And I don't
15  believe that that kind -- that to me is what the
16  American Statistical Association was saying in
17  terms of inappropriately using statistical
18  significance to make clinically relevant
19  decisions.
20         So in my field, we would not make
21  that kind of a statement that would, in my view,
22  minimize a potential risk of something that has
23  been shown to possibly impact 10 percent of the
24  incidence of ovarian cancer.

Page 379

1         So I'm sorry.  That's -- that's an
2  inappropriate -- inappropriate comment.
3             MR. HEGARTY:  You mentioned
4      your commentary and I marked your
5      commentary as Exhibit Number 28.
6             (Document marked for
7      identification as Harlow Exhibit 28.)
8             THE WITNESS:  My letter to
9      the editor?
10  BY MR. HEGARTY:
11     Q.    Sorry.  I misspoke.
12     A.    No worries.
13     Q.    Your letter to the editor, which
14  happens to be under the "Comment & Response"
15  section, correct?
16     A.    Yes.
17     Q.    With regard to the letter to the
18  editor that we're looking at in Exhibit 28 --
19     A.    Yes.
20     Q.    -- your letter to the editor begins
21  over on page 2096, correct?
22     A.    Yes, that's correct.
23     Q.    The letter to the editor is from
24  three authors.

Page 380

1         Who is the primary, if there was
2  one, author of this document, of this letter to
3  the editor?
4      A.    Well, I was the first author, but I
5  -- it was a -- somebody had to be first.  It was a
6  collaboration between the three of us.
7         I was the one who initiated this
8  collaboration in response to this.
9      Q.    At the time that you wrote this
10  letter to the editor --
11     A.    Yes.
12     Q.    -- you had been serving as a
13  consultant to plaintiffs' lawyers in cases
14  involving talcum powder use and ovarian cancer,
15  correct?
16             MR. TISI:  Objection.
17             THE WITNESS:  No, that's not
18      true.
19             I told you, I believe, earlier
20      that I had stopped doing that as of 2017.
21      This was written in 2020.
22  BY MR. HEGARTY:
23     Q.    Please look at the conflict of
24  interest disclosure --

Page 381

1      A.    Yes.
2      Q.    -- in this document.
3      A.    Yes.
4      Q.    It reads:
5         "Dr. Harlow reported publishing
6  research and serving as a consultant on the topic
7  of talc and ovarian cancer risk."
8         Did I read that correctly?
9      A.    That's correct, but I was not at the
10  time serving as a consultant.  I was -- I was
11  doing the appropriate thing and letting the
12  readership know that I had been a consultant at
13  some point, but I was not when I wrote this letter
14  to the editor.
15     Q.    Was your intent by that statement to
16  refer back to the consulting you and I talked
17  about with regard to the Chakalos case and other
18  cases?
19     A.    My intent was to be forthcoming in
20  letting the readership know that I had received
21  some consulting arrangements in the past around
22  this.
23     Q.    You did not report to the reader on
24  whose side you had consulted --

96 (Pages 378 - 381)

Page 382

1    A.    I did --
2    Q.    -- with regard to talc and ovarian
3 cancer, correct?
4    A.    I did not.
5    Q.    Do you think it's important -- let
6 me ask a different way.
7        Do you not think it's important for
8 the reader to know whether you had been a
9 consultant for plaintiffs' lawyers who are
10 bringing lawsuits involving talcum powder use
11 versus Johnson & Johnson who's defending lawsuits
12 involving talcum powder use?
13    A.    I was not an expert.  I was not
14 doing any expert testimony.
15        I was merely being a consultant and
16 evaluating scientific literature.  It had no
17 bearing on my interpretation.
18        And all three of my coauthors and I
19 have -- again, I had no idea what Dr. Rothman had
20 or had not done.  When I wrote this, I did not
21 know about his report in 2000.  And to my
22 knowledge, Dr. Murray has not been involved in any
23 of this.
24        This was a collaborative letter that

Page 383

1 we wrote, and I could never have influenced my
2 colleagues one way or another because of any kind
3 of past consulting that I've done.
4    Q.    You don't disclose a prior
5 relationship in a conflict of interest disclosure
6 only if you believe it is biasing your statements
7 or your opinions that you are writing, correct?
8        MR. TISI:  Objection.
9        THE WITNESS:  I'm sorry.  Can
10    you repeat that question?
11 BY MR. HEGARTY:
12    Q.    Sure.
13        You don't only identify a conflict
14 of interest when you believe you are presenting
15 biased statements in a publication, correct?
16    A.    I -- anytime I would be -- would
17 write anything around the talc and ovarian cancer
18 beyond what I had already published, knowing that
19 I had spent a period of time as a consultant, it
20 would have been inappropriate for me not to have
21 indicated that disclosure, and so that's what I
22 did here.
23    Q.    Don't you think the reader was
24 entitled to know on whose side you had been a

Page 384

1 consultant with regard to talc and ovarian cancer?
2        MR. TISI:  Objection.  Asked
3    and answered.
4        THE WITNESS:  I didn't feel
5    it had any influence or bearing on my --
6    on my conclusions here and, as I just
7    indicated before, this is a joint letter
8    between the three of us.  And even if I
9    was trying to bias in one direction, it
10    would never have been approved by my
11    coauthors.
12 BY MR. HEGARTY:
13    Q.    If you were to write this letter
14 today, would you identify in your conflict of
15 interest disclosure that you're a
16 consultant/expert testifying for plaintiffs in
17 cases involving talcum powder use and ovarian
18 cancer?
19        MR. TISI:  Objection.
20        THE WITNESS:  May I answer
21    the question?
22        MR. TISI:  Sure.
23        THE WITNESS:  Yes, I would.
24    Yes, I would.  I'm not sure I would be

Page 385

1    comfortable in a position doing that
2    simply because of the situation that I'm
3    in right now.
4 BY MR. HEGARTY:
5    Q.    Please look at Drs. O'Brien,
6 Sandler, and Wentzensen's response letter at the
7 bottom of page 2096 to 2097.
8        You've read that before today,
9 correct?
10    A.    Oh.  Oh, Dr. O'Brien's response.
11    Q.    Yes, or reply.
12    A.    Yes.  Yes, yes, yes.  I'm sorry.
13 Yes.  Uh-huh.
14    Q.    Please look at the bottom of page
15 2096 in the right-hand column, second paragraph.
16        Dr. O'Brien and her coauthors write:
17        "Conversely, empirical evidence
18 supports that recall bias is present in
19 retrospective studies."
20        That's what Dr. O'Brien wrote,
21 correct?
22    A.    This was, again, not in response to
23 my letter.  This was in response to Dr. Cramer's
24 letter.

97 (Pages 382 - 385)

Page 386

1    Q.    But without regard to who she's
2 responding to, that's what she wrote, correct?
3    A.    She did write that.
4        But as you note in my report, there
5 are a number of -- of citations where I indicated
6 that recall bias has minimal to little impact on
7 estimates.
8    Q.    So you disagree with that statement?
9    A.    I don't disagree that there can be
10 recall bias in retrospective studies. I believe
11 I've been very clear that recall bias in those who
12 are at the highest level of exposure is unlikely
13 to explain the associations that we've observed.
14    Q.    The next statement by Dr. O'Brien
15 and others says:
16        "While true never users are unlikely
17 to report daily use, some users may fail to report
18 use and others may misreport frequency and
19 duration of use or type of product used. If
20 misclassification is differential by case status,
21 it could influence effect estimates in
22 case-control studies."
23        Do you agree with those statements?
24    A.    Yes, but it could influence in

Page 387

1 either direction. It doesn't necessarily
2 influence in one direction or the other.
3    Q.    Please look at the very last
4 paragraph on the next page of Dr. O'Brien and
5 others' response. Please tell me when you can --
6 where you're at. The paragraph that begins "We
7 agree."
8    A.    Yes, I'm here.
9    Q.    In the middle of that paragraph, the
10 authors write:
11        "However, because of the rarity of
12 ovarian cancer and the risk of recall bias in
13 retrospective studies, we think that despite the
14 limitations, the prospective cohorts included in
15 the analysis offered -- included in -- included in
16 the analysis offered important new data for
17 addressing this question."
18        Do you agree with that statement?
19    A.    Well, yes, because I had
20 specifically stated that -- that I -- we felt that
21 the association was -- was, in fact, there. And
22 they specifically said that they completely agree
23 with me and colleagues that our results,
24 particularly the analyses limited to women with

Page 388

1 intact reproductive tracts, should not be
2 discounted because of lack of statistical
3 significance. For all estimates we reported 95
4 percent confidence intervals.
5        So do I believe that this is
6 important addition to the literature? Yes, I
7 absolutely do, when considering the limitations
8 related to these cohort studies.
9        I'm not suggesting this is not an
10 important contribution. I'm suggesting that, in
11 our view, given the attenuation that is likely to
12 be occurring for many of the reasons that we
13 report in the letter, that we report in our
14 report, make this an important contribution and to
15 me validates the consistency of the findings that
16 we see in case-control studies.
17    Q.    Dr. O'Brien in her reply doesn't
18 retract or withdraw the 2020 O'Brien paper or any
19 statements in it, correct?
20    A.    No. She merely agrees with our
21 interpretation.
22    Q.    She agrees with what she says she
23 agrees with in her reply, correct?
24    A.    That's right, but I believe there's

Page 389

1 more than one place where she agrees.
2    Q.    It says what it says, right?
3    A.    Yeah, yeah. It says what it says.
4    Q.    All right. Thank you.
5    A.    Yeah.
6    Q.    You can put that aside.
7    A.    Okay.
8    Q.    You mentioned a moment ago a
9 reference to this 10 percent number that you
10 reported in your 1992 study, correct?
11    A.    Yes.
12    Q.    Is it your opinion that 10 percent
13 of ovarian cancers diagnosed in 2024 are caused by
14 talcum powder?
15    A.    At the time I wrote that, it was
16 based on the risk estimates that we saw in 1992,
17 and at that point, that was my estimate of the
18 potential proportion of the incidence that could
19 be explained by talc exposure.
20    Q.    My question --
21    A.    I don't know what talc -- what's
22 happening now with respect to talc exposure. I
23 suspect that given that they have taken the
24 product off the market and there have been a lot

98 (Pages 386 - 389)

Page 390

1 of media around this in the news that perhaps the
2 prevalence of the exposure has decreased recently.
3 I just don't know.
4      Q.    My question is to find out if you
5 have this opinion.
6           And is it your opinion that sitting
7 here today that 10 percent of ovarian cancer
8 diagnosed this year in 2024 will have been caused
9 by genital use of talcum powder?
10     A.    Given that the most recent studies
11 that were done in 2016, eight years ago, found
12 similar risks as we found in 1992, and given that
13 there is a certain period of time that exposure
14 needs to occur in order to likely induce a
15 carcinogenic process, I would say that it's quite
16 likely that 10 percent of the incidence of ovarian
17 cancer today could be attributable to talc
18 exposure from the past.
19     Q.    So is it your opinion that with
20 regard to 2000 women or 10 percent of women
21 diagnosed in 2024 with ovarian cancer, that they
22 never would have developed ovarian cancer if they
23 had not used talcum powder?
24     A.    I can't -- I can't say that, but

Page 391

1 even if half of them didn't, being able to prevent
2 a thousand cases of ovarian cancer a year is a
3 huge public health intervention.
4           MR. HEGARTY:  Let's go off the
5      record real quick.
6           (Recess:  5:19 p.m. -
7           5:33 p.m.)
8           MR. HEGARTY:  We are back on
9      the record.
10 BY MR. HEGARTY:
11     Q.    Dr. Harlow, I might jump around a
12 little bit on subject areas with my remaining
13 time.
14           We talked earlier about the findings
15 from McDonald about talc in the ovaries of the
16 women studied both in the cases and the controls.
17           Can you cite for me any studies
18 showing an increase in risk of ovarian cancer in
19 women who have talc in their ovaries?
20     A.    I don't believe there's any studies
21 that have been done that would have identified
22 women with ovarian cancer and talc in their
23 ovaries compared to women with ovarian cancer and
24 not talc in their ovaries and looking at the

Page 392

1 association, other than the fact that McDonald had
2 tried to do that in a very small sample.
3      Q.    Can you cite for me any study
4 reporting talc in the presence of inflammation in
5 the ovary before ovarian cancer has been
6 diagnosed?
7      A.    I don't know of any studies like
8 that.
9      Q.    Can you cite to any studies showing
10 an association between talc in the ovaries and
11 ovarian cancer risk, that is, having an increase
12 in risk if there's a prior finding of talc in the
13 ovaries?
14     A.    I don't believe that kind of a study
15 has been done or really could be done in women who
16 don't have ovarian cancer.  I don't know how you
17 would be able to biopsy essentially the tissue in
18 order to make that determination in healthy women.
19     Q.    With regard to what you've generated
20 in this case as part of your work, we've talked
21 about the materials you brought with you.  We
22 talked about your report.
23           Have you otherwise provided to the
24 attorneys representing plaintiffs in this case all

Page 393

1 the materials you reviewed and all the work
2 product you've generated as part of your work on
3 this case?
4      A.    I believe so.
5           Again, as of this point, yes, but I
6 don't know what will become available in the
7 future.
8      Q.    All I'm asking you about is what you
9 can testify to today.
10     A.    Yeah.
11     Q.    Have you provided to the lawyers
12 representing the plaintiffs in this case all the
13 materials you've reviewed and generated as part of
14 your work on this case?
15     A.    Yes.
16     Q.    And do you know if Dr. Rothman ever
17 provided all the materials he worked on or
18 reviewed as part of his work on this case?
19     A.    I don't -- I don't know what he did
20 in prior to him inviting me to work with him.  So
21 I don't know what he had done and what might have
22 been provided.  And I don't know believe there was
23 anything that he did while we were working
24 together that would have been independent of my --

99 (Pages 390 - 393)

Page 394

1 my work.
2    Q.    As part of your work in this case or
3 otherwise, have you ever reviewed what your
4 university, Boston University, says about ovarian
5 cancer risk factors?
6    A.    No.
7    Q.    Have you ever reviewed what Dana
8 Farber says about ovarian cancer risk factors?
9    A.    No.
10    Q.    I'll represent to you that those
11 websites, that the websites for those two
12 facilities don't list talc as a risk factor for
13 ovarian cancer.
14        Do you have a response to that?
15        MR. TISI:  Objection.  Vague
16    and ambiguous and unanswerable but...
17 BY MR. HEGARTY:
18    Q.    If you can answer.
19        MR. TISI:  You can answer if
20    you even understand the question.  I'm
21    not sure I do.
22        THE WITNESS:  No, I understand
23    the question, and I am sure they may be
24    concerned, given the known litigation

Page 395

1    that's going on, for them to come forward
2    and put that kind of information on their
3    external-facing page.
4        That would be my guess.  I
5    have no other -- I have no known
6    knowledge as to why they do or do not put
7    that kind of information on their web --
8    on their website.
9 BY MR. HEGARTY:
10    Q.    Have you reviewed as part of your
11 work in this case the list of risk factors
12 reported by the Society of Gynecologic Oncology,
13 the SGAO, the CDC?
14    A.    SGO.
15    Q.    SGO.  Thank you.
16        The SGO, the CDC, and ACOG?
17    A.    I am aware that they either do not
18 indicate it as a risk factor or have indicated
19 that it is unclear whether it is a risk factor or
20 not.  They may even have said it's not.  I don't
21 know.
22    Q.    Have you reviewed --
23    A.    I haven't.
24    Q.    -- the list and the risk factors?

Page 396

1    A.    I haven't.
2    Q.    What information do you have as far
3 as whether these groups on their websites do or do
4 not list talc as a risk factor for ovarian cancer?
5    A.    I would have to go and look on the
6 website.
7    Q.    Do you have any comment as to those
8 groups to the extent they don't list talc as a
9 risk factor on their websites?
10        MR. TISI:  Objection.  Vague.
11    Ask him to speculate.
12        Go ahead.
13        THE WITNESS:  I think if they
14    don't list it, that it would be
15    appropriate for them to -- to list it
16    as -- as a potential risk factor that
17    perhaps may not be advisable to be used.
18    That would be my recommendation.
19 BY MR. HEGARTY:
20    Q.    You have not personally contacted
21 SGO --
22    A.    No.
23    Q.    -- CDC or ACOG, correct?
24    A.    No.

Page 397

1    Q.    You make a reference in your report
2 to a study by Taher, correct?
3    A.    T-a-h-e-r.  Yes.
4    Q.    Please look at the end of your
5 report the list of citations, and to what Taher
6 study do you make reference to?
7    A.    Well, let me pull out the Taher
8 study.  It's right here.
9    Q.    No, I need you to look at your
10 report and tell me what you specifically refer to
11 at the back.
12    A.    Okay.
13    Q.    I want to make sure we start on the
14 same page.
15    A.    I understand.
16        MR. TISI:  Is there only one?
17        THE WITNESS:  I don't know.
18        MR. HEGARTY:  That's what
19    we're trying to find out.
20        MR. TISI:  Okay.
21        THE WITNESS:  Taher is -- is
22    cited from the 2020 article.  "Data on
23    systematic review of meta-analysis of
24    epidemiologic evidence."

100 (Pages 394 - 397)

Page 398

1        MR. HEGARTY:  And I'll mark as
2    Exhibit 29 that 2020 article.
3            (Document marked for
4        identification as Harlow Exhibit 29.)
5        THE WITNESS:  Uh-huh.
6        MR. HEGARTY:  I'll also mark
7    as Exhibit Number 30 the Taher 2019
8    article.
9            (Document marked for
10       identification as Harlow Exhibit 30.)
11   BY MR. HEGARTY:
12       Q.    My question is:  When you talked
13   about Taher in your report, were you intending to
14   refer to the 2020 article or the 2019 article?
15       A.    Yeah, this is -- I believe it's the
16   same data, but I probably was reviewing the
17   critical -- it was -- it was this one, yeah.  The
18   critical -- the "Critical review."
19           I wonder if I might have cited it
20   wrong.
21       Q.    That was my question.
22       A.    Yeah.
23       Q.    When you make reference to Taher
24   over on page 13 of your report --

Page 399

1        A.    Yep.
2        Q.    -- carrying over to page 14, did you
3    intend to actually cite Exhibit 30, which is the
4    "Critical review," but instead you cited Exhibit
5    29, the "Data on systematic review"?
6        A.    (Reviews document.)
7            It looks like it's the 24
8    case-control studies, and that would have been the
9    article.  So it was -- it was the critical
10   evaluation paper.
11       Q.    So the citation in your report
12   should be to Exhibit Number 30 instead of Exhibit
13   Number 29?
14       A.    That's correct, and, in fact, the
15   odds ratio that I present in my report is the one
16   from 2019, the 1.28 in the abstract.  Sorry.
17       Q.    Please note at Exhibit Number 30,
18   the systematic review article.
19       A.    The Taher article?
20       Q.    The Taher article.
21       A.    Yes.
22       Q.    And turn over to page 99.
23           Please look at the "Conclusion"
24   section and tell me when you get there.  Tell me

Page 400

1    when you are there.
2        A.    Uh-huh.  I am there.
3        Q.    At the end of the first paragraph of
4    the "Conclusion" section, the authors write:
5            "Consistent with a previous
6    evaluation by the IARC in 2010, the present
7    evaluation of all currently available relevant
8    data indicates that perineal exposure to talc
9    powder is a possible cause of ovarian cancer in
10   humans."
11           Do you see where I'm reading?
12       A.    Yes, I do.
13       Q.    Do you agree with that statement?
14       A.    Yes.
15       Q.    Please turn next in this paper over
16   to page 96.  Just above the "Discussion" section.
17       A.    Yes.
18       Q.    The paragraph just before the
19   "Discussion" section reads:
20           "Overall, the graphical results
21   shown in this Figure 3 suggests a possible
22   increasing trend in ovarian cancer risk with
23   increasing cumulative exposure to talc; however,
24   there is also a high degree of uncertainty

Page 401

1    surrounding many of the individual risk
2    estimates."
3            Do you agree with that statement?
4        MR. TISI:  Objection.
5        THE WITNESS:  Well, as I look
6    at the figure that they're referring to,
7    all but two of the point estimates are
8    above 1 from what I can see, maybe three,
9    which is why they have a 1.28 with a very
10   narrow confidence interval -- this is 24
11   studies -- from 1.20 to 1.37.
12   BY MR. HEGARTY:
13       Q.    So going back to my question:  Do
14   you agree with the way they characterize their
15   data as I read to you in that sentence?
16       A.    Yeah.  Where was that sentence
17   again?  Sorry.
18       Q.    It's in the -- it's in the paragraph
19   above "Discussion."
20       A.    Right.  Paragraph above
21   "Discussion."
22           (Reviews document.)
23           Well, that's -- that's -- that's why
24   doing this type of a meta-analysis of 24 studies

101 (Pages 398 - 401)

Page 402

1 allows us to have better precision in the risk.
2 So any one particular study is going to not have
3 the precision that we would gain by being able to
4 meta-analyze 24 of them together.
5        So when they say "there is also a
6 high degree of uncertainty surrounding many of the
7 individual risk estimates," that's the whole
8 reason why we do meta-analyses like this,
9 especially in the context of something like this
10 association which is around 1.3 and you have
11 variability around that.
12     Q.     If there is systematic error in a
13 case-control or cohort study -- and let me expand
14 that.
15        If there are systematic errors in
16 cases in control studies that you combine in a
17 meta-analysis, combining them in a meta-analysis
18 will not correct the systematic errors, correct?
19        MR. TISI:  Objection.
20        THE WITNESS:  Well, I don't
21     know that -- I don't believe they said
22     system -- I don't believe he said
23     systematic -- systematic error.
24        What did you say it was?  I'm

Page 403

1     sorry.  That term you used.
2 BY MR. HEGARTY:
3     Q.     And, again, let me start that
4 question over.
5     A.     Yeah, because --
6     Q.     My question --
7     A.     -- what they specifically said was
8 that "there was a high degree of uncertainty
9 surrounding many of the individual risk
10 estimates."
11        Uncertainty could relate to power.
12 It could relate to the width of the confidence
13 intervals.  It could, but it doesn't -- it doesn't
14 suggest there's systematic error in -- in the
15 studies.
16     Q.     My question -- and sorry if it was
17 confusing -- is not specific as to the Taher
18 study.
19        My question is that:  If there are
20 is a consistent systematic error across a group of
21 case-control and cohort studies that you're
22 combining in a meta-analysis --
23     A.     I see.
24     Q.     -- that combining them in a

Page 404

1 meta-analysis will not correct the systematic
2 error?
3     A.     That is correct.  You would have to
4 make the assumption that the dozens of
5 case-control studies that are all showing a risk
6 of about 1.3 to 1.5 -- well, as I say, 1.0 to
7 1.8 -- would systematically all be having an error
8 in the same direction and that's highly unlikely.
9     Q.     In that same part of the Taher
10 paper, after the statement I read to you, the
11 authors go on to say:
12        "A formal statistical test for trend
13 was not attempted because of the high degree of
14 heterogeneity among studies noted previously in
15 our meta-analysis discussed in Section 3.4."
16        Is that saying that there was --
17 that they did not do a formal statistical test for
18 trend, in your opinion, because of the differences
19 across the studies that was reflected in their
20 test for heterogeneity?
21     A.     I'm not sure what they're referring
22 to in a statistical test of trend because usually
23 a statistical test of trend is looking within a
24 particular study, or if you're pooling studies,

Page 405

1 they -- they have been -- they have been merged
2 together in a way that would allow you to assess a
3 test of trend with increasing exposure with
4 increasing risk of the disease.
5        So I'm not sure what they're talking
6 about in terms of a test of trend in the context
7 of that statement.
8     Q.     Please turn over to page 98, the
9 Section 4.4 "Applying GRADE framework."  Tell me
10 when you are there.
11     A.     "Applying GRADE framework."  Yes.
12 Uh-huh.
13     Q.     The authors state here that they
14 apply "the GRADE framework to assess the quality
15 of the evidence derived from the studies included
16 in this review," correct?
17     A.     Yes, that's what they state.
18     Q.     They go on to say:
19        "Using GRADEpro for the assessment,
20 the certainty of the evidence was classified as
21 very low."
22        Correct?
23        MR. TISI:  Objection.
24        THE WITNESS:  (Reviews

102 (Pages 402 - 405)

Page 406

1    document.)
2         Can you reread that sentence
3    where it is?  I'm not seeing it.
4  BY MR. HEGARTY:
5    Q.    Sure.
6         It's just after the sentence I
7  read --
8         MR. TISI:  Right there.
9  BY MR. HEGARTY:
10   Q.    -- under the section "Applying GRADE
11 framework."  The first sentence.  The second
12 sentence reads --
13   A.    Oh.  Yes.
14   Q.    -- "Using GRADEpro for the
15 assessment, the certainty of the evidence was
16 classified as very low."
17   A.    Yes, they say that.
18   Q.    Are you familiar with the GRADE
19 framework outside of this study?
20   A.    I am not.
21   Q.    The authors a couple sentences or at
22 least one sentence later says:
23        "However, we deemed the findings to
24 be subject to an appreciable risk of bias, mainly

Page 407

1  due to the potential for recall bias in the
2  included case control studies and the relatively
3  short follow-up periods between exposure and
4  outcome assessment in the included cohort
5  studies."
6         First of all, did I read that
7  correctly?
8    A.    You did, but you failed to read the
9  sentence before where they say:
10        "First, we considered our findings
11 from the meta-analysis to lack any serious issues
12 with respect to inconsistency, indirectness, and
13 imprecision."
14   Q.    Going to my question, though, did I
15 read that statement correctly?
16   A.    Yes, you did.
17   Q.    Do you disagree with that statement?
18   A.    I disagree with the issue of recall
19 bias.  Although, again, when you're only looking
20 at ever never with respect to talc exposure, there
21 will possibly be some recall bias.
22        But, again, as I've stated many
23 times, I believe the risk of talc exposure is
24 substantially due to long-term use for decades on

Page 408

1  a daily basis.
2    Q.    Please turn over to the next page,
3  page 99.
4    A.    Yes.
5    Q.    The paragraph at the top begins:
6         "Study design is a critical
7  component in the GRADE assessment, where
8  randomized controlled trials (RCTs) are viewed as
9  providing considerably stronger evidence than
10 observational studies."
11        Do you agree with that statement?
12   A.    I do.
13   Q.    They go on to say:
14        "As such, the evidence derived from
15 the observational studies in this review was
16 initially classified as being of low certainty
17 within the GRADE framework; this was further
18 downgraded to very low certainty in light of the
19 risk of bias noted above."
20        Do you see where the authors
21 downgraded their evidence to very low certainty?
22   A.    Yeah, but again --
23        MR. TISI:  Objection.
24        THE WITNESS:  -- the next

Page 409

1         sentence says:
2         "Despite the very low
3    certainty assigned by the GRADE
4    evaluation, which heavily factors
5    evidence from RCTs."
6         You can't do an RCT and assign
7    women to receive or not receive talc
8    exposure.  So the grade evaluation if it
9    relies heavily on -- on results from
10   randomized clinical trials is going to
11   grade, apparently from this statement,
12   everything low that's not an RCT.
13 BY MR. HEGARTY:
14   Q.    Please look over at or back at page
15 98.
16        In Footnote A at the bottom, they
17 describe the "GRADE Working Group grades"?
18   A.    Uh-huh.
19   Q.    Correct?
20   A.    Uh-huh.
21   Q.    Yes?
22   A.    Yes, I see it.  Sorry.
23   Q.    In that footnote, they describe the
24 grade very low certainty as:

103 (Pages 406 - 409)

Page 410

1          "We have little confidence in the
2  effect estimate: the true effect is likely to be
3  substantially different from the estimate of
4  effect."
5          Did I read that correctly?
6     A.    You did.
7     Q.    So the authors in this study
8  concluded that their evidence with regard to
9  talcum powder use and ovarian cancer is of very
10  low certainty, correct?
11          MR. TISI:  Objection.
12          THE WITNESS:   That was their
13      opinion.
14  BY MR. HEGARTY:
15     Q.    Did you read when you -- sorry.
16  Strike that.
17          Did you see when you read the Health
18  Canada screening assessment that they rely or that
19  they reference this Taher study?
20     A.    I believe they reference a lot of
21  studies.  I don't know.  I mean, I have the Health
22  Canada report and I -- I don't dispute that they
23  -- that they reference this study.
24     Q.    Do you see where it says under the

Page 411

1  "Sources of funding" part of this paper that:
2          "This work was supported by Health
3  Canada as part of their Chemicals Management Plan
4  via contract number" and they list the contract
5  number?
6     A.    Yes.
7     Q.    "To Risk Scientists International
8  (RSI), Ottawa Canada -- Ontario, Canada"?
9     A.    Yes, I see that.
10     Q.    Does that indicate to you that
11  Health Canada provided funding to do this study?
12     A.    Yes, they -- they did.
13          I don't believe that -- I believe
14  Health Canada is a governmental agency.  Okay.
15  It's not a private foundation.  It's a
16  governmental agency.  Just like we are funded here
17  in the United States by the National Institutes of
18  Health for a lot of research that we do.
19     Q.    We've been talking today about the
20  studies reporting on relative risk or odds ratios
21  between women with patent and women with unpatent
22  tubes, correct?
23     A.    (Nods head).
24     Q.    Correct?

Page 412

1     A.    Yes.
2     Q.    Assume for purpose of my question
3  that the average age of women starting talcum
4  powder use on a regular basis is age 20, and the
5  average age of a tubal ligation and/or a
6  hysterectomy is in the 40s.
7          Is that 20 years of use
8  insufficient, in your view, to increase those
9  women's risk of ovarian cancer?
10     A.    Not necessarily.  20 years of use
11  every day in a patent genital tract until that
12  time is a substantial amount of exposure, in my
13  view.
14     Q.    In my hypothetical, if that is the
15  nature of use in the studies that we looked at
16  that have looked at patent and unpatent tubes, how
17  is then an emphasis on the finding -- findings of
18  unpatent tubes a noteworthy finding?
19          MR. TISI:  Objection.
20  BY MR. HEGARTY:
21     Q.    If you can understand my question?
22          MR. TISI:  Misstates his
23      testimony.
24          Go ahead.

Page 413

1          THE WITNESS:   Why don't you
2      repeat that question, please.
3  BY MR. HEGARTY:
4     Q.    Sure.
5          If my hypothetical is accurate and
6  the women studied in those studies that have
7  looked at patent and unpatent tubes had 20 years
8  of talc exposure prior to having tubal ligation or
9  hysterectomy, how is it noteworthy to compare
10  those women to women with patent tubes?
11          MR. TISI:  Objection.
12  BY MR. HEGARTY:
13     Q.    If you can understand -- do you
14  understand my question?
15     A.    Yeah.  I think you're -- you're
16  assuming that the studies looked only at women who
17  were exposed during times when they had patent
18  tubes, and then looking at women who are only
19  exposed during times when their genital tract was
20  closed.
21          Is that what you're saying?
22     Q.    Well, I'm not sure that's what I'm
23  saying, but my point -- the question I'm asking
24  you is: To the extent those -- there's

104 (Pages 410 - 413)

Page 414

1 differences between the group who used talc for 20
2 years prior to having tubal ligation or
3 hysterectomy and those that had patent tubes, what
4 do you explain the differences to be?
5      A.    Well, I believe others have
6 explained the possibility that if they're using it
7 and they do not have patent tubes, it does not
8 preclude them from exposure, particularly from
9 inhalation.
10     Q.    Is it your opinion that inhalation
11 of talcum powder use can cause ovarian cancer?
12     A.    There's some evidence that it was --
13 that it's a possibility.  I believe it was -- was
14 it Schildkraut's article that discussed that?
15         One of the articles did discuss that
16 as a possibility, and I didn't do an extensive
17 search on -- on inhalation of talc and its impact
18 specifically on ovarian cancer.
19     Q.    Do you have an opinion one way or
20 another as to whether inhalation of talc can cause
21 ovarian cancer?
22     A.    I don't have an opinion at this
23 point, but you've tweaked my interest.
24     Q.    You had -- you don't make any

Page 415

1 reference in your report to studies that have
2 looked at talc-dusted diaphragms or talc-dusted
3 condoms in ovarian cancer risk, correct?
4      A.    In my -- in my previous research, I
5 definitely discuss that.  In the report, we -- we
6 focus on -- on direct perineal application.
7 Although I would not be surprised if within my
8 report on some of these particular studies we
9 talked about the issue of exposure on diaphragms
10 or condoms.
11         But I believe in most of the
12 research that I've looked at, the risk is lower in
13 those women.  Probably because of the infrequent
14 nature of the exposure.
15     Q.    My question is not what the risk is
16 that's or has been reported in the study.
17         My question is:  Did you do an
18 analysis in your report in this case of the
19 studies that looked at the risk of ovarian cancer
20 from women using talc-dusted diaphragms or
21 talc-dusted condoms?
22     A.    I did not specifically put a section
23 in my report about that particular risk.
24     Q.    Why did you not do that?

Page 416

1      A.    Well, because most of the studies
2 that have looked at this have shown that it is not
3 as strong a risk factor as that among women who
4 apply it daily on a regular basis.
5      Q.    You said you reported on that data
6 in at least one of your prior studies, correct?
7      A.    We have, yes.
8      Q.    Is that appropriate data to look at
9 when evaluating whether there's a risk of ovarian
10 cancer with talcum powder use?
11     A.    I believe so.
12     Q.    We talked a moment -- talked earlier
13 in the day about whether it is necessary for talc
14 to reach the ovary for purposes of your biologic
15 plausibility assessment, and you also referenced
16 that talc can get to the fallopian tubes.
17         Do you recall that discussion?
18     A.    Yes.
19     Q.    Is it necessary for purposes of your
20 biologic plausibility opinion that talc at least
21 reached the fallopian tube?
22     A.    I think it would be reasonable to.
23 If there were no evidence of talc reaching the
24 fallopian tubes, I would -- I would reassess that,

Page 417

1 but the fact is there is.
2         MR. TISI:  May I ask how much
3     time we have?
4         MR. HEGARTY:  Let's go off the
5     record.
6         (Recess:  6:01 p.m. -
7         6:02 p.m.)
8         MR. HEGARTY:  We're back on
9     the record.
10        I have some amount of time
11    left, 16 minutes, I believe, that we
12    talked about.  I'm going to reserve that
13    time for any further questioning once
14    plaintiffs' counsel is finished asking or
15    doing his direct examination of
16    Dr. Harlow.
17        MR. TISI:  And we will, you
18    know, I will be flexible with you as long
19    as it's not unreasonable.
20        MR. HEGARTY:  Thank you.
21        (Recess:  6:03 p.m. -
22        6:04 p.m.)
23 //
24 //

Page 418

1             EXAMINATION
2 BY MR. TISI:
3      Q.    Doctor, I'm Chris Tisi.  I am the
4 attorney who is the -- who has retained you to
5 give your expert opinion in this case.
6           So let me just start with the big
7 picture and perhaps maybe we can maneuver to some
8 specific areas.
9           You were asked a lot of questions
10 about -- I think you talked about Weiss's study
11 and different studies over the course of the past
12 40, 50 years.  I'm going to bring you to today and
13 just ask you a big picture question.
14           Based upon what's known today and
15 having considered all the things you considered
16 over the past 50 years of research, do you
17 continue to believe to a reasonable degree of
18 scientific certainty that talc is a cause of
19 epithelial ovarian cancer?
20           MR. HEGARTY:  Objection to
21      form.
22           THE WITNESS:  I do.
23 BY MR. TISI:
24      Q.    Okay.  Did anything that counsel

Page 419

1 told -- asked you about today change that opinion
2 at all?
3           MR. HEGARTY:  Objection to
4      form.
5           THE WITNESS:  No.
6 BY MR. TISI:
7      Q.    Okay.  Do you believe it's
8 biologically plausible that talc can reach the
9 ovaries, can cause inflammation resulting in
10 cellular changes, enter the ovary, and -- and it's
11 biologically plausible that that is in the chain
12 of events leading to ovarian cancer?
13           MR. HEGARTY:  Objection to
14      form of the question.
15           THE WITNESS:  It's
16      biologically plausible.
17 BY MR. TISI:
18      Q.    Okay.  And so you were asked a lot
19 of questions today about Dr. O'Brien.
20           Did you look at Dr. O'Brien's
21 research?  Did you look at Dr. O'Brien's research
22 over -- over time?
23      A.    Yes.
24      Q.    Okay.

Page 420

1      A.    I've looked at --
2           MR. HEGARTY:  Do you have
3      copies of any studies you're going to
4      use?
5           MR. TISI:  Yeah.
6           MR. HEGARTY:  Do you have
7      copies for me?
8           MR. TISI:  I do.
9           MR. HEGARTY:  I was going to
10      say I can find copies if I need to, but I
11      will wait.
12 BY MR. TISI:
13      Q.    I'm going to use by way of
14 example -- I'm going to show you a study or -- I'm
15 sorry.  Maybe this is one in which I don't.
16           MR. HEGARTY:  Which one is it?
17           MR. TISI:  This is the 2021.
18      This one.
19           MS. PARFITT:  Which one?
20      O'Brien?
21           MR. TISI:  2021.
22           MR. HEGARTY:  Who are the
23      authors?
24           MR. TISI:  It's O'Brien

Page 421

1      Weinberg, D'Aloisio Moore, and Sandler.
2           MR. HEGARTY:  I think I have a
3      copy.  If you don't have a copy, I think
4      I have one.  I can find it.
5           MR. TISI:  Okay.  I'm going to
6      have this marked as Plaintiff's Exhibit
7      Number 1.
8           Do you have a copy of that?
9           THE WITNESS:  Yes, I do.
10           MR. TISI:  Can I mark yours as
11      Exhibit Number 1, please?
12           (Document marked for
13      identification as Exhibit P1.)
14           MR. HEGARTY:  Do you have a
15      copy?
16           MR. TISI:  You can read over
17      his shoulder if you don't mind.
18           MR. HEGARTY:  Yeah, I do want
19      to when you're done.  Is your copy marked
20      on?
21           MR. TISI:  I would give you my
22      copy.
23           MR. HEGARTY:  I just want to
24      look at back over it.

106 (Pages 418 - 421)

Page 422

1          MR. TISI:  Sure.
2          MR. HEGARTY:  Beyond what
3     you're asking him about.
4          MR. TISI:  No problem.
5 BY MR. TISI:
6     Q.    I'm going to -- this is an article
7 that Dr. O'Brien and colleagues wrote on "The
8 association between douching, general talc use,
9 and the risk of prevalent and incident cervical
10 cancer."
11          Have you seen this article before?
12     A.    Yes.
13     Q.    Okay.  I'm going to refer you to the
14 second page.  She says -- she describes -- she
15 describes her own research as well as biologic
16 plausibility, and I'm going to read it to you and
17 ask whether you agree with it.  Okay?
18     A.    Yes.
19     Q.    It says:
20          "Genital talc use could also
21 plausibly contribute to cervical cancer risk."
22          She's talking about cervical cancer
23 there, right?
24     A.    Uh-huh.

Page 423

1     Q.    Okay.  But then she goes on to say:
2          "Talc applied to underwear, sanitary
3 napkins, diaphragms, or directly to the perineal
4 region can enter the vagina and travel up the
5 reproductive tract."
6          Is that consistent with what you
7 described in your literature 20, 30 years ago?
8          MR. HEGARTY:  Objection to the
9     form.
10          THE WITNESS:  Yes.
11 BY MR. TISI:
12     Q.    Okay.  Secondly says:
13          "Talc particles may act as
14 irritants, inciting an inflammatory response and
15 potentially affecting individuals'
16 susceptibility."
17          Do you see that?
18     A.    I do.
19     Q.    Okay.  Is that something you wrote
20 about 20, 30, or 40 years ago?
21          MR. HEGARTY:  Objection to the
22     form.
23          THE WITNESS:  I for sure
24     mentioned it in my review article in

Page 424

1 1994.
2 BY MR. TISI:
3     Q.    It says:
4          "Additional or more severe adverse
5 effects could occur if the talc contains asbestos,
6 a known carcinogen sometimes mined in the same
7 location as talc."
8          Do you see that?
9     A.    Yes, I do.
10          MR. HEGARTY:  Objection to the
11     form.
12 BY MR. TISI:
13     Q.    Okay.  Does that add to the biologic
14 plausibility that talc is a cause of ovarian
15 cancer and is that something that you wrote about
16 in your article in 1989?
17     A.    Yes.
18          MR. HEGARTY:  Objection to the
19     form.
20          THE WITNESS:  It is something
21     that I mentioned in 1989 in my article.
22 BY MR. TISI:
23     Q.    And then she goes on to say:
24          "The epidemiologic literature

Page 425

1 supports a possible positive association between
2 general talc use and ovarian cancer."
3          Do you see that?
4     A.    Yes, Do I.
5     Q.    And if you look at the citation, she
6 cites her own pooled analysis that counsel was
7 asking you about before, correct?
8     A.    That's correct, and the Terry study.
9     Q.    Okay.  Now, you --
10     A.    Are we done with this?
11     Q.    Yes, we are.
12     A.    Okay.
13     Q.    In fact, she's made that -- that
14 comment on more than one occasion since publishing
15 her article, correct?
16          MR. HEGARTY:  Objection to the
17     form.
18          THE WITNESS:  I would need to
19     see it.
20          MR. TISI:  Okay.  Okay.  I
21     have another.  I have another copy of it.
22     Here you go.
23          MR. HEGARTY:  Okay.  I'll give
24     you your copy back.  Is that Exhibit

107 (Pages 422 - 425)

Page 426

1    Number 1?
2         THE WITNESS:  Oh, I've got
3    the one that says exhibit on it.  Here
4    you go.  Oh, it's Exhibit 1.  Do I give
5    you this back?
6  BY MR. TISI:
7    Q.   No, just leave it.
8    All right.  So --
9         MR. HEGARTY:  Are you using
10   that as P1 or 1?
11        MR. TISI:  P1.  Plaintiff's 1.
12        MR. HEGARTY:  I just want to
13   make sure that when we read the record we
14   don't --
15        MR. TISI:  Yeah, if I have to
16   go back and follow your system, I won't
17   be able to.
18  BY MR. TISI:
19   Q.   Okay.  So let me go back and ask you
20  some things.
21        He asked you some questions about
22  whether you were a toxicologist, whether you were
23  a cellular biologist, whether you're a medical
24  doctor.

Page 427

1         Remember all those questions?
2    A.   Yes.
3    Q.   Okay.  Doctor, in the course of
4  being an epidemiologist for your entire career, do
5  you have opportunity to synthesize the biologic
6  evidence to evaluate in connection with the
7  statistical evidence that you gather as an
8  epidemiologist?
9         MR. HEGARTY:  Objection to the
10   form.
11        THE WITNESS:  It's the
12   standard of practice.
13        Anytime I do an analysis and
14   come forward with the research findings,
15   a section of the discussion needs to be
16   related to the biological rationale for
17   why a particular association would exist,
18   and to do that, one needs to review the
19   literature on whether it be animal
20   studies or cell-based studies, or other
21   studies that would provide evidence that
22   the association makes biological sense.
23  BY MR. TISI:
24   Q.   Okay.  And you were also asked some

Page 428

1  questions by counsel about whether you had ever
2  made any effort to educate your colleagues with
3  the medical and scientific community about the
4  potential problems of talc and ovarian cancer.
5         Do you remember those questions?
6         MR. HEGARTY:  Objection to
7    form.
8         THE WITNESS:  Yes, I remember
9    those questions.
10  BY MR. TISI:
11   Q.   Okay.  Now, taking those two things,
12  together talking about the biologic plausibility
13  of talc and ovarian cancer and the question of
14  letting people know about your views, is that
15  something you did in the published medical
16  literature before you were ever contacted by me,
17  Ms. Parfitt, or anybody else?
18        MR. HEGARTY:  Objection to the
19   form.
20        THE WITNESS:  Well, in my
21   published article, my 1989 article, my
22   1992 article, my 1994 article and the
23   article I did with Dr. Cramer in 1999, we
24   always ended with our belief that this

Page 429

1    was an exposure that women should avoid.
2  BY MR. TISI:
3    Q.   And you talked about asbestos
4  contamination in those articles, correct?
5    A.   Yes.
6    Q.   You talked about biologic
7  plausibility including the migration, correct?
8         MR. HEGARTY:  Objection to the
9    form.
10        THE WITNESS:  As I do in all
11   of my research articles.
12  BY MR. TISI:
13   Q.   You talked about -- you talked about
14  all the things that counsel asked you about today
15  long before you were ever retained by us, true?
16        MR. HEGARTY:  Objection to the
17   form.
18        THE WITNESS:  That's correct.
19  BY MR. TISI:
20   Q.   Okay.  For example, let me show you
21  what I have marked as Exhibit Number P2, which is
22  your article from 1989.
23        (Document marked for
24   identification as Exhibit P2.)

108 (Pages 426 - 429)

Page 430

1 BY MR. TISI:
2    Q.    And I'm not going to go over every
3 aspect of it, but you're familiar with this
4 article, correct?
5    A.    Yes.
6    Q.    Okay.  And this is a study called "A
7 Case-Control Study of Borderline Ovarian Tumors:
8 The Influence of Perineal Exposure to Talc,"
9 correct?
10    A.    Yes.
11    Q.    Okay.  And this was 1989, correct?
12    A.    That's correct.
13    Q.    Okay.  George Bush the first was
14 president, right?
15    A.    I don't recall.  (Laugh.)
16    Q.    Long time ago, fair?
17    A.    Yes.
18    Q.    Okay.  And you write at the end of
19 your -- and you talk about that there was an
20 increased incidence in borderline ovarian tumors
21 in women who had been exposed to deodorizing
22 powders, correct?
23    A.    It was not incidence.  It was risk.
24    Q.    Risk.  True?

Page 431

1    A.    Yes.
2    Q.    Okay.  But I want to refer you to
3 the very end of the article and, again, you were
4 not retained as an expert at the time, correct?
5    A.    Correct.
6    Q.    In fact, there was -- I'm going to
7 represent to you that no case of ovarian cancer
8 and talc wasn't ever filed until 2009.
9        All your published literature, with
10 the exception of the letter to the editor, was
11 published before there was any talc litigation,
12 correct?
13    A.    Yes.
14    Q.    Okay.  And you write at the end, the
15 last sentence.  I'll read it into the record.
16       "Although these data need
17 replication, they raise the possibility that the
18 risk of ovarian tumors in women who apply
19 deodorizing powder to the perineum may not relate
20 to talc per se but rather to asbestos
21 contamination and/or a substances or substances
22 used specifically for deodorization."
23       Do you see that?
24    A.    Yes.

Page 432

1    Q.    Okay.  So one of the things you
2 talked about in your early literature is whether
3 or not asbestos was in these products that were
4 used perineally, correct?
5       MR. HEGARTY:  Objection to the
6    form.
7       THE WITNESS:  That is
8    correct, and I believe in the body of the
9    discussion I talk about the evidence for
10    that.
11 BY MR. TISI:
12    Q.    Okay.  Let's go to the next one,
13 1982, which I think was previously marked, but I'm
14 going to mark it again because I don't want to dig
15 through my stuff.
16    A.    1992?
17    Q.    1992.  This is an article "Perineal
18 Exposure to Talc and Ovarian Cancer Risk," Bernard
19 Harlow, and this will be Exhibit P3.
20       (Document marked for
21    identification as Exhibit P3.)
22 BY MR. TISI:
23    Q.    And what was the significance of
24 this study, Doctor?

Page 433

1    A.    Well, I believe this was one of the
2 -- one of the first studies to really try to tease
3 out the dose-response association with talc
4 applications by looking at it excluding use after
5 hysterectomy or tubal ligation and during
6 non-ovulatory months where we see an important
7 dose response.
8    Q.    And you saw anywhere between a --
9 you saw an increased risk in dealing with women
10 with patent intact reproductive tracts of ovarian
11 cancer, true?
12       MR. HEGARTY:  Objection to the
13    form.
14       THE WITNESS:  Yes, but it
15    wasn't -- it wasn't specifically asking
16    about that.  It was actually calculating
17    applications that were used during
18    periods when there was a patent genital
19    tract.
20 BY MR. TISI:
21    Q.    Okay.  And that brings me to a
22 question that counsel was asking a lot of
23 questions about.
24       He asked you about years of use.  He

109 (Pages 430 - 433)

Page 434

1 asked you about frequency of use.
2        As an epidemiologist, you understand
3 that exposure -- do you understand that exposure
4 to a potential toxin is a -- is the important
5 consideration with respect to dose response, true?
6        MR. HEGARTY:  Objection to the
7     form.
8        THE WITNESS:  Yes, exposure.
9     Not just how many years you've used it or
10    how frequently you use it, but the
11    combination of both that allows you to
12    get an accurate assessment of exposure.
13 BY MR. TISI:
14    Q.    Okay.  And that's what you tried to
15 do in this particular study, correct?
16    A.    Correct.
17    Q.    All right.  And at the end of the
18 study, you state -- again, this is long before
19 litigation in 1992:
20        "Given the poor prognosis for women
21 for ovarian cancer, any potentially harmful
22 exposures should be avoided, particularly those
23 with limited benefits.  For this reason, we
24 discourage the use of talc in genital hygiene,

Page 435

1 particularly as a daily habit."
2        Correct?
3    A.    Yes.
4    Q.    Okay.  And so when counsel asked
5 you, did you ever tell the medical and scientific
6 community about your point of view, you actually
7 published in the peer-reviewed literature about
8 that, correct?
9        MR. HEGARTY:  Objection to the
10    form.  Misstates my question.
11    You can answer.
12        THE WITNESS:  You correctly
13    summarize what I had indicated in my
14    published work.
15 BY MR. TISI:
16    Q.    Okay.  So now let's talk about the
17 Carr, the ISRTP conference.
18        You were asked to attend that
19 meeting, correct?
20    A.    Yes.
21    Q.    Okay.  Is it your understanding that
22 this was primarily a meeting that was convened
23 between the talc industry and the FDA, correct?
24        MR. HEGARTY:  Objection to the

Page 436

1     form.
2        THE WITNESS:  I did not think
3     of it as the talc industry.  I thought of
4     it as the Food and Drug Administration
5     and the International Society of
6     Regulatory Toxicology & Pharmacology.  I
7     did not --
8 BY MR. TISI:
9    Q.    At the time.
10    A.    At the time, I did not think to
11 myself, oh, this is an industry-sponsored
12 conference.
13    Q.    Okay.
14    A.    I basically wanted -- I was pleased
15 to be invited, was pleased to have the opportunity
16 to convey my findings, with the hope that it would
17 lead to potential mitigation of the exposure.
18    Q.    Okay.  And so when you went into
19 this -- when you went into this meeting, you were
20 pretty clear that not only was there an
21 association in people who had been exposed --
22 women who had been exposed, but that for
23 precautionary reasons they shouldn't be using it,
24 true?

Page 437

1        MR. HEGARTY:  Objection to the
2     form.
3        THE WITNESS:  I had stated
4     that in my 1989 article.  I had stated
5     that in my 1992 article.  And when I went
6     into the conference in 1994, my views had
7     not changed.
8 BY MR. TISI:
9    Q.    Now, in the article itself -- and do
10 you have a copy of the article in front of you?
11    A.    The summation of it by Carr or
12 the -- my -- my article?  My review?
13        MR. TISI:  I'm going to mark
14     it as Exhibit Number 4.
15        (Document marked for
16     identification as Exhibit P4.)
17        MR. HEGARTY:  Is that P4?
18        MR. TISI:  P4.
19        MR. HEGARTY:  So we don't have
20     two 4s.
21        THE WITNESS:  So that's the --
22        MR. TISI:  P4.  I think it's
23     your Number 8.
24        THE WITNESS:  Right.

110 (Pages 434 - 437)

Page 438

1    MR. HEGARTY: I trust you.
2    THE WITNESS: Yes, that's
3    this. Yes, that's the summary. The
4    summary by Rapporteur Jelleff Carr.
5  BY MR. TISI:
6    Q.    Now, in here it says -- on page 215
7  on the left-hand side, it says:
8    "Dr. Hartge (National Cancer
9  Institute) and Dr. Harlow (Harvard University)
10 presented a review of epidemiologic studies --
11 including their own original studies -- pertaining
12 to perineal talc exposure and ovarian cancer
13 risk."
14   A.    Can you show me where that is,
15 please?
16   Q.    On the left-hand side.
17   A.    Yeah.
18   Q.    The last full paragraph on page 215.
19   A.    Oh, 215. I'm sorry.
20   Okay. Dr. Hartge and Dr. Harlow. I
21 got the paragraph. Go ahead.
22   Q.    Did this article at all explain what
23 your presentation was so that people subsequent to
24 this hearing could hear about your presentation

Page 439

1 about the risks?
2    MR. HEGARTY: Objection to the
3    form.
4    THE WITNESS: No.
5  BY MR. TISI:
6    Q.    Okay.
7    A.    There was nothing other than
8  indicating that we presented original research --
9    Q.    Okay.
10   A.    -- and that the studies reviewed
11 brought to light the many interpretative
12 difficulties of epidemiology as an observational
13 science and are detailed in the papers by Harlow
14 and Hartge appear in this issue of the journal.
15   They only said -- they only put into
16 this review that all we talked about were the
17 concerns.
18   Q.    That doesn't --
19   A.    Whereas, we talked about the
20 evidence in a balanced and, I believe,
21 academically appropriate manner.
22   Q.    Did you feel that this summary was
23 fair and balanced?
24   A.    No.

Page 440

1    MR. HEGARTY: Objection to
2    form.
3  BY MR. TISI:
4    Q.    Okay. Did you ultimately write a
5  full review of what it was that you -- that you
6  presented at the meeting in 2014?
7    A.    Yes.
8    Q.    Okay. In fact, just to be -- just
9  to be clear, the only reference in this article
10 was -- was to whom?
11   A.    Dr. Rothman.
12   Q.    Okay. Somebody who counsel implied
13 may have been statistically unsophisticated.
14   Would you ever classify Dr. Rothman
15 or yourself as statistically unsophisticated?
16   MR. HEGARTY: Objection to the
17   form.
18   THE WITNESS: No.
19 BY MR. TISI:
20   Q.    Okay. Between the two of you, would
21 you maybe have published perhaps anywhere between
22 500 and a thousand articles in the peer-reviewed
23 literature?
24   MR. HEGARTY: Objection to

Page 441

1    form.
2    THE WITNESS: Yes.
3  BY MR. TISI:
4    Q.    Okay. He's published textbooks and
5  the textbooks that are used in medical schools
6  throughout the country?
7    A.    And in schools of public health --
8    MR. HEGARTY: Objection to
9    form.
10   THE WITNESS: -- across the
11   country.
12 BY MR. TISI:
13   Q.    Okay. Now, it talks about at the
14 end here, it says:
15   "The possibility of an association
16 of talc exposure and ovarian cancer is an
17 important hypothesis of potential public health
18 importance. However, this association remains a
19 research hypothesis whose verification or
20 falsification needs additional study."
21   And it goes on to say that there is
22 "epidemiologic study have provided weak and
23 conflicting risk signals" for this association,
24 "and it is unlikely that further studies" would

111 (Pages 438 - 441)

Page 442

1 yield any additional concern.
2        Do you see that at the very end of
3 the paragraph?
4    A.    Yes.
5        "For epidemiology, further
6 refinements may be possible in the selection and
7 characterization of control subjects and in the
8 accounting of possible confounders and biases.
9 However, epidemiologic studies have provided weak
10 and conflicting risk signals for this association,
11 and it is unlikely that further studies may prove
12 adequate to raise concern at a level sufficient to
13 warrant regulatory or public health measures."
14    Q.    In fact -- in fact, after this
15 particular study, there were literally dozens of
16 studies that were funded by -- by institutions
17 throughout the country, including National Cancer
18 Institute, correct?
19        MR. HEGARTY:  Objection to the
20    form.
21        THE WITNESS:  There were.
22    There were.
23 BY MR. TISI:
24    Q.    Do you think --

Page 443

1    A.    But I'd also like to state that in
2 this article, we actually did do an assessment of
3 the research that had been published as of this
4 date and all of the studies, except one, showed a
5 positive association.
6    Q.    Okay.
7    A.    So to the extent that -- that --
8 that further studies may prove adequate to raise
9 concern at a level sufficient to warrant
10 regulatory is not necessary is -- or even to
11 suggest that we need is to suggest that no further
12 studies are needed because the evidence is not
13 there.  When, in fact, in the article that I
14 present -- in my presentation, I actually showed a
15 number of studies, not just mine, that showed
16 reasonable consistency and has been -- has been
17 duplicated since then.
18    Q.    Let me show you Exhibit Number 5,
19 which is your review article --
20    A.    Yeah.
21    Q.    -- that came out of this.
22        (Document marked for
23        identification as Exhibit P5.)
24 BY MR. TISI:

Page 444

1    Q.    And you'll see at the very first
2 part of it, it says -- it says:
3        "Presented, in part" --
4        Footnote 1 says:
5        "Presented, in part, at the
6 International Society of Regulatory Toxicology and
7 Pharmacology," referring to this meeting, correct?
8    A.    Yes.
9    Q.    Okay.  And it was your goal here is
10 to -- to communicate what it was you were trying
11 to communicate at that meeting, correct?
12        MR. HEGARTY:  Objection to the
13    form.
14        THE WITNESS:  Yes.
15 BY MR. TISI:
16    Q.    Okay.  And if you look, it talks
17 about, for example, on the right-hand side studies
18 which showed talc particles in the ovaries going
19 back to 1979, a study by Henderson in 1979,
20 correct?
21    A.    Yes.
22    Q.    Okay.  You didn't have to be -- you
23 didn't have to be a pathologist to read that
24 study, right?

Page 445

1        MR. HEGARTY:  Objection to the
2    form.
3        THE WITNESS:  Yes.
4 BY MR. TISI:
5    Q.    Okay.  You talked about asbestos on
6 the next page and the fact that it could
7 potentially migrate, correct?
8        MR. HEGARTY:  Objection to the
9    form.
10        THE WITNESS:  Yes.
11 BY MR. TISI:
12    Q.    Okay.  You talked about biologic
13 plausibility of -- of asbestos causing ovarian
14 cancer, correct?
15        MR. HEGARTY:  Objection to the
16    form.
17        THE WITNESS:  I did.
18 BY MR. TISI:
19    Q.    Okay.  You talked about and you
20 finally came out with -- and on page 256 on the
21 left-hand side.
22    A.    Uh-huh.
23    Q.    You say:
24        "Because the risk of any one outcome

112 (Pages 442 - 445)

Page 446

1 is dependent upon both the frequency and length of
2 exposure."
3        You talked about why you did both of
4 those things, correct?
5    A.    Yes.
6    Q.    Is one of the flaws in the studies
7 that you've looked at to date that they either
8 measured length or frequency but not both
9 together?
10        MR. HEGARTY:  Objection to
11    form.
12        THE WITNESS:  I believe
13    that's a limitation.
14 BY MR. TISI:
15    Q.    Okay.  But you tried to do that in
16 your own studies, correct?
17    A.    Yes.
18    Q.    And what did you find in your own
19 studies in the 1990s?
20    A.    We found the dose response --
21    Q.    Okay.
22    A.    -- when there was an open genital
23 tract.
24    Q.    And, in fact, you put that in your

Page 447

1 article here.  It says:
2        "There was a sizable increase in
3 risk in women with more than 10,000 applications
4 of talc which persisted after multivariate
5 adjustment for parity, education, marital status,
6 douching, weight, and use of sanitary napkins."
7        Do you see that?
8    A.    Yes, I do.
9    Q.    Now, counsel asked you whether or
10 not you looked at the literature relating to
11 things like douching, weight, and the risks of
12 ovarian cancer, true?
13        MR. HEGARTY:  Objection to the
14    form.
15        THE WITNESS:  In -- in
16    preparation of the report that I did?
17 BY MR. TISI:
18    Q.    Right.
19    A.    No, I didn't do that for preparation
20 of the report.  I obviously did that in deciding
21 what potential covariates we should adjust for in
22 our analyses in this, in the 1992 paper.
23    Q.    In fact, one of the things you
24 looked at when you looked at these studies over

Page 448

1 time was whether or not they adjusted for these
2 confounders, true?
3    A.    Yes.
4    Q.    In fact, you didn't have to be -- do
5 a complete comprehensive review of all the medical
6 literature of douching to know that you had to
7 adjust for douching, correct?
8        MR. HEGARTY:  Objection to the
9    form.
10        THE WITNESS:  To know that I
11    need to determine whether adjusting for
12    douching would impact my estimates.
13 BY MR. TISI:
14    Q.    Okay.  You talk about in this
15 article in 1995 the recollection of talc
16 exposures.
17        Do you see that?
18    A.    Where are we talking about now?
19    Q.    On page 257.
20    A.    Oh, 257.  Where are we?  Where are
21 we now?
22    Q.    On page 257.
23    A.    Yes.
24    Q.    The bottom to the next page,

Page 449

1 correct?
2    A.    Where it starts "Thus the basic
3 design"?
4    Q.    On the very bottom.  I'm sorry.  It
5 says "Recollection of Talc Exposure."
6        On the bottom right-hand side.
7    A.    Oh, I'm sorry.  Got it.
8    Q.    On page 257 going on to the next
9 page.
10    A.    Yes.  Yes, yes, yes.  I'm there.
11 I'm there.  Yes.
12    Q.    Now, you offer the opinion that
13 today that misclassification because of recall
14 bias differentially in the case-control studies
15 might be a problem if it was not a routine or
16 habit of a woman, but if something is routine, it
17 would be not as much of a problem, correct?
18    A.    Yes.
19        MR. HEGARTY:  Objection to the
20    form.
21 BY MR. TISI:
22    Q.    Is that something you wrote right
23 here at the bottom of page 250 -- excuse me -- 258
24 on the left-hand side when you say:

113 (Pages 446 - 449)

Page 450

1    "Differential misclassification and
2 random error are most likely to occur if the
3 question is too long or too vague and if the
4 behavior itself is intermittent and trivial."
5    A.    Correct.
6    Q.    Okay.  Do you see that?
7    A.    Yes.
8    Q.    Okay.  And you also noted on the top
9 part that the risk --
10    A.    Where are you referring to now?
11    Q.    In the chart, Table 3.
12    A.    Oh, Table 3, yes.
13    Q.    That people with prior to tubal
14 ligation, hysterectomy, and during ovulatory
15 periods only, the risk for greater than 10,000
16 applications was 2.8.
17        Do you see that?
18    A.    Yes.
19    Q.    Okay.  Now, at the summary of your
20 article, you indicated what you thought was the
21 range of relative risks based upon the literature
22 existed at that time, correct?
23    A.    Yes.
24        MR. HEGARTY:  Objection to the

Page 451

1    form.
2 BY MR. TISI:
3    Q.    You mentioned several times today
4 that you thought that risk was between 1.0, 1.8,
5 correct?
6    A.    Yes.
7        MR. HEGARTY:  Objection to the
8    form.
9 BY MR. TISI:
10    Q.    You wrote that back in 1995,
11 correct, in this article?
12        MR. HEGARTY:  Objection to the
13    form.
14        THE WITNESS:  And I believe I
15    presented it at the -- at the conference
16    as well.
17 BY MR. TISI:
18    Q.    That wasn't in the summary of the --
19 of the conference, was it?
20    A.    No, but it was in the minutes of
21 the -- the -- what do they call it?  Minutes of
22 the meeting.
23    Q.    Right.
24    A.    Or the transcript.  Transcript of

Page 452

1 the meeting.
2    Q.    So the point is here do you feel
3 that the -- if anybody were to -- first of all,
4 Dr. Carr was not an employee of the FDA, the
5 person who took these minutes, correct?
6        MR. HEGARTY:  Objection to the
7    form.
8        THE WITNESS:  I have no idea
9    who Dr. -- I don't even know if it's
10    Dr. Carr.  I don't know who that person
11    was.
12 BY MR. TISI:
13    Q.    Was there anything in the
14 presentations that were made that changed your
15 view that women ought to be -- that risks -- that
16 the risks ought to be mitigated based upon at
17 least what's available 30, 40 years ago --
18        MR. HEGARTY:  Objection.
19 BY MR. TISI:
20    Q.    -- after going to this meeting at
21 the FDA?
22        MR. HEGARTY:  Objection to the
23    form.
24        THE WITNESS:  Can you repeat

Page 453

1    the question?  I'm sorry.
2 BY MR. TISI:
3    Q.    Yeah.
4        Is there anything that you heard at
5 that meeting that changed your view expressed in
6 your 1992 letter --
7    A.    Article.
8    Q.    -- article that women should not use
9 talcum powder products because of the risk of
10 cancer?
11    A.    There was nothing --
12        MR. HEGARTY:  Objection to
13    form.
14        THE WITNESS:  -- that changed
15    my view that women should curtail, if not
16    completely abstain from, perineal
17    application of talcum powder.
18 BY MR. TISI:
19    Q.    In fact, you reiterated that in your
20 1999 article, correct?
21        MR. HEGARTY:  Objection to
22    form.
23        THE WITNESS:  Yes, we do.
24        MR. TISI:  I'm going to show

114 (Pages 450 - 453)

Page 454

1    you that article, Exhibit Number 5.
2         MR. HEGARTY:  I have Exhibit
3    Number 6, P6.
4         MR. TISI:  Oh.  Exhibit
5    Number 6.  I'm sorry.
6         MR. HEGARTY:  I have the last
7    article you designated as P5.
8         (Document marked for
9    identification as Exhibit P6.)
10 BY MR. TISI:
11    Q.    Okay.  This is P6.  It's entitled
12 "Genital Talc Exposure and Risk of Ovarian
13 Cancer."  This is the 1990 article by Dr. Cramer.
14       Do you see that?
15    A.    Yes.
16    Q.    Now, you were asked several
17 questions about whether Dr. Cramer was an expert
18 for plaintiffs.
19       You know that, right?
20    A.    Yes.
21    Q.    Again, I'm going to represent to you
22 that the first case for ovarian cancer had not
23 even been filed until at least 10, 15 years after
24 this article was published.

Page 455

1        Do you have any reason to believe
2    that Dr. Cramer was an expert or consultant in
3    talc litigation at the time you wrote this
4    article?
5             MR. HEGARTY:  Objection to the
6       form.
7             THE WITNESS:  No.
8    BY MR. TISI:
9       Q.    Okay.  Now, in this article, you
10 concluded that there was, in fact, a dose response
11 when considering all application for women
12 particularly with patent tubes, correct?
13            MR. HEGARTY:  Objection to the
14      form.
15            THE WITNESS:  That is
16      correct.
17 BY MR. TISI:
18      Q.    Would you go to page -- Table III,
19 please?
20      A.    Uh-huh.
21      Q.    It says when you censured patients.
22 At the very bottom it says "Application censured."
23            Could you tell what that means?
24 Could you tell us what that means?

Page 456

1    A.    It means that "Excludes applications
2    following hysterectomy or tubal ligation and
3    applications during pregnancy and periods of oral
4    contraceptive use."
5    Q.    Okay.  Why did you do that?
6    A.    Because women would not necessarily
7    be ovulating and the idea the potential
8    possibilities that with the talc migrating during
9    ovulatory times, the talc particulates have the
10 opportunity to embed into the inclusion cysts
11 after ovulation.
12    Q.    Okay.  And so this was a recognition
13 that there was -- was this a recognition that
14 there was a biologically plausible mechanism that
15 talc applied perineally could -- could travel up
16 the -- up the genital tract, reach the ovaries,
17 and you wanted to test that hypothesis in this
18 study, correct?
19            MR. HEGARTY:  Objection to the
20      form.
21            THE WITNESS:  Yes.
22 BY MR. TISI:
23      Q.    Okay.  And when you looked at
24 applications with less than 3,000 applications,

Page 457

1 what did you see?
2    A.    We saw the highest adjusted odds
3 ratio being in those that had greater than 10,000
4 applications when limiting this exposure
5 assessment.
6    Q.    Okay.  Did you see a dose response
7 when you compared 3,000, 3,000 to 10,000, and
8 greater than 10,000?
9    A.    The risks --
10           MR. HEGARTY:  Objection to the
11     form.
12           THE WITNESS:   The risks went
13     from 1.54 to 1.72 to 1.8.
14 BY MR. TISI:
15    Q.    Were they all statistically
16 significant?
17    A.    The confidence intervals did not --
18 included 1.
19    Q.    Okay.
20    A.    Not -- yes, included 1 in all of
21 them.
22    Q.    Now, counsel was asking questions
23 about your methodology.
24           You remember that?  Your causal

115 (Pages 454 - 457)

Page 458

1 methodology?
2    A.    Yes.
3    Q.    Okay.  Here in your article, you
4 describe the causal methodology that you, in fact,
5 used in this case, correct?
6          MR. HEGARTY:  Objection to the
7    form.
8          THE WITNESS:  In this 1999
9       paper, I followed the approach that I've
10       used for all of the research in trying to
11       interpret the findings in the context of
12       potential biases.
13 BY MR. TISI:
14    Q.    Let's look at page 353 of your
15 article, please, under the "Discussion" section.
16    A.    Uh-huh.
17    Q.    It says:
18          "In our discussion, we will examine
19 whether this association satisfies traditional
20 criteria for a causal association including
21 consistency and strength of the association,
22 potential biases, dose response and biologic
23 credibility."
24          Do you see that?

Page 459

1    A.    Yes, I do.
2    Q.    Are those the very same things when
3 you published those -- those in your peer-reviewed
4 paper that you applied when you -- you and
5 Dr. Rothman got together and re-reviewed the
6 evidence in 2023?
7          MR. HEGARTY:  Objection to
8    form.
9          THE WITNESS:  That's correct.
10 BY MR. TISI:
11    Q.    Okay.  So you looked at primarily --
12 you didn't list each and every one of the
13 Bradford-Hill factors, right?
14          You talked about primarily strength,
15 consistency, biologic plausibility, and dose
16 response and whether or not there was evidence of
17 a bias, correct?
18    A.    That's correct.
19          MR. HEGARTY:  Objection to
20    form.
21 BY MR. TISI:
22    Q.    That would otherwise explain the
23 association?
24    A.    That's correct.

Page 460

1          MR. HEGARTY:  Objection to
2    form.
3 BY MR. TISI:
4    Q.    That's what you explained in your --
5 in your expert report?
6    A.    In the methodology section of that
7 report, yes.
8    Q.    And it's what was published in the
9 peer-reviewed -- peer-reviewed literature; is that
10 correct?
11          MR. HEGARTY:  Objection to
12    form.
13          THE WITNESS:  Published in
14       this paper in 1999.
15 BY MR. TISI:
16    Q.    By the way, counsel spent a lot of
17 time asking about the National Cancer Institute
18 and how important an agency that is.
19          Could you tell us who funded your
20 research in 1999?
21    A.    The National Cancer Institute.
22    Q.    Thank you very much.
23          Oh, and by the way, at the very end
24 of the article, they talk about you provide a

Page 461

1 summary?
2    A.    Yes.  "In summary, we have
3 demonstrated."
4    Q.    Okay.  It says, and I'll read it
5 into the record:
6          "In summary, we have demonstrated a
7 consistent association between talc and ovarian
8 cancer that appears unlikely to be explained by
9 recall and confounding."
10          Do you see that?
11    A.    Yes.
12    Q.    Okay.  So you talked about
13 consistency, correct?
14          MR. HEGARTY:  Objection to the
15    form.
16          THE WITNESS:  Yes.
17 BY MR. TISI:
18    Q.    Okay.
19    A.    Yes.
20    Q.    You talked about whether or not it's
21 explained by these other biases that counsel was
22 asking about all day today, correct?
23          MR. HEGARTY:  Objection to the
24    form.

116 (Pages 458 - 461)

Page 462

1          THE WITNESS: Yes.
2    BY MR. TISI:
3        Q.    Okay. You talked about, it says:
4        "The dose-response relationship is
5    weak but improved by considering factors such as
6    closure of the female tract, ovulation and
7    exposure prior to pregnancy, and we have outlined
8    a plausible biologic rationale for this
9    association."
10        Do you see that?
11    A.    Yes, I do.
12        Q.    That's exactly the same kinds of
13    things you talked about in your litigation report,
14    correct?
15          MR. HEGARTY: Objection to the
16    form.
17          THE WITNESS: Yes.
18    BY MR. TISI:
19        Q.    Okay. It says:
20        "We estimate that avoidance of talc
21    in genital hygiene might reduce the occurrence of
22    a highly lethal form of cancer by at least 10%."
23        Correct?
24    A.    Yes.

Page 463

1          MR. HEGARTY: Objection to the
2    form.
3    BY MR. TISI:
4        Q.    Okay. And that's something that was
5    published in the peer-reviewed literature,
6    correct?
7          MR. HEGARTY: Objection to the
8    form.
9          THE WITNESS: Yes.
10    BY MR. TISI:
11        Q.    Okay. It says:
12        "Balanced against what are primarily
13    aesthetic reasons for using talc as genital
14    hygiene, the risk benefit decision is not complex.
15    Appropriate warnings should be provided to women
16    about the potential risks of regular use in the
17    genital area."
18        Do you see that?
19          MR. HEGARTY: Objection to the
20    form.
21          THE WITNESS: Yes.
22    BY MR. TISI:
23        Q.    Okay. So when counsel asked you
24    whether or not you had ever made -- ever told

Page 464

1    anybody about your opinions about the biologic
2    plausibility of talc, about the potential for talc
3    reaching the ovaries, about the potential for
4    asbestos contamination, that women ought to be
5    told about -- about the risk or told to avoid the
6    risk, you wrote that all in the 1990s.
7        Correct?
8    A.    Yes.
9          MR. HEGARTY: Objection to the
10    form.
11    BY MR. TISI:
12        Q.    That was before you were ever
13    contacted by any lawyers in this litigation, true?
14          MR. HEGARTY: Object.
15    BY MR. TISI:
16        Q.    By decades?
17    A.    Correct.
18        Q.    True?
19          MR. HEGARTY: Objection to
20    form.
21          THE WITNESS: Yes.
22    BY MR. TISI:
23        Q.    All right. Let's move on.
24        Counsel asked you some questions

Page 465

1    about your letter to the editor.
2        Okay. Now, this would have been
3    after you had done some consulting with -- for --
4    not made as an expert but was a consultant for
5    talc litigants, correct?
6          MR. HEGARTY: Objection to the
7    form.
8          THE WITNESS:   That is
9    correct.
10    BY MR. TISI:
11        Q.    Okay. You told people -- you told
12    the world that you had been a consultant in
13    litigation, correct?
14          MR. HEGARTY: Objection to the
15    form.
16          THE WITNESS:  I believe I
17    said I -- well, I believe I --
18          MR. HEGARTY:  Misstates what
19    he says.
20          THE WITNESS:  I specifically
21    said that Dr. Harlow reported publishing
22    research and serving as consultant on the
23    topic of talc and ovarian cancer risk.
24    BY MR. TISI:

117 (Pages 462 - 465)

Page 466

1    Q.    Okay.  Now, Dr. Rothman.  We've
2 talked about Dr. Rothman's report.
3        Do you know if Dr. Rothman actually
4 did a report for the talc industry?
5        MR. HEGARTY:  Objection to
6    form.
7        THE WITNESS:  At the time
8    that I wrote this letter?
9 BY MR. TISI:
10   Q.    Yes.
11   A.    I did not know that.
12   Q.    Have you subsequently learned that?
13   A.    Yes.
14   Q.    Okay.  The report that counsel asked
15 you about was done at the request of the Cosmetic
16 Toiletry Products -- I forget the acronym of it --
17 and was sponsored by Johnson & Johnson, true?
18       MR. HEGARTY:  Objection to
19    form.  Lacks foundation.  Also misstates
20    the facts.  Calls for speculation.
21 BY MR. TISI:
22   Q.    Have you learned that that was --
23 that was performed at the request of the talc
24 industry?

Page 467

1    A.    Yes.
2    Q.    Okay.
3    A.    That is -- that is my understanding
4 of that report.
5    Q.    Now, you have been asked about that,
6 and I can certainly show you what Dr. Rothman
7 said, but counsel selectively asked you questions
8 about Dr. Rothman's report, but I'm going to ask
9 you about it.
10   A.    Okay.
11   Q.    First of all, here is Exhibit Number
12 P7, I believe.
13   A.    This goes to you.
14       MR. TISI:  Is it P7?
15       MR. HEGARTY:  That's what I
16    have.
17       MR. TISI:  P7.
18       (Document marked for
19    identification as Exhibit P7.)
20 BY MR. TISI:
21   Q.    Here you go.
22       Now, first of all, is there any
23 evidence that the talc industry told Dr. Rothman
24 that there was -- one of the things he says here

Page 468

1 is that there was no biologic plausibility or he
2 had concerns about biologic plausibility.
3        Do you remember that testimony?
4    A.    Yes.
5        MR. HEGARTY:  Objection to the
6    form.
7 BY MR. TISI:
8    Q.    All right.  Is there any evidence
9 here that the -- that Dr. Rothman was told that
10 there were tests performed by Johnson & Johnson in
11 the 1970s and 1980s which showed asbestos in talc?
12       MR. HEGARTY:  Objection to
13    form.
14       THE WITNESS:  I didn't see
15    any of that.
16       MR. HEGARTY:  Lacks
17    foundation.  Misstates the facts.
18 BY MR. TISI:
19   Q.    Could you go to --
20   A.    I didn't see it in the report.
21   Q.    Could you go to Section B of your
22 expert report, please?  I mean, Footnote B of your
23 expert report?
24   A.    Okay.  Okay.  Footnote A.  Footnote

Page 469

1 B.  Yes.
2    Q.    Okay.  In Footnote B --
3    A.    This is the William Longo?
4    Q.    Right.
5    A.    Okay.
6    Q.    But there's also a reference to a
7 Hopkins exhibit.
8        Do you see that?
9    A.    Yes.
10   Q.    Okay.  And do you recall counsel
11 asked you questions about -- about references to
12 asbestos in talc, and you mentioned Dr. Longo, and
13 he asked you all the questions about him being an
14 expert for plaintiffs and all that?  All that?
15   A.    (Nods head).
16   Q.    Okay.  You remember the Hopkins
17 exhibit was produced by J&J's witness, correct?
18       MR. HEGARTY:  Objection to the
19    form.  Lacks foundation.  Calls for
20    speculation.
21       THE WITNESS:  I don't know
22    who.  I don't know who.  I don't know
23    whose --
24 BY MR. TISI:

118 (Pages 466 - 469)

Page 470

1    Q.    Okay.
2    A.    -- who put that forward.
3    Q.    Okay.  I'm going to represent to you
4 that there is evidence in this case that -- that
5 William Hopkins was one of the people at the -- at
6 the ISRTP meeting in 1995 and was a J&J employee
7 testified to test results that showed asbestos in
8 talc.  I'll represent to you that.
9         Did you see any reference to that in
10 Dr. Rothman's report when he was asked to do
11 something, file this report by the talc industry?
12    A.    I didn't.
13         MR. HEGARTY:  Objection to the
14    form.
15         THE WITNESS:  I did not.
16         MR. HEGARTY:  Counsel, did you
17    say that Dr. Hopkins prepared Exhibit
18    Number 28?
19         MR. TISI:  Oh, yeah, he did.
20    I sure did.
21         MR. HEGARTY:  I would disagree
22    with that.
23         MR. TISI:  Okay.
24         MR. HEGARTY:  It was a

Page 471

1    plaintiffs' lawyer prepared document.
2         MR. TISI:  With -- with
3    Dr. Hopkins giving testimony at the time.
4         MR. HEGARTY:  But you're
5    telling -- you were telling Dr. Harlow --
6         MR. TISI:  At the deposition.
7         MR. HEGARTY:  -- that
8    Dr. Hopkins prepared Exhibit 28.
9         MR. TISI:  Okay.  Fine.  We
10    can disagree about the characterization.
11    He prepared it at a deposition
12    under oath with -- with -- with the
13    attorney asking him questions about the
14    test results.
15    But let's go -- let's go
16    through -- let's go through this.
17 BY MR. TISI:
18    Q.    It talks about a dose response.
19    A.    Are we going back to Dr. Rothman's
20 report?
21    Q.    Correct.
22    A.    Okay.
23    Q.    Do you believe that there was
24 evidence at the time of Dr. Rothman's report of a

Page 472

1 dose response?
2    A.    I do.
3    Q.    Okay.  And that would have been
4 based on your study?
5         MR. HEGARTY:  Objection to the
6    form.
7         THE WITNESS:  Yes.
8 BY MR. TISI:
9    Q.    Okay.  Now, Dr. Rothman's report was
10 written in 2000, correct?
11    A.    That's correct.
12    Q.    Okay.  When he wrote his report with
13 you in 2023, in the 23 years that had passed
14 between his report and the time that you -- that
15 you issued your report, you and he both noted that
16 over time there was evidence of a dose response
17 when considered against the backdrop of exposure,
18 true?
19         MR. HEGARTY:  Objection to the
20    form.
21         THE WITNESS:  We reported
22    that.
23 BY MR. TISI:
24    Q.    Right.

Page 473

1         And that's not unusual in science
2 where evidence accumulates over time and becomes
3 more or less persuasive, ,correct?
4         MR. HEGARTY:  Objection to the
5    form.
6         THE WITNESS:  Yes.
7 BY MR. TISI:
8    Q.    Okay.  All right.  Going back to the
9 letter to the editor that you wrote.
10         You were asked some questions about
11 and even some, I would call, insulting questions
12 about the statistically unsophisticated conclusion
13 that -- that was reached about patent tubes.
14         Do you remember that?
15         MR. HEGARTY:  Objection to the
16    form.
17         THE WITNESS:  Yes.
18 BY MR. TISI:
19    Q.    Okay.  First of all, you've --
20 you've written a lot in the epidemiology
21 literature.
22         You've never heard of Dr. Gossett or
23 Dr. del Carmen, have you?
24    A.    No.

119 (Pages 470 - 473)

Page 474

1          MR. HEGARTY: Objection to the
2      form.
3  BY MR. TISI:
4      Q.    Have you ever seen their name come
5  up in any of the talc literature that you
6  reviewed?
7      A.    No.
8      Q.    Okay. I'm going to refer you to
9  what Dr. -- putting aside what you and Dr. Rothman
10 wrote, I want to ask you about what Dr. -- how
11 Dr. O'Brien characterized her own study. Okay?
12         Look at Exhibit Number -- did we
13 mark this?
14     A.    Are we talking about the letter to
15 the editor?
16         MR. HEGARTY: We did mark it.
17 BY MR. TISI:
18     Q.    Actually, I'll just -- you have it
19 in front of you, don't you?
20     A.    I do.
21         MR. TISI: I'll give you my
22      copy.
23         MR. HEGARTY: Okay.
24         MR. TISI: I'll give you my

Page 475

1      copy. You can look at it. We have it
2      previously marked.
3  BY MR. TISI:
4      Q.    Do you see where Dr. -- if I could
5  come around the table and look at you.
6          Do you see where Dr. O'Brien writes:
7          "If cohort studies pooled HR 1.8 are
8  likely biased towards the null in case-control
9  studies are likely biased away from the null the
10 true association may be somewhere in the middle.
11         Do you see that?
12     A.    I do.
13     Q.    Does Dr. -- how do you interpret
14 what Dr. O'Brien says about the relevancy of her
15 study in either proving or disproving an
16 association between talc and ovarian cancer?
17         MR. HEGARTY: Objection to the
18      form.
19         THE WITNESS: She's saying
20      exactly what we have indicated in that
21      the -- because of the limitations on the
22      exposure assessment in the cohort
23      studies, we believe those estimates are
24      attenuated.

Page 476

1          And although we don't know
2      whether or not the association in
3      case-control study are true, in many
4      times case-control studies can
5      overestimate the association, but it
6      certainly seems like they are, as we
7      indicated, quite comparable.
8          And I believe that's what
9      she's suggesting here.
10 BY MR. TISI:
11     Q.    Okay. And particularly with women
12 with patent tubes, correct?
13         MR. HEGARTY: Objection to the
14      form.
15         THE WITNESS: Well, in the
16      next -- in the next paragraph,
17      Dr. O'Brien specifically says:
18          "We completely agree with
19      Dr. Harlow and colleagues that our
20      results, particularly the analyses
21      limited to women with intact reproductive
22      tracts, should not be discounted because
23      of lack of statistical significance."
24 BY MR. TISI:

Page 477

1      Q.    Okay. Let me show you something
2  else that Dr. O'Brien said subsequent to the
3  publication of the article.
4          I'm going to show you an article I'm
5  going to have marked as Exhibit Number -- what
6  exhibit number are we at now?
7          MR. HEGARTY: P8.
8          MR. TISI: P8.
9          MR. HEGARTY: That's what I
10     have.
11         (Document marked for
12      identification as Exhibit P8.)
13 BY MR. TISI:
14     Q.    This is an article from 2023,
15 December. So this would have been after your
16 expert report, correct?
17     A.    Yes, because I did not see this at
18 the time I was doing the review.
19     Q.    You saw that in connection with your
20 preparation for this deposition today, correct?
21     A.    That's correct.
22     Q.    And one of the things she says --
23 and this article is entitled "Association of
24 genital talc and douche use in early adolescence

120 (Pages 474 - 477)

Page 478

1  or adulthood with uterine fibroids diagnoses."
2          Do you see that?
3      A.    Yes.
4      Q.    Okay.  And she talks about -- she
5  says on the right-hand side:
6          "Talc is a poorly soluble particle,
7  and animal models have shown that once deposited
8  onto epithelial cells, it can cause chronic
9  inflammation, leading to a series of mutagenic
10  events, and this effect is worse in talc
11  contaminated with asbestos, a known carcinogen."
12          Correct?
13          MR. HEGARTY:  Objection to
14      form.
15          THE WITNESS:  That is
16      correct.  And what's interesting is she's
17      citing an article from 2015 and an
18      article from 2019.
19  BY MR. TISI:
20      Q.    Okay.
21      A.    So this isn't new information.
22      Q.    All right.  My point is:  When you
23  talk about -- to the extent that counsel is
24  vouching for Dr. O'Brien's conclusions, one of the

Page 479

1  things she talks about is the exact same biologic
2  plausible mechanism you and Dr. Rothman talked
3  about in your 2023 expert report, correct?
4          MR. HEGARTY:  Objection to
5      form.
6          THE WITNESS:  That's correct.
7  BY MR. TISI:
8      Q.    And, in fact, it's the same kind of
9  biologic plausibility you talked about in the
10  1990s and published in the peer-reviewed medical
11  literature, true?
12      A.    Yes.
13          MR. HEGARTY:  Objection to
14      form.
15  BY MR. TISI:
16      Q.    All right.  Now, by the way, talking
17  about things that are subsequent to your expert
18  report.
19          Do you understand that the FDA has
20  come out with a -- with a final rule with respect
21  to -- with respect to asbestos and, among other
22  things, ovarian cancer?
23      A.    Yes.
24          MR. HEGARTY:  Did you say FDA?

Page 480

1  BY MR. TISI:
2      Q.    I meant to say EPA.  Environmental
3  Protection Agency.
4      A.    I'm sorry.  I thought I heard EPA.
5      Q.    Now, when you were asked questions,
6  do you know of any governmental agency that ever
7  concluded that talc-containing asbestos can cause
8  ovarian cancer?
9          Do you remember those questions?
10      A.    Yes.
11          MR. HEGARTY:  Objection to the
12      form.
13  BY MR. TISI:
14      Q.    Okay.  And are you aware that the
15  United States Environmental Protection Agency
16  included just that very same thing?
17          MR. HEGARTY:  I'm going to
18      object to the form.  They did not say
19      that talc use causes ovarian cancer.
20  BY MR. TISI:
21      Q.    Talc-containing asbestos causes
22  ovarian cancer?
23          MR. HEGARTY:  Well, I didn't
24      -- are you representing that's that what

Page 481

1      that document says?
2          MR. TISI:  I'm going to
3      show -- I'm going to show him what it
4      says.
5          MR. HEGARTY:  All right.
6          THE WITNESS:  I know that
7      there have been recent -- recent
8      publications or recent documents that say
9      that asbestos causes ovarian cancer was
10      recent.
11  BY MR. TISI:
12      Q.    And they also say that talc can
13  contain asbestos -- asbestos, correct?
14          MR. HEGARTY:  Objection to the
15      form.
16          THE WITNESS:  I -- if you
17      show it to me, I will agree.
18  BY MR. TISI:
19      Q.    In fact, in Section B -- I will show
20  you this in a minute.
21      A.    Yeah.
22      Q.    In Footnote B of your expert report,
23  you refer to FDA testing of Johnson & Johnson's
24  talc, correct?

121 (Pages 478 - 481)

Page 482

1    A.    That's correct.
2    Q.    And what did they find?
3    A.    They found contamination.
4         MR. HEGARTY:  Objection to the
5    form.
6 BY MR. TISI:
7    Q.    Okay.
8    A.    They found contamination.
9         MR. TISI:  Let me mark as
10   Exhibit Number 9.
11        THE COURT REPORTER:  9.
12        MR. TISI:  Thank you for
13   keeping track for me.  I'm trying to move
14   quickly.
15        THE WITNESS:  This is 7.  Oh,
16   no.  Wait a minute.
17        MR. TISI:  That's 8.  This
18   is 9.
19        THE WITNESS:  Okay.
20        (Document marked for
21   identification as Exhibit P9.)
22        MR. TISI:  For the record,
23   this is Federal Register dated March 28,
24   2024.

Page 483

1         MR. HEGARTY:  Do you have a
2    copy for me?
3         Can I have that clip that's in
4    front of you?  It's right there.
5         MR. TISI:  Yes.
6         MR. HEGARTY:  Thank you.
7 BY MR. TISI:
8    Q.    First of all, do you see on the
9 left-hand side it says --
10   A.    Under "Summary"?
11   Q.    Under "Summary," it says is issuing
12 for --
13        "The Environmental Protection Agency
14 (EPA or the Agency) is issuing this final rule
15 under the Toxic Substances Control Act to address
16 to the extent necessary the unreasonable risk of
17 injury to health presented by chrysotile asbestos
18 based on the risks posed by certain conditions of
19 use.  The injuries to human health include."
20        Could you tell us what they say?
21   A.    "The injuries to human health
22 include mesothelioma and lung, ovarian, and
23 laryngeal cancers resulting from chronic
24 inhalation exposure to chrysotile asbestos."

Page 484

1    Q.    Going to the next page.  Page --
2 it's paginated at the top.  I think it's the
3 third -- fourth page in.  21973.
4    A.    Yes.
5    Q.    Middle paragraph, middle column.
6    A.    Yes.
7    Q.    Paragraph it says -- at the bottom
8 it says:
9         "Additionally, some" --
10   A.    Hold on.  Let me find where it is.
11        MR. HEGARTY:  I'm not
12   following where you are either.
13        THE WITNESS:  Okay.
14        MR. TISI:  (Indicates).
15        MR. HEGARTY:  What's the
16   heading on the section?
17        MR. TISI:  "Background."
18        MR. HEGARTY:  Okay.  And
19   you're talking about?
20        MR. TISI:  The middle,
21   three-fourths down.
22        MR. HEGARTY:  Okay.  Where the
23   word starts "Additionally"?
24        MR. TISI:  "Additionally."

Page 485

1         THE WITNESS:  Hold on.  I'm
2    looking for that.  Can I see that again?
3 BY MR. TISI:
4    Q.    Sure.
5    A.    I want to make sure that I'm
6 following this.
7         I got it.  Okay.  Uh-huh.
8    Q.    It says:
9         "Additionally, some talc deposits
10 and articles containing talc have been shown to
11 contain asbestos.  Thus, EPA recognizes that
12 certain uses of talc may present the potential for
13 asbestos exposure."
14        Do you see that?
15   A.    I do.
16   Q.    Okay.  And in fact, you were aware
17 that the FDA did test Johnson & Johnson's talc and
18 did find talc in it, true?
19   A.    Yes.
20        MR. HEGARTY:  Objection to the
21   form.
22 BY MR. TISI:
23   Q.    And one more question before I ask
24 you the conclusion here.

122 (Pages 482 - 485)

Page 486

1    It says --
2         MR. HEGARTY:  Where are you
3    reading?
4  BY MR. TISI:
5    Q.    On page 21975 under the title
6  "Description of Unreasonable Risk."
7    A.    Uh-huh.
8    Q.    Do you see that?
9    A.    Yes.
10   Q.    Okay.  It says -- and it talks about
11 dose response.  Three-quarters of the way down, it
12 says:
13        "Since there was no
14 exposure-response data for ovarian and laryngeal
15 cancer effects in the epidemiological literature,
16 a direct estimate of risk from ovarian and
17 laryngeal cancer could not be made for the
18 inhalation unit risk calculation."
19   A.    Uh-huh.
20   Q.    It says:
21        "An adjustment factor for ovarian
22 and laryngeal cancer effects was applied to risk
23 value estimates to correct for the underestimated
24 total cancer risk derived from only lung cancer

Page 487

1  and mesothelioma," it says.
2         And then it goes on to say:
3         "Total cancer risk encompassing all
4  four cancers known to be caused by exposure to
5  chrysotile asbestos."
6         Do you see that?
7    A.    I do.
8    Q.    And if you go above, it says --
9  right under the description, it says:
10        "Unreasonable risk includes the risk
11 of mesothelioma and lung, ovarian, and laryngeal
12 cancers from chronic inhalation exposure."
13   A.    Yes.
14   Q.    Okay.  Let me ask you a couple
15 questions about that.
16        First of all, does this support your
17 opinion that talc-containing asbestos is a
18 biologically plausible mechanism for causing
19 ovarian cancer?
20   A.    Yes.
21        MR. HEGARTY:  Objection to the
22    form.
23 BY MR. TISI:
24   Q.    Does it support your opinion -- and

Page 488

1  you were asked some questions about inhalation --
2  that this -- that this supports your opinion that
3  that is an alternative plausible biologic
4  mechanism for -- for the possibility of talc
5  causing ovarian cancer?
6         MR. HEGARTY:  Objection to
7    form.
8         THE WITNESS:  From
9    inhalation, yes.
10 BY MR. TISI:
11   Q.    Okay.  And so whether or not
12 asbestos is the cause of talc -- of talc causing
13 ovarian cancer, it is a plausible -- is it a
14 plausible mechanism?
15   A.    Yes.
16        MR. HEGARTY:  Objection to the
17    form.
18 BY MR. TISI:
19   Q.    Okay.  Is there evidence in the
20 scientific and medical literature, including by
21 this government agency, that would say that?
22   A.    Yes.
23        MR. HEGARTY:  Objection to the
24    form.

Page 489

1  BY MR. TISI:
2    Q.    In fact, that was also reported --
3  was that also reported by IARC in 2012?
4    A.    Yes.
5         MR. HEGARTY:  Objection to the
6    form.
7  BY MR. TISI:
8    Q.    So when counsel says, does any
9  federal -- does any governmental body ever say
10 that talc can cause ovarian cancer, we have two
11 agencies, including IARC and -- and the
12 Environmental Protection Agency, saying talc with
13 asbestos can cause ovarian cancer.
14        Is that true or not true?
15        MR. HEGARTY:  Misstates the
16    document.
17        THE WITNESS:  It is what they
18    say.
19 BY MR. TISI:
20   Q.    Okay.  And, in fact, if you go one
21 step further, Health Canada says they're not even
22 looking at asbestos.
23        They saw that talc as a whole,
24 whatever is in the bottle, is a likely cause of

123 (Pages 486 - 489)

Page 490

1 ovarian cancer, correct?
2           MR. HEGARTY:  Objection to the
3     form.
4           THE WITNESS:  Yes.
5 BY MR. TISI:
6     Q.    Now, did they -- unlike the FDA in
7 the 2014 letter that you were shown before by the
8 FDA --
9     A.    Uh-huh.
10    Q.    -- did Health Canada actually show
11 its work?
12          MR. HEGARTY:  Objection to the
13    form.
14          THE WITNESS:  Yes.
15 BY MR. TISI:
16    Q.    Did it list all the studies it
17 considered?
18    A.    Yes, it did.
19    Q.    Did it go through the
20 Bradford-Hill -- the Bradford considerations and
21 talked about dose response and talk about biologic
22 plausibility and all of those things, correct?
23    A.    Yes.
24          MR. HEGARTY:  Objection to the

Page 491

1     form.
2 BY MR. TISI:
3     Q.    Do you know from reading that
4 document -- we can take it out, but I'm trying to
5 be respectful of the time here.
6           Do you know -- you said it was
7 peer-reviewed.
8           Do you know whether or not J&J
9 actually -- have you been informed that J&J
10 actually met with Health Canada and actually
11 provided not only plaintiffs' expert reports in
12 litigation, but also defendants' expert reports in
13 litigation?
14    A.    I did not know that.
15          MR. HEGARTY:  Objection to the
16    form.
17 BY MR. TISI:
18    Q.    Okay.  Now, let's talk a bit about
19 dose response.
20          MR. HEGARTY:  Let me interrupt
21    for just a second.  How much longer are
22    you going to go?  I have to call to
23    change my flight.
24          MR. TISI:  Well --

Page 492

1           MR. HEGARTY:  And I need to do
2 so before the flight leaves.
3           MR. TISI:  I'm just going to
4 ask very short.  I'm going to just -- and
5 I need a break.  Just one area that I
6 know I have to -- I know I have to talk
7 about here.  Probably about -- Michelle,
8 do you -- I have about five minutes, 10
9 minutes.
10          MR. HEGARTY:  Okay.
11          MS. PARFITT:  7:02.  What time
12 is your flight?
13          MR. HEGARTY:  8:15.  So I'm
14 going to call.  I have to change before
15 it takes off.
16          MS. PARFITT:  You won't make
17 it, Mark.
18          MR. HEGARTY:  No, I know.  I'm
19 not going to try to make it.  I'm just
20 saying I have to call.
21          MS. PARFITT:  Yeah, why don't
22 we take a quick break.
23          MR. TISI:  Oh, yeah.  We can
24    do that.

Page 493

1           MR. HEGARTY:  I have to call
2    and reschedule before it takes off.
3           (Recess:  7:02 p.m. -
4           7:34 p.m.)
5 BY MR. TISI:
6     Q.    I'm going to try to do this in a
7 really summary way because it's late.
8     A.    (Nods head).
9     Q.    If you would go -- you remember the
10 discussion of the PDQ?
11    A.    Yes.
12    Q.    Okay.  And you remember the
13 discussion about the question about whether or not
14 there was inconsistency between O'Brien and the
15 Woolen article.
16          Do you remember that?
17    A.    Yes.
18    Q.    Okay.  I'm happy to show you both of
19 them.
20    A.    I have them in front of me.
21    Q.    Okay.  But based upon your review of
22 O'Brien, what did Woolen add -- what did Woolen
23 look at that O'Brien did not, if anything?
24    A.    Well, I believe that Woolen was

124 (Pages 490 - 493)

Page 494

1  trying to assess exposure in a more comprehensive
2  way.
3      Q.    Okay.
4      A.    I believe that's what they were
5  doing.
6      Q.    Okay.  And we're talking about
7  exposure, we're talking about -- to be clear,
8  we're talking about numbers of applications, which
9  is the thing that you have been concerned about
10 since the 1990s, correct?
11     A.    That's correct.
12     Q.    Okay.  And to be simple about it,
13 it's number of years times number of applications,
14 correct?
15         MR. HEGARTY:  Objection to the
16     form.
17         THE WITNESS:  Taking into
18     account both years and applications is
19     the appropriate way to do it.
20 BY MR. TISI:
21     Q.    Okay.  Did she do that?  Did
22 Woolen -- did the Woolen paper actually do that?
23     A.    Well, I can't see exactly where they
24 did that.

Page 495

1      Q.    Okay.  So let me ask you this
2  question.
3      A.    Yeah.
4      Q.    There was the suggestion before, and
5  I want to be clear.
6         Is Woolen inconsistent with or did
7  it just look at different things than O'Brien?
8      A.    Yeah.  No.
9         MR. HEGARTY:  Objection to
10     form.
11         THE WITNESS:  No, I do not see
12     them as being substantially different.
13 BY MR. TISI:
14     Q.    Okay.
15     A.    Particularly when you look at the
16 confidence intervals.
17     Q.    What did Woolen look at and what did
18 Woolen find?
19     A.    Woolen found --
20         MR. HEGARTY:  Objection to the
21     form.
22         THE WITNESS:  Woolen found
23     overall association of 1.4 with a
24     confidence interval of 1.17 and 1.68

Page 496

1      using the O'Brien data.
2  BY MR. TISI:
3      Q.    Okay.  In what patient population?
4      A.    The Nurses' Health Study.
5      Q.    Okay.  Was that the highest
6  exposure?
7      A.    I believe it was.
8      Q.    Okay.  Okay.  Did Woolen support --
9  does Woolen support your opinion that with
10 increasing -- increasing exposure comes increasing
11 risk?
12     A.    It certainly confirms or supports
13 it, yes.
14     Q.    Okay.  Let me see.  I do not think
15 that I have any other things, but let me just --
16 let me just take a quick look here.
17         Can you pull out the Taher article
18 that's Exhibit Number 26 since we're talking about
19 dose response.
20     A.    Yeah, because the one I have in my
21 -- in my notebook is the wrong one.  So do we have
22 that?
23     Q.    Yeah, I have a copy of it.
24     A.    Okay.

Page 497

1         MR. TISI:  Do you mind showing
2     him my copy?  Actually, I think I have
3     it.
4         THE WITNESS:  Because I
5     reviewed -- I reviewed the correct one,
6     but copied the wrong one.
7         (Discussion off the record)
8         THE WITNESS:  Yeah, that's the
9     one.
10 BY MR. TISI:
11     Q.    I'm going to ask you to look at
12 something different than on Michelle's copy, but
13 this is Exhibit Number 23.
14     A.    Okay.
15     Q.    I'll get you a clean one if you need
16 to but here is --
17     A.    Or I can share it with you.
18     Q.    I'm going to ask you to look at
19 table number -- this is Exhibit Number 23, but I'm
20 going to show you a clean copy of it.
21         If you would go to Table 3.
22     A.    Oh, you have it.  Okay.
23     Q.    Do you see --
24     A.    Right.

125 (Pages 494 - 497)

Page 498

1    Q.    -- there is a table?
2    A.    You mean the figure? (Indicates).
3    Q.    No, I mean the next page. Can I see
4 it? I just want to make sure.
5    A.    (Indicates).
6    Q.    No, that's not the right one. I
7 don't have my copy.
8         Here it is. Table 2.
9    A.    Table 2. Uh-huh. Yes.
10    Q.    Okay. Do you see them break out, as
11 you did, break out frequency of exposure?
12    A.    They have frequency of use, duration
13 of use.
14    Q.    Okay. When they look at frequency
15 greater than 10,000, do you see evidence of a dose
16 response?
17    A.    No. No. The frequency is low,
18 medium, high and duration is 10 years, 10 to 20
19 years, 20 plus years.
20    Q.    Okay. Do you see when you look at
21 those together, you see increasing -- increasing
22 dose response?
23    A.    I don't --
24         MR. HEGARTY: Objection to the

Page 499

1    form.
2         THE WITNESS: I don't see
3    them put together.
4 BY MR. TISI:
5    Q.    Let me see. I'm not looking at the
6 right one. Table 2, 3.2.
7    MS. PARFITT: Table 2, Chris.
8 BY MR. TISI:
9    Q.    Actually, let me just -- let me
10 just -- I don't have my copy. So I'm not going to
11 do that.
12         I have no other questions right now.
13 Why don't we go through and let Mr. Hegarty ask
14 his questions.
15         (Recess: 7:41 p.m. -
16         7:47 p.m.)
17         MR. HEGARTY: At the outset, I
18    just want to state an objection for the
19    record, that is, to the extent
20    Dr. Rothman -- I'm sorry -- Dr. Harlow
21    was asked about or brought up opinions
22    concerning studies or facts that were not
23    previously disclosed in his expert
24    report, and that's where I'll leave it

Page 500

1    at.
2         MR. TISI: Okay.
3         FURTHER EXAMINATION
4 BY MR. HEGARTY:
5    Q.    Do you have the exhibits in front of
6 you, Dr. Harlow, that Mr. Tisi asked you about?
7    A.    I have them. Yes, I guess they're
8 right here. Okay.
9    Q.    The first study he asked you about
10 was P1, "The association between douching, genital
11 talc use, and the risk of prevalent and incident
12 cervical cancer"?
13    A.    Yes.
14    Q.    You don't cite to this article in
15 this body of your report, correct?
16    A.    No, I do not.
17    Q.    Did you find this article on your
18 own?
19    A.    No.
20    Q.    Did plaintiffs' counsel provide it
21 to you?
22    A.    They did.
23    Q.    Did you even reference this article
24 in your list of references or Materials Considered

Page 501

1 list, if you know?
2    A.    Yeah. No, I did not.
3         MR. TISI: Well, it's in the
4    Materials Considered list we provided
5    you.
6         MR. HEGARTY: And that's
7    for -- is it in the box?
8         MR. TISI: It's in the box.
9    It's in the box.
10         MR. HEGARTY: Okay.
11         MR. TISI: May I have it?
12 BY MR. HEGARTY:
13    Q.    Please turn over to page 2 of this
14 article.
15    A.    Yes. Under what section?
16         MR. TISI: Here.
17         THE WITNESS: Okay.
18 BY MR. HEGARTY:
19    Q.    In the second -- I'm sorry. In the
20 first full paragraph, second sentence, it reads:
21         "Observational studies have
22 documented associations between douching and HPV,
23 cervical lesions or progression of cervical
24 lesions from low to high grade. Additional,

126 (Pages 498 - 501)

Page 502

1  several retrospective case-control studies have
2  reported positive association between douching and
3  cervical cancer.  We did not identify any
4  prospective studies of relationship between
5  douching and cervical cancer.  Such studies are
6  needed to rule out recall bias which can result
7  when an individual affected by a disease
8  over-report their exposure to an agent of
9  concern."
10         You agree with that statement, don't
11  you?
12             MR. TISI:  Objection.
13             THE WITNESS:  (Reviews
14     document.)
15             Well, again, you -- if it's
16     conducted appropriately and you can
17     actually identify those who were exposed
18     to douching and those who were not from
19     the beginning of their exposure
20     assessment, yes, then it would eliminate
21     recall bias.
22  BY MR. HEGARTY:
23     Q.    What O'Brien and her coauthors are
24  saying here is that they looked at the

Page 503

1  case-control studies, but that prospective studies
2  are needed to rule out recall bias.
3             That's what that says, right?
4     A.    That's what they're alluding to.
5     Q.    Okay.  Thank you.
6             Have you analyzed -- or let me start
7  over.
8             Have you done a comprehensive
9  analysis of the literature looking at douching as
10  a risk factor/cause for ovarian cancer?
11     A.    I have not -- I have not done a
12  primary analysis around that, but I would have to
13  look in my previous studies to see whether I
14  looked at douching as a potential covariate.
15     Q.    Do you consider douching as a risk
16  factor for ovarian cancer?
17     A.    I have not done an extensive search
18  of the literature as to what it suggests there,
19  but I believe I was looking at douching as a
20  potential covariate.
21     Q.    Do you recall that the Gonzalez
22  study concerning The Sister Study did find an
23  association statistically significant between
24  douching and ovarian cancer but not for talc use

Page 504

1  and ovarian cancer?
2     A.    Well, for one thing, The Sister
3  Study excluded 160 cases, and so I don't have a
4  lot of confidence in their findings with respect
5  to talc and ovarian cancer.
6     Q.    But did I properly summarize the
7  results of that Sister Study as published in the
8  Gonzalez paper?
9     A.    Yes, there was -- there was an
10  associate between powder talc use and subsequent
11  ovarian cancer website.  Douching was more common
12  among talc users, yes.
13         Oh, well.  Douching was more common
14  among talc users and douching at baseline was
15  associated with increased subsequent risk of
16  ovarian cancer.  Yes, that's what they said.
17     Q.    With regard to the exposure data
18  that the Gonzalez study collected, it asked about
19  talc use in the prior 12 months, correct?
20     A.    That's correct.
21     Q.    If talc use is an habitual practice,
22  then talc use in the last 12 months would actually
23  reflect long-term talc use, correct?
24     A.    Possibly, but, again, the problem is

Page 505

1  is that these are women who are -- who were
2  followed forward in time who for whatever reason
3  had not developed ovarian cancer by the time they
4  were enrolled in this -- by the time they were
5  followed in this study.  So what we call a
6  depletion of susceptibles, for whatever reason
7  they could very well have been resilient to the
8  development of ovarian cancer.
9         So I can't -- with that kind of
10  severe selection bias, I can't -- I can't really
11  put any stock in this -- in these findings,
12  particularly with respect to talc and ovarian
13  cancer.
14     Q.    But my question was simply with
15  regard to identifying exposure of talc in the last
16  12 months.
17     A.    If some --
18     Q.    If it is a habitual habit, wouldn't
19  that indicate longer term use than simply in the
20  last 12 months?
21     A.    Well, if it's just asking, have you
22  ever used it in the last 12 months, no, that would
23  not.  But if you had used it in the last 12 months
24  every day applying it to the perineum, yes, to me,

127 (Pages 502 - 505)

Page 506

1  that would suggest that they were probably using
2  it for longer periods of time.
3      Q.    But if they had simply asked, have
4  you used talc in the last 12 months, it's your
5  opinion that that would not tell you anything
6  about long-term use before the last 12 months?
7      A.    I wouldn't -- I would be hesitant to
8  make that assumption.
9      Q.    Please turn to Plaintiff's
10  Exhibit 2, your study with Dr. Weiss.
11      A.    Yes.
12      Q.    That's entitled "A Case-Control
13  Study of Borderline Ovarian Tumors: The Influence
14  of Perineal Exposure to Talc."
15      A.    Yes.
16      Q.    Do you have that in front of you?
17      A.    Yes, I do.
18      Q.    In this study, you reported/found as
19  stated in the abstract that neither the perineal
20  application of baby powder nor the perineal
21  application of corn starch was associated with an
22  appreciable altered risk of borderline ovarian
23  tumors, correct?
24      A.    That's what we found.

Page 507

1      Q.    So you did not find an association
2  between talcum powder use and borderline tumors in
3  this study, correct?
4      A.    Actually, that's not true.  We found
5  an association with deodorizing powders and
6  ovarian cancer, and deodorizing powders are known
7  to be talc-based.
8      Q.    The question, though, put to the
9  women in the study was not whether your
10  deodorizing powder contained talc, it was simply,
11  did you use deodorizing powder, correct?
12      A.    That's correct.
13      Q.    In the end, you don't know whether
14  the deodorizing powder that the women reported
15  using contained talc, right?
16      A.    Well, many of them suggested or even
17  indicated that it was Shower to Shower, and I know
18  that Shower to Shower deodorizing powder does
19  contain talc.  I don't know of deodorizing powders
20  other than corn starch, and we specifically asked
21  about corn starch, would other than -- other than
22  those that are specifically indicated as corn
23  starch, deodorizing powder I would make the
24  assumption was a talc-based product.

Page 508

1      Q.    Did you report in this study that
2  was marked as Exhibit P2 that women reported using
3  Shower to Shower?
4      A.    I don't -- I'm trying to look to see
5  if we specifically stated that that was -- it was
6  asked.
7          (Reviews document.)
8          No, I did not report that.
9          Well, let me just quickly look in
10  the methods of the assessment of -- of it.
11          (Reviews document.)
12          "Baby powder, deodorizing powder,
13  and other unspecified talcum or dusting powders or
14  as corn starch."
15          So I cannot specifically say that
16  the deodorizing powder was talc-based, but if it
17  was corn starch, they would have said corn starch,
18  which we specifically asked that.
19      Q.    In fact, if you look over in the
20  "Methods" section on page 2 --
21      A.    Yes.
22      Q.    -- your open-ended question asked
23  women to specify the type but not the brand name,
24  correct?

Page 509

1      A.    That is correct.
2      Q.    So they would not in answering that
3  question have specified Shower to Shower, which is
4  a brand name product, correct?
5      A.    We did not analyze that data.  We
6  did collect that information, but it was not
7  considered reliable to be able to actually look at
8  it that way, and so that's the reason why we
9  analyzed it this way.
10      Q.    In this study, you did not find that
11  perineal application of baby powder was associated
12  with an appreciable altered risk of borderline
13  ovarian tumors, correct?
14      A.    That's correct.  Except that
15  deodorizing powder in combination was associated
16  with risk.  As you can see in Table 1, deodorizing
17  powder only was associated with 3.5 fold
18  association and deodorizing powder only or in
19  combination was associated with 2.8 fold
20  association.
21      Q.    My question, though, was as specific
22  to baby powder.
23      A.    That is correct.  Baby powder.
24      Q.    You did not find an association

128 (Pages 506 - 509)

Page 510

1  between baby powder use and borderline ovarian
2  tumors, correct?
3      A.    It -- yes.
4      Q.    I believe you testified earlier, but
5  please correct me if I'm wrong, that you did not
6  do a separate analysis -- let me restart that.
7  Strike that.
8          Am I correct that you do not have an
9  opinion as to whether talcum powder use causes
10 borderline tumors?
11     A.    I cannot make that assumption only
12 because I believe this may be the only study that
13 specifically focused on borderline ovarian tumors.
14     Q.    Do you have an opinion as to whether
15 talcum powder use can cause endometrial cancer,
16 that is, cancer of the endometrium?
17     A.    I have not reviewed that literature.
18     Q.    Please turn to Exhibit Number 3.
19 That is P3.  I'm sorry.
20     A.    Right.  Is that the 1992 article?
21     Q.    Yes, Doctor.  With regard to that
22 article, please turn to page 25.
23          This first, the last full paragraph
24 on the right-hand side, it reads:

Page 511

1          "Non-causal explanations are
2  possible in any epidemiologic research."
3          Is that a correct statement?
4      A.    Yes.
5      Q.    Okay.  You go on to write:
6          "We cannot rule out the possibility
7  of differential over- or under-reporting of talc
8  exposure in our cases and controls, especially in
9  those with reproductive events that enhance odds
10 ratios."
11         Is that a correct statement?
12     A.    That's what I said.  That's correct,
13 yes.
14     Q.    You go on to say:
15         "In addition, though we were
16 successful in interviewing 69% of eligible ovarian
17 cancer cases and 81% of eligible controls
18 contacted, we cannot assess whether the cases and
19 controls not interviewed could have selectively
20 differentiated -- could have selectively differed
21 in their reproductive characteristics or in their
22 use of talc-containing body powders."
23         That's a correct statement as well?
24     A.    That's correct.

Page 512

1      Q.    Next you say:
2          "Because our associations are based
3  upon responses from participating cases and
4  controls, the validity of our results depends upon
5  the assumption that respondents and
6  non-respondents were similar with respect to talc
7  and other relevant exposures, or that the
8  magnitude of any respondent-non-respondent
9  difference was similar for cases and controls.
10 Because the interview provided the only source of
11 'exposure' information, we were unable to assess
12 the likelihood of this assumption."
13         That's all accurate, correct?
14     A.    That is correct.  Because non --
15 because nondifferential misclassification would
16 drive the association towards the null, which
17 means that the associations we see are an
18 underestimate of the true association.
19     Q.    You were also asked questions about
20 the ISRTP -- let me start over.
21         You were also asked questions about
22 the FDA workshop that you attended back in 1994,
23 correct?
24     A.    Yes.

Page 513

1      Q.    Who invited you to that workshop?
2      A.    I don't recall who actually sent me
3  the invitation.  I was invited by whoever was
4  coordinating it.
5          MR. TISI:  I'm sorry.  That's
6      my sticky note on it, which is not
7      intended.
8          THE WITNESS:  Sorry.
9  BY MR. HEGARTY:
10     Q.    Please look at P4, the Carr 1995
11 paper that you talked about with --
12     A.    Yes.
13     Q.    -- counsel for plaintiffs and you
14 talked about with me.
15     A.    Yes.
16     Q.    You told counsel for plaintiffs that
17 you felt that the summary as reported by Mr. Carr
18 was not fair and balanced.
19         Is that what you believe?
20     A.    I do believe that to be the case
21 with respect to the epidemiologic evidence.
22     Q.    Have you ever said or made that
23 statement in any published peer-reviewed or
24 otherwise publication of yours?

129 (Pages 510 - 513)

Page 514

1    A.    I have not.
2    Q.    Have you ever made that statement to
3  anyone outside of today's proceedings?
4    A.    I have not.
5    Q.    And as we talked, you never did a
6  follow-up letter to the editor or other report
7  where you commented on the summary that Carr
8  provided in P4?
9         MR. TISI:  Objection.
10 BY MR. HEGARTY:
11   Q.    Is that correct?
12        MR. TISI:  Objection.
13   Misstates --
14        THE WITNESS:  I'd like --
15        MR. TISI:  Misstates what
16   happened, but go ahead.
17        THE WITNESS:   Am I allowed to
18   answer?
19        MR. TISI:  Yeah.
20        THE WITNESS:   The review that
21   I did in the same issue was my response
22    to that particular summary.
23 BY MR. HEGARTY:
24   Q.    And that review, which is P5?

Page 515

1    A.    Correct.
2    Q.    So you can look at P5.
3    A.    Yeah.
4    Q.    I should say:  In that review, you
5  did not make the statement that any summary of the
6  proceedings was not fair and balanced, correct?
7    A.    I would not have done that in a
8  peer-reviewed article.
9    Q.    You made the statement in response
10 to plaintiffs' counsel --
11   A.    Are we still on this article or have
12 you moved off?
13   Q.    Let me see.  I'm looking at my --
14 okay.  Yeah.  I'm sorry.  Please stay with P5.
15        Please turn over to 256, and this
16 was a statement you talked about with counsel for
17 plaintiff.
18   A.    Uh-huh.
19   Q.    The statement:  "Because the risk of
20 any" --
21   A.    Well, just remind me where exactly
22 it is, please.
23   Q.    It is top left.
24   A.    Top left.

Page 516

1    Q.    Top left.
2    A.    Oh.  "Because the risk"?
3    Q.    First full paragraph.
4    A.    Yep.  Uh-huh.
5    Q.    "Because the risk of any one outcome
6  is dependent upon both the frequency and length of
7  the exposure, Harlow et al. (1992) created a
8  continuous measure of total lifetime applications
9  for each case and control."
10        Do you remember talking to that with
11 plaintiffs' counsel?
12   A.    Yes.
13   Q.    And then I believe you testified
14 that what that meant was that reporting only on
15 frequency or only on duration is a limitation when
16 assessing essentially dose response.
17        Is that a fair summary?
18   A.    I believe it is.
19   Q.    Do you have the Woolen paper in
20 front of you?  It's Exhibit 19.
21   A.    I do.
22   Q.    Or your copy of the Woolen paper?
23   A.    Yeah.  Yeah.  Yeah, I do.
24        Woolen is right here.  Got it.

Page 517

1    Q.    Thank you.
2         The Woolen paper reported only on
3  frequency of use and risk of ovarian cancer,
4  correct?
5    A.    Frequent use where they defined it
6  as greater than 2 times per week.
7    Q.    So the only thing they reported with
8  regard to duration or frequency was as to more
9  than 2 times a week, correct?
10   A.    Yes, that's correct.
11   Q.    They did not report a combined
12 cumulative exposure of dose of duration and
13 frequency, correct?
14   A.    No.
15        MR. TISI:  Objection.
16   Misstates.
17 BY MR. HEGARTY:
18   Q.    That would then be, according to
19 your testimony just a moment ago, a limitation of
20 what conclusions you can draw from the Woolen
21 paper, correct?
22        MR. TISI:  Objection.
23        THE WITNESS:   Actually, no,
24   that's not a limitation.

130 (Pages 514 - 517)

Page 518

1        Yes, it's a limitation in that
2    they did not look at a consecutive
3    association between, you know, between
4    increase and risk, but they did something
5    that most studies had not been able to do
6    and that's to really look at one -- at
7    the papers that provided the best
8    information on more frequent use, and
9    that's why they included only those
10   studies.
11       That information available to
12   them on greater than 2 times per week so
13   that they could look at -- rather than
14   just looking at any or none, they're now
15   able to look at greater than 2 times per
16   week versus none, and they see an
17   association that's a bit stronger.
18 BY MR. HEGARTY:
19   Q.    Woolen does not talk about duration
20 of talc use, correct?
21   A.    Only to the extent that that's the
22 way they chose to do this analysis by selecting
23 those studies that had at least greater than 2
24 times per week of exposure.

Page 519

1    Q.    Have you ever in any epidemiologic
2 study of yours reported as to dose response only
3 duration or only frequency?
4    A.    I'm sure I've done them
5 individually, but also in combination when the
6 data is available to me.
7    Q.    Are you aware that with regard to
8 the Woolen paper that one of the authors,
9 Dr. Smith-Bindman, is a plaintiffs' expert in this
10 same litigation that you are?
11   A.    No.
12   Q.    Did you review her disclosure in
13 this paper over on page 2532?
14   A.    I see that. Uh-huh.
15   Q.    Is that an appropriate disclosure if
16 you're an expert witness in talc litigation for
17 the plaintiffs?
18       MR. TISI: Objection.
19       THE WITNESS: I don't -- I
20    think it's not unreasonable to declare
21    that.
22 BY MR. HEGARTY:
23   Q.    It's not --
24   A.    In fact, I think they should. I

Page 520

1 agree.
2    Q.    Okay.
3    A.    It should be disclosed.
4    Q.    And with regard to the Woolen --
5    A.    Wait. Except that I do want to just
6 make -- make sure that you -- that it's clarified
7 that the first author, Sean Woolen, has no
8 relevant disclosures and Lazar, the second author,
9 has no relevant disclosures. And usually the
10 first author is the one that writes the paper and
11 makes the ultimate decision on what is published.
12   Q.    Well, are you aware that the Woolen
13 paper was started by Dr. Smith-Bindman as part of
14 an expert witness report that she prepared in the
15 Pennsylvania state court case called Kliner versus
16 Johnson & Johnson?
17       MR. TISI: Objection.
18       THE WITNESS: I'm not aware
19    of that.
20 BY MR. HEGARTY:
21   Q.    Would that be something important
22 for you to know?
23       MR. TISI: Objection.
24    Misstates.

Page 521

1        THE WITNESS: Only if this
2    information had not been peer-reviewed in
3    the scientific literature.
4 BY MR. HEGARTY:
5    Q.    Please turn over to Table 2 in the
6 Woolen paper.
7    A.    Yes. Table 2. Uh-huh.
8    Q.    With regard to the data that this
9 Woolen paper combined, it included frequency data
10 that was not consistent across all the studies,
11 correct?
12   A.    That's correct. Well, yes, that's
13 correct.
14   Q.    Then if you look down at the very
15 bottom in Footnote 5, do you see with regard to
16 the data from the O'Brien study that Dr. -- that
17 the Woolen paper only included data on women with
18 intact fallopian tubes?
19   A.    (Reviews document.)
20       I do see that. Uh-huh. "To
21 harmonize with other publications."
22   Q.    Have you looked at whether the other
23 publications only reported data on women with
24 intact fallopian tubes?

131 (Pages 518 - 521)

Page 522

1    A.    I have not.
2    Q.    It --
3    A.    You mean across all these other
4 studies?
5    Q.    That's right.
6    A.    Yeah.
7    Q.    So to truly harmonize across all 11
8 studies, all 11 studies would need to report their
9 data only as to women with intact fallopian tubes,
10 correct?
11         MR. TISI:  Objection.
12         THE WITNESS:  Well, I would
13    have to look at these articles.  So
14    certainly I know that Cramer and Harlow
15    would have that ability to provide to --
16    to separate out that exposure.
17         I would have to look back at
18    the articles to see if all of these
19    articles specifically allowed for that
20    separation.
21 BY MR. HEGARTY:
22    Q.    If they don't all allow for that
23 separation, then there would not be harmonization
24 across all the studies, correct?

Page 523

1    A.    I -- I think that it would not be
2 the same across all studies.  That's right.
3    Q.    You can put that document aside.
4    A.    Okay.
5    Q.    And please look at P6.
6         MR. TISI:  How much time do we
7    have?  I mean, in light of the fact I did
8    do longer, I'm giving you some leeway.
9    But are we about to land the plane?
10        MR. HEGARTY:  That's my
11    intent.
12        MR. TISI:  Okay.
13        THE WITNESS:   Okay.  So P6.
14    What am I looking at?
15 BY MR. HEGARTY:
16    Q.    That is the 1999 study.
17    A.    Got it.  Yep.
18    Q.    Turning over to Table III on page
19 354.
20    A.    Yes.
21    Q.    You did not find in the middle part
22 of that table a trend for years of use or total
23 applications of use, correct?
24    A.    That is correct, but all of the odds

Page 524

1 ratios were above 1.
2    Q.    The only trend you found was what
3 you reported at the end of that table; is that
4 correct?
5    A.    Yes, that is -- that is the trend --
6 that is -- that is a trend that we reported when
7 we felt we adequately refined the exposure aligned
8 with the biological plausibility that we were
9 testing.
10    Q.    Please turn to the very last page
11 that you were asked about by counsel for
12 plaintiffs, particularly the very last sentence of
13 this study.
14    A.    Of this article?
15    Q.    Yes, sir.
16    A.    Okay.
17    Q.    The sentence about "Appropriate
18 warnings should be provided."
19         Do you see that sentence?
20    A.    Yes.
21         "Appropriate warnings should be
22 provided to women about the potential risks of
23 regular use of talc in the genital area."
24    Q.    As we looked at today and as you are

Page 525

1 aware, FDA disagrees with that statement, correct?
2         MR. TISI:  Objection.
3    Objection.  Misstates the document.
4    Misstates the document completely.
5 BY MR. HEGARTY:
6    Q.    You can answer.
7    A.    Are you referring to the response to
8 the -- to the committee?  To the -- to the -- to
9 the -- what was it?  The -- the.
10    Q.    Citizens --
11    A.    Citizens Petition?
12    Q.    Yes.
13    A.    Is that what you're talking about?
14    Q.    I am.
15    A.    They -- they made a summary that
16 they did not feel there was evidence to put a
17 warning on or to recommend a warning on the
18 product.  That is what they said.
19    Q.    And you're aware from whatever
20 sources of information that no talcum powder
21 product in the United States -- let me start
22 again.
23         MR. TISI:  Please.
24 BY MR. HEGARTY:

132 (Pages 522 - 525)

Page 526

1    Q.    Are you aware that FDA has not
2  required an ovarian cancer warning on any talcum
3  powder product?
4           MR. TISI: Objection.
5           THE WITNESS:  I am not aware
6      that they have.
7  BY MR. HEGARTY:
8    Q.    You can put that document aside.
9           MR. TISI:  I kind of feel like
10    the plane should be landing.
11          MR. HEGARTY:  I'm simply --
12    I'm following up on things that you had
13    asked him.
14          MR. TISI:  I understand that.
15          MS. PARFITT:  Come on.
16    Denise, how long have we gone?
17          MR. HEGARTY:  Well, if you
18    want to cut me off, then that's up to
19    you.
20          MR. TISI:  Well, let me just
21    find out how much time we have.
22          MR. HEGARTY:  Sure.  Go ahead.
23          MR. TISI:  It was about 15
24    minutes.  I gave you leeway.

Page 527

1           MR. HEGARTY:  Yeah.
2           MR. TISI:  I told I was going
3  to do -- respond to your things.  You
4  chose to reserve the amount of time that
5  you did.  I'm trying to -- I'm trying to
6  be reasonable, but it is late.
7           How much time have we used?
8           THE COURT REPORTER:  Let's
9  see.  13 and 14.  27 minutes.
10          MR. HEGARTY:  Just tell me how
11  much you're going to give me, and then
12  I'll stick to it.
13          MR. TISI:  Well, I mean,
14  you've doubled.  I've given you double
15  the amount of time, and I've really tried
16  to be reasonable.
17          MR. HEGARTY:  I agree with
18  you.
19          MR. TISI:  How much time do
20  you have?
21          MR. HEGARTY:  I will cut some
22  of this.  I will -- just give me -- if
23  you want to give me five minutes, I'll
24  use five minutes.  Just tell me whatever

Page 528

1  you'll give me, and then I will limit it
2  to that.  That's all I can do.
3           MR. TISI:  As long as you tell
4  your colleagues that I did.
5           MS. PARFITT:  Give back.  Give
6  back to us, Mark.  Not everybody is --
7           MR. HEGARTY:  Sure.  So what
8  do you want?  Just tell me what you're
9  going to give me.
10          MR. TISI:  I'll give you five
11  minutes.
12          MR. HEGARTY:  Okay.  Give me
13  five minutes.  Okay.
14  BY MR. HEGARTY:
15    Q.    Looking at your conflict of interest
16  disclosure in your letter to the editor?
17    A.    Yes.
18    Q.    You did not make any reference in
19  that conflict of interest disclosure that the
20  consultation you were doing was in connection with
21  litigation?
22          MR. TISI: Objection.
23    Objection.  Assumes facts.  We went -- we
24    did go through this like in a lot of

Page 529

1    detail earlier.
2  BY MR. HEGARTY:
3    Q.    I'm just simply asking you to look
4  at the words of the disclosure itself and tell me
5  whether you made -- you reported in that
6  disclosure that the consultation work you did was
7  in connection with litigation.
8           MR. TISI:  But he indicated he
9      didn't know he was going to be in
10     litigation.
11          THE WITNESS:  No, no, no.  It
12     was not -- it was -- my conflict is that
13     I was serving as a consultant on the
14     topic of talc and ovarian cancer risk.
15          It was I -- it was -- it may
16     or may not have resulted in litigation.
17     I don't know.  I was not an expert
18     witness.
19  BY MR. HEGARTY:
20    Q.    Your consultation, though, was with
21  attorneys representing plaintiffs?
22    A.    That's correct.
23    Q.    Okay.  You were asked about Hopkins,
24  Exhibit Number 28.

133 (Pages 526 - 529)

Page 530

1          Do you know the source of that
2    exhibit?
3       A.    Oh, in my -- in my report.
4       Q.    In your report.
5       A.    Yeah.  No, other than the reference
6    that I provided.
7          This is -- this is Footnote B,
8    correct?
9          MR. TISI:  Yes.
10   BY MR. HEGARTY:
11      Q.    Yes.
12      A.    Yeah.
13         (Reviews document.)
14         Yeah.  Yeah.  And I recognize that
15   it was an exhibit from a deposition.
16      Q.    You were asked about -- final set of
17   questions.
18         You were asked about Exhibit P9,
19   correct?
20      A.    Yes, the EPA report.
21      Q.    And when did you review this exhibit
22   for the first time?
23      A.    I just saw it a few -- I think -- I
24   think I might have seen it Friday.

Page 531

1       Q.    Was that provided to you by
2    plaintiffs' counsel?
3       A.    Yes, it was.
4       Q.    Did you make a request for it
5    initially?
6       A.    No, I did not.
7       Q.    You have reviewed this document,
8    correct?
9       A.    I haven't reviewed every bit of the
10   page, but I've reviewed the summaries on it.
11      Q.    Nowhere in this document does EPA
12   cite to any published or otherwise literature that
13   it reviewed with regard to its statements as it
14   relates to asbestos and ovarian cancer or talc and
15   ovarian cancer, correct?
16         MR. TISI:  Objection.
17         THE WITNESS:  Yeah.  I -- I
18      don't -- well, I'd have to look to see if
19      they provided a citation on this report,
20      but things that come out of the Federal
21      Register are -- do not typically have
22      those kinds of references.
23         Oh, no, like -- yeah.  I don't
24      know whether if I went to the EPA site

Page 532

1          whether that information might be
2       available if I wanted to see it.
3    BY MR. HEGARTY:
4       Q.    But as far as your review of this,
5    with regard to your review of this document, you
6    did not see any of the authorities that the EPA
7    relied upon, correct?
8       A.    I did not.
9       Q.    You told me earlier in the day that
10   one of the standards for which you applied in your
11   report as to whether you would comment on an
12   analysis in your paper was they had to show you
13   the analysis that they did, correct?
14      A.    That is correct but --
15         MR. TISI:  Objection.
16         THE WITNESS:  But --
17         MR. TISI:  This is for a
18      different reason.  Now, go ahead.
19   BY MR. HEGARTY:
20      Q.    And then --
21         MR. TISI:  He testified on a
22      causal analysis.  This is just biologic
23      plausibility.  I mean, he testified to
24      that.

Page 533

1    BY MR. HEGARTY:
2       Q.    Please answer.  I think you were
3    starting to answer my question.  Go ahead.
4       A.    I was going to answer that the
5    response to the citizen committee was not
6    something that came out in the Federal Register
7    for public observation to make a position stance
8    on the part of the FDA.
9          It was my understanding in response
10   to a petition as to whether they would approve the
11   labeling of -- of risk of talc on a cosmetic talc
12   product.
13         This is in the Federal Register.
14   (Indicates).  This is a mandate essentially, in my
15   view, from the EPA and I -- it feels different to
16   me.
17      Q.    So --
18      A.    This feels different to me.
19      Q.    So with regard to P9, this would be
20   an authority you would feel would meet your
21   methodology standards for including a discussion
22   about it in your report; is that correct?
23         MS. PARFITT:  Objection.
24         THE WITNESS:  This is -- this

134 (Pages 530 - 533)

Page 534

1    is what appears to me is a mandate that
2    has been put forward by a federal agency.
3    It is different from what I saw in that
4    FDA response to a citizens committee.
5        I would hope that a mandate
6    such as this would be backed by evidence,
7    and given that it says it's its final
8    rule, I would assume that there were --
9    there were iterative processes that it
10   went through in order to be able to come
11   up with these -- this summary.
12 BY MR. HEGARTY:
13   Q.    Going back to my question.
14       Would it meet your standard that you
15 applied for preparing your report --
16   A.    If there was no --
17   Q.    -- to include an analysis in your
18 report?
19   A.    Yeah.  If there was no background
20 information that I could find to support this,
21 then it would not meet my standard.
22       MR. HEGARTY:  Okay.  All
23   right.  Given the time that I've been
24   allowed, those are all the questions that

Page 535

1    I have.
2        I'll reiterate my objection to
3    the extent that Dr. Harlow was asked
4    about a question about materials that
5    have not previously been disclosed that
6    he would include as a basis for his
7    opinions, that we reserve the right to
8    seek additional time to the extent
9    warranted.
10       MR. TISI:  We, obviously,
11   object to that.  I've given you more than
12   enough time.  All the documents that you
13   have were in the Dropbox.  We provided
14   them several days in advance.  These are
15   not new opinions.
16       These are documents that came
17   out recently and we further support the
18   opinions that you already have.  And you
19   asked him whether or not any particular
20   agency had said that talc with asbestos
21   causes cancer.  You asked him the
22   question.
23       MR. HEGARTY:  I did not ask
24   him that question.  I asked him if any

Page 536

1    agency or scientific authority had said
2    that talc use causes ovarian cancer.
3        MR. TISI:  With asbestos.
4        MR. HEGARTY:  I did not ask
5    that question.  The record will speak for
6    itself.
7        MR. TISI:  Right.
8        MR. HEGARTY:  And will not
9    reach agreement I'm sure today on our
10   objections or your response.  So --
11       MR. TISI:  I understand.
12       MR. HEGARTY:  -- I guess that
13   will be it.
14       MR. TISI:  Thank you.
15
16       (Signature not waived, the
17   deposition concluded at 8:21 p.m.)
18
19       *   *   *

Page 537

ERRATA SHEET

Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____
Page No.____Line No.____Change to:_____

Page 538

1    DECLARATION UNDER PENALTY OF PERJURY

2

3

4         I declare under penalty of

5    perjury that I have read the entire transcript of

6    my Deposition taken in the captioned matter

7    or the same has been read to me, and

8    the same is true and accurate, save and

9    except for changes and/or corrections, if

10   any, as indicated by me on the DEPOSITION

11   ERRATA SHEET hereof, with the understanding

12   that I offer these changes as if still under

13   oath.

14

15        Signed on the _____ day of

16   _____, 2024.

17

18   _____

19        BERNARD L. HARLOW, PHD

20

21

22

23

24

Page 539

1         CERTIFICATE OF REPORTER

2    DISTRICT OF COLUMBIA    )

3         I, Denise Dobner Vickery, a

4    Registered Court Reporter and Notary Public of

5    the District of Columbia, do hereby certify that

6    the witness was first duly sworn by me.

7         I do further certify that the

8    foregoing is a verbatim transcript of the

9    testimony as taken stenographically by me at the

10   time, place and on the date herein set forth, to

11   the best of my ability.

12        I do further certify that I am

13   neither a relative nor employee nor counsel of

14   any of the parties to this action, and that I am

15   neither a relative nor employee of such counsel,

16   and that I am not financially interested in the

17   outcome of this action.

18

19

20   _Denise D. Vickery_

21        DENISE DOBNER VICKERY, CRR,RMR

             Notary Public in and for the

22           District of Columbia

23

24   My Commission expires:  March 14, 2028

136 (Pages 538 - 539)

**[& - 1.8]**

**&**

**&**  1:5 2:14 3:5
3:14 4:14,14,16
9:1 43:9 61:3
62:6 190:6
198:12 202:22
238:16,19,21
240:1,18 241:6
309:10 379:14
382:11 436:6
466:17 468:10
481:23 485:17
520:16

**0**

**0.05.**  313:11
**0.15.**  371:8
**0.8**  368:1
**0.84**  302:16
**0.86**  181:9
290:15 375:2
**0.88**  304:6
**0.9**  184:12
302:23 368:1
**0.92**  327:15
**0.97**  335:5
**0.99**  312:11
372:24
**0.99.**  371:10
**05**  312:4,15
363:17

**1**

**1**  5:10,11 6:3,17
7:3 8:16 10:17
10:20 11:10

15:21,23 21:4
21:10 77:9
83:23 99:5
101:2,2 104:8
177:3,22
186:14 187:22
187:24 188:3,4
284:15 285:16
286:2,3,9 303:8
303:11,14,16
314:2,4 327:4
330:5 335:19
348:3 364:16
401:8 421:7,11
426:1,4,10,11
444:4 457:18
457:20 509:16
524:1
**1.0**  126:10
148:21 178:11
233:21 259:16
260:6,9 303:17
303:18 314:5
316:8 328:3
347:21 348:16
364:12 372:20
372:20 404:6
451:4
**1.0.**  259:12
260:7
**1.01**  373:3
374:24
**1.04**  295:18
**1.06**  297:15
**1.09**  181:8
281:21 283:9

290:14 367:19
**1.11**  168:1
**1.12**  327:15
**1.13**  302:15
371:7 373:2
374:24
**1.14**  347:24
**1.15**  184:11
372:22 375:2
**1.16**  304:5
347:22
**1.17**  495:24
**1.19**  164:4
165:6 168:7
**1.2**  102:24
**1.20**  401:11
**1.22**  347:24
**1.23**  347:24
**1.26**  373:4
375:1
**1.27**  335:2
**1.28**  399:16
401:9
**1.28.**  302:24
**1.29**  327:22
**1.3**  102:24
103:15 129:7
300:21 316:13
330:7 368:2,6
402:10 404:6
**1.31**  101:11
104:1,13
105:11
**1.31.**  101:5
**1.32**  348:1

**1.35**  297:16
**1.36**  327:16
**1.37**  181:9
290:15
**1.37.**  401:11
**1.4**  102:24
183:8 299:3
327:21 495:23
**1.4.**  103:16
368:2
**1.40**  295:7,22
300:6
**1.44**  167:24
**1.45**  312:12
**1.47**  294:9
**1.5**  233:15,20
404:6
**1.5.**  184:12
330:7
**1.51**  302:16
**1.52.**  327:22
**1.53.**  304:6
**1.54**  457:13
**1.63**  164:4
168:8
**1.66.**  335:5
**1.68**  495:24
**1.69**  337:19
**1.7**  164:6
**1.70**  168:11
**1.72**  457:13
**1.8**  148:21
177:23 178:11
404:7 451:4
475:7

**[1.8. - 1998]**                                                                 Page 2

| | | | |
|---|---|---|---|
| **1.8.**  126:10 | 505:23 506:4,6 | **1600**  4:7 | 430:11 437:4 |
| 457:13 | **12:30**  179:17 | **161**  6:7 | **1990**  177:7 |
| **1.86**  168:1 | **12:31**  179:18 | **166**  6:11 | 454:13 |
| **10**  6:7 25:9,11 | **13**  6:18 7:6 | **1665**  167:19 | **1990s**  97:5 |
| 25:21 26:17,23 | 122:2,4 180:2,4 | **17**  7:6,7 269:18 | 446:19 464:6 |
| 48:15 50:24 | 283:10 398:24 | 269:22 270:3,6 | 479:10 494:10 |
| 90:8,16,18,19 | 527:9 | 277:19,24 | **1992**  10:14 90:6 |
| 161:18,20 | **130**  4:7 | 278:10 282:11 | 90:16 120:13 |
| 166:20 237:2 | **14**  6:21 122:2,2 | **171**  6:15 | 121:1 183:13 |
| 296:9,21 | 122:5,6 162:11 | **18**  7:11 188:8 | 259:22 322:11 |
| 297:14,14 | 164:14,20,20 | 188:10 275:21 | 331:8,23 341:2 |
| 378:23 389:9 | 194:20,23 | 276:3,9,11 | 389:10,16 |
| 389:12 390:7 | 195:20 399:2 | 277:17 | 390:12 428:22 |
| 390:16,20 | 527:9 539:24 | **180**  6:18 | 432:16,17 |
| 454:23 462:22 | **1412**  162:12,13 | **1825**  2:15 3:16 | 434:19 437:5 |
| 492:8 498:18 | 163:1,2 | **18th**  4:7 | 447:22 453:6 |
| 498:18 | **1414**  164:12 | **19**  7:13 135:8 | 510:20 516:7 |
| **10,000**  155:19 | **15**  5:10,17 7:1 | 135:21 153:23 | **1993**  252:18,22 |
| 447:3 450:15 | 7:23 74:10,14 | 276:8 285:2,4 | 253:5,11 |
| 457:3,7,8 | 245:18,21 | 348:23 349:1 | **1994**  5:24 6:3 |
| 498:15 | 246:6 247:21 | 350:12 352:20 | 6:17 7:6 10:17 |
| **10:01**  44:6 | 253:19 254:1,5 | 357:6 360:24 | 10:20 36:4,10 |
| **10:19**  62:21 | 254:15,20 | 362:9 516:20 | 91:4 129:15 |
| **10:28**  62:22 | 371:14 375:3 | **19103**  4:8 | 148:20 173:18 |
| **11**  6:11 166:22 | 454:23 526:23 | **194**  6:21 | 174:1 253:4,10 |
| 166:24 168:12 | **15-16**  63:15 | **1960s**  246:17 | 310:18 357:20 |
| 287:7 522:7,8 | **15207**  539:20 | **1970s**  468:11 | 424:1 428:22 |
| **11/8/2023**  50:20 | **16**  7:3 249:4,6 | **1979**  444:19,19 | 437:6 512:22 |
| **11:31**  133:21 | 249:12,15 | **1980**  253:20 | **1995**  94:20 |
| **11:32**  133:22 | 250:18 252:1 | 254:1 337:20 | 171:3 177:5,7 |
| **11:37**  139:18 | 252:12 268:12 | **1980s**  468:11 | 178:9 448:15 |
| **11:48**  139:19 | 268:24 348:18 | **1982**  432:13 | 451:10 470:6 |
| **12**  5:3 6:15 8:3 | 348:19 417:11 | **1989**  10:11 | 513:10 |
| 162:7 171:3,5,8 | **16-2738**  1:6 | 328:17 332:5 | **1998**  5:19 |
| 504:19,22 | **160**  324:22 | 424:16,21 | 342:24 343:1 |
| 505:16,20,22 | 504:3 | 428:21 429:22 | 343:13 |

**[1999 - 2024]**                                                          Page 3

| | | | |
|---|---|---|---|
| **1999**  10:23 | **20**  5:11 7:18 | **2011**  8:3 332:15 | **2020**  8:17,23 |
| 82:22 83:10,19 | 56:2,5 81:7,22 | 333:21 336:8 | 9:3,9 66:10,19 |
| 85:13 103:2,7 | 153:6,19,21,22 | 336:12 | 66:20 194:5 |
| 115:22 121:2 | 154:20,22 | **2012**  115:22 | 237:18 287:20 |
| 123:3 134:17 | 296:16,19,24 | 221:3 489:3 | 304:9 368:13 |
| 134:18 145:10 | 297:3 321:1,2 | **2013**  8:7 168:14 | 368:17 373:23 |
| 259:23 331:9 | 321:11 412:4,7 | 341:15 | 380:21 388:18 |
| 332:3 341:2 | 412:10 413:7 | **2014**  7:3 163:11 | 397:22 398:2 |
| 428:23 453:20 | 414:1 423:7,20 | 163:13 164:3,5 | 398:14 |
| 458:8 460:14 | 498:18,19 | 165:4,24 166:2 | **2021**  6:14 8:16 |
| 460:20 523:16 | **20,000**  60:6 | 166:3 168:4,10 | 10:6 166:22 |
| **1:04**  217:16 | **200**  60:10 | 169:5,6 252:3 | 167:15 420:17 |
| **1:40**  218:2 | **2000**  6:6,20,24 | 259:19 260:18 | 420:21 |
| **2** | 11:3 100:2 | 440:6 490:7 | **2022**  7:2,17 |
| | 104:2,8,22 | **2015**  59:23 | **2023**  5:17 11:8 |
| **2**  5:10,11 6:20 | 107:7,21 108:5 | 65:15 66:16 | 22:12,16 26:16 |
| 7:17 15:22 | 108:12,18,19 | 478:17 | 26:21 29:21 |
| 19:24 20:3,5,7 | 109:5 116:4 | **2015-2016** | 43:19 44:15 |
| 20:10 21:10 | 126:15 128:12 | 65:18 | 45:16 48:15 |
| 44:13,19,23 | 128:16 129:15 | **2016**  6:10 59:23 | 49:17 50:24 |
| 45:15 47:1 49:8 | 179:22 180:2 | 65:15 120:22 | 56:22 73:5,8 |
| 49:14 60:12 | 295:7 299:4 | 121:2,6 161:17 | 74:10,14,16 |
| 82:13 94:13 | 300:7 382:21 | 236:9 322:7 | 82:7,11 89:17 |
| 100:12 103:18 | 390:20 472:10 | 390:11 | 213:17 216:13 |
| 164:12 246:12 | **20006**  2:17 3:17 | **2017**  60:2 66:16 | 269:19 270:7 |
| 258:8 352:11 | **2007**  7:23 | 380:20 | 459:6 472:13 |
| 498:8,9 499:6,7 | **2008**  7:6 253:20 | **2019**  8:13 9:13 | 477:14 479:3 |
| 501:13 506:10 | 254:1 326:13 | 66:17 193:24 | **2024**  1:15 2:8 |
| 508:20 517:6,9 | 329:5,6,20 | 349:8,19 | 5:12 7:10,12 |
| 518:12,15,23 | 331:3 | 355:19 363:11 | 11:14 26:19 |
| 521:5,7 | **2009**  431:8 | 363:13 398:7 | 42:10,18 44:16 |
| **2.0**  316:13 | **2010**  7:20 88:16 | 398:14 399:16 | 44:16 49:13 |
| **2.8**  509:19 | 89:11 296:9,13 | 478:18 | 52:9,12 54:17 |
| **2.8.**  450:16 | 296:22 297:4 | **202.759.7648** | 55:21 56:1 |
| **2.91**  164:6 | 298:20 400:6 | 3:18 | 246:15 270:11 |
| 165:3,8 168:11 | | | 270:14 389:13 |

**[2024 - 4.4]**

390:8,21
482:24 538:16
**2028** 539:24
**2096** 379:21
385:7,15
**2097** 385:7
**21** 7:21 167:15
278:11,17
326:14,16
**214** 94:16 95:8
**215** 96:5 438:6
438:18,19
**215.735.0773**
4:9
**218** 5:4
**21973** 484:3
**21975** 486:5
**22** 8:1 278:12
278:18 332:16
332:18
**23** 8:4 9:13
49:17 100:14
341:20,22
472:13 497:13
497:19
**24** 8:8 77:9
349:24 350:2
351:7 399:7
401:10,24
402:4
**245** 7:1
**249** 7:3
**25** 8:14 82:22
270:9,23 273:9
273:10,11
361:17,22

363:1 510:22
**250** 449:23
**251** 181:24
184:15
**2527** 285:20,21
**2529** 286:18
**2532** 519:13
**2555** 4:18
**256** 171:14
445:20 515:15
**2569** 286:17
**257** 172:6
448:19,20,22
449:8
**258** 172:6
449:23
**26** 8:17 9:3
56:22 64:17
368:17,19
496:18
**27** 8:20 270:9
270:23 273:9
273:10 278:11
278:12 373:15
373:17,19
527:9
**270** 7:7
**272** 92:24 93:7
**276** 7:11
**28** 6:6 7:12 9:1
10:11 11:3,14
54:17 126:15
379:5,7,18
470:18 471:8
482:23 529:24

**285** 7:13
**29** 9:4 55:20
56:1 398:2,4
399:5,13
**296** 7:18
**2:13** 247:15
**2:14** 247:16
**2:58** 293:2

### 3

**3** 5:11,12 21:9
21:10 42:13,15
42:18 52:9
76:21 77:1
108:16 246:15
252:13 259:17
345:14 352:12
400:21 450:11
450:12 497:21
510:18
**3,000** 456:24
457:7,7
**3.0** 103:14
**3.0.** 316:13
**3.2.** 499:6
**3.4.** 404:15
**3.5** 509:17
**30** 9:10 191:22
337:18 356:6
356:19 374:6
398:7,10 399:3
399:12,17
423:7,20
452:17
**31** 5:24 104:14
107:8

**316** 3:7
**32502-5996** 3:8
**326** 7:21
**332** 8:1
**341** 8:4
**349** 8:8
**353** 458:14
**354** 85:17
523:19
**355** 86:18
124:12,22
125:3,4
**359** 330:15
**361** 8:14
**368** 8:17
**373** 8:20
**379** 9:1
**398** 9:4,10
**3:10** 293:3
**3:19** 301:20
**3:22** 301:21

### 4

**4** 5:13 60:20,22
66:2 76:9
112:19 126:17
164:12 230:15
252:13,14
253:2 257:20
258:8 260:12
297:8 350:11
350:22 352:20
369:8 437:14
**4.0** 103:15
**4.4** 405:9

[4.91 - 92]

**4.91**   168:11
**4.97.**   164:7
**40**   11:9 25:12
   26:1 201:18
   418:12 423:20
   452:17
**400**   49:3,11
   60:10,12
**40s**   412:6
**412**   162:4,8,9
   162:11,24
**418**   5:5
**42**   5:12
**421**   10:3
**429**   10:7
**432**   10:12
**437**   10:15
**44**   167:23
**443**   10:18
**45**   183:13
**4500**   48:21 49:9
**454**   10:21
**467**   11:1
**477**   11:4
**482**   11:9
**4:07**   342:11
**4:21**   342:12
**4:25**   346:9
**4:26**   346:10
**4:30**   349:14
**4:31**   349:15
**4:37**   355:9
**4:44**   355:10
**4s**   437:20

**5**

**5**   5:15 9:9 76:6
   76:8,9,12,16
   77:6 129:20
   188:11 212:23
   237:2 260:22
   260:23 286:20
   318:16 347:20
   443:18 454:1
   521:15
**5,000**   29:11
**5.0.**   103:15
**50**   24:11 25:10
   26:1 282:4
   297:9 302:19
   325:9,11
   418:12,16
**500**   5:6 440:22
**52**   348:20
**54**   371:3
**56**   369:4
**598**   351:7,11
   352:5
**5:19**   391:6
**5:33**   391:7

**6**

**6**   5:18 7:10 76:4
   83:14,17,19
   116:8,21
   131:21 139:23
   155:3 260:21
   260:23 270:11
   270:14 323:5
   454:3,5

**60**   5:13
**600**   3:7 17:15
   17:23 18:21
   49:6,12 80:13
**62**   63:15
**64108**   4:19
**6474272**   1:24
**69**   511:16
**6:01**   417:6
**6:02**   417:7
**6:03**   417:21
**6:04**   417:22

**7**

**7**   5:20 7:2 8:23
   92:15,18,22
   103:21 104:11
   195:8,11,13,15
   482:15
**70**   226:11
**700**   2:16 3:16
**739**   336:19
**741**   337:14
**751**   11:10
**76**   5:15
**7:02**   492:11
   493:3
**7:34**   493:4
**7:41**   499:15
**7:47**   499:16

**8**

**8**   6:1 52:11 94:3
   94:6,9 106:10
   106:14,15
   117:11,22
   326:5,8 437:23

**482:17
**8,525**   8:6
**800**   362:17
**81**   511:17
**816.474.6550**
   4:20
**819**   343:17,22
   343:24 344:3,4
**820**   342:6
   343:16
**83**   5:18
**84**   297:16
**850.435.7999**
   3:9
**86**   372:22
**87**   164:4 168:8
**8:15**   492:13
**8:21**   536:17
**8th**   48:2

**9**

**9**   1:15 2:8 6:4
   98:10,14,24
   100:7 104:20
   116:4 126:15
   194:14 195:7,9
   195:11,12
   482:10,11,18
**9,000**   48:20,22
   49:1,9,10
**9,859**   8:6
**90**   141:17,24
   142:10
**90s**   95:6
**92**   5:20 122:20

Golkow Technologies,
A Veritext Division

**[94 - actually]**                                                           Page 6

| | | | |
|---|---|---|---|
| **94** 6:1 | 138:6 144:3 | **academically** | **acetaminophen** |
| **95** 167:24 168:7 | 147:15 148:6 | 439:21 | 28:4,23 29:1,23 |
| 168:11 181:9 | 179:1 193:13 | **acceptable** | 31:16,24 32:24 |
| 188:2 260:7 | 208:7 214:23 | 224:17 | 33:9,23 34:19 |
| 280:16 312:9 | 254:17,18 | **access** 167:10 | **acknowledge** |
| 313:6 374:24 | 255:2 257:5 | **accomplished** | 258:10,20 |
| 375:1 388:3 | 259:1 313:5 | 38:2 | **acog** 395:16 |
| **96** 400:16 | 370:7,9 391:1 | **account** 126:3 | 396:23 |
| **98** 6:4 405:8 | 392:17 402:3 | 126:12 169:3 | **acronym** |
| 409:15 | 426:17 509:7 | 183:10 185:18 | 466:16 |
| **99** 122:20,22 | 518:5,15 | 186:20 231:22 | **act** 11:13 |
| 375:1 399:22 | 534:10 | 233:3 314:19 | 423:13 483:15 |
| 408:3 | **above** 85:22 | 315:9 335:12 | **action** 539:14 |
| **9:27** 1:16 2:9 | 101:1,2 106:13 | 345:13,13 | 539:17 |
| **9:34** 21:13 | 117:23 287:8 | 494:18 | **activities** 24:1 |
| **9:36** 21:14 | 330:5 362:20 | **accounting** | 24:22 |
| **9:57** 44:5 | 400:16 401:8 | 315:12 319:19 | **actual** 139:11 |
| **9th** 48:2 | 401:19,20 | 442:8 | 228:11 286:14 |
| **a** | 408:19 487:8 | **accounts** 132:4 | **actually** 52:21 |
| | 524:1 | **accumulates** | 54:16 77:17 |
| **a.m.** 1:16 2:9 | **absence** 330:22 | 473:2 | 92:12 104:1,4 |
| 21:13,14 44:5,6 | 330:24 331:14 | **accurate** | 105:20 109:8 |
| 62:21,22 | 339:12,14 | 107:22 155:1 | 116:11 117:5 |
| 133:21,22 | 340:22 | 260:18 268:9 | 119:19,20,20 |
| 139:18,19 | **absolutely** 34:1 | 280:20 289:6 | 121:24 122:22 |
| **aaces** 6:10 | 108:6 124:8 | 290:23 291:14 | 128:19 135:5 |
| 167:22 | 149:8 388:7 | 337:8 338:20 | 154:19 178:21 |
| **abandoned** | **abstain** 453:16 | 340:14 346:21 | 184:8 189:3 |
| 363:23 | **abstract** 83:23 | 352:22 413:5 | 199:10 206:1 |
| **ability** 205:22 | 84:2,3,18,20,20 | 434:12 512:13 | 227:15 230:1 |
| 206:19 311:15 | 84:23 177:2,11 | 538:8 | 250:1 252:13 |
| 522:15 539:11 | 177:12,14 | **accurately** | 256:19 276:17 |
| **able** 38:3 45:8 | 181:2 186:2 | 42:21 87:20 | 284:19 299:7 |
| 47:7 87:20,21 | 334:5 335:7,19 | 266:14 291:22 | 302:22 322:18 |
| 87:24 128:24 | 348:3,8 371:2 | 291:22 | 334:20 345:21 |
| 129:1 137:21 | 399:16 506:19 | | 347:19 353:5 |

[actually - agree]                                                    Page 7

354:5 370:9
399:3 433:16
435:6 443:2,14
466:3 474:18
490:10 491:9
491:10,10
494:22 497:2
499:9 502:17
504:22 507:4
509:7 513:2
517:23
**acute**  254:8
**add**  120:1,17,21
248:2 424:13
493:22
**added**  49:12
**addition**  126:5
253:18 338:12
388:6 511:15
**additional**
50:21 51:1
55:14 177:23
213:6 214:5,6
251:3 253:21
254:7,10
288:24 289:1
297:15 298:24
298:24 424:4
441:20 442:1
501:24 535:8
**additionally**
484:9,23,24
485:9
**address**  202:23
363:13 483:15

**addressed**  87:6
97:21 125:13
**addressing**
201:20 236:5
378:8 387:17
**adds**  207:16
**adelman**  18:18
**adenocarcino...**
140:17 141:11
141:22 142:8
156:20 157:23
295:18 301:3,3
**adequate**
442:12 443:8
**adequately**
185:24 524:7
**adhd**  29:2
**adjective**  336:3
**adjunct**  25:17
**adjust**  131:1
447:21 448:7
**adjusted**  298:3
304:4 371:8
448:1 457:2
**adjusting**
448:11
**adjustment**
335:3 447:5
486:21
**administration**
436:4
**adolescence**
11:5 477:24
**adulthood**  11:6
478:1

**advance**  42:8
235:16 535:14
**advanced**  365:8
**adverse**  230:14
424:4
**advice**  18:9
**advisable**
396:17
**advise**  23:9
32:12 251:4
**advised**  23:4
**advisor**  334:2
**aesthetic**
463:13
**affect**  86:6
**affected**  502:7
**affecting**  109:1
423:15
**affiliated**  25:15
**affirmative**
5:14 61:2
**affirmatively**
215:17
**african**  6:9,13
**afternoon**  5:4
218:1
**age**  159:10
183:13 282:3
302:19 325:9
325:10 337:18
412:3,4,5
**agencies**  489:11
**agency**  35:17
35:18,20 36:24
211:21 265:14
411:14,16

460:18 480:3,6
480:15 483:13
483:14 488:21
489:12 534:2
535:20 536:1
**agent**  315:23
502:8
**aggregate**
130:8
**ago**  50:17 82:22
91:4 122:23
192:15 249:1
249:20 343:1
356:19 370:13
389:8 390:11
423:7,20
430:16 452:17
517:19
**agree**  72:4,14
101:10 105:10
106:5 107:22
127:19 128:7
128:11 129:9
130:11 131:17
132:10 134:15
135:16 149:5
155:22 160:14
199:4 203:20
218:11 220:6
224:12 258:19
259:6,13,19,21
260:17 265:13
265:17 266:2
272:24 273:2
280:3,6 292:14
299:24 312:3,6

**[agree - analyze]** 

314:9 329:23
339:18 340:16
354:20 355:17
356:23 365:2
365:10 366:18
386:23 387:7
387:18,22
400:13 401:3
401:14 408:11
422:17 476:18
481:17 502:10
520:1 527:17
**agreed** 63:6
73:8 96:16
125:19 128:15
354:17 355:16
**agreeing** 71:12
**agreement**
359:22 536:9
**agrees** 256:24
388:20,22,23
389:1
**ah** 74:19 270:12
**ahead** 41:19
64:21 70:19
76:2 87:16 92:6
102:9 107:14
110:24 138:19
143:1 180:15
189:6 215:10
231:10 266:9
276:4 279:14
293:13 313:3
345:8 370:12
396:12 412:24
438:21 514:16

526:22 532:18
533:3
**air** 224:10
**al** 5:19 6:6,10
6:14,19,24 7:17
7:20,22 8:3,7
8:12,19 9:8,13
10:6,13,23 11:3
11:7 43:10
282:16,22
516:7
**al.'s** 98:10
**aligned** 71:23
524:7
**allow** 14:4,4
233:5,6 256:22
405:2 522:22
**allowed** 514:17
522:19 534:24
**allows** 402:1
434:11
**alluding** 503:4
**altered** 506:22
509:12
**alternative**
318:22 332:2
332:11 488:3
**ambient** 356:22
**ambiguous**
394:16
**amend** 213:10
**amended**
213:12
**american** 6:9
361:5 362:11
362:19 363:12

363:14 378:16
**amount** 18:4
21:20 151:12
152:4,7 161:2
185:18 189:17
225:24 226:24
412:12 417:10
527:4,15
**amounts** 55:12
318:24
**ample** 108:9
121:21
**amrhein** 362:7
362:15
**analyses** 102:10
115:1 132:1
236:11 237:24
280:1 289:19
322:23 323:2
324:24 336:9
366:15 367:21
387:24 402:8
447:22 476:20
**analysis** 7:16
8:5 9:5 35:10
99:4,23 101:19
101:24 104:20
104:22 112:5,8
112:11 113:7
115:13 116:10
116:16 132:1
140:11 143:22
144:7,12,24
145:24 161:10
163:6 165:6,18
166:5 169:4

170:6 175:14
176:7,23
183:12 203:21
218:15,24
219:6 220:23
222:17 224:18
224:23 230:19
230:24 232:23
233:10 237:19
237:19 240:7
243:3,3,9,12
280:5,22 281:5
283:7,9,16,18
284:8 286:16
287:14 288:12
288:17 293:20
294:9,12
297:20,23
300:16 326:2
327:14,24
331:17,23
341:18 344:7
363:18 369:8
375:15 387:15
387:16 397:23
401:24 402:17
402:17 403:22
404:1,15
407:11 415:18
425:6 427:13
503:9,12 510:6
518:22 532:12
532:13,22
534:17
**analyze** 111:23
115:5 310:5,6

[analyze - approach]                                                      Page 9

402:4 509:5
**analyzed**
    100:14 163:13
    305:15 503:6
    509:9
**analyzing**  39:7
    116:12 229:12
    305:11 366:10
**anapol**  4:4
**anapolweiss....**
    4:10
**anatomical**
    219:13
**ancestry**  6:14
**animal**  33:8,15
    219:6,10,20,22
    220:7 252:17
    252:22 308:2
    427:19 478:7
**anna**  208:21
**answer**  14:5,7
    15:6 27:12 30:7
    30:17 32:14,16
    45:22 46:4 59:1
    63:18 64:8,23
    72:11 97:14
    106:4 107:16
    132:19,21,22
    133:2,5 136:18
    147:17,20
    151:24 153:19
    160:21 184:14
    190:19 203:6
    204:4,5 210:13
    210:14 214:8
    216:22 217:8

241:4 247:22
250:13 263:3
272:22 276:1
317:7 345:7,9
354:12 358:13
358:21 359:6
372:16 376:23
377:4,8,14
384:20 394:18
394:19 435:11
514:18 525:6
533:2,3,4
**answered**
    141:14 151:23
    179:9 184:7
    271:19 272:19
    317:6,15 372:8
    372:15 384:3
**answering**
    90:12 358:15
    509:2
**antecedent**
    113:23
**anticipate**
    13:24
**anticipated**
    99:14 106:21
**antidepressants**
    147:9
**anxious**  174:7,8
**anybody**
    234:15 428:17
    452:3 464:1
**anytime**  383:16
    427:13

**apart**  67:19
    75:14 133:2
**apologize**
    166:19 239:20
    299:22 343:21
**apparently**
    409:11
**appear**  20:18
    439:14
**appearances**
    3:1 4:1
**appears**  22:21
    116:13 153:10
    288:23 336:4
    336:14 353:16
    461:8 534:1
**applicable**
    129:12
**application**
    89:20 150:3
    256:6 365:9,11
    366:13 415:6
    453:17 455:11
    455:22 506:20
    506:21 509:11
**applications**
    115:21 125:24
    154:20 155:14
    155:19 280:9
    321:24 334:16
    337:4 344:8
    345:14 346:23
    348:6 433:4,17
    447:3 450:16
    456:1,3,24,24
    457:4 494:8,13

494:18 516:8
523:23
**applied**  34:18
    81:10 89:15
    90:2 149:24
    152:23 154:22
    220:20 223:7
    230:10 311:15
    320:3 354:5,6,7
    363:22 366:8
    423:2 456:15
    459:4 486:22
    532:10 534:15
**applies**  151:9
**apply**  81:14,17
    104:14 140:4,9
    145:8,20
    230:10 231:23
    274:10 317:4
    373:10 405:14
    416:4 431:18
**applying**
    231:19 347:11
    405:9,11
    406:10 505:24
**appointment**
    25:1,17
**appreciable**
    406:24 506:22
    509:12
**appreciate**
    356:1
**approach**  78:9
    112:16 141:6
    148:1 229:15
    230:17 267:7

**[approach - asbestos]**                                                        Page 10

| | | | |
|---|---|---|---|
| 281:12 318:23 | 140:16 141:10 | 195:21,23 | **articles** 46:11 |
| 320:17 330:4 | 141:21 142:8 | 197:19 198:14 | 47:23 82:18 |
| 348:13 458:9 | 146:5,14 148:2 | 230:4 273:20 | 83:6 87:19 |
| **approaches** | 149:6,20 150:1 | 273:24 296:4 | 113:10 198:1 |
| 292:9 | 150:3,10 | 325:20 329:4 | 201:15 206:4 |
| **appropriate** | 152:23 159:16 | 331:8 340:18 | 212:13,17 |
| 18:3 41:13 | 206:15 209:23 | 354:14 356:3 | 215:19 223:13 |
| 78:23 79:23 | 223:7 246:19 | 357:20 362:15 | 230:1,4,8,12 |
| 122:18 126:13 | 251:8 307:21 | 397:22 398:2,8 | 248:11,13,13 |
| 187:12 197:6 | 354:6 369:11 | 398:14,14 | 253:19 254:1,5 |
| 236:2 289:18 | 369:22 375:6 | 399:9,18,19,20 | 254:15,21 |
| 340:19 359:2 | 375:17 463:17 | 414:14 422:6 | 273:19 331:9 |
| 377:20 381:11 | 492:5 524:23 | 422:11 423:24 | 357:22 414:15 |
| 396:15 416:8 | **areas** 50:9 | 424:16,21 | 429:4,11 |
| 439:21 463:15 | 157:13 223:21 | 425:15 428:21 | 440:22 485:10 |
| 494:19 519:15 | 391:12 418:8 | 428:21,22,22 | 522:13,18,19 |
| 524:17,21 | **argument** 87:3 | 428:23 429:22 | **asa** 8:16 361:18 |
| **appropriately** | **armed** 95:20 | 430:4 431:3 | 363:14,15,19 |
| 87:21 179:2 | **arrangements** | 432:17 437:4,5 | **asbestiform** |
| 281:23 502:16 | 381:21 | 437:9,10,12 | 206:13,14,24 |
| **approve** 79:17 | **article** 28:12 | 438:22 440:9 | 226:13 354:10 |
| 533:10 | 82:22 84:7 | 443:2,13,19 | **asbestos** 6:22 |
| **approved** | 85:14,18 86:15 | 447:1 448:15 | 11:10,11 |
| 384:10 | 87:15 88:5 90:7 | 450:20 451:11 | 183:16 197:18 |
| **approximately** | 90:16 95:19 | 453:7,8,20 | 198:13 200:10 |
| 55:23 | 97:8,12,16,22 | 454:1,7,13,24 | 201:8,18,21,21 |
| **approximating** | 98:3 118:9 | 455:4,9 458:3 | 202:23 203:1 |
| 367:15 | 122:11 123:3,8 | 458:15 460:24 | 203:23 205:3,4 |
| **april** 1:15 2:8 | 123:11 124:13 | 477:3,4,14,23 | 205:23 206:7 |
| 7:3 246:15 | 124:15 134:17 | 478:17,18 | 206:16 207:4,7 |
| **arbitrary** 312:7 | 134:18 145:13 | 493:15 496:17 | 207:15,18 |
| **area** 8:18,20 | 148:20 170:4 | 500:14,17,23 | 208:5,9 210:2 |
| 23:15 28:4 29:6 | 170:10 174:1 | 501:14 510:20 | 212:18 215:12 |
| 29:18 81:10 | 175:17 181:21 | 510:22 515:8 | 221:1,17 222:5 |
| 89:15 90:2 | 187:10 194:4,6 | 515:11 524:14 | 222:8,12,15,18 |
| 91:16,24 | 194:21 195:1,6 | | 222:19,21 |

**[asbestos - association]** Page 11

| | | | |
|---|---|---|---|
| 223:6,9,14,21 | 523:3 526:8 | **asking** 13:22 | 370:4,8 405:19 |
| 224:5,9,13,17 | **asked** 18:3 | 18:9,14 27:14 | 406:15 407:4 |
| 224:19 225:1,5 | 41:23 57:6 | 30:9 137:16 | 408:7 410:18 |
| 225:7,19,21,24 | 64:13 72:12 | 153:18 194:20 | 416:15 434:12 |
| 226:4,10,24 | 73:11,14,16,23 | 198:3 256:20 | 443:2 457:5 |
| 238:20 239:24 | 75:23 76:1 | 275:2 393:8 | 475:22 502:20 |
| 240:7,17 | 138:14 169:12 | 413:23 417:14 | 508:10 |
| 241:18 306:21 | 179:8 184:7 | 422:3 425:7 | **assessments** |
| 309:13 354:10 | 202:8 210:11 | 433:15,22 | 38:10 113:12 |
| 424:5 429:3 | 239:14 243:10 | 457:22 460:17 | 319:22 340:18 |
| 431:20 432:3 | 271:18 272:18 | 461:22 471:13 | **assign** 174:7 |
| 445:5,13 464:4 | 275:12 317:5 | 505:21 529:3 | 236:18 409:6 |
| 468:11 469:12 | 317:14 342:16 | **aspect** 430:3 | **assigned** 409:3 |
| 470:7 478:11 | 349:17 372:7 | **assess** 170:3,15 | **assist** 235:11 |
| 479:21 480:7 | 372:14 376:19 | 178:11 185:24 | **associate** |
| 480:21 481:9 | 384:2 418:9 | 233:18 236:15 | 504:10 |
| 481:13,13 | 419:1,18 | 255:2 262:9 | **associated** 19:9 |
| 483:17,24 | 426:21 427:24 | 282:7 366:23 | 113:3 157:17 |
| 485:11,13 | 429:14 433:24 | 405:2,14 494:1 | 158:5 159:24 |
| 487:5,17 | 434:1 435:4,18 | 511:18 512:11 | 300:21 504:15 |
| 488:12 489:13 | 447:9 454:16 | **assessed** 129:13 | 506:21 509:11 |
| 489:22 531:14 | 463:23 464:24 | 133:10 334:15 | 509:15,17,19 |
| 535:20 536:3 | 466:14 467:5,7 | 337:3 367:9 | **association** 6:7 |
| **ascertained** | 469:11,13 | **assessing** | 7:13 8:17 9:6 |
| 182:6 | 470:10 473:10 | 281:23 312:19 | 9:11 10:3 11:4 |
| **ascertainment** | 480:5 488:1 | 516:16 | 28:5 31:19,22 |
| 122:18 | 499:21 500:6,9 | **assessment** | 84:9 85:7 87:4 |
| **ashcraft** 2:14 | 504:18 506:3 | 37:10,20,23 | 89:19,21 90:14 |
| 3:14 | 507:20 508:6 | 38:16,20,23 | 90:15 93:10 |
| **ashcraftlaw.c...** | 508:18,22 | 39:4,8,11,21 | 96:16 101:7,12 |
| 3:19 | 512:19,21 | 40:1,6 41:16 | 101:13,19,24 |
| **ashkenazi** | 524:11 526:13 | 154:2 159:23 | 102:11 113:1 |
| 158:24 | 529:23 530:16 | 186:21 197:13 | 130:9 139:14 |
| **aside** 93:24 | 530:18 535:3 | 229:8 235:5 | 140:2 142:16 |
| 98:7 292:15 | 535:19,21,24 | 261:15 281:17 | 142:23 143:7 |
| 389:6 474:9 | | 303:3 324:8 | 143:15,19 |

| | | | |
|---|---|---|---|
| 144:8,16,19,22 | 328:5 329:17 | 512:17 | **attorney** 18:6 |
| 147:11,13 | 330:22 335:23 | **assume** 20:4 | 18:18 202:21 |
| 155:10 165:3 | 336:1 337:1,10 | 190:16 278:1 | 418:4 471:13 |
| 168:9 170:8 | 337:21 339:13 | 368:3 412:2 | **attorneys** 17:15 |
| 181:6 183:1,17 | 340:17 357:20 | 534:8 | 18:3 19:18 |
| 183:22 184:1 | 361:5 362:12 | **assumed** | 22:11 30:6 |
| 184:11,23 | 362:20 363:12 | 319:13 | 67:20 70:14 |
| 186:6,10,13,17 | 364:9 367:17 | **assumes** 203:3 | 71:12,24 |
| 186:23 187:7 | 367:19,20 | 528:23 | 392:24 529:21 |
| 187:12,17,18 | 368:6 369:10 | **assuming** 41:18 | **attributable** |
| 187:23 188:3 | 369:17 371:18 | 190:21 294:1 | 90:9 113:2 |
| 207:14 222:4 | 372:3 373:8,12 | 413:16 | 390:17 |
| 229:17 231:22 | 375:5 378:16 | **assumption** | **attributed** |
| 233:8 234:2,3 | 387:21 392:1 | 169:8 179:1 | 160:5 |
| 234:24 246:18 | 392:10 402:10 | 260:10 280:10 | **audibly** 15:5 |
| 251:7 258:15 | 422:8 425:1 | 367:7 404:4 | **audience** 91:15 |
| 259:4 260:11 | 427:17,22 | 506:8 507:24 | **august** 8:7,16 |
| 261:7,14 | 433:3 436:21 | 510:11 512:5 | 9:13 43:22 |
| 279:17 280:3,6 | 441:15,18,23 | 512:12 | 45:14 |
| 280:7 281:21 | 442:10 443:5 | **attempted** | **author** 121:5,9 |
| 282:8 290:1,12 | 458:19,20,21 | 305:22 404:13 | 147:4 180:24 |
| 291:19 298:13 | 459:23 461:7 | **attend** 435:18 | 230:5 296:9 |
| 300:11,24 | 462:9 475:10 | **attended** 70:2 | 325:16 332:14 |
| 302:13,15,18 | 475:16 476:2,5 | 91:4 512:22 | 380:2,4 520:7,8 |
| 303:9 308:11 | 477:23 495:23 | **attention** | 520:10 |
| 310:13 312:17 | 500:10 502:2 | 316:12 | **authored** 108:4 |
| 312:23 313:15 | 503:23 507:1,5 | **attenuate** 131:2 | 154:19 262:3 |
| 314:11 315:19 | 509:18,20,24 | 298:13 300:23 | **authorities** |
| 315:22 316:7 | 512:16,18 | 328:5 | 197:16 198:10 |
| 316:10,13,16 | 518:3,17 | **attenuated** | 532:6 |
| 316:18 317:23 | **associations** | 168:6 324:18 | **authority** |
| 318:3,6 319:4,9 | 92:2 174:21 | 325:13 367:11 | 191:20 215:23 |
| 319:10,15 | 259:10 281:22 | 367:19 475:24 | 267:17 333:18 |
| 323:11,16,24 | 324:17 325:13 | **attenuation** | 533:20 536:1 |
| 324:3,12 | 330:23 386:13 | 185:8 367:13 | **authors** 39:3 |
| 325:18,22 | 501:22 512:2 | 368:4 388:11 | 97:3 163:9 |

**[authors - based]**                                                                 Page 13

164:23 169:15
170:14 177:21
180:8 182:5
184:19 196:7
197:8 228:14
295:6 297:12
323:22 326:19
333:7 334:11
335:21 336:23
338:9 348:2
356:7 370:18
379:24 387:10
400:4 404:11
405:13 406:21
408:20 410:7
420:23 519:8
**autism**  28:14
28:23 29:23
31:17 32:24
33:10,24 34:20
**available**  15:15
203:13 213:7
214:16,16,21
214:22 217:11
218:15,24
229:18 237:5
240:7 243:14
244:4 251:17
251:20 270:21
287:3 332:11
393:6 400:7
452:17 518:11
519:6 532:2
**avedisian**  190:6
190:7

**avenues**  148:7
**average**  412:3,5
**avoid**  174:9
429:1 464:5
**avoidance**
462:20
**avoided**  361:13
434:22
**aware**  29:15
40:20 43:11
57:9 60:17 66:3
68:14 75:7 96:3
96:4 113:16
145:14 159:12
159:14 160:12
169:23 170:12
193:3,6,9 201:5
201:14,15
209:2 223:5,20
224:3,14
238:17 240:3
249:21 252:3,8
252:11 296:1,7
301:6 302:5
333:4,5 395:17
480:14 485:16
519:7 520:12
520:18 525:1
525:19 526:1,5
**awful**  235:20

**b**

**b**  242:24 243:8
321:13,20
468:21,22
469:1,2 481:19

481:22 530:7
**baby**  81:9
226:5,10,22
309:4 506:20
508:12 509:11
509:22,23
510:1
**back**  22:12 23:2
29:9 33:17
44:12 56:6
59:17 60:9
62:23 65:15,17
66:21 67:5,13
72:21 78:15
89:17 94:20
95:6 97:1,4,5
100:1 103:7
107:7 109:5
116:3 118:12
121:12 123:5
125:20 126:14
128:12 139:20
143:3 145:17
155:2,5 157:21
178:5,9 186:2
194:9 200:12
218:8 246:17
247:17 252:3
255:19 278:15
278:23 280:14
287:12 288:3,5
288:7 290:18
293:4 299:14
301:22 310:18
312:20 314:2
316:24 329:20

331:2 336:11
342:13 346:11
355:11 359:6
381:16 391:8
397:11 401:13
409:14 417:8
421:24 425:24
426:5,16,19
444:19 451:10
471:19 473:8
512:22 522:17
528:5,6 534:13
**backdrop**
472:17
**backed**  534:6
**background**
223:21 224:4,9
376:9 484:17
534:19
**bacon**  4:16
**balance**  48:20
49:9
**balanced**
439:20,23
463:12 513:18
515:6
**barr**  3:5
**barring**  213:7
**base**  17:23
247:5
**based**  31:22
50:6 78:22 84:9
85:9 86:1 87:14
92:4 99:12
103:7 105:7
106:12,19

**[based - believe]** Page 14

| | | | |
|---|---|---|---|
| 131:24 132:11 | 416:4 535:6 | 78:13 79:3,9 | 249:23 262:12 |
| 140:6,12,24 | **bathing** 335:2 | 80:3,14,14 | 276:9 279:7,9 |
| 165:19 168:20 | **baylen** 3:7 | 86:16 89:13 | 280:23 281:11 |
| 182:18 187:7 | **bearing** 382:17 | 90:6 91:19,22 | 281:14 282:23 |
| 196:18,18 | 384:5 | 99:20 102:6,7 | 283:1 284:19 |
| 205:4 214:23 | **began** 206:6 | 104:23 105:11 | 291:4 295:19 |
| 218:23 248:7 | **beginning** | 107:11,17,19 | 296:14 298:17 |
| 254:19 271:10 | 95:12 246:11 | 114:11,23 | 300:19 304:11 |
| 272:15 280:12 | 339:5 340:10 | 115:6,7,16 | 310:9 313:22 |
| 310:10 316:15 | 374:11,19 | 119:21 129:13 | 318:13 325:23 |
| 317:12 319:22 | 502:19 | 135:4,5 136:14 | 331:18,24 |
| 326:21 327:14 | **begins** 112:20 | 136:14 137:10 | 332:3 341:4 |
| 327:21,24 | 153:9 167:21 | 137:17 138:8 | 342:24 347:8 |
| 328:13,16,18 | 186:5 256:3 | 138:21 139:4,5 | 354:6 362:5 |
| 328:21,24 | 365:14 379:20 | 139:10 141:13 | 367:14 369:14 |
| 329:3 330:2 | 387:6 408:5 | 141:15 144:20 | 371:21 373:7 |
| 337:12 341:4 | **begun** 185:6 | 145:12,22 | 378:15 380:19 |
| 348:12 367:7 | **behalf** 202:22 | 146:2,7 148:18 | 383:6,14 |
| 389:16 418:14 | **behavior** 450:4 | 148:19 149:8 | 386:10 388:5 |
| 427:20 450:21 | **belief** 176:18 | 149:22 150:16 | 388:24 391:20 |
| 452:16 472:4 | 262:14 263:18 | 155:19,20 | 392:14 393:4 |
| 483:18 493:21 | 289:17 428:24 | 156:1,15 158:4 | 393:22 398:15 |
| 507:7,24 | **believable** | 159:2,19 | 402:21,22 |
| 508:16 512:2 | 234:4 237:6 | 160:11 164:1 | 407:23 410:20 |
| **baseline** 371:6 | **believe** 13:3,7 | 168:24 170:5 | 411:13,13 |
| 504:14 | 14:23 21:19 | 173:1,4 174:19 | 414:5,13 |
| **basic** 304:14,15 | 29:20 31:19 | 175:18 182:14 | 415:11 416:11 |
| 449:2 | 36:4 38:2 43:2 | 192:9 197:11 | 417:11 418:17 |
| **basically** 90:7 | 43:5 47:7 49:23 | 206:21 207:21 | 419:7 432:8 |
| 197:12 241:15 | 49:23 54:13 | 213:4,4 228:16 | 433:1 439:20 |
| 254:4 358:2 | 56:13 59:22,23 | 228:21 232:4 | 446:12 451:14 |
| 436:14 | 60:2 61:10,20 | 232:12 233:4 | 455:1 465:16 |
| **basis** 30:22 | 61:21 62:3 | 233:14,22 | 465:17 467:12 |
| 38:1 64:16 | 63:19 64:19 | 234:2,15 | 471:23 475:23 |
| 244:18 334:14 | 65:4 66:17 | 236:17 237:15 | 476:8 493:24 |
| 408:1 412:4 | 75:20 77:17 | 242:8 249:17 | 494:4 496:7 |

**[believe - board]**                                                                      Page 15

503:19 510:4
510:12 513:19
513:20 516:13
516:18
**believed** 89:19
90:7,14 92:1
93:18 105:2
174:17
**believes** 263:9
263:19
**bell** 68:23
**beneath** 376:18
**benefit** 463:14
**benefits** 434:23
**benign** 23:22
**berge** 238:11
**bernard** 1:13
2:11 5:2,15
12:3,15 16:24
218:3 432:18
538:19
**best** 115:2
332:11 364:24
367:14 518:7
539:11
**better** 80:1
188:6 377:21
402:1
**beyond** 383:18
422:2
**bias** 85:24 86:5
86:11 111:18
127:23 128:4,4
128:10,23
129:5,6,12,19
132:4 160:15

161:3,9,10
165:19 166:6
166:10,13
168:13,19
169:2,9 170:3,6
170:7,16
174:23 175:7
176:9 178:15
179:6,11,13
182:8,11
188:18,19
189:17 229:22
232:18 258:14
281:16 313:24
314:12,13,15
314:17 316:6,9
316:15 319:24
324:21 384:9
385:18 386:6
386:10,11
387:12 406:24
407:1,19,21
408:19 449:14
459:17 502:6
502:21 503:2
505:10
**biased** 383:15
475:8,9
**biases** 85:23
92:3 171:17
229:19 258:11
258:20 320:24
442:8 458:12
458:22 461:21
**biasing** 383:6

**big** 418:6,13
**biggest** 259:24
**binders** 5:10
**bindman** 69:19
519:9 520:13
**biologic** 33:12
87:3 111:19
133:16 134:1
134:10,14,24
135:10 136:8
136:20 137:7
137:13 138:3
138:11 224:19
224:24 225:20
227:5,18 228:8
260:14 349:2
350:6 353:23
357:5 416:14
416:20 422:15
424:13 427:5
428:12 429:6
445:12 458:22
459:15 462:8
464:1 468:1,2
479:1,9 488:3
490:21 532:22
**biological** 33:11
84:12 85:11
108:8 134:19
135:14 137:4
137:17,18,23
138:7 207:17
222:1,2 223:15
228:13 229:18
235:1 255:2
260:15 318:4

357:2 427:16
427:22 524:8
**biologically**
139:13 207:13
225:8,8,12
360:12 419:8
419:11,16
456:14 487:18
**biologist** 426:23
**biopsy** 392:17
**biostatistics**
25:5
**bit** 38:6 89:22
154:7 228:4
291:10 293:8
312:1 321:10
328:10 336:15
340:20 391:12
491:18 518:17
531:9
**black** 134:13
**blocks** 352:10
**blvd** 4:18
**bmc** 190:12,24
191:5
**bmi** 113:14
**board** 7:12
266:20,21,21
266:22 268:7
272:12 273:18
275:22 276:15
276:18,21
277:1,6,16
290:18,19
291:13

**[body - cancer]**                                                 Page 16

**body** 6:7 81:17 187:10 191:18 191:21 211:18 224:16 310:22 329:15 330:9 356:14 357:16 358:6 360:1 432:8 489:9 500:15 511:22

**bondurant** 208:19

**borderline** 10:8 145:8,11,15,21 146:1 334:17 337:5,19,22 430:7,20 506:13,22 507:2 509:12 510:1,10,13

**boston** 16:15 17:10 18:23 19:13 21:16,23 22:15 23:4,9 24:1,19,22 25:23 26:3 53:1 53:7 80:2 189:21 190:1,6 190:12 191:4 211:12,14 394:4

**bottle** 489:24

**bottles** 226:23

**bottom** 48:19 81:7,22 85:18 96:8,12 103:23 104:11 105:9

106:10 124:23 134:3,9 163:6 163:21 172:7 196:3,5 286:19 330:19 334:9 349:3 352:7 357:6 374:8,16 375:13 385:7 385:14 409:16 448:24 449:4,6 449:23 455:22 484:7 521:15

**bound** 312:10 312:11,11,12 314:7,8 348:17

**bounds** 280:16

**box** 134:13 501:7,8,9

**bradford** 230:24 231:19 231:24 232:15 232:23 233:4 234:6 459:13 490:20,20

**brand** 508:23 509:4

**brca1** 156:10

**brca2** 156:11

**break** 44:8 63:11 133:18 139:16 218:9 292:21 349:18 355:14 492:5 492:22 498:10 498:11

**breast** 159:6

**briefly** 363:24

**bring** 15:10,13 16:2 418:12

**bringing** 382:10

**brings** 433:21

**brockovich** 28:17

**broke** 302:1

**brought** 392:21 439:11 499:21

**bu** 190:23

**buchanan** 3:5

**build** 120:12

**building** 361:10

**bursa** 219:15

**bush** 430:13

**business** 16:18 67:23

**c**

**c** 4:17 6:2 10:16 12:1 77:15,18

**caffeine** 147:18

**calculate** 178:22 233:18

**calculating** 133:7 433:16

**calculation** 486:18

**call** 51:9 177:14 179:22 206:17 451:21 473:11 491:22 492:14 492:20 493:1

505:5

**called** 12:4 61:1 62:6 101:6 218:4 234:7 288:7 289:5 430:6 520:15

**calling** 108:21

**calls** 263:13,22 466:20 469:19

**canada** 36:21 37:3,6,9,19 38:9,19 39:13 39:17,21,24 41:14 242:1 243:17 245:9 410:18,22 411:3,8,8,11,14 489:21 490:10 491:10

**canada's** 37:23 38:15,22 39:4

**cancer** 5:19 6:5 6:8,9,12,13,16 6:19,21 7:4,15 7:19,22 8:2,5 8:19,21 9:2,8 9:13 10:6,13,19 10:22 11:2 27:2 27:6,11 28:2 42:4 57:17 63:22 65:20 81:11 82:16 83:7 84:13 85:12 87:4,5 88:16 89:16,21 90:3,9 91:17,24

| | | | |
|---|---|---|---|
| 93:11,13 98:12 | 171:21 174:8 | 278:3,11 | 390:7,17,21,22 |
| 100:15 102:5 | 176:7 181:8,10 | 279:19 280:6 | 391:2,18,22,23 |
| 102:15 104:15 | 183:2,11,20 | 282:5 290:3,13 | 392:5,11,16 |
| 107:9 113:9 | 184:2 186:11 | 290:24 291:15 | 394:5,8,13 |
| 114:5,12,22 | 186:18,24 | 291:21 292:5,7 | 396:4 400:9,22 |
| 115:3,19,20 | 190:12,24 | 292:12 295:4 | 410:9 412:9 |
| 125:7,12 130:6 | 191:5,10 192:5 | 295:23 297:13 | 414:11,18,21 |
| 130:10 131:14 | 192:20 193:1,6 | 299:17 300:3 | 415:3,19 |
| 132:6 134:11 | 193:12 203:17 | 302:7 304:18 | 416:10 418:19 |
| 134:12 135:1 | 207:1 209:5 | 304:19,20,21 | 419:12 422:10 |
| 136:9,21 137:8 | 210:8 211:4 | 304:24 305:6 | 422:21,22 |
| 138:12,22 | 212:4,15,18 | 305:12,16 | 424:15 425:2 |
| 139:3,6,9 140:3 | 215:13 221:1 | 306:1,7,16,22 | 428:4,13 431:7 |
| 140:5,7,9,22,24 | 221:18 222:5,9 | 307:2 308:12 | 432:18 433:11 |
| 141:16 142:9 | 222:15,19,22 | 310:13,20 | 434:21 438:8 |
| 142:14 143:6,9 | 223:8,9,16,17 | 311:4,9 320:5 | 438:12 441:16 |
| 143:16,21 | 224:10,20 | 321:22,24 | 442:17 445:14 |
| 144:1,10 145:7 | 225:1,3,9,21 | 323:11,17,24 | 447:12 453:10 |
| 145:20 146:14 | 227:19 229:13 | 324:10,13,23 | 454:13,22 |
| 146:16,22 | 230:6,20 | 325:1,2,19 | 460:17,21 |
| 147:1,3,6,9,12 | 234:16 237:10 | 326:1 327:11 | 461:8 462:22 |
| 148:1 149:7,10 | 237:14 238:1 | 328:17,20 | 465:23 475:16 |
| 149:12,20 | 242:5 243:5,18 | 329:18 331:21 | 479:22 480:8 |
| 150:20 151:3,8 | 244:2 245:14 | 334:7 335:24 | 480:19,22 |
| 151:12 152:6 | 245:19 246:2 | 337:1 338:12 | 481:9 486:15 |
| 153:14 155:7 | 246:20 250:8 | 342:18 343:1,2 | 486:17,22,24 |
| 155:11 156:5 | 250:15 251:8 | 343:4,9,13 | 486:24 487:3 |
| 156:10,11,14 | 256:7 258:13 | 350:7 353:24 | 487:19 488:5 |
| 156:17,24 | 258:16 259:11 | 357:24 360:9 | 488:13 489:10 |
| 157:3,7,14,18 | 260:16 261:8 | 360:14,16 | 489:13 490:1 |
| 158:3,8,12,15 | 263:9,21 | 369:12,22 | 500:12 502:3,5 |
| 158:17,21 | 265:15,19 | 375:7,18 | 503:10,16,24 |
| 159:1,4,4,7,7 | 266:3 267:16 | 378:24 380:14 | 504:1,5,11,16 |
| 159:10,17 | 268:3,5 269:5 | 381:7 382:3 | 505:3,8,13 |
| 160:4 163:12 | 269:10 271:8 | 383:17 384:1 | 507:6 510:15 |
| 167:24 170:1 | 277:7,13,18,24 | 384:18 387:12 | 510:16 511:17 |

[cancer - cases]                                                    Page 18

517:3 526:2
529:14 531:14
531:15 535:21
536:2
**cancers**   7:8
141:18 148:12
155:23 156:2,6
158:6 159:11
227:15 271:12
272:17 325:10
328:8 389:13
483:23 487:4
487:12
**capabilities**
333:15
**capable**   224:10
265:18
**capacity**   35:7
58:10,13,23
65:2,24 68:1
70:3 73:12,19
87:20
**captioned**
538:6
**capture**   129:1
**carcinogen**
99:15 106:22
424:6 478:11
**carcinogenesis**
135:24 357:11
**carcinogenic**
88:18 137:24
138:1 163:11
227:10 360:21
390:15

**care**   304:23
**career**   230:2
427:4
**careful**   250:20
250:24
**carefully**
198:21
**carmen**   8:22
61:17 62:4
373:24 473:23
**carr**   6:2 10:16
94:3,16,19 97:1
97:4,5,22 98:2
435:17 437:11
438:4 452:4,10
513:10,17
514:7
**carries**   252:14
**carry**   311:21
**carrying**   96:9
278:12 365:5
375:12 399:2
**carryover**
188:13
**carter**   61:20
62:4 208:20
**case**   6:24 8:10
10:7 16:6,12
19:19 20:13
22:11,23 23:5
26:11 28:1
34:20 43:9,12
43:18 55:8 56:8
58:5 60:16 61:3
62:6,13,16
63:20 66:23

68:1 69:2 70:15
75:8 76:14
100:14 120:11
120:19 128:5
140:21,23
149:22 153:24
155:21 160:10
160:14,19,24
168:13 169:24
170:13 171:22
172:23 182:7
182:10 187:16
188:14 191:15
192:2 193:16
202:4 203:16
207:20 210:11
210:21 211:2
211:15 215:4,7
216:1 217:5
218:12 219:19
222:7 228:22
229:11 236:2
237:9 238:14
238:22 239:4
240:2,19
244:23 259:3
268:6 269:9
279:13,15
281:11 289:23
291:17 298:9
311:15 319:18
321:6 326:4,7
327:20 329:8
332:24 338:11
342:4 358:7
360:15 367:3

368:5 370:9
381:17 386:20
386:22 388:16
392:20,24
393:3,12,14,18
394:2 395:11
399:8 402:13
403:21 404:5
407:2 415:18
418:5 430:7
431:7 449:14
454:22 458:5
470:4 475:8
476:3,4 502:1
503:1 506:12
513:20 516:9
520:15
**cases**   8:6 27:5
27:10 28:1 42:3
58:9,13,23
68:15 70:8,23
71:3 90:16
120:12,15,17
141:1 144:6
169:21 172:14
173:10 174:6
201:13 208:13
210:6 306:4
328:18 338:16
356:11 380:13
381:18 384:17
391:2,16
402:16 504:3
511:8,17,18
512:3,9

| categories | 135:1 138:11 | 535:21 536:2 | 152:15 157:16 |
|---|---|---|---|
| 23:20 314:10 | 139:6,6 147:9 | **causing** 224:10 | 166:11 174:17 |
| **category** 286:7 | 155:22 156:2,5 | 224:20 225:1 | 176:23 189:12 |
| 299:13 314:15 | 156:11,13,16 | 445:13 487:18 | 189:16 207:23 |
| **causal** 90:21,23 | 156:19,24 | 488:5,12 | 207:23 220:12 |
| 91:1 109:1 | 157:3,7,11 | **caveat** 178:6 | 222:17 224:15 |
| 111:8 112:21 | 174:7 192:24 | **cavity** 264:4 | 234:23 235:3 |
| 112:22 131:12 | 193:6,12 | **cdc** 395:13,16 | 310:23 314:14 |
| 132:2 151:2,21 | 206:24 208:1 | 396:23 | 314:14 316:11 |
| 153:2 174:20 | 210:7 215:13 | **cell** 33:19 | 318:9 320:23 |
| 222:16 231:3 | 222:8,15,21 | 141:11,21 | 343:12 467:6 |
| 231:14,21 | 223:7,9 225:3,9 | 143:24 145:1 | 476:6 496:12 |
| 232:7,9,10 | 225:12 227:10 | 156:19 220:16 | 522:14 |
| 233:6,6 251:7 | 229:12 360:16 | 220:19 308:5 | **certainty** |
| 256:5 316:22 | 400:9 414:11 | 427:20 | 187:23 405:20 |
| 318:11,24 | 414:20 418:18 | **cells** 220:20,21 | 406:15 408:16 |
| 319:1,10,12,13 | 419:9 424:14 | 478:8 | 408:18,21 |
| 329:17 331:20 | 478:8 480:7 | **cellular** 419:10 | 409:3,24 |
| 331:20,22 | 488:12 489:10 | 426:23 | 410:10 418:18 |
| 339:11 340:11 | 489:13,24 | **censured** | **certificate** |
| 457:24 458:4 | 503:10 510:15 | 455:21,22 | 539:1 |
| 458:20 511:1 | **caused** 6:21 | **center** 190:12 | **certified** 2:21 |
| 532:22 | 159:17 211:3 | 190:24 191:5 | **certify** 539:5,7 |
| **causality** 341:4 | 306:6,16,21 | **certain** 11:12 | 539:12 |
| **causation** 140:1 | 307:2 389:13 | 21:20 50:9 59:4 | **cervical** 10:5 |
| 148:11 150:2,4 | 390:8 487:4 | 147:5 161:2 | 146:16 422:9 |
| 150:11 207:19 | **causes** 28:23 | 196:7 220:12 | 422:21,22 |
| 208:3,10 229:8 | 29:2,23 31:17 | 223:21 224:5 | 500:12 501:23 |
| 233:23 311:17 | 113:2 136:9,21 | 224:16 227:15 | 501:23 502:3,5 |
| 312:19 316:19 | 137:7 140:17 | 236:4 244:13 | **cfr** 11:9 |
| 332:7 366:22 | 141:11,21 | 244:13,14 | **chain** 419:11 |
| **cause** 31:20 | 142:8 146:14 | 390:13 483:18 | **chaired** 25:20 |
| 63:22 81:11 | 146:21 147:1 | 485:12 | **chakalos** 61:3 |
| 82:4 83:6 89:16 | 148:14 156:6 | **certainly** 43:24 | 62:6,16 381:17 |
| 90:2 91:16,24 | 480:19,21 | 46:20 80:15 | **chakalos's** 62:8 |
| 134:11,12 | 481:9 510:9 | 92:5 135:16 | 63:22 65:2 |

chance 109:15
126:22 303:11
303:14 313:19
313:24 314:12
314:14,20
315:9,14,17
356:2
change 50:8
108:14 208:4
419:1 491:23
492:14 537:3,5
537:7,9,11,13
537:15,17,19
537:21,23
changed 49:12
108:12 213:16
437:7 452:14
453:5,14
changes 42:24
419:10 538:9
538:12
characteristics
511:21
characterizati...
97:12 231:9
261:9 442:7
471:10
characterize
101:14 106:1
232:24 280:20
333:14 401:14
characterized
101:6 102:22
103:3 474:11
charge 17:18
18:11 71:15

charging 17:14
49:3 60:7
chart 450:11
check 22:19
23:1
checking
354:13
checklist
112:21 159:20
231:14 232:6,9
233:2
chemical 35:2,7
139:1
chemicals
411:3
cherry 274:15
274:16 281:14
childhood
130:18
chobanian
190:6
chose 122:14
234:19 281:20
300:1 518:22
527:4
chosen 263:10
chris 110:1
118:22 124:2
202:11 274:5
346:6 358:13
359:3 376:14
377:13 418:3
499:7
christopher 3:6
chronic 478:8
483:23 487:12

chrysotile
11:11 483:17
483:24 487:5
cigarette
138:21 151:11
cigarettes
139:1,6 149:9
151:7
circle 44:12
citation 200:15
280:4,7,24
281:10 283:4
284:10 399:11
425:5 531:19
citations 386:5
397:5
cite 99:18 104:5
104:6 117:9
118:2 119:21
121:24 162:1
166:15 192:22
194:3,7,9
197:16 198:11
220:7 227:17
228:6 229:9
242:23 280:21
280:21 283:7
284:7 289:4
301:2 303:5
321:4,13
325:16 340:24
340:24 349:6
349:18 357:15
358:7 359:24
391:17 392:3,9
399:3 500:14

531:12
cited 40:18,21
41:2,9 134:17
155:18 173:1
194:16 200:10
220:2 253:20
254:5,15
258:24 273:21
273:24 279:24
280:3 282:15
282:21 283:3
333:2,2 354:15
397:22 398:19
399:4
cites 425:6
citing 136:5
148:6 282:24
288:15 478:17
citizen 7:5
244:6 248:24
249:22 250:1,6
251:12 256:15
261:18,21,24
262:9 533:5
citizens 243:13
525:10,11
534:4
city 4:19
claim 37:22
210:3
claiming 65:20
136:7
claims 27:6,11
28:22
clarification
167:9

**[clarified - come]**

**clarified** 78:8
520:6
**clarify** 30:9
228:1 239:1
322:16 363:21
**clarke** 69:11
**class** 19:15
24:13,15
309:20
**classes** 24:18
**classified** 74:1
405:20 406:16
408:16
**classify** 440:14
**clean** 199:13
497:15,20
**clear** 27:13
76:7 87:4
134:10,24
136:8,17,20
137:7,13,17
138:3,11,23
139:11 141:11
141:21 143:24
144:23 145:1
156:19 239:5
315:5 330:22
334:13 353:22
369:20 386:11
436:20 440:9
494:7 495:5
**clearly** 357:1
358:24 359:1
**cleavage**
206:10

**clinical** 146:10
409:10
**clinically**
102:19 103:13
378:18
**clinician**
146:11 305:7
307:3
**clip** 93:3 483:3
**close** 80:5
259:12,16
322:9
**closed** 413:20
**closely** 356:3
**closer** 316:8
**closure** 347:12
462:6
**clues** 95:22
**coaching** 119:4
**coalition** 7:4
**coauthored**
75:19,21 80:7
107:19
**coauthors**
382:18 384:11
385:16 502:23
**codirected** 25:4
**coffee** 147:18
**cogent** 260:14
**cohort** 112:3
117:23 128:3,9
128:17 160:16
160:20 161:1
169:24 170:13
175:14 176:6
176:17 177:1

188:15 237:14
261:6 279:16
281:13,15
282:7 289:24
291:17 323:12
323:15 324:2,6
324:7,10
325:14,18
331:1,15
339:13 367:3,8
367:13,14
388:8 402:13
403:21 407:4
475:7,22
**cohorts** 237:20
369:9 387:14
**collaboration**
380:6,8
**collaborative**
77:22 382:24
**collaboratively**
48:9 75:24
**collated** 20:21
**colleague** 18:5
71:6 80:5
**colleagues** 18:2
49:20,21 50:8
51:3,5,23 52:1
52:14 55:2
68:13 180:10
189:21,24
234:20 311:10
383:2 387:23
422:7 428:2
476:19 528:4

**collect** 509:6
**collected** 172:1
176:21 344:16
504:18
**collection** 236:8
236:9
**collectively**
59:24
**columbia** 2:23
539:2,5,22
**column** 96:9,10
163:7,10,20
184:17 336:22
343:19 344:4
371:4 374:9,13
374:14 385:15
484:5
**combination**
47:22 434:11
509:15,19
519:5
**combine** 78:18
402:16
**combined**
115:1 131:24
326:23 517:11
521:9
**combining**
402:17 403:22
403:24
**come** 17:24
33:5 49:1 52:20
89:14 90:3,23
118:22 148:2
202:10 206:13
215:15,19

**[come - concluded]**                                                                                    Page 22

234:1 254:14
310:4 342:21
346:6 358:16
360:11 376:2
395:1 427:14
474:4 475:5
479:20 526:15
531:20 534:10
**comes**   125:22
362:13 496:10
**comfortable**
132:24 385:1
**coming**   52:19
220:4
**comment**   9:1
133:12 214:12
245:5 258:23
259:1 282:14
330:12 341:24
347:6 358:7
378:7 379:2,14
396:7 425:14
532:11
**commentaries**
236:4
**commentary**
362:16 378:5
379:4,5
**commented**
227:18 258:20
355:15 371:22
514:7
**comments**
129:14 251:2
**commercially**
207:8

**commission**
539:24
**committee**   25:2
36:2,13 243:14
267:3,6 525:8
533:5 534:4
**committee's**
254:6
**committees**
24:24 25:8,11
70:2 265:11
266:18
**common**   207:6
504:11,13
**commonest**
207:7
**communicate**
79:11 444:10
444:11
**communicated**
35:21 37:2 48:6
191:13
**communicating**
216:1 364:21
**communication**
66:8
**communicati...**
64:15
**community**
268:11 329:12
364:2 428:3
435:6
**company**   34:23
35:2,7
**company's**
35:10

**comparable**
303:1 368:7
476:7
**compare**   33:21
127:8 241:11
413:9
**compared**
168:1 391:23
457:7
**comparing**
144:24 185:11
233:11 371:13
375:3
**compelled**
133:1
**compensated**
75:1
**competing**
33:21 34:3
159:23,24
**compilation**
324:5
**complete**   22:9
72:20 122:18
448:5
**completed**
72:18 73:10
218:14
**completely**
182:15 299:9
387:22 453:16
476:18 525:4
**complex**   366:11
463:14
**component**
139:1 261:12

348:21 408:7
**components**
200:19 232:14
232:15 314:16
320:23
**comprehensive**
203:21 218:14
218:23 219:6
220:15,23
240:7 254:23
271:9 272:14
360:7 448:5
494:1 503:8
**conceivable**
130:12
**concern**   95:21
96:19 97:7
178:15 179:6
226:1 289:13
289:16 316:8
442:1,12 443:9
502:9
**concerned**
197:13 331:13
394:24 494:9
**concerning**
499:22 503:22
**concerns**   332:4
363:13 439:17
468:2
**conclude**   166:4
177:21 182:24
183:21,24
**concluded**
101:5 185:3
208:4 306:14

[concluded - considered]                                                          Page 23

410:8 455:10
480:7 536:17
**concluding**
78:13
**conclusion**  99:4
99:7,18 105:7
105:19,20,24
105:24 106:2,8
106:16 107:1
128:17 134:22
139:24 142:4
254:14 329:19
336:6 360:11
375:4 399:23
400:4 473:12
485:24
**conclusions**
41:4 116:2
206:20 220:13
311:17 335:18
366:9 384:6
478:24 517:20
**conclusive**
251:6
**conclusively**
246:21
**condition**  25:18
**conditions**
11:12 95:23
483:18
**condoms**  415:3
415:10,21
**conducted**
168:14 205:14
502:16

**conducting**
317:12
**conference**
36:3 91:8,11
93:8,15 96:2
97:18 129:14
192:12 435:17
436:12 437:6
451:15,19
**confidence**
102:11 164:4,6
164:19 167:24
168:8,11 181:9
184:12 186:14
188:2,5 233:20
259:11,15
260:5 280:16
290:15 297:15
302:15,23
303:7,10,13,15
304:6 312:10
312:10,11,12
313:6 314:3,7,8
317:24 327:15
327:22 328:2
330:6 335:4
347:21,22
348:15 364:10
364:11 367:23
372:21,22
373:3 374:24
375:2 388:4
401:10 403:12
410:1 457:17
495:16,24
504:4

**confirm**  256:5
**confirms**  375:4
496:12
**conflict**  196:2
212:9 380:23
383:5,13
384:14 528:15
528:19 529:12
**conflicting**
441:23 442:10
**confounder**
113:17,20,23
114:4,7,9,17
130:14,20
**confounders**
113:11 114:20
130:7 316:4,7
442:8 448:2
**confounding**
85:24 111:19
112:5,8,10,11
112:13 113:6,8
113:14 129:23
229:21 233:16
258:14 314:12
314:13,14
315:21 316:9
316:17 319:24
328:7 461:9
**confuses**
315:23
**confusing**
294:4 403:17
**confusion**
294:23

**conjunction**
318:10
**connecticut**
18:19
**connection**
16:6 17:4 19:2
20:12 30:15
46:2 89:7
219:18 221:13
427:6 477:19
528:20 529:7
**consciously**
298:19,22
**consecutive**
518:2
**consensus**
79:22 361:10
362:19
**consider**  23:12
40:14 122:17
197:3,6,7,10
308:8,10,13,14
335:13,15
375:20 503:15
**considerably**
408:9
**consideration**
113:12 197:11
229:19 251:1
256:13 434:5
**considerations**
99:12 106:12
106:19 490:20
**considered**
77:14,18 103:9
113:22 193:22

**[considered - continues]** Page 24

213:24 215:6
229:7 233:9,16
258:12 313:14
407:10 418:15
418:15 472:17
490:17 500:24
501:4 509:7
**considering**
115:17 166:12
316:6 321:12
321:17 388:7
455:11 462:5
**consistency**
84:8 85:6,21
143:23 229:17
235:2 318:8
367:3,6 388:15
443:16 458:21
459:15 461:13
**consistent** 87:8
102:11 125:15
132:2 142:17
143:8,15,20
144:9 155:9
259:4 302:13
336:2 339:12
348:19,20
400:5 403:20
423:6 461:7
521:10
**consistently**
102:7 144:22
169:3 226:17
**consisting**
253:19

**consortium**
6:14 265:8
280:6
**constant**
131:12
**consult** 29:17
34:23 71:11
**consultant**
29:17 35:2
58:23 59:20
64:20 68:1
73:20 380:13
381:6,10,12
382:9,15
383:19 384:1
384:16 455:2
465:4,12,22
529:13
**consultation**
28:3,8,21,22
29:6,13 30:3,6
30:10,16 31:6
32:11 60:8
65:17 528:20
529:6,20
**consulted** 22:2
27:4,9,22 306:5
381:24
**consulting**
16:18 21:17
26:24 41:24
42:1 65:2,23
66:5 381:16,21
383:3 465:3
**consumer** 4:15
5:23 6:1 10:15

35:6
**contact** 66:21
67:13 72:1 97:2
97:5
**contacted**
36:17 38:24
40:2 43:17
44:10 45:1,5,6
56:7,8,10 58:4
58:8,12,20,22
59:20 67:21
89:16 90:4 95:2
191:24 219:23
237:20 252:9
269:2,7 329:8
396:20 428:16
464:13 511:18
**contacting**
57:24
**contain** 205:3,4
481:13 485:11
507:19
**contained**
15:17 98:2
108:4 226:24
507:10,15
**containing**
246:18 480:7
480:21 485:10
487:17 511:22
**contains** 197:18
198:13 314:3
424:5
**contaminant**
222:18

**contaminated**
225:4 478:11
**contamination**
183:16 201:17
206:7 207:16
207:18 223:14
226:1 227:3
354:10 429:4
431:21 464:4
482:3,8
**contend** 277:5
277:15,22
278:2,24
279:20
**content** 215:19
**contention**
262:18 263:8
268:2 280:8
290:21 291:12
291:24 356:12
**contested**
234:20,22
**context** 32:11
95:1 232:16
274:16 275:18
337:24 402:9
405:6 458:11
**continue**
120:20,21
214:21 367:19
418:17
**continued**
120:12 218:4,7
**continues**
120:22 347:23

| | | | |
|---|---|---|---|
| **continuous** 516:8 | 402:13,16 403:21 404:5 | **coordinating** 513:4 | 37:1,4,16,17 38:16 39:22,23 |
| **contraceptive** 456:4 | 407:2 430:7 442:7 449:14 | **copied** 362:1 497:6 | 43:7 44:21 48:5 52:21 53:8,20 |
| **contract** 411:4 411:4 | 475:8 476:3,4 483:15 502:1 | **copies** 20:14 351:18,23 | 53:24 54:3,9,10 57:22,23 62:13 |
| **contrary** 299:3 | 503:1 506:12 | 420:3,7,10 | 62:14 68:4,10 |
| **contrast** 168:8 | 516:9 | **copy** 42:7 72:24 | 68:22 74:7,8 |
| **contribute** 258:13 422:21 | **controlled** 408:8 | 74:11,15 76:12 162:20 343:21 | 75:2,3,5 81:1 82:2,7,16,20 |
| **contributed** 305:24 | **controlling** 115:18 319:18 | 351:8,13 421:3 421:3,8,15,19 | 83:7,21 85:14 86:3,10,15 88:5 |
| **contribution** 236:22 388:10 388:14 | 321:21 **controls** 8:6 120:12,15,18 | 421:22 425:21 425:24 437:10 474:22 475:1 | 91:5,17,20 93:21 94:15 99:19 100:17 |
| **control** 10:7 11:13 100:14 | 172:14 173:11 328:4 338:17 | 483:2 496:23 497:2,12,20 | 101:20 103:5,6 103:9 104:2,3 |
| 115:2 120:11 120:19 128:5 | 351:1 352:21 354:22 355:18 | 498:7 499:10 516:22 | 104:10,17,18 104:23 106:23 |
| 140:21,23 160:14,19,24 | 356:5,24 391:16 511:8 | **cordial** 70:4 **corn** 81:14 | 109:5 111:13 111:20,23,24 |
| 168:13 169:22 169:24 170:13 | 511:17,19 512:4,9 | 506:21 507:20 507:21,22 | 112:5 113:15 113:21 114:5,6 |
| 171:22 172:23 182:10 188:14 | **convened** 435:22 | 508:14,17,17 **corner** 95:10 | 114:10 115:5 115:15 116:12 |
| 237:9 259:3 279:15 289:23 | **convenient** 364:20 | 124:22 125:10 285:11,22 | 117:11 118:4 118:16 120:6 |
| 291:17 319:3 326:4,7 328:4 | **conventions** 364:20 | 352:7 **correct** 17:16 | 121:16 122:3 122:10,24 |
| 328:12,13 338:11 342:4 | **converse** 208:20 | 17:17 19:13 20:17 22:12 | 125:20 135:1 136:9,21 |
| 350:16 352:9 352:16 356:11 | **conversely** 385:17 | 26:6,9 28:10,11 28:15,18,19,24 | 149:13,21 153:2 162:2 |
| 367:3 368:5 370:9 386:22 | **convey** 436:16 **conveyed** | 29:2 34:21 35:14,15 36:18 | 163:14 164:8 165:1,12,17,20 |
| 388:16 399:8 | 366:12 | 36:21,22,24 | 166:6,16 |

**[correct - correct]**                                                    Page 26

| | | | |
|---|---|---|---|
| 169:18 172:4,5 | 290:13 295:4,8 | 361:5,14,15 | 460:10 461:13 |
| 172:16 173:13 | 295:24 297:16 | 368:14,15,23 | 461:22 462:14 |
| 173:15,17,23 | 297:17 298:16 | 369:13 370:1 | 462:23 463:6 |
| 174:2,11,13 | 299:19 300:3,7 | 370:16,23 | 464:7,17 465:5 |
| 175:15 176:15 | 302:11 303:6 | 371:15 372:6 | 465:9,13 |
| 178:12,15 | 303:12,23 | 379:15,21,22 | 469:17 471:21 |
| 179:7,24 | 304:19,24 | 380:15 381:9 | 472:10,11 |
| 180:10 181:12 | 305:3,4,6,9,10 | 382:3 383:7,15 | 473:3 476:12 |
| 182:12,13 | 305:13,17,18 | 385:9,21 386:2 | 477:16,20,21 |
| 183:2 184:5 | 306:1,7,17,22 | 388:19,23 | 478:12,16 |
| 185:3,13 187:1 | 307:2,5,6 308:6 | 389:10 396:23 | 479:3,6 481:13 |
| 188:20 192:16 | 308:17,18,19 | 397:2 399:14 | 481:24 482:1 |
| 192:17 195:4 | 308:20,22,23 | 402:18,18 | 486:23 490:1 |
| 197:20 198:14 | 309:1 313:15 | 404:1,3 405:16 | 490:22 494:10 |
| 204:9 205:15 | 313:16,19 | 405:22 409:19 | 494:11,14 |
| 205:24 211:12 | 314:5 315:24 | 410:10 411:22 | 497:5 500:15 |
| 211:13,15 | 316:4,10,19,20 | 411:24 415:3 | 504:19,20,23 |
| 212:1 213:1,13 | 316:22,23 | 416:6 425:7,8 | 506:23 507:3 |
| 213:24 220:21 | 322:7,21 | 425:15 429:4,7 | 507:11,12 |
| 220:22 230:21 | 324:13,16 | 429:18 430:4,9 | 508:24 509:1,4 |
| 231:14 233:14 | 326:6,21 327:1 | 430:11,12,22 | 509:13,14,23 |
| 234:8,9,12 | 327:11 328:1 | 431:4,5,12 | 510:2,5,8 511:3 |
| 235:9 242:1 | 328:13 330:10 | 432:4,8 434:15 | 511:11,12,23 |
| 244:8 247:4 | 332:24 333:9 | 434:16 435:2,8 | 511:24 512:13 |
| 248:11 250:8 | 333:10,11,12 | 435:19,23 | 512:14,23 |
| 255:4 261:9,10 | 334:18,19 | 442:18 444:7 | 514:11 515:1,6 |
| 264:17,21,24 | 335:9 338:2 | 444:11,20 | 517:4,9,10,13 |
| 265:11,15,16 | 342:4 343:7 | 445:7,14 446:4 | 517:21 518:20 |
| 266:19 268:14 | 344:10 346:18 | 446:16 448:7 | 521:11,12,13 |
| 268:15 269:20 | 346:21 347:2,3 | 449:1,17 450:5 | 522:10,24 |
| 272:8 278:21 | 347:18 349:8 | 450:22 451:5 | 523:23,24 |
| 280:23 283:21 | 349:20,21 | 451:11 452:5 | 524:4 525:1 |
| 284:12,15,18 | 350:7 351:1,2 | 453:20 455:12 | 529:22 530:8 |
| 285:8,13 286:9 | 352:17,22 | 455:16 456:18 | 530:19 531:8 |
| 286:10 288:19 | 353:8,10 | 458:5 459:9,17 | 531:15 532:7 |
| 289:2,6 290:4,8 | 357:18 358:8 | 459:18,24 | 532:13,14 |

533:22
**correcting**
276:10
**corrections**
538:9
**correctly** 96:21
96:22 99:16
132:8 136:3
143:11 160:19
160:20 178:2
246:24 251:10
256:10 258:17
258:18 274:1
275:6,19 319:6
337:6 364:3
375:9,11,23,24
381:8 407:7,15
410:5 435:12
**correlative**
8:11 352:9
**cosmetic** 6:23
34:23 35:1,11
35:22 36:14
250:16 466:15
533:11
**cosponsored**
91:5
**cost** 19:17
**cote** 69:15
**counsel** 38:24
40:3 74:6 75:8
75:15 89:17
90:4 95:2
105:20 106:5
180:22 193:17
219:24 237:21

237:21 252:9
269:3,8,14,16
329:8 360:5
417:14 418:24
425:6 428:1
429:14 433:22
435:4 440:12
447:9 457:22
460:16 461:21
463:23 464:24
466:14 467:7
469:10 470:16
478:23 489:8
500:20 513:13
513:16 515:10
515:16 516:11
524:11 531:2
539:13,15
**counselors**
266:21,22
**counterfactual**
154:12
**country** 223:22
265:18 441:6
441:11 442:17
**couple** 47:14
245:13 285:15
317:6,15
406:21 487:14
**course** 30:2,5
130:5 310:1
418:11 427:3
**courses** 26:2
**court** 1:1
275:12 482:11
520:15 527:8

539:4
**covariate** 371:8
503:14,20
**covariates**
447:21
**cover** 14:10
43:16 76:18
**coverage** 168:5
**covid** 66:10,17
**cramer** 5:19
10:23 68:4 71:1
71:5 117:11
120:3,10
121:15 123:3
158:13 180:10
180:24 322:7
322:11,21
428:23 454:13
454:17 455:2
522:14
**cramer's** 118:8
121:5 385:23
**create** 148:9
**created** 164:14
516:7
**credibility** 87:3
458:23
**criteria** 229:6
230:24 231:3,5
231:9,20,20,24
232:2,23 233:5
233:22 234:7
245:2,5 254:2
310:11 317:3
458:20

**critical** 9:10
398:17,18,18
399:4,9 408:6
**crr** 1:23 539:21
**ctisi** 3:10
**cumulative**
120:5 122:13
400:23 517:12
**current** 16:14
23:15 43:1
47:15,19 57:7
171:21 270:3
329:15 330:8
339:15 340:22
**currently** 23:21
23:22,24 24:4,5
24:12 25:1 27:3
37:11 42:1 43:6
400:7
**curriculum**
5:12 42:19
77:12,12,13
**curtail** 453:15
**curves** 133:8,11
**customary**
95:23
**cut** 153:22
154:3 187:7
312:7 526:18
527:21
**cv** 25:20 42:8
76:22,24 77:2,2
264:19 311:2,5
311:11 342:19
**cysts** 137:21
358:2 456:10

[d - del]

Page 28

| d | | | |
|---|---|---|---|
| **d** 12:1 | 317:21 319:2 | 166:16,22 | **declared** 253:5 |
| **d'aloisio** 421:1 | 319:16 323:1,2 | 167:10 169:16 | **decrease** |
| **daily** 129:17 | 329:20 334:19 | **day** 151:7 | 189:18 |
| 188:23 189:12 | 337:12 342:4 | 412:11 416:13 | **decreased** |
| 287:1 386:17 | 344:15,16 | 461:22 505:24 | 390:2 |
| 408:1 416:4 | 347:16 366:10 | 532:9 538:15 | **deem** 312:13 |
| 435:1 | 366:10,15 | **days** 535:14 | **deemed** 406:23 |
| **dairy** 147:19 | 370:15,21 | **dc** 2:17 3:17 | **defendant** |
| **dana** 343:1,13 | 387:16 397:22 | 52:18,20,20 | 204:2 |
| 394:7 | 398:16 399:5 | 53:8 | **defendants** |
| **daniel** 68:4 | 400:8 401:15 | **dealing** 433:9 | 4:14 214:13 |
| 180:10 | 416:5,8 431:16 | **dealings** 38:18 | 491:12 |
| **data** 9:4 35:10 | 486:14 496:1 | **death** 173:4 | **defending** |
| 39:7 87:21,24 | 504:17 509:5 | **decade** 201:18 | 382:11 |
| 116:12,14 | 519:6 521:8,9 | **decades** 129:18 | **defense** 55:7 |
| 120:14 121:7 | 521:16,17,23 | 130:17 150:6 | 201:20 |
| 123:7 132:11 | 522:9 | 152:10,14,18 | **define** 27:19 |
| 153:11 163:13 | **date** 43:4,21 | 152:19,22 | 153:16 154:3 |
| 171:21 172:1 | 55:16 56:22 | 188:24 226:13 | 186:12 |
| 176:4,5,14 | 74:17,21,23 | 407:24 464:16 | **defined** 517:5 |
| 233:3 236:8,8 | 99:13 106:20 | **december** 7:2 | **defining** 187:16 |
| 236:12 237:5 | 158:22 164:14 | 11:8 477:15 | **definitely** 85:15 |
| 251:6 262:10 | 165:4 170:2,15 | **decide** 359:16 | 415:5 |
| 265:5 268:13 | 185:5 216:7 | **decided** 176:1 | **definition** |
| 279:16 284:15 | 443:4 446:7 | **deciding** 447:20 | 113:5 187:17 |
| 284:17,18 | 539:10 | **decision** 146:10 | 187:19 364:13 |
| 285:12,16 | **dated** 42:9 | 236:23 254:13 | **definitive** 211:7 |
| 286:2,4,9,12,14 | 44:15 49:16 | 254:19 298:19 | **definitively** |
| 286:23 287:3,4 | 74:9,11,13 | 298:23 341:3 | 211:7 332:7 |
| 287:6,8 289:24 | 332:15 482:23 | 463:14 520:11 | **degree** 378:14 |
| 291:18 296:10 | **dates** 44:24 | **decisions** | 400:24 402:6 |
| 297:15 298:23 | 72:15 | 265:22 378:19 | 403:8 404:13 |
| 299:3,15,18,24 | **daughter** 307:6 | **declaration** | 418:17 |
| 308:11 310:5,6 | 307:8,14 | 196:2 538:1 | **del** 8:22 373:24 |
| | **davis** 6:14 | **declare** 519:20 | 473:23 |
| | 122:1,4,11 | 538:4 | |

**[deleterious - diagnosing]**                                          Page 29

**deleterious**
  347:10
**delivery** 223:8
**demonstrable**
  375:5
**demonstrate**
  87:7 125:14
  259:4
**demonstrated**
  246:21 461:3,6
**denial** 7:5
  244:6
**denise** 1:23
  2:20 14:3
  526:16 539:3
  539:21
**denying** 251:5
**deodorization**
  431:22
**deodorizing**
  430:21 431:19
  507:5,6,10,11
  507:14,18,19
  507:23 508:12
  508:16 509:15
  509:16,18
**department**
  25:21
**dependent**
  446:1 516:6
**depending**
  266:8
**depends** 160:22
  161:4 184:21
  186:12 188:4
  268:7 512:4

**depletion** 325:3
  505:6
**depo** 54:1
**deponents** 13:1
**deposed** 14:24
**deposited** 478:7
**deposition** 1:12
  2:11 5:8 10:1
  12:16,19,22
  14:16 15:11
  16:3 42:9 43:9
  51:16,17 52:1,5
  52:12 53:22
  54:5,13,15,18
  54:23 235:8
  471:6,11
  477:20 530:15
  536:17 538:6
  538:10
**depositions**
  41:10 274:10
**deposits** 485:9
**derive** 116:14
**derived** 405:15
  408:14 486:24
**describe** 42:21
  310:3 409:17
  409:23 458:4
**described**
  106:13 286:3
  320:8,22 338:1
  423:7
**describes** 109:4
  285:11,12
  422:14,15

**describing**
  252:17
**description** 5:9
  10:2 322:23
  486:6 487:9
**design** 258:11
  408:6 449:3
**designate** 15:20
**designated** 22:3
  26:12 43:12
  62:12 64:13
  69:2 88:17
  201:24 210:21
  454:7
**designation**
  5:13 60:24 61:2
  61:8 76:10
**designed**
  128:18 140:20
  141:3 144:3
  161:6 178:7
  179:2 182:16
**despite** 84:8
  85:6,21 231:2
  324:6 387:13
  409:2
**detail** 529:1
**detailed** 439:13
**details** 309:10
**detection**
  241:14
**determinant**
  229:7
**determination**
  392:18

**determine**
  207:12 251:18
  253:21 254:6
  254:18 273:19
  315:14,16
  316:14 364:11
  448:11
**determined**
  233:24 244:16
  246:1 332:7
**determining**
  159:15 310:9
  310:11 312:16
  364:8,8
**develop** 30:2,11
  30:14 32:22
  33:2 310:4
**developed** 30:5
  30:24 31:1,4,6
  32:6,10 375:17
  390:22 505:3
**developing**
  149:12 153:13
**development**
  305:24 505:8
**device** 35:6
**devote** 24:10
**devoted** 25:12
**dhhs** 7:3
**diagnosed**
  282:5 389:13
  390:8,21 392:6
**diagnoses** 11:7
  478:1
**diagnosing**
  305:5,8

[diagnosis - discussion]

Page 30

**diagnosis** 176:8
182:7
**diaphragms**
154:23 415:2,9
415:20 423:3
**dichotomous**
153:19 297:18
312:7
**dichotomy**
189:11
**differed** 511:20
**difference**
169:17 185:17
328:10 344:9
344:13 346:15
347:1 370:21
371:8 372:5,20
512:9
**differences**
371:18 374:23
404:18 414:1,4
**different** 17:18
38:7 47:21
89:23 90:12
102:2 114:1,13
115:9 123:22
153:5 154:8
162:18,20
185:13 219:13
228:5 243:7,9
250:11 252:7
261:14,15
291:11 297:21
297:24 299:8
300:5,10
305:14 314:16

317:9 320:7
326:24 327:7
340:19 341:8
367:17 369:17
373:2,6 382:6
410:3 418:11
495:7,12
497:12 532:18
533:15,18
534:3
**differential**
172:22,22
173:20 338:18
338:19 386:20
450:1 511:7
**differentially**
449:14
**differentiated**
511:20
**differently**
20:21 172:14
173:10
**difficult** 219:11
**difficulties**
439:12
**dig** 432:14
**digest** 257:6
**diminish**
373:12
**direct** 415:6
417:15 486:16
**directed** 25:3
343:16
**directing** 378:7
**direction** 384:9
387:1,2 404:8

**directly** 17:7
35:21 152:23
372:23,23
423:3
**disagree** 31:7
31:10 107:6
290:7 336:5,8
348:13 364:5
386:8,9 407:17
407:18 470:21
471:10
**disagreed** 364:7
**disagreement**
79:19
**disagreements**
79:21
**disagrees** 525:1
**disclose** 212:9
383:4
**disclosed** 21:21
60:14 499:23
520:3 535:5
**disclosing** 22:2
**disclosure**
21:17,23 22:15
22:22 60:15
196:2 380:24
383:5,21
384:15 519:12
519:15 528:16
528:19 529:4,6
**disclosures**
520:8,9
**discounted**
388:2 476:22

**discourage**
434:24
**discuss** 52:12
75:11 78:20
112:9,12
113:14,20
114:3,9,15,19
118:13 161:9
234:6 281:21
359:20 414:15
415:5
**discussed** 44:9
114:23 193:15
220:24 261:23
273:20 341:13
343:3 404:15
414:14
**discusses** 118:3
**discussing**
215:24 219:2
228:8 349:7
350:10
**discussion** 18:7
49:4,17,19
50:10,12 57:12
57:15 63:1 72:3
96:15 117:5
134:18 161:8
182:2 200:2
322:24 337:13
338:6 360:4
369:5 400:16
400:19 401:19
401:21 416:17
427:15 432:9
458:15,18

493:10,13
497:7 533:21
**discussions**
75:14 118:20
**disease** 113:3
131:15 312:17
312:23 319:5
320:10 331:7
405:4 502:7
**disorder** 31:17
**disorders** 23:23
28:5 29:4 31:24
32:24 33:10
**disproving**
475:15
**dispute** 96:23
147:16 168:15
168:17 271:13
271:17,23
272:1,6 277:20
410:22
**disputed** 290:6
**dissertation**
334:1
**dissimilar**
219:14
**dissociate** 225:2
**distorted**
172:15 173:12
173:17
**district** 1:1,2
2:23 539:2,5,22
**divided** 77:21
**dobner** 1:23
2:21 539:3,21

**doctor** 62:1
110:2 114:13
117:16 119:8
119:19 139:23
161:12 167:5
191:9 205:9,11
218:11 249:12
252:20 255:24
257:2 264:15
275:20 293:7
342:16 353:1
353:10 355:15
358:5,21
359:24 418:3
426:24 427:3
432:24 510:21
**doctoral** 378:14
**doctors** 262:7
266:3,12
267:17 268:5
290:22 291:14
292:1,3,4 374:4
**document** 20:2
42:13,14 50:18
60:21 61:1,9
66:1 73:3 76:15
83:16 92:17
93:24 94:1,5
98:7,8,11,13
107:3 112:15
115:8 116:4
129:21 133:24
161:13,19
162:5 163:17
166:23 171:4
180:3 189:4

194:22 204:9
205:20 242:17
245:20 246:9
248:20 249:5
257:15 258:2
264:14 270:5
272:8 276:2,7
279:5 281:18
284:4 285:3
287:9 288:22
289:22 292:15
296:18 326:15
328:23 332:17
335:10 340:4
341:21 344:11
345:1,4,15
350:1 352:23
353:2,9,11,13
353:15 354:3
354:11 361:18
361:21 363:18
365:16 368:18
373:16 379:6
380:2 381:2
398:3,9 399:6
401:22 406:1
421:12 429:23
432:20 437:15
443:22 454:8
467:18 471:1
477:11 481:1
482:20 489:16
491:4 502:14
508:7,11
521:19 523:3
525:3,4 526:8

530:13 531:7
531:11 532:5
**documented**
78:11 159:20
501:22
**documents**
5:10 15:10,13
16:9,10 45:17
45:18,20 46:2
46:18 47:4,11
127:7 217:10
238:15,16,18
238:21 239:16
239:24 240:8
240:18 268:2
274:18 275:17
481:8 535:12
535:16
**doing** 21:22
38:10 40:1
44:12 45:4,7
46:12 73:24
91:2 99:2
116:13 144:7
176:1 197:12
235:11 257:21
274:14 275:14
301:16 307:13
348:12 359:11
380:20 381:11
382:14 385:1
401:24 417:15
477:18 494:5
528:20
**dosage** 347:18

| | | | |
|---|---|---|---|
| **dose** 33:6 84:10 85:10 87:5,6,8 87:22 88:1 109:7,14 111:7 111:19 115:5 115:13 116:10 117:8,10 118:3 118:10,15,15 120:15,20 121:15,22 122:1,9,23 123:11 125:13 125:15 126:1,7 126:8,11 127:13 131:4 133:10 150:17 166:2 225:7,19 229:17 234:24 259:18,20,22 259:23 260:1 280:2 322:24 331:9 335:8 338:2 348:10 369:20 433:3,7 434:5 446:20 455:10 457:6 458:22 459:15 462:4 471:18 472:1,16 486:11 490:21 491:19 496:19 498:15,22 516:16 517:12 519:2 **double** 527:14 | **doubled** 527:14 **doubt** 216:10 **douche** 11:5 477:24 **douching** 10:3 158:16 422:8 447:6,11 448:6 448:7,12 500:10 501:22 502:2,5,18 503:9,14,15,19 503:24 504:11 504:13,14 **downgraded** 408:18,21 **dozens** 404:4 442:15 **dr** 12:11 13:14 13:15 14:15,20 20:11 23:6,8 42:7 44:8 50:11 54:7,9,18 55:6 56:9 57:2,16,24 66:22 67:14,20 68:4,21 69:4,7 69:9,11,15,17 69:19,21 70:6 70:12,21 71:1,5 71:5 72:4,12,17 75:5,8,11,12,23 77:4,5,13,21,23 78:3,6,8,17 79:1,5,11,24 80:6,8 98:10 99:3,22 100:13 101:11 104:2,9 | 104:19 107:6 108:5,11 109:5 111:6 116:4 117:2 126:15 126:21 127:11 128:1 129:4,15 130:4 131:10 131:22 132:11 134:8,17 135:17 158:13 170:20 171:9 180:10,24 190:17,23 191:14 193:20 193:23 196:8,9 196:22,22,23 197:18 200:16 201:1 203:15 203:16 204:8 204:13,13,18 205:2,6,14,22 212:21 229:3 320:22 334:11 335:22 354:18 368:9 371:21 372:4 381:5 382:19,22 385:10,16,20 385:23 386:14 387:4 388:17 391:11 393:16 417:16 419:19 419:20,21 422:7 428:23 438:8,9,20,20 440:11,14 | 452:4,9,10 454:13,17 455:2 459:5 465:21 466:1,2 466:3 467:6,8 467:23 468:9 469:12 470:10 470:17 471:3,5 471:8,19,24 472:9 473:22 473:23 474:9,9 474:10,11 475:4,6,13,14 476:17,19 477:2 478:24 479:2 499:20 499:20 500:6 506:10 519:9 520:13 521:16 535:3 **dr.p.h.** 5:17 **draft** 49:17 50:11 **drafts** 48:11,14 78:10 **draw** 517:20 **drawn** 366:10 **drive** 512:16 **driver** 169:17 **dropbox** 535:13 **drs** 373:24 385:5 **drug** 436:4 **due** 48:20 49:9 286:5 303:11 303:14 313:18 |

**[due - endometrium]** Page 33

313:24 407:1
407:24
**duly** 12:5 218:5
539:6
**duplicated**
443:17
**duration** 120:5
122:12 151:1
151:20 154:17
339:16 340:23
369:21 386:19
498:12,18
516:15 517:8
517:12 518:19
519:3
**dusted** 415:2,2
415:20,21
**dusting** 337:2
337:17 508:13
**duty** 291:22

**e**

**e** 12:1,1 79:12
79:14 397:3
**earlier** 29:19
41:23 54:19
135:17 145:4
152:9 229:14
290:11,19
314:4 321:11
346:20 380:19
391:14 416:12
510:4 529:1
532:9
**early** 11:5
130:17 235:7

432:2 477:24
**earn** 17:6,11
**easier** 14:3
**eastern** 1:16
2:9
**editor** 82:19
83:1 97:2 369:1
370:4 371:22
378:5 379:9,13
379:18,20,23
380:3,10
381:14 431:10
465:1 473:9
474:15 514:6
528:16
**editorial** 7:12
275:22 276:15
363:13,16
373:19
**editors** 82:24
**edits** 48:2,6
**educate** 428:2
**education**
42:22 204:16
447:5
**edx** 352:9
356:17
**effect** 86:12
129:7 163:12
164:23 165:10
165:19 172:24
175:1,10
176:11 184:20
185:1 208:9
256:7 300:17
347:10 368:4

375:19 386:21
410:2,2,4
478:10
**effectively**
138:8
**effects** 254:9
300:12 424:5
486:15,22
**efficient** 46:9
46:16
**effort** 428:2
**egilman** 196:8
196:9,22
**eight** 390:11
**either** 48:9
155:16 157:5,9
203:17 215:5
224:3 236:13
255:21 337:4
374:3 387:1
395:17 446:7
475:15 484:12
**elaborate** 50:9
**electron** 8:12
**elevated** 186:13
**eligible** 511:16
511:17
**eliminate**
502:20
**eliminated**
182:10,15
**eliminating**
363:16
**embed** 137:20
456:10

**embedded**
358:1
**emerges** 129:7
**emphasis**
412:17
**empirical**
385:17
**employed** 35:5
35:17,19
229:11
**employee** 452:4
470:6 539:13
539:15
**employer** 16:14
**encloses** 219:16
**encompassing**
487:3
**encourage**
67:15
**encouraged**
71:7
**encouraging**
255:21
**ended** 66:5
347:24 428:24
508:22
**endometrial**
146:21 510:15
**endometrioid**
143:24 145:1
156:17 157:23
**endometriosis**
156:16,19
157:22
**endometrium**
510:16

[endorsed - estimate]                                                          Page 34

**endorsed**
   362:17
**engines**   235:13
**england**   120:11
**enhance**   511:9
**enhancing**
   366:16
**enrolled**   182:17
   325:8 505:4
**ensuing**   96:15
**enter**   419:10
   423:4
**entire**   29:3
   97:16 107:1
   181:19 187:10
   275:4 427:4
   538:5
**entirety**   87:14
   200:17,22
   221:12 235:24
**entitled**   359:1
   361:18 383:24
   454:11 477:23
   506:12
**entity**   41:14
   192:23 211:15
**entries**   47:9,14
   48:1 50:2,14
   53:21
**entry**   45:16
   48:15 49:16
   50:20,24 51:15
   52:11 54:17,21
   54:23
**environment**
   356:22

**environmental**
   480:2,15
   483:13 489:12
**epa**   214:19
   215:11,21
   217:3 480:2,4
   483:14 485:11
   530:20 531:11
   531:24 532:6
   533:15
**epi**   47:15,16,21
   47:23
**epidemiologic**
   6:4 9:5 11:1
   31:23 34:19
   98:11 111:9
   177:24 206:18
   207:14 220:4
   308:11 312:5
   313:8 314:20
   315:8 320:19
   330:9 397:24
   424:24 438:10
   441:22 442:9
   511:2 513:21
   519:1
**epidemiologi...**
   171:17 256:5
   329:16 330:4
   330:21 486:15
**epidemiologi...**
   376:17
**epidemiologist**
   38:3 138:6
   148:1 241:16
   333:15 427:4,8

   434:2
**epidemiologi...**
   318:21 319:1
   375:19
**epidemiology**
   6:9 23:14,16
   24:17 25:5,21
   80:20 131:13
   177:22 255:5
   309:24 310:2
   311:21 320:16
   333:18,19
   343:2 378:14
   439:12 442:5
   473:20
**epithelial**   6:12
   7:18 8:2 140:7
   140:13,24
   141:8,16,18,24
   145:7,20
   148:12 181:7
   184:2 186:11
   186:18,24
   227:15 261:8
   290:12 334:7
   418:19 478:8
**equals**   129:7
   168:7
**equated**   49:10
**equating**   138:2
**erin**   28:17
**errata**   537:1
   538:11
**erroneous**
   314:12

**error**   282:23
   283:2 284:9
   291:5 319:2,11
   319:16,19
   402:12,23
   403:14,20
   404:2,7 450:2
**errors**   172:1,2
   361:12 402:15
   402:18
**escalina**   208:19
**especially**
   59:18 85:23
   87:10 108:6
   115:23 125:17
   168:14 177:24
   322:1 402:9
   511:8
**esq**   3:6,15 4:5
   4:17
**essential**
   366:14
**essentially**
   231:13 281:6
   364:13 392:17
   516:16 533:14
**establish**
   329:17
**established**
   159:12,14
   363:12
**estimate**   164:3
   164:5 187:19
   188:7 233:15
   233:19 260:7
   299:17 303:16

312:9 313:5,9 316:15 318:1 389:17 410:2,3 462:20 486:16

**estimated** 104:13 183:8 371:7,10 372:24

**estimates** 133:6 172:15 173:11 173:21 177:22 298:3 303:4 330:5 366:24 367:10,13 386:7,21 388:3 389:16 401:2,7 402:7 403:10 448:12 475:23 486:23

**estimating** 178:21,23

**estrogen** 158:6

**et** 5:19 6:6,10 6:14,19,24 7:17 7:20,22 8:3,7 8:12,19 9:8,13 10:6,13,23 11:3 11:7 43:10 98:10 282:15 282:21 516:7

**etiological** 148:8

**etiology** 230:13 230:13 255:6

**evaluate** 22:7 34:2 38:3

196:18 241:15 427:6

**evaluated** 140:6 172:21 176:18 245:3 266:14

**evaluates** 266:23 267:6

**evaluating** 197:4 236:13 277:12 382:16 416:9

**evaluation** 38:4 40:13 92:4 113:10 145:3 248:6 312:5 317:20 399:10 400:6,7 409:4,8

**evasive** 183:9

**evening** 53:13 53:15

**event** 70:5 129:17

**events** 22:6 68:12 419:12 478:10 511:9

**everybody** 149:9,9 528:6

**evidence** 8:22 9:6 31:19,22 41:18 57:8 73:17 89:3,5,7 99:13 106:20 108:9 115:17 115:19 117:18 121:21 134:20

135:9 137:18 157:15 166:5 169:10 199:9 203:3 207:15 222:2 227:3,14 244:20,24 245:7 248:5 251:6 254:13 254:20 259:18 259:20 266:12 271:10 272:15 321:12,23 322:5,20 329:16 330:9 330:21 331:18 336:24 337:9 341:2 354:9 357:1 375:22 385:17 397:24 405:15,20 406:15 408:9 408:14,21 409:5 410:8 414:12 416:23 427:6,7,21 432:9 439:20 443:12 459:6 459:16 467:23 468:8 470:4 471:24 472:16 473:2 488:19 498:15 513:21 525:16 534:6

**evident** 115:22

**exact** 43:20 135:23 137:4

357:9,10 479:1

**exactly** 50:1 59:5 142:19 288:1 301:11 462:12 475:20 494:23 515:21

**examination** 5:2 12:4,8 218:4,7 274:21 417:15 418:1 500:3

**examine** 458:18

**examined** 12:5 87:10 125:17 218:5 338:12

**examining** 8:21

**example** 19:12 53:23 134:13 140:21 214:18 214:19 216:4 216:17 233:7 234:10,14 236:2 282:6 420:14 429:20 444:17

**examples** 200:11 339:3

**exceeds** 21:19

**except** 86:4 201:15 443:4 509:14 520:5 538:9

**exception** 111:8 431:10

**excerpt** 253:13

| | | | |
|---|---|---|---|
| **excess** 300:21 | 20:3,5,7,10 | 349:23,24 | **existing** 48:13 |
| 330:24 331:15 | 42:6,13,15,18 | 350:2 351:7 | 153:11 236:12 |
| 335:2 | 44:13,19,23 | 361:17,17,22 | 273:23 |
| **excessive** | 45:15 47:1 49:8 | 363:1 368:17 | **exists** 93:11 |
| 348:18 | 60:19,22 66:2 | 368:19 373:15 | 112:22 232:10 |
| **excited** 176:24 | 76:4,5,8,12,16 | 373:17,19 | 316:3 |
| **excluded** | 77:6,15,18 | 379:5,7,18 | **expand** 402:13 |
| 324:23 504:3 | 80:23 83:14,17 | 398:2,4,7,10 | **expect** 150:19 |
| **excludes** 456:1 | 83:19 92:14,14 | 399:3,4,12,12 | 184:23 202:6 |
| **excluding** 126:4 | 92:18,22 94:2,6 | 399:17 421:6 | 214:22 367:10 |
| 126:6 281:13 | 94:9 98:10,14 | 421:11,13 | **expenses** 19:8 |
| 433:4 | 98:23 100:7 | 425:24 426:3,4 | **experience** |
| **exclusion** | 104:20 116:3 | 429:21,24 | 42:22 204:16 |
| 289:14,18 | 126:14 161:17 | 432:19,21 | 261:17 |
| **exclusive** 216:5 | 161:20 166:21 | 437:14,16 | **experiences** |
| **excuse** 344:17 | 166:24 167:12 | 443:18,23 | 71:2 |
| 361:24 449:23 | 171:3,5,8 180:2 | 454:1,2,4,9 | **experiment** |
| **executive** 6:3 | 180:4 188:11 | 467:11,19 | 234:11 |
| 78:12 99:8,9 | 194:20,23 | 469:7,17 | **experimental** |
| 105:9,18,21 | 195:20 212:23 | 470:17 471:8 | 329:15 330:11 |
| 106:1 142:12 | 245:18,21 | 474:12 477:5,6 | **expert** 1:12 |
| 142:19 155:2 | 247:20,21 | 477:12 482:10 | 2:11 5:15 16:11 |
| 323:3 | 249:4,6,12,15 | 482:21 496:18 | 16:20 17:7,11 |
| **exhaustive** | 250:18 251:24 | 497:13,19 | 22:3 26:12 28:7 |
| 222:4 | 252:12 268:20 | 506:10 508:2 | 37:22 38:8 39:1 |
| **exhibit** 5:10,11 | 270:2,3,6 | 510:18 516:20 | 40:8,21 41:2 |
| 5:12,13,15,18 | 275:21 276:3,8 | 529:24 530:2 | 43:12,13,18 |
| 5:20 6:1,4,7,11 | 276:11 277:17 | 530:15,18,21 | 44:11 45:2 49:5 |
| 6:15,18,21 7:1 | 277:19,24 | **exhibits** 5:8 | 54:11 56:7,11 |
| 7:3,7,11,13,18 | 278:10 285:1,4 | 10:1 41:9 67:10 | 57:3,6,10 58:1 |
| 7:21 8:1,4,8,14 | 296:16,19,21 | 77:11 124:16 | 58:3,5,7 60:14 |
| 8:17,20 9:1,4 | 296:24 297:3 | 276:12 500:5 | 62:13,15 63:20 |
| 9:10 10:3,7,12 | 326:14,16 | **exist** 203:9 | 64:13 66:22 |
| 10:15,18,21 | 327:2 332:16 | 231:5 427:17 | 67:14,16 68:2 |
| 11:1,4,9 15:21 | 332:18 341:20 | **existed** 203:8 | 68:15 70:7,22 |
| 15:23 19:24 | 341:22 349:11 | 246:22 450:22 | 71:2,8,13 72:5 |

**[expert - exposure]**                                                                                              Page 37

| | | | |
|---|---|---|---|
| 72:13,16 73:9 | **expert's**  55:7 | 347:14 511:1 | 212:12 221:17 |
| 73:14,20,21 | **expertise**  23:16 | **exposed**  126:3 | 222:7,12,15,19 |
| 74:7,9,13 75:2 | 38:1 39:10 49:5 | 128:21 129:16 | 224:12 225:4,7 |
| 75:4,9,16 76:13 | 211:6 305:5,8 | 153:12,14 | 225:19,21 |
| 77:5,9 89:8,11 | 305:11 | 182:18,18 | 228:10,12 |
| 90:5,21 162:2 | **experts**  5:14 | 183:15 187:12 | 233:17 234:16 |
| 180:9,14 188:9 | 28:14 61:2 69:1 | 286:6 298:12 | 235:5 254:9,24 |
| 188:10 193:24 | 193:16 201:6 | 299:11,13 | 261:15 278:17 |
| 196:10 197:9 | 202:21 253:4 | 300:12,22 | 279:1,18 |
| 201:20 202:20 | 277:7,12 | 348:21 413:17 | 280:12,18 |
| 203:21,22 | **expires**  539:24 | 413:19 430:21 | 281:17,24 |
| 206:15,16,17 | **explain**  93:12 | 436:21,22 | 286:7 287:2 |
| 210:21 214:12 | 137:24 229:20 | 502:17 | 290:2 291:1,20 |
| 216:16,19 | 291:23 318:10 | **exposure**  5:18 | 292:12 297:18 |
| 221:10,13 | 368:10 386:13 | 6:16,22 8:1 | 303:3 306:21 |
| 237:13,22 | 414:4 438:22 | 10:10,12,19,21 | 312:17,23 |
| 238:2 241:20 | 459:22 | 86:1 87:9 90:10 | 316:1,2 318:4 |
| 252:10 269:3,8 | **explained**  92:3 | 93:10 96:17 | 319:4,23 |
| 282:11 307:23 | 166:9 233:12 | 111:11,18,23 | 320:10 324:8 |
| 308:2,5,8,10,13 | 233:16 319:10 | 112:2 113:3,18 | 330:23 331:5,6 |
| 308:15,24 | 389:19 414:6 | 113:24 119:24 | 331:13 334:6 |
| 309:4 329:9 | 460:4 461:8,21 | 120:6 122:13 | 335:24 338:5 |
| 341:13 342:1 | **explaining** | 122:19 125:16 | 338:13,19 |
| 368:14 382:13 | 170:7 318:5 | 126:13 128:5 | 339:17 340:18 |
| 382:14 384:16 | 319:14 | 128:19 129:2 | 340:24 346:22 |
| 418:5 431:4 | **explanation** | 129:12 131:15 | 350:24 352:21 |
| 454:17 455:2 | 108:8 139:13 | 132:3,5 140:3 | 353:18,19 |
| 460:5 465:4 | 140:2 166:13 | 140:10 146:1 | 354:22 355:18 |
| 468:22,23 | 174:24 175:10 | 150:5,9,21 | 356:15 367:9 |
| 469:14 477:16 | 176:10 182:9 | 151:13 152:4,7 | 370:4,8 386:12 |
| 479:3,17 | 207:13 234:1 | 153:15 154:20 | 389:19,22 |
| 481:22 491:11 | 315:15,17 | 160:23 161:5 | 390:2,13,18 |
| 491:12 499:23 | **explanations** | 169:6 172:3 | 400:8,23 405:3 |
| 519:9,16 | 33:22 174:20 | 178:8 179:14 | 407:3,20,23 |
| 520:14 529:17 | 231:21 318:11 | 182:7,20 | 409:8 412:12 |
| | 318:23 319:14 | 185:19 186:20 | 413:8 414:8 |

**[exposure - falsification]**                                      Page 38

| | | | |
|---|---|---|---|
| 415:9,14 429:1 | 173:19 204:1 | 446:24 447:23 | 462:5 |
| 430:8 432:18 | 228:9,10 318:1 | 448:4 453:19 | **facts** 41:18 |
| 434:3,3,8,12 | 334:14 337:2 | 455:10 458:4 | 203:3 466:20 |
| 436:17 438:12 | 337:11 358:22 | 479:8 481:19 | 468:17 499:22 |
| 441:16 446:2 | 396:8 413:24 | 485:16 489:2 | 528:23 |
| 449:5 454:12 | 443:7 478:23 | 489:20 508:19 | **fail** 386:17 |
| 457:4 462:7 | 483:16 499:19 | 519:24 523:7 | **failed** 87:7 |
| 472:17 475:22 | 518:21 535:3,8 | **factor** 113:2,14 | 125:14 262:19 |
| 483:24 485:13 | **external** 266:15 | 114:12 157:22 | 290:22 291:13 |
| 486:14 487:4 | 395:3 | 158:3,8,11,16 | 291:22 407:8 |
| 487:12 494:1,7 | **externally** | 158:20 159:1 | **fair** 83:2 119:11 |
| 496:6,10 | 245:10 | 160:5 226:17 | 119:15,16 |
| 498:11 502:8 | | 316:21,22 | 120:1 154:17 |
| 502:19 504:17 | **f** | 328:7 338:14 | 154:18 240:5 |
| 505:15 506:14 | **facilities** 394:12 | 394:12 395:18 | 307:24 308:1 |
| 511:8 512:11 | **facing** 265:23 | 395:19 396:4,9 | 329:19 430:16 |
| 516:7 517:12 | 266:15 395:3 | 396:16 416:3 | 439:23 513:18 |
| 518:24 522:16 | **fact** 28:12 | 486:21 503:10 | 515:6 516:17 |
| 524:7 | 87:19 91:7 | 503:16 | **fairly** 368:7 |
| **exposures** 86:6 | 103:2 128:9 | **factors** 7:18 | **fairness** 132:14 |
| 147:6 157:13 | 134:16,19 | 24:7 111:18 | **fall** 312:9 |
| 172:8,13 173:9 | 152:24 162:1 | 113:8 115:3,19 | **fallopian** 7:7 |
| 300:1 335:16 | 169:11 206:3 | 130:6,8 141:4 | 227:11,16,20 |
| 434:22 448:16 | 207:14 231:2 | 147:24 148:4 | 227:24 228:3,7 |
| 512:7 | 264:19 280:1 | 150:19 157:14 | 228:10 271:11 |
| **express** 97:7 | 281:22 293:19 | 159:24 160:1 | 272:16 416:16 |
| **expressed** 31:2 | 294:3 302:18 | 229:6 232:23 | 416:21,24 |
| 31:4,5 453:5 | 324:6 341:2 | 234:7,12 235:6 | 521:18,24 |
| **extensive** 168:5 | 354:4,14 | 246:22 258:12 | 522:9 |
| 237:4 414:16 | 374:11,17,18 | 265:5 290:23 | **falls** 148:21,22 |
| 503:17 | 374:22 387:21 | 305:12,16,23 | 188:7 290:16 |
| **extent** 18:9 | 392:1 399:14 | 311:4 315:18 | 318:1 327:16 |
| 30:1 46:8 71:14 | 417:1 425:13 | 321:4,22 335:4 | **false** 278:4 |
| 81:19 82:23 | 431:6 440:8 | 343:4 394:5,8 | 279:1,7,10,21 |
| 157:1 158:18 | 442:14,14 | 395:11,24 | **falsification** |
| 169:5 173:16 | 443:13 445:6 | 409:4 459:13 | 441:20 |

**[familiar - findings]** Page 39

| | | | |
|---|---|---|---|
| **familiar** 134:5 | 310:17 311:7 | **fees** 17:6 | **financially** |
| 156:21 157:24 | 435:23 452:4 | **felt** 222:1 237:5 | 539:16 |
| 158:9,18 | 452:21 479:19 | 280:20 289:13 | **find** 107:7 |
| 161:23 180:6 | 479:24 481:23 | 291:8 387:20 | 122:9 176:24 |
| 182:21 208:24 | 485:17 490:6,8 | 513:17 524:7 | 185:16 251:5 |
| 264:16 278:20 | 512:22 525:1 | **female** 462:6 | 254:9 282:6 |
| 406:18 430:3 | 526:1 533:8 | **fetal** 173:4,4 | 342:23 343:20 |
| **familiarize** | 534:4 | **fewer** 120:15 | 390:4 397:19 |
| 194:19 | **fda's** 245:18,24 | **fibers** 184:21 | 420:10 421:4 |
| **family** 159:3,6 | 246:14 261:17 | 224:20 225:1 | 446:18 482:2 |
| **far** 81:4 86:8 | **feasible** 127:21 | 226:10,13 | 484:10 485:18 |
| 240:17 301:2 | 336:18 | **fibroids** 11:6 | 495:18 500:17 |
| 396:2 532:4 | **feature** 131:12 | 478:1 | 503:22 507:1 |
| **farber** 343:1,13 | **features** 219:14 | **fibrous** 6:22 | 509:10,24 |
| 394:8 | **feb** 6:24 | 207:23,24 | 523:21 526:21 |
| **fast** 256:17 | **february** 6:20 | **field** 378:20 | 534:20 |
| 257:2 | 7:12,17 8:3 9:9 | **fields** 277:8,11 | **finding** 37:6 |
| **fda** 5:22 7:1 | 10:11 44:16,16 | **fifth** 138:14 | 104:2 143:14 |
| 35:13,22 36:1,4 | 52:9 54:17 | **figure** 17:24 | 260:24 294:8 |
| 36:10,13,14,17 | 55:20 56:1 | 18:22 101:2,2 | 295:2,17 |
| 41:1 91:5,23 | 193:24 | 104:8 327:4 | 298:15,20 |
| 92:15 94:4 | **federal** 11:9 | 400:21 401:6 | 299:4 314:4,11 |
| 242:4 243:4,13 | 265:14 482:23 | 498:2 | 315:15,17 |
| 243:17,24 | 489:9 531:20 | **figures** 116:11 | 316:18 327:18 |
| 244:6 245:13 | 533:6,13 534:2 | 301:12 | 353:6,22 |
| 246:1 247:3,24 | **feel** 32:15 133:1 | **file** 470:11 | 392:12 412:17 |
| 248:23 250:10 | 181:18 199:11 | **filed** 163:11 | 412:18 |
| 250:15,18 | 242:14 281:19 | 431:8 454:23 | **findings** 41:3 |
| 251:4,5,13,18 | 339:24 355:1 | **fill** 22:22 | 115:13 147:5 |
| 252:3,17 253:2 | 365:15,21 | **filled** 22:1 | 147:16,16 |
| 253:4,10,24 | 384:4 439:22 | **final** 51:15 | 182:10 229:20 |
| 254:9 257:19 | 452:2 525:16 | 79:16 479:20 | 235:2 237:6 |
| 258:8 261:17 | 526:9 533:20 | 483:14 530:16 | 242:4 243:4 |
| 261:21,24 | **feels** 132:23 | 534:7 | 252:17 255:6 |
| 262:8,15,18 | 533:15,18 | **finally** 445:20 | 283:20 284:6 |
| 263:8,19 | | | 287:13,15,18 |

[findings - form]                                                    Page 40

287:19 288:14
288:18 293:22
294:13 303:23
310:7,8,10
318:12 324:9
337:24 347:14
369:16 370:14
388:15 391:14
406:23 407:10
412:17 427:14
436:16 458:11
504:4 505:11
**fine**  64:10 93:5
110:10,21,23
127:1 199:13
199:15 257:23
301:18 345:19
471:9
**finish**  14:4,7
32:9 105:14
133:24 247:22
**finished**  45:11
208:17 264:14
309:23 341:9
354:12 417:14
**finken**  4:5
34:12,14
**firms**  59:4,15
59:18,21
**first**  13:20
19:15 43:17
44:1,9,10 45:1
45:16 47:9 49:2
49:7 56:6,19,21
56:23 63:5
67:21 76:1 77:8

83:22 84:4
94:18 96:20
98:23 99:1
103:23 110:3
128:1 131:10
132:7 134:5
143:10,17
167:15 182:4
196:3 208:21
231:1 232:7
245:17,23
247:21 249:15
249:24 250:17
251:9,21
255:10,24
259:13 269:21
270:20 278:14
279:11 281:8
281:19 290:5
291:16 296:8
332:14 336:22
337:17,20
338:9 339:5
343:19 350:11
350:22 363:3,6
363:8 369:7
375:8 376:24
378:3 380:4,5
400:3 406:11
407:6,10
430:13 433:2
444:1 452:3
454:22 467:11
467:22 473:19
483:8 487:16
500:9 501:20

510:23 516:3
520:7,10
530:22 539:6
**five**  8:10 111:17
492:8 527:23
527:24 528:10
528:13
**fl**  3:8
**flawed**  237:3
281:16 282:2
324:7
**flaws**  303:3
446:6
**flew**  19:12
**flexible**  417:18
**flight**  19:18
491:23 492:2
492:12
**fluid**  43:6
**fly**  19:15
**focus**  24:3
234:19 415:6
**focused**  23:20
228:7 231:21
234:22 235:4
510:13
**focusing**  23:22
145:15 163:23
220:3 340:17
**fold**  363:20
509:17,19
**follow**  30:19
296:2,8 298:24
407:3 426:16
514:6

**followed**
229:15 230:2
325:1 458:9
505:2,5
**following**  86:5
96:14 128:21
456:2 484:12
485:6 526:12
**follows**  12:6
218:6
**food**  436:4
**footnote**  243:8
286:20,20
409:16,23
444:4 468:22
468:24,24
469:2 481:22
521:15 530:7
**force**  8:14
361:19 363:13
363:19
**foregoing**  539:8
**foreign**  36:24
**forget**  466:16
**forgot**  14:13
**form**  22:2,8,15
22:22 63:21
119:2 149:15
150:15 151:4
267:21 275:13
275:19 418:21
419:4,14 423:9
423:22 424:11
424:19 425:17
427:10 428:7
428:19 429:9

**[form - further]**                                                                    Page 41

| | | | |
|---|---|---|---|
| 429:17 432:6 | 494:16 495:10 | 507:4 524:2 | 517:8,13 519:3 |
| 433:13 434:7 | 495:21 499:1 | **foundation** | 521:9 |
| 435:10 436:1 | **formal** 404:12 | 134:14 320:18 | **frequent** 7:13 |
| 437:2 439:3 | 404:17 | 411:15 466:19 | 143:5,16 153:2 |
| 440:2,17 441:1 | **forth** 78:15 | 468:17 469:19 | 154:24 155:10 |
| 441:9 442:20 | 539:10 | **four** 82:18 | 155:13 179:14 |
| 444:13 445:2,9 | **forthcoming** | 142:13 237:19 | 302:22 517:5 |
| 445:16 446:11 | 176:3,5,14 | 352:10 356:16 | 518:8 |
| 447:14 448:9 | 212:2 381:19 | 487:4 | **frequently** |
| 449:20 451:1,8 | **forum** 97:24 | **fourth** 484:3 | 375:18 434:10 |
| 451:13 452:7 | 343:6 | **fourths** 484:21 | **friday** 530:24 |
| 452:23 453:13 | **forward** 126:7 | **fragment** | **friend** 80:5 |
| 453:22 455:6 | 128:21 158:14 | 206:10 | **front** 15:18 |
| 455:14 456:20 | 262:13 395:1 | **framework** | 167:4 171:11 |
| 457:11 458:7 | 427:14 470:2 | 405:9,11,14 | 257:14 274:18 |
| 459:8,20 460:2 | 505:2 534:2 | 406:11,19 | 297:5 368:1 |
| 460:12 461:15 | **found** 117:9 | 408:17 | 437:10 474:19 |
| 461:24 462:16 | 122:23 142:2 | **frankly** 229:24 | 483:4 493:20 |
| 462:22 463:2,8 | 144:15 147:12 | 236:7 | 500:5 506:16 |
| 463:20 464:10 | 164:23 165:2,2 | **free** 32:15 | 516:20 |
| 464:20 465:7 | 165:8,10 | 106:24 181:18 | **full** 12:13 |
| 465:15 466:6 | 185:12 244:22 | 242:14 339:24 | 126:19 153:8 |
| 466:19 468:6 | 244:23 259:9 | 355:1 365:15 | 336:22 339:5 |
| 468:13 469:19 | 297:14 301:2 | 365:22 | 363:3 438:18 |
| 470:14 472:6 | 342:20 346:17 | **freight** 127:6 | 440:5 501:20 |
| 472:20 473:5 | 347:17 348:10 | **frequency** | 510:23 516:3 |
| 473:16 474:2 | 350:17,18,24 | 119:24 120:5 | **funded** 411:16 |
| 475:18 476:14 | 352:16,20 | 122:12 151:1 | 442:16 460:19 |
| 478:14 479:5 | 353:17 354:22 | 151:20 154:1 | **funding** 197:3 |
| 479:14 480:12 | 355:18 356:4 | 154:17,24 | 197:8 411:1,11 |
| 480:18 481:15 | 356:12,16 | 181:11 189:18 | **fundings** |
| 482:5 485:21 | 367:2 370:20 | 209:16 369:21 | 197:15 |
| 487:22 488:7 | 390:11,12 | 386:18 434:1 | **further** 5:6 |
| 488:17,24 | 446:20 482:3,8 | 446:1,8 498:11 | 46:5 55:15 66:7 |
| 489:6 490:3,13 | 495:19,22 | 498:12,14,17 | 218:6 367:21 |
| 491:1,16 | 506:18,24 | 516:6,15 517:3 | 408:17 417:13 |

**[further - go]**                                                      Page 42

441:24 442:5
442:11 443:8
443:11 489:21
500:3 535:17
539:7,12
**future**  212:9
215:19 393:7

**g**

**g**  12:1
**gain**  402:3
**gallardo**  208:21
**gates**  7:20
296:9,13,22
297:4 298:15
298:20
**gather**  427:7
**gears**  293:7
**gene**  156:10
**general**  18:12
18:13 128:17
173:9 301:14
422:8 425:2
**generally**  81:18
96:15 156:10
314:10 336:2
375:19
**generated**
392:19 393:2
393:13
**generating**
249:19
**genes**  156:13
**geneticist**
308:17

**genetics**  34:4
**genital**  5:18
6:11 8:1,4,18
8:20 9:1 10:4
10:21 11:4
81:11 89:15,20
90:2 91:16,24
140:16 141:10
141:21 142:5,8
146:5,14 149:6
149:20 150:1,3
150:10 159:16
165:3 167:23
168:4 184:22
209:23 223:7
246:19 256:6
307:21 324:5
334:6 335:13
338:13 344:7
346:23 347:12
348:4 354:5
369:11,17,22
370:15 372:1
373:9 375:6
390:9 412:11
413:19 422:20
433:18 434:24
446:22 454:12
456:16 462:21
463:13,17
477:24 500:10
524:23
**geology**  308:24
**george**  430:13
**gerel**  2:14 3:14

**gertig**  6:19
179:22 180:2
237:15 261:10
283:7,9 284:7
286:15 290:9
294:1,20 295:2
295:7,10,17
296:12 299:4,6
299:8,18 300:7
325:20,24
339:23
**getting**  185:22
185:23 342:8
**give**  14:5 18:12
67:4 109:15
126:22 130:8
199:2 208:16
214:23 295:9
351:13 359:6
418:5 421:21
425:23 426:4
474:21,24
527:11,22,23
528:1,5,5,9,10
528:12
**given**  12:16
72:24 107:18
108:6 142:9
145:11 303:1
310:21 354:2,4
356:20 367:12
388:11 389:23
390:10,12
394:24 434:20
527:14 534:7
534:23 535:11

**giving**  275:1
311:7 356:2
471:3 523:8
**gloves**  356:8
**go**  17:7 20:23
21:11 29:9
33:17 34:10
41:19 44:3 47:3
47:10 59:17
60:9 62:17,18
62:19 64:20
70:19 76:2
87:16 92:6
94:18 102:9
103:24 107:14
110:14,17,23
123:5,7 134:17
138:19 139:16
143:1,3 157:21
159:10 162:15
174:22 179:15
180:15 189:6
200:12 215:10
216:8 217:14
231:10,12
247:10,13,17
251:22 266:9
272:4 276:4
278:13,14
279:14 288:5
292:24 293:13
295:20 310:2,8
313:2 327:3,5
342:9 343:16
345:8,17,18
347:23,24

| | | | |
|---|---|---|---|
| 349:12 353:22 | 67:13 68:24 | 431:6 432:14 | **grade** 405:9,11 |
| 355:2,4,5 | 76:5,6 83:11 | 437:13 444:18 | 405:14 406:10 |
| 370:12 371:11 | 92:13 93:3 94:1 | 449:8 452:20 | 406:18 408:7 |
| 391:4 396:5,12 | 109:9 110:6,6 | 453:24 454:21 | 408:17 409:3,8 |
| 404:11 405:18 | 110:16,17,19 | 467:8 470:3 | 409:11,17,24 |
| 408:13 412:24 | 118:12 121:12 | 471:19 473:8 | 501:24 |
| 417:4 425:22 | 124:18 126:7 | 474:8 477:4,5 | **gradepro** |
| 426:4,16,19 | 131:7 132:16 | 480:17 481:2,3 | 405:19 406:14 |
| 430:2 432:12 | 133:18 145:17 | 484:1 491:22 | **grades** 409:17 |
| 438:21 455:18 | 150:8 155:2,5 | 492:3,4,14,19 | **grand** 4:18 |
| 467:21 468:19 | 166:21 171:1 | 493:6 497:11 | **grant** 264:23 |
| 468:21 471:15 | 180:1 188:4 | 497:18,20 | 265:2,3 |
| 471:15,16 | 210:5,10,12,15 | 499:10 527:2 | **grants** 265:9 |
| 487:8 489:20 | 216:14,15,20 | 527:11 528:9 | **graphical** |
| 490:19 491:22 | 217:4 235:17 | 529:9 533:4 | 400:20 |
| 493:9 497:21 | 246:17 256:17 | 534:13 | **graphs** 344:3 |
| 499:13 511:5 | 260:7,8 263:21 | **gold** 330:3 | **great** 334:3 |
| 511:14 514:16 | 268:20 270:1 | **gonzalez** | **greater** 104:15 |
| 526:22 528:24 | 275:9,21,24 | 503:21 504:8 | 107:8 152:5,7 |
| 532:18 533:3 | 278:23 280:14 | 504:18 | 153:13 164:20 |
| **goal** 444:9 | 287:12 290:18 | **good** 12:11,12 | 165:4 187:24 |
| **godleski** 68:21 | 299:14 300:23 | 15:7 52:3 59:16 | 260:9 297:18 |
| **goes** 25:10 38:9 | 301:11 312:20 | 255:16 | 298:1 313:10 |
| 126:9 185:4 | 314:2 316:24 | **goodman** 170:5 | 316:8,11 331:6 |
| 221:24 256:12 | 321:19 326:12 | **gossett** 8:22 | 450:15 457:3,8 |
| 261:4 283:7 | 344:19 349:10 | 373:24 473:22 | 498:15 517:6 |
| 284:7 347:21 | 355:4 359:4,4 | **gotten** 216:7 | 518:12,15,23 |
| 365:6 423:1 | 359:21 361:16 | **government** | **greatest** 130:16 |
| 424:23 441:21 | 372:1 377:12 | 35:19 267:12 | 151:10,12 |
| 467:13 487:2 | 395:1 401:13 | 488:21 | 155:20 |
| **going** 13:22 | 402:2 407:14 | **government's** | **greenland** |
| 19:23 30:19 | 409:10 417:12 | 265:14 | 173:3 362:7 |
| 31:11,12 32:5 | 418:12 420:3,9 | **governmental** | **ground** 15:8 |
| 42:7,12 44:3 | 420:13,14 | 35:17,18 | **group** 21:5 |
| 51:10 56:6 | 421:5 422:6,13 | 411:14,16 | 71:24 191:18 |
| 60:18 66:21 | 422:16 430:2 | 480:6 489:9 | 192:23 211:21 |

[group - health]                                                          Page 44

300:23 311:10
403:20 409:17
414:1
**grouping**
300:14
**groups** 378:2
396:3,8
**growing** 307:12
**guess** 106:5
173:14,14,16
291:16 301:8
395:4 500:7
536:12
**guidance** 292:9
**guided** 24:16
309:24 310:1
**guidelines**
230:2
**gynecologic**
23:17,23 26:5
69:13 190:5
193:9 305:3
328:8 395:12
**gynecologists**
190:5

**h**

**h** 397:3
**habit** 435:1
449:16 505:18
**habits** 176:8
**habitual** 504:21
505:18
**half** 325:9
391:1

**hand** 85:18
86:20,21 95:10
96:9,9 124:22
125:10 163:7
163:10,20
184:17 196:6
285:11,22
330:14 336:22
343:19 344:4
352:7 374:8,13
374:14 385:15
438:7,16
444:17 445:21
449:6,24 478:5
483:9 510:24
**handed** 98:19
351:22
**handles** 261:24
**hang** 279:22
**happen** 264:7
284:3
**happened**
20:23 22:7
103:15 514:16
**happening**
389:22
**happens** 313:10
379:14
**happy** 31:8
118:24 351:5
493:18
**hardy** 4:16
**harlow** 1:13
2:12 5:2,8,11
5:12,16 6:17
10:10,13,20

12:3,11,15
15:23 16:24
20:3,11 42:7,15
44:8 60:22
76:16 77:4,5,13
83:17 92:18
94:6 98:14
161:20 166:24
171:5 180:4
194:23 218:3
245:21 249:6
270:6 276:3
285:4 296:19
326:16 332:18
341:22 350:2
354:18 361:22
368:19 372:4
373:17 379:7
381:5 391:11
398:4,10
417:16 432:19
438:9,20
439:13 465:21
471:5 476:19
499:20 500:6
516:7 522:14
535:3 538:19
**harlow's** 5:10
**harm** 224:13
**harmful** 434:21
**harmonization**
522:23
**harmonize**
521:21 522:7
**hartge** 6:17
10:20 129:15

170:20,22,23
171:9 438:8,20
439:14
**harvard** 277:2
438:9
**hazard** 304:5
371:6,10
372:24 373:2
**he'll** 257:23
**head** 170:17
231:15 411:23
469:15 493:8
**heading** 484:16
**health** 5:24 6:1
7:9 10:15 16:16
23:18 24:8 25:3
25:4 36:20 37:3
37:6,9,19,23
38:9,15,19,22
39:4,13,17,21
39:24 41:14
175:14 176:6
176:15,20
179:21 182:15
191:2 242:1
243:17 245:8
261:6 265:9,14
271:9 272:13
282:2 284:15
284:20 285:13
287:2 289:14
289:16 293:23
295:21 296:10
304:3 323:18
367:16 391:3
410:17,21

| | | | |
|---|---|---|---|
| 411:2,11,14,18 | 70:20 72:10 | 161:16,22 | 246:6,7 247:9 |
| 441:7,17 | 73:6 74:24 76:2 | 162:12 163:4 | 247:13,17,19 |
| 442:13 483:17 | 76:11,17 77:3 | 164:22 166:14 | 248:15,19,22 |
| 483:19,21 | 83:13,18 84:21 | 166:20 167:3 | 249:3,10 |
| 489:21 490:10 | 86:24 88:2,11 | 167:11,14,18 | 250:12 255:9 |
| 491:10 496:4 | 88:14 92:13,20 | 171:1,7 175:20 | 255:12,18,23 |
| **healthy** 146:4 | 93:23 94:7 | 175:24 176:12 | 257:1,9,18,23 |
| 392:18 | 97:19 98:6,18 | 179:3,15,19 | 258:7 263:7,17 |
| **hear** 34:8,12,13 | 98:22 100:11 | 180:1,5 181:1 | 264:5 266:1,17 |
| 438:24 | 100:24 102:1 | 181:16,23 | 267:14,24 |
| **heard** 40:2 | 102:21 103:17 | 183:18 184:4 | 270:1,8 271:22 |
| 218:13 224:15 | 105:6,13 106:3 | 184:13 186:1 | 272:23 273:16 |
| 453:4 473:22 | 107:5,15 108:2 | 187:14 190:18 | 274:5,9,12,20 |
| 480:4 | 108:23 109:13 | 190:22 191:3,8 | 275:7,11,20 |
| **hearing** 223:3 | 109:17 110:1,9 | 192:10 193:8 | 276:6 277:14 |
| 224:4 438:24 | 110:12,21 | 194:18,24 | 278:9 279:8 |
| **heavily** 409:4,9 | 111:1,16 117:4 | 198:2,23 | 284:22 285:1,6 |
| **hegarty** 4:17 | 117:15,21 | 199:18,22 | 285:19,21,24 |
| 5:3,6 12:10 | 118:11,22 | 200:1,4 201:11 | 288:2 289:3,20 |
| 14:4,6,10,14 | 119:2,7,12,16 | 202:1,7,11,16 | 291:9 292:20 |
| 15:20,24 18:14 | 119:18 121:4 | 202:18 203:5 | 292:24 293:4,6 |
| 18:20 19:23 | 121:23 123:4 | 203:14 204:3,7 | 293:15 296:6 |
| 20:6,9 21:1,4,8 | 123:14,19,21 | 210:13,18,22 | 296:15,20 |
| 21:11,15 27:16 | 124:1,7,11,21 | 210:24 214:7 | 300:15 301:13 |
| 27:20 30:8,12 | 127:10 131:9 | 214:24 216:21 | 301:18,22,24 |
| 30:18,22 31:9 | 132:20 133:14 | 217:14 218:8 | 305:20 306:12 |
| 31:14 32:20 | 133:19,23 | 218:10 219:17 | 311:24 313:12 |
| 34:10,16 38:14 | 135:19 136:16 | 220:14 222:13 | 314:1,24 315:7 |
| 40:17 41:8,22 | 137:5,12 138:9 | 223:4,18 224:1 | 315:20 317:8 |
| 42:6,12,17 44:2 | 139:7,15,20,22 | 225:16 226:2 | 318:15 320:20 |
| 44:7 45:12,24 | 141:19 143:2 | 231:11 232:20 | 322:14 325:15 |
| 46:17 58:18,19 | 146:12 148:24 | 239:8,11,15,19 | 326:12,18 |
| 59:8 60:18,23 | 149:18 150:23 | 239:22 240:16 | 327:23 330:13 |
| 62:19,23 63:12 | 151:15 152:8 | 241:3 242:21 | 332:13,22 |
| 63:16,17 64:2 | 152:17 156:8 | 243:1,15,23 | 335:6 340:7 |
| 64:22 67:2,6,12 | 160:6,13 161:7 | 245:12,22 | 341:11,15,19 |

**[hegarty - hill]** Page 46

| | | | |
|---|---|---|---|
| 341:23 342:10 | 421:2,14,18,23 | 473:15 474:1 | 536:12 |
| 342:13,15 | 422:2 423:8,21 | 474:16,23 | **held** 2:12 36:3 |
| 343:23 346:1,5 | 424:10,18 | 475:17 476:13 | **help** 148:4 |
| 346:11,13 | 425:16,23 | 477:7,9 478:13 | 210:10 242:19 |
| 349:10,16,22 | 426:9,12 427:9 | 479:4,13,24 | **helpful** 14:24 |
| 350:4 351:10 | 428:6,18 429:8 | 480:11,17,23 | **henderson** |
| 351:17,22 | 429:16 432:5 | 481:5,14 482:4 | 444:19 |
| 352:3,4 355:5 | 433:12 434:6 | 483:1,6 484:11 | **hereof** 538:11 |
| 355:11,13 | 435:9,24 437:1 | 484:15,18,22 | **heritage** 158:24 |
| 357:3 358:12 | 437:17,19 | 485:20 486:2 | **hesitant** 506:7 |
| 358:16,20 | 438:1 439:2 | 487:21 488:6 | **heterogeneity** |
| 359:3,9,12,15 | 440:1,16,24 | 488:16,23 | 326:20 371:12 |
| 359:21,23 | 441:8 442:19 | 489:5,15 490:2 | 375:3 404:14 |
| 360:23 361:16 | 444:12 445:1,8 | 490:12,24 | 404:20 |
| 361:23 365:19 | 445:15 446:10 | 491:15,20 | **high** 400:24 |
| 366:5 368:16 | 447:13 448:8 | 492:1,10,13,18 | 402:6 403:8 |
| 368:21 373:14 | 449:19 450:24 | 493:1 494:15 | 404:13 498:18 |
| 373:18 376:6 | 451:7,12 452:6 | 495:9,20 | 501:24 |
| 376:11,14,19 | 452:18,22 | 498:24 499:13 | **higher** 167:23 |
| 376:22 377:3,7 | 453:12,21 | 499:17 500:4 | 348:17 367:22 |
| 377:12,18,22 | 454:2,6 455:5 | 501:6,10,12,18 | **highest** 152:16 |
| 379:3,10 | 455:13 456:19 | 502:22 513:9 | 286:7 314:7 |
| 380:22 383:11 | 457:10 458:6 | 514:10,23 | 348:1,1,17,21 |
| 384:12 385:4 | 459:7,19 460:1 | 517:17 518:18 | 386:12 457:2 |
| 391:4,8,10 | 460:11 461:14 | 519:22 520:20 | 496:5 |
| 394:17 395:9 | 461:23 462:15 | 521:4 522:21 | **highlight** |
| 396:19 397:18 | 463:1,7,19 | 523:10,15 | 168:12 |
| 398:1,6,11 | 464:9,14,19 | 525:5,24 526:7 | **highlighted** |
| 401:12 403:2 | 465:6,14,18 | 526:11,17,22 | 375:21 |
| 406:4,9 409:13 | 466:5,18 | 527:1,10,17,21 | **highlighting** |
| 410:14 412:20 | 467:15 468:5 | 528:7,12,14 | 361:24 362:1 |
| 413:3,12 417:4 | 468:12,16 | 529:2,19 | **highly** 183:14 |
| 417:8,20 | 469:18 470:13 | 530:10 532:3 | 404:8 462:22 |
| 418:20 419:3 | 470:16,21,24 | 532:19 533:1 | **hilary** 208:20 |
| 419:13 420:2,6 | 471:4,7 472:5 | 534:12,22 | **hill** 229:6 |
| 420:9,16,22 | 472:19 473:4 | 535:23 536:4,8 | 230:24 231:19 |

231:24 232:15
232:23 234:6
459:13 490:20
**hired** 34:22
35:2 193:10
**histologic** 7:19
140:12 141:5
142:1 144:21
227:22 334:17
**history** 159:3,6
185:2 356:20
**hmm** 162:14
**hold** 106:17
108:19 124:14
175:2 189:3
195:10 268:16
284:2 344:1
374:15 484:10
485:1
**holding** 255:18
**honestly** 244:11
256:16 274:7
274:24 376:9
**hope** 200:18
436:16 534:5
**hopefully** 150:7
**hopkins** 469:7
469:16 470:5
470:17 471:3,8
529:23
**hormone**
113:20 114:3
130:23 156:23
158:2,4
**hospital** 326:20
327:9,14,24

328:4,4,6,12,13
**houghton** 301:5
302:10 303:23
**hour** 17:15,23
18:22 49:3,11
60:7 292:23
**hourly** 49:5
**hours** 25:22,24
49:10 53:6,16
55:19,24 56:5
79:1,4,7 80:21
**hpv** 501:22
**hr** 374:24 375:1
475:7
**hrs** 374:23
**hrt** 156:23
**huge** 391:3
**huh** 42:11,16
52:10 61:4
77:19 81:23
82:14 86:19
95:18 96:7,11
98:15,21
100:18 106:17
111:12 124:14
126:18 130:2
155:8 163:22
167:1,20
177:13 188:18
188:21,21
212:24 221:5
242:2 252:15
252:19 271:6
272:9 273:22
276:13 317:2
321:7 323:6

334:8,10
335:20 337:12
338:8 340:13
341:14 342:2,7
343:18 350:3
357:7 362:3
369:6 370:19
374:7,10
385:13 398:5
400:2 405:12
409:18,20
422:24 445:22
455:20 458:16
485:7 486:7,19
490:9 498:9
515:18 516:4
519:14 521:7
521:20
**human** 95:22
99:15 106:22
220:4 253:6
483:19,21
**humans** 400:10
**huncharek**
279:24
**hygiene** 434:24
462:21 463:14
**hygienist**
308:21
**hypotheses**
148:3
**hypothesis**
158:13 310:6
441:17,19
456:17

**hypothesized**
223:14
**hypothetical**
412:14 413:5
**hysterectomy**
126:5 184:10
256:8 335:17
344:9,13
346:16,24
412:6 413:9
414:3 433:5
450:14 456:2

## i

**i.e.** 168:4
**iarc** 88:7,15,24
89:2,12 221:3
241:24 243:17
245:11 260:24
400:6 489:3,11
**idea** 18:13
100:9 128:13
128:14 176:16
180:17 193:14
207:11 210:15
210:16 244:16
247:5 258:22
261:19 382:19
452:8 456:7
**ideally** 127:12
127:20 128:22
**identification**
15:23 20:3
42:15 60:22
76:16 83:17
92:18 94:6

**[identification - inconsistent]**                                  Page 48

| | | | |
|---|---|---|---|
| 98:14 161:20 | **implied** 440:12 | **incessant** | 303:8,11,16 |
| 166:24 171:5 | **implies** 152:22 | 158:11 | 319:15 364:12 |
| 180:4 194:23 | **importance** | **incidence** 90:8 | 487:10 |
| 245:21 249:6 | 441:18 | 90:18,19 93:13 | **including** 32:24 |
| 270:6 276:3 | **important** 15:3 | 178:20,22,22 | 35:22 36:14 |
| 285:4 296:19 | 102:20 103:14 | 246:19 378:24 | 81:9 87:7 98:3 |
| 326:16 332:18 | 130:7 197:10 | 389:18 390:16 | 115:18 125:14 |
| 341:22 350:2 | 222:12 312:5 | 430:20,23 | 196:7 198:12 |
| 361:22 368:19 | 335:4 337:23 | **incident** 10:5 | 214:17 254:2 |
| 373:17 379:7 | 338:23 355:23 | 422:9 500:11 | 258:13 264:23 |
| 398:4,10 | 363:23 365:7 | **incidents** | 321:13,19 |
| 421:13 429:24 | 375:20 382:5,7 | 142:10 | 334:11 335:21 |
| 432:21 437:16 | 387:16 388:6 | **inciting** 423:14 | 338:15 339:15 |
| 443:23 454:9 | 388:10,14 | **include** 34:3 | 340:22 429:7 |
| 467:19 477:12 | 433:6 434:4 | 40:7 81:19 | 438:11 442:17 |
| 482:21 | 441:17 460:18 | 147:9 186:14 | 458:20 488:20 |
| **identified** | 520:21 | 187:22 194:8 | 489:11 533:21 |
| 235:23 391:21 | **imprecision** | 301:5,5 302:19 | **inclusion** |
| **identify** 47:4 | 407:13 | 303:14 328:2 | 137:21 245:2,5 |
| 82:15 128:24 | **impressed** | 364:12 483:19 | 287:4 358:1 |
| 148:4 305:23 | 230:1 | 483:22 534:17 | 456:10 |
| 383:13 384:14 | **improper** 119:3 | 535:6 | **income** 17:10 |
| 502:3,17 | **improved** | **included** 33:15 | 26:22 |
| **identifying** | 462:5 | 100:16 157:10 | **incomplete** |
| 205:23 233:11 | **inaccurate** | 244:20 245:9 | 40:10 84:11 |
| 505:15 | 262:13 355:20 | 282:6 286:4 | 85:10 87:14 |
| **ignore** 373:7,12 | **inaccurately** | 302:10 387:14 | 148:16 340:20 |
| **iii** 455:18 | 189:1,9,14 | 387:15,15 | 370:7 |
| 523:18 | **inadequate** | 405:15 407:2,4 | **inconsistency** |
| **impact** 24:6 | 279:17 290:1 | 457:18,20 | 407:12 493:14 |
| 207:24 378:23 | 291:19 | 480:16 518:9 | **inconsistent** |
| 386:6 414:17 | **inappropriate** | 521:9,17 | 225:13 279:16 |
| 448:12 | 312:14 379:2,2 | **includes** 28:17 | 283:5,19 284:5 |
| **impacts** 173:20 | 383:20 | 77:11 188:3 | 287:15,18 |
| **implemented** | **inappropriately** | 193:23 233:21 | 288:14,17 |
| 231:4 | 378:17 | 241:18 298:6 | 289:24 291:18 |

**[inconsistent - information]** Page 49

293:21 294:13
495:6
**incorporate**
359:1
**incorporates**
359:18
**incorrect**  281:9
281:9 284:1
354:23
**incorrectly**
282:15,21
**increase**  33:22
159:4,7 181:10
189:17 280:11
301:4 327:10
334:14 366:9
391:18 392:11
412:8 447:2
518:4
**increased**
148:13 151:10
279:18 280:17
290:2 291:20
337:1,10,16
354:7 430:20
433:9 504:15
**increases**  152:6
**increasing**
111:11 115:20
115:21 119:23
119:24 120:4,5
121:14,14
122:9 131:14
181:10 280:11
280:17 318:2,3
321:23,24

331:6 337:2,9
337:11 339:16
339:16 340:23
347:18,18
348:6 400:22
400:23 405:3,4
496:10,10,10
498:21,21
**incur**  135:24
357:10
**incurred**  19:9
**independent**
393:24
**index**  5:1
**indicate**  99:14
106:21 169:16
271:15 313:9
338:4 395:18
411:10 505:19
**indicated**  14:23
71:15 78:20
90:7 135:17
144:3 150:5
232:14 291:8
320:16 325:7
383:21 384:7
386:5 395:18
435:13 450:20
475:20 476:7
507:17,22
529:8 538:10
**indicates**  84:16
95:16 125:2
127:17 165:18
400:8 484:14
498:2,5 533:14

**indicating**
313:14 439:8
**indirectness**
407:12
**indisputable**
139:5 264:4,8
268:9
**individual**
131:24 221:19
314:22 401:1
402:7 403:9
502:7
**individually**
519:5
**individuals**
59:6 286:6
423:15
**induce**  137:22
357:24 390:14
**inducing**  139:2
**industrial**
308:21
**industry**
312:22 313:1,2
435:23 436:3
436:11 466:4
466:24 467:23
470:11
**infer**  153:23
**inference**  109:1
112:22,22
134:11,13,14
231:14 232:7
232:10,11
233:6 331:22
364:1

**inferences**
318:22 366:22
**inferior**  188:15
**inferred**  136:15
**inflammation**
136:2 137:22
357:12,18,21
357:23 358:8
360:2,8,16
392:4 419:9
478:9
**inflammatory**
208:2 358:3
423:14
**influence**  10:9
24:7 170:7
265:5 328:8
360:13 384:5
386:21,24
387:2 430:8
506:13
**influenced**
168:22 197:14
232:17 235:5
338:15 383:1
**influencing**
315:19
**information**
15:16 66:7
128:6 154:6
174:9 209:3
213:6 214:6,15
215:15,18
251:1,4 257:6
265:19 271:8
271:10 272:13

[information - interval]                                                    Page 50

272:15 289:1
304:15,16
339:1 395:2,7
396:2 478:21
509:6 512:11
518:8,11 521:2
525:20 532:1
534:20
**informed**  332:8
491:9
**infrequent**
415:13
**infrequently**
168:21
**inhalation**
414:9,10,17,20
483:24 486:18
487:12 488:1,9
**inhaled**  347:10
**inherent**
364:22
**inherited**
364:21
**initial**  66:21
67:13 72:3
78:10,18
**initially**  57:2
58:20 59:20
78:16 221:7
408:16 531:5
**initiate**  227:23
234:16
**initiated**  380:7
**initiative**  282:2
289:16 304:4

**injured**  196:11
**injuries**  483:19
483:21
**injury**  483:17
**input**  78:22
**installment**
49:2
**instances**  229:9
**institute**  343:2
343:14 438:9
442:18 460:17
460:21
**institutes**
411:17
**institutions**
442:16
**instruct**  30:7
30:16 32:6,14
45:22 110:3,6
**instructing**
377:8
**instructions**
30:20
**insufficient**
329:16 330:10
412:8
**insult**  376:12
**insulting**
376:10 473:11
**intact**  375:16
388:1 433:10
476:21 521:18
521:24 522:9
**integrity**
310:12

**intend**  19:17
213:2,22 215:3
215:24 399:3
**intended**  272:6
272:21 273:1
290:10 513:7
**intending**  272:2
398:13
**intensity**  87:9
125:16
**intent**  211:2
243:22 381:15
381:19 523:11
**interest**  129:1
196:2 212:10
315:24,24
316:2 380:24
383:5,14
384:15 414:23
528:15,19
**interested**
73:24 203:10
204:22 539:16
**interesting**
297:24 478:16
**intermittent**
450:4
**internal**  238:15
267:8
**international**
5:20 411:7
436:5 444:6
**internet**  28:9
**interpret**  187:5
310:6 368:8
458:11 475:13

**interpretation**
6:4 11:1 98:11
132:2 135:11
153:11 231:18
264:8 310:7
339:12 340:12
348:14 361:13
382:17 388:21
**interpretative**
439:11
**interpreted**
187:6 363:15
363:22 366:9
368:10
**interpreting**
366:15
**interrupt**  34:7
142:19 491:20
**interrupted**
302:1
**interval**  164:4,6
164:20 167:24
168:8,11 181:9
184:12 186:14
188:2,6 233:20
290:15 297:16
302:15,23
303:7,10,13,15
304:6 313:6
314:3 317:24
327:15,22
328:2 330:6
335:5 347:21
347:22 364:12
367:23 372:21
372:22 373:3

374:24 375:2
401:10 495:24
**intervals**
102:12 260:6
348:15 364:10
388:4 403:13
457:17 495:16
**intervene** 148:5
**intervention**
391:3
**interventions**
148:9
**interview**
164:13 165:4
165:11,19
170:2,15
512:10
**interviewed**
168:3,10
511:19
**interviewing**
511:16
**interviews**
128:6 164:3,5
**intramural**
266:23
**introduce**
129:5
**introduced**
56:20 356:21
**introduction**
100:13 101:1
**invasive** 295:23
297:13 299:5
299:17 300:3
301:3 302:7

303:22 326:1
334:16 337:5
337:19
**investigations**
178:1,10
**investigators**
266:24 267:9
**invitation**
513:3
**invited** 36:5
311:3 363:19
436:15 513:1,3
**inviting** 393:20
**invoice** 19:8,17
20:15,19 45:16
49:14,14 51:15
52:8 54:8 55:16
56:23 72:15
**invoiced** 19:4
57:1 60:3
**invoices** 5:11
19:24 20:12,16
43:24 44:13,14
55:10,12,15,17
59:11 72:19,21
78:21,24 80:23
81:3
**involve** 136:1
357:12
**involved** 23:24
28:16 35:9
36:13 39:6,11
50:11 52:1 72:1
76:1 94:22 97:6
202:5 246:23
261:20 262:8

262:15 304:22
382:22
**involvement**
71:21
**involving** 27:2
27:5,10 28:1
42:3 58:6,9,13
58:23 68:16
70:23 90:17
100:14 169:24
203:16 219:7
220:16 380:14
382:10,12
384:17
**irritants** 423:14
**isrtp** 253:4,10
435:17 470:6
512:20
**issue** 97:17 98:1
128:4 129:18
185:23 200:10
200:10 203:22
210:17 236:5
266:9 279:23
291:6 304:18
304:20 318:7
324:19,20
338:13 359:4
369:14 370:11
378:9 407:18
415:9 439:14
514:21
**issued** 20:12
201:6 202:20
213:12 249:21
252:4 472:15

**issues** 96:14
108:24 201:20
202:23 229:16
232:18 319:22
335:14 341:6
407:11
**issuing** 483:11
483:14
**items** 157:9
**iterative** 78:14
534:9

**j**

**j** 5:16
**j&j** 239:6 470:6
491:8,9
**j&j's** 469:17
**jama** 8:17,23
9:3 82:24
**january** 5:24
8:23 44:15,16
49:13 52:9,11
**jelleff** 6:2 10:16
438:4
**jersey** 1:2 4:3
63:3 201:10,13
201:23 203:4
208:15
**jewish** 158:24
**job** 1:24 115:2
138:6 262:16
262:19
**john** 68:21
**johnson** 1:5,5
4:14,14,14,15
43:9,9 61:3,3

**[johnson - knowing]**                                                Page 52

62:6,6 198:12
198:12 202:22
202:22 238:16
238:16,19,19
238:21,21
240:1,1,18,18
241:6,7 309:10
309:10 382:11
382:11 466:17
466:17 468:10
468:10 481:23
485:17 520:16
520:16
**johnson's** 81:9
226:5,10,22
309:4 481:23
485:17
**joint** 78:22
326:2 384:7
**journal** 57:22
363:14 439:14
**judge** 210:5
211:2 218:13
359:5,16
**judkins** 208:20
**july** 10:14
**jump** 391:11
**june** 167:15
**jury** 210:6
211:2 218:14
**justice's** 28:14

**k**

**k** 2:15 3:16
**kansas** 4:19

**karl** 208:22
**keep** 48:14 67:7
67:9 141:7
222:24
**keeping** 482:13
**ken** 48:4 50:21
**kenneth** 5:16
**kind** 13:23 67:9
70:5 120:22
142:4 154:2,23
280:1 306:10
311:8 370:8
378:15,21
383:2 392:14
395:2,7 479:8
505:9 526:9
**kinds** 462:12
531:22
**kjr** 48:2,4,16
**kliner** 520:15
**knew** 57:18
169:13 174:3
176:22
**know** 20:22
25:20 28:15
39:3,6,10,24
41:1,6 43:13,14
55:23 61:21
63:9 64:12
67:20 68:4,6,18
68:21 69:2,5,7
69:8,8,9,10,11
69:15,17,19,23
70:1,6,10 75:15
75:18 80:1,8
82:23 83:3,4

105:1,19
116:14 119:3,5
119:6,12
120:10 124:3,4
128:14 130:21
132:14 133:6
133:10 134:21
137:3 139:4,10
147:24 150:22
157:12 160:7
165:23 166:1
167:8 169:4
176:20 181:20
183:10 199:16
199:20,22
202:6 204:15
204:18 205:1,5
205:5,16
206:10 207:6
208:12,17
209:7,9,13,16
209:19,22
210:1,7 211:3,8
211:9 215:14
215:22 216:2
217:3,9,12
223:3 226:14
226:19 239:2
241:13 244:3,9
251:19 254:4
254:12,14
256:16 259:23
262:5 264:1
274:12,13,14
274:14,24
276:18,23

277:3,10,11
286:13 287:11
295:6 297:1
298:5 307:12
328:9,17
330:12 333:2
335:3 339:22
345:11 358:17
365:21 367:24
374:3,5 378:6
378:12 381:12
381:20 382:8
382:21 383:24
389:21 390:3
392:7,16 393:6
393:16,19,21
393:22 395:21
397:17 402:21
410:21 417:18
428:14 448:6
448:10 452:9
452:10 454:19
466:3,11
469:21,22,22
476:1 480:6
481:6 491:3,6,8
491:14 492:6,6
492:18 501:1
507:13,17,19
518:3 520:22
522:14 529:9
529:17 530:1
531:24
**knowing** 71:14
141:17 204:23
383:18

**[knowledge - letting]**                                    Page 53

**knowledge**
26:12 60:13
62:11 168:22
169:9 209:10
241:5 382:22
395:6
**knowledgeable**
205:10,12
**known** 79:24
80:3 115:2,18
150:17 154:6
156:7 203:7,8
315:18 321:21
394:24 395:5
418:14 424:6
478:11 487:4
507:6
**knows** 64:12

**l**

**l** 1:13 2:11 5:2
5:15 12:3,15
16:24 218:3
538:19
**label** 253:23
254:11
**labeling** 533:11
**laboratory**
197:13 205:17
239:12
**labs** 205:7
**lack** 87:4 135:7
135:9 388:2
407:11 476:23
**lacking** 259:18
259:20 260:16

**lacks** 134:14
466:19 468:16
469:19
**land** 523:9
**landing** 526:10
**langseth** 7:22
326:13 329:4
340:24
**language** 97:7
**large** 93:12
183:10 261:6
369:9
**largely** 43:7
324:16
**laryngeal**
483:23 486:14
486:17,22
487:11
**late** 493:7 527:6
**latest** 270:11
**laugh** 26:1 52:4
59:18 61:12
80:13 190:7
200:19 235:20
307:7 430:15
**law** 59:4,15,18
59:21
**lawsuit** 27:23
**lawsuits** 163:10
168:4 382:10
382:11
**lawyer** 28:13
58:4,9 64:16
67:24 471:1
**lawyers** 18:10
19:4 31:5 32:11

32:12 53:22
54:1,24 60:14
60:15 65:24
68:15 71:20
191:14 196:23
380:13 382:9
393:11 464:13
**lay** 232:19
**lazar** 520:8
**lead** 78:3,4,5,7
84:12 85:12
260:15 358:3
436:17
**leading** 419:12
478:9
**leads** 232:24
234:16
**learned** 466:12
466:22
**leave** 34:4
426:7 499:24
**leaves** 492:2
**lectured** 310:19
**leeway** 523:8
526:24
**left** 85:18 86:20
86:21 96:9
124:22 125:10
163:20 196:6
247:20 281:24
299:9 330:14
343:19 344:4
352:7 374:8,13
374:14 417:11
438:7,16
445:21 449:24

483:9 515:23
515:24 516:1
**legal** 26:13
27:23 32:13
51:1,2,12
**leigh** 49:24
**length** 326:6
446:1,8 516:6
**lengths** 326:5,6
**lesions** 501:23
501:24
**lethal** 462:22
**letter** 7:3 82:19
97:2 244:7
248:23 249:21
250:19 251:4
251:24 252:4,8
253:17 254:3
256:12 261:4
261:16 262:3
369:1 370:4
371:22 378:4
379:8,13,17,20
379:23 380:2
380:10 381:13
382:24 384:7
384:13 385:6
385:23,24
388:13 431:10
453:6 465:1
466:8 473:9
474:14 490:7
514:6 528:16
**letters** 82:24
**letting** 381:11
381:20 428:14

[level - literature]                                                            Page 54

| | | | |
|---|---|---|---|
| **level**  148:13 | **likely**  74:19 | **line**  129:3 | 140:20 141:7 |
| 149:11 150:9 | 86:6 95:23 | 365:13 369:7 | 143:15 146:15 |
| 151:20 211:6 | 130:13 148:22 | 369:19 537:3,5 | 146:17 147:3 |
| 222:7,14 | 156:4 160:3 | 537:7,9,11,13 | 147:10 156:18 |
| 224:17 306:3 | 174:24 175:10 | 537:15,17,19 | 156:22 157:2,4 |
| 310:14,16 | 176:10 187:20 | 537:21,23 | 158:1,10,19,23 |
| 338:16 348:1 | 188:7 189:13 | **linear**  154:1 | 196:18 201:16 |
| 386:12 442:12 | 227:23 303:18 | **lines**  63:15 | 206:5,20 |
| 443:9 | 303:19 367:18 | 142:13 | 207:10,12 |
| **levels**  169:6 | 388:11 390:14 | **link**  246:21,22 | 215:16 218:15 |
| 224:13 225:7 | 390:16 410:2 | **list**  43:3 46:10 | 218:24 220:16 |
| 225:19 318:3 | 450:2 475:8,9 | 46:10 68:24 | 222:4 223:5,6 |
| **levin**  3:4 | 489:24 | 77:14,15 | 229:10 230:19 |
| **levinlaw.com** | **limit**  118:23 | 193:22 213:24 | 233:11 235:8 |
| 3:10 | 175:21 201:12 | 215:6 276:14 | 235:13,18,20 |
| **liability**  1:8 | 241:13 275:7 | 394:12 395:11 | 235:23 236:10 |
| **life**  149:12 | 528:1 | 395:24 396:4,8 | 240:14 245:8 |
| **lifetime**  86:13 | **limitation** | 396:14,15 | 246:11,13,16 |
| 129:17 280:8 | 446:13 516:15 | 397:5 411:4 | 247:4 248:1,8,9 |
| 334:16 337:4 | 517:19,24 | 459:12 490:16 | 248:14 253:19 |
| 348:6 516:8 | 518:1 | 500:24 501:1,4 | 254:8,24 |
| **ligation**  126:5 | **limitations**  38:4 | **listed**  61:6 | 256:14 266:13 |
| 184:10,24 | 171:16,23 | 114:21 199:3 | 267:10 277:17 |
| 185:2,6,7,12,12 | 236:23 366:13 | 322:22 | 277:21 309:8,9 |
| 185:20 256:8 | 367:8 387:14 | **listen**  202:11,16 | 309:14 325:17 |
| 335:17 344:8 | 388:7 475:21 | 358:4 377:13 | 360:8 362:6 |
| 344:12 346:16 | **limited**  168:3 | 377:21 | 365:1 382:16 |
| 346:24 412:5 | 179:5 183:19 | **listening** | 388:6 423:7 |
| 413:8 414:2 | 184:9 198:7 | 377:19 | 424:24 427:19 |
| 433:5 450:14 | 225:4 387:24 | **lists**  111:17 | 428:16 431:9 |
| 456:2 | 434:23 476:21 | 231:3 | 432:2 435:7 |
| **light**  8:11 253:3 | **limiting**  216:12 | **literally**  442:15 | 440:23 447:10 |
| 408:18 439:11 | 457:4 | **literature**  32:4 | 448:6 450:21 |
| 523:7 | **limits**  259:11 | 33:3 34:2 38:5 | 460:9 463:5 |
| **likelihood** | 259:15 | 46:15 47:12,20 | 473:21 474:5 |
| 512:12 | | 47:24 78:11 | 479:11 486:15 |

488:20 503:9
503:18 510:17
521:3 531:12
**litigants** 465:5
**litigation** 1:9
  16:18 17:4 19:2
  19:6,10 21:22
  22:4 23:10
  26:16,19,22
  27:1,5,10,18
  29:18 32:13
  39:1 40:3,8,16
  40:18,22 41:2
  41:14 43:10,14
  44:11 45:2 46:3
  54:12 55:19,24
  56:12 57:4,10
  57:19 58:2,3
  63:4 67:15 71:8
  71:13,21 72:6
  72:16 73:9,15
  75:19 80:22
  81:3 90:5 95:3
  95:4 101:18
  102:14 166:1
  168:23 169:10
  169:13 189:22
  190:2 191:11
  193:11,18
  196:10 197:9
  204:2,20 206:6
  208:4,15
  212:10,21
  213:3 237:22
  239:4,17 240:9
  252:10 269:4

305:17,21
306:5 394:24
431:11 434:19
455:3 462:13
464:13 465:13
491:12,13
519:10,16
528:21 529:7
529:10,16
**little** 38:6 89:22
  90:11 154:7
  172:24 228:4
  291:10 293:8
  312:1 321:10
  328:10 336:15
  339:1 386:6
  391:12 410:1
**live** 209:7
**living** 50:18
**llc** 16:18,19,21
  16:23 17:1,3
**llp** 2:14 3:14
  4:16
**located** 117:20
**location** 283:11
  424:7
**locations**
  198:19 200:9
**logan** 4:6
**long** 17:1 45:8
  53:4,14 56:3
  66:13 79:24
  150:5 152:22
  153:12,17
  154:9,14,15
  169:3 188:24

189:13 198:24
209:13 235:20
292:18 307:13
344:19,22,24
407:24 417:18
429:15 430:16
434:18 450:3
504:23 506:6
526:16 528:3
**longer** 168:6
  338:4 345:16
  491:21 505:19
  506:2 523:8
**longo** 196:23
  197:18 198:13
  200:16 201:1
  203:15 204:13
  204:18 205:2
  205:14 206:8
  240:15 469:3
  469:12
**longo's** 193:23
  204:8 205:6,22
**look** 13:5 20:10
  22:8,8 33:8
  43:24 59:10,11
  59:17 60:9
  61:13 83:9,22
  86:4 95:11 96:8
  105:23,24
  106:9 108:16
  108:24 110:8
  116:3 123:7,12
  124:12 125:22
  125:23,24
  127:22 128:18

129:3 130:3
134:3 141:3
144:4,5 145:10
153:6 155:18
162:22 164:18
165:13 170:19
177:2,9 178:8
178:20 182:16
186:2 187:9
195:7 196:5
198:18,21
199:1,12 200:7
206:19 208:22
213:6 230:15
232:14,16
242:11 245:12
253:13 254:17
255:5 258:8
270:9 278:5
279:3 280:15
284:23 285:10
285:14 286:17
295:11 298:2
299:6 300:1
301:9,10
302:22 303:24
304:1 305:22
311:2,2 315:18
324:9 327:4
329:11,24
330:14 332:1
334:22 335:18
337:15,23
338:6 339:20
340:1 341:5
342:19 343:15

**[look - made]**                                                                  Page 56

| | | | |
|---|---|---|---|
| 344:20,22 | 221:17 236:3 | 313:13 317:22 | 280:15 303:19 |
| 345:6,16 | 236:21 237:3 | 318:1 320:10 | 312:10,11 |
| 347:20,20 | 245:24 249:18 | 334:5,23 352:2 | 347:21 348:17 |
| 351:5,6 355:8 | 290:11 299:10 | 357:6 363:2 | 372:2 415:12 |
| 356:2 363:1 | 319:21 324:2 | 371:3 379:18 | **lowest** 314:7 |
| 364:10,15 | 334:6 345:12 | 391:24 404:23 | **ludicrous** |
| 365:13,16,22 | 412:15,16 | 407:19 413:18 | 373:10 |
| 366:3 367:23 | 413:7,16 415:2 | 433:4 485:2 | **lump** 122:12 |
| 371:2 380:23 | 415:12,19 | 489:22 499:5 | **lumped** 141:8 |
| 385:5,14 387:3 | 416:2 420:1 | 503:9,19 | **lunch** 218:9 |
| 396:5 397:4,9 | 446:7 447:10 | 515:13 518:14 | **luncheon** |
| 399:23 401:5 | 447:24,24 | 523:14 528:15 | 217:17 |
| 409:14 416:8 | 456:23 459:11 | **looks** 34:7 45:3 | **lung** 138:22 |
| 419:20,21 | 502:24 503:14 | 76:20 399:7 | 139:6 149:10 |
| 421:24 425:5 | 521:22 524:24 | **lot** 14:2 76:20 | 151:8,11 |
| 444:16 458:14 | **looking** 19:21 | 145:13 166:9 | 483:22 486:24 |
| 474:12 475:1,5 | 31:23 34:18 | 173:18 222:2 | 487:11 |
| 493:23 495:7 | 44:23 45:15 | 236:3 341:6 | **lydia** 277:2 |
| 495:15,17 | 48:1,19 55:11 | 354:17 355:16 | **lynch** 156:13 |
| 496:16 497:11 | 61:11 77:6 81:6 | 389:24 410:20 | **lynda** 208:19 |
| 497:18 498:14 | 95:8 103:18 | 411:18 418:9 | |
| 498:20 503:13 | 105:3 114:21 | 419:18 433:22 | **m** |
| 508:4,9,19 | 131:19 139:23 | 460:16 473:20 | |
| 509:7 513:10 | 159:23 161:5 | 504:4 528:24 | **made** 31:15,18 |
| 515:2 518:2,6 | 163:5 164:9 | **love** 240:4 | 66:9 81:24 82:5 |
| 518:13,15 | 169:16 173:7 | 254:17 331:12 | 82:9 90:21 96:1 |
| 521:14 522:13 | 181:2 194:16 | **low** 405:21 | 134:21 135:12 |
| 522:17 523:5 | 195:12 205:22 | 406:16 408:16 | 169:8 178:14 |
| 529:3 531:18 | 229:16 236:6 | 408:18,21 | 179:5 192:24 |
| **looked** 22:20 | 249:14 250:17 | 409:2,12,24 | 204:19 236:23 |
| 33:11,12,18 | 251:24 253:16 | 410:10 498:17 | 243:14 248:6 |
| 40:12 72:20 | 257:19 265:4 | 501:24 | 254:12,19 |
| 78:24 89:1 | 272:3 277:16 | **lower** 95:10 | 275:15 281:6,9 |
| 103:2 113:11 | 280:15 288:3 | 124:22 125:10 | 281:9 282:23 |
| 122:23 141:2 | 289:12 291:16 | 259:11,15 | 283:1,4 284:2 |
| 144:14 170:5 | 298:8 308:11 | 260:5 265:7 | 306:10 319:22 |
| | | | 332:3 344:9,13 |

**[made - material]**                                                        Page 57

346:24 352:19
425:13 428:2
452:14 463:24
465:4 486:17
513:22 514:2
515:9 525:15
529:5
**magnitude**
234:3,23 512:8
**mail**  79:12
**mails**  79:14
**main**  72:1
283:19 284:5
287:15 288:14
293:21 294:13
330:21
**major**  256:4
**majority**  144:6
183:10
**make**  13:21
14:6,21 18:22
31:21 43:1 47:7
61:11 76:7
136:17 139:12
142:3 144:5,13
153:18 171:20
186:23 189:10
201:2,19
206:20 226:16
241:24 247:2,8
248:10 250:10
257:6 260:10
268:13 278:3
282:10 292:17
295:1,15
298:15,19,22

318:22 323:8,8
330:12,19
338:24 341:3
344:18 345:20
347:5 348:3,13
350:21,22
354:14 357:8
361:4,7,8 362:9
367:1 370:14
373:4 376:15
376:15 378:18
378:20 388:14
392:18 397:1,6
397:13 398:23
404:4 414:24
426:13 485:5
492:16,19
498:4 506:8
507:23 510:11
515:5 520:6,6
528:18 531:4
533:7
**makes**  14:2
142:9 207:16
427:22 520:11
**making**  41:3
63:2 128:17
133:11 136:14
160:2 169:7
229:7 244:14
280:10 306:14
366:21
**management**
411:3
**mandate**
533:14 534:1,5

**maneuver**
418:7
**manner**  439:21
**manufactured**
226:23
**manuscripts**
15:14
**march**  5:12
7:10 11:14
42:10,18
270:11,14
482:23 539:24
**marital**  447:5
**mark**  4:17
19:24 42:7,13
76:3,5,6 86:23
92:14 98:9
109:16 166:21
167:7 171:2
180:2 194:20
245:16,17
268:20 270:2
275:21 284:22
285:17 349:11
349:22 361:17
398:1,6 421:10
432:14 437:13
474:13,16
482:9 492:17
528:6
**marked**  15:22
20:2 42:14
44:13,18 47:1
60:21 66:1
76:15 80:23
83:13,16 92:17

92:21 94:5,9
98:13 100:6
161:17,19
166:19,23
167:12 171:4
180:3 188:11
194:22 195:20
212:23 245:20
249:3,5 270:5
276:2,7 277:24
285:3 296:15
296:18 326:14
326:15 332:15
332:17 341:20
341:21 350:1
361:21 368:16
368:18 373:15
373:16 379:4,6
398:3,9 421:6
421:12,19
429:21,23
432:13,20
437:15 443:22
454:8 467:18
475:2 477:5,11
482:20 508:2
**market**  389:24
**marketing**  1:7
**marking**  20:7
60:19 76:12
94:2
**mas**  1:6
**master's**  25:3,4
310:16
**material**  39:20

**[materials - members]**                                                                Page 58

| | | | |
|---|---|---|---|
| **materials** 15:17 | 129:15 142:18 | **measures** 87:9 | 441:5 448:5 |
| 16:2 17:19 | 168:24 190:20 | 111:10 125:16 | 479:10 488:20 |
| 39:16 74:5 | 199:12,16 | 131:15 364:20 | **medication** |
| 77:14,18 91:11 | 202:9 214:3,18 | 442:13 | 147:11 |
| 163:3 193:22 | 216:4,16 | **mechanism** | **medications** |
| 198:14 213:19 | 223:24 228:18 | 84:12 85:11 | 147:8 |
| 213:21,23 | 233:21 241:14 | 111:20 133:16 | **medium** 498:18 |
| 215:3,6,9 | 242:18 260:6 | 134:1,10,24 | **medline** 46:12 |
| 235:22 392:21 | 264:6 282:20 | 135:24 136:8 | 46:14 235:15 |
| 393:1,13,17 | 294:18 301:9 | 136:20 137:4,7 | **meet** 48:17 |
| 500:24 501:4 | 303:8 316:11 | 137:14,17,18 | 53:11,14 |
| 535:4 | 316:18 317:19 | 138:11,24 | 533:20 534:14 |
| **matter** 27:10 | 331:4,5 339:21 | 139:11 158:14 | 534:21 |
| 27:18 35:3 | 367:5 370:5 | 223:15 260:14 | **meeting** 50:20 |
| 218:16,21 | 376:5 410:21 | 260:15 357:9 | 50:22 51:1,12 |
| 219:1 538:6 | 468:22 498:2,3 | 357:10,23 | 52:2,6,12,24 |
| **matters** 26:16 | 522:3 523:7 | 360:12,20 | 53:4,17,18 54:1 |
| 26:19,22 27:1,1 | 527:13 532:23 | 456:14 479:2 | 56:19,21 78:21 |
| 27:5 32:13 | **meaning** | 487:18 488:4 | 157:2 253:14 |
| **mcdonald** 8:12 | 134:13 154:10 | 488:14 | 273:20 435:19 |
| 349:8,19 | 155:12 283:6 | **mechanisms** | 435:22 436:19 |
| 350:10 352:15 | 284:6 350:23 | 136:1 137:2 | 440:6 444:7,11 |
| 353:5 354:21 | **means** 27:18 | 138:3,3 357:11 | 451:22 452:1 |
| 355:19 391:15 | 103:12,14 | **media** 168:5 | 452:20 453:5 |
| 392:1 | 206:1,2,3 260:7 | 390:1 | 470:6 |
| **mcshane** 362:7 | 303:16 313:18 | **mediators** | **meetings** 52:17 |
| **mctiernan** 69:4 | 326:23 327:16 | 131:1 | 53:18 70:2 80:4 |
| **mdl** 1:5 3:13 | 455:23,24 | **medical** 26:3 | **meets** 233:22 |
| 43:10 201:9,12 | 456:1 512:17 | 35:6 62:9 65:1 | **meghan** 61:20 |
| 201:23 203:3 | **meant** 480:2 | 65:3,11,19 | 62:4 |
| 208:14 | 516:14 | 159:13 190:8 | **member** 276:21 |
| **mean** 13:16 | **measure** | 191:24 192:18 | 277:1 |
| 14:20 49:7 50:5 | 122:13 127:13 | 192:23 262:22 | **members** 59:3 |
| 51:7 61:23 | 362:24 516:8 | 277:2 305:2 | 273:18 276:15 |
| 86:16 101:23 | **measured** | 360:7 426:23 | 276:19 277:5 |
| 103:13 112:10 | 160:24 446:8 | 428:3,15 435:5 | 277:15 291:13 |

**[mentioned - misreport]**                                                Page 59

**mentioned** 15:3
  56:13,14,17
  71:16,17,17
  91:3 122:20
  152:9 157:20
  192:14 209:11
  235:7 245:15
  249:20 314:4
  322:15 370:13
  379:3 389:8
  423:24 424:21
  451:3 469:12
**mentor** 80:5
  333:10,12,23
**merely** 103:12
  244:13 312:8
  382:15 388:20
**merged** 405:1
**merit** 2:22
**mesothelioma**
  203:18 305:9
  483:22 487:1
  487:11
**mess** 276:11
**met** 48:16 80:3
  80:4 204:12
  245:1 491:10
**meta** 7:16 9:5
  102:10 115:1
  132:1,1 236:11
  237:19,24
  280:1 322:23
  323:2 336:9
  397:23 401:24
  402:4,8,17,17
  403:22 404:1

  404:15 407:11
**method** 163:3
  316:14
**methodologic**
  78:9
**methodological**
  112:17
**methodology**
  34:18 109:4,10
  109:24 111:17
  159:15 160:8
  228:23 229:4
  229:11 230:10
  230:18,19
  243:16 245:4
  309:16,18,21
  310:3 311:14
  311:16 316:24
  317:4,11 320:4
  320:9,21
  457:23 458:1,4
  460:6 533:21
**methods**
  205:22 241:10
  241:18,21
  320:16 332:2
  366:13,14
  508:10,20
**mhegarty** 4:21
**mice** 219:12
**michelle** 3:15
  49:23,24 51:8
  53:2 175:20
  492:7
**michelle's**
  497:12

**microscopy**
  8:12
**middle** 95:11
  117:22 126:20
  148:23 177:9
  184:17 303:20
  323:7 330:17
  365:14,20
  387:9 475:10
  484:5,5,20
  523:21
**migrate** 264:2
  264:13 445:7
**migrating**
  456:8
**migration** 8:8
  137:19 184:21
  429:7
**mind** 142:21
  154:17 155:16
  242:18 352:1
  421:17 497:1
**mine** 18:2
  162:15 341:1
  354:16 443:15
**mined** 309:5,11
  424:6
**mineral** 206:14
  308:9
**mineralogist**
  308:19
**mineralogy**
  308:15
**minimal** 386:6
**minimize**
  378:22

**minimum**
  151:20 348:18
**mining** 309:12
**minnesota**
  25:16,19
**minute** 199:2
  481:20 482:16
**minutes** 253:13
  417:11 451:20
  451:21 452:5
  492:8,9 526:24
  527:9,23,24
  528:11,13
**mischaracteri...**
  72:8 250:10
**misclassificat...**
  111:18,23
  112:2 172:22
  173:20 185:8
  229:21 233:17
  314:17 319:23
  324:19 338:18
  386:20 449:13
  450:1 512:15
**misinterpreted**
  289:11 291:6
**misleading**
  291:8 358:19
**misleads**
  261:13
**misquoted**
  353:4
**misread** 351:4
**misreport**
  386:18

| | | | |
|---|---|---|---|
| **missed** 58:17 | **modest** 132:4,5 | **month** 14:17 | **murray** 371:22 |
| **missing** 21:10 | 335:23 | 43:20 155:16 | 382:22 |
| **misspoke** 74:12 | **modestly** 129:6 | 189:16 273:19 | **musser** 262:4,5 |
| 356:23 379:11 | **modifiable** | **months** 17:2 | **mutagenic** |
| **misstates** | 147:24 | 433:6 504:19 | 478:9 |
| 107:12 117:13 | **modification** | 504:22 505:16 | **mutation** |
| 117:17 118:6 | 50:3,4 164:24 | 505:20,22,23 | 156:10 |
| 120:8 121:18 | 165:10 185:1 | 506:4,6 | **mute** 34:8 |
| 136:12 175:17 | **modifications** | **moor** 13:4 | **n** |
| 184:7 198:16 | 50:15,16 | **moore** 421:1 | **n** 4:7 12:1 |
| 240:11 241:2 | **modified** 48:16 | **moorman** 13:7 | **name** 12:14 |
| 243:20 287:23 | 50:6 213:16 | 13:8,9,15 69:9 | 13:10,17 14:13 |
| 358:10 412:22 | **modify** 48:3,13 | **moorman's** | 16:23 18:15,17 |
| 435:10 465:18 | **modifying** | 13:14 14:15 | 54:4 56:14,16 |
| 466:19 468:17 | 78:15,22 | 54:18 | 68:23 100:3 |
| 489:15 514:13 | **moldurano** | **morning** 12:11 | 170:21 202:5 |
| 514:15 517:16 | 208:23 | 12:12 212:22 | 207:3 474:4 |
| 520:24 525:3,4 | **moment** 36:7 | **motley** 61:17 | 508:23 509:4 |
| **misstating** | 43:17 50:17 | **mougey** 3:5 | **names** 13:13 |
| 119:6,8 | 98:7 192:14 | **mouth** 64:19 | 51:4,24 52:4 |
| **mistake** 284:3 | 249:1,20 | **move** 242:19 | 56:17 59:7,14 |
| **mistakenly** | 292:16 295:9 | 464:23 482:13 | 59:17 61:15,19 |
| 363:15 | 334:22 369:3 | **moved** 515:12 | 71:19 208:16 |
| **mitigated** | 370:13 389:8 | **mparfitt** 3:19 | 208:22,24 |
| 452:16 | 416:12 517:19 | **mucinous** | 209:10 211:4 |
| **mitigation** | **moments** 74:5 | 140:9,17,22 | **napkins** 423:3 |
| 436:17 | **monday** 53:9 | 143:24 145:2 | 447:6 |
| **mixes** 298:11 | 53:10 | **multiple** 8:9 | **narrow** 102:11 |
| **mixing** 299:12 | **money** 204:18 | 102:8 139:12 | 330:6 348:16 |
| 300:12,17 | **monograph** | 148:18 318:8 | 401:10 |
| 303:1 | 88:7,15,19,24 | 322:10 341:1 | **national** 265:4 |
| **mo** 4:19 | 89:1,12 221:3,6 | 368:5,5 | 287:2 411:17 |
| **models** 219:10 | 221:9,13,16,23 | **multivariate** | 438:8 442:17 |
| 219:20 478:7 | **monotonically** | 181:8 304:4 | 460:17,21 |
| **modern** 80:20 | 131:14 | 447:4 | |

**[naturally - nonusers]**

| | | | |
|---|---|---|---|
| **naturally** 298:13 | 263:20 332:10 416:13,19 443:10 483:16 | **neither** 128:8 506:19 539:13 539:15 | **news** 390:1 **newsome** 208:20 |
| **nature** 362:16 412:15 415:14 | **need** 22:21 109:22 127:2,3 | **ness** 69:21 70:6 70:12,21 71:5 | **nhs** 285:16 286:2,9,23 288:13 |
| **nci** 7:7,11 265:17 266:2 266:16,18,23 266:24 267:1,8 267:12,16 268:3 269:5,9 269:10,19,21 270:4,14 271:14,17,24 272:12 277:6,6 277:16 278:3 287:13 288:4,6 288:10 289:21 290:19 292:1 292:11 293:18 | 147:14 148:9 199:12 200:5,7 222:3 235:21 242:11 255:1,7 257:5,10 275:3 275:3 279:3 296:3 300:18 315:4 332:6 345:2,6,16 352:24 353:12 355:1 360:10 364:9 371:17 371:23 397:9 420:10 425:18 | **neurodevelop...** 28:5 29:4 **neurologic** 31:17,24 32:23 33:10 **never** 14:24 17:20,20 35:13 36:17,20,23 37:2 57:20 66:7 70:4 81:24 82:5 153:14 176:17 297:22 305:15 305:21 306:5 306:20 307:1,4 | **nih** 264:16,20 264:24 265:9 265:10,13 **nine** 175:3,5 234:6 **nods** 231:15 411:23 469:15 493:8 **noel** 80:6 333:8 340:16 **non** 174:20 206:14,24 231:21 318:11 |
| **nci's** 268:13 270:4 | 431:16 443:11 448:11 492:1,5 497:15 522:8 | 324:13 353:6 353:21 364:7 | 318:24 338:16 338:19 339:11 340:11 433:6 |
| **nearly** 131:12 **necessarily** 144:18 172:19 182:14 196:18 208:6 227:12 233:21 267:17 268:4 316:21 336:7 354:1 387:1 412:10 456:6 | **needed** 22:18 109:18 178:1 178:11 443:12 502:6 503:2 **needs** 110:2,2,8 110:12,13 150:17 255:16 255:17 257:24 315:5 346:7 390:14 427:15 | 383:1 384:10 386:16 390:22 407:20 473:22 514:5 **new** 1:2 4:3 7:1 63:3 120:10 133:18 148:7 172:20 201:9 201:12,23 203:4 208:15 | 511:1 512:6,8 512:14 **nondifferential** 512:15 **nonexistent** 95:23 **nonpatent** 375:1 378:2,11 **nonridiculous** 377:11 |
| **necessary** 43:1 150:9 151:1,21 152:4 207:19 222:8 225:7,19 226:16 227:8 | 427:18 441:20 **negative** 350:24 352:21 354:22 355:18 | 227:14 236:8,8 298:23 323:1,2 387:16 478:21 535:15 | **nonscientific** 311:13 **nonusers** 375:18 |

**[normally - object]**                                                    Page 62

| | | | |
|---|---|---|---|
| **normally** 13:23 | 314:2 372:2,24 | 398:7 399:12 | 287:1,4,16,19 |
| 101:17 | 475:8,9 512:16 | 399:13,17 | 288:15,18 |
| **notary** 2:22 | **number** 5:9 | 411:4,5 421:7 | 294:5,20 301:5 |
| 539:4,21 | 10:2 15:21 18:1 | 421:11 426:1 | 302:21 303:23 |
| **note** 40:6 84:7 | 19:24 20:7,10 | 429:21 437:14 | 304:9,11 324:1 |
| 104:11 171:20 | 44:13,19,23 | 437:23 443:15 | 326:2 368:13 |
| 196:1 213:9 | 45:15 47:1 49:8 | 443:18 454:1,3 | 368:17 373:23 |
| 323:10 344:6 | 49:14 52:9 | 454:5 467:11 | 385:5,16,20 |
| 370:18 386:4 | 55:18 60:20 | 470:18 474:12 | 386:14 387:4 |
| 399:17 513:6 | 65:5 66:2 76:4 | 477:5,6 482:10 | 388:17,18 |
| **notebook** | 76:6,8,12,21 | 494:13,13 | 419:19 420:20 |
| 496:21 | 77:1,6 83:14,19 | 496:18 497:13 | 420:24 422:7 |
| **notebooks** | 92:15,22 94:3,9 | 497:19,19 | 474:11 475:6 |
| 15:18,21,22 | 98:10,24 100:7 | 510:18 529:24 | 475:14 476:17 |
| 16:1 47:1,2,4 | 104:20 116:4 | **numbered** 93:1 | 477:2 493:14 |
| **noted** 85:21 | 126:15 135:13 | **numbers** 142:2 | 493:22,23 |
| 328:3 334:13 | 152:20,21 | 162:15,15 | 495:7 496:1 |
| 336:24 404:14 | 154:4,5 155:15 | 280:9,12 494:8 | 502:23 521:16 |
| 408:19 450:8 | 155:17 161:18 | **numerical** | **o'brien's** |
| 472:15 | 166:22 179:11 | 236:19 | 294:16 385:10 |
| **notes** 16:5 | 188:11 195:20 | **nurses** 175:13 | 419:20,21 |
| 101:4 255:10 | 206:4 212:23 | 176:6,14,20 | 478:24 |
| **noteworthy** | 221:16 247:21 | 179:21 182:15 | **o'dell** 49:24 |
| 412:18 413:9 | 252:1 277:19 | 261:5 284:15 | 51:8 71:18 |
| **notice** 2:20 | 285:2 296:16 | 284:20 285:13 | **oath** 471:12 |
| **november** 5:17 | 296:21 297:3 | 293:23 295:21 | 538:13 |
| 6:6 7:6 8:13 | 300:5,6,17,20 | 296:10 323:18 | **obesity** 130:22 |
| 11:3 50:24 | 301:1 314:16 | 367:16 496:4 | 157:3,17 |
| 56:22 73:5,8 | 322:13 332:16 | **nw** 2:15 3:16 | **object** 18:8 |
| 74:10,11,14,16 | 334:16 336:9 | | 41:18 64:11,14 |
| 82:7,10 126:15 | 337:4 338:11 | **o** | 105:16,17 |
| 213:16 216:13 | 341:20 348:6 | | 203:4 214:1 |
| **ntp** 252:17,22 | 357:21 363:1 | **o** 12:1 | 216:3 231:8 |
| 253:5,11 | 368:17 373:15 | **o'brien** 3:5 8:19 | 232:1 275:16 |
| **null** 260:11 | 373:19 379:5 | 10:6 237:18 | 305:19 372:12 |
| 303:8 313:14 | 386:5 389:9 | 282:15,21 | 464:14 480:18 |
| | | 283:21 286:21 | |

**[object - obtained]** Page 63

| | | | |
|---|---|---|---|
| 535:11 | 210:9 214:1,10 | 419:3,13 423:8 | 488:6,16,23 |
| **objecting**  110:5 | 217:6 219:8 | 423:21 424:10 | 489:5 490:2,12 |
| 175:21 | 220:10 222:10 | 424:18 425:16 | 490:24 491:15 |
| **objection**  29:24 | 223:10 225:10 | 427:9 428:6,18 | 494:15 495:9 |
| 30:1,23 38:12 | 225:11,22 | 429:8,16 432:5 | 495:20 498:24 |
| 40:9 41:5 45:21 | 240:10,21 | 433:12 434:6 | 499:18 502:12 |
| 63:6,7 64:5 | 241:1 242:6,7 | 435:9,24 437:1 | 514:9,12 |
| 72:7 87:13 | 243:19 250:9 | 439:2 440:1,16 | 517:15,22 |
| 97:10,11 100:8 | 257:22 262:21 | 440:24 441:8 | 519:18 520:17 |
| 101:21 102:17 | 263:1,13,22 | 442:19 444:12 | 520:23 522:11 |
| 103:10 104:24 | 265:20 266:5,6 | 445:1,8,15 | 525:2,3 526:4 |
| 105:12 107:10 | 267:4,19 | 446:10 447:13 | 528:22,23 |
| 108:1,20 | 271:18 272:18 | 448:8 449:19 | 531:16 532:15 |
| 111:14 117:12 | 275:19 277:9 | 450:24 451:7 | 533:23 535:2 |
| 118:5,20 119:3 | 279:2 287:22 | 451:12 452:6 | **objections**  63:8 |
| 120:7 121:17 | 288:20 289:7,9 | 452:18,22 | 118:23 275:8 |
| 123:1 135:2 | 291:3 300:8 | 453:12,21 | 275:15 536:10 |
| 136:10,11,23 | 301:7 306:8 | 455:5,13 | **objective**  317:3 |
| 136:24 137:9 | 311:18 312:24 | 456:19 457:10 | 317:18 |
| 138:4,13 | 313:20 315:11 | 458:6 459:7,19 | **observation** |
| 141:12 146:8 | 317:5,14 | 460:1,11 | 533:7 |
| 148:15 149:14 | 320:13 322:8 | 461:14,23 | **observational** |
| 150:12,13 | 324:14 327:12 | 462:15 463:1,7 | 236:7 408:10 |
| 151:4,22 | 329:21 334:21 | 463:19 464:9 | 408:15 439:12 |
| 152:12 155:24 | 354:24 355:21 | 464:19 465:6 | 501:21 |
| 159:18 160:9 | 358:9,17 | 465:14 466:5 | **observed**  85:22 |
| 160:17 166:7 | 360:17 372:7 | 466:18 468:5 | 92:2 131:23 |
| 175:16 178:16 | 372:14 376:2 | 468:12 469:18 | 168:9 170:8 |
| 179:8 180:11 | 376:15,15 | 470:13 472:5 | 181:6 186:5,23 |
| 180:13,18 | 380:16 383:8 | 472:19 473:4 | 226:13 228:2 |
| 181:13 183:3 | 384:2,19 | 473:15 474:1 | 281:23 348:5 |
| 184:3,6 185:14 | 394:15 396:10 | 475:17 476:13 | 371:19 386:13 |
| 187:2 192:7 | 401:4 402:19 | 478:13 479:4 | **obtain**  128:5 |
| 193:2 197:21 | 405:23 408:23 | 479:13 480:11 | 251:23 370:8 |
| 198:15 199:7 | 410:11 412:19 | 481:14 482:4 | **obtained**  47:6 |
| 201:22 203:24 | 413:11 418:20 | 485:20 487:21 | 74:6 233:4 |

**[obvious - okay]**                                                      Page 64

| | | | |
|---|---|---|---|
| **obvious** 87:2 | 295:4,7,18,22 | 302:9 304:10 | 177:17 181:17 |
| 234:18 | 299:3,16 302:6 | 321:17 326:9 | 181:22 189:5 |
| **obviously** 56:4 | 327:19 337:18 | 327:2,3 336:7 | 191:6 195:13 |
| 64:15 80:2 | 399:15 411:20 | 344:3 346:22 | 199:4,12 200:3 |
| 107:18 234:14 | 457:2 511:9 | 351:14,19 | 200:14 239:15 |
| 237:3 447:20 | 523:24 | 362:14,18 | 239:19 243:6 |
| 535:10 | **offer** 213:2 | 365:24 373:5 | 248:21 250:3 |
| **occasion** | 449:12 538:12 | 374:20 376:21 | 255:20 258:6 |
| 425:14 | **offered** 218:18 | 385:10,10 | 268:21,23 |
| **occupation** | 218:20 387:15 | 406:13 426:2,4 | 273:3,11 288:5 |
| 23:12 | 387:16 | 436:11 438:19 | 293:11 294:21 |
| **occur** 158:15 | **offering** 218:12 | 448:20 449:7 | 294:24 295:12 |
| 223:17 235:1 | **office** 46:19 | 450:12 454:4 | 329:1 336:18 |
| 325:10 390:14 | 47:11 68:11 | 460:23 470:19 | 340:5 341:10 |
| 424:5 450:2 | **offices** 2:12 | 482:15 492:23 | 345:19 351:24 |
| **occurred** 86:7 | **official** 363:15 | 497:22 504:13 | 354:17 355:5 |
| 129:2 235:1 | **ogunsina** 11:7 | 516:2 530:3 | 372:18 378:8 |
| 335:16 344:8 | **oh** 35:19 45:13 | 531:23 | 389:7 397:12 |
| 344:12 346:23 | 54:4 57:18 | **okay** 13:6,11 | 397:20 411:14 |
| **occurrence** | 61:16,23 62:2 | 20:8 21:1,11 | 418:24 419:7 |
| 462:21 | 66:11 76:23 | 26:2 31:2,13 | 419:18,24 |
| **occurring** 56:4 | 77:7,17,18 84:3 | 34:10,15 63:16 | 421:5 422:13 |
| 388:12 | 84:17,17,17,24 | 63:16 67:11 | 422:17 423:1 |
| **october** 6:3,17 | 94:10 95:4,17 | 73:2 76:11 85:1 | 423:12,19 |
| 7:23 10:17,20 | 99:8 106:15 | 88:13 93:4,6 | 424:13 425:9 |
| 44:15 45:16 | 122:6 125:5 | 98:20 108:19 | 425:12,20,20 |
| 48:2,15 49:17 | 127:18 162:17 | 108:22 109:17 | 425:23 426:19 |
| **odd** 188:1 | 164:13 165:7 | 115:11 118:24 | 427:3,24 |
| **odds** 32:2,23 | 177:7 194:11 | 120:9 124:20 | 428:11 429:20 |
| 84:10 85:9,22 | 194:11 195:13 | 125:11 127:4,9 | 430:6,11,13,18 |
| 102:4,14 103:4 | 195:13 196:17 | 127:18 133:19 | 431:2,14 432:1 |
| 103:7,9,12 | 230:12 239:10 | 153:23,23 | 432:12 433:21 |
| 145:1 167:24 | 260:22 268:19 | 154:4 162:6,20 | 434:14 435:4 |
| 168:7,10 | 273:10,11 | 163:2,16 | 435:16,21 |
| 178:24 187:21 | 280:4 283:17 | 164:14,21 | 436:13,18 |
| 187:21 233:9 | 295:16,19 | 175:23 177:13 | 438:20 439:6,9 |

**[okay - opportunity]** Page 65

440:4,8,12,20
441:4,13 443:6
444:9,16,22
445:5,12,19
446:15,21
448:14 450:6,8
450:19 454:11
455:9 456:5,12
456:23 457:6
457:19 458:3
459:11 461:4
461:12,18
462:3,19 463:4
463:11,23
465:2,11 466:1
466:14 467:2
467:10 468:24
468:24 469:2,5
469:10,16
470:1,3,23
471:9,22 472:3
472:9,12 473:8
473:19 474:8
474:11,23
476:11 477:1
478:4,20
480:14 482:7
482:19 484:13
484:18,22
485:7,16
486:10 487:14
488:11,19
489:20 491:18
492:10 493:12
493:18,21
494:3,6,12,21

495:1,14 496:3
496:5,8,8,14,24
497:14,22
498:10,14,20
500:2,8 501:10
501:17 503:5
511:5 515:14
520:2 523:4,12
523:13 524:16
528:12,13
529:23 534:22
**old** 48:14
**older** 183:13
229:24 302:20
337:18
**once** 80:3 151:9
154:22 184:9
189:15,16
297:18,19
298:6,12
417:13 478:7
**oncologist**
69:13 193:10
**oncologists**
26:6,8 190:5
**oncology** 305:3
395:12
**ones** 48:14
124:19 144:17
157:19 234:14
234:19,21
235:3 236:1
323:2 330:3
336:1
**ongoing** 29:14
168:4

**online** 22:20
167:10,15
**ontario** 411:8
**open** 115:24
148:7 295:10
322:1 326:3
335:13 342:24
372:1 446:22
508:22
**opinion** 29:22
30:13,15 31:1,5
32:22 33:2,5
41:21 63:21
64:3 81:8,14,17
81:21 89:14
90:1,3,24 91:1
102:13 106:6
137:6 140:4,16
141:10,20
142:5,7 145:6
145:19 146:4
146:13,18,19
146:20,23,24
147:7 148:13
149:1 150:1,11
150:24 151:17
151:19 152:3
152:16 158:17
158:21 160:2
186:9,17,22
188:23 189:5,7
206:23 207:2
208:8 222:6,14
222:20,23
224:8,11 225:6
225:18 226:3,9

226:16,21
227:1,6 262:7
263:18 292:10
306:6,20
360:15 389:12
390:5,6,19
404:18 410:13
414:10,19,22
416:20 418:5
419:1 449:12
487:17,24
488:2 496:9
506:5 510:9,14
**opinions** 50:8
108:14 148:11
153:1 190:1,8
190:13 191:10
191:15,18,22
192:1,4,11
193:16 207:19
208:3,10 213:2
213:8,15,22
214:23 215:4
216:1 217:5
218:12,16,19
218:21 219:5
220:5 310:20
319:18 321:5
383:7 464:1
499:21 535:7
535:15,18
**opportunity**
178:20 274:17
275:1 427:5
436:15 456:10

**[opposed - ovarian]**                                                      Page 66

| | | | |
|---|---|---|---|
| **opposed** 154:20 | **outset** 499:17 | 130:10 132:6 | 211:4 212:4,15 |
| 178:21,23 | **outside** 21:17 | 134:11,12 | 212:18 215:13 |
| 227:24 | 42:2 71:11 | 135:1 136:9,21 | 221:1,18 222:5 |
| **oral** 456:3 | 191:14 193:10 | 137:8 138:12 | 222:8,15,19,22 |
| **orally** 23:3 | 263:1 267:11 | 139:9 140:3,5,7 | 223:8,9,16,16 |
| **order** 147:13 | 305:16,21 | 140:9,13,22,24 | 224:10,20 |
| 255:1 332:7 | 306:4 310:17 | 141:8,16,18,24 | 225:1,3,9,20 |
| 360:11 390:14 | 311:6 328:20 | 142:14 143:6,8 | 227:15,19,20 |
| 392:18 534:10 | 406:19 514:3 | 143:16,20 | 229:13 230:5 |
| **organ** 8:9 | **outstanding** | 144:1,10 145:7 | 230:20 234:15 |
| **organization** | 333:16 | 145:11,15,20 | 237:9,14 238:1 |
| 192:19,23 | **outward** | 147:6,9,12,23 | 242:5 243:5,18 |
| 193:4 211:18 | 265:23 | 147:24 148:12 | 244:2 245:14 |
| 267:13 | **ovarian** 5:19 | 149:7,12,20 | 245:19 246:1 |
| **organizations** | 6:5,8,12,13,16 | 150:20 151:3 | 246:20 250:8 |
| 192:1 | 6:19,21 7:7,15 | 152:5 153:13 | 251:8 256:7 |
| **original** 281:7 | 7:19,22 8:2,5 | 155:6,10,23 | 258:13,16 |
| 283:20 287:16 | 8:19,21 9:2,8 | 156:2,5,6,9,11 | 259:10 260:16 |
| 288:15 293:22 | 9:12 10:8,13,19 | 156:14,17,24 | 261:8 263:9,20 |
| 293:23 294:2,5 | 10:22 11:2 27:2 | 157:3,6,7,14,17 | 269:5,10 |
| 294:6,14,16,18 | 27:6,11 28:2 | 157:23 158:3,7 | 271:11 272:16 |
| 438:11 439:8 | 42:3 57:17 | 158:8,12,15,17 | 277:7,13,18,24 |
| **originally** 49:3 | 63:22 65:20 | 158:20 159:1,3 | 278:3,11 |
| **osan** 54:7 55:6 | 81:11 82:16 | 159:4,7,9,17 | 279:19 280:5 |
| **osan's** 54:9 | 83:6 84:13 | 160:4 163:12 | 282:5 290:3,12 |
| **ottawa** 411:8 | 85:12 87:4,5 | 167:23 170:1 | 290:24 291:15 |
| **ought** 452:15 | 88:16 89:16,21 | 171:21 176:7 | 291:21 292:5,7 |
| 452:16 464:4 | 90:2,8 91:16,24 | 181:8,10 183:2 | 292:12 295:23 |
| **outcome** | 93:11,13 96:17 | 183:9,11,19 | 297:13 299:17 |
| 128:24 212:12 | 98:12 100:15 | 184:2 186:11 | 300:3 302:7 |
| 230:14 315:24 | 102:5,15 | 186:18,24 | 304:5,19,20,24 |
| 316:2 407:4 | 104:15 107:8 | 191:10 192:5 | 305:6,12,16 |
| 445:24 516:5 | 113:9 114:4,12 | 192:20,24 | 306:1,6,16,22 |
| 539:17 | 114:22 115:3 | 193:6,12 | 307:2 308:12 |
| **outlined** 358:24 | 115:19,20 | 203:17 206:24 | 310:12,20 |
| 462:7 | 125:7,12 130:6 | 209:5 210:8 | 311:4,9 320:4 |

**[ovarian - p5]**                                                                Page 67

| | | | |
|---|---|---|---|
| 321:22,23 | 445:13 447:12 | **overall** 93:13 | 446:16,18 |
| 323:11,17,24 | 454:12,22 | 112:16 129:6 | 474:11 500:18 |
| 324:10,13,23 | 461:7 465:23 | 130:9 132:4,5 | **p** |
| 324:24 325:2 | 475:16 479:22 | 145:6 149:4,4 | **p** 12:1 153:20 |
| 325:10,19 | 480:8,19,22 | 181:6 184:11 | 312:4,15 |
| 326:1 327:11 | 481:9 483:22 | 186:5,10,23 | 313:11 362:23 |
| 328:20 329:18 | 486:14,16,21 | 230:17 261:7 | 363:17,21 |
| 331:21 334:7 | 487:11,19 | 280:2,7 281:21 | 364:7,10,14,19 |
| 335:23 337:1 | 488:5,13 | 287:19 288:18 | 364:23 366:7 |
| 337:22 338:12 | 489:10,13 | 290:12 300:17 | 371:12 375:2 |
| 342:18 343:2,4 | 490:1 503:10 | 314:23 324:11 | **p.m.** 179:17,18 |
| 343:9 350:6 | 503:16,24 | 330:24 331:15 | 217:16 218:2 |
| 353:24 357:24 | 504:1,5,11,16 | 339:13 340:17 | 247:15,16 |
| 360:9,13,14,16 | 505:3,8,12 | 367:10,20 | 293:2,3 301:20 |
| 369:11,22 | 506:13,22 | 375:4 400:20 | 301:21 342:11 |
| 375:7,17 | 507:6 509:13 | 495:23 | 342:12 346:9 |
| 378:24 380:14 | 510:1,13 | **overestimate** | 346:10 349:14 |
| 381:7 382:2 | 511:16 517:3 | 476:5 | 349:15 355:9 |
| 383:17 384:1 | 526:2 529:14 | **overreport** | 355:10 391:6,7 |
| 384:17 387:12 | 531:14,15 | 174:6 | 417:6,7,21,22 |
| 389:13 390:7 | 536:2 | **ovulating** 456:7 | 493:3,4 499:15 |
| 390:16,21,22 | **ovaries** 115:24 | **ovulation** 126:6 | 499:16 536:17 |
| 391:2,18,22,23 | 146:6 149:17 | 158:11 335:14 | **p1** 10:3 421:13 |
| 392:5,11,16 | 184:21 219:16 | 358:2 456:11 | 426:10,11 |
| 394:4,8,13 | 227:9,13,21,24 | 462:6 | 500:10 |
| 396:4 400:9,22 | 228:3,12 322:2 | **ovulatory** | **p2** 10:7 429:21 |
| 410:9 412:9 | 349:7 353:7,21 | 433:6 450:14 | 429:24 508:2 |
| 414:11,18,21 | 391:15,19,23 | 456:9 | **p3** 10:12 432:19 |
| 415:3,19 416:9 | 391:24 392:10 | **own** 46:13 47:6 | 432:21 510:19 |
| 418:19 419:12 | 392:13 419:9 | 51:20,22 | **p4** 10:15 437:16 |
| 424:14 425:2 | 444:18 456:16 | 147:13 216:7 | 437:17,18,22 |
| 428:4,13 430:7 | 464:3 | 224:3 235:8 | 513:10 514:8 |
| 430:20 431:7 | **ovary** 256:9 | 236:14,21 | **p5** 10:18 443:23 |
| 431:18 432:18 | 392:5 416:14 | 358:10 359:19 | 454:7 514:24 |
| 433:10 434:21 | 419:10 | 359:19 422:15 | 515:2,14 |
| 438:12 441:16 | | 425:6 438:11 | |

**[p6 - paragraph]**

Page 68

**p6**  10:21 454:3
454:9,11 523:5
523:13
**p7**  11:1 467:12
467:14,17,19
**p8**  11:4 477:7,8
477:12
**p9**  11:9 482:21
530:18 533:19
**pa**  3:5 4:8
**pace**  277:2
**package**  341:5
**page**  5:2,9 10:2
49:7 61:5,13,23
63:15 76:18
81:6,22 82:13
83:23 85:17
86:18 92:24
94:13,16 95:8
96:5,6 99:5
100:12 103:18
103:21 104:11
106:10,14,15
108:16 112:18
112:19 116:8
116:21 117:11
117:22 122:2,4
124:12 125:1
126:17 129:20
131:20,21
135:8,21
139:23 153:6
155:3 162:4,7
163:19 164:12
167:19,21
171:14 174:4

177:3 181:17
181:24 184:15
188:8 194:14
195:7,12 196:3
200:23,23
230:15 246:8
246:12 250:17
252:13,13,14
253:2 257:19
257:20 258:8
260:20,21,22
260:23 268:12
268:24 269:18
269:22 270:9
270:23 273:6,8
273:9,21
278:11,12
282:11 285:10
285:19 286:17
297:8 318:16
321:2,11 323:5
326:5,8 330:15
335:19 336:19
337:14 338:22
339:4 342:6
343:24 348:3
348:23 349:1
350:12 351:7
351:11 357:6
360:24 361:3
362:9 363:5,8
364:16 365:14
369:4 371:3
374:6 379:21
385:7,14 387:4
395:3 397:14

398:24 399:2
399:22 400:16
405:8 408:2,3
409:14 422:14
438:6,18 445:6
445:20 448:19
448:22,24
449:8,9,23
455:18 458:14
484:1,1,3 486:5
498:3 501:13
508:20 510:22
519:13 523:18
524:10 531:10
537:3,5,7,9,11
537:13,15,17
537:19,21,23
**pages**  61:14
77:8 122:2
172:6 252:16
278:17
**paginated**
484:2
**paid**  29:5,8
40:14 55:11
316:12
**pain**  24:6 265:6
**panel**  253:4
**papatonio**  3:4
**paper**  87:23
94:17,19 104:9
121:2,6,10
169:15,16
170:19 171:2,8
171:11 180:24
197:4,7 236:16

236:19,21
257:14 284:11
285:2,7 299:4,8
334:6 353:1,5
355:1 367:21
369:5,16
388:18 399:10
400:15 404:10
411:1 447:22
458:9 459:4
460:14 494:22
504:8 513:11
516:19,22
517:2,21 519:8
519:13 520:10
520:13 521:6,9
521:17 532:12
**paper's**  161:10
**papers**  15:15
43:6 80:7 121:2
148:6 155:18
331:23 439:13
518:7
**paragraph**
83:23 84:4,22
85:18 86:20
87:1,18 93:7
95:12,15
112:19 117:22
126:19,20
129:4 132:18
134:4 142:13
143:5 153:8
174:23 175:4,6
175:13 177:9
182:4 184:17

[paragraph - patent]                                                        Page 69

188:14 198:18
231:1 232:8
246:10 250:1
250:18,21
253:16 255:10
258:8,21 259:2
259:17 260:12
260:12,23
273:17 274:3
281:20 321:1
321:20 323:7,8
330:17 336:22
337:16 338:9
339:5,8,20
340:1 343:19
350:10,11,22
352:20 361:9
363:4,6 365:5
374:16 375:12
385:15 387:4,6
387:9 400:3,18
401:18,20
408:5 438:18
438:21 442:3
476:16 484:5,7
501:20 510:23
516:3
**paragraphs**
231:13
**parameters**
205:16
**parfitt**   3:15
53:12,19 71:17
72:2 76:9 77:1
100:8 136:10
136:24 138:4

141:12 149:14
167:7,13,16
175:16,22
176:2 285:17
285:23 289:7
329:21 420:19
428:17 492:11
492:16,21
499:7 526:15
528:5 533:23
**parity**   447:5
**parse**   208:9
**part**   11:10,10
39:17,21 45:4
60:4 71:20 77:8
125:1 132:12
143:12,17
178:14 179:6
186:4,7 196:20
230:23 232:21
238:14 240:1
259:13,17
286:15 289:1
289:17 332:24
335:7 349:6,18
357:15 360:6
361:3 392:20
393:2,13,18
394:2 395:10
404:9 411:1,3
444:2,3,5 450:9
520:13 523:21
533:8
**participant**
36:5 94:14

**participants**
128:20 287:3
**participate**
71:8 72:5
**participating**
237:22 512:3
**participation**
36:10 253:10
**particle**   478:6
**particles**
350:13,24
352:11,16
353:6 356:16
423:13 444:18
**particular**
23:19 77:24
83:9 87:23
113:18 120:18
120:19 131:14
141:4 144:17
144:21 145:4
145:23 147:12
152:3,20,21
154:16 155:15
160:1,23 178:8
198:18 202:24
209:13 212:12
230:14 233:19
235:4 238:5,18
278:7 285:14
290:24 304:1
305:22 306:16
310:5 341:1
360:19 369:15
369:16 402:2
404:24 415:8

415:23 427:17
434:15 442:15
514:22 535:19
**particularly**
179:12 186:4
194:13 255:16
324:20 330:1
331:23 354:2,4
357:24 370:6
387:24 414:8
434:22 435:1
455:12 476:11
476:20 495:15
505:12 524:12
**particulates**
137:19,20
228:2 264:2,13
456:9
**parties**   539:14
**parts**   221:15
224:5
**passed**   472:13
**past**   22:7
237:16 381:21
383:3 390:18
418:11,16
**patency**   185:23
371:13
**patent**   184:22
324:5 326:3,3
369:17 370:15
370:22,23
371:6,9,20,20
372:1,5,6 373:9
374:24 378:1
378:10 411:21

**[patent - period]**                                                     Page 70

412:11,16
413:7,10,17
414:3,7 433:10
433:18 455:12
473:13 476:12
**path**  360:20
**pathogenesis**
131:13
**pathogenic**
135:23 139:11
357:10 360:19
**pathological**
138:24
**pathologist**
444:23
**patient**  304:23
307:1 352:11
352:12 496:3
**patient's**  65:1
159:16 305:12
305:15,22
306:16
**patients**  191:10
268:5 292:2,4
307:18 346:15
350:12,16
352:11,17
356:14,17
378:11 455:21
**patricia**  13:8,9
**pattern**  131:23
334:13
**payments**
196:23
**pcpc**  239:6

**pdq**  7:9,11
268:14 269:5
269:16,19,22
270:4,16 271:2
271:8,14,17,24
272:12 275:21
276:14 277:6,7
277:16,23
278:3 282:15
282:21 283:6
284:7 287:13
288:4,6,10
289:17,21
290:19 291:12
292:1,11
293:18 493:10
**pdqs**  269:9
**pearson**  69:11
**peer**  40:19,22
41:10 57:22
82:1,21,24
192:6,15 204:9
204:11 206:20
244:15 245:10
248:14 271:10
272:15 435:7
440:22 459:3
460:9,9 463:5
479:10 491:7
513:23 515:8
521:2
**peers**  218:22
310:19 311:10
**pelvic**  8:9 356:6
356:13,18

**penalty**  538:1,4
**pending**  32:12
63:10,13
175:13 176:14
213:4 265:2
302:2
**penninkilampi**
238:6
**pennsylvania**
520:15
**pensacola**  3:8
**people**  51:9
56:14 95:13,20
130:22 139:5
196:11 289:13
300:22 428:14
436:21 438:23
450:13 465:11
470:5
**percent**  24:11
25:9,10,11,12
26:17,23 90:8
90:16,18,19
104:15 107:8
141:17,24
142:10 188:2
260:8 280:16
312:9 313:6
348:18,20,20
378:23 388:4
389:9,12 390:7
390:16,20
**percentage**
24:9 25:7 26:15
26:18,21
226:19,22

**performed**
109:5 466:23
468:10
**perineal**  6:15
7:14,21 9:7,11
10:9,12,18
140:2 152:23
251:8 278:17
279:1,18 290:2
290:24 291:15
291:20 292:11
329:17 337:2
337:17 353:18
356:14 375:17
400:8 415:6
423:3 430:8
432:17 438:12
453:16 506:14
506:19,20
509:11
**perineally**
432:4 456:15
**perineum**  8:9
264:3 431:19
505:24
**period**  59:24
65:16,18 66:15
86:7 129:2
150:6 152:22
153:12,17
154:10,13,13
154:14,16
168:2 169:4
299:1 383:19
390:13

**[periods - plausibility]**                                                Page 71

**periods**  126:3
  151:13 188:24
  189:13 338:4
  407:3 433:18
  450:15 456:3
  506:2
**peritoneal**  7:8
  264:4 271:11
  272:16
**perjury**  538:1,5
**permitted**
  124:9
**persisted**  447:4
**person**  48:9,17
  50:22 51:13
  52:6,16,24
  53:18 160:2,10
  173:3 175:21
  317:12 378:13
  452:5,10
**personal**  16:17
  86:2
**personally**  69:3
  69:23 396:20
**perspectives**
  5:24 6:2 10:16
**persuasive**
  473:3
**pertain**  212:14
  338:2
**pertaining**
  438:11
**pertinent**
  277:17
**petition**  244:7
  249:22 254:6

  261:21 262:9
  525:11 533:10
**petitions**  7:5
  248:24 250:2,6
  251:2,3,5,12,14
  253:20 256:15
  261:18 262:1
**ph.d.**  5:16
**pharmaceutical**
  35:1,6
**pharmacology**
  5:22 436:6
  444:7
**phd**  1:13 2:12
  5:2 12:3 218:3
  538:19
**phenomena**
  314:10
**philadelphia**
  4:8
**phone**  51:13
  52:6 58:16
  299:16
**phrase**  149:23
  154:9,11,15
  155:5,9 187:17
  264:9
**phraseology**
  264:11
**physician**
  268:13 305:1
  307:18
**pi**  265:4,6
**picked**  132:15
  133:2

**picking**  274:15
  274:16 281:14
  339:21
**picture**  418:7
  418:13
**piece**  359:2
**pitting**  318:22
  318:24
**place**  67:21
  97:11 234:14
  240:24 389:1
  539:10
**places**  200:9
  295:2
**plaintiff**  40:8
  515:17
**plaintiff's**  5:13
  10:1 58:4 61:2
  421:6 426:11
  506:9
**plaintiffs**  3:3
  3:13 4:3 17:15
  19:5,19 22:4,11
  38:24 40:3
  43:15 67:24
  68:15 69:1 70:7
  72:16 73:9 74:6
  75:7,15 89:17
  90:4 95:2 180:9
  191:14 193:11
  193:17 204:19
  205:2 208:13
  208:14 219:24
  237:20,21
  252:9 269:3,7
  269:14 329:8

  380:13 382:9
  384:16 392:24
  393:12 417:14
  454:18 469:14
  471:1 491:11
  500:20 513:13
  513:16 515:10
  516:11 519:9
  519:17 524:12
  529:21 531:2
**plan**  411:3
**plane**  523:9
  526:10
**planning**
  176:23
**plausibility**
  33:12 134:19
  135:10,14
  138:2,7,18
  207:17 222:1,3
  224:19,24
  225:20 227:6
  227:18 228:8
  228:13 229:18
  235:2 255:2
  318:5 349:3
  350:6 353:23
  357:2,5 416:15
  416:20 422:16
  424:14 428:12
  429:7 445:13
  459:15 464:2
  468:1,2 479:9
  490:22 524:8
  532:23

**[plausible - possibility]** Page 72

| | | | |
|---|---|---|---|
| **plausible** 108:8 136:1 137:23 139:13 153:11 177:23 207:13 225:8,9,12 264:10,12 357:11,23 360:12 419:8 419:11,16 456:14 462:8 479:2 487:18 488:3,13,14 **plausibly** 108:8 422:21 **play** 137:3 166:11 341:7 **please** 12:13 20:10 27:7 32:19 49:13 52:8 61:5,13 85:3,17 86:18 92:24 94:16 106:24 109:10 110:3 111:5 116:3 126:14 126:17 127:22 129:3,20 131:3 131:20 133:15 134:1,3 153:3 162:4 163:19 167:19 171:14 174:4 177:2 181:24 188:8 195:7 214:7 216:24 224:21 225:15 230:15 | 246:8 251:21 252:12 257:17 260:20 270:23 274:3 275:7 286:17 297:8 302:4 321:1 323:3 329:11 334:21 335:18 337:13 338:6 338:22 339:4 342:6 343:15 348:23 351:6 352:3 353:14 358:12 360:24 361:24 363:1 364:15 365:13 366:3 369:4 371:2 374:6 376:11,11,14 377:14 380:23 385:5,14 387:3 387:5 397:4 399:17,23 400:15 405:8 408:2 409:14 413:2 421:11 438:15 455:19 458:15 468:22 501:13 506:9 510:5,18,22 513:10 515:14 515:15,22 521:5 523:5 524:10 525:23 533:2 | **pleased** 436:14 436:15 **plenty** 216:16 282:9 **plm** 241:19 **plus** 498:19 **point** 22:5 72:14 120:1 131:7 153:22 154:3 164:3,5 176:21 187:8 210:16 235:21 253:22 254:10 256:4 299:17 302:12 303:4 303:16 312:8 313:5,9 318:21 338:23 355:23 381:13 389:17 393:5 401:7 413:23 414:23 435:6 452:2 478:22 **pointed** 229:6 346:14 370:3 **pointing** 271:5 **policies** 21:17 22:20 **policy** 21:23 363:15 **polycystic** 157:6 158:7 **pooled** 8:5 237:19 280:5 327:13,19,24 341:17 342:3 | 369:8 425:6 475:7 **pooling** 404:24 **poor** 84:10 85:9 282:6 434:20 **poorly** 478:6 **popularly** 366:12 **population** 211:6 306:2 326:21 327:21 328:16,18,21 328:24 329:3 330:2 348:22 496:3 **posed** 483:18 **posing** 231:21 **position** 306:19 306:23 385:1 533:7 **positive** 33:22 101:6,12,13 147:5 168:9 182:9 187:20 258:15 259:4 259:10 347:15 425:1 443:5 502:2 **possibilities** 139:12 456:8 **possibility** 182:7 414:6,13 414:16 431:17 441:15 488:4 511:6 |

**[possible - preparation]**                                                      Page 73

| | | | |
|---|---|---|---|
| **possible** 85:24 | 456:7 458:12 | 219:7 220:17 | 507:5,6,19 |
| 86:11,12 130:5 | 458:22 463:16 | 226:5,10,22 | 508:13 511:22 |
| 137:2 151:6 | 464:2,3 485:12 | 227:9 229:12 | **power** 403:11 |
| 163:11 169:17 | 503:14,20 | 230:20 239:23 | **practice** 311:23 |
| 174:15 228:16 | 524:22 | 244:1 250:7 | 320:15 427:12 |
| 246:17 318:2 | **potentially** 57:3 | 254:24 263:20 | 504:21 |
| 336:4,13 | 58:1 185:7 | 277:18 299:18 | **practices** 1:7 |
| 338:21 347:14 | 233:15 258:12 | 300:2 302:7 | **pre** 163:13 |
| 400:9,21 425:1 | 423:15 434:21 | 306:17 307:19 | 164:3 |
| 442:6,8 511:2 | 445:7 | 309:4 334:6,15 | **preamble** |
| **possibly** 51:7 | **powder** 1:6 6:7 | 335:1 337:3,3 | 180:19 |
| 88:17 127:21 | 6:11 7:14 8:1,4 | 338:13 342:18 | **precautionary** |
| 130:21 183:15 | 8:17,20 9:2,7 | 343:9 344:7 | 436:23 |
| 316:5 378:6,23 | 9:12 27:2,6,11 | 346:23 348:4 | **preceded** |
| 407:21 504:24 | 28:1 35:23 | 353:7,22,23 | 113:17 130:14 |
| **post** 163:13 | 36:15,18 42:3 | 369:11,21 | 130:20 |
| 164:5 | 57:17 58:6,9,13 | 375:6,17 | **precision** |
| **postulating** | 58:24 65:21 | 380:14 382:10 | 366:23 402:1,3 |
| 174:20 | 68:16 70:7,23 | 382:12 384:17 | **preclude** 188:3 |
| **potential** 85:23 | 71:3,21 81:9,9 | 389:14 390:9 | 414:8 |
| 112:9,13 113:7 | 114:4,22 140:9 | 390:23 400:9 | **predicated** |
| 113:14,20 | 140:16 141:10 | 410:9 412:4 | 150:5 |
| 114:3,9,17,20 | 141:21 146:1 | 414:11 416:10 | **predictors** |
| 137:20 148:7 | 146:21 147:1 | 431:19 453:9 | 148:8 |
| 158:14 168:13 | 148:14 149:6 | 453:17 504:10 | **pregnancy** |
| 170:16 174:20 | 149:19,21,24 | 506:20 507:2 | 28:23 29:2,23 |
| 182:9 184:20 | 150:10 151:2 | 507:10,11,14 | 31:16 33:1,9,23 |
| 206:7 264:2,7 | 151:21 167:23 | 507:18,23 | 34:20 456:3 |
| 316:4,15 318:5 | 168:2,5 196:12 | 508:12,12,16 | 462:7 |
| 319:14 332:8 | 197:18 198:11 | 509:11,15,17 | **pregnant** 28:4 |
| 338:14,17 | 198:12 201:8 | 509:18,22,23 | **prep** 54:1 |
| 339:2,2 378:22 | 203:17,23 | 510:1,9,15 | **preparation** |
| 389:18 396:16 | 204:20 205:3 | 525:20 526:3 | 51:16,17 52:2,5 |
| 407:1 428:4 | 209:11,14,17 | **powders** 6:23 | 53:22 54:24 |
| 434:4 436:17 | 209:20,23 | 81:18 246:18 | 94:22 99:2 |
| 441:17 447:21 | 210:2 212:3,14 | 337:18 430:22 | 447:16,19 |

**[preparation - proceeding]**                                           Page 74

477:20
**prepare** 16:5,8
  16:10 22:14
  62:15 73:16,23
  75:21 235:16
**prepared** 48:11
  55:14 63:19
  74:7 107:23
  212:21 244:10
  321:13 470:17
  471:1,8,11
  520:16
**preparing** 57:7
  73:19 79:2,10
  79:20 89:8
  219:18 221:13
  228:24 237:8
  237:13 238:2
  269:23 277:18
  298:14 360:6
  534:15
**preponderance**
  115:17 321:12
  322:20
**presence** 392:4
**present** 121:22
  150:18,20
  160:1 183:17
  226:18 315:22
  320:1 331:10
  385:18 399:15
  400:6 443:14
  485:12
**presentation**
  310:17 311:7,8
  311:9 342:20

343:10 438:23
438:24 443:14
**presentations**
  311:3 342:17
  452:14
**presented**
  91:23 97:18
  251:6 438:10
  439:8 440:6
  444:3,5 451:15
  483:17
**presenters**
  96:15
**presenting**
  383:14
**preserved** 63:8
**preserving**
  73:19
**president**
  363:11 430:14
**president's**
  8:14 361:18
**press** 28:9
**pretty** 302:13
  436:20
**prevalence**
  390:2
**prevalent** 10:5
  422:9 500:11
**prevent** 391:1
**preventing**
  256:8
**prevention** 7:4
  7:9,11 265:7
  271:12 272:17
  275:22 276:15

**previous** 182:9
  220:2 336:1
  360:4 400:5
  415:4 503:13
**previously**
  15:14 218:5
  342:16 404:14
  432:13 475:2
  499:23 535:5
**primarily**
  435:22 459:11
  459:14 463:12
**primary** 7:8
  171:24 236:8
  265:14 271:11
  272:16 333:10
  333:12 380:1
  503:12
**principal**
  143:14
**principally**
  172:1
**principles**
  363:24
**print** 94:24
**printed** 21:3
**printout** 245:18
  246:14
**prior** 12:23
  26:11 29:20
  38:23 56:21
  57:14,24 60:15
  63:2 71:12 72:8
  73:14,16 89:10
  90:3 95:2,4
  128:24 168:3

180:10 182:7
185:19 238:1
252:6,8 269:2
329:7 356:14
358:23 383:4
392:12 393:20
413:8 414:2
416:6 450:13
462:7 504:19
**private** 411:15
**privilege** 64:17
**probability**
  95:22
**probably** 14:17
  21:7 26:1 29:19
  45:6,14 60:11
  93:11 196:17
  339:1 355:24
  367:24 368:1
  398:16 415:13
  492:7 506:1
**problem**
  148:10 219:10
  244:12 319:3
  422:4 449:15
  449:17 504:24
**problems** 428:4
**procedures**
  205:13 356:19
  364:24
**proceed** 112:23
  232:11
**proceeding**
  26:13 27:23
  92:16

[proceedings - public]                                                            Page 75

**proceedings**
92:8,11 514:3
515:6
**process**  15:1,3
37:23 38:9
39:18,22 50:17
78:14 79:10
89:2,4,7 138:1
208:2 227:11
229:3 237:8,12
238:2,6,9,12
244:13 256:20
269:23 310:8
317:19 320:8
358:3 360:21
390:15
**processed**
309:6
**processes**
137:24 205:13
309:11 534:9
**processing**
309:12
**proctor**  3:4
**produce**  129:6
**produced**
238:16,19,21
240:1,18
469:17
**product**  34:23
35:6 205:15
210:3 227:9
332:9 386:19
389:24 393:2
507:24 509:4
525:18,21

526:3 533:12
**products**  1:6,8
7:15 81:9,15
147:19 205:3,4
226:14 227:2
250:16 263:20
432:3 453:9
466:16
**profession**  71:7
313:2
**professional**
7:10
**professionally**
68:7 69:24 70:1
70:4 80:9
**professionals**
271:9 272:14
**professor**  18:23
23:14
**prognosis**
434:20
**program**  25:4
**progression**
501:23
**progressive**
111:10
**promote**
150:20
**promotions**
25:2
**proper**  262:16
358:17 365:8
365:11 366:13
**properly**
363:22 366:8
504:6

**proportion**
93:12 227:2
389:18
**proposal**
329:12,14
**proposed**  231:4
360:22
**prospective**
6:18 175:14
176:6 177:24
178:7,10 261:6
280:22 281:6
283:19 288:13
293:21,24
294:10,11,12
387:14 502:4
503:1
**protection**
480:3,15
483:13 489:12
**protective**
115:19 256:7
321:22
**protocol**  235:17
235:21
**prove**  442:11
443:8
**provide**  22:8
28:3 59:12
216:20 272:13
292:8 332:12
339:1 340:18
357:1 364:20
427:21 460:24
500:20 522:15

**provided**  20:1
42:8 44:15
45:17,18,20,23
46:18 47:5,11
47:13 74:6
76:13 213:7
214:14 216:6
236:15 239:2
239:17 240:8
240:15 251:13
251:18 286:2,5
287:4 392:23
393:11,17,22
411:11 441:22
442:9 463:15
491:11 501:4
512:10 514:8
518:7 524:18
524:22 530:6
531:1,19
535:13
**provides**  271:9
272:14
**providing**
174:9 213:22
215:3 217:5
408:9
**proving**  475:15
**prudence**  95:21
**psychotropic**
147:8,11
**public**  2:22
16:15 25:3,4
31:3,15,18 82:8
98:4 167:9
191:1 218:18

261:13 265:24
343:6 391:3
441:7,17
442:13 533:7
539:4,21
**publication**
37:6,9,14,19
40:19,23 41:10
57:21 82:2
83:11,20 94:3,8
97:6,21 102:23
103:3 108:18
108:21 115:22
115:23 160:7
177:5 192:6
215:23 218:21
320:11 383:15
477:3 513:24
**publications**
43:3 80:12,16
82:15 89:19
145:5 154:19
212:3,6,8 220:2
220:24 229:15
230:9 481:8
521:21,23
**publicize**
363:20
**publicized** 28:9
**publicly** 15:15
31:2 97:24 98:5
**publish** 267:9
287:1
**published**
15:14 30:4 33:4
37:15 82:1,18

82:21 83:6
85:14 88:4,7,15
97:17,20 98:1
120:13 167:10
167:14 179:22
197:24 201:16
218:19 223:6
229:10 236:10
239:5 246:11
246:13,16
273:19 306:10
325:17 383:18
428:15,21
431:9,11 435:7
435:14 440:21
441:4 443:3
454:24 459:3
460:8,13 463:5
479:10 504:7
513:23 520:11
531:12
**publishing**
306:13 381:5
425:14 465:21
**pubmed** 235:15
**pull** 46:13 59:5
59:9 123:8
221:19 268:16
397:7 496:17
**pulled** 269:17
**purported**
231:3
**purpose** 153:16
157:2 271:3
363:20 412:2

**purposes** 16:11
41:15 57:11
76:3 187:15
222:6 227:5
245:4 251:23
254:22 416:14
416:19
**pursuant** 2:20
21:22
**put** 25:23,24
64:18 93:23
98:6 152:5
158:14 225:11
236:3 247:21
262:13 268:3
269:10 272:12
274:18 290:22
291:14 292:15
300:22 317:9
389:6 395:2,6
415:22 439:15
446:24 470:2
499:3 505:11
507:8 523:3
525:16 526:8
534:2
**puts** 267:16
**putting** 39:7,11
41:15 262:15
268:8,9 474:9

**q**

**qualified** 262:9
262:12
**qualitative**
159:22 160:2

317:19
**quality** 405:14
**quantitative**
170:6 317:20
364:22
**quantitatively**
319:20
**quarters**
486:11
**quartile** 348:18
**queried** 176:8
**query** 268:14
**question** 14:5,8
30:17 32:14,16
32:19 37:13
38:6,8 46:5
58:16 59:2
63:10,13,18,24
64:14 89:22,24
90:11,20 100:5
105:15 109:20
109:22 111:5
114:1,13,14
115:10 118:12
119:17 121:12
123:9,15,16,22
124:8 132:19
138:15 143:3
145:18 146:16
150:8 151:18
151:23 154:7
170:9,12 179:4
180:22 183:19
186:16 191:3
198:6 199:19
200:13 202:12

**[question - rcts]**

202:12,17,19
203:2 210:23
214:8 215:1
216:22,23
224:2 226:7
228:4 239:9,11
239:14 242:22
243:2,7,9
247:22,23
248:2 256:21
256:22 258:5
267:23 271:16
275:13,24
276:1 278:15
278:23 291:10
295:13 299:14
299:21 302:2
310:5 312:20
315:2 318:14
322:16 323:20
323:22 327:6
339:14 340:6
346:19 358:4
370:12 377:4,9
377:11,15,20
383:10 384:21
387:17 389:20
390:4 394:20
394:23 398:12
398:21 401:13
403:4,6,16,19
407:14 412:2
412:21 413:2
413:14,23
415:15,17
418:13 419:14

428:13 433:22
435:10 450:3
453:1 485:23
493:13 495:2
505:14 507:8
508:22 509:3
509:21 533:3
534:13 535:4
535:22,24
536:5
**questioning**
124:2 417:13
**questions**   13:23
13:24 15:5 46:5
119:11,15
133:2 157:10
175:3 210:11
216:18 274:6
418:9 419:19
426:21 427:1
428:1,5,9
433:23 454:17
457:22 464:24
467:7 469:11
469:13 471:13
473:10,11
480:5,9 487:15
488:1 499:12
499:14 512:19
512:21 530:17
534:24
**quick**   21:12
301:10 349:13
349:18 391:5
492:22 496:16

**quickly**   302:2
304:2 482:14
508:9
**quiet**   377:14
**quite**   74:19
148:22 151:6
230:1 299:8
300:5 390:15
476:7
**quote**   257:16
362:14
**quoting**   257:13

**r**

**r**   12:1 397:3
**rafferty**   3:4
**raise**   431:17
442:12 443:8
**raised**   49:5
96:14 182:8
332:4
**ran**   68:11
**random**   313:19
450:2
**randomized**
408:8 409:10
**range**   60:11
102:23 177:21
317:24 450:21
**ranked**   237:1,2
**rapporteur**
438:4
**rare**   111:8
**rarely**   356:12
**rarity**   387:11

**rate**   17:18 49:6
49:11 178:22
178:23
**rates**   223:21
224:5,9 347:24
**rather**   343:16
431:20 518:13
**ratio**   32:3,23
104:14 105:14
105:15 167:24
168:10 178:24
183:8 187:21
233:9 295:7,18
295:22 299:3
299:16 304:5
337:18 371:7
371:10 373:2
399:15 457:3
**rationale**
368:11 427:16
462:8
**ratios**   84:10
85:9,22 102:4
102:14 103:4,8
103:9,12
144:24 145:1
168:7 178:23
178:24 295:4
302:6 327:20
411:20 511:10
524:1
**rats**   219:13
**rct**   409:6,12
**rcts**   408:8
409:5

[reach - reasonably]                                                      Page 78

**reach** 227:9
359:22 416:14
419:8 456:16
536:9
**reached** 191:21
192:19 227:13
319:17 416:21
473:13
**reaching**
311:16 321:5
416:23 464:3
**read** 12:19,23
13:3,3,7 14:15
38:15,22 47:10
47:12 63:14
68:24 79:17
80:11,14,15,17
81:22 82:6 85:2
86:8 88:3,19,21
88:24 95:1
96:20,22 98:3
99:16 107:1,21
109:10,16,18
109:22 110:3,4
110:13,19
132:7,17,18
134:18 136:3
143:10,12
163:15 168:16
176:13 178:2
181:18 186:4,7
195:23 196:1
200:16,18,22
205:21 211:4
218:22 221:6,9
221:12,15,20

223:19 224:7
227:22 231:16
235:24 236:1
237:8,13,15,17
237:18,24
238:5,8,11
246:24 249:11
249:15 251:9
252:22 255:7
255:17,17,24
256:10,18,21
256:21,23
257:4,16
258:17,18
269:4 272:8
274:1,2,3,18
275:2,3,3,6,18
278:16 284:11
285:7 296:12
296:21 297:3,7
309:7,9,13
319:6 329:4,7
332:23 333:20
335:7 337:6
340:10 346:20
362:4 364:3,6
368:22,24
374:1 375:8,10
375:23,24
381:8 385:8
401:15 404:10
406:7 407:6,8
407:15 410:5
410:15,17
421:16 422:16
426:13 431:15

444:23 461:4
538:5,7
**reader** 375:22
381:23 382:8
383:23
**readership**
381:12,20
**readily** 129:5
**reading** 81:12
84:14 101:8
110:15 127:15
132:24 189:2
224:3 229:24
231:6 253:7
255:13,15
256:20 257:2,7
257:13,15
258:2 273:7
275:5,17 292:1
322:3 323:13
348:7 352:13
357:13 374:12
400:11 486:3
491:3
**reads** 87:1
95:19 96:13
353:2 364:18
366:6 369:7
374:21 381:4
400:19 406:12
501:20 510:24
**ready** 133:4
**real** 21:12
303:16 349:12
391:5

**realized** 49:4
**really** 40:15
56:18,18 73:22
133:12 148:9
161:4 188:4
199:24 256:17
301:17 329:2
370:5 392:15
433:2 493:7
505:10 518:6
527:15
**realm** 43:23
**realtime** 2:21
**reanalyses**
236:11
**reason** 34:8
122:14 144:4
169:8 178:18
260:10 283:12
294:19 316:9
328:5 402:8
434:23 455:1
505:2,6 509:8
532:18
**reasonable**
95:13,20,21
140:1 332:9
367:2,5 416:22
418:17 443:16
527:6,16
**reasonableness**
205:12
**reasonably**
99:14 106:21
234:18

| | | | |
|---|---|---|---|
| **reasons** 179:11 | 238:24 244:11 | 390:2 535:17 | **record** 14:2 |
| 179:12 217:7 | 253:9,12 | **recess** 21:13 | 21:12 34:11 |
| 233:12 388:12 | 280:14 311:7 | 44:5 62:21 | 44:4 62:18,20 |
| 436:23 463:13 | 320:22 333:22 | 133:21 139:18 | 62:24 63:14 |
| **reassess** 416:24 | 343:8,11 | 179:17 217:17 | 76:3 110:14,17 |
| **recall** 13:1,14 | 385:18 386:6 | 247:15 293:2 | 133:20 139:16 |
| 13:15 33:7,16 | 386:10,11 | 301:20 342:11 | 139:21 179:16 |
| 33:20 34:5 | 387:12 407:1 | 346:9 349:14 | 217:15 218:9 |
| 43:20 45:8 | 407:18,21 | 355:9 391:6 | 225:11 247:10 |
| 46:20 47:18 | 416:17 430:15 | 417:6,21 493:3 | 247:14,18 |
| 48:18 50:1,23 | 449:13 461:9 | 499:15 | 257:12 292:19 |
| 51:4,24 56:16 | 469:10 502:6 | **recognition** | 293:1,5 301:19 |
| 56:18 59:7,14 | 502:21 503:2 | 456:12,13 | 301:23 342:9 |
| 60:3,11 62:3 | 503:21 513:2 | **recognize** 61:14 | 342:14 345:17 |
| 64:7,9,24 65:5 | **recalled** 172:13 | 61:15,19 | 345:18,24 |
| 66:13 71:19 | 173:10 189:1,8 | 163:10 371:18 | 346:2,4,6,8,12 |
| 83:8 85:23,24 | 189:13 | 530:14 | 349:12 355:2,4 |
| 86:5,11 88:23 | **recalling** | **recognized** | 355:6,12 391:5 |
| 94:21,24 | 165:24 | 168:19 324:3 | 391:9 417:5,9 |
| 111:18 117:7 | **receive** 14:18 | **recognizes** | 426:13 431:15 |
| 127:23 128:4,4 | 19:1 409:7,7 | 485:11 | 461:5 482:22 |
| 128:10,23 | **received** 48:20 | **recollection** | 497:7 499:19 |
| 129:5,12,19 | 49:8 66:7 251:2 | 62:5 86:2 172:2 | 536:5 |
| 145:9 160:15 | 381:20 | 172:8 174:23 | **recorded** 55:18 |
| 161:3,9,10 | **recent** 13:16 | 175:7 176:9 | **records** 62:9 |
| 165:18 166:6 | 25:6 117:24 | 448:15 449:5 | 65:1,3,6,10,11 |
| 166:10,12 | 118:9 121:3 | **recommend** | 65:14,19 |
| 168:13,19 | 170:4 214:19 | 117:2 525:17 | **recruiting** |
| 169:2,9 170:3,7 | 215:11 217:3 | **recommendat...** | 128:19 282:3 |
| 170:16 178:15 | 362:16 390:10 | 396:18 | **reduce** 462:21 |
| 179:6,11,13 | 481:7,7,8,10 | **recommendat...** | **reduced** 182:11 |
| 182:8,20 | **recently** 68:8,9 | 332:4 | **refer** 47:14,16 |
| 188:18,19 | 74:4 92:12,22 | **recommended** | 72:21 104:1 |
| 189:17 194:1,6 | 94:11 270:19 | 307:17 331:24 | 109:9 161:14 |
| 228:14,22 | 270:21 273:18 | 363:16 | 215:3,14,24 |
| 229:22 238:23 | 310:23 366:3 | | 217:4 220:19 |

**[refer - registered]**                                                Page 80

243:16,24
269:22 287:16
298:20 322:6
322:19 341:12
367:20 381:16
397:10 398:14
422:13 431:2
474:8 481:23
**reference**   40:7
168:12 179:20
193:23 195:3,5
195:8,9,15
213:22 221:4
241:23,24
242:3 247:3
248:10 254:2
268:13,22
282:1 283:10
283:24 290:10
292:17 294:16
294:17 295:1
295:15 298:15
299:10,13
300:6,13,23
303:21 347:5
355:19 359:18
361:4 362:7,8
370:14 389:9
397:1,6 398:23
410:19,20,23
415:1 440:9
469:6 470:9
500:23 528:18
530:5
**referenced**
37:5,8,18

137:14 197:24
215:22 217:3
219:23 221:22
244:15 416:15
**references**   40:7
46:10 194:8
217:4,10
469:11 500:24
531:22
**referencing**
248:3
**referred**   105:18
198:20 221:16
243:8 249:19
**referring**   46:24
106:13 142:14
243:7 258:23
260:24 278:8
282:17 283:15
286:20,21
294:1 362:21
401:6 404:21
444:7 450:10
525:7
**refers**   54:8,18
54:23 141:15
230:23 247:24
250:1 264:20
269:18 270:10
283:20
**refine**   173:19
**refined**   524:7
**refinement**
126:12,13
186:20

**refinements**
442:6
**reflect**   78:24
79:7 85:23
257:13 504:23
**reflected**   80:22
81:3 404:19
**reflects**   87:18
**regard**   18:21
26:24 28:20
30:9 36:14
50:10 52:19
53:21 55:6,10
65:13 74:3 77:5
79:16 81:21
83:10 89:24
113:8 117:8
149:23 151:3
155:6 156:9
161:8 164:2
173:6 184:14
200:15 201:7
209:4 212:20
219:4 227:19
227:20 228:7
228:23 235:22
239:23 241:18
244:1 245:14
250:7 254:24
261:16 262:19
266:3 267:16
268:3 269:13
282:13 290:9
293:17 300:2
309:16 310:19
311:14 320:9

333:18 337:9,9
344:6 350:12
350:16 354:21
360:8 370:15
373:23 379:17
381:17 382:2
384:1 386:1
390:20 392:19
410:8 504:17
505:15 510:21
517:8 519:7
520:4 521:8,15
531:13 532:5
533:19
**regarded**
174:24 175:9
176:10
**regarding**
34:23 35:10,22
40:16 50:14
88:8,16 135:10
148:11 163:11
212:3 230:20
238:1 306:11
**regardless**
306:13 313:23
316:12
**regards**   104:13
335:8
**region**   423:4
**register**   11:9
482:23 531:21
533:6,13
**registered**   2:22
539:4

**[registry - replicability]**                                                    Page 81

| | | | |
|---|---|---|---|
| **registry** 265:4 | 143:5,22 145:7 | 302:6 313:13 | **remains** 130:5 |
| **regression** | 145:19,24 | 411:20 450:21 | 319:4 441:18 |
| 132:1 | 196:7,9 202:24 | 539:13,15 | **remember** 13:9 |
| **regular** 152:22 | 227:19 242:4 | **relatively** 85:22 | 13:11,12,12,17 |
| 337:17,20 | 243:4,18 | 348:16 407:2 | 29:12 33:18 |
| 412:4 416:4 | 245:19 247:23 | **relevance** 253:5 | 59:19 61:21 |
| 463:16 524:23 | 299:4,16 | **relevancy** | 91:14 113:17 |
| **regularly** 354:7 | 531:14 | 475:14 | 152:11 157:19 |
| **regulation** | **relating** 447:10 | **relevant** 47:24 | 170:18 186:7 |
| 11:11 | **relation** 111:9 | 102:19 118:9 | 249:15 427:1 |
| **regulatory** 5:21 | 111:10 131:15 | 212:11 253:18 | 428:5,8 457:24 |
| 36:24 191:20 | 132:5 153:1 | 378:18 400:7 | 468:3 469:16 |
| 211:21 224:16 | 249:16 256:6 | 512:7 520:8,9 | 473:14 480:9 |
| 436:6 442:13 | 369:22 | **reliability** | 493:9,12,16 |
| 443:10 444:6 | **relations** | 206:3 | 516:10 |
| **reiterate** 535:2 | 131:13 | **reliable** 159:15 | **remind** 515:21 |
| **reiterated** | **relationship** | 205:23 206:1,9 | **removed** 146:6 |
| 453:19 | 66:5 67:24 | 254:19 265:18 | **repeat** 27:7 |
| **reject** 377:24 | 280:2 315:23 | 266:2,11 267:3 | 32:18 216:23 |
| **rejecting** | 331:20,21 | 267:17 268:4 | 223:24 224:21 |
| 231:16 | 375:22 383:5 | 292:12 311:16 | 225:15 226:7 |
| **rejection** | 462:4 502:4 | 316:14 333:17 | 267:23 295:12 |
| 248:23 | **relationships** | 333:18 509:7 | 299:20,20 |
| **relate** 176:7 | 84:11 85:10 | **relied** 218:13 | 340:5 346:19 |
| 208:10 230:13 | 87:8 125:15 | 218:22 268:4 | 383:10 413:2 |
| 292:8 403:11 | **relative** 32:2,23 | 312:19 532:7 | 452:24 |
| 403:12 431:19 | 72:15 101:4,10 | **relies** 358:10 | **rephrase** |
| **related** 28:22 | 102:4,14,23 | 409:9 | 160:21 223:24 |
| 33:9 129:18 | 103:4 105:11 | **rely** 41:14 | **replace** 273:23 |
| 158:6 175:12 | 129:7 131:2 | 213:20 267:18 | **replacement** |
| 197:1 229:16 | 169:18 172:14 | 292:1 321:5 | 113:21 114:3 |
| 232:18 319:23 | 173:11 177:22 | 350:5 358:23 | 130:23 156:23 |
| 320:24 328:6 | 178:11 181:8 | 410:18 | 158:2,4 |
| 388:8 427:16 | 185:9 187:22 | **remain** 358:2 | **replicability** |
| **relates** 38:19 | 233:9 290:14 | **remaining** | 8:16 361:20 |
| 63:3 111:7 | 295:3 297:13 | 391:12 | 366:16 |

**[replicate - report]**                                                                    Page 82

| | | | |
|---|---|---|---|
| **replicate** | 114:24 115:4,7 | 213:3,5,8,11,13 | 298:14 300:6 |
| 147:16 | 115:12,14 | 213:16,23 | 303:22 304:1 |
| **replication** | 116:6,19 | 214:12,17 | 304:13 309:17 |
| 431:17 | 117:14,16,18 | 215:4,5,11,20 | 310:3 317:1 |
| **reply**   385:11 | 118:3,6,14,18 | 215:21 216:8 | 318:16 321:2 |
| 388:17,23 | 118:21 119:6,9 | 217:3 219:5,19 | 322:6,19,22 |
| **report**   5:15 | 119:22 120:4,8 | 220:8,21 221:4 | 323:4 324:18 |
| 16:11 37:11,15 | 120:13 121:13 | 221:10,14 | 333:3,6 341:13 |
| 39:13 48:3,12 | 121:15,18,20 | 224:19,24 | 342:1 347:4,6,7 |
| 48:16 49:18 | 122:9 126:15 | 225:2 228:24 | 348:24 349:1,6 |
| 50:2,4,7,11,15 | 128:10,15,16 | 230:11,16,23 | 349:19 357:5 |
| 54:9,11,14 57:7 | 132:12 134:24 | 231:24 232:13 | 357:16,17 |
| 57:10,10,16 | 135:6,18,21 | 232:21 234:5 | 358:6,24 360:1 |
| 62:15 63:20 | 136:5,7,19 | 237:8,13 238:3 | 360:4,7 361:1,4 |
| 72:9,18,20 | 137:15 138:10 | 239:3,7 240:11 | 367:2 368:14 |
| 73:11,17,20,23 | 139:24 142:12 | 240:15 241:2 | 370:3 381:23 |
| 74:7,9,13 75:2 | 143:4 144:8 | 241:23,24 | 382:21 386:4 |
| 75:4,18,19,22 | 145:4,24 146:3 | 242:4,12 243:4 | 386:17,17 |
| 76:4,7,13 77:6 | 149:24 152:24 | 244:2,4,10,21 | 388:13,13,14 |
| 77:9,20,24 79:2 | 153:17 161:11 | 245:6,9 248:4,7 | 392:22 397:1,5 |
| 79:5,8,11,16,17 | 161:12,14 | 248:10 249:19 | 397:10 398:13 |
| 79:20 81:6 | 162:2 166:15 | 254:3,16,22 | 398:24 399:11 |
| 82:10,13 89:8 | 168:2 173:2 | 263:2 264:19 | 399:15 410:22 |
| 89:11,15 90:1 | 183:7 185:11 | 268:12,19,24 | 415:1,5,8,18,23 |
| 90:22 91:2 99:2 | 187:15 188:9 | 269:18,22,24 | 447:16,20 |
| 99:19 100:4 | 188:10 190:2,9 | 270:22 276:16 | 460:5,7 462:13 |
| 101:18 102:3 | 190:13 191:18 | 281:7 282:11 | 466:2,4,14 |
| 103:18,19,20 | 192:5,12,15 | 282:15,21 | 467:4,8 468:20 |
| 105:21 106:7 | 193:15,24 | 283:20 287:12 | 468:22,23 |
| 107:19 108:5 | 194:3,9,13 | 287:16,20 | 470:10,11 |
| 108:10,17,19 | 195:3 196:23 | 288:8,15 289:6 | 471:20,24 |
| 110:7,18,20 | 197:17,19,23 | 292:17 293:22 | 472:9,12,14,15 |
| 111:22 112:1,1 | 198:7,8,20 | 293:23 294:5,6 | 477:16 479:3 |
| 112:4,7,13,14 | 199:6 200:16 | 294:14,16,17 | 479:18 481:22 |
| 113:9,13,19 | 200:17 201:1,2 | 294:18 295:1 | 499:24 500:15 |
| 114:2,8,15,20 | 204:8 212:20 | 295:15,16,22 | 502:8 508:1,8 |

**[report - response]**                                         Page 83

514:6 517:11
520:14 522:8
530:3,4,20
531:19 532:11
533:22 534:15
534:18
**reported**   1:23
96:18 101:11
102:4,15 103:3
118:14,15
122:1 164:2
165:16,17
181:5 183:8
267:2 287:7,19
288:18 290:11
290:14 295:4,6
296:8 297:12
302:6 324:11
326:19 329:20
337:17 353:7
369:10 381:5
388:3 389:10
395:12 415:16
416:5 465:21
472:21 489:2,3
502:2 506:18
507:14 508:2
513:17 517:2,7
519:2 521:23
524:3,6 529:5
**reporter**   2:21
2:22 63:14
482:11 527:8
539:1,4
**reporting**   147:5
172:2 189:7

223:20 299:24
392:4 411:20
511:7 516:14
**reports**   28:13
40:8,19 41:2,15
132:11 201:6
201:20 202:20
203:9,21 204:1
216:17,19
491:11,12
**represent**
183:14 211:12
287:14 394:10
431:7 454:21
470:3,8
**representing**
17:15 19:5,18
22:11 202:21
268:10 392:24
393:12 480:24
529:21
**represents**
312:8
**reproductive**
23:17 127:13
371:6,9 375:16
388:1 423:5
433:10 476:21
511:9,21
**request**   14:21
196:11 201:2
201:19 466:15
466:23 531:4
**requested**   72:9
**require**   250:11
250:15 263:21

**required**
182:19 526:2
**reread**   85:3
406:2
**reschedule**
493:2
**research**   24:1,3
24:10,17,21
25:11 92:1
111:9 147:13
206:18,19
235:17 265:8
265:15 266:4
266:23,24
267:7,10
309:24 310:2,5
310:22,22
311:22 313:8
320:19 328:15
328:19 329:3
329:12 330:4
381:6 411:18
415:4,12
418:16 419:21
419:21 422:15
427:14 429:11
439:8 441:19
443:3 458:10
460:20 465:22
511:2
**researching**
235:19
**resected**   356:13
**reserve**   213:10
214:11 216:17
417:12 527:4

535:7
**reserves**   214:10
**resilient**   505:7
**resolved**   31:12
**resource**
265:18 266:3
266:11,15
**respect**   57:18
89:20 128:15
130:16 210:17
220:4 229:20
260:5 326:3
333:19 334:3
335:14 345:12
389:22 407:12
407:20 434:5
479:20,21
504:4 505:12
512:6 513:21
**respectful**
491:5
**respond**   140:18
202:23 214:15
527:3
**respondent**
512:8,8
**respondents**
512:5,6
**responding**
262:8 386:2
**response**   9:1
33:6 34:17
52:22 84:10
85:10 87:5,6,8
87:22 88:1
109:14 111:7

**[response - reviewed]**                                                    Page 84

| | | | |
|---|---|---|---|
| 111:19 115:5 | 515:9 516:16 | 170:14 171:17 | 82:24 92:10 |
| 115:13 116:10 | 519:2 525:7 | 175:13 183:24 | 94:11,19,23 |
| 117:8,10 118:3 | 533:5,9 534:4 | 185:13 239:12 | 97:16 101:5 |
| 118:10,15,15 | 536:10 | 259:3 261:5 | 112:3,17 |
| 120:16,20 | **responses** | 279:13,15 | 146:15,17 |
| 121:22 122:1 | 261:18 512:3 | 289:23 291:17 | 147:2,10 157:1 |
| 122:10,24 | **responsibilities** | 291:23 326:23 | 170:9,19 171:2 |
| 123:12 125:13 | 291:13 | 336:21 344:10 | 171:8 207:11 |
| 125:15 126:1,7 | **responsibility** | 344:14 347:1 | 219:19,22 |
| 126:8,11 131:4 | 263:5 290:22 | 364:22 366:11 | 220:15 230:18 |
| 141:23 187:4 | **responsible** | 366:15,17 | 237:4 248:11 |
| 229:17 234:24 | 277:6 356:9 | 371:13 387:23 | 248:13,13 |
| 243:13 244:16 | 360:20 | 400:20 409:9 | 250:20,24 |
| 244:21 249:22 | **rest** 175:12 | 470:7 471:14 | 251:3,12,24 |
| 251:2 259:18 | **restart** 510:6 | 476:20 504:7 | 254:23 261:21 |
| 259:20,22,23 | **restate** 183:20 | 512:4 | 269:21 270:18 |
| 260:2 261:17 | 302:3 350:19 | **retained** 73:20 | 273:18 277:17 |
| 262:16 280:2 | **restricted** | 193:17 418:4 | 277:21 286:4 |
| 318:14 323:1 | 144:17 183:12 | 429:15 431:4 | 352:24 353:12 |
| 330:23 331:5 | 371:5 | **retainer** 19:1 | 355:1 357:19 |
| 331:10 335:8 | **restricting** | 48:22,23 | 357:20 397:23 |
| 338:2,16 | 344:7 346:22 | **retract** 388:18 | 398:18 399:4,5 |
| 348:10 369:20 | **restriction** | **retrospective** | 399:18 405:16 |
| 379:14 380:8 | 169:21 | 385:19 386:10 | 408:15 423:24 |
| 385:6,10,22,23 | **result** 153:15 | 387:13 502:1 | 427:18 437:12 |
| 387:5 394:14 | 196:11 233:1 | **revealed** 261:7 | 438:10 439:16 |
| 423:14 433:3,7 | 233:13 258:14 | **review** 6:15 | 440:5 443:19 |
| 434:5 446:20 | 297:21 303:11 | 7:16 9:4,10 | 448:5 477:18 |
| 455:10 457:6 | 313:18,22 | 10:18 17:19 | 493:21 514:20 |
| 458:22 459:16 | 314:11 502:6 | 22:21 31:23 | 514:24 515:4 |
| 462:4 471:18 | **resulted** 529:16 | 32:4 39:16 40:6 | 519:12 530:21 |
| 472:1,16 | **resulting** 185:7 | 40:11 43:6 | 532:4,5 |
| 486:11,14 | 419:9 483:23 | 45:17 47:15,19 | **reviewed** 33:3 |
| 490:21 491:19 | **results** 93:9 | 48:2 50:7 54:11 | 40:5,19,22 |
| 496:19 498:16 | 163:20 165:14 | 54:18 62:8 | 41:10 54:5,13 |
| 498:22 514:21 | 168:6,12 170:1 | 65:13 74:5 | 55:8 57:22 |

| | | | |
|---|---|---|---|
| 64:24 65:6,10 | **reviews** 73:3 | 196:14,15,16 | 516:24 522:5 |
| 65:18 82:1,21 | 78:10 107:3 | 199:11 213:6 | 523:2 534:23 |
| 89:11 92:7,22 | 112:15 115:8 | 213:10 214:11 | 535:7 536:7 |
| 97:1,4 103:8 | 161:13 163:17 | 214:11 216:18 | **rigler** 196:22 |
| 114:21 157:4,8 | 189:4 220:1 | 217:13 249:7 | 198:13 200:16 |
| 192:6,15 | 242:16 279:4 | 249:11 250:21 | 204:13 205:14 |
| 203:15 204:9 | 281:18 284:4 | 250:22 270:24 | **rigler's** 193:23 |
| 204:11 206:20 | 287:9 288:21 | 271:1 273:14 | 197:19 201:1 |
| 219:4,9 220:1 | 304:1 328:23 | 274:11 276:16 | 203:16 |
| 238:15,19,20 | 335:10 340:4 | 278:13 279:22 | **rigor** 267:7 |
| 240:2,13,19 | 344:11 345:1,4 | 281:8 285:11 | 366:9 |
| 244:15,17 | 345:15 352:23 | 285:22 327:6,6 | **ring** 68:23 |
| 245:7,10 | 353:9,11,15 | 335:11 336:22 | **rise** 130:8 |
| 248:14 253:18 | 354:3,11 399:6 | 344:1 351:10 | **risk** 5:18 6:11 |
| 254:5 269:9,12 | 401:22 405:24 | 351:21 362:4 | 6:16 7:18,21 |
| 269:13 270:13 | 502:13 508:7 | 362:21 365:20 | 8:2,4,18,21 9:7 |
| 271:10 272:15 | 508:11 521:19 | 365:20 374:16 | 9:12 10:4,13,19 |
| 276:14 297:1 | 530:13 | 376:1 385:3,15 | 10:21 32:2,23 |
| 393:1,13,18 | **revisions** 42:24 | 388:24 389:2,4 | 33:22 37:9,19 |
| 394:3,7 395:10 | 50:15,16,21 | 397:8 401:20 | 37:23 38:10 |
| 395:22 435:7 | 51:1 | 406:8 422:23 | 89:21 95:22 |
| 439:10 440:22 | **rice** 61:18 | 426:8 430:14 | 101:5,10 |
| 459:3,5 460:9,9 | **right** 17:21 | 434:17 437:24 | 104:14,15 |
| 463:5 474:6 | 27:16 31:10 | 444:17,24 | 105:11,14,15 |
| 479:10 491:7 | 54:19 61:16 | 447:18 449:6 | 107:8 113:24 |
| 497:5,5 510:17 | 72:23 77:7 | 449:22 451:23 | 114:12 115:2 |
| 513:23 515:8 | 82:22 93:16 | 454:19 459:13 | 115:18,20 |
| 521:2 531:7,9 | 95:10,17 96:9 | 464:23 468:8 | 119:23 129:7 |
| 531:10,13 | 117:24 128:22 | 469:4 472:24 | 130:6,16 131:2 |
| **reviewers** | 128:23 163:7 | 473:8 478:5,22 | 131:16 132:6 |
| 273:3,12 | 163:10 165:7 | 479:16 481:5 | 141:4 144:24 |
| **reviewing** 54:9 | 177:7,15,18 | 483:4 487:9 | 148:13,19,20 |
| 89:2,4,7 203:10 | 179:23 184:17 | 497:24 498:6 | 149:11 150:18 |
| 206:18 207:10 | 190:17 194:11 | 499:6,12 500:8 | 151:8,10,11 |
| 247:3 248:1 | 195:18,18,18 | 503:3 507:15 | 152:5,6,16 |
| 254:1 398:16 | 195:18 196:13 | 510:20,24 | 153:13 155:20 |

**[risk - rushed]**                                                      Page 86

| | | | |
|---|---|---|---|
| 157:13,22 | 372:2,2 375:7 | **risks**  34:3 102:4 | 130:4 131:10 |
| 158:3,8,11,16 | 378:22 381:7 | 102:14,23 | 131:22 132:11 |
| 158:20,24 | 387:12 389:16 | 103:4 156:9 | 134:8,17 |
| 159:4,7,9,23,24 | 391:18 392:11 | 169:18 185:9 | 135:17 190:17 |
| 167:23 172:14 | 392:12 394:5,8 | 390:12 439:1 | 190:23 191:14 |
| 173:11,20 | 394:12 395:11 | 447:11 450:21 | 193:20 212:21 |
| 177:22 178:11 | 395:18,19,24 | 452:15,16 | 229:3 239:3 |
| 181:8,10 183:8 | 396:4,9,16 | 457:9,12 | 368:9 371:21 |
| 186:13 187:19 | 400:22 401:1 | 463:16 483:18 | 382:19 393:16 |
| 187:22 222:19 | 402:1,7 403:9 | 524:22 | 440:11,14 |
| 226:17 233:9 | 404:5 405:4 | **rls**  1:6 | 459:5 466:1,3 |
| 233:15,19 | 406:24 407:23 | **rmr**  1:23 | 467:6,23 468:9 |
| 246:22 253:6 | 408:19 411:7 | 539:21 | 474:9 479:2 |
| 258:16 260:6 | 411:20 412:9 | **robert**  18:18 | 499:20 |
| 263:9 277:13 | 415:3,12,15,19 | **roberta**  69:21 | **rothman's** |
| 279:18 280:11 | 415:23 416:3,9 | **role**  166:11 | 75:11 104:2 |
| 280:17 290:2 | 422:9,21 | **rosenblatt**  8:3 | 108:5 116:4 |
| 290:14,16,23 | 430:23,24 | 332:15,21,23 | 126:15 320:22 |
| 291:20 295:3 | 431:18 432:18 | 333:20 | 466:2 467:8 |
| 297:14 300:21 | 433:9 438:13 | **rothman**  5:17 | 470:10 471:19 |
| 301:4 302:6 | 441:23 442:10 | 6:6 11:3 23:6,8 | 471:24 472:9 |
| 305:12,16,23 | 445:24 447:3 | 48:4 50:11 56:9 | **roussa**  208:19 |
| 311:4 312:8 | 450:9,15 451:4 | 57:2,16,24 | **route**  223:8 |
| 313:13 316:21 | 453:9 454:12 | 66:22 67:14,20 | **routine**  449:15 |
| 321:21,23 | 463:14 464:5,6 | 72:4,12,17 75:5 | 449:16 |
| 325:6 327:10 | 465:23 483:16 | 75:8,12,23 77:5 | **rsi**  411:8 |
| 329:18 330:24 | 486:6,16,18,22 | 77:21,23 78:3,6 | **rule**  64:17 |
| 331:6,15 332:8 | 486:24 487:3 | 78:8,17 79:1,5 | 214:19 274:9 |
| 332:8 334:7,13 | 487:10,10 | 79:11,24 80:8 | 479:20 483:14 |
| 335:2,4 336:24 | 496:11 500:11 | 98:10 99:3,22 | 502:6 503:2 |
| 337:16 338:14 | 503:10,15 | 100:13 101:11 | 511:6 534:8 |
| 339:16 343:4 | 504:15 506:22 | 104:9,19 107:6 | **rules**  15:8 |
| 348:5,19 354:7 | 509:12,16 | 108:11 109:5 | **run**  16:20 |
| 366:23 367:10 | 515:19 516:2,5 | 111:6 117:2 | **rushed**  199:11 |
| 367:15 369:11 | 517:3 518:4 | 126:21 127:11 | |
| 369:23 371:8 | 529:14 533:11 | 128:1 129:4 | |

Case 3:16-md-02738-MAS-RLS   Document 33013-54   Filed 07/23/24   Page 224 of 252 PageID: 220395

| **s** | 489:12 492:20 | 449:5 455:21 | 207:12 211:18 |
|---|---|---|---|
| **s** 12:1 | 502:24 | 455:22 458:17 | 215:15 236:24 |
| **sac** 219:15 | **says** 45:16 | 461:4 462:3,19 | 240:14 244:12 |
| **safety** 35:10 | 47:19 48:2,15 | 463:11 465:19 | 244:18 245:8 |
| 41:3 262:10,19 | 48:20 49:8,17 | 467:24 475:14 | 246:11,13,16 |
| **salary** 17:10 | 50:20,24 51:15 | 476:17 477:22 | 247:3 248:1,8,9 |
| **sales** 1:7 | 52:12 54:14 | 478:5 481:1,4 | 248:14 251:3 |
| **salient** 200:18 | 74:15 99:11 | 483:9,11 484:7 | 254:8 256:14 |
| **sample** 286:6 | 106:11 123:12 | 484:8 485:8 | 266:13,20,22 |
| 392:2 | 143:18 174:15 | 486:1,10,12,20 | 267:6,7,10 |
| **sandler** 385:6 | 175:2,19 176:4 | 487:1,8,9 489:8 | 268:11 310:12 |
| 421:1 | 181:5 196:6,21 | 489:21 503:3 | 362:6 364:2 |
| **sandra** 173:2 | 232:3 246:1,15 | 534:7 | 366:12,16 |
| **sanitary** 423:2 | 248:8 250:15 | **scanning** 8:11 | 382:16 418:18 |
| 447:6 | 250:18 253:2 | **schildkraut** | 428:3 435:5 |
| **sat** 70:1 | 253:17 259:2,8 | 6:10 119:22 | 488:20 521:3 |
| **satisfies** 458:19 | 259:18 260:13 | 120:2,3 121:10 | 536:1 |
| **satisfy** 233:10 | 273:17 276:9 | 121:15 161:9 | **scientifically** |
| 254:2 | 278:20 283:15 | 161:15,17 | 206:21 245:7 |
| **save** 538:8 | 285:15 286:1 | 170:2,16 | 254:20 260:1 |
| **saw** 99:1 | 286:24 288:11 | 228:18,19 | **scientists** 148:2 |
| 155:20 196:17 | 289:22 293:20 | 322:12,15,21 | 262:8 361:11 |
| 284:14 389:16 | 329:14 339:10 | **schildkraut's** | 411:7 |
| 433:8,9 457:2 | 352:8 358:10 | 119:21 414:14 | **scope** 263:2 |
| 477:19 489:23 | 359:13,14,17 | **school** 16:15 | **scott** 61:17 62:4 |
| 530:23 534:3 | 359:18 363:3 | 25:2 26:3 190:8 | **screening** 7:11 |
| **saying** 136:19 | 365:18 369:19 | 191:1 277:2 | 38:16,19,23 |
| 154:4 168:19 | 386:15 388:22 | **schools** 441:5,7 | 39:4,7,11,21 |
| 231:23 232:22 | 389:2,2,3,3 | **science** 365:8 | 40:1,5 41:16 |
| 286:8 287:13 | 394:4,8 406:22 | 439:13 473:1 | 275:22 276:15 |
| 287:17 288:16 | 409:1 410:24 | **scientific** 34:2 | 410:18 |
| 319:8 336:13 | 422:14,19 | 38:5 47:23 57:7 | **se** 431:20 |
| 348:9 378:16 | 423:12 424:3 | 78:11 80:4 | **sean** 520:7 |
| 404:16 413:21 | 426:3 438:6,7 | 191:17,21 | **search** 46:12,15 |
| 413:23 475:19 | 441:14 444:2,2 | 192:22 201:16 | 222:4 235:9,23 |
| | 444:4 447:1 | 206:5 207:10 | 236:14 360:8 |

**[search - seems]** Page 88

| | | | |
|---|---|---|---|
| 414:17 503:17 | 242:24 255:5 | 164:9,21 | 401:8 403:23 |
| **second** 61:5 | 256:1,3 271:3 | 167:13,16 | 408:20 409:22 |
| 124:14 126:19 | 273:3,12 | 169:19 170:6 | 410:17,24 |
| 142:13 143:5 | 278:17,24 | 171:18 176:24 | 411:9 423:17 |
| 153:8 164:16 | 279:21 286:8 | 188:17 189:2 | 424:8 425:3,19 |
| 175:2 179:16 | 288:7 317:1 | 194:10 195:5 | 431:23 433:6 |
| 182:4 189:3 | 323:4 326:5 | 196:6,20,24 | 442:2 444:1 |
| 195:10 214:6 | 329:11 335:19 | 197:2 199:2 | 447:7 448:17 |
| 246:10 255:11 | 336:21 337:14 | 200:8 229:20 | 450:6,17 |
| 273:17 274:3 | 338:7 349:2,4 | 231:6 234:2 | 454:14 457:1,6 |
| 279:22 284:2 | 350:11,22 | 236:4 241:8,9 | 458:24 461:10 |
| 285:10 323:7 | 352:20 357:4 | 241:10 243:13 | 462:10 463:18 |
| 339:10 343:1 | 369:5 379:15 | 246:10 249:24 | 468:14,20 |
| 353:14 363:10 | 399:24 400:4 | 250:4 251:13 | 469:8 470:9 |
| 371:4 385:15 | 400:16,19 | 252:16 253:1,7 | 475:4,6,11 |
| 406:11 422:14 | 404:15 405:9 | 253:14 258:5 | 477:17 478:2 |
| 491:21 501:19 | 406:10 415:22 | 261:2 270:10 | 483:8 485:2,14 |
| 501:20 520:8 | 427:15 458:15 | 271:5 273:4 | 486:8 487:6 |
| **secondly** | 460:6 468:21 | 280:16 281:4 | 494:23 495:11 |
| 423:12 | 481:19 484:16 | 282:17 283:8 | 496:14 497:23 |
| **section** 83:23 | 501:15 508:20 | 286:24 287:5 | 498:3,10,15,20 |
| 84:1,2 100:13 | **sections** 77:24 | 287:21 288:10 | 498:21 499:2,5 |
| 101:1 106:16 | 78:1,2,5,6,16 | 298:1,8 311:2 | 503:13 508:4 |
| 108:24 109:1,9 | 78:18,19,22 | 319:3,21 322:3 | 509:16 512:17 |
| 110:7,18,19 | **see** 20:20 43:24 | 323:13 327:2 | 515:13 518:16 |
| 111:6 127:22 | 61:6 70:3 74:19 | 328:10,21,22 | 519:14 521:15 |
| 129:23 130:4 | 77:16 81:12 | 331:6 332:20 | 521:20 522:18 |
| 131:3 133:15 | 83:9 84:14 85:2 | 333:1,3 339:8 | 524:19 527:9 |
| 134:1,6,9 135:8 | 85:4 95:14,18 | 342:19 344:15 | 531:18 532:2,6 |
| 135:15,20 | 98:23 101:8 | 345:2,5 348:7 | **seeing** 365:18 |
| 155:3 163:3,6 | 109:2 113:11 | 348:18 349:4 | 406:3 |
| 163:20 165:14 | 120:20 126:1,7 | 352:13 357:13 | **seek** 535:8 |
| 171:16,18,20 | 126:8,9 127:15 | 366:1 367:16 | **seeking** 250:6 |
| 172:7 182:2 | 139:14 147:14 | 367:16 373:8 | 250:10 |
| 188:15,19,22 | 148:3 162:24 | 374:12 378:13 | **seems** 86:5,6 |
| 230:17 231:18 | 163:18,23 | 388:16 400:11 | 144:21 157:17 |

**[seems - share]**                                                                    Page 89

234:17 341:7
368:7 371:19
476:6
**seen**  61:8 76:19
94:8,23 102:7
185:1 196:14
196:16 200:11
216:12 223:12
223:13 240:14
241:5 249:9
302:14 335:24
365:22 366:3
422:11 474:4
530:24
**selected**  118:8
261:12,12
**selecting**
518:22
**selection**
182:11 258:13
281:16 314:17
324:21 442:6
505:10
**selective**  236:6
**selectively**
255:15 375:20
467:7 511:19
511:20
**self**  369:10
**sem**  352:9
356:17
**seminal**  80:15
**seminar**  310:21
**sense**  15:1
173:9 187:11
188:6 373:4

427:22
**sent**  201:3,4
513:2
**sentence**  85:5
86:5,8,9 95:12
95:14 96:12
110:23 112:24
128:2 131:11
143:13 155:13
182:4 232:8
259:14 275:4
279:11,23
281:20 283:15
283:24 290:5
291:17 293:20
294:6 321:15
323:8 339:10
363:10 364:16
374:19 401:15
401:16 406:2,6
406:11,12,22
407:9 409:1
431:15 501:20
524:12,17,19
**sentences**
132:15,16
133:3 274:16
275:5,17
285:15 339:21
406:21
**separate**  16:17
20:16 77:2
78:18 144:24
510:6 522:16
**separation**  47:8
522:20,23

**september**
43:23 45:5
55:20 56:22
**series**  6:24
120:19 236:2
478:9
**serious**  407:11
**serous**  6:21
141:18 142:1,8
142:9 143:8,20
144:1,5,10,12
144:15 145:2
155:6 183:9
295:4,18,23
297:13 299:5
299:17 300:2
301:2,3 302:7
302:22 303:22
304:5 325:22
326:1
**serve**  28:13
29:17 58:10
65:23 67:16
71:12 72:4,13
72:15 73:8,14
130:24 131:1
**served**  36:1,12
65:1 68:14
265:10 266:18
266:20
**serves**  70:6
196:10
**serving**  43:18
44:11 45:1 56:7
56:11 57:3 58:1
58:2,5,12,22

59:20 66:22
67:14 70:22
71:2 90:5
252:10 269:3,8
329:9 380:12
381:6,10
465:22 529:13
**session**  5:4 56:3
218:1
**sessions**  78:4
**set**  17:3 99:5
120:14 121:8
160:8 190:2
192:11 213:3
213:15,23
215:4 224:23
229:10 231:4
234:8 309:17
311:10 363:24
530:16 539:10
**sets**  230:18
**setting**  311:13
**seven**  53:6
**several**  50:2,14
130:7 258:10
258:19 291:7
295:2 360:22
451:3 454:16
502:1 535:14
**severe**  424:4
505:10
**sgao**  395:13
**sgo**  395:14,15
395:16 396:21
**share**  229:3
497:17

**[shared - single]**                                                                 Page 90

| | | | |
|---|---|---|---|
| **shared** 192:4 | 353:20 371:24 | 224:13 226:18 | 312:2,4 313:23 |
| 192:11 306:15 | 373:14 420:14 | 300:19 322:13 | 314:21 315:10 |
| **shb.com** 4:21 | 429:20 438:14 | 322:19 331:9 | 315:13 348:12 |
| **sheet** 537:1 | 443:18 453:24 | 368:6 378:23 | 361:20 362:24 |
| 538:11 | 467:6 477:1,4 | 400:21 416:2 | 363:21 364:23 |
| **shift** 293:7 | 481:3,3,17,19 | 478:7 485:10 | 366:8,21 378:1 |
| **shifting** 280:17 | 490:10 493:18 | 490:7 | 378:10,18 |
| 300:11 | 497:20 532:12 | **shows** 94:13 | 388:3 432:23 |
| **shook** 4:16 | **showed** 33:6 | 111:9 118:9 | 476:23 |
| **short** 44:8 86:7 | 259:22,23 | 187:19 312:16 | **significant** |
| 91:3 122:23 | 325:18 327:9 | 323:18 352:15 | 126:7,9 165:1 |
| 135:15 154:13 | 334:19 337:21 | 353:5 | 165:12 168:7,9 |
| 154:13 218:9 | 352:10 369:16 | **shut** 66:17 | 185:16 280:10 |
| 355:8 407:3 | 443:4,14,15 | **shutdown** | 301:4 302:8 |
| 492:4 | 444:18 468:11 | 66:10 | 303:3,5 312:13 |
| **shortcomings** | 470:7 | **side** 67:8 86:20 | 313:18 324:4 |
| 253:3 | **shower** 81:10 | 86:21 196:6 | 324:12 325:23 |
| **shoulder** | 81:10 226:5,5 | 330:15 381:24 | 327:10 328:1 |
| 421:17 | 226:11,11,22 | 383:24 438:7 | 348:5 361:11 |
| **show** 60:19 | 226:23 507:17 | 438:16 444:17 | 363:17 369:10 |
| 79:4 83:11 | 507:17,18,18 | 445:21 449:6 | 374:23 375:5 |
| 87:22,24 94:2 | 508:3,3 509:3,3 | 449:24 478:5 | 457:16 503:23 |
| 102:10 104:4,8 | **showing** 120:15 | 483:9 510:24 | **silkraut** 228:17 |
| 112:7 120:22 | 121:14 142:22 | **siemiatycki** | **similar** 229:15 |
| 123:11,23 | 172:23 187:6 | 69:7 | 311:8 390:12 |
| 124:1,6 137:19 | 206:6 312:22 | **sign** 61:12 | 512:6,9 |
| 138:7 142:19 | 364:13 391:18 | **signals** 441:23 | **simple** 494:12 |
| 144:21 161:16 | 392:9 404:5 | 442:10 | **simply** 268:22 |
| 165:22 169:10 | 497:1 | **signatories** | 280:12 385:2 |
| 186:10,17 | **shown** 44:24 | 362:17 | 505:14,19 |
| 227:4 248:15 | 55:12 66:1 | **signature** 74:18 | 506:3 507:10 |
| 248:22 260:1 | 116:21 137:21 | 536:16 539:20 | 526:11 529:3 |
| 280:1 287:24 | 138:8,10 | **signed** 100:3 | **singh** 69:17 |
| 287:24 301:11 | 157:16 158:5 | 538:15 | **single** 117:9 |
| 313:5,8 323:23 | 201:17 206:2 | **significance** | 150:3 258:11 |
| 326:13 332:14 | 208:1 222:21 | 8:15 280:13 | 349:7,19 |

[sir - specific]                                                    Page 91

**sir**  39:14 95:5
  100:19 109:11
  258:3 274:4
  524:15
**sis**  286:5
**sister**  237:16
  289:15 303:2
  324:22 503:22
  504:2,7
**sisters**  289:14
**sit**  24:24,24
  25:1
**site**  269:16
  531:24
**sites**  8:10
**sitting**  15:18
  140:15 150:24
  151:19 207:3
  211:1,11 215:2
  215:22 217:2
  244:9 251:16
  311:6 390:6
**situation**
  130:13 168:20
  197:12 202:2
  263:6 373:11
  385:2
**situations**
  129:11 131:18
  187:13 347:15
**six**  17:2 207:4
  208:13 352:16
  356:5,11
**sizable**  447:2
**size**  286:6
  375:19

**sized**  129:6
**skepticism**  84:9
  85:7,16
**skewed**  303:19
**skipped**  132:15
**slides**  91:10,13
**slight**  101:6,11
  101:15
**slip**  70:18
**slow**  256:18
**slowly**  361:10
**small**  259:9
  286:6 392:2
**smaller**  142:2
**smith**  69:19
  519:9 520:13
**smokes**  149:9
  151:7
**smoking**  114:9
  114:11,15
  138:22 151:11
  158:20
**social**  67:23
  68:12 70:5
**socially**  68:6,9
  80:8
**societies**  192:1
**society**  5:20
  192:18 193:4
  395:12 436:5
  444:6
**solely**  229:7
**soluble**  478:6
**somebody**
  151:6,8 153:19
  153:21 154:3

  154:21 248:8
  346:7 380:5
  440:12
**somewhat**
  341:8 368:12
**sonal**  69:17
**sorry**  14:12
  20:8 32:18
  34:15 38:13
  45:10,13 51:22
  52:3 55:20
  58:15,16 59:16
  62:2 74:12 76:5
  77:4 84:1,24,24
  100:22 102:9
  103:21 116:24
  122:6 125:5,9
  127:16 142:18
  162:6,10,13
  166:18 177:16
  194:4 207:22
  215:9 222:24
  223:2,23 246:4
  246:12 247:9
  260:4,23
  273:10,11
  276:10 279:14
  285:17 286:18
  289:8 296:13
  296:24 299:20
  304:7 321:2,14
  326:9 340:16
  344:4,5 345:2
  345:22 346:19
  351:13,19
  353:10 372:10

  372:13,17
  379:1,11 383:9
  385:12 399:16
  401:17 403:1
  403:16 409:22
  410:15 420:15
  438:19 449:4,7
  453:1 454:5
  480:4 499:20
  501:19 510:19
  513:5,8 515:14
**sort**  15:7 95:11
  281:13
**sound**  363:24
**sounds**  34:17
**source**  197:7
  207:16 361:12
  512:10 530:1
**sources**  17:9
  171:24 224:4
  316:15 319:24
  411:1 525:20
**south**  3:7
**speak**  15:4,4
  189:15 211:14
  262:11,24
  263:4 265:22
  536:5
**speaking**
  211:17,20,23
  299:16
**specific**  140:11
  141:4 159:16
  160:10 191:4
  198:6 210:11
  210:21 311:3

**[specific - statement]**                                    Page 92

323:21 403:17
418:8 509:21
**specifically**
37:13 57:5 77:9
90:20 97:21
105:4 108:7
118:17 121:1
128:9,18
129:16 135:12
138:23 139:2
140:20 141:3
144:15 145:15
146:2 169:20
178:7 182:16
193:5 198:7
200:8 220:7
236:5 241:6
247:24 250:14
253:14 264:1
271:21 322:6
322:19 356:10
370:24 387:20
387:22 397:10
403:7 414:18
415:22 431:22
433:15 465:20
476:17 507:20
507:22 508:5
508:15,18
510:13 522:19
**specified**
215:12 509:3
**specify** 508:23
**spectrum** 29:3
**speculate**
263:16 396:11

**speculation**
263:14,23
466:20 469:20
**speed** 256:23
257:4
**spend** 25:8
46:11 207:9
**spent** 19:6
26:16,19 55:19
55:24 79:1,5,8
80:21 383:19
460:16
**spoke** 91:7
**spoken** 189:20
**sponsored**
28:13 36:4
436:11 466:17
**sporadically**
86:13
**spring** 309:24
**spurious**
258:15 310:10
**square** 4:6
**staff** 68:12
**stance** 533:7
**stand** 86:9,11
86:15,17 87:12
100:1,6 178:4
277:23
**standard**
136:12 311:22
312:16,22
313:1,4,7 318:9
320:15 330:3
427:12 534:14
534:21

**standards**
532:10 533:21
**standing**
173:22
**standpoint**
312:21 327:1
**stands** 100:3
**starch** 81:15
506:21 507:20
507:21,23
508:14,17,17
**start** 16:9 45:3
54:22 97:3
126:2 136:6
142:6 150:8
159:13 183:22
196:8 205:10
212:7 213:20
218:19 231:17
252:7 282:3
327:7 397:13
403:3 418:6
503:6 512:20
525:21
**started** 22:10
45:7 99:1
221:10 229:2
237:7,12 238:6
238:9,12
520:13
**starting** 63:2
89:10 172:7
238:2 268:12
412:3 533:3
**starts** 14:7
252:13 260:24

449:2 484:23
**state** 73:17 81:7
83:5 102:3
103:23 115:16
116:1 135:22
143:4 153:3,4
174:22 181:15
211:8 323:23
350:9 360:19
405:13,17
434:18 443:1
499:18 520:15
**stated** 93:8
108:7 118:17
121:20 146:3
148:18 169:20
183:6,7 193:11
217:7 223:6
253:15 313:22
362:14,17
387:20 407:22
437:3,4 506:19
508:5
**statement** 8:14
31:16,18,21
63:3 79:17
81:21 82:1,5,8
82:9 86:3 87:12
88:4 90:21
93:21 96:1,23
111:13 125:20
125:21 127:19
128:7,11 129:9
130:11 131:17
134:15 136:15
140:8 141:15

[statement - strong]                                                    Page 93

144:13 172:16
173:6,13,15,18
173:22,23
174:10,12,14
176:13 178:14
179:5 182:12
186:22 192:24
197:4 234:8
240:5 247:2,6
253:24 259:6,8
260:18 282:10
283:6 284:6
289:5 306:11
306:14 307:24
308:1 323:9
330:20 334:18
338:24 340:9
346:14,20,21
347:3,6 348:3
350:21,23
351:3 352:19
354:20 355:17
355:20 357:8
361:4,7,19
362:19 363:19
364:6 365:10
367:1 369:13
369:15 377:2,6
377:23 378:21
381:15 386:8
386:14 387:18
400:13 401:3
404:10 405:7
407:15,17
408:11 409:11
502:10 511:3

511:11,23
513:23 514:2
515:5,9,16,19
525:1
**statements**   31:3
79:20 85:13
86:14 89:2
97:22 98:2,3
108:4 132:10
168:15,18
197:17 198:11
244:14,24
277:23 278:2,8
278:10,24
279:6,9,12,20
290:23 291:7
291:14 331:2
336:6,11 338:1
338:20 339:18
340:9,14 361:8
365:3 366:19
370:1 383:6,15
386:23 388:19
531:13
**states**   1:1 101:4
107:4,13 224:6
271:7 411:17
480:15 525:21
**stating**   137:1
244:13 281:12
**statistical**   8:15
163:5 165:6
187:7 280:13
312:2,3 313:23
314:21 315:10
315:13 326:24

348:12 361:5
361:11,19
362:11,20,23
363:12,18
364:1,19,24
366:14,21
370:20 371:17
371:24 373:11
378:1,10,16,17
388:2 404:12
404:17,22,23
427:7 476:23
**statistically**
164:24 165:11
185:13,16
280:10 301:4
302:8 303:5
312:13 313:17
324:4,12
325:23 327:10
328:1 363:17
369:9 372:4
373:1,6 375:5
375:21 440:13
440:15 457:15
473:12 503:23
**statistician**
363:14
**statistics**   365:1
**status**   338:19
386:20 447:5
**stay**   345:23
515:14
**staying**   135:20
184:14

**steffen**   6:24
194:5,21
**steffen's**   195:15
195:21 197:19
198:14
**stem**   171:23
**stenographic...**
539:9
**step**   489:21
**steve**   262:3,5
**stick**   527:12
**sticky**   513:6
**stock**   236:3
505:11
**stop**   370:12
**stopped**   380:20
**stopping**   131:7
**stratified**   145:5
170:1
**stratify**   170:14
**street**   2:15 3:7
3:16 4:7
**strength**   101:19
101:23 143:23
229:16 233:8
317:22 364:9
458:21 459:14
**strengths**   38:4
236:15,22
**strike**   58:21
67:18 208:7
226:20 410:16
510:7
**strong**   102:5,6
102:16 114:12
206:22 233:10

[strong - study]                                            Page 94

| | | | |
|---|---|---|---|
| 337:21 416:3 | 157:18 160:15 | 339:15 340:22 | 502:1,4,5 503:1 |
| **stronger** | 160:16,19,20 | 341:1,5 344:16 | 503:1,13 518:5 |
| 142:16,24 | 161:1,1 168:13 | 350:8 353:20 | 518:10,23 |
| 143:7,19 144:9 | 169:14 170:13 | 357:17 358:7 | 521:10 522:4,8 |
| 184:23 281:22 | 171:22 172:20 | 358:11,23 | 522:8,24 523:2 |
| 336:3,15,16 | 172:23 175:3,5 | 359:19,19 | **study** 6:10,18 |
| 408:9 518:17 | 177:24 178:7 | 360:1 367:4 | 10:7 97:5,13,13 |
| **strongly** 144:16 | 182:10 188:14 | 368:5 370:10 | 104:2 113:4 |
| 371:19 | 212:14,18 | 385:19 386:10 | 117:9,24 118:2 |
| **student** 310:14 | 219:6,12,19,22 | 386:22 387:13 | 118:8,14 |
| **students** 24:12 | 220:4,20 | 388:8,16 | 119:21 120:6 |
| 309:18 310:4 | 221:17,19 | 390:10 391:17 | 120:10,11 |
| 310:16 | 223:19,20 | 391:20 392:7,9 | 121:16 122:1,2 |
| **studied** 309:3 | 227:17 228:6 | 399:8 401:11 | 122:4,8,16,21 |
| 364:24 391:16 | 235:3 236:7,13 | 401:24 402:16 | 122:22 123:24 |
| 413:6 | 237:9,14 | 403:15,21 | 124:6,6 140:21 |
| **studies** 6:5 8:10 | 246:20 254:8 | 404:5,14,19,24 | 140:23 145:9 |
| 11:2 31:23 33:6 | 256:5 258:10 | 405:15 407:2,5 | 161:6,10,23 |
| 33:8,13,15,19 | 258:19,22,24 | 408:10,15 | 166:16,22 |
| 34:19 40:12 | 259:3,5,9 260:1 | 410:21 411:20 | 169:24 170:11 |
| 47:15,16,21,23 | 279:16 281:13 | 412:15 413:6 | 171:17 175:14 |
| 86:1 87:6 98:12 | 281:15 289:24 | 413:16 415:1,8 | 176:6,15,17,20 |
| 100:14,16 | 291:18 300:20 | 415:19 416:1,6 | 177:1 179:2,20 |
| 102:8 112:3 | 301:1 302:5,14 | 418:11 420:3 | 179:21,22 |
| 114:5,21,24 | 308:3,6 314:23 | 427:20,20,21 | 180:2,6 181:4 |
| 115:14,15 | 318:8 319:22 | 433:2 438:10 | 182:16,17,19 |
| 117:23 121:13 | 320:4 322:10 | 438:11 439:10 | 182:22 183:1 |
| 121:24 125:8 | 322:13,18,21 | 441:24 442:9 | 183:21 184:1 |
| 125:13 128:3,5 | 323:12,15,23 | 442:11,16 | 185:10 186:9 |
| 128:10,18 | 324:2,6,7,10,11 | 443:4,8,12,15 | 186:17 188:15 |
| 129:8,13 | 325:14,18 | 444:17 446:6 | 194:4,4 220:7 |
| 131:24 140:19 | 326:4,7,21,24 | 446:16,19 | 220:16 228:15 |
| 141:2 142:3 | 327:9,21 | 447:24 449:14 | 228:20 237:16 |
| 144:2 145:10 | 328:13,14 | 475:7,9,23 | 252:18,23 |
| 145:14 147:5,8 | 330:1,2 336:3,9 | 476:4 490:16 | 253:2,5,11 |
| 147:18 157:16 | 338:11,15 | 499:22 501:21 | 258:11,11 |

**[study - suggest]**                                                                  Page 95

| | | | |
|---|---|---|---|
| 261:6,6,10,12 | 342:3 343:15 | **studying** 24:5,6 | 284:17 287:14 |
| 279:24 280:22 | 343:17 344:1 | **stuff** 432:15 | 288:12,17 |
| 281:6 282:7,14 | 347:17 349:7,8 | **subcontract** | 293:20 294:9 |
| 282:24 283:19 | 349:19,23 | 25:19 265:7 | 294:12 |
| 283:21 284:15 | 350:5,13,17 | **subgroup** | **substances** |
| 284:20 285:13 | 352:15 354:21 | 375:15 | 11:13 431:21 |
| 286:5,9 287:2,7 | 355:19 367:8 | **subgroups** | 431:21 483:15 |
| 288:13,13 | 367:13,14,16 | 375:1,3 | **substantial** |
| 289:15,15 | 368:13,17,22 | **subject** 29:6,18 | 172:21 354:8 |
| 290:9,11 | 373:24 378:2 | 128:6 157:13 | 412:12 |
| 293:21,24,24 | 389:10 392:3 | 160:15 161:1,2 | **substantially** |
| 294:10,12 | 392:14 397:2,6 | 179:13 180:17 | 367:22 407:24 |
| 295:3,7,10,21 | 397:8 402:2,13 | 218:16,21 | 410:3 495:12 |
| 296:2,8,10,13 | 403:18 404:24 | 219:1 293:17 | **substantive** |
| 296:16,22 | 406:19 408:6 | 391:12 406:24 | 344:9,13 347:1 |
| 297:4,9 298:21 | 410:7,19,23 | **subjective** | **subtype** 7:20 |
| 301:5,11 | 411:11 415:16 | 317:11,17 | 23:19 141:5 |
| 302:11,21 | 418:10 420:14 | **subjects** 442:7 | 142:17 143:8 |
| 303:2,2 312:5 | 425:8 430:6,7 | **submission** | 143:20 144:9 |
| 312:16 313:17 | 432:24 434:15 | 66:6,9 | 144:21 |
| 314:11,20,23 | 434:18 441:20 | **submit** 39:20 | **subtypes** 140:5 |
| 315:9,22 316:3 | 441:22 442:15 | **submitted** | 140:12 141:2 |
| 319:2 322:7,11 | 444:19,24 | 39:17 49:18 | 142:1 143:24 |
| 322:11,12 | 456:18 472:4 | 50:11 55:17 | 144:4,13 |
| 323:18 324:1 | 474:11 475:15 | 59:12 74:21 | 227:23 334:17 |
| 324:22 325:9 | 476:3 496:4 | 197:1 251:1,6 | **successful** |
| 326:6,6,13,19 | 500:9 503:22 | 256:14 | 511:16 |
| 327:14 328:17 | 503:22 504:3,7 | **subsequent** | **suffer** 128:3,23 |
| 330:23 331:1 | 504:18 505:5 | 126:4 438:23 | **sufficient** 96:18 |
| 331:15 332:14 | 506:10,13,18 | 477:2 479:17 | 228:11,12 |
| 332:23 333:4,5 | 507:3,9 508:1 | 504:10,15 | 331:18 442:12 |
| 333:7,20 | 509:10 510:12 | **subsequently** | 443:9 |
| 334:22 335:24 | 519:2 521:16 | 466:12 | **suggest** 93:9 |
| 339:13,15,23 | 523:16 524:13 | **subset** 280:22 | 95:22 99:13 |
| 340:23 341:4,7 | **study's** 370:14 | 281:5 283:16 | 106:20 121:22 |
| 341:9,11,15,24 | | 283:18 284:14 | 134:20 144:18 |

**[suggest - systematically]**                                                                 Page 96

227:14 354:9
356:7 403:14
443:11,11
506:1
**suggested**
246:17 253:22
254:8,11
302:17 357:22
507:16
**suggesting**
166:10 224:16
375:15 376:8
376:16 388:9
388:10 476:9
**suggestion**
347:9 495:4
**suggests** 132:3
144:20 206:8
290:16 400:21
503:18
**suite** 2:16 3:7
3:16 4:7
**summaries**
531:10
**summarize**
435:13 504:6
**summarized**
97:17 137:18
**summarizing**
366:10
**summary** 6:3
78:12 93:9 99:8
99:9 105:10,19
105:22 106:2,6
107:21 135:22
142:13,20

155:3 231:16
271:2,4,8
272:13 292:10
292:13 304:12
323:4 337:8
365:14,18
366:7 438:3,4
439:22 450:19
451:18 461:1,2
461:6 483:10
483:11 493:7
513:17 514:7
514:22 515:5
516:17 525:15
534:11
**summation**
437:11
**supplemental**
286:3
**support** 251:14
253:21 254:7
254:10 256:14
279:17 290:1
291:19 339:6
361:8 487:16
487:24 496:8,9
534:20 535:17
**supported**
356:11 411:2
**supports**
385:18 425:1
488:2 496:12
**suppose** 347:13
**supposed** 362:2
**sure** 13:21 14:6
14:9 27:8,17,21

32:21 52:23
58:18 61:11
62:19 72:22
84:15 91:12
95:6 101:22
103:1 112:10
136:18 156:18
204:10 208:21
217:1 224:22
225:17 226:8
244:19 245:1
247:8 249:8,18
257:6 259:24
268:1 288:3
292:24 295:14
299:22 329:23
331:4 340:8,16
343:11 344:18
345:20 351:6
354:14 355:6
365:4 383:12
384:22,24
394:21,23
397:13 404:21
405:5 406:5
413:4,22 422:1
423:23 426:13
470:20 485:4,5
498:4 519:4
520:6 526:22
528:7 536:9
**surgery** 356:6
356:18
**surgical** 356:8
**surgically**
356:13

**surprised** 29:10
325:12 328:9
415:7
**surrounding**
401:1 402:6
403:9
**susceptibility**
423:16
**susceptibles**
325:4 505:6
**suspect** 389:23
**swear** 359:5
**swedish** 265:4
**sworn** 12:5
218:5 539:6
**symposia**
192:12
**symptoms**
265:8
**syndrome**
156:13 157:6
158:7 173:5
**synthesize**
427:5
**system** 402:22
426:16
**systematic** 7:16
9:4 286:4 319:2
319:11,15,19
397:23 399:5
399:18 402:12
402:15,18,23
402:23 403:14
403:20 404:1
**systematically**
404:7

**[t - talc]** Page 97

| t | | | |
|---|---|---|---|
| **t** 397:3 | 295:10 300:21 | 130:10,15,16 | 227:19 228:2,8 |
| **table** 123:13 | 301:10 327:4 | 132:2,5 134:11 | 230:5 234:16 |
| 125:22 164:11 | 334:22 335:11 | 134:12 135:1 | 236:5 237:9,14 |
| 164:12,12 | 335:12 339:20 | 135:11,24 | 238:1 241:18 |
| 286:3 287:8 | 344:19,22 | 136:9,21 137:7 | 242:5 243:5,18 |
| 297:8 345:5,14 | 355:7 356:2 | 137:20 138:11 | 245:14,19 |
| 347:20 450:11 | 365:15 366:3 | 139:8 140:3 | 246:1,19 |
| 450:12 455:18 | 367:18 491:4 | 142:5,7,14 | 250:16 251:7 |
| 475:5 497:19 | 492:22 496:16 | 143:5,16 145:7 | 256:6,9 258:15 |
| 497:21 498:1,8 | **taken** 98:1 | 145:20 146:5 | 259:10 260:15 |
| 498:9 499:6,7 | 113:11 217:17 | 146:13 148:12 | 261:7 262:20 |
| 509:16 521:5,7 | 229:24 389:23 | 150:3,21 151:9 | 263:10 277:13 |
| 523:18,22 | 538:6 539:9 | 153:12,15 | 277:23 278:4 |
| 524:3 | **takes** 492:15 | 154:21 155:10 | 278:11,17 |
| **tables** 164:10 | 493:2 | 159:16 163:12 | 279:1,18 290:2 |
| **taher** 9:8,13 | **talc** 5:18,23 6:1 | 169:24 171:21 | 290:13,24 |
| 122:2,8,16 | 6:5,15,18,23,23 | 172:2,8,13 | 291:15,20 |
| 238:8 397:2,5,7 | 7:1,21 8:8 9:7 | 173:10 174:6 | 292:11 297:12 |
| 397:21 398:7 | 9:12 10:4,10,12 | 174:24 175:10 | 300:20 306:6 |
| 398:13,23 | 10:15,18,21 | 176:8,11,21 | 307:2,5,9,15 |
| 399:19,20 | 11:2,4 38:16,23 | 181:7 182:6,18 | 308:9,12,15 |
| 403:17 404:9 | 39:12 43:10 | 182:20 183:1 | 309:11,12 |
| 410:19 496:17 | 81:20 82:16 | 184:2,20,21,24 | 310:12,20 |
| **take** 43:8 78:5,6 | 83:6 84:12 | 185:6,8 186:10 | 311:9 320:4 |
| 93:3 110:8 | 85:12 86:1 87:3 | 186:18,24 | 321:24 323:11 |
| 126:2,12 | 87:5 88:8,16,17 | 188:23 189:12 | 323:17,24 |
| 133:18 139:15 | 89:12,15,20 | 192:5,19,24 | 324:10,12 |
| 163:15 164:17 | 90:1,9 91:4,16 | 193:5,12 | 325:18 327:11 |
| 169:2 185:18 | 91:23 93:10 | 200:10,11 | 329:18 331:21 |
| 186:20 195:10 | 96:17 98:12 | 201:17,21,21 | 347:9 349:7 |
| 198:24 247:7 | 99:14 100:14 | 202:23,24 | 350:6,13,18,23 |
| 255:8 257:5 | 102:5,15 | 205:14 207:18 | 352:10,16 |
| 278:5 279:2,23 | 104:15 106:21 | 207:24 208:1,5 | 353:6,17,19,20 |
| 292:20,22 | 107:9 113:8 | 208:10 215:12 | 354:9 356:4,7 |
| | 115:21 125:7 | 220:20 223:7,9 | 356:12,16,20 |
| | 125:12 127:13 | 223:15 226:14 | 357:10,17,19 |

**[talc - talked]**                                                          Page 98

| | | | |
|---|---|---|---|
| 357:24 358:1,8 | 478:6,10 480:7 | 197:17 198:11 | 294:15 304:12 |
| 360:2,13 381:7 | 480:19,21 | 198:12 201:8 | 326:5 340:21 |
| 382:2 383:17 | 481:12,24 | 203:17,23 | 357:17,21 |
| 384:1 389:19 | 485:9,10,12,17 | 204:19 205:3 | 360:1 366:20 |
| 389:21,22 | 485:18 487:17 | 209:11,14,17 | 368:13 369:2 |
| 390:17 391:15 | 488:4,12,12 | 209:19,22 | 430:19 432:9 |
| 391:19,22,24 | 489:10,12,23 | 210:2 212:3,14 | 435:16 448:14 |
| 392:4,10,12 | 500:11 503:24 | 219:7 220:16 | 460:24 478:23 |
| 394:12 396:4,8 | 504:5,10,12,14 | 227:8 229:12 | 490:21 491:18 |
| 400:8,23 | 504:19,21,22 | 230:20 239:23 | 492:6 518:19 |
| 407:20,23 | 504:23 505:12 | 244:1 250:7 | **talked**  54:19 |
| 409:7 413:8 | 505:15 506:4 | 254:24 263:20 | 70:17,21 71:1 |
| 414:1,17,20 | 506:14 507:7 | 277:18 299:18 | 128:9 138:17 |
| 415:2,2,20,21 | 507:10,15,19 | 300:2 302:6 | 190:11 191:17 |
| 416:13,16,20 | 507:24 508:16 | 306:17 307:19 | 228:15,17,20 |
| 416:23 418:18 | 511:7,22 512:6 | 342:18 343:9 | 248:24 290:19 |
| 419:8 422:8,20 | 518:20 519:16 | 353:7,21,23 | 312:1 321:10 |
| 423:2,13 424:5 | 524:23 529:14 | 380:14 382:10 | 324:17 331:16 |
| 424:7,14 425:2 | 531:14 533:11 | 382:12 384:17 | 342:17 343:8 |
| 428:4,13 430:8 | 533:11 535:20 | 389:14 390:9 | 368:12 381:16 |
| 431:8,11,20 | 536:2 | 390:23 410:9 | 391:14 392:20 |
| 432:18 433:3 | **talcum**  1:6 7:14 | 412:3 414:11 | 392:22 398:12 |
| 434:24 435:23 | 27:2,5,11 28:1 | 416:10 453:9 | 415:9 416:12 |
| 436:3 438:12 | 35:23 36:14,18 | 453:17 507:2 | 416:12 417:12 |
| 441:16 444:18 | 42:3 57:16 58:6 | 508:13 510:9 | 418:10 429:3,6 |
| 447:4 448:15 | 58:9,13,24 | 510:15 525:20 | 429:13,13 |
| 449:5 454:12 | 65:20 68:16 | 526:2 | 432:2 439:16 |
| 455:3 456:8,9 | 70:7,23 71:3,21 | **talk**  13:24 | 439:19 445:5 |
| 456:15 461:7 | 81:8 114:4,22 | 27:24 36:6 42:2 | 445:12,19 |
| 462:20 463:13 | 140:9,16 | 71:22 98:9 | 446:3 459:14 |
| 464:2,2 465:5 | 141:10,20 | 99:22 121:1 | 461:12,20 |
| 465:23 466:4 | 146:1,21 147:1 | 130:22 135:13 | 462:3,13 466:2 |
| 466:23 467:23 | 148:14 149:6 | 152:24 190:4 | 479:2,9 490:21 |
| 468:11 469:12 | 149:19,21,24 | 232:12 233:7 | 513:11,14 |
| 470:8,11 474:5 | 150:10 151:2 | 234:10,13 | 514:5 515:16 |
| 475:16 477:24 | 151:21 196:12 | 283:8 294:4,8 | |

**[talking - thank]**

Page 99

**talking** 74:4
89:6 98:16
155:6 177:10
210:6 212:22
230:3,4 244:6
247:20 253:1
293:17 294:7
304:19 339:23
362:8,18 376:1
376:5,20
377:23 378:4,9
405:5 411:19
422:22 428:12
448:18 474:14
479:16 484:19
494:6,7,8
496:18 516:10
525:13
**talks** 441:13
444:16 471:18
478:4 479:1
486:10
**tamara** 208:20
**target** 140:21
**task** 8:14
361:18 363:13
363:19
**taught** 24:13,14
24:16,18 26:2
309:17,20,21
**teach** 24:15
26:5,8 310:14
311:21
**teachers** 333:24
**teaching** 24:12
24:21 25:13

309:23
**team** 28:14,17
51:1,2,12
**tease** 433:2
**tell** 12:13 20:11
44:24 56:10
57:2 59:5 69:2
91:15 108:11
110:2,13 119:8
124:23 130:1
135:6 200:20
208:16 210:5
211:2 230:9
236:9 257:10
257:24 297:10
307:11,18
334:24 350:13
377:13 387:5
397:10 399:24
399:24 405:9
435:5 455:23
455:24 460:19
483:20 506:5
527:10,24
528:3,8 529:4
**telling** 152:11
287:6 377:10
471:5,5
**tem** 241:19
**temporal** 318:7
**temporality**
229:21 234:11
234:17
**term** 83:9
91:18,21
101:16 177:18

313:1 336:15
336:16 403:1
407:24 504:23
505:19 506:6
**terminology**
264:9
**terms** 86:14
142:2 154:24
268:10 281:16
317:23 324:7
336:13 340:15
367:8,14 370:7
378:17 405:6
**terry** 8:7
341:16 343:15
344:2 347:17
425:8
**test** 148:3
311:15,20
371:17,24
373:11 404:12
404:17,20,22
404:23 405:3,6
456:17 470:7
471:14 485:17
**tested** 309:6
**testified** 12:5
13:20 201:7
205:2 218:5
470:7 510:4
516:13 532:21
532:23
**testify** 17:21
393:9
**testifying** 38:24
43:12,13 60:14

62:13 202:22
204:19 384:16
**testimony**
17:19 40:22
41:3 55:7 72:8
184:7 187:16
203:9,16,22
267:15 382:14
412:23 468:3
471:3 517:19
539:9
**testing** 201:7,21
202:24 205:4
205:17 210:1
238:20 239:12
239:24 240:8
240:17 241:6
241:17 361:12
363:22 481:23
524:9
**tests** 205:13
309:12 364:23
366:8 468:10
**text** 167:21
273:21
**textbook** 80:18
80:19 320:22
**textbooks** 80:17
320:17 441:4,5
**tfinken** 4:10
**thank** 14:11
110:11 139:17
167:1,17
276:10 285:23
294:24 332:19
374:20 389:4

**[thank - time]** Page 100

| | | | |
|---|---|---|---|
| 395:15 417:20 | 527:3 531:20 | 413:15 416:22 | 17:16 19:5 24:9 |
| 460:22 482:12 | **think** 20:22,22 | 418:10 421:2,3 | 25:7 26:15,18 |
| 483:6 503:5 | 20:23 21:2,6 | 432:13 436:2 | 46:9,12,16 47:3 |
| 517:1 536:14 | 29:19 41:13 | 436:10 437:22 | 48:10 63:10 |
| **thanks** 143:1 | 45:11 54:16 | 442:24 484:2 | 65:16,18 66:6 |
| **theories** 318:24 | 59:22 63:1 | 496:14 497:2 | 66:16 69:6 |
| **theory** 319:1 | 73:22,24 74:20 | 519:20,24 | 72:14 80:24 |
| **therapeutic** | 79:22 110:1 | 523:1 530:23 | 86:7 88:4 91:3 |
| 332:10 | 127:20 128:14 | 530:24 533:2 | 91:20,22 93:19 |
| **therapy** 113:21 | 128:16 129:10 | **third** 129:3 | 103:4,8 107:18 |
| 114:3 130:23 | 129:11 130:12 | 171:24 250:18 | 107:22 108:9 |
| 156:24 158:2,5 | 130:19 141:6 | 256:4 484:3 | 110:15 116:23 |
| **thicker** 76:20 | 145:9 150:4 | **thirds** 181:4 | 116:24 122:23 |
| **thing** 133:9 | 154:18 157:15 | **thought** 64:20 | 126:3 128:21 |
| 181:19 208:11 | 160:18,22,24 | 107:18 108:12 | 129:2 138:14 |
| 274:4 348:9 | 166:8 175:24 | 121:21 236:1 | 150:6 151:14 |
| 381:11 480:16 | 176:16,16 | 283:3,11 | 152:23 153:13 |
| 494:9 504:2 | 197:10 222:11 | 290:10 294:19 | 153:17 154:10 |
| 517:7 | 229:14,23 | 325:22 436:3 | 154:13,14,14 |
| **things** 43:5 | 233:2 234:15 | 450:20 451:4 | 154:16 164:17 |
| 130:24 132:17 | 234:17 235:21 | 480:4 | 168:2 169:4 |
| 166:9 199:3 | 242:9 259:24 | **thoughts** 78:13 | 174:2,3,18 |
| 214:18,20 | 261:11,11 | **thousand** 391:2 | 180:14 189:13 |
| 216:5,18 | 265:21 266:7 | 440:22 | 200:5,6,7,12 |
| 245:10,13 | 266:11,21 | **three** 12:24 | 207:9 214:17 |
| 309:6 314:17 | 268:7 281:8 | 20:16 44:14 | 217:11 229:2 |
| 328:7 355:16 | 282:1,9 293:22 | 59:24 65:8,14 | 235:20 237:7 |
| 418:15 426:20 | 309:15 311:1 | 171:24 281:13 | 237:12 244:4 |
| 428:11 429:14 | 311:19 313:21 | 314:10 324:6 | 253:22 254:7 |
| 432:1 446:4 | 328:16 331:5 | 370:5,6 379:24 | 254:10 255:8 |
| 447:11,23 | 332:11 337:23 | 380:6 382:18 | 257:5,11,17,24 |
| 459:2 462:13 | 338:23 340:20 | 384:8 401:8 | 260:8 270:20 |
| 467:24 477:22 | 354:1 355:22 | 484:21 486:11 | 299:1 307:13 |
| 479:1,17,22 | 359:3 376:21 | **till** 73:7 293:10 | 309:21 310:23 |
| 490:22 495:7 | 382:5,7 383:23 | **time** 1:16 2:9 | 312:9 333:21 |
| 496:15 526:12 | 387:13 396:13 | 13:20 15:4 | 336:4,14 338:5 |

**[time - tisi]** Page 101

| | | | |
|---|---|---|---|
| 343:3 346:8 | 18:16 19:22 | 123:1,10,17,20 | 217:6 219:8 |
| 352:24 353:12 | 20:4,8,20 21:2 | 123:23 124:4 | 220:10 222:10 |
| 355:1 380:9 | 21:6 27:12 | 124:10,18 | 222:24 223:10 |
| 381:10 383:19 | 29:24 30:11,14 | 126:22 127:2,5 | 223:23 225:10 |
| 389:15 390:13 | 30:24 31:13 | 131:6 132:13 | 225:22 231:8 |
| 391:13 412:12 | 32:5,8 34:6,13 | 132:22 133:17 | 232:1 239:1,13 |
| 417:3,10,13 | 34:15 38:12 | 135:2 136:11 | 239:16 240:10 |
| 419:22 430:16 | 40:9 41:5,17 | 136:23 137:9 | 240:21,24 |
| 431:4 436:9,10 | 45:10,19,21 | 138:13,17 | 242:6,11,14,18 |
| 448:1 450:22 | 46:1,4 47:5 | 139:17 142:21 | 242:23 243:6 |
| 455:3 460:17 | 49:20,22 50:7 | 146:8 148:15 | 243:19 246:4 |
| 466:7 471:3,24 | 51:3,23 52:13 | 150:12,15 | 247:7,11 249:8 |
| 472:14,16 | 53:1,11,19 55:1 | 151:4,22 | 250:9 252:2 |
| 473:2 477:18 | 56:20 57:12,15 | 152:12 155:24 | 255:7,11,14,20 |
| 491:5 492:11 | 58:15 59:1 | 159:18 160:9 | 256:16 257:7 |
| 505:2,3,4 506:2 | 62:17 63:5,23 | 160:17 162:10 | 257:12,21 |
| 523:6 526:21 | 64:5,8,10 66:24 | 162:17,21 | 258:1,6 262:21 |
| 527:4,7,15,19 | 67:9 70:18 | 163:1 164:17 | 263:1,13,22 |
| 530:22 534:23 | 71:16 72:2,7,23 | 166:7,18 | 265:20 266:5,8 |
| 535:8,12 | 74:20 76:1,21 | 178:16 179:8 | 267:4,19,21 |
| 539:10 | 84:19 86:22 | 180:11,13,18 | 271:18 272:18 |
| **timeline** 356:20 | 87:13 88:9,13 | 180:21 181:13 | 273:14 274:2,7 |
| **times** 68:11 | 97:10 98:16,20 | 181:18,22 | 274:11,13,23 |
| 126:4,6 148:18 | 100:21 101:21 | 183:3 184:3,6 | 275:9,14,23 |
| 189:8 205:1 | 102:17 103:10 | 185:14 187:2 | 276:4 277:9 |
| 317:6,15 | 104:24 105:12 | 190:16,20 | 278:5 279:2 |
| 335:12 407:23 | 105:16 106:24 | 191:6 192:7 | 287:22 288:20 |
| 413:17,19 | 107:10,12 | 193:2 197:21 | 289:9 291:3 |
| 451:3 456:9 | 108:1,20 109:8 | 198:15 199:7 | 292:18,22 |
| 476:4 494:13 | 109:15,21 | 199:10,16,20 | 293:12 296:3 |
| 517:6,9 518:12 | 110:5,11,16,22 | 199:24 200:3 | 300:8 301:7,16 |
| 518:15,24 | 111:14 116:23 | 201:9,22 202:3 | 305:19 306:8 |
| **timing** 344:16 | 117:12,17 | 202:9,14 203:2 | 311:18 312:24 |
| **tisi** 3:6 5:5 | 118:5,19,24 | 203:12,24 | 313:20 314:22 |
| 13:18 14:20 | 119:5,10,14 | 204:5 210:9,20 | 315:4,11 317:5 |
| 15:2 17:14 18:8 | 120:7 121:17 | 214:1,5,9 216:3 | 317:14 320:13 |

| | | | |
|---|---|---|---|
| 322:8 324:14 | 427:23 428:10 | 475:3 476:10 | **tisi's** 30:19 |
| 327:12 334:21 | 429:2,12,19 | 476:24 477:8 | 46:19 47:11 |
| 339:19,24 | 430:1 432:11 | 477:13 478:19 | **tissue** 352:10 |
| 343:20 345:21 | 432:22 433:20 | 479:7,15 480:1 | 392:17 |
| 345:23 346:3 | 434:13 435:15 | 480:13,20 | **tissues** 356:13 |
| 351:8,12,16,20 | 436:8 437:8,13 | 481:2,11,18 | **title** 486:5 |
| 352:1 354:24 | 437:18,22 | 482:6,9,12,17 | **titled** 61:1 |
| 355:21 358:9 | 438:5 439:5 | 482:22 483:5,7 | **today** 12:23 |
| 358:14,18,22 | 440:3,19 441:3 | 484:14,17,20 | 27:24 42:2 43:1 |
| 359:8,10,13,17 | 441:12 442:23 | 484:24 485:3 | 43:8 56:4 61:9 |
| 360:17 365:15 | 443:24 444:15 | 485:22 486:4 | 71:22 74:4 81:4 |
| 365:21 366:2 | 445:4,11,18 | 487:23 488:10 | 94:9 140:15 |
| 372:7,11,14,18 | 446:14 447:17 | 488:18 489:1,7 | 149:1 151:1,19 |
| 376:2,8,12,16 | 448:13 449:21 | 489:19 490:5 | 200:20 207:3 |
| 376:21 377:1,5 | 451:2,9,17 | 490:15 491:2 | 210:6 211:1,11 |
| 377:10,16,21 | 452:12,19 | 491:17,24 | 215:2,22,24 |
| 380:16 383:8 | 453:2,18,24 | 492:3,23 493:5 | 217:2 228:20 |
| 384:2,19,22 | 454:4,10 455:8 | 494:20 495:13 | 240:6 244:9 |
| 394:15,19 | 455:17 456:22 | 496:2 497:1,10 | 249:16 251:17 |
| 396:10 397:16 | 457:14 458:13 | 499:4,8 500:2,6 | 256:1 278:16 |
| 397:20 401:4 | 459:10,21 | 501:3,8,11,16 | 311:6 354:18 |
| 402:19 405:23 | 460:3,15 | 502:12 513:5 | 355:16 368:12 |
| 406:8 408:23 | 461:17 462:2 | 514:9,12,15,19 | 374:1 384:14 |
| 410:11 412:19 | 462:18 463:3 | 517:15,22 | 385:8 390:7,17 |
| 412:22 413:11 | 463:10,22 | 519:18 520:17 | 393:9 411:19 |
| 417:2,17 418:2 | 464:11,15,22 | 520:23 522:11 | 418:12,14 |
| 418:3,23 419:6 | 465:10,24 | 523:6,12 525:2 | 419:1,19 |
| 419:17 420:5,8 | 466:9,21 | 525:23 526:4,9 | 429:14 449:13 |
| 420:12,17,21 | 467:14,17,20 | 526:14,20,23 | 451:3 461:22 |
| 420:24 421:5 | 468:7,18 | 527:2,13,19 | 477:20 524:24 |
| 421:10,16,21 | 469:24 470:19 | 528:3,10,22 | 536:9 |
| 422:1,4,5 | 470:23 471:2,6 | 529:8 530:9 | **today's** 15:11 |
| 423:11 424:2 | 471:9,17 472:8 | 531:16 532:15 | 16:2 514:3 |
| 424:12,22 | 472:23 473:7 | 532:17,21 | **together** 39:8 |
| 425:20 426:6 | 473:18 474:3 | 535:10 536:3,7 | 39:12 41:15 |
| 426:11,15,18 | 474:17,21,24 | 536:11,14 | 48:8 68:10,11 |

**[together - trials]**                                          Page 103

| | | | |
|---|---|---|---|
| 78:2,12 100:4 | **top** 42:9 49:16 | **toxicology** 5:21 | 14:19,22 |
| 115:1 122:12 | 52:11 93:1 | 307:23 436:6 | **transfer** 369:21 |
| 141:8 262:15 | 126:20 131:22 | 444:6 | **translate** 139:8 |
| 298:11 324:2 | 137:19 170:17 | **toxin** 434:4 | **translocation** |
| 342:8 393:24 | 195:8,12 | **track** 67:10 | 256:9 |
| 402:4 405:2 | 270:10 318:18 | 482:13 | **transparencies** |
| 428:12 446:9 | 321:4,11,16 | **tract** 115:24 | 91:13 |
| 459:5 498:21 | 326:10 408:5 | 127:14 184:22 | **transvaginal** |
| 499:3 | 450:8 484:2 | 265:8 322:1 | 137:19 |
| **toiletry** 466:16 | 515:23,24 | 335:13 347:12 | **travel** 423:4 |
| **told** 25:10 | 516:1 | 371:20 372:1 | 456:15 |
| 50:17 67:20 | **topic** 381:6 | 412:11 413:19 | **treating** 191:9 |
| 68:19 70:11,12 | 465:23 529:14 | 423:5 433:19 | 268:5 292:2,4,6 |
| 70:14 75:20 | **total** 26:22 | 446:23 456:16 | **treatment** |
| 80:24 81:4 | 48:19,20 49:8 | 462:6 | 292:9 304:23 |
| 90:13,15 100:6 | 125:24 155:16 | **tracts** 324:5 | **tremolite** |
| 189:24 190:15 | 352:10 486:24 | 326:3 369:18 | 206:13,24 |
| 191:9 307:1,4,8 | 487:3 516:8 | 370:16 371:6,9 | **trend** 87:10 |
| 307:15 320:3 | 523:22 | 373:9 375:16 | 115:20 116:12 |
| 332:1 377:24 | **totality** 65:10 | 388:1 433:10 | 117:10 118:3 |
| 380:19 419:1 | 140:7 | 476:22 | 118:16 119:23 |
| 463:24 464:5,5 | **totally** 202:14 | **tracy** 4:5 34:8 | 120:4,23 |
| 465:11,11 | **toward** 45:4 | **tracy's** 63:7 | 121:14 122:9 |
| 467:23 468:9 | 222:1 303:19 | **traditional** | 125:17 321:23 |
| 513:16 527:2 | **towards** 134:3 | 458:19 | 322:5 339:15 |
| 532:9 | 134:8 163:21 | **trained** 69:5 | 340:23 347:18 |
| **took** 44:8 63:11 | 330:19 334:9 | **training** 42:22 | 348:5 400:22 |
| 78:3,4 349:17 | 374:8 475:8 | 127:6 204:16 | 404:12,18,22 |
| 355:14 369:14 | 512:16 | 305:2 | 404:23 405:3,6 |
| 452:5 | **toxic** 11:13 | **transcript** | 523:22 524:2,5 |
| **tool** 312:18 | 483:15 | 12:20 14:16,18 | 524:6 |
| 364:8 | **toxicity** 253:19 | 92:7,10,15,21 | **trends** 111:19 |
| **tools** 235:13 | 254:23 | 451:24,24 | 115:5,14 131:4 |
| 363:23 365:7 | **toxicologist** | 538:5 539:8 | **trials** 408:8 |
| 366:23 | 426:22 | **transcripts** | 409:10 |
| | | 12:22 13:2 | |

**[tried - two]**                                                    Page 104

| | | | |
|---|---|---|---|
| **tried** 46:15 | **truly** 93:11 | 370:23 372:6 | 181:17,24 |
| 170:14 232:5 | 261:14 370:8 | 378:11 411:22 | 188:8 246:8 |
| 232:19 368:10 | 522:7 | 412:16,18 | 251:21 252:12 |
| 392:2 434:14 | **trust** 438:1 | 413:7,10,18 | 260:20 270:23 |
| 446:15 527:15 | **truth** 169:11 | 414:3,7 416:16 | 273:21 274:21 |
| **trivial** 450:4 | **try** 148:7 170:3 | 416:24 455:12 | 297:8 318:16 |
| **true** 85:13 86:3 | 187:10 332:12 | 473:13 476:12 | 321:1 323:3 |
| 88:3 89:21 | 433:2 492:19 | 521:18,24 | 337:13 338:22 |
| 90:14 93:21 | 493:6 | 522:9 | 339:4 342:6 |
| 99:21 111:13 | **trying** 115:2 | **tuesday** 1:15 | 348:23 360:24 |
| 112:6 115:6 | 177:17 189:10 | 2:8 | 369:4 374:6 |
| 123:3 125:20 | 195:5 318:10 | **tumors** 10:8 | 399:22 400:15 |
| 125:21 135:4 | 328:16 333:1 | 96:17 140:13 | 405:8 408:2 |
| 172:16,18 | 384:9 397:19 | 141:8,24 | 501:13 506:9 |
| 174:10,14 | 444:10 458:10 | 144:15 145:8 | 510:18,22 |
| 176:2 183:5 | 482:13 491:4 | 145:11,16,21 | 515:15 521:5 |
| 187:23 199:21 | 494:1 508:4 | 146:1 183:9 | 524:10 |
| 199:23 205:9 | 527:5,5 | 299:5 304:5 | **turning** 100:12 |
| 205:11 308:3,4 | **tsca** 11:14 | 325:22 328:22 | 172:6 336:19 |
| 308:7 310:10 | **tubal** 126:4 | 334:17 335:1 | 523:18 |
| 314:4,6 331:2 | 184:10,24 | 337:5,19,22 | **tweaked** 414:23 |
| 336:11 347:19 | 185:2,6,7,11,12 | 430:7,20 | **two** 14:19 15:18 |
| 351:3 367:15 | 185:20 256:7 | 431:18 506:13 | 15:21 16:1 |
| 368:4 369:13 | 335:16 344:8 | 506:23 507:2 | 23:20 46:24 |
| 369:24 380:18 | 344:12 346:15 | 509:13 510:2 | 47:2,9 53:16 |
| 386:16 410:2 | 346:24 412:5 | 510:10,13 | 59:24 61:14 |
| 429:15 430:24 | 413:8 414:2 | **turn** 49:13 52:8 | 62:3 65:7,14 |
| 433:11 434:5 | 433:5 450:13 | 61:5 85:17 | 116:11 121:13 |
| 436:24 447:12 | 456:2 | 86:18 92:24 | 121:24 151:7 |
| 448:2 464:13 | **tube** 7:7 228:7 | 94:16 96:5 | 169:18 181:4 |
| 464:18 466:17 | 271:11 272:16 | 126:14,17 | 189:8 208:14 |
| 472:18 475:10 | 416:21 | 129:20 131:3 | 231:12 250:1 |
| 476:3 479:11 | **tubes** 146:6 | 131:20 133:15 | 252:16 265:1 |
| 485:18 489:14 | 227:11,16,20 | 134:1 162:4 | 281:13,15 |
| 489:14 507:4 | 227:24 228:3 | 163:19 167:19 | 322:18 338:20 |
| 512:18 538:8 | 228:10 370:22 | 171:14 174:4 | 340:9 351:17 |

**[two - unexposed]**                                    Page 105

| | | | |
|---|---|---|---|
| 351:23 352:11 | 252:19 271:6 | 395:19 | **understand** |
| 352:12,16 | 272:9 273:22 | **uncontrolled** | 15:5 18:16 |
| 356:4,5,17 | 276:13 317:2 | 258:14 | 29:16 57:14 |
| 363:20 365:2 | 321:7 323:6 | **under**  11:12 | 65:24 66:4 |
| 370:5,6 374:3 | 334:8,10 | 43:6 48:19 | 73:13,18 |
| 394:11 401:7 | 335:20 337:12 | 83:23 84:1 | 136:18 165:5 |
| 428:11 437:20 | 338:8 340:13 | 95:23 108:24 | 165:15 179:4 |
| 440:20 489:10 | 341:14 342:2,7 | 113:3 135:6,7 | 198:5 239:8 |
| **type**  22:1,14 | 343:18 350:3 | 163:20 172:7 | 251:16 274:23 |
| 23:3 187:4 | 357:7 362:3 | 179:1 182:2 | 286:11 315:1,5 |
| 206:14 209:4 | 369:6 370:19 | 187:12 255:5 | 362:10,13 |
| 386:19 401:24 | 374:7,10 | 271:3 273:3,12 | 394:20,22 |
| 508:23 | 385:13 398:5 | 326:7 329:11 | 397:15 412:21 |
| **types**  207:4 | 400:2 405:12 | 350:11,22 | 413:13,14 |
| 222:21 | 409:18,20 | 352:20 367:7 | 434:2,3 479:19 |
| **typically**  25:23 | 422:24 445:22 | 369:5 379:14 | 526:14 536:11 |
| 531:21 | 455:20 458:16 | 406:10 410:24 | **understanding** |
| **u** | 485:7 486:7,19 | 458:15 471:12 | 22:24 57:20 |
| | 490:9 498:9 | 483:10,11,15 | 65:9 84:11 |
| **u.s.**  40:8 192:22 | 515:18 516:4 | 486:5 487:9 | 85:11 141:9 |
| 265:15 369:9 | 519:14 521:7 | 501:15 511:7 | 151:16 252:6 |
| **uh**  42:11,16 | 521:20 | 538:1,4,12 | 284:21 435:21 |
| 52:10 61:4 | **ultimate**  106:6 | **underestimate** | 467:3 533:9 |
| 77:19 81:23 | 520:11 | 512:18 | 538:11 |
| 82:14 86:19 | **ultimately**  58:2 | **underestimated** | **understood** |
| 95:18 96:7,11 | 179:21 185:10 | 486:23 | 27:23 65:20 |
| 98:15,21 | 289:21 440:4 | **underestimates** | 110:9 140:14 |
| 100:18 106:17 | **unable**  512:11 | 302:18 | 145:17 186:15 |
| 111:12 124:14 | **unanswerable** | **underestimati...** | 364:24 |
| 126:18 130:2 | 394:16 | 49:4 325:5 | **underwear** |
| 155:8 163:22 | **unaware**  62:12 | **undergone** | 423:2 |
| 167:1,20 | **uncertainty** | 356:6,18 | **unexplained** |
| 177:13 188:18 | 364:21 400:24 | **underlie**  138:1 | 24:5 265:6 |
| 188:21,21 | 402:6 403:8,11 | **underreport** | **unexposed** |
| 212:24 221:5 | **unclear**  283:6 | 174:8 | 128:19,20 |
| 242:2 252:15 | 284:7 317:10 | | 298:7,11 299:9 |

[unexposed - use]                                    Page 106

299:10,12
300:13
**unfair**  202:15
274:24 359:10
359:16
**unfortunately**
231:2
**unidentified**
130:6 132:4
**unit**  486:18
**united**  1:1
224:5 411:17
480:15 525:21
**university**
16:15 17:11
18:23 21:16,18
21:23 22:15
23:4,9 24:1,19
24:22 25:16,19
25:23 26:3 69:6
80:2,6 189:21
190:1,6,12
191:4 211:12
211:15 276:22
394:4,4 438:9
**unknown**  136:1
155:23 156:3,7
316:4 357:11
**unmeasured**
130:13,19
**unpatent**
411:21 412:16
412:18 413:7
**unpublished**
284:17 286:12
286:14 287:8

**unreasonable**
367:22 417:19
483:16 486:6
487:10 519:20
**unrecognized**
320:2
**unrelated**
149:21
**unreliable**
233:1
**unsophisticated**
375:21 376:17
440:13,15
473:12
**unspecified**
508:13
**unusual**  473:1
**update**  270:11
273:23
**updates**  273:4
273:13
**upper**  127:13
280:16 285:11
285:22 312:10
312:12 347:22
361:3
**urinary**  265:7
**urological**  24:7
25:18 265:9
**use**  6:8,11,18
7:14,21 8:4,18
8:20 9:2,7,11
10:4 11:5,12
27:6,11 28:1,4
28:23 29:1,23
31:16,24 33:1,9

33:23 34:19
42:3 58:6,9,13
58:24 65:21
68:16 70:23
80:18,19 82:16
83:6,8 88:8,16
91:16,18,21,24
95:24 101:17
102:5,15
113:18,24
114:22 122:13
130:14 140:16
141:10,21
142:6,7 143:6
143:16 145:7
145:20 147:1
148:12,14
149:21 150:10
151:2,21 152:9
152:14,18,22
153:1,22,23
154:4,20 155:9
155:10 156:23
156:24 158:2
159:16 165:3
168:2,5,20
171:21 174:6
177:17 181:7,7
181:11 183:2
184:2 185:6,8
186:11,18,24
188:23 189:12
192:24 193:12
209:11 212:3
212:14 229:12
230:20 235:14

244:1 246:18
250:7 251:7
258:15 261:7
263:10 290:13
291:15 299:18
300:2,20 302:7
306:17 307:2,4
307:9,15,18
316:13 323:11
323:17,24
324:10,13
325:19 327:11
328:4,18
329:18 331:21
334:14 337:2
337:11,17,20
342:18 343:9
347:9 350:6
353:23 356:15
363:16,21
366:21,23
369:10,21
375:6 380:14
382:10,12
384:17 386:17
386:18,19
390:9 407:24
410:9 412:4,7
412:10,15
414:11 416:10
420:4,13 422:8
422:20 425:2
433:4,24 434:1
434:10,24
447:6 453:8
456:4 463:16

[use - voice]                                                              Page 107

| | | | |
|---|---|---|---|
| 477:24 480:19 | 434:9 441:5 | **vaginal** 115:24 | **verification** |
| 483:19 498:12 | 458:5,10 | 146:14 322:1 | 441:19 |
| 498:13 500:11 | 505:22,23 | **vague** 38:12 | **version** 7:10 |
| 503:24 504:10 | 506:4 527:7 | 219:8 266:6 | 270:3 |
| 504:19,21,22 | **useful** 364:1 | 394:15 396:10 | **versus** 17:19 |
| 504:23 505:19 | **users** 87:10 | 450:3 | 61:3 62:6 160:5 |
| 506:6 507:2,11 | 104:16 107:9 | **valid** 104:14,23 | 169:5 227:21 |
| 510:1,9,15 | 125:17 149:20 | 105:2,15 107:7 | 237:4 371:14 |
| 511:22 517:3,5 | 302:23 348:4 | 231:4 233:13 | 382:11 518:16 |
| 518:8,20 | 386:16,17 | 254:20 260:1 | 520:15 |
| 523:22,23 | 504:12,14 | 364:19 | **vickery** 1:23 |
| 524:23 527:24 | **uses** 5:23 6:1 | **validates** | 2:21 539:3,21 |
| 536:2 | 10:15 485:12 | 388:15 | **view** 130:16 |
| **used** 31:20 | **using** 50:17 | **validity** 236:24 | 147:14 148:20 |
| 78:23 86:13 | 116:14 130:17 | 338:14 512:4 | 152:14 154:2 |
| 91:11 97:7 | 154:23 166:2 | **value** 153:20 | 187:9 189:17 |
| 102:6,7 133:7 | 168:21 189:18 | 236:19 312:4 | 225:3,24 237:4 |
| 141:7 146:5,13 | 196:12 216:16 | 312:15 313:14 | 268:10 324:4 |
| 149:6,23 | 312:4 332:9 | 314:2,3,6 | 330:10 347:23 |
| 154:21 167:22 | 353:7 378:17 | 362:23 364:10 | 373:13 378:21 |
| 169:3 184:24 | 405:19 406:14 | 364:14 371:12 | 388:11 412:8 |
| 207:7 209:14 | 414:6 415:20 | 375:2 486:23 | 412:13 435:6 |
| 209:17,20,22 | 426:9 436:23 | **values** 363:21 | 452:15 453:5 |
| 210:3 223:12 | 463:13 496:1 | 364:7,19,23 | 453:15 533:15 |
| 229:5 232:6 | 506:1 507:15 | 366:7 | **viewed** 84:9 |
| 233:18 235:15 | 508:2 | **variability** | 85:7 408:8 |
| 241:11 249:18 | **usually** 34:2 | 402:11 | **views** 428:14 |
| 282:7 284:14 | 404:22 520:9 | **variables** 298:4 | 437:6 |
| 310:11 312:18 | **uterine** 11:6 | **variations** | **virtually** |
| 334:15 335:1 | 147:1,2 478:1 | 261:15 | 230:12 |
| 336:17 337:3 | | **various** 111:10 | **visited** 205:6 |
| 353:21 375:17 | **v** | 115:13 141:1 | **vitae** 5:12 42:19 |
| 386:19 390:23 | | 305:23 | 77:12,12,13 |
| 396:17 403:1 | **v** 3:6 | **varying** 169:6 | **voice** 223:1 |
| 414:1 431:22 | **vagina** 264:3 | **verbatim** 539:8 | 299:15 |
| 432:4 433:17 | 423:4 | | |

**[volume - wentzensen's]**                                    Page 108

**volume** 209:19
  226:4,10,14,16
**vouching**
  478:24
**vulnerable**
  151:13
**vulvar** 24:6
  265:6

**w**

**wait** 30:8 32:8
  61:23 97:10
  133:17 177:10
  274:6 293:10
  420:11 482:16
  520:5
**waiting** 258:4,5
**waived** 536:16
**walk** 234:5
**want** 13:21
  34:6 44:12
  64:18 76:7 98:8
  105:23 109:23
  123:23 165:13
  168:18 178:24
  199:11 216:10
  216:11 228:1
  232:24 241:14
  247:10 256:21
  274:17 276:11
  292:20,22
  293:7,16
  302:12 332:13
  341:12 345:19
  345:23 397:13
  421:18,23

  426:12 431:2
  432:14 474:10
  485:5 495:5
  498:4 499:18
  520:5 526:18
  527:23 528:8
**wanted** 162:6
  239:5,18
  245:17 293:9
  344:18 436:14
  456:17 532:2
**wants** 123:12
  255:21
**warned** 331:24
**warning** 96:18
  250:11,15
  253:22 254:11
  263:19 332:12
  525:17,17
  526:2
**warnings** 250:7
  463:15 524:18
  524:21
**warrant** 228:13
  442:13 443:9
**warranted**
  336:4,14 535:9
**washington**
  2:17 3:17 69:6
  80:6 276:22
**watching** 257:8
**water** 19:21
**way** 25:15 34:1
  70:19 73:23
  74:1 83:3,4
  102:2 115:9

  146:20 153:5
  162:16 232:12
  241:12 244:20
  252:7 280:19
  301:15 305:14
  311:20 314:19
  315:8,13,16
  317:10 320:7
  327:8 338:3
  367:9 368:8,9
  382:6 383:2
  401:14 405:2
  414:19 420:13
  460:16,23
  479:16 486:11
  493:7 494:2,19
  509:8,9 518:22
**ways** 135:13
  340:19,19
**we've** 47:1
  55:11 74:3
  76:13 131:7
  302:14 304:18
  312:1 346:6,8
  386:13 392:20
  411:19 466:1
**weak** 84:10
  85:9,22 93:11
  96:16 102:24
  103:4,9,11
  130:9 441:22
  442:9 462:5
**weaker** 316:7
**weakness** 87:2
**weaknesses**
  236:16

**web** 395:7
**website** 7:1
  245:18,24
  246:14 266:15
  270:4 395:8
  396:6 504:11
**websites** 394:11
  394:11 396:3,9
**week** 25:22
  53:1,2,5,18
  56:3 151:9
  154:22 155:16
  189:8,16
  297:19,19
  298:6,12 517:6
  517:9 518:12
  518:16,24
**weigh** 220:13
**weight** 236:18
  447:6,11
**weinberg** 421:1
**weiss** 4:4 10:11
  80:6 333:8
  334:11 335:22
  506:10
**weiss's** 418:10
**went** 58:17
  166:5 269:15
  269:16 291:5
  436:18,19
  437:5 457:12
  528:23 531:24
  534:10
**wentzensen's**
  385:6

**[whi - witness]**                                              Page 109

| | | | |
|---|---|---|---|
| **whi** 237:17 | 90:5 92:19 | 196:10 197:22 | 329:9,22 |
| 302:10,17 | 97:15 98:15,21 | 198:17 199:8 | 332:19 334:23 |
| 303:2 325:7 | 100:9,22 | 199:14 203:22 | 339:22 340:2 |
| **width** 188:5 | 101:22 102:18 | 204:6 210:14 | 341:14,17 |
| 403:12 | 103:11 105:1 | 214:3 217:9 | 343:22 345:22 |
| **william** 469:3 | 107:2,11 | 219:9 220:11 | 350:3 351:11 |
| 470:5 | 108:22 109:12 | 222:11 223:2 | 351:14,19,24 |
| **wise** 24:23 | 109:19 111:15 | 223:11 225:14 | 355:3,7,22 |
| **wish** 127:12 | 117:1,14,19 | 225:23 232:4 | 360:18 365:17 |
| 152:1 | 118:7 119:4 | 239:10,21 | 365:24 368:20 |
| **withdraw** | 120:9 121:19 | 240:12,23 | 372:9,13,17,19 |
| 115:10 123:14 | 123:2 124:20 | 242:8,13,16 | 376:4,13 379:8 |
| 123:15 124:7 | 126:24 127:4,9 | 243:11,21 | 380:17 383:9 |
| 388:18 | 132:14 133:4 | 248:17,21 | 384:4,20,23 |
| **withdrawal** | 135:3 136:13 | 249:2,7 252:10 | 394:22 396:13 |
| 75:12 | 137:1,10 138:5 | 258:4 262:23 | 397:17,21 |
| **withdrawn** | 138:16,20 | 263:4,15,24 | 398:5 401:5 |
| 75:8,16 | 141:13 142:23 | 265:21 266:7 | 402:20 405:24 |
| **witness** 14:9,12 | 146:9 148:17 | 266:10 267:5 | 408:24 410:12 |
| 16:20 17:7,12 | 149:16 150:14 | 267:20,22 | 413:1 418:22 |
| 18:17 22:3 | 150:16 151:5 | 269:4,8 270:7 | 419:5,15 421:9 |
| 26:13 27:17 | 152:2,13 156:1 | 271:20 272:20 | 423:10,23 |
| 32:7,17 38:13 | 159:19 160:11 | 273:15 275:1 | 424:20 425:18 |
| 40:11 41:7,20 | 160:18 161:21 | 277:10 278:7 | 426:2 427:11 |
| 42:11,16 44:11 | 162:14,19,23 | 279:4 284:24 | 428:8,20 |
| 45:2 46:7 56:7 | 163:2 164:19 | 285:5,20 | 429:10,18 |
| 56:11 57:3,6 | 166:8 167:1 | 287:24 288:21 | 432:7 433:14 |
| 58:1,3,5,7 59:3 | 171:6 175:18 | 289:10 291:4 | 434:8 435:12 |
| 64:1,7,9 66:23 | 176:3 178:17 | 293:14 296:5 | 436:2 437:3,21 |
| 67:4,11,15,16 | 179:10,24 | 296:17 300:9 | 437:24 438:2 |
| 68:2,15 70:7,22 | 180:12,16,20 | 301:8 306:9 | 439:4 440:18 |
| 71:3,9,13 72:5 | 180:23 181:14 | 311:19 313:4 | 441:2,10 |
| 72:13,16 73:1,9 | 181:20 183:4 | 313:21 315:12 | 442:21 444:14 |
| 73:15,21 74:22 | 184:8 185:15 | 317:16 320:14 | 445:3,10,17 |
| 75:16 76:23 | 187:3 192:8 | 322:9 324:15 | 446:12 447:15 |
| 83:15 87:17 | 193:3,10 | 326:17 327:13 | 448:10 451:14 |

**[witness - work]**                                                        Page 110

| | | | |
|---|---|---|---|
| 452:8,24 | **woman** 65:19 | 412:3 413:6,10 | 518:19 519:8 |
| 453:14,23 | 150:2 152:5 | 413:10,16,18 | 520:4,7,12 |
| 455:7,15 | 307:4,15 | 415:13,20 | 521:6,9,17 |
| 456:21 457:12 | 449:16 | 416:3 429:1 | **word** 31:20 |
| 458:8 459:9 | **woman's** 159:9 | 430:21 431:18 | 82:3 102:7 |
| 460:13 461:16 | 306:6,21 | 433:9 434:20 | 126:9 157:10 |
| 462:1,17 463:9 | **women** 6:13 | 436:22 447:3 | 200:8 232:2 |
| 463:21 464:21 | 28:4 81:11 | 452:15 453:8 | 359:2 484:23 |
| 465:8,16,20 | 126:3 130:15 | 453:15 455:11 | **wording** 78:23 |
| 466:7 468:14 | 130:15 146:5 | 456:6 463:15 | 79:23 |
| 469:17,21 | 149:11,16,19 | 464:4 476:11 | **words** 17:24 |
| 470:15 472:7 | 150:1 153:12 | 476:21 505:1 | 40:1 64:19 |
| 472:21 473:6 | 153:14 165:24 | 507:9,14 508:2 | 144:11 223:12 |
| 473:17 475:19 | 167:22 168:3 | 508:23 521:17 | 529:4 |
| 476:15 478:15 | 168:21 169:12 | 521:23 522:9 | **work** 16:6,12 |
| 479:6 481:6,16 | 182:17,19 | 524:22 | 16:20 17:4 19:2 |
| 482:15,19 | 183:12 184:24 | **women's** 23:17 | 19:9 20:13 |
| 484:13 485:1 | 185:6,11 | 24:7 25:18 65:6 | 21:18,21 22:22 |
| 488:8 489:17 | 208:18 209:4 | 65:14 210:7 | 23:5,7,10 24:9 |
| 490:4,14 | 209:10 211:9 | 211:3 265:8 | 24:23 25:7,18 |
| 494:17 495:11 | 211:10 219:15 | 282:2 289:15 | 26:15,18,22 |
| 495:22 497:4,8 | 282:3,4 302:19 | 304:3 328:8 | 29:6,13,20 30:4 |
| 499:2 501:17 | 324:22 325:8 | 412:9 | 30:16 41:24 |
| 502:13 513:8 | 331:24 332:8 | **wonder** 398:19 | 45:4,7 46:2 |
| 514:14,17,20 | 337:16,19 | **woolen** 7:17 | 55:8,15 57:6 |
| 517:23 519:16 | 347:11 353:6 | 280:23 282:14 | 60:1,4,8 73:13 |
| 519:19 520:14 | 353:21 354:5 | 284:11 285:2 | 75:1 77:20 81:2 |
| 520:18 521:1 | 370:15,21,22 | 287:14,18 | 89:10 99:2 |
| 522:12 523:13 | 371:5,9,13,24 | 288:17 294:7,8 | 150:21 173:19 |
| 526:5 529:11 | 372:5 373:8 | 493:15,22,22 | 189:21 197:1 |
| 529:18 531:17 | 375:16 387:24 | 493:24 494:22 | 206:8 212:10 |
| 532:16 533:24 | 390:20,20 | 494:22 495:6 | 238:14 245:2,2 |
| 539:6 | 391:16,19,22 | 495:17,18,19 | 245:11 264:20 |
| **witnesses** 197:9 | 391:23 392:15 | 495:22 496:8,9 | 267:1,2 305:16 |
| 377:17 | 392:18 409:7 | 516:19,22,24 | 307:13 332:24 |
| | 411:21,21 | 517:2,20 | 360:6 392:20 |

**[work - yeah]**

| | | | |
|---|---|---|---|
| 393:1,2,14,18 | 318:20 335:21 | 90:15 97:16 | 164:9,13 |
| 393:20 394:1,2 | 336:23 338:10 | 100:1,4,13 | 179:10 180:16 |
| 395:11 411:2 | 383:17 384:13 | 108:3 125:6 | 180:20,23 |
| 435:14 490:11 | 385:16 386:3 | 128:12 154:9 | 188:17 191:6,7 |
| 529:6 | 387:10 400:4 | 154:15 172:4 | 192:8 193:21 |
| **worked** 35:13 | 430:18 431:14 | 172:12 174:5 | 194:15,15,15 |
| 35:16 36:20,23 | 440:4 511:5 | 174:18 175:7 | 195:2,13,13 |
| 48:8 68:10 | **writes** 106:18 | 176:19 177:20 | 196:15 200:21 |
| 71:20 306:2 | 111:6 126:21 | 178:9,10 200:8 | 201:14 223:11 |
| 393:17 | 127:11 128:1 | 378:4 380:9 | 224:2 225:23 |
| **working** 19:6 | 129:4 130:4 | 381:13 382:20 | 226:12 228:19 |
| 22:10 50:18 | 131:10,22 | 383:1 385:20 | 232:19 238:7 |
| 55:19,24 56:14 | 134:8 258:9 | 386:2 389:15 | 239:21 240:12 |
| 79:8 80:22 | 475:6 520:10 | 422:7 423:19 | 240:23 242:13 |
| 208:14 212:13 | **writing** 23:4 | 424:15 449:22 | 243:11 247:11 |
| 212:17 221:10 | 57:16 79:5 | 451:10 455:3 | 249:2 261:1 |
| 264:24 393:23 | 244:4 383:7 | 464:6 466:8 | 263:15,24 |
| 409:17 | **writings** 197:23 | 472:12 473:9 | 265:21 266:10 |
| **works** 119:13 | 198:4 | 474:10 | 267:20 269:1,1 |
| 124:3,5 | **written** 78:16 | | 269:23 270:12 |
| **workshop** 5:23 | 80:16 82:7 | **x** | 281:2,3,3 |
| 36:10 91:4,23 | 86:17 89:18 | **xrd** 241:19 | 283:13,22 |
| 92:16 94:4 | 173:18,24 | **y** | 284:24 285:5 |
| 253:4,10 | 174:12 192:6 | **yeah** 18:16 28:3 | 289:10 296:17 |
| 310:18 512:22 | 205:19 243:3 | 36:8,16 59:13 | 297:5 304:10 |
| 513:1 | 247:1 320:11 | 63:19 64:6 | 304:17 321:16 |
| **world** 465:12 | 369:1 373:21 | 65:22 66:20 | 322:17 325:23 |
| **worried** 222:18 | 375:10 378:6 | 73:4 77:7,18 | 326:17 327:5 |
| **worries** 299:23 | 380:21 472:10 | 87:17 92:5 | 328:24 329:22 |
| 379:12 | 473:20 | 102:18 105:8 | 332:21 339:7 |
| **worse** 478:10 | **wrong** 283:4,4 | 106:17 107:2,2 | 340:2,3 344:3,4 |
| **worth** 248:3 | 398:20 496:21 | 109:12,12 | 345:18 350:15 |
| **write** 72:9 | 497:6 510:5 | 121:19 124:17 | 350:20 352:6 |
| 77:23 78:17,19 | **wrote** 37:12 | 125:21 127:18 | 354:19 355:22 |
| 97:2 182:5 | 75:4 78:1,9,12 | 133:4 138:16 | 365:17,24 |
| 184:19 231:1 | 83:24 85:20 | 145:11 157:24 | 373:22 375:14 |

**[yeah - zoom]**                                                      Page 112

| | |
|---|---|
| 389:3,3,5 | 337:18 356:6 |
| 393:10 398:15 | 356:19 390:11 |
| 398:17,22 | 412:7,10 413:7 |
| 401:16 403:5 | 414:2 418:12 |
| 408:22 413:15 | 418:16 423:7 |
| 420:5 421:18 | 423:20 433:24 |
| 426:15 438:17 | 434:9 452:17 |
| 443:20 453:3 | 454:23 472:13 |
| 470:19 481:21 | 494:13,18 |
| 492:21,23 | 498:18,19,19 |
| 495:3,8 496:20 | 523:22 |
| 496:23 497:8 | **yep**   92:19 93:2 |
| 501:2 514:19 | 99:10 124:24 |
| 515:3,14 | 125:5,11 |
| 516:23,23,23 | 126:16,16 |
| 522:6 527:1 | 161:21 163:8 |
| 530:5,12,14,14 | 171:15 326:17 |
| 531:17,23 | 399:1 516:4 |
| 534:19 | 523:17 |
| **year**   22:6,7 | **yesterday**   53:8 |
| 24:11,13,15,16 | 53:12,13,14,17 |
| 59:24 164:24 | **yield**   442:1 |
| 165:11,19 | |
| 390:8 391:2 | **z** |
| **years**   25:21 | |
| 59:24 82:22 | **zoom**   48:10 |
| 119:24 153:19 | 51:14 52:7,16 |
| 153:22,24 | 52:17,18 53:23 |
| 154:5,5,21,22 | 54:2 55:4 |
| 154:24 183:13 | |
| 191:22 201:18 | |
| 226:6,11,23 | |
| 269:11 296:9 | |
| 297:14,14 | |
| 302:19 331:19 | |
| 334:15 337:3 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.