# EXHIBIT 76

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

---------------------------

IN RE:  JOHNSON & JOHNSON      MDL NO.:
TALCUM POWDER PRODUCTS         16-2738 (FLW)(LGH)
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

---------------------------

IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS

STATE OF MISSOURI

---------------------------

VALERIE SWANN, et al.,

          Plaintiffs,

V.                            Cause No.

JOHNSON & JOHNSON, et al.,    1422-CC09326-03

          Defendants.        Division 10

---------------------------

EXPERT DEPOSITION OF

LAURA M. PLUNKETT, PHD, DABT

Tuesday, August 10, 2021, 9:07 a.m.

Washington, DC 20006


Reported by:

Denise Dobner Vickery, Registered Merit Reporter,

Certified Realtime Reporter, Notary Public

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 2

```
 1
 2
 3
 4
 5
 6
 7                    Tuesday, August 10, 2021
 8                    9:07 a.m.
 9
10          Expert Deposition of LAURA M. PLUNKETT,
11   PHD, DABT, held at the offices of:
12
13          ASHCRAFT & GEREL LLP
14          1825 K Street NW
15          Suite 700
16          Washington, DC 20006
17
18
19
20          Pursuant to notice, before Denise Dobner
21   Vickery, Certified Realtime Reporter, Registered
22   Merit Reporter, and Notary Public in and for the
23   District of Columbia.
24
```

Page 3

```
 1   APPEARANCES:
 2
 3   For MDL Plaintiffs and Plaintiff Valerie Swann:
 4          ASHCRAFT & GEREL LLP
 5          BY:  MICHELLE A. PARFITT, ESQ.
 6             JAMES F. GREEN, ESQ.
 7          1825 K Street NW, Suite 700
 8          Washington, DC 20006
 9          202.759.7648
10          mparfitt@ashcraftlaw.com
11          jgreen@ashcraftlaw.com
12
13
14   For MDL Plaintiffs and Plaintiff Valerie Swann:
15          BEASLEY ALLEN LAW FIRM
16          BY:  RYAN BEATTIE, ESQ.
17          218 Commerce Street
18          PO Box 4160
19          Montgomery, AL 36104
20          308.874.3186
21          ryan.beattie@beasleyallen.com
22
23
24
```

Page 4

```
 1   APPEARANCES:  (Continued)
 2
 3   For Defendants Johnson & Johnson and Johnson &
 4   Johnson Consumer Inc.:
 5          SHOOK HARDY & BACON LLP
 6          BY:  MARK C. HEGARTY, ESQ.
 7          2555 Grand Blvd.
 8          Kansas City, MO 64108
 9          816.474.6550
10          mhegarty@shb.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1                    INDEX
 2   EXAMINATION OF
 3   LAURA M. PLUNKETT, PHD, DABT            PAGE
 4   BY MR. HEGARTY                    10
 5
 6
 7
 8          PLUNKETT DEPOSITION EXHIBITS
 9   NUMBER     DESCRIPTION            PAGE
10   Exhibit 1  Integrative Biostrategies, LLC    25
11          Talc MDL Invoices period ending
12          30 November 2018 Invoice Number 1519
13   Exhibit 2  Integrative Biostrategies, LLC    27
14          Talc MDL Invoices period ending 30
15          September 2019 Invoice Number 1606
16   Exhibit 3  List of Testimony for       45
17          Dr. Laura M. Plunkett, PHD, DABT
18          Last Updated August 2, 2021
19   Exhibit 4  Curriculum Vitae         49
20   Exhibit 5  PowerPoint. Laura M. Plunkett,   67
21          PHD, DABT
22   Exhibit 6  Amended Expert Report of      84
23          Laura M. Plunkett, PHD, DABT
24          Dated June 30, 2021
```

2 (Pages 2 to 5)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 6

PLUNKETT DEPOSITION EXHIBITS

1
2  NUMBER     DESCRIPTION          PAGE
3  Exhibit 7  Rule 26 Expert Report of      86
4         Laura M. Plunkett, PHD, DABT
5         Dated November 16, 2018
6  Exhibit 8  Supplemental Expert Report of    86
7         Laura M. Plunkett, PHD, DABT
8         August 29, 2018
9  Exhibit 9  Responsive Materials for NOD of   108
10        Laura M. Plunkett - 8.10.2021
11  Exhibit 10  Dropbox - Responsive Materials   110
12         for NOD of Laura Plunkett - 8.10.2021
13  Exhibit 11  Laura M. Plunkett, PHD, DABT    111
14         Additional Materials Considered,
15         August 1-10, 2021
16  Exhibit 12  The Lack of an Ovarian Effect of  112
17         Lifetime Talc Exposure in
18         F344/N Rats and B6C3F1 Mice
19         Boorman and Seely
20  Exhibit 13  Screening Assessment Talc     147
21         Environment and Climate Change
22         Canada, Health Canada, April 2021
23
24

Page 8

PLUNKETT DEPOSITION EXHIBITS

1
2  NUMBER     DESCRIPTION          PAGE
3  Exhibit 20  Amended Notice of Oral Deposition 238
4         of Laura M. Plunkett, PHD, DABT and
5         Duces Tecum in Swann
6  Exhibit 21  Letter dated August 6, 2021 from  240
7         Parfitt to Sharko
8  Exhibit 22  Plaintiff's Amended Disclosure of  243
9         Expert Witnesses in Swann
10  Exhibit 23  Review. The Secondary Mullerian  246
11         System Revisited, Lauchlan
12  Exhibit 24  Gynecologic Oncology. Analytic   250
13         Comparison of talc in commercially
14         Available baby powder and in pelvic
15         Tissues resected from ovarian
16         Carcinoma patients, Johnson et al.
17  Exhibit 25  Environmental Research. The     257
18         effect of talc particles on
19         phagocytes in co-culture with ovarian
20         cancer cells, Mandarino et al.
21  Exhibit 26  Molecular Basis Supporting the   268
22         Association of Talcum Powder Use
23         With Increased Risk of Ovarian
24         Cancer, Fletcher et al.

Page 7

PLUNKETT DEPOSITION EXHIBITS

1
2  NUMBER     DESCRIPTION          PAGE
3  Exhibit 14  Final Report on Carcinogens     154
4         Background Document for
5         Silica, Crystalline (Respirable
6         Size), December 2-3, 1998, NTP
7         Board of Scientific Counselors
8  Exhibit 16  Use of Powder in the Genital Area 179
9         And Ovarian Cancer Risk. Examining
10         The Evidence, Editorial, Gossett
11         And del Carmen, JAMA January 7, 2020
12  Exhibit 17  Reproductive Toxicology. Critical 207
13         Review of the association between
14         Perineal use of talc powder and
15         Risk of ovarian cancer, Taher et al.
16  Exhibit 18  Johnson & Johnson Consumer Health 232
17         Announces Discontinuation of
18         Talc-based Johnson's Baby Powder in
19         U.S. and Canada, May 19, 2020
20  Exhibit 19  Amended Notice of Oral Deposition 238
21         of Laura M. Plunkett, PHD, DABT and
22         Duces Tecum in MDL
23
24

Page 9

PLUNKETT DEPOSITION EXHIBITS

1
2  NUMBER     DESCRIPTION          PAGE
3  Exhibit 27  Research report. Perineal use of 275
4         Talc and risk of ovarian cancer,
5         Langseth et al.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Laura M. Plunkett, Ph.D, D.A.B.T.

| Page 10 |
| --- |

1            PROCEEDINGS
2                 - - -
3        LAURA M. PLUNKETT, PHD, DABT
4    called for examination, and, after having been
5    duly sworn, was examined and testified as
6    follows:
7                 - - -
8            EXAMINATION
9                 - - -
10   BY MR. HEGARTY:
11       Q.    Good morning, Dr. Plunkett.
12       A.    Good morning.
13       Q.    Would you please state your full
14   name for the record?
15       A.    Laura Massey Plunkett.
16       Q.    Dr. Plunkett, we're here today to
17   take your deposition in the MDL litigation.
18            Do you understand that?
19       A.    Yes.
20       Q.    Do you also understand we're here
21   today to take your deposition in the case of Swann
22   versus Johnson & Johnson, et al.?
23       A.    I understand that, yes.
24       Q.    Did you bring any materials with you

| Page 11 |
| --- |

1    to the deposition?
2        A.    The only thing I brought was this
3    notebook which has my report.  Do you -- I brought
4    this notebook, to answer your question.  I'm
5    sorry.  (Laugh.)
6        Q.    There are some materials to your
7    right.
8            Are those counsel's materials?
9        A.    Yes.
10       Q.    Okay.  What is your business
11   address?
12       A.    1127 Eldridge, E-l-d-r-i-d-g-e,
13   Parkway, Suite 300-335, Houston, Texas 77077.
14       Q.    You testified in the past that your
15   office was in your home, but this sounds like it's
16   an address that's actually in an office building.
17            Is that correct?
18       A.    No.  I have a home-based office
19   that's my mailing address.
20       Q.    Okay.
21       A.    So all materials -- so if you ask
22   me -- if you ask me where to send something to me
23   in my -- in my office, you would send it to that
24   mailing address.

| Page 12 |
| --- |

1        Q.    Thank you.
2            What is the current name of your
3    consulting business?
4        A.    BioPolicy Solutions, Inc.  I'm
5    sorry.  LLC.
6        Q.    Your consulting business was
7    formerly known as Integrated Biostrategies; is
8    that correct?
9        A.    Integrative Biostrategies, yes.
10       Q.    Why the name change?
11       A.    That business is closed because I
12   took on a full-time business partner.  So we now
13   have a different structure to the company.  It's a
14   partnership versus before I was the sole owner of
15   the company.
16       Q.    The person that you have now entered
17   into business with is Larisa Rudenko?
18       A.    Larisa Rudenko, yes.
19       Q.    How did you come to start working
20   with her?
21       A.    So this time or how far back in
22   time?
23       Q.    Well, with regard to your new
24   company, BioPolicy Solutions.

| Page 13 |
| --- |

1        A.    Okay.  So in December of 2019,
2    January of 2020, she contacted me and she had just
3    finished -- she had finished a sabbatical at MIT
4    and had recently retired from FDA two years prior,
5    and she had reached the time period where she
6    could now -- based on her tenure at FDA having
7    ended more than two years, she could now start to
8    consult back with the industry that she regulated
9    when she was at FDA.
10            So she wanted to -- she wanted to
11   know if I was interested in working again.  We had
12   been partners on Integrative Biostrategies
13   initially.  She's the one who actually started
14   Integrative Biostrategies back in 2001.
15       Q.    What is her area of expertise?
16       A.    Similar to mine.  She's a
17   board-certified toxicologist.  She has a PhD in --
18   whereas mine is in pharmacology, hers is in
19   molecular biochemistry.  And the difference in
20   what we do is not that great, other than her
21   contacts and her -- her clients that she has
22   brought to the company are companies that
23   specialize in making products through different
24   processes of biotechnology.

4 (Pages 10 to 13)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 14

1      At FDA, she was a policy person
2  working on the issues of new policy and new
3  initiatives under products of biotechnology, and
4  she was based jointly out of the Center for
5  Veterinary Medicine and she also had a position
6  that was through the commissioner's office as
7  well.
8      Q.     You anticipated.  One of my
9  questions was with regard to what your consulting
10 company does.
11     Your report called what you did
12 before as product development stewardship, that
13 is, you one of your prior reports, and now you
14 describe it as development and marketing of
15 existing products as well as new technologies.
16     So is there a difference in what
17 your company is doing now, what you're doing now
18 than what you did at the time you did your initial
19 MDL report back in 2018?
20     A.     Not -- not really, other than the
21 majority of the new clients are what I call new
22 technologies, whereas before the majority of my
23 clients were in the areas that were not this area
24 of new technologies.

Page 15

1      Do you want me to give you an
2  example to understand or --
3      Q.     Well, when you say "the majority,"
4  what percentage of your clients are now this --
5  these new technology clients?
6      A.     I'd say right now 90 to 98 percent
7  of our clients.  We have one client that is not in
8  this area of new technologies, but most of the
9  clients we're working with are in a space of
10 emerging technologies in ways to make ingredients
11 for food or make foods in bioreactors.  So
12 cell-based meat.  I don't know if you've seen the
13 press on that.  That's an area we're working in.
14     We're also working on novel food
15 ingredients produced by methods of biotechnology.
16     Q.     You said you were going to give me
17 some examples.
18     Are those examples?
19     A.     Those are examples.  Exactly, yes.
20     Q.     Has Ms. Rudenko worked in the past
21 on any talc product, if you know?
22     A.     I don't know whether she did or not.
23 I can't answer that.
24     Q.     Do you know whether she has done any

Page 16

1  work for Johnson & Johnson?
2      A.     At ENVIRON, she very likely worked,
3  like I did, on a project for Johnson & Johnson
4  because I believe we were working together
5  generally in that area, but I don't know since
6  then.  I can't answer that.  So, no.
7      Q.     Has she ever been involved in
8  litigation work, to your knowledge?
9      A.     In the past, yes.
10     Q.     What type of work do you know of
11 that she's been involved in the past in a general
12 sense?
13     A.     Just in general sense?  I know she
14 worked on some issues -- has worked on some issues
15 related to safety of biotechnology.
16     Q.     Has she helped you with any of your
17 litigation work?
18     A.     To date, no, not in the talc
19 litigation at all.
20     Q.     Your report at paragraph 1 refers to
21 a location in Ventura, California.
22     Is that where she's located?
23     A.     That's correct.
24     Q.     Has there been any other -- has

Page 17

1  there been any other change in the employees of
2  your consulting business since your MDL deposition
3  in December of 2018?
4      A.     So we're partners.  My husband is
5  still -- is a contractor to the new company.  He's
6  not a salaried employee.  And we have -- we have a
7  permanent subcontractor.  When I say "permanent,"
8  he -- we guarantee him 10 hours a week of work.
9  He's also a recently retired FDA person that was a
10 friend of Larisa's who retired from FDA about a
11 year ago.
12     Q.     Who is that?
13     A.     Dr. Robert Merker, M-e-r-k-e-r.
14     Q.     Has he assisted you in any of your
15 litigation work?
16     A.     No, huh-uh, he has not.
17     Q.     And when you say -- you answered
18 earlier that Dr. Rudenko has not yet -- not
19 assisted you in any of your litigation work.
20     Do you anticipate her -- asking her
21 to assist you in any way in your litigation work?
22     A.     It's possible I may have her work
23 with me on some cases in the -- in the future,
24 yes.  She has an interest, but right now she is

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 18

1  not doing that. And the talc litigation I don't
2  know that she would because there's a lot to come
3  up to speed on. So I don't know if she has that
4  interest or not.
5      Q.  In what state did you set up this
6  new partnership?
7      A.  Texas. It's a Texas LLC.
8      Q.  What percentage of your business
9  time this year, that is 2021, has been spent on
10 litigation matters?
11     A.  Less than 30 percent.
12     Q.  Same question as to 2020.
13     A.  Also less than 30 percent in 2020.
14     Q.  Same question as to 2019.
15     A.  Oh, 2019 was probably about -- it
16 was probably a third. It was more of my income in
17 2019 than it was -- than it is in 2020 and 2021 so
18 far.
19     Q.  When you say as to 2021 and 2020
20 less than 30 percent, are you able to be any more
21 precise?
22     A.  Well, 2021 is kind of hard because I
23 don't have statistics for the year. In 2020, it
24 was actually about 18 percent of my -- of my -- my

Page 19

1  time that I spent in 2020 because we did run -- I
2  did run a report for that just to figure out what
3  the change was. We had less income in 2020, but
4  we also -- when I say "less income," we had a lot
5  more income in the regulatory area.
6          So the majority of the work I did in
7  2020 came out of regulatory projects with the new
8  BioPolicy Solutions clients or in -- also in
9  intellectual property work that I continued to do
10 with my sister's law firm.
11     Q.  Do the fees paid to you from your
12 litigation work go to the company or directly to
13 you?
14     A.  To the company.
15     Q.  What percentage of those fees do you
16 get personally?
17     A.  Well, I draw a salary from the
18 company. So whatever percentage that is, I don't
19 know. I can't tell you. I draw a salary. There
20 is this -- there was profit sharing between the
21 two of us. So there's distribution is how the LLC
22 is set up. I'm not a lawyer, but you do have to
23 distribute assets at the end of the year. So we
24 did distribute assets based on a 50/50 scale.

Page 20

1  That's we're 50 percent partners, so 50/50. I'm
2  sorry.
3          She draws a salary as well. We draw
4  equal salaries right now from the company, and
5  then we pay -- we pay the subcontractors as well,
6  and they come out of whatever is brought in from
7  the company overall. So, in other words, we don't
8  segregate that only litigation assets go to
9  Dr. Plunkett. They go to the company, and then we
10 all share within that.
11     Q.  So you and Dr. Rudenko are paid the
12 exact same amount from the company?
13     A.  In terms of our salary, yes. Then
14 based on profit sharing, even though we're 50/50
15 partners, there may be some instances where she
16 has something that is just for her. Because she
17 had some old clients that came into the company
18 and so those are not handled the same way
19 necessarily as -- as other things.
20          But anything that I bring in pretty
21 much is -- is distributed through the company with
22 equal shares to the -- to the partners, and then I
23 have -- I cover also right now -- because I have
24 many more clients than she does, I cover the

Page 21

1  salaries for the subcontractors as well.
2      Q.  So the more litigation work that you
3  would do and bring in, you don't get any direct
4  benefit from that personally?
5      A.  Well, I do as the company does. If
6  the company benefits --
7      Q.  Right.
8      A.  -- I benefit, obviously. So
9  (laugh).
10     Q.  But you don't get -- your salary
11 doesn't go up above Dr. Rudenko based on the
12 amount of litigation work you do?
13     A.  No, that has not happened. Well,
14 and with the new company. So I'm telling you as
15 of today --
16     Q.  Okay.
17     A.  -- that's what we do.
18     Q.  Are you able to estimate how much
19 revenue your company has received this year from
20 litigation matters?
21     A.  No, I don't have the number for this
22 year. Like I said, it's about the same amount as
23 last year in terms of being less than 30 percent,
24 and my guess is it's closer to the less than 20

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 22

```
 1    percent. But I will tell you that with trials
 2    kicking back in, it will absolutely be going up.
 3         Q.    Are you able to tell me the amount
 4    of revenue your company received in 2020 from
 5    litigation work?
 6              MS. PARFITT: Objection.
 7              You can answer.
 8              THE WITNESS: I don't -- no,
 9         I don't have a number. It was about 18
10         percent of -- of the revenue stream that
11         came in. So a company may -- I mean, we
12         can guess. You want me to guess? I can
13         guess for you, but I don't know.
14    BY MR. HEGARTY:
15         Q.    Are you able to take 18 percent of
16    your revenue from the company in 2020 and give me
17    an estimate?
18         A.    Well, the company made about
19    $270,000 in 2020. So I don't have the math. I
20    think that was what it was after expenses.
21         Q.    Fair enough.
22         A.    Yeah.
23         Q.    How about 2019? Are you able to
24    tell me the revenue received by your company from
```

Page 23

```
 1    litigation matters in 2019?
 2         A.    I don't have that number off the top
 3    of my head. I believe I have testified to that
 4    before, though, maybe even in talc litigation, but
 5    I don't recall. I would say maybe look back at my
 6    deposition testimony in another case for talc and
 7    I think that is there.
 8         Q.    Are you able to estimate the revenue
 9    from your company from 2019?
10              MS. PARFITT: Objection.
11              THE WITNESS: I can only
12         estimate the -- are you asking -- are you
13         asking me what went into the taxes on the
14         tax forms?
15    BY MR. HEGARTY:
16         Q.    Fair enough.
17         A.    What I remember from 2020 was the
18    company --
19         Q.    I'm sorry. 2019.
20         A.    Oh, I'm sorry. For 2019. The 2019
21    I don't recall --
22              MS. PARFITT: Objection.
23              THE WITNESS: -- the exact
24         number, but it was more than 2020.
```

Page 24

```
 1         Obviously the COVID pandemic work issues
 2         impacted everyone, including me.
 3    BY MR. HEGARTY:
 4         Q.    With regard to the percentage of
 5    your -- with regard to your fees from litigation
 6    consulting, what percentage of those fees this
 7    year are from talc litigation?
 8         A.    From this year? I don't know.
 9    Certainly I would tell you that right now it is
10    the most active litigation I'm involved in. It's
11    the only trials that have started back up for me
12    has been the talc trials.
13         Q.    Okay.
14         A.    So I can't tell you. I would
15    imagine if I could run the numbers for you at the
16    end of the year and find that out, but right now I
17    can't tell you, no.
18              MR. HEGARTY: We were provided
19         prior to the deposition copies of
20         invoices that I want to mark as exhibits.
21              I'm going to start by marking
22         as Exhibit No. 1 a copy of invoices that
23         begin with the first one of "Talc MDL"
24         November 30, 2018.
```

Page 25

```
 1              (Document marked for
 2         identification as Plunkett Exhibit 1.)
 3    BY MR. HEGARTY:
 4         Q.    Do you see that?
 5         A.    Yes.
 6         Q.    All of these invoices include as the
 7    project name or description "Talc MDL"; is that
 8    correct?
 9         A.    Yes.
10         Q.    And I received the two sets of
11    invoices, and this is one set.
12              Are these invoices -- do these
13    invoices in Exhibit No. 1 represent those that you
14    have invoiced for your work on the Talc MDL?
15         A.    Yes, that's correct. That's that --
16    they're segregated that way because I believe you
17    asked for them that way on the notice of
18    deposition.
19         Q.    If you turn over to the March 31,
20    2019 invoice?
21         A.    Yes.
22         Q.    When you -- when you make reference
23    to "review of documents," what do you include in
24    the definition of documents?
```

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 26

1       A.    So it would be any documents that --
2  and the reason I use the word "documents" is
3  because it's not just published literature public.
4  It would include the internal company documents
5  that I have access to.  It could include
6  deposition testimony of individuals, even myself
7  within the case.  So it's broader.
8             It could include published
9  literature, but it's a broad definition versus
10 just published literature, for example.
11      Q.    And on that invoice it says
12 "conference call re MDL deposition."
13            Do you remember who the conference
14 call was with?
15      A.    Don't remember the exact number of
16 people, no, but I'm sure it was either someone --
17 it may have been a combination of people from
18 Beasley Allen and maybe Ms. Parfitt as well.  I
19 don't know.  Both of those -- both of those firms
20 are involved with me working on the MDL.
21      Q.    Would you turn to the last page of
22 Exhibit No. 1.  That invoice is not dated.
23            Do you -- are you aware of a date of
24 that invoice?

Page 27

1       A.    This would have -- should have been
2  -- hold on.  Should have been sent the end of -- I
3  filed the report on July 2nd.  So it would have
4  been June 20 -- and I apologize.  It should be on
5  there.
6       Q.    Okay.
7       A.    June 2021.
8       Q.    Does the time set out in this report
9  represent the -- all the time you spent in
10 preparing your amended MDL report?
11      A.    Just this invoice?
12      Q.    Just this invoice.
13      A.    No.  I would say document review
14 that may have occurred early.  Some of these
15 documents that I reviewed in 2020 were discussed
16 within my report.  But I would say to you if you
17 want to talk -- if you're asking me about the time
18 I sat down and actually drafted it, it would be
19 this time, yes.
20            MR. HEGARTY:  All right.  The
21      next set of invoices I will mark as
22      Exhibit No. 2.
23            (Document marked for
24      identification as Plunkett Exhibit 2.)

Page 28

1  BY MR. HEGARTY:
2       Q.    Would you tell me what those sets --
3  that set of invoices represents?
4       A.    This is other talc litigation.  So
5  this would be the state cases that I've worked on
6  since my deposition that was given in the MDL.
7       Q.    Would you turn to the invoice dated
8  April 30, 2020, and tell me when you can find it.
9       A.    Yes, I'm there.
10      Q.    The description of the work on that
11 invoice says "review of documents and call with
12 client."
13            What does "client" mean?
14      A.    That would be the attorneys.  I
15 apologize.
16      Q.    Okay.
17      A.    Yeah.  Yeah.  Yeah.  I don't -- I
18 don't speak with plaintiffs specifically.  This is
19 my client would be the law firm.
20      Q.    Would you turn to the next invoice.
21 That invoice is also not dated.
22            Can you tell me the date of that
23 invoice?
24      A.    I apologize these aren't dated.  And

Page 29

1  you know what?  Maybe I should get you those with
2  dates on them.  So I apologize for that.  I don't
3  know the -- the date.  I'd have to look at the
4  date --
5       Q.    Okay.
6       A.    -- to tell you what that was.
7             The same thing with the next one I'm
8  noticing it doesn't have a date either.  So...
9       Q.    On the one we were looking at,
10 there's a list -- there's a list of a number of
11 cases.
12            Are those all cases in which you
13 have done -- done work on as reflected in this
14 invoice?
15      A.    Yes.  And so this was an unusual
16 request from the law firm to break out document
17 review into variety of different cases, and so
18 that's what I did.
19      Q.    I did not see a reference in the
20 invoices provided to the Kleiner case from
21 Pennsylvania.
22            Have you billed any time to the
23 Kleiner case in Pennsylvania?
24      A.    Not yet, but I would be billing when

8 (Pages 26 to 29)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 30

```
1    I show up at the trial.
2         Let me just clarify.  The issue is
3    that it wasn't until sometime in 2020 where I was
4    asked to always make sure to reference individual
5    cases if I could.  Before that, I would -- may put
6    MDL or state cases, but -- but I've been asked to
7    do it this way.
8         And actually based on the payment of
9    this, I will tell you, being that it was paid in
10   February, my guess is the bill would have been
11   sometime within 90 days before that.
12   Q.   Okay.
13   A.   Okay?  Just -- but I can -- if you
14   need those, I can certainly provide that.
15   Q.   Would you turn to the next page.
16   There's no description of the -- the matter other
17   than "talc."
18   A.   (Laugh).  I apologize for that.
19   Q.   What does this invoice represent?
20   It's the one that's --
21   A.   Sure.
22   Q.   -- for 450 total.
23   A.   Yeah.  So this would have been
24   unspecified state cases.  So, in other words,
```

Page 31

```
1    where I wasn't asked to specify or needed to
2    specify a state case, but it is the MDL.  I
3    always was asked to separate MDL from other cases.
4    Q.   Same question same answer for the
5    next one?
6    A.   Yes, exactly.
7    Q.   That's the one that said $1200.
8    A.   Uh-huh.
9    Q.   If you turn to the next one, there's
10   a reference to a Canada case or cases.
11        What is that?
12   A.   So I have been asked to look at
13   issues related to the regulatory system in Canada
14   and I have not yet filed a report, but I've been
15   working on that.
16   Q.   Is that related to a particular
17   matter or case?
18   A.   A case in Canada, but I don't know
19   any more details.  I have to -- to dig into that.
20   Q.   What law firm are you working with?
21   A.   I'm working through Beasley Allen
22   and I believe Ms. Parfitt's firm, Ashcraft is also
23   involved.  But definitely, definitely Beasley
24   Allen.
```

Page 32

```
1    Q.   You say you are in the process of
2    preparing a report?
3    A.   Yes.  I've been working on a report,
4    yes.
5    Q.   And does this invoice reflect the
6    time you spent in working on that report?
7    A.   As for this month that was -- that
8    was invoiced here, yes, and there's another one.
9    Q.   And the next one --
10   A.   Yeah.
11   Q.   And the next one is also related to
12   a Canada case.
13        Is that the same matter?
14   A.   Same matter.  This one hasn't -- let
15   me see check something.  Yeah.  This one has not
16   been paid you'll notice.  So this is an
17   outstanding invoice.  So it says paid, that means
18   I have received payment.  If it isn't, then it's
19   an outstanding invoice.
20   Q.   Do you know what Canadian province
21   the case is pending in?
22   A.   I don't know.
23   Q.   You mentioned that it related to
24   regulatory matters?
```

Page 33

```
1    A.   Well, the --
2         MS. PARFITT:  I'm going to
3    object at this point in time, Mark, with
4    regard to the fact there's been some
5    consulting responsibilities.
6         MR. HEGARTY:  Fair enough.
7         MS. PARFITT:  Thank you.
8    BY MR. HEGARTY:
9    Q.   Would you look through the rest of
10   the invoices and tell me whether Exhibit No. 2
11   represents the -- all of the invoices that you
12   have provided to counsel since 2000 -- in 2019
13   through 2021.
14   A.   Yes, I believe so because I actually
15   went to my system and -- and had these pulled.
16   Q.   Okay.
17   A.   So, yes.
18   Q.   We talked earlier about your
19   consulting outside of litigation matters.
20        Are you currently consulting outside
21   of litigation matters on any cosmetic product?
22   A.   Not a product.  On ingredients.
23   Q.   What kind of ingredient?
24        MS. PARFITT:  I'm going to
```

9 (Pages 30 to 33)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 34

 1         object at this point in time as well as
 2         far as her consulting activities because
 3         I'm not certain whether there's some
 4         proprietary aspect to which -- for which
 5         we would obviously be concerned.
 6                 MR. HEGARTY:  Let me lay some
 7         foundation.
 8                 MS. PARFITT:  Thank you.
 9     BY MR. HEGARTY:
10         Q.     And tell me whether you can answer
11     the question.
12                Are you able to provide the type of
13     or description or generalities as to the
14     ingredient as opposed to identifying the company
15     you're working for?
16         A.     So I can give you some general
17     description.  I mean, the company is I typically
18     would not do that without checking with the -- I'm
19     working through an attorney on intellectual
20     property issues as well as regulatory issues.
21         Q.     Are you able to through your -- are
22     you able to give me any kind of general
23     description of the cosmetic ingredient?
24         A.     Yes.  I can tell you that there is a

Page 35

 1     variety of different types of ingredients.
 2     They're -- a lot of them are natural plant
 3     extracts.  A lot of the ingredients I'm looking
 4     at.  So they're complex mixtures of plant extracts
 5     that are going into various cosmetics based on the
 6     bioactivity of the -- of the ingredient.
 7         Q.     Are you able to identify for me the
 8     types of cosmetics that these ingredients going on
 9     into?
10                MS. PARFITT:  I'm going to
11         object again because I'm concerned we're
12         getting a little too close to the
13         proprietary nature of this.
14     BY MR. HEGARTY:
15         Q.     Is that getting into the proprietary
16     part of your consulting relationship?
17         A.     It would give you the exact
18     names.  I could just tell you that it's all
19     different kinds of products.  They would go into a
20     variety of different kinds of formulations.  It's
21     not just one particular product.
22         Q.     Are you currently consulting outside
23     of litigation matters as to any cosmetic
24     ingredient or any cosmetic that has talc as an

Page 36

 1     ingredient?
 2                MS. PARFITT:  Objection.
 3                THE WITNESS:  I don't know.
 4         That's a good question.  It's possible
 5         that the finished products may.  I don't
 6         know.
 7     BY MR. HEGARTY:
 8         Q.     How many consulting matters did you
 9     have in 2019 involving cosmetics?  Just
10     approximately.
11         A.     Well, it was -- it was ongoing work.
12         Q.     These are non-litigation matters.
13         A.     In 2019 you said?
14         Q.     2019.
15         A.     Probably 20 percent of the time that
16     I spent overall in my consulting practice, and it
17     was probably 80 percent of the work I was doing
18     through my sister's law firm at the time.
19         Q.     Same question as to 2020.
20         A.     About the same.  Although it also --
21     I would say it wasn't all cosmetic ingredients.  I
22     also worked on some food ingredients for the same
23     client --
24         Q.     Yeah.

Page 37

 1         A.     -- who is a company that has a
 2     variety of different kinds of subsidiaries.
 3         Q.     And my question is exclusive as to
 4     cosmetic.
 5         A.     I couldn't give you a percentage.
 6     As I say, I know I would worked on more than
 7     cosmetic ingredients for this client in 2020.
 8         Q.     What percentage of your time in 2021
 9     has been spent on consulting matters involving a
10     cosmetic ingredient?
11         A.     Probably about 20 percent of my
12     overall time this year so far.
13         Q.     From 2019 to 2020, did you do any
14     consulting for the American Chemistry Council?
15         A.     No.
16         Q.     Have you consulted from 2019 to
17     today with any trade group?
18         A.     No, I don't believe so.
19         Q.     Have you consulted from 2019 to
20     today with any pesticide manufacturer?
21                MS. PARFITT:  Again, just
22         object just to the extent it may reveal
23         some proprietary relationship.  So...
24                THE WITNESS:  No, I don't

10 (Pages 34 to 37)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 38

1     believe I have. No.
2  BY MR. HEGARTY:
3     Q.    Have you consulted from 2019 to
4  today with any chemical manufacturer?
5         MS. PARFITT: Again, objection
6     to the extent it may involve some type of
7     proprietary consulting arrangement.
8         THE WITNESS: Yes. There have
9     been some companies that make chemicals,
10    yeah, with the general term "chemical,"
11    yes.
12 BY MR. HEGARTY:
13    Q.    All right. What -- what are your
14 limitations on talking about those consulting
15 matters?
16    A.    Because it comes through an
17 attorney. So I look at what I do as being
18 privileged and confidential without gaining -- in
19 other words, it's not a direct agreement with the
20 -- I don't have a direct contract with the
21 company. I work through a law firm.
22    Q.    Okay. Have you done any consulting
23 in the last three years on any lead paint product?
24        MS. PARFITT: Again, objection

Page 39

1  to the extent it reveals any consulting
2     proprietary agreement that Dr. Plunkett
3     has.
4         THE WITNESS: No, I can say
5     that definitively I have not. That has
6     not come up in the last couple of years.
7  BY MR. HEGARTY:
8     Q.    Same question as to any pesticide
9  products.
10        MS. PARFITT: Objection to the
11    extent it goes into proprietary
12    consulting arrangements.
13        THE WITNESS: I do, indeed,
14    continue to work on some issues related
15    to products that are active ingredients
16    in pesticide formulations, yes.
17 BY MR. HEGARTY:
18    Q.    Have you communicated with any
19 regulatory agency or group on behalf of the
20 American Chemistry Council or any other company or
21 trade group in the 2019-2021 time period?
22        MS. PARFITT: Objection.
23    Again, Dr. Plunkett --
24        THE WITNESS: Myself, no.

Page 40

1         MS. PARFITT: -- I just --
2         THE WITNESS: Okay.
3         MS. PARFITT: -- caution you
4     to be careful with --
5         MR. HEGARTY: Yeah.
6         MS. PARFITT: -- regard to any
7     type of proprietary --
8  BY MR. HEGARTY:
9     Q.    And this question --
10        MS. PARFITT: -- arrangement.
11 BY MR. HEGARTY:
12    Q.    And this question would be public.
13 That's public.
14    A.    Yeah. Not -- no, not in that time
15 frame. I have not.
16    Q.    Have you communicated with any
17 regulatory agency or group on any topic in the
18 2019 to 2021 time period?
19    A.    Yes.
20    Q.    What agency, what regulatory agency
21 or group?
22    A.    So I -- you should be aware I was --
23 I attended and participated in the February
24 2020 --

Page 41

1     Q.    Yes.
2     A.    -- talc meeting at FDA.
3     Q.    Any other such regulatory agency or
4  group meeting or presentations that you were
5  involved in?
6     A.    Yes, for some of my clients. Again,
7  some of that is confidential work at this point,
8  but, yes, I -- in the BioPolicy Solutions space,
9  I'm currently assisting with regulatory
10 submissions to the FDA for four different clients.
11 So I'm interacting with the FDA by e-mail at
12 least, but also we've had some virtual meetings.
13    Q.    Are there any -- have there been any
14 publicly available or publicly aware -- known
15 communications with any regulatory group or any
16 regulatory agency or group besides the FDA?
17        MS. PARFITT: Again, object.
18    I'm not sure I understand the question.
19 BY MR. HEGARTY:
20    Q.    Where you -- sure.
21        Other than your presentation to FDA
22 in February 2020, have you communicated in a
23 public way that's not in a confidential manner
24 with any other regulatory agency or group in the

11 (Pages 38 to 41)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 42

```
 1    2019-2021 time period?
 2         MS. PARFITT:  About anything
 3    at all?
 4    BY MR. HEGARTY:
 5         Q.    About anything.
 6         A.    Outside of the FDA?
 7         Q.    Yes.
 8         A.    Yes.
 9         Q.    What have you done outside of the
10    FDA?
11         MS. PARFITT:  Objection.
12         THE WITNESS:  Just in general
13    I can tell you that I've had interactions
14    with the Singapore Food Authority.  I've
15    had some interactions with the EFSA and
16    interactions with the Ministry of Health,
17    Labour and Welfare, MHLW, in Japan.
18    BY MR. HEGARTY:
19         Q.    What --
20         A.    And also -- and also FSANZ, Food
21    Safety -- the food safety group New Zealand and
22    Australia.  I think it's called FSANZ, F-S-A-N-Z.
23         Q.    You said an acronym earlier.
24         What was that acronym?
```

Page 43

```
 1         A.    MHLW.  The Ministry of Health,
 2    Labour and Welfare I believe is what it means at
 3    Japan.  It's the -- it's the Japanese equivalent
 4    to -- they do a lot of the same things that the
 5    FDA does for certain kinds of products.
 6         Q.    The other one you mentioned was
 7    EFSA?
 8         A.    EFSA.
 9         Q.    What is that?
10         A.    European Food Safety Authority.  So
11    it's a separate body that advises the European
12    Union, the EC, and the European Commission on
13    issues related to food safety.
14         Q.    Did all of these interactions that
15    you just mentioned involve food safety in one way
16    or another?
17         MS. PARFITT:  Again, to the
18    extent it involves any proprietary
19    communication --
20         THE WITNESS:  Sure.
21         MS. PARFITT:  -- I ask you not
22    to respond.
23         THE WITNESS:  Product safety
24    in general I would say.  Not everything
```

Page 44

```
 1    was food.  EFSA was food, but not
 2    everything was food.
 3    BY MR. HEGARTY:
 4         Q.    Would any of those product have talc
 5    as an ingredient?
 6         MS. PARFITT:  Objection.
 7         THE WITNESS:  That I worked
 8    on?
 9    BY MR. HEGARTY:
10         Q.    That you worked on.
11         A.    The project -- I don't believe so,
12    but I can't -- I don't think so, no.
13         Q.    Other than the interaction you had
14    with FDA in 2020, have you provided testimony to
15    any regulatory group or organization in the 2019
16    to 2021 time period?
17         A.    Not how I define testimony as having
18    been like in a public meeting or commenting, no.
19         MS. PARFITT:  And I assume
20    that was the nature of the question.
21         MR. HEGARTY:  Correct.  That
22    was my question.
23    BY MR. HEGARTY:
24         Q.    How about where you submitted a
```

Page 45

```
 1    written statement that's public to any regulatory
 2    group or organization?  Have you done that in the
 3    2019 to 2021 time period?
 4         A.    Nothing that's public, but I have
 5    submitted comments to the agencies as part of my
 6    work with clients that is still considered
 7    confidential business information.
 8         MR. HEGARTY:  I'm going to
 9    mark as the next exhibit Exhibit No. 3.
10         (Document marked for
11    identification as Plunkett Exhibit 3.)
12    BY MR. HEGARTY:
13         Q.    Exhibit No. 3 is the list of
14    testimony that we have been provided that you have
15    given either by deposition or at trial in the last
16    four years or I guess since 2016.
17         Is this list that we marked as
18    Exhibit No. 3 a complete list of the testimony
19    that you have provided either by deposition or at
20    trial in litigation since 2016?
21         A.    Yes.
22         Q.    If you would turn over to page 5,
23    there's a reference towards the bottom to Coleman
24    case, Cook Medical?
```

12 (Pages 42 to 45)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 46

1       A.    Uh-huh.
2       Q.    Can you give any better description
3  of what that matter is?
4       A.    It was an IVC filter that was
5  manufactured by Cook Medical.  Particular -- I
6  don't remember the particular model but -- and I
7  gave a deposition related to the injuries caused
8  by, but I was talking in this case about
9  some of the regulatory oversight for 510(k)
10 devices at FDA.  I was working on behalf of
11 plaintiffs that had filed injury cases, and this
12 actually may have been someone who died.  I'm not
13 sure.
14      Q.    Do you recall where that case was
15 located?
16      A.    What state?  I don't know.  I can't
17 tell you that.  I don't recall.
18      Q.    Would you turn --
19      A.    Could be -- this could be one that
20 settled.  So I just don't -- I don't recall.
21      Q.    Would you turn over to page 7,
22 please.  Towards the top, there's a reference to
23 McDermott case.
24            Can you provide any more details

Page 47

1  about that case name besides the McDermott case?
2       A.    So that I believe was also an IVC
3  filter case, and I'd have to dig out to get you
4  which company was involved.  It may have -- it was
5  -- it would have either been Rex Argon, Cook
6  Medical, or Cordis.
7       Q.    Okay.
8       A.    Those are the three types of
9  devices -- those are the manufacturers of the
10 three types of devices that I have been working
11 on.
12      Q.    Have there been any cases since 2018
13 where you have been identified or disclosed as an
14 expert witness, but where you have not given
15 deposition or trial testimony?
16            Besides those listed in --
17      A.    Well, I --
18      Q.    -- Exhibit 3.
19      A.    Yeah.  So I'm sure that I have been
20 designated in other talc cases, for example.  That
21 for sure, and I'm sure there's other IVC filter
22 cases.  Those are the two areas of litigation that
23 are what I call active right now where I know that
24 there are trials upcoming and that there hasn't

Page 48

1  been any kinds of global settlement or things like
2  that.
3       Q.    Do you have any depositions
4  scheduled in 2021 after today?
5       A.    No.  Just some trial testimony
6  that's scheduled.
7       Q.    And that trial testimony would
8  include -- or let me back -- let me back up.
9            Other than talc cases, do you have
10 any planned trial testimony in 2021?
11      A.    I have --
12            MS. PARFITT:  Where you've
13       been disclosed.
14            THE WITNESS:  Yeah.
15 BY MR. HEGARTY:
16      Q.    Where you've been disclosed, yes.
17      A.    Yeah.  Yeah.  Yeah.
18            So, no, I have dates on my calendar
19 for upcoming trials in several IVC filter cases,
20 and I have an upcoming trial testimony scheduled
21 in November for Taxotere.
22      Q.    What defense firm represents the
23 defendant in the IVC filter cases?
24      A.    Oh, a lot of different defense

Page 49

1  firms.  I can't tell you.  I'm trying to think
2  who -- I'm trying to think of his name.
3       Q.    Is there a national counsel?
4       A.    Yeah, I'm sure there -- well, there
5  is for Cordis.  I'm not sure on Rex Argon.  It's a
6  company based out -- all the cases are coming out
7  of Philadelphia because they're a Pennsylvania
8  firm.  I'm trying to think who showed up.  There
9  are people I don't usually see.
10      Q.    Okay.
11      A.    They're not -- they're not like
12 Covington and the big firms that I sometimes see.
13 Or like your firm.  Yeah.
14      Q.    So you don't remember who represents
15 Cordis?
16      A.    No.  But if you go to the
17 depositions, obviously if you pull the
18 depositions, you'll -- you'll -- they will all be
19 listed there.
20            MR. HEGARTY:  I'm going to
21       mark next as Exhibit 4 a copy of at least
22       one of the more recent CVs of yours.
23            (Document marked for
24       identification as Plunkett Exhibit 4.)

13 (Pages 46 to 49)

Laura M. Plunkett, Ph.D, D.A.B.T.

| | Page 50 |
|---|---|

BY MR. HEGARTY:

1  Q.    Would you look at that and tell me
2  whether that is, I guess, the -- the more recent
3  CV of yours with one update needed; is that
4  correct?
5  A.    That's correct.  Yes.
6  Q.    What is that update?
7  A.    So on page 3 -- oh, no.  This one
8  actually has it.  No.  This one is good.  (Laugh).
9  It has it on page 3.
10         I was looking for one that has the
11 listing for "President, Society of Toxicology,
12 Risk Assessment Specialty Section."  So this one
13 is an updated one.  So you have it.
14     Q.    Okay.  Good.
15         So Exhibit 4 is your current
16 curriculum vitae?
17     A.    That's correct.
18     Q.    You can keep that in front of you.
19     A.    All right.
20     Q.    Your curriculum vitae includes all
21 of your publications; is that correct?
22     A.    Yes.
23     Q.    It also includes all of your

| | Page 51 |
|---|---|

1  abstracts and presentations?
2  A.    Yes.
3  Q.    If you turn over to page, I think,
4  7, there's a couple abstracts listed there since
5  2019.  They are actually dated 2021.
6         What did those pertain to?
7  A.    They're presentations that I gave at
8  two different meetings on the issues of regulatory
9  and commercialization issues with CBD products.
10 Cannabidiol is abbreviated CBD.
11     Q.    Would you turn over to the
12 presentations list on page 13.  You have a couple
13 presentations listed there in paragraphs 1 and 2
14 where you were invited lecturer first at NYU.
15         What did that lecture involve?
16     A.    It was a general toxicology lecture
17 in a course that is held -- it's part of their
18 master's program at NYU and I was -- my lecture
19 was a general topic of reproductive toxicology.
20 In other words, how do you test for it.  Examples
21 of reproductive toxicants.  What kinds of injuries
22 can be seen in people that may be harmed by
23 something that attacks the parts of the
24 reproductive system.

| | Page 52 |
|---|---|

1  Q.    Did that presentation touch on any
2  of the matters or opinions that you have in your
3  MDL reports?
4  A.    It did touch -- I did use -- I did
5  talk or was asked questions, actually, by the
6  students about talc and ovarian cancer.  So, yes.
7  I don't think I had a slide on that, but it came
8  up because the students were -- had seen --
9  obviously in the press they see things, and they
10 were very interested in sort of topical nature of
11 the kinds of things that are out there that deal
12 with the issue of reproductive toxicology.
13     Q.    Who invited you to give that
14 lecture?
15     A.    Judith Zelikoff.  She's -- I met her
16 through the Society of Toxicology.  We were both
17 on the nominating committee several years ago and
18 became friends, and I like to lecture and she's
19 happy to bring people in from outside.
20     Q.    Do you know that she's also a
21 plaintiff's expert in the MDL?
22     A.    I do now.  It's funny.  When she and
23 I first met and I agreed to work with her, I did
24 not know that, but yes.

| | Page 53 |
|---|---|

1  Q.    You mentioned that you knew her
2  before being invited --
3  A.    Yes.
4  Q.    -- to this lecture?
5  A.    That's correct.  Yes.  Through the
6  Society of Toxicology.
7  Q.    Paragraph 2 lists another
8  presentation.
9         What did that -- I'm sorry.  That's
10 the one we'll talk about here in a moment.  I
11 meant paragraph number 3.
12         What did that lecture concern?
13     A.    So that was a general lecture again,
14 and she had a different course on risk assessment
15 that year, and that course she asked me to speak
16 about my experience with risk assessment for
17 pesticides.  And so I called it "Pesticide
18 Toxicology" being that recently that was -- that's
19 the underpinning of the risk assessment.  It's
20 done for registration of pesticides in the U.S.
21 You have to do a series of toxicological
22 evaluations.
23     Q.    This was, again, through
24 Dr. Zelikoff?

14 (Pages 50 to 53)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 54

1    A.    Yes, exactly.  Different course, but
2   yes.
3    Q.    You mentioned that with regard to
4   the presentation that's listed in paragraph
5   number 1 you did prepare a PowerPoint presentation
6   for that?
7    A.    Yes.
8    Q.    How about the presentation mentioned
9   in paragraph number 3?
10   A.    Yes, I did for that one as well.
11   Q.    Since your --
12   A.    I should also tell you.  I didn't
13  put this on here.  In number 1, that was actually
14  a virtual presentation because we weren't allowed
15  to travel.  So the 2019 one I actually traveled up
16  to New York City, but that one was a virtual
17  presentation.
18   Q.    Since your MDL deposition in
19  December of 2018, have you given any presentations
20  to any group besides the FDA presentation when
21  talc was discussed and this presentation that we
22  just talked about at NYU?
23   A.    Uh-huh.  I don't believe so, no.
24   Q.    Same question as to ovarian cancer.

Page 55

1    A.    I don't believe, other than the
2   reproductive toxicology, no.
3    Q.    Same question as to asbestos.
4    A.    No, I don't believe I touched on
5   asbestos, actually, in those -- in that
6   presentation -- either of those -- those lectures.
7    Q.    Same question as to heavy metals.
8    A.    I did speak to heavy metals with
9   reproductive toxicology because there's enough --
10  there's several that deal with -- you have to deal
11  with that issue.
12   Q.    Since your MDL deposition in
13  December 2018, have you given any presentations
14  for any group where silica was discussed?
15   A.    I don't believe so, no.
16   Q.    How about where fragrances were
17  discussed?
18   A.    Don't think so, no.
19   Q.    Do you have any presentations
20  planned through the rest of 2021 or 2022 regarding
21  any of the topics I just covered?
22       MS. PARFITT:  Objection.
23       THE WITNESS:  Other than
24   trial testimony, no, I don't believe so.

Page 56

1       On talc and those kinds of things, no.
2   BY MR. HEGARTY:
3    Q.    And since your deposition in
4   December 2018 in the MDL, have you written -- have
5   you published any article where you discussed any
6   of these topics: talc, ovarian cancer, asbestos,
7   heavy metals, silica, or fragrances?
8    A.    No, not in a -- in an article, no.
9    Q.    You mentioned earlier that you
10  had -- or let me strike that.
11       You identified in recent testimony a
12  committee of the EPA to which you self-nominated
13  in 2020.
14       Do you recall that testimony?
15   A.    Yes, I do.
16   Q.    Can you identify for me any other
17  committees that you were nominated for either
18  yourself or by others to which you were not
19  selected?
20   A.    Not since -- not since my last
21  deposition.  If you're limiting it to that time
22  period, that would have been the only example.  In
23  the past, I have volunteered for committees at EPA
24  and may not have been chosen, but I don't -- I

Page 57

1   don't have a list of those.  So I can't tell you
2   that.
3    Q.    Okay.  With regard to the EPA
4   committee to which you were not selected in 2020,
5   do you have any documentation from -- remaining
6   from your submission or from comments back or from
7   any correspondence?
8    A.    The only documentation, there was a
9   document marked as an exhibit at trial that had
10  the summary that I wrote.  That summary was
11  actually something that I wrote and that EPA put
12  into the -- the docket, I guess, to describe who
13  was being nominated.
14       I may have an e-mail because I know
15  I got an e-mail in maybe late 2020, early 2021
16  saying that I had not been chosen, but they were
17  keeping my credentials on record for further
18  committees that may come up.
19   Q.    Other than possibly an e-mail, do
20  you have any other documents related to the
21  nomination for or response by this EPA committee
22  in 2020?
23   A.    No, I do not.
24   Q.    Since your MDL deposition in 2018,

15 (Pages 54 to 57)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 58

1  have you discussed your opinions in your June 2021
2  MDL report with any colleague or group not
3  involved in the litigation that we have not
4  discussed already?
5          MS. PARFITT: I'm going to
6      object to the form.
7          If you could, you're free to
8      answer.
9          THE WITNESS: Other than --
10     other than confidential discussions with
11     attorneys, no. If you're asking me about
12     scientists outside of, no, I haven't. I
13     haven't done that.
14 BY MR. HEGARTY:
15     Q.  You mentioned earlier that you
16 appeared at the February 4, 2020 FDA meeting,
17 correct?
18     A.  Yes.
19     Q.  Did you hear about this meeting on
20 your own?
21     A.  I do believe I saw it in the Federal
22 Register on my own. I don't know whether, though,
23 I had been told about it first by the attorneys
24 that are involved in litigation, but I did see it

Page 59

1  on my own as well. I get what I call daily
2  newsletters where those kinds of things show up
3  from the FDA world, and so it was -- it was posted
4  and made available on those newsletters.
5      Q.  How did you come to speak at that
6  presentation?
7      A.  Well, I actually -- I actually
8  called the attorneys and let them know that I was
9  interested in doing so, and so actually I -- that
10 was on my own dime. I paid my own way to go
11 and -- and developed my own comments in order to
12 present at the meeting. I wanted it to be
13 Dr. Plunkett, not Dr. Plunkett through another --
14 another body.
15     Q.  You mentioned that you communicated
16 with the attorneys about going.
17         What attorneys?
18     A.  I believe I spoke with Mr. Meadows,
19 Ms. O'Dell, and maybe Ms. Parfitt was on the
20 phone. I don't recall, but I did -- they would --
21 I called them. Obviously I wouldn't have done it
22 without letting them know that I was doing that
23 and that I had an interest in doing that.
24     Q.  To the extent you know, how did you

Page 60

1  go from making that call to actually being listed
2  as a presenter?
3      A.  So I had to be --
4          MS. PARFITT: Objection.
5      Form.
6          THE WITNESS: All I know is I
7      know I had to request. I had to send
8      in -- on the website for the FDA, they
9      had you send in your name and your
10     request and what you want to talk about.
11     So I sent that in myself and I was
12     given -- what was it? -- five minutes
13     during the public comment period to
14     present.
15 BY MR. HEGARTY:
16     Q.  Do you still have what you sent to
17 FDA in some electronic or document form?
18     A.  You mean my -- my PowerPoint
19 presentation?
20     Q.  No, I'm sorry. What you submitted
21 to FDA --
22     A.  Oh, the ask.
23     Q.  -- to be put on the -- on the
24 speaker list.

Page 61

1      A.  I might. I might. I'm sure I have
2  the e-mail still. I believe I did send a little
3  bio sketch of who I am. So I probably do have
4  that.
5      Q.  Did you get a response back from FDA
6  to which you still have a copy of?
7      A.  I got the e-mail back saying you --
8  you can present during the public meeting. You're
9  one of so many. This is how many minutes you
10 have. Maybe it was three minutes. I don't
11 remember, but it was a very small amount of time
12 that everybody was given to -- to present.
13     Q.  Do you still have that e-mail?
14     A.  I possibly do on that. That's
15 probably in my archives, yes.
16     Q.  But you had actually requested by
17 contacting FDA to speak at that FDA meeting?
18     A.  Yes. Yes, that was the -- that was
19 the -- what was -- what was told -- that's what
20 you were told to do at the website. If you wanted
21 to speak, to send this in.
22     Q.  Did you understand that this was a
23 public meeting where anyone could appear?
24     A.  Yes. Well, within limits of the

16 (Pages 58 to 61)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 62

1    time that they had set aside. That was my
2    understanding.
3        Q.    Other than sending in the
4    required -- requested information via the website,
5    did FDA ask you for any additional information?
6        A.    I don't recall. I don't believe so,
7    no, once -- once that you were told you could and
8    you were given the time period.
9        Q.    Did you meet with any lawyers for
10   the plaintiff in the talc litigation about your
11   testimony that you were going to provide at that
12   meeting?
13       A.    I notified them and provided them a
14   copy of the slides I was going to present, yes, so
15   they had an understanding of what I was going to
16   do.
17       Q.    Did they provide to you revisions or
18   comments or suggestions as to your slide deck?
19       A.    No revisions, no. I mainly got
20   feedback, general feedback that -- that it was
21   fine.
22           MS. PARFITT: Objection.
23           THE WITNESS:  You know,
24       essentially, I mean, it was -- there was

Page 63

1        no -- there was no give-and-take. There
2        was no -- there was no change as to the
3        slides made at the request of the
4        attorneys.
5    BY MR. HEGARTY:
6        Q.    Ms. Leigh O'Dell was at the meeting,
7    correct?
8        A.    She did. She presented, yes.
9        Q.    Did you meet or talk with her
10   beforehand about the meeting?
11       A.    Only -- not about the specifics of
12   the meeting, but yes, she was there. We had
13   coffee together. There were other people from --
14   attorneys I've worked with that were at the
15   meeting, but so I did see them there. I just
16   didn't -- we did not -- we did not discuss any
17   particular issues related to what I was going to
18   be presenting, other than the time period I had.
19       Q.    You mentioned that you saw other
20   attorneys there that you knew.
21           What other attorneys did you know
22   that were there?
23           MS. PARFITT: Objection.
24       Form.

Page 64

1            THE WITNESS:  So Ms. O'Dell
2        was there. Mr. Meadows was there.
3        Ms. Parfitt I believe. Maybe you were
4        there. I think so. Mr. Beattie, were
5        you there? I can't recall.
6    BY MR. HEGARTY:
7        Q.    Only who you can recall.
8        A.    Yeah. Okay. So those three for
9    sure. And then there were some other people there
10   that I have recognized from the past, but I just
11   remember going into the room and seeing people
12   that I recognized from when I used to live in DC,
13   but a specific name I can't tell you.
14       Q.    Did -- other than I think you
15   mentioned having coffee with Ms. O'Dell before the
16   meeting, did you meet with or had communications
17   with any other plaintiff's attorney in the talc
18   litigation before the meeting about your
19   testimony?
20           MS. PARFITT: Objection.
21           THE WITNESS: No. I had
22       conversations about I'm going. I'm going
23       to be staying here. Where are you
24       staying? Because we did get together for

Page 65

1        a dinner or a meal after the -- after the
2        -- after the hearing.
3    BY MR. HEGARTY:
4        Q.    Who did you get together for a
5    dinner or a meal after the meeting?
6        A.    Ms. O'Dell, Mr. Meadows,
7    paralegal -- a couple paralegals. I think that
8    there was -- there was at least one or two of the
9    plaintiffs, the clients of the law firms were
10   there. And I think at least one of them presented
11   and I -- and I'd have to go back and look for the
12   names. I apologize.
13       Q.    Did -- did you pay for your own
14   lunch or meal?
15       A.    Yes. I paid all my expenses and --
16   and my hotel and my plane and all of that, yes.
17       Q.    That would include the dinner that
18   you had?
19       A.    Oh, some -- you know what? They may
20   have picked up the cost for the dinner afterwards.
21   I don't recall. I believe, though, but I did -- I
22   did pay my -- all my other expenses. That one I
23   don't recall whether I threw my credit card down
24   or not. I can't tell you.

17 (Pages 62 to 65)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 66

1    Q.    And when you say you paid for it
2  with your own -- your own money, does that mean
3  you didn't bill that money?
4    A.    No. Yeah.
5    Q.    You billed those expenses or that
6  time?
7    A.    No. It was an expense for my
8  company and me personally at the time.
9    Q.    There were six other plaintiff's
10 experts who spoke at that meeting.
11       Did you meet or talk with any of
12 them?
13   A.    I saw them at the meeting, but I did
14 not, and a couple of them may have been at the
15 dinner afterwards or the meal afterwards, and I
16 don't even know if it was dinner. It may have
17 been a lunch meeting afterwards, but yes.
18   Q.    Do you remember their names?
19   A.    I believe Dr. Godleski was there,
20 and I don't know. That's the one I recall.
21   Q.    Did you ride with any attorney for
22 plaintiffs in the talc litigation to the hearing?
23       MS. PARFITT: Objection.
24       THE WITNESS: We stayed in

Page 67

1        different hotels. So my guess is no. I
2        know I did not ride there, but I
3        certainly did leave the meeting in Ubers
4        with other people, yes. Or I shouldn't
5        say Uber. That's kind of an
6        advertisement. In a cab. (Laugh.)
7  BY MR. HEGARTY:
8    Q.    Okay. Fair enough.
9    A.    Afterwards. I was headed back into
10 the city. I didn't leave the city until the next
11 day.
12       MR. HEGARTY: You mentioned a
13       moment ago that you prepared a PowerPoint
14       for that presentation. I'm going to show
15       you what I marked as Exhibit No. 5.
16       MS. PARFITT: Thank you, Mark.
17       (Document marked for
18       identification as Plunkett Exhibit 5.)
19 BY MR. HEGARTY:
20   Q.    Would you look at Exhibit No. 5 and
21 tell me whether that is the PowerPoints you used
22 for that presentation?
23   A.    Yes, it is.
24   Q.    And did you prepare this PowerPoint?

Page 68

1    A.    I did.
2    Q.    Other than what you talked about
3  with regard to providing this to counsel for
4  plaintiffs in the talc litigation, did any lawyer
5  for plaintiffs in the talc litigation assist you
6  in preparing this PowerPoint presentation?
7        MS. PARFITT: Objection.
8        Asked and answered.
9        THE WITNESS: No.
10 BY MR. HEGARTY:
11   Q.    Did anyone besides yourself assist
12 you in preparing the PowerPoint?
13       MS. PARFITT: Objection.
14       Asked and answered.
15       THE WITNESS: My husband made
16       them look pretty. The slides. So, yes.
17       He does formatting for me. So he would
18       have assisted with that.
19 BY MR. HEGARTY:
20   Q.    With regard to the slide that says
21 "Fibers in Talc Body Powders"?
22   A.    The one that says "Publicly
23 Available" right here?
24   Q.    Correct.

Page 69

1    A.    Yes.
2    Q.    Which of the studies that you list
3  found what you call -- what you would call fibrous
4  talc?
5    A.    I'd have to -- well, I have it here.
6  The ones where it says an F. So all of these.
7  The Pooley and Rowlands says F, Rohl, Paoletti,
8  Blount and Anderson, and as well as the FDA Safety
9  Alert document.
10   Q.    Would you turn to the next page with
11 the heading "Fiber Toxicity and Carcinogenicity."
12   A.    Yes.
13   Q.    Was this a slide that you had used
14 in litigation that you modified for this
15 presentation?
16       MS. PARFITT: Objection.
17       THE WITNESS: No. It's a
18       slide that I made based on my research in
19       the litigation, yes, some of this, and
20       then these -- but these slides were made
21       for this purpose only.
22       I have -- I don't believe I've
23       used any -- well, the only thing that
24       might be similar to something that's been

18 (Pages 66 to 69)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 70

1     shown at a trial would be the baby powder
2     bottle language.
3     BY MR. HEGARTY:
4         Q.    Okay.  Would you turn to the one --
5     the slide that says "Fiber Toxicity and
6     Carcinogenesis."
7              Was this a slide that you had used
8     in litigation that you modified for this
9     presentation?
10        A.    Yes.
11        Q.    If you know.
12        A.    Yeah.  Yeah, I did.  I mean, this
13    was something that I modified for the -- for the
14    purposes of here.  You'll notice that some of this
15    is similar in terms of the -- I think I had this
16    slide looks more like a stepdown PowerPoint that
17    I've used at trial.
18        Q.    Did you modify this PowerPoint slide
19    by adding "fibers" to it whereas before it said
20    "particles"?  If you know.
21        A.    Well, I certainly did put "fibers"
22    on here and particles and fibers.  So, yes.  I
23    mean, I would have modified it for that in that
24    way, yes.

Page 71

1         Q.    If you turn over to slide 8, the
2     Bibliography in Support of Plunkett Slide 8.
3              Do you see that, Doctor?
4         A.    I do.
5         Q.    Do any of the studies listed on this
6     slide refer to fibrous talc?
7         A.    So you asked me do they use the word
8     "fibrous talc" or do they use the word "talc
9     fibers" or are you asking me --
10        Q.    First of all my question would just
11    be "fibrous talc," those two words.
12        A.    I don't know.  I'd have to go back
13    and look.  I mean, some of them I don't believe
14    would, but, I mean, some of the others may.
15        Q.    With regard to the presentation that
16    you gave that day, did you read from a written
17    statement?
18        A.    I had prepared a written statement,
19    but I had less time than I thought I would.  So I
20    believe -- when I got up there, if I remember
21    correctly, I just talked from my slides, which is
22    what I typically do.  But there was -- I did have
23    a written statement prepared, yes.
24        Q.    Did you --

Page 72

1         A.    And I sent that in after the
2     meeting, I believe, yes.
3         Q.    Did you provide in advance of the
4     meeting the written statement to lawyers for the
5     plaintiffs in the talc litigation?
6              MS. PARFITT:  Objection.
7              THE WITNESS:  I don't think
8         so, no.  I did give it to them, though,
9         with the slides after the meeting, yes.
10    BY MR. HEGARTY:
11        Q.    Did you write the written statement
12    yourself?
13        A.    Yes, I did.
14        Q.    Did anyone assist you in writing
15    that written statement?
16        A.    No, that I would have typed up
17    myself.
18        Q.    Other than providing your written
19    statement after the meeting to FDA, have you had
20    any contact with FDA with regard to that meeting
21    in any respect?
22        A.    No.  Although I continue to look at
23    their website to look for what they are doing, and
24    I haven't seen them -- seen the FDA make public

Page 73

1     any additional work from their internal work that
2     I believe that they are doing based upon what they
3     do say on the website.
4              They say they're looking at certain
5     things, but I haven't -- I haven't seen anything
6     else made public.  And I have not called the
7     Office of Cosmetics, for example, to ask when to
8     expect anything, no.
9         Q.    Have you had any contact with FDA
10    about talc or asbestos other than this one
11    meeting?
12             MS. PARFITT:  Objection.
13        Form.
14             THE WITNESS:  I'm thinking
15        back to the SOT meeting in 2019, which
16        was the last in-face meeting.  There
17        were, indeed, I did, indeed, talk to a
18        number of people at the meeting about
19        presentations on talc and fibers and
20        elongated mineral particles, and I can't
21        tell you if any of them were FDA or not.
22        I don't know.  I'd have to go back and
23        look.
24    BY MR. HEGARTY:

19 (Pages 70 to 73)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 74

1    Q.    What is this SOT meeting?
2    A.    Society of Toxicology. So it's an
3  annual meeting held where 15,000 toxicologists get
4  together and talk about fun things.
5    Q.    Do you recall if you did give or
6  have discussions with anyone at that meeting about
7  talc or asbestos?
8        MS. PARFITT: Objection.
9      Form.
10        THE WITNESS: I did have
11      conversations with different scientists
12      because there were several posters at the
13      meeting and so, yes, I did. I just --
14      I'd have to go back and look at my
15      program in order to tell you which ones I
16      went to. And off the top of my head --
17      that's been a couple years ago -- I don't
18      recall the exact people who I spoke with.
19  BY MR. HEGARTY:
20    Q.    That was going to be my next
21  question.
22        Do you recall any of the scientists
23  that you spoke with at that meeting?
24    A.    Anybody who had a presentation on

Page 75

1  talc and asbestos or asbestos and talc or powders
2  or elongated mineral particles, I made a point of
3  going to those sessions if they didn't conflict.
4  In other words, sometimes, unfortunately, the
5  meeting is large and a poster session presenter is
6  at the same time as a platform, and I may not get
7  to speak to the person in person.
8    Q.    Do you have any planned
9  presentations or meetings with FDA regarding talc
10  or asbestos?
11        MS. PARFITT: Objection.
12      Form.
13        THE WITNESS: As I sit here
14      right now, no.
15  BY MR. HEGARTY:
16    Q.    The focus of the FDA's meeting in
17  February 2020 was on testing for asbestos,
18  correct?
19    A.    Well, it was actually focused -- it
20  was part of that, but the topic at the meeting was
21  the toxicity of elongated mineral particles as
22  well. There were presentations done by government
23  scientists on that general issue. So particles
24  and fibers, the mineral fibers, which asbestos is

Page 76

1  one, but it was triggered by the finding of
2  asbestos in Johnson & Johnson's baby powder.
3  That's my understanding when you read what the
4  meeting announcement was about.
5    Q.    And with regard to that February
6  2020 meeting, you agree that you are not an expert
7  on the testing of talc for asbestos, correct?
8    A.    No, I don't. I don't do that kind
9  of testing myself. I have expertise in -- in
10  interpreting data from types test, but I don't do
11  those tests myself.
12    Q.    You're not an expert on the methods
13  used by Dr. Longo or Dr. Rigler to test talc for
14  asbestos, correct?
15        MS. PARFITT: Mark, I would
16      just object to the extent that those
17      questions had previously been asked --
18        MR. HEGARTY: Okay. All
19      right.
20        MS. PARFITT: -- in 2018 and
21      '19 and '20 and '21. Thank you.
22  BY MR. HEGARTY:
23    Q.    At the 2020 meeting, you didn't
24  represent yourself as an expert on TEM, SEM, or

Page 77

1  XRD, correct?
2    A.    No. My comments were not directed
3  to that specific topic, and there were others that
4  did that. That is correct.
5    Q.    Since your MDL deposition in 2018,
6  have you had any communications with Health Canada
7  regarding any talcum powder products?
8    A.    I participated in a virtual press
9  conference that Health Canada held after they
10  released their -- their final risk assessment. So
11  I didn't -- I didn't speak up orally at the
12  meeting, but they were there and they were on the
13  phone. I could have -- could have spoken up.
14  They did -- they did ask questions. It was
15  mainly, though, for the -- I believe it was to
16  invite the press to ask questions.
17    Q.    Any other communication with Health
18  Canada since your deposition in December 2018
19  besides that one?
20    A.    Not on talc, no. I have interacted
21  with Health Canada for some of my clients on other
22  issues.
23    Q.    Have you communicated with any
24  foreign regulatory authority about talcum powder

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 78

1    since your December 2018 MDL deposition?
2        A.    Other than the meeting at FDA, no.
3        Q.    Have you spoken to any expert in
4    these cases -- the MDL, the Swann case -- about
5    their amended MDL reports or disclosures in the
6    Swann case?
7        A.    No.
8        Q.    Have you spoken to any of the MDL
9    plaintiffs or their family, that is, the
10   plaintiffs identified for the bellwether cases in
11   the MDL?
12       A.    No.
13       Q.    Do you know the names of the
14   plaintiffs in the cases selected for the trials in
15   the MDL?
16           MS. PARFITT:  Objection.
17       Form.
18           THE WITNESS:  Off the top of
19       my head, I don't.  I may actually have
20       heard those names before in filings --
21       seen them in filings, but no, I can't
22       tell you who they are.
23   BY MR. HEGARTY:
24       Q.    Do you know where any of the

Page 79

1    named -- any of the plaintiffs named in the -- let
2    me strike that.
3           Do you know the names of any of the
4    -- strike that.
5           As to any of the plaintiffs named in
6    the MDL bellwether cases, do you know where they
7    lived?
8           MS. PARFITT:  Objection.
9       Dr. Plunkett is here as a general expert
10      witness and would not have any
11      familiarity with the specifics of the
12      cases.
13           MR. HEGARTY:  I know.  I just
14      need that -- I just need that from her.
15           THE WITNESS:  No, I'm not a
16      case-specific expert.  I don't know their
17      names or where they live, no.
18   BY MR. HEGARTY:
19       Q.    Do you have any knowledge of each of
20   the plaintiffs use of Baby Powder or Shower to
21   Shower?
22           MS. PARFITT:  Same objection.
23           THE WITNESS:  Same answer.
24       No, I'm not case-specific.  So I do not

Page 80

1        have that information.
2    BY MR. HEGARTY:
3        Q.    Do you know whether any of the MDL
4    plaintiffs saw any Johnson's Baby Powder or Shower
5    to Shower advertisements prior to purchasing the
6    product?
7           MS. PARFITT:  Same objection.
8           THE WITNESS:  Same answer.  I
9       couldn't answer those questions.  I'm not
10      familiar with any of their testimonies or
11      their statements.
12   BY MR. HEGARTY:
13       Q.    Do you know whether any of the MDL
14   plaintiffs had a BMI over 30 or were considered
15   overweight?
16           MS. PARFITT:  Mr. Hegarty, to
17      the extent all these do go to
18      case-specific issues, and I know we have
19      limited time.  So I'm actually trying to
20      help you on that.
21           MR. HEGARTY:  Right.
22           MS. PARFITT:  She does not
23      have -- so I'll make a representation.
24      She's here as a general -- a general

Page 81

1    expert witness and has no information
2    about the case-specific.  So to some
3    extent you may be using up your time for
4    information she doesn't have.
5           MR. HEGARTY:  Well, and I can
6       explain.  I think there can be arguments
7       made about whether certain testimony that
8       might relate to advertisements generally
9       as it pertains to these plaintiffs may
10      become relevant where you might argue
11      that --
12           MS. PARFITT:  Sure.
13           MR. HEGARTY:  -- testimony
14      about an ad that the plaintiff didn't see
15      is relevant.  So -- and Dr. Plunkett does
16      provide testimony about advertisements.
17      So that's where I'm coming from.
18           MS. PARFITT:  Sure, but I am
19      just trying to make it easier for us for
20      the four hours that you have --
21           MR. HEGARTY:  Right.
22           MS. PARFITT:  -- that she has
23      been provided no information with regard
24      to any of the MDL witnesses or bellwether

21 (Pages 78 to 81)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 82

1     cases. Absolutely none.
2  BY MR. HEGARTY:
3     Q.    So is it correct, Dr. Plunkett, that
4  you've been provided no information about any of
5  the MDL plaintiffs; is that correct?
6     A.    That's correct.
7     Q.    Is it also correct that you have not
8  been provided any information about Ms. Swann in
9  the Swann case?
10    A.    That's correct.
11    Q.    That would include anything about
12 their demographics or their physical health or
13 even their race?
14    A.    No. The only thing I know -- the
15 only thing I am aware of by their name whether
16 they're women (laugh), and obviously the one
17 question I always ask attorneys when I start
18 litigation is, these are all cases about ovarian
19 cancer? Yes. Yes, that's what I know, but I
20 don't know the specific women's cancer or when it
21 occurred or any of those kinds of things.
22    Q.    Do you know of any testing that was
23 done on either their tissues or any of the product
24 that they used?

Page 83

1            MS. PARFITT: Objection.
2            THE WITNESS:  In the MDL?
3        No, I do not.
4  BY MR. HEGARTY:
5     Q.    In the MDL.
6        And I was going to ask you
7  particularly about any testing that Dr. Godleski
8  has done.
9        Are you familiar -- are you aware of
10 any of the testing he has done as to the MDL
11 plaintiffs?
12           MS. PARFITT:  Same objection.
13           THE WITNESS:  No, I am not.
14    I am not aware.
15 BY MR. HEGARTY:
16    Q.    Okay. Same question as to
17 Ms. Swann.
18        Do you know of any testing that
19 Dr. Godleski did as to Ms. Swann's tissues?
20           MS. PARFITT:  Same objection.
21           THE WITNESS:  Same answer.
22    No, I do not.
23 BY MR. HEGARTY:
24    Q.    With regard to your MDL report,

Page 84

1  which we will go ahead and mark as --
2            MS. PARFITT:  And for ease,
3     Mark, we have a copy of it in front of
4     her.
5            THE WITNESS:  You want to mark
6     this?
7            MR. HEGARTY:  Okay. I'm
8     trying to get rid of some of the copies
9     that I brought.
10           MS. PARFITT:  That's okay. We
11    can hold on to them.
12           MR. HEGARTY:  I'm going to
13    mark as Exhibit No. 6 a copy of your
14    June 30, 2021 MDL report, amended MDL
15    report.
16           (Document marked for
17    identification as Plunkett Exhibit 6.)
18 BY MR. HEGARTY:
19    Q.    Would you just take a quick look at
20 that and tell me whether that does appear to be
21 your June 30, 2021 amended MDL report?
22    A.    Yes, it is.
23    Q.    And do you have a copy of that
24 report in front of you?

Page 85

1     A.    I do. I don't know that I have all
2  the appendices, though. You have all the
3  appendices.
4     Q.    Did you make any notations or
5  writing on the copy that's sitting in front of
6  you?
7     A.    No, I do not.
8     Q.    If I looked through that, I wouldn't
9  see anything different than what I marked as
10 Exhibit No. 6?
11    A.    Other than it does not have the
12 appendices pages. I have the title page
13 "Appendix C," but I didn't bother to kill the tree
14 (laugh) to print out all those pages, but yes.
15    Q.    And with regard to the -- do you
16 have anything else in the notebook in front of you
17 besides the amended MDL report?
18    A.    I have the original MDL report.
19 That one actually does have appendices with it. I
20 have the Health Canada final screening assessment,
21 and I have the Taher paper that's referred to,
22 which actually is not new since, but certainly I
23 brought that because it is discussed within the
24 Health Canada assessment.

22 (Pages 82 to 85)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 86

1      MR. HEGARTY: You mentioned
2  your prior MDL report, and I'm going to
3  mark as Exhibit No. 7 your November 16,
4  2018 MDL report.
5      (Document marked for
6  identification as Plunkett Exhibit 7.)
7  BY MR. HEGARTY:
8      Q.   Is that the initial MDL report that
9  you prepared for the MDL?
10     A.   Yes, that's correct.
11     MR. HEGARTY: I'm going to
12  next mark as Exhibit No. 8 a supplemental
13  expert report dated August 29, 2018.
14     (Document marked for
15  identification as Plunkett Exhibit 8.)
16  BY MR. HEGARTY:
17     Q.   Can you tell me what that document
18  is?
19     A.   So this was a report I repaired --
20  prepared before the MDL report, but after my
21  initial report in litigation, which I believe
22  was --
23     MS. PARFITT: Thank you, Mark.
24     THE WITNESS: -- in 2016 based

Page 87

1  on having -- having additional documents
2  that were reviewed. Well, some of it was
3  new discovery and then some are new
4  things that I reviewed and relied upon,
5  and then some additional research that I
6  had done since the original report
7  looking historically back in time at
8  notice and what was known to the company.
9  BY MR. HEGARTY:
10     Q.   Were you asked to do anything
11  different in preparing your amended MDL report
12  than you had been asked to do in preparing your
13  original MDL report?
14     A.   No.
15     Q.   Did you do any medical or scientific
16  literature research for your amended report?
17     A.   Yes.
18     Q.   What databases did you search, if
19  any?
20     A.   I searched through the PubMed
21  website and then I also did -- I think I did -- I
22  may have even done a Google -- just a Google query
23  on talc and ovarian cancer to see if there was
24  anything that didn't show up on the -- in the

Page 88

1  PubMed documents.
2      Q.   Do you recall what search terms you
3  used in the PubMed search?
4      A.   Sure. PubMed I was just very
5  general because I do those -- those searches about
6  every four or five months. I did just did "talc"
7  and then I just looked -- I organize it
8  chronologically and I just looked at things since
9  the last time I had -- I had done -- done research
10  or done a search.
11     Q.   When you say "looked at things," how
12  do you go about looking at this, the search
13  results that you get from that broad of a search?
14     A.   So I start -- I do it on my
15  computer. I start with the titles and the
16  authors. I look at what's there and then I click
17  to the abstract, if there is one available. The
18  good thing since the pandemic is almost every
19  journal provides almost every article free now.
20     So in the -- in the research that I
21  did before the amended MDL report, in addition to
22  the abstract, I usually almost always able to see
23  the full article.
24     Q.   Is the time that you spent doing

Page 89

1  that search reflected in the invoices that we
2  marked?
3      A.   Yes. The time for review of
4  documents before I actually prepared the report,
5  but then during that month I was preparing the
6  report, that would have been also looking again at
7  the -- at it to see if there's anything new in the
8  literature that showed up in June of 2021.
9      Q.   Did plaintiff's counsel provide you
10  with any literature or other materials that you
11  reviewed for your 2021 amended MDL report?
12     A.   Not literature, but let me -- which
13  one is it? Number 6?
14     Q.   Number 6.
15     A.   Yeah. I believe there was some new
16  deposition testimony.
17     MR. HEGARTY: And I have a
18  copy.
19     MS. PARFITT: Thanks, Mark.
20     THE WITNESS: Let's see. So
21  if you go to page -- pages 67 through 69
22  in the Appendix C where there's
23  deposition testimony. If there's
24  deposition -- there's some depositions

23 (Pages 86 to 89)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 90

1    here that occurred after my original MDL
2    report that would have been provided
3    through counsel. Actually, all of these
4    documents on here always were provided
5    through counsel.
6    BY MR. HEGARTY:
7        Q.    When you say "all the documents on
8    here," what do you mean?
9        A.    I mean that I have a transcript. So
10   anything on the transcript page would have been
11   provided through counsel, and I know that there
12   are documents on here that I saw -- well, for
13   example, there was one -- there were two
14   depositions of Steven Mann taken in April of 2021.
15   So that's something that I didn't have, obviously,
16   in 2018, right?
17        And then there's also, even though
18   there's a 2019 Alex Gorsky deposition, there's
19   also deposition and exhibits from trial testimony
20   of Alex Gorsky in a couple of trials. So towards
21   the end of here, there's a number of things that
22   are since my MDL report.
23        Q.    Did you request any specific
24   depositions or were those depositions just

Page 91

1    provided to you by counsel?
2        A.    I requested any new depositions.
3    Actually, it's a standing request. If there's any
4    new depositions in the areas I typically cover,
5    for example, or someone who has given a deposition
6    before that now gives a second deposition, another
7    deposition, I ask for that.
8        I also, for example, after trials
9    that I've been at, if I know a certain person has
10   testified and it covers, overlaps with my area, I
11   may ask for that.
12        Q.    With regard to the new literature
13   that you identified, did you assess the strengths
14   and weaknesses of each article?
15        A.    Same -- same way I always do, yes.
16   I applied my -- my -- the same method I would to
17   the new articles just as I did to the old
18   articles.
19        Q.    And as to the new articles that you
20   cited in your amended MDL report, did you assign a
21   weight as it relates to your risk assessment to
22   those new articles?
23        A.    In the same way that I've done it
24   before. It's not a written document, but

Page 92

1    certainly I segregate. So, for example, articles,
2    when I add them to my report, those are ones that
3    I've given weight to in terms I believe they're --
4    they're relevant to the opinions I've expressed in
5    the case.
6        But you're asking me for -- I mean,
7    my original MDL, the deposition, we spent a lot of
8    time with Ms. Branscome I believe her name was --
9        Q.    Correct.
10        A.    -- going through this issue.
11   There's nothing different today that I did that is
12   different from what I did then.
13        Q.    And that applies to both assessing
14   the strengths and weaknesses and assigning a
15   weight to the articles; is that correct?
16        A.    That's correct.
17        Q.    And did you do either of those in
18   some written format in some other document besides
19   in your MDL report or your amended MDL report?
20        A.    No.
21        Q.    Did you perform any search of
22   company documents for your amended report?
23        A.    Yes, I did. I requested some
24   searches be done specifically on a couple of

Page 93

1    issues that I knew there had been additional trial
2    testimony about or things I had heard about in
3    transcripts or read in transcripts.
4        So when I asked for exhibits to
5    trials or depositions, I asked for additional
6    searches to be done around, for example, the
7    issues of asbestos in talc, some additional
8    information or additional does. Even documents
9    that actually may have been in the original
10   discovery ones that I had not focused on before.
11        So I spent a little more time
12   focusing on some of that just because I had seen
13   that come up, for example, in the Forrest trial
14   that I participated in and some other -- other
15   depositions I participated in.
16        Q.    Is the document database, that is
17   the document database of produced documents by
18   Johnson & Johnson, something that you have access
19   to?
20        A.    I do and I will do searches, but in
21   the case of this most recent searches, I asked for
22   others to help me. And I say "others." I asked
23   the attorneys to do searches for these kinds of
24   documents.

24 (Pages 90 to 93)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 94

1        Q.    So with regard to your amended MDL
2   report as it relates to searches across company
3   documents, you asked the lawyers to do those
4   searches.
5             You did not do them personally?
6             MS. PARFITT:  Objection.
7             THE WITNESS:  Well, I was --
8             MS. PARFITT:  Misstates her
9   testimony.
10            THE WITNESS:  So I gave
11      directions to the attorneys on what to
12      look for in terms of keywords as in
13      topics, but no, I did not physically do.
14            But what I do do, though, is
15      I'm given a Dropbox with lots of
16      documents in it, and then I go through
17      those myself and determine which ones I
18      think are relevant to add to my reliance
19      list.
20            For example, if there are
21      things that show up on my reliance list
22      as new, those are all things I've said
23      that I believe were ones that I would
24      like to have added to my Appendix C.

Page 95

1   BY MR. HEGARTY:
2        Q.    As far as the company documents that
3   you have access to, is this via a hard drive?
4        A.    It's computer.  I mean, there's a --
5   the attorneys have a large database that I've been
6   provided access to, and I can do that myself,
7   okay?  So it's all electronic, but then I can
8   print out documents if I want, obviously, download
9   and print out.
10       Q.    Do you know whether this database
11  that you're provided access to has been updated as
12  new documents have been produced?
13       A.    It's my understanding, yes, and
14  that's one of the reasons why every once in a
15  while I get a communication from the attorneys
16  that there's been new -- new documents that have
17  been provided through -- from Johnson & Johnson to
18  plaintiff's counsel.
19       Q.    Do you recall the search terms that
20  you provided to counsel for plaintiffs to have to
21  use to search across the company document
22  databases?
23            MS. PARFITT:  And this would
24      be between the '18 and the '21 report.

Page 96

1             MR. HEGARTY:  Correct.
2   BY MR. HEGARTY:
3        Q.    This would be in preparing your
4   amended report.
5        A.    Sure.  Yes, I was looking for
6   documents that discussed asbestos in talc powder.
7   Talc powder.  I also was looking for documents
8   that talked about corn starch, additional corn
9   starch documents.  What the company was doing in
10  terms of development of corn starch.
11            And then I think I also searched for
12  some names of individuals that I had seen given
13  deposition testimony.  I think we did -- I did
14  some additional looking for documents from Steve
15  Mann, from Steve Mann based on some of the
16  testimony he gave more recently but also in the
17  past.  He's been on different e-mails documents
18  that I've relied upon and presented at trial.
19            I think we searched for -- I think I
20  searched for Kathleen Wille again.  I think I
21  searched also for -- I'm trying to think who else
22  was in there.  Mann.  Wille.
23            Let me look again on this.  I might
24  be able to tell you by looking at it.

Page 97

1             Those are the two I can recall.  I
2   mean, it's possible I also searched nettle --
3   Nettesheim but...
4        Q.    When you get the results back from
5   the document searches, how do you go about
6   reviewing those documents?
7        A.    So they're provided to -- the
8   documents themselves are put into a Dropbox.  So
9   where I can -- where I don't have to go physically
10  to their offices.  They share them electronically,
11  and then I review them.  So they're put in just
12  individual folders for me, Dr. Plunkett's request
13  or whatever and the date.
14            And then I go through and open them,
15  read them, determine if there's ones that I
16  believe are ones I would, for example, want to
17  cite in the amended report.  Ones that I think
18  need to be added to Appendix C.  Or there may be
19  some that I feel are not really relevant to the
20  opinions I'm expressing.  So they may not
21  necessarily go in, or they may.  You know, it just
22  depends.
23            I may just say, dump them all in.
24  Sometimes I don't, though.  I will say, just go

25 (Pages 94 to 97)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 98

1 for this subsection of documents because those
2 search terms weren't helpful. You know, sometimes
3 I'll give a search term and what I get back is not
4 helpful in terms of the kinds of testimony or the
5 kinds of opinions that I've expressed in the case.
6       Q.    Do you read the entirety of the --
7 or did you read the entirety of the documents that
8 were provided to you from this, the searches?
9            MS. PARFITT:  Objection.
10    Form.
11           THE WITNESS:  In most of them
12    I do.  Some of them I don't.  And
13    sometimes you can tell from the first
14    page.  If it's a 40-page document and
15    it's something that just isn't really
16    relevant to the question I'm asking, then
17    I may not read all 40 pages, but I
18    typically do.
19           Majority of the documents that
20    I reviewed and added to the amended
21    expert report were -- were shorter than
22    that, though.  So I would have looked or
23    skimmed through quickly the entire
24    document.

Page 99

1 BY MR. HEGARTY:
2       Q.    And in your amended expert report,
3 you've identified some new company documents and
4 you've also included some new company documents in
5 your list of materials considered.
6            What is the distinction between the
7 documents cited in the report versus the documents
8 in the list of materials considered?
9       A.    So the ones cited in the report are
10 being cited for a specific statement I'm making.
11 I believe that document is supportive of that
12 specific statement.  There are also documents
13 that -- that I believe might be ones that would be
14 potentially used at trial.  I mean, some of those
15 you may recognize, the ones we have used in direct
16 testimony at trial before.
17           And then the ones considered may be
18 ones that I may decide to use at trial, for
19 example, may ask to be added to the list, or they
20 may just be another.  I have 10 documents that
21 talk about the same thing.  So I cite one or two,
22 but not all of them.
23           You'll notice -- I think I've said
24 this to you before -- when I cite to documents, if

Page 100

1 I use the term "e.g.," for example, that means
2 it's not every document that I reviewed that's
3 supportive, but those are kind of the ones I think
4 really make the point or very -- of the -- of the
5 statement I am -- I am making in that sentence
6 where I'm citing to it.
7       Q.    Since your MDL report, initial MDL
8 report, and deposition in 2018, have you done any
9 additional work on heavy metals and ovarian cancer
10 risk?
11      A.    I have not written any additional
12 reports, other than what you have, but I certainly
13 have looked, for example, at some of the
14 literature that might have come up.  Yes, that's
15 possible I have looked at that.  I certainly did
16 -- I also did at one point -- and I want to say it
17 was in response to questions asked at a deposition
18 since my MDL deposition.  One of the state cases.
19           I believe I did go and look at some
20 of the IARC documents for the individual metals to
21 see.  Because I was asked questions somewhere
22 about, well, can you point me to where it says
23 ovarian cancer in that document?  So I did go on
24 some of those and look and to see what was there.

Page 101

1       Q.    Since your MDL deposition December
2 2018, have you done any additional work on
3 fragrances and ovarian cancer risk?
4       A.    In the -- I need to ask a question.
5       Q.    Sure.
6       A.    I need to look.  In the 2018 report,
7 the list of fragrances I had was long.  I do --
8 yes, there has been since that time a shorter
9 list, I believe, that has shown up on the website
10 where they've cut -- when I say "they," the
11 company has gone to -- gone to the work, I
12 believe, or they've -- they've started taking some
13 things out of their fragrance, and they
14 reformulated their fragrance.
15           Now, I don't have confidential
16 documents that tells me that's the only thing in
17 there, but that list is now much shorter than the
18 list that I relied upon for my -- my MDL report.
19 So that research I have done.  I have gone to see
20 what has been said, and I am aware that today
21 they've changed their fragrance constituents as
22 far as what's in the fragrance.
23      Q.    Have you done anything specific to
24 give your opinions as reflected in your June 2021

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 102

1    amended MDL report that's not reflected by the
2    report itself?
3        A.    I don't recall.  No, I don't -- I
4    don't believe so.  Because I believe that's been
5    -- if that isn't -- that isn't -- if that issue on
6    the less fragrances wasn't discussed in the
7    report, I would say to you I know I discussed --
8    we discussed it at a deposition since the MDL
9    report, but I don't recall if I had that
10   discussion.  I'd have to look.
11       Q.    I guess my question is:  Are there
12   any opinions or other work --
13       A.    Oh.
14       Q.    -- that you have that you intend to
15   offer in the MDL that's not -- that are not
16   contained in your amended MDL report?
17       A.    No.  I have attempted to give you --
18   that's why I'm here today.  To tell you that this
19   is the opinions that I would be prepared to
20   express in the MDL at this point in time based
21   upon what is in the report or any of the documents
22   that are, obviously, in my appendices.
23       Q.    So is it a correct statement that
24   your amended MDL report contains all of your

Page 103

1    current opinions and reliance materials?
2        A.    Yes, that's true.
3        Q.    To the extent you --
4        A.    Well, does it cite to?  With the --
5    with the caveat, I always say that also anything
6    that I've said or stated within testimony that I
7    believe is incorporated into this, but if it's
8    not, I should point that out.  Because I don't
9    know that I list that as a separate appendix, but
10   yes.
11       Q.    You're talking about current
12   opinions and reliance materials that you've
13   provided during your deposition testimony?
14       A.    Or trial testimony.
15       Q.    Or trial testimony?
16       A.    Yes, that's correct.
17       Q.    Between the deposition testimony,
18   trial testimony, and your amended MDL report, that
19   should contain all of your current opinions and
20   reliance materials?
21       A.    Yes, that's correct.
22       Q.    To the extent you intend to testify
23   about any company witness testimony that's
24   identified in your report, this would be -- let me

Page 104

1    restate that.
2            To the extent you intend to testify
3    about any company witness testimony, this would be
4    set out in your amended MDL report or your prior
5    deposition testimony, correct?
6            MS. PARFITT:  Or trial
7        testimony.
8    BY MR. HEGARTY:
9        Q.    Or trial testimony?
10       A.    Or trial testimony.  Yes, that's
11   correct.
12       Q.    Is the same true for internal
13   company documents?  To the extent you intend to
14   testify about any internal company document, this
15   would be set out in your amended MDL report or
16   your deposition or trial testimony?
17       A.    Yes.  As we sit here today, that is
18   correct.
19           MS. PARFITT:  Mark, could we
20       take a short bio break?
21           MR. HEGARTY:  Yes.
22           MS. PARFITT:  Okay.
23           MR. HEGARTY:  Yes.  Let's go
24       ahead and take that break.

Page 105

1            MS. PARFITT:  Is it a good
2        place?
3            MR. HEGARTY:  Yes, that's
4        okay.
5            (Recess:  10:35 a.m. -
6            10:50 a.m.)
7            MR. HEGARTY:  We're back on
8        the record.
9    BY MR. HEGARTY:
10       Q.    Dr. Plunkett, we've been talking
11   about your June 2021 amended MDL report, and in
12   that report, did you set out any analysis that's
13   specific to the subtypes of ovarian cancer for the
14   plaintiffs in this case -- in these cases?
15       A.    No.
16       Q.    Did you do any type of risk
17   assessment or analysis by subtype based on the
18   types of cancers that the MDL plaintiffs have?
19           MS. PARFITT:  Objection.
20       Form.
21           THE WITNESS:  No.  I'm not
22       case-specific.
23    BY MR. HEGARTY:
24       Q.    Do you understand that in the MDL

27 (Pages 102 to 105)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 106

1    there are two Johnson & Johnson companies in the
2    case: Johnson & Johnson Consumer, Inc. and Johnson
3    & Johnson?
4        A.    Yes, I believe that's true.  I've
5    seen that on the pleadings, yes.
6        Q.    Does your amended report set out any
7    analysis specific to each defendant?
8        A.    No.  Some documents may relate only
9    to one entity in terms of the way it's listed, but
10   to me it's all Johnson & Johnson generally.
11   Everything applies to both, in my mind, in terms
12   of my opinions.
13       Q.    Does your amended report set out an
14   analysis where you address separately Johnson's
15   Baby Powder and Shower to Shower?
16       A.    No, does not.
17       Q.    Your report at the end includes
18   references to other companies' labels.
19           Do you recall that?
20       A.    Yes.
21       Q.    Since your MDL deposition in
22   December of 2018, have you done any analysis of
23   any other company's knowledge and reason for
24   including warnings on their talcum powder product?

Page 107

1        A.    No, I have not because I would have
2    done that based upon having access to their
3    internal company documents or conversations with
4    individuals.  So, no, I have not done that.
5        Q.    You have not since your MDL
6    deposition looked at any internal company
7    documents or spoken to anyone at these companies
8    who put ovarian cancer warnings on their talcum
9    powder products?
10       A.    No, I have not.
11       Q.    You have testified several times
12   that you're not a causation witness.
13           With regard to your amended MDL
14   report, is that still the case?
15       A.    Yes, I'm not doing general
16   causation.
17           MR. HEGARTY:  We were provided
18       prior to your deposition some materials
19       that you have reviewed, and we've looked
20       at several of those so far.
21           And I want to mark as Exhibit
22       No. 9 the printout of a Dropbox we were
23       provided which contains the first page of
24       the documents that, hopefully, we can

Page 108

1        follow along with.
2           (Document marked for
3           identification as Plunkett Exhibit 9.)
4    BY MR. HEGARTY:
5        Q.    With regard to the Federal Register
6    document listed there, do you recall if there's
7    anything in that Federal Register document that
8    you rely upon for your opinions in your MDL report
9    or amended MDL report?
10       A.    Why.  It's part of -- it has been
11   part of my reliance materials for a long time.  I
12   need to see if I cite to this specific one.  You
13   want me to look and see?
14       Q.    Let me ask you about that.
15           The Federal Register document is 300
16   pages, but within that there's a reference to
17   antiperspirant drug products for over-the-counter
18   human use.
19           Is that the part of that document to
20   which you are referring to?
21       A.    I'd have to -- that may very well
22   be, but I'd have to pull that one out to tell you
23   that for sure.
24       Q.    We'll see if I have time and I'll

Page 109

1    come back to that.
2           You make several references --
3    strike that.
4           Within Exhibit No. 9, there are
5    several references to cosmetovigilance.
6           Is there anything in those documents
7    that you rely upon for your amended MDL report?
8    Because I didn't see anything cited to those in
9    your amended MDL report.
10       A.    I don't have a specific reference to
11   these documents, but they are relevant to my
12   opinions related to the responsibility of a
13   company.
14           So if you read these documents, they
15   talk about what companies can do in terms of
16   setting up systems and procedures within the
17   company to look for adverse events and safety
18   concerns that arise after the drug has been -- I'm
19   sorry, not the drug -- after the product has
20   entered the marketplace.
21           MR. HEGARTY:  I'll mark as
22       Exhibit No. 10 the references, the
23       document that says "All References and
24       Materials."  It's the first row to the

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 110

1      far right.
2              (Document marked for
3      identification as Plunkett Exhibit 10.)
4              THE WITNESS:  Uh-huh.
5   BY MR. HEGARTY:
6      Q.    Can you tell me what Exhibit No. 10
7   is or what it represents?
8      A.    Yeah, I've seen that.
9              MS. PARFITT:  The far right.
10             THE WITNESS:  Yeah.  Yeah.
11  Yeah.  Yeah.
12             So can you -- can you provide
13     me with the notice of deposition?  That
14     might make it easier because these --
15     that's what these are responsive to, and
16     I might be able to tell you by looking at
17     what you asked for.  Do you understand?
18  BY MR. HEGARTY:
19     Q.    I do.
20     A.    Because --
21     Q.    Sitting here -- but looking at the
22  document, you can't tell what it is?  What it
23  represents?
24     A.    These are clearly internal company

Page 111

1   documents that are within my -- within my reliance
2   materials.  That I can tell by just general
3   looking at what they are.  But in order to tell
4   you which -- what it's responsive to, it's
5   responsive to something you asked for.  So that's
6   why I said if you show me --
7      Q.    Okay.
8      A.    -- your notice of deposition
9   subpoena, I can maybe answer that more fully.
10     Q.    Okay.  Maybe we'll come back when I
11  have some time.
12     A.    Okay.
13             MR. HEGARTY:  There's another
14     document I want to show you that was
15     provided that I'll mark as Exhibit
16     No. 11.
17             (Document marked for
18     identification as Plunkett Exhibit 11.)
19  BY MR. HEGARTY:
20     Q.    Can you tell me what that document
21  is?
22     A.    Yes.  So this is a document looking
23  at things that I have considered more recently.
24  So up till today essentially, right?  So that's

Page 112

1   what that is.  Things that I have looked at more
2   recently.
3      Q.    I'll mark --
4      A.    Because I continue to work on this
5   because I have other cases coming up and...
6              MR. HEGARTY:  I'll mark next
7      as Exhibit No. 12 a copy of the Boorman
8      article, which is not new, but it is
9      included on the materials that were
10     provided to us for purposes of this
11     deposition.
12             (Document marked for
13     identification as Plunkett Exhibit 12.)
14  BY MR. HEGARTY:
15     Q.    Is there a reason that we were
16  provided the Boorman article versus other articles
17  that you referred to before or that are dated well
18  before your MDL report?
19     A.    No.  This -- this is -- as far as I
20  know, this has been in my materials for a long
21  time.  So...
22             MS. PARFITT:  And, Mark, if I
23     can just, maybe it will be helpful.
24             MR. HEGARTY:  Sure.

Page 113

1              MS. PARFITT:  What happened
2      is, because there were other reliance
3      lists, we tried to cross-check in the
4      MDL, and it may have been that for state
5      court cases or even back as early as the
6      original report, there were documents
7      that were provided to you and we
8      duplicated them out of an abundance of
9      caution.
10             MR. HEGARTY:  Okay.
11             MS. PARFITT:  So feel free to
12     inquire about any particular one, but
13     that's why you see some that are,
14     frankly, redundant that had been provided
15     to you earlier.
16  BY MR. HEGARTY:
17     Q.    If you would turn to the second to
18  the last page of Exhibit No. 9, there is a
19  document in the lower left-hand corner P1851,
20  which is "Johnson's Baby Talcum Powder: A
21  Comprehensive Review, March 17, 2020."
22             Do you recall that document?
23     A.    Yes.
24     Q.    Have you read that document?

29 (Pages 110 to 113)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 114

1    A.    I have.  Now I have, yes.
2    Q.    When did you first read it?
3    A.    First read it as it was -- as with
4  respect to trial testimony in the last case by
5  Dr. Kuffner.  So it was made -- I was made aware
6  of that document.
7    Q.    Have you done an assessment of any
8  strengths and weaknesses about that document?
9    A.    I formed some opinions about
10 strengths and weaknesses, yes, after reading his
11 trial testimony and that document.
12    Q.    What are those opinions?
13    A.    So consistent with what I have, I
14 think, already testified in the past, that
15 particular document and their review is, again, in
16 my opinion, not consistent with what the weight of
17 the evidence says.  So I disagree with the
18 conclusions drawn.  They're certainly -- many of
19 the studies and some of the information, they're
20 some of the same ones that I have reviewed.
21        I also in Dr. Kuffner's trial
22 testimony where he discusses his review, I
23 disagree with some of the statements he makes
24 about what individual pieces of evidence may or

Page 115

1  may not mean.
2        I mean, if you want -- it's going to
3  be a long discussion, but if you want to go
4  through.  I mean, essentially I disagree with how
5  he -- how he describes -- how he looks at the
6  results of the Canadian final safety assessment
7  versus what other -- other assessments may have
8  been done.
9        The Health Canada assessment is a
10 much more comprehensive, in-depth assessment
11 across the literature than, for example, anything
12 that you find on the NCI website or you find even
13 done by the CIR when they did their review.  And
14 those are opinions I've already expressed to you
15 about the limitations of those.
16        But I think that that testimony and
17 that document are, in my view, additional evidence
18 for the fact that the company is not recognizing
19 or refuses to recognize the importance of the
20 information that is available to the hazard of
21 their product and the need to have provided for
22 years a warning to women or consumers about the
23 use of the product.
24    Q.    Do you have any other sort of bullet

Page 116

1  point or topical areas of opinions as it relates
2  to the comprehensive review document, first of
3  all, and then second as it relates to
4  Dr. Kuffner's testimony?
5    A.    I think I've told you the general --
6  my general issues.  I mean, if you want to go line
7  by line through it, we can talk about it.
8    Q.    Probably don't have time to do that.
9    A.    Yeah.  I'm sorry.
10    Q.    So are you able to just give me the
11 subject areas of opinions that we have not already
12 covered.
13    A.    So I disagree with some of the
14 discussion in there when you go to the sections
15 where they talk about the weight of the evidence
16 from the EPI studies, the weight of the evidence
17 from some of the animal work.  I mean, if you've
18 read my report, you know that I don't agree with
19 some of the conclusions that are drawn in that --
20 in that review.  Absolutely.
21        The issues related -- I think he
22 covers -- covers migration, for example.  We have
23 a disagreement about that as well.
24        And then on Dr. Kuffner's trial

Page 117

1  testimony, you know, I just disagree with the
2  conclusions he draws about it.
3        I also would point out that it's
4  very clear that he himself did not do the review
5  of those individual pieces of evidence.  In other
6  words, he -- he talks about he gave it to some
7  epidemiologist to look at it or this person to
8  look at it.
9        So, you know, I just -- I disagree
10 with what he says because I don't believe he has
11 the -- has done the in-depth analysis, for
12 example, that I've done of each of those pieces of
13 evidence.
14    Q.    With regard to the comprehensive
15 review document, did you find anything that you
16 found to be wrong, mistaken, any omissions that
17 you thought should have been included, or anything
18 along those lines?
19        MS. PARFITT:  Okay.  And I'll
20        just object to the very broad nature of
21        that question and Dr. Plunkett's ability
22        to actually address that with any
23        specificity.
24        THE WITNESS:  Yeah.  So as I

30 (Pages 114 to 117)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 118

1    sit here today, I would not be able to
2    give you that.  I haven't -- again, this
3    is something I just got in the last week
4    after the trial in St. Louis.
5            So I haven't had an
6    opportunity to necessarily cite to you
7    everything that I would point to, but
8    certainly I think I've given you an
9    understanding of what I believe about
10   that document.
11   BY MR. HEGARTY:
12       Q.    Right.
13       A.    I don't believe it's an accurate
14   reflection of the weight of the evidence.  I don't
15   believe that -- I don't agree with some of the
16   assertions he makes.
17           I am familiar with Dr. Kuffner from
18   the Tylenol litigation, as you may be aware.  So,
19   again, not surprised by some of the things I see,
20   but it's -- I don't think it's consistent with the
21   evidence in the case.
22       Q.    Yeah.  But from your first review of
23   the comprehensive review, did you find anything
24   that was missing or did you find anything that you

Page 119

1    recall here today that was a mistake or error?
2            MS. PARFITT:  Again, objection
3        to the very broad nature of that question
4        and Dr. Plunkett's ability to answer with
5        any specificity.
6            THE WITNESS:  Yeah.  I haven't
7        done a side-by-side to see if everything
8        he cites is everything I've cited and
9        that's -- I think that's answers part of
10       your question.
11           And I would reserve the right
12       to do that.  I just haven't had a chance
13       to do that yet.
14   BY MR. HEGARTY:
15       Q.    Okay.
16       A.    And certainly I'll make you aware if
17   I have a new opinion about this area.
18       Q.    I want to now turn to your MDL
19   report, which we have marked as Exhibit 6, I
20   believe.
21           Do you have a copy in front of you?
22       A.    Yes, I do.
23       Q.    And feel free to work from your --
24   the report you have in front of you or the one

Page 120

1    that I have marked as an exhibit.
2            The first paragraph that I want to
3    talk about that has been revised is paragraph 22.
4    Tell me when you are there.
5        A.    I am.
6        Q.    Towards the end of that paragraph,
7    you added the sentence beginning:  "It also is
8    important to note."
9            Do you see that sentence?
10       A.    Yes.
11       Q.    With regard to the statement in that
12   sentence that "use of the term 'hazard' rather
13   than 'risk' by FDA in its cosmetic labeling
14   standard means that the likelihood of the harm
15   being discussed (i.e., cancer) does not need to be
16   understood; it only requires that the inherent
17   properties of the substance indicate the substance
18   is capable of harm," why did you add this sentence
19   to your report?
20       A.    Because during trial testimony and
21   questions asked by defense, it was very clear that
22   this was an important distinction to make.  In
23   other words, the standard for warnings for a
24   cosmetic product are different than the standard

Page 121

1    for warnings for some other types of FDA-regulated
2    products where risk and understanding the
3    likelihood are more important because there's a
4    risk-benefit weighting, right?  And there's no
5    risk-benefit weighting for this.
6            This sentence was added specifically
7    because I felt that in the discussion I've given
8    in trial, that this is the opinion I have
9    expressed.  So I wanted to make sure.  I think
10   it's important to understand.
11       Q.    What does capable of causing harm
12   mean in this sentence?
13       A.    It means that there is a hazard that
14   has been identified based on reliable scientific
15   evidence.  So capable of causing harm means
16   that -- that it can happen, but we don't know --
17   you don't have to know -- and this is the issue --
18   we don't need to know that it happens one in a
19   million people, but we know that cancer can occur.
20           So it's the idea that that hazard is
21   there.  The potential is there.
22       Q.    When you say "does not need to be
23   understood," what do you mean?
24       A.    That the likelihood.  You have to --

31 (Pages 118 to 121)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 122

1    you have to get the whole phrase.
2        Q.    Okay.
3        A.    The likelihood of the harm does not
4    need. So it's the number, the quantification of
5    that.
6        Q.    You refer in that sentence to FDA's
7    "cosmetic labeling standard."
8        To what are you referring to?
9        A.    Referring to 740.1, but I'm also
10   referring back to the Federal Register from where
11   they discuss this in 1975 and also back to the
12   Food, Drug, and Cosmetic Act, which talks about
13   some of the basic responsibilities of putting a
14   safe product on the market.
15       Q.    And the Federal Register is
16   something that you've talked about previously?
17       A.    I have, yes.
18       Q.    As well as the other documents you
19   just referenced?
20       A.    Yes, that's correct.
21       Q.    Do you cite, though, in this part of
22   your report those other sources that you just
23   referenced?
24       Because you cite no published

Page 123

1    authorities for the statement, that is --
2        A.    Where?
3        Q.    Well, you say that -- you make
4    reference to the FDA's cosmetic labeling standard,
5    but you include no citation to what that standard
6    is.
7        A.    Well, I'll give you 21 -- oh, I give
8    it in another part of -- I give it in another
9    part. Not in this paragraph. So I take you to
10   740.1 in another paragraph.
11       Q.    Okay.
12       A.    Here -- here the view of this
13   paragraph is, I'm trying to explain the issue of
14   drug labeling where there is a higher standard for
15   adding a warning to a product than there is in
16   cosmetics -- than there is for a cosmetic, and I
17   discussed this at the last trial a bit, too. It
18   is different.
19       Q.    I just want to make sure that I have
20   the published authorities that you rely upon for
21   the sentence that we're talking about.
22       You mentioned 740.1.
23       A.    Right.
24       Q.    You mentioned a Federal Register

Page 124

1    from 1975.
2        Tell me what other authorities.
3        A.    And if you go to the description
4    within the -- the original description within the
5    1938 law about what the standards are for
6    marketing a cosmetic.
7        And then the other one would be, I
8    cite somewhere else in this document in this
9    report the 1978 paper by Dr. Kennedy. He also
10   talks about that.
11       And then I would point you to the --
12   the Congressional testimony in 2012 and the GAO
13   report from 1978.
14       Q.    And those are otherwise referenced
15   in your amended MDL report?
16       A.    They're all in here, yeah. Exactly.
17   Just not cited in this paragraph. But if you're
18   asking for the cites for that, that's what I would
19   be building from, that foundation I laid in
20   earlier paragraphs or later paragraphs in my
21   report.
22       Q.    And what is your definition in this
23   sentence of "harm"?
24       A.    Harm -- well, I'm referring,

Page 125

1    obviously, in this report to cancer, but harm
2    would be anything. Toxicity to tissues.
3    Depending upon what piece of evidence that you're
4    looking at. So harm is -- is something that is an
5    adverse response in the individual or in the
6    tissues of the individual.
7        Q.    Have you published any article where
8    you set out the kind of standard that you're
9    talking about here?
10       MS. PARFITT:  Objection.
11   Form.
12   BY MR. HEGARTY:
13       Q.    In that added sentence.
14       A.    I need to look at my -- to answer
15   that, I have to go to the CV to answer. I can do
16   that if you'd like.
17       Q.    Okay. Please.
18       A.    Here it is. I got it.
19       So I'm in Exhibit 4.
20       So in the general part of this
21   sentence about the difference between hazard and
22   risk, that is in some of my papers where I talk
23   about toxicity programs and testing.
24       So, for example --

32 (Pages 122 to 125)

Laura M. Plunkett, Ph.D, D.A.B.T.

---

Page 126

1      Q.    Do you have any paragraph numbers?
2      A.    Oh, I'm sorry.  On page 4,
3  references number 4 and 5.  I'm talking about the
4  concepts of hazard versus risk in those -- in
5  those.  So that's -- that's kind of generally what
6  I'm talking about here.
7          I can see if there's any other.  So
8  it would be things like that in my CV.
9          In 8, I talk about hazard and risk,
10 paragraph -- that paper, too.  I also talk about
11 hazard and risk in paper 9.
12     Q.    Do the references you cite refer to
13 hazard and risk in the cosmetic ingredient
14 context?
15     A.    They're not talking just about
16 cosmetics.  They're talking about chemical
17 exposures.  So which would include cosmetic
18 ingredients.  So to me this sentence here, I agree
19 I reference the cosmetic labeling standard, but
20 the most important part of why I'm adding this is
21 to have people understand there's a different
22 between hazard and risk.
23         So that I'll say let me point you to
24 there for right now.  There are some other

---

Page 127

1  presentations that I've done on regulatory
2  paradigms, and I've talked to you about before.
3  Before.  Maybe not you, maybe someone else took my
4  deposition.  Where I've discussed cosmetics as
5  part of the FDA regulatory world and the
6  differences in the standard.
7          MS. PARFITT:  And I would just
8      object to the extent that
9      Ms. Branscome --
10         MR. HEGARTY:  Right.
11         MS. PARFITT:  -- back in her
12     deposition went at length about hazard
13     and risk and what the differences were.
14 BY MR. HEGARTY:
15     Q.    With regard to the sentence we've
16 been talking about, other than what you've
17 identified so far, can you cite for me any FDA
18 authority for the labeling standard that you are
19 discussing?
20     A.    Well, I would -- the Kennedy paper.
21 Kennedy was a commissioner of the FDA.  So I'd
22 cite you to that as an authority, and then the
23 regulations themselves.
24     Q.    Okay.  Can you identify any cosmetic

---

Page 128

1  or cosmetic ingredients whose labeling applies
2  this standard or that you would hold up as an
3  example of a labeling that applies the standard
4  from this new sentence you've added?
5          MS. PARFITT:  Objection.
6      Form.
7          THE WITNESS:  I would say to
8      you that I hope that every marketed
9      cosmetic, indeed, applies it because
10     they're supposed to.  I have worked with
11     clients that I instruct them on this
12     standard.  Some of which I can't tell you
13     the names of the companies, but obviously
14     so.  That's why I point to the published
15     literature because -- and then the GAO
16     report talks about this issue as well.
17 BY MR. HEGARTY:
18     Q.    Based on your added statement in
19 paragraph 22, you agree that a cosmetic does not
20 need a warning about a hazard it is not capable of
21 causing, correct?
22         MS. PARFITT:  Objection.
23     Form.
24         THE WITNESS:  If no hazard

---

Page 129

1      exists and that has been verified by the
2      company, I would agree.
3          There is the other caveat that
4      if the company has not -- has not done
5      the assessment to look at whether there
6      is a hazard, then there is the
7      requirement to put a statement on the
8      label -- and I've talked about this
9      before --
10 BY MR. HEGARTY:
11     Q.    Sure.
12     A.    -- right -- that the safety of this
13 product has not been determined.
14     Q.    A related question based on your
15 added statement.
16         You agree that a cosmetic -- you
17 agree that a cosmetic does not need a warning
18 about a hazard objectively it is not capable of
19 causing, correct?
20         MS. PARFITT:  Objection.
21         THE WITNESS:  If the
22     assessment has been done to determine
23     that, yes.  Again, it all has to
24     predicate back to whether or not an

---

Golkow Litigation Services - 1.877.370.DEPS

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 130

1        assessment was done.
2    BY MR. HEGARTY:
3        Q.    If you would turn next to paragraph
4    28 of your amended MDL report.
5        A.    Okay.
6        Q.    There is language in the middle of
7    that paragraph that you added beginning the "IARC
8    in its 2010 Monograph on talc"?
9        A.    Yes.
10       Q.    Do you see that part that you added?
11            Why did you add this language to
12   this part of your report?
13       A.    Because this is consistent with
14   testimony that I've given in talc cases that I
15   have worked on, so -- since the original MDL
16   report was written and so I thought it was
17   important to clarify.  Obviously based on
18   questions asked at trial, there appears to be some
19   confusion about this issue.
20       Q.    This section, the section that you
21   added, describes two different types of talc.
22   First, one that may appear as fibers and second,
23   talc that has been formed as asbestiform fibers
24   that are "very long and thin and occur in parallel

Page 131

1    bundles that are easily separated from each other
2    by hand pressure," correct?
3        A.    That statement is there.  That is
4    correct.
5        Q.    In other words, do you agree that
6    the additional statement you added describes two
7    types of talc: one that appears as fibers and the
8    second that has been formed as asbestiform fibers?
9            MS. PARFITT:  You're asking
10           her if that's what that statement says?
11           MR. HEGARTY:  Correct.
12           THE WITNESS:  I don't think I
13   understand.
14   BY MR. HEGARTY:
15       Q.    Sure.
16       A.    I don't think the question is that.
17   I would agree with you that there are platy talc
18   and there's fibrous talc.  If that's what you're
19   asking me, I would agree to that.
20       Q.    Let me ask in a different way.
21            The way that the quoted language as
22   I read it says:
23            "Talc particles are normally
24   plate-like.  When viewed under the microscope in

Page 132

1    bulk samples or on an air filters, they may appear
2    to be fibres and have been identified as such.
3    Talc may also form as true mineral fibres that are
4    asbestiform."
5            So between those two parts of that
6    addition, are those talking, in your view, about
7    two different types of talc?
8            MS. PARFITT:  Objection.
9            THE WITNESS:  I wouldn't say
10           two different.  I would say type -- types
11           of talc if what you're referring to is
12           physical form, yes.  But not -- they're
13           all talc and they're all in talcum
14           powder.
15   BY MR. HEGARTY:
16       Q.    But do you agree that the sentence
17   that you added in quotations includes two --
18   describes two different types of physical -- the
19   physical form of talc?
20           MS. PARFITT:  And I would just
21           make the comment.  That's not the
22           completed sentence.  It goes on to say
23           "Asbestiform describes the pattern of
24           growth."  So you've referred her to just

Page 133

1            part of the sentence, not the complete
2            sentence.
3            MR. HEGARTY:  Sure.
4    BY MR. HEGARTY:
5        Q.    And what I'm trying to just
6    establish is whether, in adding this sentence, you
7    understood that the quoted material from the IARC
8    2010 Monograph is talking about two different --
9    two different physical forms of talc.
10           MS. PARFITT:  Objection.
11           THE WITNESS:  I would say it
12           is -- it is referring to talc that can
13           occur in a -- in a powder physically that
14           looked different under a microscope.  So,
15           in other words, they do look different
16           and they have some different physical
17           properties because of that.
18            However, all of them are
19           within talc.  Talc itself is a natural
20           product that has these things within it.
21   BY MR. HEGARTY:
22       Q.    And what are the physical properties
23   of the first talc they describe that where they're
24   talking about "in bulk samples or on air filters,

34 (Pages 130 to 133)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 134

1    they may appear to be fibres and have been
2    identified as such"?
3              MS. PARFITT: I would -- I'm
4    going to object. This examination with
5    regard to fibers, asbestiform,
6    asbestiform the pattern was all examined
7    exhaustively by Ms. Branscome back in her
8    2018 deposition. We talked about IARC
9    '87, '10, '12.
10             So I would suggest that this
11   is material that is not new material that
12   Dr. Plunkett has examined, not only in
13   her last deposition but, frankly, in the
14   multiple trials in between that window.
15             MR. HEGARTY: But I am
16   talking, though, about a new section
17   that's been added to this paragraph only
18   that was not there before.
19             MS. PARFITT: Yeah, a new
20   section, but the materials precisely what
21   was addressed in the deposition. She may
22   have added that paragraph, but the
23   examination of what that paragraph states
24   was something that Dr. Plunkett was

Page 135

1    exhaustively examined about.
2              MR. HEGARTY: So is that an
3    area that we would disagree on that has
4    been covered before?
5              MS. PARFITT: I believe it
6    would be, yes.
7              MR. HEGARTY: Okay.
8              MS. PARFITT: Yes.
9    Absolutely.
10             MR. HEGARTY: So at least for
11   now we'll -- we'll --
12             MS. PARFITT: Put it over to
13   that category.
14             MR. HEGARTY: -- mark that as
15   an area that we disagree on whether we
16   covered it or not.
17             MS. PARFITT: That's fine.
18   BY MR. HEGARTY:
19       Q.   The next paragraph that I want to
20   reference is paragraph 30 in your report, and tell
21   me when you're there.
22       A.   I am.
23       Q.   About five lines down, you added to
24   that, to the list of material that you say is in

Page 136

1    talcum powder, silica.
2              Do you see that addition?
3        A.   Yes, I do.
4        Q.   Why did you add silica to your list
5    where you had not done that before?
6        A.   So I don't know why it wasn't there
7    before because I believe it's in one of my earlier
8    reports before the MDL report. So if you go back
9    and look at my 2016 original report, I talk about
10   silica, and I talk about silica in my original MDL
11   report in the section on chemical constituents. I
12   think I mention it.
13             But -- so I added it just because I
14   believe that this is consistent with things I have
15   said before at trial and also consistent with, I
16   believe, my original report in 2016.
17       Q.   In your original report, that was
18   not in the MDL, though, right?
19       A.   No, but it formed the basis for me
20   eventually writing my MDL. All of my reports have
21   built one on the other. So certainly when I
22   started to write the original MDL report, I
23   started with my report that I believe -- am I
24   wrong on the date? I believe it's 2016 but --

Page 137

1        Q.   2016 --
2        A.   Yeah.
3        Q.   -- is when you did a report.
4        A.   Yeah, exactly. So -- so that's my
5    answer to that is I was looking. I wanted to make
6    sure that everything in this amended report was
7    consistent with things that were in my original
8    MDL report, but also consistent with any testimony
9    or discussion I may have had in throughout the
10   litigation that I participated in.
11       Q.   Do you recall if in those prior
12   reports whether you did a risk analysis as it
13   relates to silica in baby powder?
14       A.   So what do you mean by "a risk
15   analysis"?
16       Q.   Let me restate my question.
17             Do you recall in any prior report
18   whether you did any type of analysis of any risk
19   of ovarian cancer as it relates to silica exposure
20   in talcum powder?
21       A.   I did not do a separate risk for
22   silica as a particular constituent of baby powder
23   that drove a risk. Instead what I did with
24   silica, as I did with all of these constituents

35 (Pages 134 to 137)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 138

1  listed here, is that they all contribute to the
2  risk. So, in other words, these are multiple
3  compounds that have this ability to cause
4  irritation and chronic inflammation.
5      Q.   All right. If you would look at the
6  next paragraph, paragraph 31. You added the line
7  at the end that says:
8          "My analysis is consistent with how
9  IARC considered the cancer risks of different
10 forms of talc."
11         Do you see that additional line?
12     A.   Yes.
13     Q.   Why did you add that additional
14 line?
15     A.   Because I believe that is consistent
16 with what I've had said at trial before when I've
17 talked about the different issues related to the
18 IARC analysis.
19     Q.   And when you say "considered the
20 cancer risks," are you saying your approach was
21 identical to IARC's approach?
22     A.   No. I'm saying that my analysis is
23 consistent in terms of the fact of identifying the
24 fact that there are multiple constituents which

Page 139

1  can drive the risk.
2      Q.   Did you go and compare the materials
3  you reviewed with the materials IARC reviewed in
4  2006 to see if you had reviewed the same thing?
5      A.   I did do that. I believe I was
6  asked about that a while ago. I did initially do
7  that, yes. I looked at the literature that IARC
8  described, and obviously they don't have all the
9  literature I have because they -- the analysis
10 from 2010 was based upon literature up to 2006,
11 for example. But yes, I did do that initially.
12     Q.   And based on the data available to
13 IARC in 2006, do you agree with where IARC came
14 down at the time?
15         MS. PARFITT: Objection. This
16     area was previously examined --
17         MR. HEGARTY: Okay.
18         MS. PARFITT: -- back on her
19     deposition of 12/18/19.
20         MR. HEGARTY: Okay. I'm not
21     sure that's correct, but we'll put that
22     aside for now.
23         MS. PARFITT: Sure. Okay.
24 BY MR. HEGARTY:

Page 140

1      Q.   The next paragraph I want to talk
2  about is paragraph 33. Tell me when you are
3  there.
4      A.   I am.
5      Q.   You say towards the beginning of
6  that paragraph or you added towards the beginning
7  of that paragraph that "the data has shown that
8  powders contain variable levels of fibers,
9  including" then you added the phrase "fibrous talc
10 as well as."
11         Do you see that addition?
12     A.   I do.
13     Q.   Whereas, before you had only said
14 "including fibers that were stated to be
15 asbestos."
16         Why did you add that reference here?
17     A.   To make the clear distinction
18 that -- that as -- as I have discussed within my
19 testimony that there is a separate constituent
20 known as fibrous talc that is not asbestos. There
21 is asbestos fibers and then there's talc fibers,
22 and they are, indeed -- and there are in these
23 documents cited here, for example, some of the
24 internal company documents. They distinguish

Page 141

1  between fiber amphiboles within talc, which they
2  call "tremolite," but they don't call it asbestos,
3  and then they have other times that they talk
4  about asbestos.
5          So it's -- it is in order to be
6  consistent with the documents that I'm relying
7  upon, I think that's important to point out.
8      Q.   Later on in that paragraph, you have
9  added additions to what Drs. Longo and Rigler
10 reported in their report of August 2, 2017.
11         Do you see that -- that part of the
12 addition to this paragraph?
13     A.   Yes.
14     Q.   There you make reference to them
15 referring to or finding asbestiform talc. Then
16 you say "report of Longo and Rigler dated
17 February 1, 2019."
18         Do you see that reference?
19     A.   In the next sentence? Yes.
20     Q.   Yes, the next sentence.
21     A.   Yes, I see that.
22     Q.   And when you say "asbestiform talc"
23 as it relates to that report, to what are you
24 referencing?

36 (Pages 138 to 141)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 142

1      A.    I'm referencing how they referred to
2  it in their report, which I believe that is
3  exactly what they said.  I attempted to take the
4  language of the report.
5      Q.    In this -- this addition that you've
6  provided here, are you defining fibrous talc the
7  same as Longo and Rigler are defining it in their
8  report?
9          MS. PARFITT:  Objection.
10  Form.
11          THE WITNESS:  I'm defining
12      it -- I'm defining it in my report and
13      that's what I'm relying on.
14          So I can't answer that without
15      -- I don't recall whether or not -- what
16      they say in terms.  I mean, they have
17      their own report and their own definition
18      potentially.  I think I'm consistent with
19      that, though.
20          They understand -- when I've
21      looked at their data in their reports,
22      they are, indeed, recognizing that there
23      are fibers of talc, fibrous talc, and
24      that there are also can be at times

Page 143

1      asbestos as well.
2  BY MR. HEGARTY:
3      Q.    Well -- and then my question really
4  goes with regard to the additions you have here,
5  are you defining fibrous talc the same as Longo
6  and Rigler are defining it?
7          MS. PARFITT:  Objection.
8      Asked and answered.
9          THE WITNESS:  All I can tell
10      you is, I have -- I don't -- I haven't
11      done that comparison to tell you that.
12          I can tell you I have defined
13      it the way I am using it, and so when I
14      testify, hopefully you understand and you
15      read this, you know what I mean.  I
16      believe it's consistent, but I haven't
17      gone to read every word to see if every
18      definition is the same.
19  BY MR. HEGARTY:
20      Q.    Towards the end of that paragraph,
21  you added the line:
22          "In IARC's most recent findings
23  regarding asbestos and cancer (IARC, 2012)
24  scientists explicitly stated that its findings on

Page 144

1  asbestos and cancer risk apply equally to
2  asbestiform talc."
3          Do you see where I'm reading from?
4      A.    No, I'm sorry.  On the next page?
5  Are you on page 22?
6      Q.    It's towards the bottom.  It's the
7  last third of the paragraph.
8      A.    Okay.  Yeah, I got it.  I see that.
9      Q.    Do you see that?
10          And the addition, the next line
11  says:
12          "This makes clear that IARC has
13  classified fibrous talc as a known human
14  carcinogen.  Other regulatory authorities have
15  addressed the cancer risk associated with fibrous
16  talc."
17          Do you see those additions?
18      A.    I do.
19      Q.    Are you referring in this addition
20  to fibrous talc as the same thing as asbestiform
21  talc?
22          MS. PARFITT:  Objection.
23      Again, these questions have been asked at
24      the prior deposition.

Page 145

1          MR. HEGARTY:  I don't think
2      this.  I think this is specific to these
3      additions.  So I don't agree with that.
4      I'm just talking about in these lines --
5      these two lines.
6          MS. PARFITT:  Sure.
7  BY MR. HEGARTY:
8      Q.    Are you equating fibrous talc with
9  asbestiform talc?
10      A.    Fibrous talc would be talc in the
11  asbestiform habit.  Yes, that is correct.
12      Q.    Okay.
13      A.    Which is consistent with IARC's
14  discussion in their documents.
15      Q.    And you make reference here to other
16  regulatory authorities that have addressed cancer
17  risk associated with fibrous talc.  You give one
18  example there.  Actually, you give a couple
19  examples.
20          Do you have any other examples
21  besides -- that you're referring to when you're
22  saying "other regulatory authorities" besides
23  those you list here?
24      A.    Well, I think -- I think I could --

37 (Pages 142 to 145)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 146

1    I only listed this here, but any -- if I look
2    across the world, there are many regulatory bodies
3    that have called talc -- have called asbestiform
4    fibers known human carcinogens.  I certainly
5    haven't given you every one.  So certainly Health
6    Canada would fit here.
7        Q.    All right.  Did Health Canada,
8    though, in its 2021 assessment use the phrase
9    "fibrous talc"?
10        A.    No.  They used the word -- they used
11    words such as "asbestiform habit" or
12    "non-asbestiform," yes.
13        Q.    And in particular, though, as it
14    relates to the Health Canada assessment, that
15    assessment was directed at talc without asbestos,
16    correct?
17        A.    The without asbestos, that's
18    correct.
19        Q.    And that assessment was also
20    addressing -- also addressed talc without what you
21    would call fibrous talc, correct?
22            MS. PARFITT:  Objection.
23            THE WITNESS:  I don't know
24    whether I agree with that or not.  I -- I

Page 147

1        think -- let's pull it out because they
2        actually -- let me look at their
3        language.
4    BY MR. HEGARTY:
5        Q.    Okay.  Let me --
6        A.    Because they do have specific
7    language.  So...
8            MR. HEGARTY:  Let me go ahead
9        and mark that just so you have it for the
10        record.  I'll mark it as -- the Health
11        Canada risk assessment as Exhibit No. 13.
12            (Document marked for
13        identification as Plunkett Exhibit 13.)
14            MR. HEGARTY:  I have a copy,
15        counsel, for you.
16            MS. PARFITT:  Thank you.
17            THE WITNESS:  I have one
18        here, too.
19    BY MR. HEGARTY:
20        Q.    Okay.  And you get that one.
21            The question now standing is:  Where
22    in that assessment do you identify Health Canada
23    as indicating that assessment applies to fibrous
24    talc?

Page 148

1        A.    (Reviews document.)
2            MR. HEGARTY:  Can we go off
3        the record just for a second.
4            (Recess:  11:30 a.m. -
5            11:32 a.m.)
6            MR. HEGARTY:  We're back on
7        the record.
8            And when we went off the
9        record, I had asked Dr. Plunkett to find
10        in either the Health Canada -- the Health
11        Canada risk assessment that we marked as
12        Exhibit No. 13 where she believes Health
13        Canada applies their findings to fibrous
14        talc.
15            And during the course of being
16        off the record, Dr. Plunkett also
17        indicated she needed to look at her
18        report in a particular paragraph for that
19        report.
20    BY MR. HEGARTY:
21        Q.    And I believe, Dr. Plunkett, you
22    have not yet found that reference you're looking
23    for; is that correct?
24        A.    Yes, that's exactly right.  Although

Page 149

1    I think I already answered the question.  I don't
2    believe they use the word "fibrous talc."  That's
3    for sure.  So...
4        Q.    Did you find anything in the risk
5    assessment itself of a description of -- of a
6    description that you thought was applicable to
7    fibrous talc?  In other words, where you thought
8    that the assessment would apply to fibrous talc
9    based on the language used?
10        A.    Right.  I would say that based on
11    the language used, what I -- what I remember from
12    this -- and that's why I was looking -- is that
13    there's a -- there's actually a discussion that
14    they are focusing on findings for non-asbestiform
15    talc, right, in other words, and they found that
16    to be a carcinogen, not even looking at, I
17    believe, this issue of the known human
18    carcinogenicity of asbestos and those things.
19            But I believe they were focusing on
20    the issue of asbestos-free, and that's what I need
21    to look at.  So...
22        Q.    Okay.  We'll make a note and come
23    back to that.
24            MS. PARFITT:  See where we are

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 150

```
1        time-wise, yes.
2   BY MR. HEGARTY:
3        Q.    Towards the end of that paragraph,
4   actually at the very end of the paragraph we're
5   looking at, which is paragraph number 33.
6        A.    Yeah.
7        Q.    You added a statement:
8              "A finding that also could be
9   applied to similar fibers, such as fibrous talc."
10             You see that addition?
11       A.    Yes.
12       Q.    And that sentence now reads:
13             "This means that human exposure to
14  even very low levels of asbestos increase the risk
15  of toxic effects including cancer."
16             Then you added:
17             "A finding that also could be
18  applied to similar fibers, such as fibrous talc."
19             Do you see where I'm reading from?
20       A.    Yes.
21       Q.    Can you identify for me any written
22  authority for applying that same finding as to low
23  levels of asbestos to fibers, such as fibrous
24  talc?
```

Page 151

```
1        A.    So it would be based upon -- there's
2   a document that I've either used at trial or maybe
3   it's in my report here where the company
4   themselves recognizes that fibers of talc carry
5   the same type of hazard as asbestos does, and then
6   it's the -- it's general principle of toxicology
7   that knowing that what drives asbestos is the
8   shape.  It's the fibrous form of asbestos.
9              So other fibers would be expected to
10  have the same issue in terms of being carrying a
11  risk even at low levels of exposure because the
12  tissue can't handle the fiber.  That's the same
13  issue.  Asbestos fibers get into the tissue.  They
14  aren't degraded by the tissue or can't be based
15  upon they're too big for the macrophage to engulf.
16  Same thing with the talc fiber.
17       Q.    So other than what you recall as a
18  company document that makes reference to fibrous
19  talc in relation to asbestos, can you cite for me
20  any other written document that makes this same
21  statement that you have extended from very low
22  levels of asbestos to fibers, such as fibrous
23  talc?
24             MS. PARFITT:  Objection.
```

Page 152

```
1   Form.
2              THE WITNESS:  So it would be
3   my training and experience in toxicology.
4              And I'd also say this is
5   consistent, although it's making a
6   different point than IARC, but IARC
7   documents make the point that fibrous
8   forms of talc, asbestiform habit talc, is
9   a known human carcinogen just as asbestos
10  would be.
11             So I would start there, go to
12  the fact that the general principles of
13  toxicology would dictate that the
14  physical form is the issue.  And so at
15  very low levels of a physical form of
16  asbestos cause carcinogenicity, I would
17  expect there to be very low levels cause
18  it with talc.
19             I'm not saying they have the
20  exact same threshold if we could find
21  one, which we don't for either of these,
22  but it would be the same principle in
23  terms of health protection and -- and
24  risk, or hazard.
```

Page 153

```
1   BY MR. HEGARTY:
2        Q.    If we turn next to paragraph 37.
3   You added a couple of statements in this paragraph
4   directed at silica.  In particular, you added a
5   statement that referred to a few Johnson & Johnson
6   documents.  260573 through 5704, 260570, 260709.
7              Do you see where I'm reading from?
8        A.    I do.
9        Q.    Then towards the end of the
10  paragraph, you added the sentence:
11             "With respect to silica, levels also
12  appeared to vary across lots.  Like asbestos and
13  fibrous talc, silica is a known human carcinogen."
14             Do you see that?
15       A.    I do.
16       Q.    And with regard to silica and your
17  statement that it is a known human carcinogen,
18  what types of cancer has it been shown to cause?
19       A.    I'd have to pull the -- certainly it
20  has been shown to cause lung cancer.  I'd have to
21  pull out the -- to give you a complete list, I'd
22  have to pull the monograph out.
23             But the issue is, it's a hazard of
24  cancer, just like it's a hazard of cancer for
```

39 (Pages 150 to 153)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 154

1  these other fibrous or particle-like substances
2  within the -- so I'm using this in hazard in
3  notice. I'm not necessarily building a block for
4  general causation because I'm not doing that,
5  actually, but it's a different issue.
6          MR. HEGARTY: One of the
7      materials we were provided that we had
8      looked at earlier from Exhibit No. 9 is
9      what I'm marking as Exhibit No. 14.
10         (Document marked for
11      identification as Plunkett Exhibit 14.)
12         MR. HEGARTY: I only have one
13      copy. I'm sorry.
14  BY MR. HEGARTY:
15      Q.   What is that? What is Exhibit
16  No. 14?
17      A.   So this is the report on carcinogens
18  from 1998. So in the litigation, I've talked
19  about the RoC process for talc. Well, there was a
20  RoC process for silica, and so this was one of the
21  documents.
22          I've actually had this in my files
23  for a long time, but since I was filling out --
24  I'm sorry -- this section of my report with a

Page 155

1  little more detail, I added this one, too, because
2  I had this one already in my files. I pulled this
3  a while ago.
4      Q.    Okay. Do you recall reviewing any
5  published medical literature that has linked
6  exposure to silica to ovarian cancer risk?
7          MS. PARFITT: Objection.
8      Form.
9          THE WITNESS: I did not do a
10     specific assessment for only ovarian
11     cancer risk and silica, no.
12  BY MR. HEGARTY:
13      Q.    For the statements you've added to
14  your paragraph regarding silica, did you do any
15  assessment as it relates to dose levels of silica
16  that create any type of risk?
17          MS. PARFITT: Objection.
18      Form.
19          THE WITNESS: Are you asking
20     me about, did I try to determine if
21     there's a particular threshold within
22     talcum body powder that needs to be
23     reached, or are you just asking me
24     generally about dose-response? Because,

Page 156

1      for example, this document talks about
2      dose-response.
3  BY MR. HEGARTY:
4      Q.    I guess the -- the first question,
5  just generally whether in making the statement
6  that silica is a known human carcinogen whether
7  you did an assessment as far as what doses are
8  necessary for it to have carcinogenic effect.
9          MS. PARFITT: Objection.
10     Dr. Plunkett was examined with regard to
11     heavy metals and some of the other types
12     of minerals.
13         MR. HEGARTY: Right.
14         MS. PARFITT: You are correct.
15     Silica at that time was not examined.
16         MR. HEGARTY: Right.
17         MS. PARFITT: But I believe
18     her general explanation with regard to
19     all heavy metals and dosages and
20     thresholds and all of that was clearly
21     examined.
22         THE WITNESS: So the answer
23     to your question is, I did not do a
24     silica-specific ovarian cancer risk

Page 157

1      assessment. That's probably the best
2      answer to your question.
3          Again, my assessment for the
4      heavy metals, as well as silica, was
5      focusing on the issue of a complex
6      mixture of constituents that could have
7      additive effects when you talk about
8      cancer hazard and also even risk.
9          Because we know that in cancer
10     risk assessments, compounds that share
11     the same mechanism of action, which by
12     the way this one causes irritation,
13     chronic inflammatory responses, as a
14     plausible mechanism discussed for the
15     onset of cancer.
16  BY MR. HEGARTY:
17      Q.    You say that "silica levels also
18  appeared to vary across lots."
19          Are you talking about lots of
20  Johnson's Baby Powder?
21      A.    Yes, that's correct. And I
22  apologize. That would have been more precise to
23  say that. I should say lots of Johnson &
24  Johnson's Baby Powder as well as -- and what I

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 158

1    mean by that, also I would say even there's some
2    -- some data on the -- not the bottle of the
3    powder, but also the drums of the baby powder as
4    well.
5        Q.    When you referred to silica varying
6    across lots, did you make any assessment as to
7    whether the amount of silica in those lots was at
8    a dose capable of causing any type of cancer?
9            MS. PARFITT:  Objection.
10    Form.
11            THE WITNESS:  I didn't do a
12    dose analysis, no.  But what I did do was
13    look at and I'm aware of what the company
14    themselves, and there may be some of
15    these documents that I'm citing here
16    about levels of silica.  They may have
17    made that comment.
18            It's the idea that silica is
19    something that -- there are
20    specifications where you don't want
21    certain levels of silica in powder
22    products.
23            So there were even, I think,
24    within the specifications for Johnson &

Page 159

1        Johnson some issues about that.  Yet,
2    they still were detecting it at times in
3    certain product.
4    BY MR. HEGARTY:
5        Q.    You did not do an assessment as to
6    whether the amounts of silica that you have seen
7    reported in Johnson's Baby Powder lots are capable
8    of creating an ovarian cancer risk by themselves,
9    correct?
10            MS. PARFITT:  Objection.
11    Form.
12            THE WITNESS:  That is
13    correct.  Because my -- my issue on
14    ovarian cancer risk is driven by the
15    complex mixture, not just by individual
16    constituent.
17    BY MR. HEGARTY:
18        Q.    Okay.  If you would next turn to
19    paragraph 41.
20        A.    Okay.
21        Q.    Towards the end of that paragraph,
22    you make reference to findings of -- or let me
23    back up.
24            Towards the end of that paragraph,

Page 160

1    you make reference to Canadian government action
2    in 2007 as well as the risk assessment that Canada
3    did as it relates to talc in December 2018 and
4    April 2021.
5            Do you see that?
6        A.    I do.
7        Q.    Those additions?
8        A.    Yes.
9        Q.    What is your authority or source
10    document for the statements regarding the Canadian
11    government's findings in 2007?
12        A.    So that's at their website.  If you
13    go to the Hotlist for talc, you'll find that there
14    was an addition of a warning to the product that
15    was talked about in 2007.
16        Q.    Did that additional warning result
17    from a finding of toxicity with talc products?
18        A.    I'd have to go look at the site.
19            It had to do with the data and the
20    information about -- about talc products, yes,
21    about talc powder and lung toxicity, yes.  I
22    believe it had to do with these issues -- part of
23    it was related to the issues of not only the
24    infants, but more than that as well.

Page 161

1        Q.    But my question was or what I was
2    trying to get at was whether the warning as
3    relates to inhaling talc particles was limited to
4    asphyxiation?
5        A.    No, I don't think this one was.
6    Because this one is also related, I believe, to
7    the WHMIS Toxic TEA, which talks about lung
8    toxicity in workers.  So it's not just certainly
9    the infants were there, but it was the worker.  I
10    believe this has to do with the WHMIS as well.
11        Q.    Whatever the references would be or
12    citations would be reflected in the website that
13    you just referred me to, correct?
14        A.    Either looking at the WHMIS listing
15    for it or the -- I mean, if you search "talc" on
16    the Health Canada website, you can link to all
17    these pages and so that's where I went.  And there
18    are actions in 2007 that are reflected by these,
19    the statement I'm making.
20        Q.    And the reason I ask that was
21    because you don't include a citation after that
22    sentence.
23        A.    Oh.  So the citation that should be
24    there is the Health Canada website.  So I

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 162

1    apologize.  You noticed I tended to do that for
2    you, and that's one that should be there, yes.
3        Q.    Regarding the Health Canada risk
4    assessment that you describe here, again, you have
5    not had any communication with the Canadian
6    regulatory authority about talc or asbestos,
7    correct?
8        A.    That's correct.  I have dealt with
9    Health Canada before in other venues for other
10   compounds.  I'm very familiar with them, but not
11   with talc.  I haven't talked to them specifically.
12       Q.    And we'll talk about that just in a
13   moment.
14           Did you provide any of your expert
15   reports to Health Canada?
16       A.    No, I did not.
17       Q.    When you reviewed the Health Canada
18   risk assessment, did you note that it included in
19   its list of reliance materials expert reports from
20   litigation?
21       A.    In the final screening assessment?
22   It did.
23       Q.    Yes.
24       A.    That's correct.  The public --

Page 163

1    public was invited to submit and some of the
2    reports of both defense and plaintiff's experts in
3    litigation were submitted to the website or to the
4    docket.
5        Q.    Have you in any of your published
6    articles ever referenced to or cited litigation
7    reports?
8        A.    In my published articles?
9        Q.    Correct.
10       A.    I probably have not, no.  It doesn't
11   mean that I haven't seen it done by -- by -- other
12   regulatory authorities do do that because
13   everything that comes in must be listed as part of
14   the information they looked at.
15       Q.    And I was limiting my question to
16   just your published articles.
17           And you have not done so?
18       A.    No, I have not.
19       Q.    Can you cite for me to any risk --
20   to any written safety assessment from FDA where it
21   cited to expert reports from litigation?
22           MS. PARFITT:  Objection.
23   Form.
24           THE WITNESS:  That's

Page 164

1    something I'd have to do an analysis of.
2    It's very possible that in the broad FDA
3    world, for example, that that has
4    happened across different products and
5    different categories.  It's very
6    possible, but I haven't done that
7    analysis.
8            So I'd have to look to answer
9    that question.
10   BY MR. HEGARTY:
11       Q.    Are you aware of any written
12   assessment from any regulatory authority that has
13   cited to expert reports in litigation?
14           MS. PARFITT:  Objection.
15   Asked and answered.
16           THE WITNESS:  Any regulation?
17   You mean not just FDA?
18   BY MR. HEGARTY:
19       Q.    Any regulation, not just FDA.
20           MS. PARFITT:  Objection.
21           THE WITNESS:  I'd have to go
22   look.  I can't answer that without
23   looking.  I've never done that type of
24   analysis.

Page 165

1    BY MR. HEGARTY:
2        Q.    You are aware that IARC limits its
3    review to published medical literature, correct?
4        A.    Public --
5        Q.    Publicly available.
6            MS. PARFITT:  Objection.
7            THE WITNESS:  Publicly
8    available information.  That's correct.
9    BY MR. HEGARTY:
10       Q.    IARC would not consider expert
11   reports in litigation, correct?
12           MS. PARFITT:  Objection.
13   Form.
14           THE WITNESS:  It may.  It may
15   consider an expert report in litigation
16   in terms of the science cited that's
17   public, but no, I can't imagine that they
18   would rely on an expert report by itself
19   without digging all the way into the
20   science, which is what they do.  They go
21   to the -- the primary sources that have
22   been looked at.
23   BY MR. HEGARTY:
24       Q.    Have you ever advised a client as to

42 (Pages 162 to 165)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 166

1  an issue about a cosmetic based on an expert
2  report from litigation?
3           MS. PARFITT:  Objection.
4           THE WITNESS:  No.  It's never
5       come up in the clients I've worked with.
6  BY MR. HEGARTY:
7       Q.    Have you looked for any other
8  Canadian authorities that has come -- that have
9  come to a conclusion similar to Health Canada's
10 risk assessment?
11          MS. PARFITT:  Objection.
12          THE WITNESS:  For any
13      chemical in any?  I don't understand.
14 BY MR. HEGARTY:
15      Q.    No.  Let me restate the question.
16          With regard to Canada's risk
17 assessment on talc that came out in April of 2021,
18 have you looked for any other Canadian authorities
19 have cited to that or come to similar conclusions
20 as it relates to talcum powder products?
21          MS. PARFITT:  Objection.
22      Form.
23          THE WITNESS:  Well, there
24      would be no other Canadian authority that

Page 167

1       would do this.  You have to understand.
2       Health Canada is the FDA of Canada.  So
3       just like in the U.S., if you're talking
4       talcum powder products, the regulatory
5       authority would be FDA, and there it is
6       Health Canada.
7  BY MR. HEGARTY:
8       Q.    Do you consider yourself an expert
9  on the Canadian system for regulating cosmetics?
10          MS. PARFITT:  Objection.
11      Form.
12          THE WITNESS:  I do, yes.  I
13      have dealt with that with my clients, and
14      that's one of the reasons that when I
15      talk to you about all dimension worldwide
16      authority, I do more than cosmetics just
17      in the U.S.
18 BY MR. HEGARTY:
19      Q.    Under Canada's regulatory system,
20 can Health Canada require a warning on a cosmetic?
21          MS. PARFITT:  Objection.
22          THE WITNESS:  They can
23      through this type of rulemaking.  So they
24      have to do these kinds of assessments

Page 168

1       where they can go and they'll put --
2       that's what they have done with the --
3       that's what they did back in 2007, I
4       believe, where they also talked about
5       putting it onto the labeling.
6  BY MR. HEGARTY:
7       Q.    Is there a Canadian regulation that
8  defines the warning standard for cosmetics?
9       A.    Not in the exact same way as in the
10 U.S.  Do you want me to explain?
11      Q.    Sure.
12      A.    Because it's a long explanation
13 but --
14      Q.    Well, when you say "long
15 explanation," can you give me an estimate of how
16 long it will take?
17      A.    It will take me a couple of minutes.
18      Q.    Okay.  Well, let me just -- let's
19 stick with my question.
20      A.    Okay.
21      Q.    Is there a Canadian regulation that
22 defines the standard for warning for cosmetics?
23      A.    It does, but it's not the exact
24 same.  It's not directly analogous to the U.S.,

Page 169

1  the way the regulations in the U.S. are laid out,
2  and that's what why I'm saying.  I would need to
3  explain to you, but they do have a standard.  It's
4  just not where I can go, like I can to 740.1,
5  and find it so concisely stated.  That's what I'm
6  telling you.
7       Q.    What would be the regulation
8  citation where you would go to look?
9       A.    So it would be looking at the law
10 first.  So in Canada, under cosmetics, there is a
11 -- there's a food drug law.  Then there's a
12 cosmetics regulation that was established back in
13 the 1980s.  And within those, when you read them,
14 you will find there is a discussion of what the
15 standard is in terms of regulating the cosmetics.
16          They have very similar standard.
17 Premarket safety assessment.  It has to be safe
18 before it's marketed.  And they also require that
19 information be provided in the label that informs
20 the consumers of the hazards of the product.  So
21 it's a hazard standard, just like it is in the
22 U.S.
23          But you don't get it in the same
24 way.  Again, it's not as -- that's the problem is

43 (Pages 166 to 169)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 170

1    it's not as -- it's not laid out in quite the same
2    way because their regulatory system and their
3    regulations aren't laid out in the same way ours
4    are.
5         However, you can go and find
6    statements on their website for different
7    chemicals where they talk about the process. They
8    go through it, and it's exactly the same basic
9    process in terms of a hazard standard, a
10   possibility standard, not -- for cosmetics and
11   those types of ingredients, not like a drug
12   standard where there's -- they do risk-benefit
13   weighting there just like they do in the U.S.
14        Q.    Is there a numerical -- is there a
15   regulation that you can cite to?
16        A.    I can, but not off the top of my
17   head.  So I have those in my files.  If you're
18   interested in that, I'd have to pull.  I have a
19   file at home on cosmetic regulations in Canada
20   and, yes, there's citations I can give you.
21        Q.    Has Canada mandated an ovarian
22   cancer warning on talc for perineal use?
23        A.    It's in the process of developing
24   their recommendations that will go onto the

Page 171

1    Hotlist.  So there will be, I believe, just like
2    you see currently for the -- for the regulation,
3    the warnings that they're going to ask or the risk
4    mitigation processes that they're going to put in
5    place.  And some of that is already on the Health
6    Canada's website.
7         So it's what Health Canada does
8    rather than what the company does, but I do
9    believe there's going to be something that will
10   happen.  It just hasn't happened yet, and that's
11   because this risk assessment screening assessment
12   just came out, and it's going to take time.
13        And I think if you listened -- when
14   I went on and listened to that -- the reason I
15   went to that press release to listen to what they
16   were saying, they discuss that issue.  How they
17   are -- there's going to be actions taken as far as
18   changes to the Hotlist for this particular issue,
19   and you'll notice that the consumer-facing page --
20   in the last trial we showed that -- is different.
21        Q.    So is it your understanding that the
22   Health Canada will actually mandate that talcum
23   powder products contain a warning about ovarian
24   cancer for perineal use?

Page 172

1              MS. PARFITT:  Objection.
2    Form.
3              THE WITNESS:  They may.  We
4    just don't know.  That's what I'm saying
5    to you.  I don't know yet.  That's what
6    they're in the process of doing.
7         They also may ban it.  It's
8    possible they could decide to ban it
9    for -- for use.
10        And then you also have the
11   issue of the product is no longer being
12   sold in Canada, just like it isn't being
13   sold here.  So that may impact the
14   actions Canada takes as well.  I don't
15   know.  You'd have to talk to the
16   regulator to ask them that.
17   BY MR. HEGARTY:
18        Q.    You agree, though, that the Health
19   Canada risk assessment is not just limited to body
20   powders, correct?
21        A.    No.  It discusses -- in fact, if you
22   read their website, it talks about all the
23   different places, other types of personal care
24   products -- and I realize I'm talking really

Page 173

1    fast -- that this could apply to, and so it's not
2    just body powders.  That is correct.
3         Q.    But from your understanding so far
4    as it relates to a manufacturer of a product
5    containing talcum powder products, there's been no
6    mandate or requirement to take any action,
7    correct?
8              MS. PARFITT:  Objection.
9    Form.
10   BY MR. HEGARTY:
11        Q.    From Health Canada.
12             MS. PARFITT:  Objection.
13   Form.
14             THE WITNESS:  At this point
15   in time, they have not mandated a
16   specific language for a label.  That is
17   correct.  They have put on notice
18   companies to understand what their
19   opinion is, but you're correct.
20        The next step is to see what
21   actions they will take for risk
22   mitigation.  That's what they call it
23   there.  That next step is risk
24   mitigation: labeling, banning from a

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 174

1    product, limiting the percentage
2    potentially. There's a number of actions
3    they could take to mitigate the risk.
4  BY MR. HEGARTY:
5    Q.    Have you ever published an article
6  where you referred to a safety assessment finding
7  by Health Canada?
8        MS. PARFITT: Objection.
9    Form.
10        THE WITNESS: I don't think
11    I've published an article, but I have
12    seen that in other peer-reviewed
13    publications where others that I know
14    or -- well, other articles I have seen
15    cite to Health Canada screening risk
16    assessments, yes.
17  BY MR. HEGARTY:
18    Q.    Have you ever lectured to a medical
19  or scientific group where you have discussed
20  Canadian regulation of cosmetics?
21    A.    Sorry. Your question?
22    Q.    Sure.
23        Have you ever lectured to a medical
24  or scientific group where you have discussed

Page 175

1  Canadian regulation of cosmetics?
2    A.    No. I have talked to students about
3  it, but not to a -- not like a presentation at a
4  scientific meeting. No, I have not done that.
5    Q.    Have you ever interacted directly
6  with Health Canada regarding a cosmetic?
7        MS. PARFITT: Objection.
8    Form.
9        THE WITNESS: Not a finished
10    product, no, but ingredients that I know
11    can be used in cosmetics, yes.
12  BY MR. HEGARTY:
13    Q.    Have you ever been involved in a
14  Health Canada safety assessment for any cosmetic
15  or cosmetic ingredient?
16    A.    No, I have not been. By that I
17  would think you would -- you're meaning performing
18  the assessment or submitting comments?
19    Q.    Right.
20        Any type of assessment that Health
21  Canada has done for a cosmetic or cosmetic
22  ingredient. Along the lines you just talked
23  about. Whether you provided materials. You
24  provided comment. You were some way involved.

Page 176

1    A.    Not for --
2        MS. PARFITT: Objection.
3        THE WITNESS: Not that I can
4    recall for a cosmetic for sure. Cosmetic
5    ingredients, possible. I'd have to think
6    back. I don't -- I don't recall
7    something off the top of my head, but I
8    have done that before for ingredients
9    that are used in cosmetics.
10  BY MR. HEGARTY:
11    Q.    Have you ever advised clients about
12  Canadian regulations for warnings on a cosmetic?
13        MS. PARFITT: Objection.
14    Form.
15        THE WITNESS: In general
16    terms, yes. I've never told them what to
17    put on their product, but I -- for
18    example, some of the work that I do where
19    I told you I've been working with someone
20    who's an ingredient supplier, I deal with
21    Canadian compliance, EU compliance, U.S.
22    compliance, Japanese compliance, as well
23    as other worldwide authorities.
24  BY MR. HEGARTY:

Page 177

1    Q.    Did you assess for purposes of your
2  MDL report the strengths and weaknesses of the
3  Canadian final risk assessment --
4    A.    Yes.
5    Q.    -- for talc?
6    A.    For the amended report?
7    Q.    Yes.
8    A.    Yes, I did do that.
9    Q.    What are the weaknesses? What
10  weaknesses did you find with regard to that final
11  risk assessment?
12        MS. PARFITT: Objection.
13    Form.
14        THE WITNESS: So I can't --
15    I'm not going to -- I don't think I have
16    a particular weakness.
17        I actually found that the
18    assessment was consistent with the type
19    of assessment that I did and it was --
20    appeared to be including all of the
21    relevant articles that I would expect to
22    see.
23        They discuss some limitations
24    of their own or weaknesses in their own

45 (Pages 174 to 177)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 178

1    assessment, and so maybe I would just
2    point you to that.
3        I mean, consistent with a high
4    quality assessment, you should discuss
5    like that that you did. In a regulatory
6    body, you have to lay out your strengths
7    and weaknesses for transparency purposes,
8    and so it was there.
9        I didn't find any particular
10   weakness that I would point to to say
11   that there's a reason I would discount
12   something they did, but certainly I did
13   consider that when I looked at -- at it.
14           MR. HEGARTY: Can we go ahead
15   and take a quick break? We've been going
16   a little while.
17           MS. PARFITT: Yes.
18           (Recess: 11:59 a.m. -
19           12:15 p.m.)
20           MR. HEGARTY: Back on the
21   record.
22   BY MR. HEGARTY:
23   Q.    Dr. Plunkett, the next paragraph I
24   want to talk about is paragraph 72 of your report.

Page 179

1        In this part of your report, you
2    discuss the O'Brien study, correct?
3    A.    Yes, that's correct.
4    Q.    And what are the strengths and
5    weaknesses of the O'Brien study, in your opinion?
6    A.    So the -- the strengths and
7    weaknesses of the O'Brien study -- and if you want
8    all of them, I'm going to need to pull it out, but
9    essentially --
10           MR. HEGARTY: I have a copy of
11   the O'Brien study --
12           THE WITNESS: Okay.
13           MR. HEGARTY: -- that I'll
14   mark as Exhibit No. 15.
15           (Document marked for
16   identification as Plunkett Exhibit 15.)
17           MS. PARFITT: Thank you. Got
18   it.
19           THE WITNESS: Go ahead. I'm
20   sorry.
21   BY MR. HEGARTY:
22   Q.    I'm ready whenever you're ready.
23   A.    Yeah. Okay. So the strengths of
24   the O'Brien study is that it is a -- it is an

Page 180

1    analysis that's pooling across studies of the same
2    type. These are the cohort studies.
3        And another I think an advantage to
4    this study is they did look at the data in terms
5    of people with a patent reproductive tract versus
6    someone who doesn't have a reproductive tract that
7    would enable talc to travel up the -- up towards
8    the fallopian tubes or the ovaries. So that's
9    definitely a strength of it.
10       The weaknesses of this are similar
11   to the weaknesses of some of the individual
12   studies in that we, unfortunately, still have
13   limited data on when people were exposed and for
14   how long. Not for all the studies.
15       We have some better data in some
16   studies, but the Nurses' Health Study -- that's
17   one of those studies that we can keep going back
18   to that is a big part of this -- is a study that
19   was not designed to look at the relationship
20   between talc and ovarian cancer. And as a result,
21   the question that was asked was asked at a time
22   period and then that frequent -- that duration of
23   exposure was never tied down.
24       So those are the same kind of basic.

Page 181

1    The things that existed within the studies that
2    are used in the analysis are still there. So
3    those weaknesses are still there. It can't be
4    corrected based upon the analysis they've done.
5        But I think to me a strength of it
6    is the fact that they did focus in on this issue
7    of patent versus nonpatent reproductive tracts,
8    and that's what I talk about a little bit. I
9    think that's -- do I mention that? I think I talk
10   about that in my -- in this paragraph that I added
11   it.
12       And I added this study in this
13   paragraph just because this is new. So I did try
14   to update with some of the newer. Because you
15   know I mention -- I try to mention the available
16   epidemiological data, and so that's why this was
17   added.
18   Q.    Any other strengths and
19   weaknesses --
20           MS. PARFITT: Objection.
21   BY MR. HEGARTY:
22   Q.    -- that we haven't talked about?
23   A.    No, and I would point you to the
24   paper itself where they discuss their strengths

46 (Pages 178 to 181)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 182

1  and weaknesses there, and things I've said before
2  generally about -- about some of the individual
3  studies that are part of this.
4          Q.    Do you agree the O'Brien study was
5  sufficiently powered to identify a 1.3 relative
6  risk if it exists?
7          MS. PARFITT:  Objection.
8  Form.  For what?  Patent, not patent?
9          MR. HEGARTY:  Between -- well,
10         let me ask it.  Let me rephrase it.
11 BY MR. HEGARTY:
12         Q.    Do you agree that the O'Brien study
13 was sufficiently powered to identify a 1.3
14 relative risk between every use of body powder and
15 ovarian cancer risk if it exists?
16         MS. PARFITT:  Are you speaking
17         with regard to patent tubes?
18         MR. HEGARTY:  No.  Just the
19         overall conclusion of the study, just as
20         I said in my -- inn my question.
21         MS. PARFITT:  Objection.
22         THE WITNESS:  I have formed
23         the opinion that it was underpowered to
24         do that or overpowered.  I relied on what

Page 183

1          the authors themselves said in terms of
2          how they designed the study and what they
3          looked at.
4              So I don't have a criticism
5          that it was -- that it was underpowered
6          to do that.  Although the biggest
7          criticisms of these studies is that none
8          of them were designed to look at it and,
9          as a result, don't have sufficient
10         information, in my view, on exposure to
11         be able to say that you can definitively
12         say whatever use or -- ever use versus
13         never use really was in the individuals
14         and how long that went on.
15 BY MR. HEGARTY:
16         Q.    You're referring in this part of
17 your report to the subgroup analysis on women with
18 patent tubes.
19             You agree that the O'Brien study
20 came to an overall conclusion with regard to body
21 powder use in the genital area in the incidence of
22 ovarian cancer, correct?
23         MS. PARFITT:  Objection.
24         Misstates the article and the

Page 184

1          conclusions.
2          THE WITNESS:  Can you ask it
3          again?
4  BY MR. HEGARTY:
5          Q.    Sure.
6          A.    Can you read the question again?
7          Q.    The conclusion and relevance in the
8  paper itself says that:
9              "In this analysis of pooled data
10 from women in four U.S. cohorts, there was not a
11 statistically significant association between use
12 of powder in the genital area and incidence of
13 ovarian cancer.  However, the study may have been
14 underpowered to identify a small increase in
15 risk."
16             Did I read that correctly?
17         A.    You did exactly.
18         Q.    Do you state that conclusion
19 anywhere in your report?
20         MS. PARFITT:  Objection.
21         Misstates not only her report, but the
22         conclusions in the study and data in the
23         study.
24         THE WITNESS:  So I don't -- I

Page 185

1          do not quote the sentences, if that's
2          what you're asking me.  I think that's
3          what you're asking me.
4  BY MR. HEGARTY:
5          Q.    Well --
6          A.    But I do think -- go ahead.
7          Q.    I don't -- let me just restate my
8  question.  We don't -- don't get off-track.  I'm
9  not asking whether you quoted it.
10             I'm asking:  Do you include the
11 conclusion or reference to the conclusion about
12 there not being "a statistically significant
13 association between use of powder in the genital
14 area and the incidence of ovarian cancer," that
15 part of the report anywhere in your MDL report?
16         MS. PARFITT:  Objection.
17         Form.
18         THE WITNESS:  Well, I think I
19         do in my report.  I mean, I -- I'm
20         looking at the exact language I used in
21         my report about this study, but I think
22         if you read what I have -- what I have
23         written about the study and then read
24         the quote I did pull out.

47 (Pages 182 to 185)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 186

1    Because there were some
2  criticisms or some comments or letters to
3  the editor about the study where O'Brien
4  actually responds to questions asked
5  about the fact that there may have been a
6  lack of statistical significance within
7  some parts of the study in terms of what
8  was found.
9    But to me, as I have stated, I
10  think the study shows that there, indeed,
11  is within the women with a patent
12  reproductive tract a statistically
13  significant increased finding.
14    I don't know what else to tell
15  you.  I'd say I'd refer you to my
16  paragraph where I attempted to, I think,
17  give an accurate reflection of what the
18  study is.
19  BY MR. HEGARTY:
20    Q.    If you turn over to the Discussion
21  section on page 56, do you agree with the
22  statement, the first statement that "In this
23  pooled analysis of four large U.S. cohorts, there
24  was no statistically significant association

Page 187

1  between self-reported use of powder in the genital
2  area and risk of ovarian cancer"?
3    MS. PARFITT:  Objection.
4    Asked and answered.  She said that's what
5    it says, but she did not say she agreed.
6  BY MR. HEGARTY:
7    Q.    Do you agree that that's -- that
8  sentence describes what the study found?
9    MS. PARFITT:  Objection.
10    Misstates the study results and data.
11  BY MR. HEGARTY:
12    Q.    You can answer.
13    A.    So I -- my first answer was going to
14  be, you have read that correctly.  I agree that
15  that statement is there.
16    But as I have stated in my -- in my
17  report, I believe that there is statistically
18  significant findings that inform on this
19  association between use of genital talc and risk
20  of ovarian cancer.
21    But I don't disagree with you that
22  that's -- this sentence is absolutely there.  I
23  see that sentence.
24    Q.    Does that sentence accurately apply

Page 188

1  without regard to the -- would apply to the
2  overall look at the cases and controls --
3    MS. PARFITT:  Objection.
4    Form.
5  BY MR. HEGARTY:
6    Q.    -- as opposed to looking at a
7  subgroup analysis?
8    MS. PARFITT:  Objection.
9    Form.  Misstates the data.
10  BY MR. HEGARTY:
11    Q.    You can answer.
12    MS. PARFITT:  And study
13    results.  Go ahead.
14    THE WITNESS:  Okay.
15    So, again, I think the best
16    way to answer that is to point you to
17    what Dr. O'Brien herself says or himself
18    says -- it's a her I think -- says about
19    it in response to Dr. Harlow.
20    Because I think she's pointing
21    out that the data is consistent with
22    the -- with their hypothesis.  The data
23    they have is consistent with the
24    hypothesis and it doesn't say that

Page 189

1  there's no risk.
2    But I don't disagree with you.
3  They have described it with that
4  sentence.  I agree that's there.
5    I think, however, the study
6  provides important evidence that adds to
7  the weight of the evidence that there,
8  indeed, is a repeated signal, repeated
9  finding of an increased risk of ovarian
10  cancer in women that use talc genitally.
11  BY MR. HEGARTY:
12    Q.    Do you agree with the next sentence
13  in that section that we're looking at as a finding
14  from this study that "There was no clear
15  dose-response transfer duration and frequency of
16  powder use in the genital area in relation to
17  ovarian cancer risk"?
18    MS. PARFITT:  Objection.
19    Misstates the data.
20    THE WITNESS:  So I agree that
21    you have read that correctly, and I would
22    say in response to that that I don't
23    think that's an accurate reflection of
24    the weaknesses of the study.

48 (Pages 186 to 189)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 190

1  In other words, I've already
2  told you that they themselves talk about
3  the fact that they don't have the data on
4  frequency and duration on all of them.
5  So if they don't have it, obviously then
6  you're not going to be able to find it,
7  right?
8  So I think I understand why
9  they have written this sentence, but I
10  think there if you go further into the
11  paper, they actually talk about these
12  particular issues about the fact that
13  they don't -- they don't have that
14  information on duration.
15  BY MR. HEGARTY:
16  Q.    With regard to the subgroup analysis
17  on women with patent and nonpatent tubes, does the
18  paper identify data on the age of the women at the
19  time they had the tubal ligation or where their
20  tubes became nonpatent?
21  MS. PARFITT:  Objection.
22  Form.
23  THE WITNESS:  I don't believe
24  it does, but let me look if they were

Page 191

1  able to get that.
2  (Reviews document.)
3  I don't believe they had that
4  information because I think they're
5  saying here that it was not recorded.  So
6  they don't have that information for
7  everything.
8  Is that what you're asking me?
9  BY MR. HEGARTY:
10  Q.    Yes.
11  A.    If it was done post their entry into
12  the study.  So if they had -- they had -- they
13  have that data for individuals as they enter the
14  study, but are you asking me -- but they don't
15  have complete information based on what they're
16  saying here.
17  Is that what you're asking me?
18  Q.    My question:  Does it identify the
19  age at which the women -- women's tubes became
20  nonpatent as to that group?
21  MS. PARFITT:  Objection.
22  Form.
23  THE WITNESS:  I imagine you
24  could get that if you went to the records

Page 192

1  that are in the study, but I don't know.
2  They don't -- they don't comment on that.
3  So I can't answer that.  I can't answer
4  that for you.
5  BY MR. HEGARTY:
6  Q.    Does the paper identify the extent
7  of exposure to talcum or body powder at the time
8  they had the tubal ligation or other procedure
9  where their tubes became nonpatent?
10  A.    In answer to that, I'd have to dig
11  into their records.  I don't know.  I don't recall
12  that being stated in here, but I don't.  You want
13  me to read it and look?  I can't answer that
14  without looking.
15  Q.    Well, do you recall sitting here
16  today one way or the other?
17  A.    I don't recall looking for that
18  information.  So I don't recall that, no.
19  Q.    Did women who had nonpatent tubes
20  have enough exposure to baby powder prior to their
21  tubes becoming nonpatent to increase their risk of
22  ovarian cancer, in your opinion?
23  MS. PARFITT:  Objection.
24  THE WITNESS:  I haven't

Page 193

1  formed that opinion one way or the other.
2  BY MR. HEGARTY:
3  Q.    Does the paper identify the
4  difference in exposure history to talcum or body
5  powder between the women with and without a tubal
6  ligation at the time they had the procedure where
7  their tubes became nonpatent?
8  A.    I'll have to look to answer that
9  question.  I didn't attempt to look for the answer
10  to that question when I was reviewing the paper.
11  Q.    Did you review the editorial comment
12  by Gossett published at the time of O'Brien?
13  A.    Was it -- if it was within the
14  comments at the same time that Harlow's comments
15  were given -- I think there were several -- then I
16  may have.  If it's in a different edition or a
17  different -- if it's in a different time, then I
18  don't know.  I'd have to see it.
19  MR. HEGARTY:  Let me mark as
20  Exhibit No. 16 the Gossett --
21  MS. PARFITT:  Thank you.
22  MR. HEGARTY:  -- editorial
23  that was published in JAMA January 7,
24  2020.

49 (Pages 190 to 193)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 194

1          (Document marked for
2     identification as Plunkett Exhibit 16.)
3     BY MR. HEGARTY:
4          Q.    Can you tell me whether you had
5     reviewed this at the same time you reviewed the
6     O'Brien study?
7          A.    I will try to answer that for you.
8     I'm looking at something that I can find in my --
9     (reviews document.)
10         I believe I've seen this before.  I
11    don't know that it -- this was not part of the --
12    the letters to the editor.  So this is a different
13    document.  So I believe this was published maybe
14    not in the same -- I don't know if it's published
15    in the same one.  Let me look and see.
16         Q.    It was published in the --
17         A.    That's what I --
18         Q.    -- same volume as the O'Brien
19    article?
20         A.    Right.  But it was not -- it was not
21    something that was in the back like the Harlow
22    comments is what I'm saying.
23         Q.    Correct.
24         A.    Yes, exactly.  So I have seen this

Page 195

1     before, yes.  If that's what you're asking me?
2          Q.    Yes.
3               And did you --
4          A.    Yes, I have seen it before.
5          Q.    I saw it -- strike that.
6               My review of your amended report
7     doesn't show that you reference this Gossett
8     editorial; is that correct?
9          A.    I do not reference this in the -- in
10    the body of my report.  That is correct.
11         Q.    But you had read it at the time that
12    you prepared your amended report, correct?
13         A.    I read it when I retrieved the
14    information on the O'Brien article, yes.  I can't
15    tell you exactly when I read it, but I did, yes.
16         Q.    Do you know Dr. Gossett?
17         A.    No, I don't believe I do.
18         Q.    Do you know Dr. del Carmen?
19         A.    No, I do not.
20         Q.    Do you know their qualifications?
21         A.    Only by what they list here.
22         Q.    Okay.
23         A.    I could tell you based on the paper,
24    but I don't know them specifically.  I have no

Page 196

1     personal knowledge of any of that.
2          Q.    Do you have any criticisms of
3     Exhibit No. 16?
4               MS. PARFITT:  Objection.
5          Form.
6               THE WITNESS:  I haven't
7          formed an opinion based on this document
8          at this point in time.
9     BY MR. HEGARTY:
10         Q.    If you look over at Exhibit No. 16
11    page 30?
12         A.    Okay.  I'm there.
13         Q.    The first full paragraph beginning
14    with the word "Given."
15              Do you see that paragraph?
16         A.    Yes.
17         Q.    This paragraph relates to the
18    subject area of patent tubes, and it says:
19              "Given this punitive mechanism of
20    exposure, the subgroup analysis of women with
21    patent reproductive tracts is of particular
22    interest.  However, it is not possible to equate a
23    patent reproductive tract with exposure in a
24    nonpatent reproductive tract with non-exposure."

Page 197

1               Do you agree with that sentence?
2               MS. PARFITT:  Objection.
3          Dr. Plunkett has indicated that she not
4          only did not cite this as a reference,
5          but had not digested the article and had
6          no opinions with regard to its context.
7               THE WITNESS:  Well, I mean,
8          I've seen -- you have read that statement
9          correctly.  I see it.
10    BY MR. HEGARTY:
11         Q.    Do you agree with that statement?
12         A.    That -- are you asking me do I agree
13    with whether or not you can't equate the two
14    generally or are you asking me about --
15         Q.    Yes.
16         A.    -- their study?
17         Q.    I am asking you:  It is not possible
18    -- is it correct that it is not possible in this
19    study to equate a patent reproductive tract with
20    exposure and a nonpatent reproductive tract with
21    non-exposure?
22              MS. PARFITT:  Objection.
23              THE WITNESS:  I think that
24         would be highly dependent on the

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 198

1    information you had. I think it's -- I
2    certainly think the patent versus
3    nonpatent is important in terms of
4    biologic mechanism that we believe it has
5    to get there, but I don't -- I don't know
6    that I can answer that -- that question
7    that I agree or disagree simply because I
8    think there's more to it than that.
9         The sentence is not saying --
10   I don't think it's saying quite how
11   you're -- you're stating it. I think
12   it's -- I think he's -- I think it's you
13   have to read that in conjunction with the
14   rest that's in the paragraph.
15   BY MR. HEGARTY:
16     Q.   Well, the next sentence says:
17       "Women who undergo tubal ligation or
18   hysterectomy (nonpatent) and use powders in the
19   genital area cannot be assumed to have started
20   using them only after their surgeries."
21       Do you agree with that statement?
22      MS. PARFITT: Objection.
23   Form.
24      THE WITNESS: I haven't

Page 199

1    looked at their data. So I can't --
2    that's why I said to you. I'd have to go
3    look at the data to know if they have
4    that or not. I can't answer that.
5   BY MR. HEGARTY:
6     Q.   If you continue down in that
7   paragraph, it says:
8      "The fact that there are no
9   significant differences in the HRs in the patent
10   and nonpatent groups where they list HR 1.13 and
11   HR .99, P value for heterogeneity comparing these
12   subgroups of .15 confirms the overall conclusion
13   that there is no demonstrable statistically
14   significant association between use of powder in
15   the genital area and ovarian cancer risk."
16      Do you see the sentence I'm reading
17   from?
18     A.   You've read that correctly, and I
19   disagree based on what they -- the authors
20   themselves say about -- about their findings on
21   page 53 of my report.
22     Q.   Well, that sentence is saying that
23   if you do a test for heterogeneity between the HRs
24   for the group with patent tubes and the HR for the

Page 200

1   group with nonpatent tubes, you find that there
2   are no statistical difference between the two,
3   correct?
4      MS. PARFITT: Objection.
5   Misstates her testimony.
6      THE WITNESS: I agree -- if
7   you're asking me do I agree that that is
8   written there? I absolutely do.
9      What I'm saying to you is, I
10   disagree that that's what the authors
11   themselves feel about their data. That's
12   all I'm saying to you.
13      I think that they're saying if
14   you read what -- read this response to
15   Dr. Harlow, they talk about it. They
16   talk about what their findings are.
17      They talk about the fact that
18   the findings are not -- may not all be
19   equally important and that there was,
20   indeed, the positive association is
21   consistent with the hypothesis that
22   there's an association, which is
23   different than using this study to draw
24   an overall conclusion.

Page 201

1      I don't think the authors are
2   doing that. I don't do that. No one
3   should do that. You should look across
4   all the data.
5   BY MR. HEGARTY:
6     Q.   Do you agree a P value for
7   heterogeneity of .15 means that there is no
8   heterogeneity between the groups?
9      MS. PARFITT: Objection.
10   Misstates the article. Misstates the
11   science. Misstates --
12   BY MR. HEGARTY:
13     Q.   You can answer.
14      MS. PARFITT: -- her
15   testimony.
16      THE WITNESS: If you're
17   asking me simply as a general premise, if
18   you had a P value of .15, what conclusion
19   would you draw? Is that what you're
20   asking me?
21   BY MR. HEGARTY:
22     Q.   Yes.
23     A.   Okay. By that, I would say that I
24   have seen that conclusion drawn with those types

51 (Pages 198 to 201)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 202

1    of values.
2        I'm saying to you, however, that's a
3    different question than what the actual -- the
4    actual authors draw about the conclusions --
5        Q.    Right.
6        A.    -- of their study.
7        Q.    And my question is simply as a
8    matter of epidemiological statistical analysis.
9        And you're familiar with statistical
10    analysis for epidemiologic studies, correct?
11        A.    Yes, I am.
12        Q.    And you agree when you compare two
13    HRs statistically and there is a test for
14    heterogeneity that comes out that's not
15    statistically significant, you can't say the two
16    values are different --
17        MS. PARFITT: Objection.
18    BY MR. HEGARTY:
19        Q.    -- correct?
20        MS. PARFITT: Objection.
21    Misstates her testimony.
22        THE WITNESS: So I think that
23    depends. I mean, on that question, if
24    you want to go that specific to -- to

Page 203

1    this data, I would point to the
2    epidemiologists in these cases, which are
3    going to deal with these issues.
4        I'm just -- I answered the
5    general premise question to you to tell
6    you my experience. I understand what
7    these tests are used for. So as a
8    general premise, I can see that done.
9        I am saying to you, however,
10    that I don't think it's a simplistic
11    saying that that one value is what should
12    drive your overall conclusions for the
13    study, and I think that's what is
14    consistent with what the authors
15    themselves are saying.
16    BY MR. HEGARTY:
17        Q.    If we continue in that paragraph, it
18    says:
19        "The subgroup analysis suggesting
20    that women with intact reproductive tracts who use
21    powder in the perineal area developed ovarian
22    cancer more frequently than nonusers is below the
23    effect size that epidemiologists generally
24    consider important and should not be selectively

Page 204

1    highlighted by the statistically unsophisticated
2    reader as evidence of a relationship."
3        Did I read that correctly?
4        A.    I'm looking where you are. I
5    apologize. I lost you. So...
6        Q.    All right.
7        A.    Oh, here it is. Okay. I'm sorry.
8        You did read that correctly. Yes, I
9    do see that line.
10        Q.    Okay. Do you agree with that
11    statement?
12        MS. PARFITT: Objection.
13    Misstates her testimony.
14        THE WITNESS: I haven't
15    formed an opinion one way or the other on
16    this statement. As I told you, I have
17    not formed any opinions on this paper at
18    this point in time.
19    BY MR. HEGARTY:
20        Q.    And why was it that you chose not to
21    cite the Gossett study within your amended MDL
22    report?
23        MS. PARFITT: Objection.
24    Form.

Page 205

1        THE WITNESS: No particular
2    reason where I -- I can't tell you that I
3    have a particular reason for this was not
4    cited. I can tell you what I did cite,
5    which is what I believe to be
6    appropriate, which would be the authors'
7    own conclusions about their own findings.
8        And, again, it's -- it's how
9    when you do weight of the evidence, you
10    look at each individual piece of
11    information on its own and draw
12    conclusions based upon what that author
13    says about their own work.
14        And then you put that into an
15    analysis of what I as a scientist --
16    conclusions I will draw or would draw
17    based upon what I see in that -- in that
18    data.
19    BY MR. HEGARTY:
20        Q.    You don't know whether any of the
21    plaintiffs that were -- that were -- that are part
22    of the cases we're looking at, the MDL plaintiffs
23    or the Swann plaintiffs have patent or nonpatent
24    tubes, do you?

52 (Pages 202 to 205)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 206

1          MS. PARFITT: Objection. It's
2    a case-specific question and Dr. Plunkett
3    is not here to give opinions on
4    case-specific issues.
5          THE WITNESS:  I am -- I'm not
6    case-specific.
7          MS. PARFITT: Objection.
8          THE WITNESS:  So I can't
9    answer that question for any of the
10   individual plaintiffs in this case.
11   BY MR. HEGARTY:
12      Q.    If you would turn next to paragraph
13   75 in your report.
14          In that paragraph, you talk about
15   the Taher study, correct?
16      A.    Somewhere here I think I do.  Are
17   you -- are you -- you're further back in time,
18   though.  You're paragraph 104?
19          MS. PARFITT:  Paragraph 75.
20   BY MR. HEGARTY:
21      Q.    I'm sorry.  Paragraph 75.
22      A.    75.  Oh, I'm sorry.
23      Q.    Toward the end, you include an
24   analysis in this paragraph about the Taher study,

Page 207

1    correct?
2      A.    Yes, I do.  I talk about it down
3    here.
4          MR. HEGARTY:  I'll mark as
5    Exhibit 17 the Taher paper.
6          (Document marked for
7    identification purposes as Plunkett
8    Exhibit 17.)
9    BY MR. HEGARTY:
10      Q.    First of all, Health Canada relied
11   on this paper as part of the making its risk
12   assessment, correct?
13          MS. PARFITT: Objection.
14   Form.
15          THE WITNESS:  It certainly
16   referred to this paper as part of the
17   work that they did, yes.  They made
18   their -- Health Canada took this and then
19   they -- they developed their own
20   screening assessment outside of just this
21   paper.
22   BY MR. HEGARTY:
23      Q.    Do you agree with the Taher analysis
24   as set out in Exhibit No. 17?

Page 208

1          MS. PARFITT: Objection.
2    Form.  Broad.
3          THE WITNESS:  I don't know
4    quite what you mean by --
5          MS. PARFITT:  The analysis?
6          THE WITNESS:  I don't know
7    quite what you mean, other than I think I
8    can tell you that I did cite to it.  It's
9    part of my weight of the evidence.
10          Are you asking me something
11   else?
12   BY MR. HEGARTY:
13      Q.    Well, do you agree with the way that
14   Taher analyzed the data to come to its
15   conclusions?
16          MS. PARFITT: Objection.
17   Form.
18          THE WITNESS:  Well, I don't
19   disagree with his method.
20   BY MR. HEGARTY:
21      Q.    Okay.
22      A.    I mean, he's done a different.  I
23   mean, I'm very familiar who this group is.  I
24   actually know Dr. Krewski, Dr. Krishnan, and

Page 209

1    Dr. Madison to some extent.  I know this group.  I
2    know their reputation.  So absolutely when I read
3    it, I wasn't -- I expected, as I did see, was I do
4    see a quality assessment in terms of what they've
5    gone through, but it's, you know, it is a piece of
6    evidence on its own.
7          It's not the only piece of evidence
8    that I think I or Health Canada, if you look at
9    what they did, relied upon.
10      Q.    Do you agree with the conclusions
11   that the authors reached in the Taher paper?
12          MS. PARFITT: Objection.  Is
13   there a specific question?  Specific
14   conclusion?  It is a multiple page study.
15          THE WITNESS:  So in this --
16   in the MDL, first off, I'm not providing
17   a causation analysis, right?
18          But certainly I see his -- are
19   you asking me about his conclusion that
20   perineal use of talc is a possible
21   cause --
22   BY MR. HEGARTY:
23      Q.    Correct.
24      A.    -- of humans?

53 (Pages 206 to 209)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 210

1    I think you should know, based on
2  testimony I've given in other cases, that I
3  believe perineal talc use can cause ovarian cancer
4  in women, yes.  So that, I guess, we agree with
5  the fact that there is a causal connection, but
6  I'm not in the MDL providing a causation opinion.
7      Q.    And the same is true for the Swann
8  case?
9      A.    If it's part of the MDL or not?
10  It's a separate case?
11      Q.    Swann is the state court, Missouri
12  case.
13      A.    Oh, I'm not doing general causation,
14  no.
15      Q.    Okay.
16      A.    So unless you've been told I'm doing
17  general cause, which I don't think you've been
18  told that, then, no.
19      Q.    What are the strengths and
20  weaknesses of the Taher article I've marked as
21  Exhibit No. 17?
22          MS. PARFITT:  Objection.
23      Form.  Broad.
24          THE WITNESS:  So -- well,

Page 211

1      like all the papers that I look at,
2  luckily they give you a description of --
3  of what -- what the strengths and
4  weaknesses are of the data they looked at
5  as individual pieces.
6          You know, they do provide --
7  in fact, Dr. -- I mean, my earlier depo,
8  Ms. Branscome went through this issue
9  with me.  She asked me questions about
10  the Klimisch scoring.  She asked me
11  questions about all of that in here.
12          I think I told her that what I
13  see here is consistent with a weight of
14  the evidence like I've done, it's just
15  they've laid it out in a different way.
16  But I don't know how else to answer.
17          So the strength would be that
18  it's consistent with general methodology
19  used when you're doing a weight of the
20  evidence.  Strength is that I know these
21  people.  I know they're a high quality
22  group.
23          And then a weakness of any
24  publication is -- is that you can only --

Page 212

1      you have to deal with the limitations on
2  the data you have, and I think they talk
3  about there's some, you know, some things
4  would be nice.
5          Like in the cohort studies, it
6  would have been really nice if we had
7  complete exposure information, which we
8  don't have.  Things like that.
9          But I think the strengths of
10  this is, they did a detailed weight of
11  the evidence, and it's very transparent
12  for you.  They lay it out in detail.
13  BY MR. HEGARTY:
14      Q.    You said you know this group.
15          What do you know about some of these
16  folks in this group?
17      A.    So I published with Dr. Krewski on
18  my public -- on my -- my list of publications,
19  you'll see I have a copper puff paper.  So I have
20  met with him, worked with him one-on-one on
21  projects.  And Dr. Krewski may be the last author
22  in this paper, but, boy, he is always a driver
23  between anything -- in anything he works on.
24          So I, you know, it is -- it is an

Page 213

1      issue of, I know the McLaughlin Centre for
2  Population Health Risk Assessment, which is where
3  Dan Krewski is.
4          And Dr. Taher I don't know
5  personally, but all of the people that I've ever
6  known that came out of his what I call group or
7  his oversight are good quality risk assessors.
8      Q.    You make reference in this paragraph
9  to two papers by Wu.
10          Why did you add the two papers by Wu
11  to this paragraph?
12      A.    You're in paragraph?
13      Q.    Same paragraph.
14      A.    Oh, I'm sorry.
15      Q.    75.
16      A.    I think they were always in my
17  reliance list, if I remember correctly, but I'm
18  giving you ones that the 2006 panel did not have.
19  So if you read starting on page 55, I said it
20  should be noted that the 2006 IARC did not have
21  access to reports, and the Wu's are listed.
22          So what I did here in this report is
23  go ahead and give you a description of what each
24  of those are.  It really was mainly for my

54 (Pages 210 to 213)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 214

1  benefit. So if you asked me in a deposition I can
2  remember who Wu was based upon. But I just tried
3  to tell you what it was that they did generally
4  and lay it out as evidence that was not considered
5  by IARC, showing that there has been an
6  accumulation of evidence post-IARC.
7       Q.    You made reference to what the IARC
8  group did not have in front of it. You mentioned
9  the Wu paper.
10           But IARC also did not have in front
11 of it the Gates 2010 paper, the Houghton 2014
12 paper, and the Gonzalez 2016 paper, correct?
13      A.    That is correct. Anything that came
14 after 2006 would not have been included in that
15 assessment.
16      Q.    But in your report, you don't make
17 reference to the IARC group not having those
18 studies either, correct?
19      A.    That is correct. I do not.
20      Q.    Why didn't you do that?
21      A.    No particular reason to not include
22 them. It's just that these are -- I'm citing for
23 you the evidence that I think is additional
24 information for the weight of the evidence.

Page 215

1           In other words, these are studies
2  that add to that weight showing that there is a
3  statistically significant increased risk in human
4  populations that have been looked at. It's not to
5  say that there aren't studies that don't show a
6  statistically significant increased risk, but
7  these studies do.
8       Q.    The next paragraph I want to look at
9  is paragraph 89 of your report.
10           This is a new paragraph; is that
11 correct?
12      A.    Yes, this was a new document that I
13 had -- new -- new documents in terms of opinions
14 expressed. I believe they were brought out either
15 from depositions that I read, and I think that's
16 where I got these from. These may be old
17 documents in terms of time, but documents that
18 were discussed in either later testimony or other
19 things that occurred after I wrote my report in
20 terms of my trial testimony.
21      Q.    Have you ever dealt directly with
22 the PCPC?
23      A.    Yes, I have, when I worked at
24 ENVIRON.

Page 216

1       Q.    How about since you left ENVIRON?
2       A.    Probably not, no.
3       Q.    And how -- in what way did you deal
4  directly with PCPC when you were at ENVIRON?
5       A.    So we worked on projects where PCPC
6  were in meetings with clients of ours that, you
7  know, we would have a meeting with a client. PCPC
8  would also be in the meeting. I don't know that
9  we only ever worked for the PCPC, but certainly we
10 did work on issues that involved the client as
11 well as the PCPC.
12      Q.    The next paragraph, number 90, you
13 also added; is that correct?
14      A.    Yes, that's correct.
15      Q.    And why did you add that paragraph?
16      A.    Again, I think this would be
17 consistent with additional documents that I either
18 discussed at trial testimony -- during trial
19 testimony or -- and so I was trying to give a
20 little more detail in terms of some of the
21 additional evidence or themes that had been
22 developed since my initial MDL report.
23      Q.    At the beginning of that paragraph,
24 you say, you make the statement:

Page 217

1           "The influence of industry on FDA
2  actions."
3           What do you mean by that phrase
4  "influence of industry"?
5       A.    It's -- well, it's the evidence
6  showing that when -- when it came to interactions
7  on the issues related to talc, industry being
8  either through the PCPC or industry themselves,
9  people from Imerys or people from J&J, were having
10 direct interactions with FDA staff.
11           And in my view, if you read the
12 documents where they describe the actions being
13 taken and the relationship -- some of those we've
14 talked about at trials -- it's the idea that -- in
15 fact, in the last trial, we talked about Johnson &
16 Johnson employees talking about -- and the Imerys
17 employees talking about John Bailey being the
18 person at FDA to carry their water. It's those
19 issues.
20           It's the idea of the fact that, in
21 my view, there was influence that I don't think,
22 in my view, was -- was appropriate in terms of
23 what I would tell my clients to do in their
24 interactions with -- with the FDA.

55 (Pages 214 to 217)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 218

1      And many FDA employees -- well, the
2  two people that work for me right now or work with
3  me right now -- will talk to you about the ethics
4  at FDA, and that's different than what we're
5  seeing in some of these documents that occurred.
6      Q.   Is it your opinion that without the
7  influence that you cite in these new paragraphs 89
8  and 90 that FDA would have done something
9  different than what they have done so far to date?
10         MS. PARFITT:  Objection.
11     Form.
12         THE WITNESS:  I don't think I
13     formed that opinion because I think these
14     paragraphs have to do with specific
15     instances where I do believe that,
16     without the influence on the NTP process,
17     there might have been a very different
18     finding in terms of the listing of NTP.
19     A listing in the 10th RoC.  That's
20     paragraph 90.
21         So I do believe that the
22     influence of industry and industry
23     themselves, the individual at the
24     companies are talking about their wins in

Page 219

1      terms of influencing the process.  Not
2      getting a listing for talc with the NTP.
3      So that's the opinions I formed.
4          I haven't formed the opinion
5      the way you've expressed it.
6  BY MR. HEGARTY:
7      Q.   Yeah.  My question was specific to
8  FDA.
9          You understood that?
10     A.   I did and I answered it first.  I
11 thought I said that to you first.  I can look.
12     Q.   So you're not going to provide the
13 opinion that one way -- any type of opinion as to
14 relates to what FDA would have done with regard to
15 talc absent this what you call influence --
16         MS. PARFITT:  Objection.
17     Form.
18 BY MR. HEGARTY:
19     Q.   -- that you cite in these two
20 paragraphs?
21         MS. PARFITT:  I'm sorry.
22     Objection.  Form.
23         THE WITNESS:  I think that's
24     a crystal ball question.  We'll never

Page 220

1  know, unfortunately, because this
2  influence was part of -- part of what
3  happened.
4          I can tell you based on what I
5  believe is, in my view, not appropriate
6  based upon my working with the industry
7  or what I would influence -- I would tell
8  my -- my clients to do.
9          And I also, like I said, I
10 have -- I have personal knowledge now of
11 what people tell me people that work at
12 FDA say about the kinds of interactions
13 they're allowed to have or not have, and
14 I think that what was going on here was
15 inconsistent with that.
16 BY MR. HEGARTY:
17     Q.   In paragraph 91, you refer to the
18 PCPC and industry representatives failing to
19 provide FDA with accurate description of their
20 knowledge of talc safety.
21         Do you see that --
22     A.   Where?
23     Q.   -- addition?
24     A.   No.  I'm looking now.

Page 221

1          MS. PARFITT:  Here you go.
2  BY MR. HEGARTY:
3      Q.   It's in the first part of --
4      A.   Okay.
5      Q.   -- I think paragraph 91.
6          Do you see where I'm reading from?
7      A.   I do see that now.  Starting with "A
8  review of the minutes"?
9      Q.   Correct.
10     A.   Yes.  Okay.
11     Q.   Who are the industry representatives
12 you're referring to in that addition to this
13 paragraph?
14     A.   I would have to pull the document
15 out to look at it.  So who was at the meeting.
16 But the Talc Interested Party, it's referring to a
17 meeting of those folks.  There would be -- should
18 be J&J people there.  There should be Imerys
19 people there.  There should be maybe Colgate
20 Palmolive there.  Typically those were all members
21 of the -- of the -- of the Talc Interested Party
22 task force, including PCPC.
23     Q.   To what are you referring to when
24 you say that these representatives failed to

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 222

1    provide FDA with accurate information -- accurate
2    description of their cosmetic talc safety?  To
3    what documents are you referring to, if any?
4        A.    Well, I'm referring to -- I give you
5    examples.  I say here.  When you look at the
6    minutes to the meeting, I'm saying here examples
7    would be the knowledge that U.S. samples of
8    cosmetic talc were not asbestos-free, and I
9    believe that document talks about it being
10   asbestos-free.  They also -- and I point you there
11   to the issue of a listing of talc.  So that's an
12   example.
13       Q.    Okay.
14       A.    If you need other examples, let me
15   pull the document out and I could try to help you
16   with that but...
17       Q.    That's okay.
18             You refer in this paragraph to
19   Ms. Wille's affidavit and deposition testimony,
20   correct?
21       A.    Yes, I do.
22       Q.    Have you read both her affidavit and
23   deposition testimony?
24       A.    I have.

Page 223

1        Q.    Are you saying by this paragraph
2    that Ms. Wille was not truthful in her affidavit
3    and deposition testimony?
4        A.    I don't have proof that she wasn't
5    truthful, but in my view, when I read her
6    deposition testimony where she continually says
7    she doesn't remember, doesn't remember, doesn't
8    remember, but yet she's so definitive in her
9    affidavit, I do question -- I do question that in
10   my mind.
11             But certainly it will speak for
12   itself and obviously that's what I would -- you
13   notice I don't say anything further than just say
14   this exists, but I felt I needed to do this
15   because during trial, these documents were put
16   before me.  So, again, I'm adding that in here
17   because this is something I know came up at trial.
18       Q.    Well, for purposes of your opinions
19   as set out in the amended MDL report, are you
20   choosing not to believe Ms. Wille in her affidavit
21   or her deposition testimony about this issue of --
22   that you describe in this paragraph?
23       MS. PARFITT:  Objection.
24       Form.  Asked and answered.

Page 224

1        THE WITNESS:  I think I just
2    told you what my opinion was.
3             I said when I see the
4    affidavit and then read her deposition
5    testimony, I questioned her -- her
6    affidavit because of the lack of memory
7    she has about almost everything else she
8    talks about.
9    BY MR. HEGARTY:
10       Q.    Okay.
11       A.    That's what I'm saying to you.  It's
12   an issue.  I as an expert can look at the
13   credibility of the evidence, and I'm just saying
14   to you:  When I read her deposition testimony, she
15   clearly has no memory of almost anything and, as a
16   result, the question is, how is there such a
17   specific memory of that?
18             But the evidence will speak for
19   itself.  You know, a jury can decide what's
20   credible and it's not, too, on their own.  I'm
21   just telling you it's my opinion that the
22   deposition testimony cast doubt on credibility.
23       Q.    Have you read the entirety of Steve
24   Mann's deposition?

Page 225

1        A.    I have.
2        Q.    Have you read the entirety of
3    Ms. Telofski's deposition?
4        A.    She has more than one, doesn't she?
5        Q.    Her most recent one in 2021?
6        A.    It's on my list, yes.  I have read
7    that.  It's been a while, but I have read that,
8    yes.
9        Q.    Have you read the Nettesheim
10   deposition as well?
11       A.    Yes.  All of the new ones I added, I
12   have read.
13       Q.    If you would turn next to paragraph
14   96.  At the end of that paragraph, you added the
15   statement:
16             "Evidence in this case shows that
17   Defendants failed to perform such testing, despite
18   awareness of safety concerns with cosmetic talc."
19             Do you see where I'm reading?
20       A.    Yes.
21       Q.    Do you have an opinion as to what
22   such testing should have been done?
23       A.    I don't think I formed the opinion
24   that a specific study should be done, but it's

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 226

1  very clear that no studies were done on this issue
2  by the company. So I think it's more of an issue
3  of what they didn't do versus should they have
4  done this test, that test, that test. I haven't
5  formed that specific opinion yet.
6      Q.    Is there any published authority
7  that defines what tests a manufacturer of a talcum
8  powder product should do to establish its safety?
9          MS. PARFITT: Objection.
10  Form.
11         THE WITNESS: So the
12    regulations in the U.S. do not prescribe
13    a specific number of tests, and if you
14    read the guidance that is there on the
15    FDA website for cosmetics, it talks about
16    the fact that the company is supposed to
17    ensure that the product is safe as used.
18    And if they don't know if it's safe, they
19    have to inform consumers that they don't
20    know.
21         And neither of those --
22    neither -- I don't see -- see either of
23    those things happening in this case.
24  BY MR. HEGARTY:

Page 227

1      Q.    Are you an expert on what tests
2  should be done to ensure the safety of a talcum
3  powder product?
4          MS. PARFITT: Objection.
5  Form.
6          THE WITNESS: So as a
7    toxicologist, I certainly have expertise
8    and I have given advice to my clients on
9    what types of testing to do for cosmetic
10    ingredients or even cosmetic products.
11    So I do have that expertise, yes.
12  BY MR. HEGARTY:
13     Q.    Do you have -- are you an expert on
14  what, though, a talcum powder product manufacturer
15  should do to ensure the safety of its talc with
16  regard to testing?
17     A.    Are you asking me about testing for
18  purity or testing for safety?
19     Q.    Testing for safety.
20     A.    So I certainly have that expertise,
21  yes, because it's -- it's the same expertise that
22  I would apply to any of my --
23     Q.    Okay.
24     A.    -- my clients.

Page 228

1      Q.    And have you formed opinions in this
2  case about what tests Johnson & Johnson should
3  have conducted to establish the safety of its baby
4  powder products?
5      A.    I have not put together a specific
6  list of tests that they should have done.
7  Instead, what I pointed out is that the test that
8  -- the studies that were available to them, in my
9  opinion, provided them the notice and the
10  knowledge that they didn't act upon.
11         So I do think that there's data --
12  reliable data out there they didn't support, but
13  they don't use in terms of what that notice should
14  have triggered in terms of either a warning on the
15  product. Or in the case of what I've heard some
16  of the -- I've seen in the testimony of J&J,
17  they've said numerous time that if we had any --
18  had any reason to believe there was a problem, we
19  would take it off the market, and they haven't
20  done that either. So...
21     Q.    Do you have an opinion as to what
22  any such test would show as it relates to the
23  safety of talcum powder products if they had been
24  done?

Page 229

1          MS. PARFITT: Objection.
2  Form.
3          THE WITNESS: Oh, I think --
4          MS. PARFITT: Vague.
5          THE WITNESS: I think you can
6    go to the literature. I would answer
7    that in general terms. The literature.
8    Studies show us if they had done studies
9    like the ones in the published
10    literature, what they would expect to
11    get, yeah.
12         I mean, if you look at the
13    chinchilla study or you look at the
14    Hamilton study or you look at the
15    BuzZard study or you look at the
16    Fletcher studies or you look at -- oh,
17    there's a whole list of studies that you
18    could go through, animal.
19         And then you can go to the
20    epidemiological research and sponsoring
21    their own epidemiological research years
22    ago, which hasn't been done.
23  BY MR. HEGARTY:
24     Q.    Do you have an opinion in this case

58 (Pages 226 to 229)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 230

1    as to whether there are any tests that are not --
2    that have not been done on talcum powder products
3    as far as their safety that should be done?
4           MS. PARFITT:  Objection.  I
5      believe her testimony was there were no
6      tests done.  Vague.
7    BY MR. HEGARTY:
8      Q.    And then to be clear, I'm talking
9    about you mentioned that all this testing that's
10   already out there that's already been done in the
11   public domain.
12     A.    Right.
13     Q.    Do you have any opinion as to
14   whether there are additional tests beyond those
15   that still be should be done?
16     A.    I do have an opinion.
17          MS. PARFITT:  By the company?
18   BY MR. HEGARTY:
19     Q.    Okay.  By the company.
20     A.    I do have an opinion.
21     Q.    Okay.  What is that?
22     A.    My opinion is, there's more than
23   enough data already out there for the company to
24   take action to either remove the product from the

Page 231

1    market or add a warning.  There would -- in my
2    view, there would be no need to do.  The data has
3    been there for decades.
4           But there's -- I mean, if you want
5    to ask me in a science question, we can talk about
6    that all day, but, I mean, I think this is what
7    I've told you already before.  That I believe that
8    there's enough evidence to have.  The company
9    should have taken an action years ago.
10     Q.    If you would next turn to paragraph
11   109.  You mention in that paragraph the
12   discontinuation of Johnson's Baby Powder.  I'm
13   sorry.  This is in paragraph 110.
14     A.    Okay.
15     Q.    You mention in paragraph 110 Johnson
16   & Johnson's discontinuation of baby powder,
17   correct?
18     A.    I talk about the removal of
19   constituents.  Oh, you're -- the very last
20   sentence?
21     Q.    Very last sentence.
22     A.    Yeah.  Yeah.  I state a fact, yes.
23     Q.    What documents have you reviewed
24   that discuss Johnson & Johnson's discontinuation

Page 232

1    of baby powder?
2      A.    The things on their own website.
3    So -- and if you need the citation, I apologize
4    for not giving you, but you can go to the Johnson
5    & Johnson website.  There's also some press
6    releases.  I think Reuters had an article that we
7    may have talked about in one of the trials.  So
8    there's some press as well as their own website.
9           MR. HEGARTY:  Did you -- let
10     me go ahead and mark that press release.
11     I mark as Exhibit No. 18 the Johnson &
12     Johnson press release --
13          MS. PARFITT:  Thank you.
14          MR. HEGARTY:  -- of May 19,
15     2020.
16          (Document marked for
17     identification as Plunkett Exhibit 18.)
18   BY MR. HEGARTY:
19     Q.    Have you seen that document?
20     A.    I have seen this document, yes.
21     Q.    I think that's Exhibit 18?
22     A.    Yes.
23     Q.    Have you reviewed the deposition
24   testimony of any company witnesses regarding the

Page 233

1    discontinuation of baby powder?
2      A.    I believe it's addressed maybe by
3    trial testimony of Dr. Gorsky -- Mr. Gorsky.  I'll
4    have to look.  I do believe there's some testimony
5    about -- that I've read about this, but it may be
6    trial testimony, not deposition.
7      Q.    Do you cite in your report where you
8    talk about the discontinuation, any deposition or
9    trial testimony you've read about Johnson &
10   Johnson's decision to discontinue the product?
11     A.    No, because all I'm trying to do in
12   this sentence is state a fact.  I'm not -- I'm not
13   arguing a point.  I'm saying this is what -- this
14   is what has happened.
15     Q.    Do you intend to testify that the
16   discontinuation was for reasons other than what's
17   stated in Exhibit No. 18?
18          MS. PARFITT:  Objection.
19     Form.
20          THE WITNESS:  Well, if you're
21     asking me to get into the mind of the --
22     of the individuals, I can't do that.  I
23     don't testify about their motivation
24     because I haven't, you know, can't get

59 (Pages 230 to 233)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 234

1  inside them. I can tell you what my
2  opinion is based on whether or not that
3  action made sense to do or not.
4       I think there should have been
5  things done way before this. But I
6  understand a company deciding to stop
7  distributing because there's a safety
8  concern. I mean, it was a clear safety
9  concern being raised by FDA about the
10  presence of asbestos in the product.
11 BY MR. HEGARTY:
12  Q.   Is it your opinion that Johnson &
13 Johnson's decision to discontinue the sale of baby
14 powder in U.S. -- in the U.S. and Canada was based
15 on a concern about the safety of the product?
16       MS. PARFITT: Objection.
17       THE WITNESS: I said to you,
18  I can't get inside their minds. All I
19  can tell you is, based upon what I know,
20  that certainly there were safety concerns
21  being raised at right before this time
22  not only by the FDA because of the
23  asbestos found in the product.
24       Also right before this time we

Page 235

1  had that February meeting in 2020 with
2  the FDA. The public hearing. So we know
3  FDA is looking at things.
4       We know that Health Canada
5  is -- wrote a screening assessment, a
6  draft one.
7       I mean, all these things are
8  there. Safety has been questioned at
9  this point in time. But that's all I can
10  tell you.
11       I am -- I can't get into the
12  mind of any one individual. I can tell
13  you what I think the evidence shows, and
14  the evidence shows there were significant
15  safety concerns that were going on at
16  this point in time.
17       And would it make sense to
18  take the product off the market?
19  Absolutely. Would it make sense to do it
20  a lot sooner? Absolutely.
21 BY MR. HEGARTY:
22  Q.   You mentioned safety concerns that
23 were going on at the time.
24       Is it your opinion that anyone

Page 236

1  inside of Johnson & Johnson had safety concerns
2  about Johnson's Baby Powder at the time --
3  A.   Well --
4  Q.   -- it chose to discontinue the
5 product?
6       MS. PARFITT: Objection.
7  Form. Vague. Broad.
8       THE WITNESS: So I would say
9  to you there were -- there were certainly
10  concerns about safety raised throughout
11  the decades.
12       I don't believe that any of
13  the witnesses I've seen testify have said
14  that the way you're asking it. So I
15  can't point to their testimony.
16       But there were certainly --
17  for example, they were told by their own
18  consultants and their own internal people
19  all kinds of issues over the years about
20  what evidence was there. So I do believe
21  that they understood the safety concerns.
22 BY MR. HEGARTY:
23  Q.   Well -- and I want to be direct on
24 my questioning.

Page 237

1       My question is whether you're going
2 to come into the courtroom and say, based on
3 documents I reviewed or testimony I reviewed, I
4 know that I have the opinion that Johnson &
5 Johnson discontinued the product not for the
6 reasons that they said in their -- in their -- in
7 their press release, but for safety reasons?
8  A.   Oh, I don't think I can do that. I
9 don't think a judge would let me do that. Because
10 that's, again, to me that's getting into the mind
11 of the company.
12       I'm saying to you, I can tell you
13 what I believe in terms of what was going on at
14 the time, what it clearly made sense to be doing.
15 I'm just telling you it should have been
16 happening --
17  Q.   Right.
18  A.   -- much sooner than that.
19       MR. HEGARTY: Could we take a
20  quick break? Can I -- we can go off the
21  record.
22       (Recess: 1:06 p.m. -
23       1:23 p.m.)
24       MR. HEGARTY: Let's go back on

60 (Pages 234 to 237)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 238

```
 1    the record.
 2         I want to mark next the
 3    notices of the two depositions for the
 4    MDL and the Swann case as Exhibits 19 and
 5    20.
 6         (Document marked for
 7    identification as Plunkett Exhibit 19.)
 8         (Document marked for
 9    identification as Plunkett Exhibit 20.)
10    BY MR. HEGARTY:
11         Q.    And with regard to the documents
12    requested, Dr. Plunkett, did you have a chance to
13    go through the paragraphs requesting documents?
14         A.    Yeah.  I'm trying to decide if I've
15    seen both of these.
16         Q.    Just focus on the MDL one --
17         A.    Okay.
18         Q.    -- because it's identical.
19              Have you seen the MDL notice?
20         A.    Yes, that I have.  That's the one.
21         Q.    You went through the paragraphs in
22    the MDL notice?
23         A.    Yeah, and I helped identify.  You
24    asked me a question earlier.  I said this would
```

Page 239

```
 1    help me know where that document came from, that
 2    kind of thing.  So, yeah.
 3         Q.    And did you provide your counsel
 4    with any responsive documents to those paragraphs?
 5         A.    Yes, I did, and mostly I just told
 6    them what documents that within my reliance
 7    materials they needed to provide or I sent them,
 8    for example, my new trial list, things like that.
 9    Yeah.
10         MS. PARFITT:  And for the
11    record, Mark, we produced a letter
12    August 6, 2021 to you.
13         MR. HEGARTY:  Right, and I'm
14    going to mark this here in a moment.
15         MS. PARFITT:  Which is in
16    response directly to the notice of
17    deposition.
18         MR. HEGARTY:  I'll just go
19    ahead and mark that since you brought
20    that up.
21         MS. PARFITT:  Okay.
22         MR. HEGARTY:  I'll mark as
23    Exhibit No. 21 an August 6, 2021 letter
24    from Ms. Parfitt to Ms. Sharko.
```

Page 240

```
 1         (Document marked for
 2    identification as Plunkett Exhibit 21.)
 3    BY MR. HEGARTY:
 4         Q.    And with regard to the -- to
 5    paragraph 7 in that document, supplemental
 6    materials provided between August 1 to August 10,
 7    2021.
 8         Do you see that reference?
 9         A.    Yes.
10         Q.    What are those supplemental
11    materials?
12         A.    It's -- you had a list of those.
13    Remember?
14         Q.    Is it this list, Exhibit 9?
15         A.    No.  No.  No.  No.  It's that -- you
16    had a little.  A shorter document we marked.  It's
17    not this thing.  You already reviewed or
18    something.  You showed it to me.
19         MS. PARFITT:  And I did not
20    get a copy.  You have the only one.
21    BY MR. HEGARTY:
22         Q.    Is it this exhibit, Exhibit 11?
23         A.    Yes, that's it.  That -- that goes
24    with number -- where is that?
```

Page 241

```
 1         Q.    7?
 2         A.    Number 7, yeah.
 3         Q.    Are these materials you had reviewed
 4    only for the first time between August 1 and
 5    August 10, 2021?
 6         A.    No.  Some of these are not.  Some of
 7    these are ones that obviously I had -- I had
 8    already considered before.
 9         Q.    Which ones?
10         A.    So there may be a few mistakes on
11    here.  Like, for example, I would not have put
12    McDonald 2019 on here because they obviously -- I
13    had that in my -- that should have been in my
14    reliance materials for the Cadigan trial, in fact,
15    earlier that was presented.  So it may not have
16    been on my MDL list before.  So that may be the
17    issue.
18         MS. PARFITT:  I'll
19    represent --
20    BY MR. HEGARTY:
21         Q.    Can you identify which of those you
22    have seen -- you have only seen -- you have only
23    seen for the first time since August 1, 2021?
24         A.    Okay.  So that would be any of
```

61 (Pages 238 to 241)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 242

1  the -- the Kuffner document. That may not even be
2  on here. The -- hold on. Okay. So I wouldn't
3  have put August 1st. I think there's a number of
4  these that should go back to the Cadigan trial,
5  which would be July, okay?
6        So, for example, this EPA comments
7  document I hadn't. That was a surprise to me at
8  the trial. I admit that, right? So that would be
9  there.
10       Q.    What else --
11       A.    Let me see.
12       Q.    -- is new since either July or
13  August 1st?
14       A.    Yeah, okay. I think I had 9. No.
15  No. I had that. I had that.
16       So you did not know that I had
17  reviewed this color advertisement. I doubt that
18  was on my material, my reliance list before, but I
19  had reviewed that before. So that is new to you
20  to ask questions about, okay?
21       Q.    Okay. And not new to you?
22       A.    No, it's not new to me, and that's
23  what I'm saying. I don't think there's anything
24  really new. The only thing that I can see on here

Page 243

1  that was, quote-unquote, new to me would have been
2  this EPA document.
3        Q.    Okay.
4        A.    But -- and the fact that I gave you
5  an updated trial list.
6        Q.    Okay.
7        A.    So I think otherwise.
8        MR. HEGARTY:   All right. You
9  can set that aside.
10       Next mark as Exhibit 22
11  your -- the Plaintiff's Amended
12  Disclosure of Expert Witnesses in the
13  Swann case, and I seem to have only one
14  copy of it.
15       MS. PARFITT:  That's fine.
16       MR. HEGARTY:  If you guys
17  could share.
18       (Document marked for
19  identification as Plunkett Exhibit 22.)
20  BY MR. HEGARTY:
21       Q.    Would you look over at page or
22  paragraph 2 I think is on page --
23       MS. PARFITT:  He knows Swann.
24  BY MR. HEGARTY:

Page 244

1        Q.    I think it's on page 3 where you see
2  your name?
3        A.    I see that, yes.
4        Q.    Would you look at that paragraph and
5  tell me whether you have ever seen it before right
6  now in this document?
7        A.    I don't know that I've seen this
8  document, but I've seen this -- something very
9  similar to this in my other -- other times I've
10  seen documents where I've been listed as an
11  expert.
12       Q.    And is your testimony -- your
13  anticipated testimony in the MDL based on your
14  amended report as well as your deposition and
15  trial testimony up through the present day what
16  you plan on testifying in the Swann case as well?
17       A.    Yes, that's my understanding. I
18  have had -- I have had no other information that
19  would indicate otherwise.
20       Q.    Have you prepared any invoice
21  containing any time dedicated to the Swann case?
22       A.    No.
23       Q.    If we could go back to your report,
24  I just --

Page 245

1        A.    Oh, wait a minute. Did you check?
2  I can't say that without looking at that one bill.
3  Was that one bill that had all those cases?
4        Q.    Yeah. If you want to go back and
5  look at that.
6        A.    Yeah, let me look at that. I just
7  remembered that. Sorry. There it is.
8        Q.    It should be Exhibit No. 2.
9        A.    Yes. Let me just check to make sure
10  if Swann is listed there or not.
11       Yes, it is listed. So, yes.
12       Q.    Okay.
13       A.    Valerie Swann?
14       Q.    Yes.
15       A.    Yes. So I had charged 2 hours for
16  docket review sometime before, probably in January
17  or December. December 2020 or January 2021.
18       Q.    Okay. If you could go back to your
19  report, paragraph 53, and tell me when you are
20  there. I'm sorry. It's paragraph 52.
21       A.    Okay. I'm there.
22       Q.    You added to this paragraph a
23  reference to the Lauchlan 1994 paper, correct?
24       A.    Yes, that's correct.

62 (Pages 242 to 245)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 246

1    Q.    Why did you add this paper?
2    A.    Because it was an additional piece
3 of information that I had that was relevant to
4 migration. That and I added the Alexander paper,
5 too, to this general discussion.
6    Q.    With regard to the Lauchlan paper,
7 when did you first read this paper in relation to
8 your preparing your amended report?
9    A.    Sometime after my original report.
10 So I can't tell you what date in 2019 or 2020 it
11 would have been, but sometime after my original
12 report, I believe.
13    Q.    And how did you come across it, if
14 you can recall?
15    A.    If you show it to me, maybe that
16 will trigger something. I apologize.
17    MR. HEGARTY:  I'll mark as
18    Exhibit 23 the Lauchlan paper we've been
19    talking about.
20    (Document marked for
21    identification as Plunkett Exhibit 23.)
22    MS. PARFITT:  Thank you.
23    (Off the record discussion.)
24    THE WITNESS:  Do you want me

Page 247

1    to answer?
2 BY MR. HEGARTY:
3    Q.    Sure.
4    A.    I'm sorry.
5    Q.    The question was:  Do you recall
6 where you obtained -- from where you obtained the
7 document?
8    A.    No. It could be one that I found in
9 my research or it could be one that was within --
10 cited by someone else in an expert report. I
11 don't know, but I am certainly this is one I had.
12 In fact, I may have even had this before my
13 original MDL report. It's possible. I just don't
14 recall.
15    Q.    Do you agree that with regard to the
16 Lauchlan study that it cites no published article
17 that analyzed whether particles applied to the
18 perineum, talc or otherwise, can reach the
19 ovaries?
20    MS. PARFITT:  Objection. Are
21    you referring to a specific paragraph?
22    THE WITNESS:  Yeah. Yeah.
23    There's a talc section. So let me look.
24 BY MR. HEGARTY:

Page 248

1    Q.    And my question is:  As it relates
2 throughout the document, it doesn't cite to any
3 study that actually looked at whether particles
4 applied externally to the perineum, talc or
5 otherwise, can reach the ovaries or did reach the
6 ovaries?
7    MS. PARFITT:  Objection.
8    THE WITNESS:  (Reviews
9    document.)
10    They don't provide a specific
11    study on talc that was applied to the
12    perineum, no. Instead, they are talking
13    about the general literature, like I did,
14    and the old literature about looking at
15    particles that are similar to talc.
16    And then this particular
17    author then is taking that to the next
18    step. He's -- he's talking about the
19    fact that it's from Parmley and Woodruff.
20    Causative agents for ovarian cancer could
21    gain access through this route, and then
22    he talks about the issue with talc.
23    So, no, I don't think it's a
24    piece of data the way you're asking it.

Page 249

1 BY MR. HEGARTY:
2    Q.    Okay. If you turn next to paragraph
3 55?
4    A.    Okay.
5    Q.    In that paragraph, you refer to a
6 study by McDonald and colleagues, correct?
7    A.    Yes. There's two studies.
8    Q.    And by Johnson as well, right?
9    A.    Yes. There's three studies, yes.
10    Q.    Two studies by McDonald and a study
11 by Johnson, correct?
12    A.    Yes. Exactly.
13    Q.    And do you understand that the
14 authors -- some of the authors of those two papers
15 are experts for plaintiffs in the talc litigation?
16    A.    On the McDonald papers, yes, I'm
17 aware of that. Johnson paper I need to see the
18 other list. I can't answer that without looking
19 at the list.
20    MR. HEGARTY:  I'll mark as
21    Exhibit 24 the Johnson article that you
22    cite in your amended report.
23    THE WITNESS:  Yeah.
24    (Document marked for

63 (Pages 246 to 249)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 250

1    identification as Plunkett Exhibit 24.)
2         THE WITNESS: Yes. Okay. It
3    is. It's Dr. Godleski's group. So, yes,
4    I'm aware of that.
5    BY MR. HEGARTY:
6         Q.    And are you aware that the authors
7    of the Johnson study paid for it themselves?
8         MS. PARFITT: Objection.
9    Form.
10   BY MR. HEGARTY:
11        Q.    And you can look at the --
12        A.    I need to look.
13        Q.    -- very last page on the financial
14   support section.
15        A.    I see that. That's what they say,
16   yes.
17        Q.    Neither the McDonald papers nor the
18   Johnson papers identify any asbestos, correct?
19        A.    I'd have to look, but I don't
20   believe that's true. I would say to you I believe
21   that -- that you have a correct statement, but
22   I -- to confirm, I'd have to look at them again.
23        Q.    They don't refer to fibrous talc
24   either, correct?

Page 251

1         MS. PARFITT: Objection.
2    Form.
3         THE WITNESS: I'd have to
4    look. I can't -- in order to answer that
5    question, I'd have to look whether or not
6    they call -- they talk about fibers or
7    not. I don't know. I'd have to look.
8         They do actually, I think, in
9    this paper talk about things that are --
10   have the width and diameter of
11   potentially being fibers. This is the
12   Johnson paper, but I'd have to look to
13   tell you. I don't know.
14   BY MR. HEGARTY:
15        Q.    Can you cite for me any study that
16   shows migration of talc fibers from the perineum
17   to the ovaries?
18        MS. PARFITT: Other than this
19   study?
20   BY MR. HEGARTY:
21        Q.    Including any study. Can you cite
22   for me any study that purports to show migration
23   of talc fibers from the perineum to the ovaries?
24        A.    Well, I believe that Dr. Godleski

Page 252

1    has shown that in his work, fibers as well as talc
2    particles. I believe he's seen both. If you want
3    me to tell you whether he reports either of those
4    in these three papers, I'd have to look.
5         Q.    If we --
6         A.    But --
7         Q.    If we set aside the studies by
8    McDonald and Johnson because we might have to go
9    and look at them in detail, are you aware of any
10   studies that tried to evaluate the migration of
11   fibers from the vagina to the tubes and ovaries?
12        MS. PARFITT: Objection.
13   Other than what she's provided in prior
14   depositions and her reports.
15        THE WITNESS: So I would say
16   to you, depending on the size of a fiber,
17   they would fit within the studies that
18   talk about particles.
19        So the fiber could if the
20   fiber is of a size that's similar to some
21   of the particles that have been studied,
22   and I'd have to do that comparison in
23   order to -- to look at what fiber you're
24   talking about.

Page 253

1         But I do believe whether it's
2    a fibrous talc or whether it's a talc
3    particle that may include platy talc plus
4    fibers within it -- because the particle
5    could be -- could be a complex mixture of
6    those things -- it's possible that those
7    things are occurring that way.
8         Then I think that there is
9    evidence to show that talc can migrate of
10   the -- of the size that is found within
11   baby powder, and obviously baby powder is
12   of a size that includes at
13   microscopically both fibers and
14   particles -- and smaller particles.
15   BY MR. HEGARTY:
16        Q.    If we go back to paragraph 55, you
17   include a quotation to a portion of the Johnson
18   study that was discussed in the Health Canada risk
19   assessment, correct?
20        A.    Yes, that's correct.
21        Q.    And with regard to that cited
22   passage in your report that refers to reactive
23   fibroblastic tissue or chronically inflamed
24   tissue.

64 (Pages 250 to 253)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 254

1    Do you see that?
2    A.    I do.
3    Q.    Now, with regard to ovarian cancer,
4  both of these types of tissues can arise from the
5  cancer itself, correct?
6    A.    Oh, I think you should talk to an
7  ovarian cancer pathogenesis person about that.
8    Q.    Okay.  So fair enough.
9    And the same question goes as to
10  whether you know both of those types of tissues
11  can arise from chemotherapy?
12    A.    Same.
13    MS. PARFITT:  Objection.
14    THE WITNESS:  It would be the
15    same answer.  I think you should talk to
16    someone who is an expert in looking at
17    those tumors under the microscope.
18  BY MR. HEGARTY:
19    Q.    With respect to the statement in the
20  cited portion that you include in your report that
21  says with respect to "the presumption is that talc
22  accumulates in benign tissue some time prior to
23  the tumour developing."
24    Do you see that part of the quote?

Page 255

1    A.    Yes, I do.
2    Q.    Did you cite any published reporting
3  an accumulation of talc and tissue prior to tumor
4  development?
5    A.    Yes.  The -- the NTP rat study shows
6  accumulation of talc -- micronized talc in tissue
7  prior.  Remember I used that with the issue of
8  preneoplastic lesions that develop in the area of
9  the talc.  And then the chinchilla study.  I point
10  you to that as well.
11    And I'd also point you to the rat
12  ovarian bursal study, which is Hamilton, I think.
13  I may have that -- or Davies.  One of the two.
14  Yeah.
15    Q.    Can you cite any authorities seeing
16  this accumulation in tissue in women who later
17  developed ovarian cancer?
18    A.    Accumulation in benign tissue?
19    Q.    Correct.
20    A.    Well, I think that's what they're
21  talking about here.  They're talking about the
22  Johnson paper where they talk about benign tissue.
23    Q.    And my question -- I need to be more
24  specific then.

Page 256

1    Can you cite for me then any studies
2  showing this accumulation of tissue in women prior
3  to diagnosis of ovarian cancer but then later are
4  diagnosed with ovarian cancer?
5    MS. PARFITT:  Objection.
6    THE WITNESS:  I don't know.
7    I have no idea.  You'd have to ask -- I
8    think you could ask the pathologist in
9    this case.  Maybe he has seen such
10    samples.
11  BY MR. HEGARTY:
12    Q.    Are you an expert in the type of
13  studies conducted in the Johnson and McDonald
14  papers?
15    MS. PARFITT:  Objection.
16    Form.
17    THE WITNESS:  If are you
18    asking me, am I an expert in performing
19    these studies?  No.  I have expertise in
20    understanding the importance of this kind
21    of data, however.
22    I am familiar with and have
23    expertise in understanding the importance
24    of electron microscopy in looking at

Page 257

1  these kinds of tissues for these types of
2  particles, but I don't do this kind of
3  work.
4  BY MR. HEGARTY:
5    Q.    If you would turn next to paragraph
6  62 in your report.
7    A.    Yes, I'm there.
8    Q.    In that paragraph, you discuss in
9  some detail the Mandarino 2020 study, correct?
10    A.    I think that's what was new here,
11  correct?
12    Q.    Correct.
13    A.    Yeah.  I'm looking where it starts.
14  So...
15    Q.    Starts towards the bottom.
16    A.    Oh, here it is.  Yes, I find it.
17  Yes.
18    MR. HEGARTY:  And I'll mark as
19    Exhibit 25 the Mandarino 2020 study.
20    (Document marked for
21    identification as Plunkett Exhibit 25.)
22    MS. PARFITT:  Thank you.
23  BY MR. HEGARTY:
24    Q.    The Mandarino study that you cite

65 (Pages 254 to 257)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 258

1    refers to mouse cells, right?
2        A.    Yes, that's correct. They're
3    looking at marine ovarian epithelial cells.
4        Q.    And, again, are you an expert on the
5    type of study done in this type of paper?
6            MS. PARFITT: I'm going to
7        object as vague to that question.
8            THE WITNESS:  So I have
9        expertise in in vitro toxicology methods,
10       and I'm very familiar and have -- I
11       understand the strengths and weaknesses
12       of doing these kinds of studies.
13           I have not -- I have done in
14       vitro cell studies before myself in the
15       lab.  I have not -- obviously I did not
16       do this study, and I think that this
17       would be a study that would be best maybe
18       discussed, however, with the author, who
19       is in the litigation.  Dr. Godleski could
20       talk to you about it.
21           I am familiar, though, and
22       these are the kinds of studies I rely on
23       for the evidence in the case.
24   BY MR. HEGARTY:

Page 259

1        Q.    Are you aware of any studies showing
2    the same findings reported in Mandarino in women
3    using talc?
4        A.    So what do you mean by -- are you
5    asking me do they see -- we certainly see
6    inflammatory changes would be consistent with
7    reactive oxygen species, but I haven't seen
8    somebody take -- you're asking me if somebody take
9    human cells out and done the same thing in a human
10   cell?
11       Q.    Correct.
12       A.    I don't know.  I'd have to look.  I
13   know that there are human ovarian cell lines that
14   have been studied, and I believe Dr. Fletcher does
15   some of that.  I need to look and see, but I
16   think.
17       Q.    This quote --
18       A.    Yes.
19       Q.    -- from the Mandarino paper refers
20   to reactive oxygen species and changes in
21   expression of macrophage pertinent to cancer
22   development.
23           Do you see that?
24       A.    I do.

Page 260

1        Q.    Are you aware of any articles that
2    say that changes in expression of macrophages is
3    pertinent to cancer development?
4        A.    I don't think I'll find that
5    sentence. I think I'll find what's right, which
6    is what here, which is on mechanistic data, the
7    role of the scientist is to look for cellular
8    changes that would be relevant to how we know
9    cancer can develop.
10           And so I don't think I would say it
11   the way you asked it.  I would say it the way that
12   the authors say it.  That there are macrophage
13   genes that are relevant and pertinent to looking
14   at mechanisms of cancer development.
15       Q.    How does the dose of talc exposure
16   to the cells in this study compare to what the
17   exposure would be to the ovaries in women using
18   talc, in your opinion?
19       A.    I haven't formed an opinion on -- on
20   the comparison of that dose, but I believe I've
21   talked about these issues before in deposition, if
22   you want me to rehash that but --
23       Q.    No.  I'm referring --
24           MS. PARFITT: Yeah.

Page 261

1    BY MR. HEGARTY:
2        Q.    -- specifically to this paper and
3    the doses they used.
4        A.    I haven't done that analysis.  To
5    me, this is a mechanistic study.  It provides
6    important mechanistic information.
7        Q.    Can you cite to me any studies
8    showing a link between changes of gene expression
9    as referenced in this article to ovarian cancer
10   risk?
11       A.    I don't think anybody has done that
12   kind of work that I'm aware of, other than looking
13   at genetic changes that are predispositions for
14   cancer, but that's different than what they're
15   doing here.  They're looking here at changes after
16   exposure.
17       Q.    Are you aware of any study that
18   looks at any state of immunosuppression, whether
19   associated with immunosuppression drugs after
20   transplant or immunocompromised individuals, that
21   have been shown to increase the risk of ovarian
22   cancer?
23           In other words, are you aware of any
24   study showing that in immunocompromised state,

66 (Pages 258 to 261)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 262

1    women are at increased risk of developing ovarian
2    cancer?
3          MS. PARFITT:  Objection.
4          THE WITNESS:  Well, I don't
5       think that's what this paper is talking
6       about.  It's talking about
7       immunosurveillance, which is different
8       than immunocompromised.  So are you
9       asking me about immunosurveillance or --
10   BY MR. HEGARTY:
11      Q.    Well, let me ask that.  Let me go
12   back and ask that.
13         Do you see immunosurveillance
14   different than immunocompromised?
15      A.    It can be, yes.
16      Q.    How are they different, in your
17   opinion?
18      A.    So to me, immunocompromised is a
19   specific clinical diagnosis in an individual,
20   whether or not they're looking across --
21   wholistically across the immune system.
22         Immunosurveillance is a mechanism
23   that operates in the human body in order to
24   protect you from things, such as exposure to

Page 263

1    exogenous substances, but also to keep your system
2    working properly just generally as you age.
3       Q.    Okay.  The paper, the Mandarino
4    paper, does talk about macrophages, correct?
5       A.    It does.
6       Q.    Macrophages are created by
7    monocytes; is that right?
8       A.    They derive from those, yes.
9       Q.    Do you know how many monocytes a
10   body creates every day?
11      A.    Oh, I could find that in my
12   physiology text, but I do not know off the top of
13   my head.
14      Q.    Do you know how many macrophages are
15   in the body at any given time?
16      A.    Same answer.  I certainly have that
17   in my materials, but I can't recite that for you.
18      Q.    Does this study or are you aware of
19   any study that shows that talcum powder exposure
20   reduces the number of macrophages in the body?
21      A.    Yes, there are studies that show
22   that they undergo apoptosis, or cellular death, in
23   the presence of talc.  So that means you're
24   reducing the numbers, obviously, if you're killing

Page 264

1    the cells off.
2          But are you asking me something
3    else?  Are you asking me whether somebody has done
4    quantitative measuring or --
5       Q.    Correct.  Quantitative measuring.
6       A.    I don't know.  I haven't looked for
7    that.
8       Q.    Are you aware of any studies showing
9    that talc has an effect on monocytes?
10      A.    I don't believe anybody that I
11   recognize in the literature I've looked at looks
12   just at monocytes.  They're focusing on
13   macrophages for a reason.
14      Q.    The reported effect by Maldinado was
15   localized to the cells in which talc came into
16   contact with, correct?
17      A.    In Mandarino or --
18      Q.    I'm sorry.  Mandarino.
19      A.    Yes.  Yes, that's correct.
20      Q.    And does not purport to show what a
21   system-wide effect would be across the body to a
22   particular portion of tissue exposed to talc,
23   correct?
24         MS. PARFITT:  Objection.

Page 265

1    Form.
2          THE WITNESS:  I would say
3       that that is not at all the design of
4       this study.
5          This study is an in vitro
6       study looking at isolated events that can
7       build towards understanding the
8       pathogenesis of cancer.
9    BY MR. HEGARTY:
10      Q.    Macrophages when they respond to an
11   insult -- I'll put it that way -- come from all
12   parts of the body to that insult, correct?
13         MS. PARFITT:  Objection.
14   Form.
15         THE WITNESS:  What do you
16       mean by "come from all parts of the
17       body"?  That doesn't really make sense to
18       me.
19   BY MR. HEGARTY:
20      Q.    Well, let me ask it a different way.
21         If you have an inflammation or let's
22   say -- let me start over.
23         If you have an infection that
24   macrophages respond to, do you agree that the

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 266

1    macrophage -- that the response is just not
2    limited to the local tissue where that infection
3    is -- is located, correct?
4         A.    It can be if it's -- if you catch
5    the infection early. That's the whole point.
6    So -- but I would agree. What I would say to you
7    is it can travel beyond the local infection. When
8    it becomes a systemic issue, yes, that can happen.
9    But if the infection stays in a small site, it's
10   the local tissue response that hopefully can --
11   can take care of the problem.
12        Q.    You agree, though, that
13   macrophages -- the body can call upon macrophages
14   across other parts of the body to come to a
15   localized area where they are needed, correct?
16             MS. PARFITT: Objection.
17   Form.
18             THE WITNESS: I don't think
19        the body does it quite that way. I think
20        if you wanted -- if you wanted to make it
21        simplistic, I would say to you that your
22        immune system overall is there to respond
23        to insults.
24             And if insults become

Page 267

1         significant and move beyond a very
2         localized area of the body that, yes,
3         other -- the blood system, for example,
4         or even the lymph system can carry and
5         take away and contribute to -- to a more
6         systemic response.
7              But I don't think the way
8         you're asking it is quite right.
9    BY MR. HEGARTY:
10        Q.    If you would turn next to paragraph
11   65.
12        A.    Yes.
13        Q.    Towards the end of that paragraph,
14   you add some references to the 2019 Fletcher
15   paper, correct?
16        A.    That's correct.
17        Q.    Have you ever done the type of
18   studies that are reported in the Fletcher paper
19   yourself?
20        A.    I have done -- I have -- I have in
21   the laboratory when I was in academics worked in
22   the lab in with studies that had been looking at
23   redox enzymes in cells. Yes, I have done that,
24   but I -- this was not something that was the focus

Page 268

1    of my research. But yes, I have done those things
2    before.
3              MR. HEGARTY: And I'll mark as
4         Exhibit 26 the Fletcher paper that you've
5         added a reference to in that paragraph.
6              MS. PARFITT: Thank you.
7              (Document marked for
8         identification as Plunkett Exhibit 26.)
9    BY MR. HEGARTY:
10        Q.    And the study -- the cells that he
11   used in the study are immortalized cells, correct?
12        A.    Yes, that's correct. That's
13   typically what you are required to do with these
14   kinds of assays.
15        Q.    So they would not be considered
16   normal cells, right?
17             MS. PARFITT: Objection.
18   Form.
19             THE WITNESS: Okay. So I
20        would point you -- I would point you to
21        others in this litigation to go into the
22        details, but I can answer that question.
23   BY MR. HEGARTY:
24        Q.    Okay.

Page 269

1         A.    And that is the issue of the fact
2    that just because a cell is immortalized doesn't
3    mean it is, quote-unquote, abnormal. It just
4    means that it's a process used in order to be able
5    to make -- put those cells in a state where they
6    will reproduce in culture.
7              So the idea is you have to
8    immortalize the cells in order to keep the cell
9    culture going and be able to do the experiment.
10             It is not -- it is not that the cell
11   is some kind of an abnormal cell that you don't
12   expect it to respond like normal cells would.
13   That's where I disagree with you.
14             I think that you do this as a tool,
15   but it's -- but it does not mean that the findings
16   are not relevant to normal physiology.
17        Q.    Do you agree that to make the cells
18   immortalized, they are injected with a type of
19   virus?
20        A.    This one is, yes. There's other
21   ways to do that, too. You can actually use
22   different kinds of external cell mediators to do
23   it as well.
24        Q.    So is it your opinion that the

68 (Pages 266 to 269)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 270

1  process of making the cells that Dr. Saed used in
2  his study immortalized did not make them abnormal
3  or precancerous?
4          MS. PARFITT:  Objection.
5  Form.
6          THE WITNESS:  I don't think I
7      formed that opinion and I don't believe
8      that -- I would say you should ask him
9      about his studies.  I believe he's
10     involved in the -- in the MDL.
11         I would just say to you what I
12     already did, which is, as a toxicologist,
13     this data is relevant to my assessment
14     for the reasons that, hopefully, you
15     understand based on the testimony I've
16     given about this kind of data in the
17     past.
18  BY MR. HEGARTY:
19     Q.    And with regard to what Fletcher
20  reported as it relates to key redox enzymes, key
21  redox enzymes are not the same thing as reactive
22  oxygen species, correct?
23     A.    No, they're not.  The redox enzyme
24  forms the ROS.

Page 271

1      Q.    And ROS are such things superoxide,
2  hydrogen peroxide, hydroxyl radicals, hydroxyl
3  ions, nitric oxide, correct?
4      A.    Yes, that's correct.
5      Q.    And with regard to reactive oxygen
6  species, the human body generates those every day,
7  right?
8          MS. PARFITT:  Objection.
9  Form.
10         THE WITNESS:  They can
11     generate those every day, but it's very
12     important to understand that they are
13     linked to inflammatory mechanisms.  So it
14     can lead to abnormal physiology
15     depending on what happens with the
16     process.
17  BY MR. HEGARTY:
18     Q.    Just exercising, though, increases
19  reactive oxygen species in the body, correct?
20     A.    Yes, and when you stop, it doesn't
21  occur anymore.  The difference is talc is there
22  all the time.
23     Q.    Have you read Dr. Saed's testimony
24  with regard to his study?

Page 272

1      A.    I don't think that's on my list of
2  things I've seen.  I don't know.  If it's on my
3  list, I have.
4      Q.    Would you look at your list to see
5  if you read Dr. Saed's deposition testimony?
6      A.    Do you remember what the number of
7  that one is?  I'm sorry.
8      Q.    It's at the top.
9      A.    Was that --
10     Q.    Well, it would be in your report.
11     A.    Oh, it is Exhibit C to my report.
12     Q.    Exhibit C in your report?
13     A.    Yes.  So let me look real quick.
14  Sorry.  You have a better memory than I do today.
15         (Reviews document.)
16         I don't see it in my list, no.
17     Q.    And you don't have a memory here
18  today of seeing it?
19     A.    No, I do not.
20     Q.    If you turn next to paragraph 75 in
21  your report, and tell me when you're there.
22     A.    Mr. Hegarty, I just realized, I
23  looked at the wrong appendix here.
24     Q.    Okay.

Page 273

1      A.    I actually looked at Appendix C.
2  You want me to look at this?  I realized that's my
3  original report.
4      Q.    Yes.  Please look at your report --
5      A.    Okay.
6      Q.    -- where you would list the
7  deposition testimony you have read.
8      A.    Yeah.  I'm sorry.
9      Q.    I want to make sure that you are
10  accurate about it.
11     A.    I just realized that.
12         No, I don't see it.
13     Q.    Before we look at paragraph 75,
14  prior in the deposition you were looking for a
15  reference in your report to the 2021 risk
16  assessment that you thought might pertain to
17  fibrous talc.
18         Were you able to find that
19  reference?
20     A.    So the reference that I remembered
21  was dealing to -- was dealing with what they
22  stated that they -- what they said they assumed,
23  and they assumed that it was talc that did not
24  have asbestiform fibers in their -- in their

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 274

1  assessment. So that means that they would not
2  have assumed it had fibrous talc in their risk
3  assessment, which is important because that means
4  it's an assessment, like IARC, in terms of -- of
5  focusing on the toxicity of talc, not just one
6  constituent.
7      Q.    Would you turn again to paragraph
8  75.
9      A.    I'm there.
10     Q.    You added in that paragraph a
11 reference to the Langseth paper 2008.
12        Do you see that?
13     A.    Yeah. This is the same list that I
14 had before. Remember I told you -- I thought we
15 talked about this. I told you Wu was added for
16 that reason.
17     Q.    Why did you add Langseth to this
18 part of your report?
19     A.    Because it's one that they didn't
20 have access to, that's all, and I'm telling you
21 that they didn't have access to it.
22        MR. HEGARTY: And with regard
23 to the Langseth paper, I'm going to mark
24 as Exhibit 27.

Page 275

1        MS. PARFITT: Mark, I don't
2  want to interrupt you, but I think we're
3  about at four hours.
4        MR. HEGARTY: Yeah, I have --
5  I have like two minutes, three minutes
6  left. So I agree we're almost.
7        MS. PARFITT: Okay.
8        MR. HEGARTY: I'm going to
9  mark as Exhibit 27 the Langseth paper.
10        MS. PARFITT: All right.
11        (Document marked for
12        identification as Plunkett Exhibit 27.)
13 BY MR. HEGARTY:
14     Q.    And if you turn over to the second
15 page under Proposal: To Research Community? Do
16 you see that section?
17     A.    Yes, I have it.
18     Q.    And before we get there, are you
19 aware that three of these authors were part of the
20 epidemiology working group for IARC --
21     A.    Yes.
22     Q.    -- 2006 review?
23     A.    Yes. It says at the back here.
24     Q.    Do you agree with the statement

Page 276

1  under that heading that says --
2        MS. PARFITT: I'm just going
3  to object to the extent this article was
4  examined. It was one that existed well
5  before her 2018 deposition. So...
6        MR. HEGARTY: Do you believe
7  that it was in her report before the 2006
8  -- 2021 amended report?
9        MS. PARFITT: I thought it was
10 in her 2018 report. I would almost --
11        MR. HEGARTY: Can we go off
12 the record for just a second?
13        (Recess: 2:00 p.m. -
14        2:02 p.m.)
15        MR. HEGARTY: We can go back
16 on the record.
17        I believe that's all that I
18 have given our time limitations and
19 obviously subject to the couple of areas
20 that we perhaps might want to follow up
21 on, whether they were covered or not.
22        MS. PARFITT: That concludes
23 in Plaintiff's mind the entire
24 deposition, and thank you very much, Dr.

Page 277

1  Plunkett. I have no further questions.
2  Thank you, Mark.
3        MR. HEGARTY: Thank you.
4
5        (Time noted: 2:02 p.m.)
6
7            *    *    *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

70 (Pages 274 to 277)

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 278

1          ERRATA SHEET
2
3    Page No._____ Line No._____ Change to:_____
4    _____
5    Page No._____ Line No._____ Change to:_____
6    _____
7    Page No._____ Line No._____ Change to:_____
8    _____
9    Page No._____ Line No._____ Change to:_____
10   _____
11   Page No._____ Line No._____ Change to:_____
12   _____
13   Page No._____ Line No._____ Change to:_____
14   _____
15   Page No._____ Line No._____ Change to:_____
16   _____
17   Page No._____ Line No._____ Change to:_____
18   _____
19   Page No._____ Line No._____ Change to:_____
20   _____
21   Page No._____ Line No._____ Change to:_____
22   _____
23   Page No._____ Line No._____ Change to:_____
24   _____

Page 280

1          CERTIFICATE OF REPORTER
2    DISTRICT OF COLUMBIA    )
3          I, DENISE DOBNER VICKERY, CRR/RMR and
4    Notary Public, hereby certify the witness was by
5    me first duly sworn to testify to the truth; that
6    the said deposition was recorded stenographically
7    by me and thereafter reduced to printing under my
8    direction; and that said deposition is a true
9    record of the testimony given by said witness.
10         I certify the inspection, reading and
11   signing of said deposition were NOT waived by
12   counsel for the respective parties and by the
13   witness; and that I am not a relative or employee
14   of any of the parties, or a relative or employee
15   of either counsel, and I am in no way interested
16   directly or indirectly in this action.
17
18
19
20
21         Denise Dobner Vickery, CRR/RMR
22         Notary Public in and for the
23         District of Columbia
24   My Commission expires:  February 28, 2023

Page 279

1          DECLARATION UNDER PENALTY OF PERJURY
2
3
4          I declare under penalty of
5    perjury that I have read the entire transcript of
6    my Deposition taken in the captioned matter
7    or the same has been read to me, and
8    the same is true and accurate, save and
9    except for changes and/or corrections, if
10   any, as indicated by me on the DEPOSITION
11   ERRATA SHEET hereof, with the understanding
12   that I offer these changes as if still under
13   oath.
14
15         Signed on the _____ day of
16   _____, 2021.
17
18   _____
19   LAURA M. PLUNKETT, PHD, DABT
20
21
22
23
24

71 (Pages 278 to 280)

Laura M. Plunkett, Ph.D, D.A.B.T.

**A**

**a.m**
1:19 2:8 105:5,6
148:4,5 178:18
**abbreviated**
51:10
**ability**
117:21 119:4 138:3
**able**
18:20 21:18 22:3
22:15,23 23:8
34:12,21,22 35:7
88:22 96:24
110:16 116:10
118:1 183:11
190:6 191:1 269:4
269:9 273:18
**abnormal**
269:3,11 270:2
271:14
**absent**
219:15
**absolutely**
22:2 82:1 116:20
135:9 187:22
200:8 209:2
235:19,20
**abstract**
88:17,22
**abstracts**
51:1,4
**abundance**
113:8
**academics**
267:21
**access**
26:5 93:18 95:3,6
95:11 107:2
213:21 248:21
274:20,21
**accumulates**
254:22
**accumulation**
214:6 255:3,6,16
255:18 256:2
**accurate**

118:13 186:17
189:23 220:19
222:1,1 273:10
279:8
**accurately**
187:24
**acronym**
42:23,24
**act**
122:12 228:10
**action**
157:11 160:1 173:6
230:24 231:9
234:3 280:16
**actions**
161:18 171:17
172:14 173:21
174:2 217:2,12
**active**
24:10 39:15 47:23
**activities**
34:2
**actual**
202:3,4
**ad**
81:14
**add**
92:2 94:18 120:18
130:11 136:4
138:13 140:16
213:10 215:2
216:15 231:1
246:1 267:14
274:17
**added**
94:24 97:18 98:20
99:19 120:7 121:6
125:13 128:4,18
129:15 130:7,10
130:21 131:6
132:17 134:17,22
135:23 136:13
138:6 140:6,9
141:9 143:21
150:7,16 153:3,4
153:10 155:1,13

181:10,12,17
216:13 225:11,14
245:22 246:4
268:5 274:10,15
**adding**
70:19 123:15
126:20 133:6
223:16
**addition**
88:21 132:6 136:2
140:11 141:12
142:5 144:10,19
150:10 160:14
220:23 221:12
**additional**
6:14 62:5 73:1 87:1
87:5 93:1,5,7,8
96:8,14 100:9,11
101:2 115:17
131:6 138:11,13
160:16 214:23
216:17,21 230:14
246:2
**additions**
141:9 143:4 144:17
145:3 160:7
**additive**
157:7
**address**
11:11,16,19,24
106:14 117:22
**addressed**
134:21 144:15
145:16 146:20
233:2
**addressing**
146:20
**adds**
189:6
**admit**
242:8
**advance**
72:3
**advantage**
180:3
**adverse**

109:17 125:5
**advertisement**
67:6 242:17
**advertisements**
80:5 81:8,16
**advice**
227:8
**advised**
165:24 176:11
**advises**
43:11
**affidavit**
222:19,22 223:2,9
223:20 224:4,6
**age**
190:18 191:19
263:2
**agencies**
45:5
**agency**
39:19 40:17,20,20
41:3,16,24
**agents**
248:20
**ago**
17:11 52:17 67:13
74:17 139:6 155:3
229:22 231:9
**agree**
76:6 116:18 118:15
126:18 128:19
129:2,16,17 131:5
131:17,19 132:16
139:13 145:3
146:24 172:18
182:4,12 183:19
186:21 187:7,14
189:4,12,20 197:1
197:11,12 198:7
198:21 200:6,7
201:6 202:12
204:10 207:23
208:13 209:10
210:4 247:15
265:24 266:6,12
269:17 275:6,24

**agreed**
52:23 187:5
**agreement**
38:19 39:2
**ahead**
84:1 104:24 147:8
178:14 179:19
185:6 188:13
213:23 232:10
239:19
**air**
132:1 133:24
**al**
1:11,14 3:19 7:15
8:16,20,24 9:5
10:22
**Alert**
69:9
**Alex**
90:18,20
**Alexander**
246:4
**Allen**
3:15 26:18 31:21
31:24
**allowed**
54:14 220:13
**amended**
5:22 7:20 8:3,8
27:10 78:5 84:14
84:21 85:17 87:11
87:16 88:21 89:11
91:20 92:19,22
94:1 96:4 97:17
98:20 99:2 102:1
102:16,24 103:18
104:4,15 105:11
106:6,13 107:13
108:9 109:7,9
124:15 130:4
137:6 177:6 195:6
195:12 204:21
223:19 243:11
244:14 246:8
249:22 276:8
**American**

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 282

37:14 39:20
**amount**
20:12 21:12,22
22:3 61:11 158:7
**amounts**
159:6
**amphiboles**
141:1
**analogous**
168:24
**analysis**
105:12,17 106:7,14
106:22 117:11
137:12,15,18
138:8,18,22 139:9
158:12 164:1,7,24
180:1 181:2,4
183:17 184:9
186:23 188:7
190:16 196:20
202:8,10 203:19
205:15 206:24
207:23 208:5
209:17 261:4
**Analytic**
8:12
**analyzed**
208:14 247:17
**and/or**
279:9
**Anderson**
69:8
**animal**
116:17 229:18
**announcement**
76:4
**Announces**
7:17
**annual**
74:3
**answer**
11:4 15:23 16:6
22:7 31:4 34:10
58:8 79:23 80:8,9
83:21 111:9 119:4
125:14,15 137:5

142:14 156:22
157:2 164:8,22
187:12,13 188:11
188:16 192:3,3,10
192:13 193:8,9
194:7 198:6 199:4
201:13 206:9
211:16 229:6
247:1 249:18
251:24 254:15
263:16 268:22
**answered**
17:17 68:8,14
143:8 149:1
164:15 187:4
203:4 219:10
223:24
**answers**
119:9
**anticipate**
17:20
**anticipated**
14:8 244:13
**antiperspirant**
108:17
**anybody**
74:24 261:11
264:10
**anymore**
271:21
**apologize**
27:4 28:15,24 29:2
30:18 65:12
157:22 162:1
204:5 232:3
246:16
**apoptosis**
263:22
**appear**
61:23 84:20 130:22
132:1 134:1
**APPEARANCES**
3:1 4:1
**appeared**
58:16 153:12
157:18 177:20

**appears**
130:18 131:7
**appendices**
85:2,3,12,19
102:22
**appendix**
85:13 89:22 94:24
97:18 103:9
272:23 273:1
**applicable**
149:6
**applied**
91:16 150:9,18
247:17 248:4,11
**applies**
92:13 106:11 128:1
128:3,9 147:23
148:13
**apply**
144:1 149:8 173:1
187:24 188:1
227:22
**applying**
150:22
**approach**
138:20,21
**appropriate**
205:6 217:22 220:5
**approximately**
36:10
**April**
6:22 28:8 90:14
160:4 166:17
**archives**
61:15
**area**
7:8 13:15 14:23
15:8,13 16:5 19:5
91:10 119:17
135:3,15 139:16
183:21 184:12
185:14 187:2
189:16 196:18
198:19 199:15
203:21 255:8
266:15 267:2

**areas**
14:23 47:22 91:4
116:1,11 276:19
**Argon**
47:5 49:5
**argue**
81:10
**arguing**
233:13
**arguments**
81:6
**arrangement**
38:7 40:10
**arrangements**
39:12
**article**
56:5,8 88:19,23
91:14 112:8,16
125:7 174:5,11
183:24 194:19
195:14 197:5
201:10 210:20
232:6 247:16
249:21 261:9
276:3
**articles**
91:17,18,19,22
92:1,15 112:16
163:6,8,16 174:14
177:21 260:1
**asbestiform**
130:23 131:8 132:4
132:23 134:5,6
141:15,22 144:2
144:20 145:9,11
146:3,11 152:8
273:24
**asbestos**
55:3,5 56:6 73:10
74:7 75:1,1,10,17
75:24 76:2,7,14
93:7 96:6 140:15
140:20,21 141:2,4
143:1,23 144:1
146:15,17 149:18
150:14,23 151:5,7

151:8,13,19,22
152:9,16 153:12
162:6 234:10,23
250:18
**asbestos-free**
149:20 222:8,10
**Ashcraft**
2:13 3:4 31:22
**aside**
62:1 139:22 243:9
252:7
**asked**
25:17 30:4,6 31:1,3
31:12 52:5 53:15
68:8,14 71:7
76:17 87:10,12
93:4,5,21,22 94:3
100:17,21 110:17
111:5 120:21
130:18 139:6
143:8 144:23
148:9 164:15
180:21,21 186:4
187:4 211:9,10
214:1 223:24
238:24 260:11
**asking**
17:20 23:12,13
27:17 58:11 71:9
92:6 98:16 124:18
131:9,19 155:19
155:23 185:2,3,9
185:10 191:8,14
191:17 195:1
197:12,14,17
200:7 201:17,20
208:10 209:19
227:17 233:21
236:14 248:24
256:18 259:5,8
262:9 264:2,3
267:8
**aspect**
34:4
**asphyxiation**
161:4

Case 3:16-md-02738-MAS-RLS   Document 33013-77   Filed 07/23/24   Page 75 of 111
PageID: 221372
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 283

**assays**
268:14
**assertions**
118:16
**assess**
91:13 177:1
**assessing**
92:13
**assessment**
6:20 50:13 53:14
53:16,19 77:10
85:20,24 91:21
105:17 114:7
115:6,9,10 129:5
129:22 130:1
146:8,14,15,19
147:11,22,23
148:11 149:5,8
155:10,15 156:7
157:1,3 158:6
159:5 160:2 162:4
162:18,21 163:20
164:12 166:10,17
169:17 171:11,11
172:19 174:6
175:14,18,20
177:3,11,18,19
178:1,4 207:12,20
209:4 213:2
214:15 235:5
253:19 270:13
273:16 274:1,3,4
**assessments**
115:7 157:10
167:24 174:16
**assessors**
213:7
**assets**
19:23,24 20:8
**assign**
91:20
**assigning**
92:14
**assist**
17:21 68:5,11
72:14

**assisted**
17:14,19 68:18
**assisting**
41:9
**associated**
144:15 145:17
261:19
**association**
7:13 8:22 184:11
185:13 186:24
187:19 199:14
200:20,22
**assume**
44:19
**assumed**
198:19 273:22,23
274:2
**attacks**
51:23
**attempt**
193:9
**attempted**
102:17 142:3
186:16
**attended**
40:23
**attorney**
34:19 38:17 64:17
66:21
**attorneys**
28:14 58:11,23
59:8,16,17 63:4
63:14,20,21 82:17
93:23 94:11 95:5
95:15
**August**
1:19 2:7 5:18 6:8
6:15 8:6 86:13
141:10 239:12,23
240:6,6 241:4,5
241:23 242:3,13
**Australia**
42:22
**author**
205:12 212:21
248:17 258:18

**authorities**
123:1,20 124:2
144:14 145:16,22
163:12 166:8,18
176:23 255:15
**authority**
42:14 43:10 77:24
127:18,22 150:22
160:9 162:6
164:12 166:24
167:5,16 226:6
**authors**
88:16 183:1 199:19
200:10 201:1
202:4 203:14
209:11 249:14,14
250:6 260:12
275:19
**authors'**
205:6
**available**
8:14 41:14 59:4
68:23 88:17
115:20 139:12
165:5,8 181:15
228:8
**aware**
26:23 40:22 41:14
82:15 83:9,14
101:20 114:5
118:18 119:16
158:13 164:11
165:2 249:17
250:4,6 252:9
259:1 260:1
261:12,17,23
263:18 264:8
275:19
**awareness**
225:18
_____
          **B**
**B6C3F1**
6:18
**baby**
7:18 8:14 70:1 76:2

79:20 80:4 106:15
113:20 137:13,22
157:20,24 158:3
159:7 192:20
228:3 231:12,16
232:1 233:1
234:13 236:2
253:11,11
**back**
12:21 13:8,14
14:19 22:2 23:5
24:11 48:8,8 57:6
61:5,7 65:11 67:9
71:12 73:15,22
74:14 87:7 97:4
98:3 105:7 109:1
111:10 113:5
122:10,11 127:11
129:24 134:7
136:8 139:18
148:6 149:23
159:23 168:3
169:12 176:6
178:20 180:17
194:21 206:17
237:24 242:4
244:23 245:4,18
253:16 262:12
275:23 276:15
**Background**
7:4
**BACON**
4:5
**Bailey**
217:17
**ball**
219:24
**ban**
172:7,8
**banning**
173:24
**based**
13:6 14:4 19:24
20:14 21:11 30:8
35:5 49:6 69:18
73:2 86:24 96:15

102:20 105:17
107:2 121:14
128:18 129:14
130:17 139:10,12
149:9,10 151:1,14
166:1 181:4
191:15 195:23
196:7 199:19
205:12,17 210:1
214:2 220:4,6
234:2,14,19 237:2
244:13 270:15
**basic**
122:13 170:8
180:24
**basis**
8:21 136:19
**Beasley**
3:15 26:18 31:21
31:23
**Beattie**
3:16 64:4
**becoming**
192:21
**beginning**
120:7 130:7 140:5
140:6 196:13
216:23
**behalf**
39:19 46:10
**believe**
16:4 23:3 25:16
31:22 33:14 37:18
38:1 43:2 44:11
47:2 54:23 55:1,4
55:15,24 58:21
59:18 61:2 62:6
64:3 65:21 66:19
69:22 71:13,20
72:2 73:2 77:15
86:21 89:15 92:3
92:8 94:23 97:16
99:11,13 100:19
101:9,12 102:4,4
103:7 106:4
117:10 118:9,13

Laura M. Plunkett, Ph.D, D.A.B.T.

118:15 119:20
135:5 136:7,14,16
136:23,24 138:15
139:5 142:2
143:16 148:21
149:2,17,19
156:17 160:22
161:6,10 168:4
171:1,9 187:17
190:23 191:3
194:10,13 195:17
198:4 205:5 210:3
215:14 218:15,21
220:5 222:9
223:20 228:18
230:5 231:7 233:2
233:4 236:12,20
237:13 246:12
250:20,20 251:24
252:2 253:1
259:14 260:20
264:10 270:7,9
276:6,17
**believes**
148:12
**bellwether**
78:10 79:6 81:24
**benefit**
21:4,8 214:1
**benefits**
21:6
**benign**
254:22 255:18,22
**best**
157:1 188:15
258:17
**better**
46:2 180:15 272:14
**beyond**
230:14 266:7 267:1
**Bibliography**
71:2
**big**
49:12 151:15
180:18
**biggest**

183:6
**bill**
30:10 66:3 245:2,3
**billed**
29:22 66:5
**billing**
29:24
**bio**
61:3 104:20
**bioactivity**
35:6
**biochemistry**
13:19
**biologic**
198:4
**BioPolicy**
12:4,24 19:8 41:8
**bioreactors**
15:11
**Biostrategies**
5:10,13 12:7,9
13:12,14
**biotechnology**
13:24 14:3 15:15
16:15
**bit**
123:17 181:8
**block**
154:3
**blood**
267:3
**Blount**
69:8
**Blvd**
4:7
**BMI**
80:14
**Board**
7:7
**board-certified**
13:17
**bodies**
146:2
**body**
43:11 59:14 68:21
155:22 172:19

173:2 178:6
182:14 183:20
192:7 193:4
195:10 262:23
263:10,15,20
264:21 265:12,17
266:13,14,19
267:2 271:6,19
**Boorman**
6:19 112:7,16
**bother**
85:13
**bottle**
70:2 158:2
**bottom**
45:23 144:6 257:15
**Box**
3:18
**boy**
212:22
**Branscome**
92:8 127:9 134:7
211:8
**break**
29:16 104:20,24
178:15 237:20
**bring**
10:24 20:20 21:3
52:19
**broad**
26:9 88:13 117:20
119:3 164:2 208:2
210:23 236:7
**broader**
26:7
**brought**
11:2,3 13:22 20:6
84:9 85:23 215:14
239:19
**build**
265:7
**building**
11:16 124:19 154:3
**built**
136:21
**bulk**

132:1 133:24
**bullet**
115:24
**bundles**
131:1
**bursal**
255:12
**business**
11:10 12:3,6,11,12
12:17 17:2 18:8
45:7
**Buz'Zard**
229:15

---

**C**
**C**
4:6 10:1 85:13
89:22 94:24 97:18
272:11,12 273:1
**cab**
67:6
**Cadigan**
241:14 242:4
**calendar**
48:18
**California**
16:21
**call**
14:21 26:12,14
28:11 47:23 59:1
60:1 69:3,3 141:2
141:2 146:21
173:22 213:6
219:15 251:6
266:13
**called**
10:4 14:11 42:22
53:17 59:8,21
73:6 146:3,3
**Canada**
6:22,22 7:19 31:10
31:13,18 32:12
77:6,9,18,21
85:20,24 115:9
146:6,7,14 147:11
147:22 148:10,11

148:13 160:2
161:16,24 162:3,9
162:15,17 167:2,2
167:6,20 169:10
170:19,21 171:7
171:22 172:12,14
172:19 173:11
174:7,15 175:6,14
175:21 207:10,18
209:8 234:14
235:4 253:18
**Canada's**
166:9,16 167:19
171:6
**Canadian**
32:20 115:6 160:1
160:10 162:5
166:8,18,24 167:9
168:7,21 174:20
175:1 176:12,21
177:3
**cancer**
7:9,15 8:20,24 9:4
52:6 54:24 56:6
82:19,20 87:23
100:9,23 101:3
105:13 107:8
120:15 121:19
125:1 137:19
138:9,20 143:23
144:1,15 145:16
150:15 153:18,20
153:24,24 155:6
155:11 156:24
157:8,9,15 158:8
159:8,14 170:22
171:24 180:20
182:15 183:22
184:13 185:14
187:2,20 189:10
189:17 192:22
199:15 203:22
210:3 248:20
254:3,5,7 255:17
256:3,4 259:21
260:3,9,14 261:9

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 77 of 111
PageID: 221374
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 285

261:14,22 262:2
265:8
**cancers**
105:18
**Cannabidiol**
51:10
**capable**
120:18 121:11,15
128:20 129:18
158:8 159:7
**captioned**
279:6
**carcinogen**
144:14 149:16
152:9 153:13,17
156:6
**Carcinogenesis**
70:6
**carcinogenic**
156:8
**carcinogenicity**
69:11 149:18
152:16
**carcinogens**
7:3 146:4 154:17
**Carcinoma**
8:16
**card**
65:23
**care**
172:23 266:11
**careful**
40:4
**Carmen**
7:11 195:18
**carry**
151:4 217:18 267:4
**carrying**
151:10
**case**
10:21 23:6 26:7
29:20,23 31:2,10
31:17,18 32:12,21
45:24 46:8,14,23
47:1,1,3 78:4,6
82:9 92:5 93:21

98:5 105:14 106:2
107:14 114:4
118:21 206:10
210:8,10,12
225:16 226:23
228:2,15 229:24
238:4 243:13
244:16,21 256:9
258:23
**case-specific**
79:16,24 80:18
81:2 105:22 206:2
206:4,6
**cases**
17:23 28:5 29:11
29:12,17 30:5,6
30:24 31:3,10
46:11 47:12,20,22
48:9,19,23 49:6
78:4,10,14 79:6
79:12 82:1,18
100:18 105:14
112:5 113:5
130:14 188:2
203:2 205:22
210:2 245:3
**cast**
224:22
**catch**
266:4
**categories**
164:5
**category**
135:13
**causal**
210:5
**causation**
107:12,16 154:4
209:17 210:6,13
**Causative**
248:20
**cause**
1:13 138:3 152:16
152:17 153:18,20
209:21 210:3,17
**caused**

46:7
**causes**
157:12
**causing**
121:11,15 128:21
129:19 158:8
**caution**
40:3 113:9
**caveat**
103:5 129:3
**CBD**
51:9,10
**cell**
258:14 259:10,13
269:2,8,10,11,22
**cell-based**
15:12
**cells**
8:20 258:1,3 259:9
260:16 264:1,15
267:23 268:10,11
268:16 269:5,8,12
269:17 270:1
**cellular**
260:7 263:22
**Center**
14:4
**Centre**
213:1
**certain**
34:3 43:5 73:4 81:7
91:9 158:21 159:3
**certainly**
24:9 30:14 67:3
70:21 85:22 92:1
100:12,15 114:18
118:8 119:16
136:21 146:4,5
153:19 161:8
178:12 198:2
207:15 209:18
216:9 223:11
227:7,20 234:20
236:9,16 247:11
259:5 263:16
**CERTIFICATE**

280:1
**Certified**
1:24 2:21
**certify**
280:4,10
**chance**
119:12 238:12
**change**
6:21 12:10 17:1
19:3 63:2 278:3,5
278:7,9,11,13,15
278:17,19,21,23
**changed**
101:21
**changes**
171:18 259:6,20
260:2,8 261:8,13
261:15 279:9,12
**charged**
245:15
**check**
32:15 245:1,9
**checking**
34:18
**chemical**
38:4,10 126:16
136:11 166:13
**chemicals**
38:9 170:7
**Chemistry**
37:14 39:20
**chemotherapy**
254:11
**chinchilla**
229:13 255:9
**choosing**
223:20
**chose**
204:20 236:4
**chosen**
56:24 57:16
**chronic**
138:4 157:13
**chronically**
253:23
**chronologically**

88:8
**CIR**
115:13
**CIRCUIT**
1:8
**citation**
123:5 161:21,23
169:8 232:3
**citations**
161:12 170:20
**cite**
97:17 99:21,24
103:4 108:12
118:6 122:21,24
124:8 126:12
127:17,22 151:19
163:19 170:15
174:15 197:4
204:21 205:4
208:8 218:7
219:19 233:7
248:2 249:22
251:15,21 255:2
255:15 256:1
257:24 261:7
**cited**
91:20 99:7,9,10
109:8 119:8
124:17 140:23
163:6,21 164:13
165:16 166:19
205:4 247:10
253:21 254:20
**cites**
119:8 124:18
247:16
**citing**
100:6 158:15
214:22
**city**
1:8 4:8 54:16 67:10
67:10
**clarify**
30:2 130:17
**classified**
144:13

Laura M. Plunkett, Ph.D, D.A.B.T.

clear
117:4 120:21
  140:17 144:12
  189:14 226:1
  230:8 234:8
clearly
110:24 156:20
  224:15 237:14
click
88:16
client
15:7 28:12,13,19
  36:23 37:7 165:24
  216:7,10
clients
13:21 14:21,23
  15:4,5,7,9 19:8
  20:17,24 41:6,10
  45:6 65:9 77:21
  128:11 166:5
  167:13 176:11
  216:6 217:23
  220:8 227:8,24
Climate
6:21
clinical
262:19
close
35:12
closed
12:11
closer
21:24
co-culture
8:19
coffee
63:13 64:15
cohort
180:2 212:5
cohorts
184:10 186:23
Coleman
45:23
Colgate
221:19
colleague

58:2
colleagues
249:6
color
242:17
Columbia
2:23 280:2,22
combination
26:17
come
12:19 18:2 20:6
  39:6 57:18 59:5
  93:13 100:14
  109:1 111:10
  149:22 166:5,8,9
  166:19 208:14
  237:2 246:13
  265:11,16 266:14
comes
38:16 163:13
  202:14
coming
49:6 81:17 112:5
comment
60:13 132:21
  158:17 175:24
  192:2 193:11
commenting
44:18
comments
45:5 57:6 59:11
  62:18 77:2 175:18
  186:2 193:14,14
  194:22 242:6
Commerce
3:17
commercialization
51:9
commercially
8:13
Commission
43:12 280:24
commissioner
127:21
commissioner's
14:6

committee
52:17 56:12 57:4
  57:21
committees
56:17,23 57:18
communicated
39:18 40:16 41:22
  59:15 77:23
communication
43:19 77:17 95:15
  162:5
communications
41:15 64:16 77:6
Community
275:15
companies
13:22 38:9 106:1
  107:7 109:15
  128:13 173:18
  218:24
companies'
106:18
company
12:13,15,24 13:22
  14:10,17 17:5
  19:12,14,18 20:4
  20:7,9,12,17,21
  21:5,6,14,19 22:4
  22:11,16,18,24
  23:9,18 26:4
  34:14,17 37:1
  38:21 39:20 47:4
  49:6 66:8 87:8
  92:22 94:2 95:2
  95:21 96:9 99:3,4
  101:11 103:23
  104:3,13,14 107:3
  107:6 109:13,17
  110:24 115:18
  129:2,4 140:24
  151:3,18 158:13
  171:8 226:2,16
  230:17,19,23
  231:8 232:24
  234:6 237:11
company's

106:23
compare
139:2 202:12
  260:16
comparing
199:11
comparison
8:13 143:11 252:22
  260:20
complete
45:18 133:1 153:21
  191:15 212:7
completed
132:22
complex
35:4 157:5 159:15
  253:5
compliance
176:21,21,22,22
compounds
138:3 157:10
  162:10
comprehensive
113:21 115:10
  116:2 117:14
  118:23
computer
88:15 95:4
concepts
126:4
concern
53:12 234:8,9,15
concerned
34:5 35:11
concerns
109:18 225:18
  234:20 235:15,22
  236:1,10,21
concisely
169:5
concludes
276:22
conclusion
166:9 182:19
  183:20 184:7,18
  185:11,11 199:12

200:24 201:18,24
  209:14,19
conclusions
114:18 116:19
  117:2 166:19
  184:1,22 202:4
  203:12 205:7,12
  205:16 208:15
  209:10
conducted
228:3 256:13
conference
26:12,13 77:9
confidential
38:18 41:7,23 45:7
  58:10 101:15
confirm
250:22
confirms
199:12
conflict
75:3
confusion
130:19
Congressional
124:12
conjunction
198:13
connection
210:5
consider
165:10,15 167:8
  178:13 203:24
considered
6:14 45:6 80:14
  99:5,8,17 111:23
  138:9,19 214:4
  241:8 268:15
consistent
114:13,16 118:20
  130:13 136:14,15
  137:7,8 138:8,15
  138:23 141:6
  142:18 143:16
  145:13 152:5
  177:18 178:3

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 79 of 111
PageID: 221376
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 287

188:21,23 200:21
203:14 211:13,18
216:17 259:6
**constituent**
137:22 140:19
159:16 274:6
**constituents**
101:21 136:11
137:24 138:24
157:6 231:19
**consult**
13:8
**consultants**
236:18
**consulted**
37:16,19 38:3
**consulting**
12:3,6 14:9 17:2
24:6 33:5,19,20
34:2 35:16,22
36:8,16 37:9,14
38:7,14,22 39:1
39:12
**Consumer**
4:4 7:16 106:2
**consumer-facing**
171:19
**consumers**
115:22 169:20
226:19
**contact**
72:20 73:9 264:16
**contacted**
13:2
**contacting**
61:17
**contacts**
13:21
**contain**
103:19 140:8
171:23
**contained**
102:16
**containing**
173:5 244:21
**contains**

102:24 107:23
**context**
126:14 197:6
**continually**
223:6
**continue**
39:14 72:22 112:4
199:6 203:17
**continued**
4:1 19:9
**contract**
38:20
**contractor**
17:5
**contribute**
138:1 267:5
**controls**
188:2
**conversations**
64:22 74:11 107:3
**Cook**
45:24 46:5 47:5
**copies**
24:19 84:8
**copper**
212:19
**copy**
24:22 49:21 61:6
62:14 84:3,13,23
85:5 89:18 112:7
119:21 147:14
154:13 179:10
240:20 243:14
**Cordis**
47:6 49:5,15
**corn**
96:8,8,10
**corner**
113:19
**correct**
11:17 12:8 16:23
25:8,15 44:21
50:5,6,18,22 53:5
58:17 63:7 68:24
75:18 76:7,14
77:1,4 82:3,5,6,7

82:10 86:10 92:9
92:15,16 96:1
102:23 103:16,21
104:5,11,18
122:20 128:21
129:19 131:2,4,11
139:21 145:11
146:16,18,21
148:23 156:14
157:21 159:9,13
161:13 162:7,8,24
163:9 165:3,8,11
172:20 173:2,7,17
173:19 179:2,3
183:22 194:23
195:8,10,12
197:18 200:3
202:10,19 206:15
207:1,12 209:23
214:12,13,18,19
215:11 216:13,14
221:9 222:20
231:17 245:23,24
249:6,11 250:18
250:21,24 253:19
253:20 254:5
255:19 257:9,11
257:12 258:2
259:11 263:4
264:5,16,19,23
265:12 266:3,15
267:15,16 268:11
268:12 270:22
271:3,4,19
**corrected**
181:4
**corrections**
279:9
**correctly**
71:21 184:16
187:14 189:21
197:9 199:18
204:3,8 213:17
**correspondence**
57:7
**cosmetic**

33:21 34:23 35:23
35:24 36:21 37:4
37:7,10 120:13,24
122:7,12 123:4,16
124:6 126:13,17
126:19 127:24
128:1,9,19 129:16
129:17 166:1
167:20 170:19
175:6,14,15,21,21
176:4,4,12 222:2
222:8 225:18
227:9,10
**cosmetics**
35:5,8 36:9 73:7
123:16 126:16
127:4 167:9,16
168:8,22 169:10
169:12,15 170:10
174:20 175:1,11
176:9 226:15
**cosmetovigilance**
109:5
**cost**
65:20
**Council**
37:14 39:20
**counsel**
33:12 49:3 68:3
89:9 90:3,5,11
91:1 95:18,20
147:15 239:3
280:12,15
**counsel's**
11:8
**Counselors**
7:7
**couple**
39:6 51:4,12 65:7
66:14 74:17 90:20
92:24 145:18
153:3 168:17
276:19
**course**
51:17 53:14,15
54:1 148:15

**court**
1:1,8 113:5 210:11
**courtroom**
237:2
**cover**
20:23,24 91:4
**covered**
55:21 116:12 135:4
135:16 276:21
**covers**
91:10 116:22,22
**COVID**
24:1
**Covington**
49:12
**create**
155:16
**created**
263:6
**creates**
263:10
**creating**
159:8
**credentials**
57:17
**credibility**
224:13,22
**credible**
224:20
**credit**
65:23
**Critical**
7:12
**criticism**
183:4
**criticisms**
183:7 186:2 196:2
**cross-check**
113:3
**CRR/RMR**
280:3,21
**crystal**
219:24
**Crystalline**
7:5
**culture**

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 80 of 111
PageID: 221377
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 288

269:6,9
**current**
12:2 50:16 103:1
103:11,19
**currently**
33:20 35:24 41:9
171:2
**curriculum**
5:19 50:17,21
**cut**
101:10
**CV**
50:4 125:15 126:8
**CVs**
49:22

**D**

**D**
10:1
**DABT**
1:18 2:11 5:3,17,21
5:23 6:4,7,13 7:21
8:4 10:3 279:19
**daily**
59:1
**Dan**
213:3
**data**
76:10 93:8 139:12
140:7 142:21
158:2 160:19
180:4,13,15
181:16 184:9,22
187:10 188:9,21
188:22 189:19
190:3,18 191:13
199:1,3 200:11
201:4 203:1
205:18 208:14
211:4 212:2
228:11,12 230:23
231:2 248:24
256:21 260:6
270:13,16
**database**
93:16,17 95:5,10

**databases**
87:18 95:22
**date**
16:18 26:23 28:22
29:3,4,8 97:13
136:24 218:9
246:10
**dated**
5:24 6:5 8:6 26:22
28:7,21,24 51:5
86:13 112:17
141:16
**dates**
29:2 48:18
**Davies**
255:13
**day**
67:11 71:16 231:6
244:15 263:10
271:6,11 279:15
**days**
30:11
**DC**
1:20 2:16 3:8 64:12
**deal**
52:11 55:10,10
176:20 203:3
212:1 216:3
**dealing**
273:21,21
**dealt**
162:8 167:13
215:21
**death**
263:22
**decades**
231:3 236:11
**December**
7:6 13:1 17:3 54:19
55:13 56:4 77:18
78:1 101:1 106:22
160:3 245:17,17
**decide**
99:18 172:8 224:19
238:14
**deciding**

234:6
**decision**
233:10 234:13
**deck**
62:18
**DECLARATION**
279:1
**declare**
279:4
**dedicated**
244:21
**defendant**
48:23 106:7
**Defendants**
1:15 4:3 225:17
**defense**
48:22,24 120:21
163:2
**define**
44:17
**defined**
143:12
**defines**
168:8,22 226:7
**defining**
142:6,7,11,12
143:5,6
**definitely**
31:23,23 180:9
**definition**
25:24 26:9 124:22
142:17 143:18
**definitive**
223:8
**definitively**
39:5 183:11
**degraded**
151:14
**del**
7:11 195:18
**demographics**
82:12
**demonstrable**
199:13
**Denise**
1:23 2:20 280:3,21

**dependent**
197:24
**depending**
125:3 252:16
271:15
**depends**
97:22 202:23
**depo**
211:7
**deposition**
1:17 2:10 5:8 6:1
7:1,20 8:1,3 9:1
10:17,21 11:1
17:2 23:6 24:19
25:18 26:6,12
28:6 45:15,19
46:7 47:15 54:18
55:12 56:3,21
57:24 77:5,18
78:1 89:16,23,24
90:18,19 91:5,6,7
92:7 96:13 100:8
100:17,18 101:1
102:8 103:13,17
104:5,16 106:21
107:6,18 110:13
111:8 112:11
127:4,12 134:8,13
134:21 139:19
144:24 214:1
222:19,23 223:3,6
223:21 224:4,14
224:22,24 225:3
225:10 232:23
233:6,8 239:17
244:14 260:21
272:5 273:7,14
276:5,24 279:6,10
280:6,8,11
**depositions**
48:3 49:17,18
89:24 90:14,24,24
91:2,4 93:5,15
215:15 238:3
252:14
**derive**

263:8
**describe**
14:14 57:12 133:23
162:4 217:12
223:22
**described**
139:8 189:3
**describes**
115:5 130:21 131:6
132:18,23 187:8
**description**
5:9 6:2 7:2 8:2 9:2
25:7 28:10 30:16
34:13,17,23 46:2
124:3,4 149:5,6
211:2 213:23
220:19 222:2
**design**
265:3
**designated**
47:20
**designed**
180:19 183:2,8
**despite**
225:17
**detail**
155:1 212:12
216:20 252:9
257:9
**detailed**
212:10
**details**
31:19 46:24 268:22
**detecting**
159:2
**determine**
94:17 97:15 129:22
155:20
**determined**
129:13
**develop**
255:8 260:9
**developed**
59:11 203:21
207:19 216:22
255:17

Laura M. Plunkett, Ph.D, D.A.B.T.

developing
170:23 254:23
262:1
development
14:12,14 96:10
255:4 259:22
260:3,14
devices
46:10 47:9,10
diagnosed
256:4
diagnosis
256:3 262:19
diameter
251:10
dictate
152:13
died
46:12
difference
13:19 14:16 125:21
193:4 200:2
271:21
differences
127:6,13 199:9
different
12:13 13:23 29:17
35:1,19,20 37:2
41:10 48:24 51:8
53:14 54:1 67:1
74:11 85:9 87:11
92:11,12 96:17
120:24 123:18
126:21 130:21
131:20 132:7,10
132:18 133:8,9,14
133:15,16 138:9
138:17 152:6
154:5 164:4,5
170:6 171:20
172:23 193:16,17
193:17 194:12
200:23 202:3,16
208:22 211:15
218:4,9,17 261:14
262:7,14,16

265:20 269:22
dig
31:19 47:3 192:10
digested
197:5
digging
165:19
dime
59:10
dimension
167:15
dinner
65:1,5,17,20 66:15
66:16
direct
21:3 38:19,20
99:15 217:10
236:23
directed
77:2 146:15 153:4
direction
280:8
directions
94:11
directly
19:12 168:24 175:5
215:21 216:4
239:16 280:16
disagree
114:17,23 115:4
116:13 117:1,9
135:3,15 187:21
189:2 198:7
199:19 200:10
208:19 269:13
disagreement
116:23
disclosed
47:13 48:13,16
Disclosure
8:8 243:12
disclosures
78:5
discontinuation
7:17 231:12,16,24
233:1,8,16

discontinue
233:10 234:13
236:4
discontinued
237:5
discount
178:11
discovery
87:3 93:10
discuss
63:16 122:11
171:16 177:23
178:4 179:2
181:24 231:24
257:8
discussed
27:15 54:21 55:14
55:17 56:5 58:1,4
85:23 96:6 102:6
102:7,8 120:15
123:17 127:4
140:18 157:14
174:19,24 215:18
216:18 253:18
258:18
discusses
114:22 172:21
discussing
127:19
discussion
102:10 115:3
116:14 121:7
137:9 145:14
149:13 169:14
186:20 246:5,23
discussions
58:10 74:6
distinction
99:6 120:22 140:17
distinguish
140:24
distribute
19:23,24
distributed
20:21
distributing

234:7
distribution
19:21
District
1:1,2 2:23 280:2,22
Division
1:15
Dobner
1:23 2:20 280:3,21
docket
57:12 163:4 245:16
Doctor
71:3
document
7:4 25:1 27:13,23
29:16 45:10 49:23
57:9 60:17 67:17
69:9 84:16 86:5
86:14,17 91:24
92:18 93:16,17
95:21 97:5 98:14
98:24 99:11 100:2
100:23 104:14
108:2,6,7,15,19
109:23 110:2,22
111:14,17,20,22
112:12 113:19,22
113:24 114:6,8,11
114:15 115:17
116:2 117:15
118:10 124:8
147:12 148:1
151:2,18,20
154:10 156:1
160:10 179:15
191:2 194:1,9,13
196:7 207:6
215:12 221:14
222:9,15 232:16
232:19,20 238:6,8
239:1 240:1,5,16
242:1,7 243:2,18
244:6,8 246:20
247:7 248:2,9
249:24 257:20
268:7 272:15

275:11
documentation
57:5,8
documents
25:23,24 26:1,2,4
27:15 28:11 57:20
87:1 88:1 89:4
90:4,7,12 92:22
93:8,17,24 94:3
94:16 95:2,8,12
95:16 96:6,7,9,14
96:17 97:6,8 98:1
98:7,19 99:3,4,7,7
99:12,20,24
100:20 101:16
102:21 104:13
106:8 107:3,7,24
109:6,11,14 111:1
113:6 122:18
140:23,24 141:6
145:14 152:7
153:6 154:21
158:15 215:13,17
215:17 216:17
217:12 218:5
222:3 223:15
231:23 237:3
238:11,13 239:4,6
244:10
doing
14:17,17 18:1
36:17 59:9,22,23
72:23 73:2 88:24
96:9 107:15 154:4
172:6 201:2
210:13,16 211:19
237:14 258:12
261:15
domain
230:11
dosages
156:19
dose
155:15 158:8,12
260:15,20
dose-response

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 82 of 111
PageID: 221379
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 290

155:24 156:2
189:15
**doses**
156:7 261:3
**doubt**
224:22 242:17
**download**
95:8
**Dr**
5:17 10:11,16
17:13,18 20:9,11
21:11 39:2,23
53:24 59:13,13
66:19 76:13,13
79:9 81:15 82:3
83:7,19 97:12
105:10 114:5,21
116:4,24 117:21
118:17 119:4
124:9 134:12,24
148:9,16,21
156:10 178:23
188:17,19 195:16
195:18 197:3
200:15 206:2
208:24,24 209:1
211:7 212:17,21
213:4 233:3
238:12 250:3
251:24 258:19
259:14 270:1
271:23 272:5
276:24
**draft**
235:6
**drafted**
27:18
**draw**
19:17,19 20:3
200:23 201:19
202:4 205:11,16
205:16
**drawn**
114:18 116:19
201:24
**draws**

20:3 117:2
**drive**
95:3 139:1 203:12
**driven**
159:14
**driver**
212:22
**drives**
151:7
**Dropbox**
6:11 94:15 97:8
107:22
**drove**
137:23
**Drs**
141:9
**drug**
108:17 109:18,19
122:12 123:14
169:11 170:11
**drugs**
261:19
**drums**
158:3
**Duces**
7:22 8:5
**duly**
10:5 280:5
**dump**
97:23
**duplicated**
113:8
**duration**
180:22 189:15
190:4,14

————————
**E**
**E**
10:1,1
**E-l-d-r-i-d-g-e**
11:12
**e-mail**
41:11 57:14,15,19
61:2,7,13
**e-mails**
96:17

**e.g**
100:1
**earlier**
17:18 33:18 42:23
56:9 58:15 113:15
124:20 136:7
154:8 211:7
238:24 241:15
**early**
27:14 57:15 113:5
266:5
**ease**
84:2
**easier**
81:19 110:14
**easily**
131:1
**EC**
43:12
**edition**
193:16
**editor**
186:3 194:12
**editorial**
7:10 193:11,22
195:8
**effect**
6:16 8:18 156:8
203:23 264:9,14
264:21
**effects**
150:15 157:7
**EFSA**
42:15 43:7,8 44:1
**either**
26:16 29:8 45:15
45:19 47:5 55:6
56:17 82:23 92:17
148:10 151:2
152:21 161:14
214:18 215:14,18
216:17 217:8
226:22 228:14,20
230:24 242:12
250:24 252:3
280:15

**Eldridge**
11:12
**electron**
256:24
**electronic**
60:17 95:7
**electronically**
97:10
**elongated**
73:20 75:2,21
**emerging**
15:10
**employee**
17:6 280:13,14
**employees**
17:1 217:16,17
218:1
**enable**
180:7
**ended**
13:7
**engulf**
151:15
**ensure**
226:17 227:2,15
**enter**
191:13
**entered**
12:16 109:20
**entire**
98:23 276:23 279:5
**entirety**
98:6,7 224:23
225:2
**entity**
106:9
**entry**
191:11
**ENVIRON**
16:2 215:24 216:1
216:4
**Environment**
6:21
**Environmental**
8:17
**enzyme**

270:23
**enzymes**
267:23 270:20,21
**EPA**
56:12,23 57:3,11
57:21 242:6 243:2
**EPI**
116:16
**epidemiologic**
202:10
**epidemiological**
181:16 202:8
229:20,21
**epidemiologist**
117:7
**epidemiologists**
203:2,23
**epidemiology**
275:20
**epithelial**
258:3
**equal**
20:4,22
**equally**
144:1 200:19
**equate**
196:22 197:13,19
**equating**
145:8
**equivalent**
43:3
**ERRATA**
278:1 279:11
**error**
119:1
**ESQ**
3:5,6,16 4:6
**essentially**
62:24 111:24 115:4
179:9
**establish**
133:6 226:8 228:3
**established**
169:12
**estimate**
21:18 22:17 23:8

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 83 of 111
PageID: 221380
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 291

23:12 168:15
et
1:11,14 7:15 8:16
8:20,24 9:5 10:22
ethics
218:3
EU
176:21
European
43:10,11,12
evaluate
252:10
evaluations
53:22
events
109:17 265:6
eventually
136:20
everybody
61:12
evidence
7:10 114:17,24
115:17 116:15,16
117:5,13 118:14
118:21 121:15
125:3 189:6,7
204:2 205:9 208:9
209:6,7 211:14,20
212:11 214:4,6,23
214:24 216:21
217:5 224:13,18
225:16 231:8
235:13,14 236:20
253:9 258:23
exact
20:12 23:23 26:15
35:17 74:18
152:20 168:9,23
185:20
exactly
15:19 31:6 54:1
124:16 137:4
142:3 148:24
170:8 184:17
194:24 195:15
249:12

examination
5:2 10:4,8 134:4,23
examined
10:5 134:6,12
135:1 139:16
156:10,15,21
276:4
Examining
7:9
example
15:2 26:10 47:20
56:22 73:7 90:13
91:5,8 92:1 93:6
93:13 94:20 97:16
99:19 100:1,13
115:11 116:22
117:12 125:24
128:3 139:11
140:23 145:18
156:1 164:3
176:18 222:12
236:17 239:8
241:11 242:6
267:3
examples
15:17,18,19 51:20
145:19,20 222:5,6
222:14
exclusive
37:3
exercising
271:18
exhaustively
134:7 135:1
exhibit
5:10,13,16,19,20
5:22 6:3,6,9,11,13
6:16,20 7:3,8,12
7:16,20 8:3,6,8,10
8:12,17,21 9:3
24:22 25:2,13
26:22 27:22,24
33:10 45:9,9,11
45:13,18 47:18
49:21,24 50:16
57:9 67:15,18,20

84:13,17 85:10
86:3,6,12,15
107:21 108:3
109:4,22 110:3,6
111:15,18 112:7
112:13 113:18
119:19 120:1
125:19 147:11,13
148:12 154:8,9,11
154:15 179:14,16
193:20 194:2
196:3,10 207:5,8
207:24 210:21
232:11,17,21
233:17 238:7,9
239:23 240:2,14
240:22,22 243:10
243:19 245:8
246:18,21 249:21
250:1 257:19,21
268:4,8 272:11,12
274:24 275:9,12
exhibits
5:8 6:1 7:1 8:1 9:1
24:20 90:19 93:4
238:4
existed
181:1 276:4
existing
14:15
exists
129:1 182:6,15
223:14
exogenous
263:1
expect
73:8 152:17 177:21
229:10 269:12
expected
151:9 209:3
expense
66:7
expenses
22:20 65:15,22
66:5
experience

53:16 152:3 203:6
experiment
269:9
expert
1:17 2:10 5:22 6:3
6:6 8:9 47:14
52:21 76:6,12,24
78:3 79:9,16 81:1
86:13 98:21 99:2
162:14,19 163:21
164:13 165:10,15
165:18 166:1
167:8 224:12
227:1,13 243:12
244:11 247:10
254:16 256:12,18
258:4
expertise
13:15 76:9 227:7
227:11,20,21
256:19,23 258:9
experts
66:10 163:2 249:15
expires
280:24
explain
81:6 123:13 168:10
169:3
explanation
156:18 168:12,15
explicitly
143:24
exposed
180:13 264:22
exposure
6:17 137:19 150:13
151:11 155:6
180:23 183:10
192:7,20 193:4
196:20,23 197:20
212:7 260:15,17
261:16 262:24
263:19
exposures
126:17
express

102:20
expressed
92:4 98:5 115:14
121:9 215:14
219:5
expressing
97:20
expression
259:21 260:2 261:8
extended
151:21
extent
37:22 38:6 39:1,11
43:18 59:24 76:16
80:17 81:3 103:3
103:22 104:2,13
127:8 192:6 209:1
276:3
external
269:22
externally
248:4
extracts
35:3,4

F
F
3:6 69:6,7
F-S-A-N-Z
42:22
F344/N
6:18
fact
33:4 115:18 138:23
138:24 152:12
172:21 181:6
186:5 190:3,12
199:8 200:17
210:5 211:7
217:15,20 226:16
231:22 233:12
241:14 243:4
247:12 248:19
269:1
failed
221:24 225:17

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 84 of 111
PageID: 221381
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 292

**failing**
220:18
**fair**
22:21 23:16 33:6
67:8 254:8
**fallopian**
180:8
**familiar**
80:10 83:9 118:17
162:10 202:9
208:23 256:22
258:10,21
**familiarity**
79:11
**family**
78:9
**far**
12:21 18:18 34:2
37:12 95:2 101:22
107:20 110:1,9
112:19 127:17
156:7 171:17
173:3 218:9 230:3
**fast**
173:1
**FDA**
13:4,6,9 14:1 17:9
17:10 41:2,10,11
41:16,21 42:6,10
43:5 44:14 46:10
54:20 58:16 59:3
60:8,17,21 61:5
61:17,17 62:5
69:8 72:19,20,24
73:9,21 75:9 78:2
120:13 127:5,17
127:21 163:20
164:2,17,19 167:2
167:5 217:1,10,18
217:24 218:1,4,8
219:8,14 220:12
220:19 222:1
226:15 234:9,22
235:2,3
**FDA's**
75:16 122:6 123:4

**FDA-regulated**
121:1
**February**
30:10 40:23 41:22
58:16 75:17 76:5
141:17 235:1
280:24
**Federal**
58:21 108:5,7,15
122:10,15 123:24
**feedback**
62:20,20
**feel**
97:19 113:11
119:23 200:11
**fees**
19:11,15 24:5,6
**felt**
121:7 223:14
**fiber**
69:11 70:5 141:1
151:12,16 252:16
252:19,20,23
**fibers**
68:21 70:19,21,22
71:9 73:19 75:24
75:24 130:22,23
131:7,8 134:5
140:8,14,21,21
142:23 146:4
150:9,18,23 151:4
151:9,13,22 251:6
251:11,16,23
252:1,11 253:4,13
273:24
**fibres**
132:2,3 134:1
**fibroblastic**
253:23
**fibrous**
69:3 71:6,8,11
131:18 140:9,20
142:6,23 143:5
144:13,15,20
145:8,10,17 146:9
146:21 147:23

148:13 149:2,7,8
150:9,18,23 151:8
151:18,22 152:7
153:13 154:1
250:23 253:2
273:17 274:2
**figure**
19:2
**file**
170:19
**filed**
27:3 31:14 46:11
**files**
154:22 155:2
170:17
**filings**
78:20,21
**filling**
154:23
**filter**
46:4 47:3,21 48:19
48:23
**filters**
132:1 133:24
**final**
7:3 77:10 85:20
115:6 162:21
177:3,10
**financial**
250:13
**find**
24:16 28:8 115:12
115:12 117:15
118:23,24 148:9
149:4 152:20
160:13 169:5,14
170:5 177:10
178:9 190:6 194:8
200:1 257:16
260:4,5 263:11
273:18
**finding**
76:1 141:15 150:8
150:17,22 160:17
174:6 186:13
189:9,13 218:18

**findings**
143:22,24 148:13
149:14 159:22
160:11 187:18
199:20 200:16,18
205:7 259:2
269:15
**fine**
62:21 135:17
243:15
**finished**
13:3,3 36:5 175:9
**firm**
3:15 19:10 28:19
29:16 31:20,22
36:18 38:21 48:22
49:8,13
**firms**
26:19 49:1,12 65:9
**first**
24:23 51:14 52:23
58:23 71:10 98:13
107:23 109:24
114:2,3 116:2
118:22 120:2
130:22 133:23
156:4 169:10
186:22 187:13
196:13 207:10
209:16 219:10,11
221:3 241:4,23
246:7 280:5
**fit**
146:6 252:17
**five**
60:12 88:6 135:23
**Fletcher**
8:24 229:16 259:14
267:14,18 268:4
270:19
**FLW**
1:4
**focus**
75:16 181:6 238:16
267:24
**focused**

75:19 93:10
**focusing**
93:12 149:14,19
157:5 264:12
274:5
**folders**
97:12
**folks**
212:16 221:17
**follow**
108:1 276:20
**follows**
10:6
**food**
15:11,14 36:22
42:14,20,21 43:10
43:13,15 44:1,1,2
122:12 169:11
**foods**
15:11
**force**
221:22
**foreign**
77:24
**form**
58:6 60:5,17 63:24
73:13 74:9 75:12
78:17 98:10
105:20 125:11
128:6,23 132:3,12
132:19 142:10
151:8 152:1,14,15
155:8,18 158:10
159:11 163:23
165:13 166:22
167:11 172:2
173:9,13 174:9
175:8 176:14
177:13 182:8
185:17 188:4,9
190:22 191:22
196:5 198:23
204:24 207:14
208:2,17 210:23
218:11 219:17,22
223:24 226:10

Laura M. Plunkett, Ph.D, D.A.B.T.

227:5 229:2
233:19 236:7
250:9 251:2
256:16 265:1,14
266:17 268:18
270:5 271:9
**format**
92:18
**formatting**
68:17
**formed**
114:9 130:23 131:8
136:19 182:22
193:1 196:7
204:15,17 218:13
219:3,4 225:23
226:5 228:1
260:19 270:7
**formerly**
12:7
**forms**
23:14 133:9 138:10
152:8 270:24
**formulations**
35:20 39:16
**Forrest**
93:13
**found**
69:3 117:16 148:22
149:15 177:17
186:8 187:8
234:23 247:8
253:10
**foundation**
34:7 124:19
**four**
41:10 45:16 81:20
88:6 184:10
186:23 275:3
**fragrance**
101:13,14,21,22
**fragrances**
55:16 56:7 101:3,7
102:6
**frame**
40:15

**frankly**
113:14 134:13
**free**
58:7 88:19 113:11
119:23
**frequency**
189:15 190:4
**frequent**
180:22
**frequently**
203:22
**friend**
17:10
**friends**
52:18
**front**
50:19 84:3,24 85:5
85:16 119:21,24
214:8,10
**FSANZ**
42:20,22
**full**
10:13 88:23 196:13
**full-time**
12:12
**fully**
111:9
**fun**
74:4
**funny**
52:22
**further**
57:17 190:10
206:17 223:13
277:1
**future**
17:23

──────── **G** ────────
**G**
10:1
**gain**
248:21
**gaining**
38:18
**GAO**

124:12 128:15
**Gates**
214:11
**gene**
261:8
**general**
16:11,13 34:16,22
38:10 42:12 43:24
51:16,19 53:13
62:20 75:23 79:9
80:24,24 88:5
107:15 111:2
116:5,6 125:20
151:6 152:12
154:4 156:18
176:15 201:17
203:5,8 210:13,17
211:18 229:7
246:5 248:13
**generalities**
34:13
**generally**
16:5 81:8 106:10
126:5 155:24
156:5 182:2
197:14 203:23
214:3 263:2
**generate**
271:11
**generates**
271:6
**genes**
260:13
**genetic**
261:13
**genital**
7:8 183:21 184:12
185:13 187:1,19
189:16 198:19
199:15
**genitally**
189:10
**GEREL**
2:13 3:4
**getting**
35:12,15 219:2

237:10
**give**
15:1,16 22:16
34:16,22 35:17
37:5 46:2 52:13
72:8 74:5 98:3
101:24 102:17
116:10 118:2
123:7,7,8 145:17
145:18 153:21
168:15 170:20
186:17 206:3
211:2 213:23
216:19 222:4
**give-and-take**
63:1
**given**
28:6 45:15 47:14
54:19 55:13 60:12
61:12 62:8 91:5
92:3 94:15 96:12
118:8 121:7
130:14 146:5
193:15 196:14,19
210:2 227:8
263:15 270:16
276:18 280:9
**gives**
91:6
**giving**
213:18 232:4
**global**
48:1
**go**
19:12 20:8,9 21:11
35:19 49:16 59:10
60:1 65:11 71:12
73:22 74:14 80:17
84:1 88:12 89:21
94:16 97:5,9,14
97:21,24 100:19
100:23 104:23
115:3 116:6,14
124:3 125:15
136:8 139:2 147:8
148:2 152:11

160:13,18 164:21
165:20 168:1
169:4,8 170:5,8
170:24 178:14
179:19 185:6
188:13 190:10
199:2 202:24
213:23 221:1
229:6,18,19 232:4
232:10 237:20,24
238:13 239:18
242:4 244:23
245:4,18 252:8
253:16 262:11
268:21 276:11,15
**Godleski**
66:19 83:7,19
251:24 258:19
**Godleski's**
250:3
**goes**
39:11 132:22 143:4
240:23 254:9
**going**
15:16 22:2 24:21
33:2,24 35:5,8,10
45:8 49:20 58:5
59:16 62:11,14,15
63:17 64:11,22,22
67:14 74:20 75:3
83:6 84:12 86:2
86:11 92:10 115:2
134:4 171:3,4,9
171:12,17 177:15
178:15 179:8
180:17 187:13
190:6 203:3
219:12 220:14
235:15,23 237:1
237:13 239:14
258:6 269:9
274:23 275:8
276:2
**Gonzalez**
214:12
**good**

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 86 of 111
PageID: 221383
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 294

10:11,12 36:4
50:9,15 88:18
105:1 213:7
**Google**
87:22,22
**Gorsky**
90:18,20 233:3,3
**Gossett**
7:10 193:12,20
195:7,16 204:21
**government**
75:22 160:1
**government's**
160:11
**Grand**
4:7
**great**
13:20
**GREEN**
3:6
**group**
37:17 39:19,21
40:17,21 41:4,15
41:16,24 42:21
44:15 45:2 54:20
55:14 58:2 174:19
174:24 191:20
199:24 200:1
208:23 209:1
211:22 212:14,16
213:6 214:8,17
250:3 275:20
**groups**
199:10 201:8
**growth**
132:24
**guarantee**
17:8
**guess**
21:24 22:12,12,13
30:10 45:16 50:3
57:12 67:1 102:11
156:4 210:4
**guidance**
226:14
**guys**

243:16
**Gynecologic**
8:12

_____
**H**
**habit**
145:11 146:11
152:8
**Hamilton**
229:14 255:12
**hand**
131:2
**handle**
151:12
**handled**
20:18
**happen**
121:16 171:10
266:8
**happened**
21:13 113:1 164:4
171:10 220:3
233:14
**happening**
226:23 237:16
**happens**
121:18 271:15
**happy**
52:19
**hard**
18:22 95:3
**HARDY**
4:5
**Harlow**
188:19 194:21
200:15
**Harlow's**
193:14
**harm**
120:14,18 121:11
121:15 122:3
124:23,24 125:1,4
**harmed**
51:22
**hazard**
115:20 121:13,20

125:21 126:4,9,11
126:13,22 127:12
128:20,24 129:6
129:18 151:5
152:24 153:23,24
154:2 157:8
169:21 170:9
**hazard'**
120:12
**hazards**
169:20
**head**
23:3 74:16 78:19
170:17 176:7
263:13
**headed**
67:9
**heading**
69:11 276:1
**health**
6:22 7:16 42:16
43:1 77:6,9,17,21
82:12 85:20,24
115:9 146:5,7,14
147:10,22 148:10
148:10,12 152:23
161:16,24 162:3,9
162:15,17 166:9
167:2,6,20 171:5
171:7,22 172:18
173:11 174:7,15
175:6,14,20
180:16 207:10,18
209:8 213:2 235:4
253:18
**hear**
58:19
**heard**
78:20 93:2 228:15
**hearing**
65:2 66:22 235:2
**heavy**
55:7,8 56:7 100:9
156:11,19 157:4
**Hegarty**
4:6 5:4 10:10 22:14

23:15 24:3,18
25:3 27:20 28:1
33:6,8 34:6,9
35:14 36:7 38:2
38:12 39:7,17
40:5,8,11 41:19
42:4,18 44:3,9,21
44:23 45:8,12
48:15 49:20 50:1
56:2 58:14 60:15
63:5 64:6 65:3
67:7,12,19 68:10
68:19 70:3 72:10
73:24 74:19 75:15
76:18,22 78:23
79:13,18 80:2,12
80:16,21 81:5,13
81:21 82:2 83:4
83:15,23 84:7,12
84:18 86:1,7,11
86:16 87:9 89:17
90:6 95:1 96:1,2
99:1 104:8,21,23
105:3,7,9,23
107:17 108:4
109:21 110:5,18
111:13,19 112:6
112:14,24 113:10
113:16 118:11
119:14 125:12
127:10,14 128:17
129:10 130:2
131:11,14 132:15
133:3,4,21 134:15
135:2,7,10,14,18
139:17,20,24
143:2,19 145:1,7
147:4,8,14,19
148:2,6,20 150:2
153:1 154:6,12,14
155:12 156:3,13
156:16 157:16
159:4,17 164:10
164:18 165:1,9,23
166:6,14 167:7,18
168:6 172:17

173:10 174:4,17
175:12 176:10,24
178:14,20,22
179:10,13,21
181:21 182:9,11
182:18 183:15
184:4 185:4
186:19 187:6,11
188:5,10 189:11
190:15 191:9
192:5 193:2,19,22
194:3 196:9
197:10 198:15
199:5 201:5,12,21
202:18 203:16
204:19 205:19
206:11,20 207:4,9
207:22 208:12,20
209:22 212:13
219:6,18 220:16
221:2 224:9
226:24 227:12
229:23 230:7,18
232:9,14,18
234:11 235:21
236:22 237:19,24
238:10 239:13,18
239:22 240:3,21
241:20 243:8,16
243:20,24 246:17
247:2,24 249:1,20
250:5,10 251:14
251:20 253:15
254:18 256:11
257:4,18,23
258:24 261:1
262:10 265:9,19
267:9 268:3,9,23
270:18 271:17
272:22 274:22
275:4,8,13 276:6
276:11,15 277:3
**held**
2:11 51:17 74:3
77:9
**help**

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 295

80:20 93:22
222:15 239:1
**helped**
16:16 238:23
**helpful**
98:2,4 112:23
**hereof**
279:11
**heterogeneity**
199:11,23 201:7,8
202:14
**high**
178:3 211:21
**higher**
123:14
**highlighted**
204:1
**highly**
197:24
**historically**
87:7
**history**
193:4
**hold**
27:2 84:11 128:2
242:2
**home**
11:15 170:19
**home-based**
11:18
**hope**
128:8
**hopefully**
107:24 143:14
266:10 270:14
**hotel**
65:16
**hotels**
67:1
**Hotlist**
160:13 171:1,18
**Houghton**
214:11
**hours**
17:8 81:20 245:15
275:3

**Houston**
11:13
**HR**
199:10,11,24
**HRs**
199:9,23 202:13
**huh-uh**
17:16
**human**
108:18 144:13
146:4 149:17
150:13 152:9
153:13,17 156:6
215:3 259:9,9,13
262:23 271:6
**humans**
209:24
**husband**
17:4 68:15
**hydrogen**
271:2
**hydroxyl**
271:2,2
**hypothesis**
188:22,24 200:21
**hysterectomy**
198:18

_____
**I**
**i.e**
120:15
**IARC**
100:20 130:7 133:7
134:8 138:9,18
139:3,7,13,13
143:23 144:12
152:6,6 165:2,10
213:20 214:5,7,10
214:17 274:4
275:20
**IARC's**
138:21 143:22
145:13
**idea**
121:20 158:18
217:14,20 256:7

269:7
**identical**
138:21 238:18
**identification**
25:2 27:24 45:11
49:24 67:18 84:17
86:6,15 108:3
110:3 111:18
112:13 147:13
154:11 179:16
194:2 207:7
232:17 238:7,9
240:2 243:19
246:21 250:1
257:21 268:8
275:12
**identified**
47:13 56:11 78:10
91:13 99:3 103:24
121:14 127:17
132:2 134:2
**identify**
35:7 56:16 127:24
147:22 150:21
182:5,13 184:14
190:18 191:18
192:6 193:3
238:23 241:21
250:18
**identifying**
34:14 138:23
**imagine**
24:15 165:17
191:23
**Imerys**
217:9,16 221:18
**immortalize**
269:8
**immortalized**
268:11 269:2,18
270:2
**immune**
262:21 266:22
**immunocompro...**
261:20,24 262:8,14
262:18

**immunosuppress...**
261:18,19
**immunosurveilla...**
262:7,9,13,22
**impact**
172:13
**impacted**
24:2
**importance**
115:19 256:20,23
**important**
120:8,22 121:3,10
126:20 130:17
141:7 189:6 198:3
200:19 203:24
261:6 271:12
274:3
**in-depth**
115:10 117:11
**in-face**
73:16
**incidence**
183:21 184:12
185:14
**include**
25:6,23 26:4,5,8
48:8 65:17 82:11
123:5 126:17
161:21 185:10
206:23 214:21
253:3,17 254:20
**included**
99:4 112:9 117:17
162:18 214:14
**includes**
50:21,24 106:17
132:17 253:12
**including**
24:2 106:24 140:9
140:14 150:15
177:20 221:22
251:21
**income**
18:16 19:3,4,5
**inconsistent**
220:15

**incorporated**
103:7
**increase**
150:14 184:14
192:21 261:21
**increased**
8:23 186:13 189:9
215:3,6 262:1
**increases**
271:18
**INDEX**
5:1
**indicate**
120:17 244:19
**indicated**
148:17 197:3
279:10
**indicating**
147:23
**indirectly**
280:16
**individual**
30:4 97:12 100:20
114:24 117:5
125:5,6 159:15
180:11 182:2
205:10 206:10
211:5 218:23
235:12 262:19
**individuals**
26:6 96:12 107:4
183:13 191:13
233:22 261:20
**industry**
13:8 217:1,4,7,8
218:22,22 220:6
220:18 221:11
**infants**
160:24 161:9
**infection**
265:23 266:2,5,7,9
**inflamed**
253:23
**inflammation**
138:4 265:21
**inflammatory**

157:13 259:6
271:13
**influence**
217:1,4,21 218:7
218:16,22 219:15
220:2,7
**influencing**
219:1
**inform**
187:18 226:19
**information**
45:7 62:4,5 80:1
81:1,4,23 82:4,8
93:8 114:19
115:20 160:20
163:14 165:8
169:19 183:10
190:14 191:4,6,15
192:18 195:14
198:1 205:11
212:7 214:24
222:1 244:18
246:3 261:6
**informs**
169:19
**ingredient**
33:23 34:14,23
35:6,24 36:1
37:10 44:5 126:13
175:15,22 176:20
**ingredients**
15:10,15 33:22
35:1,3,8 36:21,22
37:7 39:15 126:18
128:1 170:11
175:10 176:5,8
227:10
**inhaling**
161:3
**inherent**
120:16
**initial**
14:18 86:8,21
100:7 216:22
**initially**
13:13 139:6,11

**initiatives**
14:3
**injected**
269:18
**injuries**
46:7 51:21
**injury**
46:11
**inn**
182:20
**inquire**
113:12
**inside**
234:1,18 236:1
**inspection**
280:10
**instances**
20:15 218:15
**instruct**
128:11
**insult**
265:11,12
**insults**
266:23,24
**intact**
203:20
**Integrated**
12:7
**Integrative**
5:10,13 12:9 13:12
13:14
**intellectual**
19:9 34:19
**intend**
102:14 103:22
104:2,13 233:15
**interacted**
77:20 175:5
**interacting**
41:11
**interaction**
44:13
**interactions**
42:13,15,16 43:14
217:6,10,24
220:12

**interest**
17:24 18:4 59:23
196:22
**interested**
13:11 52:10 59:9
170:18 221:16,21
280:15
**internal**
26:4 73:1 104:12
104:14 107:3,6
110:24 140:24
236:18
**interpreting**
76:10
**interrupt**
275:2
**invite**
77:16
**invited**
51:14 52:13 53:2
163:1
**invoice**
5:12,15 25:20
26:11,22,24 27:11
27:12 28:7,11,20
28:21,23 29:14
30:19 32:5,17,19
244:20
**invoiced**
25:14 32:8
**invoices**
5:11,14 24:20,22
25:6,11,12,13
27:21 28:3 29:20
33:10,11 89:1
**involve**
38:6 43:15 51:15
**involved**
16:7,11 24:10
26:20 31:23 41:5
47:4 58:3,24
175:13,24 216:10
270:10
**involves**
43:18
**involving**

36:9 37:9
**ions**
271:3
**irritation**
138:4 157:12
**isolated**
265:6
**issue**
30:2 52:12 55:11
75:23 92:10 102:5
121:17 123:13
128:16 130:19
149:17,20 151:10
151:13 152:14
153:23 154:5
157:5 159:13
166:1 171:16,18
172:11 181:6
211:8 213:1
222:11 223:21
224:12 226:1,2
241:17 248:22
255:7 266:8 269:1
**issues**
14:2 16:14,14 24:1
31:13 34:20,20
39:14 43:13 51:8
51:9 63:17 77:22
80:18 93:1,7
116:6,21 138:17
159:1 160:22,23
190:12 203:3
206:4 216:10
217:7,19 236:19
260:21
**IVC**
46:4 47:2,21 48:19
48:23

———————
**J**
———————
**J&J**
217:9 221:18
228:16
**JAMA**
7:11 193:23
**JAMES**

3:6
**January**
7:11 13:2 193:23
245:16,17
**Japan**
42:17 43:3
**Japanese**
43:3 176:22
**JERSEY**
1:2
**jgreen@ashcraft...**
3:11
**John**
217:17
**Johnson**
1:4,4,14,14 4:3,3,3
4:4 7:16,16 8:16
10:22,22 16:1,1,3
16:3 76:2 93:18
93:18 95:17,17
106:1,1,2,2,3,10
106:10 153:5,5
157:23 158:24
159:1 217:15,16
228:2,2 231:15,24
232:4,5,11,12
233:9 234:12
236:1,1 237:4,5
249:8,11,17,21
250:7,18 251:12
252:8 253:17
255:22 256:13
**Johnson's**
7:18 76:2 80:4
106:14 113:20
157:20,24 159:7
231:12,16,24
233:10 234:13
236:2
**jointly**
14:4
**journal**
88:19
**judge**
237:9
**Judith**

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 297

52:15
**July**
27:3 242:5,12
**June**
5:24 27:4,7 58:1
84:14,21 89:8
101:24 105:11
**jury**
224:19

## K

**K**
2:14 3:7
**Kansas**
4:8
**Kathleen**
96:20
**keep**
50:19 180:17 263:1
269:8
**keeping**
57:17
**Kennedy**
124:9 127:20,21
**key**
270:20,20
**keywords**
94:12
**kicking**
22:2
**kill**
85:13
**killing**
263:24
**kind**
18:22 33:23 34:22
67:5 76:8 100:3
125:8 126:5
180:24 239:2
256:20 257:2
261:12 269:11
270:16
**kinds**
35:19,20 37:2 43:5
48:1 51:21 52:11
56:1 59:2 82:21

93:23 98:4,5
167:24 220:12
236:19 257:1
258:12,22 268:14
269:22
**Kleiner**
29:20,23
**Klimisch**
211:10
**knew**
53:1 63:20 93:1
**know**
13:11 15:12,21,22
15:24 16:5,10,13
18:2,3 19:19
22:13 24:8 26:19
29:1,3 31:18
32:20,22 36:3,6
37:6 46:16 47:23
52:20,24 57:14
58:22 59:8,22,24
60:6,7 62:23
63:21 65:19 66:16
66:20 67:2 70:11
70:20 71:12 73:22
78:13,24 79:3,6
79:13,16 80:3,13
80:18 82:14,19,20
82:22 83:18 85:1
90:11 91:9 95:10
97:21 98:2 102:7
103:9 112:20
116:18 117:1,9
121:16,17,18,19
136:6 143:15
146:23 157:9
172:4,5,15 174:13
175:10 181:15
186:14 192:1,11
193:18 194:11,14
195:16,18,20,24
198:5 199:3
205:20 208:3,6,24
209:1,2,5 210:1
211:6,16,20,21
212:3,14,15,24

213:1,4 216:7,8
220:1 223:17
224:19 226:18,20
233:24 234:19
235:2,4 237:4
239:1 242:16
244:7 247:11
251:7,13 254:10
256:6 259:12,13
260:8 263:9,12,14
264:6 272:2
**knowing**
151:7
**knowledge**
16:8 79:19 106:23
196:1 220:10,20
222:7 228:10
**known**
12:7 41:14 87:8
140:20 144:13
146:4 149:17
152:9 153:13,17
156:6 213:6
**knows**
243:23
**Krewski**
208:24 212:17,21
213:3
**Krishnan**
208:24
**Kuffner**
114:5 118:17 242:1
**Kuffner's**
114:21 116:4,24

## L

**lab**
258:15 267:22
**label**
129:8 169:19
173:16
**labeling**
120:13 122:7 123:4
123:14 126:19
127:18 128:1,3
168:5 173:24

**labels**
106:18
**laboratory**
267:21
**Labour**
42:17 43:2
**lack**
6:16 186:6 224:6
**laid**
124:19 169:1 170:1
170:3 211:15
**Langseth**
9:5 274:11,17,23
275:9
**language**
70:2 130:6,11
131:21 142:4
147:3,7 149:9,11
173:16 185:20
**large**
75:5 95:5 186:23
**Larisa**
12:17,18
**Larisa's**
17:10
**late**
57:15
**Lauchlan**
8:11 245:23 246:6
246:18 247:16
**laugh**
11:5 21:9 30:18
50:9 67:6 82:16
85:14
**Laura**
1:18 2:10 5:3,17,20
5:23 6:4,7,10,12
6:13 7:21 8:4
10:3,15 279:19
**law**
3:15 19:10 28:19
29:16 31:20 36:18
38:21 65:9 124:5
169:9,11
**lawyer**
19:22 68:4

**lawyers**
62:9 72:4 94:3
**lay**
34:6 178:6 212:12
214:4
**lead**
38:23 271:14
**leave**
67:3,10
**lecture**
51:15,16,18 52:14
52:18 53:4,12,13
**lectured**
174:18,23
**lecturer**
51:14
**lectures**
55:6
**left**
216:1 275:6
**left-hand**
113:19
**Leigh**
63:6
**length**
127:12
**lesions**
255:8
**let's**
89:20 104:23 147:1
168:18 237:24
265:21
**letter**
8:6 239:11,23
**letters**
186:2 194:12
**letting**
59:22
**levels**
140:8 150:14,23
151:11,22 152:15
152:17 153:11
155:15 157:17
158:16,21
**LGH**
1:4

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 90 of 111
PageID: 221387
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 298

**LIABILITY**
1:5
**Lifetime**
6:17
**ligation**
190:19 192:8 193:6
198:17
**likelihood**
120:14 121:3,24
122:3
**limitations**
38:14 115:15
177:23 212:1
276:18
**limited**
80:19 161:3 172:19
180:13 266:2
**limiting**
56:21 163:15 174:1
**limits**
61:24 165:2
**line**
116:6,7 138:6,11
138:14 143:21
144:10 204:9
278:3,5,7,9,11,13
278:15,17,19,21
278:23
**lines**
117:18 135:23
145:4,5 175:22
259:13
**link**
161:16 261:8
**linked**
155:5 271:13
**list**
5:16 29:10,10
45:13,17,18 51:12
57:1 60:24 69:2
94:19,21 99:5,8
99:19 101:7,9,17
101:18 103:9
135:24 136:4
145:23 153:21
162:19 195:21

199:10 212:18
213:17 225:6
228:6 229:17
239:8 240:12,14
241:16 242:18
243:5 249:18,19
272:1,3,4,16
273:6 274:13
**listed**
47:16 49:19 51:4
51:13 54:4 60:1
71:5 106:9 108:6
138:1 146:1
163:13 213:21
244:10 245:10,11
**listen**
171:15
**listened**
171:13,14
**listing**
50:12 161:14
218:18,19 219:2
222:11
**lists**
53:7 113:3
**literature**
26:3,9,10 87:16
89:8,10,12 91:12
100:14 115:11
128:15 139:7,9,10
155:5 165:3 229:6
229:7,10 248:13
248:14 264:11
**litigation**
1:6 10:17 16:8,17
16:19 17:15,19,21
18:1,10 19:12
20:8 21:2,12,20
22:5 23:1,4 24:5,7
24:10 28:4 33:19
33:21 35:23 45:20
47:22 58:3,24
62:10 64:18 66:22
68:4,5 69:14,19
70:8 72:5 82:18
86:21 118:18

137:10 154:18
162:20 163:3,6,21
164:13 165:11,15
166:2 249:15
258:19 268:21
**little**
35:12 61:2 93:11
155:1 178:16
181:8 216:20
240:16
**live**
64:12 79:17
**lived**
79:7
**LLC**
5:10,13 12:5 18:7
19:21
**LLP**
2:13 3:4 4:5
**local**
266:2,7,10
**localized**
264:15 266:15
267:2
**located**
16:22 46:15 266:3
**location**
16:21
**long**
101:7 108:11
112:20 115:3
130:24 154:23
168:12,14,16
180:14 183:14
**longer**
172:11
**Longo**
76:13 141:9,16
142:7 143:5
**look**
23:5 29:3 31:12
33:9 38:17 50:2
65:11 67:20 68:16
71:13 72:22,23
73:23 74:14 84:19
88:16 94:12 96:23

100:19,24 101:6
102:10 108:13
109:17 117:7,8
125:14 129:5
133:15 136:9
138:5 146:1 147:2
148:17 149:21
158:13 160:18
164:8,22 169:8
180:4,19 183:8
188:2 190:24
192:13 193:8,9
194:15 196:10
199:3 201:3
205:10 209:8
211:1 215:8
219:11 221:15
222:5 224:12
229:12,13,14,15
229:16 233:4
243:21 244:4
245:5,6 247:23
250:11,12,19,22
251:4,5,7,12
252:4,9,23 259:12
259:15 260:7
272:4,13 273:2,4
273:13
**looked**
85:8 88:7,8,11
98:22 100:13,15
107:6,19 112:1
133:14 139:7
142:21 154:8
163:14 165:22
166:7,18 178:13
183:3 199:1 211:4
215:4 248:3 264:6
264:11 272:23
273:1
**looking**
29:9 35:3 50:11
73:4 87:7 88:12
89:6 96:5,7,14,24
110:16,21 111:3
111:22 125:4

137:5 148:22
149:12,16 150:5
161:14 164:23
169:9 185:20
188:6 189:13
192:14,17 194:8
204:4 205:22
220:24 235:3
245:2 248:14
249:18 254:16
256:24 257:13
258:3 260:13
261:12,15 262:20
265:6 267:22
273:14
**looks**
70:16 115:5 261:18
264:11
**lost**
204:5
**lot**
18:2 19:4 35:2,3
43:4 48:24 92:7
235:20
**lots**
94:15 153:12
157:18,19,23
158:6,7 159:7
**Louis**
1:8 118:4
**low**
150:14,22 151:11
151:21 152:15,17
**lower**
113:19
**luckily**
211:2
**lunch**
65:14 66:17
**lung**
153:20 160:21
161:7
**lymph**
267:4

_____
**M**
_____

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 91 of 111
PageID: 221388
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 299

**M**
1:18 2:10 5:3,17,20
  5:23 6:4,7,10,13
  7:21 8:4 10:3
  279:19
**M-e-r-k-e-r**
17:13
**macrophage**
151:15 259:21
  260:12 266:1
**macrophages**
260:2 263:4,6,14
  263:20 264:13
  265:10,24 266:13
  266:13
**Madison**
209:1
**mailing**
11:19,24
**majority**
14:21,22 15:3 19:6
  98:19
**making**
13:23 60:1 99:10
  100:5 152:5 156:5
  161:19 207:11
  270:1
**Maldinado**
264:14
**Mandarino**
8:20 257:9,19,24
  259:2,19 263:3
  264:17,18
**mandate**
171:22 173:6
**mandated**
170:21 173:15
**Mann**
90:14 96:15,15,22
**Mann's**
224:24
**manner**
41:23
**manufactured**
46:5
**manufacturer**

37:20 38:4 173:4
  226:7 227:14
**manufacturers**
47:9
**March**
25:19 113:21
**marine**
258:3
**mark**
4:6 24:20 27:21
  33:3 45:9 49:21
  67:16 76:15 84:1
  84:3,5,13 86:3,12
  86:23 89:19
  104:19 107:21
  109:21 111:15
  112:3,6,22 135:14
  147:9,10 179:14
  193:19 207:4
  232:10,11 238:2
  239:11,14,19,22
  243:10 246:17
  249:20 257:18
  268:3 274:23
  275:1,9 277:2
**marked**
25:1 27:23 45:10
  45:17 49:23 57:9
  67:15,17 84:16
  85:9 86:5,14 89:2
  108:2 110:2
  111:17 112:12
  119:19 120:1
  147:12 148:11
  154:10 179:15
  194:1 207:6
  210:20 232:16
  238:6,8 240:1,16
  243:18 246:20
  249:24 257:20
  268:7 275:11
**market**
122:14 228:19
  231:1 235:18
**marketed**
128:8 169:18

**marketing**
1:5 14:14 124:6
**marketplace**
109:20
**marking**
24:21 154:9
**Massey**
10:15
**master's**
51:18
**material**
133:7 134:11,11
  135:24 242:18
**materials**
6:9,11,14 10:24
  11:6,8,21 89:10
  99:5,8 103:1,12
  103:20 107:18
  108:11 109:24
  111:2 112:9,20
  134:20 139:2,3
  154:7 162:19
  175:23 239:7
  240:6,11 241:3,14
  263:17
**math**
22:19
**matter**
30:16 31:17 32:13
  32:14 46:3 202:8
  279:6
**matters**
18:10 21:20 23:1
  32:24 33:19,21
  35:23 36:8,12
  37:9 38:15 52:2
**McDermott**
46:23 47:1
**McDonald**
241:12 249:6,10,16
  250:17 252:8
  256:13
**McLaughlin**
213:1
**MDL**
1:4 3:3,14 5:11,14

7:22 10:17 14:19
  17:2 24:23 25:7
  25:14 26:12,20
  27:10 28:6 30:6
  31:2,3 52:3,21
  54:18 55:12 56:4
  57:24 58:2 77:5
  78:1,4,5,8,11,15
  79:6 80:3,13
  81:24 82:5 83:2,5
  83:10,24 84:14,14
  84:21 85:17,18
  86:2,4,8,9,20
  87:11,13 88:21
  89:11 90:1,22
  91:20 92:7,19,19
  94:1 100:7,7,18
  101:1,18 102:1,8
  102:15,16,20,24
  103:18 104:4,15
  105:11,18,24
  106:21 107:5,13
  108:8,9 109:7,9
  112:18 113:4
  119:18 124:15
  130:4,15 136:8,10
  136:18,20,22
  137:8 177:2
  185:15 204:21
  205:22 209:16
  210:6,9 216:22
  223:19 238:4,16
  238:19,22 241:16
  244:13 247:13
  270:10
**Meadows**
59:18 64:2 65:6
**meal**
65:1,5,14 66:15
**mean**
22:11 28:13 34:17
  60:18 62:24 66:2
  70:12,23 71:13,14
  90:8,9 92:6 95:4
  97:2 99:14 115:1
  115:2,4 116:6,17

121:12,23 137:14
  142:16 143:15
  158:1 161:15
  163:11 164:17
  178:3 185:19
  197:7 202:23
  208:4,7,22,23
  211:7 217:3
  229:12 231:4,6
  234:8 235:7 259:4
  265:16 269:3,15
**meaning**
175:17
**means**
32:17 43:2 100:1
  120:14 121:13,15
  150:13 201:7
  263:23 269:4
  274:1,3
**meant**
53:11
**measuring**
264:4,5
**meat**
15:12
**mechanism**
157:11,14 196:19
  198:4 262:22
**mechanisms**
260:14 271:13
**mechanistic**
260:6 261:5,6
**mediators**
269:22
**medical**
45:24 46:5 47:6
  87:15 155:5 165:3
  174:18,23
**Medicine**
14:5
**meet**
62:9 63:9 64:16
  66:11
**meeting**
41:2,4 44:18 58:16
  58:19 59:12 61:8

Laura M. Plunkett, Ph.D, D.A.B.T.

61:17,23 62:12
63:6,10,12,15
64:16,18 65:5
66:10,13,17 67:3
72:2,4,9,19,20
73:11,15,16,18
74:1,3,6,13,23
75:5,16,20 76:4,6
76:23 77:12 78:2
175:4 216:7,8
221:15,17 222:6
235:1

**meetings**
41:12 51:8 75:9
216:6

**members**
221:20

**memory**
224:6,15,17 272:14
272:17

**mention**
136:12 181:9,15,15
231:11,15

**mentioned**
32:23 43:6,15 53:1
54:3,8 56:9 58:15
59:15 63:19 64:15
67:12 86:1 123:22
123:24 214:8
230:9 235:22

**Merit**
1:23 2:22

**Merker**
17:13

**met**
52:15,23 212:20

**metals**
55:7,8 56:7 100:9
100:20 156:11,19
157:4

**method**
91:16 208:19

**methodology**
211:18

**methods**
15:15 76:12 258:9

**mhegarty@shb.c...**
4:10

**MHLW**
42:17 43:1

**Mice**
6:18

**MICHELLE**
3:5

**micronized**
255:6

**microscope**
131:24 133:14
254:17

**microscopically**
253:13

**microscopy**
256:24

**middle**
130:6

**migrate**
253:9

**migration**
116:22 246:4
251:16,22 252:10

**million**
121:19

**mind**
106:11 223:10
233:21 235:12
237:10 276:23

**minds**
234:18

**mine**
13:16,18

**mineral**
73:20 75:2,21,24
132:3

**minerals**
156:12

**Ministry**
42:16 43:1

**minute**
245:1

**minutes**
60:12 61:9,10
168:17 221:8

222:6 275:5,5

**missing**
118:24

**Missouri**
1:9 210:11

**Misstates**
94:8 183:24 184:21
187:10 188:9
189:19 200:5
201:10,10,11
202:21 204:13

**mistake**
119:1

**mistaken**
117:16

**mistakes**
241:10

**MIT**
13:3

**mitigate**
174:3

**mitigation**
171:4 173:22,24

**mixture**
157:6 159:15 253:5

**mixtures**
35:4

**MO**
4:8

**model**
46:6

**modified**
69:14 70:8,13,23

**modify**
70:18

**molecular**
8:21 13:19

**moment**
53:10 67:13 162:13
239:14

**money**
66:2,3

**monocytes**
263:7,9 264:9,12

**monograph**
130:8 133:8 153:22

**Montgomery**
3:19

**month**
32:7 89:5

**months**
88:6

**morning**
10:11,12

**motivation**
233:23

**mouse**
258:1

**move**
267:1

**mparfitt@ashcra...**
3:10

**Mullerian**
8:10

**multiple**
134:14 138:2,24
209:14

—— N ——

**N**
10:1

**name**
10:14 12:2,10 25:7
47:1 49:2 60:9
64:13 82:15 92:8
244:2

**named**
79:1,1,5

**names**
35:18 65:12 66:18
78:13,20 79:3,17
96:12 128:13

**national**
49:3

**natural**
35:2 133:19

**nature**
35:13 44:20 52:10
117:20 119:3

**NCI**
115:12

**necessarily**

20:19 97:21 118:6
154:3

**necessary**
156:8

**need**
30:14 79:14,14
97:18 101:4,6
108:12 115:21
120:15 121:18,22
122:4 125:14
128:20 129:17
149:20 169:2
179:8 222:14
231:2 232:3
249:17 250:12
255:23 259:15

**needed**
31:1 50:4 148:17
223:14 239:7
266:15

**needs**
155:22

**neither**
226:21,22 250:17

**Nettesheim**
97:3 225:9

**nettle**
97:2

**never**
164:23 166:4
176:16 180:23
183:13 219:24

**new**
1:2 12:23 14:2,2,15
14:21,21,24 15:5
15:8 17:5 18:6
19:7 21:14 42:21
54:16 85:22 87:3
87:3 89:7,15 91:2
91:4,12,17,19,22
94:22 95:12,16,16
99:3,4 112:8
119:17 128:4
134:11,16,19
181:13 215:10,12
215:13,13 218:7

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 93 of 111
PageID: 221390
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 301

225:11 239:8
242:12,19,21,22
242:24 243:1
257:10
**newer**
181:14
**newsletters**
59:2,4
**nice**
212:4,6
**nitric**
271:3
**NOD**
6:9,12
**nominated**
56:17 57:13
**nominating**
52:17
**nomination**
57:21
**non-asbestiform**
146:12 149:14
**non-exposure**
196:24 197:21
**non-litigation**
36:12
**nonpatent**
181:7 190:17,20
191:20 192:9,19
192:21 193:7
196:24 197:20
198:3,18 199:10
200:1 205:23
**nonusers**
203:22
**normal**
268:16 269:12,16
**normally**
131:23
**Notary**
1:24 2:22 280:4,21
**notations**
85:4
**note**
120:8 149:22
162:18

**notebook**
11:3,4 85:16
**noted**
213:20 277:5
**notice**
2:20 7:20 8:3 25:17
32:16 70:14 87:8
99:23 110:13
111:8 154:3
171:19 173:17
223:13 228:9,13
238:19,22 239:16
**noticed**
162:1
**notices**
238:3
**noticing**
29:8
**notified**
62:13
**novel**
15:14
**November**
5:12 6:5 24:24
48:21 86:3
**NTP**
7:6 218:16,18
219:2 255:5
**number**
5:9,12,15 6:2 7:2
8:2 9:2 21:21
22:9 23:2,24
26:15 29:10 53:11
54:5,9,13 73:18
89:13,14 90:21
122:4 126:3 150:5
174:2 216:12
226:13 240:24
241:2 242:3
263:20 272:6
**numbers**
24:15 126:1 263:24
**numerical**
170:14
**numerous**
228:17

**Nurses'**
180:16
**NW**
2:14 3:7
**NYU**
51:14,18 54:22

---

## O

**O**
10:1
**O'Brien**
179:2,5,7,11,24
182:4,12 183:19
186:3 188:17
193:12 194:6,18
195:14
**O'Dell**
59:19 64:1,15 65:6
**O'Dell**
63:6
**oath**
279:13
**object**
33:3 34:1 35:11
37:22 41:17 58:6
76:16 117:20
127:8 134:4 258:7
276:3
**objection**
22:6 23:10,22 36:2
38:5,24 39:10,22
42:11 44:6 55:22
60:4 62:22 63:23
64:20 66:23 68:7
68:13 69:16 72:6
73:12 74:8 75:11
78:16 79:8,22
80:7 83:1,12,20
94:6 98:9 105:19
119:2 125:10
128:5,22 129:20
132:8 133:10
139:15 142:9
143:7 144:22
146:22 151:24
155:7,17 156:9

158:9 159:10
163:22 164:14,20
165:6,12 166:3,11
166:21 167:10,21
172:1 173:8,12
174:8 175:7 176:2
176:13 177:12
181:20 182:7,21
183:23 184:20
185:16 187:3,9
188:3,8 189:18
190:21 191:21
192:23 196:4
197:2,22 198:22
200:4 201:9
202:17,20 204:12
204:23 206:1,7
207:13 208:1,16
209:12 210:22
218:10 219:16,22
223:23 226:9
227:4 229:1 230:4
233:18 234:16
236:6 247:20
248:7 250:8 251:1
252:12 254:13
256:5,15 262:3
264:24 265:13
266:16 268:17
270:4 271:8
**objectively**
129:18
**obtained**
247:6,6
**obviously**
21:8 24:1 34:5
49:17 52:9 59:21
82:16 90:15 95:8
102:22 125:1
128:13 130:17
139:8 190:5
223:12 241:7,12
253:11 258:15
263:24 276:19
**occur**
121:19 130:24

133:13 271:21
**occurred**
27:14 82:21 90:1
215:19 218:5
**occurring**
253:7
**off-track**
185:8
**offer**
102:15 279:12
**office**
11:15,16,18,23
14:6 73:7
**offices**
2:11 97:10
**oh**
18:15 23:20 48:24
50:8 60:22 65:19
102:13 123:7
126:2 161:23
204:7 206:22
210:13 213:14
229:3,16 231:19
237:8 245:1 254:6
257:16 263:11
272:11
**okay**
11:10,20 13:1
21:16 24:13 27:6
28:16 29:5 30:12
30:13 33:16 38:22
40:2 47:7 49:10
50:15 57:3 64:8
67:8 70:4 76:18
83:16 84:7,10
95:7 104:22 105:4
111:7,10,12
113:10 117:19
119:15 122:2
123:11 125:17
127:24 130:5
135:7 139:17,20
139:23 144:8
145:12 147:5,20
149:22 155:4
159:18,20 168:18

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 94 of 111
PageID: 221391
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 302

168:20 179:12,23
188:14 195:22
196:12 201:23
204:7,10 208:21
210:15 221:4,10
222:13,17 224:10
227:23 230:19,21
231:14 238:17
239:21 241:24
242:2,5,14,20,21
243:3,6 245:12,18
245:21 249:2,4
250:2 254:8 263:3
268:19,24 272:24
273:5 275:7

**old**
20:17 91:17 215:16
248:14

**omissions**
117:16

**once**
62:7,7 95:14

**Oncology**
8:12

**one-on-one**
212:20

**ones**
69:6 74:15 92:2
93:10 94:17,23
97:15,16,17 99:9
99:13,15,17,18
100:3 114:20
213:18 225:11
229:9 241:7,9

**ongoing**
36:11

**onset**
157:15

**open**
97:14

**operates**
262:23

**opinion**
114:16 119:17
121:8 173:19
179:5 182:23

192:22 193:1
196:7 204:15
210:6 218:6,13
219:4,13,13 224:2
224:21 225:21,23
226:5 228:9,21
229:24 230:13,16
230:20,22 234:2
234:12 235:24
237:4 260:18,19
262:17 269:24
270:7

**opinions**
52:2 58:1 92:4
97:20 98:5 101:24
102:12,19 103:1
103:12,19 106:12
108:8 109:12
114:9,12 115:14
116:1,11 197:6
204:17 206:3
215:13 219:3
223:18 228:1

**opportunity**
118:6

**opposed**
34:14 188:6

**Oral**
7:20 8:3

**orally**
77:11

**order**
59:11 74:15 111:3
141:5 251:4
252:23 262:23
269:4,8

**organization**
44:15 45:2

**organize**
88:7

**original**
85:18 87:6,13 90:1
92:7 93:9 113:6
124:4 130:15
136:9,10,16,17,22
137:7 246:9,11

247:13 273:3

**outside**
33:19,20 35:22
42:6,9 52:19
58:12 207:20

**outstanding**
32:17,19

**ovarian**
6:16 7:9,15 8:15,19
8:23 9:4 52:6
54:24 56:6 82:18
87:23 100:9,23
101:3 105:13
107:8 137:19
155:6,10 156:24
159:8,14 170:21
171:23 180:20
182:15 183:22
184:13 185:14
187:2,20 189:9,17
192:22 199:15
203:21 210:3
248:20 254:3,7
255:12,17 256:3,4
258:3 259:13
261:9,21 262:1

**ovaries**
180:8 247:19 248:5
248:6 251:17,23
252:11 260:17

**over-the-counter**
108:17

**overall**
20:7 36:16 37:12
182:19 183:20
188:2 199:12
200:24 203:12
266:22

**overlaps**
91:10

**overpowered**
182:24

**oversight**
46:9 213:7

**overweight**
80:15

**owner**
12:14

**oxide**
271:3

**oxygen**
259:7,20 270:22
271:5,19

---

**P**

**P**
10:1 199:11 201:6
201:18

**p.m**
178:19 237:22,23
276:13,14 277:5

**P1851**
113:19

**page**
5:3,9 6:2 7:2 8:2
9:2 26:21 30:15
45:22 46:21 50:8
50:10 51:3,12
69:10 85:12 89:21
90:10 98:14
107:23 113:18
126:2 144:4,5
171:19 186:21
196:11 199:21
209:14 213:19
243:21,22 244:1
250:13 275:15
278:3,5,7,9,11,13
278:15,17,19,21
278:23

**pages**
85:12,14 89:21
98:17 108:16
161:17

**paid**
19:11 20:11 30:9
32:16,17 59:10
65:15 66:1 250:7

**paint**
38:23

**Palmolive**
221:20

**pandemic**
24:1 88:18

**panel**
213:18

**Paoletti**
69:7

**paper**
85:21 124:9 126:10
126:11 127:20
181:24 184:8
190:11,18 192:6
193:3,10 195:23
204:17 207:5,11
207:16,21 209:11
212:19,22 214:9
214:11,12,12
245:23 246:1,4,6
246:7,18 249:17
251:9,12 255:22
258:5 259:19
261:2 262:5 263:3
263:4 267:15,18
268:4 274:11,23
275:9

**papers**
125:22 211:1 213:9
213:10 249:14,16
250:17,18 252:4
256:14

**paradigms**
127:2

**paragraph**
16:20 53:7,11 54:4
54:9 120:2,3,6
123:9,10,13
124:17 126:1,10
128:19 130:3,7
134:17,22,23
135:19,20 138:6,6
140:1,2,6,7 141:8
141:12 143:20
144:7 148:18
150:3,4,5 153:2,3
153:10 155:14
159:19,21,24
178:23,24 181:10

Laura M. Plunkett, Ph.D, D.A.B.T.

181:13 186:16
196:13,15,17
198:14 199:7
203:17 206:12,14
206:18,19,21,24
213:8,11,12,13
215:8,9,10 216:12
216:15,23 218:20
220:17 221:5,13
222:18 223:1,22
225:13,14 231:10
231:11,13,15
240:5 243:22
244:4 245:19,20
245:22 247:21
249:2,5 253:16
257:5,8 267:10,13
268:5 272:20
273:13 274:7,10
**paragraphs**
51:13 124:20,20
218:7,14 219:20
238:13,21 239:4
**paralegal**
65:7
**paralegals**
65:7
**parallel**
130:24
**Parfitt**
3:5 8:7 22:6 23:10
23:22 26:18 33:2
33:7,24 34:8
35:10 36:2 37:21
38:5,24 39:10,22
40:1,3,6,10 41:17
42:2,11 43:17,21
44:6,19 48:12
55:22 58:5 59:19
60:4 62:22 63:23
64:3,20 66:23
67:16 68:7,13
69:16 72:6 73:12
74:8 75:11 76:15
76:20 78:16 79:8
79:22 80:7,16,22

81:12,18,22 83:1
83:12,20 84:2,10
86:23 89:19 94:6
94:8 95:23 98:9
104:6,19,22 105:1
105:19 110:9
112:22 113:1,11
117:19 119:2
125:10 127:7,11
128:5,22 129:20
131:9 132:8,20
133:10 134:3,19
135:5,8,12,17
139:15,18,23
142:9 143:7
144:22 145:6
146:22 147:16
149:24 151:24
155:7,17 156:9,14
156:17 158:9
159:10 163:22
164:14,20 165:6
165:12 166:3,11
166:21 167:10,21
172:1 173:8,12
174:8 175:7 176:2
176:13 177:12
178:17 179:17
181:20 182:7,16
182:21 183:23
184:20 185:16
187:3,9 188:3,8
188:12 189:18
190:21 191:21
192:23 193:21
196:4 197:2,22
198:22 200:4
201:9,14 202:17
202:20 204:12,23
206:1,7,19 207:13
208:1,5,16 209:12
210:22 218:10
219:16,21 221:1
223:23 226:9
227:4 229:1,4
230:4,17 232:13

233:18 234:16
236:6 239:10,15
239:21,24 240:19
241:18 243:15,23
246:22 247:20
248:7 250:8 251:1
251:18 252:12
254:13 256:5,15
257:22 258:6
260:24 262:3
264:24 265:13
266:16 268:6,17
270:4 271:8 275:1
275:7,10 276:2,9
276:22
**Parfitt's**
31:22
**Parkway**
11:13
**Parmley**
248:19
**part**
35:16 45:5 51:17
75:20 108:10,11
108:19 119:9
122:21 123:8,9
125:20 126:20
127:5 130:10,12
133:1 141:11
160:22 163:13
179:1 180:18
182:3 183:16
185:15 194:11
205:21 207:11,16
208:9 210:9 220:2
220:2 221:3
254:24 274:18
275:19
**participated**
40:23 77:8 93:14
93:15 137:10
**particle**
253:3,4
**particle-like**
154:1
**particles**

8:18 70:20,22
73:20 75:2,21,23
131:23 161:3
247:17 248:3,15
252:2,18,21
253:14,14 257:2
**particular**
31:16 35:21 46:5,6
63:17 113:12
114:15 137:22
146:13 148:18
153:4 155:21
171:18 177:16
178:9 190:12
196:21 205:1,3
214:21 248:16
264:22
**particularly**
83:7
**parties**
280:12,14
**partner**
12:12
**partners**
13:12 17:4 20:1,15
20:22
**partnership**
12:14 18:6
**parts**
51:23 132:5 186:7
265:12,16 266:14
**Party**
221:16,21
**passage**
253:22
**patent**
180:5 181:7 182:8
182:8,17 183:18
186:11 190:17
196:18,21,23
197:19 198:2
199:9,24 205:23
**pathogenesis**
254:7 265:8
**pathologist**
256:8

**patients**
8:16
**pattern**
132:23 134:6
**pay**
20:5,5 65:13,22
**payment**
30:8 32:18
**PCPC**
215:22 216:4,5,7,9
216:11 217:8
220:18 221:22
**peer-reviewed**
174:12
**pelvic**
8:14
**penalty**
279:1,4
**pending**
32:21
**Pennsylvania**
29:21,23 49:7
**people**
26:16,17 49:9
51:22 52:19 63:13
64:9,11 67:4
73:18 74:18
121:19 126:21
180:5,13 211:21
213:5 217:9,9
218:2 220:11,11
221:18,19 236:18
**percent**
15:6 18:11,13,20
18:24 20:1 21:23
22:1,10,15 36:15
36:17 37:11
**percentage**
15:4 18:8 19:15,18
24:4,6 37:5,8
174:1
**perform**
92:21 225:17
**performing**
175:17 256:18
**perineal**

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 96 of 111
PageID: 221393
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 304

7:14 9:3 170:22
171:24 203:21
209:20 210:3
**perineum**
247:18 248:4,12
251:16,23
**period**
5:11,14 13:5 39:21
40:18 42:1 44:16
45:3 56:22 60:13
62:8 63:18 180:22
**perjury**
279:1,5
**permanent**
17:7,7
**peroxide**
271:2
**person**
12:16 14:1 17:9
75:7,7 91:9 117:7
217:18 254:7
**personal**
172:23 196:1
220:10
**personally**
19:16 21:4 66:8
94:5 213:5
**pertain**
51:6 273:16
**pertains**
81:9
**pertinent**
259:21 260:3,13
**pesticide**
37:20 39:8,16
53:17
**pesticides**
53:17,20
**phagocytes**
8:19
**pharmacology**
13:18
**PhD**
1:18 2:11 5:3,17,21
5:23 6:4,7,13 7:21
8:4 10:3 13:17

279:19
**Philadelphia**
49:7
**phone**
59:20 77:13
**phrase**
122:1 140:9 146:8
217:3
**physical**
82:12 132:12,18,19
133:9,16,22
152:14,15
**physically**
94:13 97:9 133:13
**physiology**
263:12 269:16
271:14
**picked**
65:20
**piece**
125:3 205:10 209:5
209:7 246:2
248:24
**pieces**
114:24 117:5,12
211:5
**place**
105:2 171:5
**places**
172:23
**plaintiff**
3:3,14 62:10 81:14
**plaintiff's**
8:8 52:21 64:17
66:9 89:9 95:18
163:2 243:11
276:23
**plaintiffs**
1:12 3:3,14 28:18
46:11 65:9 66:22
68:4,5 72:5 78:9
78:10,14 79:1,5
79:20 80:4,14
81:9 82:5 83:11
95:20 105:14,18
205:21,22,23

206:10 249:15
**plan**
244:16
**plane**
65:16
**planned**
48:10 55:20 75:8
**plant**
35:2,4
**plate-like**
131:24
**platform**
75:6
**platy**
131:17 253:3
**plausible**
157:14
**pleadings**
106:5
**please**
10:13 46:22 125:17
273:4
**Plunkett**
1:18 2:10 5:3,8,17
5:20,23 6:1,4,7,10
6:12,13 7:1,21 8:1
8:4 9:1 10:3,11,15
10:16 20:9 25:2
27:24 39:2,23
45:11 49:24 59:13
59:13 67:18 71:2
79:9 81:15 82:3
84:17 86:6,15
105:10 108:3
110:3 111:18
112:13 134:12,24
147:13 148:9,16
148:21 154:11
156:10 178:23
179:16 194:2
197:3 206:2 207:7
232:17 238:7,9,12
240:2 243:19
246:21 250:1
257:21 268:8
275:12 277:1

279:19
**Plunkett's**
97:12 117:21 119:4
**plus**
253:3
**PO**
3:18
**point**
33:3 34:1 41:7 75:2
100:4,16,22
102:20 103:8
116:1 117:3 118:7
124:11 126:23
128:14 141:7
152:6,7 173:14
178:2,10 181:23
188:16 196:8
203:1 204:18
222:10 233:13
235:9,16 236:15
255:9,11 266:5
268:20,20
**pointed**
228:7
**pointing**
188:20
**policy**
14:1,2
**pooled**
184:9 186:23
**Pooley**
69:7
**pooling**
180:1
**Population**
213:2
**populations**
215:4
**portion**
253:17 254:20
264:22
**position**
14:5
**positive**
200:20
**possibility**

170:10
**possible**
17:22 36:4 97:2
100:15 164:2,6
172:8 176:5
196:22 197:17,18
209:20 247:13
253:6
**possibly**
57:19 61:14
**post**
191:11
**post-IARC**
214:6
**posted**
59:3
**poster**
75:5
**posters**
74:12
**potential**
121:21
**potentially**
99:14 142:18 174:2
251:11
**powder**
1:4 7:8,14,18 8:14
8:22 70:1 76:2
77:7,24 79:20
80:4 96:6,7
106:15,24 107:9
113:20 132:14
133:13 136:1
137:13,20,22
155:22 157:20,24
158:3,3,21 159:7
160:21 166:20
167:4 171:23
173:5 182:14
183:21 184:12
185:13 187:1
189:16 192:7,20
193:5 199:14
203:21 226:8
227:3,14 228:4,23
230:2 231:12,16

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 97 of 111
PageID: 221394
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 305

232:1 233:1
234:14 236:2
253:11,11 263:19
**powders**
68:21 75:1 140:8
172:20 173:2
198:18
**powered**
182:5,13
**PowerPoint**
5:20 54:5 60:18
67:13,24 68:6,12
70:16,18
**PowerPoints**
67:21
**practice**
36:16
**PRACTICES**
1:5
**precancerous**
270:3
**precise**
18:21 157:22
**precisely**
134:20
**predicate**
129:24
**predispositions**
261:13
**Premarket**
169:17
**premise**
201:17 203:5,8
**preneoplastic**
255:8
**prepare**
54:5 67:24
**prepared**
67:13 71:18,23
86:9,20 89:4
102:19 195:12
244:20
**preparing**
27:10 32:2 68:6,12
87:11,12 89:5
96:3 246:8

**prescribe**
226:12
**presence**
234:10 263:23
**present**
59:12 60:14 61:8
61:12 62:14
244:15
**presentation**
41:21 52:1 53:8
54:4,5,8,14,17,20
54:21 55:6 59:6
60:19 67:14,22
68:6 69:15 70:9
71:15 74:24 175:3
**presentations**
41:4 51:1,7,12,13
54:19 55:13,19
73:19 75:9,22
127:1
**presented**
63:8 65:10 96:18
241:15
**presenter**
60:2 75:5
**presenting**
63:18
**President**
50:12
**press**
15:13 52:9 77:8,16
171:15 232:5,8,10
232:12 237:7
**pressure**
131:2
**presumption**
254:21
**pretty**
20:20 68:16
**previously**
76:17 122:16
139:16
**primary**
165:21
**principle**
151:6 152:22

**principles**
152:12
**print**
85:14 95:8,9
**printing**
280:7
**printout**
107:22
**prior**
13:4 14:13 24:19
80:5 86:2 104:4
107:18 137:11,17
144:24 192:20
252:13 254:22
255:3,7 256:2
273:14
**privileged**
38:18
**probably**
18:15,16 36:15,17
37:11 61:3,15
116:8 157:1
163:10 216:2
245:16
**problem**
169:24 228:18
266:11
**procedure**
192:8 193:6
**procedures**
109:16
**process**
32:1 154:19,20
170:7,9,23 172:6
218:16 219:1
269:4 270:1
271:16
**processes**
13:24 171:4
**produced**
15:15 93:17 95:12
239:11
**product**
14:12 15:21 33:21
33:22 35:21 38:23
43:23 44:4 80:6

82:23 106:24
109:19 115:21,23
120:24 122:14
123:15 129:13
133:20 159:3
160:14 169:20
172:11 173:4
174:1 175:10
176:17 226:8,17
227:3,14 228:15
230:24 233:10
234:10,15,23
235:18 236:5
237:5
**products**
1:4,5 13:23 14:3,15
35:19 36:5 39:9
39:15 43:5 51:9
77:7 107:9 108:17
121:2 158:22
160:17,20 164:4
166:20 167:4
171:23 172:24
173:5 227:10
228:4,23 230:2
**profit**
19:20 20:14
**program**
51:18 74:15
**programs**
125:23
**project**
16:3 25:7 44:11
**projects**
19:7 212:21 216:5
**proof**
223:4
**properly**
263:2
**properties**
120:17 133:17,22
**property**
19:9 34:20
**Proposal**
275:15
**proprietary**

34:4 35:13,15
37:23 38:7 39:2
39:11 40:7 43:18
**protect**
262:24
**protection**
152:23
**provide**
30:14 34:12 46:24
62:11,17 72:3
81:16 89:9 110:12
162:14 211:6
219:12 220:19
222:1 239:3,7
248:10
**provided**
24:18 29:20 33:12
44:14 45:14,19
62:13 81:23 82:4
82:8 90:2,4,11
91:1 95:6,11,17
95:20 97:7 98:8
103:13 107:17,23
111:15 112:10,16
113:7,14 115:21
142:6 154:7
169:19 175:23,24
228:9 240:6
252:13
**provides**
88:19 189:6 261:5
**providing**
68:3 72:18 209:16
210:6
**province**
32:20
**public**
1:24 2:22 26:3
40:12,13 41:23
44:18 45:1,4
60:13 61:8,23
72:24 73:6 162:24
163:1 165:4,17
212:18 230:11
235:2 280:4,21
**publication**

Laura M. Plunkett, Ph.D, D.A.B.T.

211:24
**publications**
50:22 174:13
212:18
**publicly**
41:14,14 68:22
165:5,7
**published**
26:3,8,10 56:5
122:24 123:20
125:7 128:14
155:5 163:5,8,16
165:3 174:5,11
193:12,23 194:13
194:14,16 212:17
226:6 229:9
247:16 255:2
**PubMed**
87:20 88:1,3,4
**puff**
212:19
**pull**
49:17 108:22 147:1
153:19,21,22
170:18 179:8
185:24 221:14
222:15
**pulled**
33:15 155:2
**punitive**
196:19
**purchasing**
80:5
**purity**
227:18
**purport**
264:20
**purports**
251:22
**purpose**
69:21
**purposes**
70:14 112:10 177:1
178:7 207:7
223:18
**Pursuant**

2:20
**put**
30:5 54:13 57:11
60:23 70:21 97:8
97:11 107:8 129:7
135:12 139:21
168:1 171:4
173:17 176:17
205:14 223:15
228:5 241:11
242:3 265:11
269:5
**putting**
122:13 168:5

**Q**
**qualifications**
195:20
**quality**
178:4 209:4 211:21
213:7
**quantification**
122:4
**quantitative**
264:4,5
**query**
87:22
**question**
11:4 18:12,14 31:4
34:11 36:4,19
37:3 39:8 40:9,12
41:18 44:20,22
54:24 55:3,7
71:10 74:21 82:17
83:16 98:16 101:4
102:11 117:21
119:3,10 129:14
131:16 137:16
143:3 147:21
149:1 156:4,23
157:2 161:1
163:15 164:9
166:15 168:19
174:21 180:21
182:20 184:6
185:8 191:18

193:9,10 198:6
202:3,7,23 203:5
206:2,9 209:13
219:7,24 223:9,9
224:16 231:5
237:1 238:24
247:5 248:1 251:5
254:9 255:23
258:7 268:22
**questioned**
224:5 235:8
**questioning**
236:24
**questions**
14:9 52:5 76:17
77:14,16 80:9
100:17,21 120:21
130:18 144:23
186:4 211:9,11
242:20 277:1
**quick**
84:19 178:15
237:20 272:13
**quickly**
98:23
**quite**
170:1 198:10 208:4
208:7 266:19
267:8
**quotation**
253:17
**quotations**
132:17
**quote**
185:1,24 254:24
259:17
**quote-unquote**
243:1 269:3
**quoted**
131:21 133:7 185:9

**R**
**R**
10:1
**race**
82:13

**radicals**
271:2
**raised**
234:9,21 236:10
**rat**
255:5,11
**Rats**
6:18
**reach**
247:18 248:5,5
**reached**
13:5 155:23 209:11
**reactive**
253:22 259:7,20
270:21 271:5,19
**read**
71:16 76:3 93:3
97:15 98:6,7,17
109:14 113:24
114:2,3 116:18
131:22 143:15,17
169:13 172:22
184:6,16 185:22
185:23 187:14
189:21 192:13
195:11,13,15
197:8 198:13
199:18 200:14,14
204:3,8 209:2
213:19 215:15
217:11 222:22
223:5 224:4,14,23
225:2,6,7,9,12
226:14 233:5,9
246:7 271:23
272:5 273:7 279:5
279:7
**reader**
204:2
**reading**
114:10 144:3
150:19 153:7
199:16 221:6
225:19 280:10
**reads**
150:12

**radicals**
**ready**
179:22,22
**real**
272:13
**realize**
172:24
**realized**
272:22 273:2,11
**really**
14:20 97:19 98:15
100:4 143:3
172:24 183:13
212:6 213:24
242:24 265:17
**Realtime**
1:24 2:21
**reason**
26:2 106:23 112:15
161:20 171:14
178:11 205:2,3
214:21 228:18
264:13 274:16
**reasons**
95:14 167:14
233:16 237:6,7
270:14
**recall**
23:5,21 46:14,17
46:20 56:14 59:20
62:6 64:5,7 65:21
65:23 66:20 74:5
74:18,22 88:2
95:19 97:1 102:3
102:9 106:19
108:6 113:22
119:1 137:11,17
142:15 151:17
155:4 176:4,6
192:11,15,17,18
246:14 247:5,14
**received**
21:19 22:4,24
25:10 32:18
**Recess**
105:5 148:4 178:18
237:22 276:13

Laura M. Plunkett, Ph.D, D.A.B.T.

**recite**
263:17
**recognize**
99:15 115:19
264:11
**recognized**
64:10,12
**recognizes**
151:4
**recognizing**
115:18 142:22
**recommendations**
170:24
**record**
10:14 57:17 105:8
147:10 148:3,7,9
148:16 178:21
237:21 238:1
239:11 246:23
276:12,16 280:9
**recorded**
191:5 280:6
**records**
191:24 192:11
**redox**
267:23 270:20,21
270:23
**reduced**
280:7
**reduces**
263:20
**reducing**
263:24
**redundant**
113:14
**refer**
71:6 122:6 126:12
186:15 220:17
222:18 249:5
250:23
**reference**
25:22 29:19 30:4
31:10 45:23 46:22
108:16 109:10
123:4 126:19
135:20 140:16

141:14,18 145:15
148:22 151:18
159:22 160:1
185:11 195:7,9
197:4 213:8 214:7
214:17 240:8
245:23 268:5
273:15,19,20
274:11
**referenced**
122:19,23 124:14
163:6 261:9
**references**
106:18 109:2,5,22
109:23 126:3,12
161:11 267:14
**referencing**
141:24 142:1
**referred**
85:21 112:17
132:24 142:1
153:5 158:5
161:13 174:6
207:16
**referring**
108:20 122:8,9,10
124:24 132:11
133:12 141:15
144:19 145:21
183:16 221:12,16
221:23 222:3,4
247:21 260:23
**refers**
16:20 253:22 258:1
259:19
**reflect**
32:5
**reflected**
29:13 89:1 101:24
102:1 161:12,18
**reflection**
118:14 186:17
189:23
**reformulated**
101:14
**refuses**

115:19
**regard**
12:23 14:9 24:4,5
33:4 40:6 54:3
57:3 68:3,20
71:15 72:20 76:5
81:23 83:24 85:15
91:12 94:1 107:13
108:5 117:14
120:11 127:15
134:5 143:4
153:16 156:10,18
166:16 177:10
182:17 183:20
188:1 190:16
197:6 219:14
227:16 238:11
240:4 246:6
247:15 253:21
254:3 270:19
271:5,24 274:22
**regarding**
55:20 75:9 77:7
143:23 155:14
160:10 162:3
175:6 232:24
**Register**
58:22 108:5,7,15
122:10,15 123:24
**Registered**
1:23 2:21
**registration**
53:20
**regulated**
13:8
**regulating**
167:9 169:15
**regulation**
164:16,19 168:7,21
169:7,12 170:15
171:2 174:20
175:1
**regulations**
127:23 169:1 170:3
170:19 176:12
226:12

**regulator**
172:16
**regulatory**
19:5,7 31:13 32:24
34:20 39:19 40:17
40:20 41:3,9,15
41:16,24 44:15
45:1 46:9 51:8
77:24 127:1,5
144:14 145:16,22
146:2 162:6
163:12 164:12
167:4,19 170:2
178:5
**rehash**
260:22
**relate**
81:8 106:8
**related**
16:15 31:13,16
32:11,23 39:14
43:13 46:7 57:20
63:17 109:12
116:21 129:14
138:17 160:23
161:6 217:7
**relates**
91:21 94:2 116:1,3
137:13,19 141:23
146:14 155:15
160:3 161:3
166:20 173:4
196:17 219:14
228:22 248:1
270:20
**relation**
151:19 189:16
246:7
**relationship**
35:16 37:23 180:19
204:2 217:13
**relative**
182:5,14 280:13,14
**release**
171:15 232:10,12
237:7

**released**
77:10
**releases**
232:6
**relevance**
184:7
**relevant**
81:10,15 92:4
94:18 97:19 98:16
109:11 177:21
246:3 260:8,13
269:16 270:13
**reliable**
121:14 228:12
**reliance**
94:18,21 103:1,12
103:20 108:11
111:1 113:2
162:19 213:17
239:6 241:14
242:18
**relied**
87:4 96:18 101:18
182:24 207:10
209:9
**rely**
108:8 109:7 123:20
165:18 258:22
**relying**
141:6 142:13
**remaining**
57:5
**remember**
23:17 26:13,15
46:6 49:14 61:11
64:11 66:18 71:20
149:11 213:17
214:2 223:7,7,8
240:13 255:7
272:6 274:14
**remembered**
245:7 273:20
**removal**
231:18
**remove**
230:24

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 100 of 111
PageID: 221397
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 308

repaired
86:19
repeated
189:8,8
rephrase
182:10
report
5:22 6:3,6 7:3 9:3
11:3 14:11,19
16:20 19:2 27:3,8
27:10,16 31:14
32:2,3,6 58:2
83:24 84:14,15,21
84:24 85:17,18
86:2,4,8,13,19,20
86:21 87:6,11,13
87:16 88:21 89:4
89:6,11 90:2,22
91:20 92:2,19,19
92:22 94:2 95:24
96:4 97:17 98:21
99:2,7,9 100:7,8
101:6,18 102:1,2
102:7,9,16,21,24
103:18,24 104:4
104:15 105:11,12
106:6,13,17
107:14 108:8,9
109:7,9 112:18
113:6 116:18
119:19,24 120:19
122:22 124:9,13
124:15,21 125:1
128:16 130:4,12
130:16 135:20
136:8,9,11,16,17
136:22,23 137:3,6
137:8,17 141:10
141:16,23 142:2,4
142:8,12,17
148:18,19 151:3
154:17,24 165:15
165:18 166:2
177:2,6 178:24
179:1 183:17
184:19,21 185:15

185:15,19,21
187:17 195:6,10
195:12 199:21
204:22 206:13
213:22 214:16
215:9,19 216:22
223:19 233:7
244:14,23 245:19
246:8,9,12 247:10
247:13 249:22
253:22 254:20
257:6 272:10,11
272:12,21 273:3,4
273:15 274:18
276:7,8,10
reported
1:22 141:10 159:7
259:2 264:14
267:18 270:20
Reporter
1:23,24 2:21,22
280:1
reporting
255:2
reports
14:13 52:3 78:5
100:12 136:8,20
137:12 142:21
162:15,19 163:2,7
163:21 164:13
165:11 213:21
252:3,14
represent
25:13 27:9 30:19
76:24 241:19
representation
80:23
representatives
220:18 221:11,24
represents
28:3 33:11 48:22
49:14 110:7,23
reproduce
269:6
reproductive
7:12 51:19,21,24

52:12 55:2,9
180:5,6 181:7
186:12 196:21,23
196:24 197:19,20
203:20
reputation
209:2
request
29:16 60:7,10 63:3
90:23 91:3 97:12
requested
61:16 62:4 91:2
92:23 238:12
requesting
238:13
require
167:20 169:18
required
62:4 268:13
requirement
129:7 173:6
requires
120:16
research
8:17 9:3 69:18 87:5
87:16 88:9,20
101:19 229:20,21
247:9 268:1
275:15
resected
8:15
reserve
119:11
respect
72:21 114:4 153:11
254:19,21
respective
280:12
Respirable
7:5
respond
43:22 265:10,24
266:22 269:12
responds
186:4
response

57:21 61:5 100:17
125:5 188:19
189:22 200:14
239:16 266:1,10
267:6
responses
157:13
responsibilities
33:5 122:13
responsibility
109:12
responsive
6:9,11 110:15
111:4,5 239:4
rest
33:9 55:20 198:14
restate
104:1 137:16
166:15 185:7
result
160:16 180:20
183:9 224:16
results
88:13 97:4 115:6
187:10 188:13
retired
13:4 17:9,10
retrieved
195:13
Reuters
232:6
reveal
37:22
reveals
39:1
revenue
21:19 22:4,10,16
22:24 23:8
review
7:13 8:10 25:23
27:13 28:11 29:17
89:3 97:11 113:21
114:15,22 115:13
116:2,20 117:4,15
118:22,23 165:3
193:11 195:6

221:8 245:16
275:22
reviewed
27:15 87:2,4 89:11
98:20 100:2
107:19 114:20
139:3,3,4 162:17
194:5,5 231:23
232:23 237:3,3
240:17 241:3
242:17,19
reviewing
97:6 155:4 193:10
reviews
148:1 191:2 194:9
248:8 272:15
revised
120:3
revisions
62:17,19
Revisited
8:11
Rex
47:5 49:5
rid
84:8
ride
66:21 67:2
right
11:7 15:6 17:24
20:4,23 21:7 24:9
24:16 27:20 38:13
47:23 50:20 68:23
75:14 76:19 80:21
81:21 90:16 110:1
110:9 111:24
118:12 119:11
121:4 123:23
126:24 127:10
129:12 136:18
138:5 146:7
148:24 149:10,15
156:13,16 175:19
190:7 194:20
202:5 204:6
209:17 218:2,3

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 101 of 111
PageID: 221398
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 309

230:12 234:21,24
237:17 239:13
242:8 243:8 244:5
249:8 258:1 260:5
263:7 267:8
268:16 271:7
275:10
**Rigler**
76:13 141:9,16
142:7 143:6
**risk**
7:9,15 8:23 9:4
50:13 53:14,16,19
77:10 91:21
100:10 101:3
105:16 121:2
125:22 126:4,9,11
126:13,22 127:13
137:12,14,18,21
137:23 138:2
139:1 144:1,15
145:17 147:11
148:11 149:4
150:14 151:11
152:24 155:6,15
155:16 156:24
157:8,10 159:8,14
160:2 162:3,18
163:19 166:10,16
171:3,11 172:19
173:21,23 174:3
174:15 177:3,11
182:6,14,15
184:15 187:2,19
189:1,9,17 192:21
199:15 207:11
213:2,7 215:3,6
253:18 261:10,21
262:1 273:15
274:2
**risk'**
120:13
**risk-benefit**
121:4,5 170:12
**risks**
138:9,20

**Robert**
17:13
**RoC**
154:19,20 218:19
**Rohl**
69:7
**role**
260:7
**room**
64:11
**ROS**
270:24 271:1
**route**
248:21
**row**
109:24
**Rowlands**
69:7
**Rudenko**
12:17,18 15:20
17:18 20:11 21:11
**Rule**
6:3
**rulemaking**
167:23
**run**
19:1,2 24:15
**RYAN**
3:16
**ryan.beattie@be...**
3:21

_____

**S**

**S**
10:1
**sabbatical**
13:3
**Saed**
270:1
**Saed's**
271:23 272:5
**safe**
122:14 169:17
226:17,18
**safety**
16:15 42:21,21

43:10,13,15,23
69:8 109:17 115:6
129:12 163:20
169:17 174:6
175:14 220:20
222:2 225:18
226:8 227:2,15,18
227:19 228:3,23
230:3 234:7,8,15
234:20 235:8,15
235:22 236:1,10
236:21 237:7
**salaried**
17:6
**salaries**
20:4 21:1
**salary**
19:17,19 20:3,13
21:10
**sale**
234:13
**SALES**
1:5
**samples**
132:1 133:24 222:7
256:10
**sat**
27:18
**save**
279:8
**saw**
58:21 63:19 66:13
80:4 90:12 195:5
**saying**
57:16 61:7 138:20
138:22 145:22
152:19 169:2
171:16 172:4
191:5,16 194:22
198:9,10 199:22
200:9,12,13 202:2
203:9,11,15 222:6
223:1 224:11,13
233:13 237:12
242:23
**says**

26:11 28:11 32:17
68:20,22 69:6,7
70:5 100:22
109:23 114:17
117:10 131:10,22
138:7 144:11
184:8 187:5
188:17,18,18
196:18 198:16
199:7 203:18
205:13 223:6
254:21 275:23
276:1
**scale**
19:24
**scheduled**
48:4,6,20
**science**
165:16,20 201:11
231:5
**scientific**
7:7 87:15 121:14
174:19,24 175:4
**scientist**
205:15 260:7
**scientists**
58:12 74:11,22
75:23 143:24
**scoring**
211:10
**screening**
6:20 85:20 162:21
171:11 174:15
207:20 235:5
**search**
87:18 88:2,3,10,12
88:13 89:1 92:21
95:19,21 98:2,3
161:15
**searched**
87:20 96:11,19,20
96:21 97:2
**searches**
88:5 92:24 93:6,20
93:21,23 94:2,4
97:5 98:8

**second**
91:6 113:17 116:3
130:22 131:8
148:3 275:14
276:12
**Secondary**
8:10
**section**
50:13 130:20,20
134:16,20 136:11
154:24 186:21
189:13 247:23
250:14 275:16
**sections**
116:14
**see**
25:4 29:19 32:15
49:9,12 52:9
58:24 63:15 71:3
81:14 85:9 87:23
88:22 89:7,20
100:21,24 101:19
108:12,13,24
109:8 113:13
118:19 119:7
120:9 126:7
130:10 136:2
138:11 139:4
140:1 141:11,18
141:21 143:17
144:3,8,9,17
149:24 150:10,19
153:7,14 160:5
171:2 173:20
177:22 187:23
193:18 194:15
196:15 197:9
199:16 203:8
204:9 205:17
209:3,4,18 211:13
212:19 220:21
221:6,7 224:3
225:19 226:22,22
240:8 242:11,24
244:1,3 249:17
250:15 254:1,24

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 310

259:5,5,15,23
262:13 272:4,16
273:12 274:12
275:16
**seeing**
64:11 218:5 255:15
272:18
**Seely**
6:19
**seen**
15:12 51:22 52:8
72:24,24 73:5
78:21 93:12 96:12
106:5 110:8 159:6
163:11 174:12,14
194:10,24 195:4
197:8 201:24
228:16 232:19,20
236:13 238:15,19
241:22,22,23
244:5,7,8,10
252:2 256:9 259:7
272:2
**segregate**
20:8 92:1
**segregated**
25:16
**selected**
56:19 57:4 78:14
**selectively**
203:24
**self-nominated**
56:12
**self-reported**
187:1
**SEM**
76:24
**send**
11:22,23 60:7,9
61:2,21
**sending**
62:3
**sense**
16:12,13 234:3
235:17,19 237:14
265:17

**sent**
27:2 60:11,16 72:1
239:7
**sentence**
100:5 120:7,9,12
120:18 121:6,12
122:6 123:21
124:23 125:13,21
126:18 127:15
128:4 132:16,22
133:1,2,6 141:19
141:20 150:12
153:10 161:22
187:8,22,23,24
189:4,12 190:9
197:1 198:9,16
199:16,22 231:20
231:21 233:12
260:5
**sentences**
185:1
**separate**
31:3 43:11 103:9
137:21 140:19
210:10
**separated**
131:1
**separately**
106:14
**September**
5:15
**series**
53:21
**session**
75:5
**sessions**
75:3
**set**
18:5 19:22 25:11
27:8,21 28:3 62:1
104:4,15 105:12
106:6,13 125:8
207:24 223:19
243:9 252:7
**sets**
25:10 28:2

**setting**
109:16
**settled**
46:20
**settlement**
48:1
**shape**
151:8
**share**
20:10 97:10 157:10
243:17
**shares**
20:22
**sharing**
19:20 20:14
**Sharko**
8:7 239:24
**SHEET**
278:1 279:11
**SHOOK**
4:5
**short**
104:20
**shorter**
98:21 101:8,17
240:16
**show**
30:1 59:2 67:14
87:24 94:21 111:6
111:14 195:7
215:5 228:22
229:8 246:15
251:22 253:9
263:21 264:20
**showed**
49:8 89:8 171:20
240:18
**Shower**
79:20,21 80:4,5
106:15,15
**showing**
214:5 215:2 217:6
256:2 259:1 261:8
261:24 264:8
**shown**
70:1 101:9 140:7

153:18,20 252:1
261:21
**shows**
186:10 225:16
235:13,14 251:16
255:5 263:19
**side-by-side**
119:7
**signal**
189:8
**Signed**
279:15
**significance**
186:6
**significant**
184:11 185:12
186:13,24 187:18
199:9,14 202:15
215:3,6 235:14
267:1
**signing**
280:11
**silica**
7:5 55:14 56:7
136:1,4,10,10
137:13,19,22,24
153:4,11,13,16
154:20 155:6,11
155:14,15 156:6
156:15 157:4,17
158:5,7,16,18,21
159:6
**silica-specific**
156:24
**similar**
13:16 69:24 70:15
150:9,18 166:9,19
169:16 180:10
244:9 248:15
252:20
**simplistic**
203:10 266:21
**simply**
198:7 201:17 202:7
**Singapore**
42:14

**sister's**
19:10 36:18
**sit**
75:13 104:17 118:1
**site**
160:18 266:9
**sitting**
85:5 110:21 192:15
**six**
66:9
**size**
7:6 203:23 252:16
252:20 253:10,12
**sketch**
61:3
**skimmed**
98:23
**slide**
52:7 62:18 68:20
69:13,18 70:5,7
70:16,18 71:1,2,6
**slides**
62:14 63:3 68:16
69:20 71:21 72:9
**small**
61:11 184:14 266:9
**smaller**
253:14
**Society**
50:12 52:16 53:6
74:2
**sold**
172:12,13
**sole**
12:14
**Solutions**
12:4,24 19:8 41:8
**somebody**
259:8,8 264:3
**sooner**
235:20 237:18
**sorry**
11:5 12:5 20:2
23:19,20 53:9
60:20 109:19
116:9 126:2 144:4

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 103 of 111
PageID: 221400
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 311

154:13,24 174:21
179:20 204:7
206:21,22 213:14
219:21 231:13
245:7,20,20 247:4
264:18 272:7,14
273:8
**sort**
52:10 115:24
**SOT**
73:15 74:1
**sounds**
11:15
**source**
160:9
**sources**
122:22 165:21
**space**
15:9 41:8
**speak**
28:18 53:15 55:8
59:5 61:17,21
75:7 77:11 223:11
224:18
**speaker**
60:24
**speaking**
182:16
**specialize**
13:23
**Specialty**
50:13
**species**
259:7,20 270:22
271:6,19
**specific**
64:13 77:3 82:20
90:23 99:10,12
101:23 105:13
106:7 108:12
109:10 145:2
147:6 155:10
173:16 202:24
209:13,13 218:14
219:7 224:17
225:24 226:5,13

228:5 247:21
248:10 255:24
262:19
**specifically**
28:18 92:24 121:6
162:11 195:24
261:2
**specifications**
158:20,24
**specificity**
117:23 119:5
**specifics**
63:11 79:11
**specify**
31:1,2
**speed**
18:3
**spent**
18:9 19:1 27:9 32:6
36:16 37:9 88:24
92:7 93:11
**spoke**
59:18 66:10 74:18
74:23
**spoken**
77:13 78:3,8 107:7
**sponsoring**
229:20
**St**
1:8 118:4
**staff**
217:10
**standard**
120:14,23,24 122:7
123:4,5,14 125:8
126:19 127:6,18
128:2,3,12 168:8
168:22 169:3,15
169:16,21 170:9
170:10,12
**standards**
124:5
**standing**
91:3 147:21
**starch**
96:8,9,10

**start**
12:19 13:7 24:21
82:17 88:14,15
152:11 265:22
**started**
13:13 24:11 101:12
136:22,23 198:19
**starting**
213:19 221:7
**starts**
257:13,15
**state**
1:9 10:13 18:5 28:5
30:6,24 31:2
46:16 100:18
113:4 184:18
210:11 231:22
233:12 261:18,24
269:5
**stated**
103:6 140:14
143:24 169:5
186:9 187:16
192:12 233:17
273:22
**statement**
45:1 71:17,18,23
72:4,11,15,19
99:10,12 100:5
102:23 120:11
123:1 128:18
129:7,15 131:3,6
131:10 150:7
151:21 153:5,17
156:5 161:19
186:22,22 187:15
197:8,11 198:21
204:11,16 216:24
225:15 250:21
254:19 275:24
**statements**
80:11 114:23 153:3
155:13 160:10
170:6
**states**
1:1 134:23

**stating**
198:11
**statistical**
186:6 200:2 202:8
202:9
**statistically**
184:11 185:12
186:12,24 187:17
199:13 202:13,15
204:1 215:3,6
**statistics**
18:23
**stayed**
66:24
**staying**
64:23,24
**stays**
266:9
**stenographically**
280:6
**step**
173:20,23 248:18
**stepdown**
70:16
**Steve**
96:14,15 224:23
**Steven**
90:14
**stewardship**
14:12
**stick**
168:19
**stop**
234:6 271:20
**stream**
22:10
**Street**
2:14 3:7,17
**strength**
180:9 181:5 211:17
211:20
**strengths**
91:13 92:14 114:8
114:10 177:2
178:6 179:4,6,23
181:18,24 210:19

211:3 212:9
258:11
**strike**
56:10 79:2,4 109:3
195:5
**structure**
12:13
**students**
52:6,8 175:2
**studied**
252:21 259:14
**studies**
69:2 71:5 114:19
116:16 180:1,2,12
180:14,16,17
181:1 182:3 183:7
202:10 212:5
214:18 215:1,5,7
226:1 228:8 229:8
229:8,16,17 249:7
249:9,10 252:7,10
252:17 256:1,13
256:19 258:12,14
258:22 259:1
261:7 263:21
264:8 267:18,22
270:9
**study**
179:2,5,7,11,24
180:4,16,18
181:12 182:4,12
182:19 183:2,19
184:13,22,23
185:21,23 186:3,7
186:10,18 187:8
187:10 188:12
189:5,14,24
191:12,14 192:1
194:6 197:16,19
200:23 202:6
203:13 204:21
206:15,24 209:14
225:24 229:13,14
229:15 247:16
248:3,11 249:6,10
250:7 251:15,19

Case 3:16-md-02738-MAS-RLS   Document 33013-77   Filed 07/23/24   Page 104 of 111
PageID: 221401
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 312

251:21,22 253:18
255:5,9,12 257:9
257:19,24 258:5
258:16,17 260:16
261:5,17,24
263:18,19 265:4,5
265:6 268:10,11
270:2 271:24
**subcontractor**
17:7
**subcontractors**
20:5 21:1
**subgroup**
183:17 188:7
190:16 196:20
203:19
**subgroups**
199:12
**subject**
116:11 196:18
276:19
**submission**
57:6
**submissions**
41:10
**submit**
163:1
**submitted**
44:24 45:5 60:20
163:3
**submitting**
175:18
**subpoena**
111:9
**subsection**
98:1
**subsidiaries**
37:2
**substance**
120:17,17
**substances**
154:1 263:1
**subtype**
105:17
**subtypes**
105:13

**sufficient**
183:9
**sufficiently**
182:5,13
**suggest**
134:10
**suggesting**
203:19
**suggestions**
62:18
**Suite**
2:15 3:7 11:13
**summary**
57:10,10
**superoxide**
271:1
**supplemental**
6:6 86:12 240:5,10
**supplier**
176:20
**support**
71:2 228:12 250:14
**Supporting**
8:21
**supportive**
99:11 100:3
**supposed**
128:10 226:16
**sure**
26:16 30:4,21
41:18,20 43:20
46:13 47:19,21,21
49:4,5 61:1 64:9
81:12,18 88:4
96:5 101:5 108:23
112:24 121:9
123:19 129:11
131:15 133:3
137:6 139:21,23
145:6 149:3
168:11 174:22
176:4 184:5 245:9
247:3 273:9
**surgeries**
198:20
**surprise**

242:7
**surprised**
118:19
**Swann**
1:11 3:3,14 8:5,9
10:21 78:4,6 82:8
82:9 83:17 205:23
210:7,11 238:4
243:13,23 244:16
244:21 245:10,13
**Swann's**
83:19
**sworn**
10:5 280:5
**system**
8:11 31:13 33:15
51:24 167:9,19
170:2 262:21
263:1 266:22
267:3,4
**system-wide**
264:21
**systemic**
266:8 267:6
**systems**
109:16

--- T ---
**Taher**
7:15 85:21 206:15
206:24 207:5,23
208:14 209:11
210:20 213:4
**take**
10:17,21 22:15
84:19 104:20,24
123:9 142:3
168:16,17 171:12
173:6,21 174:3
178:15 228:19
230:24 235:18
237:19 259:8,8
266:11 267:5
**taken**
90:14 171:17
217:13 231:9

279:6
**takes**
172:14
**talc**
5:11,14 6:17,20
7:14 8:13,18 9:4
15:21 16:18 18:1
23:4,6 24:7,12,23
25:7,14 28:4
30:17 35:24 41:2
44:4 47:20 48:9
52:6 54:21 56:1,6
62:10 64:17 66:22
68:4,5,21 69:4
71:6,8,8,11 72:5
73:10,19 74:7
75:1,1,9 76:7,13
77:20 87:23 88:6
93:7 96:6,7 130:8
130:14,21,23
131:7,17,18,23
132:3,7,11,13,19
133:9,12,19,19,23
138:10 140:9,20
140:21 141:1,15
141:22 142:6,23
142:23 143:5
144:2,13,16,20,21
145:8,9,10,10,17
146:3,9,15,20,21
147:24 148:14
149:2,7,8,15
150:9,18,24 151:4
151:16,19,23
152:8,8,18 153:13
154:19 160:3,13
160:17,20,21
161:3,15 162:6,11
166:17 170:22
177:5 180:7,20
187:19 189:10
209:20 210:3
217:7 219:2,15
220:20 221:16,21
222:2,8,11 225:18
227:15 247:18,23

248:4,11,15,22
249:15 250:23
251:16,23 252:1
253:2,2,3,9
254:21 255:3,6,6
255:9 259:3
260:15,18 263:23
264:9,15,22
271:21 273:17,23
274:2,5
**Talc-based**
7:18
**talcum**
1:4 8:22 77:7,24
106:24 107:8
113:20 132:13
136:1 137:20
155:22 166:20
167:4 171:22
173:5 192:7 193:4
226:7 227:2,14
228:23 230:2
263:19
**talk**
27:17 52:5 53:10
60:10 63:9 66:11
73:17 74:4 99:21
109:15 116:7,15
120:3 125:22
126:9,10 136:9,10
140:1 141:3 157:7
162:12 167:15
170:7 172:15
178:24 181:8,9
190:2,11 200:15
200:16,17 206:14
207:2 212:2 218:3
231:5,18 233:8
251:6,9 252:18
254:6,15 255:22
258:20 263:4
**talked**
33:18 54:22 68:2
71:21 96:8 122:16
127:2 129:8 134:8
138:17 154:18

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 105 of 111
PageID: 221402
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 313

160:15 162:11
168:4 175:2,22
181:22 217:14,15
232:7 260:21
274:15

**talking**
38:14 46:8 103:11
105:10 123:21
125:9 126:3,6,15
126:16 127:16
132:6 133:8,24
134:16 145:4
157:19 167:3
172:24 217:16,17
218:24 230:8
246:19 248:12,18
252:24 255:21,21
262:5,6

**talks**
117:6 122:12
124:10 128:16
156:1 161:7
172:22 222:9
224:8 226:15
248:22

**task**
221:22

**tax**
23:14

**taxes**
23:13

**Taxotere**
48:21

**TEA**
161:7

**technologies**
14:15,22,24 15:8
15:10

**technology**
15:5

**Tecum**
7:22 8:5

**tell**
19:19 22:1,3,24
24:9,14,17 28:2,8
28:22 29:6 30:9

33:10 34:10,24
35:18 42:13 46:17
49:1 50:2 54:12
57:1 64:13 65:24
67:21 73:21 74:15
78:22 84:20 86:17
96:24 98:13
102:18 108:22
110:6,16,22 111:2
111:3,20 120:4
124:2 128:12
135:20 140:2
143:9,11,12
186:14 194:4
195:15,23 203:5
205:2,4 208:8
214:3 217:23
220:4,7,11 234:1
234:19 235:10,12
237:12 244:5
245:19 246:10
251:13 252:3
272:21

**telling**
21:14 169:6 224:21
237:15 274:20

**tells**
101:16

**Telofski's**
225:3

**TEM**
76:24

**tended**
162:1

**tenure**
13:6

**term**
38:10 98:3 100:1
120:12

**terms**
20:13 21:23 70:15
88:2 92:3 94:12
95:19 96:10 98:2
98:4 106:9,11
109:15 138:23
142:16 151:10

152:23 165:16
169:15 170:9
176:16 180:4
183:1 186:7 198:3
209:4 215:13,17
215:20 216:20
217:22 218:18
219:1 228:13,14
229:7 237:13
274:4

**test**
51:20 76:10,13
199:23 202:13
226:4,4,4 228:7
228:22

**testified**
10:5 11:14 23:3
91:10 107:11
114:14

**testify**
103:22 104:2,14
143:14 233:15,23
236:13 280:5

**testifying**
244:16

**testimonies**
80:10

**testimony**
5:16 23:6 26:6
44:14,17 45:14,18
47:15 48:5,7,10
48:20 55:24 56:11
56:14 62:11 64:19
81:7,13,16 89:16
89:23 90:19 93:2
94:9 96:13,16
98:4 99:16 103:6
103:13,14,15,17
103:18,23 104:3,5
104:7,9,10,16
114:4,11,22
115:16 116:4
117:1 120:20
124:12 130:14
137:8 140:19
200:5 201:15

202:21 204:13
210:2 215:18,20
216:18,19 222:19
222:23 223:3,6,21
224:5,14,22
228:16 230:5
232:24 233:3,4,6
233:9 236:15
237:3 244:12,13
244:15 270:15
271:23 272:5
273:7 280:9

**testing**
75:17 76:7,9 82:22
83:7,10,18 125:23
225:17,22 227:9
227:16,17,18,19
230:9

**tests**
76:11 203:7 226:7
226:13 227:1
228:2,6 230:1,6
230:14

**Texas**
11:13 18:7,7

**text**
263:12

**thank**
12:1 33:7 34:8
67:16 76:21 86:23
147:16 179:17
193:21 232:13
246:22 257:22
268:6 276:24
277:2,3

**Thanks**
89:19

**themes**
216:21

**thin**
130:24

**thing**
11:2 29:7 69:23
82:14,15 88:18
99:21 101:16
139:4 144:20

151:16 239:2
240:17 242:24
259:9 270:21

**things**
20:19 43:4 48:1
52:9,11 56:1 59:2
73:5 74:4 82:21
87:4 88:8,11
90:21 93:2 94:21
94:22 101:13
111:23 112:1
118:19 126:8
133:20 136:14
137:7 149:18
181:1 182:1 212:3
212:8 215:19
226:23 232:2
234:5 235:3,7
239:8 240:17
251:9 253:6,7
262:24 268:1
271:1 272:2

**think**
22:20 23:7 42:22
44:12 49:1,2,8
51:3 52:7 55:18
64:4,14 65:7,10
70:15 72:7 81:6
87:21 94:18 96:11
96:13,19,19,20,21
97:17 99:23 100:3
114:14 115:16
116:5,21 118:8,20
119:9 121:9
131:12,16 136:12
141:7 142:18
145:1,2,24,24
147:1 149:1
158:23 161:5
171:13 174:10
175:17 176:5
177:15 180:3
181:5,9,9 185:2,6
185:18,21 186:10
186:16 188:15,18
188:20 189:5,23

Laura M. Plunkett, Ph.D, D.A.B.T.

190:8,10 191:4
193:15 197:23
198:1,2,8,10,11
198:12,12 200:13
201:1 202:22
203:10,13 206:16
208:7 209:8 210:1
210:17 211:12
212:2,9 213:16
214:23 215:15
216:16 217:21
218:12,13 219:23
220:14 221:5
224:1 225:23
226:2 228:11
229:3,5 231:6
232:6,21 234:4
235:13 237:8,9
242:3,14,23 243:7
243:22 244:1
248:23 251:8
253:8 254:6,15
255:12,20 256:8
257:10 258:16
259:16 260:4,5,10
261:11 262:5
266:18,19 267:7
269:14 270:6
272:1 275:2
**thinking**
73:14
**third**
18:16 144:7
**thought**
71:19 117:17
130:16 149:6,7
219:11 273:16
274:14 276:9
**three**
38:23 47:8,10
61:10 64:8 249:9
252:4 275:5,19
**threshold**
152:20 155:21
**thresholds**
156:20

**threw**
65:23
**tied**
180:23
**till**
111:24
**time**
12:21,22 13:5
14:18 18:9 19:1
27:8,9,17,19
29:22 32:6 33:3
34:1 36:15,18
37:8,12 39:21
40:14,18 42:1
44:16 45:3 56:21
61:11 62:1,8
63:18 66:6,8
71:19 75:6 80:19
81:3 87:7 88:9,24
89:3 92:8 93:11
101:8 102:20
108:11,24 111:11
112:21 116:8
139:14 154:23
156:15 171:12
173:15 180:21
190:19 192:7
193:6,12,14,17
194:5 195:11
196:8 204:18
206:17 215:17
228:17 234:21,24
235:9,16,23 236:2
237:14 241:4,23
244:21 254:22
263:15 271:22
276:18 277:5
**time-wise**
150:1
**times**
107:11 141:3
142:24 159:2
244:9
**tissue**
151:12,13,14
253:23,24 254:22

255:3,6,16,18,22
256:2 264:22
266:2,10
**tissues**
8:15 82:23 83:19
125:2,6 254:4,10
257:1
**title**
85:12
**titles**
88:15
**today**
10:16,21 21:15
37:17,20 38:4
48:4 92:11 101:20
102:18 104:17
111:24 118:1
119:1 192:16
272:14,18
**told**
58:23 61:19,20
62:7 116:5 176:16
176:19 190:2
204:16 210:16,18
211:12 224:2
231:7 236:17
239:5 274:14,15
**tool**
269:14
**top**
23:2 46:22 74:16
78:18 170:16
176:7 263:12
272:8
**topic**
40:17 51:19 75:20
77:3
**topical**
52:10 116:1
**topics**
55:21 56:6 94:13
**total**
30:22
**touch**
52:1,4
**touched**

55:4
**toxic**
150:15 161:7
**toxicants**
51:21
**toxicity**
69:11 70:5 75:21
125:2,23 160:17
160:21 161:8
274:5
**toxicological**
53:21
**toxicologist**
13:17 227:7 270:12
**toxicologists**
74:3
**toxicology**
7:12 50:12 51:16
51:19 52:12,16
53:6,18 55:2,9
74:2 151:6 152:3
152:13 258:9
**tract**
180:5,6 186:12
196:23,24 197:19
197:20
**tracts**
181:7 196:21
203:20
**trade**
37:17 39:21
**training**
152:3
**transcript**
90:9,10 279:5
**transcripts**
93:3,3
**transfer**
189:15
**transparency**
178:7
**transparent**
212:11
**transplant**
261:20
**travel**

54:15 180:7 266:7
**traveled**
54:15
**tree**
85:13
**tremolite**
141:2
**trial**
30:1 45:15,20
47:15 48:5,7,10
48:20 55:24 57:9
70:1,17 90:19
93:1,13 96:18
99:14,16,18
103:14,15,18
104:6,9,10,16
114:4,11,21
116:24 118:4
120:20 121:8
123:17 130:18
136:15 138:16
151:2 171:20
215:20 216:18,18
217:15 223:15,17
233:3,6,9 239:8
241:14 242:4,8
243:5 244:15
**trials**
22:1 24:11,12
47:24 48:19 78:14
90:20 91:8 93:5
134:14 217:14
232:7
**tried**
113:3 214:2 252:10
**trigger**
246:16
**triggered**
76:1 228:14
**true**
103:2 104:12 106:4
132:3 210:7
250:20 279:8
280:8
**truth**
280:5

Case 3:16-md-02738-MAS-RLS    Document 33013-77    Filed 07/23/24    Page 107 of 111
PageID: 221404
Laura M. Plunkett, Ph.D, D.A.B.T.

Page 315

**truthful**
223:2,5
**try**
155:20 181:13,15
194:7 222:15
**trying**
49:1,2,8 80:19
81:19 84:8 96:21
123:13 133:5
161:2 216:19
233:11 238:14
**tubal**
190:19 192:8 193:5
198:17
**tubes**
180:8 182:17
183:18 190:17,20
191:19 192:9,19
192:21 193:7
196:18 199:24
200:1 205:24
252:11
**Tuesday**
1:19 2:7
**tumor**
255:3
**tumors**
254:17
**tumour**
254:23
**turn**
25:19 26:21 28:7
28:20 30:15 31:9
45:22 46:18,21
51:3,11 69:10
70:4 71:1 113:17
119:18 130:3
153:2 159:18
186:20 206:12
225:13 231:10
249:2 257:5
267:10 272:20
274:7 275:14
**two**
13:4,7 19:21 25:10
47:22 51:8 65:8

71:11 90:13 97:1
99:21 106:1
130:21 131:6
132:5,7,10,17,18
133:8,9 145:5
197:13 200:2
202:12,15 213:9
213:10 218:2
219:19 238:3
249:7,10,14
255:13 275:5
**Tylenol**
118:18
**type**
16:10 34:12 38:6
40:7 105:16
132:10 137:18
151:5 155:16
158:8 164:23
167:23 175:20
177:18 180:2
219:13 256:12
258:5,5 267:17
269:18
**typed**
72:16
**types**
35:1,8 47:8,10
76:10 105:18
121:1 130:21
131:7 132:7,10,18
153:18 156:11
170:11 172:23
201:24 227:9
254:4,10 257:1
**typically**
34:17 71:22 91:4
98:18 221:20
268:13

——————————
**U**
——————————
**U.S**
7:19 53:20 167:3
167:17 168:10,24
169:1,22 170:13
176:21 184:10

186:23 222:7
226:12 234:14,14
**Uber**
67:5
**Ubers**
67:3
**Uh-huh**
31:8 46:1 54:23
110:4
**undergo**
198:17 263:22
**underpinning**
53:19
**underpowered**
182:23 183:5
184:14
**understand**
10:18,20,23 15:2
41:18 61:22
105:24 110:17
121:10 126:21
131:13 142:20
143:14 166:13
167:1 173:18
190:8 203:6 234:6
249:13 258:11
270:15 271:12
**understanding**
62:2,15 76:3 95:13
118:9 121:2
171:21 173:3
244:17 256:20,23
265:7 279:11
**understood**
120:16 121:23
133:7 219:9
236:21
**unfortunately**
75:4 180:12 220:1
**Union**
43:12
**UNITED**
1:1
**unsophisticated**
204:1
**unspecified**

30:24
**unusual**
29:15
**upcoming**
47:24 48:19,20
**update**
50:4,7 181:14
**updated**
5:18 50:14 95:11
243:5
**use**
7:8,14 8:22 9:3
26:2 52:4 71:7,8
79:20 95:21 99:18
100:1 108:18
115:23 120:12
146:8 149:2
170:22 171:24
172:9 182:14
183:12,12,13,21
184:11 185:13
187:1,19 189:10
189:16 198:18
199:14 203:20
209:20 210:3
228:13 269:21
**usually**
49:9 88:22

——————————
**V**
——————————
**V**
1:13
**vagina**
252:11
**vague**
229:4 230:6 236:7
258:7
**Valerie**
1:11 3:3,14 245:13
**value**
199:11 201:6,18
203:11
**values**
202:1,16
**variable**
140:8

**variety**
29:17 35:1,20 37:2
**various**
35:5
**vary**
153:12 157:18
**varying**
158:5
**Ventura**
16:21
**venues**
162:9
**verified**
129:1
**versus**
10:22 12:14 26:9
99:7 112:16 115:7
126:4 180:5 181:7
183:12 198:2
226:3
**Veterinary**
14:5
**Vickery**
1:23 2:21 280:3,21
**view**
115:17 123:12
132:6 183:10
217:11,21,22
220:5 223:5 231:2
**viewed**
131:24
**virtual**
41:12 54:14,16
77:8
**virus**
269:19
**vitae**
5:19 50:17,21
**vitro**
258:9,14 265:5
**volume**
194:18
**volunteered**
56:23

——————————
**W**
——————————

Laura M. Plunkett, Ph.D, D.A.B.T.

**wait**
245:1
**waived**
280:11
**want**
15:1 22:12 24:20
27:17 60:10 84:5
95:8 97:16 100:16
107:21 108:13
111:14 115:2,3
116:6 119:18
120:2 123:19
135:19 140:1
158:20 168:10
178:24 179:7
192:12 202:24
215:8 231:4
236:23 238:2
245:4 246:24
252:2 260:22
273:2,9 275:2
276:20
**wanted**
13:10,10 59:12
61:20 121:9 137:5
266:20,20
**warning**
115:22 123:15
128:20 129:17
160:14,16 161:2
167:20 168:8,22
170:22 171:23
228:14 231:1
**warnings**
106:24 107:8
120:23 121:1
171:3 176:12
**Washington**
1:20 2:16 3:8
**wasn't**
30:3 31:1 36:21
102:6 136:6 209:3
223:4
**water**
217:18
**way**

17:21 20:18 25:16
25:17 30:7 41:23
43:15 59:10 70:24
91:15,23 106:9
131:20,21 143:13
157:12 165:19
168:9 169:1,24
170:2,3 175:24
188:16 192:16
193:1 204:15
208:13 211:15
216:3 219:5,13
234:5 236:14
248:24 253:7
260:11,11 265:11
265:20 266:19
267:7 280:15
**ways**
15:10 269:21
**we'll**
53:10 108:24
111:10 135:11,11
139:21 149:22
162:12 219:24
**we're**
10:16,20 15:9,13
15:14 17:4 20:1
20:14 35:11 105:7
123:21 148:6
150:4 189:13
205:22 218:4
275:2,6
**we've**
41:12 105:10
107:19 127:15
178:15 217:13
246:18
**weakness**
177:16 178:10
211:23
**weaknesses**
91:14 92:14 114:8
114:10 177:2,9,10
177:24 178:7
179:5,7 180:10,11
181:3,19 182:1

189:24 210:20
211:4 258:11
**website**
60:8 61:20 62:4
72:23 73:3 87:21
101:9 115:12
160:12 161:12,16
161:24 163:3
170:6 171:6
172:22 226:15
232:2,5,8
**week**
17:8 118:3
**weight**
91:21 92:3,15
114:16 116:15,16
118:14 189:7
205:9 208:9
211:13,19 212:10
214:24 215:2
**weighting**
121:4,5 170:13
**Welfare**
42:17 43:2
**went**
23:13 33:15 74:16
127:12 148:8
161:17 171:14,15
183:14 191:24
211:8 238:21
**weren't**
54:14 98:2
**WHMIS**
161:7,10,14
**wholistically**
262:21
**width**
251:10
**Wille**
96:20,22 223:2,20
**Wille's**
222:19
**window**
134:14
**wins**
218:24

**witness**
22:8 23:11,23 36:3
37:24 38:8 39:4
39:13,24 40:2
42:12 43:20,23
44:7 47:14 48:14
55:23 58:9 60:6
62:23 64:1,21
66:24 68:9,15
69:17 72:7 73:14
74:10 75:13 78:18
79:10,15,23 80:8
81:1 83:2,13,21
84:5 86:24 89:20
94:7,10 98:11
103:23 104:3
105:21 107:12
110:4,10 117:24
119:6 128:7,24
129:21 131:12
132:9 133:11
142:11 143:9
146:23 147:17
152:2 155:9,19
156:22 158:11
159:12 163:24
164:16,21 165:7
165:14 166:4,12
166:23 167:12,22
172:3 173:14
174:10 175:9
176:3,15 177:14
179:12,19 182:22
184:2,24 185:18
188:14 189:20
190:23 191:23
192:24 196:6
197:7,23 198:24
200:6 201:16
202:22 204:14
205:1 206:5,8
207:15 208:3,6,18
209:15 210:24
218:12 219:23
224:1 226:11
227:6 229:3,5

233:20 234:17
236:8 246:24
247:22 248:8
249:23 250:2
251:3 252:15
254:14 256:6,17
258:8 262:4 265:2
265:15 266:18
268:19 270:6
271:10 280:4,9,13
**witnesses**
8:9 81:24 232:24
236:13 243:12
**women**
82:16 115:22
183:17 184:10
186:11 189:10
190:17,18 191:19
192:19 193:5
196:20 198:17
203:20 210:4
255:16 256:2
259:2 260:17
262:1
**women's**
82:20 191:19
**Woodruff**
248:19
**word**
26:2 71:7,8 143:17
146:10 149:2
196:14
**words**
20:7 30:24 38:19
51:20 71:11 75:4
117:6 120:23
131:5 133:15
138:2 146:11
149:7,15 190:1
215:1 261:23
**work**
16:1,8,10,17 17:8
17:15,19,21,22
19:6,9,12 21:2,12
22:5 24:1 25:14
28:10 29:13 36:11

Laura M. Plunkett, Ph.D, D.A.B.T.

36:17 38:21 39:14
41:7 45:6 52:23
73:1,1 100:9
101:2,11 102:12
112:4 116:17
119:23 176:18
205:13 207:17
216:10 218:2,2
220:11 252:1
257:3 261:12
**worked**
15:20 16:2,14,14
28:5 36:22 37:6
44:7,10 63:14
128:10 130:15
166:5 212:20
215:23 216:5,9
267:21
**worker**
161:9
**workers**
161:8
**working**
12:19 13:11 14:2
15:9,13,14 16:4
26:20 31:15,20,21
32:3,6 34:15,19
46:10 47:10
176:19 220:6
263:2 275:20
**works**
212:23
**world**
59:3 127:5 146:2
164:3
**worldwide**
167:15 176:23
**wouldn't**
59:21 85:8 132:9
242:2
**write**
72:11 136:22
**writing**
72:14 85:5 136:20
**written**
45:1 56:4 71:16,18

71:23 72:4,11,15
72:18 91:24 92:18
100:11 130:16
150:21 151:20
163:20 164:11
185:23 190:9
200:8
**wrong**
117:16 136:24
272:23
**wrote**
57:10,11 215:19
235:5
**Wu**
213:9,10 214:2,9
274:15
**Wu's**
213:21

_____

**X**

**XRD**
77:1

_____

**Y**

**yeah**
22:22 28:17,17,17
30:23 32:10,15
36:24 38:10 40:5
40:14 47:19 48:14
48:17,17,17 49:4
49:13 64:8 66:4
70:12,12 89:15
110:8,10,10,11,11
116:9 117:24
118:22 119:6
124:16 134:19
137:2,4 144:8
150:6 179:23
219:7 229:11
231:22,22 238:14
238:23 239:2,9
241:2 242:14
245:4,6 247:22,22
249:23 255:14
257:13 260:24
273:8 274:13

275:4
**year**
17:11 18:9,23
19:23 21:19,22,23
24:7,8,16 37:12
53:15
**years**
13:4,7 38:23 39:6
45:16 52:17 74:17
115:22 229:21
231:9 236:19
**York**
54:16

_____

**Z**

**Zealand**
42:21
**Zelikoff**
52:15 53:24

_____

**0**

_____

**1**

**1**
5:10 16:20 24:22
25:2,13 26:22
51:13 54:5,13
141:17 240:6
241:4,23
**1-10**
6:15
**1.13**
199:10
**1.3**
182:5,13
**1:06**
237:22
**1:23**
237:23
**10**
1:15,19 2:7 5:4
6:11 17:8 99:20
109:22 110:3,6
134:9 240:6 241:5
**10:35**
105:5
**10:50**

105:6
**104**
206:18
**108**
6:9
**109**
231:11
**10th**
218:19
**11**
6:13 111:16,18
240:22
**11:30**
148:4
**11:32**
148:5
**11:59**
178:18
**110**
6:11 231:13,15
**111**
6:13
**112**
6:16
**1127**
11:12
**12**
6:16 112:7,13
134:9
**12/18/19**
139:19
**12:15**
178:19
**1200**
31:7
**13**
6:20 51:12 147:11
147:13 148:12
**14**
7:3 154:9,11,16
**1422-CC09326-03**
1:14
**147**
6:20
**15**
179:14,16 199:12

201:7,18
**15,000**
74:3
**1519**
5:12
**154**
7:3
**16**
6:5 7:8 86:3 193:20
194:2 196:3,10
**16-2738**
1:4
**1606**
5:15
**17**
7:12 113:21 207:5
207:8,24 210:21
**179**
7:8
**18**
7:16 18:24 22:9,15
95:24 232:11,17
232:21 233:17
**1825**
2:14 3:7
**19**
7:19,20 76:21
232:14 238:4,7
**1938**
124:5
**1975**
122:11 124:1
**1978**
124:9,13
**1980s**
169:13
**1994**
245:23
**1998**
7:6 154:18
**1st**
242:3,13

_____

**2**

**2**
5:13,18 27:22,24

Laura M. Plunkett, Ph.D, D.A.B.T.

33:10 51:13 53:7
141:10 243:22
245:8,15
**2-3**
7:6
**2:00**
276:13
**2:02**
276:14 277:5
**20**
8:3 21:24 27:4
36:15 37:11 76:21
238:5,9
**2000**
33:12
**20006**
1:20 2:16 3:8
**2001**
13:14
**2006**
139:4,10,13 213:18
213:20 214:14
275:22 276:7
**2007**
160:2,11,15 161:18
168:3
**2008**
274:11
**2010**
130:8 133:8 139:10
214:11
**2012**
124:12 143:23
**2014**
214:11
**2016**
45:16,20 86:24
136:9,16,24 137:1
214:12
**2017**
141:10
**2018**
5:12 6:5,8 14:19
17:3 24:24 47:12
54:19 55:13 56:4
57:24 76:20 77:5

77:18 78:1 86:4
86:13 90:16 100:8
101:2,6 106:22
134:8 160:3 276:5
276:10
**2019**
5:15 13:1 18:14,15
18:17 22:23 23:1
23:9,19,20,20
25:20 33:12 36:9
36:13,14 37:13,16
37:19 38:3 40:18
44:15 45:3 51:5
54:15 73:15 90:18
141:17 241:12
246:10 267:14
**2019-2021**
39:21 42:1
**202.759.7648**
3:9
**2020**
7:11,19 13:2 18:12
18:13,17,19,23
19:1,3,7 22:4,16
22:19 23:17,24
27:15 28:8 30:3
36:19 37:7,13
40:24 41:22 44:14
56:13 57:4,15,22
58:16 75:17 76:6
76:23 113:21
193:24 232:15
235:1 245:17
246:10 257:9,19
**2021**
1:19 2:7 5:18,24
6:15,22 8:6 18:9
18:17,19,22 27:7
33:13 37:8 40:18
44:16 45:3 48:4
48:10 51:5 55:20
57:15 58:1 84:14
84:21 89:8,11
90:14 101:24
105:11 146:8
160:4 166:17

225:5 239:12,23
240:7 241:5,23
245:17 273:15
276:8 279:16
**2022**
55:20
**2023**
280:24
**207**
7:12
**21**
8:6 76:21 95:24
123:7 239:23
240:2
**218**
3:17
**22**
8:8 120:3 128:19
144:5 243:10,19
**23**
8:10 246:18,21
**232**
7:16
**238**
7:20 8:3
**24**
8:12 249:21 250:1
**240**
8:6
**243**
8:8
**246**
8:10
**25**
5:10 8:17 257:19
257:21
**250**
8:12
**2555**
4:7
**257**
8:17
**26**
6:3 8:21 268:4,8
**260570**
153:6

**260573**
153:6
**260709**
153:6
**268**
8:21
**27**
5:13 9:3 274:24
275:9,12
**270,000**
22:19
**275**
9:3
**28**
130:4 280:24
**29**
6:8 86:13
**2nd**
27:3

**3**
**3**
5:16 45:9,11,13,18
47:18 50:8,10
53:11 54:9 244:1
**30**
5:12,14,24 18:11
18:13,20 21:23
24:24 28:8 80:14
84:14,21 135:20
196:11
**300**
108:15
**300-335**
11:13
**308.874.3186**
3:20
**31**
25:19 138:6
**33**
140:2 150:5
**36104**
3:19
**37**
153:2

**4**
**4**
5:19 49:21,24
50:16 58:16
125:19 126:2,3
**40**
98:17
**40-page**
98:14
**41**
159:19
**4160**
3:18
**45**
5:16
**450**
30:22
**49**
5:19

**5**
**5**
5:20 45:22 67:15
67:18,20 126:3
**50**
20:1
**50/50**
19:24 20:1,14
**510(k)**
46:9
**52**
245:20
**53**
199:21 245:19
**55**
213:19 249:3
253:16
**56**
186:21
**5704**
153:6

**6**
**6**
5:22 8:6 84:13,17
85:10 89:13,14

Laura M. Plunkett, Ph.D, D.A.B.T.

Page 319

119:19 239:12,23

**62**
257:6
**64108**
4:8
**65**
267:11
**67**
5:20 89:21
**69**
89:21

---

**7**

**7**
6:3 7:11 46:21 51:4
86:3,6 193:23
240:5 241:1,2
**700**
2:15 3:7
**72**
178:24
**740.1**
122:9 123:10,22
169:4
**75**
206:13,19,21,22
213:15 272:20
273:13 274:8
**77077**
11:13

---

**8**

**8**
6:6 71:1,2 86:12,15
126:9
**8.10.2021**
6:10,12
**80**
36:17
**816.474.6550**
4:9
**84**
5:22
**86**
6:3,6
**87**

134:9
**89**
215:9 218:7

---

**9**

**9**
6:9 107:22 108:3
109:4 113:18
126:11 154:8
240:14 242:14
**9:07**
1:19 2:8
**90**
15:6 30:11 216:12
218:8,20
**91**
220:17 221:5
**96**
225:14
**98**
15:6
**99**
199:11