# EXHIBIT 77

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW JERSEY

3

4    _____

                                    )
5    IN RE JOHNSON & JOHNSON        )

     TALCUM POWDER PRODUCTS         ) MDL NO. 16-2738 (MAS)(RLS)

6    MARKETING SALES PRACTICES,     )

     AND PRODUCTS LIABILITY         )

7    LITIGATION                     )

     _____)

8

9

10

11

12

13          DEPOSITION OF REBECCA SMITH-BINDMAN, M.D.

14                 San Francisco, California

15                 Wednesday, March 20, 2024

16                        Volume I

17

18

19

20

21   Reported by:

     CATHERINE A. NOLASCO, RMR, CRR, BS

22   CSR No. 8239

23   Job No. 6498236

24

25   PAGES 1 - 215

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NEW JERSEY
 3
 4    _____
                              )
 5  IN RE JOHNSON & JOHNSON    )
     TALCUM POWDER PRODUCTS    ) MDL NO. 16-2738 (MAS)(RLS)
 6  MARKETING SALES PRACTICES, )
     AND PRODUCTS LIABILITY    )
 7  LITIGATION                 )
    _____)
 8
 9
10
11
12
13        Deposition of REBECCA SMITH-BINDMAN, M.D.,
14  Volume I, taken on behalf of Defendant, with the Witness
15  appearing at the Omni, 505 California Street, San
16  Francisco, California, beginning at 9:08 a.m. and ending
17  at 2:25 p.m., on Wednesday, March 20, 2024, before
18  CATHERINE A. NOLASCO, Certified Shorthand Reporter No.
19  8239.
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  For Plaintiffs:
 4     BEASLEY ALLEN LAW FIRM
        BY:  P. LEIGH O'DELL
 5     Attorney at Law
        218 Commerce Street
 6     P.O. Box 4160
        Montgomery, Alabama  36103-4160
 7     800.898.2034
        334.954.7555 Fax
 8     leigh.odell@beasleyallen.com
 9     MOTLEY RICE, LLC
        BY:  DANIEL R. LAPINSKI (appearing remotely)
10     Attorney at Law
        210 Lake Drive East, Suite 101
11     Cherry Hill, New Jersey  08002
        856.667.0500
12     dlapinski@motleyrice.com
13     (Mr. Lapinski was not present at the commencement
        of the deposition proceedings.)
14
15
16  For Defendant Johnson and Johnson:
17     SHOOK, HARDY & BACON L.L.P.
        BY:  MARK HEGARTY
18     Attorney at Law
        2555 Grand Boulevard
19     Kansas City, Missouri  64108-2613
        816.474.6550
20     816.421.5547 Fax
        mhegarty@shb.com
21
22
23  ALSO PRESENT:
24  KARA FLAGEOLLET, Shook, Hardy & Bacon, L.L.P.
25  MARGARET THOMPSON, M.D.
```

Page 4

```
 1                    INDEX
 2  WITNESS                    EXAMINATION
 3  REBECCA SMITH-BINDMAN, M.D.
     Volume I
 4      BY MR. HEGARTY            10
 5      BY MS. O'DELL            202
 6
 7
 8          EXHIBITS
 9  NUMBER      DESCRIPTION        PAGES
10  Exhibit 1  "PLAINTIFFS' THIRD AMENDED DISCLOSURE   11
11      OF EXPERT WITNESSES"; 15 pages
12
13  Exhibit 2  "SECOND AMENDED EXPERT REPORT OF        18
14      REBECCA SMITH-BINDMAN, MD"; 126 pages
15
16  Exhibit 3  "Association Between the Frequent Use   19
17      of Perineal Talcum Powder Products and
18      Ovarian Cancer: a Systematic Review
19      and Meta-analysis"; 16 pages
20
21  Exhibit 4  "JAMA, Original Investigation,          24
22      Association of Powder Use in the
23      Genital Area With Risk of Ovarian
24      Cancer"; 18 pages
25  //
```

Page 5

```
 1          EXHIBITS (Continued)
 2  NUMBER          DESCRIPTION        PAGES
 3  Exhibit 5  "NATIONAL CANCER INSTITUTE, Ovarian,    30
 4      Fallopian Tube, and Primary Peritoneal
 5      Cancers Prevention (PDQ)-Health
 6      Professional Version"; 35 pages
 7
 8  Exhibit 6  Email series, "Subject: RE: Talc        72
 9      analyses - one additional
10      sensitivity"; 3 pages
11
12  Exhibit 7  "Gynecologic Oncology, Analytic        105
13      comparison of talc in commercially
14      available baby powder and in pelvic
15      tissues resected from ovarian
16      carcinoma patients"; 7 pages
17
18  Exhibit 8  "Environmental Research, The effect of 114
19      talc particles on phagocytes in
20      co-culture with ovarian cancer cells";
21      12 pages
22
23
24
25  //
```

2 (Pages 2 - 5)

Page 6

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGES

Exhibit 9  "Taylor & Francis Group, RESEARCH          122
           PAPER, Transcriptomic and epigenomic
           effects of insoluble particles on J774
           macrophages"; 18 pages

Exhibit 10 "Talcum powder induces malignant          125
           transformation in normal human primary
           ovarian epithelial cells" from
           "Minerva Obstetrics and Gynecology
           2023 April;75(2):150-7"; 8 pages

Exhibit 11 "Journal of Ovarian Research, REVIEW,      137
           Investigation on factors associated
           with ovarian cancer: an umbrella
           review of systematic review and
           meta-analyses"; 17 pages

Exhibit 12 "CANCER EPIDEMIOLOGY, BIOMARKERS &         144
           PREVENTION, RESEARCH ARTICLE, Genital
           Powder Use and Risk of Epithelial
           Ovarian Cancer in the Ovarian Cancer
           in Women of African Ancestry
           Consortium"; 9 pages

Page 7

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGES

Exhibit 13 "Environmental International, Use of        153
           personal care product mixtures and
           incident hormone-sensitive cancers in
           the Sister Study: A U.S.-wide
           prospective cohort"; 16 pages

Exhibit 14 "INVOICE, Rebecca Smith-Bindman, MD,       159
           October 4, 2021"; 1 page

Exhibit 15 "INVOICE, Rebecca Smith-Bindman, MD,       159
           November 12, 2023"; 1 page

Exhibit 16 "Rebecca Smith-Bindman, Materials          163
           Considered"; 33 pages

Exhibit 17 "SECOND AMENDED RULE 26 EXPERT REPORT      164
           OF JUDITH WOLF MD"; 36 pages

Exhibit 18 "University of California, San             168
           Francisco, CURRICULUM VITAE, Prepared:
           March 9, 2024, Name: Rebecca
           Smith-Bindman, MD"; 68 pages

Page 8

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGES

Exhibit 19 "PLAINTIFFS' STEERING COMMITTEE'S          169
           RESPONSE AND OBJECTIONS TO THE NOTICE
           OF ORAL DEPOSITION OF REBECCA
           SMITH-BINDMAN, M.D. AND DUCES TECUM";
           13 pages

Exhibit 20 Handwritten notes entitled "PDQ"; 4        173
           pages

Exhibit 21 Handwritten notes from a small red         174
           notebook; 18 pages

Exhibit 22 Three binders                              175

Exhibit 23 "Comments for Manuscript 'Association       175
           between the frequent use of perineal
           talcum powder products and ovarian
           cancer: A systematic review and
           meta-analysis.'"; 3 pages

Exhibit 24 Email dated February 15, 2021,             175
           "Subject: Decision from Annals of
           Internal Medicine"; 1 page
//

Page 9

EXHIBITS (Continued)

NUMBER          DESCRIPTION          PAGES

Exhibit 25 Email dated January 13, 2022,              184
           "Subject: Fwd: Your Submission
           JGIM-D-21-02485R3 -
           [EMID:3e89167ef1fa9782]"; Bates
           Smith-Bindman_March 2024_000001 -
           Smith-Bindman_March 2024_000003

Exhibit 26 "Douching and Genital Talc Use:            191
           Patterns of Use and Reliability of
           Self-reported Exposure" from
           "Epidemiology, Volume 34, Number 3,
           May 2023"; 20 pages

Exhibit 27 "EDITORIAL, Use of Powder in the           196
           Genital Area and Ovarian Cancer Risk,
           Examining the Evidence" from JAMA,
           January 7, 2020, Volume 323, Number
           1"; 3 pages


                  ---o0o---

Page 10

1  San Francisco, California; Wednesday, March 20, 2024
2          9:08 a.m.
3
4          REBECCA SMITH-BINDMAN, M.D.,
5  having been administered an oath, was examined and
6  testified as follows:
7
8          EXAMINATION
9  BY MR. HEGARTY:
10  Q   Good morning, Doctor.
11  A   Good morning.
12  Q   Would you please state your full name.
13  A   Rebecca Smith-Bindman.
14  Q   Dr. Smith-Bindman, my name is Mark Hegarty.  I
15  represent Johnson & Johnson in this case.  We're here
16  today to take your deposition in the In Re MDL case
17  involve -- against Johnson & Johnson involving talcum
18  powder cases, in particular as to your most recent
19  amended report from November of 2023.
20      Do you understand that?
21  A   Yes.
22  Q   Related, we're here primarily to determine if
23  any of your opinions have changed or are new or if you
24  intend to refer to additional literature or materials
25  that were not identified when you were last deposed at

Page 11

1  your MDL deposition back in October of 2021.
2      Do you understand that too?
3  A   Yes.
4  Q   Are you also aware that you've been disclosed
5  as an expert witness in two New Jersey talc cases:  Carl
6  and Balderrama?
7  A   Yes.
8      MR. HEGARTY:  I am going to mark, as the first
9  exhibit, the disclosure in the Carl and Balderrama
10  cases.
11      (Exhibit 1 was marked for identification by
12      the court reporter.)
13      MS. O'DELL:  Thank you.
14      MR. HEGARTY:  Now, what I've marked as Exhibit
15  No. 1 is "PLAINTIFFS' THIRD AMENDED DISCLOSURE OF EXPERT
16  WITNESSES."
17  Q   And if you would turn over to page 6 and 7.
18      Can you tell me -- and before we go there, can
19  you tell me if this document is familiar to you at all?
20  A   No.
21  Q   Would you look at paragraph 5 on pages 6 and 7
22  and tell me whether you've ever seen that paragraph that
23  begins with your name?
24  A   Yes.
25  Q   Can you tell me when you first reviewed or saw

Page 12

1  the paragraph 5 in Exhibit No. 1?
2  A   I mean, this paragraph is -- is the same as
3  has been used in the past, so several years ago.
4  Q   Have you had a chance to read through this
5  paragraph?
6  A   Yes.
7  Q   Is everything in it accurate?
8  A   Yes.
9  Q   Are -- are there any necessary changes to it?
10  A   No.
11  Q   You can put that aside.  Thank you.
12      Do you recall when you were initially
13  contacted about serving as an expert in the Carl and
14  Balderrama New Jersey state court cases?
15  A   No.
16  Q   Have you reviewed any medical or other
17  materials specific to Ms. Carl?
18  A   No.
19  Q   Have you reviewed any medical or other
20  material specific to Ms. Balderrama?
21  A   No.
22  Q   Do you know what type of cancer that Ms. Carl
23  had?
24  A   No.
25  Q   Do you know what type of -- do you know

Page 13

1  anything about any talc use by Ms. Carl?
2  A   No.
3  Q   Do you know what type of cancer Ms. Balderrama
4  had?
5  A   No.
6  Q   Do you know anything about Ms. Balderrama's
7  use of talc?
8  A   No.
9  Q   Did you prepare any type of report specific to
10  the Carl or Balderrama cases?
11  A   I have not.
12  Q   Do you intend to testify as to the -- to the
13  cause of Ms. Carl's cancer?
14  A   My understanding is that I am just a general
15  expert rather than a case-specific expert.
16  Q   Do you intend to testify as to the specific
17  cause of Ms. Balderrama's cancer?
18  A   The same answer.  No, not that I know of.
19  Q   Are you prepared today to discuss the latest
20  amendments to your MDL report as well as any changed or
21  new opinions and any new literature or materials
22  identified in your recent amended report?
23  A   I am.
24  Q   Did you bring any materials with you to the
25  deposition?

4 (Pages 10 - 13)

Page 14

1    A  I did.
2    Q  What materials did you bring with you?
3    A  I brought a binder full of the references that
4  I cite and have reviewed, a binder of my prior
5  deposition reports, and a binder of experts from other
6  expert witnesses and a small red book that I took notes
7  in over the last day or two in my review of the
8  materials.
9    Q  And with regard to the binder of depositions
10  of other experts, can you grab that binder and tell me
11  whose depositions you had in it?
12    A  Yes, of course.
13      Mine, Anne McTiernan, Harlow and Rothman,
14  Sonal Singh, Dr. Moormon, Dr. Kessler, William Longo's
15  third report, Longo's second report, and George Newman.
16    Q  As to the deposition transcripts, besides
17  yourself, can you tell me approximately when you first
18  received those deposition transcripts?
19      MS. O'DELL: I think there may be
20  miscommunication.  I don't think she mentioned other
21  depositions.
22      THE WITNESS:  Just my own.
23      MR. HEGARTY:  Oh, I'm sorry.  Let me make
24  more --
25    Q  Oh, so you're saying that, as far as the

Page 15

1  depositions, the only one that's in there are yours; the
2  others are reports?
3    A  Correct.  The other --
4    Q  Okay.  I'm sorry.
5    A  -- expert reports.
6    Q  I'm sorry.  That's my confusion.
7      As far as the other witnesses' reports, when
8  did you -- approximately, did you receive those?
9    A  In the last week or two.
10    Q  Did you receive those from counsel for
11  Plaintiffs?
12    A  I did.
13    Q  Did you make a specific request for those or
14  any other experts' reports?
15    A  I did.
16    Q  Did you make a specific request for those
17  specific expert reports?
18    A  No, it was a generic request.
19    Q  What was a generic request?
20    A  Just to see the reports of the other experts.
21    Q  When you say "other experts," other experts in
22  the MDL?
23    A  Yes.
24    Q  Did you review those reports in advance of
25  today's deposition?

Page 16

1    A  I skimmed them.
2    Q  You also mentioned that you have a red book of
3  notes that you've made in the last couple days.
4    A  Yes.
5    Q  How many pages of notes are those?
6    A  A few dozen.  Tiny pages, mostly scribbles.
7    Q  Before we complete the deposition, I will ask
8  to take a look at those, and then we'll -- we'll go
9  ahead and mark, not physically, but to be copied and
10  marked as an exhibit at the deposition.
11      Does that sound all right?
12    A  Yes.
13    Q  And before we move on to another topic, just
14  covering the materials you brought with you, when you
15  say notes you made in the -- in the -- this red book you
16  brought, can you generally describe notes -- what the
17  notes are of?
18    A  Yes.  As I'm reviewing the data on the
19  biologic mechanisms, I write down the -- the important
20  references that inform my opinion; or if I'm reviewing
21  the other systematic reviews, I note down important
22  points.  It's mostly, the way I remember stuff is by
23  writing it down, more the writing-down process than
24  actually reviewing it at any point after that.
25    Q  Other than the materials you've identified so

Page 17

1  far that you brought with you, including the notes, have
2  you prepared any other notes or materials related to
3  your testimony in this case since your last MDL
4  deposition in October 2021?
5    A  No.
6      MR. HEGARTY:  I want to mark next --
7      THE WITNESS:  Can -- it's a mild amendment.
8      In addition to my red book, I also took notes
9  on a couple of other papers as well that I can share.
10  BY MR. HEGARTY:
11    Q  Are those separate from the notes in your red
12  book?
13    A  Yes.
14    Q  And you have those on separate pages?
15    A  I have them on a separate piece of paper --
16    Q  Okay.  Thank you.
17    A  -- a bigger piece of paper.  I'm not sure why
18  some are big and some are in the red book.
19    Q  What studies or documents did you make notes
20  of in that second set?
21    A  The -- the PDQ on talc, I specifically
22  reviewed, and there's one on -- on the Chang study from
23  2023.
24      MR. HEGARTY:  I'm going to mark next, as
25  Exhibit No. 2, your November 2023 -- is that your

5 (Pages 14 - 17)

Page 18

1  November 2023 -- your expert report?
2       THE WITNESS:  I was just given the 21.
3       MR. HEGARTY:  Twenty-one.  Okay.  Let me --
4  let's go off the record quick.  That's my fault.
5       (Discussion Off the Record.)
6       (Exhibit 2 was marked for identification by
7       the court reporter.)
8       MR. HEGARTY:  Okay.  We are back on the
9  record.
10       I had marked previously, as Exhibit No. 2,
11  Dr. Smith-Bindman -- Smith-Bindman's 2021 amended
12  report.  I meant to have marked, as Exhibit No. 2, her
13  November 23rd, 2023, second amended report.
14       Q    And is, now, Exhibit No. 2 your November 23rd,
15  2023, second amended report?
16       A    It is.
17       Q    And can you look through it and does it appear
18  to be what you believe to be the entirety of your
19  November 23rd, 2023, second amended report?
20       A    Yes.
21       Q    Okay.  Thank you.
22       I'm going to mark next, as -- I'll tell you
23  which one -- as Exhibit No. 3, your 2022 paper,
24  "Association Between the Frequent Use of Perineal Talcum
25  Powder Products and Ovarian Cancer: a" systemic --

Page 19

1  "Systematic Review and Meta-analysis."
2       I'm going to mark that as Exhibit No. 3.
3       (Exhibit 3 was marked for identification by
4       the court reporter.)
5       MS. O'DELL:  I'm just going to put that in the
6  basket since she's going to be looking at that one.
7  BY MR. HEGARTY:
8       Q    And do you have a copy of Exhibit No. 3,
9  Dr. Smith-Bindman?
10       A    Yes.
11       Q    What journal was Exhibit No. 3 published in?
12       A    JGIM, Journal of General Internal Medicine.
13       Q    Had you ever published in that journal before?
14       A    I think so.
15       Q    Your 2022 -- well, first of all, I'm going to
16  call it -- I'll refer to it as the Woolen paper; is that
17  fair?
18       A    Yes.
19       Q    Your 2022 Woolen paper was based on a meta
20  analysis that you started for litigation, correct?
21       A    I --
22       MS. O'DELL:  Object to form.
23       THE WITNESS:  I wouldn't characterize it that
24  way.
25       MR. HEGARTY:  Let me ask in a different way,

Page 20

1  then.
2       Q    You generated a version of the same meta
3  analysis you published in 2022 as part of your work as
4  an expert for Plaintiffs in the talc litigation,
5  correct?
6       A    I would also say that differently.  I -- I did
7  a review, and then the Woolen review was a new review
8  from scratch.
9       Q    You initially set out the review along the
10  lines of what was published that you said started from
11  scratch in the reports you prepared for the MDL dated
12  November 18, 2018, correct?
13       MS. O'DELL:  Object- --
14       THE WITNESS:  Yes.
15  BY MR. HEGARTY:
16       Q    You did not start the review that you describe
17  in your November 2018 report prior to being contacted by
18  Plaintiffs' counsel in this litigation, correct?
19       A    Correct.
20       Q    You subsequently set out your meta analysis
21  that you had done as part of your work on the talc
22  litigation in your second amended report of July 2021,
23  correct?
24       A    I don't understand the question.
25       Q    You continued to talk about the meta analysis

Page 21

1  you had done as part of your work in the talc litigation
2  in your first amended report --
3       A    Yes.
4       Q    -- correct?
5       A    Yes.
6       Q    And in your most recent amended report, now
7  you talk about the Woolen 2022 paper, correct?
8       A    That's correct.
9       Q    And is it -- are you telling me that none of
10  the work that went into the Woolen paper and getting it
11  published was done as part of your work in any of the
12  amended reports that you prepared?
13       A    That's correct.
14       Q    You did not include -- let me ask a different
15  way.
16       Was any of the work that went into the meta
17  analysis that eventually became the 2022 Woolen report
18  invoiced to Plaintiffs' counsel in this litigation?
19       A    It is correct that none of that work was paid
20  for by Plaintiff counsel.
21       Q    Was any percentage of thought or initiation or
22  the genesis of the 2022 Woolen paper part of your work
23  in this litigation?
24       MS. O'DELL:  Object to the form.
25       THE WITNESS:  The idea for doing a systematic

6 (Pages 18 - 21)

Page 22

1  review on the topic grew out of my work as an expert,
2  but the actual work on the new systematic review led by
3  Woolen was deliberately and very explicitly new work led
4  by Dr. Woolen. I helped guide him, and I was a
5  participant, but it was very deliberately started from
6  scratch without any of the insights that I may have
7  learned from the prior review.
8  BY MR. HEGARTY:
9    Q   Is it fair to say, though, that you would not
10  have done the meta analysis that was published as of
11  2022 Woolen paper if you had not been contacted by
12  Plaintiffs' counsel to work on the talc litigation?
13    A   I would agree that this was a new area
14  entirely for me. I didn't know anything about this
15  topic area before I was approached to be an expert.
16  Once I learned about the topic, then I became interested
17  in -- in wanting to produce this work in the scientific
18  literature. So in terms of a topic area, this was
19  entirely new to me from the expert witness work that I
20  did.
21    Q   Would you agree that if you had never been
22  contacted by Plaintiffs' counsel to work on this case,
23  you would not have prepared the 2022 Woolen meta
24  analysis?
25    MS. O'DELL:  Object to the form.  Speculation.

Page 23

1    THE WITNESS:  I have contributed or led a
2  number of systematic reviews, probably a half dozen or
3  so. I went down this area of investigation because I
4  was contacted about this, but whether or not I could
5  have gotten to that same place, I would have no idea.
6    MR. HEGARTY:  Let me see if you can answer it
7  this way.
8    Q   Would you agree that it's more likely than not
9  you would not have done the -- the meta analysis set out
10  in the 2022 Woolen paper if you had never been contacted
11  about serving as an expert witness for Plaintiffs in the
12  talc litigation?
13    A   I think that's probably true.
14    Q   Now, with regard to the -- the manner in which
15  you define frequency in your 2022 Woolen paper, the 2022
16  [sic] O'Brien study of the four cohorts looked at
17  frequency of use as well, correct?
18    A   In a limited number of those papers, it did
19  look at frequency of use. I think there are four
20  papers, and I think they were able to look at frequency
21  in two of them.
22    Q   The 2022 [sic] O'Brien study defined frequency
23  as greater or equal to once a week.
24    Does that sound right to you?
25    MS. O'DELL:  And if you need to see the

Page 24

1  O'Brien paper --
2    THE WITNESS:  I would need to see it.
3    MR. HEGARTY:  We have a copy of the O'Brien
4  paper in -- it should be --
5    MS. O'DELL:  Do you want to see that?
6    THE WITNESS:  I don't mind.
7    MR. HEGARTY:  Yeah, it's right here.
8    And we'll go ahead and mark that as Exhibit
9  No. 4. I think we're on Exhibit No. 4, aren't we?
10    MS. FLAGEOLLET:  Yep.
11    (Exhibit 4 was marked for identification by
12    the court reporter.)
13  BY MR. HEGARTY:
14    Q   So I've had marked, as Exhibit No. 4, the 2020
15  O'Brien study that I had just referenced in my question.
16    Do you have a copy of that paper in front of
17  you, Doctor?
18    A   I do.
19    Q   If you look at the very first page in the
20  abstract, it -- when it talks about exposure, it looks
21  at ever long-term greater than 20 -- greater than or
22  equal to 20 years and frequent greater than or equal to
23  once per week; is that correct?
24    A   I do see that in the abstract.  I'm just
25  checking the -- yes.

Page 25

1    Q   Thank you.
2    The 2020 O'Brien study, as you found -- or let
3  me start over again.
4    The 2022 [sic] O'Brien study, as you even
5  state in the 2020 Woolen paper, found as its main
6  conclusion that there was no statistically significant
7  association between genital talc use and ovarian cancer,
8  correct?
9    MS. O'DELL:  Where -- where are you reading,
10  please?  Just --
11    MR. HEGARTY:  I'm reading at the end of the
12  first paragraph under the "INTRODUCTION" section.
13    MS. O'DELL:  Of O'Brien?
14    MR. HEGARTY:  No. I'm sorry. No. Of Woolen
15  2022.
16    MS. O'DELL:  Thank you.
17    THE WITNESS:  I just want to clarify
18  something.
19    We cite the explicit conclusion of O'Brien
20  that they didn't find a statistically significant
21  association. I would not interpret their results as
22  finding that. They did find a statistically significant
23  association, but they do conclude that they didn't. So
24  we cite what they concluded, but I don't agree that that
25  was what they found.

7 (Pages 22 - 25)

Page 26

BY MR. HEGARTY:

2  Q   In your 2022 Woolen paper, you actually state
3  the main conclusion was that there was no statistically
4  significant association between genital talc use and
5  ovarian cancer, correct?
6  A   I would state again: We cited what they
7  concluded, which is what they concluded. We cited
8  that -- their main conclusion.
9  Q   Just agree -- can you agree, though, that in
10  the first paragraph under the "INTRODUCTION" section,
11  when you're referring to the Woolen paper, you use the
12  two words "main conclusion"?
13  A   Again, in its main conclusion. So that's not
14  my main conclusion of their study. Those are important
15  differences.
16  Q   Understood.
17       The 2022 [sic] O'Brien paper also found no
18  association between use of talc greater or equal to once
19  a week and ovarian cancer, correct? In other words, it
20  found no statistically significant association between
21  use at that amount -- that level and ovarian cancer,
22  right?
23       MS. O'DELL: Object to the form.
24       THE WITNESS: No, I -- I would not agree with
25  that conclusion.

Page 27

BY MR. HEGARTY:

2  Q   What's wrong -- what part of my question do
3  you not agree with and tell me why?
4  A   Several parts of it.
5       I think they had many results that show a
6  significant association between that powder use 1 --
7  greater than once per week and ovarian cancer. So there
8  are -- I'm looking specifically at Table 3 in their
9  report. And in Table 3, they -- they look at the
10  results, use powder, at the top part of that greater
11  than one time per week. They show it for three
12  individual studies, and then the pooled estimate is
13  1.09. It goes from 0.97 to 1.23. I think that's an
14  important result.
15       And then in the bottom half of their table,
16  they show it for the pooled estimate greater than 1 who
17  used greater than once a week and have patent
18  reproductive tract. They show an estimate of 1.19, 1.03
19  to 1.37. I think both of those show a meaningful
20  association.
21  Q   In epidemiologic terms, the fact that the
22  confidence interval range was from .97 to 1.23 with
23  regard to the 1.09 adjusted odds ratio means that you --
24  means that the result could be due to chance, correct?
25  A   I believe that interpretation of epidemiology

Page 28

1  results where if it overlaps 1, you no longer believe
2  it's real is a little bit of an outdated interpretation.
3  So the movement is away from considering the edge of the
4  confidence interval, the edge of what we understand and,
5  rather, look at the confidence interval as giving you
6  some understanding of the precision of the estimate, but
7  the greatest strength is in the point estimate, and that
8  is for the 1.09.
9       And the fact that the confidence interval is
10  wider, I agree with you; in the past that would have --
11  the language that would have been used is it's not
12  statistically significant, but -- but there's really
13  been a very strong shift away from that rigorous
14  interpretation of that, is if it's aligned towards the
15  most likely answer is, for that estimate, there's a 9
16  percent increase in risk and the precision is -- is
17  wider than -- than it -- than it would be if it didn't
18  overlap 1.
19  Q   Having a confidence interval that crosses 1
20  also means you cannot reject a null hypothesis, correct?
21  A   Again, I think historically that was often
22  used as a cut-off, a threshold, and I think -- I think
23  Dr. Rothman has written about this very eloquently, and
24  it's gotten hundreds of leading biostatisticians to sign
25  on to a statement that says: We no longer consider that

Page 29

1  a meaningful conclusion.
2  Q   Did you sign on to that statement?
3  A   I'm not sure if I was at a medical school when
4  that statement was written, but --
5  Q   I'm talking about: Did you sign on to the
6  800-or-so --
7  A   I'm saying it was --
8  Q   -- group?
9  A   -- it was before my time. It was before I did
10  training. They're even older than I am.
11  Q   You mentioned a short time ago that you took
12  notes on the NCI PDQ?
13  A   (Witness nods head.)
14  Q   Is that correct?
15  A   I did.
16  Q   Did you review the NCI PDQ from March 6th,
17  2024?
18  A   I did.
19       MR. HEGARTY: I'm going to mark that as my
20  next exhibit.
21       MS. O'DELL: I'm sorry.
22       THE WITNESS: I'm not sure about the date. It
23  was the recent PDQ.
24       MR. HEGARTY: Well, I'll go ahead and mark it,
25  and we'll all get to look at the date.

8 (Pages 26 - 29)

Page 30

1    It should be the thick document.  No, not that
2  one.  It would be the --
3        MS. O'DELL:  I would state --
4        MR. HEGARTY:  -- that one.
5        MS. O'DELL:  -- for the record:  I haven't
6  seen the March 6th.  The latest is the October 16th,
7  so --
8        MR. HEGARTY:  So we'll mark -- I'm going to
9  mark it as Exhibit No. 5.
10       MS. O'DELL:  So I'm sure Dr. Smith-Bindman was
11  probably looking at the October version.
12       MR. HEGARTY:  I think we'll all see that it
13  has not changed with regard to the particular section
14  that we're interested in.
15       (Exhibit 5 was marked for identification by
16       the court reporter.)
17       MR. HEGARTY:  So I've marked, as Exhibit No.
18  5, NCI PDQ for "Ovarian, Fallopian Tube, and Primary
19  Peritoneal Cancer Prevention, Health Professional
20  Version."
21    Q    If you look over to the second-to-the-last
22  page of that document, do you see where it was updated
23  March 6th, 2024?
24    A    I see the updated date, yep.
25    Q    And that was just two weeks ago; is that

Page 31

1  correct?
2    A    Yes.
3    Q    Would you please turn over to the section of
4  Exhibit No. 5 that talks about perineal talc exposure.
5  The copy I gave you is not page numbered.
6    A    Yes.  No, I'm there.
7    Q    But it's towards the latter part of it.  If
8  you could please tell me when you can find it.
9    A    I'm there.
10    Q    I'm really interested in asking you about the
11  portion of Exhibit No. 5, the NCI PDQ, that talks about
12  your study.
13    A    Yes.
14    Q    So if you could turn over to the next page
15  right in the middle section where it makes reference to
16  your study as -- as reference 10 and the O'Brien study
17  as reference 11.
18       Do you see where I am referring you to?
19    A    I do.
20    Q    The statements that are describing your paper
21  and your paper in reference to O'Brien are the same as
22  the previous PD- -- NCI PDQ you reviewed, correct?
23    A    Correct.
24    Q    The NCI PDQ refers to your study as a meta
25  analysis that used a highly selected subset analysis of

Page 32

1  one prospective cohort study, correct?
2    A    It does say that.
3    Q    It is referring to your use of a subset of
4  data from the 2020 O'Brien study, correct?
5        MS. O'DELL:  Object to form.
6        THE WITNESS:  It's referring to my use of data
7  from the National -- the NHS Study I.
8  BY MR. HEGARTY:
9    Q    That data was included in the 2020 O'Brien
10  study, correct?
11    A    No.  O'Brien looked at data from the NHS I.
12  O'Brien didn't look at data on frequent talc exposure
13  that -- as we defined it in that publication.
14    Q    The NCI PDQ goes on to state that the subset
15  analysis of the prospective study was inconsistent with
16  the main findings of the original report, citing to the
17  2020 O'Brien study, correct?
18    A    I'm not sure what that statement was supposed
19  to mean.  I don't know if they're trying to say it was
20  inconsistent with the main findings of the initial
21  report of that population, the Gertig study, or if they
22  mean the findings that O'Brien found in -- in her
23  analysis of the NHS I, but in either case, the results
24  of that analysis were positive.  So it's confusing to me
25  what they were intending to communicate with that

Page 33

1  citation.  In the -- in the O'Brien study, the results
2  are positive for the NHS I, and the original publication
3  in the Gertig study is positive -- the O'Brien study.
4        So I'm not sure which results they're
5  referring to, but in either case, whether it's the
6  original Gertig or the subset that O'Brien did, the
7  results in Woolen are consistent with both of those
8  prior publications.
9    Q    Let's see if we can reach -- at least reach an
10  agreement as to the following:  The NCI PDQ says:  "The
11  subset analysis of the prospective study was
12  inconsistent with the main findings of the original
13  report."
14       It says that, correct?
15    A    It does.
16    Q    After that statement, it makes a reference to
17  11, which is the 2020 O'Brien study, correct?
18    A    It does.
19    Q    The next sentence after that citation to the
20  2020 O'Brien study says:  "However, because of the
21  structure of this analysis, the results should be
22  interpreted with care."
23       Did I read that correctly --
24    A    You --
25    Q    -- and is that a correct statement from that

9 (Pages 30 - 33)

Page 34

1 NCI PDQ?
2    A   You read it --
3        MS. O'DELL:  Object to form.
4        THE WITNESS:  You read it correctly.  That
5 does -- I don't know what that sentence is supposed to
6 suggest.
7 BY MR. HEGARTY:
8    Q   Do you agree with that sentence?
9    A   That the structure of the analysis -- the
10 results should be interpreted -- I do not.
11       The systematic review by Woolen was done at
12 exemplary level and laid out every step of the way and
13 followed every guideline.  So I'm not sure what they
14 mean by that.
15       THE REPORTER:  Counsel, I believe someone is
16 trying to join by Zoom.
17       MR. HEGARTY:  Okay.  Let's go off the record.
18       (Mr. Lapinski joined the deposition
19       proceedings.)
20 BY MR. HEGARTY:
21    Q   The statements that we just went over in the
22 March 2024 NCI PDQ have been in that NCI PDQ in the
23 prior versions for at least a year.
24       Can we agree with that?
25       MS. O'DELL:  Object to the form.

Page 35

1        Mark, would you mind restating that?
2        MR. HEGARTY:  Sure.
3        MS. O'DELL:  I'm not sure I understood your
4 question.
5 BY MR. HEGARTY:
6    Q   The statements we read from the March 6th,
7 2024, NCI PDQ, as it relates to your paper and the
8 comments about O'Brien, have been previously set out in
9 other versions of the NCI PDQ, correct?
10    A   Yes.
11    Q   So today is not the first time you're reading
12 those statements, correct?
13    A   Correct.
14    Q   When you first read those statements, did you
15 ever reach out to the board members to discuss what they
16 mean by those statements or their characterization of
17 your paper or the O'Brien paper?
18    A   I did not.
19    Q   Why not?
20    A   I am familiar with the PDQ process.  I served
21 on this PDQ for many years.
22       The quality of the review was poor.  They
23 reviewed 7 of 48 studies, and my reading is every
24 statement or almost every statement is false on how they
25 summarized it, and so the entire summary is just a

Page 36

1 really shoddy piece of work.
2        And the way that process works is it's not a
3 process that's peer-reviewed.  It's not open for
4 external criticism.  There's no formal mechanism to say
5 that that work is shoddy work, and it doesn't really
6 have -- other than the context of this case, does not
7 have much of an impact on people's thinking.  So there's
8 just no mechanism to say this is a terrible report.
9    Q   Do you know any of the individuals on the
10 current NCI PDQ board?
11    A   I'm not --
12    Q   I can bring it up if we need to.
13    A   I think we'd have to.  I'm not sure.  The
14 person who ran it when I was on it is long gone.
15    Q   You do agree, though, that because of your
16 involvement, you can contact NCI PDQ board members and
17 comment on what is in an NCI PDQ, correct?
18    A   There is nothing that would hinder me from
19 contacting them, but there's no process for that to be
20 formally included in their process of -- of rereviewing.
21    Q   Do you have any intention, sitting here today,
22 to reach out to any of the current board members about
23 the statements in the NCI PDQ as it relates to your
24 paper?
25    A   I do not.

Page 37

1    Q   Yet you have, for various -- over various
2 times in your career, with regard to various parts of
3 your work, given interviews that have been cited in
4 newspaper articles, correct?
5    A   Across all topics?
6    Q   Across whatever kind of topics you're -- that
7 are -- let me start over again.
8        With regard to all topics.
9    A   Yes, I have.
10    Q   Across all topics.
11    A   Yes, I have.
12    Q   You've also done videos on YouTube, correct?
13    A   I believe that educational meetings that I've
14 led have been posted on YouTube, but I -- I've
15 personally never been involved in that.  So I led a
16 meeting in the fall with a hundred lecturers, and I --
17 someone on my team uploaded them, but I've never done
18 informational interviews for YouTube.
19    Q   Do you have social media accounts?
20    A   I -- I believe that my lab has a Twitter
21 account.  I don't think we post very much, and I
22 personally never post on it.  I can't actually tell you
23 what we posted.
24    Q   Did you help create any of the content on your
25 university's website as it relates to you?

Page 38

1    A   Yes.
2    Q   You have commented on the potential effects of
3  radiation and cancer in various newspaper articles,
4  correct?
5    A   Yes.
6    Q   Have you ever contacted a newspaper article,
7  ever done a video on YouTube, ever put anything on the
8  content of your university website as it relates to the
9  NCI PDQ's characterization of your Woolen paper?
10    A   No.
11    Q   Have you used any of these communication
12  outlets in any way to discuss your Woolen paper in any
13  respect?
14    A   I don't believe so.
15    Q   Have you used any of these communication
16  outlets to discuss your opinions in the talc litigation?
17    A   I have not.
18        Can -- can -- I don't know if I can clarify
19  something that I said.  I have spoken to newspapers and
20  various outlets about research projects that I've been
21  contacted about.  I have never reached out to newspapers
22  or any other outlet to describe my work in the absence
23  of it being generated from them to ask about my -- about
24  my work.
25    Q   Now, with regard to your 2022 article, that

Page 39

1  is, the Woolen article, you collaborated with Sean
2  Woolen and Ann Lazar, correct?
3    A   Yes.
4    Q   At the time that you began collaborating with
5  them about the 2022 Woolen paper -- that became the 2022
6  Woolen paper, were they aware that you are an expert
7  witness for Plaintiffs in talc cases?
8    A   Absolutely.
9    Q   Other than you and Dr. Woolen and Dr. Lazar,
10  was anyone else involved in any aspect of the study, its
11  preparation and publication?
12        MS. O'DELL:  Let's make -- Mark, during
13  Dr. Smith-Bindman's October 1nd, 2020, deposition -- if
14  you're laying the foundation -- I'm not objecting.  I'm
15  just saying:  There was a long line of questions that
16  followed all of this.
17        MR. HEGARTY:  Understood, and I'm -- just one
18  question about --
19        MS. O'DELL:  Sure.
20        MR. HEGARTY:  -- about that.
21        MS. O'DELL:  I just wanted to make you aware
22  of that.
23        THE WITNESS:  I'm hesitating because I do not
24  remember if we had an editor who edited the manuscript
25  or not.

Page 40

1  BY MR. HEGARTY:
2    Q   Are you talking about an editor at the journal
3  level?
4    A   No.  There's an editor that I've worked with on
5  various papers who doesn't bring content expertise, but
6  who has edited some of our papers before publication.
7    Q   Who is that?
8    A   Chris Tachibana.  I don't -- I actually have
9  no recollection if she was involved or not, but I was
10  looking if we had thanked her.  I don't remember, but
11  that's a possibility.
12    Q   At the time the Woolen paper was published in
13  2022, did either Dr. Woolen or Dr. Lazar work for you?
14    A   No.  No.  No.
15    Q   At the time of publication, were you
16  supervising them in any way?
17    A   No.
18    Q   Were you filling out evaluations for them?
19    A   No.
20    Q   What funds paid for their time?
21    A   I have academic funds that I can use for that
22  kind of work.  Dr. Woolen was not paid, and Dr. Lazar
23  was paid as a biostatistical consultant from one of the
24  funds.
25    Q   Is there any documentation of the amount of

Page 41

1  cost that went into getting the Woolen paper published?
2        MS. O'DELL:  Object to the form.
3        THE WITNESS:  There would be a track record of
4  having paid it.  It almost certainly wouldn't have gone
5  to Dr. Lazar.  It would have gone to the statistical
6  bio-consulting service, and so it would be possible to
7  possibly find records of how that were paid.
8  BY MR. HEGARTY:
9    Q   Are those documents you provided to counsel
10  for Plaintiffs?
11        MS. O'DELL:  I'll represent:  No.
12  BY MR. HEGARTY:
13    Q   Are there any other accounting documents that
14  you're aware of that would relate to the work in getting
15  -- in getting the Woolen paper published; that is, the
16  -- where you had to itemize the -- the cost and expenses
17  that went into the published paper?
18        MS. O'DELL:  Object to the form.
19        THE WITNESS:  The only cost that could exist
20  would be the cost to pay the biostatistical consultants,
21  and that would be findable with some digging through the
22  financial records.  Not by me, but someone at UCSF, and
23  I don't believe that this journal has a publication
24  cost, but if there -- if there was, there could be a
25  cost for that.

11 (Pages 38 - 41)

Page 42

1 BY MR. HEGARTY:
2    Q    You said that you have access to funding --
3 funding as part of your work.
4        Do you have to do an accounting, that is,
5 prepare a physical document of the accounting of use of
6 that funds -- did you have to prepare an accounting, as
7 far as use of that funds, for the Woolen paper?
8    A    The amount of money was -- was not very much,
9 and if you're spending money on the -- the -- it's
10 called the CTSI, the biostatistical consulting, there
11 would be no other documentation needed.
12        In general, I have incredible detailed records
13 I have to provide for everything I spend, but internal
14 UCSF money for biostatistical consulting would be just
15 accepted as necessary.
16    Q    So would that have been the only expense that
17 you would have had as part of the 2022 Woolen paper?
18    A    Yes.
19    Q    And as you indicated, there would be no
20 separate document accounting for what that expense would
21 be; is that right?
22    A    That's correct.
23    Q    The 2022 Woolen paper focused on frequency of
24 talcum powder use, correct?
25    A    Yes.

Page 43

1    Q    You agree that there is more likelihood for
2 exposure misclassification when patients provide
3 frequency data versus "ever/never" use data, correct?
4    A    I would not agree with that.
5    Q    Why would you not agree with that?
6    A    I think "ever" is a very broad category.  As I
7 state in the report, that could be once or twice.  It
8 could be a thousand or 10,000 times.  It's such a broad
9 range that I think perhaps the capacity to say ever
10 "yes" or "no" might be easy to remember, but it wouldn't
11 be a meaningful remember; whereas, I think asking about
12 frequent talcum powder use is asking about a habitual
13 activity that I think women are likely to remember.
14        And I think in detailed surveys the most
15 common amount of talcum powder use is daily, and I think
16 women who use it daily would have a good remembrance
17 that this was part of their daily routine, like
18 moisturizer or something like that.
19    Q    Let me ask it in a different way, which I
20 think tracks what you're saying.
21        Do you agree that there is more likelihood for
22 misremembering the frequency of talcum powder use as
23 compared to whether you ever use talcum powder?
24    A    I -- I do understand the question, and I'm not
25 sure that I would agree with that.  I think I couldn't

Page 44

1 personally answer the question have I ever used it.  I
2 think that -- kind of, I've been around talcum powder,
3 but I don't know if I ever used it; whereas, if you're
4 asking women are they using it frequently, meaning kind
5 of every day, I think women would remember that very
6 clearly.
7    Q    Let me ask it, then, still a different way.
8        If we're talking about not just did you use it
9 frequently, but if you're talking about the specific
10 number of times you used it in a month versus just if
11 you ever used it, do you agree that there's more
12 likelihood for misremembering the number of times you
13 use it in a month versus ever or never using it?
14    A    I -- I'm not sure that I agree with that.  I
15 just -- I couldn't answer the question of ever/not ever.
16 I'd be unable to.  Whereas, if your question is getting
17 at would a woman know if she used it three or four times
18 a week, is there lack of precision between three and
19 four, which I think is what you're getting at, there
20 might be.  But if there's lack of precision between
21 using it a lot versus have you ever used it, I'm not
22 sure that "Have you ever used it?" is a reliable answer
23 just because I couldn't answer that question.
24        MR. HEGARTY:  Let's go off the record.
25        (Recess.)

Page 45

1        MR. HEGARTY:  We're back on the record after a
2 short break.  I want to leave the PDQ question, Doctor,
3 that we just talked about, but I did have the
4 opportunity to pull up the PDQ screen and prevention
5 editorial board from the website.
6    Q    Would you mind scrolling through that website
7 on my laptop and tell me if you know any of the
8 individuals that are listed there.
9    A    I know Joanne Elmore from UCLA, and I think I
10 might know Joe Wrubbel from Connecticut, but I can't
11 remember.
12    Q    How well --
13    A    Not well.
14    Q    How well do you know Dr. Elmore?
15    A    Fairly well.
16    Q    How would you describe her reputation-wise?
17    A    It's good.
18    Q    Do you have any criticisms of her capabilities
19 as a scientist?
20    A    I don't.
21    Q    Any criticisms you just provided at this
22 deposition as it relates to their review of perineal
23 talc as set out in the NCI PDQ you're saying apply to
24 her too, right?
25    A    The way the reviews get done is an individual

12 (Pages 42 - 45)

Page 46

1 person takes the lead on each one.
2      I am very confident that Joanne Elmore didn't
3 do that particular review.
4      Q    Every board member of the NCI PDQ signs off on
5 every sentence in the NCI PDQ?
6      A    No, I don't think that's true.
7      Q    And I don't mean that in a formal way, but
8 they put their name to the -- the NCI PDQ as being on
9 the board, correct?
10      MS. O'DELL:  Object to the form.
11      THE WITNESS:  No, I don't -- I don't think
12 it's that kind of document.  I think there are documents
13 that the NCI puts out that have that kind of weight.
14 This does not.
15      This is a group of scientists who, together,
16 help the public and other physicians understand the
17 medical literature, but it's not a degree of every one
18 of those scientists stands behind everything that comes
19 out of that.  There remains a lot of internal
20 disagreements about things that get published on the
21 PDQ.  It's not a uniform, "We support this."
22 BY MR. HEGARTY:
23      Q    You have no personal knowledge of Dr. Elmore's
24 or anyone else on the board's involvement with the NCI
25 PDQ that we marked as Exhibit No. 5 in this case,

Page 47

1 correct?
2      A    I do not.
3      Q    You have no personal knowledge of what any of
4 the board members did with regard to reviewing of the
5 documents or preparing the NCI PDQ we've marked as
6 Exhibit No. 5 --
7      A    I --
8      Q    -- correct?
9      A    -- do not.
10      Q    Do you feel comfortable enough with Dr. Elmore
11 to talk to her about the NCI PDQ?
12      A    I would, yeah.
13      Q    If -- assume for my question -- the purpose of
14 my question, hypothetical, that Dr. Elmore agrees with
15 what's set out in the NCI PDQ with regard to perineal
16 talc exposure.
17      Would the criticisms that you have told me
18 today about it apply to her as well?
19      MS. O'DELL:  Object to the form.
20      THE WITNESS:  I don't believe I criticized a
21 person.  I criticized the quality of the work, and
22 whoever wrote that did a very poor job.
23 BY MR. HEGARTY:
24      Q    And if Dr. Elmore reviewed it and found it to
25 be correct, would you be critical of her?

Page 48

1      MS. O'DELL:  Object to the form.  Assumes
2 facts.
3      THE WITNESS:  I disagree with almost every
4 statement in that PDQ.  If it were Joanne's or if Joanne
5 agreed to it, I'd be happy to have a vigorous discussion
6 with Joanne, and if we end up being together in some
7 location in the near future, I will, for your
8 suggestion, raise it with her and share my views of it.
9 BY MR. HEGARTY:
10      Q    But what you know about Dr. Elmore, is she
11 capable of reviewing the studies that you reviewed,
12 including those in the NCI PDQ, and coming to
13 conclusions about what they mean?
14      A    I -- I respect Joanne as an epidemiologist.  I
15 think she would be able to do such a task.
16      Q    I want to talk about specific parts of your --
17 of the 2022 Woolen paper, and I'm going to cite to
18 specific parts of it.
19      So do you have a copy in front of you?
20      A    I do.
21      Q    First of all, the study does not report on the
22 finding -- does not report findings on any specific sub
23 type of ovarian cancer, correct?
24      A    That's correct.
25      Q    If you look at the background section, the

Page 49

1 very first section on the first page, the first sentence
2 says (as read):  "Risk of ovarian cancer in women with
3 frequent perineal talcum powder product is not well
4 understood."
5      Did I read that correctly?
6      MS. O'DELL:  Can I just ask -- I'm sorry,
7 Mark.  I got lost.  You're in Woolen --
8      MR. HEGARTY:  I'm in the very first page, the
9 very first sentence.
10      MS. O'DELL:  Oh, yeah.  I'm sorry.
11      THE WITNESS:  Yeah.
12      MS. O'DELL:  Okay.  Forgive.  Thank you.
13      THE WITNESS:  Yes.  And I'm sorry.  You're
14 asking me if that is what the first sentence says?
15      MR. HEGARTY:  Yes.
16      THE WITNESS:  Yes.
17 BY MR. HEGARTY:
18      Q    That was -- that statement was true in 2022,
19 and it's true today, correct?
20      A    I believe our systematic review changed that
21 sentence.  I think it's much better understood since
22 this publication came out.
23      Q    In 2022 when you wrote that sentence, that
24 sentence was true, correct?
25      A    Yes.

13 (Pages 46 - 49)

Page 50

1    Q    Now, this study looked at frequency only, that
2 is, frequency of talcum powder use only, correct?
3    A    Yes.
4    Q    It did not account for duration of use,
5 correct?
6    A    Correct.
7    Q    It does not measure cumulative use, correct?
8    A    Correct.
9    Q    So --
10    A    I'm hesitating.  The focus was on frequency of
11 use.  For many of the included articles, they provided
12 information on cumulative use.
13    Q    My question, though, was:  Your 2022 Woolen
14 paper does not measure cumulative use, correct?
15        MS. O'DELL:  Object to form.
16        MR. HEGARTY:  Or let me say it differently.
17        THE WITNESS:  Yeah.
18 BY MR. HEGARTY:
19    Q    Your 2020 [sic] Woolen paper does not report
20 findings as to cumulative use?
21    A    Correct.
22    Q    So frequency of use is an acceptable measure
23 of exposure in an epidemiologic study involving talc,
24 correct?
25    A    Yes.

Page 51

1    Q    Looking at the "METHODS" section, it says that
2 the quality assessment using a Newcastle-Ottowa Scale
3 was performed independently by two reviewers.
4        Who were those two reviewers?
5    A    Sean Woolen and myself.
6    Q    Had you ever used a Newcastle-Ottowa Scale
7 prior to this publication?
8    A    I had not.
9    Q    I'm sorry?
10    A    I had not.
11    Q    Okay.  Thank you.
12        Looking at the "CONCLUSIONS" section at the
13 bottom of the first page, left-hand column, it states:
14 "This review suggests an increased risk of ovarian
15 cancer associated with frequent perineal powder exposure
16 of 31 to 65%," correct?
17        MS. O'DELL:  You're back in the abstract?
18        MR. HEGARTY:  I'm still in the abstract.
19 That's what I said.  First page --
20        THE WITNESS:  Still in the abstract.
21        MR. HEGARTY:  -- bottom left-hand corner,
22 conclusion.
23    Q    Did I read that conclusion correctly?
24    A    Yes.
25    Q    You did not include or -- let me state -- let

Page 52

1 me restate that.
2        You did not state in that conclusion that
3 frequent perineal powder exposure causes ovarian cancer,
4 correct?
5    A    Correct.
6    Q    In fact, nowhere in this paper do you say that
7 talcum powder use causes ovarian cancer, correct?
8    A    I would have to read it more carefully, but I
9 -- I wouldn't be surprised if what you're saying is
10 true.  I would have to read it to -- to remember that.
11    Q    Looking over at the "INTRODUCTION" section,
12 right-hand column, second paragraph, the first line says
13 (as read):  "The differences in conclusions between the
14 meta analyses are at least partially due to the
15 inconsistent talcum powder exposure questions regarding
16 the frequency and type of exposure."
17        Did I read that correctly?
18    A    Yes.
19    Q    Can you cite for me any publication in any
20 journal who has made a similar statement as the one I
21 just read?
22        MS. O'DELL:  Object to the form.  Vague.
23        THE WITNESS:  My recollection is that maybe in
24 the Health Canada and Taher studies they might have said
25 something about -- about this similar issue.

Page 53

1 BY MR. HEGARTY:
2    Q    Please turn to the next page.
3        Under the section "Search Strategy and
4 Information Sources" --
5    A    Mm-hmm.
6    Q    -- do you see that section?
7    A    Mm-hmm.
8    Q    It says, in the first line (as read):
9 "Comprehensive searches were performed by an expert
10 health science informationist -- informationist from
11 inception of the relevant databases" in August -- "to
12 August 2nd, 2022 [sic]."
13        Who was that?
14    A    At one of the UCSF sites at Mt. Zion they have
15 a amazing library search team of professionals.  So it
16 would have been someone in that group.
17    Q    Do you know who that someone was --
18    A    No.
19    Q    -- by name?
20    A    No.
21    Q    Looking under the "Eligibility Criteria and
22 Study Selection" section, second paragraph, the first
23 couple lines reads (as read):  "Studies were screened
24 for inclusion using prespecified selection criteria by a
25 single author S.W.  Selection criteria included

14 (Pages 50 - 53)

Page 54

1 publication of primary data, reporting on multiple times
2 per week (greater than or equal to two times per week)
3 perineal exposure to talcum powder including direct
4 application of talcum powder to the perineum and rectum,
5 application to underwear or sanitary napkins, or on
6 birth control devices -- devices like diaphragms and
7 risk for ovarian malignancy."
8    Did I read that correctly?
9    A   Yes.
10    Q   That described the selection criteria for the
11 studies to include, correct?
12    A   Yes.
13    Q   Now, the O'Brien data did not meet that
14 criteria, correct?
15    A   Correct.
16    Q   Why did you include it, then?
17    A   We didn't include the O'Brien study.  We
18 included data from the Nurses' Health Initiative Study,
19 and I learned about that study in -- in more detail from
20 the O'Brien publication, but we didn't use the O'Brien
21 publication.  It didn't -- none of the -- none of the
22 pieces that they pulled from the existing cohorts could
23 be used.  So that was a second request to get
24 unpublished data from whichever the cohorts had relevant
25 data.  So that's described in the next paragraph.

Page 55

1    Q   The inclusion criteria set out in the section
2 "Eligibility Criteria and Study Selection" did not
3 include a requirement that the women in the study had
4 patent tubes, correct?
5    A   Correct.
6    Q   Carrying over still in the same eligibility
7 criteria section to the next paragraph at the top on the
8 right-hand column, there's a reference to the Sister
9 Study at the very end of that section, correct?
10    A   Yes.
11    Q   The Sister Study actually collected data on
12 two or more times of talc use per week, correct?
13    A   We looked at the study protocols for all of
14 those, and indeed the Sister Study did have questions
15 about the number of times per week in their -- in their
16 questionnaire.
17    Q   Are you saying, in this part of the paper,
18 that there were only two women who met the eligibility
19 requirement from the Sister Study data?
20    A   Yes.  We reached out to the person who
21 basically oversees the data for the Sister Study and the
22 NH I [sic] study.  Because they had the relevant
23 questions in the Sister Study and in the NH -- NHS I
24 study, we asked for those data, and what we were told is
25 that -- they wouldn't share the data for the Sister

Page 56

1 Study because there were two patients who reported the
2 high-use category, and that just wasn't enough to be
3 meaningful.  So they told us there were only two
4 patients who reported frequent use in that study.
5    Q   That was provided to you orally?
6    A   I think it was probably a written document
7 from O'Brien to Woolen explaining that.
8    Q   So does that mean that you never got access to
9 the Sister Study data?
10    A   That's correct.
11    Q   So the statement at the end of this is based
12 on the statement that the number that met your criteria
13 was only two?
14    A   Yes.
15    Q   Turning to the section "Data Extraction," in
16 the middle it says that the reference group was "women
17 who reported no talc exposure"; is that accurate?  In
18 other words, you compared the group with frequent use
19 versus women who had no talc exposure?
20    A   Yes.
21    Q   The next line says:  "When duplicate reports
22 of the same subject were published, the publication
23 reporting the highest talc use was selected."
24    Was there any duplication of study subjects
25 included in any of the results?

Page 57

1    A   Not that I remember.  I think we were careful
2 to try to make sure that patients were only reported
3 once.
4    Q   The very end of that section says:
5 "Disagreements in data extraction were resolved by
6 consensus."
7    Who were they resolved between by consensus?
8 In other words, who was making that resolution?
9    A   The three authors.
10    I want to correct something from -- the paper
11 says the data extraction were performed by two authors,
12 which it were -- which it was, but Dr. Lazar actually
13 did the data extraction for all those studies as well.
14    Q   Please turn over to the page that has Table 1
15 on it and Table 2.
16    A   Yes.
17    Q   Looking at the text, you know, on the
18 left-hand column, it refers to the age range of included
19 women as being between 18 and 79.
20    Is that at the point in time -- at what point
21 in time is that?  At the time of their reporting of talc
22 use or at what other -- at what time?
23    A   For the case control studies, they would
24 report when they were enrolled in the trial.  For the
25 NHS I, I -- I don't remember if it was when they were

15 (Pages 54 - 57)

Page 58

1 enrolled in the trial or at the end of follow-up. I
2 believe it's at enrollment, but I'd have to check.
3      Q    Carrying over to the next column, it states
4 that the range of frequent talcum powder use was defined
5 as four to seven times per week, correct?
6      A    Can you say that one more time?
7      Q    Sure.
8            Carrying over to the -- to the right-hand
9 column at the text on the page we're looking at, it says
10 the range of frequent talcum powder use was defined as
11 four to seven times per week, correct?
12     A    Yes.
13     Q    Do you recall, in your prior reports in the
14 MDL, you defined the frequency range as three or more
15 times per week?
16     A    Yes.
17     Q    And with regard to what you actually report in
18 the findings, you report yet a different number,
19 correct?
20         MS. O'DELL:  Object to the form.
21         THE WITNESS:  I think there's a difference
22 between what we set out to require for inclusion and
23 what the articles actually found.  So we set out to
24 include use that was at least several times per week,
25 but the articles that reported on frequent use, in fact,

Page 59

1 had average use that was higher than we required.
2 BY MR. HEGARTY:
3      Q    In the end, you reported on as frequent use
4 two or more times per week, correct?
5      A    Yeah.
6      Q    But the initial eligibility requirement was
7 four to seven times per week, correct?
8         MS. O'DELL:  Object to the form.
9         THE WITNESS:  No, it didn't say that.  The
10 eligibility was greater than two times per week, but the
11 articles ended up identifying higher use than that.
12 BY MR. HEGARTY:
13     Q    Looking down at Table No. 2, only four studies
14 report actual weekly talcum powder use:  Booth, Mills,
15 Schildkraut, and O'Brien, correct?
16         MS. O'DELL:  Object to the --
17         THE WITNESS:  I would agree if you look in
18 this table.  Some of the numbers show times per week,
19 and some show a lifetime exposure.
20         For each of those papers that had a lifetime
21 exposure, we calculated how many years the women were
22 followed, how many times per week that 10,000 lifetime
23 exposure would correspond to.  So we reported in the
24 language that they use, but when you do the simple math,
25 you end up getting a way to estimate the weekly

Page 60

1 exposure.
2 BY MR. HEGARTY:
3      Q    In your simple math, did you assume one time
4 per day of use?
5      A    When it said 20 times per month, we took that
6 to mean 20 days of exposure.
7      Q    What did you do when it said 10,000 or more
8 lifetime uses?
9      A    We divided it by, I believe, the age of the
10 average person to come up with an estimate of how many
11 times per week they would have used talc to get
12 approximately that -- that level, but we included
13 studies if the amount of exposure would have been at
14 least two times per -- per week, but assuming one time
15 per day.
16     Q    That assumption would not account for women if
17 they reported using -- if they reported, as far as their
18 lifetime use, based on five times use a day, correct?
19     A    That's correct.
20     Q    The Cook 2000 -- or -- I'm sorry -- the Cook
21 1997 paper also reported use of between 5- and 10,000
22 lifetime uses, correct?
23     A    Do you have the Cook paper?
24     Q    I do not have the Cook paper.
25         Let's go off the record real quick.

Page 61

1         (Discussion Off the Record.)
2         MR. HEGARTY:  Okay.  We can go back on the
3 record.
4      Q    When we took a short break, Doctor, I was
5 asking you about the Cook 1997 paper, and we both had an
6 opportunity to pull that up.
7         And are you looking at it now?
8      A    I am.
9      Q    And in particular, Table 3 provides use of
10 talcum powder between 5,001 and 10,000 uses for lifetime
11 days, correct?
12     A    Yes.
13     Q    And from that -- go ahead.
14     A    I'm sorry.  It says "lifetime days."
15         When you asked your question earlier about if
16 a person had used it five times a day, in this case, it
17 would count once for each day the way they extracted.  I
18 never thought about that -- or hadn't thought about the
19 issue in ages, but --
20     Q    Okay.  Thank --
21     A    -- so this would take that away.
22     Q    But with regard to Table 3, you used the
23 number of greater than 10,000, correct?
24     A    Yes.
25     Q    Cook also provides from 5,001 to 10,000 uses,

16 (Pages 58 - 61)

Page 62

1 correct?
2    A    Yes.
3    Q    You did not use that data, correct?
4    A    Did not.
5    Q    Why did you not use that data?
6    A    As we laid out in the "METHODS," we took the
7 highest frequency use, and so 10,000 is the highest
8 frequency use.
9    Q    So even though you might have had data that
10 was greater than two times per week, you still took the
11 highest that was available, correct?
12    A    Yes.
13    Q    Why did you do that?  Let me ask it a
14 different way.
15        If you had additional data that would then
16 have satisfied what you were reporting on in this paper,
17 why did you not include it too?
18    A    There are several reasons.  First, we were
19 trying to get at -- I think we say in the paper
20 approximate daily use.  So that would be the highest
21 number.  So if someone -- if there was a material
22 difference between women who reported twice a week, four
23 times a week or seven times a week, we were trying to
24 get at seven times a week, the highest use.  So that's
25 the first.

Page 63

1        The second is you can't pull multiple data
2 points from one study in a systematic review method.
3 You have to represent each study with a single estimate.
4 There are ways of combining data within one systematic
5 review and then using that in a weighted way in an
6 overall review, and I've done that for a systematic
7 review on an unrelated topic, but in general, each study
8 should be represented by a single reflection of the
9 work.  So you can't take multiple points.  It just would
10 -- it would make it impossible to weight the work
11 appropriately.
12    Q    You did that not only as to the Cook paper,
13 but there were other papers as well that reported on
14 frequent use that might have been in the greater than 2
15 times a week, but if it had a greater number, you used
16 the greater number?
17    A    That's correct.
18    Q    There was one set of numbers that I could not
19 quantify as it relates to the number of exposed cases
20 and the number of exposed controls, and that is the
21 Harlow 1992 paper.
22        Do you have the Harlow 1992 paper?
23    A    I think you -- I think you nailed the two
24 papers that I have to find on my computer.
25    MR. HEGARTY:  Let's go off the record real

Page 64

1 quick.
2        (Discussion Off the Record.)
3        MR. HEGARTY:  We can go back on the record.
4 We took just a moment to find the Harlow 1992 paper.
5    Q    I was looking at the relative risk number that
6 you use for Harlow, which was the 1.8 number with a
7 confidence interval of 1.1 to 3.0 that is shown in Table
8 1 for greater than 10,000.
9        Do you see where I'm referring to?
10    A    I'm seeing for greater than 30 applications
11 per month in Table 2.
12        Am I in the wrong table?
13    Q    Okay.  Let me come back out to Table 2.
14    A    I'm sorry.
15    Q    Which number did you use?
16    A    It seems to be the same number, but let me
17 see.  Applications per month.
18    Q    And as you're saying that -- because you
19 reported on greater than 10,000 uses, which would more
20 correspond -- which would correspond to what's reported
21 in Table 3, correct?
22    A    The point estimate is the same.  So I just
23 need to look at my paper to see what number corresponds
24 to the number.
25        I think I -- I think I gave you that number

Page 65

1 incorrectly.  I think you are correct that for Harlow
2 58 ...
3        (Pause.)
4    Q    And what I'm asking about is --
5    A    Yeah.
6    Q    -- for the number greater than 10,000, I'm not
7 seeing the numbers 58 and 41 that you report in Table 3,
8 and I'm hoping you can explain the difference.
9        Let's go ahead and go off the record.
10        (Discussion Off the Record.)
11        MR. HEGARTY:  Okay.  Let's go back on the
12 record.
13        When we took a short break, I asked
14 Dr. Smith-Bindman to explain to me, from using Table 3,
15 the -- the numbers reported there as far as the cases it
16 controls versus the numbers reported in the Woolen 2022
17 paper in Table No. 2.
18    Q    Are you -- are you ready to do that?
19    A    I am.
20    Q    Okay.  Can you explain it to me?
21    A    I can.
22        So the numbers that we extracted from the
23 Harlow paper were not from Table 3, but they're from
24 Table 2 that talk about the applications of talc per
25 month.  So the number that was actually extracted was

Page 66

1 greater than 30 applications per month from Table 2.
2 That shows you the 58 cases and 41 controls that align
3 with the numbers in both Table 2 and Figure 2.
4     Q   Why did you use those numbers from the greater
5 than 30 times per month from Table 2 versus the numbers
6 from the greater than 10,000 times, which you reported
7 in your paper, that are in Table 3?
8         MS. O'DELL: Object to the form.
9         Table 3 in Harlow?
10        MR. HEGARTY: In Harlow. Yes. Thank you.
11        THE WITNESS: In Harlow.
12        I think we were trying to get at the most
13 number of applications per month, and the greater than
14 30 most directly reflects that question, how many times
15 per month, and that's -- the answer is 30. That's
16 daily.
17 BY MR. HEGARTY:
18    Q   A related question is, then: Why didn't you
19 report in this -- in Table 2 of your Woolen paper the
20 greater-than-30-times-per-month number?
21    A   I believe that's an error.
22    Q   Okay. Thank you.
23        If you look at the bottom of this -- of the
24 page we're looking at, the footnotes under Table 2,
25 there's a reference in the last footnote to only using

Page 67

1 the -- the data from that O'Brien -- that Dr. O'Brien
2 provided --
3     A   I'm sorry.
4     Q   I'm sorry.
5     A   We've left --
6     Q   The very -- the very last footnote --
7     A   No. We're back on Woolen. We've left Harlow.
8     Q   No, no -- yeah, we left Harlow. We're now
9 back to your Woolen paper.
10    A   Okay. Fantastic. Let me move. Let me move.
11    Q   Okay. I'm glad -- now we're on Table 2 on
12 your Woolen paper in -- at the bottom of that page in
13 Footnote 5.
14        First of all, we talked earlier about you
15 using data from the O'Brien 2020 paper that was
16 unpublished, correct?
17    A   Again, from the NHS I cohort that was not
18 published.
19    Q   That's right. Thank you.
20        You then report in this footnote that (as
21 read): "We included data on women with intact fallopian
22 tubes," correct?
23    A   Yes.
24    Q   And then you make the statement after that "to
25 harmonize with other publications," correct?

Page 68

1     A   Yes.
2     Q   What other publications specifically called
3 out their data as "women with intact fallopian tubes"?
4     A   I think the other studies looked at open tubes
5 versus closed tubes and showed the results for ovarian
6 cancer risk as it varied by talc and whether the tubes
7 were open or not. Of those studies that showed that
8 patent fallopian tubes had higher risks were Kramer,
9 Harlow, and Whittlemore. I think in terms of reporting
10 it that way, I think -- I believe that Whittlemore
11 reported it that way; although, it was a little bit
12 ambiguous in that publication.
13    Q   Do you agree that there were at least some of
14 the -- at least some of the studies in Table 2 did not
15 break down their figures by whether the women had intact
16 tubes or non-intact tubes?
17    A   Absolutely.
18    Q   So the extent that you then used O'Brien data
19 on women with intact tubes, that's potentially
20 inconsistent with some of the other studies who did not
21 report one way or the other, correct?
22        MS. O'DELL: Object to the form.
23        I think Dr. Smith-Bindman said repeatedly it's
24 not the O'Brien data; it's the Nurses' Health Study
25 data.

Page 69

1         MR. HEGARTY: Okay. That's what I meant.
2     Q   Did you -- when I -- when I asked that
3 question, I meant the Nurses' Health Study data.
4         Did -- so same question, making reference to
5 the Nurses' Health Study data.
6     A   I think many of the studies adjusted in the
7 multivariate analysis for whether or not the tubes were
8 patent or not patent. In the O'Brien study, that wasn't
9 an available adjustment. So most consistent to get at
10 the question, which is does talcum powder cause ovarian
11 cancer, to be consistent with the intent of those other
12 papers, which is to account for patent tubes, I believe
13 choosing the representation of the cohort who had patent
14 tubes made the most sense in terms of consistency.
15    Q   Do you agree, though, that there -- to the
16 extent that you're comparing a set of data with -- of
17 women with intact fallopian tubes to a set of data that
18 didn't distinguish it and, therefore, would include
19 women with intact and with not intact fallopian tubes,
20 there could be some inconsistency?
21    A   I think there was an adjustment for that, but
22 the degree that the results are not stratified, which I
23 think is what you're getting at, presented separately, I
24 think there is not perfect consistency on that issue
25 where everyone was with open tubes or not.

18 (Pages 66 - 69)

Page 70

1    Q   Did you have all the Nurses' Health Study data
2 that included women with and without intact tubes?
3        MS. O'DELL:  Object to the form.
4        THE WITNESS:  We did have results on all
5 women.
6 BY MR. HEGARTY:
7    Q   Could you have included all women in this
8 analysis?
9    A   Yes, we could have.
10    Q   Did you do that and -- and see if it made a
11 difference?
12    A   At the time of doing the study, we had not
13 done that, but I saw that that was raised by you guys,
14 and when I saw that, I thought that was a valid point to
15 evaluate, and at that point I did reach out, I think, in
16 December to ask the biostatistician to do a sensitivity
17 analysis to evaluate the impact had we made that other
18 decision.
19    Q   Who is the biostatistician you reached out to?
20    A   The same.  Lazar.
21    Q   Has that sensitivity analysis been done?
22    A   Yes.
23    Q   Do you have documentation of that sensitivity
24 analysis?
25    A   Yes.

Page 71

1    Q   Is that something you brought with you today?
2    A   I think we sent it to you.  I think it's one
3 of those documents that was recently shared.  I was
4 given these results about a week ago or so by Ann, and I
5 forwarded them to the lawyers.
6        MS. O'DELL:  And they were provided.
7        MR. HEGARTY:  Is that in the email?
8        MS. O'DELL:  Yes.  It was provided in keeping
9 with the requirements for disclosure, and they were
10 actually put in early, was Saturday, and it was in the
11 DropBox that was provided to you.
12        MR. HEGARTY:  Understood.  My question is more
13 specific than that.
14        Is that in the email that -- that was provided
15 in that DropBox?
16        MS. O'DELL:  Correct.  I can represent -- she
17 doesn't know what's in the DropBox.  I'll represent that
18 it was in the DropBox.
19        MR. HEGARTY:  I will go ahead and show you a
20 copy of that email that we were provided.  It should be
21 just a single page.  Did we not get it?
22        MS. O'DELL:  I'm happy to provide a -- a copy
23 if you want to mark it.
24        MR. HEGARTY:  We may not have gotten a copy
25 that -- oh, wait.  We got it.  We got it.  We'll mark

Page 72

1 that -- the email we were provided as the next exhibit,
2 which is Exhibit --
3        MS. FLAGEOLLET:  Six.
4        MR. HEGARTY:  -- 6.
5        (Exhibit 6 was marked for identification by
6        the court reporter.)
7        THE WITNESS:  Thank you.
8        MR. HEGARTY:  So I've marked, as Exhibit No.
9 6, a document we were provided prior to the deposition.
10    Q   Can you tell me what this document is, what
11 Exhibit 6 is?
12    A   Yes.
13        I reached out to the biostatistician on the
14 Woolen paper to ask her a sensitivity analysis if she
15 would recalculate the overall results by using the
16 number from the Nurses' Health Study of all women rather
17 than those with open fallopian tubes.
18    Q   Is this the only document that you have
19 reporting on that sensitivity analysis?
20    A   Yes.
21    Q   Would Dr. Lazar have -- based on how you
22 understand she works, have additional documents that
23 would reflect the sensitivity analysis that she did?
24    A   I suspect she could have some SAS programming
25 code, but -- but that would be all.

Page 73

1    Q   The SAS programming code wouldn't be something
2 -- would that be something you could print out that
3 would show the data input and the results she got from
4 the sensitivity analysis?
5    A   I'm going to have to say I don't know the
6 answer to that.  There's probably some -- some
7 documentation of her code.
8    Q   What were the results when she -- let me back
9 up again.
10        So what she did was do the same study analysis
11 but included the entirety of the Nurses' Health Study
12 women with and without patent tubes?
13    A   That's correct.
14    Q   What did she find when she did that
15 sensitivity -- sensitivity analysis?
16    A   And I should say she included about four
17 sensitivity analyses in the published paper where we
18 included all those results as supplemental materials.
19        For this sensitivity, she basically swapped
20 out the numbers for O'Brien's NHS I data for all women
21 versus just with patent tubes, and the impact was very
22 small on the overall estimate.  The overall estimate had
23 a point estimate of 1.47 with a confidence interval of
24 about 1.35 to 1.68.  When she swapped it out, the point
25 estimate was 1.41 with a confidence interval of 1.24 to

19 (Pages 70 - 73)

Page 74

1  1.64, so a very small change.

2      Q    Okay.  You can put that aside.  We may -- we

3  may come back to it.

4          Had you thought about doing that sensitivity

5  analysis since you -- before you had read some -- or

6  understood there was some commentary about the use of

7  patent versus tot- -- the tot- -- patent women versus

8  the totality of women?

9          MS. O'DELL:  Object to the form.

10         You may answer.

11         THE WITNESS:  Had I thought of it, we would

12  have done it.  I didn't think of it.  I thought it was a

13  -- a valid question that was raised by -- by your team.

14  BY MR. HEGARTY:

15     Q    Turning over to the next page of the Woolen

16  paper, the page that includes the discussion part of it,

17  you took it -- you mentioned you did several sensitivity

18  analysis [sic] that included running -- running the

19  analysis without the Wu paper, correct?  The Wu data, I

20  should say.  And I'm looking at the top left-hand side

21  of the page with a discussion on it on the --

22     A    Yes.

23     Q    -- right-hand column.

24     A    Yes, we did.  Yes, we did.

25     Q    Did you also do that same sensitivity analysis

Page 75

1  excluding the Schildkraut data?

2      A    I believe we did, but let me see if I can find

3  it.

4          MS. O'DELL:  If you need the supplemental

5  tables, Doctor, just let us know.

6          MR. HEGARTY:  They should be at the back of

7  that copy.

8          MS. O'DELL:  Okay.

9          THE WITNESS:  I -- I don't -- I don't see that

10  we did that, but --

11  BY MR. HEGARTY:

12     Q    The reason I ask about Schildkraut was that

13  their definition -- that paper's definition of body

14  powder included cornstarches, correct?

15     A    I believe it -- I believe it did.

16     Q    Did you consider doing a sensitivity analysis

17  without Schildkraut because of the way they define body

18  powder use?

19     A    The fact that we didn't do that sensitivity

20  analysis suggests that we didn't think about doing that

21  sensitivity analysis.

22     Q    Looking over in the "DISCUSSION" section, the

23  second paragraph, the first line says:  "The precise

24  mechanism whereby talcum powder causes ovarian cancer is

25  not fully understood."

Page 76

1          That was a true statement in 2022, correct?

2      A    Yes.

3      Q    That's still a true statement, correct?

4      A    I think we've made a lot of progress in

5  understanding the mechanism since then.  So I think the

6  statement's true in that we don't know the precise

7  mechanism, but we have a lot more supporting evidence of

8  how it happens than we did at the time of this

9  publication.

10     Q    Talking generally about your paper as it

11  relates to frequency, you actually state in your amended

12  report, as you had stated previously, that with regard

13  to the Gertig study, that -- you say a potential

14  weakness of the Gertig study was that frequency but not

15  duration was measured so that clear lifetime exposure

16  was missing.

17         That statement applies to your study as well,

18  right?

19     A    I think that statement suggests that it would

20  be good to have a combination of frequency and duration.

21  I don't think one invalidates the other, but it would be

22  better, particularly in a cohort study where you have

23  the opportunity to ask questions as broadly as possible,

24  for them to have added that other question.

25     Q    But my question, though, is:  As -- as it

Page 77

1  relates to the statements you made about Gertig and it

2  only reporting on frequency of data as a potential

3  weakness, that applies to your paper too?

4          MS. O'DELL:  Object to the form.

5  BY MR. HEGARTY:

6      Q    In other words, what would be the difference

7  in between how you characterize your reporting of

8  frequency versus how Gertig characterized its reporting

9  of frequency?  And that's referring to the 2000 paper.

10     A    I think in my criticism of the published work,

11  I was talking about broadly how these papers contribute

12  to our knowledge and how they could have been better.

13  And so I think it doesn't invalidate what they report on

14  frequency, which is important, but it would have also

15  been good if they gave us a combined frequency and

16  duration.  That would have been even better.

17         In our review, some of the contributing papers

18  did do frequency and duration, which was even better.  I

19  don't think it invalidates any results about frequency.

20  It's just saying it would be better to have more detail

21  than -- I don't think I levied those criticisms lightly.

22  It was a cohort study that should have asked that from

23  the very beginning.

24     Q    So your comment about it would have been

25  better would apply to your paper too, right?

Page 78

1    A    The -- the criticisms of a systematic review
2 were different. I didn't have a capacity to tell the
3 investigators what to ask. I was just pooling what they
4 did ask, and so you wouldn't consider that a criticism
5 of a systematic review. You pool what's been published,
6 and what's been published is reliably on frequency and
7 not duration. So I wouldn't levy that against our --
8 our paper.
9    Q    If you look at the "Strengths and Limitations"
10 section, you actually say in the first line that "The
11 primary strength of our study is our focus on frequent
12 users of perineal talcum powder," correct?
13    A    I believe you, but I'm not sure --
14    Q    Sure.
15    A    -- where I say that.
16    Q    Look at the "Strengths and Limitations"
17 section --
18    A    Oh.
19    Q    -- the heading "Strengths and Limitations" --
20    A    Oh, yes. Yes.
21    Q    -- and the first line under that.
22    A    Yes.
23    Q    The first line under the "Strengths and
24 Limitations" section says: "The primary strength of our
25 study is our focus on frequent users of perineal talcum

Page 79

1 powder," correct?
2    A    Yes.
3    Q    That would then also -- that should also apply
4 is -- in other words, that same statement should apply
5 to the Gertig 2000 paper, right?
6        MS. O'DELL: Object to the form.
7        THE WITNESS: I'm not sure what you're asking.
8 BY MR. HEGARTY:
9    Q    Well, Gertig also focused on frequency of
10 perineal talcum powder use, correct?
11    A    Yes.
12    Q    That would also mean that that's a primary
13 strength of that study, just as you say focusing on
14 frequency is a primary strength of your study, correct?
15        MS. O'DELL: Object to the form.
16        THE WITNESS: I think -- I mean, the primary
17 strength of the Gertig study is it's a large cohort
18 study that followed women for decades. That's the
19 primary strength of that study.
20        To address the importance of what -- whether
21 talcum powder is a risk factor, you need to assess
22 frequency, and I think they did that, so I think that is
23 a strength of the study.
24 BY MR. HEGARTY:
25    Q    Turning over to the last page of your study,

Page 80

1 the "Conflict of Interest" section. Tell me when you're
2 there.
3    A    Yes.
4    Q    You disclosed that you have served as a paid
5 expert witness for the plaintiffs in the talcum powder
6 litigation, correct?
7    A    Yes.
8    Q    You agree that it's important for the reader
9 of your Woolen 2022 paper to know that, correct?
10    A    Yes.
11    Q    That -- so that a reader could evaluate
12 whether there's a conflict of interest that you have as
13 it relates to the results of this paper in relation to
14 your work in the talc litigation, correct?
15    A    Yes.
16    Q    You can put that paper aside.
17        I want to talk for now -- let me start over
18 again.
19        I want to talk more -- in more detail about
20 your Second Amended Expert Report. So if you could have
21 that with you.
22    A    I do have that. I'm just checking the time,
23 and I'm going to have to go to the bathroom --
24    Q    Okay.
25    A    -- before we get to the end, if this is a good

Page 81

1 break.
2        MR. HEGARTY: It's a good break because we're
3 switching to -- to the -- another document --
4        THE WITNESS: Perfect.
5        MR. HEGARTY: -- so let's go ahead and take
6 that break.
7        THE WITNESS: Great.
8        (Recess.)
9        MR. HEGARTY: We are back on the record.
10    Q    I have one other question as it relates to
11 Exhibit No. 6. It's the email Dr. Lazar to you dated
12 March 4, 2024.
13        Do you still have that exhibit in front of
14 you, Doctor?
15    A    I do.
16    Q    Can you explain to me what -- if you can, what
17 Dr. Lazar is talking about in the first paragraph?
18    A    Yes.
19        She's saying to generate the graphs that we
20 used in the manuscript -- and she generated those graphs
21 for each of the sensitivity analysisn [sic] -- that the
22 program she's using, STATA, she's not sure what happens
23 when she generates the graphs. The confidence intervals
24 are coming out wrong. So she said if I want the graphs,
25 she will dig in and figure it out, but, otherwise, the

21 (Pages 78 - 81)

Page 82

1 point estimate she just used with SAS. SAS is
2 notoriously not good with graphs.
3    Q    Had you responded to this email that is the
4 March 4, 2024, email?
5    A    It seems likely that I did.
6        MR. HEGARTY:  Can we get a copy of that email?
7 We'll follow up on it.
8        MS. O'DELL:  (Nods head.)
9 BY MR. HEGARTY:
10    Q    Do you remember what you -- what your
11 follow-up was?
12    A    I'm going to guess I said, "Thanks.  This is
13 great.  Don't need the graphs."
14    Q    You're saying here today you don't need the
15 graphs.
16        Why don't you need the graphs?
17    A    The change -- there's nothing I would do with
18 those graphs.  I wanted to know the impact on the
19 results.  She's giving me the impact on the results.
20 The graphs don't inform that at all.  That would just be
21 if I was publishing them, and we're not publishing them.
22 There's no -- there's nothing to them to publish.
23    Q    To know what is happening with the -- the
24 graphs with this new analysis, that is, the specifics of
25 it, we'd have to talk to Dr. Lazar; is that correct?

Page 83

1        MS. O'DELL:  Object to the form.
2        THE WITNESS:  You mean what's wrong with the
3 software?
4 BY MR. HEGARTY:
5    Q    Or what she's seeing when she's doing the
6 software, what she's running it.  You would -- she would
7 have those details and not you, correct?
8    A    That's correct.
9    Q    You can put that aside.
10        So now we're talking about Exhibit No. 1, I
11 believe, which is your Second Amended Expert Report.
12        Is that, indeed, Exhibit No. 1?
13        MS. O'DELL:  It's 2.
14        MR. HEGARTY:  Two.  I'm sorry.
15    Q    So now we're going to talk about in more
16 detail Exhibit No. 2, your second amended report.
17        If you could first turn to page 4 just before
18 the paragraph -- I'm sorry.  I need to back up.
19        Page 4, four lines down from the top.  Tell me
20 when you're on page 4.
21    A    I'm there.
22    Q    There's a line you added after the phrase "nor
23 does it confirm the specific component in talcum powder
24 products that make them carcinogenic."  You added:
25 "- asbestiform talc, platy talc, asbestos, heavy metals,

Page 84

1 and fragrances may all play a role."
2        Do you see where I'm reading?
3    A    I do.
4    Q    Now, you say they "may all play a role."
5        Which of these substances, in your opinion, to
6 a reasonable degree of medical or scientific certainty,
7 do play a role in talcum powder use causing ovarian
8 cancer?
9    A    I think the evidence that I have looked at the
10 most closely is asbestiform talc and asbestos.  I know
11 less about the etiology and the mechanism of how heavy
12 metals and fragrances may play a role.  Nonetheless, in
13 reading about the harmful effects of those in IARC
14 reports, they have a role in carcinogenesis.  I just
15 have seen less detailed mechanistic evidence related to
16 those.
17    Q    Can you quantify the role of asbestiform talc
18 and asbestos in talcum powder use causing ovarian
19 cancer?
20        MS. O'DELL:  Object to the form.
21        You may answer.
22        THE WITNESS:  I believe strongly that those
23 ingredients in talcum powder products causes the ovarian
24 cancer.
25        MR. HEGARTY:  When I say "quantify," let me be

Page 85

1 more clear.
2    Q    Are you able to assign a percentage of their
3 contribution or other -- in other- -- or otherwise
4 quantify in some numerical fashion the extent of their
5 contribution as it relates to -- as compared to platy
6 talc versus heavy -- heavy metals, fragrances and
7 everything else in -- as alleged in -- as is in talcum
8 powder?
9    A    The epidemiology describes the exposure.
10 That's the -- that's the cause of avagia [phonetic].  In
11 terms of guessing which of the components numerically, I
12 think it's mostly the asbestos and the asbestiform talc,
13 but I don't have a way to attach a numerical number
14 there.
15    Q    Have you developed any new or additional
16 expertise on asbestos and ovarian cancer since your
17 October 2021 deposition?
18    A    I've read a lot more papers since then about
19 the few lines of evidence that I think are important,
20 the mechanism, both basic science and different sort of
21 cellular studies that have shown the impact of asbestos
22 and talc and on ovarian cell lines and ovarian cancer.
23 So I've read a number of papers about that that I cite
24 in this report.
25        And then I've seen a good amount of testing

22 (Pages 82 - 85)

Page 86

1  data that shows more definitive and incontroversial
2  [sic] evidence that there's asbestos in basically all
3  talc products. So I think those two lines of evidence
4  have informed me, more -- more importantly, since my
5  prior deposition.
6      Q   As to the cellular studies, are those studies
7  that are -- that you read -- have read for the first
8  time -- that you read for the first time since your
9  October 2021 deposition?
10     A   Yes.
11     Q   As far as the -- those studies, did any of
12  those involve asbestos or asbestiform talc in the cell
13  study?
14         MS. O'DELL: Objection to the form.
15         THE WITNESS: I think there were studies using
16  talcum powder products. We know talcum powder products
17  all have asbestos and asbestiform talc, so, yes, I think
18  they did directly study that.
19  BY MR. HEGARTY:
20     Q   So your comment with regard to the cellular
21  studies was not as to any cellular studies that applied
22  asbestos to cells, correct?
23     A   Correct.
24         MS. O'DELL: Objection to the form.
25         THE WITNESS: Correct.

Page 87

1  BY MR. HEGARTY:
2      Q   As far as the testing data, have you seen
3  testing data for the first time -- let me restate that
4  again.
5          Have you seen, since your October 2021
6  deposition, testing of talcum powder for asbestos that
7  you had not seen before?
8      A   Yes.
9      Q   What testing data had you not seen as of your
10 October 2021 MDL deposition?
11     A   So I believe the information that was included
12 in Longo's expert report, there -- his third expert
13 report had new testing data, particularly of talcum
14 powder from Chinese mines. I believe I hadn't seen that
15 before, and I believe there were something like 48 new
16 testing results, and maybe 43 of them had asbestos. I
17 think that was new from what I had seen before.
18     Q   Any other new testing data of talc for
19 asbestos that you've seen since your October 2021
20 deposition?
21     A   I would have to check. I don't remember if I
22 had seen the FDA testing results that -- that confirmed
23 that there was asbestos in talcum powder products before
24 that deposition or not. It might have been included,
25 but I don't remember.

Page 88

1      Q   And I will stop at your report where I -- I've
2  identified, I think, new studies or new references, and
3  maybe that will cover what we're talking about here.
4          Can you cite to any published medical or
5  scientific literature stating that asbestiform talc in
6  talcum powder causes ovarian cancer?
7          MS. O'DELL: Object to the form.
8          Mark, that question is -- very much goes back
9  to what was covered in her 2021 deposition at length
10 about asbestiform talc, talc fibers, et cetera, and --
11 and so if you have something in regard to anything new,
12 that's one thing, but I think that's re- -- covering
13 ground that previously was covered.
14         MR. HEGARTY: Well, let me ask it in a
15 different way.
16     Q   Since your October 2021 deposition, have you
17 read any published medical or scientific literature
18 stating that asbestiform talc in talcum powder causes
19 ovarian cancer?
20     A   And that -- that statement suggests a review
21 of an entire literature, and so I'm not -- I'm not sure
22 if you're asking me if there are papers that support
23 that view or that state that view.
24     Q   Yeah, the -- my question is specific -- is as
25 specific as I asked it.

Page 89

1          That is, since your October 2021 deposition,
2  have you read any studies that have stated that
3  asbestiform talc in talcum powder causes or is the cause
4  of ovarian cancer when talcum powder -- when users use
5  talcum powder?
6          MS. O'DELL: Object to the form.
7          THE WITNESS: I'm not understanding what
8  you're asking.
9          MR. HEGARTY: Sure.
10     Q   I'm asking if you have read any papers since
11 your October 2021 deposition that actually calls out the
12 asbestiform talc in talcum powder as being the cause of
13 ovarian cancer.
14         MS. O'DELL: Object to the form.
15         THE WITNESS: There have been statements that
16 have suggested we now know that there's asbestos and
17 asbestiform talc in talcum powder and that it's of
18 greater concern. IARC made a statement or -- I'm not
19 sure before or after my deposition -- that we now see
20 that there's asbestos. This is a problem at risk for
21 ovarian cancer. So that sort of is what you're asking
22 for.
23         Many of the mechanistic studies say this is
24 probably the problem in -- that it's the asbestos in the
25 talcum powder that's causing these cellular changes that

23 (Pages 86 - 89)

Page 90

1 are consistent with carcinogenic changes.
2     MR. HEGARTY: You're going back and covering
3 things that you had already covered at deposition, which
4 I don't want to.
5   Q My question was -- my question was: Since
6 your October 2021 deposition --
7   A Yeah.
8   Q -- so the last two and a half years, have you
9 read anything additional to what you had read in October
10 2021 that states that it is -- it is the asbestiform
11 talc in talcum powder that is the cause of ovarian
12 cancer?
13   A And separate that -- separate than IARC that
14 says this, because I think they said it before the -- so
15 any new people who have said that?
16   Q Correct.
17   A I'm just seeing who I cited newly.
18   I'm not sure that, off the top of my head, I
19 can remember a new citation of that.
20   Q Same question. The question only relates to
21 something you have read for the first time since your
22 October 2021 deposition that calls out the asbestos in
23 talcum powder as the cause of ovarian cancer in talcum
24 powder users.
25     MS. O'DELL: Object to the form.

Page 91

1     THE WITNESS: I'm not sure that there is a new
2 statement of that that I've read.
3 BY MR. HEGARTY:
4   Q Since your October 2021 deposition, have you
5 read any published medical or scientific literature that
6 reports on the level of exposure to asbestiform talc
7 necessary to cause ovarian cancer?
8   A No.
9   Q Since your October 2021 deposition, have you
10 read any medical or scientific literature that reports
11 on the level of asbestos that is necessary in talcum
12 powder to cause ovarian cancer?
13   A No.
14   Q Have you developed any new or additional
15 expertise since your October 2021 deposition with regard
16 to heavy metals and ovarian cancer?
17   A No.
18   Q Same question as to fragrances.
19   A No.
20   Q Staying on page 4, before the section "In
21 summary" you added a phrase to the sentence beginning
22 "This finding supports that local tissue response and
23 inflammation" -- first of all, do you see where I'm
24 reading?
25   A I don't.

Page 92

1   Q The statement -- it's -- again, it's before
2 the summary section on page 4. The sentence begins:
3 "This finding supports that local tissue response --"
4   A Yes.
5   Q -- et cetera.
6   At the end of that, you added a phrase to this
7 report, quote, "as well as cellular changes that are
8 initiated in response to talc," closed quote.
9   Do you see that phrase?
10   A I do.
11   Q To what studies are you referring to?
12   A There were several cellular studies that were
13 published that -- that were new. They were new since my
14 report and that I newly read. And those were a study by
15 Emi in 2021 that described the cascade of gene
16 expression changes that happen in relationship to -- to
17 talc, and so I think that really was pivotal to my
18 understanding that there are so many different
19 epigenetic changes that occur from the exposure to talc.
20   There's also the paper by Mandarino that
21 describes on a cellular level the -- the disruption of
22 macrophage functions that happen at the cellular level
23 to the talc.
24   I think those were the -- I think there were
25 several others, but I think those were pretty pivotal.

Page 93

1   Q Turning to the "Qualifications" section also
2 on page 4, you deleted from your previous report your
3 being a professor of radiology and biomedical imaging.
4   Why did you take that out?
5   A I moved my primary department from radiology
6 to epidemiology.
7   Q Okay. Please turn next to the "Background"
8 section at Section III, page 11 under the section
9 "Asbestos."
10   Please tell me when you're there.
11   A I'm there.
12   Q In the first paragraph under the section
13 "Asbestos" about two-thirds of the way down you added a
14 reference -- let me start -- you added a statement that
15 says: "talcum powder products have never been free of
16 asbestos."
17   Do you see where I'm reading? It's just prior
18 to a cite to "Longo & Rigler 2019; Hopkins Dep. 2018;
19 FDA Testing 2019."
20   A Yes.
21   Q Specifically, you added a reference to
22 Dr. Hopkins' deposition.
23   When did you first receive Dr. Hopkins'
24 deposition?
25   A I -- a long time ago.

24 (Pages 90 - 93)

Page 94

1    Q    Had you read Dr. Hopkins' deposition as of
2  your 2021 MDL deposition?
3    A    I remember knowing about it before the trial
4  that I participated in. I don't remember if I had it at
5  the time of the deposition.
6    Q    Do you remember, though, if you had read it as
7  of your October 2021 deposition in the MDL?
8    A    No.
9         MS. O'DELL: Object to the report -- form. I
10  think that's just what she was answering. That was the
11  question she just answered.
12        MR. HEGARTY: I wasn't exactly clear on the
13  answer, so that's why I asked a follow-up question.
14    Q    Do you recall if, as of your October 2021
15  deposition, which was after Kleiner, had you read
16  Dr. Hopkins' deposition, his 2018 deposition?
17    A    I believe I had.
18    Q    Originally, did you ask for Dr. Hopkins' 2018
19  deposition?
20    A    My recollection is it was referred to, and
21  then I asked to see it.
22    Q    Referred to in some other document or
23  somewhere else?
24    A    Either -- I don't remember how it was referred
25  to, but I remember hearing about it and then asking to

Page 95

1  see the report.
2    Q    Have you read the entirety of Dr. Hopkins'
3  2018 deposition?
4         MS. O'DELL: Let me just object.
5         So Dr. Hopkins -- her reliance on the exhibits
6  to his deposition were covered, actually, in 2018, and
7  -- and so to the degree you're asking any detailed
8  questions, I think this really is -- goes very, very far
9  back.
10        MR. HEGARTY: I agree. I'm not going to get
11  into those exhibits unless to lay a foundation, but
12  there is a new reference in the report to Dr. Hopkins'
13  deposition in 2018 to support this statement. And so I
14  do think it's fair -- fair game.
15        MS. O'DELL: Her -- Dr. Hopkins' deposition
16  and exhibits have been on her Materials Considered list
17  and I think were referenced in her 2018 report, but I
18  could be mistaken about the specific reference, but
19  they've been on her materials list for five years or
20  more, so however long that is.
21        MR. HEGARTY: The next question, though, I'm
22  sure, will clarify why I'm able to get into this.
23    Q    You cite Dr. Hopkins' December -- Dr. Hopkins'
24  2018 deposition for the proposition that talcum powder
25  products have never been free of asbestos, correct?

Page 96

1    A    Yes.
2    Q    And that line is new to your report, right?
3    A    In thinking about it, I'm not sure if it's new
4  or if it's just new in this location. So I'm not --
5  you're telling me it's the first time I've cited
6  Hopkins, but I don't think that's true. I think I'm
7  just citing it here to say there's more evidence that we
8  know that the talcum powder products are not free from
9  asbestos.
10    Q    My question, though, is: The line or the
11  phrase "talcum powder products had never been free of
12  asbestos," that is new to your report, right?
13        MS. O'DELL: Object to the form. Misstates
14  the evidence.
15        THE WITNESS: I -- I can't say whether that's
16  new to this report. It's certainly not new to my
17  thinking. So I'm guessing if I looked hard, it was in
18  the report, just a different location before.
19  BY MR. HEGARTY:
20    Q    Have you read all of Dr. Hopkins' deposition
21  testimony and trial testimony?
22    A    I --
23        MS. O'DELL: Object to the form.
24        THE WITNESS: I'm guessing it's in the
25  category of information I've skimmed and there are sort

Page 97

1  of important tables that he has presented that I've
2  looked at carefully, but his whole report, I'm guessing
3  I skimmed it.
4  BY MR. HEGARTY:
5    Q    Now, I'm talking about: Just his deposition
6  testimony and trial testimony over the years, have you
7  read at all?
8         MS. O'DELL: Objection to -- she's referred
9  to, I believe, his deposition here, and you've changed
10  the question to his trial testimony, which, as you
11  know --
12        MR. HEGARTY: Right.
13        MS. O'DELL: -- is -- is -- is expansive, including
14  mesothelioma cases and other cancer cases.
15        MR. HEGARTY: Oh, sure.
16        MS. O'DELL: So I think the question is
17  confusing and unfair and certainly is not reflected that
18  she's seen his trial testimony in her materials list.
19  BY MR. HEGARTY:
20    Q    Following up on counsel's statements, do you
21  agree that you've not read all of Dr. Hopkins' testimony
22  either at deposition or at trial?
23    A    Yes, I would agree with that.
24    Q    Have you read any other Johnson & Johnson
25  employees' deposition or trial testimony as it relates

25 (Pages 94 - 97)

Page 98

1 to testing of Johnson & Johnson talcum powder for
2 asbestos --
3        MS. O'DELL: Since --
4 BY MR. HEGARTY:
5    Q  -- through today?
6        MS. O'DELL: Since 2021?
7 BY MR. HEGARTY:
8    Q  Since 2021. I'll amend it to that.
9    A  I have not seen anything new.
10    Q  Have you reviewed any additional testing
11 either done by -- let me ask a different way.
12        Have you read, since your October 2021
13 deposition, any Johnson & Johnson -- any of Johnson &
14 Johnson's expert reports or experts' testimony as it
15 relates to the testing of talcum powder for asbestos?
16    A  I don't believe I have.
17    Q  You also cite in this part of your report to
18 FDA's testing of 2019.
19        Have you reviewed FDA's testing of Johnson's
20 Baby Powder in 2009 and 2010?
21    A  I have seen older testing results. I'm not
22 sure if that -- those are the testing results that
23 you're referring to, but I have seen older testing
24 results.
25    Q  Have you reviewed any of FDA's testing of

Page 99

1 talcum powder products that did not involve Johnson &
2 Johnson talcum powder products in 2022?
3    A  I'm not sure what the document is. If you
4 shared it with me, I can --
5    Q  Let me just ask it a different way.
6    A  Yeah.
7    Q  Are you aware of FDA reporting on testing of a
8 number of talcum powder products in 2022? Were you --
9 are you aware of that?
10        MS. O'DELL: Object to the form.
11        THE WITNESS: If you showed me the document, I
12 could confirm whether I've seen it or not. It sounds
13 familiar that they were testing a more broad sample of
14 products, but I don't remember the specifics of that.
15 BY MR. HEGARTY:
16    Q  Do you recall if you reviewed any of the
17 testing results of -- of FDA's testing of talcum powder
18 products from 2022?
19        MS. O'DELL: Object to the form. Asked and
20 answered.
21        THE WITNESS: I don't remember that, but,
22 again, if you showed it to me, I could more easily
23 confirm whether I had seen it or not.
24 BY MR. HEGARTY:
25    Q  Based on your statement that talcum powder

Page 100

1 products have never been free of asbestos, is it your
2 opinion that testing by FDA that reports no finding of
3 asbestos are invalid?
4        MS. O'DELL: Object to the form.
5        THE WITNESS: I -- I think the way the testing
6 is done is profoundly important. And your capacity to
7 find asbestos would depend heavily on how you look. And
8 we've seen from the Longo evidence and the
9 reconsideration of using the electron microscopy TEM
10 approach and the importance of that at finding more and
11 the FDA's acknowledgment that this is actually the right
12 way to look to find it. Having the lack of detection,
13 using an insensitive test would not convince me that
14 that was an appropriate result, or I wouldn't put trust
15 in it.
16 BY MR. HEGARTY:
17    Q  Is it your opinion that every model of
18 Johnson's Baby Powder that has ever been sold has
19 contained asbestos?
20    A  Yes, that's my opinion.
21    Q  Is it your opinion that every consumer product
22 that contains talcum powder has some level of asbestos
23 in it?
24        MS. O'DELL: Object to the form.
25        THE WITNESS: The general nature of that

Page 101

1 question encompasses so many products I've never looked
2 at, know nothing about. That being said, I'm not sure
3 you can take asbestos out of talcum powder. So I could
4 venture to guess, but I have no basis for knowing the
5 list of products you're talking about or what's in them.
6 BY MR. HEGARTY:
7    Q  A related question: In your opinion, is it
8 possible to create talcum powder that can be used in a
9 cosmetic product that does not contain asbestos?
10        MS. O'DELL: Object to the form. Beyond her
11 expertise.
12 BY MR. HEGARTY:
13    Q  You can answer.
14    A  I -- from what I've learned about the presence
15 of asbestiform talc in talcum powder and asbestos in
16 talcum powder, I wouldn't see how you could get it out
17 of the product, but -- but that is outside -- I don't
18 know if it's chemical engineering or geological
19 expertise that -- that I don't have.
20    Q  Please turn or look next at page 11 of your
21 report to the paragraph just before the paragraph that
22 begins "However, IARC explicitly stated." Please tell
23 me if you can tell where I'm pointing to.
24    A  On page 11?
25    Q  On page 11.

26 (Pages 98 - 101)

Page 102

1    A   In the middle of the "Asbestos" paragraph
2   or --
3    Q   No.  It is the paragraph above the paragraph
4   that begins:  "However, IARC explicitly stated that the
5   findings in this monograph apply to all forms of
6   asbestos."
7    A   I don't have the "However."
8    Q   The "However" is new.  It starts -- the line
9   starts in the -- no.  Let me start over again, my
10  question.
11      The line does begin:  "However, IARC
12  explicitly stated."
13      Is that not in your report at page 11?
14   A   Page 11, I have four paragraphs:
15  "Relationship," "Why Talcum Powder," "Carcinoma," and
16  "Asbestos."
17      Which paragraph is it in?
18   Q   Let me just take a quick look.  Let me find my
19  copy of the 2023 report.
20      MS. O'DELL:  Are you talking about page 12?
21      MR. HEGARTY:  Let's go off the record for just
22  a second until I find mine.
23      (Discussion Off the Record.)
24      MR. HEGARTY:  So we're back on the record.
25   Q   Please turn to page 12.  The paragraph just

Page 103

1   before the paragraph that begins "However, IARC
2   explicitly stated," et cetera.
3    A   Yeah.
4    Q   Are you there?
5    A   I'm there.
6    Q   You added the line at the end of that
7   paragraph that says:  "To the degree that we now know
8   talcum powder products contain asbestos fibers, this
9   study also supports that talcum powder causes ovarian
10  cancer."
11      You're referring -- to what study are you
12  referring to?
13   A   I think the Camargo 2011 and the IARC 2012.
14   Q   Since your October 2021 deposition, have you
15  read any scientific or medical literature reporting that
16  asbestos in any consumer product can cause any form of
17  cancer?
18   A   Anything that's new is the question?
19   Q   Yes, ma'am.
20   A   I don't think so.
21   Q   Is it your opinion that any amount of asbestos
22  in talcum powder causes ovarian cancer over the talc- --
23  the talcum powder alone?
24      MS. O'DELL:  Object to the form.
25      THE WITNESS:  Can you restate that?

Page 104

1      MR. HEGARTY:  Sure.
2    Q   This -- this is getting at your -- the line
3   you added.
4      Are you saying, by the line that you added,
5   that it is the asbestos fibers in the talcum powder that
6   is causing the ovarian cancer in the users of the
7   product?
8      MS. O'DELL:  Object to the form.  And that
9   question was asked, I believe, in 2018 and 2021.
10  BY MR. HEGARTY:
11   Q   You can answer, because I'm asking
12  specifically about this line you added.
13      MS. O'DELL:  The question wasn't limited to
14  that.
15      And so you may answer, but I'm just -- I'm
16  noting my objection on the record.  This is really going
17  back.
18      THE WITNESS:  I think in terms of the
19  carcinogenicity, asbestos and asbestiform -- asbestiform
20  talc are equivalent, and I think that's a very strong
21  culprit of what's causing ovarian cancer from talcum
22  powder products.
23  BY MR. HEGARTY:
24   Q   Please turn next to page 13, the paragraph
25  that begins "The female genital tract is open."

Page 105

1      Do you see that paragraph?
2    A   I do.
3    Q   You added a study referenced in that paragraph
4   to -- that is a reference to Johnson 2020.
5      Do you see that reference?
6    A   I do.
7      MR. HEGARTY:  I'm going to go ahead and mark
8   that as our next exhibit.  That's it.  I'm marking as
9   Exhibit No. --
10      MS. FLAGEOLLET:  Seven.
11      MR. HEGARTY:  -- 7, the 2020 Johnson paper.
12      (Exhibit 7 was marked for identification by
13      the court reporter.)
14  BY MR. HEGARTY:
15   Q   Do you have that paper in front of you?
16   A   I do.
17   Q   Did you find the 2020 Johnson paper on your
18  own?
19   A   I believe I did.
20   Q   This study was available back at the time that
21  you prepared your amended MDL report in 2021.
22      Why did you not cite it then?
23   A   I think I didn't find it then.
24      What was the date of my prior report?
25   Q   Your last MDL report, prior to your current

27 (Pages 102 - 105)

Page 106

1 one, was dated -- or is dated July 2nd --
2    A    Sure.
3    Q    -- 2021.
4    A    Great.
5    Q    Had you read the Johnson 2020 paper as of July
6 2nd, 2021?
7    A    No.
8    Q    Did you find it on a subsequent search that
9 you did of the medical literature?
10    A    I believe I did.
11    Q    If you turn over to the second page of this
12 study, page 528, under the section "Resected tissues
13 from ovarian carcinoma patients."
14        Do you see that section?
15    A    I'm sorry. I -- I got lost.
16    Q    It's the second page on the right-hand column
17 under the section 2.3, "Resected tissues from ovarian
18 carcinoma" --
19        MS. O'DELL: On page 2.
20 BY MR. HEGARTY:
21    Q    -- "patients." On the second page.
22    A    On the second page. Yes.
23    Q    About eight or -- seven or eight or line --
24 seven or eight lines down, there's a line that says:
25 "All 11 patient cases were received for consultative

Page 107

1 purposes by JJG, each representing a patient with
2 ovarian carcinoma and a significant known history of
3 perineal talc use."
4        Do you see where I'm reading?
5    A    Yes.
6    Q    JJG is a -- is a reference to John Godleski.
7        Are you aware of that?
8    A    Yeah.
9    Q    And are you aware that John Godleski --
10 Dr. Godleski is an expert witness for Plaintiffs in the
11 MDL as well?
12    A    Yes.
13    Q    Are you aware that the 11 patients he's
14 reporting are patients that he received through his work
15 with Plaintiffs' counsel?
16    A    Yes.
17    Q    Does that have any impact on your
18 interpretation of -- and weight given to this study that
19 it involves patients that are -- that Dr. Godleski
20 received through lit- -- his litigation work?
21    A    It does not.
22    Q    If you turn over to page 532 at the bottom,
23 looking at the right-hand column, the first carryover
24 paragraph.
25        Are you with me?

Page 108

1    A    I'm with you.
2    Q    About halfway down, the paper makes the
3 statement: "A substantial number of birefringent
4 particles may be other categories, particularly
5 silicates. These may be absorbed into the perineum
6 through general living practices, in a manner similar to
7 talc."
8        Do you agree that other particulates -- other
9 particles, that is, can be absorbed or disseminated
10 locally in other tissues as talc is?
11    A    Yes.
12        MS. O'DELL: Object to the form.
13 BY MR. HEGARTY:
14    Q    With regard to the tissue that is analyzed in
15 this paper, that tissue was handled by the surgeon and
16 other people as it was taken to and from the pathology
17 department, correct?
18    A    Yes.
19    Q    Do you agree that surgery removed from -- that
20 tissue removed during surgery and then taken to
21 pathology can pick up particulates or particles along
22 the way?
23    A    I think very difficult to pick up particles
24 inside. So on the edge of the surface, I think the
25 standard sterile procedures are imperfect when you're

Page 109

1 removing something from the OR that's less concerned
2 about it, but you can't get particulate matter inside
3 the -- inside the tissue.
4    Q    You agree, though, that with regard to these
5 authors, they were not able to -- let me start over
6 again.
7        With regard to the tissue used by the authors
8 in these papers, these -- they were not involved in the
9 -- in the removal or the initial review of the -- the
10 pathology, correct?
11    A    I'm -- I'm --
12        MS. O'DELL: Object to the form. Excuse me.
13 Sorry.
14        THE WITNESS: I wouldn't -- I wouldn't
15 possibly know if they were involved or not.
16 BY MR. HEGARTY:
17    Q    Do you know if and how -- if and then how the
18 author accounted for the potential for contamination in
19 their findings?
20    A    I -- I hear the theoretical concern of
21 contamination. I did a year of pathology before I went
22 into radiology and was often the person who went to the
23 operating room to get the specimens, and often I was
24 next to the researcher who is also getting the specimens
25 next to me in the operating room. And then I would be

28 (Pages 106 - 109)

Page 110

1 responsible for going back to the pathology lab and
2 slicing the specimen.
3         You don't look on the edge of the specimen.
4 You look -- the specimen has millions of potential
5 fields of views. You're not focusing on the edge.
6         So if you look at the photos that they're
7 showing in Figure 1, these photos are not on the edge.
8 They're in the center of the material. And so, no, I
9 don't think -- that's not where you look. You don't
10 look in -- on the edge. You look in the body, and then
11 that's not susceptible to contamination.
12     Q   In the work you described, there was no effort
13 made to keep the tissue from coming into contact with
14 other particles or particulates along the way, correct?
15     A   No, that's not true. It's -- you try to be
16 towards a sterile condition when you're picking up the
17 specimen. It comes from the operating room table. It's
18 in, you know, some kind of container that's supposed to
19 be sterile and kept sterile, and you take it to the
20 pathology lab, and you typically mark -- mark the edge
21 of the specimen with blue ink, and then when you section
22 it, you're looking interior to that.
23         It -- it loses the importance of it being
24 completely sterile the way the operating room is.
25 There's no longer a patient at risk, but you try to keep

Page 111

1 the specimen as clean and uncontaminated as possible.
2 It's just standard procedure.
3         So I -- I don't disagree that there's a
4 possibility for some contamination, but that would be on
5 the surface, not in- -- inside. And every one of these
6 images, Figure 2, Figure 3, we're looking at talcum
7 particles inside a blood vessel that's inside the
8 specimen. That's not from contamination.
9     Q   You do agree, though, that in the transfer of
10 tissue from the surgical lab to the pathology department
11 and then putting it into the slides, it can pick up
12 particles in the air or from the person that's carrying
13 those or from paper it's set on along the way, at least
14 as to the surface, correct?
15     MS. O'DELL: Objection. Form.
16         You may answer.
17     THE WITNESS: To the surface, absolutely.
18 BY MR. HEGARTY:
19     Q   If you turn to the very last page, the
20 "Conflict of interest statement." Please tell me when
21 you're there.
22     A   I'm there.
23     Q   The first "Conflict of interest statement"
24 refers to CEJ [sic], which is Kurt E. Johnson, and
25 states that -- KEJ. I said "CEJ." I meant KEJ --

Page 112

1 worked as a paid expert medical witness for the Beasley
2 Allen law firm in 2018 and 2019, correct?
3     A   Yes.
4     Q   You're represented here today by two attorneys
5 from the Beasley Allen law firm?
6     A   Yes.
7     Q   The next "Conflict of interest statement" says
8 "JJG" -- that refers to John Godleski -- "has served as
9 a consultant and provided expert testimony in talc and
10 other environmental litigation."
11         Did I read that correctly?
12     A   Yes.
13     Q   In your opinion, if that -- is that a
14 sufficient conflict of interest disclosure for
15 Dr. Godleski, knowing that he is serving in the same
16 capacity as you are in this litigation?
17     MS. O'DELL: Object to the form.
18     THE WITNESS: I read this -- I'm not sure if
19 it's accurate or not -- as being that JJG has been a
20 consultant in many cases as opposed to just a single.
21         So that -- that doesn't seem to be less than a
22 conflict. He's suggesting he has the potential for many
23 such conflicts. So I think that statement is perfectly
24 fine.
25 //

Page 113

1 BY MR. HEGARTY:
2     Q   Would you be satisfied in your Woolen paper
3 with a disclosure that read "Dr. Smith-Bindman has
4 served as a consultant and provided expert testimony in
5 talc litigation" without identifying who you were
6 testifying for?
7     A   I think that's a interesting question
8 that's -- that's up for debate, how much you have to --
9 from my perspective, I wanted to put as much information
10 out there for people to understand.
11         I'm on the university's conflict of interest
12 committee, and it comes up quite a lot, what is required
13 and not required. And the -- the rule at UCSF is the
14 investigator writes what they want, and then we decide
15 if it's adequate. So I think I wanted to be very clear
16 who had paid me, but I don't think it's required.
17     Q   In your disclosure in the Woolen paper, you
18 felt it was important to the reader to know on whose
19 side you were testifying?
20     A   Yes.
21     Q   Thank you.
22         You can put that paper aside.
23         If you look at page 14 at the top, you make a
24 reference in that paragraph to the Mandarino study,
25 which you referred to earlier; is that correct?

29 (Pages 110 - 113)

Page 114

1    A   Yes.
2        MR. HEGARTY:  I want to ask you a few
3    questions about the Mandarino study.  I'll go ahead and
4    mark that as my next exhibit.
5        (Exhibit 8 was marked for identification by
6        the court reporter.)
7        MR. HEGARTY:  And that should be Exhibit No.
8    8.
9        MS. O'DELL:  Thank you.
10   BY MR. HEGARTY:
11   Q   Do you have the Mandarino study in front of
12   you, Doctor?
13   A   I do.
14   Q   Did you find this study on your own?
15   A   I did.
16   Q   Had you read the Mandarino study as of the
17   time of your July 2021 amended expert report?
18   A   The last report?
19   Q   The last report.
20   A   I believe I had not.  I believe it was in the
21   interim.
22   Q   This study used mouse cells, correct?
23   A   I'm not sure what the murine ovarian surface
24   epithelial cells came from, but --
25   Q   Doesn't "murine" --

Page 115

1    A   -- I hadn't thought to ask.
2    Q   Doesn't "murine" refer to mouse?
3    A   I don't know that.  I'm not questioning you,
4    but I don't know that.
5    Q   Do -- whether it does or doesn't, do mice get
6    ovarian cancer?
7    A   I don't know that either, but I don't think
8    that's the usefulness of the cells.
9    Q   Are you an expert in the type of study that's
10   reported in this Mandarino paper?
11   A   I am not.
12   Q   Have you ever done the type of study reported
13   in the -- in the Mandarino paper?
14   A   I have not.
15   Q   Is the talc dose used in this study comparable
16   to what humans would be exposed to by using talcum
17   powder to the perineal area?
18   A   I think that would be an impossible question
19   for anyone to answer.
20   Q   The cells studied in the Mandarino paper were
21   in a petri dish.
22       Is it your opinion that these results can be
23   directly translated to humans in vivo?
24       MS. O'DELL:  Object to form.
25       THE WITNESS:  Basic science studies like this

Page 116

1    are meant to inform a mechanism.  So it's not a direct
2    one to one.  It's rather, this elucidates on a cellular
3    level what happens, and then that is taken to provide
4    insights on what might happen in actual patients, but,
5    no, it's not a direct one to one.
6    BY MR. HEGARTY:
7    Q   Are you aware of any medical or scientific
8    literature that correlates findings in murine cells to
9    what happens in humans?
10       MS. O'DELL:  Object to the form.
11       THE WITNESS:  I'm not sure if that evidence
12   existed, that I would even know it, but I'm not familiar
13   with that.
14   BY MR. HEGARTY:
15   Q   Is it your opinion that this study in any way
16   establishes the carcinogenicity of talc in humans?
17   A   I think my opinion about the carcinogenicity
18   of talc is informed by a lot of studies that I've read,
19   and I think this by no means was a paper that -- that
20   determined my opinion by itself, but it contributes to
21   my view that -- that we have a mechanism that -- that
22   clearly is -- is one that would explain how the talc
23   leads to carcinoma.  It's not by itself deterministic,
24   but it contributes to everything I've read.
25   Q   Please turn over to page 9, the right-hand

Page 117

1    column at the very bottom, the paragraph that begins
2    "Our report."
3        Do you see that paragraph?
4    A   Yes.
5    Q   About five lines down, that part of the study
6    says:  "In our study we did not investigate carcinogenic
7    properties of talc per se."
8        Do you agree with that?
9    A   I do.
10   Q   Turning over to the next page in this same
11   section, at the very top and then left-hand column --
12   A   Yes.
13   Q   -- the paper says:  "Further research is
14   needed to determine whether and to what extent the
15   effect of talc on phagocytes exists in vivo,
16   particularly in humans; these studies were beyond the
17   scope of our project."
18       Do you agree with that statement?
19   A   Yes.
20   Q   The next statement says (as read):  "We did
21   not investigate whether the inhibited tumor- --
22   tumoricidal activity" --
23   A   "-cidal."
24   Q   You might say it better than me.
25   A   Tumoricidal.

30 (Pages 114 - 117)

Page 118

1    Q    -- "tumoricidal activity we discovered could
2  entail an increased likelihood of tumor growth."
3        Do you agree with that statement?
4    A  Yes.
5    Q    This study measured, as you report, reactive
6  oxygen species; is that correct?
7    A  It was primarily the impact on macrophages,
8  but there might also be reactive oxygen species as part
9  of what they quantified.
10   Q    Well, do murine macrophages function the same
11 way as human macrophages?
12   A    Again, you're -- you're outside my area of
13 expertise, but typically the mouse model cell lines that
14 are used are ones that have something in common with
15 the -- with the particular human cancer of interest.
16 I'm not familiar with this line to -- to address that.
17   Q    If we stay in this paragraph on Mandarino, you
18 write that "Co-exposure of macrophages to talc and
19 estradiol led to increased production of reactive oxygen
20 species (which increase carcinogenesis and inflammation)
21 and changes in expression of macrophage genes pertinent
22 in cancer development and immunosurveillance."
23       Did I read that correctly?
24   A  I'm sorry.  Did we jump back to my report?
25   Q  Yeah.  We're in your report.

Page 119

1    A    And which --
2    Q    I'm sorry.
3    A    -- page?  14?
4    Q    We're still at page -- top of page 14 on the
5  section on Mandarino.
6    A    Okay.  I'm back.  Thank you.
7    Q    Do you -- did you find the sentence I read?
8    A    Yes, I'm there.
9    Q    Does a finding of -- any increase in
10 reactive oxygen species at a single point in time equate
11 to carcinogenesis?
12   A    There's an association with the degree of
13 reactive oxygen species to the likelihood of developing
14 cancer, is our understanding.  So, no, at some point in
15 time, you can't say this is going to cause cancer or
16 not.
17   Q    Same question as it relates to inflammation.
18       Can a single-point finding in a cell study of
19 an increase in reactive oxygen species equate to
20 inflammation?
21       MS. O'DELL:  Object to the form.
22       Would you mind repeating the question?  Or I'm
23 happy to look at it on the screen.
24 BY MR. HEGARTY:
25   Q    Did you understand the question, Doctor?

Page 120

1    A    I think you're asking if it's an all or
2  nothing.  If there's inflammation, is there cancer?
3    Q    Well, let me ask a different way.
4        Does a single point -- does a single finding
5  of increased reactive oxygen species, as reported in
6  this study, mean that inflammation will result that can
7  -- that will lead to cancer?
8    A    It does not.
9    Q    Is -- did anything measured in the study
10 constitute a measure of cell mutation?
11   A    No.
12   Q    The study also reports on titanium dioxide and
13 estradiol, correct?
14   A    Yes.
15   Q    Do the statements that you have in your
16 report, as it relates to talc and estradiol, also apply
17 to titanium dioxide and estradiol?
18   A    I think the titanium was the control group to
19 show that it didn't lead to those same changes.  So --
20 so the conclusions would not pertain to the control
21 group.  It was just the talc that led to those changes.
22   Q    Well, if you turn over to page 4, Figure 2, do
23 you see that at least in some of the reported findings,
24 that the titanium dioxide and the estradiol also
25 reported an increase in what they called ROX?

Page 121

1        Do you see that?
2    A    I do.  If I look at the middle figure as an
3  example, the talc plus estradiol has a value of 125, and
4  the titanium has a value of 2.  So -- so if you're
5  asking if it's at zero, the control group is meant to
6  contrast with the exposure group because you don't know
7  what the baseline is, and so this is showing that the
8  titanium is much lower than the talc and even lower than
9  the talc plus estradiol.
10   Q    If you look at the first graph, though, do you
11 see the --
12   A    Right.  There's a -- if you compare the last
13 two results, one is 80 and the other is 40.  So it's
14 twice as high.  So the control is meant to standardize
15 so that you wouldn't assume that the talc plus E2 is
16 entirely causing the -- the results.  Some of it is due
17 to background, and the titanium is showing a much lower
18 level of background activity than with the exposure that
19 they're -- that they're testing in the -- in the active
20 group, which is talc here.
21   Q    Ultimately, though, the control also showed a
22 reaction of some sort, correct?
23   A    To a much lower degree, absolutely.
24   Q    You also include in this part of your report a
25 reference to the Emi paper, correct?

31 (Pages 118 - 121)

Page 122

1    A   Yes.
2        MR. HEGARTY:  And I'll mark that as our next
3    exhibit.
4        (Exhibit 9 was marked for identification by
5        the court reporter.)
6        MR. HEGARTY:  I've got this one.
7        So we'll mark the Emi paper as Exhibit No. 9.
8    Q   This study looked at mouse macrophages,
9    correct?
10   A   Yes.
11   Q   No ovarian cells were used, right?
12   A   I'm going to have to remember.
13       I'm sorry.  What was the question?
14   Q   This paper did not look at ovarian cells,
15   correct?
16   A   Their cell model is the murine cell line, yes.
17   Q   In fact, they looked at macrophages, not
18   ovarian epithelial cells, correct?
19   A   Correct.
20   Q   Is it your contention that this paper shows
21   mutations of mouse macrophages?
22   A   My recollection is that it was both mutations
23   and gene expression changes in the -- those cell
24   lines.
25   Q   Where do you see a reference to reporting on

Page 123

1    mutations?
2    A   So under the page 1056, "Significant Analysis
3    of Microarrays" describes that this approach is one of
4    the more stringent analysis [sic] that identifies highly
5    significant genes in microarray.  It shows that ten
6    times more genes were significantly different after talc
7    and estrogen exposure versus titanium dioxide.
8    Q   Is it your opinion that that's referring to
9    mutation of cells?
10   A   I think so.  It says the "genes."  I mean,
11   they both looked at expression of the genes, but also
12   the genes themselves.
13   Q   Is it your opinion that a measure of gene
14   expression in a study like this is a measure of
15   carcinogenicity?
16   A   This paper is telling us how activated the
17   cells are and activated in a way that you would expect
18   to be activated in a pathway that leads to
19   carcinogenesis.  So I think this study, just like the
20   previous study, adds to my understanding of a possible
21   mechanism whereby exposure to talc can lead to cancer.
22   By itself, this is a single piece of evidence.  It's not
23   sufficient to confirm a single pathway in all patients.
24   Q   Have there been any studies in humans
25   reporting on the effect of talc on macrophages based --

Page 124

1    in -- in what they're measuring here?
2        MS. O'DELL:  Object to the form.
3        THE WITNESS:  I believe there are studies that
4    I've referenced in the past maybe of Saed's that measure
5    activation -- that -- maybe -- I don't remember Saed --
6    that show in actual patients that there's greater --
7    there's been greater expression in ovarian cancer
8    patients, but I can't remember that -- the reference.
9    BY MR. HEGARTY:
10   Q   And I'm specifically referring to cell studies
11   and macrophages, that is, a study like this using human
12   epithelial cells -- I'm sorry -- using human
13   macrophages.
14   A   An in vivo study that duplicates these
15   results?
16   Q   No, an in vitro study that duplicates these
17   results or shows these results.
18   A   Not that I know of.
19   Q   Now, are you aware of any in vivo studies that
20   show these results?
21   A   Not these exact results, no.
22   Q   The next study you referenced that's new to
23   your report is Harper 2023.  That's on pages 14 and 15.
24   A   I'm looking for Harper.  Yep.
25       MR. HEGARTY:  Yes, ma'am.  I'm going to mark

Page 125

1    that as the next exhibit.
2        That's it right there.
3        I'm going to mark Harper 2023 as Exhibit No.
4    10.
5        (Exhibit 10 was marked for identification by
6        the court reporter.)
7    BY MR. HEGARTY:
8    Q   Do you have that, Dr. Smith-Bindman?
9    A   I do.
10   Q   Did you find this study on your own?
11   A   I did.
12   Q   Do you know any of the authors?
13   A   I do not.
14   Q   This was published in a publication called
15   Minerva Obstetrics and Gynecology.
16       Had you heard of that journal before you read
17   this paper?
18   A   Yes.
19   Q   Had you ever read that journal before?
20   A   I've read articles from that journal.
21   Q   Have you ever cited to an article from that
22   journal in any of your publications?
23   A   I wouldn't remember that.
24   Q   Have you ever performed the type of cell
25   studies that this article reports about?

32 (Pages 122 - 125)

Page 126

1    A   I have not.
2        Did you ask me if I knew these authors?
3    Q   I did.
4    A   I've seen -- I don't know Saed, but I've seen
5  his papers before.
6    Q   My question was whether you personally know
7  any of the authors.
8    A   No, I do not.
9    Q   What from the Harper 2023 paper do you rely
10  upon for your opinions in this case?
11    A   The fact that you could cause cells to change
12  the way they're organized and lead to clustering of
13  them, sort of significant in the concept of how a cancer
14  is formed, is a really novel and unfortunate
15  documentation of how the cancer could -- could occur,
16  how a malignant transformation happens.
17    Q   This study uses an assay that measures cell
18  proliferation, correct?
19    A   Yes.
20    Q   Do you equate cell proliferation with
21  carcinogenicity?
22    A   In general, causing a lot of cell turnover and
23  a lot of duplication is -- is one hallmark of cancer.
24    Q   If you cut your finger and -- in the process
25  of repair calls -- causes a lot of cell proliferation

Page 127

1  and turnover, correct?
2    A   Absolutely.
3    Q   That does not cause cancer, right?
4    A   Absolutely correct that there's normal process
5  of cell turnover, cell death, cell proliferation and
6  pathologic cell proliferation and cell death or lack of
7  cell death.
8    Q   Is it your contention that cell proliferation
9  is the same as malignant transformation?
10    A   In the context of this study, they're showing
11  that cells treated will grow in sort of an uncontrolled
12  way and begin to form clusters and that -- that process
13  is one that's known to occur in cancer.
14    Q   Understood.
15        But do you equate a finding of cell
16  proliferation in the type of test that is done here
17  generally with malignant transformation?
18    A   Again, this is a single article that
19  contributes to my opinion, but it's not taken by itself.
20  So I think this is a very damning study, but --
21    Q   I'm sorry?
22    A   This is a damning study. To say that you can
23  turn a single cell into a cluster of organized cells is
24  very predictive of what you would expect in cancer, but,
25  no, this does not prove that this proliferation means

Page 128

1  cancer. It's just predictive of what you'd expect to
2  happen in the setting of developing cancer.
3    Q   But this study didn't show that a single cell
4  proliferated in the presence of talc, right? It did not
5  look at a single cell, correct?
6        MS. O'DELL: Object to the form.
7        THE WITNESS: You're not asking if they
8  studied one cell in this.
9        MR. HEGARTY: Correct.
10        THE WITNESS: They did not study a single
11  cell.
12  BY MR. HEGARTY:
13    Q   Is the amount of talc used in this cell study
14  in any way equivalent to what you would expect a human
15  to be exposed to, in particular a human ovary?
16        MS. O'DELL: Object to the form.
17        THE WITNESS: You asked this question before,
18  of how much we're exposing a cell to and is that similar
19  to what we would expect a human to. There's no way to
20  make a direct comparison, but I will say that the amount
21  of asbestos particles in baby powder is many, many, many
22  orders of magnitude greater than the amount they expose
23  these cells to. So I don't think there's a comparable
24  amount, how many particulates that they put in a cell
25  versus how much a woman is exposed to, but the amount

Page 129

1  women are exposed to is a very high number.
2  BY MR. HEGARTY:
3    Q   When you look -- strike that -- strike that.
4        When you consider or weigh a paper like this,
5  do you evaluate how the study was funded, in other
6  words, who funded the study?
7    A   You've asked this question a few times about
8  individuals' conflicts of interest. And I think every
9  publication needs to be taken for the details that are
10  provided. So if a study is well designed, describes all
11  the steps they took and seems to have tried very hard to
12  create a meaningful scientific experiment, then I
13  believe it, and I think the purpose of the conflict of
14  interest statement is just to let me know that there's
15  this potential conflict.
16        On the other hand, if a study is just poorly
17  designed, seems to not have any balance, then that
18  statement would mean something very different to me.
19  So --
20    Q   Is it your -- I'm sorry. You can finish.
21    A   So in this case -- I don't mean to be an
22  expert on this topic. I'm not, but reading through this
23  article, it seems to be a very well-designed, thoughtful
24  study, and the fact that -- whether it was funded by --
25  by the lawyers, I've got to look closely to see that,

33 (Pages 126 - 129)

Page 130

1 but it's a well-designed study, so I believe the results
2 that they're showing.
3    Q   Do you know whether this paper was rejected by
4 other journals before it was published in Minerva?
5    A   No, I would have no idea.
6    Q   Would that be of interest to you?
7    A   I -- I know that is of interest because I've
8 been asked so much about my paper's prior rejections,
9 but in general, no, our papers, as scientists, get
10 rejected all the time.  That's -- I mean, if it ends up
11 being published in a place that's not worthy, that's in
12 a throw-away journal or a journal that you pay to have
13 it published, then that's of interest to me.  Then I'm
14 -- I don't really give it any weight whatsoever.  But if
15 it's published in a reputable place and it had a history
16 of being rejected but where the authors improved it
17 based on that peer review and -- and fixed issues that
18 were raised and it finally gets published in a reputable
19 place, no, I -- that's not something I've ever even
20 thought about.
21    Q   So the fact that this paper was rejected by
22 three other journals before it was published is not
23 relevant to your evaluation of it; is that fair?
24       MS. O'DELL:  Object to the form.
25       THE WITNESS:  You're just telling me that for

Page 131

1 the first time, so I didn't know that, but, no, that
2 would not be relevant to my consideration of the
3 validity of the paper.
4 BY MR. HEGARTY:
5    Q   Have you been made aware that Dr. Saed, as
6 part of this litigation, produced the reviewer comments
7 that he received from the three journals that rejected
8 this paper?
9    A   I didn't know that.
10    Q   You have not reviewed the -- you have not been
11 provided with the reviewer comments of this Harper 2023
12 paper?
13    A   I have not.
14    Q   Would you be interested in reading those
15 reviewer comments?
16       MS. O'DELL:  Object to form.
17       THE WITNESS:  I'm going to guess that reviewer
18 comments on this journal article could be over my head.
19 So I -- I suspect that the issues that they raised were
20 probably quite subtle, that I would not be able to fully
21 reflect on the importance of them.
22 BY MR. HEGARTY:
23    Q   Would you -- would -- strike that.
24       Are reviewer comments when you're evaluating a
25 paper, if they're accessible to you, relevant to how you

Page 132

1 weigh a paper?
2       MS. O'DELL:  Object to the form.
3       THE WITNESS:  I don't believe I've ever seen
4 reviewer comments related to a paper.  I think -- I'll
5 take that back.  I have published papers in Europe.  I
6 have published papers at the BMJ, and the BMJ makes all
7 of those reviews open, and they're not making them open
8 at the end of the process.  They're open through the
9 whole process, meaning they're written understanding
10 they're going to be made public as opposed to not the
11 case (indicating).
12       I've never actually looked at reviewer
13 comments for the BMJ papers, but I know they must
14 publish them because they published the ones from my
15 paper, but I've never looked at them for any paper.
16 BY MR. HEGARTY:
17    Q   Another way to put my question is:  If the --
18 if, in weighing it and evaluating a paper and the
19 reviewer comments are attached or included with the
20 paper, would you review them?
21    A   I think, in general, no, but if it was a topic
22 that I was particularly interested in or a topic where I
23 was questioning why they did something or how they got
24 away with doing that because that was such a poor thing
25 to do, I could see for curiosity and scientific purposes

Page 133

1 wondering if any reviewers raised that issue that I'm
2 thinking of and why they didn't publish it that way.
3       So I could imagine doing that.  But in
4 general, I read papers very critically towards the study
5 design to the degree that I'm able and don't
6 particularly think I need to rely on other people's
7 reviews.
8       Again, if it's outside my area, I'm certainly
9 respectful that other people might have more insights,
10 but what you are raising as a possibility is not
11 something that's a routine practice.
12    Q   If you turn to the very end of the paper,
13 looking at the conflict of interest section, it reports
14 that Dr. Saed "has served as a paid consultant and
15 expert witness for the plaintiffs in the talcum powder
16 litigation."
17       Do you see that?
18    A   I do.
19    Q   Under the "Funding" part it says (as read):
20 "A portion of Dr. Saed's time conducting this research
21 was paid for by the lawyers representing plaintiffs in
22 the talcum powder litigation."
23       Do you see that?
24    A   I do.
25    Q   Are those two statements relevant to how this

34 (Pages 130 - 133)

Page 134

1 paper should be weighed and considered?
2    A    Again, reading this paper, it seems like a
3 very thoughtfully designed scientific study.  So it's
4 great that he reports this conflict of interest, but,
5 no, it doesn't reduce my interest in this paper knowing
6 that it was funded in part by lawyers.
7    Q    As part of your role in the 2022 paper, did
8 you make it a point of emphasis to not include -- not
9 include any of the work that you had been paid for as
10 part of what you did in this study?
11    A    I did.
12    Q    Why did you do that?
13    A    I think there are several reasons I did it.
14       First, I worked with two other investigators
15 on this -- on this paper and did not want to have
16 Dr. Woolen feel that I was controlling the process in
17 any way.  I wanted it to be a completely, from the
18 get-go, new review.  He was the leader.  He made
19 decisions, and if I was paid, that would, I think,
20 create not necessarily real, but would create the
21 appearance of a greater conflict of interest.
22       And so I wanted it to be incredibly clear and
23 explicit that I was not paid for this, this was a new
24 project, this was an academic project.  That doesn't
25 mean there would have been a conflict of interest that

Page 135

1 altered the work had if I'd been paid, but I think we
2 discussed a great deal on our conflict of interest
3 committee the appearance of bias as important as bias,
4 and so I did not want to leave any appearance of bias,
5 whether or not I would have created any meaningful bias.
6    Q    You agree that the -- the funding of a paper
7 by lawyers in a litigation would give the appearance of
8 bias, correct?
9       MS. O'DELL:  Object to the -- object to the
10 form.
11       THE WITNESS:  The appearance of a potential
12 for bias.  And so in some cases -- I'm not sure this
13 fits under that category, but I think Dr. Longo's work
14 would fit under that category.  There are no experts in
15 testing of the kind of work he does who have not been
16 involved in litigation.  That expertise of doing testing
17 for asbestos is a very specific expertise that people
18 have developed in large part because of the need that's
19 come about through litigation.  And so in that context,
20 there is no other way to do the work except by using
21 paid experts, and I think that does not taint the work
22 at all.  That's -- that's the labs that do this work or
23 the labs that are paid by these -- by -- by the lawyers.
24       In this case, he did a research study that
25 supported his work in his lab, and the fact that it was

Page 136

1 funded by the lawyers certainly is something to think
2 about when you read this study and so require extra
3 careful attention to the details of study design and the
4 methods.
5       And so in reading this study, I think they did
6 that, but I certainly want to know who's paying for it
7 so I can say, "Wait a minute.  They didn't -- they
8 didn't have a control group.  They compared talc to no
9 exposure.  That's not a valid thing to do," but that's
10 not what happened.  There was a control group.
11       And so I think -- again, I think the potential
12 for conflict of interest exists in everything we do,
13 whether or not we're paid by someone or not.
14       I have a potential conflict of interest to
15 show that radiation is harmful because that's a big part
16 of where I am drawing my professional reputation from.
17 And even though no one is paying me to say that, someone
18 could argue that I have a conflict of interest there
19 because I want to keep showing this because that
20 enhances my career.
21       A paid conflict of interest needs to be
22 declared, but it doesn't mean that it really introduces
23 a real bias or a conflict.
24       MR. HEGARTY:  Let's go ahead and take a break.
25 We've been going for a bit.

Page 137

1       (Recess.)
2       MR. HEGARTY:  Okay.  We're back on the record.
3       We're following up on some additions to your
4 most recent amended report.  If you could turn to page
5 26.  Go to the reference to the Tanha 2021 study.
6       I'm going to mark that as the next exhibit, as
7 Exhibit No. 11.
8       (Exhibit 11 was marked for identification by
9       the court reporter.)
10       MS. O'DELL:  I'm sorry.
11 BY MR. HEGARTY:
12    Q    Did you find this study on your own?
13    A    I did.
14    Q    Do you think it's a well-done study?
15    A    Yeah.
16    Q    As to talcum powder use in ovarian cancer, it
17 looked at four studies:  Penninkilampi, Berge, Huncharek
18 2007, and Taher.
19       Are those four studies sufficient in your
20 opinion to analyze whether there's an association
21 between talcum powder use and ovarian cancer?
22    A    I think that's a little bit misleading
23 summary.  It's a systematic review of systematic
24 reviews.  So they looked at Taher, but Taher looked at
25 -- what did Taher look at?  Taher looked at 30 studies.

35 (Pages 134 - 137)

Page 138

1    Q   Understood.
2        But my question is:  Do you think that this
3    study looking at four is -- in particular, the four it
4    looked at, is it sufficient analysis for reporting on
5    whether there's an association between talcum powder use
6    and ovarian cancer?
7        MS. O'DELL:  Objection to form.  Asked and
8    answered.
9        THE WITNESS:  You're suggesting they looked at
10   four studies.  They looked at four systematic reviews.
11   The study means the research that was done.  They looked
12   at more than 30 research studies.
13       So, yes, I think a systematic review of
14   several systematic reviews is very worthwhile.
15   BY MR. HEGARTY:
16   Q   Okay.  If you turn over to the discussion
17   section on page 10 of 17.  Please tell me when you're
18   there.
19   A   I'm there.
20   Q   The study states in that section that (as
21   read:  "Coffee, egg, and fat can significantly enhance
22   the risk of ovarian cancer."
23       Do you agree?
24   A   I'm sorry.  I don't -- tell me where we are.
25   Q   Sure.  On the "Discussion" section --

Page 139

1    A   Oh, the "Discussion."
2    Q   -- about four lines down, it says that the (as
3    read) "intake of coffee, egg, and fat can significantly
4    enhance the risk of ovarian cancer."
5        Do you agree with that statement?
6    A   I need to find it.
7        I see coffee is rich in antioxidants.
8        I'm there.  Okay.  I'm sorry.  I -- I'm -- I'm
9    surprised by that statement.  The paragraph before that
10   I was reading shows that the potential impact of coffee
11   is quite low.  So I'm confused why they then conclude
12   "can enhance the risk of ovarian cancer."
13       So I'd have to read this more carefully, but
14   my gut is no, I wouldn't agree.
15   Q   And let me ask it separately.
16       Apart from this paper, does coffee use
17   increase the risk of ovarian cancer, in your opinion?
18   A   I don't have a particular opinion about that,
19   but I don't remember seeing evidence that would suggest
20   that, that I would be convinced by.
21   Q   Does eating eggs increase your risk of ovarian
22   cancer, in your opinion?
23   A   I've seen nothing to suggest that.
24   Q   Has a high fat diet -- or does a high fat diet
25   increase the risk of ovarian cancer?

Page 140

1    A   The -- the -- the high fat diet -- I would not
2    say it increases the risk, but obesity is a risk factor
3    for ovarian cancer.  So I would suspect that having a
4    high fat diet would be a risk factor, but I haven't seen
5    research that particularly looks at the diet as opposed
6    to just being obese.
7    Q   Staying in this same section in this
8    "Discussion" section, it says (as read):  "Estrogen and
9    estrogen-progesterone therapies (generally, hormone
10   therapy) are also associated with the elevated risk of
11   ovarian cancer."
12       Do you agree with that statement?
13   A   I believe estrogen is associated with an el-
14   -- estrogen alone is.  I'm not -- I'm not sure if
15   estrogen-progesterone together are.  I think it's mostly
16   estrogen, but I would agree with that portion of that
17   statement.
18   Q   The next line says (as read):  "Several
19   diseases (for example, diabetes, endometriosis, and
20   polycystic ovarian syndrome), as well as some genetic
21   polymorphisms" those listed "can significantly increase
22   the incidence of ovarian cancer."
23       Is it your opinion that diabetes increases the
24   incidence of ovarian cancer?
25   A   Again, not that I've seen explicitly, unless

Page 141

1    we're going through the obesity approach, but I haven't
2    seen that literature.
3    Q   Does endometriosis significantly increase the
4    incidence of ovarian cancer?
5    A   I've seen a number of publications, including
6    recent ones, that -- that suggest that, indeed,
7    endometriosis and inflammation do increase the risk of
8    ovarian cancer.
9    Q   Does polycystic ovarian syndrome significantly
10   increase the incidence of ovarian cancer?
11   A   Again, if it's mediated through obesity, which
12   is common in polycystic ovarian cysts [sic] perhaps, but
13   I haven't seen specific evidence of polycystic ovarian
14   cysts -- syndrome.
15   Q   The last sentence of that paragraph, it refers
16   to talc, but it also says "obesity, overweight and
17   smoking...are also accompanied by an increased risk of
18   ovarian cancer."
19       Do you agree those three -- obesity,
20   overweight, and smoking -- are accompanied by an
21   increased risk of ovarian cancer?
22   A   I -- as I mentioned, I think overweight is
23   probably a risk factor for ovarian cancer.  I'm -- but
24   I'm blanking on the smoking.  I don't remember that
25   association.

36 (Pages 138 - 141)

Page 142

1    Q    If you look at -- you can set that paper
2  aside.
3        If you look at the section "Systematic
4  Reviews: Summary" on page 27 of your report.
5    A    Yes.
6    Q    At the end of that paragraph, you say (as
7  read): "Similarly, Woolen provides a high quality
8  review with similar results suggesting an increased risk
9  of ovarian cancer associated with" an increase -- "with
10 frequent perineal exposure of 31 to 65%."
11       Do you see where I'm reading?
12   A    I do.
13   Q    Has anyone outside of experts for Plaintiffs
14 in this litigation, to your knowledge, ever called the
15 Woolen paper a high-quality review?
16       MS. O'DELL:  Object to the form.
17       THE WITNESS:  Has anyone told me that's a
18 high-quality review?
19       MR. HEGARTY:  Yes.
20       THE WITNESS:  Yes.
21       MR. HEGARTY:  Yes, ma'am.
22       THE WITNESS:  Yes.
23 BY MR. HEGARTY:
24   Q    Who is that?
25   A    I have both a colleague who pushed me to write

Page 143

1  the review when I described the work, and other
2  colleagues have told me it's a great review.
3    Q    Who are those colleagues?
4    A    I think I was asked that when I -- I
5  originally mentioned it, and I declined to name them,
6  but I don't mind naming friends who told me that my
7  review was great.
8    Q    Are any --
9    A    Is that what you're asking?
10   Q    -- of those friends epidemiologists, like you?
11   A    The person who pushed me to write the review
12 was Nicole Lurie.  She was Assistant Secretary of Health
13 in the Obama administration, has had many very large,
14 influential roles as an epidemiologist.  She leads an
15 international effort around COVID vaccines, and she
16 thought the review was terrific.
17       Rita Redberg is the former editor of the
18 Journal of General Internal Medicine.  She thought it
19 was a terrific review.  Two people that come to mind.
20       And I think -- you asked me earlier if I had
21 ever spoken to the news about that publication.  I think
22 there were a couple of newspaper articles that -- that
23 did small coverage of the paper, and I did speak to
24 them.
25   Q    Who are those -- what are those articles?

Page 144

1    A    I don't remember.
2        MR. HEGARTY:  Turn next to the bottom of page
3  29 of your report.  I specifically want to ask you about
4  the addition of the Davis 2021 paragraph, and I'll mark
5  that as the next exhibit, Exhibit No. 12.
6        (Exhibit 12 was marked for identification by
7        the court reporter.)
8  BY MR. HEGARTY:
9    Q    Do you have it in front of you?
10   A    I don't.  I don't think I have that.
11   Q    We have a copy here as well.
12       MS. O'DELL:  Sorry.
13       THE WITNESS:  Fantastic.  Great.
14 BY MR. HEGARTY:
15   Q    Do you have a copy of the Davis --
16   A    I do.
17   Q    -- 2021 paper?
18       Did you find that study on your own?
19       MS. O'DELL:  Here's one.
20       THE WITNESS:  I don't remember.
21 BY MR. HEGARTY:
22   Q    Staying with -- or looking at the abstract of
23 the study, it reported an odds ratio of 1.22, but it was
24 not statistically significant, correct, as it relates to
25 African-American women and ovarian cancer generally,

Page 145

1  correct?
2    A    It reported an odds ratio of 1.22 with a
3  confidence interval that went from .97 to 1.53.  I -- I
4  wouldn't conclude that wasn't statistically significant,
5  per our earlier discussion.
6    Q    As part of your Bradford-Hill analysis in your
7  most recent report, you consider dose response or
8  biologic gradient, correct?
9    A    Yes.
10   Q    That is an important factor in a Bradford-Hill
11 analysis, correct?
12   A    I think it's more complicated than that, but,
13 yes, it's certainly one of the things to consider.
14   Q    Certainly whether there is a dose response
15 between an exposure and a disease is a consideration of
16 whether there is causation, correct?
17   A    I like the way you said it.  It's something to
18 consider.  You don't necessarily have to have a dose
19 response for something to be causal, but -- but it is
20 one of the factors to consider, and there is clear
21 evidence of dose response in this -- in this area.
22   Q    The Davis study we're looking at looked at
23 whether there was a dose response between talc use and
24 ovarian cancer, correct?
25   A    Correct.

37 (Pages 142 - 145)

Page 146

1    Q    The authors found no dose response based on
2  frequency of use, correct?
3    A    Based on a dichotomy of more or less than one
4  time per week, they did not document a dose response.
5    Q    They also found no dose response based on
6  duration of use, correct?
7    A    Correct.
8    Q    And you did not add a reference to Davis in
9  your discussion of dose response in your amended report,
10  correct?
11    A    I know I cite several papers as showing dose
12  response.  This would not be one that I would cite that
13  shows dose response.  It -- I think the important dose
14  responses are the systematic reviews that have more
15  power and go across a greater number of exposures.
16    Q    One of the authors on this paper is Patricia
17  Moormon.
18    Do you know Patricia Moormon?
19    A    I don't.
20    Q    Are you aware that she's also an expert
21  witness for Plaintiffs in the talc litigation?
22    A    Yes, I think I do know that.
23    Q    In fact, I believe you told me you have one of
24  her reports --
25    A    Right.  That's how I know --

Page 147

1    Q    -- is that correct?
2    A    -- it.
3    Q    Would you turn to the -- the authors'
4  disclosures on page 1667 of this study.  Tell me when
5  you're there.
6    A    I'm there.
7    Q    Do you see where it refers to P.G. Moormon?
8  Do you see that reference?
9    A    Yes.
10    Q    That reference says (as read):  "P.G. Moormon
11  reports grants from Duke University during the conduct
12  of the -- of the study, as well as personal fees from
13  Law Firm outside the submitted work."
14    Do you see where I'm reading?
15    A    I don't.
16    Q    It's in the "Authors' Disclosures" --
17    A    Oh --
18    Q    -- section.
19    A    -- "Disclosures."  I'm sorry.  I was in the
20  wrong section.  Yes.  One second.
21    Yes.
22    Q    Dr. Moormon has served as an expert witness
23  for Plaintiffs dating back 2017 or 2018.
24    Do you think this is a sufficient disclosure
25  for her potential conflict of interest as it relates to

Page 148

1  her prior work and current work as an expert witness for
2  Plaintiffs in this paper?
3    MS. O'DELL:  Object to the form.
4    THE WITNESS:  Per our earlier discussion.  She
5  says she gets personal fees from the law firm.  So,
6  again, that -- I think that is -- that is sufficient
7  disclosure.  It's not as detailed as saying what side
8  gave her the fees, but it is a sufficient disclosure.
9  We would accept that on our conflict of interest
10  committee as being appropriate.
11  BY MR. HEGARTY:
12    Q    It also does not refer to the subject area of
13  where she has received fees from a law firm -- from,
14  correct?
15    A    You know, I don't really know her, but I'm
16  guessing she's an epidemiologist.
17    Is that a fair --
18    Q    Yes, ma'am.
19    A    So I think she gave opinions in her area,
20  which is epidemiology.
21    Q    Would you consider this same wording as a
22  sufficient disclosure for you on your Woolen paper?
23    MS. O'DELL:  Object to the form.
24    THE WITNESS:  Again, it is a very personal
25  decision you make a disclosure.  But this is the only

Page 149

1  kind of thing -- well, there are only three things that
2  I've ever had to disclose.  One of them involved being a
3  consultant.  One has to do with a business I created.
4  And so I have wanted to bend over backwards to be really
5  explicit so there'd be no uncertainty of what that
6  potential conflict was.
7    I think I probably go a little bit on the
8  extreme side of that compared to what most people do,
9  but for my work on the conflict of interest committee,
10  this type of exposure is -- this type of disclosure is
11  common and appropriate.
12  BY MR. HEGARTY:
13    Q    Your university has a disclosure requirement
14  in order to do expert witness work, correct?
15    A    Yes.
16    Q    You're supposed to fill that out on a yearly
17  basis --
18    A    Yes.
19    Q    -- correct?
20    A    It's not specific to expert witness.  You're
21  supposed to disclose every year any sources of income
22  you got or travel or anything like that.
23    Q    There's actually categories of what your
24  disclosures are supposed to be, correct?
25    A    Correct.

38 (Pages 146 - 149)

Page 150

1    Q    This falls into category two, correct?

2    A    I'm going to trust you, but it sounds about

3 right. I --

4        MS. O'DELL: Easy --

5 BY MR. HEGARTY:

6    Q    It requires an annual report, right?

7    A    It's definitely an annual report.

8    Q    In each of the years you've served as an

9 expert witness for Plaintiffs in this litigation, have

10 you filled out an annual report disclosing that work?

11    A    I have.

12    Q    And have you provided all the information that

13 was requested in that report?

14    A    It's -- the reports at the University of

15 California are very explicit. I have to give an amount

16 of money for what work, any paid travel, all of that.

17 That's been disclosed every year.

18    Q    And do you still have copies of those forms

19 that you submitted as part of that policy?

20    A    They're kept as a running total. So I don't

21 possess them, but they're online, and I can go through

22 the 50-such reports I filed over the last ten years.

23        MR. HEGARTY: And we will follow up, and we'll

24 make a request for those documents. You don't have to

25 decide about it now, but I'm just giving you a heads-up.

Page 151

1        MS. O'DELL: Yeah. And we'll just tell you

2 we'll object, and we'll talk about it later.

3        MR. HEGARTY: Okay. I'll make a request, but

4 we'll follow up.

5    Q    If you would turn, next, over to page 35 of

6 your report.

7        You revised the dose response section between

8 this report and your prior report.

9        Do you stand behind the statement you

10 previously made in the -- in your reports about dose

11 response?

12    A    Can you be more explicit about what -- what

13 statements? I'm guessing I stand by it, but I don't

14 know what statements.

15    Q    Well, let me just ask it separately.

16        With regard to your prior statements as it

17 relates to dose response in your initial report and your

18 first amended report, do you stand by those statements?

19    A    I'd have to see what those statements were.

20        MS. O'DELL: Can I just make an objection.

21        Objection to the form to the degree it's vague

22 and it's calling her to make detailed analysis of

23 something that's not in front of her.

24        But to the degree you remember and can

25 respond, please do so.

Page 152

1        THE WITNESS: I mean, I remember wanting to go

2 through the individual studies in more detail this time,

3 but I don't remember what -- what led me to want to do

4 that. I don't remember what the report said before.

5 BY MR. HEGARTY:

6    Q    Well, with regard to the statements you made

7 in your prior reports, is there any uncertainty that you

8 would stand behind those statements still here today?

9    A    I don't know what those statements are. If --

10 if there was an error that I cited one study as showing

11 a dose report and it didn't and I corrected it in this

12 report, then I would stand by this report and

13 acknowledge I made a mistake.

14        If I said something in the prior report that

15 was important to know how I changed my view, I'd need to

16 know what it was to know how I changed it. I don't

17 remember a meaningful change in my position on dose

18 report [sic].

19    Q    The -- the Woolen 2022 paper did not look at

20 dose response, correct?

21    A    I think, taken into context, the Woolen

22 contributes a great deal to dose response. So if you --

23 if you look at the other systematic reviews, like Taher

24 and Penninkilampi that looked at any exposure, there are

25 several systematic reviews, and they have point

Page 153

1 estimates of 1.28 to 1.35 with any use, and then Woolen

2 shows multiple, and the point estimate is higher, 1.47.

3 I think that shows strong evidence of dose response even

4 though within the paper itself it didn't evaluate the

5 dose response.

6        MR. HEGARTY: The next paper I want to mark as

7 an exhibit is a paper you referenced that you had read

8 earlier or that your counsel had referenced that you

9 read earlier, a 2024 paper by Chang. This is going to

10 be marked as an exhibit.

11        MS. O'DELL: Make sure it's in your binder.

12        THE WITNESS: Is that the one?

13        MS. O'DELL: It could be. I'm not sure.

14        MR. HEGARTY: That is Exhibit, what, 13?

15        MS. FLAGEOLLET: Yeah.

16        (Exhibit 13 was marked for identification by

17        the court reporter.)

18 BY MR. HEGARTY:

19    Q    Do you have any comments with respect to this

20 paper that you would add to your November 2023 report?

21        MS. O'DELL: Object to the form in the sense

22 that she didn't comment on it in her November 2023

23 report. So you -- I'm not sure what you're asking her.

24 BY MR. HEGARTY:

25    Q    Did you understand my question?

39 (Pages 150 - 153)

Page 154

1    A   I think so.  You're wondering if I would
2 choose to highlight this paper if I were revising my
3 report now?
4    Q   Or otherwise comment on it.
5    A   Yeah.
6        I think the idea of what they wanted to
7 explore is an interesting idea, whether multiple things
8 taken together could explain associations rather than a
9 single.  I think the data they had available to work
10 with from the Sister Study was far too small of a study
11 to answer a question about 40 different exposures mixed
12 together in the sample size, and they describe in here
13 that they've looked at the amount of exposure to each of
14 these, but I know from -- from our prior correspondence
15 with Katie O'Brien that the Sister Study had no patients
16 who reported extensive talc exposure.  So I don't think
17 they had relevant data to do the analysis that they did,
18 and so I looked at the study carefully.  I don't think
19 there's anything that I would choose to enhance my
20 report with based on these results.
21    Q   Do you have any comments with respect to what
22 they reported as far as vaginal talc exposure and the
23 relative risk that they find or reported on?
24    A   They reported an elevated risk from hygiene
25 products together, and then they had, I think, three

Page 155

1 different graphs showing the breakdown by individual
2 products, and I had a very hard time telling them apart.
3        So I'd have to look at this much more
4 carefully to see if there's something in here, but they
5 showed the results so many different ways.  It didn't
6 feel consistent to me, and they didn't have frequent
7 talc exposure, because I know this population doesn't
8 have frequent --
9        So there's nothing in here that I took when I
10 read it that would change my opinions particularly,
11 but -- but I'd have to look at this paper more carefully
12 to see if there's anything particularly about talc to
13 report.
14    Q   That was going to be my next question.
15        Would you need to look at this paper more --
16 in more detail and take more time to talk about the
17 reporting of -- of its finding as it relates to talc
18 vaginal use across the various figures that they have?
19    MS. O'DELL:  Object to the form.
20    THE WITNESS:  Again, they -- they show -- I
21 quickly looked at the graphs, and some show a protective
22 effect.  Some show an increased effect.  Some show
23 counterintuitive versus underarm talc versus vaginal
24 talc.  I know they didn't have heavy uses of vaginal
25 talc, so I think they had some measurement error, but

Page 156

1 the underlying study assessed exposures in a short
2 period of time, had very few talc users, I think 14
3 percent versus 50 percent.  They had no heavy talc
4 users.
5        So I -- I question their measurement of their
6 talc in general, meaning I can't really trust their
7 graphs for telling me much.
8        And they show -- again, I looked at this
9 quickly, and I couldn't figure out what the difference
10 is between table -- Figure 4 and Figure 5 and Figure 3.
11    MR. HEGARTY:  Let's go off the record just
12 real quick.
13    (Discussion Off the Record.)
14    MR. HEGARTY:  We can go back on the record.
15    Q   Prior to today, Doctor, did you go back and
16 review your testimony from your last deposition in
17 October 2021?
18    A   I didn't.
19    Q   Prior to today, in preparation for your
20 deposition, did you go back and review your testimony
21 from the Kleiner case?
22    A   No.
23    Q   Has there been any change in your employment
24 status since October of 2021?
25    A   No.

Page 157

1    Q   Are you still working full-time?
2    A   Yes.
3    Q   Any change in the number of hours you've
4 worked per week?
5    A   No.
6    Q   Any change in the type of day-to-day work
7 activities you do?
8    A   Since 2021.
9    Q   Yes, ma'am.
10    A   I stopped doing clinical work a couple years
11 ago, and I think that was after that testimony.
12    Q   So does that mean you no longer have any
13 interaction with patients?
14    A   That's correct.
15    Q   You don't read radiology findings for any
16 patients?
17    A   That's right.
18    Q   So whatever you described previously at your
19 depositions or at trial with regard to your clinical
20 practice, you have not done that for the last two years?
21    A   That's correct.
22    Q   Why have you stopped doing that?
23    A   I stopped during COVID I think for two
24 reasons.  I -- I had done a day a week before, and I
25 took less joy in the clinical practice in the hospital

40 (Pages 154 - 157)

Page 158

1 when we had to be so gowned up that I couldn't really
2 talk to patients anymore. So that's probably the main
3 reason.
4    Q   Have you been deposed or testified in any
5 other litigation since October 2021?
6    A   No.
7    Q   To your knowledge, have you been disclosed as
8 an expert witness in any other case not involving talcum
9 powder?
10    A   No.
11    Q   -- since October 2021?
12    A   No. I mean I have not.
13        MR. HEGARTY: I'm going to mark as our next
14 exhibit Exhibit 14, the invoices we've been provided.
15        Are there two different ones?
16        MS. FLAGEOLLET: They're two pages.
17        MS. O'DELL: Do you want to mark --
18        MR. HEGARTY: How many different invoices are
19 there?
20        MS. O'DELL: Two.
21        MR. HEGARTY: Two. I want to make --
22        MS. O'DELL: To my memory, one is 2021 and one
23 is dated --
24        MR. HEGARTY: Which one --
25        MS. O'DELL: -- 2023.

Page 159

1        MR. HEGARTY: -- is this one?
2        Let's go off the record real quick just to get
3 this clarified.
4        (Discussion Off the Record.)
5        (Exhibit 14 and Exhibit 15 were marked for
6        identification by the court reporter.)
7        MR. HEGARTY: Okay. Go back on the record.
8    Q   So I'm going to hand you, Doctor, two invoices
9 we were provided in advance of today's deposition, which
10 I've marked as Exhibits 14 and 15.
11    A   Yes.
12    Q   Are these the only invoices that you've
13 created for your work in the talcum powder litigation
14 since 2021?
15    A   Yes.
16    Q   Do they reflect all of the work that you have
17 done with regard to the talcum powder litigation since
18 October 2021?
19    A   Other than work I've done in the last week or
20 two, yes.
21    Q   To be fair, the invoice we've marked as
22 Exhibit No. 15 is dated November 12th, 2023, correct?
23    A   Yes.
24    Q   Do you have any estimate of how many hours you
25 have worked that you intend to invoice since November

Page 160

1 12th, 2021 -- 23 I mean?
2    A   Probably another 15 or 20 hours.
3    Q   Outside of today?
4    A   Including today.
5    Q   So since November of -- November 12, 2023,
6 you've worked only another 15 to 20 hours on the talc
7 litigation?
8    A   Yes.
9    Q   Have you been paid for the -- the amount
10 invoiced in Exhibits 14 and 15?
11    A   Yes.
12    Q   Does invoice -- do the invoices of Exhibit --
13 strike -- strike that.
14        Do -- do Exhibit 14 to 15 show that you did
15 not do any work on the talcum powder litigation in 2022?
16    A   Yes.
17        It's possible that there was an hour or two
18 that I would not have bothered to bill until the
19 November case. So it's included in that 25 hours in
20 2022.
21    Q   What percentage of your income in 2023 was
22 from your work in the talcum powder litigation?
23    A   I wish it was an earlier question that I was
24 given.
25        Maybe 7 percent.

Page 161

1    Q   What percentage of your income in 2021, which
2 goes beyond this -- I understand this is from September
3 forward, but are you able to estimate what percentage of
4 your total income from 2021 was from your work as an
5 expert witness in the talc litigation?
6        MS. O'DELL: Object to the form.
7        Mark, did you mean to ask -- you meant to ask
8 2021?
9        MR. HEGARTY: 2021.
10        MS. O'DELL: Okay. Excuse me.
11        THE WITNESS: Probably a smaller percent
12 because I was still in the radiology department. So my
13 salary was higher. So the amount was probably a smaller
14 percent.
15 BY MR. HEGARTY:
16    Q   Since October 2021, have you worked on or
17 drafted any other publications that mention talc or
18 asbestos?
19    A   No.
20    Q   Do you have any articles that you plan to do
21 that relate to talc or asbestos?
22    A   No.
23    Q   Any planned studies?
24    A   No.
25    Q   Since October 2021, have you given any formal

41 (Pages 158 - 161)

Page 162

1 presentations or lectures where you're standing in front
2 of your peers and discussed talcum powder use in ovarian
3 cancer?
4    A    I mean, I don't think it's exactly what you're
5 asking, but I've used it as an example when I teach the
6 medical students.
7    Q    How about in a forum more like standing in
8 front of a podium?
9    A    No.
10    Q    Since October 2021, have you discussed, in any
11 setting, the opinions you have in the MDL with any of
12 your colleagues or peers besides the teaching that you
13 just mentioned?
14    A    The teaching context was to teach them how to
15 do systematic reviews and how you could use it in real
16 world.  I, on a casual level, describe these results to
17 friends and colleagues when it comes up.
18    Q    Outside of what you've already told me about,
19 since October 2021, have you discussed any of your
20 opinions in the MDL with anyone other than counsel for
21 the plaintiffs?
22    A    Again, I -- I casually discuss the results and
23 what I think are important results with friends and
24 colleagues, but not in any formal context.
25        MR. HEGARTY:  I want to mark next as an

Page 163

1 exhibit your updated reliance list that we were provided
2 today.
3        We're going to need more, if you want to print
4 out some more.
5        (Exhibit 16 was marked for identification by
6        the court reporter.)
7        MR. HEGARTY:  So I've had marked as Exhibit --
8 what is that?  Exhibit 16?
9        MS. O'DELL:  Yes.
10        MR. HEGARTY:  -- the Materials Considered list
11 we were provided with today.
12    Q    Do you see that, Doctor?
13    A    I do.
14    Q    My understanding is, from talking to counsel
15 for Plaintiffs -- that there were some additions
16 added at the end versus the version in your November
17 2023 expert report; is that correct?
18    A    Yes.
19    Q    And were these materials added something you
20 read since -- something you have read since November of
21 2023?
22    A    Some of them I've read since that time.
23    Q    Some of those added you had previously read?
24    A    Yes.
25    Q    Why were they not included, the -- with the

Page 164

1 Materials Considered list in your November 2023 report?
2        MS. O'DELL:  I think there might be some just
3 confusion, so let me just comment.  Since
4 Dr. Smith-Bindman directed us to create the list, what
5 was new and provided prior to the deposition, in keeping
6 with the court's order, was the additional materials
7 that she had read -- or we were aware she had read since
8 the report.  And so they occur at page 30 of the
9 Materials Considered list, and I believe they start at
10 528.  It could be 527, but I believe it's 528.
11        MR. HEGARTY:  Thank you.
12        The next exhibit I want to show you -- I'm
13 sorry.  I only have one copy, so you guys will need to
14 share -- is a -- is the November 15th, 2023, second
15 amended Rule 26 report of Dr. Judith -- Judith Wolf.
16        (Exhibit 17 was marked for identification by
17        the court reporter.)
18 BY MR. HEGARTY:
19    Q    Have you read Dr. Wolf's expert report that is
20 the expert report I marked as Exhibit --
21        MS. FLAGEOLLET:  Seventeen.
22 BY MR. HEGARTY:
23    Q    -- 17?
24    A    I think I may have glanced at it.
25    Q    Please look over at the Materials Considered

Page 165

1 list starting at page 26.
2    A    Yes.
3    Q    And also look at Exhibit 16, your Materials
4 Considered list, also at page 26.
5        And tell me when you're there on both
6 documents.
7    A    I'm there.
8    Q    Do you see, starting at number 441, for both
9 documents, that the listing of materials is identical?
10    A    Yes.
11    Q    Do you know how those come out to be
12 identical?
13    A    I mean, I think they're identical for the
14 whole page.
15    Q    And over the next --
16    A    Yeah.
17    Q    -- several pages?
18    A    I mean, I know that I have sent many materials
19 to the lawyers, and they have generated the Materials
20 Considered, including the materials I've sent to them,
21 as well as the ones that they have suggested that I look
22 at, and so I think they generated the same list for all
23 of their experts and provided all these materials to --
24 to all of us.  So papers that I found I suspect were
25 shared with the other experts, and -- and vice versa.

42 (Pages 162 - 165)

Page 166

1    Q    Since October of 2021, have you read --
2  reviewed any medical records for any of the MDL workup
3  plaintiffs, that is, the six workup plaintiffs?
4    A    No.
5    Q    And to be specific, since October 2021, have
6  you reviewed any medical records or other materials
7  concerning Ms. Judkins?
8    A    No.
9    Q    Have you reviewed any materials or medical
10  records concerning Ms. Bonderand [phonetic]?
11    A    No.
12    Q    Since October 2021, have you reviewed any
13  materials or medical records concerning Ms. Newsom?
14    A    No.
15    Q    Since October 2021, have you reviewed any
16  materials or medical records concerning Ms. Rausa?
17    A    No.
18    Q    Since October 2021, have you reviewed any
19  materials or medical records concerning Ms. Converse?
20    A    No.
21    Q    In terms of your preparation for today's
22  deposition, did you have a chance to meet with counsel
23  for Plaintiffs?
24    A    Yes.
25    Q    Who did you meet with?

Page 167

1    A    Margaret and Leigh.
2    Q    How many times did you meet to prepare for
3  today's deposition?
4    A    We met yesterday, and then I think we met for
5  a few hours last week to discuss what I should focus
6  my --
7    Q    How long did you --
8    A    -- review --
9    Q    -- meet -- I'm sorry to interrupt.
10    A    Yesterday we met for a half day, and last week
11  we met for a couple of hours.
12    Q    Did you review any --
13    A    By phone.
14    Q    I'm sorry.
15    A    By Zoom.
16    Q    Both were by Zoom?
17    A    No, yesterday was in person.
18    Q    Other than what we've already been -- I've
19  already asked you about, did you review any other
20  materials to prepare for today's deposition, that is,
21  things outside of what you and I have talked about over
22  the course of today?
23        MS. O'DELL:  Object to the form.
24        THE WITNESS:  Are you asking if I did any
25  other reading that I haven't highlighted?

Page 168

1  BY MR. HEGARTY:
2    Q    Or that we haven't talked about today.
3    A    I -- I spent a lot of time yesterday reading
4  about both asbestos concentration in different
5  environments on various websites:  OSHA, FDA, like that.
6    Q    Anything else that you reviewed to prepare for
7  today's deposition that we haven't touched upon or
8  talked about?
9    A    No.
10    Q    The rate that you charged in your invoice is
11  $1,000 an hour.
12        Did that rate change from October 2021?
13    A    No.
14    Q    Is that rate the same for depositions or for
15  document review or for trial testimony?
16    A    Yes.
17        MR. HEGARTY:  The next document we'll mark as
18  an exhibit is the -- is your current CV.
19        (Exhibit 18 was marked for identification by
20        the court reporter.)
21        MR. HEGARTY:  We were provided today -- we
22  were provided a couple -- a few days ago with an updated
23  version of your CV from the one that was attached to
24  your November 2023 second amended report.  This is
25  Exhibit --

Page 169

1        MS. FLAGEOLLET:  Eighteen.
2        MR. HEGARTY:  -- No. 18.
3    Q    Is Exhibit No. 18 a current copy of your
4  curriculum vitae?
5    A    Yes.
6    Q    Does it accurately -- accurately reflect your
7  medical education, training, and experience?
8    A    Yes.
9    Q    Are there any additions that -- that you need
10  to add that have come up since March 9th, 2024?
11    A    No.
12        MR. HEGARTY:  The next document that I want to
13  mark as an exhibit, which this would be Exhibit 19 --
14        MS. FLAGEOLLET:  Mm-hmm.
15        MR. HEGARTY:  -- is "PLAINTIFFS' STEERING
16  COMMITTEE'S RESPONSE AND OBJECTIONS TO THE NOTICE OF
17  ORAL DEPOSITION OF REBECCA SMITH-BINDMAN, M.D. AND DUCES
18  TECUM."
19        (Exhibit 19 was marked for identification by
20        the court reporter.)
21  BY MR. HEGARTY:
22    Q    Do you have that document in front of you?
23    A    I do.
24    Q    Let's just walk through the requests very
25  quickly.

43 (Pages 166 - 169)

Page 170

1        The first request starting on page 3 --
2    A    Sorry.  Just -- just --
3    Q    I'm sorry.
4    A    -- just to understand what this is ...
5    Q    I'm just going to ask you the question
6  separate, really, from what this document is.
7    A    Okay.
8    Q    So I'll just -- I'll just ask you the
9  question.
10   A    Okay.
11   Q    I'm just using this as a reference.
12       MS. O'DELL:  I'll just -- can I just state:
13  We objected to certain requests or responded to certain
14  requests in -- in the notice of the deposition, which
15  you've seen.
16       THE WITNESS:  Thank you.
17       MS. O'DELL:  So this is just our pleading.
18       THE WITNESS:  Thank you.
19  BY MR. HEGARTY:
20   Q    Looking at page 3, No. 1, it asks for a
21  complete and current copy of your curriculum vitae.
22       Did we just mark that as an exhibit?
23   A    Yes.
24   Q    No. 2, it asks for copies of materials related
25  to your retention or payment for services as a

Page 171

1  testifying expert in the MDL and/or the Talc Litigation
2  since the date of your last deposition in this case as
3  October 2021.
4        Do you have any such documents since October
5  of 2021?
6        MS. O'DELL:  Other than the ones that were
7  produced and marked?
8  BY MR. HEGARTY:
9    Q    Other than the ones that were produced or
10  marked?
11   A    No.
12   Q    Part B of that question asks for (as read):
13  "All documents reflecting work done, time spent, or
14  expenses incurred by You, Your organization, or anyone
15  under Your direction or control or the direction or
16  control of Your organization in connection with this MDL
17  and/or the Talc Litigation since the last date of your
18  MDL deposition, and all bills, invoices, or accounts
19  rendered to attorneys, law firms or others in connection
20  with those activities."
21       Have we marked those today of those that you
22  have prepared that fall under that description?
23       MS. O'DELL:  So again, we've objected to
24  certain portions of this request, and subject to those
25  objections, we provided the responsive documents, and

Page 172

1  those have been the documents that have been marked
2  today.
3  BY MR. HEGARTY:
4    Q    Paragraph No. 4 on page 4 asks for "All
5  records of payments of any kind received by You since
6  the date of your last MDL deposition from any
7  journalist, media outlet or other third party for
8  assistance or information related to Talc and/or Talc
9  Products."
10       Are there any such documents?
11   A    No.
12   Q    Paragraph No. 5 asks for "A copy of all
13  materials of any kind added since the date of your last
14  MDL deposition to Your complete file or files related to
15  the work done concerning this MDL or the Talc Litigation
16  more generally."
17       Are there any materials that fall under that
18  description that you have not brought with you or that
19  we have not talked about?
20   A    No.
21       MS. O'DELL:  Let me just make -- I just want
22  to qualify this.  Plaintiff steering committee's
23  response is outlined on page 6, and it includes certain
24  objections, and Dr. Smith-Bindman's Materials Considered
25  and file has been produced by email via a link to a

Page 173

1  DropBox folder.
2  BY MR. HEGARTY:
3    Q    Have you provided -- or let me start over.
4        Have you provided or brought with you today
5  any notes you have prepared as part of your work on the
6  talcum powder litigation since October 2021?
7    A    Just the ones that I shared with you.
8        MR. HEGARTY:  And we'll go and designate those
9  notes now as exhibits.  I think we're on Exhibit 19.
10  There was a -- there was a set of three pages of notes.
11       Do you want me to put that on here, Leigh?
12       MS. O'DELL:  That's fine.
13       MR. HEGARTY:  We'll mark those notes --
14       MS. O'DELL:  Is that okay with you?
15       THE WITNESS:  Yeah.  I -- I would love a copy
16  back.
17       MS. O'DELL:  Oh, of course.  You'll get it
18  back.
19       THE WITNESS:  Okay.
20  BY MR. HEGARTY:
21   Q    I've marked those three pages of notes as
22  Exhibit No. 20; is that correct?
23   A    Yep.
24       (Exhibit 20 was marked for identification by
25       the court reporter.)

44 (Pages 170 - 173)

Page 174

1    MR. HEGARTY:  We have also -- you also
2 provided to you [sic] notes in a red book that you've
3 shown me, and we're going to designate those notes that
4 were created October 2021 as it relates to your --
5 your work in the talcum powder litigation as Exhibit No.
6 21.
7        (Exhibit 21 was marked for identification by
8        the court reporter.)
9    MR. HEGARTY:  And we'll not go ahead and mark
10 those now, but we'll designate those and copy those as
11 an exhibit to the transcript.
12    MS. O'DELL:  So we'll get those scanned and
13 provide them to the court reporter.
14 BY MR. HEGARTY:
15    Q   You mentioned that you have looked at -- or
16 looked at or received additional reports from other
17 experts since your October 2021 deposition.
18        Have you had any communication with any expert
19 that you understood or understand is an expert for
20 Plaintiffs in the MDL litigation since October 2021?
21    A   I have not.
22    Q   You brought with you three notebooks, or is it
23 two notebooks?
24    A   Three.
25    Q   Three notebooks.  I will designate those

Page 175

1 notebooks as Exhibit 22.  And we'll make arrangements to
2 copy those, and those notebooks are a literature
3 notebook, a -- a report and testimony notebook.  And
4 remind me what the third notebook is.
5    A   And my -- my own depositions.
6    Q   Your own depositions.  Thank you.
7        Let's go off the record real quick.
8        (Discussion Off the Record.)
9        (Exhibit 22, Exhibit 23, and Exhibit 24 were
10        marked for identification by the court
11        reporter.)
12    MR. HEGARTY:  We can go back on the record.
13        The next documents I've marked as Exhibits
14 23 and 24 are additional documents produced since
15 October 2021.  And those are reviewer comments from the
16 Annals of Internal Medicine and then the February 15,
17 2021, letter to Dr. Woolen from Dr. Chang regarding the
18 acceptance of your paper.
19    THE WITNESS:  Yep.
20    MS. O'DELL:  Give me just a second.
21    MR. HEGARTY:  Let's go ahead and go off the
22 record.
23        (Discussion Off the Record.)
24    MR. HEGARTY:  Okay.  Let's go back on the
25 record.

Page 176

1    Q   First, looking at Exhibit 2023 -- I'm sorry --
2 Exhibit 23, these are comments you received as part of
3 the rejection by the Annals of Internal Medicine,
4 correct?
5    A   They're definitely -- they're definitely
6 comments.  I think if they were together with this
7 cover, then they're -- then they're -- then they're
8 those comments from Annals of Internal Medicine.
9    Q   This is a document you've seen before?
10    A   I've seen this document, but I've just
11 realized that -- did these two documents come together?
12    Q   No.  They are separate documents.  They are
13 not related.
14    A   Okay.  I think they are Annals of Internal
15 Medicine comments, but ...
16    Q   This was part -- this -- these were received
17 as part of the -- that journal rejecting your Woolen
18 2022 paper?
19    A   I think that's what you asked for, yes.
20    Q   And it specifically refers in this -- these
21 comments to lines -- and did you receive a lined
22 manuscript in conn- -- in addition to these comments?
23    MS. O'DELL:  Objection to the form.
24    THE WITNESS:  I don't believe I did.  I think
25 I got these comments through Dr. Woolen forwarding me

Page 177

1 the comments, but not the actual document.
2 BY MR. HEGARTY:
3    Q   Looking at the first comment, lines 132 to
4 137, second line, it says (as read):  "It's unclear
5 whether studies that examined talcum powder applications
6 from both the perineum and 'other' sites/used were
7 excluded [sic] or excluded."
8        What's the answer to that?
9    A   So in the paper, we extracted information that
10 described perineal exposure, ignoring the other site.
11 So we didn't extract information for underarm exposure,
12 but if it was any genital exposure, that's what we took,
13 ignoring the other exposures.
14    Q   The next paragraph below says (as read):
15 "They defined genital use as 'including on underwear or
16 sanitary napkins'" -- this is in reference to the
17 Schildkraut study.
18    A   Yes.
19    Q   -- "'or on birth control devices like
20 diaphragms,' which was apparently excluded from this
21 analy- -- meta-analysis."
22        Is that correct?
23    A   We excluded exposures that were only
24 diaphragmatic exposure, as opposed to if there was
25 genital exposure that also had other exposures, we kept

45 (Pages 174 - 177)

Page 178

1 them in with the understanding that there were a small
2 percent of patients who may have had just sanitary
3 napkin exposure, but if it was just diaphragm, we didn't
4 include it. If it was perineal exposure plus the
5 Schildkraut included these other exposures, they were
6 included.
7    Q    Looking at paragraph 3, lines 163 to 164, I
8 believe you answered this earlier, that the reference
9 group was nonusers of talcum powder, correct?
10    A    As line 163 to 164?
11    Q    Yes.
12    A    Yes.
13    Q    Line four -- or paragraph 4 says (as read):
14 "Since the OR and RR are equal only when there is no
15 effect, is it appropriate to combine them?"
16        Is that -- is it appropriate to combine them?
17    A    I mean, this question is: How can you compare
18 case control studies and cohort studies?
19        And yes, I think it's appropriate to combine
20 them.
21    Q    Looking at paragraph 5, it purported to
22 identify an error where the number of women reported
23 with ovarian cancer was 2,000 -- 204,377.
24        Was that correct?
25    A    They're -- they're saying that an earlier

Page 179

1 draft we listed the number of person years of follow-up,
2 which is the number of people times the number of years
3 as subjects, and that's wildly off, yes. I don't see
4 that draft in any other paper, but this was an obvious
5 error.
6    Q    Turning to the next page --
7    A    In the -- in our old draft, not in the -- not
8 in the published manuscript.
9    Q    Turn to the next page, paragraph 7, lines 260
10 to 262. It says (as read): "Differential recall by
11 cases versus controls is an important concern in
12 case-control studies."
13        Do you agree with that statement?
14    A    I think it's a -- it's an important potential
15 control -- a -- an important potential concern.
16    Q    And do you see where they raise the issue of
17 including -- or any reference -- let me start over
18 again.
19        It goes on to say (as read): "Do you have any
20 references to support your claim that recall bias is
21 unlikely to have made much of an effect on the studies
22 included in this meta-analysis?"
23        Did you put such -- any such reference in the
24 paper itself?
25    A    We did, and we explained why we didn't think

Page 180

1 it was an important bias.
2    Q    Looking down under reviewer No. 2's comments,
3 it -- in particular the paragraph that reads -- that
4 starts: "Misclassification of talc."
5    A    Yes.
6    Q    It says (as read): "Misclassification of talc
7 as an IARC Group 1 carcinogen." Then it refers to lines
8 92 and 94. It goes on to say (as read): "Talc-based
9 body power -- based body powder (perineal use of) should
10 be classified -- should be correctly classified as
11 'possibly carcinogenic to humans (carcinogen group 2B)',
12 as per -- per IARC."
13        Is that correct?
14    A    That's a very incorrect statement, but one
15 that others have shared. IARC considers talc-based
16 products that have asbestiform talc as being a group 1
17 carcinogen.
18    Q    The next line reads: "According to the IARC
19 asbestos and talc containing asbestiform fibers are
20 classified as group 1 carcinogens, but perineal --
21 perineal use of talc-based" body "powder is not."
22        Do you agree with that statement?
23    A    I strongly disagree with that statement.
24    Q    For reasons you've told me about already?
25    A    Yes.

Page 181

1    Q    The next paragraph says: "In the Results and
2 Discussion, an explanation for the exclusion of duration
3 and cumulative talc exposure should be included."
4        Did you provide an explanation in your Woolen
5 2022 paper?
6    A    We did not. This is saying you should have
7 done a different topic, and that's not something usually
8 included in a paper that -- why we chose not to do a
9 different topic.
10    Q    The next paragraph says that at least the
11 draft they read states (as read): "Recall bias on these
12 studies is unlikely to be meaningful given publicity
13 related to talc did not exist at the time these studies
14 was completed."
15        Recall bias is not dependent upon publicity of
16 an exposure versus an outcome, correct?
17    A    I would disagree with that. There's -- you
18 only misremember something if you think it's important.
19 So you misremember your smoking if you have lung cancer
20 because you know how important it is. But there's no
21 reason to misremember something that has no material
22 difference. So I think it's -- I think the publicity
23 would be a potential reason to misremember, where you
24 know that's supposed to be harmful, and so you are more
25 likely to remember that if you have the disease.

46 (Pages 178 - 181)

Page 182

1  Q   Asking in a different way, though:  Recall
2 bias isn't just exclusive to those exposures that have
3 been publicized, correct?
4  A   I think the issue with recall bias is a
5 differential remembering between cases and not cases.
6      So if you're saying that everyone misremembers
7 all the time, that is true.  But if it's a differential
8 misremembering, that's important to the study, and so
9 the differential misremembering would be related to an
10 exposure or a beneficial exposure that you want to
11 remember.  Like mammography, if you have breast cancer,
12 there's very differential remembering because women
13 attribute a -- a importance to that.  If there's nothing
14 important about it, then there's misremembering equally
15 in the cases and control.
16  Q   Did you make any revisions to your manuscript
17 based on the reviewer comments that we marked as Exhibit
18 23?
19  A   Extensively.
20  Q   Looking at Exhibit No. 24 --
21  A   Twenty-four.
22  Q   -- that is the acceptance of your paper.
23      Did you subsequently receive galley sheets?
24      There's also a reference to -- in the second
25 paragraph of the email, to receiving a line numbered

Page 183

1 version of your manuscript attached thereto.
2      Do you have any of those kinds of documents?
3  A   No, this -- I forwarded this.  This was from
4 Dr. Woolen, so he would have those.
5  Q   Thank you.
6      MS. O'DELL:  And this was Exhibit -- what
7 number was the exhibit?  Because --
8      THE WITNESS:  Actually, it's not numbered.
9      MR. HEGARTY:  I thought it was -- I thought we
10 put 24 on it.
11      THE WITNESS:  I think I have this, but I don't
12 have a number on it.
13      MR. HEGARTY:  I think, yeah, the exhibit
14 number is there.
15      THE WITNESS:  Did I lose the exhibit number?
16      MS. FLAGEOLLET:  It should be 24.
17      THE WITNESS:  Oh, there it is.  I'm sorry.
18      MS. O'DELL:  Actually, Exhibit 24 is a
19 February 15th, 2021, email.
20      MR. HEGARTY:  Right.  That's what I was
21 talking about.  And 23 was the Annals of Internal
22 Medicine comments.
23      MS. O'DELL:  Okay.  So you have not marked
24 that?  Okay.  Excuse me.
25      MR. HEGARTY:  Which one have I not marked?

Page 184

1      Yeah, that should be 24, and this is 23.
2      Which -- which one have I not marked?
3      THE WITNESS:  I was responding to a different
4 one.
5      MR. HEGARTY:  Oh, let me see that.
6      Okay.  Let's go ahead and mark this one as the
7 next exhibit, Exhibit 25.
8      (Exhibit 25 was marked for identification by
9       the court reporter.)
10 BY MR. HEGARTY:
11  Q   Can you tell me what Exhibit 25 is?
12  A   Twenty-five is what you were just asking
13 about.  That's the acceptance.
14  Q   But in terms of the Exhibit 24, there is a
15 reference in it to saying a copy of the line-numbered
16 version of the manuscript is attached hereto, and that's
17 what I asked you about before.
18  A   Okay.
19  Q   Did you ever receive that?
20  A   I did not.
21  Q   Did you ever see any galley sheets?
22  A   No.
23  Q   Can I have that one back real quick?
24  A   Yeah, this one is marked 25.
25      MR. HEGARTY:  Let's go ahead and go off the

Page 185

1 record.
2      (Discussion Off the Record.)
3      MR. HEGARTY:  Okay.  We are back on the
4 record.
5      I want to start by looking back at Exhibit No.
6 24.  I think I misidentified what that was based on my
7 questions.
8  Q   Exhibit 24 is a copy of an email to Dr. Woolen
9 from Ms. Chang where the Annals of Internal Medicine are
10 rejecting publication of the -- what became the Woolen
11 2022 paper, correct?
12  A   Mm-hmm.
13  Q   "Yes"?
14  A   Yes.
15  Q   And this is the email that forwarded the
16 reviewer comments that we talked about earlier, correct?
17  A   Yes.
18  Q   Did you consider resubmitting your paper to
19 the Annals of Internal Medicine after the revisions --
20 after revisions were made?
21  A   As opposed to taking their referral?
22  Q   Yes.
23  A   Again, I'm -- I'm trying to remember what
24 happened, but in general, this letter doesn't say they
25 didn't take it because of the flaws.  They didn't take

Page 186

1 it because it's less likely to influence clinical
2 practice, and so that letter wouldn't suggest that
3 fixing whatever flaws they identified would lead to it
4 having a better chance to change practice, so I --
5 reading this letter, we would not have resubmitted it.
6    Q   Okay. Thank you.
7        Since October of 2021, your last deposition,
8 have you told any patient of yours that -- with ovarian
9 cancer that it was caused by use of talcum powder?
10   A   No.
11   Q   Since October of 2021, have you determined
12 that any patient's ovarian cancer was caused by either
13 use of talcum powder or exposure to asbestos?
14   A   No.
15   Q   Since October of 2021, have you told anyone to
16 stop using talcum powder?
17   A   Yes.
18   Q   Who have you told?
19   A   I tell friends all the time not to use talcum
20 powder, particularly friends who have grandchildren.
21   Q   Since October of 2021, have you communicated
22 with any scientific or medical organization with regard
23 to your opinions in this litigation?
24   A   I have not.
25   Q   In particular, have you communicated with FDA

Page 187

1 or any other regulatory authority since October of 2021?
2    A   I have not.
3    Q   Have you communicated with any medical society
4 or organization about your opinions in this case since
5 October of 2021?
6    A   I have not.
7    Q   Since October of 2021, have you become aware
8 of any US scientific or medical group, entity,
9 organization who has made the statement that talc use
10 can cause ovarian cancer?
11   MS. O'DELL: Object to the form. Vague.
12   THE WITNESS: So you're excluding the
13 Canadian --
14   MR. HEGARTY: Correct.
15   THE WITNESS: -- report?
16 BY MR. HEGARTY:
17   Q   I'm talking exclusively as to the United
18 States.
19   A   The NCI has a statement, I believe, on talcum
20 powder and ovarian cancer.
21   Q   My question was specifically whether -- that
22 you're aware of any US scientific or medical group has
23 made the statement that talcum powder use can cause
24 ovarian cancer.
25   A   I believe the NCI has made that statement.

Page 188

1    Q   Where has the NCI made that statement?
2    A   I can see if I can find it for you, but they
3 have a statement online that I think describes that.
4    Q   A statement online under what section of the
5 website or what part of the website?
6    A   I -- I can't remember exactly where I would
7 have found that.
8    Q   You said you could find it for me.
9        What would you [sic] take to find it?
10   A   I can look in my documents.
11   MR. HEGARTY: Okay. Let's go ahead and go off
12 the record.
13   (Discussion Off the Record.)
14   MR. HEGARTY: Okay. We can go back on the
15 record.
16       We took a short break for Dr. Smith-Bindman to
17 find the statement she was thinking about as it relates
18 to NCI and whether talcum powder use can cause ovarian
19 cancer.
20   Q   In looking at your materials, what did you
21 find, Dr. Smith-Bindman?
22   A   It said asbestos causes ovarian cancer.
23   Q   Going back to my question:  Are you aware of
24 any scientific or medical group in the United States,
25 since your last deposition, who has made the statement

Page 189

1 that talc use can cause ovarian cancer?
2    A   No.
3    Q   Are you aware of anyone as of today, March 20,
4 2024, outside of witnesses hired by the plaintiffs in
5 this litigation, who has stated that talc use can cause
6 ovarian cancer?
7    A   I'm not sure I -- is that also in the United
8 States?
9    Q   No, it's worldwide.
10   A   So, I mean, I think IARC states that the use
11 of talcum powder can cause ovarian cancer.
12   Q   How about we limit it to an individual, not an
13 entity?
14   A   I think a lot of the mechanistic studies that
15 are shown on a cellular level get changes suggest that
16 talcum powder can cause ovarian cancer and this is a
17 mechanism by doing so.
18   Q   My question, though, is:  As to individuals
19 who have made statements, are you aware of any
20 individuals who have made statements outside of experts
21 for Plaintiffs in this litigation?
22   A   And outside of publications?
23   Q   Outside of publications.
24   A   So public statements.
25       No, I don't -- I'm not sure of something that

48 (Pages 186 - 189)

Page 190

1  comes to mind.
2    Q   Since your last deposition, have you reviewed
3  any documents produced by Johnson & Johnson that you had
4  not had before?  In other words, did you get any new
5  documents that you understood came from Johnson &
6  Johnson since your October 2021 deposition?
7    A   No.
8    Q   Are there any other materials that you intend
9  to reference as part of your opinions in this case that
10  are not contained in your amended report of November
11  2023 or that we have talked about here today?
12        In other words, sitting here today, do you
13  know of other documents that you do intend to reference
14  that are not disclosed in the materials we've looked at
15  or talked about today?
16    A   I -- I mentioned earlier that I had been doing
17  some reading on OSHA and other websites about the
18  concentration of asbestos in different exposure
19  environments, and those references are on my disclosed
20  list of references, but it's not something that I've
21  discussed a lot in the report.
22    Q   Anything else that you might -- that you think
23  you might reference that we have not talked about or
24  looked at here today?
25    A   No.

Page 191

1    Q   Does -- do you intend to have -- or let me
2  start over again.
3        Does your current report need to be revised in
4  any way to accurately -- to accurately reflect your
5  opinions in this case?
6    A   No.
7    Q   You make reference in your report to an [sic]
8  2023 study by O'Brien called "Douching and Genital Talc
9  Use:  Patterns of Use and Reliability of Self-reported
10  Exposure."
11        Do you recall that study?
12    A   I do.
13    Q   Do you have --
14    A   I do.
15        MR. HEGARTY:  I'm going to mark that as our
16  next exhibit.
17        (Exhibit 26 was marked for identification by
18        the court reporter.)
19        MS. O'DELL:  Thank you.
20        THE WITNESS:  I do.
21  BY MR. HEGARTY:
22    Q   This study shows that the response of the
23  women's study differed between the two time periods they
24  looked at, correct?
25    A   My recollection is the opposite -- was the

Page 192

1  conclusion was the opposite.
2    Q   Well, if you look over at page 379, the
3  right-hand column, first paragraph, it says (as read):
4  "Recall of genital talc use was slightly less
5  consistent, with 87% of women providing the same
6  response as [sic] follow-up as they did at enrollment."
7        Do you see that?
8    A   We're disagreeing whether that's good
9  agreement or not good agreement.  So 87 percent's pretty
10  good agreement.
11    Q   If --
12    A   It's not a hundred percent, but it's a very
13  high number.
14    Q   Can a 13 percent difference in recollection in
15  -- in a case control study have an effect on the
16  results?
17    A   Probably a small effect, yes, but not a big
18  effect.  It's mostly what you're looking at agreement --
19  something like a CAPA statistic is how much agreement is
20  there beyond chance alone.  This kind of number is in
21  the outstanding category.  This is very high agreement.
22    Q   Look back at the first page under the abstract
23  section.  In the "Results" section, isn't that saying
24  that, upon initial reporting, that 27 percent of women
25  reported ever using genital talc; on the follow-up

Page 193

1  questionnaire, 32 percent reported ever using genital
2  talc, correct?
3    A   Mm-hmm.
4    Q   "Yes"?
5    A   Yes.
6    Q   So the number went from 27 to 32 percent,
7  correct?
8    A   Yes.
9    Q   And, again, going back to my last question, is
10  that not a difference that could have an impact on study
11  results?
12        MS. O'DELL:  Object to the form.
13        THE WITNESS:  That's -- that's a small
14  difference, and so yes, it can have effect, but not a --
15  not a big effect.  This is -- are predicter variables in
16  science?  We hope for this one.  So this is a very good
17  result.  There's a -- there's a difference between 37 --
18  27 and 32.5 percent have any impact?  It does, but it's
19  small.  So if you put a confidence interval around those
20  numbers, they would overlap.
21  BY MR. HEGARTY:
22    Q   Please turn over to page 383 of this study.
23  Right-hand column at the top, the carryover paragraph,
24  the last sentence reads:  "The observed increase in
25  self-" --

49 (Pages 190 - 193)

Page 194

1    A   Wait. Wait. Wait. The carryover.
2    Q   The carryover paragraph.
3    A   Top right?
4    Q   In the top right corner on page 383.
5        Are you there with me?
6    A   I am.
7    Q   Right up here (indicating).
8    A   "However, it is unclear"? That sentence?
9    Q   Well, I'm not at the sentence yet. I want to
10 make sure we're -- you're focusing on the --
11   A   They're not systematically different.
12   Q   Okay. The sentence reads: "The observed
13 increase" --
14       Do you see where I'm reading?
15   A   Yes. Next sentence, yeah.
16   Q   (As read): "The observed increase in
17 self-reported genital talc use and follow-up" -- which
18 is just what we talked about -- "relative to enrollment
19 among ovarian cancer survivors may indicate recall bias
20 is present and potentially driving some of the
21 previously observed differences in effect estimates
22 between" the "studies collecting genital powder exposure
23 status retrospectively versus prospectively."
24       Did I read that correctly?
25   A   You did.

Page 195

1    Q   Do you agree with that statement?
2    A   I would not agree that -- that -- they're
3 making a very large conclusion about a small difference.
4    Q   Do you actually -- is it -- strike that.
5        Is it your opinion that this paper actually
6 supports your opinions in this case?
7    A   I do.
8    Q   And how does it support your opinions in this
9 case?
10   A   It suggests that there's consistency in
11 reporting of talc use. Even though it's an imperfect
12 agreement, which is what you're pointing out, it's very
13 good agreement.
14   Q   You can set that aside.
15       If you could take -- find your Woolen paper,
16 which I think is Exhibit 1 or 2.
17       Do you know what exhibit the Woolen paper is?
18   MS. O'DELL: I don't. She has her version in
19 front of her.
20   THE WITNESS: Yes.
21   MS. FLAGEOLLET: Three.
22 BY MR. HEGARTY:
23   Q   Turn over to the page that has "Strengths and
24 Limitations." It's --
25   A   Yep. I'm there.

Page 196

1    Q   You make reference in the left-hand column to
2 the -- O'Brien's reporting of women with patent tube
3 [sic] versus unpatent tubes.
4        Do you see that in the --
5    A   In the "Strengths and Limitations"?
6    Q   No, in the section on the other side that
7 begins "The pooled odd [sic] ratio."
8    A   Yes.
9    Q   And there --
10   A   Yes.
11   Q   -- you refer to the differences between the
12 patent and the nonpatent findings, correct?
13   A   Yes.
14   Q   You've seen, before, an editorial by Gossett
15 as it relates to this article, correct?
16   A   Yes.
17       MR. HEGARTY: I'm going to show you that
18 editorial that I'll mark as Exhibit 27.
19       (Exhibit 27 was marked for identification by
20       the court reporter.)
21   MS. O'DELL: Yeah, this has been marked
22 before, Mark.
23       MR. HEGARTY: Oh, I understand, but this is
24 now in reference to the statements made in this article.
25       MS. O'DELL: But you're going to ask her about

Page 197

1 this article.
2        MR. HEGARTY: Well, I'm just going to ask
3 her -- you probably want me to use my time on something
4 that's already been covered, so you should be happy with
5 it.
6    Q   If you turn over to the second page, the
7 left-hand column --
8    MS. O'DELL: You got four minutes, so knock
9 yourself out.
10   MR. HEGARTY: I'm not sure about that part.
11 I've got -- I think I've got about six, but --
12   Q   Dr. Gossett -- by the way, do you know her?
13   A   I do know her.
14   Q   She makes a statement, in essence, that
15 because there's -- that the P value for heterogeneity
16 comparing these groups is 1.5. Statistically, they're
17 no different.
18       Isn't that what she's saying in this
19 editorial?
20   MS. O'DELL: Are you -- are you pointing her
21 to a specific page?
22   MR. HEGARTY: Yeah, I'm pointing her to the
23 second page over in the left-hand column, the line that
24 reads (as read): "The fact that there are no
25 significant differences in the HRs in the patent and

50 (Pages 194 - 197)

Page 198

1 nonpatent subgroups (P value for heterogeneity comparing
2 these subgroups at .15)."
3    Q   Do you see where I'm reading?
4    A   I do.
5    Q   Isn't she saying that, statistically, the two
6 groups are not different?
7    A   I -- we haven't discussed this editorial in
8 great length, but it's a very poorly written, poorly
9 thought through -- this statement is consistently very
10 poorly written and poorly thought through.
11       So you don't use P values for tests of
12 heterogeneity with the power you would expect a primary
13 test to be.  So I completely disagree with the
14 conclusion she makes.  But a P value for a test of
15 heterogeneity of .15 is a significant difference.  It's
16 very difficult to get low values for tests of
17 heterogeneity.  They're very weak statistically.  So
18 those two numbers are quite different.  They have
19 different overlapping -- nonoverlapping confidence
20 intervals.  Those are very different, and a P value of
21 .15 for a test of heterogeneity, to me, suggests, oh,
22 yeah, those are -- that's a big -- those are big
23 differences.
24    Q   But ultimately, I guess, going back to my
25 question, is not what she -- she's arguing -- let me

Page 199

1 start over again.
2       Is what she's arguing there is that
3 statistically there are no differences between the two
4 groups?
5    A   She is arguing that, and she's mistaken.
6    Q   How is she mistaken?
7    A   The point estimates are -- are very different
8 between those groups.  One has a value of 1 -- .99 is
9 basically 1 -- with sort of symmetry on both sides of
10 the 1: .86 to 1.15.  That's a very different number
11 than 1.13 versus 1.01 to 1.26.  Those numbers are very
12 different.  In one group, there's a 15 percent increase
13 in risk, and the other there's no relationship.  Those
14 are, in my mind, statistically different, and a
15 heterogeneity test of .15 could add extra weight to
16 that.
17    Q   Have you communicated -- or let me back up.
18       You have not, since October of 2021, written
19 anything with regard to the O'Brien 2020 study beyond
20 what you've done in this litigation --
21    A   There were a lot of letters.
22    Q   -- and --
23    A   There were a lot of letters written about
24 this.  So -- so the issues -- the important issues about
25 the O'Brien and this editorial were raised.

Page 200

1    Q   The only comments you have made about O'Brien
2 have been in your reports and in the Woolen study in a
3 written --
4    A   Correct.
5    Q   -- form, correct?
6    A   Correct.
7       Yes.  That's correct.
8    Q   With regard to the cellular studies we talked
9 about right at the very beginning -- or right at the
10 very beginning of the deposition, as referenced in your
11 report, have we talked about the cell study -- the new
12 cell studies you reviewed --
13    A   Yes.
14    Q   -- since October of 2021?
15    A   Yes.
16    Q   There's another article you referenced in your
17 most recent report by Slomovitz as it relates to
18 asbestos and ovarian cancer.
19       Is that an article you've read?
20    A   I have skimmed it.
21    Q   Do you intend to have any comment about it if
22 you testify in this litigation?
23       MS. O'DELL:  Object to the form.
24 BY MR. HEGARTY:
25    Q   Do you have any plans to comment, as part of

Page 201

1 your opinions in this case, about Slomovitz 2021?
2    A   I would answer questions to it, but it doesn't
3 weigh heavily in my opinions, so I would not.
4    Q   You don't intend to affirmatively talk about
5 it as part of your opinions based on -- based on -- let
6 me start over again.
7       Is it your intention to affirmatively, that
8 is, to talk about it outside of cross-examination,
9 during your examination in this case?  That's a bad
10 question.  Let me start over again.
11       Do you intend to rely -- do you rely in any
12 way on the Slomovitz 2021 article for your opinions in
13 this case?
14    A   I do not.
15    Q   You made a -- added a reference in your report
16 to Sochin [phonetic] 2004 --
17       MS. O'DELL:  Hey, Mark, I hate to be the
18 timekeeper, but I think you are a little over.
19 Catherine's the official clock --
20       MR. HEGARTY:  Yeah.
21       MS. O'DELL:  -- but we started at 1:48.
22       MR. HEGARTY:  Okay.  Let's go ahead and go off
23 the record.
24       (Discussion Off the Record.)
25       MR. HEGARTY:  Let's go back on the record.  I

51 (Pages 198 - 201)

Page 202

1 understand that I've got -- I've reached my four hours.
2        So, Doctor Smith-Bindman, thank you. I
3 appreciate your attention and responsiveness today.
4 I have no further questions for today.
5        MS. O'DELL: Dr. Smith-Bindman, I have a
6 couple of follow-up questions, and I'll try to get
7 myself organized so we can do this efficiently.
8        I want to make sure you have your report in
9 front of you, so I'll grab --
10       THE WITNESS: I think I refiled it.
11       MS. O'DELL: You refiled it.
12       THE WITNESS: Yeah.
13       MS. O'DELL: Okay. So I'm going to pull that
14 back out.
15       MR. HEGARTY: Just a second. We want to make
16 sure I get a copy of the 2023 report, because I kept
17 seeing the 2021, and my copies are a redlined version.
18       THE WITNESS: I don't have a redline version.
19       MR. HEGARTY: No, I did not mark a redline
20 version, but I want to get a copy of it. I know I have
21 copies here somewhere.
22       (Discussion Off the Record.)
23               EXAMINATION
24 BY MS. O'DELL:
25    Q    So, Dr. Smith-Bindman, I want to direct your

Page 203

1 attention to -- to your report, and you were asked a
2 series of questions about -- on page 11 regarding your
3 section on asbestos, and you were asked specifically
4 about references that you had included in connection
5 with the sentence reading: "While the talcum powder
6 products have long been believed to be free from
7 asbestos based on the voluntary guideline, this is
8 absolutely incorrect; talcum powder products have never
9 been free of asbestos."
10       First, let me ask: Do you stand by that
11 statement?
12    A    Yes.
13    Q    And when writing that statement, was it your
14 intention to -- when you said "talcum powder products,"
15 to be referring to Johnson's Baby Powder and Shower to
16 Shower, the -- the products at issue in this case?
17    A    Yes.
18    Q    And I'll ask if you'll turn to page 14 of your
19 report. And at the top of the page, you refer to the
20 Mandarino paper --
21    A    Yes.
22    Q    -- is that right?
23    A    Yes.
24    Q    And I have it in front of you as well as
25 Exhibit -- it was marked as Exhibit 8.

Page 204

1    A    Yes.
2    Q    And would ask if you would please turn to page
3 10 of the Mandarino paper. And it's at -- at the
4 left-hand side of the -- at the top of the page, and a
5 number of sentences were read to you by counsel for
6 Johnson & Johnson, including the sentence: "Further
7 research is needed to determine whether and to what
8 extent the effect of talc on phagocytes exist in vivo,
9 particularly in humans; these studies were beyond the
10 scope of the project."
11       He also read: "We did not investigate whether
12 the inhibited tumori-" --
13    A    Tumoricidal.
14    Q    Thank you.
15       -- "tumoricidal activity we discovered could
16 entail an increased likelihood of tumor growth."
17       You recall him reading that?
18    A    I do.
19    Q    Does the paragraph go on to say: "However, we
20 believe our findings can help reconcile the presumed
21 innocuous nature of talc with epidemiologic data on talc
22 powder use in OC" or ovarian cancer "risk by suggesting
23 that the effect can be mediated by the macrophages"?
24    A    Yes.
25    Q    And is that consistent with your opinion in

Page 205

1 this case?
2    A    Yes, it is.
3    Q    And you rely on that in reaching your
4 opinions?
5    A    Yes, I do.
6    Q    And it goes on further in the next paragraph.
7 You were asked a number of questions about titanium
8 dioxide as the control that was used. And if you'll
9 look, the study reads (as read): "Control particles,
10 paren, titanium dioxide, concentrated urban air
11 particulates or diesel exhaust particles did not have
12 the effect -- i.e. did not have the effect" --
13    A    Right.
14    Q    -- "as talc"; is that correct?
15    A    That's --
16       MR. HEGARTY: Objection to the form.
17       THE WITNESS: -- correct.
18 BY MS. O'DELL:
19    Q    "Exposure" -- it goes on to state (as read):
20 "Exposure of the macrophages to talc and especially
21 co-exposure to talc and estradiol has led to increased
22 production of reactive oxygen species and changes in
23 expression of macrophage gene -- genes pertinent in
24 cancer development and immunosurveillance."
25       Did I read that correctly?

52 (Pages 202 - 205)

Page 206

1    A    Yes, you did.
2    Q    And, in fact, is that what you include in your
3 report?
4    A    Yes.
5    Q    And you were asked a number of questions about
6 this cell study, the Mandarino study, as well as Emi and
7 others.
8        As you've reviewed these cell studies that
9 have considered the effect of talc on different cells
10 and different cell lines, has the data been
11 consistent -- generally consistent across studies?
12    A    Yeah.
13        MR. HEGARTY:  Objection to the form.
14        THE WITNESS:  Yes, it has.
15 BY MS. O'DELL:
16    Q    I want to ask you to recall the series of
17 questions that were posed by counsel regarding testing
18 of talcum powder products in 2022.
19    A    Yes.
20    Q    Do you recall that?
21    A    I do.
22    Q    And maybe 2021 as -- as well.
23        If -- if -- do you have any understanding of
24 whether those tests included Johnson's Baby Powder?
25    A    I believe I was asked about tests that were

Page 207

1 more cosmetic in general that could have talcum powder
2 rather than the specific testing that I think I was
3 referring to, which is from a decade earlier.
4    Q    And if the testing that was done in 2022 by
5 the FDA was testing of cosmetics like eye shadow and
6 other cosmetics not including Johnson's Baby Powder or
7 Shower to Shower, would that have limited relevance to
8 your opinions in this case?
9        MR. HEGARTY:  Objection to the form.
10        THE WITNESS:  It's unrelated to the case.
11 BY MS. O'DELL:
12    Q    Let me ask if you would take out your paper --
13 the Woolen paper, which was previously marked, I
14 believe, as Exhibit 3.  And -- and then, also, we -- in
15 relation -- so you can compare them, we had a discussion
16 about the Harlow 1992 paper.
17        Do you recall that?
18    A    I do.
19    Q    And -- and to my memory, the Harlow paper was
20 not marked; you just referred to it.
21    A    Yes.
22    Q    And so if you'll turn in the Woolen paper,
23 Exhibit 3, to Table 2.
24        MR. HEGARTY:  Can you give me just a second,
25 Leigh?  I don't need to go off the record.  I just need

Page 208

1 to find my copy of it.  For some reason, it's hiding
2 from me.  Okay.  I found it.  Go ahead.
3 BY MS. O'DELL:
4    Q    And -- and you were --
5        MR. HEGARTY:  What page again?  I'm sorry.
6        MS. O'DELL:  We were -- in Woolen, we were on
7 Table 2.
8        MR. HEGARTY:  Okay.  Thank you.
9 BY MS. O'DELL:
10    Q    And specifically, I want to direct your
11 attention to line 5 --
12    A    Yes.
13    Q    -- and -- which is the Harlow 1992 --
14    A    Yes.
15    Q    -- paper.
16        And you were asked a series of questions about
17 the data that was extracted from the Harlow paper, and,
18 if I recall, you, in response to questions, told counsel
19 that the data that was extracted was from Harlow Table
20 2.
21        MR. HEGARTY:  Object to form.
22        THE WITNESS:  Yes.
23 BY MS. O'DELL:
24    Q    And -- and -- and so, Doctor, I want to just
25 ask you, first:  Was the data that was included in the

Page 209

1 Woolen study from the Harlow paper correct?
2    A    Yes, it was.
3    Q    And was the data that was extracted from the
4 Harlow paper that was included to generate the point
5 estimate that you report in the paper -- was that
6 accurate?
7    A    Yes --
8        MR. HEGARTY:  Objection.
9        THE WITNESS:  -- that's correct.
10 BY MS. O'DELL:
11    Q    And you -- you mentioned that, you know, it's
12 referred to in Table 2 of Woolen the Harlow
13 specification of talc exposure use is -- is referenced
14 as greater-than-10,000-lifetime applications.
15    A    It does say that in the table.
16    Q    And -- and is that some- -- is that something
17 you would change or leave as-is?
18        MR. HEGARTY:  Objection to the form.
19        THE WITNESS:  The data that were extracted
20 from the paper reflect greater-than-30-times-a-week
21 exposure, and it's characterized as
22 greater-than-10,000-lifetime exposures, but I'd prefer
23 it said greater than 30 times per month because that's
24 what we actually extracted, but the description of it is
25 -- is inaccurate.  The abstracted data is completely

53 (Pages 206 - 209)

Page 210

1 accurate.
2 BY MS. O'DELL:
3     Q    And do you stand by the -- a hundred percent
4 the results that are reported in the Woolen paper?
5     A    Absolutely.
6         Can I just add:  The point estimates are the
7 same for greater-than-10,000 exposures or greater than
8 30 times a month, and so when we were checking the
9 numbers, I think it was an oversight that we described
10 it as greater than 10,000 when, in fact, it was the
11 exact number greater than 30 times per month.
12     Q    And when you said --
13         THE REPORTER:  I'm sorry.  You trailed off.
14         THE WITNESS:  The numbers that were extracted
15 are correct.  The point estimate is the same for greater
16 than 10,000 or greater than 30 times per month, and the
17 description in Table 2 says greater-than-10,000-lifetime
18 exposures, but, indeed, reflects greater than 30 times
19 per month.  You get the same point estimate, but the
20 data we abstracted were greater than 30 times per month.
21 BY MS. O'DELL:
22     Q    You were asked a number of -- still on Woolen.
23 You were asked a number of studies -- "studies."  Excuse
24 me -- a number of questions about the studies that
25 adjusted for patent versus nonpatent --

Page 211

1     A    Yes.
2     Q    -- but didn't report separate data for both
3 patent and women with nonpatent --
4     A    Yes.
5     Q    -- tubes.
6         And if, in fact, some of the women that were
7 included in the study -- studies had had hysterectomy or
8 had had tubagulation, cutting off the flow or exposure
9 of talcum powder applied perineally to the ovaries,
10 would that, in fact, have depressed the point estimate
11 for those individual studies?
12         MR. HEGARTY:  Objection to the form.
13         THE WITNESS:  The point estimates would be
14 even higher and further from the null if they were
15 limited to women who had patent tubes.
16 BY MS. O'DELL:
17     Q    And so to the degree that counsel for Johnson
18 & Johnson has tried to draw a distinction, is that a
19 distinction, in your mind, that's meaningful?
20         MR. HEGARTY:  Objection to the form.
21         THE WITNESS:  I think had we had data to limit
22 to women with open tubes based on the study results that
23 almost uniformly showed the results were higher, there
24 was a greater chance of cancer in women who had open
25 tubes.  Had we been able to extract that data from each

Page 212

1 study, the point estimate would clearly be higher than
2 we found.
3         MS. O'DELL:  I have nothing further.  Thank
4 you, Doctor.
5         I should ask --
6         MR. HEGARTY:  Thank you.  I'll just state on
7 the record:  We have some materials that need to be
8 copied and then provided as exhibits.  That would
9 include the notebook pages, the three pages of notes,
10 and then the notebooks we marked.
11         Leigh, will you take possession of those and
12 make those copies, or do you want to do it in a
13 different way?
14         MS. O'DELL:  I would like to talk to
15 Catherine, our court reporter, about taking possession
16 of the notebooks that will stay here in -- in San
17 Francisco.  I'll take possession of the notes and make
18 sure they're scanned and provided and, of course,
19 returned to you, Dr. Smith-Bindman, but I will take
20 possession of those.
21         MR. HEGARTY:  So you'll make arrangements with
22 the court reporter on how to get the notebooks copied
23 and --
24         THE WITNESS:  The notebooks will stay with the
25 court reporter?

Page 213

1         MR. HEGARTY:  -- included within the -- to the
2 exhibits -- included as an exhibit and then provided to
3 the parties?
4         MS. O'DELL:  Yes.
5         MR. HEGARTY:  Okay.
6         MS. O'DELL:  Yes.  I think -- I guess I want
7 to be clear:  I'm taking responsibility for the notes
8 because some of the notes in Dr. Smith-Bindman's
9 notebooks were not related to talc.  So I want to
10 oversee that process, but we're going to provide the
11 notebooks --
12         MR. HEGARTY:  Okay.
13         MS. O'DELL:  -- to Golkow and the court
14 reporting service and let them handle --
15         MR. HEGARTY:  Okay.
16         MS. O'DELL:  -- all of the details on that.
17         Thank you very much.
18         MR. HEGARTY:  All right.  I don't think I have
19 anything else.  Thank you.
20         MS. O'DELL:  We're off the record.
21         (TIME NOTED:  2:25 p.m.)
22
23
24
25

54 (Pages 210 - 213)

Page 214

1        I, REBECCA SMITH-BINDMAN, M.D., do hereby
2 declare under penalty of perjury that I have read the
3 foregoing transcript; that I have made any corrections
4 as appear noted, in ink, initialed by me, or attached
5 hereto; that my testimony as contained herein, as
6 corrected, is true and correct.
7        EXECUTED this _____ day of _____,
8 2024, at _____, _____.
         (City)              (State)
9
10       _____
         REBECCA SMITH-BINDMAN, M.D.
11               VOLUME I
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 215

1        I, the undersigned, a Certified Shorthand Reporter
2 of the State of California, do hereby certify:
3        That the foregoing proceedings were taken before
4 me at the time and place herein set forth; that any
5 witnesses in the foregoing proceedings, prior to
6 testifying, were administered an oath; that a record of
7 the proceedings was made by me using machine shorthand
8 which was thereafter transcribed under my direction;
9 that the foregoing is a true record of the testimony
10 given.
11       Further, that if the foregoing pertains to the
12 original transcript of a deposition in a Federal Case,
13 before completion of the proceedings, review of the
14 transcript [ X ] was [  ] was not requested.
15       I further certify that I am neither
16 financially interested in the action nor a relative or
17 employee of any attorney or any party to this action.
18       IN WITNESS WHEREOF, I have this date subscribed my
19 name.
20 Dated:   04/03/2024
21
22       *Catherine A. Nolasco*
         Catherine A. Nolasco, RMR, CRR, BS
23       CSR No. 8239
24
25

55 (Pages 214 - 215)

**[& - 1nd]**                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  1:5 2:5 3:17 3:24 6:3,20 10:15,17 93:18 97:24 98:1,13 98:13 99:1 190:3,5 204:6 211:18 | **1.15.**  199:10 **1.19**  27:18 **1.22**  144:23 145:2 **1.23**  27:22 **1.23.**  27:13 **1.24**  73:25 **1.26.**  199:11 **1.28**  153:1 **1.35**  73:24 153:1 **1.37.**  27:19 **1.41**  73:25 **1.47**  73:23 **1.47.**  153:2 **1.5.**  197:16 **1.53.**  145:3 **1.64**  74:1 **1.68.**  73:24 **1.8**  64:6 **10**  4:4 6:8 31:16 125:4,5 138:17 204:3 **10,000**  43:8 59:22 60:7,21 61:10,23,25 62:7 64:8,19 65:6 66:6 209:14,22 210:7,10,16,17 **101**  3:10 **105**  5:12 **1056**  123:2 **11**  4:10 6:14 31:17 33:17 93:8 101:20,24 | 101:25 102:13 102:14 106:25 107:13 137:7,8 203:2 **114**  5:18 **12**  5:21 6:20 7:13 102:20,25 144:5,6 160:5 **122**  6:3 **125**  6:8 121:3 **126**  4:14 **12th**  159:22 160:1 **13**  7:3 8:7 9:3 104:24 153:14 153:16 192:14 **132**  177:3 **137**  6:14 177:4 **14**  7:9 113:23 119:3,4 124:23 156:2 158:14 159:5,10 160:10,14 203:18 **144**  6:20 **15**  4:11 7:12 8:22 124:23 159:5,10,22 160:2,6,10,14 175:16 198:2 198:15,21 199:12,15 **150-7**  6:12 **153**  7:3 **159**  7:9,12 | **15th**  164:14 183:19 **16**  4:19 7:7,15 163:5,8 165:3 **16-2738**  1:5 2:5 **163**  7:15 178:7 178:10 **164**  7:17 178:7 178:10 **1667**  147:4 **168**  7:20 **169**  8:3 **16th**  30:6 **17**  6:18 7:17 138:17 164:16 164:23 **173**  8:9 **174**  8:12 **175**  8:14,16,22 **18**  4:13,24 6:6 7:20 8:13 20:12 57:19 168:19 169:2,3 **184**  9:3 **19**  4:16 8:3 169:13,19 173:9 **191**  9:10 **196**  9:16 **1992**  63:21,22 64:4 207:16 208:13 **1997**  60:21 61:5 **1:48**  201:21 **1nd**  39:13 |
| **0** | | | |
| **0.97**  27:13 **000001**  9:7 **000003**  9:8 **04/03/2024** 215:20 **08002**  3:11 | | | |
| **1** | | | |
| **1**  1:25 4:10 7:10 7:13 8:24 9:20 11:11,15 12:1 27:6,16 28:1,18 28:19 57:14 64:8 83:10,12 110:7 170:20 180:7,16,20 195:16 199:8,9 199:10 **1,000**  168:11 **1.01**  199:11 **1.03**  27:18 **1.09**  27:23 **1.09.**  27:13 28:8 **1.1**  64:7 **1.13**  199:11 | | | |

**[2 - 262]**                                                                 Page 2

| **2** | | | |
|---|---|---|---|
| **2**  4:13 6:12 | 95:3,6,13,17,24 | 175:17 183:19 | **2024**  1:15 2:17 |
| 17:25 18:6,10 | 104:9 112:2 | 186:7,11,15,21 | 7:22 9:7,8 10:1 |
| 18:12,14 57:15 | 147:23 | 187:1,5,7 190:6 | 29:17 30:23 |
| 59:13 63:14 | **2019**  93:18,19 | 199:18 200:14 | 34:22 35:7 |
| 64:11,13 65:17 | 98:18 112:2 | 201:1,12 | 81:12 82:4 |
| 65:24 66:1,3,3 | **202**  4:5 | 202:17 206:22 | 153:9 169:10 |
| 66:5,19,24 | **2020**  9:19 24:14 | **2022**  9:3 18:23 | 189:4 214:8 |
| 67:11 68:14 | 25:2,5 32:4,9 | 19:15,19 20:3 | **204,377**  178:23 |
| 83:13,16 | 32:17 33:17,20 | 21:7,17,22 | **21**  8:12 18:2 |
| 106:19 111:6 | 39:13 50:19 | 22:11,23 23:10 | 174:6,7 |
| 120:22 121:4 | 67:15 105:4,11 | 23:15,15,22 | **21-02485r3**  9:5 |
| 170:24 195:16 | 105:17 106:5 | 25:4,15 26:2,17 | **210**  3:10 |
| 207:23 208:7 | 199:19 | 38:25 39:5,5 | **215**  1:25 |
| 208:20 209:12 | **2021**  7:10 8:22 | 40:13 42:17,23 | **218**  3:5 |
| 210:17 | 11:1 17:4 18:11 | 48:17 49:18,23 | **22**  8:14 175:1,9 |
| **2's**  180:2 | 20:22 85:17 | 50:13 53:12 | **23**  8:16 160:1 |
| **2,000**  178:23 | 86:9 87:5,10,19 | 65:16 76:1 80:9 | 175:9,14 176:2 |
| **2.3**  106:17 | 88:9,16 89:1,11 | 99:2,8,18 134:7 | 182:18 183:21 |
| **20**  1:15 2:17 8:9 | 90:6,10,22 91:4 | 152:19 160:15 | 184:1 |
| 9:14 10:1 24:21 | 91:9,15 92:15 | 160:20 176:18 | **23rd**  18:13,14 |
| 24:22 60:5,6 | 94:2,7,14 98:6 | 181:5 185:11 | 18:19 |
| 160:2,6 173:22 | 98:8,12 103:14 | 206:18 207:4 | **24**  4:21 8:22 |
| 173:24 189:3 | 104:9 105:21 | **2023**  6:12 7:13 | 175:9,14 |
| **2000**  60:20 77:9 | 106:3,6 114:17 | 9:14 10:19 | 182:20 183:10 |
| 79:5 | 137:5 144:4,17 | 17:23,25 18:1 | 183:16,18 |
| **2004**  201:16 | 156:17,24 | 18:13,15,19 | 184:1,14 185:6 |
| **2007**  137:18 | 157:8 158:5,11 | 102:19 124:23 | 185:8 |
| **2009**  98:20 | 158:22 159:14 | 125:3 126:9 | **25**  9:3 160:19 |
| **2010**  98:20 | 159:18 160:1 | 131:11 153:20 | 184:7,8,11,24 |
| **2011**  103:13 | 161:1,4,8,9,16 | 153:22 158:25 | **2555**  3:18 |
| **2012**  103:13 | 161:25 162:10 | 159:22 160:5 | **26**  7:17 9:10 |
| **2017**  147:23 | 162:19 166:1,5 | 160:21 163:17 | 137:5 164:15 |
| **2018**  20:12,17 | 166:12,15,18 | 163:21 164:1 | 165:1,4 191:17 |
| 93:18 94:16,18 | 168:12 171:3,5 | 164:14 168:24 | **260**  179:9 |
| | 173:6 174:4,17 | 176:1 190:11 | **262**  179:10 |
| | 174:20 175:15 | 191:8 202:16 | |

**[27 - absorbed]**                                                                 Page 3

| | | | |
|---|---|---|---|
| **27**  9:16 142:4 192:24 193:6 193:18 196:18 196:19 | **34**  9:13 | **50**  150:22 156:3 | **816.421.5547**  3:20 |
| **29**  144:3 | **35**  5:6 151:5 | **505**  2:15 | **816.474.6550**  3:19 |
| **2:25**  2:17 213:21 | **36**  7:18 | **527**  164:10 | **8239**  1:22 2:19 215:23 |
| **2b**  180:11 | **36103-4160**  3:6 | **528**  106:12 164:10,10 | **856.667.0500**  3:11 |
| **2nd**  53:12 106:1,6 | **37**  193:17 | **532**  107:22 | **86**  199:10 |
| | **379**  192:2 | **58**  65:2,7 66:2 | **87**  192:5,9 |
| | **383**  193:22 194:4 | | |

**3e89167ef1fa...**  9:6

**3**

**6**

**9**

| | | | |
|---|---|---|---|
| **3**  4:16 5:10 8:20 9:13,20 18:23 19:2,3,8,11 27:8,9 61:9,22 64:21 65:7,14 65:23 66:7,9 111:6 156:10 170:1,20 178:7 207:14,23 | **4**  4:21 7:10 8:9 24:9,9,11,14 81:12 82:4 83:17,19,20 91:20 92:2 93:2 120:22 156:10 172:4,4 178:13 | **6**  5:8 11:17,21 72:4,5,9,11 81:11 172:23 | **9**  6:3,25 7:22 28:15 116:25 122:4,7 |
| **3.0**  64:7 | **40**  121:13 154:11 | **64108-2613**  3:19 | **92**  180:8 |
| **30**  5:3 64:10 66:1,5,14,15,20 137:25 138:12 164:8 209:20 209:23 210:8 210:11,16,18 210:20 | **41**  65:7 66:2 | **6498236**  1:23 | **94**  180:8 |
| **31**  51:16 142:10 | **4160**  3:6 | **65**  51:16 142:10 | **97**  27:22 145:3 |
| **32**  193:1,6 | **43**  87:16 | **68**  7:23 | **99**  199:8 |
| **32-5**  193:18 | **441**  165:8 | **6th**  29:16 30:6 30:23 35:6 | **9:08**  2:16 10:2 |
| **323**  9:19 | **48**  35:23 87:15 | | **9th**  169:10 |
| **33**  7:16 | | **7** | **a** |
| **334.954.7555**  3:7 | **5** | **7**  5:12,16 9:19 11:17,21 35:23 105:11,12 160:25 179:9 | **a.m.**  2:16 10:2 |

**4**

| |
|---|
| **5**  5:3 11:21 12:1 30:9,15,18 31:4 31:11 46:25 47:6 60:21 67:13 156:10 172:12 178:21 208:11 |
| **5,001**  61:10,25 |

| |
|---|
| **72**  5:8 |
| **7484**  215:22 |
| **75**  6:12 |
| **79**  57:19 |

**8**

| |
|---|
| **8**  5:18 6:12 114:5,8 203:25 |
| **80**  121:13 |
| **800**  29:6 |
| **800.898.2034**  3:7 |

| |
|---|
| **able**  23:20 48:15 85:2 95:22 109:5 131:20 133:5 161:3 211:25 |
| **above**  102:3 |
| **absence**  38:22 |
| **absolutely**  39:8 68:17 111:17 121:23 127:2,4 203:8 210:5 |
| **absorbed**  108:5 108:9 |

**abstract** 24:20
24:24 51:17,18
51:20 144:22
192:22
**abstracted**
209:25 210:20
**academic** 40:21
134:24
**accept** 148:9
**acceptable**
50:22
**acceptance**
175:18 182:22
184:13
**accepted** 42:15
**access** 42:2
56:8
**accessible**
131:25
**accompanied**
141:17,20
**account** 37:21
50:4 60:16
69:12
**accounted**
109:18
**accounting**
41:13 42:4,5,6
42:20
**accounts** 37:19
171:18
**accurate** 12:7
56:17 112:19
209:6 210:1
**accurately**
169:6,6 191:4,4

**acknowledge**
152:13
**acknowledg...**
100:11
**action** 215:16
215:17
**activated**
123:16,17,18
**activation**
124:5
**active** 121:19
**activities** 157:7
171:20
**activity** 43:13
117:22 118:1
121:18 204:15
**actual** 22:2
59:14 116:4
124:6 177:1
**actually** 16:24
26:2 37:22 40:8
55:11 57:12
58:17,23 65:25
71:10 76:11
78:10 89:11
95:6 100:11
132:12 149:23
183:8,18 195:4
195:5 209:24
**add** 146:8
153:20 169:10
199:15 210:6
**added** 76:24
83:22,24 91:21
92:6 93:13,14
93:21 103:6

104:3,4,12
105:3 163:16
163:19,23
172:13 201:15
**addition** 17:8
144:4 176:22
**additional** 5:9
10:24 62:15
72:22 85:15
90:9 91:14
98:10 164:6
174:16 175:14
**additions** 137:3
163:15 169:9
**address** 79:20
118:16
**adds** 123:20
**adequate**
113:15
**adjusted** 27:23
69:6 210:25
**adjustment**
69:9,21
**administered**
10:5 215:6
**administration**
143:13
**advance** 15:24
159:9
**affirmatively**
201:4,7
**african** 6:24
144:25
**age** 57:18 60:9
**ages** 61:19

**ago** 12:3 29:11
30:25 71:4
93:25 157:11
168:22
**agree** 22:13,21
23:8 25:24 26:9
26:9,24 27:3
28:10 34:8,24
36:15 43:1,4,5
43:21,25 44:11
44:14 59:17
68:13 69:15
80:8 95:10
97:21,23 108:8
108:19 109:4
111:9 117:8,18
118:3 135:6
138:23 139:5
139:14 140:12
140:16 141:19
179:13 180:22
195:1,2
**agreed** 48:5
**agreement**
33:10 192:9,9
192:10,18,19
192:21 195:12
195:13
**agrees** 47:14
**ahead** 16:9 24:8
29:24 61:13
65:9 71:19 81:5
105:7 114:3
136:24 174:9
175:21 184:6
184:25 188:11

**[ahead - area]**                                                                    Page 5

201:22 208:2
**air**  111:12
205:10
**alabama**  3:6
**align**  66:2
**aligned**  28:14
**alleged**  85:7
**allen**  3:4 112:2
112:5
**altered**  135:1
**amazing**  53:15
**ambiguous**
68:12
**amend**  98:8
**amended**  4:10
4:13 7:17 10:19
11:15 13:22
18:11,13,15,19
20:22 21:2,6,12
76:11 80:20
83:11,16
105:21 114:17
137:4 146:9
151:18 164:15
168:24 190:10
**amendment**
17:7
**amendments**
13:20
**american**
144:25
**amount**  26:21
40:25 42:8
43:15 60:13
85:25 103:21
128:13,20,22

128:24,25
150:15 154:13
160:9 161:13
**analy**  177:21
**analyses**  5:9
6:18 52:14
73:17
**analysis**  4:19
8:20 19:1,20
20:3,20,25
21:17 22:10,24
23:9 31:25,25
32:15,23,24
33:11,21 34:9
69:7 70:8,17,21
70:24 72:14,19
72:23 73:4,10
73:15 74:5,18
74:19,25 75:16
75:20,21 82:24
123:2,4 138:4
145:6,11
151:22 154:17
177:21 179:22
**analysisn**  81:21
**analytic**  5:12
**analyze**  137:20
**analyzed**
108:14
**ancestry**  6:24
**ann**  39:2 71:4
**annals**  8:23
175:16 176:3,8
176:14 183:21
185:9,19

**anne**  14:13
**annual**  150:6,7
150:10
**answer**  13:18
23:6 28:15 44:1
44:15,22,23
66:15 73:6
74:10 84:21
94:13 101:13
104:11,15
111:16 115:19
154:11 177:8
201:2
**answered**  94:11
99:20 138:8
178:8
**answering**
94:10
**antioxidants**
139:7
**anymore**  158:2
**apart**  139:16
155:2
**apparently**
177:20
**appear**  18:17
214:4
**appearance**
134:21 135:3,4
135:7,11
**appearances**
3:1
**appearing**  2:15
3:9
**application**
54:4,5

**applications**
64:10,17 65:24
66:1,13 177:5
209:14
**applied**  86:21
211:9
**applies**  76:17
77:3
**apply**  45:23
47:18 77:25
79:3,4 102:5
120:16
**appreciate**
202:3
**approach**
100:10 123:3
141:1
**approached**
22:15
**appropriate**
100:14 148:10
149:11 178:15
178:16,19
**appropriately**
63:11
**approximate**
62:20
**approximately**
14:17 15:8
60:12
**april**  6:12
**area**  4:23 9:17
22:13,15,18
23:3 115:17
118:12 133:8
145:21 148:12

**[area - aware]**                                                      Page 6

148:19
**argue**  136:18
**arguing**  198:25
199:2,5
**arrangements**
175:1 212:21
**article**  6:21
38:6,25 39:1
125:21,25
127:18 129:23
131:18 196:15
196:24 197:1
200:16,19
201:12
**articles**  37:4
38:3 50:11
58:23,25 59:11
125:20 143:22
143:25 161:20
**asbestiform**
83:25 84:10,17
85:12 86:12,17
88:5,10,18 89:3
89:12,17 90:10
91:6 101:15
104:19,19
180:16,19
**asbestos**  83:25
84:10,18 85:12
85:16,21 86:2
86:12,17,22
87:6,16,19,23
89:16,20,24
90:22 91:11
93:9,13,16
95:25 96:9,12

98:2,15 100:1,3
100:7,19,22
101:3,9,15
102:1,6,16
103:8,16,21
104:5,19
128:21 135:17
161:18,21
168:4 180:19
186:13 188:22
190:18 200:18
203:3,7,9
**aside**  12:11
74:2 80:16 83:9
113:22 142:2
195:14
**asked**  55:24
61:15 65:13
69:2 77:22
88:25 94:13,21
99:19 104:9
128:17 129:7
130:8 138:7
143:4,20
167:19 176:19
184:17 203:1,3
205:7 206:5,25
208:16 210:22
210:23
**asking**  31:10
43:11,12 44:4
49:14 61:5 65:4
79:7 88:22 89:8
89:10,21 94:25
95:7 104:11
120:1 121:5

128:7 143:9
153:23 162:5
167:24 182:1
184:12
**asks**  170:20,24
171:12 172:4
172:12
**aspect**  39:10
**assay**  126:17
**assess**  79:21
**assessed**  156:1
**assessment**
51:2
**assign**  85:2
**assistance**
172:8
**assistant**
143:12
**associated**  6:15
51:15 140:10
140:13 142:9
**association**
4:16,22 8:16
18:24 25:7,21
25:23 26:4,18
26:20 27:6,20
119:12 137:20
138:5 141:25
**associations**
154:8
**assume**  47:13
60:3 121:15
**assumes**  48:1
**assuming**  60:14
**assumption**
60:16

**attach**  85:13
**attached**
132:19 168:23
183:1 184:16
214:4
**attention**  136:3
202:3 203:1
208:11
**attorney**  3:5,10
3:18 215:17
**attorneys**  112:4
171:19
**attribute**
182:13
**august**  53:11,12
**author**  53:25
109:18
**authority**  187:1
**authors**  57:9,11
109:5,7 125:12
126:2,7 130:16
146:1,16 147:3
147:16
**avagia**  85:10
**available**  5:14
62:11 69:9
105:20 154:9
**average**  59:1
60:10
**aware**  11:4
39:6,21 41:14
99:7,9 107:7,9
107:13 116:7
124:19 131:5
146:20 164:7
187:7,22

**[aware - bindman]**                                                    Page 7

| | | | |
|---|---|---|---|
| 188:23 189:3 189:19 | **bad** 201:9 | 200:9,10 | 77:18,20,25 117:24 186:4 |
| **b** | **balance** 129:17 | **begins** 11:23 | **beyond** 101:10 |
| **b** 171:12 | **balderrama** 11:6,9 12:14,20 13:3,10 | 92:2 101:22 102:4 103:1 104:25 117:1 196:7 | 117:16 161:2 192:20 199:19 204:9 |
| **baby** 5:14 98:20 100:18 128:21 203:15 206:24 207:6 | **balderrama's** 13:6,17 | **behalf** 2:14 | **bias** 135:3,3,4,5 135:8,12 136:23 179:20 |
| **back** 11:1 18:8 45:1 51:17 61:2 64:3,13 65:11 67:7,9 73:8 74:3 75:6 81:9 83:18 88:8 90:2 95:9 102:24 104:17 105:20 110:1 118:24 119:6 132:5 137:2 147:23 156:14,15,20 159:7 173:16 173:18 175:12 175:24 184:23 185:3,5 188:14 188:23 192:22 193:9 198:24 199:17 201:25 202:14 | **based** 19:19 56:11 60:18 72:21 99:25 123:25 130:17 146:1,3,5 154:20 180:8,9 180:15,21 182:17 185:6 201:5,5 203:7 211:22 | **believe** 18:18 27:25 28:1 34:15 37:13,20 38:14 41:23 47:20 49:20 58:2 60:9 66:21 68:10 69:12 75:2,15,15 78:13 83:11 84:22 87:11,14 87:15 94:17 97:9 98:16 104:9 105:19 106:10 114:20 114:20 124:3 129:13 130:1 132:3 140:13 146:23 164:9 164:10 176:24 178:8 187:19 187:25 204:20 206:25 207:14 | 180:1 181:11 181:15 182:2,4 194:19 |
| | | | **big** 17:18 136:15 192:17 193:15 198:22 198:22 |
| | **baseline** 121:7 | | **bigger** 17:17 |
| | **basic** 85:20 115:25 | | **bill** 160:18 |
| | **basically** 55:21 73:19 86:2 199:9 | | **bills** 171:18 |
| | | | **binder** 14:3,4,5 14:9,10 153:11 |
| | **basis** 101:4 149:17 | | **binders** 8:14 |
| | **basket** 19:6 | | **bindman** 1:13 2:13 4:3,14 7:9 7:12,15,23 8:6 9:7,8 10:4,13 10:14 18:11 19:9 30:10 65:14 68:23 113:3 125:8 164:4 169:17 188:16,21 202:2,5,25 212:19 214:1 214:10 |
| | **bates** 9:6 | | |
| | **bathroom** 80:23 | | |
| **background** 48:25 93:7 121:17,18 | **beasley** 3:4 112:1,5 | **believed** 203:6 | |
| **backwards** 149:4 | **beasleyallen....** 3:8 | **bend** 149:4 | |
| | | **beneficial** 182:10 | |
| **bacon** 3:17,24 | **began** 39:4 | **berge** 137:17 | |
| | **beginning** 2:16 77:23 91:21 | **better** 49:21 76:22 77:12,16 | |

**[bindman's - capacity]**                                          Page 8

| | | | |
|---|---|---|---|
| **bindman's** 18:11 39:13 172:24 213:8 | 180:21 **bonderand** 166:10 | **business** 149:3 | 91:7,12,16 97:14 103:10 103:17,22 |
| **bio** 41:6 | **book** 14:6 16:2 | **c** | 104:6,21 115:6 |
| **biologic** 16:19 145:8 | 16:15 17:8,12 17:18 174:2 | **calculated** 59:21 | 118:15,22 119:14,15 |
| **biomarkers** 6:20 | **booth** 59:14 | **california** 1:14 2:15,16 7:20 | 120:2,7 123:21 124:7 126:13 |
| **biomedical** 93:3 | **bothered** 160:18 | 10:1 150:15 215:2 | 126:15,23 127:3,13,24 |
| **biostatistical** 40:23 41:20 42:10,14 | **bottom** 27:15 51:13,21 66:23 67:12 107:22 | **call** 19:16 **called** 42:10 68:2 120:25 | 128:1,2 137:16 137:21 138:6 138:22 139:4 |
| **biostatistician** 70:16,19 72:13 | 117:1 144:2 **boulevard** 3:18 | 125:14 142:14 191:8 | 139:12,17,22 139:25 140:3 |
| **biostatisticians** 28:24 | **box** 3:6 **bradford** 145:6 | **calling** 151:22 **calls** 89:11 | 140:11,22,24 141:4,8,10,18 |
| **birefringent** 108:3 | 145:10 **break** 45:2 61:4 | 90:22 126:25 **camargo** | 141:21,23 142:9 144:25 |
| **birth** 54:6 177:19 | 65:13 68:15 81:1,2,6 136:24 | 103:13 **canada** 52:24 | 145:24 162:3 178:23 181:19 |
| **bit** 28:2 68:11 136:25 137:22 149:7 | 188:16 **breakdown** 155:1 | **canadian** 187:13 **cancer** 4:18,24 | 182:11 186:9 186:12 187:10 187:20,24 |
| **blanking** 141:24 | **breast** 182:11 **bring** 13:24 | 5:3,20 6:16,20 6:23,23 8:19 | 188:19,22 189:1,6,11,16 |
| **blood** 111:7 **blue** 110:21 | 14:2 36:12 40:5 **broad** 43:6,8 | 9:17 12:22 13:3 13:13,17 18:25 | 194:19 200:18 204:22 205:24 |
| **bmj** 132:6,6,13 **board** 35:15 | 99:13 **broadly** 76:23 | 25:7 26:5,19,21 27:7 30:19 38:3 | 211:24 **cancers** 5:5 7:5 |
| 36:10,16,22 45:5 46:4,9 47:4 | 77:11 **brought** 14:3 | 48:23 49:2 51:15 52:3,7 | **capa** 192:19 **capabilities** |
| **board's** 46:24 **body** 75:13,17 | 16:14,16 17:1 71:1 172:18 | 68:6 69:11 75:24 84:8,19 | 45:18 **capable** 48:11 |
| 110:10 180:9,9 | 173:4 174:22 **bs** 1:21 215:22 | 84:24 85:16,22 88:6,19 89:4,13 89:21 90:12,23 | **capacity** 43:9 78:2 100:6 |

[capacity - chance]                                                    Page 9

112:16
**carcinogen**
180:7,11,17
**carcinogenesis**
84:14 118:20
119:11 123:19
**carcinogenic**
83:24 90:1
117:6 180:11
**carcinogenicity**
104:19 116:16
116:17 123:15
126:21
**carcinogens**
180:20
**carcinoma**   5:16
102:15 106:13
106:18 107:2
116:23
**care**   7:4 33:22
**career**   37:2
136:20
**careful**   57:1
136:3
**carefully**   52:8
97:2 139:13
154:18 155:4
155:11
**carl**   11:5,9
12:13,17,22
13:1,10
**carl's**   13:13
**carrying**   55:6
58:3,8 111:12
**carryover**
107:23 193:23

194:1,2
**cascade**   92:15
**case**   10:15,16
13:15 17:3
22:22 32:23
33:5 36:6 46:25
57:23 61:16
126:10 129:21
132:11 135:24
156:21 158:8
160:19 171:2
178:18 179:12
187:4 190:9
191:5 192:15
195:6,9 201:1,9
201:13 203:16
205:1 207:8,10
215:12
**cases**   10:18
11:5,10 12:14
13:10 39:7
63:19 65:15
66:2 97:14,14
106:25 112:20
135:12 179:11
182:5,5,15
**casual**   162:16
**casually**   162:22
**categories**
108:4 149:23
**category**   43:6
56:2 96:25
135:13,14
150:1 192:21
**catherine**   1:21
2:18 212:15

215:22
**catherine's**
201:19
**causal**   145:19
**causation**
145:16
**cause**   13:13,17
69:10 85:10
89:3,12 90:11
90:23 91:7,12
103:16 119:15
126:11 127:3
187:10,23
188:18 189:1,5
189:11,16
**caused**   186:9
186:12
**causes**   52:3,7
75:24 84:23
88:6,18 89:3
103:9,22
126:25 188:22
**causing**   84:7,18
89:25 104:6,21
121:16 126:22
**cej**   111:24,25
**cell**   85:22 86:12
118:13 119:18
120:10 122:16
122:16,23
124:10 125:24
126:17,20,22
126:25 127:5,5
127:5,6,6,7,8
127:15,23
128:3,5,8,11,13

128:18,24
200:11,12
206:6,8,10
**cells**   5:20 6:10
86:22 114:22
114:24 115:8
115:20 116:8
122:11,14,18
123:9,17
124:12 126:11
127:11,23
128:23 206:9
**cellular**   85:21
86:6,20,21
89:25 92:7,12
92:21,22 116:2
189:15 200:8
**center**   110:8
**certain**   170:13
170:13 171:24
172:23
**certainly**   41:4
96:16 97:17
133:8 136:1,6
145:13,14
**certainty**   84:6
**certified**   2:18
215:1
**certify**   215:2,15
**cetera**   88:10
92:5 103:2
**chance**   12:4
27:24 166:22
186:4 192:20
211:24

**[chang - comments]**                                                    Page 10

chang  17:22
  153:9 175:17
  185:9
change  74:1
  82:17 126:11
  152:17 155:10
  156:23 157:3,6
  168:12 186:4
  209:17
changed  10:23
  13:20 30:13
  49:20 97:9
  152:15,16
changes  12:9
  89:25 90:1 92:7
  92:16,19
  118:21 120:19
  120:21 122:23
  189:15 205:22
characterizati...
  35:16 38:9
characterize
  19:23 77:7
characterized
  77:8 209:21
charged  168:10
check  58:2
  87:21
checking  24:25
  80:22 210:8
chemical
  101:18
cherry  3:11
chinese  87:14
choose  154:2,19

choosing  69:13
chose  181:8
chris  40:8
cidal  117:23
citation  33:1,19
  90:19
cite  14:4 25:19
  25:24 48:17
  52:19 85:23
  88:4 93:18
  95:23 98:17
  105:22 146:11
  146:12
cited  26:6,7
  37:3 90:17 96:5
  125:21 152:10
citing  32:16
  96:7
city  3:19 214:8
claim  179:20
clarified  159:3
clarify  25:17
  38:18 95:22
classified
  180:10,10,20
clean  111:1
clear  76:15
  85:1 94:12
  113:15 134:22
  145:20 213:7
clearly  44:6
  116:22 212:1
clinical  157:10
  157:19,25
  186:1

clock  201:19
closed  68:5
  92:8
closely  84:10
  129:25
cluster  127:23
clustering
  126:12
clusters  127:12
code  72:25 73:1
  73:7
coffee  138:21
  139:3,7,10,16
cohort  7:7 32:1
  67:17 69:13
  76:22 77:22
  79:17 178:18
cohorts  23:16
  54:22,24
collaborated
  39:1
collaborating
  39:4
colleague
  142:25
colleagues
  143:2,3 162:12
  162:17,24
collected  55:11
collecting
  194:22
column  51:13
  52:12 55:8
  57:18 58:3,9
  74:23 106:16
  107:23 117:1

  117:11 192:3
  193:23 196:1
  197:7,23
combination
  76:20
combine
  178:15,16,19
combined
  77:15
combining  63:4
come  60:10
  64:13 74:3
  135:19 143:19
  165:11 169:10
  176:11
comes  46:18
  110:17 113:12
  162:17 190:1
comfortable
  47:10
coming  48:12
  81:24 110:13
commencem...
  3:13
comment  36:17
  77:24 86:20
  153:22 154:4
  164:3 177:3
  200:21,25
commentary
  74:6
commented
  38:2
comments  8:16
  35:8 131:6,11
  131:15,18,24

[comments - considered]                                    Page 11

132:4,13,19
153:19 154:21
175:15 176:2,6
176:8,15,21,22
176:25 177:1
180:2 182:17
183:22 185:16
200:1
**commerce** 3:5
**commercially**
5:13
**committee**
113:12 135:3
148:10 149:9
**committee's**
8:3 169:16
172:22
**common** 43:15
118:14 141:12
149:11
**communicate**
32:25
**communicated**
186:21,25
187:3 199:17
**communication**
38:11,15
174:18
**comparable**
115:15 128:23
**compare**
121:12 178:17
207:15
**compared**
43:23 56:18
85:5 136:8

149:8
**comparing**
69:16 197:16
198:1
**comparison**
5:13 128:20
**complete** 16:7
170:21 172:14
**completed**
181:14
**completely**
110:24 134:17
198:13 209:25
**completion**
215:13
**complicated**
145:12
**component**
83:23
**components**
85:11
**comprehensive**
53:9
**computer**
63:24
**concentrated**
205:10
**concentration**
168:4 190:18
**concept** 126:13
**concern** 89:18
109:20 179:11
179:15
**concerned**
109:1

**concerning**
166:7,10,13,16
166:19 172:15
**conclude** 25:23
139:11 145:4
**concluded**
25:24 26:7,7
**conclusion** 25:6
25:19 26:3,8,12
26:13,14,25
29:1 51:22,23
52:2 192:1
195:3 198:14
**conclusions**
48:13 51:12
52:13 120:20
**condition**
110:16
**conduct** 147:11
**conducting**
133:20
**confidence**
27:22 28:4,5,9
28:19 64:7
73:23,25 81:23
145:3 193:19
198:19
**confident** 46:2
**confirm** 83:23
99:12,23
123:23
**confirmed**
87:22
**conflict** 80:1,12
111:20,23
112:7,14,22

113:11 129:13
129:15 133:13
134:4,21,25
135:2 136:12
136:14,18,21
136:23 147:25
148:9 149:6,9
**conflicts** 112:23
129:8
**confused**
139:11
**confusing**
32:24 97:17
**confusion** 15:6
164:3
**conn** 176:22
**connecticut**
45:10
**connection**
171:16,19
203:4
**consensus** 57:6
57:7
**consider** 28:25
75:16 78:4
129:4 145:7,13
145:18,20
148:21 185:18
**consideration**
131:2 145:15
**considered**
7:16 95:16
134:1 163:10
164:1,9,25
165:4,20
172:24 206:9

**[considering - correct]**                                              Page 12

| | | | |
|---|---|---|---|
| **considering** | **contacting** | **contribution** | 144:15 164:13 |
| 28:3 | 36:19 | 85:3,5 | 169:3 170:21 |
| **considers** | **contain**  101:9 | **control**  54:6 | 172:12 173:15 |
| 180:15 | 103:8 | 57:23 120:18 | 174:10 175:2 |
| **consistency** | **contained** | 120:20 121:5 | 184:15 185:8 |
| 69:14,24 | 100:19 190:10 | 121:14,21 | 202:16,20 |
| 195:10 | 214:5 | 136:8,10 | 208:1 |
| **consistent**  33:7 | **container** | 171:15,16 | **corner**  51:21 |
| 69:9,11 90:1 | 110:18 | 177:19 178:18 | 194:4 |
| 155:6 192:5 | **containing** | 179:12,15 | **cornstarches** |
| 204:25 206:11 | 180:19 | 182:15 192:15 | 75:14 |
| 206:11 | **contains**  100:22 | 205:8,9 | **correct**  15:3 |
| **consistently** | **contamination** | **controlling** | 19:20 20:5,12 |
| 198:9 | 109:18,21 | 134:16 | 20:18,19,23 |
| **consortium** | 110:11 111:4,8 | **controls**  63:20 | 21:4,7,8,13,19 |
| 6:25 | **content**  37:24 | 65:16 66:2 | 23:17 24:23 |
| **constitute** | 38:8 40:2 | 179:11 | 25:8 26:5,19 |
| 120:10 | **contention** | **converse** | 27:24 28:20 |
| **consultant** | 122:20 127:8 | 166:19 | 29:14 31:1,22 |
| 40:23 112:9,20 | **context**  36:6 | **convince** | 31:23 32:1,4,10 |
| 113:4 133:14 | 127:10 135:19 | 100:13 | 32:17 33:14,17 |
| 149:3 | 152:21 162:14 | **convinced** | 33:25 35:9,12 |
| **consultants** | 162:24 | 139:20 | 35:13 36:17 |
| 41:20 | **continued**  5:1 | **cook**  60:20,20 | 37:4,12 38:4 |
| **consultative** | 6:1 7:1 8:1 9:1 | 60:23,24 61:5 | 39:2 42:22,24 |
| 106:25 | 20:25 | 61:25 63:12 | 43:3 46:9 47:1 |
| **consulting**  41:6 | **contrast**  121:6 | **copied**  16:9 | 47:8,25 48:23 |
| 42:10,14 | **contribute** | 212:8,22 | 48:24 49:19,24 |
| **consumer** | 77:11 | **copies**  150:18 | 50:2,5,6,7,8,14 |
| 100:21 103:16 | **contributed** | 170:24 202:17 | 50:21,24 51:16 |
| **contact**  36:16 | 23:1 | 202:21 212:12 | 52:4,5,7 54:11 |
| 110:13 | **contributes** | **copy**  19:8 24:3 | 54:14,15 55:4,5 |
| **contacted** | 116:20,24 | 24:16 31:5 | 55:9,12 56:10 |
| 12:13 20:17 | 127:19 152:22 | 48:19 71:20,22 | 57:10 58:5,11 |
| 22:11,22 23:4 | **contributing** | 71:24 75:7 82:6 | 58:19 59:4,7,15 |
| 23:10 38:6,21 | 77:17 | 102:19 144:11 | 60:18,19,22 |

[correct - curiosity]                                                    Page 13

| | | | |
|---|---|---|---|
| 61:11,23 62:1,3 | 193:2,7 196:12 | 208:18 211:17 | **covering**  16:14 |
| 62:11 63:17 | 196:15 200:4,5 | **counsel's**  97:20 | 88:12 90:2 |
| 64:21 65:1 | 200:6,7 205:14 | **count**  61:17 | **covid**  143:15 |
| 67:16,22,25 | 205:17 209:1,9 | **counterintuitive** | 157:23 |
| 68:21 71:16 | 210:15 214:6 | 155:23 | **create**  37:24 |
| 73:13 74:19 | **corrected** | **couple**  16:3 | 101:8 129:12 |
| 75:14 76:1,3 | 152:11 214:6 | 17:9 53:23 | 134:20,20 |
| 78:12 79:1,10 | **corrections** | 143:22 157:10 | 164:4 |
| 79:14 80:6,9,14 | 214:3 | 167:11 168:22 | **created**  135:5 |
| 82:25 83:7,8 | **correctly**  33:23 | 202:6 | 149:3 159:13 |
| 86:22,23,25 | 34:4 49:5 51:23 | **course**  14:12 | 174:4 |
| 90:16 95:25 | 52:17 54:8 | 167:22 173:17 | **criteria**  53:21 |
| 108:17 109:10 | 112:11 118:23 | 212:18 | 53:24,25 54:10 |
| 110:14 111:14 | 180:10 194:24 | **court**  1:1 2:1 | 54:14 55:1,2,7 |
| 112:2 113:25 | 205:25 | 11:12 12:14 | 56:12 |
| 114:22 118:6 | **correlates** | 18:7 19:4 24:12 | **critical**  47:25 |
| 120:13 121:22 | 116:8 | 30:16 72:6 | **critically**  133:4 |
| 121:25 122:9 | **correspond** | 105:13 114:6 | **criticism**  36:4 |
| 122:15,18,19 | 59:23 64:20,20 | 122:5 125:6 | 77:10 78:4 |
| 126:18 127:1,4 | **correspondence** | 137:9 144:7 | **criticisms** |
| 128:5,9 135:8 | 154:14 | 153:17 159:6 | 45:18,21 47:17 |
| 144:24 145:1,8 | **corresponds** | 163:6 164:17 | 77:21 78:1 |
| 145:11,16,24 | 64:23 | 168:20 169:20 | **criticized**  47:20 |
| 145:25 146:2,6 | **cosmetic**  101:9 | 173:25 174:8 | 47:21 |
| 146:7,10 147:1 | 207:1 | 174:13 175:10 | **cross**  201:8 |
| 148:14 149:14 | **cosmetics**  207:5 | 184:9 191:18 | **crosses**  28:19 |
| 149:19,24,25 | 207:6 | 196:20 212:15 | **crr**  1:21 215:22 |
| 150:1 152:20 | **cost**  41:1,16,19 | 212:22,25 | **csr**  1:22 215:23 |
| 157:14,21 | 41:20,24,25 | 213:13 | **ctsi**  42:10 |
| 159:22 163:17 | **counsel**  15:10 | **court's**  164:6 | **culprit**  104:21 |
| 173:22 176:4 | 20:18 21:18,20 | **cover**  88:3 | **culture**  5:20 |
| 177:22 178:9 | 22:12,22 34:15 | 176:7 | **cumulative** |
| 178:24 180:13 | 41:9 107:15 | **coverage** | 50:7,12,14,20 |
| 181:16 182:3 | 153:8 162:20 | 143:23 | 181:3 |
| 185:11,16 | 163:14 166:22 | **covered**  88:9,13 | **curiosity** |
| 187:14 191:24 | 204:5 206:17 | 90:3 95:6 197:4 | 132:25 |

[current - depositions]                                                 Page 14

**current**  36:10
36:22 105:25
148:1 168:18
169:3 170:21
191:3
**curriculum**
7:21 169:4
170:21
**cut**  28:22
126:24
**cutting**  211:8
**cv**  168:18,23
**cysts**  141:12,14

**d**

**d**  9:5
**daily**  43:15,16
43:17 62:20
66:16
**damning**
127:20,22
**daniel**  3:9
**data**  16:18 32:4
32:6,9,11,12
43:3,3 54:1,13
54:18,24,25
55:11,19,21,24
55:25 56:9,15
57:5,11,13 62:3
62:5,9,11,15
63:1,4 67:1,15
67:21 68:3,18
68:24,25 69:3,5
69:16,17 70:1
73:3,20 74:19
75:1 77:2 86:1

87:2,3,9,13,18
154:9,17
204:21 206:10
208:17,19,25
209:3,19,25
210:20 211:2
211:21,25
**databases**
53:11
**date**  29:22,25
30:24 105:24
171:2,17 172:6
172:13 215:18
**dated**  8:22 9:3
20:11 81:11
106:1,1 158:23
159:22 215:20
**dating**  147:23
**davis**  144:4,15
145:22 146:8
**day**  14:7 44:5
60:4,15,18
61:16,17 157:6
157:6,24
167:10 214:7
**days**  16:3 60:6
61:11,14
168:22
**deal**  135:2
152:22
**death**  127:5,6,7
**debate**  113:8
**decade**  207:3
**decades**  79:18
**december**
70:16 95:23

**decide**  113:14
150:25
**decision**  8:23
70:18 148:25
**decisions**
134:19
**declare**  214:2
**declared**
136:22
**declined**  143:5
**defendant**  2:14
3:16
**define**  23:15
75:17
**defined**  23:22
32:13 58:4,10
58:14 177:15
**definitely**  150:7
176:5,5
**definition**
75:13,13
**definitive**  86:1
**degree**  46:17
69:22 84:6 95:7
103:7 119:12
121:23 133:5
151:21,24
211:17
**deleted**  93:2
**deliberately**
22:3,5
**dep**  93:18
**department**
93:5 108:17
111:10 161:12

**decide**  113:14

**depend**  100:7
**dependent**
181:15
**deposed**  10:25
158:4
**deposition**  1:13
2:13 3:13 8:5
10:16 11:1
13:25 14:5,16
14:18 15:25
16:7,10 17:4
34:18 39:13
45:22 72:9
85:17 86:5,9
87:6,10,20,24
88:9,16 89:1,11
89:19 90:3,6,22
91:4,9,15 93:22
93:24 94:1,2,5
94:7,15,16,16
94:19 95:3,6,13
95:15,24 96:20
97:5,9,22,25
98:13 103:14
156:16,20
159:9 164:5
166:22 167:3
167:20 168:7
169:17 170:14
171:2,18 172:6
172:14 174:17
186:7 188:25
190:2,6 200:10
215:12
**depositions**
14:9,11,21 15:1

**[depositions - disclosure]**                                      Page 15

157:19 168:14
175:5,6
**depressed**
211:10
**describe**   16:16
20:16 38:22
45:16 154:12
162:16
**described**   54:10
54:25 92:15
110:12 143:1
157:18 177:10
210:9
**describes**   85:9
92:21 123:3
129:10 188:3
**describing**
31:20
**description**   4:9
5:2 6:2 7:2 8:2
9:2 171:22
172:18 209:24
210:17
**design**   133:5
136:3
**designate**   173:8
174:3,10,25
**designed**
129:10,17,23
130:1 134:3
**detail**   54:19
77:20 80:19
83:16 152:2
155:16
**detailed**   42:12
43:14 84:15

95:7 148:7
151:22
**details**   83:7
129:9 136:3
213:16
**detection**
100:12
**determine**
10:22 117:14
204:7
**determined**
116:20 186:11
**deterministic**
116:23
**developed**
85:15 91:14
135:18
**developing**
119:13 128:2
**development**
118:22 205:24
**devices**   54:6,6
177:19
**diabetes**   140:19
140:23
**diaphragm**
178:3
**diaphragmatic**
177:24
**diaphragms**
54:6 177:20
**dichotomy**
146:3
**diesel**   205:11
**diet**   139:24,24
140:1,4,5

**differed**   191:23
**difference**
58:21 62:22
65:8 70:11 77:6
156:9 181:22
192:14 193:10
193:14,17
195:3 198:15
**differences**
26:15 52:13
194:21 196:11
197:25 198:23
199:3
**different**   19:25
21:14 43:19
44:7 58:18
62:14 78:2
85:20 88:15
92:18 96:18
98:11 99:5
120:3 123:6
129:18 154:11
155:1,5 158:15
158:18 168:4
181:7,9 182:1
184:3 190:18
194:11 197:17
198:6,18,19,20
199:7,10,12,14
206:9,10
212:13
**differential**
179:10 182:5,7
182:9,12
**differently**   20:6
50:16

**difficult**   108:23
198:16
**dig**   81:25
**digging**   41:21
**dioxide**   120:12
120:17,24
123:7 205:8,10
**direct**   54:3
116:1,5 128:20
202:25 208:10
**directed**   164:4
**direction**
171:15,15
215:8
**directly**   66:14
86:18 115:23
**disagree**   48:3
111:3 180:23
181:17 198:13
**disagreeing**
192:8
**disagreements**
46:20 57:5
**disclose**   149:2
149:21
**disclosed**   11:4
80:4 150:17
158:7 190:14
190:19
**disclosing**
150:10
**disclosure**   4:10
11:9,15 71:9
112:14 113:3
113:17 147:24
148:7,8,22,25

**[disclosure - duration]**                                          Page 16

149:10,13
**disclosures**
147:4,16,19
149:24
**discovered**
118:1 204:15
**discuss** 13:19
35:15 38:12,16
162:22 167:5
**discussed** 135:2
162:2,10,19
190:21 198:7
**discussion** 18:5
48:5 61:1 64:2
65:10 74:16,21
75:22 102:23
138:16,25
139:1 140:8
145:5 146:9
148:4 156:13
159:4 175:8,23
181:2 185:2
188:13 201:24
202:22 207:15
**disease** 145:15
181:25
**diseases** 140:19
**dish** 115:21
**disruption**
92:21
**disseminated**
108:9
**distinction**
211:18,19
**distinguish**
69:18

**district** 1:1,2
2:1,2
**divided** 60:9
**dlapinski** 3:12
**doctor** 10:10
24:17 45:2 61:4
75:5 81:14
114:12 119:25
156:15 159:8
163:12 202:2
208:24 212:4
**document**
11:19 30:1,22
42:5,20 46:12
56:6 72:9,10,18
81:3 94:22 99:3
99:11 146:4
168:15,17
169:12,22
170:6 176:9,10
177:1
**documentation**
40:25 42:11
70:23 73:7
126:15
**documents**
17:19 41:9,13
46:12 47:5 71:3
72:22 150:24
165:6,9 171:4
171:13,25
172:1,10
175:13,14
176:11,12
183:2 188:10
190:3,5,13

**doing** 21:25
70:12 74:4
75:16,20 83:5
132:24 133:3
135:16 157:10
157:22 189:17
190:16
**dose** 115:15
145:7,14,18,21
145:23 146:1,4
146:5,9,11,13
146:13 151:7
151:10,17
152:11,17,20
152:22 153:3,5
**douching** 9:10
191:8
**dozen** 16:6 23:2
**dr** 10:14 14:14
14:14 18:11
19:9 22:4 28:23
30:10 39:9,9,13
40:13,13,22,22
41:5 45:14
46:23 47:10,14
47:24 48:10
57:12 65:14
67:1 68:23
72:21 81:11,17
82:25 93:22,23
94:1,16,18 95:2
95:5,12,15,23
95:23 96:20
97:21 107:10
107:19 112:15
113:3 125:8

131:5 133:14
133:20 134:16
135:13 147:22
164:4,15,19
172:24 175:17
175:17 176:25
183:4 185:8
188:16,21
197:12 202:5
202:25 212:19
213:8
**draft** 179:1,4,7
181:11
**drafted** 161:17
**draw** 211:18
**drawing** 136:16
**drive** 3:10
**driving** 194:20
**dropbox** 71:11
71:15,17,18
173:1
**duces** 8:6
169:17
**due** 27:24 52:14
121:16
**duke** 147:11
**duplicate** 56:21
**duplicates**
124:14,16
**duplication**
56:24 126:23
**duration** 50:4
76:15,20 77:16
77:18 78:7
146:6 181:2

[e - equal]                                                                    Page 17

| e | | | |
| --- | --- | --- | --- |

**e**  111:24
**e2**  121:15
**earlier**  61:15
  67:14 113:25
  143:20 145:5
  148:4 153:8,9
  160:23 178:8
  178:25 185:16
  190:16 207:3
**early**  71:10
**easily**  99:22
**east**  3:10
**easy**  43:10
  150:4
**eating**  139:21
**edge**  28:3,4
  108:24 110:3,5
  110:7,10,20
**edited**  39:24
  40:6
**editor**  39:24
  40:2,4 143:17
**editorial**  9:16
  45:5 196:14,18
  197:19 198:7
  199:25
**education**
  169:7
**educational**
  37:13
**effect**  5:18
  117:15 123:25
  155:22,22
  178:15 179:21

192:15,17,18
193:14,15
194:21 204:8
204:23 205:12
205:12 206:9
**effects**  6:5 38:2
  84:13
**efficiently**
  202:7
**effort**  110:12
  143:15
**egg**  138:21
  139:3
**eggs**  139:21
**eight**  106:23,23
  106:24
**eighteen**  169:1
**either**  32:23
  33:5 40:13
  94:24 97:22
  98:11 115:7
  186:12
**el**  140:13
**electron**  100:9
**elevated**  140:10
  154:24
**eligibility**  53:21
  55:2,6,18 59:6
  59:10
**elmore**  45:9,14
  46:2 47:10,14
  47:24 48:10
**elmore's**  46:23
**eloquently**
  28:23

**elucidates**
  116:2
**email**  5:8 8:22
  9:3 71:7,14,20
  72:1 81:11 82:3
  82:4,6 172:25
  182:25 183:19
  185:8,15
**emi**  92:15
  121:25 122:7
  206:6
**emid**  9:6
**emphasis**  134:8
**employee**
  215:17
**employees**
  97:25
**employment**
  156:23
**encompasses**
  101:1
**ended**  59:11
**endometriosis**
  140:19 141:3,7
**ends**  130:10
**engineering**
  101:18
**enhance**  138:21
  139:4,12
  154:19
**enhances**
  136:20
**enrolled**  57:24
  58:1
**enrollment**
  58:2 192:6

194:18
**entail**  118:2
  204:16
**entire**  35:25
  88:21
**entirely**  22:14
  22:19 121:16
**entirety**  18:18
  73:11 95:2
**entitled**  8:9
**entity**  187:8
  189:13
**environmental**
  5:18 7:3 112:10
**environments**
  168:5 190:19
**epidemiologic**
  27:21 50:23
  204:21
**epidemiologist**
  48:14 143:14
  148:16
**epidemiologi...**
  143:10
**epidemiology**
  6:20 9:13 27:25
  85:9 93:6
  148:20
**epigenetic**
  92:19
**epigenomic**  6:4
**epithelial**  6:10
  6:22 114:24
  122:18 124:12
**equal**  23:23
  24:22,22 26:18

**[equal - existing]**                                      Page 18

54:2 178:14
**equally**  182:14
**equate**  119:10
119:19 126:20
127:15
**equivalent**
104:20 128:14
**error**  66:21
152:10 155:25
178:22 179:5
**especially**
205:20
**essence**  197:14
**establishes**
116:16
**estimate**  27:12
27:16,18 28:6,7
28:15 59:25
60:10 63:3
64:22 73:22,22
73:23,25 82:1
153:2 159:24
161:3 209:5
210:15,19
211:10 212:1
**estimates**  153:1
194:21 199:7
210:6 211:13
**estradiol**
118:19 120:13
120:16,17,24
121:3,9 205:21
**estrogen**  123:7
140:8,9,13,14
140:15,16

**et**  88:10 92:5
103:2
**etiology**  84:11
**europe**  132:5
**evaluate**  70:15
70:17 80:11
129:5 153:4
**evaluating**
131:24 132:18
**evaluation**
130:23
**evaluations**
40:18
**eventually**
21:17
**evidence**  9:18
76:7 84:9,15
85:19 86:2,3
96:7,14 100:8
116:11 123:22
139:19 141:13
145:21 153:3
**exact**  124:21
210:11
**exactly**  94:12
162:4 188:6
**examination**
4:2 10:8 201:8
201:9 202:23
**examined**  10:5
177:5
**examining**  9:18
**example**  121:3
140:19 162:5
**except**  135:20

**excluded**  177:7
177:7,20,23
**excluding**  75:1
187:12
**exclusion**  181:2
**exclusive**  182:2
**exclusively**
187:17
**excuse**  109:12
161:10 183:24
210:23
**executed**  214:7
**exemplary**
34:12
**exhaust**  205:11
**exhibit**  4:10,13
4:16,21 5:3,8
5:12,18 6:3,8
6:14,20 7:3,9
7:12,15,17,20
8:3,9,12,14,16
8:22 9:3,10,16
11:9,11,14 12:1
16:10 17:25
18:6,10,12,14
18:23 19:2,3,8
19:11 24:8,9,11
24:14 29:20
30:9,15,17 31:4
31:11 46:25
47:6 72:1,2,5,8
72:11 81:11,13
83:10,12,16
105:8,9,12
114:4,5,7 122:3
122:4,7 125:1,3

125:5 137:6,7,8
144:5,5,6 153:7
153:10,14,16
158:14,14
159:5,5,22
160:12,14
163:1,5,7,8
164:12,16,20
165:3 168:18
168:19,25
169:3,13,13,19
170:22 173:9
173:22,24
174:5,7,11
175:1,9,9,9
176:1,2 182:17
182:20 183:6,7
183:13,15,18
184:7,7,8,11,14
185:5,8 191:16
191:17 195:16
195:17 196:18
196:19 203:25
203:25 207:14
207:23 213:2
**exhibits**  4:8 5:1
6:1 7:1 8:1 9:1
95:5,11,16
159:10 160:10
173:9 175:13
212:8 213:2
**exist**  41:19
181:13 204:8
**existed**  116:12
**existing**  54:22

**[exists - factor]**                                      Page 19

**exists** 117:15
136:12
**expansive**
97:13
**expect** 123:17
127:24 128:1
128:14,19
198:12
**expense** 42:16
42:20
**expenses** 41:16
171:14
**experience**
169:7
**experiment**
129:12
**expert** 4:11,13
7:17 11:5,15
12:13 13:15,15
14:6 15:5,17
18:1 20:4 22:1
22:15,19 23:11
39:6 53:9 80:5
80:20 83:11
87:12,12 98:14
107:10 112:1,9
113:4 114:17
115:9 129:22
133:15 146:20
147:22 148:1
149:14,20
150:9 158:8
161:5 163:17
164:19,20
171:1 174:18
174:19

**expertise** 40:5
85:16 91:15
101:11,19
118:13 135:16
135:17
**experts** 14:5,10
15:14,20,21,21
98:14 135:14
135:21 142:13
165:23,25
174:17 189:20
**explain** 65:8,14
65:20 81:16
116:22 154:8
**explained**
179:25
**explaining** 56:7
**explanation**
181:2,4
**explicit** 25:19
134:23 149:5
150:15 151:12
**explicitly** 22:3
101:22 102:4
102:12 103:2
140:25
**explore** 154:7
**expose** 128:22
**exposed** 63:19
63:20 115:16
128:15,25
129:1
**exposing**
128:18
**exposure** 9:12
24:20 31:4

32:12 43:2
47:16 50:23
51:15 52:3,15
52:16 54:3
56:17,19 59:19
59:21,23 60:1,6
60:13 76:15
85:9 91:6 92:19
118:18 121:6
121:18 123:7
123:21 136:9
142:10 145:15
149:10 152:24
154:13,16,22
155:7 177:10
177:11,12,24
177:25 178:3,4
181:3,16
182:10,10
186:13 190:18
191:10 194:22
205:19,20,21
209:13,21
211:8
**exposures**
146:15 154:11
156:1 177:13
177:23,25
178:5 182:2
209:22 210:7
210:18
**expression**
92:16 118:21
122:23 123:11
123:14 124:7
205:23

**extensive**
154:16
**extensively**
182:19
**extent** 68:18
69:16 85:4
117:14 204:8
**external** 36:4
**extra** 136:2
199:15
**extract** 177:11
211:25
**extracted** 61:17
65:22,25 177:9
208:17,19
209:3,19,24
210:14
**extraction**
56:15 57:5,11
57:13
**extreme** 149:8
**eye** 207:5

**f**

**fact** 27:21 28:9
52:6 58:25
75:19 122:17
126:11 129:24
130:21 135:25
146:23 197:24
206:2 210:10
211:6,10
**factor** 79:21
140:2,4 141:23
145:10

**[factors - focused]**                                                    Page 20

| | | | |
|---|---|---|---|
| **factors** 6:15 | **fda's** 98:18,19 | 100:7,12 | 51:13,19 52:12 |
| 145:20 | 98:25 99:17 | 102:18,22 | 53:8,22 62:18 |
| **facts** 48:2 | 100:11 | 105:17,23 | 62:25 67:14 |
| **fair** 19:17 22:9 | **february** 8:22 | 106:8 114:14 | 75:23 78:10,21 |
| 95:14,14 | 175:16 183:19 | 119:7 125:10 | 78:23 81:17 |
| 130:23 148:17 | **federal** 215:12 | 137:12 139:6 | 83:17 86:7,8 |
| 159:21 | **feel** 47:10 | 144:18 154:23 | 87:3 90:21 |
| **fairly** 45:15 | 134:16 155:6 | 188:2,8,9,17,21 | 91:23 93:12,23 |
| **fall** 37:16 | **fees** 147:12 | 195:15 208:1 | 96:5 107:23 |
| 171:22 172:17 | 148:5,8,13 | **findable** 41:21 | 111:23 121:10 |
| **fallopian** 5:4 | **felt** 113:18 | **finding** 25:22 | 131:1 134:14 |
| 30:18 67:21 | **female** 104:25 | 48:22 91:22 | 151:18 170:1 |
| 68:3,8 69:17,19 | **fibers** 88:10 | 92:3 100:2,10 | 176:1 177:3 |
| 72:17 | 103:8 104:5 | 119:9,18 120:4 | 192:3,22 |
| **falls** 150:1 | 180:19 | 127:15 155:17 | 203:10 208:25 |
| **false** 35:24 | **fields** 110:5 | **findings** 32:16 | **fit** 135:14 |
| **familiar** 11:19 | **figure** 66:3 | 32:20,22 33:12 | **fits** 135:13 |
| 35:20 99:13 | 81:25 110:7 | 48:22 50:20 | **five** 60:18 61:16 |
| 116:12 118:16 | 111:6,6 120:22 | 58:18 102:5 | 95:19 117:5 |
| **fantastic** 67:10 | 121:2 156:9,10 | 109:19 116:8 | 184:12 |
| 144:13 | 156:10,10 | 120:23 157:15 | **fixed** 130:17 |
| **far** 14:25 15:7 | **figures** 68:15 | 196:12 204:20 | **fixing** 186:3 |
| 17:1 42:7 60:17 | 155:18 | **fine** 112:24 | **flageollet** 3:24 |
| 65:15 86:11 | **file** 172:14,25 | 173:12 | 24:10 72:3 |
| 87:2 95:8 | **filed** 150:22 | **finger** 126:24 | 105:10 153:15 |
| 154:10,22 | **files** 172:14 | **finish** 129:20 | 158:16 164:21 |
| **fashion** 85:4 | **fill** 149:16 | **firm** 3:4 112:2 | 169:1,14 |
| **fat** 138:21 | **filled** 150:10 | 112:5 147:13 | 183:16 195:21 |
| 139:3,24,24 | **filling** 40:18 | 148:5,13 | **flaws** 185:25 |
| 140:1,4 | **finally** 130:18 | **firms** 171:19 | 186:3 |
| **fault** 18:4 | **financial** 41:22 | **first** 11:8,25 | **flow** 211:8 |
| **fax** 3:7,20 | **financially** | 14:17 19:15 | **focus** 50:10 |
| **fda** 87:22 93:19 | 215:16 | 21:2 24:19 | 78:11,25 167:5 |
| 99:7 100:2 | **find** 25:20,22 | 25:12 26:10 | **focused** 42:23 |
| 168:5 186:25 | 31:8 41:7 63:24 | 35:11,14 48:21 | 79:9 |
| 207:5 | 64:4 73:14 75:2 | 49:1,1,1,8,9,14 | |

**[focusing - funds]**

Page 21

| | | | |
|---|---|---|---|
| **focusing** 79:13 | 103:24 104:8 | 47:24 58:23 | 146:2 |
| 110:5 194:10 | 108:12 109:12 | 146:1,5 165:24 | **frequent** 4:16 |
| **folder** 173:1 | 111:15 112:17 | 188:7 208:2 | 8:17 18:24 |
| **follow** 58:1 | 115:24 116:10 | 212:2 | 24:22 32:12 |
| 82:7,11 94:13 | 119:21 124:2 | **foundation** | 43:12 49:3 |
| 150:23 151:4 | 127:12 128:6 | 39:14 95:11 | 51:15 52:3 56:4 |
| 179:1 192:6,25 | 128:16 130:24 | **four** 23:16,19 | 56:18 58:4,10 |
| 194:17 202:6 | 131:16 132:2 | 44:17,19 58:5 | 58:25 59:3 |
| **followed** 34:13 | 135:10 138:7 | 58:11 59:7,13 | 63:14 78:11,25 |
| 39:16 59:22 | 142:16 148:3 | 62:22 73:16 | 142:10 155:6,8 |
| 79:18 | 148:23 151:21 | 83:19 102:14 | **frequently** 44:4 |
| **following** 33:10 | 153:21 155:19 | 137:17,19 | 44:9 |
| 97:20 137:3 | 161:6 167:23 | 138:3,3,10,10 | **friends** 143:6 |
| **follows** 10:6 | 176:23 187:11 | 139:2 178:13 | 143:10 162:17 |
| **footnote** 66:25 | 193:12 200:5 | 182:21 197:8 | 162:23 186:19 |
| 67:6,13,20 | 200:23 205:16 | 202:1 | 186:20 |
| **footnotes** 66:24 | 206:13 207:9 | **fragrances** 84:1 | **front** 24:16 |
| **foregoing** 214:3 | 208:21 209:18 | 84:12 85:6 | 48:19 81:13 |
| 215:3,5,9,11 | 211:12,20 | 91:18 | 105:15 114:11 |
| **forgive** 49:12 | **formal** 36:4 | **francis** 6:3 | 144:9 151:23 |
| **form** 19:22 | 46:7 161:25 | **francisco** 1:14 | 162:1,8 169:22 |
| 21:24 22:25 | 162:24 | 2:16 7:21 10:1 | 195:19 202:9 |
| 26:23 32:5 34:3 | **formally** 36:20 | 212:17 | 203:24 |
| 34:25 41:2,18 | **formed** 126:14 | **free** 93:15 | **full** 10:12 14:3 |
| 46:10 47:19 | **former** 143:17 | 95:25 96:8,11 | 157:1 |
| 48:1 50:15 | **forms** 102:5 | 100:1 203:6,9 | **fully** 75:25 |
| 52:22 58:20 | 150:18 | **frequency** | 131:20 |
| 59:8 66:8 68:22 | **forth** 215:4 | 23:15,17,19,20 | **function** 118:10 |
| 70:3 74:9 77:4 | **forum** 162:7 | 23:22 42:23 | **functions** 92:22 |
| 79:6,15 83:1 | **forward** 161:3 | 43:3,22 50:1,2 | **funded** 129:5,6 |
| 84:20 86:14,24 | **forwarded** 71:5 | 50:10,22 52:16 | 129:24 134:6 |
| 88:7 89:6,14 | 183:3 185:15 | 58:14 62:7,8 | 136:1 |
| 90:25 94:9 | **forwarding** | 76:11,14,20 | **funding** 42:2,3 |
| 96:13,23 99:10 | 176:25 | 77:2,8,9,14,15 | 133:19 135:6 |
| 99:19 100:4,24 | **found** 25:2,5,25 | 77:18,19 78:6 | **funds** 40:20,21 |
| 101:10 103:16 | 26:17,20 32:22 | 79:9,14,22 | 40:24 42:6,7 |

**[further - grandchildren]** Page 22

| | | | |
|---|---|---|---|
| **further** 117:13 202:4 204:6 205:6 211:14 212:3 215:11 215:15 | **genes** 118:21 123:5,6,10,11 123:12 205:23 | **glanced** 164:24 **go** 11:18 16:8 18:4 24:8 29:24 34:17 44:24 | 83:15 90:2 95:10 104:16 105:7 110:1 119:15 122:12 124:25 125:3 |

**further** 117:13
202:4 204:6
205:6 211:14
212:3 215:11
215:15
**future** 48:7
**fwd** 9:4

**g**

**galley** 182:23
184:21
**game** 95:14
**gene** 92:15
122:23 123:13
205:23
**general** 13:14
19:12 42:12
63:7 100:25
108:6 126:22
130:9 132:21
133:4 143:18
156:6 185:24
207:1
**generally** 16:16
76:10 127:17
140:9 144:25
172:16 206:11
**generate** 81:19
209:4
**generated** 20:2
38:23 81:20
165:19,22
**generates** 81:23
**generic** 15:18
15:19

**genes** 118:21
123:5,6,10,11
123:12 205:23
**genesis** 21:22
**genetic** 140:20
**genital** 4:23
6:21 9:10,17
25:7 26:4
104:25 177:12
177:15,25
191:8 192:4,25
193:1 194:17
194:22
**geological**
101:18
**george** 14:15
**gertig** 32:21
33:3,6 76:13,14
77:1,8 79:5,9
79:17
**getting** 21:10
41:1,14,15
44:16,19 59:25
69:23 104:2
109:24
**give** 130:14
135:7 150:15
175:20 207:24
**given** 18:2 37:3
71:4 107:18
160:24 161:25
181:12 215:10
**giving** 28:5
82:19 150:25
**glad** 67:11

**glanced** 164:24
**go** 11:18 16:8
18:4 24:8 29:24
34:17 44:24
60:25 61:2,13
63:25 64:3 65:9
65:9,11 71:19
80:23 81:5
102:21 105:7
114:3 134:18
136:24 137:5
146:15 149:7
150:21 152:1
156:11,14,15
156:20 159:2,7
173:8 174:9
175:7,12,21,21
175:24 184:6
184:25,25
188:11,11,14
201:22,22,25
204:19 207:25
208:2
**godleski** 107:6
107:9,10,19
112:8,15
**goes** 27:13
32:14 88:8 95:8
161:2 179:19
180:8 205:6,19
**going** 11:8
17:24 18:22
19:2,5,6,15
29:19 30:8
48:17 73:5
80:23 82:12

83:15 90:2
95:10 104:16
105:7 110:1
119:15 122:12
124:25 125:3
131:17 132:10
136:25 137:6
141:1 150:2
153:9 155:14
158:13 159:8
163:3 170:5
174:3 188:23
191:15 193:9
196:17,25
197:2 198:24
202:13 213:10
**golkow** 213:13
**good** 10:10,11
43:16 45:17
76:20 77:15
80:25 81:2 82:2
85:25 192:8,9
192:10 193:16
195:13
**gossett** 196:14
197:12
**gotten** 23:5
28:24 71:24
**gowned** 158:1
**grab** 14:10
202:9
**gradient** 145:8
**grand** 3:18
**grandchildren**
186:20

**[grants - hegarty]**

**grants** 147:11
**graph** 121:10
**graphs** 81:19
  81:20,23,24
  82:2,13,15,16
  82:18,20,24
  155:1,21 156:7
**great** 81:7
  82:13 106:4
  134:4 135:2
  143:2,7 144:13
  152:22 198:8
**greater** 23:23
  24:21,21,22
  26:18 27:7,10
  27:16,17 54:2
  59:10 61:23
  62:10 63:14,15
  63:16 64:8,10
  64:19 65:6 66:1
  66:4,6,13,20
  89:18 124:6,7
  128:22 134:21
  146:15 209:14
  209:20,22,23
  210:7,7,10,11
  210:15,16,17
  210:18,20
  211:24
**greatest** 28:7
**grew** 22:1
**ground** 88:13
**group** 6:3 29:8
  46:15 53:16
  56:16,18
  120:18,21

121:5,6,20
  136:8,10 178:9
  180:7,11,16,20
  187:8,22
  188:24 199:12
**groups** 197:16
  198:6 199:4,8
**grow** 127:11
**growth** 118:2
  204:16
**guess** 82:12
  101:4 131:17
  198:24 213:6
**guessing** 85:11
  96:17,24 97:2
  148:16 151:13
**guide** 22:4
**guideline** 34:13
  203:7
**gut** 139:14
**guys** 70:13
  164:13
**gynecologic**
  5:12
**gynecology**
  6:11 125:15

**h**

**habitual** 43:12
**half** 23:2 27:15
  90:8 167:10
**halfway** 108:2
**hallmark**
  126:23
**hand** 51:13,21
  52:12 55:8

57:18 58:8
74:20,23
106:16 107:23
116:25 117:11
129:16 159:8
192:3 193:23
196:1 197:7,23
204:4
**handle** 213:14
**handled** 108:15
**handwritten**
  8:9,12
**happen** 92:16
  92:22 116:4
  128:2
**happened**
  136:10 185:24
**happening**
  82:23
**happens** 76:8
  81:22 116:3,9
  126:16
**happy** 48:5
  71:22 119:23
  197:4
**hard** 96:17
  129:11 155:2
**hardy** 3:17,24
**harlow** 14:13
  63:21,22 64:4,6
  65:1,23 66:9,10
  66:11 67:7,8
  68:9 207:16,19
  208:13,17,19
  209:1,4,12

**harmful** 84:13
  136:15 181:24
**harmonize**
  67:25
**harper** 124:23
  124:24 125:3
  126:9 131:11
**hate** 201:17
**head** 29:13 82:8
  90:18 131:18
**heading** 78:19
**heads** 150:25
**health** 5:5
  30:19 52:24
  53:10 54:18
  68:24 69:3,5
  70:1 72:16
  73:11 143:12
**hear** 109:20
**heard** 125:16
**hearing** 94:25
**heavily** 100:7
  201:3
**heavy** 83:25
  84:11 85:6,6
  91:16 155:24
  156:3
**hegarty** 3:17
  4:4 10:9,14
  11:8,14 14:23
  17:6,10,24 18:3
  18:8 19:7,25
  20:15 22:8 23:6
  24:3,7,13 25:11
  25:14 26:1 27:1
  29:19,24 30:4,8

[hegarty - human]                                                    Page 24

| | | | |
|---|---|---|---|
| 30:12,17 32:8 | 124:25 125:7 | 200:24 201:20 | **highlight** 154:2 |
| 34:7,17,20 35:2 | 128:9,12 129:2 | 201:22,25 | **highlighted** |
| 35:5 39:17,20 | 131:4,22 | 202:15,19 | 167:25 |
| 40:1 41:8,12 | 132:16 136:24 | 205:16 206:13 | **highly** 31:25 |
| 42:1 44:24 45:1 | 137:2,11 | 207:9,24 208:5 | 123:4 |
| 46:22 47:23 | 138:15 142:19 | 208:8,21 209:8 | **hill** 3:11 145:6 |
| 48:9 49:8,15,17 | 142:21,23 | 209:18 211:12 | 145:10 |
| 50:16,18 51:18 | 144:2,8,14,21 | 211:20 212:6 | **hinder** 36:18 |
| 51:21 53:1 59:2 | 148:11 149:12 | 212:21 213:1,5 | **hired** 189:4 |
| 59:12 60:2 61:2 | 150:5,23 151:3 | 213:12,15,18 | **historically** |
| 63:25 64:3 | 152:5 153:6,14 | **help** 37:24 | 28:21 |
| 65:11 66:10,17 | 153:18,24 | 46:16 204:20 | **history** 107:2 |
| 69:1 70:6 71:7 | 156:11,14 | **helped** 22:4 | 130:15 |
| 71:12,19,24 | 158:13,18,21 | **hereto** 184:16 | **hmm** 53:5,7 |
| 72:4,8 74:14 | 158:24 159:1,7 | 214:5 | 169:14 185:12 |
| 75:6,11 77:5 | 161:9,15 | **hesitating** | 193:3 |
| 79:8,24 81:2,5 | 162:25 163:7 | 39:23 50:10 | **hope** 193:16 |
| 81:9 82:6,9 | 163:10 164:11 | **heterogeneity** | **hoping** 65:8 |
| 83:4,14 84:25 | 164:18,22 | 197:15 198:1 | **hopkins** 93:18 |
| 86:19 87:1 | 168:1,17,21 | 198:12,15,17 | 93:22,23 94:1 |
| 88:14 89:9 90:2 | 169:2,12,15,21 | 198:21 199:15 | 94:16,18 95:2,5 |
| 91:3 94:12 | 170:19 171:8 | **hey** 201:17 | 95:12,15,23,23 |
| 95:10,21 96:19 | 172:3 173:2,8 | **hiding** 208:1 | 96:6,20 97:21 |
| 97:4,12,15,19 | 173:13,20 | **high** 56:2 | **hormone** 7:5 |
| 98:4,7 99:15,24 | 174:1,9,14 | 121:14 129:1 | 140:9 |
| 100:16 101:6 | 175:12,21,24 | 139:24,24 | **hospital** 157:25 |
| 101:12 102:21 | 177:2 183:9,13 | 140:1,4 142:7 | **hour** 160:17 |
| 102:24 104:1 | 183:20,25 | 142:15,18 | 168:11 |
| 104:10,23 | 184:5,10,25 | 192:13,21 | **hours** 157:3 |
| 105:7,11,14 | 185:3 187:14 | **higher** 59:1,11 | 159:24 160:2,6 |
| 106:20 108:13 | 187:16 188:11 | 68:8 153:2 | 160:19 167:5 |
| 109:16 111:18 | 188:14 191:15 | 161:13 211:14 | 167:11 202:1 |
| 113:1 114:2,7 | 191:21 193:21 | 211:23 212:1 | **hrs** 197:25 |
| 114:10 116:6 | 195:22 196:17 | **highest** 56:23 | **human** 6:9 |
| 116:14 119:24 | 196:23 197:2 | 62:7,7,11,20,24 | 118:11,15 |
| 122:2,6 124:9 | 197:10,22 | | 124:11,12 |

**[human - increase]**                                                          Page 25

128:14,15,19
**humans** 115:16
115:23 116:9
116:16 117:16
123:24 180:11
204:9
**huncharek**
137:17
**hundred** 37:16
192:12 210:3
**hundreds** 28:24
**hygiene** 154:24
**hypothesis**
28:20
**hypothetical**
47:14
**hysterectomy**
211:7

**i**

**i.e.** 205:12
**iarc** 84:13
89:18 90:13
101:22 102:4
102:11 103:1
103:13 180:7
180:12,15,18
189:10
**idea** 21:25 23:5
130:5 154:6,7
**identical** 165:9
165:12,13
**identification**
11:11 18:6 19:3
24:11 30:15
72:5 105:12

114:5 122:4
125:5 137:8
144:6 153:16
159:6 163:5
164:16 168:19
169:19 173:24
174:7 175:10
184:8 191:17
196:19
**identified** 10:25
13:22 16:25
88:2 186:3
**identifies** 123:4
**identify** 178:22
**identifying**
59:11 113:5
**ignoring**
177:10,13
**iii** 93:8
**images** 111:6
**imagine** 133:3
**imaging** 93:3
**immunosurve...**
118:22 205:24
**impact** 36:7
70:17 73:21
82:18,19 85:21
107:17 118:7
139:10 193:10
193:18
**imperfect**
108:25 195:11
**importance**
79:20 100:10
110:23 131:21
182:13

**important**
16:19,21 26:14
27:14 77:14
80:8 85:19 97:1
100:6 113:18
135:3 145:10
146:13 152:15
162:23 179:11
179:14,15
180:1 181:18
181:20 182:8
182:14 199:24
**importantly**
86:4
**impossible**
63:10 115:18
**improved**
130:16
**inaccurate**
209:25
**inception** 53:11
**incidence**
140:22,24
141:4,10
**incident** 7:5
**include** 21:14
51:25 54:11,16
54:17 55:3
58:24 62:17
69:18 121:24
134:8,9 178:4
206:2 212:9
**included** 32:9
36:20 50:11
53:25 54:18
56:25 57:18

60:12 67:21
70:2,7 73:11,16
73:18 74:18
75:14 87:11,24
132:19 160:19
163:25 178:5,6
179:22 181:3,8
203:4 206:24
208:25 209:4
211:7 213:1,2
**includes** 74:16
172:23
**including** 17:1
48:12 54:3
97:13 141:5
160:4 165:20
177:15 179:17
204:6 207:6
**inclusion** 53:24
55:1 58:22
**income** 149:21
160:21 161:1,4
**inconsistency**
69:20
**inconsistent**
32:15,20 33:12
52:15 68:20
**incontroversial**
86:1
**incorrect**
180:14 203:8
**incorrectly**
65:1
**increase** 28:16
118:20 119:9
119:19 120:25

[increase - introduces]                                                    Page 26

139:17,21,25
140:21 141:3,7
141:10 142:9
193:24 194:13
194:16 199:12
**increased** 51:14
118:2,19 120:5
141:17,21
142:8 155:22
204:16 205:21
**increases** 140:2
140:23
**incredible**
42:12
**incredibly**
134:22
**incurred**
171:14
**independently**
51:3
**index** 4:1
**indicate** 194:19
**indicated** 42:19
**indicating**
132:11 194:7
**individual**
27:12 45:25
152:2 155:1
189:12 211:11
**individuals**
36:9 45:8 129:8
189:18,20
**induces** 6:8
**inflammation**
91:23 118:20
119:17,20

120:2,6 141:7
**influence** 186:1
**influential**
143:14
**inform** 16:20
82:20 116:1
**information**
50:12 53:4
87:11 96:25
113:9 150:12
172:8 177:9,11
**informational**
37:18
**informationist**
53:10,10
**informed** 86:4
116:18
**ingredients**
84:23
**inhibited**
117:21 204:12
**initial** 32:20
59:6 109:9
151:17 192:24
**initialed** 214:4
**initially** 12:12
20:9
**initiated** 92:8
**initiation** 21:21
**initiative** 54:18
**ink** 110:21
214:4
**innocuous**
204:21
**input** 73:3

**insensitive**
100:13
**inside** 108:24
109:2,3 111:5,7
111:7
**insights** 22:6
116:4 133:9
**insoluble** 6:5
**institute** 5:3
**intact** 67:21
68:3,15,16,19
69:17,19,19
70:2
**intake** 139:3
**intend** 10:24
13:12,16
159:25 190:8
190:13 191:1
200:21 201:4
201:11
**intending** 32:25
**intent** 69:11
**intention** 36:21
201:7 203:14
**interaction**
157:13
**interest** 80:1,12
111:20,23
112:7,14
113:11 118:15
129:8,14 130:6
130:7,13
133:13 134:4,5
134:21,25
135:2 136:12
136:14,18,21

147:25 148:9
149:9
**interested**
22:16 30:14
31:10 131:14
132:22 215:16
**interesting**
113:7 154:7
**interim** 114:21
**interior** 110:22
**internal** 8:24
19:12 42:13
46:19 143:18
175:16 176:3,8
176:14 183:21
185:9,19
**international**
7:3 143:15
**interpret** 25:21
**interpretation**
27:25 28:2,14
107:18
**interpreted**
33:22 34:10
**interrupt** 167:9
**interval** 27:22
28:4,5,9,19
64:7 73:23,25
145:3 193:19
**intervals** 81:23
198:20
**interviews** 37:3
37:18
**introduces**
136:22

**[introduction - know]**                                                          Page 27

**introduction**
25:12 26:10
52:11
**invalid** 100:3
**invalidate**
77:13
**invalidates**
76:21 77:19
**investigate**
117:6,21
204:11
**investigation**
4:21 6:15 23:3
**investigator**
113:14
**investigators**
78:3 134:14
**invoice** 7:9,12
159:21,25
160:12 168:10
**invoiced** 21:18
160:10
**invoices** 158:14
158:18 159:8
159:12 160:12
171:18
**involve** 10:17
86:12 99:1
**involved** 37:15
39:10 40:9
109:8,15
135:16 149:2
**involvement**
36:16 46:24
**involves** 107:19

**involving** 10:17
50:23 158:8
**issue** 52:25
61:19 69:24
133:1 179:16
182:4 203:16
**issues** 130:17
131:19 199:24
199:24
**itemize** 41:16

**j**

**j774** 6:5
**jama** 4:21 9:18
**january** 9:3,19
**jersey** 1:2 2:2
3:11 11:5 12:14
**jgim** 9:5 19:12
**jjg** 107:1,6
112:8,19
**joanne** 45:9
46:2 48:4,6,14
**joanne's** 48:4
**job** 1:23 47:22
**joe** 45:10
**john** 107:6,9
112:8
**johnson** 1:5,5
2:5,5 3:16,16
10:15,15,17,17
97:24,24 98:1,1
98:13,13,13
99:1,2 105:4,11
105:17 106:5
111:24 190:3,3
190:5,6 204:6,6

211:17,18
**johnson's** 98:14
98:19 100:18
203:15 206:24
207:6
**join** 34:16
**joined** 34:18
**journal** 6:14
19:11,12,13
40:2 41:23
52:20 125:16
125:19,20,22
130:12,12
131:18 143:18
176:17
**journalist**
172:7
**journals** 130:4
130:22 131:7
**joy** 157:25
**judith** 7:18
164:15,15
**judkins** 166:7
**july** 20:22
106:1,5 114:17
**jump** 118:24

**k**

**kansas** 3:19
**kara** 3:24
**katie** 154:15
**keep** 110:13,25
136:19
**keeping** 71:8
164:5

**kej** 111:25,25
**kept** 110:19
150:20 177:25
202:16
**kessler** 14:14
**kind** 37:6 40:22
44:2,4 46:12,13
110:18 135:15
149:1 172:5,13
192:20
**kinds** 183:2
**kleiner** 94:15
156:21
**knew** 126:2
**knock** 197:8
**know** 12:22,25
12:25 13:3,6,18
22:14 32:19
34:5 36:9 38:18
44:3,17 45:7,9
45:10,14 48:10
53:17 57:17
71:17 73:5 75:5
76:6 80:9 82:18
82:23 84:10
86:16 89:16
96:8 97:11
101:2,18 103:7
109:15,17
110:18 113:18
115:3,4,7
116:12 121:6
124:18 125:12
126:4,6 129:14
130:3,7 131:1,9
132:13 136:6

**[know - lines]** Page 28

146:11,18,22
146:25 148:15
148:15 151:14
152:9,15,16,16
154:14 155:7
155:24 165:11
165:18 181:20
181:24 190:13
195:17 197:12
197:13 202:20
209:11
**knowing** 94:3
101:4 112:15
134:5
**knowledge**
46:23 47:3
77:12 142:14
158:7
**known** 107:2
127:13
**kramer** 68:8
**kurt** 111:24

**l**

**l.l.p.** 3:17,24
**lab** 37:20 110:1
110:20 111:10
135:25
**labs** 135:22,23
**lack** 44:18,20
100:12 127:6
**laid** 34:12 62:6
**lake** 3:10
**language** 28:11
59:24

**lapinski** 3:9,13
34:18
**laptop** 45:7
**large** 79:17
135:18 143:13
195:3
**latest** 13:19
30:6
**law** 3:4,5,10,18
112:2,5 147:13
148:5,13
171:19
**lawyers** 71:5
129:25 133:21
134:6 135:7,23
136:1 165:19
**lay** 95:11
**laying** 39:14
**lazar** 39:2,9
40:13,22 41:5
57:12 70:20
72:21 81:11,17
82:25
**lead** 46:1 120:7
120:19 123:21
126:12 186:3
**leader** 134:18
**leading** 28:24
**leads** 116:23
123:18 143:14
**learned** 22:7,16
54:19 101:14
**leave** 45:2
135:4 209:17
**lecturers** 37:16

**lectures** 162:1
**led** 22:2,3 23:1
37:14,15
118:19 120:21
152:3 205:21
**left** 51:13,21
57:18 67:5,7,8
74:20 117:11
196:1 197:7,23
204:4
**leigh** 3:4 167:1
173:11 207:25
212:11
**leigh.odell** 3:8
**length** 88:9
198:8
**letter** 175:17
185:24 186:2,5
**letters** 199:21
199:23
**level** 26:21
34:12 40:3
60:12 91:6,11
92:21,22
100:22 116:3
121:18 162:16
189:15
**levied** 77:21
**levy** 78:7
**liability** 1:6 2:6
**library** 53:15
**lifetime** 59:19
59:20,22 60:8
60:18,22 61:10
61:14 76:15
209:14,22

210:17
**lightly** 77:21
**likelihood** 43:1
43:21 44:12
118:2 119:13
204:16
**likely** 23:8
28:15 43:13
82:5 181:25
186:1
**limit** 189:12
211:21
**limitations** 78:9
78:16,19,24
195:24 196:5
**limited** 23:18
104:13 207:7
211:15
**line** 39:15 52:12
53:8 56:21
75:23 78:10,21
78:23 83:22
96:2,10 102:8
102:11 103:6
104:2,4,12
106:23,24
118:16 122:16
140:18 177:4
178:10,13
180:18 182:25
184:15 197:23
208:11
**lined** 176:21
**lines** 20:10
53:23 83:19
85:19,22 86:3

**[lines - machine]**                                                Page 29

106:24 117:5
118:13 122:24
139:2 176:21
177:3 178:7
179:9 180:7
206:10
**link**  172:25
**list**  95:16,19
97:18 101:5
163:1,10 164:1
164:4,9 165:1,4
165:22 190:20
**listed**  45:8
140:21 179:1
**listing**  165:9
**lit**  107:20
**literature**  10:24
13:21 22:18
46:17 88:5,17
88:21 91:5,10
103:15 106:9
116:8 141:2
175:2
**litigation**  1:7
2:7 19:20 20:4
20:18,22 21:1
21:18,23 22:12
23:12 38:16
80:6,14 107:20
112:10,16
113:5 131:6
133:16,22
135:7,16,19
142:14 146:21
150:9 158:5
159:13,17

160:7,15,22
161:5 171:1,17
172:15 173:6
174:5,20
186:23 189:5
189:21 199:20
200:22
**little**  28:2 68:11
137:22 149:7
201:18
**living**  108:6
**llc**  3:9
**local**  91:22 92:3
**locally**  108:10
**location**  48:7
96:4,18
**long**  24:21
36:14 39:15
93:25 95:20
167:7 203:6
**longer**  28:1,25
110:25 157:12
**longo**  93:18
100:8
**longo's**  14:14
14:15 87:12
135:13
**look**  11:21 16:8
18:17 23:19,20
24:19 27:9 28:5
29:25 30:21
32:12 48:25
59:17 64:23
66:23 78:9,16
100:7,12
101:20 102:18

110:3,4,6,9,10
110:10 113:23
119:23 121:2
121:10 122:14
128:5 129:3,25
137:25 142:1,3
152:19,23
155:3,11,15
164:25 165:3
165:21 188:10
192:2,22 205:9
**looked**  23:16
32:11 50:1
55:13 68:4 84:9
96:17 97:2
101:1 122:8,17
123:11 132:12
132:15 137:17
137:24,24,25
138:4,9,10,11
145:22 152:24
154:13,18
155:21 156:8
174:15,16
190:14,24
191:24
**looking**  19:6
27:8 30:11
40:10 51:1,12
52:11 53:21
57:17 58:9
59:13 61:7 64:5
66:24 74:20
75:22 107:23
110:22 111:6
124:24 133:13

138:3 144:22
145:22 170:20
176:1 177:3
178:7,21 180:2
182:20 185:5
188:20 192:18
**looks**  24:20
140:5
**lose**  183:15
**loses**  110:23
**lost**  49:7 106:15
**lot**  44:21 46:19
76:4,7 85:18
113:12 116:18
126:22,23,25
168:3 189:14
190:21 199:21
199:23
**love**  173:15
**low**  139:11
198:16
**lower**  121:8,8
121:17,23
**lung**  181:19
**lurie**  143:12

| m |
| --- |

**m.d.**  1:13 2:13
3:25 4:3 8:6
10:4 169:17
214:1,10
**ma'am**  103:19
124:25 142:21
148:18 157:9
**machine**  215:7

[macrophage - materials]                                          Page 30

**macrophage**
92:22 118:21
205:23
**macrophages**
6:6 118:7,10,11
118:18 122:8
122:17,21
123:25 124:11
124:13 204:23
205:20
**made**   16:3,15
52:20 69:14
70:10,17 76:4
77:1 89:18
110:13 131:5
132:10 134:18
151:10 152:6
152:13 179:21
185:20 187:9
187:23,25
188:1,25
189:19,20
196:24 200:1
201:15 214:3
215:7
**magnitude**
128:22
**main**   25:5 26:3
26:8,12,13,14
32:16,20 33:12
158:2
**make**   14:23
15:13,16 17:19
39:12,21 57:2
63:10 67:24
83:24 113:23

128:20 134:8
148:25 150:24
151:3,20,22
153:11 158:21
172:21 175:1
182:16 191:7
194:10 196:1
202:8,15
212:12,17,21
**makes**   31:15
33:16 108:2
132:6 197:14
198:14
**making**   57:8
69:4 132:7
195:3
**malignancy**
54:7
**malignant**   6:8
126:16 127:9
127:17
**mammography**
182:11
**mandarino**
92:20 113:24
114:3,11,16
115:10,13,20
118:17 119:5
203:20 204:3
206:6
**manner**   23:14
108:6
**manuscript**
8:16 39:24
81:20 176:22
179:8 182:16

183:1 184:16
**march**   1:15
2:17 7:22 9:7,8
10:1 29:16 30:6
30:23 34:22
35:6 81:12 82:4
169:10 189:3
**margaret**   3:25
167:1
**mark**   3:17
10:14 11:8 16:9
17:6,24 18:22
19:2 24:8 29:19
29:24 30:8,9
35:1 39:12 49:7
71:23,25 88:8
105:7 110:20
110:20 114:4
122:2,7 124:25
125:3 137:6
144:4 153:6
158:13,17
161:7 162:25
168:17 169:13
170:22 173:13
174:9 184:6
191:15 196:18
196:22 201:17
202:19
**marked**   11:11
11:14 16:10
18:6,10,12 19:3
24:11,14 30:15
30:17 46:25
47:5 72:5,8
105:12 114:5

122:4 125:5
137:8 144:6
153:10,16
159:5,10,21
163:5,7 164:16
164:20 168:19
169:19 171:7
171:10,21
172:1 173:21
173:24 174:7
175:10,13
182:17 183:23
183:25 184:2,8
184:24 191:17
196:19,21
203:25 207:13
207:20 212:10
**marketing**   1:6
2:6
**marking**   105:8
**mas**   1:5 2:5
**material**   12:20
62:21 110:8
181:21
**materials**   7:15
10:24 12:17
13:21,24 14:2,8
16:14,25 17:2
73:18 95:16,19
97:18 163:10
163:19 164:1,6
164:9,25 165:3
165:9,18,19,20
165:23 166:6,9
166:13,16,19
167:20 170:24

**[materials - millions]**                                                 Page 31

172:13,17,24
188:20 190:8
190:14 212:7
**math**   59:24
60:3
**matter**   109:2
**mctiernan**
14:13
**md**   4:14 7:9,12
7:18,23
**mdl**   1:5 2:5
10:16 11:1
13:20 15:22
17:3 20:11
58:14 87:10
94:2,7 105:21
105:25 107:11
162:11,20
166:2 171:1,16
171:18 172:6
172:14,15
174:20
**mean**   12:2
32:19,22 34:14
35:16 46:7
48:13 56:8 60:6
79:12,16 83:2
120:6 123:10
129:18,21
130:10 134:25
136:22 152:1
157:12 158:12
160:1 161:7
162:4 165:13
165:18 178:17
189:10

**meaning**   44:4
132:9 156:6
**meaningful**
27:19 29:1
43:11 56:3
129:12 135:5
152:17 181:12
211:19
**means**   27:23,24
28:20 116:19
127:25 138:11
**meant**   18:12
69:1,3 111:25
116:1 121:5,14
161:7
**measure**   50:7
50:14,22
120:10 123:13
123:14 124:4
**measured**
76:15 118:5
120:9
**measurement**
155:25 156:5
**measures**
126:17
**measuring**
124:1
**mechanism**
36:4,8 75:24
76:5,7 84:11
85:20 116:1,21
123:21 189:17
**mechanisms**
16:19

**mechanistic**
84:15 89:23
189:14
**media**   37:19
172:7
**mediated**
141:11 204:23
**medical**   12:16
12:19 29:3
46:17 84:6 88:4
88:17 91:5,10
103:15 106:9
112:1 116:7
162:6 166:2,6,9
166:13,16,19
169:7 186:22
187:3,8,22
188:24
**medicine**   8:24
19:12 143:18
175:16 176:3,8
176:15 183:22
185:9,19
**meet**   54:13
166:22,25
167:2,9
**meeting**   37:16
**meetings**   37:13
**member**   46:4
**members**   35:15
36:16,22 47:4
**memory**
158:22 207:19
**mention**   161:17
**mentioned**
14:20 16:2

29:11 74:17
141:22 143:5
162:13 174:15
190:16 209:11
**mesothelioma**
97:14
**met**   55:18
56:12 167:4,4
167:10,11
**meta**   4:19 6:18
8:20 19:1,19
20:2,20,25
21:16 22:10,23
23:9 31:24
52:14 177:21
179:22
**metals**   83:25
84:12 85:6
91:16
**method**   63:2
**methods**   51:1
62:6 136:4
**mhegarty**   3:20
**mice**   115:5
**microarray**
123:5
**microarrays**
123:3
**microscopy**
100:9
**middle**   31:15
56:16 102:1
121:2
**mild**   17:7
**millions**   110:4

**[mills - never]**

**mills** 59:14
**mind** 24:6 35:1
  45:6 119:22
  143:6,19 190:1
  199:14 211:19
**mine** 14:13
  102:22
**minerva** 6:11
  125:15 130:4
**mines** 87:14
**minute** 136:7
**minutes** 197:8
**misclassificat...**
  43:2 180:4,6
**miscommuni...**
  14:20
**misidentified**
  185:6
**misleading**
  137:22
**misremember**
  181:18,19,21
  181:23
**misremembe...**
  43:22 44:12
  182:8,9,14
**misremembers**
  182:6
**missing** 76:16
**missouri** 3:19
**misstates** 96:13
**mistake** 152:13
**mistaken** 95:18
  199:5,6
**mixed** 154:11

**mixtures** 7:4
**mm** 53:5,7
  169:14 185:12
  193:3
**model** 100:17
  118:13 122:16
**moisturizer**
  43:18
**moment** 64:4
**money** 42:8,9
  42:14 150:16
**monograph**
  102:5
**montgomery**
  3:6
**month** 44:10,13
  60:5 64:11,17
  65:25 66:1,5,13
  66:15,20
  209:23 210:8
  210:11,16,19
  210:20
**moormon**
  14:14 146:17
  146:18 147:7
  147:10,22
**morning** 10:10
  10:11
**motley** 3:9
**motleyrice.com**
  3:12
**mouse** 114:22
  115:2 118:13
  122:8,21
**move** 16:13
  67:10,10

**moved** 93:5
**movement** 28:3
**mt** 53:14
**multiple** 54:1
  63:1,9 153:2
  154:7
**multivariate**
  69:7
**murine** 114:23
  114:25 115:2
  116:8 118:10
  122:16
**mutation**
  120:10 123:9
**mutations**
  122:21,22
  123:1

**n**

**nailed** 63:23
**name** 7:22
  10:12,14 11:23
  46:8 53:19
  143:5 215:19
**naming** 143:6
**napkin** 178:3
**napkins** 54:5
  177:16
**national** 5:3
  32:7
**nature** 100:25
  204:21
**nci** 29:12,16
  30:18 31:11,22
  31:24 32:14
  33:10 34:1,22

  34:22 35:7,9
  36:10,16,17,23
  38:9 45:23 46:4
  46:5,8,13,24
  47:5,11,15
  48:12 187:19
  187:25 188:1
  188:18
**near** 48:7
**necessarily**
  134:20 145:18
**necessary** 12:9
  42:15 91:7,11
**need** 23:25 24:2
  36:12 64:23
  75:4 79:21
  82:13,14,16
  83:18 133:6
  135:18 139:6
  152:15 155:15
  163:3 164:13
  169:9 191:3
  207:25,25
  212:7
**needed** 42:11
  117:14 204:7
**needs** 129:9
  136:21
**neither** 215:15
**never** 22:21
  23:10 37:15,17
  37:22 38:21
  43:3 44:13 56:8
  61:18 93:15
  95:25 96:11
  100:1 101:1

132:12,15
203:8
**new** 1:2 2:2
3:11 10:23 11:5
12:14 13:21,21
20:7 22:2,3,13
22:19 82:24
85:15 87:13,15
87:17,18 88:2,2
88:11 90:15,19
91:1,14 92:13
92:13 95:12
96:2,3,4,12,16
96:16 98:9
102:8 103:18
124:22 134:18
134:23 164:5
190:4 200:11
**newcastle** 51:2
51:6
**newly** 90:17
92:14
**newman** 14:15
**news** 143:21
**newsom** 166:13
**newspaper**
37:4 38:3,6
143:22
**newspapers**
38:19,21
**nh** 55:22,23
**nhs** 32:7,11,23
33:2 55:23
57:25 67:17
73:20

**nicole** 143:12
**nods** 29:13 82:8
**nolasco** 1:21
2:18 215:22
**non** 68:16
**nonoverlapping**
198:19
**nonpatent**
196:12 198:1
210:25 211:3
**nonusers** 178:9
**normal** 6:9
127:4
**note** 16:21
**notebook** 8:13
175:3,3,4 212:9
**notebooks**
174:22,23,25
175:1,2 212:10
212:16,22,24
213:9,11
**noted** 213:21
214:4
**notes** 8:9,12
14:6 16:3,5,15
16:16,17 17:1,2
17:8,11,19
29:12 173:5,9
173:10,13,21
174:2,3 212:9
212:17 213:7,8
**notice** 8:4
169:16 170:14
**noting** 104:16
**notoriously**
82:2

**novel** 126:14
**november** 7:13
10:19 17:25
18:1,13,14,19
20:12,17
153:20,22
159:22,25
160:5,5,19
163:16,20
164:1,14
168:24 190:10
**null** 28:20
211:14
**number** 4:9 5:2
6:2 7:2 8:2 9:2
9:13,19 23:2,18
44:10,12 55:15
56:12 58:18
61:23 62:21
63:15,16,19,20
64:5,6,15,16,23
64:24,25 65:6
65:25 66:13,20
72:16 85:13,23
99:8 108:3
129:1 141:5
146:15 157:3
165:8 178:22
179:1,2,2 183:7
183:12,14,15
192:13,20
193:6 199:10
204:5 205:7
206:5 210:11
210:22,23,24

**numbered** 31:5
182:25 183:8
184:15
**numbers** 59:18
63:18 65:7,15
65:16,22 66:3,4
66:5 73:20
193:20 198:18
199:11 210:9
210:14
**numerical** 85:4
85:13
**numerically**
85:11
**nurses** 54:18
68:24 69:3,5
70:1 72:16
73:11

**o**

**o'brien** 23:16
23:22 24:1,3,15
25:2,4,13,19
26:17 31:16,21
32:4,9,11,12,17
32:22 33:1,3,6
33:17,20 35:8
35:17 54:13,17
54:20,20 56:7
59:15 67:1,1,15
68:18,24 69:8
154:15 191:8
199:19,25
200:1
**o'brien's** 73:20
196:2

| | | | |
|---|---|---|---|
| **o'dell** 3:4 4:5 | 132:2 135:9 | **obese** 140:6 | **objecting** 39:14 |
| 11:13 14:19 | 137:10 138:7 | **obesity** 140:2 | **objection** 86:14 |
| 19:5,22 20:13 | 142:16 144:12 | 141:1,11,16,19 | 86:24 97:8 |
| 21:24 22:25 | 144:19 148:3 | **object** 19:22 | 104:16 111:15 |
| 23:25 24:5 25:9 | 148:23 150:4 | 20:13 21:24 | 138:7 151:20 |
| 25:13,16 26:23 | 151:1,20 | 22:25 26:23 | 151:21 176:23 |
| 29:21 30:3,5,10 | 153:11,13,21 | 32:5 34:3,25 | 205:16 206:13 |
| 32:5 34:3,25 | 155:19 158:17 | 41:2,18 46:10 | 207:9 209:8,18 |
| 35:3 39:12,19 | 158:20,22,25 | 47:19 48:1 | 211:12,20 |
| 39:21 41:2,11 | 161:6,10 163:9 | 50:15 52:22 | **objections** 8:4 |
| 41:18 46:10 | 164:2 167:23 | 58:20 59:8,16 | 169:16 171:25 |
| 47:19 48:1 49:6 | 170:12,17 | 66:8 68:22 70:3 | 172:24 |
| 49:10,12 50:15 | 171:6,23 | 74:9 77:4 79:6 | **observed** |
| 51:17 52:22 | 172:21 173:12 | 79:15 83:1 | 193:24 194:12 |
| 58:20 59:8,16 | 173:14,17 | 84:20 88:7 89:6 | 194:16,21 |
| 66:8 68:22 70:3 | 174:12 175:20 | 89:14 90:25 | **obstetrics** 6:11 |
| 71:6,8,16,22 | 176:23 183:6 | 94:9 95:4 96:13 | 125:15 |
| 74:9 75:4,8 | 183:18,23 | 96:23 99:10,19 | **obvious** 179:4 |
| 77:4 79:6,15 | 187:11 191:19 | 100:4,24 | **oc** 204:22 |
| 82:8 83:1,13 | 193:12 195:18 | 101:10 103:24 | **occur** 92:19 |
| 84:20 86:14,24 | 196:21,25 | 104:8 108:12 | 126:15 127:13 |
| 88:7 89:6,14 | 197:8,20 | 109:12 112:17 | 164:8 |
| 90:25 94:9 95:4 | 200:23 201:17 | 115:24 116:10 | **october** 7:10 |
| 95:15 96:13,23 | 201:21 202:5 | 119:21 124:2 | 11:1 17:4 30:6 |
| 97:8,13,16 98:3 | 202:11,13,24 | 128:6,16 | 30:11 39:13 |
| 98:6 99:10,19 | 205:18 206:15 | 130:24 131:16 | 85:17 86:9 87:5 |
| 100:4,24 | 207:11 208:3,6 | 132:2 135:9,9 | 87:10,19 88:16 |
| 101:10 102:20 | 208:9,23 | 142:16 148:3 | 89:1,11 90:6,9 |
| 103:24 104:8 | 209:10 210:2 | 148:23 151:2 | 90:22 91:4,9,15 |
| 104:13 106:19 | 210:21 211:16 | 153:21 155:19 | 94:7,14 98:12 |
| 108:12 109:12 | 212:3,14 213:4 | 161:6 167:23 | 103:14 156:17 |
| 111:15 112:17 | 213:6,13,16,20 | 187:11 193:12 | 156:24 158:5 |
| 114:9 115:24 | **o0o** 9:23 | 200:23 208:21 | 158:11 159:18 |
| 116:10 119:21 | **oath** 10:5 215:6 | **objected** | 161:16,25 |
| 124:2 128:6,16 | **obama** 143:13 | 170:13 171:23 | 162:10,19 |
| 130:24 131:16 | | | 166:1,5,12,15 |

166:18 168:12
171:3,4 173:6
174:4,17,20
175:15 186:7
186:11,15,21
187:1,5,7 190:6
199:18 200:14
**odd** 196:7
**odds** 27:23
144:23 145:2
**official** 201:19
**oh** 14:23,25
49:10 71:25
78:18,20 97:15
139:1 147:17
173:17 183:17
184:5 196:23
198:21
**okay** 15:4 17:16
18:3,8,21 34:17
49:12 51:11
61:2,20 64:13
65:11,20 66:22
67:10,11 69:1
74:2 75:8 80:24
93:7 119:6
137:2 138:16
139:8 151:3
159:7 161:10
170:7,10
173:14,19
175:24 176:14
183:23,24
184:6,18 185:3
186:6 188:11
188:14 194:12

201:22 202:13
208:2,8 213:5
213:12,15
**old** 179:7
**older** 29:10
98:21,23
**omni** 2:15
**once** 22:16
23:23 24:23
26:18 27:7,17
43:7 57:3 61:17
**oncology** 5:12
**ones** 118:14
132:14 141:6
158:15 165:21
171:6,9 173:7
**online** 150:21
188:3,4
**open** 36:3 68:4
68:7 69:25
72:17 104:25
132:7,7,8
211:22,24
**operating**
109:23,25
110:17,24
**opinion** 16:20
84:5 100:2,17
100:20,21
101:7 103:21
112:13 115:22
116:15,17,20
123:8,13
127:19 137:20
139:17,18,22
140:23 195:5

204:25
**opinions** 10:23
13:21 38:16
126:10 148:19
155:10 162:11
162:20 186:23
187:4 190:9
191:5 195:6,8
201:1,3,5,12
205:4 207:8
**opportunity**
45:4 61:6 76:23
**opposed** 112:20
132:10 140:5
177:24 185:21
**opposite** 191:25
192:1
**oral** 8:5 169:17
**orally** 56:5
**order** 149:14
164:6
**orders** 128:22
**organization**
171:14,16
186:22 187:4,9
**organized**
126:12 127:23
202:7
**original** 4:21
32:16 33:2,6,12
215:12
**originally**
94:18 143:5
**osha** 168:5
190:17

**ottowa** 51:2,6
**outcome**
181:16
**outdated** 28:2
**outlet** 38:22
172:7
**outlets** 38:12,16
38:20
**outlined** 172:23
**outside** 101:17
118:12 133:8
142:13 147:13
160:3 162:18
167:21 189:4
189:20,22,23
201:8
**outstanding**
192:21
**ovarian** 4:18,23
5:3,15,20 6:10
6:14,16,23,23
8:18 9:17 18:25
25:7 26:5,19,21
27:7 30:18
48:23 49:2
51:14 52:3,7
54:7 68:5 69:10
75:24 84:7,18
84:23 85:16,22
85:22 88:6,19
89:4,13,21
90:11,23 91:7
91:12,16 103:9
103:22 104:6
104:21 106:13
106:17 107:2

[ovarian - paper]                                                    Page 36

| | | | |
|---|---|---|---|
| 114:23 115:6 | 125:10 137:12 | 138:17 142:4 | 23:10,15 24:1,4 |
| 122:11,14,18 | 144:18 175:5,6 | 144:2 147:4 | 24:16 25:5 26:2 |
| 124:7 137:16 | **oxygen** 118:6,8 | 151:5 164:8 | 26:11,17 31:20 |
| 137:21 138:6 | 118:19 119:10 | 165:1,4,14 | 31:21 35:7,17 |
| 138:22 139:4 | 119:13,19 | 170:1,20 172:4 | 35:17 36:24 |
| 139:12,17,21 | 120:5 205:22 | 172:23 179:6,9 | 38:9,12 39:5,6 |
| 139:25 140:3 | | 192:2,22 | 40:12 41:1,15 |

**p**

| | | | |
|---|---|---|---|
| 140:11,20,22 | **p** 3:4 197:15 | 193:22 194:4 | 41:17 42:7,17 |
| 140:24 141:4,8 | 198:1,11,14,20 | 195:23 197:6 | 42:23 48:17 |
| 141:9,10,12,13 | **p.g.** 147:7,10 | 197:21,23 | 50:14,19 52:6 |
| 141:18,21,23 | **p.m.** 2:17 | 203:2,18,19 | 55:17 57:10 |
| 142:9 144:25 | 213:21 | 204:2,4 208:5 | 60:21,23,24 |
| 145:24 162:2 | **p.o.** 3:6 | **pages** 1:25 4:9 | 61:5 62:16,19 |
| 178:23 186:8 | **page** 7:10,13 | 4:11,14,19,24 | 63:12,21,22 |
| 186:12 187:10 | 8:24 11:17 | 5:2,6,10,16,21 | 64:4,23 65:17 |
| 187:20,24 | 24:19 30:22 | 6:2,6,12,18,25 | 65:23 66:7,19 |
| 188:18,22 | 31:5,14 49:1,8 | 7:2,7,16,18,23 | 67:9,12,15 |
| 189:1,6,11,16 | 51:13,19 53:2 | 8:2,7,10,13,20 | 72:14 73:17 |
| 194:19 200:18 | 57:14 58:9 | 9:2,14,20 11:21 | 74:16,19 76:10 |
| 204:22 | 66:24 67:12 | 16:5,6 17:14 | 77:3,9,25 78:8 |
| **ovaries** 211:9 | 71:21 74:15,16 | 124:23 158:16 | 79:5 80:9,13,16 |
| **ovary** 128:15 | 74:21 79:25 | 165:17 173:10 | 92:20 105:11 |
| **overall** 63:6 | 83:17,19,20 | 173:21 212:9,9 | 105:15,17 |
| 72:15 73:22,22 | 91:20 92:2 93:2 | **paid** 21:19 | 106:5 108:2,15 |
| **overlap** 28:18 | 93:8 101:20,24 | 40:20,22,23 | 111:13 113:2 |
| 193:20 | 101:25 102:13 | 41:4,7 80:4 | 113:17,22 |
| **overlapping** | 102:14,20,25 | 112:1 113:16 | 115:10,13,20 |
| 198:19 | 104:24 106:11 | 133:14,21 | 116:19 117:13 |
| **overlaps** 28:1 | 106:12,16,19 | 134:9,19,23 | 121:25 122:7 |
| **oversee** 213:10 | 106:21,22 | 135:1,21,23 | 122:14,20 |
| **oversees** 55:21 | 107:22 111:19 | 136:13,21 | 123:16 125:17 |
| **oversight** 210:9 | 113:23 116:25 | 150:16 160:9 | 126:9 129:4 |
| **overweight** | 117:10 119:3,4 | **paper** 6:4 17:15 | 130:3,21 131:3 |
| 141:16,20,22 | 119:4 120:22 | 17:17 18:23 | 131:8,12,25 |
| **own** 14:22 | 123:2 137:4 | 19:16,19 21:7 | 132:1,4,15,15 |
| 105:18 114:14 | | 21:10,22 22:11 | 132:18,20 |

133:12 134:1,2
134:5,7,15
135:6 139:16
142:1,15
143:23 144:17
146:16 148:2
148:22 152:19
153:4,6,7,9,20
154:2 155:11
155:15 175:18
176:18 177:9
179:4,24 181:5
181:8 182:22
185:11,18
195:5,15,17
203:20 204:3
207:12,13,16
207:19,22
208:15,17
209:1,4,5,20
210:4
**paper's** 75:13
130:8
**papers** 17:9
23:18,20 40:5,6
59:20 63:13,24
69:12 77:11,17
85:18,23 88:22
89:10 109:8
126:5 130:9
132:5,6,13
133:4 146:11
165:24
**paragraph**
11:21,22 12:1,2
12:5 25:12

26:10 52:12
53:22 54:25
55:7 75:23
81:17 83:18
93:12 101:21
101:21 102:1,3
102:3,17,25
103:1,7 104:24
105:1,3 107:24
113:24 117:1,3
118:17 139:9
141:15 142:6
144:4 172:4,12
177:14 178:7
178:13,21
179:9 180:3
181:1,10
182:25 192:3
193:23 194:2
204:19 205:6
**paragraphs**
102:14
**paren** 205:10
**part** 20:3,21
21:1,11,22 27:2
27:10 31:7 42:3
42:17 43:17
55:17 74:16
98:17 117:5
118:8 121:24
131:6 133:19
134:6,7,10
135:18 136:15
145:6 150:19
171:12 173:5
176:2,16,17

188:5 190:9
197:10 200:25
201:5
**partially** 52:14
**participant**
22:5
**participated**
94:4
**particles** 5:19
6:5 108:4,9,21
108:23 110:14
111:7,12
128:21 205:9
205:11
**particular**
10:18 30:13
46:3 61:9
118:15 128:15
138:3 139:18
180:3 186:25
**particularly**
76:22 87:13
108:4 117:16
132:22 133:6
140:5 155:10
155:12 186:20
204:9
**particulate**
109:2
**particulates**
108:8,21
110:14 128:24
205:11
**parties** 213:3
**parts** 27:4 37:2
48:16,18

**party** 172:7
215:17
**past** 12:3 28:10
124:4
**patent** 27:17
55:4 68:8 69:8
69:8,12,13
73:12,21 74:7,7
196:2,12
197:25 210:25
211:3,15
**pathologic**
127:6
**pathology**
108:16,21
109:10,21
110:1,20
111:10
**pathway**
123:18,23
**patient** 106:25
107:1 110:25
186:8
**patient's**
186:12
**patients** 5:16
43:2 56:1,4
57:2 106:13,21
107:13,14,19
116:4 123:23
124:6,8 154:15
157:13,16
158:2 178:2
**patricia** 146:16
146:18

[patterns - platy]    Page 38

| | | | |
|---|---|---|---|
| **patterns** 9:11 | 179:2 | **periods** 191:23 | **physically** 16:9 |
| 191:9 | **people's** 36:7 | **peritoneal** 5:4 | **physicians** |
| **pause** 65:3 | 133:6 | 30:19 | 46:16 |
| **pay** 41:20 | **percent** 28:16 | **perjury** 214:2 | **pick** 108:21,23 |
| 130:12 | 156:3,3 160:25 | **person** 36:14 | 111:11 |
| **paying** 136:6 | 161:11,14 | 46:1 47:21 | **picking** 110:16 |
| 136:17 | 178:2 192:12 | 55:20 60:10 | **piece** 17:15,17 |
| **payment** | 192:14,24 | 61:16 109:22 | 36:1 123:22 |
| 170:25 | 193:1,6,18 | 111:12 143:11 | **pieces** 54:22 |
| **payments** | 199:22 210:3 | 167:17 179:1 | **pivotal** 92:17 |
| 172:5 | **percent's** 192:9 | **personal** 7:4 | 92:25 |
| **pd** 31:22 | **percentage** | 46:23 47:3 | **place** 23:5 |
| **pdq** 5:5 8:9 | 21:21 85:2 | 147:12 148:5 | 130:11,15,19 |
| 17:21 29:12,16 | 160:21 161:1,3 | 148:24 | 215:4 |
| 29:23 30:18 | **perfect** 69:24 | **personally** | **plaintiff** 21:20 |
| 31:11,22,24 | 81:4 | 37:15,22 44:1 | 172:22 |
| 32:14 33:10 | **perfectly** | 126:6 | **plaintiffs** 3:3 |
| 34:1,22,22 35:7 | 112:23 | **perspective** | 4:10 8:3 11:15 |
| 35:9,20,21 | **performed** 51:3 | 113:9 | 15:11 20:4,18 |
| 36:10,16,17,23 | 53:9 57:11 | **pertain** 120:20 | 21:18 22:12,22 |
| 45:2,4,23 46:4 | 125:24 | **pertains** 215:11 | 23:11 39:7 |
| 46:5,8,21,25 | **perineal** 4:17 | **pertinent** | 41:10 80:5 |
| 47:5,11,15 48:4 | 8:17 18:24 31:4 | 118:21 205:23 | 107:10,15 |
| 48:12 | 45:22 47:15 | **petri** 115:21 | 133:15,21 |
| **pdq's** 38:9 | 49:3 51:15 52:3 | **phagocytes** | 142:13 146:21 |
| **peer** 36:3 | 54:3 78:12,25 | 5:19 117:15 | 147:23 148:2 |
| 130:17 | 79:10 107:3 | 204:8 | 150:9 162:21 |
| **peers** 162:2,12 | 115:17 142:10 | **phone** 167:13 | 163:15 166:3,3 |
| **pelvic** 5:14 | 177:10 178:4 | **phonetic** 85:10 | 166:23 169:15 |
| **penalty** 214:2 | 180:9,20,21 | 166:10 201:16 | 174:20 189:4 |
| **penninkilampi** | **perineally** | **photos** 110:6,7 | 189:21 |
| 137:17 152:24 | 211:9 | **phrase** 83:22 | **plan** 161:20 |
| **people** 90:15 | **perineum** 54:4 | 91:21 92:6,9 | **planned** 161:23 |
| 108:16 113:10 | 108:5 177:6 | 96:11 | **plans** 200:25 |
| 133:9 135:17 | **period** 156:2 | **physical** 42:5 | **platy** 83:25 |
| 143:19 149:8 | | | 85:5 |

**[play - predictive]**

| | | | |
|---|---|---|---|
| **play** 84:1,4,7,12 | **polymorphisms** | 109:18 110:4 | 102:15 103:8,9 |
| **pleading** | 140:21 | 112:22 129:15 | 103:22,23 |
| 170:17 | **pool** 78:5 | 135:11 136:11 | 104:5,22 |
| **please** 10:12 | **pooled** 27:12,16 | 136:14 139:10 | 115:17 128:21 |
| 25:10 31:3,8 | 196:7 | 147:25 149:6 | 133:15,22 |
| 53:2 57:14 93:7 | **pooling** 78:3 | 179:14,15 | 137:16,21 |
| 93:10 101:20 | **poor** 35:22 | 181:23 | 138:5 158:9 |
| 101:22 102:25 | 47:22 132:24 | **potentially** | 159:13,17 |
| 104:24 111:20 | **poorly** 129:16 | 68:19 194:20 | 160:15,22 |
| 116:25 138:17 | 198:8,8,10,10 | **powder** 1:5 2:5 | 162:2 173:6 |
| 151:25 164:25 | **population** | 4:17,22 5:14 | 174:5 177:5 |
| 193:22 204:2 | 32:21 155:7 | 6:8,22 8:18 | 178:9 180:9,21 |
| **plus** 121:3,9,15 | **portion** 31:11 | 9:16 10:18 | 186:9,13,16,20 |
| 178:4 | 133:20 140:16 | 18:25 27:6,10 | 187:20,23 |
| **podium** 162:8 | **portions** 171:24 | 42:24 43:12,15 | 188:18 189:11 |
| **point** 16:24 | **posed** 206:17 | 43:22,23 44:2 | 189:16 194:22 |
| 28:7 57:20,20 | **position** 152:17 | 49:3 50:2 51:15 | 203:5,8,14,15 |
| 64:22 70:14,15 | **positive** 32:24 | 52:3,7,15 54:3 | 204:22 206:18 |
| 73:23,24 82:1 | 33:2,3 | 54:4 58:4,10 | 206:24 207:1,6 |
| 119:10,14,18 | **possess** 150:21 | 59:14 61:10 | 211:9 |
| 120:4 134:8 | **possession** | 69:10 75:14,18 | **power** 146:15 |
| 152:25 153:2 | 212:11,15,17 | 75:24 78:12 | 180:9 198:12 |
| 199:7 209:4 | 212:20 | 79:1,10,21 80:5 | **practice** 133:11 |
| 210:6,15,19 | **possibility** | 83:23 84:7,18 | 157:20,25 |
| 211:10,13 | 40:11 111:4 | 84:23 85:8 | 186:2,4 |
| 212:1 | 133:10 | 86:16,16 87:6 | **practices** 1:6 |
| **pointing** 101:23 | **possible** 41:6 | 87:14,23 88:6 | 2:6 108:6 |
| 195:12 197:20 | 76:23 101:8 | 88:18 89:3,4,5 | **precise** 75:23 |
| 197:22 | 111:1 123:20 | 89:12,17,25 | 76:6 |
| **points** 16:22 | 160:17 | 90:11,23,24 | **precision** 28:6 |
| 63:2,9 | **possibly** 41:7 | 91:12 93:15 | 28:16 44:18,20 |
| **policy** 150:19 | 109:15 180:11 | 95:24 96:8,11 | **predicter** |
| **polycystic** | **post** 37:21,22 | 98:1,15,20 99:1 | 193:15 |
| 140:20 141:9 | **posted** 37:14,23 | 99:2,8,17,25 | **predictive** |
| 141:12,13 | **potential** 38:2 | 100:18,22 | 127:24 128:1 |
| | 76:13 77:2 | 101:3,8,15,16 | |

[prefer - provide]                                                    Page 40

**prefer** 209:22
**preparation**
  39:11 156:19
  166:21
**prepare** 13:9
  42:5,6 167:2,20
  168:6
**prepared** 7:21
  13:19 17:2
  20:11 21:12
  22:23 105:21
  171:22 173:5
**preparing** 47:5
**presence**
  101:14 128:4
**present** 3:13,23
  194:20
**presentations**
  162:1
**presented**
  69:23 97:1
**prespecified**
  53:24
**presumed**
  204:20
**pretty** 92:25
  192:9
**prevention** 5:5
  6:21 30:19 45:4
**previous** 31:22
  93:2 123:20
**previously**
  18:10 35:8
  76:12 88:13
  151:10 157:18
  163:23 194:21

207:13
**primarily**
  10:22 118:7
**primary** 5:4
  6:9 30:18 54:1
  78:11,24 79:12
  79:14,16,19
  93:5 198:12
**print** 73:2
  163:3
**prior** 14:4
  20:17 22:7 33:8
  34:23 51:7
  58:13 72:9 86:5
  93:17 105:24
  105:25 130:8
  148:1 151:8,16
  152:7,14
  154:14 156:15
  156:19 164:5
  215:5
**probably** 23:2
  23:13 30:11
  56:6 73:6 89:24
  131:20 141:23
  149:7 158:2
  160:2 161:11
  161:13 192:17
  197:3
**problem** 89:20
  89:24
**procedure**
  111:2
**procedures**
  108:25

**proceedings**
  3:13 34:19
  215:3,5,7,13
**process** 16:23
  35:20 36:2,3,19
  36:20 126:24
  127:4,12 132:8
  132:9 134:16
  213:10
**produce** 22:17
**produced** 131:6
  171:7,9 172:25
  175:14 190:3
**product** 7:4
  49:3 100:21
  101:9,17
  103:16 104:7
**production**
  118:19 205:22
**products** 1:5,6
  2:5,6 4:17 8:18
  18:25 83:24
  84:23 86:3,16
  86:16 87:23
  93:15 95:25
  96:8,11 99:1,2
  99:8,14,18
  100:1 101:1,5
  103:8 104:22
  154:25 155:2
  172:9 180:16
  203:6,8,14,16
  206:18
**professional**
  5:6 30:19
  136:16

**professionals**
  53:15
**professor** 93:3
**profoundly**
  100:6
**progesterone**
  140:9,15
**program** 81:22
**programming**
  72:24 73:1
**progress** 76:4
**project** 117:17
  134:24,24
  204:10
**projects** 38:20
**proliferated**
  128:4
**proliferation**
  126:18,20,25
  127:5,6,8,16,25
**properties**
  117:7
**proposition**
  95:24
**prospective** 7:7
  32:1,15 33:11
**prospectively**
  194:23
**protective**
  155:21
**protocols** 55:13
**prove** 127:25
**provide** 42:13
  43:2 71:22
  116:3 174:13
  181:4 213:10

[provided - quote]                                            Page 41

**provided** 41:9
45:21 50:11
56:5 67:2 71:6
71:8,11,14,20
72:1,9 112:9
113:4 129:10
131:11 150:12
158:14 159:9
163:1,11 164:5
165:23 168:21
168:22 171:25
173:3,4 174:2
212:8,18 213:2
**provides** 61:9
61:25 142:7
**providing**
192:5
**public** 46:16
132:10 189:24
**publication**
32:13 33:2
39:11 40:6,15
41:23 49:22
51:7 52:19 54:1
54:20,21 56:22
68:12 76:9
125:14 129:9
143:21 185:10
**publications**
33:8 67:25 68:2
125:22 141:5
161:17 189:22
189:23
**publicity**
181:12,15,22

**publicized**
182:3
**publish** 82:22
132:14 133:2
**published**
19:11,13 20:3
20:10 21:11
22:10 40:12
41:1,15,17
46:20 56:22
67:18 73:17
77:10 78:5,6
88:4,17 91:5
92:13 125:14
130:4,11,13,15
130:18,22
132:5,6,14
179:8
**publishing**
82:21,21
**pull** 45:4 61:6
63:1 202:13
**pulled** 54:22
**purported**
178:21
**purpose** 47:13
129:13
**purposes** 107:1
132:25
**pushed** 142:25
143:11
**put** 12:11 19:5
38:7 46:8 71:10
74:2 80:16 83:9
100:14 113:9
113:22 128:24

132:17 173:11
179:23 183:10
193:19
**puts** 46:13
**putting** 111:11

**q**

**qualifications**
93:1
**qualify** 172:22
**quality** 35:22
47:21 51:2
142:7,15,18
**quantified**
118:9
**quantify** 63:19
84:17,25 85:4
**question** 20:24
24:15 27:2 35:4
39:18 43:24
44:1,15,16,23
45:2 47:13,14
50:13 61:15
66:14,18 69:3,4
69:10 71:12
74:13 76:24,25
81:10 88:8,24
90:5,5,20,20
91:18 94:11,13
95:21 96:10
97:10,16 101:1
101:7 102:10
103:18 104:9
104:13 113:7
115:18 119:17
119:22,25

122:13 126:6
128:17 129:7
132:17 138:2
153:25 154:11
155:14 156:5
160:23 170:5,9
171:12 178:17
187:21 188:23
189:18 193:9
198:25 201:10
**questioning**
115:3 132:23
**questionnaire**
55:16 193:1
**questions** 39:15
52:15 55:14,23
76:23 95:8
114:3 185:7
201:2 202:4,6
203:2 205:7
206:5,17
208:16,18
210:24
**quick** 18:4
60:25 64:1
102:18 156:12
159:2 175:7
184:23
**quickly** 155:21
156:9 169:25
**quite** 113:12
131:20 139:11
198:18
**quote** 92:7,8

**[r - received]**                                                          Page 42

| r | | | |
|---|---|---|---|
| **r** 3:9 | **reaching** 205:3 | 177:14 178:13 | 92:17 95:8 |
| **radiation** 38:3 | **reaction** 121:22 | 179:10,19 | 104:16 126:14 |
| 136:15 | **reactive** 118:5 | 180:6,8 181:11 | 130:14 136:22 |
| **radiology** 93:3 | 118:8,19 | 181:11 192:3 | 148:15 149:4 |
| 93:5 109:22 | 119:10,13,19 | 194:16,24 | 156:6 158:1 |
| 157:15 161:12 | 120:5 205:22 | 197:24 200:19 | 170:6 |
| **raise** 48:8 | **read** 12:4 33:23 | 204:5,11 205:9 | **reason** 75:12 |
| 179:16 | 34:2,4 35:6,14 | 205:19,25 | 158:3 181:21 |
| **raised** 70:13 | 49:2,5 51:23 | 214:2 | 181:23 208:1 |
| 74:13 130:18 | 52:8,10,13,17 | **reader** 80:8,11 | **reasonable** |
| 131:19 133:1 | 52:21 53:8,23 | 113:18 | 84:6 |
| 199:25 | 54:8 67:21 74:5 | **reading** 25:9,11 | **reasons** 62:18 |
| **raising** 133:10 | 85:18,23 86:7,7 | 35:11,23 84:2 | 134:13 157:24 |
| **ran** 36:14 | 86:8 88:17 89:2 | 84:13 91:24 | 180:24 |
| **range** 27:22 | 89:10 90:9,9,21 | 93:17 107:4 | **rebecca** 1:13 |
| 43:9 57:18 58:4 | 91:2,5,10 92:14 | 129:22 131:14 | 2:13 4:3,14 7:9 |
| 58:10,14 | 94:1,6,15 95:2 | 134:2 136:5 | 7:12,15,22 8:5 |
| **rate** 168:10,12 | 96:20 97:7,21 | 139:10 142:11 | 10:4,13 169:17 |
| 168:14 | 97:24 98:12 | 147:14 167:25 | 214:1,10 |
| **rather** 13:15 | 103:15 106:5 | 168:3 186:5 | **recalculate** |
| 28:5 72:16 | 112:11,18 | 190:17 194:14 | 72:15 |
| 116:2 154:8 | 113:3 114:16 | 198:3 203:5 | **recall** 12:12 |
| 207:2 | 116:18,24 | 204:17 | 58:13 94:14 |
| **ratio** 27:23 | 117:20 118:23 | **reads** 53:23 | 99:16 179:10 |
| 144:23 145:2 | 119:7 125:16 | 180:3,18 | 179:20 181:11 |
| 196:7 | 125:19,20 | 193:24 194:12 | 181:15 182:1,4 |
| **rausa** 166:16 | 133:4,19 136:2 | 197:24 205:9 | 191:11 192:4 |
| **reach** 33:9,9 | 138:21 139:3 | **ready** 65:18 | 194:19 204:17 |
| 35:15 36:22 | 139:13 140:8 | **real** 28:2 60:25 | 206:16,20 |
| 70:15 | 140:18 142:7 | 63:25 134:20 | 207:17 208:18 |
| **reached** 38:21 | 147:10 153:7,9 | 136:23 156:12 | **receive** 15:8,10 |
| 55:20 70:19 | 155:10 157:15 | 159:2 162:15 | 93:23 176:21 |
| 72:13 202:1 | 163:20,20,22 | 175:7 184:23 | 182:23 184:19 |
| | 163:23 164:7,7 | **realized** 176:11 | **received** 14:18 |
| | 164:19 166:1 | **really** 28:12 | 106:25 107:14 |
| | 171:12 177:4 | 31:10 36:1,5 | 107:20 131:7 |

**[received - related]**                                              Page 43

148:13 172:5
174:16 176:2
176:16
**receiving**
182:25
**recent** 10:18
13:22 21:6
29:23 137:4
141:6 145:7
200:17
**recently** 71:3
**recess** 44:25
81:8 137:1
**recollection**
40:9 52:23
94:20 122:22
191:25 192:14
**reconcile**
204:20
**reconsideration**
100:9
**record** 18:4,5,9
30:5 34:17 41:3
44:24 45:1
60:25 61:1,3
63:25 64:2,3
65:9,10,12 81:9
102:21,23,24
104:16 137:2
156:11,13,14
159:2,4,7 175:7
175:8,12,22,23
175:25 185:1,2
185:4 188:12
188:13,15
201:23,24,25

202:22 207:25
212:7 213:20
215:6,9
**records** 41:7,22
42:12 166:2,6
166:10,13,16
166:19 172:5
**rectum** 54:4
**red** 8:12 14:6
16:2,15 17:8,11
17:18 174:2
**redberg** 143:17
**redline** 202:18
202:19
**redlined** 202:17
**reduce** 134:5
**refer** 10:24
19:16 115:2
148:12 196:11
203:19
**reference** 31:15
31:16,17,21
33:16 55:8
56:16 66:25
69:4 93:14,21
95:12,18 105:4
105:5 107:6
113:24 121:25
122:25 124:8
137:5 146:8
147:8,10
170:11 177:16
178:8 179:17
179:23 182:24
184:15 190:9
190:13,23

191:7 196:1,24
201:15
**referenced**
24:15 95:17
105:3 124:4,22
153:7,8 200:10
200:16 209:13
**references** 14:3
16:20 88:2
179:20 190:19
190:20 203:4
**referral** 185:21
**referred** 94:20
94:22,24 97:8
113:25 207:20
209:12
**referring** 26:11
31:18 32:3,6
33:5 64:9 77:9
92:11 98:23
103:11,12
123:8 124:10
203:15 207:3
**refers** 31:24
57:18 111:24
112:8 141:15
147:7 176:20
180:7
**refiled** 202:10
202:11
**reflect** 72:23
131:21 159:16
169:6 191:4
209:20
**reflected** 97:17

**reflecting**
171:13
**reflection** 63:8
**reflects** 66:14
210:18
**regard** 14:9
23:14 27:23
30:13 37:2,8
38:25 47:4,15
58:17 61:22
76:12 86:20
88:11 91:15
108:14 109:4,7
151:16 152:6
157:19 159:17
186:22 199:19
200:8
**regarding**
52:15 175:17
203:2 206:17
**regulatory**
187:1
**reject** 28:20
**rejected** 130:3
130:10,16,21
131:7
**rejecting**
176:17 185:10
**rejection** 176:3
**rejections**
130:8
**relate** 41:14
161:21
**related** 10:22
17:2 66:18
84:15 101:7

**[related - reporter]**                                      Page 44

| | | | |
|---|---|---|---|
| 132:4 170:24 | **reliance**  95:5 | **repeatedly** | 151:6,8,8,17,18 |
| 172:8,14 | 163:1 | 68:23 | 152:4,11,12,12 |
| 176:13 181:13 | **rely**  126:9 | **repeating** | 152:14,18 |
| 182:9 213:9 | 133:6 201:11 | 119:22 | 153:20,23 |
| **relates**  35:7 | 201:11 205:3 | **report**  4:13 | 154:3,20 |
| 36:23 37:25 | **remains**  46:19 | 7:17 10:19 13:9 | 155:13 163:17 |
| 38:8 45:22 | **remember** | 13:20,22 14:15 | 164:1,8,15,19 |
| 63:19 76:11 | 16:22 39:24 | 14:15 18:1,12 | 164:20 168:24 |
| 77:1 80:13 | 40:10 43:10,11 | 18:13,15,19 | 175:3 187:15 |
| 81:10 85:5 | 43:13 44:5 | 20:17,22 21:2,6 | 190:10,21 |
| 90:20 97:25 | 45:11 52:10 | 21:17 27:9 | 191:3,7 200:11 |
| 98:15 119:17 | 57:1,25 82:10 | 32:16,21 33:13 | 200:17 201:15 |
| 120:16 144:24 | 87:21,25 90:19 | 36:8 43:7 48:21 | 202:8,16 203:1 |
| 147:25 151:17 | 94:3,4,6,24,25 | 48:22 50:19 | 203:19 206:3 |
| 155:17 174:4 | 99:14,21 | 57:24 58:17,18 | 209:5 211:2 |
| 188:17 196:15 | 122:12 124:5,8 | 59:14 65:7 | **reported**  1:21 |
| 200:17 | 125:23 139:19 | 66:19 67:20 | 9:12 56:1,4,17 |
| **relation**  80:13 | 141:24 144:1 | 68:21 76:12 | 57:2 58:25 59:3 |
| 207:15 | 144:20 151:24 | 77:13 80:20 | 59:23 60:17,17 |
| **relationship** | 152:1,3,4,17 | 83:11,16 85:24 | 60:21 62:22 |
| 92:16 102:15 | 181:25 182:11 | 87:12,13 88:1 | 63:13 64:19,20 |
| 199:13 | 185:23 188:6 | 92:7,14 93:2 | 65:15,16 66:6 |
| **relative**  64:5 | **remembering** | 94:9 95:1,12,17 | 68:11 115:10 |
| 154:23 194:18 | 182:5,12 | 96:2,12,16,18 | 115:12 120:5 |
| 215:16 | **remembrance** | 97:2 98:17 | 120:23,25 |
| **relevance**  207:7 | 43:16 | 101:21 102:13 | 144:23 145:2 |
| **relevant**  53:11 | **remind**  175:4 | 102:19 105:21 | 154:16,22,23 |
| 54:24 55:22 | **remotely**  3:9 | 105:24,25 | 154:24 178:22 |
| 130:23 131:2 | **removal**  109:9 | 114:17,18,19 | 191:9 192:25 |
| 131:25 133:25 | **removed** | 117:2 118:5,24 | 193:1 194:17 |
| 154:17 | 108:19,20 | 118:25 120:16 | 210:4 |
| **reliability**  9:11 | **removing**  109:1 | 121:24 124:23 | **reporter**  2:18 |
| 191:9 | **rendered** | 137:4 142:4 | 11:12 18:7 19:4 |
| **reliable**  44:22 | 171:19 | 144:3 145:7 | 24:12 30:16 |
| **reliably**  78:6 | **repair**  126:25 | 146:9 150:6,7 | 34:15 72:6 |
| | | 150:10,13 | 105:13 114:6 |

**[reporter - results]**                                                    Page 45

122:5 125:6
137:9 144:7
153:17 159:6
163:6 164:17
168:20 169:20
173:25 174:8
174:13 175:11
184:9 191:18
196:20 210:13
212:15,22,25
215:1
**reporting**  54:1
56:23 57:21
62:16 68:9
72:19 77:2,7,8
99:7 103:15
107:14 122:25
123:25 138:4
155:17 192:24
195:11 196:2
213:14
**reports**  14:5
15:2,5,7,14,17
15:20,24 20:11
21:12 56:21
58:13 84:14
91:6,10 98:14
100:2 120:12
125:25 133:13
134:4 146:24
147:11 150:14
150:22 151:10
152:7 174:16
200:2
**represent**  10:15
41:11 63:3

71:16,17
**representation**
69:13
**represented**
63:8 112:4
**representing**
107:1 133:21
**reproductive**
27:18
**reputable**
130:15,18
**reputation**
45:16 136:16
**request**  15:13
15:16,18,19
54:23 150:24
151:3 170:1
171:24
**requested**
150:13 215:14
**requests**  169:24
170:13,14
**require**  58:22
136:2
**required**  59:1
113:12,13,16
**requirement**
55:3,19 59:6
149:13
**requirements**
71:9
**requires**  150:6
**rereviewing**
36:20
**research**  5:18
6:3,14,21 38:20

117:13 133:20
135:24 138:11
138:12 140:5
204:7
**researcher**
109:24
**resected**  5:15
106:12,17
**resolution**  57:8
**resolved**  57:5,7
**respect**  38:13
48:14 153:19
154:21
**respectful**
133:9
**respond**  151:25
**responded**  82:3
170:13
**responding**
184:3
**response**  8:4
91:22 92:3,8
145:7,14,19,21
145:23 146:1,4
146:5,9,12,13
151:7,11,17
152:20,22
153:3,5 169:16
172:23 191:22
192:6 208:18
**responses**
146:14
**responsibility**
213:7
**responsible**
110:1

**responsive**
171:25
**responsiveness**
202:3
**restate**  52:1
87:3 103:25
**restating**  35:1
**resubmitted**
186:5
**resubmitting**
185:18
**result**  27:14,24
100:14 120:6
193:17
**results**  25:21
27:5,10 28:1
32:23 33:1,4,7
33:21 34:10
56:25 68:5
69:22 70:4 71:4
72:15 73:3,8,18
77:19 80:13
82:19,19 87:16
87:22 98:21,22
98:24 99:17
115:22 121:13
121:16 124:15
124:17,17,20
124:21 130:1
142:8 154:20
155:5 162:16
162:22,23
181:1 192:16
192:23 193:11
210:4 211:22
211:23

**retention**
170:25
**retrospectively**
194:23
**returned**
212:19
**review** 4:18
6:14,17,17 8:19
14:7 15:24 19:1
20:7,7,7,9,16
22:1,2,7 29:16
34:11 35:22
45:22 46:3
49:20 51:14
63:2,5,6,7
77:17 78:1,5
88:20 109:9
130:17 132:20
134:18 137:23
138:13 142:8
142:15,18
143:1,2,7,11,16
143:19 156:16
156:20 167:8
167:12,19
168:15 215:13
**reviewed** 11:25
12:16,19 14:4
17:22 31:22
35:23 36:3
47:24 48:11
98:10,19,25
99:16 131:10
166:2,6,9,12,15
166:18 168:6
190:2 200:12

206:8
**reviewer** 131:6
131:11,15,17
131:24 132:4
132:12,19
175:15 180:2
182:17 185:16
**reviewers** 51:3
51:4 133:1
**reviewing**
16:18,20,24
47:4 48:11
**reviews** 16:21
23:2 45:25
132:7 133:7
137:24 138:10
138:14 142:4
146:14 152:23
152:25 162:15
**revised** 151:7
191:3
**revising** 154:2
**revisions**
182:16 185:19
185:20
**rice** 3:9
**rich** 139:7
**right** 16:11
23:24 24:7
26:22 31:15
42:21 45:24
52:12 55:8 58:8
67:19 74:23
76:18 77:25
79:5 96:2,12
97:12 100:11

106:16 107:23
116:25 121:12
122:11 125:2
127:3 128:4
146:25 150:3,6
157:17 183:20
192:3 193:23
194:3,4,7 200:9
200:9 203:22
205:13 213:18
**rigler** 93:18
**rigorous** 28:13
**risk** 4:23 6:22
9:17 28:16 49:2
51:14 54:7 64:5
68:6 79:21
89:20 110:25
138:22 139:4
139:12,17,21
139:25 140:2,2
140:4,10 141:7
141:17,21,23
142:8 154:23
154:24 199:13
204:22
**risks** 68:8
**rita** 143:17
**rls** 1:5 2:5
**rmr** 1:21
215:22
**role** 84:1,4,7,12
84:14,17 134:7
**roles** 143:14
**room** 109:23,25
110:17,24

**rothman** 14:13
28:23
**routine** 43:17
133:11
**rox** 120:25
**rr** 178:14
**rule** 7:17
113:13 164:15
**running** 74:18
74:18 83:6
150:20

**s**

**s.w.** 53:25
**saed** 124:5
126:4 131:5
133:14
**saed's** 124:4
133:20
**salary** 161:13
**sales** 1:6 2:6
**sample** 99:13
154:12
**san** 1:14 2:15
7:20 10:1
212:16
**sanitary** 54:5
177:16 178:2
**sas** 72:24 73:1
82:1,1
**satisfied** 62:16
113:2
**saturday** 71:10
**saw** 11:25
70:13,14

[saying - seen]                                                                            Page 47

**saying** 14:25
29:7 39:15
43:20 45:23
52:9 55:17
64:18 77:20
81:19 82:14
104:4 148:7
178:25 181:6
182:6 184:15
192:23 197:18
198:5
**says** 28:25
33:10,14,20
49:2,14 51:1
52:12 53:8
56:16,21 57:4
57:11 58:9
61:14 75:23
78:24 90:14
93:15 103:7
106:24 112:7
117:6,13,20
123:10 133:19
139:2 140:8,18
141:16 147:10
148:5 177:4,14
178:13 179:10
180:6 181:1,10
192:3 210:17
**scale** 51:2,6
**scanned** 174:12
212:18
**schildkraut**
59:15 75:1,12
75:17 177:17
178:5

**school** 29:3
**science** 53:10
85:20 115:25
193:16
**scientific** 22:17
84:6 88:5,17
91:5,10 103:15
116:7 129:12
132:25 134:3
186:22 187:8
187:22 188:24
**scientist** 45:19
**scientists** 46:15
46:18 130:9
**scope** 117:17
204:10
**scratch** 20:8,11
22:6
**screen** 45:4
119:23
**screened** 53:23
**scribbles** 16:6
**scrolling** 45:6
**se** 117:7
**sean** 39:1 51:5
**search** 53:3,15
106:8
**searches** 53:9
**second** 4:13
7:17 14:15
17:20 18:13,15
18:19 20:22
30:21 52:12
53:22 54:23
63:1 75:23
80:20 83:11,16

102:22 106:11
106:16,21,22
147:20 164:14
168:24 175:20
177:4 182:24
197:6,23
202:15 207:24
**secretary**
143:12
**section** 25:12
26:10 30:13
31:3,15 48:25
49:1 51:1,12
52:11 53:3,6,22
55:1,7,9 56:15
57:4 75:22
78:10,17,24
80:1 91:20 92:2
93:1,8,8,12
106:12,14,17
110:21 117:11
119:5 133:13
138:17,20,25
140:7,8 142:3
147:18,20
151:7 188:4
192:23,23
196:6 203:3
**see** 15:20 23:6
23:25 24:2,5,24
30:12,22,24
31:18 33:9 53:6
64:9,17,23
70:10 75:2,9
84:2 89:19
91:23 92:9

93:17 94:21
95:1 101:16
105:1,5 106:14
107:4 117:3
120:23 121:1
121:11 122:25
129:25 132:25
133:17,23
139:7 142:11
147:7,8,14
151:19 155:4
155:12 163:12
165:8 179:3,16
184:5,21 188:2
192:7 194:14
196:4 198:3
**seeing** 64:10
65:7 83:5 90:17
139:19 202:17
**seem** 112:21
**seems** 64:16
82:5 129:11,17
129:23 134:2
**seen** 11:22 30:6
84:15 85:25
87:2,5,7,9,14
87:17,19,22
97:18 98:9,21
98:23 99:12,23
100:8 126:4,4
132:3 139:23
140:4,25 141:2
141:5,13
170:15 176:9
176:10 196:14

**[selected - significant]**                                     Page 48

| | | | |
|---|---|---|---|
| **selected**  31:25 | **september** | **shadow**  207:5 | 152:10 155:1 |
| 56:23 | 161:2 | **share**  17:9 48:8 | **shown**  64:7 |
| **selection**  53:22 | **series**  5:8 203:2 | 55:25 164:14 | 85:21 174:3 |
| 53:24,25 54:10 | 206:16 208:16 | **shared**  71:3 | 189:15 |
| 55:2 | **served**  35:20 | 99:4 165:25 | **shows**  66:2 86:1 |
| **self**  9:12 191:9 | 80:4 112:8 | 173:7 180:15 | 122:20 123:5 |
| 193:25 194:17 | 113:4 133:14 | **shb.com**  3:20 | 124:17 139:10 |
| **sense**  69:14 | 147:22 150:8 | **sheets**  182:23 | 146:13 153:2,3 |
| 153:21 | **service**  41:6 | 184:21 | 191:22 |
| **sensitive**  7:5 | 213:14 | **shift**  28:13 | **sic**  23:16,22 |
| **sensitivity**  5:10 | **services**  170:25 | **shoddy**  36:1,5 | 25:4 26:17 |
| 70:16,21,23 | **serving**  12:13 | **shook**  3:17,24 | 50:19 53:12 |
| 72:14,19,23 | 23:11 112:15 | **short**  29:11 | 55:22 74:18 |
| 73:4,15,15,17 | **set**  17:20 20:9 | 45:2 61:4 65:13 | 81:21 86:2 |
| 73:19 74:4,17 | 20:20 23:9 35:8 | 156:1 188:16 | 111:24 123:4 |
| 74:25 75:16,19 | 45:23 47:15 | **shorthand**  2:18 | 141:12 152:18 |
| 75:21 81:21 | 55:1 58:22,23 | 215:1,7 | 174:2 177:7 |
| **sent**  71:2 | 63:18 69:16,17 | **show**  27:5,11 | 188:9 191:7 |
| 165:18,20 | 111:13 142:1 | 27:16,18,19 | 192:6 196:3,7 |
| **sentence**  33:19 | 173:10 195:14 | 59:18,19 71:19 | **side**  74:20 |
| 34:5,8 46:5 | 215:4 | 73:3 120:19 | 113:19 148:7 |
| 49:1,9,14,21,23 | **setting**  128:2 | 124:6,20 128:3 | 149:8 196:6 |
| 49:24 91:21 | 162:11 | 136:15 155:20 | 204:4 |
| 92:2 119:7 | **seven**  58:5,11 | 155:21,22,22 | **sides**  199:9 |
| 141:15 193:24 | 59:7 62:23,24 | 156:8 160:14 | **sign**  28:24 29:2 |
| 194:8,9,12,15 | 105:10 106:23 | 164:12 196:17 | 29:5 |
| 203:5 204:6 | 106:24 | **showed**  68:5,7 | **signature** |
| **sentences**  204:5 | **seventeen** | 99:11,22 | 215:22 |
| **separate**  17:11 | 164:21 | 121:21 155:5 | **significant**  25:6 |
| 17:14,15 42:20 | **several**  12:3 | 211:23 | 25:20,22 26:4 |
| 90:13,13 170:6 | 27:4 58:24 | **shower**  203:15 | 26:20 27:6 |
| 176:12 211:2 | 62:18 74:17 | 203:16 207:7,7 | 28:12 107:2 |
| **separately** | 92:12,25 | **showing**  110:7 | 123:2,5 126:13 |
| 69:23 139:15 | 134:13 138:14 | 121:7,17 | 144:24 145:4 |
| 151:15 | 140:18 146:11 | 127:10 130:2 | 197:25 198:15 |
| | 152:25 165:17 | 136:19 146:11 | |

**significantly**
123:6 138:21
139:3 140:21
141:3,9
**signs** 46:4
**silicates** 108:5
**similar** 52:20
52:25 108:6
128:18 142:8
**similarly** 142:7
**simple** 59:24
60:3
**singh** 14:14
**single** 53:25
63:3,8 71:21
112:20 119:10
119:18 120:4,4
123:22,23
127:18,23
128:3,5,10
154:9
**sister** 7:6 55:8
55:11,14,19,21
55:23,25 56:9
154:10,15
**site** 177:10
**sites** 53:14
177:6
**sitting** 36:21
190:12
**six** 72:3 166:3
197:11
**size** 154:12
**skimmed** 16:1
96:25 97:3
200:20

**slicing** 110:2
**slides** 111:11
**slightly** 192:4
**slomovitz**
200:17 201:1
201:12
**small** 8:12 14:6
73:22 74:1
143:23 154:10
178:1 192:17
193:13,19
195:3
**smaller** 161:11
161:13
**smith** 1:13 2:13
4:3,14 7:9,12
7:15,23 8:6 9:7
9:8 10:4,13,14
18:11,11 19:9
30:10 39:13
65:14 68:23
113:3 125:8
164:4 169:17
172:24 188:16
188:21 202:2,5
202:25 212:19
213:8 214:1,10
**smoking** 141:17
141:20,24
181:19
**sochin** 201:16
**social** 37:19
**society** 187:3
**software** 83:3,6
**sold** 100:18

**sonal** 14:14
**sorry** 14:23
15:4,6 25:14
29:21 49:6,10
49:13 51:9
60:20 61:14
64:14 67:3,4
83:14,18
106:15 109:13
118:24 119:2
122:13 124:12
127:21 129:20
137:10 138:24
139:8 144:12
147:19 164:13
167:9,14 170:2
170:3 176:1
183:17 208:5
210:13
**sort** 85:20
89:21 96:25
121:22 126:13
127:11 199:9
**sound** 16:11
23:24
**sounds** 99:12
150:2
**sources** 53:4
149:21
**speak** 143:23
**species** 118:6,8
118:20 119:10
119:13,19
120:5 205:22
**specific** 12:17
12:20 13:9,15

13:16 15:13,16
15:17 44:9
48:16,18,22
71:13 83:23
88:24,25 95:18
135:17 141:13
149:20 166:5
197:21 207:2
**specifically**
17:21 27:8 68:2
93:21 104:12
124:10 144:3
176:20 187:21
203:3 208:10
**specification**
209:13
**specifics** 82:24
99:14
**specimen** 110:2
110:3,4,17,21
111:1,8
**specimens**
109:23,24
**speculation**
22:25
**spend** 42:13
**spending** 42:9
**spent** 168:3
171:13
**spoken** 38:19
143:21
**stand** 151:9,13
151:18 152:8
152:12 203:10
210:3

[standard - studies]                                                  Page 50

**standard**
  108:25 111:2
**standardize**
  121:14
**standing**  162:1
  162:7
**stands**  46:18
**start**  20:16 25:3
  37:7 80:17
  93:14 102:9
  109:5 164:9
  173:3 179:17
  185:5 191:2
  199:1 201:6,10
**started**  19:20
  20:10 22:5
  201:21
**starting**  165:1,8
  170:1
**starts**  102:8,9
  180:4
**stata**  81:22
**state**  10:12
  12:14 25:5 26:2
  26:6 30:3 32:14
  43:7 51:25 52:2
  76:11 88:23
  170:12 205:19
  212:6 214:8
  215:2
**stated**  76:12
  89:2 101:22
  102:4,12 103:2
  189:5
**statement**
  28:25 29:2,4

32:18 33:16,25
35:24,24 48:4
49:18 52:20
56:11,12 67:24
76:1,3,17,19
79:4 88:20
89:18 91:2 92:1
93:14 95:13
99:25 108:3
111:20,23
112:7,23
117:18,20
118:3 129:14
129:18 139:5,9
140:12,17
151:9 179:13
180:14,22,23
187:9,19,23,25
188:1,3,4,17,25
195:1 197:14
198:9 203:11
203:13
**statement's**
  76:6
**statements**
  31:20 34:21
  35:6,12,14,16
  36:23 77:1
  89:15 97:20
  120:15 133:25
  151:13,14,16
  151:18,19
  152:6,8,9
  189:19,20,24
  196:24

**states**  1:1 2:1
  51:13 58:3
  90:10 111:25
  138:20 181:11
  187:18 188:24
  189:8,10
**stating**  88:5,18
**statistic**  192:19
**statistical**  41:5
**statistically**
  25:6,20,22 26:3
  26:20 28:12
  144:24 145:4
  197:16 198:5
  198:17 199:3
  199:14
**status**  156:24
  194:23
**stay**  118:17
  212:16,24
**staying**  91:20
  140:7 144:22
**steering**  8:3
  169:15 172:22
**step**  34:12
**steps**  129:11
**sterile**  108:25
  110:16,19,19
  110:24
**stop**  88:1
  186:16
**stopped**  157:10
  157:22,23
**strategy**  53:3
**stratified**  69:22

**street**  2:15 3:5
**strength**  28:7
  78:11,24 79:13
  79:14,17,19,23
**strengths**  78:9
  78:16,19,23
  195:23 196:5
**strike**  129:3,3
  131:23 160:13
  160:13 195:4
**stringent**  123:4
**strong**  28:13
  104:20 153:3
**strongly**  84:22
  180:23
**structure**  33:21
  34:9
**students**  162:6
**studied**  115:20
  128:8
**studies**  17:19
  27:12 35:23
  48:11 52:24
  53:23 54:11
  57:13,23 59:13
  60:13 68:4,7,14
  68:20 69:6
  85:21 86:6,6,11
  86:15,21,21
  88:2 89:2,23
  92:11,12
  115:25 116:18
  117:16 123:24
  124:3,10,19
  125:25 137:17
  137:19,25

**[studies - sure]**                                                    Page 51

138:10,12
152:2 161:23
177:5 178:18
178:18 179:12
179:21 181:12
181:13 189:14
194:22 200:8
200:12 204:9
206:8,11
210:23,23,24
211:7,11
**study**  7:6 17:22
23:16,22 24:15
25:2,4 26:14
31:12,16,16,24
32:1,4,7,10,15
32:17,21 33:1,3
33:3,11,17,20
39:10 48:21
50:1,23 53:22
54:17,18,19
55:2,3,9,11,13
55:14,19,21,22
55:23,24 56:1,4
56:9,24 63:2,3
63:7 68:24 69:3
69:5,8 70:1,12
72:16 73:10,11
76:13,14,17,22
77:22 78:11,25
79:13,14,17,18
79:19,23,25
86:13,18 92:14
103:9,11 105:3
105:20 106:12
107:18 113:24

114:3,11,14,16
114:22 115:9
115:12,15
116:15 117:5,6
118:5 119:18
120:6,9,12
122:8 123:14
123:19,20
124:11,14,16
124:22 125:10
126:17 127:10
127:20,22
128:3,10,13
129:5,6,10,16
129:24 130:1
133:4 134:3,10
135:24 136:2,3
136:5 137:5,12
137:14 138:3
138:11,20
144:18,23
145:22 147:4
147:12 152:10
154:10,10,15
154:18 156:1
177:17 182:8
191:8,11,22,23
192:15 193:10
193:22 199:19
200:2,11 205:9
206:6,6 209:1
211:7,22 212:1
**stuff**  16:22
**sub**  48:22
**subgroups**
198:1,2

**subject**  5:8 8:23
9:4 56:22
148:12 171:24
**subjects**  56:24
179:3
**submission**  9:4
**submitted**
147:13 150:19
**subscribed**
215:18
**subsequent**
106:8
**subsequently**
20:20 182:23
**subset**  31:25
32:3,14 33:6,11
**substances**  84:5
**substantial**
108:3
**subtle**  131:20
**sufficient**
112:14 123:23
137:19 138:4
147:24 148:6,8
148:22
**suggest**  34:6
139:19,23
141:6 186:2
189:15
**suggested**
89:16 165:21
**suggesting**
112:22 138:9
142:8 204:22
**suggestion**  48:8

**suggests**  51:14
75:20 76:19
88:20 195:10
198:21
**suite**  3:10
**summarized**
35:25
**summary**
35:25 91:21
92:2 137:23
142:4
**supervising**
40:16
**supplemental**
73:18 75:4
**support**  46:21
88:22 95:13
179:20 195:8
**supported**
135:25
**supporting**
76:7
**supports**  91:22
92:3 103:9
195:6
**supposed**  32:18
34:5 110:18
149:16,21,24
181:24
**sure**  17:17 29:3
29:22 30:10
32:18 33:4
34:13 35:2,3
36:13 39:19
43:25 44:14,22
57:2 58:7 78:13

**[sure - talc]**                                                        Page 52

78:14 79:7
81:22 88:21
89:9,19 90:18
91:1 95:22 96:3
97:15 98:22
99:3 101:2
104:1 106:2
112:18 114:23
116:11 135:12
138:25 140:14
153:11,13,23
189:7,25
194:10 197:10
202:8,16
212:18
**surface**   108:24
111:5,14,17
114:23
**surgeon**   108:15
**surgery**   108:19
108:20
**surgical**   111:10
**surprised**   52:9
139:9
**surveys**   43:14
**survivors**
194:19
**susceptible**
110:11
**suspect**   72:24
131:19 140:3
165:24
**swapped**   73:19
73:24
**switching**   81:3

**symmetry**
199:9
**syndrome**
140:20 141:9
141:14
**systematic**   4:18
6:17 8:19 16:21
19:1 21:25 22:2
23:2 34:11
49:20 63:2,4,6
78:1,5 137:23
137:23 138:10
138:13,14
142:3 146:14
152:23,25
162:15
**systematically**
194:11
**systemic**   18:25

**t**

**table**   27:8,9,15
57:14,15 59:13
59:18 61:9,22
64:7,11,12,13
64:21 65:7,14
65:17,23,24
66:1,3,5,7,9,19
66:24 67:11
68:14 110:17
156:10 207:23
208:7,19
209:12,15
210:17
**tables**   75:5 97:1

**tachibana**   40:8
**taher**   52:24
137:18,24,24
137:25,25
152:23
**taint**   135:21
**take**   10:16 16:8
61:21 63:9 81:5
93:4 101:3
102:18 110:19
132:5 136:24
155:16 185:25
185:25 188:9
195:15 207:12
212:11,17,19
**taken**   2:14
108:16,20
116:3 127:19
129:9 152:21
154:8 215:3
**takes**   46:1
**talc**   5:8,13,19
9:10 11:5 13:1
13:7 17:21 20:4
20:21 21:1
22:12 23:12
25:7 26:4,18
31:4 32:12
38:16 39:7
45:23 47:16
50:23 55:12
56:17,19,23
57:21 60:11
65:24 68:6
80:14 83:25,25
84:10,17 85:6

85:12,22 86:3
86:12,17 87:18
88:5,10,10,18
89:3,12,17
90:11 91:6 92:8
92:17,19,23
101:15 103:22
104:20 107:3
108:7,10 112:9
113:5 115:15
116:16,18,22
117:7,15
118:18 120:16
120:21 121:3,8
121:9,15,20
123:6,21,25
128:4,13 136:8
141:16 145:23
146:21 154:16
154:22 155:7
155:12,17,23
155:24,25
156:2,3,6 160:6
161:5,17,21
171:1,17 172:8
172:8,15 180:4
180:6,8,15,16
180:19,21
181:3,13 187:9
189:1,5 191:8
192:4,25 193:2
194:17 195:11
204:8,21,21
205:14,20,21
206:9 209:13
213:9

**[talcum - thank]** Page 53

**talcum** 1:5 2:5
4:17 6:8 8:18
10:17 18:24
42:24 43:12,15
43:22,23 44:2
49:3 50:2 52:7
52:15 54:3,4
58:4,10 59:14
61:10 69:10
75:24 78:12,25
79:10,21 80:5
83:23 84:7,18
84:23 85:7
86:16,16 87:6
87:13,23 88:6
88:18 89:3,4,5
89:12,17,25
90:11,23,23
91:11 93:15
95:24 96:8,11
98:1,15 99:1,2
99:8,17,25
100:22 101:3,8
101:15,16
102:15 103:8,9
103:22,23
104:5,21 111:6
115:16 133:15
133:22 137:16
137:21 138:5
158:8 159:13
159:17 160:15
160:22 162:2
173:6 174:5
177:5 178:9
186:9,13,16,19

187:19,23
188:18 189:11
189:16 203:5,8
203:14 206:18
207:1 211:9
**talk** 20:25 21:7
47:11 48:16
65:24 80:17,19
82:25 83:15
151:2 155:16
158:2 201:4,8
212:14
**talked** 45:3
67:14 167:21
168:2,8 172:19
185:16 190:11
190:15,23
194:18 200:8
200:11
**talking** 29:5
40:2 44:8,9
76:10 77:11
81:17 83:10
88:3 97:5 101:5
102:20 163:14
183:21 187:17
**talks** 24:20 31:4
31:11
**tanha** 137:5
**task** 48:15
**taylor** 6:3
**teach** 162:5,14
**teaching**
162:12,14
**team** 37:17
53:15 74:13

**tecum** 8:6
169:18
**tell** 11:18,19,22
11:25 14:10,17
18:22 27:3 31:8
37:22 45:7
72:10 78:2 80:1
83:19 93:10
101:22,23
111:20 138:17
138:24 147:4
151:1 165:5
184:11 186:19
**telling** 21:9
96:5 123:16
130:25 155:2
156:7
**tem** 100:9
**ten** 123:5
150:22
**term** 24:21
**terms** 22:18
27:21 68:9
69:14 85:11
104:18 166:21
184:14
**terrible** 36:8
**terrific** 143:16
143:19
**test** 100:13
127:16 198:13
198:14,21
199:15
**testified** 10:6
158:4

**testify** 13:12,16
200:22
**testifying** 113:6
113:19 171:1
215:6
**testimony** 17:3
96:21,21 97:6,6
97:10,18,21,25
98:14 112:9
113:4 156:16
156:20 157:11
168:15 175:3
214:5 215:9
**testing** 85:25
87:2,3,6,9,13
87:16,18,22
93:19 98:1,10
98:15,18,19,21
98:22,23,25
99:7,13,17,17
100:2,5 121:19
135:15,16
206:17 207:2,4
207:5
**tests** 198:11,16
206:24,25
**text** 57:17 58:9
**thank** 11:13
12:11 17:16
18:21 25:1,16
49:12 51:11
61:20 66:10,22
67:19 72:7
113:21 114:9
119:6 164:11
170:16,18

**[thank - time]** Page 54

| | | | |
|---|---|---|---|
| 175:6 183:5 | 69:23,24 70:15 | 148:19 149:7 | 143:16,18 |
| 186:6 191:19 | 71:2,2 74:12 | 152:21 153:3 | 183:9,9 198:9 |
| 202:2 204:14 | 75:20 76:4,5,19 | 154:1,6,9,16,18 | 198:10 |
| 208:8 212:3,6 | 76:21 77:10,13 | 154:25 155:25 | **thoughtful** |
| 213:17,19 | 77:19,21 79:16 | 156:2 157:11 | 129:23 |
| **thanked** 40:10 | 79:22,22 84:9 | 157:23 162:4 | **thoughtfully** |
| **thanks** 82:12 | 85:12,19 86:3 | 162:23 164:2 | 134:3 |
| **theoretical** | 86:15,17 87:17 | 164:24 165:13 | **thousand** 43:8 |
| 109:20 | 88:2,12 90:14 | 165:22 167:4 | **three** 8:14 |
| **therapies** 140:9 | 92:17,24,24,25 | 173:9 176:6,14 | 27:11 44:17,18 |
| **therapy** 140:10 | 94:10 95:8,14 | 176:19,24 | 57:9 58:14 |
| **thereto** 183:1 | 95:17 96:6,6 | 178:19 179:14 | 130:22 131:7 |
| **thick** 30:1 | 97:16 100:5 | 179:25 181:18 | 141:19 149:1 |
| **thing** 88:12 | 103:13,20 | 181:22,22 | 154:25 173:10 |
| 132:24 136:9 | 104:18,20 | 182:4 183:11 | 173:21 174:22 |
| 149:1 | 105:23 108:23 | 183:13 185:6 | 174:24,25 |
| **things** 46:20 | 108:24 110:9 | 188:3 189:10 | 195:21 212:9 |
| 90:3 145:13 | 112:23 113:7 | 189:14 190:22 | **threshold** 28:22 |
| 149:1 154:7 | 113:15,16 | 195:16 197:11 | **throw** 130:12 |
| 167:21 | 115:7,18 | 201:18 202:10 | **time** 27:11 29:9 |
| **think** 14:19,20 | 116:17,19 | 207:2 210:9 | 29:11 35:11 |
| 19:14 23:13,19 | 120:1,18 | 211:21 213:6 | 39:4 40:12,15 |
| 23:20 24:9 27:5 | 123:10,19 | 213:18 | 40:20 57:20,21 |
| 27:13,19 28:21 | 127:20 128:23 | **thinking** 36:7 | 57:21,22 58:6 |
| 28:22,22 30:12 | 129:8,13 132:4 | 96:3,17 133:2 | 60:3,14 70:12 |
| 36:13 37:21 | 132:21 133:6 | 188:17 | 76:8 80:22 86:8 |
| 43:6,9,11,13,14 | 134:13,19 | **third** 4:10 | 86:8 87:3 90:21 |
| 43:15,20,25 | 135:1,13,21 | 11:15 14:15 | 93:25 94:5 96:5 |
| 44:2,5,19 45:9 | 136:1,5,11,11 | 87:12 172:7 | 105:20 114:17 |
| 46:6,11,12 | 137:14,22 | 175:4 | 119:10,15 |
| 48:15 49:21 | 138:2,13 | **thirds** 93:13 | 130:10 131:1 |
| 56:6 57:1 58:21 | 140:15 141:22 | **thompson** 3:25 | 133:20 146:4 |
| 62:19 63:23,23 | 143:4,20,21 | **thought** 21:21 | 152:2 155:2,16 |
| 64:25,25 65:1 | 144:10 145:12 | 61:18,18 70:14 | 156:2 157:1 |
| 66:12 68:4,9,10 | 146:13,22 | 74:4,11,12 | 163:22 168:3 |
| 68:23 69:6,21 | 147:24 148:6 | 115:1 130:20 | 171:13 181:13 |

**[time - tubes]**

Page 55

182:7 186:19
191:23 197:3
213:21 215:4
**timekeeper**
201:18
**times** 37:2 43:8
44:10,12,17
54:1,2 55:12,15
58:5,11,15,24
59:4,7,10,18,22
60:5,11,14,18
61:16 62:10,23
62:23,24 63:15
66:5,6,14,20
123:6 129:7
167:2 179:2
209:20,23
210:8,11,16,18
210:20
**tiny** 16:6
**tissue** 91:22
92:3 108:14,15
108:20 109:3,7
110:13 111:10
**tissues** 5:15
106:12,17
108:10
**titanium**
120:12,17,18
120:24 121:4,8
121:17 123:7
205:7,10
**today** 10:16
13:19 35:11
36:21 47:18
49:19 71:1

82:14 98:5
112:4 152:8
156:15,19
160:3,4 163:2
163:11 167:22
168:2,21
171:21 172:2
173:4 189:3
190:11,12,15
190:24 202:3,4
**today's** 15:25
159:9 166:21
167:3,20 168:7
**together** 46:15
48:6 140:15
154:8,12,25
176:6,11
**told** 47:17
55:24 56:3
142:17 143:2,6
146:23 162:18
180:24 186:8
186:15,18
208:18
**took** 14:6 17:8
29:11 60:5 61:4
62:6,10 64:4
65:13 74:17
129:11 155:9
157:25 177:12
188:16
**top** 27:10 55:7
74:20 83:19
90:18 113:23
117:11 119:4
193:23 194:3,4

203:19 204:4
**topic** 16:13
22:1,15,16,18
63:7 129:22
132:21,22
181:7,9
**topics** 37:5,6,8
37:10
**tot** 74:7,7
**total** 150:20
161:4
**totality** 74:8
**touched** 168:7
**towards** 28:14
31:7 110:16
133:4
**track** 41:3
**tracks** 43:20
**tract** 27:18
104:25
**trailed** 210:13
**training** 29:10
169:7
**transcribed**
215:8
**transcript**
174:11 214:3
215:12,14
**transcriptomic**
6:4
**transcripts**
14:16,18
**transfer** 111:9
**transformation**
6:9 126:16
127:9,17

**translated**
115:23
**travel** 149:22
150:16
**treated** 127:11
**trial** 57:24 58:1
94:3 96:21 97:6
97:10,18,22,25
157:19 168:15
**tried** 129:11
211:18
**true** 23:13 46:6
49:18,19,24
52:10 76:1,3,6
96:6 110:15
182:7 214:6
215:9
**trust** 100:14
150:2 156:6
**try** 57:2 110:15
110:25 202:6
**trying** 32:19
34:16 62:19,23
66:12 185:23
**tubaligation**
211:8
**tube** 5:4 30:18
196:2
**tubes** 55:4
67:22 68:3,4,5
68:6,8,16,16,19
69:7,12,14,17
69:19,25 70:2
72:17 73:12,21
196:3 211:5,15
211:22,25

**tumor** 117:21
118:2 204:16
**tumori** 204:12
**tumoricidal**
117:22,25
118:1 204:13
204:15
**turn** 11:17 31:3
31:14 53:2
57:14 83:17
93:7 101:20
102:25 104:24
106:11 107:22
111:19 116:25
120:22 127:23
133:12 137:4
138:16 144:2
147:3 151:5
179:9 193:22
195:23 197:6
203:18 204:2
207:22
**turning** 56:15
74:15 79:25
93:1 117:10
179:6
**turnover**
126:22 127:1,5
**twenty** 18:3
182:21 184:12
**twice** 43:7
62:22 121:14
**twitter** 37:20
**two** 11:5 14:7
15:9 23:21
26:12 30:25

51:3,4 54:2
55:12,18 56:1,3
56:13 57:11
59:4,10 60:14
62:10 63:23
83:14 86:3 90:8
93:13 112:4
121:13 133:25
134:14 143:19
150:1 157:20
157:23 158:15
158:16,20,21
159:8,20
160:17 174:23
176:11 191:23
198:5,18 199:3
**type** 12:22,25
13:3,9 48:23
52:16 115:9,12
125:24 127:16
149:10,10
157:6
**typically**
110:20 118:13

**u**

**u.s.** 7:6
**ucla** 45:9
**ucsf** 41:22
42:14 53:14
113:13
**ultimately**
121:21 198:24
**umbrella** 6:16
**unable** 44:16

**uncertainty**
149:5 152:7
**unclear** 177:4
194:8
**uncontaminat...**
111:1
**uncontrolled**
127:11
**under** 25:12
26:10 53:3,21
66:24 78:21,23
93:8,12 106:12
106:17 123:2
133:19 135:13
135:14 171:15
171:22 172:17
180:2 188:4
192:22 214:2
215:8
**underarm**
155:23 177:11
**underlying**
156:1
**undersigned**
215:1
**understand**
10:20 11:2
20:24 28:4
43:24 46:16
72:22 113:10
119:25 153:25
161:2 170:4
174:19 196:23
202:1
**understanding**
13:14 28:6 76:5

89:7 92:18
119:14 123:20
132:9 163:14
178:1 206:23
**understood**
26:16 35:3
39:17 49:4,21
71:12 74:6
75:25 127:14
138:1 174:19
190:5
**underwear**
54:5 177:15
**unfair** 97:17
**unfortunate**
126:14
**uniform** 46:21
**uniformly**
211:23
**united** 1:1 2:1
187:17 188:24
189:7
**university** 7:20
38:8 147:11
149:13 150:14
**university's**
37:25 113:11
**unpatent** 196:3
**unpublished**
54:24 67:16
**unrelated** 63:7
207:10
**updated** 30:22
30:24 163:1
168:22

**[uploaded - voluntary]**                                          Page 57

**uploaded**  37:17
**urban**  205:10
**use**  4:16,22
  6:22 7:3 8:17
  9:10,11,16 13:1
  13:7 18:24
  23:17,19 25:7
  26:4,11,18,21
  27:6,10 32:3,6
  40:21 42:5,7,24
  43:3,12,15,16
  43:22,23 44:8
  44:13 50:2,4,7
  50:11,12,14,20
  50:22 52:7
  54:20 55:12
  56:2,4,18,23
  57:22 58:4,10
  58:24,25 59:1,3
  59:11,14,24
  60:4,18,18,21
  61:9 62:3,5,7,8
  62:20,24 63:14
  64:6,15 66:4
  74:6 75:18
  79:10 84:7,18
  89:4 107:3
  137:16,21
  138:5 139:16
  145:23 146:2,6
  153:1 155:18
  162:2,15
  177:15 180:9
  180:21 186:9
  186:13,19
  187:9,23

  188:18 189:1,5
  189:10 191:9,9
  192:4 194:17
  195:11 197:3
  198:11 204:22
  209:13
**used**  12:3 27:17
  28:11,22 31:25
  38:11,15 44:1,3
  44:10,11,17,21
  44:22 51:6
  54:23 60:11
  61:16,22 63:15
  68:18 81:20
  82:1 101:8
  109:7 114:22
  115:15 118:14
  122:11 128:13
  162:5 177:6
  205:8
**usefulness**
  115:8
**users**  78:12,25
  89:4 90:24
  104:6 156:2,4
**uses**  60:8,22
  61:10,25 64:19
  126:17 155:24
**using**  44:4,13
  44:21 51:2
  53:24 60:17
  63:5 65:14
  66:25 67:15
  72:15 81:22
  86:15 100:9,13
  115:16 124:11

  124:12 135:20
  170:11 186:16
  192:25 193:1
  215:7
**usually**  181:7

**v**

**vaccines**  143:15
**vaginal**  154:22
  155:18,23,24
**vague**  52:22
  151:21 187:11
**valid**  70:14
  74:13 136:9
**validity**  131:3
**value**  121:3,4
  197:15 198:1
  198:14,20
  199:8
**values**  198:11
  198:16
**variables**
  193:15
**varied**  68:6
**various**  37:1,1
  37:2 38:3,20
  40:5 155:18
  168:5
**venture**  101:4
**versa**  165:25
**version**  5:6
  20:2 30:11,20
  163:16 168:23
  183:1 184:16
  195:18 202:17
  202:18,20

**versions**  34:23
  35:9
**versus**  43:3
  44:10,13,21
  56:19 65:16
  66:5 68:5 73:21
  74:7,7 77:8
  85:6 123:7
  128:25 155:23
  155:23 156:3
  163:16 179:11
  181:16 194:23
  196:3 199:11
  210:25
**vessel**  111:7
**vice**  165:25
**video**  38:7
**videos**  37:12
**view**  88:23,23
  116:21 152:15
**views**  48:8
  110:5
**vigorous**  48:5
**vitae**  7:21 169:4
  170:21
**vitro**  124:16
**vivo**  115:23
  117:15 124:14
  124:19 204:8
**volume**  1:16
  2:14 4:3 9:13
  9:19 214:11
**voluntary**
  203:7

**[wait - witness]**

Page 58

## w

**wait** 71:25
136:7 194:1,1,1
**walk** 169:24
**want** 17:6 24:5
25:17 45:2
48:16 57:10
71:23 80:17,19
81:24 90:4
113:14 114:2
134:15 135:4
136:6,19 144:3
152:3 153:6
158:17,21
162:25 163:3
164:12 169:12
172:21 173:11
182:10 185:5
194:9 197:3
202:8,15,20,25
206:16 208:10
208:24 212:12
213:6,9
**wanted** 39:21
82:18 113:9,15
134:17,22
149:4 154:6
**wanting** 22:17
152:1
**way** 16:22
19:24,25 21:15
23:7 34:12 36:2
38:12 40:16
43:19 44:7
45:25 46:7

59:25 61:17
62:14 63:5
68:10,11,21
75:17 85:13
88:15 93:13
98:11 99:5
100:5,12
108:22 110:14
110:24 111:13
116:15 118:11
120:3 123:17
126:12 127:12
128:14,19
132:17 133:2
134:17 135:20
145:17 182:1
191:4 197:12
201:12 212:13
**ways** 63:4
155:5
**we've** 47:5 67:5
67:7 76:4 100:8
136:25 158:14
159:21 167:18
171:23 190:14
**weak** 198:17
**weakness** 76:14
77:3
**website** 37:25
38:8 45:5,6
188:5,5
**websites** 168:5
190:17
**wednesday**
1:15 2:17 10:1

**week** 15:9
23:23 24:23
26:19 27:7,11
27:17 44:18
54:2,2 55:12,15
58:5,11,15,24
59:4,7,10,18,22
60:11,14 62:10
62:22,23,23,24
63:15 71:4
146:4 157:4,24
159:19 167:5
167:10 209:20
**weekly** 59:14
59:25
**weeks** 30:25
**weigh** 129:4
132:1 201:3
**weighed** 134:1
**weighing**
132:18
**weight** 46:13
63:10 107:18
130:14 199:15
**weighted** 63:5
**went** 21:10,16
23:3 34:21 41:1
41:17 109:21
109:22 145:3
193:6
**whatsoever**
130:14
**whereof** 215:18
**whichever**
54:24

**whittlemore**
68:9,10
**wide** 7:6
**wider** 28:10,17
**wildly** 179:3
**william** 14:14
**wise** 45:16
**wish** 160:23
**witness** 2:14
4:2 11:5 14:22
17:7 18:2 19:23
20:14 21:25
22:19 23:1,11
24:2,6 25:17
26:24 29:13,22
32:6 34:4 39:7
39:23 41:3,19
46:11 47:20
48:3 49:11,13
49:16 50:17
51:20 52:23
58:21 59:9,17
66:11 70:4 72:7
74:11 75:9 79:7
79:16 80:5 81:4
81:7 83:2 84:22
86:15,25 89:7
89:15 91:1
96:15,24 99:11
99:21 100:5,25
103:25 104:18
107:10 109:14
111:17 112:1
112:18 115:25
116:11 124:3
128:7,10,17

**[witness - wrubbel]**                                                      Page 59

| | | | |
|---|---|---|---|
| 130:25 131:17 | 49:2 55:3,18 | 142:15 148:22 | 160:15,22 |
| 132:3 133:15 | 56:16,19 57:19 | 152:19,21 | 161:4 171:13 |
| 135:11 138:9 | 59:21 60:16 | 153:1 175:17 | 172:15 173:5 |
| 142:17,20,22 | 62:22 67:21 | 176:17,25 | 174:5 |
| 144:13,20 | 68:3,15,19 | 181:4 183:4 | **worked** 40:4 |
| 146:21 147:22 | 69:17,19 70:2,5 | 185:8,10 | 112:1 134:14 |
| 148:1,4,24 | 70:7 72:16 | 195:15,17 | 157:4 159:25 |
| 149:14,20 | 73:12,20 74:7,8 | 200:2 207:13 | 160:6 161:16 |
| 150:9 152:1 | 79:18 129:1 | 207:22 208:6 | **working** 157:1 |
| 153:12 155:20 | 144:25 178:22 | 209:1,12 210:4 | **works** 36:2 |
| 158:8 161:5,11 | 182:12 192:5 | 210:22 | 72:22 |
| 167:24 170:16 | 192:24 196:2 | **wording** 148:21 | **workup** 166:2,3 |
| 170:18 173:15 | 211:3,6,15,22 | **words** 26:12,19 | **world** 162:16 |
| 173:19 175:19 | 211:24 | 56:18 57:8 77:6 | **worldwide** |
| 176:24 183:8 | **women's** | 79:4 129:6 | 189:9 |
| 183:11,15,17 | 191:23 | 190:4,12 | **worthwhile** |
| 184:3 187:12 | **wondering** | **work** 20:3,21 | 138:14 |
| 187:15 191:20 | 133:1 154:1 | 21:1,10,11,16 | **worthy** 130:11 |
| 193:13 195:20 | **woolen** 19:16 | 21:19,22 22:1,2 | **write** 16:19 |
| 202:10,12,18 | 19:19 20:7 21:7 | 22:3,12,17,19 | 118:18 142:25 |
| 205:17 206:14 | 21:10,17,22 | 22:22 36:1,5,5 | 143:11 |
| 207:10 208:22 | 22:3,4,11,23 | 37:3 38:22,24 | **writes** 113:14 |
| 209:9,19 | 23:10,15 25:5 | 40:13,22 41:14 | **writing** 16:23 |
| 210:14 211:13 | 25:14 26:2,11 | 42:3 47:21 63:9 | 16:23 203:13 |
| 211:21 212:24 | 33:7 34:11 38:9 | 63:10 77:10 | **written** 28:23 |
| 215:18 | 38:12 39:1,2,5 | 80:14 107:14 | 29:4 56:6 132:9 |
| **witnesses** 4:11 | 39:6,9 40:12,13 | 107:20 110:12 | 198:8,10 |
| 11:16 14:6 15:7 | 40:22 41:1,15 | 134:9 135:1,13 | 199:18,23 |
| 189:4 215:5 | 42:7,17,23 | 135:15,20,21 | 200:3 |
| **wolf** 7:18 | 48:17 49:7 | 135:22,25 | **wrong** 27:2 |
| 164:15 | 50:13,19 51:5 | 143:1 147:13 | 64:12 81:24 |
| **wolf's** 164:19 | 56:7 65:16 | 148:1,1 149:9 | 83:2 147:20 |
| **woman** 44:17 | 66:19 67:7,9,12 | 149:14 150:10 | **wrote** 47:22 |
| 128:25 | 72:14 74:15 | 150:16 154:9 | 49:23 |
| **women** 6:24 | 80:9 113:2,17 | 157:6,10 | **wrubbel** 45:10 |
| 43:13,16 44:4,5 | 134:16 142:7 | 159:13,16,19 | |

**[wu - zoom]**　　　　　　　　　　　　　　Page 60

| | |
|---|---|
| **wu**  74:19,19 | **youtube**  37:12 |
| **x** | 37:14,18 38:7 |
| **x**  215:14 | **z** |
| **y** | **zero**  121:5 |
| **yeah**  24:7 47:12 | **zion**  53:14 |
| 49:10,11 50:17 | **zoom**  34:16 |
| 59:5 65:5 67:8 | 167:15,16 |
| 88:24 90:7 99:6 | |
| 103:3 107:8 | |
| 118:25 137:15 | |
| 151:1 153:15 | |
| 154:5 165:16 | |
| 173:15 183:13 | |
| 184:1,24 | |
| 194:15 196:21 | |
| 197:22 198:22 | |
| 201:20 202:12 | |
| 206:12 | |
| **year**  34:23 | |
| 109:21 149:21 | |
| 150:17 | |
| **yearly**  149:16 | |
| **years**  12:3 | |
| 24:22 35:21 | |
| 59:21 90:8 | |
| 95:19 97:6 | |
| 150:8,22 | |
| 157:10,20 | |
| 179:1,2 | |
| **yep**  24:10 30:24 | |
| 124:24 173:23 | |
| 175:19 195:25 | |
| **yesterday** | |
| 167:4,10,17 | |
| 168:3 | |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.