# EXHIBIT 11

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON      )
TALCUM POWDER PRODUCTS        )
MARKETING SALES               )
PRACTICES, AND PRODUCTS       ) MDL NO.16-2738(FLW)(LHG)
LIABILITY LITIGATION          )
_____)

VIDEO-RECORDED DEPOSITION OF

MARK W. RIGLER, PH.D.

February 6, 2019

9:14 a.m.

11340 Lakefield Drive
Suite 200
Johns Creek, Georgia

Frances Buono, RPR, CCR-B-791

Atlanta Reporters, Inc.
Georgia Certified Court Reporters
(866) 344-0459
www.atlanta-reporters.com

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporter.com

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

LEE CIRSCH, Esq.
The Lanier Law Firm
21550 Oxnard Street
3rd Floor
Woodland Hills, California  91367
Lee.cirsch@lanierlawfirm.com

P. LEIGH O'DELL, Esq.
Beasley Allen Law Firm
218 Commerce Street
Montgomery, Alabama  36103-4160
Leigh.odell@beasleyallen.com

MICHELLE A. PARFITT, Esq.
JAMES GREEN, Esq.
Ashcraft & Gerel, LLP
1825 K. Street
Suite 700
Washington, D.C.  20036
Mparfitt@ashcraftlaw.com

DENNIS M. GEIER, Esq.
Cohen Placitella Roth, PC
127 Maple Avenue
Red Bank, New Jersey  07701
Dgeier@cprlaw.com

Atlanta Reporters, Inc.    www.atlanta-reporters.com

## Page 3

APPEARANCES OF COUNSEL (continued)

On behalf of the Defendant,
  Johnson & Johnson and Johnson & Johnson Consumer
  Inc.:

ALEX V. CHACHKES, Esq.
NINA TROVATO, Esq.
Orrick, Herrington & Sutcliffe, LLP
51 West 52nd Street
New York, New York  10019-1642
Achachkes@orrick.com
Ntrovato@orrick.com

JACK N. FROST, JR., Esq.
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, New Jersey  07932-1047
Jack.frost@dbr.com

On behalf of the Defendant,
  Imerys Talc America, Inc.:

MARK K. SILVER, Esq.
Coughlin Duffy, LLP
350 Mount Kemble Avenue
Morristown, New Jersey  07962
Msilver@coughlinduffy.com

MARK A. PROST, Esq.
Sandberg Phoenix & von Gontard, P.C.
600 Washington Avenue
15th Floor
St. Louis, Missouri  63101-1313
Mprost@sandbergphoenix.com

Atlanta Reporters, Inc.    www.atlanta-reporters.com

## Page 4

APPEARANCES OF COUNSEL (continued)

On behalf of the Defendant,
  PTI:

MICHAEL ANDERTON, Esq.
Tucker Ellis, LLP
950 Main Avenue
Suite 1100
Cleveland, Ohio  44113-7213
Michael.anderton@tuckerellis.com

On behalf of the Defendant,
  PCPC:

REBECCA WOODS, Esq.
Seyfarth Shaw
1075 Peachtree Street, NE
Suite 2500
Atlanta, Georgia  30309
Rwoods@seyfarth.com

Also Present:

George Montiel, Videographer

- - -

Atlanta Reporters, Inc.    www.atlanta-reporters.com

**Page 5**

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Chachkes | 7 |
| Examination by Mr. Silver | 214 |
| Examination by Ms. O'Dell | 219 |

- - -

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**Page 6**

INDEX TO EXHIBITS

Defendants'

| Exhibit | Description | Page |
|---|---|---|
| 1 | Invoices | 204 |
| 2 | Excerpt - Trial transcript, February 20, 2018, Vol. XIV, Lanzo vs. Cyprus Amax | 136 |
| 3 | MAS TEM Coefficient of Variation for Tremolite and Anthophyllite in Talc, A Quality Control Study, 9-6-18 | 173 |
| 4 | Graph | 177 |

(Original Exhibits 1 through 4 have been attached to the original transcript.)

- - -

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**Page 7**

1  (Reporter disclosure made pursuant to
2  Article 10.B. of the Rules and Regulations of
3  the Board of Court Reporting of the Judicial
4  Council of Georgia.)
5  (Identification statement by
6  videographer.)
7  MARK W. RIGLER, PH.D.,
8  having been first duly sworn, was examined and
09:13:39  9  testified as follows:
09:13:39  10  EXAMINATION
09:13:42  11  BY MR. CHACHKES:
09:13:42  12  Q.   Good morning, Dr. Rigler.
09:14:52  13  A.   **Good morning.**
09:14:52  14  Q.   How are you?
09:14:52  15  A.   **Good; you?**
09:14:53  16  Q.   Good.
09:14:55  17  MR. CHACHKES:  So just for the record, I
09:14:55  18  have the same late production objections as
09:14:58  19  yesterday and the same request to keep the
09:15:01  20  deposition open.  I assume you have the same?
09:15:03  21  MS. O'DELL:  We have the same opposition.
09:15:06  22  Q.   (By Mr. Chachkes) Okay.  So what I've
09:15:07  23  done is I've brought some exhibits from yesterday, so
09:15:10  24  if you're wondering why there's stamps on them, it's
09:15:14  25  because they're the stamps from Dr. Longo's

