# EXHIBIT 12

Case 3:16-md-02738-MAS-RLS    Document 33014-12    Filed 07/23/24    Page 2 of 6
PageID: 221707

Olson v.
Brenntag, et al.

Longo
February 26, 2019

Page 1600

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 7
 2   ------------------------------------------X
 3   DONNA A. OLSON and ROBERT M. OLSON,
 4                         Plaintiff,
                                        Index No.
 5        -against-                     190328/2017
 6   BRENNTAG NORTH AMERICA, INC.;
     BRENNTAG SPECIALTIES, INC.;
 7        Individually, and f/k/a Mineral Pigment
          Solutions, Inc., and as successor-in-interest to
 8        Whittaker, Clark & Daniels, Inc.,
     CYPRUS AMAX MINERALS COMPANY,
 9        Individually and as successor-in-interest to
          American Talc Company, Metropolitan Talc
10        Company, Inc., Charles Mathieu, Inc., and
          Resource Processors, Inc.;
11   IMERYS TALC AMERICA, INC.,
     JOHNSON & JOHNSON CONSUMER, INC.;
12   WHITTAKER, CLARK & DANIELS, INC.,
          Individually and as successor-in-interest
13        To American Talc Company, Metropolitan Talc
          Company, Inc., Charles Mathieu, Inc., and
14        Resource Processors, Inc.;
15   ------------------------------------------X
                              Defendants.
16   Jury Selection        60 Centre Street
                           New York, New York
17                         February 26, 2019
18   B E F O R E :
19        HONORABLE  GERALD LEBOVITZ,
20                     JUSTICE
21   A P P E A R A N C E S :
22        LEVY KONIGSBERG, LLP
          ATTORNEYS FOR THE PLAINTIFFS
23          800 THIRD AVENUE
            NEW YORK, NEW YORK 10022
24        BY:   JEROME H. BLOCK, ESQ.,
25                          CONTINUED:
```

Page 1601

```
 1          APPEARANCES CONTINUED:
 2        MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
            150 WEST 30TH STREET
 3          NEW YORK, NEW YORK 10001
          BY:   SUZANNE M. RATCLIFFE, ESQ.,
 4                CHRISTIAN HARTLEY, ESQ.,
 5
 6        PATTERSON BELKNAP WEBB & TYLER, LLP
          ATTORNEYS FOR JOHNSON & JOHNSON
 7          1133 AVENUE OF THE AMERICAS
            NEW YORK, NEW YORK  10036
 8        BY:   THOMAS P. KURLAND, ESQ.,
                LOUIS M. RUSSO, ESQ.,
 9                -and-
          KIRKLAND & ELLIS, LLP
10          300 NORTH LaSALLE STREET
            CHICAGO, IL  60654
11        BY:   MIKE BROCK, ESQ.,
                STACEY GARBIS PAGONIS, ESQ.,
12                BARRY E. FIELDS, ESQ.,
                ALLISON RAY, ESQ.,
13
14                        Lori Sacco
                          Michael Ranita
15        *            Official Court Reporters
                              *            *
16
17
18
19
20
21
22
23
24
25
```

Dr. Longo - Plaintiff - Direct (Mr. Block)    Page 1602

```
 1        THE COURT: Good morning to everyone.
 2        MR. BLOCK: Good morning.
 3        MR. BROCK: Good morning.
 4        THE WITNESS: Good morning, your Honor.
 5        THE COURT: I understand that you would like to put
 6   the TV recording into evidence? You want to do that now or
 7   do you want to wait until a little bit later after the jury?
 8        MR. BROCK: We'll wait until a little later. I
 9   think Tom is bringing it.
10        MR. BLOCK: It's our understanding they want it to
11   be a Court Exhibit.
12        THE COURT: Yes.
13        MR. BROCK: Yes.
14        THE COURT: It was played to the court, so it
15   should be an Exhibit, you know, if they want it in evidence.
