# Exhibit 41

Page 1

NO. 16-CI-03503    JEFFERSON CIRCUIT COURT
              DIVISION TEN (10)

DONNA ANN HAYES                    PLAINTIFF

VS.    TRANSCRIPT OF PROCEEDINGS

    JULY 23, 2019

COLGATE-PALMOLIVE COMPANY,
ET AL.                          DEFENDANTS

              * * *

 Heard before the Hon. Angela McCormick Bisig,
Judge, Jefferson Circuit Court, Division 3,
Louisville Justice Center, Louisville, Kentucky.

              * * *

         NANCY L. NUNNELLEY, R.M.R.
           Coulter Reporting, LLC
            East Kentucky Street
                Suite 200
          Louisville, Kentucky 40203
              (502) 582-1627
           FAX: (502) 587-6299

Page 2

1                I N D E X
2
3    WITNESS: WILLIAM LONGO, Ph.D.
4
     Direct Examination by Mr. Satterley........... 6
5    Cross Examination by Mr. Dubin................ 111
     Cross Examination by Mr. Mularczyk............ 212
6    Redirect Examination by Mr. Satterley......... 253
     Recross Examination by Mr. Dubin.............. 270
7    Recross Examination by Mr. Mularczyk.......... 279
     Redirect Examination by Mr. Satterley......... 281
8
9    WITNESS: LEE POYE
10
     Direct Examination by Mr. Satterley........... 283
11
12
     Reporter's Certificate Page................... 327
13
14
15              * * *
16
17
18
19
20
21
22
23
24
25

Page 3

1          A P P E A R A N C E S
2
   FOR THE PLAINTIFF:
3
     JOSEPH D. SATTERLEY
4    PAUL J. KELLEY
     Satterley & Kelley
5    8700 Westport Road, Suite 202
     Louisville, Kentucky 40242
6    Jsatterley@satterleylaw.com
     Pkelley@satterleylaw.com
7
8  FOR THE DEFENDANT, COLGATE-PALMOLIVE COMPANY:
9    MEREDITH M. SHAW
     Quinn Emanuel Urquhart & Sullivan, LLP
10   51 Madison Avenue, 22nd Floor
     New York, New York 10010
11   Meredithshaw@quinnemanuel.com
12   EDWARD M. SLAUGHTER
     Gordon Rees Scully Mansukhani
13   2200 Ross Avenue, Suite 4100 West
     Dallas, Texas 75201
14   ESlaughter@grsm.com
15   PETER M. MULARCZYK
     Foley & Mansfield
16   300 South Grand Avenue, Suite 2800
     Los Angeles, California 90017
17   Pmularczyk@foleymansfield.com
18   MATTHEW W. BREETZ
     FREDERICK R. BENTLEY
19   Stites & Harbison, PLLC
     400 West Market Street, Suite 1800
20   Louisville, Kentucky 40202
     Wbreetz@stites.com
21   Rbentley@stites.com
22
23
24
25

Page 4

1  FOR THE DEFENDANT, JOHNSON & JOHNSON:
2    MORTON DUBIN
     MATTHEW BUSH
3    PAIGE PAVONE
     NINA TROVATO
4    Orrick, Herrinngton & Sutcliffe, LLP
     51 West 52nd Street
5    New York, New York 10019-6119
     Mdubin@orrick.com
6    Ppavone@orrick.com
     Mbush@orrick.com
7    Ntrovato@orrick.com
8    R. SCOTT MASTERSON
     Lewis Brisbois Bisgaard & Smith, LLP
9    1180 Peachtree Street, NE, Suite 2900
     Atlanta, Georgia 30309
10   Scott.Masterson@lewisbrisboiscom
11
12
13
              ***
14
15
16
17
18
19
20
21
22
23
24
25

E-MAIL: Nnunnelley@coulterreporting.com

Page 5

```
 1                P R O C E E D I N G S
 2         SHERIFF:  All rise for the jury.
 3         THE COURT:  All right.  Everyone may be
 4   seated.
 5         We are on our court record in the matter
 6   of Donna Hayes versus Colgate and Johnson &
 7   Johnson.  For the court record, our attorneys are
 8   present and in the courtroom this morning, as are
 9   the parties, as are our 14 ladies and gentlemen of
10   the jury.
11         Good morning.  It's a little cooler
12   outside today.  Maybe you can get outside on your
13   lunch break for a few minutes, get a little air.
14         Anyone have any problems or issues with
15   the Court's admonishments over the evening recess?
16   Hopefully they're used to the routine at home,
17   that you're coming home and not talking.  I know
18   it's a lot to have that rattling around in your
19   head.  Certainly when you're dismissed to
20   deliberate, you'll be able to discuss it with each
21   other, and then when you're finished with your
22   service you'll be able to discuss it at home.
23         When we recessed yesterday, plaintiffs
24   were still putting on proof, so I'm going to
25   invite Mr. Satterley to call his next witness.
```

