# Exhibit 55

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 2 of 10
PageID: 222601

Matthew Streck, et al. v. Johnson & Johnson, et al.                                                    Page 1 (1 - 4)
5/16/2023                                                                                              William E. Longo, Ph.D.

## Page 1

```
 1  NO. 21-CI-06290        JEFFERSON CIRCUIT COURT
                              DIVISION FOUR (4)
 2                           JUDGE JULIE KAELIN
 3
 4
 5  MATTHEW STRECK, Individually, et al.    PLAINTIFFS
 6
 7
 8  V.      VIDEO DEPOSITION FOR THE DEFENDANTS
 9
10
11  JOHNSON AND JOHNSON, et al.            DEFENDANTS
12
13                     *  *  *
14
15  DEPONENT:  WILLIAM E. LONGO, Ph.D.
16  DATE:      MAY 16, 2023
17
18                     *  *  *
19
20
21            ELLEN L. COULTER
         REGISTERED PROFESSIONAL REPORTER
22          COULTER REPORTING, LLC
            101 East Kentucky Street
23                 Suite 200
            Louisville, Kentucky  40203
24             (502) 582-1627
            FAX:  (502) 587-6299
25  E-MAIL:  Ecoulter@coulterreporting.com
```

## Page 2

```
                      INDEX

 3  Examination by Mr. Williams .................   7
 4  Examination by Ms. Browning .................  77
 5  Examination by Mr. Vives ....................  78
 6  Examination by Mr. Smith ....................  150
 7  Reporter's Certificate ......................  152

                     EXHIBITS

10  Deposition Exhibit No. 1 ....................  12
       (January 19, 2023 letter to William E.
11      Longo, Ph.D., from Joseph D. Satterley)
12  Deposition Exhibit No. 2 ....................  20
13     (Plaintiffs' Expert Witness Disclosure)
14  Deposition Exhibit No. 3 ....................  30
       (Declaration of William Longo, Ph.D.,
15      Gina Anderson v. Avon Products, Inc.)
16  Deposition Exhibit No. 4 ....................  44
       (Exhibit R, MAS Chart of Gold Bond Testing,
17      June 23, 2022)
18  Deposition Exhibit No. 5 ....................  68
       (Matthew Streck depo notes)
19
    Deposition Exhibit No. 6 ....................  84
20     (Matthew Streck deposition, Volume II,
        dated March 9, 2022)
21
    Deposition Exhibit No. 7 ....................  102
22     (Dr. Longo's report in the Valadez case,
        dated February 28, 2023)
23
    Deposition Exhibit No. 8 ....................  110
24    (EPA Test Method, Method for the
        Determination of Asbestos in Bulk
25      Building Materials, July 1993)
```

## Page 3

```
    EXHIBITS (continued):

 2  Deposition Exhibit No. 9 ....................  126
       (RJ Lee J&J Historical Baby Powder
 3      Analysis, Dr. Sanchez)
 4  Deposition Exhibit No. 10 ...................  139
       (March 9, 2023 letter to Joseph Satterley
 5      and Ian Rivamonte, from Julia E. Romano)
 6  Deposition Exhibit No. 11 ...................  140
       (March 15, 2023 email to Julia Romano and
 7      others, from Joseph D. Satterley)
 8  Deposition Exhibit No. 12 ...................  146
       (March 21, 2023 email to Julia Romano and
 9      others, from Joseph D. Satterley)
10  Deposition Exhibit No. 13 ...................  147
       (March 23rd, 2023 status conference,
11      Valadez v. Johnson & Johnson)
```

## Page 4

```
                    APPEARANCES

 2  FOR THE PLAINTIFFS:

           PAUL J. KELLEY - Via Video
 4         Satterley & Kelley, PLLC
           8700 Westport Road, Suite 202
 5         Louisville, Kentucky  40242
           pkelley@satterleylaw.com

 7  FOR THE DEFENDANT, CHATTEM, INC.:

 8         JAMES T. WILLIAMS - Via Video
           Miller & Martin
 9         Volunteer Building, Suite 1200
           832 Georgia Avenue
10         Chattanooga, Tennessee  37402
           james.williams@millermartin.com

12  FOR THE DEFENDANT, JOHNSON & JOHNSON:

13         MICHAEL VIVES - Via Video
           King & Spalding, LLP
14         1185 Avenue of the Americas, 34th Floor
           New York, New York  10036
15         mvives@kslaw.com

17  FOR THE DEFENDANT, THE KROGER COMPANY:

           TRAVIS R. SMITH - Via Video
18         Dinsmore & Shohl, LLP
           211 N. Pennsylvania Street
19         One Indiana Square, Suite 1800
           Indianapolis, Indiana  46204
20         travis.smith@dinsmore.com

22  FOR THE DEFENDANT, BARRETTS MINERALS, INC.:

           CAROL DAN BROWNING - Via Video
23         Stites & Harbison, PLLC
           400 West Market Street, Suite 1800
24         Louisville, Kentucky  40202
           cbrowning@stites.com
```

Case 3:16-md-02738-MAS-RLS    Document 33015-32    Filed 07/23/24    Page 3 of 10
Matthew Streck, et al. v. Johnson & Johnson, et al.                                        5/16/2023
                                                                              William E. Longo, Ph.D.

