# Exhibit 78

**Page 1**

```
         SUPERIOR COURT OF THE STATE OF CALIFORNIA
              FOR THE COUNTY OF LOS ANGELES

KIRK VON SALZEN and          )
JANET VON SALZEN,            )
                             )
         Plaintiffs,         )
                             )
    vs.                      )
                             )
AMERICAN INTERNATIONAL       ) Case No. JCCP 4674/
INDUSTRIES INC. (sued        )           BC680576
individually and as          )
successor to PINAUD, INC.,   )
BARBARA ALICE, INC., ED      )
PINAUD, INC. d/b/a ED.       )
PINAUD, and NESTLE-LE MUR    )
COMPANY); et al.,            )
                             )
         Defendants.         )
_____)


                   DEPOSITION OF

                WILLIAM E. LONGO, PhD


                   June 27, 2018

                   11:28 a.m.


           11555 Medlock Bridge Road, Suite 100
                   Johns Creek, Georgia


           Debra R. Luther, RMR, CRR, CCR-B-881

                   Atlanta Reporters, Inc.
               Georgia Certified Court Reporters
                      (866) 344-0459
                   www.atlanta-reporters.com
```

Atlanta Reporters, Inc.    866-344-0459    www.atlanta-reporters.com

---

**Page 2**

APPEARANCES OF COUNSEL

On behalf of the Plaintiffs:

    STUART J. PURDY, Esq.
    Simon Greenstone Panatier, PC
    3780 Kilroy Airport Way
    Suite 540
    Long Beach, California 90806
    spurdy@sgptrial.com

On behalf of the Defendant
    Johnson & Johnson and
    Johnson & Johnson Consumer Inc.:

    ALEXANDER G. CALFO, Esq.
    King & Spalding, LLP
    633 West Fifth Street
    Suite 1700
    Los Angeles, California 90071
    acalfo@kslaw.com

On behalf of the Defendants
    Imerys Talc America, Inc.:

    FREDERIC W. NORRIS, Esq.
    Dentons US, LLP
    601 South Figueroa Street
    Suite 2500
    Los Angeles, California 90017-5704
    rick.norris@dentons.com

On behalf of the Defendant
    Shulton, Inc.:

    JOHN D. COSMICH, Esq.
    Cosmich, Simmons & Brown, PLLC
    One Eastover Center, Suite 200
    100 Vision Drive
    Jackson, Mississippi 39211
    cos@cs-law.com
    (Appearance by telephone)

Also Present:
    Mr. Connor Scott (via telephone)

Atlanta Reporters, Inc.    www.atlanta-reporters.com

---

**Page 3**

INDEX TO EXAMINATIONS

| Examination | Page |
|---|---|
| Examination by Mr. Norris | 5 |
| Examination by Mr. Calfo | 113 |
| Further Examination by Mr. Norris | 177 |

- - -

(Original Exhibits 1 through 7 and 9 through 12 have been attached to the original transcript. Exhibit 8 was not provided to court reporter at time of production.)

Atlanta Reporters, Inc.    www.atlanta-reporters.com

---

**Page 4**

INDEX TO EXHIBITS

| Defendant's Exhibit | Description | Page |
|---|---|---|
| 1 | Defendants Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Notice of Taking Depositions of Plaintiffs' Expert Witnesses and Requests for Production of Documents | 5 |
| 2 | Letter of 6/18/2018 from Romano to Kagan | 5 |
| 3 | Notes by Dr. Longo | 5 |
| 4 | Letter of 6/7/2018 from Jenna Sanchez to Dr. Longo | 6 |
| 5 | Argonaut Fact Sheet | 29 |
| 6 | Luzenac America Technical Report, Analysis of Fibrous Material from Argonaut Waste Rock | 29 |
| 7 | PLM and XRD Analysis of 26 Johnson & Johnson Talc Samples, by Lee Poye of J3 Resources, 2/8/2018 | 32 |
| 8 | QC reports | 43 |
| 9 | Amphibole Content of Cosmetic and Pharmaceutical Talcs (Blount, 1991) | 50 |
| 10 | Detection and Quantification of Asbestos and Other Trace Minerals (Blount, 1990) | 54 |
| 11 | Occupational Exposure to Asbestos, Tremolite, Anthophyllite, and Actinolite (OSHA, 1992) | 99 |
| 12 | Excerpt from report for test samples M66352-001 and M66352-002 | 181 |

