# Exhibit 109

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

IN RE: JOHNSON & JOHNSON TALCUM :     Civil Action No. 3:16-md-2738-MAS-RLS
POWDER PRODUCTS MARKETING,   :
SALES PRACTICES AND PRODUCTS   :
LIABILITY LITIGATION             :
_____ :

**EXPERT REPORT\*
DAVID A. KESSLER, M.D.**

Submitted November 15, 2023

\* This Amended Report should substitute for my 2018 report.

1

# TABLE OF CONTENTS

I.    QUALIFICATIONS AND INTRODUCTION .......................................................1

II.   COSMETIC MANUFACTURERS HAVE A RESPONSIBILITY TO SUBSTANTIATE
      THE SAFETY OF THEIR PRODUCTS PRIOR TO MARKETING ................................8

      A. The regulatory standards for cosmetics..............................................................8

      B. The standards in the cosmetic industry to substantiate the safety of cosmetic products...12

      C. Defendants' statements that cosmetic manufacturers have responsibility to substantiate
         the safety of their product...........................................................................14

      D. Modernization of Cosmetic Regulation Act of 2022 (MoCRA) ............................17

III.  DEFENDANTS DID NOT SUBSTANTIATE THE SAFETY OF THEIR TALCUM
      POWDER PRODUCTS IN LIGHT OF QUESTIONS ABOUT ASBESTOS, NON-
      ASBESTIFORM AMPHIBOLES, AND FIBROUS TALC IN THEIR PRODUCT .........18

      A. Asbestos is a known carcinogen....................................................................19

           i.  No safe threshold for asbestos ...............................................................21

      B. Definition of asbestos ................................................................................22

      C. The safety of nonasbestiform amphibole was and still has not been established.............22

           i.  Geological relationships between asbestos and talc ................................22

           ii. Distinguishing asbestos, non-asbestiform amphiboles and talc .............................30

IV.   IN LIGHT OF LABORATORY TEST FINDINGS CONDUCTED BY, PROVIDED TO,
      OR MADE AVAILABLE TO JNJ, BEGINNING IN AT LEAST THE EARLY 1970S,
      JNJ COULD NOT SUBSTANTIATE THE SAFETY OF ITS TALCUM POWDER
      PRODUCTS AND SHOULD HAVE NOT SOLD ITS PRODUCTS................................45

      A. From the 1950s through the 2000s, JNJ received and acknowledged reports from
         affiliated and non-affiliated laboratories identifying or suspecting the presence of
         naturally occurring mineral silicate fibers of the serpentine and amphibole series
         including, but not limited to, tremolite fibers, actinolite fibers, anthophyllite fibers,
         amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform
         amphibole in talc sample .............................................................................46

V.    THE DEFENDANTS DID NOT SUBSTANTIATE THE SAFETY OF THEIR PRODUCT
      IN LIGHT OF QUESTIONS RAISED BY SCIENTIFIC EPIDEMIOLOGICAL STUDIES
      AND REVIEWS CONCERNING THE SAFETY OF TALC ............................................58

      A. FDA's 2014 Citizen's Petition Response stated there was some evidence to suspect or
         question the safety of talcum powder products ...............................................59

      B. The International Association for Research on Cancer (IARC) concluded that there was
         evidence of talcum powder's carcinogenicity. ...............................................66

      C. Defendants failed to substantiate the safety of their talcum powder products.................67

VI.   ALTHOUGH CONTROVERSIES AND COMPLEXITIES EXISTED, JNJ  DEFENDED
      ITS PRODUCT DESPITE SIGNIFICANT QUESTIONS REGARDING ITS SAFETY
      AND PUT THE PUBLIC AT RISK ...................................................................67

A. JNJ recognized iconic nature of their product .................................................... 67

B. JNJ was in possession of evidence and/or had concerns regarding asbestos and the safety of its product beyond what is discussed above ................................................. 68

C. JNJ failed to report to the FDA that laboratory tests found evidence of naturally occurring mineral silicate fibers of the serpentine and amphibole series. In my opinion, that failure misled the FDA over the last half a century .................................................... 73

D. JNJ defended its products to health agencies by representing that its products were asbestos-free and safe ........................................................................................ 76

   i.  JNJ attempted to remove talc from NTP list of carcinogenic substances ............... 76

   ii. JNJ attempted to preempt IARC's designation of talc as carcinogenic and didn't update MSDS based on the IARC designation ........................................... 80

   iii. JNJ attempted to prevent actions by Health Canada to remove talcum powder products from the market ....................................................................... 85

E. JNJ through CTFA created the impression beginning in 1976 that changes in testing resolved the asbestos controversy in talc; yet JNJ claimed its testing never found asbestiform particles .......................................................................................... 88

F. JNJ defended its product by representing that there could be safe levels of asbestos when there was no known threshold .............................................................................. 91

G. JNJ opposed testing methods that would improve the sensitivity of their testing and reduce the number of false negatives .................................................................. 93

H. JNJ had evidence that existing methods could lead to false negative results or other irregularities that could result in negative test records ...................................... 96

I.  JNJ failed to recognize and mitigate the potential risks of fibrous talc ......................... 100

J.  JNJ implemented laboratory testing methods that had criteria that risked missing positive results of asbestos. ............................................................................................ 101

K. JNJ's approach to the asbestos issue in talc was to initiate studies only as required by confrontation .................................................................................................... 103

L. JNJ created confusion and doubt when the safety of their product was brought into question ............................................................................................................ 104

M. JNJ Misled doctors ........................................................................................... 105

N. JNJ Described Scientists as "Antagonistic Personalities" ......................................... 106

O. JNJ continues to mislead the public via their website www.factsabouttalc.com ........... 107

P. Conclusion ......................................................................................................... 109

VII. JNJ had an available alternative to talcum powder in cornstarch and had evidence of that in the 1970's ........................................................................................................ 109

VIII. JNJ BABY POWDER LABEL AND LABELING WAS FALSE AND MISLEADING . 113

IX.    SUMMARY OF OPINIONS ....................................................................... 116

**SCHEDULE**[1]

SCHEDULE I: EPIDEMIOLOGICAL LITERATURE TABLE..............................................123

**APPENDICES**

APPENDIX A: RESUME ....................................................................................155

APPENDIX B: PRIOR TESTIMONY...................................................................180

APPENDIX C: MATERIALS CONSIDERED ......................................................184

---

[1] The schedules were prepared by legal staff at my direction and under my review.

## I.      QUALIFICATIONS AND INTRODUCTION

1.      My name is David A. Kessler, M.D. I received my M.D. degree from Harvard Medical

School in 1979 and my J.D. degree from the University of Chicago Law School in 1978.

2.      I did my pediatrics training at Johns Hopkins Hospital.

3.      In 1990, I was appointed by President George H. W. Bush as Commissioner of the United

States Food and Drug Administration ("Commissioner") and was confirmed by the United States

Senate. I also served in that position under President William Jefferson Clinton until February

1997.

4.      I am currently professor of Pediatrics and Epidemiology, and Biostatistics at University

of California, San Francisco.

5.      From January 20, 2021-January 19, 2023, I served as Chief Science Officer of the United

States Covid-19 Response and co-led what was known as Operation Warp Speed (subsequently

known as the Counter Measures Acceleration Group (CAG)).

6.      I have taught food and drug law at Columbia University Law School, and I have testified

many times before the United States Congress on food, drug, and consumer protection issues

under federal and state law. Over the last thirty years, I have published numerous articles in

legal, medical, and scientific journals on the federal regulation of food, drugs, and medical

devices. I have had special training in pharmacoepidemiology at Johns Hopkins Hospital.

7.      My resume is attached as Appendix A. A list of cases in which I have testified as an

expert witness in the last ten years, and documentation of my expert witness fee, is attached as

Appendix B.

8.      As Commissioner, I had ultimate responsibility for implementing and enforcing the

United States Food, Drug, and Cosmetic Act (the "Act"). I was responsible for overseeing five

Centers within the FDA. They included, among others, the Center for Drug Evaluation and Research, the Center for Devices and Radiological Health, the Center for Food Safety and Applied Nutrition which regulated cosmetics, and the Center for Biologics Evaluation and Research. In addition to those duties, I placed high priority on getting promising therapies for serious and life-threatening diseases to patients as quickly as possible. During my tenure as Commissioner, the FDA announced a number of new programs including: the regulation of the marketing and sale of tobacco products to children; nutrition labeling for food; user fees for drugs and biologics; preventive controls to improve food safety; measures to strengthen the nation's blood supply; and the MEDWatch program for reporting adverse events and product problems. I created an Office of Criminal Investigation within the Agency to investigate suspected criminal violations of the Act, FDA regulations and other related laws. While I was Commissioner, I attempted to institute a voluntary reporting system of adverse events from cosmetics. The cosmetic industry, through its association, vigorously opposed such regulation.

9.      Over the past forty years, I have published numerous articles in legal, medical, and scientific journals on the FDA federal regulation.

10.     I have served as senior advisor to TPG Capital, a leading global private equity firm, which owns pharmaceutical and biomedical companies. I served on the board of Aptalis Pharma, Stoke Pharmaceuticals, Tokai Pharmaceuticals and the medical device and biologics company Immucor, Inc. In these advisory and fiduciary capacities, I have advised companies on the standards and duties of care within the pharmaceutical and medical device industry. I also chaired the compliance committee of Aptalis Pharma, and currently chair the quality committee at Immucor, Inc., which involves ensuring compliance with the FDA's regulations and requirements.

2

11.     I have served as a consultant/staff to the United States Senate Labor and Human

Resources Committee and was responsible for, among other things, FDA issues.

12.     I have had access to 1) MDL discovery repository; 2) deposition transcripts and exhibits;

3) trial testimony and exhibits; 4) all of the documents available on Johnson & Johnson's (JNJ)

website Review the Evidence page of https://www.factsabouttalc.com;[2] 5) FDA's website.

13.     The documents I have considered are listed in Appendix C.

14.     At my request, and subject to my directions and review, the attached Schedules were

prepared by legal staff.

15.     Based on my review of the documents listed in Appendix C, and utilizing methods I have

used while at FDA, academia, and on boards of corporate entities, including my training and

experience, I have a number of opinions that are detailed below.

16.     It is my understanding that the cases in this litigation include, but are not limited to, the

following claims[3] as they relate to talcum powder products:

     a.      Negligence;

     b.      Negligent Misrepresentation;

     c.      Strict Products Liability – Failure to Warn;

     d.      Strict Product Liability – Defective Manufacture and Design;

     e.      Breach of Express Warranties;

     f.      Breach of Implied Warranty of Merchantability;

     g.      Breach of Implied Warranty of Fitness for a Particular Purpose;

     h.      Fraud;

---

[2] https://jjcloud.ent.box.com/s/2x692lcj24crvjunf0lnu590zw5g528e
[3] It is my understanding that a Motion to Amend the Complaint is currently pending. Should the Court amend the Complaint as proposed, this will not affect my opinions within this report.

      i.      Fraudulent Concealment;

      j.      Violation of Consumer Protection Laws;

      k.      Civil Conspiracy;

      l.      Loss of Consortium;

      m.      Punitive Damages;

      n.      Discovery Rule and Tolling;

      o.      Wrongful Death;

      p.      Survival Action.[4]

17.    It is my understanding the Defendants in this case are Johnson & Johnson; Johnson & Johnson Consumer Inc. f/k/a Johnson & Johnson Consumer Companies, Inc.; Imerys Talc America, Inc., f/k/a Luzenac, Inc., f/k/a Rio Tinto Materials, Inc.; and Personal Care Products Council ("PCPC") f/k/a Cosmetic, Toiletry, and Fragrance Association ("CTFA").   Use of any individual Defendant name is meant to reflect the totality of Defendants.

18.    It is my understanding that the products at issue in this matter include JNJ's talcum powder products, including Johnson's Baby Powder and Shower to Shower.

19.    It is my understanding that the talc that went into these products was mined at[5]:

| 1946-1964 | Val Chisone, IT | 2000-2001 | Argonaut Rainbow Hamm (Windham) |
| 1964-1966 | Hammondsville, VT Val Chisone, IT | 2001-2003 | Argonaut |
| 1966-1979 | Hammondsville | 2003-2009 | Zhizhua quarry Guping quarry Huamei mine Shang Lang quarry Tongzi quarry |

---

[4] See Plaintiffs First Amended Master Long Form Complaint and Jury Demand for MDL 3:16-md-2738-FLW-LHG, Dkt. 132 filed March 16, 2017.

[5] See Defendants Johnson & Johnson Consumer, Inc. and JNJ's Responses to Plaintiffs' Supplemental Interrogatories and Requests for Production of Documents Dated November 10, 2017, at 12-13.

| 1980 | Hammondsville Val Chisone, IT | 2009-2010 | Zhizhua quarry |
|------|-------------------------------|-----------|----------------|
| 1981-1988 | Hammondsville | 2010 | Argonaut |
| 1989-1990 | Hammondsville Argonaut Rainbow | 2010-Present | Zhizhua quarry |
| 1990-2000 | Hammondsville Argonaut Rainbow Hamm (Windham) | | |

20.     The plaintiffs in this case consist of all current plaintiffs in or subsequently added to
MDL No. 3:16-md-2738-FLW-LHG.  It is my understanding that the plaintiffs in this litigation
have been diagnosed with various forms of ovarian cancer, including ovarian cancer, cancer of
the fallopian tube, and primary peritoneal cancer.[6]

21.     Talcum powder products can be regulated as either drugs or cosmetics depending on their
intended use and the claims that are made for the product.  Talc may also be used as an inactive
ingredient in a number of regulated products.  It has also had certain historical uses as a food and
color additive and in medical devices.  It is my understanding that the products at issue in this
matter have been regulated as cosmetic.

22.     My opinions in this case focus on the responsibilities of cosmetic manufacturers,
focusing on the regulatory interface between cosmetic manufacturers and the FDA, as well as
industry standards. I have not been asked to opine on causation issues.  I have been asked to
address the duties and conduct of defendant cosmetic companies in the face of a potential health
hazard.  In formulating my regulatory and safety opinions in this case, reviews of the
epidemiology, laboratory testing methodology, chemical and geological relationship between talc

---

[6] *See* Plaintiffs First Amended Master Long Form Complaint and Jury Demand for MDL 3:16-md-2738-FLW-LHG,
Dkt. 132 filed March 16, 2017.

and asbestos, health consequences with asbestos and elongated mineral particles, and product formulation and manufacturing were performed. The approach and methods utilized here are consistent with those I have taken to address regulatory questions in academia, my work as a government official, and as a board member advising corporate entities for over forty years.

23.    The following is a general timeframe of events:

23.1.    In 1894, Johnson & Johnson first marketed talcum powder products.[7]

23.2.    In the 1930's, scientists began exploring the geological formation and relationship between asbestos and talc. [8]

23.3.    By the mid-1950's, asbestos was recognized as a human carcinogen. Over the next two decades, it was generally agreed that there was no known safe level of asbestos exposure.[9]

23.4.    In the early 1960's, inert particles were shown to be capable of ascending through the open human female reproductive tract to the ovaries and peritoneal cavity.[10]

23.5.    By the early 1970's, concern was expressed about the presence of asbestos and other fibers in talc. Laboratory tests began to report asbestos fibers in talc products. Asbestos was identified in human lung tissue. Shortly thereafter, talc was identified in human ovarian tissue.[11]

23.6.    By the early 1980's, the first epidemiological study demonstrated an association between perineal talcum powder use and ovarian cancer.[12]

---

[7] https://ourstory.jnj.com/ accessed 11/14/2023.
[8] Bain, G.W. 1934, Serpentinization, origin of certain asbestos, talc and soapstone depositions. Economic Geology v. 29, no. 4, 397-400.
[9] Doll R. 1955a. Mortality from lung cancer in asbestos workers. Br J Ind Med 12: 81-86.
[10] Egli & Newton. 1961. "The Transport of Carbon Particles in the Human Female Reproductive Tract." Fertility and Sterility 12 (April): 151-55.
[11] *See* Section IV. of this report. Henderson, et al. *A replication technique for the identification of asbestos fibres in mesotheliomas*. Eur J Cancer (1969) DEC;5(6:621); Henderson, et al. *Talc and Carcinoma of the Ovary and Cervix*. The Journal of Obstetrics and Gynecology of the British Commonwealth March 1971 Vol. 78. Pp. 266-272.
[12] Cramer et al. Ovarian cancer and talc: a case-control study. Cancer 1982; 50:372-6.

23.7.    Over the next four decades, additional epidemiological studies were performed, continuing to raise concerns about an association between talc and ovarian cancer.[13]

23.8.    In 2010, IARC published findings that talc not containing asbestiform fibers was a Group 2B possible human carcinogen. In 2012, IARC confirmed all six forms of asbestos, including fibrous talc (i.e., talc containing asbestiform fibers), as Group 1 known human carcinogens.[14]

23.9.    In 2019, FDA found asbestos and fibrous talc in a bottle of Johnson's Baby Powder. That resulted in a lot recall.[15]

23.10.    In 2020, Johnson & Johnson discontinued North American sales of talcum powder products. In 2023, Johnson & Johnson stopped the global sale of talcum powder products.[16]

24.    Based on my recollection, I was not substantially involved in talc cosmetic matters while I was Commissioner.

25.    On November 16, 2018, I submitted an opening expert report.  Since that time, and after leaving government service in January 2023, I have had the opportunity to review more documents discussed above.  For convenience, I now submit this report which includes my cumulative opinions.  Formally, this amended report should substitute for my 2018 report.

---

[13] *See* Section V. of this report.
[14] IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. "Carbon Black, Titanium Dioxide, and Talc." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans/World Health Organization, International Agency for Research on Cancer 93 (2010): 1-413; IARC Monographs of the Evaluation of Carcinogenic Risks to Humans: Volume 100C," 2012.
[15] https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos
[16] https://www.jnj.com/our-company/johnson-johnson-consumer-health-announces-discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada.

II.  **COSMETIC MANUFACTURERS HAVE A RESPONSIBILITY TO
     SUBSTANTIATE THE SAFETY OF THEIR PRODUCTS PRIOR TO
     MARKETING**

    A.  **The regulatory standards for cosmetics**

III.  Unlike drugs, the Federal Food, Drug, and Cosmetic Act does not require the premarket approval of cosmetics.

27.  FDA promulgated regulations on March 3, 1975, which remain in effect today that require that, "[e]ach ingredient used in a cosmetic product and each finished cosmetic product shall be adequately substantiated for safety prior to marketing." 21 CFR §740.10.

28.  The regulations further state that, "[a]ny such ingredient or product whose safety is not adequately substantiated prior to marketing is misbranded unless it contains the following conspicuous, statement on the principal display panel: Warning-The safety of this product has not been determined." 21 CFR §740.10.

29.  A manufacturer who has not adequately substantiated the safety of their cosmetic product or their ingredients and has not displayed the appropriate warning as noted above cannot ship their product in interstate commerce and would be considered misbranded under the Act. 21 USC §331(a).

30.  In reality, most cosmetic manufacturers who are selling a product for which they could not substantiate the safety would likely not choose to put the "Warning-The safety of this product has not been determined" on the product and would attempt to reformulate or remove the product from the market.

31.  In addition, a manufacturer of a cosmetic product must assure that the cosmetic's label "shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." 21 CFR §740.10.

32.     The regulations also state that, "[a]n ingredient or product having a history of use in or as a cosmetic may at any time have its safety brought into question by new information that in itself is not conclusive. The warning required by paragraph (a) of this section is not required for such an ingredient or product If: (1) The safety of the ingredient or product had been adequately substantiated prior to development of the new information; (2) The new information does not demonstrate a hazard to human health; <u>and</u> (3) Adequate studies are being conducted to determine expeditiously the safety of the ingredient or product."[17] 21 CFR §740.10(b) [emphasis added].

33.     A cosmetic is adulterated if it bears or contains, "any poisonous or deleterious substance which may render it injurious to users." 21 USC §361.

34.     In my opinion, of all the products that fall under FDA's jurisdiction, cosmetics are among the least regulated.  This is reflected in the fact that there is no premarket approval of cosmetic products.

35.     Moreover, only very limited resources have ever been committed to cosmetic product review, monitoring, or safety.

36.     The limited oversight of cosmetics products has been recognized.

37.     In 1978, the United States General Accounting Office (GAO) "concluded that the effectiveness of FLN'S regulatory actions was limited by inadequacies in both FDA'S legislative authority and the industry's participation."[18]

38.     In March 1990, the GAO reported to the Subcommittee on Regulation, Business

---

[17] The regulation continues, this requirement ". . . does not constitute an exemption to the adulteration provisions of the act or to any other requirement in the act or this chapter." 21 USC 740.10(c).

[18] Cosmetics Regulation. Information on Voluntary Actions Agreed to by FDA and the Industry. (GAO/HRD-90-58, Mar. 1990), citing Lack of Authority Hampers Attempts to Increase Cosmetic Safety. (GAO/HRD-78-139, Aug. 1978).

Opportunities, and Energy that the "FDA's regulatory authority over the cosmetics industry is less comprehensive than its authority over food and drugs. Consequently, in its oversight of the cosmetics industry, FDA must rely, in part, on voluntary industry cooperation . . . FDA does not have authority to require the industry to do safety testing and injury reports. FDA must rely on manufacturers to volunteer the data and reports. FDA officials have found that many manufacturers lack adequate data on safety tests and have generally refused to disclose the results of these tests . . . Finally, FDA has been studying the industry report on toxic chemicals used in cosmetics, but has committed no resources to do its own safety reviews and ranking."[6]

39.     In their 2017 article, Robert Califf, et al. wrote, "[t]he debate about regulation of the cosmetics industry to protect the public health has gone unresolved for more than a century . . . The challenge for regulators is daunting; the global cosmetics industry is enormous, with an expected $265 billion in revenue in 2017. The Office of Cosmetics and Colors within the FDA's Center for Food Safety and Applied Nutrition [CFSAN] is tiny in contrast and, with a budget of around $13 million for Fiscal Year 2017, chronically underfunded, even considering its limited responsibilities and scope of authority . . . History has repeatedly shown that when there is insufficient regulatory oversight, a few unscrupulous people or companies will exploit the vulnerable public for profit . . . [a]lthough FDA oversight of drugs and medical devices has been substantially strengthened by later legislation, the lack of similar enhancements for cosmetics means that the cosmetic industry remains largely self-regulated . . .For cosmetics—and for dietary supplements—the FDA's oversight authority remains stuck at the levels established in 1938, nearly 80 years ago . . . The FDA is vastly underresourced for even the very limited

responsibility it currently has for the safety of cosmetics."[19]

40.      In 2017, Kwa, et al. wrote, "[b]etter cosmetic surveillance is needed given their ubiquity and lack of a premarket approval pathway. Unlike devices, pharmaceuticals, and dietary supplements, cosmetic manufacturers have no legal obligation to forward adverse events to the FDA; CFSAN reflects only a small proportion of all events. The data suggest that consumers attribute a significant proportion of serious health outcomes to cosmetics. The lack of high-quality data leads to reactionary responses by the FDA subject to consumer pressure."[20]

41.      In July 2018, Senators Dianne Feinstein and Susan Collins wrote in the Journal of the American Medical Association, "[t]here is no other class of products so widely used in the United States with so little regulation . . . [t]he lack of oversight is a broad threat to public health. . . As a result, US companies that market personal care products largely determine their own safety standards."[21]

42.      On November 11, 2008, Anna Prilutsky, then Senior Director Research & Development at Johnson & Johnson, sent a PowerPoint from Lori Dolginoff, then Director, Global Communications at JNJ, containing "the latest version of the content for the Pure Truth website" which stated on a slide titled "Ingredients in JOHNSON's Baby products" that there is "[l]imited role of FDA."  JNJ000367482-3.

43.      In a December 2013 PowerPoint presentation, Defendant Imerys stated "[c]osmetics are different from foods and drugs and are governed by much looser regulation . . . Companies are in

[19] Califf, Robert M., Jonathan McCall, and Daniel B. Mark. "Cosmetics, Regulations, and the Public Health: Understanding the Safety of Medical and Other Products." JAMA Internal Medicine 177, no. 8 (August 1, 2017): 1080–82. https://doi.org/10.1001/jamainternmed.2017.2773.
[20] Kwa, Michael, Leah J. Welty, and Shuai Xu. "Adverse Events Reported to the US Food and Drug Administration for Cosmetics and Personal Care Products." JAMA Internal Medicine 177, no. 8 (August 1, 2017): 1202–4. https://doi.org/10.1001/jamainternmed.2017.2762.
[21] Feinstein, Dianne, and Susan Collins. "The Personal Care Products Safety Act." JAMA Internal Medicine 178, no. 5 (May 1, 2018): 601–2. https://doi.org/10.1001/jamainternmed.2018.0064.

charge of performing the analysis and conforming to the standards. The FDA requires no prior testing for cosmetic products." IMERYS 068497.

44.    A 2009 JNJ memorandum regarding "Cosmetics Regulation" stated that "the oversight of the FDA is secondary to individual company responsibility to self-regulate in meeting these standards." JNJTALC00494340.

45.    The memorandum continued, "[v]oluntary self-regulation of the cosmetics industry in the United States is not working. Consumers deserve a government that protects them from unsafe chemical exposures in the cosmetics they use every day." JNJTALC000494340 at 49.

46.    In my opinion, a cosmetic manufacturer has a responsibility to substantiate the safety of their product or must warn consumers that the safety of their product has not been determined or not sell the product.

47.    In my opinion, in addition, if a health hazard <u>may be associated</u> with the product, a cosmetic manufacturer must include a warning on their product.

### B.    The standards in the cosmetic industry to substantiate the safety of cosmetic products

48.    Defendants have been long standing members of the Personal Care Products Council (formerly the CTFA). Deposition of Mark Pollack, August 29, 2018. 44:7-45:6; 62:15-64:2; 105:13-18; 110:12-21; 128:10-21; Prepared Statement of Pamela G. Bailey, President Personal Care Products Council, May 14, 2008, United States House of Representatives Committee on Energy and Commerce.

49.    The CTFA established the Cosmetic Ingredient Review in 1976. "The Cosmetic Ingredient Review (CIR) was established in 1976 by the industry trade association with the participation of the U.S. Food and Drug Administration and the Consumer Federation of America. The CIR is the industry funded panel that reviews the safety of the ingredients used in

cosmetics today. Its meetings are open to the public and its findings and minutes are publicly available on its website." FLDI Primer on Cosmetic Regulation, P. 12, PCPC_MDL00000998 at 1012.

50.     According to the CIR, the purpose of such review is " to determine those cosmetic ingredients for which there is a reasonable certainty in the judgment of competent scientists that the ingredient is safe under its conditions of use." [emphasis added] CIR Procedures Report June 2018, at 3.

51.     The CIR has stated, "'Safe' or 'safety' means no evidence in the available information that demonstrates or suggests reasonable grounds to suspect a hazard to the public under the conditions of use that are now current or that might reasonably be expected in the future, e.g., a low incidence of minor adverse reactions (as shown in animal or human testing or product experience). Such information includes, but is not limited to, the chemical structure of the ingredient, published and unpublished tests on the ingredient and products containing the ingredient, significant human experience on products containing the ingredient during marketing, and information on similar or related substances. A lack of information about an ingredient shall not be sufficient to justify a determination of safety." [emphasis added] CIR Procedures Report June 2018, at 2.

52.     Executive Vice President and Legal and General Counsel Elizabeth H. Anderson and Associate General Counsel Farah K. Ahmed of the Personal Care Products Council authored the 2012 Food and Drug Law Institute's Primer on the Cosmetic Regulatory Process which states, "[c]osmetics are not subject to premarket approval by the Food and Drug Administration (FDA), but the product and ingredients must be tested for safety. If the manufacturer cannot substantiate safety, a warning is required . . . The 'intended use' doctrine states that cosmetic or drug status is

13

determined by claims about the intended use of the product." PCPC_MDL00000998 at 1004.

53.      In my opinion, consistent with FDA regulations and statutes, a cosmetic manufacturer under the cosmetic industry standards must assure the safety of their ingredients.  It is the responsibility of the cosmetic manufacturer to assure that there is reasonable certainty in the judgment of competent scientists that the product is safe.  Safe as defined by the industry standards means "no evidence in the available information that demonstrates or suggests reasonable grounds to suspect a hazard to the public under the conditions of use that are now current or that might reasonably be expected in the future . . .." Cosmetic Ingredient Review Procedures, October, 2010/June 2018 Part A – General, Section 1. Definitions. (m).

54.      Thus, in my opinion, manufacturers have a responsibility to assure that there is reasonable certainty there is no evidence to suspect their cosmetic may pose harm.  Furthermore, in my opinion, if there is evidence that there are reasonable grounds to suspect that the cosmetic product may pose harm for the proposed conditions of use, such product does not meet the industry standards for safety.

   **C.      Defendants' statements that cosmetic manufacturers have responsibility to substantiate the safety of their product.**

55.      On January 26, 1994, Dr. Stephen D. Gettings, Director-Toxicology of the CTFA sent a final draft of a manuscript for presentation at a symposium [22] to the "Talc Interested Party Task Force," which included Dr. William Ashton and Michael Chudkowski (both at JNJ), as well as Dennis Christensen and Richard Zazenksi (both at Luzenac America, Inc., now Imerys).  Dr. Gettings thanked the Talc Interested Party Task for members "for all your help" and stated he still had questions that he needs answered before he gives the presentation. In the attached

---

[22] The symposium, "Workshop on Talc: Consumer Uses and Health Perspectives" was held on January 31, 1994, at the National Institutes of Health.  IMERYS_00057325.

manuscript, Dr. Gettings stated, "In the United States, the safety of cosmetic ingredients and finished formulations must be substantiated by manufacturers. Raw material suppliers also bear a responsibility for the safety substantiation of ingredients they supply to the cosmetic industry since Section 201(i) of the FD&C Act defines 'cosmetic' to include articles used as components of cosmetic products (21 U.S.C. 321(i))." IMERYS-A_0005946.

56.     Dr. Gettings further stated, "The talc industry has a moral and legal responsibility to supply products that can be used safely . . . Talc facilities engaged in the manufacture of USP, FCC, or CRFA-grade talc products are subject to the general provisions of the FDC&C Act and are prohibited from introducing adulterated articles into interstate commerce . . ." IMERYS-A_0005946.

57.     In a June 24, 2003, PowerPoint, JNJ stated that Johnson's Baby products are "assessed for safety based on the intended use." JNJTALC000777136.

58.     On November 11, 2008, in the aforementioned email and PowerPoint presentation sent by Anna Prilutsky, Senior Director Research & Development at JNJ, Ms. Prilutsky stated,  "The FDA requires an ingredient declaration on the product's packaging to enable you  to make informed purchasing decisions . . . The FDA also requires that each ingredient used in personal care products and each finished product be adequately substantiated for safety prior to marketing. FDA regulations do not have prescriptive tests that manufacturers are required to follow to substantiate safety.  The responsibility for determining and conducting appropriate tests to substantiate safety is that of the manufacturer.  Furthermore, if the safety is not substantiated, the label must bear the statement: *Warning – The safety of this product has not been  determined.*" JNJ000367482-3.

59.     The same PowerPoint continued, "Our baby products are composed of a variety of ingredients obtained from reputable, trusted suppliers.  We hold these suppliers to high standards

of material safety, purity and quality based on our best for baby standards. The safety and quality of these materials are critical to the success – how well they meet your needs – and safety of the final products.  When we acquire raw materials and active ingredients from our suppliers, we don't simply take their word for the safety of ingredients. We rely on validated scientific proof of safety for individual ingredients and finished products. Every lot of every raw material is evaluated before it is released for use in any finished product. And we ensure that all ingredients comply fully with regulations in all countries where our baby products are sold." JNJ000367483.

60.     In a June 1, 2010, PowerPoint presentation, sent by David Stanavage, then Senior Product Director, JNJ and Kathleen Wille, Manager, Regulatory Affairs, JNJ and meant to address concerns raised by retailer Walmart about what was "best for baby" and stated that it "assessed each ingredient that we consider for use in our personal care products for baby."  JNJ 000438939-41.  The PowerPoint continues, "[a]ll final baby product formulations are comprehensively assessed for safety . . . Johnson's Brand is responsible for the ethical management of health, safety, and environmental aspects of our products through their total lifecycle."  JNJ 000438939-41.

61.     The PowerPoint continued, "the FDA has limited resources and enforces according to the risk to public health.  The FDA does not pre-approve personal care product labeling prior to marketing.  It is the manufacturer's responsibility to ensure that labeling is accurate.  We follow strict rules for nomenclature to ensure an accurate representation of the contents of our products." JNJ 000438941.

62.     On October 15, 2012, Lorena Telofski testified on behalf of Johnson & Johnson that Johnson & Johnson goes "through a process to substantiate safety for the present use.  If it doesn't meet the threshold of safety for present use, it is not going to go on the market."

16

201:198-23; *see* also 199:21-23.

63.    On December 16, 2014, Jay Ansell, Vice President – Cosmetics Program, Personal Care

Products Council (Formerly CTFA), sent an email stating his "primary concern" regarding the

statement in a "Frequently Asked Questions" document for the Look Good Feel Better

Program[23] that, "Cosmetic Ingredients are not required by federal or state laws to be tested for

their contributions to the risks of acquiring cancer or other adverse health conditions from long-

term use."  Ansell continued that "While it is true that Federal law does not require 'Testing',

Federal law absolutely requires the safety be substantiated.  21 CFR 740.10(a)."

PCPC_MDL00122041.

### D.    Modernization of Cosmetic Regulation Act of 2022 (MoCRA)

64.    At the end of the 117th Congress, the 102nd Session, Congress enacted the Consolidated

Appropriations Act, 2023.  As part of that omnibus appropriations, Congress enacted the

Modernization of Cosmetic Regulation Act of 2022 (MoCRA).  The implementation date for a

number of these new requirements is December 29, 2023.  FDA issued a new Guidance Document

in November 2023, announcing that, "FDA does not intend to enforce the requirements under

section 607 of the FD&C Act related to cosmetic product facility registration and cosmetic

product listing for an additional six months after the December 29, 2023, statutory deadline, or

until July 1, 2024, to provide regulated industry additional time to comply with these

requirements. In addition, FDA does not intend to enforce the registration requirement for

owners or operators of facilities that first engaged in manufacturing or processing a cosmetic

product after December 29, 2022, or the listing requirement for cosmetic products first marketed

---

[23] According to the Personal Care Products Council, the Look Good Feel Better program is offered as a collaboration of the Personal Care Products Council Foundation, the American Cancer Society, and the Professional Beauty Association that "teaches cancer patients how to cope with the appearance (related) side-effects of cancer treatment. PCPC_MDL00122043.

after December 29, 2022, until July 1, 2024." Compliance Policy for Cosmetic Product Facility Registration and Cosmetic Product Listing, Guidance for Industry, U.S. Dept. of Health and Human Services, Food and Drug Administration, Office of Chief Scientist (OCS), November 2023.

65.    While the new requirements are yet to be effective, it is important to note that the new legislation builds upon the concept of safety substantiation that currently exists in the regulation under 21 CFR 740.10. Prior to the implementation of MoCRA, 21 CFR 740.10 required companies to substantiate the safety of their product prior to marketing but, in lieu of safety substantiation, it permitted cosmetic manufacturers to label the Warning disclaimer. The new legislation requires companies to adequately substantiate that a cosmetic product is safe and maintain records to support such representations. There is no Warning that can substitute for substantiating the safety of the product.

66.    Both in the past and going forward, cosmetic manufacturers must substantiate the safety of their product.

### III.    DEFENDANTS DID NOT SUBSTANTIATE THE SAFETY OF THEIR TALCUM POWDER PRODUCTS IN LIGHT OF QUESTIONS ABOUT ASBESTOS, NON-ASBESTIFORM AMPHIBOLES, AND FIBROUS TALC IN THEIR PRODUCT

67.    In my opinion, once JNJ had evidence of a) the presence of asbestos because of its known carcinogenicity and absence of a threshold dose; or b) the presence of non-asbestiform amphiboles or fibrous talc, the safety of their product was not established.

68.    In my opinion, beginning in the 1970's, the safety of JNJ's talcum powder products had not been substantiated, consumers were not warned of potential health risks, and there was a reasonable basis to believe that such an association between the product and health risks existed.

69.    In my opinion, beginning in the 1970's, because the safety of their product was not

established, their talcum powder products should not have been sold.

### A.    Asbestos is a known carcinogen

70.    According to the National Cancer Institute, "Asbestos has been classified as a known human carcinogen (a substance that causes cancer) by the U.S. Department of Health and Human Services (HHS), the U.S. Environmental Protection Agency (EPA), and the International Agency for Research on Cancer (IARC)."[24]

71.    According to the International Agency for Research on Cancer (IARC), "There is *sufficient evidence* in humans for the carcinogenicity of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite, and anthophyllite). All forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite, and anthophyllite) are *carcinogenic in humans*." (IARC, "Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite," p. 294).

72.    In regard to asbestos, talc containing asbestos, and talc containing asbestiform fibers (fibrous talc), IARC published Monograph 100c, which found that, "[t]here is sufficient evidence in humans for the carcinogenicity of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite, and anthophyllite). Asbestos causes mesothelioma and cancer of the lung, larynx, and ovary . . . There is sufficient evidence in experimental animals for the carcinogenicity of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite and anthophyllite). All forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite and anthophyllite) are carcinogenic to humans (Group 1)." "The conclusions reached in this Monograph about asbestos

---

[24] *See*, Agency for Toxic Substances and Disease Registry. *Toxicological Profile for Asbestos*. September 2001. Retrieved April 18, 2017, National Toxicology Program. Asbestos. In: *Report on Carcinogens. Fourteenth Edition*. U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program, 2016. U.S. Environmental Protection Agency. *Health Effects Assessment for Asbestos*. September 1984. EPA/540/1-86/049 (NTIS PB86134608). Retrieved April 18, 2017. IARC Working Group on the Evaluation of Carcinogenic Risk to Humans. Arsenic, Metals, Fibres and Dusts Lyon (FR): International Agency for Research on Cancer; 2012. (IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, No. 100C).

and its carcinogenic risks apply to these six types of fibres wherever they are found, and that includes talc containing asbestiform fibres." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 100c, 2012.[25]

73.     In 2010, IARC published Monograph 93, which found that "[t]he relative risks for ovarian cancer among users of body powder (versus non-users) were homogenous across this relatively diverse set of eight studies, each of which indicated a 30–60% increase in risk . . . Perineal use of talc-based body powder is possibly carcinogenic to humans (Group 2B)." "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 93," 2010. This monograph specifically addresses the safety of talc not containing asbestiform fibers.

---

[25] In IARC 100c published in 2012, "the Working Group noted that a causal relationship between exposure to asbestos and cancer of the ovary was clearly established, based on five strongly positive cohort studies of women with heavy occupational exposure to asbestos [references omitted]. The conclusion received additional support from studies showing that women and girls with environmental, but not occupational exposure to asbestos [references omitted] had positive, though non-significant, increases in both ovarian cancer incidence and mortality"

Since IARC's review, while published in 2012, included studies through 2009, there have been three meta-analyses regarding asbestos exposure and ovarian cancer risk:

In 2011, Camargo, et al. performed a meta-analysis of 18 cohort studies of women occupationally exposed to asbestos. "The overall pooled SMR [standardized mortality ratio] estimate for ovarian cancer was 1.77 (95% confidence interval, 1.37-2.28) . . . Our study supports the IARC conclusion that exposure to asbestos is associated with increased risk of ovarian cancer." Camargo et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. *Environ Health Perspect.* 2011;119:1211-1217.

In 2011, Reid, et al. also performed a meta-analysis to "quantify the evidence that exposure to asbestos causes ovarian cancer." . . . "Fourteen cohort and two case-controlled studies were identified. . . When all studies were included in a meta-analysis, the effect size was 1.75 (95% CI, 1.45-2.10 attenuating to 1.29 (95% CI, 0.97-1.73) in studies with confirmed ovarian cancers. The authors "suggest that the IARC decision was premature and not wholly supported by the evidence."  Reid et al. *Cancer Epidemiol Biomarkers Prev.*; 21(7) July 2011.

More recently in 2021, the German Medical Expert Advisory Board on Occupational Diseases at the Federal Ministry of Labour and Social Affairs (BMAS) conducted its own meta-analysis. This meta-analysis yielded an overall SMR of 1.88 (95% CI 1.47-2.39). "If the distinction is made according to "ovarian cancers confirmed", as in Reid et al., a pooled effect estimate of 1.89 (95% CI 1.40-2.55) is obtained for the studies without histological verification of ovarian cancer and a pooled effect estimate of 1.98 (95% CI 1.32-2.97) for those with histological confirmation of ovarian cancer.  The difference is thus negligible (p>0.8.)." Nowak, et al. *Asbestos Exposure and Ovarian Cancer – a Gynaecological Occupational Disease.* Background, Mandatory Notification, Practical Approach. Published online 2021 May 20. doi: 10. 1055/a-1361-1715.

### i.    No safe threshold for asbestos

74.    According to a Rio Tinto Minerals presentation, "Talc: Asbestos Issues and Management," "Asbestos has long been considered a human carcinogen" J&J 252.

74.1.    "Because there is no recognized 'safe' level of exposure to asbestos, the presence of any amount in talc would be a serious problem." J&J 252.[26]

75.    According to OSHA, "There is no 'safe' level of asbestos exposure for any type of asbestos fiber."[27]

76.    NIOSH, similarly, states, "Evaluation of all available human data provides no evidence for a threshold or for a 'safe' level of asbestos exposure." ("WORKPLACE EXPOSURE TO ASBESTOS Review and Recommendations," DHHS (NIOSH) Publication No. 81-103, November 1980).

---

[26] *See* also, Trial Testimony of Susan Nicholson in *Prudencio v. Johnson & Johnson*, RG20061303, June 18, 2021, at p. 964 ("Q. Are you aware of there being a safe level of exposure to asbestos? MS. BROWN: Objection. Beyond the scope. Calls for expert opinion.  THE WITNESS: Well, as an expert, I could opine on that. Our policy at Johnson & Johnson is no asbestos in our products. So our company position is no asbestos is safe"); Trial Testimony of Dr. John Hopkins in *Weirick v. Brenntag North America, Inc.*, JCCP 4647, Case No. BC656423, April 11, 2018, at p. 108-109 ("Q    Okay.  And Johnson & Johnson knows there's no safe level of asbestos exposure, especially for children, correct, sir? MR. BICKS:  Objection to the form.  No foundation. A. Again, there is no known safe level. Q. That's right.  Especially for children, correct? A. Yes."); Trial Testimony of Dr. John Hopkins in *Barden v. Brenntag North America, et. al*, MID-L-0932-17AS, July 22, 2019, at p. 48-49 (Q "Johnson & Johnson knows there is no safe level of asbestos exposure, correct? A. Scientists have not shown a safe level.  So, yeah, I would not disagree. Q. There is no known safe level of asbestos exposure, especially, for children, correct? A. Again, same answer.  There's no -- no evidence to say otherwise, so we'll assume it's correct. Q. Well, in fact, your answer, if you could go right below on Page 108, you were asked this question.  "Okay, and Johnson & Johnson knows there's no safe level of asbestos exposure, especially for children, correct, sir?" And your answer was again, "There is no known safe level," correct? A. Yes.  That's what I said. Q. And then the followup question was, "That's right, especially, for children, correct?" And you said, "yes," correct? A. That's right.  That's what I agree, yeah.").

[27] *See* Skammeritz, E. et al. "Asbestos Exposure and Survival in Malignant Mesothelioma: A Description of 122 Consecutive Cases at an Occupational Clinic." *The International Journal of Occupational and Environmental Medicine (IJOEM)*, Vol 2, No 4 October 2011., Greenberg M., Davies L, T. A. Mesothelioma Register 1967-68. *British Journal of Industrial Medicine,* 31, 91-104, 1974, Asbestos (Actinolite, amosite, anthophyllite, chrysotile, crocidolite, tremolite). World Health Organization (WHO), International Agency for Research on Cancer (IARC) Monographs on the Evaluation of Carcinogenic Risks to Humans, Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42, Supplement 7, 1998.

77.    Per the World Health Organization, "No safe level can be proposed for asbestos because a threshold is not known to exist."[28,29]

### B.    Definition of asbestos

78.    Asbestos is the generic commercial designation for a group of naturally occurring mineral silicate fibers of the serpentine and amphibole series.  These include the serpentine mineral chrysotile, and the 5 amphibole minerals – actinolite, amosite, anthophyllite, crocidolite and tremolite. IARC Monogr Eval Carcinog Risk Chem Man. 1973;2:1–181.

79.    Johnson and Johnson, from the 1960's through 2019, defined asbestos as follows:

79.1.    "Asbestos is defined to be the fibrous serpentine, chrysotile and the fibrous forms of the amphibole group as represented by amosite, anthophyllite, crocidolite, tremolite asbestos and actinolite".[30]

### C.    The safety of nonasbestiform amphibole was and still has not been established

### i.    Geological relationships between asbestos and talc

80.     According to Rio Tinto Minerals, as documented in a presentation in June 2009 titled "Analytical Capabilities and Test Methods," there are different pathways that lead to the formation of talc. They cite the following breakdown of Talc Deposit mineralization by world production (IMERYS 300644, at p. 10):

---

[28] WHO Air Quality Guidelines 2nd edition http://www.euro.who.int/document/aiq/6_2_asbestos.pdf
[29] https://www.niehs.nih.gov/health/materials/asbestos_508.pdf
[30] See 4/21/64, Johnson & Johnson Baby Products Company Material Specification for Windsor 66 Talc, Bates labeled JNJNL61_000021162 (DX7144), 1/28/77, J&J Audit Testing of Windsor 66 Talc for Asbestos, Bates Labeled J&J-0086339, 2/23/78 Letter from J&J's George Lee to R. N. Miller, Bates labeled JNJ 000285031 (J&J 159), JJCPI Authorization for Interim Specification 11/20/1989, amended 6/5/91, Bates labeled JNJMX68_0000000440, 9/23/97 Material Specification for Windsor Grade 66 Talc by Luzenac America, Inc., Bates labeled JNJAZ55_000020366, Imerys certificate of analysis dated 11/30/2017, Bates labeled JNJTALC0000580245, Imerys certificate of analysis dated 2019, Bates labeled JNJTALC001427814.

    a.    20%= Serpentine Host Rock (RTM Vermont, Ontario) Potential for serpentine asbestos

    b.    <10% = Amphibole-bearing host rock* (non-RTM; New York State) Potential for amphibole asbestos

    c.    10% = Meta-sedimentary host rock (RTM Trimouns, France)

    d.    60% = Mg-rich carbonate host rock (RTM Montana, Chinese Guangxi)

81.    According to another Rio Tinto Materials presentation, "All talc deposits have the risk of localized asbestos occurrence if isolated metamorphic events (intrusion, etc.) occur in or near the deposit." (IMERYS_422064).

82.    A September 13, 2011 presentation, titled "Fiber Management Overview," asked the question, "Can asbestos occur with talc?" The slide answered that question by stating (PLT-04451-0001, at p. 8):

    82.1.    "Talc derived from a metamorphic host rock can contain amphiboles and serpentine

    82.2.    "Ultramafic (serpentine) host rocks can contain chrysotile.

    82.3.    "All types: localized metamorphic events can produce amphiboles."

83.    At a U.S. Food and Drug Administration Public Meeting: Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc on February 4, 2020, Dr. Bradley Van Gosen from the United States Geological Survey described "the mineral fibers that can be naturally intergrown with talc and show that their presence or absence is based on the mineral deposit type, that is the geologic conditions that form the talc deposit." (U.S. Food and Drug Administration Public Meeting: Testing Methods for Asbestos in Talc And Cosmetic Products Containing Talc,.  In a slide deck and published article, Dr. Van Gosen stated,

83.1.    "Talc formation. Talc is a replacement mineral – It replaces a preexisting magnesium-rich mineral." (p.10).

83.2.    "This process can be driven by:

* Regional metamorphism (tectonics)

* Contact metamorphism (igneous intrusion)

* Circulation of magmatic hydrothermal fluids (heated by magma at depth)."

(p.10).

83.3.    "The geologic environments that form asbestos bring together magnesium and silica in solution, the same chemistry that forms talc."  (p. 9).

83.4.    In the article titled "Using the geologic setting of talc deposits as an indicator of amphibole asbestos content," Dr. Van Gosen states, "Talc deposits are products of metasomatism caused by regional metamorphism, contact metamorphism, or hydrothermal metamorphism (meteoric fluids or brines heated by distant or buried intrusion).

83.5.    "A number of U.S. talc deposits of commercial size (under past or present economic conditions) were formed by metasomatic processes driven by regional metamorphism; these large bodies consistently contain talc intergrown with amphiboles, such as tremolite and (or) anthophyllite. Debate over the asbestos mineral content (major versus trace amounts) within these talc-amphibole deposits is the result of differing interpretations of the predominant habit (asbestiform versus non-asbestiform) of the amphibole particles." (p. 920).

83.6.    "The host rock composition and process of formation determines the qualities of talc, which in turn affects the industrial applications of a particular deposit. The grain size and shape, color, and purity of talc influence its uses (Piniazkiewicz et al. 1994).

83.7.   "In addition, the talc-forming mechanism – hydrothermal processes, contact metamorphism, or regional metamorphism – directly influenced the ultimate amphibole content of the talc ore body, described below through examples. Within a single mineral deposit, such as some talc ore bodies, amphibole crystals may range in habit from blocky to prismatic to acicular to asbestiform." (p. 922).

83.8.   "Talc deposits in Vermont are typical "black wall" deposits, formed by regional metamorphism and metasomatism of ultramafic rocks, originally composed of dunite or peridotite.

83.9.   "These deposits form as zoned alteration "rinds" around ultramafic bodies; the altered zones can be 6.5 km or more long and 460 km wide (Cady and others 1963)" (p. 933).

83.10.  "Black-wall talc deposits are associated spatially with serpentine masses that in some areas host well-developed chrysotile asbestos (Bain 1942; Cady and others 1963). The alteration zone locally contains actinolite, tremolite, anthophyllite, and (or) cummingtonite, as described by Cady and others (1963)." (p. 934).

83.11.  At the FDA meeting, Dr. Van Gosen stated, "Talc and anthophyllite form in the same – can form in the same geologic environment. You'll see that magnesium, silica, and water are the essential ingredients to form both talc and the asbestos minerals." (p. 27:5-9).

83.12.  Dr. Van Gosen further stated, "When an amphibole bearing rock, including talc is pulverized, micronized, and put into a product, it can be difficult to determine whether a very small, thin, elongate amphibole particle that you observe, even under high magnification, whether it represents a cleavage fragment or instead is a fiber that was once part of a fiber bundle. And just to complicate matters, some amphibole particles, such as this example in the lower right, can display characteristics of both fibers and cleavage fragments." (p. 29:10-21).

83.13.  "The same geologic processes that form talc can also form amphiboles, sometimes including the asbestiform varieties of the amphiboles." (p. 30:1-4).

83.14.  In 2020, Van Gosen at the FDA Public Meeting suggested "…that a very detailed mineralogy examination of the talc ores from this deposit types, taken from samples at the mine site, is a study that should be undertaken." (p. 39:14-17). He further stated, "that it would be much easier to determine the amphibole and chrysotile content of a talc that was used in a commercial product, including cosmetics, if the mineralogy was examined from samples that were collected in place at the mine site before the talc rock had been mined, pulverized, micronized, and then mixed into a product where the mineral particles now, including fibers are now extremely small and scattered, and are difficult to observe or to analyze." (p. 44:1-11).

83.15.  In comments submitted to the FDA as part of the public docket, Dr. Laura Webb, a professor of geology at the University of Vermont, and a Defendant expert witness in this matter, stated with regard to Dr. Van Gosen's publication in 2004 and 2005, "Although a good summary, one cannot accept at face value generalizations about the association of talc and amphibole asbestos made by Van Gosen [citation omitted]. That is, those generalizations are not representative of an exclusive suite of talc ores formed under conditions favorable neither to chrysotile or amphibole asbestos formation (or preservation). One must in fact understand the details of the local and regional geology of any give [sic] mine – including the potential for a complex distribution of rocks of different metamorphic grades resulting from complex tectonic history." (Webb, "Comments on Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc, FDA-2020-N-0025," p. 12).

84.  In an email dated January 30, 2008, from Rio Tinto Materials Regulatory Affairs Manager Richard Zazenski to colleagues Peter Argust, Julie Pier, and Greg Hunter, Mr. Zazenski stated:

84.1.   "Geologically, it doesn't make sense to me that you can have a mineral deposit that just contains 'non-asbestiform' tremolite. I believe the USGS study of talc from Death Valley, California, nailed it correctly that if a deposit contains 'non-asbestiform' tremolite, there is also asbestiform tremolite naturally present as well. And since tremolite was never really a large commercial mineral such as chrysotile or crocidolite, there is not enough medical data to conclude that 'blocky' tremolite is simply a nuisance dust. But that has been the story line for Vanderbilt for years and they're sticking to it.

84.2.   "I closely followed the OSHA/Vanderbilt debate during the 1980's and early 1990's. Essentially, OSHA 'threw in the towel' rather than expend their limited resources any longer on this issue. Their decision by no means should be interpreted as a vindication of Vanderbilt's arguments." IMERYS 442002-4.

85.     A confidential report of the Geology Section, Windsor Minerals, Inc. by William J. Gregg dated February 20, 1978, written "under the direction of R. Roger N. Miller, President of Windsor Minerals" stated, "the amphibolites in the Moretown usually occur not more than 100 to 200 meters away from the ultramafics and are generally more abundant than the amphibolites in the Cram Hill. In rarer cases very thin amphibolite layers less than 1 foot thick may run parallel to the ultramafic zone at less than 2 feet from the contact. These rocks are medium to coarse-grained and may occur as strongly layered lenses or larger, unlayered bodies up to 1 meter thick. The rocks contain abundant blue-green amphibole and albite, and minor amounts of carbonate, chlorite and opaque minerals". IMERYS 437016.

85.1.   "The amphibolites within the Cram Hill usually occur within 10 to 20 meters of the ultramafic zone. They are usually fine-grained rocks composed of blue-green pleochroic amphiboles, albite, carbonates and chlorite in varying proportions. The feldspathic and carbonate

27

minerals are often segregated in layers with little or no amphiboles present. These layers are the dominant element of the earliest compositional layering recognized in the amphibolite ($S_0$). This layering is disposed in tight to isoclinal early folds and is later refolded by open folds. (Fig. 9) IMERYS 437013.

85.2.    A photographic image demonstrating the layering in the amphibolites of the Cram Hill is shown in Figure 9. IMERYS 437017.

86.    A Literature Review of Geology and Mineralogy of the Vermont Talcs started with general description of the authigenesis of talc mineral and stated "The authigenesis of 'pure talc' mineral, $Mg_3 [Si_4 0_{10}] (OH)_2$ is generally represented as being the end member (lowest free energy) of a long chain of mineralogical or geothermal or geochemical alterations (weathering events) taking place along very diverse paths depending basically on the geothermal and geohydraulic conditions of exposure over many millions of years. However, there is general agreement that the basic chain of events was about as follows:

86.1.    "An intrusive ultramafic (high in magnesium) magma which is essentially magnesian silicate glass with a large number of minor associated constituents;

86.2.    "Crystallization to a 'serpentine' or 'serpentinite' which is not a mineral but is a rock name for a rock formation with a high magnesium silicate content. The serpentines may alter or crystallize by a number of hydrothermal, geothermal, or a combination of sequences or reactions requiring ionic mobilities, disporportionations, solution replacements, etc., into a rather wide variety of recognizable and identifiable crystallographic types or 'minerals.' The most common of these are the platy hydrous magnesium (2-layer) phyllosilicates, antigorite or lizardite; the rare form of this group is the fibrous (asbestiform morphology) chrysotile. Other related minerals commonly found associated with the crystalline serpentine minerals are those few amphibole

28

structures - - tremolite, actinolite, and rarely, anthophyllite which are some of the crystallographically recognizable forms of the amphibole rock formations.

86.3.    "Under certain conditions all of these minerals, depending on temperature, pressure, ground water solutions, and/or other factors, alter first to chlorite, then to carbonates or dolomite, and finally to talc; there is some debate whether dolomite precedes talc or both are formed more or less simultaneously from the chlorite and there can be said to be evidence for both sequences. In some cases the dolomitic limestone is well separated from the steatite (talc); in other cases, there is much intermixing in various proportions where the ore is generally known by the miners as 'grit'. The important aspect of these series of alterations is that talc is <u>always</u> the lowest free energy end-member and the alteration sequence has never been observed to go in the opposite direction. In many cases, however, there may be isomorphous replacements by talc of the preceding mineral morphologies, as well as occasional unaltered relics of preceding mineral species.

86.4.    "The so-called "black-wall chlorite" is in fact the geochemical transition zone between the serpentine or other host rock and the talcose series replacements. This transition zone (the blackwall) may vary from a few inches to several free in thickness and 'fingers' or extensions of it may occasionally intrude into the talc ore body. It is at this transition interface that the associated minerals, i.e., chlorite, tremolite, actinolite, and rarely, chrysotile, may be found. Occasionally some small parts of this materials is mined and mixed up along with the talc ore. The blackwall is thermodynamically and geothermally only metastable and it moves very slowly as the replacements and transitions occur as described above through geologic time." JNJ000263852.

87.    A chart titled "Vermont Rock Type Code" identify as accessory minerals "amphiboles" on the first and second page. IMERYS 426609.

88.    A memo from J.J. Godla and D. G. Ogden to J.S. Forbes dated January 5, 1988, re: Visit to Ludlow, VT operations of Windsor Minerals, Inc. with Roger Miller, President and Winston Dezaine, Mine Supt. December 31, 1987, stated under a section titled Argonaut Mine: "The bladed amphibole mineral actinolite was observed in numerous areas within the chlorite schist inclusions." In the General Comment section the memo states:

88.1.    "As far as asbestos problems [sic] are concerned, Miller states that he has been sampling all mine ore and produce shipped for 14 years. Composites have been submitted to McCrone Laboratory in Chicago, and no asbestiform minerals have been reported. The amphibole, actinolite (bladed) was observed in the chlorite schist inclusions and wall rock at <u>all</u> of the Ludlow mining operations." IMERYS 542268.

89.    A document entitled Windsor Minerals, Inc. "Geology of the Talc Mine at East Johnson, Vermont" incorporated a thesis written by Barry O. Seymour titled "Geology of the Talc Mine at East Johnson, Vermont." JNJ 000287099. The thesis stated:

89.1.    "As mentioned earlier, serpentinization is much less intense in Quebec, than in the north-central Vermont area, and most deposits contain a combination of talc and asbestos, instead of just talc." JNJ 000287264.

90.    A Luzenac February 2010 report written by E.F. McCarthy titled Talc Geology, Mining and Processing for Cosmetic, Pharma and Food Applications, included a table titled Talc Ore Mineralogy (Cosmetic Source), which included columns for Montana, Vermont, Australia, China, and India.  Under the heading "China", a row titled "Tremolite" reported "0-5" and a row titled "Serp'tine" reported "trace".  IMERYS 081025.

ii.    Distinguishing asbestos, non-asbestiform amphiboles and talc

91.    According to the Rio Tinto Materials presentation, "Analytical Capabilities and Test Methods," the slide "Asbestos is a possible trace contaminant in talc" states it is "difficult to

determine if individual fibers were originally associated with a bundle (may be disaggregated from milling and/or sample prep)." IMERYS 448613 (p. 14).

91.1.   The presentation went on to state:

a.      "Talc vs. Chrysotile [Identification]: Easy! (p. 15).

b.      Serpentine Interpretation: Easy! (p. 16).

c.      Amphibole Interpretation: May be difficult…" (p. 17).

91.2.   According to this industry presentation, there is an overlap of the Amphibole Fiber Mean Aspect Ratio between tremolite cleavage fragments and tremolite asbestos fibers. (p. 18).

91.3.   According to this presentation, elongated mineral particles are fibers which are "a regulated term defined by aspect ratio and length – varies according to method/regulation," which include a subset that are asbestiform and a further subset that are asbestos.  (p. 12).

92.      Another presentation by Rio Tinto Materials, "Talc: Asbestos Issues and Management," stated:

92.1.   "It is not known whether cleavage fragments of similar dimensions to asbestiform fibers pose the similar health risks.[31]

92.2.   "On a microscopic scale, one cannot distinguish between asbestiform and cleavage fragment.

92.3.   "Deposits can contain both asbestiform and non-asbestiform particles." J&J 252 (p. 11).

93.      According to a presentation by the RJ Lee Group, Inc. on January 29, 2009 titled "What is Asbestos? Analytical Methods for Asbestos," RJ Lee stated, "Controversy over whether asbestos

---

[31] As I have stated previously, I am not offering any causation opinions regarding the health effects of cleavage fragments.

and non-asbestos elongated mineral particles have different biological and health effects."
IMERYS 441186.

94.    According to an official statement from The American Thoracic Society titled "Health
Effects of Tremolite" dated June 1990 and distributed by the American Mining Congress, "A
troublesome issue has been the mineralogical distinction between fibers and cleavage fragments,
and whether this distinction has biological implications." IMERYS-MDL-AB_000194. The
American Thoracic Society statement went on to state,

94.1.    "…the focus on tremolite has raised the issue of the importance of cleavage
fragments as opposed to asbestiform fibers. The issue, fundamentally, is whether two fibrous
particles of identical size and shape will have different biologic properties if the particles are pieces
of mineral which have broken off a larger sample parallel to a crystal face (i.e., cleavage fragments)
as opposed to particles which have originally grown in a fibrous habitat (i.e., asbestiform fibers).

94.2.    "It became apparent both from our review of the literature and from submissions
made to this Committee by experienced mineralogists, that the distinction between cleavage
fragment and asbestiform fibers, although theoretically clear, is in practice extremely murky. Some
mineralogists believe that these two types of particles are always distinct, whereas others believe
they shade off one into the other, and that intermediate forms (byssolite) exist. Further, these same
submissions were at odds with each other in identifying particular samples used in various
experiments (including the play sand samples analyzed by members of the Committee) as
asbestiform fibers or cleave fragments. To complicate matters, it was also suggested to us that the
important distinction is not that between cleavage fragments and asbestiform fibers, but between
non-asbestiform and asbestiform fibers.

94.3.    "Because of the lack of consensus among mineralogists, as well as the limited information about the minerals present in most published human and animal data (i.e., whether the particles used or observed really are fibers or cleavage fragments), we have to a great extent ignored the distinction, and ended up treating most of the data as based on 'fibers' of various sizes. The Committee recognizes that this is not an ideal solution, and where stronger evidence for the cleavage fragment or asbestiform nature of a particular fiber exists, we have noted it. However, until there is reasonable mineralogic unanimity both on general definition and the classification of specific samples, and then animal experimentation with such classified materials, it appears to us impossible to draw general conclusions about biologic effects based on the distinction between cleave fragments and asbestiform fibers." IMERYS-MDL-AB_0001941.

94.4.    The society concluded, "Unquestioned health effects of tremolite asbestos have been demonstrated in both man and animals. These effects are identical to those produced by other forms of asbestos.

94.5.    "There may be important physico-chemical distinctions between asbestiform and non-asbestiform tremolite dust particles. However, there appears to be considerable controversy in applying these mineralogic definitions to specific samples of mineral, particularly individual particles viewed microscopically after collection by air sampling or found in human lung, or when used experimentally.

94.6.    "The evidence for biological effect distinctions based on mineralogical parameters, other than fiber dimension and fiber number, is currently inadequate.

94.7.    "At present, the prudent public health policy course is to regard appropriately sized tremolite 'fibers,' in sufficient exposure dose (concentration and duration), as capable of producing

the recognized asbestos-related diseases, and they should be regulated accordingly." IMERYS-MDL-AB_0001953.

95.    In the correspondence section in the British Journal of Industrial Medicine dated 1991, author Dr. B.W.K from the University of Pittsburgh said three questions needed to be answered before non-asbestiform tremolite could be "let off the hook" from a health perspective: "Firstly, can 'non-asbestiform' fibres, by mineralogical definition, be unambiguously identified to the satisfaction of experts and regulators? Secondly, if they can be identified, are they present to the exclusion of 'asbestiform' fibres in the same mix? Thirdly, if both of the previous conditions can be satisfied, do they inform as to the biological effects of long, thin, durable fibres that do not meet the crystallographic growth characteristics for asbestiform nature required by some experts? The answer to all three questions-without tergiversation-is no." JNJ00000049.

95.1.    They concluded, "Until there is actual evidence, that 'non-asbestiform' fibres are easily defined, clearly separated from tremolite asbestos in real world work environments, and not productive of lung fibrosis or other health effects, it seems folly to declare them exempt from regulation." JNJ00000049-50.

95.2.    According to an Executive Summary of Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc, dated January 6, 2020, written by US federal government subject matter experts on the (IWGACP[32]):

95.3.    "The difficulty of identifying and quantifying individual asbestos or other mineral particles present at low concentrations in talc is compounded by the presence of non-asbestiform

---

[32] The IWGACP, Interagency Working Group on Asbestos in Consumer Products, is made up of subject matter experts from eight federal agencies: Dept. of Health and Human Services (including experts from Food and Drug Administration (FDA), National Institute of Occupational Safety and Health (NIOSH), and National Institutes of Health (NIH)/National Institute of Environmental Health Sciences (NIEHS)), Dept. of Labor: Occupational Safety and Health Administration (OSHA), Environmental Protection Agency (EPA), Consumer Product Safety Commission (CPSC), Dept. of the Interior: U.S. Geological Survey (ISGS), and Dept. of Commerce: National Institute of Standards and Technology (NIST). *IWGACP Public Meeting, 4 February 2020.*

analogs with the same elemental composition and crystal structure, but different growth habit. Using TEM, differentiation of chrysotile from non-asbestiform serpentine analogs is relatively straightforward; however, each of the non-asbestiform amphiboles can disaggregate into particles resembling asbestiform fibers, giving rise to disputes between laboratories over whether elongate amphibole particles are truly asbestos, or are particles resulting from attrition of larger particles of a non-asbestiform analog. Because both types of elongate minerals are suspected of having biological activity with similar pathological outcomes, the distinction is irrelevant. Lack of consensus concerning what should be called 'asbestos' has persisted since the first reports indicating that asbestos might be present in talc used in cosmetics and has inhibited thorough toxicological and epidemiological investigations of disease attributable to talc that contains asbestos." (p. 3)[33].

96.     According to the White Paper, "IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc" that provided "the scientific opinions of subject matter experts (SMEs) from an interagency working group related to testing cosmetic products containing talc and talc intended for use in cosmetics for the presence of asbestos, as well as other potentially harmful amphibole particles that can affect cosmetic product safety" (p. 4). That White Paper stated,

96.1.    "The difficulty of identifying and quantifying amphibole asbestos particles in talc is compounded by the potential presence of amphibole particles that have the same elemental composition and crystal structure as one of the asbestos minerals but may have originated from their non-asbestiform analogues. (See Appendix D) The characteristic feature of an 'asbestos structure' is the 'bundle' consisting of multiple particles that may show definitive characteristics

---

[33] See JNJTALC0015234748

of asbestos particles such as splaying or longitudinal splitting at either end of the structure. However, asbestos structures are less readily identifiable after extensive processing that can result in attrition, such as milling of talc to produce cosmetics. In the milling process, non-asbestos amphibole particles in the ore can be reduced in size, resulting in particles that may look like asbestos." (White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc, p. 14).

96.2.    According to Appendix D of the White Paper (p. 29), forces "applied to prismatic amphibole crystals can result in perfect cleavage along planes of weakness, often referred to as cleavage fragments. Similarly, attrition of bundles of asbestiform amphibole fibers can lead to structures such as the fibrils." Appendices to White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc (p. 33).

96.3.    Appendix D went on to state, "Alternatively, fracture at points of structural weakness caused by defects in amphibole crystals can result in particles having random shapes. Consequently, significant variation in morphology of amphibole particles can occur even within a mineral deposit and it may be difficult to classify individual particles as being asbestiform or non-asbestiform." (p. 34)

96.4.    It further stated, "Because fiber bundles undergo attrition, it is difficult to draw conclusions about the (asbestiform/non-asbestiform) habit of any individual amphibole particle at the levels of magnification afforded by electron microscope." (p. 36).

97.    Appendix E of the White Paper titled "Health-Based Characteristics to Address Impacts of Asbestos and Other Elongate Mineral Particles in Talc Intended for Use in Cosmetics," stated the following:

97.1.  "Asbestos is a known human carcinogen…there is no established threshold for health effects from asbestos exposure.

97.2.  "These effects are rarely seen acutely but are more likely to occur many months or years following exposure.

97.3.  "The specific biological mechanisms underlying asbestos and other elongate mineral particle (EMP) [footnote omitted] induced inflammation and/or diseases in humans and other animals remain uncertain… a more complete understanding of particle characteristics associated with activation of these biological mechanisms is lacking…

97.4.  "Decisions to limit elongate particle size definition to specific size fractions (e.g., length >5 μm; width > 0.2 μm, and aspect ratio >3:1) were established for the convenience of using light microscopy to estimate exposures in occupational environments [citation omitted]. Thus, while it may be a useful index for exposure in certain situations, 'the fiber counting protocol using a 3:1 aspect ratio and a length of 5 μm or greater as being in some way a definition of asbestos has no scientific basis.'

97.5.  "Particle size, tensile strength, morphology, chemical composition, bio-persistence, surface charge, surface porosity, and reactivity have all been implicated in the pathogenic processes associated with EMP exposure. (HEI 1991). Our general understanding of the mechanisms and progression of EMP-related disease comes from studies about biophysical, cellular, animal, and human responses to exposure. (NATO 1990, Fubini and Arean 1999, Xu, Zhou et al. 2002). Elongate particle interactions with cellular components can result in aberrations in cell division (Livingston, Rom et al. 1980, Achard, Perderiset et al. 1987, Renier, Levy et al. 1990, Korkina, Durnev et al. 1992), generation of reactive oxygen species (Brown, Fisher et al. 1998) and an inflammatory response (Shukla, Ramos-Nino et al. 2003, Mossman 2018, Pfau,

37

McNew et al. 2019). Several studies in animal models report that longer fibers are more strongly associated with cancer incidence (Stanton M.F. and Layard 1981, Davis, Addison et al. 1991, Berman,Crump et al. 1995).

97.6.  "Particle size, aspect ratio (length-to-width ratio), dissolution characteristics, and cellular processes affect exposure. Additionally, anatomy and physiology of the host, internal distribution, retention, and clearance from the body are all determinants of internal exposure. (CDC/NIOSH 2011).

97.7.  "Generally, thinner particles with higher aspect ratios, may penetrate more deeply into the lungs (Timbrell1982, Lippmann 1990, Bernstein, Rogers et al. 2011). Larger particles and those with higher density may impact the nasopharyngeal region of the upper airways, where they are more efficiently removed from the respiratory tract…

97.8.  "…censored exposure indices are not capable of, nor were intended to, be used in context of consumer exposure to the presence of asbestos in cosmetics.

97.9.  "More than four decades ago (prior to the practice of indexing fibers), the CDC/NIOSH fully characterized the presence of EMPs (including subsets of regulated asbestos and asbestiform minerals), in a talc mining and milling operation in St. Lawrence County, New York; where morbidity and mortality was significant in workers exposed to dusts (NIOSH1980). It was observed that 97% of the worker exposures to tremolite and 90-92% of the worker exposures to anthophyllite were to fibers <5 μm in length, well below the size range commonly recorded by less sensitive light microscopic techniques.

97.10.  "Once inside the body through inhalation, ingestion, or perineal exposure, EMPs can migrate through tissues and organs to secondary sites of exposure where progressive cell damage can occur (Cook and Olson 1979, Wehner 1994, Heller, Westhoff et al. 1996). The risks

of irreversible damage to cells and tissues of the body following exposure are associated with the accumulation of elongate particles in susceptible tissues. Retention and accumulation of elongate particles in biological tissue is influenced by the nature of the EMP, magnitude of the exposure, host physiology, type of tissue, migration and transformation of particles within the body, and clearance of particles through cellular mechanisms, including dissolution and removal by alveolar macrophages.

97.11.  "Research findings of Stayner et al. (2008) show that cumulative exposures to 'all fibre size indices, including fibres <5 um in length, were highly statistically significant predictors of lung cancer or asbestosis mortality.' (Stayner, Kuempel et al. 2008).

97.12.  "Together, many characteristics contribute to EMP toxicity, such as biological persistence, inter-tissue migration, or *in vivo* comminution (splitting of bundles into elongate fragments or fibers). Interactions of EMP at the biological interface can trigger intracellular multiprotein complexes associated with inflammation.

97.13.  "A number of studies (Goodglick and Kane 1990, Dodson, Atkinson et al. 2003, Ji, Wang et al. 2012) report an association between fiber length, width, and disease in laboratory animals and in exposed human populations. However, the methods, definitions, and protocols used to measure and count fibers in environmental samples are not independent of the specific analyst or microscope used to character exposures. (Rooker, Vaughan et al. 1982).

97.14.  "Although shorter particles are generally more rapidly cleared than longer ones, at a steady state of exposure, short EMPs can accumulate, presenting a persistent and much larger bioactive surface area than the commonly recorded longer fibers. (Lehnert, Valdez et al. 1989).

97.15.  "When comprehensive dose characterization has been available, biologically active EMPs, also known as censored EMPs (i.e., <5 μm in length), are often implicated as contributing

to disease. These EMPs have been frequently removed from the exposure analysis due to the limitations of optical microscopy. Further, our understanding of disease in relation to exposure (exposure-response analysis) is severely limited. The presence of elongate amphibole and serpentine minerals in some talc deposits have been known for many years (Kleinfeld, Messite et al. 1967, Rohl and Langer 1974, NIOSH 1980), yet analytical methods restricted by available technology (Rooker, Vaughan et al. 1982, Kenny, Rood et al. 1987) and developed for other purposes, have been adopted as tools for the scientific characterization of toxicological response and risk assessment in both occupational and non-occupational epidemiologic studies. This has severely limited our understanding of how exposure to EMPs of various size and characteristics contribute to asbestos-related disease (Stayner, Kuempel et al. 2008) [figure omitted].

97.16.  "Thus, for the purpose of evaluating the presence of asbestos in talc intended for use in cosmetics and talc-containing cosmetics, measurement and characterization of EMPs should be more inclusive in order to consider biologically relevant physical-chemical characteristics as they relate to biological actions of the offending mineral particles." Appendices to White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc (p. 42-49).

98.    According to Appendix F of the White Paper, titled "Testing Issues," "Some researchers have suggested that populations of amphibole asbestos fibers can be differentiated from non-asbestiform particles or cleavage fragments based on population width distributions reflecting differing tendencies in particle attrition among the two growth habits (Blount 1991; Van Orden et al. 2008, 2009; Harper et al. 2008). General guidelines for differentiation based on dimensions do not exist, although there are minima for length and aspect ratio for asbestos counting in published standards. The strict application of length and aspect ratio as measures to differentiate asbestiform

and non-asbestiform particles remains debated in the scientific literature. Thus, IWGACP is not in favor of using dimensional criteria to differentiate asbestiform and non-asbestiform particles in talc and cosmetics." Appendices to White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc (p. 71).

99.    The significance of asbestiform versus nonasbestiform fibers was discussed by the pharmaceutical firm Pfizer, Inc. in 1977. Commenting on statements by the talc firm, R.T. Vanderbilt Co., Inc., Pfizer's official J.P. Bartels wrote in a memo, "Vanderbilt Talc Letter," "Tremolite then has always been classified as a form of asbestos." (p. 3).

99.1.    Pfizer's Mr. Bartels stated, "[R.T. Vanderbilt] launched a massive effort to block the [OSHA] standard and later to overturn it. Initially their thrust was that the amphiboles were not asbestos and should not be included in the asbestos standard. Later they took the position that the five amphiboles involved, especially tremolite, existed in both 'asbestiform' and 'non-asbestiform' varieties and that Vanderbilt talc contained the non-harmful variety. Although their position has never been supported by any scientist of renown or any other talc company, Vanderbilt has remained adamant in their defense of it." Booker-MTI001061.

99.2.    Pfizer's Mr. Bartels further stated, "Johns-Manville, another major talc producer, with considerable expertise in asbestos took a radically different approach. On September 30, 1974, they issued a letter stating that their Grantham talcs contained amphiboles of asbestos and placed asbestos warning labels on their talc packages. In June 1976, they officially shut down their Grantham talc operation in Death Valley and went out of business.

99.3.    "Cyprus Mines and Engelhard have issued weak statements claiming that their products do not contain any asbestiform minerals." Booker-MTI001062.

100.    In a Cyprus Ore Reserve Evaluation "Preliminary Summary," R.C. Munro stated,

41

100.1.  "Fibrous minerals – tremolite and actinolite are ubiquitous in several zones of the Vermont mines. The potential problems involved with fibre in dumps, and to some degree in products, must be carefully evaluated." IMERYS 416201.

100.2.  Discussing impurities, Munro further stated, "Actinolite: can be present (needles and blades) in most of the deposits (2*), generally in well known locations (close to walls or waste contacts, in the chloritic fault zones, in pinched zones of deposits). The miners know these zones and seem to master the problem (what for contractors?), but it is impossible to get rid of accidental traces." IMERYS 416215.

101.    In an interoffice memo from Cyprus Mines dated March 25, 1992, R. C. Munro, under the heading "Tremolite," stated:

101.1.  "The other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of the amphibole minerals, tremolite and actinolite (hydrous calcium iron-magnesium silicates) which have been classified as asbestiform minerals by OSHA and EPA. OSHA was expected to de-classify non-fibrous (blocky) tremolite on February 29, but has not yet announced their decision.

101.2.  "As a result, all tremolite, the fibrous varieties of al all amphiboles and chrysotile asbestos in talc ores are a source of great concern to all talc producers and especially to marketers of cosmetic products.

101.3.  "Cyprus claims that there are not fibres in their cosmetic talc products and they work rigorously to ensure this. However, a recent paper published by Rutgers University worker, Alice Blount, suggests the presence of fibre in several cosmetic talcs, some of which might have been from Cyprus West Windsor material, which is a source of great concern to Cyprus management and potentially to their principal customer, Johnson & Johnson. Talc de Luzenac

personnel are well aware of the situation and Phillipe Moreau is currently quietly working to identify the reality and the magnitude of the problem.

101.4. "Vermont talcs are derived from altered serpentine - a natural host for asbestiform minerals. There is certainly visible tremolite and actinolite in specific zones of the Vermont deposits -fibrous tremolite was identified by the writer in exposures and cores at the East Argonaut and Black Bear mines. Cyprus staff report past tremolite from the Hammondsville and Clifton deposits.

101.5. "Tremolite in these deposits is encountered in the contact zones between the talc and the surrounding schist; in 'grey talcs' in the vicinity of the contacts; and associated with the chlorite/amphibole waste zones within the talc ores that are locally termed "cinders." Cyprus maintains a selective mining program in Vermont that is directed toward exclusion of all of these potentially fibre-bearing zones from the ores sent to the mills, and those suspect tonnages, including the associated talc, are left in the pit walls or sent to waste piles." IMERYS 219721.

102.    In response to the position taken by some asbestos testing laboratory scientists that, "there is a toxicological difference between asbestos structures which formed as fiber crystals and fibers which formed by cleavage plane separation" (p. 11), the Environmental Protection Agency (EPA) Region 9 stated on April 20, 2006,

102.1. "It is the position of EPA, the U.S. Centers for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry (ATSDR) and National Institute for Occupational Safety and Health (NIOSH), and the American Thoracic Society, among others, that microscopic structures of amphibole and serpentine minerals that are asbestiform and meet the size definition of PCM fibers, should be counted as asbestos, regardless of the manner by which they were formed.

102.2.  "There are four reasons why the health agencies have taken this position: (1) The epidemiologic and health studies underlying EPA, and California EPA, cancer risk assessment methods were based on exposures to both cleavage fragments and fibers, but were unable to distinguish between the two, (2) The most recent panel of experts to review asbestos risk assessment methods, the 2003 Peer Consultation Panel convened by EPA, concluded that "it is prudent at this time to conclude equivalent potency [of cleavage fragments and fibers] for cancer, (3) No well-designed animal or human epidemiological studies have been conducted to date to test the hypothesis that cleavage fragments with the same dimensions of a fiber are benign, or that the human body makes any distinction, and studies that purport to show that cleavage fragments are benign are questioned by many asbestos health experts, (4) There are no routine air analytical methods, including those used by EPA, NIOSH, the Mine Safety and Health Administration (MSHA), the American Society for Testing and Materials (ASTM), and the ISO which differentiate between cleavage fragments and crystalline fibers." (p. 11) (footnotes omitted).

103.    In my opinion, the safety of nonasbestiform amphibole or cleavage fragments was and has not been established.

104.    In my opinion, determination by a laboratory that certain amphibole particles were nonasbestiform in nature does not mean the safety of those nonasbestiform amphiboles was substantiated.

105.    In my opinion, the controversies and/or complexities surrounding: 1) the definition of asbestos; 2) what was excluded from the definition of asbestos; 3) the geologic relationship between asbestos and talc; 4) the difficulty of laboratory tests to characterize individual amphibole fibers as asbestiform or non-asbestiform; 5) whether cleavage fragments of similar dimensions to asbestiform fibers pose similar risks; 6) the difficulties distinguishing between asbestiform and

cleavage fragments as discussed below; 7) the limitations of detection by various laboratory measurements; 8) epidemiological results; 9) the inability over the decades of FDA to arrive at a definitive testing method for asbestos in talc; 10) the significance of talc fibers; and 11) the extent and routes of exposure, reinforce the conclusion that the safety of the product had not been established.

106.    In my opinion, unable to substantiate the safety of their talcum powder products, JNJ was required to place the following conspicuous statement on the principal display panel: "Warning-The safety of this product has not been determined." 21 CFR §740.10.

## IV.    IN LIGHT OF LABORATORY TEST FINDINGS CONDUCTED BY, PROVIDED TO, OR MADE AVAILABLE TO JNJ, BEGINNING IN AT LEAST THE EARLY 1970S, JNJ COULD NOT SUBSTANTIATE THE SAFETY OF ITS TALCUM POWDER PRODUCTS AND SHOULD HAVE NOT SOLD ITS PRODUCTS

107.    JNJ's corporate representative, Dr. John Hopkins, testified:

> Q.    And [JNJ] has always told the public that there's never been a single fiber of asbestos in any of its talc for Johnson's Baby Powder or Shower to Shower, correct?
>
> A.    Yes.
>
> Q.    It told that to customers, nurses, doctors and regulators and hospitals, correct?
>
> A.    Yes.[34]

107.1.  Dr. Hopkins further testified:

> Q.    [JNJ] agrees that if the baby powder has asbestos, it should be withdrawn from the market immediately, correct?
>
> A.    It wouldn't be sold in the first place.
>
> . . .
>
> Q.    And [JNJ] agrees with that, the acceptable level of asbestos in cosmetic talc [is] zero, right?

_____

[34] Trial Testimony of Dr. John Hopkins in *Barden v. Brenntag North America, et. al*, MID-L-0932-17AS, July 22, 2019, at p. 43.

A.    Yes.[35]

**A.    From the 1950s through the 2000s, JNJ received and acknowledged reports from affiliated and non-affiliated laboratories identifying or suspecting the presence of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, actinolite fibers, anthophyllite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc sample**

108.    JNJ's corporate representative, Dr. John Hopkins, and Imerys' corporate representative, Julie Pier, confirmed that from the 1950s through the 2000s, JNJ received and acknowledged reports from affiliated and non-affiliated laboratories identifying or suspecting the presence of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc samples.[36]

109.    I have reviewed Exhibit D-1-A to Dr. John Hopkins' corporate representative deposition and Dr. Hopkins' deposition testimony about JNJ's response to the reports to JNJ of talc samples containing naturally occurring mineral silicate fiekutabers of the serpentine and amphibole series.[37] In his corporate representative deposition testimony, Dr. Hopkins confirmed that many of the reports JNJ received of naturally occurring mineral silicate fibers of the serpentine and amphibole series met the company's definition of asbestos.[38]

110.    A May 10, 1971, report to JNJ from Colorado School of Mines identified: "Report results: 'Free nontalc needles' .6%. 'Free talc needles' 2.21%". JNJ 000294462 (J&J-255). In a May 14, 1971, internal memorandum, JNJ stated, "The attached letter shows the particle size-shape consists

---

[35] *Id.* at p. 198.
[36] Hopkins Dep. Ex. D-1-A; Hopkins Dep. Ex. 28; Pier Dep. Ex. 47; Deposition of Julie Pier, September 12-13, 2018.
[37] Hopkins Dep. Ex. D-1-A; Deposition of John Hopkins, Ph.D., October 17, 2018. *See also* Trial Testimony of Dr. John Hopkins in *Barden v. Brenntag North America, et. al*, MID-L-0932-17AS, July 22, 2019, at pp. 38-39 ("Q. Alright. Johnson & Johnson understood that it would be very, very bad for business and J&J's representation if it ever came out that baby powder or any of its talc products ever contained asbestos, correct? A. If the baby powder did contain asbestos, it would be bad for business, if it did, yes.").
[38] Hopkins Dep., October 17, 2018, 1070:3-22; Hopkins Dep. Ex. 27; Hopkins Dep. Ex. D-1-A.

of a production batch of our product produced in December, 1970." JNJ 000294462 (Ex. J&J-255). The internal memorandum concluded, "We consider the free non-talc needles but a trace, both on a count and area basis.  Those particles are tremolite." JNJ 000294462 (Ex. J&J-255).

111.    A JNJ memorandum dated July 29, 1971, stated, "The talc used in JOHNSON'S Baby Powder is obtained from a selected mine in Vermont where the ore consists mainly of platy talc with only trace amounts of fibrous minerals (tremolite/actinolite)."  The memorandum continues, "The resulting talc has been shown by three independent consulting laboratories* [Colorado School of Mines Research Institute, McCrone Associates, Inc., and Dartmouth College Geology Department] to contain negligible traces of fibrous minerals and no chrysotile fibers." JNJMX88__000004646 (Ex. J&J-19).

112.    A November 10, 1971, letter to Johnson & Johnson from Dr. Arthur M. Langer at Mount Sinai School of Medicine stated, "We have also analyzed one of your talc samples in some detail. In addition to the normal platy talc present, we have observed many 'fibrous talcs' as well." Dr. Langer continued, "We also observed trace amounts of chrysotile asbestos only when the talc was sonified and markedly dispersed. The amounts of chrysotile are relatively small, occurring in amounts, we estimate, at less than .01%." JNJTALC000292656.

113.    An internal JNJ memorandum dated September 26, 1972, discussed the results of testing performed on Johnson and Johnson's product by FDA consultant Dr. S. Lewin on August 3, 1972 and September 21, 1972.  The results showed, "J&J Medicated Powder sample: 4% tremolite," "Johnson's Baby Powder sample: 2% chrysotile," another "Johnson's Baby Powder sample: 3% chrysotile," "J&J Shower to Shower samples: 2% chrysotile" in 3 samples and "5% +/- 2%" in a 4th sample."  JNJ000232996 (J&J-31)[39].

---

[39] See also Ex. J&J-28 (August 3, 1972 report).

114.    An October 1972 internal JNJ handwritten note stated, "There are trace quantities present confirmed both by McCrone & Bill Ashton. Levels are extremely low but occasionally can be detected optically. This is not new." JNJAZ55_000004156 (J&J-26).

115.    In 1972, University of Minnesota Space Science Center received "specimens of powdered talc" from "[JNJ] and from McCrone Associates.  Analysis of these samples using the scanning electron microscope was requested in order to determine the possible content of fibrous chrysotile asbestos contained in the talc samples. The University of Minnesota reported "Numerous fibrous structures were observed during this examination of both the original Lewin material [the samples from McCrone] and the Shower to Shower material supplied by [JNJ]." Under the section titled "Transmission Electron Microscopy," the testing found "A large number of grids were examined and numerous examples of fibrous material were seen. Of the large number of grids examined, three examples of fibers which upon examination by electron diffraction could be classified as likely candidates for chrysotile asbestos in the [S]hower to [S]hower material and one example was found in the Lewin material," and "[i]n Figures 17a and 18a, electron micrographs of the transmission type show the typical stranded appearance of chrysotile asbestos." The University of Minnesota concluded, "It is felt therefore that chrysotile asbestos does exist in the specimens of [S]hower to [S]hower and Lewin supplied to this laboratory." JOJO-MA2546-01282 (J&J-33). The University of Minnesota's Thomas Hutchinson provided images of "Chrysotile Fibers Embedded in Talc Particles," and handwritten notes that stated, "Five fibrous particles were found which gave electron diffraction patterns unmistakably chrysotile asbestos" and ""Shower to Shower' . . . Three clear examples were found of serpentine material and which gave perfect chrysotile patterns." JOJO-MA2546-00138.

116.    An internal JNJ memorandum dated April 19, 1973 titled "Dispersion Staining Examination of Retained Samples of Johnson's Baby Powder" stated, "Twenty-five samples of Johnson's Baby Powder representing retained samples from both ESDP and Chicago facilities were examined microscopically by the Dispersion-Staining technique for the presence of tremolite. Four of these samples are suspected of containing tremolite based on the finding of one or two 'fibers' per sample which satisfy the color/morphology criteria." JNJ 000245155 (J&J-296).

117.    An internal JNJ memorandum dated April 26, 1973 stated: "It is our joint conclusion that we should not rely on the 'Clean Mine' approach as a protective device for Baby Powder in the current Asbestos or Asbestos-Form controversy. We believe this mine to be very clean; however, we are also confident that fiber forming or fiber type minerals could be found. The usefulness of the 'Clean Mine' approach for asbestos only is over." The memorandum went on, "Our Baby Powder contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of tremolite or actinolite are identifiable (Optical Microscope) and these might be classified as asbestos fiber." The memorandum further "cautioned" that "no final product will ever be made which will be totally free from respirable particles." JNJMX68_000013464 (J&J-44).

118.    An April 27, 1973 internal JNJ memorandum titled "Microscopic Examination of Johnson's Baby Powder" stated, "Petrographic optical microscopy revealed 'trace' amounts of amphibole in each of the above samples.  Based on the number of particles scanned, we estimate 'trace' amounts to be .001 to .01% by weight." JNJMX68_000010608 (J&J-335).

119.    A May 8, 1973 internal "Personal" memorandum from JNJ's William Ashton stated, "Baby Powder lots 108T & 109T were alleged to contain asbestiforms by Lewin. . .. The first showing of actinolite we know about is October 1972." JNJ 000301719 (J&J-368).

49

120.     An internal JNJ memorandum dated May 16, 1973, titled "Proposed Specs for Analyzing Talc" stated, "'Preconcentration of Asbestos':  "This technique has not been written up yet, but evidently when applied to Vermont talc, 0.05% of tremolite-type is found. The limitation of this method is that it may be too sensitive." JNJ 000232679.

121.     An August 27, 1973 internal JNJ memorandum acknowledged that the "Dutch Consumer Organization" analyzed Johnson's Baby Powder and "detected asbestos-content of 1.59%." Johnson & Johnson noted that the Organization's definition of asbestos "could cause some errors," and "At this moment they are analyzing our powder again, because we remarked that our powder was free of asbestos.  However, when they stick to the same method and definition they might trace asbestos again, and . . .. publicize the results." JNJAZ55_000006341 (J&J-299). A December 13, 1973 internal JNJ memorandum titled "asbestos in baby powder" stated, "On our request they have tested another sample and the result of this second test was 0.3% . . . " JNJAZ55_000006532.

122.     A December 27, 1973 report prepared for JNJ by Colorado School of Mines titled "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers" stated, "Since developing the procedure, it has been applied to various talc samples examined for chrysotile and/or tremolite, as follows: A memorandum report dated April 2, 1973 [to JNJ] on the examination of four talc samples identified tremolite at levels of less than 20 ppm in one sample, and chrysotile at levels of less than 7 ppm in three samples. A letter report dated December 21, 1973 [to JNJ] on the examination of Italian and Vermont talc identified chrysotile at a level of less than 10 ppm in the Vermont sample." 57-0198 (J&J-263).

123.     In March 1974, Dartmouth College sent a "Confidential" memorandum to Johnson & Johnson subsidiary Windsor Minerals Inc. titled "Analysis of Talc Products and Ores for Asbestiform Amphiboles." Dartmouth stated, "The purpose of this study is to develop methods for

measuring the concentration of asbestiform amphiboles in fine grained talc products and talc ores," and "For the reasons described above, a concentration technique is mandatory because it brings the amphiboles into a reasonable concentration range for optical or other methods of analysis." Dartmouth continued, "Talc ore and talc product, provided by V. Zeitz of Windsor Minerals, were run through this procedure." The memorandum concluded, "Conclusions: '(2) The ore sample contains 2300 ppm actinolite, and the talc product contains [approx.] 170ppm actinolite. (3) Actinolite is the dominant fiberform amphibole in the ore and talc product provided by Windsor Minerals. Small amounts of anthophyllite may be present.'" Further, "Plate 2" noted, "the length-striated character of actinolite; this is characteristic;" and "Plate 7" noted "Actinolite, talc, chromite, and a large anthophyllite fiber." JNJNL61_000029411 (J&J-58).

124.    A May 8, 1974, report from JNJ subsidiary Windsor Minerals Company titled "Examination of Talc Ores and Products: Beneficiation Processes," examined McCrone Associates' testing of "6 samples of talc ores and talc products produced from these ores using the methods of light microscopy and transmission electron microscopy." The results included, "one fiber, probably tremolite" and "a few other fibrous or rod-shaped particles" in Sample 66A-ore, "fibrous forms of talc" in Sample 66U-ore, "one very small fiber" that "resembled chrysotile" in Sample 66U-product, "eight chrysotile fibers" in Sample 66AC-ore, "fibrous talc" and "one chrysotile fiber" in Sample 66AC-product. JNJ 000326107 (J&J-66).

125.    On November 5, 1975, JNJ's testing agency McCrone Associates, Inc. sent a letter to Johnson & Johnson's subsidiary Windsor Materials Company "supplement[ing their] report of 1 July 1975 on a series of talc ore samples which we have analyzed for you." JNJNL6_000079335 (J&J-97).[40] McCrone stated, "Table 1 shows the actual fiber counts . . .. Some of them seem rather

---

[40] See also JNJMX68_000012745 (J&J-89).

high, one had 10 and one had 9 amphiboles. Most of these come in bundles of 1, 2, or 3 fibers with anywhere from 2-5 amphiboles in a bundle." The attached "Table 1" reported "Fibers of Asbestos" in 10 samples. JNJNL61_000079335 (J&J-97).

126.    On March 16, 1976, Johnson & Johnson sent "two nine ounce bottles of our Baby Powder" to Colorado School of Mines for testing. Handwritten notes dated July 5, 1976, stated, "Optical Mic shows small (1%?) amounts of amphibole needles." JNJ 000064762 (J&J-303).

127.    An April 23, 1998, letter from Rutgers Professor Alice M. Blount, Ph.D. advised Johnson & Johnson that "as [she] told [JNJ]," her 1991 paper titled "Amphibole Content of Cosmetic and Pharmaceutical Talcs" identified JNJ's Baby Powder (Vermont Talc) as having "trace amounts of asbestos." J&J-0049150.[41]

128.    On February 24, 2004, JNJ was faxed a report titled "Quantitative Analysis Report Asbestos in Bulk Material" describing results from a January 5, 2004, Transmission Electron Microscopy test of a Johnson's Baby Powder sample performed by Forensic Analytical. The "Analytical Results" found 3.8% anthophyllite asbestos in the Johnson's Baby Powder sample, equating to an "Asbestos Weight Percent" of .20%. JNJ 000375389.[42]

129.    A 2013 JNJ "Draft" "Copy for Safety and Care Commitment Website" describing the company's "Use of Cosmetic Talc in Personal Care Products" was edited internally from "Our talc-based consumer products have always been asbestos free" to "Our talc-based products are asbestos free," noting that "we cannot say 'always.'" JNJTALC000067661.

---

[41] *See also* Blount, A.M., *Amphibole Content of Cosmetic and Pharmaceutical Talcs*, Environmental Health Perspective, Vol. 94, at pp. 225-230 (1991).

[42] *See also* IMERYS299277 (March 22, 2004, email from Julie Pier stating, "Johnson & Johnson called us frantically, because some outside lab apparently found asbestos in off-the-shelf baby powder. . .. [I]t prompted J&J to ask us where all the data was on their product. I was supposed to be doing quarterly samples by TEM, but they were all in the backlog. Since 2001. Oops . . .").

130.    In September 2018, FDA awarded AMA Analytical Services, Inc. "a one-year contract to test talc-containing cosmetics for the presence of asbestos fibers."[43] "AMA used Polarized Light Microscopy (PLM) and Transmission Electron Microscopy (TEM) to detect and quantify mineral particles suspected of being a form of asbestos."[44] "As part of this testing, two samples of Johnson's Baby Powder were tested: one sample from lot #22318RB was found to be positive for asbestos; a second Johnson's Baby Powder sample, lot #00918RA, tested negative for asbestos."[45] Specifically, "FDA testing [ ] found that [the sample from lot #22318RB] contains chrysotile fibers, a type of asbestos" and "a few talc fibers."[46]

131.    On October 16, 2019, FDA advised JNJ that "Asbestos is a poisonous and/or deleterious substance, and, therefore, Johnson's Baby Powder Batch #22318RB is adulterated within the

---

[43]    https://www.fda.gov/food/cfsan-constituent-updates/fda-releases-data-agencys-year-long-sampling-assignment-test-talc-containing-cosmetic-products.  During the February 4, 2020 FDA "Public Meeting: Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc," FDA's Dr. Linda Katz acknowledged, "The manufacturers are responsible for making sure that the cosmetics that they market are safe for their intended conditions of use. They may do testing, and whatever testing they decide to do is up to them. We are not specific as to how these products must be tested." *See* Transcript of the FDA's Public Meeting, available at https://www.fda.gov/media/136305/download?attachment, at p. 12. Dr. Katz noted that FDA became aware of issues with testing "going back to the 1960s and '70s" and "began to grapple with what would be the best approach and proposed a mandatory optical microscopy method. But at the same time, in around 1976, the [CTFA] also began developing a new method. And that method was referred to as the CTFA Method J4-1. The method was actually published in the 'Asbestiform Amphibole Minerals in Cosmetic Talc.' And this method became the standard that industry used to assess for talc that was being used in cosmetic products. That basically this is a method that uses Polarized Light Microscopy only if the X-ray Diffraction is positive. . . . But that in terms of being able to identify chrysotile fibers, that its sensitivity is not really very good." *Id.* at pp. 14-15. Dr. Katz further stated that FDA "did not have capabilities to do the testing ourself," and "FDA has still no established labs to conduct this testing." *Id.* at p. 17. FDA has retained contract labs to conduct testing on limited occasions. *See* Dr. Lewin testing in 1972 (Ex. J&J-31, Ex. J&J-28); Sperry Rand confirmatory testing in 1972 (Ex. J&J-29); 2009-2010 AMA testing of 34 samples ("FDA Summary of Results from Testing of Official Samples of Talc-Containing Cosmetics of Asbestiform Fibers by AMA Laboratories During 2009-2010," available at https://www.fda.gov/media/122418/download?attachment); AMA 2019 testing (AMA Certificate of Analysis, available at: https://www.fda.gov/media/131989/download).

[44]    https://www.fda.gov/food/cfsan-constituent-updates/fda-releases-data-agencys-year-long-sampling-assignment-test-talc-containing-cosmetic-products.

[45]    https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos.

[46]    *See* AMA Certificate of Analysis, found at: https://www.fda.gov/media/131989/download; *see also* https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos.

meaning of Section 601(a) of the Federal Food, Drug, and Cosmetics Act." JNJTALC001281991.

On October 18, 2019, JNJ voluntarily recalled "Lot #22318RB of Johnson's Baby Powder."[47]

132.    JNJ provided FDA with an "Investigation Final Report" regarding Lot #22318RB.
According to JNJ, "the resulting investigation has determined that [Johnson's Baby Powder] does
not contain chrysotile based on the totality of the evidence," and "the most probable causes are lab
contamination error and/or chrysotile mis-identification." JNJTALC001284148. In a prior draft of
JNJ's report, JNJ internally suggested removing language that chrysotile asbestos has never been
"detected" ("I know this is accurate but since Imerys detected but later confirmed it was an
environmental contaminate should we choose the word like confirmed?) and questioned why TEM
was not used in sampling ("But no TEM? Would there be a rationale why not?"; "Do we really
have a good answer regarding the lack of TEM done by Imerys?"; "How do we resolve that less
TEM is done or am I wrong that it is and doesn't matter?"). JNJTALC001298411.

133.    AMA's Andreas Saldivar confirmed AMA's results in his March 19, 2020, deposition:

> "Q.    Here's my question: For the results you turned over to the U.S.F.D.A., as a result of
> this·contract of some 50 samples, whether or not those were -- those results reported
> in non-detect or a positive finding of asbestos, does AMA stand behind all of its
> results?
>
> A.    Yes.
>
> MR. MASSENBURG:· Form.
>
> BY MR. PANATIER:
>
> Q.    Okay. And did AMA follow all of the appropriate separation and analytical
> methodologies that it told the F.D.A. it would?
>
> A.    We did, and we also followed all instructions from the F.D.A.
>
> Q.    Okay.  All right. In that respect, sir, did you turn over valid results to the F.D.A.?

---

[47]    https://www.jnj.com/johnson-johnson-consumer-inc-to-voluntarily-recall-a-single-lot-of-johnsons-baby-powder-in-the-united-states.

A.    We did.

Andreas Saldivar Dep., 129:2-17.

134.    On May 19, 2020, JNJ "announced the discontinuation of talc-based baby powder in the United States and Canada."[48] Following this announcement, the House Subcommittee on Economic and Consumer Policy stated, "My Subcommittee's 14-month investigation revealed that [JNJ] knew for decades that its product contains asbestos, and the company fought to keep using a testing method that would never have allowed it to be detected."[49]

135.    In addition, I have reviewed other documents describing JNJ conducting or learning about additional findings of naturally occurring mineral silicate fibers of the serpentine and amphibole series in talc samples.[50]

---

[48]    https://oversightdemocrats.house.gov/news/press-releases/oversight-subcommittee-s-year-long-investigation-leads-to-johnson-johnson.

[49]    https://oversightdemocrats.house.gov/news/press-releases/oversight-subcommittee-s-year-long-investigation-leads-to-johnson-johnson.

[50]    *See, e.g.*, JNJNL61_000000266 (July 13, 1966 internal Johnson & Johnson memorandum titled "Microscopic Examination Museum Baby Powder Samples, identifying "tremolite" and "fibrous talc"); JNJAZ55_000004563 (October 10, 1967 internal Johnson & Johnson memorandum reporting microscopic examination of three talc samples and finding "nonplaty talc" and "serpentine" non-talc particles in all three samples); JNJAZ55_000006090, J&J-15 (July 7, 1971 report from Colorado School of Mines on the "344-L Vermont talc product and the six monthly Vermont talc product samples, detecting minor amounts (below 1%) of "tremolite and actinolite."); JNJAZ55_000008893, J&J-257 (September 3, 1971 finding low percentages of "chrysotile" in Shower to Shower tested by McCrone); JNJAZ55_000005958, J&J-23 (October 12, 1971 McCrone analysis finding traces of chrysotile in one of the additives in Shower to Shower); JNJ 000248615, J&J-29 (August 24, 1972 Johnson & Johnson handwritten notes regarding "Talc/Asbestos Shower to Shower Talc," detailing Sperry Rand report of asbestos fibers detected in the Shower to Shower sample previously examined by Dr. Lewin."); JNJ000260833, J&J-34 (October 27, 1972 McCrone report to Johnson & Johnson with handwritten "Do not use this Report. Replaced by Another Version," which deleted references to specific amount of tremolite detected in talc samples); JNJNL61_000008084, J&J-100 (February 26, 1973 report from Colorado School of Mines titled "Mineralogical Examination of Five Talc Samples," finding "slight traces of tremolite-actinolite minerals," "a very minor amount of serpentine which may be chrysotile," and "possible serpentine fibers."); JNJMX68_000002666, J&J-65 (April 24, 1974 McCrone report of core samples taken from ore body and reporting chrysotile asbestos and fibrous tremolite when using transmission electron microscopy); J&J-74 (October 10, 1974 McCrone report of samples from Windsor Materials, finding one sample to "contain fibrous asbestiform material," and other samples to contain "chrysotile fibers"); JNJMX68_000012745, J&J-89 (July 1, 1975 McCrone report to Windsor Materials, finding "these samples do show some amphiboles at an extremely low level," and "We kept a running tabulation of the asbestos which we could positively identify . . . In no case did the asbestos content exceed medium."); JNJNL61_000064366, J&J-92 (September 9, 1975 Johnson & Johnson memorandum regarding Dr. Langer's analysis of talcum powder products, stating "He has identified the products by name and claims that he

has detected tremolite and anthophyllite in Johnson's Baby Powder."); J&J-0150033 (March 31, 1976 Johnson & Johnson internal memorandum regarding "meeting with Johnson & Johnson personnel and the Mt. Sinai School of Medicine," stating, "The Mt. Sinai group indicated that over the weekend the Selikoff group had been studying 6 new samples of talc and had reported that all of them contained minimal amounts of asbestos."); J&J-0043753 (November 14, 1978 letter regarding "Reducing the Number of ore Samples Collected for Analysis by McCrone Associates," and stating from "Mid-1975 to May 1978 . . . Three samples only contained asbestiform fibers, one in each of these samples, i.e., 2 amphiboles and 1 chrysotile fiber."); Ex. J&J-164 (February 9, 1979 report from George Lee's Group finding tremolite and actinolite in composite samples); J&J-0085506 (March 4, 1981 Johnson & Johnson internal memorandum analyzing Guang Dong talc and noting "Classification of the various components in this talc sample is as follows: . . . Approximately 1% tremolite. (US Health agencies will classify this component under asbestos fiber definition); Ex. J&J-305 (January 12, 1984 McCrone report analyzing "for asbestos in the talc sample . . . identified as 'Talc Powder – Superior Grade EV' and finding that "Using polarized light microscopy with dispersion staining, it was determined that the sample contains 2 to 3% by weight tremolite-actinolite. The tremolite-actinolite in the sample is considered to be asbestos by current government regulations; however it appears to be cleavage fragments of the massive form rather than true asbestiform."); Ex. J&J-177 (May 15, 1984 report from Mine Safety and Health Administration documenting asbestos at a mill used to supply Johnson & Johnson talc); J&J-0145303 (February 26, 1985 "Analytical Request and Report" submitted to Johnson & Johnson identifying sample of 100T lot of cosmetic grade Chinese talc to be "asbestiforms positive" using "Microscopy."); J&J-0034630 (August 22, 1985 McCrone report to Windsor Minerals, Inc. analyzing seven talc samples and finding "The presence of asbestos minerals was verified by selected area electron diffraction (SAED), energy dispersive x-ray analysis (EDX) and by morphology," and reporting "chrysotile asbestos" in 2 of the 7 talc samples); Ex. J&J-182 (April 29, 1986 McCrone report to Windsor Minerals analyzing "three (3) talc samples for asbestos analysis," and finding that "Examinations by transmission electron microscopy resulted in the detection of trace amounts of chrysotile asbestos in the samples."); Ex. J&J-260 (March 14, 1988 letter to Johnson & Johnson from R.J. Lee analyzing "a talc sample using transmission electron microscopy to determine the serpentine and amphibole content," with analysis "confined to the fibrous forms," and concluding that "talc sample 879-57 Talc L contains approximately .0024% of chrysotile and .014% of fibrous tremolite."); J&J-0145151 (January 17, 1989 "Talc Analysis" of Talc Powder, 200 Mesh Quixia Shan Dong performed by ES Laboratories, Inc. for Johnson & Johnson's Baby Powder division using the "CTFA J4-1 Method," and finding "0.5%" in "Amphibole Group ['Tremolite, Actinolite, and Anthophyllite']" and "1.0%" in "Serpentine Group ['Chrysotile']"); JNJNL_000006792 (Pier Dep. Ex. 36) (May 23, 1989 letter from RJ Lee Group to Johnson & Johnson regarding "detailed analytical electron microscopical analysis of [Sample 731-116]" and detecting "two chrysotile fibers in the area examined (10 grid squares)."); JNJ 000223449 (July 31, 1989 RJ Lee Group letter to Johnson & Johnson regarding "detailed analytical electron microscopical analysis of [Sample 731-120]" and detecting "three (3) chrysotile fibers in the area examined (10 grid squares)."); Ex. J&J-202 (March 25, 1992 report titled "Cyprus Ore Reserves-Arsenic and Tremolite" noting that "serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of the amphibole minerals, tremolite and actinolite (hydrous calcium iron-magnesium silicates) which have been classified as asbestiform minerals by OSHA and EPA."); Ex. J&J-327 (April 1, 1992 report titled "Cyprus Ore Reserve Evaluation Preliminary Summary" stating that "Fibrous minerals – tremolite and actinolite are ubiquitous in several zones of the Vermont mines."); J&J-0077385 (October 13, 1995 letter from RJ Lee Group to Johnson & Johnson finding "One tremolite particle" in the Johnson's Baby Powder sample tested); J&J-0021092 (August 25, 1997 report from State University of New York examining sample of Johnson's Baby Powder, and finding "Intermixed with the platy particles were long fibrous particles which had a chemical composition of talc. Several of the fibers observed were asbestiform in nature with diameters less than 5 micrometers and lengths greater than 10 micrometers. Some curved 'serpentine' fibers were found with similar composition."). *See also* The Analysis of Johnson & Johnson's Historical Product Containers and Imerys' Historical Railroad Car Samples from the 1960's to the Early 2000's for Amphibole Asbestos, 2nd Supplemental Report of William E. Longo, Ph.D. and Mark W. Rigler, Ph.D., February 1, 2019 ((providing results from PLM, ATEM and HLS testing of 72 historical talc samples from both the Italian (from 1960 to 1967) and Vermont talc mines (from the last 1960s, 1970s, 1980s, 1990s, and early 2000s): 57 Johnson & Johnson powder samples (including 34 from Johnson's Baby Powder, 23 from Johnson and Johnson's Shower to Shower containers), and 15 separate cosmetic talc samples from Imerys labeled "Railroad Car," and finding that 42 of the 57 historical Johnson & Johnson talc samples (73%) were positive for amphibole asbestos and possessed

136.    I also reviewed trial testimony of Dr. Hopkins during which he detailed and confirmed various laboratory tests JNJ received of talc samples containing naturally occurring mineral silicate fibers of the serpentine and amphibole series.[51]

137.    I have reviewed multiple JNJ documents describing talc samples in which no naturally occurring mineral silicate fibers of the serpentine and amphibole series were detected.[52] This is not surprising since, as detailed below, JNJ opposed testing methods that were too sensitive and implemented methods that had significant limits of detection.[53]  I also recognize that on subsequent testing, or retesting or reinterpretation, findings changed.

---

significant amounts of amphibole asbestos fibers/bundles per gram of talc, and 8 of the 15 Imerys "Railroad Car" samples (53%) were positive for asbestos); Trial Testimony of Matthew Sanchez, Ph.D. in *Ingham, et. al v. Johnson & Johnson, et. al*, Cause No. 1522-CC10417-01, June 27-28, 2018.  In an email dated June 2, 2009, sent by Rio Tinto's Rhea Kincaid, Product Stewardship, distributed an attachment labeled "May Highlights – Product Stewardship/Regulatory Affairs."  The document states, "Chinese authorities informed J&J that its internal testing confirmed asbestos in several talc body powders marketed in China including two products from J&J. However, four independent Chinese laboratories using similar test method to the Chinese authorities did not find any asbestos. J&J approached RTM for help on the issue. RTM provided initial support in identifying potential drawback of the test method used by the Chinese authorities. Chinese authorities invited J&J, the other concerned talc body powder companies, and the four independent Chinese laboratories whose asbestos test results were negative to discuss and resolve the test method discrepancies." IMERYS 309325-28.

[51] *See, e.g.*, Trial Testimony of Dr. John Hopkins in *Ingham, et. al v. Johnson & Johnson, et. al*, Cause No. 1522-CC10417-01, April 16, 2019, at pp. 5342-5365, 5371-5373; Trial Testimony of Dr. John Hopkins in *Barden v. Brenntag North America, et. al*, MID-L-0932-17AS, July 22, 2019, at pp. 118-119, 193-194 (regarding Dr. Langer's confirmation that his team found asbestos in Johnson's Baby Powder), at pp. 225-226 (regarding Colorado School of Mines May 1971 findings), at pp. 271-274 (regarding Dr. Langer's 1970s analysis of talc samples).

[52] *See, e.g.*, Exs. D-0263 to D-0732 (identifying non-detect results from 1990 to 1994); D-0916 to D-1919 (2005); D-1019, D-1029 (2009); D-1256 to D-1258 (2013); D-1447 to D-1471 (1973 to 1979).

[53] *See also* JNJMX68_000009139 (December 17, 1974 JNJ letter stating, "We believe it is critical for the C.T.F.A. to now recommend these methods to the F.D.A. before the art advances to more sophisticated techniques with higher levels of sensitization."); J&J-0084545 (February 18, JNJ letter regarding analytical testing methods stating, "I have also included our test method for the proposed Xray technique which was drawn up by Boots Ltd in conjunction with Dr. Pooley. We deliberately have not included a concentration technique as we felt it would not be in worldwide company interests to do this."); JNJ000242147 (November 24, 1976 Johnson & Johnson letter from William Ashton to George Lee discussing FDA's proposal request regarding "Separation of Asbestos in Foods, Drugs and Talc for Identification and Determination," recognizing that "As I have pointed out many times, there are many talcs on all markets which will be hard pressed in supporting purity claims when ultra sophisticated assay separation and isolation techniques are applied.  Chances are that this FDA proposal will open up new problem areas with asbestos and talc minerals."); IMERYS446794 (April 4, 2002, email from Julie Pier discussing R.J. Lee's approach); IMERYS299322 (Pier Dep. Ex. 18) (March 1, 2004 emails between Julie Pier and Rich Zazenski detailing "J&J criteria" for testing and reporting "no asbestos").

138.    I recognize that all laboratory tests have some limitations and can be "explained away." The opinions below are based on the totality of evidence JNJ and its affiliates accumulated over 50 years, not on any one laboratory test or set of tests.

139.    In my opinion, based on the totality of evidence, JNJ's findings and notice of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, actinolite fibers, anthophyllite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc samples prohibited JNJ from selling JNJ talcum powder products because they contained poisonous and deleterious substances, which "*may* render" the products "injurious to users under the conditions of use described in the labeling thereof or under such conditions of use as are customary or usual . . . ," and were therefore adulterated. 21 U.S.C. § 361 (emphasis added).

140.    In my opinion, based on the totality of evidence, at a minimum, Johnson & Johnson's findings and notice of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, actinolite fibers, anthophyllite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc samples prohibited the company from determining that the safety of Johnson & Johnson talcum powder products had been substantiated.

## V.    THE DEFENDANTS DID NOT SUBSTANTIATE THE SAFETY OF THEIR PRODUCT IN LIGHT OF QUESTIONS RAISED BY SCIENTIFIC EPIDEMIOLOGICAL STUDIES AND REVIEWS CONCERNING THE SAFETY OF TALC

141.    As noted above, according to industry standards, if there is <u>evidence that there are reasonable grounds to suspect</u> that the cosmetic product <u>may</u> pose harm for the proposed conditions of use, such products do not meet the industry standards for safety.

142.    Further, as noted above, FDA regulations require that a cosmetic manufacturer has a

58

responsibility to substantiate the safety of their product or must warn consumers that the safety of their product has not been determined.

143.    The safety of a cosmetic, as is the case for other FDA regulated products, needs to be determined "under such conditions of use that are customary or usual . . ."[54]  Thus, it is not the safety of talc that is determinative, rather it is the safety of talc as it is in fact used.  Thus safety needed to be substantiated for talcum powder products that come into contact with the perineum/genital area.

> **A.    FDA's 2014 Citizen's Petition Response stated there was some evidence to suspect or question the safety of talcum powder products**

144.    In its 2014 response to the 1994[55] and 2008 Citizen's Petitions, the FDA stated, "epidemiologic data [] show a statistically significant but modest increased risk of epithelial ovarian cancer, especially with serous histology, among women with a history of genital dusting with talcum powder. While the growing body of evidence to support a possible association between genital talc exposure and serous ovarian cancer is difficult to dismiss, the evidence is insufficient for FDA to require as definitive a warning as you are seeking."[56]  Steven M. Musser, Ph.D., letter to Samuel S. Epstein, April 1, 2014.

145.    The FDA's response continued, "While there exists no direct proof of talc and ovarian carcinogenesis, the potential for particulates to migrate from the perineum and vagina to the peritoneal cavity is indisputable. It is, therefore, plausible that perineal talc (and other particulate) that reaches the endometrial cavity, Fallopian Tubes, ovaries and peritoneum may

---

[54] Section 601 of the FD&C Act [21 U.S.C. 361].
[55] As I stated above, based on my recollection, I was not personally and substantially involved in talc matters while Commissioner. There were certain letters that were addressed to the Commissioner during that time period concerning talc.
[56] The FDA response reviewed data dating back to at least 1961 and performed an expanded literature search from 2008-2014.

elicit a foreign body type reaction and inflammatory response that, in some exposed women, may progress to epithelial cancers."

146.    While I am a professor of Epidemiology and Biostatistics, I leave it to other experts to discuss in detail the strengths, weaknesses, and specifics of the scientific evidence.  FDA's statement that "epidemiological data which show a statistically significant but modest increased risk of epithelial ovarian cancer, especially with serous histology, among women with a history of genital dusting with talcum powder," while not supporting, in FDA's opinion, the petition's request for a "definitive" warning, demonstrates that the safety of talcum powder products was in question.  Schedule 4 provides a summary of epidemiologic studies concerning the association of talcum powder products and ovarian cancer.

147.    Searches of PubMed for "talc and ovarian cancer" and "body powders and ovarian cancer" from 01/01/2014-11/09/2023 demonstrates since the FDA response to the citizens petition in 2014 there are ten (10)  publications of original data including meta-analyses, clinical studies, clinical trials, systematic reviews, and observational studies.[57]

148.     I reviewed the abstracts from these 10 articles. From those, I selected all epidemiological studies, including cohort studies (1), and meta-analyses (5) relating to talcum powder usage and the risk of ovarian cancer.[58]

149.    These epidemiological studies include:

a.      A meta-analysis published by Berge et al. "resulted in a weak but statistically significant association between genital use of talc and ovarian cancer, which

---

[57] The searches yielded ten (10) articles and one (1) article respectively.  Note that there is no "article type" or "filter" for pooled study.  *See* below for listing of additional studies that this PubMed search did not identify with the above search criteria.

[58] The remaining four (4) include: 1) Leemans, et al.; and 2) Frost, et al. that are both related the use of talc with pleurodesis; 3) Rasmussen, et al., studies the association between pelvic inflammatory disease and ovarian cancer; and 4) Mundt, et al. is a systematic review that does not have a meta-analysis associated with it.

appears to be limited to serous carcinoma." However, the authors concluded:
"Several aspects of our results, including the heterogeneity of results between
case-control and cohort studies, and the lack of a dose-response with duration and
frequency of use, however, do not support a causal interpretation of the
association." Berge 2017.

b.    Another meta-analysis published by Penninkilampi and Eslick found that "[any]
perineal talc use was associated with increased risk of ovarian cancer (OR = 1.31;
95% CI = 1.24, 1.39). More than 3600 lifetime applications (OR = 1.42; 95% CI
= 1.25, 1.61) were slightly more associated with ovarian cancer than <3600 (OR =
1.32; 95% CI = 1.15, 1.50). An association with ever use of talc was found in
case-control studies (OR = 1.35; 95% CI = 1.27, 1.43), but not cohort studies (OR
= 1.06; 95% CI = 0.90, 1.25). However, cohort studies found an association
between talc use and invasive serous type ovarian cancer (OR = 1.25; 95% CI =
1.01, 1.55)." This is the most common type of ovarian epithelial cancer.
Penninkilampi 2018.

c.    Regarding a potential mechanism for the observed increased risk, Penninkilampi
and Eslick state "[t]he mechanism by which perineal talc use may increase the
risk of ovarian cancer is uncertain. It has been previously proposed that talc, as a
foreign body, may ascend from the vagina through to the uterine tubes and
instigate a chronic inflammatory response, which may predispose to the
development of ovarian cancer. It is argued that cellular injury, oxidative stress,
and local increase in inflammatory mediators such as cytokines and
prostaglandins may be mutagenic and hence promote carcinogenesis. If chronic

61

inflammation due to ascending foreign body is indeed the mechanism by which talc use is associated with increased ovarian cancer risk, then these results fit the picture." *Id*.

d.    Taher, et al. (2019) is a meta-analysis that showed a positive association between a perineal use of talc powder and ovarian cancer was found [OR: 1.28 (95% CI: 1.20-1.37)].  A significant risk was noted in Hispanics and Whites, in women applying talc to underwear, in pre-menopausal women and in post-menopausal women receiving hormonal therapy. A negative association was noted with tubal ligation.

e.    Woolen, et al. (2022) studied women with frequent perineal talcum powder use and finding "[f]requent talcum powder use was associated with an elevated risk of ovarian cancer (adjusted pooled summary odds ratio 1.47 (95% CI 1.31, 1.65, P<0.0001). There was no evidence of bias and low heterogeneity (I2= 24%, P=0.22)."

f.    Houghton, et al. (2014) is a cohort study[59] based on data from the Women's

---

[59] JNJ's "Facts About Talc" under "Explore the Science: Studies on Talc and Ovarian Cancer" describes three [or four depending on whether the Nurses' Health Study is broken down NHS (Gertig 2000) and NHSII (Gates 2010)] prospective studies published between 2000 and 2016 that considered an association between the perineal use of talc and ovarian cancer.  (https://www.factsabouttalc.com/studies).  These are the Nurse's Health Study (Gertig, 2000 and Gates 2010), the Women's Health Initiative (Houghton 2014) and The Sister Study (Gonzalez 2016). None of these three cohort studies found a significantly increased overall risk of ovarian cancer.

These studies cited their limitations:

The Nurses' Health Study authored by Gertig (2000) cites for example: a) "the questions on talcum powder use refer to ever use and we cannot determine the age at which women began using talc or the duration of use"; b) "our relatively short follow up period may be inadequate to detect an association if the latency for development of ovarian cancer is more than 15 years"; c) "although we controlled of tubal ligation history the tubal ligation question was asked as part of a question on contraception use: therefore, postmenopausal women who were not sexually active may not have responded to the question"; and d) "[t]he prevalence of talc use in our study is somewhat higher than that in other studies and may reflect the fact that we asked about frequency of ever use rather than current use."

Health Initiative.  Perineal powder use was assessed at baseline by self-report

regarding application to genitals, sanitary napkins, or diaphragms and duration of

use."  The authors found, "[e]ver use of perineal powder (hazard ratio [HR]adj =

1.06, 95% confidence interval [CI] = 0.87 to 1.28) was not associated with risk of

---

The Nurses' Health Study authored by Gates (2010) cites for example: a) "although our analysis included a large number of epithelial cases, we had a limited number of cases with certain subtypes and there was incomplete data for a few exposures, in particular talc use and family history of ovarian cancer"; and b) "the incomplete data may have influenced the observed associations for these exposures".  Of note, the Nurses' Health Study by Gates only obtained information about talc use at baseline ("information on frequency of genital talc use was collected in 1982.").

The Women's Health Initiative authored by Houghton (2014) cites for example: a) "our analysis includes a lack of information regarding oophorectomy after baseline, which would result in the inclusion of some women not at risk for ovarian cancer in the analytical cohort"; b) "we have information on duration of powder use but not frequency"; c) "those using powder prior to 1976 may have been potentially exposed to asbestos, a known carcinogen"; d) "the WHI queried general perineal powder use rather than talc powder use and we had no specific information regarding the content of talc in products used."

The Sister Study authored by Gonzalez (2016) cites for example: a) "An important limitation of our study is that we collected douching and talc information on individuals for the year prior to study entry and have not accounted for the latency of ovarian cancer, which is likely to be long"; and b) "[a]t baseline participants were asked about douching and talc use during the previous 12 months".  Of note, the Sister Study had a median follow up period of 6.6 years.

Recent meta-analysis that included: a) cohort studies; b) case-control studies; or c) combine cohort and case-control studies, were done by Penninkilampi (2018), Berge (2018), Taher (2019), Woolen (2022).

In Penninkilampi meta-analysis (2018), for all cohort and case-control studies found "Any perineal talc use was associated with increased risk of ovarian cancer (OR = 1.31; 95% CI 1.24, 1.39)." Subgroup analysis: Cohort studies for all ovarian cancer found an "(OR = 1.06; 95% CI = 0.90, 1.25). However, cohort studies found an association between talc use and invasive serous type ovarian cancer (OR = 1.25; 95% CI = 1.01, 1.55)."

In Berge meta-analysis (2018), the "main meta-analysis" for the combined cohort and case-controlled studies found "the summary relative risk (RR) for ever use of genital talc and ovarian cancer was 1.22 [95% confidence interval CI 1.13-1.30].  The stratified meta-analysis showed a RR for case–control studies was 1.26 (95% CI: 1.17–1.35) and for cohort studies was 1.02 (95% CI: 0.85–1.20)."

In Taher meta-analysis (2019), for the combined cohort and case-control studies, found "[a] positive association between perineal use of talc powder and ovarian cancer was found [OR: 1.28 (95% CI: 1.20-1.37)]." Subgroup analysis: cohort effect was 1.06 (0.90, 1.25).

In Woolen meta-analysis (2022), for the combined cohort and case-control studies, found "[f]requent talcum powder use was associated with an elevated risk of ovarian cancer (adjusted pooled summary odds ratio 1.47 (95% CI 1.31, 1.65, P<0.0001)."

A recent pooled analysis of the four large cohort studies by O'Brien (2021) found that "the estimated HR for frequent vs never use was 1.09 (95% CI, 0.97 to 1.23 and for long-term vs never use, the HR was 1.01 (95% CI, 0.82 to 1.25). However, the estimated HR for the association between ever use of powder in the genital area and ovarian cancer risk among women with a patent reproductive tract was 1.13 (95% CI, 1.01 to 1.26)."

63

ovarian cancer compared with never use. Individually, ever use of powder on the

genitals (HRadj = 1.12, 95% CI = 0.92 to 1.36), sanitary napkins (HRadj = 0.95,

95% CI = 0.76 to 1.20), or diaphragms (HRadj = 0.92, 95% CI = 0.68 to 1.23)

was not associated with risk of ovarian cancer compared with never use, nor were

there associations with increasing durations of use."

150.    I am aware of several studies since 2014 that the PubMed search on 11/9/2023 did not

identify.  For completeness they are:

150.1.    In a case-control and pooled study from Cramer et al., overall, "genital talc use

was associated [with EOC] with an OR (95% CI) of 1.33 (1.16, 1.52) with a trend for increasing

risk by talc years."  The authors stated that "[t]hese observations provide a framework for talc

carcinogenicity in EOC involving chronic inflammation.  Cramer 2016.

150.2.    Using four case-control studies, Wu et al., examined six "well-accepted" risk

factors for invasive epithelial ovarian cancer, including talc use, among Hispanics, African-

Americans, and non-Hispanic whites. The population attributable risk percentage (PAR%)

estimate was "12.2% to 15.1% for using talc in the three groups." The combined OR with talc use

was 1.46 (95% CI 1.27-1.69 (Wu 2015).

150.3.    In a study of African American women from Schildkraut et al., "[g]enital powder

was associated with an increased risk of [epithelial ovarian cancer] EOC (OR = 1.44; 95% CI,

1.11-1.86) and a dose-response relationship was found for duration of use and number of lifetime

applications (P < 0.05)." The authors concluded that "[t]he results support that body powder is a

modifiable risk factor for EOC among AA women."

150.4.    Regarding mechanism, Schildkraut et al. stated that their results "are consistent

with localized chronic inflammation in the ovary due to particulates that travel through a direct

transvaginal route. The dose-response observed for duration of genital powder use provides

further evidence for the relationship between genital powder and overall EOC risk."

150.5.   Davis, et al. (2021) is a meta-analysis using "data from five studies in the

Ovarian Cancer in Women of African Ancestry consortium" and found "[e]ver use of genital

powder was associated with higher odds of ovarian cancer among African-American women [OR

= 1.22; 95% confidence interval (CI) = 0.97-1.53] and White women (OR = 1.36; 95% CI =

1.19-1.57). In African-American women, the positive association with risk was more pronounced

among high-grade serous tumors (OR = 1.31; 95% CI = 1.01-1.71) than with all other histotypes

(OR = 1.05; 95% CI = 0.75-1.47). In White women, a significant association was observed

irrespective of histotype (OR = 1.33; 95% CI = 1.12-1.56 and OR = 1.38; 95% CI = 1.15-1.66,

respectively)." Davis further concluded, "[w]hile genital powder use was more prevalent among

African-American women, the associations between genital powder use and ovarian cancer risk

were similar across race and did not materially vary by histotype."

150.6.  O'Brien, et al. (2020) is a pooled study using data from the Nurses' Health Study.

"Ovarian cancer incidence was 61 cases/100 000 person-years among ever users and 55 cases/100

000 person-years among never users (estimated risk difference at age 70 years, 0.09% [95% CI, -

0.02% to 0.19%]; estimated HR, 1.08 [95% CI, 0.99 to 1.17]).  The estimated HR for frequent vs

never use was 1.09 (95% CI, 0.97 to 1.23) and for long-term vs never use, the HR was 1.01 (95%

CI, 0.82 to 1.25)."  The authors found further that "While the estimated HR for the association

between ever use of powder in the genital area and ovarian cancer risk among women with a patent

reproductive tract was 1.13 (95% CI, 1.01 to 1.26), the P value for interaction comparing women

with vs without patent reproductive tracts was .15."

150.7.  Gonzalez, et al.  reported on data from the Sister Study looking at douching, talc

use, and risk of ovarian cancer.  The authors found, "[t]here was little association between baseline perineal talc use and subsequent ovarian cancer (HR: 0.73, CI: 0.44, 1.2). Douching was more common among talc users (odds ratio: 2.1, CI: 2.0, 2.3), and douching at baseline was associated with increased subsequent risk of ovarian cancer (HR: 1.8, CI: 1.2, 2.8)."  The authors concluded, "[d]ouching but not talc use was associated with increased risk of ovarian cancer in the Sister Study."

151.    In my opinion, based on FDA's analysis to the citizens petitions and the totality of the medical literature since FDA's 2014 petition response, there is scientific evidence to suspect or question the safety of talcum powder products.

> **B.    The International Association for Research on Cancer (IARC) concluded that there was evidence of talcum powder's carcinogenicity.**

152.    In 2010, IARC published Monograph 93, which found that "[t]he relative risks for ovarian cancer among users of body powder (versus non-users) were homogenous across this relatively diverse set of eight studies, each of which indicated a 30–60% increase in risk . . . Perineal use of talc-based body powder *is possibly carcinogenic to humans (Group 2B)*."  "IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 93," 2010.4F[60]  This monograph specifically addresses the safety of talc not containing asbestiform fibers.

153.    In regard to asbestos, talc containing asbestos, and talc containing asbestiform fibers (fibrous talc), IARC published Monograph 100c, which found that, "[t]here is *sufficient evidence* in humans for the carcinogenicity of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite, and anthophyllite). Asbestos causes mesothelioma and cancer of the lung, larynx, and ovary . . . There is *sufficient evidence* in experimental animals for the carcinogenicity

---

[60] IARC looked at data dating from at least 1933.

of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite and anthophyllite).

All forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite and anthophyllite) are

*carcinogenic to humans (Group 1).*"  "IARC Monographs on the Evaluation of Carcinogenic

Risks to Humans: Volume 100c," 2012.  "The conclusions reached in this *Monograph* about

asbestos and its carcinogenic risks apply to these six types of fibres wherever they are found, and

that includes talc containing asbestiform fibres."[61]

### C.    Defendants failed to substantiate the safety of their talcum powder products

154.    In my opinion, in light of a) the FDA's 2014 petition response acknowledging that there

remains some evidence to suspect or question the safety of talcum powder products, b) the

totality of the medical literature since  2014 that continues to raise safety questions; and c)

IARC's classification, defendants failed to substantiate the safety of their talcum powder

products.

## VI.    ALTHOUGH CONTROVERSIES AND COMPLEXITIES EXISTED, JNJ DEFENDED ITS PRODUCT DESPITE SIGNIFICANT QUESTIONS REGARDING ITS SAFETY AND PUT THE PUBLIC AT RISK

### A.    JNJ recognized iconic nature of their product

155.    On July 22, 2019, JNJ's corporate representative John Hopkins testified, JNJ's Baby

Powder had been "sold for over 100 years," "was a historical product . . . from the 1890's" and

was referred to as "[JNJ's] flagship product."[62]

156.    An August 4, 1999, Communication with Europe Strategic Planning states, "classic

Johnson's Baby Powder fragrance is the most recognizable fragrance in the world".   JNJ

000559770.

---

[61] *Id.*  It is my understanding that other experts will discuss the specific aspects of asbestos and talc with asbestiform fibers (fibrous talc).
[62] Trial Testimony of Dr. John Hopkins in *Barden v. Brenntag North America, et. al*, MID-L-0932-17AS, July 22, 2019, at pp. 102:10-104:1.

157.    A June 20, 2003, JNJ email titled "JB Powder w China Talc" references baby powder as a sacred cow: "My sense is that the Baby Powder is such a 'Scared Cow' that we will just leave it alone." JNJL4T5 000004485.

158.    A JNJ document dated October 5, 1976, stated that the Market Share based volume in ounces for Johnson's Baby Powder was 53.6% and for Shower to Shower was 11.1%. The other four named products together accounted for approximately 25%. JNJ000300223

159.    On JNJ affiliated website ourstory.jnj.com, the home page displays the title JOHNSON'S BABY POWDER 1894: "The company's baby product business was born in 1894 when JOHNSON'S BABY POWDER hit the market."

160.    A JNJ document regarding Johnson's Baby Powder Talc Aspiration states "Baby Powder represents the cornerstone of our baby products franchise." JNJNL_61_000009898.

**B.    JNJ was in possession of evidence and/or had concerns regarding asbestos and the safety of its product beyond what is discussed above**

161.    A letter to H.L. Warner, Office of General Counsel at JNJ on April 12, 1960, from W.E. Chase at Batelle Memorial Institute, concerns a patent application for "Platy Talc Beneficiation." The purpose of the study was to determine if various reagents were "effective in selective flotation of platy talc" In the chart, Summary of Flotation Experiments with Surface Active Reagents, Float Results indicated reduction but continued presence of nonplaty talc and tremolite. (D-0182).  A patent was never obtained to reduce the recognized presence of fibrous talc and tremolite.

162.    In a JNJ memo dated March 30, 1973, Tom Shelley, director of JNJ's Central Research Laboratories writes to Mr. Warner's colleagues: "[W]e will want to carefully consider the Pooley patents re. asbestos in talc. It's quite possible that we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know." J&J 0070263; JNJAZ65 000014444.

163.    Medical literature beginning in the 1960s raised concerns about the presence of fibers in cosmetic talcum products.

163.1.    Cralley et al. studied 22 talcum products, finding "fiber contents ranging from 8% to 30% by count of the total particulates with an average of 19%. Although the specific fibrous materials were not identified, they were predominantly fibrous talc, as shown by X-ray diffraction, with the probably [sic] presence in minor amounts of other fibrous minerals such as tremolite, anthophyllite, chrysotile and pyrophyllite." JNJ000018189.

164.    The following year, in a letter to Dr. G. Hildick-Smith, dated April 9, 1969, W.H. Ashton discusses the subject, Alternate Domestic Talc Sources:

164.1.    "[We] have to firm up the position the Company should have on the presence of the mineral Tremolite in talc. Your staff will have to do this for us since the objections to that mineral have been mainly medical or clinical as opposed to chemical or physical.

164.2.    "The reason we have to firm up our position is that we moved into high gear on some alternate talc sources and it is normal to find different levels of Tremolite in many U.S. talcs.

164.3.    "Historically, in our Company, Tremolite has been bad because it has needle type crystals. . . Over the past year or two, the medical literature has made reference to potential hazards of talcs containing Tremolite and I have seen some articles under the umbra of environmental health agencies from here and abroad which pinpoint severe objections to that mineral in talcum powders." JNJAZ55_000001073-74.

165.    Dr. C. S. Thompson with R. T. Vanderbilt, copying JNJ's Dr. Hildrick-Smith replies that he has occasionally received inquiries from various individuals, including General Johnson and several pediatricians expressing concern over the possibility of the adverse effects on the lungs of babies or mothers who might inhale any substantial amounts of our talc formulations."

165.1.  The possibility of litigation was also discussed: "It might be that someone in the Law Department should be consulted with regard to the defensibility of our position in the event that such a situation could ever arise."

165.2.  Dr. Thompson concluded, "It is my personal feeling that until we have at least substantial evidence, based on animal work, to the effect that the presence of Tremolite in our talc does not produce adverse effects, we should not extend its usage beyond an absolute minimum previously mentioned." factsabouttalc.com 0144.pdf; JNJL61_000001535.

166.    On April 26, 1973, JNJ's D.R. Petterson wrote a memo to D.D. Johnston, Subject: Windsor Minerals and Talc. That memo discusses a number of points of "considerable concern" that were discussed between JNJ's D.R. Petterson, Bill Ashton, Roger Miller and Vernon Zeitz. According to the memo, the points that were covered at that meeting were:

166.1.  "1. It is our joint conclusion that we should not rely on the 'Clean Mine' approach as a protective device for Baby Powder in the current Asbestos or Asbestos-Form controversy. We believe this mine to be very clean; however, we are also confident that fiber forming or fiber type minerals could be found. The usefulness of the 'Clean Mine' approach for asbestos only is over.

166.2.  "2. It is possible that the technique of identification for asbestos or asbestos-form materials will be an optical approach. It probably will be some variation of the McCrone method. This method with appropriate concentrating techniques will permit a good laboratory to identify asbestos or tremolite in a talc sample.

166.3.  "3. The current medical research is confirming that it is particle shape, not chemical substance which is harmful as such-fiber-like materials will be suspect. The argument rages as to whether an aspect ratio of 3/1, 5/1, or 10/1 will be adopted.

166.4.  "4. The problem then is two fold, one for Windsor and one for Baby Powder

70

a. At Windsor the mine is currently under the jurisdiction of the Bureau of Mines. The inspections of the mine indicate that we are well within the limits presently accepted for non-fibrous dust. Roger Miller feels that they could live within the current TLV values for fibrous talc of 5 parts per million. We don't know the impact of a TLV of 2 fibers per cubic meter.

The May 8th meeting will primarily be an information meeting on mine and manufacturing safety. We would not expect standards to be set, however, there will be agitation probably by OSHA, NIOSH, and the Consumer Group (Selikoff), to lower the standards for the industrial exposure to the same level as asbestos…

b. As for Baby Powder, the entire thrust of communications with the FDA has concentrated on asbestos as harmful fiber-like material. Sophisticated techniques have been proposed to make sure that fiber-form materials present in the samples were identified as being asbestos. The implication is that all other fiber-forms, if present, were talc or other minerals and these were safe. This posture will no longer be satisfactory. If the FDA Food Division, which is moving more rapidly than the Cosmetic Division, publishes a standard, it will probably be to ban asbestos-form or fibrous material in talc. That could eliminate the current uses of talc in packaging materials. These talcs contain widely varying amounts of tremolite or fibrous talc. Our Baby Powder contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of tremolite or actinolite are identifiable (Optical Microscope) and these might be classified as asbestos fiber.

166.5. "5. We have been pursuing several alternatives to better protect our powder franchise. These include:

"a. An improvement in the flotation technique to better select platy talc, and perhaps reduce any tremolite or talc shards. The work is still in the lab and the timetable for

commercialization is unknown. It is, however, a chemical procedure and therefore would probably not require major equipment change.

"b. A program investigating two different ways of removing a large portion of the very fine particles presently found in talc. We have demonstrated the feasibility of both approaches. The equipment and process development would take between 9 and 12 months on a crash basis. Other approaches which might be less expensive or more effective, have only been talked about. A crash engineering program could be undertaken with a good chance of success in this area. It should be cautioned, however, that no final product will ever be made which will be totally free from respirable particles. We are talking about a significant reduction in fine particle count but not 100% clean-up.

"c. Corn starch is obviously another answer. The product by its very nature does not contain fibers. Furthermore, it is assimilated by the body.

166.6.  "We would recommend that items 'a' and 'c' receive top priority. The Corn Starch program, is primarily one of merchandising and the development of explosion proof facilities. We would recommend this program be spear-headed by a task force under Jim Dettre.

166.7.  "The flotation program is currently being worked on at Windsor by Vernon Zeitz. We would propose a task force of Zeitz, Goodman, and Ashton and Rolle, to identify the opportunities in removing fiber-like materials from the beneficiated talc, with a recommendation to Management in 30 days.

166.8.  "If we are agreed with the above, then the Battelle program should be restudied to include cells of animals on a, b, and c. We might wish these to be new cells, or to delete certain cells now in the program." JNJ000251888-90.

**C.    JNJ failed to report to the FDA that laboratory tests found evidence of naturally occurring mineral silicate fibers of the serpentine and amphibole series.  In my opinion, that failure misled the FDA over the last half a century**

167.    Dr. John Hopkins, 30(b)(6) corporate representative of Johnson & Johnson, testified over four days (August 16, 2018, August 17, 2018, October 17, 2018, and November 5, 2018).

167.1.  Over the course of those four days, Dr. Hopkins reviewed numerous laboratory testing results of JNJ talc. His response was recorded in a chart, with a column made to document the results as provided in the testing reports. A second column was used to record Dr. Hopkins' comments regarding those results. On Dr. Hopkins' final day of testimony, he went through each result and responded with whether the results met JNJ's definition of asbestos. Hopkins Dep. Vol. III-IV.

167.2.  The samples tested varied from research samples, ore, Shower to Shower, Baby Powder, medicated powders, talc, processed talc, air samples, core, and plant run samples.

167.3.  According to chart D-1-AA, developed during the deposition, Dr. Hopkins answered that there were approximately 28 times when Dr. Hopkins responded that the laboratory findings met JNJ's definition of asbestos.

167.4.  One of the affirmative responses was for the laboratory results set forth in a report from Walter C. McCrone Associates, Inc. dated May 8, 1974, titled "Examination of Talc Ores and Products: Benefication Processes. "In sample 66-AC-Product, the report stated, "Only one chrysotile fiber was found in this sample; a significant reduction from the level in the ore sample. Again, no asbestiform amphibole minerals were detected." JNJ 000326106 (J&J-66).

167.5.  The corresponding ore sample, 66-AC-ore, reported that "Eight chrysotile fibers were found in this sample, however, their lengths were all less than 1/3 of 1 μm. No asbestiform amphiboles were observed." JNJ 000326106 (J&J-66).

167.6. In the summary section, this report stated in regards to the 66-AC-Product chrysotile fiber finding, "At the level of one fiber in a sample it is debatable whether this represents a true chrysotile level in the sample or whether it represents contamination during taking or preparation of the sample." JNJ 000326106 (J&J-66).

167.7. When asked at his November 5, 2018, deposition whether these findings met JNJ's definition of asbestos, Dr. Hopkins stated: "Q. Right. Chrysotile satisfies the [JNJ] definition of asbestos, correct? A. If chrysotile is present, it would satisfy the definition, correct." Hopkins Dep., November 5, 2018, 1238:8-12.

167.8. Another affirmative response was for the laboratory results set forth in a report from Walter C. McCrone Associates, Inc. dated September 3, 1971. titled "Preliminary Report on Examination of Grantham Ore, Medicated Talcum Powder, and Shower to Shower Talcum Powder." (J&J 257), Hopkins Dep., 1238:8-12.

167.9. The report stated, "In the medicated powder, we found one fiber of chrysotile, and we estimate that this powder contains less than 0.001 % asbestos." J&J 252, p.2.

167.10. The report further stated in the "Shower to Shower sample we found several fibers which do not show the coring typical of chrysotile. These may be fine fibers of talc or of Ca(PO 4)2nH20 which also occur as needles. There was one very small fiber which could have been chrysotile in a field of fine talc flakes. We were unable to obtain a diffraction pattern from the sample, but we feel strongly that it may be chrysotile. Again, the percentage of chrysotile is very low, in the range of p. 001-0. 0001%." J&J 252, p.2.

167.11. At his October 17, 2018, deposition, Dr. Hopkins testified as follows:

"Q: Is it the fourth entry. The fourth entry. My bad.

A. Yes.

Q. 'Fiber of chrysotile.' Do you see that?

A. Yes.

Q. Okay. Under the Johnson & Johnson definition that's behind you, that would

be asbestos, correct, chrysotile?

A. Chrysotile fiber would be asbestos, yes."  Hopkins Dep., 1072:1-13.

168.    In a March 17, 2016, letter to the United States Food and Drug Administration, Johnson

& Johnson's, Vice President of Regulatory Affairs North America, Jethro Ekuta, responded to the

FDA's February 25, 2016 "Request for Information on Talc." Ekuta stated: "JJCI talc is also

evaluated for a number of additional impurities…"

168.1.  Table two in the letter lists impurity testing for JJCI body powders, which

included asbestos.

168.2.  On the subject of asbestos, Ekuta specifically states: "**No asbestos-form

structures have ever been found during any testing**." [emphasis added] JNJ 000636145, p.12

(PLT-00131).

168.3.  Rather than sharing JNJ's test results with the FDA, Ekuta cited FDA surveys to

the FDA: "FDA summarized its 2009 exploratory survey of marketed cosmetic grade raw

material talc and finished cosmetic products containing talc, including JJCI products

(Johnson's® Baby Powder and Shower to Shower® Morning Fresh Absorbent Body Powder).

FDA indicated that no asbestos fibers or structures were found in samples of cosmetic-grade raw

material talc or cosmetic products containing talc including eye shadow, blush, foundation, face

powder, and body powder." JNJ 000636145, p.6 (PLT-00131).

168.4.  Ekuta references no other results in the letter than FDA results, which FDA

already had.

168.5.  In my opinion, JNJ's representation to the FDA in their March 17, 2016, letter that no asbestos-form structures have ever been found during any testing was false and misleading.

**D.      JNJ defended its products to health agencies by representing that its products were asbestos-free and safe**

**i.      JNJ attempted to remove talc from NTP list of carcinogenic substances**

169.    In a July 12, 2001, email titled "NTP – A Strategic Proposal," from Imerys' Director of Environment and Safety, Rich Zazenski, Mr. Zazenski states that "[w]ith regard to human data on 'talc not containing asbestos' [TNCA], clearly the epidemiology studies linking cosmetic talc and ovarian cancer have been the most troublesome. While everyone admits the relative risk ratios are borderline, there are simply too many studies with these low RR's to be ignored."  Zazenski states:

169.1.  "[A]dmittedly we did not grasp upon the significance of this 'flaw' anytime in the past 10-15 years when these studies were being published.

169.2.  "The NTP draft background document brought to life the uncertainty of the purity of the 'cosmetic' talcs used by the women in these study groups."

169.3.  "If we can "invalidate" most, if not all, of the published epidemiology studies by demonstrating that sufficient doubt exists as to the purity of the cosmetic talc used prior to the mid-1970s, then it is likely that NTP might defer any reconsideration of 'talc not containing asbestos (TNCA).'

169.4.  "In order to accomplish this objective, two key technical points are required. One, the published literature on the quality of cosmetic talcs prior to the 1970's must be sufficient and persuasive (in that cosmetic talc may have contained asbestos).  Secondly, there must be published data that authenticates that asbestos is a risk factor for ovarian cancer.  I believe we can document both of these points sufficiently to construct a well-referenced 'White Paper' for NTP . . .

169.5.  "Our 'White Paper' can effectively invalidate the only 'troublesome human data that NTP has for TNCA. I am going to investigate the literature on crystalline silica and ovarian cancer to see if this can 'compound' the quality dilemma . . . That would mean that cosmetic talcs (in the past) might have contained two substances that have been declared known human carcinogens. This type of information would irrefutably invalidate the conclusion of the epidemiology studies for TNCA."

169.6.  "Last thought – I recognize the potential dangers in digging up this information – but were it not for this specific quality issue, we would be preparing now for a very dim future in the talc business."  IMERYS239757-8.

170.    A January 2, 2002, Luzenac[63] document titled "Principal Argument for Adopting Luzenac America's NTP Strategy" states, "We engaged the council of the Center for Regulatory Effectiveness ('CRE') in November 2000 for the purpose of providing us direct assistance in developing a business strategy to challenge the NTP talc review. CRE 'knows' NTP.

170.1.  "From the beginning, CRE has recommended that we adopt an aggressive (professional) approach with NTP. Our technical (and legal) arguments have alternated between Luzenac and CRE letterhead - designed to maximize the intended effect.

170.2.  "CRE believes the request for by Dr. Olden (NTP Director) presents us with an opportunity to 'proactively' submit a detailed literature research paper that not only directly addresses the unresolved issues (mineralogy), but also other controversial issues that we anticipate will (or should) resurface (epidemiology, causation, consistency of results). It affords us the opportunity to initiate the agenda for discussions with NTP.

---

[63] Luzenac Group was a wholly owned subsidiary of Rio Tinto from 1988 until August 2011, when it was sold to Imerys. It was the sole supplier of J&J talc during that time period.

170.3.  "In November 2000, Luzenac discovered the "fatal flaw" in the NTP report. With the help of CRE we exploited this issue with NTP which ended in the deferral decision by the NTP Executive Committee.  The public record will reflect that Luzenac America was the only talc-interested-party who recognized this fatal flaw (and winning strategy).

170.4.  "KEY POINTS . . . I am not at all concerned about angering CTFA or any of its members who might be customers. With our entire business literally at stake, we have the 'standing' to do what we feel is necessary in this battle for survival. As an aside, only [JNJ] and possibly one other company expressed interest in further funding of the consultants utilized by CTFA last December."  Pltf_LUZ_00000093-4;LUZ000566-7.

171.    In a presentation by Steve Jarvis, Head of Health, Safety and Environmental matters for Luzenac American, following NTP's final review, he stated, "Now realistically . . .  there are some health issues with talc. For nearly 20 years, epidemiologists have been finding a weak, but persistent statistical link between the hygienic use of talc and ovarian cancer. However . . . . the studies are weakened by no one being able to offer any feasible 'causal' explanations as to how and why talc would cause ovarian cancer . . . . but not a multitude of other cancers in the human anatomy.

171.1.  "But now we had only two months to prepare for the third NTP review meeting . . . a public meeting of the influential Board of Scientific Counselors Subcommittee. This occurred in December of last year and we achieved a very dramatic turnaround. The BSC subcommittee voted 7-3 *not* to list talc. [emphasis in original]

171.2.  "Our successful defense strategy was threefold . . . Secondly . . . and this was our secret weapon, engage the services of the Washington based Center for Regulatory Effectiveness, CRE. Since its formation in 1996 by several ex-high ranking officials in the OMB, CRE has grown

into a nationally recognized . . . and relatively respected . . . regulatory watchdog organization. Federal agencies frequently come to them for assistance. CRE has also taken NTP to court.

171.3. "And thirdly, we decided to be aggressive. This was a fight we simply could not lose. As such, we retained expert legal counsel to ensure we would have a solid foundation for a legal challenge if necessary . . .  it was the same firm which assisted CRE in their court battle with NTP . . .  and we also became very aggressive in our communication with NTP and other federal agencies. We didn't let the windows of 'formal comment periods' become restrictive. We sent e-mails, faxes, overnight letters, and even telephones calls to key players in this battle . . . right up until hours before the final Executive Committee meeting. And we believe these strategies paid-off.

171.4. "While we certainly would have preferred a total victory - where NTP declared talc was not a human carcinogen . . .  we were relieved to at least get the review process 'derailed' for now . . . at least we have some 'breathing space' to prepare a thorough, scientific defense of talc.

171.5. "One of the issues we plan to focus on is demonstrating to NTP that virtually all of the epidemiology studies they previously used must be declared invalid for use in assessing talc 'not containing asbestos.' This will be an expansion of the 'Fatal Flaw' defense Luzenac employed in the first review on talc.  Additionally, we believe the latest epidemiology study which IS valid with regard to talc quality . . . it's called the Gertig study[64] . . . and which happens to be the largest

---

[64] Gertig, published in 2000 reported data from the Nurses' Health Study. Gertig accepted that "[c]osmetic talc may have been more likely to contain asbestos fibers prior to 1976, before voluntary guidelines were proposed", citing Harlowe, a 1992 case-control study Gertig also affirmed the migration of talc into the peritoneal cavity and ovaries, stating "Talc is able to migrate through the genital tract and gain access to the ovaries because talc fibers have been detected in benign and malignant ovarian tissue." Gertig found an increased, but not statistically significant, risk of all epithelial cancer with ever use of perineal talc (RR 1.09 (0.86-1.37)) and a statistically significant association with ever talc use and serous ovarian cancer (RR 1.40 (1.02-1.91)), the most common subtype of epithelial ovarian cancer – accounting for >50%.

study as well . . . shows no increased risk of ovarian cancer. The significance of this study must be more heavily weighted than prior studies.

171.6. "One last point……lest we get complacent……regardless of what happens with NTP, we also have to keep an eye out for IARC. IARC reviewed talc back in 1986 and concluded there was insufficient evidence of talc carcinogenicity in humans. We are hoping that this NTP activity doesn't stimulate IARC conduct an 'end-run' around NTP declare talc a possible human carcinogen . . . because I think you all know, we do not have the ability to become an active participant in that relatively 'closed' process. Pltf_IMERYS_00044439; IMERYS-A_0021921.

172.    These documents show that talc manufacturers argued to the NTP that talc prior to 1970's had asbestos and that was the reason for the increased risk in epidemiologic studies. They imply that something changed in the manufacturing process that yielded asbestos free talc.

173.    If it was the voluntary adoption of the CTFA testing standard in 1976 that changed, that supports the notion that the talc mines always contained asbestos, and it was the testing that improved the quality of the talc.

174.    According to industry reviewers, "In 1976, specifications for cosmetic talc requiring that no detectable fibrous, asbestos mineral be present were developed. Therefore, this report will only address the safety of talc that does not contain asbestos. Because the specification was developed in 1976, that year was used in determining what data are more likely relevant to the safety of cosmetic talc; therefore, some studies performed prior to 1976 may not be relevant to talc as currently used in cosmetics, and they might not be included in this assessment." Fiume 2015.

      ii.       **JNJ attempted to preempt IARC's designation of talc as carcinogenic and didn't update MSDS based on the IARC designation**

175.    IARC found in 1987 that there was sufficient evidence for talc containing asbestiform fibers to be considered carcinogenic (Group 1 known human carcinogen); the evidence was

considered insufficient for talc not containing asbestiform fibres (Group 3 not classifiable).

IARC 1987.

176.    In 2006, the Working Group met again to consider the evidence for talc without

asbestiform fibres, considering evidence up until 2006. Although JNJ described the IARC

process as "relatively closed," JNJ still attempted to influence the process.

177.    In an email discussion with CPCUS (JNJ Consumer Products Division) members

regarding having input into the IARC process dated August 29, 2005, the following was

considered:

177.1.  "It is VERY difficult to have any impact on the IARC, and this has recently

become more difficult by rule changes that make industry input difficult and suspect. CTFA

advised that the best we can do was to ask Dr. John Hopkins to follow a process called "Self-

Nomination." And offer his name to IARC as a talc expert. I have asked John to do this and he

agreed. I provided John with the proper weblink.  We have some hope that [JNJ]'s reputation and

our major commitment to talc might make John a valuable asset to the IARC (maybe?). CTFA

also advised that Dr. Muscat is already involved with another IARC committee. Dr. Muscat and

Huncharek are experts that are working with us on white papers for NTP and whom we respect.

CTFA will ask Dr. Muscat and Huncharek to also self nominate for IARC. We would be happy if

one of these experts was involved in the process." JNJ000003911.

178.    In an email dated October 17, 2005, titled IARC Talc Review, CTFA sought support for

the cost of Observers near the IARC Working Group meeting from JNJ. A "war room was to be

operated near the IARC facility to serve as a meeting and communication site where Observers

can go research issues." JNJ 000003915; JNJ000004015.

179.    Although not a member of the Working Group, Dr. Muscat, a JNJ consultant, attended the meetings as an observer and confidentially reported back to Luzenac through the law firm Crowell & Moring.  (P334 JNJ000003969). On February 8, 2006, Dr. Muscat relayed the Working Groups epidemiology discussion including his "introduction into the discussion of the fact that the talc-diagram studies (supported by JNJ) did not show a relationship; with the scientific premise that talc-coated diaphragm would be a more plausible and direct route of exposure than perineal dusting. Evidently, the Working Group was not going to consider, or even be aware, of the negative talc-diaphragm studies . . . . It is critical that the Support Team provide scientific reasoning to knock the underpinnings from the Cramer et al. studies. P334 JNJ000003969.

180.    IARC listed talc without asbestiform fibers as a possible carcinogen (Group 2b). Following the designation, Imerys added the following to its Material Safety Data Sheet (MSDS) for talc:

180.1.  "IARC (2006 in preparation) Has [sic] concluded that perineal use of talc based body powder is possibly carcinogenic to humans (Group 2B).  This is not a route of exposure relevant for workers and applies to one specific use of talc only."  IMERYS 049953.

181.    In a January 19, 2005, email Dana Mickel (CPCUS) with the subject "MSDS Carcinogenic Rating," stated:

181.1.  "I wanted to bring to your attention that a new field has been added to the Wercs (the system that is used to generate product MSDS) that identifies carcinogenic or suspected carcinogenic ingredients.  Three of our products for the February launch have been flagged thus far with this warning. One of the products is Shower to Shower® Shimmer Effects Body Powder, Project Shimmer has been identified with 41.95% Talc. The other two are Aveeno® Lip

Relief Medicated Therapy, Project Angelina and Aveeno® Lip Relief Medicated Therapy Stick,

Project Jagger both having Camphor at 1.1%. I do believe that a few other products will be

flagged upon Scott's review later this week as well.  The attached spreadsheet will help you

identify where the carcinogenic classification of ingredients is derived from. JNJ 000390337.

181.2.  The email contained two attachments:

181.2.1.    "ProjectShimmer.rtf" that stated, "The below component(s) have

been defined as a cancer-suspect agent by a worldwide reputable agency" and lists Talc.

JNJ000390340

181.2.2.    "J&JCaringenciList.xls" [sic][65] the following excerpt

| CAS | Name | JNJ | ACGIH | IARC | NTP | OSHA | CA Prop 65 | EU Annex I | Australia | Japan | Korea | Mexico |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 68952-81-8 | TAIL GAS, PETROLEUM, THERMAL-CRACKED DISTILLATE, GAS OIL AND NAPHTHA ABSORBER | O | | | | | | K | O | | | |
| 68308-12-3 | TAIL GAS, PETROLEUM, VACUUM GAS OIL HYDRODESULFURIZER, HYDROGEN SULFIDE-FREE | O | | | | | | K | O | | | |
| 68478-34-2 | TAIL GAS, PETROLEUM, VACUUM RESIDUES THERMAL CRACKER | O | | | | | | K | O | | | |
| | TALC | K | K | K | | | K | | | K | | |
| 14807-96-6 | TALC (MG3H2(SIO3)4) | O | | | | | | | | | | O |
| 10540-29-1 | TAMOXIFEN | K | | K | K | | K | | | | | |
| | TAMOXIFEN AND ITS SALTS | K | | | | | K | | | | | |

JNJ 000390346.

 In a second tab labeled "REG," TALC is listed as A1 (ACGIH) and 3 (IARC).  TALC

(MG3H2(SIO3)4) is listed as A4 (ACGIH) and 3 by IARC.  JNJ 000390346.

181.3.  In response, Robert A. Predale stated, "Do NOT send out any MSDS with this

statement on it!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!  I will discuss with Joan, Steve and Paul and get

back to you." JNJ 000390337.

---

[65] The email gives the legend as follows:
  "K- 'The below component(s) have been defined as a human carcinogen by a worldwide reputable agency.'
   0 - 'The below component(s) have been defined as a cancer-suspect agent by a worldwide reputable agency.'
   Under review- 'The below component(s) are under review for carcinogenic effects by a worldwide reputable agency.'"

181.4.  On February 2, 2005, Joan Casalvieri responded, "Talc is listed as both ACGIH A4 and IARC class 3 - again not classified as a human carcinogen. There is another listing for talc that is class 1 'confirmed human carcinogen' but we suspect this must be the grade that is known to contain asbestos. Please clarify if you know what this listing is. Cosmetic talc that we use in our products does not contain asbestos and is not carcinogenic. We are aware that the NTP is looking at talc as part of the 12th ROC. We are very involved in that exercise and will be on top of the findings." JNJ 000390347.

181.5.  She further states, "I would suggest that the Wercs system needs to be modified so that materials that are not classified are not identified as requiring a warning statement. As toxicologists we need to be able to make assessment calls on our finished products based on the intended use. We do a very thorough internal safety assessment on our products and are assured that they are safe in general and specifically do not contain cancer causing ingredients. The scientific data and our safety assessment do not warrant that a warning statement be placed on our products."  JNJ 000390347.

182.    In 2006, IARC upped its classification of talc not containing asbestiform fibers to 2B, "Possibly carcinogenic to humans." IARC 2007.

183.    Even after the 2006 classification, JNJ did not add a warning to its MSDS for talcum powder products.

184.    In a letter dated July 12, 2006, Eric Turner, VP of Health and Sustainability with Luzenac/Imerys wrote to Mark Ellis, President of Industrial Minerals Association of North America regarding Luzenac's decision to forego any further funding of the University of Vermont talc study (re: "Mossman" study). Turner explained, "When IARC concluded their review and classified 'perineal use of talc-based powders' as a Group 2b carcinogen, we began to

question the value of proceeding any further with the Mossman study. To put it in the vernacular, the 'horse has already left the barn.' Due to the considerable costs involved and deadlines no longer a factor, Luzenac (Rio Tinto Minerals) made the business decision that the potential value of this study was greatly diminished and did not warrant any further pursuit at this time." LUZ001443.

184.1.  A deleted sentence stated, "one of their primary arguments is that there are simply too many positive epidemiology studies published to stem the tide of negative sentiment." LUZ001443.

### iii.    JNJ attempted to prevent actions by Health Canada to remove talcum powder products from the market

185.    Following the release of a draft Health Canada report, "Screening Assessment Talc $(Mg_3H_2(SiO_3)_4)$,[66]" JNJ submitted a briefing document that was critical of Health Canada's process and conclusions and defending the absence of asbestos in talc even though Health Canada made their conclusions based on a non-asbestos containing talcum powder.  Johnson's Baby Powder: A Comprehensive Review is dated March 17, 2020.  JNJTALC001465273.

185.1.  In April 2021, Health Canada published its Final Assessment[67] regarding the health risks of the genital use of talcum powder, in particular, ovarian cancer.  Based on the information provided in the CIR review article (see discussion), Health Canada stated: "Historically, some talc source materials were contaminated with asbestos. However, in 1976, the Cosmetic Toiletry and Fragrance Association (CTFA) set purity standards for cosmetic-grade talc resulting in a reduction in asbestos levels in cosmetic products. (Fiume et al. 2015).

---

[66] https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/draft-screening-assessment-talc-mg3h2sio34.html
[67] Screening Assessment Talc $(Mg_3H_2(SiO_3)_4)$, Chemical Abstracts Service Registry Number 14807-96-6, environment and Climate Change, Health Canada, April 2021.

185.2.  "Cosmetic-grade talc should comply with USP standards that require a limit of 20ppm lead and an absence of asbestos (Fiume et al. 2015) . . . "The cosmetic-grade talc used in the health effect studies in this assessment were considered to be free of asbestos."  Nonetheless, Health Canada found: "With regards to perineal exposure, analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect." The human health effects portion of the Assessment underwent external peer review.

186.    JNJ made the argument in front of Health Canada that talc and asbestos were different.

186.1.  JNJ's table compares the characteristics of asbestos and talc

**Table 1.    Comparison of Characteristics of Asbestos and Talc**

|  | Asbestos Minerals | Talc |
|---|---|---|
| Silicate mineral group | Amphibole[a]<br>Serpentine[a] | Clay minerals |
| Mineral name/idealized chemical structure | • Tremolite $Ca_2Mg_5Si_8O_{22}(OH)_2$<br>• Actinolite $Ca_2(Fe^{2+}Mg)_5Si_8O_{22}(OH)_2$<br>• Anthophyllite $Mg_7Si_8O_{22}(OH)_2$<br>• Amosite $Fe^{2+}_7Si_8O_{22}(OH)_2$<br>• Crocidolite $Na_2(Fe^{2+}_3Fe^{3+}_2)Si_8O_{22}(OH)_2$<br>• Chrysotile $Mg_3(Si_2O_5)(OH)_4$ | Talc $Mg_3Si_4O_{10}(OH)_2$ |
| Crystal habit | Asbestiform (amosite and crocidolite)<br>Asbestiform or non-asbestiform (chrysotile, tremolite, actinolite and anthophyllite) | Non-asbestiform (platy) |
| Particle characteristics | Asbestiform fibers<br>• High aspect ratio (length-to-width)<br>• Diameter: <0.25-0.5 μm [18,19]<br>• Majority respirable [19]<br>• Flexible | Sheet fragments<br>• Low aspect ratio<br>• Particle size: 4-15 μm; <37-74 μm[b]<br>• Minor fractions considered respirable [21] |

a:    Tremolite, actinolite, anthophyllite, amosite, and crocidolite are amphibole minerals, and chrysotile is a serpentine mineral [17]
b:    Based on 200 to 400 mesh used to size cosmetic talc [21]

186.2.  JNJ also stated, "[i] n order to distinguish between asbestos and other minerals and confirm the absence of asbestos in Johnson's Baby Powder, [JNJ] uses highly advanced, reliable, and reproducible techniques, including x-ray diffraction, polarized light microscopy, and transmission electron microscopy. JNJTALC001465273, p. 14.

186.3.  "[JNJ] uses talc that meets or exceeds standards for both cosmetic and pharmaceutical grade talc. [JNJ] has rigorous testing standards and has never confirmed the presence of asbestos in Johnsons Baby Powder or any other [JNJ] product containing talc." JNJTALC001465273, p. 14.

186.4.  JNJ argued in front of Health Canada "Regarding Potential Ovarian Findings:"

- "Proposed conclusions represent a complete reversal from previous scientific engagement;

- "Perhaps influenced by civil litigation outcomes in the US (not science based);

- "More appropriate and comprehensive application of Bradford Hill considerations required;

- "Explore all likely explanations for epidemiological findings (balanced by considerations for mode of action and biological plausibility);

- "Appropriate weighting of unpublished, non-peer reviewed studies (critical studies selection) is necessary" P-1206.

186.5.  JNJ further argued "Additional General Considerations": "Proposed conclusions regarding ovarian toxicity do not consider the full body of scientific evidence and are at odds with other bodies of largely the same scientific evidence (US FDA, NCI, CR, etc.).  P-1206.

187.    In the late 70's, Vernon Zeitz, the Director of Research at JNJ's Windsor Minerals, in a handwritten letter to his colleagues, including Dr. Hildick-Smith, wrote in frustration after the

then Department of Health Education and Welfare contacted him about a government study of

Vermont talc workers: "I am also aware that this approach is not the way that [JNJ] does things,

however, most wars are not won at peace talks around the conference table, but are won on the

battle field by legions who are the most ruthless who have the greatest desire to win, along with

possessing the best overall strategy and weapons. If we are to be those legions, it is imperative

we overcome the inertia of our past to modernize and mobilize our defenses and offenses so we

enter into battle with the outcome assured." WTALC00007366, PX9718, J&J-87.

188.    In my opinion, JNJ decided in the 1970's to aggressively defend its product. That

strategy kept their product on the market for fifty years but put the public's health at risk. It need

not have been that way if JNJ was willing to bear any additional cost and reformulate the

product.

189.    In my opinion, a reasonable and prudent company, would have reformulated the product

in the 1970's.

### E.    JNJ through CTFA created the impression beginning in 1976 that changes in testing resolved the asbestos controversy in talc; yet JNJ claimed its testing never found asbestiform particles

190.    In a 1977 Status Report – Defense of Talc Safety, written by J&J's George Lee, Mr. Lee

states:

190.1.  "The past two months have seen no disruptive influences and to the contrary, the

cosmetic talcs have enjoyed confirming reassurance from several independent authoritative

sources that they are assessed to be free of hazard for normal consumer use.

190.2.  "We attribute this growing opinion to the fact that (1) the existence of CTFA's

self-regulating cosmetic grade talc specification has become common knowledge and that (2)

favorable data from the various [JNJ] sponsored studies have been disseminated effectively to

the scientific and medical communities in the U.K. and U.S." J&J-0146266-69; JNJMX68_000013482-85.

191.    In my opinion, the problems with the CTFA testing methodology J4-1 were: 1) it did not address chrysotile; 2) it had some very significant detection limits because it did not include transmission electron microscopy; 3) it was not apparently accompanied by any changes in mining or manufacturing which made the product safer; 4) and it failed to report fibrous talc. Moreover, the repeated assertion by JNJ that there have never been any positive tests for asbestiform particles suggests that the CTFA testing methodology J4-1 did not accomplish anything.  To be useful CTFA's testing methodology would have to detect some positive samples for asbestiform particles.

192.    JNJ continued to tell the public that its testing methodologies made the product asbestos-free and that no asbestos-form structures have ever been found during any testing. JNJ 000636145, p. 12 (PLT-00131).

192.1.  A 2013 draft for the Home Page of JNJ's SafetyandCareCommitment.com website included a heading with these remarks and edits:

1.  "Talc has over 100 years of ~~safe~~ use in personal care products.

2.  JOHNSON'S talc products are made using Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. Our talc-based consumer products are ~~have always been~~ (we cannot say "always") asbestos free, as confirmed by regular testing conducted since the 1970s.

3.  We also make JOHNSON'S Baby Powder that contains cornstarch.

JNJTALC000067661(P-83).

193.    Numerous epidemiologic studies accepted the concept that talcum powder became asbestos free beginning in 1976, for example:

193.1.  Gertig (2000): "Cosmetic talc may have been more likely to contain asbestos fibers prior to 1976, before voluntary guidelines were proposed."

193.2.  Huncharek (2003): "Voluntary guidelines were established by the cosmetic industry in 1976 to limit the content of asbestiform fibers in commercial talc preparations, although the magnitude of the risk of ovarian cancer as a result of perineal exposure to talc remains unclear."

193.3.  Berge (2017): "Furthermore, talcum powders for domestic use in the USA have been virtually asbestos free since the 1970s (Rohl et al., 1976)."

193.4.  Schildkraut (2016): "Although particles of asbestos have been found in older body powder formulations, particularly prior to 1976, more recent body powder formulations no longer contain asbestos."

193.5.  Cramer (1982): "Generic 'talc' is seldom pure and may be contaminated with asbestos, particularly in powders formulated prior to 1976."

194.    Health agencies also accepted the concept that talcum powder became asbestos-free beginning in 1976:

194.1.  Health Canada stated, "Historically, some talc source materials were contaminated with asbestos.  However, in 1976, the Cosmetic Toiletry and Fragrance Association (CTFA) set purity standards for cosmetic-grade talc resulting in a reduction of asbestos levels in cosmetic products."[68]

---

[68] Screening Assessment Talc ($Mg_3H_2(SiO_3)_4$), Chemical Abstracts Service Registry Number 14807-96-6, environment and Climate Change, Health Canada, April 2021.

194.2.  The American Cancer Society Website "Talcum Powder and Cancer" states, "[i]n 1976, the Cosmetic, Toiletry, and Fragrances Association (CTFA), the trade association representing the cosmetic and personal care products industry, issued voluntary guidelines stating that all talc used in cosmetic products in the United States should be free from detectable amounts of asbestos according to their standards."[69]

195.    In my opinion, the acceptance of JNJ's concept that changes in testing resolved the asbestos controversy in talc by researchers and health agencies impeded the resolution of important safety issues.

**F.    JNJ defended its product by representing that there could be safe levels of asbestos when there was no known threshold**

196.    On September 6, 1974, Dr. Nashed of JNJ wrote to Dr. Schaffner at FDA, stating that "[JNJ] has been cooperating with the Cosmetic, Toiletry and Fragrance Association Subcommittee on Asbestos in Talc," copying multiple individuals.  JNJNL61_000013575.

196.1.  He further states that: "In an effort to answer the question about the required degree of sensitivity of the method of assay for asbestos in talc, our statistical group has made an estimation of a theoretical safe level of asbestos fiber in baby powder utilizing the TLV for asbestos and the data on dusting of baby powder." JNJNL61_000013575.

196.2.  He concluded: "Therefore, methods capable of determining less that 1% asbestos in talc are not necessary to assure the safety of cosmetic talc."  Plaintiff's Exhibit 2489, JNJNL61_000013575.

197.    In a memo with letter dated February 13, 1975, on letterhead "Johnson & Johnson Baby Products Company" reporting on a meeting with CTFA and FDA, CTFA's Dr. Estrin "indicated

---

[69] https://www.cancer.org/cancer/risk-prevention/chemicals/talcum-powder-and-cancer.html

that the purpose of our meeting was to present the analytical methodology which had been developed by the CTFA Task Force as applicable to cosmetic talcs. Representing the FDA were Dr. Schaffner, Mr. Eiermann, Dr. Yates, and others. Representing CTFA were Dr. Estrin, Mr. Sandland, Mr. Lee, and others. Discussions at the meeting included:

197.1.  "When questioned as to FDA efforts and progress in the approach of 'concentrating asbestos' to increase the level of sensitivity, Dr. Yates replied in a tone of frustration that all attempts have met with failure; they had investigated heavy density liquid separation.

197.2.  "Dr. Yates did not state that efforts would be continued in this direction.

197.3.  "Dr. Schaffner agreed that no one has purported to have seen chrysotile in cosmetic talc except Professor Lewin.

197.4.  "Dr. Berdick made the point that if chrysotile is not expected to be found in talc, then the FDA should not propose regulations to cover chrysotile.

197.5.  "Mr. G. Sandland stated that a regulation of 1% asbestos in talc was not only achievable by thoroughly tested methods., but also gave a safety factor of 48,000 (Silvertson calculation). Mr. Eiermann bluntly said that the calculation was wrong since the standard of 2 fibers/cc is not a time weighted average.

197.6.  "Before we had a chance for rebuttal Dr. Schaffner said that the Silvertson calculation was foolish since no mother was going to powder her baby with 1% of a known carcinogen irregardless of the large safety factor.

197.7.  "Dr. Schaffner emphasized that there is an ultimate and more important need for talc clinical safety data in order to satisfy the consumerist advocates.  The writer assured him that this would be forthcoming from [JNJ]. Plaintiff's Exhibit 60; J&J-0089804.

198.    In trial testimony, John Hopkins confirmed that there is no safe level of asbestos.

Q: Now on the issue of the safe level [of asbestos] is zero, J&J agrees with that?

A: Yes.

199.    In a January 16 memo regarding a meeting with FDA Commissioner Schmidt, JNJ's Dr. Nashed stated: "Our very preliminary calculation suggests that substantial asbestos can be allowed safely in a baby powder. J&J-0132008, Plaintiff's Exhibit 2456.

200.    In my opinion, JNJ defended its product by representing that there could be safe levels of asbestos when there was no known threshold in the 1970's and put the public at risk because there is no known safe level of asbestos.

### G.    JNJ opposed testing methods that would improve the sensitivity of their testing and reduce the number of false negatives

201.    As noted above, JNJ was aware that false negative results would occur with its testing methodology, in part because these tests were not sensitive enough. In light of the fact that asbestos was a known carcinogen with no known threshold, in my opinion, a reasonable and prudent company would attempt to improve the sensitivity of its testing so as not to put the public at risk.

202.    With regard to its approach to the improving of its laboratory methods, JNJ took the following actions:

202.1.  In 1973, JNJ's Dr. Nashed, replying to Mullen's questions regarding 9-28-72 regulations proposed by FDA, stated, "The proposal will have no impact on our talc since the method of analysis in the proposal will show that our talc is acceptable. However, if they change the method, we may have problems."  JNJAZ55_000006212.

202.2.  In a May 16, 1973, letter, JNJ's Dr. Shelley wrote to colleagues that he was planning to meet with scientists in England regarding "specs for analyzing talc for asbestos." The

scientists there were considering a "method of concentrating the asbestos so as to be able to analyze by X-ray." JNJAZ55_000001893.

202.3.   In his letter, Dr. Shelley described the "Pooley Method" which uses "two techniques for preconcentration of chrysotile and tremolite in talc by x-ray diffraction analysis . . ." Dr. Shelley further stated, "The limitation of this method is that it may be too sensitive." JNJAZ55_000001896.

202.4.   A J&J memo dated November 24, 1976, to Mr. George Lee from W.H. Ashton discussed "a disturbing proposal request which the FDA has currently made available to qualified bidders." The subject was the Separation of Asbestos in Foods, Drugs and Talc for Identification and Determination. Mr. Ashton expressed his concerns:

202.4.1.    "I find this proposal more disturbing than other proposals up to now because it aims at separation and isolation of asbestos from a wide scope of products and animal tissues. Up to now, our main problems have had to do with identification, whereas, now it looks like the FDA is getting into separation and isolation methodology which will mean concentration procedures.

202.4.2.    "As I have pointed out many times, there are many talcs on all markets which will be hard pressed in supporting purity claims, when ultra sophisticated assay separation and isolation techniques are applied. Pltf_JNJ_00031883.

202.5.   A report from the Colorado School of Mines, prepared for JNJ titled "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers" stated:

202.5.1.    "The purpose of this document is to report the methods used at the Colorado School of Mines Research Institute for detection of chrysotile and/or tremolite-actinolite in samples predominantly composed of talc.

202.5.2.        "As the impurity level becomes very low (<<1%), it is necessary to examine increasingly larger amounts of sample in order to detect the impurity.  As a result of the requirement to detect the proverbial "needle in a haystack," we have evolved a procedure which preconcentrates the impurities prior to examination.

202.5.3.        "A procedure to detect the presence of chrysotile and/or tremolite fibers in talc is presented. The procedure involves two heavy liquid separations to concentrate any chrysotile and tremolite-actinolite which may be present.

202.5.4.        "The heavy liquid concentrates are examined by optical microscopy for the presence of optical size (greater than approximately 2 microns in length) fibers of chrysotile and/or tremolite-actinolite. The procedure is capable of detecting fibers present at a level of approximately 10 ppm or less. JNJ 000268039.

202.6.  In a February 1975 letter from Sloane to Dr. R. Rohl, Mr. Sloane, in commenting on a concentration technique, stated: "We deliberately have not included a concentration technique because we felt that it would not be in worldwide company interest to do this." PX58, JNJ000063925, JNJ0069873.

203.    When there is no known safe level of a carcinogenic substance, having the ability to detect the smallest feasible quantities is paramount.

204.    In my opinion, when dealing with known human carcinogens, safety cannot be substantiated in the absence of being able to detect the smallest feasible quantities of those carcinogens.

205.    In my opinion, in the absence of being able to detect the smallest quantities, there can be no representation that the baby powder is free of carcinogenic substances.

206.    Yet, JNJ made repeat representations that their baby powder was asbestos free.

207.    Making claims that the product was asbestos free fails to tell the whole story unless the limit of detection is explained.

208.    Non-detection is not equivalent to asbestos-free and can be easily misinterpreted.

209.    Making claims to the public that Baby Powder contains no asbestos is misleading unless its testing methods detect the smallest quantities of asbestos.

210.    In my opinion, making claims that its product was asbestos free without vigorous efforts to improve the sensitivity of the testing methods is concerning.

211.    In my opinion, making such claims while opposing efforts to improve the sensitivity of the testing methods is evidence that JNJ defended its powder while putting the public at risk.

212.    In my opinion, for more than fifty years JNJ made representations that were misleading and not transparent.

213.    The sampling, detection, and interpretation of asbestos in talc is complex.   A sophisticated company like JNJ deals with those questions all the time.

214.    In my opinion, confronted by the laboratory, geological and epidemiological evidence in its possession, a reasonable and prudent company would reformulate the product or stop selling it.

   **H.    JNJ had evidence that existing methods could lead to false negative results or other irregularities that could result in negative test records**

215.    A September 13, 2011, presentation, titled "Fiber Management Overview," discusses "Potential False Negatives." The slide identifies, "[e]xisiting methods [that] may lead to false negative results[70] if:

---

[70] Imerys also noted the potential for false positive results: "Existing methods may lead to <u>false positive</u> results if: Chlorite is present (interference with serpentine by XRD). Zinc stearate is present in cosmetic (interference with amphibole by XRD. XRD is used without microscopy follow-up. Identification by morphology alone without PLM/Dispersion staining. Other elongated inorganic phases are present. Platy particles viewed on edge. Presence of organic fibers (i.e., bag house fibers)." PLT-04451, p. 14.

215.1.   "Asbestos is present, but is below XRD detection limit.

215.2.   "Chrysotile is present, but is below resolution limit of PLM.

215.3.   "Product is ground too finely for adequate PLM characterization (not typical for personal care products).

215.4.   "TEM underestimates due to exclusion of larger particles."

215.5.   Imerys continues by discussing, "[false] negative results on questionable ore can result in:

215.6.   "<u>Potential worker health problem</u>. [emphasis added]

215.7.   "Potential public health issue."

215.8.   "Significant litigation potential."

215.9.   Imerys also stated on a previous slide, "False negative results on questionable ore can result in:

215.9.1.      "Potential litigation risk.

215.9.2.      "Potential unnecessary waste of ore."

PLT-04451, p.14-15.

216.    In my opinion, in light of the fact that JNJ had evidence that (a) its existing methodologies could produce false negatives that would fail to identify asbestos particles when they were present, and (b) the asbestos was a carcinogen for which there was no known safe exposure, JNJ had a responsibility to take all feasible steps to develop either a methodology that reduced the amount of false negatives as low as reasonably possible or to stop selling the talc product.

217.    It also appears that human factors may have contributed, deliberately or not, to the reporting of negative test results.

217.1.  In an email from Luzenac's Julie Pier to Bruno Ducasse, with the subject "RE: Clivage [sic] fragments," Pier writes, "R.J. Lee has a different approach to the whole thing. They believe that if you can find a hint of a diffraction pattern from another mineral while you are looking at the amphibole fiber, then you can call the fiber 'transitional' and not truly amphibole. The analyst told me that when she finds a tremolite fiber, she will tilt the stage until she can see a talc diffraction pattern come into view. I am very skeptical of this. There is a lot of scatter of the electrons and you can sometimes get interference in the diffraction patterns from adjacent particles, especially at a higher title. I have spoken to someone at the USGS about this, and they are also skeptical about the R.J. Lee philosophy."[71]  IMERYS446794.

217.2.  A May 17, 2001, Confidential Draft of an Interoffice Memo from R. J. Zazenski to D. D. Harris with the subject "LNAO Product Certification Program," under a heading "TEM Analysis Protocol," Zazenski states, "If asbestos fibers are present above the detection limit in samples from **current mining and production**, a second sample will be prepared and re-analyzed. If the second analysis fails to confirm the first, the results from the sample will be formally recorded as '**asbestos detected, not confirmed.**' If the second analysis confirms the first, the sample will be sent to RJ Lee Group for independent validation. The results of the RJ Lee analysis

---

[71] *See* also May 16, 2016, letter from George Lincoln at R.J. Lee to Sid Shankar at JNJ responding to an audit.  The letter states, "In several instances, a CAR or investigation was not opened to document why there was presence of chrysotile (white asbestos) in J&J analytical reports."  It also stated, "It indicated that Sample in ID# 3138494 had multiple chrysotile particles. Re-preparation could not duplicate the original results . . . As a result, the samples were re-analyzed . . ."  If further states, "The re-test samples were re-analyzed using specific talc parameters on the XRF which should have been applied when the original samples were analyzed. They were not applied because the analyst who typically runs the XRF was out of the office and her backup did not apply the talc specific settings . . . Corrective Action, CAR-16012-XRD, has been opened in order to document the need for analyst retraining according to SOP XRD.019 and XRD.026 in order to provide a standard procedure" JNJ000521616.  On June 28, 2016, letter from George Lincoln at R.J. Lee to Michael Lesh at JNJ, stated, "RJ Lee Group staff acknowledge that communication in a formal narrative to the client in terms of re-testing irregular results prior to the issuance of a final report was lacking."  JNJTALC001042772.  *See* also PLT-019, IMERYS 308446.

will be recorded as the formal, final result for that sample." (emphasis in original) IMERYS
039204.

218.    In my opinion, there is evidence that the opportunity for bias was introduced into the
asbestos testing programs.

219.    It appears that it was not uncommon practice for J&J's testing program to re-test samples
when a positive test was reported. Re-testing would be appropriate if a pre-testing protocol
governed such conduct and there were methods to assure that bias would not be introduced into
the testing process. Re-testing outside of an agreed upon protocol can lead to what is known as
"testing into compliance." FDA has said in other contexts, "'testing into compliance' is unscientific
and objectionable."[72]

220.    Certainly, a sophisticated company such as JNJ recognizes the potential for introduction of
bias in re-testing.

221.    As late as 2016, JNJ's selected third party testing laboratories were arguing against using
a "conservative" approach in talc testing. R.J. Lee's Drew R. Van Order wrote to Dr. Stephen
Raven of Johnson and Johnson on March 10, 2016, and stated,

221.1.  "Specification of a conservative aspect ratio (3:1) instead of a value of 20:1 to 100:1
as is found in global analytical procedures will lead to increased variability in the reported asbestos
content in the absence of the consideration of morphological criteria (e.g., very thin fibrils
(generally thinner than 0.5 um) occurring in bundles or masses and often showing curvature). The
variability results from the inclusion of non-asbestos minerals that are elongated simply due to
fracture mechanics, not due to the growth of a fiber. These minerals may include the talc itself."
JNJTALC000276224-5.

---

[72] "Guidance for Industry Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production,"
U.S. Department of Health and Human Services, October 2006, p.8.

222.    In my opinion, a reasonable and prudent manufacturer, when confronted with a carcinogen for which there is no known human threshold, would adopt procedures that were most protective (i.e., "conservative") of the public health, even at the risk of increased variability.

222.1.  In contrast to the personal care product industry, the methods written for building materials have the included implication that a finding that amphiboles are asbestos. ("Existing methods written for building materials have the implication that amphibole/serpentine is asbestos." IMERYS 193653.

223.    In my opinion, while microscopists and geologists have much to add to our scientific understanding, the failure of JNJ to adopt a public health approach to asbestos in talc testing, even if that led to over-inclusion and false positives, put consumers at risk.

**I.      JNJ failed to recognize and mitigate the potential risks of fibrous talc**

224.    Cralley et al. studied 22 talcum products, finding "fiber contents ranging from 8% to 30% by count of the total particulates with an average of 19%. Although the specific fibrous materials were not identified, they were predominantly fibrous talc, as shown by X-ray diffraction, with the probably [sic] presence in minor amounts of other fibrous minerals such as tremolite, anthophyllite, chrysotile and pyrophyllite." JNJ000018189.

225.    In the 1973 memo from D.R. Petterson to D.D. Johnston previously discussed relating to Windsor Mineral and talc, asbestos fibers and talc fibers were distinguished. The memo stated:

225.1.  "As for Baby Powder, the entire thrust of our communications with the FDA has concentrated on asbestos as harmful fiber like material.  Sophisticated techniques have been proposed to make sure that fiber-form materials present in samples were identified as being asbestos.  The implication is that all other fiber-forms, if present, were talc or other minerals and these were safe.

100

225.2.  "This posture will no longer be satisfactory.  If the FDA Food Division, which is moving more rapidly than the Cosmetic Division, publishes a standard, it will probably be to ban asbestos-form fibrous materials in talc.

225.3.  "Our Baby Powder contains talc fragments classifiable as fiber.  Occasionally sub-trace quantities of tremolite or actinolite are identifiable (optical Microscope) and these might be classifiable as asbestos fiber."  JNJ00000294872.

226.    In an October 11, 1972, letter from Johnson & Johnson to the FDA, W. Nashed writes, "In summary, as stated above, talc itself may contain "asbestos-form" particles that are not asbestos.  There are no specific data of other information showing that talc is carcinogenic." JNJAZ55_00001362.

227.    As discussed above, FDA and other government scientists have recognized that the health risks associated with particles like asbestos extend to elongated mineral particles.

228.    Furthermore, IARC has categorized talc in fibrous form as a Group 1 carcinogen in the same category as asbestos.

229.    In my opinion, JNJ's failure to recognize and mitigate the potential risks of fibrous talc put the public at risk.

> **J.**    **JNJ implemented laboratory testing methods that had criteria that risked missing positive results of asbestos.**

230.    JNJ adopted a standard test method for "Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy" dated March 8, 1989, that set a limit of quantifiable detection. Under the heading "Limit of Quantifiable Detection," J&J's test method stated:

230.1.  "The detection of five or more asbestiform minerals of one variety in an analysis constitutes a quantifiable level of detection." J&J-0007920.

230.2.  Dr. James R. Millette from Millette Technical Consulting discussed this setting of a quantifiable level of detection in the article, stating,

230.3.  "For lack of better statistical information at the time in 1990, the publication stated a rule of thumb that the detection of five or more asbestiform minerals of one variety in an analysis constituted a quantifiable level of detection. Subsequent method of development in the area of TEM analysis for asbestos has shown that the detection of less than five fibers in a sample can provide a statistically valid result." Millette, James R., (2015). Procedure for the Analysis of Talc for Asbestos. *The Microscope*, Vol. 63(1), 11-20, 12.

230.4.  Generally, a detection limit means the minimum concentration of an analyte, substance or particles, that can be measured and reported with a certain degree of confidence that the analyte, substance or particles is distinguishable from the method blank results. *See generally, for example*, 40 CFR § 136.2.

230.5.  The estimated LOD, according to CDC method 7402, dated May 15 1989, is "1 confirmed asbestos fiber above 95% of expected mean blank value." Asbestos by TEM, Method 7402, NIOSH Manual of Analytical Methods (NMAM), Fourth Edition, 8/15/1994, p.1.

230.6.  According to a 2019 publication of ASTM International by Bertram Price titled The Foundation for ASTM D6620 *Standard Practice for Asbestos Detection Limit Based on Counts* and Its Application as a Study Design Parameter stated:

230.6.1.    "A detection limit (DL) is often, but erroneously, thought of as a quantitative boundary between measurements that are reliably differentiated from background and measurements nor differentiable from background.

230.6.2.    "That is not, however, a DL's function; A DL is the mean value of a statistical distribution of measurements that have a high probability of not being confused with *below detection* measurements."[73]

230.7.  In my opinion, in dealing with a known carcinogen, the test methods that are employed should use a level of detection that does not miss finding asbestos fibers that are present in the sample, taking into account the mean background level.  The test methods should be sensitive enough to protect the public health.

### K.    JNJ's approach to the asbestos issue in talc was to initiate studies only as required by confrontation

231.    In a "Strictly Confidential" memo, dated March 3, 1975, with Subject: "Management Authorization for Additional Talc Safety Studies," Dr. Petterson writes:

231.1.  "Our current posture with respect to sponsorship of talc safety studies has been to initiate studies only as dictated by confrontation. This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators who question the safety of talc.

231.2.  "The principal advantage for this operating philosophy lies in the fact that we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing.

231.3.  "An alternative philosophy . . . would favor a more anticipatory approach. We would carry out other reasonable safety studies to continue our contradiction of generated negative data and to anticipate questions on safety which will probably be raised."
Plaintiff's Exhibit 2514, JNJNL61_000016437.

---

[73] See generally ASTM D6620.

232.     In my opinion JNJ, by adopting the approach to the asbestos issue in talc, which was to initiate studies only as required by confrontation, failed to substantiate the safety of its product.

L.     **JNJ created confusion and doubt when the safety of their product was brought into question**

233.     Per a November 13, 2000, email between Luzenac's Rich Zazenski and Erin Turner, Luzenac referenced a "Critique" by Dr. Wehner by stating, "I expossed [sic] concern about the strident, some might say arrogant, tone of his original essay. That document failed to convince (although we do not know if the style contributed to that) so this time I strongly recommend we turn it round into a collaborative style that puts the consultants who prepared the draft in the firing line, not the NTP and its venerable Counsellors. The aim should be to create a reasonable doubt in their minds that they may not be acting on the best of advice from their consultants. It is not to curse them for fools in the hope they wiii [sic] agree they are fools and change their minds. All the points stay the same just the target of the -- critisism [sic] changes." IMERYS 239407.

234.     On January 4, 2001, Luzenac's Rich Zazenski sends an email to colleague Eric Turner reporting on a recent CRE meeting. Strategies for approaching and influencing health agencies were discussed:

234.1.   CRE's Jim Tozzi "recommended that over the coming months, we target specific individuals at each of the agencies on the Executive Committee who might be likely be the attendees for the talc review.  Then we select an issue which we want that particular individual to become familiar with before the committee meeting. For example, we target individuals within the FDA and the CPSC to focus on the weaknesses of the epidemiologic studies. Then perhaps we target individuals at OSHA and NIOSH for pointing out the irrelevance of the NTP animal study, etc.

234.2.  "We dodged a bullet in December based entirely over the definition issue. However, I believe that given the issue at hand, the Draft report can be amended to remove the 'fatal flaw assumptions' by accounting for the ambiguities surrounding the content of body powders prior to 1976 in a different context.

234.3.  "Essentially, if the report were to be rewritten to state that the possibility of asbestos contamination of cosmetic talc prior to 1976 should simply be accounted for as an additional 'confounding' factor in the epidemiology studies, a revote for 'talc not containing fibers' would likely go the other way.

234.4.  The additional confounding factor might simply reduce the relevance of the human studies from 'sufficient' to 'limited.' Limited human studies most certainly result in a NTP listing recommendation – regardless of the relevance of the animal study."

234.5.  Attendee Robert Bernstein responds: "Time to come up with more confusion." IMERYS 303828.

235.    In my opinion, JNJ's defensive strategy of creating doubt and confusion failed to resolve the safety issues associated with its product.

**M.    JNJ Misled doctors**

236.    JNJ had multiple communications with the medical community. Regarding the perineal use of talcum powder and ovarian cancer, one of the most important groups were gynecologic oncologists who care for women with ovarian cancer. PLT-09808.

236.1.  For example, in an email exchange in February 2016, the JNJ marketing lead for the SGO (Society of Gynecologic Oncology) asked for talking points for the annual SGO meeting. The individual was provided with the "talc facts, verbatim, that are posted on www.jnj.com."  JNJTALC000250188.

236.2.  This information on the document included:

1)  "JOHNSON'S talc products do not contain asbestos. . .The talc used in all our global

production is carefully selected and processed to be asbestos-free, which is confirmed

by regular testing since the 1970s.

2)  "The safety of talc is based on a long history of safe use and more than 30 years of

research by independent researchers, scientific review boards and global authorities.

3)  "The grade of talc used in cosmetics is of high purity, comparable to that used for

pharmaceutical applications and is free from asbestos and asbestiform fibers.

Cosmetic grade talc is only mined from select deposits from certified locations, and

milled to relatively large non-respirable particle size (>5μm).

4)  "Our sources for talc undergo comprehensive qualification. The incoming talc is

routinely evaluated using a sophisticated battery of tests designed to ensure quality,

safety, and compliance with all global standards."  JNJTALC000250189-90."

237.    In my opinion, in light of the totality of evidence in JNJ's possession regarding scientific

evidence of the association of talcum powder and ovarian cancer, laboratory testing suggesting

the presence of particles for which the safety was not established, and the complexities of the

geologic formation of talc and asbestos, JNJ's statements to the gynecologic oncologists and the

medical community more broadly was misleading because they failed to tell the whole story.

**N.      JNJ Described Scientists as "Antagonistic Personalities"**

238.    By December 1972, JNJ had already identified "Antagonistic Personalities In The Talc

Story in the U.S. A. A memo from Dr. Gavin Hildrick-Smith to colleagues, including Drs. Fuller,

Nashed, and Petterson, made these statements:

238.1.  "The increase in the profile of talc as a potential health hazard has been actively promoted for a variety of reasons.

238.2.  "The start of the attack on talc originated in England at the Tenovus Research Institute in Cardiff where a technician in microscopy published a paper.

238.3.  "In the U.S.A. the leading group who initiated the attack is located in New York City and included these scientists: Dr. Sellikoff, Dr. Langer ('a microscopist who visually identifies chrysotile in most samples of talc,' others in Dr. Sellikoff's department 'who have the same mental attitude as Dr. Sellikoff"), Dr. Weissler at FDA ('seems particularly anxious to condemn talc'), and Dr. Lewin, Professor of Analytical Chemistry at New York University who was used as a consultant by FDA ('insists on claiming that asbestos is present in talc found to be free of asbestos by other authorities'). Plaintiff's Exhibit 2514, JNJNL61_000016437.

O.     **JNJ continues to mislead the public via their website www.factsabouttalc.com**

239.    The current JNJ website "Facts about Talc" states in part:

239.1.  "We continue to use talc in our products because decades of science have reaffirmed its safety. Your trust in Johnson's Baby Products and your confidence using them every day is a huge responsibility – that's why we only use ingredients that are deemed safe to use by the latest science. Research, clinical evidence and over 40 years of studies by medical experts around the world continue to support the safety of cosmetic talc. Health authorities around the world have reviewed the data on talc, and it is used widely across the globe.

239.2.  "Even with talc's long history of safe use in consumer products, some have questioned whether using talcum powder can increase a person's risk of developing cancer. Recently, there have been questions raised as to whether the talc used in consumer products is

contaminated with asbestos. The weight of the science does not support any claim that our talc products cause cancer.

239.3. "Thousands of tests repeatedly confirm that our consumer talc products do not contain asbestos. Our talc comes from ore sources confirmed to meet our stringent specifications. Not only is our talc routinely tested to ensure it does not contain asbestos, our talc has also been tested and confirmed to be asbestos-free by a range of independent laboratories and universities."[74]

240.    In contrast, FDA's website about Talc states in part:

240.1. "Published scientific literature going back to the 1960s has suggested a possible association between the use of powders containing talc in the genital area and the incidence of ovarian cancer. However, these studies have not conclusively demonstrated such a link, or if such a link existed, what risk factors might be involved.

240.2. "Cosmetics must be properly labeled, and they must be safe for use by consumers under labeled or customary conditions of use. The law does not require cosmetic companies to share safety information with FDA.

240.3. "Both talc and asbestos are naturally occurring minerals that may be found in close proximity in the earth. Unlike talc, however, asbestos is a known carcinogen when inhaled. There is the potential for contamination of talc with asbestos.

240.4. "In addition, questions about the potential contamination of talc with asbestos have been raised since the 1970s."[75]

241.    In my opinion, JNJ continues to mislead the public on its website factsabouttalc.com.

---

[74]Johnson & Johnson Consumer Inc., *Facts About Talc*, https://www.factsabouttalc.com/ (last visited November 13, 2023).
[75] U.S. Food & Drug Administration, *Talc*, https://www.fda.gov/cosmetics/cosmetic-ingredients/talc (last visited November 13, 2023).

P.     Conclusion

242.    In my opinion, although controversies and complexities existed, JNJ defended its product despite significant questions regarding its safety and put the public at risk.

VII.    **JNJ had an available alternative to talcum powder in cornstarch and had evidence of that in the 1970's**

243.    In a 1964 memo with subject "Cornstarch Development" reported a meeting with JNJ's W. H. Ashton, R.G. Schoel, and others, Dr. Ashton writes:

243.1.    "Mr. Schoel requested we immediately undertake the formulation and development of a cornstarch product which is inexpensive and free-flowing.

243.2.    "The product will use our standard perfume, P-5. It will be compounded at a level which gives an aroma match to our standard talc article.

243.3.    "The raw material cost of the Staley product is estimated to be 6.7 cents/lb. of product plus perfume."

243.4.    Of the cornstarch products considered, "the Dry Flo has very appealing tone because it would open the door to a merchandising advantage which could refer to an all starch product, i.e. a blend of it with U.S.P. Cornstarch would have no inorganics.

243.5.    One of the largest commercial uses of Dry Flo was "as a condom lubricant where it replaced talc because it was found to be absorbed safely in the vagina whereas, of course, talc was not. JNJ 000265536-38.

244.    A Johnson & Johnson research proposal written by W. Ashton, dated March 5, 1974, and titled "TALC ALTERNATIVES" stated:

244.1.    "During the past couple of years our need for a non-talc dusting powder base has increased as a direct results of the talc/asbestos controversy. The thrust against talc has centered

primarily on biological problems alleged to result from the inhalation of talc and related mineral problems.

244.2.  "For defensive reasons, in the event that talc must be removed from the market, the development of a product based on ordinary cornstarch (Formula 31) is being finalized.

244.3.  "The product concept is that Formula 31 is divorced from talc allegations since cornstarch is a non-mineral. The assumption is that Formula 31 will be non-reactive (i.e., biodegradable) . . ." JNJNL61_000001954-66.

245.    In JNJ's Corn Starch Powder Fact Book dated 1976, the research and development of the cornstarch baby powder was described:

245.1.  "The first development period which took place between February 1964 to March 1968 was centered on producing a medicated corn starch baby powder. JNJTALC000866115.

245.2.  It continued, "During the second phase of development which began in July 1971 and is active presently, the effort was directed at duplicating Johnson's Baby Powder (talc) with a biodegradable powder either as a replacement in even[sic] of a crisis or as an extension product. JNJTALC000866116.

245.3.  "The properties of corn starch and other powders did not duplicate those of talc but had unique and desired properties of their own. Corn Starch Baby Powder is more absorbent, whiter, more flowable, apparently able to retain perfume better than the talc products.  It is lubricious but has a different texture than talc." JNJTALC000866116.

245.4.  "Human and animal studies were found to be satisfactory." JNJTALC000866116.

245.5.  "Johnson's Corn Starch labeled as such was preferred over Johnson's Baby Powder by 62% to 30%.  The Corn Starch powder was preferred for its effectiveness, curative and other properties related to corn starch, i.e., absorption." JNJTALC000866117.

245.6.  "The data supports the conclusion that cornstarch is less reactive than talc and that there was a progressive loss of starch from the tissue with time.  This latter observation would suggest that the accidental inhalation of cornstarch powder will not result in any chronic harmful effects." JNJTALC000866125.

245.7.  The "Estimated Release Date" is written as "August 1976." JNJTALC000866104.

246.    In 1978, the FDA determined that "corn starch is safe and effective for OTC use as a skin protectant." JNJ000348778; Department of Health, Education, and Welfare, Food and Drug Administration, Skin Protectant Drug Products for Over-The-Counter Human Use, Conditions for Safety, Effectiveness and Labeling; Proposed Rulemaking.  August 4, 1978, Part II.

247.    A July 18, 1977, JNJ review with the subject "JOHNSON'S Baby Powder with Cornstarch U/A Analysis" to C.E. LaRosa from Lauren E. Hielle-Tucker states: "In view of possible government legislation banning the cosmetic use of talcum powder, the Brand is test marketing JOHNSON'S Baby Powder with Corn Starch in Ft. Wayne, Indiana as a possible product replacement formula." JNJ 0002456.

248.    In 1984, A document titled "Johnson & Johnson Baby Powder: Questions and Answers," was "developed for limited internal distribution in response to the need for clarification of issues relating to baby powder and talc." JNJ 000011150.  This document states:

248.1.  "Specifically, its sole purpose at this time is to provide designated company spokespersons with answers to questions which could be raised by the press. It is not meant for distribution to anyone other than the individuals who will act as company spokespersons as necessary." Three executives are mentioned, including James Utaski, President of JNJ's Baby Products Company. JNJ 000011151.

248.2.  "Communication objectives are: 1) Johnson & Johnson Baby Powder, used

properly, is safe. Extensive, scientifically documented evidence supports this claim as does the

Food and Drug Administration (FDA), and 2) No one knows more about safe, high quality baby

care than Johnson & Johnson Baby Products Company. To ensure continued confidence in our

baby powder, we will conduct research as needed to reconfirm the safety of the product." JNJ

000011152.

248.3.  Examples of Q&A included:

"Q: Haven't they found traces of asbestos in talcum powder?

A: Not in JOHNSON'S Baby Powder. Since the 1940's, when the testing

technology first became available, Johnson & Johnson has regularly tested its talc

to insure no asbestos contamination. Years ago, before quality controls were in

place, some talcum powders could have contained asbestiform particles. Since

1976, however, the FDA has been conducting tests on a regular basis and has

declared all talc-based baby powders to be free of such particles.

Q: Why did you introduce a cornstarch product?

A: While talc provides a moisture repellent barrier on the skin, cornstarch absorbs

moisture to make skin feel dry. It was found that some consumers preferred it, and

we wanted to provide them with a superior cosmetic grade cornstarch.

Q: Isn't it because it is safer?

A: Not at all. First, the safety of talcum powder has been continuously re-affirmed

by Johnson & Johnson, the medical community and by the government.  And, we

are always conducting research to ensure its safety.  JNJ 000011156, JNJ

000011185.

249.    In 2000, a review article, published in the American Journal of Obstetrics and Gynecology and titled "Perineal application of talc and cornstarch powders: valuation of ovarian cancer risk" addressed these issues and concluded:

249.1.  "In contrast to talc, cornstarch contains no asbestos and is capable of being removed from the peritoneal cavity, as demonstrated by in vivo studies on granuloma formation.

249.2.   "In view of the chemical nature of cornstarch, an increased risk for ovarian cancer as a result of perineal exposure to cornstarch, is biologically implausible. Furthermore, epidemiologic studies have found no association between perineal application of exclusively cornstarch powders and ovarian cancer.

249.3.  "Consequently, no increased risk for ovarian cancer from the use of perineal powder containing cornstarch exclusively is predicted from the review of the available literature." JNJ000018894, Whysner John and Mohan, Melissa.  Am J Obstet Gynecol 182(3).

250.    As noted above, in my opinion, confronted by the laboratory, geological and epidemiological evidence in its possession, a reasonable and prudent company would reformulate the product or stop selling it.  JNJ had evidence in its possession that cornstarch was a safe and effective replacement for talc.  The failure to switch to cornstarch put the public at risk.

## VIII.   JNJ BABY POWDER LABEL AND LABELING WAS FALSE AND MISLEADING

250.1.  Over decades, JNJ Baby Powder made claims that it was "clinically and scientifically proven," "mild and gentle," "pure," "purest, mildest, gentlest," and "most effective." JNJ 000364540.

251.    Over time, JNJ's Baby Powder made the claims that "Johnson's the Number 1 choice of hospitals." JNJ 000108692.

252.    JNJ for decades built an image that it associated with its products "enhancing bond between mom and baby" and "most trusted by parents and health care professionals." JNJTALC000733349.

253.    "That trust" was used within the company as its major asset and "golden egg." JNJ 000364540.

254.    Key to JNJ's corporate strategy was an image of trust that grew out of the mother and child bond.

255.    A JNJ PowerPoint presentation titled "EQUITY," prepared by Vice President of Global Marketing Marco Cirillo for "Baby Camp," stated:

255.1.  "Agenda: Why is Baby the corporation's #1 asset?  [JNJ] is a name.  [JNJ] is a logo. [JNJ] is a brand of products. [JNJ] is a manufacturer of branded products. [JNJ] is a large healthcare company. [JNJ] is a parent company. [JNJ] is more than that. It is a complex sum of meanings, associations, values and feelings. [JNJ] is deeply linked to baby products."

255.2.    A Healthcare Corporate Identity Study by Yankelovich Partners in 1995 showed 88% of consumers linked Johnson & Johnson to "baby products".

255.3.  An Emotional Bonding Study, comparing Johnson & Johnson with competitors, from 1995 associated Johnson & Johnson (Johnson's) baby care with trust (72%) and safety (75%).

255.4.  "Trust is important for healthcare companies." According to a Johnson & Johnson Corporate Equity Study in 1996, 95% of consumers and healthcare professionals both stated that trust is "Extremely/very important".

255.5.  From the 1996 Johnson & Johnson Architecture Study, "What is 'Trust' in healthcare?: Products that **will work** without any **unexpected adverse** physical/emotional **effects.**" [emphasis in original]

255.6.  "What is 'Trust' in healthcare?": Consumers depend on the company to make products that are "effective" and "will not harm".

255.7.  "Johnson & Johnson has: 'Deep, Personal Trust.'"

255.8.  A 1996 Johnson & Johnson Architecture Study, "Deep, Personal Trust" based on being "safe" ("Won't hurt me") and "personal" ("'Familiar' intimacy with the Company").

255.9.  "Johnson & Johnson's unique trust results in real business gains for the company." The slide gives the following examples of public tendencies: "Consumers: Forgive "brand" crisis. Institution: More interested in, willingness to work with, ability to consider ideas from. Partners: Predisposition for likeability, credibility and authority."

255.10.       "What does the Johnson's Baby brand stand for?" JNJ lists "Safe," "Mild," "Pure," "Gentle," . . . "Effective," "Appealing in use," "Trustworthy," "Wholesome" . . . "Caring" and "Warm."

255.11.       JNJ summarizes their presentation by stating: "(1) Baby is the corporation's #1 asset and the mother-infant bond is at its core; (2) Johnson's baby is 50% heart and 50% mind; (3) We MUST protect and enhance the Baby Equity." JNJTALCC000354984.

256.    In my opinion the words JNJ used to market its baby powder created an impression that the company had substantiated the safety and purity of its product. That was false and misleading.

## IX.    SUMMARY OF OPINIONS[76]

In my opinion:

1.  Of all the products that fall under FDA's jurisdiction, cosmetics are among the least regulated.  This is reflected in the fact that there is no premarket approval of cosmetic products.

2.  A cosmetic manufacturer has a responsibility to substantiate the safety of their product or must warn consumers that the safety of their product has not been determined or not sell their product.

3.  If a health hazard may be associated with the product, a cosmetic manufacturer must include a warning on their product.

4.  The federal regulation of cosmetics is less stringent than the regulation of drugs, medical devices, and food additives.  FDA's oversight of cosmetics is also limited by resource constraints.

5.  Consistent with FDA regulations and statutes, a cosmetic manufacturer under the cosmetic industry standards must assure the safety of their ingredients.  It is the responsibility of the cosmetic manufacturer to assure that there is reasonable certainty in the judgment of competent scientists that the product is safe.

6.  Manufacturers have a responsibility to assure that there is reasonable certainty there is no evidence to suspect their cosmetic may pose harm.

7.  If there is evidence that there are reasonable grounds to suspect that the cosmetic product may pose harm for the proposed conditions of use, such product does not meet the

---

[76] This list of opinions is not exclusive.  For all opinions, please see entire report.

116

industry standards for safety.

8.  Once JNJ had evidence of a) the presence of asbestos because of its known carcinogenicity and absence of a threshold dose; or b) the presence of non-asbestiform amphiboles or fibrous talc, the safety of their product was not established.

9.  Beginning in the 1970's, the safety of JNJ's talcum powder products had not been substantiated, consumers were not warned of potential health risks, and there was a reasonable basis to believe that such an association between the product and health risks.

10. Beginning in the 1970's, because the safety of their product was not established, their talcum powder products should not have been sold.

11. The safety of nonasbestiform amphibole or cleavage fragments was and has not been established.

12. Determination by a laboratory that certain amphibole particles were nonasbestiform in nature does not mean the safety of those nonasbestiform amphiboles was substantiated.

13. The controversies and/or complexities surrounding: 1) the definition of asbestos; 2) what was excluded from the definition of asbestos; 3) the geologic relationship between asbestos and talc; 4) the inability of laboratory tests to characterize individual amphibole fibers as asbestiform or non-asbestiform; 5) whether cleavage fragments of similar dimensions to asbestiform fibers pose similar risks; 6) the ability to distinguish between asbestiform and cleavage fragments; 7) the limitations of detection by various laboratory measurements; 8) epidemiological results; 9) the inability over the decades of FDA to arrive at a definitive testing method for asbestos in talc; 10) the significance of talc fibers; and 11) the extent and routes of exposure, reinforce the conclusion that the safety of the product had not been established.

14. Unable to substantiate the safety of their talcum powder products, JNJ was required to place the following conspicuous statement on the principal display panel: "Warning-The safety of this product has not been determined." 21 CFR §740.10.

15. Based on the totality of evidence, JNJ's findings and notice of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, actinolite fibers, anthophyllite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc samples prohibited JNJ from selling JNJ talcum powder products because they contained poisonous and deleterious substances, which "may render" the products "injurious to users under the conditions of use described in the labeling thereof or under such conditions of use as are customary or usual . . . ," and were therefore adulterated. 21 U.S.C. §361.

16. Based on the totality of evidence, at a minimum, Johnson & Johnson's findings and notice of naturally occurring mineral silicate fibers of the serpentine and amphibole series including, but not limited to, tremolite fibers, amphibole asbestos, chrysotile (serpentine asbestos), fibrous talc and non-asbestiform amphibole in talc samples prohibited the company from determining that the safety of Johnson & Johnson talcum powder products had been substantiated.

17. In light of a) the FDA's 2014 petition response acknowledging that there remains some evidence to suspect or question the safety of talcum powder products, b) the totality of the medical literature since 2014 that continues to raise safety questions; and c) IARC's classification, defendants failed to substantiate the safety of their talcum powder products.

18. JNJ decided in the 1970's to aggressively defend its product. That strategy kept their product on the market for fifty years but put the public's health at risk. It need not have been that way if JNJ was willing to bear any additional cost and reformulate the product.

19. A reasonable and prudent company, would have reformulated the product in the 1970's.

20. JNJ through CTFA created the impression beginning in 1976 that changes in testing resolved the asbestos controversy in talc.

21. The problems with the CTFA testing methodology J4-1 were: 1) it did not address chrysotile; 2) it had some very significant detection limits because it did not include transmission electron microscopy; 3) it was not accompanied by any changes in mining or manufacturing which made the product safer; 4) and it failed to report fibrous talc. The repeated assertion by JNJ that there have never been any positive tests for asbestiform particles indicates that the CTFA testing methodology J4-1 did not accomplish anything.

22. The acceptance of JNJ's concept that changes in testing resolved the asbestos controversy in talc by researchers and health agencies impeded the resolution of important safety issues.

23. JNJ defended its product by representing that there could be safe levels of asbestos when there was no known threshold and put the public at risk because there is no known safe level of asbestos.

24. In light of the fact that asbestos was a known carcinogen with no known threshold, a reasonable and prudent company would attempt to improve the sensitivity of its testing so as not to put the public at risk.

25. Making claims that its product was asbestos free without vigorous efforts to improve the sensitivity of the testing methods is concerning.

26. Opposing efforts to improve the sensitivity of the testing methods is evidence that JNJ defended its powder while putting the public at risk.

27. For more than fifty years JNJ made representations that were misleading and not transparent.

28. Confronted by the laboratory, geological and epidemiological evidence in its possession, the only prudent and reasonable option was to reformulate the product or stop selling it.

29. In light of the totality of evidence in JNJ's possession regarding scientific evidence of the association of talcum powder and ovarian cancer, laboratory testing suggesting the presence of particles for which the safety was not established, and the complexities of the geologic formation of talc and asbestos, JNJ's statements to the gynecologic oncologists and the medical community more broadly were misleading because they failed to tell the whole story.

30. JNJ, by adopting the approach to the asbestos issue in talc, which was to initiate studies only as required by confrontation, failed to substantiate the safety of its product.

31. In light of the fact that JNJ had evidence that (a) its existing methodologies could produce false negatives that would fail to identify asbestos particles when they were present, and (b) the asbestos was a carcinogen for which there was no known safe exposure, JNJ had a responsibility to take all feasible steps to develop either a methodology that reduced the amount of false negatives as low as reasonably possible or to stop selling the talc product.

32. There is evidence that the opportunity for bias was introduced into the asbestos testing programs.

33. A reasonable and prudent manufacturer, when confronted with a carcinogen for which there is no known human threshold, would adopt procedures that were most protective (i.e. "conservative") of the public health, even at the risk of increased variability.

34. While microscopists and geologists have much to add to our scientific understanding, the failure to adopt a public health approach to asbestos in talc testing, even if that led to over-inclusion and false positives, put consumers at risk.

35. In dealing with a known carcinogen, the test methods that are employed should use a level of detection that does not miss finding asbestos fibers that are present in the sample, taking into account the mean background level. The test methods should be sensitive enough to protect the public health.

36. JNJ's failure to recognize and mitigate the potential risks of fibrous talc put the public at risk.

37. JNJ's defensive strategy of creating doubt and confusion failed to resolve the safety issues associated with its product.

38. JNJ continues to mislead the public on its website factsabouttalc.com.

39. JNJ failed to report to the FDA that laboratory tests found evidence of naturally occurring mineral silicate fibers of the serpentine and amphibole series. That failure misled the FDA over the last half a century.

40. JNJ's representation to the FDA in their March 17, 2016, letter that no asbestos-form structures have ever been found during any testing was false and misleading.

41. Although controversies and complexities existed, JNJ defended its product despite significant questions regarding its safety and put the public at risk.

42. Confronted by the laboratory, geological and epidemiological evidence in its possession, a reasonable and prudent company would reformulate the product or stop selling it.  JNJ had evidence in its possession that cornstarch was a safe and effective replacement for talc.  The failure to switch to cornstarch put the public at risk.

November 15, 2023

**SCHEDULE I: EPIDEMIOLOGICAL LITERATURE TABLE**

## I.    COHORT STUDIES

| AUTHOR | STUDY DESCRIPTION | FINDINGS | LIMITATIONS | DISCUSSION AND CONCLUSIONS |
|---|---|---|---|---|
| Gertig (2000)

Gates (2008)

Gates (2010) | Cohort Study (Nurses' Health Study "NHS")

Study of 121,700 registered nurses between ages 30-55 years from across US. Talc use determined by self-administered 1982 questionnaire. Asked women if they had ever commonly used talcum, baby powder, or deodorizing powder on their perineal. Possible responses were: no, daily, 1-6 times per week, or < 1/week. Also asked if they had applied products to sanitary napkins. "Ever talc use" classified as ever talc use on either perineal area or sanitary napkins. Every two years, participants reported health updates; no updates on talc use were included, but self-reported cases of ovarian cancer were adjudicated through medical record reviews. Exclusions for incomplete questionnaires on talc, if reported both ovaries removed, if reported a hysterectomy but did not report whether at least one ovary remaining, or history of radiation therapy.

Three publications resulted from this study.

The first, published in 2000, included 78,630 women, of whom 307 cases of ovarian cancer were diagnosed. Ever | **2000 (1st Report):**
•Ever Talc Use – R.R. 1.09 (0.86 – 1.37)
•Invasive Serous Ovarian Cancer – R.R. 1.40 (1.02 – 1.91)

**Gates 2008 Follow-up (2nd):**
•Epithelial OC = 1.36 (1.14 – 1.63)
 •Serous OC = 1.60 (1.26 – 2.02)

**Gates 2010 Follow-up (3rd):**
•Results not statistically significant for talc exposure
•All epithelial = 1.06 (0.89 – 1.28)
•Serous = 1.06 (0.84 – 1.35) | **OVERALL**
The questions on talcum powder use referred to ever use and cannot determine the age at which women began using talc or the duration.

Relatively short follow-up. Tubal ligation questions asked as part of contraception.

**2010 (2nd Follow-up)**
• Extended the follow up through 2006 but no updated use or exposure data | **2000:**
Prospective Study
No overall association between "ever use" of talcum powder and total risk for ovarian cancer (R.R. 1.09; 95% CI .86 – 1.37)
40% Increased risk for serous invasive cancer with any (ever) history of talc use which comprises the majority of ovarian cancer (R.R. 1.40; 95% CI 1.02 -1.9)
Risk stratified by histologic sub-type
There was no apparent dose response, although lacked information on duration of use.

**2008:**
•Regular talc use was associated with increased ovarian cancer risk in the combined study population (RR, 1.36; 95% CI, 1.14-1.63; Ptrend < 0.001). may have a higher risk of ovarian cancer associated with genital talc use.

These results provided additional support for a main effect of genital talc exposure on risk of epithelial ovarian cancer. The presence of a significant trend between frequency of talc use and risk of total and serous invasive ovarian cancer in the NECC and pooled analysis further strengthens the evidence for an association, as most previous studies have not observed a dose-response |

| AUTHOR | STUDY DESCRIPTION | FINDINGS | LIMITATIONS | DISCUSSION AND CONCLUSIONS |
|--------|-------------------|----------|-------------|----------------------------|
|  | use of talc was reported by 40.4% of the cohort; 14.5% ever used talc daily.<br><br>The second report from the Nurses' Health Study was in 2008. This was a pooled analysis post-NHS: 2 phases (1992-1997; 1998-2003). Results from the Nurses' Health Study were combined with other cases and controls from case-control studies. Study updated talc analysis from NHS, including 8 additional years of follow-up. Analysis included 1,175 cases and 1,202 controls from a New England-based case-control study and 210 cases and 600 controls from the prospective Nurses' Health<br><br>Study.<br><br>Additional support for the presence of a significant trend between the frequency of talc use and risk of total and serous ovarian cancer<br><br>The third Nurses' Health Study report was published in 2010. This analysis included women from two separate cohorts; the exact numbers of women and cases with exposure data regarding talc was not specified. |  |  | with increasing frequency or duration of talc use.<br>Inflammatory response in vivo<br><br>In vitro study where cells undergo cell proliferation, neoplastic transformation and cellular generation of reactive oxygen species increasing with increased exposure to talc.<br><br>Although no prior studies have examined gene-talc interactions, the indication of a possible immune-related mechanism between talc and ovarian carcinogenesis and the evidence for gene-asbestos interactions suggest that genes involved in detoxification and inflammatory pathways could be important in the response to talc.<br><br>**2010**<br>The incomplete data for a few exposures, in particular talc use and family history of ovarian cancer, also are weaknesses because the limited data may have influenced the observed associations for these exposures. The association with talc use in our analysis differed from the association in a previous analysis of the NHS cohort (34), possibly because of a greater degree of exposure misclassification over 24 years of followup. However, the suggestive positive association with the mucinous subtype may reflect a longer latency period between talc |

| AUTHOR | STUDY DESCRIPTION | FINDINGS | LIMITATIONS | DISCUSSION AND CONCLUSIONS |
|---|---|---|---|---|
| | | | | exposure and development of mucinous tumors.<br>Finally, the use of a single summary measure for certain exposures, such as physical activity, also may have limited our ability to detect an association.<br>Associations differ by subtype. |
| Houghton (2014) | Cohort Study (Women's Health Initiative)<br><br>• Enrolled 93,676 women between 1993-1998<br>• 61,576 post-menopausal participants in the study cohort<br><br>• 429 total ovarian cancer cases<br>• Average age at time completed questionnaire of talc use 62-63.3<br>• Follow up for disease ascertainment was a mean of 12.4 years<br>• Included post-menopausal women between 50 & 79<br>• Talc use assessed at baseline with self-reporting questionnaires | • Use of genital powders for >20 years resulted in a RR 1.06, 95% CI (0.87-1.28)<br>• Risk of serous invasive cancer was increased by a non-statistically significant 13% (hazard ratio 1.13, 95% CI 0.84 - 1.51). | Asked about duration of use only. The study may have been comparing long-term infrequent users with short term frequent users.<br>Lack of information regarding oophorectomy after baseline<br>Non-differential misclassification (need to recall past use and duration); leading to a bias toward the null<br>Information on use was not collected after baseline.<br>Assumed women remained in same exposure group for 12 years<br>Information of powder use not collected after baseline<br>Short follow-up period (12.4 years)<br>Obtained information on duration of use via interviews, but unknown during which years powder used (i.e. application on genital area, sanitary napkins and diaphragm) | Ever perineal powder use was not associated with ovarian cancer risk, nor was it associated with ovarian cancer when assess by area of application, duration of use, or ovarian cancer subtype. |

| AUTHOR | STUDY DESCRIPTION | FINDINGS | LIMITATIONS | DISCUSSION AND CONCLUSIONS |
|---|---|---|---|---|
| | | | Queried general powder use rather than talc powder and had no specific information regarding the content of talc in products used. | |
| Gonzalez (2016) | Cohort Study (Sister Study)<br><br>The Sister Study, launched in 2003, enrolled 50,884 women who had a sister diagnosed with breast cancer Participants included 154 exposed cases with ovarian cancer who did not have diagnosis of breast cancer but sister had breast cancer Enrollees were ages 35-74 years At baseline, participants asked about talc and douching use during the previous 12 months 52% menopausal | •Talc - H.R. 0.73 (0.44 – 1.2)<br>•Douching – O.R. 2.1 (2.0 – 2.3) | Not specifically a talc or ovarian cancer study. Baseline questionnaire inquired of douching and talc use during the previous 12 months of study initiation Questionnaire did not inquire about lifetime exposures 37% of cases had no medical records 84% white women; 56% post-menopausal Short follow-up 6.6 years Reported prevalence of talc use was 14%. | Douching, not talc use, associated with increased risk of ovarian cancer |

## II.  CASE CONTROL STUDIES

| AUTHOR | STUDY DESCRIPTION | FINDINGS | REPORTED LIMITATIONS | AUTHORS' DISCUSSION AND CONCLUSIONS |
|---|---|---|---|---|
| Cramer (1982) | Case Control Study. Population based. Evaluated 215 women with epithelial ovarian cancer and 215 age-matched control from greater Boston, MA area. Talc exposure was determined by questionnaire regarding "regular" talc use on the | *Adjusted for parity and menopausal status, any perineal talc exposure reported a relative risk of 1.92 (1.27-2.89) for epithelial ovarian cancer. Women who had regularly engaged in both perineal use and on sanitary napkins had an adjusted relative risk of 3.28 (1.68-6.42) compared to women with neither exposure.* | Potential biases include that menstrual characteristics may differ between women with ovarian cancer and controls. Further since talc into the pelvic cavity is prevented by hysterectomy or tubal ligation inclusion of subjects with pelvic surgery may obviate any association | The argument linking talc and ovarian cancer includes four elements: the chemical relationship between talc and asbestos, asbestos as a cause of pleural and peritoneal mesotheliomas, the possible relation between epithelial ovarian cancers and mesotheliomas, and the |

127

| | | | |
|---|---|---|---|
| | perineum and/or on sanitary napkins. 42.8% of ovarian cancer patients reported regular use of talc (prior to developing ovarian cancer) compared to 28.4% of controls. | | between talc and ovarian cancer. Other confounders include potential for selection bias. Etiology may derive from asbestos content of talc or uniqueness of the ovary which make it susceptible to carcinogenesis from both talc and other particulates. Recall bias is also a potential limitation. | ability of talc to enter the pelvic cavity. The mineral talc is a specific hydrous magnesium silicate chemically related to several asbestos group minerals and occurring in nature with them. Generic "talc" is seldom pure and may be contaminated with asbestos, particularly in powders formulated prior to 1976.<br>This study provides some support for an association between talc and ovarian cancer hypothesized because of the similarity of ovarian cancer to mesotheliomas and the chemical relation of talc to asbestos, a known cause of mesotheliomas. |
| Hartge (1983) (Letter to the Editor) | Case Control Study. Hospital based. Evaluated 135 women with epithelial ovarian cancer and 171 controls from the Washington, DC area. Talc exposure was ascertained via questionnaire, but the authors did not provide detail as to questions asked. | The authors reported that women who reported any talc use (body powder or diaphragm) had an estimated relative risk of **0.7 (0.4-1.1)**, while use on their genitals had an estimated relative risk of **2.5 (0.70-10.0)** compared with never users. | The analysis was based on only 7 cases and 3 controls. Chance, bias in selection or observation, or confounding may have influenced these estimates. Further, patients with ovarian cancer may have or perceived a greater need for using body powder in the genital area for reasons related to their ovarian cancer or life style. | Data indicate no overall association between all talc use and risk of ovarian cancer. Although a small group of women who specifically reported genital use of body talcum powders showed an excess relative risk, use of talc on a diaphragm, which would be closest to the ovaries, did not seem to elevate risk. |
| Whittemore (1988) | Case Control Study. Hospital based. Evaluation included 188 ovarian cancer cases and 539 controls in the San Francisco, CA area. *Exposure to talc was determined through structured personal interviews and documented type of use including,* | Women who reported using talcum powder to the perineum showed a relative risk of **1.45 (0.81-2.60).** Use on sanitary pad was associated with a non-statistically significant 38% reduce risk and use on diaphragms was associated with a non-statistically significant 50% increased risk. The relative risk for ovarian cancer increased with increasing applications of talc per | The study results should be interpreted cautiously based on the studies' failure to interview all eligible controls, potential pitfalls in combining two studies and the two control groups in the second study. The is also the possibility of confounding by unmeasured variables. | The data show a trend of increasing risk with increasing frequency of perineal talc exposure, but the trend was not statistically significant. Thus, while these data do not exonerate talc as an ovarian carcinogen, neither do they provide strong evidence to implicate it. |

| | | | | |
|---|---|---|---|---|
| | *perineum, sanitary pads, diaphragm or some combination of these uses. Duration of talc use was also ascertained.* | month; relative to nonusers, the relative risk for 1-20 times per month was **1.27**, and the relative risk for 20 or more times per month was **1.45**. None of these values was statistically significant. The increased relative risk was apparent for women who had never had tubal ligation or hysterectomy, but not for women who had had one of these procedures. Compared with non-users, women with 1-9 years of use had a relative risk of **1.6 (1.00-2.57),** but women with greater years of use had only a relative risk of **1.11 (0.74-1.65).** | | |
| Booth (1989) | Case Control Study. Hospital based. Evaluated 235 cases with ovarian cancer and 451 controls in the UK. A questionnaire ascertained the frequency of exposure to talc in the genital area (never, rarely, monthly, weekly, daily). | The authors reported women who used talc in the genital area had the following relative risk for ovarian cancer based on the frequency of exposure:<br>Rarely use: **0.9 (0.3-2.4)**<br>Monthly: **0.7 (0.3-1.8)**<br>Weekly: **2.0 (1.3-3.4)**<br>Daily: **1.3 (0.8-1.9)**<br><br>Cases and controls did not differ by percentage who kept diaphragms in talc. | As the design is case control there may have been some misclassification of controls. The women were not asked how long they had been using talc (duration). | The evidence linking talc with ovarian cancer is controversial.  In this study, women who reported talc use in the genital area more than once a week or daily had higher risks of ovarian cancer than women who used talc less frequently.  The women were not asked how long they used talc. It is possible that because of their symptoms talc use by the cases may not have reflected their frequency of past use.  Since these and other results (Cramer 1982; Hartge 1983) are insufficient to reject an association, further work is need on the relation between genital use of talc and ovarian cancer. |
| Harlow (1989) | Case Control Study. Population based. Evaluated 116 women with serous or mucinous borderline ovarian cancer identified through a Western Washington | Women who used deodorizing powders had a relative risk of **2.8 (1.1-11.7)** for borderline ovarian tumors, while any perineal exposure to powder showed a relative risk of **1.1 (0.7-2.1)** | The elevated risk among women who specifically used deodorizing powders could have been due to chance or applicable only to borderline, not malignant ovarian tumors. | Given the clues provided by this study regarding the possible importance of deodorizing powders, it would be advisable for future studies to elicit information on brand name of talc-containing powders and the timing and duration of such use.  Although |

| | | | |
|---|---|---|---|
| | population-based cancer registry, as well a population-based sample of 158 control women. The study used an open-ended question asking women to specify the types of powder they used for perineal application after bathing, on sanitary napkins, and for diaphragm storage. Powder was categorized as baby powder, deodorizing powder, other/unspecified talcum/dusting powders or as cornstarch. | No data were presented regarding frequency or duration of talc/powder use. | | these data need replication, they raise the possibility that the risk of ovarian tumors in women who apply deodorizing powder to the perineum may not relate to talc per se but rather to asbestos contamination and/or a substance or substance used specifically for deodorization. An association between talc use and ovarian neoplasms seems biologically plausible, since particulates contaminating the vaginal area may migrate into the pelvic cavity and since particles of talc have been observed within ovarian tissue. |
| Chen (1992) | Case Control Study. Population based. Interviewed 112 women with ovarian cancer and 224 community controls in Beijing, China. A questionnaire was developed to obtain histories and data was collected via face-to-face interviews. No information was provided about how women were asked about talc-containing dusting powder product use prior to 3 years before diagnosis (for cases) and a comparable date in controls. | Seven cases and 5 controls reported using "dusting powder" to the lower abdomen and perineum for 3 or more months. After adjusting for education and parity, the users of "talc-containing" dusting powder showed a relative risk of **3.9 (0.9-10.6).** | Given the nature of the cancer registry in China, some of the ovarian cancer patients may not have been ascertained for study. Also, potentially damaging were the high rate of loss due to deaths. A third limitation was the exclusion of controls with current health problems. The small number of subjects of exposed to talc is another limitation. | Similar to previous studies, a threefold increased risk was associated with perineal talc exposure. It is interesting that that similar results are obtained from quite different parts of the world. |
| Harlow & Cramer (1992) | Case Control Study. Population based. Interviewed *235 white women diagnosed with ovarian cancer in the* | *Perineal talc use was associated with an odds ratio for epithelial ovarian cancer of 1.5 (1.0-2.1) when adjusted for parity, education, marital status, religion, use of* | Authors stated that this study failed to answer a key issue in talc-ovarian cancer association: whether the risk pertains to all cosmetic talc | Because the overall association between genital use of talc and ovarian cancer remains weak, it is unlikely that this exposure-disease pathway is the principal one involved |

|  | | | |
|---|---|---|---|
|  | *Boston, MA metropolitan area. Tumors were confirmed through an independent pathology review. Talc exposure was determined through in-person interviews. Talc use was reported as any genital application, type of application (sanitary napkin/underwear, via partner or application to diaphragm, via dusting to perineum), number of applications per month, years of use, age at first use, years since last use, whether use was before or after 1960, brand of application, estimated total lifetime applications, estimated applications excluding use after hysterectomy or tubal ligation, and estimated applications excluding use after hysterectomy or tubal ligation and use during nonovulatory months.* | *sanitary napkins, douching, age, and weight. Direct perineal application showed an odds ratio of 1.7 (1.1-2.7). Use of talc on a daily basis increased the odds ratio for ovarian cancer to 1.8 (1.1-3.0) and use for more than 10 years 1.6 (1.0-2.7). For women who had more than 10,000 applications while menstruating had an odds ratio of 2.8 (1.4-5.4).*<br>*Using techniques of metaanalysis, the authors calculated an OR of 1.3 (1.1-1.6) for any perineal exposure and ovarian cancer risk.* | or only to certain preparations likely to be contaminated with asbestos.<br><br>The variation in risk among histologic subtypes may reflect a chance finding or a need to examine endometroid and borderline tumors more carefully for evidence of foreign body effect.<br><br>Authors cannot rule out the possibility of differential over or under reporting of talc exposure their cases and controls, especially in those with reproductive events that enhance ORs.<br><br>Authors presume that responders and non-responders were similar in characteristics, but validity depends on that presumption.<br><br>Adjustments were made to account for confounding, but authors cannot rule out the presence of unknown factors might have influenced the observed associations. | in ovarian cancer etiology. The authors concluded that they calculate that by applying these odds ratios to the exposure rate among cases, the proportion of ovarian cancer incidence attributable to this level of talc exposure is about 10%. They further state that given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For that reason, they discouraged the use of talc in genital hygiene, particularly as a daily habit. |
| Rosenblatt (1992) | Case Control Study. Hospital based. Evaluated a total of 77 cases of ovarian cancer and 46 controls, who were treated for non-gynecologic/non-malignant diseases from Baltimore, | Women who were exposed to genital fibers greater than or equal to 37.4 years had an increased odds ratio for ovarian cancer of **2.4 (1.0-5.8).** Exposure to talc on sanitary napkins resulted in an increase odds ratio of **4.8 (1.3-17.8).** Use of genital bath talc was associated with | Given its small sample size and the potential selection bias stemming from the inclusion of patients from only one hospital, further research needs to be performed in order to confirm the findings. | The authors stated that the results of their study and others suggested that genital fiber exposure may be associated with an adverse effect, but further study is needed to determine if this relationship is causal in nature. |

| | | | |
|---|---|---|---|
| | MD. Participants were interviewed via questionnaire (questions provided in Appendix 1 of publication) about presence and length of genital fiber and respiratory fiber exposure. Fiber exposure was defined as exposure to asbestos, talc, and fiberglass. The "dose" of exposure was determined by adding the number of years of each type of genital or respiratory exposures from all sources. Further, only exposure prior to tubal ligation (for women who had that procedure) was counted. | an odds ratio of **1.7 (0.7-3.9)**. Diaphragm use with powder showed an odds ratio of **3.0 (0.8-10.8).** A negative association was observed for antecedent tubal ligation with an odds ratio of **0.15 (0.027-0.88).** | | Tubal ligation may protect against ovarian cancer by inhibiting carcinogenic action of talc through blockage of the fallopian tube or through screening effect. |
| Tzonou (1993) | Case Control Study. Hospital based. Evaluated189 women with ovarian cancer and 200 controls in Greater Athens, Greece area. Exposure was ascertained by asking if women used of talc in the perineal area (no; yes). | After adjusting for variable, talc application in the perineum was associated with a relative risk of **1.05 (0.28-3.98)** based on 6 cases and 7 controls reported using talc in the perineal area. | The study has the power limitation associated with its moderate size and, as in any case-control study, there exists a possibility of selection and, less likely, of information bias. The possibility that ovarian cancer may be caused by exposure to asbestos has be raised by other authors who pointed out that mineral talc is closely related asbestos and presented clinical and experiments evidence linking exposure to talc with ovarian cancer. | The results of the present study do not support an association between talc and ovarian cancer but, given the overlapping range of the confidence intervals, they are not incompatible with it. |

| Purdie (1995) | Case Control Study. Population based. *Evaluated 824 cases of epithelial ovarian cancer and 860 controls from gynecological oncology treatment centers in three Australian states. Talc exposure was determined through use of a questionnaire via face-to-face interviews.* | *Use of talc around abdomen/perineum was associated increase risk for ovarian cancer with an odds ratio of 1.27 (1.04 - 1.54).* | Selection and recall biases and potential confounders were considered. | Regular use of talc in the region of the abdomen or perineum was associated with a slight increase (and positively associated) in the risk of ovarian cancer. |
|---|---|---|---|---|
| Cramer (1995) | Case Control Study. Population based. Evaluated 450 women diagnosed with ovarian cancer in Boston, MA area hospitals, and 454 controls selected from the general population. Examined the association between ovarian cancer and prior hysterectomy or tubal ligation. | Use of talc "in genital hygiene" was associated with an increased risk for ovarian cancer with an odds ratio **1.6 (1.2-2.1).** | Authors considered recall bias and confounding | Authors reported a protective effect of prior hysterectomy or tubal ligation for ovarian cancer and offer several explanations including blockage of vaginal contaminants. Thus tubal effluences or vaginal contaminants are no longer able to reach the pelvic cavity and ovaries. Although many vaginal contaminants could be proposed, talc use in genital hygiene may be an important one. |
| Chang (1997) | Case Control Study. Population based. Evaluated 450 patients with borderline or invasive ovarian cancer and 564 population controls in Ontario, Canada. A questionnaire was used during an in-person interview. Questions about regular talc use and type of talc use, as well as questions from which information about duration and frequency of exposure | Women with any regular talc exposure had an increased risk of developing ovarian cancer with an odds ratio of **1.42 (1.08-1.86).** Use of cornstarch was not associated with increased risk, but there were small numbers in this exposure group. Use of talc on sanitary napkins was associated with an odds ratio of **1.26 (0.81-1.96)**, and use of talc after bathing showed an odds ratio of **1.31 (1.00-1.73)**. Dose response data revealed an odds ratio per 10 years of use at **1.06 (0.99-1.14).** | Differences in talc concentration among various baby powders, body powders and deodorizing powders were not investigated in this study. Furthermore, reporting error in reported talc use and failure to interview all eligible case and control subjects may have led to biases. As with any case control study, the possibility of selection bias and information bias exists, although the consistency of | This investigation supports previous contentions that exposure to talc may increase risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated. A questionable dose-response relationship was observed between duration or frequency of exposure and risk. |

133

| | | | |
|---|---|---|---|
| | were included. Women were questioned about the application of talc to the perineum and about use of talc on sanitary napkins. They also ascertained the use of cornstarch on the perineum and sanitary napkins. | | this study with others that have addressed reproductive factors and ovarian carcinoma is reassuring. | |
| Green (1997) | Case Control Study. Population based. Included 824 women with ovarian cancer who were identified through cancer registries and 855 population-based controls from 3 Australian states. A Questionnaire was used to determine perineal talc exposure but no details were provided on the specific questions posed regarding talc use. Duration and particular ages/years used were also obtained. | Women who had ever used talc in the perineal region had an increased risk for ovarian cancer with a relative risk **1.3 (1.1-1.6).**  Further the authors found that compared with women who had neither used talc nor had surgical sterilization, risk was highest among talc users without surgery with a relative risk **1.3 (1.0-1.7)** and lowest among women with a history or tubal sterilization or hysterectomy who had not applied talc to the perineum with a relative risk **0.6 (0.5-0.84).** | Recall of use of talc among older women may not have been accurate, tending to reduce the estimated RRs; moreover, the actual quantity of talc used was unknown. | Despite the limitation, these results add support to the body of evidence implicating talc as a factor in the pathogenesis of peritoneal epithelial neoplasia. Our findings support the theory that contaminants from the vagina, such as talc,… gain access to the peritoneal cavity through patent fallopian tubes and may enhance malignant transformation of the ovarian surface epithelium. Surgical tubal occlusion may reduce the risk of ovarian cancer by preventing the access of such agents. In view of this particular finding (reduction of risk of ovarian and peritoneal tumors) and the evidence presented here and elsewhere that pelvic contaminants such as talc are associated with ovarian cancer, we conclude that closure of the fallopian tubes by surgery prevents chronic contact between these agents and ovarian epithelium. It seem likely that peritoneal irritants act as co-carcinogens by increasing the accumulated number of mutational events in ovarian surface epithelial cells. |

| Cook (1997) | Case Control Study. Population based. Evaluated 313 cases of ovarian cancer identified through a cancer registry and 422 population-based controls in Western Washington. Women were questioned about storing diaphragms in powder, dusting perineal areas with powder after bathing, powdering sanitary napkins, and using genital deodorant sprays. Women were also questioned about duration and frequency of powder application and about types of powder applied. | Use of any of the genital powder applications (perineal application, sanitary napkins, genital deodorant sprays, diaphragms resulted in a relative risk **1.5 (1.1-2.0).** The risk was highest in women who dusted perineal areas with powder, with a relative risk **1.8 (1.2-2.9).** Compared with never users of genital deodorant sprays, women who used these products for 12 months or less had a relative risk for ovarian cancer of **1.5,** while those who used them for more than 12 months had a relative risk of **2.7.** Compared with never users of genital deodorant sprays, women who used an estimated 500 lifetime applications or less of genital deodorant sprays had a relative risk for ovarian cancer of **1.7,** while those who had an estimated lifetime applications greater than 500 had a relative risk of **2.6.** Both of these dose-response trends were statistically significant (p < 0.05). None of the other types of perineal talcum powder product use showed trends to greater risk with greater estimated duration used or applications. The authors then categorized powders into specific types: cornstarch, talcum powder, baby powder, deodorant powder, and scented body/bath powder (assuming talcum powder was likely a constituent of the latter three as well). Exclusive use of cornstarch only or of deodorizing powder only were associated with no increase in risk for ovarian cancer, but the | Study reported that it is difficult to postulate that an increased risk for ovarian cancer may specifically be due to powder and associated constituents when some of the deodorant sprays do not contain aerosolized powder.

Limitations of the present study include the fairly low proportion of eligible women who participated and the potential differential recall of powder usage. | These results offer support for the hypothesis, raised by prior epidemiologic studies, that powder exposure from perineal dusting contributes to the development of ovarian cancer.
Given the common practice (28-51% of women), even the modest elevation in ovarian cancer risk by most epidemiological studies could have a notable impact on the incidence of ovarian cancer in the US. |

| | | numbers of cases were very small (5 and 9, respectively). Exclusive use of other types of powder increased risk between 20 and 60 percent, but the results were not statistically significant. Risk for serous ovarian cancers increased in women who ever used any genital powder with a relative risk **1.7 (1.1-2.5).** The relative risk for "other tumors" among ever users was **1.8 (1.1-2.8),** while risks for mucinous or endometrioid tumors were not increased in genital powder users. | | |
|---|---|---|---|---|
| Godard (1998) | Case Control Study. Population based. Evaluated 170 women with ovarian carcinomas or borderline tumors and 170 controls in Montreal, Canada. The authors used questionnaires, but talc use questions were not described in the publication. However, the variable of "ever" versus "never" perineal use of talc was reported. | Women who had ever used perineal talc had an increased risk for ovarian cancer with a relative risk **2.49 (0.94-6.58).** The relative risk for sporadic ovarian cancer **2.45 (0.85-7.07),** and a relative risk of **3.25 (0.85-12.4)** for familial ovarian cancer. | | Perineal talc used was a nonsignificant risk factor (RR 2.49, P=.064). Talc has previously been implicated in the development of ovarian cancer. Although there are reports of talc embedded in human ovarian tissue and of talc migrating through the human female reproductive tract, the literature reviewed does not provide any convincing evidence that pure cosmetic talc, when used as intended, presents a health risk to women. |
| Wong (1999) | Case Control Study. Hospital based. Evaluated 499 patients with ovarian cancer and 755 patients with non-gynecological malignancies in Buffalo, NY.  Exposure to talc was determined using a self- | Women with ever use of talc in genital or thigh region had an odds ratio of **1.0 (0.8-1.3)** and both talc applied to those region and sanitary napkin has an odds ratio of **1.1 (0.7-1.7).**  For duration of use of talc, a use of 1-9 years reported an odds ratio of **0.9 (0.6-1.5);** 10-19 years at | The study has two potential weaknesses. First, as with any retrospective study using data collected from the patients' recall of evens, potential ascertainment and recall bias may exist. Second, condoms and diaphragms are potential sources of talc | A significant association between the use of talcum powder and the risk of developing epithelial ovarian cancer is not demonstrable, even with prolonged exposure. |

| | | | |
|---|---|---|---|
| | administered questionnaire. Women were queried on site of talc use (sanitary napkin vs. genital/thigh area) and duration of use. But, the study did not report the questions asked. | **1.4 (0.9-2.2)** and greater than or equal to 20 years of **0.9 (0.6-1.2).** | exposure. The questionnaire asked about these forms of contraception but does not ask about the frequency or duration of usage. Consequently, the study is limited to the use of talc on the perineum or sanitary napkins and does not address potential talc exposure from condom or diaphragm use. | |
| Cramer (1999) | Case Control Study. Population based. Evaluated 563 women with ovarian cancer and 523 controls in eastern MA and NH areas. Exposure to body powders was ascertained through personal interview. Women were asked if they had "regularly used talc, baby or deodorizing powders dusted or sprayed" to feet, arms, or other non-genital areas, to the genital or rectal area, on sanitary napkins or on underwear. A husband's use of powder in his genital area was also assessed. Age at first use, types of powders, applications per month and total years of use were assessed. Potential exposure from condoms or diaphragms was not assessed. | Women with any genital exposure had an adjusted odds ratio of **1.60 (1.18-2.15).** For frequency per month, women with less use less than 30 had an odds ratio of **2.21 (1.37-3.56)** whereas with 40+ use had an odds ratio of **1.57 (0.8-3.10).** Women with serous invasive ovarian cancer had an adjusted odds ratio of **1.7 (1.22-2.39)** | The relatively weak odds ratios observed could reflect potential biases, especially recall and confounding. Recall bias is possible because talc exposure in these studies is based on person recollection. However, recall bias seems more likely to affect exposures that have occurred over a short term than those that have occurred over long term. If publicity regarding the association correlated with selective recall, one might expect a trend for cases from more recent studies to report higher exposure rate. As to confounding, the authors found no evidence that genital talc exposure varied by key risk factors for ovarian cancer such as age, parity, OC use. The demonstrated consistent association between talc and ovarian cancer appears to be | In summary, we have demonstrated a consistent association between talc and ovarian cancer that appears unlikely to be explained by recall or confounding. The dose-response relationship is weak but improved by considering factors such as closure of the female tract, ovulation and exposure prior to pregnancy, and we have outlined a plausible biologic rationale for this association. We estimate that avoidance of talc in genital hygiene might reduce the occurrence of a highly lethal form of cancer by at least 10%. Balanced against what are primarily aesthetic reasons for using talc in genital hygiene, the risk benefit decision is not complex. Appropriate warnings should be provided to women about the potential risks of regular use of talc in the genital area. |

| | | | unlikely to be explained by recall or confounding.<br>In attempting to address the lack of a clear dose response, the authors point out that it is difficult to quantify the amount of powder actually used and degree of perineal dusting that might constitute an "application of talc," Other considerations include the use during ovulation and closure of tract as a result of tubal ligation or hysterectomy. | |
| Ness (2000) | Case Control Study. Hospital based. Evaluated women with ovarian cancer ascertained from 39 hospitals in Eastern Pennsylvania, Southern New Jersey, and Delaware. 767 cases of ovarian cancer were interviewed, with 1,367 population-based controls. Talc exposure was determined by asking women if they ever used talc, baby, or deodorizing powder at least once per month for 6 or more months in their genital or rectal area, on sanitary napkins, on underwear, on a diaphragm or cervical cap, or on non-genital areas. They also were asked about male partner | Compared with never-users, women who used talc in genital/rectal areas had an elevated odds ratio for ovarian cancer of **1.5 (1.1-2.0).** Users on sanitary napkins had an increased risk for ovarian cancer with an odds ratio **1.6 (1.1-2.3).** Use on underwear increased risk to an odds ratio of **1.7 (1.2-2.4).** Use on a diaphragm/cervical cap or by a male partner did not increase risk. Among those who used in the genital/rectal or other body areas did not show increasing risk with increasing numbers of years of use. | A limitation of the study was the somewhat low participation rate among cases and controls. Another limitation is the potential for recall bias, which is a concern with any case-control study. However, in this study recall bias is unlikely to explain factors that appear to be protective, which was the case for many of the associations found. A final limitation is that many of the effect sizes were modest. | Talc use on all areas of the body elevated ovarian cancer risk, even after adjustment for potentially important confounding factors.<br><br>Environmental factors and medical conditions that increased the risk included talc use…. The spectrum of associations provides support for the hypothesis that inflammation may mediate ovarian cancer risk. |

|  |  |  |  |  |
|---|---|---|---|---|
|  | use of talc to the genital area or underwear. |  |  |  |
| Mills (2004) | Case Control Study. Population based. Evaluated 256 cases from cancer registries and 1,122 population-based controls from in 22 counties of Central California. Women were queried about their talcum powder use in the genital area, years of use, frequency of use, and total duration of use. Invasive and borderline tumors were studied. | Ever use of perineal talc had an increased risk for ovarian cancer with an odds ratio **1.37 (1.02-1.85).** Increasing use of use was associated with increasing risk- women using talc 4-7 times per week had an odds ratio of **1.74 (1.14-2.64)** for ovarian cancer (p=0.015). There was an indication of trend with duration of use up to 4-12 years OR **1.86 (1.16-2.98),** but the number of years beyond that did not increase risk further. A similar relationship was found for cumulative dose (frequency x duration) and risk peaked in second and third quartiles (p=0.051). Risk for women with serous invasive tumors had an odds ratio of **1.77 (1.12-2.81).** | The sample size was relatively small and the response fraction lower than ideal. Recall bias has been implicated…. It has also been suggested that use of talc is habitual versus memorable and not likely to be subject to recall bias. Treatment effect is also a limitation. | This study provides some support for the hypothesis that perineal talc use is associated with an increased risk for epithelial ovarian cancer. The precautionary principal should be invoked, especially given that this is serous form of cancer, usually associated with a poor prognosis, with no current effective screening tool…. Unlike other forma of environmental exposures, talcum powder use is easily avoidable. |
| Merritt (2008) | Case Control Study. Population based. Evaluated 1,576 women with ovarian cancer and 1,509 population-based controls from Australia. Women provided information on self-administered questionnaires. To determine use of talcum powder in the perineal region, participants were asked if they had ever used powder or talc in the genital area, on underwear, | Ever use of talc in the perineal region was associated with an odds ratio of **1.17 (1.01-1.36).** The increase was strongest for serous with an odds ratio **1.21 (1.03-1.44)** and was also seen for endometrioid with an odds ratio **1.18 (0.81-1.70).** A trend for duration of use greater than 25 years was seen for all cases with an odds ratio **1.29 (1.04-1.58) p=0.021).** | Low response rate for controls (47%), which could have resulted in selection bias and possibly lead to an over-representation of health subjects among the controls. Additionally, the analysis of the medical conditions was based entirely on self-reported medical history and as a result the accuracy of these reports could not be confirmed, although self-reports of these miscellaneous conditions are | Former studies together with the current findings support the hypothesis that talc particles are transported to the ovaries via unobstructed fallopian tubes. Focusing on talc use, we found that any use of perineal talc was associated with a small but significantly increased risk of ovarian cancer overall and specifically amongst the invasive and LMP serous tumours although no clear dose-response with increasing duration of use was identified. This finding is consistent with results of previous studies. |

| | or on sanitary pads/diaphragms. They were also asked about age at first use and years of talc use in these areas. Duration of talcum powder use prior to and after surgical sterilization was calculated, and all analyses were limited to the time when the fallopian tubes would have been patent. Use of talc on arms, chest or abdomen was also collected. | | unlikely to be influenced greatly by case/control status. | We conclude that on balance chronic inflammation does not play a major role in the development of ovarian cancer. |
|---|---|---|---|---|
| Moorman (2009) | *Case control. Population based. Investigated 1,114 cases with histopathologically confirmed tumors as part of the North Carolina Ovarian Cancer Study conducted in a 48-county region of North Carolina. Control women were frequency-matched by age and race/ethnicity. Talc exposure was ascertained through in-person interviews and questionnaire conducted by nurses.* | *After adjusting for age there was an increased risk for ovarian cancer with (ever/never) talc use reported for both whites with an odds ratio of 1.04 (0.82 -1.33) and African American of 1.19 (0.68-2.09).* | The North Carolina Ovarian Cancer Study included more African-American women that any other study of ovarian cancer, but the relatively small sample made it difficult to ascertain which association were true associations and which were due to chance findings. Other limitations included the case-control method. The possibility of bias being introduced due to nonparticipation of ovarian cancer cases and controls should be considered. | The relative importance of ovarian cancer risk factor may differ for African-American women but conclusions were limited by the small sample. |
| Wu (2009) | *Case control. Population based. Evaluated 609 women with newly diagnosed epithelial ovarian cancer and 688 population-based control women residing in Los Angeles county, CA. Talc* | *After adjusting for race, age, education, tubal ligation, family history, menopausal status, use of oral contraceptives, and parity ever perineal use of talc was associated with an increased relative risk of ovarian cancer 1.53 (1.13-2.09). The risk of ovarian cancer* | Confounding, bias. | The role of talc in the development of ovarian cancer has been studied extensively. In a 2006 review by the International Agency for Research on Cancer (IARC), talc was classified as possibly carcinogenic to humans *(i.e., Group 2B)* on the basis that most of the 20 epidemiological studies on talc |

| | | | |
|---|---|---|---|
| | *exposure was determined through a comprehensive questionnaire that used a reference date of 2 years before the date of diagnosis (or date of interview for controls). Subjects were asked if they ever used talc at least once per month for 6 months or more. If the response was positive, they were asked if they had ever used talc in non-perineal areas, perineal areas or on underwear or sanitary pad/diaphragm. Questions on talc use included age at first use, frequency of use (times per month) and years of talc use.* | *increased significantly with increasing frequency and duration of talc use; compared to never users risk and was highest among long duration (20 years), frequent (at least daily) talc users with an adjusted relative risk of 2.08 (1.34-3.23). The association between talc use and risk of ovarian cancer was strongest for serous ovarian cancer with a relative risk for any use of 1.70 (1.27-2.28).* | | and ovarian cancer show consistently a 30--60% increased risk associated with talc use. However, only about half of the studies examined exposure response relationships and the evidence for this is less consistent. This study adds to small group of studies that have investigated the combination of frequency and duration of talc use and ovarian cancer. Results show a significant trend with increasing number of total applications. The results also suggest that talc use prior to 1976 may be more important. The lack of sufficient information on frequency, duration and calendar period of talc use may have contributed to misclassification of this exposure variable in some previous studies. OK |
| Rosenblatt (2011) | Case control. Population based. Evaluated a total of 812 women with ovarian cancer identified through a cancer registry and 1,313 controls from the western Washington population. Sources of genital powder were ascertained, including direct perineal application, use on sanitary napkins and diaphragms, and use of deodorant vaginal spray. For powder use on sanitary napkins and use of vaginal deodorant sprays, the | Risk of ovarian cancer with genital powder was associated with an odds ratio **1.27 (0.97-1.66).** The risk for borderline ovarian tumors showed an odds ratio of **1.55 (1.02-2.37)** and for invasive ovarian cancers the odds ratio was **1.27(0.87-1.58).** Use of powder on either sanitary napkins or diaphragms did not increase risk. Use of vaginal deodorant spray showed an odds ratio **1.15 (0.85-1.56).** None of the dose-response or time variables (years of use, lifetime number of applications, age at first use, age at last use, calendar year of first use, time since first year, time since last use) showed evidence of | The validity of all of these studies, including this may be influenced by the level of non-response among cases and controls and by the potential for misclassification (differentials and non-differential) of exposure status. | IARC has designated perineal exposure to talc as a possible carcinogen in women. A modest association of ovarian cancer with this exposure was seen in the study and in some previous ones, bur the association generally has not been consistent with or among studies. Therefore, no stronger adjective than "possible" appears warranted at this time. It is not evident how (or if) additional investigation will be able to resolve the issue of whether perineal exposure to talc predisposes to ovarian malignancy. Further case-control studies will continue to be hindered by |

| | | | |
|---|---|---|---|
| | authors recorded the total number of months or years in which these products were used. For use of perineal powder, the investigators recorded the age began and ended, number of weeks or months of use per year, and average days per week used. Study participants were also asked about the types of powder used, including talcum, baby, cornstarch, deodorant, body/bath, and other or unknown. The authors then calculated the lifetime duration of use, and estimated lifetime number of applications. | increasing relative risk of ovarian cancer with increasing level of exposure to talcum powder products. Similarly, there was no evidence of increased risk for ovarian cancer with increasing dose of powder use on sanitary napkins, or of vaginal deodorant sprays. | | the limitations mentioned above. Data from additional cohort studies would be welcome, but without details concerning the composition of the powders used by cohort members – details that many participants may not be able to provide – the results of such studies may similarly be ambiguous in their interpretation.<br>OK |
| Kurta (2012) | Case Control. Population based. Evaluated 902 cases of women with ovarian cancer and 1,802 controls from resident of Western Pennsylvania, Eastern Ohio, and Western New York State. Perineal talc use was defined as ever using dusting powder or deodorizing spray on the genital or rectal areas, on sanitary napkins, on underwear, or on diaphragms or cervical caps. | Use of perineal talc showed an increased risk for ovarian cancer with an odds ratio **1.40 (1.16–1.69).** | Reliance on self-reported use of study drugs and talc- recall bias. | Concludes that risk of ovarian cancer is significantly associated with talc use.<br>Compared to Caucasians, African Americans had a significantly increased risk of ovarian cancer. The following variables were also significantly associated with ovarian cancer risk: age at menarche, OC use, parity, gravidity, duration of breastfeeding, perineal talc use, and tubal ligation.<br>OK |

| Wu (2015) | Case Control. Population based. Investigated the associations of risk of ovarian cancer and talcum powder products use and other risk factors. 1,701 cases were identified through the SEER population-based University of Southern California cancer registry. and 2,319 controls were recruited from the cases' neighborhoods using random selection from population lists. In-person interviews were conducted. To determine use of talcum powder, women were asked if they ever used talc at least once per month for 6 months or more. If the response was positive, they were asked whether they had ever used talc in non-perineal areas (feet, arms, chest or back), perineal areas, or on underwear or sanitary pads/diaphragm. Questions on talc use included age at first use, frequency of use (times per month) and years of talc use. | Use of genital talc for one year or more in combined ethnicities was associated with an increased risk for ovarian cancer with an odds ratio **1.46 (1.27-1.69).** Similar relative risks were seen in non-Hispanic white, Hispanic, and African-American women. For 5 years increments of genital talc use, the risk for ovarian cancer increased with an odds ratio of **1.14 (1.09-1.20).** | Small sample sizes for Hispanics and African Americans | Population attributable risk percentages (PAR%s), defined as the percentages of disease in the population that are attributable to a given risk factor (or set of risk factors), were calculated. The risk associations with six well-accepted factors (parity, oral contraceptive use, tubal ligation, endometriosis, family history of ovarian cancer, and talc use) were comparable and significant in Hispanics, AA, and non-Hispanic whites. As expected, each of these six risk factors had statistically significant effects on risk in all three groups. |
| Cramer (2016) | Case control. Population based. Reported on association between genital talc use and risk of ovarian cancer. | Genital talc use was associated with an increased risk of ovarian cancer with an odds ratio of **1.33 (1.16-1.52).** Reported a significant trend for greater ovarian cancer risk with | Recall bias. There are no external records to validate talc use reported by study participants to assess whether our degree of | Overall, there is an association between genital talc use and EOC and a significant trend with increasing "talc years" of use. |

| | Evaluated 2,041 cases of ovarian cancer from tumor boards and registries in Eastern Massachusetts and Massachusetts and 2100 controls identified from the sample population as controls. Participants were asked if they "regularly" or "at least monthly" applied powder to the genital or rectal area, sanitary napkins or tampons, underwear, or non-genital areas. Type of powder, age begun, years used, and applications per month were ascertained. Lifetime exposure was estimated by multiplying frequency of applications per month by months used, and talc-years was calculated. Participants were then divided into quartiles according to these variables. Participants were also asked if their partners dusted or sprayed powder to their genital or rectal areas. Condom and diaphragm use were ascertained as potential sources of genital talc exposure. | increasing talc-years of use. > 7,200 apps (equivalent to >20 years of daily use showed an odds ratio **1.49 (1.06-2.10).** | misclassification is reasonable. Whether the association is a result of confounding must be addressed. No evidence of confounding was identified but authors did find several examples of effect modification that have biological relevance: prolactin may be mediator.<br><br>There are inherent limitations quantifying a dose–response due to a lack of metrics for how much talc is in an "application," how much enters the vagina, and how much reaches the upper genital tract where, presumably, any deleterious effect is mediated. This may account for the failure to identify a dose–response in many papers on talc and ovarian cancer. | Among many epidemiologic variables, no confounders for the association were identified.<br>The association may be stronger in AA women.<br>OK |
| Schildkraut (2016) | Case control. Population based. Investigated the association between body powder use | Use of genital powder was associated with an odds ratio **1.44 (1.11-1.86).** A dose response was found for duration of use (> 20 | Result could have been spurious do to underreporting of genital talc and sample | Study showed that genital powder use was associated with ovarian cancer risk in AA women and are consistent with localized chronic inflammation |

| | | | |
|---|---|---|---|
| | and ovarian cancer in African American women in 11 geographic areas of the U.S. Evaluated 584 case identified through SEER cancer registries or through hospital departments and 745 controls. Controls were randomly selected from the same populations as the cases. Participants were questioned via phone interview whether they had ever regularly used talc, cornstarch, baby, or deodorizing powders. Women were classified as "regular users" if they reported using any of these powders at least monthly for at least 6 months, and "never users" otherwise. Regular users were asked about frequency and duration of use; use on genital areas, underwear, sanitary napkins, or diaphragms; and use on non-genital areas. Lifetime number of applications was estimated as number of applications per month times number of months used. Occupational exposure (yes/no) was ascertained for a subset of participants. | years was associated with an odds ratio of **1.52 (1.11-2.07)** and number of lifetime applications **(P trend 1.14)** and daily use of genital powder showed an odds ratio of **1.71 (1.26-2.33.)** Histological analysis revealed an odds ratio of **1.38 (1.03-1.85)** for serous and genital use of powder and **1.63 (1.04-2.55)** for non-serous. | size may have been too small. | in the ovary due to particulates that travel through a direct transvaginal route. The dose response observed for duration of genital powder use provides further evidence for the relationship between genital powder and overall EOC risk. Data suggest an increased risk for serous and non-serous subtypes with use of genital powder.

The results of the current study suggest that the use of body powder is an especially important modifiable risk factor for EOC in AA women. |

## III.    META-ANALYSES AND POOLED STUDIES

| AUTHOR | STUDY DESCRIPTION | FINDINGS | REPORTED LIMITATIONS | AUTHORS' DISCUSSION AND CONCLUSIONS |
|---|---|---|---|---|
| Harlow (1992) | Meta-Analysis of 6 studies with 1106 cases | Statistically significant OR of 1.3 for any perineal talc exposure Daily vs. <daily talc use and talc use >10 years vs. <10 years were associated with greater risk for ovarian cancer. | Cannot rule out the possibility in differential over- or under-reporting of talc exposure in cases and controls | Because the overall association between genital use of talc and ovarian cancer remains weak, it is unlikely that this exposure-disease pathway is the principal one involved in ovarian cancer etiology. The authors concluded that they calculate that by applying these odds ratios to the exposure rate among cases, the proportion of ovarian cancer incidence attributable to this level of talc exposure is about 10%. They further state that given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits.  For that reason, they discouraged the use of talc in genital hygiene, particularly as a daily habit. |
| Gross & Berg, 1995 | OR = 1.27 Pooled 10 studies – 614 cases Supported by J&J | 1.27 (95%CI, 1.09-1.48) | Other risk factors were not adjusted for in a consistent manner across studies. Selection bias and differential bias were not addressed specifically in the studies. | The body of knowledge found in the medical literature does not unequivocally support the hypothesis that talc use by women puts them at an increased risk of ovarian cancer. However, the results of the meta-analyses do suggest the possibility of an increased risk of ovarian cancer due to perineal talc use. Further research in this area *is* warranted by these results. |
| Cramer, 1999 | Meta-analysis Pooled 14 studies plus Cramer 1999 Attributable Risk of 10-11% Ruled out recall bias Grant by NCI | 1.36 (95%CI, 1.24-1.49) | Recall: Recall bias seems more likely to affect exposures that have occurred over a short term than those that have occurred over a long term. Since average duration of talc | There is a consistent association between talc and ovarian cancer that appears unlikely to be explained by recall or confounding. The dose-response relationship is weak but improved by considering factors such as closure of the |

| | | | use exceeded 20 years in both cases and controls in our current study, genital talc exposure may be less likely to be subject to recall bias. Furthermore, if publicity regarding the association correlated with selective recall, one might expect a trend for cases from more recent studies to report higher exposure rates, but the exposure rates reported do not suggest this is the case. It also seems reasonable that selective recall would lead to cases reporting all types of talc exposure more frequently than controls, but our study found that cases did not report a significant excess of talc use in non-genital areas compared to controls.<br>Confounding: Authors found no evidence that genital talc exposure varied by key risk factors for ovarian cancer such as age, parity or OC use and little variability of the association by these and other variables. | female tract, ovulation and exposure prior to pregnancy, and we have outlined a plausible biologic rationale for this association. Authors estimated that avoidance of talc in genital hygiene might reduce the occurrence of a highly lethal form of cancer by at least 10%. Balanced against what are primarily aesthetic reasons for using talc in genital hygiene, the risk benefit decision is not complex.<br>Appropriate warnings should be provided to women about the potential risks of regular use of talc in the genital area. |
| Huncharek, 2003[77] | Meta-analysis<br>RR = 1.33<br>16 studies<br>No disclosure regarding industry relationship. | 1.33 (95%CI, 1.16-1.45) | The meta-analysis presented shows inconsistencies in the available data. | Despite the finding of a positive association, demonstration of a dose-response relationship is an important criterion for making causal inferences from epidemiological data. If no |

---

[77] Dr. Muscat and Huncharek were consulting with Johnson & Johnson at the time of this publication. In October 2000, Dr. Huncharek solicited finding for an Ovarian Cancer Meta-Analysis from J&J to be performed by he and Dr. Muscat and he provided J&J with "preliminary results" of his analysis in November 2000.  Deposition of Susan Nicholson, dated July 26, 2018; Deposition of Linda Loretz, Ph.D., dated October 1, 2018. In November 2000, J&J, through its senior scientist, John Hopkins provided editorial comments to Dr. Huncharek's preliminary results that would more strongly refute the relationship between asbestos and talc and causation.  JNJ 000377405.   These 2000 J&J comments were ultimately incorporated into the final Huncharek Meta-Analysis which was submitted in 2002 and published in 2003.This relationship was not disclosed.

| | | | The summary relative risk may be spurious due to bias or uncontrolled confounding. | relationship exists, a causal link between exposure and disease is questionable.<br><br>Asbestos contamination of talc has been identified in the past but current production methods limit or completely eliminate contamination.<br><br>In summary, pooling data from the sixteen available observational studies examining the relationship between perineal use of cosmetic talc and the development of invasive epithelial ovarian cane.er failed to show evidence of a causal relationship. |
| Langseth, 2008 | Meta-analysis<br>20 case-control studies; one cohort (Gertig)<br>No studies below 1.0 RR<br>IARC review<br>Financed by the Cancer Registry of Norway | 1.35 (95%CI, 1.26-1.46)<br>Pooled OR = 1.35 (1.26-1.46) | Methodological factors such as recall bias should always be considered in case-control studies. It could have been a problem had there been widespread publicity about the possible association between use of body powder and cancer. The International Agency for Research on Cancer (IARC) working group considers that there has not been widespread public concern about this issue and therefore considers it unlikely that such a bias could explain the consistent findings. Another source of recall bias could result from the fact that | The evidence in favor of an association, a very large number of studies have found that women who used talc experienced excess risks of ovarian cancer; some results were statistically significant and some were not. There was some indication in the cohort study of an increase in serous tumours. The evidence of talc migrating to the ovaries lends credibility to such a possible association. The main epidemiological evidence against the association is the absence of clear exposure-response associations in most studies, as well as the absence of an overall excess risk in the cohort study. On balance, the epidemiological evidence suggests that use of cosmetic talc in the perineal area may be associated with ovarian cancer risk. The mechanism of carcinogenicity may be related to inflammation. High degree of consistency among studies. The carcinogenicity of non-asbestiform talc was assessed by a monograph working |

| | | | women with the cancer tend to remember or overreport their use of body powder. The influence of this type of recall bias cannot be ruled out. | group at IARC in 2006. After considering biases and possible confounding factors, the IARC working group concluded that the epidemiological studies provided limited evidence for the carcinogenicity of perineal use of talc-based body powder, and classified this use as possibly carcinogenic to human beings (that is, group 2B). The current body of experimental and epidemiological evidence is insufficient to establish a causal association between perineal use of talc and ovarian cancer risk. |
|---|---|---|---|---|
| Berge, 2017 | Meta-analysis 24 case-control studies and three cohort studies 302,705 women | Summary RR =1.22 (95%CI, 1.13-1.30) Case-control studies = RR 1.26; cohort studies = 1.02 Serous carcinoma RR = 1.24 There was no trend in RR with either duration or frequency of genital talc use. | The heterogeneity of results by study design and the lack of a trend for duration and frequency of use, however, detract from a causal interpretation of this association. | This meta-analysis resulted in a weak but statistically significant association between genital use of talc and ovarian cancer, which appears to be limited to serous carcinoma. |
| Penninkilampi, 2018 | Meta-analysis 24 case-control (13, 421 cases) and three cohort studies (890 cases, 181,860 person-years) | Any perineal talc use was associated with increased risk of ovarian cancer (OR = 1.31; 95% CI = 1.24, 1.39). More than 3600 lifetime applications (OR = 1.42; 95% CI = 1.25, 1.61) were slightly more associated with ovarian cancer than <3600 (OR = 1.32; 95% CI = 1.15, 1.50). An association with ever use of talc was found in case–control studies (OR = 1.35; 95% CI = 1.27, 1.43), but not cohort studies (OR | A limitation of this study is that it pools nonrandomized studies, primarily case–control studies. The retrospective nature of case–control studies introduces the potential for recall bias. In this case, it is entirely possible that patients with ovarian cancer may be more aware of their previous talc use and hence be more likely to report higher past use. It is possible to attempt to overcome this by blinding the participants to the nature of the study, usually by asking spurious questions; | Hence while case–control studies are low-level evidence, they have been preferred in the investigation of the association between talc use and ovarian cancer. They also have the important advantage of not requiring 15 or more years of follow-up, as is necessary for a cohort study to sufficient detect cases of ovarian cancer relative to certain exposures. One potential way to overcome this limitation in future studies is to ensure that talc use is always included in questionnaires of any cohort studies investigating ovarian cancer. It is important not only that talc use be investigated but also the precise location, |

149

| | | = 1.06; 95% CI = 0.90, 1.25). However, cohort studies found an association between talc use and invasive serous type ovarian cancer (OR = 1.25; 95% CI = 1.01, 1.55). | however, the effectiveness of this approach may be limited. Many of the studies in this review recorded data about talc use as part of a more extensive questionnaire focused on other associations, which may reduce the potential for recall bias. However, since the initiation of lawsuits in 2014, there has been extensive media coverage especially regarding this association, and the potential for recall bias in case–control studies conducted since then may be exacerbated. | duration, and frequency of use. As it stands, a meta-analysis of observational studies such as the present study provides the highest level of evidence practically feasible for this research question.

The results of this review indicate that perineal talc use is associated with a 24%–39% increased risk of ovarian cancer. While the results of case–control studies are prone to recall bias, especially with intense media attention following the commencement of litigation in 2014, the confirmation of an association in cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association. |
|---|---|---|---|---|
| Terry, 2013 | Pooled analysis RR = 1.24 (1.15-1.33) 8 population based studies; 8,525 cases and 9,859 controls (2600 exposed cases) Pooled study; authored by OCAC | Any perineal talc use was associated with increased risk of ovarian cancer (OR = 1.31; 95% CI = 1.24, 1.39). More than 3600 lifetime applications (OR = 1.42; 95% CI = 1.27, 1.61) were slightly more associated with ovarian cancer than <3600 (OR = 1.32; 95% CI = 1.15, 1.50). An association with ever use of talc was found in case–control studies (OR = 1.35; 95% CI = 1.27, 1.43), but not cohort studies (OR = 1.06; 95% CI = 0.90, 1.25). However, cohort studies found an association between talc use and invasive serous type ovarian cancer (OR = 1.25; 95% CI = 1.01, 1.55). | Differences in the wording of questions about genital powder use and retrospective nature of the exposure ascertainment. This results in varying levels of misclassification of true exposure. There was missing data, but was not likely to bias results, according to authors | In conclusion, our large pooled analysis of case-control studies shows a small-to-moderate (20–30%) increased risk of ovarian cancer with genital-powder use, most clearly pertaining to non-mucinous epithelial ovarian tumors. More work is needed to understand how genital powders may exert a carcinogenic effect, and which constituents (e.g. talc) may be involved. Since there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence.

The biologic plausibility for the observed association between genital-powder use and ovarian cancer risk has been challenged because evidence for dose-response has been inconsistent. The lack of significant dose-response may reflect the difficulty inherent in accurate recollection of specific details of frequency and duration of genital-powder use. Alternatively, the association between genital-powder exposure and ovarian cancer risk may not |

150

| | | | |
|---|---|---|---|
| | | | be linear and a modest exposure may be sufficient to increase cancer risk.<br><br>When unexposed group was included in the analysis there was a clear dose response w/ increased number of applications. |
| O'Brien, 2020 | Data were pooled from 4 large, US-based cohorts: Nurses' Health Study, Nurses' Health Study II, Sister Study, and Women's Health Initiative Observational Study. Ever, long-term (>20 years, and frequent (>1/week) use of powder in the genital area were studied.  The primary analysis examined the association between ever use of powder in the genital area and self-reported incident ovarian cancer. | The pooled sample included 252 745 women (median age at baseline, 57 years) with38% self-reporting use of powder in the genital area. Ten percent reported long-term use, and 2 2% reported frequent use. During a median of 11.2 years of follow-up (3.8 million person-years at risk), 2168 women developed ovarian cancer (58 cases/100 000person-years). Ovarian cancer incidence was 61 cases/100 000 person-years among ever users and 55 cases/100 000 person-years among never users (estimated risk difference at age 70 years, 0.09% [95% CI, −0.02% to 0.19%]; estimated HR, 1.08 [95% CI, 0.99 to 1.17]).The estimated HR for frequent vs never use was 1.09 (95% CI, 0.97 to 1.23) and for long-term vs never use, the HR was 1.01 (95% CI, 0.82 to 1.25). Subgroup analyses were conducted for10 variables; the tests for heterogeneity were not statistically significant for any of these comparisons. While the estimated HR for the association between ever use of powder in the | This study has several limitations": 1) the included cohorts varied widely in how they assessed exposure, particularly the duration and frequency of powder use; 2) use of powder in the genital area could not be assess as a time-varying factor, as none of the four studies collected data on use after baseline; 3) specific exposure windows could not be examined, nor could type of powder used or patency status at time of powder use; 4) as with all observational studies, residual confounding is possible; 5) the study may have limited generalizability; 6) confounding by indication is another potential limitation, and it would occur if women with other underlying conditions that were associated with ovarian cancer were also more likely to use powder in the genital area; 7) because tests to confirm patency were not performed, it is possible that not all women categorized as having a patent reproductive | "In this analysis of pooled data from women in 4 cohorts, there was not a statistically significant association between self-reported ever use of powder in the genital area and incident ovarian cancer. The HR for the association between ever powder use and incident ovarian cancer was 1.08 (95% CI, 0.99 to 1.17) . . . When restricted to women with patent reproductive tracts at baseline, the HR was 1.13 (95% CI, 1.01 to 1.260." . . . "However, the study may have been underpowered to identify a small increase in risk." |

| | | genital area and ovarian cancer risk among women with a patent reproductive tract was 1.13(95% CI, 1.01 to 1.26), the P value for interaction comparing women with vs without patent reproductive tracts was .15. | tract in this analysis had truly patent tubes. | |
|---|---|---|---|---|
| Davis (2021) | We used data from five studies in the Ovarian Cancer in Women of African Ancestry consortium. Participants included 620 African-American cases, 1,146 African-American controls,2,800 White cases, and 6,735 White controls who answered questions on genital powder use prior to 2014. The association between genital powder use and ovarian cancer risk by race was estimated using logistic regression. | The prevalence of ever genital powder use for cases was 35.8% among African-American women and 29.5% among White women. Ever use of genital powder was associated with higher odds of ovarian cancer among African-American women [OR:1.22;95% confidence interval (CI): 0.97–1.53] and White women (OR: 1.36; 95% CI: 1.19–1.57). In African-American women, the positive association with risk was more pronounced among high-grade serous tumors (OR: 1.31; 95% CI:1.01–1.71) than with all other histotypes (OR:1.05; 95% CI:0.75–1.47). In White women, a significant association was observed irrespective of histotype (OR:1.33; 95% CI:1.12–1.56 and OR: 1.38; 95% CI:1.15–1.66, respectively)." | Limitations of our study must be considered.  Recall bias was not a concern for the cases and controls included in our study from the prospective study (WHI). However, for case–control studies, recall bias can be a concern for some exposures. This is particularly true for genital powder use with the advent of talc related lawsuits in 2014.All our analyses excluded interviews from case–control studies after 2014 to address this issue of recall bias. Genital body powder use was self-reported in each of the contributing OCWAA studies. It is possible that there were systematic differences in the way participants remember or report genital body powder and there were differences in the wording of the genital powder questions in the various studies. However, the definition of genital body powder exposure was the same for cases and controls in each of the individual OCWAA studies and we did not observe heterogeneity across studies in the effect estimates, highlighting that the results from our included prospective study (WHI) were not materially different from the four | In conclusion, in this consortium analysis of AA and White women, while the prevalence of ever genital body powder use was higher among AA women in the OCWAA consortium, the association between genital powder use and ovarian cancer risk was similar among AA and White women. Furthermore, there was not a dose-response relationship between frequency or duration of genital powder use and ovarian cancer risk or any significant differences in association by histotype. |

| | | | |
|---|---|---|---|
| | | retrospective case–control studies. It is likely that with the exclusion of interviews conducted in 2014 and later, any misclassification would be non-differential with respect to the outcome, resulting in bias toward the null. | |
| Woolen (2022) | A systematic review and meta-analysis was conducted according to meta-analysis of observational studies in epidemiology guidelines. . . case-control and cohort studies were included if they reported frequent perineal talcum powder use and an adjusted odds ratio or hazard ratio for ovarian cancer. | Initial database searches returned 761unique citations and after review, eleven studies describing 66,876 patients, and 6542 cancers were included (Cohen's κ= 0.88). Publication quality was high (median NOS = 8, range: 4 to 9). Frequent talcum powder use was associated with an elevated risk of ovarian cancer (adjust-ed pooled summary odds ratio 1.47 (95% CI 1.31, 1.65, P<0.0001). There was no evidence of bias and low heterogeneity (I2= 24%, P=0.22). There was no meaningful difference limiting analysis to publications with a NOS quality score of 8 or 9 or limiting studies based on study design. | The primary strength of our study is our focus on frequent users of perineal talcum powder. Among women who report talcum powder use, the most common frequency is dailyuse,13and this is the first systematic review to focus on multiple times per week users. The results were highly consistent and homogenous, and the included studies were of high quality. The work has limitations as well. We constructed our selection criteria prospectively to include studies with multiple times per week and as close to daily talcum powder exposure as possible. However, this meant that cohort and case-control studies that might have frequent-use patients were excluded if the questionnaire did not explicitly capture this information. The definition of talcum powder use varied by frequency and duration between the case-control and cohort studies. Additionally, studies by Cook et al., Mills et al, Rosenblatt et al, and Schildkraut et al.17were unable to differentiate between use of perineal powders and the small subset using cornstarch (estimated at 1.5%). However, the differences in definition and small inclusion of cornstarch | In this analysis of pooled data 10 case-control studies and a single cohort study, the frequent use of perineal talcum powder use is associated with increased risk of ovarian cancer. These results support women avoiding the frequent use of talcum powder in the perineal area. We found frequent use of perineal talcum powder is associated with an increased risk of ovarian cancer, with a pooled adjusted odds ratio of 1.47 (95% CI 1.31, 1.65). |

| | | | likely did not affect the results as there was no evidence for statistical heterogeneity in our study. The included studies were adjusted for multiple covariates. The possibility of additional confounders to the studies likely exists. | |
|---|---|---|---|---|

**APPENDIX A: RESUME**

# DAVID A. KESSLER

| | |
|---|---|
| 1969-1973 | AMHERST COLLEGE, Amherst, Massachusetts<br>Bachelor of Arts, *magna cum laude* (B.A. Independent Scholar, 1973) |
| 1973-1979 | HARVARD MEDICAL SCHOOL, Boston, Massachusetts<br>Doctor of Medicine (M.D. 1979) |
| 1975-1977 | UNIVERSITY OF CHICAGO LAW SCHOOL, Chicago, Illinois<br>Doctor of Law (J.D., 1978), Harvard Law School, 1977-1978 |
| 1984-1986 | NEW YORK UNIVERSITY GRADUATE SCHOOL OF BUSINESS<br>ADMINISTRATION (Manhattanville), Purchase, New York<br>Advanced Professional Certificate in Management |

EMPLOYMENT

| | |
|---|---|
| 2021-2023 | **CHIEF SCIENCE OFFICER, COVID-19 RESPONSE<br>OPERATION WARP SPEED, COUNTERMEASURES<br>ACCELERATION GROUP** |
| 2003-present | UNIVERSITYOF CALIFORNIA, SAN FRANCISCO<br>Professor of Pediatrics, Epidemiology and Biostatistics |
| 2003-2007 | Dean, School of Medicine<br>Vice Chancellor of Medical Affairs |
| 1997-2003 | YALE UNIVERSITY SCHOOL OF MEDICINE<br>Dean<br>Professor of Pediatrics, Internal Medicine, and Public Health |
| 1990-1997 | UNITED STATES FOOD AND DRUG ADMINISTRATION<br>Commissioner<br>(Appointed by President George H. W. Bush, Reappointed by President<br>William J. Clinton) |
| 1984-1990 | THE HOSPITAL OF THE ALBERT EINSTEIN COLLEGE<br>OF MEDICINE<br>Medical Director |
| 1986-1990 | COLUMBIA UNIVERSITY<br>Julius Silver Program in Law, Science and Technology Lecturer<br>on Law |
| 1982-1984 | MONTEFIORE MEDICAL CENTER<br>Special Assistant to the President |
| 1981-1984 | UNITED STATES SENATE COMMITTEE ON LABOR AND<br>HUMAN RESOURCES, Consultant to the Chairman |

David A. Kessler                                                                              Page 2

## HONORARY DEGREES

1992          AMHERST COLLEGE, Amherst, Massachusetts
              Doctor of Science *honoris causa*

1992          GEORGE WASHINGTON UNIVERSITY, Washington, D.C.
              Doctor of Science *honoris causa*

1993          PHILADELPHIA COLLEGE OF PHARMACY AND SCIENCE, Philadelphia,
              Pennsylvania, Doctor of Science *honoris causa*

1993          DICKINSON COLLEGE OF LAW, Carlisle, Pennsylvania
              Doctor of Laws *honoris causa*

1995          ALBANY MEDICAL COLLEGE, Albany, New York
              Doctor of Science *honoris causa*

1997          NORTHEASTERN UNIVERSITY, Boston, Massachusetts
              Doctor of Science *honoris causa*

1998          MOUNT SINAI SCHOOL OF MEDICINE, New York, New York
              Doctor of Humane Letters *honoris causa*

1998          COLGATE UNIVERSITY, Hamilton, New York
              Doctor of Science *honoris causa*

1998          YALE UNIVERSITY, New Haven, Connecticut
              Master of Arts *privation*

1999          CONNECTICUT COLLEGE, New London, Connecticut
              Doctor of Humane Letters *honoris causa*

2001          DICKINSON COLLEGE, Carlisle, Pennsylvania
              Doctor of Science, *honoris causa*

2001          UNION COLLEGE, Schenectady, New York
              Doctor of Laws, *honoris causa*

2002          UNIVERSITY OF LOUISVILLE, Louisville, Kentucky
              Doctor of Public Service, *honoris causa*

2005          STATE UNIVERSITY OF NEW YORK, Syracuse, NY
              Doctor of Science, *honoris causa*

David A. Kessler                                                                    Page 3

2012        DREXEL UNIVERSITY, Philadelphia, PA
            Doctor of Science, *honoris causa*

2013        CLAREMONT GRADUATE UNIVERSITY, Claremont, CA
            Doctor of Science, *honoris causa*

2021        ALBERT EINSTEIN COLLEGE OF MEDICNE


HONORS

            NATIONAL ACADEMY OF SCIENCES, Public Welfare Medal,
            Honorary Member

            INSTITUTE OF MEDICINE, Member

            AMERICAN SOCIETY OF CLINICAL ONCOLOGY
            Distinguished Service Award for Scientific Achievement

            AMERICAN ACADEMY OF ARTS AND SCIENCES, Fellow

            PHI BETA KAPPA, Amherst College

            UNIVERSITY OF CHICAGO LAW REVIEW, Associate Editor

            2008 PUBLIC HEALTH HERO AWARD, UC Berkeley

            SIGMA XI, The Scientific Research Society of North America

            BARNARD COLLEGE Barnard
            Medal of Distinction

            CASPAR PLATT AWARD, The University of Chicago Law School

            HARVARD BLODGETT AWARD IN BIOLOGY, Amherst College

            WHITING FOUNDATION GRANT-IN-AID for research at
            Sloan-Kettering Institute

            NATIONAL SCIENCE FOUNDATION FELLOWSHIP (declined)

            JOHN WOODRUFF SIMPSON FELLOWSHIP, awarded by Amherst
            College for the study of medicine

            ALVAN T.--VIOLA D. FULLER AMERICAN CANCER SOCIETY
            JUNIOR RESEARCH FELLOW (declined)

            NATIONAL INSTITUTES OF HEALTH TRAINING FELLOWSHIP
            RECIPIENT Marine Biological Laboratory,

Woods Hole, Massachusetts

PHI DELTA THETA SCHOLARSHIP
DISTINGUISHED PUBLIC SERVICE AWARD
The George Washington University School of Medicine and Health Sciences

UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION
Special Citation

AMERICAN SOCIETY OF PUBLIC ADMINISTRATION
National Capitol Area Chapter
President's Award for Outstanding Achievement

AMERICAN FEDERATION FOR AIDS RESEARCH (AmFAR)
Sheldon W. Andelson Public Policy Achievement Award

THE WOODROW WILSON AWARD FOR DISTINGUISHED
GOVERNMENT SERVICE Johns Hopkins University

HAL OGDEN AWARD
Association of State and Territorial Directors of Health Promotion and
Public Health Education and the U. S. Centers for Disease Control

NATIONAL ORGANIZATION FOR RARE DISEASES (NORD)
Outstanding Service to the Public Health Award

MARCH OF DIMES
Franklin Delano Roosevelt Leadership Award

CHILDREN'S HOSPITAL NATIONAL MEDICAL CENTER
Children's Research Institute Award of Academic Excellence

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Food Labeling

ISRAEL CANCER RESEARCH FOUNDATION
President's Award

INSTITUTE FOR ADVANCED STUDIES IN IMMUNOLOGY AND AGING
Lifetime Public Service Award

AMERICAN LUNG ASSOCIATION
Special Recognition Award

UNIVERSITY OF CHICAGO ALUMNI ASSOCIATION
Professional Achievement Award (Washington, D.C. Chapter)

U. S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

Secretary's Award for Excellence in Public Service

NATIONAL KIDNEY CANCER ASSOCIATION
Progressive Leadership Award

JOHNS HOPKINS UNIVERSITY SCHOOL OF PUBLIC HEALTH
Dean's Medal

AMERICAN CANCER SOCIETY
Medal of Honor

AMERICAN HEART ASSOCIATION
Meritorious Achievement Award

WORLD HEALTH ORGANIZATION Pan
American World Health Organization World
No Tobacco Day Award

AMERICAN HEART ASSOCIATION
National Public Affairs Special Recognition Award for Tobacco

PROFESSIONAL ACHIEVEMENT CITATION, University of
Chicago Alumni Association

PENNSYLVANIA HOSPITAL Molly
and Sidney N. Zubrow Award

AMERICAN LUNG ASSOCIATION OF CONNECTICUT
Humanitarian Award

AMERICAN COLLEGE OF PREVENTIVE MEDICINE
Special Recognition Award

ASSOCIATION OF AMERICAN MEDICAL COLLEGES AND THE ROBERT
WOOD JOHNSON FOUNDATION
David E. Rogers Award for Improving Health and Healthcare of the American
People

JACOBS INSTITUTE OF WOMEN'S HEALTH
Excellence in Women's Health Award

NARAL PRO-CHOICE AMERICA
Lifetime Achievement Award

THE ASSOCIATION OF STATE AND TERRITORIAL CHRONIC DISEASE
PROGRAM DIRECTORS
Joseph W. Cullen Award for Outstanding Contributions to Chronic Disease
Prevention and Control

David A. Kessler                                                                 Page 6

THE COLLEGE OF WILLIAM & MARY LAW SCHOOL
2005 Benjamin Rush Medal

CALIFORNIA CENTER FOR PUBLIC HEALTH ADVOCACY
David Kessler Award for Extraordinary Contribution to the Public
Health

BOOKS FOR A BETTER LIFE AWARD

INTERNSHIP & RESIDENCY

1981-1982   SENIOR ASSISTANT RESIDENT, Department of Pediatrics,
            The Johns Hopkins Hospital

1980-1981   ASSISTANT RESIDENT, Department of Pediatrics,
            The Johns Hopkins Hospital

1979-1980   INTERN, Department of Pediatrics,
            The Johns Hopkins Hospital


ACADEMIC APPOINTMENTS

2003-       UNIVERSITY OF CALIFORNIA, SAN FRANCISCO
present     Professor of Pediatrics
            Professor of Epidemiology and Biostatistics

1997-       YALE UNIVERSITY
2003        Professor of Pediatrics
            Professor of Internal Medicine
            Professor of Public Health

1990-       ALBERT EINSTEIN COLLEGE OF MEDICINE
1997        Department of Pediatrics
            Department of Epidemiology and Social Medicine
            Associate Professor of Pediatrics
            Associate Professor of Epidemiology and Social Medicine

1988-       ALBERT EINSTEIN COLLEGE OF MEDICINE
1990        Department of Epidemiology and Social Medicine
            Assistant Professor

1986-       COLUMBIA UNIVERSITY SCHOOL OF LAW
1990        Julius Silver Program in Law, Science and Technology
            Lecturer on Law

David A. Kessler                                                                                    Page 7

| 1982- | ALBERT EINSTEIN COLLEGE OF MEDICINE |
|---|---|
| 1990 | Department of Pediatrics |
| | Assistant Professor |

SPECIAL STUDY

| June | JOHNS HOPKINS SCHOOL OF HYGIENE AND PUBLIC HEALTH |
|---|---|
| 1987 | Graduate Summer Program in Epidemiology - Pharmacoepidemiology |

| June | YALE SCHOOL OF ORGANIZATION AND MANAGEMENT |
|---|---|
| 1985 | Advanced Management Studies in Health Care Management |

1977-1978   HARVARD LAW SCHOOL, Special Student

RESEARCH EXPERIENCE

| Summers | SLOAN-KETTERING INSTITUTE FOR CANCER RESEARCH |
|---|---|
| 1970-1972 | Division of Drug Resistance, New York, New York |
| | Research Asst |

| Summer | MARINE BIOLOGICAL LABORATORY, Woods Hole, Massachusetts |
|---|---|
| 1972 | Physiology course |

| 1974-1975 | CHILDREN'S HOSPITAL MEDICAL CENTER |
|---|---|
| | Department of Surgical Research, Boston, Massachusetts |
| | Research Associate |

| Summer | DEPARTMENT OF HEALTH, EDUCATION and WELFARE |
|---|---|
| 1976 | Office of the General Counsel, Chicago, Illinois |
| | Law Clerk |

VISITING COMMITTEE

1992-1994     UNIVERSITY OF CHICAGO LAW SCHOOL

UNIVERSITY ACCREDITATION

| 2008-2012 | WESTERN ASSOCIATION OF SCHOOLS AND COLLEGES, |
|---|---|
| | Chair of LLU Accreditation Committee |

| 2013-2015 | NORTHWEST COMMISSION ON COLLEGES AND UNIVERSITIES |
|---|---|
| | University of Washington |

SPECIAL PROJECTS

1982-1988     THE ROBERT WOOD JOHNSON FOUNDATION
              Program for Hospital Initiatives in Long-Term Care,

1989-1990     THE PEW CHARITABLE TRUSTS
              THE ROBERT WOOD JOHNSON FOUNDATION
              Program to Strengthen Hospital Nursing Co-Director


CORPORATE BOARD AND ADVISORY POSITIONS AND COMMITTEES

2020              ELLODI PHARMACEUTICALS

2011 -  2020    IMMUCOR
                Member of Board, Chairman of Compliance Committee

2008 - 2020     TPG  Senior Advior

2011 - 2014     APTALIS HOLDINGS
                Member of Board, Chairman of Compliance Committee

2009 –2017      TOKAI
                Member of Board

2007              GOOGLE HEALTH ADVISORY COUNCIL

2007              REVOLUTION HEALTH GROUP
                Medical Advisory Board

2007              PERSEUS LLC
                Advisory Board

2003 – 2014     FLEISHMAN HILLARD INTERNATIONAL COMMUNICATIONS
                International Advisory Board

2000 - 2003     PERSEUS-SOROS BIOTECHNOLOGY FUND Scientific Advisory Board


ADVISORY COMMITTEES

2007              THE RHODES TRUST, THE RHODES SCHOLARSHIPS
                Chair, California Selection Committee

David A. Kessler                                                                 Page 9

| | |
|---|---|
| 2006 | CENTER FOR THE ADVANCED STUDIES ON AGING, UNIVERSITY OF MIAMI External Advisory Group |
| 2005 -2015 | BROAD MEDICAL RESEARCH PROGRAM Advisory Board |
| 2005 | CLINTON SCHOOL OF PUBLIC HEALTH, UNIVERSITY OF ARKANSAS FOR MEDICAL SCIENCES National Advisory Board |
| 2003, 2013 | HEINZ AWARDS (HEINZ FAMILY FOUNDATION) Awards Juror |
| 2003 | MARCH OF DIMES Chair, Prematurity Campaign in Northern California |
| 2002 - 2004 | CENTER ON ALCOHOL MARKETING AND YOUTH AT GEORGETOWN UNIVERSITY Advisory Board |
| 2001 - | UNIVERSITY OF CHICAGO LAW REVIEW Editorial Advisory Board |
| 2000 - 2005 | JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION Oversight Committee |
| 2000 | GOVERNOR'S BLUE RIBBON COMMISSION ON MENTAL HEALTH, STATE OF CONNECTICUT Honorary Chair |
| 2000 | FILM AID INTERNATIONAL, INTERNATIONAL RESCUE COMMITTEE Advisory Board |
| 1999 | WORLD HEALTH ORGANIZATION Expert Panel on Tobacco |
| 1997 | ADVISORY COMMITTEE ON TOBACCO AND PUBLIC HEALTH (Co-Chairman with C. Everett Koop) |
| 1993 | GOVERNMENT UNIVERSITY INDUSTRY ROUNDTABLE National Academy of Sciences |
| 1990 | ADVISORY COMMITTEE ON THE FOOD AND DRUG ADMINISTRATION Chairman, Drugs and Biologics Subcommittee |
| 1988 - 1989 | NATIONAL ADVISORY COUNCIL ON HEALTH CARE TECHNOLOGY ASSESSMENT, Department of Health and Human Services, Washington, D.C. Chairman, Patient Outcomes Subcommittee |

David A. Kessler                                                      Page 10

## PRIOR FEDERAL COMMITTEE MEMBERSHIPS

WHITE HOUSE COMMISSION ON PRESIDENTIAL SCHOLARS

NATIONAL COUNCIL ON SCIENCE AND TECHNOLOGY
Committee on Health, Safety and Food R&D, Vice Chair

INSTITUTE OF MEDICINE
Forum On Drug Development and Regulation

INSTITUTE OF MEDICINE
AIDS Roundtable

NATIONAL TASK FORCE ON AIDS DRUG DEVELOPMENT

OFFICE OF SCIENCE AND TECHNOLOGY POLICY Federal Coordinating
Council for Science, Engineering and Technology Committee on Life Science
and Health Biotechnology Research Subcommittee, Member ex officio


## BOARDS OF DIRECTORS

Past

CENTER FOR SCIENCE IN THE PUBLIC INTEREST

Chairman of Board

DRUG STRATEGIES

AMHERST COLLEGE BOARD OF TRUSTEES

ELIZABETH GLASER PEDIATRIC AIDS FOUNDATION

Chairman, Board of Directors

NATIONAL CENTER FOR ADDICTION AND SUBSTANCE ABUSE
COLUMBIA UNIVERSITY

INTERNATIONAL PARTNERSHIP FOR MICROBICIDES INDEPENDENT
CITIZENS OVERSIGHT COMMITTEE OF THE CALIFORNIA INSTITUTE
FOR REGENERATIVE MEDICINE

HENRY J. KAISER FAMILY FOUNDATION

DOCTORS OF THE WORLD

David A. Kessler                                                                                          Page 11

YALE-NEW HAVEN HOSPITAL

CONSUMERS UNION

NATIONAL COMMITTEE FOR QUALITY ASSURANCE

NEW YORK COUNTY HEALTH SERVICE REVIEW ORGANIZATION

COMPREHENSIVE MEDICAL REVIEW ORGANIZATION


FELLOWSHIP

YALE COLLEGE Fellow,
Calhoun College


LECTURESHIPS

THE REGIS J. FALLON LECTURE SERIES ON HEALTH AND LAW
University of Chicago

GRAYSON DISTINGUISHED LECTURE
Southern Illinois University School of Law

WEINBERG SYMPOSIUM LECTURE
Harvard Medical School

THE THOMAS B. FERGUSON LECTURE
Society of Thoracic Surgeons

GEORGE E. ALTMAN, M.D. LECTURE
Beth Israel Hospital

BETH AND RICHARD SACKLER LECTURE
University of Pennsylvania

MARTIN W. WITTE LECTURE
Newport Beach Public Library and Newport Beach Public Library Foundation

HERBERT L. ABRAMS LECTURE
Harvard Medical School

GEORGE GOODMAN LECTURE
State University of New York at Stony Brook

EVNIN LECTURE
Princeton University, Woodrow Wilson School

BOYARSKY LECTURE
Law, Medicine, and Ethics, Kenan Ethics Program, Duke University

CHARTER LECTURE
The University of Georgia

GARDERE & WYNNE LECTURE
Health Law and Policy Institute, University of Houston

DISTINGUISHED LECTURE IN NATIONAL SERVICE
University of Miami

TENTH ANNUAL JOHN O. VIETA, MD LECTURE
Lenox Hill Hospital

HARPER FELLOWSHIP LECTURE
Yale Law School

DR. JAMES STEWART KAUFMAN MEMORIAL LECTURE
The Mt. Sinai Health Care Foundation

DULCY B. MILLER MEMORIAL LECTURE
Smith College

JEAN MAYER LECTURE IN NUTRITION AND FOOD POLICY
Tufts University

HENRY BARNETT DISTINGUISHED LECTURESHIP
Albert Einstein College of Medicine

MARTIN A. CHERKASKY DISTINGUISHED LECTURESHIP
Robert Wagner Graduate School of Public Service New York
University

ALPHA OMEGA ALPHA DISTINGUISHED LECTURESHIP
Cornell Medical School--New York Hospital

ST. GEORGE SOCIETY LECTURESHIP
Johns Hopkins Medical School

GOVERNOR WINTHROP ROCKEFELLER DISTINGUISHED
LECTURESHIP University of Arkansas Medical School

MOLLY AND SIDNEY N. ZUBROW LECTURE
Pennsylvania Hospital

LEROY HOECK M.D. DISTINGUISHED LECTURESHIP
Children's Hospital National Medical Center

David A. Kessler                                                                                    Page 13

JULES AND JANE HIRSH HEALTH POLICY ADDRESS
George Washington University

JOHN S. LATTA LECTURESHIP
University of Nebraska Medical
School

PAUL K. SMITH MEMORIAL LECTURE
George Washington University

WOLK HEART FOUNDATION LECTURE
Colgate University

HASTINGS LECTURE
Association for the Advancement of Medical Instrumentation
National Heart, Lung and Blood Institute

INSTITUTE OF MEDICINE 25TH DISTINGUISHED LECTURESHIP University
of Washington

RALPH CAZORT LECTURESHIP
Meharry Medical School

DAVID M. IFSHIN MEMORIAL LECTURE
Potomac, Maryland

CHARLES C. LEIGHTON MEMORIAL LECTURE
Leonard David Institute of Health Economics
University of Pennsylvania

D. W. HARRINGTON LECTURE State
University of New York At Buffalo School of
Medicine and Biomedical Sciences

SAMUEL RUBIN LECTURE FOR THE ADVANCEMENT OF LIBERTY
Columbia University

LEO S. WEIL MEMORIAL LECTURE
Tulane Medical Center, Touro Infirmary,
and Louisiana State University School of Medicine

THOMAS PARRIN LECTURE
University of Pittsburgh School of Public Health

DAVID PACKARD LECTURE
Uniformed Services University of the Health Sciences

NORMAN E. ZINBERG LECTURE
Harvard Medical School

JOHN H. ERSKINE LECTURE
St. Jude's Children's Research Hospital

MARTIN V. BONVENTRE MEMORIAL LECTURE
The Brooklyn Hospital Center

PURVES LECTURE
Woodbridge Library, Woodbridge, Connecticut

VISITING SCHOLAR LECTURE University of
Oklahoma - Board of Regents Oklahoma Scholar
Leadership Extension Program

J. ROSWELL GALLAGHER LECTURER
Society of Adolescent Medicine

KATHERINE BOUCOT STURGIS LECTURESHIP
American College of Preventive Medicine

HELMUT SCHUMANN LECTURE
Dartmouth-Hitchcock Medical Center

50TH ANNIVERSARY COMMUNICATION LECTURE
Centers for Disease Control and Prevention

5TH JAMES BORDLEY III MEMORIAL LECTURE
Mary Imogene Bassett Hospital

TURNER LECTURE
University of California

MARIE SHULSKY MEMORIAL LECTURE ON HEALTH AND
SOCIAL RESPONSIBILITY
Fifth Avenue Synagogue, New York, New York

GERTRUDE AND G.D. CRAIN, JR. LECTURE SERIES
Medill School of Journalism, Northwestern University

GEORGE ARMSTRONG LECTURE
Ambulatory Pediatric Society

ARCO FORUM OF PUBLIC AFFAIRS
Institute of Politics, John F. Kennedy School of Government
Harvard University

PAUL LEVINGER LECTURE AND PROFESSORSHIP PRO TEM IN THE
ECONOMICS OF HEALTH CARE Brown University

ARNOLD J. SCHWARTZ MEMORIAL HEALTH LECTURE
Robert F. Wagner Graduate School of Public Service New York
University

RONALD ALTMAN MEMORIAL LECTURE
Festival of Arts, Books and Culture, Cherry Hills, New Jersey

SAMUEL MARTIN, M.D. III MEMORIAL LECTURE Division of
General Internal Medicine and Leonard Davis Institute University of
Pennsylvania

CARL J. MARTINSON, M.D. MEMORIAL LECTURESHIP ON HEALTH
PROMOTION AND DISEASE PREVENTION University of Minnesota

LEONARD SILK MEMORIAL LECTURE Mt.
Desert Island Biological Laboratories

CALDWELL LECTURE
American Roentgen Ray Society

RICHARD H. DENT LECTURE St.
George's School

ROBERT T. WONG DISTINGUISHED PROFESSORSHIP
University of Hawaii, Manoa

NIDA/American Psychiatric Association Obesity Symposium

HARVARD OBESITY COURSE

STANFORD BARIATRIC COURSE

AMERICAN BARIATRIC SOCIETY

RHODES ENDOWED LECTURE

STAFFORD LITTLE LECTURE PUBLIC LECTURES AT
PRINCETON

GERALD AND SALLY DENARDO LECTURESHIP, SANTA
CLARA UNIVERSITY

ALEX AND LENA CASPER MEMORIAL LECTURE, MIAMI
UNIVERSITY

UNIVERSITY OF VERMONT FOOD SYSTEMS
LEADERSHIP

GOOGLE LECTURE

David A. Kessler                                                                          Page 16

GLOBAL STUDIES SYMPOSIUM, WHITMAN COLLEGE
Excellence in Public Service

DONALD DUNPHY LECTURE, MCCONE HOSPITAL,
UNIVERSITY OF NORTH CAROLINA

CENTER FOR GLOBAL HEALTH, STANFORD MEDICAL
SCHOOL

STANFORD UNIVERSITY: THE ETHICS OF FOOD & THE
ENVIRONMENT

STANFORD MEDICAL SCHOOL, DEPARTMENT OF
MEDICINE, GRAND ROUNDS

LEGACY WARNER SERIES LECTURE ON IMPACT OF
FAMILY AND SMOKING PREVENTION AND CONTROL
ACT

LEADING VOICES IN PUBLIC HEALTH, EAST
TENNESSEE STATE UNIVERSITY

92ND STREET YMCA PUBLIC LECTURE, NEW YORK

COMMONWEALTH CLUB OF CALIFORNIA

SAN FRANCISCO PUBLIC LIBRARY LECTURE

KANSAS CITY PUBLIC LIBRARY

YALE ROBERT WOOD JOHNSON CLINICAL SCHOLARS
PROGRAM


COMMUNITY/PUBLIC SERVICE AWARDS

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED
PEOPLE
Montgomery County Chapter
Person of the Year

LEAGUE OF WOMEN VOTERS, NEW YORK
Carrie Chapman Catt Award

COMMON CAUSE
Public Service Achievement Award

David A. Kessler                                                              Page 17

AMERICAN ACADEMY OF PEDIATRICS
Excellence in Public Service

BUSINESS WEEK
Best in Public Service

GEORGE ORWELL AWARD FOR HONESTY AND CLARITY
IN PUBLIC LANGUAGE
National Conference of Teachers of English

ANTI-DEFAMATION LEAGUE OF B'NAI BRITH
Man of Achievement Five Towns, New York

GOLDEN SLIPPER CLUB OF PHILADELPHIA
Golden Slipper Award

NATIONAL FATHER'S DAY COMMITTEE
Father of the Year Award

UNITED SENIORS HEALTH COOPERATIVE
Seniors Advocate Award

NATIONAL ASSOCIATION OF GOVERNMENT COMMUNICATORS
Communicator of the Year Award

NATIONAL CONSUMERS LEAGUE
Trumpeter Award

THE INTERNATIONAL PLATFORM ASSOCIATION
George Crile Award

AMERICAN LUNG ASSOCIATION of New York
Life and Breath Award in Public Health

CONSUMER FEDERATION OF AMERICA
Philip Hart Public Service Award

CAMPAIGN FOR TOBACCO FREE KIDS
Distinguished Service Award

MEDICAL SOCIETY OF NEW YORK, 1st District Branch
Public Service Award

ONCOLOGY NURSING SOCIETY
Public Service Award

PUBLIC VOICE FOR FOOD & HEALTH POLICY
Special Recognition Award for Advancing the Consumer Interest in Food and
Agriculture Policy

David A. Kessler                                                                   Page 18

## ATTENDING PEDIATRICIAN

2003 - 2013     UNIVERSITY OF CALIFORNIA, SAN FRANCISCO MEDICAL
                CENTER

1997-2003       YALE-NEW HAVEN HOSPITAL

1982-1990       BRONX MUNICIPAL HOSPITAL CENTER

1982-1990       NORTH CENTRAL BRONX HOSPITAL

1982-1990       MONTEFIORE MEDICAL CENTER

1982-1990       HOSPITAL OF THE ALBERT EINSTEIN COLLEGE OF MEDICINE


## COMMUNITY ACTIVITIES

                SCARSDALE SCHOOL DISTRICT, Scarsdale, New York

1986-1990       Legislative Affairs Advisory Committee 1988-
                1990 Buildings and Facilities Advisory
                Committee

1990            SCARSDALE STUDENT TRANSFER EDUCATION PLAN, Board of Trustees


## GENERAL INFORMATION

Address:                                              Office Phone:
    9 Oxford Street                                       (415)310-8084
    Chevy Chase, Maryland 20815

Married:                                              Born:
    Paulette Kessler                                      May 31, 1951
    Two children - Elise and Ben


## MEDICAL LICENSURE

                California
                Connecticut (non-active)
                Maryland
                New York (non-active)

David A. Kessler                                                                                    Page 19

<u>PUBLICATIONS</u>

Kessler, David A.,  <u>FAST CARBS, SLOW CARBS</u>, Harper (2020)
快碳水、 慢碳水:
Kessler, David A., <u>CAPTURE: UNRAVELING THE MYSTERY OF MENTAL SUFFERING</u>, Harper, April 2016    Paperback : April, 2017
被绑架的心灵
Kessler, David A. <u>THE END OF OVEREATING</u>: <u>TAKING CONTROL OF THE INSATIABLE AMERICAN APPETITE</u>, Rodale, 2009

Translated and Adapted:
過食にさようなら-止まらない食欲をコントロール [単行本]
КОНЕЦ ОБЖОСТВЖУ
이 페이지 번역하기
Perché mangianmo troppo (e come fare per smetteria
Laat je niet volvreten: Hoe de voedselindustgrie schade toebrengt ann onze gexondheid
Das Ende des groben Fressens  Wie die Nahrungsmittelindustrie Sie zu ubermaBigem Essen berleitet und was Sie dagegen tun konnen
Muszáj annyit enni? Hadüzenet a só, a zsír és a cukor ellen
Also: Romania, Canada, UK, Australia, India
Your Food is Fooling You: How Your Brain is Hijacked by Sugar Fat and Salt (US Young Adult Version)
Hijacked: How Your Brain is Fooled by Food (Canadian Young Adult Version)

Kessler, David A., <u>A QUESTION OF INTENT: A GREAT AMERICAN BATTLE WITH A DEADLY INDUSTRY</u>, Public Affairs (Hardcover 2001) (Paperback 2002)


Edited Books

Eisdorfer, Carl, Kessler, David A., Spector, Abby (eds.), <u>CARING FOR THE ELDERLY: RESHAPING HEALTH POLICY</u>, Johns Hopkins University Press, 1989. Includes chapter by Coombs, C., Eisdorfer, C., Feiden, K., and Kessler, D.A. "Lessons from the Program for Hospital Initiatives in Long-Term Care."


Articles

Kessler, David A., Nesbit, J.A., Westmoreland, T.M., Albright, M.B., "A Tribute to C. Everett Koop," <u>PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA</u>, 110(18):7108-9 (April 30, 2013)

Articles

McClellan M, Benner J, Schilsky R, Epstein D, Woosley R, Friend S, Sidransky D, Geoghegan C, Kessler D. An accelerated pathway for targeted cancer therapies. NATURE DRUG DISCOVERY. 2011 10(2):79-80

Kessler, David A., "Towards More Comprehensive Food Labeling," NEW ENGLAND JOURNAL OF MEDICINE, 371:193-195 (July 27, 2014)

Kessler DA, Mande JR, Scarbrough FE, Schapiro R, Feiden K. Developing the "nutrition facts" food label. HARVARD HEALTH POLICY REVIEW 2003;4:13-24

Kessler, David A., Nesbit, J.A., Westmoreland, T.M., Albright, M.B., "A Tribute to C. Everett Koop," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES OF THE UNITED STATES OF AMERICA, 110(18):7108-9 (April 30, 2013)

Naleid, A.M., Grimm, J.W., Kessler, David A., Sipols, A.J., Aliakbari, S., Bennett, J.L., Wells, J., Figlewicz, D.P., "Deconstructing the Vanilla Milkshake: the Dominant Effect of Sucrose on Self-administration Flavor Mixtures," APPETITE, 50(1):128-38 (January 2008)

Halme, Dina J. and Kessler, David A., "FDA Regulation of Stem Cell-Based Therapies", NEW ENGLAND JOURNAL OF MEDICINE, 355 (16): 1730-1735 (October 19, 2006)

Kessler, David A., "Alcohol Marketing and Youth: The Challenge for Public Health," JOURNAL OF PUBLIC HEALTH POLICY, 26(3):292-295 (Autumn 2005)

Kessler, David A., "The Tobacco Settlement," NEW ENGLAND JOURNAL OF MEDICINE, 337:1082-1083 (October 9, 1997)

Kessler, David A., Wilkenfeld, J.P., Thompson. L.J. "The Food and Drug Adminstration's Rule on Tobacco: Blending Science and Law," PEDIATRICS, 99(6):884-887 (June 1997)

Kessler, David A., Natanblut, Sharon L., Wilkenfeld, Judith P., Lorraine, Catherine C., Mayl, Sharon Lindan, Bernstein, Ilisa B.G. and Thompson, Larry, "Nicotine Addiction: A Pediatric Disease," JOURNAL OF PEDIATRICS, 130:518-524 (April 1997)

Kessler, David A., Barnett, Philip S., Witt, Ann, Zeller, Mitchell R., Mande, Jerold R. and Schultz, William B., "The Legal and Scientific Basis for FDA's Assertion of Jurisdiction Over Cigarettes and Smokeless Tobacco," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 277:405-409 (February 5, 1997)

Kessler, David A., Hass, Arthur E., Feiden, Karyn L. , Lumpkin, Murray and

David A. Kessler                                                                                    Page 21

Temple, Robert, "Approval of New Drugs in the United States: Comparison with the United Kingdom, Germany and Japan," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 276:1826-1831 (December 11, 1996)

Kessler, David A., Witt, Ann, Barnett, Philip S., Zeller, Mitchell R., Natanblut, Sharon, Wilkenfeld, Judith, Lorraine, Catherine C., Thompson, Larry J. and Schultz, William B., "The Food and Drug Administration's Regulation of Tobacco Products," NEW ENGLAND JOURNAL OF MEDICINE, 335:988-994 (September 26, 1996)

Silverman, Barbara G., Brown, S. Lorie, Bright, Roslie A., Kaczmarek, Ronald G., Arrowsmith-Lowe, Janet B., Kessler, David A., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," ANNALS OF INTERNAL MEDICINE, 124:744-756 (April 15, 1996)

Kessler, David A., "Nicotine Addiction in Young People," NEW ENGLAND JOURNAL OF MEDICINE, 333:186-189 (July 20, 1995)

Kessler, David A., "Accelerating the Approval of Drugs for Life-Threatening and Serious Diseases," SCIENTIFIC AMERICAN, 272:48-52 (March 1995)

Kessler, David A., Rose, Janet L., Temple, Robert J., Schapiro, Renie and Griffin, Joseph, "Therapeutic Class Wars: Drug Promotion in a Competitive Marketplace," NEW ENGLAND JOURNAL OF MEDICINE, 331:1350 (November 17, 1994)

Kessler, David A., Merkatz, Ruth B., Schapiro, Renie, "A Call for Higher Standards for Breast Implants," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 270:2607-2608 (December 1, 1993)

Kessler, David A., Siegel, Jay P., Noguchi, Philip D., Zoon, Kathryn C., Feiden, Karyn L., and Woodcock, Janet, "Regulation of Somatic Cell Therapy and Gene Therapy by the Food and Drug Administration," NEW ENGLAND JOURNAL OF MEDICINE, 329:1169-1173 (October 14, 1993)

Merkatz, Ruth B., Temple, Robert, Sobel, Solomon, Feiden, Karyn, Kessler, David A., and members of the working group on Women in Clinical Trials, "Women in Clinical Trials of New Drugs: A Change in FDA Policy," NEW ENGLAND JOURNAL OF MEDICINE, 329:292-296 (July 22, 1993)

Kessler, David A. for the Working Group, "A New Approach to Reporting Medication and Device Adverse Effects and Product Problems," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 269:2765-2768 (June 2, 1993)

Kessler, David A., Taylor, Michael A., Maryanski, James H., Flamm, Eric L., and Kahl, Linda S., "The Safety of Foods Developed by Biotechnology," SCIENCE, 256:1747-1749 (June 26, 1992)

Kessler, David A., "The Basis for the FDA's Decision on Breast Implants,"

NEW ENGLAND JOURNAL OF MEDICINE, 326:1713-1715 (June 18, 1992)

Kessler, David A., "Communicating to Patients About Their Medication," NEW ENGLAND JOURNAL OF MEDICINE, 325:1650-1652 (December 5, 1991)

Kessler, David A., "Drug Promotion and Scientific Exchange," NEW ENGLAND JOURNAL OF MEDICINE, 325:201-203 (July 18, 1991)

Kessler, David A. and Pines, Wayne L., "The Federal Regulation of Prescription Drug Advertising and Promotion," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 264:2409-2415 (November 14, 1990)

Kessler, David A., "The Federal Regulation of Food Labeling: Promoting Foods to Prevent Disease," NEW ENGLAND JOURNAL OF MEDICINE, 321:717-725 (September 14, 1989)

Kessler, David A., "The Regulation of Investigational Drugs," NEW ENGLAND JOURNAL OF MEDICINE, 320:281-288 (February 2, 1989)

Kessler, David A., Pape, Stuart, and Sundwall, David, "The Federal Regulation of Medical Devices," NEW ENGLAND JOURNAL OF MEDICINE, 317:357-366 (August 6, 1987)

Kessler, David A., "Food Safety: Revising the Statute," SCIENCE, 223:1034-1040 (March 1984)

Kessler, David A., "Regulating the Prescribing of Human Drugs for Nonapproved Uses Under the Food, Drug and Cosmetic Act," HARVARD JOURNAL OF LEGISLATION, 693-760 (1978)

Kessler, David A., "Implementing the Anticancer Clauses of the Food, Drug and Cosmetic Act," THE UNIVERSITY OF CHICAGO LAW REVIEW, 44:817-850 (1977)

Kessler, David A., Langer, Robert S., Pless, Naomi A., and Folkman, Judah, "Mast Cells and Tumor Angiogenesis," INTERNATIONAL JOURNAL OF CANCER, 18:703-709 (November 15, 1976)

Kessler, David A., "Experimental Activation of the Herpes Virus Associated with the Lucke Renal Adenocarcinoma of the Leopard Frog, Rana Pipiens," unpublished thesis, Amherst College (1973)

Editorials

Kessler, David A., Myers, Matthew, "Beyond the Tobacco Settlement," NEW ENGLAND JOURNAL OF MEDICINE, 345:535-537 (August 16, 2001) (editorial)

Kessler, David A., "Cancer and Herbs," NEW ENGLAND JOURNAL OF MEDICINE, 342 (23):1742-43 (June 8, 2000) (editorial)

Koop, C. Everett, Kessler, David A., Lundberg, George D., "Reinventing American Tobacco Policy - Sounding the Medical Community's Voice," JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 279:550-552 (February 18, 1998) (editorial)

Kessler, David A., "Addressing the Problem of Misleading Advertising," ANNALS OF INTERNAL MEDICINE, 116:950-951 (June 1, 1992) (editorial)

Published Speeches

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 52:1-5, presented at the Food and Drug Law Institute's 39th Annual Educational Conference, Washington, D.C. (December 10-11, 1996)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 51:207-216 (1996), presented at the Food and Drug Law Institute's 38th Annual Educational Conference, Washington, D.C. (December 12-13, 1995)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," FOOD AND DRUG LAW JOURNAL, 50:327-334 (1995), presented at the Food and Drug Law Institute's 37th Annual Educational Conference, Washington, D.C.(December 13-14, 1994)

Kessler, David A., "Statement on Nicotine-Containing Cigarettes," TOBACCO CONTROL, 3:148-158 (1994)

Kessler, David A., "Issues in Approving Drugs for AIDS Treatment," REGULATORY AFFAIRS, 6:189-200 (1994), presented at the Institute of Medicine's 25th anniversary lecture series, Seattle, Washington

Kessler, David A., "FDA's Revitalization of Medical Device Review and Regulation," BIOMEDICAL INSTRUMENTATION AND TECHNOLOGY, May/June 1994:220-226, presented at the AAMI/NIH Cardiovascular Science and Technology Conference, Rockville, Maryland (December 10, 1993)

Kessler, David A., "Harmonization," PHARMACEUTICAL ENGINEERING, 14:38-40 (January/February 1994), presented at the Second International Conference on Harmonization of Technical Requirements for Registration of Pharmaceuticals for Human Use, Orlando, Florida (October 27, 1993)

Kessler, David A. "The Academic/Industry Interface: The Risks of Scientists Becoming Entrepreneurs," HOPKINS MEDICAL NEWS, Fall 1993:58

David A. Kessler                                                                Page 24

Kessler, David A., "Controlled Release and Rational Drug Development," presented at the Controlled Release Society Meeting, July 27, 1993, <u>FOOD AND DRUG REPORTS,</u> 4:9 (1993)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," <u>FOOD DRUG COSMETIC LAW JOURNAL,</u> 48:1-10 (1993), presented at The Food and Drug Law Institute's 35th Annual Educational Conference, Washington, D.C. (December 8, 1992)

Kessler, David A., "Reinvigorating the Food and Drug Administration," <u>FOOD TECHNOLOGY,</u> 46:20 (August 1992), presented at the Annual Meeting of Institute of Food Technologists, New Orleans, LA (June 20-24, 1992)

Kessler, David A., "A Challenge for American Pharmacists," <u>AMERICAN PHARMACY,</u> 33-36 (January 1992)

Kessler, David A., "Remarks--1991 Annual DIA Meeting," <u>DRUG INFORMATION JOURNAL</u> (October 1991)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," <u>FOOD DRUG COSMETIC LAW JOURNAL,</u> 46:773-779 (November 1991), presented at the Association of Food and Drug Officials' Annual Conference, Grand Rapids, MI (June 17, 1991)

Kessler, David A., "Restoring the FDA's Preeminence in Regulation of Food," <u>FOOD DRUG COSMETIC LAW JOURNAL</u> (May 1991)

Kessler, David A., "Remarks Upon Taking the Oath of Office," <u>JOURNAL OF THE ASSOCIATION OF FOOD AND DRUG OFFICIALS,</u> 55:7-10 (April 1991)

Kessler, David A., "Remarks by the Commissioner of Food and Drugs," <u>FOOD DRUG COSMETIC LAW JOURNAL,</u> 46:21-26 (January, 1991), presented at the Food and Drug Law Institute's 33rd Annual Educational Conference, Washington, D.C. (December 11, 1990)

**APPENDIX B: PRIOR TESTIMONY**

Dr. David Kessler testified at trial or deposition as an expert in the following cases over more
than the last twelve years through November 15, 2023:

- *In re Risperdal*, Philadelphia, PA and Texas cases, including No. 2012CCV-61916-1
  (Tex. Dist. Ct. filed Oct. 2, 2012 and Pledger and Walker); Wolken JCCP 4775
- *Wells v. Allergan, Inc.* No. 12-973 (W.D. Okla. filed Sept. 4, 2012);
- *Drake v. Allergan*, Case No. 2013 vv00234 (U.S. Dist. Ct. Burlington, Vermont)
- *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187 (S.D.W.V.
  filed July 15,2010)
- *SB v. Ortho-McNeil-Janssen Pharm., Inc. (In re Risperdal Litig.)*, No. 100503629
  (Pa. Ct. Com. Pl. filed May 27, 2010)
- *In re Yaz & Yasmin (Drospirenone) Marketing, Sales Practices & Prods. Lib.
  Litig.*, MDL No. 2100 (J.P.M.L. filed July 30, 2009)
- *In re Flonase Antitrust Litigation* (American Sales Company, Inc. v. Smithkline
  Beecham Corp.), 08-cv- 3149, United States District Court, Eastern District of
  Pennsylvania
- *Pharmathene, Inc. v. Siga Techs., Inc.*, No. 2627 (Del. Ch. filed Dec. 20, 2006)
- *Commonwealth v. Merck & Co.*, No. 09-1671 (Ky. Cir. Ct. filed Sept. 28, 2009) (and
  Utah)
- *State v. Merck & Co.*, No. 05-3700 (E.D. La. filed Aug. 5, 2005)
- *Commonwealth Care Alliance v. AstraZeneca Pharm. L.P.*, No. SUCV2005-269
  (Mass. Super. Ct. filed Jan. 25, 2005)
- *Smith & Nephew, Inc. v. N.H. Ins. Co.*, No. 04-3027 (W.D. Tenn. filed Dec. 17,2004)
- *In re Neurontin Marketing, Sales Practices & Prods. Liab. Litig.*, MDL No. 1629
  (D. Mass. filed June 9, 2004)
- *Brown v. Am. Brands, Inc.*, No. 711400 (Cal Super. Ct. filed June 10, 1997)
- *In re: Actos (Pioglitazone) Prods. Lib. Litig.*, No. 11-md-2299 (W. D. La. filed Dec. 29,
  2011)
- *Brown v RJ Reynolds Tobacco Company et al.*, No. 2007 CA 002855 (Fla. Cir. Ct. filed
  Nov. 28,2007)
- *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, MDL No. 1658, No. 05-
  2367 (D.N.J. filed May 5, 2005)
- *In re Prograf Antitrust Litigation,* MDL No. 2242 (U.S. District Court, District of
  Massachusetts
- *In re Nexium Antitrust Litigation,* MDL No. 2419 (U.S. District Court, District of
  Massachusetts)
- *Cabana v. Stryker.* Superior Court of State of California, Los Angeles
- *In Re: Fosamax Litigation,* Civil Action No. 282, (Superior Court of New Jersey,
  Atlantic County) and Case No. 30-2012-00547764 (Superior Court of California,
  Orange County)
- *Western Sugar Coop et al v. Archer-Daniels-Midland Co, et al*, No. 11-03473
  (U.S. District Court, Central District of California)
- *H.B., et al. v. Abbott Laboratories*, No. #15-cv-702-NJR-SCW (U.S. District
  Court, Southern District of Illinois, filed June 26, 2015)
- *In re New England Compounding Pharmacy, Inc. Products Liability Litigation*,

MDL No. 2419 (U.S. District Court, District of Massachusetts, filed 2/14/13)

- ***In re: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig.***, MDL No. 3:11-md-02244 (U.S. District Court, Northern District of Texas, filed May 24, 2011)
- ***In re: Tropicana Orange Juice Mktg. & Sales Practices Litig.***, MDL No. 2353, No. 2:11-cv-07382 (U.S. District Court, District of New Jersey, filed Aug. 10, 2012)
- ***In re Cipro Cases I and II,*** Nos. 4154 & 4220 (Cal. Super. Ct., filed Feb. 25, 2002)
- ***Anders v. Medtronic, Inc., et al.,*** No. 1322-CC10219-02 (Mo Cir. Ct.)
- ***Austin v. C.R. Bard, Inc., et al.***, Case No. 15-cv-8373 (Circuit Court of the 17th Judicial Circuit (Div. 7), Broward County, Florida).
- ***In re Bard IVC Filters Products Liability Litigation***, Case No. 2:15-MD- 02641-DGC.
- ***In re: Zoloft Litigation***, JCCP No. 4771 (Superior Court of California, Orange County)
- ***In re: Testosterone Replacement Therapy Product Liability Litigation***, MDL No. 2545 (U.S. District Court, Northern District of Illinois – Eastern Division)
- ***In re: Xarelto Products Liability Litigation***, MDL No. 2592 (U.S. District Court, Eastern District of Louisiana – New Orleans Division); Philadelphia County Court of Common Pleas
- ***In re: Benicar (Olmesartan) Product Liability Litigation***, Civil No. 15-2606 (U.S. District Court, District of New Jersey)
- ***In re: Cook Medical, Inc. IVC Filters Marketing, Sales Practices and Product Liability Litigation***, MDL No. 2570 (U.S. District Court, Southern District of Indiana – Indianapolis Division)
- ***State of Texas, ex rel. v. AstraZeneca LP, et al.***, Case No. D-1-GN-13-003530 (District Court of Travis County, Texas)
- ***Council for Education and Research on Toxics v. Starbucks Corp*. *et al.***, case number BC435759
- ***In re: Asacol Antitrust Litigation,*** Case No. 1:15-cv-12730-DJC (U.S. District Court for the District of Massachusetts)
- ***United States v. Merck.*** ex rel., In re: Merck Mumps Vaccine Antitrust Litigation (U.S. District Court, Eastern District of Pennsylvania)
- ***Blue Cross Blue Shield v GlaxoSmithKline*** (U.S. District Court, Eastern District of Pennsylvania)
- ***Tinsley v. Streich*** (Circuit Court City of Charlottesville, Virginia))
- ***People of the State of California v. Johnson & Johnson, et al.***, Case No. 37-2016-00017229-CU-MC-CTL (Superior Court of the State of California, County of San Diego)
- ***In re: Taxotere (Docetaxel) Products Liability Litigation***, MDL No. 2740 (U.S. District Court, Eastern District of Louisiana)
- ***In re: National Prescription Opiate Litigation,*** MDL No. 3804 (U.S. District Court, Northern District of Ohio)
- ***The Hospital Authority of Metropolitan Government of Nashville and Davidson County, Tennessee v. Momenta Pharmaceuticals, et al.,*** Case No. 3:15-cv-01100 (U.S. District Court, Middle District of Tennessee)
- ***Coordinated Proceeding Essure Product*** JCCP 4887, Superior Ct of California, Alalameda

- ***In re: Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation***, 2:18-md-2846 (U.S. District Court, Southern District of Ohio)
- ***People of the State of New York v. Opioid Manufacturers, Distributors and Pharmacies*** *Supreme Court of the State of New York, County of Suffolk*
- ***In re: Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation***, Case No. 1:18-md-02819 (U.S. District Court, Eastern District of New York)
- ***Hamilton v. Novartis, et. al.***, Case No. 37-2013-00070440 (California Superior Court)
- ***Hofferth v. Janssen Pharmaceuticals***, Case No. 3:17-01560 (U.S. District Court, D. South Carolina, Columbia Division)


Dr. David Kessler provided sworn expert statements in the following cases:


- ***DePuy ASR Hip System Cases***, No. CJC-10-4649 (Cal. Super. Ct. filed Dec. 22, 2010)
- ***Cordero v. Endoscopy Ctr. of S. Nev. LLC (In the Matter of Endoscopy Ctr. & Associated Businesses)***, No. 08-A-558091-C (Nev. Dist. Ct. filed Feb. 28, 2008)
- ***Jenkins et. al. v. Medtronic, Inc. et al.***, Case No. 2:13cv02985 (U.S. District Court, Western District of Tennessee)
- ***People of the State of California v. Purdue Pharma L.P., et al.***, Case No. 30-2014-00725287-CU-BT-CXC (Superior Court of the State of California, County of Orange)
- ***N.C.minor v. Hain Celestial Group et al.*** Superior Court for the State of California, County of Los Angeles  Case No. 21STCV22822


Hourly rate: $1,250/hr

**APPENDIX C: MATERIALS CONSIDERED**

21 CFR 176.170

21 CFR 178.3297

21 CFR 182.2437

21 CFR 182.70

21 CFR 182.90

21 CFR 310.545

21 CFR 73.1550

21 CFR 740.10

21 CFR 895.102

21 CFR 895.103

21 CFR 895.104

21 USC §331(a)

21 USC §361

30(b)(6) Deposition and Exhibits of Donald Hicks taken on 6.28.18 and 6.29.18

30(b)(6) Deposition and Exhibits of John Hopkins taken on 8.16.18, 8.17.18, 10.17.18, 11.05.18

30(b)(6) Deposition and Exhibits of Joshua Muscat taken on 9.25.18

30(b)(6) Deposition and Exhibits of Julie Pier taken on 9.12.18 and 9.13.18

30(b)(6) Deposition and Exhibits of Linda Loretz taken on 7.17.18, 10.1.18 and 10.2.18

30(b)(6) Deposition and Exhibits of Margaret Gurowitz taken on 7.12.18

30(b)(6) Deposition and Exhibits of Mark Pollack taken on 8.29.18

30(b)(6) Deposition and Exhibits of Pat Downey taken on 8.7.18 and 8.8.18

30(b)(6) Deposition and Exhibits of Robert Glenn taken on 10.18.18

30(b)(6) Deposition and Exhibits of Susan Nicholson taken on 7.26.18 and 7.27.18

30(b)(6) Deposition and Exhibits of Tina French taken on 8.15.18

40 CFR § 136.2

Acheson, E. D. et al. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. Br.J Ind.Med. 39(4), (1982):344-348.

Ad A Magic Veil of Protection

Ad A Service to Mothers

Ad An Endless Chain of Approval

Ad Buenhogar con Good Housekeeping, August 1967, Vol. 4 No. 2

Ad Cashmere Bouquet Modern Screen magazine, April, Vol. 56 No. 43

Ad Cashmere Bouquet Modern Screen magazine, August, Vol. 54 No. 8

Ad Co-Ed magazine, January 1975, Vol. 20, No. 5

Ad Co-Ed magazine, September 1973, Vol. 19, No. 1

Ad Country Gentleman, June 1946 - Vol. 116, No. 6

Ad Family Circle, July 1953, Vol. 43, No. 1

Ad It's a Feeling You Never Outgrow

Ad Let's Both Get Down to Earth, Mom!

Ad Of All Flowers Do Not Deserve the Greatest Care

Ad Play it Cool…

Ad Redbook magazine, November 1968, Vol. 132, No. 1

Ad Seventeen magazine, June 1972, Vol. 31 No. 6

Ad Soothe Baby's Path to Summer Safety

Ad Specially Made for Baby

Ad Think of Softness Think of Johnson's

Ad Welcoming the Newcomers

Ads Baby Powder

Ads JOHNSON'S BABY POWDER. Early Ads, 1953-1971

Agency for Toxic Substances and Disease Registry. Toxicological Profile for Asbestos. September 2001. Retrieved April 18, 2017.

All documents cited in this report, including footnotes and schedules.

All documents posted on https://jjcloud.ent.box.com/s/2x692lcj24crvjunf0lnu590zw5g528e

All FDA statutes, regulations and web pages

All John Hopkins deposition and trial testimony and exhibits

All Matthew Sanchez deposition and trial testimony and exhibits.

All sources cited in Schedules 1 and 2 of this report.

All Susan Nicholson deposition and trial testimony and exhibits.

All text and documents posted on Johnson & Johnson Consumer Inc., Facts About Talc, https://www.factsabouttalc.com/

AMA 2019 testing (AMA Certificate of Analysis, available at: https://www.fda.gov/media/131989/download

AMA Certificate of Analysis, found at: https://www.fda.gov/media/131989/download; see also https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos

AMA Final Report for Sample D 58 FDA Redacted.pdf

Analytical Capabilities and Test Methods, Rio Tinto Minerals Analytical and Technical Services. June 2009

Appendices to White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Consumer Products Containing Talc, Interagency Working Group on Asbestos in Consumer Products (IWGACP) (December 2021).

Appendices to White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc. (December 2021)

186

Asbestos (Actinolite, amosite, anthophyllite, chrysotile, crocidolite, tremolite). World Health Organization (WHO), International Agency for Research on Cancer (IARC) Monographs on the Evaluation of Carcinogenic Risks to Humans, Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42, Supplement 7, 1998.

Asbestos by TEM, Method 7402, NIOSH Manual of Analytical Methods (NMAM), Fourth Edition, 8/15/1994

ASTM D5756 Webpage. 2008. https://www.astm.org/DATABASE.CART/WITHDRAWN/D5756.htm

ASTM D6620

ASTM D6620 Webpage. 2010. https://www.astm.org/Standards/D6620.htm

Baan, R., et al. Carcinogenicity of carbon black, titanium dioxide and talc. The Lancet 7, (April 2006): 295-296.

BAILEY_0000207

BAILEY_0000423

BAILEY_0000423

BAILEY_0002968

BAILEY_0003251

Bain, G.W. 1934, Serpentinization, origin of certain asbestos, talc and soapstone depositions. Economic Geology v. 29, no. 4, 397-400.

Berge, W., et al. Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis. European Journal of Cancer Prevention, January 2017.

Berry, G., et al. Mortality from All Cancers of Asbestos Factory Workers in East London 1933-80. Occupational and Environmental Medicine 57, No. 11 (November 2000): 782–85.

Blount, A M. Amphibole Content of Cosmetic and Pharmaceutical Talcs. Environmental Health Perspectives 94 (August 1991): 225–30.

Booker-MTI001061

Booth, M., V. Beral, and P. Smith. Risk Factors for Ovarian Cancer: A Case-Control Study. British Journal of Cancer 60, No. 4 (October 1989): 592–98.

Bradford Hill, Austin. The Environment and Disease: Association or Causation? Proceedings of the Royal Society of Medicine 58, no. 5 (May 1965): 295–300.

Brazilian Blowout 8_22_11

Buz'Zard, A. R., et al. Pycnogenol Reduces Talc-Induced Neoplastic Transformation in Human Ovarian Cell Cultures. Phytotherapy Research: PTR 21, No. 6 (June 2007): 579–86.

Califf, R., et al. Cosmetics Regulations and the Public Health. JAMA Int Med, No. 177 (8) (August 2017): 1080-1082.

Camargo et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect. 2011

Carl v. J&J Kemp Hearing Trancript for Curtis J. Omiecinski Dated 08.15.16

Carl v. J&J Kemp Hearing Trancript for Graham Colditz Dated 08.16.16

187

Carl v. J&J Kemp Hearing Transcript for Douglas L. Weed Dated 08.11.16

Carr, C. J. Talc: Consumer uses and health perspectives. Regulatory Toxicology and Pharmacology No. 21 (1995): 211-215.

CFTA Round Robin 12.10.1972

Chang, S., and Risch, H.A. Perineal Talc Exposure and Risk of Ovarian Carcinoma. Cancer 79, No. 12 (June 15, 1997): 2396–2401.

Chen, Y., et al. Risk Factors for Epithelial Ovarian Cancer in Beijing, China. International Journal of Epidemiology 21, No. 1 (February 1992): 23–29.

CIR - Final Report - Safety Assessment of Talc as Used in Cosmetics.

CIR Procedures Report - June 2018

Company Briefs, The New York Times (2018)

Compliance Policy for Cosmetic Product Facility Registration and Cosmetic Product Listing, Guidance for Industry, U.S. Dept. of Health and Human Services, Food and Drug Administration, Office of Chief Scientist (OCS), November 2023

Composite Exhibit of D-8621; D-8814; D-7099

Composite Exhibit of D-8813; D-8622; D-8815; D-8816; D-8623; D-8624; D-7705; D-8625; D-7704; D-7702; D-7700

Congressional Testimony 05.14.08 - Pamela Bailey Prepared Statement

Cook, L. S., et al. Perineal Powder Exposure and the Risk of Ovarian Cancer. American Journal of Epidemiology 145, No. 5 (March 1, 1997): 459–65.

Cosmetic Ingredient Review Procedures, October 2010/June 2018

Cosmetics Regulation - GAO-HRD-90-58 Mar. 1990

Cosmetics Regulation. Information on Voluntary Actions Agreed to by FDA and the Industry. (GAO/HRD-90-58, Mar. 1990), citing Lack of Authority Hampers Attempts to Increase Cosmetic Safety.
(GAO/HRD-78-139, Aug. 1978).

Cralley, L.J., et al. Fibrous and Mineral Content of Cosmetic Talcum Products. American Industrial Hygiene Association Journal (July-August 1968): 350-354.

Cramer, D. W. and H. Xu. Epidemiologic evidence for uterine growth factors in the pathogenesis of ovarian cancer. Ann. Epidemiol. 5(4) (1995): 310-314.

Cramer, D. W. Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case-Control Study. Obstet.Gynecol. 94, No. 1 (July 1999): 160–61.

Cramer, D. W., et al. Genital Talc Exposure and Risk of Ovarian Cancer. International Journal of Cancer 81, No. 3 (May 5, 1999): 351–56.

Cramer, D. W., et al. Ovarian Cancer and Talc: A Case-Control Study. Cancer 50, No. 2 (July 15, 1982): 372–76.

Cramer, D. W., et al. Presence of Talc in Pelvic Lymph Nodes of a Woman with Ovarian Cancer and Long-Term Genital Exposure to Cosmetic Talc. Obstet.Gynecol. 110, No. 2 Pt 2 (August 2007): 498–501.

Cramer, D. W., et al. The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States. Epidemiology (Cambridge, Mass.) 27, No. 3 (May 2016): 334–46.

Cramer, D.W., et al. Thoughts on the Prevention and Early Detection of Postmenopausal Ovarian Cancer. Menopausal Medicine No. 19(1) (2011): S1-S11.

CTFA Cosmetic Ingredient Dictionary 2d Ed. The Cosmetic, Toiletry and Fragrance Association, Inc., 1977.

CTFA Response to FDA 1973.12.26

Cuzick, J., et al. Aspirin and Non-Steroidal Anti-Inflammatory Drugs for Cancer Prevention: An International Consensus Statement. The Lancet No. 10(5) (2009): 501-507.

D-0182

D-0263-732

D-0916-1919

D-1019

D-1029

D-1256-58

D-1447-71

D-237 Certified Copy_FDA 1986 Response Ltr to 1983 Citizen Petition

D568 3-17-16 JNJ LTR TO FDA RE INFO ON TALC_Part 1 of 3

D-7482.pdf (D-7482 - 313 pages of assorted various bates #s)

D-7839

D-7840

D-7841

D-7842

D-7843

D-7844

Daly, M. and G. I. Obrams. Epidemiology and Risk Assessment for Ovarian Cancer. Semin.Oncol. 25(3) 1998: 255-264.

Daniels v. J&J Volume 17 Trial Transcript

Davis meta-analysis (2021)

Deer, W. A. et al., An Introduction to the Rock-Forming Minerals (2nd Edition) (1996)

Defendants Johnson & Johnson Consumer, Inc. and JNJ's Responses to Plaintiffs' Supplemental Interrogatories and Requests for Production of Documents Dated November 10, 2017, at 12-13.

Defendants' Motion to Exclude Plaintiffs' Experts' General Causation Opinions in Carl v. J&J

Defendants' Motion to Exclude the Testimony of David Steinberg

Deposition and Exhibits of Andreas Saldivar Taken on 3.19.20 and 6.21.19

Deposition of John Hopkins Taken 10.19.12 in the Berg v. J&J Matter

Deposition of Joshua Muscat Taken 3.3.2016 in the Hogans v. J&J Matter

189

Deposition of Susan Nicholson, M.D. , Foley v. Avon Products, Inc. et al. (2/19/19)

Deposition of Susan Nicholson, M.D. , Prudencio v. Johnson & Johnson et al. (4/23/21)

Development of a New ASTM Method for Analysis ppt.

Development of a New ASTM Method for the Analysis of Cosmetic and Pharmaceutical Talc for Asbestos, ASTM Talc Task Team, Johnson Conference. July 2011

DJ-7506A.001, JNJAZ55_00001715

Doll R. 1955a. Mortality from lung cancer in asbestos workers. Br J Ind Med 12: 81-86.

DRAFT 1 - Copy for SafetyandCareCommittment Website

DX-10682.1; WTALC00008340

DX13027 - Compilation of exhibits D-8813; DX 8622, DX8815; DX8816; DX8623; DX 8624; DX7705; DX 8625; DX 7702; DX 7700

DX13028 - Compilation of exhibits D-8598, D8597, D8599, D8603, 8601, 8605, 8604, 8606, 8609, 8608, 8611, 8610,8612, 8615, 8617, et seq.

DX13030 - Compilation of exhibits DX-8546, DX-8547, DX-8548, DX-8549, DX-7091, et seq. ( - 70 pages)

DX13031 - Compilation of exhibits DX-7522, DX-8445, DX-8446, et seq.

DX13033 - Compilation of exhibits DX-7309, DX-7142, DX-8187, et seq.

DX13034 - Compilation of exhibits DX-8535, DX-8536, DX-8537, et seq.

DX-7000; JNJ 000370144

DX-7014; JNJTALC000091746

DX-7043; JNJ 000248918

DX7052; J&J-0005504; JNJ 000346836

DX-7054; JNJ 000268964

DX-7057; JNJTalc000286961

DX-7083; JNJ 000266903

DX-7084; JNJTALC00286990

DX-7085; JNJ 000246903

DX-7089; J&J-0083326; JNJ 000326070

DX-7103; J&J-0005742; JNJ 000065678

DX7147 0001; JNJMX68 000003 (Bates #s cut off)

DX-7147; JNJ 000237200

DX-7723; JNJTALC000290267

DX-8011; JNJ 000264500 (J&J103 - pages out of order)

DX-8057; JNJ 000260840

DX-8065; WTALC00008340

DX-8068; JNJ 000270084

DX-8076; JNJTALC000064952

DX-8142; JNJ 000246850

DX-8189; JNJTALC000155607

DX-8196; JNJTALC000091181

DX-8205; JNJ 000085374

DX-8246; JNJ 000252636

DX-8269; JNJ 000682638

DX-8409; J&J-0005568; JNJ 000346879

DX-8538; JNJTALC000166674

DX-8728; JNJ 000280907

DX-8817; JNJ 000248953

Eberl, J. J., et al. Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves. Am.J Surg. 75, No. 3 (March 1948): 493–97.

Egli & Newton. 1961. "The Transport of Carbon Particles in the Human Female Reproductive Tract." Fertility and Sterility 12 (April): 151-55

Egli, G. E., et al. The Transport of Carbon Particles in the Human Female Reproductive Tract. Fertility and Sterility 12 (April 1961): 151–55.

Epidemiological Study of Workers in Italian Talc Mines (bates # cut off)

European Pharmacopoeia 7.0

European Pharmacopoeia 9th Edition Webpage. 2018. https://www.edqm.eu/en/european-pharmacopoeia-ph-eur-9th-editioo

Excipient Monographs 2 Expert Committee Workplan (2015), available at http://www.usp.org/expert-committees/excipient-monographs-2-expert-committee-work-plan

Executive Summary of Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc, January 6, 2020

Executive Summary Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc,  United States Food and Drug Administration. January 6, 2020. https://www.fda.gov/media/134005/download

Exhibit 104 CFTA

Exhibit J&J-252

Expert Report of Daniel Cramer, MD in the Ristesund v. J&J Matter Dated 11.01.15

Expert Report of Dr. Douglas L. Weed Dated 2.19.16

Expert Report of Dr. Douglas Weed in the Giannecchini v. J&J Matter Dated 08.18.16

Expert Report of F. Alan Andersen in the Giannecchini v. J&J Matter

Expert Report of John J. Godleski - REDACTED Dated 4.3.15

Expert Report of Laura Webb, PhD (Feb. 25, 2019).pdf

Expert Report of Robert B. Cook, PhD (11.16.2018)

FAQs Food Chemicals Codex (FCC) Webpage. https://www.usp.org/frequently-asked- questions/food-chemicals-codex-fcc

FDA Ltr re Asbestos in Talc 03-18-76

FDA Risk Mgmt. Adv. Comm. Excerpt

FDA Summary of Results from Testing of Official Samples of Talc-Containing Cosmetics of Asbestiform Fibers by AMA Laboratories During 2009-2010, available at https://www.fda.gov/media/122418/download?attachment

FDA Survey on Talc Safety (2009-2010), http://www.fda.gov/cosmetics/productsingredients/ingredients/ucm293184.htm

FDA_FOIA_000022

FDA_FOIA_000025

FDA_FOIA_000061

FDA_FOIA_000091

FDA_FOIA_000095

FDA_FOIA_000108

FDA_FOIA_000150

FDA_FOIA_000192

FDA_FOIA_000208

FDA_FOIA_000254

FDA_FOIA_003204

FDA_FOIA_004453

FDA_FOIA_004529

FDA_FOIA_004557

FDA_FOIA_004563

FDA_FOIA_004597

FDA_FOIA_004655

FDA_FOIA_004675

FDA_FOIA_004884

FDA_FOIA_005113

FDA_FOIA_005535

FDA_FOIA_005549

FDA_FOIA_005593

FDA_FOIA_005631

FDA_FOIA_005647

FDA_FOIA_005767

FDA_FOIA_009003

FDA_FOIA_009373

FDA_FOIA_009726

FDA_FOIA_009797

FDA_FOIA_009825

FDA_FOIA_009865

FDA_FOIA_010086

FDA_FOIA_010269

FDA_FOIA_010730

FDA_FOIA_013254

FDA_FOIA_013265

FDA_FOIA_013272

FDA_FOIA_013481

Federal Register 1965.12.23

Federal Register 1978.10.10

Federal Register 1990.06.20

Federal Register 1996.04.31

Feinstein, D., et al. The Personal Care Products Safety Act. JAMA Internal Medicine 178(5) (May 2018): 601-602.

Fiume, M. M., et al. Safety Assessment of Talc as Used in Cosmetics. International Journal of Toxicology 34, No. 1 Suppl (July 1, 2015): 66S-129S.

FR_A1910246Ver01_Redacted.pdf

Gates, M. A., et al. Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype. American Journal of Epidemiology 171, No. 1 (January 2010): 45–53.

Gates, M. A., et al. Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer. Cancer Epidemiol Biomarkers Prev. No. 17(9) (September 2008): 2436–44.

Germani, D., et al. Cohort Mortality Study of Women Compensated for Asbestosis in Italy. Am.J Ind.Med. 36, No. 1 (July 1999): 129–34.

Gertig, D. M., et al. Prospective Study of Talc Use and Ovarian Cancer. J Natl.Cancer Inst. 92, No. 3 (February 2, 2000): 249–52.

Gilbertson, W.E. The Regulatory Status of Talc. Regulatory Toxicology and Pharmacology 21 (1995): 230-232.

Glasgow, T. (2016, June 19). Johnson & Johnson: No Link Between Talc and Ovarian Cancer - Houston Chronicle.

GoBackToFactsAboutTalc.docx

Godard, B., et al. Risk Factors for Familial and Sporadic Ovarian Cancer among French Canadians: A Case-Control Study. Amer J Obstet Gynecol 179, No. 2 (August 1998): 403–10.

Gonzalez, N. L., et al. Douching, Talc Use, and Risk of Ovarian Cancer. Epidemiology (Cambridge, Mass.) 27, No. 6 (2016): 797–802.

Gordon, R. E., et al. Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women. Int.J Occup.Environ.Health 20, No. 4 (October 2014): 318–32.

Graham, J., and R. Graham. "Ovarian Cancer and Asbestos." Environmental Research 1, No. 2 (October 1967): 115–28.

Green, A., et al. Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer. Survey of Women's Health Study Group. Int.J Cancer 71, No. 6 (June 11, 1997): 948–51.

Greenberg M., Davies L, T. A. Mesothelioma Register 1967-68. British Journal of Industrial Medicine, 31, 91-104, 1974.

Grivennikov, S. et al. Immunity, Inflammation, and Cancer. Cell 140, No. 6 (March 19, 2010): 883–99.

Gross, A. J., et al. A Meta-Analytical Approach Examining the Potential Relationship between Talc Exposure and Ovarian Cancer. J.Expo.Anal.Environ.Epidemiol. 5, No. 2 (1995): 181–95.

Guidance for Industry Investigating Out-of-Specification (OOS) Test Results for Pharmaceutical Production, U.S. Department of Health and Human Services, October 2006

Harlow, B. L., et al. Perineal Exposure to Talc and Ovarian Cancer Risk. Obstet Gynecol 80, No. 1 (July 1992): 19-26.

Harlow, B.L., et al. A Case-Control Study of Borderline Ovarian Tumors: The Influence of Perineal Exposure to Talc. . Am.J Epidemiol. 130, No. 2 (August 1989): 390–94.

Hartge, P., et al. Talc and Ovarian Cancer. JAMA 250, No. 14 (October 14, 1983): 1844.

Heller, D. S., et al. The Relationship between Perineal Cosmetic Talc Usage and Ovarian Talc Particle Burden. Am.J Obstet.Gynecol. 174, No. 5 (May 1996): 1507–10.

Henderson, et al.  A replication technique for the identification of asbestos fibres in mesotheliomas, Eur J Cancer (1969) DEC;5(6:621)

Henderson, W. J., et al. Talc and Carcinoma of the Ovary and Cervix. The Journal of Obstetrics and Gynaecology of the British Commonwealth 78, No. 3 (March 1971): 266–72.

Henderson, W. J., et al. Talc in Normal and Malignant Ovarian Tissue. Lancet 1, No. 8114 (March 3, 1979): 499.

Henderson, W. J., et al. The Demonstration of the Migration of Talc from the Vagina and Posterior Uterus to the Ovary in the Rat. Environ.Res. 40(2) (1986):247-250.

Hogans v. J&J Stipulated Protective Order Dated 1.28.15

Hopkins 01

Hopkins 02

Hopkins 03

Hopkins 04

Hopkins 09

Hopkins 10

Hopkins 11

Hopkins 110 (13 pages of various assorted bates #s; begins at JNJ 000250901)

Hopkins 12

Hopkins 124 (45 pages of various assorted bates #s)

Hopkins 127 (100 pages various bates #s)

Hopkins 128 (168 pages of various bates #s)

Hopkins 13

Hopkins 133 (781 various assorted bates #s beginning at JNJMX68_000000434)

Hopkins 134 (314 various assorted bates #s; begins at JNJI4T5_000000692)

Hopkins 14

Hopkins 15

Hopkins 150; JNJAZ55_000006088

Hopkins 152

Hopkins 155

Hopkins 158

Hopkins 159

Hopkins 160; JNJMX68_000002666

Hopkins 161; JNJAZ55_000001886

Hopkins 163; J&J-0034630; JNJMX68_000013019

Hopkins 165; JNJMX68_000008980 (bates # cut off but deduced with page count)

Hopkins 18

Hopkins 19

Hopkins 20

Hopkins 21

Hopkins 22; J&J-0123238; JNJNL61_000079334

Hopkins 23

Hopkins 24

Hopkins 25; JNJNL61_000013575

Hopkins 26; JNJNL61_000021693

Hopkins 28

Hopkins 29; JNJNL61_000020392

Hopkins 30; JNJAZ55_000004628

Hopkins 31

Hopkins 32; JNJ 000238365; Leavitt Pltfs' Ex JJ-3592

Hopkins 34; JNJNL61_000020544

Hopkins 36; JNJNL61_000020621

Hopkins 37; JNJAZ55_000001692

Hopkins 38; JNJNL61_000005496

Hopkins 40; JNJMX68_000005032

Hopkins 41; JNJAZ55_000003635

Hopkins 42; J&J-0147727; JNJAZ55_000015519

Hopkins 43

Hopkins 44; JNJAZ55_000004573

Hopkins 46; J&J 258; JNJAZ55_000009127

Hopkins 47; J&J 384

Hopkins 49; JNJAZ55_000004644

Hopkins 50; J&J 26

Hopkins 51; JNJNL61_000000126

Hopkins 52

Hopkins 53; JNJAZ55_000001073

Hopkins 55; J&J-0132008; JNJMX68_000017147; Plaintiff's Exhibit 2456

Hopkins 56; JNJI4T5_000004097

Hopkins 57; JNJI4T5_000004090

Hopkins 9; J&J-0148425; JNJNL61_000058245

Hopkins D-1-AA

Hopkins J&J-188

Hopkins J&J-335

Hopkins J&J-345

Hopkins J&J-346

Hopkins J&J-348

Hopkins J&J-350

Hopkins J&J-352

Hopkins J&J-357

Hopkins J&J-366

Hopkins J&J-367

Hopkins J&J-368

Hopkins J&J-369

Hopkins J&J-370

Hopkins J&J-373

Hopkins J&J-374

Hopkins J&J-376

Horizon 149; J&J-0017054; JNJZ55 000015437

Houghton, S. C., et al. Perineal Powder Use and Risk of Ovarian Cancer. J Natl.Cancer Inst. 106, No. 9 (September 2014).

https://ourstory.jnj.com/, accessed 11/14/2023

https://oversightdemocrats.house.gov/news/press-releases/oversight-subcommittee-s-year-long-investigation-leads-to-johnson-johnson

https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/draft-screening-assessment-talc-mg3h2sio34.html

https://www.cancer.org/cancer/risk-prevention/chemicals/talcum-powder-and-cancer.html

https://www.fda.gov/food/cfsan-constituent-updates/fda-releases-data-agencys-year-long-sampling-assignment-test-talc-containing-cosmetic-products

https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos

https://www.jnj.com/johnson-johnson-consumer-inc-to-voluntarily-recall-a-single-lot-of-johnsons-baby-powder-in-the-united-states

https://www.jnj.com/our-company/johnson-johnson-consumer-health-announces-discontinuation-of-talc-based-johnsons-baby-powder-in-u-s-and-canada

https://www.niehs.nih.gov/health/materials/asbestos_508.pdf

Huncharek, M. et al. Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: A Meta-Analysis of 11,933 Subjects from Sixteen Observational Studies. Anticancer Res. 25, (2003): 1955-1960.

Huncharek, M., and J. Muscat. Perineal Talc Use and Ovarian Cancer Risk: A Case Study of Scientific Standards in Environmental Epidemiology. Eur.J.Cancer Prev. 20, No. 6 (2011)

Huncharek, M, et al. Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: A Meta-Analysis of Nine Observational Studies: Eur.J.Cancer Prev. 16, No. 5 (October 2007)

IARC 1987

IARC 2007

IARC Monograph  Evaluation of Carcinogenic Risk of Chemicals to Man (1973)

IARC Monographs on the Evaluation of Carcinogenic Risks to Humans: Volume 93 (2010)

IARC Working Group on the Evaluation of Carcinogenic Risk to Humans. Arsenic, Metals, Fibres and Dusts Lyon (FR): International Agency for Research on Cancer; 2012. (IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, No. 100C).

IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. "Carbon Black, Titanium Dioxide, and Talc." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans/World Health Organization, International Agency for Research on Cancer 93 (2010): 1-413

IARC, "Asbestos (Chrysotile, Amosite, Crocidolite, Tremolite, Actinolite, and Anthophyllite)."

IMA-NA0000749

IMA-NA0024007

IMA-NA0025819

IMERYS 039088

IMERYS 039203

IMERYS 039204

IMERYS 049428

IMERYS 049953

IMERYS 050651

IMERYS 068497

IMERYS 077676

IMERYS 081025

IMERYS 117597

IMERYS 124796

IMERYS 140471

IMERYS 145558

IMERYS 173520

IMERYS 193653

IMERYS 196407

IMERYS 219720

IMERYS 219721

IMERYS 239407

IMERYS 242497

IMERYS 245837

IMERYS 248208

IMERYS 271483

IMERYS 281625

IMERYS 299322

IMERYS 300644

IMERYS 303828

IMERYS 308446

IMERYS 309325

IMERYS 330548

IMERYS 393976

IMERYS 414536

IMERYS 416192

IMERYS 416201

IMERYS 416215

IMERYS 418290

IMERYS 418301

IMERYS 422062

IMERYS 422992

IMERYS 426609

IMERYS 430404

IMERYS 436972

IMERYS 437013

IMERYS 437016

IMERYS 437017

IMERYS 441158

IMERYS 441186

IMERYS 442002

IMERYS 443102

IMERYS 444294

IMERYS 446059

IMERYS 446417

IMERYS 446794

IMERYS 446967

IMERYS 447074

IMERYS 447341

IMERYS 448613

IMERYS 542261

IMERYS 542268

IMERYS 550153

IMERYS_00057325

IMERYS_422064

IMERYS026527

IMERYS028813

IMERYS034215

IMERYS038563

IMERYS040759

IMERYS051370

IMERYS056686

IMERYS074844

IMERYS074887

IMERYS081025

IMERYS099495

IMERYS136822

IMERYS136824

IMERYS138675

IMERYS152814

IMERYS205540

IMERYS208853

IMERYS209398

IMERYS209930

IMERYS210472

IMERYS210707

IMERYS239749

IMERYS239757

IMERYS239791

IMERYS239883

IMERYS240286

IMERYS240342

IMERYS240415

IMERYS244415

IMERYS244677

IMERYS250192

IMERYS250983

IMERYS251651

IMERYS255224

IMERYS255384

IMERYS265231

IMERYS269418

IMERYS279682

IMERYS280786

IMERYS281179

IMERYS284935

IMERYS288545

IMERYS288588

IMERYS299277

IMERYS299322

IMERYS303828

IMERYS303841

IMERYS303861

IMERYS306274

IMERYS306387

IMERYS308446

IMERYS309326

IMERYS324700

IMERYS325989

IMERYS363871

IMERYS418290

IMERYS422289

IMERYS437666

IMERYS442501

IMERYS446794

IMERYS456885

IMERYS462959

IMERYS467511

IMERYS467736

IMERYS-A_0005946

IMERYS-A_0010837

IMERYS-A_0021921

IMERYS-MDL-AB_0001939

IMERYS-MDL-AB_000194

IMERYS-MDL-AB_0001941

IMERYS-MDL-AB_0001953

IMERYS-MDL-AB_0001975

Ingham v. Johnson & Johnson, 608 S.W.2d 663 (Mo. Ct. App. 2020)

INTERIM_JNJTALC_000000638

Int'l Cosmetic Ingredient Dictionary 16th Ed

IWGACP Public Meeting, 4 February 2020

J Hopkins 25

J Hopkins 26

J Hopkins 27

J Hopkins D-1

J Hopkins D-10

J Hopkins D-11

J Hopkins D-12

J Hopkins D-13

J Hopkins D-14

J Hopkins D-15

J Hopkins D-16

J Hopkins D-17

J Hopkins D-18

J Hopkins D-19

J Hopkins D-1A

J Hopkins D-2

J Hopkins D-20

J Hopkins D-21

J Hopkins D-22

J Hopkins D-23

J Hopkins D-24

J Hopkins D-25

J Hopkins D-26

J Hopkins D-27

J Hopkins D-28

J Hopkins D-29

J Hopkins D-3

J Hopkins D-4

J Hopkins D-5

J Hopkins D-6

J Hopkins D-7

J Hopkins D-8

J Hopkins D-9

J Hopkins Imerys 05

J Hopkins PM Imerys 07

J Hopkins PM J&J 201

J Hopkins PM J&J 225

J Hopkins PM J&J 283

J Hopkins PM J&J 287

J Hopkins PM J&J 297

J Hopkins PM J&J 299

J Hopkins PM J&J 301

J Hopkins PM J&J 303

J Hopkins PM J&J 305

J Hopkins PM J&J 306

J Hopkins PM J&J 309

J Hopkins PM J&J 310

J Hopkins PM J&J 311

J Hopkins PM J&J 313

J Hopkins PM J&J 314

J Hopkins PM J&J 327

J Hopkins PM J&J 329

J Hopkins PM J&J 330

J Hopkins PM J&J 331

J Hopkins PM J&J 334

J Hopkins PM J&J 340

J Hopkins PM J&J 341

J Hopkins PM J&J 342

J&J 0005925

J&J 0007794

J&J 0007919; JNJ 000291563

J&J 0012116; JNJ 000338279

J&J 0017054; JNJZ55 000015437; Plaintiff Exhibit 2226-1

J&J 0018692

J&J 0023059;  JNJMX68 000015818

J&J 0023063; JNJMX68 000015819

J&J 0023507; JNJMX68 000015892

J&J 0023533; JNJMX68 000015898

J&J 0023545; JNJ 000315161

J&J 0023551; JNJ 000315164

J&J 0023554; JNJ 000315167

J&J 0023558; JNJ 000315170

J&J 0023562; JNJ 000315173

J&J 0023570; JNJ 000315179

J&J 0023574; JNJMX68 000315182

J&J 0023578; JNJ 000315185

J&J 0023582; JNJ 000315188

J&J 0023590; JNJ 000315194

J&J 0023595; JNJMX68 000315197

J&J 0023608; JNJMX68 000015916

J&J 0023633;  JNJMX68 000015922

J&J 0023637;  JNJMX68 000015923

J&J 0023641;  JNJMX68 000015924

J&J 0023778; JNJ 000315321

J&J 0023782; JNJ 000315324

J&J 0024162; JNJ 000315520

J&J 0024166;  JNJ 000315523

J&J 0024174;  JNJMX68 000016021

J&J 0024239; JNJMX68 000016037

J&J 0024248; JNJMX68 000016039

J&J 0024313; JNJMX68 000016053

J&J 0024337; JNJMX68 000016059

J&J 0024413; JNJMX68 000016074

J&J 0024431; JNJMX68 000016078

J&J 0024440; JNJMX68 000016080

J&J 0024456; JNJ 000315730

J&J 0024464; JNJMX68 000016085

J&J 0024485;  JNJ 000315751

J&J 0024501; JNJ 000315763

J&J 0024509; JNJMX68 000016096

J&J 0024513; JNJ 000315772

J&J 0024523; JNJ 000315778

J&J 0024526; JNJ000315781; D 0428 0001

J&J 0024530; JNJ 000315784

J&J 0024534; JNJ 000315787

J&J 0024538; JNJ 000315790; D 0422 0001

J&J 0024538; JNJMX68 00001612; D 0427 0001

J&J 0024542; JNJ 000315793; D 0425 0001

J&J 0024546; JNJ 000315796

J&J 0024550; JNJ 000315805; D 0419 0001

J&J 0024554;  JNJ 000315802; D 0418 0001

J&J 0024562; JNJ 000315808; D 0424 0001

J&J 0024567; JNJ 000315811; D 0415 0001

J&J 0024571; JNJ 000315814; D 0414 0001

J&J 0024575; JNJ 000315817;  D 0411 0001

J&J 0024580; JNJ 000315820; D 0409 0001

J&J 0024592; JNJ 000315829

J&J 0024601; JNJ 000315835

J&J 0024605; JNJ 000315838

J&J 0024622; JNJ 000315850

J&J 0024626; JNJ 000315853

J&J 0024688;  JNJ 000315826

J&J 0025005; JNJMX68 00016129

J&J 0025014; JNJMX68 000016132

J&J 0025058; JNJMX68 000016150

J&J 0025075; JNJMX68 000016157

J&J 0025107; JNJMX68 000016169

J&J 0025155; JNJMX 000016186

J&J 0025168; JNJMX68 000016189

J&J 0025201; JNJMX68 00016196

J&J 0025214;  JNJMX68 000016199

J&J 0026063; JNJMX68 000016152

J&J 0037447;  JNJMX68 000011090

J&J 0037466;  JNJMX68 000011106

J&J 0037475;  JNJNL61_000037723

J&J 0037477;  JNJMX68 000011109

J&J 0037480;  JNJMX68_000011111

J&J 0037492;  JNJMX68 000011116

J&J 0037504;  JNJMX68 000011124

J&J 0037512;  JNJNL61_000037726

J&J 0037519;  JNJMX68_000011126

J&J 0037540;  JNJNL61_000037730

J&J 0037541;  JNJNL61_000037731

J&J 0037542;  JNJNL61_000037732

J&J 0037543;  JNJNL61_000037733

J&J 0037544;  JNJNL61_000037734

J&J 0037546;   JNJ 000280852

J&J 0037547;   JNJNL61_000037737

J&J 0037548;   JNJNL61_000037738

J&J 0037623;  JNJNL61_000037763

J&J 0037625;  JNJNL61_000037765

J&J 0037626;  JNJNL61_000037766

J&J 0037627; JNJNL61_000037767

J&J 0037628;  JNJNL61_000037768

J&J 0037629;  JNJNL61_000037769

J&J 0037642;  JNJNL61_000037770

J&J 0037644;  JNJNL61_000037771

J&J 0037645;  JNJNL61_000037772

J&J 0037646;  JNJNL61_000037773

J&J 0037647;  JNJNL61_000037774

J&J 0037651;  JNJNL61_000037775

J&J 0037653;  JNJNL61_000037777

J&J 0044937; JNJ 000292066

J&J 0049150; JNJNL61 000052427

J&J 0059869;  JNJMX68_000012023; Plaintiff Exhibit 2451-1

J&J 0066332; JNJ 000327788; Pltf JNJ 00062458

J&J 0066447; JNJNL61 000063476

J&J 0070071; JNJMX68_000012063

J&J 0070263; JNJAZ65 000014444

J&J 0073785; JNJTALC000102214; Plaintiff Exhibit 2668-1

J&J 0073843; JNJTALC000138

J&J 0073930; JNJ 000329832; Plft JNJ 00063125

J&J 0083118; JNJNL 61 000062534

J&J 0083362; JNJH29W_000010709

J&J 0084545; JNJNL61_000062953

J&J 0084587; JNJNL61 000062964; Schmitz Pltfs Ex 0647

J&J 0087535; JNJAZ55_000017891

J&J 0087625; JNJNL61 000064937

J&J 0089804; JNJAZ55_000013775

J&J 0090798; JNJNL61 000048137

J&J 0093588; JNJAZ55_000011185

J&J 0095138; JNJ 000033761; Plft JNJ 00006478

J&J 0096500; JNJTALC000172085

J&J -0096500; JNJTALC000376774; JNJTALC000172086

J&J 0106409;  JNJNL61 0000053191

J&J 0109238; JNJ000684154; Leavitt Pltfs Ex D-1603

J&J 0110820; JNJNL61 000067469

J&J 0111727; JNJ 000334161; Pltf JNJ 000000034161

J&J 0112675; JNJ 000065211

J&J 0123236; JNJMX68_000019932; Plaintiff Exhibit-1

J&J 0123238; JNJNL61 000079334

J&J 0123238; JNJNL61 000079334; Plaintiff Exhibit 2631-1

J&J 0132008;  JNJMX68_000017147

J&J 0132008; JNJMX68_000017147

J&J 0146303; JNJAZ55 000013489

J&J 0147727; JNJAZ55_000015519, Plaintiff Exhibit 2603-1

J&J 0148312; JNJNL61 000058192

J&J 0149688; JNJMX68_000015773

J&J 0150033

J&J 0150033; JNJ 000304421

J&J 0151109; JNJ 000343318

J&J 0151109; JNJ 000343318; Hopkins 87

J&J 0152253

J&J 0152253; JNJ 000064511

J&J 0163917; JNJNL61 000042443

J&J 0164224; JNJ 000064649

J&J 0164227; JNJ 000064652

J&J 02

J&J 04

J&J 09

J&J 10

J&J 100

J&J 105

J&J 107

J&J 108

J&J 11

J&J 111

J&J 112

J&J 121

J&J 14

J&J 141

J&J 142

J&J 148425; JNJNL61 000058245; Plaintiff Exhibit 2398-1

J&J 15

J&J 154

J&J 157

J&J 158

J&J 159

J&J 164

J&J 169

J&J 17

J&J 175

J&J 177

J&J 179

J&J 18

J&J 182

J&J 184

J&J 185

J&J 19

J&J 190

J&J 194

J&J 198

J&J 200

J&J 201

J&J 202

J&J 207

J&J 211

J&J 213

J&J 216

J&J 217

J&J 219

J&J 220

J&J 221

J&J 224

J&J 228

J&J 23

J&J 230

J&J 234

J&J 241

J&J 246

J&J 252

J&J 253

J&J 255

J&J 256

J&J 256; JNJAZ55_00000606 (bates# cut off)

J&J 257

J&J 258

J&J 26

J&J 262

J&J 263

J&J 267

J&J 28

J&J 29

J&J 296

J&J 298

J&J 31

J&J 33

J&J 335

J&J 34

J&J 34; J&J-0005509

J&J 35

J&J 36

J&J 38

J&J 39

J&J 44

J&J 46

J&J 47

J&J 49

J&J 57

J&J 58

J&J 60

J&J 65

J&J 66

J&J 69

J&J 71

J&J 74

J&J 75

J&J 77

J&J 87

J&J 89

J&J 90

J&J 92

J&J 93

J&J 95

J&J 97

J&J Healthwashing Babies For 100 Years

J&J_0148425; JNJNL61_000058245

J&J-00037531; JNJNL61_000037729

J&J-0004370; JNJ000065570

J&J-0004453; JNJ 000578888

J&J-0004454; JNJ 000065627

J&J-0004479; JNJ 000065646; DX-7202

J&J-0004667; JNJH29W_000078719

J&J-0004724; JNJNL61_000078757

J&J-0005504; JNJ000346836

J&J-0005504; JNJNL61_00007880

J&J-0005694; JNJNL61_000078916

J&J-0005912; JNJ 000577872

J&J-0005925; JNJMX68_000012745

J&J-0005925; JNJMX68_000012745; Plaintiff Exhibit 2620-1

J&J-0005925; JNJMX68_000012745; PLT-00036-0001

J&J-0006986; JNJ 000346992

J&J-0007007; JNJ 000346999

J&J-0007013; JNJNL61_000078978

J&J-0007042; JNJ000347002

J&J-0007064; JNJ000341705

J&J-0007507; JNJMX68_000012803

J&J-0007590; JNJ 000291467 (E-0564 - bates #s are out of order and assorted)

J&J-0007785; JNJMX68_0000128749

J&J-0007794; JNJMX68_000012851

J&J-0007920

J&J-0008053; JNJMX68_000012905

J&J-0008356; JNJ 000291787

J&J-0011098; JNJNL61_000053641

J&J-0017054; JNJ 000309861

J&J-0018692; JNJ 000346335; Pltf_JNJ_00068182

J&J-0020224; JNJNL61_000052948

J&J-0020831; JNJ 000064241

J&J-0021092

J&J-0030343; JNJ 000312967

J&J-0034263; JNJ 000314226

J&J-0034263; JNJ 000314226; Hopkins 137

J&J-0034299; JNJ 000684541

J&J-0034484; JNJNL61_0000134004

J&J-0034593; JNJNL61_000043235

J&J-0034609; JNJ 00031425 (cut off)

J&J-0034630

J&J-0034630; JNJMX68_000013019

J&J-0034643; JNJNL61_000043240

J&J-0034677; JNJ 000314255

J&J-0036693; JNJ 000031001

J&J-0037209; JNJMX68_000011026

J&J-0037376; JNJ 000280750

J&J-0037377; JNJ 000280751

J&J-0037380; JNJ 000280754

J&J-0037381; JNJ 000280755

J&J-0037382; JNJ 000280756

J&J-0037383; JNJ 000280757

J&J-0037388; JNJ 000280759

J&J-0037390; JNJ 000280761

J&J-0037391; JNJ 000280762; Pltf_JNJ (bates # illegible)

J&J-0037394; JNJ 000280765

J&J-0037395; JNJ 000280766

J&J-0037404; JNJ 000280772

J&J-0037404; JNJMX68_000011056

J&J-0037405; JNJ 000280773

J&J-0037406; JNJ 000280774

J&J-0037407; JNJ 000280775

J&J-0037409; JNJ 000280777

J&J-0037410; JNJ 000280778

J&J-0037417; JNJ 000280782

J&J-0037420; JNJ 000280785

J&J-0037421; JNJ 000280786

J&J-0037425; JNJ 000280790

J&J-0037439; JNJ 00071234

J&J-0037440; JNJTALC000071235

J&J-0037474; JNJ 00071242

J&J-0037476; JNJ 00071243

J&J-0037478; JNJ 000280820

J&J-0037479; JNJ 00071244

J&J-0037481; JNJ 000280822

J&J-0037482; JNJ 00071245

J&J-0037486; JNJ 00071247

J&J-0037488; JNJ 000280825

J&J-0037489; JNJ 000280826

J&J-0037497; JNJ 00071250

J&J-0037500; JNJ 00071250

J&J-0037503; JNJ 00071252

J&J-0037511; JNJ 00071255

J&J-0037512; JNJ 00071256

J&J-0037514; JNJ 00071257

J&J-0037515; JNJ 00071258

J&J-0037516; JNJ 00071259

J&J-0037517; JNJ 00071260

J&J-0037518; JNJ 00071261

J&J-0037521; JNJ 00071262

J&J-0037526; JNJNL61_000037727

J&J-0037528; JNJNL61_000037728

J&J-0037532; JNJ 00071266

J&J-0037533; JNJ 00071267

J&J-0037534; JNJ 00071268

J&J-0037535; JNJ 00071269

J&J-0037536; JNJTALC000071270

J&J-0037537; JNJ 00071271

J&J-0037538; JNJ 00071272

J&J-0037624; JNJNL61_000037764

J&J-0037632; JNJ 000683572

J&J-0037633; JNJ 000683573

J&J-0037648; JNJ 000683579

J&J-0043656; JNJ 000347203

J&J-0043746; JNJ 00031431

J&J-0043746; JNJMX68_000015709

J&J-0043746; JNJMX68_000015709; Hopkins 112

J&J-0043753

J&J-0043753; JNJ 000314315

J&J-0043753; JNJMX68_00015711; Hopkins 111

J&J-0044096; JNJNL61_000043286

J&J-0044780; JNJMX68_000013066

J&J-0044793;  JNJMX68_00013067

J&J-0044840; JNJ 000292059

J&J-0044868; JNJ 000314361

J&J-0044868; JNJMX68_000015726

J&J-0044934; JNJ 000063285

J&J-0044934; JNJMX68 000013080

J&J-0044937;  JNJMX68_00013082

J&J-0045013; JNJMX68_010913

J&J-0049150; JNJNL61_000052427

J&J-0049807; JNJ 000064087

J&J-0049964; JNJ000064591

J&J-0055341; JNJNL61_000074060

J&J-0056679; JNJAZ55_000018511

J&J-0056679; JNJTALC000301073

J&J-0059869; JNJMX68_000012023

J&J-0060851; JNJTALC000171588

J&J-0060870; JNJ000294461

J&J-0060888; JNJ 000294462

J&J-0060938; JNJ 000294507; PLT-04497-0001

J&J-0060957; JNJMX68_000013398

J&J-0061460; JNJH29W_000009932

J&J-0061460; JNJH29W_000009932; Hopkins 93

J&J-0063313; JNJNL61_000076240

J&J-00700701; JNJMX68_000012063

J&J-0070071; JNJMX68_000012063

J&J-0070263; JNJAZ55_000014444

J&J-0070812; JNJ 000303042

J&J-0070812; JNJH29W_000008569

J&J-0070812; JNJMX68_000014190

J&J-0073766; JNJMX68_000017758

J&J-0073883; JNJ 000329803

J&J-0073930; JNJ 000329832; Pltf_JNJ_00063125

J&J-0073975; JNJNL61_000064375

J&J-0076514; JNJAZ55_000012423

J&J-0077385

J&J-0077385; JNJ 000063951

J&J-0082407;  JNJ 000046762; Pltj_JNJ_00008906

J&J-0082492; JNJAZ55_000016555

J&J-0082492; JNJAZ55_000016555; Hopkins 77

J&J-0082756; JNJH29W_000010514

J&J-0082779; JNJNL61_000062372

J&J-0083118; JNJNL61_000062534

J&J-0083120; JNJ 000325951

J&J-0083129; JNJNL61_000062639

J&J-0083381; JNJ 000326125

J&J-0084545

J&J-0084545; JNJNL61_000062953; PLT-00058-0001

J&J-0084587; JNJ000326963

J&J-0084611; JNJNL61_000062982

J&J-0084692; JNJMX68_000017515

J&J-0085506

J&J-0086337; JNJMX68_000018543

J&J-0086339

J&J-0086339; JNJMX68_000018545

J&J-0086491; JNJTALC000102293

J&J-0087625; JNJNL61_000064937

J&J-0088056; JNJTALC000471186

J&J-0089804; Plaintiff's Exhibit 60

J&J-0090656; JNJ 000300297

J&J-0090834; JNJ 000300436; Pltf_JNJ_00051924

J&J-0093588; JNJAZ55_000011185

J&J-0095138; JNJ 000033761

J&J-0096500; JNJTALC000376774

J&J-0098861; JNJAZ55_000015021

J&J-0101371; JNJNL61_000067306

J&J-0102399; JNJ 000297377

J&J-0104613; JNJNL61_000047375

J&J-0104613; JNJNL61_000047376

J&J-0106161; JNJ 000289953

J&J-0106244; JNJ 000033681; Pltf_JNJ_00006016

J&J-0106453; JNJNL61_000053222

J&J-0109225; JNJAZ55_000013621

J&J-0109238; JNJ 000063581

J&J-0109238; JNJ 000063581; Hopkins 120

J&J-0109926; JNJ 000308358

J&J-0111752; JNJNL61_000067711

J&J-0111862; JNJNL61_000067783

J&J-0123238; JNJNL61_000079334

J&J-012338; JNJNL61_000079334

J&J-0129763; JNJNL61_000063992

J&J-0129835; JNJMX68_000011214

J&J-0130530; JNJAZ55_000017552

J&J-0130530; JNJTALC000300260

J&J-0132008; JNJMX68_000017147

J&J-0141179; JNJMX68_000015598

J&J-0141525; JNJ 000284176

J&J-0141625; JNJ 000284275

J&J-0141654; JNJ 000284303

J&J-0141657; JNJ 000284306

J&J-0141688; JNJ 0002843337

J&J-0142149; JNJTALC000295905

J&J-0142694; JNJMX68_000011557

J&J-0142694; JNJMX68_000011557; Hopkins 126

J&J-0142783; JNJ000285111

J&J-0142803; JNJ 000285131

J&J-0142816; JNJTALC00007133

J&J-0142830; JNJ000285154

J&J-0144932; JNJ000285446

J&J-0145030; JNJ 000285541

J&J-0145040; JNJ 000285551

J&J-0145055; JNJ 000285566

J&J-0145060; JNJ 000285571

J&J-0145151

J&J-0145303

J&J-0145685; JNJ 000294872; Pltf_JNJ_00050035

J&J-0145685; JNJ 000294872; Pltf_JNJ_00050035; PLT-00040-0001

J&J-0145685; JNJMX68_000013464

J&J-0146266

J&J-0146266; JNJMX68_000013482

J&J-0147505; JNJTALC000471205

J&J-0147606; JNJ 000312709

J&J-0147727; JNJAZ55_000015519

J&J-0148425;  JNJNL61_000058245

J&J-0148425; JNJN61_000058245

J&J-0148425; JNJNL61_000058245

J&J-0149149; JNJ 000035171

J&J-0149674;JNJ 000314559

J&J-0149688; JNJMX68_000015773

J&J-0149699; JNJ000314584

J&J-0149699; JNJ000314584; Hopkins 82

J&J-0150033

J&J-0150033; JNJ 000304421

J&J-0150033; JNJ000304421

J&J-0150089; JNJ 000063955; Pltf_JNJ_00007386

J&J-0151607; JNJNL61_000057638

J&J-0153295

J&J-0157876; JNJ000318396

J&J-0161635; JNJNL61_000065569

J&J-0163874; JNJH29W_000007641

J&J-0163911; JNJNL61_000042441

J&J-0163917; JNJNL61_000042443

J&J-0163931; JNJ 000288585

216

J&J-0163931; JNJ 000288585; Hopkins 106

J&J-0163944; JNJNL61_000042448

J&J-0164278; JNJMX68_000016961

J&J-0166451; JNJ 000058767

J&J-017870; JNJ 00003550

J&J-0312008; JNJMX68_000017147

J&J-044521; JNJ 000063266; Pltf_JNJ_0006449

J&J-044925; JNJ 000063284

J&J-069607

J&J-090834; JNJ 000300436

J&J1

J&J100

J&J141

J&J15

J&J164

J&J-164

J&J169

J&J17

J&J175

J&J177

J&J-177

J&J182

J&J-182

J&J184

J&J185

J&J-188

J&J19

J&J190

J&J2

J&J202

J&J-202

J&J220

J&J23

J&J255

J&J256

J&J257

J&J258

J&J-260

J&J-263

J&J28

J&J-28

J&J29

J&J-29

J&J-305

J&J31

J&J-31

J&J-327

J&J33

J&J44

J&J47

J&J57

J&J58

J&J65

J&J66

J&J74

J&J-74

J&J75

J&J-87

J&J89

J&J9

J&J-9; J&J-0005141; JNJAZ55_00015127

J&J97

jh081618

jh081718

jh101718

jh110518

JJCI Invest Summary- 3DEC2019.pdf

JNJ 000 315152; J&J (Bates # cut off)

JNJ 000 315155; J&J (Bates # cut off)

JNJ 000 315158; J&J (Bates # cut off)

JNJ 000000119

JNJ 000000316089; J&J-0025176 (bates # cut off)

218

JNJ 000000497

JNJ 000000523

JNJ 000000636

JNJ 000000704

JNJ 000001403

JNJ 000002302 (P287 - bates #s cut off)

JNJ 000002303

JNJ 000002303; Plft JNJ 00000205

JNJ 000002348

JNJ 000002351; Plft JNJ 00000212

JNJ 000002412

JNJ 0000024568

JNJ 000003401

JNJ 000003405

JNJ 000003405; Plft JNJ 00000258

JNJ 000003478

JNJ 000003618

JNJ 000003628; Plft JNJ 00000294

JNJ 000003632

JNJ 000003753

JNJ 000003911; Plft JNJ 00000322

JNJ 000003915

JNJ 000003916

JNJ 000003916; Plft JNJ 00000324

JNJ 000003934

JNJ 000003934; Plft JNJ 00000330

JNJ 000003948

JNJ 000003948; Plft JNJ 00000335

JNJ 000003954 (Bates #s cut off) - P326

JNJ 000003954; Plft JNJ 00000337

JNJ 000003964

JNJ 000003969

JNJ 000003985

JNJ 000003987 (Bates #s cut off) - P338

JNJ 000004113

JNJ 000004225

JNJ 000004225; Plfr JNJ 00000377

JNJ 000004464

JNJ 000004541

JNJ 000004581

JNJ 000004641; Pltf_JNJ_00000450

JNJ 000004682

JNJ 000004712

JNJ 000004797

JNJ 000005180; Hopkins 88

JNJ 0000060681

JNJ 000006201

JNJ 000010648

JNJ 000011150

JNJ 000011151

JNJ 000011152

JNJ 000011156

JNJ 000011185

JNJ 000011708

JNJ 000011916

JNJ 000013963

JNJ 000013964

JNJ 000014309

JNJ 000014317

JNJ 000015538

JNJ 000015543  (bates # cut off but deduced with page count)

JNJ 000015573  (bates # cut off but deduced with page count)

JNJ 000015750; Pltf_MISC_00000197

JNJ 000016381

JNJ 000016604

JNJ 000016645

JNJ 000016908

JNJ 000017775

JNJ 000018265

JNJ 000019616; Pltf_JNJ_ (bates # illegible)

JNJ 000020733; Pltf_JNJ_00000001

JNJ 000021008

JNJ 000021035

JNJ 000021090

JNJ 000021092

JNJ 000021093

JNJ 000022050

JNJ 000022307; Plft JNJ 00002617

JNJ 000022679 (bates # cut off but deduced with page count)

JNJ 000023186

JNJ 0000239703

JNJ 000024462

JNJ 000024495

JNJ 000024568

JNJ 000024701

JNJ 000026241

JNJ 00002693

JNJ 000029640

JNJ 000029970

JNJ 000030679

JNJ 000037468

JNJ 000040596; J&J-0115053

JNJ 000058760

JNJ 000059401; Pltf JNJ 00003973

JNJ 000060260

JNJ 000060624

JNJ 000060818

JNJ 000061131

JNJ 000061164

JNJ 000061342

JNJ 000061617

JNJ 000061832

JNJ 00006201; Plft JNJ 00000758

JNJ 000063281; J&J-0044777

JNJ 000064190; J&J-0164319

JNJ 000064439; J&J-0044836

JNJ 000064762; J&J-303

JNJ 000065646; J&J-0004479

JNJ 000069507

JNJ 000069510

JNJ 000069513

JNJ 000069516

JNJ 000069519

JNJ 000069522

JNJ 000069525

JNJ 000069528

JNJ 000069531

JNJ 000069534

JNJ 000069537

JNJ 000069540

JNJ 000069543

JNJ 000069546

JNJ 000069549

JNJ 000069552

JNJ 000069555

JNJ 000069558

JNJ 000069561

JNJ 000069564

JNJ 000069567

JNJ 000069570

JNJ 000069573

JNJ 000069576

JNJ 000069579

JNJ 000069582

JNJ 000069585

JNJ 000069588

JNJ 000069591

JNJ 000069594

JNJ 000069597

JNJ 000069600

JNJ 000069603

JNJ 000069606

JNJ 000069609

JNJ 000069612

JNJ 000069615

JNJ 000069618

JNJ 000069621

JNJ 000069624

JNJ 000069627

JNJ 000069630

JNJ 000069633

JNJ 000069637

JNJ 000069641

JNJ 000069644

JNJ 000069647

JNJ 000069650

JNJ 000069653

JNJ 000069658

JNJ 000069661

JNJ 000069664

JNJ 000069667

JNJ 000069670

JNJ 000069673

JNJ 000069676

JNJ 000069679

JNJ 000069682

JNJ 000069685

JNJ 000069688

JNJ 000069691

JNJ 000069694

JNJ 000069697

JNJ 000069700

JNJ 000069703

JNJ 000069706

JNJ 000069709

JNJ 000069712

JNJ 000069715

JNJ 000069718

JNJ 000069724

JNJ 000069727

JNJ 000069730

JNJ 000069736

JNJ 000069739

JNJ 000069742

JNJ 000069745

JNJ 000069748

JNJ 000069751

JNJ 000069754

JNJ 000069757

JNJ 000069760

JNJ 000069763

JNJ 000069766

JNJ 000069769

JNJ 000069771

JNJ 000069772

JNJ 000069775

JNJ 000069778

JNJ 000069784; D 0423 0001

JNJ 000069787; D 0426 0001

JNJ 000069790

JNJ 000069793

JNJ 000069796; D 0420 0001

JNJ 000069799; D 0421 0001

JNJ 000069805; D 0416 0001

JNJ 000069811; D 0412 0001

JNJ 000069814; D 0410 0001

JNJ 000069817; D 0408 0001

JNJ 000069820; D 0413 0001

JNJ 000069826

JNJ 000069829

JNJ 000069832

JNJ 000069835

JNJ 000069838

JNJ 000069841

JNJ 000069844

JNJ 000069847

JNJ 000069850

JNJ 000069853

JNJ 000069856

JNJ 000069859

JNJ 000069862

JNJ 000069865

JNJ 000069868

JNJ 000069871

JNJ 000069874

JNJ 000069880

JNJ 000069883

JNJ 000069886

JNJ 000069887

JNJ 000069889

JNJ 000069892

JNJ 000069895

JNJ 000069898

JNJ 000069901

JNJ 000069904

JNJ 000069907

JNJ 000069910

JNJ 000069913

JNJ 000069916

JNJ 000069919

JNJ 000069925

JNJ 000069928

JNJ 000069931

JNJ 000069934

JNJ 000069937

JNJ 000069940

JNJ 000069943

JNJ 000069946

JNJ 000069952

JNJ 000070044

JNJ 000070047

JNJ 000070162

JNJ 000070169

JNJ 000070173

JNJ 000070178

JNJ 000070182

JNJ 000070187

JNJ 000070191

JNJ 000070195

JNJ 000070199

JNJ 000070203

JNJ 000070205

JNJ 000070210

JNJ 000070214

JNJ 000070218

JNJ 000070223

JNJ 000070227

JNJ 000070232

JNJ 000070236

JNJ 000070239

JNJ 000070242

JNJ 000070245

JNJ 000070248

JNJ 000070251

JNJ 000070254

JNJ 000070260

JNJ 000070263

JNJ 000070268

JNJ 000070272

JNJ 000070275

JNJ 000070278

JNJ 000070281

JNJ 000070285

JNJ 000070288

JNJ 000070291

JNJ 000070294

JNJ 000070297

JNJ 000070300

JNJ 000070303

JNJ 000070306

JNJ 000070309

JNJ 000070312

JNJ 000070315

JNJ 000070318

JNJ 000070321

JNJ 000070324

JNJ 000070327

JNJ 000070330

JNJ 000070333

JNJ 000070336

JNJ 000070339

JNJ 000071263; J&J-0037527

JNJ 000071264; J&J-0037529

JNJ 000071265; J&J-0037530

JNJ 000084970

JNJ 000085114; Pltf_JNJ_00013482

JNJ 000085294; Pltf_JNJ_00013566

JNJ 000086540

JNJ 000086587

JNJ 000086612

JNJ 000086638

JNJ 000087425

JNJ 000087825

JNJ 000087952

JNJ 000087991

JNJ 000088012

JNJ 000089413

JNJ 000089770; Pltf_JNJ_00015068

JNJ 000093555

JNJ 000093556; Pltf_JNJ_00015498

JNJ 000108692

JNJ 000132581

JNJ 000135529; J&J-0024774 (bates # cut off)

JNJ 000135541; J&J-0024191

JNJ 000221052

JNJ 000221699

JNJ 000221705

JNJ 000222859

JNJ 000223449

JNJ 000223509; Pltf_JNJ_ (bates # illegible) ; PLT-04716-0001

JNJ 000224459; Hopkins 71

JNJ 000227834

JNJ 000227834; Hopkins 141

JNJ 000227883

JNJ 00023

JNJ 000231284

JNJ 000231334

JNJ 000231419

JNJ 000231479

JNJ 000231543

JNJ 00023155

JNJ 000231766; Pltf_JNJ_00028745

JNJ 000232501

JNJ 000232501; Pltf_JNJ_00028989

JNJ 000232679

JNJ 000232679; Pltf_JNJ_00029049

JNJ 000232852 (bates # cut off but deduced with page count)

JNJ 000232996

JNJ 000232996; Pltf_JNJ_00029144

JNJ 000233714; Pltf_JNJ (bates illegible)

JNJ 000235197

JNJ 000235207; Pltf_JNJ_(bates # illegible)

JNJ 000235235  (bates # cut off but deduced with page count)

JNJ 000235393; Hopkins 102

JNJ 000236073

JNJ 000236135

JNJ 000237200

JNJ 000237227

JNJ 000237229

JNJ 000237244

JNJ 000237264

JNJ 000237272

JNJ 000237275

JNJ 000237278

JNJ 000237281

JNJ 000237285

JNJ 000237291

JNJ 000237293

JNJ 000237298

JNJ 000237299

JNJ 000237310

JNJ 000237318

JNJ 000237322

JNJ 000237332

JNJ 000237334

JNJ 000237336

JNJ 000237340

JNJ 000237341

JNJ 000237344

JNJ 000237345

JNJ 000237347

JNJ 000237369

JNJ 000239634

JNJ 000239703   (bates # cut off but deduced with page count)

JNJ 000239823

JNJ 000239824

JNJ 000239825

JNJ 000240311

JNJ 000240739

JNJ 000240739; Pltf_JNJ (bates # illegible)

JNJ 000241394

JNJ 000241394; Pltf_JNJ_00031718

JNJ 000242147

JNJ 000242147; Pltf JNJ 00031883

JNJ 000242789

JNJ 000243003; JPltf_JNJ_00032154

JNJ 000244013

JNJ 000244358

JNJ 000244743

JNJ 000244743; DX-7058

JNJ 000244773

JNJ 000245155

JNJ 000245520

JNJ 000245526

JNJ 000245548

JNJ 0002456

JNJ 0002456

JNJ 000245678; Pltf_JNJ_00032929

JNJ 000246135

JNJ 000246159

JNJ 000246180

JNJ 000246183

JNJ 000246272

JNJ 000246294

JNJ 000246309

JNJ 000246329

JNJ 000246445

JNJ 000246863

JNJ 000247504

JNJ 000247504; DX7073

JNJ 000248615

JNJ 000248953

JNJ 000249322; Pltf JNJ 00034286

JNJ 000250047

JNJ 000250250

JNJ 000250495

JNJ 000250539

JNJ 000250604; Pltf_JNJ_00034656

JNJ 000250897

JNJ 000250919

JNJ 000251322

JNJ 000251888

JNJ 000251923

JNJ 000252339

JNJ 000252636

JNJ 000252694; Pltf JNJ 0000000252694

JNJ 000252948

JNJ 000253056

JNJ 000253056; Pltf_JNJ (bates # illegible)

JNJ 000255905

JNJ 000255906

JNJ 000255916

JNJ 000257537

JNJ 000257631

JNJ 000257707

JNJ 000258113

JNJ 000259267;  Pltf JNJ 00037754

JNJ 000260285; Pltf JNJ 00000002060285

JNJ 000260473

JNJ 000260700

JNJ 000260833

JNJ 000260833; Pltf_JNJ_00038325

JNJ 000261010

JNJ 000261816

JNJ 000261816; DX8373.0001

JNJ 000261816; Hopkins 116

JNJ 000263849

JNJ 000264495; Pltf_JNJ_00039476

JNJ 000264500 (pages out of order; first pg is JNJ 000264510)

JNJ 000264500 (pgs out of order; first pg is JNJ 000264509)

JNJ 000264617

JNJ 000264620

JNJ 000264673

JNJ 000264708

JNJ 000264721

JNJ 000264725

JNJ 000264728

JNJ 000264731; Pltf_JNJ_00039587

JNJ 000264733

JNJ 000264734

JNJ 000264747

JNJ 000264813

JNJ 000265133; Hopkins 169

JNJ 000265139

JNJ 000265173

JNJ 000265344

JNJ 000265404

JNJ 000265536; Pltf JNJ 00039857

JNJ 000265782

JNJ 000266375

JNJ 000266428

JNJ 000266448

JNJ 000266479

JNJ 000266498

JNJ 000266500

JNJ 000266519

JNJ 000266524

JNJ 000266529

JNJ 000266534

JNJ 000266544

JNJ 000266554

JNJ 000266559

JNJ 000266587

JNJ 000266591; Ex 39 - 243 various bates

JNJ 000266592

JNJ 000266597

JNJ 000266602

JNJ 000266607

JNJ 000266612

JNJ 000266617

JNJ 000266622

JNJ 000266627

JNJ 000266632

JNJ 000266637

JNJ 000266642

JNJ 000266651

JNJ 000266656

JNJ 000266670

JNJ 000266687

JNJ 000266688

JNJ 000266691

JNJ 000266692

JNJ 000266693

JNJ 000266694

JNJ 000266698

JNJ 000266699

JNJ 000266700

JNJ 000266701

JNJ 000266702

JNJ 000266706

JNJ 000266708

JNJ 000266710

JNJ 000266711

JNJ 000266713

JNJ 000266713 is first page (Ex 17 - 195 of various bates #s)

JNJ 000266719

JNJ 000266720

JNJ 000267602

JNJ 0002680 (bates # cut off)

JNJ 000268037

JNJ 000268037; Pltf_JNJ_ (bates # illegible)

JNJ 000268548

JNJ 000268964

JNJ 000268988

JNJ 00026953

JNJ 000270070

JNJ 00027008

JNJ 00027008 (bates # cut off) Exhibit 6611

JNJ 000270083

JNJ 000270084

JNJ 000270390 (bates # cut off but deduced with page count)

JNJ 000270495; Plf_JNJ_00041555

JNJ 000271546

JNJ 000273650

JNJ 000273664

JNJ 000273729

JNJ 000273759

JNJ 00027409

JNJ 000274273; Pltf_JNJ_00042548

JNJ 000274510

JNJ 000274547

JNJ 000274634

JNJ 000274706

JNJ 000275518

JNJ 000276515

JNJ 000277158

JNJ 000277175

JNJ 000277537

JNJ 000277555

JNJ 000280690; J&J-0037209

JNJ 000280750; J&J-0037376

JNJ 000280751; J&J-0037377

JNJ 000280754; J&J-0037380

JNJ 000280755; J&J-0037381

JNJ 000280756; J&J-0037382

JNJ 000280757; J&J-0037383

JNJ 000280758; J&J-0037384

JNJ 000280765; J&J-0037394

JNJ 000280766; J&J-0037395

JNJ 000280774; J&J-0037406

JNJ 000280777; J&J-0037409

JNJ 000280785; J&J-0037420

JNJ 000280786; J&J-0037421

JNJ 000280824; J&J-0037485

JNJ 000280826; J&J-0037489

JNJ 000280852; J&J-0037546

JNJ 000281816

JNJ 000285031; J&J 159

JNJ 000285133; J&J-0142805

JNJ 000285248

JNJ 000285249

JNJ 000285302; J&J-0144367; Leavitt Pltfs' Ex JJ-3584 pg 1; Hopkins 24

JNJ 000287009

JNJ 000287099

JNJ 000287264

JNJ 000290049; J&J-0106581

JNJ 000291602; J&J-0007992

JNJ 000291632; J&J-0008042

JNJ 000292058; J&J-0044831

JNJ 000292062; J&J-0044894

JNJ 000301719

JNJ 000304716; J&J-0038831

JNJ 000306944; J&J-0098163

JNJ 000309430; J&J-0164283

JNJ 000312709

JNJ 000314849; J&J-0023059

JNJ 000314852; J&J-0023063

JNJ 000314855; J&J-0023067

JNJ 000314858; J&J-0023071 (bates # cut off)

JNJ 000314859; J&J-0023075 (bates # cut off)

JNJ 000314862; J&J-0023080 (bates # cut off)

JNJ 000314865; J&J (bates # cut off)

JNJ 000315131; J&J (bates # cut off)

JNJ 000315134; J&J (bates # cut off)

JNJ 000315137; J&J (bates # cut off)

JNJ 000315140; J&J (bates # cut off)

JNJ 000315143

JNJ 000315146

JNJ 000315149

JNJ 000315191; J&J-0023586

JNJ 000315198;  J&J-0023600

JNJ 000315201; J&J-0023604

JNJ 000315204;  J&J-0023608

JNJ 000315207;  J&J-0023612

JNJ 000315207; J&J-0023612

JNJ 000315210; J&J-0023616

JNJ 000315213; J&J-0023620

JNJ 000315216; J&J-0023624

JNJ 000315219; J&J-0023629

JNJ 000315222; J&J-0023633

JNJ 000315225; J&J-0023637

JNJ 000315231; J&J-0023645

JNJ 000315390; J&J-0023903

JNJ 000315460; J&J-0024021

JNJ 000315517; J&J-0024158

JNJ 000315526; J&J-0024170

JNJ 000315532; J&J-0024178

JNJ 000315535; J&J-0024182

JNJ 000315538; J&J-0024186 (bates # cut off)

JNJ 000315544; J&J-0024195

JNJ 000315547; J&J-002419 (bates # cut off)

JNJ 000315550; J&J-0024203

JNJ 000315556; J&J-0024211

JNJ 000315562; J&J-0024218

JNJ 000315565; J&J-0024223 (bates # cut off)

JNJ 000315568; J&J-0024227

JNJ 00031557; J&J-0024239

JNJ 000315571; J&J-00242 (bates # cut off)

JNJ 000315574; J&J-0024236 (bates # cut off)

JNJ 000315580; J&J-0024243

JNJ 000315583; J&J  0021248

JNJ 000315586; J&J-0024263

JNJ 000315589; J&J-0024257

JNJ 000315592; J&J-0024261 (bates # cut off)

JNJ 000315595; J&J-0024265

JNJ 000315601; J&J-0024274

JNJ 000315604; J&J-0024278 (bates # cut off)

JNJ 000315610; J&J-0024286 (bates # cut off)

JNJ 000315613; J&J-0024281

JNJ 000315616; J&J-0024295

JNJ 000315619; J&J-0024299

JNJ 000315622; J&J-0024304

JNJ 000315625; J&J-0024309

JNJ 000315628;  J&J-0024 (bates # cut off)

JNJ 000315631; J&J-0024317

JNJ 000315634; J&J-0024321

JNJ 000315637; J&J-0021325

JNJ 000315640; J&J-0024328

JNJ 000315643; J&J-0024333

JNJ 000315649; J&J-0024341

JNJ 000315655; J&J-0024350

JNJ 000315658; J&J-0024 (bates # cut off)

JNJ 000315670; J&J (bates # cut off)

JNJ 000315673; J&J (bates # cut off)

JNJ 000315676; J&J (bates # cut off)

JNJ 000315676; J&J-0024337

JNJ 000315685; J&J-0024393

JNJ 000315688; J&J (bates # cut off)

JNJ 000315691; J&J (bates # cut off)

JNJ 000315694; J&J (bates # cut off)

JNJ 000315697; J&J (bates # cut off)

JNJ 000315700

JNJ 000315703; J&J (bates # cut off)

JNJ 000315708; J&J (bates # cut off)

JNJ 000315709; J&J (bates # cut off)

JNJ 000315712; J&J (bates # cut off)

JNJ 000315715; J&J (bates # cut off)

JNJ 000315718;  J&J (bates # cut off)

JNJ 000315721; J&J (bates # cut off)

JNJ 000315727; J&J (bates # cut off)

JNJ 000315733; J&J (bates # cut off)

JNJ 000315736; J&J (bates # cut off)

JNJ 000315739; J&J (bates # cut off)

JNJ 000315742; J&J (bates # cut off)

JNJ 000315745; J&J (bates # cut off)

JNJ 000315748; J&J-00240 (bates # cut off)

JNJ 000315757; J&J (bates # cut off)

JNJ 000315766; J&J-0024505

JNJ 000315841; J&J-0024609

JNJ 000315844; J&J  0024614

JNJ 000315847; J&J-0024618

JNJ 000315863; J&J-0025005 (bates # cut off)

JNJ 000315870; J&J (bates # cut off)

JNJ 000315877; J&J-002626 (bates # cut off)

JNJ 000315880;  J&J (bates # cut off)

JNJ 000315881; J&J (bates # cut off)

JNJ 000315886; J&J (bates # cut off)

JNJ 000315974; J&J (bates # cut off)

JNJ 000315994;  J&J (bates # cut off)

JNJ 000315998;  J&J (bates # cut off)

JNJ 000316000; J&J (bates # cut off)

JNJ 000316004

JNJ 000316009; J&J (bates # cut off)

JNJ 000316013; J&J (bates # cut off)

JNJ 000316017; J&J (bates # cut off)

JNJ 000316022; J&J (bates # cut off)

JNJ 000316026; J&J (bates # cut off)

JNJ 000316031; J&J (bates # cut off)

JNJ 000316037; J&J (bates # cut off)

JNJ 000316040; J&J  025111(bates # cut off)

JNJ 000316043; J&J (bates # cut off)

JNJ 000316046; J&J (bates # cut off)

JNJ 000316049; J&J (bates # cut off)

JNJ 000316052; J&J (bates # cut off)

JNJ 000316058; J&J-0025135

JNJ 000316061; J&J-0025139 (bates # cut off)

JNJ 000316070; J&J-0025151

JNJ 000316076; J&J-0025159

JNJ 000316078; J&J-0025163

JNJ 000316083; J&J-0026168

JNJ 000316085; J&J (bates # cut off)

JNJ 000316101; J&J-0025 (bates # cut off)

JNJ 000316104; J&J-0025201

JNJ 000316107; J&J-0025205

JNJ 000316111; J&J-0025214

JNJ 000317600; J&J-0061460

JNJ 000324759; J&J-0058754

JNJ 000324762; J&J-0005857

JNJ 000324795; J&J-0058790

JNJ 000326106: J&J-66

JNJ 000326107; J&J-66

JNJ 000332579

JNJ 000346335

JNJ 000346748; J&J-0004742

JNJ 000347203; J&J-0043656

JNJ 000347440; J&J-0123035

JNJ 00035508; Pltf JNJ 00035508

JNJ 000356204

JNJ 000356232

JNJ 000357359

JNJ 000364540

JNJ 000369649

JNJ 000370144

JNJ 000370144;

JNJ 000370144;  Plaintiff Exhibit 2291-1

JNJ 000370144; Hopkins 129

JNJ 00037313

JNJ 000375382

JNJ 000375389

JNJ 0003763

JNJ 000379229

JNJ 000381975

JNJ 000383282; Pltf_JNJ_00076427

JNJ 000389261

JNJ 000389261; Pltf_JNJ_00077274

JNJ 000389973; Pltf_JNJ_00077390

JNJ 000390337

JNJ 000390346

JNJ 000390347

JNJ 000405425

JNJ 00040596

JNJ 000422053

JNJ 000426237

JNJ 000426315; Pltf JNJ 00081620

JNJ 000438939

JNJ 000438940

JNJ 000438941

JNJ 000444737; Pltf JNJ_00084026

JNJ 000448866

JNJ 000456993

JNJ 000457161

JNJ 000468753

JNJ 000468783

JNJ 000468863  (bates # cut off but deduced with page count)

JNJ 000470363; Pltf_JNJ_00087036

JNJ 000470365; Pltf_JNJ_00087037

JNJ 000488207

JNJ 000488207; Leavitt Pltfs' Ex. LE-0852

JNJ 000488208

JNJ 000489313

JNJ 000490055

JNJ 000519841

JNJ 000519842

JNJ 000519843

JNJ 000521581

JNJ 000521602

JNJ 000521616

JNJ 000557904

JNJ 000558343

JNJ 000558360

JNJ 000558372

JNJ 000558382

JNJ 000558568

JNJ 000558731

JNJ 000558931

JNJ 000558970

JNJ 000559770

JNJ 000576297

JNJ 000577860; J&J-0163919

JNJ 000577861; J&J-0163920

JNJ 000577862; J&J-0163921

JNJ 000631351

JNJ 000636145

JNJ 000636145; PLT-00131

JNJ 000645424

JNJ 00064658; J&J-0164240

JNJ 000648488

JNJ 000683572; J&J-0037632

JNJ 000683573; J&J-0037633

JNJ 000683579; J&J-0037648

JNJ 000695224

JNJ 000872667

JNJ 000877145

JNJ 000877372

JNJ 000877441_0001

JNJ 000879224

JNJ 000880026

JNJ 000881713

JNJ 000881859_0001

JNJ 000881899

JNJ 000881905

JNJ 000881917

JNJ 000882142

JNJ 000883004

JNJ 000885696

JNJ 000886031

JNJ 000886826

JNJ 000886933 (bates # cut in half/illegible)

JNJ 0083118; JNJNL61 000061  (no bates # but deduced with page count)

JNJ_000245868; Pltf_JNJ_00033024

JNJ000000022

JNJ000000112

JNJ000000251

JNJ00000049

JNJ000000636

JNJ000000767

JNJ000000935

JNJ000001400

JNJ000002484

JNJ000002527

JNJ00000294872

JNJ000003911

JNJ000004015

JNJ000004349

JNJ000007936

JNJ000011704

JNJ000014476

JNJ000015565

JNJ000015573

JNJ000016326

JNJ000016393

JNJ000016566

JNJ000016645

JNJ000017587

JNJ000017613

JNJ000018189

JNJ000018407

JNJ000018894

JNJ000019157

JNJ000019158

JNJ000019228

JNJ000019415

JNJ000019709

JNJ000020298

JNJ000020656

JNJ000020728

JNJ000020759

JNJ000020907

JNJ000021004

JNJ000021008

JNJ000021285

JNJ000022597

JNJ000023191

JNJ000024397

JNJ000024418

JNJ000024462

JNJ000025132

JNJ000026092

JNJ000026764

JNJ000030027

JNJ000030036

JNJ000030476

JNJ000031001

JNJ000033761

JNJ000035173

JNJ000035707

JNJ000036519

JNJ000038327

JNJ000040596

JNJ000042593

JNJ000047005

JNJ000047066

JNJ000050364

JNJ000063925

JNJ000066259

JNJ000066264

JNJ000085114

JNJ000086531

JNJ000087989

JNJ000087991

JNJ000088278

JNJ000092224

JNJ000133095

JNJ000221062

JNJ000231207

JNJ000231422

JNJ000232574

JNJ000232996

JNJ000237115

JNJ000238358

JNJ000238365

JNJ000239315

JNJ000239387

JNJ000242147

JNJ000242147

JNJ000245216

JNJ000245488

JNJ000248160

JNJ000248584

JNJ000248615

JNJ000249213

JNJ000249322

JNJ000250399

JNJ000250666

JNJ000251888

JNJ000253027

JNJ000254361

JNJ000257836

JNJ000259267

JNJ000260697

JNJ000260833, J&J-34

JNJ000261557

JNJ000261640

JNJ000263103

JNJ000263852

JNJ000265404

JNJ000265536

JNJ000266504

JNJ000267139

JNJ000267823

JNJ000268037

JNJ000269042

JNJ000270084

JNJ000284107

JNJ000294872; Pltf JNJ 00050035

JNJ000300223

JNJ0003007294

JNJ000304364

JNJ000304421

JNJ000304716

JNJ000304864

JNJ000307413

JNJ000308280

JNJ000314657

JNJ000315799

JNJ000326795

JNJ000330448

JNJ000336835

JNJ000343580

JNJ000343611

JNJ000343612

JNJ000343613

JNJ000343614

JNJ000343946

JNJ000346836

JNJ000348778

JNJ000349424

JNJ000356521

JNJ000367482

JNJ000367483

JNJ000368327

JNJ000368353

JNJ000369269

JNJ000374512

JNJ000375389

JNJ000376770

JNJ000377123

JNJ000377125

JNJ000377405

JNJ000382894

JNJ000383006

JNJ000383057

JNJ000385468

JNJ000390340

JNJ000405087

JNJ000405610

JNJ000422578

JNJ000426237

JNJ000441710

JNJ000447755

JNJ000458312

JNJ000468813

JNJ000468930

JNJ000471544

JNJ000488208

JNJ000489313

JNJ000519460

JNJ000521602

JNJ000521616

JNJ000523964

JNJ000523967

JNJ000542058

JNJ000566815

JNJ000566816

JNJ000576624

JNJ000576831

JNJ000592573

JNJ000598569

JNJ000623908

JNJ000635886

JNJ000636886

JNJ000636887

JNJ000636921

JNJ000636932

JNJ000636949

JNJ000636972

JNJ000637555

JNJ000639691

JNJ000648485

JNJ000681690

JNJ000682019

JNJ000682120

JNJ000682134

JNJ000682228

JNJ000801383

JNJ000877320_0001

JNJ00250919; Pltf_JNJ_00034825

JNJ0069873

JNJ19L61_000021692

JNJ55 0000000088

JNJA255_000002042

JNJAZ000009378

JNJAZ000009380

JNJAZ5 000004875

JNJAZ55 000000024

JNJAZ55 000000088

JNJAZ55 000001096

JNJAZ55 000001096; Schmitz Pltfs Ex 0692

JNJAZ55 000001583

JNJAZ55 000001607

JNJAZ55 000001856

JNJAZ55 000001871

JNJAZ55 000002042

JNJAZ55 000003312

JNJAZ55 000003320

JNJAZ55 000003548

JNJAZ55 000003585

JNJAZ55 000003635

JNJAZ55 000003645

JNJAZ55 000004904

JNJAZ55 000004959

JNJAZ55 000005743

JNJAZ55 000006061

JNJAZ55 000006212

JNJAZ55 000009050

JNJAZ55 000009057

JNJAZ55 000009059

JNJAZ55 000009126

JNJAZ55 000009127

JNJAZ55 000009432

JNJAZ55 000009434

JNJAZ55 000010706

JNJAZ55 000020377

JNJAZ55_ 000001101

JNJAZ55_ 000009347

JNJAZ55_0000000049

JNJAZ55_000000027

JNJAZ55_000000049

JNJAZ55_000000081

JNJAZ55_000000087; Hopkins 63

JNJAZ55_0000002042

JNJAZ55_0000002042; Plaintiff Exhibit 2523-1

JNJAZ55_000000280

JNJAZ55_000000367

JNJAZ55_000000388

JNJAZ55_000000577

JNJAZ55_000000577; Hopkins 79

JNJAZ55_0000006228

JNJAZ55_000000797

JNJAZ55_000000797; Hopkins 78

JNJAZ55_0000008386

JNJAZ55_000000840

JNJAZ55_000000840; Hopkins 75

JNJAZ55_000000905

JNJAZ55_000000905; Hopkins 73

JNJAZ55_000001013; JNJAZ55_000000049 - JNJAZ55_000000051

JNJAZ55_000001014

JNJAZ55_000001032

JNJAZ55_000001032; Hopkins 72

JNJAZ55_000001073

JNJAZ55_000001073; Plaintiff Exhibit 2356-1

JNJAZ55_000001095

JNJAZ55_000001096

JNJAZ55_000001096

JNJAZ55_000001096 (no bates # on first page but deduced with page count)

JNJAZ55_000001096; Plaintiff Exhibit 2595-1

JNJAZ55_000001101

JNJAZ55_000001114

JNJAZ55_000001195 (P-2342 - 6 various bates #s)

JNJAZ55_000001223

JNJAZ55_000001282

JNJAZ55_000001283

JNJAZ55_000001283; J&J-00000943

JNJAZ55_000001583

JNJAZ55_000001583; Plaintiff Exhibit 2541-1

JNJAZ55_000001587

JNJAZ55_000001588

JNJAZ55_000001607

JNJAZ55_000001687

JNJAZ55_000001819

JNJAZ55_000001866

JNJAZ55_00000187

JNJAZ55_000001871

JNJAZ55_000001871; Plaintiff Exhibit 2496-1

JNJAZ55_000001885

JNJAZ55_000001885; Plaintiff Exhibit 2580-1

JNJAZ55_000001892

JNJAZ55_000001893

JNJAZ55_000001896

JNJAZ55_000002037

JNJAZ55_000002038

JNJAZ55_000002042

JNJAZ55_000002190

JNJAZ55_000002541

JNJAZ55_000002542

JNJAZ55_000002550

JNJAZ55_000002560

JNJAZ55_000002561

JNJAZ55_000002882

JNJAZ55_000003021

JNJAZ55_000003239

JNJAZ55_000003312

JNJAZ55_000003320

JNJAZ55_000003357

JNJAZ55_000003381

JNJAZ55_000003496

JNJAZ55_000003545

JNJAZ55_000003548

JNJAZ55_000003548; Plaintiff Exhibit 2439-1

JNJAZ55_000003553

JNJAZ55_000003576; Leavitt Pltfs' Ex. ITV-4096 pg1

JNJAZ55_000003585

JNJAZ55_000003635

JNJAZ55_000003635; Plaintiff Exhibit 2447-1

JNJAZ55_000003645

JNJAZ55_000003645; Hopkins 62

JNJAZ55_000003645; Plaintiff Exhibit 2446-1

JNJAZ55_000003828; Hopkins 84

JNJAZ55_000004156

JNJAZ55_000004172

JNJAZ55_000004563

JNJAZ55_000004573

JNJAZ55_000004614

JNJAZ55_000004628

JNJAZ55_000004628

JNJAZ55_000004643

JNJAZ55_000004644

JNJAZ55_000004804; Plaintiff Exhibit 2404-1

JNJAZ55_000004875

JNJAZ55_000004875; Leavitt Pltfs' Ex L-0110

JNJAZ55_000004904

JNJAZ55_000004959

JNJAZ55_0000050

JNJAZ55_000005015

JNJAZ55_000005015; Plaintiff Exhibit 2455-1

JNJAZ55_000005041

JNJAZ55_000005081

JNJAZ55_000005084

JNJAZ55_000005253

JNJAZ55_000005261

JNJAZ55_000005725

JNJAZ55_000005743

JNJAZ55_000005743; Plaintiff Exhibit 2382-1

JNJAZ55_000005839

JNJAZ55_000005914

JNJAZ55_000005914; Plaintiff Exhibit 2565-1

JNJAZ55_000005957

JNJAZ55_000005957 (108 various bates numbers)

JNJAZ55_000005957 (134 pages of assorted various bates #s)

JNJAZ55_000005957 (D-7481 - 134 pages of assorted various bates #s)

JNJAZ55_000005958

JNJAZ55_000005967

JNJAZ55_000005980

JNJAZ55_000006060

JNJAZ55_000006061

JNJAZ55_000006061; Plaintiffs Exhibit 2371-1

JNJAZ55_000006075

JNJAZ55_000006081

JNJAZ55_000006088

JNJAZ55_000006088; Plaintiff Exhibit 2375-1

JNJAZ55_0000060880

JNJAZ55_000006090

JNJAZ55_000006145

JNJAZ55_000006196

JNJAZ55_000006212

JNJAZ55_000006341

JNJAZ55_000006344

JNJAZ55_00000653

JNJAZ55_000006532

JNJAZ55_000006914

JNJAZ55_000007436

JNJAZ55_000008118; Plaintiff's Exhibit 90219.00

JNJAZ55_000008177

JNJAZ55_000008241

JNJAZ55_000008888

JNJAZ55_000008893

JNJAZ55_000009057

JNJAZ55_000009127

JNJAZ55_000009265

JNJAZ55_000009265; Plaintiff Exhibit 2617-1

JNJAZ55_000009314

JNJAZ55_000009320

JNJAZ55_000009378; Plaintiff Exhibit 2578-1

JNJAZ55_000009380

JNJAZ55_000010175

JNJAZ55_000010175; Hopkins 123

JNJAZ55_000010177

JNJAZ55_000010259

JNJAZ55_000010568

JNJAZ55_000010662

JNJAZ55_000010706

JNJAZ55_000010707

JNJAZ55_000013489

JNJAZ55_00001362

JNJAZ55_000019613; Hopkins 107

JNJAZ55_000020366

JNJAZ55_000020377

JNJAZ55_000020437

JNJAZ55_000020530

JNJAZ55_000020531

JNJAZ55_00004643

JNJAZ55_0000596

JNJAZ55_0000596

JNJAZ56_000001892

JNJAZ65 000006061

JNJAZ65_000005743

JNJH29W 000008569; J&J-0070812

JNJH29W 000008569; J&J-0070812; Hopkins 70

JNJH29W_000000025

JNJH29W_000002618

JNJH29W_000002618; Hopkins 86

JNJH29W_000003085

JNJH29W_00003081

JNJI4T5 000004096;

JNJI4T5 000004096; Plaintiff Exhibit 2261-1

JNJI4T5 000004097

JNJI4T5 000004097 (no bates # on first page but deduced with page count)

JNJI4T5_000000386

JNJI4T5_000000692

JNJI4T5_000000816

JNJI4T5_000000826

JNJI4T5_000000837

JNJI4T5_000000883

JNJI4T5_000000938

JNJI4T5_000000957

JNJI4T5_000000994

JNJI4T5_000001061

JNJI4T5_000001076

JNJI4T5_000001138

JNJI4T5_000004090

JNJI4T5_000004090; TALC KCRA-TV 3

JNJI4T5_000004097

JNJI4T5_000004099

JNJI4T5_000004251

JNJI4T5_000004293

JNJI4T5_000004302

JNJI4T5_000004336

JNJI4T5_000004345

JNJI4T5_000004354

JNJI4T5_000004386

JNJI4T5_000004396

JNJI4T5_000004406

JNJI4T5_000004485

JNJJNL61 000007330

JNJJNL61 000013301

JNJJNL61 000017453

JNJJNL61 000021202

JNJJNL61 000029410

JNJJNL61 000029410; Schmitz Pltfs Ex 0740

JNJL4T5 000004485

JNJL4T5 00000944

JNJL61_000001535; factsabouttalc.com 0144.pdf

JNJL61_0000020439

JNJL91000106449

JNJMC 000000364

JNJMC 000028491; Hopkins 130

JNJMC 000120267; Hopkins 131

JNJMX60_000009120

JNJMX66 000002659

JNJMX68  000012851

JNJMX68 000000130

JNJMX68 000000131

JNJMX68 000000132

JNJMX68 000000135

JNJMX68 000000158

JNJMX68 000000168

JNJMX68 000000177

JNJMX68 000000182

JNJMX68 000000187

JNJMX68 000000190

JNJMX68 000000210

JNJMX68 000000226

JNJMX68 000000242

JNJMX68 000000257

JNJMX68 000000261

JNJMX68 000000268

JNJMX68 000000311

JNJMX68 000000312

JNJMX68 000000313

JNJMX68 000000332

JNJMX68 000000334

JNJMX68 000000336

JNJMX68 000000343

JNJMX68 000000344

JNJMX68 000000434

JNJMX68 000002659

JNJMX68 000003579

JNJMX68 000003597

JNJMX68 000003678

JNJMX68 000003687

JNJMX68 000003699

JNJMX68 000005963

JNJMX68 000005973

JNJMX68 000008474

JNJMX68 000008782

JNJMX68 000015907

JNJMX68 000016111; D 0417 0001

JNJMX68 000018726; J&J-012421

JNJMX68 00005982

JNJMX68_0000000440

JNJMX68_000000295

JNJMX68_000000298

JNJMX68_000000430

JNJMX68_000000434

JNJMX68_000000439

JNJMX68_000000451

JNJMX68_000000454

JNJMX68_000000746

JNJMX68_000000758

JNJMX68_000000860

JNJMX68_000000871

JNJMX68_000001313

JNJMX68_000001483

JNJMX68_000001878

JNJMX68_000002 (P-5794 - bates #s cut off)

JNJMX68_000002659

JNJMX68_000002666

JNJMX68_000002666, J&J-65

JNJMX68_000002873

JNJMX68_000002913

JNJMX68_000003239

JNJMX68_000003258

JNJMX68_000003579

JNJMX68_000003587

JNJMX68_000003591

JNJMX68_000003597

JNJMX68_000003611

JNJMX68_000003613 (Ex 35 - 36 various bates numbers)

JNJMX68_000003619

JNJMX68_000003621

JNJMX68_000003622

JNJMX68_000003624

JNJMX68_000003625

JNJMX68_000003626

JNJMX68_000003627

JNJMX68_000003628

JNJMX68_000003632

JNJMX68_000003667

JNJMX68_000003687

JNJMX68_000003699

JNJMX68_000003728

JNJMX68_000003965

JNJMX68_000004242

JNJMX68_000004247

JNJMX68_000004248

JNJMX68_000004249

JNJMX68_000004296

JNJMX68_000004346

JNJMX68_000004614; Hopkins 97

JNJMX68_000004624

JNJMX68_000004646

JNJMX68_000004646; Hopkins 61

JNJMX68_000004826

JNJMX68_000004830

JNJMX68_000004865

JNJMX68_000004882

JNJMX68_000004907

JNJMX68_000004915

JNJMX68_000004921 (Ex 40 - 168 various bates)

JNJMX68_000004937

JNJMX68_000004947

JNJMX68_000004996

JNJMX68_000005032

JNJMX68_000005032; Plaintiff Exhibit 2256-1

JNJMX68_000005036  (no bates # on first page but deduced with page count)

JNJMX68_000005051

JNJMX68_000005056

JNJMX68_000005057

JNJMX68_000005964

JNJMX68_000005969

JNJMX68_000006016

JNJMX68_000006301

JNJMX68_000006446

JNJMX68_000006930

JNJMX68_000006930; Hopkins 95

JNJMX68_000006930; Leavitt Pltfs' Ex C-5909 pg 1

JNJMX68_000006930; Plaintiff Exhibit 2450-1

JNJMX68_000006935

JNJMX68_000006935; Plaintiff Exhibit 2452-1

JNJMX68_000006996

JNJMX68_000007001

JNJMX68_000007007

JNJMX68_000007031

JNJMX68_000007040

JNJMX68_000007044

JNJMX68_000007236

JNJMX68_000008189

JNJMX68_000008235

JNJMX68_000008235 (EXH 90305.00 - pages stamped out of order)

JNJMX68_000008235 (P-0176 - pages stamped out of order)

JNJMX68_000008235 (pages stamped out of order)

JNJMX68_000008725

JNJMX68_000008782

JNJMX68_000008964

JNJMX68_000008981

JNJMX68_000008981; Plaintiff Exhibit 2708-1

JNJMX68_000009097

JNJMX68_000009120

JNJMX68_000009127

JNJMX68_000009139

JNJMX68_000009139

JNJMX68_000009139; PLT-04767-00001

JNJMX68_00001 (bates # cut off); J&J-0163931

JNJMX68_00001 (bates # cut off); J&J-0163931; Pooley 6

JNJMX68_00001 (bates #s cut off); J&J-0163931

JNJMX68_00001 (cut off); J&J-0163931

JNJMX68_000010608

JNJMX68_000010608; Plaintiff Exhibit 2484-1

JNJMX68_000010692

JNJMX68_000010778

JNJMX68_000011067; J&J-0037418

JNJMX68_000011072; J&J-0037423

JNJMX68_000011078; J&J-0037431

JNJMX68_000011081; J&J-0037434

JNJMX68_000011084; J&J-0037441

JNJMX68_000011090; J&J-0037447

JNJMX68_000011093; J&J-0037450

JNJMX68_000011120; J&J-0037498

JNJMX68_000011122; J&J-0037501

JNJMX68_000011124; J&J-0037504

JNJMX68_000012745

JNJMX68_000012745 (J&J-89)

JNJMX68_000012745, J&J-89

JNJMX68_000013082

JNJMX68_000013482

JNJMX68_000015840; J&J-0023292

JNJMX68_000015843; J&J-0023308

JNJMX68_000015847; J&J-0023325

JNJMX68_000015853; J&J-0023352

JNJMX68_000015859; J&J-0023380

JNJMX68_000015862; J&J-0023392

JNJMX68_000015867; J&J-0023414

JNJMX68_000015871; J&J-0023431

JNJMX68_000015876; J&J-0023453

JNJMX68_000015884; J&J-0023492

JNJMX68_000015909; J&J-0023578

JNJMX68_000015928; J&J-0023659

JNJMX68_000015936; J&J-0023693

JNJMX68_000015951; J&J-0023764

JNJMX68_000015956; J&J-0023816

JNJMX68_000015988; J&J-0023935

JNJMX68_000015994; J&J-0023963

JNJMX68_000016000; J&J-0023999

JNJMX68_000016005; J&J-0024021

JNJMX68_000016012; J&J-0024050

JNJMX68_000016015; J&J-0024063

JNJMX68_000016319; J&J-0025384

JNJMX68_000016320; J&J-0025388

JNJMX68_000016327; J&J-0025417

JNJMX68_000016329; J&J-0025425

JNJMX68_000016332; J&J-0025438

JNJMX68_000016335; J&J-0025451

JNJMX68_000016338; J&J-0025465

JNJMX68_000016342; J&J-0025486

JNJMX68_000016349; J&J-0025515

JNJMX68_000016352; J&J-0025529

JNJMX68_000016359; J&J-0025559

JNJMX68_000016367; J&J-0025594

JNJMX68_000016372; J&J-0025616

JNJMX68_000016375; J&J-0025629

JNJMX68_000016379; J&J-0025646

JNJMX68_000020276

JNJMX68_000021315

JNJMX68_000021317

JNJMX68_000021318

JNJMX68_000021319

JNJMX68_00002662

JNJMX68_00007031

JNJMX68_00009103 (D-7485 - 54 pages of assorted various bates #s)

JNJMX68_00009103 (D-8200 - 52pages of various bates #s)

JNJMX68_00009103 (Ex 37 - 54 pages of various bates)

JNJMX68_00009499

JNJMX68_000098729

JNJMX68_000314981; J&J-0023279

JNJMX68_000315064; J&J-0023409

JNJMX88__000004646; Ex. J&J-19

JNJMZ68 000000151

JNJN61_000078806; J&J-0005504

JNJNL 000005496

JNJNL_000006792

JNJNL_61_000009898

JNJNL61 _000013575

JNJNL61 000001123

JNJNL61 000001123; Plaintiff Exhibit 2430-1

JNJNL61 000001534

JNJNL61 000001534; Plaintiff Exhibit 2357-1

JNJNL61 000001954

JNJNL61 0000022019

JNJNL61 0000029410

JNJNL61 000005032

JNJNL61 000005496

JNJNL61 000007290

JNJNL61 000008084

JNJNL61 000012330

JNJNL61 000013350

JNJNL61 000013575

JNJNL61 000013575; Plaintiff Exhibit 2586-1

JNJNL61 000014431

JNJNL61 000016344

JNJNL61 000016437

JNJNL61 000016471

JNJNL61 000018340

JNJNL61 000018722

JNJNL61 000018722; Plaintiff Exhibit 2659-1

JNJNL61 000020012

JNJNL61 000020012 (D-8201- 100 pages various bates #s)

JNJNL61 000020469

JNJNL61 000020521

JNJNL61 000021162

JNJNL61 000021203

JNJNL61 0000216

JNJNL61 000021692

JNJNL61 000021692; Plaintiff Exhibit 2653-1

JNJNL61 000021695

JNJNL61 000021796

JNJNL61 000021796; Plaintiff Exhibit 2690-1

JNJNL61 000032 (Bates # cut off)

JNJNL61 000035499

JNJNL61 000035728

JNJNL61 000043150

JNJNL61 000095941

JNJNL61 000095945

JNJNL61 00106449

JNJNL61_00000006

JNJNL61_0000001114

JNJNL61_000000126

JNJNL61_0000001341

JNJNL61_0000001369

JNJNL61_0000001369; Hopkins 76

JNJNL61_000000167

JNJNL61_000000266

JNJNL61_000000492

JNJNL61_000001 ( bates #  cut off)

JNJNL61_000001123

JNJNL61_000001139

JNJNL61_00000126

JNJNL61_000001341

JNJNL61_000001369

JNJNL61_000001480

JNJNL61_000001480; Hopkins 80

JNJNL61_000001489

JNJNL61_000001526

JNJNL61_000001534

JNJNL61_000001634

JNJNL61_000001954

JNJNL61_000002474

JNJNL61_000003621

JNJNL61_000004925

JNJNL61_000004930

JNJNL61_000005032

JNJNL61_000005032; Hopkins 108

JNJNL61_000005496

JNJNL61_000006032

JNJNL61_000006431

JNJNL61_000006431; Glasgow 53

JNJNL61_000006726

JNJNL61_000006785

JNJNL61_000007290

JNJNL61_000007330

JNJNL61_000008084, J&J-100

JNJNL61_000008111

JNJNL61_000008340

JNJNL61_000008390

JNJNL61_000008624

JNJNL61_000008633

JNJNL61_000008742

JNJNL61_000008749

JNJNL61_0000093558

JNJNL61_000009483

JNJNL61_000009766

JNJNL61_000009897

JNJNL61_000009898

JNJNL61_0000100282

JNJNL61_000011789

JNJNL61_000012050

JNJNL61_000012099

JNJNL61_000012110

JNJNL61_000013350

JNJNL61_000013350; Hopkins 135

JNJNL61_000013575

JNJNL61_000013746; JNJNL61_000014013-JNJNL61_000014014

JNJNL61_000013947

JNJNL61_000014431

JNJNL61_000014437; PLT-07580-0007

JNJNL61_000015083

JNJNL61_000016002

JNJNL61_000016276

JNJNL61_000016358

JNJNL61_000016437

JNJNL61_000016437, Plaintiff's Exhibit 2514

JNJNL61_000016437; Plaintiff Exhibit 2614-1

JNJNL61_000016536

JNJNL61_000016536 and JNJAZ55_000006145

JNJNL61_000016911

JNJNL61_000016916

JNJNL61_000016922

JNJNL61_000016930

JNJNL61_000016948

JNJNL61_000016953

JNJNL61_000016958

JNJNL61_000018213

JNJNL61_000018722

JNJNL61_000019271; Pooley 12

JNJNL61_000019288

JNJNL61_000019573

JNJNL61_000020012

JNJNL61_000020012 (D-7484 - 90 pages of assorted various bates #s)

JNJNL61_000020392

JNJNL61_000020414

JNJNL61_000020469

JNJNL61_000020521

JNJNL61_000020522

JNJNL61_000020530

JNJNL61_000020544

JNJNL61_000021162

JNJNL61_000021162; DX7144

JNJNL61_000021203; Hopkins 122

JNJNL61_000021235

JNJNL61_000021368; Hopkins 121

JNJNL61_000021543

JNJNL61_000021623

JNJNL61_000021692

JNJNL61_000021695

JNJNL61_000021695; DX7119.0001

JNJNL61_000021695; Hopkins 91

JNJNL61_000021796

JNJNL61_000021978

JNJNL61_000022019

JNJNL61_000024417

JNJNL61_000024417; Hopkins 125

JNJNL61_000029172

JNJNL61_000029184

JNJNL61_000029184  (Ex 45 - 313 various bates)

JNJNL61_000029184 (11 assorted various bates #s)

JNJNL61_000029209

JNJNL61_000029254

JNJNL61_000029257

JNJNL61_000029410

JNJNL61_000029411

JNJNL61_000029422;Schmitz Pltfs EX 0740

JNJNL61_000030041

JNJNL61_000030069

JNJNL61_000030078

JNJNL61_000030078; Hopkins 136

JNJNL61_000032375

JNJNL61_000032876

JNJNL61_000032876 (D-7483 - 168 pages of assorted various bates #s)

JNJNL61_000032876 (Ex 20 - 136 pages of various bates #s)

JNJNL61_000032876 is 1st pg (Ex 38 - 168 pages  various bates)

JNJNL61_000034842

JNJNL61_000035499

JNJNL61_000035499; Hopkins 89

JNJNL61_000035499; Pooley 18

JNJNL61_000035728

JNJNL61_000036350

JNJNL61_000036527

JNJNL61_000037724; J&J-0037483

JNJNL61_000039831; J&J-0141621

JNJNL61_000039855; J&J-0141660

JNJNL61_000040531; J&J-0144475

JNJNL61_000043150

JNJNL61_000045174

JNJNL61_000052427

JNJNL61_000054212

JNJNL61_000064366, J&J-92

JNJNL61_000067348

JNJNL61_000079335; J&J-97

JNJNL61_000088731

JNJNL61_000103055

JNJNL61_000103086

JNJNL61_00010421

JNJNL61_000106449

JNJNL61_000107929

JNJNL61_000109139

JNJNL61_000112188

JNJNL61_000112189

JNJNL61_000112217

JNJNL61_000118282; Hopkins 113

JNJNL61_000119155

JNJNL61_00012048

JNJNL61_00012098

JNJNL61_00012109

JNJNL61_00019288

JNJNL67_000006496

JNJNMX68_000003591

JNJS71R_000000780

JNJTACL0000160672 (bates # nearly illegible)

JNJTACL0000165993  (bates # nearly illegible)

JNJTAL000912770

JNJTALC0000062062

JNJTALC000008859

JNJTALC000018919

JNJTALC0000580245

JNJTALC000061199

JNJTALC000061900; Hopkins 99

JNJTALC0000627

JNJTALC000062785

JNJTALC000062894

JNJTALC000064952

JNJTALC000067661

JNJTALC000067661 (PLT-00001 - no bates # on face of document)

JNJTALC000070307

JNJTALC000071246; J&J-0037484

JNJTALC000071258; J&J-0037515

JNJTALC000071261; J&J-0037518

JNJTALC0000751

JNJTALC000089631; Plaintiff Exhibit 2354-1

JNJTALC000090135

JNJTALC000090275

JNJTALC000091181

JNJTALC000091746

JNJTALC000093003

JNJTALC000120730

JNJTALC000129140

JNJTALC000129216

JNJTALC000165870

JNJTALC000169805

JNJTALC000173802

JNJTALC000173803

JNJTALC000178819

JNJTALC000186146

JNJTALC000186566

JNJTALC000196139

JNJTALC000196176

JNJTALC000196252

JNJTALC000196576

JNJTalc000215579

JNJTALC000217062

JNJTALC000217067

JNJTALC000217111

JNJTALC000217126

JNJTALC000217155

JNJTALC000217164

JNJTALC000217169

JNJTALC000217211

JNJTALC000217256

JNJTALC000217264

JNJTALC000217276

JNJTALC000217284

JNJTALC000218768

JNJTALC000218978

JNJTALC000237200

JNJTALC000250188

JNJTALC000250188; PLT-090808-0001

JNJTALC000250189

JNJTALC000276223

JNJTALC000276224

JNJTALC000283403

JNJTALC000289190

JNJTALC000289268

JNJTALC000291475

JNJTALC000292656

JNJTALC000292917

JNJTALC000294278

JNJTALC000327308

JNJTALC000341336; PLT-09558-0001

JNJTALC000341338

JNJTALC000352537

JNJTALC000355057 (partially illegible - P-30)

JNJTALC000355541

JNJTALC000359711

JNJTALC000359850

JNJTALC000376583

JNJTALC000387085

JNJTALC000387116

JNJTALC000387140

JNJTALC000387143

JNJTALC000387182

JNJTALC000387211

JNJTALC000387236

JNJTALC000387254

JNJTALC000387334

JNJTALC000387515

JNJTALC0003876 (PX2724 - bates # cut off)

JNJTALC000387656

JNJTALC000387660

JNJTALC000387698

JNJTALC000397344

JNJTALC000398656

JNJTALC000413069

JNJTALC000413104

JNJTALC000437220

JNJTALC000452609; Leavitt Pltfs' Ex JJ-3587; Hopkins 27

JNJTALC000461499

JNJTALC000494340

JNJTALC000533553

JNJTALC000587252

JNJTALC000587252; DX-8111

JNJTALC000634631; Leavitt Pltfs Ex D-1886

JNJTALC000733349

JNJTALC000777136

JNJTALC000777137

JNJTALC000852994

JNJTALC000866104

JNJTALC000866105

JNJTALC000866115

JNJTALC000866116

JNJTALC000866117

JNJTALC000866125

JNJTALC000873044

JNJTALC000884800

JNJTALC000906383

JNJTALC001042772

JNJTALC001281991

JNJTALC001284148

JNJTALC001288729

JNJTALC001295879

JNJTALC001298411

JNJTALC001427814

JNJTALC001446337

JNJTALC001465273

JNJTALCC000354984

JNJZ55 000001282; Plaintiff Exhibit 2245-1

JNJZ55 000004628; Plaintiff Exhibit 2593-1

JNJZ55 000015437

John Hopkins Trial Testimony Vol. 1 of 2 (8.14.19)

John Hopkins Trial Testimony Vol. 2 of 2 (8.14.19)

Johnson & Johnson Responds To The December 10, 2019 Hearing of The Subcommittee On Economic And Consumer Policy, Committee On Oversight and Reform, U.S. House of Representatives . https://www.factsabouttalc.com/_document/johnson-johnson-responds-to-the-december-10-2019-hearing-of-the-subcommittee-on-economic-and-consumer-policy-committee-on-oversight-and-reform-u-s-house-of-representatives?id=0000016f-0f3c-ddfd-abef-cf7fe1fd0000

Johnson's* Baby Powder Claim Support Project No. 0519.00 (bates # cut in half/illegible)

JOJO-MA2546-00138

JOJO-MA2546-01282

JOJO-MA2546-01283

JOJO-MA2546-01484

Julie Pier (Imerys Corp. Rep.) 9/13/18 Deposition Exhibit 47

JUNJTALC00634637

Kasper, C. S., et al. Possible Morbidity in Women from Talc on Condoms. JAMA 273, No. 11 (March 15, 1995): 846–47.

Keal, E E. Asbestosis and Abdominal Neoplasms. The Lancet (December 3, 1960): 1211-16.

Kurta, M. et al. Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a US-Based Case-Control Study. Cancer Epidemiol Biomarkers Prev. No. 21(8) (August 2012): 1282–92.

Kwa, M., et al. Adverse Events Reported to the US Food and Drug Administration for Cosmetics and Personal Care Products. JAMA Int Med. No. 177(8) (2017): 1202-1204.

L-1285 - Wehner, Inhalation of Talc Baby Powder By Hamsters

Langseth, H., et al. Perineal Use of Talc and Risk of Ovarian Cancer. J. Epidemiol. Comm. Health 62, No. 4 (April 2008): 358–60.

Leavitt Pltfs' Ex JJ-2509 ; J&J-0123238; JNJNL61_000079334

Levadie, B., Definitions for Asbestos and Other Health-Related Silicates (1984)

Lewin to WCD

Lewin to WCD 9.14.1972

Lockey, J. E. Nonasbestos Fibrous Minerals. Clinics in Chest Medicine 2, No. 2 (May 1981): 203–18.

LoGiudiceWCD0139

LoGiudiceWCD0187

LoGiudiceWCD0309

LoGiudiceWCD0523

LTL 0018034

LTL 0018241

LUZ000566

LUZ001443

LUZ022207

MDL_KELLY00011280

Merritt, M. A., et al. Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer. Int.J Cancer 122, No. 1 (2008): 170–76.

Millette, J. "Procedure for the Analysis of Talc for Asbestos." THE MICROSCOPE, Vol. 63:1, pp 11-20 (2015)


Millette, James R., (2015). Procedure for the Analysis of Talc for Asbestos. The Microscope, Vol. 63(1).

Mills, P. K., et al. Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California. Int.J Cancer 112, No. 3 (November 10, 2004): 458–64.

Modernization of Cosmetic Regulation Act of 2022 (MoCRA)

Moorman, P. et al. Ovarian Cancer Risk Factors in African-American and White Women. Am J Epidemiol 170, No. 5 (September 1, 2009): 598–606.

Muscat, Joshua E., and Michael S. Huncharek. Perineal Talc Use and Ovarian Cancer: A Critical Review: Eur.J Cancer Prev. 17, No. 2 (April 2008): 139–46.

National Toxicology Program. Asbestos. In: Report on Carcinogens. Fourteenth Edition. U.S. Department of Health and Human Services, Public Health Service, National Toxicology Program, 2016.

NCI, A Snapshot of Ovarian Cancer - National Cancer Institute (2016), http://www.cancer.gov/research/progress/snapshots/ovarian

NCI, SEER Cancer Statistics Review, 1975-2005.

Ness, R. (2016, June 3). Commentary: A PL's Witness in the Baby Powder Case. Houston Chronicle.

Ness, R. B., and C. Cottreau. Possible Role of Ovarian Epithelial Inflammation in Ovarian Cancer. J Natl.Cancer Inst. 91, No. 17 (September 1999): 1459–67.

Ness, R. B., et al. Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer. Epidemiology 11, No. 2 (March 2000): 111–17.

Ness, R. Does Talc Exposure Cause Ovarian Cancer? International Journal of Gynecological Cancer 25, Supplement 1 (May 2015): 51.

Newhouse, M. L., et al. A Study of the Mortality of Female Asbestos Workers. Brit. J. Industr. Med. 29, (1972): 134-41.

NIOSH Current Intelligence Bulletin. Revised Edition. Asbestos Fibers and Other Elongated Mineral Particles: State of the Science and Roadmap for Research, January 2009.

Nowak, et al. Asbestos Exposure and Ovarian Cancer – a Gynaecological Occupational Disease. Background, Mandatory Notification, Practical Approach. Published online 2021 May 20. doi: 10. 1055/a-1361-1715

NTP Toxicology and Carcinogenesis Studies of Talc. (CAS No. 14807-96-6) In F344/N Rats and B6C3F Mice (Inhalation Studies).

Nurse's Health Study (Gertig 2000 and Gates 2010)

O'Brien (2020)

Oules v. J&J Order Stipulated Protective Order Dated 10.26.15

Ovarian Cancers - Evolving Paradigms in Research and Care. The National Academies Press. (2016)

P-0662 - Business Plan

P-0710_Redacted - JJCI Response to FDA Request for Information of Talc

P-0771 - Johnson's Baby Powder 2010 Promotional Radio Program Recap

P-1

P-10_Redacted

P-101

P-11

P-115

P-12_Redacted

P-1206

P-131 - Correspondence from Wallace Steinberg

P-134

P-137

P-18

P-19

P-20

P-21

P-22

P-223

P-225

P-23

P-239

P-24

P-242

P-25

P-26_Redacted

P-27_Redacted

P-29

P-30

P308

P309

P-31

P310

P-317

P319

P-32_Redacted

P-321

P322

P-324

P-33_Redacted

P334 JNJ000003969

P-34_Redacted

P-340

P-341

P-342

P-344

P347

P-348

P-35

P-37

P-372

P374

P-374

P-38

P-414

P-414 - PowerPoint - Johnson's Baby Powder

P-418

P-432

P-455

P-458

P-47

P-508

P-519

P-55

P-557

P-558

P-59

P-659

P-709

P-80

P-81

P-820

P-83- no bates # on first page

P-84

P-85- no bates #s

P-9

Paoletti, L., et al. Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs. Regul.Toxicol.Pharmacol. 4, No. 3 (1984)

PCPC Comments on Citizens Petition

PCPC_MDL00000998

PCPC_MDL00001327

PCPC_MDL00004583

PCPC_MDL00006123

PCPC_MDL00006126

PCPC_MDL00007392

PCPC_MDL00007745

PCPC_MDL00015232

PCPC_MDL00020769

PCPC_MDL00021038

PCPC_MDL00026122

PCPC_MDL00026217

PCPC_MDL00026482

PCPC_MDL00028619

PCPC_MDL00029211

PCPC_MDL00030416

PCPC_MDL00030744

PCPC_MDL00031696

PCPC_MDL00032180

PCPC_MDL00032183

PCPC_MDL00034800

PCPC_MDL00044971

PCPC_MDL00090607

PCPC_MDL00110545

PCPC_MDL00122041

PCPC_MDL00122043

PCPC_MDL00122051

PCPC_MDL00122054

PCPC_MDL00122056

PCPC_MDL00140807

PCPC_MDL00140808

PCPC_MDL00140810

PCPC_MDL00141265

PCPC_MDL00141416

PCPC_MDL00141907

PCPC_MDL00144926

PCPC0005505

PCPC0005508

PCPC0058503

PCPC0058604

PCPC0059224

PCPC0059477

PCPC0061009

PCPC0061912

PCPC0066561

PCPC0075385

PCPC0075387

PCPC0075827

PCPC0078446

PCPC0079602

PCPC0080521

PCPC0080710

PCPC0081179

Penninkilampi, R., et al. Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis. Epidemiology 29, No. 1 (January 2018): 41–49.

Pier, Julie, "Fiber Management Overview," September 13, 2011

Plaintiffs Ex Talc 1344; JNJAZ55_000001032

Plaintiffs Ex Talc 1458; JNJAZ55_000001892

Plaintiffs Ex Talc 1462; JNJMX68_000003239

Plaintiffs Ex Talc 1524; JNJMX68_000002666

Plaintiffs Ex Talc 1649; J&J-0086339; JNJMX68_000018545

Plaintiffs Ex Talc 1827; JNJMX68_000002659

Plaintiff's Exhibit 2279; J&J-0093588; JNJAZ55_000011185

Plaintiff's Exhibit 2301; JNJAZ55_000006088

Plaintiffs' Exhibit IC-309; J&J-0109238; JNJ 000684154

Plaintiff's Exhibit J&J 114; JNJAZ55_000000905

Plaintiff's Exhibit J&J 115; JNJNL61_0000001341

Plaintiff's Exhibit J&J 116; JNJNL61_0000001114

Plaintiff's Exhibit J&J 118; JNJNL61_0000001369

Plaintiff's Exhibit J&J 122; JNJAZ55_000001014

Plaintiff's Exhibit J&J 124; J&J-0076514; JNJAZ55_000012423

Plaintiff's Exhibit J&J 132; JNJAZ55_00001104

Plaintiff's Exhibit J&J 51; JNJAZ55_000004643

Plaintiff's Exhibit J&J 73; J&J-0146266; JNJMX68_000013482

Plaintiff's Exhibit Talc 1419; JNJAZ55_000005980

Plaintiff's Exhibit Talc 1493; JNJAZ55_000004573

Plaintiff's Exhibit Talc 1557; JNJMX68_000009139

Plaintiff's Exhibit Talc 1557; JNJMX68_000009140

Plaintiff's Exhibit Talc 1610; JNJAZ55_000004644

Plaintiff's Exhibit Talc 1626; JNJNL61_000020392

Plaintiff's Exhibit Talc 1637;  JNJNL61_000020544

Plaintiff's Exhibit Talc 1647; JNJNL61 000020521

Plaintiff's Exhibit Talc 1657; J&J 258; JNJAZ55_000009127

Plaintiff's Exhibit Talc 1706; J&J-0034630; JNJMX68_000013019

Plaintiff's Exhibit Talc 1734; JNJNL61_000103086

Plaintiff's Exhibit Talc 1741; JNJNL61_000005496

Plaintiff's Exhibit Talc 1830;JNJI4T5_000004097

Plaintiff's Exhibit WCD-26

Plaintiffs First Amended Master Long Form Complaint and Jury Demand for MDL 3:16-md-2738-FLW-LHG, Dkt. 132 filed March 16, 2017

PL's First Amended Master Long Form Complaint in Talc MDL

PLT-019

PLT-04451

PLT-04451-0001

PLT-09391-0001; JNJ 000232985; Pltf_JNJ_00029136

PLT-09808

Pltf_IMERYS_00044439

Pltf_JNJ_00000609(JNJ000021035)

Pltf_JNJ_00001141(JNJ000011704-11708)

Pltf_JNJ_00003102(JNJ000024495-24500)

Pltf_JNJ_00003373(JNJ000020397)

Pltf_JNJ_00014267; JNJ 000087710

Pltf_JNJ_00031488(JNJ000240311)

Pltf_JNJ_00031883

Pltf_LUZ_00000093(LUZ000566-567)

Pltf_LUZ_00000419(LUZ003204)

Pltf_LUZ_00000647(LUZ005090-5091)

Pltf_LUZ_00000899(LUZ006056)

Pltf_LUZ_00005093(LUZ011963)

Pltf_LUZ_00008807(LUZ022207-22208)

Pltf_MedLit_00000057

Pltf_MedLit_00000212

Pltf_MedLit_00000451

Pltf_MedLit_00000504

Pltf_PCPC_0002036(PCPC0077761-7926)

Pooley 37; JNJAZ55_000010715

PreLim RPT_A1910246  Letter BVNA JJ  Lot #22318RB 10-27-19.pdf

Products _ Hair-Smoothing Products That Release Formaldehyde When Heated

Profit Opportunity - Adult market JNJ BP

Protective Order in Hogans, et al. v. J&J, Exhibit A

PubMed search results for "talc and ovarian cancer" and "body powders and ovarian cancer" from 01/01/2014-11/09/2023, including four excluded studies: Leemans, et al.; Frost et al., Rasmussen, et al.; Mundt, et al.

Purdie, D., et al. Reproductive and Other Factors and Risk of Epithelial Ovarian Cancer: An Australian Case-Control Study. Int.J Cancer 62, No. 6 (September 15, 1995): 678–84.

PX58

PX9718

Recommendations from the IWGACP: Data Reporting and Analysis (Subgroup 3) and Recap of Overall Preliminary Recommendations. Steven Wolfgang, FDA Office of Cosmetics and Colors. https://www.fda.gov/cosmetics/cosmetics-news-events/public-meeting-testing-methods-asbestos-talc-and-cosmetic-products-containing-talc-02042020

Reid et al. Cancer Epidemiol Biomarkers Prev.; 21(7) July 2011

Reid, A., et al. Does Exposure to Asbestos Cause Ovarian Cancer? A Systematic Literature Review and Meta-Analysis. Cancer Epidemiol Biomarkers Prev. 20, No. 7 (2011): 1287–95.

Response of RJ Lee Group to the United States Environmental Protection Agency Region IX Response (dated April 20, 2006) to the November 2005 National Stone, Sand & Gravel Association Report Prepared by the R. J. Lee Group, Inc [sic],  Evaluation of EPA's Analytical Data from the El Dorado Hills Asbestos Evaluation Project. Exhibit A. Dated July, 2006

Response to Public Citizen request 1.11.1979 Redacted

Responses to Russell on Particles in Talc

Rinkunas, S. (April 4, 2016). How Vagina Shame Led to These Incredibly Sad Cancer Lawsuits. Nethers.

Rio Tinto Minerals HSE&EA Science Advisory Meeting . Center for Regulatory Effectiveness. September 17-19, 2007

Ristesund v. J&J Closing Powerpoint

Ristesund v. J&J Trial Transcript Volume 16 (Closing)

Ristesund v. J&J Trial Transcript Volume 6A (Colditz)

Ristesund v. J&J Trial Transcript Volume 6B (Colditz)

Ristesund v. J&J Trial Transcript Volume 7A (Godleski)

Ristesund v. J&J Trial Transcript Volume 7B (Godleski)

Ristesund v. J&J Trial Transcript Volume 8A (Cramer)

Ristesund v. J&J Trial Transcript Volume 8B (Cramer)

Ristesund v. J&J Trial Transcript Volume 9A (Cramer)

Ristesund v. J&J Trial Transcript Volume 9B (Cramer)

Rodney V. Metcalf, PhD, Department of Geoscience, University of Nevada-Las Vegas, 10 December 2019, Testimony before Subcommittee on Economic and Consumer Policy Hearing Examining Asbestos in Talc

Rohl, A.N., et al. Consumer Talcums and Powders: Mineral and Chemical Characerization. J Toxicol Environ Health No. 2, (1976): 255-284.

Rohl, Arthur N., et al. Identification and Quantitation of Asbestos in Talc. Environ Health Perspect No. 9, (December 1974): 95-109.

Rosenblatt, K. A., et al. Mineral Fiber Exposure and the Development of Ovarian Cancer. Gynecol Oncol. 45, No. 1 (April 1992): 20–25.

Rosenblatt, K. et al. Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer. Cancer Causes & Control: CCC 22, No. 5 (May 2011): 737–42.

Rothman, K. J., et al. 2008. Modern Epidemiology, 3rd Edition. Wolters Kluwer - Lippincott Williams & Wilkins: Philadelphia, Chapter 2.

Schildkraut, J. M., et al. Association Between Body Powder Use and Ovarian Cancer: The African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev. 25, No. 10 (2016): 1411–17.

Screening Assessment Talc ($Mg_3H_2(SiO_3)_4$), Chemical Abstracts Service Registry Number 14807-96-6, environment and Climate Change, Health Canada, April 2021.

Simpson v. J&J Filed Complaint Dated 03.14.16

Skammeritz, E. et al. "Asbestos Exposure and Survival in Malignant Mesothelioma: A Description of 122 Consecutive Cases at an Occupational Clinic." The International Journal of Occupational and Environmental Medicine (IJOEM), Vol 2, No 4 October 2011.

Speaker Presentation: Interagency Working Group on Asbestos in Consumer Products (IWGACP) Overview by Deborah C. Smegal, M.P.H. from FDA (February 4, 2020)

Speaker Presentation: Mineral Fibers in the Lung - Exposure and Toxicity by Christopher P. Weis, Ph.D., D.A.B.T. from the National Institute of Environmental Health Sciences (February 4, 2020)

Speaker Presentation: Mineral Fibers of Potential Concern in Talc - Geology and Mineralogy by Bradley S. Van Gosen from the United States Geological Survey (February 4, 2020)

Steve Gettings - Vice-President Global Product Safety & Regulatory Affairs

Steven M. Musser, Ph.D., letter to Samuel S. Epstein, April 1, 2014.

Taher meta-analysis (2019)

Talc 2338; J&J-0073785; JNJTALC000102214

Terminology and Definitions of Mineral Fibers of Concern in Talc. Paul C. Howard, US FDA. https://www.fda.gov/cosmetics/cosmetics-news-events/public-meeting-testing-methods-asbestos-talc-and-cosmetic-products-containing-talc-02042020

Terry, K. L., et al. Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls. Cancer Prev Res. 6, No. 8 (August 2013): 811–21.

Testimony of Lorena Telofski - 10.15.21

The Analysis of Johnson & Johnson's Historical Product Containers and Imerys' Historical Railroad Car Samples from the 1960's to the Early 2000's for Amphibole Asbestos, 2nd Supplemental Report of William E. Longo, Ph.D. and Mark W. Rigler, Ph.D., February 1, 2019.

The Birth of Our Baby Products Kilmer House

The British Pharmacopoeia Commission Webpage. 2014-2015. https://www.pharmacopoeia.com/the-bp-Commission

The European Pharmacopoeia Commission Webpage. https://www.edqm.eu/en/european-pharmacopoeia-commission

The Sister Study (Gonzalez 2016)

TLH9100472 Analytical Report 102819.pdf

TLH9100472 TEM Incidence Report 102819.pdf

TLH910472 6 Sample Report 102919.pdf

TLH910477 Analytical Report 102819.pdf

TLH910477 Analytical Report 110519.pdf

Trabert, B., et al. Aspirin, NSAID, and Acetaminophen Use and Risk of Invasive Epithelial Ovarian Cancer: A Pooled Analysis in the Ovarian Cancer Association Consortium. JNCI No. 106(2) (2014).

Trabert, B., et al. Pre-Diagnostic Serum Levels of Inflammation Markers and Risk of Ovarian Cancer in the Prostate, Lung, Colorectal and Ovarian Cancer (PLCO) Screening Trial. Gynecol Oncol. 135, No. 2 (2014): 297–304.

Transcript of the FDA's Public Meeting, available at https://www.fda.gov/media/136305/download?attachment

Trial Testimony of Dr. John Hopkins in Barden v. Brenntag North America, et. al, MID-L-0932-17AS, July 22, 2019

Trial Testimony of Dr. John Hopkins in Ingham, et. al v. Johnson & Johnson, et. al, Cause No. 1522-CC10417-01, April 16, 2019

Trial testimony of John Hopkins, M.D., Barden v. Brenntag North American, et al. (7/22/19)

Trial testimony of John Hopkins, M.D., Weirick v. Brenntag North American, et al. (4/11/18)

Trial testimony of Susan Nicholson, M.D. , Prudencio v. Johnson & Johnson et al. (6/18/21)

Tzonou, A., et al. Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer. Inter J Cancer. No. 3 (1993): 408-10.

U.S. Environmental Protection Agency. Health Effects Assessment for Asbestos. September 1984. EPA/540/1-86/049 (NTIS PB86134608). Retrieved April 18, 2017.

U.S. Food and Drug Administration Public Meeting: Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc. 02/04/2020

USP-NF Publication & Comment Schedule Webpage. 2018. https://www.uspnf.com/publication-comment-schedule

Van Tibolli Beauty Corp 9.2.15

Venter, P. F., et al. Migration of a Particulate Radioactive Tracer from the Vagina to the Peritoneal Cavity and Ovaries. South African Medical Journal 55, No. 23 (June 2, 1979): 917–19.

WCD – Krempecki (NJ) - 00005

WCD000001

WCD000016

WCD000039

WCD000067

Webb, Laura, "Comments on Testing Methods for Asbestos in Talc and Cosmetic Products Containing Talc, FDA-2020-N-0025."

What is the BP Webpage. https://www.pharmacopoeia.com/what-is-the-bp

White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc and articles cited within (December 2021).

White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc,  Interagency Working Group on Asbestos in Consumer Products (IWGACP). December 2021.

Whittemore, A. S., et al. Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer. Am.J Epidemiol. 128, No. 6 (1988): 1228-40.

WHO Air Quality Guidelines 2nd edition http://www.euro.who.int/document/aiq/6_2_asbestos.pdf

Whysner John and Mohan, Melissa.  Am J Obstet Gynecol 182(3).

Whysner, John, and Melissa Mohan. Perineal Application of Talc and Cornstarch Powders: Evaluation of Ovarian Cancer Risk. Am.J Obstet.Gynecol. 182, No. 3 (March 2000): 720–24.

Wignall, B.K., and A.J. Fox. Mortality of Female Gas Mask Assemblers" Br J Ind Med. 39, No. 1 (February 1, 1982): 34–38.

WIND-04055-0001

WIND-MA10764-0001

Women's Health Initiative (Houghton 2014)

Wong, C., et al. Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: A Case- Control Study. Obstet and Gynecol 93, No. 3 (March 1999): 372–76.

Woolen meta-analysis (2022)

WORKPLACE EXPOSURE TO ASBESTOS Review and Recommendations," DHHS (NIOSH) Publication No. 81-103, November 1980

WTALC000002762

WTALC00002674

WTALC00002695

WTALC00002712

WTALC00002745

WTALC000028 (PX2723 - bates # cut off)

WTALC00002845

WTALC00002851

WTALC00002901

WTALC00004586

WTALC00007366

WTALC00008339

WTALC00008340

WTALC00010137

WTALC00010137; Hopkins 118

WTALC00010327

WTALC00010373

WTALC00010373; Hopkins 117

Wu, A. H., et al. African Americans and Hispanics Remain at Lower Risk of Ovarian Cancer Than Non-Hispanic Whites after Considering Nongenetic Risk Factors and Oophorectomy Rates. Cancer Epidemiol Biomarkers Prev; 24(7) (2015): 1094–100.

Wu, A. H., et al. Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County. Int J Cancer 124, No. 6 (March 15, 2009): 1409–15.