# Exhibit AL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW JERSEY

3    IN RE:                    :   MDL NO.:

     JOHNSON & JOHNSON TALCUM  :   16-2738 (MAS)(RLS)

4    POWDER PRODUCTS           :

     MARKETING, SALES          :

5    PRACTICES, AND PRODUCTS   :

     LIABILITY LITIGATION      :

6

7                        - - -

8               Wednesday, July 10, 2024

9                        - - -

10             Remote videotaped deposition of PAUL

11   HESS, via Zoom video conference, conducted at

12   the location of the witness in Atlanta,

13   Georgia, taken on the above date, beginning at

14   approximately 9:06 a.m., before Jessica M.

15   Gericke, RPR, CCR-NJ, and Notary Public in and

16   for Delaware, New Jersey, and Pennsylvania.

17

18

19

20

21

22

23

24

25

Page 2

1 APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2 BOVIS, KYLE, BURCH & MEDLIN, LLC
  BY:  ERIC LUDWIG, ESQUIRE
3 200 Ashford Center North
  Suite 500
4 Atlanta, GA  30338-2668
  678-338-3925
5 eludwig@boviskyle.com
  (Present with Witness)
6
  Counsel for Deponent and Materials
7 Analytical Services
8
  BEASLEY, ALLEN, CROW, METHVIN,
9 PORTIS & MILES, P.C.
  BY:  P. LEIGH O'DELL, ESQUIRE
10 218 Commerce Street
  Montgomery, AL 36104
11 334-269-2343
  leigh.odell@beasleyallen.com
12 (Present with Witness)
13 Counsel for Plaintiff Steering Committee
14
  COHEN, PLACITELLA & ROTH
15 BY:  CHRISTOPHER M. PLACITELLA, ESQUIRE
       DREW M. RENZI, ESQUIRE
16 127 Maple Avenue
  Red Bank, NJ  07701
17 732-747-9003
  cplacitella@cprlaw.com
18
  Counsel for Plaintiff Steering Committee
19
20
21
22
23
24
25

Page 3

1 APPEARANCES (continued):
2 ASHCRAFT & GEREL, LLP
  BY:  MICHELLE A. PARFITT, ESQUIRE
3 1824 K Street NW
  Washington, DC  20006
4 202-669-0032
  mparfitt@ashercraftlaw.com
5
  Counsel for Plaintiff Steering Committee
6
7 REILLY, McDEVITT & HENRICH, P.C.
  BY:  BRANDY L. HARRIS, ESQUIRE
8 3 Executive Campus
  Suite 310
9 Cherry Hill, NJ  08002
  856-317-7180
10 bharrs@rmh-law.com
11 Counsel for Personal Care Products Council
12
  KING SPALDING, LLP
13 BY:  MORTON D. DUBIN, II, ESQUIRE
       KEVIN HYNES, ESQUIRE
       JAKE KEESTER, ESQUIRE
14 1185 Avenue of the Americas
15 34th Floor
  New York, NY  10036
16 212-790-5343
  mdubin@kslaw.com
17
18
19 FAEGRE DRINKER BIDDLE & REATH LLP
  BY:  SUSAN M. SHARKO, ESQUIRE
20 600 Campus Drive
  Florham Park, NJ  07932
21 973-549-7000
  susan.sharko@faegredrinker.com
22
  Counsel for Defendant Johnson & Johnson
23
24       - - -
25

Page 4

1 APPEARANCES (continued):
2 ALSO PRESENT:
3     SPECIAL MASTER JOEL SCHNEIDER
4     CAROLIN De La ROSA, VIDEOGRAPHER
5     SHU-CHUN SU, PH.D.
6       - - -
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1               I N D E X
2 WITNESS NAME                 PAGE
3 Paul Hess
4     By Mr. Dubin             6
5
6       - - -
7
8            E X H I B I T S
9 NO.      DESCRIPTION          PAGE
10 1    Resume of Paul M. Hess      8
11 2    MAS Report, dated          20
     February 24, 2020
12
   3    MAS Report, dated February   22
13   1, 2019
14 4    Hess Slide 2             46
15 5    MAS Report, dated September  58
     16, 2020
16
   6    MAS report, dated February   64
17   24, 2020
18 7    Declaration of William       69
     Longo, Ph.D.
19
   8    Hess Slide 20            70
20
   9    Hess Slide 22            74
21
   10   Hess Slide 24            76
22
   11   Hess Slide 25            81
23
   12   J3 Resources Inc. Report,   83
24   dated July 13, 2018
25

Page 6

1  INDEX (continued):
2  13      MAS Report, dated April 13,    87
          2021
3
    14      MAS Report, dated February    91
4          28, 20
5  15      Hess Slide 34          105
6  16      Su Tables            108
7  17      Hess Slide 43          110
8  18      Hess Slide            127
9  19      Hess Slide            134
10 20      Image, CX-00056        137
11 21      CX-00012            143
12 22      Hess Slide 48          143
13 23      Image, CX-00062        147
14 24      Image, CX-00019        164
15 25      Image, CX-00029        169
16 26      William E. Longo, Ph.D.,    176
          Deposition Transcript,
17        dated March 22, 2024
18 27      Hess Slide 95          178
19                    - - -
20
21
22
23
24
25

Page 7

1                  - - -
2            VIDEOGRAPHER:  We are now on
3  the record.  My name is Carolin De La Rosa, a
4  videographer for Golkow Litigation Services.
5  Today's date is July 10, 2024, and the time is
6  9:06 a.m.  This deposition is being held in
7  the matter of Talcum Powder litigation MDL
8  2738 versus Johnson & Johnson.  The deponent
9  today is Paul Hess.
10          All parties to this deposition
11  are appearing remotely and have agreed for the
12  witness to be sworn in remotely.  All parties
13  are noted on the stenographic record this
14  morning.
15            Would the court reporter,
16  please, administer the oath to the witness.
17                  - - -
18            PAUL HESS, after having been
19    first duly sworn, was examined and
20    testified as follows:
21  BY MR. DUBIN:
22    Q.   Hi, Mr. Hess.  Good morning.
23    A.   Good morning.
24    Q.   So we're going to make the first
25  exhibit to your deposition a resume that I

Page 8

1  have received from you or at least I assume it
2  originated with you and we'll just call that
3  up and walk a little bit through your
4  employment background.
5            MR. DUBIN:  Jake, can we call
6  that up, please?
7          (Exhibit 1 marked for
8    identification.)
9  BY MR. DUBIN:
10    Q.   So it looks like you joined MAS in
11  December of 1995; is that correct?
12    A.   Yes, sir.
13    Q.   Okay.  Can you tell me very briefly
14  what this position was that you held before
15  that at Law Associates?
16    A.   PLM microscopist.
17    Q.   And what was -- what is or was Law
18  Associates?
19    A.   They were an engineering firm in
20  Atlanta, Georgia.
21    Q.   Okay.  Do you know why it has "law"
22  in the name?
23    A.   I have no idea.
24    Q.   Okay.  Does that have anything to do
25  with something legal or is it just -- was it

Page 9

1  somebody's name?  You have no idea?
2    A.   No idea, sir.
3    Q.   Okay.  And then it looks like you
4  departed MAS in August of 2008 for a fairly
5  short period and went to Long Brothers Oil &
6  Gas; is that right?
7    A.   That is correct.
8    Q.   Okay.  And then you went back to MAS
9  and you were there until February of 2023, as
10  a full-time employee, before leaving for a
11  brief period of a year where you were just a
12  consultant; is that right?
13    A.   That is correct.
14    Q.   Okay.  And then your current
15  employment status at MAS is what?
16    A.   Part-time.
17    Q.   Okay.  And looking through your
18  resume, it looks like you have a bachelor's of
19  science degree; is that correct?
20    A.   That is correct.
21    Q.   You don't have any further advanced
22  degrees, right, no master's and no Ph.D.?
23    A.   No, sir.
24    Q.   Okay.  I am sorry.  Sometimes it can
25  be confusing.

3 (Pages 6 - 9)

Page 10

1      It's correct you do not have a
2  master's or a doctorate; is that right?
3      A.  That is correct.
4      Q.  Thank you.  All right.  So we may go
5  through some of that in more depth later, but
6  what is -- what positions have you held over
7  time at MAS?
8      A.  PLM microscopist.
9      Q.  I have heard you referred to
10 sometimes as an analyst.
11      Is that the name of your
12 position, is PLM microscopist the name of your
13 position or what's the formal name of your
14 position?
15      A.  To the best of my knowledge, it's
16 PLM microscopist.
17      Q.  Okay.  That's fine.  And are you
18 represented by counsel today?
19      A.  I am.
20      Q.  Okay.  And is that your personal
21 counsel?  Was it provided to you by MAS?
22      A.  Provided by MAS.
23      Q.  Okay.  And it says here that you
24 have 34 years experience as a PLM
25 microscopist, analyzing an average of 10,000

Page 11

1  samples per year.
2      When you say that, are most of
3  the samples asbestos samples or is that a
4  variety of different types of PLM work?
5      A.  Most of those were standard asbestos
6  samples.
7      Q.  Okay.  And so is it correct to say
8  that your general job duties at MAS is just
9  PLM microscopy?
10      A.  That is correct.
11      Q.  Do you do any other type of
12 microscopy work at MAS?
13      A.  I had done some phase contrast.
14      Q.  No transmission electron microscopy;
15 is that right?
16      A.  No, sir.
17      Q.  Okay.  And do you know approximately
18 what percentage of your time at MAS is spent
19 performing work related to litigation?
20      MR. LUDWIG:  Objection to form.
21 BY MR. DUBIN:
22      Q.  You can respond.
23      A.  Just the last few years.
24      Q.  Okay.  So let me make sure I
25 understand what you're saying.

Page 12

1      You have only become involved
2  in litigation work within the last few years;
3  is that right?
4      A.  That is correct.
5      Q.  Okay.  And since becoming involved
6  with litigation work, about what percentage of
7  your time or your work at MAS relates to
8  litigation -- is related to litigation?
9      MR. LUDWIG:  Objection to form.
10      You can answer.
11      THE WITNESS:  I would say the
12 majority of the time.
13 BY MR. DUBIN:
14      Q.  Can you explain to me when and how
15 you started to become involved with litigation
16 work?
17      A.  I do not recall the exact year, but
18 Dr. Longo asked me to start taking a look at
19 amphiboles in talc samples.
20      Q.  And so you started -- they asked you
21 to take a look by PLM for amphiboles in talc
22 samples; is that right?
23      A.  That is right.
24      Q.  Okay.  Did you have any discussion
25 at that time about whether you should also

Page 13

1  look for chrysotile?
2      A.  Not that I recall.
3      Q.  Okay.  Did you ask why you were only
4  being -- being asked to look for amphiboles at
5  that time?
6      A.  Not that I recall.
7      Q.  Okay.  When you typically perform a
8  PLM analysis, let's say, before you became
9  involved in this litigation work, when you
10 were examining a sample, would you typically
11 look for both chrysotile and for amphiboles?
12      A.  In the standard samples, that is
13 correct.
14      Q.  So you -- when you first became
15 involved with looking at, let's say, talcum
16 powder samples, why didn't you continue to
17 follow that protocol and look for both
18 amphibole and chrysotile?
19      MR. LUDWIG:  Objection to form.
20      THE WITNESS:  At that time it
21 was basically just for the amphiboles.  I was
22 not asked to look for the chrysotile.
23 BY MR. DUBIN:
24      Q.  Okay.  And at some point you were
25 asked to start looking for chrysotile in

4 (Pages 10 - 13)

Page 14

1  cosmetic talc samples; is that right?
2      A.   I was asked to see what I could find
3  other than the amphiboles.
4      Q.   Okay.  And do you recall when
5  approximately that was?
6      A.   I do not recall.
7      Q.   Prior to becoming involved with
8  litigation work in the last several years, had
9  you ever previously examined talc, whether
10 industrial or cosmetic, for the presence of
11 asbestos by PLM?
12     A.   Not that I recall.
13     Q.   Okay.  When was the first time you
14 recall being involved with the testing of talc
15 at MAS, irrespective of whether it was
16 cosmetic or industrial?
17        MS. O'DELL:  Would you repeat
18 the question, please?
19 BY MR. DUBIN:
20     Q.   Sure.  When was the first time you
21 recall becoming involved with the testing of
22 talc for asbestos at MAS, irrespective of
23 whether it was cosmetic talc or industrial
24 talc?
25     A.   As I recall, it was somewhere around

Page 15

1  2018.
2      Q.   Have you looked at both industrial
3  and cosmetic talc by PLM for the presence of
4  asbestos?
5      A.   I don't recall industrial.
6      Q.   Okay.  Do you recall when the first
7  time was that you used -- and we'll talk more
8  about what this means -- but a 1.550
9  refractive index oil to examine talc,
10 irrespective of whether it's cosmetic or
11 industrial talc?
12     A.   1.550 has always been the oil used
13 since doing standard things or standard
14 samples, I should say.
15     Q.   So over -- but do you recall when
16 the first time you used that oil to examine
17 talc was?
18     A.   I don't recall exactly.
19     Q.   Okay.  You indicated before -- we
20 talked about the fact that you had experience
21 as a PLM microscopist looking at many
22 different samples over your career.
23        Can you tell me what type or
24 types of asbestos-containing products you
25 recall examining by PLM over your history?

Page 16

1      A.   Ceiling tiles, joint compounds,
2  roofing, putties, floor tiles.  A whole
3  spectrum of different types of building
4  materials.
5      Q.   And so do you recall being able to
6  identify chrysotile by PLM in products such as
7  joint compounds and floor tiles?
8      A.   Yes, sir.
9      Q.   And do you know what type or types
10 of chrysotile asbestos -- well, let me ask you
11 a different question.
12        Do you recall any of the brand
13 names of the joint compounds that you looked
14 at?
15     A.   I don't recall any brand names being
16 given by the clients that sent the samples in.
17     Q.   Do you know whether any of those
18 joint compounds or floor tiles would have
19 contained Calidria asbestos?
20     A.   Not that I recall; however, I did at
21 one point come to the understanding that
22 Calidria had been used in some of the floor
23 tiles.
24     Q.   Okay.  And you were able to identify
25 chrysotile in those floor tiles using PLM?

Page 17

1      A.   Yes, sir.
2      Q.   All right.  We'll talk a little bit
3  more about that later.
4        Are you the -- how many PLM
5  analysts have -- during the time you have been
6  there, have typically been employed by MAS?
7      A.   I do not know exactly how many.
8      Q.   Were there others besides you?
9      A.   There were.
10     Q.   Okay.  Let's say within the last
11 three years, how many other PLM analysts do
12 you recall working at MAS?
13     A.   One other besides myself.
14     Q.   And who was that?
15     A.   That was Christopher Dubois.
16        MR. LUDWIG:  Mr. Dubin, can I
17 ask you a question?  Are you finished with the
18 resume?  Because it's still up on the screen.
19 I didn't know if you were --
20        MR. DUBIN:  We can pull it down
21 for now; that's fine.
22 BY MR. DUBIN:
23     Q.   And was that individual trained in
24 PLM dispersion staining analysis?
25     A.   Yes, sir.

5 (Pages 14 - 17)

Page 18

1    Q.   Was there anything about his
2  training that would lead you to believe he
3  wasn't trained to look for chrysotile by PLM?
4          MR. LUDWIG:  Objection to form;
5  calls for speculation.
6  BY MR. DUBIN:
7    Q.   To your knowledge.
8    A.   I do not recall.
9    Q.   Okay.  We'll come back to some
10 background later, but what did you do to
11 prepare for your deposition today?
12   A.   I had a few sessions with
13 Mr. Ludwig.
14   Q.   Anything else?  Did you speak to
15 anybody else in preparation for your
16 deposition?
17   A.   Ms. O'Dell.
18   Q.   Okay.  How about Dr. Longo?
19   A.   Dr. Longo has been very busy the
20 last couple of weeks or so and I have not had
21 an opportunity to sit down and talk with him.
22   Q.   Okay.  Did you review any materials
23 to prepare for your deposition?
24   A.   I did review the reports by Dr. Su
25 and Dr. Wylie.

Page 19

1    Q.   Okay.  Did you review any of your
2  own PLM analysis?
3    A.   I did not go back over and review
4  any of the PLM analysis.
5    Q.   How are you compensated at MAS?  Are
6  you a salaried employee?
7    A.   Currently, I am hourly.
8    Q.   Okay.  How about before you --
9  before you took the recent break and became a
10 consultant?  Were you salaried at that time?
11   A.   I was.
12   Q.   Do you -- in your current structure,
13 do you receive bonuses?
14   A.   No, sir.
15   Q.   How about before, when you were a
16 salaried employee?  Did you receive bonuses?
17   A.   A long time ago the company used to
18 have an annual bonus that they would give out,
19 but that has not been in place for many years.
20         MR. DUBIN:  Okay.  I'm going to
21 mark as the next exhibit -- and start to get
22 into a little bit of substance -- what I
23 understand to be the first report that MAS
24 issued claiming to find chrysotile by PLM, and
25 that will be exhibit 2, internal reference

Page 20

1  number is CX-6 for pulling it up.  It's a
2  report, dated February 24, 2020, related to
3  Zimmerman, the Zimmerman report.
4          (Exhibit 2 marked for
5          identification.)
6  BY MR. DUBIN:
7    Q.   I don't know that you -- whether you
8  personally recall.
9          Do you recall this being the
10 first time you looked at cosmetic talc from
11 Johnson & Johnson by PLM for the presence of
12 chrysotile?
13   A.   I don't recall.
14   Q.   Okay.  We'll look at that report
15 some, but before I do that, I want to look at
16 something else.
17         Did you become aware at some
18 point that the FDA had reported a positive
19 finding for chrysotile by TEM in a bottle of
20 Johnson & Johnson?
21         MR. LUDWIG:  Objection to form.
22         Just for the record, Mr. Hess
23 is a fact witness that we produced because of
24 Court Order.  He is not here to opine on
25 expert issues or hearsay issues.

Page 21

1          MR. DUBIN:  I don't know what
2  you're saying, but I am sure I disagree with
3  it.  So let's just see how it goes with
4  individual questions.  Because I am definitely
5  going to be asking him about his work.
6          MR. LUDWIG:  You're asking
7  about FDA analysis and so I am going to object
8  to the form.
9          MR. DUBIN:  Okay.  Well, you
10 can object if you like, but you can respond.
11 Thank you.
12 BY MR. DUBIN:
13   Q.   Did you become aware of that at some
14 point?
15   A.   I am aware of that.
16   Q.   Okay.  Do you recall how you became
17 aware of that?
18   A.   I don't recall exactly.
19   Q.   Do you recall ever reporting
20 chrysotile in any Johnson & Johnson talc
21 samples prior to that FDA finding?
22   A.   I do not.
23   Q.   Now, what -- what type of refracted
24 index oil would you use traditionally to look
25 for fibrous talc by PLM?

