Page 1

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEW JERSEY

3      ---------------------------------------X

4      IN RE JOHNSON & JOHNSON

       TALCUM POWDER PRODUCTS

5      MARKETING, SALES PRACTICES,   MDL NO. 16-2738(MAS)(RLS)

       AND PRODUCTS LIABILITY

6      LITIGATION

7      ---------------------------------------

8

9

10                   ** ORAL DEPOSITION**

11                    JEFF BOYD, Ph.D.

12                  Friday, July 19, 2024

13

14

15

16     Reported by:

17     Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

18     Job 6786619

19

20

21

22

23

24

25

Page 2

```
 1
 2              Friday, July 19, 2024
 3              9:51 a.m.
 4
 5      ORAL deposition OF Jeff Boyd, Ph.D., before
 6      Angela M. Shaw-Crockett, a Certified
 7      Court Reporter, Certified Realtime Reporter,
 8      Registered Merit Reporter and Notary Public of
 9      the States of New York, New Jersey, and
10      Connecticut.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S:
 2  ATTORNEY FOR THE PLAINTIFFS:
 3  MOTLEY RICE
        210 Lake Drive East
 4      Suite 101
        Cherry Hill, New Jersey  08002
 5
    BY:  DANIEL R. LAPINSKI, ESQ.
 6      dlapinski@motleyrice.com
 7
 8  ATTORNEY FOR THE PLAINTIFFS:
 9  ANAPOL WEISS
        130 North 18th Street
10      #1600
        Philadelphia, Pennsylvania  19103
11
    BY:  RICHARD GOLOMB, ESQ., of Counsel
12      rgolomb@anapolweiss.com
        (Appearing Remotely)
13
14
15  ATTORNEY FOR THE PLAINTIFFS:
16  ASHCRAFT & GEREL, LLP
        1825 K Street NW
17      Suite 700
        Washington, District of Columbia  20006
18
    BY:  MICHELLE A. PARFITT, ESQ.
19      mparfitt@ashcraftlaw.com
        (Appearing Remotely)
20
21
22
23
24
25
```

Page 4

```
 1  A P P E A R A N C E S:  (CONT'D)
 2  ATTORNEY FOR THE PLAINTIFFS:
 3  BEASLEY ALLEN
        218 Commerce Street
 4      Montgomery, Alabama  36104
 5  BY:  MARGARET M. THOMPSON, ESQ.,
        LEIGH ODELL, ESQ.
 6      margaret.thompson@beasleyallen.com
        leigh.odell@beasleyallen.com
 7      (Appearing Remotely)
 8
 9  ATTORNEY FOR THE DEFENDANTS:
    JOHNSON & JOHNSON
10
11  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
        One Manhattan West
12      395 9th Avenue
        New York, New York  10001
13
    BY:  JESSICA DAVIDSON, ESQ.
14      ANTHONY BALZANO, ESQ.
        jessica.davidson@skadden.com
15      anthony.balzano@skadden.com
16
17  REILLY, McDEVITT & HENRICH
        3 Executive Campus
18      Suite 310
        Cherry Hill, New Jersey  08002
19
    BY:  SUZANNE TURPIN, ESQ.
20      sturpin@rmh-law.com
        (Appearing Remotely)
21
22
23  ALSO PRESENT:  Danny Ortega, Remote Tech
24      **      **      **
25
```

Page 5

```
 1  Jeff Boyd, Ph.D., having been first duly sworn by a Notary
 2  Public of the State of New York, was examined and
 3  testified as follows:
 4  EXAMINATION
 5  BY MR. LAPINSKI:
 6      Q.   Dr. Boyd, good morning.  My name is Dan
 7  Lapinski.  I'm an attorney with the Motley Rice law
 8  firm and a member of the plaintiffs' steering
 9  committee in talcum powder litigations.
10          Pleasure to meet you.
11      A.   Thank you.  Good morning.
12      Q.   Right off the bat, I've got to cough.  I
13  apologize.
14          We're here today to take your deposition.
15  As you're aware, you've been designated as an
16  expert.  Not only in the talc federal litigation but
17  also in the New Jersey multicounty litigation that's
18  pending in Atlantic County against the defendants.
19          You're aware of that?
20      A.   Yes.
21      Q.   And the supplemental report that we'll
22  introduce into evidence this morning, that's a
23  report that you have provided that you're going to
24  rely upon in both federal litigation and the
25  New Jersey state court litigation?
```

2 (Pages 2 - 5)

Page 6

1    A. Yes.
2    Q. I know that you are becoming an old hat at
3 this and you've been deposed several times before,
4 correct?
5    A. Couple of times, yes.
6       MR. BALZANO: Objection, form.
7       MS. DAVIDSON: Wait a minute. This is his
8 first deposition that Anthony is defending. I
9 will not interrupt, but I think the term "old
10 hat" is improper and so --
11       MR. BALZANO: Object to form.
12       MS. DAVIDSON: Thank you.
13 BY MR. LAPINSKI:
14    Q. You've also testified at trial in regard
15 to your opinions related to talcum powder, correct?
16    A. Twice. Yes, correct.
17    Q. And for approximately how long have you
18 been serving as an expert for Defendants Johnson &
19 Johnson as it relates to talcum powder?
20    A. Approximately five years.
21    Q. Okay. And you just indicated that you
22 have testified twice at trial in regard to your
23 opinions related to talcum powder?
24    A. Yes.
25    Q. Do you know how many times you've been

Page 7

1 disclosed as an expert witness in individual cases
2 as it relates to your opinions on talcum powder?
3    A. No, I couldn't say for sure. I'm sorry.
4    Q. Do you know whether it's more than five?
5    A. No, I really couldn't say.
6    Q. Okay. Just by way of refresher, during
7 the deposition whenever we're on the record, you're
8 under oath. You understand that.
9       Is there any reason today that you won't
10 be able to testify truthfully to the questions that
11 I'm going to ask?
12    A. No, there is no reason I would not be able
13 to so.
14    Q. Because we are on the record, your
15 responses are going -- I just want to make sure you
16 responses are verbal responses. The court reporter
17 can't take down the nod of a head or hand gestures
18 or anything, so any responses will have to be
19 verbal, okay?
20    A. Understood.
21    Q. Any time you want to or need to take a
22 break, you can let me know, and as long as we're not
23 in the middle of a question, then we'll be able to
24 go off the record and take a break as needed, okay?
25    A. Understood.

Page 8

1    Q. Very good.
2       MR. LAPINSKI: You can mark this as one.
3       (Boyd Exhibit 1 was received and marked
4    for identification, as of this date.)
5 BY MR. LAPINSKI:
6    Q. Dr. Boyd, you've been handed a document
7 that we have marked as Boyd Exhibit 1. And this is
8 an amended notice of oral deposition.
9       I'm going to ask, have you seen this
10 document before?
11    A. No.
12    Q. Okay. If you could turn to the fourth
13 page of the document.
14    A. (Witness complies.)
15    Q. And there's a Schedule A, definitions. Do
16 you see that at the top of the page?
17    A. Yes.
18    Q. Okay. And as it runs over to the next
19 page, which is page 5, it lists -- has a heading
20 "Documents to be Produced."
21       Do you see that?
22    A. Yes.
23    Q. In advance of this deposition, did you do
24 any type of search for documents that may be
25 responsive to the documents that have been requested

Page 9

1 here?
2    A. I'm sorry. I'm not following the
3 question.
4    Q. Sure. In advance of this deposition --
5 and this notice was sent out on July 2nd. In
6 between July 2nd and today's date, have you done
7 anything in order to be able to search for and
8 provide documents related to this deposition notice?
9    A. No, I don't believe so.
10       (Boyd Exhibit 2 was received and marked
11    for identification, as of this date.)
12       MR. LAPINSKI: You can mark that as 2.
13       That's going to be 2. And what I'm going
14 to do is mark multiple exhibits which are all
15 these invoices, and just put them in front of
16 him at one time, multiple exhibits.
17       MR. BALZANO: Different exhibits for each
18 invoice?
19       MR. LAPINSKI: That's going to be a
20 different exhibit for each invoice only because
21 they came as individual pages.
22       MR. BALZANO: Got it.
23       MR. LAPINSKI: This will be 3.
24       (Boyd Exhibit 3 was received and marked
25    for identification, as of this date.)

3 (Pages 6 - 9)

Page 10

1    MR. LAPINSKI:  This is going to be 4.
2    (Boyd Exhibit 4 was received and marked
3    for identification, as of this date.)
4    MR. LAPINSKI:  And to the extent we end up
5    kind of tossing documents to each other at some
6    point in time, it's not because I'm trying to
7    be rude or flippant.  It's just the table was a
8    little wider than I thought it was.
9 BY MR. LAPINSKI:
10    Q.  Dr. Boyd, you've been handed three
11 different exhibits that have been marked
12 respectively as Exhibits 2, 3 and 4.
13    Do you have those three exhibits in front
14 of you?
15    A.  Yes.
16    Q.  Okay.  And looking first at Exhibit No. 2,
17 can you tell me what Exhibit Number 2 is?
18    A.  It's an invoice submitted to Large
19 representing Johnson & Johnson for work performed in
20 what appear to be calendar year 2021.
21    Q.  Okay.  And on Exhibit 2 the dates of work
22 that was done run from September 23 of 2021 through
23 October 14 of 2021, correct?
24    A.  Correct.
25    Q.  Okay.  I want to ask you about the line

Page 11

1 items that you have on this particular exhibit.
2 I'll start with the first one which is September 23,
3 2021.  The work performed was:
4    "Review of plaintiffs' expert DC-P
5 deposition transcript."
6    Can you tell me what that refers to?
7    A.  I can only assume that it's plaintiffs'
8 deposition transcript.  I honestly don't remember
9 what capital letters DC-P mean.
10    Q.  You don't know whose deposition transcript
11 that refers to?
12    MS. DAVIDSON:  Are you asking because you
13    don't know, or are you asking because you want
14    to know if --
15    MR. LAPINSKI:  I'm asking because I want
16    to know if he knows.
17    MS. DAVIDSON:  Oh.
18    THE WITNESS:  I can make a reasonable
19    assumption that it's Dr. Saed, but I can't say
20    for sure.
21 BY MR. LAPINSKI:
22    Q.  In your practice when --
23    MS. DAVIDSON:  This is from 9/23/2021?
24    MR. LAPINSKI:  Yes.
25    Jess, we're going to have one dialogue

Page 12

1 here.  Anthony is attorney of record and he's
2 going to be the only one who's talking, okay?
3    MS. DAVIDSON:  I mean DC-P is obviously
4 Clarke-Pearson.  I understand that it's 2021.
5    MR. LAPINSKI:  Okay.  Jessica, I'm not
6 going to have comments coming from the
7 sidelines, okay?
8    Anthony is the attorney of record.  He's
9 defending the deposition.  Anthony is the one
10 who's going to talk, okay?  I'm going to ask
11 you respectfully that you abide by that.
12    MS. DAVIDSON:  And I would just note for
13 the record that we have had depositions where
14 two plaintiffs' attorneys talked.  This is --
15    MR. LAPINSKI:  I understand.
16    MS. DAVIDSON:  -- 2021.  And I don't know
17 how he could be possibly expected to remember.
18    MR. LAPINSKI:  I'm not trying to be
19 argumentative here, Jessica.  I don't know
20 what's happened in other depositions, but I can
21 tell you that the purpose of this deposition,
22 where it's my deposition that I'm taking,
23 Anthony is the attorney of record.  If Anthony
24 has something he wants to say, he can say it.
25 You're otherwise here to be able to observe the

Page 13

1    deposition, okay?
2    MS. DAVIDSON:  I hear you.
3    MR. LAPINSKI:  Okay.  Thank you.
4 BY MR. LAPINSKI:
5    Q.  So, Dr. Boyd, you don't have a specific
6 recollection as to what the DC-P stands for,
7 correct?
8    A.  I didn't before.  I do now.
9    Q.  Okay.  Now Jessica's coaching, what --
10    MR. BALZANO:  Object to form.
11 BY MR. LAPINSKI:
12    Q.  What deposition is this referring to?
13    A.  Dr. Clarke-Pearson, it would appear.
14    Q.  Do you have any recollection of specifics
15 of that deposition that you considered for purposes
16 of your opinion?
17    MR. BALZANO:  Yeah.  I object to form.
18    Object to the entire questioning of this.  I
19    mean 2021, it's four years ago, almost
20    four years ago.  Whether or not he specifically
21    recalls reviewing a specific deposition
22    transcript is --
23    But you can answer.
24 BY MR. LAPINSKI:
25    Q.  Do you have any recollection of reviewing

4 (Pages 10 - 13)

Page 14

1 the deposition transcript?
2    A.  No.
3    Q.  Okay.  In your practice as an expert when
4 you review a transcript, what's the process that you
5 follow when you're reviewing a transcript?
6    A.  That's a difficult question to answer
7 other than reading it and trying to understand the
8 back and forth between the witness and the
9 interrogating attorney.
10    Q.  Is it your practice to take notes in a
11 deposition transcript as you're reviewing it?
12    A.  No, never.
13    Q.  Okay.  Is it your practice while you're
14 reviewing the deposition transcript to work relevant
15 points of the transcript into a draft report that
16 you may have?
17       MR. BALZANO:  Object to the form.
18       THE WITNESS:  It's conceivable, yes.
19 BY MR. LAPINSKI:
20    Q.  The second line item that you have listed
21 is November 23, 2021.  Says:
22       "Work on expert report re: Saed
23 abstract/poster presentation."
24       That's two hours of time you spent there,
25 correct?

Page 15

1    A.  Correct.
2    Q.  Do you have a recollection -- and we'll
3 actually look at the 23rd, 24th and 25th together,
4 which are all the same type of work that was being
5 done.
6       You would agree with that, right?
7       MR. BALZANO:  Object to the form.  Asking
8    about questions -- I mean, invoice like
9    descriptions of work from four years ago.
10 BY MR. LAPINSKI:
11    Q.  Dr. Boyd, this invoice that you have in
12 front of you from September of 2021, this invoice
13 relates to work that you did in regard to your MDL
14 expert report, correct?
15    A.  That is correct.
16    Q.  Okay.  Thank you.
17       And if you don't remember what you were
18 doing during this particular time that relates to
19 the opinions that you're going to be giving in your
20 expert report, you can tell me you don't remember
21 what you were doing at that particular time.  Okay?
22    A.  I'll be happy to.
23    Q.  But this is work that you did in support
24 of the expert report that you're going to be -- that
25 you provided, correct?

Page 16

1       MR. BALZANO:  Object to the form.
2       THE WITNESS:  Correct.
3 BY MR. LAPINSKI:
4    Q.  Okay.  This is work that you did that will
5 support any opinions that you're going to provide,
6 whether it be in your reports or at trial, correct?
7       MR. BALZANO:  I'm going to object to
8    anything that could be infringing on any type
9    of privilege or work product basis.  I mean,
10    although I think, you know, the descriptions of
11    work may not be privileged, I think anything
12    going further, as in how he formed his reports
13    or anything that are privileged information, I
14    would object to.
15       MR. LAPINSKI:  When the time comes that I
16    say I request something that's privileged, you
17    have the right to be able to object to it, but
18    for now, I'm going to continue to ask the
19    questions.
20 BY MR. LAPINSKI:
21    Q.  Dr. Boyd, for these three dates, the 23rd,
22 24th and 25th, when you list the work being done as
23 work on the expert report, slash -- re:  Saed
24 abstract/poster presentations, do you recall
25 specifically the work that you were doing on those

Page 17

1 three dates?
2       MR. BALZANO:  Object to form.
3       THE WITNESS:  On those specific days or on
4    those specific topics?
5 BY MR. LAPINSKI:
6    Q.  Well, on those specific days.  You have a
7 total of eight hours that you spent over a three-day
8 period of time you were working on your expert
9 report related to the Saed abstract, correct?
10       MR. BALZANO:  Object to form.
11       THE WITNESS:  That's what I was doing over
12    those three days, yes.
13 BY MR. LAPINSKI:
14    Q.  Okay.  You don't recall what specifically
15 you were doing during those three days, though, do
16 you?
17       MR. BALZANO:  Object to form.  Recalling
18    specifically what you did four years ago on a
19    specific day.
20       MR. LAPINSKI:  What's wrong with the form
21    of it?
22       MR. BALZANO:  Well, I mean it's just we're
23    asking questions about what he specifically
24    did.
25       MR. LAPINSKI:  Yeah.

5 (Pages 14 - 17)

Page 18

1    MS. DAVIDSON: Four years ago.
2    MR. LAPINSKI: Yeah.
3    MS. DAVIDSON: That's an absurd question.
4    MR. LAPINSKI: Well, I don't know that
5    absurd is the basis of an objection. But this
6    is work that he did in support of his expert
7    report, and if he doesn't know, that's fine, he
8    doesn't know.
9    THE WITNESS: I don't remember what I was
10    doing specifically on those three days.
11 BY MR. LAPINSKI:
12    Q. Okay. As it relates to the SGO 2020 and
13 the SRI 2021 poster presentations, did you do any
14 type of document searches as it relates to those two
15 posters?
16    MR. BALZANO: Object to form.
17    THE WITNESS: I don't remember.
18 BY MR. LAPINSKI:
19    Q. Do you remember at any time doing any type
20 of PubMed search or any other type of search in
21 support of your opinions related to the Saed
22 poster --
23    MR. BALZANO: Object to form.
24 BY MR. LAPINSKI:
25    Q. -- meaning the Saed 2020 SGO poster?

Page 19

1    A. I don't remember one way or the other.
2    Q. Do you have any recollection of doing any
3 type of med pub [sic] or other search related to the
4 Saed SRI 2021 poster?
5    MR. BALZANO: Object to form.
6    THE WITNESS: I don't remember one way or
7    the other.
8 BY MR. LAPINSKI:
9    Q. Okay. Did you review any documents
10 related to the 2020 SGO poster?
11    MR. BALZANO: Object to form. And
12    review -- I mean vague.
13    THE WITNESS: Documents other than the
14    poster material itself?
15 BY MR. LAPINSKI:
16    Q. Yeah, documents other than the poster
17 itself.
18    A. I don't recall.
19    Q. On October 9, 2021, you spent eight hours
20 reviewing additional Saed document productions and
21 incorporation of a draft supplemental report for the
22 MDL.
23    Do you see that?
24    A. I do.
25    MR. BALZANO: Object to form.

Page 20

1 BY MR. LAPINSKI:
2    Q. Do you have a recollection of what
3 additional documents you reviewed on that day?
4    MR. BALZANO: Object to form.
5    THE WITNESS: No.
6 BY MR. LAPINSKI:
7    Q. Do you have a recollection of doing any
8 type of a PubMed search or any other type of
9 literature search on that particular day as it
10 related to this Saed work?
11    MR. BALZANO: Object to form.
12    THE WITNESS: I have no recollection of
13    such searches.
14 BY MR. LAPINSKI:
15    Q. Okay. How about on the following day,
16 October 10? You spent eight and a half hours
17 reviewing additional Saed documents and
18 incorporating into the draft supplemental expert
19 report for the MDL.
20    Is that a correct statement?
21    MR. BALZANO: Object to form. Just again
22    objecting to this entire line of questioning.
23    I mean asking specifically what Dr. Boyd
24    searched four years ago, I certainly don't
25    remember what I searched four years ago in

Page 21

1 Google or PubMed.
2    MR. LAPINSKI: You're also not being paid
3    to testify as an expert in Johnson & Johnson in
4    regard to your opinions and work that you did.
5    Your objection is noted. And for purposes of
6    form, you can note your objection on the record
7    and then you can just end it there. We don't
8    need the colloquy, okay?
9    MS. DAVIDSON: You get colloquy every
10    single times your colleagues object.
11    MR. LAPINSKI: My colleagues are not here.
12    This is my deposition. This is how we're going
13    it. Jessica, come on.
14    MS. DAVIDSON: No. I'm not going to let
15    you tell Anthony that he can't do it. Every
16    other lawyer has done it in litigation.
17    MR. LAPINSKI: Okay. I'm going to tell
18    Anthony that he needs to abide by the Federal
19    Rules, and to the extent that during other
20    depositions you and/or lawyers don't abide by
21    it, that's not my issue. My issue is here
22    today, okay?
23    MR. BALZANO: I'm going to try to just
24    stick to objecting to form and I have, but
25    sometimes --

6 (Pages 18 - 21)

Page 22

1    MR. LAPINSKI: Appreciate that.
2    MR. BALZANO: -- I may need to make the
3    record clear.
4 BY MR. LAPINSKI:
5    Q. All right. Dr. Boyd, looking at the last
6 entry on this, October 14, 2021, preparation for
7 final supplemental expert report for the MDL, four
8 hours there, correct?
9    MR. BALZANO: Object to form.
10    THE WITNESS: Correct.
11 BY MR. LAPINSKI:
12    Q. Okay. Do you have any recollection of
13 what you did on that day?
14    A. I prepared the final supplement expert
15 report for the MDL, and I submitted it to Ms. Miller
16 at the time.
17    MS. DAVIDSON: And you submitted it to
18    who? Me?
19    THE WITNESS: Jessica Davidson, who at the
20    time was Ms. Miller.
21 BY MR. LAPINSKI:
22    Q. Dr. Boyd, during any time in 2021, did you
23 do any type of med pub searches in support of your
24 opinions related to Dr. Saed's poster presentations?
25    MS. DAVIDSON: When you said med pub, do

Page 23

1    you mean PubMed?
2    MR. LAPINSKI: Did I say med pub? Okay.
3    MS. DAVIDSON: Yeah, you did.
4    MR. LAPINSKI: Okay.
5    MR. BALZANO: Object to form, vague.
6    THE WITNESS: I almost certainly did.
7 BY MR. LAPINSKI:
8    Q. Do you have any recollection as you sit
9 here of any results of any of the searches that you
10 did?
11    MR. BALZANO: Object to form. Vague.
12    THE WITNESS: No. And I would just add
13    that there's seldom a day that goes by in my
14    professional life when I don't do a PubMed
15    search or a Google search of some type, whether
16    it's related to this litigation or my
17    professional work. So generally speaking, it's
18    very likely I would have done a PubMed search
19    about something.
20 BY MR. LAPINSKI:
21    Q. Well, my question was specific to Dr. Saed
22 and whether you have a recollection of doing a
23 search specific to Dr. Saed in your opinions on
24 Dr. Saed?
25    A. No specific recollection on that -- no

Page 24

1 specific recollection in that context.
2    Q. If you'd look at Exhibit 3, please.
3    A. (Witness complies.)
4    Q. And Exhibit 3 is an invoice for December
5 of 2021, correct?
6    A. Correct.
7    Q. And you have two different line items of
8 work that you did in December of 2021, both on
9 December 26 of 2021; is that correct?
10    MR. BALZANO: Same objections as the last
11    exhibit.
12    THE WITNESS: That's correct.
13 BY MR. LAPINSKI:
14    Q. Okay. And the first part of that was an
15 hour where you spent reviewing Harper, et al.,
16 Minerva Obstetrics and Gynecology, correct?
17    MR. BALZANO: Objection, form.
18    THE WITNESS: That is correct.
19 BY MR. LAPINSKI:
20    Q. And that reference, that refers to the
21 Saed article that was published in Minerva related
22 to malignant transformation?
23    MS. DAVIDSON: Objection.
24    MR. BALZANO: Object to form.
25    THE WITNESS: Could you ask the question

Page 25

1    again, please?
2 BY MR. LAPINSKI:
3    Q. Sure.
4    That reference to review of Harper, et
5 al., Minerva Obstetrics and Gynecology, is that the
6 Saed article on malignant transformation that was
7 published in Minerva?
8    MR. BALZANO: Object to form.
9    THE WITNESS: It was a Saed article, yes.
10 BY MR. LAPINSKI:
11    Q. Do you recall where you got that article
12 from?
13    MR. BALZANO: Object to form.
14    THE WITNESS: No.
15 BY MR. LAPINSKI:
16    Q. Do you recall doing any type of PubMed
17 searches in and around your review of the Harper
18 Minerva Obstetrics and Gynecology article?
19    MR. BALZANO: Object to form.
20    THE WITNESS: Not specifically, no.
21 BY MR. LAPINSKI:
22    Q. If you look at Exhibit 4, please.
23    A. (Witness complies.)
24    Q. Exhibit 4 is an invoice from you that's
25 dated April 18 of 2024, correct?

7 (Pages 22 - 25)

Page 26

1    MR. BALZANO: Object to form.
2    THE WITNESS: Correct.
3 BY MR. LAPINSKI:
4    Q. And this details work that you did
5 beginning in December 18 of 2023 and running through
6 April 4 of 2024; is that correct?
7    A. That's correct.
8    Q. And, Dr. Boyd, this is all work that you
9 did in support of your supplemental expert report?
10    A. Are we asking about the MDL case now?
11    Q. MDL and/or the New Jersey litigation.
12    A. To the best -- I honestly don't understand
13 the question.
14    Q. Okay. The invoice that you have here,
15 this is an invoice for work that you did on behalf
16 of the Johnson & Johnson defendants?
17    A. That is correct.
18    Q. And it's work that you did related to the
19 supplemental expert report that you've submitted in
20 the MDL case?
21    MR. BALZANO: I'm going to object. I
22 think the document speaks for itself.
23    THE WITNESS: Some of it is, and some of
24 it is not.
25

Page 27

1 BY MR. LAPINSKI:
2    Q. Can you tell me what parts of it are not?
3    MR. BALZANO: Object to form.
4    THE WITNESS: Well, any teleconference I
5 had with any of the lawyers listed here --
6 BY MR. LAPINSKI:
7    Q. I'm going to interrupt real fast. I don't
8 want to know anything that was said with the
9 lawyers. Just want to know whether or not it
10 relates to the MDL or not, okay?
11    A. That's fine because I don't remember. I
12 was just going through the line items.
13    Q. Okay.
14    A. Preparation of written critique of Emi, et
15 al., for incorporation to a expert report, that
16 would have been included in the supplemental expert
17 report. Same for March 9, 2024, including review of
18 Shawn Levy expert report.
19    Same for March 10, exactly the same thing.
20 Writing the supplemental expert report on March 15,
21 same thing. And if we can just -- March 17,
22 March 18, writing supplemental expert report,
23 obviously related to preparing the expert report.
24    Work on March 18 related to the deposition
25 of Dr. Levy related to the supplemental expert

Page 28

1 report, as would be work on March 19 involving
2 completion of the supplemental expert report.
3    March 23 seems to be relating to again to
4 the Shawn Levy deposition which would be relevant to
5 the supplemental expert report. Same for March 24.
6 Same for March 25.
7    March 28, review and editing of
8 supplemental expert report obviously related to the
9 aforementioned report. March 31 seems to be a mixed
10 bag of work related to cases that are relevant to
11 the supplemental expert report and in this case, as
12 does work performed on April 1.
13    Teleconference April 1, couldn't say.
14 April 2nd, again reviewing and editing of
15 supplemental expert report, would appear to be
16 relevant. And again April 4, some of it relevant
17 and some of it not to this particular supplemental
18 expert report.
19    Q. Okay. And I want to, for a minute, go
20 back to the top of the second page, March 23 through
21 25. Research and consulting to Jessica Davidson re:
22 the Shawn Levy deposition.
23    Was that research that you were doing as
24 it relates to the opinions in your report?
25    MR. BALZANO: I'm going to object and

Page 29

1    caution the witness to not reveal any
2    privileged information or substance of any of
3    these conversations.
4    Object to form, too. The document speaks
5    for itself.
6    MS. DAVIDSON: I don't think he can answer
7    that question.
8    MR. LAPINSKI: He can answer the question
9    as to whether or not research he was doing was
10    related to his opinion and his report.
11    MR. BALZANO: It says research and
12    consulting.
13    MR. LAPINSKI: And I didn't ask him about
14    the consulting. I asked him about the
15    research.
16    MR. BALZANO: But the research would have
17    been relevant to privileged conversations.
18    MS. DAVIDSON: Yeah, this was a privileged
19    conversation.
20    MR. LAPINSKI: Let's break them up one by
21    one.
22 BY MR. LAPINSKI:
23    Q. March 23, 2024, is the work here that was
24 research and consulting to Jessica Davidson re: the
25 Shawn Levy deposition.

8 (Pages 26 - 29)

Page 30

1    Do you see that?
2    A.  Yes.
3    Q.  On that day did you do two hours of
4  research and consulting related to the Shawn Levy
5  deposition?
6        MR. BALZANO:  Object to form.
7        THE WITNESS:  Yes.
8  BY MR. LAPINSKI:
9    Q.  Any of the research that you did on
10  March 23, 2024, relevant to the opinions that you're
11  going to be expressing in this case?
12        MR. BALZANO:  Object to form.
13        THE WITNESS:  Yes.
14  BY MR. LAPINSKI:
15    Q.  Can you tell me the research that you did
16  on March 23 that's relevant to the opinions you're
17  expressing in this case?
18        MR. BALZANO:  I think I'm going to object
19  on privileged grounds for this.  I think the
20  research, as it relates to this specific line
21  item, is too tied to whatever privileged
22  conversations were had on that call.
23        MR. LAPINSKI:  Okay.  The witness -- the
24  witness -- hang on one second.
25        The witness just testified that the work

Page 31

1  that he did on May 23 is relevant to the
2  opinions that he's going express in this case,
3  right?
4        To the extent that he just testified that
5  the research that he did is relevant to the
6  opinions that he's expressed, you can't say
7  that it's privileged research because it's
8  research that he's going to be using for
9  purposes of his opinion.
10        MR. BALZANO:  Well, I'm just going to
11  caution the witness to not reveal any substance
12  of that privileged conversation.
13        MR. LAPINSKI:  I'm not asking for any --
14  I'm not asking for any conversations.  I'm not
15  asking for him to reveal any privileged
16  conversations.
17        My question is simply, during that
18  two-hour period of time you did research that's
19  related to the opinions you're going to express
20  in this case, correct?
21        MR. BALZANO:  Objection.  Because it says
22  research and consulting.  Like it still seems
23  to me like it's too intrinsically linked.
24        MS. DAVIDSON:  Related to -- I'm just
25  concerned that this is raising a legal issue as

Page 32

1  opposed to something that Dr. Boyd can possibly
2  know what he can answer to and what he can't
3  answer to.
4        And I'm not sure that what you mean by
5  related to your opinions is what he means by
6  related to your opinions.  I'm concerned about
7  this line of questioning.  So I think -- and I
8  know that he is new at this.
9        (To the witness.)  Dr. Boyd, to the extent
10  that you did research that under Rule 26, I
11  think the line that should be drawn is if you
12  did research that underlies your opinions that
13  you're going to give in this case, then I do
14  agree with Dan, that that's discoverable.
15        If you did research because I had a
16  question about the deposition I was taking and
17  I wanted your input, that is not appropriate
18  because that wouldn't have influenced your
19  opinions, that was for me.
20        Does that make sense?
21        THE WITNESS:  Yes.
22        MS. DAVIDSON:  From a legal perspective?
23  I'm sorry.  I know you didn't want me to
24  interrupt, but I'm trying to like make this go
25  smooth and explain to the witness since he's

Page 33

1    not a lawyer.
2  BY MR. LAPINSKI:
3    Q.  So with Jessica's instruction in mind as
4  it relates to privilege, is there any work that you
5  did on March 23, 2023, that would be relevant to the
6  opinions that you're expressing in this case?
7        MS. DAVIDSON:  And again I'm just saying,
8  it's not really relevant.  I would say -- I
9  wish I had Rule 26 in front of me, but it's
10  data and research that underlie your opinion or
11  the basis for your opinion, not just relevant
12  generally; in other words, generally relevant
13  to anything on talc.  So I'm just wondering if
14  you can make that more --
15        MR. LAPINSKI:  Sure.  Let me take a step
16  back.
17  BY MR. LAPINSKI:
18    Q.  Dr. Boyd, there are situations where you
19  may be conferring with counsel and counsel maybe
20  asking you for assistance as it relates to certain
21  things and you provide information to counsel at
22  their request, okay?
23        Is March 23 an example of what was done on
24  that day?
25        MR. BALZANO:  Object to form.  I mean --

9 (Pages 30 - 33)

Page 34

1    MR. LAPINSKI: Hang on one second. You
2    objected to the form.
3  BY MR. LAPINSKI:
4    Q. You can answer that question.
5    A. After the recent back and forth, I would
6  conclude that the work I did on March 23, March 24
7  and March 25 was more in line with the description
8  that you just gave.
9    Q. Which is what description? What's your
10  understanding of what that work was?
11    A. Consulting with Ms. Davidson over
12  Shawn Levy's testimony.
13    Q. That three-day period of time did not have
14  anything to do with you forming and writing your
15  opinions in the supplemental expert report, correct?
16    A. Based on the way I worded this
17  particular -- these particular line items, I would
18  answer your question, yes, correct.
19    Q. I want to go back to the first page, and
20  there's a similar entry at the bottom of the first
21  page from March 18. Now, is it correct that the one
22  hour of time that you spent on March 18 was
23  unrelated to the formation of the opinions that
24  you're going to be sharing in this case?
25    A. Inasmuch as my wording is exactly the same

Page 35

1  as for March 23 through 25, I would say that -- the
2  same answer, yes, unrelated to the opinions that I'm
3  going render in this case.
4    Q. Going to the top of the first page,
5  12/18/23, there's a teleconference with
6  Mark Hegerty. Mark Hegerty is an attorney for the
7  defendant, correct?
8    A. Yes.
9    Q. And did this teleconference have anything
10  to do with forming the opinions that you're going to
11  be sharing in this case?
12    MR. BALZANO: Object to form.
13    THE WITNESS: No.
14  BY MR. LAPINSKI:
15    Q. How about the line item below that which
16  is January 8, 2024. Your one-hour conversation with
17  Ms. Davidson. Anything during that one-hour
18  conference with Ms. Davidson that you're relying
19  upon for purposes of your opinions in this case?
20    MR. BALZANO: Object to form.
21    THE WITNESS: I honestly can't recall.
22  BY MR. LAPINSKI:
23    Q. If you go back to the second page of this
24  exhibit and look at your May 31, 2024 entry.
25    MR. BALZANO: Sorry. You said May?

Page 36

1    MR. LAPINSKI: I'm sorry March 31, 2024
2    entry.
3  BY MR. LAPINSKI:
4    Q. And that's an hour and a half that you
5  spent on the review of pathology and clinical
6  reports of Plaintiffs Newsome, Bondurant, Rausa,
7  Judkins, Converse and Gallardo, with an expert
8  report of Shawn Levy, correct?
9    MR. BALZANO: I'm going object to form.
10  It seems like that this isn't related to the
11  MDL or Carl or the Balderrama case.
12    MS. DAVIDSON: It is, it is.
13    I'm sorry.
14    MR. LAPINSKI: And just for the record,
15  this invoice does say:
16    "Work as expert in preparation of
17  supplemental expert report." So to the extent
18  that it's on here, my assumption is that it's
19  related. That's why I'm asking the question.
20    MS. DAVIDSON: He jumped all over the
21  place.
22    MR. LAPINSKI: Okay.
23  BY MR. LAPINSKI:
24    Q. But looking at that March 31, 2024, entry
25  Dr. Boyd, that was an hour and half of time that you

Page 37

1  spent reviewing pathology and clinical reports of --
2  as Jessica referred to them -- bellwether
3  plaintiffs, correct?
4    A. To the extent I understand what a
5  bellwether plaintiff is.
6    Q. Well, on March 31 you spent an hour and a
7  half reviewing pathology and clinical reports of six
8  individuals listed that are there, correct?
9    MR. BALZANO: Object to form.
10    MS. DAVIDSON: I can tell you that that's
11  not related to his expert reports. I remember
12  why I asked him and this would be not be -- no,
13  no. This is important. This is not something
14  that he should be --
15    MR. LAPINSKI: It's going to be quicker if
16  I ask the questions that I ask. I'm not
17  doing --
18    MS. DAVIDSON: Yeah. But I need to assert
19  the privilege here because this was not related
20  to the actual items in his expert report or his
21  expert opinions, but I remember why I wanted to
22  ask him those questions.
23    MR. LAPINSKI: Better if I have the
24  testimony from him than from you.
25    MS. DAVIDSON: I understand. But he did

10 (Pages 34 - 37)

Page 38

1  not remember or understand the privilege.
2     MR. LAPINSKI:  And that's -- I'm going to
3  ask questions that will clarify all of that.
4  BY MR. LAPINSKI:
5     Q.  Dr. Boyd, this one-and-half-hour period of
6  time related to -- related to individual plaintiffs
7  and review of their medical records, does that time
8  that you spent there have any relevance to the
9  opinions that you're going to be expressing in this
10  MDL?
11     MR. BALZANO:  Object to form.
12     THE WITNESS:  No.
13  BY MR. LAPINSKI:
14     Q.  Okay.  Dr. Boyd, have you been asked to
15  provide case-specific opinions for any of the six
16  plaintiffs that are part of this federal trial?
17     MR. BALZANO:  Object to form.
18     MS. DAVIDSON:  Do you know what that
19  means?
20     THE WITNESS:  Not really.
21     MS. DAVIDSON:  That's what I figured.
22  BY MR. LAPINSKI:
23     Q.  Okay.  Dr. Boyd, have you been asked to
24  provide an opinion as to the cause of ovarian cancer
25  in any of the six individuals who are currently

Page 39

1  identified as bellwether plaintiffs in the federal
2  litigation?
3     MR. BALZANO:  Object to form.  Also think
4  it's outside the scope of his supplemental
5  expert report.
6     THE WITNESS:  Yes.
7  BY MR. LAPINSKI:
8     Q.  You have been asked to provide specific
9  causation testimony as it relates to individual
10  plaintiffs?
11     A.  No, not testimony.
12     MR. BALZANO:  Object to form.
13  BY MR. LAPINSKI:
14     Q.  Have you been asked to provide case
15  specific opinions as it relates to individuals?
16     MS. DAVIDSON:  Hold on, hold on, hold on.
17  By opinions, he means disclosed opinions
18  that you're going to testify at trial.  Not if
19  I asked you questions.  This is important.  Not
20  if I asked you questions about these people.
21     MR. BALZANO:  And objecting to --
22     MS. DAVIDSON:  Like when I ask you, hey,
23  Dr. Boyd, something, and you tell me your
24  opinion, that's not -- the word opinion here
25  has a very specific legal meaning.  This is

Page 40

1  important, Dan.
2     MR. LAPINSKI:  It's important, and that's
3  what Anthony's job is.
4     MS. DAVIDSON:  I understand, but I'm the
5  one who had these conversations.  And this
6  Anthony's first expert deposition.
7     MR. LAPINSKI:  I understand that.  I get
8  it, but it doesn't mean that it's two lawyers
9  that get to participate in the deposition.
10     MS. DAVIDSON:  I'm not running the
11  deposition.  I'm ensuring my privileged
12  communications with Mr. Boyd are protected.
13     MR. LAPINSKI:  That's what Anthony's job
14  is here.  I'm just reminding you of that,
15  Jessica, okay?
16     MS. DAVIDSON:  I understand.  And I'm --
17  BY MR. LAPINSKI:
18     Q.  I'm not looking for any privileged
19  information, Dr. Boyd, okay?  I'm looking for what
20  you know based upon what your understanding is of
21  the work that you've done.  Okay?
22     Is it your understanding that you will be
23  giving testimony as it relates to bellwether
24  plaintiffs and the specific cause of their ovarian
25  cancer?

Page 41

1     A.  At this point in time, no.
2     Q.  You have not been asked to do that at this
3  point in time, correct?
4     A.  That's correct.
5     MS. DAVIDSON:  Those questions were worded
6  this an appropriate way.  So if you have
7  further questions, I think the way you just
8  worded it, we won't have objections and Anthony
9  won't object.
10     MR. LAPINSKI:  So I'm doing my job right?
11     MS. DAVIDSON:  You're doing your job
12  right.
13     MR. LAPINSKI:  Note that on the record,
14  please.
15  BY MR. LAPINSKI:
16     Q.  Beyond the hour-and-a-half time you spent
17  on May 31 reviewing pathology and clinical reports,
18  have you reviewed any other medical records related
19  to the six bellwether plaintiffs in this case?
20     MR. BALZANO:  I think you meant March 31.
21     MR. LAPINSKI:  Did I say "May" again?
22     MR. BALZANO:  Yes.
23  BY MR. LAPINSKI:
24     Q.  So let me ask the question again.  Going
25  back to the March 31, 2024 entry, other than the

11 (Pages 38 - 41)

Page 42

1  hour-and-a-half time that you spent on the review of
2  pathology and clinical reports for the six
3  bellwether plaintiffs, have you reviewed any other
4  medical records related to this case?
5       MR. BALZANO: Object to form. Vague.
6       THE WITNESS: Not that I recall.
7  BY MR. LAPINSKI:
8       Q.  Okay. Now on April 1, you spent an hour
9  doing a review of clinical records of Balderamma and
10 Carl, do you see that entry?
11      A.  I do.
12      Q.  Do you know who Balderrama and Carl are?
13      MR. BALZANO: Object to form.
14      THE WITNESS: I assume they're plaintiffs.
15 BY MR. LAPINSKI:
16      Q.  That's a good assumption. I just didn't
17 know whether or not you knew where they were
18 plaintiffs or who they were, and I'm just trying to
19 be able to get your understanding so that we can lay
20 a proper foundation.
21      A.  Understood.
22      Q.  Do you know who Carl and/or Balderrama
23 are?
24      MR. BALZANO: Objection. Asked and
25      answered.

Page 43

1       THE WITNESS: I assume that they're
2       plaintiffs.
3  BY MR. LAPINSKI:
4       Q.  Okay. Are you aware that they're
5  plaintiffs in the New Jersey litigation that's
6  pending in Atlantic County, New Jersey?
7       MR. BALZANO: Object to form. Object to
8       asked and answered.
9       THE WITNESS: No. I can't say I knew the
10      specifics of which state and so forth, no.
11 BY MR. LAPINSKI:
12      Q.  Have you been asked to provide
13 case-specific testimony on the cause of
14 Ms. Balderrama's ovarian cancer?
15      A.  No.
16      Q.  Have you been asked to provide case
17 specific testimony as to the cause of Ms. Carl's
18 ovarian cancer?
19      A.  No.
20      Q.  Dr. Boyd, Exhibit 4 is an invoice for work
21 that you've done up through April 4, 2024,
22 correct?
23      A.  If I --
24      Q.  If you look at the second page, the last
25 entry on the second page.

Page 44

1       A.  (Witness complies.)
2       I'm sorry. Where are we?
3       Q.  Sure.
4       If you look at the bottom of the second
5  page of Exhibit 4, the last entry that you have on
6  there is April 4 of 2024, correct?
7       A.  That is correct.
8       Q.  Okay. Have you done any work in support
9  of your opinions that are being provided in this
10 case since April 4 of 2024?
11      A.  This case being talc litigation generally
12 or MDL?
13      Q.  So it would either be the MDL litigation
14 or the New Jersey litigation that's pending in
15 Atlantic County.
16      A.  Yes.
17      Q.  Can you tell me what additional work you
18 have done since April 4 of 2024?
19      A.  Research.
20      Q.  Can you tell me what type of search you've
21 done since April 4?
22      A.  Research related to talc and ovarian
23 cancer and research related to preparation of my
24 supplemental expert report, occasionally
25 teleconferences with counsel and so forth.

Page 45

1       Q.  Taking teleconferences with counsel out of
2  it, describe for me the research that you've done as
3  it relates to talc and ovarian cancer since April 4.
4       A.  Reading documents, reading literature.
5       Q.  Do you know what documents you've read?
6       A.  I couldn't possibly say over that period
7  of time. I spent hours going through documents,
8  going through PubMed, going through Google, reading
9  the same documents over and over. I have a poor
10 memory.
11      Q.  Do you know approximately how much time
12 you spent doing that?
13      A.  Since April 4?
14      Q.  Yes.
15      A.  Forty-one hours.
16      Q.  Forty-one hours?
17      A.  Yes.
18      Q.  You quickly said 41 hours. Have you
19 recently prepared an invoice that was submitted to
20 Johnson & Johnson as it relates to that?
21      MR. BALZANO: Object to form.
22      THE WITNESS: No, I suspected you would
23      ask the question.
24 BY MR. LAPINSKI:
25      Q.  No, I didn't say anything about 41 hours.

12 (Pages 42 - 45)

Page 46

1       MS. DAVIDSON:  No.  He's saying he
2  suspected you would ask the question, so he did
3  the math.  I think that's what he was saying.
4       THE WITNESS:  I wanted to be ready.
5       MR. LAPINSKI:  I should have objected to
6  your form of your question to me.
7  BY MR. LAPINSKI:
8    Q.  So you spent -- from April 4, 2024 until
9  today, you've spent an additional 41 hours as it
10 relates to this ongoing litigation?
11   A.  Roughly, yes.  I think that's fair.
12   Q.  Part of that 41 hours included conference
13 calls with counsel, correct?
14   A.  Correct.
15   Q.  Do you know approximately how much of that
16 41 hours related to conference calls that you had
17 with counsel?
18       MR. BALZANO:  Object to form.  I don't
19   think the question is asking privilege, but
20   just caution him not to reveal privileged
21   information.
22       THE WITNESS:  A minority of that time
23   would have been spent with teleconferences with
24   counsel.
25

Page 47

1  BY MR. LAPINSKI:
2    Q.  Do you know how much time was spent
3  editing your supplemental expert report?
4    A.  I couldn't say --
5    Q.  Okay.
6    A.  -- with certainty.
7    Q.  But some of the time was spent editing
8  your supplemental expert report?
9    A.  Yes.  This is the report, May 24 if I
10 recall.  So that would have been -- the work up
11 until May 24, 2024 would have been involved
12 finalizing the report, yes.
13       MS. DAVIDSON:  Can we go off the record
14   for a second?
15       MR. LAPINSKI:  Sure.
16       (At 10:37 a.m. a recess was taken.)
17       (At 10:47 a.m. the deposition resumes.)
18 BY MR. LAPINSKI:
19   Q.  We're back on the record.
20       Dr. Boyd, I'm going to have handed to you
21 a document that has been marked as Boyd Exhibit 5.
22       (Boyd Exhibit 5 was received and marked
23   for identification, as of this date.)
24 BY MR. LAPINSKI:
25   Q.  Dr. Boyd, this is a CV that was produced

Page 48

1  to us.  It's a CV that's dated August 1, 2023.
2       Do you see that?
3    A.  Yes, I do.
4    Q.  And this is your CV, correct?
5    A.  That's correct.
6    Q.  Is this the most updated CV that you have?
7    A.  Obviously, it's a year old, but for all
8  practical purposes, there's nothing substantive that
9  I would add to it today if I could.
10   Q.  Okay.  Dr. Boyd, you're not a medical
11 doctor, correct?
12   A.  That is correct.
13   Q.  Do you hold yourself out to be an expert
14 in gynecology?
15       MR. BALZANO:  Object to form.
16       THE WITNESS:  No, I'm not a gynecologist.
17 BY MR. LAPINSKI:
18   Q.  Are you planning to give medical diagnosis
19 opinions in this case?
20   A.  No, I'm not.
21   Q.  Do you hold yourself out to be an expert
22 in medical oncology?
23   A.  I do not.
24   Q.  Okay.  Are you an expert in pathology?
25   A.  These are relatively vague questions now.

Page 49

1       I'm a professor in the Department of
2  Pathology and Laboratory Medicine at Northwell
3  Health.  I'm not a practicing anatomic or clinical
4  pathologist, however.
5    Q.  Have you ever held yourself out to be an
6  expert in pathology?
7       MR. BALZANO:  I'm going to object to this
8    line of questioning just because this could
9    have been asked in 2019.  My understanding is
10   that the scope of this deposition should be
11   limited to the supplemental report.
12       But you can answer.
13       THE WITNESS:  I did not hold myself out as
14   a pathologist.
15 BY MR. LAPINSKI:
16   Q.  Just for purposes of foundation, Dr. Boyd,
17 your supplemental expert report, you're relying upon
18 your experience and certain expertise to formulate
19 the opinions that you have in this case, correct?
20   A.  Correct.
21   Q.  Okay.  Do you conduct laboratory research?
22   A.  Some, yes.
23   Q.  When is the last time you were in a lab
24 conducting research?
25   A.  The last time I was physically in a lab

Page 50

1  conducting research, it's been probably 20 years,
2  which is very different than meeting or conducting a
3  service.
4       Q.  Do you have an active laboratory-based
5  research program?
6       A.  Yes.  I participate in laboratory research
7  programs in terms of collaboration.  I do not have
8  my own personal research laboratory at this time in
9  my career.
10      Q.  Would you agree that a large portion of
11 your career has been spent in clinical departments
12 of hospitals or treatment centers?
13      MR. BALZANO:  Object to form.
14      THE WITNESS:  Yes, I would agree that a
15      large proportion of my career has been spent in
16      clinical settings, yes.
17 BY MR. LAPINSKI:
18      Q.  Have you ever presented on the topic of
19 genital talcum powder use and ovarian cancer?
20      MR. BALZANO:  Object to form.  And again I
21      would just object to the -- that this should be
22      just limited to period between 2019 and now.
23 BY MR. LAPINSKI:
24      Q.  And you are going to be testifying, and
25 your supplemental report involves talcum powder and

Page 51

1  ovarian cancer, correct?
2       A.  Correct.
3       Q.  Have you ever presented on the topic of
4  genital talcum powder use and ovarian cancer?
5       MR. BALZANO:  Just going to object again
6       to the scope and just that this should be
7       limited to 2019, from his last report until
8       now.
9       MS. DAVIDSON:  Dan, the way the question's
10      been asked is since 2019, have you; and then he
11      won't object.
12 BY MR. LAPINSKI:
13      Q.  Since 2019 have you conducted any research
14 on genital talcum powder use and ovarian cancer?
15      A.  No, I have not.
16      Q.  Since 2019, have you ever presented on the
17 topic of genital talcum powder use and ovarian
18 cancer?
19      A.  No.
20      Q.  Since 2019, is any of your research
21 focused on epidemiology regarding chronic
22 inflammation of the development of cancer?
23      A.  No.
24      Q.  I'm going to have marked as Exhibit 6 and
25 put in front of you Dr. Boyd, the next exhibit,

Page 52

1  which is your February 2019 --
2       MR. BALZANO:  Actually, I don't have a
3       copy.
4       MR. LAPINSKI:  Well, you can take it
5       anyway.  That's less that I have to bring home.
6       (Boyd Exhibit 6 was received and marked
7       for identification, as of this date.)
8       THE WITNESS:  (Witness reviews document.)
9  BY MR. LAPINSKI:
10      Q.  Dr. Boyd, you've had put in front of you a
11 document that has been marked as Exhibit 6.  And if
12 you could take a minute to look at that and let me
13 know if you've had an opportunity to look at it.
14      A.  Yes, I have.
15      Q.  And as it relates to your 2019 report --
16 and I'm not going into -- I have a couple of
17 questions just in order to be able to rule out the
18 fact that 2019 report can be put aside.
19      So the 2019 report contains your opinions
20 on Dr. Saed's 2019 article that was published in
21 reproductive sciences, correct?
22      A.  And related issues around Dr. Saed's
23 research, yes.
24      Q.  Okay.  And since the 2019 report, you've
25 submitted a supplemental report in this case that's

Page 53

1  dated May 24 of 2024, correct?
2       A.  Correct.
3       Q.  Okay.
4       MR. LAPINSKI:  I'm going to have that
5       marked as Exhibit 7, please.
6       (Boyd Exhibit 7 was received and marked
7       for identification, as of this date.)
8       THE WITNESS:  Thank you.
9       (Witness reviews document.)
10 BY MR. LAPINSKI:
11      Q.  I'm going to stick with Exhibit 6 for a
12 minute, Dr. Boyd, but I just wanted to be able to
13 put Exhibit 7 in front of you.
14      And Exhibit 7 is the supplemental report
15 dated May 24, 2024, you've provided in this case,
16 correct?
17      A.  Yes.
18      Q.  Okay.  And your supplemental report of
19 May 24, 2024, adopts by reference your 2019 report?
20      A.  I'm sorry.  Could you repeat the question?
21      Q.  Sure.
22      Your May 24, 2024 report adopts by
23 reference your original 2019 report, correct?
24      MR. BALZANO:  Object to form.  Could
25      you -- is there somewhere where it says that

14 (Pages 50 - 53)

Page 54

1    specifically on this?
2 BY MR. LAPINSKI:
3    Q.  If he can answer the question, he can
4 answer the question.
5    A.  I'm not really square on the terminology
6 with respect to adopts.
7    Q.  If you look on page -- if you look on
8 page 3 of your 2024 report.
9    A.  (Witness complies.)
10    Q.  Which is the supplemental report.
11    I'm going to go down to the second full
12 paragraph that starts off with "First paper."
13    Do you see that?
14    A.  Yes.
15    Q.  Okay.  And I'm going to go about halfway
16 down that paragraph, and the sentence starts on the
17 right-hand side.  Says:
18    "I discussed this article" -- which is
19 referring to the Fletcher/Saed 2019 -- "in depth in
20 my original report (submitted herewith), and I do
21 not repeat that discussion here."
22    Do you see that?
23    A.  I do.
24    Q.  Okay.  So are we in agreement that, for
25 purposes of your supplemental report, you're not

Page 55

1 repeating the discussions that -- and your opinions
2 that were in your 2019 report, correct?
3    A.  Correct.
4    Q.  And in your supplemental report, do you
5 cite to any new studies in further support of your
6 opinions in the 2019 article -- strike that.
7    In your supplemental report, do you cite
8 to any new studies in further support of your
9 opinions that you provided in 2019?
10    MR. BALZANO:  Object to form.
11    THE WITNESS:  Yes.
12 BY MR. LAPINSKI:
13    Q.  What are the studies that you cite to in
14 your supplemental report that relate back to your
15 2019 report?
16    A.  Additional work done by Dr. Saed and
17 co-authors.
18    Q.  Well, just so we're clear, there was
19 additional work done by Dr. Saed and his co-authors
20 since the time of your 2019 report, correct?
21    A.  Correct.
22    Q.  And your supplemental report provides
23 opinions of that supplemental work that was done by
24 Dr. Saed, correct?
25    A.  Correct.

Page 56

1    Q.  Does your supplemental report in any way
2 cite to new studies that you're relying upon in
3 further support of your 2019 opinions?
4    MR. BALZANO:  Object to form.
5    THE WITNESS:  Yes.  It refers to new
6 studies since 2019 by Dr. Saed and colleagues.
7    MS. DAVIDSON:  I'm not sure you guys
8 are --
9    MR. LAPINSKI:  Yeah.
10 BY MR. LAPINSKI:
11    Q.  So your supplemental report --
12    MS. DAVIDSON:  I think your question is
13 too legalese for him.
14 BY MR. LAPINSKI:
15    Q.  Okay.  Your supplemental report addresses
16 Dr. Saed's supplemental work, correct?
17    A.  My supplemental report addresses work done
18 since 2019 by Dr. Saed.
19    Q.  Okay.  Your supplemental report doesn't
20 have anything in it that goes back and at all
21 amends, supplements, or supports the opinions that
22 you first shared in 2019, correct?
23    A.  As far as I recall, no.
24    Q.  Okay.
25    A.  Correct.

Page 57

1    Q.  We shall -- we're going to look at,
2 Dr. Boyd, your 2024 supplemental report.
3    A.  (Witness complies.)
4    Q.  That report has been marked as Exhibit 7.
5    Dr. Boyd, can you tell me how did you go
6 about preparing this report?
7    MR. BALZANO:  Object to form.  Vague.
8    THE WITNESS:  Yeah, it's a difficult
9 question to answer.  I reviewed additional data
10 and materials submitted by Dr. Saed and
11 co-authors to various national meetings.  I
12 reviewed an additional manuscript that was
13 eventually published by Dr. Saed and
14 colleagues.  I reviewed, as it says here on
15 page 16, other mechanistic studies relied on by
16 plaintiffs' experts, including papers by
17 Drs. Mandarino and Emi.
18    I briefly reviewed a new paper by
19 Dr. O'Brien.  And I went into -- and I'm sorry.
20 There was an additional -- what appeared to be
21 a review article by Dr. Saed published in 2024
22 that I briefly commented on.
23    And I also reviewed in some detail the
24 content of Dr. Shawn Levy's expert report.  And
25 in so doing, relied on that material, carefully

15 (Pages 54 - 57)

Page 58

1    researched and put together what I hope is an
2    informative report based on my opinion.
3  BY MR. LAPINSKI:
4    Q.  And when you say that after you carefully
5  reviewed it, you researched it, can you tell me what
6  you did for purposes of researching it?
7    A.  Not specifically.  Whenever issues come up
8  that I'm interested in pursuing further or may have
9  questions about, I'll always go to the Internet and
10  look at material that may be relevant or may not be.
11    Q.  And do you have a recollection of any
12  specific searches that you did on the Internet as it
13  relates to your preparation of this report?
14    A.  No.
15    Q.  Other than the documents that you just
16  went through that you reviewed in preparation of
17  this report, did you review any other documents?
18    MR. BALZANO:  Object to form.
19    THE WITNESS:  Probably.
20  BY MR. LAPINSKI:
21    Q.  Do you have a recollection of any other
22  documents that you reviewed?
23    A.  Not specifically.
24    Q.  Do you have a recollection of reviewing
25  any journal articles other than the ones that you

Page 59

1  cite in your paper?
2    MR. BALZANO:  Object to form.  Vague.
3    MR. LAPINSKI:  Strike that question.
4  BY MR. LAPINSKI:
5    Q.  Other than -- other than the journal
6  articles that you just testified that you had
7  reviewed, do you have a specific recollection of
8  reviewing any other journal articles in preparation
9  of this report?
10    MR. BALZANO:  Object to form, vague.
11    I'm sorry.  Go ahead.
12    THE WITNESS:  Not specifically.
13    (Boyd Exhibit 8 was received and marked
14    for identification, as of this date.)
15  BY MR. LAPINSKI:
16    Q.  Dr. Boyd, you've had put in front of you a
17  document that's been marked as Plaintiffs'
18  Exhibit 8.
19    A.  (Witness reviews document.)
20    Q.  And have you seen this document before?
21    A.  Yes.
22    Q.  Okay.  Is this a document that you
23  prepared?
24    MR. BALZANO:  Object to form.
25    THE WITNESS:  Did I type and print the

Page 60

1  document?  No.
2    I discussed with counsel what additional
3  materials I had relied upon in forming my
4  opinion relevant to this case, and I think
5  someone in the Skadden office probably actually
6  prepared the list.
7  BY MR. LAPINSKI:
8    Q.  And this list -- this list of additional
9  materials considered since May 24 lists five
10  different deposition transcripts and exhibits,
11  correct?
12    A.  Correct.
13    Q.  Have you reviewed any additional
14  materials -- strike that.
15    Have you considered any additional
16  materials as related to your opinions since
17  May 2024?
18    A.  None that inform my opinion on this case,
19  no.
20    Q.  Dr. Boyd, if we take Exhibit 8, which is
21  your additional materials considered since May 24,
22  2024, and we take the materials considered that you
23  have listed in your May 24th report and then also
24  take the materials considered that you have listed
25  in your 2019 report, would that comprise the

Page 61

1  substance of all things that you've considered for
2  purposes of rendering your opinion?
3    A.  For the purposes of rendering my opinion,
4  I would say that's a correct statement, yes.
5    Q.  If we could take a look at your
6  supplemental report, Doctor.  I'm going to go to
7  page 2 of the report, please.
8    A.  (Witness complies.)
9    Q.  Page 2, Section 2 of the report is
10  entitled "Scope of Report," correct?
11    A.  Correct.
12    Q.  And the scope of your supplemental report
13  includes a review of the two Saed posters; is that
14  correct?
15    A.  Among other things, yes, that's correct.
16    Q.  It includes a study, the study that was
17  associated with those two posters that was published
18  if Minerva?
19    A.  Yes.
20    Q.  It includes your opinions on the Mandarino
21  article, correct?
22    A.  Yes.
23    Q.  It includes your opinions on the Emi
24  article, correct?
25    A.  Yes.

16 (Pages 58 - 61)

Page 62

1    Q.   And it includes your opinions on the
2  opinion of Dr. Shawn Levy, correct?
3    A.   It includes the opinion of Dr. Levy's
4  expert report, correct.
5    Q.   It includes your opinion on Dr. Levy's --
6    A.   My opinion of Dr. Levy's -- the content of
7  Dr. Levy's expert report, yes.
8    Q.   And does the scope of the opinions that
9  you're going to provide related to the supplemental
10 report go beyond what you've stated here on page 2?
11       MR. BALZANO:  Objection, form.
12       THE WITNESS:  No.
13 BY MR. LAPINSKI:
14   Q.   All right, sir.  At the bottom of page 2,
15 Dr. Boyd, there's a footnote 1.  And for purposes of
16 context, section 3 of your report is -- the title of
17 it is:
18       "Plaintiffs' experts have not shown that
19 their proposed mechanisms for ovarian carcinogenesis
20 are plausible."
21       Do you see that?
22   A.   Yes.
23   Q.   And the first sentence says.
24       "Plaintiffs' experts proposed that talc
25 cause inflammation, which leads to cancer, or that

Page 63

1  inflammation causes oxidative stress, which damages
2  DNA, which results in cancer."
3       Did I read that correctly?
4    A.   You did.
5    Q.   And footnote 1 refers to expert reports of
6  multiple of plaintiffs' experts, including, among
7  others, Anne McTiernan, Judith Wolf, Laura Plunkett,
8  Michelle Cote, Rebecca Smith-Bindman and Shawn Levy.
9       Do you see that?
10   A.   Yes.
11   Q.   The question is, since that time have you
12 been provided with the updated or amended expert
13 reports from those individual experts?
14   A.   Since which time?
15   Q.   Well, your footnote says that you
16 reviewed, for example, Anne McTiernan's November 15,
17 2023, second amended report.
18       Do you see that on the first line?
19   A.   Yes.
20   Q.   Okay.  Have you reviewed Anne McTiernan's
21 third amended expert report?
22   A.   Since May 24th?
23   Q.   At any time?
24   A.   No, not that I recall.
25   Q.   As it relates to Judith Wolf, have you

Page 64

1  reviewed the third amended expert report of Judith
2  Wolf?
3    A.   No.
4    Q.   Have you reviewed the third amended expert
5  report of Laura Plunkett?
6    A.   No.
7    Q.   Have you reviewed the amended expert
8  report of Michelle Cote?
9    A.   No.
10   Q.   Have you reviewed the third amended expert
11 report of Rebecca Smith-Bindman?
12   A.   No.
13   Q.   Have you reviewed the amended expert
14 report of Shawn Levy -- strike that.
15       Have you reviewed the second amended
16 expert report of Shawn Levy?
17   A.   No.
18   Q.   Turn to page 3 of your report, Doctor.
19   A.   (Witness complies.)
20   Q.   The first full paragraph of page 3 starts
21 off:
22       "Dr. Saed is an associate professor at
23 Wayne State University."
24       Do you see where I am?
25   A.   I do.

Page 65

1    Q.   And in that paragraph, the last sentence
2  of that paragraph says:
3       "Dr. Saed's efforts at academic
4  publication yielded only modest success.  Ultimately
5  he and his co-authors were able to publish two
6  articles in lower-tiered journals after the
7  manuscripts were rejected by highly critical
8  reviewers at higher impact journals."
9       Did I read that correctly?
10   A.   Yes.
11   Q.   Can you tell me what you mean by a
12 lower-tiered journal?
13   A.   A lower tier than the journals to which
14 you originally submitted the paper.
15   Q.   And what -- upon what are you basing a
16 tier ranking to say that one journal is a
17 higher-tiered journal than another?
18   A.   Scientists typically use a metric known as
19 citation index.  It's rather subjective, but,
20 accordingly -- and we've -- I've presented some
21 objective evidence for the most recent paper in
22 Minerva.
23   Q.   Can you describe for me what you mean by
24 the citation index?  What is the citation index?
25   A.   How often papers are cited and by which

17 (Pages 62 - 65)

Page 66

1 journals those citations are contained in. It's a
2 measure of the strength of the original paper in
3 terms of its citation index, or an offered citation
4 index.
5    Q. So the strength of an individual paper is
6 determined by the number of times that it may be
7 cited by other papers in other journals, correct?
8    MR. BALZANO: Object to form.
9    THE WITNESS: That's one factor, but as I
10   also indicated in this paragraph --
11 BY MR. LAPINSKI:
12    Q. And I'm going to stop you for a second
13 because I think we're going -- I think we're going
14 in two different directions. I'm not looking
15 specifically at the Saed article.
16    Your statement was that it was a
17 lower-tiered journal. And as compared to an
18 individual -- as compared to an individual article,
19 having a high or low citation index, I'm trying to
20 understand the basis for determining whether a
21 journal is a higher-tier or a lower-tier journal.
22    A. I can think of no other objective
23 criteria.
24    Q. Other than the citation index?
25    A. Or impact index, yeah.

Page 67

1    Q. Okay. Now, are the citation index -- and
2 I may not be getting these terms right. Are the
3 citation index and the impact index the same thing?
4    A. Citation index typically refers to an
5 individual's output. Impact factor typically refers
6 to a specific journal.
7    Q. Okay. So that's what I was trying to get.
8 Impact factor refers to the journal.
9    So in your statement that Dr. Saed and his
10 co-authors were able to publish two articles in
11 lower-tiered journals, you're basing that on the
12 impact factor of the journal it was published as
13 compared to other journals?
14    MR. BALZANO: Object to form.
15    THE WITNESS: In the field of gynecologic
16   oncology, yes.
17 BY MR. LAPINSKI:
18    Q. You say in the field of gynecologic
19 oncology. Is that because there are different
20 factors that are used outside of the field of
21 gynecologic oncology to scale the strength of a
22 journal?
23    A. No. The fact of the matter is that if one
24 is publishing on ovarian cancer, one would expect
25 the authors to attempt to publish in a journal

Page 68

1 related to gynecologic cancers as opposed to, for
2 example, reproductive sciences.
3    This litigation isn't about reproductive
4 science. It's about ovarian cancer.
5    Q. So when you're -- with your statement of a
6 lower-tiered journal, you're referring to a
7 lower-tiered journal as compared to other journals
8 related to gynecologic oncology?
9    A. Yes. And I would also point out that the
10 sentence continues with respect to how the critical
11 reviews and the journals to whether which the papers
12 were first submitted by the peer reviewers of those
13 journals.
14    Q. Well, I think at the outset -- I read the
15 entire sentence at the outset. I'm not trying to
16 cut anything off. I'm just trying to get an
17 understanding as to the basis of your statement as
18 it relates to lower-tiered journals. I just want to
19 make sure that we're on the same page.
20    Your statement that he was able to publish
21 two articles in lower-tiered journals is based upon
22 the impact factor of that journal, as compared to
23 other gynecologic oncology journals, correct?
24    A. That's fair.
25    Q. The articles that were published by

Page 69

1 Dr. Saed, they were peer reviewed, correct?
2    A. They were indeed.
3    Q. And to the extent that a peer-reviewed
4 article is published in, to use your term, a
5 lower-tiered journal, that's something that the
6 reader of that article can take into consideration,
7 right?
8    MR. BALZANO: Object to form.
9    THE WITNESS: Possibly.
10 BY MR. LAPINSKI:
11    Q. Do you weigh the strength of a journal
12 when you're considering how much weight to give the
13 findings of a particular article?
14    MR. BALZANO: Object to form.
15    THE WITNESS: Yes, generally. Although
16   not always.
17 BY MR. LAPINSKI:
18    Q. And just like you do, other individuals
19 can weigh the strength of the journal when
20 considering how much weight to give to the findings,
21 correct?
22    MR. BALZANO: Object to form.
23    THE WITNESS: Yeah. My answer would be
24   the same. Generally, but not always.
25

18 (Pages 66 - 69)

Page 70

1 BY MR. LAPINSKI:
2    Q.  You mentioned the fact Dr. Saed's second
3 article, which is his article on malignant
4 transformation, underwent peer review, correct?
5    A.  That's correct.
6    Q.  Would you agree that peer reviewers are
7 typically experts in the field of manuscript that's
8 been submitted to the journal for review?
9       MR. BALZANO:  Object to form.
10       THE WITNESS:  Yes, generally speaking.
11 BY MR. LAPINSKI:
12    Q.  And expert peer review is a necessary part
13 of the process of publishing medical journals?
14       MR. BALZANO:  Object to form.
15       THE WITNESS:  It's a requirement, yes, of
16 course.
17 BY MR. LAPINSKI:
18    Q.  Is it an accepted part of the process of
19 publishing medical journals?
20       MS. DAVIDSON:  Objection, asked and
21 answered.
22       MR. BALZANO:  Objection, asked and
23 answered.
24       MR. LAPINSKI:  Actually it was a different
25 question.  If you want to have it read back, it

Page 71

1 was a different question.
2       THE WITNESS:  Yeah.  If you could ask the
3 question again.
4 BY MR. LAPINSKI:
5    Q.  Sure.
6       The peer review process, that's an
7 accepted part of a process of publishing medical
8 journals?
9    A.  Medical or scientific.  Yes, peer review
10 is essential to the process of publishing anything
11 in -- about medical literature.
12    Q.  Part of the reason that it's essential to
13 the process is it helps to ensure the integrity of
14 the work, right?
15       MR. BALZANO:  Object to form.
16       THE WITNESS:  Yes, I would agree to that.
17 BY MR. LAPINSKI:
18    Q.  And after Dr. Saed's manuscript was peer
19 reviewed by an expert in the field, the publishers
20 at Minerva made the decision to publish it, correct?
21       MR. BALZANO:  Object to form, vague.
22       THE WITNESS:  I assume so.
23 BY MR. LAPINSKI:
24    Q.  You've served as a peer reviewer in the
25 past?

Page 72

1    A.  Many times.
2    Q.  You've served on editorial boards in the
3 past?
4    A.  Many times.
5    Q.  And it would be your expectation that if
6 an expert peer reviewer had issues with the design
7 of a study, the peer reviewer would raise that issue
8 as part of his or her review?
9       MR. BALZANO:  Object to form.
10       THE WITNESS:  Yes, but not always.
11 BY MR. LAPINSKI:
12    Q.  Going back to your report, Dr. Boyd, on
13 page 3 of your report, looking at the paragraph that
14 starts off, "The first paper," that's the paragraph
15 that I'm focusing on, okay?
16       At the bottom of that paragraph, the
17 second-to-last sentence says:
18       "Because many of plaintiffs' experts
19 continue to rely heavily on Dr. Saed's work, I
20 discuss it at length."
21       Do you see where I'm reading?
22    A.  Yes.
23    Q.  Upon what is your statement based that
24 other plaintiffs' experts are relying heavily on
25 Dr. Saed's work?

Page 73

1    A.  In the past I've looked at plaintiffs'
2 expert reports.
3    Q.  And your review of plaintiffs' expert
4 reports leaves you with the opinion that plaintiffs'
5 experts are relying heavily on the work of Dr. Saed?
6    A.  Yes.  Dr. Saed has published, managed to
7 publish most of the work in the field of cell
8 studies on talc and ovarian cancer and so there's
9 nothing else to rely on except his work, and perhaps
10 a couple of other papers that we'll get to, I'm
11 sure.
12    Q.  Would you agree that plaintiffs' experts
13 cite to articles exclusive of the work done by
14 Dr. Saed?
15       MR. BALZANO:  Object to form.
16       THE WITNESS:  I'm sorry.  Can you repeat
17 that?
18 BY MR. LAPINSKI:
19    Q.  Sure.
20       Would you agree this plaintiffs'
21 experts -- I'll reword the question.
22       Would agree that plaintiffs' experts cite
23 to articles other than the articles published by
24 Dr. Saed?
25    A.  I'm sure they do.

19 (Pages 70 - 73)

Page 74

1    Q.  Would you agree that plaintiffs' experts
2 cite to articles on oxidative stress?
3        MR. BALZANO:  Object to form.
4        THE WITNESS:  Perhaps.
5 BY MR. LAPINSKI:
6    Q.  Would you agree that plaintiffs' experts
7 cite to other articles -- strike that.
8        Would you agree that plaintiffs' experts
9 cite to articles other than Dr. Saed's work dealing
10 with talc and inflammation?
11        MR. BALZANO:  I'm going to object to form
12 and just vague.
13        And if you have a specific report or
14 studies in which he's -- or other plaintiff
15 experts are in, I would ask you to show the
16 witness.
17        THE WITNESS:  With respect to specific
18 cell studies, Saed and a couple of others.  We
19 can talk about review articles and about
20 opining about hypotheses and conjecturing and
21 putting together hypothetical models, but in
22 terms of specific papers, we're talking about
23 Saed's work and possibly Mandarino and Emi.
24 BY MR. LAPINSKI:
25    Q.  And your opinion is that, other than Saed,

Page 75

1 Mandarino and Emi, there are no published studies
2 related to cell studies and talcum powder, correct?
3        MR. BALZANO:  Object to form.  Vague.
4        THE WITNESS:  No, I wouldn't agree with
5    that.  I wouldn't say that with respect to cell
6    studies suggesting a mechanism, a hypothetical
7    mechanism through which talc induces ovarian
8    cancer in women through the perineal use of
9    talcum powder.  Those are the cell studies that
10    I'm familiar with.
11 BY MR. LAPINSKI:
12    Q.  And you've stated in your report -- we've
13 discussed that you say:
14        "The plaintiffs' experts continue to rely
15 heavily on Dr. Saed's work," and that's based upon
16 your review of their expert reports, correct?
17    A.  Still is, yes.
18    Q.  Okay.  And in your review of those expert
19 reports, did you also see that experts referred to
20 studies related to oxidative stress?
21        MR. BALZANO:  Object to form.
22        And again I would request if you have
23    specific -- if you're referring to specific
24    expert reports and specific citations, you
25    should show him.

Page 76

1        MR. LAPINSKI:  I'm asking if he has a
2    recollection.
3        THE WITNESS:  I recall that plaintiffs'
4    experts typically attempt to build a
5    hypothetical model involving oxidative stress,
6    inflammation, carcinogenesis and so forth, but
7    that's irrelevant to the actual cell studies
8    that exist in the literature.
9 BY MR. LAPINSKI:
10    Q.  Now, to my question.  Do you have a
11 recollection, based upon your review of the
12 plaintiffs' expert reports, plaintiffs' experts
13 referring to articles related to oxidative stress?
14        MR. BALZANO:  Object to form.
15        THE WITNESS:  It seems like the same
16    question I've answered, but, yes, plaintiffs
17    typically refer to papers, often review
18    articles, attempting to put together
19    hypothetical models involving oxidative stress
20    and inflammation and its involvement in ovarian
21    cancer.
22 BY MR. LAPINSKI:
23    Q.  So would you agree then that plaintiffs'
24 experts have also referred to articles and reviews
25 related to talc and inflammation?

Page 77

1        MR. BALZANO:  Object to form.
2        THE WITNESS:  Plaintiffs' experts often
3    refer to that type of literature, yes.
4 BY MR. LAPINSKI:
5    Q.  Okay.  And for the literature related to
6 oxidative stress in response to talc?
7        MR. BALZANO:  Object to form.
8        THE WITNESS:  It's a very general question
9    but, yes, these are typically hypothetical,
10    hypothesis-generated review articles, yes.
11 BY MR. LAPINSKI:
12    Q.  Okay.  And how about articles related to
13 inflammation associated with the increased risk of
14 cancer, plaintiffs' expert cited to articles on that
15 topic?
16        MR. BALZANO:  Object to form.
17        THE WITNESS:  Generally speaking, yes.
18 BY MR. LAPINSKI:
19    Q.  Same with articles on talc and various
20 cancer biomarkers, plaintiffs' experts cited to
21 those types of articles?
22        MR. BALZANO:  Object to form.
23        THE WITNESS:  I'm only familiar with the
24    Saed article in that context, but yes, they
25    continually refer to or cite to Saed and

Page 78

1    coworkers.
2 BY MR. LAPINSKI:
3    Q.   In forming an opinion as a medical
4 professional, do you think it's important to
5 consider as much relevant information as possible?
6        MR. BALZANO:  Object to form.
7        THE WITNESS:  Generally speaking, yes.
8 BY MR. LAPINSKI:
9    Q.   Would it be inappropriate to cherry-pick
10 studies that --
11       Would it be inappropriate to cherry-pick
12 certain studies that support your opinion while not
13 considering others that might not have been
14 supportive?
15       MR. BALZANO:  Object to form.
16       MS. DAVIDSON:  Would you repeat that
17    question?
18       MR. LAPINSKI:  Sure.
19       MS. DAVIDSON:  Or she can repeat it.
20       MR. LAPINSKI:  That's all right.  I can
21    just --
22 BY MR. LAPINSKI:
23    Q.   Would it be inappropriate to cherry-pick
24 certain studies that support your opinion while not
25 considering other studies that might not be

Page 79

1 supportive?
2        MR. BALZANO:  Object to form.
3        THE WITNESS:  I think the relevant
4    literature should be considered in any case.
5 BY MR. LAPINSKI:
6    Q.   Moving to page 4.  Moving to page 4 of
7 your report.
8    A.   (Witness complies.)
9        MS. DAVIDSON:  Do you need a break?
10       MR. LAPINSKI:  Yeah.
11       MS. DAVIDSON:  We can take a break.  Do
12    you want to go off the record?
13       MR. LAPINSKI:  Yeah.  Let's go off the
14    record.
15       (At 11:27 a.m. a recess was taken.)
16       (At 11:40 a.m. the deposition resumes.)
17 BY MR. LAPINSKI:
18    Q.   Dr. Saed -- Dr. Boyd, I want to refer you
19 back to Exhibit 7, which is your May 24, 2024 expert
20 report, and I want to turn to page 4, please.
21    A.   (Witness complies.)
22    Q.   And at top of page 4 or towards the top of
23 page 4, you provide opinions as it relates to the
24 2020 abstract/poster that was published in SGO,
25 correct?

Page 80

1    A.   It was published as an abstract in the
2 Journal of Gynecological Oncology as part of the
3 meeting proceedings of that year's SGO annual
4 meeting, yes.
5    Q.   Okay.
6    A.   More or less.
7    Q.   And that poster, which is referred to as
8 number 1 on page 4 of your report, was based upon
9 Dr. Saed's work on malignant transformation,
10 correct?
11    A.   His purported work on malignant
12 transformation, yeah.
13    Q.   Yes.  I'm not trying to create a situation
14 where you're acknowledging that you agree with or
15 don't agree with the work.  I just want to make sure
16 we're talking about the same thing.
17    A.   Understood.
18    Q.   Okay.  A purpose of a poster like the one
19 that was presented by Dr. Saed is to provide
20 snapshot of the work that's being done in a
21 particular field, right?
22       MR. BALZANO:  Object to form.
23       THE WITNESS:  No, not correct.  I would
24    say its purpose is to provide a snapshot of the
25    work that's being done in his laboratory.

Page 81

1 BY MR. LAPINSKI:
2    Q.   Okay.  Is the poster intended to represent
3 all of the information that may end up in a
4 published manuscript?
5        MR. BALZANO:  Object to form.
6        THE WITNESS:  That's a very general
7    question, but typically the idea is to present
8    in poster first and then go to manuscript, and
9    so there may occasionally be additional data
10    that are included in a manuscript that aren't
11    included in a poster, but the poster should be
12    material in that context.
13 BY MR. LAPINSKI:
14    Q.   And posters like the one that Dr. Saed
15 submitted are reviewed by a committee to determine
16 whether or not the posters would be being presented
17 at the meeting?
18       MR. BALZANO:  Object to form.
19       THE WITNESS:  At the SGO, they are.
20 BY MR. LAPINSKI:
21    Q.   And Dr. Saed's poster was reviewed by a
22 committee of SGO members that determined it was
23 worthy of being presented, correct?
24       MR. BALZANO:  Object to form.
25       THE WITNESS:  Ultimately, yes.

21 (Pages 78 - 81)

Page 82

1  BY MR. LAPINSKI:
2      Q.  And you served as a member of the board of
3  directors of SGO for a while; is that correct?
4      A.  I served a three-year term; that's
5  correct.
6      Q.  And that term was from 2017 to 2020?
7      A.  I'm sure my CV is correct, yes, if that's
8  what it says.
9      Q.  Were you a member of the board of SGO when
10 Dr. Saed's poster was accepted for presentation at
11 the annual meeting?
12     A.  I would have been, yes, because the annual
13 meeting was to have taken place during COVID and the
14 meeting was canceled.  Yeah, so --
15     Q.  As a member of the board of SGO, did you
16 raise issue with Dr. Saed's poster on malignant
17 transformation at the time it was accepted?
18         MR. BALZANO:  Object to form.
19         THE WITNESS:  The board of directors is
20     not involved in the peer review of abstracts
21     submitted for presentation at the SGO annual
22     meeting.
23 BY MR. LAPINSKI:
24     Q.  So you did not raise any issue with it?
25         MS. DAVIDSON:  Objection, asked and

Page 83

1  answered.  Oh, sorry.
2         MR. BALZANO:  Objection, asked and
3  answered.
4         MS. DAVIDSON:  Being quiet is really
5  challenging guys.  I do not have that skill.
6         THE WITNESS:  It was impossible to raise
7     any objection because I wasn't privy to the
8     abstracts that the review committee had access
9     to.
10 BY MR. LAPINSKI:
11     Q.  Have you, at any time, gone back to SGO to
12 raise issue with Dr. Saed's poster having been
13 accepted for presentation?
14     A.  No.
15     Q.  At the top of page 5 of your report, you
16 discuss the review of posters and you note that --
17 well, let's start at the bottom of the page 4.
18         The last sentence -- the last sentence at
19 the bottom of the page 4 says:
20         "Illustrating the difference between
21     acceptance as a publisher for a convention and
22     traditional peer review for publication, 842
23     abstracts were submitted to SGO for its 2020 annual
24     meeting, and 743 of those were accepted for
25     presentation."

Page 84

1      Did I read that correctly?
2      A.  Yes, having left out the 88 percent, you
3  are correct.
4      Q.  Okay.  So 88 percent of them were accepted
5  for presentation, correct?
6      A.  Correct.
7      Q.  So there was 12 percent of posters that
8  were submitted that were rejected?
9      A.  12 percent of abstracts, yes.
10     Q.  And Dr. Saed's abstract could have been
11 rejected?
12         MR. BALZANO:  Object to form.
13         THE WITNESS:  It's possible.
14 BY MR. LAPINSKI:
15     Q.  But it wasn't, correct?
16     A.  Clearly not.
17     Q.  In the next -- in the next paragraph on
18 page 5, the last sentence, you reference -- you
19 state:
20         "It is virtually certain that Gynecologic
21     oncology would have rejected a manuscript solely
22     addressing Dr. Saed's 2020 study as well."
23         Do you see that?
24     A.  No, actually.
25     Q.  Okay.  Second -- the first full paragraph

Page 85

1  on page 5.  Starts off "Difference between poster
2  review and peer review."
3      A.  Yes.
4      Q.  Okay.  So as we go through that paragraph,
5  you note towards the middle of the paragraph:
6         "Most notably, Gynecologic Oncology itself
7     rejected a manuscript Dr. Saed submitted in 2021."
8         Do you see that?
9      A.  Yes.
10     Q.  Have you ever been a peer reviewer for
11 Gynecologic Oncology?
12     A.  More times that I can count, yes.
13     Q.  Did you review -- were you one of the
14 reviewers who reviewed Dr. Saed's submission to
15 Gynecologic Oncology?
16     A.  No.
17     Q.  Did you have any communication with the
18 reviewer who reviewed Dr. Saed's submission to
19 Gynecologic Oncology at the time they were doing the
20 review?
21     A.  No.
22         I might add that the reviewers are
23 confidential.
24     Q.  Have you ever been a peer reviewer for
25 PlusOne?

22 (Pages 82 - 85)

Page 86

1     A.   It's possible.  I've been a peer reviewer
2  for so many journals.  They're all listed on my CV.
3  If PlusOne is on there, then the answer is yes.
4  Otherwise it's no.
5     Q.   Did you review Dr. Saed's 2021 manuscript
6  on behalf of PlusOne?
7     A.   No.
8     Q.   Did you provide comments to PlusOne or
9  anyone affiliated with PlusOne in regard to
10  Dr. Saed's manuscript in 2021?
11     A.   No.
12     Q.   If you go down to the bottom of page 5, in
13  the "Objective" section.  Again, this still relates
14  to -- this still relates to the SGO poster from
15  2020.
16          In the "Objective" section you note that
17  there's -- it says:
18          "This section incorrectly states that
19  'exposure to talcum powder was shown (in Fletcher et
20  al. in 2019) to induce specific point mutations in
21  key redox enzymes that altered their activities in
22  both normal and epithelial ovarian cancer cells.'"
23          Did I read that correctly?
24     A.   You did.
25     Q.   "But the Fletcher/Saed 2019 study did not,

Page 87

1  by any means, demonstrate that cell mutations were
2  induced by talcum powder."
3          Did I read that correctly?
4     A.   You did.
5     Q.   Is there a difference between a point
6  mutation and a cell mutation?
7     A.   I'm not familiar with the term "cell
8  mutation."
9     Q.   Well, that's -- you in your -- you in your
10  report have said:
11          "But the Fletcher/Saed 2019 study did not,
12  by any means, demonstrate that cell mutations were
13  induced by talcum powder."
14     A.   So --
15     Q.   Let me ask my question and then you can...
16          In your sentence, what did you mean by
17  "cell mutation"?
18     A.   Any type of genetic mutation.
19     Q.   And is a point mutation a type of genetic
20  mutation?
21     A.   It's one of several types of genetic
22  mutations, yes.
23     Q.   Going to page 6 of your report, you
24  discuss methods -- in the first paragraph of
25  "Methods," in your methods, you have statements

Page 88

1  about the dose of talcum powder that was used.
2          Is that fair statement?
3          MR. BALZANO:  Object to form.
4          THE WITNESS:  Yes.
5  BY MR. LAPINSKI:
6     Q.   And you're critical of the dose of talcum
7  powder that Dr. Saed used during his experiments,
8  right?
9     A.   Yes.
10     Q.   And you cite to peer reviewer comments
11  from Gynecologic Oncology, correct?
12     A.   Where are we reading?
13     Q.   In that first paragraph as it relates to
14  your criticisms on dose, the dose of talc Dr. Saed
15  used.
16          In the footnotes, for example, footnote
17  16 -- let's take a step back.
18          MR. BALZANO:  Counsel, because the
19          footnote 16 is for the second paragraph --
20  BY MR. LAPINSKI:
21     Q.   And so the second paragraph starts off:
22          "Dr. Saed's peer reviewers raised similar
23  concerns regarding Dr. Saed's methodology as
24  described in his 2020 manuscript, questioning why
25  the recorded doses were chosen and their relevance

Page 89

1  to human exposure."
2          You see where I just read?
3     A.   Yes.
4     Q.   And then footnote 16 refers to several
5  Dr. Saed documents.
6          Do you see that?
7     A.   Yes.
8     Q.   Okay.  I'll represent to you that those
9  two Dr. Saed -- the two references there are
10  references to critiques from PlusOne peer reviewers
11  and critiques from Reproductive Science peer
12  reviewers.
13          Do you recall reading those critiques?
14     A.   Yes, I do.
15     Q.   Okay.  When was it that you first read
16  those critiques of Dr. Saed's work?
17     A.   I don't recall.
18     Q.   Did you read the critiques of Dr. Saed's
19  work on -- related to the dose of talcum powder
20  before or after you formulated your opinion on his
21  work?
22     A.   After.
23     Q.   When was it that you first read Dr. Saed's
24  manuscript on malignant transformation?
25     A.   This particular manuscript?

23 (Pages 86 - 89)

Page 90

1    Q.  The 2020 -- the 2020 poster or the 2020
2  abstract that we're talking about right now.
3    A.  Again, hard to say.  I would suspect I
4  read it as soon as it published in Gynecologic
5  Oncology as an abstract presented at the annual
6  meeting.
7    Q.  Okay.  And do you have a specific
8  recollection of having read it when it was first
9  published?
10    A.  The abstract or the paper?
11    Q.  The just dealing with the 2020 SGO
12  abstract.
13    A.  I have a recollection of reading it.  I
14  don't have a recollection of when that was.
15    Q.  Do you have a specific recollection as to
16  whether it was before or after you first saw the
17  critiques of the peer reviewers?
18        MR. BALZANO:  Object to form, asked and
19    answered.
20        THE WITNESS:  Well, it would have had to
21    have been before I saw the comments of the peer
22    reviewers because the poster in a temporal
23    context occurred -- the poster and the abstract
24    and its publication occurred before preparation
25    of the manuscript and submission for

Page 91

1    publication.  So I would not have seen comments
2    of peer reviewers until after I had read the
3    abstract leading up to the manuscript that was
4    subject to peer review.
5  BY MR. LAPINSKI:
6    Q.  Well, that's with the assumption that, in
7  some context, you did see the poster or the SGO
8  abstract, correct?
9        MR. BALZANO:  Object to form.
10        THE WITNESS:  I saw the abstract in its
11    published form, yes.
12  BY MR. LAPINSKI:
13    Q.  Okay.  And do you recall when you saw the
14  abstract in its published form?
15    A.  No, I do not.
16    Q.  Do you have an approximate time of when
17  you saw the abstract in its published form?
18    A.  It would have been at some point not long
19  after the annual meeting took place when the
20  abstracts are published in aggregate.
21    Q.  And at the time that the abstracts are
22  published in aggregate, do you review all of the
23  abstracts that are published?
24    A.  No.  I tend to look at the abstracts that
25  are presented in preliminary presentations.

Page 92

1    Q.  And you testified earlier that you weren't
2  aware of the fact that Dr. Saed had submitted an
3  abstract to SGO for publication at the time that he
4  did it, correct?
5        MR. BALZANO:  Object to form.
6    Mischaracterizes the testimony.
7        THE WITNESS:  I'm sorry.  I couldn't
8    follow the question.
9  BY MR. LAPINSKI:
10    Q.  Yeah.  You testified previously that at
11  the time Dr. Saed submitted his abstract to SGO for
12  consideration, you weren't aware of the fact that he
13  had a submitted the abstract, correct?
14        MR. BALZANO:  Object to form.
15        THE WITNESS:  There is no way I could have
16    been because I'm not involved in the peer
17    review of the abstracts submitted for
18    presentation at the SGO annual meeting.
19  BY MR. LAPINSKI:
20    Q.  So then when is it that you first became
21  aware of the fact there was a Saed abstract that
22  would be of interest to you for review?
23    A.  Again, working from memory, it was when I
24  read the abstract in the proceedings of the annual
25  meeting in the Journal of Gynecological Oncology.

Page 93

1    Q.  When you formulated your opinion that
2  Dr. Saed used an improper dose of talcum powder for
3  purposes of the work that he did, upon what did you
4  base that determination?
5    A.  My understanding of his scientific
6  methodology, based on review of laboratory notebooks
7  and previous work where he actually worked backwards
8  from a dose that was literally toxic to cells to a
9  dose that was not toxic to cells and then went with
10  that extremely high dose, as opposed to accepted
11  scientific methodology where one typically starts
12  with very a low dose and works up to a dose where a
13  biological effect is observed, which is a more
14  traditional approach in terms of scientific
15  methodology.
16    Q.  So just so that I'm clear, I'm not trying
17  to put words in your mouth, your opinion about an
18  improper dose related to Dr. Saed's malignant
19  transformation work is based upon your review of his
20  lab notebooks for the 2019 work that he did?
21    A.  That's one thing.
22    Q.  Okay.  What, if any, were other factors?
23    A.  It's an extraordinarily high dose.  It's
24  an amount that you can presumably see in your hand,
25  which when applied to cells in a Petri dish, I would

Page 94

1 consider remarkably high by any standard.
2    Q.  Other than your review of the Saed
3 notebooks and the dosing that he used for his 2019
4 work and your opinion that it's an extremely high
5 dose, did you rely upon anything else for a
6 determination that it was an improper dose?
7    A.  In terms of my own personal opinion, no.
8       I did note that peer reviewers also had
9 the same opinion.
10    Q.  As it relates to the dosing from his lab
11 notebooks in 2019, were you aware that the dosing
12 used in the 2019 studies have also been used in
13 other talc-related studies?
14       MR. BALZANO:  Object to form.
15       THE WITNESS:  I can't answer that without
16    knowing which studies you're referring to and
17    looking at the doses and looking at the papers.
18 BY MR. LAPINSKI:
19    Q.  You've referenced in your work the work
20 done by Dr. Mossman, correct?
21    A.  Yes.
22    Q.  Are you aware that Dr. Mossman testified
23 that the dosing that was used by Dr. Saed in his
24 2019 work was acceptable dosing?
25       MR. BALZANO:  Object to form.

Page 95

1       Yeah, I mean, if you could show him that
2    prior testimony.
3       THE WITNESS:  I don't recall that --
4       MS. DAVIDSON:  Foundation.
5       THE WITNESS:  I don't recall that
6    testimony, if that's what it is, by Dr.
7    Mossman.
8 BY MR. LAPINSKI:
9    Q.  Are you aware that the dosing that was
10 used by Dr. Saed in his 2019 work is similar dosing
11 that's been used in other talcum powder studies?
12       MR. BALZANO:  Object to form, vague.
13    Lacks foundation.
14       MS. DAVIDSON:  Hold on.  You
15    interpreted -- did you get all of that?
16       Just wait until the objection is done.
17       THE WITNESS:  If we could start over,
18    please, with the question.
19 BY MR. LAPINSKI:
20    Q.  Would you read the question back, please?
21       (The last question was read back by the
22    Reporter.)
23       THE WITNESS:  That question would be
24    impossible to answer without knowing which
25    studies you're referring to and without being

Page 96

1    able to read.
2 BY MR. LAPINSKI:
3    Q.  If there were studies that used dosing of
4 talc that's similar to what Dr. Saed used in his
5 2019 study, would that be relevant to the formation
6 of your opinions?
7       MR. BALZANO:  Same objections.  Vague,
8    lacks foundation.
9       THE WITNESS:  No.  My opinion is that the
10    dose is extraordinarily high and would remain
11    so.
12 BY MR. LAPINSKI:
13    Q.  Have you ever conducted studies on talcum
14 powder?
15    A.  No.
16    Q.  Have you ever conducted studies on talcum
17 powder and its effect on ovarian cancer tissue?
18       MR. BALZANO:  Objection, just to purposes
19    of scope.  You know, should be since 2019.
20 BY MR. LAPINSKI:
21    Q.  Okay.  Since 2019, have you conducted any
22 studies on talc and its impact on ovarian cancer
23 tissue -- strike that.
24       Since 2019, have you conducted any studies
25 on talc and its impact on ovarian tissue?

Page 97

1    A.  No.
2    Q.  Since 2019, have you done any type of lab
3 research related to talcum powder?
4    A.  No.
5    Q.  Have you ever made a determination as to
6 what an appropriate and/or inappropriate level of
7 talc is for purposes of in vitro studies?
8    A.  Again, a very general sort of question.  I
9 would say that, as I said before in responding to
10 another of your questions, that whenever you're
11 exposing cells in vitro to a xenobiotic, whatever it
12 may be, the accepted scientific methodology is to
13 begin with the lowest dose possible, working up to
14 the point where a biological effect is observed if
15 you're truly interested in determining what effect
16 that xenobiotic may have, if any, on the cells and
17 culture, rather than starting with a toxic dose that
18 literally kills all the cells in the Petri dish and
19 then working backwards to a dose that doesn't seem
20 to kill the cells.
21       But no, I have never personally performed
22 a study with talcum powder in that context.
23    Q.  The bottom of page 6, the last full
24 sentence says:
25       "I also agree with later peer reviewers

25 (Pages 94 - 97)

Page 98

1 that Dr. Saed's decision to use ovarian surface
2 epithelial cells rather than fallopian tube cells
3 significantly marginalizes his study, given that
4 scientists now agree that most high-grade serous
5 ovarian cancers are originate in the fallopian
6 tubes."
7     Did I read that correctly?
8 A. Yes.
9 Q. Did you formulate that opinion at the same
10 time you formulated the opinion in regard to your
11 dose?
12     MR. BALZANO: Objection to the form,
13 vague.
14     THE WITNESS: I honestly can't remember
15     when I formed one opinion as opposed to another
16     opinion related to this in particular or in
17     terms of temporality, no.
18 BY MR. LAPINSKI:
19 Q. Did you form that opinion at a time after
20 you had read the criticisms from various peer
21 reviewers?
22     MR. BALZANO: Object to form. When you
23     say "that opinion," you mean the sentence?
24     MR. LAPINSKI: Yes, the sentence we're
25     talking about.

Page 99

1     THE WITNESS: I would respond by saying
2     that all of my opinions were formed with
3     respect to this aspect of Dr. Saed's work
4     before reading any of the expert reviews from
5     various journals he attempted to publish his
6     work in.
7 BY MR. LAPINSKI:
8 Q. Dr. Boyd, if you would, for a minute, go
9 back to Exhibit 2.
10     Dr. Saed's abstract that was published in
11 SGO was published in March of 2020, correct?
12 A. I'm still looking for Exhibit 2. I'm
13 sorry.
14     Okay. I have the exhibit.
15 Q. Okay. Last question that I just asked
16 was, Dr. Saed's abstract was published by SGO in
17 March of 2020, correct?
18 A. No, not correct. I believe that the -- if
19 memory serves, that the abstract and poster were
20 presented at the SGO annual meeting in March of
21 2020. It was not published at that time.
22 Q. Was it published after that?
23 A. By necessity, yes.
24 Q. Okay. And usually how long after that is
25 it published, based upon your experience with -- as

Page 100

1 an editor of --
2 A. A couple of months.
3 Q. Okay. Dr. Saed's work was presented at
4 SGO in March of 2020 in whatever form SGO had their
5 conference because of COVID, correct?
6 A. This was a virtual conference, and it was
7 presented, as we have discussed, as a virtual
8 poster.
9     MR. LAPINSKI: Can we mark this as
10     Exhibit 9, please.
11     (Boyd Exhibit 9 was received and marked
12     for identification, as of this date.)
13 BY MR. LAPINSKI:
14 Q. Dr. Boyd, we've marked as Exhibit 9, a
15 poster session from Gynecologic Oncology, and I just
16 want to confirm that this is the poster that we've
17 been discussing.
18 A. Number 297, yes.
19 Q. And again, just to kind of lay the
20 groundwork for this, this would have been presented
21 in or around March of 2020, correct?
22 A. The poster?
23 Q. Yes.
24 A. Yes.
25 Q. And then would have been published, the

Page 101

1 abstract would have been published within several
2 months of that March 2020 date, correct?
3 A. Yes.
4 Q. Now if we go to Exhibit 2, which are your
5 invoices that have been produced, and we look at
6 your first entry of March 23, 2021, it has review of
7 plaintiffs' expert DC- -- strike that.
8     We're looking at the second entry:
9 "March 23, 2021. Work on expert report Saed
10 abstract/poster SGO 2020."
11     Did I read that correctly?
12     MR. BALZANO: I'm sorry, Counsel. You
13     said March. It's September.
14     THE WITNESS: No. September 23.
15 BY MR. LAPINSKI:
16 Q. So let me read it again. For some reason
17 when I look at the date, I can't seem to get the
18 month right.
19     Your second entry says:
20     "September 23, 2021. Work on expert
21 report RE Saed abstract/poster presentation
22 (SGO 2020 and SRI 2021)."
23     Did I read that correctly?
24 A. Yes.
25 Q. Okay. Was there a point in time prior to

26 (Pages 98 - 101)

Page 102

1 September 23, 2021, where you had formulated
2 opinions in regard to Dr. Saed's 2SGO poster?
3        MR. BALZANO: Object to form.
4        THE WITNESS: I'm sorry. Would you repeat
5    the question?
6 BY MR. LAPINSKI:
7    Q.  Sure.
8        You testified earlier that you would have
9 read Dr. Saed's poster and formulated an opinion in
10 regard to an improper dose not long after it was
11 made available, I believe you said, for plaintiff
12 review; is that correct?
13   A.  No.  I originally formulated my opinion
14 regarding Dr. Saed and dosage in 2019 when I was
15 reviewing his lab notebooks, but the same dosage was
16 carried over to his work in 2020.
17   Q.  In 2020 -- that same dosage which carried
18 over to his work in 2020 and the malignant
19 transformation work we were doing -- that he was
20 doing?
21   A.  Yes.
22   Q.  Okay.  And to the extent that that dosage
23 carried over to 2020 and was part of the malignant
24 transformation work, when you first viewed his
25 poster, you knew that the dose was wrong, in your

Page 103

1 opinion?
2        MR. BALZANO: Object to form.
3        THE WITNESS: I considered it wrong in
4    2019, and I considered it wrong in 2020 when I
5    reviewed his abstract, yes.
6 BY MR. LAPINSKI:
7    Q.  Okay.  But you didn't start to formulate
8 that as part of your opinion until September of
9 2021; is that correct?
10   A.  No, that's incorrect.
11   Q.  Is there work that you did between March
12 of 2020 and September of 2021 related to your expert
13 opinions that are not listed here?
14   A.  No.
15   Q.  So you didn't do any work on your expert
16 report at any time prior to September 23, 2021,
17 correct?
18   A.  I'm sorry.  I'm getting a little confused
19 about preparation of my expert report and developing
20 opinions.  My opinions were developed long before
21 preparation of the expert report.
22   Q.  Okay.  And then they were put into your
23 expert report beginning in September 2021, correct?
24   A.  Apparently, yes.
25   Q.  Okay.  Did the opinions of the peer

Page 104

1 reviewers in any way influence the opinions that you
2 had related to Dr. Saed's work?
3        MR. BALZANO: Object to form.  Asked and
4    answered.
5        THE WITNESS: No, they did not influence
6    my opinions.  They just reinforced my opinions.
7 BY MR. LAPINSKI:
8    Q.  Okay.  Do you have any opinions that
9 you've shared in your report that are separate and
10 apart from the opinions that were shared by the peer
11 reviewers?
12   A.  I'm sure I do, yes.
13   Q.  Okay.  As we go through, I'd like you to
14 point out to me any opinions that you have that were
15 not also expressed by the peer reviewers, okay?  So
16 we're going to go through that and we're going to
17 see where that is.
18       If we go to page 4 of your report.
19   A.  (Witness complies.)
20   Q.  The first paragraph that you have, as it
21 relates to the 2020 abstract, says:
22       "This study purports to have found that
23 talcum powder 'induces malignant transformation of
24 normal ovarian epithelial cells' which 'represents a
25 direct causation mechanism' through which perineal

Page 105

1 use of talcum powder causes ovarian cancer."
2        Do you see that?
3    A.  I do.
4    Q.  Is that what the poster says, Dr. Boyd?
5    A.  It's in quotation marks.  I presume it
6 does.
7    Q.  Well, the part that's not in quotation
8 marks.  Does the poster say that "through which
9 perineal use of talcum powder causes ovarian
10 cancer"?
11       MR. BALZANO: Object to form.  If you just
12    want to look at the poster and see what was
13    exactly said by Dr. Saed, you can do that.
14       It's Exhibit 9.
15 BY MR. LAPINSKI:
16   Q.  Okay.  So if you would look at -- you can
17 look at Exhibit 9, Doctor.  And the bottom left-hand
18 corner, "Conclusions."
19   A.  (Witness complies.)
20   Q.  Now, for reference, as we read the
21 conclusion, it says:
22       "Exposure to" -- and this is the quote
23 that you use -- "talcum powder induces malignant
24 transformation in normal ovarian epithelial cells."
25       You quoted that part of the conclusion,

27 (Pages 102 - 105)

Page 106

1 correct?
2    A.  Yes.
3    Q.  Okay.  Then the conclusion continues to
4 say:
5         "But not in normal peritoneal fibroblasts.
6 This finding" -- and then you again -- "represents a
7 direct causation mechanism," and then closed quote.
8 That's what you put in your report, right?
9    A.  Yes.
10    Q.  Okay.  But then, the conclusion in the
11 poster goes on to say:
12         "Of talcum powder exposure specific to
13 normal ovarian cells and further supports previous
14 studies of the association of genital use of talcum
15 powder and increased risk of ovarian cancer."
16         Do you see that?
17    A.  Yes.
18    Q.  Now is there a difference in your mind
19 between an association and a cause?
20    A.  Yes.
21    Q.  Okay.  And what -- to you, what's the
22 difference between something being associated, let's
23 say associated with ovarian cancer as compared to
24 causing ovarian cancer?
25    A.  Epidemiologic data are an association-type

Page 107

1 study.  A causation-type study is the type that
2 Dr. Saed is attempting to perform as exemplified by
3 his statement that this finding represents a direct
4 causation mechanism.  Those types of inferences
5 cannot be made from epidemiologic studies.
6 Association studies, for example.
7    Q.  But his conclusion also says that it
8 supports the association of genital use of talcum
9 powder and increased risker of ovarian cancer.  It
10 does not say the cause of ovarian cancer, does it?
11         MR. BALZANO:  Object to form.
12         THE WITNESS:  I would disagree.  I would
13    say this finding represents a direct causation
14    mechanism.
15 BY MR. LAPINSKI:
16    Q.  But that's not what he said.
17    A.  I'm reading --
18         MR. BALZANO:  Object.
19         THE WITNESS:  -- right from the abstract.
20         MR. BALZANO:  We object to form, and
21    document speaks for itself.
22 BY MR. LAPINSKI:
23    Q.  He says:
24         "The findings represent a direct causation
25 mechanism of talcum powder exposure specific to

Page 108

1 normal ovarian cancer cells."
2         We agree on that, right?
3    A.  We agree that's what the sentence says,
4 yes.
5    Q.  And then he says:
6         "And further supports previous studies of
7 the association of genital use of talcum powder and
8 increased risk of ovarian cancer," correct?
9    A.  Correct.
10    Q.  Whereas you have cited it as saying that
11 talcum powder causes ovarian cancer, correct?
12         MR. BALZANO:  Object to form.
13         MS. DAVIDSON:  Objection.
14 BY MR. LAPINSKI:
15    Q.  In your report it says:
16         "Through which use of talcum powder causes
17 ovarian cancer."
18    A.  Can you ask a question, please?
19    Q.  Sure.
20         Your statement -- your statement says that
21 Dr. Saed's study purports to have found -- and then
22 you quote him twice -- that talcum powder induces
23 malignant transformation of normal ovarian
24 epithelial cells.
25         You also quote him.  It says:

Page 109

1         "Which represents a direct causal
2 mechanism."
3         But then as compared to directly quoting
4 him, you say:
5         "Through which perineal use of talcum
6 powder causes ovarian cancer."
7         But that's not what Dr. Saed says in his
8 conclusion, is it?
9         MR. BALZANO:  Object to form.
10         THE WITNESS:  I would suggest that any
11    reasonable reader would infer that when he's
12    suggesting that this represents a direct
13    causation mechanism and then links that
14    sentence with association data from
15    epidemiologic studies, that he's suggesting
16    that he's providing a direct causation
17    mechanism.
18         So I stand by the sentence that we're
19    citing in my expert report.
20 BY MR. LAPINSKI:
21    Q.  Dr. Boyd, on page 7 you have opinions as
22 it relates to Dr. Saed's statements about
23 transformation of cells after 72 hours of treatment;
24 is that correct?
25    A.  I'll need to back to page 6 to see where

28 (Pages 106 - 109)

Page 110

1 we are in terms of --
2      So this would pertain to methodology,
3 presumably. Or results. I'm not sure where you're
4 going here.
5      Q. Well, I'll tell you what. Let's do this.
6 We're in the "Method" section right now.
7      A. Okay.
8      Q. Okay?
9      And on page -- at the top of page 7, you
10 start off by saying:
11      "An additional issue with methodology for
12 Dr. Saed's 2020 study is that he employs a
13 commercial cell transformation assay."
14      And in parentheses you describe that
15 particular assay.
16      "To achieve a result that is both beyond
17 the capabilities of the assay and biologically
18 implausible."
19      Did I read that correctly?
20      A. Yes.
21      MR. LAPINSKI: Can we mark that?
22      (Boyd Exhibit 10 was received and marked
23      for identification, as of this date.)
24 BY MR. LAPINSKI:
25      Q. Dr. Boyd, you've been handed what's been

Page 111

1 marked as Exhibit 10. This is a copy of the Cell
2 Transformation Assay Kit product guide that you had
3 referred to -- or a protocol booklet that you had
4 referred to in footnote 20 of your report.
5      A. (Witness reviews document.)
6      Q. Dr. Said used a commercial cell
7 transformation assay kit, correct?
8      A. Yes.
9      Q. And it was the ab235698 kit that's
10 manufactured by Abcam?
11      A. Yes.
12      Q. Are you familiar with that assay kit?
13      A. As familiar as I could be after reading
14 the pamphlet he produced here as Exhibit 10.
15      Q. Other than the protocol booklet that's
16 been produced to you as Exhibit 10, do you have any
17 personal knowledge related to this type of assay
18 kit?
19      MR. BALZANO: Object to form.
20      THE WITNESS: This type of assay kit?
21 BY MR. LAPINSKI:
22      Q. This particular assay kit.
23      A. I've never used this particular assay kit.
24      Q. Have you ever used any type of cell
25 transformation assay kit?

Page 112

1      A. Yes, of course.
2      Q. And when is the last time that you used a
3 commercial cell transformation assay kit?
4      A. I've never used a commercial cell
5 transformation assay kit. I simply produce my own
6 reagents at the time. These were several years
7 before Dr. Saed had the luxury of purchasing kits.
8      Q. And approximately when would that have
9 been?
10      A. 1990s, early 2000s perhaps.
11      Q. So approximately 25 years ago, if not
12 longer?
13      A. Yes.
14      Q. Now, you referenced the fact that Dr. Saed
15 had the -- I think you said the convenience of the
16 availability of a commercial assay kit. Twenty-five
17 years ago these types of commercial kits were not
18 available, correct?
19      MR. BALZANO: Object to form.
20      THE WITNESS: I cannot say. I didn't use
21      them.
22 BY MR. LAPINSKI:
23      Q. Is this -- is this commercial assay kit
24 the type of assay kit that is now typically used in
25 the scientific community?

Page 113

1      MR. BALZANO: Object to form.
2      THE WITNESS: I can't say what's typically
3      use in the scientific community.
4 BY MR. LAPINSKI:
5      Q. Well, you're rendering an opinion in
6 regard to Dr. Saed's use of this kit. Do you know
7 whether or not this kit is typically used for this
8 type of research?
9      A. No.
10      Q. No, you don't know?
11      A. No. I'm referencing this kit based on
12 what I've read from the pamphlet provided.
13      Q. Okay. Are you aware of whether there are
14 any commercial assay kits that specifically test for
15 malignant transformation?
16      A. No, not specifically. I don't search
17 catalogs for kits that purport to measure anything.
18      Q. If we look at this protocol booklet and we
19 go to page 3 of the protocol booklet, there is an
20 overview. And the overview begins:
21      "Transformation of normal cells into
22 neoplastic (malignant) cells is the first step in
23 tumorgenesis."
24      Do you agree with that statement?
25      A. I'm sorry. Where are we reading?

29 (Pages 110 - 113)

Page 114

1    Q.  Section 1, "Overview," the first sentence:
2        "Transformation of normal cells into
3  neoplastic (malignant) cells is the first step in
4  tumorgenesis."
5        Do you agree with that statement?
6    A.  No.  A malignant cell is a cancerous cell,
7  so it couldn't be the first step.
8    Q.  So in your opinion what would the first
9  step be?
10   A.  The first step would be the acquisition of
11 a rate-limiting genetic alteration that sets a
12 normal cell on a path towards the becoming a
13 completely malignant tumor cell.
14   Q.  Do you agree that in vitro assays of
15 cellular oncotransformation are a critical tool in
16 studying the mechanisms of carcinogenesis?
17       MR. BALZANO:  Objection to form.
18       THE WITNESS:  Not really.
19 BY MR. LAPINSKI:
20   Q.  Do you agree that cell transformation
21 assays are frequently employed in toxicology to
22 evaluate the carcinogenic potential of a particular
23 compound?
24       MR. BALZANO:  Object to form.
25       THE WITNESS:  This sounds like an

Page 115

1  advertisement, not a scientific treatise, but I
2  honestly don't know what the manufacturer means
3  by "cell transformation" in this context.
4        If they're referring to malignant
5  transformation, I would disagree.
6  BY MR. LAPINSKI:
7    Q.  But if they're referring to just cell
8  transformation, you would agree?
9        MR. BALZANO:  Object to form.
10       THE WITNESS:  I cannot honestly say that
11 I'm familiar what cell transformation -- other
12 than malignant transformation -- is, other than
13 some state that preexists prior to the
14 conversion of a normal cell into a completely
15 malignant cell.
16       Transformation is a very subjective word
17 or term.
18 BY MR. LAPINSKI:
19   Q.  Do you agree with the statement:
20       "Anchorage-independent cell growth is the
21 hallmark of cell transformation"?
22       MR. BALZANO:  Object to form.
23       THE WITNESS:  That's a very complicated
24 question.  There is no single hallmark to
25 malignant transformation.

Page 116

1        And as I've stated, I'm not totally clear
2  on what the investigators mean by "cell
3  transformation" outside the context of
4  malignant transformation.
5        But I would suggest that there's no single
6  hallmark of whatever they mean by
7  transformation or malignant transformation.
8  Cancer cells have multiple hallmarks and
9  properties.
10 BY MR. LAPINSKI:
11   Q.  Is malignant transformation a type of cell
12 transformation?
13       MR. BALZANO:  Object to form.
14       THE WITNESS:  Malignant transformation is
15 simply malignant transformation, the
16 transformation of a normal cell into a
17 malignant cancer cell.
18       They appear to be trying to distinguish
19 between some other type of cell transformation
20 other than malignant transformation in this
21 work and in this kit overview.  But as I've
22 stated, transformation is a very subjective
23 term without the preceding term "malignant"
24 attached to it.
25

Page 117

1  BY MR. LAPINSKI:
2    Q.  In the second paragraph, on page 7.
3        MR. BALZANO:  Of his report or of his --
4        MR. LAPINSKI:  Of his report.
5  BY MR. LAPINSKI:
6    Q.  Let's stick with the -- let's stick with
7  the kit for a moment.  If you were conducting a type
8  of study that Dr. Saed conducted, what type of kit
9  would you have used?
10       MR. BALZANO:  Object to form.
11       THE WITNESS:  As I've indicated before, I
12 wouldn't use a kit.
13 BY MR. LAPINSKI:
14   Q.  Okay.  If you were conducting the type of
15 study that Dr. Saed conducted, what would you have
16 done?
17       MR. BALZANO:  Object to form.
18       THE WITNESS:  I'm not sure in what context
19 I would have conducted such a study.
20       If I were looking for malignant
21 transformation, I would go straight to animals.
22 BY MR. LAPINSKI:
23   Q.  An animal study would be one of three
24 different steps that are taken as it relates to
25 proving causation of something, correct?

30 (Pages 114 - 117)

Page 118

1      MR. BALZANO: Object to form.
2      THE WITNESS: As opposed to what?
3  BY MR. LAPINSKI:
4      Q. I think you've testified before that there
5  are in vitro studies. That's the first step to
6  investigating something, correct? Then the second
7  step is animal studies. And then the third step
8  would be human studies, correct?
9      MR. BALZANO: Object to form.
10     And I would ask you show him his prior
11     testimony.
12 BY MR. LAPINSKI:
13     Q. Do you agree with that statement?
14     A. Makes sense, yeah.
15     Q. Okay. And as it relates to the work on
16 malignant transformation, your opinion would be that
17 you wouldn't do in vitro studies, you would go
18 directly to animal studies for purposes of malignant
19 transformation?
20     A. Yeah. It's important to start with cells
21 and culture in order treat them and render them into
22 some altered state. At which point, I would inject
23 the cells or perhaps look for mutations in the cells
24 that were treated in vitro for genetic alterations
25 that we previously discussed.

Page 119

1      An essential characteristic of any tumor
2  cell is malignant -- or is genetic mutation. I'm
3  sorry.
4      So there are some in vitro things that can
5  be done. But in order to show that -- in essence
6  that the treatment of cultured cells in a Petri dish
7  have been rendered malignant, it's ultimately
8  necessary to put those cells into an animal,
9  generally in a subcutaneous context, but sometimes
10 in an intraperitoneal context, sometimes in a tail
11 ring context. But the idea is to show there they're
12 creating tumors in animals.
13     But the treatment of the cells must occur
14 in vitro in a Petri dish.
15     Q. If Dr. Saed, in his 2021 poster, had
16 referenced cell transformation as compared to
17 malignant transformation, would that have been okay
18 in your opinion?
19     MR. BALZANO: Object to form.
20     THE WITNESS: It would have been okay in
21     terms of him not suggesting that he is showing
22     malignant transformation. It wouldn't have
23     gotten him any closer to showing malignant
24     transformation however.
25

Page 120

1  BY MR. LAPINSKI:
2      Q. If Dr. Saed had used the term "cell
3  transformation" as compared to "malignant
4  transformation," in your opinion, would have fit
5  within the indication of Abcam commercial assay kit,
6  correct?
7      MR. BALZANO: Object to form.
8      THE WITNESS: To the extent that one
9      understands what "transformation" means outside
10     the context of malignant transformation. And I
11     don't.
12 BY MR. LAPINSKI:
13     Q. Now going to the second paragraph of
14 page 7 of your report, you also raise issue with
15 Dr. Saed's reference to transformation after 72
16 hours of treatment; is that correct?
17     A. Yes, I think that's correct.
18     Q. And again, that's an opinion that is
19 shared by the peer reviewers who had provided
20 critique of Dr. Saed's manuscript, correct?
21     A. I believe so, yes.
22     MR. BALZANO: Object to form. If we could
23     look at the peer review criticisms.
24     MS. DAVIDSON: Dr. Boyd, the way a
25     deposition is supposed to work is he asks the

Page 121

1  question, he objects, then you answer.
2      You're not giving him time to object, so
3  we're getting a screwed-up record.
4      So take a deep breath. 15 seconds, that's
5  all we ask. We know you're here to answer. 15
6  seconds till the answer, for him to object.
7      MR. LAPINSKI: Off the record.
8      (A discussion was held off the record.)
9  BY MR. LAPINSKI:
10     Q. Dr. Boyd, on page 8 of your report, you
11 talk about anchorage-independent growth in the top
12 paragraph.
13     Do you see that?
14     A. Yes.
15     Q. What is your understanding of the meaning
16 of anchorage-independent cell growth?
17     A. Growth in a semisolid medium, independent
18 of a solid medium such as a plastic Petri dish.
19 Semisolid medium being, for example, soft agar.
20     Q. Is anchorage-independent cell growth a
21 feature of transformed cells?
22     A. Again, we're getting back to this
23 distinction between transformed cells and
24 malignantly transformed cells. I don't have a grasp
25 of what the term "transformed cells" means in this

31 (Pages 118 - 121)

Page 122

1  context as a cancer scientist.
2        He seems to be conflating the two
3  throughout, which is a problem I have, using the
4  term "transformed cells" when he's trying to imply
5  that he's rendered the cells malignantly
6  transformed.
7        Q.  You're saying that he's conflating the
8  terms cell transformation and malignant
9  transformation?
10       A.  In my opinion --
11             MR. BALZANO:  Object to form.
12       Sorry.
13             THE WITNESS:  In my opinion, yes.
14       No, I'm sorry.
15  BY MR. LAPINSKI:
16       Q.  Is anchorage-independent cell growth a
17  feature of cell transformation?
18             MR. BALZANO:  Object to form.  Asked and
19       answered.
20             THE WITNESS:  Again, I don't understand
21       what "cell transformation" means in this
22       context.  There's a certain amount of cancer
23       cells.
24  BY MR. LAPINSKI:
25       Q.  Well, is transformation of a cell a

Page 123

1  prerequisite for a cell to become malignant?
2             MR. BALZANO:  Object to form vague.
3             THE WITNESS:  Again, I'm unfamiliar with
4       the term "cell transformation" outside the
5       context of malignant cell transformation.
6  BY MR. LAPINSKI:
7       Q.  Okay.  Well, let's talk about malignant
8  cell transformation.  Malignant cell transformation
9  is a cell transforming from one state to another
10  state, correct?
11             MR. BALZANO:  Object to form.
12             THE WITNESS:  Malignant cell
13       transformation is the ultimate of the
14       transformation of a normal cell into a -- cell
15       that's in the process of a transformation of a
16       normal cell into a tumor cell.
17       And in cells in culture, we don't have the
18       luxury of looking at premalignant states like
19       we do in tissues in, for example, humans where
20       we recognize precursor lesions such as polyps
21       and adenomas and carcinoma in situ and so
22       forth.
23  BY MR. LAPINSKI:
24       Q.  So we if start off with a normal cell and
25  if we end with a malignant cell, in between that,

Page 124

1  there's been transformation, correct?
2             MR. BALZANO:  Object to form.
3             THE WITNESS:  By definition.
4  BY MR. LAPINSKI:
5       Q.  Okay.  And there may be multiple steps of
6  transformation in that process from a normal cell
7  transforming into a malignant cell, correct?
8       A.  To the extent that multiple genetic
9  alterations -- genetic alterations have been
10  acquired by a normal cell en route to becoming a
11  malignant cancer cell, yes.
12       Q.  And what if -- to the extent that didn't
13  happen, would that mean that -- excuse me -- would
14  that mean there would only be a single
15  transformation from a normal cell to a malignant
16  cell?
17             MR. BALZANO:  Object to form.
18             THE WITNESS:  I don't understand what a
19       single transformation is.
20  BY MR. LAPINSKI:
21       Q.  Well, I'm trying to understand from your
22  perspective.  As a cell biologist we have a normal
23  cell that ultimately becomes a malignant cell.  And
24  during that process, there are transformations that
25  occur within that cell, correct, in order for it to

Page 125

1  go from a normal cell to a malignant cell?
2             MR. BALZANO:  Object to form.
3             THE WITNESS:  Again, you're focused on the
4       term transformation, which, again, I'm not
5       familiar with.  I'm familiar with the
6       acquisition and accumulation of genetic
7       alterations that are the right limiting steps
8       for a normal cell to become a malignant cancer
9       cell.  But I'm not familiar with, to use your
10       term, states of transformation.
11  BY MR. LAPINSKI:
12       Q.  Can an environmental factor cause
13  malignant transformation?
14             MR. BALZANO:  Object to form.  Vague.
15             THE WITNESS:  Certain environmental
16       factors, physical and chemical, have been
17       associated with the development of human
18       cancer, yes.
19  BY MR. LAPINSKI:
20       Q.  And the development of human cancer
21  through an environmental factor or environmental
22  chemicals results because that environmental factor
23  impacts the genetic formation of a cell.
24       Is that a fair statement?
25             MR. BALZANO:  Object to form.

32 (Pages 122 - 125)

Page 126

1    THE WITNESS: That -- it's -- the
2  environmental factor would have to initiate
3  malignant transformation by creating one or
4  more of the initial rate-limiting genetic
5  alterations required for normal cells to become
6  a tumor cell.
7  BY MR. LAPINSKI:
8    Q.  Would you agree that chronic proliferation
9  is a critical biologic property of malignant cells?
10    MR. BALZANO: Object to form vague.
11    THE WITNESS: Cell proliferation and
12  programmed cell death are properties of
13  malignant tumors, yes.
14  BY MR. LAPINSKI:
15    Q.  In your report on page 8, you refer to the
16  manufacturer of the commercial assay and you say:
17    "Of note, the manufacturer website from
18  which Dr. Saed appears to have copied this sentence
19  states that 'anchorage-independent cell growth is
20  the hallmark of cell transformation.'"
21    MR. BALZANO: I'm sorry, Counsel. What
22  paragraph? The first one?
23    MR. LAPINSKI: The first paragraph.
24    MR. BALZANO: I got it.
25

Page 127

1  BY MR. LAPINSKI:
2    Q.  Do you see that statement?
3    A.  Yes.
4    Q.  And do you agree with that statement?
5    A.  Yes.
6    Q.  And do you agree with the statement
7  "anchorage-independent cell growth is the hallmark
8  of cell transformation"?
9    MR. BALZANO: Just not to -- I'm not to --
10  but meaning -- because this sentence, it says
11  that the manufacturer website states this. And
12  do you agree with that statement?
13    MR. LAPINSKI: That's what I'm asking.
14    MS. DAVIDSON: You asking, does he agree
15  it says it. Or does he agree --
16    MR. LAPINSKI: No. I'm asking, does he
17  agree with the statement.
18    MR. BALZANO: No, because I think the
19  first question was, did that state -- does the
20  manufacturer website state that.
21    Now he's asking if you agree with that
22  statement.
23    THE WITNESS: No. And that's why I put in
24  italics "cell transformation" because to
25  further emphasize the point that I still don't

Page 128

1  understand what is meant by "cell
2  transformation" outside the context of
3  malignant cell transformation.
4  BY MR. LAPINSKI:
5    Q.  In the second paragraph on page 8, you
6  state that it states that:
7    "Dr. Saed further states that 'treatment
8  with talcum powder resulted in formation of colonies
9  indicating cell malignant transformation in a
10  dose-dependent manner.'"
11    Do you see where I am?
12    A.  Yes.
13    Q.  And you say:
14    "None of this is correct. For one thing
15  there's no indication of how colonies were counted."
16  And then in parentheses, it says:
17    "(In any of the materials related to the
18  studies, including the laboratory notebook) as peer
19  reviewers observed."
20    So that's another opinion that you have,
21  that he was incorrect about his statement related to
22  formation of colonies, right?
23    MR. BALZANO: Object to form.
24    And I would ask that you read the rest of
25    the sentence.

Page 129

1    MR. LAPINSKI: I did read the entire
2  sentence.
3    MR. BALZANO: No, I think you stopped, "as
4  peer reviewers observed," and it says, "and it
5  is" --
6    MR. LAPINSKI: Oh, I'm sorry.
7  BY MR. LAPINSKI:
8    Q.  "And it is therefore impossible to verify
9  that" -- strike that.
10    Dr. Boyd, you have an opinion in regard to
11  Dr. Saed's reference to the treatment with talcum
12  powder resulting in formation of colonies; is that
13  correct?
14    A.  Yes.
15    Q.  And that's another criticism that was
16  shared by the peer reviewers who reviewed Dr. Saed's
17  manuscript, correct?
18    MR. BALZANO: Object to form, vague.
19    THE WITNESS: Yes.
20  BY MR. LAPINSKI:
21    Q.  In the last paragraph, you talked the
22  major quantitative conclusion of the 2020 study, and
23  you refer to the fact that Dr. Saed states:
24    "Treatment with talcum powder
25  significantly increased the number of transformed

33 (Pages 126 - 129)

Page 130

1 ovarian cells by 11 percent and 20 percent in the
2 100 and 500 dose respectively," correct?
3     A.   More or less correct, yes.
4     Q.   Okay.  And you say -- the last part of
5 that sentence, you say that it's nonsensical?
6     A.   Yes.
7     Q.   And you go on to say that the reason that
8 it's nonsensical is that it is a basic principle of
9 elementary school math that any number multiplied by
10 0 is 0, correct?
11     A.   Correct.
12     Q.   And that's your opinion, correct?
13     A.   No, not correct.  That's a fact.
14 11 percent of nothing is nothing.
15     Q.   Okay.  Yes, that's a fact.
16        But it's your opinion that Dr. Saed's
17 application or Dr. Saed's quantitative calculations
18 are incorrect because of that fact that you just
19 stated?
20        MR. BALZANO:  Object to form.
21 Mischaracterizes testimony.
22        MS. DAVIDSON:  You told me not to talk.
23 You told me to tell Anthony what to say.  I'm
24 doing it.
25        THE WITNESS:  Again, 11 percent or

Page 131

1    20 percent of 0 is 0.  So it's a nonsensical
2    statement, and it's a nonsensical conclusion
3    based on elementary concepts of mathematics.
4 BY MR. LAPINSKI:
5     Q.   That's your opinion.  That's your overall
6 opinion.  I'm not trying to quarrel with you in
7 regard to the mathematics.
8        I'm asking you just to confirm your
9 opinion, which I believe you just did, correct?
10     A.   That's my opinion with respect to the
11 quantitative aspects of this assay that he
12 undertook.
13     Q.   And that's also an opinion that was noted
14 by the peer reviewers in the peer review comments,
15 correct?
16        MR. BALZANO:  Object to form.  I would
17 again ask that you show him the specific
18 comments from the peer reviewers.
19 BY MR. LAPINSKI:
20     Q.   If we look at footnote 34, Dr. Boyd, you
21 specifically reference documents that were produced,
22 and it says:
23        "Page 5 states the negative control was a
24 blank.  If so, how can we have a positive percent?"
25        You also refer to Gynecologic Oncology

Page 132

1 reviewer; is that correct?
2     A.   That's correct.
3        MS. DAVIDSON:  Is this a good time for
4 lunch?  We've been going over an hour, and we
5 probably want to break and let people go.
6        MR. LAPINSKI:  That's fine.  Off the
7 record.
8        (At 12:47 p.m. a luncheon recess was
9 taken.)
10        (At 1:13 p.m. the deposition resumes.)

Page 133

1 *****************************************
2     A F T E R N O O N   S E S S I O N
3 *****************************************
4 BY MR. LAPINSKI:
5     Q.   Dr. Boyd, welcome back from lunch.
6     A.   Thank you.
7     Q.   Dr. Boyd, I just want to go over a couple
8 of things that we may have already touched on a
9 little bit.
10        One of your opinions is that Dr. Saed's
11 work was incorrect because he did testing on
12 epithelial ovarian cancer cells as compared to
13 fallopian tube cells; is that correct?  Strike that.
14        One of your criticisms is that Dr. Saed
15 used epithelial cells ovarian cells and not
16 fallopian tube cells; is that correct?
17     A.   Yes.  Several opinions regarding the cells
18 that he used.  That was one of them.
19     Q.   Right.  I'm breaking them up.
20        That's one of your opinions, correct?
21     A.   Yes.
22     Q.   And upon what is that opinion based?
23     A.   That's generally viewed now that the great
24 majority of high-grade serous ovarian cancers, which
25 are the majority of ovarian cancer type, occurs in

34 (Pages 130 - 133)

Page 134

1 the fallopian tube, in which case the use of some
2 normal type of fallopian tube cell would have been
3 more appropriate.
4       Q.   And have you been doing any testing using
5 fallopian tube cells in the lab?
6       MR. BALZANO:  Object to the form.
7       THE WITNESS:  Me personally?
8 BY MR. LAPINSKI:
9       Q.   Yes.
10      A.   No.  As I've stated before, I don't have
11 an active research laboratory any longer, although I
12 have a clinical laboratory; but no, I don't.
13      Q.   Are you aware of anyone who's now doing
14 testing on fallopian tube cells in a laboratory as
15 compared ovarian cells?
16      MR. BALZANO:  Object to form, vague.
17      THE WITNESS:  In what context?
18 BY MR. LAPINSKI:
19      Q.   In the context of the research related to
20 ovarian cancer.
21      MR. BALZANO:  Object to form.
22      THE WITNESS:  With regard to any research
23 related to ovarian cancer?
24 BY MR. LAPINSKI:
25      Q.   Yeah.  I believe your statement in your

Page 135

1 report was that one of the flaws in Dr. Saed's work
2 is that when looking at epithelial ovarian cancer,
3 he was using epithelial ovarian cells as compared to
4 fallopian tube cells, correct?
5       A.   Can we point to the --
6       MR. BALZANO:  Yeah, object.  And I would
7 just -- it's on page 6 at the bottom, the last
8 sentence of page 6, Dr. Boyd.
9       MS. DAVIDSON:  Dr. Boyd, I need to
10 interrupt.  Those of us attending virtually can
11 see the deponent no longer.
12      Please remember to let Anthony object.
13 It's not that hard.  Dan objected to 15
14 seconds, so I'm willing to lower it to 10.
15 BY MR. LAPINSKI:
16      Q.   So if you look at bottom of page 6 of your
17 report.
18      A.   (Witness complies.)
19      Q.   You're critical of Dr. Saed's decision to
20 use ovarian surface epithelial cells rather than
21 fallopian tube cells, correct?
22      A.   Yes.
23      Q.   Okay.  And as it relates to epithelial
24 ovarian cancer research, are you aware of anyone who
25 was doing in vitro studies using fallopian tube

Page 136

1 cells as compared to epithelial -- surface
2 epithelial cells?
3       MR. BALZANO:  Object to form.  Vague.
4       THE WITNESS:  I'm aware that, generally
5 speaking, most ovarian cancer research in this
6 era when the subject is high-grade serous
7 ovarian cancer, the research focuses on the
8 fallopian tube or fallopian tube cells.
9 BY MR. LAPINSKI:
10      Q.   So your answer is, yes, you're aware of
11 doctors who, in the lab, are using fallopian tube
12 cells for purposes of studying epithelial ovarian
13 cancer?
14      MR. BALZANO:  Object to form.  Asked and
15 answered.
16      THE WITNESS:  When studying high-grade
17 serous ovarian cancer, yes.
18 BY MR. LAPINSKI:
19      Q.   Okay.  Are you able to cite to any
20 research that you've done on the issue?
21      A.   Not specifically, no.
22      Q.   Are you able to say to any studies where
23 fallopian tube were used?
24      MR. BALZANO:  Object to form.
25      THE WITNESS:  No, but I don't have a

Page 137

1       computer.  I don't have notes.
2       Not from memory, no.
3 BY MR. LAPINSKI:
4       Q.   Okay.  In the work that you've done here,
5 whether it's materials that you relied upon in your
6 2019 report, materials that you relied upon up
7 through your May 24 report, or materials that you
8 considered in your supplemental list of materials
9 considered, does any of the information that you
10 considered involve in vitro testing using fallopian
11 tube cells?
12      MR. BALZANO:  Object to form.  Vague.
13      THE WITNESS:  Not that I recall.
14 BY MR. LAPINSKI:
15      Q.   As it relates to your opinion on page 7
16 regarding 72 hours of treatment done by Dr. Saed,
17 did you do any PubMed searches as it relates to the
18 amount of time that the cells should have been
19 treated by Dr. Saed?
20      MR. BALZANO:  Object to form.
21      THE WITNESS:  Only during the -- are we
22 talking about the paragraph that begins "In
23 addition"?
24 BY MR. LAPINSKI:
25      Q.   Yeah.

35 (Pages 134 - 137)

Page 138

1    "In addition the notion that a commercial
2 cellular assay kit could be used to demonstrate
3 malignant cell transformation after 72 hours of
4 treatment with an agent is scientifically
5 incoherent."
6        Did I read that correctly?
7    A.  You did.
8    Q.  Okay.  Did you do any research in order to
9 be able to form the basis of that statement about
10 72-hour exposure -- 72-hour treatment.  Excuse me.
11    A.  No, I didn't need to.  It's based on
12 several decades of experience in how cells are
13 transformed into malignant cells.
14    Q.  And that's several decades of experience
15 that you have in the work that you're doing now as a
16 cell biologist?
17    A.  It's based on decades of experience in
18 cancer generally, cancer research generally, and the
19 process of neoplastic transformation.
20    Q.  Are there any studies that you're able to
21 cite to that support that proposition?
22        MR. BALZANO:  Object to form.
23        THE WITNESS:  No.  That's a nonsensical
24    question in my opinion because one doesn't cite
25    negative studies.  Well, I think one doesn't

Page 139

1    publish negative studies.  Scientists don't
2    publish studies showing that you can't
3    transform normal cells into malignant cells in
4    72 hours.  So of course I can't point to a
5    study showing that you can't transform a normal
6    cell into a malignant cell in 72 hours because
7    it can't be done.
8 BY MR. LAPINSKI:
9    Q.  Is there any research you're able to point
10 to that shows how long you would have to treat a
11 cell in order to show malignancy?
12    A.  Not specifically.
13    Q.  There's none that you pointed to in any of
14 the documents that you considered for purposes of
15 your opinion, correct?
16        MR. BALZANO:  Object to form.  The report
17    speaks for itself.
18        THE WITNESS:  I relied my experience of
19    decades of cancer research and study.
20 BY MR. LAPINSKI:
21    Q.  On page 9 of your report in the
22 "Conclusion" section, the second full paragraph that
23 starts off:
24    "The 2020 abstract and poster and
25 manuscript additionally conclude that the study's

Page 140

1 findings represent 'a direct causation mechanism of
2 talcum powder exposure specific to normal ovarian
3 cells and further supports previous studies of the
4 association of general use of talcum powder and
5 increased risk of ovarian cancer.'"
6        Did I read that correctly?
7    A.  Almost correctly, but that's fine.
8    Q.  And then you say:
9        "This egregious statement is not supported
10 by the data presented by Dr. Saed's research,
11 well-accepted scientific principles, or common
12 sense."
13        Did I read that correctly?
14    A.  No.  I said "this egregious
15 overstatement."
16    Q.  I'm sorry.  I thought that's what I had
17 said.
18    A.  I think you said statement, but that's
19 okay.
20    Q.  I apologize.
21    A.  I'm reading along with you.
22    Q.  "This egregious overstatement is not
23 supported by the data presented in Dr. Saed's
24 research, well-accepted scientific principles, or
25 common sense."

Page 141

1        Did I read that correctly?
2    A.  Yeah.
3    Q.  What is the overstatement that you're
4 referring to?
5    A.  A direct causation mechanism of talcum
6 powder exposure specific to normal ovarian cells
7 supporting increased risk in ovarian cancer.
8        He has demonstrated absolutely no direct
9 causation mechanism for genital use of talcum powder
10 and increased risk of ovarian cancer.  It's an
11 egregiously-flawed overstatement in my opinion.
12    Q.  And did you review Dr. Saed's data?
13        MR. BALZANO:  Object to form.
14        THE WITNESS:  Well, of course I reviewed
15    his data.
16 BY MR. LAPINSKI:
17    Q.  Okay.  And did you interpret Dr. Saed's
18 data?
19        MR. BALZANO:  Object to form.
20        THE WITNESS:  Well, yes.
21 BY MR. LAPINSKI:
22    Q.  Okay.  When you were reviewing and
23 interpreting Dr. Saed's data, did you do any
24 calculations as it relates to the work that he did?
25    A.  Calculations in what context?

36 (Pages 138 - 141)

Page 142

1    Q.   In any context that Dr. Saed may have had
2  data that he was using to calculate it.
3    A.   Are you referring to mathematical
4  calculations or -- I'm just not clear on it.
5    Q.   Yes.
6    A.   It's a very --
7    Q.   Yeah, it's --
8    A.   -- kind of question.
9    Q.   Mathematical calculations.
10    A.   I think it's fair to say I made some
11  quantitative mathematical assumptions.  I didn't
12  take pen to paper and perform calculations, no.
13    Q.   Okay.  In the middle of the paragraph, you
14  say:
15        "More so, contrary to Dr. Saed's
16  assertion, the overall body of epidemiological
17  studies does not establish an increased risk of
18  ovarian cancer for talcum powder use."
19        Do you see where I'm reading?
20    A.   Not yet, if you could help me out here.
21    Q.   About two-thirds of the way down in the
22  paragraph.  It begins with "moreover."  It's on the
23  left-hand side of the paragraph.
24    A.   Which page are we on?
25    Q.   On page 9.

Page 143

1        MR. BALZANO:  We're on page 9.  It's
2  "Moreover."
3        THE WITNESS:  "Moreover," okay.  I'm with
4  you.
5  BY MR. LAPINSKI:
6    Q.   "Moreover, contrary to Dr. Saed's
7  assertion, the overall body of epidemiological
8  studies does not establish an increased risk of
9  ovarian cancer from talcum powder use."
10        Did I read that correctly?
11    A.   Yes.
12    Q.   And there's a footnote there.  That's
13  footnote 38.  In footnote 38 you cite to an O'Brien
14  2020 article and also an O'Brien 2021 article; is
15  that correct?
16    A.   Yes.
17    Q.   Are you familiar -- well, you're aware
18  that O'Brien published in 2024 another epidemiologic
19  study related to talcum powder.
20        Are you aware of that?
21    A.   Yes.
22    Q.   Did you review that study?
23    A.   I read the study, but I'm not an
24  epidemiologist and so I don't suggest that I'm
25  familiar with the mathematical manipulation she used

Page 144

1  to come to her conclusion and the reanalysis of the
2  sister case controls -- of the sister cohort study.
3        THE WITNESS:  I should learn to say
4  "strike that," but I --
5        MS. DAVIDSON:  I'm sorry.
6        THE WITNESS:  I said I should learn to say
7  "strike that," but I'm not a lawyer.  So I just
8  kept that to myself.
9        (Boyd Exhibit 11 was received and marked
10    for identification, as of this date.)
11  BY MR. LAPINSKI:
12    Q.   And, Dr. Boyd, you've been handed what's
13  been marked as Plaintiffs' Exhibit 11, and that's a
14  copy of the O'Brien 2024 study.
15    A.   (Witness reviews document.)
16    Q.   And you've seen this study?
17        MR. BALZANO:  Do you have an extra copy of
18    that?  I'm sorry.
19        Oh, thanks.
20  BY MR. LAPINSKI:
21    Q.   And did you give consideration to this
22  study when you were forming your opinions for this
23  case?
24        MR. BALZANO:  Object to form.
25        THE WITNESS:  I gave considerations to

Page 145

1    some aspects of her interpretation of her own
2    study, yes.
3  BY MR. LAPINSKI:
4    Q.   And you said you're not an epidemiologist,
5  correct?
6    A.   I do not hold myself out to be an
7  epidemiologist, correct.
8    Q.   You're not an expert in epidemiology?
9    A.   I do not hold myself out to be an expert
10  in epidemiology.
11    Q.   And you're not providing an opinion as it
12  relates to the O'Brien 2024 study, correct?
13        MR. BALZANO:  Object to form.  Vague.
14        THE WITNESS:  I am providing an opinion
15    with respect to some of the statements she made
16    in the study, the paper itself.
17  BY MR. LAPINSKI:
18    Q.   Okay.  And did Dr. O'Brien make any
19  statements in her 2024 study that relate to cell
20  biology?
21    A.   Yes, I believe she did.
22    Q.   Okay.  And what statements would they be
23  that would fall within your area of expertise and
24  allow you to comment on them?
25    A.   If we turn to page 13 in the paper and go

37 (Pages 142 - 145)

Page 146

1 to the second column, the second paragraph beginning
2 with "These." I would say that these results -- I
3 would quote Dr. O'Brien in saying that "these
4 results do not establish causality and do not
5 implicate any cancer-specific inducing agent."
6    Q. So you're quoting Dr. O'Brien. You're not
7 analyzing whether or not Dr. O'Brien is right or
8 wrong in that statement. You're just referring to
9 that part of her article, correct?
10    MR. BALZANO: Object to form.
11    THE WITNESS: Yes. As a cell and
12 molecular biologist, I was particularly struck
13 by that comment with regard to the impact of
14 the study on association versus causality and
15 her belief that her results are unrelated to
16 causality.
17 BY MR. LAPINSKI:
18    Q. So she does also say in the report, on the
19 first page, going onto the second page:
20    "Use of powder in the genital area could
21 plausibly promote carcinogenesis through mechanisms
22 other than direct contact with asbestos, including
23 exposure to other chemicals or irritation and
24 inflammation of the reproductive tract."
25    Do you see that?

Page 147

1    A. Yes.
2    Q. Okay. And you agree with that?
3    A. I agree that that's what she said or
4 wrote.
5    Q. Okay. She also wrote -- well, actually
6 not that she wrote it. Dr. Fleming stated:
7    "These findings" -- and this is at the top
8 of page 2, as far as relevance:
9    "These findings support the hypothesis
10 that there is a positive association between genital
11 talc use and the development of ovarian cancer, but
12 unmeasured confounding can still be present."
13    Do you see that?
14    A. Yes.
15    Q. Do you agree with that?
16    A. I agree that it's a finding hypothesis and
17 that's what she's shown.
18    Q. Now, as it relates to your opinion on the
19 overall body of epidemiological studies, did you
20 give any consideration to the findings in the
21 Health Canada report in April of 2021?
22    A. I read it, yes.
23    Q. Did you give any consideration to it?
24    A. I did, actually.
25    Q. Okay. Is it listed in your list of

Page 148

1 materials considered?
2    A. No, but it's not -- it wasn't useful in
3 the formation of my opinion as a cause of ovarian
4 cancer.
5    (Boyd Exhibit 12 was received and marked
6    for identification, as of this date.)
7    THE WITNESS: (Witness reviews document.)
8 BY MR. LAPINSKI:
9    Q. Dr. Boyd, you have in front of you what's
10 been marked as Boyd Exhibit 12, which is the
11 April 2021 Health Canada report. You said you have
12 seen this before, correct?
13    A. I have, yes.
14    Q. And this was something that you did look
15 at as it relates to your opinions?
16    MR. BALZANO: Object to form.
17    THE WITNESS: I did look at it. I did not
18 use the report in forming my opinions in my
19 revised expert report.
20 BY MR. LAPINSKI:
21    Q. And what's your understanding of what the
22 Health Canada report is?
23    MR. BALZANO: Object to form.
24    THE WITNESS: It's an assessment by a
25 review group on the association of perineal use

Page 149

1 of talcum powder and subsequent development of
2 ovarian cancer.
3 BY MR. LAPINSKI:
4    Q. Is there a particular reason as to why you
5 did not consider this for purposes of your report?
6    MR. BALZANO: Object to form.
7    THE WITNESS: I thought the report was
8 particularly -- particularly uninformative
9 because of several reasons. They seem to
10 contradict themselves with respect to the
11 weight of the epidemiologic data, especially on
12 page 24, paragraph 2.
13 BY MR. LAPINSKI:
14    Q. Any other reasons?
15    A. That's the main reason.
16    Q. Dr. Boyd, are you familiar with IARC?
17    A. I am.
18    Q. And is IARC a specialized cancer agency of
19 the World Health Organization?
20    A. I think that's a fair description of IARC.
21    Q. And are they an independent international
22 organization?
23    MR. BALZANO: Object to form.
24    THE WITNESS: I'm not sure how you're
25 defining "independent."

38 (Pages 146 - 149)

Page 150

1    MR. LAPINSKI:  You can mark that as
2  Exhibit 13.
3    (Boyd Exhibit 13 was received and marked
4    for identification, as of this date.)
5  BY MR. LAPINSKI:
6    Q.  Dr. Boyd, you've been handed a document
7  that's been marked as Boyd Exhibit 13, and this is a
8  printout from IARC's website.  I just want to go
9  over a couple of things with you.
10   A.  (Witness reviews document.)
11   Q.  In the second paragraph, see:
12     "The objective of IARC is to promote
13  international collaboration in cancer research.  The
14  agency is interdisciplinary, bringing together
15  skills in epidemiology and laboratory sciences and
16  biostatistics to identify the causes of cancer so
17  that preventative measures may be adopted and the
18  burden of disease and associated suffering reduced."
19     Did I read that correctly?
20   A.  Yes.
21   Q.  As it relates to IARC, would you agree
22  with that statement?
23   A.  It's a reasonable statement, yes.
24   Q.  Now, the next sentence says:
25     "A significant feature of the agency is

Page 151

1  its expertise in coordinating research across
2  countries and organizations.  It's independent role
3  as an international organization facilitates this
4  activity."
5     Would you agree that IARC plays an
6  independent role as an international organization?
7   A.  Perhaps.  To the extent that it's
8  describing itself one has to take everything with a
9  grain of salt, but I think it's reasonable
10  statement.
11   Q.  Do you not think that IARC is an
12  independent international organization?
13     MR. BALZANO:  Object to form.
14     THE WITNESS:  I have no reason to believe
15     that it's not independent, at least
16     acknowledging it's an agency of the World
17     Health Organization.
18  BY MR. LAPINSKI:
19   Q.  Are you aware that in July of 2024, just
20  earlier this month, IARC published the results of a
21  working group as it relates to the classification of
22  talcum powder as a carcinogen?
23   A.  I am.
24   Q.  I'm sorry.  You are aware of that?
25   A.  Yes.

Page 152

1    Q.  Okay.  Did you review that publication?
2    MR. BALZANO:  Object to form.
3    (Boyd Exhibit 14 was received and marked
4    for identification, as of this date.)
5  BY MR. LAPINSKI:
6    Q.  Dr. Boyd, I've handed you what's been
7  marked as Boyd Exhibit 14, which copy of the article
8  that was published in Lancet Oncology regarding the
9  IARC Working Group.
10     Have you seen this document before?
11   A.  Yes.
12   Q.  Did you review this?
13   A.  I read it, yes.
14   Q.  Is the determination of IARC something
15  that you've considered in -- strike that.
16     Have you considered the determinations of
17  IARC in forming your opinions as it relates in this
18  case?
19     MR. BALZANO:  Object to form.  Vague.
20  BY MR. LAPINSKI:
21   Q.  Have you considered the opinions of
22  IARC -- strike that.
23     Have you considered the findings of IARC
24  as it relates to the opinions you're sharing in this
25  case?

Page 153

1   A.  I have considered them, yes.
2    MS. DAVIDSON:  I just wanted to say
3  something.
4    MR. LAPINSKI:  Sure.
5    MS. DAVIDSON:  We should have added, I
6  think, these IARC things.  I think what
7  happened was his deposition got moved.  This
8  got written, I think, before his deposition was
9  moved.
10    We can do a supplemental reliance list and
11  add the couple of things we sent in like in the
12  last week or two because I believe this was --
13    MR. BALZANO:  July 3rd was the original.
14    MS. DAVIDSON:  The deposition date.
15    MR. BALZANO:  Yeah.  I think the press
16  release was July 5.
17    MS. DAVIDSON:  That's on Skadden.  Because
18  we prepared this list and so if you want us to
19  prepare a supplemental list now that we can --
20    That should have been on there.
21    MR. LAPINSKI:  So just -- yeah.  Just --
22  I'm good.
23    Let me ask questions and we'll clarify.
24    MS. DAVIDSON:  Understood.  And we're
25  happy to -- I would like to state for the

39 (Pages 150 - 153)

Page 154

1 record that we can do it, additional materials
2 considered lists that have this IARC document
3 that we did.
4      MR. LAPINSKI:  So for today, if anything,
5 what we've accomplished is this:  On the
6 record, Jessica had said that I was right, and
7 on the record, Jessica has acknowledged that
8 she was wrong about something or that you made
9 a mistake.
10      MS. DAVIDSON:  Or that an associate made a
11 mistake.  Not that I made a mistake.
12 BY MR. LAPINSKI:
13   Q.  So, Dr. Boyd, I'm going to ask you some
14 questions in regard to the IARC determination.  On
15 July 5 in Lancet Oncology, this article was
16 published as it relates to the IARC 2024 findings,
17 correct?
18   A.  That's my understanding, yes.
19   Q.  Okay.  And this IARC 2024 finding was
20 provided to you for purposes of your review and
21 consideration; is that correct?
22      MR. BALZANO:  Object to form.
23      THE WITNESS:  Actually, I found it myself
24 by clicking on the link in the original IARC
25 press release or whatever it was that led me to

Page 155

1 the Lancet Oncology article.  So I found it
2 myself.
3      Is that the question?
4 BY MR. LAPINSKI:
5   Q.  That wasn't my question, but thank you for
6 the clarification.  My question is more so, you
7 found it, correct?
8   A.  I did indeed.
9   Q.  You've reviewed it?
10   A.  I've read it.
11   Q.  And -- okay.  Is there a difference
12 between reading and reviewing?
13      MR. BALZANO:  Object to form.
14      MR. LAPINSKI:  I said "review," he said
15 "read."  I'm asking him for the difference
16 between the two.
17      THE WITNESS:  I think, generally speaking,
18 reviewing is more in-depth analysis of a body
19 of work or a publication as opposed to reading
20 and understanding the words on the paper, yes.
21 BY MR. LAPINSKI:
22   Q.  And as we sit here today, you have not yet
23 reviewed this, correct?
24   A.  I have not undertaken an in-depth review
25 of this paper, no.

Page 156

1   Q.  Have you done enough of a review in order
2 for you to consider the findings by IARC as it
3 relates to your opinions in the case?
4      MR. BALZANO:  Object to form.  Vague.
5      THE WITNESS:  The findings of IARC do not
6 relate to the formation of my opinions in this
7 case.
8 BY MR. LAPINSKI:
9   Q.  Now, IARC has classified talc not
10 containing asbestos as probably carcinogenic to
11 humans; is that correct?
12   A.  That's my understanding, yes.
13   Q.  And IARC has also found that there is a
14 strong -- there is strong mechanistic evidence in
15 human primary cells and environmental systems; is
16 that correct?
17   A.  That's correct.  And that's why I have not
18 considered the new IARC press release in the
19 formation of my opinions in this case because I
20 strongly disagree.
21   Q.  And talc containing asbestos retains its
22 classification as Group 1 carcinogen in humans,
23 correct?
24   A.  No, I don't believe that is correct.
25   Q.  You don't believe that IARC has maintained

Page 157

1 its classification of talc containing asbestos as a
2 Group 1 carcinogen to humans?
3      MR. BALZANO:  Well, I'll object to form.
4   I think the press release -- I'm not sure if it
5   mentions -- or at least you can point out to us
6   where it mentions retaining.
7 BY MR. LAPINSKI:
8   Q.  So at the bottom of the second paragraph,
9 the last sentence says:
10      "Talc containing asbestos was not
11 re-evaluated and retains its classification within
12 asbestos, Group 1, from Volume 100C."
13      Did I read that correctly?
14   A.  I'm not with you.  On are we back on the
15 Lancet Oncology article?
16   Q.  Yes, the Lancet Oncology article, bottom
17 of the second paragraph on the first page.  It says:
18      "Talc containing asbestos was not
19 re-evaluated and retains its classification within
20 asbestos, Group 1, for from Volume 100C."
21      Did I read that correctly?
22   A.  Oh I see, yes.  Within asbestos, Group 1.
23      So, in other words, I consider asbestos to
24 be a Group 1 carcinogen and it would appear that
25 they're including talc containing asbestos, whatever

Page 158

1 that is, within the broad category of asbestos as a
2 Group 1 carcinogen.
3     Q.  Now, you do consider asbestos to be a
4 carcinogen?
5     A.  Yes.
6     Q.  If you would go to page 2 of the Lancet
7 article.
8     A.  (Witness complies.)
9     Q.  The second paragraph from the bottom
10 states:
11         "There was 'limited' evidence that talc
12 causes ovarian cancer in humans.  Most of the
13 available studies assessed use of talc-based body
14 powder.  Since Volume 93, more consistent positive
15 associations for ever-use versus never-use has been
16 reported in pooled cohort studies and case-control
17 studies, including evidence of an exposure-response
18 relationship with frequency or duration of use."
19         Did I read that correctly?
20     A.  You did.
21     Q.  And do you agree with that statement?
22     A.  No.
23     Q.  If you go to the third page, in the last
24 paragraph of the article, which is towards the top
25 of the page, it says:

Page 159

1         "Talc induces chronic inflammation.  In
2 experimental systems in vivo, consistent and cohort
3 evidence was observed in various tissues following
4 different routes and exposure of up to two years."
5         Do you agree with that statement?
6     A.  No.
7         MR. BALZANO:  Coherent instead of cohort.
8         MR. LAPINSKI:  Coherent.  I'm sorry.
9         THE WITNESS:  I would have to look at what
10 reference 11 is.
11         So the only study that's cited in this
12 very long and convoluted sentence is the NTP study
13 where, in rats and mice, were exposed via lifelong
14 inhalation of talc.  And in female rats, lung
15 cancers were observed, and in male and female rats,
16 pheochromocytomas were observed.  No tumors were
17 observed in mice.
18         So to the extent that that's the result of
19 the NTP study, I don't really see how it relates to
20 a lot of -- the rest of the sentence involving
21 chronic inflammation and consistent and coherent
22 evidence in various tissues.  I think it's an
23 overstatement based on the NTP study.
24 BY MR. LAPINSKI:
25     Q.  Well, it next states:

Page 160

1         "Talc alters cell proliferation."
2         Do you agree with that?
3         MR. BALZANO:  Object to form.  Agree that
4     that's what's written, or agree with the
5     statement?
6 BY MR. LAPINSKI:
7     Q.  Agree with the statement.
8     A.  No, I don't agree with the statement.
9 It's a very broad and general statement that doesn't
10 specify what system, what experiment, what study.
11 There's no citation.  It's hard to agree with such a
12 general -- generalization.
13     Q.  Would you have the same position as it
14 relates to the statement that talc alters cell
15 death?
16     A.  Yeah, I would have the same opinion with
17 respect to the rest of the sentence where there are
18 no citations also.
19     Q.  Do you know the bases upon which IARC
20 decisions were made?
21         MR. BALZANO:  Object to form.  Vague.
22         THE WITNESS:  I would ask whether you're
23     referring to the committee that was convened to
24     reassess carcinogenicity of talc as opposed to
25     IARC itself.

Page 161

1 BY MR. LAPINSKI:
2     Q.  We'll start there.  There was a committee
3 formed by IARC in order to investigate this issue,
4 correct?
5     A.  There was a working group formed, yes.
6     Q.  And that working group evaluated
7 scientific literature that was available on the
8 topic?
9     A.  I should hope so.
10     Q.  Okay.  Are you aware of all the scientific
11 literature that was evaluated?
12     A.  No.
13         MR. BALZANO:  Object to form.
14 BY MR. LAPINSKI:
15     Q.  So you did not include this in your
16 July 16, 2024 additional materials considered,
17 correct?
18         Just -- correct?
19     A.  Correct.
20     Q.  Okay.  It's my understanding that that was
21 an oversight, but that you have reviewed this in
22 support of your opinions.
23         MR. BALZANO:  To make the record clear,
24     oversight by me.  So we will supplement that.
25         MR. LAPINSKI:  You could have said "Yes."

41 (Pages 158 - 161)

Page 162

1    She's not allowed to speak on the record.
2    MS. DAVIDSON: Hasn't stopped me.
3    THE COURT REPORTER: No.
4 BY MR. LAPINSKI:
5    Q. Dr. Boyd --
6    MS. DAVIDSON: For the record, Anthony is
7 being nice. It wasn't Anthony. It was a
8 paralegal under Anthony's supervision. There's
9 a lot of layers.
10 BY MR. LAPINSKI:
11    Q. So, Dr. Boyd, we just went through your
12 opinions as it relates to the Saed 2020 poster and
13 the research that was associated with that, correct?
14    A. That's correct.
15    Q. And if I'm correct, your criticisms of
16 Dr. Saed's poster relate to the dosing, the amount
17 of talc dosing, correct?
18    MR. BALZANO: Object to form. One of his
19    criticisms.
20 BY MR. LAPINSKI:
21    Q. One of your criticisms is an issue with
22 the dosing that he used, correct?
23    A. That's correct.
24    Q. Okay. Another of your criticisms is that
25 he didn't use fallopian tube cells, correct?

Page 163

1    A. That's correct.
2    Q. Another of your criticisms is the 72-hour
3 transformation, correct?
4    A. The 72-hour malignant transformation, yes.
5    Q. Another one of your criticisms is the
6 quantitative criticism as far as the percent
7 increases that he referenced, correct?
8    A. That is very correct.
9    Q. Now another one of your criticisms is that
10 a single -- strike that.
11    Another one of your criticisms is that a
12 single application would have resulted in much
13 higher -- would result in much higher results of
14 ovarian cancer in epidemiologic studies if what
15 Dr. Saed had done was accurate, correct?
16    MR. BALZANO: Object to form. And I would
17    like you to maybe show the witness where in his
18    report.
19    MR. LAPINSKI: Sure. Sure.
20 BY MR. LAPINSKI:
21    Q. If you look at the bottom of -- if you
22 look at the bottom of page 9, it says, contrary
23 to -- this is after the sentence related to
24 epidemiologic studies.
25    It says:

Page 164

1    "The cohort studies are most telling that
2 there was no increased risk. Such an increase would
3 have been observed in epidemiology studies and
4 almost certainly would have been much larger."
5    Do you see where I read from?
6    A. Yes.
7    Q. Okay. And one of your criticisms is that
8 if what Dr. Saed was doing was scientifically
9 accurate, then in epithelial epidemiology studies,
10 we would see higher reports of ovarian cancer; is
11 that correct?
12    MR. BALZANO: Object to form, vague.
13    THE WITNESS: I believe that if one
14    exposed cells in culture for 72 hours to talc
15    and that resulted in malignant transformation,
16    then I believe that the widespread -- the very
17    widespread use of talcum powder, in a perineal
18    context, in women, would have an enormous
19    association with ovarian cancer, and we
20    wouldn't be litigating this issue 14 years on
21    or however long it's been.
22 BY MR. LAPINSKI:
23    Q. I'm sorry. I just lost my train of
24 thought. Give me a second.
25    Each of the criticisms that we just went

Page 165

1 over are criticisms that were also shared by peer
2 reviewers who commented on Dr. Saed's manuscript,
3 correct?
4    MR. BALZANO: Object to form. And if --
5    Dr. Boyd, if you want to look at the specific
6    peer review criticisms, you can.
7    THE WITNESS: I'll just say that many of
8    them were. I can't sit here today, without
9    reading all of the material carefully, and say
10    that every one of my criticisms were shared,
11    but I think most of them, in addition to some
12    additional criticisms, were shared, yes.
13 BY MR. LAPINSKI:
14    Q. The additional criticisms that you just
15 referred to, can you point me in your report, the
16 first part of your report as it relates to the
17 poster, any criticisms that are different or apart
18 from criticisms that were shared by peer reviewers?
19    A. No, because I'm referencing my own
20 citings.
21    (Clarification by the Reporter.)
22    THE WITNESS: I said, no, because I'm
23    citing to my own statements so there would be
24    no additional citations or references in this
25    expert report. I'm just, by memory, recalling

42 (Pages 162 - 165)

Page 166

1 the substance of the peer review reports that I
2 remember reading.
3     MR. BALZANO:  So are you asking if he has
4 additional or if the peer review commenters had
5 additional criticisms?  You're asking if in his
6 report he has additional?
7     MR. LAPINSKI:  He answered my question.
8 BY MR. LAPINSKI:
9   Q.  In the 2021 poster that Dr. Saed had
10 published or presented --
11     (Boyd Exhibit 15 was received and marked
12     for identification, as of this date.)
13 BY MR. LAPINSKI:
14   Q.  Dr. Boyd, you've been handed Exhibit 15.
15   A.  Yes.
16   Q.  Okay.  And this is a poster that was
17 presented at SRI in Boston, Massachusetts in July of
18 2021.
19     Is this the poster that you're referring
20 to in Section 2 of your report on page 10?
21   A.  Yes.
22   Q.  And this poster reports on the 2021 study
23 which purports to supplement the 2020 study
24 discussed involving -- strike that.
25     In your -- in the second paragraph under

Page 167

1 Section 2 talking about this poster, you state "this
2 poster reports on a 2021 study, which purports to
3 supplement the 2020 study discussed above by
4 incorporating those experiments and adding a
5 'assessment of p53 and Ki67 expression with
6 immunohistochemistry.'"
7     Did I read that correctly?
8   A.  Yes.
9   Q.  Now the assessment of p53 and the Ki67
10 expression, that was a criticism of one of the peer
11 reviewers, correct, that Dr. Saed had not done that
12 in his original poster?
13     MR. BALZANO:  Objection.  Lacks
14 foundation.
15     Dr. Boyd, you can look at the peer review
16 comments if you want.
17     THE WITNESS:  No.  I don't think that's
18 the essence of the peer review at all.  I think
19 the peer review was criticizing the conclusions
20 drawn from the experiments, not that they were
21 or were not included.
22     MS. DAVIDSON:  Do you have the peer review
23 comments?
24     MR. LAPINSKI:  I do have the peer review
25 comments.

Page 168

1     What I'm going to do is come back to that
2 because I've got limited time, and I want to
3 make sure --
4     MS. DAVIDSON:  Got it.
5 BY MR. LAPINSKI:
6   Q.  Dr. Boyd, as it relates to this July 2021
7 poster, Dr. Saed's work was again then reviewed by a
8 committee to determine whether the poster was worthy
9 of being presented at this meeting, correct?
10     MR. BALZANO:  Objection.
11     MS. DAVIDSON:  Yeah.  That was really
12     fast, I couldn't even process it.
13 BY MR. LAPINSKI:
14   Q.  Dr. Boyd, in regard to the 2021 SRI
15 poster, Dr. Saed's work would have again been
16 reviewed by a committee to determine whether or not
17 the poster was worthy of being presented at the
18 meeting; is that correct?
19     MR. BALZANO:  Object to form.
20     THE WITNESS:  Not necessarily.  I'm not a
21 member of the Society for Reproductive
22 Investigation and so I'm not familiar with
23 procedures and protocols for evaluating
24 submissions to their annual meeting.
25

Page 169

1 BY MR. LAPINSKI:
2   Q.  So you don't know whether or not
3 Dr. Saed's SRI poster was peer reviewed?
4   A.  No.
5   Q.  And your opinions as it relates to this
6 poster, in addition to carrying over the opinions
7 from the 2020 work, I'm not trying to say that these
8 are exclusive of the opinions you previously shared.
9 But on page 11, the bottom of page 11 going into
10 page 12 says:
11     "As to IHC analysis, it does not make
12 scientific or logical sense to assert that
13 IHC-demonstrated changes in expression of two
14 proteins, Ki67 and p53, as documented by
15 photographs, are evidence of conversion of normal
16 cells to cancerous cells."
17     You see that?
18   A.  Yes.
19   Q.  And that's a criticism that was, again,
20 stated by one of the peer reviewers, correct?
21     MR. BALZANO:  Object to form.  And again,
22     if you want to look at --
23 BY MR. LAPINSKI:
24   Q.  You can look at -- you can look at
25 footnote 54.  And footnote 54, Dr. Boyd, you

43 (Pages 166 - 169)

Page 170

1 reference a reviewer, explaining that:
2     "The use of IHC to determine p53 mutation
3 status is not very sensitive."
4     And "Needs to be confirmed with
5 sequencing."
6     Do you see that?
7     MR. BALZANO: Dr. Boyd, if you want to
8 look at the full context of that, you can
9 request to see that full comment.
10     THE WITNESS: No, I'm fine.
11     I see it.
12 BY MR. LAPINSKI:
13     Q. Okay. And that's -- so again, your
14 criticism in regard to the IHC-demonstrated changes
15 are a criticism that is also a peer reviewer
16 criticism?
17     MR. BALZANO: Object to form.
18     THE WITNESS: Oh, apparently, yes.
19 BY MR. LAPINSKI:
20     Q. And you also have criticisms as it relates
21 to p53 expression in the results. It says:
22     "It has been well-known for decades that
23 nuclear expression of p53 tumor suppressor protein
24 as assessed by IHC staining of cells is not a
25 function of the half-life of the p53 protein. The

Page 171

1 half-life of p53 protein is typically quite short
2 and thus undetectable by IHC staining."
3     Did you see that?
4     MR. BALZANO: I think you put a "not" in
5 between "is" and "a function."
6     THE WITNESS: You did.
7     I was going to wait for him to finish.
8 BY MR. LAPINSKI:
9     Q. "Is a function of the half-life of the p53
10 protein."
11     A. Yes, I see it.
12     And now you've read it correctly.
13     Q. Okay. And you're, again, critical in that
14 paragraph of Dr. Saed and his work, correct?
15     A. Yes.
16     Q. Is there any research that you did as it
17 relates to that particular criticism?
18     MR. BALZANO: Object to form. Vague.
19     THE WITNESS: Yes, I've looked at p53
20     expressions.
21 BY MR. LAPINSKI:
22     Q. Okay. There's no citation here, though,
23 to any article or treatise or scientific information
24 that you relied upon as it relates to that
25 criticism, correct?

Page 172

1     A. No, not correct.
2     There's a body of literature going back 30
3 or 40 years that reflects my comments that the
4 half-life of the p53 protein and IHC staining are
5 unrelated to the p53 mutation.
6     Q. And is that cited to here in this
7 paragraph?
8     MR. BALZANO: Object to form. Document
9 speakers for itself.
10     MR. LAPINSKI: Okay. I'll rephrase the
11 question.
12 BY MR. LAPINSKI:
13     Q. Did you cite to those scientific treatises
14 in this paragraph?
15     MR. BALZANO: Object to form.
16     THE WITNESS: No. I chose not to cite to
17 decades of research and what is common
18 knowledge in the cancer research community.
19 BY MR. LAPINSKI:
20     Q. Did you include citation to that
21 scientific literature in your materials considered
22 list?
23     A. No. Again, I didn't feel citations were
24 necessary since it's common knowledge in the cancer
25 research community and has been, again, for decades.

Page 173

1     Q. In the next paragraph, you talk about --
2 I'll read the beginning of it:
3     "Second, the authors state that 'talcum
4 powder treatment increased the proliferation index
5 in both cell lines' respective baselines of 50
6 and 70 percent to 90 percent, but do not describe
7 the statistical analysis used to conclude that PI
8 increased to 90 percent."
9     Did I read that correctly?
10     A. Yes.
11     Q. And so you were critical because it's
12 unclear of how a 90 percent PI increase was
13 calculated based on binary categories, correct?
14     A. Yes. He and his colleagues simply
15 classified the Ki67 expression as being high or low,
16 and so it's impossible for me to understand how they
17 came up with a number of 50 and 70 percent to
18 90 percent when they're using binary categories for
19 assessing expressions.
20     Q. And right after that, you state:
21     "It's unclear how a 90 percent PI increase
22 was calculated based on these binary categories, as
23 a peer reviewer explained"?
24     A. Yes. That's what I just said prior to
25 your question.

44 (Pages 170 - 173)

Page 174

1    Q.  Okay.  So you're relying upon the peer
2 reviewer for your position as it relates to the PI
3 increase?
4        MR. BALZANO:  Object to form.
5        THE WITNESS:  No, not at all.  I reviewed
6    this poster long before I ever saw peer
7    reviewers' comments, which would have only come
8    out after the paper had been submitted for
9    publication.
10 BY MR. LAPINSKI:
11    Q.  And did you -- did you cite in your report
12 in this paragraph any scientific literature that
13 supports your position?
14        MR. BALZANO:  Object to form.  The report
15    speaks for itself.
16        MR. LAPINSKI:  I'm not asking what the
17    report says.  I'm asking what he did.  So your
18    objection is noted.
19        But go ahead, you can answer, Doctor.
20        THE WITNESS:  No.  I don't believe it's
21    necessary to cite to common sense.  This was a
22    binary classification that was then converted
23    into some kind of percentage increase, which is
24    impossible to do in my mind.  So I didn't feel
25    the need to cite to something that's impossible

Page 175

1    to accomplish.
2 BY MR. LAPINSKI:
3    Q.  So this paragraph doesn't require any
4 level of expertise?  This is just a commonsense
5 paragraph?
6        MR. BALZANO:  Object to form.
7        MS. DAVIDSON:  That mischaracterizes his
8    testimony.
9        MR. LAPINSKI:  I'm asking him a question.
10        MS. DAVIDSON:  Can you make that
11    objection, please.
12        MR. BALZANO:  Objection.  Mischaracterizes
13    testimony.
14        THE WITNESS:  It's inconsistent with my
15    common sense as a longtime biological
16    scientist.
17        MR. LAPINSKI:  Let's go off the record for
18    five minutes.
19        (At 2:09 p.m. a recess was taken.)
20        (At 2:11 p.m. the deposition resumes.)
21        (Boyd Exhibit 16 was received and marked
22    for identification, as of this date.)
23 BY MR. LAPINSKI:
24    Q.  Dr. Boyd, you've been handed what's been
25 marked as Exhibit 16, and is Exhibit 16 the journal

Page 176

1 article authored by Harper, Dr. Saed and others as
2 it relates to malignant transformation?
3    A.  Is that a question?
4    Q.  Yes.  Is this the article?
5    A.  It's an article, yes.
6    Q.  Okay.
7    A.  It's a published paper, yes.
8    Q.  Is this the published paper that you're
9 referring to on page 14 of your report?
10    A.  Yes.
11    Q.  As it relates to this publication of the
12 work that was done for this publication, did you try
13 to reproduce the work that was done by Dr. Saed?
14        MR. BALZANO:  Object to form.
15        THE WITNESS:  No.
16 BY MR. LAPINSKI:
17    Q.  Have you tried to test the effect of talc
18 on ovarian cancer cells in vitro?
19        MR. BALZANO:  Object to form.
20        THE WITNESS:  No.  I think I stated at the
21    beginning of this deposition that I've never
22    performed work on talc and ovarian cancer or in
23    any other context.
24 BY MR. LAPINSKI:
25    Q.  Not did any testing to determine if talc

Page 177

1 elicits an inflammatory response?
2    A.  I'm sorry.  I would give you the same
3 answer.  I've never experimented with talc in any
4 context in my career.
5    Q.  Are you aware of studies showing the
6 presence of asbestos in Johnson's Baby Powder?
7        MR. BALZANO:  Object to form.  It lacks
8    foundation.
9        MS. DAVIDSON:  Wait a minute.
10        THE WITNESS:  I'm vaguely aware of a press
11    release reporting that a lot of Johnson's Baby
12    Powder was found to have trace amounts of
13    asbestos at some point in the past.
14 BY MR. LAPINSKI:
15    Q.  Are you aware of any testing that showed
16 the presence of asbestos in Johnson's Baby Powder?
17        MR. BALZANO:  Object to form.  Vague.
18    Lacks foundation.
19        MS. DAVIDSON:  Asked and answered.
20        MR. LAPINSKI:  It's different question.
21        THE WITNESS:  To the best of my knowledge,
22    Johnson & Johnson, based on the one report that
23    I remember from several years ago, states that
24    they routinely test their product for the
25    presence of asbestos and extremely small

45 (Pages 174 - 177)

Page 178

1    amounts of asbestos were found in one lot of
2    Johnson's Baby Powder, but not in others,
3    before or -- or before that time either.
4  BY MR. LAPINSKI:
5    Q.  In developing your opinions for this
6  litigation, did you look at the role that asbestos
7  may have in ovarian cancer?
8        MR. BALZANO: Object to form.
9        THE WITNESS: I read the --
10       MS. DAVIDSON: All right. Hold on, hold
11  on, hold on, hold on. Since 2019?
12       MR. LAPINSKI: Sure.
13  BY MR. LAPINSKI:
14   Q.  Since 2019, in developing your opinions
15  for your supplemental report, did you look at the
16  role that asbestos may have played -- may have on --
17  strike that. Start again.
18       In 2019 -- since 2019, in developing your
19  opinions for this litigation, have you looked at the
20  role that asbestos may have on ovarian cancer?
21   A.  Only in the sense that I've skimmed the
22  2012 IARC monograph on asbestos and cancer.
23   Q.  Are you aware of any constituents that are
24  contained in Johnson's Baby Powder other than talc?
25       MR. BALZANO: Object to form. Vague.

Page 179

1        THE WITNESS: No.
2  BY MR. LAPINSKI:
3    Q.  Did you do any research to determine
4  whether there are any constituents in Johnson's Baby
5  Powder other than talc?
6        MR. BALZANO: Object to form. And should
7  be since 2019.
8        THE WITNESS: Any research personally?
9  Like --
10  BY MR. LAPINSKI:
11   Q.  Yes.
12       MS. DAVIDSON: Not at this point. This
13  question has to be rephrased.
14  BY MR. LAPINSKI:
15   Q.  Since 2019, have you done any research to
16  determine whether there are other constituents in
17  Johnson's Baby Powder?
18       MR. BALZANO: Object to form, vague.
19       THE WITNESS: Any literature research?
20  BY MR. LAPINSKI:
21   Q.  Any type of research?
22   A.  No.
23   Q.  Is arsenic a carcinogen?
24   A.  To the best of my knowledge, yes.
25   Q.  Is nickel a carcinogen?

Page 180

1        MR. BALZANO: Object to form.
2        THE WITNESS: I honestly don't know.
3  BY MR. LAPINSKI:
4    Q.  I'm sorry. You say you don't know?
5        MS. DAVIDSON: Hold on.
6        MR. BALZANO: I think these are very vague
7  questions.
8  BY MR. LAPINSKI:
9    Q.  In -- you're a cell biologist, correct?
10   A.  Partially, yes.
11   Q.  Your career has been focused on studying
12  ovarian cancer and different forms of cancer?
13   A.  Yes.
14   Q.  Based upon your professional experience
15  and as you sit here today as an expert witness, do
16  you believe nickel is a carcinogen?
17       MS. DAVIDSON: Of ovarian cancer or you
18  asking carcinogen?
19       MR. LAPINSKI: I'm asking whether it's a
20  carcinogen.
21       MR. BALZANO: Object to form. Vague.
22       THE WITNESS: And I would have to reply,
23  depends on the context.
24  BY MR. LAPINSKI:
25   Q.  How about chromium-6?

Page 181

1        MR. BALZANO: Object to form. Vague.
2        MS. DAVIDSON: I think he's an expert on
3  ovarian cancer, if you want to ask him about --
4  also, wait a minute. These are precisely the
5  types of questions that our experts --
6        MR. LAPINSKI: Hang on one second.
7  Go off the record.
8        MS. DAVIDSON: No. You can't ask these
9  questions.
10       MR. LAPINSKI: I just asked if --
11       MS. DAVIDSON: I know, but they're not
12  okay. They could have been asked --
13       MR. LAPINSKI: Anthony --
14       MS. DAVIDSON: Anthony.
15  Right. Anthony can handle it.
16       MR. LAPINSKI: Anthony, tell me on the
17  record why. State your objection, and then
18  we'll go from there.
19       MR. BALZANO: I think it's outside the
20  scope. If we're going -- if you're going to
21  ask questions, you need to ask, did you form
22  any opinions on this since 2019.
23       MR. LAPINSKI: Okay.
24  BY MR. LAPINSKI:
25   Q.  Dr. Boyd, since 2019 have you formed any

46 (Pages 178 - 181)

Page 182

1 opinion as to whether or not chromium-6 is a
2 carcinogen?
3      MR. BALZANO:  Objection to form, vague.
4 Lacks foundation too.
5      THE WITNESS:  No.
6 BY MR. LAPINSKI:
7   Q.  Okay.  Dr. Boyd since 2019, have you
8 formed any opinion as to whether or not nickel is a
9 carcinogen?
10   A.  No.
11      MR. LAPINSKI:  Mark that as 17.
12      (Boyd Exhibit 17 was received and marked
13   for identification, as of this date.)
14 BY MR. LAPINSKI:
15   Q.  Dr. Boyd, you've been handed a document
16 that's been marked as Exhibit 17.  This is the
17 Amended Rule 26 Expert Report of Dr. Levy.
18      And this is a report that you've reviewed
19 and provided opinions on, starting on page 22 of
20 your report, correct?
21      MR. LAPINSKI:  Let's go off the record for
22   a second.
23      (A discussion was held off the record.)
24      MR. LAPINSKI:  Back on the record?
25

Page 183

1
2      (Boyd Exhibit 17 was received and marked
3   for identification, as of this date.)
4
5 BY MR. LAPINSKI:
6   Q.  So, Dr. Boyd, you have in front of you
7 Exhibit 17, which is the Amended Rule 26 Expert
8 Report of Dr. Shawn Levy, correct?
9   A.  Correct.
10   Q.  Okay.  And this report is a report you
11 have provided opinions on beginning on page 22 of
12 your report, correct?
13   A.  Correct.
14   Q.  Now, you state in your report that
15 Dr. Levy's CV left you troubled, to say the least;
16 is that correct?
17   A.  Correct.
18   Q.  Are you aware of the fact that Dr. Levy's
19 a Ph.D. in biochemistry?
20   A.  At this moment, no, but I'll take your
21 word for it.
22   Q.  Are you aware that Dr. Levy has a
23 postdoctorate fellowship in genetics at Emory
24 University?
25      MS. DAVIDSON:  (To the witness.)  Do you

Page 184

1 have the CV in front of you?
2      THE WITNESS:  No.
3      MS. DAVIDSON:  Why you don't put the CV in
4 front of him?  Then he'll be aware.
5      MR. LAPINSKI:  Because I don't have it
6 printed out.
7      MS. DAVIDSON:  You can't expect someone to
8 memorize someone's CV.
9      MR. LAPINSKI:  I'm asking him whether he's
10 aware.
11      MS. DAVIDSON:  Do you ask to print it out?
12 I don't think it's fair to ask him questions
13 about the whole CV.  If you want, we can go off
14 the record and we get it printed.
15      MR. LAPINSKI:  Okay.  Let's go off the
16 record, and you can print it for me.
17      (At 2:20 p.m. a recess was taken.)
18      (At 2:21 p.m. the deposition resumes.)
19      MR. LAPINSKI:  Okay.  Back on the record.
20 BY MR. LAPINSKI:
21   Q.  Dr. Boyd, you state in your report that
22 Dr. Levy's CV left you troubled to say the least,
23 correct?
24   A.  Yes.
25   Q.  And that opinion is based upon your review

Page 185

1 of his CV?
2   A.  Yes.
3   Q.  Okay.  And you state that of the 221
4 papers listed on his CV, he is first or last author
5 on only 14 of those papers, correct?
6   A.  Correct.
7   Q.  Okay.  And that's part of -- that forms
8 part of the basis as to why you're troubled by his
9 CV?
10   A.  Yes.
11   Q.  Is it your opinion that Dr. Levy is not
12 qualified to render genetic opinions?
13      MR. BALZANO:  Object to form.
14      THE WITNESS:  It's my opinion that
15   Dr. Levy has never authored or coauthored a
16   paper on ovarian cancer, so I would call into
17   question his qualifications for rendering an
18   opinion on ovarian cancer.
19 BY MR. LAPINSKI:
20   Q.  Are you familiar with who Dr. Saens is?
21   A.  Pardon me?
22   Q.  Saens, S-A-E-N-S.
23   A.  Dr. Cheryl Saens?  Yes.
24   Q.  Are you aware that Dr. Saens is giving
25 general causation opinions in this case?

47 (Pages 182 - 185)

Page 186

1      MR. BALZANO: Objection. Lacks
2  foundation, vague.
3      THE WITNESS: Yes.
4  BY MR. LAPINSKI:
5      Q. Are you aware that she's giving molecular
6  and genetic opinions in this case?
7      MR. BALZANO: Objection to form, vague.
8      MS. DAVIDSON: If you want, show him her
9  report.
10     MR. LAPINSKI: Just asking if he knows.
11     THE WITNESS: I honestly don't know since
12  I haven't read her expert report.
13     MS. DAVIDSON: Are you asking about her
14  post-2019 report?
15     MR. LAPINSKI: No, I'm asking her about
16  her report in general.
17     MS. DAVIDSON: This is not fair. This is
18  what they did to us. Every single question I
19  asked, if it wasn't post 2019, I was shut down.
20     I'm sorry. It's just "What's good for the
21  goose is good for the gander."
22     MR. LAPINSKI: I'm asking not about her
23  report. I'm asking about her qualifications.
24  I'm asking whether he's aware --
25     MS. DAVIDSON: Then after 2019, was he

Page 187

1  aware of Dr. Saens' qualifications? This was
2  done to me. It was painful.
3  BY MR. LAPINSKI:
4      Q. Are you aware of Dr. Saens'
5  qualifications?
6      MR. BALZANO: Object to form.
7      THE WITNESS: Yeah. She trained at my
8  lab, but I believe she's highly-qualified.
9  BY MR. LAPINSKI:
10     Q. Do you know how many papers she's been
11  first author on?
12     MR. BALZANO: I would object to the scope
13  of it. It should be limited to since 2019.
14     THE WITNESS: You mean first or first and
15  last?
16  BY MR. LAPINSKI:
17     Q. I started with first.
18     A. No, I'm not aware.
19     Q. Are you aware of how many papers she's
20  been the last author on?
21     MR. BALZANO: And would you rephrase the
22  question to include since 2019 since you
23  haven't asked that question?
24     MR. LAPINSKI: No. This has to do with
25  her qualifications. If you're going to -- if

Page 188

1  you're going to, for purposes of this
2  litigation, if you're going to rely only upon
3  what Dr. Saens has done since 2019, as far as
4  her qualifications, then I'll limit my
5  questions.
6      MR. BALZANO: No, we're not -- we're
7  not --
8      MR. LAPINSKI: Hang on. I'm not done.
9      As long as you make that representation
10  I'm happy to do that. I'm not talking about
11  her opinions and I'm not talking about opinions
12  she shared pre 2019 or post 2019.
13     This is a question in regard to her
14  qualifications.
15     MR. BALZANO: Yeah, but it has nothing to
16  do with whether or not -- I'm not going to make
17  any representation that we're not going to rely
18  on Dr. Seans' opinions or reports before 2019.
19     But the point of it is that the scope of
20  this deposition should be limited to anything
21  that you couldn't have asked him after his
22  first deposition in 2019. You could have asked
23  him in 2019 these questions about Dr. Saens,
24  but you didn't.
25     MS. DAVIDSON: It's --

Page 189

1      MR. LAPINSKI: Okay. But I -- hang on one
2  second.
3      But I couldn't ask of those questions in
4  context of Dr. Boyd's 2024 report and what he
5  has to say about Dr. Levy.
6      MR. BALZANO: I think it's outside the
7  scope of the supplemental report.
8      MR. LAPINSKI: It's not outside the scope
9  of the supplemental report in that he's -- he's
10  asking -- he's making statements about the
11  qualifications of Dr. Levy as an expert. I'm
12  trying to understand the bases for his -- for
13  his opinions on the qualifications, and I'm
14  trying to put that into context with other
15  doctors who are serving as experts in this
16  litigation.
17     It's not outside the scope. There's
18  nothing wrong with the question I'm asking. It
19  doesn't have to be limited from 2019 to present
20  because it has to do with his 2024 report.
21     MR. BALZANO: Then I'll just restate that
22  I think it's outside the scope of his
23  supplemental report, and it's been happening a
24  lot this deposition. I'm not throwing any
25  shade. I'm just saying sometimes I didn't

48 (Pages 186 - 189)

Page 190

1    catch it, but there has been plenty of times
2    where the question should have been phrased,
3    "since 2019," and they weren't.
4         MR. LAPINSKI:  All right.
5  BY MR. LAPINSKI:
6    Q.  In your report, Dr. Boyd, on page 25 you
7  state:
8         "Given the many errors in his report, it's
9  not surprising that the majority of Dr. Levy's
10 conclusion are false, misleading, or both."
11        Do you see that?
12   A.  Yes.
13   Q.  And then you have six different points
14 that you bring up in regard to that?
15   A.  Yes.
16   Q.  Okay.  The first one is:  "Inflammation
17 has been shown to play a vital role in epithelial
18 ovarian cancer," correct?
19   A.  Yes.  Yeah, the words are correct.
20   Q.  Okay.  And your opinion is that there's
21 absolutely no evidence that inflammation plays a
22 vital role in epithelial ovarian, cancer?
23        MR. BALZANO:  Object to form.
24        (To the witness.)  I would ask that you
25   just read what it says in that sentence, the

Page 191

1    next two sentences.
2         THE WITNESS:  My opinion is what follows
3    this -- the quotation.  "There is no evidence
4    that inflammation is involved in the initiation
5    or progression of ovarian cancer
6    carcinogenesis," in my opinion.
7  BY MR. LAPINSKI:
8    Q.  Do you agree that there's peer-reviewed
9  literature that contradicts your opinion?
10        MR. BALZANO:  Object to form.  Vague.
11   Lacks foundation.
12        THE WITNESS:  I disagree that there's
13   substantive literature that actually provides
14   actual data that inflammation plays a role in
15   epithelial ovarian cancer.  There's a multitude
16   of papers.  Indeed, there's a cottage industry
17   of publishing review articles and statements
18   representing other papers that reference other
19   papers, suggesting that inflammation plays a
20   role in ovarian cancer, when, in my opinion,
21   there's absolutely no solid scientific data to
22   support such a claim.
23 BY MR. LAPINSKI:
24   Q.  Have you reviewed any of the literature to
25 the contrary as it relates to talcum powder and

Page 192

1  chronic information?
2         MR. BALZANO:  Object to form and vague.
3         THE WITNESS:  Insofar as I've done
4    literature searches to search for papers that
5    link with respect to keywords "ovarian cancer
6    and inflammation."  I've looked at many, many
7    papers, and none of them have any bearing on my
8    opinion regarding this case.
9  BY MR. LAPINSKI:
10   Q.  We just talked about talcum powder.
11 You're aware of the plaintiffs' claim that J&J's
12 talcum powder products contain asbestos?
13        MR. BALZANO:  Object to form.  Lacks
14   foundation.
15        THE WITNESS:  I'm aware that plaintiffs
16   claim -- could you repeat the question so I
17   could repeat my answer?
18 BY MR. LAPINSKI:
19   Q.  Sure.
20        The claim that Johnson & Johnson's talcum
21 powder products contains asbestos --
22        MR. BALZANO:  I would object that it's
23   outside the scope.  This could have been asked
24   in the 2019 deposition.
25        I would ask that you somehow try to

Page 193

1  rephrase that too.
2         MR. LAPINSKI:  Well, I could have asked it
3    in 2019, but in 2019 he hadn't commented on
4    Dr. Levy.
5         So now I'm asking it now within the
6    context of him criticizing Dr. Levy.
7         MS. DAVIDSON:  If you would like to keep
8    it to his supplemental opinions or to some
9    post 2019 development, that's fine.
10        MR. LAPINSKI:  That's -- this bullet
11   number 2 is "Talcum powder products cause
12   chronic inflammation."
13        MS. DAVIDSON:  Well, that's not his bullet
14   number.
15        MR. LAPINSKI:  Well, it's -- "Given the
16   many errors in his report, it's not surprising
17   that the majority of Dr. Levy's conclusions are
18   false, misleading, or both.  Specifically,
19   number 2, "Talcum powder products cause
20   inflammation."
21        And I just finished asking questions about
22   talcum powder and chronic inflammation, and now
23   I just asked the question of whether or not he
24   was aware that J&J -- that plaintiffs are
25   claiming that J&J talcum powder products

49 (Pages 190 - 193)

Page 194

1    contain asbestos.
2        MS. DAVIDSON: That is not, in my opinion,
3    related to --
4        MR. LAPINSKI: No, you're not --
5        MS. DAVIDSON: I'm sorry. But plaintiffs
6    have been alleging that Johnson's Baby Powder
7    has asbestos since this timing --
8        MR. BALZANO: Before 2019 -- asbestos --
9        MS. DAVIDSON: That has nothing to do with
10   it. He does not address asbestos there, does
11   he, Anthony?
12       I'm sorry. I don't have it in front of
13   me. That is quite a stretch that -- to say
14   that somehow this brings asbestos within the
15   scope of his opinions. It does not, and that
16   question is improper.
17       MR. LAPINSKI: Okay. Your objection is
18   noted.
19   BY MR. LAPINSKI:
20   Q.  Doctor, you can answer the question.
21       MS. DAVIDSON: Cool. That's --
22       THE WITNESS: Are we on --
23       MS. DAVIDSON: -- it works.
24       THE WITNESS: Are we on number 2 now, in
25   terms of this list of --

Page 195

1        MR. BALZANO: I think the question of
2    whether or not Johnson & Johnson's Baby Powder
3    contains asbestos is outside the scope of this
4    deposition.
5        MS. DAVIDSON: Correct.
6        MR. BALZANO: It could have been asked in
7    2019, but there's certainly a plaintiffs'
8    theory in 2019 when Dr. Boyd was the first
9    deposed.
10   BY MR. LAPINSKI:
11   Q.  Dr. Boyd, since 2019, have you been aware
12   that plaintiffs claim that Johnson -- J&J's talcum
13   powder products contain asbestos?
14       THE WITNESS: Oh, have we moved away from
15   the report?
16   BY MR. LAPINSKI:
17   Q.  It's a question.
18       Since 2019, have you been aware that
19   plaintiffs claim that Johnson's Baby Powder products
20   contain asbestos?
21       MR. BALZANO: The question is -- I still
22   object because it still is getting -- that
23   question could have been asked. You're asking
24   if, since 2019, has there been continued
25   allegations --

Page 196

1        MR. LAPINSKI: I couldn't have asked that
2    in 2019 because I'm asking now about the last
3    five years.
4        MS. DAVIDSON: If you are asking a
5    question about what he's done since 2019,
6    that's different. If you are asking about a
7    question about literature he's reviewed since
8    2019, that's different. But you cannot ask him
9    a question about allegations relating to
10   asbestos because that's been in this litigation
11   since day one. And that is the same rules that
12   your co-counsel imposed on me when I was taking
13   depositions.
14       MR. BALZANO: But it's still just a
15   general question, but you're just trying to
16   frame it in the supplemental report.
17       MR. LAPINSKI: Correct. I'm framing it to
18   the supplemental report. That's what I'm
19   asking, since 2019. Because from 2019 until
20   the present, in order for him to be able to
21   render opinions in regard to Dr. Levy, I have
22   to understand, since 2019, what he's basing
23   those opinions on.
24       Jessica, I would agree with what you were
25   saying if Dr. Levy had rendered a report in

Page 197

1    2019 and Dr. Boyd had shared opinions in regard
2    to Dr. Levy's report in 2019. But that's not
3    the situation that we're in.
4        He's providing opinions on a report that
5    was submitted in 2023. He's criticizing a work
6    that was done by the expert.
7        MS. DAVIDSON: If there is language -- so
8    here's the deal. If there is something in
9    Dr. Levy's report from 2023 that Dr. Boyd is
10   addressing for the first time in 2023, and
11   there is language in here that you want to
12   point him to, then I think that that is
13   legitimate.
14       MR. LAPINSKI: Here's what I'm going to
15   do. Instead of just arguing for the point of
16   arguing, I'll just ask a different question,
17   okay?
18       MS. DAVIDSON: I'm really not trying to be
19   overly difficult. I was constrained in this
20   way, and I found it frustrating as hell.
21       MR. LAPINSKI: Jessica, sometimes you
22   don't have to try. You can just be difficult.
23   BY MR. LAPINSKI:
24   Q.  Dr. Boyd, would you agree that not all
25   women with BRCA1 or BRCA2 develop ovarian cancer?

50 (Pages 194 - 197)

Page 198

1    MR. BALZANO: Objection outside the scope.
2  I mean, these are just general questions.
3    MR. LAPINSKI: It's general question --
4  it's general question related to Dr. Levy's
5  opinion.
6    MR. BALZANO: In which that's point 3.
7  Which point would that relate to?
8    MR. LAPINSKI: Well, point 5 is
9  "Internalization of asbestiform fibers," --
10    MR. BALZANO: Right. Sorry.
11    MR. LAPINSKI: -- "including asbestos and
12  fibrous talc, causes DNA damage, which provides
13  a biologically plausible mechanism for
14  carcinogenicity of talcum powder products."
15    That was one of Dr. Levy's statements.
16  Dr. Levy made a statement about asbestos.
17  Dr. Levy made a statement about talc, fibrous
18  talc.
19    Dr. Boyd, post 2019, has provided an
20  opinion as it relates to that statement. He
21  says:
22    "This statement is misleading at best.
23  Because there is no evidence that talcum powder
24  causes DNA damage, the above statement is
25  irrelevant to biological plausibility related

Page 199

1  to talcum powder and ovarian carcinogenesis."
2  BY MR. LAPINSKI:
3    Q.  Now with number 5 in mind, Dr. Boyd, are
4  you aware the plaintiffs have been claiming that
5  there is asbestos in Johnson's Baby Powder?
6    MR. BALZANO: Object, because I think
7    that's where it goes too far. "Are you aware
8    plaintiffs are alleging." I think you can ask
9    about "Are you criticizing Dr. Levy's opinion
10    here?"
11    MR. LAPINSKI: Okay.
12  BY MR. LAPINSKI:
13    Q.  Dr. Boyd, in criticizing Dr. Levy, did you
14  take into consideration the presence of asbestos in
15  defendants' baby powder?
16    A.  I'm not aware that there is asbestos in
17  Johnson's Baby Powder.
18    Q.  In criticizing Dr. Levy, did you take into
19  the presence of fibrous talc in defendants' baby
20  powder?
21    MR. BALZANO: Object to form, lacks
22    foundation, vague.
23    THE WITNESS: I'm not aware that there is
24    fibrous talc in Johnson's Baby Powder.
25

Page 200

1  BY MR. LAPINSKI:
2    Q.  If there were fibrous talc in Johnson's
3  Baby Powder, would that change your opinion?
4    MR. BALZANO: Object to form, vague.
5    Lacks foundation.
6    THE WITNESS: No. I base my opinion on
7    whatever is in the bottle labeled "Johnson's
8    Baby Powder."
9  BY MR. LAPINSKI:
10    Q.  Okay. If there was asbestos in Johnson's
11  Baby Powder, would that change your opinion?
12    MR. BALZANO: Object to form. It had been
13    asked and answered. Vague.
14    THE WITNESS: No. I base my opinion on
15    whatever is in the bottle that is labeled
16    "Johnson's Baby Powder."
17  BY MR. LAPINSKI:
18    Q.  You base your opinion on what's in the
19  bottle or what it says on the label?
20    MR. BALZANO: Object to form, vague. I
21    mean --
22    THE WITNESS: I don't distinguish the two.
23  BY MR. LAPINSKI:
24    Q.  By not distinguishing the two, what you're
25  saying is, what it says on the bottle of Johnson's

Page 201

1  Baby Powder, that's what's contained in the bottle?
2    MR. BALZANO: Object. Mischaracterizes.
3    MR. LAPINSKI: I'm trying to get
4    clarification. I'm not trying to
5    mischaracterize. I'm trying to get
6    clarification as to what he means.
7    MS. DAVIDSON: Why don't you explain what
8    you meant by that.
9    Why don't explain to him what you meant by
10    your statement so we can move on.
11    THE WITNESS: My opinion is that a bottle
12    that says Johnson's Baby Powder -- Johnson &
13    Johnson's Baby Powder contains Johnson &
14    Johnson's Baby Powder.
15  BY MR. LAPINSKI:
16    Q.  And if the ingredients say only talcum
17  powder, then you're going on the assumption that
18  there's only talcum powder contained in that bottle?
19    MR. BALZANO: Object to form.
20    THE WITNESS: I'm not aware of the
21    ingredients that are listed on the bottle, but
22    if it says "talcum powder," then I'm going on
23    that assumption, yes.
24  BY MR. LAPINSKI:
25    Q.  Your sixth statement in regard to Dr. Levy

51 (Pages 198 - 201)

Page 202

1  says:
2       "Women with inherited gene mutations in
3  genes involved in DNA repair, such as BRCA1 or
4  BRCA2, are more susceptible to the effect of
5  carcinogens than women without inherited gene
6  mutations."
7       Other than me leaving out the sic
8  reference, did I read that correctly?
9    A.  Yes.
10      MS. DAVIDSON:  I just want to make
11  something clear.  You're reading statements as
12  though he said them, and I think it's important
13  to hear that these are statements he's
14  disagreeing with.
15      MR. BALZANO:  I just read a statement and
16  asked question whether it is correct.
17      My next question is going to be reading
18  what he says next.
19      MS. DAVIDSON:  But you're reading these
20  statements out of context.
21      MR. LAPINSKI:  Jessica, I'm not --
22      MS. DAVIDSON:  These are statements that
23  he says he's quoting.
24      MR. LAPINSKI:  Jessica --
25      Anthony, what do you have to say about it?

Page 203

1       MS. DAVIDSON:  It's misleading.
2       MR. LAPINSKI:  If you need to go off the
3  record and confer with Jessica, we can go off
4  the record.
5       Otherwise, state your objection, Jessica.
6  Enough, okay?
7       MR. BALZANO:  It needs to be clear that
8  you read that correctly.  It's not that he
9  agrees with the statement you said.  It was
10  read --
11      MR. LAPINSKI:  That's what I asked.
12      MR. BALZANO:  That's the statement was
13  asked, but it's criticizing Levy.  It's from
14  Levy.
15      MR. LAPINSKI:  Listen.
16 BY MR. LAPINSKI:
17   Q.  Dr. Boyd, page 26 of your report, number 6
18  of your criticisms of Dr. Levy state:
19      "Women with inherited gene mutations in
20  genes involved DNA repair, such as BRCA1 or BRCA2,
21  are more susceptible to the effect of carcinogens
22  than women without inherited gene mutations."
23      Doctor, did I read that correctly?
24      MR. BALZANO:  I would just object --
25      MR. LAPINSKI:  Anthony, just let me ask my

Page 204

1  question.  Your objection is noted.
2       MS. DAVIDSON:  No.
3       MR. BALZANO:  Yeah, no, you did ask the
4  question.  I think I will only, and I think
5  it's such a helpful add, is that you quote
6  Dr. Levy when you write.
7       Just so that's in the question.
8       THE WITNESS:  Like you are quoting
9  Dr. Levy, and then --
10      MS. DAVIDSON:  The way you're asking the
11  question is misleading.
12      MR. LAPINSKI:  I understand how I'm asking
13  the question.  I don't think it's misleading.
14 BY MR. LAPINSKI:
15   Q.  Did I read that correctly, Dr. Boyd?
16   A.  You read Dr. Levy's statement, correct,
17 yes.
18   Q.  So the next thing that it says is that you
19 believe that statement is misleading, correct?
20   A.  Yes.
21   Q.  Do you agree that not all women with BRCA1
22 develop ovarian cancer?
23      MR. BALZANO:  I would object, again.  This
24 is, again, outside the scope.
25      MR. LAPINSKI:  How is it outside the scope

Page 205

1  when Dr. Levy talks about BRCA1 and BRCA2 in
2  his 2024 report.  And in Dr. Boyd's 2024
3  report, he also talks about BRCA1 and BRCA2?
4       How could a question about BRCA1 then be
5  out outside the scope?  You're just being
6  obstructive now.  This is getting a little
7  ridiculous.
8       MR. BALZANO:  No, I'm not.  I mean -- so I
9  take -- I mean, it's because --
10      The first question is fine.  The first
11  question is, this is criticizing Dr. Levy.
12      And you're asking, Dr. Levy says that, you
13  think that's misleading, right?
14      But then you're going on to ask general
15  questions about BRCA that should have been
16  asked in 2019.
17      MR. LAPINSKI:  How can I ask them in 2019
18  if I didn't know what his opinion in 2024 was
19  going to be?  That's absurd.
20      Jessica, I have the right to be able to
21  ask questions that lay a foundation, okay?
22      If he said something about BRCA1 and BRCA2
23  in 2019 report, which I don't necessarily agree
24  that he did, I still have the right to be able
25  to ask a question to lay the foundation for his

52 (Pages 202 - 205)

Page 206

1  2024 opinions.
2      The position that you're taking on this is
3  out there.
4      MR. BALZANO:  On page 2 of his 2019
5  report, he says:
6      "Among the few accepted significant risk
7  factors for ovarian cancer," then he talks
8  about BRCA1 and BRCA2.
9      MR. LAPINSKI:  Okay.  So he talked about
10 BRCA1 and BRCA2.
11 BY MR. LAPINSKI:
12     Q.  And now within the context of what
13 Dr. Levy said, I want to understand, since 2019,
14 Dr. Boyd, would you agree that not all women with
15 BRCA1 develop ovarian cancer?
16     A.  Yes.  The penetrance of BRCA1 or BRCA2 is
17 not 100 percent in any woman with breast or ovarian
18 cancer.
19     Q.  Would you also agree that women with Lynch
20 syndrome do not develop -- all women with Lynch
21 syndrome do not develop ovarian cancer?
22     MR. BALZANO:  I would object again.  So
23 this is outside the scope.  Could have been
24 asked in his 2019 deposition.  These are
25 general questions.

Page 207

1  BY MR. LAPINSKI:
2      Q.  Dr. Boyd, since 2019, would you agree that
3  not all women with Lynch syndrome develop ovarian
4  cancer?
5      A.  Well, you don't have the syndrome until
6  you have cancer, but I would suggest that the four
7  genes responsible for Lynch syndrome are now a
8  100 percent penetrant for ovarian cancer.
9      Q.  Is it your opinion that women with
10 inherited mutations are not susceptible to other
11 carcinogens?
12     MR. BALZANO:  I mean, I object to that.  I
13 mean, that's totally -- I mean, his whole --
14 his entire first report, it's all about
15 genetics.  You could have totally asked --
16 these are general questions.  These are not
17 questions limited to --
18 BY MR. LAPINSKI:
19     Q.  Dr. Boyd, as it relates to your criticism
20 of Dr. Levy, is it your opinion that women with
21 inherited mutations are not susceptible to other
22 carcinogens?
23     MR. BALZANO:  Object to form, vague.
24     A.  That's not my criticism in number 6.  My
25 criticism is that Dr. Levy says:

Page 208

1      "Women with inherited gene mutations, such
2  as BRCA1 and BRCA2, are more susceptible to the
3  effect of carcinogens."
4      And I completely disagree with that
5  statement.
6  BY MR. LAPINSKI:
7      Q.  Is part of your opinion based upon a
8  belief that women with inherited mutations are not
9  susceptible to other carcinogens?
10     MR. BALZANO:  Object to form, vague.
11     THE WITNESS:  That's not the statement I'm
12 disagreeing.  It is number 6.
13 BY MR. LAPINSKI:
14     Q.  I'm not asking you about a statement that
15 you're agreeing or disagreeing with.  I'm asking you
16 whether or not the basis of your opinion, part of
17 the basis of your opinion and criticism is based
18 upon the fact that women with inherited mutations
19 are not susceptible to other carcinogens?
20     MR. BALZANO:  Object to form.  So it's
21 related to the critics of criticism 6?
22     MR. LAPINSKI:  Correct.
23     MR. BALZANO:  Okay.  I think it was asked
24 and answered already, but...
25     THE WITNESS:  It's a very difficult

Page 209

1  question to answer because it's too generally
2  broad.  All of us are susceptible to
3  carcinogens under certain circumstances.  If
4  women with BRCA1 or BRCA2 mutations work in an
5  asbestos mill, then they may be susceptible to
6  mesothelioma, for example.
7      MR. LAPINSKI:  Go off the record for one
8  minute.
9      MS. DAVIDSON:  You have one minute left on
10 record.
11     (At 2:45 p.m. a recess was taken.)
12     (At 2:48 p.m. the deposition resumes.)
13 BY MR. LAPINSKI:
14     Q.  Dr. Boyd, I'm going to ask you to look at
15 Exhibit 18 first.
16     (Boyd Exhibit 18 was received and marked
17 for identification, as of this date.)
18     THE WITNESS:  (Witness complies.)
19 BY MR. LAPINSKI:
20     Q.  And Exhibit 18 is an article that was
21 published by Mandarino entitled:
22     "The effect of talc particles and
23 phagocytes in co-culture with ovarian cancer cells,"
24 is that correct?
25     A.  That's the title of the paper, correct.

53 (Pages 206 - 209)

Page 210

1    Q.  Okay.  And the paper that you have in
2 front of you, which is Exhibit 18, is that the paper
3 that you opined on, on page 17 of your expert
4 report?
5    A.  I'll assume that it is.
6    Q.  I'd like you to give me a yes or no as
7 compared to an assumption.
8    A.  Eighteen, in fact, is actually Henrietta.
9 Mandarino is on page 17.
10    Q.  And on page 18 of your report, you cite to
11 an article by Emi, entitled "Transcriptomic and
12 epigenomic effects of insoluble particles on J774
13 macrophages."
14    Do you see that in your report on page 7
15 of Exhibit 18?
16    A.  Yes.
17    Q.  And the paper that you are opining on, on
18 page 18 from Emi, is that in front of you and has
19 been marked as Exhibit 17?
20    A.  It's actually 18 -- no, I'm sorry.  I'm --
21 we're going back forth.
22    Emi is Exhibit 17, correct.
23    MR. LAPINSKI:  Okay.
24    MR. BALZANO:  I think we're at the
25    four hours, but we'll give a little leeway.

Page 211

1    MR. LAPINSKI:  I just wanted to stall to
2 be able to go over the four hours.
3    I have no other questions.
4    MR. BALZANO:  Final transcript.  We'll
5 take a rough draft.
6
7
8    (Time noted:  2:51 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 212

1    I N D E X
2 Examination of:              Page
3 Jeff Boyd, Ph.D.
4
5    C O N T E N T S
6 MR. LAPINSKI                      5
7
8    E X H I B I T S
9    (Retained by the court reporter)
10 DEPOSITION    EXHIBIT         PAGE
11 Exhibit 1  Amended Notice of Oral Deposition    8
12 Exhibit 2  Invoice                9
13 Exhibit 3  Invoice               10
14 Exhibit 4  Invoice               10
15 Exhibit 5  Dr. Boyd's CV              47
16 Exhibit 6  Dr. Boyd's February 2019 Report    52
17 Exhibit 7  Dr. Boyd's Supplemental Report     53
18 Exhibit 8  Additional Materials List        59
19 Exhibit 9  SGO Poster               100
20 Exhibit 10  Cell Transformation Assay Kit     110
       product guide
21
   Exhibit 11  O'Brien 2024 Study          144
22
   Exhibit 12  April 2021 Health Canada Report    148
23
   Exhibit 13  IARC's Website Printout        150
24
   Exhibit 14  Lancet Oncology Article        152
25

Page 213

1    E X H I B I T S (CONT'D)
2    (Retained by the court reporter)
3 Exhibit 15  SRI Poster             166
4 Exhibit 16  Harper/Saed Journal Article    175
5 Exhibit 17  Dr. Levy's Amended Report      182
6 Exhibit 17  Amended Rule 26 Expert Report of Dr. 183
       Shawn Levy
7
   Exhibit 18  Mandarino Article          209
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

54 (Pages 210 - 213)

Page 214

```
 1
 2              CERTIFICATE
 3  STATE OF NEW JERSEY)
 4              :  ss
 5       I, Angela M. Shaw-Crockett, a Certified Court
 6  Reporter, Registered Merit Reporter and Notary Public within
 7  and for the States of New York, New Jersey and Connecticut,
 8  do hereby certify that prior to the commencement of the
 9  examination, JEFF BOYD, Ph.D. was duly sworn by me to
10  testify to the truth, the whole truth and nothing but the
11  truth.
12       I DO FURTHER CERTIFY that the foregoing is a
13  verbatim transcript of the testimony as taken
14  stenographically by me at the time, place and on the date
15  hereinbefore set forth, to the best of my ability.  Witness
16  will read and sign.
17       I DO FURTHER CERTIFY that I am neither a relative
18  nor employee nor attorney nor counsel of any of the parties
19  to this action, and that I am neither a relative nor
20  employ                        nsel, and that I am not
21  financi                              n.
22
23  ----------------------------------------
    ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR
24  LICENSE NO. XI00218400
    Notary Public
25  Dated:
```

Page 215

```
 1  NAME OF CASE:  Talcum Powder Litigation MDL No. 2738 v.
    Johnson & Johnson
 2
 3  DATE OF DEPOSITION:  July 19, 2024
 4  NAME OF WITNESS:  Jeff Boyd, Ph.D.
 5  Reason Codes:
 6    1. To clarify the record.
      2. To conform to the facts.
 7    3. To correct transcription errors.
 8  Page _____ Line _____ Reason _____
    From _____ to _____
 9
10  Page _____ Line _____ Reason _____
    From _____ to _____
11
12  Page _____ Line _____ Reason _____
    From _____ to _____
13
14  Page _____ Line _____ Reason _____
    From _____ to _____
15
16  Page _____ Line _____ Reason _____
    From _____ to _____
17
18  Page _____ Line _____ Reason _____
    From _____ to _____
19
20  Page _____ Line _____ Reason _____
    From _____ to _____
21
22  Page _____ Line _____ Reason _____
    From _____ to _____
23
24    _____
    -     JEFF BOYD, Ph.D.
25
```

**[& - 2019]**                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**   1:4 3:16 4:9 4:11,17 6:18 10:19 21:3 26:16 45:20 177:22 192:20 195:2 201:12 201:13 215:1 | **11**   130:1,14,25 144:9,13 159:10 169:9,9 212:21 | **17**   27:21 182:11 182:12,16 183:2,7 210:3,9 210:19,22 213:5,6 | **20006**   3:17 **2000s**   112:10 **2012**   178:22 **2017**   82:6 **2019**   49:9 50:22 51:7,10,13,16 51:20 52:1,15 52:18,19,20,24 |

**0**

**0**   130:10,10 131:1,1
**08002**   3:4 4:18

**1**

**1**   8:3,7 28:12,13 42:8 48:1 62:15 63:5 80:8 114:1 156:22 157:2 157:12,20,22 157:24 158:2 212:11 215:6
**10**   20:16 27:19 110:22 111:1 111:14,16 135:14 166:20 212:13,14,20
**100**   130:2 206:17 207:8 212:19
**10001**   4:12
**100c**   157:12,20
**101**   3:4
**10:37**   47:16
**10:47**   47:17

**110**   212:20
**11:27**   79:15
**11:40**   79:16
**12**   84:7,9 148:5 148:10 169:10 212:22
**12/18/23**   35:5
**12:47**   132:8
**13**   145:25 150:2 150:3,7 212:23
**130**   3:9
**14**   10:23 22:6 152:3,7 164:20 176:9 185:5 212:24
**144**   212:21
**148**   212:22
**15**   27:20 63:16 121:4,5 135:13 166:11,14 213:3
**150**   212:23
**152**   212:24
**16**   57:15 88:17 88:19 89:4 161:16 175:21 175:25,25 213:4
**16-2738**   1:5
**1600**   3:10
**166**   213:3

**175**   213:4
**18**   25:25 26:5 27:22,24 34:21 34:22 209:15 209:16,20 210:2,10,15,18 210:20 213:7
**182**   213:5
**1825**   3:16
**183**   213:6
**18th**   3:9
**19**   1:12 2:2 28:1 215:3
**19103**   3:10
**1990s**   112:10
**1:13**   132:10

**2**

**2**   9:10,12,13 10:12,16,17,21 61:7,9,9 62:10 62:14 99:9,12 101:4 147:8 149:12 158:6 166:20 167:1 193:11,19 194:24 206:4 212:12 215:6
**20**   50:1 111:4 130:1 131:1

53:19,23 54:19 55:2,6,9,15,20 56:3,6,18,22 60:25 86:20,25 87:11 93:20 94:3,11,12,24 95:10 96:5,19 96:21,24 97:2 102:14 103:4 137:6 178:11 178:14,18,18 179:7,15 181:22,25 182:7 186:14 186:19,25 187:13,22 188:3,12,12,18 188:22,23 189:19 190:3 192:24 193:3,3 193:9 194:8 195:7,8,11,18 195:24 196:2,5 196:8,19,19,22 197:1,2 198:19 205:16,17,23 206:4,13,24 207:2 212:16

**[2020 - 6]**

**2020** 18:12,25
19:10 79:24
82:6 83:23
84:22 86:15
88:24 90:1,1,1
90:11 99:11,17
99:21 100:4,21
101:2,10,22
102:2,16,17,18
102:23 103:4
103:12 104:21
110:12 129:22
139:24 143:14
162:12 166:23
167:3 169:7
**2021** 10:20,22
10:23 11:3 12:4
12:16 13:19
14:21 15:12
18:13 19:4,19
22:6,22 24:5,8
24:9 85:7 86:5
86:10 101:6,9
101:20,22
102:1 103:9,12
103:16,23
119:15 143:14
147:21 148:11
166:9,18,22
167:2 168:6,14
212:22
**2023** 26:5 33:5
48:1 63:17
197:5,9,10
**2024** 1:12 2:2
25:25 26:6

27:17 29:23
30:10 35:16,24
36:1,24 41:25
43:21 44:6,10
44:18 46:8
47:11 53:1,15
53:19,22 54:8
57:2,21 60:17
60:22 79:19
143:18 144:14
145:12,19
151:19 154:16
154:19 161:16
189:4,20 205:2
205:2,18 206:1
212:21 215:3
**209** 213:7
**210** 3:3
**218** 4:3
**22** 182:19
183:11
**221** 185:3
**23** 10:22 11:2
14:21 28:3,20
29:23 30:10,16
31:1 33:5,23
34:6 35:1 101:6
101:9,14,20
102:1 103:16
**23rd** 15:3 16:21
**24** 28:5 34:6
47:9,11 53:1,15
53:19,22 60:9
60:21 79:19
137:7 149:12

**24th** 15:3 16:22
60:23 63:22
**25** 28:6,21 34:7
35:1 112:11
190:6
**25th** 15:3 16:22
**26** 24:9 32:10
33:9 182:17
183:7 203:17
213:6
**2738** 215:1
**28** 28:7
**297** 100:18
**2:09** 175:19
**2:11** 175:20
**2:20** 184:17
**2:21** 184:18
**2:45** 209:11
**2:48** 209:12
**2:51** 211:8
**2nd** 9:5,6 28:14

**3**

**3** 4:17 9:23,24
10:12 24:2,4
54:8 62:16
64:18,20 72:13
113:19 198:6
212:13 215:7
**30** 172:2
**31** 28:9 35:24
36:1,24 37:6
41:17,20,25
**310** 4:18
**34** 131:20

**36104** 4:4
**38** 143:13,13
**3944** 214:22
**395** 4:12
**3rd** 153:13

**4**

**4** 10:1,2,12
25:22,24 26:6
28:16 43:20,21
44:5,6,10,18,21
45:3,13 46:8
79:6,6,20,22,23
80:8 83:17,19
104:18 212:14
**40** 172:3
**41** 45:18,25
46:9,12,16
**47** 212:15

**5**

**5** 8:19 47:21,22
83:15 84:18
85:1 86:12
131:23 153:16
154:15 198:8
199:3 212:6,15
**50** 173:5,17
**500** 130:2
**52** 212:16
**53** 212:17
**54** 169:25,25
**59** 212:18

**6**

**6** 51:24 52:6,11
53:11 87:23

[6 - additional]                                                                    Page 3

97:23 109:25
135:7,8,16
180:25 182:1
203:17 207:24
208:12,21
212:16
**6786619**  1:18

**7**

**7**  53:5,6,13,14
57:4 79:19
109:21 110:9
117:2 120:14
137:15 210:14
212:17
**70**  173:6,17
**700**  3:17
**72**  109:23
120:15 137:16
138:3,10,10
139:4,6 163:2,4
164:14
**743**  83:24

**8**

**8**  35:16 59:13
59:18 60:20
121:10 126:15
128:5 212:11
212:18
**842**  83:22
**88**  84:2,4

**9**

**9**  19:19 27:17
100:10,11,14
105:14,17

139:21 142:25
143:1 163:22
212:12,19
**9/23/2021**  11:23
**90**  173:6,8,12
173:18,21
**93**  158:14
**9:51**  2:3
**9th**  4:12

**a**

**a.m.**  2:3 47:16
47:17 79:15,16
**ab235698**  111:9
**abcam**  111:10
120:5
**abide**  12:11
21:18,20
**ability**  214:15
**able**  7:10,12,23
9:7 12:25 16:17
42:19 52:17
53:12 65:5
67:10 68:20
96:1 136:19,22
138:9,20 139:9
196:20 205:20
205:24 211:2
**above**  167:3
198:24
**absolutely**
141:8 190:21
191:21
**abstract**  14:23
16:24 17:9
79:24 80:1

84:10 90:2,5,10
90:12,23 91:3,8
91:10,14,17
92:3,11,13,21
92:24 99:10,16
99:19 101:1,10
101:21 103:5
104:21 107:19
139:24
**abstracts**  82:20
83:8,23 84:9
91:20,21,23,24
92:17
**absurd**  18:3,5
205:19
**academic**  65:3
**acceptable**
94:24
**acceptance**
83:21
**accepted**  70:18
71:7 82:10,17
83:13,24 84:4
93:10 97:12
140:11,24
206:6
**access**  83:8
**accomplish**
175:1
**accomplished**
154:5
**accumulation**
125:6
**accurate**
163:15 164:9

**achieve**  110:16
**acknowledged**
154:7
**acknowledging**
80:14 151:16
**acquired**
124:10
**acquisition**
114:10 125:6
**action**  214:19
214:21
**active**  50:4
134:11
**activities**  86:21
**activity**  151:4
**actual**  37:20
76:7 191:14
**actually**  15:3
52:2 60:5 70:24
84:24 93:7
147:5,24
154:23 191:13
210:8,20
**add**  23:12 48:9
85:22 153:11
204:5
**added**  153:5
**adding**  167:4
**addition**  137:23
138:1 165:11
169:6
**additional**
19:20 20:3,17
44:17 46:9
55:16,19 57:9
57:12,20 60:2,8

[additional - anthony]                                                      Page 4

60:13,15,21
81:9 110:11
154:1 161:16
165:12,14,24
166:4,5,6
212:18
**additionally**
139:25
**address** 194:10
**addresses** 56:15
56:17
**addressing**
84:22 197:10
**adenomas**
123:21
**adopted** 150:17
**adopts** 53:19,22
54:6
**advance** 8:23
9:4
**advertisement**
115:1
**affiliated** 86:9
**aforementioned**
28:9
**agar** 121:19
**agency** 149:18
150:14,25
151:16
**agent** 138:4
146:5
**aggregate**
91:20,22
**ago** 13:19,20
15:9 17:18 18:1
20:24,25

112:11,17
177:23
**agree** 15:6
32:14 50:10,14
70:6 71:16
73:12,20,22
74:1,6,8 75:4
76:23 80:14,15
97:25 98:4
108:2,3 113:24
114:5,14,20
115:8,19
118:13 126:8
127:4,6,12,14
127:15,17,21
147:2,3,15,16
150:21 151:5
158:21 159:5
160:2,3,4,7,8
160:11 191:8
196:24 197:24
204:21 205:23
206:14,19
207:2
**agreeing**
208:15
**agreement**
54:24
**agrees** 203:9
**ahead** 59:11
174:19
**al** 24:15 25:5
27:15 86:20
**alabama** 4:4
**allegations**
195:25 196:9

**alleging** 194:6
199:8
**allen** 4:3
**allow** 145:24
**allowed** 162:1
**alteration**
114:11
**alterations**
118:24 124:9,9
125:7 126:5
**altered** 86:21
118:22
**alters** 160:1,14
**amended** 8:8
63:12,17,21
64:1,4,7,10,13
64:15 182:17
183:7 212:11
213:5,6
**amends** 56:21
**amount** 93:24
122:22 137:18
162:16
**amounts**
177:12 178:1
**analysis** 155:18
169:11 173:7
**analyzing**
146:7
**anapol** 3:9
**anapolweiss....**
3:12
**anatomic** 49:3
**anchorage**
115:20 121:11
121:16,20

122:16 126:19
127:7
**angela** 1:17 2:6
214:5,23
**animal** 117:23
118:7,18 119:8
**animals** 117:21
119:12
**anne** 63:7,16,20
**annual** 80:3
82:11,12,21
83:23 90:5
91:19 92:18,24
99:20 168:24
**answer** 13:23
14:6 29:6,8
32:2,3 34:4,18
35:2 49:12 54:3
54:4 57:9 69:23
86:3 94:15
95:24 121:1,5,6
136:10 174:19
177:3 192:17
194:20 209:1
**answered** 42:25
43:8 70:21,23
76:16 83:1,3
90:19 104:4
122:19 136:15
166:7 177:19
200:13 208:24
**anthony** 4:14
6:8 12:1,8,9,23
12:23 21:15,18
41:8 130:23
135:12 162:6,7

**[anthony - assay]** Page 5

181:13,14,15
181:16 194:11
202:25 203:25
**anthony's** 40:3
40:6,13 162:8
**anthony.balz...**
4:15
**anyway** 52:5
**apart** 104:10
165:17
**apologize** 5:13
140:20
**apparently**
103:24 170:18
**appear** 10:20
13:13 28:15
116:18 157:24
**appeared** 57:20
**appearing** 3:12
3:19 4:7,20
**appears** 126:18
**application**
130:17 163:12
**applied** 93:25
**appreciate** 22:1
**approach** 93:14
**appropriate**
32:17 41:6 97:6
134:3
**approximate**
91:16
**approximately**
6:17,20 45:11
46:15 112:8,11
**april** 25:25 26:6
28:12,13,14,16

42:8 43:21 44:6
44:10,18,21
45:3,13 46:8
147:21 148:11
212:22
**area** 145:23
146:20
**arguing** 197:15
197:16
**argumentative**
12:19
**arps** 4:11
**arsenic** 179:23
**article** 24:21
25:6,9,11,18
52:20 54:18
55:6 57:21
61:21,24 66:15
66:18 69:4,6,13
70:3,3 77:24
143:14,14
146:9 152:7
154:15 155:1
157:15,16
158:7,24
171:23 176:1,4
176:5 209:20
210:11 212:24
213:4,7
**articles** 58:25
59:6,8 65:6
67:10 68:21,25
73:13,23,23
74:2,7,9,19
76:13,18,24
77:10,12,14,19

77:21 191:17
**asbestiform**
198:9
**asbestos** 146:22
156:10,21
157:1,10,12,18
157:20,22,23
157:25 158:1,3
177:6,13,16,25
178:1,6,16,20
178:22 192:12
192:21 194:1,7
194:8,10,14
195:3,13,20
196:10 198:11
198:16 199:5
199:14,16
200:10 209:5
**ashcraft** 3:16
**ashcraftlaw.c...**
3:19
**aside** 52:18
**asked** 29:14
37:12 38:14,23
39:8,14,19,20
41:2 42:24 43:8
43:12,16 49:9
51:10 70:20,22
82:25 83:2
90:18 99:15
104:3 122:18
136:14 177:19
181:10,12
186:19 187:23
188:21,22
192:23 193:2

193:23 195:6
195:23 196:1
200:13 202:16
203:11,13
205:16 206:24
207:15 208:23
**asking** 11:12,13
11:15 15:7
17:23 20:23
26:10 31:13,14
31:15 33:20
36:19 46:19
76:1 127:13,14
127:16,21
131:8 155:15
166:3,5 174:16
174:17 175:9
180:18,19
184:9 186:10
186:13,15,22
186:23,24
189:10,18
193:5,21
195:23 196:2,4
196:6,19
204:10,12
205:12 208:14
208:15
**asks** 120:25
**aspect** 99:3
**aspects** 131:11
145:1
**assay** 110:13,15
110:17 111:2,7
111:12,17,20
111:22,23,25

112:3,5,16,23
112:24 113:14
120:5 126:16
131:11 138:2
212:20
**assays** 114:14
114:21
**assert** 37:18
169:12
**assertion**
142:16 143:7
**assessed** 158:13
170:24
**assessing**
173:19
**assessment**
148:24 167:5,9
**assistance**
33:20
**associate** 64:22
154:10
**associated**
61:17 77:13
106:22,23
125:17 150:18
162:13
**association**
106:14,19,25
107:6,8 108:7
109:14 140:4
146:14 147:10
148:25 164:19
**associations**
158:15
**assume** 11:7
42:14 43:1

71:22 210:5
**assumption**
11:19 36:18
42:16 91:6
201:17,23
210:7
**assumptions**
142:11
**atlantic** 5:18
43:6 44:15
**attached**
116:24
**attempt** 67:25
76:4
**attempted** 99:5
**attempting**
76:18 107:2
**attending**
135:10
**attorney** 3:2,8
3:15 4:2,9 5:7
12:1,8,23 14:9
35:6 214:18,20
**attorneys** 12:14
**august** 48:1
**author** 185:4
187:11,20
**authored** 176:1
185:15
**authors** 55:17
55:19 57:11
65:5 67:10,25
173:3
**availability**
112:16

**available**
102:11 112:18
158:13 161:7
**avenue** 4:12
**aware** 5:15,19
43:4 92:2,12,21
94:11,22 95:9
113:13 134:13
135:24 136:4
136:10 143:17
143:20 151:19
151:24 161:10
177:5,10,15
178:23 183:18
183:22 184:4
184:10 185:24
186:5,24 187:1
187:4,18,19
192:11,15
193:24 195:11
195:18 199:4,7
199:16,23
201:20

**b**

**b** 212:8 213:1
**baby** 177:6,11
177:16 178:2
178:24 179:4
179:17 194:6
195:2,19 199:5
199:15,17,19
199:24 200:3,8
200:11,16
201:1,12,13,14

**back** 14:8 28:20
33:16 34:5,19
35:23 41:25
47:19 55:14
56:20 70:25
72:12 79:19
83:11 88:17
95:20,21 99:9
109:25 121:22
133:5 157:14
168:1 172:2
182:24 184:19
210:21
**backwards**
93:7 97:19
**bag** 28:10
**balderamma**
42:9
**balderrama**
36:11 42:12,22
**balderrama's**
43:14
**balzano** 4:14
6:6,11 9:17,22
13:10,17 14:17
15:7 16:1,7
17:2,10,17,22
18:16,23 19:5
19:11,25 20:4
20:11,21 21:23
22:2,9 23:5,11
24:10,17,24
25:8,13,19 26:1
26:21 27:3
28:25 29:11,16
30:6,12,18

**[balzano - belief]**                                           Page 7

| | | | |
|---|---|---|---|
| 31:10,21 33:25 | 115:22 116:13 | 171:18 172:8 | 99:25 113:11 |
| 35:12,20,25 | 117:3,10,17 | 172:15 174:4 | 131:3 133:22 |
| 36:9 37:9 38:11 | 118:1,9 119:19 | 174:14 175:6 | 138:11,17 |
| 38:17 39:3,12 | 120:7,22 | 175:12 176:14 | 158:13 159:23 |
| 39:21 41:20,22 | 122:11,18 | 176:19 177:7 | 173:13,22 |
| 42:5,13,24 43:7 | 123:2,11 124:2 | 177:17 178:8 | 177:22 180:14 |
| 45:21 46:18 | 124:17 125:2 | 178:25 179:6 | 184:25 208:7 |
| 48:15 49:7 | 125:14,25 | 179:18 180:1,6 | 208:17 |
| 50:13,20 51:5 | 126:10,21,24 | 180:21 181:1 | **baselines** 173:5 |
| 52:2 53:24 | 127:9,18 | 181:19 182:3 | **bases** 160:19 |
| 55:10 56:4 57:7 | 128:23 129:3 | 185:13 186:1,7 | 189:12 |
| 58:18 59:2,10 | 129:18 130:20 | 187:6,12,21 | **basic** 130:8 |
| 59:24 62:11 | 131:16 134:6 | 188:6,15 189:6 | **basing** 65:15 |
| 66:8 67:14 69:8 | 134:16,21 | 189:21 190:23 | 67:11 196:22 |
| 69:14,22 70:9 | 135:6 136:3,14 | 191:10 192:2 | **basis** 16:9 18:5 |
| 70:14,22 71:15 | 136:24 137:12 | 192:13,22 | 33:11 66:20 |
| 71:21 72:9 | 137:20 138:22 | 194:8 195:1,6 | 68:17 138:9 |
| 73:15 74:3,11 | 139:16 141:13 | 195:21 196:14 | 185:8 208:16 |
| 75:3,21 76:14 | 141:19 143:1 | 198:1,6,10 | 208:17 |
| 77:1,7,16,22 | 144:17,24 | 199:6,21 200:4 | **bat** 5:12 |
| 78:6,15 79:2 | 145:13 146:10 | 200:12,20 | **bearing** 192:7 |
| 80:22 81:5,18 | 148:16,23 | 201:2,19 | **beasley** 4:3 |
| 81:24 82:18 | 149:6,23 | 202:15 203:7 | **beasleyallen....** |
| 83:2 84:12 88:3 | 151:13 152:2 | 203:12,24 | 4:6,6 |
| 88:18 90:18 | 152:19 153:13 | 204:3,23 205:8 | **becoming** 6:2 |
| 91:9 92:5,14 | 153:15 154:22 | 206:4,22 | 114:12 124:10 |
| 94:14,25 95:12 | 155:13 156:4 | 207:12,23 | **beginning** 26:5 |
| 96:7,18 98:12 | 157:3 159:7 | 208:10,20,23 | 103:23 146:1 |
| 98:22 101:12 | 160:3,21 | 210:24 211:4 | 173:2 176:21 |
| 102:3 103:2 | 161:13,23 | **base** 93:4 200:6 | 183:11 |
| 104:3 105:11 | 162:18 163:16 | 200:14,18 | **begins** 113:20 |
| 107:11,18,20 | 164:12 165:4 | **based** 34:16 | 137:22 142:22 |
| 108:12 109:9 | 166:3 167:13 | 40:20 50:4 58:2 | **behalf** 26:15 |
| 111:19 112:19 | 168:10,19 | 68:21 72:23 | 86:6 |
| 113:1 114:17 | 169:21 170:7 | 75:15 76:11 | **belief** 146:15 |
| 114:24 115:9 | 170:17 171:4 | 80:8 93:6,19 | 208:8 |

[believe - build]                                                    Page 8

| | | | |
|---|---|---|---|
| **believe** 9:9 | **biomarkers** | 32:1,9 33:18 | 209:14,16 |
| 99:18 102:11 | 77:20 | 36:25 38:5,14 | 212:3 214:9 |
| 120:21 131:9 | **biostatistics** | 38:23 39:23 | 215:4,24 |
| 134:25 145:21 | 150:16 | 40:12,19 43:20 | **boyd's** 189:4 |
| 151:14 153:12 | **bit** 133:9 | 47:20,21,22,25 | 205:2 212:15 |
| 156:24,25 | **blank** 131:24 | 48:10 49:16 | 212:16,17 |
| 164:13,16 | **board** 82:2,9,15 | 51:25 52:6,10 | **brca** 205:15 |
| 174:20 180:16 | 82:19 | 53:6,12 57:2,5 | **brca1** 197:25 |
| 187:8 204:19 | **boards** 72:2 | 59:13,16 60:20 | 202:3 203:20 |
| **bellwether** 37:2 | **body** 142:16 | 62:15 72:12 | 204:21 205:1,3 |
| 37:5 39:1 40:23 | 143:7 147:19 | 79:18 99:8 | 205:4,22 206:8 |
| 41:19 42:3 | 155:18 158:13 | 100:11,14 | 206:10,15,16 |
| **best** 26:12 | 172:2 | 105:4 109:21 | 208:2 209:4 |
| 177:21 179:24 | **bondurant** 36:6 | 110:22,25 | **brca2** 197:25 |
| 198:22 214:15 | **booklet** 111:3 | 120:24 121:10 | 202:4 203:20 |
| **better** 37:23 | 111:15 113:18 | 129:10 131:20 | 205:1,3,22 |
| **beyond** 41:16 | 113:19 | 133:5,7 135:8,9 | 206:8,10,16 |
| 62:10 110:16 | **boston** 166:17 | 144:9,12 148:5 | 208:2 209:4 |
| **binary** 173:13 | **bottle** 200:7,15 | 148:9,10 | **break** 7:22,24 |
| 173:18,22 | 200:19,25 | 149:16 150:3,6 | 29:20 79:9,11 |
| 174:22 | 201:1,11,18,21 | 150:7 152:3,6,7 | 132:5 |
| **bindman** 63:8 | **bottom** 34:20 | 154:13 162:5 | **breaking** |
| 64:11 | 44:4 62:14 | 162:11 165:5 | 133:19 |
| **biochemistry** | 72:16 83:17,19 | 166:11,14 | **breast** 206:17 |
| 183:19 | 86:12 97:23 | 167:15 168:6 | **breath** 121:4 |
| **biologic** 126:9 | 105:17 135:7 | 168:14 169:25 | **briefly** 57:18 |
| **biological** 93:13 | 135:16 157:8 | 170:7 175:21 | 57:22 |
| 97:14 175:15 | 157:16 158:9 | 175:24 181:25 | **bring** 52:5 |
| 198:25 | 163:21,22 | 182:7,12,15 | 190:14 |
| **biologically** | 169:9 | 183:2,6 184:21 | **bringing** |
| 110:17 198:13 | **boyd** 1:11 2:5 | 190:6 195:8,11 | 150:14 |
| **biologist** 124:22 | 5:1,6 8:3,6,7 | 197:1,9,24 | **brings** 194:14 |
| 138:16 146:12 | 9:10,24 10:2,10 | 198:19 199:3 | **broad** 158:1 |
| 180:9 | 13:5 15:11 | 199:13 203:17 | 160:9 209:2 |
| **biology** 145:20 | 16:21 20:23 | 204:15 206:14 | **build** 76:4 |
| | 22:5,22 26:8 | 207:2,19 | |

[bullet - cause]                                                    Page 9

| | | | |
|---|---|---|---|
| **bullet** 193:10 193:13 | 122:1,22 124:11 125:8 | **capital** 11:9 | 31:2,20 32:13 33:6 34:24 35:3 |
| **burden** 150:18 | 125:18,20 133:12,25 | **carcinogen** 151:22 156:22 | 35:11,19 36:11 38:15 39:14 |
| **c** | 134:20,23 135:2,24 136:5 | 157:2,24 158:2 158:4 179:23 | 41:19 42:4 43:13,16 44:10 |
| **c** 3:1 4:1 212:5 | 136:7,13,17 138:18,18 | 179:25 180:16 180:18,20 | 44:11 48:19 49:19 52:25 |
| **calculate** 142:2 | 139:19 140:5 141:7,10 | 182:2,9 | 53:15 60:4,18 79:4 134:1 |
| **calculated** 173:13,22 | 142:18 143:9 146:5 147:11 | **carcinogenesis** 62:19 76:6 | 144:2,23 152:18,25 |
| **calculations** 130:17 141:24 141:25 142:4,9 142:12 | 148:4 149:2,18 150:13,16 158:12 163:14 164:10,19 | 114:16 146:21 191:6 199:1 **carcinogenic** 114:22 156:10 | 156:3,7,19 158:16 185:25 186:6 192:8 215:1 |
| **calendar** 10:20 | 172:18,24 176:18,22 | **carcinogenicity** 160:24 198:14 | **cases** 7:1 28:10 |
| **call** 30:22 185:16 | 178:7,20,22 180:12,12,17 | **carcinogens** 202:5 203:21 | **catalogs** 113:17 **catch** 190:1 |
| **calls** 46:13,16 | 181:3 185:16 185:18 190:18 | 207:11,22 208:3,9,19 | **categories** 173:13,18,22 |
| **campus** 4:17 | 190:22 191:5 191:15,20 | 209:3 | **category** 158:1 |
| **canada** 147:21 148:11,22 212:22 | 192:5 197:25 204:22 206:7 | **carcinoma** 123:21 | **causal** 109:1 **causality** 146:4 146:14,16 |
| **canceled** 82:14 | 206:15,18,21 207:4,6,8 | **career** 50:9,11 50:15 177:4 | **causation** 39:9 104:25 106:7 |
| **cancer** 38:24 40:25 43:14,18 44:23 45:3 | 209:23 **cancerous** 114:6 169:16 | 180:11 **carefully** 57:25 58:4 165:9 | 107:1,4,13,24 109:13,16 117:25 140:1 |
| 50:19 51:1,4,14 51:18,22 62:25 | **cancers** 68:1 98:5 133:24 | **carl** 36:11 42:10,12,22 | 141:5,9 185:25 **cause** 38:24 |
| 63:2 67:24 68:4 73:8 75:8 76:21 | 159:15 **capabilities** | **carl's** 43:17 **carried** 102:16 | 40:24 43:13,17 62:25 106:19 |
| 77:14,20 86:22 96:17,22 105:1 | 110:17 | 102:17,23 **carrying** 169:6 | 107:10 125:12 148:3 193:11 |
| 105:10 106:15 106:23,24 107:9,10 108:1 108:8,11,17 109:6 116:8,17 | | **case** 26:10,20 28:11 30:11,17 | |

[cause - clarification]                                                    Page 10

193:19
**causes**   63:1
   105:1,9 108:11
   108:16 109:6
   150:16 158:12
   198:12,24
**causing**   106:24
**caution**   29:1
   31:11 46:20
**ccr**   1:17 214:23
**cell**   73:7 74:18
   75:2,5,9 76:7
   87:1,6,7,12,17
   110:13 111:1,6
   111:24 112:3,4
   114:6,6,12,13
   114:20 115:3,7
   115:11,14,15
   115:20,21
   116:2,11,16,17
   116:19 119:2
   119:16 120:2
   121:16,20
   122:8,16,17,21
   122:25 123:1,4
   123:5,8,8,9,12
   123:14,14,16
   123:16,24,25
   124:6,7,10,11
   124:15,16,22
   124:23,23,25
   125:1,1,8,9,23
   126:6,11,12,19
   126:20 127:7,8
   127:24 128:1,3
   128:9 134:2

138:3,16 139:6
139:6,11
145:19 146:11
160:1,14 173:5
180:9 212:20
**cells**   86:22 93:8
   93:9,25 97:11
   97:16,18,20
   98:2,2 104:24
   105:24 106:13
   108:1,24
   109:23 113:21
   113:22 114:2,3
   116:8 118:20
   118:23,23
   119:6,8,13
   121:21,23,24
   121:25 122:4,5
   122:23 123:17
   126:5,9 130:1
   133:12,13,15
   133:15,16,17
   134:5,14,15
   135:3,4,20,21
   136:1,2,8,12
   137:11,18
   138:12,13
   139:3,3 140:3
   141:6 156:15
   162:25 164:14
   169:16,16
   170:24 176:18
   209:23
**cellular**   114:15
   138:2

**centers**   50:12
**certain**   33:20
   49:18 78:12,24
   84:20 122:22
   125:15 209:3
**certainly**   20:24
   23:6 164:4
   195:7
**certainty**   47:6
**certificate**
   214:2
**certified**   2:6,7
   214:5
**certify**   214:8,12
   214:17
**challenging**
   83:5
**change**   200:3
   200:11
**changes**   169:13
   170:14
**characteristic**
   119:1
**chemical**
   125:16
**chemicals**
   125:22 146:23
**cherry**   3:4 4:18
   78:9,11,23
**cheryl**   185:23
**chose**   172:16
**chosen**   88:25
**chromium**
   180:25 182:1
**chronic**   51:21
   126:8 159:1,21

192:1 193:12
193:22
**circumstances**
   209:3
**citation**   65:19
   65:24,24 66:3,3
   66:19,24 67:1,3
   67:4 160:11
   171:22 172:20
**citations**   66:1
   75:24 160:18
   165:24 172:23
**cite**   55:5,7,13
   56:2 59:1 73:13
   73:22 74:2,7,9
   77:25 88:10
   136:19 138:21
   138:24 143:13
   172:13,16
   174:11,21,25
   210:10
**cited**   65:25 66:7
   77:14,20
   108:10 159:11
   172:6
**citing**   109:19
   165:23
**citings**   165:20
**claim**   191:22
   192:11,16,20
   195:12,19
**claiming**
   193:25 199:4
**clarification**
   155:6 165:21
   201:4,6

[clarify - conference]                                              Page 11

**clarify**  38:3
153:23 215:6
**clarke**  12:4
13:13
**classification**
151:21 156:22
157:1,11,19
174:22
**classified**  156:9
173:15
**clear**  22:3
55:18 93:16
116:1 142:4
161:23 202:11
203:7
**clearly**  84:16
**clicking**  154:24
**clinical**  36:5
37:1,7 41:17
42:2,9 49:3
50:11,16
134:12
**closed**  106:7
**closer**  119:23
**coaching**  13:9
**coauthored**
185:15
**codes**  215:5
**coherent**  159:7
159:8,21
**cohort**  144:2
158:16 159:2,7
164:1
**collaboration**
50:7 150:13

**colleagues**
21:10,11 56:6
57:14 173:14
**colloquy**  21:8,9
**colonies**  128:8
128:15,22
129:12
**columbia**  3:17
**column**  146:1
**come**  21:13
58:7 144:1
168:1 174:7
**comes**  16:15
**coming**  12:6
**commencem...**
214:8
**comment**
145:24 146:13
170:9
**commented**
57:22 165:2
193:3
**commenters**
166:4
**comments**  12:6
86:8 88:10
90:21 91:1
131:14,18
167:16,23,25
172:3 174:7
**commerce**  4:3
**commercial**
110:13 111:6
112:3,4,16,17
112:23 113:14
120:5 126:16

138:1
**committee**  5:9
81:15,22 83:8
160:23 161:2
168:8,16
**common**
140:11,25
172:17,24
174:21 175:15
**commonsense**
175:4
**communication**
85:17
**communicati...**
40:12
**community**
112:25 113:3
172:18,25
**compared**
66:17,18 67:13
68:7,22 106:23
109:3 119:16
120:3 133:12
134:15 135:3
136:1 210:7
**completely**
114:13 115:14
208:4
**completion**
28:2
**complicated**
115:23
**complies**  8:14
24:3 25:23 44:1
54:9 57:3 61:8
64:19 79:8,21

104:19 105:19
135:18 158:8
209:18
**compound**
114:23
**comprise**  60:25
**computer**
137:1
**conceivable**
14:18
**concepts**  131:3
**concerned**
31:25 32:6
**concerns**  88:23
**conclude**  34:6
139:25 173:7
**conclusion**
105:21,25
106:3,10 107:7
109:8 129:22
131:2 139:22
144:1 190:10
**conclusions**
105:18 167:19
193:17
**conduct**  49:21
**conducted**
51:13 96:13,16
96:21,24 117:8
117:15,19
**conducting**
49:24 50:1,2
117:7,14
**confer**  203:3
**conference**
35:18 46:12,16

**[conference - correct]**                                          Page 12

100:5,6
**conferring**
  33:19
**confidential**
  85:23
**confirm**  100:16
  131:8
**confirmed**
  170:4
**conflating**
  122:2,7
**conform**  215:6
**confounding**
  147:12
**confused**
  103:18
**conjecturing**
  74:20
**connecticut**
  2:10 214:7
**consider**  78:5
  94:1 149:5
  156:2 157:23
  158:3
**consideration**
  69:6 92:12
  144:21 147:20
  147:23 154:21
  199:14
**considerations**
  144:25
**considered**
  13:15 60:9,15
  60:21,22,24
  61:1 79:4 103:3
  103:4 137:8,9

137:10 139:14
148:1 152:15
152:16,21,23
153:1 154:2
156:18 161:16
172:21
**considering**
  69:12,20 78:13
  78:25
**consistent**
  158:14 159:2
  159:21
**constituents**
  178:23 179:4
  179:16
**constrained**
  197:19
**consulting**
  28:21 29:12,14
  29:24 30:4
  31:22 34:11
**cont'd**  4:1
  213:1
**contact**  146:22
**contain**  192:12
  194:1 195:13
  195:20
**contained**  66:1
  178:24 201:1
  201:18
**containing**
  156:10,21
  157:1,10,18,25
**contains**  52:19
  192:21 195:3
  201:13

**content**  57:24
  62:6
**context**  24:1
  62:16 77:24
  81:12 90:23
  91:7 97:22
  115:3 116:3
  117:18 119:9
  119:10,11
  120:10 122:1
  122:22 123:5
  128:2 134:17
  134:19 141:25
  142:1 164:18
  170:8 176:23
  177:4 180:23
  189:4,14 193:6
  202:20 206:12
**continually**
  77:25
**continue**  16:18
  72:19 75:14
**continued**
  195:24
**continues**  68:10
  106:3
**contradict**
  149:10
**contradicts**
  191:9
**contrary**
  142:15 143:6
  163:22 191:25
**control**  131:23
  158:16

**controls**  144:2
**convened**
  160:23
**convenience**
  112:15
**convention**
  83:21
**conversation**
  29:19 31:12
  35:16
**conversations**
  29:3,17 30:22
  31:14,16 40:5
**converse**  36:7
**conversion**
  115:14 169:15
**converted**
  174:22
**convoluted**
  159:12
**cool**  194:21
**coordinating**
  151:1
**copied**  126:18
**copy**  52:3 111:1
  144:14,17
  152:7
**corner**  105:18
**correct**  6:4,15
  6:16 10:23,24
  13:7 14:25 15:1
  15:14,15,25
  16:2,6 17:9
  20:20 22:8,10
  24:5,6,9,12,16
  24:18 25:25

26:2,6,7,17
31:20 34:15,18
34:21 35:7 36:8
37:3,8 41:3,4
43:22 44:6,7
46:13,14 48:4,5
48:11,12 49:19
49:20 51:1,2
52:21 53:1,2,16
53:23 55:2,3,20
55:21,24,25
56:16,22,25
60:11,12 61:4
61:10,11,14,15
61:21,24 62:2,4
66:7 68:23 69:1
69:21 70:4,5
71:20 75:2,16
79:25 80:10,23
81:23 82:3,5,7
84:3,5,6,15
88:11 91:8 92:4
92:13 94:20
99:11,17,18
100:5,21 101:2
102:12 103:9
103:17,23
106:1 108:8,9
108:11 109:24
111:7 112:18
117:25 118:6,8
120:6,16,17,20
123:10 124:1,7
124:25 128:14
129:13,17
130:2,3,10,11

130:12,13
131:9,15 132:1
132:2 133:13
133:16,20
135:4,21
139:15 143:15
145:5,7,12
146:9 148:12
154:17,21
155:7,23
156:11,16,17
156:23,24
161:4,17,18,19
162:13,14,15
162:17,22,23
162:25 163:1,3
163:7,8,15
164:11 165:3
167:11 168:9
168:18 169:20
171:14,25
172:1 173:13
180:9 182:20
183:8,9,12,13
183:16,17
184:23 185:5,6
190:18,19
195:5 196:17
202:16 204:16
204:19 208:22
209:24,25
210:22 215:7
**correctly**   63:3
65:9 84:1 86:23
87:3 98:7
101:11,23

110:19 138:6
140:6,7,13
141:1 143:10
150:19 157:13
157:21 158:19
167:7 171:12
173:9 202:8
203:8,23
204:15
**cote**   63:8 64:8
**cottage**   191:16
**cough**   5:12
**counsel**   3:11
33:19,19,21
44:25 45:1
46:13,17,24
60:2 88:18
101:12 126:21
196:12 214:18
214:20
**count**   85:12
**counted**   128:15
**countries**   151:2
**county**   5:18
43:6 44:15
**couple**   6:5
52:16 73:10
74:18 100:2
133:7 150:9
153:11
**course**   70:16
112:1 139:4
141:14
**court**   1:1 2:7
5:25 7:16 162:3
212:9 213:2

214:5
**covid**   82:13
100:5
**coworkers**   78:1
**create**   80:13
**creating**   119:12
126:3
**criteria**   66:23
**critical**   65:7
68:10 88:6
114:15 126:9
135:19 171:13
173:11
**criticism**
129:15 163:6
167:10 169:19
170:14,15,16
171:17,25
207:19,24,25
208:17,21
**criticisms**
88:14 98:20
120:23 133:14
162:15,19,21
162:24 163:2,5
163:9,11 164:7
164:25 165:1,6
165:10,12,14
165:17,18
166:5 170:20
203:18
**criticizing**
167:19 193:6
197:5 199:9,13
199:18 203:13
205:11

**[critics - department]**    Page 14

| | | | |
|---|---|---|---|
| **critics** 208:21 | 140:23 141:12 | 47:13 51:9 56:7 | **dc** 11:4,9 12:3 |
| **critique** 27:14 | 141:15,18,23 | 56:12 70:20 | 13:6 101:7 |
| 120:20 | 142:2 149:11 | 78:16,19 79:9 | **deal** 197:8 |
| **critiques** 89:10 | 191:14,21 | 79:11 82:25 | **dealing** 74:9 |
| 89:11,13,16,18 | **date** 8:4 9:6,11 | 83:4 95:4,14 | 90:11 |
| 90:17 | 9:25 10:3 47:23 | 108:13 120:24 | **death** 126:12 |
| **crockett** 1:17 | 52:7 53:7 59:14 | 127:14 130:22 | 160:15 |
| 2:6 214:5,23 | 100:12 101:2 | 132:3 135:9 | **decades** 138:12 |
| **crr** 1:17 214:23 | 101:17 110:23 | 144:5 153:2,5 | 138:14,17 |
| **csr** 1:17 | 144:10 148:6 | 153:14,17,24 | 139:19 170:22 |
| **culture** 97:17 | 150:4 152:4 | 154:10 162:2,6 | 172:17,25 |
| 118:21 123:17 | 153:14 166:12 | 167:22 168:4 | **december** 24:4 |
| 164:14 209:23 | 175:22 182:13 | 168:11 175:7 | 24:8,9 26:5 |
| **cultured** 119:6 | 183:3 209:17 | 175:10 177:9 | **decision** 71:20 |
| **currently** 38:25 | 214:14 215:3 | 177:19 178:10 | 98:1 135:19 |
| **cut** 68:16 | **dated** 25:25 | 179:12 180:5 | **decisions** |
| **cv** 47:25 48:1,4 | 48:1 53:1,15 | 180:17 181:2,8 | 160:20 |
| 48:6 82:7 86:2 | 214:25 | 181:11,14 | **deep** 121:4 |
| 183:15 184:1,3 | **dates** 10:21 | 183:25 184:3,7 | **defendant** 35:7 |
| 184:8,13,22 | 16:21 17:1 | 184:11 186:8 | **defendants** 4:9 |
| 185:1,4,9 | **davidson** 4:13 | 186:13,17,25 | 5:18 6:18 26:16 |
| 212:15 | 6:7,12 11:12,17 | 188:25 193:7 | 199:15,19 |
| | 11:23 12:3,12 | 193:13 194:2,5 | **defending** 6:8 |
| **d** | 12:16 13:2 18:1 | 194:9,21,23 | 12:9 |
| | 18:3 21:9,14 | 195:5 196:4 | **defining** 149:25 |
| **d** 212:1 | 22:17,19,25 | 197:7,18 201:7 | **definition** |
| **damage** 198:12 | 23:3 24:23 | 202:10,19,22 | 124:3 |
| 198:24 | 28:21 29:6,18 | 203:1 204:2,10 | **definitions** 8:15 |
| **damages** 63:1 | 29:24 31:24 | 209:9 | **demonstrate** |
| **dan** 5:6 32:14 | 32:22 33:7 | **day** 17:7,19 | 87:1,12 138:2 |
| 40:1 51:9 | 34:11 35:17,18 | 20:3,9,15 22:13 | **demonstrated** |
| 135:13 | 36:12,20 37:10 | 23:13 30:3 | 141:8 169:13 |
| **daniel** 3:5 | 37:18,25 38:18 | 33:24 34:13 | 170:14 |
| **danny** 4:23 | 38:21 39:16,22 | 196:11 | **department** |
| **data** 33:10 57:9 | 40:4,10,16 41:5 | **days** 17:3,6,12 | 49:1 |
| 81:9 106:25 | 41:11 46:1 | 17:15 18:10 | |
| 109:14 140:10 | | | |

**departments**
  50:11
**dependent**
  128:10
**depends**  180:23
**deponent**
  135:11
**deposed**  6:3
  195:9
**deposition**  1:10
  2:5 5:14 6:8 7:7
  8:8,23 9:4,8
  11:5,8,10 12:9
  12:21,22 13:1
  13:12,15,21
  14:1,11,14
  21:12 27:24
  28:4,22 29:25
  30:5 32:16 40:6
  40:9,11 47:17
  49:10 60:10
  79:16 120:25
  132:10 153:7,8
  153:14 175:20
  176:21 184:18
  188:20,22
  189:24 192:24
  195:4 206:24
  209:12 212:10
  212:11 215:3
**depositions**
  12:13,20 21:20
  196:13
**depth**  54:19
  155:18,24

**describe**  45:2
  65:23 110:14
  173:6
**described**  88:24
**describing**
  151:8
**description**
  34:7,9 149:20
**descriptions**
  15:9 16:10
**design**  72:6
**designated**  5:15
**detail**  57:23
**details**  26:4
**determination**
  93:4 94:6 97:5
  152:14 154:14
**determinations**
  152:16
**determine**
  81:15 168:8,16
  170:2 176:25
  179:3,16
**determined**
  66:6 81:22
**determining**
  66:20 97:15
**develop**  197:25
  204:22 206:15
  206:20,21
  207:3
**developed**
  103:20
**developing**
  103:19 178:5
  178:14,18

**development**
  51:22 125:17
  125:20 147:11
  149:1 193:9
**diagnosis**  48:18
**dialogue**  11:25
**difference**
  83:20 85:1 87:5
  106:18,22
  155:11,15
**different**  9:17
  9:20 10:11 24:7
  50:2 60:10
  66:14 67:19
  70:24 71:1
  117:24 159:4
  165:17 177:20
  180:12 190:13
  196:6,8 197:16
**difficult**  14:6
  57:8 197:19,22
  208:25
**direct**  104:25
  106:7 107:3,13
  107:24 109:1
  109:12,16
  140:1 141:5,8
  146:22
**directions**
  66:14
**directly**  109:3
  118:18
**directors**  82:3
  82:19
**disagree**  107:12
  115:5 156:20

  191:12 208:4
**disagreeing**
  202:14 208:12
  208:15
**disclosed**  7:1
  39:17
**discoverable**
  32:14
**discuss**  72:20
  83:16 87:24
**discussed**  54:18
  60:2 75:13
  100:7 118:25
  166:24 167:3
**discussing**
  100:17
**discussion**
  54:21 121:8
  182:23
**discussions**
  55:1
**disease**  150:18
**dish**  93:25
  97:18 119:6,14
  121:18
**distinction**
  121:23
**distinguish**
  116:18 200:22
**distinguishing**
  200:24
**district**  1:1,2
  3:17
**dlapinski**  3:6
**dna**  63:2
  198:12,24

**[dna - dr]**                                                                                       Page 16

202:3 203:20
**doctor**   48:11
61:6 64:18
105:17 174:19
194:20 203:23
**doctors**   136:11
189:15
**document**   8:6
8:10,13 18:14
19:20 26:22
29:4 47:21 52:8
52:11 53:9
59:17,19,20,22
60:1 107:21
111:5 144:15
148:7 150:6,10
152:10 154:2
172:8 182:15
**documented**
169:14
**documents**
8:20,24,25 9:8
10:5 19:9,13,16
20:3,17 45:4,5
45:7,9 58:15,17
58:22 89:5
131:21 139:14
**doing**   15:18,21
16:25 17:11,15
18:10,19 19:2
20:7 23:22
25:16 28:23
29:9 37:17
41:10,11 42:9
45:12 57:25
85:19 102:19

102:20 130:24
134:4,13
135:25 138:15
164:8
**dosage**   102:14
102:15,17,22
**dose**   88:1,6,14
88:14 89:19
93:2,8,9,10,12
93:12,18,23
94:5,6 96:10
97:13,17,19
98:11 102:10
102:25 128:10
130:2
**doses**   88:25
94:17
**dosing**   94:3,10
94:11,23,24
95:9,10 96:3
162:16,17,22
**dr**   5:6 8:6 10:10
11:19 13:5,13
15:11 16:21
20:23 22:5,22
22:24 23:21,23
23:24 26:8
27:25 32:1,9
33:18 36:25
38:5,14,23
39:23 40:19
43:20 47:20,25
48:10 49:16
51:25 52:10,20
52:22 53:12
55:16,19,24

56:6,16,18 57:2
57:5,10,13,19
57:21,24 59:16
60:20 62:2,3,5
62:6,7,15 64:22
65:3 67:9 69:1
70:2 71:18
72:12,19,25
73:5,6,14,24
74:9 75:15
79:18,18 80:9
80:19 81:14,21
82:10,16 83:12
84:10,22 85:7
85:14,18 86:5
86:10 88:7,14
88:22,23 89:5,9
89:16,18,23
92:2,11 93:2,18
94:20,22,23
95:6,10 96:4
98:1 99:3,8,10
99:16 100:3,14
102:2,9,14
104:2 105:4,13
107:2 108:21
109:7,21,22
110:12,25
111:6 112:7,14
113:6 117:8,15
119:15 120:2
120:15,20,24
121:10 126:18
128:7 129:10
129:11,16,23
130:16,17

131:20 133:5,7
133:10,14
135:1,8,9,19
137:16,19
140:10,23
141:12,17,23
142:1,15 143:6
144:12 145:18
146:3,6,7 147:6
148:9 149:16
150:6 152:6
154:13 162:5
162:11,16
163:15 164:8
165:2,5 166:9
166:14 167:11
167:15 168:6,7
168:14,15
169:3,25 170:7
171:14 175:24
176:1,13
181:25 182:7
182:15,17
183:6,8,15,18
183:22 184:21
184:22 185:11
185:15,20,23
185:24 187:1,4
188:3,18,23
189:4,5,11
190:6,9 193:4,6
193:17 195:8
195:11 196:21
196:25 197:1,2
197:9,9,24
198:4,15,16,17

[dr - examined]                                                              Page 17

198:19 199:3,9
199:13,13,18
201:25 203:17
203:18 204:6,9
204:15,16
205:1,2,11,12
206:13,14
207:2,19,20,25
209:14 212:15
212:16,17
213:5,6
**draft** 14:15
19:21 20:18
211:5
**drawn** 32:11
167:20
**drive** 3:3
**drs** 57:17
**duly** 5:1 214:9
**duration**
158:18

**e**

**e** 3:1,1 4:1,1
133:2,2 185:22
212:1,5,8 213:1
**earlier** 92:1
102:8 151:20
**early** 112:10
**east** 3:3
**editing** 28:7,14
47:3,7
**editor** 100:1
**editorial** 72:2
**effect** 93:13
96:17 97:14,15

176:17 202:4
203:21 208:3
209:22
**effects** 210:12
**efforts** 65:3
**egregious** 140:9
140:14,22
**egregiously**
141:11
**eight** 17:7
19:19 20:16
**eighteen** 210:8
**either** 44:13
178:3
**elementary**
130:9 131:3
**elicits** 177:1
**emi** 27:14 57:17
61:23 74:23
75:1 210:11,18
210:22
**emory** 183:23
**emphasize**
127:25
**employed**
114:21
**employee**
214:18,20
**employs** 110:12
**en** 124:10
**enormous**
164:18
**ensure** 71:13
**ensuring** 40:11
**entire** 13:18
20:22 68:15

129:1 207:14
**entitled** 61:10
209:21 210:11
**entry** 22:6
34:20 35:24
36:2,24 41:25
42:10 43:25
44:5 101:6,8,19
**environmental**
125:12,15,21
125:21,22
126:2 156:15
**enzymes** 86:21
**epidemiologic**
106:25 107:5
109:15 143:18
149:11 163:14
163:24
**epidemiologi...**
142:16 143:7
147:19
**epidemiologist**
143:24 145:4,7
**epidemiology**
51:21 145:8,10
150:15 164:3,9
**epigenomic**
210:12
**epithelial** 86:22
98:2 104:24
105:24 108:24
133:12,15
135:2,3,20,23
136:1,2,12
164:9 190:17
190:22 191:15

**era** 136:6
**errors** 190:8
193:16 215:7
**especially**
149:11
**esq** 3:5,11,18
4:5,5,13,14,19
**essence** 119:5
167:18
**essential** 71:10
71:12 119:1
**establish**
142:17 143:8
146:4
**et** 24:15 25:4
27:14 86:19
**evaluate** 114:22
**evaluated**
157:11,19
161:6,11
**evaluating**
168:23
**eventually**
57:13
**evidence** 5:22
65:21 156:14
158:11,17
159:3,22
169:15 190:21
191:3 198:23
**exactly** 27:19
34:25 105:13
**examination**
5:4 212:2 214:9
**examined** 5:2

[example - extent]                                                          Page 18

| | | | |
|---|---|---|---|
| **example**  33:23 | 209:16,20 | 27:16,18,20,22 | 75:14,19 76:4 |
| 63:16 68:2 | 210:2,15,19,22 | 27:23,25 28:2,5 | 76:12,24 77:2 |
| 88:16 107:6 | 212:10,11,12 | 28:8,11,15,18 | 77:20 181:5 |
| 121:19 123:19 | 212:13,14,15 | 34:15 36:7,16 | 189:15 |
| 209:6 | 212:16,17,18 | 36:17 37:11,20 | **explain**  32:25 |
| **except**  73:9 | 212:19,20,21 | 37:21 39:5 40:6 | 201:7,9 |
| **exclusive**  73:13 | 212:22,23,24 | 44:24 47:3,8 | **explained** |
| 169:8 | 213:3,4,5,6,7 | 48:13,21,24 | 173:23 |
| **excuse**  124:13 | **exhibits**  9:14,16 | 49:6,17 57:24 | **explaining** |
| 138:10 | 9:17 10:11,12 | 62:4,7 63:5,12 | 170:1 |
| **executive**  4:17 | 10:13 60:10 | 63:21 64:1,4,7 | **exposed**  159:13 |
| **exemplified** | **exist**  76:8 | 64:10,13,16 | 164:14 |
| 107:2 | **expect**  67:24 | 70:12 71:19 | **exposing**  97:11 |
| **exhibit**  8:3,7 | 184:7 | 72:6 73:2,3 | **exposure**  86:19 |
| 9:10,20,24 10:2 | **expectation** | 75:16,18,24 | 89:1 105:22 |
| 10:16,17,21 | 72:5 | 76:12 77:14 | 106:12 107:25 |
| 11:1 24:2,4,11 | **expected**  12:17 | 79:19 99:4 | 138:10 140:2 |
| 25:22,24 35:24 | **experience** | 101:7,9,20 | 141:6 146:23 |
| 43:20 44:5 | 49:18 99:25 | 103:12,15,19 | 158:17 159:4 |
| 47:21,22 51:24 | 138:12,14,17 | 103:21,23 | **express**  31:2,19 |
| 51:25 52:6,11 | 139:18 180:14 | 109:19 145:8,9 | **expressed**  31:6 |
| 53:5,6,11,13,14 | **experiment** | 148:19 165:25 | 104:15 |
| 57:4 59:13,18 | 160:10 | 180:15 181:2 | **expressing** |
| 60:20 79:19 | **experimental** | 182:17 183:7 | 30:11,17 33:6 |
| 99:9,12,14 | 159:2 | 186:12 189:11 | 38:9 |
| 100:10,11,14 | **experimented** | 197:6 210:3 | **expression** |
| 101:4 105:14 | 177:3 | 213:6 | 167:5,10 |
| 105:17 110:22 | **experiments** | **expertise**  49:18 | 169:13 170:21 |
| 111:1,14,16 | 88:7 167:4,20 | 145:23 151:1 | 170:23 173:15 |
| 144:9,13 148:5 | **expert**  5:16 | 175:4 | **expressions** |
| 148:10 150:2,3 | 6:18 7:1 11:4 | **experts**  57:16 | 171:20 173:19 |
| 150:7 152:3,7 | 14:3,22 15:14 | 62:18,24 63:6 | **extent**  10:4 |
| 166:11,14 | 15:20,24 16:23 | 63:13 70:7 | 21:19 31:4 32:9 |
| 175:21,25,25 | 17:8 18:6 20:18 | 72:18,24 73:5 | 36:17 37:4 69:3 |
| 182:12,16 | 21:3 22:7,14 | 73:12,21,22 | 102:22 120:8 |
| 183:2,7 209:15 | 26:9,19 27:15 | 74:1,6,8,15 | 124:8,12 151:7 |

**[extent - footnote]**                                                              Page 19

| | | | |
|---|---|---|---|
| 159:18 | 136:8,8,11,23 | 71:19 73:7 | 114:1,3,7,8,10 |
| **extra** 144:17 | 137:10 162:25 | 80:21 | 118:5 126:22 |
| **extraordinarily** | **false** 190:10 | **figured** 38:21 | 126:23 127:19 |
| 93:23 96:10 | 193:18 | **final** 22:7,14 | 146:19 157:17 |
| **extremely** | **familiar** 75:10 | 211:4 | 165:16 185:4 |
| 93:10 94:4 | 77:23 87:7 | **finalizing** 47:12 | 187:11,14,14 |
| 177:25 | 111:12,13 | **financially** | 187:17 188:22 |
| **f** | 115:1 125:5,5 | 214:21 | 190:16 195:8 |
| | 125:9 143:17 | **finding** 106:6 | 197:10 205:10 |
| **f** 133:2 | 143:25 149:16 | 107:3,13 | 205:10 207:14 |
| **facilitates** | 168:22 185:20 | 147:16 154:19 | 209:15 |
| 151:3 | **far** 56:23 147:8 | **findings** 69:13 | **fit** 120:4 |
| **fact** 52:18 | 163:6 188:3 | 69:20 107:24 | **five** 6:20 7:4 |
| 67:23 70:2 92:2 | 199:7 | 140:1 147:7,9 | 60:9 112:16 |
| 92:12,21 | **fast** 27:7 168:12 | 147:20 152:23 | 175:18 196:3 |
| 112:14 129:23 | **feature** 121:21 | 154:16 156:2,5 | **flawed** 141:11 |
| 130:13,15,18 | 122:17 150:25 | **fine** 18:7 27:11 | **flaws** 135:1 |
| 183:18 208:18 | **february** 52:1 | 132:6 140:7 | **fleming** 147:6 |
| 210:8 | 212:16 | 170:10 193:9 | **fletcher** 54:19 |
| **factor** 66:9 | **federal** 5:16,24 | 205:10 | 86:19,25 87:11 |
| 67:5,8,12 68:22 | 21:18 38:16 | **finish** 171:7 | **flippant** 10:7 |
| 125:12,21,22 | 39:1 | **finished** 193:21 | **flom** 4:11 |
| 126:2 | **feel** 172:23 | **firm** 5:8 | **focused** 51:21 |
| **factors** 67:20 | 174:24 | **first** 5:1 6:8 | 125:3 180:11 |
| 93:22 125:16 | **fellowship** | 10:16 11:2 | **focuses** 136:7 |
| 206:7 | 183:23 | 24:14 34:19,20 | **focusing** 72:15 |
| **facts** 215:6 | **female** 159:14 | 35:4 40:6 54:12 | **follow** 14:5 |
| **fair** 46:11 68:24 | 159:15 | 56:22 62:23 | 92:8 |
| 88:2 125:24 | **fibers** 198:9 | 63:18 64:20 | **following** 9:2 |
| 142:10 149:20 | **fibroblasts** | 68:12 72:14 | 20:15 159:3 |
| 184:12 186:17 | 106:5 | 81:8 84:25 | **follows** 5:3 |
| **fall** 145:23 | **fibrous** 198:12 | 87:24 88:13 | 191:2 |
| **fallopian** 98:2,5 | 198:17 199:19 | 89:15,23 90:8 | **footnote** 62:15 |
| 133:13,16 | 199:24 200:2 | 90:16 92:20 | 63:5,15 88:16 |
| 134:1,2,5,14 | **field** 67:15,18 | 101:6 102:24 | 88:19 89:4 |
| 135:4,21,25 | 67:20 70:7 | 104:20 113:22 | 111:4 131:20 |

**[footnote - frequency]**                                                  Page 20

| | | | |
|---|---|---|---|
| 143:12,13,13 | 84:12 88:3 | 157:3 160:3,21 | **formulate** |
| 169:25,25 | 90:18 91:9,11 | 161:13 162:18 | 49:18 98:9 |
| **footnotes** 88:16 | 91:14,17 92:5 | 163:16 164:12 | 103:7 |
| **foregoing** | 92:14 94:14,25 | 165:4 168:19 | **formulated** |
| 214:12 | 95:12 98:12,19 | 169:21 170:17 | 89:20 93:1 |
| **form** 6:6,11 | 98:22 100:4 | 171:18 172:8 | 98:10 102:1,9 |
| 13:10,17 14:17 | 102:3 103:2 | 172:15 174:4 | 102:13 |
| 15:7 16:1 17:2 | 104:3 105:11 | 174:14 175:6 | **forth** 14:8 34:5 |
| 17:10,17,20 | 107:11,20 | 176:14,19 | 43:10 44:25 |
| 18:16,23 19:5 | 108:12 109:9 | 177:7,17 178:8 | 76:6 123:22 |
| 19:11,25 20:4 | 111:19 112:19 | 178:25 179:6 | 210:21 214:15 |
| 20:11,21 21:6 | 113:1 114:17 | 179:18 180:1 | **forty** 45:15,16 |
| 21:24 22:9 23:5 | 114:24 115:9 | 180:21 181:1 | **found** 104:22 |
| 23:11 24:17,24 | 115:22 116:13 | 181:21 182:3 | 108:21 154:23 |
| 25:8,13,19 26:1 | 117:10,17 | 185:13 186:7 | 155:1,7 156:13 |
| 27:3 29:4 30:6 | 118:1,9 119:19 | 187:6 190:23 | 177:12 178:1 |
| 30:12 33:25 | 120:7,22 | 191:10 192:2 | 197:20 |
| 34:2 35:12,20 | 122:11,18 | 192:13 199:21 | **foundation** |
| 36:9 37:9 38:11 | 123:2,11 124:2 | 200:4,12,20 | 42:20 49:16 |
| 38:17 39:3,12 | 124:17 125:2 | 201:19 207:23 | 95:4,13 96:8 |
| 42:5,13 43:7 | 125:14,25 | 208:10,20 | 167:14 177:8 |
| 45:21 46:6,18 | 126:10 128:23 | **formation** | 177:18 182:4 |
| 48:15 50:13,20 | 129:18 130:20 | 34:23 96:5 | 186:2 191:11 |
| 53:24 55:10 | 131:16 134:6 | 125:23 128:8 | 192:14 199:22 |
| 56:4 57:7 58:18 | 134:16,21 | 128:22 129:12 | 200:5 205:21 |
| 59:2,10,24 | 136:3,14,24 | 148:3 156:6,19 | 205:25 |
| 62:11 66:8 | 137:12,20 | **formed** 16:12 | **four** 13:19,20 |
| 67:14 69:8,14 | 138:9,22 | 98:15 99:2 | 15:9 17:18 18:1 |
| 69:22 70:9,14 | 139:16 141:13 | 161:3,5 181:25 | 20:24,25 22:7 |
| 71:15,21 72:9 | 141:19 144:24 | 182:8 | 207:6 210:25 |
| 73:15 74:3,11 | 145:13 146:10 | **forming** 34:14 | 211:2 |
| 75:3,21 76:14 | 148:16,23 | 35:10 60:3 78:3 | **fourth** 8:12 |
| 77:1,7,16,22 | 149:6,23 | 144:22 148:18 | **frame** 196:16 |
| 78:6,15 79:2 | 151:13 152:2 | 152:17 | **framing** 196:17 |
| 80:22 81:5,18 | 152:19 154:22 | **forms** 180:12 | **frequency** |
| 81:24 82:18 | 155:13 156:4 | 185:7 | 158:18 |

**[frequently - good]**                                                        Page 21

**frequently**
    114:21
**friday**    1:12 2:2
**front**    9:15
    10:13 15:12
    33:9 51:25
    52:10 53:13
    59:16 148:9
    183:6 184:1,4
    194:12 210:2
    210:18
**frustrating**
    197:20
**full**    54:11 64:20
    84:25 97:23
    139:22 170:8,9
**function**    170:25
    171:5,9
**further**    16:12
    41:7 55:5,8
    56:3 58:8
    106:13 108:6
    127:25 128:7
    140:3 214:12
    214:17

**g**

**gallardo**    36:7
**gander**    186:21
**gene**    202:2,5
    203:19,22
    208:1
**general**    77:8
    81:6 97:8 140:4
    160:9,12
    185:25 186:16

196:15 198:2,3
198:4 205:14
206:25 207:16
**generalization**
    160:12
**generally**    23:17
    33:12,12 44:11
    69:15,24 70:10
    77:17 78:7
    119:9 133:23
    136:4 138:18
    138:18 155:17
    209:1
**generated**
    77:10
**genes**    202:3
    203:20 207:7
**genetic**    87:18
    87:19,21
    114:11 118:24
    119:2 124:8,9
    125:6,23 126:4
    185:12 186:6
**genetics**    183:23
    207:15
**genital**    50:19
    51:4,14,17
    106:14 107:8
    108:7 141:9
    146:20 147:10
**gerel**    3:16
**gestures**    7:17
**getting**    67:2
    103:18 121:3
    121:22 195:22
    205:6

**give**    32:13
    48:18 69:12,20
    144:21 147:20
    147:23 164:24
    177:2 210:6,25
**given**    98:3
    160:18 190:8
    193:15
**giving**    15:19
    40:23 121:2
    185:24 186:5
**go**    7:24 28:19
    32:24 34:19
    35:23 47:13
    54:11,15 57:5
    58:9 59:11 61:6
    62:10 79:12,13
    81:8 85:4 86:12
    99:8 101:4
    104:13,16,18
    113:19 117:21
    118:17 125:1
    130:7 132:5
    133:7 145:25
    150:8 158:6,23
    174:19 175:17
    181:7,18
    182:21 184:13
    184:15 203:2,3
    209:7 211:2
**goes**    23:13
    56:20 106:11
    199:7
**going**    5:23 7:11
    7:15 8:9 9:13
    9:13,19 10:1

11:25 12:2,6,10
12:10 15:19,24
16:5,7,12,18
21:12,14,17,23
26:21 27:7,12
28:25 30:11,18
31:2,8,10,19
32:13 34:24
35:3,4,10 36:9
37:15 38:2,9
39:18 41:24
45:7,8,8 47:20
49:7 50:24 51:5
51:24 52:16
53:4,11 54:11
54:15 57:1 61:6
62:9 66:12,13
66:13 72:12
74:11 87:23
104:16,16
110:4 120:13
132:4 146:19
154:13 168:1
169:9 171:7
172:2 181:20
181:20 187:25
188:1,2,16,17
197:14 201:17
201:22 202:17
205:14,19
209:14 210:21
**golomb**    3:11
**good**    5:6,11 8:1
    42:16 132:3
    153:22 186:20
    186:21

**[google - hours]**                                                                 Page 22

google  21:1
  23:15 45:8
goose  186:21
gotten  119:23
grade  98:4
  133:24 136:6
  136:16
grain  151:9
grasp  121:24
great  133:23
grounds  30:19
groundwork
  100:20
group  148:25
  151:21 152:9
  156:22 157:2
  157:12,20,22
  157:24 158:2
  161:5,6
growth  115:20
  121:11,16,17
  121:20 122:16
  126:19 127:7
guide  111:2
  212:20
guys  56:7 83:5
gynecologic
  67:15,18,21
  68:1,8,23 84:20
  85:6,11,15,19
  88:11 90:4
  100:15 131:25
gynecological
  80:2 92:25
gynecologist
  48:16

gynecology
  24:16 25:5,18
  48:14

**h**

h  212:8 213:1
half  20:16 36:4
  36:25 37:7 38:5
  41:16 42:1
  170:25 171:1,9
  172:4
halfway  54:15
hallmark
  115:21,24
  116:6 126:20
  127:7
hallmarks
  116:8
hand  7:17
  54:17 93:24
  105:17 142:23
handed  8:6
  10:10 47:20
  110:25 144:12
  150:6 152:6
  166:14 175:24
  182:15
handle  181:15
hang  30:24
  34:1 181:6
  188:8 189:1
happen  124:13
happened
  12:20 153:7
happening
  189:23

happy  15:22
  153:25 188:10
hard  90:3
  135:13 160:11
harper  24:15
  25:4,17 176:1
  213:4
hat  6:2,10
he'll  184:4
head  7:17
heading  8:19
health  49:3
  147:21 148:11
  148:22 149:19
  151:17 212:22
hear  13:2
  202:13
heavily  72:19
  72:24 73:5
  75:15
hegerty  35:6,6
held  49:5 121:8
  182:23
hell  197:20
help  142:20
helpful  204:5
helps  71:13
henrich  4:17
henrietta  210:8
hereinbefore
  214:15
herewith  54:20
hey  39:22
high  66:19
  93:10,23 94:1,4
  96:10 98:4

133:24 136:6
  136:16 173:15
higher  65:8,17
  66:21 163:13
  163:13 164:10
highly  65:7
  187:8
hill  3:4 4:18
hold  39:16,16
  39:16 48:13,21
  49:13 95:14
  145:6,9 178:10
  178:10,11,11
  180:5
home  52:5
honestly  11:8
  26:12 35:21
  98:14 115:2,10
  180:2 186:11
hope  58:1 161:9
hospitals  50:12
hour  24:15
  31:18 34:22
  35:16,17 36:4
  36:25 37:6 38:5
  41:16 42:1,8
  132:4 138:10
  138:10 163:2,4
hours  14:24
  17:7 19:19
  20:16 22:8 30:3
  45:7,15,16,18
  45:25 46:9,12
  46:16 109:23
  120:16 137:16
  138:3 139:4,6

[hours - induces]                                          Page 23

164:14 210:25
211:2
**human**  89:1
118:8 125:17
125:20 156:15
**humans**  123:19
156:11,22
157:2 158:12
**hypotheses**
74:20
**hypothesis**
77:10 147:9,16
**hypothetical**
74:21 75:6 76:5
76:19 77:9

**i**

**iarc**  149:16,18
149:20 150:12
150:21 151:5
151:11,20
152:9,14,17,22
152:23 153:6
154:2,14,16,19
154:24 156:2,5
156:9,13,18,25
160:19,25
161:3 178:22
**iarc's**  150:8
212:23
**idea**  81:7
119:11
**identification**
8:4 9:11,25
10:3 47:23 52:7
53:7 59:14

100:12 110:23
144:10 148:6
150:4 152:4
166:12 175:22
182:13 183:3
209:17
**identified**  39:1
**identify**  150:16
**ihc**  169:11,13
170:2,14,24
171:2 172:4
**illustrating**
83:20
**immunohisto...**
167:6
**impact**  65:8
66:25 67:3,5,8
67:12 68:22
96:22,25
146:13
**impacts**  125:23
**implausible**
110:18
**implicate**  146:5
**imply**  122:4
**important**
37:13 39:19
40:1,2 78:4
118:20 202:12
**imposed**  196:12
**impossible**  83:6
95:24 129:8
173:16 174:24
174:25
**improper**  6:10
93:2,18 94:6

102:10 194:16
**inappropriate**
78:9,11,23 97:6
**inasmuch**
34:25
**include**  161:15
172:20 187:22
**included**  27:16
46:12 81:10,11
167:21
**includes**  61:13
61:16,20,23
62:1,3,5
**including**  27:17
57:16 63:6
128:18 146:22
157:25 158:17
198:11
**incoherent**
138:5
**inconsistent**
175:14
**incorporating**
20:18 167:4
**incorporation**
19:21 27:15
**incorrect**
103:10 128:21
130:18 133:11
**incorrectly**
86:18
**increase**  164:2
173:12,21
174:3,23
**increased**  77:13
106:15 107:9

108:8 129:25
140:5 141:7,10
142:17 143:8
164:2 173:4,8
**increases**  163:7
**independent**
115:20 121:11
121:16,17,20
122:16 126:19
127:7 149:21
149:25 151:2,6
151:12,15
**index**  65:19,24
65:24 66:3,4,19
66:24,25 67:1,3
67:3,4 173:4
**indicated**  6:21
66:10 117:11
**indicating**
128:9
**indication**
120:5 128:15
**individual**  7:1
9:21 38:6 39:9
63:13 66:5,18
66:18
**individual's**
67:5
**individuals**
37:8 38:25
39:15 69:18
**induce**  86:20
**induced**  87:2
87:13
**induces**  75:7
104:23 105:23

**[induces - jersey]** Page 24

108:22 159:1
**inducing** 146:5
**industry**
191:16
**infer** 109:11
**inferences**
107:4
**inflammation**
51:22 62:25
63:1 74:10 76:6
76:20,25 77:13
146:21 159:1
159:21 190:16
190:21 191:4
191:14,19
192:6 193:12
193:20,22
**inflammatory**
177:1
**influence** 104:1
104:5
**influenced**
32:18
**inform** 60:18
**information**
16:13 29:2
33:21 40:19
46:21 78:5 81:3
137:9 171:23
192:1
**informative**
58:2
**infringing** 16:8
**ingredients**
201:16,21

**inhalation**
159:14
**inherited** 202:2
202:5 203:19
203:22 207:10
207:21 208:1,8
208:18
**initial** 126:4
**initiate** 126:2
**initiation** 191:4
**inject** 118:22
**input** 32:17
**insofar** 192:3
**insoluble**
210:12
**instruction**
33:3
**integrity** 71:13
**intended** 81:2
**interdisciplin...**
150:14
**interest** 92:22
**interested** 58:8
97:15 214:21
**internalization**
198:9
**international**
149:21 150:13
151:3,6,12
**internet** 58:9
58:12
**interpret**
141:17
**interpretation**
145:1

**interpreted**
95:15
**interpreting**
141:23
**interrogating**
14:9
**interrupt** 6:9
27:7 32:24
135:10
**intraperitoneal**
119:10
**intrinsically**
31:23
**introduce** 5:22
**investigate**
161:3
**investigating**
118:6
**investigation**
168:22
**investigators**
116:2
**invoice** 9:18,20
10:18 15:8,11
15:12 24:4
25:24 26:14,15
36:15 43:20
45:19 212:12
212:13,14
**invoices** 9:15
101:5
**involve** 137:10
**involved** 47:11
82:20 92:16
191:4 202:3
203:20

**involvement**
76:20
**involves** 50:25
**involving** 28:1
76:5,19 159:20
166:24
**irrelevant** 76:7
198:25
**irritation**
146:23
**issue** 21:21,21
31:25 72:7
82:16,24 83:12
110:11 120:14
136:20 161:3
162:21 164:20
**issues** 52:22
58:7 72:6
**italics** 127:24
**item** 14:20
30:21 35:15
**items** 11:1 24:7
27:12 34:17
37:20

**j**

**j&j** 193:24,25
**j&j's** 192:11
195:12
**j774** 210:12
**january** 35:16
**jeff** 1:11 2:5 5:1
212:3 214:9
215:4,24
**jersey** 1:2 2:9
3:4 4:18 5:17

5:25 26:11 43:5
43:6 44:14
214:3,7
**jess** 11:25
**jessica** 4:13
12:5,19 21:13
22:19 28:21
29:24 37:2
40:15 154:6,7
196:24 197:21
202:21,24
203:3,5 205:20
**jessica's** 13:9
33:3
**jessica.davids...**
4:14
**job** 1:18 40:3
40:13 41:10,11
**johnson** 1:4,4
4:9,9 6:18,19
10:19,19 21:3,3
26:16,16 45:20
45:20 177:22
177:22 192:20
195:2,12
201:12,13
215:1,1
**johnson's** 177:6
177:11,16
178:2,24 179:4
179:17 192:20
194:6 195:2,19
199:5,17,24
200:2,7,10,16
200:25 201:12
201:13,14

**journal** 58:25
59:5,8 65:12,16
65:17 66:17,21
66:21 67:6,8,12
67:22,25 68:6,7
68:22 69:5,11
69:19 70:8 80:2
92:25 175:25
213:4
**journals** 65:6,8
65:13 66:1,7
67:11,13 68:7
68:11,13,18,21
68:23 70:13,19
71:8 86:2 99:5
**judith** 63:7,25
64:1
**judkins** 36:7
**july** 1:12 2:2
9:5,6 151:19
153:13,16
154:15 161:16
166:17 168:6
215:3
**jumped** 36:20

**k**

**k** 3:16
**keep** 193:7
**kept** 144:8
**key** 86:21
**keywords**
192:5
**ki67** 167:5,9
169:14 173:15

**kill** 97:20
**kills** 97:18
**kind** 10:5
100:19 142:8
174:23
**kit** 111:2,7,9,12
111:18,20,22
111:23,25
112:3,5,16,23
112:24 113:6,7
113:11 116:21
117:7,8,12
120:5 138:2
212:20
**kits** 112:7,17
113:14,17
**knew** 42:17
43:9 102:25
**know** 6:2,25
7:4,22 11:10,13
11:14,16 12:16
12:19 16:10
18:4,7,8 27:8,9
32:2,8,23 38:18
40:20 42:12,17
42:22 45:5,11
46:15 47:2
52:13 96:19
113:6,10 115:2
121:5 160:19
169:2 180:2,4
181:11 186:11
187:10 205:18
**knowing** 94:16
95:24

**knowledge**
111:17 172:18
172:24 177:21
179:24
**known** 65:18
170:22
**knows** 11:16
186:10

**l**

**lab** 49:23,25
93:20 94:10
97:2 102:15
134:5 136:11
187:8
**label** 200:19
**labeled** 200:7
200:15
**laboratory** 49:2
49:21 50:4,6,8
80:25 93:6
128:18 134:11
134:12,14
150:15
**lacks** 95:13
96:8 167:13
177:7,18 182:4
186:1 191:11
192:13 199:21
200:5
**lake** 3:3
**lancet** 152:8
154:15 155:1
157:15,16
158:6 212:24

**[language - lapinski]**                                            Page 26

| | | | |
|---|---|---|---|
| **language**   197:7 | 52:4,9 53:4,10 | 123:6,23 124:4 | 172:12,19 |
| 197:11 | 54:2 55:12 56:9 | 124:20 125:11 | 174:10,16 |
| **lapinski**   3:5 5:5 | 56:10,14 58:3 | 125:19 126:7 | 175:2,9,17,23 |
| 5:7 6:13 8:2,5 | 58:20 59:3,4,15 | 126:14,23 | 176:16,24 |
| 9:12,19,23 10:1 | 60:7 62:13 | 127:1,13,16 | 177:14,20 |
| 10:4,9 11:15,21 | 66:11 67:17 | 128:4 129:1,6,7 | 178:4,12,13 |
| 11:24 12:5,15 | 69:10,17 70:1 | 129:20 131:4 | 179:2,10,14,20 |
| 12:18 13:3,4,11 | 70:11,17,24 | 131:19 132:6 | 180:3,8,19,24 |
| 13:24 14:19 | 71:4,17,23 | 133:4 134:8,18 | 181:6,10,13,16 |
| 15:10 16:3,15 | 72:11 73:18 | 134:24 135:15 | 181:23,24 |
| 16:20 17:5,13 | 74:5,24 75:11 | 136:9,18 137:3 | 182:6,11,14,21 |
| 17:20,25 18:2,4 | 76:1,9,22 77:4 | 137:14,24 | 182:24 183:5 |
| 18:11,18,24 | 77:11,18 78:2,8 | 139:8,20 | 184:5,9,15,19 |
| 19:8,15 20:1,6 | 78:18,20,22 | 141:16,21 | 184:20 185:19 |
| 20:14 21:2,11 | 79:5,10,13,17 | 143:5 144:11 | 186:4,10,15,22 |
| 21:17 22:1,4,11 | 81:1,13,20 82:1 | 144:20 145:3 | 187:3,9,16,24 |
| 22:21 23:2,4,7 | 82:23 83:10 | 145:17 146:17 | 188:8 189:1,8 |
| 23:20 24:13,19 | 84:14 88:5,20 | 148:8,20 149:3 | 190:4,5 191:7 |
| 25:2,10,15,21 | 91:5,12 92:9,19 | 149:13 150:1,5 | 191:23 192:9 |
| 26:3 27:1,6 | 94:18 95:8,19 | 151:18 152:5 | 192:18 193:2 |
| 29:8,13,20,22 | 96:2,12,20 | 152:20 153:4 | 193:10,15 |
| 30:8,14,23 | 98:18,24 99:7 | 153:21 154:4 | 194:4,17,19 |
| 31:13 33:2,15 | 100:9,13 | 154:12 155:4 | 195:10,16 |
| 33:17 34:1,3 | 101:15 102:6 | 155:14,21 | 196:1,17 |
| 35:14,22 36:1,3 | 103:6 104:7 | 156:8 157:7 | 197:14,21,23 |
| 36:14,22,23 | 105:15 107:15 | 159:8,24 160:6 | 198:3,8,11 |
| 37:15,23 38:2,4 | 107:22 108:14 | 161:1,14,25 | 199:2,11,12 |
| 38:13,22 39:7 | 109:20 110:21 | 162:4,10,20 | 200:1,9,17,23 |
| 39:13 40:2,7,13 | 110:24 111:21 | 163:19,20 | 201:3,15,24 |
| 40:17 41:10,13 | 112:22 113:4 | 164:22 165:13 | 202:21,24 |
| 41:15,21,23 | 114:19 115:6 | 166:7,8,13 | 203:2,11,15,16 |
| 42:7,15 43:3,11 | 115:18 116:10 | 167:24 168:5 | 203:25 204:12 |
| 45:24 46:5,7 | 117:1,4,5,13,22 | 168:13 169:1 | 204:14,25 |
| 47:1,15,18,24 | 118:3,12 120:1 | 169:23 170:12 | 205:17 206:9 |
| 48:17 49:15 | 120:12 121:7,9 | 170:19 171:8 | 206:11 207:1 |
| 50:17,23 51:12 | 122:15,24 | 171:21 172:10 | 207:18 208:6 |

[lapinski - longer]                                                    Page 27

208:13,22
209:7,13,19
210:23 211:1
212:6
**large**  10:18
50:10,15
**larger**  164:4
**laura**  63:7 64:5
**law**  5:7
**law.com**  4:20
**lawyer**  21:16
33:1 144:7
**lawyers**  21:20
27:5,9 40:8
**lay**  42:19
100:19 205:21
205:25
**layers**  162:9
**leading**  91:3
**leads**  62:25
**learn**  144:3,6
**leaves**  73:4
**leaving**  202:7
**led**  154:25
**leeway**  210:25
**left**  84:2 105:17
142:23 183:15
184:22 209:9
**legal**  31:25
32:22 39:25
**legalese**  56:13
**legitimate**
197:13
**leigh**  4:5
**leigh.odell**  4:6

**length**  72:20
**lesions**  123:20
**letters**  11:9
**level**  97:6 175:4
**levy**  27:18,25
28:4,22 29:25
30:4 36:8 62:2
63:8 64:14,16
182:17 183:8
183:22 185:11
185:15 189:5
189:11 193:4,6
196:21,25
198:16,17
199:13,18
201:25 203:13
203:14,18
204:6,9 205:1
205:11,12
206:13 207:20
207:25 213:6
**levy's**  34:12
57:24 62:3,5,6
62:7 183:15,18
184:22 190:9
193:17 197:2,9
198:4,15 199:9
204:16 213:5
**liability**  1:5
**license**  214:24
**life**  23:14
170:25 171:1,9
172:4
**lifelong**  159:13
**likely**  23:18

**limit**  188:4
**limited**  49:11
50:22 51:7
158:11 168:2
187:13 188:20
189:19 207:17
**limiting**  114:11
125:7 126:4
**line**  10:25 14:20
20:22 24:7
27:12 30:20
32:7,11 34:7,17
35:15 49:8
63:18 215:8,10
215:12,14,16
215:18,20,22
**lines**  173:5
**link**  154:24
192:5
**linked**  31:23
**links**  109:13
**list**  16:22 60:6,8
60:8 137:8
147:25 153:10
153:18,19
172:22 194:25
212:18
**listed**  14:20
27:5 37:8 60:23
60:24 86:2
103:13 147:25
185:4 201:21
**listen**  203:15
**lists**  8:19 60:9
154:2

**literally**  93:8
97:18
**literature**  20:9
45:4 71:11 76:8
77:3,5 79:4
161:7,11 172:2
172:21 174:12
179:19 191:9
191:13,24
192:4 196:7
**litigating**
164:20
**litigation**  1:6
5:16,17,24,25
21:16 23:16
26:11 39:2 43:5
44:11,13,14
46:10 68:3
178:6,19 188:2
189:16 196:10
215:1
**litigations**  5:9
**little**  10:8
103:18 133:9
205:6 210:25
**llp**  3:16 4:11
**logical**  169:12
**long**  6:17 7:22
91:18 99:24
102:10 103:20
139:10 159:12
164:21 174:6
188:9
**longer**  112:12
134:11 135:11

**[longtime - march]**                                                    Page 28

**longtime**
  175:15
**look** 15:3 24:2
  25:22 35:24
  43:24 44:4
  52:12,13 54:7,7
  57:1 58:10 61:5
  91:24 101:5,17
  105:12,16,17
  113:18 118:23
  120:23 131:20
  135:16 148:14
  148:17 159:9
  163:21,22
  165:5 167:15
  169:22,24,24
  170:8 178:6,15
  209:14
**looked** 73:1
  171:19 178:19
  192:6
**looking** 10:16
  22:5 36:24
  40:18,19 66:14
  72:13 94:17,17
  99:12 101:8
  117:20 123:18
  135:2
**lost** 164:23
**lot** 159:20
  162:9 177:11
  178:1 189:24
**low** 66:19 93:12
  173:15
**lower** 65:6,12
  65:13 66:17,21

67:11 68:6,7,18
68:21 69:5
135:14
**lowest** 97:13
**lunch** 132:4
  133:5
**luncheon** 132:8
**lung** 159:14
**luxury** 112:7
  123:18
**lynch** 206:19
  206:20 207:3,7

**m**

**m** 1:17 2:6 4:5
  214:5,23
**macrophages**
  210:13
**made** 71:20
  97:5 102:11
  107:5 142:10
  145:15 154:8
  154:10,11
  160:20 198:16
  198:17
**main** 149:15
**maintained**
  156:25
**major** 129:22
**majority**
  133:24,25
  190:9 193:17
**make** 7:15
  11:18 22:2
  32:20,24 33:14
  68:19 80:15

145:18 161:23
168:3 169:11
175:10 188:9
188:16 202:10
**makes** 118:14
**making** 189:10
**male** 159:15
**malignancy**
  139:11
**malignant**
  24:22 25:6 70:3
  80:9,11 82:16
  89:24 93:18
  102:18,23
  104:23 105:23
  108:23 113:15
  113:22 114:3,6
  114:13 115:4
  115:12,15,25
  116:4,7,11,14
  116:15,17,20
  116:23 117:20
  118:16,18
  119:2,7,17,22
  119:23 120:3
  120:10 122:8
  123:1,5,7,8,12
  123:25 124:7
  124:11,15,23
  125:1,8,13
  126:3,9,13
  128:3,9 138:3
  138:13 139:3,6
  163:4 164:15
  176:2

**malignantly**
  121:24 122:5
**managed** 73:6
**mandarino**
  57:17 61:20
  74:23 75:1
  209:21 210:9
  213:7
**manhattan**
  4:11
**manipulation**
  143:25
**manner** 128:10
**manufactured**
  111:10
**manufacturer**
  115:2 126:16
  126:17 127:11
  127:20
**manuscript**
  57:12 70:7
  71:18 81:4,8,10
  84:21 85:7 86:5
  86:10 88:24
  89:24,25 90:25
  91:3 120:20
  129:17 139:25
  165:2
**manuscripts**
  65:7
**march** 27:17,19
  27:20,21,22,24
  28:1,3,5,6,7,9
  28:20 29:23
  30:10,16 33:5
  33:23 34:6,6,7

34:21,22 35:1
36:1,24 37:6
41:20,25 99:11
99:17,20 100:4
100:21 101:2,6
101:9,13
103:11
**margaret** 4:5
**margaret.tho...**
4:6
**marginalizes**
98:3
**mark** 8:2 9:12
9:14 35:6,6
100:9 110:21
150:1 182:11
**marked** 8:3,7
9:10,24 10:2,11
47:21,22 51:24
52:6,11 53:5,6
57:4 59:13,17
100:11,14
110:22 111:1
144:9,13 148:5
148:10 150:3,7
152:3,7 166:11
175:21,25
182:12,16
183:2 209:16
210:19
**marketing** 1:5
**marks** 105:5,8
**mas** 1:5
**massachusetts**
166:17

**material** 19:14
57:25 58:10
81:12 165:9
**materials** 57:10
60:3,9,14,16,21
60:22,24
128:17 137:5,6
137:7,8 148:1
154:1 161:16
172:21 212:18
**math** 46:3
130:9
**mathematical**
142:3,9,11
143:25
**mathematics**
131:3,7
**matter** 67:23
**mcdevitt** 4:17
**mctiernan** 63:7
**mctiernan's**
63:16,20
**mdl** 1:5 15:13
19:22 20:19
22:7,15 26:10
26:11,20 27:10
36:11 38:10
44:12,13 215:1
**meagher** 4:11
**mean** 11:9 12:3
13:19 15:8 16:9
17:22 19:12
20:23 23:1 32:4
33:25 40:8
65:11,23 87:16
95:1 98:23

116:2,6 124:13
124:14 187:14
198:2 200:21
205:8,9 207:12
207:13,13
**meaning** 18:25
39:25 121:15
127:10
**means** 32:5
38:19 39:17
87:1,12 115:2
120:9 121:25
122:21 201:6
**meant** 41:20
128:1 201:8,9
**measure** 66:2
113:17
**measures**
150:17
**mechanism**
75:6,7 104:25
106:7 107:4,14
107:25 109:2
109:13,17
140:1 141:5,9
198:13
**mechanisms**
62:19 114:16
146:21
**mechanistic**
57:15 156:14
**med** 19:3 22:23
22:25 23:2
**medical** 38:7
41:18 42:4
48:10,18,22

70:13,19 71:7,9
71:11 78:3
**medicine** 49:2
**medium** 121:17
121:18,19
**meet** 5:10
**meeting** 50:2
80:3,4 81:17
82:11,13,14,22
83:24 90:6
91:19 92:18,25
99:20 168:9,18
168:24
**meetings** 57:11
**member** 5:8
82:2,9,15
168:21
**members** 81:22
**memorize**
184:8
**memory** 45:10
92:23 99:19
137:2 165:25
**mentioned** 70:2
**mentions** 157:5
157:6
**merit** 2:8 214:6
**mesothelioma**
209:6
**method** 110:6
**methodology**
88:23 93:6,11
93:15 97:12
110:2,11
**methods** 87:24
87:25,25

[metric - normal]                                                               Page 30

**metric**  65:18
**mice**  159:13,17
**michelle**  3:18
  63:8 64:8
**middle**  7:23
  85:5 142:13
**mill**  209:5
**miller**  22:15,20
**mind**  33:3
  106:18 174:24
  199:3
**minerva**  24:16
  24:21 25:5,7,18
  61:18 65:22
  71:20
**minority**  46:22
**minute**  6:7
  28:19 52:12
  53:12 99:8
  177:9 181:4
  209:8,9
**minutes**  175:18
**mischaracterize**
  201:5
**mischaracteri...**
  92:6 130:21
  175:7,12 201:2
**misleading**
  190:10 193:18
  198:22 203:1
  204:11,13,19
  205:13
**mistake**  154:9
  154:11,11
**mixed**  28:9

**model**  76:5
**models**  74:21
  76:19
**modest**  65:4
**molecular**
  146:12 186:5
**moment**  117:7
  183:20
**monograph**
  178:22
**montgomery**
  4:4
**month**  101:18
  151:20
**months**  100:2
  101:2
**morning**  5:6,11
  5:22
**mossman**  94:20
  94:22 95:7
**motley**  3:3 5:7
**motleyrice.com**
  3:6
**mouth**  93:17
**move**  201:10
**moved**  153:7,9
  195:14
**moving**  79:6,6
**mparfitt**  3:19
**multicounty**
  5:17
**multiple**  9:14
  9:16 63:6 116:8
  124:5,8
**multiplied**
  130:9

**multitude**
  191:15
**mutation**  87:6
  87:6,8,17,18,19
  87:20 119:2
  170:2 172:5
**mutations**
  86:20 87:1,12
  87:22 118:23
  202:2,6 203:19
  203:22 207:10
  207:21 208:1,8
  208:18 209:4

**n**

**n**  3:1 4:1 133:2
  133:2,2 185:22
  212:1,5,5
**name**  5:6 215:1
  215:4
**national**  57:11
**necessarily**
  168:20 205:23
**necessary**
  70:12 119:8
  172:24 174:21
**necessity**  99:23
**need**  7:21 21:8
  22:2 37:18 79:9
  109:25 135:9
  138:11 174:25
  181:21 203:2
**needed**  7:24
**needs**  21:18
  170:4 203:7

**negative**  131:23
  138:25 139:1
**neither**  214:17
  214:19
**neoplastic**
  113:22 114:3
  138:19
**never**  14:12
  97:21 111:23
  112:4 158:15
  176:21 177:3
  185:15
**new**  1:2 2:9,9
  3:4 4:12,12,18
  5:2,17,25 26:11
  32:8 43:5,6
  44:14 55:5,8
  56:2,5 57:18
  156:18 214:3,7
  214:7
**newsome**  36:6
**nice**  162:7
**nickel**  179:25
  180:16 182:8
**nod**  7:17
**nonsensical**
  130:5,8 131:1,2
  138:23
**normal**  86:22
  104:24 105:24
  106:5,13 108:1
  108:23 113:21
  114:2,12
  115:14 116:16
  123:14,16,24
  124:6,10,15,22

**[normal - object]**                                                      Page 31

125:1,8 126:5
134:2 139:3,5
140:2 141:6
169:15
**north** 3:9
**northwell** 49:2
**notably** 85:6
**notary** 2:8 5:1
214:6,24
**note** 12:12 21:6
41:13 83:16
85:5 86:16 94:8
126:17
**notebook**
128:18
**notebooks** 93:6
93:20 94:3,11
102:15
**noted** 21:5
131:13 174:18
194:18 204:1
211:8
**notes** 14:10
137:1
**notice** 8:8 9:5,8
212:11
**notion** 138:1
**november**
14:21 63:16
**ntp** 159:12,19
159:23
**nuclear** 170:23
**number** 10:17
66:6 80:8
100:18 129:25
130:9 173:17

193:11,14,19
194:24 199:3
203:17 207:24
208:12
**nw** 3:16

**o**

**o** 133:2,2,2
212:5
**o'brien** 57:19
143:13,14,18
144:14 145:12
145:18 146:3,6
146:7 212:21
**oath** 7:8
**object** 6:11
13:10,17,18
14:17 15:7 16:1
16:7,14,17 17:2
17:10,17 18:16
18:23 19:5,11
19:25 20:4,11
20:21 21:10
22:9 23:5,11
24:24 25:8,13
25:19 26:1,21
27:3 28:25 29:4
30:6,12,18
33:25 35:12,20
36:9 37:9 38:11
38:17 39:3,12
41:9 42:5,13
43:7,7 45:21
46:18 48:15
49:7 50:13,20
50:21 51:5,11

53:24 55:10
56:4 57:7 58:18
59:2,10,24 66:8
67:14 69:8,14
69:22 70:9,14
71:15,21 72:9
73:15 74:3,11
75:3,21 76:14
77:1,7,16,22
78:6,15 79:2
80:22 81:5,18
81:24 82:18
84:12 88:3
90:18 91:9 92:5
92:14 94:14,25
95:12 98:22
102:3 103:2
104:3 105:11
107:11,18,20
108:12 109:9
111:19 112:19
113:1 114:24
115:9,22
116:13 117:10
117:17 118:1,9
119:19 120:7
120:22 121:2,6
122:11,18
123:2,11 124:2
124:17 125:2
125:14,25
126:10 128:23
129:18 130:20
131:16 134:6
134:16,21
135:6,12 136:3

136:14,24
137:12,20
138:22 139:16
141:13,19
144:24 145:13
146:10 148:16
148:23 149:6
149:23 151:13
152:2,19
154:22 155:13
156:4 157:3
160:3,21
161:13 162:18
163:16 164:12
165:4 168:19
169:21 170:17
171:18 172:8
172:15 174:4
174:14 175:6
176:14,19
177:7,17 178:8
178:25 179:6
179:18 180:1
180:21 181:1
185:13 187:6
187:12 190:23
191:10 192:2
192:13,22
195:22 199:6
199:21 200:4
200:12,20
201:2,19
203:24 204:23
206:22 207:12
207:23 208:10
208:20

**[objected - opinion]**                                                    Page 32

| | | | |
|---|---|---|---|
| **objected** 34:2 | **occasionally** | 54:15,24 56:15 | 183:10 184:15 |
| 46:5 135:13 | 44:24 81:9 | 56:19,24 59:22 | 184:19 185:3,7 |
| **objecting** 20:22 | **occur** 119:13 | 63:20 67:1,7 | 189:1 190:16 |
| 21:24 39:21 | 124:25 | 72:15 75:18 | 190:20 194:17 |
| **objection** 6:6 | **occurred** 90:23 | 77:5,12 80:5,18 | 197:17 199:11 |
| 18:5 21:5,6 | 90:24 | 81:2 84:4,25 | 200:10 203:6 |
| 24:17,23 31:21 | **occurs** 133:25 | 85:4 89:8,15 | 205:21 206:9 |
| 42:24 62:11 | **october** 10:23 | 90:7 91:13 | 208:23 210:1 |
| 70:20,22 82:25 | 19:19 20:16 | 93:22 96:21 | 210:23 |
| 83:2,7 95:16 | 22:6 | 99:14,15,24 | **old** 6:2,9 48:7 |
| 96:18 98:12 | **odell** 4:5 | 100:3 101:25 | **oncology** 48:22 |
| 108:13 114:17 | **offered** 66:3 | 102:22 103:7 | 67:16,19,21 |
| 167:13 168:10 | **office** 60:5 | 103:22,25 | 68:8,23 80:2 |
| 174:18 175:11 | **oh** 11:17 83:1 | 104:8,13,15 | 84:21 85:6,11 |
| 175:12 181:17 | 129:6 144:19 | 105:16 106:3 | 85:15,19 88:11 |
| 182:3 186:1,7 | 157:22 170:18 | 106:10,21 | 90:5 92:25 |
| 194:17 198:1 | 195:14 | 110:7,8 113:13 | 100:15 131:25 |
| 203:5 204:1 | **okay** 6:21 7:6 | 117:14 118:15 | 152:8 154:15 |
| **objections** | 7:19,24 8:12,18 | 119:17,20 | 155:1 157:15 |
| 24:10 41:8 96:7 | 10:16,21,25 | 123:7 124:5 | 157:16 212:24 |
| **objective** 65:21 | 12:2,5,7,10 | 130:4,15 | **oncotransfor...** |
| 66:22 86:13,16 | 13:1,3,9 14:3 | 135:23 136:19 | 114:15 |
| 150:12 | 14:13 15:16,21 | 137:4 138:8 | **ones** 58:25 |
| **objects** 121:1 | 16:4 17:14 | 140:19 141:17 | **ongoing** 46:10 |
| **observe** 12:25 | 18:12 19:9 | 141:22 142:13 | **opined** 210:3 |
| **observed** 93:13 | 20:15 21:8,17 | 143:3 145:18 | **opining** 74:20 |
| 97:14 128:19 | 21:22 22:12 | 145:22 147:2,5 | 210:17 |
| 129:4 159:3,15 | 23:2,4 24:14 | 147:25 152:1 | **opinion** 13:16 |
| 159:16,17 | 26:14 27:10,13 | 154:19 155:11 | 29:10 31:9 |
| 164:3 | 28:19 30:23 | 161:10,20 | 33:10,11 38:24 |
| **obstetrics** | 33:22 36:22 | 162:24 164:7 | 39:24,24 58:2 |
| 24:16 25:5,18 | 38:14,23 40:15 | 166:16 170:13 | 60:4,18 61:2,3 |
| **obstructive** | 40:19,21 42:8 | 171:13,22 | 62:2,3,5,6 73:4 |
| 205:6 | 43:4 44:8 47:5 | 172:10 174:1 | 74:25 78:3,12 |
| **obviously** 12:3 | 48:10,24 49:21 | 176:6 181:12 | 78:24 89:20 |
| 27:23 28:8 48:7 | 52:24 53:3,18 | 181:23 182:7 | 93:1,17 94:4,7 |

**[opinion - oversight]**

94:9 96:9 98:9
98:10,15,16,19
98:23 102:9,13
103:1,8 113:5
114:8 118:16
119:18 120:4
120:18 122:10
122:13 128:20
129:10 130:12
130:16 131:5,6
131:9,10,13
133:22 137:15
138:24 139:15
141:11 145:11
145:14 147:18
148:3 160:16
182:1,8 184:25
185:11,14,18
190:20 191:2,6
191:9,20 192:8
194:2 198:5,20
199:9 200:3,6
200:11,14,18
201:11 205:18
207:9,20 208:7
208:16,17
**opinions**   6:15
6:23 7:2 15:19
16:5 18:21 21:4
22:24 23:23
28:24 30:10,16
31:2,6,19 32:5
32:6,12,19 33:6
34:15,23 35:2
35:10,19 37:21
38:9,15 39:15

39:17,17 44:9
48:19 49:19
52:19 55:1,6,9
55:23 56:3,21
60:16 61:20,23
62:1,8 79:23
96:6 99:2 102:2
103:13,20,20
103:25 104:1,6
104:6,8,10,14
109:21 133:10
133:17,20
144:22 148:15
148:18 152:17
152:21,24
156:3,6,19
161:22 162:12
169:5,6,8 178:5
178:14,19
181:22 182:19
183:11 185:12
185:25 186:6
188:11,11,18
189:13 193:8
194:15 196:21
196:23 197:1,4
206:1
**opportunity**
52:13
**opposed**   32:1
68:1 93:10
98:15 118:2
155:19 160:24
**oral**   1:10 2:5
8:8 212:11

**order**   9:7 52:17
118:21 119:5
124:25 138:8
139:11 156:1
161:3 196:20
**organization**
149:19,22
151:3,6,12,17
**organizations**
151:2
**original**   53:23
54:20 66:2
153:13 154:24
167:12
**originally**
65:14 102:13
**originate**   98:5
**ortega**   4:23
**output**   67:5
**outset**   68:14,15
**outside**   39:4
67:20 116:3
120:9 123:4
128:2 181:19
189:6,8,17,22
192:23 195:3
198:1 204:24
204:25 205:5
206:23
**ovarian**   38:24
40:24 43:14,18
44:22 45:3
50:19 51:1,4,14
51:17 62:19
67:24 68:4 73:8
75:7 76:20

86:22 96:17,22
96:25 98:1,5
104:24 105:1,9
105:24 106:13
106:15,23,24
107:9,10 108:1
108:8,11,17,23
109:6 130:1
133:12,15,24
133:25 134:15
134:20,23
135:2,3,20,24
136:5,7,12,17
140:2,5 141:6,7
141:10 142:18
143:9 147:11
148:3 149:2
158:12 163:14
164:10,19
176:18,22
178:7,20
180:12,17
181:3 185:16
185:18 190:18
190:22 191:5
191:15,20
192:5 197:25
199:1 204:22
206:7,15,17,21
207:3,8 209:23
**overall**   131:5
142:16 143:7
147:19
**overly**   197:19
**oversight**
161:21,24

**overstatement**
140:15,22
141:3,11
159:23
**overview**
113:20,20
114:1 116:21
**own** 50:8 94:7
112:5 145:1
165:19,23
**oxidative** 63:1
74:2 75:20 76:5
76:13,19 77:6

**p**

**p** 3:1,1 4:1,1
11:4,9 12:3
13:6
**p.m.** 132:8,10
175:19,20
184:17,18
209:11,12
211:8
**p53** 167:5,9
169:14 170:2
170:21,23,25
171:1,9,19
172:4,5
**page** 8:13,16,19
8:19 28:20
34:19,21 35:4
35:23 43:24,25
44:5 54:7,8
57:15 61:7,9
62:10,14 64:18
64:20 68:19

72:13 79:6,6,20
79:22,23 80:8
83:15,17,19
84:18 85:1
86:12 87:23
97:23 104:18
109:21,25
110:9,9 113:19
117:2 120:14
121:10 126:15
128:5 131:23
135:7,8,16
137:15 139:21
142:24,25
143:1 145:25
146:19,19
147:8 149:12
157:17 158:6
158:23,25
163:22 166:20
169:9,9,10
176:9 182:19
183:11 190:6
203:17 206:4
210:3,9,10,14
210:18 212:2
212:10 215:8
215:10,12,14
215:16,18,20
215:22
**pages** 9:21
**paid** 21:2
**painful** 187:2
**pamphlet**
111:14 113:12

**paper** 54:12
57:18 59:1
65:14,21 66:2,5
72:14 90:10
142:12 145:16
145:25 155:20
155:25 174:8
176:7,8 185:16
209:25 210:1,2
210:17
**papers** 57:16
65:25 66:7
68:11 73:10
74:22 76:17
94:17 185:4,5
187:10,19
191:16,18,19
192:4,7
**paragraph**
54:12,16 64:20
65:1,2 66:10
72:13,14,16
84:17,25 85:4,5
87:24 88:13,19
88:21 104:20
117:2 120:13
121:12 126:22
126:23 128:5
129:21 137:22
139:22 142:13
142:22,23
146:1 149:12
150:11 157:8
157:17 158:9
158:24 166:25
171:14 172:7

172:14 173:1
174:12 175:3,5
**paralegal** 162:8
**pardon** 185:21
**parentheses**
110:14 128:16
**parfitt** 3:18
**part** 24:14
38:16 46:12
70:12,18 71:7
71:12 72:8 80:2
102:23 103:8
105:7,25 130:4
146:9 165:16
185:7,8 208:7
208:16
**partially**
180:10
**participate**
40:9 50:6
**particles**
209:22 210:12
**particular** 11:1
15:18,21 20:9
28:17 34:17,17
69:13 80:21
89:25 98:16
110:15 111:22
111:23 114:22
149:4 171:17
**particularly**
146:12 149:8,8
**parties** 214:18
**parts** 27:2
**past** 71:25 72:3
73:1 177:13

[path - pleasure]                                                Page 35

**path**  114:12
**pathologist**
    49:4,14
**pathology**  36:5
    37:1,7 41:17
    42:2 48:24 49:2
    49:6
**pearson**  12:4
    13:13
**peer**  68:12 69:1
    69:3 70:4,6,12
    71:6,9,18,24
    72:6,7 82:20
    83:22 85:2,10
    85:24 86:1
    88:10,22 89:10
    89:11 90:17,21
    91:2,4 92:16
    94:8 97:25
    98:20 103:25
    104:10,15
    120:19,23
    128:18 129:4
    129:16 131:14
    131:14,18
    165:1,6,18
    166:1,4 167:10
    167:15,18,19
    167:22,24
    169:3,20
    170:15 173:23
    174:1,6 191:8
**pen**  142:12
**pending**  5:18
    43:6 44:14

**penetrance**
    206:16
**penetrant**
    207:8
**pennsylvania**
    3:10
**people**  39:20
    132:5
**percent**  84:2,4
    84:7,9 130:1,1
    130:14,25
    131:1,24 163:6
    173:6,6,8,12,17
    173:18,21
    206:17 207:8
**percentage**
    174:23
**perform**  107:2
    142:12
**performed**
    10:19 11:3
    28:12 97:21
    176:22
**perineal**  75:8
    104:25 105:9
    109:5 148:25
    164:17
**period**  17:8
    31:18 34:13
    38:5 45:6 50:22
**peritoneal**
    106:5
**personal**  50:8
    94:7 111:17
**personally**
    97:21 134:7

    179:8
**perspective**
    32:22 124:22
**pertain**  110:2
**petri**  93:25
    97:18 119:6,14
    121:18
**ph.d.**  1:11 2:5
    5:1 183:19
    212:3 214:9
    215:4,24
**phagocytes**
    209:23
**pheochromoc...**
    159:16
**philadelphia**
    3:10
**photographs**
    169:15
**phrased**  190:2
**physical**  125:16
**physically**
    49:25
**pi**  173:7,12,21
    174:2
**pick**  78:9,11,23
**place**  36:21
    82:13 91:19
    214:14
**plaintiff**  37:5
    74:14 102:11
**plaintiffs**  3:2,8
    3:15 4:2 5:8
    11:4,7 12:14
    36:6 37:3 38:6
    38:16 39:1,10

    40:24 41:19
    42:3,14,18 43:2
    43:5 57:16
    59:17 62:18,24
    63:6 72:18,24
    73:1,3,4,12,20
    73:22 74:1,6,8
    75:14 76:3,12
    76:12,16,23
    77:2,14,20
    101:7 144:13
    192:11,15
    193:24 194:5
    195:7,12,19
    199:4,8
**planning**  48:18
**plastic**  121:18
**plausibility**
    198:25
**plausible**  62:20
    198:13
**plausibly**
    146:21
**play**  190:17
**played**  178:16
**plays**  151:5
    190:21 191:14
    191:19
**please**  24:2
    25:1,22 41:14
    53:5 61:7 79:20
    95:18,20
    100:10 108:18
    135:12 175:11
**pleasure**  5:10

**[plenty - presentation]**                                    Page 36

**plenty**  190:1
**plunkett**  63:7
  64:5
**plusone**  85:25
  86:3,6,8,9
  89:10
**point**  10:6 41:1
  41:3 68:9 86:20
  87:5,19 91:18
  97:14 101:25
  104:14 118:22
  127:25 135:5
  139:4,9 157:5
  165:15 177:13
  179:12 188:19
  197:12,15
  198:6,7,8
**pointed**  139:13
**points**  14:15
  190:13
**polyps**  123:20
**pooled**  158:16
**poor**  45:9
**portion**  50:10
**position**  160:13
  174:2,13 206:2
**positive**  131:24
  147:10 158:14
**possible**  78:5
  84:13 86:1
  97:13
**possibly**  12:17
  32:1 45:6 69:9
  74:23
**post**  186:14,19
  188:12 193:9

198:19
**postdoctorate**
  183:23
**poster**  14:23
  16:24 18:13,22
  18:25 19:4,10
  19:14,16 22:24
  79:24 80:7,18
  81:2,8,11,11,21
  82:10,16 83:12
  85:1 86:14 90:1
  90:22,23 91:7
  99:19 100:8,15
  100:16,22
  101:10,21
  102:2,9,25
  105:4,8,12
  106:11 119:15
  139:24 162:12
  162:16 165:17
  166:9,16,19,22
  167:1,2,12
  168:7,8,15,17
  169:3,6 174:6
  212:19 213:3
**posters**  18:15
  61:13,17 81:14
  81:16 83:16
  84:7
**potential**
  114:22
**powder**  1:4 5:9
  6:15,19,23 7:2
  50:19,25 51:4
  51:14,17 75:2,9
  86:19 87:2,13

88:1,7 89:19
93:2 95:11
96:14,17 97:3
97:22 104:23
105:1,9,23
106:12,15
107:9,25 108:7
108:11,16,22
109:6 128:8
129:12,24
140:2,4 141:6,9
142:18 143:9
143:19 146:20
149:1 151:22
158:14 164:17
173:4 177:6,12
177:16 178:2
178:24 179:5
179:17 191:25
192:10,12,21
193:11,19,22
193:25 194:6
195:2,13,19
198:14,23
199:1,5,15,17
199:20,24
200:3,8,11,16
201:1,12,13,14
201:17,18,22
215:1
**practical**  48:8
**practice**  11:22
  14:3,10,13
**practices**  1:5
**practicing**  49:3

**pre**  188:12
**preceding**
  116:23
**precisely**  181:4
**precursor**
  123:20
**preexists**
  115:13
**preliminary**
  91:25
**premalignant**
  123:18
**preparation**
  22:6 27:14
  36:16 44:23
  58:13,16 59:8
  90:24 103:19
  103:21
**prepare**  153:19
**prepared**  22:14
  45:19 59:23
  60:6 153:18
**preparing**
  27:23 57:6
**prerequisite**
  123:1
**presence**  177:6
  177:16,25
  199:14,19
**present**  4:23
  81:7 147:12
  189:19 196:20
**presentation**
  14:23 82:10,21
  83:13,25 84:5
  92:18 101:21

**presentations**
16:24 18:13
22:24 91:25
**presented**
50:18 51:3,16
65:20 80:19
81:16,23 90:5
91:25 99:20
100:3,7,20
140:10,23
166:10,17
168:9,17
**press** 153:15
154:25 156:18
157:4 177:10
**presumably**
93:24 110:3
**presume** 105:5
**preventative**
150:17
**previous** 93:7
106:13 108:6
140:3
**previously**
92:10 118:25
169:8
**primary** 156:15
**principle** 130:8
**principles**
140:11,24
**print** 59:25
184:11,16
**printed** 184:6
184:14
**printout** 150:8
212:23

**prior** 95:2
101:25 103:16
115:13 118:10
173:24 214:8
**privilege** 16:9
33:4 37:19 38:1
46:19
**privileged**
16:11,13,16
29:2,17,18
30:19,21 31:7
31:12,15 40:11
40:18 46:20
**privy** 83:7
**probably** 50:1
58:19 60:5
132:5 156:10
**problem** 122:3
**procedures**
168:23
**proceedings**
80:3 92:24
**process** 14:4
70:13,18 71:6,7
71:10,13
123:15 124:6
124:24 138:19
168:12
**produce** 112:5
**produced** 8:20
47:25 101:5
111:14,16
131:21
**product** 16:9
111:2 177:24
212:20

**productions**
19:20
**products** 1:4,5
192:12,21
193:11,19,25
195:13,19
198:14
**professional**
23:14,17 78:4
180:14
**professor** 49:1
64:22
**program** 50:5
**programmed**
126:12
**programs** 50:7
**progression**
191:5
**proliferation**
126:8,11 160:1
173:4
**promote**
146:21 150:12
**proper** 42:20
**properties**
116:9 126:12
**property** 126:9
**proportion**
50:15
**proposed** 62:19
62:24
**proposition**
138:21
**protected** 40:12
**protein** 170:23
170:25 171:1

171:10 172:4
**proteins** 169:14
**protocol** 111:3
111:15 113:18
113:19
**protocols**
168:23
**provide** 9:8
16:5 33:21
38:15,24 39:8
39:14 43:12,16
62:9 79:23
80:19,24 86:8
**provided** 5:23
15:25 44:9
53:15 55:9
63:12 113:12
120:19 154:20
182:19 183:11
198:19
**provides** 55:22
191:13 198:12
**providing**
109:16 145:11
145:14 197:4
**proving** 117:25
**pub** 19:3 22:23
22:25 23:2
**public** 2:8 5:2
214:6,24
**publication**
65:4 83:22
90:24 91:1 92:3
152:1 155:19
174:9 176:11
176:12

**[publish - quoting]**                                                    Page 38

**publish**  65:5
67:10,25 68:20
71:20 73:7 99:5
139:1,2
**published**
24:21 25:7
52:20 57:13,21
61:17 67:12
68:25 69:4 73:6
73:23 75:1
79:24 80:1 81:4
90:4,9 91:11,14
91:17,20,22,23
99:10,11,16,21
99:22,25
100:25 101:1
143:18 151:20
152:8 154:16
166:10 176:7,8
209:21
**publisher**  83:21
**publishers**
71:19
**publishing**
67:24 70:13,19
71:7,10 191:17
**pubmed**  18:20
20:8 21:1 23:1
23:14,18 25:16
45:8 137:17
**purchasing**
112:7
**purport**  113:17
**purported**
80:11

**purports**
104:22 108:21
166:23 167:2
**purpose**  12:21
80:18,24
**purposes**  13:15
21:5 31:9 35:19
48:8 49:16
54:25 58:6 61:2
61:3 62:15 93:3
96:18 97:7
118:18 136:12
139:14 149:5
154:20 188:1
**pursuing**  58:8
**put**  9:15 51:25
52:10,18 53:13
58:1 59:16
76:18 93:17
103:22 106:8
119:8 127:23
171:4 184:3
189:14
**putting**  74:21

**q**

**qualifications**
185:17 186:23
187:1,5,25
188:4,14
189:11,13
**qualified**
185:12 187:8
**quantitative**
129:22 130:17
131:11 142:11

163:6
**quarrel**  131:6
**question**  7:23
9:3 14:6 18:3
23:21 24:25
26:13 29:7,8
31:17 32:16
34:4,18 36:19
41:24 45:23
46:2,6,19 53:20
54:3,4 56:12
57:9 59:3 63:11
70:25 71:1,3
73:21 76:10,16
77:8 78:17 81:7
87:15 92:8
95:18,20,21,23
97:8 99:15
102:5 108:18
115:24 121:1
127:19 138:24
142:8 155:3,5,6
166:7 172:11
173:25 175:9
176:3 177:20
179:13 185:17
186:18 187:22
187:23 188:13
189:18 190:2
192:16 193:23
194:16,20
195:1,17,21,23
196:5,7,9,15
197:16 198:3,4
202:16,17
204:1,4,7,11,13

205:4,10,11,25
209:1
**question's**  51:9
**questioning**
13:18 20:22
32:7 49:8 88:24
**questions**  7:10
15:8 16:19
17:23 37:16,22
38:3 39:19,20
41:5,7 48:25
52:17 58:9
97:10 153:23
154:14 180:7
181:5,9,21
184:12 188:5
188:23 189:3
193:21 198:2
205:15,21
206:25 207:16
207:17 211:3
**quicker**  37:15
**quickly**  45:18
**quiet**  83:4
**quite**  171:1
194:13
**quotation**
105:5,7 191:3
**quote**  105:22
106:7 108:22
108:25 146:3
204:5
**quoted**  105:25
**quoting**  109:3
146:6 202:23
204:8

**[r - reference]**

Page 39

| r | | | |
|---|---|---|---|
| **r**  3:1,5 4:1 133:2 | 158:19 164:5 167:7 171:12 173:2,9 178:9 186:12 190:25 202:8,15 203:8 203:10,23 204:15,16 214:16 | 215:22 | **recognize** 123:20 |
| **raise**  72:7 82:16 82:24 83:6,12 120:14 | | **reasonable** 11:18 109:11 150:23 151:9 | **recollection** 13:6,14,25 15:2 19:2 20:2,7,12 22:12 23:8,22 23:25 24:1 |
| **raised**  88:22 | | **reasons**  149:9 149:14 | 58:11,21,24 59:7 76:2,11 |
| **raising**  31:25 | | **reassess**  160:24 | 90:8,13,14,15 |
| **ranking**  65:16 | **reader**  69:6 109:11 | **rebecca**  63:8 64:11 | **record**  7:7,14 7:24 12:1,8,13 |
| **rate**  114:11 126:4 | **reading**  14:7 45:4,4,8 72:21 | **recall**  16:24 17:14 19:18 25:11,16 35:21 | 12:23 21:6 22:3 36:14 41:13 |
| **rather**  65:19 97:17 98:2 135:20 | 88:12 89:13 90:13 99:4 107:17 111:13 | 42:6 47:10 56:23 63:24 76:3 89:13,17 | 47:13,19 79:12 79:14 121:3,7,8 132:7 154:1,6,7 |
| **rats**  159:13,14 159:15 | 113:25 140:21 142:19 155:12 | 91:13 95:3,5 137:13 | 161:23 162:1,6 175:17 181:7 |
| **rausa**  36:6 | 155:19 165:9 166:2 202:11 | **recalling**  17:17 165:25 | 181:17 182:21 182:23,24 |
| **read**  45:5 63:3 65:9 68:14 | 202:17,19 | **recalls**  13:21 | 184:14,16,19 203:3,4 209:7 |
| 70:25 84:1 86:23 87:3 89:2 | **ready**  46:4 **reagents**  112:6 | **received**  8:3 9:10,24 10:2 | 209:10 215:6 |
| 89:15,18,23 90:4,8 91:2 | **real**  27:7 **really**  7:5 33:8 | 47:22 52:6 53:6 59:13 100:11 | **recorded**  88:25 **records**  38:7 |
| 92:24 95:20,21 96:1 98:7,20 | 38:20 54:5 83:4 114:18 159:19 | 110:22 144:9 148:5 150:3 | 41:18 42:4,9 **redox**  86:21 |
| 101:11,16,23 102:9 105:20 | 168:11 197:18 **realtime**  2:7 | 152:3 166:11 175:21 182:12 | **reduced**  150:18 **refer**  76:17 |
| 110:19 113:12 128:24 129:1 | **reanalysis** 144:1 | 183:2 209:16 **recent**  34:5 | 77:3,25 79:18 126:15 129:23 |
| 138:6 140:6,13 141:1 143:10 | **reason**  7:9,12 71:12 101:16 | 65:21 **recently**  45:19 | 131:25 **reference**  24:20 |
| 143:23 147:22 150:19 152:13 | 130:7 149:4,15 151:14 215:5,8 | **recess**  47:16 79:15 132:8 | 25:4 53:19,23 84:18 105:20 |
| 155:10,15 157:13,21 | 215:10,12,14 215:16,18,20 | 175:19 184:17 209:11 | |

**[reference - remember]**                                          Page 40

120:15 129:11
131:21 159:10
170:1 191:18
202:8
**referenced**
94:19 112:14
119:16 163:7
**references** 89:9
89:10 165:24
**referencing**
113:11 165:19
**referred** 37:2
75:19 76:24
80:7 111:3,4
165:15
**referring** 13:12
54:19 68:6
75:23 76:13
94:16 95:25
115:4,7 141:4
142:3 146:8
160:23 166:19
176:9
**refers** 11:6,11
24:20 56:5 63:5
67:4,5,8 89:4
**reflects** 172:3
**refresher** 7:6
**regard** 6:14,22
15:13 21:4 86:9
98:10 102:2,10
113:6 129:10
131:7 134:22
146:13 154:14
168:14 170:14
188:13 190:14

196:21 197:1
201:25
**regarding**
51:21 88:23
102:14 133:17
137:16 152:8
192:8
**registered** 2:8
214:6
**reilly** 4:17
**reinforced**
104:6
**rejected** 65:7
84:8,11,21 85:7
**relate** 55:14
145:19 156:6
162:16 198:7
**related** 6:15,23
9:8 17:9 18:21
19:3,10 20:10
22:24 23:16
24:21 26:18
27:23,24,25
28:8,10 29:10
30:4 31:19,24
32:5,6 36:10,19
37:11,19 38:6,6
41:18 42:4
44:22,23 46:16
52:22 60:16
62:9 68:1,8
75:2,20 76:13
76:25 77:5,12
89:19 93:18
94:13 97:3
98:16 103:12

104:2 111:17
128:17,21
134:19,23
143:19 163:23
194:3 198:4,25
208:21
**relates** 6:19 7:2
15:13,18 18:12
18:14 27:10
28:24 30:20
33:4,20 39:9,15
40:23 45:3,20
46:10 52:15
58:13 63:25
68:18 79:23
86:13,14 88:13
94:10 104:21
109:22 117:24
118:15 135:23
137:15,17
141:24 145:12
147:18 148:15
150:21 151:21
152:17,24
154:16 156:3
159:19 160:14
162:12 165:16
168:6 169:5
170:20 171:17
171:24 174:2
176:2,11
191:25 198:20
207:19
**relating** 28:3
196:9

**relationship**
158:18
**relative** 214:17
214:19
**relatively** 48:25
**release** 153:16
154:25 156:18
157:4 177:11
**relevance** 38:8
88:25 147:8
**relevant** 14:14
28:4,10,16,16
29:17 30:10,16
31:1,5 33:5,8
33:11,12 58:10
60:4 78:5 79:3
96:5
**reliance** 153:10
**relied** 57:15,25
60:3 137:5,6
139:18 171:24
**rely** 5:24 72:19
73:9 75:14 94:5
188:2,17
**relying** 35:18
49:17 56:2
72:24 73:5
174:1
**remain** 96:10
**remarkably**
94:1
**remember** 11:8
12:17 15:17,20
18:9,17,19 19:1
19:6 20:25
27:11 37:11,21

**[remember - research]**                                      Page 41

38:1 98:14
135:12 166:2
177:23
**reminding**
40:14
**remote** 4:23
**remotely** 3:12
3:19 4:7,20
**render** 35:3
118:21 185:12
196:21
**rendered** 119:7
122:5 196:25
**rendering** 61:2
61:3 113:5
185:17
**repair** 202:3
203:20
**repeat** 53:20
54:21 73:16
78:16,19 102:4
192:16,17
**repeating** 55:1
**rephrase**
172:10 187:21
193:1
**rephrased**
179:13
**reply** 180:22
**report** 5:21,23
14:15,22 15:14
15:20,24 16:23
17:9 18:7 19:21
20:19 22:7,15
26:9,19 27:15
27:17,18,20,22

27:23 28:1,2,5
28:8,9,11,15,18
28:24 29:10
34:15 36:8,17
37:20 39:5
44:24 47:3,8,9
47:12 49:11,17
50:25 51:7
52:15,18,19,24
52:25 53:14,18
53:19,22,23
54:8,10,20,25
55:2,4,7,14,15
55:20,22 56:1
56:11,15,17,19
57:2,4,6,24
58:2,13,17 59:9
60:23,25 61:6,7
61:9,10,12 62:4
62:7,10,16
63:17,21 64:1,5
64:8,11,14,16
64:18 72:12,13
74:13 75:12
79:7,20 80:8
83:15 87:10,23
101:9,21
103:16,19,21
103:23 104:9
104:18 106:8
108:15 109:19
111:4 117:3,4
120:14 121:10
126:15 135:1
135:17 137:6,7
139:16,21

146:18 147:21
148:11,18,19
148:22 149:5,7
163:18 165:15
165:16,25
166:6,20
174:11,14,17
176:9 177:22
178:15 182:17
182:18,20
183:8,10,10,12
183:14 184:21
186:9,12,14,16
186:23 189:4,7
189:9,20,23
190:6,8 193:16
195:15 196:16
196:18,25
197:2,4,9
203:17 205:2,3
205:23 206:5
207:14 210:4
210:10,14
212:16,17,22
213:5,6
**reported** 1:16
158:16
**reporter** 2:7,7
2:8 7:16 95:22
162:3 165:21
212:9 213:2
214:6,6
**reporting**
177:11
**reports** 16:6,12
36:6 37:1,7,11

41:17 42:2 63:5
63:13 73:2,4
75:16,19,24
76:12 164:10
166:1,22 167:2
188:18
**represent** 81:2
89:8 107:24
140:1
**representation**
188:9,17
**representing**
10:19 191:18
**represents**
104:24 106:6
107:3,13 109:1
109:12
**reproduce**
176:13
**reproductive**
52:21 68:2,3
89:11 146:24
168:21
**request** 16:16
33:22 75:22
170:9
**requested** 8:25
**require** 175:3
**required** 126:5
**requirement**
70:15
**research** 28:21
28:23 29:9,11
29:15,16,24
30:4,9,15,20
31:5,7,8,18,22

[research - reviews]                                              Page 42

32:10,12,15
33:10 44:19,22
44:23 45:2
49:21,24 50:1,5
50:6,8 51:13,20
52:23 97:3
113:8 134:11
134:19,22
135:24 136:5,7
136:20 138:8
138:18 139:9
139:19 140:10
140:24 150:13
151:1 162:13
171:16 172:17
172:18,25
179:3,8,15,19
179:21
**researched**
58:1,5
**researching**
58:6
**respect** 54:6
68:10 74:17
75:5 99:3
131:10 145:15
149:10 160:17
192:5
**respectfully**
12:11
**respective**
173:5
**respectively**
10:12 130:2
**respond** 99:1

**responding**
97:9
**response** 77:6
158:17 177:1
**responses** 7:15
7:16,16,18
**responsible**
207:7
**responsive** 8:25
**rest** 128:24
159:20 160:17
**restate** 189:21
**result** 110:16
159:18 163:13
**resulted** 128:8
163:12 164:15
**resulting**
129:12
**results** 23:9
63:2 110:3
125:22 146:2,4
146:15 151:20
163:13 170:21
**resumes** 47:17
79:16 132:10
175:20 184:18
209:12
**retained** 212:9
213:2
**retaining** 157:6
**retains** 156:21
157:11,19
**reveal** 29:1
31:11,15 46:20
**review** 11:4
14:4 19:9,12

25:4,17 27:17
28:7 36:5 38:7
42:1,9 57:21
58:17 61:13
70:4,8,12 71:6
71:9 72:8 73:3
74:19 75:16,18
76:11,17 77:10
82:20 83:8,16
83:22 85:2,2,13
85:20 86:5 91:4
91:22 92:17,22
93:6,19 94:2
101:6 102:12
120:23 131:14
141:12 143:22
148:25 152:1
152:12 154:20
155:14,24
156:1 165:6
166:1,4 167:15
167:18,19,22
167:24 184:25
191:17
**reviewed** 20:3
41:18 42:3 57:9
57:12,14,18,23
58:5,16,22 59:7
60:13 63:16,20
64:1,4,7,10,13
64:15 69:1,3
71:19 81:15,21
85:14,18 103:5
129:16 141:14
155:9,23
161:21 168:7

168:16 169:3
174:5 182:18
191:8,24 196:7
**reviewer** 71:24
72:6,7 85:10,18
85:24 86:1
88:10 132:1
170:1,15
173:23 174:2
**reviewers** 65:8
68:12 70:6
85:14,22 88:22
89:10,12 90:17
90:22 91:2 94:8
97:25 98:21
104:1,11,15
120:19 128:19
129:4,16
131:14,18
165:2,18
167:11 169:20
174:7
**reviewing**
13:21,25 14:5
14:11,14 19:20
20:17 24:15
28:14 37:1,7
41:17 58:24
59:8 102:15
141:22 155:12
155:18
**reviews** 52:8
53:9 59:19
68:11 76:24
99:4 111:5
144:15 148:7

150:10
**revised** 148:19
**reword** 73:21
**rgolomb** 3:12
**rice** 3:3 5:7
**richard** 3:11
**ridiculous**
205:7
**right** 5:12 15:6
16:17 22:5 31:3
41:10,12 54:17
62:14 67:2 69:7
71:14 78:20
80:21 88:8 90:2
101:18 106:8
107:19 108:2
110:6 125:7
128:22 133:19
146:7 154:6
173:20 178:10
181:15 190:4
198:10 205:13
205:20,24
**ring** 119:11
**risk** 77:13
106:15 108:8
140:5 141:7,10
142:17 143:8
164:2 206:6
**risker** 107:9
**rls** 1:5
**rmh** 4:20
**rmr** 1:17
214:23
**role** 151:2,6
178:6,16,20

190:17,22
191:14,20
**rough** 211:5
**roughly** 46:11
**route** 124:10
**routes** 159:4
**routinely**
177:24
**rude** 10:7
**rule** 32:10 33:9
52:17 182:17
183:7 213:6
**rules** 21:19
196:11
**run** 10:22
**running** 26:5
40:10
**runs** 8:18

| **s** |

**s** 3:1 4:1 133:2
133:2,2 185:22
185:22 212:5,8
213:1
**saed** 11:19
14:22 16:23
17:9 18:21,25
19:4,20 20:10
20:17 23:21,23
23:24 24:21
25:6,9 54:19
55:16,19,24
56:6,18 57:10
57:13,21 61:13
64:22 66:15
67:9 69:1 73:5

73:6,14,24
74:18,25 77:24
77:25 79:18
80:19 81:14
85:7 86:25
87:11 88:7,14
89:5,9 92:2,11
92:21 93:2 94:2
94:23 95:10
96:4 101:9,21
102:14 105:13
107:2 109:7
112:7,14 117:8
117:15 119:15
120:2 126:18
128:7 129:23
133:14 137:16
137:19 142:1
162:12 163:15
164:8 166:9
167:11 171:14
176:1,13 213:4
**saed's** 22:24
52:20,22 56:16
65:3 70:2 71:18
72:19,25 74:9
74:23 75:15
80:9 81:21
82:10,16 83:12
84:10,22 85:14
85:18 86:5,10
88:22,23 89:16
89:18,23 93:18
98:1 99:3,10,16
100:3 102:2,9
104:2 108:21

109:22 110:12
113:6 120:15
120:20 129:11
129:16 130:16
130:17 133:10
135:1,19
140:10,23
141:12,17,23
142:15 143:6
162:16 165:2
168:7,15 169:3
**saens** 185:20,22
185:23,24
187:1,4 188:3
188:23
**sales** 1:5
**salt** 151:9
**saw** 90:16,21
91:10,13,17
174:6
**saying** 33:7
46:1,3 99:1
108:10 110:10
122:7 146:3
189:25 196:25
200:25
**says** 14:21
29:11 31:21
53:25 54:17
57:14 62:23
63:15 65:2
72:17 82:8
83:19 86:17
97:24 101:19
104:21 105:4
105:21 107:7

[says - september]                                                    Page 44

107:23 108:3,5
108:15,20,25
109:7 127:10
127:15 128:16
129:4 131:22
150:24 157:9
157:17 158:25
163:22,25
169:10 170:21
174:17 190:25
198:21 200:19
200:25 201:12
201:22 202:1
202:18,23
204:18 205:12
206:5 207:25
**scale** 67:21
**schedule** 8:15
**school** 130:9
**science** 68:4
89:11
**sciences** 52:21
68:2 150:15
**scientific** 71:9
93:5,11,14
97:12 112:25
113:3 115:1
140:11,24
161:7,10
169:12 171:23
172:13,21
174:12 191:21
**scientifically**
138:4 164:8
**scientist** 122:1
175:16

**scientists** 65:18
98:4 139:1
**scope** 39:4
49:10 51:6
61:10,12 62:8
96:19 181:20
187:12 188:19
189:7,8,17,22
192:23 194:15
195:3 198:1
204:24,25
205:5 206:23
**screwed** 121:3
**seans** 188:18
**search** 8:24 9:7
18:20,20 19:3
20:8,9 23:15,15
23:18,23 44:20
113:16 192:4
**searched** 20:24
20:25
**searches** 18:14
20:13 22:23
23:9 25:17
58:12 137:17
192:4
**second** 14:20
28:20 30:24
34:1 35:23
43:24,25 44:4
47:14 54:11
63:17 64:15
66:12 70:2
72:17 84:25
88:19,21 101:8
101:19 117:2

118:6 120:13
128:5 139:22
146:1,1,19
150:11 157:8
157:17 158:9
164:24 166:25
173:3 181:6
182:22 189:2
**seconds** 121:4,6
135:14
**section** 61:9
62:16 86:13,16
86:18 110:6
114:1 139:22
166:20 167:1
**see** 8:16,21
19:23 30:1
42:10 48:2
54:13,22 62:21
63:9,18 64:24
72:21 75:19
84:23 85:8 89:2
89:6 91:7 93:24
104:17 105:2
105:12 106:16
109:25 121:13
127:2 128:11
135:11 142:19
146:25 147:13
150:11 157:22
159:19 164:5
164:10 169:17
170:6,9,11
171:3,11
190:11 210:14

**seem** 97:19
101:17 149:9
**seems** 28:3,9
31:22 36:10
76:15 122:2
**seen** 8:9 59:20
91:1 144:16
148:12 152:10
**seldom** 23:13
**semisolid**
121:17,19
**sense** 32:20
118:14 140:12
140:25 169:12
174:21 175:15
178:21
**sensitive** 170:3
**sent** 9:5 153:11
**sentence** 54:16
62:23 65:1
68:10,15 72:17
83:18,18 84:18
87:16 97:24
98:23,24 108:3
109:14,18
114:1 126:18
127:10 128:25
129:2 130:5
135:8 150:24
157:9 159:12
159:20 160:17
163:23 190:25
**sentences** 191:1
**separate** 104:9
**september**
10:22 11:2

[september - sorry]                                                Page 45

| | | | |
|---|---|---|---|
| 15:12 101:13 | **shade** 189:25 | **sidelines** 12:7 | **skill** 83:5 |
| 101:14,20 | **shared** 56:22 | **sign** 214:16 | **skills** 150:15 |
| 102:1 103:8,12 | 104:9,10 | **signature** | **skimmed** |
| 103:16,23 | 120:19 129:16 | 214:22 | 178:21 |
| **sequencing** | 165:1,10,12,18 | **significant** | **slash** 16:23 |
| 170:5 | 169:8 188:12 | 150:25 206:6 | **slate** 4:11 |
| **serous** 98:4 | 197:1 | **significantly** | **small** 177:25 |
| 133:24 136:6 | **sharing** 34:24 | 98:3 129:25 | **smith** 63:8 |
| 136:17 | 35:11 152:24 | **similar** 34:20 | 64:11 |
| **served** 71:24 | **shaw** 1:17 2:6 | 88:22 95:10 | **smooth** 32:25 |
| 72:2 82:2,4 | 214:5,23 | 96:4 | **snapshot** 80:20 |
| **serves** 99:19 | **shawn** 27:18 | **simply** 31:17 | 80:24 |
| **service** 50:3 | 28:4,22 29:25 | 112:5 116:15 | **society** 168:21 |
| **serving** 6:18 | 30:4 34:12 36:8 | 173:14 | **soft** 121:19 |
| 189:15 | 57:24 62:2 63:8 | **single** 21:10 | **solely** 84:21 |
| **session** 100:15 | 64:14,16 183:8 | 115:24 116:5 | **solid** 121:18 |
| **set** 214:15 | 213:6 | 124:14,19 | 191:21 |
| **sets** 114:11 | **short** 171:1 | 163:10,12 | **someone's** |
| **settings** 50:16 | **show** 74:15 | 186:18 | 184:8 |
| **several** 6:3 | 75:25 95:1 | **sir** 62:14 | **soon** 90:4 |
| 87:21 89:4 | 118:10 119:5 | **sister** 144:2,2 | **sorry** 7:3 9:2 |
| 101:1 112:6 | 119:11 131:17 | **sit** 23:8 155:22 | 32:23 35:25 |
| 133:17 138:12 | 139:11 163:17 | 165:8 180:15 | 36:1,13 44:2 |
| 138:14 149:9 | 186:8 | **situ** 123:21 | 53:20 57:19 |
| 177:23 | **showed** 177:15 | **situation** 80:13 | 59:11 73:16 |
| **sgo** 18:12,25 | **showing** 119:21 | 197:3 | 83:1 92:7 99:13 |
| 19:10 79:24 | 119:23 139:2,5 | **situations** | 101:12 102:4 |
| 80:3 81:19,22 | 177:5 | 33:18 | 103:18 113:25 |
| 82:3,9,15,21 | **shown** 62:18 | **six** 37:7 38:15 | 119:3 122:12 |
| 83:11,23 86:14 | 86:19 147:17 | 38:25 41:19 | 122:14 126:21 |
| 90:11 91:7 92:3 | 190:17 | 42:2 190:13 | 129:6 140:16 |
| 92:11,18 99:11 | **shows** 139:10 | **sixth** 201:25 | 144:5,18 |
| 99:16,20 100:4 | **shut** 186:19 | **skadden** 4:11 | 151:24 159:8 |
| 100:4 101:10 | **sic** 19:3 202:7 | 60:5 153:17 | 164:23 177:2 |
| 101:22 102:2 | **side** 54:17 | **skadden.com** | 180:4 186:20 |
| 212:19 | 142:23 | 4:14,15 | 194:5,12 |

**[sorry - stopped]**                                                                Page 46

198:10 210:20
**sort**  97:8
**sounds**  114:25
**speak**  162:1
**speakers**  172:9
**speaking**  23:17
70:10 77:17
78:7 136:5
155:17
**speaks**  26:22
29:4 107:21
139:17 174:15
**specialized**
149:18
**specific**  13:5,21
17:3,4,6,19
23:21,23,25
24:1 30:20
38:15 39:8,15
39:25 40:24
43:13,17 58:12
59:7 67:6 74:13
74:17,22 75:23
75:23,24 86:20
90:7,15 106:12
107:25 131:17
140:2 141:6
146:5 165:5
**specifically**
13:20 16:25
17:14,18,23
18:10 20:23
25:20 54:1 58:7
58:23 59:12
66:15 113:14
113:16 131:21

136:21 139:12
193:18
**specifics**  13:14
43:10
**specify**  160:10
**spent**  14:24
17:7 19:19
20:16 24:15
34:22 36:5 37:1
37:6 38:8 41:16
42:1,8 45:7,12
46:8,9,23 47:2
47:7 50:11,15
**square**  54:5
**sri**  18:13 19:4
101:22 166:17
168:14 169:3
213:3
**ss**  214:4
**staining**  170:24
171:2 172:4
**stall**  211:1
**stand**  109:18
**standard**  94:1
**stands**  13:6
**start**  11:2 83:17
95:17 103:7
110:10 118:20
123:24 161:2
178:17
**started**  187:17
**starting**  97:17
182:19
**starts**  54:12,16
64:20 72:14
85:1 88:21

93:11 139:23
**state**  5:2,25
43:10 64:23
84:19 115:13
118:22 123:9
123:10 127:19
127:20 128:6
153:25 167:1
173:3,20
181:17 183:14
184:21 185:3
190:7 203:5,18
214:3
**stated**  62:10
75:12 116:1,22
130:19 134:10
147:6 169:20
176:20
**statement**
20:20 61:4
66:16 67:9 68:5
68:17,20 72:23
88:2 107:3
108:20,20
113:24 114:5
115:19 118:13
125:24 127:2,4
127:6,12,17,22
128:21 131:2
134:25 138:9
140:9,18 146:8
150:22,23
151:10 158:21
159:5 160:5,7,8
160:9,14
198:16,17,20

198:22,24
201:10,25
202:15 203:9
203:12 204:16
204:19 208:5
208:11,14
**statements**
87:25 109:22
145:15,19,22
165:23 189:10
191:17 198:15
202:11,13,20
202:22
**states**  1:1 2:9
86:18 123:18
125:10 126:19
127:11 128:6,7
129:23 131:23
158:10 159:25
177:23 214:7
**statistical**  173:7
**status**  170:3
**steering**  5:8
**stenographic...**
214:14
**step**  33:15
88:17 113:22
114:3,7,9,10
118:5,7,7
**steps**  117:24
124:5 125:7
**stick**  21:24
53:11 117:6,6
**stop**  66:12
**stopped**  129:3
162:2

**[straight - supporting]**                                       Page 47

| | | | |
|---|---|---|---|
| **straight** 117:21 | 138:25 139:1,2 | **submission** | 166:23 167:3 |
| **street** 3:9,16 | 140:3 142:17 | 85:14,18 90:25 | **supplemental** |
| 4:3 | 143:8 147:19 | **submissions** | 5:21 19:21 |
| **strength** 66:2,5 | 158:13,16,17 | 168:24 | 20:18 22:7 26:9 |
| 67:21 69:11,19 | 163:14,24 | **submitted** | 26:19 27:16,20 |
| **stress** 63:1 74:2 | 164:1,3,9 177:5 | 10:18 22:15,17 | 27:22,25 28:2,5 |
| 75:20 76:5,13 | **study** 61:16,16 | 26:19 45:19 | 28:8,11,15,17 |
| 76:19 77:6 | 72:7 84:22 | 52:25 54:20 | 34:15 36:17 |
| **stretch** 194:13 | 86:25 87:11 | 57:10 65:14 | 39:4 44:24 47:3 |
| **strike** 55:6 59:3 | 96:5 97:22 98:3 | 68:12 70:8 | 47:8 49:11,17 |
| 60:14 64:14 | 104:22 107:1,1 | 81:15 82:21 | 50:25 52:25 |
| 74:7 96:23 | 108:21 110:12 | 83:23 84:8 85:7 | 53:14,18 54:10 |
| 101:7 129:9 | 117:8,15,19,23 | 92:2,11,13,17 | 54:25 55:4,7,14 |
| 133:13 144:4,7 | 129:22 139:5 | 174:8 197:5 | 55:22,23 56:1 |
| 152:15,22 | 139:19 143:19 | **subsequent** | 56:11,15,16,17 |
| 163:10 166:24 | 143:22,23 | 149:1 | 56:19 57:2 61:6 |
| 178:17 | 144:2,14,16,22 | **substance** 29:2 | 61:12 62:9 |
| **strong** 156:14 | 145:2,12,16,19 | 31:11 61:1 | 137:8 153:10 |
| 156:14 | 146:14 159:11 | 166:1 | 153:19 178:15 |
| **strongly** 156:20 | 159:12,19,23 | **substantive** | 189:7,9,23 |
| **struck** 146:12 | 160:10 166:22 | 48:8 191:13 | 193:8 196:16 |
| **studies** 55:5,8 | 166:23 167:2,3 | **success** 65:4 | 196:18 212:17 |
| 55:13 56:2,6 | 212:21 | **suffering** | **supplements** |
| 57:15 73:8 | **study's** 139:25 | 150:18 | 56:21 |
| 74:14,18 75:1,2 | **studying** | **suggest** 109:10 | **support** 15:23 |
| 75:6,9,20 76:7 | 114:16 136:12 | 116:5 143:24 | 16:5 18:6,21 |
| 78:10,12,24,25 | 136:16 180:11 | 207:6 | 22:23 26:9 44:8 |
| 94:12,13,16 | **sturpin** 4:20 | **suggesting** 75:6 | 55:5,8 56:3 |
| 95:11,25 96:3 | **subcutaneous** | 109:12,15 | 78:12,24 |
| 96:13,16,22,24 | 119:9 | 119:21 191:19 | 138:21 147:9 |
| 97:7 106:14 | **subject** 91:4 | **suite** 3:4,17 | 161:22 191:22 |
| 107:5,6 108:6 | 136:6 | 4:18 | **supported** |
| 109:15 118:5,7 | **subjective** | **supervision** | 140:9,23 |
| 118:8,17,18 | 65:19 115:16 | 162:8 | **supporting** |
| 128:18 135:25 | 116:22 | **supplement** | 141:7 |
| 136:22 138:20 | | 22:14 161:24 | |

**[supportive - telling]**                                                                  Page 48

**supportive**
  78:14 79:1
**supports**  56:21
  106:13 107:8
  108:6 140:3
  174:13
**supposed**
  120:25
**suppressor**
  170:23
**sure**  7:3,15 9:4
  11:20 25:3 32:4
  33:15 44:3
  47:15 53:21
  56:7 68:19 71:5
  73:11,19,25
  78:18 80:15
  82:7 102:7
  104:12 108:19
  110:3 117:18
  149:24 153:4
  157:4 163:19
  163:19 168:3
  178:12 192:19
**surface**  98:1
  135:20 136:1
**surprising**
  190:9 193:16
**susceptible**
  202:4 203:21
  207:10,21
  208:2,9,19
  209:2,5
**suspect**  90:3
**suspected**
  45:22 46:2

**suzanne**  4:19
**sworn**  5:1
  214:9
**syndrome**
  206:20,21
  207:3,5,7
**system**  160:10
**systems**  156:15
  159:2

**t**

**t**  133:2 212:5,5
  212:8 213:1
**table**  10:7
**tail**  119:10
**take**  5:14 7:17
  7:21,24 14:10
  33:15 52:4,12
  60:20,22,24
  61:5 69:6 79:11
  88:17 121:4
  142:12 151:8
  183:20 199:14
  199:18 205:9
  211:5
**taken**  47:16
  79:15 82:13
  117:24 132:9
  175:19 184:17
  209:11 214:13
**talc**  5:16 33:13
  44:11,22 45:3
  62:24 73:8
  74:10 75:7
  76:25 77:6,19
  88:14 94:13

96:4,22,25 97:7
147:11 156:9
156:21 157:1
157:10,18,25
158:11,13
159:1,14 160:1
160:14,24
162:17 164:14
176:17,22,25
177:3 178:24
179:5 198:12
198:17,18
199:19,24
200:2 209:22
**talcum**  1:4 5:9
  6:15,19,23 7:2
  50:19,25 51:4
  51:14,17 75:2,9
  86:19 87:2,13
  88:1,6 89:19
  93:2 95:11
  96:13,16 97:3
  97:22 104:23
  105:1,9,23
  106:12,14
  107:8,25 108:7
  108:11,16,22
  109:5 128:8
  129:11,24
  140:2,4 141:5,9
  142:18 143:9
  143:19 149:1
  151:22 164:17
  173:3 191:25
  192:10,12,20
  193:11,19,22

193:25 195:12
198:14,23
199:1 201:16
201:18,22
215:1
**talk**  12:10
  74:19 121:11
  123:7 130:22
  173:1
**talked**  12:14
  129:21 192:10
  206:9
**talking**  12:2
  74:22 80:16
  90:2 98:25
  137:22 167:1
  188:10,11
**talks**  205:1,3
  206:7
**tech**  4:23
**teleconference**
  27:4 28:13 35:5
  35:9
**teleconferences**
  44:25 45:1
  46:23
**tell**  10:17 11:6
  12:21 15:20
  21:15,17 27:2
  30:15 37:10
  39:23 44:17,20
  57:5 58:5 65:11
  110:5 130:23
  181:16
**telling**  164:1

[temporal - together]                                                          Page 49

| | | | |
|---|---|---|---|
| **temporal** 90:22 | **testing** 133:11 | 171:4 176:20 | 31:18 34:13,22 |
| **temporality** | 134:4,14 | 180:6 181:2,19 | 36:25 38:6,7 |
| 98:17 | 137:10 176:25 | 184:12 189:6 | 41:1,3,16 42:1 |
| **tend** 91:24 | 177:15 | 189:22 195:1 | 45:7,11 46:22 |
| **term** 6:9 69:4 | **thank** 5:11 6:12 | 197:12 199:6,8 | 47:2,7 49:23,25 |
| 82:4,6 87:7 | 13:3 15:16 53:8 | 202:12 204:4,4 | 50:8 55:20 |
| 115:17 116:23 | 133:6 155:5 | 204:13 205:13 | 63:11,14,23 |
| 116:23 120:2 | **thanks** 144:19 | 208:23 210:24 | 82:17 83:11 |
| 121:25 122:4 | **theory** 195:8 | **third** 63:21 | 85:19 91:16,21 |
| 123:4 125:4,10 | **thing** 27:19,21 | 64:1,4,10 118:7 | 92:3,11 98:10 |
| **terminology** | 67:3 80:16 | 158:23 | 98:19 99:21 |
| 54:5 | 93:21 128:14 | **thirds** 142:21 | 101:25 103:16 |
| **terms** 50:7 66:3 | 204:18 | **thompson** 4:5 | 112:2,6 121:2 |
| 67:2 74:22 | **things** 33:21 | **thought** 10:8 | 132:3 137:18 |
| 93:14 94:7 | 61:1,15 119:4 | 140:16 149:7 | 168:2 178:3 |
| 98:17 110:1 | 133:8 150:9 | 164:24 | 197:10 211:8 |
| 119:21 122:8 | 153:6,11 | **three** 10:10,13 | 214:14 |
| 194:25 | **think** 6:9 16:10 | 16:21 17:1,7,12 | **times** 6:3,5,25 |
| **test** 113:14 | 16:11 26:22 | 17:15 18:10 | 21:10 66:6 72:1 |
| 176:17 177:24 | 29:6 30:18,19 | 34:13 82:4 | 72:4 85:12 |
| **testified** 5:3 | 32:7,11 39:3 | 117:23 | 190:1 |
| 6:14,22 30:25 | 41:7,20 46:3,11 | **throwing** | **timing** 194:7 |
| 31:4 59:6 92:1 | 46:19 56:12 | 189:24 | **tissue** 96:17,23 |
| 92:10 94:22 | 60:4 66:13,13 | **tied** 30:21 | 96:25 |
| 102:8 118:4 | 66:22 68:14 | **tier** 65:13,16 | **tissues** 123:19 |
| **testify** 7:10 | 78:4 79:3 | 66:21,21 | 159:3,22 |
| 21:3 39:18 | 112:15 118:4 | **tiered** 65:6,12 | **title** 62:16 |
| 214:10 | 120:17 127:18 | 65:17 66:17 | 209:25 |
| **testifying** 50:24 | 129:3 138:25 | 67:11 68:6,7,18 | **today** 5:14 7:9 |
| **testimony** | 140:18 142:10 | 68:21 69:5 | 21:22 46:9 48:9 |
| 34:12 37:24 | 149:20 151:9 | **till** 121:6 | 154:4 155:22 |
| 39:9,11 40:23 | 151:11 153:6,6 | **time** 7:21 9:16 | 165:8 180:15 |
| 43:13,17 92:6 | 153:8,15 | 10:6 14:24 | **today's** 9:6 |
| 95:2,6 118:11 | 155:17 157:4 | 15:18,21 16:15 | **together** 15:3 |
| 130:21 175:8 | 159:22 165:11 | 17:8 18:19 | 58:1 74:21 |
| 175:13 214:13 | 167:17,18 | 22:16,20,22 | 76:18 150:14 |

**[told - twice]**                                        Page 50

**told**   130:22,23
**took**   91:19
**tool**   114:15
**top**   8:16 28:20
  35:4 79:22,22
  83:15 110:9
  121:11 147:7
  158:24
**topic**   50:18
  51:3,17 77:15
  161:8
**topics**   17:4
**tossing**   10:5
**total**   17:7
**totally**   116:1
  207:13,15
**touched**   133:8
**towards**   79:22
  85:5 114:12
  158:24
**toxic**   93:8,9
  97:17
**toxicology**
  114:21
**trace**   177:12
**tract**   146:24
**traditional**
  83:22 93:14
**train**   164:23
**trained**   187:7
**transcript**   11:5
  11:8,10 13:22
  14:1,4,5,11,14
  14:15 211:4
  214:13

**transcription**
  215:7
**transcriptomic**
  210:11
**transcripts**
  60:10
**transform**
  139:3,5
**transformation**
  24:22 25:6 70:4
  80:9,12 82:17
  89:24 93:19
  102:19,24
  104:23 105:24
  108:23 109:23
  110:13 111:2,7
  111:25 112:3,5
  113:15,21
  114:2,20 115:3
  115:5,8,11,12
  115:16,21,25
  116:3,4,7,7,11
  116:12,14,15
  116:16,19,20
  116:22 117:21
  118:16,19
  119:16,17,22
  119:24 120:3,4
  120:9,10,15
  122:8,9,17,21
  122:25 123:4,5
  123:8,8,13,14
  123:15 124:1,6
  124:15,19
  125:4,10,13
  126:3,20 127:8

127:24 128:2,3
  128:9 138:3,19
  163:3,4 164:15
  176:2 212:20
**transformatio...**
  124:24
**transformed**
  121:21,23,24
  121:25 122:4,6
  129:25 138:13
**transforming**
  123:9 124:7
**treat**   118:21
  139:10
**treated**   118:24
  137:19
**treatise**   115:1
  171:23
**treatises**   172:13
**treatment**
  50:12 109:23
  119:6,13
  120:16 128:7
  129:11,24
  137:16 138:4
  138:10 173:4
**trial**   6:14,22
  16:6 38:16
  39:18
**tried**   176:17
**troubled**
  183:15 184:22
  185:8
**truly**   97:15
**truth**   214:10,10
  214:11

**truthfully**   7:10
**try**   21:23
  176:12 192:25
  197:22
**trying**   10:6
  12:18 14:7
  32:24 42:18
  66:19 67:7
  68:15,16 80:13
  93:16 116:18
  122:4 124:21
  131:6 169:7
  189:12,14
  196:15 197:18
  201:3,4,5
**tube**   98:2
  133:13,16
  134:1,2,5,14
  135:4,21,25
  136:8,8,11,23
  137:11 162:25
**tubes**   98:6
**tumor**   114:13
  119:1 123:16
  126:6 170:23
**tumorgenesis**
  113:23 114:4
**tumors**   119:12
  126:13 159:16
**turn**   8:12 64:18
  79:20 145:25
**turpin**   4:19
**twenty**   112:16
**twice**   6:16,22
  108:22

**two** 12:14 14:24
18:14 24:7 30:3
31:18 40:8
61:13,17 65:5
66:14 67:10
68:21 89:9,9
122:2 142:21
153:12 155:16
159:4 169:13
191:1 200:22
200:24
**type** 8:24 15:4
16:8 18:14,19
18:20 19:3 20:8
20:8 22:23
23:15 25:16
44:20 59:25
77:3 87:18,19
97:2 106:25
107:1,1 111:17
111:20,24
112:24 113:8
116:11,19
117:7,8,14
133:25 134:2
179:21
**types** 77:21
87:21 107:4
112:17 181:5
**typically** 65:18
67:4,5 70:7
76:4,17 77:9
81:7 93:11
112:24 113:2,7
171:1

**u**

**ultimate** 123:13
**ultimately** 65:4
81:25 119:7
124:23
**unclear** 173:12
173:21
**under** 7:8 32:10
162:8 166:25
209:3
**underlie** 33:10
**underlies** 32:12
**understand** 7:8
12:4,15 14:7
26:12 37:4,25
38:1 40:4,7,16
66:20 122:20
124:18,21
128:1 173:16
189:12 196:22
204:12 206:13
**understanding**
34:10 40:20,22
42:19 49:9
68:17 93:5
121:15 148:21
154:18 155:20
156:12 161:20
**understands**
120:9
**understood**
7:20,25 42:21
80:17 153:24
**undertaken**
155:24

**undertook**
131:12
**underwent**
70:4
**undetectable**
171:2
**unfamiliar**
123:3
**uninformative**
149:8
**united** 1:1
**university**
64:23 183:24
**unmeasured**
147:12
**unrelated**
34:23 35:2
146:15 172:5
**updated** 48:6
63:12
**use** 50:19 51:4
51:14,17 65:18
69:4 75:8 98:1
105:1,9,23
106:14 107:8
108:7,16 109:5
112:20 113:3,6
117:12 125:9
134:1 135:20
140:4 141:9
142:18 143:9
146:20 147:11
148:18,25
158:13,15,15
158:18 162:25
164:17 170:2

**used** 67:20 88:1
88:7,15 93:2
94:3,12,12,23
95:10,11 96:3,4
111:6,23,24
112:2,4,24
113:7 117:9
120:2 133:15
133:18 136:23
138:2 143:25
162:22 173:7
**useful** 148:2
**using** 31:8
122:3 134:4
135:3,25
136:11 137:10
142:2 173:18
**usually** 99:24

**v**

**v** 215:1
**vague** 19:12
23:5,11 42:5
48:25 57:7 59:2
59:10 71:21
74:12 75:3
95:12 96:7
98:13 123:2
125:14 126:10
129:18 134:16
136:3 137:12
145:13 152:19
156:4 160:21
164:12 171:18
177:17 178:25
179:18 180:6

**[vague - witness]**

Page 52

| | | | |
|---|---|---|---|
| 180:21 181:1 | **want**  7:15,21 | **week**  153:12 | 57:3,8 58:19 |
| 182:3 186:2,7 | 10:25 11:13,15 | **weigh**  69:11,19 | 59:12,19,25 |
| 191:10 192:2 | 27:8,9 28:19 | **weight**  69:12 | 61:8 62:12 |
| 199:22 200:4 | 32:23 34:19 | 69:20 149:11 | 64:19 66:9 |
| 200:13,20 | 68:18 70:25 | **weiss**  3:9 | 67:15 69:9,15 |
| 207:23 208:10 | 79:12,18,20 | **welcome**  133:5 | 69:23 70:10,15 |
| **vaguely**  177:10 | 80:15 100:16 | **went**  57:19 | 71:2,16,22 |
| **various**  57:11 | 105:12 132:5 | 58:16 93:9 | 72:10 73:16 |
| 77:19 98:20 | 133:7 150:8 | 162:11 164:25 | 74:4,16,17 75:4 |
| 99:5 159:3,22 | 153:18 165:5 | **west**  4:11 | 76:3,15 77:2,8 |
| **verbal**  7:16,19 | 167:16 168:2 | **wider**  10:8 | 77:17,23 78:7 |
| **verbatim** | 169:22 170:7 | **widespread** | 79:3,8,21 80:23 |
| 214:13 | 181:3 184:13 | 164:16,17 | 81:6,19,25 |
| **verify**  129:8 | 186:8 197:11 | **willing**  135:14 | 82:19 83:6 |
| **versus**  146:14 | 202:10 206:13 | **wish**  33:9 | 84:13 88:4 |
| 158:15 | **wanted**  32:17 | **witness**  7:1 | 90:20 91:10 |
| **viewed**  102:24 | 37:21 46:4 | 8:14 11:18 14:8 | 92:7,15 94:15 |
| 133:23 | 53:12 153:2 | 14:18 16:2 17:3 | 95:3,5,17,23 |
| **virtual**  100:6,7 | 211:1 | 17:11 18:9,17 | 96:9 98:14 99:1 |
| **virtually**  84:20 | **wants**  12:24 | 19:6,13 20:5,12 | 101:14 102:4 |
| 135:10 | **washington** | 22:10,19 23:6 | 103:3 104:5,19 |
| **vital**  190:17,22 | 3:17 | 23:12 24:3,12 | 105:19 107:12 |
| **vitro**  97:7,11 | **way**  7:6 19:1,6 | 24:18,25 25:9 | 107:19 109:10 |
| 114:14 118:5 | 34:16 41:6,7 | 25:14,20,23 | 111:5,20 |
| 118:17,24 | 51:9 56:1 92:15 | 26:2,23 27:4 | 112:20 113:2 |
| 119:4,14 | 104:1 120:24 | 29:1 30:7,13,23 | 114:18,25 |
| 135:25 137:10 | 142:21 197:20 | 30:24,25 31:11 | 115:10,23 |
| 176:18 | 204:10 | 32:9,21,25 | 116:14 117:11 |
| **vivo**  159:2 | **wayne**  64:23 | 35:13,21 38:12 | 117:18 118:2 |
| **volume**  157:12 | **we've**  65:20 | 38:20 39:6 42:6 | 119:20 120:8 |
| 157:20 158:14 | 75:12 100:14 | 42:14 43:1,9 | 122:13,20 |
| **w** | 100:16 132:4 | 44:1 45:22 46:4 | 123:3,12 124:3 |
| **wait**  6:7 95:16 | 154:5 | 46:22 48:16 | 124:18 125:3 |
| 171:7 177:9 | **website**  126:17 | 49:13 50:14 | 125:15 126:1 |
| 181:4 | 127:11,20 | 52:8,8 53:8,9 | 126:11 127:23 |
| | 150:8 212:23 | 54:9 55:11 56:5 | 129:19 130:25 |

**[witness - yeah]**                                                                                    Page 53

| | | | |
|---|---|---|---|
| 134:7,17,22 | 201:11,20 | 30:25 33:4 34:6 | **worthy** 81:23 |
| 135:18 136:4 | 204:8 208:11 | 34:10 36:16 | 168:8,17 |
| 136:16,25 | 208:25 209:18 | 40:21 43:20 | **write** 204:6 |
| 137:13,21 | 209:18 214:15 | 44:8,17 47:10 | **writing** 27:20 |
| 138:23 139:18 | 215:4 | 55:16,19,23 | 27:22 34:14 |
| 141:14,20 | **wolf** 63:7,25 | 56:16,17 71:14 | **written** 27:14 |
| 143:3 144:3,6 | 64:2 | 72:19,25 73:5,7 | 153:8 160:4 |
| 144:15,25 | **woman** 206:17 | 73:9,13 74:9,23 | **wrong** 17:20 |
| 145:14 146:11 | **women** 75:8 | 75:15 80:9,11 | 102:25 103:3,4 |
| 148:7,7,17,24 | 164:18 197:25 | 80:15,20,25 | 146:8 154:8 |
| 149:7,24 | 202:2,5 203:19 | 89:16,19,21 | 189:18 |
| 150:10 151:14 | 203:22 204:21 | 93:3,7,19,20 | **wrote** 147:4,5,6 |
| 154:23 155:17 | 206:14,19,20 | 94:4,19,19,24 | **x** |
| 156:5 158:8 | 207:3,9,20 | 95:10 99:3,6 | |
| 159:9 160:22 | 208:1,8,18 | 100:3 101:9,20 | **x** 1:3 212:1,8 |
| 163:17 164:13 | 209:4 | 102:16,18,19 | 213:1 |
| 165:7,22 | **wondering** | 102:24 103:11 | **xenobiotic** |
| 167:17 168:20 | 33:13 | 103:15 104:2 | 97:11,16 |
| 170:10,18 | **word** 39:24 | 116:21 118:15 | **xi00218400** |
| 171:6,19 | 115:16 183:21 | 120:25 133:11 | 214:24 |
| 172:16 174:5 | **worded** 34:16 | 135:1 137:4 | **y** |
| 174:20 175:14 | 41:5,8 | 138:15 141:24 | |
| 176:15,20 | **wording** 34:25 | 155:19 168:7 | **yeah** 13:17 |
| 177:10,21 | **words** 33:12 | 168:15 169:7 | 17:25 18:2 |
| 178:9 179:1,8 | 93:17 155:20 | 171:14 176:12 | 19:16 23:3 |
| 179:19 180:2 | 157:23 190:19 | 176:13,22 | 29:18 37:18 |
| 180:15,22 | **work** 10:19,21 | 197:5 209:4 | 56:9 57:8 66:25 |
| 182:5 183:25 | 11:3 14:14,22 | **worked** 93:7 | 69:23 71:2 |
| 184:2 185:14 | 15:4,9,13,23 | **working** 17:8 | 79:10,13 80:12 |
| 186:3,11 187:7 | 16:4,9,11,22,23 | 92:23 97:13,19 | 82:14 92:10 |
| 187:14 190:24 | 16:25 18:6 | 151:21 152:9 | 95:1 118:14,20 |
| 191:2,12 192:3 | 20:10 21:4 | 161:5,6 | 134:25 135:6 |
| 192:15 194:22 | 23:17 24:8 26:4 | **works** 93:12 | 137:25 141:2 |
| 194:24 195:14 | 26:8,15,18 | 194:23 | 142:7 153:15 |
| 199:23 200:6 | 27:24 28:1,10 | **world** 149:19 | 153:21 160:16 |
| 200:14,22 | 28:12 29:23 | 151:16 | 168:11 187:7 |
| | | | 188:15 190:19 |

**[yeah - york]**                                                    Page 54

204:3
**year**  10:20 48:7
  82:4
**year's**  80:3
**years**  6:20
  13:19,20 15:9
  17:18 18:1
  20:24,25 50:1
  112:6,11,17
  159:4 164:20
  172:3 177:23
  196:3
**yielded**  65:4
**york**  2:9 4:12
  4:12 5:2 214:7

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.