# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT, LLC'S OBJECTIONS TO THE SPECIAL MASTER'S ORDER ON DEFENDANTS' MOTION TO COMPEL MR. HESS'S DEPOSITION TESTIMONY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ................................................................................1

BACKGROUND ..................................................................................6

    A.    Dr. Longo and MAS ......................................................6

    B.    PLM Analysis ...............................................................7

    C.    PLM Requires Specialized Expertise And The Judgment Of The Analyst .........................................9

    D.    Dr. Longo Is Not A PLM Analyst. ...............................9

    E.    Dr. Longo Relies On Paul Hess For PLM Analysis. ...........11

    F.    Procedural History ........................................................13

LEGAL STANDARD ...........................................................................15

ARGUMENT ......................................................................................17

I.    The Special Master's Original Reasoning And Findings Warrant An Unrestricted Deposition Of Mr. Hess. .............................17

II.    The Extreme Limitations The Special Master Placed On The Deposition Are Inconsistent And Unjustified ...............................19

    A.    Questions That Touch On Mr. Hess's Own Prior Testing In This MDL ............................................23

    B.    Questions That Touch On Mr. Hess's Other Prior Talc Testing .......24

    C.    Questions Regarding Illumination And Color Filtering ....................26

    D.    Questions Regarding The "Caldiria" Reference Sample That Is A Critical Component Of MAS's PLM Methodology........................29

    E.    Questions Regarding The Chrysotile Reference Sample In The ISO 22262-1 Methodology MAS Purports To Follow. .....................33

    F.    Questions Regarding Dr. Su And Dr. Wyle's Review Of Mr. Hess's Work ................................................35

    G.    Questions Regarding The Effect Of Switching Oil ............................36

    H.    Other Questions Regarding Mr. Hess's Testing. .................................37

III.    In The Alternative Dr. Longo's Chrysotile Report Should Be Stricken. ......39

CONCLUSION ....................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Apple Inc. v. Samsung Elecs. Co.*,
  No. 11-cv-1846, 2016 U.S. Dist. LEXIS 17596 (N.D. Cal. Feb. 10, 2016) ........................................................................................................40

*Bell v. Lee*,
  2017 WL 1316938 (N.D. Cal. Apr. 10, 2017)....................................................16

*Bordelon Marine, Inc. v. F/V KENNY BOY*,
  2011 WL 164636 (E.D. La. Jan. 19, 2011) .......................................................16

*Carbone v. Carbone*,
  2023 WL 3452333 (D.N.J. May 15, 2023).........................................................16

*Hess, et al. v. American Int'l Indus., et al.*,
  No. 1:24-CV-02195 ECF (N.D. Ga. June 3, 2024) ...........................................24

*Hochstein v. Microsoft Corp.*,
  2009 WL 2616253 (E.D. Mich. Aug. 21, 2009).................................................17

*Lucas v. Breg, Inc.*,
  2016 WL 2996843 (S.D. Cal. May 13, 2016) ....................................................16

*Quick v. Township of Bernards*,
  2023 WL 4237059 (D.N.J. June 28, 2023).........................................................16

*Specht v. Google, Inc.*,
  268 F.R.D. 596 (N.D. Ill. 2010).........................................................................16

*United States v. Andrews*,
  12 F.4th 255 (3d Cir. 2021) ...............................................................................16

*Williams v. Benshetrit*,
  2020 WL 3315982 (E.D. Pa. June 18, 2020)......................................................16

Defendants Johnson & Johnson And LLT Management LLC submit these Objections To The Special Master's Order On Defendants' Motion To Compel Mr. Hess's Deposition Testimony. *See* ECF 33067.

## INTRODUCTION

For *months*, Defendants have sought nothing more than their fundamental right under the rules of evidence to explore Plaintiffs' case-defining asbestos theory. It is undisputed that this theory rises and falls on the reliability of Plaintiffs' testing expert, Dr. William Longo's, methodology. Dr. Longo has testified repeatedly that to understand his method and conclusions that Defendants' talc supposedly contains "chrysotile" asbestos, one cannot simply review his report, repeat his alleged method or even rely on deposition questions and answers. Instead, one must be looking live down his microscope. He has even admitted that looking live down his microscope is the only way to justify why his "entire analysis" isn't "wrong". Ex. E, Longo *Clark* Hr'g (Vol. I) 118:20-119:3.

To repeat what is inherent in Dr. Longo's own testimony, there is ***no other, post-facto, photographic way to conduct similar discovery into this core issue***, not even with Dr. Longo's own photographs. *See* ECF 32817 at 4 ("Because these observations are subjective and unrepeatable, no one can retroactively observe what Mr. Hess saw – not even Dr. Longo.") (quoting *Hess, et al. v. American Int'l Indus., et al.*, No. 1:24-CV-02195 ECF (N.D. Ga. June 3, 2024)). Yet Dr. Longo is not the

one looking down the microscope, his analyst Paul Hess is. Mr. Hess is in fact doing *all the work* and is the one who actually determines whether a particle is chrysotile or not.

Defendants have been rebuffed time and again in their efforts at the most basic discovery of Dr. Longo's method and resulting opinions. And so, they came to the Court with two, simple requests:

1. Allow Defendants to look down Dr. Longo's microscope and inspect his method as it unfolds in real time; and

2. Allow Defendants to depose Mr. Hess, the man who Dr. Longo himself identified as the expert in PLM microscopy and the individual who takes the critical look down the microscope and reports what he sees, the very foundation of Dr. Longo's expert opinion.

The Special Master denied Defendants' first request, which issue is on appeal before this Court. The Special Master expressly stated that he did so in part because he granted Defendants' second request and ordered a deposition of Mr. Hess. That deposition, for all practical purposes, has yet to occur.

In the Special Master's first ruling permitting the deposition of Mr. Hess, he explained the need and importance of Mr. Hess's testimony. He stated: "Hess is important because Hess, not Longo, is the analyst that conducted the PLM tests that support Longo's opinions. Hess, not Longo, did the microscopic analysis required under the PLM methodology." ECF 32817 at 2 "Hess, not Longo, has decades of

experience doing PLM testing." *Id.* at 1. He even said that "Defendants persuasively argue" that "Mr. Hess is the one making all the key decisions." *Id.* at 5

The Special Master's original order also expressly stated that Mr. Hess is an expert. He explained that "[d]efendants' subpoena seeks to depose Paul Hess, a non-testifying expert. *Id.* at 2. He described Mr. Hess as the "expert Longo will rely upon to support his opinion that defendants' talc products contained asbestos." *Id.* at 3.

