# EXHIBIT 17

```
                                                              Page 1

     IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
            IN AND FOR SARASOTA COUNTY, FLORIDA


  ---------------------------------§
  PHILIPPE MATTHEY, as Personal    §
  Representative for the Estate of §
  PATRICIA A. MATTHEY,             §
                                   § Civil Action No.
       Plaintiff,                  § 2018-CA-4809-NC
                                   §
  vs.                              §
                                   §
  JOHNSON & JOHNSON, JOHNSON &     §
  JOHNSON CONSUMER INC., f/k/a     §
  JOHNSON & JOHNSON CONSUMER       §
  COMPANIES, INC., AND PUBLIX      §
  SUPER MARKETS, INC.,             §
                                   §
       Defendants.                 §
  ---------------------------------§
   - - -
```

                                - - -

                    Tuesday, November 24, 2020

                                - - -

       This is the Remote Deposition of JENNIFER B.
  PERMUTH, PhD, MS, commencing at 8:58 a.m., on the
  above date, before Kelly J. Lawton, Registered
  Professional Reporter, Licensed Court Reporter,
  and Certified Court Reporter.
                                - - -
                    GOLKOW LITIGATION SERVICES
              877.370.3377 ph | 917.591.5672 fax
                        deps@golkow.com

1  that. All I know is I reviewed the bulk of the
2  literature and what was reported.
3      Q.  Do you know what fibrous talc is?
4      A.  I don't recall offhand.
5      Q.  Did -- I understand from your earlier
6  testimony that you did not do a literature review on
7  fibrous talc, correct?
8      A.  I don't recall specifically entering "fibrous
9  talc" into a search term box.
10     Q.  Well, your -- do your opinions about talc in
11 this matter include opinions about fibrous talc?
12     A.  Again, as I think about talc in this case, I
13 think of talc as an entity.
14     Q.  You don't have specific opinions about
15 fibrous talc then?
16     A.  I think of talc as an entity.
17     Q.  Did you have an opinion as to whether pure
18 talc exists?
19     A.  Again, to me as an epidemiologist and when I
20 review the literature, I'm thinking of talc as a
21 whole and ovarian cancer and what's reported.
22     Q.  If Johnson & Johnson made claims that their
23 talc is pure, you're not in a position to opine as to
24 whether that's misleading or not, true?
25     A.  I would have to defer to mineralogists on

Jennifer B. Permuth, Ph.D., MS

Page 39

```
 1   that.
 2      Q.   Do you know anything about the particle size
 3   of the material within a bottle of Johnson's baby
 4   powder?
 5      A.   I would have to refer to colleagues about
 6   that.
 7      Q.   You did not make any consideration -- or, you
 8   did not consider particle size of any of the product
 9   in formulating your opinions, correct?
10      A.   Particle size -- again, I'm focused on the
11   entity as a whole, talc powder; you know, big
12   particle, small particle.
13      Q.   And you did not consider whether fibrous talc
14   was contained in a bottle of Johnson's baby powder in
15   formulating your opinions, correct?
16      A.   As I said, I looked at talc as a whole.
17      Q.   So I'm going to ask you some questions today
18   about the mechanism by which talcum powder may cause
19   or contribute to ovarian cancer.
20           And I understand from your report and the
21   disclosure that you're going to provide testimony
22   regarding that topic; is that fair?
23      A.   That is fair.
24      Q.   Okay.  Now, when delivering testimony about
25   talcum powder, does it not make a difference to you
```

Page 40

1    what the components of the talcum powder is?
2            MR. JAMES:  Object to the form.
3        A.   Again, I know I sound like a robot here, but
4    I evaluated talc and what was reported to be talc.
5    And these articles don't go into the granular detail
6    of exactly what's in there.  So my job was to
7    evaluate talc and the association with ovarian
8    cancer.
9        Q.   If there are components of the talcum powder
10   that could cause ovarian cancer, wouldn't you want to
11   know about the existence of those components?
12           MR. JAMES:  Object to the form.
13       A.   I don't have an opinion on that.
14       Q.   You didn't consider components of the --
15   components of talcum powder as part of your opinion
16   in this case; is that correct?
17           MR. JAMES:  Object to the form.
18       A.   Again, I looked at talc as a whole.
19       Q.   Sure.
20           And you don't have to worry about how -- I
21   know it feels odd, the -- depositions are an odd
22   situation.  So I'm not trying to badger you by
23   continuing to ask these questions.  I just have to
24   ask them, okay?
25       A.   No, understood, understood.

Jennifer B. Permuth, Ph.D., MS

Page 55

```
 1    that's what you're getting at.
 2        Q.   I'm talking about the universe of documents:
 3    Medical literature, any regulatory documents,
 4    anything that would have indicated that asbestos had
 5    been found in Johnson's baby powder?
 6             MR. JAMES:  Objection to the form.
 7        A.   I guess I would go back to what I said
 8    earlier, I considered the powder as a whole, as an
 9    entity, and its association with the disease of
10    interest, ovarian cancer.
11        Q.   Okay.  And the powder as a whole, you didn't
12    consider what was in the powder as a whole, whether
13    it be asbestos or fibrous talc or other minerals,
14    correct?
15        A.   I considered the powder as a whole.
16        Q.   You do understand that studies have shown
17    that consumer talc contains asbestos, correct?
18             MR. JAMES:  Objection to the form.
19        A.   I'm aware there are studies out there.
20        Q.   Did you consider those in your opinion?
21        A.   I considered the epidemiologic literature.
22        Q.   I'm sorry, say that one more time.  I
23    missed --
24        A.   I considered the epidemiologic literature,
25    not recent investigations or allegations.
```

Page 142

```
 1              Do you see that?
 2         A.   I see that.
 3         Q.   Do you disagree with that?
 4         A.   I believe the uterus can contract.  We know
 5    that.
 6         Q.   Okay.  Does the uterus possess motility?
 7         A.   I would -- I would really refer to a
 8    gynecologic oncologist to speak to that better than I
 9    could.
10         Q.   Okay.  So you wouldn't have the ability to
11    opine on the motility of the uterus, correct?
12              MR. JAMES:  Object to the form.
13         A.   I'll go back to what I'm opining to, that
14    talc, when one is exposed to talc, it doesn't appear
15    to be carcinogenic to the ovaries.
16         Q.   So part of your opinion is based on the fact
17    that you reject the hypothesis that perennially
18    applied talcum powder can make its way to the
19    fallopian tubes or the ovaries; isn't that true?
20              MR. JAMES:  Object to the form.
21         A.   I don't believe that mechanism is sound.
22         Q.   Okay.  But you're not an OB-GYN and you
23    don't -- you haven't studied, you haven't practiced
24    in the area of uterine motility, correct?
25         A.   Uterine motility is not my area of expertise.
```