# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS<br><br>MDL No. 16–2738 (MAS) (RLS) |

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT LLC'S MEMORANDUM OF LAW IN OPPOSITION TO THE PLAINTIFF'S STEERING COMMITTEE'S MOTION TO EXCLUDE THE GEOLOGY OPINIONS OF DRS. MARY POULTON AND LAURA WEBB

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .................................................................................................1

BACKGROUND ................................................................................................3

    I.     Dr. Poulton ........................................................................................3

    II.    Dr. Webb ..........................................................................................5

ARGUMENT ......................................................................................................7

    I.     Drs. Poulton And Webb Are Eminently Qualified To Offer Their Expert Opinions.........................................................................................7

         A.    Dr. Poulton is more than qualified to opine on talc mining and the methodological flaws in the opinions of Drs. Cook and Krekeler.............................................................................8

         B.    Plaintiffs' criticisms of Dr. Poulton's qualifications lack merit. .......................................................................................9

         C.    Dr. Webb is more than qualified to provide opinions about the talc deposits at issue, including whether the deposits are likely to contain asbestos. ..................................................11

    II.    The Opinions Offered By Drs. Webb And Poulton Are Based On Reliable Methodologies And Supported By The Relevant Scientific Evidence..............................................................................13

         A.    Plaintiffs' attacks on Dr. Poulton's methodology misunderstand the role of defense experts, misrepresent Dr. Poulton's opinions and misstate the law.............................13

             1.    Dr. Poulton properly rebuts the unreliable opinions offered by Drs. Cook and Krekeler. ...............................13

             2.    Dr. Poulton performed a comprehensive review of the materials and literature cited by Drs. Cook and Krekeler as supporting their opinions............................16

             3.    Dr. Poulton's opinions are based on reliable scientific evidence, not *ipse dixit*....................................22

             4.    Plaintiffs' other disagreements with Dr. Poulton's conclusions are not supported by the record. .................27

5.    Dr. Poulton's opinions are supported by the materials on which she relies...........................................31

B.    Plaintiffs' Attacks On Dr. Webb's Methodology Are Similarly Baseless. ....................................................33

1.    Dr. Webb's geology and petrology opinions are based on the same, reliable review methods she employs outside the courtroom......................................33

2.    Dr. Webb performed a comprehensive review of the relevant scientific literature. ...........................................38

CONCLUSION .......................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Lab. Corp. of Am.*,
   760 F.3d 1322 (11th Cir. 2014) ..........................................................................23

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002) ...............................................................................37

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*,
   829 F. Supp. 2d 802 (D. Minn. 2011).............................................................15, 16

*Del. Display Grp. LLC v. VIZIO, Inc.*,
   2017 WL 784988 (D. Del. Mar. 1, 2017) ............................................................23

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   2018 WL 3829218 (C.D. Cal. June 7, 2018)......................................................33

*Edison Wetlands Ass'n v. Akzo Nobel Chems., Inc.*,
   2009 WL 5206280 (D.N.J. Dec. 22, 2009)..............................................22, 23 25

*Hamilton v. Emerson Elec. Co.*,
   133 F. Supp. 2d 360 (M.D. Pa. 2001)..................................................................24

*Holbrook v. Lykes Bros. S.S. Co.*,
   80 F.3d 777 (3d Cir. 1996) ..................................................................................14

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
   299 F. Supp. 3d 1291 (N.D. Fla. 2018) .........................................................14, 15

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
   2009 WL 1649773 (D. Kan. June 9, 2009).........................................................15

*In re Human Tissue Prods. Liab. Litig.*,
   582 F.Supp.2d 644 (D.N.J. 2008)..........................................................................7

*In re Levaquin Prods. Liab. Litig.*,
   2010 WL 8399948 (D. Minn. Nov. 12, 2010)....................................................17

*In re Nuvaring Prods. Liab. Litig.*,
   2013 WL 791828 (E.D. Mo. Mar. 4, 2013)........................................................17

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ........................................................................7

*In re Zyprexa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ..................................................14, 15

*McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*,
2013 WL 3487560 (W.D. Pa. July 12, 2013) ........................................36, 37

*Montgomery Cty. v. Microvote Corp.*,
320 F.3d 440 (3d Cir. 2003) .................................................................23, 24

*Oddi v. Ford Motor Co.*,
234 F.3d 136 (3d Cir. 2000) ....................................................................23

*Pineda v. Ford Motor Corp.*,
520 F.3d 237 (3d Cir. 2008) ......................................................................7

*Poolworks, Inc. v. Aquafin, Inc.*,
2016 WL 4544348 (D.V.I. Aug. 30, 2016) ...............................................23

*Poust v. Huntleigh Healthcare*,
998 F. Supp. 478 (D.N.J. 1998) .................................................................7

*Suchanek v. Sturm Foods, Inc.*,
311 F.R.D. 239 (S.D. Ill. 2015) ................................................................33

*Suter v. Gen. Accident Ins. Co. of Am.*,
424 F. Supp. 2d 781 (D.N.J. 2006) ..........................................................42

*TVIIM, LLC v. McAfee, Inc.*,
2015 WL 4148354 (N.D. Cal. July 9, 2015) .............................................22

*Ward v. Carnival Corp.*,
2019 WL 1228063 (S.D. Fla. Mar. 14, 2019) ...........................................13

*Westley v. Ecolab, Inc.*,
2004 WL 1068805 (E.D. Pa. May 12, 2004) ............................................42

**Other Authorities**

Federal Rule of Civil Procedure 701 ...............................................................14

Federal Rule of Civil Procedure 702 ........................................................*passim*

## INTRODUCTION

Defendants have offered two highly qualified experts in the fields of geology and geological engineering – Drs. Laura Webb and Mary Poulton – to address the highly speculative and unreliable opinions offered by plaintiffs' experts in these fields regarding the alleged presence of asbestos in the talc ore used to source Johnson's Baby Powder and Shower to Shower ("the Products").

Despite Drs. Poulton and Webb's stellar resumes and copious experience, plaintiffs advance the frivolous argument that neither is qualified to serve as an expert in this litigation. These arguments are not only misguided but also ironic, because they would unquestionably require exclusion of plaintiffs' own experts, Drs. Cook and Krekeler. For example, plaintiffs contend that Drs. Poulton and Webb are not qualified to serve as experts in this litigation because they have not published on the specific topic of "asbestiform amphiboles in talc" and do not have experience in "microscopically detecting asbestos in talc."[1] But neither Dr. Cook nor Dr. Krekeler has such experience, either. Indeed, the top-notch credentials held by Drs. Webb and Poulton with respect to geology, petrology (the formation of rocks) and mining are far more impressive than those of Drs. Cook and Krekeler. Thus, if Drs. Poulton and

---

[1]    (Pls.' Steering Committee's Mem. of Law in Supp. of Mot. to Exclude the Geology Opinions of Drs. Mary Poulton and Laura Webb ("Pls.' Br.") at 11, 14, July 23, 2024 (ECF No. 32996-1).)

Webb were not sufficiently qualified to testify as experts in these fields, plaintiffs' own experts would be all the more unqualified.

Plaintiffs' challenges to the methodologies employed by Drs. Poulton and Webb are equally meritless. With respect to Dr. Poulton, plaintiffs complain that she "failed to employ the necessary scientific rigor" to offer expert testimony because her opinions "amount to nothing more than a critique of the PSC's experts."[2] But, as numerous courts have recognized, that is the very role typically and appropriately played by a defense expert. The remainder of plaintiffs' criticisms of Dr. Poulton's opinions are based on egregious misrepresentations of the record and focus on Dr. Poulton's purported failure to consider materials related to opinions that she does not seek to offer.

Plaintiffs' arguments with respect to Dr. Webb fare no better. While plaintiffs assert that Dr. Webb's methodology is invalid because she did not conduct her own talc sampling and testing, her opinions are reliably based on decades of scientific research and testing related to the geology and petrology of the specific talc ore formations at issue. In addition, plaintiffs' assertion that Dr. Webb relies on a "small set" of "cherry picked" sources[3] is belied by the pages upon pages of supporting materials cited in Dr. Webb's report and reviewed by her in forming her opinions.

