# EXHIBIT 3

Robert Cook, Ph.D.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW JERSEY

_____

IN RE:  JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION
                              Case No. 16-2738
THIS DOCUMENT RELATES TO      (FLW)  (LHG)
ALL CASES

MDL Docket No. 2738
_____

Wednesday, January 30, 2019

- - - - -

The video deposition of ROBERT COOK, Ph.D.,

taken pursuant to notice, was held at the

Hilton Garden Inn, 2555 Hilton Garden Drive,

Auburn, Alabama, commencing at approximately

8:56 a.m., on the above date, before Lois Anne

Robinson, Registered Diplomate Reporter,

Certified Realtime Reporter, and

Notary Public for the State of Alabama.

Robert Cook, Ph.D.

## Page 2

```
 1        A P P E A R A N C E S
 2   COUNSEL FOR PLAINTIFFS' STEERING COMMITTEE:
 3      BEASLEY, ALLEN, P.C.
        218 Commerce Street
 4      Montgomery, Alabama  36104
        BY:  P. LEIGH O'DELL, Esquire
 5         Leigh.odell@beasleyallen.com
           JENNIFER K. EMMEL, ESQUIRE
 6         Jennifer.emmel@beasleyallen.com
 7      WILENTZ, GOLDMAN & SPITZER, P.A.
        90 Woodbridge Center Drive
 8      Suite 900, Box 10
        Woodbridge, New Jersey  07095-0958
 9        BY:  DANIEL R. LAPINSKI, ESQUIRE
           Dlapinski@wilentz.com
10
11   FOR THE DEFENDANT, JOHNSON & JOHNSON:
12      DRINKER BIDDLE & REATH LLP
        600 Campus Drive
13      Florham Park, New Jersey  07932-1047
        BY:  JACK N. FROST, JR., ESQUIRE
14         Jack.frost@dbr.com
15      DRINKER BIDDLE & REATH
        One Logan Square, Suite 2000
16      Philadelphia, Pennsylvania  19103
        BY:  KATHERINE McBETH, ESQUIRE
17         Katherine.mcbeth@dbr.com
18
19   FOR THE DEFENDANT, IMERYS TALC AMERICA:
20      GORDON & REES SCULLY MANSUKHANI, LLP
        816 Congress Avenue, Suite 1510
20      Austin, Texas  78701
        BY:  KENNETH J. FERGUSON, ESQUIRE
21         Kferguson@gordonrees.com
           ANDREW W. CARY, ESQUIRE
22         Acary@gordonrees.com
23
24
```

## Page 3

```
 1        A P P E A R A N C E S - (continued)
 2
 3   COUNSEL FOR PERSONAL CARE PRODUCTS COUNCIL:
 4      SEYFARTH SHAW LLP
        975 F Street N.W.
 5      Washington, D.C. 20004-1454
        BY:  JAMES R. BILLINGS-KANG, ESQUIRE
 6         Jbillingskang@seyfarth.com
 7
     COUNSEL FOR PHARMATECH INDUSTRIES (PTI):
 8
        TUCKER ELLIS, LLP
 9      950 Main Avenue, Suite 1100
        Cleveland, Ohio  44113
10      BY:  TARIQ M. NAEEM, ESQUIRE
           Tariq.Naeem@TuckerEllis.com
11
12
13
     VIDEOGRAPHER:
14      Julie Robinson
15
16
17
18
        LOIS ANNE ROBINSON, RPR, RDR, CRR
19      COURT REPORTER
20
21
22
23
24
```

## Page 4

```
 1              I N D E X
 2   EXAMINATION                      PAGE
 3   By Mr. Frost                      11
 4   By Mr. Ferguson                  410
 5   By Ms. O'Dell                    455
 6   By Mr. Ferguson                  495
 7   By Mr. Frost                     505
 8            * * * * * *
 9   EXHIBITS
10   1 Rule 26 Expert Report of Robert H. Cook, Ph.D.    11
11   2 Amended Rule 26 Expert Report of Robert H. Cook,  11
12     Ph.D.
13   3 File folder of notes brought to depo, individually  12
14     marked 3.1 to 3.24
15   4 Invoices and checks paid to Dr. Cook              13
16   5 List of specific items requested relative to      32
17     mining and geology
18   6 "Mining" - Rishabh Metals and Chemicals           54
19   7 Expert report of Judith Zelikoff, Ph.D.           55
20   8 Mineral Resource Provinces of Vermont            145
21   9 "Serpentinization: Origin of certain Asbestos,   155
22     Talc and Soapstone Deposits."
23   10 Chapter V - Ore Deposits near contact of massive 157
24     and layered rocks
```

## Page 5

```
 1           I N D E X - (continued)
 2   11 Article - "Using the geologic setting of talc     164
 3      deposits as an indicator of amphibole asbestos content
 4   12 IARC Monographs on the Evaluation of Carcinogenic 165
 5      Risks to Humans, Volume 93
 6   13 "6. Cosmetics"                                    170
 7   14 IMERYS-A_0015758 to 61 - Characterization of      198
 8      the Guangxi #1 Crude and Cimpact 710 Product
 9   15 "Perineal Powder Exposure and the Risk of         235
10      Ovarian Cancer"  JNJ000030983 - 994
11   16 "Perineal Powder Exposure and the Risk of         237
12      Ovarian Cancer"  JNJ000016791  797
13   17 Colorado School of Mines Research Institute       238
14      Letter of 2/3/77 to W. H. Ashton from Jerry Krause
15   18 J&J Worldwide Talc Sources, February 1975         239
16   19 Department of Mineral Exploitation -              240
17      JNJ000322351 -475
18   20 Methodology X-Ray limitations; 8/6/71 letter      246
19      to W. T. Caneer from W. Ashton
20   21 Asbestos Content of Talcs from Italian mines and  253
21      fibre concentration in various commercial talcum powders
22      used in Italy.  (Marconi and Verdel)
23   22 Talc Resources of the United States               260
24   23 "Dusts and Disease"                               263
```

Robert Cook, Ph.D.

Page 6

1                    I N D E X - (Continued)
2    24  Harlan Project C74445 - IMERYS 151337 - 151396    268
3    25  "May Highlights - Product Stewardship/Regulatory   276
4        Affairs" IMERYS 309326  328 and IMERYS 031716 to 720
5    26  RJ Lee Group letter of 5/16/16 to J&J        280
6        JNJ000521616 to 638
7    27  Intertek Supplier Audit Report - IMERYS 031712   306
8        to 715
9    28  IMERYS Talc Certificate of Analysis -        308
10       JNJ000631362 to 380
11   29  Interoffice Correspondence dated 5/21/92 -    323
12       IMERYS 238270 to 277
13   30  Article from "MICROSCOPE" Vol. 38, Fourth    363
14       Quarter, 1990 - "A Standard TEM Procedure for
15       Identification and Quantitation of Asbestiform Minerals in
16       talc"
17   31  Fibers Document Binder              368
18   32  Preliminary Investigation of Cosmetic Talc    467
19       Potential - JNJ000059273 to 59301
20   33  Rio Tinto Minerals doc - Sample Procedures for  470
21       Chinese Crude Ore - HST - IMERYS 036949 to 951
22   34-1 BATES Documents CSMRI Project # 10704    507
23       (11/5/1971) and HHS00000001 - IMERYS210707
24

Page 8

1                    I N D E X - (continued)
2    38  Hopkins, 1914  p. 67, 194                      507
3        Longo 11/2018
4        USGS 2001 Facts about Asbestos
5        JNJ000348020
6        JNJAZ55_000000597  1955 Talc in US
7        JNJMX68_000021632 Windsor and J&J
8    39  Color photo of books                          507
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 7

1                    I N D E X - (continued)
2    34-2 BATES Documents IIMERYS210707 - 885;      507
3        IMERYS427326  427415
4    34-3 Bates Documents IMERYS430707 - JNJ000270588    507
5    34-4 Bates Documents JNJ000059273 - JNJI4T5_000005163504
6    34-5 Bates Documents JNJMX68_000004296 - LUZ015663  507
7    34-6 Core Logs and Maps            507
8    34-7 Depositions of Pat Downey - John Hopkins Part 1  507
9    34-8 Deposition of John Hopkins Part 2        507
10   34-9 Deposition of John Hopkins Part 3 and      507
11       Julie Pier Part 1
12   34-10 Deposition of Julie Pier Part 2 and Blount   507
13       (Ingham)
14   34-11 Literature - Blount (1991) - IARC (1987)    507
15       Supp. 7
16   34-12 Literature - IARC (2006) Preamble and IARC   507
17       (2010)
18   34-13 Literature - IARC (2012) and Zeitz Memo (1974) 507
19   35  William E. Longo, Ph.D./Mark W Rigler Ph.D. -   507
20       State Court Reports
21   36  Longo Supplement Volume 1            507
22   37  Longo Supplement Volume 2            507
23
24

Page 9

1    VIDEOGRAPHER:
2        We are now on the record.
3        My name is Julie Robinson.  I'm a
4    videographer representing Golkow Litigation
5    Services.
6        Today's date is January 30th, 2019, and
7    the time is 8:56 a.m.
8        This video deposition is being held in
9    Auburn, Alabama, in the matter of
10   Johnson & Johnson Talcum Powder Product
11   Marketing, Sales Practices, and Products
12   Liability Litigation, MDL Docket Number 2738.
13       The deponent is Dr. Robert B. Cook.
14       Will counsel please state appearances
15   for the record.
16   MS. O'DELL:
17       Leigh O'Dell, Beasley Allen, for the
18   plaintiffs.
19   MS. EMMELL:
20       Jennifer Emmell, Beasley Allen, for the
21   plaintiffs.
22   MR. LAPINSKI:
23       Daniel Lapinski, the Wilentz Law Firm,
24   for the plaintiffs.

3 (Pages 6 to 9)

Robert Cook, Ph.D.

Page 10

1    MR. FROST:
2        Jack Frost, Drinker Biddle & Reath, on
3    behalf of Johnson & Johnson.
4    MS. McBETH:
5        Catherine McBeth, Drinker Biddle &
6    Reath, on behalf of Johnson & Johnson.
7    MR. FERGUSON:
8        Ken Ferguson, Gordon & Rees, for
9    Imerys.
10   MR. CARY:
11       Andrew Cary, Gordon & Rees, for Imerys.
12   VIDEOGRAPHER:
13       The court reporter is Lois Robinson,
14   who will now swear in the witness.
15   THE COURT REPORTER:
16       We just had someone arrive.
17       Do you want to state your appearances?
18   MR. BILLINGS-KANG:
19       Sure.
20       This is James Billings-Kang on behalf
21   of Personal Care Products Council.
22       ROBERT B. COOK, Ph.D.,
23       the witness, after having first been
24   duly sworn to tell the truth, the whole truth,

Page 11

1    and nothing but the truth, was examined and
2    testified as follows:
3        EXAMINATION
4    BY MR. FROST:
5    Q    All right. Good morning, Dr. Cook.
6    A    Good morning.
7    Q    My name is Jack Frost, and I'll be
8    asking the majority of the questions today.
9    A    Okay.
10   Q    Before we get started, have you ever
11   been deposed before?
12   A    Yes.
13   Q    Okay. So you generally know how this
14   works. We've got to verbalize all our answers.
15   A    Correct.
16   Q    Hand gestures, uh-huhs, huh-uhs don't
17   work. And, other than that, we need to be
18   careful not to speak over each other.
19       All right. Can I please mark these
20   two?
21       (DEPOSITION EXHIBITS 1 AND 2
22       WERE MARKED FOR IDENTIFICATION.)
23   MR. FROST:
24   Q    I'm gonna hand you what's been marked

Page 12

1    as Exhibits 1 and 2. And do you recognize these
2    are the reports that you drafted in this matter?
3    A    The cover pages are correct, and I
4    assume that the contents are.
5    Q    Okay. And other than these two
6    reports, do you have any other reports, written
7    research, anything else that you've created for
8    this matter that isn't reflected by those?
9    A    I have a few handwritten notes that I
10   brought in response to your request.
11   Q    Okay. Could I see those?
12   A    (Witness complies.)
13   Q    We'll mark them now, and I'll take a
14   look at them during the break.
15   A    Yeah.
16   MR. FROST:
17       Could you mark this as Exhibit 3,
18   please.
19       (DEPOSITION EXHIBIT NUMBER 3
20       WAS MARKED FOR IDENTIFICATION.)
21   MR. FROST:
22   Q    And then I also note counsel brought a
23   collection of invoices today. I'll mark those as
24   Exhibit 4.

Page 13

1        (DEPOSITION EXHIBIT NUMBER 4
2        WAS MARKED FOR IDENTIFICATION.)
3    MR. FROST:
4    Q    All right. So other than the two
5    reports and your notes, is there anything else,
6    any other writings that you have that reflects
7    any of the work you've done in this case?
8    A    Well, I brought a -- some photographs
9    of my personal library, which -- which I used to
10   gather my -- my background information.
11   Q    Okay.
12   A    And I brought photographs because I
13   donated my library to a museum that maintains a
14   research library in Atlanta just a couple months
15   ago.
16   Q    That's okay.
17   A    If you'd like to see what I was using,
18   I brought pictures of it.
19   Q    Yeah.
20   MR. FROST:
21       I think what we'll do, Leigh, is at the
22   end, we'll do like we did with -- for
23   Dr. Crocker. We'll somehow figure out a way to
24   mark everything that's been brought and, you

4 (Pages 10 to 13)

Robert Cook, Ph.D.

Page 14

```
1    know, we'll figure out during a break what the
2    best way to -- to do that is.  So we'll -- for
3    now we can refer to the stuff that's on the
4    table.
5    Q      It looks like you brought a collection
6    of documents, literature, and, as you said, the
7    picture of your library.
8    A      Yes.  And a publication on amphiboles,
9    if there were any questions about amphiboles.
10   Q      Okay.
11   A      Just a good summary document.
12   Q      All right.  And is that, the book on
13   amphiboles, is that in the materials relied upon?
14   A      Well, I relied on it.  I don't remember
15   whether we listed it or not.  It's --
16   MS. O'DELL:
17        I believe it to be.
18   MR. FROST:
19        It is reflected?
20   MS. O'DELL:
21        I believe it to be reflected.  But we
22   can go through --
23   MR. FROST:
24        I was going to say, we can always
```

Page 15

```
1    check --
2    MS. O'DELL:
3        Yeah.
4    MR. FROST:
5        -- that during a break as well.
6    Q      All right.  Excellent.
7        So you understand that you've been
8    retained by plaintiffs to be an expert in this
9    talc MDL; is that correct?
10   A      Correct.
11   Q      And you understand that you're offering
12   some opinions in this case; right?
13   A      Correct.
14   Q      All the opinions that you plan to offer
15   in this case, are they all reflected in the two
16   reports that we've marked as Exhibits 1 and 2?
17   A      Yes.  Based on the reports as they
18   stand, yes.  I did reserve the right to -- to
19   supplement these reports if additional
20   information is supplied.
21   Q      Okay.
22   A      But, yes, my opinions are pretty much
23   everything that I -- I wanted to say.
24   Q      All right.  So is it fair to say that,
```

Page 16

```
1    sitting here today, you don't intend to offer any
2    additional opinions that aren't otherwise set
3    forth in these reports?
4    A      That's correct.
5    Q      And do you believe the reports to be
6    accurate and complete?
7    A      When you say "the reports," you mean
8    these two reports?
9    Q      Yes.
10   A      Yes.
11   Q      Yes.  These, Exhibit 1 and Exhibit 2.
12   A      Yes.
13   Q      And is it fair to summarize the
14   opinions you're rendering in this case all relate
15   to geology, mineralogy, and sort of mining
16   practices?
17   A      It's -- it goes beyond that in that I
18   am offering opinions related to sampling and
19   analytical techniques.
20   Q      Okay.  I'd loop that under the mining.
21   A      Yeah.
22   Q      Other than the geology, mineralogy,
23   mining practices, and the sampling and
24   compositing techniques, is there anything else
```

Page 17

```
1    you intend to offer opinions on here today?
2    A      No.
3    Q      And, in fact, you don't intend to offer
4    any opinions on whether or not talc or talcum
5    powder can cause ovarian cancer; correct?
6    A      No.  No.
7    Q      And same with mesothelioma.  You don't
8    intend to offer opinions that talc or talcum
9    powder can cause mesothelioma?
10   A      No.
11   MS. O'DELL:
12        Dr. Cook, if you'd just wait till Jack
13   finishes.
14   THE WITNESS:
15        Uh-huh.
16   MS. O'DELL:
17        Can you just --
18   THE WITNESS:
19        Okay.
20   MS. O'DELL:
21        Another couple of seconds.  That will
22   be helpful.
23   MR. FROST:
24   Q      Turning to Exhibit 2, this is captioned
```

5 (Pages 14 to 17)

Robert Cook, Ph.D.

Page 18

1    as an amended report -- is that correct? --
2    that -- the Exhibit 2, the second of the two
3    reports?
4    A    Yes.
5    Q    Okay.  And why did you issue an amended
6    report in this case?
7    A    Additional information came in, and in
8    editing my own original first version, I found
9    grammatical errors and that type of thing, which,
10   being a retired professor, I can't abide.
11   Q    Do you recall what additional
12   information came in that you reviewed?
13   A    There were depositions by several
14   people.  There was a McCarthy report related to
15   beneficiation.  There was information related --
16   additional information related to Italian talc.
17   There was a stack of documents that I received
18   primarily online in -- in a Dropbox.
19   Q    The depositions by several people you
20   received, do you recall what depositions those
21   were?
22   A    Two of them were by people that were
23   not really involved in this, but they -- they
24   offered information related to the -- the

Page 19

1    mineralogy of talc and related amphiboles.  One
2    was by Mickey Gunter.  One was by a man named
3    Sanchez, who was one of Gunter's students.  There
4    was a deposition by a man named Glassley, who
5    once worked in Vermont.  Those were the three
6    that I remember.
7    Q    Do you recall the dates on those
8    depositions?
9    A    No.
10   Q    Do you recall if those depositions were
11   taken after you had drafted your initial report?
12   A    I think that they were all before.
13   Q    They were all before?
14   A    Uh-huh.
15   Q    And those had not been made available
16   to you prior to your first report?
17   A    No.
18   Q    And I take it plaintiffs' counsel
19   provided those depositions to you?
20   A    Yes.
21   Q    Did plaintiffs' counsel advise you as
22   to why they were providing those depositions to
23   you?
24   A    No.

Page 20

1    MS. O'DELL:
2         Excuse me.  And just to any questions
3    that would -- would require you to disclose
4    things that we've discussed, those would be
5    things that are protected by the work product
6    privilege, and --
7    THE WITNESS:
8         Right.
9    MS. O'DELL:
10        -- and I would ask you not to --
11   THE WITNESS:
12        Right.
13   MS. O'DELL:
14        -- testify to those.  And I -- I'll be
15   careful to object to --
16   THE WITNESS:
17        Correct.
18   MS. O'DELL:
19        -- a specific question.
20   MR. FROST:
21   Q    And your counsel is correct.  I'm
22   allowed to know data, documents, things like
23   that, and other things that they gave you or told
24   you that influenced your opinion in this case,

Page 21

1    but not communications, necessarily, between the
2    two.
3    A    I understand.
4         The -- the flow of documents has been
5    sort of a continual thing.  It -- it's not that,
6    "Okay" --
7         I -- I finished writing my -- my report
8    in '08.
9         -- "we've got another big pile of
10   documents we want you to see."
11        They would enter material into my
12   Dropbox routinely, I mean, maybe a couple times a
13   week.  Because, apparently, material was being
14   supplied all along by Johnson & Johnson or Imerys
15   or someone.  And as they would scan or screen the
16   material, if it was -- if they were things that
17   would relate to what I was looking at, then they
18   would enter them into my Dropbox and alert me.
19        But there was no -- no instructions in
20   -- in terms of what I should be looking at or for
21   or anything like that.  It was just, "Here's more
22   information."
23   Q    All right.  When did plaintiffs --
24        And I take it, by "they," you're

6  (Pages 18 to 21)

Robert Cook, Ph.D.

Page 22

1    referring to plaintiffs' counsel?
2    A       Correct.
3    Q       When did plaintiffs' counsel start
4    sending you documents for your review in this
5    case?
6    A       Ms. O'Dell contacted me, I think, in
7    April of 2017, and she supplied me -- you know,
8    after discussing the -- the -- what she would
9    like for me to do, I agreed, and she began to
10   give me background information, including, you
11   know, the documents that you see here, I think
12   still in late April of 2017.
13   Q       And plaintiffs' counsel continued to
14   supply you documents through --
15   A       Still going on.
16   Q       Still -- they're still --
17   A       Sure.
18   Q       -- continuing to supply you documents
19   now?
20   A       Sure.
21   Q       And it sounds like you have a -- a
22   Dropbox that they're loading documents into?
23   A       Yes.
24   Q       Is that the only way that they're

Page 23

1    sending you documents?
2    A       No. No. Sometimes they'll print them
3    out for me. These were printed out in -- in
4    Montgomery. I didn't print them out on my HP
5    bottom-of-the-line printer.
6    Q       And looking over at the binders that
7    are on the table, I note that there are tabs and
8    sort of stickies and things like that --
9    A       Sure.
10   Q       -- throughout them. Are those things
11   that you put in, or did they come that way from
12   plaintiffs' counsel?
13   A       No. It's -- it's -- it's a little
14   of -- of both. These are the actual documents
15   that I referred to in my report. And some of
16   them are long --
17   Q       Uh-huh.
18   A       -- and there may be only one page that
19   I'm actually referencing. And, so, I've gone
20   through, with their help, and marked that page so
21   that if you ask me about a document, I -- we
22   don't spend two hours as I kind of try to figure
23   out which page out of a hundred pages we need to
24   find a quote on.

Page 24

1    Q       Did they mark the pages of interest for
2    you to look at before you wrote your report?
3    A       No. No.
4    Q       Okay. This was all done in preparation
5    for the deposition --
6    A       Oh, yes.
7    Q       -- today?
8    A       Just within the last day or so.
9    Q       Okay. I'll rephrase my question.
10           So, in sending you documents, at any
11   time that you were being sent documents that you
12   were gonna rely on for your report, did they ever
13   send documents that were already tabbed or
14   highlighted or had any annotations on them?
15   A       Highlighted, some of these look like
16   they had been highlighted years ago, because they
17   were xeroxed copies and you could see where there
18   was a -- a different shade of gray.
19   Q       Uh-huh.
20   A       And, so, yes, there were documents like
21   that. And occasionally I would get something
22   that would have a yellow -- yellow highlighter on
23   it, and it may or may not have related to what I
24   was, you know, supposed to be looking at.

Page 25

1    Q       Okay. Did you use these highlights and
2    things of that nature to help influence what you
3    were looking at or writing in your report?
4    A       No. But -- but I couldn't help but
5    wonder why they were highlighted, so I, of
6    course, looked at them. And some of them were
7    of -- of value, and some weren't.
8            I mean, you'll -- I mean, even though
9    this looks like a lot of material, this isn't --
10   it's not half of what they sent. And I -- I have
11   looked at every page. I won't -- won't say I've
12   read every page, but I've certainly looked at
13   every page that they sent.
14           I mean, you know, you can't go through
15   the IARC stuff without falling asleep repeatedly.
16   So, you know, you just can't read all that. But
17   you can look at it, looking for, you know, key
18   words and things like that.
19   Q       Okay. Regarding the Imerys and
20   Johnson & Johnson documents that you've been
21   provided in this case, I take it everything you
22   have has been provided to you by plaintiffs'
23   counsel?
24   A       Other -- other than the material in my

7 (Pages 22 to 25)

Robert Cook, Ph.D.

Page 26

1    own library, which --
2    Q    Uh-huh.
3    A    -- which, you know, some of it's
4    been -- been referenced in my report.  And
5    there's a lot of other stuff that, you know,
6    there would be no need to reference but yet it
7    deals with talc.
8    Q    Did plaintiffs' counsel provide you any
9    of the published literature you relied on in your
10   reports?
11   A    They've supplied me with the IARC
12   stuff, if you want to consider that published,
13   which I do.  But in terms of copies of certain
14   published papers that were in journals, yes, they
15   supplied me with some full copies of things that
16   I only had abstracts of.
17        And -- and, in fact, there was one that
18   I couldn't -- I had a -- I had a really good
19   reference to it, but I couldn't come up with it,
20   and it's from a field trip guide book in Italy.
21   And they supplied me with that.
22   Q    Did plaintiffs -- I guess, better way
23   of asking this, did plaintiffs supply you with
24   any published literature other than the two IARC

Page 27

1    publications on their own, or was it all stuff
2    that you had requested if they could get copies
3    of for you?
4    A    No.  I -- I'm sure that if we went back
5    through everything I had, there would be copies
6    of publications.  There were some Bureau of Mines
7    publications.  There was a USGS publication.
8    Um --
9    Q    And I don't mean to cut you off, but
10   were these publications that you asked to see or
11   were these publications that plaintiffs' counsel
12   sent you and told you --
13   A    It was a --
14   Q    -- to look at?
15   A    It was a little bit of both.
16   Q    Little bit --
17   A    If you --
18   Q    -- of both?
19   A    If you look -- if you look at the back
20   of my report, there's an enormous long listing
21   of -- of materials that I -- I relied on.  And
22   this is -- this is pretty much the list of things
23   that -- that -- that I -- I have looked at.  Some
24   of those were supplied by Beasley Allen.  Some I

Page 28

1    already had copies of.  Some they gave me a copy
2    of and I already had it.
3    Q    Uh-huh.
4    A    So there's sort of a -- of an overlap
5    there.
6    Q    Okay.  Was there anything that they
7    supplied you that you'd never seen before that
8    influenced or changed your opinions in this case?
9    MS. O'DELL:
10        Object to the form.
11        Do you mean like in --
12   MR. FROST:
13        I'm talking about literature.
14   MS. O'DELL:
15        Okay.  Was it --
16        I'm sorry.
17   MR. FROST:
18        Yeah, I was going to say --
19   MS. O'DELL:
20        That was my objection.
21   MR. FROST:
22        You're correct.  My question wasn't
23   clear.
24   Q    Focusing on literature, was there any

Page 29

1    literature that plaintiffs' counsel forwarded you
2    that influenced -- influenced or changed the
3    opinions that you were gonna render in this case?
4    MS. O'DELL:
5        Object to the form.
6    A    No.  And there -- there's -- there's a
7    reason for that.  I didn't have a lot of
8    opinions.  I hadn't thought about the -- the
9    talc-ovarian cancer issue at all until Ms. O'Dell
10   called me.  So I had -- I had very few opinions.
11        I was familiar with the geology, and I
12   know a lot about mining, and, so, you know, my --
13   my fundamental knowledge and ideas in those two
14   areas were already pretty well established.
15        And, so, from the standpoint of -- of
16   those, the mineralogy, there was nothing that --
17   I mean, there's some errors in the mineralogy
18   that, you know, that's floating around right now.
19   But that was information I knew already.
20        The -- a couple of the papers that I --
21   I found in dealing with the Italian talc deposits
22   enhanced what I knew.  They were -- they were
23   interesting.
24   MR. FROST:

8 (Pages 26 to 29)

Robert Cook, Ph.D.

Page 30

1  Q      Okay.  If -- if we were to go through
2  the -- the reference list at the back of your
3  report, would you be able to tell me what was
4  supplied to you by plaintiffs that you didn't
5  already have?
6  A      Hmm.
7  MS. O'DELL:
8         Are you limiting that to the
9  literature?
10 MR. FROST:
11        I gotcha.
12        Yeah, to the literature.
13 THE WITNESS:
14        Did we put all the IARC stuff in -- in
15 literature?
16        I mean, some of it has Bates numbers.
17 And if it was a Bates number, then they obviously
18 supplied it to me.  Doesn't mean I didn't already
19 have a copy of it.
20        If it was a -- if it was a company
21 document of some sort, obviously, I never had a
22 copy of it.
23        But there -- I could sit down and maybe
24 go through the list with you and show you which

Page 31

1  things that -- that they may have given me, but
2  it's not gonna be -- isn't anything consequential
3  relative to the materials I already had.
4  MR. FROST:
5         Okay.  I'm gonna ask maybe we'll do
6  that during a break or something --
7  THE WITNESS:
8         Yeah.
9  MR. FROST:
10        -- if we can highlight on the Exhibit
11 2, you know, what he believes was supplied by
12 plaintiffs' counsel.  That might be helpful.
13 A      It's -- it's mainly documents related
14 to governmental agencies, that type of thing,
15 that I would not have had in my -- my library up
16 until this point.
17 MR. FROST:
18 Q      Okay.  Turning to the company
19 documents, did you make a particular request for
20 documents or the type of documents that you would
21 want to see, or did plaintiffs' counsel just
22 provide you documents?
23 A      No.  I did.  I made a request for a
24 long list of things related to the mining and

Page 32

1  geology of the -- the relevant talc deposits.
2  Q      Do you recall what you asked for?
3  A      Well, just happen to have written it
4  down.
5         Yeah.  There you go.
6         That's a fairly comprehensive list of
7  what I asked for.
8  MR. FROST:
9         Mark this as Exhibit 5.  I think we're
10 on 5; right?
11 THE COURT REPORTER:
12        Yes, uh-huh.
13 MR. FROST:
14        Thank you.
15        (DEPOSITION EXHIBIT NUMBER 5
16        WAS MARKED FOR IDENTIFICATION.)
17 MR. FROST:
18 Q      Okay.  I'll hand this back to you.
19 A      Okay.
20 Q      So you believe that's a fairly
21 comprehensive list of all the documents you asked
22 for from plaintiffs' counsel?
23 A      It probably isn't, because this has
24 been going on -- we're pushing two years now.

Page 33

1  And I'm sure there were instances when -- when we
2  were talking on the phone and I'd say, "Do we --
3  do we have anything related to froth flotation
4  that was used at West Windsor?"  I mean, I might
5  have -- I might have, you know, couched a
6  question like that.
7         So I would say that, in all fairness, I
8  probably did ask for other things.
9  Q      Sitting here today, you couldn't come
10 up with a -- a list --
11 A      No.
12 Q      -- of what those other things may be?
13 A      No.
14 Q      Do they all generally relate to the
15 categories that are, you know, in there, which
16 appear to be kind of the geology, mineralogy of
17 the three districts --
18 A      Yes.
19 Q      -- and then the mining practices of the
20 two companies?
21 A      Yes.
22 Q      And did you ever ask for any documents
23 that you weren't provided?
24 A      I don't think so.

9 (Pages 30 to 33)

Robert Cook, Ph.D.

Page 34

1    Q      Did you ever ask to conduct your own
2    searches of all of the documents provided by the
3    two corporate defendants in this case?
4    A      I'm -- I'm not sure I understand what
5    you're asking.
6    Q      Sure. Did you ever ask for access to
7    all of the documents that have been produced in
8    this case by --
9    A      No.
10   Q      -- either Johnson & Johnson or Imerys?
11   A      No.
12   Q      Did you ever ask to be able to run any
13   searches yourself against a database, say, of all
14   of those documents?
15   A      No.
16   Q      So you've relied on the set of
17   documents as put together by plaintiffs'
18   counsel --
19   A      Yes.
20   Q      -- for your opinions?
21   MS. O'DELL:
22          Object -- object to the form.
23   MR. FROST:
24   Q      And you have no way of knowing --

Page 35

1    right? -- if you've received every document that
2    would be responsive to any of the requests you
3    made?
4    A      Based on the Bates numbers, I would say
5    that -- that -- that there's -- that I've -- I've
6    looked at maybe a few percent of the documents
7    that are somehow entered into this. And, so, I
8    can't say that -- that Imerys 436182 wouldn't
9    have something relevant.
10   Q      Uh-huh.
11   A      But I may not have seen it. It may not
12   have been screened by the -- by the lawyers and
13   deemed something that they should send to me.
14   Q      Okay.
15   A      So I don't really know.
16   Q      I was gonna say, that -- that's sort of
17   what I'm getting at. What I'm getting at is
18   you -- you have no way of knowing one way or the
19   other whether or not what you were provided in
20   response to your request for documents is a
21   complete set of all documents on those topics;
22   correct?
23   MS. O'DELL:
24          Object to the form.

Page 36

1    A      I was told that -- that, relative to
2    this material here, that what I've got is what --
3    is what they received after their request.
4    MR. FROST:
5    Q      All right. And you have no way of
6    verifying whether or not what they sent you was
7    just a collection of documents that they had
8    culled through that --
9    MS. O'DELL:
10          Object --
11   MR. FROST:
12   Q      -- justifies their opinions and their
13   positions in this case?
14   MS. O'DELL:
15          Object to the form.
16   A      I would have -- I don't know how
17   anybody would know the answer to that. I mean,
18   no.
19   MR. FROST:
20   Q      Okay.
21   A      I mean, I've not had access to every
22   document involved in this case, so I have no --
23   no idea.
24   Q      Okay. Do you think, as an expert

Page 37

1    giving opinions regarding some of the mining and
2    sampling practices -- for example, of Imerys and
3    Johnson & Johnson -- that it would be important
4    to have a complete set of all data and
5    information before rendering those opinions?
6    MS. O'DELL:
7          Object to the form.
8    A      My opinions are based on the material
9    that was supplied to us after we asked.
10   MR. FROST:
11   Q      Okay. So if there were additional
12   materials, you know, that either contradict or
13   are different than some of the materials you've
14   seen, would you look at and view those with an
15   open mind?
16   A      Absolutely. I mean, that's the way I
17   started this, and that's the way we're gonna end
18   it.
19   Q      And, again, if there were documents
20   that potentially refuted some of your opinions,
21   yeah, you would look at those and be willing to
22   either adjust or change your opinions based on
23   those documents?
24   A      Well, I -- I looked at this as a -- as

10 (Pages 34 to 37)

Robert Cook, Ph.D.

Page 38

1    an exercise in the application of the scientific
2    method.  And, so, that -- that requires you to
3    continue to test what you have opinion on.  But
4    it looks like, based on everything that I've --
5    I've been given, that -- that there's pretty --
6    pretty solid support for the opinions I've made
7    so far.  But -- but I would be more than willing
8    to look at additional data, for sure.
9    Q        And, for example, you know, you note
10   with respect to, say, sampling and testing that
11   there appears to be hundreds, if not thousands,
12   of tests that are missing from the documents
13   you've looked at.  Is that correct?
14   MS. O'DELL:
15           Object to the form.
16   A        That -- that would be my -- that --
17   that could be an opinion, yes.  It -- because
18   there's description of samples that are taken
19   here, there, and everywhere and in certain time
20   periods, and then -- but you look for the results
21   of the analyses, and they aren't there.
22   MR. FROST:
23   Q        Okay.
24   A        So, yeah, I'm sure.

Page 39

1    Q        So you agree with me it looks like,
2    you know, you don't have the complete set of
3    testing data, for example?
4    MS. O'DELL:
5            Object to the form.
6    A        I would say that -- that it may be that
7    I have everything that's available.  It may be
8    that a lot of these results don't exist in
9    anybody's files anymore.
10   MR. FROST:
11   Q        But you can't tell me one way or the
12   other, without speculating, as to whether or not
13   any of those additional testing samples, testing
14   documents, records, et cetera, exist in the
15   documents produced by the two companies in this
16   case and just weren't provided to you by counsel;
17   correct?
18   A        I have no idea.
19   Q        Okay.  Now, you had talked about a
20   couple of the depositions.  I also note in your
21   report I think you -- you referenced the
22   deposition of Mr. -- or Dr. Downey in your
23   report.  Other than what you've disclosed in --
24   in the report and the three you've talked about

Page 40

1    today, have you reviewed any other depositions to
2    prepare for this case?
3    MS. O'DELL:
4            Object to the form.  I don't think he's
5    mentioned a Dr. -- there's not -- I'm not aware
6    of a Downey --
7    MR. FROST:
8            Oh, is he not a doctor?
9    MS. O'DELL:
10           -- witness in this case.
11   MR. FROST:
12           Oh, okay.
13   MS. O'DELL:
14           I don't think -- he's a doctor, but I
15   don't think he mentioned him.
16   MR. FROST:
17           Okay.
18   MS. O'DELL:
19           So you might ask an open-ended
20   question.
21           Or, if you understand it, please --
22   A        I -- I understand what you're asking.
23   MR. FROST:
24   Q        Sure.

Page 41

1    A        There's a list of depositions that I --
2    I have looked at that's in this list of materials
3    considered.
4            And there's Hopkins.  It's footnoted in
5    my report.
6            Julie Pier, I've looked at hers.
7            I've looked at Alice Blount's.
8            There's one that I looked at a long
9    time ago.  I can't -- can't even remember the
10   person's name, and it -- it had little relevance
11   to what we're doing.
12           Hopkins, Downey, Blount, Glassley,
13   which I mentioned.
14           There may -- I think there's at least
15   one more that's -- that's actually in my list of
16   materials considered.
17   Q        Okay.  But it would be -- it would --
18   it would be listed in the materials considered?
19   A        Yes.
20   Q        It's just the three, the Gunter,
21   Sanchez and Gassley, that --
22   A        Glassley.
23   Q        -- weren't listed?
24           Glassley?

Robert Cook, Ph.D.

Page 42

1    MS. O'DELL:
2        I think Glassley was listed.
3    MR. FROST:
4        Oh, was he?
5    MS. O'DELL:
6        Yeah.
7    MR. FROST:
8    Q    Have you reviewed any of the
9    depositions of the other experts in this talc
10   MDL?
11   A    I don't know.
12        Oh, the depositions?
13   Q    Yes.
14   A    I'm not sure about who was --
15        When you say the MDL --
16   Q    In this particular case.
17   A    Oh.
18   Q    Any of the other experts from
19   plaintiffs' counsel in this case?
20   A    I think we've got them listed.
21   Q    Have -- other than the --
22        I'll ask this a different way. We've
23   been taking depositions of various plaintiffs'
24   experts for the past about month.

Page 43

1    A    Uh-huh.
2    Q    Have you seen or read any of those
3    transcripts?
4    A    No.
5    Q    Okay. And you're aware that plaintiffs
6    served other expert reports, like yours, in -- in
7    November?
8    A    Yes.
9    Q    And then some in January?
10   A    Yes.
11   Q    Have you reviewed any of those reports?
12   A    I looked at a -- a draft of Krekeler
13   and Campion. I'm assum- -- I don't know whether
14   he's been deposed or not. And there were --
15   there were two others who were really related to
16   generating summaries of published literature.
17   But Campion's was interesting since it was a
18   Raman spectra deposition or expert report.
19   Q    Do you recall who the other two were?
20   A    No. Believe it or not, one of them's
21   name was Smith, and the other one had a foreign
22   name.
23   Q    Would that be Dr. Zelikoff?
24   A    Yes.

Page 44

1    Q    And you've reviewed these while they
2    were in draft form?
3    MS. O'DELL:
4        Object to the form.
5    A    I don't know whether they were draft
6    form or not. They were -- they were in good
7    shape in terms of grammar and punctuation. I
8    would have -- I would have certainly thought they
9    were close to final.
10   MR. FROST:
11   Q    Did you review these prior to
12   finalizing your initial report?
13   A    No.
14   Q    Have you reviewed these after the
15   initial report?
16   A    Yes.
17   Q    Did you review these before the --
18   issuing the second report?
19   A    Yes.
20   Q    The amended?
21        In reviewing the -- the Smith,
22   Zelikoff, Campion, and Krekeler reports, did that
23   at all influence any of the opinions or any of
24   the analysis you did in the amended report?

Page 45

1    A    It did not. I -- I was a little bit
2    intrigued with the Campion, the Campion report.
3    It made me think that that was a field of
4    potential research. I didn't realize that --
5    that the Raman approach could be as useful as it
6    might be.
7    Q    Was this more a, you know, sort of
8    piqued your interest or personal curiosity --
9    A    Yeah. Right.
10   Q    -- as opposed to the opinions you're
11   rendering in this case?
12   A    Yes.
13   Q    I take it you've done work with Raman's
14   spectrograph?
15   A    I have sort of steered clear of it. We
16   didn't have a machine on campus, and so I
17   didn't -- I wasn't as familiar with it as I
18   probably should have been. And then I read his
19   report, and I -- and it's pretty interesting.
20   Q    And you noted that you looked at a
21   draft of Krekeler's report.
22   A    Correct.
23   Q    Did you have any comments to that
24   draft?

12 (Pages 42 to 45)

Robert Cook, Ph.D.

Page 46

1  A       There were two drafts that I looked at.
2  I looked at an early one and a final one.  The --
3  the -- the parts that I thought were --
4  MS. O'DELL:
5          Dr. Cook --
6  THE WITNESS:
7          Yes.
8  MS. O'DELL:
9          -- To the degree that you're -- that
10 there were any discussions, those are not
11 something that I -- I would instruct you not to
12 testify to discussions --
13 THE WITNESS:
14         I understand.
15 MS. O'DELL:
16         -- with plaintiffs' counsel.
17 THE WITNESS:
18         Understand.
19         I felt that they were in depth and --
20 and that -- that what he had to say was -- was
21 good in -- in a lot of areas.
22 MR. FROST:
23 Q       Okay.  Do you offer any comments to
24 Dr. Krekeler's report?

Page 47

1  A       In -- like in writing?
2  MS. O'DELL:
3          Same instruction.
4  THE WITNESS:
5          Yeah.
6          Not really.
7  MR. FROST:
8  Q       Okay.  By "not really," does that mean
9  that, you know, none as far as writing and
10 content, or did you have some comments in the
11 report that you then conveyed?
12 A       Well, I mean, if you're gonna read
13 something, so -- you're gonna end up discussing
14 it in some way.  You know, if you don't, then
15 why -- why bother reading it if it's not gonna
16 enter into the bigger picture?
17         But -- but, no.  I mean, I wasn't -- I
18 wasn't asked to sit down and carefully critique
19 either one of those reports.  And I certainly
20 think that he -- he pointed out some important
21 things that -- that that should be considered.
22 Q       Do you know why you were asked to
23 review drafts of Dr. Krekeler's report?
24 A       No.  But -- but I think that it may be

Page 48

1  because I work closely with a man named
2  John Rakovan, who is probably his boss.  He's
3  a -- John is also a professor at Miami of Ohio.
4  And I had -- when they were considering Krekeler,
5  I -- you know, I checked -- checked with John
6  Rakovan about him, and he got a nice clean bill
7  of health.  So I kind of knew who he was going
8  into this.
9  Q       Did you offer any written comments --
10 A       No.
11 Q       -- to either of the two drafts?
12 A       I don't think I did.
13 Q       Okay.  Did you discuss any comments to
14 the drafts with plaintiffs' counsel?
15 A       I probably did.
16 Q       Do you remember what areas of his
17 report those comments would have been about?
18 A       They were -- I think that they weren't
19 really about areas of his report.  They were --
20 they were more about he's gone into great detail
21 here.  Probably it's, you know, irrelevant, he
22 needs to shorten it, that type of thing.
23         I looked at his report as if I was
24 looking at a student's report and what I would do

Page 49

1  to, you know, to make it easier to read, more
2  understandable.  I mean, I thought that he --
3  that his first draft was -- was probably way more
4  than was needed.
5  Q       And other than grammatical things and
6  things that relate to length, did you have any
7  substantive comments about the contents of his
8  report?
9  A       I liked -- I liked --
10 MS. O'DELL:
11         Dr. Cook, to the degree that those
12 comments were discussions that you had with me --
13 THE WITNESS:
14         Right.
15 MS. O'DELL:
16         -- or plaintiffs' counsel, they're not
17 entitled to ask you that question, and, so, I'm
18 instructing you not to convey those comments.
19 THE WITNESS:
20         Okay.
21 MR. FROST:
22         We disagree.  And you can raise it, but
23 we think, you know, any communications between
24 experts, including whether they're filtered

13 (Pages 46 to 49)

Robert Cook, Ph.D.

Page 50

1  through counsel or not, are subject to
2  disclosure. But we can deal with that at a later
3  time if you're instructing him not to answer.
4  THE WITNESS:
5       Yeah.
6  MS. O'DELL:
7       And to the --
8       Excuse me.
9       To the degree that there is a comment
10  that you've made to me or -- or other plaintiffs'
11  counsel, then -- then that's something that I'm
12  instructing you not to testify to.
13  THE WITNESS:
14       Right.
15  MS. O'DELL:
16       So if there's -- so --
17  THE WITNESS:
18       You're not asking if I've had direct
19  contact with Krekeler, are you?
20  MR. FROST:
21  Q       Asking that next, but --
22  A       Well, I haven't.
23  Q       Okay.
24  A       And -- and I personally think that

Page 51

1  there was some -- some important things that he
2  pointed out. And whether or not I mentioned them
3  to Miss O'Dell or not, I don't know. But I
4  certainly, in reading his final draft, I thought
5  there were some interesting things in there.
6  They weren't things that I had addressed myself,
7  and I thought they were good.
8  Q       Is there anything in the Krekeler
9  drafts that you included in your report because
10  you had read through his?
11  A       I only mentioned and actually deferred
12  to him the concept of sampling frequency, the --
13  the expected failure rate of samples that --
14       He had references to all of that and
15  pointed out that that seemed to be something
16  that -- that was contrary to expectation. And,
17  so, I pointed that out. But I refer completely
18  to him.
19  Q       If you turn --
20       Actually, this is a good point. I take
21  it by -- I take it your intention was that the
22  amended report in Exhibit 2 would take the place
23  of the original report in Exhibit 1?
24  A       Yes.

Page 52

1  Q       So there's no reason to flip through
2  Exhibit 1 at this point. Exhibit 2 --
3  A       No.
4  Q       -- contains your opinions.
5       Okay. If you could turn to page 38 of
6  your amended report at the very bottom.
7  A       Okay. Okay. Got it.
8  Q       I take it this is the reference you're
9  talking about, the "normally expected failure or
10  rejection rates were not observed, as discussed
11  in detail in the expert report of Krekeler
12  (2018)?
13  A       That's correct.
14  Q       Okay. And I take it, other than this
15  reference, you know, you yourself have no
16  opinions about the -- whether or not failure
17  rejection rates were correct? You're deferring
18  to Krekeler for that?
19  A       I'm deferring to him. I have an
20  opinion, you know, but I don't -- I don't have
21  the strength of knowledge to support my opinion.
22  Q       Okay.
23  A       But I defer to him because I believe he
24  does.

Page 53

1  Q       Yeah. So you haven't done any
2  independent statistical analysis or anything like
3  that regarding rejection rates?
4  A       No.
5  Q       Do you believe there's anything in your
6  report that you accidentally copied from a site
7  that you didn't either put quotes around or put a
8  proper citation to?
9  A       I hope not. I mean, there could be,
10  but I would hope that there wouldn't be.
11  Q       If you turn to page 9 of your report.
12  Specifically, I'll direct your attention to
13  Footnote 12.
14  A       Okay.
15  Q       Do you know where you got this
16  information from?
17  A       This was probably pulled out of perhaps
18  AGI glossary or one of the -- one of the AIME
19  references.
20  Q       Are you familiar with the website of a
21  company called Rishabh Metals & Chemicals?
22  A       No.
23  Q       I'll mark this as Exhibit 6.
24       I believe we're on 6; right?

14 (Pages 50 to 53)

Robert Cook, Ph.D.

Page 54

1  THE COURT REPORTER:
2       Yes, we are.
3       (DEPOSITION EXHIBIT NUMBER 6
4       WAS MARKED FOR IDENTIFICATION.)
5  MR. FROST:
6  Q     I'd like to turn your attention to what
7  is on the printout -- 1, 2, 3, 4, 5, 6 -- page 7.
8  A     I'm not sure that I haven't seen this
9  on the Internet.
10 Q     If you look under "or beneficiation."
11 A     Sure.
12 Q     And do you agree with me that what's in
13 the report appears to be a quote --
14 A     Sure.
15 Q     -- from this website?
16 A     It'd be nice to know where they got
17 their definition.  Seriously.
18 Q     Okay.  But do you believe that you saw
19 this website while you were drafting your report?
20 A     You know, when you -- when you
21 mentioned the name, it didn't ring a bell.  But I
22 believe I have seen this.
23 Q     Okay.
24 A     But I don't -- I don't know the

Page 55

1  company.
2  Q     All right.  Mark this as Exhibit 7,
3  please.
4       (DEPOSITION EXHIBIT NUMBER 7
5       WAS MARKED FOR IDENTIFICATION.)
6  MR. FROST:
7  Q     Do you recognize this as the expert
8  report of Dr. Judith Zelikoff that you reviewed?
9  A     I only have it online.
10 Q     Okay.
11 A     But I'm assuming it is the same.
12 Q     Okay.  If you could please turn to page
13 31 of your report.
14 A     Of my --
15       I'm sorry.  I'm going to hers.
16 Q     And I guess I'll start here.  Did
17 anybody help you write your report?
18 A     No.
19 Q     You wrote all of it yourself?
20 A     Every word.  There was help with --
21 with the tables.  My report was table-less
22 initially.
23 Q     Okay.
24 A     And it was extremely cumbersome because

Page 56

1  the things in the table I described -- you know,
2  every single reference I had described verbally.
3  And then when I saw the table that was being
4  prepared, I guess, in Hopkins, it was pretty
5  clear that, oh, my God, this is -- you know, I
6  need to do this with -- with every data set, go
7  ahead and make tables.
8       And, so, Beasley Allen folks helped
9  construct the -- I guess it was an Excel table.
10 Q     These are the tables that are --
11 A     Yeah.  But that's it.  Everything else
12 is -- is --
13       And if -- I'm just thinking about the
14 Zelikoff thing.  I did get a -- I did get a
15 reference out of hers.  But that's all I
16 remember.
17 Q     Okay.  And by "the tables," you're
18 referring to the various tables that appear --
19 you know, some start on page 13.
20 A     The tables have replaced very long
21 paragraphs that describe each one of these -- for
22 the most part, each one.  Some of them, the ones
23 from the Hicks -- not Hicks -- the Hopkins depo,
24 some of those I didn't have until I got his depo.

Page 57

1  Q     Okay.  Did you put together the tables
2  or was that something that Beasley Allen --
3  A     No.  They helped.
4  Q     -- put together for you?
5  A     They helped.
6  Q     And I take it, when they sent you the
7  tables, it sounds like there were additional
8  references in there that originally you didn't
9  have or didn't review?
10 A     There -- there were not.
11 Q     Okay.
12 A     I don't think that there were.  The
13 ones that -- that were related to the Hopkins
14 exhibits, I had them, but I think I got them
15 after I had prepared my first draft, something
16 like that.  And so they are -- they were new, new
17 to the second edition.
18 Q     Were there any references when you
19 reviewed the tables that you hadn't seen prior to
20 the tables being generated by Beasley Allen?
21 A     I don't think so.  I didn't -- I -- I
22 didn't notice any.  But there are like a
23 hundred-and-something references just in the
24 table that deals with asbestos.

15  (Pages 54 to 57)

Robert Cook, Ph.D.

Page 58

1  Q     And, so, I compared the -- you know,
2  the report in Exhibit 1 to the report in Exhibit
3  2. It looks like a lot of the changes that were
4  made were within the tables. Does that sound
5  correct?
6  A     It -- there could have been, sure.
7  Q     What type of changes were made to
8  Table --
9        Well, strike that.
10       Did -- were these changes that you made
11 or were these changes that were made by Beasley
12 Allen?
13 A     I went through the table in one and
14 found a goodly number of things that I thought
15 were wrong, but they were -- some of them were
16 spellings that were related to probably
17 spellchecker, like the word "Cyprus" for Cyprus
18 Corporation was misspelled a number of times.
19       There were some incidences where I
20 questioned whether the right terminology was used
21 for mineralogy, for a mineralogical citation.
22       And, you know, we keep going back
23 through these tables, and there's -- I think
24 there may be one sample in the asbestos that may

Page 59

1  not actually be a cosmetic -- or in the talc that
2  may not be a cosmetic talc.
3  Q     Okay. Do you -- do you recall which
4  one that would be or --
5  A     No.
6  Q     -- do you have the ability to identify?
7        Okay.
8  A     It was a -- it had a number. It was a
9  numerical sample number.
10 Q     And were these changes, then, that you
11 made to the --
12 A     I don't think --
13 Q     -- charts that were prepared?
14 A     I don't think -- they were intact, and
15 I didn't notice that until a day or two ago.
16 Q     Okay. The other changes that were made
17 between the original report and the amended
18 report, were these changes that you made in going
19 through the original report and correcting the
20 spellings?
21 A     Tried to, yes.
22 Q     Okay. And are you the one who made all
23 of the changes to the reports that show up now in
24 the amended --

Page 60

1  A     I think so.
2  Q     -- report?
3        Okay. So these weren't new lists that
4  were sent to you by Beasley Allen?
5  A     No. No, no.
6  Q     And have you reviewed all of the
7  documents that are in each of the charts?
8  A     I think I have.
9  Q     And I note that your charts are -- I'm
10 not gonna say exactly the same, because,
11 actually, your amended ones change some of the
12 language, but they're materially similar to those
13 showing up in the report of Dr. Krekeler. Have
14 you had a chance to review the charts in his
15 reports?
16 A     I've seen a version. I don't know
17 whether it was his latest version. And, yeah,
18 he -- he had -- I mean, that was the whole idea.
19 We've got -- now we've got charts to replace long
20 paragraphs. And, so, they should be similar.
21 Q     Okay. And this was the work done by
22 Beasley Allen?
23 A     In terms of --
24 MS. O'DELL:

Page 61

1        Object to the form.
2  A     Right. In terms of the compilation of
3  the charts, I mean, I'm pretty sure a secretary
4  did it.
5  MR. FROST:
6  Q     Okay. And then they sent it to you for
7  inclusion in the report?
8  A     Yes.
9  MS. O'DELL:
10       Object to the form.
11 MR. FROST:
12 Q     All right. So turning to page 31 of
13 your report.
14 A     Yes.
15 Q     See the paragraph at the top of 31, it
16 says -- it's starts with the "According to J&J's
17 corporate representative."
18 A     Right.
19 Q     Do you know where you got this
20 information from?
21 A     Yes.
22 MS. O'DELL:
23       Which one are you --
24 MR. FROST:

16 (Pages 58 to 61)

Robert Cook, Ph.D.

Page 62

1      The top paragraph in 31, the "According
2   to J&J's corporate representative."
3   A      I think that that's in a deposition.
4   Q      Can you turn to page 11 of
5   Dr. Zelikoff's report?
6   A      Okay.
7   Q      Third paragraph down, starts "According
8   to Johnson & Johnson's corporate representative."
9   A      Right.
10  Q      And I'll just let you review the two.
11  Do you agree with me that these two paragraphs
12  are almost exactly the same?
13  MS. O'DELL:
14          Object to the form.
15  A      Well, I can tell you that I wrote mine
16  before she wrote -- or before I ever saw hers.
17  MR. FROST:
18  Q      Okay.
19  A      So, you know, if they're similar, okay.
20  But, you know, I didn't receive hers until maybe
21  a month ago.
22  Q      Okay.  So you certainly would -- didn't
23  read and rely on Dr. Zelikoff --
24  A      No.

Page 63

1   Q      -- in order to draft your -- your
2   portion of the report?
3   A      No.
4   Q      If you can turn to page 32 of your
5   report, the second paragraph that says -- starts
6   "Talc mine in Vermont."
7   A      Okay.
8   Q      Okay.  Again, if you can look at
9   Dr. Zelikoff's page 11.
10  A      Okay.
11  Q      And it's the fourth paragraph down.  If
12  you can read those two.
13          Do you agree with me that they're
14  almost exactly the same again?
15  A      Yep.
16  MS. O'DELL:
17          Object to the form.
18  MR. FROST:
19  Q      And, again, you weren't relying on
20  Dr. Zelikoff to draft your report?
21  A      No.
22  Q      And plaintiffs' counsel didn't provide
23  you this paragraph --
24  A      No.

Page 64

1   Q      -- or the one preceding it that we
2   talked about?
3   A      No.
4   Q      I'm gonna show you one more on page 34
5   of your report, please.  Do you see the paragraph
6   that's above "Cobalt"?
7   A      Yes.
8   Q      Okay.  And then the paragraph right
9   above that, I think it's the second-to-last
10  sentence, starts "Interestingly, there is
11  significant difference between."
12  A      Okay.
13  MS. O'DELL:
14          I'm sorry.  Where -- where are you,
15  Jack?  Excuse me.
16  MR. FROST:
17          It's page 34, so it's the full
18  paragraph above "Cobalt" and then the last two
19  sentences in the paragraph above that.  It
20  starts, "Interestingly, there is significant
21  difference."
22  MS. O'DELL:
23          Okay.
24  MR. FROST:

Page 65

1   Q      Okay.  And looking back again at pages
2   11 and 12 of Dr. Zelikoff's report --
3   A      That's interesting, because this is
4   a -- something that was in my original report.
5   Q      Okay.  Yeah.  I was gonna say,
6   actually, I -- I will say all of this information
7   was in your original report.
8   A      Yeah.  I mean, I -- maybe she got ahold
9   of it.  I don't know.
10  Q      Okay.
11  A      But I certainly didn't take anything
12  out of hers.
13  Q      All right.  And you'd agree with me, if
14  you look at page 11 to 12 --
15  A      Right.
16  Q      -- again, the same language --
17  A      Right.
18  Q      -- shows up?
19  MS. O'DELL:
20          Object to the form.
21  MR. FROST:
22  Q      Okay.  And --
23  MS. O'DELL:
24          Excuse me.  Just give me a minute --

17 (Pages 62 to 65)

Robert Cook, Ph.D.

Page 66

1  not a minute, actually -- a second to object if I
2  need to.
3  THE WITNESS:
4       I'm sorry.
5  MS. O'DELL:
6       No worries.
7  MR. FROST:
8  Q       So you certainly didn't take
9  Dr. Zelikoff's report to draft yours; correct?
10  A       Certainly not.
11  Q       And the -- the language in these
12  various paragraphs I pointed out weren't provided
13  to you by plaintiffs' counsel?
14  A       No.
15  Q       Okay. And you don't know how they
16  ended up in Dr. Zelikoff's report?
17  A       I have no earthly idea.
18  Q       Okay. Thank you. I'm done with
19  Dr. Zelikoff's. You can put that to the side.
20       I will say, may as well keep your --
21       As we go through today, I'm sort of
22  going to reference your report.
23  A       Sure.
24  Q       So you may as well keep Exhibit 2 close

Page 67

1  by --
2  A       Okay.
3  Q       -- as we'll be walking through that as
4  the day progresses.
5  A       Okay.
6  Q       And we had already talked about it
7  before, but it seems like you did -- is it fair
8  to say that you did investigation of your own
9  library to find some of the reference material
10  you cite in your report?
11  A       Yes.
12  Q       Other than looking through your
13  physical library, did you do any other type of
14  research? Did you go to a research library,
15  Internet, anything like that?
16  A       For the most part, there was no reason
17  to. I've got a complete set of American
18  Mineralogist back to day one, complete set of
19  Economic Geology to day one, complete set of
20  Bibliography of North American Geology. And
21  everything that the USGS has done, I have a copy
22  of. I mean, I had 5,000 books.
23       And, so, the only thing I really -- I
24  really did on the Internet was search for geology

Page 68

1  of -- of the Italian talc deposits.
2  Q       Okay.
3  A       And -- and, you know, and that was an
4  interesting search. There is new -- there is new
5  data.
6  Q       Do you remember where you searched for
7  the geology of the Italian deposit?
8  A       It was just Google searches. Putting
9  in Val Chisone or Val Germanasca talc, You -- you
10  begin to get lots of hits. And there -- there
11  are a couple of recent papers that are pretty
12  good.
13  Q       And I believe -- I think you cite
14  Mindat.org?
15  A       Yes.
16  Q       And that's -- that's the types of
17  things you were searching through on the
18  Internet?
19  A       Well, Mindat.org is -- that's sort of
20  an interesting website. It -- it originated in
21  Poland, and the amount of work that's gone into
22  that is -- is unbelievable, because there's only
23  a couple of guys that did this.
24       And the value of Mindat.org is that,

Page 69

1  for many of the localities where they'll
2  attribute a mineral to, they'll list the
3  reference. So it's a darn good place to go find
4  references.
5  Q       It's a great place to start?
6  A       Yeah. It's a really good place to
7  start. And -- and they've won awards, worldwide
8  awards, for that particular site and the amount
9  of work they've had to put into it.
10  Q       And you've already told me nobody
11  helped you draft your report. Did anybody help
12  you do the research?
13  A       No.
14  Q       You didn't use any graduate students
15  or --
16  A       No. No. No, no, no.
17  Q       Okay. All right. And we -- we've
18  covered a little bit of this, but your
19  background, do you consider yourself a geologist,
20  a mineralogist? What -- how do you define your
21  expertise?
22  A       Well, you know, I started out as a
23  mining engineer. So my original educational
24  background was in mining engineering. And then I

18 (Pages 66 to 69)

Robert Cook, Ph.D.

Page 70

1    was lucky enough to get to go on in graduate
2    school at Georgia in geology. And, so, I'm
3    really both. I'm a mining engineer. I'm not a
4    registered engineer. I should have gone ahead
5    and done that, but I didn't. But I am, of
6    course, a registered geologist in -- in a number
7    of states.
8    Q        I was gonna say, I believe you're
9    registered in Georgia, Florida, and Alabama?
10   A        Right. Those are the -- the three good
11   ones.
12   Q        All right. And you're not a medical
13   doctor; correct?
14   A        I'm -- I'm certainly hoping I'm not.
15   Q        Right?
16   A        No, I'm not.
17   Q        And you're not a toxicologist?
18   A        No.
19   Q        And you don't hold a degree in either,
20   you know --
21            Medical doctor is a terrible way, but
22   you don't hold an M.D. or a degree as a
23   toxicologist; correct?
24   A        No. No.

Page 71

1    Q        And you have no formal training in
2    either what I'll call human medicine or
3    toxicology?
4    A        No.
5    Q        Do you consider yourself a regulatory
6    expert?
7    A        40 CFR is -- I mean, I -- I understand
8    some of it, and I've certainly worked with it.
9            When -- when the RCRA law first came
10   out, I was -- I was into that very deep. And
11   today, probably not, except in very specific
12   areas.
13   Q        Would one of -- do you consider your --
14   yourself an expert in the regulatory process of
15   talc mining or talc ore?
16   A        I'm not sure that -- that there really
17   is a regulatory issue related to talc mining that
18   -- that's unique. There are certainly
19   regulations related to that type of mining, and I
20   -- I'm familiar with them.
21   Q        Okay. Is it just a familiarity, or
22   would you consider yourself an expert in the --
23   the regulations regarding that type of mining?
24   A        In that I have had to suffer through

Page 72

1    fines, MSHA fines, I'm probably an expert.
2    Q        Okay. Have you ever done any -- any
3    research or publication regarding mine
4    regulations?
5    A        In terms of research, yes. But -- but
6    in a practical sense, I mean, I -- I have an
7    interest in three operating mines, so -- so I
8    have to try to stay on top of this.
9    Q        Okay. Have you ever participated in
10   the regulatory process either with, you know, the
11   SEC, JORC, any of the other regulatory agencies?
12   A        No. But I have tried to supply
13   students to the regulatory agencies, and -- and I
14   have a number that -- that are -- are pretty high
15   up. One of mine is very high up in EPA right
16   now. And I am kind of proud of them. I've got
17   three or four that are really doing well.
18   Q        Okay. But you yourself have never --
19   A        Well --
20   Q        -- been part of that process?
21   A        Well, they send me consulting work.
22   Q        Okay.
23   A        Why do you think I pointed them in that
24   direction?

Page 73

1    Q        Well, sure.
2            Other than sending you consulting work,
3    you know, you've never testified before any of
4    the bodies or --
5    A        Well --
6    Q        -- given any comments --
7    A        -- I've testified relative to,
8    you know --
9            Yes, I've testified relative to
10   litigation in terms of the mining impact on
11   private properties.
12   Q        Okay. Have you ever testified at any
13   of the hearings regarding regulations or
14   commented on the regulatory process?
15   A        The only one that I formally commented
16   on was the SOAP program, which was called the --
17   the Small Operator Assistance Program, that was
18   put in place probably in the late '70s. And it
19   may not even exist anymore. But it was a way
20   that small mining companies could get federal
21   assistance so that they -- they were able to
22   comply with new environmental regulations. And I
23   actually participated in that.
24   Q        Okay. Have you ever formally commented

19 (Pages 70 to 73)

Robert Cook, Ph.D.

Page 74

1    on any regulations regarding, you know, for
2    example, requirements of drilling, requirements
3    of sampling and compositing, anything of that
4    nature?
5    MS. O'DELL:
6              To regulatory agencies?
7    MR. FROST:
8    Q         To regulatory agencies.
9    A    I've had discussions with regulators.
10   Q    But no formal comments?
11   A    No, no.
12   Q    Have you ever worked with talc before?
13   A    Yes.
14   Q    When was that?
15   A    Well, first thing I ever did with talc
16   was to get money to live on. I sold talc when I
17   was between my -- my graduation date at the
18   School of Mines and when I started at Georgia.
19         There was a company that was trying to
20   buy talc to put into kits that they were selling,
21   mineral kits. And, so, they -- they sent me a
22   list of materials they wanted, and talc was right
23   at the top.
24         So I knew some of the talc locations in

Page 75

1    Georgia, and so I went and began to pick through
2    the mine dumps looking for lumps of talc that
3    made it onto the dumps. That was my first
4    experience with talc.
5         But, since then, it -- it's gone a long
6    way. I mean, I'm looking at ultra -- ultramafic
7    rocks right now in a project that we actually key
8    in on talc and asbestos occurrences. But we're
9    looking for nickel and -- and precious metals
10   associated with them. And this has grew out of
11   some work I did for the US Geological Survey.
12   Six of us put together one of their professional
13   papers, number 1475, which was a paper that
14   discussed the -- the evolution of -- of the
15   eastern part of the US, specifically Georgia and
16   Alabama.
17        But what we came up with was a -- a
18   much broader picture that would allow a
19   connection all the way up the Eastern Seaboard,
20   even into Vermont and on into Canada, that showed
21   the relationship of ultramafic rocks to the
22   development of the eastern part of the US. And
23   that has -- you know, people are still citing it,
24   cursing it and citing it.

Page 76

1         So, from that standpoint, I have a
2    pretty good background into the geology of that
3    type of talc occurrence, keeping in mind that
4    that isn't the only type.
5    Q    Uh-huh.
6    A    But I have done work for companies that
7    are exploring for talc.
8         In fact, I just recently -- I -- I had
9    to relog some drill core and redo some thin
10   sections for a company that -- that had
11   undertaken a talc project as a consultant and
12   then they were unable to do it. They -- they
13   weren't sure what they were doing.
14        You know, we -- I'm sure we'll mention
15   Alice Blount. She -- she was interested in the
16   talc deposits at Winterboro, Alabama, and I had
17   drilled them with a -- a company and had also
18   designed an exploration program for additional
19   talc deposits at Winterboro which were carried
20   out.
21        But Dr. Blount wanted to look at the
22   drill core. And -- and I was actually the one
23   that pulled the boxes for her and showed her the
24   intervals that she wanted to show and -- and

Page 77

1    would turn my back when she took a sample, that
2    kind of thing. So...
3    Q    All right.
4    A    So, anyway...
5         And -- and I've been working -- working
6    on talc projects all along since -- since I got
7    out of school.
8    Q    Okay. Have you ever published anything
9    other than this -- the USGS paper regarding talc?
10   A    Yes. The -- I wrote the mineralogies
11   for both Georgia and Alabama, and there are
12   sections on talc in both of those.
13   Q    And other than the two books you
14   published, is there anything else that you
15   published, peer-reviewed?
16   A    I'm absolutely sure that there are.
17   I'm -- I'm an executive editor for a magazine
18   that publishes Geographic Mineralogy, and I've
19   edited many papers dealing, in part, with talc
20   for that journal. So...
21        But in terms of have I -- have I
22   discussed talc in any other papers? I'm sure,
23   yes. I mean, you've got my -- my vita.
24   Q    Uh-huh.

20 (Pages 74 to 77)

Robert Cook, Ph.D.

Page 78

1    A        And, I mean, there's a lot of pages in
2    there.  I'd have to go through them one by one
3    and think back and, you know, "Did I mention
4    talc?"
5             The problem with this is that I've done
6    petrographic work for probably 25 or 30 quarries.
7    And -- and this is done routinely.
8             I mean, some of these quarries I've
9    done the work maybe four or five times because
10   they do it ann- -- maybe not annually but maybe
11   every couple of years, just to make sure that
12   their product does not contain asbestos.
13   Q        Uh-huh.
14   A        And, so, talc is not that rare of a
15   mineral.  And, so, I'm sure that, in some of
16   those reports, I'm -- I'm mentioning, "Yep,
17   you've got .03 percent talc in your product."
18   Q        I guess a better way to ask this
19   question, have you ever published any literature
20   that expressly focuses on talc, as opposed to
21   just mentioning it within the paper?
22   MS. O'DELL:
23            So solely on talc.
24   MR. FROST:

Page 79

1    Q        Yes, solely on talc or where talc is
2    one of the main -- it wouldn't be solely, but,
3    you know, where talc is the main focus of the
4    paper or the research.
5    A        I'm gonna say no, but -- but maybe I
6    might think of one or two --
7    Q        Okay.
8    A        -- as we -- as we go along.
9    Q        If you do, let me know.
10            Have you ever published anything
11   regarding amphiboles directly?
12   A        Yeah.  The -- the same story is true
13   there because, I mean, amphiboles are -- are
14   exceedingly common, and I probably -- I probably
15   have 50 publications that deal with amphiboles.
16   Q        That deal with amphiboles specifically?
17   A        Yeah.  Yeah.  They'll be -- well, the
18   problem with amphiboles is they're such a
19   common -- the family is so common that -- that if
20   you're gonna go out in the crystalline rocks of
21   the Eastern US, you're gonna find amphibolites or
22   rocks that contain amphiboles.  And, then, if
23   you're gonna write -- write the paper, you -- you
24   describe them.

Page 80

1    Q        I think I've read that amphiboles make
2    up a -- it's a creepy percentage.  It's like 10
3    or --
4    A        I -- I saw that, and I questioned it.
5    MS. O'DELL:
6             Let him finish, Doctor.
7    THE WITNESS:
8             Okay.
9    MR. FROST:
10   Q        I was gonna say, have you ever read
11   anything about, you know, sort of how abundant
12   amphiboles are?
13   MS. O'DELL:
14            Object to the form.
15   A        Yes.
16   MR. FROST:
17   Q        Okay.  Do you agree with me the --
18   especially throughout the Eastern United States,
19   the Appalachian Belt, things like that,
20   amphiboles are extremely common?
21   A        They are.  They -- they occur generally
22   in belts of rocks.  You know, when -- when you
23   see the -- the number that you're referring to,
24   I -- I read that, and I said, "Holy criminy,

Page 81

1    this -- this just can't be right."
2             But, then, if -- if you begin to think
3    about the shallow crust, a great -- a large
4    percent of it is really oceanic crust.  And
5    amphiboles and related mafic minerals are very
6    common in the oceanic crust.  And, of course,
7    that underlies the continents, so...
8    Q        Have you ever done any testing of talc?
9    A        In terms of, like, brightness, density,
10   no.
11   Q        Okay.
12   A        I -- I've certainly described talc,
13   you know, optically in thin section.
14   Q        What do you mean by "described" it?
15   A        You know, if it occurs in a rock, I
16   would describe grain size, relationship to
17   adjacent mineral grains, that type of thing.
18   Q        Okay.  What about amphiboles?  Have you
19   ever done any specific testing on amphiboles?
20   MS. O'DELL:
21            Object to the form.
22   A        Let me back up.  I've x-rayed talc
23   in -- in years past, and I've certainly x-rayed a
24   lot of amphiboles.

21 (Pages 78 to 81)

Robert Cook, Ph.D.

Page 82

1    MR. FROST:
2    Q        And by "x-ray," are you talking about
3    XRF or XRD?
4    A        XRD.
5    Q        And was this related to academics, or
6    was this related to the work you were doing with
7    some of the mining companies?
8    A        Academics.
9    Q        And was this for mineral identification
10   purposes?
11   A        Mainly.
12   Q        Did you ever publish any of your
13   mineral identification XRD work on either talc or
14   amphiboles?
15   A        A lot of it is published but without
16   reference to the analytical technique.
17          I mean, I -- when you're -- when you're
18   writing a paper, you can't describe how you
19   identified every single mineral grain in every
20   single sample. I mean, it's just impossible.
21          But it was very common to -- to run
22   confirmatory x-ray diffraction analyses on
23   samples that we thought we knew what we had.
24   "Let's -- let's check and make sure."

Page 83

1    Q        Do you consider yourself an expert in
2    XRD?
3    A        I would say that I used to be. I could
4    just about make a diffractometer jump up and
5    dance. Not -- not anymore. There's a whole new
6    generation of machines out there that are -- that
7    are -- can do things that I never thought would
8    ever be done.
9    Q        And it's just not something -- you
10   haven't kept up with the technology or the
11   research?
12   A        No. Actually, they sold my -- I had
13   a -- I had my own x-ray machine, and the
14   university sold it when I retired because nobody
15   knew how to run it. I'm serious. I -- they
16   should have never done that.
17   Q        All right. Have you ever done -- have
18   you ever published anything regarding asbestos?
19   A        Same -- same story. You know, in -- in
20   the two state mineralogies, there's lots of
21   information I published on asbestos. And I've --
22   you know, I've testified relative to asbestos and
23   for -- and I'm -- I'm sure that I can say this,
24   but for Oldcastle, I did a complete asbestos

Page 84

1    study for about six or eight of their quarries.
2    But they were -- you know, they were concerned,
3    like everybody is, is quarrying something out of
4    the ground that -- that, you know, when you're
5    producing a couple million tons a year out of a
6    single hole in hard rock that's of
7    a metamorphic grade that might have asbestos
8    minerals, you want to know whether or not you've
9    got something.
10   Q        Okay.
11   A        And, so, I did the work for Oldcastle,
12   and they have a whole series of reports that I
13   did for them that -- that outline the absence of
14   asbestos.
15   Q        Okay. And Oldcastle, I looked them up.
16   I believe they're a gravel quarry? Is that -- is
17   that fair?
18   A        No.
19   Q        Okay.
20   A        They're one of the largest construction
21   materials company in the world. They own the
22   Bank of Scotland. That's where the word
23   Oldcastle comes from. They're a Scottish
24   company --

Page 85

1    Q        Okay.
2    A        -- that operate in the US under a lot
3    of different names. But -- but the man I did
4    this for was David Toolan, who's their general
5    counsel in Atlanta. And so I used the word
6    "Oldcastle" because he's the Oldcastle general
7    counsel.
8    Q        What type of ores were you looking at
9    when you were doing these reviews?
10   A        What was that?
11   Q        What type of ores were you looking at
12   when you were doing these reviews?
13   A        Everything they had was being sold for
14   aggregate for one use or another. You know,
15   there are different uses for aggregate.
16   Q        Uh-huh.
17   A        And, so, each one of the quarries was a
18   quarry that -- that was crushing and sizing stone
19   for either a concrete market, a surface materials
20   market.
21          A lot of material gets -- gets sold to
22   Florida because Florida doesn't have adequate
23   rock to surface their own highways. So
24   everything that is -- is a good surface material,

22 (Pages 82 to 85)

Robert Cook, Ph.D.

Page 86

1  if it's asphalt in Florida, it's coming out of
2  Georgia or Alabama.
3  Q    Okay. So --
4  A    And that's -- that's the type of stuff.
5  Q    All right. I apologize. I used the
6  word "gravel." I'm guessing gravel is probably
7  not --
8  A    No.
9  Q    -- the right mining term.
10  A    I'm very upset with that.
11  Q    But I think we're talking about the
12  same thing.
13  A    Yeah.
14  Q    So aggregate seems to be the correct
15  term.
16  A    Aggregate.
17  Q    And I apologize.
18       And it seems like your job was to
19  determine -- locate asbestos within that ore, or
20  the absence of it?
21  A    Well, it was -- it was a little bit
22  more than that. They had -- I had to go and
23  sample their stockpiles and select samples from
24  the stockpiles to --

Page 87

1       I use a lab in Salt Lake City or in
2  Lindon, Utah, which is south of Salt Lake, to
3  make my -- my -- my thin sections. And, so --
4  and then I would do complete thin section
5  analysis for each sample. And I would count more
6  or less a thousand grains in each thin section
7  and -- and report on the mineral composition of
8  their rock.
9  Q    Uh-huh.
10  A    And if there was a --
11       And some of them actually have
12  amphiboles. But, with one exception, I never saw
13  anything that I would have -- I would have, you
14  know, said this is a -- you know, you're looking
15  at some chrysotile or something like that. I did
16  see some once.
17  Q    Okay. Have you ever done any testing
18  of finished talcum powder?
19  A    No.
20  MS. O'DELL:
21       Jack, are you at a stopping point?
22  MR. FROST:
23       Yeah. I've got like one more question,
24  and then I'll be done with this topic.

Page 88

1  Q    And you've never published anything
2  regarding talcum powder specifically; correct?
3  A    No.
4  Q    And did you have any opinions
5  regarding, you know, talcum powder and the
6  potential of asbestos or heavy metals in talcum
7  powder prior to being engaged in this litigation?
8  MS. O'DELL:
9       Object to the form.
10  A    No.
11  MR. FROST:
12  Q    Okay.
13       All right. That's a good place to take
14  a break.
15  VIDEOGRAPHER:
16       Going off the record. The time is
17  10:06 a.m.
18       (OFF THE RECORD.)
19  VIDEOGRAPHER:
20       We're back on the record. The time is
21  10:25 a.m.
22  MR. FROST:
23  Q    All right. Let's turn to page 2 of
24  your report. And under the section "Summary of

Page 89

1  Opinions," you've set forth seven opinions. Does
2  that sound right?
3  A    Yes.
4  Q    Will you agree with me that, you know,
5  these are the opinions -- these are the ultimate
6  conclusions and the opinions that are supported
7  by your report?
8  A    Yes.
9  Q    And I won't read them all, but I'll
10  start by going over a couple of them. The first
11  opinion states, "Talc deposits derived by the
12  alteration of serpentinites contain chrysotile
13  and amphibole species and fibrous asbestiform
14  habits, all of which are known carcinogens."
15       Did I read that correctly?
16  A    I believe so.
17  Q    And you'll agree with me that the
18  question here is whether or not -- it's not
19  necessarily what's in the deposit; correct?
20  We're concerned with what's in -- what ends up in
21  the ore. Would you agree with that?
22  MS. O'DELL:
23       Object to the form.
24  A    I'm not sure you're not asking a -- a

23 (Pages 86 to 89)

Robert Cook, Ph.D.

<table>
<tr><td colspan="2">Page 90</td><td colspan="2">Page 92</td></tr>
<tr>
<td>

1  redundant question of some sort, because what is
2  in the ore is in the -- in the -- in the deposit
3  as a whole, unless you want to refine that a
4  little bit.
5  MR. FROST:
6  Q      I was gonna say, are you looking at
7  deposit more -- are you looking at deposit as
8  only the ore, or are you looking at deposit as
9  the entirety of --
10        I'll -- I'll strike that.
11        You agree with me what is the -- the
12  mineable deposit is different than the entirety
13  of the deposit when you're talking about talc;
14  correct?
15  A      Yeah.  Yes and no.  Don't -- I -- I
16  object to the use of the word "deposit."
17  "Deposit," to an economic geologist, means the --
18  the occurrence of the ore.
19  Q      Okay.
20  A      And so -- so you're -- what -- I think
21  what you're saying is that the serpentinite as a
22  whole may be mineralogically at variance with the
23  ore deposit itself.
24        Is that what you're asking?

</td>
<td>

1  MR. FROST:
2  Q      Okay.
3  A      In --
4  Q      And, so, what I want to get at --
5  MS. O'DELL:
6        Let him finish.
7        Were you finished, Dr. Cook?
8  A      Well, I was gonna -- gonna just finish
9  with one more sentence.
10  MR. FROST:
11  Q      Sure.  Go ahead.
12  A      In -- in the ore deposit itself, the
13  talc ore, of course, is gonna be different from
14  the serpentinite from which it was derived.
15        I mean, serpentinite and talc are not
16  the same thing, so, of course they're different.
17  Q      Would you agree with me that, within
18  the talc deposit, you can have areas of the talc
19  that are less pure than other areas of the
20  deposit, say closer to or further from the -- the
21  edges of the deposit?
22  A      Sure.
23  Q      And you'd agree with me that not the --
24  not all of that talc will end up getting mined

</td>
</tr>
<tr><td colspan="2">Page 91</td><td colspan="2">Page 93</td></tr>
<tr>
<td>

1  Q      That's correct.  That's what I'm
2  talking to.
3        You can have -- when you look at a -- I
4  was talking about deposit in more of a global
5  term, that when you have an area of talc, I was
6  looking at that as the deposit and then -- which
7  is separate from the sort of smaller economic
8  deposit of ore that's mineable inside of it.
9  MS. O'DELL:
10        Object to the form.
11  MR. FROST:
12  Q      So when you refer to "deposit," you're
13  just talking about the mined ore and not what
14  surrounds it?
15  MS. O'DELL:
16        Object to the form.
17  A      It may not be mined.  It would be part
18  of the talc deposit per se.  These things are
19  part of a -- a larger occurrence of -- of a rock
20  that's silica-deficient, rich in magnesium.  It's
21  altered by the influx of warm waters at some
22  point.  And within or around or adjacent to maybe
23  in some cases a core of serpentinite, you will
24  have a talc deposit.

</td>
<td>

1  and used as the ultimate ore; correct?
2  MS. O'DELL:
3        Object to the form.
4  A      That may or may not occur.  There are
5  companies who will get every single scrap of --
6  of ore they can, and that would -- that would
7  cause them in some cases to incorporate some of
8  the wall rock in with the last bit of ore that
9  they remove.  And, so, that's -- that happens.
10  That's not really very uncommon.
11  MR. FROST:
12  Q      Okay.  Focusing, though, on cosmetic
13  talc, which, you know, is what we're concerned
14  with here --
15  A      Right.
16  Q      -- you'd agree with me that if you have
17  an area of the deposit that is, you know, only
18  5 percent talc and an area of the deposit that is
19  60 percent talc, that the -- what becomes the ore
20  does not necessarily come from the -- they're not
21  gonna use the entire deposit to create cosmetic
22  ore; correct?
23  MS. O'DELL:
24        Object to the form.

</td>
</tr>
</table>

24 (Pages 90 to 93)

Robert Cook, Ph.D.

Page 94

1    A     I -- I think that that's -- that's a
2   fair statement. But you might also say you
3   wouldn't use the entire deposit to make -325 mesh
4   talc to put in paint. I mean, it -- you know,
5   you could say that with respect to a lot of the
6   products.
7   MR. FROST:
8   Q     Sure.
9         So that's what I'm getting at is it's
10   not necessarily the entire deposit that is of
11   concern. It's really which part of that deposit
12   ends up becoming the talc ore. Correct?
13   A     Correct.
14   MS. O'DELL:
15         Object to the form.
16   MR. FROST:
17   Q     Okay.
18   MS. O'DELL:
19         Give me just a second.
20   THE WITNESS:
21         Yeah. Sorry about that.
22   MR. FROST:
23   Q     And the first opinion relates to the
24   alteration of serpentinites. That, for purposes

Page 95

1   of this case, only relates to Vermont; right?
2   A     Let me see the way I've worded that
3   again.
4         For purposes of this case, yeah.
5   Q     Okay. You'll agree with me that in
6   China and Italy are derivations of carbonates?
7   A     That's what I'd say, yes.
8   Q     Looking at the second opinion, which is
9   B, the one that states -- talks about fibrous
10   talc --
11   A     Right.
12   Q     -- at the very end of that you state
13   that, "Fibrous talc fulfills the requirements for
14   inclusion with asbestiform minerals which are
15   known to be human carcinogens."
16   A     Correct.
17   Q     Okay. And you repeat this on page 9 of
18   your report.
19   A     Okay.
20   Q     It appears to be -- it's the last
21   sentence. Is it the last sentence? Sorry. It's
22   the sentence before that. You talk -- generally,
23   it's that last paragraph. Again, we're talking
24   about, you know, fibrous talc, and then, you

Page 96

1   know, that it's been determined to have similar
2   health effects as asbestos, and you quote two
3   IARC papers.
4   A     Yes.
5   Q     And I think we've -- we've already
6   determined you're not an expert. You know,
7   you're not a doctor. You're not a toxicologist.
8   A     No.
9   Q     And are you aware, sitting here today,
10   of any scientific studies that have determined
11   fibrous talc to be a human carcinogen?
12   A     I'm aware that IARC says it is.
13   Q     Okay. And, other than IARC, can you
14   cite to me any other studies that show that
15   fibrous talc is a human carcinogen?
16   A     I cannot. But I'd like to say that
17   IARC wouldn't have considered it carcinogenic if
18   there weren't studies that supported that
19   conclusion.
20   Q     And you're not here to, you know, opine
21   what may or may not cause human disease; right?
22   A     No, absolutely not.
23   Q     And do you consider yourself to be an
24   expert in reading, you know, IARC and

Page 97

1   interpreting IARC monographs?
2   A     No.
3   Q     Okay. And you agree with me that the
4   IARC monographs themselves aren't firsthand
5   research papers; correct?
6   MS. O'DELL:
7         Object to the form.
8   A     I think that there are people that
9   would consider some of them research papers in
10   that it is they are drawing conclusions based on
11   research into the literature with a hypothesis
12   that fibrous talc does cause cancer or they might
13   use an alternate hypothesis, fibrous talc does
14   not cause cancer. And then to support either one
15   of those opinions, they're looking at the results
16   of research.
17   Q     You --
18   A     And, so, from that standpoint, maybe
19   the IARC documents are in a way a research paper.
20   Q     Well, you agree with me they're not
21   doing any independent lab work?
22   A     I don't think they are.
23   Q     And they're not doing any independent
24   epidemiology studies on their own?

25 (Pages 94 to 97)

Robert Cook, Ph.D.

Page 98

1    A    I don't think so.
2    Q    Okay.
3    A    Let me back up.  I don't know what
4    their budgeting is.  There are organizations like
5    this that make grants for the study of things
6    that they're interested in gathering data on.
7    The World Health Organization as a whole I think
8    does.  National Institute of Health does here in
9    the US.  They're a very, very robust ranking
10   agency.
11   Q    Okay.  With respect to the IARC
12   monographs, you'd agree with me that they're
13   reviewing work done by other scientists and
14   drawing conclusions based on them?
15   A    That's what I -- sure.
16   Q    And other than what the conclusions
17   that IARC has drawn, you can't point me to any
18   peer-reviewed studies that support their
19   research?
20   A    No.  I'm -- I'm sure they're listed in
21   the monographs.
22   Q    And you'd also agree with me that IARC
23   does not conclude that there's any link between
24   fibrous talc and ovarian cancer; correct?

Page 99

1    MS. O'DELL:
2        Object to the form.
3    A    I don't know the answer to that.
4    MR. FROST:
5    Q    That's fine.  "I don't know" is a
6    perfectly acceptable answer.
7    A    Yeah.  I -- I think that they -- that
8    ovarian cancer is mentioned.  But in the actual
9    statement that it's a group 1 member, they
10   probably don't mention ovarian cancer per se.
11   Q    Okay.  And --
12   A    But -- but they might.  I don't know
13   that.
14   Q    All right.  And you're not an expert on
15   the subject, so you can't sit here and tell me
16   what types of cancer fibers talc may or may not
17   be associated with?
18   A    No.  No.
19   Q    Other than the seven opinions that we
20   have put forth here on pages 2 and 3 of your
21   report, do you have any other opinions that you
22   plan to render --
23   A    No.
24   Q    -- in this case?

Page 100

1    A    No.
2    Q    Do you intend to publish your opinions
3    in this case?
4    A    No.
5    Q    Is there a particular reason why you --
6    you do or don't intend to publish them?
7    A    I don't think it's a -- I don't think
8    it's a good practice to do this.  I know people
9    that do, and they're not looked upon well by
10   their peers.  I don't think it's good to publish
11   data that's generated in litigation.
12   Q    And it's --
13   A    That's my personal opinion.
14   Q    No.  That's a fair opinion.
15       So you believe there's a difference
16   between litigation-derived, you know, research
17   and opinions versus academic-derived research --
18   MS. O'DELL:
19       Object to the form.
20   MR. FROST:
21   Q    -- research and opinions?
22   MS. O'DELL:
23       I'm sorry.
24   MR. FROST:

Page 101

1        I didn't -- I didn't think you were
2    being rude in talking over me.
3    MS. O'DELL:
4        Yes.  Yeah.  I was just trying to get
5    my objection in.
6        Objection.
7    A    I'm not saying that there's a
8    difference.  I think that it has to do with
9    motivation behind research, has to do with who's
10   paying for it.  I think it's more of a
11   philosophical issue with me than anything else.
12   MR. FROST:
13   Q    Did you certainly --
14   A    I've been involved with litigation
15   since probably the mid-1970s, and I've never
16   thought about publishing the results that I
17   obtained during a litigation research project,
18   let's say.
19   Q    Okay.  You'd agree with me that's
20   because there are issues with potential bias
21   issues --
22   A    Sure.
23   Q    -- with conflict of interest
24   disclosures?

26 (Pages 98 to 101)

Robert Cook, Ph.D.

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    MS. O'DELL:
2              Excuse me.  Give me a chance.
3    A      Sorry.
4    MS. O'DELL:
5              Object to the form.
6              I don't think there's a question
7    pending, Doctor.
8    MR. FROST:
9    Q      Yeah.  I was going to say, did you
10   answer?
11             The second part of the question, so
12   you -- the second part of the question is, you
13   know, one of the issues would be conflict of
14   interest disclosures, sources of funding, things
15   like that would all, you know, go into the
16   decision as to whether or not, you know, you
17   would decide to publish?
18   MS. O'DELL:
19             Object to the form.
20   A      The conflict of interest is -- is a
21   really important topic.  And -- and I agree that
22   would be one of the reasons not to.
23   MR. FROST:
24   Q      Okay.  Turn to page 4 of your report.

**Page 103**

1    At the beginning of the second paragraph you note
2    that talc deposits can attain -- can contain
3    asbestos.
4    A      Uh-huh.
5    Q      How do you define asbestos?
6    A      Well, fibrous mineral that is -- I'm
7    trying to decide how to describe mineralogically
8    what they are, because the original six
9    chrysotile and then the five amphiboles that are
10   mentioned, the five amphiboles, some of them are
11   not even minerals anymore.  And, so, somebody
12   somewhere has got to go in and actually redefine
13   asbestos mineralogically.
14             For example, anthophyllite is actually
15   a solid solution series with anthophyllite at one
16   end and ferro-anthophyllite at the other.  But
17   ferro-anthophyllite is a mineral that forms
18   asbestos, and yet it's not mentioned in the
19   original definition of asbestos.  They just say
20   anthophyllite.
21             And, so, traditionally you've got --
22   you've got chrysotile is your serpentine member
23   of the asbestos family, and then you've got the
24   five amphiboles.  Well, okay.  That's great.

**Page 104**

1              So what are the characteristics that
2    these minerals have to be called
3    asbestos?  Well, fibrous.  They've got to have an
4    aspect ratio of -- some people want to say as low
5    as 3-to-1.  I don't agree with that.  5-to-1 is
6    what most people, I think, would use today.
7              They occur in groups of parallel
8    fibers.  Can be -- you can call them bundles.
9    Bundles can show -- if you look at the end of a
10   bundle, you can see that they -- that there is --
11   they are composed of more than one particle.  You
12   can begin to see a spray at the end of a bundle.
13             These things are -- they're flexible.
14   In other words, you can bend them without
15   breaking, for the most part, although that's a
16   little bit questionable because the -- the
17   tendency to break perpendicular to the length in
18   amphiboles is different from -- in chrysotile.
19   So there can be a little bit of a difference
20   there.
21             The tensile strength is usually pretty
22   high.
23   Q      Okay.
24   A      Resistance to electricity, resistance

**Page 105**

1    to heat.  I think that they need to be larger
2    than 5 microns in length to be of significance.
3              So what we're really talking about are
4    fibers, minerals that occur in fibers that have
5    to belong to generally that group of minerals
6    that were originally described.
7    Q      And do you recall what the five
8    amphibole minerals were?
9    A      Well, the problem with this is that
10   some of them are called minerals and they're
11   actually trade names.
12   Q      Okay.
13   A      Like amosite is not a mineral at all.
14   You know, that's gonna be grunerite, for the most
15   part.
16             Crocidolite is actually a sodium
17   amphibole called riebeckite.  And so there's
18   actinolite, tremolite, then those two and
19   anthophyllite.
20   Q      Okay.  And are you familiar with the
21   term "asbestiform"?
22   A      Yes.
23   Q      And the asbestiform habit?
24   A      (Nods affirmatively.)

27 (Pages 102 to 105)

Robert Cook, Ph.D.

| Page 106 | Page 108 |
|---|---|

Page 106

1  Q       Could you describe for me or can you
2  define for me what asbestiform means?
3  A       We sort of talked about it in the
4  definition of asbestos.  But asbestiform, again,
5  is related to a fibrous nature.  And, from my
6  perspective, I've looked at a lot of asbestos in
7  rock samples.
8            Now, granted, the -- what you see in a
9  rock sample is gonna be coarse-grained asbestos.
10  And, so, if you see a little band of asbestos,
11  generally the fibers will be perpendicular to the
12  edges of that band, and if it -- if it's
13  asbestos, the chances are you can rub your
14  fingernail across it and actually dislodge --
15  dislodge fibers.  There are minerals that form
16  the same type of a band that you can't.
17  Q       Uh-huh.
18  A       And they will not dislodge.  And
19  usually that won't be -- that won't be asbestos.
20  But the two may look asbestiform.  So the real
21  question is can you have an asbestiform mineral
22  that is not asbestos?  And the answer is yes.
23  Q       Okay.
24  VIDEOGRAPHER:

Page 107

1            Can I go off the record really quickly?
2  MR. FROST:
3            Sure.
4  VIDEOGRAPHER:
5            The time is 10:42 a.m.
6            (OFF THE RECORD.)
7  VIDEOGRAPHER:
8            We're back on the record.  The time is
9  10:42 a.m.
10  MR. FROST:
11  Q       And, so, we're talking about the
12  definition of asbestos.  Chrysotile, I believe,
13  is always asbestiform.  That's the asbestiform
14  serpentine?
15  A       If you -- if you actually apply a
16  minimum length to the fiber to chrysotile, then
17  it isn't always asbestiform.
18  Q       Oh, okay.
19  A       I mean, it can be below that 5 micron
20  and then, you know, it's out the door as
21  asbestos.
22  Q       And, then, with respect --
23  MS. O'DELL:
24            Are you finished -- were you finished,

Page 108

1  Doctor?
2  THE WITNESS:
3            Yeah, I think so.
4  MR. FROST:
5  Q       And with respect to the five
6  amphiboles, you'd agree with me it's the
7  asbestiform or the fibrous variant that's defined
8  as, quote, asbestos, closed quote; correct?
9  MS. O'DELL:
10            Object to the form.
11  A       I'm sorry, Jack.  Can you ask that --
12  MR. FROST:
13            Sure.
14  Q       And you'd agree with me, with respect
15  to the five amphiboles, it's the fibrous or
16  asbestiform version of those amphiboles that is
17  defined as, quote, asbestos, closed quote?
18  MS. O'DELL:
19            Object to the form.
20  A       That is correct.  But there is some --
21  the literature is inconsistent in that regard.
22  There should -- if you've got -- if you've got
23  actinolite asbestos, it should always say
24  actinolite asbestos --

Page 109

1  MR. FROST:
2  Q       Okay.
3  A       -- or fibrous actinolite.  There
4  should -- there should be a modifier if you're
5  going to -- to go from the mineral species by
6  itself into the realm of asbestos.
7  Q       And that's sort of the question I was
8  getting to.  There's a difference between --
9            And we'll use actinolite, which you
10  just used.
11            There's actinolite, which isn't
12  necessarily asbestos, and then there's
13  asbestiform or fibrous actinolite, which is.
14  Correct?
15  A       Correct.
16  Q       And you can have one without the other;
17  right?
18  A       Correct.
19  MS. O'DELL:
20            Object to the form.
21  MR. FROST:
22  Q       And do you know what a cleavage
23  fragment is?  Is that a term you're familiar
24  with?

28 (Pages 106 to 109)

Robert Cook, Ph.D.

Page 110

1    A        Correct.  It is.
2    Q        Okay.  Can you please explain to me
3    what a cleavage fragment is?
4    A        A cleavage fragment, according to the
5    American Geological Institute, their definition
6    is wrong, and I can tell you why.  But their
7    definition is that it's a crystal particle that
8    is bounded by cleavage surfaces.  And since not
9    all crystals have three directions of cleavage
10   that would give you cleavage on every side, that
11   can't be right.
12           But, in essence, it's a -- a broken
13   crystal fragment that is bounded at least
14   partially by planes of breakage rather than
15   crystallization.
16   Q        Would you agree with me that the
17   difference between a cleavage fragment and an
18   asbestiform fiber is the habit in which it grew,
19   the way in which it developed?
20   MS. O'DELL:
21           Object to the form.
22   A        Let me answer that this way.  The
23   answer is yes and no.  It's possible to have an
24   amphibole that is truly an asbestos fiber.  And

Page 111

1    because of the cleavage in amphiboles, you can
2    take that original asbestos fiber and break it up
3    into a cleavage fragment.  And, so, therein is
4    the problem.
5            You can certainly have cleavage
6    fragments that were derived from a large single
7    crystal that are prismatic, they look like
8    needles, and they're not related to an asbestos
9    particle.  But you can have something that looks
10   exactly the same that is.  And, so, that's a --
11   it's a very tough call.
12   MR. FROST:
13   Q        Are there any properties that you would
14   use to identify the difference between a cleavage
15   fragment and an asbestiform fiber?
16   A        With respect to chrysotile, yes, of
17   course.  With respect to amphiboles, your value
18   there is to look at lots and lots of material.
19   And if -- if the material is -- is asbestiform,
20   you're ultimately gonna see the pieces that are,
21   and then you begin to get the -- the concept that
22   these cleavage fragments, which are always gonna
23   be smaller, are derived from a fiber.  I mean, I
24   think that you really are --

Page 112

1            Well...
2    Q        So how would you go about determining
3    whether a population of particles are cleavage
4    fragments versus asbestiform fibers?
5    MS. O'DELL:
6            Object to the form.
7    A        I -- I would hit it with the polarizing
8    microscope first so -- because that allows you to
9    look at a lot of -- a lot of grains.
10           You know, one of the problems with this
11   is that as you -- as you look at finer and finer
12   grain material, your ability to look at large
13   numbers of grains diminishes.  I like to pop a
14   sample, ground it up not too fine but grind it
15   up, put it in an immersion oil and put it under a
16   petrographic microscope and see what I see.
17           I would also like to have a thin
18   section of that same sample, because sometimes in
19   a thin section you can see that there is no
20   asbestiform thing there at all, and yet you may
21   end up with a suspect sample.  On the other hand,
22   just the opposite can happen.
23           So I think that the idea is that you've
24   got to start large and -- and work down if

Page 113

1    it's -- if it's required.
2    MR. FROST:
3    Q        Okay.  Is a good way to summarize that
4    that you have to look at the population of
5    particles as a whole?  You can't just necessarily
6    focus in on one or two individual particles to
7    make a call?
8    MS. O'DELL:
9            Objection, to the degree "particles" is
10   vague.
11   A        Yeah.  I -- I'm not saying that.  I'm
12   not saying that if you -- if you look at a small
13   population, see a chrysotile particle, that you
14   need to then go back and look at a 5-ton rock
15   sample just to make sure it was chrysotile.  You
16   don't have to do that.  But if you're worried
17   about the presence or absence, period, then you
18   need to look at a lot of samples.
19   MR. FROST:
20   Q        Okay.  You can't just look at one, you
21   know --
22           Are you familiar with the term
23   "elongated mineral particle"?
24   A        Sure.

29 (Pages 110 to 113)

Robert Cook, Ph.D.

Page 114

```
 1   Q      So you can't just look at one EMP and
 2   make a determination as to whether or not that's
 3   asbestos?
 4   MS. O'DELL:
 5          Object to the form.
 6   A      One particle?  You might be able to.
 7   Depends on the particle.
 8   MR. FROST:
 9   Q      And what types of things would you have
10   to look for in that particular particle?
11   A      Well, are we talking about amphibole or
12   chrysotile?
13   Q      I was going to say, I understand
14   amphibole is different because amphibole has a
15   lot of its own characteristics.
16   A      All right.
17   Q      Let me rephrase my question.  We'll --
18   let's focus on the amphiboles, because I think
19   that's a little more difficult.
20   A      Yeah.  It is.  Yeah, the amphiboles are
21   tough.
22          And your question had to do with an
23   elongated particle, is it asbestiform or not?
24   Q      That's correct.
```

Page 115

```
 1   A      The -- I'm not sure that without seeing
 2   the sample from which the particle came that you
 3   can make a real good call there unless you -- you
 4   have an entire particle.  Now, some of these
 5   particles will not be broken at the ends and you
 6   can actually see the termination of the grain.
 7          If it is non-asbestiform, the
 8   termination will normally be a single oblique
 9   plane to the direction of elongation.
10          If it's -- if it's an asbestiform
11   fragment, sometimes these fragments taper to a
12   point.  And that's pretty much of a giveaway that
13   you're looking at a single crystallized fiber.
14          Another thing you might do is see
15   whether your population has bent fibers in it.
16   Okay?  Many times that's a dead giveaway.
17   Q      That has to go with -- I think you --
18   flexibility or tensile strength are some of the
19   aspects you had listed earlier?
20   A      Right.
21          And with amphiboles, you have to be
22   careful because there is a cleavage plane
23   direction that is perpendicular to the
24   elongation.  So if you try to bend an amphibole,
```

Page 116

```
 1   it would have a tendency to break.  But, still,
 2   it's not hard to find amphibole grains that are
 3   bent.  And when they are, then, you know, then
 4   you're beginning to satisfy the definition.
 5   Q      If I were to show you pictures of, you
 6   know, sort of isolated particles under TEM, is
 7   that the kind of thing that you could look at and
 8   go, yeah, that's cleavage fragment; yeah, that's
 9   asbestos?
10   A      Sometimes.
11   Q      Sometimes?
12   A      Sure.  Sometimes, yes; sometimes, no.
13   Q      Is that something that you routinely do
14   in your job?
15   A      No.
16   Q      No.
17          Okay.  Is it something that you have
18   any experience with doing?
19   MS. O'DELL:
20          Are you talking about TEM?
21   MR. FROST:
22   Q      TEM or SEM images.
23   A      I mean, I've looked at some.  But
24   that's not -- that's not part and parcel of what
```

Page 117

```
 1   I normally do.
 2   Q      Okay.  You're not an expert in
 3   reviewing TEM or SEM images?
 4   A      I wouldn't think I was.
 5   Q      Do you have any opinion as to whether
 6   or not surface chemistries of asbestiform or
 7   non- -- and non-asbestiform particles are
 8   different?
 9   A      Surface chemistry?
10   Q      Yes.
11   A      I'm not sure I understand how the
12   surface chemistry's gonna be greatly different
13   from the chemistry through the grain.
14   Q      Okay.  So that's -- that's not
15   something you have an opinion about, about
16   surface chemistry?
17   A      I think that -- I'm not sure -- I'm not
18   sure what you're really asking.
19          The -- if you're gonna do, like, EDAX,
20   how far into the grain do you think you're really
21   analyzing?  Is that what you're talking about
22   when you say "surface"?  Because you may not be
23   getting an analysis that's gonna be
24   representative of the grain as a whole on --
```

30 (Pages 114 to 117)

Robert Cook, Ph.D.

Page 118

1  on -- on a lot of these techniques. You're --
2  you're -- the penetrating power may not be that
3  great.
4         But I don't think that -- I don't think
5  that I would be greatly concerned about surface
6  chemistry versus chemistry five -- five or six
7  microns into a grain. I'm not sure there should
8  be any big difference unless you're -- there's a
9  coating of some sort that -- that maybe is,
10  you know, has been applied.
11        You know, you have to -- to coat some
12  of these samples, anyway, if you're -- if you're
13  doing SEM work.
14        So, I mean, you know, you get carbon.
15  In fact, I'm sure that you've looked at a lot of
16  these analyses. And if you look at the analyses,
17  you'll see that they'll have silica. They'll
18  mark it, and they'll mark it SI. And they'll
19  have magnesium, and they'll mark it MG. And then
20  about here, there'll be iron. And then just
21  beyond iron, there'll be a strong peak. And they
22  never identify it, and yet it's there. It's part
23  of their analysis. You know what it is? Copper.
24  That's the copper peak from the sample. So they

Page 119

1  just ignore that.
2         And, so -- so you have to -- you have
3  to really take a look at the technique that's
4  being used if you want to talk about surface
5  chemistry versus total chemistry.
6  Q      And do you have an opinion as to
7  whether or not -- I'll call it the cleavage
8  fragments versus asbestiform fibers have
9  different surface features and different surface
10  identifiable markers?
11  MS. O'DELL:
12        Object to form.
13  A      I think that -- that it's possible to
14  identify cleavage surfaces under some situations,
15  because they don't have to be perfectly planar.
16  You can have steps where -- where the cleavage
17  fragment is actually peeling away from the
18  adjacent fragment that results when the two
19  separate.
20        The problem with this is that that can
21  happen in a fiber. I mean, an amphibole fiber,
22  if you can come up with a hammer small enough and
23  hit it, it's gonna break into cleavage fragments.
24  So...

Page 120

1  MR. FROST:
2  Q      So you'd agree with me that if you're
3  looking at a small population of fibers or you're
4  looking at -- well, not fibers, but if you're
5  looking at a small population of particles or
6  looking at a single particle, a lot of times the
7  call as to whether or not it's cleavage or,
8  you know, prismatic versus asbestiform fiber
9  is -- is subjective unless you have a larger
10  population to review?
11  MS. O'DELL:
12        Excuse me. Object to the form.
13  A      It can be. I think that -- that it's
14  necessary to begin to go back and look at the
15  original definitions and begin to try to apply
16  them to that particular grain.
17  MR. FROST:
18  Q      Uh-huh.
19  A      And -- and sometimes it's possible.
20  Sometimes it may not be. And that's why it's
21  important to look at many, many, many, many, many
22  samples, many grains.
23  Q      Okay. And I take it you have no
24  opinion regarding the potential health risks

Page 121

1  associated with a cleavage fragment versus an
2  asbestiform --
3  A      No.
4  Q      -- mineral?
5  A      No.
6  Q      Turn to page -- still on 4 of your
7  report. It's the -- the remainder of that
8  sentence, "Talc deposits can contain asbestos,
9  asbestiform minerals, or minerals containing
10  elevated levels of heavy metals and arsenic,
11  making their ores potentially unsafe. The
12  distribution of asbestos and/or these undesirable
13  elements can be quite irregular within individual
14  talc deposits themselves or in the immediately
15  adjacent host rocks."
16        Did I read that right?
17  A      Sure.
18  Q      So you -- you'll agree with me that --
19        Should I -- is it right to call the ore
20  the economic mineral, you know, in a talc
21  deposit?
22  MS. O'DELL:
23        Object to the form.
24  A      Let -- let's call it the material that

31 (Pages 118 to 121)

Robert Cook, Ph.D.

Page 122

1  you intend to extract and mill.
2  MR. FROST:
3  Q     Okay.  You'd agree with me that the
4  shape, size, and distribution of that, you know,
5  area of mineral you intend to extract as ore can
6  be different and irregular?
7  A     Very.
8  Q     And they're different for every
9  deposit; right?
10  A     Very.  Yes, sure.
11  Q     It's not always gonna be the same
12  shape.  It's not always gonna be the same size.
13  A     That's why they have mining engineers.
14  Q     And you'd agree with me that each
15  mineral deposit is usually complex?
16  A     Yes.
17  MS. O'DELL:
18       Object to the form.
19  MR. FROST:
20  Q     You know, and they have complex and
21  different geological histories?
22  MS. O'DELL:
23       Do you mean that specific mineral
24  deposits?

Page 123

1  MR. FROST:
2  Q     Just in -- just in general.  Well,
3  we'll narrow it down to talc deposits.
4  MS. O'DELL:
5       With the world of talc or world of
6  minerals.
7  MR. FROST:
8       No.  I was going to say...
9  Q     We'll narrow it down to the world of
10  talc deposits.
11       You'd agree with me that, you know,
12  talc deposits can have complex and different
13  geological history?
14  MS. O'DELL:
15       Object to the form.
16  A     Sure.  If you're looking at talc on a
17  worldwide basis, of course.
18  MR. FROST:
19  Q     Yeah.  And, you know, you'll have
20  folding and faulting and you'll have different
21  geological circumstances that, you know, may
22  affect a localized area that wouldn't affect
23  somewhere else?
24  MS. O'DELL:

Page 124

1       Object to the form.
2  A     I mean, you could have things that you
3  mentioned that don't even exist in some areas.
4  MR. FROST:
5  Q     Exactly.
6  A     So, of course.
7  Q     Okay.  And would you also generally
8  agree with me that the -- the areas of talc that
9  are mined for use in cosmetic talcum powder,
10  you know, are much purer than, you know, sort of
11  the average deposit of talc you might find
12  somewhere in the world?
13  A     Are you --
14  MS. O'DELL:
15       Object to the form.
16  A     Are you restricting this to the -- to
17  the US?
18  MR. FROST:
19  Q     I don't have to.  I can ask it --
20       Is -- is your answer different if it's
21  US versus --
22  A     It is.
23  Q     -- somewhere else?
24  A     Yes.

Page 125

1  Q     Okay.  So restricted it to the US.  So
2  what's your opinion there?
3  A     Then with -- with respect to the US,
4  yeah, it's a higher quality talc.
5  Q     Okay.  And why is that different when
6  you then add in worldwide talc deposits?
7  A     I think that there are examples of
8  impure talcs being used in -- in powders that
9  have originated from deposits in other countries
10  that, you know, that never make it to the US.
11  But you see the product analyzed and, you know,
12  my -- oh, my God, it's 99 percent asbestos, and
13  it's on, you know, every newspaper in the world,
14  but it isn't talc that was mined here and it
15  isn't talc that was sold in the US.
16  Q     Okay.  I see.  And, then, actually,
17  now, I really appreciate the difference.
18       So with respect to the deposits that
19  were used by Johnson & Johnson, you know, say, to
20  source the talc for its talcum powder products,
21  you know, you'd agree those come from deposits
22  that tend to be higher in purity and, you know,
23  more monomineralic than, say, other deposits that
24  exist?

32 (Pages 122 to 125)

Robert Cook, Ph.D.

Page 126

1  MS. O'DELL:
2       Object to the form.
3  A    Yeah.  You can't -- you can't say that,
4  simply because the Vermont talc deposits are not
5  monomineralic.  They actually mine ore that's
6  talc plus carbonate.
7  MR. FROST:
8  Q    Okay.
9  A    They do it on purpose.
10      So that's not monomineralic.
11 Q    I see.
12      So I guess a better way to ask it,
13 you know, the -- the talcum powder -- the
14 deposits that were used to source the talcum
15 powder for Johnson & Johnson, they tended to be
16 higher percentages of talc and sort of more pure
17 talc deposits than other talc deposits that exist
18 throughout the United States, for example?
19 MS. O'DELL:
20      Object to the form.
21 A    No, that's not right.
22 MR. FROST:
23 Q    Okay.  So you don't believe that,
24 you know, companies try to find talc deposits

Page 127

1  with a higher concentration of talc to use for
2  cosmetic talcum powder?
3  MS. O'DELL:
4       Object to the form.
5  A    Not necessarily.  I think that -- that
6  with respect to the Vermont talc deposits,
7  probably the best talc in them is the talc that
8  is associated with magnesite.  And, so --
9       And, in fact, that's why the West
10 Windsor mill was so important.  It -- that mill
11 was built to handle talc magnesite ore.  Because
12 once you get the magnesite out, then you have a
13 relatively nice talc product.  But it doesn't
14 start out being pure talc.
15 MR. FROST:
16 Q    Okay.  Would you also agree with me
17 that when you're looking at sort of talc deposits
18 in general, just because you find some --
19      Are you familiar with the term
20 "accessory minerals"?
21 A    Sure.
22 Q    Okay.  Just because you find some
23 accessory minerals in one deposit doesn't mean
24 you're gonna find the same compilation of

Page 128

1  accessory minerals in every deposit.  Is that a
2  fair statement?
3  MS. O'DELL:
4       Are you talking about the same
5  geographic area or different geographic area for
6  the deposit?
7  MR. FROST:
8  Q    Just in -- in general, you know, for
9  talc deposits.  You know, we can limit it, let's
10 say, for example, in the United States, along the
11 ultramafic belt.
12 MS. O'DELL:
13      Object to the form.
14 A    In the ultramafic belt, you can expect
15 to find certain minerals just by virtue of -- of
16 how the ultramafic bodies themselves got to where
17 they are, how they were altered, what -- what
18 metamorphic grade they occur at.
19      And, interestingly enough, the
20 chemistry of the rocks that surround them
21 apparently have a little bit to do with what --
22 what you're gonna see.
23 MR. FROST:
24 Q    Okay.  You'd agree with me, just

Page 129

1  because you find actinolite in one deposit
2  doesn't mean actinolite is gonna be in every
3  single talc deposit along the belt; correct?
4  A    My guess is that, if you want to use
5  actinolite as an example, you can pick a talc
6  deposit at random, we can go and spend enough
7  time to find an actinolite grain.
8  Q    Okay.
9  A    I mean, actinolite is so common.  I
10 mean, it's -- it's everywhere.
11 Q    All right.  How about tremolite or
12 anthophyllite?
13 A    Well, tremolite -- here's -- here's the
14 thing with tremolite.  Tremolite has calcium in
15 it, and talc doesn't.  And, so, if -- if there's
16 calcium in the -- the original rock that's being
17 altered, the calcium has got to have somewhere to
18 go.  And tremolite is a very easy place to -- to
19 store calcium.  And, so, it's not -- it's not
20 unexpected to see tremolite.
21      You certainly see tremolite in the talc
22 deposits that are formed from carbonate rocks
23 because a lot of those carbonates are dolomites
24 plus calcium carbonate-rich limestone.  So

33 (Pages 126 to 129)

Robert Cook, Ph.D.

Page 130

1   they're -- they're interbedded.
2        And, so, you -- you do tend to see
3   tremolite in those.  But you've got to
4   accommodate calcium somehow, and that's -- that's
5   a common way.
6   Q    Okay.  But, so you'd agree with me,
7   then, that not every deposit of talc is gonna
8   have tremolite in it, because they're not all
9   gonna be comprised of the same underlying
10  original materials before metamorphosis; right?
11  MS. O'DELL:
12       Object to the form.
13  A    I'm -- I'm not gonna say that they all
14  don't --
15       Talc deposits can be -- you know,
16  they're pretty large.  And if you found a
17  little -- you know, these are little, rootless
18  ultramafic bodies.  Some of them are no bigger
19  than this (indicating).  And you might find a
20  little teeny one like that, and there won't be a
21  tremolite grain within 50 feet of it.
22       But in terms of an economic talc
23  deposit, I would be shocked if you couldn't go
24  and station somebody at the mine the day it

Page 131

1   opened and -- and have them do nothing but search
2   for tremolite every day, and sometime during the
3   operation of that mine they're gonna come in with
4   a piece of tremolite.  I'd be surprised if
5   that -- if that wouldn't happen.
6   MR. FROST:
7   Q    So it's your position, sitting here as
8   a scientist, that every single talc deposit in,
9   say, the ultramafic belt will have the exact same
10  compilation of accessory minerals associated --
11  A    No.
12  Q    -- with it?
13  A    No.  I'm not saying that.
14  MS. O'DELL:
15       Excuse me.  Object to the form.
16  Misstates his testimony.
17  MR. FROST:
18  Q    Okay.  So you agree with me that each
19  particular deposit will have its own particular
20  set of potential accessory minerals; right?
21  MS. O'DELL:
22       Object to the form.
23  A    If we're gonna be very broad in our
24  definition of "accessory minerals."  For

Page 132

1   instance, I think the Johnson mine has had
2   cobaltite reported from it, and -- and we don't
3   see any evidence of cobaltite at any of the other
4   talc deposits.
5       And, so, from that standpoint, sure,
6   there -- there can be a difference in the suite
7   of accessory minerals.
8       But if you're gonna talk about the
9   common rock-forming minerals, geez, you know,
10  those things show up all over the place.
11       I mean, if you look at the black wall,
12  you know, most of these deposits have got a -- a
13  rind around them; and the black wall, by
14  definition, has amphiboles in it.  And based on
15  the chemistry of these things, they're bound to
16  be actinolite.
17  MR. FROST:
18  Q    Okay.  You'd agree with me that,
19  depending at the pressures, temperature, and the
20  time in which they form, what you're gonna find
21  associated with each, you know, mineable talc
22  deposit's gonna be different?
23  MS. O'DELL:
24       Object to the form.  Asked and

Page 133

1   answered.
2   A    Yeah.  I -- I -- the way -- the way
3   that you stated that, I -- I don't think I would
4   exactly agree with you on that.
5   MR. FROST:
6   Q    You wouldn't agree with me that you
7   have to look at the individual formation of each
8   deposit to determine, you know, what is or is not
9   going to be in it?
10  A    When you say "the formation," you're
11  talking about the -- the genesis, not the rock
12  formation?
13  Q    Yes.  I'm talking about the genesis,
14  the actual, you know --
15  A    Yeah.
16  Q    -- time, heat, pressure of
17  metamorphism.
18  A    The conditions of formation certainly
19  control the mineralogy of any rock.
20  Q    Okay.  And the conditions of formation,
21  you know, can be extremely localized, correct,
22  depending on what the -- what the original rock
23  was?
24  MS. O'DELL:

34 (Pages 130 to 133)

Robert Cook, Ph.D.

| Page 134 | Page 136 |
|---|---|

Page 134

1            Object to the form.
2       A       It certainly can.  There seem to be
3    some -- some consistent threads that run through
4    these.  But if you've looked at any of the mine
5    maps, you've seen that some of these deposits are
6    certainly cut by faults, and -- and some of these
7    faults actually control the disposition of some
8    of these accessory minerals.
9    MR. FROST:
10      Q       Uh-huh.
11      A       So if it's not like faulting, then,
12   you know, then you might not see a certain
13   mineral.
14            Some of these also had lamprophyre
15   dikes in them.  And those dikes, they have their
16   own mineral assemblage.  But -- but since it's
17   almost impossible to mine some of the talc
18   without incorporating some of the lamprophyre,
19   then -- then you've got to look at the
20   lamprophyre.
21      Q       Okay.  You'd agree with me, you know,
22   depending on what the surrounding rock was of the
23   serpentinite, when it was formed, the temperature
24   and pressure at which it was formed, you know,

Page 136

1    unit.  The -- the most recent publications spell
2    it out pretty clearly that -- that that is a -- a
3    sequence of rocks that contain carbonates, and
4    those carbonates are deformed and they're -- they
5    have been originally metamorphosed at apparently
6    high grade, because they're garnets in the -- in
7    the adjacent schists.  And garnets are a mineral
8    that -- that actually signals the beginning of a
9    certain level of regional metamorphism.
10            When you hit garnet grade metamorphism,
11   you open up -- it's not really a Pandora's box,
12   but you have the opportunity for a lot of -- a
13   lot of more complicated mineralogy.
14            And -- and that was what I meant in
15   that statement.  If you -- if you go to the
16   literature and read about the accessory minerals
17   there in the Italian talc deposits, you'll see
18   some minerals mentioned that -- that you don't
19   see attributed to some of the stuff in Vermont,
20   for instance.
21      Q       Okay.  So that's what you're talking --
22   that's what you're talking about is because it's
23   hosted from a different type of -- of rock?
24      A       It's a different type -- it's a --

| Page 135 | Page 137 |
|---|---|

Page 135

1    whether or not it went through multiple stages of
2    metamorphosis, all of this would, you know,
3    change what might be in that particular localized
4    deposit?
5    MS. O'DELL:
6            Object to the form.
7       A       In terms of accessory minerals, it
8    might.
9    MR. FROST:
10      Q       Okay.  Okay.  Page 4, go to section 1,
11   "Chronology of Talc Sources."  In that first
12   paragraph, we're talking about the Italian mine
13   in -- in this; correct?  The Fontane mine?
14      A       Sure.
15      Q       Okay.  And down towards the bottom of
16   that paragraph you state, "Deposits from this
17   region are known to be mineralogically complex,
18   particularly with respect to their host
19   metamorphics"?
20      A       Right.
21      Q       Can you explain to me how the
22   particular deposit at the Fontane mine was
23   formed?
24      A       Yeah.  That -- that is a carbonate

Page 137

1    those are different type deposits.
2       Q       Okay.  And you'd agree with me that,
3    you know, the literature basically says that the
4    mineralogical composition was effectively stable
5    through its formation in the Fontane area or the
6    Val Chisone area?
7    MS. O'DELL:
8            Object to the form.
9    MR. FROST:
10      Q       And remained stable throughout
11   subsequent metamorphism?
12   MS. O'DELL:
13            Object to the form.
14      A       I think I know what you're asking.
15            Are you asking about the talc remaining
16   stable?
17   MR. FROST:
18      Q       That's correct.
19      A       That's probably right.
20      Q       Okay.  And, at the end of that
21   paragraph, you note, "The deposits were often
22   small and mined by underground methods."
23      A       Yes.
24      Q       What do you mean by "small"?

35 (Pages 134 to 137)

Robert Cook, Ph.D.

| Page 138 | Page 140 |
|---|---|
| 1 A The -- the -- some of the earlier | 1 Valley. |
| 2 descriptions of the -- the Val Chisone district's | 2 A Yes. |
| 3 deposits show them to be lens-like within the | 3 Q Not necessarily the Fontane deposit. |
| 4 host carbonate-bearing strata. And, so, if | 4 A Right. Right. |
| 5 you've -- if you've ever seen a -- a | 5 Q And have you ever read the work by |
| 6 cross-section of the Germanasca Valley, you've | 6 Sandrone and Zuchetti? |
| 7 got a valley, and there are mines on both sides | 7 A I don't recognize the names. It |
| 8 of it. | 8 doesn't mean I haven't read it. |
| 9 Q Uh-huh. | 9 Q Okay. And -- |
| 10 A And at the Fontane mine, you've got -- | 10 A Can I -- can I continue with my answer |
| 11 you've got openings on one side and the other, | 11 to that last question? |
| 12 and they are all accumulated into material that's | 12 Q Sure. |
| 13 called Fontane mine. And, yet, they're not | 13 A The reason I mentioned the small mines, |
| 14 really a mine that's connected, and yet they're | 14 there -- there is an issue with -- with -- with |
| 15 all in the same stratigraphic horizon. | 15 talc mining as well as gold mining. If you have |
| 16 If you were to go up or down the | 16 a mineral deposit that -- that has value on |
| 17 valley -- let's say up the valley -- you're | 17 paper, you have got to convert that mineral |
| 18 following the stratigraphy. Okay? The valley | 18 deposit into somebody giving you a check for the |
| 19 has actually cut through the band of rocks that | 19 ore or the finished product. |
| 20 contain the talc. And Fontane is in -- is, | 20 And, so, what happens if you're in the |
| 21 you know, in the sides of the valley. | 21 Germanasca Valley and you've got a very small, |
| 22 If you go up the valley, you're still | 22 very nice grade, very nice talc deposit? You've |
| 23 following that same bed of rock, and there are | 23 got to have some way to mill that. |
| 24 lens-like occurrences of talc that have been | 24 Well, suppose there's only one mill in |

| Page 139 | Page 141 |
|---|---|
| 1 mined. And, so, those would be much smaller | 1 the whole region? And, so, what do you do? You |
| 2 mines than the Fontane. The Fontane's a big | 2 take some samples, you go to the guy that owns |
| 3 mine. | 3 the mill and you say, "Um, I've got all this |
| 4 Q Okay. That's what I was gonna get at. | 4 really good talc I'd like to -- I've got to do |
| 5 That statement doesn't necessarily, you know -- | 5 something with it. Will you buy it?" And if |
| 6 you'd agree with me that the deposit at Fontane | 6 they like it, they say, "Sure," and it just goes |
| 7 mine is actually considered to be a fairly large | 7 right in with the product coming labeled Val |
| 8 talc deposit? | 8 Chisone. |
| 9 A It's big. Vertically, you're looking | 9 Q And -- |
| 10 at multiple levels that -- I can't remember | 10 A Because it's the only mill in the |
| 11 exactly, but you're looking at least -- at least | 11 region. This happens all over the world. People |
| 12 400 feet in terms of vertical extent in that | 12 have smaller deposits, and they feed mills that |
| 13 mine. And I take that to mean that there are | 13 are actually being run to process ore from the |
| 14 multiple ore horizons, which would be | 14 district's main mine. |
| 15 interesting. I don't think you're gonna find a | 15 Q And, sitting here, you have no evidence |
| 16 talc deposit that's 400 feet thick. I mean, I | 16 to show that that actually happened -- |
| 17 don't think that's happening. | 17 A No. |
| 18 So my interpretation of the | 18 Q -- with respect to the Fontane? |
| 19 cross-section I've seen is that there are | 19 A I'm just pointing out that that is a |
| 20 multiple horizons within the rock unit that | 20 very common characteristic -- |
| 21 contains the -- the talc. | 21 Q Okay. |
| 22 Q Okay. So the statement you have, you | 22 A -- of mining in general. |
| 23 know, that the deposits were often small, that's | 23 Q But, without speculating, you can't |
| 24 really more a generalization for the Val Chisone | 24 tell me that talc ore used for talcum powder |

36 (Pages 138 to 141)

Robert Cook, Ph.D.

| Page 142 | Page 144 |
|---|---|

Page 142

1  sourced by Johnson & Johnson came from anywhere
2  other than the Fontane mine; correct?
3  MS. O'DELL:
4       Object to the form.
5  A     I'm not sure that -- that all the
6  documents actually say that. I think that some
7  of them are careful or, let's just say -- I think
8  some of them don't actually name the Fontane mine
9  by name. They -- they just talk about the
10 district or the -- the -- the valley, the Chisone
11 Valley. And I think that it's --
12      This is sort of an interesting thing,
13 because it may be that -- that the ore that's
14 processed from the smaller occurrences might be
15 very, very, very high grade or it wouldn't have
16 been accepted at the mill.
17 MR. FROST:
18 Q     But you have no evidence to show --
19 A     No.
20 Q     -- one way or the other?
21 A     No, other -- other than they talk about
22 small mines. And you don't -- you don't have a
23 small mine if there's nowhere to process the ore.
24 Q     Who -- who talks about small mines?

Page 143

1  A     Well, it's in the literature.
2  Q     The literature?
3  A     Yeah.
4  Q     The literature talks about small mines?
5  A     Sure.
6  Q     But not any of the documents from
7  Johnson & Johnson or Imerys; correct?
8  A     I think they may be mentioned in one of
9  the published papers. But that's characteristic
10 of -- of any district. You're gonna have large
11 mines and small mines. I mean, I can't think of
12 anywhere where you've just got one huge mine and
13 there never was anything else around it.
14 Q     Okay. You'd agree with me the Fontane
15 mine has been mined, I think, for at least a
16 hundred years?
17 A     Yes.
18 Q     And it might even be longer?
19 A     Yes.
20 Q     And that's -- you know, any time that
21 evidence actually points to where the
22 Italian-sourced talc came from, it specifically
23 talks about the company that operates the Fontane
24 mine and the Fontane mine; correct?

Page 144

1  A     I think that --
2  MS. O'DELL:
3       Object to the form.
4  A     Right. I think today it's a family or
5  it was a family-operated enterprise.
6  MR. FROST:
7  Q     Uh-huh.
8  A     And, so, they own the Fontane mine and,
9  so, what they sell is gonna be attributed to the
10 Fontane mine.
11 Q     Okay. Turn to page 5. The first full
12 sentence on the page starts, "The first
13 comprehensive overview of Vermont's talc deposits
14 were given by Chidester, Billings, and Cady in
15 1951" --
16 A     Right.
17 Q     -- "and a review of the ultramafic
18 province of Vermont including its
19 serpentinite-associated talc and asbestos
20 deposits was published in Ratté in 1982."
21      Did I read that right?
22 A     I think you did. I'm not sure I worded
23 it right, but --
24 Q     And then it continues, "The

Page 145

1  consanguinity of talc and asbestos in such
2  deposits is further supported by the numerous
3  descriptions of both talc and asbestos in
4  deposits such as Bain (1934; 1942). The intimate
5  association of amphiboles, including those of
6  asbestiform habit with talc deposits derived from
7  serpentinites and related rocks, is discussed by
8  Van Gosen (2004)."
9       Correct?
10 A     Right.
11 Q     All right. So the way the last
12 sentence reads, you're not saying that every talc
13 rock is guaranteed to have asbestos and
14 amphiboles associated in it; correct?
15 A     No, I'm not saying that.
16 Q     Okay. All right.
17      I'm gonna mark --
18      What exhibit are we on?
19 THE COURT REPORTER:
20      Eight.
21      (DEPOSITION EXHIBIT NUMBER 8
22      WAS MARKED FOR IDENTIFICATION.)
23 MR. FROST:
24 Q     Mark this as Exhibit 8. And I'll --

37 (Pages 142 to 145)

Robert Cook, Ph.D.

| Page 146 | Page 148 |
|---|---|
| 1 specifically turning your attention to page 33.<br>2 I believe it's 33, 34.<br>3 A      My page numbers are --<br>4 MS. O'DELL:<br>5          Front and back, I believe.<br>6 A      Yeah. I've got one with -- with one<br>7 page number on it.<br>8          Okay. I've got 33. Have you<br>9 highlighted it in yellow?<br>10 MR. FROST:<br>11 Q      The copy I had was highlighted.<br>12 A      Okay.<br>13 Q      I didn't highlight it, but --<br>14 A      Okay.<br>15 Q      -- it's the only copy I had.<br>16          Is yours not highlighted?<br>17 MS. O'DELL:<br>18          No.<br>19 MR. FROST:<br>20          On page 33?<br>21 MS. O'DELL:<br>22          No.<br>23 MR. FROST:<br>24          Huh. All right. Do you want to | 1 A      Back to back.<br>2 Q      And if you look down at the section<br>3 called "Talc in Soapstones," you'll note on the<br>4 second paragraph --<br>5 A      Right. Right.<br>6 Q      -- it says, "The talc-soapstone<br>7 mineralization coincide with the described above<br>8 for asbestos and is included within the<br>9 ultramafic process."<br>10          Correct?<br>11 A      Right.<br>12 Q      So he's referencing specifically with<br>13 the talc-soapstone mineralization that, you know,<br>14 it relates to the asbestos discussed above.<br>15 Right?<br>16 A      Right.<br>17 Q      If you turn to the top of page 34,<br>18 Ratté states that the talc mines of Windsor<br>19 Minerals, Inc., in Hammondsville and Ludlow, a<br>20 Vermont Talc Company mine in Andover, and the<br>21 Vermont Soapstone Company Mine in Chester are<br>22 included in the southern talc mining district."<br>23          Correct?<br>24 A      That's what he says, sure. |

| Page 147 | Page 149 |
|---|---|
| 1 mark -- maybe we'll mark that one, then. It<br>2 doesn't really -- unless you care. I don't -- I<br>3 don't care.<br>4 MS. O'DELL:<br>5          If it's -- that's fine if you -- if<br>6 you've marked that one.<br>7 MR. FROST:<br>8          Yeah. I was going to say, I mean, it<br>9 actually speeds things up --<br>10 MS. O'DELL:<br>11          My hope --<br>12 MR. FROST:<br>13          -- if I point him in the right place.<br>14 MS. O'DELL:<br>15          Yeah. That's fine.<br>16 MR. FROST:<br>17 Q      Okay. So you'll agree with me that the<br>18 top of the -- of the Ratté -- here on page 33,<br>19 you know, Ratté's talking about the asbestos<br>20 deposits, and that's what you mentioned in your<br>21 paper; correct?<br>22 A      Yeah. He does asbestos and talc in<br>23 this paper.<br>24 Q      Okay. | 1 Q      And he's distinguishing the<br>2 talc-soapstone mineralization that he coincides<br>3 with the asbestos from the southern -- what does<br>4 he call it? -- talc mining district. Correct?<br>5 MS. O'DELL:<br>6          Object to the form.<br>7 A      I'm not sure that that's what he's<br>8 saying. But I'll accept that.<br>9 MR. FROST:<br>10 Q      Yeah. Okay.<br>11 A      But -- but, before we go on, I'd like<br>12 to point out what he says in the second full<br>13 paragraph on that page.<br>14 Q      Okay. On which page?<br>15 A      34.<br>16 Q      34? Okay.<br>17 A      He warns about the -- the -- the<br>18 consequences of the occurrence of these minerals<br>19 together.<br>20 Q      Okay. These -- I don't understand<br>21 where he's warning. He says Vermont leads the<br>22 nation in talc production.<br>23 A      No.<br>24 Q      Products manufactured from Vermont are |

38 (Pages 146 to 149)

Robert Cook, Ph.D.

Page 150

1   popular --
2   A       No. It's the paragraph that starts
3   "because of the natural mineralogical
4   associations."
5   Q       Okay. So not the second paragraph?
6   A       Second full paragraph. At least,
7   that's what it is on mine.
8           No. I'm sorry. Third. Go ahead.
9   MS. O'DELL:
10          Why don't you read the section you're
11  referring to?
12  A       All right.
13          "Because of the natural mineralogical
14  associations of serpentine asbestos and talc,
15  similar environmental health concerns" --
16  Q       Uh-huh.
17  A       Et cetera, et cetera.
18          So he's pointing out the fact that
19  asbestos and talc occur in similar environments
20  and you'd better watch out.
21  Q       Okay. But you agree with me he's
22  specifically coinciding the deposits together,
23  when he's talking about the talc-soapstone
24  mineralization and the relationship to the

Page 151

1   asbestos mines, he specifically is excepting out
2   of that talc mines of southern Vermont; correct?
3   MS. O'DELL:
4           Object to the form.
5   A       I'm not -- I'm not sure that's what
6   he's doing.
7   MR. FROST:
8   Q       Well, that's certainly how the document
9   reads, isn't it?
10  MS. O'DELL:
11          Object to the form.
12  A       If you read it that way, okay. I read
13  that last paragraph as being inclusive of the
14  ultramafic belt because I think this whole
15  section is the Vermont ultramafic belt.
16  MR. FROST:
17  Q       But you agree with me he's breaking it
18  into two different districts, the southern talc
19  mining district --
20  A       Yeah. I think you can actually break
21  it into three. And the reason he does that is
22  that in northern Vermont, you have a district
23  that is dominated by asbestos mining and with --
24  with some talc mining, but not a -- not a great

Page 152

1   deal.
2           And probably the largest asbestos mine
3   that ever was in Vermont was on a mountain called
4   Belvidere Mountain. And there was an early talc
5   mine on Belvidere Mountain in the serpentinite.
6           But if you -- if you ask somebody about
7   Belvidere Mountain, they're gonna say, "Oh, yeah,
8   that's a great old big asbestos mine." And, yet,
9   there was talc there.
10          And I think Ratté, Ratté, I think, was
11  a pretty good state geologist, and I think he --
12  he was a visionary and was clearly concerned
13  about the occurrence of these two minerals
14  together. And that was why I point this out.
15  Q       Okay. But you agree with me, as he's
16  talking about --
17  A       There's definitely a central and a
18  southern district also.
19  Q       Okay. And these are different --
20  different districts in the talc --
21          I mean, is it fair to say as you're
22  moving south along the Appalachians --
23  A       They're geographically different.
24  MS. O'DELL:

Page 153

1           Excuse me.
2   MR. FROST:
3   Q       Yes. The geo- -- the -- the two or
4   three different talc and chrysotile deposits, you
5   know, change as you move south; correct?
6   MS. O'DELL:
7           Object to the form.
8   MR. FROST:
9   Q       They change and they're different?
10  MS. O'DELL:
11          Object to the form.
12  A       I'm not --
13  MS. O'DELL:
14          Would you mind --
15          Excuse me.
16          Could you -- would you repeat your
17  question?
18  MR. FROST:
19          Sure.
20  Q       And you'd agree with me, based on what
21  Ratté is saying here, you know, if there's a
22  difference between, you know, the northern
23  belt --
24          Actually, I specifically think he talks

39 (Pages 150 to 153)

Robert Cook, Ph.D.

Page 154

1  about the Belvidere, you know, Mountain --
2  A      Yeah.  Sure.
3  Q      -- versus the southern talc districts;
4  right?
5  A      He does.  But -- but he doesn't say
6  that the geology is different.
7  Q      Well, he defines them as separate
8  geological districts, doesn't he?
9  A      He does.  But, I mean, you can go to
10  the state of Nevada, and there's 150 different
11  gold districts, but they're the same in terms of
12  geology.  It's a geographic separation of the --
13  the -- the -- the areas that tend to have gold
14  mineralization.
15  Q      Okay.
16  A      But the mineralization is the same.
17  Same type.
18  Q      But you'd agree with me that Ratté is
19  very specifically stating that the talc mines of
20  southern Wind- -- of Windsor Minerals in the
21  southern mining district are different than what
22  he talks about with the soapstone mineralization
23  district and the asbestos mining district of the
24  Upper Missisquoi River Valley.

Page 155

1  A      Yeah.
2  MS. O'DELL:
3          Object to the form.
4  MR. FROST:
5  Q      Okay.
6  A      I would be willing to say that he's
7  making a distinction between the two.
8  Q      Okay.
9          (DEPOSITION EXHIBIT NUMBER 9
10          WAS MARKED FOR IDENTIFICATION.)
11  MR. FROST:
12  Q      I'll mark as Exhibit 9 --
13  A      He pronounces his name "rat-TAY."
14  Q      It's "rat-TAY"?
15  A      Yeah.
16  Q      He's French, I guess?
17  A      Yeah.
18  Q      Do you recognize this to be --
19          Do you have it yet?  Here it is.
20  A      No.
21  Q      Do you recognize Exhibit 9 to be the
22  Bain 1934?
23  A      Yeah.
24  Q      Okay.  Do you agree that this is a

Page 156

1  comment and not a peer-reviewed publication;
2  right?
3  MS. O'DELL:
4          Object to the form.
5  A      I can't say that.  It isn't a
6  peer-reviewed publication, but you can't say that
7  it wasn't peer-reviewed before they were willing
8  to publish it.  But it isn't a publication.  It's
9  a response.
10  MR. FROST:
11  Q      Yeah.  I was gonna say you'd agree with
12  me it's a specific comment or response to
13  something --
14  A      Yes.
15  Q      -- else that's done; right?
16          Now, will you also agree with me
17  that -- it's fairly short, but it never
18  specifically mentions any of the mines from
19  Vermont that were used to source talcum powder
20  for Johnson; right?
21  A      I don't think there's a specific mine
22  mentioned in there.
23  Q      Okay.
24          Mark this as Exhibit 10.

Page 157

1          (DEPOSITION EXHIBIT NUMBER 10
2          WAS MARKED FOR IDENTIFICATION.)
3  MR. FROST:
4  Q      And, again, do you recognize this to be
5  the Bain 1942?
6  A      Sure.
7  Q      And, again, you'd agree with me that
8  this paper does not address any of the mines
9  actual utilized by Johnson & Johnson to source
10  talc for its talcum powder; correct?
11  MS. O'DELL:
12          Object to the form.
13  A      I don't think it specifically names
14  any.  I think that the date of the article would
15  kind of preclude most of that.
16  MR. FROST:
17  Q      Turn to page 256.
18  A      Okay.
19  Q      Second column, the second paragraph
20  after the one above Belvidere Mountain Asbestos
21  district.  Do you see where I am?
22  MS. O'DELL:
23          So you're on the right-hand side?
24  MR. FROST:

Robert Cook, Ph.D.

Page 158

1          Yeah, right-hand side.
2    A     Right-hand side.
3    MR. FROST:
4    Q     It's the last paragraph before
5    Belvidere Mountain asbestos district. It's
6    the -- if you're going up --
7    A     Oh, I see it.
8    Q     -- it's the second paragraph up.
9    A     Okay. Right.
10   Q     The second sentence reads, "Every
11   ultrabasic intrusive has a talc deposit, and
12   about one-third have some fibrous magnesia
13   mineral."
14   A     Okay.
15   Q     It continues down below, "The
16   occurrences illustrate progressively increased
17   intensity of change from talc to asbestos in
18   proportionate amounts of Belvidere Mountain" --
19         That's what we just talked about.
20         -- "to completely" --
21         How do you pronounce that word?
22   MS. O'DELL:
23         Did you skip a sentence?
24   MR. FROST:

Page 159

1          I did. I skipped one. Because I -- we
2    can -- I can read it if you want, but --
3    MS. O'DELL:
4          I just wanted to make sure we --
5    MR. FROST:
6          No, no. We're reading it right.
7    MS. O'DELL:
8          -- we're all staying together.
9    MR. FROST:
10         Yeah.
11   A     I'm not sure which one you're talking
12   about.
13   MR. FROST:
14   Q     Straight as a S-T-E-A-T-I-T-I-Z-E-D.
15   A     I can't see it. It's so fine.
16   Q     I looked it up. I know it means talc,
17   but I think it's just an older word.
18   A     Yeah.
19   Q     "State-a-zide." Stat- -- statizied
20   [sic] bodies?
21   A     Oh. You're talking about steatitized.
22   Q     Steatitized. There you go. Okay.
23   A     Yeah. That's just the conversion of
24   something to talc.

Page 160

1    Q     Yeah.
2          Okay. So steatitized bodies at Chester
3    in Windham; correct?
4    A     Correct.
5    Q     So, effectively, what Bain is saying
6    here is that -- you know, he's not saying you
7    find fibrous magnesium minerals in every talc
8    deposit in Vermont; right?
9    A     That's right.
10   Q     And --
11   A     I'm not sure to what degree he's
12   talking about that. Is he -- if he's talking --
13         See, this is an Economic Geology
14   publication.
15   Q     Okay.
16   A     It's on, you know, structural
17   relationship of ore bodies. And he may be
18   referring to economic asbestos since that's what
19   this whole publication is about. I don't see how
20   he could say that there is not a single grain of
21   asbestos in -- in a -- talc deposits once you
22   get 15 miles south of Belvidere Mountain, let's
23   say.
24   Q     Okay.

Page 161

1    A     That doesn't really make good sense.
2    Q     You agree with me that I read it
3    correctly.
4    A     You --
5    Q     What he's saying --
6    A     Yeah. Yeah. You read it --
7    Q     -- is that you'll get fibrous magnesium
8    in about one-third of the talc deposits; correct?
9    MS. O'DELL:
10         Object to the form.
11   MR. FROST:
12   Q     That's what Bain says.
13   A     Correct.
14   Q     And then he also talks about the
15   fact --
16   A     Let me -- let me back up.
17         If he just says fibrous magnes- --
18   magnesium?
19   Q     Yeah. Magnesian mineral.
20   A     Okay. How about those that aren't
21   magnesian only? Suppose -- they're calcium
22   magnesian or --
23   Q     Sir, we're just reading what Bain is
24   saying.

41 (Pages 158 to 161)

Robert Cook, Ph.D.

| Page 162 | Page 164 |
|---|---|
| 1  A     I know.  But that would -- what he's<br>2  saying specifically would be minerals that were<br>3  magnesian, period.<br>4  Q     Okay.<br>5  A     That would be chrysotile.  And that may<br>6  be -- that may be what he's saying.  He may be<br>7  referring to chrysotile and not the amphiboles.<br>8  Q     But, again, I'm reading what Bain is<br>9  saying correctly?<br>10  A     Correct.<br>11  Q     Okay.  And then he also talks about<br>12  that there's a difference in the occurrence of --<br>13  he specifically says talc and asbestos in<br>14  proportionate amounts of Belvidere Mountain,<br>15  which we know is the chrysotile mine, and then he<br>16  talks about two completely steritized [sic]<br>17  bodies" --<br>18  A     Right.<br>19  Q     I'm sure I pronounced that incorrectly.<br>20       -- "at Chester and Windham."<br>21       Correct?<br>22       So what he's saying is there's a<br>23  difference between the deposit at Belvidere and<br>24  the deposits found south, which are completely -- | 1       (DEPOSITION EXHIBIT NUMBER 11<br>2          WAS MARKED FOR IDENTIFICATION.)<br>3  MR. FROST:<br>4  Q     You recognize this article?<br>5  A     Yes.<br>6  Q     And, again, you'd agree with me that<br>7  Van Gosen never talks specifically about any of<br>8  the talc mines that have been utilized by<br>9  Johnson & Johnson for talcum powder; correct?<br>10  MS. O'DELL:<br>11       Object to the form.<br>12  A     I believe that he does not mention<br>13  specific mines.<br>14  MR. FROST:<br>15       Okay.  Mark this as Exhibit 12.<br>16       And leave the 2010 IARC.<br>17       To save space and so I could put it all<br>18  in one box, I didn't bring an extra copy.<br>19  MS. O'DELL:<br>20       Yeah, no problem.  Just give me a<br>21  minute to get mine.<br>22  MR. FROST:<br>23       Yes.<br>24  MS. O'DELL: |
| Page 163 | Page 165 |
| 1  and I think we had defined steatitized as the<br>2  conversion of talc.<br>3  A     Well, it was only Windham.<br>4  Q     Okay.  And the -- and Windham is the<br>5  area we're talking about; correct?<br>6  A     Right.<br>7  Q     Okay.<br>8  A     You know that if you go -- go back and<br>9  read the publications on Belvidere Mountain,<br>10  there were zones of pure talc six feet thick in<br>11  the asbestos mountain.  And had they -- had they<br>12  wanted to, they could have probably built a mill<br>13  that would have -- would have recovered the talc.<br>14  Q     Okay.  But nobody ever --<br>15       Johnson & Johnson never sourced any<br>16  talc from Belvidere; correct?<br>17  A     Correct.<br>18  MR. FROST:<br>19       And I'll mark the Van Gosen article.<br>20  What are we on now?  Ten?<br>21  THE COURT REPORTER:<br>22       Eleven.<br>23  MR. FROST:<br>24       Eleven. | 1       And that's Exhibit 12?<br>2  MR. FROST:<br>3       Yes.<br>4       (DEPOSITION EXHIBIT NUMBER 12<br>5          WAS MARKED FOR IDENTIFICATION.)<br>6  MR. FROST:<br>7  Q     I'll direct your attention to page 283,<br>8  sir.  I take it you recognize this as the IARC --<br>9  A     Right.<br>10  Q     -- 2010 document?<br>11  MS. O'DELL:<br>12       I'm sorry.  You have 2010 or 2012?<br>13  MR. FROST:<br>14       2010.<br>15  MS. O'DELL:<br>16       Excuse me.  Give me just one more<br>17  second.<br>18  A     And which page did you say?<br>19  MR. FROST:<br>20  Q     283.<br>21  A     283?  Okay.<br>22  MR. FROST:<br>23       You there, Leigh?<br>24  MS. O'DELL: |

42 (Pages 162 to 165)

Robert Cook, Ph.D.

Page 166

1        Yeah.
2    MR. FROST:
3            You got it?  All right.
4    Q      About halfway down, there's the -- the
5    sentence starts "Chlorite in amphiboles."
6    A      Yes.
7    Q      And it reads, "Chlorite in amphiboles
8    are usually associated with this type of talc
9    deposit, although they are commonly separated in
10   space from talc ore (Vermont).  The amphiboles
11   may or may not be asbestiform, depending on the
12   local geological history."
13           Did I read that right?
14   A      Correct.
15   Q      So what they're saying is you have to
16   look at the individual deposit; right?
17   A      Correct.
18   Q      All right.  So I guess the summary of
19   all of this is, you know, local geology is
20   important.  You can look at the belt, but you
21   actually have to look at local geology, too;
22   right?
23   A      Absolutely.
24   Q      Okay.  The next paragraph on page 5 of

Page 167

1    your report, the second paragraph of that
2    page --
3    A      We're done with IARC?
4    Q      Yeah, we're done for now.  I'd keep
5    that close.  I think that comes up --
6    A      Okay.
7    Q      -- a bunch of times, but...
8    A      Okay.  Which page did you say?  Nine?
9    Q      Page 5.
10   A      Oh, 5.
11           Okeydoke.
12   Q      In the second paragraph you note at the
13   bottom that, "Talc was sourced from the following
14   Vermont mines from 1965 to 2003," and the first
15   one you include is Johnson.
16   A      Right.
17   Q      Is that a mistake, sir, or do you have
18   any evidence to show that talc ever was sourced
19   by Johnson & Johnson for talcum powder from the
20   Johnson mine?
21   A      I think that there's a document that
22   shows that.
23   Q      Do you know what document that is?
24   A      I don't have the number in my head, but

Page 168

1    there is one that -- that shows that there was a
2    period when they did -- did use cosmetic grade
3    talc from the Johnson mine.
4    Q      You'd agree with me that the Johnson
5    mine was an industrial talc mine; correct?
6    MS. O'DELL:
7            Object to the form.
8            Repeat your question, please.
9    MR. FROST:
10   Q      You'd agree with me that the Johnson
11   mine was --
12   A      I think, primarily.
13   Q      Yeah.  And you'd agree with me that
14   the -- the talc ore from the Johnson mine was
15   actually sent to a different mill?
16   MS. O'DELL:
17           Object to the form.
18   A      I'm not sure that that's correct.
19   They -- they -- the Johnson mill had a flotation
20   circuit in it that might could have been used to
21   come up with some cosmetic grade rock or product.
22   MR. FROST:
23   Q      Okay.  You can't point me, sitting here
24   right now, to a single document --

Page 169

1    A      No.  I think --
2    Q      -- to base that opinion on?
3    A      I think that --
4    MS. O'DELL:
5            I'm sorry.
6    A      -- Ms. O'Dell may be looking for it.
7    But there is -- there is such a document.  I
8    found it.
9    MR. FROST:
10   Q      What document are you looking at?
11   A      (Produces document.)
12   Q      Which one are you referring to it as?
13   This one, the J&J Exhibit 4.
14   MS. O'DELL:
15           That's what I've -- I've seen it
16   referred to as is Exhibit 4.  I'm sure there are
17   other transcripts that have referred to it
18   various ways.
19   MR. FROST:
20           Okay.  We'll call it the J&J Exhibit --
21   Exhibit J&J-4 for now.
22   Q      Do you mind if I read this, sir?
23   A      No.  Please.
24           Down at the bottom of one of the pages,

43 (Pages 166 to 169)

Robert Cook, Ph.D.

| Page 170 | Page 172 |
|---|---|
| 1 there's actually the mention of the Johnson mine | 1 A    Right. |
| 2 and the fact that there was some cosmetic talc | 2 Q    -- or the numbers of talc that are |
| 3 production there. | 3 coming from the Johnson mine. |
| 4 Q    Okay.  I see what you're talking about | 4 A    Right. |
| 5 here, sir. | 5 Q    And it says Grade 500 and Grade 549. |
| 6 MS. O'DELL: | 6 A    Right. |
| 7     I think he may be talking about another | 7 Q    What evidence do you have to show that |
| 8 page, Jack.  Take a look at the whole thing. | 8 Grade 500 and Grade 549 were actually utilized by |
| 9 MR. FROST: | 9 Johnson & Johnson in its cosmetic talcum powder |
| 10     We'll mark this as whatever exhibit | 10 products at issue in this case? |
| 11 we're on.  Thirteen? | 11 MS. O'DELL: |
| 12     Just put it there.  I was gonna say, | 12     Object to the form. |
| 13 we'll -- we'll add another exhibit number to | 13 A    I'm not saying that. |
| 14 this -- this document when -- | 14 MR. FROST: |
| 15 MS. O'DELL: | 15 Q    Okay.  And, in fact, in most of the |
| 16     Might be worthwhile to put Cook 13 on | 16 documents, and you refer to it in your report as |
| 17 it or something like that. | 17 Grade 66, is the Vermont ore that was used by |
| 18 MR. FROST: | 18 Johnson & Johnson; correct? |
| 19     That's right.  Oh, it says "Cook." | 19 A    I think so. |
| 20 MS. O'DELL: | 20 Q    Further down on page 5 of your |
| 21     Oh, it does? | 21 report -- it's the end of the fourth paragraph -- |
| 22     (DEPOSITION EXHIBIT NUMBER 13 | 22 A    Okay. |
| 23     WAS MARKED FOR IDENTIFICATION.) | 23 Q    -- you state, "There's ample evidence |
| 24 MR. FROST: | 24 that the main and east Argonaut ore bodies are |

| Page 171 | Page 173 |
|---|---|
| 1 Q    Okay.  I hand you this document. | 1 segments of the same body" -- sorry - "same ore |
| 2 A    Okay.  Thank you, sir. | 2 body swarm, making them and talc derived from |
| 3 Q    And, so, you're relying on, it looks | 3 them essentially equivalent." |
| 4 like, the second page of it, if you want to open | 4 A    Right. |
| 5 the document. | 5 Q    What do you mean by -- what's the -- |
| 6 MS. O'DELL: | 6 what's the measure of equivalency you're using |
| 7     Why -- why don't you take a look, | 7 here? |
| 8 Doctor, and -- | 8 A    The Argonaut ore body is actually a |
| 9 MR. FROST: | 9 zone of talc that wraps around a -- a remaining |
| 10 Q    Yeah.  I was gonna say. | 10 core of serpentinite.  And, so, if you're mining |
| 11     Can you show me where -- what you're | 11 on one side of the serpentinite, you've got one |
| 12 relying on to say that talc from the Johnson mine | 12 pit, and you're mining the same rock on the other |
| 13 was utilized by Johnson & Johnson for its final | 13 side of the serpentinite.  And that's -- that's |
| 14 talcum powder products? | 14 all I was saying.  You have one big ore body |
| 15 A    It's at the bottom of page 3. | 15 there. |
| 16 Q    Let me see that, sir. | 16 Q    Okay.  Do you have any -- any |
| 17 A    But I think that there's actually more. | 17 geological surveys or any, you know, mine |
| 18 I think that there's another document that | 18 drilling data you can point me at to show that |
| 19 actually puts a limit, a time limit on when they | 19 the two bodies were, you know, identical, or |
| 20 were securing cosmetic talc there.  It's a short | 20 you're just saying they were part of the same |
| 21 period. | 21 generalized formation? |
| 22 Q    If I can turn your attention to the | 22 A    Well, you used the word "identical." |
| 23 second page of this document, it notes -- look | 23 And I -- you know, we try not to use -- |
| 24 right here -- it notes the grades of talc -- | 24 Q    I guess I should - |

44 (Pages 170 to 173)

Robert Cook, Ph.D.

| Page 174 | Page 176 |
|---|---|
| 1    A     -- that word in geology. | 1    sure -- |
| 2    Q     -- use -- use "equivalent"? | 2          Would you finish, Doctor, and then you |
| 3    A     Yeah. | 3    can go, Jack? I'm sorry. It just -- |
| 4    Q     So is the equivalency purely that they | 4    MR. FROST: |
| 5    form from the same, you know, the general -- the | 5          Yeah. |
| 6    same general formation deposit? | 6    MS. O'DELL: |
| 7    A     Right. I mean -- | 7          -- seems like he wasn't finished |
| 8    MS. O'DELL: | 8    trying -- |
| 9          Object to the form. | 9    MR. FROST: |
| 10    A     Yeah. Your own documents indicate | 10          Oh. I thought he finished. |
| 11    this. You know, there's the 2008 report on | 11    MS. O'DELL: |
| 12    Argonaut that goes through the geology. But | 12          -- to explain what he was saying. |
| 13    you've got -- you've got geologic data that goes | 13    A     Yeah. Well, yeah, to sum it up, I |
| 14    back, I guess, to 1973 or '4 related to Argonaut | 14    would say that Argonaut is -- is looking at one |
| 15    when it was even an underground mine. And it's | 15    large ore deposit that's being mined in two pits |
| 16    pretty clear that, as mining progressed there, | 16    that are separated, because part of the |
| 17    that there was one very large ore body there. | 17    serpentinite was not altered to talc. And, so, |
| 18    And -- but it has a piece of serpentinite left, | 18    it's in place and it kind of protrudes in, and |
| 19    as a -- as a lot of these things do. | 19    you've got the two big pits on either side of it. |
| 20          Because the ore-forming process works | 20    MR. FROST: |
| 21    in toward the -- toward the center of the | 21    Q     And you're not necessarily saying that |
| 22    serpentinite, hoping to eat it up entirely. | 22    the talc from one pit is, you know, exactly the |
| 23    You know, ideally, there wouldn't be any | 23    same as the other. They don't have the same -- |
| 24    serpentinite left. That doesn't happen often. | 24    they don't necessarily have the same percentage |

| Page 175 | Page 177 |
|---|---|
| 1    MR. FROST. | 1    of talc, the same percentage of other minerals, |
| 2    Q     Yeah. I -- I think we can both agree | 2    you know, chlorite, for example, things like |
| 3    that -- | 3    that; right? |
| 4    A     Sure. | 4    MS. O'DELL: |
| 5    Q     -- you tend to have a serpentinite | 5          Object to the form. |
| 6    core -- | 6    A     I think you can go to any of the mines |
| 7    A     Sure. | 7    and say that. |
| 8    Q     -- in a lot of these deposits. | 8    MR. FROST: |
| 9    A     And, so, that's what it looks like when | 9    Q     Yeah. |
| 10    you -- when you look at a map of the mine as it | 10    A     You can go to the north end, it will be |
| 11    progressed. As it was developed, they came in | 11    slightly different than the south end, or maybe |
| 12    and began to -- to mine in an open pit more or | 12    it won't be, but -- |
| 13    less where the old underground mine was. But | 13    Q     That's -- that's what I'm getting at |
| 14    then if you -- if you keep looking, this open pit | 14    is, you know, even within the mineral deposit, |
| 15    expands, and you've got a major working on one | 15    you can have changes of talc composition. |
| 16    side of the serpentinite and then one on the | 16    A     That is why it is so important to do |
| 17    other side. | 17    your drilling and to analyze your core, analyze |
| 18    Q     All right. So that's the essential | 18    your -- your blast hole drills -- |
| 19    equivalence is that it's -- | 19    Q     Okay. |
| 20    A     It's all one big deposit. | 20    A     -- and drill cuttings. |
| 21    Q     -- one geological deposit? | 21    Q     I agree. |
| 22          You're not necessarily -- | 22    A     I mean, you really need to be doing |
| 23    MS. O'DELL: | 23    that. |
| 24          Excuse me. Sorry, y'all. Just make | 24    Q     All right. Next sentence on page 5, |

45 (Pages 174 to 177)

Robert Cook, Ph.D.

Page 178

1    you talk about "The Johnson mine as well as the
2    Hammondsville, Hamm, Rainbow, and Argonaut mines
3    exploited talc deposits that are closely
4    associated with serpentinite bodies. Asbestos
5    minerals, including chrysotile, actinolite,
6    tremolite and anthophyllite, occur in
7    talc-bearing serpentinites."
8          And you're saying that, as a
9    generalization, that, you know, serpentinite
10   obviously is a serpentine mineral, but --
11         So you're not saying -- you're not
12   saying that every deposit that has converted from
13   serpentinite will always have each one of these
14   particular minerals in it; correct?
15   A    No, I'm not saying that.
16   Q    And I think we just talked about you
17   have to look at the local geology; right?
18   A    That's correct.
19   Q    Turning to page 6, under "Mining and
20   Talc Composition" --
21   A    Okay.
22   Q    -- third paragraph down starts, "On a
23   daily basis."
24   A    Okay.

Page 179

1    Q    Okay. "On a daily basis, the boundary
2    between ore and waste is often determined
3    visually by mining equipment operator based on
4    his experience with that particular ore type. It
5    is a common practice for some mines for the
6    geologists to spray paint lines or otherwise mark
7    the boundaries between ore and non-ore. Although
8    the miner" -- I'm sorry -- "although, to the
9    miner, the rock may look the same on either side
10   of that line, these marks guide him through his
11   shift."
12         Did I read that right?
13   A    Yes.
14   Q    And you'll agree with me there was
15   actually more done than just, you know,
16   visualization of the talc? You had just talked
17   before about drilling and --
18   A    Well, I was really referring to the guy
19   that's actually doing the mining. The -- the
20   mining is done with a loader and a truck. And
21   somehow the guy running the loader has got to
22   know whether this load goes to the mill or goes
23   to the -- the waste dump.
24   Q    Yep.

Page 180

1    A    And, so, the -- the loader operator has
2    got to make some -- some very important decisions
3    as -- as he's mining. And -- and in many mines
4    it's up to the geologist or the mine
5    superintendent to make sure the loader operator
6    knows where the ore is. And oftentimes they use
7    spray paint, because the geologist may be -- may
8    be pretty good about knowing where you've got
9    chlorite-rich rock, or maybe he's seen some
10   asbestos. And, so, he'll spray-paint a line and
11   tell the operator, "Do not cross that line."
12   Q    And, then, that's what I was gonna say.
13   It's not the miner himself who's determining --
14   it's not the guy who's the load operator who is
15   saying where to go. There's actually a geologist
16   or a mine planner or a supervisor?
17   A    I said there should be.
18   Q    Okay.
19   A    I didn't say there was. We can always
20   hope that there is.
21   Q    So --
22   A    But, in reality, it isn't always the
23   case.
24   Q    But, in general mine theory, there

Page 181

1    should be a geologist, a supervisor, or somebody
2    who comes up with the daily shift plan or the
3    short-term mine plan; correct?
4    A    The -- yes, there should be someone
5    that alerts the person doing the mining to what
6    he should be mining and what he should be -- be
7    telling the train operator or whatever, take this
8    load to the dump.
9    Q    Yeah. And that geologist would be
10   looking at drill core samples, blast core
11   samples, I'm sure geological models, things like
12   this to determine, you know, where they'll be
13   mining in that particular shift or where the ore
14   will be? Is that -- that fair?
15   MS. O'DELL:
16         Object to the form.
17   A    He -- he had better be using all the
18   data that's available to him for that part of the
19   mine.
20   MR. FROST:
21   Q    Okay.
22   A    And it can be all or part of what you
23   mentioned.
24   Q    Yeah. And one of the ways that's --

46 (Pages 178 to 181)

Robert Cook, Ph.D.

Page 182

1  you know, I think nowadays, I believe they use
2  GPSs and things like that, and the buckets tell
3  them exactly where to go; right?
4  MS. O'DELL:
5       Object to the form.
6  A     There are places in the world where you
7  can do that. I'm not sure that that's -- that
8  that would be easy to do in a talc open-pit
9  operation.
10 MR. FROST:
11 Q     But, you know, that's just one of the
12 ways, you know. Another visual cue is an
13 engineer is, you know, painting lines so that the
14 operator knows generally which direction to go
15 and where to stop loading ore talc; correct?
16 A     Correct. And -- and color is -- is
17 used pretty much everywhere for talc. If you --
18      I mean, obviously, you -- you need high
19 whiteness, high brightness. And talc, once you
20 begin to get chlorite in it or accessory
21 dolomite, you can begin to make your talc gray,
22 and -- and suddenly you're -- you've got a
23 product that, no matter what you do to it in the
24 mill, you're not gonna get your color right.

Page 183

1  Q     Uh-huh.
2  A     And, so, it may be simply a matter of
3  color. And if that's all it is, then a loader
4  operator may -- may very well be able to handle
5  it.
6  Q     Okay.
7  A     But if it's something else
8  mineralogically, he may be completely clueless
9  and need someone, likely a geologist or the mine
10 superintendent, to tell him what to do.
11 Q     Okay. You'd agree with me it's,
12 you know, it's more than just the guy who's doing
13 the -- the loader. There's a whole process in
14 place, typically, at mines to figure out how to
15 follow the ore body and what to mine and what to
16 waste; correct?
17 A     There's -- there's --
18 MS. O'DELL:
19      Object to the form.
20 A     Yes.
21 MR. FROST:
22 Q     Okay.
23 A     There is supposed to be.
24 Q     At the bottom of that page, on page 6,

Page 184

1  you write, "In short, it is almost impossible to
2  operate a mine in commodities that occur in
3  relatively small, irregular deposits such as
4  high-quality talc without periodically
5  incorporating host rock, low-grade ore, and/or
6  otherwise undesirable ore into the material being
7  removed from the mine and processed."
8       Okay. So my question there is: On
9  what basis are we defining the possibility? Are
10 you talking about on an hourly basis, a shift, a
11 day, a month, over the life of the mine?
12 A     Well, you know, I'm tempted to say "All
13 of the above," but that's not really -- that was
14 not really the way I was saying that.
15      That's a statement that says that when
16 you've got an irregular ore body of variable
17 composition, it's not possible to mine one grade
18 of rock exclusively, day in and day out, without
19 having bits and pieces of adjacent wall rock.
20      I mean, in the underground mine, every
21 time they shoot, you've got to go in with a steel
22 bar and tap the roof and listen for loose rocks
23 or you're -- you're fixing to die.
24      And if you're mining over near the edge

Page 185

1  of the ore body, that loose rock on the ceiling
2  could be black wall. And -- and you've got to
3  scale it down. That rock is coming down into
4  your ore. And the miner doesn't -- he's not
5  gonna get it out.
6       And, so, the point is that -- that
7  in -- the reality of mining is such that you --
8  you don't go out with tweezers and pick the best
9  stuff out. You know, mining is a -- is a -- a
10 process where you -- you come out of a hole with
11 hundreds of tons of rock a day. And -- and to
12 think that -- that every pound that makes up that
13 hundreds of tons is gonna be the purest, best,
14 high-grade talc or whatever ore that there is
15 is -- it just doesn't work like that.
16 Q     Okay. And, in fact --
17      Sorry.
18 A     Well, and I was -- I was gonna add that
19 most mines have very specific quality control
20 programs that -- that try to make sure that they
21 are getting the best they can get. But I don't
22 know of -- of any mine I've ever been associated
23 with that didn't have occasional issues with --
24 with wall rock or -- or a big included xenolith

47 (Pages 182 to 185)

Robert Cook, Ph.D.

| Page 186 | Page 188 |
|---|---|
| 1 that they were unaware of getting blasted in with<br>2 their product.<br>3     And in an open pit it's even worse<br>4 because, you know, you can try as much as you can<br>5 to -- to stay in ore, but if you've got an<br>6 irregular surface that marks the boundary between<br>7 talc and schists, let's say, your -- your drill<br>8 cuttings may not tell you that unless you really<br>9 have somebody looking at drill cuttings for your<br>10 blast holes every single day.<br>11     Now, in the quarries that I work on, we<br>12 blast about sometimes once a week, sometimes once<br>13 every two weeks. We blast 40- or 50,000 tons at<br>14 a shot, which would be much larger than at the<br>15 talc mine.<br>16     But -- but when we blast, we always<br>17 find material that we weren't anticipating, and<br>18 we've got to get rid of it.<br>19 Q   Sure. And --<br>20 MS. O'DELL:<br>21     Jack, do you mind if we go off the<br>22 record just for a second?<br>23 MR. FROST:<br>24     Sure. | 1 MS. O'DELL:<br>2     Object to the form.<br>3 A   It depends on how your mill is set up.<br>4 There are mills that might not -- might not<br>5 handle the chlorite-rich cinders. Because when<br>6 you -- when you crush and grind chlorite, it will<br>7 tend to report with talc in a -- in a flotation<br>8 plant.<br>9 Q   But, again, my question was more<br>10 general than that.<br>11 A   Okay.<br>12 Q   It's when done properly, the point of<br>13 sorting and beneficiation is to remove these<br>14 excess rocks and things that end up in the ores;<br>15 correct?<br>16 MS. O'DELL:<br>17     Object to the form.<br>18 MR. FROST:<br>19 Q   That's -- that's why you do sorting and<br>20 beneficiation?<br>21 MS. O'DELL:<br>22     Object to the form.<br>23 A   The sorting, yes. And beneficiation in<br>24 general, you're -- you're correct. I wouldn't |

| Page 187 | Page 189 |
|---|---|
| 1 MS. O'DELL:<br>2     And if you need to ask a couple -- I<br>3 don't mean to --<br>4 MR. FROST:<br>5     Yeah, I was going to say, do you mind<br>6 if I ask two questions?<br>7 MS. O'DELL:<br>8     Sure.<br>9 MR. FROST:<br>10     Then we can go off.<br>11 Q   And, you know, in mining, that's sort<br>12 of expected, and that's why you have, on the back<br>13 end, you have sorting, beneficiation processes,<br>14 things like that; correct?<br>15 MS. O'DELL:<br>16     Object to the form.<br>17 A   Correct.<br>18 MR. FROST:<br>19 Q   And you'd also agree with me that,<br>20 you know, the point of sorting, beneficiation,<br>21 et cetera, when done properly, is to remove that<br>22 wall rock, host rock, things like that, you know,<br>23 that we talked about that may end up in the ores;<br>24 correct? | 1 have worded it that way, but, yes. I mean, the<br>2 object of beneficiation is to make what goes in<br>3 better when it comes out.<br>4 MR. FROST:<br>5 Q   Okay.<br>6 A   So, from that standpoint, sure.<br>7 Q   We can take a break.<br>8 VIDEOGRAPHER:<br>9     Going off the record. The time is<br>10 11:52 a.m.<br>11     (OFF THE RECORD.)<br>12 VIDEOGRAPHER:<br>13     We're back on the record. The time is<br>14 12:11 p.m.<br>15 MR. FROST:<br>16 Q   Doctor, could you turn to page 7 of<br>17 your report?<br>18 A   Okay.<br>19 Q   And it's the paragraph that starts<br>20 "Imerys encountered difficulties."<br>21 A   Right.<br>22 Q   Look at the last sentence of that. It<br>23 says, "The need for careful, selective mining<br>24 relative to the controlled potential |

48 (Pages 186 to 189)

Robert Cook, Ph.D.

Page 190

1  fiber-bearing zones in Vermont was emphasized in
2  a Cyprus interoffice correspondence."
3      I read that right?
4  A      Yes.
5  Q      And, if you look down, I take it that's
6  the -- that's the quote from the correspondence
7  we're talking about, the Imerys 219720 below
8  that?
9  A      Right.
10 Q      Tremolite and use deposits as
11 encountered?
12     The second sentence reads, "Cyprus
13 maintains a selective mining program in Vermont
14 that is directed towards exclusion of all these
15 potentially fiber-bearing zones when the ore is
16 sent to the mills, and those suspect tonnages,
17 including the associated talc, are left in the
18 pit walls or sent to waste piles."
19     Right?
20 A      I see that.
21 Q      So you agree with me that this
22 indicates that Imerys knew that they had to be
23 selective of the mining in the --
24 MR. FROST:

Page 191

1      Yeah.
2  MS. O'DELL:
3      I'm just putting in front of him the
4  documents.
5  MR. FROST:
6      The documents? That's fine.
7  Q      You agree with me with that statement?
8  You know, that shows that Imerys knew that they
9  had to -- that they couldn't use all of the ore body;
10 correct?
11 MS. O'DELL:
12     Object to the form.
13 A      That's correct.
14 MR. FROST:
15 Q      And it also, you know, indicates that
16 they could tell the difference between what was,
17 you know, effectively the ore and the fibrous
18 waste; right?
19 MS. O'DELL:
20     Object to the form.
21 A      Would you ask it again?
22 MR. FROST:
23 Q      Sure.
24     And it also indicates that they knew

Page 192

1  there was a difference between the ore they
2  wanted to send to the mill and the -- the fibrous
3  waste ore; right?
4  MS. O'DELL:
5      Object to the form.
6  A      That is correct, obviously.
7  MR. FROST:
8  Q      Okay. And that it shows that they had,
9  in fact, you know, put in a selective mining
10 program to make sure that they weren't capturing
11 these fiber zones within the ore sent to the
12 mills; right?
13 MS. O'DELL:
14     Object to the form.
15 A      The -- the implementation of the
16 selective mining is -- is -- I think that that
17 was part and parcel of -- of several agreements
18 that actually stated that in order to -- to -- to
19 make these operations worthwhile and profitable,
20 they had to have selective mining. And, so, from
21 that -- from that standpoint, they have to --
22 they have to do it. They have to -- they had
23 agreed to do it.
24 MR. FROST:

Page 193

1  Q      Okay. And, in fact --
2      Sorry.
3  A      And, so, you know, the point that I
4  would make is that -- that we asked for all the
5  documents that would demonstrate this, and we did
6  not receive them.
7  Q      Well --
8  A      And -- and, so, if we -- if we don't
9  have a way to verify the fact that they
10 implemented a selective mining, then -- then
11 we're left with -- with, you know, with a lot of
12 data that -- that suggests that -- that maybe
13 they didn't. Maybe they just saw white rock and
14 went for it.
15 Q      Okay. And, again, you're speculating
16 on whether or not they implemented this or not
17 because you haven't seen all of the data; right?
18 MS. O'DELL:
19     Object to the form.
20 A      We asked for the data.
21 MR. FROST:
22 Q      Okay. And I want to unpack that a bit.
23     By we -- by "We asked for the data,"
24 you mean you asked plaintiffs' counsel to give

49 (Pages 190 to 193)

Robert Cook, Ph.D.

Page 194

1  you all the documents?
2  A      I asked them to ask for them.
3  Q      Okay.  And you have no way to verify
4  whether what -- the selective set of documents
5  they gave you contains all of the data that might
6  relate to selective mining; correct?
7  MS. O'DELL:
8          Object to the form.
9  A      I have no way to know.  But -- but it
10 wouldn't make sense for them not to -- give me
11 everything they've got that I asked for.
12 MR. FROST:
13 Q      Well, except for the fact that they're
14 pursuing theories in these cases, so maybe they
15 selected the documents that specifically support
16 their theories; correct?  That's a possibility.
17 A      Well, I'm not sure that what they sent
18 me supports their theories.
19 Q      Okay.  But, again, without speculating,
20 you can't tell me one way or the other what the
21 full intent was of the selective mining program
22 at Imerys; right?  You just don't know if there
23 was more, if there's less.  You know, you can't
24 tell because you don't know if you have all the

Page 195

1  documents.  Is that fair?
2  MS. O'DELL:
3          Object to the form.
4  A      I don't -- I would think that I don't
5  have all the documents.  But in -- in a mining
6  scenario, it's -- it's common for documents to
7  get destroyed once you're past where you are
8  mining.
9          And so, it's possible that -- that
10 there were documents that don't exist anymore.
11 MR. FROST:
12 Q      Okay.
13 A      But selective mining is gonna be tough
14 in some of these, especially underground.  I
15 mean, it's pretty clear that it -- that it --
16 that they needed to get -- get out of underground
17 as quickly as they could at Hammondsville and at
18 Johnson.
19 Q      Okay.
20 A      That -- that's a difficult thing to do
21 selectively.
22 Q      You'd agree with me, one way or the
23 other, you don't have sufficient evidence to make
24 concrete opinions about what selective mining was

Page 196

1  being done and how potentially effective it was
2  at all stages of the mine life; correct?
3  MS. O'DELL:
4          Object to the form.
5  A      The data I have supports the opinion
6  that I have that -- that there may not have been
7  sufficient selective mining to eliminate all of
8  the -- the waste that should have been
9  eliminated.
10 MR. FROST:
11 Q      Okay.  And you'd agree that that
12 opinion is solely based on the data you had
13 available to you?
14 A      That's correct.
15 Q      And, again, I think we've established
16 you'd be open to reviewing other data, and if
17 it --
18 A      Absolutely.
19 Q      -- supported a different opinion, you'd
20 be willing to change your opinion based on that
21 data?
22 MS. O'DELL:
23          Object to the form.
24 A      I'm -- I'm willing to look at -- at any

Page 197

1  additional data that comes along.
2  MR. FROST:
3  Q      Turn to page 8 of your report, please,
4  last paragraph on the page.
5  A      Okay.
6  Q      About halfway down, it's a sentence
7  that starts, "It is known that Rio Tinto" --
8  A      Okay.
9  Q      -- "identified problems with long
10 Guangxi talc ores in 1997 which resulted in the
11 recommendation that a Luzenac representative be
12 present at the mine during the mining and sorting
13 process."
14 A      Correct.
15 Q      Correct?
16          And then you cite Imerys-A15758?
17 A      Right.  Correct.
18 MS. O'DELL:
19          Are you gonna mark that, Jack?
20          I'll take this one.
21          What's the number?
22 MR. FROST:
23          Fourteen?
24 THE COURT REPORTER:

50 (Pages 194 to 197)

Robert Cook, Ph.D.

Page 198

1        Yes.
2    MS. O'DELL:
3        Thank you.
4        (DEPOSITION EXHIBIT NUMBER 14
5        WAS MARKED FOR IDENTIFICATION.)
6    MR. FROST:
7    Q     And I'll turn your attention
8    specifically under -- under "Introduction."
9    A     Okay.
10   Q     Do you agree with me it talks about
11   quality control issues with Cimpact 10?
12   A     Okay.
13   Q     And you can review the rest of it, but
14   will you also agree with me that the Cimpact 10
15   ore is different than the Guangxi number 1 and
16   the Guangxi number 2 ores?
17   A     I think it is.
18   Q     So you agree that the problems
19   identified that this document are specifically
20   addressing are the Cimpact 10 quality control
21   issues; correct?
22   A     Hang on a sec.
23   MS. O'DELL:
24       If you need a minute to review the

Page 199

1    document, Doctor, feel free to do that.
2    A     In the introduction, they are fairly
3    clear that they're worried about Guangxi, not
4    Cimpact.
5    MR. FROST:
6    Q     But they're talking about the quality
7    control problems with Cimpact; correct?
8    A     Well, it --
9    MS. O'DELL:
10       Object to the form.
11   A     Well, it's not just them. It's -- and
12   I'm reading up in the summary. It's indicated
13   the need for better technical and probably
14   mineralogical specifications for the Guangxi
15   number 1 crude. So they're including at least
16   some Guangxi in this.
17   MR. FROST:
18   Q     Well, they're talking about they want
19   to implement a program for both Cimpact and
20   Guangxi; correct?
21   A     Right.
22   Q     And then when they specifically talk
23   about the quality control problems, you'll agree
24   with me, down in the introduction, as they

Page 200

1    address it, they're talking about the Cimpact 10
2    problems that --
3    A     Yeah.
4    Q     -- they had at Grand Island.
5    MS. O'DELL:
6        Excuse me. Object to the form.
7    A     Yeah.
8        But if they weren't having quality
9    control problems at both places, why would they
10   mention both places? Doesn't make sense.
11   MR. FROST:
12   Q     What do you mean by "both places"?
13   A     In the summary. They're talking about
14   the Cim- --
15       Well, they're talking about Guangxi 1,
16   and, so, you've got two separate things you're
17   talking about, but they're talking about issues
18   with both of them.
19   Q     Where in this document does it point
20   out that they have problems with the testing of
21   the Guangxi 1 ore?
22   A     In the -- in the summary of this
23   document.
24   Q     And you're talking about where it talks

Page 201

1    about, at the very beginning --
2    A     Right.
3    Q     -- where they say "New specifications
4    should go into," and they're talking about the
5    Guangxi number 1 crew?
6    A     Why would they need any specifications
7    if they weren't having problems?
8    Q     But, again --
9    A     That's the way I read it.
10   Q     I was going to say, but -- that's how
11   you're reading it, but you agree with me the
12   document itself only talks about problems that
13   have come up with the Cimpact 10 crew --
14   A     Yeah, after the --
15   MS. O'DELL:
16       Excuse me. Just let him finish and
17   then give me a minute. Okay?
18       Are you finished with your question?
19   MR. FROST:
20       Yes.
21   MS. O'DELL:
22       Object to the form. Misstates the
23   document.
24   MR. FROST:

51 (Pages 198 to 201)

Robert Cook, Ph.D.

Page 202

1    Q      You'd agree with me the only specific,
2    you know --
3          When they actually talk about the
4    problems that have come up, they're only talking
5    about problems that have been identified in the
6    Cimpact 10 or Cimpact 710 ore; correct?
7    MS. O'DELL:
8          Object to the form.
9    A     Well, I -- I don't agree with that at
10   all.  If you go to the second page, about midway
11   down, they start again about Guangxi number 1
12   crude.
13   MR. FROST:
14   Q     Okay.
15   A     And, so, I mean, I'm not sure that --
16   why we're making -- why we're saying it's only
17   Cimpact, because it's -- they're talking about
18   Guangxi crude here.
19   Q     But where are they talking about
20   quality control problems they've identified with
21   Guangxi 1 crude?
22   A     I -- I think that's what they're
23   addressing.  You know, they're trying to
24   respecify what they need.

Page 203

1    Q      But you're speculating, based on new
2    specifications, that they have found some
3    undocumented problem with the Guangxi number 1
4    crude despite the fact that they only list issues
5    with the Cimpact 710?
6    A     I'm not sure --
7    MS. O'DELL:
8          Object to the form.
9    A     I'm not sure that's right.  It looks to
10   me like this document is addressing Guangxi
11   number 1 and the other.
12   MR. FROST:
13   Q     As far as the specifications; right?
14   A     Well, with the thought in mind that
15   these need to be changed for some reason.
16   Q     Okay.  And, again, it seems -- it's not
17   "seems."  It says -- the document itself says the
18   bases for the wanting to change are, quote,
19   "after several episodes of quality control
20   problems with the Cimpact 10 and product at the
21   Grand Island during the first quarter of 1997."
22   Correct?
23   A     Right.
24   MS. O'DELL:

Page 204

1          Object to the form.
2    MR. FROST:
3    Q     Okay.  And, again, if we look at
4    Grand Island, it talks about June 24 samples of
5    Cimpact 10 lot.
6          That's on the bottom of page 2.
7    MS. O'DELL:
8          Where are you reading?
9    MR. FROST:
10   Q     Right?  I've read the document
11   correctly?
12   MS. O'DELL:
13         Okay.  Were you on page 2, not page 1?
14   MR. FROST:
15         Yes.
16   MS. O'DELL:
17         And, Dr. Cook, were you -- I mean,
18   don't respond that he's read it correctly --
19   MR. FROST:
20         Yeah.
21   MS. O'DELL:
22         No, I don't mean this pejoratively.
23   MR. FROST:
24         No.  I think the witness and I were on

Page 205

1    the same page.
2    MS. O'DELL:
3          I don't think you were, because he
4    wasn't looking at that.
5          So the -- I don't mean this in a
6    pejorative sense --
7    MR. FROST:
8          No.
9    MS. O'DELL:
10         -- but --
11         Let me finish.
12         So if you -- there's a specific
13   question that you asked about page 2, I wanted to
14   make sure that the doctor understood where you
15   were in the document.
16   MR. FROST:
17         Sure.
18   A     You know, if you go beyond what you
19   just read, I mean, there's more to this document
20   than just that.
21         If you go to the next page, there they
22   are looking at Guangxi number 1 again --
23   MR. FROST:
24   Q     Uh-huh.  And it shows --

52 (Pages 202 to 205)

Robert Cook, Ph.D.

Page 206

1  A      -- as if there's some issue there.
2  Q      Well, that's just showing the testing
3  results, as it said.  But the only place it ever
4  shows quality control problems is on page 1,
5  under the introduction; correct?
6  MS. O'DELL:
7            Object to the form.
8  A      Hang on a second.
9      You have to really wonder, because the
10 table that they've got here on page 3 shows
11 silica out of spec for Guangxi 1.
12     So it seems to me that they -- that
13 they realized that they may have an issue and
14 that this document is simply pointing it out,
15 says, "Let's tighten things up."
16 MR. FROST:
17 Q      Again, that's your interpretation of
18 this document.  It's clearly not what the
19 document says; correct?
20 MS. O'DELL:
21           Object to the form.  Misstates the --
22 A      I'm not -- I'm not sure it doesn't say
23 that.  I mean, you read this part here correctly,
24 but there's more to the document beyond what you

Page 207

1  read.
2  MR. FROST:
3  Q      Okay.  It shows the testing results.
4  Again --
5  A      Right.  And it shows something else --
6  Q      Let's walk through it.  You ready?
7  A      -- out of spec, I think.
8  Q      How do you know?  Do you --
9  A      Because they have the range that the
10 analyses have to fall within.
11 Q      Okay.  But does it say there are
12 quality control issues with respect to --
13 A      Well, I mean, what else is going on,
14 other than quality control?
15 Q      But, again, that's your interpretation
16 of this document.  The actual document itself --
17 A      It's my opinion that this -- that this
18 has to do with quality control.
19 Q      Okay.
20 A      And they have included both types here.
21 Q      But, again, the document itself only
22 talks about quality control problems with the
23 Cimpact 10 product at Grand Island; correct?
24 MS. O'DELL:

Page 208

1            Object to -- object to the form.
2  A      That's not what it says.  It says it in
3  one sentence, but that one sentence is part of a
4  larger document that, past that one sentence, has
5  some analytical data for Guangxi 1, and it shows
6  something to be out of spec.
7      And it -- it's a very simple thing.
8  All they're saying is, "We need to tighten up our
9  processes of quality control."  They don't say
10 this is asbestos.  They don't say it's heavy
11 metals.  And what it really amounts to is a
12 little bit of chlorite in the talc.
13 Q      Okay.  And you agree with me it's not
14 saying quality control.  They're talking about
15 changing the specifications.
16 MS. O'DELL:
17           Object to the form.
18 A      If you don't want that to be quality
19 control, okay.
20 MR. FROST:
21 Q      Well, sure.  I mean --
22 A      If that's what you say isn't quality
23 control, I'm gonna -- I'll --
24 MS. O'DELL:

Page 209

1            No, don't --
2  THE WITNESS:
3            Okay.  I don't agree with it.
4  MS. O'DELL:
5            Yeah.  I mean, don't agree because --
6  with -- with the definitions of counsel if you
7  don't agree with them.
8  THE WITNESS:
9            Sure.
10           I don't agree.
11 MR. FROST:
12 Q      All right.  That's fine.
13     Move on to page 9.
14 A      Okay.
15 Q      Third paragraph down, "A review of
16 milling and beneficiation practices employed at
17 Imerys's Houston plant indicate that the
18 flotation method utilized for decades in Vermont
19 was not used but, rather, a series of grinding
20 and air classification processes."
21 A      Yeah.
22 Q      Okay.  You agree with me that flotation
23 isn't the only type of beneficiation that can be
24 used on an ore; correct?

Robert Cook, Ph.D.

Page 210

1  A    I agree.
2  Q    Okay.  In fact, there are bunches of
3  different types of beneficiation?
4  A    Correct.
5  Q    And the documents you cite here
6  specifically talk about how Imerys determined
7  that flotation beneficiation was necessary for
8  the Vermont ores; correct?
9  A    Yeah.  You use the flotation process if
10 you -- if you've got a talc carbonate ore.
11 You've got to get rid of the carbonate.
12 Q    Okay.
13 A    And, so, that's why you float.
14 Q    So you agree with me the fact that they
15 weren't using flotation on the Chinese ore
16 doesn't show that there was necessarily a
17 breakdown of the process.  They were just using a
18 different form of beneficiation?
19 A    Right.  Right.  There's no carbonate in
20 the -- to speak of in the -- in the Chinese ores.
21 Q    Okay.  The next paragraph down, you
22 talk about quality control.  Do you see where I
23 am?  "Quality control issues are discussed" --
24 A    Okay.

Page 211

1  Q    -- below in the report?
2  A    Sure, uh-huh.
3  Q    Sort of halfway through that sentence
4  you said, you know -- it says, "makes it clear
5  non-talc material such as asbestos and high
6  concentrations of some heavy metals are included
7  in the finished products."
8  A    Sure.
9  Q    Are you talking about the ore or are
10 you talking about finished talcum product, like
11 finished talcum powder, in the sentence?
12 A    No.  I'm talking about the finished
13 product.
14 Q    All right.
15 A    There's nothing in the Houston mill
16 that's gonna get out heavy metals.  And if there
17 happened to be some asbestos, I don't think that
18 that plant -- I mean, it's not set up to handle
19 that.  So...
20 Q    And the basis of your opinion on that
21 is --
22      Have you looked at any sampling data?
23 Have you looked at any research or literature
24 regarding that?

Page 212

1  A    Yeah.  It has to do with the type of
2  mill.  I mean, the mill was set up originally for
3  baryte, and -- and it uses a -- an interesting
4  air separation technique.  And -- and I think
5  it's probably very effective for talc.
6      But there's -- there's nothing in that
7  type of a process that would address heavy metals
8  at all, unless the heavy metals were restricted
9  to some extremely dense accessory mineral.  And I
10 don't think we've got evidence for that in the
11 Chinese talc.
12 Q    Okay.  And what are you relying on to
13 say --
14      Well, I guess strike that.
15      So is this limited, when we're talking
16 here, we're limiting it to the heavy metals?
17 MS. O'DELL:
18      Object to the form.
19 A    No.  I mean, the same is true if there
20 was asbestos in any of the crude that came in.
21 Probably it would pass on through with the talc.
22 There's nothing set up there in Houston that
23 would specifically cut the -- any asbestiform
24 mineral out.

Page 213

1  MR. FROST:
2  Q    So you used the word "probably."  Do
3  you have any scientific study or research to show
4  that the various air beneficiation processes used
5  at the Houston mill would be completely incapable
6  of removing asbestos from the ore?
7  A    Well, I didn't --
8  MS. O'DELL:
9      Object to the form.
10 A    Right.  I didn't say it was completely
11 incapable.  What I -- what I said was that I
12 don't think there's anything in the -- in the
13 system there now that would cut a -- a
14 asbestiform mineral out of the -- out of the
15 airflow, you know, once the grinding process has
16 been done.
17      And, you know, I'm sure there's lots
18 of, you know, papers on physical metallurgy
19 that'll back that up.
20 MR. FROST:
21 Q    Can you cite me any right now that
22 would back up the fact that --
23 A    I -- I had some --
24 Q    -- this design --

54 (Pages 210 to 213)

Robert Cook, Ph.D.

| Page 214 |
|---|

1    A    -- when I came in here, and I can't
2  remember them.
3    Q    Okay.
4    A    No, I can't remember them.
5    Q    So, sitting here today, you can't tell
6  me that?
7    A    No.
8    Q    Okay.  Can you agree with me you've
9  never actually yourself tested any --
10   A    No.
11   Q    -- Johnson & Johnson talcum powder?
12  MS. O'DELL:
13       Let him finish with the question, sir.
14  THE WITNESS:
15       I'm sorry.
16   A    No, I have not.
17  MR. FROST:
18   Q    And your role here isn't to testify
19  that any particular level of heavy metals made it
20  into any finished product, like any --
21       I'll strike -- I'll -- I'll rephrase
22  that question.
23       You're not here to offer an opinion
24  that any particular bottle of Johnson's --

| Page 215 |
|---|

1  Johnson & Johnson talcum powder had any
2  particular level of heavy metals or asbestos in
3  it; right?
4  MS. O'DELL:
5       Object to the form.
6    A    I am.
7  MR. FROST:
8    Q    You're here to talk about individual
9  bottles that were used by consumers?
10   A    I'm not gonna say an individual bottle,
11  but I will say this.  If you take every analysis
12  you've got of 66, every single one is out of spec
13  for heavy metals.
14       And, so, if that's the case, then --
15  then go pick a bottle off the shelf today and --
16  oh, well, not today, but go back in time 20
17  years, pick one off the shelf and analyze it, and
18  it's gonna have excessive amounts of nickel, for
19  sure, probably chromium and probably cobalt.
20   Q    So it's your test [sic] that every
21  single test of every single sample of Vermont 66
22  that's ever been done was out of spec for heavy
23  metals?
24   A    Every --

| Page 216 |
|---|

1  MS. O'DELL:
2       Object to the form.
3    A    Every spec sheet I've been given is out
4  of -- is out of compliance.
5  MR. FROST:
6    Q    See, that's a very different answer,
7  now, isn't it, between every single sample is out
8  of compliance versus every single sample that was
9  given to you by plaintiffs' counsel?  Do you
10  agree?
11  MS. O'DELL:
12       Object to the form.
13   A    I'm not sure that they aren't the same
14  thing.
15  MR. FROST:
16   Q    You have no way to verify, so you
17  believe you've been shown every single sample of
18  Vermont 66 that exists?
19   A    I think that --
20  MS. O'DELL:
21       Excuse me.  Object to the form.
22       Just note that's a very different
23  question.
24  MR. FROST:

| Page 217 |
|---|

1       Okay.  You can object to the form.
2  MS. O'DELL:
3       I will object to the form, because
4  that's a different --
5    A    We asked for the results.
6  MR. FROST:
7    Q    Okay.
8    A    And we requested a set of data.  And
9  the set of data we were given shows consistent
10  high levels of those three metals.
11   Q    Would you be surprised if I told you
12  that there were hundreds and even thousands of
13  additional sample sets that weren't included in
14  the materials that were given to you by
15  plaintiffs' counsel?
16  MS. O'DELL:
17       Object to the form.
18   A    Well, I think that I would like to
19  believe that and I think it would be great to see
20  them.
21  MR. FROST:
22   Q    Okay.  But you certainly don't have
23  them and you haven't been given them.
24  MS. O'DELL:

55 (Pages 214 to 217)

Robert Cook, Ph.D.

| Page 218 | Page 220 |
|---|---|
| 1    Object to the form. | 1  for example, and you're basing this off of 19 |
| 2    A    If there's thousands of -- | 2  test results despite the fact the product has |
| 3    MS. O'DELL: | 3  been on the market for over a hundred years? |
| 4    Excuse me.  Excuse me. | 4  MS. O'DELL: |
| 5    Object to the form.  Misstates the | 5    Object to the form.  Misstates his |
| 6    record. | 6  testimony. |
| 7    A    If there are thousands of additional | 7    A    Yeah.  That -- that -- I don't see how |
| 8    ones, then that implies I haven't seen them, | 8  that question is relative to -- to anything |
| 9    which is true. | 9  because of the going-back-hundred-year idea.  I |
| 10    MR. FROST: | 10  mean, probably it's true if you could go back a |
| 11    Q    Okay.  And would that change your | 11  hundred years.  But I know that the data that |
| 12    opinion?  Because this -- this appears to be | 12  we've got -- I mean, it's more than just the |
| 13    based on the fact that you're saying every single | 13  19-year collection of annual composites. |
| 14    test you've seen is out of spec.  Would it change | 14    I mean, that's just a subset of a much |
| 15    your opinion if you were to see a significant | 15  larger data set we've got.  I can't tell you how |
| 16    collection of documents that showed a very | 16  many analyses we've got, but it's many hundreds. |
| 17    different result? | 17  And there isn't a single data set we've got |
| 18    MS. O'DELL: | 18  that -- that puts nickel, cobalt, or chromium in |
| 19    Object to the form. | 19  spec.  Not a single one. |
| 20    A    The -- the data that we've got for the | 20    MR. FROST: |
| 21    annual composite samples, I think we've got | 21    Q    Okay.  And by "in spec," what are you |
| 22    annual composites for 19 years.  And every one of | 22  referring to? |
| 23    them's out of spec. | 23    A    Ten parts per million. |
| 24    So if you -- if -- and, so, if you come | 24    Q    And where are you getting the spec |

| Page 219 | Page 221 |
|---|---|
| 1    up with eight more years worth of annual | 1  from? |
| 2    composites, I'm gonna bet you that they're gonna | 2    A    It's my value. |
| 3    be out of spec, too.  Because these 19 we've got | 3    Q    I mean, what is the spec? |
| 4    are -- are staggered in time. | 4    A    That's what was given in testimony -- |
| 5    MR. FROST: | 5  in depositions, and it's in lots of documents |
| 6    Q    Okay.  But, again, you're looking at 19 | 6  where the heavy metals are being reported as |
| 7    over, I think, a 115-year history of -- | 7  10 ppm lead max, and that was an old-time way of |
| 8    A    No.  These are the annual -- | 8  reporting a group of metals you reported as lead |
| 9    Well, no. | 9  because there was a point in time when everybody |
| 10    Q    -- of the product. | 10  was terrified of lead.  They were so worried |
| 11    A    That is not correct.  No. | 11  about lead because of their -- their children. |
| 12    The -- we didn't start getting any | 12  You know, it impacts the mental ability of |
| 13    analytical data for heavy metals before, say, | 13  children. |
| 14    1970.  And I don't think anybody cared, really, | 14    Q    Okay.  Can you -- you have no opinion |
| 15    prior to that. | 15  as to what level of cobalt is required to cause |
| 16    Q    Okay.  So, again, you're making | 16  human disease, do you? |
| 17    generalizations -- | 17    A    I think cobalt is -- is a Group 2 |
| 18    A    No generalization. | 18  element -- |
| 19    Q    -- based on -- | 19    Q    Listen to my question, though, sir. |
| 20    A    I'm telling you fact. | 20    Do you have an opinion as to what level |
| 21    Q    Again, you have to go back to my | 21  -- |
| 22    original question that was you can sit here and | 22    MS. O'DELL: |
| 23    tell me that every single bottle, any particular | 23    He was -- he was answering -- excuse |
| 24    bottle is out of spec for heavy metals, you know, | 24  me, Jack.  He was answering your question. |

Robert Cook, Ph.D.

Page 222

1    You may answer.
2    A    Yeah. I was gonna -- I was gonna say
3    that if you're thinking of cancer, there may be
4    one level, but if you go -- if you go and try to
5    pull the acceptable levels from -- from various
6    governmental agencies, you find some really
7    strange things because it depends on the medium
8    that you're working with.
9        Like if you were running a landfill,
10   then the --
11   MR. FROST:
12   Q    I'll stop you here because I'm just
13   very confused by this. You're not a
14   toxicologist; right?
15   A    Right.
16   Q    And you're not here to offer any
17   opinions as to whether or not --
18   A    I'm trying to answer your question.
19   Q    Well, no. That's why -- I was trying
20   to get at that, and that's --
21       You know, my question really is you're
22   not here to offer any opinions that say a
23   particular level of cobalt or a particular level
24   of nickel found in a product can cause human

Page 223

1    disease; right?
2    MS. O'DELL:
3        Object to the form. And I would just
4    ask if you'd let the witness finish before you
5    interrupt him, please.
6        If your answer --
7    A    Nickel and chromium and arsenic, I
8    think that there's plenty of evidence that the
9    limits are way lower than what --
10       Well, maybe not arsenic. But -- but I
11   think with respect to cancer, nickel and chromium
12   are pretty well established.
13       But -- but the point is that
14   Johnson & Johnson established its own limits.
15   MR. FROST:
16   Q    Sir, can you please listen --
17   MS. O'DELL:
18       Let's --
19   MR. FROST:
20       No, no.
21   MS. O'DELL:
22       Excuse me.
23   MR. FROST:
24       He's not answering my question.

Page 224

1    MS. O'DELL:
2        He's --
3    MR. FROST:
4        We're on my time.
5    MS. O'DELL:
6        No. He's not --
7    MR. FROST:
8        No. My question is whether or not he
9    believes he's an expert --
10   MS. O'DELL:
11       You cannot interrupt him.
12   MR. FROST:
13       Leigh, my question is whether or not --
14   MS. O'DELL:
15       He's trying to answer the question.
16   MR. FROST:
17       -- he believes he's an expert.
18   It's a "yes" or "no" question.
19   A    I've answered that over and over. I
20   said no.
21   MR. FROST:
22   Q    That's what I'm saying.
23   A    Yes, I have. And I said "no."
24   Q    I know. And that's what I'm getting

Page 225

1    at. But now you seem to be offering opinions
2    about levels of heavy metals that could be in
3    talcum powder that can cause disease.
4        Are you here to offer an opinion about
5    that today?
6    MS. O'DELL:
7        Excuse me.
8        He's trying to answer your question
9    regarding the specification, so let him answer.
10   THE WITNESS:
11       Yeah.
12   MR. FROST:
13       But, again, that's the question as
14   you're framing it. It's not the actual question
15   I asked.
16   MS. O'DELL:
17       I think he --
18   A    Well, I'm gonna answer it. I don't
19   care whether you like it or not.
20       Johnson & Johnson set its specs. The
21   specs have to be there for a reason. And the
22   specs are quite low, and the talcum powder
23   product, it exceeds them. I mean, it's as simple
24   as that. I'm not saying it's causing --

Robert Cook, Ph.D.

Page 226

1     I mean, it could be causing gum
2  disease. I don't know. But it's their specs I'm
3  referring to.
4  MR. FROST:
5  Q     Okay. And that's my question.
6  A     Their own specifications.
7  Q     And you can't tell me if out of spec
8  has any -- you know, whether or not any
9  particular level, in spec or out of spec, has any
10  potential concern for causation of human disease;
11  correct?
12  A     I am gonna leave that to the experts
13  who I'm sure will have lots to say about that.
14  Q     And that's what I was trying to get at,
15  sir.
16  A     Okay.
17  Q     That's not your area of expertise.
18  A     Well, I've answered that question over
19  and over again. I'm not an expert in toxicology.
20  Q     Okay. Then next time, don't explain
21  something that you're not into.
22  A     Well, you asked the question, and I
23  tried to give you the knowledge that I had. But
24  the basis for my statement is the fact that there

Page 227

1  are set specifications that were made by
2  Johnson & Johnson, and the analyses exceed that.
3  I mean, it's just as simple as that.
4  Q     Okay.
5  A     I'm not trying to say anything more.
6  Q     I was gonna say, and that's -- that's
7  what I'm trying to get at. That's all you're
8  saying --
9  A     Yeah.
10  Q     -- is that you looked at a set of specs
11  and your opinion is that, based on the testing
12  results you've been given, they're outside of
13  those specs.
14  MS. O'DELL:
15     Object to the form.
16  A     It's not an opinion. They are outside
17  of the specs.
18  MR. FROST:
19  Q     Well, we call it an opinion --
20  A     It's just a fact. It's a fact.
21     Okay. An opinion.
22  Q     But that's -- that's the opinion you're
23  rendering is that, based on the testing results
24  that you reviewed, they were out of spec?

Page 228

1  MS. O'DELL:
2     Object to the form.
3  A     Absolutely.
4  MR. FROST:
5  Q     Okay. All right. Turning to the
6  "Mineralogy" section of your report that starts
7  on page 9.
8  A     Okay.
9  Q     Can you point me to a specific
10  geological report that you rely on that talks
11  about the geological deposit of the Jhizhua talc
12  mine, in the Guangxi province of China?
13  A     Yeah. There --
14  MS. O'DELL:
15     On page 9?
16  MR. FROST:
17     It starts on the -- the section starts
18  on page 9. I'm talking about Section B,
19  "Mineralogy," in general.
20  MS. O'DELL:
21     Okay. And you're directing him to the
22  section on China beginning on page 12?
23  MR. FROST:
24     Yeah. I'm not directing him to any

Page 229

1  specific. It was a general question, and that
2  was, you know, what geological studies do you
3  have that relate to --
4  A     I think the two that I've referenced
5  that are actually published reports.
6  MR. FROST:
7  Q     Do you recall which ones those are?
8  A     I don't remember the authors. But
9  they're modern reports. And, plus, just recently
10  we got a copy of the geologic map for the mine,
11  which was helpful.
12  Q     And for Vermont, do you rely on any
13  very -- you know, any of the specific geological
14  reports that relate to Hammondsville, Hamm,
15  Argonaut, or Rainbow specifically?
16  MS. O'DELL:
17     Object to the form. Vague.
18  A     The -- yeah. There are specific
19  reports like there's a U.S. Bureau of Mines
20  report that's -- that's good on the Johnson mine,
21  and there's the Barry Seymour thesis that's
22  pretty good on Johnson. There are two reports on
23  Hammondsville that I looked at. One was by the
24  School of Mines, Colorado School of Mines. One

58 (Pages 226 to 229)

Robert Cook, Ph.D.

| Page 230 | Page 232 |
|---|---|
| 1  was by Gregg. Then there's a whole series of | 1  misidentification of platy talc lying on plane as |
| 2  documentation on -- on Argonaut, many reports on | 2  potentially fibrous? |
| 3  Argonaut that -- | 3  MS. O'DELL: |
| 4  MR. FROST: | 4       Object to the form. |
| 5  Q     Okay. You mentioned the Johnson mine. | 5  A     I think that that's something that is |
| 6  Again, we established before, but for that one | 6  fairly common. You turn a plate on edge, it |
| 7  reference that talks about -- | 7  looks like fiber. |
| 8       I forget the ore numbers. I believe | 8  MR. FROST: |
| 9  they're 500 -- 507. | 9  Q     Yeah. And that's because most of the |
| 10      You have nothing else -- you certainly | 10  microscopes are 2D as opposed to 3D image? |
| 11  have nothing to show that Grade 66 talc ever came | 11  A     Correct. |
| 12  from the Johnson mine; correct? | 12  MS. O'DELL: |
| 13  MS. O'DELL: | 13      Object to the form. |
| 14      Object to the form. | 14  A     I -- can you -- can you ask or make |
| 15  A     I'm not sure about Grade 66. I don't | 15  that statement again about the 2D versus 3D? |
| 16  know what they called it when Johnson mine was | 16  MR. FROST: |
| 17  operating. | 17  Q     And that's because when you're looking |
| 18      I think that I have one other document | 18  at a 2D image, it's hard to tell if you're |
| 19  that -- that would indicate that for a short | 19  looking at something on plane or on edge? |
| 20  period of time cosmetic talc was produced at | 20  A     That's kind of an -- that's an |
| 21  Johnson. | 21  interesting comment, because when you're using a |
| 22  MR. FROST: | 22  polarized light microscope, if you're just using |
| 23  Q     But you agree with me the only document | 23  a ground-up talc sample, the way you do that, you |
| 24  we've been able to come up with thus far, I | 24  put a little pinch of the talc on a glass slide |

| Page 231 | Page 233 |
|---|---|
| 1  believe, was Grade 500 and 549, according to my | 1  and then you put a drop of refractive index oil |
| 2  notes -- | 2  on it. That does tend to make the plates lay |
| 3  MS. O'DELL: | 3  down. |
| 4      Objection. | 4  Q     Okay. |
| 5  MR. FROST: | 5  A     And it would reduce the -- probably |
| 6  Q     -- for the grades that were coming out | 6  reduce the number of those standing on edge. |
| 7  of the Johnson mine? | 7  And, so, from the standpoint of are you always |
| 8  MS. O'DELL: | 8  looking at two-dimensional materials, it's |
| 9      Object to the form. Misstates -- | 9  probably not right. |
| 10  A     That was -- that was what it said at | 10      If you used a binocular scope, which |
| 11  the place that you pointed to. | 11  some people do, for the initial examination, that |
| 12  MR. FROST: | 12  certainly gives you some depth of field, which |
| 13  Q     Okay. And you agree that Grade 500 or | 13  then translates into 3D. |
| 14  Grade 49 [sic] would be different than Grade 66, | 14  Q     Okay. I guess my comment was sort of a |
| 15  which was also listed -- | 15  nonscientific way. And that's the images, it's, |
| 16  A     I would think so. | 16  you know, flat plane versus edge -- |
| 17  Q     -- on that document? | 17  A     Right. |
| 18      Have you ever done any work identifying | 18  Q     -- and the edge can be mistaken for |
| 19  talc as either platy or fibrous in your academic | 19  fiber; correct? |
| 20  career? | 20  A     Correct. |
| 21  A     I have not. | 21  Q     Okay. |
| 22  Q     Are you aware -- I'll call it the | 22      All right. Page 10 of your report |
| 23  contour, but it's probably the wrong word for it. | 23  under the section of "Italy." |
| 24  But are you aware that there's a problem with | 24  A     Okay. |

59 (Pages 230 to 233)

Robert Cook, Ph.D.

Page 234

1    Q      It reads, "Deposits derived from
2    sedimentary carbonate rock, such as the Italian
3    deposits, typically contain accessory minerals
4    that may include asbestos (actinolite and
5    tremolite in asbestiform habits) and the chlorite
6    family minerals."
7         Right?
8    A      Correct.
9    Q      And then, you know, you continue on to
10   talk about Pooley, and you cite, you know, the
11   various documents.  I can read the whole thing if
12   you want.  But at the end of that you say various
13   different documents, right, that support that
14   position?
15   A      Yeah.
16   Q      Okay.
17        I'll mark -- what number are we at?
18   THE COURT REPORTER:
19        15.
20   MR. FROST:
21        I should be able to get through this
22   pretty quickly, Leigh, and then we -- then we
23   can -- we can break.
24   MS. O'DELL:

Page 235

1         Yeah.  If we could break at 2:50 --
2    MR. FROST:
3         Yeah.
4    MS. O'DELL:
5         -- that would be -- because I need
6    to --
7    MR. FROST:
8         Yeah.  I think we can get through the
9    next set of documents in five minutes.  Should --
10   MS. O'DELL:
11        Okay.
12   MR. FROST:
13        I should be able to do it.
14   MS. O'DELL:
15        I need -- we need a little bit of time
16   to get --
17   MR. FROST:
18        Yeah.  No.  I get it.
19   MS. O'DELL:
20        -- prepared for the call to the court.
21        Thank you.
22        (DEPOSITION EXHIBIT NUMBER 15
23        WAS MARKED FOR IDENTIFICATION.)
24   MR. FROST:

Page 236

1    Q      Okay.  Do you have the marked document
2    in front of you?
3         Okay.  If you look at the report, the
4    first document you cite to is JNJ_00030983.  And
5    do you agree that's the document I've put in
6    front of you?
7    A      I don't know.  It doesn't look like it.
8         Oh, wait a minute.
9    Q      Look at the very -- the very bottom
10   right.
11   A      Yeah.  There's three different sets of
12   numbers on this thing.  I'm not even sure this is
13   the right document.
14   MS. O'DELL:
15        That --
16   MR. FROST:
17   Q      Well, that's what I was gonna say is
18   that I can tell you this is the document that was
19   produced as JNJ_00030983.  And you agree with me
20   this is -- appears to be an epidemiological
21   study, not a -- not a mining study; correct?
22   A      Yeah.  And this is -- this is my fear
23   all the way through here, you know.  When I've
24   gotten multiple Bates numbers on things, I have

Page 237

1    to pick one.  And this -- I don't think this is a
2    document that I've looked at.
3    Q      Okay.
4    MS. O'DELL:
5         And, to be fair, it's -- it's -- this
6    is the -- what's been given to him is J&J, not J,
7    capital N, J.  So it's not identical to what's in
8    his report.  So I would just point that out.  I'm
9    not sure if that's --
10   MR. FROST:
11        No, no.  Look at the very bottom
12   number, JNJ, bottom right hand.
13   MS. O'DELL:
14        Oh, I see.  But still, I'm not sure
15   that -- that -- it's not underscore.  So I -- I
16   don't believe it's the same one.  But if there's
17   an error on the Bates number, we'll address that.
18   MR. FROST:
19        I will say as production, this is the
20   one that matches the JNJ_, et cetera.
21        I have marked this one as the next one.
22        (DEPOSITION EXHIBIT NUMBER 16
23        WAS MARKED FOR IDENTIFICATION.)
24   MR. FROST:

Robert Cook, Ph.D.

Page 238

1  Q      I think you're gonna recognize this
2  document.  So this is the second document in the
3  series.
4  A      I am gonna recognize it?
5  Q      JNJ000016791.
6  A      Yeah.
7  Q      Again, this is a --
8  A      Something's screwed up.
9  Q      Seems to be a better copy of the same
10 document.
11 A      Yeah.
12 Q      Okay.  All right.  Move on to the next
13 one which is cited, which is the JNJ60592.
14        (DEPOSITION EXHIBIT NUMBER 17
15        WAS MARKED FOR IDENTIFICATION.)
16 A      Okay.
17 MR. FROST:
18 Q      Okay.  You'll agree with me that this
19 document talks about the presence of quartz.
20 Nowhere does it talk about the presence of
21 fibrous amphiboles.
22 A      Correct.
23 Q      Okay.  Move on to the next one, tab --
24 which is JNJ238194.

Page 239

1        Sorry.  What number are we on?
2  THE COURT REPORTER:
3        18.
4  MR. FROST:
5        18.
6        (DEPOSITION EXHIBIT NUMBER 18
7        WAS MARKED FOR IDENTIFICATION.)
8  MR. FROST:
9  Q      And, again, if you want, I can give you
10 time to look at it.  But, specifically, we're
11 talking about Italy, which is on the first page.
12       My question here is, again, this
13 document nowhere mentions fibrous amphiboles or
14 fibrous serpentines with respect to the -- the
15 ore; correct?
16 A      Hang on a sec.  Let me look that up.  I
17 don't think that this is the document I was
18 referencing.  Huh-uh.  Hang on.
19       Yeah.  I don't think that's the right
20 document.
21 Q      Okay.  And, in fact, if we're looking
22 at this document, under Category 1, "Maximum
23 Confidence," which includes the Italian ore, it
24 states, quote, "Long experience of established

Page 240

1  quality, purity, uniformity and reliability of
2  supply, outstanding performance for many years
3  when compounded into Johnson's baby powder."
4  A      Right.
5  Q      Okay.  All right.  This last one I'll
6  mark, and then we can break.
7        So this is the Pooley report, which is
8  JNJ322351.
9  A      Is this the long one or there's --
10 there's multiply Pooley reports.
11 Q      Yeah, I believe this is the long one.
12 A      Okay.
13 Q      It's the one that deals with the
14 Italian mines.
15 A      Yeah.  Well, there are a number of
16 them.
17 Q      Yeah.  There's one that's extremely
18 short --
19 A      Yeah.
20 Q      -- and then there's the longer one.
21 This is the longer of the two.
22        (DEPOSITION EXHIBIT NUMBER 19
23        WAS MARKED FOR IDENTIFICATION.)
24 MR. FROST:

Page 241

1  Q      And I'll first address your attention
2  to page 6 of the report.
3  A      Okay.
4  Q      The bottom paragraph, he sort of --
5  it's the summary of what he's doing.
6  A      Hang on.  I may have the wrong page.
7        All right.  I've got it.
8  Q      Okay.  The second sentence is,
9  "Numerous photomicrographs taken under PPL and XN
10 are provided with the descriptions to illustrate
11 the rock textures, which it is hoped will provide
12 information useful to the continuing" -- or --
13 A      I'm sorry, Jack.  Show me the --
14 Q      Sure.  It's --
15 A      You say it's page 6?
16 Q      Page 6.
17 A      Okay.  All right.  I've got it.
18 MS. O'DELL:
19       I'm on a different page 6, so give me
20 just a minute.
21 MR. FROST:
22       Sure.  It says "page 6" at the top.
23 Q      Must be more full page sixes.
24 A      Yeah, I think there may be.

61 (Pages 238 to 241)

Robert Cook, Ph.D.

| Page 242 | Page 244 |
|---|---|
| 1  Q     One, two, three, four, five -- | 1  MR. FROST: |
| 2  MS. O'DELL: | 2       Yeah, the entire exhibit. |
| 3       The page 6 I have, it's -- it's got a | 3  Q     Look at the bottom paragraph.  On -- |
| 4  picture on it.  So it's not what you're -- | 4       Sorry.  On the page on the left. |
| 5  MR. FROST: | 5       Okay.  The second sentence down says, |
| 6       So it's the ninth page in. | 6  "The only asbestos-type mineral to be detected in |
| 7  MS. O'DELL: | 7  the Hamm samples was tremolite, which was found |
| 8       And I'm sorry.  It's right before our | 8  in three of the specimens.  The tremolite was |
| 9  call with the Court. | 9  associated" -- |
| 10  MR. FROST: | 10       Under our conclusion. |
| 11       Yeah, that's fine.  We can pause here. | 11       -- "with carbonate minerals, mainly |
| 12  VIDEOGRAPHER: | 12  magnesite and calcite.  No tremolite was detected |
| 13       Going off the record.  The time is | 13  in the talc-typed specimens." |
| 14  12:53 p.m. | 14  A     Okay. |
| 15       (OFF THE RECORD.) | 15  Q     And, then, if you go to the |
| 16  VIDEOGRAPHER: | 16  second-to-last paragraph of the paper -- |
| 17       We're back on the record.  The time is | 17  A     Okay. |
| 18  1:48 p.m. | 18  Q     -- towards the bottom of that paragraph |
| 19  MR. FROST: | 19  it reads, "Particles formed of the amphibole |
| 20  Q     Okay.  Welcome back from lunch, sir. | 20  mineral found at the mine were hardly fibrous in |
| 21       So we were on page 6 of the Pooley | 21  character, the majority of the tremolite breaking |
| 22  report. | 22  in -- breaking to give compact particles." |
| 23  A     Okay.  Right. | 23  A     Uh-huh. |
| 24  Q     I believe you're on the correct page. | 24  Q     I read it poorly, but did I read it |

| Page 243 | Page 245 |
|---|---|
| 1  A     Uh-huh. | 1  right? |
| 2  Q     Okay.  The bottom paragraph? | 2  MS. O'DELL: |
| 3  A     Right. | 3       Object to the form. |
| 4  Q     Okay.  It's talking about the report, | 4  A     Right.  I've read it. |
| 5  and it says, "Numerous photomicrographs taken | 5  MR. FROST: |
| 6  under PPL and XN are provided with the | 6  Q     Okay.  So do you agree with me that the |
| 7  description to mainly illustrate the rock | 7  Pooley report does not mention finding any |
| 8  textures, which it is hoped will provide | 8  fibrous materials at the -- the Italian mine? |
| 9  information useful in the" -- | 9  MS. O'DELL: |
| 10       That's a tough one. | 10       Object to the form. |
| 11       -- "continuation" -- | 11  A     Yeah. |
| 12  A     Right. | 12       This isn't the only Pooley report. |
| 13  Q     -- "of particular -- of particularly | 13  MR. FROST: |
| 14  the talc ore samples and also displays the | 14  Q     This is the one that's cited in your |
| 15  nonoccurrence of asbestiform amphiboles in the | 15  report on -- |
| 16  talc ore." | 16  A     Right.  There's more -- |
| 17       Did I read that correctly? | 17  Q     -- page 10; correct? |
| 18  A     Yes. | 18  A     There's more than one.  But I think |
| 19  Q     And if you turn to the last two | 19  that in the material that you read, he doesn't -- |
| 20  pages -- | 20  does not mention fibrous tremolite. |
| 21  A     The last two? | 21  Q     You'd agree this is the document that |
| 22  Q     Yeah, the last two. | 22  starts JNJ000322351 that you cite in your report |
| 23  MS. O'DELL: | 23  on page 10? |
| 24       Of the entire exhibit? | 24  A     Right.  That's that one. |

62 (Pages 242 to 245)

Robert Cook, Ph.D.

Page 246

1  Q     Okay.
2         Great.  Sorry.  I've got to reorient
3  myself where I am in your report.  If you'll give
4  me a second.
5  A     It's all right.
6  VIDEOGRAPHER:
7         Jack, do you have your mic on?
8  MR. FROST:
9         I do not.
10  Q     Page 10, we're under "Italy."  So about
11  halfway through your paragraph, you have a
12  sentence that reads, "Chrysotile is also reported
13  in the Val Chisone mineral suite in 1971 by
14  Ashton."
15  A     Right.
16  Q     And you cite JNJAZ55-6103.
17        I've got that document.
18  A     And he's got a list of minerals kind of
19  in the middle of -- in the middle of the page
20  there, and chrysotile, I think, is mentioned.
21        Right.
22        (DEPOSITION EXHIBIT NUMBER 20
23        WAS MARKED FOR IDENTIFICATION.)
24  MR. FROST:

Page 247

1  Q     Yeah, it's -- you're talking about
2  where the -- the arrow is on the paper?
3  A     Correct.
4  Q     And you'd also agree with me that
5  he's -- he's talking about the valley, what --
6  mineralizations in the valley.  He's not talking
7  about the Fontane ore or mine specifically;
8  correct?
9  A     He might have been.
10  Q     But there's no way to tell by this
11  document; correct?
12  MS. O'DELL:
13        Object to the form.
14  A     Well, this is a general comment about
15  the location.
16  MR. FROST:
17  Q     Okay.  And he's talking about, "I have
18  checked into the mineralization of the part of
19  the territory"; correct?
20  MS. O'DELL:
21        Object to the form.
22  MR. FROST:
23  Q     He's talking about the valley?
24  MS. O'DELL:

Page 248

1         Object to the form.
2  MR. FROST:
3  Q     Because it continues, "And the minerals
4  we'll show in the valley are."
5  MS. O'DELL:
6         Object to the form.
7  A     Well, the valley is where the mine is.
8  MR. FROST:
9  Q     Okay.  But he's not saying that he has
10  found talc, pyrite, magnesite, calcite, dolomite,
11  apatite, clinochlore, chrysotile, tourmaline,
12  tremolite, actinolite, aluminite, and albite all
13  in the Fontane mine ore; correct?
14  MS. O'DELL:
15        Object to the form.
16  A     Well, I'm -- I'm not sure that he even
17  relates Fontane in that paragraph at all.
18  MR. FROST:
19  Q     Exactly.  He's just talking about the
20  mineralization of the valley --
21  A     That's right.
22  Q     -- correct?
23  A     But Fontane's in the valley.
24  Q     Yes.  But there are lots of other

Page 249

1  places in the valley that aren't the Fontane
2  mass; correct?
3  MS. O'DELL:
4         Object to the form.
5  A     That's right.  But I don't know why
6  he'd be interested in them.
7  MR. FROST:
8  Q     So you're telling me, by reading this,
9  you couldn't relate to the fact that he's found
10  all of these and they're associated with the
11  Fontane mine because that mine is located in that
12  valley?
13  A     I think if you read what's been
14  published about this, what you find is that the
15  host rocks that contain the carbonate sequence
16  with the talc in it is rich in some of these.
17  Q     Okay.  And, again, you're --
18  A     So he's probably --
19        And I'm, once again, I'm making an
20  assumption.  I don't think he'd go out and decide
21  that he'd go up to the rim of the valley and
22  collect a bunch of rocks that have nothing to do
23  with -- with J&J or who he was working for.
24        But, you know, I think that the list of

63 (Pages 246 to 249)

Robert Cook, Ph.D.

Page 250

1    minerals here could be extended out to the edges
2    of -- of the ore body. And if you went to the
3    Fontane mine, went underground, you could
4    probably find these minerals in the ore body but
5    next to the host rocks because --
6    Q      Okay.
7    A      Well, anyway, this is a pretty
8    extensive suite. And -- and the reason I say
9    that is tourmaline is not a mineral that you
10   would see in a -- in a talc ore body, but it
11   would occur next to one.
12   Q      So I've heard in your answer a lot of
13   "I guess, I suppose." I mean, you can't sit here
14   and tell me that, "Yeah, this shows the
15   chrysotile is associated with the Fontane ore
16   body"; correct?
17   MS. O'DELL:
18            Object to the form.
19   A      Well, it has to be associated with
20   whatever processes took place that would form
21   chrysotile. And it wouldn't be in the enclosing
22   schists. I mean, that -- that's just not the
23   right locale.
24   MR. FROST:

Page 251

1    Q      So, again, my -- my question is just
2    because it says "chrysotile" in this document
3    doesn't mean there's chrysotile in the ore at
4    Fontane; correct?
5    MS. O'DELL:
6            Object to the form.
7    A      Yeah. He doesn't say --
8    MR. FROST:
9    Q      Okay.
10   A      He doesn't specifically say the Fontane
11   mine.
12   Q      Okay. And, again, I think you --
13   tourmaline, you pointed out, wouldn't even be
14   associated with the talc.
15   A      You wouldn't -- you wouldn't think so.
16   Q      Okay. Moving on, on page 10 you note
17   that "Fibrous tremolite" --
18            Do you see where I am? It's another
19   sentence down.
20            "Fibrous tremolite was reported from
21   Italian talc as late as 2009."
22   A      Correct.
23   Q      Okay. And you agree with me that, by
24   2009, Johnson & Johnson certainly wasn't sourcing

Page 252

1    any talc from the Italian mines; correct?
2    A      There is a document that says that they
3    were considering using it again.
4    Q      Okay.
5    A      And it's in that time period.
6    Q      But, again, they weren't using it.
7    They were considering using it.
8    A      To my knowledge, they weren't.
9    Q      Okay. And, to this day, you're
10   aware -- I think you say in your report from '03
11   to today they used Chinese talc. Correct?
12   A      That's my -- my understanding.
13   Q      Skipping down, next couple sentences,
14   it says, "A paper describing asbestos in Italian
15   talc deposits was published by Marconi and Verdel
16   in 1990."
17   A      Okay.
18   Q      Do you recall that?
19   A      Yeah, I recall the reference, sure.
20   Q      Do you recall whether or not they say
21   that there's any asbestos found in the Fontane
22   mine deposit?
23   A      I'm not sure they say that
24   specifically.

Page 253

1    Q      Okay. I'll mark it. I'll show it to
2    you.
3            (Technical difficulties)
4    THE COURT REPORTER:
5            Do you want to go off the record?
6    MR. FROST:
7            Yeah, I was gonna say, let's go off the
8    record.
9    VIDEOGRAPHER:
10           Going off the record. The time is
11   1:57 p.m.
12           (OFF THE RECORD.)
13   VIDEOGRAPHER:
14           We're back on the record. The time is
15   1:58 p.m.
16   MR. FROST:
17   Q      Okay. We are marking the Marconi and
18   Verdel Exhibit 21.
19           (DEPOSITION EXHIBIT NUMBER 21
20           WAS MARKED FOR IDENTIFICATION.)
21   MR. FROST:
22   Q      And I'll -- I'm specifically looking at
23   pages 109, 110.
24   A      Okay.

64 (Pages 250 to 253)

Robert Cook, Ph.D.

| Page 254 | Page 256 |
|---|---|
| 1  Q    At the very bottom of 109 -- of 109, | 1  MS. O'DELL: |
| 2  the section called "Results and Discussion." | 2      Object. |
| 3  A    Right. | 3  MR. FROST: |
| 4  Q    And it says, "Sample still in | 4  Q    And, again, I can -- |
| 5  production does not show the presence of | 5  A    Wow. |
| 6  serpentine or tremolite amphibole minerals." | 6  Q    I can mark it if you want. |
| 7      Did I read that correctly? | 7  A    That's a long thesis. |
| 8  A    Yes. | 8  Q    It's a very long paper. |
| 9  Q    If you turn over to 110, if you look at | 9  A    I'm not saying that somewhere in there |
| 10  Table 1, which is the mean mineralogy composition | 10  he doesn't say Hammondsville, but he doesn't -- |
| 11  of talcs from active Italian mines, the first one | 11  he doesn't present any significant information |
| 12  is the Fontane mine in Piedmont; right? | 12  about Hammondsville. |
| 13  A    Right. | 13  Q    Okay.  Well, it's a happy medium.  I |
| 14  Q    Okay.  On page 11 of your report, in | 14  can tell you that the word "Hammondsville" is not |
| 15  that first paragraph we're now -- we've moved on | 15  there -- |
| 16  to the Vermont deposits. | 16  A    Okay. |
| 17  A    Okay. | 17  Q    -- but you agree with me he's certainly |
| 18  Q    And, at the end of that -- that first | 18  not talking specifically about the Hammondsville |
| 19  paragraph, there's a sentence that says, "These | 19  geology? |
| 20  include the Carlton talc mine in Chester, Windsor | 20  A    No. |
| 21  County, and other Vermont serpentinite-related | 21  MS. O'DELL: |
| 22  actinolite or tremolite occurrences as documented | 22      Object to the form. |
| 23  by Seymour" -- you have (J&J 53200) -- "at | 23  A    Yeah.  He -- he's not talking about |
| 24  Hammondsville, the Barton steatite quarry, Holden | 24  geology at the Hammondsville mine.  The geology |

| Page 255 | Page 257 |
|---|---|
| 1  talc quarry, Rochester verde antique quarry, and | 1  may be quite similar. |
| 2  Mad River mine." | 2  MR. FROST: |
| 3      I've read it, again, poorly, but did I | 3  Q    Okay. |
| 4  read it correctly? | 4  A    But he's not -- |
| 5  A    Right.  Well, and, in all fairness, | 5  Q    He's not focusing on the geology of |
| 6  this is a paragraph that I began to take material | 6  Hammondsville. |
| 7  out of to add to tables. | 7  A    Right. |
| 8  Q    Okay. | 8  Q    Do you know whether or not commercial |
| 9  A    So it may read herky-jerky because of | 9  asbestos was ever mined from either |
| 10  that.  You know, it doesn't -- it doesn't flow as | 10  Hammondsville, Hamm, Argonaut, or the Rainbow |
| 11  brilliantly as it did when I first wrote it. | 11  mines? |
| 12  Q    Okay.  I'm not gonna -- I won't | 12  A    I don't think it was ever mined from |
| 13  question you on that. | 13  that north-south trend at Ludlow. |
| 14  A    Okay. | 14  Q    Okay. |
| 15  Q    Do you agree with me that the Seymour | 15  A    I'm not sure about Hammondsville. |
| 16  report only relates to the East Johnson mine in | 16  The -- the Hammondsville deposit is pretty large, |
| 17  particular?  I can mark it if you want me to. | 17  and it -- you know, it was mined underground, and |
| 18  A    He actually mentions some other mines | 18  I don't have a reference that says that it was. |
| 19  in it, but just giving them as examples of other | 19  Q    Okay.  That was my next question. |
| 20  locations.  And he mentions little mineralogy. | 20  Sitting here, you certainly can't point me to |
| 21  But his thesis is the Johnson mine. | 21  anything that ever says Hammondsville was used as |
| 22  Q    Okay.  And you agree with me that the | 22  an asbestos mine; right? |
| 23  paper nowhere -- the paper nowhere mentions the | 23  A    I don't have a reference to that. |
| 24  Hammondsville mine; correct? | 24      On the other hand, it would be |

65 (Pages 254 to 257)

Robert Cook, Ph.D.

Page 258

1    interesting to -- to actually do an asbestos
2    study for the same areas that we've done a talc
3    study for. And I actually have not done that.
4        In fact, I was surprised when I found
5    that talc had been mined on Belvidere Mountain.
6    I was surprised.
7        So, you know, it's not impossible that
8    at some point in time there was asbestos mined
9    somewhere near Hammondsville in the same rock
10   unit.
11   Q    You don't know one way or the other --
12   A    No.
13   Q    -- sitting here today?
14       All right. Still on page 11 of your
15   report, you note -- it's the paragraph that
16   starts "A literature review for Vermont talc."
17   A    Okay.
18   MS. O'DELL:
19       Still on page 11?
20   MR. FROST:
21       Yes, still on page 11.
22   Q    Sorry.
23   A    It's all right.
24   Q    Trying to orient myself. I apologize.

Page 259

1        I can't find where it is in your
2    report -- bear with me -- but one of the
3    publications you rely on in your report is the
4    Chidester 1951 USGS survey. Does that ring a
5    bell? I'm sure I'm saying it wrong.
6    A    Chidester, Billings and Cady?
7    Q    Yes. I've got it.
8    A    Okay.
9    Q    And do you agree with me that the
10   Hammondsville mine in particular is called out in
11   his report? Correct?
12   A    He mentions it very briefly.
13   Q    And you agree with me that nowhere does
14   Chidester mention the occurrence of asbestos
15   associated with the Hammondsville mine; correct?
16   MS. O'DELL:
17       Object to the form.
18   A    That's correct.
19   MR. FROST:
20   Q    And, then, I believe the Chidester 64
21   document is also on --
22       I'm gonna mark this document. I
23   believe we're on 22.
24   THE COURT REPORTER:

Page 260

1        Yep.
2        (DEPOSITION EXHIBIT NUMBER 22
3        WAS MARKED FOR IDENTIFICATION.)
4    MR. FROST:
5    Q    I don't believe this report is on your
6    literature list. Is that correct?
7    A    I certainly have it. I'm not sure
8    whether I used it or not. I don't believe I did,
9    but -- but I could have.
10       If I had used it, I would have probably
11   been referencing maybe some of the other similar
12   deposits elsewhere than -- or elsewhere than
13   Vermont.
14   Q    Okay. Quickly, if you turn to page 49
15   of this document.
16   A    Okay.
17   MS. O'DELL:
18       And if you need a minute to take a look
19   at it, Dr. Cook, feel free to do that.
20   MR. FROST:
21   Q    Although I promise you the question is
22   really easy.
23   MS. O'DELL:
24       Well, but --

Page 261

1    MR. FROST:
2    Q    No. No, but I agree. If you need time
3    to read it, please take your time.
4    A    Yeah. Go ahead.
5    Q    So if you look at the Table 22, if you
6    look below --
7    A    Right.
8    Q    -- you agree with me that 40A, 40B, and
9    40C are all testing of products that have come
10   from the Hammondsville quarry; correct?
11   A    Looks that way.
12   Q    Okay.
13   A    These are chemical analyses. I think
14   that I'm looking at the right table.
15   Q    Yes, you're looking at the right table.
16   A    Okay.
17   Q    But I'm just noting that, you know,
18   here's another Chidester article where USGS is
19   specifically looking at the Hammondsville quarry.
20   You agree with me on that one; right?
21   A    Yes.
22   Q    If you look -- I think you mentioned
23   NIOSH earlier this morning; correct? You're at
24   least aware who NIOSH is?

66 (Pages 258 to 261)

Robert Cook, Ph.D.

Page 262

1  MS. O'DELL:
2      I don't think he's mentioned NIOSH,
3  but --
4  MR. FROST:
5  Q      I thought you had.  But do you know who
6  NIOSH is?
7  A      Right.
8  Q      And are you aware that NIOSH did an
9  epidemiological study of talc miners working at
10  the various Vermont talc plants?
11  A      I know it exists.  I don't know the
12  results.
13  Q      Okay.  And are you aware the reason
14  that NIOSH specifically chose the Vermont talc
15  mines for purposes of the study?
16  A      No.
17  Q      Were you ever aware that NIOSH chose
18  them because they believed those talc mines to be
19  asbestos-free?
20  MS. O'DELL:
21      Objection to form.
22  MR. FROST:
23  Q      And if you haven't, okay.
24  A      No, I didn't know that.

Page 263

1  MR. FROST:
2      I'm gonna mark another exhibit.
3  MS. O'DELL:
4      23?
5  MR. FROST:
6      No.  That's 22.  No, 23.  You're right.
7      (DEPOSITION EXHIBIT NUMBER 23
8      WAS MARKED FOR IDENTIFICATION.)
9  MR. FROST:
10  Q      So on the fourth piece of paper, which
11  is probably the eighth page into -- I guess the
12  seventh page, it shows a paper or a study called
13  "Occupational exposures to non-asbestiform talc
14  in Vermont" by Boundy.
15  A      Right.
16  Q      Have you ever seen this paper before?
17  A      I don't think so.
18      I don't think I referenced it, did I?
19  Q      No.  It's not in a reference.
20  A      Huh-uh.  I don't think I've seen it.
21  Q      Okay.
22  MS. O'DELL:
23      If you need to take a minute and look
24  at it, Doctor, feel free to.

Page 264

1  A      This is -- it's kind of interesting
2  that they would write this paper.
3  MR. FROST:
4  Q      Why is that?
5  A      Well, the title, it -- it suggests that
6  they're willing to accept the fact that
7  asbestiform talc exists.
8  Q      Okay.  But if you turn to page 377,
9  under "Conclusions" --
10  A      Uh-huh.
11  Q      Do you see where I am?
12  A      Yep.
13      Hang on a sec.  I can't make the pages
14  turn for me.  Hang on a sec.
15  MS. O'DELL:
16      Yeah.  Take a minute if you -- since
17  you haven't seen it, Doctor, if you need to look
18  at it, feel free to take a look at it.
19  A      Have you noticed that half the
20  documents we've got don't have dates on them?
21  MR. FROST:
22  Q      I have, actually.
23  A      Have you noticed that?  It's the most
24  irritating thing.

Page 265

1  Q      I have noticed that.
2  A      See, this is a 1979 document.
3  Q      That's correct.
4  A      And yet their -- the title is
5  forward-looking.
6  Q      So, again, once you're done looking at
7  it, I'm on page 377.
8  A      Yeah, I'm there.  I'm --
9  Q      Okay.  You see under the first sentence
10  it says, "The Vermont talc industry was selected
11  by NIOSH for both epidemiological and
12  environmental surveys to distinguish a TWA dust
13  exposure because this talc is believed to contain
14  minimal amounts of quartz and asbestos."
15      And then if you look at the bottom
16  sentence, that paragraph, "Petrographic
17  microscopy analysis, analytical transmission
18  electron microscopy, and x-ray diffraction with
19  step scanning revealed no asbestos in the bulk
20  samples."
21      Correct?
22  MS. O'DELL:
23      That's what it states.
24  MR. FROST:

67 (Pages 262 to 265)

Robert Cook, Ph.D.

Page 266

1  Q    That's what it states?
2  A    That's what it states.  But in the
3  first thing that you read, it says minimum --
4  minimal amounts.
5  Q    Of, quotes, in asbestos.
6  A    Right.  I would question, you know,
7  whether some of those analytical techniques are
8  sufficient to say there's no asbestos.
9  Q    So you believe that TEM is
10 insufficient?
11 A    TEM, I think, is -- is okay.
12 Q    Okay.
13 A    But I don't think XRD is.
14 Q    Okay.  But, again, analytical
15 transmission electron microscopy, that's TEM;
16 right?
17 A    It is.  But, now, that's gonna tell you
18 the -- the mineralogy of a specific particle.
19 Q    Okay.
20 A    One particle.  Okay?
21 Q    Sure.  But you agree that TEM is a
22 proper --
23 A    Well, the point is that they can't have
24 analyzed a lot of -- a lot of samples because

Page 267

1  it's too time-consuming and too expensive.  So
2  the fact that they didn't find any asbestos with
3  TEM is, you know, that's interesting.
4  Q    And, again, that's just speculating
5  because I'm looking at this sentence, how much
6  they looked at and what they looked at.
7  A    Right.
8  Q    Okay.  Okay.  Can you point me to any
9  specific geology studies or reports in the
10 published literature that show there's any
11 asbestos at the Hammondsville, Hamm, Argonaut, or
12 Rainbow mines?
13 A    In the published literature?
14 Q    Yes, in the published literature.
15 A    No.
16 Q    Okay.  Turn to page 11 of your report.
17 A    Let me -- I'm still thinking about my
18 very rapid "no" response.  We were mine-specific.
19 I'm thinking about -- back about the US
20 Geological Survey's database.  I don't think
21 there -- that they have pointed out asbestos in
22 those mines.  I don't think they have.  They have
23 in some, but I don't think those were -- were
24 mentioned.  I don't think that asbestos was

Page 268

1  mentioned in those mines in the mineral index of
2  Vermont, which, you know, it isn't complete, but
3  I think that it's a useful thing to cite.
4        So, no, I can't think of any in the
5  published literature.  They may exist.  I'm just
6  drawing a blank right now.
7  Q    Okay.  All right.  So turn to page 11,
8  sir, of your report.
9  A    Okay.
10 Q    You state, about halfway through,
11 "Amphibole in amounts less than .1 percent were
12 found in float feed in Hamm mine ore as reported
13 in a product certification report in 1992."
14       And then you cite Imerys 151337.
15 A    Hopefully, that's the right report.
16 MR. FROST:
17       Mark this as 24.
18       (DEPOSITION EXHIBIT NUMBER 24
19       WAS MARKED FOR IDENTIFICATION.)
20 MR. FROST:
21       Here you are.
22 Q    And, again, you'll agree with me this
23 is not a product certification?
24 A    No.  This is a -- not something I've

Page 269

1  seen before.
2  Q    Okay.  And this certainly doesn't talk
3  about amphibole found in float feeder in the
4  mine?
5  A    No.
6  Q    Okay.  Turn to page 12.  The top
7  paragraph, it says, "Concern with incorporating
8  serpentine and lampr- --"
9  A    Lamprophyre.
10 Q    -- "lamprophyre" --
11 A    Uh-huh.
12 Q    -- "from dikes in processed Vermont ore
13 was expressed in 2006" --
14 A    Right.
15 Q    -- "suggesting a maximum of 2 percent
16 for serpentine."
17       Do you also agree with me that by '06
18 Johnson & Johnson was no longer using Vermont
19 talc?  Correct?
20 A    Right.  They were using it but not for
21 cosmetic talc.
22 Q    Not for cosmetic talcum powder.
23 A    It was industrial.
24 Q    Right.

Robert Cook, Ph.D.

Page 270

1    A      You know, the reason I had that in my
2    report was --
3    MS. O'DELL:
4         Go ahead.
5    THE WITNESS:
6         He's not listening.
7    MR. FROST:
8    Q      I'm listening, sir.
9    A      Are you?
10   Q      Okay.  Yes.
11   A      -- was that there's no indication that
12   there was a dramatic change in geology at
13   Argonaut and, so, we know that the lamprophyre
14   dikes are -- are pretty prevalent there.  So I'm
15   just pointing out once again that there, you
16   know, there are things that are there that could
17   have been in the ore from the start.
18   Q      Okay.  But, again, you know, we're
19   using "could have."  We're just sort of guessing
20   at this point.
21   A      Right.
22   MS. O'DELL:
23        Object to the form.
24   MR. FROST:

Page 271

1    Q      All right.  Further down on page 12 --
2    it's the next paragraph -- you write (as read:)
3    "Screening talc ore samples for trace to small
4    amounts of specific amphibole series by X-ray
5    diffraction is not adequate because of its was
6    [sic] high detection limit."
7         Do you see that?
8    A      Uh-huh.  Yes.
9    Q      And what's your basis for the
10   statement?
11   A      Well, I have done I don't know how many
12   years of analytical work with x-ray diffraction,
13   and for my clients, I'm not willing to give it
14   below 1 percent.  But there you -- they do use
15   step scanning, which is a repetitive process that
16   exaggerates the presence of a peak.  I'm willing
17   to buy .1, but that's it.  I mean, I don't think
18   you could possibly do it below that.
19        And it depends on the peaks that you're
20   using, because some of these -- some of these
21   rock units have got minerals --
22        I mean, all of them have multiple
23   peaks.  Okay?  You're not just dealing with an
24   x-ray pattern that has a single peak for one

Page 272

1    mineral.  Every mineral's got multiple peaks.
2         And, so, if you've got a sample that's
3    got, let's say, talc, magnesite, and some
4    chlorite, you can have a very complicated x-ray
5    diffractogram and, unfortunately, there is
6    interference with some of the characteristic
7    peaks, particularly for chrysotile.  I mean, you
8    just -- you can't do chrysotile by XRD because
9    there are two or three things that interfere with
10   the very peak that you need to look at.
11        And, so, it's hard -- it's hard to get
12   to .1, I would say.  But I'm willing to accept
13   that.  But I've, in my experience, I have never
14   been able to get there.
15   Q      Okay.  You agree the published
16   literature says .1, give or take --
17   A      Yeah.
18   Q      -- is the accepted level or the -- the
19   level of sensitivity of the instrument?
20   A      It's there.  That's mentioned.
21   Q      And are you aware that the FDA
22   regulates talcum powder?
23   MS. O'DELL:
24        Object to the form.

Page 273

1    A      I've read that.
2    MR. FROST:
3    Q      Okay.  And you're aware that, under the
4    FDA agreed-upon testing, that XRD testing of bulk
5    talcum powder is the first step?
6    A      Yes.  Yes.  That's been the first step
7    for decades.
8    Q      Okay.  And we've already talked about
9    this, but you don't have an opinion or you're not
10   qualified to give an opinion as to whether or not
11   any amphibole materials that might exist in talc
12   below .1 percent detection level could be capable
13   of causing human disease; right?
14   MS. O'DELL:
15        Object to the form.
16   A      No.
17   MR. FROST:
18   Q      Okay.  Further down on that page, you
19   start talking about chlorite.
20        It's over on page 12, Leigh, third
21   paragraph down.
22        You note, "Chlorite family species can
23   contain specific heavy metals such as chromium
24   and are consistently reported in core logs from

69 (Pages 270 to 273)

Robert Cook, Ph.D.

Page 274

1  the Argonaut mine."
2          Then you have a cite and the example of
3  "chlorite content of 4.1 percent is reported for
4  its ores in a reserve study produced in '08.
5          Okay? And just because a level of
6  chlorite shows up in the drilling core logs
7  doesn't necessarily mean that it's in the talc
8  that's used to produce the ore; correct?
9  A      Well, let me answer it in an
10 interesting way. When you look at the analyses
11 that we had --
12         And, by the way, earlier when I said I
13 hadn't seen a set of analyses that were in spec
14 for the metals, I was referring to Vermont.
15 Q      Okay.
16 A      I mean, you know, China's usually in
17 spec completely for metals.
18         But if you look at the -- the analyses
19 for Grade 66 talcum, if you have 99 percent talc,
20 which is wonderful, there's still 1 percent
21 something else. And that something else is
22 probably a chlorite family mineral. That's
23 probably the way you have got to explain that,
24 that other 1 percent.

Page 275

1          If it is a chlorite family mineral,
2  then it's possible that these high metal numbers
3  that you have may be related to the chlorite, at
4  least in part. And that was -- that was the
5  reason for my comment.
6  Q      Okay.
7  A      I'm -- I'm trying to explain some of
8  the numbers.
9  Q      I understand.
10         So it's more of a scientific
11 analysis --
12 A      Right, exactly.
13 Q      -- of here's how you could explain some
14 of the higher levels because they'd be associated
15 with chlorite?
16 A      Right.
17 Q      Okay.
18 MS. O'DELL:
19         This is the document I think that he
20 was asking you about.
21 THE WITNESS:
22         Okay.
23 MR. FROST:
24 Q      All right. Gonna move on to China now.

Page 276

1  A      Whatever.
2  Q      Still on page 12, but --
3  A      Yep. Yep.
4  Q      -- we'll move into China.
5  A      Thanks.
6  Q      You note at the second paragraph under
7  the heading "China," quote, "There was a report
8  of asbestos in Chinese talc in late 2009 (Imerys
9  309326)." And then you state, "In 2016
10 chrysotile particles were found in talc mined in
11 China (JNJ52161)."
12         All right. So let's look at those in
13 turn. Let's start with the Imerys 309326.
14         (DEPOSITION EXHIBIT NUMBER 25
15         WAS MARKED FOR IDENTIFICATION.)
16 MR. FROST:
17 Q      And I'll direct your attention to the
18 last page.
19 A      Yeah. Got it.
20 Q      Okay. And I take it you're relying on
21 the sentence about halfway through. It says,
22 "Chinese authorities have informed J&J" --
23 A      Right.
24 Q      -- "that its internal testing contained

Page 277

1  asbestos in several talc body powers marketed in
2  China, including two products from J&J."
3  A      Correct.
4  Q      Okay. Do you agree with me that it
5  continues to read, "However, four independent
6  Chinese laboratories using similar test method to
7  the Chinese authorities did not find any
8  asbestos. J&J approached RTM" --
9          Which is Rio Tinto Minerals.
10 A      Yeah.
11 Q      -- "for help in the issue. RTM
12 provided initial support in identifying potential
13 drawback of the test method used by the Chinese
14 authorities. Chinese authorities invited J&J and
15 others concerned -- J&J, the other concerned talc
16 body powder companies and the four independent
17 Chinese laboratories whose asbestos test results
18 were negative, to discuss and resolve the test
19 method discrepancies."
20         I read that right?
21 A      Yeah. Sure.
22 Q      Okay. So, again, you're not noting in
23 here that there's a question as to whether or not
24 the Chinese talc findings of chrysotile are

70 (Pages 274 to 277)

Robert Cook, Ph.D.

Page 278

1    correct; right?
2    MS. O'DELL:
3            Object to the form.
4    A        Well, sure.  I mean, it's a report
5    of -- of asbestos in a particular sample.  And it
6    doesn't mean you can't take more samples that are
7    asbestos-free.
8    MR. FROST:
9    Q        Okay.  And, again, do you know -- do
10   you know if the Chinese authorities ever had the
11   conversation with the various labs that tested
12   whether or not they ever came to the
13   determination that there truly was chrysotile?
14   A        I think --
15   MS. O'DELL:
16           Excuse me.
17           Object to the form.  Misstates the
18   record.
19   MR. FROST:
20   Q        You can answer.
21   A        I think that there is a whole series of
22   memoranda and reports that relate to, you know,
23   it was the bee in the bonnet here.  And I don't
24   remember the exact details of who did what to

Page 280

1            Excuse me.  Just give me a second,
2    Jack.
3    MR. FROST:
4            Sure.
5    MS. O'DELL:
6            Were you finished?  I apologize.  I was
7    trying to get --
8    MR. FROST:
9            Yeah.  You can object.
10   MS. O'DELL:
11           Object to the form.  Misstates the
12   record.
13   MR. FROST:
14   Q        Okay.
15   A        Yeah.  I don't remember exactly what
16   the -- the resolution was, but I don't think
17   everybody quit -- quit using the Chinese talc
18   because of the -- the results of that -- of that
19   test.
20   Q        All right.
21   A        But it doesn't -- to me, it doesn't
22   mean there was no asbestos.
23   Q        Okay.  I'm gonna mark JNJ52616.
24           (DEPOSITION EXHIBIT NUMBER 26

Page 279

1    whom, but I think in the end they decided that it
2    must have been a mistake.
3    Q        Okay.
4    A        They didn't prove it was a mistake, but
5    I think that that was the consensus.
6    Q        That was the ultimate determination?
7    Okay.
8    A        You know, I'm experienced with the
9    Chinese, and -- and, in the first place, they
10   would never report talc if it would damage their
11   competitive market for a product.  They would
12   have never reported asbestos in talc.  So it
13   seemed to me kind of odd that they -- that they
14   did it in the first place if there was any
15   question about it.
16           The -- the analytical equipment
17   available in China is, you know, some's good and
18   some's bad.
19   Q        Okay.  But, again, you agree -- you
20   know, your recollection is the ultimate
21   determination is that it was a mistake --
22   A        It kind of --
23   Q        -- it ---
24   MS. O'DELL:

Page 281

1            WAS MARKED FOR IDENTIFICATION.)
2    A        For -- you know, let me just give you
3    an example.  If these people determined asbestos
4    with XRD, it's a pretty good chance that it was
5    certainly higher than .1.  I would guess that
6    their equipment wouldn't -- wouldn't get it down
7    that low.  So they must have -- they must have
8    seen something.
9    MR. FROST:
10   Q        But, again, you're only guessing at
11   this point; correct?
12   A        Yeah, I'm guessing.
13   MS. O'DELL:
14           Object to the form.
15   MR. FROST:
16   Q        All right.  Let's look at the document
17   that's marked 26.  And if you turn to the second
18   page under Section 3, "Observation," about
19   halfway down the last full paragraph in that --
20   that box, it states, "The samples were reprepped
21   and analyzed on 2-22-2016.  It indicated the
22   sample and ID number 3138494 had multiple
23   chrysotile particles.  Reproduction could not
24   duplicate the original results."

71 (Pages 278 to 281)

Robert Cook, Ph.D.

| Page 282 | Page 284 |
|---|---|
| 1        I take it that's the section of this<br>2 document you're relying on --<br>3 A      Yes.<br>4 Q      -- to say that chrysotile was found in<br>5 2016?<br>6 A      Yes.<br>7 Q      Okay. If you turn over to the next<br>8 page.<br>9 A      Can I make a comment about that?<br>10 Q     Sure.<br>11 A      It's amazing how many reanalyses end up<br>12 with nothing in them. And unless you know how<br>13 they're re- -- resampling and reanalyzing, you're<br>14 really not sure what's going on here. If they<br>15 had a split of the original sample and came up<br>16 with nothing when the first split had something,<br>17 they should have run it a third time.<br>18 Q      Okay. Well, let's look over to the --<br>19 to page 4, or the fourth page of this. I don't<br>20 believe it has page numbers.<br>21 A      Okay.<br>22 Q      About halfway through that paragraph it<br>23 states, "Retest samples were reanalyzed using<br>24 specific talc parameters on the XRF which should | 1 I mean, it isn't gonna work.<br>2 MR. FROST:<br>3 Q      Okay. You agree that's what the<br>4 document says; right?<br>5 A      Yeah. You read it -- you read it the<br>6 way it's written, but...<br>7 Q      All right. I'm gonna turn to some more<br>8 general questions now.<br>9        Now, you're generally aware that there<br>10 are various regulations regarding ore reserve<br>11 reporting, models of deposits, mine plans, things<br>12 like that that miners have to abide by; correct?<br>13 MS. O'DELL:<br>14        Object --<br>15 A      You said regulations?<br>16 MR. FROST:<br>17 Q      Yeah, regulations.<br>18 MS. O'DELL:<br>19        Object to the form.<br>20 MR. FROST:<br>21 Q      Or laws and regulations.<br>22 MS. O'DELL:<br>23        Object to the form as vague as to time<br>24 and location. |

| Page 283 | Page 285 |
|---|---|
| 1 have been applied when the original samples were<br>2 analyzed."<br>3 A      With XRF?<br>4 Q      XRF. I'm just reading from the<br>5 document.<br>6 A      Uh-huh.<br>7 Q      "They were not applied because the<br>8 analyst who typically runs the XRF was out of the<br>9 office and her backup did not apply the<br>10 talc-specific settings."<br>11        Did I read that correctly?<br>12 MS. O'DELL:<br>13        Object to the form.<br>14 A      Yeah. I --<br>15 MR. FROST:<br>16 Q      Do you agree with me that what they're<br>17 saying there is that the first tested was because<br>18 of poor lab procedure?<br>19 MS. O'DELL:<br>20        Object to the form.<br>21 A      I'm not sure that's what it says, but<br>22 I'm -- and I'm puzzled about the use of XRF.<br>23 I -- I would think that they would -- they had to<br>24 have been XRD. You can't do XRF with asbestos. | 1 A      Yeah. The -- this -- you must be<br>2 talking about state-specific things.<br>3 MR. FROST:<br>4 Q      Let me -- the SEC, for example, has<br>5 mining regulations. Are you aware of those?<br>6 A      Did you say SEC?<br>7 Q      I said SEC.<br>8 A      Like Southeastern Conference?<br>9 Q      No. Like the Securities Exchange<br>10 Commission.<br>11 A      Yeah. I think that in the sense that<br>12 if you're a publicly traded company, there's<br>13 certain data that has to be made available.<br>14 Q      Okay. And there are also -- you know,<br>15 there's also JORC? Have you ever heard of JORC,<br>16 the Joint --<br>17 A      I've heard of it. I don't know what it<br>18 is.<br>19 Q      Okay. And there's other bodies. EPA<br>20 has regulations. State regulators have<br>21 regulations. So you agree there's a body of law<br>22 in regulation, right, that relates to mining?<br>23 A      There are --<br>24 MS. O'DELL: |

Robert Cook, Ph.D.

| Page 286 | Page 288 |
|---|---|

Page 286

1          Object to the form.  Vague.  It's
2   unclear what you're asking.
3          But if you understand the question --
4   but don't speculate as to what it means.
5   A      I -- I -- I think I understand it.
6          The states, when you're gonna open up a
7   mine, require certain information to be presented
8   in support of, really, your reclamation plan.
9   But in order to present a good reclamation plan,
10  you have to give them information about the
11  mining, the length of the mining operation, its
12  life, and some details about what you're doing.
13         So each state can have slightly varying
14  requirements for that.  But the whole idea is
15  they want your money.  They want you to put up a
16  reclamation bond.  And in order to figure out
17  exactly how hard to squeeze, they need some
18  information.
19  MR. FROST:
20  Q      Okay.  I'll ask it a different way
21  because I'm not just focusing in on reclamation.
22         But are you aware that there are
23  regulations and standards out there that mines
24  have to follow regarding things like, you know,

Page 287

1   for example, model -- you know, how to model a --
2   how -- how to model a deposit, mine plan, things
3   of that nature?
4   MS. O'DELL:
5          Object to the form.
6   A      I have never been required to turn in a
7   mine plan to a regulatory agency.  But what I
8   have had to turn in were the data necessary for
9   them to issue water permits and air permits.
10  And -- and those require some modeling.
11         I have an interest in three operating
12  mines right now.  We've never been asked to
13  submit our detailed mining plans.
14  MR. FROST:
15  Q      Okay.  So you're getting very focused
16  in on -- on examples.  So I guess is it fair to
17  say you're not an expert in nor are you
18  particularly familiar with, like, the JORC
19  specifications that require talc mines?
20  A      Like I said, I've heard of JORC and
21  I -- but I don't know anything about it.
22  Q      Okay.  And you also couldn't tell me,
23  you know, other than a couple examples, you're
24  not an expert in the regulatory requirements that

Page 288

1   would, you know, cover, for example, the Windsor
2   Minerals operations in Vermont?
3   A      I don't see how it would be that
4   different from anything else, any other
5   operation.
6   Q      Okay.  But, sitting here today, can you
7   tell me that -- what the regulations are that
8   they're required to follow?
9   A      Well --
10  MS. O'DELL:
11         Object- -- objection as to 1965 to
12  2000 --
13  MR. FROST:
14         Sure.  I'm just asking generally if
15  he's aware of any of the -- the regulations that
16  are required, and then we can sort of focus in
17  from there.
18  MS. O'DELL:
19         Well, you asked a question that relates
20  to today at Windsor Minerals.  And I don't think
21  Windsor Minerals is operating --
22  MR. FROST:
23         It -- it doesn't --
24  MS. O'DELL:

Page 289

1          -- in Virginia -- Virginia -- Vermont
2   today.
3   MR. FROST:
4   Q      I'm not limiting my question today.
5   I'm just saying in general.
6          So I'll put it this way.  I think we
7   established at the beginning you're not a
8   regulatory expert, nor do you hold yourself out
9   to be a regulatory expert.  Correct?
10  MS. O'DELL:
11         Object to the form.
12  A      I know a lot about it.
13  MR. FROST:
14  Q      Okay.
15  A      I don't know that I'm an expert.  But
16  I've had to comply with regulatory rules and
17  regulations.  And if I was going to go and get a
18  mine permit right now --
19         Let's just use Alabama, because I know
20  enough about Alabama.
21         -- there's three permits required in
22  Alabama.  There is an air permit.  You've got to
23  prove that the operation that you're gonna open
24  up is not going to exceed a certain level of

73 (Pages 286 to 289)

Robert Cook, Ph.D.

|  | Page 290 |
|---|---|

1   particulate matter in the air, food, your
2   operation.
3       If you're gonna discharge water, you've
4   got to have a water permit.  If you --
5       You have to have what we call bugs and
6   bunnies study.  You've got to prove there's no
7   endangered species.
8       You've got to have an anthropological
9   study that proves that you're not impacting a
10  site of, you know, Indians.
11      And then the final thing is you've got
12  to get a state mining permit.  And in Alabama,
13  the state mining permit is virtually a rubber
14  stamp.  It may not be in other states.  But in
15  Alabama, that's -- that's what you've got to do.
16  And, I mean, I've done that three or four times
17  in the last ten years.
18  Q      All right.
19  A      And, so, I would assume -- I would
20  assume -- and, of course, there is -- once you
21  say you're gonna -- gonna operate, you need to
22  post your reclamation bond.  And that then
23  requires you to present certain information.  In
24  our -- in Alabama, it's to a State Department.

|  | Page 291 |
|---|---|

1   Q      Okay.  I'll ask it a different way.
2       Sitting here today, you can't tell me
3   what rules, laws, and regulations specifically
4   oversaw and that Windsor Myer -- Windsor Minerals
5   was required to abide by from the period of 1965
6   to the late 1990s when they were supplying talc
7   to Johnson & Johnson.  Is that a fair statement?
8   A      In the late 1990s, I think I gave you
9   some just now that they would have had to comply
10  with.
11  Q      Okay.  I'm not talking about some.  I'm
12  talking about can you tell me the regulatory
13  requirements that Windsor Minerals would have
14  been required to follow with respect to their
15  mine and their mining practices?
16  MS. O'DELL:
17      Object to the form.
18  A      Is this once the mine is in operation?
19  MR. FROST:
20  Q      When the mine is operating.
21  A      Oh, okay.  I'm sorry.  I thought you
22  were talking --
23  Q      No.  I'm talking about --
24  A      -- about trying to open up the mine.

|  | Page 292 |
|---|---|

1   Q      No.  Its yearly ongoing operations.
2   A      Yeah.  Okay.  This is all totally
3   different, then.  Yeah.  That's when MSHA gets
4   involved with you.
5   Q      Okay.  And MSHA's one, and there are
6   lots of regulatory agencies; correct?
7   A      Yeah.  Well, around here, MSHA's the
8   one that you fear.  Because when they show up,
9   you're gonna get fined.  I mean, they pay for
10  their visit here to your property.
11      And, so, there's a list of things that
12  they look at that's as long as your arm.  And if
13  they can't find one of them out of compliance,
14  they'll generate one.
15  Q      Okay.  So other than the MSHA
16  requirements, which are health and safety, can
17  you tell me any of the other --
18      You know, I've mentioned JORC.  It
19  seems like you're not familiar with the JORC
20  requirements.  Correct?
21  A      If I am, it's under another name or
22  another agency applies their -- whatever their
23  regs are.
24  Q      Okay.  But, sitting here, you know, you

|  | Page 293 |
|---|---|

1   certainly can't say --
2       For example, we don't need to go --
3       A lot of the mine reports from -- from
4   the various miners talk about, you know,
5   complying with JORC specifications.  You couldn't
6   tell me what those specifications --
7   A      What does JORC stand for?
8   Q      Joint Ore Reserve Commission.
9   A      No.
10  Q      Okay.  And you certainly don't list any
11  of the laws, regulations, and requirements within
12  your report, right, that --
13  A      No.
14  Q      -- mining companies --
15  A      I bet you there's some mining companies
16  out west that would love to know about this.
17  Q      Okay.  But, again, focusing on your
18  report, you certainly don't list any of the laws,
19  regulations, requirements.
20  A      No.
21  Q      And you're not intending to offer any
22  opinions --
23  A      No.
24  Q      -- about compliance with laws,

74 (Pages 290 to 293)

Robert Cook, Ph.D.

Page 294

1  regulations, and requirements in this case.
2  A    No.  But you're gonna make me go and
3  look some stuff up.
4  Q    Sure.
5       And would you agree with me that
6  compliance with laws, requirements, regulations
7  is one of the things --
8       Strike that.  I'll ask it differently.
9       You talk quite a bit in your report
10  about sampling methodologies.  And do you agree
11  with me there are probably thousands of papers
12  that have been published about sampling
13  methodologies, you know, how to determine whether
14  or not a sample is representative of a greater
15  group of ore and things like that; right?
16  MS. O'DELL:
17       Object to the form.
18  A    I'm sure there's --
19       Pardon me.
20       I'm sure there -- I don't know that
21  there's thousands, but I know there's a lot.
22  MR. FROST:
23  Q    Okay.  And there are a bunch of
24  competing theories or different theories, anyway,

Page 295

1  about how to do sampling, how to calculate,
2  things of that nature; correct?
3  A    I don't know how competing they are.  I
4  know that they evolve with time.  If you took a
5  good paper that tried to hammer all this out that
6  was published in 2015 and compared it to one that
7  was written in 1985 --
8  Q    There'd be some differences.
9  A    Right.  There might be competitive
10  ideas in there.
11  Q    But you do agree with me sort of the
12  underlying principle under most of the different
13  theories is that you have to use geostatistics to
14  determine whether or not what you're sampling is
15  itself representative of the ore body; correct?
16  MS. O'DELL:
17       Object to the form.
18  A    You -- yeah.  You would hope that that
19  would happen.
20  MR. FROST:
21  Q    Okay.  And am I also correct that you
22  have not done any geostatistical analysis of any
23  of the sampling data from either
24  Johnson & Johnson or Imerys in this case?

Page 296

1  MS. O'DELL:
2       Object to the form.
3  A    I have -- I have not.  It's -- it's
4  insufficient to -- to work with.
5  MR. FROST:
6  Q    And, again, you know, you've -- you've
7  run no analysis to determine --
8       Well, we'll turn to the specifics when
9  we get to them.
10       But don't you agree that it's important
11  as a scientist, when you're making a
12  determination that something is complete or not,
13  that it's based on the theories of peer-reviewed
14  literature?
15  MS. O'DELL:
16       Object to the form.
17  A    Is complete or not?
18  MR. FROST:
19  Q    Yes.  Like here, such as -- you know,
20  your overall opinion that the sampling, for
21  example, done by the mining company is a
22  representative.  As a scientist, don't you agree
23  with me that it's important to base those
24  opinions on empirical data?

Page 297

1  MS. O'DELL:
2       Object to the form.
3  A    It needs to be based on data.  It sure
4  does.  I mean, and I think I've based my opinion
5  on data and the lack thereof.
6  MR. FROST:
7  Q    But you didn't run or attempt to run
8  any type of statistical analysis to determine
9  whether or not the sample was truly
10  representative, the sample was --
11  MS. O'DELL:
12       Object to the form.
13  A    No.  And my point was that there's --
14  there's -- they're missing -- there are intervals
15  in time where there's missing data.
16  MR. FROST:
17  Q    Okay.
18  A    When you have that, you can't do much.
19  Q    And you also agree with me, then, that
20  your opinions regarding the adequacy of the
21  sampling is based on an incomplete data set?
22  MS. O'DELL:
23       Object to the form.
24  A    It's -- it's worse than that.  The

75 (Pages 294 to 297)

Robert Cook, Ph.D.

Page 298

1  sampling mechanisms are not described. There'll
2  be a place where it'll describe or will mention
3  mechanical sampling, but it doesn't say when the
4  mechanical sampler was put in place to take the
5  place of, say, a grab sample. Doesn't say what
6  type of mechanical sampler it was. Is it
7  something that's sampling continuously or once an
8  hour an arm sweeps across a conveyor belt and
9  grabs a sample? There are all kind of samplers.
10        And when you've got some-- something
11  as critical as -- as your cosmetic talc that
12  really requires, you know, careful attention, I
13  would like to have seen exactly where in the
14  various process this sampling was taking place.
15        And there -- there are references to
16  sampling at the mine itself, and we can't -- we
17  haven't seen the data. And yet there should be
18  hundreds and hundreds and hundreds of analyses of
19  drill hole cuttings that are being put in as
20  blast holes. You know, I'm sure that if you're
21  gonna do selective mining, you don't use a drill
22  hole spacing that's 10 feet on a -- on a side.
23  That's what we use in the quarry. And we get
24  huge amounts of rock.

Page 299

1        If I was gonna be selectively mining
2  talc, I would have smaller faces, tighter holes.
3  I would be -- I wouldn't be having more than a
4  few thousand tons per blast. But I would know
5  exactly what I was fixing to blast and -- and
6  that data, there are documents to indicate that
7  the data sufficient to move in that direction
8  exists. But we never got it.
9  Q      Okay.
10  A      We've asked for it.
11  Q      And that's -- that's very important.
12  Because one I think we've already established,
13  you have no way of telling whether or not you
14  actually have all the documents that are
15  relative -- are relevant to these points;
16  correct?
17  MS. O'DELL:
18        Object.
19  MR. FROST:
20  Q      You have only what plaintiffs' counsel
21  has deemed to give you.
22  MS. O'DELL:
23        Object to the form. Based on what was
24  disclosed and produced in the litigation, as you

Page 300

1  well know.
2  A      They have not suggested to me that
3  they've withheld anything. Whenever I've asked
4  for something, if they got it, they give it to
5  me. If they don't, I never see it.
6  MR. FROST:
7  Q      But you're guessing that they're giving
8  you everything. You have no way of telling me
9  whether or not --
10  A      I don't know --
11  Q      -- they are --
12  MS. O'DELL:
13        Excuse me. Are you finished with your
14  question?
15  MR. FROST:
16        Yeah. I'm finished.
17  MS. O'DELL:
18        Object to the form.
19        You may answer.
20  A      I don't know that that's a guess.
21  MR. FROST:
22  Q      Well, you certainly have done nothing
23  independently, nor have you been able to, to
24  verify that; correct?

Page 301

1  A      I've tried to break into their offices
2  at night and see -- see if they had a big pile of
3  data they should have sent to me.
4  Q      Well, did you ever ask if you could
5  have access to the full database --
6  A      I'm --
7  Q      -- of documents?
8        I'm not -- I know you're being
9  facetious.
10  A      Yeah.
11  Q      But have you ever asked to have full
12  access to the document database of the
13  documents --
14  A      If they're --
15  Q      -- provided by Johnson & Johnson and
16  Imerys?
17  MS. O'DELL:
18        Object.
19  A      Pardon me.
20        No, certainly not, because of the
21  number involved. What would I do with 800,000
22  documents?
23  MR. FROST:
24  Q      And you've never run any searches

76 (Pages 298 to 301)

Robert Cook, Ph.D.

Page 302

1   yourself against the database?
2   A      No.
3   Q      So, again, you're just relying on what
4   plaintiffs have given to you.
5   MS. O'DELL:
6          Object to the form.
7   A      I have absolutely no reason to doubt
8   the honesty of Miss O'Dell and company.
9   MR. FROST:
10  Q      Well, I can tell you you don't have the
11  complete copy -- complete compilation of all of
12  the --
13  A      Well, one might ask why not since we've
14  asked for them over and over again.
15  Q      I'm talking about the documents you
16  have, sir.  I can tell you there are testing
17  results, for example, that aren't provided --
18  A      Well --
19  MS. O'DELL:
20         Object to --
21  MR. FROST:
22  Q      We'll go over some of them later.
23  MS. O'DELL:
24         Object to the form.

Page 303

1   MR. FROST:
2   Q      And we'll go over some of those later.
3   But, again --
4          So what we heard a lot of is you're not
5   saying I've reviewed all the documents and I know
6   they're not using the correct equipment.  It
7   sounds like your opinion more is "I can't tell
8   what they're using and there's incomplete data
9   here," and that's sort of the basis for your
10  opinion.  Is that -- is that a fair observation?
11  MS. O'DELL:
12         Object to the form.
13  A      Not -- not really.  I mean, it's part
14  of it.  It's part of what I see, and the total
15  document set that I've got is a suggestion that
16  there's sampling going on.  But even -- even if
17  the sampling is taking place, we don't have
18  analytical results for samples that should have
19  been taken.  And, so, it's very difficult to use
20  anything other than what we've got to draw
21  conclusions from.
22  MR. FROST:
23  Q      Okay.  You agree with me you're drawing
24  conclusions based on an incomplete record.

Page 304

1   MS. O'DELL:
2          Objection to form.
3   A      I'm not saying that at all.  I am not
4   saying that.  I'm saying that we have asked for
5   all of the data.  And if what I've been given is
6   all you've got, then fine.  That's fine with me.
7   But I'm not saying that I've got -- that there's
8   a data set out there that you guys have held back
9   and not bothered to send in.  I'm not gonna say
10  that.
11  MS. O'DELL:
12         We've been going about an hour.  Let's
13  take a short break.
14  MR. FROST:
15         That's fine.
16  VIDEOGRAPHER:
17         Going off the record.  The time is 2:44
18  p.m.
19         (OFF THE RECORD.)
20  VIDEOGRAPHER:
21         We're back on the record.  The time is
22  3:01 p.m.
23  MR. FROST:
24  Q      I've sort of come up with another

Page 305

1   general question I forgot to ask.  But would you
2   agree with me that compliance with legal
3   standards is an important consideration in
4   determining whether or not a mine is being
5   properly operated?
6   A      Yes.
7   Q      All right.  Turn to page 37 of your
8   report.
9   A      Okay.
10  Q      Okay.  The second full sentence on that
11  page, it says, "Ore sampling techniques do not
12  suggest representativeness and were questioned in
13  a 2009 Intertek audit."  And you cite Imerys
14  031712.
15  A      I think that's with respect to Chinese
16  talc.
17  Q      Okay.
18  A      Okay.
19  Q      Let's -- let's take a look at that
20  document real quick.
21  MS. O'DELL:
22         031712?
23  MR. FROST:
24         031712, yes.

77 (Pages 302 to 305)

Robert Cook, Ph.D.

Page 306

1       What number are we at?
2  THE COURT REPORTER:
3       27.
4       (DEPOSITION EXHIBIT NUMBER 27
5        WAS MARKED FOR IDENTIFICATION.)
6  MR. FROST:
7  Q       I'll call your attention to page 5.
8  A       Okay.
9  Q       The first audit area, I take it that's
10  what you're referencing --
11  A       Yes.
12  Q       -- in the sample.
13  A       Uh-huh.
14  Q       Okay.  And, again, you'd agree with me
15  that Intertek rates this audit area as minor;
16  correct?
17  A       I'm looking for a level 5 on here.  I'm
18  not seeing -- I'm not seeing the level.
19  Q       It's under the box that goes audit
20  area, finding, recommendation, and then rating.
21  Is -- is the bottom.
22  A       Oh, the rating.  I see it.  Yeah.
23  Q       Then it says "minor."
24  A       Right.  Right.  Sure.

Page 307

1  Q       Okay.
2  A       Excuse me.  I was looking for the
3  letter -- the number 5.
4  Q       Oh.  The number.  Oh, okay.  Sorry.  It
5  was page 5.  I apologize if I caused confusion.
6  A       Well, 5 is the rating for minor.
7  That's their minor rating.
8  Q       Oh, I see.
9       So you'd agree with me that whatever
10  concerns they may have addressed, they rated this
11  as a minor concern?
12  A       To them?
13  Q       Yes.
14  A       Yes.
15  Q       Okay.  Further down on page 37 of your
16  report, next paragraph, sort of in the middle,
17  you note that "As recently as 2016, Chinese
18  testing for asbestos is implied in a Guilin
19  Guiguang talc development company document,
20  JNJ631362 at 364."
21       And then, further down, the next
22  sentence, you wrote, "I have not seen any data
23  confirming this."
24       Did I read that correctly?

Page 308

1  A       That's true.
2  Q       Okay.  We'll turn to 631362.
3       (DEPOSITION EXHIBIT NUMBER 28
4        WAS MARKED FOR IDENTIFICATION.)
5  MR. FROST:
6  Q       And I'll direct your attention to page
7  364, which is the callout from the report.
8  MS. O'DELL:
9       Bates number 364 at the end?
10  MR. FROST:
11       That's correct.  So it's 631364.
12  A       Got it.
13  MR. FROST:
14  Q       Okay.  And if you look down at number
15  14 --
16       Well, first off, do you agree that this
17  is a Certificate of Analysis from the mining
18  company, the Chinese mining company?
19  A       Yes.
20  Q       Okay.  And if you look down at 14, the
21  document's been translated and it says:  In the
22  absence of asbestos, China SFDA method, none
23  detected by X-Ray Diffraction, none detected as
24  fibrous amphibole by Polarized Light Microscopy,

Page 309

1  performed only if detected by X-ray diffraction,
2  et cetera.
3       So do you agree with me that this is
4  the mine owner certifying that they've tested the
5  talc and it's come up as asbestos-free?
6  MS. O'DELL:
7       Object to the form.
8  A       It does not say that.  It says they
9  were unable to detect it with those techniques.
10  And the limit of detection's like .1.  So that's
11  not what this says.
12  MR. FROST:
13  Q       Well, it says "Absence of asbestos,
14  none detected."
15       Do you agree with me there?
16  A       That is -- that is the problem.  They
17  use this word "absence of asbestos" in their --
18  their Certificates of Analyses, and yet the
19  technique they're using can't justify that.
20  Q       So the reason you use the word
21  "implied" is because they're using a nondetect
22  standard as opposed to saying what?  Non -- no
23  asbestos?
24  A       Correct.

78  (Pages 306 to 309)

Robert Cook, Ph.D.

Page 310

1    Q      But, again, they're testing it by, you
2    know, China SFDA method; correct?
3    MS. O'DELL:
4          Object to the form.
5    A      Their FDA method isn't necessarily
6    consistent with what J&J would like.
7    MR. FROST:
8    Q      Okay.  But, again, we have testing
9    here.  They're doing it by x-ray diffraction, and
10   then polarized light microscopy is what the --
11   the notation says.
12   A      Right.
13   Q      Correct?
14   A      Correct.
15   Q      And you have no reason to doubt that --
16   or to say that the Chinese mine owner is lying on
17   their Certificate of Analysis; right?
18   MS. O'DELL:
19         Object to the form.
20   A      When he says "free from asbestos," he
21   may be lying.
22   MR. FROST:
23   Q      And why --
24   A      I mean, they do it all the time.

Page 311

1    Believe me.  I mean, that's not unusual.  But --
2    but I'm not accusing them of lying.  I'm saying
3    that there is a confusion of terminology is all.
4    Q      Okay.  And you believe the confusion of
5    the terminology is that absence of asbestos, none
6    detected --
7    A      They don't mean the same thing.
8    Q      -- implies --
9    A      They do not mean the same thing.
10   Q      Okay.  And you don't believe that they
11   are certifying here that, pursuant to the Chinese
12   FSDA method, that this is, you know, certified as
13   absent of asbestos?
14   A      If they're certi- --
15   MS. O'DELL:
16         Object to the form.
17   A      If they're certifying it as
18   asbestos-free, then if I were Johnson & Johnson,
19   I wouldn't -- I wouldn't be accepting that,
20   because we've known all along that .1 is the
21   lower detection limit using that -- that
22   technique.  So you could have .05 percent
23   chrysotile in the sample, and their nondetect
24   wouldn't ever say that.  I mean, they just are

Page 312

1    not gonna know.
2          And, so, it's improper for them to say
3    that there's no asbestos there.  They should say
4    no asbestos was detected.  It's very simple.
5    MR. FROST:
6    Q      Again, isn't that what they're saying,
7    absence of asbestos showing the Chinese method
8    and saying none detected?
9    A      No.
10   Q      I don't -- I don't understand.  The
11   words they're using on this paper are exactly
12   what you're explaining to me.
13   A      No, they're not.
14   Q      I'm confused.  All right.  So it says
15   absence of asbestos.
16   A      Stop.
17   Q      Right?
18   A      Stop right there.  Absence of asbestos
19   means there is none there.  Correct?
20   Q      Well, that's -- under the test items,
21   that's why --
22         So if you look up, test items, it says,
23   "Test, absence of asbestos."  Right?  Then it
24   says, "Test method:  China, SFDA method."  And

Page 313

1    then, under acceptance of criteria, it says "none
2    detected."
3    MS. O'DELL:
4          Object to the form.
5    A      That does not mean absence.  I mean,
6    the two do not mean the same thing.  That's --
7    that's my point.
8    MR. FROST:
9    Q      So --
10   A      When you --
11         Listen, this isn't that difficult.
12   When you say that you can't detect something, it
13   doesn't mean it isn't there.  It may be there but
14   in a level lower than your detection limit.  So
15   when they're using those two techniques, there is
16   a lower detection limit that -- that is really
17   inadequate, I think, for Johnson & Johnson's
18   purposes.  Because you can't say that something
19   is absent if you can only detect down to a tenth
20   of a percent.  And that's what's going on here.
21   Q      Okay.  And that's --
22   A      This is very simple.
23   Q      And that's just your opinion; right?
24   A      No.  No.  That's not my opinion, no,

Robert Cook, Ph.D.

Page 314

1  sir.
2  Q      Let me ask my question. That's just
3  your opinion, but we've already established the
4  FDA J4-1 method that they're required to test
5  requires XRD; correct?
6  A      Absolutely.
7  Q      And we've already established that
8  you're not an expert and can sit here and say
9  that asbestos below a level of .1 percent is
10 capable of causing human disease; correct?
11 MS. O'DELL:
12      Object to the form.
13 A      Human disease I'm not an expert in.
14 MR. FROST:
15 Q      Yeah. Exactly.
16 A      So that has nothing to do with this.
17 Q      And, again, they're saying free --
18 they're not saying there's no asbestos in here.
19 They're saying --
20 A      Yes, they are.
21 Q      No.
22 A      They say an absence of asbestos.
23 Q      That's the test name, if you look at
24 the column. They're saying none detected.

Page 315

1  A      If they say "none detected," that's
2  fine.
3  Q      And that's -- isn't that exactly what
4  it says here?
5  A      It doesn't mean asbestos-free. So if
6  they're putting this in the asbestos-free column
7  and they're using that statement to show that
8  it's asbestos-free, that's not right.
9  Q      So, again, where in this document does
10 it say asbestos-free?
11 A      I thought that you said that's what the
12 column was labeled.
13 Q      The test is absence of asbestos.
14 A      That's asbestos-free.
15 Q      And the -- no. It says absence of
16 asbestos. You are changing the words. Look at
17 the document.
18 MS. O'DELL:
19      Object to the form.
20 MR. FROST:
21 Q      It says absence of asbestos.
22 A      I'm not changing the words.
23 Q      Well, where does it say asbestos-free?
24 A      Isn't "absence of" mean free of?

Page 316

1  Q      That's the test. You agree with me
2  that's the test, and then the results are
3  truthfully reporting as you're requiring, because
4  it says "none detected."
5  A      Correct.
6  MS. O'DELL:
7      Objection. Objection to form.
8      Just give me a moment.
9  MR. FROST:
10 Q      And, again, and you're saying that this
11 is only an implication that there's not asbestos
12 in this product because you disagree completely
13 with the --
14 A      I'm not --
15 Q      -- required testing method.
16 MS. O'DELL:
17      Let him finish, please.
18 THE WITNESS:
19      Sure. I'm sorry.
20 MS. O'DELL:
21      And then let me do the object- --
22      Object to the form.
23 A      I don't think that there's an
24 implication here at all. I think that this is

Page 317

1  the crux of a large issue, and that is that J&J
2  would like for their talc product to be
3  asbestos-free. And that's great.
4      But to say something is not detected
5  when your lower detection limit is actually quite
6  high, that doesn't show that something is absent
7  from your product. It doesn't show that it's
8  asbestos-free.
9      And "absent of" and "free of," if
10 you -- I mean, we can get out Webster's
11 dictionary if you want to and argue this. But I
12 would say that -- that most people would say that
13 those two things mean the same.
14 MR. FROST:
15 Q      Okay. And, again, you'd agree with me
16 that Johnson & Johnson requires that a particular
17 test be run on its talc; correct?
18 A      I think so.
19 MS. O'DELL:
20      Object to the form.
21 MR. FROST:
22 Q      Okay. And --
23 MS. O'DELL:
24      As to asbestos or as to what?

80 (Pages 314 to 317)

Robert Cook, Ph.D.

Page 318

1  MR. FROST:
2      As to asbestos.  Talking about
3  asbestos.
4  MS. O'DELL:
5      Over time or --
6  MR. FROST:
7      We're talking -- you know, right now
8  we're talking J4-1, right, that testing method,
9  the XRD testing method.
10  Q    You agree that that's the testing
11  method that Johnson & Johnson and Imerys used;
12  correct?
13  A    That's right.
14  Q    You also agree that that's the method
15  that the FDA, you know, requires that talcum
16  powder be tested for asbestos; correct?
17  MS. O'DELL:
18      Object to the form.
19  A    I agree with all of that --
20  MR. FROST:
21  Q    Yeah.  That's what I'm saying.
22  A    -- except that that doesn't prove that
23  a product is free of asbestos.  It only proves
24  that --

Page 319

1  Q    I'm not asking that, sir.
2  A    Well, but that's what it said over and
3  over again in the COAs is "free of."  And they
4  need to say it's free of down to a detection
5  level of .1 percent.
6  Q    So your opinion is you just don't like
7  the terminology they're using, but you have no
8  opinion that anything below a .1 would cause
9  disease or be dangerous to human health?
10  MS. O'DELL:
11      Object to the form.
12  A    No.  You keep adding human health in
13  there.  I'm not -- I'm not trying to opine about
14  human health.  I'm just saying that if I had a
15  student and I handed him a sample and I said "Is
16  there any asbestos in this or not," and he goes
17  to the x-ray machine and comes back and says,
18  "No, I couldn't find any by x-ray," I'll probably
19  give him an F.
20  Q    Okay.
21  A    Because it doesn't mean that there's no
22  asbestos in that sample.  It means that he
23  couldn't detect it down to the lower detection
24  limit of that machine.  And -- and therein is a

Page 320

1  problem.
2  Q    Okay.  Don't you agree with me that
3  every method of testing has a lower limit of
4  detection?
5  MS. O'DELL:
6      Object to the form.
7  A    That's -- that's tough.  But I think,
8  in general, that's probably a pretty good
9  statement.
10  MR. FROST:
11  Q    Okay.
12  A    I think the day is gonna come when --
13  when there will be equipment that's good enough
14  to say, you know, under any circumstances,
15  there's none there.
16  Q    Okay.
17  A    But I don't think we're quite there
18  yet.
19  Q    Okay.  And, going to your scenario, if
20  you told your student to go test that sample
21  using XRD --
22  A    Right.
23  Q    -- and he tested it and came back and
24  said no asbestos --

Page 321

1  A    Right.
2  Q    -- you wouldn't fail him for that
3  because he was following the test; correct?
4  MS. O'DELL:
5      Object to the form.
6  A    No.  I would.  He should come back and
7  say, "Why did you tell me to go to the x-ray
8  machine to do this?"
9  MR. FROST:
10  Q    So even though you told him to go --
11  A    Yeah.
12  Q    So if you told somebody to go test
13  something using this test method, you would still
14  fail them when they came back and said "I used
15  the test method you told me and it" --
16  A    Well, it depends on what he comes back
17  with.  If he comes back and says, you know, "I
18  know that there's a lower limit on the ability of
19  this equipment to detect asbestos and, based on
20  that, I can't find any in here," he gets an A.
21  That's an A.
22      If he comes back and he says, "Oh, I
23  went up there and kicked the machine two or three
24  times, you know, it wouldn't spit out an asbestos

81 (Pages 318 to 321)

Robert Cook, Ph.D.

Page 322

1    determination, so I don't think there is any,"
2    well, I'd be irritated. That's not -- you know,
3    that's not a good -- a good answer to come back
4    to the teacher.
5    Q      Okay. And you'd agree with me that the
6    FDA knows that .1 percent is the lower detection
7    limit on XRD? I mean, everybody sort of knows
8    that.
9    A      I think so, sure.
10   Q      Okay. And still that's the test method
11   that they've required; correct?
12   MS. O'DELL:
13         Object to the form. Misstates the law.
14   A      As far as I know today, it -- it is. I
15   know that there are modifications being
16   considered for sure.
17   MR. FROST:
18   Q      Okay. But, as of today, you agree with
19   me that that's --
20   A      I think so.
21   MS. O'DELL:
22         Object to the form.
23   MR. FROST:
24   Q      Turn to page 37. Which I think we were

Page 323

1    on page 37, weren't we?
2    A      Yeah.
3    Q      So I'm gonna turn to the bottom
4    paragraph.
5    A      Okay.
6    Q      The second sentence starts:
7    "Production drill data do not seem to include
8    asbestos (chrysotile or amphibole) testing, and
9    in relation to drill cores taken from the Hamm
10   mine, for example, Imerys did not sample talc ore
11   intervals containing visible fibrous amphibole."
12   Then you say Imerys 238270.
13         Did I read that correctly?
14   A      I think you did.
15   Q      Let's look at 238270.
16         (DEPOSITION EXHIBIT NUMBER 29
17         WAS MARKED FOR IDENTIFICATION.)
18   MR. FROST:
19   Q      Do you recognize this document?
20   A      I do.
21   Q      First I'll call your attention to the
22   second paragraph on page 2. And it states,
23   quote, "Generally speaking, there are two types
24   of Hamm ore: Massive talc/carbonate "grit" (ore

Page 324

1    types 30 and 40) and talc/carbonate schist (ore
2    types 10 and 20.)"
3    A      Right.
4    Q      Okay. You agree with me that nowhere
5    in here are they talking about ore type 66 which
6    was used in Johnson & Johnson in its talcum
7    powder?
8    MS. O'DELL:
9          Object to the form.
10   A      They don't mention it.
11   MR. FROST:
12   Q      Okay. And, then, also on page 2, if
13   you look down to the next paragraph, second
14   sentence states, "Blast holes are analyzed for
15   brightness, talc, and arsenic content and the
16   presence of amphiboles."
17   MS. O'DELL:
18         Where are you reading, Jack?
19   MR. FROST:
20         It's third paragraph, second sentence.
21   MS. O'DELL:
22         Okay. Thank you.
23   MR. FROST:
24   Q      Did I read that correctly?

Page 325

1    A      Right.
2    Q      Okay. You'd agree with me that drill
3    holes are production drill data; correct? That
4    blast holes are part of the production drill data
5    a mine would produce?
6    MS. O'DELL:
7          Object to the form.
8    A      If you use them as such, yes. There --
9    there are plenty of companies that don't use them
10   other than just for blast holes.
11   MR. FROST:
12   Q      Okay. But here it seems like they are,
13   because it says they're testing it.
14   A      Yes, correct. And that's -- you know,
15   that's one of the reasons I cited this.
16   Q      Okay. But, again, like you said, they
17   do not seem to include asbestos, chrysotile, or
18   amphibole. Don't they say directly here that
19   they're testing for the presence of amphibole?
20   A      They do.
21   Q      Okay.
22   A      My issue was we didn't have any test
23   results for amphibole.
24   Q      Okay. But, again, this document -- you

82 (Pages 322 to 325)

Robert Cook, Ph.D.

Page 326

1  know, the statement you attribute to this
2  document is that production drill data does not
3  seem to include asbestos, but it shows here
4  they're specifically testing for it; correct?
5  MS. O'DELL:
6       Object to the form. That's not what
7  his statement is in his report.
8  MR. FROST:
9  Q     Okay. Well, I thought I read it
10  correctly.
11       I'll also turn your attention to page
12  4.
13  A     Okay.
14  Q     And the last sentence says, "Talc ore
15  observed to contain fibrous amphibole was not
16  included in a sample interval."
17       And that's what you note in your
18  report; correct?
19  A     Right.
20  Q     Okay.
21  A     Yeah, that would -- that -- I can't
22  understand why they wouldn't have pulled it out,
23  looked at it to see if it is truly asbestos or
24  not.

Page 327

1  Q      Well, that -- that kind of becomes my
2  question.
3       Sorry. I didn't mean to interrupt him.
4  If you're not done -- sorry.
5  MS. O'DELL:
6       You may finish.
7  A     Yeah. That was one of the reasons that
8  I mentioned this. And there -- there are other
9  places where it's pretty clear that they -- they
10  actually rejected core from analysis, and yet
11  they mention amphiboles. And it was like, "Okay.
12  There's some amphibole. We're not analyzing this
13  stuff." You got that feeling from looking at
14  some of this material.
15  MR. FROST:
16  Q     Well, what would be the purpose of
17  testing something you already know contains
18  fibrous amphibole? Don't they already know
19  there's asbestos in that?
20  A     To determine whether or not it really
21  is asbestos.
22  Q     Well, if they're rejecting it because
23  it has fibrous amphibole, who cares if it is
24  actually --

Page 328

1  A     No, no. They're rejecting the analysis
2  of it. They don't say they're rejecting the --
3  the ore. I mean, that -- that would be a
4  completely different thing.
5       If I -- if I was drilling at, say, Hamm
6  and pulled out a piece of drill core that had a
7  foot of cross-fiber asbestos in it, I'd sure want
8  to know everything about it, where it was, where
9  it went, is it truly asbestos, what's the
10  mineralogy, what's it associated with. I
11  wouldn't remove it from the core and throw it
12  away.
13  Q     So, based on this one single sentence
14  in this one document, you are assuming that
15  because they're not testing what they already
16  have identified as fibrous amphiboles, that
17  they're including it in the ore?
18  MS. O'DELL:
19       Object to form.
20  A     No, no. I didn't say that at all.
21  MR. FROST:
22  Q     But -- so the whole point of testing's
23  to figure out where, for example, asbestos would
24  be and where it wouldn't be in the deposit;

Page 329

1  correct?
2  A     It's -- it's that and to determine
3  the -- the characteristics of the fibrous
4  amphibole.
5  Q     And, again, if you're trying to come up
6  with a mine plan, you're trying to figure out
7  where you should take ore from and where you
8  shouldn't. Correct?
9  A     Correct. And this is -- I mean, this
10  is part of my point. I mean, what happens if the
11  geologist that logged this core leaves and takes
12  another job and you hire somebody else? He has
13  to come in and pick up where the other guy left
14  off, and he's charged with helping to devise the
15  mine plan, and that interval's gone.
16  Q     Let me -- that's a great question, too.
17  A     I mean --
18  Q     No, no. Hold on.
19       Where in the sentence does it say
20  they've left it out of the mine plan?
21  A     The mine plan isn't -- isn't mentioned
22  here. I'm just using that as an example of
23  how --
24  Q     Well, I was gonna say --

83 (Pages 326 to 329)

Robert Cook, Ph.D.

Page 330

1    A    -- this could be very, very bad.
2    MS. O'DELL:
3        Let him finish.
4    MR. FROST:
5    Q    So you're speculating that because they
6    weren't specifically testing something they've
7    already identified as asbestos, that they're
8    leaving it out of the mine plan?
9    A    Did they call that asbestos?
10    Q    They called it fibrous amphibole.
11    A    Right.
12    Q    So --
13        But you're saying the whole theory is
14    that somebody might come later and might not know
15    what it is.  But that means that this wasn't
16    included on a mine plan.
17    A    That's not what I said.
18    Q    So you're drawing a --
19        No, no?
20        You're drawing a lot of conclusions
21    that aren't supported by this document.  Do you
22    agree with me?
23    A    That is not --
24    MS. O'DELL:

Page 331

1        Excuse me.
2    A    That is not what I said.
3    MR. FROST:
4    Q    Okay.  Let's turn to page --
5    A    I did not say that.
6    MS. O'DELL:
7        He's not finished yet.
8    A    This is very simple.  When you're
9    logging drill core, if you see something that's
10    suspect, you don't ignore it.  You pull it out,
11    you test it, you make notes about it, and, if
12    you're having to use it in a mine plan, you make
13    damn sure that the people that come behind you
14    know that you saw fibrous amphibole at this step
15    in this particular drill hole.
16    MR. FROST:
17    Q    And where does it say they're not
18    logging it?  That's my confusion.
19    A    No, no.  They have it --
20    Q    Where in this sentence does it say
21    they're not logging it?
22    A    I'm not saying that they didn't log it.
23    Q    But you're saying that's the whole
24    concern.

Page 332

1    A    The concern is that they didn't pull it
2    out and test it.  And there are other -- there
3    are other statements, maybe not in this
4    particular document, where they actually talk
5    about removing the intervals and throwing them
6    away.
7    Q    Okay.  So, again, your whole basis is
8    they've identified it's asbestos, but they
9    haven't tested to see exactly what type of
10    asbestos it is?
11    A    Fibrous amphibole.
12    MS. O'DELL:
13        Excuse me.
14    MR. FROST:
15    Q    Okay.
16    MS. O'DELL:
17        Excuse me.  Just let me object.
18    MR. FROST:
19        Okay.
20    MS. O'DELL:
21        Give me a minute.
22    THE WITNESS:
23        Sure.
24    MS. O'DELL:

Page 333

1        Don't interrupt him.
2    MR. FROST:
3    Q    Okay.  Can you turn to page 1, please.
4    MS. O'DELL:
5        Object to the form.
6        Have you finished your answer, Doctor?
7    If you have, fine.
8    MR. FROST:
9        Yeah.  I was actually in the middle of
10    a question.  You interrupted me, Leigh.
11    Q    So can we turn back to page 1, please?
12    MS. O'DELL:
13        My apologies.  It's hard to tell
14    because --
15    MR. FROST:
16        That's okay.
17    MS. O'DELL:
18        -- you keep getting cut off.
19        So what's your question?
20    MR. FROST:
21    Q    Turning to page 1, second paragraph
22    down, it says, quote, "Fibrous amphiboles
23    (actinolite) were observed only within
24    chloritized mafic dikes, extending, in places, a

84 (Pages 330 to 333)

Robert Cook, Ph.D.

Page 334

1 couple of inches into the contacting talc ore."
2      So they certainly documented where it
3 was they found the fibrous amphiboles.
4 A      Sure.
5 Q      And they've identified what type of
6 fibrous amphibole it is.  So it's clearly part of
7 the mine knowledge.  They've identified that it's
8 actinolite and that it's fibrous, and they've
9 also identified that it only extends a couple
10 inches into the ore body.  Is that correct?
11 A      That's correct.
12 Q      And you also -- you note somewhere else
13 in your report in the beginning that, as a rule
14 of thumb, they used, you know, exclusion zones.
15 And that's --
16 A      Selective mining.
17 Q      Yeah.
18      So, again, if they know where it is,
19 they know how far it extends into the dike and
20 it's -- they're using exclusion zone, don't they
21 know where this fibrous amphibole is and aren't
22 they avoiding it?
23 MS. O'DELL:
24      Object to the form.

Page 335

1 A      In that one point where that one drill
2 hole goes through the zone that has fibrous
3 amphibole, we're gonna assume it's asbestos.
4      But you're looking really at a
5 one-dimensional point in a three-dimensional
6 space.  So how do you design your mine around
7 that point?
8      I mean, if -- if the ore body was
9 bounded by absolutely vertical straight walls
10 that extend in all directions to infinity, then
11 that one drill hole is really all you need, and
12 you -- you can design a mine around that one
13 hole.
14      But that's not -- that's not the shape,
15 size of the ore bodies out here.
16 MR. FROST:
17 Q      Okay.  You're confusing me again.
18 Where does it say that it's only one ore sample
19 they ever found fibrous amphibole in?
20 A      I didn't say that.
21 Q      Well, that's what your answer you just
22 gave me implied, that --
23 A      No.  I said --
24 Q      -- it -- that they wouldn't have

Page 336

1 information.
2 A      No.  If there was only one drill hole
3 and if the ore deposit was bounded by a flat
4 plane or surface and you have a drill hole that
5 goes through it and you know that the ore body
6 margin is a flat plane, then you can design
7 your -- your -- your -- your mine to stay away
8 from that one point.
9      The problem with this is that the ore
10 bodies are irregular in shape.  So you have a
11 drill hole.  Yep, we found a little bit of
12 asbestos, but you don't know five feet away
13 whether or not you've got asbestos.  You don't
14 know whether it will be a foot thick or
15 millimeter thick or if it's gonna be there at
16 all.
17 Q      Okay.  But, again, that's, one,
18 different than what you said here in the report,
19 but, two, what I'm getting at, isn't interpreting
20 the drill holes and interpreting, you know,
21 what's coming in and out of the mine what the
22 mine engineer does?  Isn't what they
23 extrapolate -- extrapolate based on their
24 experience within the ore and they extrapolate

Page 337

1 based on their production drill holes, based on
2 the exploratory drill holes, what they expect the
3 talc body to look like?
4 A      Absolutely.
5 MS. O'DELL:
6      Object to --
7      Excuse me.  I object to the form of the
8 question.  I object to the commentary.  Misstates
9 the report.
10 MR. FROST:
11      I don't believe there was any
12 commentary, but --
13 MS. O'DELL:
14      There was commentary leading up.
15 A      I understand your question.  The -- the
16 mining superintendent, which at Argonaut was one
17 of my former students for four years, they are
18 charged with taking all the data that we're
19 talking about and designing a mine plan that
20 insures that J&J is not gonna receive a product
21 coming out of the West Windsor mill that's got
22 asbestos in it.  And that -- that is a very --
23 that's a tough order.  I mean, you've got to be
24 on your toes and --

85 (Pages 334 to 337)

Robert Cook, Ph.D.

Page 338

1    And, in my experience, it's not -- it's
2 not a good idea to -- to ignore something that
3 you see in drill core that may be deleterious
4 without -- without testing it, maybe even
5 drilling a second hole.
6    There's a process known as hole
7 twinning, and a person might have wanted to --
8 it's almost like the duplicate analysis. It
9 doesn't find anything the second time. Sometimes
10 you drill a second hole five feet away and
11 there's nothing there. Hey, good.
12 MR. FROST:
13 Q    So this is why I'm confused. I mean,
14 again, this document doesn't talk about twinning.
15 It doesn't talk about ---
16 A    No, no.
17 Q    They may have been doing all these
18 things. You're talking now in sort of
19 generalities as far as mining goes.
20 A    I'm trying to be as specific as I can.
21 MS. O'DELL:
22    Object to the form.
23 MR. FROST:
24 Q    But what I'm saying is --

Page 339

1    Let's see. What do we have here?
2    So you have, "Imerys did not sample
3 talc ore intervals containing visible fibrous
4 amphiboles. This is contrary to all accepted
5 sampling practices."
6    But, again, if they know that this
7 particular section of the drill core contained
8 asbestos, we know they've identified where it is
9 on the mine plan because they say that on, one,
10 fibrous amphibole was observed only within the
11 chloritized mafic dikes, extending in places a
12 couple inches into the containing [sic] talc ore.
13 We know they've already identified it as
14 actinolite asbestos.
15 A    Well, they describe --
16 Q    What are they leaving out of the
17 analysis? Just that they're confirming that what
18 they believe is fibrous amphibole actinolite
19 actually is fibrous amphibole actinolite?
20 MS. O'DELL:
21    Object to the form. Misstates the
22 document.
23 A    Well, to start with, they call it
24 fibrous amphibole. Okay? Are we gonna assume

Page 340

1 that all fibrous amphibole is asbestos? It's
2 fine with me if we do.
3 MR. FROST:
4 Q    Well, they called it here fibrous
5 amphibole actinolite.
6 A    I know. They don't use the word
7 "asbestos."
8 Q    Okay.
9 A    Okay. So -- so let's call it asbestos.
10 To know whether or not something's actinolite,
11 you've got to know the chemistry, and you can't
12 do that by logging drill core.
13    If it's -- if it's a green fibrous
14 amphibole, then if I was logging it, I'd assume
15 it was actinolite. Okay. Go with it. I --
16    The point of all this is that --
17 that -- that a fibrous amphibole in a drill hole,
18 even if it's at the ore body margin, is an
19 important thing.
20 Q    Okay.
21 A    And I would have done more than just --
22 than just pass it off, which is the feeling that
23 I got when I read that, that they didn't do
24 anything with it but record it. So, okay.

Page 341

1 Q    And can you give me --
2    Because you say here, you know, that
3 this is contrary to all accepted sampling
4 practices.
5 A    Yes.
6 Q    What are you relying on for that? What
7 published literature, what regulation, what law?
8 A    There's --
9    Oh, this isn't a legal issue at all.
10 But if you --
11    There are many books that have been
12 written about the evaluation and sampling of a
13 mine. And when you -- when you hit a critical
14 interval, if it's a channel sample underground
15 that you're cutting with your rock hammer, if
16 you're digging a trench at the surface, if you're
17 drilling a drill hole, when -- when you -- when
18 you hit something that's significant relative to
19 the commodity you're looking at, you normally do
20 more with it than just make a note, "Oh, there it
21 is," and move on.
22 Q    Okay. And what from this document
23 implicates to you that they just moved on from it
24 and they didn't put it in the mine plan?

86 (Pages 338 to 341)

Robert Cook, Ph.D.

Page 342

1    A    We have no mine plan.
2    Q    So --
3    A    We've asked for the mine plan.
4    Q    So you're basing everything off the
5    fact that you haven't seen a mine plan?  So
6    you've read that in conjunction with this
7    document to say that they are just ignoring the
8    fibrous amphibole that they're finding and moving
9    on, which is contrary to standard --
10   MS. O'DELL:
11        Excuse me --
12   A    That's absolutely not what I said.
13   MS. O'DELL:
14        Excuse me.  Object to the form.
15   A    Did not say that.
16   MS. O'DELL:
17        Object to the form.  Misstates his
18   testimony.
19   A    Really.  I didn't say that.
20   MR. FROST:
21   Q    So, again, what -- what is it that
22   they're doing here that is contrary to standard?
23   Is it purely that they're not testing to see
24   exactly what the fibrous actinolite or the --

Page 343

1        What do they call it?
2        -- fibrous amphibole actinolite is?  Is
3    that -- is that your --
4        Your main gripe is that they haven't
5    confirmed whether or not it's asbestiform or not
6    asbestiform?
7    A    That would be --
8    MS. O'DELL:
9        Object to the form.
10   A    That would be a complaint.
11   MR. FROST:
12   Q    Okay.
13   A    But -- but this is part of a larger
14   picture.  You know, as I mentioned, I think that
15   there -- there are other instances where the
16   logging of drill core ended up with a couple of
17   issues, one.  And this is typical of diamond
18   drilling.  You don't have a hundred percent core
19   recovery anyway.
20        And, so, it's difficult to make mine
21   plans when you've got -- when you're pulling core
22   intervals where you've drilled 10 feet, you've
23   got 3 feet of core.  So you go, "Wait a minute,
24   you know, "What have I missed?"

Page 344

1        And a lot of times you blame that on
2    the driller, but -- but it may simply be because
3    of a characteristic of the rock itself.
4        And, so, there -- when you -- when you
5    look at all the drill core data, what you find is
6    that there -- there are drill holes that -- that
7    we have missing -- we have missing core, and it's
8    not the fault of anybody.  Probably it's just the
9    rock.
10       Then we have areas where there's
11   actually notations that the drill core has been
12   discarded, removed from the core box, and thrown
13   away.  And that's suspicious.
14   Q    Okay.
15   A    And that's, you know, part of the big
16   picture here.
17   Q    But, again, the only document you're
18   showing for reliance to the statement that this
19   is contrary to all accepted sampling practices is
20   Imerys 238270, which shows that they have
21   identified there's a potential problem in the
22   body.  They've also identified where it is, and
23   they've identified that they're avoiding it;
24   correct?

Page 345

1    MS. O'DELL:
2        Object to the form.  He just stated
3    that there are numerous other references.  You're
4    misstating his testimony.
5    A    This -- this document doesn't say that
6    they're avoiding it.  I don't think it does.
7    MR. FROST:
8    Q    Well, this document says where it is in
9    the ore body; correct?
10   A    Absolutely.
11   Q    And we know from your report, even, you
12   state that there's a margin of exclusion.  So
13   anything extending --
14       What do they say?
15       -- quote, a couple of inches into the
16   contacting talc ore we know would be outside of
17   the exclusion area, which you said was at least
18   one bucket.
19   MS. O'DELL:
20       Object to the form.  Misstates his
21   report.
22   A    No.  I -- I don't agree with that at
23   all.  I mean, that was why I gave the example.
24       If the margin of the ore body is a

87 (Pages 342 to 345)

Robert Cook, Ph.D.

| Page 346 | Page 348 |
|---|---|
| 1 straight, flat plane, that's one thing. You<br>2 can -- if you've got something going two inches<br>3 into it, by George, stay five feet away.<br>4     But that's not what the margins of<br>5 these ore bodies are like. They're irregular.<br>6 MR. FROST:<br>7 Q    Okay.<br>8 A    And, so, if you're gonna produce a mine<br>9 plan that assumes that you've got two inches of<br>10 an asbestiform mineral here and so you -- you<br>11 plan your scope or your bench based on that but<br>12 your bench may be 15 feet this way and you're<br>13 assuming that it's here, well, this thing could<br>14 be irregular, and the margin of the ore body may<br>15 be over here and you don't know it because your<br>16 next drill hole is way up here.<br>17 Q    Okay.<br>18 A    That's what I'm trying to say.<br>19 Q    And it sounds like your opinion is a<br>20 problem with all mining, because that's true of<br>21 every ore body that's gonna be irregular;<br>22 correct?<br>23 MS. O'DELL:<br>24     Object to the form. | 1 types of mining, that you are relying on the<br>2 quality of the mine supervisor and the data in<br>3 order to define where the ore body is. Is that a<br>4 fair statement?<br>5 MS. O'DELL:<br>6     Object to the form.<br>7 A    I think that that's, you know, that<br>8 could be the opening sentence on a paragraph on<br>9 ore reserve estimation.<br>10 MR. FROST:<br>11 Q    Okay.<br>12 A    I mean, it's just standard -- you know,<br>13 standard protocol in mining. You take all your<br>14 data and figure out where the ore is.<br>15 Q    Then later, turning back to 37, next<br>16 sentence down, you wrote, "By 2006, all Imerys<br>17 Vermont talc production was from a single open<br>18 pit in the Argonaut mine that produced 150,000<br>19 tons of talc per year," and you note "none used<br>20 for cosmetic purposes in the United States<br>21 (Imerys 499538)."<br>22     Correct?<br>23 MS. O'DELL:<br>24     I'm sorry. Where are you? |

| Page 347 | Page 349 |
|---|---|
| 1 MR. FROST:<br>2 Q    And it's not specific to what's going<br>3 on here. I believe this is the Hamm mine.<br>4 A    It --<br>5 MS. O'DELL:<br>6     Object to the form.<br>7 A    It can be better or worse. But -- but<br>8 the idea is, yes, ore bodies are, you know --<br>9 with some exceptions, they can be irregular<br>10 things. And it's very common to have wall rock<br>11 mixed in with ore when you're over near the side<br>12 of an ore body. And -- and in these, it's pretty<br>13 tough to know, particularly underground. It's<br>14 rough.<br>15 MR. FROST:<br>16 Q    Okay. But, again, that's what the mine<br>17 supervisor's for. That's why you have these<br>18 drilling campaigns; correct?<br>19 A    That's right.<br>20 MS. O'DELL:<br>21     Object to the form.<br>22 MR. FROST:<br>23 Q    And, you know, so what you're saying is<br>24 a basic statement that applies to, you know, all | 1 A    I think that's right.<br>2 MR. FROST:<br>3     37 to 38.<br>4 MS. O'DELL:<br>5     Oh, at the bottom. Okay.<br>6 MR. FROST:<br>7     The bottom.<br>8 Q    Next sentence is, "Serpentine and<br>9 arsenic occurred near the edges of the ore zone,<br>10 and ore quality control by segregation of the<br>11 mine was inadequate."<br>12     Okay. You'll agree with me now, by<br>13 2006, again, Johnson & Johnson was no longer<br>14 using Vermont talc for its cosmetic talcum<br>15 powder?<br>16 A    Correct.<br>17 Q    Okay. And you'll also agree with me<br>18 that, by this point, the mine itself was<br>19 producing industrial talcs. Correct?<br>20 A    I think that's correct.<br>21 Q    Okay. Staying on 38 --<br>22     Bear with me a second here. I guess<br>23 more of a general question than specific<br>24 question, but you'd agree with me, based on the |

88 (Pages 346 to 349)

Robert Cook, Ph.D.

Page 350

1    documents that you have, that you can't make a
2    full map of sampling frequency, where exactly
3    samples were coming from, you know, how they
4    were -- how they were being taken.  I think we
5    covered this earlier.  Is that correct?
6    MS. O'DELL:
7         Object to the form.  What type of --
8    MR. FROST:
9    Q      You know, there are -- there are holes
10   in the documents about frequency of testing,
11   frequency of sampling, things of that nature.
12   Correct?
13   A      Are you talking about in the mine or in
14   the mill of --
15   Q      In general in the mines.  Exactly.
16   MS. O'DELL:
17        Excuse me.  Object to the form.
18        What specific types of --
19   MR. FROST:
20        Well, that's what we were trying to
21   define.
22   Q      You know, we're talking about in
23   general.  You know, we'll start with there
24   appears to be -- you know, you don't have a

Page 351

1    complete -- you don't have a complete set of all
2    drill core sampling; correct?
3    MS. O'DELL:
4         Object to the form.
5    MR. FROST:
6    Q      In your documents.
7    A      I don't know that.
8    Q      Okay.  But you cert- -- there certainly
9    doesn't appear that you have -- and I think
10   you've identified earlier that you appear to be
11   missing years and missing drill core area;
12   correct?
13   MS. O'DELL:
14        Object to the form.  He didn't say that
15   in his testimony.  Not in regard to drill core.
16   A      We -- we have maps that show the
17   location of drill holes.  We do not have logs for
18   all of those drill holes.
19   MR. FROST:
20   Q      Okay.  And the same thing with
21   sampling.  It does not appear that you have a
22   complete set of the sampling records; correct?
23   A      For the mines?
24   Q      For the mines, the mill, and for the

Page 352

1    composite on the back end.  Correct?
2    MS. O'DELL:
3         Object to the form.
4    A      The --
5         I think that -- that your statement is
6    correct, based on what your own documents say.
7    MR. FROST:
8    Q      Uh-huh.
9    A      You know, they say, you know, sampling
10   intervals will be such and so, at what points
11   they're gonna be.
12        We know that we don't have all the data
13   for -- for the mines.  Because if they're gonna
14   analyze the cutting from blast holes, there's got
15   to be just tons of analyses out there.
16   Q      Okay.
17   A      And -- and -- and, in the mill, it's
18   very difficult to know because, you know, when
19   you're looking at -- at compositing samples that
20   are taken, you know, that -- that becomes a
21   different issue in itself.
22   Q      Okay.  All right.  We're in agreement
23   that you certainly -- whether or not it was
24   produced, not produced, you know, you don't have

Page 353

1    a complete set of all the sampling that was done
2    at the mines, mills, and on the composite back
3    end.  Is that a fair summary?
4    MS. O'DELL:
5         Object to the form.
6    A      Yeah.
7    MS. O'DELL:
8         "Composite back end," I'm not sure what
9    you're referring to.
10   MR. FROST:
11   Q      Yeah.  The composite back end testing
12   of the --
13   A      Yeah.  I think the word --
14   Q      -- the ground product.
15   A      -- isn't "sampling," but we don't have
16   a complete set of analytical data.  We know about
17   the sampling, but it's -- it's the data and more
18   information related to the data that we don't
19   have.
20   Q      Okay.  That's a more precise way of
21   saying it.
22   A      Yeah.  Sure.
23   Q      Okay.  Turn to page 39.
24   A      Okay.

89 (Pages 350 to 353)

Robert Cook, Ph.D.

| Page 354 | Page 356 |
|---|---|
| 1  Q      You say, quote, "It is inadequate -- it | 1  sample was taken. |
| 2  is inadequate to collect a single daily or hourly | 2  A      Right.  You may have a day that it is, |
| 3  hand or grab sample from an ore stockpile in | 3  but the problem is you may have a day when it |
| 4  front of a crusher, or from a conveyor belt | 4  really isn't and something slips by that you |
| 5  leaving a grinding circuit, and assume that this | 5  don't want to slip by. |
| 6  one sample or a composite, perhaps a kilogram in | 6  Q      But what I'm getting at is the only way |
| 7  size, is representative of a day's production of | 7  to truly derive if something is representative is |
| 8  several hundred tons." | 8  to run the -- |
| 9      Did I read that correctly? | 9      You know, all of the literature agrees |
| 10  A      Yep. | 10  that the only way to truly determine something is |
| 11  Q      Don't you agree with me the only way to | 11  representative or not is to run a statistical |
| 12  determine whether or not a sample is actually | 12  analysis of it; correct? |
| 13  representative of the whole is to conduct a | 13  MS. O'DELL: |
| 14  geostatistical analysis of that sample versus the | 14      Object to the form. |
| 15  size? | 15  A      You -- you determine the -- the |
| 16  MS. O'DELL: | 16  confidence interval of the process that you're |
| 17      Object to the form. | 17  proposing.  And if you wanted to have something |
| 18  A      Well, I think that it's much more than | 18  that you were 95 percent confident was correct, |
| 19  that.  I would -- I would say that -- that, if I | 19  then, you know, you begin to work backwards and |
| 20  was designing a sampling program for, let's, say, | 20  take a look at how you're sampling. |
| 21  the West Windsor mill, I would want to have a | 21  MR. FROST: |
| 22  person that was in charge of sampling and | 22  Q      Okay. |
| 23  analyses. | 23  A      I mean, that's a process -- a technique |
| 24      We have somebody like that at one of | 24  that's been around for a long time. |

| Page 355 | Page 357 |
|---|---|
| 1  our mines up the road here.  It adds a nickel a | 1      But it's very difficult to apply that |
| 2  ton to the cost of our production, and -- and yet | 2  to feed coming into a plant.  And that was my |
| 3  we are able to sample daily multiple times and | 3  point.  You know, if you don't -- if you don't |
| 4  run all the samples that day, and at the end of | 4  have a formal sampling, you know, analysis |
| 5  the day, we know what's gone in the railcar. | 5  program set up where ore enters the mill or, |
| 6  There is no ambiguity at all. | 6  let's say, enters a stockpile that's gonna feed |
| 7      And that's not what -- what's been | 7  the mill from, then -- then I think that you've |
| 8  done. | 8  got an issue right from the very start.  Because |
| 9  MR. FROST: | 9  no matter what you feed your statistical |
| 10  Q      Okay. | 10  analysis, if you're not collecting your samples |
| 11  A      I mean, you can't just grab a few | 11  properly, it's not -- not gonna matter what the |
| 12  pieces of rock and analyze them and say, "Oh, | 12  mass says. |
| 13  that's -- that's representative of what we mined | 13      And believe me, we've -- we've been |
| 14  today." | 14  gigged on this.  We have had railcars -- |
| 15      "Well, how many tons did you mine?" | 15      We ship out in 60-car lots, and we have |
| 16      "Oh, it was three or four hundred | 16  had whole trainloads rejected because of |
| 17  tons." | 17  out-of-spec ore in one car.  And when you're |
| 18      That doesn't work. | 18  losing 60 -- 59 other cars that are probably |
| 19  Q      Well, let's see.  Even you say, the | 19  good, I mean, this -- this is an important point. |
| 20  next sentence down, that -- you say -- you | 20  Q      Okay.  You'd agree with me the reason |
| 21  yourself say it may or may not be representative; | 21  you say you may or may not be representative is |
| 22  correct?  You say it may or may not be | 22  because you haven't done any calculations as to |
| 23  representative of the material processed on the | 23  the confidence interval; correct? |
| 24  individual sample -- on the day the individual | 24  MS. O'DELL: |

Robert Cook, Ph.D.

Page 358

1    Object to the form. Misstates his
2    testimony.
3    A    No. Like I said, I haven't done any
4    mathematical analysis of anything. But I've
5    certainly been involved with exactly what we're
6    talking about forever more. I mean, it's a --
7    it's a serious point with me.
8    MR. FROST:
9    Q    But, again, your conclusion here isn't
10   that it absolutely is or it absolutely is not.
11   You say it may or may not be. That's your --
12   that's your ultimate conclusion. That's correct?
13   A    Any --
14   MS. O'DELL:
15       Excuse me.
16   THE WITNESS:
17       Yeah. Sure.
18   MS. O'DELL:
19       Object to form.
20   A    Any given example may or may not be in
21   that.
22   MR. FROST:
23   Q    All right. Page 40. It's technically
24   the second full paragraph there, third paragraph

Page 359

1    on the page, bottom two sentences:
2        Five particles of the same asbestiform
3    mineral were required for asbestos to be
4    considered quantifiable. Amounts less than this
5    were considered background or below detection
6    limits. This suggests that something may [sic]
7    be quantifiable if present, and this is not the
8    case.
9        Did I read that correctly?
10   MS. O'DELL:
11       "Must be"?
12   MR. FROST:
13       Yes.
14   Q    Must be quantifiable if present, and
15   this is not the case.
16   A    Yeah.
17   Q    Okay.
18   A    That -- that's -- that's right.
19   Q    All right. Are you an expert in
20   designing TEM test methodologies?
21   A    No.
22   Q    Have you ever designed test
23   methodologies for testing asbestos in talc?
24   A    No.

Page 360

1    Q    You'll -- we will agree that TEM is an
2    appropriate instrument to use to test to see if
3    there is asbestos in talc; right?
4    A    Yes.
5    Q    And I take it your issue with this
6    parameter is the five-fiber detection limit?
7    A    Well, I can explain it maybe a little
8    bit better than I stated it.
9        If you have a background that is one
10   and you find three fibers and, yet, to be
11   quantifiable you need five, then why aren't the
12   three fibers reportable since they are over the
13   background?
14       That's -- that was the concept in what
15   I wrote there. And it almost seems like the use
16   of quantifiability is evading the issue of tiny
17   amounts of material that may be there but in a
18   small increment over the -- the background.
19   Q    Have you calculated what you determine
20   to be the proper detection quantitifield --
21   quanti- --
22   A    I know.
23   Q    You know the word I'm trying to say?
24   A    Right.

Page 361

1    Q    Have you run a calculation to detect
2    what the appropriate level should be?
3    MS. O'DELL:
4        Object to the form.
5    A    Well, like I said, I'm not a -- I'm not
6    a statistician. But I have -- I have done some
7    back-of-the-envelope, and -- and this is -- this
8    is what I see.
9        If you take a hundred analyses, 95 of
10   them show nothing, five of them show one fiber,
11   and those hundred analyses are of blanks, then
12   what are you gonna call your background if 95 of
13   them show nothing? I would say that background
14   is zero.
15       If background is zero, then if you find
16   four fibers, there's something in that sample,
17   and yet it's not quantifiable. And, so, from the
18   standpoint of that kind of math, yeah. I mean,
19   but anybody can do that.
20   Q    Do you know who Walter McCrone is?
21   A    Sure.
22   Q    And do you know who James Millette are?
23   A    Well, we've been talking about
24   Millette. I don't think that I know James

91 (Pages 358 to 361)

Robert Cook, Ph.D.

Page 362

1  Millette.
2  Q    Okay.
3  A    We know some Millettes but not him.
4  Q    All right.  Would you agree with me
5  that Walter McCrone is generally considered to be
6  a leader in the field of TEM testing and
7  technologies?
8  MS. O'DELL:
9       Object to the form.
10  A    He is certainly a leader in polarized
11  light microscopy.  And I think that -- that, as
12  time went on, he became a real expert in TEM
13  analysis.
14  MR. FROST:
15  Q    And because it seems like you know a
16  bunch of Millettes but not the James Millette,
17  you can't tell me whether or not he's a leader --
18  A    Well, there's a Millette that was a
19  mining engineer, mining geologist here in
20  Alabama.  And we were wondering if this Millette
21  was related to him, and we found out he wasn't.
22  Q    I was gonna say, you know, I actually
23  know the answer.
24       All right.  I'd like to mark this

Page 363

1  article as 31.
2  THE COURT REPORTER:
3       30.  It's gonna be 30.
4  MR. FROST:
5       30.  Sorry.  I was looking at your
6  stickers to try to figure out.
7       (DEPOSITION EXHIBIT NUMBER 30
8       WAS MARKED FOR IDENTIFICATION.)
9  MR. FROST:
10  Q    Have you ever heard the publication
11  Microscope?
12  A    I have.  But I don't get it.
13  Q    It's not one you subscribe to or read?
14  A    No.
15  Q    But -- and you at least do recognize
16  that it is a peer-reviewed publication that's out
17  there?
18  A    It's out there.
19  Q    And, looking at page 457, do you see
20  that the name of this article is "A Standard TEM
21  Procedure for Identification and Quantification
22  of Asbestiform Minerals in Talc"?  Then it lists
23  Kremer, James Millette.
24  A    Yeah.  I'm trying to read the date on

Page 364

1  it down at the bottom, and I can't read it.  It's
2  minuscule.
3  Q    I believe it's 1990, by the -- the
4  journal.
5  A    Okay.
6  Q    If you look to the first page on the
7  journal, Volume 38, Fourth Quarter, 1990.
8  A    Oh.  Okay.  I've got it.  Sure.
9  MS. O'DELL:
10       Yeah.  And Kremer, K-R-E-M-E-R.
11  MR. FROST:
12       Yeah, K-R-E-M-E-R.  "Creamer," maybe.
13  Q    Turn to page 463.  Under number 6,
14  Limit of Quantifiable Detection.
15  A    Okay.
16  Q    Do you see here that they note "The
17  detection limit of five or more asbestiform
18  minerals of one variety in an analysis
19  constitutes a quantifiable level of detection"?
20  A    Right.
21  Q    And you agree with me that that's the
22  same level of quantification in the J&J
23  specifications?
24  MS. O'DELL:

Page 365

1       Object to form.
2  A    That's the number that's in -- in
3  most --
4       I've seen four a couple of times, but I
5  think five is -- is the one I see the most.
6  MR. FROST:
7  Q    Okay.  So you agree with me, anyway,
8  that the five, you know --
9  A    Right.
10  Q    -- is in line with the limit of
11  quantifiable detection published in the
12  Microscope --
13  A    Right.
14  Q    -- in fourth quarter of 1990?
15  A    Correct.
16  Q    Okay.  Turn to page 41.
17  A    Okay.
18  Q    And I'm not gonna belabor the point
19  because I think we talked about this pretty
20  significantly when we were looking at the Chinese
21  document.  But the second paragraph after Testing
22  Methodologies, halfway through, you write that,
23  "Finally" -- in the sentence that starts
24  "Finally, an Imerys talc letter in 2013 states,"

92 (Pages 362 to 365)

Robert Cook, Ph.D.

Page 366

1  and it goes on.
2      And at the very bottom of this, "This,
3  of course, suggests an asbestos content of less
4  than .1 is acceptable, which is contrary to
5  Defendants' policy that its products be
6  asbestos-free."
7      This is the same opinion you had as to
8  the Chinese test; right?  Correct?
9  A      No.  No.  This is different.  I -- I
10  was surprised to even see that because it looked
11  like that suddenly we're gonna accept an asbestos
12  content up to .1.  I mean, to me, it read very
13  strangely.  I wasn't sure that it was even
14  written the way it was meant to sound.
15  Q      Oh.  I see.
16  A      Yeah.  I mean, if you -- if you go back
17  and look at the document, it almost sounds like
18  they're saying, "Well, you know, we've done the
19  best we can, but if it's got .09 percent
20  asbestos, well, that's below the .1 accepted
21  standard, so" --
22      You know, it seemed like a very
23  peculiar statement.
24  Q      I see.  So the -- it's -- the notation

Page 367

1  here is more the peculiarness of the statement
2  and the document --
3  A      Well, if it's -- if it's accurate,
4  then -- then -- then it means that everything has
5  changed suddenly, that we're not -- we're not
6  talc -- we're not asbestos-free and, in fact,
7  we're gonna accept it up to .1.
8  Q      You'd agree with me -- this is what we
9  covered before -- the test specification for
10  Johnson & Johnson's talc is utilizing the FDA
11  J4-1, which is the XRD testing method, followed
12  by PLM; correct?
13  A      Correct.
14  MS. O'DELL:
15      Object to the form.
16  MR. FROST:
17  Q      And we've also seen that there's TEM
18  testing requirement, too, in the J&J talc
19  specification; correct?
20  MS. O'DELL:
21      Object to the form.
22  A      Correct.
23  MR. FROST:
24  Q      All right.  I'm gonna mark this as

Page 368

1  Exhibit 31.
2      (DEPOSITION EXHIBIT NUMBER 31
3      WAS MARKED FOR IDENTIFICATION.)
4  MR. FROST:
5  Q      We're gonna turn gears a little bit
6  here.  Just to make it easier, I've put a
7  collection of documents together in one binder so
8  we don't have to worry about --
9  A      Oh, wonderful.
10  Q      -- running everything around.
11  A      Okay.
12  Q      So looking at page 13 of your report,
13  running through page 21, this is the chart we
14  talked about, you know, earlier --
15  A      Right, right.
16  Q      -- that has the various asbestos.
17  A      Right.
18  Q      And you've looked at each of these
19  documents, you testified, that relates to the
20  various entries on this chart?
21  A      Yes.
22  Q      And, sitting here today, can you tell
23  me confidently that every one of the positive
24  test results on this chart, you know, relates to

Page 369

1  asbestos that made its way to a final bottle of
2  talcum powder sold by Johnson & Johnson?
3  A      No.
4  Q      Okay.
5  A      I think that there may be a mistake or
6  two on here.
7  Q      Okay.  And we're gonna walk through a
8  couple.
9  A      Okay.
10  Q      I'm not gonna call out every mistake
11  because we'll be here -- you know, I'm not gonna
12  look at every document and call out every
13  mistake, but I do want to go through a few.
14  MS. O'DELL:
15      Object to the form.
16  MR. FROST:
17  Q      So if we could look at what's been
18  marked as Tab 1 in the binder of 31.
19  A      Right.
20  Q      This relates to an 8-2-22 --
21      Well, first, if you look at page 18 of
22  your report, sort of halfway down, for the test
23  result for 8-22-1985.
24  A      Okay.

Robert Cook, Ph.D.

Page 370

1    Q      All right.  Do you see that references
2    document JNJMX68 --
3    A      Yes.
4    Q      -- 13019?
5    A      Right.
6    Q      And that's talking about McCrone
7    project number ME-1862 and specifically samples
8    WMI85-28 and WMI85-30?
9    A      Right.
10   Q      Okay.  If you'd turn to Tab 1 of the
11   exhibit blinder, you'll agree that this is the
12   corresponding document, and we see WMI85-28 --
13   A      Yes.
14   Q      -- and 85-30 listed?
15   A      Yes.
16   Q      Okay.  And, from this document, you
17   can't tell where the samples WMI85-28 and
18   WMI85-30 were mined; correct?
19   MS. O'DELL:
20           Object to the form.
21   A      I don't think I can.
22   MR. FROST:
23   Q      If you turn to --
24   A      I think that they actually -- the

Page 371

1    sample numbers relate to the mill, not the mine.
2    Q      Well, we'll -- why don't we turn to Tab
3    2.  This is a document Bates numbered JNJ65646.
4    And I'll turn your attention to the second page.
5    A      Okay.
6    Q      Then we see here it says WMI85-28 and
7    it describes as grade TC-7- --
8    A      Right.  I'm aware of those two.  I
9    spotted them.
10   Q      Okay.  The grade TC-700?
11   A      Right.  I see that.
12   Q      So if we turn to the tab marked 3,
13   which is a document that starts with Bates Imerys
14   013723, and if you can turn to the fourth page of
15   that.  It's the one that's 13725.
16   A      Okay.
17   Q      Under Production Location, the second
18   one, San Andreas, California.
19   A      Correct.
20   Q      And then if you go over, it says
21   "Grade," and then it has "TC-700, light and
22   dark."
23   A      Right.
24   Q      So, by this document, it's indicating

Page 372

1    that samples TC-700 were actually talc mined at
2    San Andreas, California; correct?
3    A      It would seem to say that, yeah.
4    Q      Okay.  All right.  Looking back at your
5    report, the next entry down, 4-29-1986, it's on
6    page 18.
7    A      Okay.  Tab 4?
8    Q      Yeah.  If you turn to Tab 4 here.
9    You're ahead of me already.
10   A      Okay.
11   Q      But on the chart you identify J&J182 as
12   the source document.  Do you agree with me that
13   Tab 4 is Exhibit J&J182?
14   A      Yes.
15   Q      And, again, on your chart, you just
16   have talc samples, but here the talc samples
17   listed are WMI85-53, WMI85-55, and WMI85-57;
18   correct?
19   A      Right.
20   Q      Okay.
21           All right.  If you'll look back at Tab
22   3.  I'm sorry.  Turn to page 5.  I apologize.
23   Third page.
24   VIDEOGRAPHER:

Page 373

1            Jack, did you put your mic on?
2    MR. FROST:
3            Oh, did it fall off?  No.  I took it
4    off.
5    Q      So look at the page that ends 890.
6    A      Okay.
7    Q      And if you'll look up there, we see
8    WMI85-53.  And, again, that's Grade TC-700?
9    A      Right.
10   Q      85-55, also Grade TC-700.
11   A      Okay.
12   Q      And then the 85-57 is also grade
13   TC-700.
14   A      Okay.
15   Q      Okay.  And, you know, as we saw last
16   time, the Grade TC-700 comes from San Andreas,
17   California; correct?
18   A      Yeah.  I'd have to go back and look,
19   but I -- I think it is.
20   Q      Okay.  You can look if you want, but I
21   take it you believe me on that one?
22   A      Okay.
23   Q      Okay.  Look at page 17 of your report.
24   Right in about the middle, there's a 10-10-1974

Robert Cook, Ph.D.

Page 374

1    entry on the -- on the chart.
2    A    I see it.
3    Q    Okay. And it accounts for J&J-74 as
4    the source document.
5    A    Hang on. What was the date again?
6    Q    10-10-1974. It's about the middle of
7    page 17.
8    A    Right. Right. I'm looking at the
9    other one.
10        Huh. Page 17?
11   Q    Yeah. Here. I've highlighted it on
12   this one. I'll just let you look. Looks like
13   the second entry on page 17.
14   A    Okay. I've got it. Sure.
15   Q    And the source document for that entry
16   is J&J-74.
17   A    Right.
18   Q    Okay. If you look at Tab 8, do you
19   agree with me that that's the source document?
20   MS. O'DELL:
21        Tab 8?
22   MR. FROST:
23        Tab 8, yes. Oh, sorry. Tab 6. Looked
24   like an 8 as I was glancing at it.

Page 375

1    Q    Tab 6.
2    A    Okay.
3    Q    And if you look at the highlighted
4    portion of that document, which is highlighted on
5    the original, it notes that the sample is DG --
6    D-GI; correct?
7    A    Yes.
8    Q    In which they found the fibrous
9    asbestiform materials.
10        If you look at Tab 7, this is a
11   document that's Bates stamped JNJMX682659.
12   A    Okay.
13   Q    Third paragraph down, it states, "The
14   samples represented both the industrial minerals
15   produced at the Gassetts," and it says "GI" in
16   parentheses.
17   A    Right.
18   Q    Okay. And then if you skip down --
19   A    Yeah. I, incidentally, I picked this
20   one up.
21   Q    This is the one you picked up?
22   A    I -- well, it's one of the ones I
23   picked up.
24   Q    All right. Do you agree with me, then,

Page 376

1    that D-GI is an industrial product? It's not a
2    cosmetic talcum powder?
3    A    Right.
4    Q    All right. If you turn to page 15.
5    Oh, sorry. 14. About halfway down 14, there's a
6    document or there's an entry on the chart,
7    7-7-1971. And the what was tested column shows
8    that it was talc product 344-L?
9    A    Right.
10   Q    Okay. If you look at Tab 8, there's a
11   document JNJAZ55-6089 that appears to be -- you
12   know, it's the July 7, '71, letter that talks
13   about 344-L testing. Do you agree?
14   MS. O'DELL:
15        Jack, can you give us a moment?
16   MR. FROST:
17        Sure.
18   MS. O'DELL:
19        Because we have it as a different --
20   MR. FROST:
21        Yeah. I was gonna say, you have the --
22   that's fine. If you can find the one you have,
23   that's great.
24   MS. O'DELL:

Page 377

1        Yeah. Just -- and it may be the same
2    document, but we identified it differently, so
3    just give us just a minute --
4    MR. FROST:
5        Yeah. That's fine.
6    MS. O'DELL:
7        -- to check the Bates number.
8    MR. FROST:
9        Of course, the sticker's over the Bates
10   number; right?
11   MS. O'DELL:
12        Never helpful.
13        I believe that to be the same one.
14   MR. FROST:
15        Okay.
16   MS. O'DELL:
17        Thank you.
18   MR. FROST:
19   Q    Okay. And this is a report from
20   Colorado Schools of Mines regarding this sample
21   344-L?
22   A    Right.
23   Q    Are you aware that the Colorado School
24   of Mines issued a subsequent report on retesting

95 (Pages 374 to 377)

Robert Cook, Ph.D.

| Page 378 |
|---|
| 1 of these same samples? |
| 2 A No. |
| 3 Q Turn to Tab 9. |
| 4 A I say I'm not. I -- I don't |
| 5 remember -- I don't remember seeing it. If it -- |
| 6 if it contradicted this one, then I would have |
| 7 likely removed it from the table. So -- |
| 8 Q Okay. |
| 9 A -- I either don't remember it or didn't |
| 10 see it. |
| 11 Q Okay. That's fair. |
| 12 Go on and turn to Tab 9. It's a |
| 13 document Bates-stamped JNJAZ55-3828. |
| 14 A Where was that in the table? |
| 15 Q This particular document? |
| 16 A Yeah. Are you referring to an entry in |
| 17 the table? |
| 18 Q It's not. I'm gonna -- this document |
| 19 refers -- this is the retest that I was talking |
| 20 about from Colorado School of Mines. |
| 21 A Oh, okay. Sure. |
| 22 MS. O'DELL: |
| 23 And if you haven't seen the document, |
| 24 take your time -- |

| Page 379 |
|---|
| 1 MR. FROST: |
| 2 Q I was gonna say take your time to read |
| 3 it. I believe it's pretty short. |
| 4 A Yeah. |
| 5 Q Actually, very short. |
| 6 A There they go again, "within our limits |
| 7 of detectability." |
| 8 Right. Okay. |
| 9 Q You're reading from the middle of |
| 10 paragraph 1? |
| 11 A I'm reading -- |
| 12 Q The numbered paragraph 1? |
| 13 A I'm reading the last sentence of the |
| 14 second full paragraph. |
| 15 Q Yeah. |
| 16 So, before that, it states "Subsequent |
| 17 x-ray work" -- |
| 18 A Right. |
| 19 Q -- "on the 6-month product samples on |
| 20 the 344-L product sample shows no definite |
| 21 indications of any asbestos-type minerals within |
| 22 our limits of detectability." |
| 23 A Right. |
| 24 Q "The trace amounts I saw were evidently |

| Page 380 |
|---|
| 1 contamination from the standard asbestos |
| 2 samples." |
| 3 A Right. |
| 4 Q So, based on this, obviously, you know, |
| 5 we can't determine whether or not the sample |
| 6 344-L on the chart, you know, is an actual |
| 7 finding of asbestos in the talcum powder. Would |
| 8 you -- would you agree with that statement? |
| 9 MS. O'DELL: |
| 10 Object to form. |
| 11 A Hang on. I'm reading that third |
| 12 paragraph. |
| 13 MR. FROST: |
| 14 Q Sure. |
| 15 A Yeah. |
| 16 Q Okay. |
| 17 A Okay. |
| 18 Q Page 15, the second notation, 9-6-1972, |
| 19 J&J-31. |
| 20 A Right. |
| 21 Q And the source document is noted as |
| 22 J&J -- yeah, J&J-31. |
| 23 A Right. |
| 24 Q Turn to Tab 12. You'll agree with me |

| Page 381 |
|---|
| 1 that appears to be the source document, that |
| 2 J&J-31? |
| 3 A Right. |
| 4 Q If you turn to page 4 of 7. |
| 5 A Okay. |
| 6 Q So the sample numbers that have |
| 7 chrysotile findings you agree are 133, 134, 137, |
| 8 138, and then, if you turn to the next page, 84? |
| 9 A Read those numbers again. |
| 10 Q Sure. 133, 134 -- |
| 11 A Okay. |
| 12 Q -- then 137 and 138 and 84. |
| 13 A Right. |
| 14 Q Turn back -- or turn to Tab 11, which |
| 15 is a document dated January 7th, 1976. You can |
| 16 read the letter. But, effectively, this is a |
| 17 retest of some of the various samples by |
| 18 Dr. Lewin; correct? |
| 19 A Correct. |
| 20 Q If you turn to -- one, two, three -- |
| 21 the fourth page. So if you see -- if you look at |
| 22 84 under chrysotile, there's a question mark. |
| 23 Then if you look at 133, 134, 137 and 138 under |
| 24 chrysotile, it's now marked "nondetect." |

96 (Pages 378 to 381)

Robert Cook, Ph.D.

Page 382

1    A    Right. I see that. Uh-huh.
2    Q    So, again, just like the other
3    document, based on the retesting, you know, we
4    can't say one way or the other whether there was
5    actually asbestos in that sample; correct?
6    MS. O'DELL:
7        Object to the form.
8    A    Correct.
9    MR. FROST:
10   Q    Now, I know we've said this lots of
11   times, and I apologize, but not a doctor, not a
12   toxicologist; correct?
13   A    Correct.
14   Q    And, because of that, you can't testify
15   to a reasonable degree of scientific certainty
16   that any individual container of talcum powder
17   has sufficient asbestos in it to cause ovarian
18   cancer; correct?
19   A    Correct.
20   MS. O'DELL:
21       Object to the form.
22   MR. FROST:
23   Q    Okay. And same thing. You can't
24   testify that any particular container of talcum

Page 383

1    powder has sufficient asbestos in it to cause
2    mesothelioma; correct?
3    MS. O'DELL:
4        Object to the form.
5    A    That's correct. You know, you -- the
6    term "sufficient" is -- is an interesting one in
7    your question. I don't know that anybody on
8    earth knows that answer.
9    MR. FROST:
10   Q    Okay.
11   A    Can -- can say that.
12   Q    But that's certainly not an area
13   that -- it's not an area you've studied --
14   A    Right.
15   Q    -- or are qualified in.
16       And, again, I think I've now pointed
17   out five, I believe --
18   A    Yes.
19   Q    -- examples of, you know, sort of --
20   I'll call them inaccuracies, you know, but --
21   A    Glitches.
22   Q    -- notations on the chart, you know,
23   that we can't say whether or not are actually
24   asbestos in the product. And I believe you told

Page 384

1    me before, you know, sitting here today, you
2    can't tell me that every single one of these --
3    you know, any one of the ones that are left
4    would, you know, also be indicative of something
5    that actually ended up in talcum powder; correct?
6    MS. O'DELL:
7        Object to the form.
8    A    Well, it depends on what's being
9    analyzed. If some of it is the finished product,
10   then it's the finished product.
11   MR. FROST:
12   Q    Okay.
13   A    If not, then, you know, it depends on
14   where the sample was collected. If it was
15   collected at the mine, then that's one thing. If
16   it was collected coming out of the flotation
17   circuit, well, you know, maybe it did get --
18   probably it got in.
19   Q    Okay.
20   A    I'm not in the business of throwing --
21   throwing good product away.
22   Q    And you also -- you can't tell me,
23   sitting here, that there aren't other documents
24   that may call into question or contradict some of

Page 385

1    the other testing results here; correct?
2    MS. O'DELL:
3        Object.
4    MR. FROST:
5    Q    The -- the testing results listed here
6    were based on, you know, your best efforts and
7    reviewing the documents you had available at the
8    time; correct?
9    MS. O'DELL:
10       Objection. Object to the form.
11   A    Yeah. The table is my best effort at
12   putting together information from the documents
13   that I had. That -- that statement's accurate.
14   MR. FROST:
15   Q    Okay. Now, have you reviewed
16   Dr. Longo's reports that have been issued in this
17   case?
18   A    I'm not sure I've seen all of them.
19   Q    You've reviewed some of the Longo
20   reports, at least?
21   A    Yes.
22   Q    Okay. And are you -- are you relying
23   on the Longo test results as part of the basis
24   for your opinions in these cases?

97 (Pages 382 to 385)

Robert Cook, Ph.D.

Page 386

1    A      Not really. I mentioned him a couple
2    of times. But I got -- I got his report, his --
3    I mean, the great big huge report -- just a few
4    days ago.
5    Q      Oh, okay. So it's --
6    A      I'd seen the introductory materials and
7    some of the earlier reports he had.
8    Q      But you're not specifically relying on
9    Longo's testing and his testing methodologies and
10   things like that for the basis of your opinions
11   in this case?
12   MS. O'DELL:
13           Object to the form.
14   A      It is certainly part of the big
15   picture.
16   MR. FROST:
17   Q      You're not here to offer any opinions
18   that his testing methodologies were inadequate or
19   that, you know, his preparation procedures and
20   things like that, they -- that's -- that's not
21   part of the opinions you're offering in this
22   case, are they?
23   A      No.
24   Q      Okay.

Page 387

1    A      I did read -- I did read his methods.
2    They seem to be up to snuff.
3    Q      Okay. You didn't do any, for example,
4    calculations of BSAED dispersion patterns --
5    A      No.
6    Q      -- or you didn't try to verify any of
7    his test results?
8    A      No. No, no, no. I'm not sure how I
9    would have.
10   Q      That's -- that's not your area of
11   expertise; correct?
12   A      Nor do I have the equipment.
13   Q      Well, that's a fair point, too.
14   A      Yeah.
15   Q      Turning to page 20 --
16           Are these chronological? They are.
17   Okay.
18   MS. O'DELL:
19           Hey, Jack. We've been going a
20   hundred -- hour and 15 minutes. Can we take a
21   short break?
22   MR. FROST:
23           Yeah. We can take a break now. This
24   works well. I was moving on to a different

Page 388

1    subject.
2    VIDEOGRAPHER:
3            Going off the record. The time is 4:13
4    p.m.
5            (OFF THE RECORD.)
6    VIDEOGRAPHER:
7            We're back on the record. The time is
8    4:40 p.m.
9    MR. FROST:
10   Q      Okay. I believe we were turning to
11   page 22 of your report. No. Page 23.
12           Did your report get lost somewhere?
13   A      Yeah. I'm looking for yours with the
14   tabs on it.
15   Q      Oh. That's the binder on the bottom.
16   MS. O'DELL:
17           Do you need it?
18   MR. FROST:
19           We're gonna turn to it next, so it's a
20   good thing you have it.
21   Q      Okay. So you see the 5-25-1972
22   notation under the chart regarding fibrous talc?
23   And it notes the source document is JNJ238826,
24   248023?

Page 389

1    A      Right.
2    Q      Turn to Tab 13.
3    MS. O'DELL:
4            You said 5-25-1972?
5    MR. FROST:
6            Yes. It's on page 23 of his report.
7    MS. O'DELL:
8            Okay. So you're not talking about the
9    asbestos table. You're talking about the fibrous
10   talc table.
11   MR. FROST:
12           Yeah, the fibrous talc table.
13   MS. O'DELL:
14           Okay. All right.
15   MR. FROST:
16   Q      Okay. Do you agree with me these are
17   the two source documents?
18   A      I think so.
19   Q      And they're both referring to sample
20   FD-14?
21   A      I think that they are. Sure.
22   Q      All right.
23   A      I mean, I've looked at the first one of
24   these.

98 (Pages 386 to 389)

Robert Cook, Ph.D.

Page 390

1          Are both documents behind the same tab?
2    Q    They are.  There's a blue page
3  separating the two.
4    A    Oh, okay.  Thank you.  Gotcha.  Okay.
5    Q    And you'll also agree with me that
6  they're talking -- the FD-14 seems to have been
7  tested by a Dr. W. Smith at Fairleigh Dickinson
8  University?
9    A    Correct.
10   Q    Okay.  Turn to --
11   A    Wait a minute.
12  MS. O'DELL:
13         Dr. Smith?  Is that what you were --
14  MR. FROST:
15   Q    Dr. W. Smith, Fairleigh Dickinson
16  University.
17         Both of these are Johnson & Johnson
18  documents, but they're talking about the
19  Dr. W. Smith testing of the tremolite talc,
20  FD-14.
21         Do you agree with that statement?
22   A    Okay.  I was looking for Smith's name.
23  I remember seeing Rolle and Goudie and --
24   Q    If you look at the first document, the

Page 391

1  238826 --
2    A    Right.
3    Q    -- at the top, it says, "Subject,
4  Characterization of Tremolite Talc, FD-14,
5  Dr. W. Smith --
6    A    Oh.  Oh, yeah.
7    Q    -- Fairleigh Dickinson University.
8    A    Right.  I've got him.  Yep.  Yep.  Yep.
9  Sure.
10   Q    All right.  Turn to Tab 14.
11   A    Okay.
12   Q    It's a letter dated March 15th, 1972,
13  Bates stamped JNJ346879.
14   A    Okay.
15   Q    And, again, it's from -- you know,
16  second sentence down says, "As you may remember
17  from my brief conversation with you, we are
18  presently analyzing a talc used by
19  Dr. W. E. Smith in his animal testing.  Could you
20  please have the EM work done on this talc labeled
21  FD-14?"
22   A    Sure.
23   Q    Okay.  If you turn to Tab number 15,
24  this is a paper published on October 22, 2007, by

Page 392

1  Drs. Gamble and Gibbs --
2    A    Correct.
3    Q    -- entitled "An evaluation of the risks
4  of lung cancer and mesothelioma from exposure to
5  amphibole cleavage fragments"?
6    A    Correct.
7    Q    You can feel free to read the paper,
8  but I'm gonna direct your attention to page 23 of
9  33.
10   A    Oh, great.  Okay.  All right.
11   Q    Okay.  Second column, looks like the
12  second paragraph down, the paragraph starts,
13  "Samples used in experimental studies."
14   A    Page 23 of 33?
15   Q    Yep.  On the second column.
16   A    Second column being the right-hand
17  column?
18   Q    Yeah.  Then it starts right there.  It
19  says "Samples."
20   A    Okay.
21   Q    About halfway down in that paragraph --
22   A    Right.
23   Q    -- the sentence reads, "On the other
24  hand, there are several studies of tremolitic

Page 393

1  talc samples from the Gouverneur mine in New York
2  State."  And the second one listed is FD-14 used
3  by Dr. Smith, 1979.  Is that correct?
4  MS. O'DELL:
5         That's what it states.
6  MR. FROST:
7    Q    Or did I -- did I read that correctly?
8    A    I think you did.
9    Q    Okay.  And, by this, it indicates that
10  the tremolitic talc tested by Dr. Smith that's
11  FD-14 is actually a Gouverneur mine sample;
12  correct?
13  MS. O'DELL:
14         Object to the form.
15   A    Unless there's a peculiar duplication
16  of numbers.
17  MR. FROST:
18   Q    It certainly seems to indicate that;
19  correct?
20   A    It would suggest that.
21   Q    Okay.  If you turn to page 25 of your
22  report, again on the fiber -- fibrous talc chart,
23  an entry for 7-29-1975.  And it indicates
24  document JNJL6127053.

Robert Cook, Ph.D.

Page 394

1       Do you see where I am?
2  A      Yeah, I've got it.
3  Q      Okay.  And if you turn to Tab 16 in the
4  binder that's Exhibit 31.
5  A      Okay.
6  Q      You agree with me that this is the
7  source document for the entry on the chart;
8  correct?
9  A      I believe it's the right number.
10 Q      Okay.  Do you see up in the upper
11 left-hand corner it says "W. Minerals, Ludlow
12 36"?
13 A      Yes.
14 Q      Okay.  And if you turn to Tab 17, which
15 is a document Bates-stamped Imerys 013723.
16 A      Uh-huh.
17 Q      And if you turn to the second page,
18 fourth entry down, it says "Ludlow, Vermont."
19 A      Got it.
20 Q      Okay.  And it notes Grade 36 here.
21 A      I see Grade 36.
22 Q      Okay.  And if you look down --
23        So the production location of this is
24 Ludlow, Vermont; correct?  And then it says

Page 395

1  "Grade 36."
2  A      Correct.
3  Q      Okay.  And if you look on the next
4  page, that is different than the production
5  location being Windsor, Vermont -- right? --
6  which has the Grade 65 talc, which we know is the
7  cosmetic talc?
8  A      Okay.
9  Q      And we know that the cosmetic talc came
10 from the Windsor, Vermont, mill; correct?
11 A      It should have, yes.
12 Q      All right.  And that's separate,
13 according to this document, from the Ludlow,
14 Vermont, mill; correct?
15 MS. O'DELL:
16        Object to the form.
17 A      Yes.
18 MR. FROST:
19 Q      Okay.
20 A      I think that the point of all this is
21 that the -- the mill feed at Ludlow had fibrous
22 talc in it.
23 Q      Exactly.
24 A      Whether it was cosmetic or not, it was

Page 396

1  still fibrous talc.
2  Q      Okay.  But that's different than the
3  talc that was sourced for Johnson & Johnson
4  talcum powder; correct?
5  A      It may --
6  MS. O'DELL:
7        Object to the form.
8  A      It may or may not be.  I mean, if
9  they're coming from --
10        They list the mines, and they're the
11 same mines that were producing the cosmetic talc,
12 and there's no reason to think that -- that even
13 though we've got lots of analyses that show
14 fibrous talc in cosmetic talc that there
15 shouldn't be any fibrous talc in industrial talc.
16 It...
17 MR. FROST:
18 Q      Okay.  But, based on this, this
19 certainly isn't evidence that there was fibrous
20 talc that ended up in a bottle of Johnson's -- in
21 Johnson & Johnson's talcum powder; correct?
22 MS. O'DELL:
23        Object to the form.
24 A      That way, no.

Page 397

1  MR. FROST:
2  Q      Okay.  And, again, you know, we've
3  already covered this before, but you can't tell
4  me to a reasonable degree of scientific certainty
5  that any individual container of talcum powder
6  may have contained a sufficient number of -- or a
7  sufficient amount of fibrous talc to cause any
8  human disease; correct?
9  MS. O'DELL:
10        Object to the form.
11 A      I've never seen a paper that said how
12 much you needed to cause any kind of a problem.
13 MR. FROST:
14 Q      Okay.  And that's outside of your area
15 of expertise, anyway.
16 A      Correct.
17 Q      Okay.  Now, again, you know, you've
18 also noted on here, we've seen at various points
19 nickel, chromium, cobalt and arsenic, I believe,
20 as well.  And you'd agree with me that not all of
21 the entries on the charts for these various
22 different chemicals are, in fact, finished talcum
23 powder; correct?
24 MS. O'DELL:

100 (Pages 394 to 397)

Robert Cook, Ph.D.

| Page 398 | Page 400 |
|---|---|

**Page 398**

1    Object to the form.
2  A    Some are. Some are not.
3  MR. FROST:
4  Q    Okay. And a lot of them, you know, are
5  ore samples, things of that nature?
6  MS. O'DELL:
7    Object to the form. Object to the
8  form, "a lot." What does that mean?
9  MR. FROST:
10  Q    Many of them? You know, a certain
11  number of them come from ore samples; correct?
12  MS. O'DELL:
13    Object to the form.
14  A    I would say that -- that ore is
15  converted to finished product, and there's no
16  indication that there's been any attempt to get
17  those metals out. So that's my answer.
18  MR. FROST:
19  Q    You'd agreed with me, if done properly,
20  beneficiation could be used to lower the amounts
21  of heavy metals that may appear in a finished
22  product; correct?
23  MS. O'DELL:
24    Object to the form.

**Page 400**

1  any Vermont talc with any other Vermont talc is
2  gonna do nothing to lower potential heavy metal
3  values found in the finished product?
4  A    It depends on whether you're including
5  arsenic in there as a -- as a heavy metal. I
6  don't -- I don't include arsenic as a heavy
7  metal. But if you want to include it in there,
8  blending can reduce the arsenic level.
9  Q    Okay. And arsenic's the only one that
10  you believe that blending can reduce?
11  A    Haven't seen any indication that
12  blending with anything else would -- would reduce
13  those numbers.
14  Q    You also believe that there's no way to
15  use beneficiation to, say, remove chlorite from
16  talc?
17  A    I think that that could probably be
18  done. And, in fact, my guess is that some of
19  that is done. I think it's tough, because in
20  a -- in a flotation plant, those two minerals
21  tend to respond similarly. And, so, when you --
22  when you -- they were using a methyl isobutyl
23  something or another in one of the plants. That
24  frothing agent is excellent for talc, but I think

**Page 399**

1  A    I don't think that there's been a
2  single study that's indicated that.
3  MR. FROST:
4  Q    And would you agree with me that
5  blending is a technique that can be used to lower
6  total heavy metal counts by using ores from
7  different areas that have different
8  concentrations of heavy metals?
9  MS. O'DELL:
10    Object to the form.
11  A    If I was asked to produce a blended
12  talc that would lower the heavy metals, it would
13  have to be blending Vermont talc with a
14  non-Vermont source.
15    Say we know that the metal numbers are
16  low in Chinese talc. So if you wanted to have 50
17  percent Chinese talc, 50 percent Ludlow talc,
18  then your total metals are gonna go down.
19  Q    Okay.
20  A    So blending can do that. But there's
21  no indication that anything like that was ever
22  done other than blending Vermont talc with
23  Vermont talc.
24  Q    And your opinion is that blending of

**Page 401**

1  it's also pretty good for chlorite, too. I think
2  that by playing around, you might come up with a
3  frothing agent or an agent that might help pull
4  chlorite out if you wanted to add a separate
5  circuit.
6  Q    Okay.
7  A    But I don't know that that's true.
8  This is -- this is -- based on what I've read and
9  looked at, you might be able to do that. You'd
10  have to try. It'd have to be bench -- bench
11  scale testing.
12  Q    Okay. So you'd agree with me that,
13  hypothetically, beneficiation, done properly,
14  could remove the chlorite which would drop the
15  levels of heavy metals contained in the talc?
16  MS. O'DELL:
17    Object to the form.
18  A    I would say that it might.
19  MR. FROST:
20  Q    And, again, if I were to ask you --
21    And I'll ask it as one question, which
22  I know is compound, so there'll be an objection.
23    But if I were to ask you with respect
24  to arsenic, cobalt, chromium, nickel --

101 (Pages 398 to 401)

Robert Cook, Ph.D.

Page 402

1    I believe that's all of them.
2  A    Yep.  That's it.
3  Q    Okay.  You couldn't tell me to any
4  degree of scientific certainty that any
5  individual container would contain enough of
6  these particular heavy metals to cause human
7  disease; correct?
8  MS. O'DELL:
9    Object to the form.
10  A    I'm not an expert in human disease.
11  MR. FROST:
12  Q    And are you also aware that chromium is
13  a fairly common --
14    Well, strike that.
15    Are you aware there's two different
16  types of chromium?  Well, there's more than, but
17  there are two different types of chromium that
18  are generally recognized to be associated with
19  rocks?
20  A    Right.  Yes.
21  Q    And that's chromium 3 and chromium 6?
22  A    Correct.
23  Q    Okay.  And you're also aware that
24  chromium 6 is the one that causes concern;

Page 403

1  correct?
2  MS. O'DELL:
3    Object to the form.
4  A    Yes.  Plus 6 chromium is -- is, you
5  know, considered to be, you know, very bad.
6  MR. FROST:
7  Q    Okay.  And, in fact, chromium 3 is an
8  essential element to human bodies and everything
9  else.
10  MS. O'DELL:
11    Object to the form.
12  MR. FROST:
13  Q    It's something human bodies need to
14  function.
15  A    Uh-huh.  Yes.
16  Q    And you're also aware that cobalt 3 is
17  a common element found in rock.
18  A    Cobalt 3?
19  Q    Sorry.  Chromium 3.
20  A    Yes.
21  Q    Okay.  And you'll agree with me that
22  the chart and the testing results don't designate
23  whether or not it's chromium 3 versus chromium 6
24  they're finding in the talc samples; correct?

Page 404

1  A    It's -- the -- the technique used by
2  Johnson & Johnson would not distinguish between
3  the two, and their -- their specs don't try to
4  distinguish between the two.
5    They have a -- they have a report --
6  it's actually quite -- quite interesting -- where
7  they have tried to determine how much of each was
8  present.  And I didn't reference it, but I've got
9  it somewhere.  But there was an attempt probably
10  back in the late 1970s to look at this.
11  Q    You'd agree with me, based on the
12  sampling results that you rely on for your
13  report, you can't tell whether or not it's cobalt
14  3 versus -- I'm sorry --
15  A    Chromium.
16  Q    -- chromium 3 versus chromium 6 in the
17  talc; correct?
18  A    They don't report it that way.
19  MS. O'DELL:
20    Object to the form.
21  A    They report total chromium.
22  MR. FROST:
23  Q    Okay.
24  A    Pardon me.  I'm not even sure they're

Page 405

1  reporting total chromium because that -- that is
2  based on what extraction technique they used.
3  Q    Okay.  I'm gonna switch gears and turn
4  to Exhibit 4, which are your invoices.  And one
5  thing I noticed as I was going through,
6  variously, invoices have notations with meeting
7  with, like, for example, invoice number 5,
8  meeting with potential expert witnesses, Brian
9  Fowler and Don Burns.
10  A    Right.
11  Q    Who are Brian Fowler and Don Burns?
12  A    Don Burns is the chief geologist for
13  Omnia in Vermont, and he and I are friends.
14    And Brian Fowler, remember the citation
15  of Chidester, Billings, and Cady?
16  Q    Uh-huh.
17  A    Brian Fowler's father-in-law was Marlin
18  Billings, the Billings in that report.  And he is
19  a consulting geologist that lives in
20  New Hampshire, right across the line, and he owns
21  or owned a company called North American
22  Preserve -- Reserve that did an awful lot of work
23  up there.  And -- but, unfortunately, not much of
24  it was related to talc mining, and I didn't know

102 (Pages 402 to 405)

Robert Cook, Ph.D.

Page 406

1  that.
2         And, so, at one point, since I was up
3  there, I said, "I'm gonna look up Brian." Brian
4  Fowler had worked down here in Alabama. That's
5  how I knew him.
6         So I looked him up, and he said, you
7  know, "I don't know enough about it to be of any
8  help."
9  Q    Okay. So that was the nature of your
10 conversation with Brian Fowler is just --
11 A    Yeah, sure.
12 Q    -- I'm working on this; would you be
13 interested; and he said, "Unfortunately, I'm not
14 qualified"?
15 A    Same with Don burns, and his answer was
16 "Hell, no."
17 Q    I was gonna say. So who's Don Burns?
18 A    He's the chief geologist for Omnia.
19 Q    Okay.
20 A    Their account producer there.
21 Q    And did Mr. Burns express to you why he
22 was not interested in --
23 A    He's retiring, didn't want to be
24 involved. In fact, he's probably retired now.

Page 407

1  But he was, you know, looking at retirement a few
2  months out. He said -- you know, he's gonna live
3  in Proctorsville, Vermont, for the rest of his
4  life, and he said he just didn't want to be
5  involved. Okay.
6  Q    Okay. And did either Mr. Fowler or
7  Mr. Burns provide you with any information that
8  you relied on --
9  A    None.
10 Q    -- in drafting your opinions in this
11 case?
12 A    None whatsoever.
13 Q    And did they provide you any documents
14 or other information?
15 A    None. Well, Brian Fowler gave me a
16 document related to --
17        You know, New Hampshire's symbol is the
18 old man in the mountain rock face.
19 Q    Uh-huh.
20 A    Well, it collapsed about ten years ago.
21 It's gone. And Brian Fowler's company did the
22 study that showed why the rock face collapsed.
23 And he gave me the paper about that. And that's
24 the only thing he gave me.

Page 408

1  Q    Okay. And I take it that paper had
2  nothing to do with talc, this litigation.
3  A    Absolutely. But he gave me something.
4  Q    It was more of an interesting piece?
5  A    Yeah. Very interesting.
6  Q    Well, sir, thank you very much. That's
7  all the questions I have for right now. I'm
8  gonna yield my time at this point to my colleague
9  from Imerys, but I do reserve the right to come
10 back and ask a few questions if I find anything
11 in my notes.
12 A    Sure.
13        Can I add something? I misspoke
14 earlier about Longo.
15 Q    Okay.
16 A    I had several copies of reports that he
17 did, and I -- I actually had, I want to say,
18 about 35 pages of that supplemental report that
19 summarized, you know, the percent samples that --
20 that had fibrous talc. And I did rely on that.
21 But I didn't have the full 2,000 pages in front
22 of me.
23 Q    Okay.
24 A    So I did -- I did use him some, but not

Page 409

1  in terms of trying to analyze what he did.
2  Q    Okay. So is it fair to say your
3  reliance on the Longo testing is with respect to
4  the percentage of bottles that he found either
5  asbestiform -- well, what he characterized as
6  asbestiform minerals or fibrous talc?
7  A    It went through his methodology, which
8  I thought was pretty interesting since he
9  actually began to apply numbers to some of the
10 data.
11 Q    Uh-huh.
12 A    Which was, I thought, an interesting
13 thing.
14 Q    Okay. But I think we established
15 before you didn't do anything to check the
16 work --
17 A    No, no.
18 Q    -- or to analyze it.
19 A    But I think I kind of implied I didn't
20 really look at it very much. But I -- I looked
21 at the first half, first part of his report of
22 the supplemental report.
23 Q    All right. That's all the questions I
24 have for right now. We're gonna go off the

103 (Pages 406 to 409)

Robert Cook, Ph.D.

Page 410

1    record and I'll change seats with my colleague.
2    Thank you very much.
3    A    Sure.
4    VIDEOGRAPHER:
5        Going off the record.  The time is
6    5 p.m.
7        (OFF THE RECORD.)
8    VIDEOGRAPHER:
9        We're back on the record.  The time is
10    5:01 p.m.
11        EXAMINATION
12    BY MR. FERGUSON:
13    Q    Good afternoon, Dr. Cook.  How are you?
14    A    Fine.
15    Q    We met briefly before the deposition
16    started.
17    A    Yes.
18    Q    My name is Ken Ferguson.  Along with
19    Andrew Cary here to my right, we represent
20    Imerys.  You understand that?
21    A    Yes.
22    Q    And I'm gonna ask you some questions
23    today regarding your testimony and your report.
24    Please make sure, as Mr. Frost told you, you

Page 411

1    understand what I'm asking before you answer, and
2    then let me know if you don't, and I'll restate
3    the question.  Fair enough?
4    A    Fair enough.
5    Q    Okay.  And one thing that I think
6    everybody gets in a little trouble with in this
7    process, particularly if they haven't been
8    through it much before, is talking before the
9    person finishes asking the question.
10    A    All right.
11    Q    Because we all do that in normal
12    conversation.  So if you'd do your best to just
13    wait till I finish my question, and then -- and
14    then answer, and then I think we can -- we can go
15    a little bit smoother.  Fair enough?
16    A    Fair.
17    MS. O'DELL:
18        I would just add give me a millisecond
19    between the question and the answer, and I'll
20    have my opportunity to object if I need to.
21    THE WITNESS:
22        Okay.
23    MR. FERGUSON:
24        Fair enough.

Page 412

1    Q    Let me ask you a few things
2    preliminarily.  The one thing I noticed on your
3    CV is that you had a consultancy with Cyprus
4    Mines Corporation --
5    A    Yes.
6    Q    -- at some point.  Can you tell us when
7    that was?
8    A    1971 and '72.  And this was as a
9    consultant through a firm that I worked for.
10    Q    And what firm were you working for at
11    that time?
12    A    Lindgren Exploration Company.
13    Q    And could you tell us the general
14    nature of your consultancy with Cyprus Mines
15    Corporation?
16    A    Exploration for massive sulfites,
17    looking for copper.
18    Q    So it was an exploration stage rather
19    than a mining stage like you've been talking
20    about today?
21    A    Yes.  It was exploration.
22    Q    And how long did that consultancy with
23    Cyprus Mines continue, more or less?
24    A    It -- it was full-time pretty much for

Page 413

1    a year and a half, and then it was part-time.
2    And then I came to Auburn and it continued a
3    little bit.
4        But Cyprus, they -- they acquired
5    property where I was working, but in the end they
6    handed it off to Kennecott Copper and, you know,
7    the end result was a failed project.  We didn't
8    find anything.
9    Q    Any other consultancies with Cyprus
10    Mines Corporation?
11    A    Not -- not under that name.  You know,
12    Cyprus was sold to FI-- Freeport-McMoRan,
13    somebody like that.  And there were Cyprus
14    employees that moved over to Freeport.  But I
15    never did any more work for them, although I --
16    you know, I was associated with their employees
17    even to this day.
18    Q    And I take it you've never consulted
19    with Imerys?
20    A    No.  I have.
21    Q    Okay.  Tell me the nature of that
22    consultation.
23    A    I -- I was a witness for them in a
24    sinkhole litigation at Sylacauga.

104 (Pages 410 to 413)

Robert Cook, Ph.D.

Page 414

1  Q      I'm sorry.  At what?
2  A      Sylacauga.  It's the name of a town
3  where Imerys has three operating quarries.  They
4  make fine ground ultra-white carbonate for paper
5  coating and other -- other things.
6  Q      And when was that?
7  A      It's been within the last ten years.
8  It was a -- this was a relationship that was
9  probably a year and a half long.  I think I was
10 deposed twice.
11 Q      And how about Luzenac?  Any
12 consultancies with Luzenac?
13 A      No.
14 Q      How about Rio Tinto Minerals?
15 A      No.
16 Q      Let me change gears a little bit and
17 ask you about a couple things in your report.
18 A      Sure.
19 Q      And I'll tell you, I'm kind of
20 prioritizing since I -- I have limited time.  I'd
21 like to finish up relatively quickly here.  And,
22 so, I may skip around a little bit.  It's not to
23 confuse you.
24 A      I understand.

Page 415

1  Q      So just make sure we're on the same
2  page when you answer the questions.  Fair enough?
3  A      Sure.
4  Q      And, also, I decided it would be smart
5  to -- to copy or print your red-line version of
6  your -- your report so I could see what changes
7  you made, but it messed up the pagination.  So if
8  I get messed up there, you'll have to bear with
9  me.  Fair enough?
10 A      Fair.
11 Q      Can you go to page 11 of your report,
12 please, sir?
13 MS. O'DELL:
14        What -- what red-line?  Is that a
15 red-line you created?
16 MR. FERGUSON:
17        No.  It's your -- it's the red-line --
18 yeah, yeah.
19 MS. O'DELL:
20        Because there was no red-lining --
21 MR. FERGUSON:
22        I understand.  I just did a compare.
23 That's all.
24 MS. O'DELL:

Page 416

1          I just want him to understand that
2  there's not another document other than what he
3  has marked as exhibit -- it's been marked as
4  Exhibit 1 and 2, that that red-line is something
5  that you -- you've created.
6  MR. FERGUSON:
7          Fair enough.  Yes.  And I didn't mean
8  to imply otherwise.  So, yes.
9  Q      I just wanted to see what change you
10 made, and there are some computer programs you
11 can do.  I think we -- we all do them on
12 occasion.
13        So are you with me on page 11?
14 A      I am on page 11.
15 Q      All right.  And you see there's a
16 paragraph that starts "serpentine asbestos"?
17 A      Yes.
18 Q      Do you see that?
19 A      Yes.
20 Q      And, in that paragraph, about midway
21 through, I guess four lines down, you say, "In
22 1991, Dr. Alice Blount reported the presence of
23 asbestos needles and fibers in Vermont talc which
24 she later confirmed to be J&J baby powder."

Page 417

1          And then you cite to Blount 1991 and
2  her deposition.  Is that correct?
3  A      Well, I think that it was -- what I've
4  referenced there might have been an exhibit in
5  Hopkins' deposition.
6  Q      Okay.  Fair enough.
7          And but you also, in your citation, say
8  "Dep Alice Blount" --
9  A      Right.
10 Q      -- "Ph.D."
11 A      Right.  I read her deposition.
12 Q      Okay.
13 A      She talked about it.
14 Q      All right.  Now, did you read her 1991
15 paper?
16 A      Yes, I did.
17 Q      And while you say in here that she
18 later confirmed the presence of asbestos needles
19 and fibers in what she later confirmed as J&J
20 baby powder, there's no reference to J&J baby
21 powder in her paper itself in 1991, is there?
22 A      I don't think so.
23 Q      And when you read her deposition --
24 A      I mean, I think she was very careful,

Robert Cook, Ph.D.

Page 418

1    really, not to identify what she was working
2    with. I think she gave, you know, numerical or
3    letters to her samples.
4    MS. O'DELL:
5        In the paper?
6    THE WITNESS:
7        Right.
8        I think that she was trying to, you
9    know, shield the sources.
10   MR. FERGUSON:
11   Q    Okay. But in the paper,
12   Johnson & Johnson baby powder was not identified?
13   A    Correct.
14   Q    And you say she later confirmed that a
15   sample was Johnson & Johnson baby powder.
16   Correct?
17   A    Correct.
18   Q    Now, I have marked as -- it was already
19   marked as Exhibit 3 -- a folder with your notes,
20   and I've taken the liberty -- I hope it's okay --
21   A    Sure.
22   Q    -- marking each page. There's a 3.1,
23   3.2, so we can identify what we're talking about.
24   Fair enough?

Page 419

1    A    Fair enough.
2    Q    Okay. And let me show you what I've
3    marked as Exhibit 3.2.
4    MS. O'DELL:
5        Can you do a round robin so I can --
6    MR. FERGUSON:
7        Yeah. If I find --
8    MS. O'DELL:
9        -- so I can --
10   MR. FERGUSON:
11       Sure.
12   A    Okay.
13   MR. FERGUSON:
14   Q    And there's a reference to Alice Blount
15   at the top of that page; correct?
16   A    Yes.
17   Q    And what -- what does that say? I just
18   want to make sure I know what it means.
19   A    It says "Add Alice Blount."
20   Q    And, then, what does that mean?
21   A    It simply meant that I needed to
22   include her in my report.
23   Q    I see.
24   A    That's all.

Page 420

1    Q    And we're gonna go through these notes
2    in more detail later so -- so we can understand
3    what they are, but I just wanted to hit this
4    point early on.
5        If you'd pass that back to me if you're
6    done.
7    A    Sure.
8    Q    That's all I wanted to ask you.
9        And then I wanted to ask you about 3.5,
10   which I will pass to Miss O'Dell first.
11   MS. O'DELL:
12       Thank you.
13   MR. FERGUSON:
14   Q    Now, again, is that another page of
15   your notes?
16   A    Yes.
17   Q    Okay. And, if you wouldn't mind, can
18   you hand it -- since we just got it today, I
19   didn't make copies of it.
20   A    Sure.
21   Q    Can you hand it to me and let me ask
22   you a question or two?
23       You have a notation after page 53 that
24   says "date confusion, 1996 purchase versus 1991

Page 421

1    paper. Sample I-J&J baby powder."
2    A    Uh-huh.
3    Q    Is that correct? Did I read that
4    correctly?
5    A    Right. And I'm not sure that I wasn't
6    the one confused. But when I -- when I read --
7    this was in her deposition. I believe these page
8    numbers refer to her deposition. And I think
9    that she corrected some information that she may
10   have misspoke.
11   Q    But -- but you certainly, in reading
12   it, were confused about what she was talking
13   about; correct?
14   A    Correct.
15   Q    And you were confused about what she
16   was talking about with regard to the sample that
17   she was trying to identify; correct?
18   MS. O'DELL:
19       Object to the form.
20   A    It was the dates. Only -- only the
21   dates.
22   MR. FERGUSON:
23   Q    Okay. And you say in here 1991 versus
24   1996; correct?

106 (Pages 418 to 421)

Robert Cook, Ph.D.

Page 422

1   A    Correct.
2   Q    Okay.  Did that have to do with when
3   she acquired the sample?
4   A    I think that that had to do with the
5   date that she mentioned in her deposition, which
6   was incorrect.  Now, that's from my memory.
7   Q    And, then, you've written another note
8   by page 57.  And what does that note say?
9   A    You're asking me to read my own
10  writing?
11  Q    If you don't mind.
12  A    Okay.
13  Q    I can take a shot at it, but you may
14  have a better shot.
15  A    It says "Confusion concerning sample
16  IDs."
17       And, again, it was -- it was me that
18  was confused.  I had to go back and reread what
19  she was saying, and there were a couple of
20  handwritten exhibits, I think, in her deposition
21  that -- that I had to look at two or three times.
22  Q    And would you agree that there was some
23  confusion about when she purchased the particular
24  sample that she was referencing and she had

Page 423

1   tested?
2   A    I don't think --
3   MS. O'DELL:
4        Object to the form.
5   A    I don't think she was confused.  I
6   think I was confused.
7   MR. FERGUSON:
8   Q    Let's talk about another issue, which
9   is -- can you go to your report at page 41?
10  A    Got it.
11  Q    In the -- the -- well, it's one of
12  those where I can't tell you when.  There's a
13  heading called "Testing Methodologies For
14  Asbestos Were Inadequate."
15       Correct?
16  A    Yes.
17  Q    Okay.  And in, I believe, the first
18  paragraph, the last sentence, it says,
19  "Regardless, the specification for cosmetic talc
20  as indicated in the Hopkins, Downey, and Pier
21  depositions of 2018 is that the talc is
22  asbestos-free."
23       Correct?
24  A    Yes.

Page 424

1   Q    And -- and, so, I want to understand
2   that testimony.  I think you and Mr. Frost talked
3   a bit about that.  You're -- you're saying that,
4   for example, Mr. Downey noted in his deposition
5   that the talc is asbestos-free.  Is that correct?
6   A    I think so.
7   Q    Let's look at a portion of his
8   deposition together.  And if you'd go to your
9   left, I believe, is a white binder that says
10  "Downey."
11  A    Yeah.  Okay.
12  Q    You've got it?
13  A    Yeah.  Sure.
14  Q    Okay.  And -- and, if you would, turn
15  to Mr. Downey's deposition.
16  A    Okay.
17  MS. O'DELL:
18       Ken, when you get to wherever you're
19  going, let me know the number.  I can get there,
20  but it may take me just a second.
21  MR. FERGUSON:
22       Sure.  Yep.  Yep.  I have that.  I'm
23  trying to identify the pages on the computer.
24  Oh, there it is.

Page 425

1   Q    Okay.  So -- so if you look at page
2   96 --
3   A    Okay.
4   Q    So you see at -- starting at line 17 --
5   A    Uh-huh.
6   Q    -- the question by, I believe,
7   Miss O'Dell, it says:  "And 'Imerys Talc
8   America.' I'm just going to go ahead, since I've
9   done that much.  'RTM and Luzenac America was/is
10  responsible for ensuring that the talc sold to
11  J&J was" -- since they're currently selling it --
12  "is asbestos-free.  Can we agree on that?"
13       And then the answer, after an
14  objection, is:  "We test our product to ensure
15  that it doesn't contain measurable asbestos, and
16  that's what I can agree to."
17       And that's what Mr. Downey answered.
18  Correct?
19  MS. O'DELL:
20       Object to the form.
21  A    That's what he said here.  I'm not sure
22  this is the only point in his deposition that
23  this topic appears.
24       I would also like to add something to

107 (Pages 422 to 425)

Robert Cook, Ph.D.

Page 426

1  that. The concept of measurable asbestos is an
2  interesting one. There's a way to preconcentrate
3  samples that gives you a lot bigger opportunity
4  to detect small amounts of asbestos. And this
5  was pointed out in the -- in the '70s by both
6  Pooley, Colorado School of Mines, and even, I
7  believe, Dartmouth. And this idea of
8  preconcentration --
9       Oh, and Alice Blount even -- that was
10  what she used. It was completely rejected for
11  reasons unknown. And it would have -- it would
12  have allowed a much lower detection limit.
13      And, so, it's easy to say, you know,
14  well, we didn't really detect any. But he could
15  have allowed but we might have if we'd used a
16  preconcentration technique, as recommended. So,
17  you know, I'm not sure what -- what he really
18  might have been meaning there.
19  Q    Okay. Well, but you don't know what he
20  meant, but we can read what his testimony was, as
21  we did; correct?
22  MS. O'DELL:
23      Object to the form.
24  A    And we did.

Page 427

MR. FERGUSON:
2  Q    Okay. Why don't you go to page 97.
3  Let's read one more question and answer.
4  A    Okay.
5  Q    At page 97, starting at line 20 --
6  A    Okay.
7  Q    -- by Miss O'Dell: "Is that fair?
8  Because you wouldn't agree it's not -- you won't
9  agree it's asbestos-free. You agree that it's
10  below detectable limits; true?"
11      And then Mr. Downey's answer is -- is a
12  little long, so just follow it along with me. He
13  says, on page 98: "Our talc, we have a rigorous
14  testing program that also includes not only the
15  testing itself but our knowledge of the ore
16  deposits and the testing that and sampling and
17  mapping that we do continually through the
18  process. We are confident that our products are
19  safe, but in terms of a detection limit, I'm not
20  the expert on that. Julie Pier can speak to
21  that. But the scientific instruments are not
22  available to tell us that our product is, quote,
23  unquote, asbestos-free. We can't say that in
24  this room that has air in this room is

Page 428

1  asbestos-free, and we've been, you know, in this
2  room together for a few hours and, you know,
3  even, say, that the air in this room is
4  asbestos-free. So I can't really agree with the
5  way that you've written that."
6       Did I read that correctly?
7  A    Yeah.
8  Q    Okay. And certainly based on the
9  answers that we read --
10      And I'm not gonna sit here and read the
11  whole deposition, and you wouldn't want me to.
12  A    Yeah. That's a problem.
13  Q    But in terms of what we've read, he did
14  not say that the policy was asbestos-free. He
15  explained in his answers what his -- what the
16  policy was or his philosophy of the policy.
17  MS. O'DELL:
18      Object to the form.
19  MR. FERGUSON:
20  Q    Correct, sir?
21  A    I think on the two pages we looked at
22  out of a deposition that's, what, 5- or 600 pages
23  long.
24  Q    Can you cite me to the portion --

Page 429

1  A    No.
2  Q    -- in which Mr. Downey said what you
3  said he said, which is that the policy is
4  asbestos-free?
5  A    No.
6  MS. O'DELL:
7      Object to the form.
8  MR. FERGUSON:
9  Q    Okay. You can -- you can put that
10  away. I think we're through with Mr. Downey for
11  the time being.
12  A    Okay.
13  Q    Just go ahead and set that to your
14  left, because I know it's a big volume.
15  MS. O'DELL:
16      Don't let it go far. I'll take it.
17  MR. FROST:
18      You there, Leigh?
19  MS. O'DELL:
20      Yeah, I've got it. I'm good.
21  MR. FERGUSON:
22      You good?
23  MS. O'DELL:
24      Yeah. I'm good. Barely.

108 (Pages 426 to 429)

Robert Cook, Ph.D.

Page 430

1    MR. FERGUSON:
2        Barely?
3    MS. O'DELL:
4        Barely.
5    MR. FERGUSON:
6        You ready for us to go, Leigh?
7    MS. O'DELL:
8        Yeah, yeah.
9    MR. FERGUSON:
10   Q    Dr. Cook, as you and Mr. Frost talked
11   about, you've published a number of peer-reviewed
12   academic papers; correct?
13   A    Correct.
14   Q    Is it fair to say that customarily you
15   cite peer-reviewed research in your academic
16   papers?
17   A    It's not the only thing you cite, but,
18   sure, that's fair enough.
19   Q    Okay. And -- and in your academic
20   papers, would it be fair to say that you
21   generally do not cite to paid experts for a
22   particular party with an interest in the
23   litigation?
24   MS. O'DELL:

Page 431

1        Object to the form.
2    A    I would hope not to do that.
3    MR. FERGUSON:
4    Q    Okay. So in your academic papers, you
5    would not cite to a non-peer-reviewed publication
6    that is authored by a litigation expert who was
7    hired by a particular side in litigation;
8    correct?
9    MS. O'DELL:
10       Object to the form.
11   A    If I did, it would not be on purpose.
12   MR. FERGUSON:
13   Q    But in your report here, that's exactly
14   what you did do; correct?
15   A    I don't know.
16   Q    Did you cite to Mr. -- Dr. Longo's
17   report?
18   A    Oh, I had to. Of course. I mean, I'm
19   not sure that I understand why there's a problem
20   with that.
21   Q    But that is different than what you do
22   in your academic papers.
23   A    Well, but you --
24   MS. O'DELL:

Page 432

1        Object to the form.
2    A    I thought that you asked about
3    peer-reviewed publications. I've not cited Longo
4    in a peer-reviewed publication. The only place
5    I've ever mentioned him is in my expert report.
6    I guarantee it won't be published.
7    MR. FERGUSON:
8    Q    In your report on a number of
9    occasions, you refer to contemporaneous testing
10   that shows the presence of -- of certain
11   contaminants in Johnson & Johnson's baby powder.
12   Correct?
13   A    "Contemporaneous testing."
14   Q    Yes, sir.
15   A    I mean, is that your word or my word?
16   Q    That's your word.
17   A    Okay.
18   Q    When you refer to contemporaneous
19   testing, are you referring to -- to Dr. Longo's
20   report?
21   A    No.
22   Q    Okay. What are you referring to?
23   A    No. I think contemporaneous testing
24   means that you're -- you're testing in a -- in a

Page 433

1    timely manner relative to the processes that are
2    in place. For instance, if you're gonna -- if
3    you're gonna test the drill cuttings that are
4    generated by your blast hole driller, then you
5    need to go ahead and analyze those. It makes no
6    sense to wait for a year after the blast has been
7    made and another blast and another blast and then
8    analyze them. That would not be contemporaneous
9    testing. And that's all I'm saying. You need to
10   be testing as you move forward in the milling and
11   mining process so that you know what the
12   character of the material is at the time that
13   you're producing it, not a year or ten years
14   later.
15   Q    And you and Mr. Frost talked toward the
16   end of your questioning about the extent to which
17   you relied or didn't rely on Dr. Longo's testing.
18   Do you recall that conversation?
19   A    Yes.
20   Q    Okay. And I'm not gonna go back
21   through that.
22   A    I mean, I've referenced him. And
23   that -- that was why I said I'd like to say a
24   little -- a little bit more about Longo.

109 (Pages 430 to 433)

Robert Cook, Ph.D.

| Page 434 | Page 436 |
|---|---|
| 1 Because, you know, he has more than one report. | 1 MS. O'DELL: |
| 2 Q    Now, Dr. Longo's reports relate to | 2    Fair enough. |
| 3 whether there is or is not asbestos in baby | 3 MR. FERGUSON: |
| 4 powder; correct? | 4    Trying to save time there. |
| 5 A    And fibrous talc. | 5 MS. O'DELL: |
| 6 Q    Okay. Now, are you aware that the | 6    Okay. Well, I'm just being clear. |
| 7 U.S. Food and Drug Administration actually tested | 7 MR. FERGUSON: |
| 8 a number of body powder products and raw material | 8    Fair enough. So we'll start over so I |
| 9 talc about ten years ago to determine if, in | 9 say that -- say that technically correct. |
| 10 fact, there was asbestos detected in that -- that | 10 Q    You are aware, then, that a raw -- |
| 11 product or those products? | 11 cosmetic raw material talc that was supplied by |
| 12 A    I'm -- | 12 Rio Tinto Mineral/Luzenac America in eight |
| 13 MS. O'DELL: | 13 separate lots was supplied to the FDA for |
| 14    Object to the form. | 14 testing? |
| 15 A    I'm familiar with the report. And at | 15 A    I don't know about the eight separate |
| 16 the end of the report, it says that these results | 16 lots. |
| 17 are not to be taken to mean there's no asbestos | 17 Q    Okay. |
| 18 in these products. | 18 A    I don't remember that. |
| 19 MR. FERGUSON: | 19 Q    You know they supplied some. |
| 20 Q    With regard to the findings of that | 20 A    Yes. |
| 21 report, do you know that -- that both | 21 Q    And that there was no asbestos |
| 22 Johnson & Johnson and Imerys supplied product to | 22 detected; correct? |
| 23 be tested by the FDA? | 23 A    Correct. |
| 24 A    Yes. | 24 Q    And that there was no asbestos -- |

| Page 435 | Page 437 |
|---|---|
| 1 Q    Correct? | 1 A    With some methods employed. |
| 2 MS. O'DELL: | 2 Q    Of course. With the methods they |
| 3    Object to the form. That's a | 3 employed, the U.S. Food and Drug Administration, |
| 4 misstatement as to Johnson & Johnson, as you're | 4 there was no asbestos detected in the |
| 5 aware. | 5 Johnson & Johnson baby powder product that they |
| 6 MR. FERGUSON: | 6 had obtained. Correct? |
| 7    Let me go back. | 7 A    Right. |
| 8 MS. O'DELL: | 8 MS. O'DELL: |
| 9    In terms of supplying it. They | 9    Object to the form. |
| 10 purchased it, but Johnson & Johnson did not | 10 A    Yes. |
| 11 supply. | 11 MR. FERGUSON: |
| 12 MR. FERGUSON: | 12 Q    And is it also true that they obtained |
| 13    My -- my bad language. Okay? | 13 a Johnson & Johnson Shower to Shower product as |
| 14 Q    Do you understand that the FDA did, in | 14 well? |
| 15 fact, test a Johnson & Johnson baby powder | 15 A    I believe that's correct. |
| 16 product? | 16 Q    Okay. And, likewise, did they find |
| 17 A    Correct. | 17 that the Shower to Shower product had no asbestos |
| 18 Q    And they also tested some cosmetic raw | 18 detected by the methods they utilized? |
| 19 material talc supplied by Luzenac; correct? | 19 A    I think that's correct. |
| 20 A    I think that's right. | 20 Q    Let's talk a little bit about the other |
| 21 MS. O'DELL: | 21 substances that you have talked about today, |
| 22    Rio Tinto. | 22 including the so-called heavy metals. First of |
| 23 MR. FERGUSON: | 23 all, let me talk to you about arsenic. |
| 24    Luzenac/Rio Tinto, I think it says. | 24 A    Okay. |

110 (Pages 434 to 437)

Robert Cook, Ph.D.

| Page 438 | Page 440 |
|---|---|
| 1  Q     You've discussed arsenic today; | 1        Object to the form. |
| 2  correct? | 2   A     I don't know.  But if you tell me that, |
| 3   A     Correct. | 3  I would accept it. |
| 4   Q     Would you agree that the general | 4  MR. FERGUSON: |
| 5  population is exposed to arsenic through -- | 5   Q     Okay.  I could refer you to IARC page |
| 6  through various modes? | 6  175. |
| 7   A     Oh, I think so. | 7   A     Okay. |
| 8   Q     Arsenic is actually transported in the | 8   Q     I'll tell you IARC says that. |
| 9  environment by water; correct? | 9   A     Okay. |
| 10  MS. O'DELL: | 10   Q     You're not arguing with IARC on that |
| 11        Object to the form. | 11  point, are you? |
| 12   A     Yes.  And -- and the -- the -- the | 12   A     Nope. |
| 13  limits on arsenic in water has -- has lowered | 13   Q     Okay.  And nickel's found in food and |
| 14  dramatically. | 14  drinking water; correct? |
| 15  MR. FERGUSON: | 15   A     Yes. |
| 16   Q     And -- and arsenic is found in drinking | 16   Q     And, then, chromium was another |
| 17  water in many places, including in the | 17  substance you talked about; correct? |
| 18  United States, correct, at some level? | 18   A     Correct. |
| 19   A     I think that at some level, yes.  I | 19   Q     The general population can be exposed |
| 20  think that you're looking at the low parts per | 20  to chromium through inhalation of ambient air or |
| 21  billion is -- is, you know, where you'd better | 21  ingestion; correct? |
| 22  be.  If you're in the parts per million, you're | 22   A     Correct. |
| 23  gonna -- you know, you're out of spec.  You're in | 23   Q     Now, you've talked about each of these |
| 24  trouble. | 24  substances, nickel, chromium, arsenic, and said |

| Page 439 | Page 441 |
|---|---|
| 1   Q     Would you agree that many foods even | 1  that -- I'm trying to figure out where -- you |
| 2  contain arsenic? | 2  said these are known carcinogens, I believe, in |
| 3   A     Yes. | 3  each instance.  Is that correct? |
| 4   Q     And that particularly the highest | 4  MS. O'DELL: |
| 5  concentrations of food -- of arsenic in food are | 5        Object to the form. |
| 6  in seafood? | 6  MR. FERGUSON: |
| 7   A     I don't know that that's true.  I know | 7   Q     In your report. |
| 8  that it's true for probably mercury, but I'm | 8  MS. O'DELL: |
| 9  not -- I'm not sure about arsenic.  But I could | 9        Object to the form. |
| 10  certainly see how arsenic could -- could get into | 10   A     Yes.  You did not include cobalt; |
| 11  seafood. | 11  right? |
| 12   Q     Did you read the 2012 publication | 12  MR. FERGUSON: |
| 13  monograph by IARC on arsenic metals, fibers, and | 13   Q     I did not include cobalt. |
| 14  dusts? | 14   A     Okay.  Right, then. |
| 15   A     If I read that section, I read it | 15   Q     Is that correct? |
| 16  really early on in the process of going through | 16   A     I think so. |
| 17  all the materials that I was supplied. | 17   Q     So nickel, chromium, arsenic you have |
| 18   Q     Let's talk about another substance that | 18  said are known carcinogens; correct? |
| 19  you've talked about some, which is nickel.  Do | 19   A     I believe they are. |
| 20  you recall discussing nickel today? | 20   Q     Now, and I realize you are not an |
| 21   A     Sure. | 21  expert on toxicology -- |
| 22   Q     And nickel, in fact, is the 24th most | 22   A     Correct. |
| 23  abundant element; correct? | 23   Q     -- or carcinogenicity or medicine; |
| 24  MS. O'DELL: | 24  correct? |

111 (Pages 438 to 441)

Robert Cook, Ph.D.

Page 442

1    A      Correct.
2    Q      But in your report you said these are
3    known carcinogens; correct?  Is that based on --
4    A      Well, I think they're spelled out in
5    IARC that they are.
6    Q      Now, with regard to IARC, with regard
7    to -- and we'll take them separately.  With
8    regard to nickel, is there any statement in IARC
9    indicating that nickel is in any way associated
10   with ovarian cancer?
11   MS. O'DELL:
12        Object to the form.
13   A      I did not read anything to that effect.
14   MR. FERGUSON:
15   Q      Okay.  And with regard to chromium, is
16   there any indication in the IARC report in 2012
17   that chromium is in any way associated with
18   ovarian cancer?
19   MS. O'DELL:
20        Object to the form.
21   A      Again, I didn't read anything that
22   would indicate that.
23   MR. FERGUSON:
24   Q      And, likewise, arsenic, is there any

Page 443

1    indication in the IARC report that arsenic is in
2    any way associated with ovarian cancer?
3    MS. O'DELL:
4        Object to the form.
5    A      I didn't read anything like that.
6    MR. FERGUSON:
7    Q      And you understand that -- that the
8    litigation that we're here today about deals with
9    ovarian cancer; correct?
10   A      I -- I understand that.
11   Q      You're welcome to look at it, but I'll
12   represent to you on pages 5 to 6 of your report
13   you -- you have a quote that says, "Hand sorting
14   at the Chinese mine is used as a first step in
15   the beneficiation process."
16        Do you recall generally making that
17   comment?
18   A      Sure.  Of course.
19   Q      Well, we can look it up if you want.
20   A      No.  I remember writing it.  It's true.
21   Q      Okay.  Are you critical of hand sorting
22   as a first step in the beneficiation process?
23   A      No.
24   Q      Let's talk a little bit about asbestos.

Page 444

1    Would you agree with me that asbestos minerals
2    are widespread in the environment?
3    MS. O'DELL:
4        Object to the form.
5    A      Asbestos minerals?  Yes.  In terms of
6    the amphiboles with respect to chrysotile,
7    probably it's -- it's more limited in occurrence.
8    MR. FERGUSON:
9    Q      And why don't -- why don't we go ahead
10   and just refer, in case we need to, to the IARC
11   2012 monograph.
12        I -- I set it over there to his left,
13   Leigh.  I believe it's the one right there, if I
14   recall correctly.
15   A      Okay.
16   Q      Can you, first of all, turn to the
17   monograph itself, which I think is the first item
18   in there?
19   A      It is.
20   Q      Okay.  And would you go to page 222?
21   A      I'm getting there.  Okay.  I've got it.
22   Q      Are you there, 222?
23   A      Right.  Uh-huh.
24   Q      Under "Natural Occurrence" --

Page 445

1    A      Uh-huh.
2    Q      Do you see that section?  And there's
3    the sentence I just quoted, "Asbestos minerals
4    are widespread in the environment and are found
5    in many areas where the original rock mass has
6    undergone metamorphism."
7        Correct?
8    A      Correct.
9    Q      And further they go on in IARC to say
10   that asbestos minerals are found in the water,
11   soil, and air.
12        Is that accurate?
13   MS. O'DELL:
14        In terms of what it states or --
15   MR. FERGUSON:
16   Q      Yeah.
17   A      Air monitoring for asbestos is -- was a
18   major industry.  So with respect to air,
19   certainly.  Soil, certainly.  There's been lots
20   of work done on that.  Water, I don't -- I don't
21   have a knowledge base relative to water with
22   respect to asbestos.  I'm sure you can find it in
23   some waters.  I'm not sure that -- that these
24   waters aren't gonna be directly related to some

112 (Pages 442 to 445)

Robert Cook, Ph.D.

Page 446

1    peculiar industrial application, such as maybe
2    outside of an insulation factory, something like
3    that you might find surface water that has a
4    little asbestos in it.
5    Q      Take a look at page 224.
6    A      Okay.  Okay.  Got it.
7    Q      You see there's a section on water?
8    A      I see it.
9    Q      It says, "Asbestos can enter the
10   aquatic environment from both natural and
11   anthropogenic sources."
12   A      Sure.
13   Q      And has been measured in both ground
14   and surface water samples; correct?
15   A      Yes.
16   MS. O'DELL:
17          Would you mind finishing the paragraph?
18   MR. FERGUSON:
19          Oh, I'm happy -- I'm happy to read the
20   whole paragraph.  I don't want to read the whole
21   thing.  But it says, "Erosion of asbestos-bearing
22   rock is the principal natural source.
23   Anthropogenic sources include erosion of waste
24   piles containing asbestos, erosion of asbestos

Page 447

1    cement pipes, disintegration of
2    asbestos-containing roofing materials and
3    industrial wastewater runoff."
4    MS. O'DELL:
5          Okay.
6    MR. FERGUSON:
7    Q      Why don't you go to page 225.
8    A      Okay.
9    Q      And you see there's a section called
10   "Exposure of the General Population"?
11   A      Yes.
12   Q      And the first sentence there says,
13   "Inhalation of asbestos fibers from outdoor air
14   and, to a lesser degree, an indoor air is the
15   primary route of exposure for the nonsmoking
16   general population."
17          Correct?
18   A      Correct.
19   Q      If you look in the next paragraph, the
20   second sentence says that low levels of asbestos
21   have been measured in outdoor air in rural
22   locations.  Typical concentration, 10 fibers per
23   square meter.  Correct?
24   A      Cubic meter.

Page 448

1    Q      Cubic meter.  My bad.  I know three is
2    a cubic.
3    A      Yep.
4    Q      Is that correct?
5    A      Correct.
6    Q      Okay.  And do you take issue with that?
7    I know --
8    A      No.
9    Q      And then it goes on to say in that
10   paragraph, "Typical concentrations are about
11   tenfold higher in urban locations and about 1,000
12   times higher in close proximity to industrial
13   sources of exposure, asbestos mine or factory,
14   demolition site or improperly protected
15   asbestos-containing waste site."
16          That's what IARC says; correct?
17   A      I think there's lots of data on that.
18   Q      Sorry?
19   A      I think there's a lot of data on that
20   that would suggest that that's a correct
21   statement.
22   Q      And just a couple more here.  In the
23   next paragraph, it says, "Indoor air -- e.g.,
24   in homes, schools, and other buildings --

Page 449

1    measured concentrations of asbestos are in the
2    range of 30 to 6,000 fibers per cubic meter."
3          Correct?
4    A      Correct.
5    Q      So the bottom line is there is a level
6    of background exposure to asbestos for the
7    general population.  Correct?
8    MS. O'DELL:
9          Object to the form.
10   A      I think it's a correct statement.
11   MR. FERGUSON:
12   Q      I'm sorry?
13   A      I think that's a correct statement.
14   Q      I want to talk to you a little bit
15   about your notes that we made reference to
16   earlier.  Just -- I'm not gonna have you read
17   them into the record.
18   A      Okay.
19   Q      Thankfully.
20   A      Yeah.
21   Q      But I just had a few questions on
22   the -- what I'll hand to you as 3.1.  You have
23   the letter K in the upper left-hand corner, and
24   then it says "Page 4, Italian-mined ultramafic

113 (Pages 446 to 449)

Robert Cook, Ph.D.

| Page 450 | Page 452 |
|---|---|
| 1 origin" with two question marks. Okay? And<br>2 we'll let Miss O'Dell take a look at it, and then<br>3 I'll ask you what is meant by that.<br>4 A    Sure. Not a problem.<br>5 Q    Okay. I'm --<br>6 A    I wish I had put dates on these.<br>7 Q    I'm assuming that that is a reference<br>8 to Dr. Krekeler's report. Is that correct?<br>9 A    I think it is.<br>10 Q    Okay.<br>11 A    I can tell you what -- what the note<br>12 means.<br>13 Q    All right.<br>14 A    There -- there are ophiolites<br>15 associated with the mountain-building process<br>16 that produced the Alps. And, so, ophiolites are<br>17 ultramafic. So you could have had talc<br>18 occurrences that were similar to those in Vermont<br>19 or you could have had the Val Chisone type, which<br>20 we know are actually related, to metamorph those<br>21 carbonate rocks. And I -- I was making really a<br>22 note to myself to go back and take a hard look at<br>23 the Italian talc occurrences and make darn sure<br>24 that there are no ultramafic rocks associated | 1 A    Sorry about that.<br>2 MR. FERGUSON:<br>3 Q    And my question to you is --<br>4 And feel free to look at -- take your<br>5 time to look at it if you need to.<br>6 At the top, it says, "For expert report<br>7 12-29-18." What does that mean? Does that mean<br>8 it's -- well, you tell me what that means. Notes<br>9 for your expert report?<br>10 A    I turned in my -- the first version of<br>11 my expert report prior to this date. And then<br>12 these are notes about things that need to be<br>13 added since I'm getting the material.<br>14 Q    Okay. Fair enough.<br>15 Then 3.8, I'm just trying to figure out<br>16 generally what that is.<br>17 A    Sure.<br>18 Q    You don't have to fill me in on all the<br>19 details but I'm trying to understand what the<br>20 purpose of that document is.<br>21 A    Sure.<br>22 Oh, this is something that I did very<br>23 early on. When I first was asked by Miss O'Dell<br>24 to look at this, one of the things I did was to |

| Page 451 | Page 453 |
|---|---|
| 1 with Val Chisone.<br>2 Q    Okay.<br>3 A    And that's all that means.<br>4 Q    Could I have that back --<br>5 A    Sure.<br>6 Q    -- please?<br>7 A    You bet.<br>8 Q    Are there any ultramafic rocks in<br>9 Val Chisone?<br>10 A    They are not shown in the immediate<br>11 proximity to those talc deposits.<br>12 Q    Okay.<br>13 A    If they're there, you don't see them on<br>14 the map of the deposits.<br>15 Q    So you're not aware that they're there.<br>16 You don't see --<br>17 A    I don't think that the talc deposits<br>18 are related to ultramafic rocks.<br>19 Q    I'm sure all this will be very<br>20 interesting, but I'm not going to take the time<br>21 to go through each of these.<br>22 Let me show you 3.6.<br>23 MS. O'DELL:<br>24 Thank you. | 1 try to track possible talc sources. I wasn't<br>2 aware of -- I mean, I knew that there was Montana<br>3 talc being mined. I didn't know at this point<br>4 whether or not Montana talc was being used as a<br>5 cosmetic product, for example.<br>6 So this is -- this is just a page where<br>7 I was jotting down some notes about where talc<br>8 had been mined in the US. That's it.<br>9 Q    Thank you.<br>10 A    Sure.<br>11 Q    And then there's several pages that I<br>12 think seem obvious that you had a Downey depo.<br>13 Then you have notes --<br>14 A    Right.<br>15 Q    -- out beside page whatever.<br>16 A    Sure.<br>17 Q    So you've made notes on various<br>18 depositions; correct?<br>19 A    Yes.<br>20 Q    Did you read a transcript of a trial<br>21 called Herford?<br>22 A    I don't remember it.<br>23 Q    Okay. Or depositions from the Herford<br>24 case? |

114 (Pages 450 to 453)

Robert Cook, Ph.D.

Page 454

1  A       What would be a -- a name, a person's
2  name that would be deposed?
3  Q    I can't tell you.
4  A       I mean, the -- I think I've actually
5  seen the Herford name, but I don't -- I don't
6  know that I've seen a deposition or a transcript.
7  Q       Let me show you 3.9.  Just let me know
8  what that is.  I'm trying to figure out what it
9  is you summarized there.
10  A      Okay.
11  MS. O'DELL:
12          And you're just talking to -- about
13  this here?  Because there appears to be --
14  MR. FERGUSON:
15          There are a number of things in there.
16  MS. O'DELL:
17          That the Hicks deposition's reference,
18  which, of course, would have been in this case,
19  and some other?
20  MR. FERGUSON:
21          Right.  Yeah.
22  Q       The Herford notation, what is that?
23  MS. O'DELL:
24          Right in the center of that page.

Page 455

1  A       Uh-huh.  I don't know.  I apparently
2  didn't use it at all.  When I read the
3  deposition, apparently Hicks mentioned this on
4  page 102, and I made a note to that effect.
5          I see here that it has x-ray refraction
6  mentioned.  But I don't -- I don't know.  I
7  didn't refer to this.  I mean, I don't think I
8  referred to it in my report.
9  Q       Dr. Cook, I think that's all I have.
10  Thank you -- thank you for your time, sir.
11  A       Okay.  You're welcome.
12  MS. O'DELL:
13          Let's go off the record.
14  VIDEOGRAPHER:
15          Going off the record.  The time is 5:46
16  p.m.
17          (OFF THE RECORD.)
18  VIDEOGRAPHER:
19          We're back on the record.  The time is
20  6:21 p.m.
21          EXAMINATION
22  BY MS. O'DELL:
23  Q       Dr. Cook, I have a few questions for
24  you.

Page 456

1          Would you describe for us the
2  methodology that you've used in reaching your
3  opinions in this case?
4  A       Okay.  When -- when -- when you first
5  approached me and we discussed the -- the data
6  sets that you thought would be available and, you
7  know, did I understand mining techniques that
8  might be related to what we were doing and did I
9  understand the milling processes, did I
10  understand the -- the methodology in testing, you
11  know, I answered affirmatively.  So you began to
12  supply me with documents.
13          But based on your original description
14  of the project, I started doing my own background
15  literature review.  And, so, I began to weed that
16  literature review, the knowledge I had with that
17  review, in with information that I already had in
18  my head relative to talc and asbestos and heavy
19  metals and the mining.  Anyway, I began to
20  develop a database from which I worked.
21          And, so, as you began to give me
22  information, I began to categorize it based on
23  the type of information.  Is it asbestos sources?
24  Is it mining?  In other words, what does that --

Page 457

1  that document pertain to?
2          And, in the end, I ended up with maybe
3  six or eight headings that -- that I thought I
4  could categorize information in.
5          And, so, I began to look -- to look at
6  the material that I had put in each category and
7  see if there were trends that were beginning to
8  come out of the -- out of these data sets.
9          And, of course, in some, there were.
10  And, so, I began to take notes, and those notes
11  were in the form originally of -- of a simple
12  outline of headings with statements.  And from
13  that outline and those statements, those
14  statements became paragraphs as more information
15  was gained, and ultimately a report came out of
16  that.
17          And, so, I -- I approached it as I
18  would any research project, except that I wasn't
19  generating new data.  I was evaluating existing
20  data.  And -- and that's an accepted technique in
21  terms of using the scientific method to come to a
22  conclusion or an opinion.
23          And, so, you know, ultimately, you see
24  these documents here.  They're about maybe 650

115 (Pages 454 to 457)

Robert Cook, Ph.D.

Page 458

1  documents here, and this is not half of the
2  documents that I've reviewed so far.  And --
3  and -- and I hope to continue reviewing documents
4  that will then add to the database from which my
5  opinions will be supported.
6  Q      Why did you -- you cited some geologic
7  references in articles.  I think one of them was
8  Van Gosen.  I think you were asked about
9  Chidester earlier today, as well as some
10 references that related to not only Vermont talc
11 deposits but also Italian talc.  What was the
12 purpose of citing those references?
13 MR. FROST:
14       Objection to form.
15 A      Yeah.  Well, the Vermont papers had to
16 do with setting the stage for the geologic
17 framework within which the ultramafic rocks
18 occurred.  So they weren't intended to point out
19 any character events, any specific mine.  It was
20 to -- to give the interested reader some way to
21 gain background information.
22       And the same is really true about the
23 Italian talc deposits.  I -- I gave those
24 references that are really general geologic

Page 459

1  information so that there was a foundation upon
2  which the more detailed information could be --
3  be anchored.
4  Q      Uh-huh.  Would it have been -- would it
5  be your normal practice as a professional
6  geologist as well as a professor to refer to and
7  cite general geological references when
8  describing a specific deposit?
9  A      Yes.  That's -- that's the start of
10 the -- if it's gonna be a paper, that's the start
11 of a -- of a paper that might be submitted for
12 publication.  You don't want to start and assume
13 that the reader knows more than he may know.  You
14 need to give the reader the opportunity to start
15 at a relatively low general point.
16 Q      You were provided a copy that was
17 marked as an exhibit -- I think it was Exhibit
18 11.  Was -- was actually the Van Gosen paper.
19 A      Okay.
20 Q      And specifically in the Van Gosen
21 paper, I think it goes into Vermont talc deposits
22 on page 933.
23       And, Jack, I have it marked on mine.
24 Do you mind, just for ease, if hand it to

Page 460

1  Dr. Cook?
2  MR. FROST:
3       Oh, yes.  Absolutely.  That's fine.
4  MS. O'DELL:
5  Q      And you'll see -- I believe it's on
6  page 993, but that's where the --
7  A      Right.
8  Q      -- Vermont description occurs.
9  A      Sure.
10 Q      Would that description of the Vermont
11 talc deposits be relevant and applicable to the
12 Vermont mines that were used to source
13 Johnson & Johnson's talcum powder products?
14 A      Sure.  It's a -- it's a brief
15 description of the -- the talc district as a
16 whole, and from that you can begin to -- to put
17 individual deposits.  But this is just a -- a
18 general background paper.
19 Q      Okay.  In the methodology, have you --
20 you've described, is that methodology you've used
21 at other points in -- in your career?
22 MR. FROST:
23       Objection to form.
24 A      Yes.  And, in fact, that's -- that's

Page 461

1  the standard method of operation.  You're
2  presented with a problem.  I go to the library
3  and -- and get all the material I can get and
4  read up on it.  And, then, in the case of the
5  talc litigation here, you -- you have to treat
6  the documents that you're being given as data.
7  And the data you use as you would in any
8  scientific investigation.  You use it to either
9  confirm a hypothesis or disprove it.  And if you
10 disprove it, you modify the hypothesis and -- and
11 work on it again.  And, so, and that's exactly
12 what I did here.
13 Q      And, in doing that, did you use the
14 same attention to detail that you would use in
15 your duties previously as a professor of geology?
16 MR. FROST:
17       Objection to form.
18 A      Yes.  In fact, the attention to detail
19 is almost overwhelming.  There's a lot of -- a
20 lot of detail here.
21 MS. O'DELL:
22 Q      And would it also be the same type of
23 methodology that you would use in your duties
24 consulting for companies as a professional

Robert Cook, Ph.D.

Page 462

1  geologist?
2  MR. FROST:
3     Objection.
4  A   Yes, in fact, I've done scoping studies
5  for Kinross and one other company within the last
6  few years.  And this is pretty much what they --
7  what they're looking for is a -- a compilation of
8  all information available on a particular topic
9  or area put together in a report.  And the
10  working hypothesis for a mining company is, in
11  this area, given all the data that's available to
12  you, would you recommend coming in and spending a
13  million bucks looking for a new mineral deposit?
14     And, so, from that standpoint, it's
15  exactly what -- what I did here.  I mean, it's
16  the same general intellectual exercise.
17  MS. O'DELL:
18  Q   As a part of -- of -- of -- of your
19  methodology outside litigation, would you
20  routinely rely on testing data as a part of that
21  process?
22  A   Would I -- would I be doing the
23  testing?  Sometimes.
24  Q   No, sir.  Just -- but rely on data,

Page 463

1  testing data, in regard to your process of --
2  A   Sure.
3  Q   -- of evaluating.
4  A   Of course.  In fact, that's one of --
5  one of the problems is waiting for data to come
6  in from the lab.
7  Q   That's right.
8     You mentioned earlier today that you
9  referenced the report of -- reports of Dr. --
10  Dr. Longo --
11  A   Right.
12  Q   -- and Rigler.
13     Did you rely on the data reported in
14  Dr. Longo's reports in reaching your opinions?
15  A   Yes.
16  Q   And would, as I've mentioned,
17  testing --
18     Or let me just ask you in a non-leading
19  way.
20     As a professional geologist, would you
21  routinely rely on testing data as a part of
22  your -- your responsibility?
23  A   Yes.
24  Q   Let me ask you a couple of different --

Page 464

1  questions on a couple of different topics.
2  First, let me show you or direct your attention
3  back to the deposition of Patrick Downey.
4  A   Sure.
5  Q   You were asked some questions by
6  Mr. Ferguson about the Downey deposition.  And,
7  if I recall correctly, the suggestion was made
8  that Mr. Downey did not testify that Imerys
9  certified that the talc powder sold to
10  Johnson & Johnson was asbestos-free.  Do you
11  remember those questions?
12  A   Yes.
13  MR. FERGUSON:
14     Object to the form.
15  A   I remember the questions.
16  MS. O'DELL:
17  Q   In -- you know, direct your attention
18  to page 508 of the transcript and to line number
19  15.
20  A   508?
21  Q   506.  Excuse me.  I'm sorry.  506, line
22  15.
23  A   Okay.
24  Q   And the question was asked to

Page 465

1  Mr. Downey:  "Why were you not able to give a
2  true -- a simple true-or-false answer to the
3  question of asbestos-free?"
4     Answer:  "Well, I was trying to be
5  scientifically accurate, perhaps hypertechnical,
6  but it was the conjunction of the terms
7  'certified' and 'asbestos-free.'  That's not the
8  language that we use in certifications.  But if
9  you're asking me if our product contains
10  asbestos, no, it does not."
11     And, in fact, did Mr. Downey testify
12  that the product provided to Johnson & Johnson
13  for its talcum powder products were free of
14  asbestos?
15  MR. FERGUSON:
16     Objection to form.
17  MR. FROST:
18     Objection to form.
19  A   It certainly sounds that way in -- in
20  the deposition.
21  MS. O'DELL:
22  Q   Is that what you were referring to?
23  A   Yes, that is what I was referring to.
24  Q   Thanks, Doctor.  You can put that to

117 (Pages 462 to 465)

Robert Cook, Ph.D.

Page 466

1    the -- to the side.
2    A      Do you want it or not?
3    Q      Just put it there. Thanks so much.
4          If you will now turn to page 5 of your
5    report.
6    A      Okay.
7    Q      And, at the bottom of the page, in the
8    last paragraph on page 5, it's paragraph
9    beginning "in 2003." And on the second sentence
10   of that paragraph, it says, "Chinese talc
11   occurrences included in those" -- excuse me --
12   "including those in the Guangxi province have
13   been described in certain Imerys documents."
14         And then several are listed there.
15   A      Right.
16   MR. FROST:
17         Objection to form.
18   MS. O'DELL:
19   Q      And I think Johnson & Johnson counsel
20   showed you several documents, and I think you
21   indicated that there was an error in the Bates
22   reference.
23   A      Right. There is.
24   Q      Let me show you what I'm marking as

Page 467

1    Exhibit 32 to your deposition.
2          (DEPOSITION EXHIBIT NUMBER 32
3          WAS MARKED FOR IDENTIFICATION.)
4    MS. O'DELL:
5    Q      Is Exhibit 32 one of the documents that
6    you intended to reference at that portion of your
7    report?
8          I'm sorry. Doctor, can I take that
9    back just for a second?
10   A      Sure.
11   Q      I've added another document to it. I
12   didn't intend to do that. It just was in my
13   stack.
14   MR. FROST:
15         Leigh, can you identify what document
16   this is?
17   MS. O'DELL:
18         Sure. It is JNJ00059273.
19   A      Yeah.
20   MR. BILLINGS-KANG:
21         Is that JNJ or J&J?
22   MS. O'DELL:
23         N.
24   Q      Is that the document, one of the

Page 468

1    documents that you intended to refer to?
2    A      Yes. I almost think I had this
3    document that has a different Bates number on it.
4    But, yeah, this -- this is -- that's it.
5    Q      Okay. Thank you.
6    MR. FROST:
7          Can I see the document?
8    MS. O'DELL:
9    Q      All right. In --
10         Now, I ask -- if I could ask you,
11   Doctor, to pull out of your -- the stack over
12   there -- and maybe Lois will help us -- Exhibit
13   14.
14   A      Okay. Getting close.
15   Q      Okay.
16   A      Okay. Got it.
17   Q      And Exhibit 14 refers to -- the subject
18   is characterization of Guan- -- of the Guangxi 1
19   crude and Cimpact 710 product.
20   A      Right.
21   Q      Do you remember the discussion with
22   Johnson & Johnson counsel on that document?
23   A      Sure.
24   Q      Let me ask you to turn to, while you're

Page 469

1    holding the document, Doctor -- maybe not put it
2    too far away from you -- to page 8 of -- of your
3    report. And, at the bottom of page 8 of your
4    report, you include a sentence, "It is known that
5    Rio Tinto identified problems with Guangxi talc
6    ores in 1997 which resulted in the recommendation
7    that a Luzenac representative be present at the
8    mine during the mining and sorting process."
9    A      Right.
10   Q      Do you recall writing that?
11   A      Right. Yes.
12   Q      Turn to the last page of Exhibit 14 in
13   the Recommendations section. Is the
14   recommendation that you included in your report
15   contained in the paragraph on page 4 of this
16   document?
17   A      It is.
18   Q      And there's a sentence -- two sentences
19   at the bottom. It says, "A Luzenac
20   representative" --
21         I'm reading from page 4 of Exhibit 14.
22         "A Luzenac representative should be
23   available at the mine during the mining and
24   sorting process in order to confirm that the

118 (Pages 466 to 469)

Robert Cook, Ph.D.

Page 470

1    ore -- order is being handled per the negotiated
2    contract parameters. Meeting the ore at the port
3    will never allow us to control the quality and
4    chemistry of the crude we are ordering."
5          Is that -- did I read that correctly?
6    A    Right. You did.
7    Q    Is that what you were referring to in
8    your report?
9    A    Uh-huh. It is.
10   Q    Thank you, Doctor. Yeah.
11         You also, still speaking of China, were
12   asked about the sampling method that was used in
13   relation to Chinese ore once it reached --
14   reached the port in Houston.
15   A    Correct.
16   MR. FROST:
17         Objection to form.
18   MS. O'DELL:
19   Q    Let me ask you to look at what I'm
20   marking as Exhibit 33.
21         (DEPOSITION EXHIBIT NUMBER 33
22         WAS MARKED FOR IDENTIFICATION.)
23   MS. O'DELL:
24   Q    And it's Imerys 036949.

Page 471

1          Is Exhibit 33 the sampling protocol
2    regarding Chinese ore that you were referring to?
3    A    Yes.
4    Q    Let me ask you, Dr. Cook --
5          I'm gonna put that right here for the
6    moment. And on an exhibit marked -- I think it
7    was exhibit -- yes -- 21. Let me hand it to you.
8    It's a paper by Marconi and Verdel?
9    A    Right.
10   Q    And if you'll turn to page --
11         On the -- on the document itself, the
12   page numbers, it's -- it's page 112.
13   A    Okay.
14   Q    Does Table 3 that appears on page 112
15   of this article show test results regarding
16   cosmetic talc?
17   MR. FROST:
18         Objection to the form.
19   A    I think it does.
20   MS. O'DELL:
21   Q    Uh-huh. And if you'll look at the
22   lower third of the table, does it -- the chart
23   indicate that there were asbestos fibers found in
24   cosmetic talc samples?

Page 472

1    A    I think it does.
2    Q    And is -- is that at least one of the
3    reasons that you referenced that publication in
4    your report?
5    A    It is.
6    Q    Let me ask you, Doctor, to put that
7    aside for a moment.
8          You were asked a series of questions
9    regarding whether you would publish your expert
10   report in the peer-reviewed literature. I think
11   your response was no. Why did you respond to
12   that question in the negative?
13   MR. FROST:
14         Objection to form.
15   A    The -- to start with, as with any work
16   like this, there is a confidentiality agreement
17   that comes in very quickly. And publishing any
18   part of this would -- would violate the agreement
19   that -- that I signed.
20         The -- part of the problem with this is
21   that if you -- if you try to publish something in
22   a peer-reviewed journal, how is a peer-reviewer
23   ever gonna be able to -- to -- to evaluate a
24   report like this? He's not gonna have access to

Page 473

1    any -- any of the materials. So it wouldn't make
2    sense. It would be off limits.
3    MS. O'DELL:
4    Q    Is that because many of the materials,
5    documents that you've cited in your report, those
6    would be subject to a confidentiality order and
7    it would be a violation of that order?
8    A    That's -- that's what I mean. I mean,
9    I sign a confidentiality agreement not to divulge
10   any of this. So --
11   Q    Okay. Let me ask you to turn in your
12   report, Dr. Cook, to page 31.
13   A    Okay.
14   Q    And, specifically, I would direct your
15   attention to the table that reports some of the
16   nickel analyses that are -- that are contained in
17   your report.
18   A    Okay.
19   Q    And -- and you were asked questions
20   regarding whether this -- the samples that were
21   tested were finished product. And let me just
22   back up and ask. Were the samples, many of which
23   that you report in this chart, were they finished
24   talc product?

119 (Pages 470 to 473)

Robert Cook, Ph.D.

Page 474

1    MR. FROST:
2        Objection to form.
3    A    That is my understanding, based on the
4    description of the samples in the cited
5    references.
6    MS. O'DELL:
7    Q    All right. And, in fact, number 3 in
8    the chart, the description is baby powder.
9    Correct?
10   A    Correct.
11   Q    And in that -- that has, I think, three
12   samples that were tested. And were the findings
13   1500 parts per million, 1480 parts per million,
14   and 1500 parts per million, respectively?
15   MR. FROST:
16       Objection to form.
17   A    That's correct.
18   MS. O'DELL:
19   Q    And would it be fair to say that a
20   finding of greater than, you know, 1400 or 1500
21   parts per million, would it be fair to say that
22   that is an extremely high level of -- of nickel?
23   MR. FERGUSON:
24       Objection for form.

Page 475

1    MR. FROST:
2        Objection to form. Also, object to the
3    question since he's already admitted he's not
4    qualified to answer that.
5    THE WITNESS:
6        No, I am. The way she asked the
7    question, I am. I've dealt with geochemical
8    nickel for -- almost for the entire time I was at
9    Auburn.
10       And anything over a hundred parts per
11   million, when we're doing our field work, that is
12   an indication that we've got an unusual rock type
13   that we're looking at.
14       And, in fact, the -- the platinum and
15   nickel exploration that I'm doing right now, if
16   we could find numbers this high, we'd be
17   thrilled, because a value of 1500 parts per
18   million nickel is almost ore grade for an
19   open-pit operation, and it -- it indicates that
20   we're looking at a serpentinized ultramafic rock
21   that may have economic nickel or PGMs.
22   MS. O'DELL:
23   Q    Okay. And do the --
24   MR. FROST:

Page 476

1        Objection. Move to strike answer as
2    nonresponsive and speculative.
3    MS. O'DELL:
4        Oppose the motion.
5    Q    The -- the -- and, in this table for
6    nickel as well as the table that is compiled for
7    chromium and cobalt, does that include values or
8    data from annual samples that were provided to
9    Johnson & Johnson?
10   A    Yes.
11   MR. FROST:
12       Objection.
13   MS. O'DELL:
14   Q    And is it your understanding, based on
15   your review of the data, that that would be
16   finished product?
17   A    Yes. Finished in the sense that it's
18   gonna go toward packaging now when they're done
19   with the processing.
20   Q    Okay. Let me ask you to turn to page
21   32 of your report that relates to your discussion
22   of -- of chromium. And, Dr. Cook, let me ask you
23   a general question about the test data that's
24   reported in this chart.

Page 477

1        In each instance, do the chromium
2    numbers that were seen in these test results
3    exceed the Johnson & Johnson specification upper
4    limit of normal for chromium by, you know, orders
5    of magnitude?
6    MR. FROST:
7        Objection to form.
8    MR. BILLINGS-KANG:
9        Objection to form.
10   A    They are far higher than the 10 ppm.
11   MS. O'DELL:
12   Q    Would that also be true regarding the
13   test results that are reported in relation to
14   cobalt in --
15   A    Yes.
16   Q    You were asked a number of questions
17   regarding beneficiation and the process that was
18   undertaken to process talc ore. Let me ask you
19   specific questions about Vermont.
20       Having reviewed the descriptions of the
21   beneficiation process at West Windsor, was there
22   anything in that beneficiation process that would
23   have removed high levels of nickel found in talc
24   ore?

Robert Cook, Ph.D.

Page 478

1  MR. FROST:
2        Objection to form.
3  A     No. I don't think it was -- would be
4  possible.
5  MS. O'DELL:
6  Q     Similarly, in relation to cobalt, was
7  there any part of the beneficiation process at
8  the West Windsor mill in Vermont that would have
9  addressed high levels of cobalt?
10 MR. FROST:
11       Objection.
12 A     There's a possibility that if all of
13 the cobalt was contained in cobaltite, which is a
14 cobalt arsenic -- that's a dense mineral -- it
15 might sink in a flotation cell and be removed
16 that way. But the numbers that I've got are on
17 the finished product, not on the -- not on ore
18 going in.
19 MS. O'DELL:
20 Q     And that would suggest that, in fact,
21 the beneficiation process did not affect it?
22 A     It's probably --
23 MR. FROST:
24       Objection to the form.

Page 479

1  MR. FERGUSON:
2        Objection to the form.
3  A     That's correct.
4  MS. O'DELL:
5  Q     Let me ask it a different way to
6  address these.
7        Based on the numbers, the test data
8  that you reviewed regarding finished talc powder,
9  is it your opinion that the beneficiation process
10 at West Windsor was not affected to remove high
11 levels of cobalt?
12 MR. FROST:
13       Objection.
14 A     I don't think it could.
15 MS. O'DELL:
16 Q     Okay. Let me ask you about fibrous
17 talc in regard to the beneficiation process. Is
18 it -- do you have an opinion as to whether the
19 beneficiation process at West Windsor would
20 remove fibrous talc?
21 A     I don't see how it's possible,
22 particularly in the flotation circuit. I think
23 that the flotation process is not gonna be able
24 to distinguish platy non-fibrous talc from

Page 480

1  fibrous talc.
2  Q     And, therefore, to the degree that
3  fibrous talc was mined from the ore body and --
4  and made a part of the ore, then is it your
5  opinion that the beneficiation process would not
6  remove the fibrous talc, you know, from the
7  product?
8  A     I don't -- I don't see how it could.
9        You're referring to West Windsor;
10 right?
11 Q     Yes.
12 A     I don't see how it could.
13 Q     Would the beneficiation process at
14 West Windsor have been effective for purposes of
15 removing high levels of arsenic?
16 MR. FROST:
17       Objection to form.
18 A     I think it's possible that some arsenic
19 could have come out in the sink fraction of the
20 flotation cells.
21 MS. O'DELL:
22 Q     If asbestos was mined and removed
23 during the mining process, is there anything in
24 the beneficiation process at West Windsor that

Page 481

1  would have removed asbestos as part of the
2  processing?
3  A     Well, there -- there are reagents that
4  could suppress chrysotile. I don't know of any
5  that would suppress amphibole asbestos. But I
6  didn't see anything in the documents I was
7  supplied that would indicate that there was an
8  attempt made or that there was any kind of design
9  that was -- was pointed toward removal of -- of
10 asbestos.
11 Q     You were asked a number of questions
12 about the chart in your report addressing
13 positive test results for asbestos. Do you
14 recall those questions?
15 A     Yes.
16 Q     And I think that counsel for Johnson &
17 Johnson addressed five test results, calling them
18 into question as industrial talc.
19 A     Correct.
20 Q     And in -- in those instances --
21       Strike that.
22       Is there anything that -- that counsel
23 presented to you today that would undermine your
24 opinions regarding the other test results

121 (Pages 478 to 481)

Robert Cook, Ph.D.

| Page 482 | Page 484 |
|---|---|
| 1  contained in the chart? | 1  Q     Earlier today you were asked a lot of |
| 2  A     No. | 2  questions by counsel, and a lot of suggestions |
| 3  Q     And, generally speaking, if you know, | 3  were made that somehow documents, you know, were |
| 4  how many other positive test results for asbestos | 4  withheld by plaintiffs' counsel.  Do you recall |
| 5  are contained in a chart besides the five that he | 5  that? |
| 6  pointed out? | 6  A     Yes. |
| 7  A     Oh, there's over a hundred. | 7  MR. FROST: |
| 8  Q     And are those test results supportive | 8       Objection to form. |
| 9  of your opinion that the talc deposits in Italy | 9  MS. O'DELL: |
| 10  and Vermont contained fibrous asbestos -- | 10  Q     At the beginning of your engagement in |
| 11  asbestos mills? | 11  this case, did you provide a list of -- of |
| 12  MR. FROST: | 12  documents, really document requests, that you |
| 13       Objection to form. | 13  asked that those documents be searched for and, |
| 14  A     The published information and some of | 14  to the degree made available by defendants, |
| 15  the unpublished reports on Italy suggested there | 15  provided to you? |
| 16  could be some in that talc.  And, of course, I've | 16  A     Yes. |
| 17  got lots of data on Vermont that would suggest | 17  Q     Do you have any reason to believe |
| 18  that. | 18  that -- that documents were withheld from you |
| 19  MS. O'DELL: | 19  in -- in rendering your opinions? |
| 20  Q     You were asked questions about | 20  MR. FROST: |
| 21  selective mining today, and -- | 21       Objection to form.  Misstates |
| 22       Before I do that -- | 22  questioning and testimony. |
| 23       Excuse me.  Also in regard to the | 23  A     I have no reason to believe that -- |
| 24  fibrous talc chart, I think the counsel called | 24  that anybody has withheld anything.  You know, |

| Page 483 | Page 485 |
|---|---|
| 1  into question maybe one of the line items or the | 1  my -- my approach is everybody's on the up and |
| 2  entries -- | 2  up. |
| 3       Two.  Excuse me. | 3  MS. O'DELL: |
| 4       -- two of the entries in the fibrous | 4  Q     Do you -- did you see, in reaching your |
| 5  talc chart that you have in your report. | 5  opinions in regard to asbestos, did you see not |
| 6  A     Right. | 6  only positive test results but did you also look |
| 7  Q     Is there any data that you've been | 7  at negative test results? |
| 8  presented today or question that would -- data or | 8  A     Yes, plenty. |
| 9  information you've been presented today that | 9  Q     And did you consider those results also |
| 10  would call into question in your mind any of the | 10  in -- |
| 11  other positive test result -- results for fibrous | 11  A     Yes. |
| 12  talc? | 12  Q     Excuse me.  Let me finish.  Excuse me. |
| 13  A     No. | 13       -- in reaching your opinions in this |
| 14  MR. FROST: | 14  case? |
| 15       Objection. | 15  A     Yes, of course. |
| 16  MS. O'DELL: | 16  Q     You were asked some questions about |
| 17  Q     Are -- are you relying on the data | 17  selective mining, and -- and you -- you made a |
| 18  contained in the asbestos chart to support your | 18  statement that you -- it was your opinion that |
| 19  opinions in this case? | 19  selective mining practices had not been used |
| 20  A     Yes. | 20  in -- in mining talc -- |
| 21  Q     Are you relying on the data contained | 21  MR. FROST: |
| 22  in the fibrous talc chart to support your | 22       Objection. |
| 23  opinions? | 23  MS. O'DELL: |
| 24  A     Yes. | 24  Q     -- for purposes of sourcing talcum |

122 (Pages 482 to 485)

Robert Cook, Ph.D.

Page 486

1  powder products.
2  MR. FROST:
3       Objection to form.
4  MS. O'DELL:
5  Q      Do you recall that --
6  A      Yes.
7  Q      -- testimony?
8       What's the basis for your opinion that
9  appropriate selective mining practices were not
10 used?
11 A      Well, to start with, they're not
12 described in any of the documents. And -- and
13 the -- few photographs that we've got of the
14 mines don't suggest selective mining. It -- it
15 just isn't there.
16 Q      And if you'll look on page 8, is --
17 does -- is the photograph on page 8 one of the --
18 the photographs that you considered in reaching
19 your opinion regarding selective mining?
20 A      Yes.
21 Q      And -- and describe for us, Dr. Cook,
22 why that photograph does not depict appropriate
23 selective mining techniques.
24 MR. FROST:

Page 487

1       Objection to form.
2  A      Okay. This one is fairly simple.
3  You've got a single loader, but you've got three
4  piles of broken rock that would suggest that he's
5  gonna be loading ore from material derived from
6  three separate shots, and these -- these shot
7  piles are very close to each other. And there's
8  no indication here at all that this has anything
9  to do with selective mining. I mean, the only --
10 the only way this is selective mining is if
11 everything we see in the photograph that's broken
12 ore is good ore. We're gonna mine all of it.
13 But -- but this is not what I would expect to
14 see.
15 MS. O'DELL:
16 Q      Is -- is -- based on your knowledge of
17 the geology that --
18       Let me strike that.
19       Based on your review of the core logs
20 in -- that have been produced in this case
21 regarding the Vermont mines, would you expect in
22 a picture like this that all the -- the rocks
23 would be, you know, pure talc?
24 MR. FROST:

Page 488

1       Objection to form.
2  MR. FERGUSON:
3       Objection.
4  A      I wouldn't. I don't see anything in
5  this photograph that would suggest that there was
6  a selection of higher grade material versus lower
7  grade.
8  MR. FROST:
9       Move to strike answer as speculative.
10 MS. O'DELL:
11 Q      Is your answer speculative?
12 MR. FROST:
13      Objection to form.
14 A      It's based on my observation of the
15 photograph. It's conclusion.
16 MS. O'DELL:
17 Q      And, in reaching that conclusion, have
18 you used your, you know, your special expertise
19 as a mining engineer and, you know, professor of
20 geology that teaches mining practices?
21 MR. FROST:
22      Objection to form.
23 A      Yes.
24 MS. O'DELL:

Page 489

1  Q      You were asked a number of questions
2  regarding samples in the sampling process that
3  was utilized over the course of -- of the -- I
4  guess more than 50 years --
5  A      Right.
6  Q      -- that we've discussed today.
7  Quickly, Doctor, just in a setting like the ones
8  described, particularly in Vermont, is a monthly
9  composite sample representative?
10 MR. FROST:
11      Objection to form.
12 A      It wouldn't be to me.
13 MS. O'DELL:
14 Q      Why?
15 A      Because --
16      And -- and we can use arsenic as an
17 example. We know that there were -- there were
18 some high arsenic ores that went to the West
19 Windsor mill.
20      Suppose you had one day's run at
21 Windsor mill that had an arsenic value of 10
22 parts per million. That exceeds the acceptable
23 limit. How would you know that that ever went
24 through the mill? It's gonna go through the mill

123 (Pages 486 to 489)

Robert Cook, Ph.D.

Page 490

1    and then go into a silo, and, in that silo,
2    there's gonna be a layer that is represented by
3    that product.
4          Let's say the next day you've got
5    perfect talc, hundred percent talc, no arsenic at
6    all. Okay. That's gonna go in and it's gonna
7    sit on top of the layer of out-of-spec talc.
8          Well, if all you have is a daily
9    sample, then if you've got one that's 10 parts
10   per million arsenic, had you analyzed it that
11   day, and the -- the other 29 or 30 samples are
12   one part per million arsenic, then your composite
13   at the end of the month is gonna be in spec, but
14   you're gonna have some talc in that silo that
15   isn't.
16         And that's my objection to the way
17   compositing is done. I think it's definitely
18   something that can be done in some situations,
19   but I think here it's -- it's not a good idea.
20   MR. FROST:
21         Move to strike answer as speculative.
22   MS. O'DELL:
23   Q     Is that -- is that based on --
24   A     That is not a speculation. That is a

Page 491

1    statement of fact.
2    MR. FROST:
3          Move to strike nonresponsive answer.
4    MS. O'DELL:
5    Q     Is that based on your evaluation of the
6    variability of the geology of the deposits in
7    Vermont?
8    MR. FROST:
9          Objection to form.
10   A     Yes. And we already know there's
11   variation, and I just used arsenic as a good
12   example. Because if you look at the Hamm mine,
13   that's the one mine that we have some good
14   drilling numbers throughout the pit. Clearly
15   shows that there are areas of the mine that are
16   high arsenic, way out of spec --
17         No. I'm sorry. It was the Rainbow
18   mine.
19         And then there are areas in the mine
20   that are great.
21   MS. O'DELL:
22   Q     Uh-huh. And in your -- in your
23   review --
24         You just mentioned the core logs. In

Page 492

1    your review of the core logs that have been
2    produced in litigation, was there evidence in
3    those core logs of the presence of fibrous talc?
4    A     Fibrous talc, yes, is -- was mentioned
5    in some of the core logs.
6    Q     And was there also references to the
7    presence of amphiboles?
8    A     Of amphiboles?
9    Q     Yes.
10   A     Oh, yeah, sure.
11   Q     And -- and, in some of those cases,
12   were -- were the presence of fibrous amphiboles
13   noted?
14   A     Yes.
15   Q     Let me ask you, in regard to asbestos
16   testing, I think it was -- you referenced a
17   document in your report regarding a testing
18   procedure where samples were tested every six
19   months for asbestos in -- in Vermont. Do you
20   recall that?
21   A     Yes.
22   Q     And would sampling and testing -- would
23   a six-month sample for talc --
24         Strike that.

Page 493

1          Let me ask you, is that a
2    representative way to test talc powder for
3    asbestos?
4    MR. FROST:
5          Objection to form.
6    A     A six-month composite?
7    MS. O'DELL:
8    Q     Yes.
9    A     Well, I wouldn't be happy with it.
10   Q     Why?
11   A     Because the sample that's actually run
12   weighs less than a gram, and you're -- you're
13   trying to come up with a way to validate the fact
14   that that less than a gram of material is -- is
15   gonna be representative of perhaps a thousand
16   tons of ore, 2,000 tons. It's -- it's very hard
17   to imagine that you can show that it would be.
18   Q     Under any mathematical model, would
19   that small of a sample that's tested be
20   representative of tens of thousands of tons of
21   ore?
22   MR. FROST:
23         Objection to form.
24   A     I think it would be probably

124 (Pages 490 to 493)

Robert Cook, Ph.D.

Page 494

1  impossible. There's some things that you could
2  do to move it along toward the
3  representativeness, but I don't think they were
4  done.
5  MS. O'DELL:
6  Q    Are you -- are your opinions in this
7  case contained in your report that's dated
8  January 22nd, 2019, as well as your deposition
9  that you've given here today?
10  A    Are they --
11  Q    As well as the deposition?
12  A    No. What was the first part of the
13  question?
14  Q    Are your opinions in this case
15  contained in your --
16  A    Oh, are they contained? Sure. Of
17  course.
18  Q    Let me finish.
19      -- amended report that's dated January
20  22nd, 2019, as well as your deposition that
21  you've given here today?
22  A    Yes.
23  Q    All right. I have nothing further.
24  Thank you, Doctor.

Page 495

1  MR. FROST:
2      I'd just like two minutes. Actually,
3  no. You guys, why don't you guys stay here? I
4  think we'll be quick. I'll take Mr. Ferguson
5  outside.
6  VIDEOGRAPHER:
7      Going off the record.
8      (OFF THE RECORD.)
9  VIDEOGRAPHER:
10      We're back on the record. The time is
11  7:10 p.m.
12  MR. FERGUSON:
13      I don't think Mr. --
14      Oh, I'm sorry.
15      I don't think Mr. Frost has any
16  questions. Right, Jack?
17  MR. FROST:
18      That's correct.
19          EXAMINATION
20  BY MR. FERGUSON:
21  Q    Okay. Just very briefly, Dr. Cook.
22  So, with regarding to the -- the photographs that
23  you observed that had to do with the selective
24  mining issue you just discussed with Miss O'Dell,

Page 496

1  I want to talk about that. Okay?
2  A    Sure.
3  Q    And remind me, which mine was that at?
4  A    Okay. That one was Argonaut, that
5  photograph was. But we've got some in the back
6  that are -- I think there's a Hamm mine picture
7  possibly in there.
8  Q    All right. So with regard to the
9  Argonaut mine and your conclusion that -- that
10  appropriate selective mining procedures were not
11  being carried out, how many photographs did you
12  look at?
13  A    I looked at everything we were given.
14  And it's -- it's only a handful, not --
15  Q    Well, and does a handful mean five or
16  less?
17  A    It's probably more than five but less
18  than ten.
19  Q    Okay. So -- so somewhere between five
20  and ten photographs you looked at. Correct?
21  A    Well, I also looked at Google Earth,
22  which, you know, has its own, you know, set of
23  photographs that you can look at.
24  Q    All right. And how many Google Earth

Page 497

1  photographs did you look at?
2  A    Well, it depends. You know, they have
3  a historical, you know, button you can push. And
4  I don't remember how many different dates there
5  were of the Ludlow area. But there were -- there
6  were four or five.
7  Q    Okay. So do you have copies of the --
8  A    No. I didn't print them.
9  Q    -- photographs?
10  A    I didn't save them. But, I mean,
11  they're easy to go back to and get.
12  Q    Okay.
13  A    And I'd -- you know, I'd be more than
14  happy to tell you why I made the comment about
15  couldn't see the evidence of the selective
16  mining.
17      If you look at the photographs that
18  I --
19  Q    I don't think -- I -- I don't have a
20  question on the table, but --
21  A    Oh. I thought you did, but --
22  Q    I didn't.
23  A    Okay.
24  Q    So I'm trying to get the number of

125 (Pages 494 to 497)

Robert Cook, Ph.D.

Page 498

1  photographs.
2  A    Oh, okay.
3  Q    So between five and ten photographs
4  that you were provided that you looked at.
5  A    Correct.
6  Q    Correct?
7  A    Yes.
8  Q    And then some Google Earth
9  photographs --
10  A    Google Earth.
11  Q    -- that you -- you haven't shared with
12  us. Correct?
13  A    Correct.
14  MS. O'DELL:
15      Object to the form.
16  MR. FERGUSON:
17  Q    And when were the Google Earth
18  photographs taken? I mean, when --
19  A    They go back -- I think the most recent
20  one was a two -- I think there might have been a
21  2018 photograph. And then they go back. It's an
22  irregular number of years that they -- that they
23  present you with. But I think that maybe --
24      They had some that were so far back

Page 499

1  that they were useless. The quality of the
2  photograph was no good. And, so, with that
3  thought in mind, I'm gonna say there were
4  probably three or four of Ludlow area that were
5  useful.
6      And I can't tell you what the oldest
7  one was, but it would -- it would be, say, 2003,
8  maybe. Maybe -- maybe one that was pre-2000.
9  Q    But with regard to the photographs that
10  you looked at that were 2003 or post-2003, those
11  were when that mine was no longer being used to
12  source cosmetic talc; correct?
13  MS. O'DELL:
14      Object to the form.
15  A    Yeah, that's right. And that's why I
16  said I'd be glad to, you know, discuss the ones
17  in here, because they're pre-2003.
18  MR. FERGUSON:
19  Q    So -- so, essentially, the Google Earth
20  photographs, which are perhaps all post-2003,
21  don't tell us anything about -- about what was
22  going on in the mine during the period of time
23  when it was being used to source talc?
24  A    No. That part of the mine is gone.

Page 500

1  It's mined out.
2  MS. O'DELL:
3      Objection to form.
4  MR. FERGUSON:
5  Q    Excuse me?
6  A    It's mined out.
7  Q    Okay.
8  A    And if you're looking at a 2018
9  photograph, the material that was being mined in,
10  say, 1995, I mean, you're looking at a part of a
11  hole in the ground.
12  Q    Well, let's focus on the five to ten
13  photographs. Okay?
14  A    Okay.
15  Q    Okay? Right? The five to ten
16  photographs you were provided of the Argonaut
17  mine --
18  A    Okay.
19  Q    -- from which you concluded that
20  selective mining procedures were not being
21  applied properly.
22  A    Correct.
23  Q    Okay?
24  MS. O'DELL:

Page 501

1      Object to the form.
2  MR. FERGUSON:
3  Q    And what was the time frame for those
4  photographs?
5  A    I've got them in my report.
6  Q    Okay.
7  A    I don't remember the exact dates. But
8  they're -- each photograph I've -- I've tried to
9  give a date on.
10  Q    Okay. So how long had that mine been
11  being mined for purposes of cosmetic talc before
12  2003? Do you know?
13  A    It's an old mine. It was originally an
14  underground mine. And I think that probably as
15  long as the West Windsor mill had been in
16  operation there had been some cosmetic talc
17  coming out of Argonaut.
18  Q    So it's been mined for years and years
19  and years; correct?
20  A    I think so.
21  Q    Okay. And the five to ten photographs
22  that you looked at, how long does it take to take
23  a photograph? Something less than a second?
24  MS. O'DELL:

126 (Pages 498 to 501)

Robert Cook, Ph.D.

---

Page 502

1          Object to the form.
2     A     Yes. But --
3     MR. FERGUSON:
4     Q     Okay. So -- so those photographs were
5     showing you what the mine looked like during the
6     millisecond it took to take each of those
7     photographs; correct?
8     MS. O'DELL:
9          Object to the form.
10    A     Yeah. That's -- that's sort of a
11    loaded question, because what you see in the
12    photographs is the -- the result of mining over a
13    period of time. Sure.
14         You've got a photograph. I mean,
15    everybody knows it doesn't take very long to take
16    a photograph. But if you're taking a photograph
17    of a mine that is -- that is full of shot rock
18    and waste rock and benches that are -- have been
19    covered with -- with material that I wouldn't
20    think should be there if you were selectively
21    mining a higher-grade deposit, then the -- the
22    little millisecond that it takes to take that
23    photograph is capturing a condition that probably
24    represents a number of years.

---

Page 503

1     Q     But when you took the photo -- when you
2     looked at the photographs, they represented only
3     a very, very short span of time in a -- in a mine
4     that's been mined for years and years and years;
5     correct?
6     MS. O'DELL:
7          Object to the form.
8     A     That's what I'm saying is it may not
9     represent a short span of time. If you take a
10    look at the photographs, it should be pretty
11    obvious to you that the mines are not -- they're
12    not -- I wouldn't call them clean. There's an
13    awful lot of rock that is scattered about that --
14    that you wouldn't see if you were selectively
15    mining rock to make sure that you weren't getting
16    bad material mixed in with good.
17    MR. FERGUSON:
18    Q     And do you know what had been going on
19    immediately in the previous hour or so before the
20    photograph was taken?
21    A     It would look exactly like the
22    photograph. I mean, mining doesn't -- it
23    isn't -- unless they had shot off a blast.
24    Q     Okay. That happens, doesn't it?

---

Page 504

1     A     Well, it might. But I'd say that the
2     odds are that in that -- in the hour preceding
3     when the aerial photograph was taken, there
4     wouldn't have been a shot, because these
5     photographs were not taken by, you know, some
6     tourist flying over. These are aerial
7     photographs that were apparently taken by
8     Johnson & Johnson or probably Imerys personnel to
9     document the condition of the mine at that point.
10    It's very common to do this, because that's one
11    of the ways that you can -- can measure your
12    stockpiles is -- is by overflights.
13    Q     Do you know who took them?
14    A     No, I don't know who took them. It may
15    have said somewhere in the document.
16         They came out of -- they came out of --
17    I think some of them actually came out of a
18    Luzenac document.
19    Q     And you don't know, yourself, what
20    occurred, whether there had been a blast in the
21    previous hour, two hours?
22    A     No. What I was gonna say was if it was
23    gonna be a blast that day, I don't think I would
24    have been up in a plane over the quarry.

---

Page 505

1     Q     Okay. And have you talked to whoever
2     took the plane to take the pictures?
3     MS. O'DELL:
4          Object to the form.
5     A     I have no idea who took the pictures.
6     MR. FERGUSON:
7     Q     That's all. Thank you, sir.
8     A     Sure.
9     MS. O'DELL:
10         I have nothing further, Doctor.
11    MR. FROST:
12         I have a real quick follow-up on those
13    questions.
14    MS. O'DELL:
15         I may have something further, but not
16    after Mr. Ferguson.
17              EXAMINATION
18    BY MR. FROST:
19    Q     All right, sir. Look at page 8 of your
20    report, that picture.
21    A     Right.
22    Q     So is the airplane parked on the
23    ground?
24    A     No. The aerial photographs are in the

---

Robert Cook, Ph.D.

---

Page 506

1  exhibit in the back.
2  Q       Okay.  Let's turn to the exhibit in the
3  back.
4  A       Yeah.
5  Q       Would you agree with me that only two
6  of these pictures actually appear to be aerial
7  photos of the mine?
8  A       Right.  Sure.
9  Q       Okay.  The rest of the one, two, three,
10 four, five --
11 A       They illustrate exactly what I was
12 talking about.
13 Q       Well, again, my question is only two of
14 the photographs are aerial; correct?
15 A       Sure.
16 Q       The other five appear to be taken from
17 the ground?
18 MS. O'DELL:
19         Just count them.  Don't agree if you
20 don't --
21 A       No.
22 MR. FROST:
23 Q       Well, you can count them, but it's
24 five.

---

Page 507

1  A       But since you've pointed out that not
2  all of them were from the air, the last
3  photograph was from the ground because the plane
4  was grounded because of snow.
5  Q       Sure.  There we go.
6          All right.  That's all the questions I
7  have, sir.
8  MS. O'DELL:
9          I have nothing further.
10 VIDEOGRAPHER:
11         We're off the record.  The time is
12 7:20 p.m.
13         (DEPOSITION EXHIBITS 34-1 TO 34-13,
14         35, 36, 37, 38, AND 39 WERE MARKED
15         FOR IDENTIFICATION.)
16         (Deposition concluded at 7:20 p.m.)
17
18
19
20
21
22
23
24

---

Page 508

1                C E R T I F I C A T E
2  STATE OF ALABAMA)
3  COUNTY OF MOBILE)
4
5          I do hereby certify that the above and
6  foregoing transcript of proceedings in the matter
7  aforementioned was taken down by me in machine
8  shorthand, and the questions and answers thereto
9  were reduced to writing under my personal
10 supervision, and that the foregoing represents a
11 true and correct transcript of the proceedings
12 given by said witness upon said hearing.
13         I further certify that I am neither of
14 counsel nor of kin to the parties to the action,
15 nor am I in anywise interested in the result of
16 said cause.
17         Signed this 2nd day of February, 2019.
18
19
20
21         LOIS ANNE ROBINSON, RDR
           COURT REPORTER, NOTARY PUBLIC
           STATE OF ALABAMA AT LARGE
22         ACCR# 352; EXPIRES 9/30/19
23
24

---

Page 509

1              E R R A T A   P A G E
2
3          I, ROBERT COOK, Ph.D., the witness
   herein, have read the transcript of my testimony,
   and the same is true and correct, to the best of my
4  knowledge, with the exceptions of the following
   changes noted below, if any:
5
6  Page/Line  Word/Words to be changed  Correct Word
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21
                 _____
22               ROBERT COOK, Ph.D.
23
24

128 (Pages 506 to 509)

Robert Cook, Ph.D.

Page 510

```
 1              DECLARATION OF WITNESS
 2
 3         I, the undersigned, declare under penalty
 4   of perjury that I have read the foregoing
 5   transcript, and I have made any corrections,
 6   additions, or deletions that I was desirous of
 7   making; that the foregoing is a true and correct
 8   transcript of my testimony contained herein.
 9         EXECUTED this _____ day of _____,
10   2019, at _____, _____.
                (City)          (State)
11
12
13
14
15
         _____
16              ROBERT COOK, Ph.D.
17
18
19
20
21
22
23
24
```

Golkow Litigation Services - 1.877.370.DEPS