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

**Page 8**

09:15:17  1  deposition.  We are going to use some of the same
09:15:19  2  exhibits, if that's okay.
09:15:20  3  A.   Yes.
09:15:20  4  Q.   So what's been marked yesterday -- so all
09:15:22  5  the stamps are February 5, 2019, Longo.  And I'm
09:15:28  6  going to use those exhibits unless I use a new
09:15:31  7  exhibit.
09:15:31  8  A.   **Okay.**
09:15:32  9  Q.   So I'm just going to hand you what's been
09:15:33  10  marked yesterday as Exhibit 2.  And you recognize
09:15:36  11  that as the January 15 version of the report that you
09:15:40  12  cosigned?
09:15:41  13  A.   **Yes.**
09:15:41  14  Q.   Okay.  And what was your involvement in
09:15:44  15  drafting this report?
09:15:46  16  A.   **I reviewed the report, looked over the**
09:15:50  17  **data, and made typographical and grammatical**
09:15:55  18  **corrections throughout the report.**
09:15:57  19  Q.   Okay.  Do you feel qualified to testify to
09:16:05  20  every matter that's in that report?
09:16:07  21  MS. O'DELL:  Object to the form.
09:16:08  22  THE WITNESS:  As I say, I am qualified to
09:16:12  23  testify on what's in this report now, yes.
09:16:14  24  Q.   (By Mr. Chachkes) Okay.  So if Dr. Longo
09:16:17  25  were to, for example, not show up at a trial, you

Atlanta Reporters, Inc. 866-344-0459   www.atlanta-reporters.com

## Page 17

1  Q. More than 15 hours?
2  A. **I don't know.**
3  Q. So probably over 10 hours, but you don't
4  know beyond that?
5  A. **Correct.**
6  Q. Okay. And were you involved in the
7  creation of the protocols to test J&J talc in this
8  case?
9  A. **In terms of the protocols for the testing,**
10 **we used standard methods throughout for the analysis.**
11 **Dr. Longo essentially put together the way the test**
12 **or the study was going to be done, but we, you know,**
13 **overall use the standard methods throughout.**
14 Q. When you say Dr. Longo put together the
15 way -- you said the way the studies would be
16 conducted?
17 A. **Yes.**
18 Q. Was that something in writing?
19 A. **Well, he directs the study on a daily**
20 **basis.**
21 Q. The question is was it in writing?
22 A. **Was it in writing? I don't know. You'd**
23 **have to ask Dr. Longo.**
24 Q. Okay. So you're unaware of whether he
25 communicated with the analysts about protocol in

## Page 18

1  writing?
2  A. **Well, the --**
3     MS. O'DELL: Object to form.
4     THE WITNESS: -- laboratory has protocol
5  for the way that talc is analyzed and
6  asbestos-bearing products are analyzed, so we
7  have written protocol for those things.
8     MR. CHACHKES: Okay. And I think I've
9  requested that those be produced. I don't think
10 those have been produced.
11    MS. O'DELL: I think it's reflected in his
12 report, but we will consider your request.
13 Q. (By Mr. Chachkes) Okay. Do you
14 communicate with the analysts by email at all?
15 A. **Communicate with the analysts by email?**
16 **No. I can go speak to them.**
17 Q. Okay. There's no sort of like weekly
18 email or monthly email where you summarize what's
19 going on?
20 A. **No.**
21 Q. Did you ever change an analyst's
22 determinations where an analyst came up with some
23 conclusion and you said maybe that's not right, go
24 back?
25 A. **No.**

## Page 19

1  Q. Do you consider yourself an expert in TEM
2  analysis?
3  A. **Well, the term expert, I think, you**
4  **probably have to defer that to the court. I mean, I**
5  **have more than the layperson's knowledge so -- but I**
6  **would defer that to the court.**
7  Q. Okay. Have you --
8  A. **I mean, I've been qualified as an expert**
9  **before, but in this case...**
10 Q. When is the first time you ever used a
11 TEM?
12 A. **The first time I used a TEM? Let's see.**
13 **That would probably have been sometime in the early**
14 **'80s, I would say, yeah.**
15 Q. How many times have you used an SAED to
16 characterize a particle?
17 A. **SAED?**
18 Q. SAED.
19 A. **I don't know if I could count the number**
20 **of times.**
21 Q. How many times have you used EDXA to
22 characterize a particle?
23 A. **Same answer on that. Yes.**
24 Q. What about PLM, do you consider yourself
25 an expert on PLM?