16        MR. BROCK: That's our point.
17        THE COURT: You are entitled to it.
18        THE COURT OFFICER: Ready, Judge?
19        THE COURT: Yes.
20        THE COURT OFFICER: All rise. Jury entering.
21        (Whereupon, the jurors entered the courtroom and
22   were properly seated in the jury box.)
23        THE COURT: Good morning to everyone, and please be
24   seated. You will resume whenever you like.
25   DIRECT EXAMINATION
```

Dr. Longo - Plaintiff - Direct (Mr. Block)    Page 1603

```
 1   BY MR. BLOCK:
 2   Q   Good morning, Dr. Longo.
 3   A   Good morning.
 4        MR. BLOCK: Good morning, everybody.
 5        THE JURORS: Good morning.
 6        MR. BLOCK: Your Honor, plaintiff moves Exhibit 64
 7   into evidence at this time.
 8        MR. BROCK: No objection.
 9        (Whereupon, Plaintiff's Exhibit 64 was marked in
10   evidence.)
11   Q   Dr. Longo, I want to pick up where we left off
12   yesterday looking at this slide.
13        (Whereupon, a demonstrative aid was shown on the
14   screen.)
15   Q   Dr. Longo, looking at the screen and at this slide,
16   these terms have been used, analytical sensitivity, detection
17   limit and I just want to make sure that we are all on the same
18   page on these terms.
19        Now, did you have to change the title here to
20   analytical sensitivity?
21   A   It's analytical sensitivity, which in this case --
22        THE COURT: A little louder, please.
23   A   Analytical sensitivity is the proper way to state this.
24   It's also the detection limit. It's based on finding one fiber
25   asbestos fiber in one bundle.
```

Case 3:16-md-02738-MAS-RLS    Document 33014-12    Filed 07/23/24    Page 3 of 6
PageID: 221708

Olson v.
Brenntag, et al.

Longo
February 26, 2019

Direct-Longo-Block

1  A.    That the range of exposure on average would
2  be approximately .1 fibers per c.c. to one fiber per c.c.
3  based on our testing results.
4  Q.    Is it your opinion that that would be her
5  approximate exposure to asbestos each time that the
6  Johnson's Baby Powder, Shower to Shower was applied on her
7  body?
8      MR. BROCK: Same objection.
9  A.    No, you can't say each time.
10     THE COURT: There is an objection, sir.
11     THE WITNESS: I'm sorry, your Honor.
12     THE COURT: You need to pay attention for
13  that.  Everything happened all at once.
14  Q.    You said no, you can't say each time.  So,
15  what is your opinion as to this exposure level to asbestos
16  and her 21,000 applications of Johnson's Baby Powder and
17  Shower to Shower applied to her body?
18     MR. BROCK: Same objection.
19  A.    My opinion would be more like --
20     THE COURT: When there is an objection,
21  doctor, you need to wait until the Court's ruling.
22  Overruled.  Now you may answer.
23  A.    It would be my opinion more likely than not
24  based on our testing that when she used the product, that
25  more likely greater than 50 percent would be -- would have

Direct-Longo-Block

1  enough tremolite in it.
2      THE COURT: You need to speak up.
3  A.    Greater than 50 percent of the time she would
4  have been exposed at this level is my opinion.
5  Q.    Okay.  And is that based in part on your own
6  testing?
7  A.    Yes, sir.
8  Q.    And is that based in part on your review of
9  the peer-reviewed literature as to exposure of asbestos
10  from cosmetic talcum powder including powders that used
11  Italian talc?
12  A.    Yes, sir.
13  Q.    Is that also based upon your review of
14  Johnson & Johnson's own documents estimating exposures
15  from the use of these products?
16  A.    Yes, sir.
17  Q.    And is it also based upon your review of
18  historical documents showing asbestos in the source talc
19  that was used for these products?
20  A.    Yes, sir.
21  Q.    Thank you, Dr. Longo.  I have no other
22  questions at this time.