Page 6

```
 1         MR. SATTERLEY:  Thank you.  Good
 2   morning, everyone.  At this time the plaintiffs
 3   call Dr. William Longo.
 4         THE COURT:  And if you would, Doctor,
 5   just come forward to the chair here in the front
 6   of the courtroom, please.
 7         THE WITNESS:  Yes, ma'am.
 8         THE COURT:  All right.  I'm going to
 9   ask you to raise your right hand for me.
10         (OATH ADMINISTERED)
11         THE COURT:  All right.  If you would,
12   please, answer Mr. Satterley's questions.  You
13   sound like you have a nice voice.  I'll just ask
14   you to keep it up so that the ladies and gentlemen
15   of our jury can hear you.
16         THE WITNESS:  Yes, Your Honor.
17         DIRECT EXAMINATION
18   BY MR. SATTERLEY:
19      Q.   Please introduce yourself to the
20   ladies and gentlemen of the jury.
21      A.   My name is Bill Longo.  I live in
22   Alpharetta, Georgia, which is just one of the many
23   suburbs that ring Atlanta.
24      Q.   And are you a material scientist?
25      A.   Yes, sir, I am.
```

Page 7

```
 1      Q.   And I'm going to go through what
 2   that is and what you've done over your career in a
 3   few minutes.
 4         Have I asked you to come here and assist us
 5   in explaining issues of testing, testing products
 6   for the presence of asbestos?
 7      A.   Yes, sir.
 8      Q.   And have you tested specifically
 9   Johnson & Johnson products, talc products, for the
10   presence of asbestos?
11      A.   Yes.  Our laboratory has.
12      Q.   And have you documented and
13   photographed asbestos in the Johnson & Johnson
14   products?
15      A.   Yes, we have.
16      Q.   Have you also examined the
17   Colgate-Palmolive products for the presence of
18   asbestos?
19      A.   We have.
20      Q.   And have you done that and
21   photographed evidence that we can go over today,
22   photographic evidence showing asbestos in the
23   Cashmere Bouquet product?
24      A.   Yes, sir.
25      Q.   In addition, did I ask you to
```

Page 8

```
 1   evaluate the case of Donna Hayes with regards to
 2   exposures to asbestos from these products?
 3      A.   Yes, you have.
 4      Q.   And what opinions have you
 5   developed?
 6      A.   That over her lifetime that she was
 7   -- that she used, according to her testimony,
 8   primarily Cashmere Bouquet and Johnson & Johnson
 9   talcum powders.  In my opinion, more than likely
10   than not, she was exposed to regulated asbestos
11   from the use of those products.
12      Q.   And do you have an opinion that
13   that exposure was a substantial exposure over
14   those many decades?
15      A.   Yes, sir.
16      Q.   Let's take a step back and talk
17   about you, Dr. William Longo.
18         You've got a resume or a CV, correct?
19      A.   That is correct.
20         MR. SATTERLEY:  May I approach, Your
21   Honor?
22         THE COURT:  You may.
23         (Passing document)
24      Q.   Dr. Longo, is this a CV or resume
25   that you put together?  Is this your CV?
```

Page 173

1  Q. Well, what you were saying is,
2  "Well, looks to me like it has multiple fibers in
3  a bundle." "Why do you say it's multiple fibers?"
4  You said, "Well, it's because I can see it,"
5  right?
6  A. Yes, sir. Thinking being told it
7  was a transmission electron microscopy.
8  Q. And this image actually comes from
9  an article that you and Mr. Satterley discussed
10  earlier this morning, correct?
11  A. That is correct.
12  Q. And that article is -- I'll call it
13  by the defense -- defense number, DX-9053. And if
14  you go to page 48, do you see that? That's where
15  this image comes from. The publication by the
16  Bureau of Mines, right?
17  A. That's correct.
18  Q. And, in fact, that's cleavage
19  fragment, not a bundle, right?
20  A. According to Campbell, that's
21  correct. But it's an optical -- it's an optical
22  micrograph with an optical microscope. So it was
23  not a TEM image as it was represented to me at the
24  deposition.
25  Q. The thing that you were saying, I