Page 5

1  MODERATOR:
2       LAUREN GRAHAM
3       Coulter Reporting

Page 6

1       The video-recorded Zoom
2  videoconference deposition of WILLIAM E. LONGO,
3  Ph.D., taken on Tuesday, the 16th day of May, 2023,
4  at approximately 11:41 a.m.; said deposition being
5  taken pursuant to Notice for use in accordance with
6  the Kentucky Rules of Civil Procedure.
7
8           *  *  *
9
10          THE MODERATOR:  Today's date is
11 May 16th, 2023.  The time is 11:41 a.m.
12          We are on the record for the
13 video-recorded deposition of William Longo, Ph.D.,
14 taken in the matter of Matthew Streck, et al., versus
15 Johnson & Johnson, et al., in the Jefferson Circuit
16 Court, Case No. 21-CI-06290.
17          This deposition is being held via Zoom
18 videoconference.  The court reporter is Ellen
19 Coulter.  The Zoom moderator and videographer is
20 Lauren Graham.  If the reporter will now swear in the
21 witness.
22
23          WILLIAM E. LONGO, Ph.D., after first
24 being duly sworn, was examined as follows:
25

Page 7

1                  EXAMINATION
2
3  BY MR. WILLIAMS:
4       Q.   It's still morning, so good morning,
5  Dr. Longo.  James Williams for Chattem.  Is there
6  any --
7       A.   Good morning, Mr. Williams.  How are
8  you doing?
9       Q.   I'm doing well and I hope you are.
10      A.   I'm doing fine.
11      Q.   Good.  Is there any reason why your
12 deposition cannot go forward today?
13      A.   Only if they're real hard questions.
14 No, just kidding.  No, sir, there's not any reason.
15      Q.   Is there any reason why you could not
16 give truthful testimony today?
17      A.   There's no reason.
18      Q.   Okay.  We've obviously had -- visited
19 several times for depositions, and so I don't want to
20 be repetitive here.  But since it's been a while, I
21 want to ask some questions to make sure -- or some
22 previous questions just to make sure things are still
23 true.
24          So, Dr. Longo, is it still true that
25 all of your work from 2016 to the present concerning

Page 8

1  cosmetic or pharmaceutical talc products has been
2  solely in connection with litigation on behalf of
3  talc plaintiffs, correct?
4       A.   You know, I need to modify that
5  answer.  I had forgotten -- and I'm just getting
6  ready to do the report -- I've done some analysis on
7  behalf of a -- not even a client, but I was
8  interested in getting -- nothing to do with Gold
9  Bond.  I was interested in getting some Johnson Baby
10 Powder containers from India, and an associate -- not
11 associate, but somebody that I'm familiar with was
12 able to do that.  I'm not getting paid for that.  I
13 just wanted to see what was in the mine.  It was
14 three samples, and I've got some additional dose
15 samples from -- that's from the Mumbai mine.
16          And then there's a second mine, and I
17 haven't got to those yet.  And those are the ones I
18 got.
19          So other than that, the rest of that
20 is correct.
21      Q.   And the work that you just described,
22 that is more out of interest or research than having
23 to do with any type of cosmetic or pharmaceutical
24 talc litigation?
25      A.   That is correct.

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 4 of 11 (45 - 48)
PageID: 222603

Matthew Steck, et al. v. Johnson & Johnson, et al.                    William E. Longo, Ph.D.
7/16/2024

Page 45

1 before?
2   A.   Yes.
3   Q.   And this -- this chart which we've
4 marked as Exhibit 4 is one that your lab has prepared
5 that sort of summarizes the testing that your lab's
6 done for Gold Bond as well as, I believe, some
7 Montana talc samples, correct?
8   A.   Correct.
9   Q.   Now, the one we've marked as
10 Exhibit 4, it's dated June 23rd, 2022. It was made
11 an exhibit to the Anderson declaration that we talked
12 about a few minutes ago. And it looks like, if I
13 scroll down, there are 21 separate bottles of Gold
14 Bond that had been tested, is that right?
15   A.   That is right for that chart. There
16 is a new chart that was issued on February 26th,
17 2023, but it only changes by one container. We're
18 now up to 22 containers. A travel Gold Bond from
19 Simon Greenstone.
20   Q.   And what matter was that from?
21   A.   Client was Louanne Dunn, D-U-N-N.
22   Q.   Were the findings from the report in
23 the Dunn matter, were they similar to the findings
24 with regard to the other 21 samples, meaning that
25 there was only findings of chrysotile and no