Atlanta Reporters, Inc.    www.atlanta-reporters.com

## Page 5

    1    (Reporter disclosure made pursuant to
    2    Article 10.B. of the Rules and Regulations of
    3    the Board of Court Reporting of the Judicial
    4    Council of Georgia.)
    5    (Defendant's Exhibits 1 and 2 were marked
    6    for identification.)
    7         WILLIAM E. LONGO, PhD,
    8    having been first duly sworn, was examined and
    9    testified as follows:
   10         EXAMINATION
   11   BY MR. NORRIS:
   12    Q.   Just as a matter of housekeeping, I have
   13   gone ahead and marked as Defendant's Exhibit 1
   14   defendant Johnson & Johnson's notice of taking
   15   deposition of plaintiffs' expert witnesses and
   16   request to produce, and Exhibit 2 is going to be the
   17   letter served by King & Spalding confirming this
   18   date, time, and location, just for housekeeping.
   19        I'm also going to mark as Defendant's
   20   Exhibit 3 a set of what appear to be typewritten
   21   notes prepared by Dr. Longo.
   22        (Defendant's Exhibit 3 was marked for
   23         identification.)
   24    Q.   (By Mr. Norris) Dr. Longo, could you
   25   please state and spell your name for the record.

## Page 6

    1    A.   William Edward Longo, L-o-n-g-o.
    2    Q.   Okay. And you've been deposed a few times
    3   before?
    4    A.   I have.
    5    Q.   Sufficient -- you feel comfortable
    6   dispensing with the admonitions?
    7    A.   I do feel comfortable with that.
    8    Q.   Okay. When were you first contacted in
    9   this case?
   10    A.   The only thing I can tell you is I got a
   11   June 7, 2018, letter from Simon Greenstone
   12   transmitting the three depositions that I have.
   13    Q.   Let's mark as Exhibit 4 the June 7, 2018,
   14   letter sending Dr. Longo the three transcripts of
   15   deposition. Just to confirm, that is the two volumes
   16   of Mr. Von Salzen's deposition and the one volume of
   17   Mrs. Von Salzen's deposition; correct?
   18    A.   That would be correct.
   19        (Defendant's Exhibit 4 was marked for
   20         identification.)
   21    Q.   (By Mr. Norris) Okay. Aside from those
   22   three documents, have you reviewed any other
   23   materials specific to the Von Salzen matter,
   24   discovery responses, depositions, other case-specific
   25   materials?

## Page 7

    1    A.   No, no, and no.
    2    Q.   Okay. I am showing you a document which
    3   I've marked as Exhibit 3 which you personally handed
    4   to me. Is this document, which is marked as
    5   Exhibit 3, a true and accurate copy of the notes you
    6   prepared in this case?
    7    A.   Yes.
    8    Q.   All right. So aside from the first
    9   contact on June 7, 2018, have you had any subsequent
   10   contacts?
   11    A.   I'm sure I had contacts before that; I
   12   just don't recall it. And the only other contact I
   13   have had is with Mr. Purdy this morning.
   14    Q.   When did that occur?
   15    A.   He arrived at the office at about 9:15
   16   this morning.
   17    Q.   And how long did you meet at your office
   18   this morning?
   19    A.   Until we came over here.
   20    Q.   I personally saw Mr. Purdy here around
   21   11:00 o'clock, so safe to say that you met for about
   22   an hour and a half?
   23    A.   Correct.
   24    Q.   What did you discuss in that hour and a
   25   half?