6 (Pages 18 - 21)

Page 22

1    A.    1.550.
2    Q.    Would there be any difference in
3 your prep method in the way that you would
4 have traditionally looked for fibrous talc
5 versus chrysotile asbestos in 1.550?
6    A.    It would be no different in method
7 of preparation.
8    Q.    It makes no difference to the method
9 of preparation?  Is that what you said?
10    A.    No.  I said there is no difference
11 in preparation between the two types of
12 analyses.
13    Q.    All right.  And so I want to ask you
14 about another report before we go forward, one
15 that was issued before Zimmerman; that will be
16 exhibit 3.  It's a February 1, 2019 report
17 entitled:  MAS Second Supplemental Report.
18 Let's pull that up for a second.
19          (Exhibit 3 marked for
20      identification.)
21 BY MR. DUBIN:
22    Q.    This is a report that was issued by
23 MAS prior to the FDA finding.
24          It's entitled:  An Analysis of
25 Johnson & Johnson Historical Product

Page 23

1 Containers and Imerys' Historical Railroad Car
2 Samples from the 1960s to the early 2000s, for
3 Amphibole Asbestos, and if we --
4          MS. O'DELL:  Morty, could you
5 put the whole document on the screen so it can
6 be seen?  I am only seeing the first part.
7          MR. DUBIN:  I mean, I am going
8 to move around the document.  We can try to
9 adjust so you can see the full size.
10          Can you see it now?
11          MS. O'DELL:  Yes.  If you can
12 maybe make it a bit bigger?  Because I am
13 looking for the date on that because I can't
14 see it.
15          MR. DUBIN:  It's dated February
16 1, 2019.
17          MS. O'DELL:  Thank you.
18 BY MR. DUBIN:
19    Q.    And if we go to page 2, you can see
20 here that it relates to 72 J&J and
21 Imerys-supplied historical cosmetic talcum
22 powder containers, samples, and samples from
23 the 1960s, 1970s, 1980s, 1990s, and early
24 2000s.
25          Do you see that?  I can

Page 24

1 highlight it.
2          MS. O'DELL:  If you can't see
3 it, Dr. -- excuse me.  If you can't see it,
4 Mr. Hess, please let us know.
5          MR. DUBIN:  Jake, can you put
6 these things in chat, too?
7          MR. PLACITELLA:  Well, I want
8 the opportunity to look at the document before
9 you start asking questions about it.
10          MR. LUDWIG:  I mean, the report
11 speaks for --
12          MR. DUBIN:  (Inaudible.)
13          MR. LUDWIG:  -- themselves --
14 indicating one question or -- so the whole
15 thing speaks for itself, Paul.  I guess his
16 only --
17          MR. DUBIN:  Okay.  This is a
18 long speaking objection, it's improper, and I
19 am going to -- I am trying to show him things
20 to be able to ask him a question about it.
21          We can put these things in
22 chat, but I am not pausing at every question
23 to wait for you to read a 100-page report.  So
24 that's just not happening.  We're going to --
25          MS. O'DELL:  Well, it will

Page 25

1 happen if the witness needs it, Morty, and
2 we'll go off the record if he needs --
3          MR. DUBIN:  I haven't -- I
4 haven't asked a single question yet, other
5 than whether he sees it.  So we're not at --
6          MS. O'DELL:  Morty, I am not
7 finished and you can let me finish.
8          It's not fair to put a document
9 on the screen without giving him the
10 opportunity to see it.  Thank you for putting
11 it in the chat.  He can pull it down in the
12 chat and they will be printed if needed --
13          MR. DUBIN:  (Inaudible.)
14          MS. O'DELL:  -- examination.
15          You could have sent the
16 documents in hard copy had you chosen.  You
17 didn't do that; that's fine.  We'll work
18 around that, but he needs the opportunity to
19 review the document.
20          MR. DUBIN:  If you guys want to
21 go off record, he can read each time.  I am
22 not using my time to have him read a whole
23 report when I haven't been able to ask a
24 single question about it.
25          So if you want to go off, off

7 (Pages 22 - 25)

Page 26

1  record, and have him read the whole report, I
2  am happy to let him do that, or I can direct
3  him to the portions that I am going to ask
4  about. You choose. Because we can be here
5  all night. I don't care. So you tell me.
6         MR. LUDWIG: We're not going to
7  off the record, no. It sounds like --
8         MR. DUBIN: It is not going on
9  my time if he wants to read a 50-page document
10 that I haven't been able to ask a single
11 question about yet. This is not happening.
12        So you want to go off the
13 record and have him read this report or you
14 want me to ask him questions and then the
15 witness can tell me if there is something he
16 needs to read.
17        Those are your two options.
18        MS. O'DELL: You don't --
19        MR. PLACITELLA: The third
20 option is -- the third option is we're going
21 to call the Special Master. Because we have a
22 right to know what's in the document --
23        MR. DUBIN: It's in the
24 document --
25        MR. PLACITELLA: -- before you

Page 27

1  ask the question. So if that's how we're
2  going to proceed, by picking pieces of a
3  document that he hasn't seen for years and I
4  have never seen before, then we've got to get
5  the Judge on the phone now.
6         MR. DUBIN: Okay. We can do
7  whatever you want. You guys have been
8  complaining about this without me asking a
9  single question about the document. The
10 witness hasn't said he needs to look at
11 anything else. You're just being
12 obstructionists. I am going to --
13        MR. PLACITELLA: Well, let's
14 get the Judge on the phone.
15        MR. LUDWIG: He has not
16 reviewed the MAS reports. So --
17        MR. DUBIN: This is his work.
18 I am asking him about his work.
19        MS. O'DELL: This is the report
20 of Dr. Bill Longo and Mark Rigler. This is --
21 so --
22        MR. DUBIN: With his PLM work.
23 I am not arguing about it anymore. I am
24 asking the questions. If you want to --
25        MR. PLACITELLA: Well, let's

Page 28

1  get the Judge on the phone --
2         MR. DUBIN: -- get the Judge on
3  the line, we can get the Judge on the line.
4  Go ahead. Go ahead.
5         MR. PLACITELLA: Let's get the
6  judge on the phone.
7         MR. DUBIN: Fine.
8         THE COURT REPORTER: Would you
9  like to go off the record for a moment?
10        MR. DUBIN: Sure. We'll go off
11 the record.
12        VIDEOGRAPHER: The time is
13 9:32 a.m. We are off the record.
14        (Brief recess.)
15        (Conference with Special Master
16    Joel Schneider taken off the video
17    record.)
18        THE COURT: Am I looking at the
19 infamous Paul Hess?
20        THE WITNESS: You are, sir.
21        THE COURT: Mr. Hess, I have
22 read so much about you. I am delighted to
23 meet you in person.
24        MS. O'DELL: Judge Schneider,
25 here is the issue that we're facing and I

Page 29

1  invite Mr. Placitella to add if I don't cover
2  something, but as you know, Mr. Hess is a fact
3  witness, he is not an expert, and he has done
4  work at MAS Lab for purposes of Dr. Longo
5  rendering his expert opinion.
6         He is being shown reports by
7  Dr. Longo and Rigler. He has not -- this
8  is -- he has no involvement in the preparation
9  of the reports. His work is an underlying
10 analyst and we object to Mr. Hess being
11 examined on the full scope of Dr. Longo's
12 reports, which are not his work.
13        And so we believe -- we just
14 got started a bit ago. We think this is going
15 to be sort of the mode of the deposition and
16 we need direction from the Court as to how
17 this should be approached.
18        MR. DUBIN: Just so I can --
19        MR. PLACITELLA: Could I
20 supplement that?
21        MS. O'DELL: Please.
22        MR. PLACITELLA: So my concern,
23 your Honor, is as follows. These are reports
24 from other cases. The witness either has
25 never seen them before or hasn't seen them for

8 (Pages 26 - 29)

Page 30

1 many years.
2        Questions are being asked about
3 these reports that we have not been supplied
4 in advance of the deposition. Sticking them
5 in the chat now on a 30-page report from
6 another case doesn't give counsel even an
7 opportunity to determine whether the questions
8 are taken out of context, are fair or even
9 relevant. So we're not even in a position to
10 phrase our objections appropriately.
11        If they wanted to ask questions
12 about these reports, they should have been
13 sent long in advance of the deposition and we
14 could have had a debate about it then, not
15 now, when now they are going to claim every
16 time Mr. Hess has to stop and look at the
17 report, that somehow that counts -- it doesn't
18 count on their time for completing this
19 deposition.
20        It's an unfair way to proceed.
21 It was never contemplated by the Court and I
22 am at a loss as to how to even address these
23 circumstances. I mean, this is a tenuous
24 deposition at best and now we're taking it
25 into a whole different realm, which is

Page 31

1 completely unfair to counsel and the witness.
2        MR. DUBIN: If I could briefly
3 respond. Your Honor, I haven't asked --
4        THE COURT: One second.
5        MR. DUBIN: Sure.
6        THE COURT: You represent the
7 defendants, I assume?
8        MR. DUBIN: Yeah.
9        THE COURT: Who are who?
10        MR. DUBIN: I am Morton Dubin.
11        THE COURT: With what firm?
12        MR. DUBIN: I am with King &
13 Spalding.
14        THE COURT: And Mr. Hess is
15 physically where?
16        MR. DUBIN: He is in Atlanta.
17        THE COURT: And is
18 Mr. Placitella and Ms. O'Dell, are they both
19 in their office or are they with Mr. Hess?
20        MS. O'DELL: I am with the
21 witness, Judge, in Atlanta.
22        THE COURT: Okay.
23        MS. O'DELL: Mr. Placitella is
24 in New Jersey.
25        THE COURT: Okay. All right.

Page 32

1 Counsel, go ahead. Now I know.
2        MR. DUBIN: So I haven't even
3 asked him a single question basically
4 substantively yet before they decided that
5 they needed to approach the Court. All I had
6 done was put up one report and then I was
7 trying to orient him on what samples we were
8 talking about and then I was going to ask
9 him -- because he did the PLM work for that
10 report -- and I was going to ask him about the
11 conclusions and the work that he did.
12        And I made the entire report
13 available for counsel and I even offered if
14 they wanted to go off record and have the
15 witness read the entire report if he felt it
16 was necessary, but I didn't even get to ask a
17 single question.
18        Of course, they don't -- they
19 didn't even wait to see what the examination
20 was about other than, "Do you see here? This
21 was about 72 samples of talc," and then they
22 objected and we got the deposition shut down.
23        So I don't really know what
24 their complaint is. I am making materials
25 available to him. I am asking him about the

Page 33

1 work that he personally did, not about
2 anything else in the report, and so I don't
3 see what the objection is. It's a legitimate
4 scope of inquiry.
5        THE COURT: Can I ask a
6 question? In the case, is there a deposition
7 protocol that requires the production
8 beforehand of exhibits that are going to be
9 shown to a witness?
10        MS. O'DELL: There is a
11 deposition protocol and, your Honor, I do
12 believe that we mainly follow that, just to be
13 clear, more for an expert witness. There has
14 been a three-day disclosure rule; that's not
15 been followed in the instance of Mr. Hess
16 since his deposition is a little bit more
17 unique.
18        And so, Judge, let me just also
19 make clear, you know, as you know, in the
20 first round in the multi-district litigation,
21 the expert report that was at issue was the
22 February 1, 2019 expert report involving
23 historical samples that tested for amphibole
24 asbestos; that's the report that was at issue
25 in the Daubert hearing.

9 (Pages 30 - 33)

Page 34

1        Dr. Longo has had a two-day
2  deposition on that report. Dr. Rigler was
3  examined. Dr. Longo was examined before Judge
4  Wolfson at the Daubert hearing and the Court
5  issued a ruling allowing the analysis from
6  that report.
7        What Mr. Dubin --
8        MR. DUBIN: If I can --
9        MS. O'DELL: -- Mr. Dubin put
10 up is the February 1, 2019 material, and as
11 you are so well aware, what's been at issue in
12 the proceedings since they have been restarted
13 in the MDL are new things and there are
14 reports that have been disclosed by Dr. Longo
15 that relate to the analysis of talc for
16 chrysotile involving PLM.
17        And that is -- for those
18 reports that have been disclosed, to the
19 degree Mr. Hess was involved and worked on the
20 underlying analysis, we understand the Court
21 has allowed this deposition and that we'll go
22 forward, but for the defendants to try to go
23 back, replow 2019 round in a report that's not
24 involved is not fair.
25        For them to inquire of things

Page 35

1  that he wasn't involved in, including the
2  actual text of the report, is not fair. His
3  work was the bench work and the
4  photomicrographs and to go beyond that, we
5  believe, is objectionable and we ask the Court
6  to not allow it.
7        THE COURT: Can I jump in here?
8  Because I am very familiar with the issues.
9  And the reason why leave was granted to the
10 defendants to take Mr. Hess' deposition was
11 based on the arguments that they made in their
12 briefs.
13        Ms. O'Dell is correct that the
14 subject matter of the deposition should only
15 be limited to what I call -- and I'm not quite
16 sure if the defendants used this word -- this
17 new method. And if I remember right, even in
18 my decision I set forth -- there was, like, a
19 date range, if I remember right. I don't have
20 it in front of me. It started in 2020 and
21 maybe went to 2024.
22        And I specifically remember
23 there was an exhibit that may have been
24 duplicated in different versions that set
25 forth precisely the tests that were at issue

Page 36

1  regarding this new method; that's the first
2  thing.
3        The second thing is, the
4  deposition was only limited to Mr. Hess'
5  personal involvement. Because the defendants
6  were making the argument -- not in these
7  words, but, in essence, that it was Mr. Hess
8  that was making these ultimate decisions and
9  not Dr. Longo.
10        So the questions have to be
11 limited to only what Mr. Hess did, his tests,
12 his personal observations. The deposition is
13 not to get Mr. Hess' opinion on what somebody
14 else did or what somebody else opines.
15        Mr. Hess is there to testify
16 about his firsthand personal knowledge about
17 these -- this new testing method; that -- that
18 is precisely why Mr. Hess' deposition is
19 permitted. It was not permitted to go over
20 ground that was covered previously in the
21 case, the TEM tests, if I am --
22        MR. DUBIN: Right.
23        THE COURT: -- right or any of
24 the tests before this new method.
25        And if I remember right, I am

Page 37

1  obviously aware that Judge Wolfson had
2  stricken some of the tests in the original
3  Daubert opinion, and I think that the argument
4  is going to be that with this new method, it
5  was not subject to the old order and,
6  presumably, it will be the subject of a new
7  Daubert order.
8        But those parameters of why
9  Mr. Hess' deposition was permitted, those
10 should be the parameters of this deposition.
11 I hope that helps.
12        MR. DUBIN: We don't disagree
13 with that at all. The report I am asking him
14 about is the first time that he is using this
15 specific method to examine Johnson & Johnson,
16 as I will show when I go to the report.
17        In that report he begins to use
18 1.550 oil for the first time, which is the way
19 he is looking for chrysotile. In that report
20 is the first time that he starts to do that
21 and look at Johnson & Johnson.
22        And so that was what I was
23 going to ask him about, is about his personal
24 work using that method at that time, which
25 leads then into the first reports for

Page 38

1  chrysotile.
2      And so this is all about that
3  topic. I am not going into the TEM work. I
4  am not going into the PLM work that he did for
5  amphibole.
6      I am just asking him about this
7  kind of analysis that is the subject of the
8  entire deposition and this report, but I
9  didn't even get to get a single question in
10 before we ended up having to call your Honor,
11 I suppose.
12      THE COURT: Counsel, what you
13 were going to ask Mr. Hess about, is that one
14 of the tests that was on that list that
15 hopefully you know what I was referring?
16      MR. DUBIN: Your Honor, I will
17 go ahead and just explain to everybody,
18 although I really feel like I should be able
19 to ask the witness these questions, but what
20 we're going to see is that at this point,
21 before -- so at some point the FDA finds by
22 TEM chrysotile in one bottle of Johnson &
23 Johnson and after that time MAS starts to
24 report chrysotile by PLM basically every time
25 they look at it.

Page 39

1      What we're going to see is in
2  this report they're -- it's before the FDA
3  finding, they are using the exact same
4  methodology to look at the talc, and they do
5  not report chrysotile.
6      THE COURT: Counsel, what I'm
7  just concerned about is, you can ask him about
8  the tests using the new method. You can't --
9  the purpose of the deposition is not to say,
10 Why did this person not find chrysotile and
11 you found chrysotile?
12      Ask him about his tests and
13 what he did and how he did it.
14      MR. DUBIN: He did the work on
15 both. I am asking about his work.
16      MS. O'DELL: Your Honor, we
17 would object. This is the 2019 report. It
18 was for amphiboles. Much of that work was not
19 done at MAS, it was done by another lab, and
20 so we object as that was fully covered by the
21 last proceedings.
22      For the new material, as the
23 Court has said, for his work, if they want to
24 ask him about it and ask him what oil he used,
25 that's fair game, but to go back and somehow

Page 40

1  lay this as a foundation from the prior report
2  when some of that work was not his first is
3  improper and we object to that. I mean, the
4  2019 report is off the table.
5      MR. DUBIN: I am only asking --
6      MR. PLACITELLA: I would just
7  add to that, to be fair to everyone, you know,
8  popping a report up that's X period of -- no
9  one has looked at for four or five years, you
10 know, in this context and start asking
11 questions, it's just not proper.
12      We have -- we can't -- we don't
13 know the context. He has taken little lines.
14 He has highlighted one line or two lines in a
15 report and then says, Well, we put the report
16 in chat. Go, have it.
17      Well, that's not fair. The
18 deposition today is supposed to be about the
19 report here at issue, nothing beyond that
20 report, and that's the -- I don't know what
21 else is coming; that's why we stopped it.
22      Are they going to pull out some
23 other report from some other case? I don't
24 know, but we've got to have some parameters of
25 what we're doing here.

Page 41

1      THE COURT: Counsel, I am
2  persuaded by plaintiffs' argument. Really,
3  this shouldn't be that difficult an issue.
4  The boundaries of this deposition were set
5  forth in the requests and my Order.
6      It's just about the tests that
7  he did, how he did it, his observations. He
8  is not there to answer questions about why did
9  they get the result in a 2019 test and a
10 different result in a later test; that's not
11 why he is there.
12      He is there to talk from his
13 personal observation about the new test;
14 that's it.
15      MR. DUBIN: But I just -- all I
16 am asking him about is his own work, doing it
17 the exact same way, why he came to a
18 conclusion -- different conclusion one time
19 versus the other, his own personal PLM work.
20      I am not asking him about
21 anybody else's work, asking him to offer
22 opinions about anybody else's work. I am just
23 asking him about what he did.
24      THE COURT: Counsel, if it's
25 not one of the tests on this exhibit list that

11 (Pages 38 - 41)

Page 42

1 I referred to -- I know I referred to it
2 during oral argument. I don't recollect if I
3 referred to it in my decision.
4           If it's not one of those tests,
5 it's off limits. That's not the purpose of
6 the deposition.
7           MR. DUBIN: I am only asking
8 him about his PLM work in 1.550 and 1.560,
9 which is his chrysotile -- method for looking
10 for chrysotile, which is the subject of the
11 deposition. I'm not asking anything about any
12 PLM work.
13           THE COURT: Counsel, I don't
14 have that exhibit, that list in front of me,
15 but I have a feeling you know what I am
16 referring to, it would -- I believe it was an
17 exhibit to the two reports that the defendants
18 submitted.
19           And, you know, one of the
20 arguments for why the exception was denied was
21 because those experts prepared detailed
22 reports rebutting the plaintiffs' experts and
23 in those reports they attached as exhibits the
24 list of the samples that are at issue
25 regarding this new method. That's it. That's

Page 43

1 it. Those are the tests at issue.
2           MR. DUBIN: I understand that,
3 your Honor, and that's why as part of asking
4 about those conclusions, I need to understand
5 what changed between the two times he looked
6 at this with 1.550 oil to understand his
7 conclusions.
8           THE COURT: Well, if you're
9 asking about that, my ruling would be that's
10 off limits; that's not the purpose of this
11 deposition, not to compare old tests to new
12 tests.
13           The purpose of this deposition
14 is to ask him about his personal observations
15 regarding the new test; that's what was in the
16 defendant's papers. They didn't say anything
17 about asking him to compare old to new.
18           That's my ruling. If the
19 defendants think the questioning is going out
20 of those boundaries, instruct the witness not
21 to answer. We'll look at the transcript and
22 we'll make a ruling on a more fulsome record,
23 but I don't know what else I can say, Counsel.
24           It really should be a pretty
25 easy deposition. You have the tests at issue.

Page 44

1 Mr. Hess is only going to testify about his
2 personal observations. To me that's pretty --
3 the boundaries are pretty clear. So I don't
4 know what else I can say.
5           MR. DUBIN: I understand, your
6 Honor. Again, I believe I am trying to stay
7 within that by asking him about his personal
8 observations of this material in 1.550 and
9 1.560 oil, but I understand. I will skip this
10 report.
11           I would like to be able to ask
12 him about differences in his images. Because
13 one of the big topics here is images. If they
14 decide to try to shut it down later when I do
15 it, I guess we'll take it up then, but we'll
16 see. I need to understand how -- what his
17 microscope setups are and whether he is
18 changing them and the like.
19           THE COURT: As long as it's
20 limited to the specific tests at issue that
21 are on that exhibit list. The exhibits are
22 attached to your expert reports, Counsel. So
23 you should have those at your fingertips.
24           Those were the tests that were
25 in the motion that the argument was that new

Page 45

1 method was used and they found chrysotile
2 where they didn't previously find it; that's
3 the boundary of this deposition. Okay.
4           So I am in a mediation today,
5 but if you need me, send me an e-mail or a
6 text, and when I am available, I will get back
7 on the Zoom. Thank you, Counsel.
8           MS. O'DELL: Thank you, your
9 Honor.
10           MR. LUDWIG: Thank you, Judge.
11           MR. DUBIN: So we'll keep that
12 as an exhibit, as a proffer for the record.
13           (Break held off the record.)
14           VIDEOGRAPHER: The time is
15 10:17 a.m. We are back on the record.
16 BY MR. DUBIN:
17     Q.    In terms of your background, when
18 did you start performing PLM dispersion
19 staining analysis?
20     A.    1989.
21     Q.    That was when you took the course at
22 McCrone?
23     A.    That is correct.
24     Q.    Can you tell me a little bit about
25 that course? How long did it last? What were

12 (Pages 42 - 45)

Page 46

1 you trained in?
2  A.  It lasted a week.
3  Q.  Okay.
4  A.  And we were trained to utilize the
5 dispersion staining method to identify the
6 various asbestos forms or minerals.
7       MR. DUBIN:  And if we can call
8 up Hess slide 2.  I will make a copy of it
9 exhibit 4.
10       (Exhibit 4 marked for
11       identification.)
12 BY MR. DUBIN:
13  Q.  And do you know what this is that
14 we're looking at here in the image?
15  A.  Well, it's stated on the matrix,
16 reference chrysotile.
17  Q.  And when you taught -- took the
18 course at McCrone, were you taught that
19 chrysotile should look magenta in parallel?
20  A.  We were.
21  Q.  And are you aware that McCrone has
22 studied different types of chrysotile,
23 including Calidria?
24       MR. LUDWIG:  Objection to form.
25       THE WITNESS:  I am not aware of

Page 47

1 what Dr. McCrone or what McCrone had studied.
2       MS. O'DELL:  (Inaudible.)
3       MR. DUBIN:  That would be
4 exhibit 4.
5       MS. O'DELL:  Would you, please,
6 download it in the chat?
7       MR. DUBIN:  Sure.  Just, Jake,
8 whenever we do exhibits, let's just put them
9 in chat.
10 BY MR. DUBIN:
11  Q.  And so we'll walk through just so we
12 can understand the basic process of dispersion
13 staining.
14       The first step after you have
15 put the slide -- prepared the slide and put it
16 on the microscope, the first step is for the
17 analyst to make a judgment about what color
18 they are seeing, right?
19  A.  Yes, sir.
20  Q.  Okay.  And then after you make a
21 judgment about what color you're seeing --
22       MR. DUBIN:  Jake, there is some
23 weird stuff on the screen.  Can you take that
24 off screen, please, or just put the slide
25 back?