Critically, the Special Master ruled that the "***the how and why of the testing***" was to be "covered at Hess's deposition" since it is "important testimony." *Id.* at 3 (emphasis added). And he said that a purpose of the deposition was so Mr. Hess could "explain the basis for MAS's findings." *Id.* at 4. The order imposed no limitations at all on the deposition.

But then shortly into the start of his deposition, Mr. Hess was instructed not to answer ***40 times***, almost always on the grounds for "calls for expert opinion." In a subsequent order challenging these and other improper instructions, the Special Master upheld nearly all the instructions not to answer. One need only read the two orders side-by-side to see that they are entirely irreconcilable. Indeed, the new order is internally inconsistent with itself, and placed serve limitations on Mr. Hess's deposition without any reasoned basis.

The Special Master ruled without explanation that Mr. Hess could not be deposed in the manner that a testifying expert would be deposed, even though one

of the original rationales for permitting his deposition at all was that Mr. Hess worked so closely on the analysis, it was as if he were a testifying expert. The Special Master then limited the deposition to only *factual questions*. And in his page-line rulings, he further limited even the categories of factual questions permitted to be explored until almost nothing remained to ask. No longer could Defendants question Mr. Hess regarding the "how and why" of the case-defining testing at issue— questions which had only a month before been deemed "important testimony" that was to be "covered" at the deposition.

Most egregiously, the Special Master invented a rule that Defendants could not ask any questions that involved any comparison of testing methods and results over time. The Special Master never provided any rationale or justification for this newly developed rule, which severely handcuffs Defendants' ability to fully and legitimately question Mr. Hess on his MDL testing.

For example, for the 2019 report in this MDL nominally authored by Dr. Longo, Mr. Hess analyzed dozens of samples of Defendants' talc products using polarized light microscopy and never found any chrysotile asbestos. But in a 2024 report, Mr. Hess's polarized light microscopy analysis all of a sudden found "chrysotile" in every single sample analyzed. *Obviously*, a critical issue for exploration at the deposition is how and why Mr. Hess changed his methodology to yield these differing results. Mr. Hess is the only one who can answer this question

4

because he is the only one in both instances actually looking down the microscope and determining whether a particle is or is not chrysotile. If Defendants' talc is full of chrysotile, how did he miss it over and over and over again when he was looking down the microscope the first time around? But the Special Master prohibited any question into this topic based on his "no-test-comparison rule" even though the questioning involves all testing *Mr. Hess himself did* and *for this very MDL*.

As another example, Defendants have contended that Mr. Hess is suppressing the illumination settings on his microscope which distorts the color of the images— the critical component of the analysis. Mr. Hess is the one to ask questions about this issue because he is the one with his eyes on the microscope, he is the one controlling the illumination settings, and he is the one taking the images that are produced to the Defendants. Mr. Hess *claimed* he used the maximum illumination setting on his microscope, meaning the images were supposedly as bright as they could possibly get. In order to challenge that assertion, Defendants asked Mr. Hess if his microscope was capable of taking an image as bright as a sample polarized light microscopy image counsel showed him (which demonstrates that what Mr. Hess said is not true). Again, the Special Master prohibited this entire topic under the "no-test comparison rule."

Defendants even tried to ask Mr. Hess why *Mr. Hess's own polarized light microscopy images* of another company's talc were so much brighter that his MDL

images of the J&J talc set forth in the MDL report if his illumination settings were truly at maximum. Yet again, the Special Master invoked his "no-test comparison rule." There are dozens more examples.

Every single question Defendants asked was relevant to the testing Mr. Hess conducted at issue in this MDL. Every single question went to the "how and why" of the testing that the Special Master originally stated was "important." Yet the deposition was restricted by arbitrary limitations, and no basis for those limitations has ever been provided.

Given the impossible position Defendants have been put in, a position created by Dr. Longo's own methodology and testimony, there are only two appropriate paths forward:

1. Mr. Hess immediately sits for deposition and answers questions in line with the rules of evidence; or

2. Dr. Longo's opinions concerning PLM testing and chrysotile asbestos are stricken.

## BACKGROUND

### A.    Dr. Longo and MAS

Plaintiffs' expert Dr. Longo is the President and a 75% owner of his lab, MAS. For years, MAS never found a type of asbestos known as chrysotile in cosmetic talc. *See* Ex. A, Longo *Rimondi* Tr. 140:14-141:8. MAS then began using a new PLM method—despite Dr. Longo previously testifying that "the PLM method is not appropriate to do an evaluation for these types of products," i.e. talcum powder

products. Ex. B, Longo *Weirick* Tr. 2921:25-28. Now MAS claims to find chrysotile using PLM in nearly 100% of cosmetic talc bottles it tests. Ex. C, Longo *Forrest* Dep. 138:9-18. Indeed, Dr. Longo says that "[a]ny bottle that was sold in North America that used a mine source for cosmetic talc in North America will have some level of asbestos in it." Ex. D, Longo (Vol. III) *Eagles* Dep. 449:12-21.

**B.    PLM Analysis**

The type of PLM analysis MAS is performing turns on accurately identifying the color the particle appears under the microscope after coating it in a particular oil. Ex. E, Longo *Clark* Hr'g 48:4-8; Ex. C, Longo *Forrest* Dep. 72:15-17, 75:23-76:9. The analyst matches the color they identify to a color chart, which is used to identify that color's corresponding wavelength of light. Ex. E, Longo *Clark* Hr'g 48:9-18. Then the analyst matches the wavelength to a "refractive index" (or "RI") value using a particular set of tables. *Id.* at 48:19-49:1. And then the RI value used to identify what mineral the particle is.

The graphic below reflects the steps for this process for a reference standard for chrysotile asbestos from the International Standards Organization.



*Id.* at 48:14-18, 113:12-18.

Because Mr. Hess records the RI values for the particles that he claims are chrysotile, this process can be reversed to determine the color he claimed to see under the microscope. For example, Mr. Hess reported the yellow particle below as having an RI value of 1.564, which corresponds to purple. *Id.* at 110:22-111:23.



8

*See* Ex. F, MAS *Valadez* Rpt. at 33.

### C. PLM Requires Specialized Expertise And The Judgment Of The Analyst

Dr. Longo has testified that in order to identify asbestos in talc by PLM, there "has to be an analyst doing the PLM that has experience in looking at these types of materials, so a lot of years" because doing the analysis properly "just depends on the experience and time and individual doing it." Ex. G, Longo *Rimondi* Dep. 125:11-13, 124:20-21. In fact, he's said an analyst "would have to have decades of experience." Ex. H, Longo *Reyes* (Vol. II) Dep. 129:12-13. In Dr. Longo's view, using a "a regular PLM setup with a PLM analyst that's not experienced in looking at this, he may never find it." Ex. I, Longo *Zimmerman* (Vol. II) Dep. 374:16-18.