---

[2]     (Pls.' Br. at 17.)

[3]     (Pls.' Br. at 36.)

The additional materials that plaintiffs point to as evidence that Dr. Webb did not perform a thorough review do not contain the type of information that petrologists or geologists would rely on in assessing the geology of a particular region.

For these and other reasons, set forth in more detail below, plaintiffs' motion to exclude the testimony of Drs. Poulton and Webb[4] should be denied.

## BACKGROUND

### I.    Dr. Poulton

Dr. Poulton has a B.S., M.S., and Ph.D. in Geological Engineering from the University of Arizona.[5] She served on the faculty of the University of Arizona for 28 years, achieving the rank of Distinguished Professor in Mining and Geological Engineering and heading the department of Mining and Geological Engineering for 14 years.[6] She has authored more than 100 research papers, conference papers, abstracts and reports, and has taught courses in, among other things, mineral exploration, mineralogy and petrology (i.e., the study of the origin and composition of rocks) for mining engineers, field methods in geophysical exploration, mine

---

[4]    Plaintiffs previously submitted a Motion to Exclude the Testimony of Drs. Poulton and Webb in this case on May 7, 2019, which Defendants opposed on May 29, 2019. The Court did not rule on the issues set forth in that briefing.

[5]    (*See* Expert Report of Mary Poulton, Ph.D. ("Poulton Rpt.") at 2, Feb. 25, 2019 (attached as Ex. 1 to the Declaration of Matthew L. Bush, Esq. ("Bush Decl.").)

[6]    (*Id.*)

surveying, and earth resources and the environment.[7] She received the Daniel C. Jackling Award from the Society of Mining, Metallurgy and Exploration in 2019, the National Engineering Award from the American Association of Engineering Societies in 2017, and the Medal of Merit from the American Mining Hall of Fame in 2009.[8] She currently serves on the board of directors of the Society of Mining, Metallurgy and Exploration, and as co-director of the Lowell Institute for Mineral Resources at the University of Arizona.[9] She also formerly served as supervisor of the University of Arizona's San Xavier Underground Mine.[10]

In her report, Dr. Poulton explains the talc mining practices used in the areas from which the talc used in the Products were sourced.[11] In addition, Dr. Poulton explains why several conclusions reached by Drs. Cook and Krekeler with respect to mining and other geological issues are not supported by the materials they cite.[12] Dr. Poulton explains, for instance, how Drs. Cook and Krekeler improperly conflate talc ore samples with samples of non-ore, non-asbestiform minerals with asbestiform minerals, and the mineralogy of non-cosmetic-grade talc mines with cosmetic-grade

---

[7]    (*Id.*)
[8]    (*Id.*)
[9]    (*Id.*)
[10]   (*Id.*)
[11]   (*Id.* at 2-5.)
[12]   (*Id.* at 1, 5.)

ore that went into the Products.[13] In addition, Dr. Poulton notes that Drs. Cook and Krekeler improperly extrapolate general mineralogy from different regions to the exact mineralogy of ore that went into the Products.[14] Further, Dr. Poulton explains that Drs. Cook and Krekeler incorrectly assert that selective mining practices, which use machinery and other methods to extract only high-grade talc ore from mines without removing other minerals, was impossible and make improper assumptions about how talc drilling must be conducted.[15] Dr. Poulton also demonstrates that Drs. Cook and Krekeler misstate facts regarding mining and sampling practices employed at the relevant talc mines and rely on incomplete data to opine that quality control efforts were ineffective at these mines.[16]

## II.    Dr. Webb

Dr. Webb, a geologist, has almost 20 years of experience and specializes in using the tools of petrology and structural geology to understand the histories of rocks and regions.[17] She earned a B.S. in Geology from the University of California at Los Angeles and a Ph.D. in Geological and Environmental Sciences from Stanford

---

[13]    (*Id.* at 6-9.)

[14]    (*Id.* at 7-8.)

[15]    (*Id.* at 16-32.)

[16]    (*Id.*)

[17]    (*See* Expert Report of Laura Webb, Ph.D. ("Webb Rpt.") at 1, Feb. 25, 2019 (attached as Bush Decl. Ex. 2.)

University.[18] Dr. Webb was a Research Assistant Professor at Syracuse University for nine years, and is currently a tenured Associate Professor in the Department of Geology at the University of Vermont.[19] She has co-authored 33 peer-reviewed scientific papers on geology, mineralogy and petrology and has done extensive geological work in Vermont, Italy and China – the very regions from which the talc used in the Products is sourced.[20]

Based on her training, experience and review of the scientific literature, Dr. Webb explains that there is no reliable evidence in the relevant scientific literature that the talc deposits used to source the Products were contaminated with asbestos, that Drs. Cook and Krekeler fail to appropriately evaluate the relevant literature, and that these experts' opinions improperly conflate asbestos with non-asbestiform minerals.[21] For instance, Dr. Webb explains how: (1) any amphibole found in the products derived from the Fontane, southern Vermont and Guangxi talc mines would likely be incidental actinolite or tremolite cleavage fragments from nonasbestiform amphiboles derived from the margins of the talc deposits; (2) amphibole cleavage fragments are generally much less chemically-resistant and have different surface

---

[18]    (*Id.*)

[19]    (*Id.* at 1-2.)

[20]    (*Id.* at 2.)

[21]    (*See id.* at 1.)

chemistries than their asbestiform counterparts; and (3) there is no well-founded, scientifically-sound evidence in the peer-reviewed scientific literature for an association of amphibole asbestos with the talc deposits of concern.[22]

## ARGUMENT

## I.     Drs. Poulton And Webb Are Eminently Qualified To Offer Their Expert Opinions

Under Rule 702, an expert is "qualified to render an opinion when he or she 'possesses specialized expertise.'" *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (quoting *Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir. 2008)). The bar to survive a challenge to an expert's qualifications is not a high one. This Circuit has "eschewed imposing overly rigorous requirements of expertise." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). The Court need only determine "whether the proffered expert has minimal qualifications, either through experience or education, in a field that is relevant to a subject which will assist the trier of fact." *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 491 (D.N.J. 1998); *see also In re Paoli*, 35 F.3d at 741 (describing Rule 702's "liberal policy of admissibility" when it comes to experts' qualifications); *see also Pineda*, 520 F.3d at 2444-45. Drs. Poulton and Webb – two highly qualified scientists with

---

[22]     (*Id.* at 14-24.)

significant experience in the areas of geological engineering, geology and petrology
– hurdle this bar easily.

### A.    Dr. Poulton is more than qualified to opine on talc mining and the methodological flaws in the opinions of Drs. Cook and Krekeler.

Dr. Poulton – who holds a Ph.D. in geological engineering and served as the head of the University of Arizona's Department of Mining and Geological Engineering for 14 years – is eminently qualified to opine on talc mining and the methodological flaws in the opinions of Drs. Cook and Krekeler that relate to: (1) the likelihood that the talc ore deposits used to source the Products were formed in a way that allowed for the development of asbestos; and (2) the usefulness of selective mining practices to ensure that only high-grade talc is extracted from talc mines. Based on her extensive background and experience in mining, mineralogy, and petrology, her use of reference literature, and her analysis of the reports of Drs. Cook and Krekeler and the documents they cite, Dr. Poulton concludes that Drs. Cook and Krekeler apply flawed methodologies, incomplete sampling results, and incorrect facts about ore body characterization and selective mining to conclude that the talc sourced for use in the Products "was known to contain asbestos and heavy metals that exceeded product specifications."[23]

---

[23]    (Poulton Rpt. at 33.)