## Page 20

1  A. **I am not a PLM microscopist.**
2  Q. Okay. What was your contribution to the
3  PLM aspects of the January 15 report?
4  A. **Well, as far as PLM contributions, again,**
5  **I'm not the PLM analyst, so we just wanted to be sure**
6  **that the quality program was being followed in the**
7  **laboratory.**
8  Q. When you say that a quality program was
9  being followed, is that the same contribution you
10 made to the other portions of the report?
11    MS. O'DELL: Object to form.
12    THE WITNESS: Yes. Well, I would say yes
13 to that. Yes.
14 Q. (By Mr. Chachkes) Okay. Did you ever
15 personally test a talc sample for asbestos
16 contamination?
17 A. **Did I ever personally test them?**
18 Q. Yes.
19 A. **Not that I can recall as I sit here.**
20 Q. Okay.
21 A. **We've done tissue testing for talc and**
22 **asbestos in tissue, yes.**
23 Q. But just testing talcum powder that came
24 out of a bottle, you've never done that?
25 A. **I've not personally tested that.**

**177**

| | | |
|---|---|---|
| 14:04:17 | 1 | Q. Let me -- |
| 14:04:22 | 2 | A. **I mean, the rate is based on the number of** |
| 14:04:24 | 3 | **structures that they counted. Now, they may have** |
| 14:04:26 | 4 | **been a fiber or a bundle, but it's the total number** |
| 14:04:29 | 5 | **of structures they counted. Yep.** |
| 14:04:31 | 6 | MR. CHACHKES: Let's mark as the next |
| 14:04:32 | 7 | exhibit, what are we on, 4? |
| | 8 | (Defendants' Exhibit 4 was marked for |
| 14:04:52 | 9 | identification.) |
| 14:04:52 | 10 | Q. (By Mr. Chachkes) So what we have marked |
| 14:04:55 | 11 | as Rigler 4 is a demonstrative we worked up so that |
| 14:04:57 | 12 | we can see -- compare the analysts' work against each |
| 14:04:59 | 13 | other. |
| 14:05:00 | 14 | Can you just confirm that -- let's look, |
| 14:05:03 | 15 | for example, at analyst 1, what they found for grid |
| 14:05:10 | 16 | opening A8-E2? |
| 14:05:16 | 17 | A. **Which analysis is this? Which sample is** |
| 14:05:17 | 18 | **this?** |
| 14:05:18 | 19 | Q. So this is -- you've gone to the appendix, |
| 14:05:21 | 20 | right, of Rigler 3. |
| 14:05:26 | 21 | A. **What? Where are we --** |
| 14:05:29 | 22 | Q. So Rigler 3 is the coefficient of |
| 14:05:32 | 23 | variation study? |
| 14:05:33 | 24 | A. **Okay.** |
| 14:05:33 | 25 | Q. And if you go into -- there are sheets for |

Atlanta Reporters, Inc.866-344-0459   www.atlanta-reporters.com

**178**

| | | |
|---|---|---|
| 14:05:38 | 1 | different analysts; right? |
| 14:05:39 | 2 | A. **Yeah, these are the count sheets, right.** |
| 14:05:41 | 3 | Q. Right. So if you go to the first analyst |
| 14:05:48 | 4 | and you go to A8-E2 -- |
| 14:05:51 | 5 | A. **Okay.** |
| 14:05:51 | 6 | Q. -- you see that the structure identified |
| 14:05:53 | 7 | was a bundle -- |
| 14:05:54 | 8 | A. **Okay.** |
| 14:05:54 | 9 | Q. -- right? |
| 14:05:55 | 10 | A. **Yes.** |
| 14:05:56 | 11 | Q. Okay. And then in my demonstrative you |
| 14:05:58 | 12 | see that's a bundle; right? |
| 14:06:00 | 13 | A. **Right.** |
| 14:06:00 | 14 | Q. And then you go to analyst number 2 -- is |
| 14:06:06 | 15 | that the second page? |
| 14:06:07 | 16 | A. **Yes.** |
| 14:06:07 | 17 | Q. Okay. And it says in the upper left-hand |
| 14:06:09 | 18 | corner analyst 2? |
| 14:06:10 | 19 | A. **Yes.** |
| 14:06:10 | 20 | Q. Okay. That for A8-E2 that analyst |
| 14:06:16 | 21 | identified a fiber? |
| 14:06:17 | 22 | A. **Okay.** |
| 14:06:17 | 23 | Q. Is that correct? |
| 14:06:18 | 24 | A. **Uh-huh.** |
| 14:06:19 | 25 | Q. Okay. And that's reflected in the |