23  A.    Thank you.
24     MR. BROCK: May it please the Court?
25     THE COURT: Yes.  You may inquire.

Cross-Long-Brock

1      MR. BROCK: Good morning, members of the
2  jury.
3  CROSS EXAMINATION
4  BY MR. BROCK:
5  Q.    I want to talk about your company.  I think
6  you said yesterday that your company has tested somewhere
7  around three to 400,000 bulk samples for asbestos over the
8  last 30 years, correct?
9  A.    That is correct.
10  Q.    And in that entire period of time until 2017
11  or thereabouts you had never tested cosmetic talc for
12  asbestos, correct?
13  A.    That is correct.
14  Q.    In fact, in that entire period of time that
15  you were doing that bulk sampling, you never tested J & J
16  cosmetic talc for potential asbestos contamination,
17  correct?
18  A.    That is correct.
19  Q.    The only time you have tested J & J talc for
20  asbestos is in the context of being a litigation
21  consultant and expert, true?
22  A.    That is true.
23  Q.    Now, when it comes to the talc litigation,
24  100 percent of your work is on behalf of plaintiffs,
25  correct?

Cross-Long-Brock

1  A.    That is correct.
2  Q.    And you were mentioning yesterday that you
3  have performed some work for the government over time.  Is
4  it correct that none of your work for any of the
5  government entities had anything to do with testing talcum
6  powder?
7  A.    That is correct.
8      MR. BROCK: Could I have the Elmo, please.
9  Q.    All right.  So, yesterday you had a slide
10  that you presented to the jury in terms of your consulting
11  work.  And one of the government entities that you
12  referred to was CDC.  Is it correct that your work for the
13  CDC did not involve the testing of commercial talc?
14  A.    That is correct.
15  Q.    Nor did it involve the testing of cosmetic
16  talc?
17  A.    That is correct.
18  Q.    Same is true for the National Institutes of
19  Health, the consulting work that you did for the National
20  Institutes of Health did not involve testing of cosmetic
21  talc for asbestos, true?
22  A.    That is correct.
23  Q.    For the City and State of New York, your work
24  did not involve the testing or evaluation of cosmetic talc
25  for asbestos, true?

Case 3:16-md-02738-MAS-RLS    Document 33014-12    Filed 07/23/24    Page 4 of 6
PageID: 221709

Olson v.
Brenntag, et al.

Longo
February 26, 2019

Cross-Long-Brock

1
2  A.  That is correct.
3  Q.  Obviously I don't think your work for NASA
4  involved testing of cosmetic talc for asbestos, true?
5  A.  That is correct.  That is true.
6  Q.  You mentioned something about DOW.  And did
7  you do work on behalf of DOW?
8  A.  One of our labs did some analysis for DOW.
9  Q.  Okay.  That did not involve cosmetic talc,
10 true?
11 A.  That is correct.  It did not.
12 Q.  Then the other organization that you listed
13 was the Air Force.  That work did not involve the testing
14 of cosmetic talc, correct?
15 A.  That is correct.
16 Q.  All right.  Now, you also talk about your
17 lab, and you've referenced that you know Dr. Webber,
18 correct?
19 A.  I do.
20 Q.  You know that he used to work for the New
21 York Department of Health, correct?
22 A.  I do know that.
23 Q.  All right.  And the New York Department of
24 Health an Environmental Labs has an accreditation program
25 that certifies a lab for testing New York asbestos
26 samples, true?

Cross-Long-Brock

1
2  A.  That's true.
3  Q.  In Georgia, the state of George, Georgia, is
4  it right, that there are four labs that are certified by
5  the New York State Department of Health and Environmental
6  Labs?
7  A.  That is true.
8  Q.  And is it also correct that your lab is not
9  accredited by the New York State Department of Health and
10 Environmental Labs?
11 A.  That is correct.
12 Q.  It's true, is it not, Dr. Longo, that you
13 have never visited a talc mine?
14 A.  That is still true.
15 Q.  You are not an expert in the techniques of
16 mine talc?