Page 174

1  see all the specific fibers in there, that's a
2  bundle, it's not a bundle, right?
3  A. If I could have that image or I
4  could have that sample, it may well be.
5  Q. Actually, I think you testified
6  later after you were asked about this more that
7  there's nothing bundle about it?
8  A. Looking at that photograph, that is
9  true. But looking at it in a sample actually
10  doing polarized light microscopy, it may well meet
11  the definition.
12  Q. I want to change topics to try to
13  keep us moving along.
14  A. Yes, sir.
15  Q. All right. I want to -- I want to
16  talk a little bit now about historical testing and
17  testing results and the like, okay?
18  And you mentioned that you have done some
19  work testifying both for plaintiffs and for some
20  defendants, correct?
21  A. Yes, sir.
22  Q. So one of the things we're going to
23  be talking about a good bit in this section is
24  some things that you've said when you were
25  testifying for a particular defendant called

Page 175

1  Scott's.
2  And you're -- you recall the work that you
3  did for Scott's, right?
4  A. Yes, sir. It was Scott's
5  Fertilizer Company. And it was a product that
6  they manufactured called Turf Builder.
7  Q. Okay. And for identification, I'm
8  going to mark a copy of your report -- well, I
9  guess we're not marking demonstratives. I'm just
10  going to hand you a copy of the report so you have
11  it.
12  (Passing document)
13  Q. So to orient us, Scott's, that
14  company that you were working for -- working at
15  the request of the attorneys for, at the time had
16  a vermiculite product, right?
17  A. Yes.
18  Q. And vermiculite can be contaminated
19  with low levels of asbestos or Libby amphiboles,
20  correct?
21  A. Yes, sir. It has a tremolite solid
22  solution series, accessory mineral specifically
23  for the Libby Montana, the vermiculite mines in
24  Libby, Montana.
25  Q. Some of those accessory minerals

Page 176

1  may be richterite or winchite?
2  A. Well, they're all part of the
3  tremolite solid solution series. They used to
4  always be called sodic tremolite or just tremolite
5  asbest. Even W. R. Grace. But then it got
6  subclassified down.
7  Q. And one of the things that you
8  offered opinions about in the Scott's case was the
9  reasonableness of what they were doing to test
10  their product back in the 1970s, right?
11  A. Yes, sir.
12  Q. And if we can call up slide 51. I
13  think we've already talked a little bit about an
14  industry standard in the cosmetics industry called
15  J4-1 that involved some testing by methods that
16  include -- been something XRD and something called
17  PLM. And that's something you're familiar with,
18  right?
19  A. Yes.
20  Q. And back in the 1970s, Scott's, the
21  testing that they were having done for them, was
22  using those two methods, the XRD and the PLM,
23  right?
24  A. That is correct.
25  Q. And one of the things you said back

44 (Pages 173 to 176)

Page 177

1  at that time is that testing with those two
2  methods was the industry standard for asbestos
3  analysis at that time, and provided Scott's with a
4  reasonable basis to believe that consumer use of
5  their Libby vermiculite products did not cause any
6  significant exposure, correct?
7      A.  That's what I stated, yes.
8      Q.  And you also said that any
9  suggestion that some of these independent
10 laboratories, or Scott's, should have had the
11 knowledge or foresight to do further testing --
12 and I'm skipping a few words to -- with ATEM after
13 negative results with XRD and optical microscopy
14 in the 1970s is not reasonable or scientifically
15 valid, right?
16     A.  That is absolutely correct, for
17 Scott's --
18     Q.  Okay.
19     A.  -- Fertilizer Company.
20     Q.  And you also pointed out one of the
21 reasons why you thought -- now, they did not do --
22 or did not have done for them TEM work, right?
23     A.  That's correct.
24     Q.  Okay.  And I think you believe that
25 TEM is the most sensitive method to look for

Page 178

1  asbestos in trace quantities, correct?
2      A.  It is.  I asked them why they did
3  not -- they relied on their outside labs.  And
4  McCrone was their primary lab.  McCrone didn't
5  advise them to use TEM.
6      Q.  Okay.  Actually what you said is,
7  "One of the problems in the 1970s was that there
8  were very few, if any, ATEMs in commercial
9  laboratories that had the appropriate technology
10 to perform accurate trace amphibole contaminant
11 analysis," right?
12     A.  And that's true.
13     Q.  And you said that in defending
14 Scott's -- when you said that defending Scott's,
15 did you know that McCrone had a TEM?
16     A.  Yes.  McCrone had a TEM and that's
17 why I asked Ian Stewart, he was retired, why they
18 never told Scott's to do TEM when they had a TEM.
19 And Ian Stewart says, "Because there was nothing
20 there.  We didn't think it was necessary."
21     So you're asking a fertilizer company,
22 depending on other -- other -- other consultants
23 to be able to determine that.  That's why I stated
24 when they were using PLM and XRD, they were doing
25 the appropriate analysis.