Page 46

1 amphibole?
2   A.   That is correct.
3   Q.   And does this chart, together with the
4 additional testing that you just referenced,
5 constitute the universe of Gold Bond testing that
6 you'll be relying on in this case for purposes of
7 testifying about, you know, the contents of Gold
8 Bond?
9   A.   Yes.
10   Q.   Are you currently testing any
11 additional Gold Bond samples, the reports of which
12 are not complete?
13   A.   That, I don't know. I certainly
14 haven't issued any new reports. Do we have any
15 samples in the queue? I just don't know.
16   Q.   Are you doing any sort of TEM testing
17 now for chrysotile in talc?
18   A.   No, not yet.
19   Q.   And for each of the 22 samples, the 21
20 in the chart on Exhibit 4 and the additional sample
21 that you just referenced, there was no TEM testing
22 for purposes of detecting chrysotile, correct?
23   A.   That is correct.
24   Q.   And do you agree that for the majority
25 of these Gold Bond samples that are identified on the

Page 47

1 chart, this Exhibit 4, that MAS, or your lab, did not
2 use the Colorado School of Mines sample prep
3 technique for the PLM analysis for chrysotile?
4   A.   So 9 out of 22, and the other one
5 would be 13, so, yes, more was done by -- only 9 out
6 of 22 had CSM.
7   Q.   And the way you would tell by looking
8 at this chart whether CSM was used, if it says N/A
9 under the CSM-PLM on the right-hand side there, if it
10 says N/A, that means nonapplicable and that you did
11 not use that sample prep technique, correct?
12   A.   Correct.
13   Q.   And how long does it take, typically,
14 to examine a Gold Bond container or any talc
15 container for the presence of -- or examine it for
16 the presence of asbestos?
17   A.   If it's a nondetect, it may take one
18 to two hours. If it is a detect and -- because we're
19 counting the structures, it can be a half a day to a
20 whole day.
21   Q.   And let me ask a better question.
22 Just putting TEM aside, I just want to focus on the
23 PLM side, how long does the PLM analysis typically
24 take?
25   A.   For cosmetic talcs, right?

Page 48

1   Q.   Correct, yes. Thank you.
2   A.   Just for asbestos-added products from
3 start to finish it's usually 15 to 20 minutes. For
4 these types of samples, half a day, sometimes a whole
5 day for one sample.
6   Q.   Now, if we're looking -- and I'm on
7 the first page of the chart there in item No. 2,
8 which is M7131 -- excuse me, M71381-001, do you see
9 that?
10   A.   Yes.
11   Q.   Okay. And over on the far right it
12 says 37 bundles. Is that -- that's the number of
13 chrysotile bundles that -- that your lab detected?
14   A.   Correct.
15   Q.   Okay. But in any given report, if we
16 were to go and look through each of the reports, the
17 photomicrographs showing what MAS says is a particle
18 that's chrysotile, that's only going to be just a
19 handful of particles. Not all 37 bundles are
20 captured, is that correct?
21   A.   That's correct. That's just the
22 typically four or five structures, chrysotile
23 structures that sort of represent what we're seeing.
24   Q.   Okay. And you -- you're not involved
25 in the day-to-day PLM testing of the talc, right?

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 5 of 10 (49 - 52)
PageID: 202604

Matthew Steck, et al. v. Johnson & Johnson, et al. 7/6/2021 William E. Longo, Ph.D.

Page 49

1 That's done by another individual at your lab?
2     A.    Correct. I don't -- I don't analyze
3 these from start to finish. I just get called in if
4 there's a question or -- on the refractive indices or
5 structure, sort of the tiebreaker.
6     Q.    Okay. And so am I correct that for
7 each of the 21 Gold Bond samples identified on this
8 chart, as well as the additional sample that you
9 referenced a moment ago for a total of 22 samples,
10 those were all tested for purposes of the PLM
11 analysis for chrysotile by Mr. Paul Hess, is that
12 right?
13     A.    Yes, sir, I believe so.
14     Q.    Okay. And it's -- is it Mr. Hess --
15 he's the one who's looking through the PLM microscope
16 to make the determination of the particle's color and
17 then also a determination to match it to a refractive
18 index?
19     A.    Yes.
20     Q.    And he makes that determination in
21 both the parallel orientation of the particle as well
22 as the perpendicular orientation of the particle,
23 correct?
24     A.    That is correct.
25     Q.    Is it Mr. Hess that also makes the

Page 50

1 birefringence computation?
2     A.    No, that would be me. Now, he'll --
3 he will say in the -- he'll give his qualitative
4 estimate of what the birefringence is. You know,
5 using the Michel -- you know, they've been using the
6 Michel-Levy charts for a while. But when I get the
7 refractive indices or data in agreement with what
8 they're using, then I do that calculation.
9     Q.    Okay. But in order to do the
10 birefringence calculation -- let me back up. The
11 birefringence calculation that you do, that's taking
12 for any given particle the difference of the
13 refractive index and parallel orientation and the
14 perpendicular orientation to arrive at a
15 birefringence number, correct?
16     A.    Correct. It's a very simple
17 calculation. You take the gamma -- you take the
18 alpha, or the perpendicular, and subtract it from the
19 gamma, which is the parallel, and that number will --
20 you can then be -- it's in the low range, the medium
21 range or the high range.
22     Q.    And in order to get accurate
23 birefringence computations, you need to have accurate
24 refractive index computations, correct?
25     A.    Correct.