## Page 8

    1    A.   Probably only spent about 15, 20 minutes
    2   talking about this case. I was still trying to edit
    3   and finish the notes, and then we discussed other
    4   nonrelated issues as we chatted.
    5    Q.   How do you prepare these notes?
    6    A.   I read the depositions and I highlight
    7   them and then I go through and try to -- things that
    8   I may want to remember during the deposition, you
    9   know, where Mr. Von Salzen lived, where he went to
   10   school, where he worked, and then of course try to do
   11   a brief outline of his exposure to body powders.
   12    Q.   Do you personally transcribe or type the
   13   notes?
   14    A.   No.
   15    Q.   Okay. Who does that?
   16    A.   My assistant.
   17    Q.   How does that process work? How does she
   18   know what to type?
   19    A.   My handwritten notes.
   20    Q.   So as you're reading the deposition you
   21   take handwritten notes, provide them to your
   22   assistant, and she types it up?
   23    A.   Typically what I do is read all the
   24   depositions and highlight the volumes of some of
   25   these facts, and then I'll go back and review what

Page 53

1  specific on the methodology that you use, the
2  step-by-step methodology, have any of those agencies
3  approved or considered it?
4      A.   Well, they haven't considered, they
5  haven't said you can't do it, and they're silent on
6  it.  The heavy liquid density separation method for
7  removing amphiboles in talc has not been discussed or
8  not been written up or not approved or disapproved by
9  any of those organizations.
10          MR. CALFO:  I think you better break it
11  up.
12          MR. NORRIS:  I know.  I think so.  And
13  again --
14          MR. PURDY:  Sure.  When we get to a new
15  topic, I'll start to raise that.  I mean, these
16  just have all been asked so many times not only
17  by -- we don't even have the different firm
18  argument that Johnson & Johnson has for the same
19  firm, although maybe Alston & Bird asks
20  questions a little differently.  It's just very,
21  very, very repetitive.  It's unfortunate, but go
22  ahead.
23          MR. NORRIS:  All right.  I'm going to move
24  on from that.
25      Q.   (By Mr. Norris)  When Blount decided on

Atlanta Reporters, Inc.  866-344-0459   www.atlanta-reporters.com

Page 54

1  the 2.81 heavy density liquid, that was as a result
2  of multiple tests of liquid densities ranging from
3  below 2.1 to above 2.1; correct?
4          I'm going to give you another document
5  while you're looking for that answer.  I'd like to
6  mark as Exhibit 10 a publication by Blount titled
7  Detection and Quantification of Asbestos and Other
8  Trace Minerals, dated 1990, and that will be
9  Exhibit 10.
10         (Defendant's Exhibit 10 was marked for
11  identification.)
12     Q.   (By Mr. Norris)  I'm looking at page 560
13  of Exhibit 10.
14     A.   She used one type.  She just adjusted it.
15  We do the same thing.
16     Q.   You understand that she added extra weight
17  drop-by-drop to determine the best weight to use for
18  this method; correct?
19     A.   That's not really what she's doing.  She's
20  adding drops of water.  She's mixing it to adjust the
21  density.
22         We do the same thing.  We adjusted ours to
23  2.5.
24         She's taking one type of heavy liquid
25  density and she's basing it on the densities of