Page 48

1       MR. KEESTER:  Sorry, Morty.
2 It's hard to print a single slide while
3 we're -- I'm showing it.
4       MR. DUBIN:  Okay.  Again, we'll
5 put them in chat so that you have them later,
6 but I don't want to take them off screen while
7 we're doing this.  It's a single slide.  You
8 can see it on the screen.
9 BY MR. DUBIN:
10  Q.  All right.  So --
11       MS. O'DELL:  We can't see it.
12 Mr. Hess would, please, request a copy.
13 BY MR. DUBIN:
14  Q.  The next step after you have made a
15 judgment about what color you're looking at is
16 to figure out what wavelength of light that
17 is, right?
18  A.  That is correct.
19  Q.  And then you use some tables to
20 convert that into a refractive index?
21  A.  That is correct.  We used Dr. Su's
22 tables.
23  Q.  And then, ultimately, those numbers
24 can be used to derive a birefringence number,
25 correct?

Page 49

1  A.  Yes, sir.
2  Q.  Okay.  And can you define for me
3 what an alpha refractive index is?
4  A.  That would be your length slow --
5 length fast direction.
6  Q.  Okay.  How about a gamma refractive
7 index?  Do you know what a gamma refractive
8 index is?
9  A.  That would be your length slow
10 direction.  It's -- normally for chrysotile,
11 that would be parallel.
12  Q.  Okay.  Can your alpha refractive
13 index ever be higher than your gamma
14 refractive index?
15  A.  Only if a mineral is negative in
16 elongation.
17       THE COURT REPORTER:  Can you,
18 please, repeat the answer.
19       THE WITNESS:  Only if the
20 mineral is negative in elongation.
21 BY MR. DUBIN:
22  Q.  All right.  What does the refractive
23 index of a mineral measure?
24  A.  It measures, basically, the
25 difference in the light path as it passes

13 (Pages 46 - 49)

Page 50

1 through the oil and particle edge. They
2 interface.
3    Q.    What properties of a mineral
4 determine its refractive index?
5    A.    Generally, the chemical, density.
6    Q.    Anything else?
7        MR. LUDWIG: Objection to form.
8        THE WITNESS: I don't recall
9 off the top of my head.
10 BY MR. DUBIN:
11    Q.    What is birefringence?
12    A.    Birefringence is the difference
13 between the mineral's highest refractive
14 indices and its lowest refractive indices.
15    Q.    Okay. What do you mean by -- what
16 do you mean by highest refractive indices,
17 first?
18    A.    The highest refractive index for the
19 mineral.
20    Q.    And so if a mineral is displaying
21 more than one color, how do you determine what
22 the highest refractive index is?
23        MR. LUDWIG: Objection to form.
24        THE WITNESS: One would
25 normally look for the wavelength that would be

Page 51

1 the highest of the mineral in the gamma
2 direction and --
3 BY MR. DUBIN:
4    Q.    And -- sorry. Go ahead.
5    A.    And then apply that to the charts.
6    Q.    Okay. How do you -- and then how do
7 you determine what the lowest refractive index
8 is if a mineral is displaying more than one
9 color?
10    A.    You put it into the alpha direction.
11 For chrysotile, that would be perpendicular.
12    Q.    Is it correct that the birefringence
13 is the quantitative expression of the maximum
14 difference in refractive index due to double
15 refraction?
16        MR. LUDWIG: Objection to form.
17        THE WITNESS: That is my
18 understanding.
19 BY MR. DUBIN:
20    Q.    And what do you understand maximum
21 difference in that context to mean?
22    A.    For any particular particle, it
23 would be what my examination leads me to
24 determine to be the refractive indices in most
25 gamma and alpha direction.

Page 52

1    Q.    But is it the difference between the
2 highest and the lowest refractive indices? Is
3 that what maximum difference means?
4    A.    Can you rephrase that just a little
5 bit?
6    Q.    Sure. I mean, if you get -- if
7 you're saying that alpha and gamma are defined
8 by highest and lowest refractive indices, the
9 maximum difference means the difference
10 between that highest and that lowest
11 refractive index, right?
12    A.    That would be the way I would see
13 it, yes.
14    Q.    Okay. And do you know -- if we go
15 back to that slide that was marked as
16 exhibit 4.
17        MR. DUBIN: It could also be
18 slide 10. Whatever makes it easier for you,
19 Jake, to call it up.
20 BY MR. DUBIN:
21    Q.    Do you know what causes chrysotile
22 to appear magenta in parallel?
23    A.    It's the angle of the fraction as
24 the light passes up at the oil-particle
25 interface.

Page 53

1    Q.    And what creates the color magenta?
2 What creates -- what causes you to see the
3 color magenta specifically?
4        MS. O'DELL: I object to the
5 question to the degree it calls for an expert
6 opinion and it relates not to the testing
7 analysis that Mr. Hess has done on a specific
8 sample, which is the purpose of this
9 deposition. Asking expert opinion is not the
10 purpose of this deposition.
11        MR. LUDWIG: The Court has
12 already ordered on that. So this doesn't have
13 anything to do with the specific exam or the
14 scope on which the Court just advised the
15 parties to stay within. I am objecting to the
16 form of the question.
17        MR. DUBIN: I will lay a
18 further foundation for it.
19 BY MR. DUBIN:
20    Q.    We are going to be talking about
21 your work identifying chrysotile in Johnson &
22 Johnson but, typically, when MAS was
23 identifying chrysotile in Johnson & Johnson,
24 it was -- what was being called chrysotile was
25 yellow in parallel, right?

14 (Pages 50 - 53)

Page 54

1    MR. LUDWIG: Same objection.
2    That is exactly what the Court
3 ruled upon. So objection.
4    MR. DUBIN: No. Those are the
5 reports at issue, which the Court said we
6 could ask about.
7    MS. O'DELL: And if you would
8 like to ask Mr. Hess about specific reports,
9 he is here and prepared to respond to your
10 questions, but asking for expert opinion is
11 beyond the scope of what Judge Schneider
12 established for this deposition and we'll
13 instruct the witness not to answer.
14    MR. LUDWIG: I instruct the
15 witness not to answer that question.
16 BY MR. DUBIN:
17    Q.  In your reports identifying
18 chrysotile in Johnson & Johnson, what color
19 are the particles that you're calling
20 chrysotile typically in parallel?
21    MR. LUDWIG: Objection to form.
22    THE WITNESS: The colors that I
23 utilize to determine the wavelength are at the
24 edge of the particle and not in the center.
25 BY MR. DUBIN:

Page 55

1    Q.  Okay. What color are the particles?
2    MS. O'DELL: Objection to the
3 form.
4    What particle? What --
5 BY MR. DUBIN:
6    Q.  The particle that you're calling
7 chrysotile in the reports that you're talking
8 about today?
9    MR. LUDWIG: Is there a
10 specific report you want to show him? This
11 right here, it looks like an exhibit created
12 by defense counsel. So that's not -- he is
13 not here to opine about this exhibit that
14 looks like a PowerPoint by someone else.
15    This is not a --
16    MR. DUBIN: This is enough
17 speaking objections. You can make your
18 objections if you want to make your
19 objections. If you want to instruct your
20 witness not to answer the question, then you
21 can do that, but no more speaking objections.
22 It's gone way too far.
23    MR. LUDWIG: Based on the scope
24 that the Judge had lined out, I am instructing
25 him not to answer that question.

Page 56

1    MR. DUBIN: All right. Let's
2 take this down. We'll come back to it when we
3 show your reports.
4 BY MR. DUBIN:
5    Q.  What color -- what is the refractive
6 index of talc?
7    A.  It has wide -- a large
8 birefringence, but normally it will be
9 somewhere in the range of around 1.540 to
10 1.605, based on the experience of what I have
11 seen.
12    Q.  How about a talc plate, a flat talc
13 plate? What is -- what is the refractive
14 index of a talc plate?
15    MS. O'DELL: Object to the
16 form.
17    THE WITNESS: I don't believe
18 the talc plate has any birefringence, but the
19 edges that I have seen have been blue in 1.55,
20 and have been yellowish in 1.605.
21 BY MR. DUBIN:
22    Q.  Did the CSDS colors associated with
23 talc itself in 1.550 oil include the color
24 red?
25    MS. O'DELL: Would you repeat

Page 57

1 the question? I missed the first part.
2 BY MR. DUBIN:
3    Q.  Do the central stop dispersion
4 staining colors of talc plates themselves in
5 1.550 oil include the color red?
6    MS. O'DELL: Object to the
7 form.
8    MR. LUDWIG: Same objection as
9 before.
10    I instruct you not to answer.
11    That's -- that calls for an
12 expert opinion.
13    MR. DUBIN: I am asking his
14 understanding and it relates to this work that
15 he is doing.
16 BY MR. DUBIN:
17    Q.  Did it -- does it include red?
18    MS. O'DELL: If you have a
19 specific particle you would like to ask him
20 about, that's within the scope of the order,
21 but to ask it in isolation is beyond the scope
22 and seeks an expert opinion.
23    MR. DUBIN: Fine --
24    MR. LUDWIG: Join.
25    MR. DUBIN: -- when you get to

15 (Pages 54 - 57)

Page 58

1 the specific color, the specific reports.
2 BY MR. DUBIN:
3    Q.   So let's look at one of your reports
4 just so we can understand, again, what color
5 talc should be.  So we're now going to be
6 looking at an image from your -- from the
7 September 16, 2020 report on Chinese talc
8 research samples where you were the PLM
9 analyst.
10        MR. DUBIN:  So can we make that
11 image exhibit 5.
12        (Exhibit 5 marked for
13    identification.)
14        MS. O'DELL:  So, first, object
15 to a reference that those reports are his
16 report.  Those reports are reports from
17 Dr. Longo, first.
18        Second, if you're going to ask
19 him a question about a report, it needs to be
20 put in the chat and the specific page that
21 you're referring to needs to be identified so
22 he can see it in context.
23        MR. DUBIN:  And I am going to
24 identify the specific page that we're talking
25 about.  So let's put it in chat and then we

Page 59

1 can call it up, okay, and then we're going to
2 go to page 3 of this.
3        MS. O'DELL:  And if you would
4 identify -- please, just if you'll go back to
5 page 1.  Because I am not seeing it in the
6 chat yet.
7        MR. LUDWIG:  It's in the chat
8 here now.
9        MR. DUBIN:  It is in the chat.
10        MS. O'DELL:  Okay.
11        MR. DUBIN:  296, actually, is
12 the image and we can rotate that so we can see
13 it better.
14        MS. O'DELL:  And what's -- I'm
15 sorry, Morty.  I couldn't see it.  I was too
16 slow trying to see.  I see here.  Just a
17 moment.  Let me make sure that this is
18 actually a report at issue in the MDL.
19        This is not one of the reports
20 that's been disclosed in the MDL and so we
21 would object to questioning based on that.
22        MR. LUDWIG:  If it's not a
23 report disclosed in the MDL and it's not
24 subject to the Judge's scope, then I am
25 instructing the witness not to answer.  I

Page 60

1 don't know if it's his report or not.  I trust
2 Ms. O'Dell.
3        So you're instructed not to
4 answer.
5        MR. DUBIN:  Okay.  We'll
6 double-check what you're -- the list that went
7 in, but I believe that the results in this are
8 included in the reports, but we'll -- I'll
9 hold off on this image until after a break so
10 that we don't have to spend time arguing it.
11 BY MR. DUBIN:
12    Q.   Let's look at another image first,
13 but before I get to more images, I want to
14 stop and ask you a little bit about your
15 microscopes, okay, and what microscopes you
16 were using and how you set them up.
17        At some point initially were
18 you using an Olympus microscope for -- to look
19 at Johnson & Johnson for chrysotile?
20    A.   Olympus BH2.
21    Q.   And that -- so can you repeat the
22 model number for me?  BX?
23    A.   BH, bravo --
24    Q.   Okay.  BH2.  Okay.  And those
25 microscopes had tungsten lightbulbs?

Page 61

1    A.   Yes, sir.
2    Q.   And then at some point you switched
3 over to Leica microscopes; is that right?
4    A.   That is correct.
5    Q.   And what was the Leica model number?
6    A.   As I recall, it's the 2700P.
7    Q.   Do you recall approximately when you
8 changed over microscopes?
9    A.   It was during the early part of
10 2021, I believe.
11    Q.   And just so we understand basically
12 how it operated, how was illumination
13 controlled on the Olympus PLM?
14    A.   By individual controls on the side
15 and to bring up as much light as possible.
16    Q.   Okay.  So was it a dial?  Was it a
17 switch?  How did you adjust illumination?
18    A.   On the lamp itself, there was a
19 little dial on the side.
20    Q.   Okay.  And what -- did MAS have any
21 protocols for how illumination should be set
22 on the Olympus microscope when doing the
23 analysis?
24    A.   I would always set it myself to the
25 highest illumination.

16 (Pages 58 - 61)

Page 62

1    Q.   Okay.  As a PLM analyst, how do you
2  tell if an image is appropriately illuminated?
3    A.   Well, if the scope had capability,
4  we use Kohler illumination, but the best way
5  to get the most illumination out of any type
6  of scope is to have all the different parts
7  align and centered.
8    Q.   Okay.  And is it important for a PLM
9  analyst to be able to see all the particles in
10  the field of view clearly?
11    A.   Through the ocular, yes.
12    Q.   When you were doing your analysis on
13  the Olympus microscope and you were looking
14  for the colors of the particle, were you
15  typically doing that by assessing it through
16  the eyepiece of the microscope or by looking
17  at the -- or looking at a screen?
18    A.   Through the microscope.
19    Q.   And did the -- what is white
20  balancing?
21    A.   Basically, it takes the program that
22  you're using for the graphics and allows it to
23  adjust to the pure white light.
24    Q.   And did the Olympus come with any
25  filters, like a daylight filter or blue

Page 63

1  filter, to perform white balancing with?
2    A.   It had a -- we had a blue diffusion,
3  but there was nothing in -- to do white
4  balance, you have to have a white background.
5    Q.   So it came with a blue light or
6  daylight filter?
7    A.   I would just remove the diffuser.
8    Q.   I am sorry.  I don't understand.
9         Would -- did the microscope
10  come with or did you have a blue light or
11  daylight filter on the Olympus?
12    A.   I don't recall.
13    Q.   Do you know whether you used a blue
14  light or a daylight filter when performing
15  analysis for chrysotile in Johnson & Johnson
16  with the Olympus microscope?
17         MR. LUDWIG:  Objection to form.
18         Is there are a specific test
19  you're asking about?  It's my understanding
20  there was lots of tests.
21         So I am going to object to the
22  form.  Same scope issue.
23         MR. DUBIN:  It's the reports at
24  issue.  I'm asking about his microscope setup
25  for the reports at issue.

Page 64

1         MR. LUDWIG:  Is there a
2  specific report you're asking about?
3         MR. DUBIN:  There are a set of
4  reports that are done on an Olympus
5  microscope.  There are then a set of reports
6  that are done on the Leica microscope.
7         I am asking about the ones he
8  did on Olympus.  If we want -- if we need to
9  call up an example, I am happy to do that.  So
10  we'll call up an example of that.
11         We can go to the Zimmerman
12  report and that will be exhibit 6 and so let's
13  make that exhibit 6.  For internal reference
14  it's CX-6.  It's -- this is an image from the
15  February 24, 2020 analysis of Johnson &
16  Johnson.  We can put it in chat and call it
17  up.
18         (Exhibit 6 marked for
19     identification.)
20  BY MR. DUBIN:
21    Q.   Okay.  And I want to look at an
22  image there.  We can go to, I guess, 39 of the
23  report.  I am just going to -- okay.  For
24  example, this was in 2020.
25         So this would be on the Olympus

Page 65

1  microscope, correct?
2    A.   That is correct.
3    Q.   Okay.  So now we have an image.
4  We're talking about a specific report.
5         When you were doing these
6  analyses for Johnson & Johnson, were you using
7  a blue light or daylight filter?
8    A.   I don't recall if we ever had any
9  specific daylight or blue filters for the
10  Olympus.  The only thing blue was the
11  diffuser.
12         MS. O'DELL:  What is your other
13  report?
14         MR. DUBIN:  So this is -- this
15  was page 36, I think.
16  BY MR. DUBIN:
17    Q.   All right.  We'll come back to that
18  in a bit.
19         Do you know what the purpose is
20  of a blue light or a daylight filter?
21         MS. O'DELL:  Object to the
22  form.
23         MR. LUDWIG:  Object to the
24  form, yeah.  It calls for expert testimony.
25         I instruct you not to answer

17 (Pages 62 - 65)

Page 66

1  that question.
2          MR. DUBIN:  You're instructing
3  him not to answer?  I am asking him about the
4  work he did, how he set up his microscope, and
5  what filters he was using and you're
6  instructing him not to answer that?
7          MS. O'DELL:  That was not your
8  question.
9          MR. DUBIN:  Well, I just asked
10  him about whether it had a blue light filter
11  and whether he was using it and I am asking
12  him now what his understanding of the purpose
13  of that type of filter is.  Are you
14  instructing him not to answer that question?
15          MS. O'DELL:  He is here to --
16  he is here to testify to what he did, which
17  he -- the equipment he used, which he has been
18  responding to those questions.
19          Understanding about certain
20  methodologies, giving his opinion about
21  certain methodologies is beyond the scope of
22  what Judge Schneider has ordered.
23          MR. DUBIN:  Are you instructing
24  him not to answer --
25          MR. LUDWIG:  The objection --

Page 67

1          MR. DUBIN:  -- a simple
2  question about the purpose of a blue light
3  filter?  Are you instructing him not to
4  answer?
5          MR. LUDWIG:  Yes.
6          MR. DUBIN:  Okay.
7          MR. LUDWIG:  I believe that is
8  outside the scope of what the Judge just
9  said --
10          MR. DUBIN:  I really don't --
11  if you instruct him not to answer, I don't
12  need to hear a long speaking objection in
13  addition.
14          MR. LUDWIG:  Sure.  Fair
15  enough.
16          MS. O'DELL:  And just for the
17  record, Morty -- and I think it's just a page
18  number issue -- you identified what's on the
19  screen as page 36 of the report.  I am
20  assuming you mean 36 -- page 36 in the PDF?
21          MR. KEESTER:  It's 39 in the
22  PDF.
23          MR. DUBIN:  Thirty-nine.
24  Sorry.
25          MS. O'DELL:  Okay.  Let me just

Page 68

1  get there.  Okay.  Thank you.
2  BY MR. DUBIN:
3      Q.   Do you know how looking at an image
4  to tell whether a blue light filter or
5  daylight filter is being used?
6      A.   I don't recall ever dealing with
7  them.
8      Q.   Okay.  How was focus adjusted on the
9  Olympus microscope?
10      A.   Focus would be adjusted using the
11  fine focus knob.
12      Q.   Okay.  I want to show you another
13  image and ask you if you can tell me whether a
14  blue light filter is being used or not.
15          MR. DUBIN:  It will be
16  exhibit -- what number are we on?  We are now
17  on six?
18          THE COURT REPORTER:  Seven.
19          MR. DUBIN:  And that is --
20          THE COURT REPORTER:  You're on
21  exhibit 7, I believe.
22          MR. DUBIN:  Exhibit 7.  Okay.
23  That is CX-11A to call it up and if you could
24  just go to page 22 of it and put it in chat.
25          MS. O'DELL:  Mr. Hess, just

Page 69

1  give us a moment to see what's going to be put
2  on the screen and what the report is.
3          (Exhibit 7 marked for
4      identification.)
5  BY MR. DUBIN:
6      Q.   Page 22, can you tell me if a blue
7  light or daylight filter is being used on this
8  image?
9          MR. LUDWIG:  Objection --
10  objection.  This, once again, calls for expert
11  opinion, which is outside the scope of the
12  purpose of this deposition as instructed by
13  the Judge.
14          MR. DUBIN:  Are you instructing
15  him not to answer the question?
16          MR. LUDWIG:  I am instructing
17  him not to answer the question.
18          MS. O'DELL:  Yes.  This is not
19  a document that's been disclosed in the MDL.
20  It's a report for Dr. Longo.  It's analysis of
21  ceramic slip clay for something else that's
22  not related and we object to the use of this
23  exhibit.
24          MR. DUBIN:  Okay.  Can we call
25  up -- we'll make the next exhibit in order

18 (Pages 66 - 69)

Page 70

1 Hess slide 20.
2          THE COURT REPORTER: This is
3 exhibit 8.
4          MR. DUBIN: That's exhibit 8.
5 Can we call that up, Jake?
6          (Exhibit 8 marked for
7   identification.)
8 BY MR. DUBIN:
9    Q.   I am putting up the image that I
10 showed you before, as well as the image from
11 Zimmerman that I showed you before. These are
12 both analyses that you performed.
13          Can you tell me why the color
14 of the talc is different in the two images?
15          MS. O'DELL: We object to the
16 use of this document. First, Vanderbilt is
17 not at issue in this case, it's not a report
18 that's at issue in this case. We object to
19 the use of that image.
20          To the degree you want to have
21 him -- ask him about the Zimmerman report.
22 You had it up. He is welcome to answer
23 questions, but we object to the use of this
24 defense created exhibit.
25          MR. LUDWIG: And I am going to

Page 71

1 join and I am going to instruct him not to
2 answer.
3          Once again, you're getting into
4 expert opinion, which is outside the scope of
5 what the Judge instructed this witness.
6          MR. DUBIN: Was your -- okay.
7 So you're instructing him not to answer. I am
8 going to ask another question. If you
9 instruct him not to answer, then so be it.
10 BY MR. DUBIN:
11    Q.   But was the microscope set up
12 differently in these two analyses? Can you
13 tell by looking at the images whether the
14 microscope was set up differently in the two
15 analyses?
16          MR. LUDWIG: Same objection.
17          MS. O'DELL: Please put the
18 exhibit in the chat.
19          MR. DUBIN: Are you instructing
20 him not to answer?
21          MR. LUDWIG: Yes.
22          MR. DUBIN: And if -- can you
23 leave it back up, Jake? What's going on? I
24 am not done yet. Can you put that back up,
25 Jake? Thank you.