That's because the ability to accurately identify the color of a particle—a key PLM step—is a "judgment that comes from years and years of experience." Ex. C, Longo *Forrest* Dep. 73:11-13. Dr. Longo even believes that whether PLM analysis is "subjective depends on the analyst who's performing the analysis." Ex. J, Longo *Streck* Dep. 123:2-6; *see also id* at 123:14-15 (testifying that the level of subjectivity "just depends on your training and how much experience you've got.").

### D. Dr. Longo Is Not A PLM Analyst.

In 2018, Dr. Longo testified: "I haven't done PLM in such a long time." Ex. K, Longo *Allen* (Vol. I) Dep. 61:2-3. At least as of 2019, he had never "personally analyzed a [talc] sample for the presence of asbestos using PLM." Ex. L, Longo

*Young* Dep. 85:18-20. As he put it then, "I don't do PLM analysis." *Id.* at 86:5-6. When asked if he was "an expert in PLM," Dr. Longo responded only: "I think I know more than the average layperson." Ex. M, Longo 2/5/2019 *MDL* Dep. 262:13-15.

Dr. Longo has not taken any courses on using PLM to detect asbestos. *Id.* at 261:9-13. He has not taken any classes in PLM dispersion staining, the specific color-based PLM methodology that MAS claims to follow. Ex. N, Longo *Lanzo* (Vol. II) Dep. 278:8-10. He describes himself as "self-taught" in PLM. *Id.* at 278:11-13.

Rather, Dr. Longo views himself as an "electron microscopy person"—also referred to as "TEM" (transmission electron microscopy). Ex. O, Longo *Zundel* Dep. 182:20-24. He has historically "really considered [him]self a TEM analyst" because he's "done more TEM than anything." Ex. E, Longo *Clark* Hr'g 18:8-11. That kind of microscopic analysis "is not as complicated as PLM." Ex. O, Longo *Zundel* Dep. at 182:20-24. But Dr. Longo has refused to test Defendants' talc for chrysotile by TEM, even though using that type of microscope would make it "fairly simple to tell whether or not you are, in fact, looking at chrysotile as opposed to talc"—rather than relying on subtle color gradations. Ex. E, Longo *Clark* Hr'g 42:10-14; *see also* Ex. P, Longo *Clark* (Vol. II) Dep. 206:7-11.

Dr. Longo does not do the PLM analysis at issue in this MDL himself, but rather relies on Mr. Hess, and Dr. Longo then puts Mr. Hess's work into the reports in this MDL.

### E.    Dr. Longo Relies On Paul Hess For PLM Analysis.

Paul Hess has a degree in geology. Ex. Q, Longo *Fong* (Vol. II) Dep. 214:1. He has been conducting PLM analysis for almost 40 years, and has worked at MAS for 33 of them. Ex. R, Longo *Krich* Dep. 53:3-8. Mr. Hess was trained and took a course in PLM at McCone Laboratories, which Dr. Longo has said was "literally the best lab in the country back in the 1970's and '80s." Ex. S, Longo *Hayes* Tr. 181:6-11. In fact, Mr. Hess was taught by the lab's namesake, Walter McCrone, who "was the best optical microscopist in the world" for his timeframe according to Dr. Longo. Ex. T, Longo *Von Salzen* Dep. 148:13-18; *see also* Ex. R, Longo *Krich* Dep. 53:17-22 (Walter McCrone taught course).

Testing talc for chrysotile by PLM has been "really up to one person" at MAS: Paul Hess. Ex. O, Longo *Zundel* Dep. 182:3-11. Every time MAS has reported finding "chrysotile" by PLM in Defendants' talc products, Mr. Hess has been the analyst whose name appears on the analyst worksheets. *See, e.g.*, Ex. F, MAS *Valadez* Rpt. at 32 ("Analyst: Paul Hess").

It can take Mr. Hess "anywhere from two to six hours" to analyze one sample by PLM. Ex. U, Longo *Weirick* Dep. 21:18-21. Mr. Hess is the one "the one who's

looking through the PLM microscope to make the determination of the particle's color." Ex. J, Longo *Streck* Dep. 49:14-19. Mr. Hess is the one who makes "a determination to match it to a refractive index." *Id.* Sometimes those values are reported in a range rather than a specific number because "Mr. Hess thinks it's more accurate to do it that way." *Id.* at 108:23-109:3. Mr. Hess is also the one who selects which images make it into the report. Ex. V, Longo *Alexander-Jones* Dep. 134:24-135:1.

Dr. Longo has said that he will on infrequent occasions be called over to look at a particle, but that Mr. Hess is the one "the person that [performs the analysis] from start to finish." Ex. E, Clark Hr'g (Vol. I) 44:10-20; *see also* Ex. L, Longo Young Dep. 86:21-86:6 (Dr. Longo admits he "periodically will be asked by one of the analysts to take a look at this, what do you think").

In short, Mr. Hess is the one "identifying the particles" by PLM. Ex. V, Longo *Alexander-Jones* Dep. 135:3-8. As the Special Master put it: "Hess is the lead person at MAS who conducted PLM chrysotile analysis on J&J's talc and whose name is on MAS's reports that will be relied upon at trial." ECF 32817 at 2.  And the slides with the talc samples that Mr. Hess analyzed are discarded shortly afterward because "they don't last within a couple of weeks." Ex. J, Longo *Streck* Dep. 53:4-13.

### F.    Procedural History

In April, Defendants sought to depose Mr. Hess. The PSC filed a Motion to Quash Defendants' subpoena, arguing that Mr. Hess, "a non-testifying expert," was shielded from discovery by Rule 26(b)(4)(D). *See* ECF 32195-1 at 8.

Rule 26(b)(4)(D) states that "[o]rdinarily, a party may not . . . discover facts known or opinions held by an expert . . . who is not expected to be called as a witness at trial." However, "a party may do so" if they "show[] exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." *Id.* The PSC argued "exceptional circumstances are not present here." *Id.*

In his order denying PSC's Motion to Quash, the Special Master rejected that argument. ECF 32817 at 8. The Special Master agreed with Defendants that exceptional circumstances exist. *Id.* at 6. The Special Master further agreed that "substantial authority exists for the proposition that where a testifying expert and his assistant closely collaborate, like was done here, Rule 26(b)(4)(D) does not apply" in the first place. *Id.* at 7.

In other words, the higher standard for a deposition of non-testifying experts does not apply when that expert's work is so integral to the substance of the disclosed report. It is as if he is a disclosed expert. The Special Master explained: "[D]efendants have shown that Hess and Longo closely collaborated, that Longo

13

substantially relied on Hess, and that Hess made key decisions regarding how Longo's tests were conducted and interpreted." *Id.* "As a result," he went on, "the how and why of the testing, which will undoubtedly be covered at Hess's deposition, is important testimony." *Id.* at 3. The order placed no limitations whatsoever on Mr. Hess's deposition.