### B.    Plaintiffs' criticisms of Dr. Poulton's qualifications lack merit.

*First*, Plaintiffs fundamentally mischaracterize the nature of Dr. Poulton's opinions. Although undoubtedly qualified to do so, Dr. Poulton does not, as Plaintiffs contend, "opine on the presence of asbestos at the talc mines used to source Defendants' talcum powder products."[24] Instead, Dr. Poulton's opinions are limited to talc mining and identifying the methodological flaws in the opinions of Drs. Cook and Krekeler related to the formation and characteristics of the talc ore deposits at issue and the effectiveness of selective mining, as demonstrated by the substance of her report.[25]

*Second*, while Plaintiffs offer a list of complaints about things that Dr. Poulton did not do and experience she supposedly does not have,[26] they fail to demonstrate how any of these criticisms relates to the opinions she actually offers. For instance, Dr. Poulton's purported inability to name the particular Vermont counties in which defendants' mines were located[27] has no bearing on her ability to competently opine on talc mining and the methodological flaws in the opinions of Drs. Cook and Krekeler regarding the characteristics of the talc ore deposits at issue.

---

[24]    (Pls' Br. at 10; *accord id.* at 13 (referring to Dr. Poulton's purported "opinions regarding the geology of the [talc] deposits and the presence of asbestos in the talc mines used to source [the Products].").)

[25]    (*See* Poulton Rpt. at 1.)

[26]    (Pls.' Br. at 10-13.)

[27]    (*Id.* at 11.)

9

The same is true of plaintiffs' criticisms of Dr. Poulton based on her alleged lack of experience running a talc beneficiation or processing plant.[28] Beneficiation refers to processes used to improve the quality of mined talc ore by removing or segregating out non-ore materials, including the use of hand sorting of the rocks extracted from a mine.[29] Given Dr. Poulton's significant experience as a geological engineer with substantial mining expertise, she is more than qualified to offer testimony on the general topic of beneficiation, including an explanation of the specific beneficiation practices employed in mines.[30] This is especially true because Dr. Poulton addresses beneficiation in the context of evaluating the opinions of Drs. Cook and Krekeler, neither of whom purports to have run a talc beneficiation or processing plant.

***Third***, Plaintiffs provide no support for several other assertions regarding Dr. Poulton's purported deficiencies, a number of which are simply wrong. For example, without any support, Plaintiffs assert that Dr. Poulton "has no educational qualifications in mine development or mineral extraction."[31] But Dr. Poulton has an extensive educational background in mining and mineralogy that renders her more

---

[28]    (*See id.* at 12.)

[29]    (*See id.* at 4.)

[30]    (Poulton Rpt. at 2.)

[31]    (Pls.' Br. at 13.)

than qualified to opine on mine development and mineral extraction.[32] Further, Dr. Poulton expressly testified that, in connection with her work at the University of Arizona, she is directly involved in "surface and underground mine . . . planning [and] mine design," while "working with mining companies with real data."[33] Nor does the record demonstrate that Dr. Poulton has no expertise in geology, as plaintiffs suggest.[34] Dr. Poulton testified only that she is not a "geologic expert for Eastern Seaboard ultramafic rocks."[35]

In short, Dr. Poulton's criticisms of Drs. Cook and Krekeler – and her opinions about talc mining practices – are strongly rooted in relevant expertise.

### C. Dr. Webb is more than qualified to provide opinions about the talc deposits at issue, including whether the deposits are likely to contain asbestos.

Similarly, Dr. Webb – a tenured professor of geology who has almost 20 years of experience in the field, with a particular specialization in the origin and history of mineral deposits – is eminently qualified to opine on the scientific principles that govern the formation of mineable high-grade talc deposits and the possible relationship, or lack thereof, of such deposits with amphibole asbestos. Based on her

---

[32]    (*See* Poulton Rpt. at 2; Poulton Rpt., Ex. A (CV).)

[33]    (Dep. of M. Poulton, Ph.D. ("Poulton Dep.") at 71:19-72:9, Mar. 18, 2019 (attached as Ex. 1 to Pls.' Br.).)

[34]    (*See* Pls.' Br. at 11-13.)

[35]    (Poulton Dep. at 183:4-5.)

extensive background and experience in geology, mineralogy and petrology, her use of reference literature and her analysis of the reports of Drs. Cook and Krekeler and the documents they cite, Dr. Webb reliably concludes that the cosmetic talc sources used for the Products were limited to mines that were free of asbestiform minerals, and that the contrary opinions of Drs. Cook and Krekeler are scientifically unsound.[36]

Once again, while plaintiffs offer a list of concerns regarding Dr. Webb's qualifications, their arguments do not show that Dr. Webb lacks the qualifications to offer her opinions. For example, plaintiffs contend that Dr. Webb failed to design talc mine operations or to review talc mine planning maps or drill cores,[37] but they fail to explain how this background has any bearing on her ability to competently opine on the scientific principles that govern the formation of mineable talc deposits and the possible relationship of such deposits to amphibole asbestos. Plaintiffs also attempt to criticize Dr. Webb by asserting that "one of her primary areas of focus is the radiometric dating of minerals," which is not the subject of her testimony here.[38] But the fact that Dr. Webb also has experience in other areas – in addition to her significant knowledge and experience studying geological deposits like those at

---

[36]    (Webb Rep. at 1.)

[37]    (Pls.' Br. at 18.)

[38]    (*Id.* at 16.)

issue in this litigation – obviously does not render her unqualified. *See Ward v. Carnival Corp.*, 2019 WL 1228063, at *6 (S.D. Fla. Mar. 14, 2019) (denying a motion to exclude marine engineer, whose "resume reflect[ed] familiarity" with "many aspects of the maritime industry"; "an expert may be qualified to testify in multiple ways, and is 'not necessarily unqualified simply because [his] experience does not precisely match the matter at hand'") (citation omitted).

Accordingly, as with Dr. Poulton, none of plaintiffs' criticisms even remotely suggests that Dr. Webb is unqualified offer her opinions in this litigation.

## II.    The Opinions Offered By Drs. Webb And Poulton Are Based On Reliable Methodologies And Supported By The Relevant Scientific Evidence.

In addition to their baseless challenges to Drs. Poulton and Webb's qualifications, plaintiffs also complain that these experts' opinions – which primarily respond to and rebut the inherently unreliable opinions offered by Drs. Cook and Krekeler – are not based on proper methodologies. Plaintiffs' arguments, once again, lack merit.

### A.    Plaintiffs' attacks on Dr. Poulton's methodology misunderstand the role of defense experts, misrepresent Dr. Poulton's opinions and misstate the law.

#### 1.    Dr. Poulton properly rebuts the unreliable opinions offered by Drs. Cook and Krekeler.

Plaintiffs' primary complaint about Dr. Poulton's methodology is that her opinions "amount to nothing more than a critique of the PSC's experts rather than

an expert evaluation."[39] According to plaintiffs, Dr. Poulton evaluated the opinions offered by Drs. Cook and Krekeler, attempted to "corroborate[] their statements with" documents they cited in support of their findings and, when she could not, sought out additional information to determine whether their opinions are methodologically sound.[40] While plaintiffs summarily assert that this approach lacks "scientific rigor,"[41] they are unable to cite even one case to that effect. This is likely because the Third Circuit – and federal courts across the country – have recognized that assessing the methodology of plaintiffs' experts' opinions *is* an appropriate methodology for a defense expert under Rule 701. *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 786 (3d Cir. 1996) (noting that the test for the admissibility of defense experts is "different" because "the defense d[oes] not bear" the burden of proof); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018) (finding it "entirely appropriate" that defendants' experts' opinions "were, essentially, critiques of [p]laintiffs' experts' evidence, methodologies, and conclusions"); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) ("It is worth noting in this respect that defendants' experts have a less

---

[39]    (*Id.* at 19.)

[40]    (*Id.* at 20.)

[41]    (*Id.* at 19.)

demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts.").

As these courts have explained, "[t]here is no requirement that a defense expert offer a competing general causation opinion" on a particular issue because an expert's "opinions properly may be limited to criticizing the analysis and conclusions presented by another party." *In re Abilify*, 299 F. Supp. 3d at 1368; *see also In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 2009 WL 1649773, at *1 (D. Kan. June 9, 2009) ("Contrary to plaintiffs' suggestion, a rebuttal expert who critiques another expert's theories or conclusions need not offer his own independent theories or conclusions    "); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834-35 (D. Minn. 2011) (rejecting plaintiff's argument that defense experts failed to satisfy Rule 702's requirements because they "only criticiz[ed] [plaintiff's] experts and perform[ed] no analysis of their own"; "[i]t is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports").