Atlanta Reporters, Inc.866-344-0459   www.atlanta-reporters.com

**179**

| | | |
|---|---|---|
| 14:06:21 | 1 | demonstrative? |
| 14:06:22 | 2 | A. **Yep.** |
| 14:06:22 | 3 | Q. And analyst number 3, A8-E2, that analyst |
| 14:06:27 | 4 | detected a fiber? |
| 14:06:28 | 5 | A. **Yes.** |
| 14:06:29 | 6 | Q. Okay. And then analyst number 4, A8-E2, |
| 14:06:34 | 7 | that analyst detected a bundle? |
| 14:06:36 | 8 | A. **Yes. Yep.** |
| 14:06:37 | 9 | MS. O'DELL: Did you say A8-2 twice? |
| | 10 | THE WITNESS: This one. |
| 14:06:41 | 11 | MR. CHACHKES: A8-E2. |
| 14:06:43 | 12 | THE WITNESS: Yeah. Is that grid square? |
| 14:06:44 | 13 | MS. O'DELL: Yeah. |
| | 14 | THE WITNESS: Yeah. |
| 14:06:45 | 15 | MS. O'DELL: Got it. And then for -- |
| 14:06:49 | 16 | Q. (By Mr. Chachkes) Okay. So what we've |
| 14:06:51 | 17 | done is we've summarized these grid openings in this |
| 14:06:55 | 18 | demonstrative in that way -- |
| | 19 | A. **Right.** |
| 14:06:56 | 20 | Q. -- do you follow me so far? |
| 14:06:58 | 21 | A. **Yes.** |
| 14:06:58 | 22 | Q. And your analysts are trained to |
| 14:07:00 | 23 | distinguish between a fiber and a bundle; right? |
| 14:07:02 | 24 | A. **Yes.** |
| 14:07:02 | 25 | Q. And you ran this experiment to detect how |

Atlanta Reporters, Inc.866-344-0459   www.atlanta-reporters.com

**180**

| | | |
|---|---|---|
| 14:07:06 | 1 | good your analysts were at identifying the same |
| 14:07:09 | 2 | thing? |
| 14:07:09 | 3 | MS. O'DELL: Object to the form. |
| 14:07:10 | 4 | Q. (By Mr. Chachkes) Is that a yes? |
| 14:07:11 | 5 | A. **That would be yes.** |
| 14:07:11 | 6 | Q. But out of the 11 grid openings, your |
| 14:07:14 | 7 | analysts only came to consensus on the type of |
| 14:07:16 | 8 | structure they found only once? |
| 14:07:18 | 9 | MS. O'DELL: Object to the form. |
| 14:07:19 | 10 | THE WITNESS: Every time they came to the |
| 14:07:20 | 11 | consensus that it was tremolite. |
| 14:07:22 | 12 | Q. (By Mr. Chachkes) This is not the |
| 14:07:23 | 13 | question. |
| 14:07:23 | 14 | A. **But that is the answer. This is what** |
| 14:07:25 | 15 | **we're concerned about here, is it asbestos.** |
| 14:07:27 | 16 | Q. The question before you is: Out of 11 |
| 14:07:30 | 17 | grid openings your analysts only came to a consensus |
| 14:07:33 | 18 | on the type of structure they found only once? |
| 14:07:36 | 19 | A. **What's that? Out of 11 grid openings?** |
| 14:07:39 | 20 | Q. Right. |
| 14:07:40 | 21 | A. **No.** |
| 14:07:40 | 22 | Q. Okay. Look at the demonstrative. |
| | 23 | A. **Okay.** |
| 14:07:43 | 24 | Q. For A8-E2 your analysts did not find the |
| 14:07:46 | 25 | same structure; right? Two found bundle, two found |

Atlanta Reporters, Inc.866-344-0459   www.atlanta-reporters.com

## Page 181

| | | |
|---|---|---|
| 14:07:52 | 1 | fiber? |
| 14:07:52 | 2 | A. **Uh-huh.** |
| 14:07:53 | 3 | Q. For A8-E4 they all agree it's a fiber? |
| 14:07:57 | 4 | A. **Uh-huh.** |
| 14:07:57 | 5 | Q. For A8-E5 they did not agree whether it |
| 14:08:00 | 6 | was a bundle or fiber. |
| 14:08:02 | 7 | A. **Okay.** |
| 14:08:03 | 8 | MS. O'DELL: And feel free to check if you |
| 14:08:05 | 9 | need to check the data. It's in the |
| 14:08:08 | 10 | demonstrative. |
| 14:08:08 | 11 | Q. (By Mr. Chachkes) Yeah. I mean, if you |
| 14:08:09 | 12 | think we're putting a fraudulent -- |
| | 13 | A. **No --** |
| | 14 | Q. -- in front of you -- |
| 14:08:13 | 15 | A. **-- no.** |
| 14:08:13 | 16 | MS. O'DELL: I think mistakes can happen. |
| | 17 | THE WITNESS: I'm sure they can. |
| 14:08:15 | 18 | MS. O'DELL: I think probably the others |
| 14:08:16 | 19 | happen, too, but I'm not suggesting that in this |
| 14:08:18 | 20 | situation. |
| 14:08:18 | 21 | Q. (By Mr. Chachkes) So you can see for the |
| 14:08:20 | 22 | 11 grid openings on the demonstrative we put before |
| 14:08:23 | 23 | you, there was only one instance where the analysts |
| 14:08:27 | 24 | agreed on the fiber structure. |
| 14:08:30 | 25 | A. **Okay.** |