17 A.  No, sir, I'm not.
18 Q.  And you've never published any papers
19 relating to the possibility of asbestos contamination of
20 talc, correct?
21 A.  No, I haven't.
22 Q.  You've talked about the technique that you've
23 used for testing cosmetic talc.  Your techniques for
24 testing cosmetic talc have never been published in the
25 peer-reviewed literature, have they?
26 A.  I don't think that's quite correct.

Cross-Long-Brock

1
2  Q.  Have you published your technique the way you
3  do it in litigation in the peer-reviewed literature?
4  A.  It's not my technique.  The Blount PLM has
5  been published and we used the protocols.  It's not my
6  method.
7  MR. BROCK:  Object and move to strike, your
8  Honor.  I think it was an easy yes or no answer to
9  that question.
10 THE COURT:  He was able to answer that yes or
11 no, at least as to that one.
12 Q.  All right.  Let's keep going.  You know that
13 there are components of the tests that you have conducted
14 that are not consist with the Blount Method that is
15 reported in the peer-reviewed literature, correct?
16 A.  I don't believe that's correct.
17 Q.  You spin (gesturing) the sample in a
18 different rate, do you not?
19 A.  Not for our Blount PLM we don't.  We follow
20 the method exactly.
21 Q.  Do you use a different weight for the -- the
22 material that you're using in the test?
23 A.  No.  When we did the Blount PLM Method for
24 these analysis, we followed her protocol.  We used the
25 same heavy liquid density.
26 Q.  For your test of 30 samples that you received

Cross-Long-Brock

1
2  from eBay and collectors and from plaintiffs' lawyers who
3  had clients, when you did that test, you did the test with
4  TEM, did you not?
5  A.  Yes, sir.
6  Q.  And Blount did her test with PLM, correct?
7  A.  That is correct.
8  Q.  Have you published your technique of using
9  TEM with the concentration method in the peer-reviewed
10 literature?
11 A.  We have not published on cosmetic talcs yet.
12 Q.  You haven't published at all, correct?
13 A.  Not yet; no, sir.
14 Q.  It's correct that you have not published the
15 technique of using TEM with the Concentration Method,
16 that's true, isn't it?
17 A.  It's already been published.
18 Q.  No.  I'm asking, sir --
19 THE COURT:  You have to answer the question,
20 sir, yes, no or I don't know.  Those are your only
21 options.  Have you published it?
22 THE WITNESS:  I have not published it.
23 THE COURT:  Thank you.
24 THE WITNESS:  Thank you, your Honor.
25 Q.  Thank you.  Now, you mentioned yesterday that
26 you have been working as a testifying expert in litigation

Case 3:16-md-02738-MAS-RLS    Document 33014-12    Filed 07/23/24    Page 5 of 6
PageID: 221710

Olson v.
Brenntag, et al.

Longo
February 26, 2019

Cross-Long-Brock

1  for many years, correct?
2      A.    That is correct.
3      Q.    In fact, you've been testifying as an expert
4  since around 1990, correct?
5      A.    '90, '91, yes, sir.
6      Q.    Okay.  Your business, the one that you run
7  today MAS, was opened in 1988, correct?
8      A.    Yes, sir.
9      Q.    And soon after opening your business, you
10 started advertising your services to be involved in
11 litigation, correct?
12     A.    That's not correct.
13           MR. BROCK:  Let's look at DD I think it's
14 dash one or dash two.  Thirty-four, yes.
15     Q.    This was an advertisement for your services
16 that you put up in -- put out in 1989, correct?
17     A.    That's correct.
18     Q.    Shortly after starting your business MAS,
19 correct?
20     A.    A year later, yes, sir.
21     Q.    And that's you, a younger version of you
22 standing in a courtroom, isn't it?