Page 179

1      And the second part of this is, the
2  vermiculite from Libby, Montana, nobody is
3  disputing that it has asbestos in it.  We're not
4  looking at, like, cosmetic talc.  We know we were
5  starting with an asbestos-containing material with
6  accessory minerals, well understood, and we were
7  looking at did their process reduce the amount of
8  asbestos.
9      So I stick to everything I say in there.
10 But you can't compare a fertilizer company to a
11 giant pharmaceutical company and what they should
12 have known or not known about using transmission
13 electron microscopy.  That is just not fair.
14     Q.  Okay.  But you do know, if we go to
15 slide 54, you do know that Johnson & Johnson went
16 beyond the J-41 standard and beyond what Scott's
17 did and did have McCrone do TEM work for them?
18     A.  Yes, sir.  I know that -- well, I
19 know that after I got involved in this when all
20 the secret documents came out.
21     Q.  Okay.
22         MR. DUBIN:  Your Honor, move to strike
23 the nonresponsive portion of that answer.
24         MR. SATTERLEY:  I'll object to that.
25         THE COURT:  I'll allow him to say it.

Page 180

1  You can further question him about it if you'd
2  like.
3      Q.  Sir, my question is a simple one,
4  and I appreciate you responding to my questions
5  that I'm asking you.  Is that okay?  Will you do
6  that?
7      A.  Yes, sir.  I tried, when I get a
8  question, I tried to explain it in full.
9      Q.  Okay.  Did Johnson & Johnson go
10 beyond J4-1 and do -- have McCrone do TEM work for
11 them?
12     A.  I thought I said yes.
13     Q.  Okay.  Thank you.
14     And I think you've already mentioned that
15 Scott's, the company that you were working for,
16 the attorneys for Scott's, the lab that they used
17 was McCrone, right?
18     A.  Correct.
19     Q.  The same McCrone?
20     A.  Yes, sir.
21     Q.  And in that context, you said when
22 you were representing the defendant, that McCrone
23 would have been a good choice in the 1970s for a
24 company to go to to test a product like talc?
25 Actually you said that in this -- in this context.

Page 325

1    the time that you have had with the witnesses that
2    we've had thus far.  I just want to say that
3    hasn't occurred.
4        MR. SATTERLEY:  And I --
5        THE COURT:  So you're saying if you
6    take 10 minutes and then I'm going to let them
7    take three or four hours, that's not going to
8    happen.
9        MR. SATTERLEY:  I wasn't suggesting
10   that, Your Honor.  What I'm suggesting is if we
11   start at 9:30 and I turn the witness over at 9:40
12   and they cross-examine till 11 and I still have a
13   treating doctor, my -- the decedent, 49 minutes,
14   and within that there's cross-examination within
15   that.
16       THE COURT:  I understand.
17       MR. SATTERLEY:  And the treating
18   doctor.
19       THE COURT:  So if I give you till
20   2 o'clock, I've basically given you the time you
21   asked me for when we started this conversation.
22       MR. SATTERLEY:  Assuming the
23   cross-examination is short.  That's the assumption
24   that --
25       THE COURT:  Right.  But, again, you

Page 326

1    made decisions when Dr. Egilman was on the stand
2    to talk about a lot of things.  And, again, that's
3    your decision.
4        MR. SATTERLEY:  Okay.
5        THE COURT:  I'm giving you basically
6    what you asked me for in terms of time.  I will
7    not -- I can tell you I won't allow them to
8    cross-examine any witness double the time that
9    they're on or that will be accounted for.  I will
10   allow them to build in there some
11   cross-examination.  And I have differed from the
12   schedule somewhat.
13       MR. SATTERLEY:  I understand.
14       THE COURT:  Mostly in your -- in your
15   favor in terms of giving you more time and taking
16   time away from them.
17       MR. SATTERLEY:  I understand, Your
18   Honor.
19       THE COURT:  All right.  I'll see
20   you-all in the morning.
21
22       ***         ***         ***

Page 327

1    STATE OF KENTUCKY
2    COUNTY OF JEFFERSON
3        I, NANCY L. NUNNELLEY, RMR, Notary Public,
4    State of Kentucky at Large, do hereby certify that
5    the foregoing deposition was taken at the time and
6    place stated in the caption; that the appearances
7    were as set forth in the caption; that prior to
8    giving their testimony the witness was first duly
9    sworn by me, that said testimony was taken down by me
10   in stenographic notes and thereafter reduced under my
11   supervision to the foregoing typewritten pages and
12   that said typewritten transcript is a true, accurate
13   and complete record of my stenographic notes so
14   taken.
15       I further certify that I am not related by
16   blood or marriage to any of the parties hereto and
17   that I have no interest in the outcome of captioned
18   case.
19       My commission as Notary Public expires July 10,
20   2023.
21       Given under my hand this the 24th day of
22   July, 2019, at Louisville, Kentucky.
23
24
25              NOTARY PUBLIC