Page 51

1     Q.    And the refractive index computations
2 that underpin your birefringence determinations,
3 those are conducted by Mr. Hess, correct?
4     A.    If Mr. Hess is doing the analysis, he
5 is the one taking the dispersion color, matching it
6 to the wavelength and then using the appropriate
7 chart. Right now we're just only going to be using
8 1.560, and then he gets the refractive -- what the
9 refractive indice is based on the wavelength.
10         THE REPORTER: Based on the --
11     A.    I'm sorry, based on the wavelength.
12     Q.    And Mr. Hess is the one that completes
13 and fills out the worksheets that would be part of
14 your report?
15     A.    Yes.
16     Q.    And when I say "worksheet," I'm
17 talking about the sheet that contains, you know, the
18 refractive index data or the ranges of refractive
19 index data, the morphology, and the birefringence
20 information, correct?
21     A.    Yeah, the qualitative birefringence.
22 He'll typically put that in there, and everything
23 else, you know, is correct. That's what the data
24 shows. It will give the range of the -- the gamma
25 and alpha directions. And then each individual

Page 52

1 photographs of the gamma and alpha directions, he
2 will have on the photograph what specifically is for
3 that -- specifically is for that particular
4 structure.
5     Q.    And is it fair to say that you're
6 relying on Mr. Hess for the accuracy of the
7 refractive index determinations?
8     A.    No. I'm relying on myself to make
9 sure he is accurate. If he -- if I see something
10 that doesn't make sense, I'll walk back to him and
11 say, these -- this -- I'm not -- I'm not agreeing
12 with this refractive indice. And I would say most
13 every time he's -- you know, he's switched a number.
14 So I'm relying on -- yeah, I'm relying on him to do
15 the analysis, but the actual verification of what
16 he's doing, I rely on myself.
17     Q.    Well, a moment ago we were talking
18 about -- and I think this was -- with reference to
19 item 2, where we said, you know, there were 37
20 bundles identified, but only you said four or five
21 might be actually photographed. Do you recall that
22 discussion?
23     A.    Yes.
24     Q.    Now, apart from the four or five that
25 are photographed, only Mr. Hess is going to see the

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 27 of 105 (105 - 108)
Matthew Setzer, et al. v. Johnson & Johnson, et al.                                    5/16/2005
PageID: 222605                                                              William E. Longo, Ph.D.

Page 105

1  these particles in here and we can look at it with
2  that, if I can find it. So I just want to --
3      A.   Yeah. So there's the parallel and
4  1.564. But we're doing this in 1.560 refractive
5  indice fluid. So you're not -- instead of 1.550 --
6  and the reason we're using 1.560 is because most of
7  the gamma refractive indices for the chrysotile being
8  found in the cosmetic talcs, as well as the SG-210
9  Calidria, are all in this, you know, 1.561 to 1.569
10 with an average about 1.566.
11     Q.   Okay. And so --
12     A.   And we're basing that on what -- what
13 Dr. Su said -- Dr. Su published in his -- well, his
14 published paper in I think it was the third quarter
15 of 2022 in a journal called The Microscope.
16     Q.   Okay. So in terms of this particle --
17 so we have a refractive index of 1.564 in parallel --
18 and just for the record this is M71614-001, page 32
19 of Exhibit 7. How does Mr. Hess actually calculate
20 1.564 as being the refractive index value for this
21 particle? Is he taking averages?
22     A.   Well, you know, Mr. Hess would take
23 the -- what the wavelengths are showing and he would
24 go to Dr. Su's 1.560 table that he produced in --
25 that he had in his published paper and take the

Page 106

1  wavelength at 21 degrees centigrade, because it's
2  already been corrected -- and then go over to where
3  it states what the refractive indice is.
4      Q.   And so I know there was some testimony
5  early on about averages and how averages are used in
6  this process. Are you able to just kind of explain
7  that for me to the extent that averages are being
8  used? Because I'm just not entirely sure. I have --
9          MR. KELLEY: Object to the form of the
10 question.
11     A.   We -- if we have a -- say you have a
12 bundle, elongated structure that has different
13 thicknesses in it or -- you typically go around the
14 outer edge is the proper way, the very edge of the
15 particle in this case. And if it's -- say there's a
16 fairly significant change where you may have, you
17 know, 1.562 to 1.566. But I believe it makes it
18 easier for everybody -- and if you were to use that
19 range and then have two -- and then your alpha and
20 you use that range and calculate them both by
21 subtracting them out, then you get a certain
22 birefringence.
23         If you just average the two, put one
24 down and average the others and put one down and then
25 use that to subtract them out you get the same thing.