Atlanta Reporters, Inc.  866-344-0459   www.atlanta-reporters.com

Page 55

1  tremolite, anthophyllite, actinolite, and she chose
2  2.81.
3      Q.   Because her tests indicated that the best
4  density for a heavy liquid to separate talc from
5  amphibole was 2.81; correct?
6      A.   That's what she states.
7      Q.   Okay.  How did you go about determining
8  2.85 was the value you were going to use?
9      A.   Because 2.81 -- because 2.85 is much
10 lower -- is still low enough than tremolite, and 2.85
11 is heavier, so we were trying to make it more
12 efficient to remove the talc because you're using a
13 heavier liquid than the 2.81.  That was our decision.
14     Q.   Did you perform tests at 2.82, 2.83, 2.84
15 before selecting 2.85?
16     A.   No.
17     Q.   Blount in her paper mentions counting 20
18 fields of view.  Just for purposes of my -- I just
19 want to make sure I understand and am interpreting
20 her correctly or your understanding of it.
21         When she says fields of view, is that the
22 same thing as the grid openings that you're counting?
23     A.   Yes and no.  A grid opening is not a field
24 of view, depending on your magnification.  She's
25 using polarized light microscopy, and she's using one

Atlanta Reporters, Inc.  866-344-0459   www.atlanta-reporters.com

Page 56

1  magnification.  So typically a magnification of --
2  whatever the magnification she's using, she's saying
3  this is what I can see.  And then she's moving it.
4          In a TEM grid, your field of view at 200X
5  is most of the grid openings, or 50X.  At 20,000 to
6  25,000 your field of view is approximately 1/20 of a
7  grid opening, and a grid opening is 100 microns by
8  100 microns.
9          So it's two completely different things,
10 but we call it grid openings, and if you say I have a
11 200 mesh or a 100 mesh grid, then we know the size.
12     Q.   Okay.  All right.  When you performed your
13 calculations on how many fibers per gram were present
14 in these samples, how did you go about performing
15 that mathematical calculation?
16     A.   Well, we start with 20 milligrams.  That's
17 put into the heavy liquid density solution.  After
18 it's spun, we take the -- we harvest the amphiboles
19 or the minerals that -- the amphibole minerals
20 technically that have a higher density than 2.85.  We
21 filter it all onto a 20 millimeter square filter.
22 From there we take the TEM samples.
23         So say, for example, you find one fiber
24 and you're starting with 20 milligrams on the filter
25 and you look at 100 grid openings, so you take the

Atlanta Reporters, Inc.  866-344-0459   www.atlanta-reporters.com

## 57

1 average size of the grid openings, multiply it by 100
2 and then divide that into the overall surface area of
3 the filter and then calculate one fiber found on that
4 100 grid openings and mathematically going back to
5 what it would be for what's in the entire sample in
6 the grid and then divide by 20.
7     Q.    My question was not -- is there an
8 equation somewhere that I can look at that was used?
9     A.    Any individual who is a TEM -- your expert
10 should be able to do it. Any individual who runs
11 TEMs or knows TEMs will know how to do this.
12     Q.    Okay.
13     A.    So if you think about it, you start with
14 20 milligrams of material.
15     Q.    Understood.
16     A.    That's your starting weight. We're using
17 everything from that 20 milligrams of material, the
18 heavy density liquid separates 99.9 percent of the
19 talc, but you're putting everything that you
20 harvested from the bottom of the heavy liquid density
21 on a 20 millimeter diameter filter.
22     You calculate the surface area of that,
23 and then you calculate how many fibers, if any, you
24 found on the 100 grid openings, if you count 100 grid
25 openings, then you take the ratio of the two, then

## 58

1 you can calculate back to the 20 milligrams, and then
2 the 20 milligrams, if you have that much in
3 20 milligrams, then how much is in 1 gram.
4     Q.    Let me make it very simple. Safe to say
5 that you did not use the calculation that Blount
6 used?
7     A.    That's safe to say because it's unclear
8 how Blount did her calculation. We've looked at it,
9 and I would need to talk to Blount. It doesn't
10 provide the information I believe necessary to do
11 that.
12     And it's PLM. It's not TEM. You can't
13 take how do you calculate how much apple is there if
14 you're using an orange type thing. It's totally two
15 different calculations.
16     Q.    Well, let me ask you this. In your
17 calculation do you have to determine the efficiency
18 ratio of your ability to separate the amphiboles from
19 the talc?
20     A.    No.
21     Q.    Why not?
22     A.    That has nothing to do with the
23 calculation. We're only -- we're calculating what we
24 have found, not what potentially is there. That's an
25 unknown.