Page 72

1          And if I asked you about the
2 differences in illumination in these two
3 images, are you going to instruct your witness
4 not to answer that also?
5          MR. LUDWIG: Yes.
6          MS. O'DELL: And, again -- and,
7 Jake, I know you have a lot going on, but if
8 you would put that in the chat, please.
9 BY MR. DUBIN:
10    Q.   How are your images being taken on
11 the Olympus? How are the images being taken?
12    A.   It was done using an AmScope camera
13 and an AmScope program.
14    Q.   Okay. Were there any specific
15 settings that you had on the camera for
16 purposes of taking the images?
17    A.   I don't recall everything.
18    Q.   Are you familiar -- you're familiar
19 with ISO 22262-1?
20    A.   Familiar.
21    Q.   Do you know whether it says anything
22 about using blue or daylight filters?
23          MS. O'DELL: Object to the
24 form; calls for expert opinion; beyond the
25 scope of the work that Mr. Hess did in the

Page 73

1 MDL; and that's my objection.
2          Counsel can decide whether to
3 instruct him not to answer.
4          MR. LUDWIG: I am instructing
5 you not to answer that.
6 BY MR. DUBIN:
7    Q.   Okay. Let's talk about your Leica
8 microscope setup.
9          First, how was illumination
10 adjusted on the Leica microscope?
11    A.   It had a lamp knob on the side,
12 which we could bring up full illumination.
13    Q.   Was it a dial or was it -- was it a
14 switch? How did the illumination work?
15    A.   It was a dial.
16    Q.   And what -- if you turn that dial,
17 if you kept turning it, would it stop at some
18 point or could you continue to turn it and
19 turn it?
20    A.   I could continue to turn it.
21    Q.   Okay. So how did you set the
22 brightness on the Leica?
23    A.   By observation through the
24 microscope itself to the brightest point
25 available.

19 (Pages 70 - 73)

Page 74

1    Q.    So you -- did you always keep it at
2 the brightest point available?
3    A.    Yes, sir.
4    Q.    Okay.  And did the Leica microscope
5 come with any filters?
6    A.    The only filter I'm aware of is the
7 530 nanometer plate.
8    Q.    Did it have a daylight filter
9 switch?
10   A.    Not that I am aware of.
11        MR. DUBIN:  Let's make exhibit
12 9 Hess slide 22 and we can call that up.
13        (Exhibit 9 marked for
14   identification.)
15 BY MR. DUBIN:
16   Q.    Is this -- does this look familiar
17 to you as the Leica microscope that you were
18 using?
19   A.    It looks familiar.
20   Q.    Do you recall the switches that we
21 see here:  Daylight filter switch, neutral
22 density filter switch?
23   A.    Yes.
24   Q.    Okay.  Do you know whether your --
25 when you started using the Leica microscope,

Page 75

1 whether your daylight filter switch was in an
2 "on" or "off" position?
3    A.    I don't recall today.
4    Q.    All right.  Are you familiar with
5 what reference talc looks like from the USP
6 documents?
7        MR. LUDWIG:  Objection; calls
8 for expert opinion.  I am instructing him not
9 to answer.
10        MS. O'DELL:  Join.
11        MR. DUBIN:  Okay.  Well,
12 just -- we'll see.  You may instruct him not
13 to answer again, but I am going to ask it.
14        If we can put Hess slide 24 as
15 the next exhibit.
16        MS. O'DELL:  We have not gotten
17 the last exhibit in the chat yet.  So, please,
18 if we can just pause and take the time and put
19 that in the chat?  Thank you.
20        MR. KEESTER:  I'm sorry, Morty.
21 What slide are we doing?
22        MR. DUBIN:  Twenty-four.
23        MR. LUDWIG:  Is slide 24
24 exhibit 9 or is slide 24 exhibit 10?  I'm
25 sorry.

Page 76

1        MR. DUBIN:  Exhibit 10.
2        (Exhibit 10 marked for
3   identification.)
4 BY MR. DUBIN:
5    Q.    Do you know why your images taken on
6 the Olympus microscope of talc are more orange
7 than reference talc images?
8        MS. O'DELL:  I object to the
9 use of this exhibit.  It's unclear if it came
10 from a report that's at issue in this
11 deposition, it's unclear if it's -- if it's
12 Mr. Hess' work, and we object to its use.
13        MR. LUDWIG:  And I will join.
14 It outside the scope of the parameter of the
15 deposition.  I am instructing Mr. Hess not to
16 answer that question.
17        MR. DUBIN:  Okay.
18 BY MR. DUBIN:
19   Q.    Let's, again, go to your Zimmerman
20 report.  We have already marked that as an
21 exhibit.  We can call it back up, CX-6.  So we
22 have looked at this already.  Let's go back to
23 that image, starting at page 39.
24        So this is something that
25 you're calling chrysotile in parallel in

Page 77

1 1.550.
2        What color is that?
3        MS. O'DELL:  If you need to see
4 it and see it more closely, Mr. Hess, please
5 let us know that.
6        And if there is -- if there is
7 a specific structure you're referring to that
8 you can direct Mr. Hess?
9        MR. DUBIN:  Right.
10 BY MR. DUBIN:
11   Q.    The one with the micron bar under it
12 is the one that they are calling chrysotile.
13        What color is it?
14        MR. LUDWIG:  Can I have that
15 question reread, please?
16        THE COURT REPORTER:  One
17 moment.
18        "QUESTION:  So this is
19   something that you're calling chrysotile
20   in parallel in 1.550.
21        "What color is that?"
22        MR. LUDWIG:  I am going to
23 object once again.  It's calling for an expert
24 opinion.
25        MR. DUBIN:  This is -- I am

20 (Pages 74 - 77)

Page 78

1 asking him about his reports that are at issue
2 in this case and asking him what color that he
3 is calling particles and that is exactly in
4 the scope of the deposition.
5          So unless you're instructing
6 him not to answer that as well, my question
7 stands.
8          MR. LUDWIG: I instruct him not
9 to answer that question.
10         MR. DUBIN: Okay. So now
11 you're instructing the witness not to answer
12 questions even about the specific reports that
13 he was -- that we were permitted to depose him
14 on.
15         Is that my understanding?
16         MS. O'DELL: So would you
17 repeat your question, please?
18         MR. DUBIN: Oh, my goodness.
19 What color is the particle that you're calling
20 chrysotile here?
21         MR. LUDWIG: I am standing by
22 my objection. I am instructing him not to
23 answer.
24         It goes to -- you're asking him
25 to opine as to the color. The color is on the

Page 79

1 screen and it is part of an expert report
2 prepared by MAS and you're taking it out of
3 context.
4          So I am going to instruct you
5 not to answer.
6          If you want to ask him how he
7 developed the color, that's what the Judge
8 said, but --
9          MR. DUBIN: (Inaudible.)
10         MR. LUDWIG: -- his personal
11 involvement.
12 BY MR. DUBIN:
13    Q.   You are the analyst who did this
14 work for the Zimmerman report and we can go
15 through your PLM -- the PLM sheets.
16         You did this analysis, right?
17         MR. LUDWIG: Okay. That's
18 fine. Let's do that.
19 BY MR. DUBIN:
20    Q.   You did this analysis? These are
21 your PLM images, correct, Mr. Hess?
22    A.   It is.
23    Q.   So I'm asking you what color did you
24 assess this particle as?
25    A.   Could you zoom in on the particle?

Page 80

1    Q.   We can zoom more in.
2    A.   The center part of it is a golden
3 yellow, but I cannot determine the edges,
4 which is where I need to look.
5    Q.   Okay. Well, we'll go over this edge
6 effect, but you can agree that this is not --
7 this does not look like reference chrysotile,
8 correct?
9          MS. O'DELL: Object to the
10 form.
11         MR. LUDWIG: Same objection.
12         THE WITNESS: The center of the
13 particle is not what you would usually call.
14 BY MR. DUBIN:
15    Q.   And -- sorry. And you see that
16 there are rounded structures in this image,
17 right?
18    A.   There are.
19    Q.   Those are talc?
20    A.   Some may be.
21    Q.   Are they the same color as the
22 particle that you're calling chrysotile?
23         MS. O'DELL: Object to the
24 form.
25         THE WITNESS: It is, but I --

Page 81

1 the other particle colors, without being able
2 to see the true edges of the particle in
3 question --
4 BY MR. DUBIN:
5    Q.   Okay. We'll talk about edges --
6          MS. O'DELL: Excuse me, Morty.
7 I don't believe you could hear. He is not
8 finished with his answer.
9 BY MR. DUBIN:
10    Q.   Go ahead.
11    A.   -- I cannot comment.
12    Q.   We'll talk about edges later.
13         Have you seen any PLM work of
14 Johnson & Johnson done by any other experts?
15    A.   I don't recall.
16         MR. DUBIN: Okay. Let's put up
17 Hess slide 25 as exhibit 11.
18         (Exhibit 11 marked for
19    identification.)
20 BY MR. DUBIN:
21    Q.   We're looking at images of PLM --
22 and I will mark the entire report also from
23 Mr. Poye and from you -- both from on talcs.
24         Do you have any understanding
25 why the images look so different?

21 (Pages 78 - 81)

Page 82

1        MR. LUDWIG: Objection to form;
2 that goes into expert testimony and you made
3 your question -- this appears to be a defense
4 exhibit, I guess, comparing two different
5 samples. It is not a specific report from
6 MAS.
7        So I am instructing the witness
8 not to answer. This calls for expert opinion,
9 outside the scope of his testimony.
10        MS. O'DELL: Join.
11        MR. DUBIN: So the whole -- so
12 that we have the whole report in the record,
13 let's mark CX-53 as exhibit 11.
14        MS. O'DELL: Please put the
15 slide in the chat screen, Jake. Thank you.
16        THE COURT REPORTER: I just
17 want to confirm. Exhibit 11 was slide 25.
18 Are we now marking the whole report?
19        MR. DUBIN: Yeah, we're going
20 to now mark the whole report as exhibit 11.
21        MS. O'DELL: And we have --
22 since the --
23        MR. DUBIN: I am just marking
24 it for the record. I understand you have
25 objected to my asking him about it.

Page 83

1        MS. O'DELL: Understood, but is
2 the report going to be exhibit 12 and the
3 slide is going to be exhibit 11?
4        MR. DUBIN: I thought the
5 report was 11, but maybe I miscounted.
6        MR. LUDWIG: Exhibit 11 was the
7 slide and then exhibit 12 was going to be the
8 full report, if that's what you want to do.
9        I'm sorry. I am not trying to
10 step on your toes. I am trying to be helpful
11 in this.
12        MR. DUBIN: If the slide was
13 not marked -- I thought that was exhibit 10,
14 but if it's not marked, that's fine. I can
15 make it exhibit 12.
16        THE COURT REPORTER: This is
17 the court reporter. We have slide 25 as
18 exhibit 11. We have the report as exhibit 12.
19        MR. DUBIN: Okay.
20        MS. O'DELL: Thank you.
21        (Exhibit 12 marked for
22        identification.)
23 BY MR. DUBIN:
24        Q.  All right. You indicated that one
25 of the things that you reviewed in preparation

Page 84

1 for your deposition today was some material
2 from Dr. Su.
3        What did you review?
4        A.  I reviewed primarily the -- all the
5 images that he had put in the comments. For
6 lack of a better way to put it, the slide
7 show.
8        Q.  Okay. Have you reviewed his
9 affidavit entitled: Review of Dr. Longo's PLM
10 Methods for the Identification of Chrysotile?
11        A.  I don't recall that one.
12        Q.  Okay. What, if any, comments do you
13 have on the slides that you reviewed from
14 Dr. Su?
15        A.  Well --
16        MS. O'DELL: Object to form.
17        MR. LUDWIG: Object to the
18 form.
19        MS. O'DELL: Calls for expert
20 opinion. It's beyond the scope of this
21 deposition.
22        MR. DUBIN: Are you instructing
23 him not to answer?
24        MR. LUDWIG: I am instructing
25 him not to answer.

Page 85

1 BY MR. DUBIN:
2        Q.  You also indicated you reviewed some
3 materials from Dr. Wylie?
4        MS. O'DELL: Same.
5 BY MR. DUBIN:
6        Q.  What did you review?
7        A.  The report that -- I don't recall
8 the name of the report, but I believe it was
9 her most recent report.
10        Q.  Okay. Do you have any comments on
11 the -- on her review of your work?
12        MR. LUDWIG: Same objection.
13        I instruct him not to answer.
14 He is not here to provide criticisms of
15 Dr. Wylie. The Court made it very clear, the
16 scope of the testimony.
17        MS. O'DELL: Join.
18        MR. DUBIN: These are all
19 related to his work that is the subject of
20 this deposition, but if you're instructing him
21 not to answer, then that will be an
22 instruction. We'll take it up at some point.
23        Because we're clearly going to
24 have to go back to the drawing board about the
25 way that these objections are being made, but

Page 86

1 if you're instructing him not to answer, but
2 my proffer is that they are all about the
3 reports at issue in this case.
4        MS. O'DELL: Mr. Hess is here
5 today to answer questions regarding his
6 reports and he has answered your questions
7 about those. He is not here to offer expert
8 opinion, criticism, thoughts, et cetera, about
9 defense or expert witnesses.
10       MR. DUBIN: Okay.
11 BY MR. DUBIN:
12   Q. In terms of illumination, I want to
13 look at another report just quickly, your
14 report and your analysis. It will be exhibit
15 13. It's CX-28 is the internal reference and
16 it's dated 4/13/2021.
17       MR. DUBIN: If we could put it
18 in chat and then call it up.
19       MS. O'DELL: Chris, you put a
20 comment in chat. Did you have an objection?
21 We're not hearing you if you're making an
22 objection.
23       MR. PLACITELLA: Well, my
24 objection is that it seems like it's
25 repeatedly -- documents are repeatedly being

Page 87

1 put up in contravention of the Court's Order
2 and we're here to try to get through this
3 deposition and the purposes of trying to make
4 a record.
5        I mean, this is exactly what
6 the Judge said not to do --
7        MR. DUBIN: Okay.
8        MR. PLACITELLA: -- and you
9 keep doing it.
10       MR. DUBIN: I completely
11 disagree with you and I am making my record.
12 He is being instructed not to answer, I need a
13 record of that, and thank you for your
14 comments, but we're moving on.
15       MR. PLACITELLA: Okay. No
16 problem.
17       MR. DUBIN: Thanks.
18       (Exhibit 13 marked for
19    identification.)
20 BY MR. DUBIN:
21   Q. So I just want to understand your
22 testimony. If we go to PDF 2 here, this is
23 one of your -- sorry. It will be the image.
24 So it's at 84. And, again, I want to talk to
25 you a little bit about illumination.