Yet when defense counsel sought to question Mr. Hess about how his methodology has changed such that Mr. Hess's prior PLM testing in the MDL never found chrysotile when his newer PLM testing always found chrysotile, Plaintiffs counsel called the Special Master while he was in the middle of a mediation. The Special Master said that Defendants could not ask any questions comparing tests. *Id.* at 43:10-12 ("[T]hat's not the purpose of this deposition, not to compare old tests to new tests."). Despite the fact that Defendants raised these differing test results in their original briefing (ECF 32683 at 1), the only rationale the Special Master gave for this no-comparison rule was that Defendants supposedly "didn't say anything about asking him to compare old to new" in their brief arguing why a deposition was warranted. *Id.* at 43:16-17. Mr. Hess was then instructed not to answer ***forty questions***, completely obstructing the deposition. *See generally* Ex. Z (Chart).

Defendants filed a motion to compel further deposition testimony of Mr. Hess. ECF 32993. The Special Master largely denied the motion except for a very narrow handful of questions. ECF 33067. He doubled down on his "no comparison rule,"

stating that "questions asking Hess to compare test results" are "off-limits." ECF 33067 at 2. Despite stating "the how and why of the testing" was to be "covered at Hess's deposition" since it is "important testimony" in his first Order (ECF 32817 at 2), at the Special Master ruled in his second order that only "how and why questions [that] fit into these parameters they are permitted" (ECF 33067 at 3).

And despite his original order stating that "Hess, not Longo, has decades of experience doing PLM testing and is the expert Longo will rely upon to support his opinion that defendants' talc products contained asbestos" (ECF 32817 at 1), the Special Master stated in his second order that "the SM ruled that Hess's deposition was authorized to fill in the factual gaps in Longo's testimony" (ECF 33067 at 2). He issued page-line rulings on each instruction not to answer, which limited even questions going to factual issues of how Mr. Hess implemented his methodology. ECF 33067 at 6-7. A chart matching up the Special Master's page line rulings with the testimony at issue is attached as Exhibit Z.

Defendants now bring their objections to the Special Master's order to this Court.

## LEGAL STANDARD

This Court "shall review the findings of the Special Master according to the standards of review set forth in Fed. R. Civ. P. 53(f)(3)-(5)." ECF 704 at 3. "The court must decide de novo all objections to findings of fact made or recommended

by a master." Fed. R. Civ. P. 53(f)(3). "The court must decide de novo all objections to conclusions of law made or recommended by a master." Fed. R. Civ. P. 53(f)(4). "[T]he court may set aside a master's ruling on a procedural matter only for an abuse of discretion," Fed. R. Civ. P. 53(f)(5), meaning that the Court has "a definite and firm conviction that [the special master] committed a clear error of judgment in the conclusion it reached." *United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021).

A witness may be instructed not to answer a question only when necessary "to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)" for bad faith questioning that annoys, embarrasses, or oppresses the witness. Fed. R. Civ. P. 30(c)(2). Those are the *only* "three narrow exceptions to the general rule that a witness must answer the questions asked at a deposition." *Williams v. Benshetrit*, 2020 WL 3315982, at *3–4 (E.D. Pa. June 18, 2020).

So for example, courts routinely hold it is not proper to instruct a witness not to answer based on all manner of grounds outside those three limited categories, such as: relevance, *Carbone v. Carbone*, 2023 WL 3452333, at *2 (D.N.J. May 15, 2023), calls for speculation, *Specht v. Google, Inc.*, 268 F.R.D. 596, 599 (N.D. Ill. 2010), calls for a legal conclusion, *Quick v. Township of Bernards*, 2023 WL 4237059, at *5 (D.N.J. June 28, 2023), and calls for expert testimony, *see, e.g. Bell v. Lee*, 2017 WL 1316938, at *3 (N.D. Cal. Apr. 10, 2017); *Lucas v. Breg, Inc.*, 2016 WL

2996843, at *3 & n.3 (S.D. Cal. May 13, 2016); *Bordelon Marine, Inc. v. F/V KENNY BOY*, 2011 WL 164636, at *4 (E.D. La. Jan. 19, 2011); *Hochstein v. Microsoft Corp.*, 2009 WL 2616253, at *4 (E.D. Mich. Aug. 21, 2009).

## ARGUMENT

### I.     The Special Master's Original Reasoning And Findings Warrant An Unrestricted Deposition Of Mr. Hess.

In his original order granting Defendants the deposition of Mr. Hess, the Special Master found that "Defendants have established that Hess has key firsthand information regarding the tests upon which Longo relies." ECF 32817 at 3. The Special Master noted it was "Hess, not Longo, has decades of experience doing PLM testing and is the expert Longo will rely upon to support his opinion that defendants' talc products contained asbestos. Hess, not Longo, did the microscopic analysis and identified asbestos particles in defendants' products by PLM." *Id.*

It was for these reasons, the Special Master stated that "the how and why of the testing, which will undoubtedly be covered at Hess's deposition, is important testimony." *Id.* And the Special Master agreed with Defendants that Hess's work and testing is critical to Longo's conclusion that defendants' talc products contained asbestos." *Id.*

The Special Master further agreed that Mr. Hess's "deposition is necessary" because Dr. Longo has testified "he is unable to answer certain of defendants' questions about his conclusions without looking through a microscope." *Id.*

Therefore, the Special Master determined that "Defendants should have an opportunity to hear from the MAS expert with firsthand knowledge (i.e., Hess) of what was done." *Id.* at 4. The Special Master further stated that a reason for the deposition of Mr. Hess was that "defendants are not required to accept at face value that Longo's written methodology was followed." *Id.*

The Special Master found persuasive that: "Mr. Hess is the one making all the key decisions. He's the one determining the particle's color and matching it to its corresponding RI value - the critical step in the analysis…. As part of that, he is the one choosing what area of the particle to use for the color match." *Id.* at 5.

Therefore, because "this MDL involves issues of paramount importance to the defendants, general public, and the over 50,000 plaintiffs," "[p]laintiffs, as well as defendants, should have a complete record to decide the important issues being litigated." *Id.*

When explaining why exceptional circumstances warranted Mr. Hess's deposition, the Special Master stated: "since MAS's testing methodology changes as more research is done, exceptional circumstances exist to depose Hess because it will likely be difficult or impossible to recreate the exact conditions that existed when Hess's tests were done." *Id.* at 6. The Special Master was further persuaded that "exceptional circumstances was not even the proper test 'where a testifying expert and his assistant closely collaborate,'" as was the case with Mr. Hess. *Id.* at 7

(citing *TCL Commc'n Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2016 WL 6662727, at *4 (C.D. Cal. July 7, 2016); *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 31 (W.D. N.Y. 2002); and *Derrickson v. Cir. City Stores, Inc.*, 1999 WL 1456538, at *7-8 (D. Md. Mar. 19, 1999)).