That is precisely what Dr. Poulton does here. In addition to offering affirmative opinions on talc mining practices, Dr. Poulton serves to rebut the opinions of Drs. Cook and Krekeler by "critiqu[ing] plaintiffs' expert[s'] methodologies and point[ing] out potential flaws in [their] reports." *Aviva Sports*,

829 F. Supp. 2d at 835. This is a proper function regularly served by defense experts – and plaintiffs' unsupported assertion to the contrary is entirely meritless.

> **2.    Dr. Poulton performed a comprehensive review of the materials and literature cited by Drs. Cook and Krekeler as supporting their opinions.**

There is also no merit to plaintiffs' argument that Dr. Poulton "cherry- picked" the information on which she relied in reaching her opinions.[42] Plaintiffs assert that Dr. Poulton's opinions are unreliable because she based her opinions on a "narrow subset of material cited by the PSC's experts" and failed to consider "sufficient literature for the geographic areas of mines used to source J&J talc" or perform a full search of defendants' "document database."[43] These arguments fail for a host of reasons.

For one thing, plaintiffs again misrepresent the nature of Dr. Poulton's opinions. Contrary to plaintiffs' suggestion, Dr. Poulton does not seek to offer affirmative opinions regarding the geography of the "areas of mines used to source" the Products.[44] Instead, as noted above, she was tasked with reviewing the specific opinions offered by Drs. Cook and Krekeler, including their conclusion that "the talc source[s] for Johnson's Baby Powder and Shower to Shower [were] known to

---

[42]    (Pls.' Br. at 19.)

[43]    (*Id*. at 19, 25.)

[44]    (*Id*. at 19.)

contain asbestos and heavy metals that exceeded product specifications," and determine if they were supported by the sources Drs. Cook and Krekeler cite.[45] To that end, Dr. Poulton reviewed: (1) the materials cited by plaintiffs in support of their opinions; (2) certain additional documents that were not considered by plaintiffs but were helpful to put their opinions in context; and (3) the relevant scientific literature.[46] This was not a "narrow subset of materials," as evidenced by the fact that Dr. Poulton's reliance list includes hundreds of documents and a significant number of scientific texts.[47] In any event, plaintiffs' insistence that Dr. Poulton should have considered more or different materials in forming her opinion is not required by Rule 702. *See In re Nuvaring Prods. Liab. Litig*., 2013 WL 791828, at *4 (E.D. Mo. Mar. 4, 2013) (noting that an expert's "reasons for exclusion of data" or consideration of only certain documents "is a topic best left for cross-examination"); *In re Levaquin Prods. Liab. Litig.*, 2010 WL 8399948, at *10 (D. Minn. Nov. 12, 2010) ("If [an expert] were not able to discriminate between [materials] she considered useful and those she did not, she would be required to assess every [document on] a given topic," and "[t]his level of analysis is not required by *Daubert* or the Rules of Evidence.").

---

[45]    (Poulton Rep. at 1.)

[46]    (Poulton Dep. 19:20-21:19, 167:13-168:11, 257:16-24.)

[47]    (Pls.' Br. at 21; Poulton Rep. at 36-47.)

In addition, plaintiffs' suggestion that Dr. Poulton needed access to documents on which Cook and Krekeler did not rely in forming their opinions to evaluate whether those opinions are based on reliable scientific evidence is entirely illogical. Plaintiffs criticize Dr. Poulton because she did not have "independent access to Defendants' document database to perform her own document searches" and did not review the entire transcripts of the depositions of defendants' corporate representatives.[48] But neither Dr. Cook nor Dr. Krekeler had access to every document in the J&J defendants' possession, and Dr. Poulton had all of the documents on which these experts relied in their reports. Similarly, Dr. Poulton reviewed those portions of the corporate representative depositions (and relevant exhibits) that were cited by ***Drs. Cook and Krekeler*** to determine whether the testimony actually supported the opinions asserted.[49] In short, Dr. Poulton considered all of the materials she needed to determine whether the opinions offered by Drs. Cook and Krekeler were consistent with their own reliance materials.

The remainder of plaintiffs' "cherry-picking" allegations are based on blatant misrepresentations of Dr. Poulton's testimony and the facts in the record. For example, plaintiffs contend that Dr. Poulton did not review sufficient materials to offer opinions regarding the quality of the Vermont talc used in the Products because

---

[48]    (Pls.' Br. at 19-20.)

[49]    (*See* Poulton Dep. 135:12-137:15.)

she testified that "she was unfamiliar with one of the mines sourced by Defendants
(the Johnson mine)."[50] But, as Dr. Poulton explained at her deposition, and plaintiffs'
own experts acknowledge, the Johnson mine was used to source **industrial**, not
cosmetic, talc.[51] And while plaintiffs claim that Dr. Poulton admitted that there are
"thousands and thousands of documents" produced in this litigation that could
potentially show that the talc from the Johnson mine was used for cosmetic talc,[52]
the testimony they cite makes clear that Dr. Poulton was merely explaining that,
while it was theoretically possible that such documents exist, **neither plaintiffs'**
**counsel nor their experts had identified any such documents**.[53]

---

[50]    (Pls.' Br. at 20.)

[51]    (*See* Poulton Dep. 199:5-23 (Dr. Poulton affirming the statement in her report
that the "Johnson mine was never used to source Baby Powder"); Expert Report of
Mark Krekeler, Ph.D. ("Krekeler Rep.") at 7-8, Nov. 16, 2018 (attached as Ex. 3 to
Pls.' Br.) (not including Johnson mine in detailed "chronology of talc ore used for
cosmetic products"); Dep. of Robert Cook, Ph.D. ("Cook Dep.") 167:17-168:12;
171:1-172:19, Jan. 30, 2019 (attached as Bush Decl. Ex. 3.) (admitting that the
product code for talc sourced from the Johnson mine does not correspond to that of
the talc used in the Products).)

[52]    (Pls.' Br. at 20.)

[53]    (*See, e.g.,* Poulton Dep. 202:20-204:1 ("So I – I see Grade 66 which is what I
recognize as Johnson & Johnson's talc grade from Vermont. And that's referenced
for West Windsor. . . . I do not see that same grade referenced for Johnson. . . . I've
never seen another number in any document associated with Johnson & Johnson
cosmetic talc products."); *id.* 207:15-19 ("So seeing this document out of context, I
can't agree that the Johnson mine was used as a commercial source for Johnson &
Johnson cosmetic products.").)

Plaintiffs also criticize Dr. Poulton's alleged failure to consider information related to the geology of areas where the relevant mines were located, but they ignore the fact that Dr. Poulton is not offering geology opinions. For example, plaintiffs insist that Dr. Poulton's opinions are unreliable because she admitted that she "did not consider or rely on publications from the 1950's and 1960's that are directly applicable to Vermont geology" today.[54] But all of the publications referenced are geological surveys, which have no bearing on Dr. Poulton's opinions regarding mining practices or her criticisms of the opinions offered by Drs. Cook and Krekeler.[55] Plaintiffs' complaint that Dr. Poulton did "not focus[] on the geologic information of [Chinese] deposits" from which the Products were sourced,[56] fails for the same reason. Nowhere in her report does Dr. Poulton offer any opinions on the geology of China.

Nor is there any truth to plaintiffs' assertion that Dr. Poulton admitted that she incorrectly criticized Dr. Cook for "rel[ying] on an internal J&J report to conclude" that the talc ore used to source the Products contained asbestos.[57] As noted in Dr.

---

[54]    (Pls.' Br. at 20.)

[55]    (*See, e.g.*, Poulton Dep. 90:5-16 (Dr. Poulton noting that she may have seen at least one of the geological surveys plaintiffs confronted her with at her deposition but "decided that it wasn't relevant to looking at the – the mine planning" or her other opinions).)