## Page 182

| | | |
|---|---|---|
| 14:08:31 | 1 | Q. Right? |
| 14:08:32 | 2 | A. **Okay.** |
| 14:08:32 | 3 | Q. And did you -- did you determine an error |
| 14:08:39 | 4 | rate for your analysts' ability to determine |
| 14:08:42 | 5 | morphology? |
| 14:08:43 | 6 | A. **No.** |
| 14:08:44 | 7 | Q. If you did based on this, it would be a |
| 14:08:47 | 8 | pretty high error rate, wouldn't it? |
| 14:08:49 | 9 | MS. O'DELL: Object to the form. |
| 14:08:50 | 10 | THE WITNESS: Well, it's not an error as |
| 14:08:51 | 11 | to what the material is, is it? It's all |
| 14:08:53 | 12 | tremolite. It's all tremolite asbestos. It all |
| 14:08:56 | 13 | meets the definition for tremolite asbestos, |
| 14:08:57 | 14 | bundle, fiber. |
| 14:08:59 | 15 | Q. (By Mr. Chachkes) I'll ask the question |
| 14:09:00 | 16 | again. |
| 14:09:00 | 17 | A. **Okay.** |
| 14:09:00 | 18 | Q. If you were to determine an error rate for |
| 14:09:03 | 19 | determining the morphology of what the analysts in |
| 14:09:06 | 20 | the coefficient of variation were looking at, it |
| 14:09:09 | 21 | would be a very high error rate, wouldn't it? |
| 14:09:11 | 22 | MS. O'DELL: Object to the form. |
| 14:09:12 | 23 | THE WITNESS: No. No, it wouldn't. |
| 14:09:12 | 24 | Q. (By Mr. Chachkes) Even though they only |
| 14:09:13 | 25 | agreed once out of 11 times? |

## Page 183

| | | |
|---|---|---|
| 14:09:15 | 1 | MS. O'DELL: Object to the form. |
| 14:09:16 | 2 | THE WITNESS: No. |
| 14:09:16 | 3 | Q. (By Mr. Chachkes) Why? |
| 14:09:17 | 4 | A. **It's not.** |
| 14:09:18 | 5 | Q. Why? |
| 14:09:18 | 6 | A. **Well, the max I can see here is it might** |
| 14:09:23 | 7 | **be -- it might be maybe 50 percent, maybe, if that's** |
| 14:09:28 | 8 | **what it is.** |
| 14:09:28 | 9 | Q. Okay. |
| 14:09:29 | 10 | A. **And I don't agree with it, okay, because** |
| 14:09:32 | 11 | **the objective here is is it asbestos? Is it** |
| 14:09:35 | 12 | **asbestiform asbestos? The answer is yes.** |
| 14:09:37 | 13 | Q. So a 50 percent error rate in your mind is |
| 14:09:39 | 14 | not high? |
| 14:09:40 | 15 | MS. O'DELL: Object to the form. |
| 14:09:41 | 16 | THE WITNESS: No, this is not -- |
| 14:09:43 | 17 | MS. O'DELL: Give me a moment. |
| 14:09:45 | 18 | Object to the form. |
| 14:09:46 | 19 | Go ahead. |
| 14:09:46 | 20 | THE WITNESS: I mean, again, the objective |
| 14:09:48 | 21 | here is to determine if this is asbestos, is |
| 14:09:51 | 22 | this asbestiform. And the answer to that is |
| 14:09:54 | 23 | yes. You're going to have some variation based |
| 14:09:56 | 24 | on what they see in the microscope, all right, |
| 14:10:01 | 25 | and that is totally acceptable. |

## Page 184

| | | |
|---|---|---|
| 14:10:03 | 1 | Q. (By Mr. Chachkes) Okay. When you say |
| 14:10:05 | 2 | totally acceptable, what do you mean by that? |
| 14:10:06 | 3 | A. **Well, it's acceptable based on what the** |
| 14:10:13 | 4 | **asbestiform is, according to the definition. All** |
| 14:10:16 | 5 | **right. Fiber, bundle, .5 or greater, 5-to-1 aspect** |
| 14:10:22 | 6 | **ratio. Every one of these fits that.** |
| 14:10:24 | 7 | Q. So -- well, that's not quite correct; |
| 14:10:28 | 8 | right? A8-G4, three analysts found no detectable |
| 14:10:34 | 9 | asbestos and only one found asbestos; right? |
| 14:10:36 | 10 | A. **That happens.** |
| | 11 | Q. Okay. |
| 14:10:36 | 12 | A. **That can happen.** |
| 14:10:37 | 13 | Q. And then A8-G5, three analysts found no |
| 14:10:41 | 14 | asbestos and one identified a bundle? |
| 14:10:43 | 15 | A. **Again, that can happen.** |
| 14:10:45 | 16 | Q. And you testified before that there's a |
| 14:10:49 | 17 | right answer and a wrong answer as to whether |
| 14:10:52 | 18 | something's a fiber or a bundle; right? |
| 14:10:54 | 19 | A. **Yes.** |
| 14:10:54 | 20 | Q. Do you know for grid opening A8-E4 which |
| 14:10:59 | 21 | analyst got it wrong and which analyst got it right? |
| 14:11:01 | 22 | MS. O'DELL: Object to the form. |
| 14:11:02 | 23 | THE WITNESS: They both got it right. |
| 14:11:04 | 24 | They all got it right. |
| 14:11:05 | 25 | Q. (By Mr. Chachkes) Okay. And so if |