23     A.    Yes, sir that's a much younger version of me.
24     Q.    And this is one of your colleagues.  Is this
25 Dr. Yamete --

Cross-Long-Brock

1      A.    Dr. Yamete, yes.
2      Q.    -- standing there with you, correct?
3      A.    Yes.
4      Q.    And you're standing in a courtroom, correct?
5      A.    That's correct.
6      Q.    You showed the jury yesterday your nice
7  microscopes and the equipment that you have.  You didn't
8  take a picture of yourself in a white coat standing at the
9  TEM, did you?
10     A.    No, sir.
11     Q.    And this picture, did you put in one of the
12 magazines, you're standing in a courtroom with your
13 colleague there, Dr. Yamete, at the time, correct?
14     A.    That is correct.
15     Q.    And you took out this ad in a trade magazine
16 for a group called The National Asbestos Council, correct?
17     A.    Yes, sir.
18     Q.    And since this time, working as a consultant
19 and an expert in asbestos litigation, has been very
20 lucrative for you, hasn't it?
21     A.    It has allowed our lab to survive, yes, sir.
22     Q.    Well, you've survived to the tune, I think
23 you've described it, as a million dollars a year for
24 30 years, correct?
25     A.    That's what we billed plaintiff's attorneys,

Cross-Long-Brock

1  yes, sir.
2      Q.    And that's what you call surviving?
3      A.    Yes, sir.
4      Q.    Okay.  Now, this period of time during which
5  you've been serving as a litigation expert and consultant
6  in lawsuits, I think you just said this $30 million that
7  we're talking about is what you have billed to lawyers who
8  are representing folks that are filing lawsuits, correct?
9      A.    Yes, sir.
10     Q.    So, $30 million on behalf of plaintiffs?
11     A.    That's correct.
12     Q.    And let's talk about sort of what you do in
13 those cases.  Since that ad ran back in 1989, you have
14 said that you have testified under oath somewhere around
15 2,500 to 3,000 times, correct?
16     A.    Yes, sir.  That would be correct.
17     Q.    And that means that you're giving somewhere
18 around a hundred depositions or making trial appearances a
19 year, is that correct?
20     A.    Between 50 and a hundred, yes, sir.
21     Q.    Well, if it's 3,000 and you've been doing it
22 for 30 years, what does that come to?
23     A.    Well, I will tell you.
24     Q.    All right.
25           THE COURT:  The record should reflect the

Cross-Long-Brock

1  witness is looking at his cell phone, probably using
2  a calculator.
3      A.    Somewhere between one and two.
4      Q.    Between one and 200?
5      A.    One or two depositions a week.
6      Q.    Okay.  I was asking a different question, but
7  thank you for that.
8      A.    I'm sorry.
9      Q.    If you have given 3,000 depositions and court
10 appearances where you've testified under oath over a
11 period of 30 years, that would be about a hundred a year,
12 correct?
13     A.    Yes, sir.
14     Q.    All right.  And if we think about this as
15 working around 300 days a year, you would be giving
16 testimony under oath every third business day, correct?
17     A.    If it's that amount, yes.
18     Q.    Okay.  And that works out to about what you
19 described.  You give testimony under oath one to two times
20 a week?
21     A.    Yes, sir.
22     Q.    Now, you've also described that you've been
23 designated as an expert several thousand times by
24 plaintiffs' lawyers suing in litigation, correct?
25     A.    That is correct.

Case 3:16-md-02738-MAS-RLS     Document 33014-12     Filed 07/23/24     Page 6 of 6
                                            PageID: 221711

Olson v.                                                                          Longo
Brenntag, et al.                                                      February 26, 2019

Page 1716

Cross-Longo-Brock

1
2     Page 36. I'm sorry.
3     Q.    All right.  This is a section here on
4  cleavage fragments.  Do you see that?
5     A.    Yes, sir.
6     Q.    All right.  And it says, "Minerals with
7  perfect cleavage can produce perfect regular fragments."
8  Do you see that?
9     A.    Yes.
10     Q.    "Amphibole with prismatic cleavage will
11  produce prismatic fragments.  These fragments can be
12  elongated and on superficial observation may resemble
13  fibers."  Do you see that?