Page 107

1  So when I -- if I were doing it and
2  I -- you know, and the range was, say, 1.561 to
3  1.562, I would go just pick one, it's not going to
4  change that much type thing.
5      Q.   So I guess for some of these particles
6  it looks like, you know, there is a fair variety of
7  different colors around the outside. I'm kind of
8  seeing some blue over here, some yellow.
9      A.   Well, it's the very edge. 1.564 is
10 what I would probably -- you know, if I'm looking at
11 that, what I would probably average around the edge
12 from the wavelengths. You're looking at the
13 wavelengths first, and it's usually the outer edge
14 that you want to look at.
15     Q.   Right. And then so what would be
16 average, because, you know, I'm just not --
17     A.   Well, I mean, I -- I'd have to have a
18 closeup of that picture and look at it and see what I
19 would -- you know, and have the chart in front of me
20 so where I would look and see where that is.
21     Q.   Okay. And I think you may have said
22 this earlier, but you're aware that others like
23 Dr. Su, the way they calculate birefringence values
24 is they take the largest or the highest parallel and
25 subtract it by the lowest perpendicular, correct?

Page 108

1      A.   That's not true. They're not
2  subtracting anything like that. They're taking and
3  comparing the two. So when people say that's how he
4  does the birefringence, that's just not true.
5      Q.   When you say "comparing the two," what
6  do you mean?
7      A.   Well, he's looking at the highest
8  birefringence in the Michel-Levy charts and he's
9  looking at the -- if he has a range, looking at the
10 lowest alpha. And then he's going over and looking
11 at the chart, trying to match up those colors. And
12 you'll see a lot of -- when they do that they go low
13 to medium, you know, you've got this range, where
14 when you do the actual calculation you can say this
15 is low or this is the low end of moderate. I think
16 it's much more accurate.
17     Q.   Okay. Let's just look at one more of
18 these real quick. Okay. So this one here -- and
19 just for the record, this is M71614-001CSM-004,
20 page 47 of Exhibit 7. And this one here you have a
21 refractive index of 1.565 to 1.568 in parallel?
22     A.   Correct.
23     Q.   And so for this, why is there a range
24 provided rather than a single -- a single value?
25     A.   Because Mr. Hess thinks it's more

Case 3:16-md-02738-MAS-RLS    Document 33015-32    Filed 07/23/24    Page 28 of 109 (109 - 112)
PageID: 222606
Matthew Steck, et al. v. Johnson & Johnson, et al.                                                  William E. Longo, Ph.D.

Page 109

1  accurate to do that way because you've got this like
2  dispersion, change in color, if you look around the
3  edge.
4         If I take the average of that and go
5  to the high end, you know, it's just 1 point -- it
6  would be 1.566 to 1.567. It would be easier just to
7  average that and take the high side of it. You're
8  going to get basically the exact same thing,
9  refractive -- I mean on the birefringence, but...
10     Q.  Okay. Yeah, that was going to be my
11 next question. Like how does this impact, if at all,
12 the birefringence calculation?
13     A.  It actually doesn't when you -- if you
14 were to average the two. But what we do is you'll
15 take the high end of the gamma here and the high end
16 of the alpha, subtract it out, then average those
17 two. Or if you were to average this out and do the
18 exact same thing, you would get just about the exact
19 same number on the calculation.
20     Q.  All right. And so I think you said
21 earlier today that it's your view that EPA R-93
22 calculates birefringence in the same way that you are
23 calculating birefringence?
24     A.  No, I didn't say that. I said they
25 have examples of ranges that are in Table 2.2 --

Page 110

1     Q.  Okay.
2     A.  -- where there is a -- they reference
3  chrysotile. They have -- in that table they have
4  calculated the ranges of the birefringence that go
5  with that chrysotile. And if you sit down and do
6  that, you can get -- and take those averages from
7  that, it's -- the problem I have with some of the
8  criticism on this is saying that, you know, this is
9  not done. That's not true. I mean, Deer, Howie and
10 Zussman is considered a very authoritative reference
11 on the crystal structures, and every one of them in
12 there that has double defraction, he lays out the
13 range and then he calculates the overall
14 birefringence. And if you go and do exactly what I
15 do, you'll get the exact same numbers that he has.
16        So I just think it's -- it is -- it is
17 more precise than doing the estimated birefringence.
18     Q.  All right. Well, let's just pull up
19 the EPA R-93 method, which I'll mark as Exhibit 8.
20        (DEPOSITION EXHIBIT NO. 8 MARKED)
21     Q.  Okay. And this is the method you were
22 referencing earlier in your testimony, Dr. Longo?
23     A.  I'm not saying that when they're
24 teaching for bulk building materials that they're
25 using the subtraction method. What I am saying there