## 59

1     Q.    Well, do you agree that Blount's
2 calculation addressed an efficiency ratio?
3     A.    She did.
4     Q.    Okay. So another thing that is different
5 from Blount's method is you have not used her
6 calculation for determining fibers per gram; is that
7 correct?
8     A.    We have not used her PLM calculation. It
9 has no bearing on TEM. At some point, if we could do
10 the research and go all the way down where we say we
11 find 15 million per gram and may in fact be 30
12 million per gram, if you start looking at the
13 efficiency of it.
14     But I just don't think that is applicable
15 here because she's doing this an on optical
16 microscopy level; we're doing it on a TEM level. I
17 just don't believe that's valid, what she's doing,
18 how repeatable that is over and over and over and you
19 really know what you're starting with on how many
20 fibers per milligram you have.
21     Q.    Also, Blount recommended that you use an
22 index of refraction of 1.584. Is that purely for PLM
23 purposes?
24     A.    Yes.
25     Q.    Okay.

## 60

1     A.    There's no light in the transmission
2 electron microscope. It's all electrons.
3     Q.    Okay. What about your method is identical
4 to her method?
5     A.    Identical? Since we changed the method,
6 there's not much identical to it because we're using
7 two different counting methods.
8     Her name gets on here as the Blount method
9 because at least she's the first person to publish
10 using heavy density liquid material and analyzing
11 cosmetic talc. I mean, others have done this. Even
12 R. J. Lee, when they issued a report -- a TEM report,
13 called it the Blount method. They didn't do an
14 identical method, and they called it the Blount
15 method.
16     You know, and Pooley proposed it; he just
17 called it a heavy density liquid method. When the
18 Colorado School of Mines proposed using this for
19 cosmetic talc, they just called it the heavy liquid
20 density method. Maybe that would have been better
21 and we could eliminate at least 15 minutes of
22 cross-examination at trial.
23     Q.    After performing the heavy density
24 separation method that you used, what percentage of
25 the material remaining after separation is an

**Page 185**

C E R T I F I C A T E

STATE OF GEORGIA:
COUNTY OF GWINNETT:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 184 represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

This, the 6th day of July 2018.

_____
DEBRA R. LUTHER, B-881
Georgia Certified Court Reporter

Atlanta Reporters, Inc.   866-344-0459   www.atlanta-reporters.com

**Page 186**

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Atlanta Reporters, Inc. Atlanta Reporters was contacted by King & Spalding, LLP, to provide court reporting services for the deposition. Atlanta Reporters will not be taking this deposition under any contract that is prohibited by OCGA 15-14-37(a) and (b).

Atlanta Reporters has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Atlanta Reporters will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____
DEBRA R. LUTHER, B-881
Georgia Certified Court Reporter

Atlanta Reporters, Inc.   866-344-0459   www.atlanta-reporters.com

**Page 187**

DEPOSITION OF WILLIAM E. LONGO, PhD /DRL

I do hereby certify that I have read all questions propounded to me and all answers given by me on the 27th day of June 2018, taken before Debra R. Luther, and that:

_____ 1) There are no changes noted.
_____ 2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____

Atlanta Reporters, Inc.   866-344-0459   www.atlanta-reporters.com

**Page 188**

DEPOSITION OF WILLIAM E. LONGO, PhD /DRL

Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____
Page No. _____ Line No. _____ should read: _____
_____

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

_____
WILLIAM E. LONGO, PhD

Sworn to and subscribed before me,

This, the _____ day of _____ 20____.

_____
Notary Public
My commission expires: _____

Atlanta Reporters, Inc.   866-344-0459   www.atlanta-reporters.com