Page 88

1        Is it your testimony that this
2 image was taken at maximum illumination?
3   A. Yes, sir.
4   Q. So the brightness level on the
5 Olympus does not go any higher than this?
6        MR. LUDWIG: Objection; asked
7 and answered.
8        THE WITNESS: Pardon?
9        MR. LUDWIG: I said, objection;
10 asked and answered.
11 BY MR. DUBIN:
12   Q. Is that correct? Your testimony is
13 that the Olympus microscope you were using at
14 this time, it cannot take any brighter images
15 than this.
16        Is that your testimony?
17        MS. O'DELL: Object to the
18 form.
19        THE WITNESS: May I see the
20 lower part of the image?
21 BY MR. DUBIN:
22   Q. I'm sorry? You want to see the
23 lower part of the image? Sure.
24   A. Thank you.
25        That was not taken on the

Page 89

1 Olympus.
2   Q. Okay. So this is Leica?
3   A. This is a Leica.
4   Q. Okay. So is it your testimony that
5 the Leica microscope cannot take any brighter
6 images than this?
7        MS. O'DELL: Object to the
8 form.
9        MR. LUDWIG: Object to the
10 form.
11        THE WITNESS: That is the
12 brightest I could get for that particular
13 mount.
14 BY MR. DUBIN:
15   Q. Okay. And, for example, if we just
16 look at page 85 of this, we can see the
17 perpendicular.
18        Is it your testimony that this
19 type of image is taken at maximum brightness
20 on the Leica?
21        MS. O'DELL: Object to the
22 form.
23        THE WITNESS: It is.
24 BY MR. DUBIN:
25   Q. Okay. We'll come back to

23 (Pages 86 - 89)

Page 90

1 illumination in a bit, but let's first just
2 talk a little bit about the switch that was
3 made at some point to 1.560 oil.
4          Do you know why that switch was
5 made in your analysis?
6          MR. DUBIN: You can take this
7 down, Jake.
8          THE WITNESS: The switch was
9 made at the suggestion -- I don't recall his
10 name, but he was in, talking with Dr. Longo;
11 and he was back, watching me do some work; and
12 he made the suggestion because of the intense
13 stretch of yellow on the color chart for 1.55,
14 that we do it with 1.560 to better define the
15 upper level of what we were finding in the
16 chrysotile.
17          MR. LUDWIG: I think the
18 question went to switching microscopes.
19          MR. DUBIN: No. He understood
20 the question. It was why the oil was
21 switched.
22          MR. LUDWIG: I'm sorry.
23 BY MR. DUBIN:
24   Q.  Okay. And what is the expected
25 effect if you are switching from 1.550 to 1.60

Page 91

1 oil?
2   A.  We didn't switch to 1.60.
3   Q.  Sorry. What did you say?
4   A.  That we didn't switch to 1.60.
5   Q.  You didn't switch to 1.560? Maybe I
6 misspoke.
7          What is the expected effect of
8 switching to one, five -- 1.560 oil?
9          MR. LUDWIG: I'm going to
10 object; that calls for an expert opinion. I
11 am instructing the witness not to answer that
12 question.
13          MR. DUBIN: Okay. Well, I want
14 to call up -- let's just mark the Valadez
15 report as the next exhibit in order. I guess
16 that's 14.
17          (Exhibit 14 marked for
18      identification.)
19          MR. LUDWIG: Mr. Dubin, we have
20 been going for close to an hour and fifteen.
21 Do you want to just do this last one and then
22 take a break?
23          MR. DUBIN: I'll call up --
24 I'll put up the report and I'll put it in chat
25 because we're going to talk about it for a

Page 92

1 bit. Let's put that in chat and we can go to
2 page 32 of it. Sorry. Is it page 32? It
3 should be the image. Okay.
4          Well, let's -- I will -- we can
5 just take the break now. I will leave that in
6 chat so that if anybody needs it over the
7 break.
8          What are we going to take? Ten
9 minutes?
10          MR. LUDWIG: Ten minutes is
11 great.
12          MR. DUBIN: All right. We can
13 do ten minutes.
14          VIDEOGRAPHER: The time is
15 11:19 a.m. We are off the record.
16          (Break held off the record.)
17          VIDEOGRAPHER: The time is
18 11:37 a.m. We are back on the record.
19          MR. DUBIN: We are going to
20 start talking about the Valadez report and the
21 Valadez report -- if we can put it back up?
22 We can just go to the front cover first and
23 then we'll come back here to the image. Okay.
24 BY MR. DUBIN:
25   Q.  So the -- this is what we referred

Page 93

1 to as the Valadez report from 2023.
2          So we would be taking about a
3 Leica microscope, correct?
4   A.  That is correct.
5   Q.  And we're talking now about using
6 1.560 oil, right?
7   A.  Yes, sir.
8   Q.  Okay. And so let's go to that image
9 first.
10          MS. O'DELL: For the record,
11 what page in the PDF?
12          MR. DUBIN: What page is that,
13 Jake?
14          MR. KEESTER: This is PDF page
15 33.
16          MR. DUBIN: It's particle CSM
17 001.
18 BY MR. DUBIN:
19   Q.  Now, I want to just quickly flip
20 back to the Zimmerman report we have already
21 looked at, the image, and if we can just look
22 at the image we had up before.
23          Can you see that the image in
24 the Zimmerman report is more golden or orange
25 than the image in the Valadez report? We can

Page 94

1  go back and forth between them if you need to.
2          MR. DUBIN:  Can we flip back to
3  Valadez?
4  BY MR. DUBIN:
5      Q.  Do you see that the Zimmerman report
6  image is more golden or orange?
7      A.  I do.
8      Q.  Do you know why that is?
9      A.  From the BH2, which is the Zimmerman
10  report, we were on a tungsten lamp, and it was
11  to the respect that we were dealing with extra
12  yellows from the tungsten lamp.
13      Q.  So the tungsten lamp was changing
14  the color of the particle then?
15          MS. O'DELL:  Object to the
16  form.
17          MR. LUDWIG:  Object to form.
18  BY MR. DUBIN:
19      Q.  Is that correct?
20          MS. O'DELL:  Object to the
21  form.
22          THE WITNESS:  We felt it was
23  adding more yellow to the image of what we
24  were seeing and what we were documenting.
25  BY MR. DUBIN:

Page 95

1      Q.  Okay.  And it wasn't just adding
2  yellow.  If we go back to the Zimmerman report
3  image, it was adding sort of darker golden
4  colors or orange colors to the image, right?
5          MS. O'DELL:  Object to form.
6          MR. LUDWIG:  Objection.  This
7  calls for an expert opinion.
8          I will instruct you not to
9  answer that one.
10          MR. DUBIN:  You're instructing
11  him not to answer that question about the
12  comparison between these two images?
13          MR. LUDWIG:  Correct.  You're
14  testifying and I am going to object to that
15  one.
16          MR. DUBIN:  You're objecting
17  and you're instructing your witness not to
18  answer a question about the impact of lighting
19  on his images in the reports at issue in this
20  deposition and you're instructing him not to
21  answer.
22          Is that my understanding?
23          MR. LUDWIG:  Could you -- let
24  me hear the question again because I think
25  you -- what you said was different than what

Page 96

1  your question was.
2          MR. DUBIN:  We can read the
3  question back.
4          THE COURT REPORTER:  One
5  moment.
6          "QUESTION:  And it wasn't just
7      adding yellow.  If we go back to the
8      Zimmerman image, it was adding sort of
9      darker golden colors or orange colors to
10      the image, right?"
11          MS. O'DELL:  Object to the
12  form.
13          MR. LUDWIG:  I am going to
14  stand by my objection.
15          MR. DUBIN:  So you're not just
16  objecting.  You're instructing him not to
17  answer that question.  I need to understand
18  that.
19          MR. LUDWIG:  Correct.
20          MR. DUBIN:  So if I ask him any
21  questions trying to compare various images in
22  his reports, are you going to instruct him not
23  to answer that?
24          MS. O'DELL:  You can proceed
25  with your deposition, Morty.  It's no way

Page 97

1  to -- to respond to that.  I mean --
2          MR. DUBIN:  Okay.  I just --
3  we're obviously going to have to deal with
4  this after the end of the questioning today,
5  but we'll proceed.
6          MS. O'DELL:  I am not finished.
7          MR. DUBIN:  Okay.
8          MS. O'DELL:  Stop interrupting,
9  please.  If you ask him questions about the
10  image and the work that he did, he is
11  available to answer your question.  He is not
12  here to offer expert opinion.  It has been
13  stated numerous times.
14          MR. DUBIN:  I am asking him
15  directly about his images right now.  So --
16  and he is still being instructed not to
17  answer.
18  BY MR. DUBIN:
19      Q.  So, again, I am asking you a
20  question about this image.
21          The tungsten lighting is not
22  just adding more yellow; it's adding golden
23  colors and more orange color to the images,
24  right?  Is that correct?
25          MR. LUDWIG:  Object.

25 (Pages 94 - 97)

Page 98

1          I instruct you not to answer.
2          MR. DUBIN: You're instructing
3 him not to answer that question. Okay.
4 BY MR. DUBIN:
5    Q. And if we -- if we look at the
6 Valadez image, the effect of changing the
7 refractive index oil should have been to make
8 the particles less yellow, right? To move the
9 yellows towards the range of magenta, correct?
10   A. It was done to make it easier to
11 determine the upper refractive indices.
12   Q. But by -- if I have a particle that
13 is orange in parallel in 1.550 and I change my
14 oil to 1.560, it should appear more magenta,
15 right --
16         MS. O'DELL: Objection.
17 BY MR. DUBIN:
18   Q. -- in the magenta range?
19         MS. O'DELL: Excuse me.
20 Objection. Seeks expert opinion.
21         MR. LUDWIG: Join.
22         I instruct the witness not to
23 answer.
24 BY MR. DUBIN:
25   Q. What color is this particle that you

Page 99

1 identified as chrysotile? What color is it?
2    A. Please, focus in.
3    Q. (Counsel complies.)
4          MS. O'DELL: Again, this is
5 page 33 of the Valadez report and that's being
6 shown on the screen?
7          MR. DUBIN: It may be page 32,
8 I think, but I don't know. Is it 33 or 32,
9 Jake?
10         MR. KEESTER: I have it as PDF
11 33.
12         MR. DUBIN: Okay. PDF 33.
13         THE WITNESS: It has a mottled
14 appearance, some yellow, but I cannot
15 ascertain the edge off of the photograph.
16         MR. DUBIN: Okay.
17         MS. O'DELL: And, Morty, just
18 to correct the record, I believe that this is
19 page 32 of the Valadez --
20         MR. DUBIN: I said 32. It may
21 just be PDF 33.
22         MS. O'DELL: I am looking at
23 the actual report. The PDF report is 32 just
24 so it's clear when we go back what we're
25 looking at.

Page 100

1          MR. DUBIN: Right. And so it's
2 also clear, it's CSM 001.
3 BY MR. DUBIN:
4    Q. Do you see rounded structures here
5 that you believe to be talc plates?
6    A. There are.
7    Q. And do you see that some of those
8 rounded structures have some red coloration
9 around the edges?
10         Do you see that?
11   A. I cannot --
12   Q. (Inaudible.)
13   A. -- the edge color --
14         MS. O'DELL: He was not
15 finished; so.
16 BY MR. DUBIN:
17   Q. What was the answer?
18   A. I cannot determine the edge colors
19 from the photograph as presented.
20   Q. You don't see red edges on the talc
21 plates?
22         MR. LUDWIG: Asked and
23 answered.
24         THE WITNESS: I don't on the
25 photograph as presented.

Page 101

1 BY MR. DUBIN:
2    Q. Is red a central stop dispersion
3 color that is associated with talc itself in
4 1.550 or 1.560?
5    A. I am not aware that it is.
6    Q. Do you ever go through any process
7 to calibrate your dispersion staining colors?
8    A. We do that.
9    Q. And how do you do that? How did you
10 do that?
11   A. I didn't do them. There was
12 somebody else in the lab that did them.
13   Q. Do you know what the process was?
14   A. Initially, it was through the
15 Cargille glass solids.
16   Q. Cargille glass?
17   A. Yes, and --
18   Q. And --
19         MS. O'DELL: Sorry. He is not
20 finished.
21 BY MR. DUBIN:
22   Q. Go ahead.
23   A. And then recently was acquired a
24 refractive scope where you can check your
25 index difference.

26 (Pages 98 - 101)

Page 102

1    Q.    And Cargille -- those Cargille glass
2 standards have a single refractive index; is
3 that right?
4    A.    That is correct.
5    Q.    Meaning that they only have one true
6 central stop dispersion staining color; is
7 that correct?
8    A.    That is correct.
9    Q.    Okay. Can you still see sometimes
10 edges on the Cargille glass that show a
11 different color, not their true central stop
12 dispersion staining color? Can you sometimes
13 see edges on them of different colors?
14        MS. O'DELL: Objection to the
15 form to the degree it's talking about a
16 process that he did not do himself.
17 BY MR. DUBIN:
18    Q.    Just only if you know personally?
19        MS. O'DELL: And do not
20 speculate, please, Mr. Hess. If you -- if
21 that's a process you were involved in for
22 purposes of your work in this case, you can
23 respond, but if it was not, well, that's
24 beyond the scope, and that's expert opinion.
25        THE WITNESS: I did not do the

Page 103

1 calibrations --
2 BY MR. DUBIN:
3    Q.    Are you --
4    A.    -- just said.
5    Q.    Are you familiar with the fact that
6 you can -- that even with Cargille glass that
7 has a single refractive index, you can
8 sometimes see edge colors that don't
9 correspond to that refractive index?
10        MS. O'DELL: Objection; seeks
11 expert opinion beyond the scope of the
12 deposition. I will let Mr. Hess' counsel
13 instruct him.
14        MR. LUDWIG: I am going to
15 instruct him not to answer that question.
16 BY MR. DUBIN:
17    Q.    Do you know what total reflection
18 means in the context of PLM dispersion
19 staining?
20        MS. O'DELL: Same objection.
21        MR. LUDWIG: Is the question
22 does he know what total dispersion -- repeat,
23 please?
24 BY MR. DUBIN:
25    Q.    Total reflection.

Page 104

1    A.    I am unfamiliar with the term.
2    Q.    If we scroll down so we can see the
3 bottom of this, you see that there is a
4 refractive index number, 1.564; that is the
5 refractive index number that you assigned to
6 this particle; is that correct?
7    A.    That is correct.
8    Q.    Do you know what color that
9 refractive index number corresponds to in
10 1.560 oil?
11    A.    Without the temperature information
12 handy and without the actual charts utilized,
13 it was more of a.
14    Q.    So are you done with your answer?
15    A.    I don't recall exactly off the top
16 of my head.
17    Q.    Well, let's go through the process
18 so we understand how you can take that
19 refractive index number and determine what
20 color you were calling this particle.
21        And so I am going to show you a
22 couple different slides. We can just mark
23 them as separate exhibits. We can just start
24 with slide 34.
25        THE COURT REPORTER: For the

Page 105

1 record, I believe this is Exhibit 15.
2        MR. DUBIN: Thank you.
3        (Exhibit 15 marked for
4    identification.)
5 BY MR. DUBIN:
6    Q.    Do you know the temperature in the
7 lab at MAS?
8    A.    We did have an immersion thermometer
9 at station.
10    Q.    And what is the temperature?
11    A.    It was 21 degrees.
12    Q.    And so if we wanted to figure out
13 what color you're calling the particle, we
14 could look at the Su tables or 1.560, and we
15 take your RI given, right, and then we can
16 match that up with a wavelength of light,
17 correct?
18    A.    Correct.
19        MS. O'DELL: I object to the
20 question.
21        Where did this table -- what
22 reference did this table come from?
23        MR. DUBIN: You're familiar
24 with the Su tables. We can mark them as an
25 exhibit if it's necessary. I will mark the Su

27 (Pages 102 - 105)

Page 106

1 tables so we have them. I will mark the Su
2 tables as Exhibit 35. I guess it must be
3 CX-26.
4           MR. LUDWIG: My understanding,
5 this is a document prepared by defense
6 counsel. This is not the Su tables. This is
7 an excerpt, table, picture of Dr. Su, and some
8 other things; is that correct?
9           MR. DUBIN: An excerpt and
10 that's why in case you need it, I am marking
11 the entire document as the next exhibit.
12           MR. LUDWIG: Okay. Well, now I
13 am objecting to testimony about this document
14 then.
15           MR. DUBIN: What is your
16 possible objection about my asking him about
17 the color of the particle in the report that
18 he is here to be deposed about?
19           MR. LUDWIG: I am objecting to
20 this exhibit 15, which is a defense exhibit --
21           MR. DUBIN: It's --
22           MR. LUDWIG: -- that's what I
23 am objecting to.
24           MR. DUBIN: Okay. So,
25 Mr. Placitella, do you agree and say that you

Page 107

1 can never use a demonstrative created by
2 counsel as part of examining a witness?
3 Because I am curious about your view on that,
4 Mr. Placitella. So no more creating exhibits
5 to ask -- or demonstratives to ask our
6 witnesses about, right, Mr. Placitella, or do
7 you disagree with --
8           MR. LUDWIG: (Inaudible) --
9           MR. PLACITELLA: You're now
10 asking me questions?
11           MR. DUBIN: I am asking you
12 that question.
13           MR. PLACITELLA: How about I
14 ask you a few?
15 BY MR. DUBIN:
16     Q.    All right. I am going to continue
17 to ask you questions about this document.
18           So going back to this, you can
19 find on the table --
20           MS. O'DELL: Morty, excuse me.
21 The reason I asked is so if this is a
22 defense-created exhibit, so we understand
23 what's being discussed and for the record,
24 first; and then, second, so Mr. Hess has an
25 understanding of what's being asked of him.

Page 108

1           I understand you're going to
2 put the Su tables that you're referring to in
3 the chat and so if you go ahead and do that
4 and I assume they are going to be marked as
5 exhibit 16; is that correct?
6           MR. DUBIN: I think that's the
7 correct number. Exhibit 16 will be the Su
8 tables.
9           MS. O'DELL: And if you need to
10 see the Su tables, Mr. Hess, or anything else,
11 just request that, and we'll get it in front
12 of you.
13           MR. DUBIN: That's fine.
14           (Exhibit 16 marked for
15     identification.)
16 BY MR. DUBIN:
17     Q.    Anyway, so you can look at the RI
18 that you gave, 1.564, and that will correspond
19 with a wavelength of light, correct?
20     A.    That is correct.
21     Q.    And we can see that the wavelength
22 of -- the color associated with that
23 wavelength of light is purple, right, 560
24 nanometers?
25     A.    In the color chart, that's what it

Page 109

1 shows.
2     Q.    So for purposes of your analysis
3 calling this chrysotile, you were treating
4 this particle as if it was purple, correct?
5           MS. O'DELL: Object to the
6 form.
7           THE WITNESS: I was treating
8 what I could see around the edges through my
9 scope.
10 BY MR. DUBIN:
11     Q.    And, in fact, if we -- if we look
12 back at what we looked at before, which was
13 reference chrysotile -- we can put that slide
14 back up.
15           MR. DUBIN: I don't remember
16 what number it was, but for calling it up,
17 Jake, we can use slide 40.
18 BY MR. DUBIN:
19     Q.    Reference chrysotile, the refractive
20 index number given for that particle by ISO is
21 1.556; that corresponds to magenta, correct?
22           MS. O'DELL: Object to the
23 form.
24           We had an objection previously
25 to this exhibit because it calls for an expert

28 (Pages 106 - 109)

Page 110

1 opinion and so --
2        MR. DUBIN: Are you instructing
3 him not to answer?
4        MR. LUDWIG: I am instructing
5 him not to answer for the reasons stated
6 before.
7        MR. DUBIN: Okay. Let's go
8 to -- make the next exhibit slide 43.
9        MR. KEESTER: I'm sorry, Morty.
10 That was 43?
11        MR. DUBIN: Yeah, and that will
12 be exhibit 17.
13        (Exhibit 17 marked for
14    identification.)
15 BY MR. DUBIN:
16   Q.   The number -- the wavelength of
17 light that you assigned to this particle on
18 the left that you're calling chrysotile in
19 Johnson & Johnson, you are saying that it is
20 even more purple than standard reference
21 chrysotile depicted on the right, correct?
22        MS. O'DELL: Objection.
23        This is an incomplete depiction
24 of what's being examined. It is including
25 images that are not Dr. -- Mr. Hess', excuse

Page 111

1 me, and it is an inappropriate examination of
2 this witness, who is a fact witness, and seeks
3 expert opinion, and we to object to it.
4        MR. DUBIN: First off, I don't
5 understand how you can say every time that he
6 is a fact witness and not an expert. He is
7 here to be deposed about his polarized light
8 microscopy work. There is no way to depose
9 someone about their polarized light microscopy
10 work without asking them questions that are
11 technical in nature.
12        And so if your objection is
13 that every time I ask him for something about
14 his conclusions, it's an expert opinion, then
15 you are essentially shutting down this
16 deposition. It's --
17        MS. O'DELL: That's not
18 correct. We're asking -- we have not
19 instructed Mr. Hess to not respond to
20 questions that are technical. We have
21 instructed him not to give expert opinion
22 because he is here as a fact witness as you
23 know and as the Special Master has ruled.
24        And this seeks a comparison
25 between the photomicrograph that Mr. Hess took

Page 112

1 to an ISO record for chrysotile and that is
2 beyond the scope of this deposition.
3        That's -- that is --
4        MR. DUBIN: Are you instructing
5 him not to answer?
6        MS. O'DELL: Let me finish.
7 I'm sorry. Let me finish. I stuttered there.
8        Judge Schneider was very clear
9 that he is going to be asked about his work
10 and not a comparison of his work to others and
11 that is expert opinion and that's why we're
12 instructing him not to answer.
13        MR. DUBIN: Okay. So you're
14 instructing him not to answer?
15        MR. LUDWIG: Correct.
16        MR. DUBIN: Okay.
17 BY MR. DUBIN:
18   Q.   I want to make sure and let me raise
19 the question.
20        As a fact, factually, you
21 assigned a darker purple color to that
22 particle on the left than standard reference
23 chrysotile, correct?
24        MS. O'DELL: Objection; that is
25 the same objection, and I just also object to

Page 113

1 use of this color chart without reference to
2 the other charts from Dr. Su's tables that
3 take into consideration the temperature and
4 other aspects of the table. It's an
5 incomplete hypothetical. He --
6        MR. DUBIN: I am sorry. I
7 don't think you understand the -- I don't
8 think you understand how the analysis works.
9 Because we already did the temperature of the
10 lab when we figured out what nanometer of
11 light he was calling the particle. So that is
12 not a valid objection scientifically. Are you
13 instructing him not to answer?
14        MS. O'DELL: I am going to let
15 Mr. Hess' counsel instruct him, but I have
16 made my objection.
17        MR. LUDWIG: I am instructing
18 him not to answer.
19        MR. PLACITELLA: I would just
20 like to -- can you hear me? I would just like
21 to add the following objection and I am trying
22 to stay out of this.
23        If you're taking a tiny, little
24 piece of a big slide and then blowing -- and
25 then sticking it next to a different slide,

29 (Pages 110 - 113)

Page 114

1 there is no guarantee that this accurately
2 depicts what the actual slide looks like,
3 especially on a Zoom presentation. So that's
4 my concern to put on the record.
5          MR. DUBIN: Okay. And my --
6          MR. PLACITELLA: Now I'll go
7 back to sleep.
8          MR. DUBIN: My response to that
9 is we're comparing the colors associated with
10 two different nanometers of light, which are
11 depicted accurately on the slide, and I
12 understand that you guys are instructing him
13 not to answer and okay. So we'll have to deal
14 with that later.
15          MR. PLACITELLA: No, no, but my
16 objection was beyond that. My objection was
17 how this was put together, who put the colors
18 on what piece of the photograph and, you know,
19 what someone is being asked to interpret over
20 Zoom; that's all. Now I will go back to
21 sleep.
22          MR. DUBIN: Yeah. Okay.
23 BY MR. DUBIN:
24    Q.   So let's go back to the Valadez
25 report.