The Special Master concluded that "defendants have shown that Hess and Longo closely collaborated, that Longo substantially relied on Hess, and that Hess made key decisions regarding how Longo's tests were conducted and interpreted." *Id.*

## II. The Extreme Limitations The Special Master Placed On The Deposition Are Inconsistent And Unjustified

After granting an unrestricted deposition of Mr. Hess in his first opinion, the Special Master put severe restrictions on the deposition in his second opinion. Those restrictions are inconsistent with his prior ruling, internally inconsistent, not supported by any reasoning, and unwarranted.

As discussed above, the Special Master's original opinion stated multiple times that Mr. Hess is an expert, and the expert Dr. Longo relies on. ECF 32817 at 2 ("[D]efendants' subpoena seeks to depose Paul Hess, a non-testifying expert. . . ."); *id.* at 3 ("Hess, not Longo, has decades of experience doing PLM testing?"); *id.* (calling Mr. Hess "the expert Longo will rely upon").[1]

---

[1] Plaintiffs themselves said *three times* the deposition of Mr. Hess constituted discovery "from a non-testifying expert." ECF 32195 at 1; ECF 32195-1 at 8, 11.

The Special Master also explained in the opinion that the "***the how and why of the testing***" was to be "covered at Hess's deposition" since it is "important testimony." *Id.* at 3 (emphasis added). And a purpose of the deposition of Mr. Hess was that he could "explain the basis for MAS's findings." *Id.* at 4. Explaining not just the "how" but the "why" of the testing along with explaining the basis for MAS's findings necessarily calls for Mr. Hess's expert testimony.

But then in his second order, the Special Master stated that "the SM did not authorize Hess to be deposed as if he were a testimonial expert" and while "Hess is likely to qualify as a microscopist expert in polarized light microscopy, this does not mean the SM authorized Hess to be deposed in this capacity." ECF 33067 at 2. This limitation is not mentioned, much less even hinted at, in the original opinion. And in neither order did the Special Master ever provide any reasoning supporting this distinction.

Along the same lines, the Special Master stated that he "ruled that Hess's deposition was authorized to fill in the factual gaps." *Id.* at 2. That is simply not true. The Special Master originally ruled that it was "important" for Mr. Hess to cover the "why" of his testing and that he was to "explain the basis for MAS's findings." No interpretation of that opinion could limit the deposition to "factual gaps." Again, the

---

The Special Master even quoted that argument from Plaintiffs in the order granting the deposition. ECF 32817 at 2-3. ("Plaintiffs also claim that defendants' subpoena 'seeks discovery from a non-testifying expert. . . .'") (quoting ECF 32195 at 1).

20

Special Master did not provide any rationale for this limitation, he simply stated he had already ruled that way.

After stating in his original order that Mr. Hess was an expert and stating in his second order that Mr. Hess was not to be deposed in that capacity, the Special Master then stated *later* in the second order that "plaintiffs are mistaken if they believe the appropriate demarcation line to use regarding Hess's testimony is whether he offers an 'expert opinion.'" *Id.* at 4. That concession makes the unreasoned limitation to only "factual gaps" completely unsupportable.

While the Special Master originally stated that the "the how and why of the testing" would be "covered at Hess's deposition" (ECF 32817 at 2), in his second order he stated that only "'how and why' questions [that] fit into the[] parameters" of the new limitations he ordered would be permitted (ECF 33067 at 3). That is a sea change without any explanation. And more importantly, the limitations the Special Master placed prevent defendants from asking *any* "why" questions and numerous "how" questions—without any basis or rationale.

Most egregiously, the Special Master prohibited "questions asking Hess to compare test results." *Id.* at 2. That limitation led to page-line rulings that are inconsistent with his statements earlier in the order that Mr. Hess could be asked about factual issues. And as discussed in more detail below, that restriction prevents

Defendants from understanding how Mr. Hess is conducting his methodology in ways that *only he knows*.

For example, the Special Master prohibited Defendants from showing Mr. Hess a demonstrative of a PLM image and asking simply whether his microscope is *capable* of producing an image that bright. *See infra* § II.C. The capabilities of his microscope is a factual issue. There is no one better to ask that question to than Mr. Hess who is the one controlling the illumination on the microscope, looking down the microscope, and taking the images that were produced to Defendants. Yet Defendants are prohibited from asking that question, and the Special Master provided no explanation for why this limitation should be imposed.

The Special Master tried to reconcile his two orders by saying his original opinion mentioned the importance of Mr. Hess's "firsthand knowledge" of the testing. ECF 33067 at 2-3. But all the questions the Special Master prohibited Defendants from asking *did* go to Mr. Hess's firsthand knowledge. In the example above, the question called for an answer about Mr. Hess's firsthand knowledge of his illumination settings.

Every single question defense counsel asked at the deposition was relevant to the PLM-chrysotile testing at issue in this MDL that Mr. Hess himself conducted. No question should have been prohibited.

**A.      Questions That Touch On Mr. Hess's Own Prior Testing In This MDL**

In the first round of MDL testing, Mr. Hess tested dozens of samples of Defendants' talc by PLM and did not find chrysotile. The *central question* at issue for the current iteration of PLM testing is: *Why is MAS all of a sudden finding chrysotile now in nearly every bottle when previously they never found it at all?*

The only rationale the Special Master has ever given for prohibiting this question is stating when he was called to the deposition that Defendants "didn't say anything about asking him to compare old to new" in their briefing for why a deposition was warranted. Ex. W at 43:16-17. That is simply not true. Defendants' original brief seeking this deposition specifically argued on page 1 that Dr. Longo was now finding "a type of asbestos he previously had never found in any of his prior testing." ECF 32683 at 1. Nor should Defendants need to identify every single question they intend to ask in order to obtain a deposition of this critical witness.

The fact that Mr. Hess did not find chrysotile in his prior PLM work but now finds with his new method goes directly to "the how and why" of the new methodology. ECF 32817 at 3. *Why* is Mr. Hess only finding chrysotile for the first time beginning in 2020 and *how* has the methodology changed to accomplish that? Those questions are at the heart of the critical issues about the new PLM methodology at issue. The questions' relevance and importance does not change just because those questions about the new methodology by their nature touch on prior

23

work and involve a "comparison." That the prior work was done *by Mr. Hess* and *in this very MDL* makes them all the more relevant to the issues at hand.