[56]    (Pls.' Br. at 20.)

[57]    (*Id.* at 21.)

Poulton's report, Drs. Cook and Krekeler premise their opinions in part on a report on Italian talc undertaken by Dr. Fred Pooley of University College in Cardiff, Wales, which plaintiffs' experts assert identified fibrous tremolite and actinolite in talc ore.[58] As Dr. Poulton explained, however, the Pooley report makes clear that: (1) the tremolite and actinolite identified by Pooley were ***nonasbestiform*** (i.e., not asbestos); and (2) the samples identified as containing tremolite and actinolite did not come from talc ore that would typically be used in production of talc products (and instead were taken from the hanging wall and footwall of the mine).[59] Plaintiffs emphasize Dr. Poulton's acknowledgement at her deposition that the Pooley report also notes findings of fibrous talc,[60] but this is not contrary to her opinions. As Dr. Poulton has explained, fibrous talc – like the nonasbestiform tremolite and actinolite identified – is not asbestos.[61] And while Dr. Poulton agreed with plaintiffs' counsel that it was "theoretically, hypothetically possible [that] some of that material" from the hanging wall or footwall "could be commingled with talc ore taken to a mill, maybe," she made clear that these areas are "outside the ore zone by definition" and "mining practices would make every attempt to stay away from that material,

---

[58]    (Am. Expert Report of Robert B. Cook, Ph.D. at 10, Jan. 22, 2019 (attached as Bush Decl. Ex. 4); Krekeler Rep. at 10.)

[59]    (Poulton Rep. at 6-7.)

[60]    (Pls.' Br. at 20-21.)

[61]    (Poulton Dep. 125:17-127:7.)

because it is too hard to process."[62] In short, there is simply no truth to plaintiffs'

assertion that Dr. Poulton admitted that the findings in the Pooley report run "counter

to her opinions."[63] *See TVIIM, LLC v. McAfee, Inc.*, 2015 WL 4148354, at *3 (N.D.

Cal. July 9, 2015) (refusing to exclude expert based on statements "cherry-pick[ed]

. . . [from the expert's] deposition in an attempt to discredit his entire methodology"

because "those statements in isolation do not reflect [the expert]'s overall opinion").

### 3.    Dr. Poulton's opinions are based on reliable scientific evidence, not *ipse dixit*.

Plaintiffs' argument that several of Dr. Poulton's opinions should be excluded

as improper "*ipse dixit*"[64] also falls flat given that the statements in her report are

supported both by the scientific and record evidence she reviewed and her substantial

experience as a geological engineer.

Courts in this and other circuits have recognized that, while expert

"assumptions [that] are not grounded in the record" may be inadmissible as *ipse*

*dixit*, that is not the case where an expert's "report and testimony reveal that" her

opinions and any "assumptions" made in connection therewith "are based on

available facts and reflect educated judgments that are sensibly explained." *Edison*

*Wetlands Ass'n v. Akzo Nobel Chems., Inc.*, 2009 WL 5206280, at *4-5 (D.N.J. Dec.

---

[62]    (*Id*. 131:3-134:20.)

[63]    (Pls.' Br. at 21.)

[64]    (Pls.' Br. at 22.)

22, 2009); *Del. Display Grp. LLC v. VIZIO, Inc*., 2017 WL 784988, at *6 (D. Del. Mar. 1, 2017) (denying plaintiffs' motion to strike defense experts' testimony and concluding that the statements at issue "are not *ipse dixit* testimony because they are based on [defense expert's] experience and adequate facts"); *Poolworks, Inc. v. Aquafin, Inc.*, 2016 WL 4544348, at *8 (D.V.I. Aug. 30, 2016) (holding that "[t]his case does not present an *ipse dixit* situation" because the expert relied on his extensive experience and observations to reach his conclusions); *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1330 (11th Cir. 2014) (per curiam) (reversing district court's exclusion of an expert who "formed her opinion by using reliable tools, applying an established body of medical knowledge, and drawing on her extensive experience in the field"; this "is not an *ipse dixit* assessment").

The cases cited by plaintiffs are not to the contrary; rather, those cases excluded expert opinions that were not based on *any* reliable science or methodology "beyond [the expert's] own intuition." *Oddi v. Ford Motor Co*., 234 F.3d 136, 158 (3d Cir. 2000) (Pls.' Br. at 31) (excluding expert's opinion that certain changes to a car's design would have prevented the accident at issue because he did not test his "hypothesis" and could not point to any scientific evidence supporting it); *see also, e.g.*, *Montgomery Cty. v. Microvote Corp*., 320 F.3d 440, 448-49 (3d Cir. 2003) (Pls.' Br. at 31) (concluding that the district court did not abuse its discretion in excluding defendants' expert's testimony because "the data underlying [the expert]'s

opinion was so unreliable that no reasonable expert could base an opinion on it");

*Hamilton v. Emerson Elec. Co*., 133 F. Supp. 2d 360, 370-72 (M.D. Pa. 2001) (Pls.'

Br. at 31) (excluding expert who "does not use any discernible methodology to

determine that the miter saw contained a defect" and whose "conclusion that the saw

was defective is based only on his own authority").

In their brief, plaintiffs identify only two purported examples of Dr. Poulton

allegedly offering *ipse dixit* opinions, neither of which comes anywhere close to

falling within that category.

***First***, plaintiffs assert that Dr. Poulton lacks support to opine that minerals

from the hanging wall of a talc mine "would not be included in the material that was

bottled for Defendants' Baby Powder" because Dr. Poulton supposedly admitted at

deposition that she could not say this with a "reasonable degree of scientific

certainty."[65] This is a gross misrepresentation of Dr. Poulton's opinions and her

deposition testimony. As an initial matter, Dr. Poulton's opinions on this issue relate

to her criticism of Drs. Cook and Krekeler for relying on the Pooley report as

evidence that the Italian talc ore contains asbestos. As explained above, Dr. Poulton

noted in her expert report that the Pooley report does not support the proposition for

which Drs. Cook and Krekeler cite it because the tremolite and actinolite identified

---

[65]    (*Id*. at 22.)

by Pooley were **nonasbestiform**, and, in any event, the report indicates that these minerals were located in the hanging wall of the mine – not the talc ore.[66] Thus, any suggestion by Drs. Krekeler and Cook that the **nonasbestiform** tremolite and actinolite identified by Pooley would have made it into the Products is based entirely on speculation.

And while Dr. Poulton agreed with plaintiffs' counsel that it was "theoretically hypothetically possible" that some rock from the hanging wall might, against all odds, have been mined, she explained – based on her reading of the Pooley report and her significant experience with mining practices – that this is highly unlikely.[67] Thus, Dr. Poulton's opinion is "based on available facts and reflect[s] educated judgments that are sensibly explained." *Edison Wetlands*, 2009 WL 5206280, at *4.

**Second**, plaintiffs are also incorrect that Dr. Poulton has offered an *ipse dixit* opinion that "selective mining is successfully done in talc mines."[68] The section of Dr. Poulton's report that addresses selective mining (i.e., mining techniques that allow extraction of only high-grade ore from a mine) discusses and rebuts opinions

---

[66]     (*See* Poulton Rep. at 6-7.)

[67]     (Poulton Dep. 133:21-134:16.) As Dr. Poulton explains, the Pooley report itself states that measures were taken at the mine to prevent intermingling of the mined talc ore with rocks from the hanging and footwall. (Poulton Rep. at 6.)

[68]     (Pls.' Br. at 22.)

offered by Drs. Cook and Krekeler that "selective [talc] mining was impossible" and that "quality control [at talc mines] was ineffective."[69] To that end, Dr. Poulton performed a comprehensive review of the data and materials that plaintiffs' experts cite in forming their opinions on selective mining, as well as a variety of other published sources and company documents relevant to the issue. Indeed, this section of Dr. Poulton's report contains more than 80 citations to supporting materials.