Atlanta Reporters, Inc.866-344-0459   www.atlanta-reporters.com

## Page 185

```
14:11:08  1   there's objectively a right answer to whether it's a
14:11:11  2   fiber or bundle, how can something be both a fiber
14:11:14  3   and a bundle?
14:11:15  4       A.   As I say, the analyst, their job is to
14:11:22  5   figure out whether it meets the definition, all
14:11:24  6   right?  Fiber or bundle, it meets the specification
14:11:28  7   for whether it is asbestos, asbestiform asbestos.
14:11:33  8       Q.   Okay.  Putting --
14:11:34  9       A.   That's what we're concerned about here.
14:11:36 10       Q.   Putting aside whether there's -- what they
14:11:38 11   identified as asbestiform, I'm just talking about the
14:11:41 12   morphology.
14:11:41 13       A.   Sure.
14:11:42 14       Q.   For A8-E2, two analysts must have gotten
14:11:46 15   it wrong and two must have gotten it right.
14:11:48 16            MS. O'DELL:  Object to the form.
14:11:49 17            THE WITNESS:  No.  They all got it right.
14:11:50 18       Q.   (By Mr. Chachkes)  Okay.  So you don't
14:11:50 19   care whether an analyst correctly identifies
14:11:54 20   something as a bundle or fiber?
14:11:56 21            MS. O'DELL:  Object to the form.
14:11:56 22            MS. PARFITT:  Misstates his testimony.
14:11:59 23            THE WITNESS:  What I've said is it meets
14:12:00 24       the definition.  That's what is of concern to
14:12:03 25       me.  That's the most important part.
```
Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

## Page 186

```
14:12:04  1       Q.   (By Mr. Chachkes)  The question is do you
14:12:06  2   care whether one of your analysts misidentifies a
14:12:09  3   bundle as a fiber or a fiber as a bundle?
14:12:11  4            MS. O'DELL:  Object to the form.
14:12:13  5       Q.   (By Mr. Chachkes)  Do you care?
14:12:14  6            MS. O'DELL:  Object to the form.
14:12:15  7            THE WITNESS:  I care if they identify it
14:12:19  8       properly according to the regulations, and in
14:12:22  9       all cases they have.
14:12:23 10       Q.   (By Mr. Chachkes)  I'll ask the same
14:12:24 11   question again.
14:12:24 12       A.   And I'll answer it the same way every
14:12:26 13   time.
14:12:26 14       Q.   We'll add this to the list of things we're
14:12:28 15   going to get the magistrate to --
         16       A.   Fine.
14:12:30 17       Q.   -- answer.
14:12:30 18       A.   That's fine.
14:12:30 19       Q.   Do you care --
14:12:31 20       A.   I'm going to answer it the same way, so we
14:12:33 21   can move on.
14:12:34 22       Q.   I want a clear record.  If you don't want
14:12:36 23   to answer -- do you care --
14:12:37 24       A.   I've answered already.
14:12:37 25            MS. O'DELL:  Excuse me.  He's answered
```
Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

## Page 187

```
14:12:39  1       your question.
14:12:39  2            THE WITNESS:  Numerous times.
14:12:41  3            MS. O'DELL:  Excuse me.  Three or four
14:12:42  4       times.  If you want to waste your time, but
14:12:45  5       don't badger the witness.
14:12:46  6            MR. CHACHKES:  I'm not going to badger the
          7       witness --
14:12:50  8            MS. O'DELL:  You are badgering the
14:12:50  9       witness.
         10            MR. CHACHKES:  -- clear answer.
14:12:50 11            MS. O'DELL:  He's answered your question
14:12:51 12       very clearly.
14:12:52 13            MR. CHACHKES:  I'm going to ask the same
14:12:53 14       question again.  You can tell me I'm not allowed
14:12:56 15       to, and I'll move on.
         16            MS. O'DELL:  I'm telling you that the
         17       rules require that you not badger the witness.
         18       That's what I'm stating to you.
14:13:01 19            MR. CHACHKES:  I'm -- level voice.  It's a
14:13:02 20       calm question.  It's a serious question.  So.
14:13:04 21            MS. O'DELL:  That doesn't mean you're not
14:13:08 22       badgering the witness, as you are well aware.
14:13:09 23            MR. CHACHKES:  I believe I'm entitled to a
14:13:11 24       clear answer to a clear question.
14:13:13 25            MS. O'DELL:  You're not entitled to the
```
Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