14     A.    I do.
15     Q.    "However, because they did not grow as fiber,
16  they cannot have the characteristics of fibers."  Do you
17  see that?
18     A.    I see that.
19           MR. BROCK: Go to the next imagine,
20     consequently.  The top right here.  Cleavage
21     fragments.  Consequently cleavage fragments.
22     Q.    "Cleavage fragments cannot be called fibers."
23  Do you see that?
24     A.    I see it states that, yes.
25     Q.    That's from the Campbell paper that you
26  relied on for your distribution chart, correct?

Page 1717

Cross-Longo-Brock

1
2     A.    Yes, sir, for their data on that I did.
3     Q.    When your firm MAS is analyzing talc samples,
4  if one of your analysts who is conducting the test sees a
5  non-asbestiform amphibole cleavage fragment, it has
6  substantially parallel sides, an aspect ratio of five to
7  one or greater and is at least 5.5 micrometers long the
8  analyst will count that as an asbestos structure, true?
9     A.    Meets that definition, that is true.
10     Q.    If he finds those things, he will count it as
11  an asbestos structure, correct?
12     A.    As a regulated asbestos in that population,
13  yes.
14     Q.    But we know from what we see from the
15  regulations that we have looked at and the materials that
16  we have seen, that it's not necessarily the case that the
17  particle that's being called asbestos grew in the
18  asbestiform habit, true?
19     A.    No, I disagree with that.
20     Q.    I want to turn to some of the testing that
21  you have conducted in the case now.
22     A.    Yes, sir.
23     Q.    First of all, over the last couple of years
24  your lab has been involved in analyzing samples of Johnson
25  & Johnson talcum powder products.  We'll talk about some
26  of those.  That's one of the things you've been doing, is

Page 1718

Cross-Longo-Brock

1  that correct, sir?
2     A.    That is correct.
3     Q.    You believe MAS has the ability to analyze
4  talcum powder products and reach certain conclusions about
5  the tests that they would conduct, correct?
6     A.    That is correct.
7     Q.    Now, in this case you have not tested or
8  analyzed any talcum powder products that Ms. Olson used,
9  correct?
10     A.    Personally used?  I'm sorry.  Personally
11  used?
12     Q.    Yes.
13     A.    Yes, sir, I have.
14     Q.    You have not tested any of Ms. Olson's
15  bottles of talcum powder, correct?
16     A.    That is correct.
17     Q.    You mentioned earlier that you reviewed her
18  deposition?
19     A.    Yes.
20     Q.    And you know that she had bottles of talcum
21  powder in her possession at the -- during the pendency of
22  this lawsuit, correct?
23     A.    That is correct.
24     Q.    And you have not tested those bottles and do
25  not come to court today to say that any of the bottles
26

Page 1719

Cross-Longo-Brock

1  that she had in her possession contained asbestos, true?
2     A.    We haven't tested those bottles, no.
3     Q.    And you're aware that Ms. Olson says that she
4  saved at least three bottles of J & J talcum powder?
5     A.    Yes.  The latter years, but she did say that
6  in her deposition.
7     Q.    Is the answer to my question yes?
8     A.    The answer to your question is yes.
9     Q.    Now, you also know that your firm, your
10  organization has the ability to process tissue and do a
11  tissue digestion to see if there is an asbestos burden in
12  the tissue of a patient, correct, or a plaintiff?
13     A.    If there is appropriate tissue to do the
14  analysis, that is correct.
15     Q.    And you have people within your organization
16  who specialize in that particular field, correct?
17     A.    That is correct.
18     Q.    All right.  I think Dr. Rigler you guys hold
19  out as having a strong background in doing reviews of
20  tissue digestions, correct?
21     A.    That's correct.
22     Q.    All right.  And you have not done a tissue
23  digestion to see if there is an asbestos fiber burden with
24  regard to Ms. Olson, is that correct?
25     A.    That is correct, we have not done that
26