Page 111

1  in a table where they have referenced chrysotile and
2  they have given the range of what you find, the only
3  way to get that range is for you to actually have
4  calculated it. There we go.
5      Q.  Right. This Table 2.2 at page -- or
6  PDF page 26 is what you're referencing?
7      A.  Yes.
8      Q.  And so -- sorry, just take me back
9  through -- because I think your opinion is that
10 what's in this table is consistent, at least the
11 birefringence values are consistent with your
12 calculations in the talc litigation. Can you just
13 kind of walk me through why that's the case?
14     A.  Well, we're finding anywhere from
15 0.004 to 5 up to 0.017. If you average them all out,
16 the average birefringence that was calculated from
17 that -- what they have there at 0.011, I think, and
18 what we typically see is an average of 0.010 to
19 0.012, et cetera. So they're doing the -- to get
20 those numbers in that range, they have to do the
21 calculation.
22        And then if you go to Table 2.5, I
23 think it is -- so we see a range of birefringence for
24 chrysotile, 0.004 to 0.017. And if we go to fibrous
25 talc, which is on 2.5 of the -- right there -- 2.5 at

Page 112

1  the bottom, you can see -- if you go to the top, you
2  can see the birefringence is N parallel minus N
3  alpha, or perpendicular. And there they show optical
4  properties of selected fibers doing exactly what we
5  do.
6         And if you go down to fibrous talc,
7  the birefringence on that is 0.06, which is almost a
8  factor of five to six times higher than chrysotile.
9         And if you also go to Deer, Howie and
10 Zussman and look at their range of talc where you
11 have the double defractions, the talc plates on edge
12 are fibrous -- they're finding pretty much the same
13 thing.
14        If you go to Johns Manville research
15 documentation from 1973 when they were doing the --
16 trying out the FDA method for PLM where you spend a
17 half a day and you count all the fibers, they find
18 pretty much the same thing.
19        So it's not hard to tell the
20 difference between fibrous talc and chrysotile.
21     Q.  Well, and so just to be clear here,
22 where they're talking about fibrous talc, the colors
23 that they're seeing in parallel, pale yellow and
24 perpendicular pale blue, those are consistent with
25 the colors you're reporting as chrysotile in this

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 8 of 10 (121 - 124)
Matthew Stock, et al. v. Johnson & Johnson, et al.   PageID: 202607
Page 121 - 124                                       William E. Longo, Ph.D.

Page 121

1 admits that the thickness causes an effect or he'll
2 say that the thickness doesn't cause any effect.
3     I disagree, because the chrysotile
4 from Union Carbide out of the Coalinga mine that is
5 in the average size of 10 microns and up, it is
6 chrysotile, and it is certainly providing a yellowish
7 gold and 1.550, which if it has to be magenta, why is
8 that yellowish gold?
9   Q.   Right. Well, I guess that's kind of
10 what I'm getting to, right? If this is discussing
11 the kind of NIST or the 1866-B standard that you're
12 saying is not applicable to cosmetic talc because
13 what you're seeing, you're saying, is smaller, you
14 know, why do you think it's appropriate then to rely
15 upon this table with these birefringence values
16 that's looking at a different type of chrysotile?
17   A.   It's -- because they're calculating
18 it, it doesn't matter what these numbers are. I was
19 using this to support my opinion that you can't take
20 the highest gamma and subtract out the lowest alpha
21 and get anything that resembles the actual
22 birefringence range.
23      And if you look through the gammas on
24 the last two, if you're not seeing any of those --
25 you know, the 1.567 and the 1.561, you don't see that

Page 122

1 high a gamma in the chrysotile-added products.
2      So it's not so much relying on -- it's
3 this is how -- they show you that when you're
4 subtracting it out this is how it's done. You don't
5 take a high and a low.
6      And it's also the same thing that --
7 in the Deer, Howie, Zussman, how -- the same way
8 they're calculating ranges.
9       MR. VIVES:   All right. Well, we've
10 been going for a while. Why don't we take a break.
11       THE WITNESS:   Sure, yeah. What time
12 it is?
13       MR. VIVES:   3:08.
14       THE WITNESS:   3:00, wow. I won't hold
15 you to this. Are we off the record?
16       MR. SMITH:   Not yet. We can go off
17 the record.
18       THE MODERATOR:   Off the record at
19 3:09 p.m.
20       (OFF THE RECORD)
21       THE MODERATOR:   We are on the record
22 at 3:25 p.m.
23 BY MR. VIVES:
24   Q.   Okay, Dr. Longo, we're back after a
25 quick break. I just want to come back to a few

Page 123

1 things we were just talking about.
2      I think you said that PLM analysis
3 is -- whether it's subjective depends on the analyst
4 who's performing the analysis, or something along
5 those lines, is that correct?
6   A.   That's correct.
7   Q.   And so just to make sure I'm clear --
8   A.   And how much experience they have on
9 doing this, you know, repetitive, et cetera. And so
10 just doing asbestos-added products, you know, it's
11 pretty straightforward.
12   Q.   But you wouldn't disagree that there's
13 certainly a subjective element to PLM analysis.
14   A.   You know, just depends on your
15 training and how much experience you've got. You
16 know, this -- and it's typically .00 -- 0.0005 is the
17 error rate. So it's like anything else, these types
18 of analysis. But I don't think it's that subjective
19 if you are well experienced and you look at standards
20 and you validate the method.
21   Q.   And this subjective part would be
22 somebody looks under a microscope, looks at a sample
23 under a PLM microscope, and they try to match up the
24 color they're seeing to the color on a central
25 dispersion staining chart, correct?