Page 115

1          Are you -- are you swearing
2 that particle as purple in --
3          MS. O'DELL: Object to --
4          THE COURT REPORTER: Please
5 repeat your question.
6 BY MR. DUBIN:
7    Q.   Are you swearing that that particle
8 is purple, the one depicted in 001?
9          MR. LUDWIG: Objection to form.
10          THE WITNESS: No. The particle
11 itself interior-wise has yellow. I utilized
12 what I could find through the scope around the
13 edges or at the edge.
14 BY MR. DUBIN:
15    Q.   So are you telling me that that
16 particle we're looking at is somehow entirely
17 surrounded with purple, but we just can't see
18 it?
19          MS. O'DELL: Objection to the
20 form; asked and answered.
21          MR. LUDWIG: Argumentative.
22 BY MR. DUBIN:
23    Q.   You can respond.
24    A.   Based on what I saw through the
25 microscope.

Page 116

1    Q.   How can we independently verify with
2 your report that that particle is purple
3 without actually being at your scope?
4          MS. O'DELL: Objection.
5          MR. LUDWIG: Objection; calls
6 for -- objection to form.
7 BY MR. DUBIN:
8    Q.   You can respond.
9    A.   So I do the documentation on the
10 pictures.
11    Q.   But you're telling me that the
12 pictures don't show the purple.
13          So how can we independently --
14 how can we verify that that particle, in fact,
15 has purple?
16          MS. O'DELL: Objection;
17 misstates his testimony.
18          MR. LUDWIG: Join.
19          THE WITNESS: It's documented
20 as part of the report. It's in the picture.
21 BY MR. DUBIN:
22    Q.   So you're saying that purple is in
23 the picture.
24          So where is the purple?
25          MS. O'DELL: Objection;

Page 117

1 misstates his testimony.
2 BY MR. DUBIN:
3    Q.   You can respond.
4    A.   I make my determinations on what I
5 can see through the scope and it's represented
6 to the best that I can get it on the screen in
7 the picture.
8    Q.   Okay. But can we verify that with
9 the picture? Can we verify that in some way?
10    A.   Other than what's on the picture,
11 Counselor, I cannot speculate.
12          MR. LUDWIG: Do you need it
13 blown up?
14          MR. DUBIN: We can blow it up.
15          MR. PLACITELLA: There it is.
16 BY MR. DUBIN:
17    Q.   Do you see purple or red on the talc
18 plates in this image? To the extent you're
19 claiming you see it on that particle, do you
20 see it on all the rounded talc plates?
21    A.   On this image, I can just barely.
22    Q.   On the rounded talc plates, right?
23          MR. LUDWIG: Listen to the
24 question.
25 BY MR. DUBIN:

30 (Pages 114 - 117)

Page 118

1    Q.   You can see those kind of edge
2 effects on the talc plates as well, right?
3         MS. O'DELL:  I am -- the screen
4 is about ten feet away from Mr. Hess.  I am
5 handing him the Valadez report on my computer
6 so he can see it more clearly.
7 BY MR. DUBIN:
8    Q.   Do you see those same kind of edge
9 effects on all -- on the talc plates?
10   A.   I can see parts, yes.
11   Q.   But talc plates aren't purple in
12 1.560 oil, right, and they are not red,
13 correct?
14        MS. O'DELL:  And if you need to
15 make it bigger or smaller, Mr. Hess, you can
16 just -- you can touch my screen.
17 BY MR. DUBIN:
18   Q.   You can focus on any of these
19 rounded talc plates and you'll see the same
20 edge effects, right?
21        MS. O'DELL:  Object to the
22 form.
23        THE WITNESS:  Similar.
24 BY MR. DUBIN:
25   Q.   So what refractive index number

Page 119

1 would you assign to any of the talc plates
2 that also have that edge effect?  What would
3 you -- what is the refractive index of the
4 talc plates?
5         MS. O'DELL:  Object to the
6 form; expert opinion.
7         MR. LUDWIG:  This is an expert
8 opinion.  I am going to instruct him not to
9 answer that one.
10 BY MR. DUBIN:
11   Q.   Mr. Hess, you're basing your calling
12 this particle chrysotile on edge effects that
13 are also present on the talc plates
14 themselves; isn't that right?
15        MS. O'DELL:  Objection;
16 misstates his testimony.
17 BY MR. DUBIN:
18   Q.   You can respond.
19        MS. O'DELL:  Objection;
20 misstates his testimony.
21        MR. LUDWIG:  Join.
22        MS. O'DELL:  Seeks expert
23 opinion.
24 BY MR. DUBIN:
25   Q.   You can respond.

Page 120

1    A.   At least my opinion of what I am
2 seeing not only on the dispersion staining,
3 but also on the appearance of the structure,
4 whether it shows fibrosuity.
5    Q.   You are basing your refractive
6 index --
7         MS. O'DELL:  Excuse me.  Were
8 you finished with your answer?
9         THE WITNESS:  It's based on
10 what I see through the scope and my
11 examination of the particle.
12 BY MR. DUBIN:
13   Q.   You are basing your assessment of
14 the refractive index of this particle that
15 you're calling chrysotile based on edge
16 effects that are also present on the rounded
17 talc plates, correct?
18        MS. O'DELL:  Objection;
19 misstates his testimony.
20 BY MR. DUBIN:
21   Q.   You can respond.
22   A.   I base it on what I see around the
23 particle itself.
24   Q.   And those -- again, my question is,
25 what you're claiming -- the effect that you're

Page 121

1 claiming to see around that particle you're
2 calling chrysotile is also present on the
3 round talc plates, correct?
4         MS. O'DELL:  Objection.
5         MR. LUDWIG:  Objection, asked
6 and answered.
7         MS. O'DELL:  Misstates his
8 testimony.
9 BY MR. DUBIN:
10   Q.   You can respond.
11   A.   I am basing it on my determination
12 from what's around the particle.  I do not
13 take into account what's around the talc.
14   Q.   Okay.  So you don't consider whether
15 or not, because this effect is also on the
16 talc plates, whether it's an artifact of
17 your -- of your analysis?  You don't look at
18 the talc plates to see whether you see the
19 exact same effect on the talc plates?
20        MS. O'DELL:  Objection;
21 misstates his testimony.  It's not what he
22 testified a moment ago.
23 BY MR. DUBIN:
24   Q.   Are these talc plates, are those
25 also purple, according to you, if you're

31 (Pages 118 - 121)

Page 122

1 looking at the edge effects?
2    A.   What I am seeing on there is more of
3 a red, but it's not in focus to the point that
4 I would be able to make a determination.
5    Q.   So would the refractive -- would the
6 refractive index value for those talc plates
7 correspond to red?
8         MS. O'DELL:  Objection.
9         He was just saying it wasn't in
10 focus and you can't make that determination
11 from a photomicrograph on a screen.
12 BY MR. DUBIN:
13    Q.   So are those talc plates -- does the
14 refractive index that you assigned to them
15 based on their edges, does that correspond to
16 red?
17         MS. O'DELL:  Same objection.
18 BY MR. DUBIN:
19    Q.   You can respond.
20    A.   I would not give it the same.
21         THE COURT REPORTER:  Please
22 repeat your answer.
23         MR. LUDWIG:  I think it was:  I
24 would not give it the same.
25         I think you were still talking?

Page 123

1         THE WITNESS:  No; that's it.  I
2 would not give it the same.
3 BY MR. DUBIN:
4    Q.   So what is the CSDS color of, let's
5 say, this large talc plate towards the bottom
6 left?  What is the CSDS color that you would
7 use to assign a refractive index to that
8 particle?
9         MS. O'DELL:  Which particle?
10         MR. PLACITELLA:  I will place
11 an objection before he answers and I know
12 you're doing the best you can, but at this
13 point, at least on the screen that I am
14 seeing, this image is pretty blurry, you know,
15 but you did -- you're doing the best you can.
16         MR. DUBIN:  This is the image
17 that we have from Dr. Longo.
18         MR. PLACITELLA:  Well, that's
19 not necessarily the image.  This is a blowup
20 on a Zoom, you know.
21         MR. DUBIN:  He also has the
22 actual report in front of him on a computer.
23 Now what?
24         MR. PLACITELLA:  Just --
25         MR. DUBIN:  Okay.

Page 124

1         MR. PLACITELLA:  -- trying to
2 keep the record clean.
3         MR. DUBIN:  Okay.
4 BY MR. DUBIN:
5    Q.   What CSDS color are you assigning to
6 the talc plates that we're looking at?
7         MS. O'DELL:  Object to the
8 form; that seeks expert opinion.  He is not
9 a -- he did not analyze these particular talc
10 particles.  He didn't make findings in the
11 report.
12         To ask him to do it on the fly,
13 in a Zoom is an expert opinion and beyond the
14 scope of what he did for the report and we
15 object on that basis.
16         MR. DUBIN:  Are you instructing
17 him not to answer the question?
18         MR. LUDWIG:  I was just going
19 to say, exactly, and I am instructing him not
20 to answer that question because he is not --
21 it's not the scope.  Him doing an analysis of
22 a talc particle on the fly is not what the
23 Judge -- is not the purpose of this
24 deposition.
25         MR. DUBIN:  Okay.  You have

Page 125

1 instructed him not to answer.  We'll just deal
2 with it in court later.
3         Let's look at the second image,
4 002.
5         MS. O'DELL:  Okay.  What image
6 are you looking at and what page?
7         MR. DUBIN:  Okay.  So, Jake,
8 can you give the page?  This is the image of
9 CSM 002.
10         MR. KEESTER:  So my PDF is page
11 38, but since your report seems to be one page
12 less, it will probably be page 37, but it is
13 CSM-002.
14         MS. O'DELL:  Okay.
15 BY MR. DUBIN:
16    Q.   What color is that particle?
17    A.   Can you zoom in, please?
18    Q.   Sure.
19    A.   The particle itself, yellow with
20 some pale blue.
21    Q.   Okay.  And do you see that there is
22 a rounded talc plate?  If you move your eye
23 from the top of the two arrows over towards
24 the left, there is a rounded talc plate.
25         Do you see that?

32 (Pages 122 - 125)

Page 126

1          MR. LUDWIG: Objection.
2          Once again, you're asking him
3 to analyze what you claim to be a talc
4 particle on the fly; that calls for expert
5 testimony. I am instructing him not to answer
6 that question.
7 BY MR. DUBIN:
8     Q.   You said you have done PLM
9 dispersion staining analysis for 30 years,
10 Mr. Hess?
11    A.   That is correct.
12    Q.   Are you not -- are you not able to
13 tell me -- to follow over on the image and
14 look at this talc plate with me? Is that
15 beyond your experience and training?
16          MR. LUDWIG: I am going to
17 object.
18          This is argumentative. His
19 experience is under the microscope. So I am
20 objecting to the form of the question. It's
21 argumentative.
22 BY MR. DUBIN:
23    Q.   Is the particle you're calling
24 chrysotile here, is that essentially the same
25 color as the talc plates in the image?

Page 127

1          MR. LUDWIG: Objection, same
2 objection. I am instructing him not to
3 answer.
4          MR. DUBIN: Okay. Can't wait
5 to be heard on these. All right.
6 BY MR. DUBIN:
7     Q.   Do you know what -- if we go down
8 and we look at the RI value, RI 1.565, do you
9 know what color that -- by reporting that
10 refractive index value for this particle, do
11 you know what color you were calling it?
12    A.   I don't recall.
13          MR. DUBIN: Let's go to the
14 slide, Jake, and we'll make that the next in
15 order, the slide for this particle; that will
16 be exhibit -- are we on 17 or 18?
17          THE COURT REPORTER: One moment
18 and I can verify.
19          MR. DUBIN: Sure. I think it's
20 18.
21          THE COURT REPORTER: Yes, this
22 is Exhibit 18.
23          MR. DUBIN: Why don't we call
24 up that slide and we can put it in chat.
25          (Exhibit 18 marked for

Page 128

1 identification.)
2 BY MR. DUBIN:
3     Q.   You -- for purposes of your
4 analysis, you're calling this particle
5 somewhere between a magenta and a purple for
6 purposes of your analysis, right?
7          MS. O'DELL: Just wait a
8 minute.
9          What particle is this?
10          MR. DUBIN: This is the same
11 particle, CSM 002.
12 BY MR. DUBIN:
13    Q.   You're calling it somewhere between
14 a magenta and a purple for purposes of your
15 analysis?
16    A.   I am calling the edge that I saw.
17    Q.   You're calling the edge that you saw
18 purple and magenta? Is that what you're
19 saying?
20    A.   That is correct.
21    Q.   The same type of purple or red
22 colors that are on the talc plates?
23          MS. O'DELL: Object to the
24 form.
25          MR. LUDWIG: Object to the

Page 129

1 form.
2          I instruct you not to answer.
3 BY MR. DUBIN:
4     Q.   Do you know -- as you adjust the
5 focus on a microscope up and down, do you know
6 whether you can -- if things are out of focus,
7 you can see a red edge on particles? Are you
8 familiar with that?
9     A.   I have observed that.
10    Q.   And so one way that you can get
11 these types of edges around particles is if
12 they are just not -- if they are -- is your
13 focus, depending on your focus, right?
14          MS. O'DELL: Object to the
15 form.
16          THE WITNESS: Correct.
17 BY MR. DUBIN:
18    Q.   And without these edges, without
19 these sort of red colors at the edges, then
20 the CSDS color that you would have had to
21 assign to the particle would be -- would
22 correspond to yellow, right?
23          MR. LUDWIG: Objection to form.
24          That's calling for an expert
25 analysis, which he is not here to present

33 (Pages 126 - 129)

Page 130

1 today.
2         MR. DUBIN:  Are you instructing
3 your witness not to answer that one yet again?
4         MR. LUDWIG:  I am instructing
5 him not to answer that one, yes.
6         MR. DUBIN:  Okay.
7 BY MR. DUBIN:
8    Q.   How can you tell whether or not the
9 red that you're seeing on the edges is an
10 artifact of focus?
11    A.   By assuring that my particle is in
12 focus.
13    Q.   Mr. Placitella was complaining that
14 the image is blurry.
15         Does it look completely in
16 focus to you?
17         MS. O'DELL:  Object to the
18 form.
19         MR. LUDWIG:  Join.
20         THE WITNESS:  I base it on what
21 I see through the scope.
22 BY MR. DUBIN:
23    Q.   Do you know whether or not edge
24 effects like that can be created by total
25 refraction even for an in focus particle?  Do

Page 131

1 you know that?
2         MS. O'DELL:  Objection to the
3 form; calls for expert opinion.
4         Morty, this slide has not been
5 put in the chat and so we would request that
6 it be put in the chat.
7         MR. DUBIN:  We're doing it.
8 Obviously, it takes a little time to do the
9 slides and it's not like you're not seeing the
10 whole document, but we'll put them in chat.
11         MS. O'DELL:  We thank you and
12 we need to see them.  It's important.
13         The second thing is, where did
14 this color bar, color chart come from on the
15 side and -- because it's unclear from what's
16 being --
17         MR. DUBIN:  These are slides
18 that have been presented to Dr. Longo before
19 for his testimony and that he has agreed to.
20 So these are -- this type of color bar was
21 used in the 104 hearings with Dr. Longo, in
22 addition to being used in his Eagles and Lonzo
23 depositions.
24         MS. O'DELL:  That's completely
25 immaterial.

Page 132

1         MR. DUBIN:  You asked -- okay.
2 I have told you the answer.  I am asking him
3 about it.
4         MR. KEESTER:  Sorry to jump in.
5 I can't share a slide while I have it open.
6 It's the way Microsoft applications work.  So
7 I am sharing them the moment I close out of
8 PowerPoint.
9         MS. O'DELL:  Okay.  Thank you.
10         MR. DUBIN:  Okay.  We can go
11 back to the Valadez report.  We can put that
12 one in chat.
13 BY MR. DUBIN:
14    Q.   And as I said, I believe there was a
15 question pending before the objection.
16         Are you familiar with the fact
17 that the phenomena of total reflection can
18 create these kind of edge effects for
19 particles?
20         MR. LUDWIG:  Can that be reread
21 back?  I'm sorry.  There was a break in the
22 question, maybe distorted by the Zoom.  I am
23 sorry.
24         MR. DUBIN:  It's fine.  I
25 already asked him.  He didn't know what the

Page 133

1 phenomena was earlier.  So it's fine.  Don't
2 worry about it.  This next -- let's go to CSM
3 003.
4 BY MR. DUBIN:
5    Q.   What color is the particle?
6    A.   The particle appears to be yellow.
7    Q.   Do you know at -- by assigning RI
8 1.568, do you know what color you were calling
9 this particle?
10    A.   Not without the charts available.
11    Q.   All right.  You were -- do you know
12 you were calling this particle somewhere
13 between a magenta and purple?
14         MS. O'DELL:  Objection to form.
15         MR. LUDWIG:  Can you zoom in on
16 the particle, please?
17         MR. DUBIN:  Sure.
18 BY MR. DUBIN:
19    Q.   You're treating this particle for
20 purposes of your analysis as if it is magenta
21 and purple?
22         MS. O'DELL:  Objection to the
23 form.
24         He said he can't -- cannot
25 determine that without the charts and other

34 (Pages 130 - 133)

Page 134

1 materials used in --
2         MR. LUDWIG: (Inaudible) it's
3 clear to you. I mean, we're dealing with a
4 situation where it's ten, fifteen feet from
5 you; so.
6 BY MR. DUBIN:
7     Q.    You're the analyst who did this
8 work.
9         What color were you calling it?
10        MS. O'DELL: And just for the
11 record, what's the page of the Valadez report?
12        MR. KEESTER: Mine is page 43.
13 Yours is probably page 42.
14        MS. O'DELL: Thank you.
15        MR. DUBIN: And maybe it will
16 help. We can make exhibit 19 slide 48 and put
17 that up.
18        MR. LUDWIG: Mr. Dubin, we have
19 been going for a little --
20        MR. DUBIN: We'll break after
21 this slide and we'll take lunch.
22        MR. LUDWIG: We'll take a lunch
23 break after this slide.
24        (Exhibit 19 marked for
25     identification.)

Page 135

1 BY MR. DUBIN:
2     Q.    Do you know that the refractive
3 index that you have assigned to this particle
4 corresponds to the colors magenta and purple?
5 Are you aware of that?
6     A.    I do see --
7         MR. PLACITELLA: I have the
8 same objection I had before. This is even
9 less clear than the last one.
10 BY MR. DUBIN:
11    Q.    Okay. Are you aware that the
12 refractive index numbers you assigned to this
13 particle are -- correspond to magenta and
14 purple?
15        MS. O'DELL: Object to the
16 form.
17        He has already testified he
18 would need the charts and other information.
19 BY MR. DUBIN:
20    Q.    Well, just -- do you know that? Are
21 you aware that that's the color you said this
22 particle was?
23    A.    I am.
24    Q.    Okay.
25    A.    But not the particle.

Page 136

1     Q.    Not the particle, what you're
2 calling the edge effects, right, or the edges,
3 you're saying?
4     A.    That is correct.
5     Q.    Okay. And we can go back to the
6 image in the Valadez, same image, and you can
7 see you have these edges, the same types of
8 edges on these -- many of the rounded
9 structures that are talc plates, right?
10        MS. O'DELL: Objection to the
11 form.
12        MR. LUDWIG: Same objection.
13        I instruct him not to answer.
14 Once again, on-the-fly analysis of talc
15 plates.
16        MR. DUBIN: You're instructing
17 him not to answer?
18        MR. LUDWIG: Correct.
19 BY MR. DUBIN:
20    Q.    Okay. And, again, I want to
21 understand your experience, your personal
22 experience with these types of edge effects,
23 and I just want to ask you about an image,
24 whether it's something that you have seen
25 before.