Questioning on this topic at the bare minimum goes to the factual issues that the Special Master ruled could be asked about: How has Mr. Hess's methodology changed? That is certainly within his "firsthand knowledge." Yet the Special Master nevertheless ruled that Defendants could not ask any questions on this topic under his invented "no-test-comparison" rule.

### B.    Questions That Touch On Mr. Hess's Other Prior Talc Testing

Similarly, Defendants wanted to ask Mr. Hess about the illumination and coloring in the new PLM methodology at issue in this MDL that touches on prior testing Mr. Hess himself conducted of another company's product.

As Defendants explained in their original briefing to the Special Master, Mr. Hess is making "smaller but still important decisions" such as "controlling the illumination." ECF 32683 at 12. Defendants calso explained that it "appears as if Mr. Hess is not using enough light intensity, which would distort the color the particles appear and therefore distort the entire analysis." *Id*.

 Below are images of Mr. Hess's testing of another company's talc and his testing of sample M70484 (*Zimmerman*) that is part of Dr. Longo's report in this MDL.

| **Other Company** | **Sample M70484 (*Zimmerman*)** |



| **Date: 1/9/2020** | **Date: 2/21/2020** |
| **Analyst: Paul Hess** | **Analyst: Paul Hess** |
| **Sample: Talc** | **Sample: Talc** |
| **Oil: 1.550** | **Oil: 1.550** |

Ex. X, Vanderbilt vs. M70484 (Dep. Ex. 8).

Both are images of talc that Mr. Hess took using the same oil only a little over a month apart. Yet the illumination levels and coloring look completely different. The Special Master prohibited any questions on this topic as well.

Again, this goes directly to "the how and why" of the testing. *See* ECF 32817 at 3. Defendants want to know *how* the microscope for this MDL was set up differently than testing of talc in the same time period and *why* the microscope settings were changed. *See* Ex. W, Hess Dep. 71:11-21. The Special Master even prohibited the question: "[W]as the microscope set up differently in these two analyses?" Again, some of these questions go directly to *factual issues* of How Mr.

Hess has changed his lighting settings within his "personal knowledge," but the Special Master nevertheless prohibited any questioning into this topic.

Mr. Hess is ***the person*** who actually knows the answer to these issues because he is the one who is actually sitting at the microscope controlling its settings. If the microscope settings are being changed to change the results, that is incredibly important, relevant, and directly within Mr. Hess's knowledge (and maybe only Mr. Hess's) knowledge. Yet under the "no-test-comparison" rule, Defendants have no way to understand these critical issues.

Just because a question touches on Mr. Hess's prior work should not mean it is out of bounds. For some issues a "comparison" the best way to understand how Mr. Hess is using his microscope in the PLM testing at issue in this MDL and why he is using the microscope in that way.

### C.   Questions Regarding Illumination And Color Filtering

The Special Master ruled that Mr. Hess could be asked "if he used the maximum illumination settings" ECF 33067 at 7. He already answered that question and claimed he was using the maximum settings. Ex. W, Hess Dep. at 88:1-3. But Defendants need not simply accept what Mr. Hess says at face value, the Special Master prohibited Defendants from probing the accuracy and veracity of Mr. Hess's assertion.

26

Mr. Hess was shown as a demonstrative a sample PLM image that is plainly brighter than Mr. Hess's own PLM imaging in this MDL:

**Demosntrative PLM Talc Image**     **Mr. Hess. MDL Talc Image**

  

Ex. Y, PLM Image (Dep. Ex. 23); Ex. F, PLM Image in Valadez Report at 82 (Dep. Ex. 14);

Mr. Hess was simply asked the question: "Is your Leica microscope able to take images that are as bright as what we're seeing here?" Ex. W, Hess Dep. at 147:24-148:1. The Lecia microscope is the one Mr. Hess is currently using for the testing at issue in the MDL. *See, e.g.*, Ex. F, M71614-001/*Valadez* Rpt. (Dep. Ex. 14) at 18. He was instructed not to answer on the grounds that it "calls for expert testimony." Ex. W, Hess Dep. at 148:19-22. Mr. Hess is the one controlling the illumination settings and taking the images. That is a *factual question* about the capabilities of his microscope in his personal knowledge, yet again the Special Master prohibited the questioning under his "no comparison rule."

As defense counsel explained in the deposition, this question fell squarely within the scope of appropriate questioning since Mr. Hess was being asked "about his microscope, his illumination settings, what he sees under the microscope," and "whether his microscope that he knows and he works with is capable of producing an image at this illumination level." *Id.* at 148:23-149. The question goes directly to the "how and why" the illumination levels of Mr. Hess's images are the way they are. *See* ECF 32817 at 3. *Why* are the brightness levels too low and *how* did they get that way through the microscope's settings?

Similarly, polarized light microscopes can use filters in order to normalize coloring to ensure that the colors the analyst is seeing is an accurate representation of what the particles look like and not, for example, distorted by external light sources. Indeed, the ISO 22262-1 method that MAS claims is being followed in the testing in this MDL states that a blue "daylight" filter must be used. Ex. AA, ISO 22262-1 at 15, 25. So Mr. Hess—the person with nearly 40 years of PLM experience who Dr. Longo relies on for the testing at issue in the MDL—was asked: "Do you know what the purpose is of a blue light or a daylight filter?" Ex. W, Hess Dep. at 65:19-20. He was instructed not to answer on the grounds that it "calls for expert testimony." *Id.* at 65:23-66:1.

In his original order, the Special Master pointed out that "defendants are not required to accept at face value that Longo's written methodology was followed."

ECF 32817 at 4. The method at issue calls for a use of this filter. In seeking to know "the how and why" of the testing, *see* ECF 32817 at 3, Defendants wanted know not just *how* the testing was conducted (whether such a filter was being used), but also if the reason *why* the filter was not being used is due to Mr. Hess's awareness of its purpose. Does he not know the purpose of using the filter or does he know its purpose and is intentionally not using it? That is plainly a question within his "firsthand knowledge." It does not involve a comparison.  Yet for unknown reasons, the Special Master concluded this question could not be asked.

### D.     Questions Regarding The "Caldiria" Reference Sample That Is A Critical Component Of MAS's PLM Methodology.

Defendants explained in their original brief that "Mr. Hess is even the one who came up with the idea of using a reference sample for a unique form of chrysotile [known as Calidira] which Dr. Longo has claimed unlocked MAS's ability to identify chrysotile in talc." ECF 32683 at 11 (citing Ex. BB, Longo *Powers* Dep. 75:24-76:3; Ex. CC, Longo *Weiss* Dep. at 22:7-15; Ex. E, Longo *Clark* Hr'g 36:10-15, 159:8-16, 160:1-8).