Plaintiffs are unable to point to even one statement in Dr. Poulton's report regarding selective mining that is not supported by relevant facts or reliably informed by her significant experience in the area of mining practices. Instead, plaintiffs insist that all of Dr. Poulton's criticisms of Drs. Cook and Krekeler on the issue of selective mining should be disregarded because Dr. Poulton refused to definitively identify minerals depicted in 2-D photographs that were presented to her by plaintiffs' counsel at deposition.[70] While plaintiffs' argument is muddled, they appear to be suggesting that because Dr. Poulton refused to take this "pop quiz" at her deposition, she cannot reliably say that excavator operators engaged in selective mining can reliably differentiate between different minerals "from [their] position atop the excavator."[71] This is nonsensical for several reasons. For one thing, Dr.

---

[69]    (Poulton Rep. at 16-32.)

[70]    (*See* Pls.' Br. at 23 (citing Poulton Dep. 328:11-24, 331:13-332:7, 334:21-336:3).)

[71]    (*See id*. at 22-23.)

Poulton's unwillingness to identify minerals based on a photograph in the context of a litigation deposition has nothing to do with selective mining or its effectiveness. In addition, plaintiffs' arguments about whether excavator operators can accurately differentiate between minerals have nothing to do with the reliability of Dr. Poulton's opinions that plaintiffs' experts' opinions about selective mining are not supported by the materials they cite or the other evidence in the record.[72]

### 4. Plaintiffs' other disagreements with Dr. Poulton's conclusions are not supported by the record.

Plaintiffs' remaining criticisms of Dr. Poulton are refuted by the record. For example, plaintiffs assert that Dr. Poulton improperly criticizes Drs. Cook and Krekeler for relying on documents indicating that *nonasbestiform* minerals were found in talc for the proposition that the talc ore used in the Products contains asbestos because some of the documents these experts cite do indicate the presence of asbestiform particles.[73] Specifically, plaintiffs point to a document referenced by

---

[72]    Further, while plaintiffs insist that Dr. Poulton "characterized the excavator operator" as the person making selective mining decisions (*id*. at 26), the opposite is true. At her deposition, Dr. Poulton expressly disagreed with plaintiffs' counsel's assertion that the excavator operator has an "impact on the decision of what is determined to be ore versus waste," noting that "I would not say that the excavator operator has necessarily a major influence." (Poulton Dep. 324:8-21.) Instead, Dr. Poulton explained that excavator operators merely "execute decisions" made by mine managers and others based on their knowledge of the relevant rocks. (*Id*. 324:22-325:1.)

[73]    (Pls.' Br. at 24-25.)

Dr. Cook that "refer[s] to chrysotile," an asbestiform mineral.[74] But the document at issue merely states that chrysotile is a constituent of Italy's Val Chisone valley generally[75] – and, as Dr. Poulton details in her report, there is no evidence that chrysotile has ever been identified in the specific Italian mine from which the talc used in the Products was sourced.[76] Plaintiffs also insist that Drs. Cook and Krekeler correctly cited a Battelle testing document indicating that a talc sample contained "fibrous" material as supposed evidence that asbestos was present.[77] But, as Dr. Poulton explains in her report, "fibrous" and "asbestiform" are not interchangeable terms, and the mere fact that something is described as "fibrous" (i.e., having the dimensions of a fiber) does not mean that it grew in the asbestiform habit and therefore may be considered asbestos.[78]

Plaintiffs similarly argue that Dr. Krekeler, not Dr. Poulton, provides the better interpretation of the purpose of talc sampling performed during a field trip to prospective mining areas in China described in an Imerys document.[79] Specifically, plaintiffs insist that Dr. Krekeler was correct in assuming that the talc sampling

---

[74]  (*Id*. at 24.)

[75]  (*See* Poulton Dep. Ex. 14 (attached as Ex. 8 to Pls.' Br.).)

[76]  (Poulton Rep. at 8)

[77]  (Pls.' Br. at 24.)

[78]  (Poulton Rep. at 7; Poulton Dep. 126:3-4 (explaining that "fibrous is not the same as asbestiform").)

[79]  (Pls.' Br. at 25.)

referenced in the document must relate to the quality testing of Chinese talc ore being mined for the Products at that time and opining that the sampling was inadequate for that.[80] But, as the document itself makes clear, the sampling at issue was conducted during a field trip to China for the purpose of broadly assessing prospective mining areas and was not intended to be "a complete assessment of the specific Chinese ore [already] in use."[81]

Plaintiffs' other attacks on the "correctness" of Dr. Poulton's opinions are similarly misplaced. For example:

- Plaintiffs insist that Dr. Poulton incorrectly stated in her report that "weekly composites of talc were tested by Defendants" but later "admitted" at her deposition that defendants conducted such testing "only [on] a quarterly basis."[82] But Dr. Poulton never opined that any defendant conducted weekly talc testing. Instead, she explained that documents cited by Dr. Cook reported that "weekly" and "biweekly" composites of different types of talc were taken and that "finished talc was tested on a quarterly audit basis."[83] Thus, there is no inconsistency between Dr. Poulton's report and her deposition testimony.

- Plaintiffs argue that Dr. Poulton did not consider "pre-1987 testing results" related to the relevant mines.[84] This is false. Dr. Poulton's report addresses a wide variety of testing results from the period before 1987, including, but not limited to, testing by Pooley and the Colorado School of Mines from the 1970s and the Battelle Institute's testing in

---

[80]    (*Id.*)

[81]    (*See* Poulton Rep. at 11-12.)

[82]    (Pls.' Br. at 25.)

[83]    (Poulton Rep. at 13.)

[84]    (Pls.' Br. at 27-28.)

PageID: 230991

the 1950s.[85] Further, in the portion of Dr. Poulton's deposition testimony that plaintiffs cite as an "admission" that Dr. Poulton did not consider pre-1987 testing, Dr. Poulton expressly disagrees with plaintiffs' counsel's suggestion that this is the case.[86]

- Plaintiffs also assert that Dr. Poulton should not be permitted to opine that "Defendants' drilling methods" follow the format of the reporting standards dictated by the Joint Ore Reserve Committee ("JORC") because it is an Australian organization and its standards have not yet been adopted by regulators in the United States.[87] But Dr. Poulton explained at her deposition that JORC is an international organization that "sets a professional standard for how [mine] resources and reserves should be calculated and reported" and is therefore relevant to assessing the propriety of mining practices generally.[88]

In short, none of plaintiffs' challenges to specific statements in Dr. Poulton's report have any factual basis, nor would those criticisms rise to the level of warranting exclusion in any event.

---

[85]    (*See*, *e.g.*, Poulton Rep. at 6 (addressing the Pooley testing from the 1970s); *id*. at 7 (addressing tests conducted by the Battelle Institute from 1957 through 1959 and a memo from 1973 that references a study on talc mining in the Val Chisone region and whether it caused cancer in mine and mill workers); *id*. at 8 (addressing a 1971 letter from J&J to the Colorado School of Mines Research Institute, which purportedly reported chrysotile in the Val Chisone region); *id*. at 9 (addressing 1985 and 1986 tests results from McCrone and 1976 testing by the Colorado School of Mines); *id*. at 10 (addressing a 1975 test of Grade 36 talc, a 1971 test from the Colorado School of Mines, and Dr. Lewin's testing from the early 1970s).)

[86]    (*See* Poulton Dep. 246:7-8.)

[87]    (Pls.' Br. at 28.)

[88]    (Poulton Dep. 98:16-22, 99:2-23.) Dr. Poulton also explained that JORC standards are relevant because Rio Tinto, the owner of one of the relevant Vermont mines, is an Australian company and therefore followed JORC. (*Id*. 100:9-19.)

5.    **Dr. Poulton's opinions are supported by the materials on which she relies.**

Plaintiffs' final challenge to Dr. Poulton's opinions is to assert that a random smattering of articles referenced in her report do not support the points for which they are cited. But a review of these sources – and the manner in which they are referenced by Dr. Poulton – makes clear that plaintiffs are incorrect.