## Page 188

```
          1       answer that you want.  You're entitled to an
14:13:13  2       answer, and he's answered your question.
          3            MR. CHACHKES:  Let's maybe -- I don't
          4       think this colloquy is productive.  I'm going to
14:13:19  5       ask the same question again.  If you want to say
14:13:19  6       don't ask it, you can order me not to ask it.
14:13:22  7       I'm going to ask it again.
14:13:23  8       Q.   (By Mr. Chachkes)  Do you care whether
14:13:24  9   your analysts misidentify a bundle as a fiber or a
14:13:28 10   fiber as a bundle?  Just the morphology I'm talking
14:13:30 11   about.
14:13:31 12       A.   Asked and answered.
14:13:32 13            MS. O'DELL:  Excuse me.  Object to the
14:13:33 14       form.
14:13:34 15       Q.   (By Mr. Chachkes)  So you believe you've
14:13:37 16   already answered that?
14:13:37 17       A.   Yes.
14:13:38 18       Q.   Okay.  And if I were to say you don't care
14:13:41 19   about whether an analyst is misidentifying a
14:13:44 20   morphology, would I be wrong or right?
14:13:46 21            MS. O'DELL:  You would be misstating his
14:13:48 22       testimony.  Object to the question.
14:13:49 23       Q.   (By Mr. Chachkes)  If I said you do care
14:13:52 24   that an analyst misidentified the morphology of
14:13:56 25   asbestos, would I be wrong or right?
```
Atlanta Reporters, Inc. 866-344-0459  www.atlanta-reporters.com

### Page 201

```
14:25:21   1       A.   Correct.
14:25:21   2       Q.   Are there two kinds of tremolite,
14:25:34   3   asbestiform and nonasbestiform?
14:25:36   4       A.   Yes.
14:25:36   5       Q.   Just identifying something as tremolite
14:25:41   6   doesn't mean it's asbestiform?
14:25:43   7            MS. O'DELL:  Object to the form.
14:25:44   8            THE WITNESS:  It can be massive tremolite.
14:25:47   9   You know, if it's fibrous and it meets the
14:25:49  10   definition, then it's going to be asbestiform.
14:25:51  11   I mean, according to the definition.
14:25:53  12       Q.   (By Mr. Chachkes)  The question is just
14:25:54  13   identifying something as tremolite does not mean it's
14:25:56  14   asbestiform; is that correct?
14:25:57  15            MS. O'DELL:  Object to the form.
14:25:58  16            THE WITNESS:  Once again, you would have
14:26:02  17   to look at the form.
14:26:03  18       Q.   (By Mr. Chachkes)  To determine whether
14:26:04  19   it's asbestiform?
14:26:05  20       A.   Yes.
14:26:06  21            MS. O'DELL:  Object to the form.
14:26:07  22       Q.   (By Mr. Chachkes)  Just identifying
14:26:08  23   something as anthophyllite doesn't mean it's
14:26:10  24   asbestiform; correct?
14:26:11  25            MS. O'DELL:  Object to the form.
```

### Page 202

```
14:26:12   1            THE WITNESS:  Once again, if it meets the
14:26:15   2   definition than it would be.
14:26:17   3       Q.   (By Mr. Chachkes)  Okay.  And if it
14:26:19   4   doesn't meet the definition, it wouldn't be?
14:26:21   5            MS. O'DELL:  Object to the form.
14:26:22   6            THE WITNESS:  Well, it's still
14:26:23   7   anthophyllite.  It may be, you know, below the
14:26:26   8   aspect ratio again.  Causes the same health
14:26:30   9   effects.
14:26:30  10       Q.   (By Mr. Chachkes)  What's a cleavage
14:26:36  11   fragment again?
14:26:36  12            MS. O'DELL:  Asked and answered.
14:26:38  13            THE WITNESS:  Yeah.  Talked about that
14:26:39  14   already.
14:26:39  15       Q.   (By Mr. Chachkes)  So what is it?
14:26:41  16       A.   **It is a -- it's a form that would not have**
14:26:45  17   **parallel sides.  Wouldn't have the aspect ratio.**
14:26:49  18   **It's going to be an odd shape.**
14:26:50  19       Q.   Is something that had nonparallel sides
14:26:55  20   with an aspect ratio of 6-to-1, would that be a
14:26:59  21   cleavage fragment?
14:27:00  22            MS. O'DELL:  Object to the form.
14:27:01  23            THE WITNESS:  Most likely.
14:27:02  24       Q.   (By Mr. Chachkes)  Do you agree with the
14:27:03  25   statement:  Crushing of nonasbestiform amphibole can
```