Page 124

1   A.   Well, I don't know about somebody. I
2 would say our guys are -- have been doing it for so
3 long we're pretty consistent. So I'm sure there is
4 some subjectivity out there trying to look at it and
5 some -- so I can't really say how subjective it is
6 for other folks.
7   Q.   Right. But you're confident that your
8 analysts are able to -- you know, when we're talking
9 these shades of colors, they're able to kind of match
10 it up accurately each time.
11   A.   They are fairly consistent. I don't
12 see a lot of spread in what we can take a look at.
13 You know, the gamma is in the 1.561 up to 1.569,
14 sometimes 1.71, but it's always in that range.
15   Q.   That's after the subjective part of
16 the process has happened, right? That's after you've
17 assigned a wavelength value and generated your
18 refractive index value, right?
19   A.   I'm having trouble hearing you.
20   Q.   I'm sorry.
21   A.   There you go. It's not that
22 subjective because, you know, it is in line with what
23 we're seeing for chrysotile from the Coalinga mine
24 that's that size, okay?
25   Q.   Before you landed on chrysotile from

Case 3:16-md-02738-MAS-RLS   Document 33015-32   Filed 07/23/24   Page 9 of 10 (133 - 136)
Matthew Steele, et al. v. Johnson & Johnson, et al.                                    William E. Longo, Ph.D.
PageID: 222608   7/16/2020

Page 133

1 could -- could produce all the PLM slides he did in
2 litigation since 2016 or whenever he started.
3     Q.    Well, so it sounds like with respect
4 to -- it sounds like you're aware that there was a
5 request made for your PLM slides in the Valadez case?
6     A.    Yes, I'm aware of it. I went to go
7 look for them after I got around to it, and what I
8 didn't do is tell anybody here to make sure to keep
9 them --
10    Q.    All right.
11    A.    -- because I get sidetracked pretty
12 easily at times.
13    Q.    And do you recall when you went around
14 to look for them?
15    A.    I think it was about two weeks
16 afterwards, something like that.
17    Q.    And when you went to look for them
18 they were -- they had been destroyed?
19    A.    They weren't there.
20    Q.    Okay. So they weren't -- it wasn't
21 that they were degraded. It's that they had been
22 destroyed.
23    A.    They don't last. I mean, you can't go
24 back a week or two weeks afterwards and look -- be
25 able to find the same structures because it starts

Page 134

1 crystallizing.
2     Q.    Right, but --
3     A.    This is not like TEM grids where you
4 have to go through a whole thing and you can pull
5 them out and -- which we've done. PLM -- you can't
6 ship a PLM slide, and you can always make it again.
7     Q.    Okay. But I just want to make sure
8 we're clear because I think first you testified that
9 when you went to look for them you couldn't find
10 them. Is that --
11    A.    If they're not there, it's hard to
12 find them.
13    Q.    Right. Okay.
14    A.    So they're not here. And they were --
15 they were just -- they were thrown out.
16    Q.    Okay. And do you have any idea when
17 they were thrown out?
18    A.    I don't know within the date -- when
19 it was actually thrown out or not. It was thrown
20 out, but I don't know the date.
21    Q.    Okay. We may look at a few things on
22 this, but I think you just said -- well, I guess let
23 me just ask. What is your view on how long it takes
24 PLM slides to degrade?
25    A.    Well, they start crystallizing and the

Page 135

1 oil starts to evaporate, so it's usually, you know,
2 one to two weeks. Sometimes, you know, if I've
3 looked at the report and stuff or it's out, there's
4 no need to keep it. You know, to go back and find
5 that exact one bundle, sometimes it would be tough.
6 I don't think anybody keeps them.
7     Q.    Right. And is it your view that -- so
8 after one to two weeks if the oil evaporates the
9 slides are unusable?
10    A.    I don't know if they're absolutely
11 unusable, but to go back to the same structures, it
12 may not be possible. So it's just -- nobody keeps
13 them.
14    Q.    Have you ever tried to analyze or
15 relook at a PLM slide two weeks after it was prepared
16 to see whether you can see anything?
17    A.    No. I'm not going to take the time to
18 go and start doing an experiment because somebody --
19 they wanted to come here and analyze a sample.
20          I'd be perfectly happy to have, you
21 know, Dr. Sanchez -- well, his PLM person come here,
22 watch us make the sample. We can go and look for it
23 and say here's the structure, go ahead and look at
24 it. What is the difference? Probably better that
25 way.