Page 137

1         MR. DUBIN: And we'll mark that
2 as exhibit 20. It will be CX-56.
3         (Exhibit 20 marked for
4     identification.)
5 BY MR. DUBIN:
6     Q.    So Cargille glass, Cargille glass
7 has a single refractive index, right?
8         MS. O'DELL: Objection to the
9 form.
10        What's being shown on the
11 screen?
12        MR. DUBIN: These are images of
13 Cargille glass in dispersion staining. I am
14 asking him about his experience and his
15 background, experience, and training.
16        MS. O'DELL: He is not here as
17 an expert witness and --
18        MR. LUDWIG: Right. So --
19        MS. O'DELL: -- this is beyond
20 the scope. Excuse me. Counsel, go ahead.
21        MR. LUDWIG: I'm sorry. So I
22 am instructing the witness not to answer.
23 Exactly.
24 BY MR. DUBIN:
25    Q.    And I am going to keep asking you

35 (Pages 134 - 137)

Page 138

1  some questions about this and if your attorney
2  wants to object and say for you not to answer
3  to each of them, that's fine.  We'll do that.
4         Can you see -- are you familiar
5  with this phenomena that even if you look at a
6  particle with a single refractive index,
7  right, for example, blue here, you can see
8  sometimes these edge effects such as the red
9  or the purple that we're seeing in this image?
10        Are you familiar with the fact
11 that that happens?
12        MS. O'DELL:  Objection; beyond
13 the scope of the deposition; beyond the scope
14 of this witness' testimony; assumes facts not
15 in evidence.
16 BY MR. DUBIN:
17    Q.   Do you know how to determine --
18 sorry.
19        MR. DUBIN:  Is there
20 instruction not to answer that?
21        MR. LUDWIG:  There is
22 instruction not to answer that, yes.
23 BY MR. DUBIN:
24    Q.   Do you know how to determine in
25 these kind of circumstances what the true CSDS

Page 139

1  color is?  Do you know how to do that?
2         MR. LUDWIG:  Same objection.
3         MR. DUBIN:  Are you instructing
4  your witness not --
5         MR. LUDWIG:  I am.
6         MR. DUBIN:  -- to answer?
7         MS. O'DELL:  Join.
8         MR. DUBIN:  Okay.
9  BY MR. DUBIN:
10    Q.   Are you familiar with why you can
11 get these types of red edges around certain
12 particles that do not reflect the true central
13 stop dispersion staining color of the
14 particle?  Do you know anything about that?
15        MR. LUDWIG:  Same objection;
16 same instruction.
17        MR. DUBIN:  Okay.
18        MS. O'DELL:  Join.
19 BY MR. DUBIN:
20    Q.   If you were to base your calculation
21 of the refractive index of this piece of
22 Cargille glass on the red edge here, you would
23 be getting the wrong result, correct?
24        MR. LUDWIG:  Same objection;
25 same instruction.

Page 140

1         MS. O'DELL:  Join.
2  BY MR. DUBIN:
3     Q.   However, you, when you're looking at
4  the yellow particles in your analysis, you
5  take these edge effects and you base your
6  calculations on them, correct?
7         MR. LUDWIG:  Same objection;
8  same instruction.
9         MS. O'DELL:  Misstates the
10 record and misleading and argumentative.
11        MR. DUBIN:  All right.
12 BY MR. DUBIN:
13    Q.   Do you have experience working with
14 and analyzing Cargille glass?
15    A.   Not analyzing, but utilizing it --
16    Q.   Have you --
17    A.   -- I do recall.
18    Q.   Have you ever observed these types
19 of phenomena when looking at Cargille glass?
20    A.   I have not.
21    Q.   Okay.  What is a -- do you know how
22 to perform a Becke line analysis?
23        MS. O'DELL:  Beyond the scope
24 of the reports in this case and seeks expert
25 opinion.

Page 141

1         MR. DUBIN:  Are you --
2         MR. LUDWIG:  Join.
3         MR. DUBIN:  -- instructing him
4  not to answer?
5         MR. LUDWIG:  Not to answer.
6  BY MR. DUBIN:
7     Q.   Do you know how to use a Becke line
8  analysis to determine in a situation such as
9  we're looking at here what the correct CSDS
10 color is?
11        MR. LUDWIG:  Same objection;
12 same instruction.
13        MS. O'DELL:  Join.
14 BY MR. DUBIN:
15    Q.   Have you performed any Becke line
16 analysis with respect to any of the particles
17 that you're claiming are chrysotile in Johnson
18 & Johnson?
19    A.   I have not.
20    Q.   Okay.
21        MR. PLACITELLA:  Morty, you
22 look really hungry.
23        MR. DUBIN:  All right.  We can
24 take lunch now.  How long do you guys want?
25 We can go off the record.

36 (Pages 138 - 141)

Page 142

1    VIDEOGRAPHER: The time is
2 12:38 p.m. We're off the record.
3    (Break held off the record.)
4    VIDEOGRAPHER: The time is
5 1:28 p.m. We are back on the record.
6 BY MR. DUBIN:
7    Q.  All right. Well, we'll see. If
8 there is an objection to this as well and this
9 topic, then we'll move on from it, but I need
10 to ask it to make sure.
11    So I put together a slide and I
12 put together some excerpts from the Valadez
13 report just so they are all in one spot for
14 the backup of this slide.
15    We'll mark the backup, which is
16 CX-12, as the next exhibit in order. I guess
17 that's 20?
18    THE COURT REPORTER: If you
19 would like me to check, give me one moment.
20    MR. DUBIN: Sure. Thanks.
21    MR. KEESTER: I believe that's
22 21.
23    MR. DUBIN: Twenty-one.
24    THE COURT REPORTER: I will
25 take counsel's assertion it's 21 without

Page 143

1 checking.
2    MR. DUBIN: Okay. It's 21
3 then. All right. So we'll make that 21 and
4 can you just put it in chat, Jake?
5    MR. KEESTER: Already done.
6    MR. DUBIN: And then the slide
7 which will be 22 and that's slide 48.
8    (Exhibits 21 and 22 marked for
9    identification.)
10 BY MR. DUBIN:
11    Q.  I tried to ask you this already,
12 Mr. Hess, but the same type of edge effects
13 that you're relying on to call particles
14 chrysotile in Johnson & Johnson are also
15 present on talc plates in your analysis; is
16 that true?
17    MS. O'DELL: Objection. This
18 is beyond the scope of the deposition and
19 Mr. Hess' testimony.
20    Further, the way that these
21 particles are depicted from who knows what is
22 misleading and not representative of what was
23 actually in the reports.
24    MR. LUDWIG: I will join and
25 instruct the witness not to answer.

Page 144

1 BY MR. DUBIN:
2    Q.  Okay. But it is true, Mr. Hess,
3 that when you're calling particles chrysotile
4 in Johnson & Johnson, you're basing that not
5 on the color of the particle that you're
6 seeing, but on the color of the edge effects
7 that you're seeing, right?
8    A.  Focused at the edge, this -- the way
9 everything I do is set up initially with the
10 alignment and centering of all the objectives
11 and lenses with the scope, with the
12 illumination lamp full, field diaphragm open,
13 and I scan for a suspicious object.
14    When I focus in on what appears
15 to be suspicious, I first make sure that I can
16 see signs of fibrousity. Then I go back to
17 dispersion staining and I will utilize what's
18 in Dr. Su's paper, looking at the edge, as
19 stated on page 3 and page 5, utilizing what's
20 on page 5, which specifically shows or
21 indicates to me looking at the edge --
22    Q.  Page 5 of what?
23    A.  -- specifically says: At particle
24 edge.
25    Q.  Page 3 and page 5 of what?

Page 145

1    MS. O'DELL: He is not
2 finished, Morty.
3 BY MR. DUBIN:
4    Q.  Sorry.
5    A.  And then I -- best I can or I will
6 do everything I can to make sure that what I
7 am seeing is best represented in the
8 photograph that I take and I am not seeing the
9 things on the screen, I use the scope.
10    Q.  So are you telling me that in order
11 to understand your work and the calls that
12 you're making, that I -- someone needs to be
13 actually looking through your microscope?
14    MR. LUDWIG: Objection.
15    MS. O'DELL: Objection.
16 BY MR. DUBIN:
17    Q.  You can respond.
18    A.  No, sir. I am sure there is plenty
19 of the sample available where someone at your
20 client's place can do the same thing.
21    Q.  Well, just to understand what the
22 call is that you're making on a particular
23 particle, do I need to be looking through your
24 scope?
25    A.  It's documented in the photographs

37 (Pages 142 - 145)

Page 146

1 and the reports that are submitted.
2    Q.   So if we don't see something in the
3 photograph that you're claiming is there, then
4 it wasn't really there?
5        MS. O'DELL:  Objection.
6        MR. LUDWIG:  Objection.
7        MS. O'DELL:  Argumentative.
8        MR. LUDWIG:  Objection to form;
9 argumentative.
10 BY MR. DUBIN:
11    Q.   You can respond.
12    A.   It doesn't mean that it wasn't
13 there.  I use the scope, not the screen.
14    Q.   Okay.  You mentioned illumination.
15 So I just want to talk about that again for a
16 second.  We can go back to the Valadez report.
17 We can go to -- let's go to the first image,
18 the No. 1.  I think it's thirty- -- okay.
19        Is it your testimony that the
20 Leica microscope that you're using can't take
21 images that are any brighter than this?
22    A.   I believe I have already answered
23 that question.
24    Q.   I'm asking about this specific
25 image.

Page 147

1        Do you have an answer, sir?
2    A.   In reference to this image, as I
3 recall the previous image was something a
4 little different.  So I would have to say,
5 yes.
6    Q.   I'm sorry.  I don't understand.
7        So to make sure the question is
8 clear, is it your testimony that the Leica
9 microscope cannot take any brighter image than
10 what we see here?
11        MS. O'DELL:  Objection to the
12 form; asked and answered.
13        THE WITNESS:  I cannot answer
14 as to the actual scope itself, but in my
15 experience with it, this is the brightest I
16 can get it.
17        MR. DUBIN:  I just want to show
18 you -- we'll mark it as the next exhibit in
19 order.  I guess it's -- now we're on 23,
20 CX-62.
21        (Exhibit 23 marked for
22    identification.)
23 BY MR. DUBIN:
24    Q.   Is your Leica microscope able to
25 take images that are as bright as what we're

Page 148

1 seeing here in image 62?
2        MS. O'DELL:  Let me just --
3 what is being displayed on the screen?
4        MR. DUBIN:  I am just using it
5 for demonstrative purposes right now and I am
6 asking him a question about his microscope.
7 BY MR. DUBIN:
8    Q.   Is it able to take images that are
9 as bright as the one that we see on the
10 screen?
11        MS. O'DELL:  Object to the --
12 object to the question; calls for expert
13 testimony.  It's beyond the scope of what he
14 did for purposes of these reports.
15        MR. LUDWIG:  I want to add that
16 these images call for speculation.  I mean, he
17 is being asked to analyze an image on
18 PowerPoint on an unknown -- an unknown source.
19        I think this, once again, calls
20 for expert testimony to make that comparison.
21 So I am going to instruct him not to answer
22 the question.
23        MR. DUBIN:  I am asking him
24 about his microscope, his illumination
25 settings, what he sees under the microscope,

Page 149

1 and I'm asking him whether his microscope that
2 he knows and he works with is capable of
3 producing an image at this illumination level
4 and my question stands.
5 BY MR. DUBIN:
6    Q.   Can you answer that for me,
7 Mr. Hess?
8        MR. LUDWIG:  And I am making
9 the same objection I made and I am
10 incorporating the same response and
11 instructing him not to answer.
12        You're asking for a comparison.
13 BY MR. DUBIN:
14    Q.   Okay.  I will tell you what this is,
15 Mr. Hess.  This was an image that was taken by
16 Dr. Su on the same type of microscope that
17 you're using.
18        Are you testifying that your
19 microscope cannot take images at this level of
20 illumination?
21        MS. O'DELL:  Objection; calls
22 for expert testimony, it's beyond the scope of
23 this deposition, and he has testified already
24 to the level of illumination that he has used
25 in the photomicrographs for these reports.

38 (Pages 146 - 149)

Page 150

1       MR. LUDWIG: Once again, I am
2  going to incorporate my previous objections
3  and instruct him not to answer. Dr. Su --
4       MR. DUBIN: If you're going to
5  instruct him not to -- if you're going to
6  instruct him not to answer, we don't have
7  to --
8       MR. LUDWIG: I instruct him not
9  to answer then.
10      MR. DUBIN: And that's fine.
11  Because we will be arguing about this at some
12  point.
13  BY MR. DUBIN:
14   Q.   But let me ask you again, Mr. Hess,
15  are you testifying under oath that the images
16  that you have for, for example, in the Valadez
17  report we have looked at are taken at as high
18  an illumination setting as the microscope
19  goes? Are you testifying to that?
20      MS. O'DELL: Asked and
21  answered.
22      THE WITNESS: Yes.
23  BY MR. DUBIN:
24   Q.   What is the correct formula for
25  determining birefringence?

Page 151

1   A.   I keep a manual handy for
2  mathematics.
3   Q.   What manual?
4   A.   I have the McCrone manual and other
5  manuals within the laboratory covering what
6  McCrone covers in his coursebook.
7   Q.   Do you recall the name of the
8  manual?
9   A.   No, I do not recall.
10   Q.   Okay. Do you recall anything about
11  it other than it's a manual? When it's from?
12  Who the author is? Anything?
13   A.   The author is McCrone.
14   Q.   Okay. Do you recall what the
15  formula is, how you -- what numbers do you
16  use? What -- how do you calculate?
17   A.   I don't recall. That's why we keep
18  reference materials.
19   Q.   Are you the one who does the
20  birefringence calculations for these reports?
21   A.   No.
22   Q.   Who does them?
23   A.   I believe it's part of what
24  Dr. Longo puts together.
25   Q.   Okay. What are the correct central

Page 152

1  dispersion staining colors for chrysotile in
2  1.550 in parallel and perpendicular?
3   A.   In parallel, generally, if you can
4  get a single fiber, which is what I understand
5  that gives you the best, but, unfortunately,
6  in chrysotile, they are too small. So they
7  deal with bundles.
8       But, generally, you're looking
9  in the blue, magenta range; and in gamma,
10  based on the Canadian chrysotile, as I
11  understand it, and perpendicular, which is the
12  alpha, would be in the lighter blue range.
13   Q.   Okay. And what is your
14  understanding of the CSDS colors associated
15  with Calidria in 1.550?
16   A.   I am not familiar with that
17  particular table.
18   Q.   Okay. So you don't have a view of
19  what colors Calidria asbestos demonstrates in
20  parallel or perpendicular in 1.550?
21   A.   From my experience.
22   Q.   Okay. So what is it?
23   A.   Well, it ranges between the
24  Calidria -- excuse me -- between the Canadian
25  chrysotile standard and a yellow gold color

Page 153

1  gamma.
2   Q.   Okay. So you're saying in parallel
3  it's -- you're claiming that Calidria will be
4  between a yellow gold and a magenta.
5       Is that what you're saying?
6   A.   That's been my experience.
7   Q.   Okay. Are you aware of any
8  scientific references that say that Calidria
9  in 1.550 will be yellow gold in parallel?
10   A.   I am not aware of any.
11   Q.   Can -- in your experience can talc
12  be yellow gold in parallel?
13   A.   In my experience what I have seen
14  that ends up what I will call talc, that's
15  generally a very, very pale yellow at best to
16  white.
17   Q.   So talc should be pale yellow to
18  white.
19      MR. DUBIN: Can we go back to
20  the Zimmerman image -- go back to the
21  Zimmerman report for a second.
22  BY MR. DUBIN:
23   Q.   Looking again at the Zimmerman
24  image, we see some talc plates here.
25       Why isn't your talc pale yellow

39 (Pages 150 - 153)

Page 154

1  to white in this image?
2       MR. LUDWIG:  (Inaudible.)
3       THE COURT REPORTER:  I couldn't
4  hear you, sir.  Please repeat.
5       MR. LUDWIG:  I said, Paul, if
6  you need it zoomed in, please feel free to ask
7  it.
8       THE WITNESS:  Well, one, my
9  previous comment was based on fibrous talc,
10  not talc flakes.
11  BY MR. DUBIN:
12     Q.   And anything else?
13     A.   No.
14     Q.   Okay.  The refractive index of
15  elongated talc or a talc fiber in parallel is
16  similar to the refractive index of the talc
17  plate, correct?
18       MS. O'DELL:  Calls for an
19  expert opinion; beyond the scope of this
20  deposition.  I --
21       MR. LUDWIG:  And I join and
22  instruct him not to answer.
23       MR. DUBIN:  I am asking him
24  about what he just testified about, the
25  explanation that he just testified about, and

Page 155

1  you're instructing him not to answer.
2       Is that -- is that actually
3  happening?  Because -- are you instructing him
4  not to answer that question?
5       MR. LUDWIG:  Yes.
6       MR. DUBIN:  Okay.
7  BY MR. DUBIN:
8     Q.   The reason these are yellow and
9  orange -- these are all orange and gold is
10  because you have got a tungsten light shining
11  on them, right?
12       MS. O'DELL:  Objection.
13       MR. PLACITELLA:  I object to
14  your testimony, Morty.
15  BY MR. DUBIN:
16     Q.   Is that correct?
17       MS. O'DELL:  Same objection;
18  misstates the evidence.
19       THE WITNESS:  That is correct.
20  BY MR. DUBIN:
21     Q.   So you're saying Calidria -- when
22  did you first -- what is your view that
23  Calidria asbestos in parallel can be yellow
24  gold based on?
25     A.   Experience examining the Calidria

Page 156

1  material.
2     Q.   First, who -- at some point were you
3  examining Johnson & Johnson using 1.550 oil,
4  but not reporting chrysotile?
5       MS. O'DELL:  I'm sorry.  I
6  missed the last part of that question.  Would
7  you mind repeating it?
8  BY MR. DUBIN:
9     Q.   At some point in time were you
10  analyzing Johnson & Johnson talc using 1.550,
11  but not reporting chrysotile?
12       MS. O'DELL:  Object to the
13  form.
14       THE WITNESS:  I don't recall.
15       MR. DUBIN:  Again, but for the
16  Court's ruling, I would be asking now, along
17  those lines -- and I will just accept the --
18  make the objections.  Because we're going to
19  have to bring this up.
20  BY MR. DUBIN:
21     Q.   You did a report -- you looked at
22  about 70-something samples of Johnson &
23  Johnson related talc using 1.550 oil and
24  reported chrysotile in none of the samples at
25  some point; isn't that right?

Page 157

1       MS. O'DELL:  That is -- that is
2  direct --
3       MR. DUBIN:  Okay.  I --
4       MS. O'DELL:  -- in --
5       MR. DUBIN:  -- that you're
6  going to object to it.  I just want the
7  question on the record because we're going
8  to -- I want to -- we're going to take this at
9  issue.
10       So I understand.  You can
11  object per the Court and instruct him not to
12  answer.
13       MR. LUDWIG:  I instruct him not
14  to answer.
15       I do have a question for you,
16  Mr. Dubin.  Are you done with this image?
17  Because the --
18       MR. DUBIN:  I will take it
19  down; that's fine.
20       MR. LUDWIG:  I just don't know.
21  Because I see Paul straining to watch you;
22  that's why I asked.
23       MR. DUBIN:  Uh-huh.
24  BY MR. DUBIN:
25     Q.   So at some point you decide to use

40 (Pages 154 - 157)

Page 158

1 Calidria as a reference.
2          Whose idea was that at MAS?
3     A.   As I recall, it was a collaborative
4 effort between Dr. Longo and myself.
5     Q.   But who first suggested using
6 Calidria as a reference?
7     A.   That I do not recall.
8     Q.   Okay.  When is the first time you
9 recall ever looking at Calidria by PLM
10 dispersion staining analysis?
11    A.   I don't recall when that was either.
12    Q.   But do you recall even generally?
13 Like, what -- was it within the last ten
14 years?  Five years?  Before that?
15    A.   Within the last five.
16    Q.   Did you ever participate in any
17 NVLAP proficiency testing related to Calidria?
18    A.   No.
19    Q.   So the whole reason why dispersion
20 staining can be used is because minerals have
21 defined refractive indices, right?
22          MR. LUDWIG:  That calls for
23 expert testimony, objection.
24          I instruct you not to answer.
25          MS. O'DELL:  Join.

Page 159

1 BY MR. DUBIN:
2     Q.   Why -- how is it that you can use
3 PLM to identify minerals by dispersion
4 staining?  What property is it that allows you
5 to do that?
6     A.   The refraction angle between
7 particle and oil creates a color that we can
8 use then to try to identify wavelength based
9 on temperature and the version of oil that's
10 been used.
11    Q.   No question, if I look at Calidria
12 in 1.550, I can see generally magenta in
13 parallel and blue in perpendicular, right?
14    A.   I have seen that in my experience.
15    Q.   Okay.  So how is it in your view
16 that somehow Calidria is also showing golden
17 yellow?  What physical -- what property of
18 physics changes it so that sometimes when
19 you're finding it, it's to you golden yellow
20 as opposed to magenta?
21          MR. LUDWIG:  Objection, same
22 objection.
23          I instruct you not to answer.
24          Calls for expert testimony.
25          MS. O'DELL:  Join.