When asked whether he made the discovery that what MAS was finding in cosmetic talc was like Calidria, Dr. Longo responded "I have to give credit where credit is due. Mr. Hess came up with the suggestion." Ex. BB, Longo *Powers* Dep. 75:24-76:3. Dr. Longo further explained that it was the dispersion staining colors of Calidria that let MAS "figure[] out that was what we were seeing in the cosmetic

talc" because "[i]f you don't have that" "they would think it was fibrous talc." Ex. CC, Longo *Weiss* Dep. at 22:7-15. Dr. Longo's theory is that other "laboratories out there don't understand what Calidria looks like, that's why they're . . . missing chrysotile in all of these talc products." Ex. E, Longo *Clark* Hr'g 160:1-8.

Essentially, MAS took a sample of this form of chrysotile, put it under the PLM microscope, and Mr. Hess himself took images of it. MAS then claims to identify "chrysotile" supposedly by comparing the particles they find in Defendants' talc to this reference sample created per Mr. Hess's idea. Those images of the reference sample were marked as Exhibit 25 to the deposition. Ex. DD, Calidiria Reference Sample (Dep. Ex. 25).

Mr. Hess was shown an image of MAS's Calidiria reference sample that is a component of the methodology at issue in this MDL that Mr. Hess supposedly follows and an image from M71614-001 (the *Valadez* report) that is also part of Dr. Longo's 4th Supplemental Report in this MDL, as discussed above.

 

Dr. Longo Calidria Reference                    Dr. Longo Chrysotile in J&J

Ex. EE, M71614-001/Reference Sample Comparison (Dep. Ex. 27); Ex. W, Hess Dep. 178:2-9.

"Mr. Hess was asked: Are you claiming those two – those two images have the same dispersion staining colors?" Ex. W, Hess Dep. 178:20-22. He was instructed not to answer. *Id.* at 179:4-7. Again, comparing the particles MAS identified in Defendants' talc to MAS's Caldaria reference sample is what Dr. Longo testified was the *critical* step in the analysis that allowed MAS to identify chrysotile despite never finding it previously. Questions regarding how Mr. Hess is making this comparison when he conducts the analysis is therefore unquestionably appropriate and serve to "explain the basis" of methodology. Yet somehow the Special Master still viewed this topic as falling under his "no-test-comparison" rule.

Additionally, one of Defendants' concerns about this reference sample is that while the image contains huge swathes of chrysotile particles that appear blue, MAS chose as its point of comparison an outlier particle that is a different, yellower color that is likely an impurity in the sample (i.e. not chrysotile).



*See* Ex. DD, Calidiria Reference Sample (Dep. Ex. 25); *see also* Ex. W, Hess Dep. 177:9-11 (acknowledging that all the blue is chrysotile).

Whether the particle being used as the reference is *actually* chrysotile is incredibly significant and clearly fair game for questioning considering that Mr. Hess is the one who came up with the idea of this reference sample, took the images of the sample, and that Dr. Longo claims using the sample as a point of comparison is critical to the methodology. Yet when Mr. Hess was asked whether he was "aware that Calidria can have impurities in it," he was instructed not to answer. *Id.* at 177:12-16.

That question goes directly to the "***how and why of the testing***" that the Special Master originally ordered was to be part of the deposition—i.e *why* MAS is

using a particle that is not representative of the rest of the sample. *See* ECF 32817 at 3 (emphasis added). Similarly, Mr. Hess was instructed not to answer why the color of Calidria supposedly "changes" so "that sometimes when you're finding it, it's to you golden yellow" instead of blue on the ground that it "[c]alls for expert testimony." Ex. W, Hess Dep. 159:18-23. While the Special Master stated, "plaintiffs are mistaken if they believe the appropriate demarcation line to use regarding Hess's testimony is whether he offers an 'expert opinion.' (ECF 33067 at 4), the Special Master nevertheless prohibited questioning into this component of the very methodology at issue in this MDL.

### E.    Questions Regarding The Chrysotile Reference Sample In The ISO 22262-1 Methodology MAS Purports To Follow.

MAS also purports to rely, at least in part, on a protocol from the International Organization for Standardization ("ISO") known as ISO 22262-1 for the testing in this MDL. Ex. F, M71614-001/*Valadez* Rpt. (Dep. Ex. 14) at 3 ("The PLM analysis used method ISO 22262-1. . . ."); Ex. FF, Longo *Prudencio* Dep. 26:9-11 (similar). Part of that protocol contains reference images for what chrysotile is supposed to look like using PLM, which looks very different that the particles MAS claims are chrysotile.



Ex. GG, *Valadez/*ISO Comparison (Dep. Ex. 17).

As the graphic above shows, Mr. Hess treated the particle on the left which is part of the testing in this MDL as purple corresponding to a wavelength of light that is 560nm. Mr. Hess was asked whether the "the wavelength of light that you assigned to this particle on the left that you're calling chrysotile in Johnson & Johnson, you are saying that it is even more purple than standard reference chrysotile depicted on the right." Ex. W, Hess Dep. 110:16-21. He was instructed not to answer that question. *Id.* at 112:13-14.

He was similarly instructed not to answer the question: "As a fact, factually, you assigned a darker purple color to that particle on the left than standard reference chrysotile." *Id.* at 112:20-113:18; *see also id.* at 109:19-110:6 (Hess being instructed not to answer whether "the refractive index number given for that particle by ISO is 1.556; that corresponds to magenta."). Even though this question is based on the protocol he is supposed to be following, the Special Master prevented Defendants

from getting an answer since it is a supposed "comparison." The ruling didn't change even when framed as a *factual* question.

**F.    Questions Regarding Dr. Su And Dr. Wyle's Review Of Mr. Hess's Work**

It is basic deposition practice for a party to ask about the materials used to prepare a witness for his deposition. Yet the Special Master prohibited even those questions.

In preparation for his deposition, Mr. Hess reviewed the reports of defense experts Dr. Shu-Chun Su and Dr. Ann Wylie from this MDL. Ex. W, Hess Dep. at 18:22-25. These are reports explaining defense experts' views of why Mr. Hess's analysis in this MDL is flawed and otherwise incorrect. But when Mr. Hess was asked if he had any comments on their reviews of his work, he was instructed not to answer. *Id.* at 84:12-85:16. The reasons Mr. Hess—who has the relevant expertise who conducted the analysis at issue—thinks that defense criticisms of his own testing are wrong is at the heart of the deposition.

If Mr. Hess thinks those criticisms are correct and that he is not using the PLM microscope correctly and not identifying chrysotile, then these reports should not be in the case. Presumably Mr. Hess has *some* response to justify "the basis for MAS's findings" that the Special Master ruled was part of the purpose of the deposition. *See* ECF 32817 at 4. Defendants are left without any way to know what those responses may be.