For example, plaintiffs criticize Dr. Poulton's citation to a 2003 study of Italian millers and miners by Coggiola for the proposition that talc from the Val Chisone region does not include asbestiform fibers because the study did not specifically "involve talc testing for asbestos."[89] Coggiola (2003), an epidemiological study, is nonetheless relevant, and supports the point for which it is cited, because it reports an absence of asbestos-related disease among talc millers and miners in the Val Chisone region and expressly notes that the "talc found [in Val Chisone] is free from asbestiform fibers."[90]

Similarly, plaintiffs assert that Dr. Poulton improperly relies on a 1986 article by Guilbert and Park "in regard to the characterization of the properties of an ore body in relation to the surrounding rocks" because the article does not address

---

[89]    (Pls.' Br. at 30.)

[90]    Coggiola et al., *An update of a mortality study of talc miners and millers in Italy*, 44 Am. J. Industrial Med. 63, 63 (2003) (attached as Bush Decl. Ex. 5.)

"ultramafic talc occurrences, or talc occurrences in Vermont."[91] But this article is cited in a section of Dr. Poulton's report that discusses the mineralogy of talc ore generally. She does not purport to tie it to ultramafic or Vermont talc.[92]

Plaintiffs also challenge Dr. Poulton's reliance on a 2005 article by Noakes for the proposition that hand sorting of high-grade talc is used in production at facilities outside of China.[93] Plaintiffs do not disagree that the article supports this proposition, but note that the mine referenced in the article does not source cosmetic talc specifically.[94] Even if such a distinction were critical, however, the issue of whether hand sorting is appropriately used in the context of the beneficiation process for cosmetic talc is not actually contested. To the contrary, even Dr. Cook has expressly agreed that he is not "critical of hand sorting as a first step in the beneficiation process."[95]

Finally, plaintiffs suggest that Dr. Poulton incorrectly relies on Berkhimer's 2011 article to support the statement that "hydraulic excavators 'can electively mine layers or pockets of material,'"[96] because the article refers to hydraulic equipment

---

[91]    (Pls.' Br. at 30.)

[92]    (Poulton Rep. at 7; *see also* Poulton Dep. 183:14-15 (Dr. Poulton noting that she "was not citing [Guilbert and Park] in the context of ultramafic talc").)

[93]    (Pls.' Br. at 30.)

[94]    (*Id.*)

[95]    (Cook Dep. 443:21-24.)

[96]    (Poulton Rep. at 30.)

generally and does not specify the size of the machinery that can accomplish this task.[97] This type of nit-picking is far afield from a legitimate Rule 702 challenge. *See Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 248 (S.D. Ill. 2015) (finding a party's "overly-technical nitpicking is not sufficient to convince the [c]ourt that [an expert]'s report is unreliable"); *EcoServices, LLC v. Certified Aviation Servs., LLC*, 2018 WL 3829218, at *4 (C.D. Cal. June 7, 2018) (noting that "nitpicking of [an expert's] methodology . . . is better served in cross examination"). In any event, Dr. Poulton's significant experience in geological engineering and mining practices has provided her with the professional judgment and experience to opine on the appropriate use of a hydraulic excavator without the need to rely on literature at all.[98]

For all of these reasons, plaintiffs' challenges to Dr. Poulton's testimony are meritless and should be rejected.

### B.    Plaintiffs' Attacks On Dr. Webb's Methodology Are Similarly Baseless.

#### 1.    Dr. Webb's geology and petrology opinions are based on the same, reliable review methods she employs outside the courtroom.

---

[97]    (Pls.' Br. at 30-31.)

[98]    Plaintiffs also emphasize a typographical error in Dr. Poulton's report that resulted in Dr. Poulton incorrectly stating that Dr. Cook relied on a particular Bates-numbered document that was not included in his report. (Pls.' Br. at 29-30.) As plaintiffs note in their brief, Dr. Poulton acknowledged the typographical error at her deposition and agreed that she was not seeking to offer an opinion with respect to that document. (*Id.* at 30.) Accordingly, plaintiffs' purported challenge to such an opinion is moot.

33

As an initial matter, there is no truth to plaintiffs' argument that Dr. Webb "failed to use the very methodology that [she] normally uses" in her practice as a scientist.[99] Dr. Webb explained at her deposition that, in addition to providing a response to the opinions of Drs. Cook and Krekeler, she was asked to "provide an explanation of the petrological processes that are associated with the high purity talc deposits" and to address whether or not there is a relationship between the talc deposits at issue and asbestos.[100]

Dr. Webb testified that in developing those opinions, she employed "the same approach that [she] would [use to] approach any aspect of my science," including "writing a paper or a peer review."[101] Specifically, Dr. Webb conducted "an extensive search of the peer-reviewed literature . . . [and United States Geological Survey] reports" and examined the primary citations included therein in order to identify what has been "written about the talc bodies themselves [and] the surrounding rocks" and to identify "reports of asbestos in Vermont," all of which would help her to "understand the petrology of those systems."[102]

---

[99]    (Pls.' Br. at 32.)

[100]    (Dep. of Laura Webb, Ph.D. ("Webb Dep.") 124:8-16, Mar. 29, 2019 (attached as Ex. 6 to Pls.' Br.).)

[101]    (*Id*. 125:1-7.)

[102]    (*Id*. 125:7-127:1.)

In moving to exclude Dr. Webb's testimony, plaintiffs assert that her methodology is unreliable because it differs from the "field-based" methodology Dr. Webb has previously employed in researching other types of rock, including obtaining rock samples and examining them "under a petrographic microscope," as well as "us[ing] radioactive dating to calculate the absolute age of the rock."[103] But, as plaintiffs themselves admit, Dr. Webb had no reason to conduct radioactive dating in forming her opinions in this proceeding because "talc and asbestos cannot be dated in that manner."[104] Accordingly, their suggestion that Dr. Webb's opinions are unreliable because she failed to employ this method is entirely illogical. In addition, it was unnecessary for Dr. Webb to sample and test talc ore before forming her opinions because the geography and mineralogy of the region where the relevant talc mines are located has been well-explored and documented in the scientific literature.[105]

As Dr. Webb explained at her deposition, whether the collection and analysis of rock samples is necessary to the study of the petrology of the metamorphic conditions of a particular formation "depends on what's known and documented for

---

[103]    (Pls.' Br. at 33-34.)

[104]    (*Id*. at 33.)

[105]    (Webb Dep. 127:17-130:1.)

the region already."[106] Accordingly, Dr. Webb performs geological sampling and petrographic testing of rock when there is a "gap in [the] information" available in the relevant scientific literature because a particular mineral or region has not been sufficiently explored or tested.[107] That, however, is not the case with respect to the "Vermont talc mines that we're interested in" here, which have been the subject of "decades of work of geologists and petrologists."[108] Such work includes a 1982 study by Sanford, which "sampled from . . . three different locations in Vermont" that surround the talc mines at issue here, and the Pooley study, which sampled different rock types around the mine and included detailed petrographic data, descriptions and photomicrographs, i.e., the exact data that Dr. Webb "regularly work[s] with."[109]

In light of these detailed studies of the relevant "rock bodies . . . in those works," it was Dr. Webb's "professional opinion" that she had "the information [she] needed" to form her opinions.[110] This is a far cry from the cases cited by plaintiffs, in which experts were excluded because they failed to employ the very methodology they claimed to be using to reach their opinions. *See, e.g.*, *McMunn v. Babcock & Wilcox Power Generation Grp., Inc.*, 2013 WL 3487560, at *22 (W.D. Pa. July 12,

---

[106]    (*Id*. 118:16-22.)

[107]    (*Id*. 127:17-128:6.)

[108]    (*Id*. 127:17-128:1; *id*. 128:25-130:1.)

[109]    (*Id*. 129:1-129:20.)

[110]    (*Id*. 129:1-131:15.)