### Page 203

```
14:27:06   1   lead to elongate fragments that conform to the
14:27:09   2   definition of an asbestiform fiber?
14:27:11   3            MS. O'DELL:  Object to form.
14:27:12   4            THE WITNESS:  Yes.
14:27:12   5       Q.   (By Mr. Chachkes)  Do you agree with this
14:27:13   6   statement:  Crushed nonasbestiform amphiboles rarely
14:27:17   7   have aspect ratios exceeding 30-to-1?
14:27:21   8       A.   **I mean, that is -- that's been stated, but**
14:27:29   9   **it's as rarely -- so it's not 100 percent.  So you**
14:27:35  10   **can have some.**
14:27:35  11       Q.   But you agree with the statement?
14:27:38  12            MS. O'DELL:  Object to the form.  He just
14:27:40  13   said what he thought about the statement.
14:27:41  14            THE WITNESS:  Yeah.
14:27:41  15       Q.   (By Mr. Chachkes)  It's yes or no.  Do
14:27:43  16   crushed -- do you agree with this statement, yes or
14:27:45  17   no:  Crushed nonasbestiform amphiboles rarely have
14:27:48  18   aspect ratios exceeding 30-to-1?
14:27:50  19            MS. O'DELL:  You may answer it any way
14:27:52  20   you'd like, Doctor.  You're not restricted.
14:27:54  21            THE WITNESS:  I mean, I've already
14:27:55  22   answered part of the question, and I would say
14:27:56  23   yes, you know.
14:28:00  24            MS. O'DELL:  We have been going about an
14:28:01  25   hour.  Why don't we take a quick break.
```

### Page 204

```
14:28:04   1            MR. CHACHKES:  Sure.
14:28:43   2            (Recess from 2:28 p.m. to 2:52 p.m.)
           3            (Defendants' Exhibit 1 was marked for
14:52:54   4   identification.)
14:52:54   5       Q.   (By Mr. Chachkes)  Okay.  Dr. Rigler, this
14:53:11   6   has already been marked as Rigler Exhibit 1.  Can you
14:53:15   7   confirm that those are MAS invoices?
14:53:17   8       A.   **Let's see.  It has MAS on the letterhead.**
14:53:26   9   **They look like they are, yep.**
14:53:29  10       Q.   Okay.  It looks like the first page is an
14:53:31  11   April invoice.  Am I right there?
14:53:33  12       A.   **April 8 to April 11, 2018.**
14:53:38  13       Q.   Okay.  And it looks like the second one on
14:53:42  14   page 2 is a March invoice?
14:53:44  15       A.   **Let's see.  Yes.**
14:53:46  16       Q.   And then page 3 looks like a single block
14:53:50  17   billing for, I'm guessing, the report, the
14:53:56  18   November 15 report?
14:53:56  19       A.   **I don't know.  I have no idea.  First time**
14:53:59  20   **I've seen these.**
14:53:59  21       Q.   Okay.
14:54:00  22       A.   **Yeah, so I don't know.**
14:54:01  23       Q.   Okay.  So you wouldn't know whether
14:54:03  24   there's other billing --
14:54:04  25       A.   **I have no idea.**
```

## 229

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF HALL:

    I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 228 represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

    This, the 8th day of February, 2019.

_____
FRANCES BUONO, B-791
Georgia Certified Court Reporter

Atlanta Reporters, Inc.        866-344-0459        www.atlanta-reporters.com

## 230

COURT REPORTER DISCLOSURE

    Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

    I am a Georgia Certified Court Reporter. I am here as a representative of Atlanta Reporters, Inc. Atlanta Reporters was contacted to provide court reporting services for the deposition. Atlanta Reporters will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37(a) and (b).

    Atlanta Reporters has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Atlanta Reporters will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____
FRANCES BUONO, B-791
Georgia Certified Court Reporter

Atlanta Reporters, Inc.        866-344-0459        www.atlanta-reporters.com

## 231

DEPOSITION OF MARK W. RIGLER, PH.D. /FCB

    I do hereby certify that I have read all questions propounded to me and all answers given by me on the 6th day of February, 2019, taken before Frances Buono, and that:

\_\_\_\_\_ 1) There are no changes noted.

\_\_\_\_\_ 2) The following changes are noted:

    Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. \_\_\_ Line No. \_\_\_ should read:_____
_____

Page No. \_\_\_ Line No. \_\_\_ should read: _____
_____

Page No. \_\_\_ Line No. \_\_\_ should read: _____
_____

Page No. \_\_\_ Line No. \_\_\_ should read: _____
_____

Page No. \_\_\_ Line No. \_\_\_ should read: _____
_____

Page No. \_\_\_ Line No. \_\_\_ should read: _____
_____

Page No. \_\_\_ Line No. \_\_\_ should read:_____
_____

Page No. \_\_\_ Line No. \_\_\_ should read:_____
_____

Page No. \_\_\_ Line No. \_\_\_ should read:_____
_____

Atlanta Reporters, Inc.        866-344-0459        www.atlanta-reporters.com

## 232

DEPOSITION OF MARK W. RIGLER, PH.D. /FCB

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

Page No. \_\_\_\_\_ Line No. \_\_\_\_\_ should read:_____
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
MARK W. RIGLER, PH.D.

Sworn to and subscribed before me,
This the \_\_\_\_\_ day of _____, 20\_\_\_.

_____
Notary Public
My commission expires: _____

Atlanta Reporters, Inc.        866-344-0459        www.atlanta-reporters.com