Page 136

1     Q.    Okay. But not Dr. Sanchez? His PLM
2 person?
3     A.    He doesn't -- he never analyzes them.
4 You know, and he accused me of committing a felony,
5 so I have a problem with him coming in my lab, you
6 know, that I'm lying under oath all the time.
7           He would come here, but he's going to
8 have somebody else do the PLM analysis. I think we
9 offered that as a compromise, but that's what, you
10 know -- I would just say Dr. Sanchez can go ahead and
11 write the report that we misidentified it. He can do
12 that. He doesn't have to come here and analyze it.
13    Q.    Are you aware of any peer-reviewed
14 literature that states that PLM --
15    A.    I can't hear you.
16    Q.    Sorry. I've got this new microphone
17 that's been causing all sorts of problems. Are you
18 -- I like yours a lot better.
19          Are you aware of any peer-reviewed
20 literature that states that PLM slides degrade after
21 one to two weeks?
22    A.    You know, it's hard for me to chase
23 down every time somebody comes up with something that
24 they want to know or there's some literature. I
25 don't know.

Case 3:16-md-02738-MAS-RLS Document 33015-32 Filed 07/23/24 Page 108 of 149
Matthew Streck, et al. v. Johnson & Johnson, et al. (Page 149 - 152)
Page ID: 216226609
7/6/2022
William E. Longo, Ph.D.

Page 149

1  A.  The slides were gone. And by that
2  time probably -- I don't know -- I just don't recall
3  ever telling Mr. Satterley that.
4  Q.  Okay. Okay. That's fine. So all you
5  recall telling him is that the slides were gone.
6  A.  They were not -- they were not kept.
7  Q.  And you don't recall when you would
8  have told him that. Presumably, it was after that
9  March 15th email we looked at?
10 A.  Yeah, they -- I did not -- they were
11 not here.
12     MR. VIVES: Okay. All right. Let me
13 just take two minutes and just see if I have anything
14 else. I think that may be it for me.
15     THE WITNESS: Okay. Is anybody else
16 going to ask questions?
17     MR. SMITH: I'll be very brief.
18 Should I go during the two minutes while you look at
19 your notes, Michael?
20     MR. VIVES: Sure. Go ahead.
21     MR. SMITH: At least I think I'll be
22 very brief.
23
24
25

Page 150

1          EXAMINATION
2
3  BY MR. SMITH:
4  Q.  Dr. Longo, my name is Travis Smith.
5  Can you hear me okay?
6  A.  Yes, sir, I can.
7  Q.  I represent Kroger. Have you reviewed
8  any documents of Kroger as it relates to this case,
9  this Streck case, or cosmetic talc products
10 generally?
11 A.  No.
12 Q.  And I didn't see Kroger mentioned in
13 your notes and calculations page that we marked as
14 Exhibit 5. Have you formed any opinions in this case
15 specifically as to Kroger?
16 A.  No, I don't have any opinions about
17 Kroger, you know, who knew what when, should they
18 have known, not known, hazard, dangers of asbestos.
19 It's immaterial to me where the product was bought.
20 My only opinion is about what's in the product. It
21 could have came from Kroger or any other grocery
22 store.
23 Q.  And you haven't done any
24 quantification or calculated any cumulative dose for
25 Mr. Streck with respect to either Johnson's Baby

Page 151

1  Powder or Gold Bond talcum powders that may have been
2  purchased from Kroger as opposed to another store?
3  A.  That's correct, I have not.
4     MR. SMITH: Okay. I think that's all
5  I have. Thank you.
6     THE WITNESS: Thank you.
7     MR. VIVES: All right. No further
8  questions for me either, Dr. Longo.
9     THE WITNESS: Thank you, sir.
10    MR. KELLEY: Any other questions?
11    MS. BROWNING: None from me.
12    MR. WILLIAMS: None for Chattem.
13    MR. KELLEY: All right. I think we
14 can close the record.
15    THE MODERATOR: We are off the record
16 at 4:03 p.m.
17
18   (DEPOSITION CONCLUDED AT 4:03 P.M.)
19           *  *  *
20
21
22
23
24
25

Page 152

1  STATE OF KENTUCKY  )(
                      )( SS:
2  COUNTY OF JEFFERSON )(
3
4      I, ELLEN L. COULTER, Notary Public,
   State of Kentucky at Large, hereby certify that the
5  foregoing deposition was taken at the time and place
   stated in the caption; that the appearances were as
6  set forth in the caption; that prior to giving
   testimony the witness was first duly sworn by me;
7  that said testimony was taken down by me in
   stenographic notes and thereafter reduced under my
8  supervision to the foregoing typewritten pages and
   that said typewritten transcript is a true, accurate
9  and complete record of my stenographic notes so
   taken.
10     I further certify that I am not
   related by blood or marriage to any of the parties
11 hereto and that I have no interest in the outcome of
   captioned case.
12     Given under my hand this the
13 day of            ,      , at
14 Louisville, Kentucky.
15     My commission as Notary Public expires
   November 5, 2023.
16
17
18
19
20
21        ELLEN L. COULTER
          NOTARY PUBLIC
22        Notary I.D. 634549
23
24
25