Page 160

1 BY MR. DUBIN:
2     Q.   We saw in the Zimmerman image that
3 your talc could appear golden yellow, right?
4          MS. O'DELL:  Object to the
5 form.
6          It's not his talc.  It's
7 Johnson & Johnson talc.
8 BY MR. DUBIN:
9     Q.   Your images of talc can appear
10 golden yellow, right?
11    A.   Off the -- the Olympus BH2, yes.
12    Q.   So if both -- if in your view both
13 Calidria and talc can show golden yellow in
14 parallel, how are you distinguishing between
15 them?
16          MS. O'DELL:  Objection to the
17 form.
18          THE WITNESS:  By whether I am
19 actually looking at fibrous talc or talc
20 plates.
21 BY MR. DUBIN:
22    Q.   But your elongated talc -- now,
23 first of all, do you have any -- do you have
24 images -- what is your practice about imaging
25 when you do a review?  Do you always take

Page 161

1 images?
2     A.   If we find a structure of interest.
3     Q.   Do you do that both when you're
4 looking for fibrous talc and when you're
5 looking for chrysotile?  You take images?
6     A.   If I find something that I feel
7 comfortable calling fibrous talc, yes.
8     Q.   Do you have images -- we'll go back
9 and do that.
10         So my understanding is that
11 you're trying to say that even with the
12 tungsten light shining on the particles, talc
13 plates are going to be golden yellow, but what
14 you're calling fibrous talc is going to be
15 still bright yellow or pale yellow even --
16         MS. O'DELL:  Objection.
17 BY MR. DUBIN:
18    Q.   -- is that what you're saying?
19         MS. O'DELL:  I'm sorry.
20 Objection; misstates his testimony.
21 BY MR. DUBIN:
22    Q.   I mean, wouldn't the fibrous talc
23 also have the same color as the talc in
24 parallel?
25         MS. O'DELL:  Object to the

41 (Pages 158 - 161)

Page 162

1  form.
2           THE WITNESS:  Not in my
3  experience have I seen that.
4  BY MR. DUBIN:
5      Q.   Are you familiar with any published
6  reference values for the refractive indices of
7  talc in parallel, in talc -- elongated fiber
8  of talc in parallel?
9           MS. O'DELL:  Objection; calls
10 for expert testimony; beyond the scope of the
11 work he has done in this -- in these reports.
12          MR. LUDWIG:  I join and I
13 instruct him not to answer.
14          MR. DUBIN:  Okay.  And just one
15 more time, for purposes of the record, all of
16 this is going to his knowledge, experience,
17 and training and how he has formulated the
18 opinions that he has stated in these reports
19 and I am being prevented from asking these
20 questions.  We're going to go to the Court
21 about it, but I am going to keep going for a
22 little while so that we make clear what you
23 are objecting to or not.
24          MS. O'DELL:  There is a
25 difference between asking about the work he

Page 163

1  has done for these particular reports and
2  asking about methodology for things he hasn't
3  done and goes into expert opinion and that's
4  what we're basing our objections.  It's
5  clearly within the scope of Judge Schneider's
6  order.
7           MR. DUBIN:  Okay.  Well, we
8  have done that.  We'll do this at the end.
9  BY MR. DUBIN:
10     Q.   You were never told at McCrone when
11 you were doing your PLM training that somehow
12 Calidria could not be identified by the
13 standard colors associated with chrysotile;
14 right?  No one said that to you, correct?
15     A.   Nothing was mentioned about Calidria
16 during the course.
17     Q.   Do you know whether Calidria is
18 mentioned in ISO 22262?
19     A.   I am not aware of that.
20     Q.   Okay.  Have you reviewed -- as part
21 of familiarizing yourself with Calidria for
22 purposes of using it as a standard, did you
23 review any historical MAS analysis of Calidria
24 by dispersion staining?
25     A.   Would you, please, rephrase that?

Page 164

1      Q.   Sure.  Did you review -- as part of
2  using Calidria as a standard for your
3  analysis, did you review any MAS historical
4  analysis of Calidria and its dispersion
5  staining colors?
6      A.   I am not aware of anything like
7  that, no.
8           MR. DUBIN:  Okay.  Jake, I
9  don't have the number, but let's just call up
10 the historical MAS analysis as the next
11 exhibit.  It should be around 132 or 133 of
12 the outline and it will be exhibit 24.
13          (Exhibit 24 marked for
14   identification.)
15 BY MR. DUBIN:
16     Q.   Were you aware that MAS had recorded
17 previously their refractive indices associated
18 with Calidria asbestos?
19          MS. O'DELL:  I object to --
20 first, object to the use of this exhibit.
21 It's not been disclosed in the MDL, it's not
22 something that this witness should be asked
23 about, but I would -- I would encourage
24 counsel to instruct him not to answer.  This
25 is beyond the scope.

Page 165

1           MR. LUDWIG:  I was going to.
2  This is totally beyond the scope of what the
3  Judge said.  So I am objecting to the question
4  and I am instructing my client not to answer.
5  BY MR. DUBIN:
6      Q.   Okay.  So you don't know whether at
7  MAS, before they tried to claim that there was
8  chrysotile in Johnson & Johnson, they reported
9  that Calidria would look magenta in parallel
10 and blue in perpendicular.
11          You're not aware of that?
12          MS. O'DELL:  Objection to the
13 statements of counsel testifying, objection to
14 the representations about this document we
15 have never seen, and it is beyond the scope of
16 this deposition.
17          MR. DUBIN:  Okay.
18          MR. LUDWIG:  I join the
19 objection.
20 BY MR. DUBIN:
21     Q.   You were using Calidria as your
22 reference in the reports that we have been --
23 that you have produced claiming to find
24 chrysotile in Johnson & Johnson, correct?
25          MS. O'DELL:  Objection.

42 (Pages 162 - 165)

Page 166

1          MR. LUDWIG: Objection;
2 argumentative.
3 BY MR. DUBIN:
4    Q.   Is that correct?
5          MS. O'DELL: Restate your
6 question.
7 BY MR. DUBIN:
8    Q.   You were using Calidria asbestos as
9 the reference material for chrysotile with
10 respect to the reports that you have issued
11 claiming to find chrysotile in Johnson &
12 Johnson, correct?
13          MR. LUDWIG: Objection to the
14 form.
15          MS. O'DELL: Object to the
16 form.
17          THE WITNESS: We had not used
18 the Calidria to -- the only way we have used
19 the Calidria is to create standards in order
20 to calibrate for levels of concentration.
21 BY MR. DUBIN:
22    Q.   I'm sorry. You're using it only to
23 calibrate levels of concentration.
24          What do you mean by that?
25    A.   I mean by what might be visually

Page 167

1 apparent within a set of standards.
2    Q.   But you would agree that what you're
3 identifying as chrysotile in Johnson & Johnson
4 does not look like standard reference
5 chrysotile, correct?
6          It does not have the magenta in
7 parallel and blue in perpendicular associated
8 with standard reference Chrysotile, correct?
9          MS. O'DELL: Objection;
10 misstates the record; calls for expert
11 opinion.
12          MR. LUDWIG: Join. I instruct
13 the witness not to answer.
14          MR. DUBIN: So you're
15 instructing him not to answer about the colors
16 that he is seeing in the analysis that this
17 whole deposition is about? Is that my -- is
18 that right?
19          MS. O'DELL: That's not
20 correct.
21          MR. LUDWIG: I am instructing
22 him not to answer the question as asked.
23 BY MR. DUBIN:
24    Q.   What -- are you reporting -- when
25 you're reporting chrysotile in Johnson &

Page 168

1 Johnson, are you reporting based on seeing the
2 actual particle being magenta in parallel?
3    A.   I am reporting based on the colors I
4 see at the edge.
5    Q.   Does the actual particle itself,
6 where you see the main color, is that ever
7 magenta itself?
8          MS. O'DELL: Would you repeat
9 the question, please?
10 BY MR. DUBIN:
11    Q.   In the main center of the particle,
12 not these edge effects, do you recall ever
13 reporting it as the main color being magenta
14 itself, not the edge?
15    A.   I have seen that, yes.
16    Q.   Can you identify any report or any
17 image where you have seen the interior of
18 the -- what you're calling chrysotile in
19 Johnson & Johnson being magenta, any image,
20 any report?
21    A.   I do not recall.
22    Q.   I want to ask you a little bit about
23 your reference images of Calidria in 1.560
24 and --
25          MR. PLACITELLA: Could you

Page 169

1 just, please, define your reference images,
2 please? Thank you.
3          MR. DUBIN: The reference
4 images that he created on the PLM that are
5 part of Dr. Longo's reports.
6          MR. PLACITELLA: Thank you.
7          MS. O'DELL: Which reports?
8          MR. DUBIN: I am about to mark
9 it, but I got interrupted. All right. So --
10          MR. PLACITELLA: I wasn't
11 objecting. I was just asking.
12          MR. DUBIN: So we'll mark
13 CX-00029 or CX-29 as the next exhibit. I
14 guess we're at 25.
15          (Exhibit 25 marked for
16      identification.)
17          MR. DUBIN: If we can turn that
18 a little bit?
19          MS. O'DELL: And what report
20 did this image come from?
21          MR. DUBIN: Let's show the
22 front of the report, too, if we have it. It's
23 from the (inaudible).
24          MR. KEESTER: Morty, I don't
25 have the first page of this report. I can go

43 (Pages 166 - 169)

Page 170

1 find it if need be.
2          MR. DUBIN: Okay. Well, let's
3 make sure that we mark it as an exhibit so
4 they have the entire report. The full report
5 will be 26.
6          MS. O'DELL: I want to make
7 sure that this report is at issue in the MDL.
8 Can you represent to me which report this
9 image came from?
10         MR. DUBIN: These are all of
11 the reference images that Dr. Longo provides
12 along with all of these reports as his
13 references for his chrysotile findings. These
14 are all part of his analysis in -- it's all
15 part of the chrysotile analysis that is being
16 discussed in these -- in this deposition.
17         MS. O'DELL: With due respect,
18 Morty, that doesn't mean anything. I mean,
19 the question is, is -- is this --
20         MR. DUBIN: Dr. Longo is
21 relying on these reference images for his
22 identification of chrysotile in the reports
23 that we are discussing today.
24         MS. O'DELL: And I am asking
25 you what report does this image come from?

Page 171

1 That's what I am asking you.
2          MR. DUBIN: I will tell you the
3 name of the report, but it will be one of
4 Dr. Longo's reference image reports that he
5 supplies along with the chrysotile finding --
6 alleged chrysotile findings from Johnson &
7 Johnson.
8          MS. O'DELL: Well --
9          MR. DUBIN: (Inaudible.)
10         MS. O'DELL: -- comes from
11 without knowing if it's at issue in the MDL --
12         MR. DUBIN: It is at issue in
13 the MDL because they are his reference images
14 that he is using to compare reference
15 chrysotile to the reports that he has produced
16 in the MDL. These are his reference images
17 that are incorporated in all of his materials.
18         MS. O'DELL: I don't --
19         MR. DUBIN: Okay. We can take
20 a ten-minute break. We'll get the whole
21 report and then if you want to still instruct
22 him not to answer, then we'll just add it to
23 the pile of things, but I really can't see how
24 any legitimate argument could be made that the
25 reference images that they are relying on for

Page 172

1 Calidria to say there is chrysotile in Johnson
2 & Johnson as part of this analysis are somehow
3 off limits, but if you're going to take that
4 position, you're going to take that position.
5          MS. O'DELL: I'm not --
6          MR. DUBIN: We'll take --
7          MS. O'DELL: -- the position I
8 am taking is that you have an image on the
9 screen. We have --
10         MR. DUBIN: Okay.
11         MS. O'DELL: -- no idea where
12 it came from --
13         MR. DUBIN: (Inaudible.)
14         MS. O'DELL: (Inaudible.)
15         THE COURT REPORTER: I'm sorry.
16 This is the court reporter. Everyone is
17 talking at once and I can't hear anything.
18 Apologies.
19         MS. O'DELL: Jessica, I'm
20 sorry. I mean, I am just trying to finish my
21 objection.
22         We have no idea where this
23 image came from. I am just asking -- you're
24 saying it's a reference image from Dr. Longo.
25 I have no idea of the context and we --

Page 173

1          MR. DUBIN: (Inaudible.)
2          MS. O'DELL: -- know that
3 before the --
4          MR. DUBIN: I am telling you
5 what the context is now. Because apparently
6 he produces them as individual images. He
7 doesn't produce them as part of a report, but
8 when he is requested to produce the reference
9 images that he is relying on to use as a
10 reference for chrysotile in 1.560, he just
11 produces these images as the standards that he
12 is relying on.
13         So it's part of the materials
14 that he relies on for these reports and his
15 conclusions about the chrysotile -- alleged
16 chrysotile in Johnson & Johnson.
17         MR. PLACITELLA: I hear you --
18 I hear you, Morty, but you're not deposing
19 Dr. Longo here.
20         MR. DUBIN: But these are
21 images taken by Mr. Hess.
22         MS. O'DELL: Well, and to my
23 knowledge -- and I can be corrected on this,
24 Morty, but this is not an image that's been
25 produced in the MDL in relation to Dr. Longo's

44 (Pages 170 - 173)

Page 174

1 testimony.
2          MR. DUBIN:  I am sure he has
3 produced his reference images because he
4 always produces his reference images because
5 we always request his reference images.
6          If you really are going to shut
7 me down from asking a question about the
8 reference images that were -- that are relied
9 on for the reports in this case, then you're
10 going -- you're going to do that.  You're
11 going to make the objection and we're going to
12 go and argue about it and I think it is highly
13 improper or you could let me ask him a
14 question about an image that directly relates
15 to his work and that he took.
16          MS. O'DELL:  Well, we don't
17 have -- one, there is no evidence of that and
18 second is Mr. Hess is here to testify on the
19 reports that are produced in the MDL.  Other
20 things that Dr. Longo relies on are not at
21 issue here for his opinions.  So --
22          MR. DUBIN:  These are the --
23 again, these are the images that Dr. Longo
24 uses with his reports and the whole purpose of
25 this is to ask the person who took the images

Page 175

1 about them.
2          I am not going to continue to
3 argue with you.  If you're going to instruct
4 the witness not to answer, go ahead and do it,
5 because I think that this deposition has gone
6 way off the rails and we're going to have to
7 go to the Judge about it.  So just do whatever
8 you're going to do.  I don't want to argue
9 with you anymore.
10          Are you claiming that you are
11 going to stop this person, Mr. Hess, from
12 talking about the reference images for the
13 alleged chrysotile in Johnson & Johnson?  If
14 so, instruct him, and let's just have that
15 done.
16          MS. O'DELL:  Judge Schneider
17 was very clear as to what was fair game in
18 this deposition and those are the reports
19 produced in the MDL that involve the new
20 method, to my knowledge.  And you can correct
21 me, but I don't think I am incorrect.
22          This is not a part of those
23 reports and it's not something that's an
24 appropriate scope of this deposition and we
25 would instruct the witness not to answer.

Page 176

1          MR. LUDWIG:  And I am going to
2 join for the reasons stated and instruct the
3 witness not to answer.
4          MR. DUBIN:  We're going to take
5 a ten-minute break.  I'll be back.
6          VIDEOGRAPHER:  The time is
7 2:12 p.m.  We are off the record.
8          (Break held off the record.)
9          VIDEOGRAPHER:  The time is
10 2:26 p.m.  We are back on the record.
11          MR. DUBIN:  So for the record,
12 I am going to mark as 26 Dr. Longo's
13 deposition in a case called Kayme Clark and
14 Dusty Clark v. Johnson & Johnson, where he
15 identifies these reference images so that it's
16 in the record.  We'll put that in as 26.  We
17 don't have to do anything with it.  We're just
18 going to put it in the record.
19          (Exhibit 26 marked for
20     identification.)
21 BY MR. DUBIN:
22     Q.   And then I am going to go back to
23 the image and I am going to ask you some
24 questions and if you're instructed not to
25 answer, you are instructed not to answer.

Page 177

1          MR. DUBIN:  So can we pull back
2 up the Calidria reference image?  And I don't
3 think that was the page we were on; that was
4 one of them.
5 BY MR. DUBIN:
6     Q.   So is this an image that is -- are
7 these your PLM images of Calidria 1.560?
8     A.   Yes.
9     Q.   Okay.  And so all this blue stuff in
10 the background, that's Calidria?
11     A.   That is correct.
12     Q.   Okay.  And you're aware that
13 Calidria can have impurities in it, too?
14          MR. LUDWIG:  That's -- I am
15 going to object to the form and instruct him
16 not to answer; that's beyond the scope.
17          MR. DUBIN:  Okay.
18 BY MR. DUBIN:
19     Q.   Is this image taken at maximum
20 illumination?
21     A.   It was.
22     Q.   All right.  So images on that
23 microscope don't get any brighter than this?
24          MS. O'DELL:  Objection; asked
25 and answered.

45 (Pages 174 - 177)

Page 178

1          MR. LUDWIG:  Join.
2          MR. DUBIN:  All right.  Let's
3  make the next exhibit in order, which is 27,
4  we'll make it slide 61 -- sorry -- actually,
5  slide 95.
6          (Exhibit 27 marked for
7      identification.)
8          MS. O'DELL:  I'm sorry.  Is
9  this exhibit 27?
10          MR. DUBIN:  Twenty-seven.
11          MR. LUDWIG:  (Inaudible.)
12          THE COURT REPORTER:  If you
13  just said something, Mr. Hess, I couldn't hear
14  you.
15          MR. LUDWIG:  That was me
16  talking to myself.  I apologize, Jessica.  I
17  am simply saying that my exhibit list is
18  mis-numbered for some reason.
19  BY MR. DUBIN:
20      Q.   Are you claiming those two -- those
21  two images have the same dispersion staining
22  colors?
23          MR. LUDWIG:  I am going to
24  object to the form of the question.
25          MS. O'DELL:  I object to the

Page 179

1  question.
2          MR. LUDWIG:  Yeah.
3          MS. O'DELL:  This is --
4          MR. DUBIN:  Are you instructing
5  him not to answer?
6          MS. O'DELL:  Yes.  This is
7  beyond the scope.
8  BY MR. DUBIN:
9      Q.   Have you ever received any criticism
10  from NVLAP about your PLM work?
11      A.   None that I am aware of.
12          MR. DUBIN:  Okay.  At this
13  point, you know, I think we're going to have
14  to go to the Court.  I am going to shut the
15  deposition down for the day, but I am not
16  agreeing to end it.  I think that the
17  restrictions that have been placed on me by
18  counsels' objections and instructions not to
19  answer are improper and we're going to seek
20  relief with the Court.
21          So I am suspending it for the
22  day because I think I am handcuffed, but I
23  understand you guys have different opinions.
24  So we'll just have to deal with it later.
25          MS. O'DELL:  Our view is the

Page 180

1  objections as made have been proper and
2  absolutely consistent with Judge Schneider's
3  prior ruling and I will object to any further
4  deposition of Mr. Hess.
5          MR. DUBIN:  Okay.  We'll have
6  to resolve that.  All right.  Thanks for
7  today.  Take care.
8          VIDEOGRAPHER:  The time is
9  2:31 p.m.  We're off the record.
10          (Witness was excused.)
11          (Deposition concluded at
12      2:31 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 181

1          C E R T I F I C A T E
2      I HEREBY CERTIFY that prior to the
3  commencement of the examination, PAUL HESS,
4  was remotely sworn by me to testify to the
5  truth and that the proceedings, evidence, and
6  objections are contained fully and accurately
7  in the stenographic notes taken by me upon the
8  deposition taken on July 10, 2024, and this is
9  a true and correct transcript of same.
10
11
12      *Jessica M. Gericke*
13  _____
14      Jessica M. Gericke, RPR, CCR-NJ,
       and Notary Public
15
16
17      (The foregoing certification of this
18  transcript does not apply to any reproduction
19  of the same by any means, unless under the
20  direct control and/or supervision of the
21  certifying reporter.)
22
23
24
25

46 (Pages 178 - 181)

Page 182

1        I have read the foregoing transcript
2  of my deposition given on July 10, 2024, and
3  it is true, correct and complete, to the best
4  of my knowledge, recollection and belief,
5  except for the corrections noted hereon and/or
6  list of corrections, if any, attached on a
7  separate sheet herewith.
8
9        _____
        Paul Hess
10
11
12
13
14  Subscribed and sworn to
15  before me this _____ day
16  of _____, 20__
17
18
19  _____
20  Notary Public
21
22
23
24
25

Page 183

1  ERRATA SHEET
2
3  PAGE LINE    CHANGES OR CORRECTION AND REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20  I have inspected and read my deposition as
    captioned above and have listed all changes
21  and corrections above, along with my reasons
    therefor.
22
23  DATE: _____
24  Signature of Deponent: _____
25

Golkow Technologies,
A Veritext Division
877-370-3377                                                www.veritext.com