Plaintiffs themselves put these reports in play by using them in Mr. Hess's deposition preparation. It is fundamentally unfair for Mr. Hess to review those materials to prepare but then not be permitted to answer any questions about those very materials. If Plaintiffs did not want him to answer questions about those reports, they should not have given them to him to read.

### G.    Questions Regarding The Effect Of Switching Oil

For the tests at issue in this MDL, MAS changed the type of oil used to coat the sample from "1.550 oil" to "1.560 oil." See Ex. F, Longo *Valadez* Report at 18-19 (discussing change from 1.550 oil to 1.560 oil); compare also Ex. HH, Longo *Zimmerman* Report at 50 (1.550) with Ex. F at 34 (1.560 oil). The oil type affects the critical issue of what color the particle appears. But that change did not change the color of the particles in the way that would be expected if the particles were actually chrysotile.

So Mr. Hess was asked: "What is the expected effect of switching to . . . 1.560 oil?" Mr. Hess was instructed not to answer on the ground that it "calls for an expert opinion." Ex. W, Hess Dep. at 91:9-12. To drill down on this issue, Mr. Hess was also asked: "[I]f I have a particle that is orange in parallel in 1.550 and I change my oil to 1.560, it should appear more magenta, right?" *Id.* at 98:12-15. He was again instructed not to answer on the grounds that it "[s]eeks expert opinion." *Id.* at 98:19-23. The Special Master prohibited all these questions on the ground that they were

36

"hypotheticals." But Mr. Hess *did* change oil. That the change in oil did not have the effect it would have if the particles MAS identified are truly chrysotile is directly relevant to Mr. Hess's testing in this MDL.

### H.     Other Questions Regarding Mr. Hess's Testing.

The instructions not to answer were so numerous, that they applied to wide variety of other questions that do not neatly fall into the categories above. *See, e.g.*, Ex. W, Hess Dep. at 57:2-12 (being instructed not to answer: "Do the central stop dispersion staining colors of talc plates themselves in 1.550 oil include the color red?"); *id.* at 103:5-15 ("Are you familiar with the fact that you can -- that even with Cargille glass that has a single refractive index, you can sometimes see edge colors that don't correspond to that refractive index?"); *id.* at 141:7-10 (being instructed not to answer: "[D]o you know how to perform a Becke line analysis?"); *id.* at 158:19-23 (being instructed not to answer "So the whole reason why dispersion staining can be used is because minerals have defined refractive indices, right?"); *id.* at 162:5-8 (being instructed not to answer: "Are you familiar with any published reference values for the refractive indices of talc in parallel, in talc -- elongated fiber of talc in parallel?"). All the instructions not to answer the Special Master upheld were improper and should not have been permitted.

* * *

37

Mr. Hess's expertise is inherently at issue in the deposition. As the Special Master concluded at least at first: "Hess, not Longo, has decades of experience doing PLM testing and is the expert Longo will rely upon to support his opinion that defendants' talc products contained asbestos." ECF 32817 at 3. The "why" of the testing is "important testimony." *Id.* And Mr. Hess's "work and testing is critical to Longo's conclusion."

Mr. Hess is in fact doing *all the work*. Mr. Hess is the one looking down the microscope. Mr. Hess is the one determining what particle to evaluate. Mr. Hess is the one ascertaining the particle's color. Mr. Hess is the one assigning an "RI value" to the particle based on the color which helps determine the mineral type. Mr. Hess is the one making the decision that the particle is supposedly "chrysotile." Mr. Hess is the one taking the image of the particle that is produced to Defendants. That leaves little to nothing for Dr. Longo to actually do. Plaintiffs cannot claim that Dr. Longo reviews the imaging to independently verify Mr. Hess's results because Dr. Longo repeatedly testifies that he *cannot* verify the testing results based on the imaging and that the only way he can conduct the analysis is looking live down the microscope (which he does not do). Defendants already provided numerous examples of this testimony to the Court in their objections to the denial of a request for an inspection, (which Defendants incorporate herein by reference). *See* ECF 32872-1 at 17-18; *see also* 32817 at 3 n.4.

Mr. Hess—someone with decades of PLM experience who actually conducted the relevant tests—should be able to answer basic questions about that testing. Plaintiffs' machinations to avoid inquiry into this topic all beg the questions: What are Plaintiffs afraid of? What are they hiding? What mischief is afoot in MAS's testing?

Defendants are entitled to an *unrestricted deposition* of the *actual expert* forming the opinions. So severely limiting a deposition of Mr. Hess means the PSC can manipulate the expert process and shield their experts' work to ensure that Defendants never get to depose the actual expert who did the actual testing that forms the basis of their case defining theory. Indeed, the Special Master expressly ruled that Mr. Hess "did not authorize Hess to be deposed as if he were a testimonial expert." ECF 33067 at 2. That is fundamentally unfair and should not be permitted.

The questioning was all relevant. It was proportional to the needs of the case— going to a critical issue. And it imposed no burden on Mr. Hess. There was no basis to limit his deposition in any way.

## III.    In The Alternative Dr. Longo's Chrysotile Report Should Be Stricken.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts have discretion to preclude

a party's expert if the opposing party lacked the opportunity to depose the expert and test the veracity of the expert's statements and opinions. *See In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 958 (C.D. Cal. 2015); *see also Apple Inc. v. Samsung Elecs. Co.*, No. 11-cv-1846, 2016 U.S. Dist. LEXIS 17596, at *59-60 (N.D. Cal. Feb. 10, 2016). Without a meaningful opportunity to depose the actual expert doing all the work, MAS's PLM-chrysotile testing should be stricken.

Defendants were prejudiced because despite requesting the deposition in April in the middle of expert discovery, Defendants were not able to fully depose Mr. Hess by the time of the Rule 702 motion deadline. In any continued deposition, Mr. Hess now has an improper preview of many of the questions Defendant intend to ask him. Additionally, Defendants will have to expend twice the effort to depose Mr. Hess than they should have because of Plaintiffs' conduct in the deposition.

## CONCLUSION

The Court should overrule the Special Master's Decision to limit the deposition testimony of Mr. Hess, and Order an unrestricted deposition of Mr. Hess, and, in the alternative, preclude Plaintiffs from relying on MAS testing conducted by Mr. Hess.

Dated: August 20, 2024

Respectfully submitted,

*/s/ Kristen R. Fournier*

Kristen R. Fournier
Matthew L. Bush
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson & Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on August 20, 2024, a true and correct copy of the foregoing objections was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I hereby certify that on August 20, 2024, a true and correct copy of the foregoing objections was sent via email to counsel for Mr. Hess, Eric Ludwig, Esq.

/s/ *Kristen R. Fournier*
Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com