2013) (Pls.' Br. at 32 n.173) (excluding general causation opinion because the expert failed to employ the Bradford Hill criteria, which the expert himself called "the 'gold standard' in th[e] field"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268-69 (2d Cir. 2002) (Pls.' Br. at 32 n.173) (affirming exclusion of an expert who sought to calculate the plaintiff's exposure to a substance where the expert testified that a "proper exposure assessment" included a number of variables, but "did not include any of th[o]se variables in his calculations") (citation omitted).

Plaintiffs' other complaints about Dr. Webb's methodology – for example, that she did not "conduct[] XRD, PLM, scanning electron microscopy, or transmission electron microscopy on any J&J product samples," "review[] the… results of testing of samples" by the J&J defendants or third-party labs or inspect other company documents[111] – have no bearing on the opinions she seeks to provide in this litigation. Dr. Webb's opinions are focused on analyzing the conditions of metamorphic formation of the talc deposits at issue and determining whether these conditions could support the formation of asbestos.[112] Such opinions are properly based on, and supported by, Dr. Webb's review of the scientific data in the peer-reviewed literature and decades of research regarding these formations.

---

[111]    (Pls.' Br. at 35.)

[112]    Notably, neither Dr. Cook nor Dr. Krekeler performed any talc ore or product sampling, even though they seek to provide opinions that the talc ore used to source the Products contained asbestos.

## 2. Dr. Webb performed a comprehensive review of the relevant scientific literature.

Plaintiffs' argument that Dr. Webb's opinions are based on "a limited selection of cherry-picked literature"[113] also fails. Plaintiffs assert that Dr. Webb reviewed only a "small set of materials" in reaching her opinions, but even a cursory review of her report, which is replete with published scientific support for the statements made therein, makes clear this is false. Indeed, Dr. Webb's report cites to nearly 80 different scientific articles and studies, and her reliance list – which is nearly 10 pages long – identifies more than 140 sources, including published literature and other reference materials.

Plaintiffs focus on the fact that Dr. Webb reviewed less than 20 internal company documents in forming her opinions. But Dr. Webb had no need to review internal documents related to the specific mines at issue because the scientific literature provided the information she needed to assess the geography and petrology of the relevant talc formations.[114] As Dr. Webb has explained, she was tasked with evaluating the "petrologic systems of" the mines at issue, which turn on "the bolt composition of the rocks, the pressure and temperature conditions under which they were metamorphosed [and] the fluids that were present."[115] Thus, the scientific

---

[113]    (Pls.' Br. at 36.)

[114]    (Webb. Dep. 33:18-35.9.)

[115]    (*Id.*)

literature detailing these aspects of the relevant talc deposits provided the "information [Dr. Webb] needed" to "meet [her] charge."[116]

Dr. Webb did review some company documents, but she did so only because they included geographical study information – such as the Pooley reports referenced above – or provided information to assist her review of the scientific literature, such as the names and locations of the talc mines at issue.[117] In addition, although plaintiffs assert that Dr. Webb should have reviewed "geologic maps from any mines used to source J&J talcum powder" in the J&J defendants' possession, plaintiffs do not point to any maps that contain information relevant to the petrology of the talc ore that is not available in the relevant literature, much less information that would alter Dr. Webb's opinions. And while plaintiffs criticize Dr. Webb for not reading the reports of defendants' other experts and ensuring that she had reviewed all of the materials they did,[118] this argument makes no sense because the other experts' reports were not finalized until Dr. Webb's own report was completed and her opinions had been written. Further, the other defense experts referenced by plaintiffs – who have different specialties and areas of expertise – were asked to

---

[116]     (*Id*. 34:4-7.)

[117]     (*Id*. 174:15-175:8.)

[118]     (Pls.' Br. at 37.)

opine on different subjects than Dr. Webb. As a result, their reliance materials are not representative of the body of literature relevant to Dr. Webb's opinions.

There is also no truth to plaintiffs' suggestion that Dr. Webb admitted that she relied only on her own assumptions and findings – instead of the actual tests, data and observations of others – to conclude that there is no evidence to support the claim that there is asbestos in the relevant mines.[119] To the contrary, in the portion of Dr. Webb's deposition that plaintiffs point to for this proposition, Dr. Webb explains that "people have been looking at these rocks for over a hundred years," searching for asbestos and – if it had been found – "it would be documented in . . . state reports, the USGS reports [or] in the peer-reviewed literature around the Chester dome," but "it's not in anybody's data and observations . . . in the field."[120] And when plaintiffs' counsel asked whether Dr. Webb would change her position if some hypothetical evidence of asbestos in the relevant mines were presented to her, Dr. Webb noted that she had not come across any such evidence in her own, substantial research of the relevant literature.[121]

Finally, and contrary to plaintiffs' suggestion, Dr. Webb never conceded at her deposition that certain documents she had not reviewed referenced findings of

---

[119]   (*Id*. at 37-38.)

[120]   (Webb. Dep. 198:11-23.)

[121]   (*Id*. 198:25-200:3.)

40

asbestos in Vermont mines or that she unreliably "speculated[]" that such asbestos would not have been present in the talc ore itself.[122] Instead, Dr. Webb challenged plaintiffs' counsel's assertion that references to actinolite and tremolite in specific documents referred to the asbestiform version of those minerals, explaining – based on her study of the geology and petrology of the talc deposits at issue – that there was no reason to believe the minerals were asbestiform.[123] In addition, Dr. Webb's statement in her report that any actinolite or tremolite identified in the relevant talc mines "is most likely coming from the margins," or non-minable blackwall, of the deposit and not the talc ore itself, does not constitute impermissible speculation. To the contrary, this opinion stems from basic geological principles.

As Dr. Webb explained, calcium is required for the formation of both tremolite and actinolite and, while calcium is present in the blackwall of a mine, there are not sufficient quantities of calcium in the talc ore body (which is instead magnesium-based) to enable the growth of tremolite and actinolite.[124] Dr. Webb's significant training and experience in geology and petrology – as well as her expert review of the scientific literature regarding the petrology of the talc formation at

---

[122]    (See Pls.' Br. at 39.)

[123]    (Webb. Dep. 206:2-14.) While plaintiffs point to Dr. Webb's statement (made in jest) that she would not want to rub actinolite on her face, they ignore her later clarification that this was not because it contains asbestos, but because doing so "would hurt [as] it would be gritty." (*Id*. 215:22-217:10.)

[124]    (*See id*. 184:5-185:17.)

issue – provide a reliable basis for her testimony on this point. *See Westley v. Ecolab, Inc.*, 2004 WL 1068805, at *7 (E.D. Pa. May 12, 2004) ("[W]e are satisfied that [the expert]'s testimony is admissible under *Daubert* [because] [the expert] relied on his general experience, scientific knowledge and medical and scientific reports in forming his opinion."); *see also Suter v. Gen. Accident Ins. Co. of Am.*, 424 F. Supp. 2d 781, 789 (D.N.J. 2006) ("[T]he [c]ourt is satisfied that [the expert]'s experience reasonably supports his opinion and reliably applies to the facts of this case.").

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion to exclude the opinions offered by Drs. Poulton and Webb.

Dated: August 22, 2024                    Respectfully submitted,

                                          */s/ Kristen R. Fournier*
                                          Kristen R. Fournier
                                          Matthew L. Bush
                                          **KING & SPALDING LLP**
                                          1185 Avenue of the Americas
                                          34th Floor
                                          New York, NY 10036
                                          (212) 556-2100
                                          kfournier@kslaw.com
                                          mbush@kslaw.com

                                          Susan M. Sharko
                                          **FAEGRE DRINKER BIDDLE &
                                          REATH LLP**
                                          600 Campus Drive
                                          Florham Park, NJ 07932
                                          susan.sharko@faegredrinker.com

                                          Allison M. Brown
                                          Jessica Davidson
                                          **SKADDEN, ARPS, SLATE,
                                          MEAGHER & FLOM LLP**
                                          One Manhattan West
                                          New York, New York 10001
                                          212-735-3000

                                          *Attorneys for Defendants Johnson &
                                          Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on August 22, 2024, a true and correct copy of the foregoing motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ *Kristen R. Fournier*
Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com