Exhibit 6

William M. Sage, MD, JD

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEW JERSEY

3       --------------------------

4    IN RE:  JOHNSON & JOHNSON     MDL NO.:

5    TALCUM POWDER PRODUCTS        16-2738 (FLW)(LGH)

6    MARKETING, SALES PRACTICES,

7    AND PRODUCTS LIABILITY

8    LITIGATION

9       --------------------------

10

11               EXPERT DEPOSITION OF

12             WILLIAM M. SAGE, MD, JD

13

14           Thursday, September 23, 2021

15                   8:13 a.m.

16

17            Washington, DC 20006

18

19

20

21    Reported by:

22    Denise Dobner Vickery, NCRA Registered Merit

23    Reporter, NCRA Certified Realtime Reporter,

24    Notary Public

William M. Sage , MD, JD

Page 2

```
1
2
3
4
5
6
7
8                    Thursday, September 23, 2021
9                    8:13 a.m.
10
11      Expert Deposition of WILLIAM M. SAGE, MD, JD,
12  held at the offices of:
13
14          ASHCRAFT & GEREL LLP
15          1825 K Street NW
16          Suite 700
17          Washington, DC 20006
18
19
20      Pursuant to notice, before Denise Dobner
21  Vickery, Certified Realtime Reporter, Registered
22  Merit Reporter, and Notary Public in and for the
23  District of Columbia.
24
```

Page 3

```
1  APPEARANCES:
2
3  For MDL Plaintiffs:
4          BEASLEY ALLEN LAW FIRM
5          BY:  DR. MARGARET M. THOMPSON, ESQ.
6          218 Commerce Street
7          Montgomery, AL 36104
8          1.800.898.2034
9          margaret.thompson@beasleyallen.com
10
11
12
13  For MDL Plaintiffs:
14          ASHCRAFT & GEREL LLP
15          BY:  MICHELLE A. PARFITT, ESQ.
16          JAMES F. GREEN, ESQ.
17          1825 K Street NW, Suite 700
18          Washington, DC 20006
19          202.759.7648
20          mparfitt@ashcraftlaw.com
21          jgreen@ashcraftlaw.com
22
23
24
```

Page 4

```
1  APPEARANCES:  (Continued)
2
3  For Plaintiffs:
4          LEVIN PAPATONIO RAFFERTY PROCTOR
5          BUCHANAN O'BRIEN BARR & MOUGEY, PA
6          BY:  CHRISTOPHER V. TISI, ESQ.
7          316 South Baylen Street, Suite 600
8          Pensacola, FL 32502-5996
9          850.435.7176
10          ctisi@levinlaw.com
11
12
13  For Defendants Johnson & Johnson and Johnson &
14  Johnson Consumer, Inc.:
15          SHOOK HARDY & BACON LLP
16          BY:  MARK C. HEGARTY, ESQ.
17          2555 Grand Blvd.
18          Kansas City, MO 64108
19          816.474.6550
20          mhegarty@shb.com
21
22  Also Present Remotely:
23          KATE STONE, ESQ., Faegre Drinker
24          Biddle & Reath LLP
```

Page 5

```
1              INDEX
2  EXAMINATION OF WILLIAM M. SAGE, MD, JD      PAGE
3  BY MR. HEGARTY                   8
4  AFTERNOON SESSION                213
5  DR. THOMPSON                     426
6
7          SAGE DEPOSITION EXHIBITS
8  NUMBER      DESCRIPTION              PAGE
9  Exhibit 1   Sage Invoice dated 8/10/2021     11
10  Exhibit 2   Canada Screening Assessment     52
11          Talc, April 2021, Pages 1-65
12  Exhibit 3   Sage Curriculum Vitae      58
13  Exhibit 4   7/2/2021 Expert Report of      75
14          William M. Sage, MD, JD
15  Exhibit 5   Literature from Expert Report     82
16          Pages 1-18
17  Exhibit 6   Second Amended Notice of Oral     96
18          Deposition of William M. Sage, MD, JD
19          and Duces Tecum,
20  Exhibit 7   HHS/Musser Letter dated 4/1/2014  151
21          Re two Citizen Petitions
22  Exhibit 8   NCI: Ovarian, Fallopian Tube, and 174
23          Primary Peritoneal Cancer
24          Prevention (PDQ), Pages 1-20
```

Page 6

SAGE DEPOSITION EXHIBITS

NUMBER      DESCRIPTION                    PAGE

Exhibit 9   NCI: PDQ Screening and Prevention  188
            Editorial Board, Pages 1-2
Exhibit 10  Sage Curriculum Vitae - Current  213
Exhibit 11  Notebook: "William Sage, MD      220
            Deposition Exhibits"
Exhibit 12  Regulatory Toxicology and        224
            Pharmacology, Talc: Consumer
            Uses and Health Perspectives, Carr
Exhibit 13  Statement of Susan T. Mayne, PHD  248
            12/4/2019 "Building Consumer
            Confidence by Empowering FDA to
            Improve Cosmetic Safety"
Exhibit 14  IARC Monographs on the Evaluation  271
            of Carcinogenic Risks to Humans
            Arsenic, Metals, Fibres, and Dusts
Exhibit 15  Hopkins 28 List of Documents     277
Exhibit 16  J&J Press Release: Company
            Investigation Confirms No Asbestos
            in Johnson's Baby Powder 12/3/2019
Exhibit 17  Pier 47 List of Documents        291
Exhibit 18  Talc Timeline                    308
            PCPC_MDL00062175 - 00062196

Page 7

SAGE DEPOSITION EXHIBITS

NUMBER      DESCRIPTION                    PAGE

Exhibit 19  Plaintiffs' MDL Expert Witnesses  372
Exhibit 20  IARC Monographs on the Evaluation  384
            of Carcinogenic Risk to Humans
            Volume 93, Carbon Black, Titanium
            Dioxide, and Talc, Lyon, France 2010
Exhibit 21  Lessons From Breast Implant       390
            Litigation by William M. Sage
Exhibit 22  JAMA: Association of Powder Use   394
            in the Genital Area With Risk of
            Ovarian Cancer, O'Brien et al.
Exhibit 23  Materials Considered_William      410
            Sage, MD, JD Supplemental Materials
Exhibit 24  Safety Assessment of Talc as      415
            Used in Cosmetics, Fiume et al.
Exhibit 25  Witness Stack of Documents        418
Exhibit 26  Literature, Depositions and       423
            Transcripts, Pages 1-3
Exhibit 27  2/10/98 FDA's Cosmetic Program:   426
            Current Projects and Resources
            and A Discussion of the "Model"
            Program, PCPC0058604 - 0058654

Page 8

PROCEEDINGS
- - -

WILLIAM M. SAGE, MD, JD
called for examination, and, after having been
duly sworn, was examined and testified as
follows:
- - -
EXAMINATION
- - -
BY MR. HEGARTY:

Q.    Good morning, Dr. Sage.

A.    Good morning.

Q.    Would you please tell us your full
name?

A.    William Sage.

Q.    Who is your current employer?

A.    The University of Texas at Austin.

Q.    Do you also have a separate personal
consulting business for litigation?

A.    Not for litigation.  I have a
Schedule C for any additional income I may make in
the course of the year doing academic-related
things.

Q.    Are the -- is the income you earn as

Page 9

an expert witness ran through this Schedule C
business?

A.    It will.

Q.    When did you set up your Schedule C
business?

A.    Many years ago.

Q.    As far as the fees that you do earn
as an expert witness, do they go directly to you?

A.    Yes.

Q.    Do you have any other sources of
income besides salary from the University of Texas
and any fees you earn as speaker or as an expert?

A.    No, beyond the usual investments
that people might have.

Q.    What are you charging plaintiffs'
counsel in this case for your -- your time and
your consultation?

A.    I'm charging $800 an hour.

Q.    On what do you base that $800 an
hour figure?

A.    I do this very, very seldom.  So I
made some inquiries among friends for benchmarks,
and that seemed to be an appropriate one.

Q.    That was going to be my next

William M. Sage, MD, JD

Page 10

1  question.
2        Have you ever been paid in any other
3  situation at the rate of $800 an hour?
4        A.    Specifically 800?  No.  Perhaps 750,
5  perhaps 6.  The last time I did any expert witness
6  work for a private party was many years -- was
7  probably 10 years ago or so.
8        Q.    What was that expert witness
9  activity for a private party?
10       A.    I was assisting two merging
11  hospitals in antitrust litigation.
12       Q.    Was that a matter in which you were
13  designated as an expert witness?
14       A.    Yes.  Again, I'm not a litigator.
15  So I don't always get the procedural posture
16  right.  It was in anticipation of an
17  administrative trial before the FTC that didn't
18  ever happen.
19       Q.    Okay.  You don't make $800 an hour
20  as a professor at the University of Texas, right?
21       A.    No.
22       Q.    Did anyone outside of perhaps the
23  lawyers for the plaintiffs in this case assist you
24  in any way with preparing your expert witness

Page 11

1  report?
2        A.    I'm sorry.  Would you repeat that?
3        Q.    Sure.
4        Did anyone assist you in preparing
5  your expert witness report?
6        A.    I had assistance with formatting,
7  footnoting, and finding appropriate references
8  from the plaintiffs' lawyers.
9        Q.    Who in particular helped you with
10  those types of activities?
11       A.    Various people on the team and so, I
12  mean, Dr. Thompson and then I know people more by
13  first name.  Patrick, Brianne.  I don't remember
14  everybody's last name.
15       Q.    Did anyone outside of the lawyers
16  for the plaintiffs in any way assist you in
17  preparing your report?
18       A.    No.
19       MR. HEGARTY:  I'm going to
20       mark as Exhibit No. 1 the invoice that we
21       have been provided from you by counsel
22       for the plaintiffs.
23       (Document marked for
24       identification as Sage Exhibit 1.)

Page 12

1  BY MR. HEGARTY:
2        Q.    Would you -- this is yours.
3        A.    Okay.
4        Q.    Would you please look at Exhibit
5  No. 1 and tell me whether that is an invoice that
6  you prepared in connection with your work on this
7  MDL case.
8        A.    Yes, it is.
9        May I just ask you.  While we're
10  doing this, when you hand me things, what am I --
11  am I supposed to keep them in a pile, return them
12  to you?  I don't know.
13       Q.    I would recommend you keep them in a
14  pile as I may refer back to them.
15       A.    Okay.  Thank you.
16       Q.    So with regard to Exhibit No. 1,
17  this is an invoice that you prepared; is that
18  correct?
19       A.    Yes.
20       Q.    It's dated August 10, 2021 and lists
21  a total amount of $64,000; is that correct?
22       A.    Yes.
23       Q.    Have you been paid for this invoice?
24       A.    Yes.

Page 13

1        Q.    Have you prepared any other invoices
2  besides the one we marked as Exhibit No. 1?
3        A.    No.
4        Q.    Have you generated additional time
5  in which you will invoice since preparing this
6  invoice on August 10, 2021?
7        A.    Yes.
8        Q.    How much additional time do you plan
9  to invoice through today?  If you can estimate it.
10       A.    I haven't added it up.  I would say
11  ballpark, if this was 80 hours, 40 hours.
12       Q.    Okay.  With regard to this
13  particular invoice, in the "For" section you say
14  "Review of materials in preparation of expert
15  report from June 5 to June 2, 2021."
16       Does June 5 represent the first date
17  that you started working on this case?
18       A.    So you said June 2.  I think you
19  meant July 2 so...
20       Q.    July 2.  I'm sorry.
21       A.    June 5th represents the first date
22  that I billed any time.  All of my preliminary
23  discussions, investigations, deciding what the
24  case was about, and what my preliminary opinions

Page 14

1  might be I regarded as not billable.
2      Q.      With regard to the reference below
3  the "For" line to "Initial Meetings and Case
4  Review," who did you meet with initially that's
5  referenced in that entry?
6      A.      To the best of my recollection,
7  these were Zoom meetings with people I hadn't
8  necessarily met before, but Dr. Thompson,
9  Ms. O'Dell, Ms. Parfitt I think were the first
10 significant call.  And then Patrick and Brianne at
11 some -- at some point early on, but I don't
12 remember the details.
13     Q.      That same line refers to an entry or
14 refers to "Case Review."
15             What did you mean when you put in
16 "Case Review"?
17     A.      Cutting me a little slack on the
18 terminology because I don't do this very often, I
19 just meant this litigation.  So, you know,
20 whatever materials were -- were offered to me or
21 whatever news reports I might have found just on
22 the posture of this litigation.  I hadn't been
23 following any of the individual cases, and I
24 hadn't specifically been following multidistrict

Page 15

1  litigation.
2      Q.      The next line below the line
3  "Initial Meetings and Case Review" says
4  "Preliminary Outline of Issues."
5              Did you actually prepare a document
6  where you outlined the issues?
7      A.      Not a -- not a structured document.
8  My -- my own notes and my kind of musings about
9  how -- how this would develop as a report.
10     Q.      Do you still have those notes?
11     A.      I don't know, actually.
12     Q.      Were they handwritten or something
13 you typed on the computer?
14     A.      Handwritten.
15             MR. HEGARTY:  We would ask
16         that the doctor -- if you ask the doctor
17         to look for those notes.
18             DR. THOMPSON:  And we'll
19         object as draft of report.
20             MR. HEGARTY:  Sure.
21         Understood, but we would ask that --
22         that -- well, let me back up before I
23         make the further request.
24 BY MR. HEGARTY:

Page 16

1      Q.      Were the -- when you say -- what was
2  the preliminary outline of issues?
3      A.      That was perhaps my inartful way of
4  saying thinking about the issues and how I would
5  express my opinions.
6      Q.      Was it a draft of your report?
7      A.      Almost -- I don't know exactly how
8  to answer that.  I mean, it was my initial
9  thinking.  So whether it constitutes a draft in my
10 notes or not, I really can't say.  That's, I
11 think, a matter of your practice and requirements.
12     Q.      Well, the entry below that does
13 refer to "Preparing Expert Report."
14             Do you see that?
15     A.      Yes.
16     Q.      So I see that as was it not two
17 different activities, one preparing an outline and
18 one drafting your report?
19             DR. THOMPSON:  Object to form.
20             THE WITNESS:  I itemized them
21         differently, I believe, to reflect the
22         stages of my thinking.  I'm sure we'll
23         discuss much of this today.
24             The stages of my thinking in

Page 17

1  terms of an outline of issues just
2  thinking about:  What are the
3  self-regulatory obligations?  What are
4  the disclosure obligations?  You know,
5  what are the differences between
6  cosmetics regulations and drug
7  regulations that are relevant?
8              Various things of that sort
9  that are more general and almost
10 certainly wouldn't have involved
11 reviewing any corporate documents or --
12 or deposition testimony from the
13 litigation.  Whereas, the deep dive is
14 what followed that, and that's why I made
15 the distinction.
16             MR. HEGARTY:  Well, we'll make
17         a request for those notes.  I understand
18         your objection.  I just wanted to state
19         it on the record and we'll do necessary
20         follow-up, okay?
21             DR. THOMPSON:  (Nods head).
22 BY MR. HEGARTY:
23     Q.      The University of Texas has
24 disclosure policies for all work outside of your

Page 18

1 job; is that right?
2     A.    Yes.
3     Q.    Have you disclosed the work you're
4 doing in this litigation pursuant to that policy?
5     A.    I've disclosed everything that's
6 required to be disclosed and received any approval
7 that was required to be received.
8     Q.    As it relates to this case, correct?
9     A.    Yes.
10     Q.    Did you have to prepare a written
11 report disclosing your work on this case?
12     A.    Only in the most general terms.
13     Q.    But you actually prepared a report
14 and submitted it to someone?
15     A.    I filled out an online form.
16     Q.    Do you have a copy of that online
17 form?
18     A.    No.
19     Q.    Did you have to get approval to do
20 this work?
21     A.    I did have to get approval to do
22 this work.
23     Q.    Who did you have to get approval
24 from?

Page 19

1     A.    I had to get approval from whoever
2 was the designated individual to grant approval.
3 I identified the vice dean at the University of
4 Texas Law School, who granted approval.
5     Q.    What -- in what form was the
6 approval granted?
7     A.    A click on a website.
8     Q.    Click on a website to see if it says
9 granted?
10          In other words, how was it done?
11 Was it done by an e-mail or was it done by a phone
12 call?  Was it done by an in-person sign-off?
13     A.    Would you like me to outline the
14 process as best as I can recall it?
15     Q.    All I'm really looking for is:  In
16 what form did you get the approval?
17     A.    I submitted the form.  There are --
18 there are independent requirements at the
19 University of Texas and, as you probably know,
20 this is an area that's in flux at many
21 universities.
22          I also have a significant academic
23 expertise in conflict of interest and conflict of
24 commitment policy.  So I pay attention to all of

Page 20

1 this, including when I'm teaching professional
2 responsibility classes.
3          The way that the University of Texas
4 system currently works, they have centralized the
5 approval of outside activities that would
6 constitute conflict of commitment; in other words,
7 that might take time away from one's teaching
8 obligations to the university.  They centralized
9 those at the University of Texas system level.
10 The University of Texas is comprised of several
11 campuses.
12          That particular form asked me a
13 number of questions which I filled in on the form
14 and asked me to identify the person who would
15 grant approval.  I designated the vice dean at the
16 law school because he's the person I would expect
17 to grant approval.
18          Nothing happened for a while.  I
19 reached out to him.  He investigated, found that
20 he could grant approval, granted approval, told me
21 he had granted approval, and the next time I
22 checked the website approval had been granted.
23     Q.    Okay.  What is his name?
24     A.    Robert Chesney.

Page 21

1     Q.    Have you otherwise advised anyone at
2 the University of Texas of your work on this case?
3     A.    No.
4     Q.    What courses are you teaching, if
5 any, this summer -- this semester?
6     A.    So this semester I'm a visiting
7 professor here in Washington, DC at the George
8 Washington University Law School, and I'm teaching
9 -- that is a standard turnkey operation where the
10 University of Texas remains my employer.  I am
11 only paid by them, and they have a separate
12 agreement in a standard fashion for visiting
13 professorships with the institution that is
14 hosting the semester.
15          And at GW, I'm teaching a
16 three-credit legislation and regulation course,
17 which is my standard regulatory theory and
18 regulatory design class, and I'm teaching a
19 for-credit health law and policy survey class.
20     Q.    Have you taught classes either as a
21 visiting professor or at the University of Texas
22 ever since you started at Texas?  In other words,
23 have you taught classes every semester either at
24 Texas or somewhere else since you started?

Page 22

1    A.    No.  I have occasionally had a
2  research semester, or I've had additional teaching
3  credit, or I've had an eminent scholar fellowship
4  that would relieve me of teaching.  But I really
5  like to teach, so I usually teach the equivalent
6  of a full load every year.
7    Q.    Did you teach classes every semester
8  while at Columbia?
9    A.    Columbia, unlike the University of
10 Texas, has a structured sabbatical program.  So
11 not when I had a formal sabbatical, and I believe
12 also not when I had large research grants that the
13 law school based relief of teaching on.  But, in
14 general, I teach every semester and, in general, I
15 teach a full or an overload.  I'm teaching an
16 overload this semester.
17    Q.    Since 2001, have you been a
18 full-time law school professor?
19    A.    Since 1995, I've been a full-time
20 law school professor.
21    Q.    1995.
22         And the courses you have taught
23 since 1995 have all been in a law school, correct?
24    A.    I am interdisciplinary by training.

Page 23

1  I am dually tenured in both the law school and
2  medical school at University of Texas.  My last --
3  before GW, my last visiting professorship at NYU,
4  I had a visiting professor appointment both in law
5  school and at NYU School of Medicine.
6         And virtually all of the classes I
7  teach at my home institution are cross-listed in
8  business and public affairs and in the medical
9  schools, and I typically design my courses to
10 attract enrollment from many different schools.
11    Q.    So in your career as a professor,
12 you have taught medical students?
13    A.    Indeed, many times.
14    Q.    When is the last time you had a
15 course in which you taught medical students?
16    A.    Last spring I taught my health, law,
17 and policy class at Texas and had over a dozen
18 third-year medical students enrolled, which an
19 entering class of 50 is a significant number of
20 the medical school class.  So I'm actually very
21 proud of how many medical students I teach.
22    Q.    When you teach medical students,
23 you're teaching them law-related courses, correct?
24    A.    I'm teaching them policy-related

Page 24

1  courses.  I may be teaching them about advocacy.
2  I'm often teaching them about professional
3  responsibility.  I teach my professional ethics
4  classes from a comparative professions perspective
5  and do a lot of law/medicine comparisons and
6  occasionally other professions also.
7    Q.    But you're not teaching the practice
8  of medicine, correct?
9    A.    I'm not teaching clinical medicine,
10 no.
11    Q.    And you've never taught clinical
12 medicine to gynecologic oncologists, correct?
13    A.    No.
14    Q.    You have not taught clinical
15 medicine to oncologists, correct?
16    A.    I have not taught clinical medicine.
17 You can ask -- you can subdivide that all you
18 want.  I have not taught clinical medicine.
19    Q.    You don't teach epidemiology,
20 correct?
21    A.    I teach -- I use epidemiological
22 materials in a fair amount of my regulatory
23 teaching.  I mean, we consider all sorts of
24 preventive screens and tests.  We do a lot of

Page 25

1  basic epidemiological calculations.  I do have
2  public health students in my classes from time to
3  time, but, no, I've never taught a course in
4  epidemiology.
5    Q.    You don't teach courses in
6  toxicology, correct?
7    A.    No, I don't.
8    Q.    Have you ever taught any courses on
9  FDA's cosmetic regulations?
10   A.    I teach FDA-related issues
11 constantly, including within the last week.  I've
12 never used a cosmetic regulatory example in my
13 teaching.
14   Q.    Have you ever taught courses on the
15 manufacturing of cosmetics?
16   A.    Have I ever taught courses on the
17 manufacturing of cosmetics?  No.
18   Q.    Have you ever taught courses on the
19 marketing of cosmetics?
20   A.    I have taught -- I've -- when you
21 say "course," do you mean an entire semester
22 course or do you mean a class session or part of a
23 class session?
24   Q.    Well, have you ever -- let me ask it

Page 26

¹ a different way.
²       Have you ever taught about the
³ marketing of cosmetics specifically as to
⁴ cosmetics?
⁵      A.     Again, I've taught about the
⁶ marketing of drugs.  I've taught about the
⁷ marketing of many things.  I don't believe I've
⁸ ever taught specifically about the marketing of
⁹ cosmetics.
¹⁰      Q.     Have you ever taught specifically
¹¹ about the labeling of cosmetics?
¹²      A.     No.  Again, with the caveat that I
¹³ teach about labeling and information disclosure
¹⁴ all the time.
¹⁵      Q.     Have you ever taught any courses
¹⁶ about the testing of cosmetics?
¹⁷      A.     No.
¹⁸      Q.     Have you ever taught a course on
¹⁹ Canadian cosmetic regulatory law?
²⁰      A.     No.
²¹      Q.     Have you ever taught courses on FDA
²² regulations as they relate to drugs, medical
²³ devices, or over-the-counter medications?
²⁴      A.     I've taught many class sessions that

Page 27

¹ involve those issues.  I've never taught a
² semester-long FDA law class.
³      Q.     There is a course at University of
⁴ Texas called "Food Safety Law" that gets into FDA
⁵ regulations.
⁶       You've never taught that class, have
⁷ you?
⁸      A.     I have not taught that.
⁹      Q.     In paragraph 7 of your report, you
¹⁰ say that your expertise is in the science of
¹¹ policy-making, including the science of regulatory
¹² design.
¹³       You go on to say that you are an
¹⁴ expert in government-supervised health and
¹⁵ financial self-regulations, corporate compliance
¹⁶ and corporate governance, and the regulations of
¹⁷ self-governing professions.
¹⁸       Nowhere in your report do you list
¹⁹ any expertise in FDA cosmetic regulations,
²⁰ correct?
²¹       DR. THOMPSON:  Object to form.
²²       THE WITNESS:  I think a lot
²³    of my report is certain proceedings and
²⁴    FDA cosmetic regulations.

Page 28

¹       In terms of my statement in
²    paragraph 7 of my report, I was trying to
³    lay out the general expertise that would
⁴    relate to the specific topics in the
⁵    report.
⁶ BY MR. HEGARTY:
⁷      Q.     Tell me when you first read the FDA
⁸ cosmetic statutes and regulations that you cite in
⁹ your report.
¹⁰      A.     The cosmetic-specific regulations I
¹¹ first read as I was deciding whether I would
¹² accept the invitation to serve as an expert
¹³ witness.  The underlying pillars of FDA
¹⁴ regulations regarding, say, adulteration and
¹⁵ misbranding, which are applicable to cosmetics,
¹⁶ the general history of the Pure Food and Drug Act,
¹⁷ of the Food, Drug, and Cosmetic Act of 1938, I
¹⁸ have been teaching this my entire career and have
¹⁹ read them many times.
²⁰      Q.     But prior to being contacted as
²¹ potentially serving as expert witness in this
²² case, you had never read the cosmetic statutes and
²³ regulations that you cite in your report, correct?
²⁴       DR. THOMPSON:  Object to form.

Page 29

¹       THE WITNESS:  Again, I had
²    read the general statutes because the
³    general statutes are applicable beyond
⁴    cosmetics.  I had not read the CFR
⁵    entries for cosmetics.
⁶ BY MR. HEGARTY:
⁷      Q.     So in particular, prior to being
⁸ contacted by plaintiffs' lawyers in this case, you
⁹ had never read 21 CFR 740.1, correct?
¹⁰       DR. THOMPSON:  Object to form.
¹¹       THE WITNESS:  So, again, I'm
¹²    just going to take the liberty of -- of
¹³    when we're doing code sections, even
¹⁴    though I'm pretty sure I know which ones
¹⁵    you're referring to or CFR sections, I'm
¹⁶    just going to have them around so that I
¹⁷    can -- I can --
¹⁸ BY MR. HEGARTY:
¹⁹      Q.     Sure.
²⁰      A.     -- make sure I answer you
²¹ accurately.
²²       So you were regarding --
²³      Q.     Yes.
²⁴      A.     -- the warning statements on

Page 30

1 cosmetics specifically? No, I had not read that
2 section prior to considering these issues.
3    Q.    You're not an expert in FDA cosmetic
4 regulations. True?
5    A.    I --
6         DR. THOMPSON: Object to form.
7         THE WITNESS: I consider
8    myself an expert in cosmetic regulations.
9    It's a short number of regulations that
10    fit in a larger scheme that I have great
11    familiarity with.
12 BY MR. HEGARTY:
13    Q.    Would you have called yourself an
14 expert in FDA cosmetic regulations prior to being
15 contacted by the plaintiffs' counsel in this case?
16    DR. THOMPSON: Object to form.
17         THE WITNESS: I'm not sure I
18    know the answer to that. It would have
19    depend on the context I was being asked
20    the question.
21         I wouldn't have asserted that
22    as a focused expertise, but I would have
23    understood that a small amount of -- of
24    intense research would be sufficient to

Page 31

1    connect what was specific to cosmetic
2    regulation to my general food, drug, and
3    cosmetic expertise. So probably I would
4    have.
5 BY MR. HEGARTY:
6    Q.    Even though you had never read the
7 cosmetic regulations, correct?
8         DR. THOMPSON: Object to form.
9         THE WITNESS: (Laugh). Yes.
10 BY MR. HEGARTY:
11    Q.    Okay. Fair enough.
12         Tell me -- well, strike. Let me
13 back up.
14         Have you had any formal training,
15 formal courses on FDA cosmetic regulations and
16 practices?
17    A.    I have not taken any formal courses
18 on cosmetic regulation. I have taken -- I have
19 attended many talks and read many papers and
20 attended conferences involving FDA issues overall
21 several times.
22    Q.    Focusing specifically on cosmetic
23 regulations, can you cite for me all the work you
24 have done concerning cosmetic regulations before

Page 32

1 being hired to work on this case?
2         DR. THOMPSON: Object to form.
3         THE WITNESS: I have not done
4    specific work on cosmetic regulations
5    prior to my involvement with these
6    issues.
7 BY MR. HEGARTY:
8    Q.    Had you ever heard the term
9 "asbestiform" before being hired in this case?
10         DR. THOMPSON: Object to form.
11         THE WITNESS: I have an
12    undergraduate degree in biochemistry that
13    included a couple of geology classes. So
14    chances are, yes, but I don't recall.
15 BY MR. HEGARTY:
16    Q.    Had you ever heard the term
17 non-asbestiform before being hired?
18    A.    Same answer.
19         DR. THOMPSON: Object to form.
20 BY MR. HEGARTY:
21    Q.    Had you ever heard the term
22 "elongated mineral particles" before being hired
23 in this case?
24         DR. THOMPSON: Object to form.

Page 33

1         THE WITNESS: Elongated
2    mineral particles was an interesting
3    acronym. My impression is it's
4    relatively new. So I don't believe I had
5    ever heard that before.
6 BY MR. HEGARTY:
7    Q.    Had you ever heard the phrase
8 "fibrous talc" before being hired in this case?
9         DR. THOMPSON: Object to form.
10         THE WITNESS: Again, I don't
11    know.
12 BY MR. HEGARTY:
13    Q.    Have you ever been designated as an
14 expert witness in any lawsuit before this one?
15    A.    As we were discussing earlier, I
16 served as a named expert, but did not ultimately
17 testify in a hospital antitrust suit involving two
18 private hospitals in Illinois and the Federal
19 Trade Commission, roughly, 10 years ago, maybe 12.
20    Q.    Any time other than that instance
21 that you are aware of you've been actually
22 designated or identified as an expert witness in a
23 lawsuit?
24    A.    No.

William M. Sage, MD, JD

---

Page 34

1    Q.    You received both a law and medical
2 degrees -- or let me rephrase that.
3         You received both law and medical
4 degrees at Stanford, correct?
5    A.    Correct.
6    Q.    Which one did you complete first?
7    A.    (Laugh).  There are many ways to
8 answer that question.
9         I entered medical school first.  I
10 entered law school near the end of my third year
11 of medical school.  I integrated the two programs,
12 and I received both degrees the same day.
13   Q.    After one year of residency in
14 anesthesiology, you went to work at a law firm in
15 Los Angeles; is that correct?
16   A.    Not -- not exactly.  I did -- I
17 completed an internship year in what's called the
18 transitional year Internship in San Diego, which
19 would have been the first year of a four-year
20 anesthesia residency.  I then completed the second
21 year of that residency at Johns Hopkins, you know,
22 in the normal course, and having completed that
23 year, I then moved back to California and became
24 an associate at a law firm.

---

Page 35

1    Q.    Why did you stop practicing
2 medicine?
3    A.    My -- my intent was to acquire
4 practice experience in each profession and to go
5 back and forth between the two until I had a good
6 grounding in both.
7    Q.    When is the last time you treated a
8 patient?
9    A.    I have an active Texas medical
10 license.  I do not maintain a clinical practice.
11 I do my best to keep my clinical skills up, but I
12 don't treat patients.  So the last time I treated
13 a patient in a formal sense was during my second
14 year of postgraduate training so as an anesthesia
15 resident at Johns Hopkins.
16   Q.    What year was that?
17   A.    That would have been 1990.
18   Q.    You went to work at O'Melveny in Los
19 Angeles, correct?
20   A.    Correct.
21   Q.    And you were an associate in the
22 corporate group; is that right?
23   A.    Yes.
24   Q.    And your CV says you worked on cases

---

Page 36

1 related to public finance, securities, mergers and
2 acquisitions?
3    A.    Yes.
4    Q.    You were an associate at O'Melveny
5 for four years before leaving to become a law
6 professor?
7    A.    I was an associate for -- an
8 associate from October of 1990 until January of
9 1993, when I resigned in order to work in the
10 White House on that era of Clinton Administration
11 health reform.  And then the following September,
12 perhaps October, I rejoined O'Melveny on a half
13 time basis and I worked there until I became a law
14 professor in 1995.
15   Q.    Are you aware that O'Melveny
16 represents Johnson & Johnson?
17   A.    I am.  John Beisner was someone I
18 knew slightly when I worked in the DC office on
19 Supreme Court litigation during my otherwise
20 corporate practice years.
21   Q.    So you did work with lawyers
22 representing Johnson & Johnson?
23        DR. THOMPSON:  Object to form.
24        THE WITNESS:  No.  I knew

---

Page 37

1        that John Beisner was in the office and
2        said hi to him a few times.
3 BY MR. HEGARTY:
4    Q.    Did you ever work on any matters
5 involving Johnson & Johnson?
6    A.    No.
7    Q.    What percentage of your working time
8 this year has been spent on litigation matters?
9    A.    Would you rephrase that?
10   Q.    Sure.
11   A.    Sorry.
12   Q.    Are you working on any litigation
13 matters as an expert witness besides the one we're
14 here to talk about today?
15   A.    No.
16   Q.    How much time have you spent -- I
17 guess, let me back up.
18        The time you've spent working on
19 this case has been in 2021, correct?
20   A.    Correct.
21   Q.    And it's been the time we talked
22 about in the invoice, plus the other time you
23 billed since that time; is that right?
24   A.    Correct.

Page 38

1    Q.    Did you earn any fees as an expert
2  witness in 2020?
3    A.    No.
4    Q.    How about 2019?
5    A.    No.
6    Q.    Before this case, have you ever been
7  designated as an expert to testify about
8  cosmetics?
9    A.    No.
10   Q.    Before this case, have you ever been
11  designated as an expert to testify about cosmetic
12  regulations?
13   A.    No.
14   Q.    Have you ever been designated as an
15  expert to talk about pharmaceutical, medical
16  device, or over-the-counter regulations?
17   A.    No, but I don't do much expert
18  witness work.
19   Q.    Is this the only legal case you're
20  currently consulting on?
21   A.    Yes.
22   Q.    How many times have you given a
23  deposition?
24   A.    Only -- only once.

Page 39

1    Q.    When was that?
2    A.    That was, roughly, 10 years ago in
3  the antitrust litigation I mentioned.  An
4  excellent assistant section chief from the FTC
5  took my deposition in Austin, Texas on that case.
6    Q.    Who were the hospitals involved?
7    A.    It was two hospitals in Rockford,
8  and they have changed their names enough so that
9  I, frankly, can't remember.  I would have to look
10  at something to refresh my recollection.
11   Q.    Okay.  Have you ever taken a
12  deposition as a lawyer?
13   A.    No.
14   Q.    Have you ever testified in court?
15   A.    I've -- I've never testified as a
16  witness in court.  I've served on juries and have
17  voir dire.
18   Q.    Have you ever been hired by a
19  company to consult with regard to a cosmetic
20  ingredient?
21   A.    No.
22   Q.    Have you ever been hired by a
23  company to consult regarding a cosmetic product?
24   A.    No.

Page 40

1    Q.    Have you ever been hired by a
2  company to consult with regard to a prescription
3  drug?
4    A.    No.
5          May I just ask.  When you say "hired
6  by a company," I haven't, to my knowledge, been
7  hired by anybody for these purposes.  But when you
8  say "a company," do you mean by, I mean, as
9  opposed to a law firm or do you mean just all
10  others?
11   Q.    Yes, it would be a company.
12         My question would be:  Have you ever
13  been hired by a company who would -- who makes the
14  product --
15   A.    Okay.
16   Q.    -- the product I'm talking about, to
17  consult with regard to that particular product,
18  and my last question was a prescription drug?
19   A.    I understand now.
20   Q.    Have you ever been hired by a
21  company to consult with regard to a medical device
22  they are manufacturing?
23   A.    No.
24   Q.    Have you ever been hired by a

Page 41

1  company to consult with regard to an
2  over-the-counter product that they are
3  manufacturing?
4    A.    No.
5          Qualification, though I would not be
6  able to remember the details, is I provide
7  informal advice many times to people unpaid with
8  no documentation, often my own students, sometimes
9  students elsewhere in the university who are doing
10  collaborative startup work.  And they have
11  something that they are interested in and has a
12  health policy, health reimbursement, health law
13  type connection, and they reach out, and I am very
14  generous with my -- my unpaid time.
15         So it's quite possible that
16  something meeting these descriptions happened
17  during those contacts over the years.
18   Q.    Have you ever consulted with a
19  consumer product company on any issue?
20         DR. THOMPSON:  Object to form.
21         THE WITNESS:  Have I ever
22   consulted.  Again, for hire?  No.
23  BY MR. HEGARTY:
24   Q.    Has any cosmetic, pharmaceutical,

Page 42

1  company or over-the-counter company ever hired you
2  as a consultant for any issue?
3      A.    Would you repeat that question?
4      Q.    Sure.
5          Has any cosmetic, pharmaceutical, or
6  over-the-counter product company ever hired you to
7  assist them with anything?
8      A.    Again, not for hire.  Not for hire.
9  I have a wide circle of acquaintance.  I do
10  speaking for many organizations, including
11  conferences that may have been funded by
12  pharmaceutical companies over the years, but
13  nobody has hired me individually for consulting
14  advice.
15     Q.    Have you ever been -- strike that.
16         So you have never been employed by a
17  pharmaceutical, medical device, or consumer
18  product company, correct?
19     A.    Correct.
20     Q.    You've never worked for Johnson &
21  Johnson, correct?
22     A.    No.
23     Q.    You've never worked for any Johnson
24  & Johnson company, right?

Page 43

1      A.    I have had a lot of contact over the
2  years with the Robert Wood Johnson Foundation, and
3  I've been a recipient of at least one of their
4  grants, but I have not -- I haven't been hired by
5  a corporate entity having anything to do with
6  Johnson & Johnson.
7      Q.    Does Johnson & Johnson still --
8  strike that.
9          Does Johnson & Johnson still sell
10  Shower to Shower?
11     A.    I don't know.
12     Q.    You are not an expert in how a
13  cosmetic company operates, correct?
14         DR. THOMPSON:  Object to form.
15         THE WITNESS:  I am an expert
16  in how a lot of companies operate.  What
17  is particular to a cosmetic company I
18  couldn't say, but I have corporate law
19  practice experience.  I have corporate
20  law teaching experience.  I have
21  securities law teaching experience.
22         And my mother spent her career
23  doing fashion advertising.  So I suspect
24  I know a fair amount about corporate

Page 44

1      practice that would be relevant to
2      cosmetic companies.
3  BY MR. HEGARTY:
4      Q.    You have no personal experience on
5  working within a cosmetic company?
6      A.    Correct.
7      Q.    Have you ever assisted a company in
8  developing a cosmetic?
9      A.    No.
10     Q.    Have you ever assisted a company in
11  testing a cosmetic?
12     A.    No.
13     Q.    Have you ever assisted a company in
14  manufacturing a cosmetic product?
15     A.    No.
16     Q.    Have you ever assisted a company in
17  marketing a cosmetic?
18     A.    Personally, no.  My mom was involved
19  in some cosmetic advertising decades ago.
20     Q.    Have you ever been involved in a
21  company's analysis of safety data regarding a
22  cosmetic?
23     A.    No.
24     Q.    Have you ever advised a company

Page 45

1  about the testing needed to show the safety of a
2  cosmetic?
3      A.    No.
4      Q.    Have you ever assisted a company in
5  communicating with the FDA about a cosmetic?
6      A.    No.
7      Q.    Have you ever drafted a warning for
8  a cosmetic?
9      A.    No.
10     Q.    Have you ever -- have you ever
11  advised a cosmetic company about the need for a
12  warning on a cosmetic?
13     A.    No.
14     Q.    Have you ever worked with a company
15  on developing a warning for a cosmetic?
16     A.    No.
17     Q.    Have you ever drafted -- strike
18  that.  I asked you that.
19         Have you ever communicated with a
20  company about the cosmetic regulations?
21     A.    No.
22     Q.    Have you ever been employed by a
23  company in any capacity?
24         DR. THOMPSON:  Object to form.

Page 46

1  THE WITNESS: I'm not exactly
2  sure what you're asking, I mean.
3  BY MR. HEGARTY:
4  Q. It's as broad as it can be.
5  Have you ever worked for a company?
6  A. I mean, a law firm is a -- is a
7  company. So yes. (Laugh.)
8  Q. Have you ever worked for a company
9  outside of O'Melveny?
10  A. I worked -- I was a summer associate
11  at Davis Polk and Wardwell. (Laugh.)
12  Q. Fair enough.
13  You've never worked for FDA,
14  correct?
15  A. Correct. Oh, and, again, not a
16  company, but I -- I was a full-time federal
17  employee briefly in 1993 with the White House.
18  Q. But you never worked for FDA,
19  correct?
20  A. Correct.
21  Q. Have you ever worked for a
22  governmental agency?
23  A. Again I worked --
24  DR. THOMPSON: Object to form.

Page 47

1  THE WITNESS: I worked in the
2  White House in 1993 as a full-time
3  employee and, you know, with a clearance
4  and with a lot of connections with the
5  federal government.
6  I work extensively with state
7  governments on various issues from time
8  to time. I provide informal advice to
9  people in federal health agencies, in
10  self-regulatory organizations. It's what
11  I do. I mean, this is a career of this.
12  BY MR. HEGARTY:
13  Q. Understood. Let me ask it a
14  different way.
15  You've never been employed by a
16  governmental agency, correct?
17  DR. THOMPSON: Object to form.
18  THE WITNESS: Other than the
19  White House, no.
20  BY MR. HEGARTY:
21  Q. But you know government being the
22  job you had at the White House was not with an
23  agency, right?
24  A. It was not with a federal

Page 48

1  administrative agency, correct.
2  Q. You've never communicated with
3  anyone at FDA regarding a cosmetic, correct?
4  A. Correct.
5  Q. You've never served on any FDA
6  committees, correct?
7  A. Ever served on an FDA committee.
8  Correct.
9  Q. FDA has never contacted you about a
10  cosmetic, correct?
11  A. Correct.
12  Q. You've never worked with Health
13  Canada, correct?
14  A. Correct.
15  Q. You've never worked with any foreign
16  regulatory agency, correct?
17  A. It's a good question.
18  I have been an invited speaker and
19  conference participant in, you know, several
20  countries that involved health policy agencies,
21  health insurance agencies. I have had many
22  discussions over the years. I haven't worked on
23  discrete projects with them in a sustained way.
24  Q. You're not an expert in Canadian

Page 49

1  cosmetic regulations, correct?
2  DR. THOMPSON: Object to form.
3  THE WITNESS: Correct.
4  BY MR. HEGARTY:
5  Q. You've never communicated directly
6  with Health Canada, correct?
7  A. Correct.
8  Q. You cannot cite to me a single
9  cosmetic -- you cannot cite to me a single
10  Canadian cosmetic regulation, can you?
11  DR. THOMPSON: Object to form.
12  THE WITNESS: Can I cite?
13  No. But my habit is always to look
14  things up. So I don't cite very much.
15  Have I now read a little about Canadian
16  cosmetic regulation? Yes, but I don't --
17  I don't know chapter and verse.
18  BY MR. HEGARTY:
19  Q. Have you ever read the Canadian
20  cosmetic regulations?
21  A. No.
22  Q. Have you ever referenced in any
23  publication of yours a Canadian regulation
24  regarding cosmetics?

William M. Sage, MD, JD

Page 50

1    A.    Regarding cosmetics?  No.
2    Q.    Have you ever referenced in any
3  publication of yours a finding by Health Canada?
4         DR. THOMPSON:  Object to form.
5         THE WITNESS:  I don't believe
6    so.
7  BY MR. HEGARTY:
8    Q.    Do you claim to be an expert in
9  Health Canada's risk assessment process?
10        DR. THOMPSON:  Object to form.
11        THE WITNESS:  I have read
12    their weight of evidence documents, which
13    are compatible with documents elsewhere,
14    and I've worked on harmonization efforts
15    involving drug approval regulations
16    involving many countries, including the
17    Canadian system, but I don't know what
18    more than that I could -- I could offer.
19  BY MR. HEGARTY:
20    Q.    Well, with regard to the Canadian
21  risk assessment process, the only document you've
22  read about that is the 2001 Canadian FSAR,
23  correct?
24        DR. THOMPSON:  Object to form.

Page 51

1         THE WITNESS:  I would have to
2    look at what exactly the document you --
3    I've read -- I thought it was a
4    considerably more recent document on
5    weight of evidence explaining how they do
6    their risk assessment, what evidence, you
7    know, is -- is incorporated, what might
8    not be.
9         I'm familiar with risk
10    assessment documents for many contexts,
11    whether European precautionary principle
12    documents or, you know, U.S.
13    cost-effectiveness, cost-benefit
14    executive order type economic analysis
15    regulation documents.  I don't know the
16    ins and outs of them.  I have a good
17    familiarity with how the system works.
18  BY MR. HEGARTY:
19    Q.    Have you read anything about Health
20  Canada's risk assessment as it relates to talc
21  before being contacted by plaintiffs' counsel in
22  this case?
23    A.    No.
24    Q.    And you have read the Health Canada

Page 52

1  FSAR for talc, correct?
2    A.    Again, I am not great with acronyms.
3  If you want to show me?
4    Q.    Sure.
5    A.    It may be in my binder, but I just
6  want to make sure I'm looking at the right thing.
7         MR. HEGARTY:  I'll show you a
8    copy of it, and I'll mark as an exhibit.
9         (Document marked for
10    identification as Sage Exhibit 2.)
11  BY MR. HEGARTY:
12    Q.    I'm marking as Exhibit No. 2 the
13  screening assessment by --
14    A.    Yeah.
15    Q.    -- Health Canada for talc that's
16  dated April 21 -- April 2021.
17         And you have read this document,
18  correct?
19    A.    Yes, I have -- I have reviewed this
20  document, which means reading much of it.  Did I
21  read every word?  Probably not.
22    Q.    And you mentioned before that you
23  had not read it prior to being contacted by
24  counsel for plaintiffs in this case?

Page 53

1    A.    That's correct.
2    Q.    Do you know who wrote this document?
3    A.    No.
4    Q.    Do you know who was involved in
5  analyzing the data in putting this document
6  together?
7    A.    As individuals, no.  I would assume
8  that Health Canada is at governmental level
9  responsible for the assessments they issue.
10    Q.    Do you know the expertise of anyone
11  involved in putting Exhibit No. 2 together?
12    A.    I can make inferences, but, no.
13    Q.    Did you submit any material as part
14  of this Health Canada process that led to Exhibit
15  No. 2?
16    A.    No.
17    Q.    Did you or have you communicated
18  with Health Canada regarding this assessment?
19    A.    No.
20    Q.    Did you know Health Canada was even
21  doing an assessment about talc prior to being
22  contacted by plaintiffs' counsel in this case?
23    A.    No.
24    Q.    Do you recall from reading Exhibit

Page 54

1  No. 2 that it references as part of its reliance
2  materials expert reports from U.S. litigation?
3      A.    I don't recall anything about the
4  references in this report.
5      Q.    Well, if you turn to, for example,
6  page 55 of this report that we marked as Exhibit
7  No. 2 --
8      A.    Uh-huh.
9      Q.    -- and four lines up from the bottom
10  of that page, there's a reference -- let me --
11  that's not the right one.  I'll find the one I
12  want to reference you to.
13          Okay.  If you go to page 62.  I'm
14  sorry.  Two lines up from the bottom, there's a
15  reference to a Rule 26 expert report of Judith
16  Wolf from 2018.
17          Do you see that?
18      A.    I do.
19      Q.    Had you noted that before I pointed
20  that out to you right now?
21      A.    No.
22          The one you referenced earlier on
23  page 55, the McTiernan, reminded me that I did
24  review Congressional testimony as part of learning

Page 55

1  about these issues --
2      Q.    Okay.
3      A.    -- and formulating my opinions.
4      Q.    And if you go over to page 59, do
5  you see about five lines down from the top and
6  about another five lines down, there's a reference
7  to an expert report by Jack Siemiatycki and a
8  reference to an expert report by Rebecca
9  Smith-Bindman?
10          Do you see that?
11      A.    Yes.
12      Q.    Do you see that those reports are in
13  the same case in which your expert report was
14  filed, the United States District Court for the
15  District of New Jersey MDL?
16      A.    Yes.  I also see one in between the
17  two.  Actually, I see a couple including those
18  there.
19      Q.    Yes.
20          Dr. Singh.  You see that?
21      A.    Yes.
22      Q.    And a Dr. Ellen Blair Smith?
23      A.    Yes.
24      Q.    You understand that those are all

Page 56

1  plaintiff experts?
2      A.    I didn't know that but --
3      Q.    Okay.
4      A.    -- I'll take your word for it.
5      Q.    Can you cite for me any time FDA has
6  cited to litigation expert reports in publishing a
7  safety finding?
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  That is exactly
10      the sort of question I would research
11      before offering a view on.
12  BY MR. HEGARTY:
13      Q.    Do you know if Health Canada has
14  ever in any safety assessment cited expert reports
15  from U.S. litigation?
16          DR. THOMPSON:  Object to form.
17          THE WITNESS:  I'm not aware
18      of that, but this is the research
19      process.  I don't give casual reads on
20      complicated facts.  I look things up.
21  BY MR. HEGARTY:
22      Q.    In any published article of yours,
23  have you ever cited an expert report from a
24  litigation?

Page 57

1      A.    Not to my -- not to my knowledge,
2  but it's possible.
3      Q.    Do you -- don't you find it unusual
4  that a governmental agency would cite to a
5  litigation report as part of its reliance
6  material?
7      A.    I don't find --
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  I don't find it
10      in the least unusual.  One takes
11      information where one gets it.  One
12      weighs its importance, its reliability.
13          If I were -- if I were
14      advising a risk assessment body, I would
15      not put blanket exclusions on what it
16      considers.
17  BY MR. HEGARTY:
18      Q.    You're familiar with IARC?
19      A.    Briefly, yes.
20      Q.    Okay.  Did you have any awareness of
21  IARC prior to being contacted by plaintiffs'
22  counsel in this case?
23      A.    I'd seen --
24          DR. THOMPSON:  Object to form.

Page 58

1    THE WITNESS:   I had seen the
2  acronym.  I knew there was such a body.
3  I hadn't read any of their specific
4  assessments.
5        MR. HEGARTY:  Mark as Exhibit
6  No. 3 a copy of the curriculum vitae of
7  yours that we were provided in this
8  litigation.
9        (Document marked for
10  identification as Sage Exhibit 3.)
11  BY MR. HEGARTY:
12    Q.    Would you look at that document and
13  tell me whether this is your current curriculum
14  vitae.
15    A.    (Reviews document.)
16        This is not the most recent version.
17  I think I was asked to provide an update that
18  included the GW visit, which is how I'm judging
19  it --
20    Q.    Okay.
21    A.    -- and this doesn't include that.
22    Q.    Did you bring a copy of your updated
23  curriculum vitae?
24    A.    Yes.

Page 59

1    Q.    Do you have it with you?
2    A.    Yes, I think -- well, I think -- let
3  me see.  I definitely do.  Let me see what...
4        MR. HEGARTY:  Well, we can
5  come back.  Can I get a copy of that when
6  we have a break if you don't have it?
7        DR. THOMPSON:  I believe
8  that --
9        MS. PARFITT:  I thought that
10  was given to you.
11        DR. THOMPSON:  -- was given to
12  you in the production but...
13        MR. HEGARTY:  Okay.  The one I
14  had brought with me that I had asked
15  folks to give me is the one I marked as
16  Exhibit No. 3.
17        THE WITNESS:  Yeah.  So --
18        MS. PARFITT:  We can check and
19  substitute it.
20        MR. HEGARTY:  Okay.
21        DR. THOMPSON:  But I believe
22  the only change was his current position
23  at GW so...
24        THE WITNESS:  And a couple of

Page 60

1  articles that are now either published or
2  in the works that weren't listed before.
3        MR. HEGARTY:  If you could at
4  a break get us a copy -- get me a copy of
5  that, I would appreciate that.  And I'll
6  come back and just mark that as an
7  exhibit.
8  BY MR. HEGARTY:
9    Q.    Dr. Sage, do you understand that
10  we're here today to take your deposition in the
11  case of In re: Johnson & Johnson Talc Litigation
12  MDL, correct?
13    A.    Yes.
14    Q.    Who are the Johnson & Johnson
15  companies in this case?
16    A.    Again, I have not reviewed the case
17  file in a litigation posture.
18        My understanding is that Johnson &
19  Johnson's consumer subsidiary is the focal
20  defendant.  I don't recall whether the Johnson &
21  Johnson parent is also named.  What little I know
22  of litigation would suggest that many parties are
23  named.
24    Q.    You did mention the consumer

Page 61

1  company.  There's Johnson & Johnson Consumer, Inc.
2        Do you know when that company came
3  into existence?
4    A.    No.
5    Q.    Did you break down for purposes of
6  your report any analysis looking at the activities
7  between Johnson & Johnson and Johnson & Johnson
8  Consumer, Inc.?
9        DR. THOMPSON:  Object to form.
10        THE WITNESS:  I did in -- in
11  my report.  I was very interested in how
12  the Johnson & Johnson companies were
13  organized in terms of what regulated
14  products they produced, not just
15  cosmetics, but drugs, medical devices,
16  and the like and so, you know, I at a
17  high level of generality reviewed the
18  organizations.
19        And I think at some point,
20  there is a paragraph here that points out
21  Johnson & Johnson's umbrella expertise
22  and which subsidiaries have which
23  divisions.  All of which I thought was
24  interesting as it related to their

Page 62

1    regulatory experience and obligations.
2 BY MR. HEGARTY:
3    Q.    But in terms of the analysis that
4 you prepared across your report, did you break
5 down the analysis as between the Johnson & Johnson
6 and Johnson & Johnson Consumer, Inc. companies?
7         DR. THOMPSON:  Object to form.
8         THE WITNESS:  No, I don't have
9    the specific details to explain that
10   functionally, and as you well know in
11   terms of legal accountability, the
12   functional assignment and legal
13   accountability are not always the same.
14 BY MR. HEGARTY:
15   Q.    When were you first contacted about
16 serving as an expert in this case?
17   A.    Probably sometime in May of 2021.
18   Q.    Who contacted you?
19   A.    Dr. Margaret Thompson.
20   Q.    How was this contact made?
21   A.    Possibly e-mail, possibly telephone,
22 possibly incidental to a general catch-up
23 conversation.
24   Q.    Do you recall getting e-mails from

Page 63

1 Ms. Thompson -- Dr. Thompson prior to --
2    A.    Thank you.
3    Q.    -- about potentially serving as an
4 expert witness before you agreed to serve as an
5 expert?
6    A.    I'm sure there are e-mails that
7 discuss it in some -- in some degree because I
8 don't solicit expert witness work, and it was
9 important to me to understand both the
10 relationship between my regulatory expertise and
11 this matter and, you know, where my analysis was
12 likely to lead before I would agree to become an
13 expert witness.
14   Q.    Do you still maintain those e-mails?
15   A.    I'm sure they exist, as all e-mails
16 exist.
17         MR. HEGARTY:  Well, we would
18   ask you to retain those e-mails, and we
19   will make a request for a copy of any
20   e-mails that were generated prior to Dr.
21   Sage agreeing to serve as an expert
22   witness.
23         DR. THOMPSON:  And -- sorry.
24         MR. HEGARTY:  Go ahead.

Page 64

1         DR. THOMPSON:  And I would
2    claim that those e-mails are privileged
3    as --
4         MR. HEGARTY:  I understand.
5         DR. THOMPSON:  -- a discussion
6    of serving as an expert.
7         MR. HEGARTY:  Understood.
8 BY MR. HEGARTY:
9    Q.    When was it that you agreed to serve
10 as an expert witness in relation to the first
11 contact?
12   A.    Within a month.
13   Q.    Apart from anything that you were
14 told by the attorneys during your communications,
15 do you know how they came to contact you?
16         DR. THOMPSON:  Object to form.
17 BY MR. HEGARTY:
18   Q.    How Ms. Thompson -- Dr. Thompson
19 came to contact you?
20   A.    No.
21   Q.    Do you have any social or business
22 relationship to Dr. Thompson?
23   A.    Yes.  Dr. Thompson is one of my
24 former law students at the University of Texas,

Page 65

1 and I taught her in more than one class and she
2 was a great student.
3    Q.    What years did you teach her at the
4 law school?
5    A.    I would have forgotten exactly what
6 years, but I was reminded that I think it was 2004
7 or thereabouts.  So probably 2004/2005 or so.
8    Q.    Have you maintained any type of
9 social relationship with Dr. Thompson since you
10 taught her in law school?
11         DR. THOMPSON:  Object to form.
12         THE WITNESS:  I've maintained
13   the sorts of relationship I would have
14   with former students and, you know,
15   because Dr. Thompson and my family have
16   moved in similar social circles in Austin
17   during this time, we will run into each
18   other from time to time.
19 BY MR. HEGARTY:
20   Q.    Would you -- would you call
21 Dr. Thompson a friend apart from your work on this
22 case?
23   A.    Yes, definitely.
24   Q.    Had you known any of the other

Page 66

1 lawyers for the plaintiffs in which you have
2 worked on on this case prior to your working with
3 them?
4     A.    No.  Since you said for the
5 plaintiffs, that would exclude John Beisner.
6     Q.    Correct.
7           Had you had any working relationship
8 with Dr. Thompson prior to her contacting you
9 about potentially serving as an expert in this
10 case?
11    A.    We had had informal conversations
12 over the years about various things of the sorts
13 that I will routinely have with my former
14 students.
15    Q.    Give me an example.
16    A.    She would be working on vaginal mesh
17 litigation, and we would have a discussion of
18 vaginal mesh.
19    Q.    In what sense of a discussion would
20 you have?
21    A.    I can't recall.
22    Q.    Okay.  Does your wife have a social
23 relationship with Dr. Thompson?
24    A.    Former wife.  We're divorced.

Page 67

1     Q.    What's her name?
2     A.    Karen Sage.
3     Q.    She's a judge, correct?
4     A.    Correct.
5     Q.    Does Judge Sage have a social
6 relationship to your knowledge with Dr. Thompson?
7     A.    Yes.
8     Q.    Has she had any working relationship
9 with Dr. Thompson?
10    A.    Not to my knowledge.
11    Q.    Has Dr. Thompson or her firm ever
12 donated to your wife's campaign?
13          DR. THOMPSON:  Object to form.
14          THE WITNESS:  I don't know
15       that for a fact.  I would imagine that
16       Dr. Thompson did donate to -- to my
17       former wife's first campaign, but I have
18       no recollection of specifics, and I
19       certainly know nothing about subsequent
20       campaigns.
21 BY MR. HEGARTY:
22    Q.    Do you know if Dr. Thompson has
23 had -- ever had any involvement in any of your
24 wife's political campaigns?

Page 68

1     A.    Yes.  She had some involvement in
2 the first campaign.  I don't remember exactly for
3 how long.
4     Q.    When was that involvement?
5     A.    I don't exactly recall.  She -- she
6 helped Karen with some of the earliest fundraising
7 activities.  I don't know the details or don't
8 remember them.
9     Q.    This would have been at a time that
10 you were still married, correct?
11    A.    Yes, this would have been in 2010.
12    Q.    Do you know Dr. Ellen Smith?
13    A.    I'm sorry.  Ellen with an E?
14    Q.    Yes.
15    A.    Common name, but I don't think I do.
16    Q.    Do you know her husband, Dr. Alan
17 Campion?
18    A.    Also a name I think I have heard;
19 but, no, not personally.
20    Q.    Do you know Thomas Dydek?
21    A.    So Dydek is -- is Dr. Thompson's --
22 one of Dr. Thompson's sons' names, and I taught
23 one of Dr. Thompson's sons at Harvard Law School.
24 They're actually the only mother/son combination I

Page 69

1 recall teaching in my career.
2     Q.    Do you know if any attorney for the
3 plaintiffs in this case besides perhaps
4 Dr. Thompson ever donated any money to your wife's
5 campaign?
6     A.    I have no knowledge of that.
7     Q.    Prior to being -- to agreeing to
8 serve as an expert witness in this litigation, did
9 attorneys for plaintiff tell you anything about
10 the litigation?
11    A.    Yeah.
12          DR. THOMPSON:  Object to form.
13          THE WITNESS:  Well, yes.
14 BY MR. HEGARTY:
15    Q.    What did they tell you?
16          DR. THOMPSON:  And I'm going
17       to instruct you not to answer what we
18       told you about the litigation.
19 BY MR. HEGARTY:
20    Q.    Okay.  Prior to agreeing to serve as
21 an expert witness, did counsel for plaintiffs show
22 you any documents?
23    A.    Yes, in that I think I specifically
24 asked for the most recent court ruling, one of the

William M. Sage, MD, JD

---

Page 70

¹ Daubert causation type rulings.  I thought that
² would give me some of the -- the background I
³ needed to evaluate the overall litigation and
⁴ whether my particular expertise would be relevant
⁵ and appropriate.
⁶      Q.    I want to make this clear if it's
⁷ not.
⁸            Was there a time before you had
⁹ agreed -- was there a time between the first
¹⁰ contact that you had with Dr. Thompson and you
¹¹ actually agreeing to serve as an expert witness?
¹²      A.    Absolutely.  There was a long period
¹³ of time that I had to understand how my expertise
¹⁴ fit with this litigation, understand what I
¹⁵ thought about the defendants' conduct and
¹⁶ compliance or noncompliance with regulation.
¹⁷ Yeah, I thought very seriously about it.
¹⁸      Q.    And during that period of time, did
¹⁹ you -- did you -- let me back up.
²⁰            Did you ultimately bill any of the
²¹ time you spent doing that to the plaintiffs'
²² counsel after agreeing to serve as an expert
²³ witness?
²⁴      A.    Certainly not.

---

Page 71

¹            DR. THOMPSON:  Object to form.
²            THE WITNESS:  Certainly not.
³      I, frankly, bill minimally for these
⁴      things.
⁵ BY MR. HEGARTY:
⁶      Q.    And during this period of time, did
⁷ you consider yourself as being a retained expert
⁸ for the plaintiffs?
⁹            DR. THOMPSON:  Object to form.
¹⁰            THE WITNESS:  I considered
¹¹      myself being asked to consider being an
¹²      expert.  I was -- this was in the context
¹³      of being asked to serve as an expert.
¹⁴            Did I consider myself already
¹⁵      aligned with the plaintiffs' position?
¹⁶      Certainly not.  I was making an
¹⁷      independent decision.
¹⁸ BY MR. HEGARTY:
¹⁹      Q.    You mentioned that you requested the
²⁰ Daubert ruling.
²¹            Had you heard of the Daubert ruling
²² before being contacted by plaintiffs' counsel?
²³      A.    Before being contacted by
²⁴ Dr. Thompson, no.  But in part of those

---

Page 72

¹ discussions, she referred to what had happened
² with the case recently, including the Daubert
³ ruling, and as you might imagine given my career,
⁴ I like to read things and see for myself, and so I
⁵ wanted that document.
⁶      Q.    Had you heard of lawsuits involving
⁷ talc and ovarian cancer before being contacted by
⁸ Dr. Thompson?
⁹      A.    Yeah, certainly.
¹⁰      Q.    And where had you heard of those
¹¹ lawsuits?
¹²      A.    In my, you know, daily and weekly
¹³ health law litigation, professional
¹⁴ responsibility, tort liability, e-mail and news
¹⁵ feeds, and the things I read professionally on a
¹⁶ routine basis.
¹⁷      Q.    And how much had you read, whether
¹⁸ you do it by volume or time, spent about cases or
¹⁹ litigation involving talcum powder use and ovarian
²⁰ cancer before being contacted by Dr. Thompson?
²¹      A.    It had been infrequent.  I would --
²² I would, you know, see this type of multidistrict
²³ or multi-plaintiff litigation referred to the same
²⁴ way I'd seen other cases referred to.  It didn't

---

Page 73

¹ particularly attract my attention, but I certainly
² would read it.  It was important.
³      Q.    And you mentioned the Daubert
⁴ ruling.
⁵            What other documents did you review
⁶ between the time you were contacted by
⁷ Dr. Thompson and when you were -- you agreed to
⁸ serve as an expert as you were doing this
⁹ evaluation yourself?
¹⁰      A.    That's the -- that's the document
¹¹ that the plaintiffs' lawyers provided that I
¹² remember at the moment.  I did not ask for or
¹³ receive any corporate or confidential documents.
¹⁴ And I think what I did with respect to the talc
¹⁵ litigation was more of the Google search of what
¹⁶ might have happened recently and what I would see.
¹⁷            And then I thought it worth
¹⁸ reviewing the basics of -- of cosmetics regulation
¹⁹ again to refresh my understanding of how the
²⁰ cosmetics piece fit in the larger FDA scheme.
²¹      Q.    And prior to being contacted by
²² counsel for plaintiffs, Dr. Thompson, had you
²³ formed any opinions about with regard to
²⁴ litigation involving talcum powder use and

---

William M. Sage , MD, JD

Page 74

1 allegations of ovarian cancer?

2    A.    No.

3    Q.    You were ultimately hired as an

4 expert witness in this case; is that correct?

5    A.    Correct.

6    Q.    The lawyers for the plaintiffs paid

7 you to review materials and then offer opinions,

8 right?

9    A.    Correct.

10    Q.    Those opinions were ultimately set

11 out in your July 2, 2020 -- 2021 MDL report; is

12 that correct?

13    A.    Correct.

14    Q.    And that is the report we marked as

15 Exhibit No. 1; is that right?

16       I'm sorry, not Exhibit No. 1.  Let

17 me back up.  I don't think I marked it.

18    A.    I don't think you marked it yet

19 either but I --

20    Q.    Yes.  Let me go ahead and mark that.

21    A.    I have a copy of it in front of me.

22       MR. HEGARTY:  So let me mark

23    your July 2, 2021 MDL report as Exhibit

24    No. 4.

Page 75

1       (Document marked for

2    identification as Sage Exhibit 4.)

3 BY MR. HEGARTY:

4    Q.    And would you confirm for me that

5 Exhibit No. 4 is a copy of your July 2, 2021

6 expert report?

7    A.    Yes, confirmed.

8    Q.    And your invoice that we marked

9 previously sets out the hours you spent reviewing

10 materials in connection with your work to prepare

11 the report, correct?

12    A.    Yes.

13    Q.    It also sets out the time you spent

14 drafting the report, right?

15    A.    Yes.

16    Q.    And with regard to this deposition

17 that we're here today to do, how many -- how much

18 time did you spend preparing for this deposition?

19    A.    Again, I think I -- when you asked

20 earlier about accrued but unbilled time, I said I

21 think there's about 40 hours, not including today,

22 that have accrued between the filing of this

23 report and now.  That wasn't all preparation for

24 the deposition.  It was additional review of

Page 76

1 materials, additional sort of building my

2 knowledge of the facts and circumstances.

3    Q.    Are you able to break down the hours

4 that you have spent since your last invoice on how

5 much time you spent preparing for this deposition?

6    A.    Not off the top of my head.  I do

7 keep, you know, notes of -- of hours per day in a

8 general sense of what I'm spending them on.  So,

9 yes, I could -- I could break that out.

10    Q.    Do you have --

11    A.    I would think it should be the

12 majority of the 40 hours because this was the

13 focal point, and we've rescheduled a little and

14 it's, you know.

15    Q.    Have you spoken with any of your

16 colleagues at work about your work on this case?

17    A.    No.

18    Q.    Have you told any of them -- any of

19 the colleagues that you have at work -- about your

20 opinions in this case?

21    A.    No.

22    Q.    Have you told any of the

23 gynecologists and gynecologic oncologists at the

24 University of Texas Dale Medical School of your

Page 77

1 opinions?

2    A.    No.

3    Q.    How about those same doctors at

4 McGovern Medical School?  Have you talked to

5 them --

6    A.    Which is --

7    Q.    -- about your opinions?

8    A.    I'm sorry.  You would have to remind

9 me what McGovern Medical School is.

10    Q.    Okay.  You don't know what that is?

11    A.    There -- there have been McGovern

12 names involved in some of the University of Texas

13 areas, but I don't actually know.

14    Q.    Well, let me ask in a broader sense.

15       Have you spoken to any gynecologist

16 or gynecologic oncologist at any UT healthcare

17 facilities about your opinions in this case?

18    A.    No.

19    Q.    Have you told any doctors treating

20 patients for ovarian cancer about your opinions in

21 this case?

22    A.    No.

23    Q.    Have you told anyone at FDA about

24 your opinions?

1    A.    Not yet, but I'm -- I haven't seen
2 people yet in DC, and should I see people, I will
3 be interested in discussing this with them.
4    Q.    Do you currently have plans to
5 submit your report or otherwise communicate with
6 FDA about your opinions in this case?
7    A.    I -- part of what I do routinely is
8 work with government agencies, with legislators
9 federal and state and, yes, I'm sufficiently
10 concerned about some of the things that I've
11 reached conclusions about in connection with this
12 report that, yes, I intend to talk to people.
13       I suspect I more like to talk --
14 more likely to talk to Congressional staffers than
15 I am to FDA people because I think I'm more likely
16 to be in contact with those people.
17    Q.    Have you communicated with anyone as
18 of today outside of plaintiffs' lawyers about your
19 report?
20    A.    No.
21    Q.    Have you discussed this litigation
22 or your report with any other experts that have
23 been identified by the plaintiffs in the MDL case?
24    A.    No.

1       I'm very interested in what the
2 defense experts might say with respect to my
3 opinions.  So if those people exist, I'll look
4 forward to reading what they -- what they think.
5       MR. HEGARTY:  I'm going to
6    mark as exhibit number -- I guess, before
7    I do that, do you want to take a break at
8    this point?
9       MS. THOMPSON:  I was just
10    thinking it's about time.
11       MR. HEGARTY:  Yeah, let's take
12    a break.
13       DR. THOMPSON:  It's a good
14    spot.
15       MR. HEGARTY:  Yeah, it's a
16    good spot.  Let's go off the record.
17       (Recess:  9:21 a.m. -
18       9:35 a.m.).
19       MR. HEGARTY:  We're back on
20    the record.
21 BY MR. HEGARTY:
22    Q.    Doctor, when we broke, I was going
23 to show you a portion of your -- let me back up
24 before I do that.  I want to make sure I take care

1 of this housekeeping matter.
2       You brought some materials with you
3 here today; is that correct?
4    A.    Yes.
5    Q.    The notebook sitting in front of
6 you?
7    A.    Yes.
8    Q.    Is that a notebook you put together?
9    A.    No.
10    Q.    Who put it together?
11    A.    The plaintiffs' lawyer.
12    Q.    Did they put it together at your
13 direction?
14    A.    I asked them to provide me with
15 things that would be helpful, as I haven't been
16 deposed in years.
17    Q.    Could you walk me through what's in
18 the notebook?
19    A.    Certainly.
20       There's -- there's the notices of
21 deposition.  There's the report with attachments.
22 My invoice was here.  There's a separate copy of
23 my CV, though I noticed it was also attached to
24 the report.  There's the FDA's response to the two

1 Citizen's Petitions from 2014.  There's some IARC
2 material.  There's some Health Canada material,
3 and there's your client's submission to Health
4 Canada.  And then there's a little loose material.
5    Q.    What is that loose material?
6    A.    The loose material is the casebook
7 chapter on cosmetics that I cite in the report.  I
8 requested specifically the most recent Senate
9 version of the Personal Care Product Safety Act
10 bill that's been introduced.
11       There's the NCI informal statements
12 on talc and ovarian cancer and there's a small
13 acronym glossary that I asked -- that I
14 specifically asked for just to refresh my memory
15 about things like, you know, the Personal Care
16 Products Council and what things are called so
17 that I remember.
18       And then there's this FDA internal
19 review from 1998 that actually talks about the
20 inadequacies of the CIR and actually raises
21 concerns about the safety of talc regarding
22 ovarian cancer.
23    Q.    Can I see that document, please?
24    A.    Certainly.

Page 82

1    Q.    It is a document Bates number
2  PCPC058604 to 058654.
3         Is this a document you've read?
4    A.    Yes.
5    Q.    And then you mentioned a list of
6  acronyms.
7         Is that something the lawyers for
8  the plaintiffs prepared for you?
9    A.    At my request very specifically.
10        MR. HEGARTY:  Okay.  Thank
11    you.
12        I mark next as Exhibit 5 a
13    portion of your expert report.
14        (Document marked for
15    identification as Sage Exhibit 5.)
16 BY MR. HEGARTY:
17   Q.    And feel free to refer to that or go
18 to your expert report where that part is.
19        It is the document that you have or
20 the part of your report that has "Literature" at
21 the top of it in the upper left-hand corner.
22 Pages 1 through 18.
23        And if you could look through that
24 document and tell me whether you have read all the

Page 83

1  material that is listed in those pages.
2    A.    All the material that was in these
3  pages was made available to me.  I read word for
4  word certain items that I thought were relevant
5  and important for my consideration.  Other things
6  I may have looked at part of.  Other things I may
7  have looked at by title.
8         And when there were statements in my
9  report that required or benefited from having
10 cross-references to litigation documents, those
11 would have been materials that plaintiffs' counsel
12 supplied for the footnoting, and some of those I
13 would not have read.
14   Q.    You said made available to you, are
15 all the materials that are contained in Exhibit
16 No. 5 sent to you by counsel for the plaintiffs?
17   A.    There was a Dropbox account made
18 available that I -- that I could access.  Certain
19 materials were also e-mailed to me.  Usually
20 things that I had either specifically asked for or
21 came out of drafts through discussions.
22        I had certain things that I was very
23 interested in in reviewing in detail.  I tended to
24 ask for those, and that included a lot of the

Page 84

1  underlying science because I actually am capable
2  of reading the underlying science, and I wouldn't
3  be comfortable with only having secondary sources
4  on the underlying science.
5    Q.    With regard to this document we're
6  looking at, Exhibit No. 5, did you prepare this?
7    A.    No, this was --
8    Q.    Who prepared it?
9    A.    Probably Brianne with the
10 plaintiffs' lawyers.
11   Q.    And with regard to the materials
12 that are listed in Exhibit No. 5, do you know how
13 the plaintiffs' lawyers went about selecting these
14 materials to send to you?  What their methodology
15 was?
16        DR. THOMPSON:  Object to form.
17        THE WITNESS:  In many
18    instances, it was a specific request.  I
19    requested a lot of the science.  I
20    requested a lot of the historical
21    background for context for the science.
22        I was interested in certain
23    types -- certain of the deposition
24    testimony.  I was interested in

Page 85

1    legislative action.
2         I was very specifically
3    interested in the defendants' responses
4    in the defendants' case, and I repeatedly
5    asked when we're considering particular
6    questions, you know, well, what would the
7    defense say on this?
8  BY MR. HEGARTY:
9    Q.    You did receive some materials from
10 the plaintiffs' counsel that you did not
11 specifically request; is that correct?
12   A.    Yes.
13   Q.    Do you know how as to those
14 materials the plaintiffs' lawyers went about
15 choosing what to send to you?
16   A.    No, I don't know.
17   Q.    And with regard to the -- or let me
18 back up.
19        Do you understand the materials that
20 we're looking at listed in Exhibit No. 5 include
21 expert reports and some expert depositions.
22        Do you recall that?
23   A.    Yes.
24   Q.    Are you aware that there are

Page 86

1 hundreds more expert reports and depositions from
2 the litigation, the MDL litigation, that are not
3 on this list of materials?
4     A.    I would assume that.  I don't know
5 that for a fact.
6     Q.    Do you understand that this list
7 only includes two reports from defense experts,
8 Dr. Weed and Dr. Anderson.
9         Do you understand that?
10     A.    I would have to go look through
11 this; but, yes, I will take your word for that.
12     Q.    Well, did you ask plaintiffs'
13 counsel to give you all the defense expert reports
14 and depositions?
15     A.    I did not ask for all of the
16 plaintiffs' and I did not ask for all of the
17 defense.  I asked for documents that would express
18 key aspects of the defense positions.
19     Q.    Well, you --
20     A.    And I asked specifically for
21 anything that might relate to -- to the regulatory
22 analysis, of course.
23     Q.    But you would agree that you have
24 not done a comprehensive analysis of the expert

Page 87

1 reports and depositions in the MDL, correct?
2         DR. THOMPSON:  Object to form.
3         THE WITNESS:  I think I
4     considered everything I needed to
5     consider to formulate my opinions.
6 BY MR. HEGARTY:
7     Q.    How do you know you considered
8 everything you needed to consider if you don't
9 know what others have said in reports and
10 depositions that you don't have?
11         DR. THOMPSON:  Object to form.
12         THE WITNESS:  If there's a
13     set of regulatory opinions from defense
14     experts, I would love to see them and I
15     would be happy to take account of them in
16     finalizing my views.
17         My -- my understanding was
18     that -- having asked, was that there were
19     not defense expert reports specific to
20     regulation at this at this juncture.  If
21     that's wrong, I'd love to know.
22 BY MR. HEGARTY:
23     Q.    Well, you understand that the
24 reports and depositions included in Exhibit No. 5

Page 88

1 are some that go into the science and not the
2 regulatory issues, correct?
3     A.    Yes.  I reviewed some science and I
4 was particularly interested in regulatory
5 materials, especially deposition testimony, and I
6 was particularly interested in marketing-related
7 materials because that goes to the informational
8 environment and the informational obligations of a
9 cosmetics manufacturer.
10     Q.    But you did not request all the
11 science reports and depositions of the defense
12 expert witnesses, correct?
13     A.    That is correct.  I requested
14 specifically what might be considered the key
15 scientific studies on both sides of the question,
16 and I very emphatically requested both sides of
17 the question.
18     Q.    Did you request the key scientific
19 opinions to the reports and depositions of all the
20 witnesses, regardless on what side they are on?
21     A.    I didn't request every opinion.  I
22 was more interested in the underlying published
23 scientific literature, to the extent it existed,
24 and deposition testimony that would supplement it

Page 89

1 where you couldn't actually assess the science
2 from what had been published.
3     Q.    In your expert report, you actually
4 cite to a report by Drs. Longo and Rigler.
5         Do you recall that?
6     A.    I do recall that.
7     Q.    Do you recall that that's the only
8 expert report that you specifically cite in the
9 body of your written report?
10     A.    As -- as I recall, that is an expert
11 report that relates to adulteration of talcum
12 powder products with asbestos, and it was
13 sufficiently important to highlight in the body of
14 the report.
15     Q.    Do you intend to rely on any other
16 expert report or deposition besides Drs. -- the
17 report of Drs. Longo and Rigler cited in the body
18 of your expert report?
19     A.    I consider --
20         DR. THOMPSON:  Object to form.
21         THE WITNESS:  I consider
22     everything.  Given the nature of my
23     regulatory expertise and the fundamental
24     opinions that I'm expressing, I think

William M. Sage, MD, JD

Page 90

1  it's really a question of the totality of
2  the evidence in front of me.
3           I don't think there's any
4  single material that that I rely on in
5  the sense if you're suggesting that my
6  opinions depend only on one particular
7  report.
8  BY MR. HEGARTY:
9      Q.    Well, there what I want to try to
10 find out is if you see a distinction between what
11 you considered and what you relied upon.
12     A.    I considered.
13          DR. THOMPSON:  Object to form.
14          THE WITNESS:  My -- it's been
15 an education to me to learn how these
16 terms are used in this type of
17 proceeding.
18          I think one expresses the fact
19 of the matter and how I think about it is
20 that I request a lot of material.  I'm
21 provided a lot of material.  I consider
22 everything that I'm provided.
23          I don't feel that any piece of
24 my opinion is driven by reliance on one

Page 91

1  or a small number of documents.
2           Where I tend to think about
3  the term "reliance" is that I'm not
4  formulating independent scientific
5  conclusions; and so if we're talking
6  about scientific judgments, then I'm
7  relying on either the published
8  literature or the opinions of the
9  scientific experts for those opinions.
10 BY MR. HEGARTY:
11     Q.    You mentioned, though, that you take
12 into account everything that you considered, but
13 you would agree, though, that with regard to
14 Exhibit No. 5, you did not read all the materials
15 in Exhibit No. 5, correct?
16          DR. THOMPSON:  Object to form.
17          THE WITNESS:  I think you
18 asked me this before, and I think I
19 explained that things were made available
20 and I looked at everything and decided
21 what needed to be read in what detail.
22          And I actually think I pursued
23 the detail and a lot more of the science
24 than another nonscientific expert

Page 92

1  might -- might have.
2  BY MR. HEGARTY:
3      Q.    My follow-up question to that,
4  though, is:  You agree that you did not consider
5  every reference in Exhibit No. 5 as part of your
6  opinions in this case?
7      A.    I --
8           DR. THOMPSON:  Object to form.
9           THE WITNESS:  I considered
10 the materials.  Did I consider every
11 sentence of material that I did not read
12 every sentence of?  Of course not.
13 BY MR. HEGARTY:
14     Q.    And there are materials in this
15 exhibit that you did not read at all, correct?
16          DR. THOMPSON:  Object to form.
17          THE WITNESS:  There are
18 materials in this exhibit that I would
19 have looked at the title of, and that
20 perhaps when I had conversations with the
21 plaintiffs' lawyers about what were the
22 key scientific studies on each side,
23 didn't fall in that category; and,
24 therefore, although they were available,

Page 93

1  no, I did not read them.
2  BY MR. HEGARTY:
3      Q.    And you agree you cannot consider
4  something for your opinions that you didn't read,
5  correct?
6           DR. THOMPSON:  Object to form.
7           THE WITNESS:  I don't agree
8  with that.  I mean, I consider universe
9  of materials.  Some things may or may not
10 be relevant, and some things may or may
11 not be duplicative.
12          They're made available to me
13 and because they're made available to me,
14 my understanding is they're disclosed to
15 you, and that's the universe we're
16 discussing.
17 BY MR. HEGARTY:
18     Q.    Do you know the names of the
19 plaintiffs in the cases selected for trial in the
20 MDL?
21     A.    I do not know them.  So in the MDL,
22 I don't think I know them at all.
23     Q.    Do you know anything about them,
24 where they live, what their diagnoses were, things

William M. Sage, MD, JD

Page 94

1 like that?
2    A.    I know that they -- I know that at
3 least some of them would have serous ovarian
4 carcinomas.  I don't know anything more about
5 them.
6    Q.    How do you know that some of them
7 had serous invasive carcinoma?
8    A.    I didn't say "invasive."  I just
9 said "ovarian," but just in the sense that I know
10 that that's the form of ovarian cancer that's most
11 at issue in terms of causation.
12    Q.    Do you have any knowledge of each of
13 the plaintiffs who have been selected for trial
14 use of baby powder?
15    A.    No, I do not.
16    Q.    Do you have any knowledge of any
17 tissue analysis conducted for each of the
18 plaintiffs selected for trial in the MDL?
19    A.    No, I do not.
20    Q.    As an expert in this case, you do
21 not represent the University of Texas, correct?
22    A.    Correct.
23    Q.    You don't speak for the University
24 of Texas, correct?

Page 95

1    A.    Correct.
2    Q.    You're not speaking in this case for
3 any regulatory group or agency, correct?
4    A.    Correct.
5    Q.    You're not speaking for any law or
6 legal group, correct?
7    A.    I'm speaking for myself, expressing
8 my own opinions.  (Laugh).
9    Q.    Right.
10       You're speaking in this case solely
11 for yourself, correct?
12       DR. THOMPSON:  Object to form.
13       THE WITNESS:  Yes.
14 BY MR. HEGARTY:
15    Q.    And all the opinions in your report
16 are your subjective opinions, correct?
17       DR. THOMPSON:  Object to form.
18       THE WITNESS:  They're my
19    professional opinions.
20 BY MR. HEGARTY:
21    Q.    Okay.  Are you licensed to practice
22 law?
23    A.    I am an inactive member of the
24 California and District of Columbia bars.

Page 96

1    Q.    When is the last time you practiced
2 law?
3    A.    The last time I practiced law would
4 have been when I was working at O'Melveny and
5 Myers.
6    Q.    When was the last time you practiced
7 medicine?
8    A.    Again, the last time I practiced
9 medicine as a -- as a functional manner last time
10 I cared for a patient in a structured clinical
11 environment would have been when I was a resident
12 at Johns Hopkins.  However, I do have an active a
13 Texas medical license, and I am legally entitled
14 to practice medicine in Texas.
15       MR. HEGARTY:  I'll mark as the
16    next exhibit, which is Exhibit No. 6, the
17    notice for your deposition here today.
18       (Document marked for
19    identification as Sage Exhibit 6.)
20 BY MR. HEGARTY:
21    Q.    And, Dr. Sage, have you seen this
22 document before right now?
23    A.    I think I saw it briefly via e-mail.
24    Q.    Would you turn over to page 3.

Page 97

1 Starting on page 3, there's a list of 18
2 paragraphs that carry over to page 9.
3       Do you see that --
4    A.    Yeah.
5    Q.    -- that list?
6       Have you read through those
7 paragraphs before right now?
8    A.    No.
9    Q.    Is that something that we can have
10 you read at a break, and then I'll ask you some
11 questions about it as opposed to taking time on
12 the record to -- to read?
13    A.    It's up to you, whichever is more
14 convenient.
15       MR. HEGARTY:  Is that okay
16    with you, Dr. Thompson?
17       DR. THOMPSON:  That's fine.
18 BY MR. HEGARTY:
19    Q.    Okay.  Would you put that aside and
20 we'll come back to that document.
21    A.    Okay.
22    Q.    With regard to the expert report
23 that you prepared, Exhibit No. 4, have you sent
24 that report to anyone besides counsel for the

William M. Sage, MD, JD

Page 98

1 plaintiffs and, of course, them perhaps to the
2 defense counsel?
3    A.    No. My assumption was that this was
4 not material to be shared.
5    Q.    Do you have any drafts of this
6 report?
7    A.    There's always versions that
8 constitute drafts in the way that documents are
9 evolved electronically these days, but there would
10 be versions I'm sure.
11    Q.    And the reason I ask it that way is
12 sometimes you'll have a report that then is
13 drafted and is never changed -- it changes, but
14 the original version doesn't exist.
15         Do you have any drafts that you
16 think still exist?
17    A.    Of an earlier version?
18    Q.    Version.
19    A.    Again, I'm really not sure how to
20 answer that. I, you know, I write hundreds of
21 things that end up published, and I don't know if
22 I even know my method for writing stuff anymore.
23 It just happens.
24    Q.    The report we marked as Exhibit

Page 99

1 No. 4 defines the scope of your testimony in this
2 case, correct?
3    A.    Correct.
4         DR. THOMPSON: Object to form.
5         THE WITNESS: The report
6    includes my opinions, and they're the
7    opinions I would plan to offer.
8 BY MR. HEGARTY:
9    Q.    As a lawyer, you understand that
10 this report is supposed to be your testimony as if
11 you're on the stand before a judge and a jury,
12 right?
13    A.    Yes.
14    Q.    You understand that your opinions on
15 what you rely -- the opinions and what you rely
16 upon are supposed to be within the four corners of
17 this document, right?
18         DR. THOMPSON: Object to form.
19         THE WITNESS: I understand
20    that I might generate an opinion based on
21    our conversation today. I understand
22    that you might provide me with additional
23    material that would cause me to
24    supplement or modify an opinion I've

Page 100

1 expressed, but these are the opinions.
2 BY MR. HEGARTY:
3    Q.    That's fair.
4         But prior to coming in here today,
5 you understood that your opinions and on what you
6 rely for those opinions was to be set out within
7 the four corners of your July 2, 2021 report?
8    A.    Yes.
9         DR. THOMPSON: Object to form.
10 BY MR. HEGARTY:
11    Q.    So at least coming in here today,
12 all the opinions that you intend to offer in this
13 case are those set out in your report, correct?
14    A.    Correct.
15         DR. THOMPSON: Object to form.
16 BY MR. HEGARTY:
17    Q.    And, likewise, all the materials on
18 which you intend to rely coming in here today were
19 those referenced in your report, correct?
20         DR. THOMPSON: Object to form.
21         THE WITNESS: All the -- all
22    the materials that I considered in
23    generating the report are -- I don't know
24    what I'm supposed to say, you know -- are

Page 101

1    contained in the report or provided to
2    you as they're supposed to be provided.
3         I really don't know how this
4    works well enough, and I haven't done
5    this before. So I'm not sure I
6    understand all the terminology.
7         I'm, of course, as a lawyer,
8    you know, careful and want to comply with
9    all requirements.
10 BY MR. HEGARTY:
11    Q.    With regard to the substance of your
12 report, except where you have used quotations, is
13 it your testimony that all the sentences in your
14 report are your own words and not copied from
15 others?
16    A.    I'm --
17         DR. THOMPSON: Object to form.
18         THE WITNESS: So to the best
19    of my knowledge, everything in the report
20    that is not in quotation or could be
21    understood as -- as an expression of
22    something in something that's immediately
23    cited, that's all original work.
24         The same -- I do this report

Page 102

1  the same way I would do any other
2  writing, you know, which includes having
3  materials drawn from various sources,
4  working with those, you know, rewriting
5  things, re-expressing things.
6          There's -- what I can say with
7  confidence is, there's not a, you know,
8  there's not a sentence or a phrase in
9  this report that I haven't had my
10  author's fingerprints on.
11 BY MR. HEGARTY:
12     Q.    So you know that as an author that
13 the obligation is to properly cite material to
14 which you are relying or referencing, correct?
15        DR. THOMPSON:  Object to form.
16        THE WITNESS:  I think I am
17    experienced with standards for
18    publication.
19 BY MR. HEGARTY:
20     Q.    And the obligations require that
21 when you discuss, summarize, or paraphrase others
22 that you include a citation to those others' work,
23 correct?
24        DR. THOMPSON:  Object to form.

Page 103

1          THE WITNESS:   I think that
2    depends very much on the context and the
3    context in, say, an academic publication
4    or a student dissertation might be
5    somewhat different than in an internal
6    law firm memo, and the standards for
7    citation that apply to an expert report
8    are not something I have much familiarity
9    with, beyond the general standards I
10    would apply to my work.
11 BY MR. HEGARTY:
12     Q.    But did you write your expert report
13 in a method different than what you have written
14 published articles?
15        DR. THOMPSON:  Object to form.
16        THE WITNESS:  I wrote -- I
17    wrote it the same way I would write
18    something, but the standards for
19    citation, for example, vary -- vary
20    differently between, say, a law review
21    article and a medical journal publication
22    or health policy.  There's no single
23    standard for what you cite and when.
24          I have my own standards for

Page 104

1     when, I cite and I'd be happy to share
2     them with you if you want but...
3  BY MR. HEGARTY:
4     Q.    Well, for purposes of your report,
5  whenever you did discuss, summarize, or paraphrase
6  the work of others, did you include a cite to that
7  work by others?
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  I suspect not
10    universally, but, again, that wouldn't be
11    the standards that one would apply to a
12    lot of report writing.  If you want my
13    personal standards for citation, I'll be
14    happy to share them.
15 BY MR. HEGARTY:
16     Q.    The report -- well, let me go back
17 to Exhibit No. B -- I'm sorry -- Exhibit No. 5.
18          This is the --
19     A.    Yes.
20     Q.    -- list of literature, and if you
21 look over at page 8, there starts a number of
22 pages that include deposition and hearing
23 transcripts.
24          Do you see that?

Page 105

1     A.    Yes.
2     Q.    Did you read all of the depositions
3  and hearing transcripts listed there in their
4  entirety?
5     A.    Of course not.  I was astonished to
6  realize how long these depositions are.  I did
7  read several.
8     Q.    Do you recall sitting today which
9  ones you read in their entirety?
10     A.    I don't recall sitting here.  I
11 could tell you some familiar names such as the --
12 I mean, I know I read in its entirety over the
13 course of several deposition days the deposition
14 testimony of Kathleen Wille.  I know I read some
15 of, I think, a Susan Nicholson deposition.
16          I know I read Koberna, which had to
17 do with marketing.  And I remember reading every
18 word of a couple of the plaintiffs' experts, but
19 that was early in my work on the case, and I don't
20 really remember the details.
21     Q.    If you look over at page 10 above
22 the section Other Sources, there are some trial
23 transcripts from a case referred to as Ristesund
24 versus Johnson & Johnson.

Page 106

1    Do you see that?

2    A.    I do.

3    Q.    Did you read the transcripts from

4 the Ristesund trial that are referenced in this

5 exhibit?

6    A.    Things here were made available to

7 me.  I -- I recall reading some PowerPoints in

8 different connections in different points in what

9 I was reviewing.  I can't recall whether I read

10 this particular transcript in any -- any detail.

11    Q.    Are you aware that there have been

12 more than 10 trials involving claims of use of

13 Johnson's Baby Powder and ovarian cancer?

14    A.    I'm aware there have been several

15 trials and there are trials -- and there are

16 trials ongoing.  I don't mentally separate the

17 state trials from the MDL trials.  Again, I

18 approach this as a regulatory expert.  I don't

19 approach this as a litigator.

20    Q.    Did you ask to see the trial

21 transcripts in all the cases that have been tried?

22    A.    No.

23    Q.    Did you read all of the

24 Bates-numbered documents that begin on page 12 and

Page 107

1 carry over to page 17 -- I'm sorry -- page 18?

2    A.    No, certainly not.

3    Q.    Did you select -- did you select or

4 ask for any of the Bates-numbered documents that

5 are referenced on these pages?

6    DR. THOMPSON:  Object to form.

7    THE WITNESS:  I don't know --

8    I don't know the answer to that.

9    I approach -- I approach this

10    the way I would approach any regulatory

11    investigation, any analytic project.

12    It's a slightly different set of citation

13    practices than what one might have in law

14    review, which, as I've said, is also very

15    different from one would have in the

16    medical or health policy literature,

17    which is different from what one might

18    have in a national academy's report; and,

19    you know, I relied on plaintiffs' counsel

20    to understand what the requirements and

21    norms of this type of a report were.

22 BY MR. HEGARTY:

23    Q.    Did plaintiffs' counsel select at

24 least some of the Bates-numbered documents that

Page 108

1 are listed in these pages?

2    A.    Certainly.

3    Q.    Do you know of their methodology for

4 how they selected those documents to send to you?

5    DR. THOMPSON:  Object to form.

6    THE WITNESS:  Again, I'm --

7    I'm struggling with what you're trying to

8    ask me.  Because it seems like to me --

9    it seems to me as if the litigators on

10    both sides of a case like this understand

11    a whole lot more about how the material

12    and references get generated in

13    litigation than I do.

14 BY MR. HEGARTY:

15    Q.    Let me ask it in a different way.

16    Do you know how they went about

17 choosing which Bates-numbered documents to send to

18 you, other than those you may have asked for?

19    DR. THOMPSON:  Object to form.

20    THE WITNESS:  No, I don't.

21 BY MR. HEGARTY:

22    Q.    And do you recall asking plaintiffs'

23 counsel for any specific internal company

24 documents?

Page 109

1    A.    I was -- by -- by document

2 identification, no, because I wouldn't know what

3 the documents were.  I was very interested in

4 documents that would relate to your client's

5 understanding of its regulatory obligations.  I

6 was very interested in documents that would relate

7 to your client's approach to its informational

8 environment for consumers, which gets into the

9 marketing and advertising space.

10    I was very interested in your

11 client's documents that reflected your client's

12 best understanding of the relevant science.

13 Beyond that, you know, the references are provided

14 for this document, I am certainly hoping and

15 assuming, in compliance with law and beyond, but

16 that doesn't really go to the heart of my

17 opinions.

18    Q.    As far as the subject areas that you

19 just referenced in your answer to my last

20 question, did you ask plaintiffs' counsel for all

21 the documents that Johnson & Johnson had produced

22 on those subject areas?

23    DR. THOMPSON:  Object to form.

24    THE WITNESS:  No.  I would

William M. Sage, MD, JD

Page 110

1    assume that the all -- that asking for
2    all of anything in this type of
3    litigation would take me years to review.
4    I asked for things that seemed relevant
5    and important and that were balanced and
6    reflected arguments on both sides.
7  BY MR. HEGARTY:
8        Q.    Well, if you didn't ask for all of
9  the documents relating to the subject areas you
10 described, how do you know if you got all the
11 relevant documents on those subject areas?
12           DR. THOMPSON:  Object to form.
13           THE WITNESS:  How?  (Laugh).
14 It's -- it's interesting to be asked
15 these questions because, you know, one is
16 reconstructing how one does research in
17 pretty much anything.
18           You know, what I -- what I did
19 is, it's a -- it's an iterative process
20 as it would be for you evaluating a case.
21 You look at the different pieces of -- of
22 the case.  You look at different
23 arguments and different counterarguments
24 and the underlying facts.  And if you

Page 111

1    feel like you have a sense of each of
2    what you consider the material issues,
3    you stop.
4           You know, if you feel like you
5    have a one-sided view of five of the
6    issues, then you investigate until you
7    get the other side of those five issues.
8    And if you think you have a piece of
9    information you just -- that's just
10   missing, you pursue that.
11          I mean, you don't -- I've
12   never ever started any project as a
13   lawyer, as a physician, as a researcher
14   as a professor where I say, give me
15   everything.  That's -- that's discovery,
16   not the way I do an expert report.
17 BY MR. HEGARTY:
18       Q.    Well, that said, I mean, I have to
19 disagree that I -- that you approach it the way I
20 would approach it, which you said in your answer.
21 Because I would not approach it the way that you
22 approached it.
23          You do agree that you relied on the
24 plaintiffs' counsel as far as some of the

Page 112

1    materials that were provided to you, correct?
2        A.    I made very specific requests of
3    plaintiffs' counsel, and I made very clear that I
4    wanted material on both sides of every question
5    and evaluated that.
6        Q.    What did you do to confirm that you
7    got material on both sides of the -- of a
8    question?
9           DR. THOMPSON:  Object to form.
10          THE WITNESS:  Well, for
11   example, you know, I spent a good amount
12   of time going through Johnson & Johnson's
13   submission to Health Canada, which
14   clearly included all of the relevant
15   science and the counterarguments to
16   science establishing a causal connection
17   between perineal talc exposure and
18   ovarian cancer.
19          I mean, I felt like that was a
20   pretty good reflection of what the
21   defense would offer on the scientific
22   side.
23          On the regulatory side on the
24   marketing side, there seemed to be less

Page 113

1    material of it, and I did my best to
2    assemble what there was and I asked
3    repeatedly to see if there was anything
4    more.
5  BY MR. HEGARTY:
6        Q.    You mentioned a submission to Health
7  Canada.  You said you have it in front of you.
8           What's the date of that submission?
9        A.    I have to go back to see.
10          (Reviews document.)
11       Q.    Well, let me ask it different.
12          Is there a beginning Bates number on
13 it?
14       A.    Well, so -- so this -- so this
15 comprehensive review document that comes from
16 Johnson & Johnson Consumer, Inc. said its current
17 as of March 17, 2020, and the Bates number is
18 P-1851.
19       Q.    Through what?
20       A.    Oh, I'm sorry.  That's the exhibit
21 number.
22       Q.    What's the beginning number?
23       A.    I'm sorry.
24       Q.    What's the beginning Bates number?

Page 114

1    A.    Sorry.  You're speaking litigator
2 language.
3    Q.    Okay.
4    A.    Page 1 of 4,528.  It's a long
5 document containing a lot of assessments and
6 scientific references.  I'm happy to hand -- hand
7 it to you if you can.
8    Q.    Yeah, I'll take a look at it.
9         There is --
10    A.    Oh, some -- yeah, I still don't know
11 what you're --
12         DR. THOMPSON:  May I point?
13         MR. HEGARTY:  Sure.
14         DR. THOMPSON:  He's asking for
15    the beginning Bates number.
16         THE WITNESS:  Okay.  That's
17    now -- now it's an eye test.  All right.
18    So it ends 485273 and it goes through
19    485527.
20 BY MR. HEGARTY:
21    Q.    What does it say on the top of the
22 very first page?
23    A.    Top?
24    Q.    What is the title?

Page 115

1    A.    "Attachment B Johnson's Baby Talcum
2 Powder: A Comprehensive Review 17 March 2020."
3    Q.    Okay.  Thank you.
4         There are Bates numbers in -- well,
5 go back to Exhibit B, Doctor.  This is this
6 (indicates).
7    A.    Yes.
8    Q.    List of materials.
9         Do you still have that exhibit in
10 front of you?
11    A.    I do.
12    Q.    If you look at page 18, the very
13 last page of that set of materials, there's some
14 Bates number documents at the end listed WCD.
15         Do you know who produced those
16 documents?
17    A.    No.
18    Q.    Do you know if you read those
19 documents?
20    A.    Not without looking at documents.
21    Q.    There are a number of medical and
22 scientific studies that are included in this list
23 of material.
24         Do you see that?

Page 116

1    A.    Certainly.
2    Q.    Did you read the entirety of all the
3 medical and scientific studies referenced in
4 Exhibit No. 5?
5    A.    No, but I read probably between 10
6 and 20 scientific studies in their entirety.
7    Q.    With regard to the scientific
8 studies that are listed in Exhibit No. 5, were all
9 of those provided to you by counsel for the
10 plaintiffs?
11         DR. THOMPSON:  Object to form.
12         THE WITNESS:  In other words,
13    did anyone else provide them or did I
14    find them on my own?
15 BY MR. HEGARTY:
16    Q.    Correct.
17    A.    They were all provided by counsel
18 for the plaintiffs.
19    Q.    So the follow-up question is:  Did
20 you find from your own independent review any
21 medical literature, scientific or medical
22 literature?
23         DR. THOMPSON:  Object to form.
24         THE WITNESS:  Interesting

Page 117

1    question.
2         I'm not sure I recall.  I
3    think it's -- it's fair to say that the
4    vast majority of scientific sources were
5    provided by counsel for the plaintiff, or
6    were referenced or described in material
7    that was made available, such as Johnson
8    & Johnson's Health Canada submission.
9         It is possible I surfaced one
10    or two things on my own as I looked
11    around.
12 BY MR. HEGARTY:
13    Q.    Did you do any type of PubMed or
14 other search vehicle that doctors use to -- to
15 search across the medical and scientific
16 literature as part of your work on this case?
17    A.    I did not do a PubMed search.
18    Q.    You said the materials that
19 plaintiffs' counsel provided to you were all sent
20 via Dropbox?
21    A.    They were all made available in
22 Dropbox and some of them were probably sent as
23 e-mail attachments, but those would duplicate what
24 was in the Dropbox.

Page 118

1    Q.    On page 2 of your report.
2    A.    Report or the references?
3    Q.    The report.  Now we're back to the
4  report, which is Exhibit No. 4.
5         In the Methodology section, page or
6  paragraph 9, you say that you were asked to answer
7  the following questions, and you list two
8  questions there in that paragraph, right?
9    A.    Yes.
10   Q.    Who asked you to answer those
11 questions?
12   A.    The -- I worked with the plaintiffs'
13 counsel to formulate the questions that I would
14 answer in my opinion.
15   Q.    You state as well in that paragraph
16 that you were not asked to provide an opinion on
17 whether talc causes -- talcum powder products
18 cause cancer, correct?
19   A.    Correct.
20   Q.    In this case, you are not offering
21 opinions on causation, correct?
22   A.    I am not offering my independent
23 professional assessment of causation.  I am making
24 supportable inferences about causation and risk

Page 119

1  and uncertainty based on other expertise from
2  other individuals.
3    Q.    And you have not done your own
4  assessment of the medical and scientific
5  literature as to whether talcum powder products
6  can cause ovarian cancer, correct?
7         DR. THOMPSON:  Object to form.
8         THE WITNESS:  I have.  I have
9      done what I would consider to be a first
10     pass review of the scientific literature
11     that would be appropriate for, say,
12     writing a solid article in the peer
13     literature -- peer-reviewed literature
14     about the regulatory requirements at
15     issue here.
16         I would be perfectly
17     comfortable taking, you know, salient
18     points from my report and basing a
19     peer-reviewed article on that.
20 BY MR. HEGARTY:
21   Q.    Do you know what a Bradford Hill
22 analysis is?
23   A.    I do know.  It wasn't something -- I
24 can't recite each of the criteria.  It was

Page 120

1  something that was referenced in -- in some,
2  though not all, of the reports.  It is the -- it
3  is the type of, you know, causation algorithm that
4  would be familiar in a lot of settings.
5         In my work, I tend not to be.  My
6  expertise is, again, an expertise that involves a
7  lot of connections and a lot of considerations and
8  a lot of history.  Nothing I do requires following
9  an algorithm.
10   Q.    You did not do a Bradford Hill
11 analysis with regard to talcum powder use and
12 ovarian cancer, right?
13   A.    I did not.  I did read references in
14 some of the material to Bradford Hill criteria
15 and -- and ovarian cancer and talc.
16   Q.    You did not do a formal risk
17 assessment with regard to talcum powder use and
18 ovarian cancer, correct?
19   A.    I certainly didn't do a formal risk
20 assessment.  I read a lot of risk assessment
21 material here.
22   Q.    You did not do any type of Bradford
23 Hill analysis or formal risk assessment with
24 regard to asbestos and ovarian cancer, correct?

Page 121

1         DR. THOMPSON:  Object to form.
2         THE WITNESS:  With respect to
3      asbestos and cancer, the -- the causation
4      analysis is from a policy perspective
5      already definitive.  There's no reason to
6      do that.
7  BY MR. HEGARTY:
8    Q.    You did not do it?
9    A.    Did not.  No need.
10   Q.    You also did not do a Bradford Hill
11 or risk assessment analysis with regard to heavy
12 metals and ovarian cancer, correct?
13   A.    That's correct.
14   Q.    You didn't do a Bradford Hill or
15 risk assessment analysis with regard to fragrances
16 and cancer risk, correct?
17   A.    I don't believe there's actually
18 enough information in existence regarding the
19 fragrances in these particular products for anyone
20 to do that analysis.
21   Q.    You did not do any type of Bradford
22 Hill or risk assessment analysis with regard to
23 fibrous talc and ovarian cancer, correct?
24   A.    Again, fibrous talc is treated on a

Page 122

1 par with asbestos in enough of the material that I
2 read that I would give the same answer as for
3 asbestos.
4      Q.    Okay.  Did you assume for purposes
5 of your report that talcum powder use causes
6 ovarian cancer?
7           DR. THOMPSON:  Object to form.
8           THE WITNESS:   Did I assume
9      that talcum powder use causes ovarian
10      cancer?  Certainly not.  It's talcum
11      powder use, you know, that's a very
12      general phrase.  I could use talcum
13      powder, you know, in many ways.  Women
14      could use talcum powder in many ways and,
15      you know, I would have no basis for that
16      assumption.
17           That's different from talking
18      about what's at issue in this case, which
19      are specific applications and specific
20      ways over specific periods of time with
21      specific products whose contents are not
22      well-established.
23 BY MR. HEGARTY:
24      Q.    Well, did you assume for purposes of

Page 123

1 your report that any manner of talcum powder use
2 can cause ovarian cancer?
3           DR. THOMPSON:  Object to form.
4           THE WITNESS:  I did not make
5      the assumption.  I relied on the
6      scientific conclusions of scientific
7      experts' published literature.  I
8      evaluated the confidence intervals, the
9      risks associated, the scientific design
10      for the science, but also the assessments
11      of other umbrella bodies that have done
12      some type of systematic review for
13      whatever their own purposes are.
14           Understand that my expertise
15      fundamentally situates each one of these
16      documents in a context, and it's the
17      context that collectively forms the basis
18      for my opinion.
19           You know, what year, for what
20      purpose, by what organization, subject to
21      what types of business constraints, what
22      types of political considerations, what
23      types of resource constraints, that's
24      what I do.

Page 124

1           The information that I take
2      out of all of this material, you know,
3      actually involves context that may not be
4      similar to the context in, say, a
5      particular causation report.
6 BY MR. HEGARTY:
7      Q.    You agree that you have not reviewed
8 all of the defense expert reports as it relates to
9 talcum powder use and ovarian cancer?
10      A.    Correct.
11      Q.    You agree that before someone
12 testifies in court that talcum powder causes
13 ovarian cancer, they should have done a
14 comprehensive analysis of all the medical and
15 scientific literature on the issue, correct?
16           DR. THOMPSON:  Object to form.
17           THE WITNESS:  I don't know
18      the answer to that because I have not
19      been asked to testify in court as to
20      whether talcum powder causes ovarian
21      cancer.
22 BY MR. HEGARTY:
23      Q.    You certainly didn't do a
24 comprehensive analysis of all the medical and

Page 125

1 scientific literature on talcum powder use and
2 ovarian cancer, correct?
3           DR. THOMPSON:  Object to form.
4           THE WITNESS:  I feel that I
5      did a sufficient review of the scientific
6      literature on which to base my opinions,
7      and I actually -- actually feel quite
8      strongly about this.  Because it's one of
9      the things that, given the preparation of
10      this report, I made sure I could do, and
11      I feel I have the scientific and medical
12      background to understand that.
13           So I actually made a very
14      specific effort to consider the
15      underlying science here.
16 BY MR. HEGARTY:
17      Q.    You agree you have not analyzed all
18 the animal studies on talcum powder use and
19 ovarian cancer, correct?
20           DR. THOMPSON:  Object to form.
21           THE WITNESS:  I agree.
22 BY MR. HEGARTY:
23      Q.    You have not looked at all the cell
24 studies on talcum powder use and ovarian cancer,

William M. Sage, MD, JD

Page 126

1 correct?
2          DR. THOMPSON:  Object to form.
3          THE WITNESS:  Again, if
4    you're building the number of things I
5    haven't looked at, I don't really know
6    what the denominator is here.
7          If, for example, there were
8    two animal studies that were major animal
9    studies and that's all the animal studies
10   there were, chances are I asked for them,
11   I received them, and I looked at them.
12         So if you're giving me
13   denominators, you know, where that's
14   greater than 10 such studies, I will be
15   happy to agree that I didn't review all
16   of them; but if the denominator on some
17   of this is there were three studies,
18   possibly I did.
19 BY MR. HEGARTY:
20   Q.    Let me ask it a different way.
21         If you reviewed the submission that
22 Johnson & Johnson made to Health Canada that we
23 talked about earlier that are in your notebook,
24 you know that there are hundreds of animal cell

Page 127

1 and epidemiologic studies cited in that document,
2 correct?
3          DR. THOMPSON:  Object to form.
4          THE WITNESS:  I would want
5    to -- as I would for anything, I would
6    want to review the document.  There were
7    many studies cited.  How relevant they
8    are to the questions Health Canada was
9    considering is a matter of debate.
10 BY MR. HEGARTY:
11   Q.    Did you read the entirety of that
12 document?
13   A.    I read everything in that -- in the
14 pages that, you know, I have here.  I read
15 everything that was text that I could decipher.
16 There's a lot of things that are in tabular or
17 supplemental fashion; and, no, I did not read
18 those things.
19   Q.    You agree, though, that you did not
20 read all of the studies that are cited in that
21 document?
22   A.    I'm sure that's the case.
23   Q.    And you can't say sitting here today
24 that you read all the cell studies on talc and

Page 128

1 ovarian cancer, correct?
2          DR. THOMPSON:  Object to form.
3          THE WITNESS:  That I read all
4    the cell studies.  Again, I really find
5    it's hard to answer questions where I
6    don't know the denominator, but I'm happy
7    to agree with you that there are many
8    things that have been studied that might
9    be plausibly related to these questions
10   that have been published in scientific
11   literature that I have not.  But that
12   would be true of literally any question
13   you could ask me on any topic.
14 BY MR. HEGARTY:
15   Q.    Well, let me ask it a different way.
16         You didn't go out and try to find
17 all the cell studies on talcum powder use and
18 ovarian study, correct?
19   A.    Correct.  I do have to reinforce
20 that I understand the difference between the
21 questions you're asking and the information I'm
22 trying to provide.
23         I made a very serious effort to
24 consider the best available science on both sides

Page 129

1 and to consider it over time.
2   Q.    You didn't try to go out and make
3 sure you had found and read all the epidemiologic
4 studies on talcum powder use and ovarian cancer,
5 correct?
6   A.    The epidemiological studies, we --
7 we can certainly go into particular studies; but,
8 again, I find it very hard to answer these --
9 these denominator questions.  There tend to be a
10 small number of case-controlled studies, a small
11 number of cohort studies.
12         There's a whole bunch of
13 differences, as you well know, between studies
14 that are looking at sort of pathways to ovarian
15 cancer development.  Each of the things in terms
16 of inflammation, in terms of migration, in terms
17 of deep embeddedness of talc in ovaries.
18         There's all sorts of things that
19 anyone with, you know, a basic expertise in
20 medicine or science will be able to step you
21 through; and each one of these is going to be
22 established scientifically over time, often for
23 reasons that are not reasons that are about
24 Johnson & Johnson baby powder and ovarian cancer,

Page 130

1 and all of these, you know, collectively inform
2 scientific judgments.
3         So I'm happy to make any study you
4 want to offer me.  Please show me a study that you
5 think would be relevant to my conclusions; but at
6 the end of the day, remember I'm not offering a
7 scientific opinion on causation of ovarian cancer
8 from your product.
9     Q.    My question was different and listen
10 to my question.
11         You did not, as part of your
12 methodology in this case, go out and search across
13 all the medical and scientific literature to make
14 sure you had found all of the epidemiologic
15 studies looking at talcum powder use and ovarian
16 cancer?
17     A.    As I said before, I did not do a
18 PubMed search.
19     Q.    Cite for me any instances where you
20 have analyzed before this -- getting involved in
21 this case a cosmetic product, its manufacturer,
22 and the applicable regulations like you've done in
23 your report?
24         DR. THOMPSON:  Object to form.

Page 131

1         THE WITNESS:  I have not had
2     cause to analyze a cosmetic manufacturer.
3     I would emphasize that I, as a good
4     litigator mind in a litigation context, I
5     analyze regulatory problems across
6     industries all the time.
7 BY MR. HEGARTY:
8     Q.    Have you ever published an analysis,
9 like you've done here, looking at the manufacturer
10 of a cosmetic product and the product itself?
11         DR. THOMPSON:  Object to form.
12         THE WITNESS:  No.
13 BY MR. HEGARTY:
14     Q.    Have you ever published an article
15 where you've given opinions based on internal
16 company documents?
17         DR. THOMPSON:  Object to form.
18         THE WITNESS:  I'm sorry.  If
19     by "opinion" do you mean an expert
20     witness opinion in litigation?  We've
21     established that I don't do that very
22     much.
23 BY MR. HEGARTY:
24     Q.    Well, when have you ever published

Page 132

1 an article where you've cited to internal company
2 documents?
3     A.    I don't.  I would have to go back
4 and review articles, but there wouldn't have been
5 internal company documents that were made directly
6 available to me on a confidential basis.  They
7 would have been internal company documents
8 involving, say, tobacco or -- you know, there's a
9 lot of areas.  Silicon breast implants.
10         There are various things I've
11 written about over the years that involve
12 hazardous products that involve liability where
13 internal corporate documents may well be part of
14 the analysis, but I would have to go back and
15 look.
16     Q.    Besides sitting here today, can you
17 cite for me any published articles of yours where
18 you cited in that article internal company
19 documents?
20     A.    Not that I --
21         DR. THOMPSON:  Object to form.
22         THE WITNESS:  Not that I can
23     recall right now, but I've written a lot
24     of articles.

Page 133

1 BY MR. HEGARTY:
2     Q.    Have you ever written an article
3 where you've cited to an expert report in
4 litigation?
5         DR. THOMPSON:  Object to form.
6         THE WITNESS:  I also don't
7     know that for a fact, but I can't recall
8     any.
9 BY MR. HEGARTY:
10     Q.    In paragraph 10 of your report, you
11 discuss the literature that you reviewed.
12         Did anyone help you in reviewing the
13 literature or searching for literature, someone at
14 your office or otherwise?
15     A.    No, I didn't -- didn't use any
16 research assistants or any -- any other
17 individuals for assistance here.
18     Q.    Other than doing you mentioned a
19 Google search before, did you do -- use any other
20 formal methods of searching for materials in
21 preparing your report?
22         DR. THOMPSON:  Object to form.
23         THE WITNESS:  So I reviewed
24     sort of the leading casebook on food,

Page 134

1 drug, and cosmetic regulation that had a
2 chapter on -- on cosmetic regulation that
3 gave rise to a whole bunch of sources
4 that I may have, you know, Googled to
5 look at a Federal Register something
6 or -- or some particular reference, some
7 other -- some earlier cosmetic-related
8 controversy.
9 You know, this is -- this is a
10 casebook, you know, including among its
11 authors Peter Hutt, who, you know, is a
12 long-time expert I have great respect for
13 who tends to represent the cosmetics
14 industry in a lot -- in a lot of
15 policy-related proceedings.
16 So yes, I did a lot of
17 additional research based on things that
18 I -- I discovered reviewing that
19 material, reviewing other material.
20 It's, again, standard practice with me to
21 follow what you think are important
22 leads.
23 BY MR. HEGARTY:
24 Q. With regard to the materials that

Page 135

1 you did review, did you assign any weight --
2 formally assign any weight to the materials for
3 purposes of writing your report?
4 DR. THOMPSON: Object to form.
5 THE WITNESS: I mean, there
6 are basic hierarchies, you know, in terms
7 of legal authority. There are, you know,
8 but other than that, there are no
9 specific criteria for assigning weight.
10 I mean, one's regulatory expertise is not
11 the same as doing a quantitative risk
12 analysis or a meta-analysis.
13 BY MR. HEGARTY:
14 Q. Well, in preparing your report, did
15 you assign a numerical value to the weight of the
16 materials that you reviewed?
17 A. No.
18 DR. THOMPSON: Object to form.
19 THE WITNESS: Except perhaps
20 how heavy they were. (Laugh.)
21 BY MR. HEGARTY:
22 Q. Do you explain anywhere in your
23 report the methodology that you went about that
24 you used in identifying the materials that you

Page 136

1 considered for purposes of preparing your report?
2 DR. THOMPSON: Object to form.
3 THE WITNESS: My description
4 of the methodology at a relatively high
5 level is contained in paragraphs 9 and 10
6 and reflects exactly how I would go about
7 a regulatory analysis in any
8 health-related area, in the safety
9 risk-related area and, frankly, a whole
10 lot of regulatory areas that are -- that
11 are not about human health and safety
12 where there are governing statutes.
13 There are regulatory systems. There are
14 self-regulatory systems. There are
15 balances of federal and state authority.
16 There is a historical context,
17 a political context, an industrial, and
18 organizational context. Sometimes a
19 professional context, which is, of
20 course, very important to distinguishing
21 drug regulation from cosmetic regulation.
22 This is all routine for me.
23 It's exactly what I do if I'm writing an
24 article to teach a class or even just,

Page 137

1 you know, at home thinking about a
2 current event.
3 BY MR. HEGARTY:
4 Q. Did plaintiffs' counsel give you
5 access to a database of all the documents that
6 Johnson & Johnson had produced in this case?
7 A. They didn't give me direct access to
8 a very large universe of documents. Presumably,
9 they gave me access to the documents they thought
10 were relevant, but I actually don't know how they
11 assembled their documents and do their management.
12 Q. You did not yourself do any type of
13 search over a database of documents produced using
14 search terms to look for company -- internal
15 company documents --
16 A. I did not.
17 Q. -- that Johnson & Johnson produced?
18 A. I did not.
19 Q. But plaintiffs' counsel did provide
20 you with some internal company documents that have
21 been produced in this case, correct?
22 A. Correct.
23 Q. These were not documents you
24 selected from a larger set, correct?

William M. Sage, MD, JD

Page 138

1      A.     Except --
2             DR. THOMPSON:  Object to form.
3             THE WITNESS:  Except insofar
4      as I asked for the things that I thought
5      were not evident from what I had already
6      reviewed.  For example, asking for
7      material that would bear on marketing
8      decisions, marketing languages,
9      strategies over time for Johnson &
10     Johnson consumer products and
11     specifically for Johnson's Baby Powder.
12 BY MR. HEGARTY:
13     Q.     Did you ever ask for specific
14 document by Bates number or title of that
15 document?
16     A.     Not to my recollection.  It would
17 never have been by Bates number.  It's possible
18 that there was in a deposition transcript some
19 reference to a document that I then requested.  I
20 don't recall.
21     Q.     Are you aware that Johnson & Johnson
22 has produced thousands of documents regarding
23 communications with FDA, thousands of documents,
24 if not hundreds of thousands of documents,

Page 139

1 regarding testing of talc for asbestos.
2             Are you aware of that?
3      A.     I am aware of a number of FDA
4 contacts and a number of testing-related materials
5 Johnson & Johnson has introduced into this
6 litigation.  I have no idea what number they are,
7 and, again, I have no idea of how relevant they
8 are.
9      Q.     In the document we're looking at
10 before, Exhibit No. 5, there are a number of
11 plaintiff exhibits that are identified by P
12 numbers beginning on page 16 and carrying over to
13 page 17.
14            Do you see those pages?
15     A.     Yes.
16     Q.     Do you recall looking at any of the
17 documents that have a P number on them, an exhibit
18 sticker?
19     A.     I certainly have looked at documents
20 with P numbers, such as Johnson & Johnson response
21 to Health Canada, which we just discussed, which
22 had a P number on it.  I noticed there were P
23 numbers on some documents.
24     Q.     Did you understand in looking at

Page 140

1 some of these documents that the P numbers are
2 plaintiffs' exhibits from trial?  Did you
3 understand that?
4      A.     I do understand that.
5      Q.     Did you ask plaintiffs' counsel to
6 give you all the defense exhibits that had been
7 introduced at trials?
8      A.     I asked.  I did not ask for all the
9 defense exhibits.  I did not ask for all the
10 plaintiffs' exhibits.  I did ask for the defense
11 perspective on the issues that were relevant to my
12 opinions.
13     Q.     Did you --
14     A.     I asked --
15     Q.     I'm sorry.
16     A.     I'm sorry.  I asked repeatedly for
17 that.
18     Q.     Well, did you ask specifically for
19 defense exhibits that had been introduced at
20 trial?
21     A.     No.
22     Q.     And what did you do to confirm that
23 the plaintiffs' counsel gave you a fair
24 representation of the documents on the issues you

Page 141

1 talk about in your report?
2             DR. THOMPSON:  Object to form.
3             THE WITNESS:  I -- my
4      confirmation was looking at the internal
5      consistency of what I was reviewing and
6      the opinions I was formulating based on
7      it.  I think I would have noticed
8      significant biases.  I think I would have
9      noticed significant gaps.
10            But, no, I didn't do any
11     structured confirmation and I certainly
12     didn't -- I mean, other than an informal
13     request, I'm not sure what I could have
14     done.  So I didn't.
15 BY MR. HEGARTY:
16     Q.     Have you ever outside of any
17 litigation work in your professional career ever
18 relied on documents that were selected for you to
19 review by a plaintiff's lawyer?
20            DR. THOMPSON:  Object to form.
21            THE WITNESS:  Again, yes, in
22     the sense that I was the principal
23     investigator of a very large
24     investigation on medical malpractice

William M. Sage, MD, JD

1  policy that was funded by the Pugh Trust,
2  which involved outreach to a whole lot of
3  people and, you know, that included
4  plaintiff's lawyers, defense lawyers,
5  insurance companies, you know, physician,
6  and hospital organizations and others.
7     And, you know, when I asked for materials
8  from each of them, I got the materials
9  that they gave me.
10 BY MR. HEGARTY:
11    Q.    My question was as to any
12 non-litigation work you've ever done, not regular
13 litigation.
14    A.    This is non-litigation.
15    Q.    Which part?
16    A.    Everything I just said was
17 non-litigation.
18    Q.    And what was the situation?
19    A.    A large grant program that I led on
20 medical liability.
21    Q.    Let me ask it a different way.
22       In any publication of yours, have
23 you ever relied in the materials that you reviewed
24 on a plaintiff's lawyer to provide you the

1  materials?
2     A.    To provide me some of the materials?
3  I'm sure I have.
4     Q.    When have you ever written an
5  article that where you relied on materials that
6  came -- that came from a plaintiff's lawyer?
7     A.    If I were writing on medical
8  liability and making certain points and sometimes
9  the only way you could get information about
10 opinions that were not publicly reported or other
11 insights, I'm relying on the people I'm talking
12 to.
13       Again, perhaps I'm misunderstanding
14 your question.
15    Q.    Yeah.
16       Have you ever in any article that
17 you've published ever relied on the materials for
18 that article from a plaintiff's lawyer to produce
19 materials produced in litigation?
20    A.    I think we're also back to sort of
21 some ambiguity between:  Are you drawing a
22 distinction between considered or relied on or can
23 we use relied in a casual sense of --
24    Q.    Let me ask it a different way.

1        In any publication of yours, have
2  you ever reviewed in preparing that publication
3  materials that were provided to you from a
4  plaintiff's lawyer that were produced in a
5  litigation?
6     A.    That were -- that were -- I'm sorry.
7  That were produced through discovery in the
8  litigation?
9     Q.    Correct.
10    A.    I'm sorry.  I misunderstood the
11 question.
12       Not to my knowledge.
13    Q.    Are you aware that Johnson & Johnson
14 has put on a website all the facts about talc,
15 thousands of documents that have been introduced
16 in the lawsuits in -- in these cases?
17    A.    I reviewed -- on my own initiative,
18 I reviewed some of The Facts About Talc web pages
19 that Johnson & Johnson makes available
20 consumer-facing.  I didn't -- I didn't think of
21 that as a litigation-related resource, and if
22 there were links to a document trove, I didn't --
23 I didn't notice that.
24    Q.    So you did not review the internal

1  Johnson & Johnson documents that are on that Facts
2  About Talc website?
3        DR. THOMPSON:  Object to form.
4        THE WITNESS:  Again, it
5  depends.  It depends what they were, and
6  if you would like to show me something,
7  perhaps I'll remember that I saw it or
8  not.
9        Again, that Facts About Talc
10 website that I saw contained, you know,
11 various statements and various links to
12 other pages.  Some of which may have been
13 to documents rather than HTML sites, and
14 so it's possible.
15       But, you know, did I look
16 comprehensively through something that
17 was presented as a database of documents?
18 No, I did not.
19       MR. HEGARTY:  Why don't we go
20 ahead and take a break.  It's been
21 another hour and some.
22       DR. THOMPSON:  Okay.
23       MR. HEGARTY:  Okay.  Go off
24 record.

Page 146

1        (Recess:  10:40 a.m. -
2        11:02 a.m.)
3        MR. HEGARTY:  We are back on
4     the record.
5  BY MR. HEGARTY:
6     Q.    Doctor, we were talking about
7  Exhibit No. 5 and in particular some of the
8  literature that's listed on there.
9        Had you read any medical or
10  scientific literature regarding talc and ovarian
11  cancer before being contacted by counsel for
12  plaintiffs in this case?
13     A.    I probably had, but I don't recall
14  the specifics.  It's been an issue for a long
15  time.
16     Q.    When you say you probably had, would
17  that have been, if at all, back when you were in
18  medical school and then doing your internship or
19  residency?
20     A.    No.  It would more likely have been
21  during my teaching career because health and
22  safety regulation and health law policy are what I
23  do.
24     Q.    But sitting here today, can you say

Page 147

1  definitively that you had read any medical
2  literature, whether it's an epidemiologic article
3  or cell study or animal study, on talcum powder
4  use and ovarian cancer before being contacted by
5  counsel for the plaintiffs in this case?
6     A.    I believe that it's extremely likely
7  that I did because it's a big issue.
8     Q.    Can you identify for me any article
9  you had read or the time period in which you had
10  read such an article?
11     A.    Not specifically.
12     Q.    So are you able to identify for me
13  any article that you had read -- medical or
14  scientific article about talcum powder use and
15  ovarian cancer before being contacted by
16  plaintiffs' counsel?
17     A.    Can I identify it now?  No.
18     Q.    Had you read any article looking at
19  asbestos and ovarian cancer prior to being
20  contacted by plaintiffs' counsel in this case?
21     A.    I have read a lot of
22  asbestos-related documents over the years in dribs
23  and drabs as things came up.  Most of them were
24  mesothelioma related.  I don't recall any being on

Page 148

1  ovarian cancer specific.
2     Q.    Had you read any articles prior to
3  being contacted by plaintiffs' counsel looking at
4  heavy metal use and ovarian cancer -- heavy metal
5  exposure and ovarian cancer?
6     A.    No.
7     Q.    All of the opinions that are set out
8  in your report that we marked previously as
9  Exhibit No. 4 were formed after you were contacted
10  by plaintiffs' counsel about testifying as an
11  expert in this case, correct?
12        DR. THOMPSON:  Object to form.
13        THE WITNESS:  Yes.  After I
14     was contacted to consider whether I would
15     be an expert in this case, yes.
16  BY MR. HEGARTY:
17     Q.    You mentioned that prior to being
18  contacted by counsel for plaintiffs in this case
19  that you had been aware of an alleged link between
20  talcum powder use and ovarian cancer, correct?
21     A.    Correct.
22     Q.    And you talked generally about news
23  sources and other general perhaps sources that you
24  would see in your work that refer to -- referred

Page 149

1  to talcum powder use and ovarian cancer.
2        Are you able to cite any specific
3  things you had read prior to being contacted by
4  Dr. Thompson as it relates to talcum powder use
5  and ovarian cancer?
6     A.    I can't cite them specifically.
7  Most of the things I would see in the ordinary
8  course would be things that had either a
9  law-related or a health policy-related connection.
10  Most of my, you know, daily news feed type sources
11  are not, you know, the clinical literature as
12  much.
13        Now if something had shown up that
14  was, you know, JAMA New England Journal style
15  publication or, you know, abstracted in some
16  compendium, you know, major clinical News of the
17  Week, the old AMA news sites, then I would have
18  seen it in that connection.
19        But, you know, this is a major
20  concern and a major source of -- of potential
21  liability and litigation.  So, of course, as a law
22  and medical school professor, I've seen
23  references.
24     Q.    As a medical student and then when

Page 150

1  you finished law and medical school and did some
2  clinical practice in medicine, did you ever read
3  anything or were you ever taught anything as it
4  relates to talcum powder use and ovarian cancer?
5      A.    Not that I recall.
6      Q.    You -- first back up.
7            Have you ever taught in any course
8  of yours -- let me ask it a different way.
9            Have you ever referenced in any
10 course you have taught anything about talcum
11 powder use and ovarian cancer or litigation
12 involving talcum powder use and ovarian cancer?
13     A.    Not that I recall.
14     Q.    You cite in your report to such
15 organizations as IARC, Health Canada, and the FDA.
16     Do you recall that?
17     A.    Yes.
18     Q.    So do you agree that it was
19 important for your methodology in this case to
20 consider what these health authorities have to say
21 about talc use and ovarian cancer, correct?
22         DR. THOMPSON:  Object to form.
23         THE WITNESS:  Correct, with
24     the addition that my opinion is

Page 151

1      fundamentally about regulatory compliance
2      and self-regulatory conduct and not about
3      causation.
4  BY MR. HEGARTY:
5      Q.    On page 11 -- let me not -- I don't
6  need to reference your report.  Let me just back
7  up.
8            You mentioned earlier when you went
9  through the materials that you had in front of you
10 that you -- the April 2014 FDA letter denying two
11 Citizen's Petitions seeking warnings about the
12 risk of ovarian cancer with talcum powder use,
13 correct?
14     A.    Correct.
15         MR. HEGARTY:  I'm going to
16     mark as Exhibit No. 7 a copy of that
17     April 1, 2014 letter.
18         (Document marked for
19     identification as Sage Exhibit 7.)
20 BY MR. HEGARTY:
21     Q.    So you've seen this before, correct?
22     A.    I have.
23     Q.    You comment about it in your report,
24 right?

Page 152

1      A.    Yes.
2      Q.    As this letter shows, and as you
3  know from your own analysis, FDA did receive two
4  Citizen Petitions asking that a warning be placed
5  on talc products, and they give a couple examples
6  of those types of warnings on the first page of
7  this exhibit, right?
8      A.    They don't give examples.  They give
9  the specific warnings that were requested in the
10 Citizen's Petitions.
11     Q.    Fair enough.
12         And in 2014, FDA determined that the
13 data did not demonstrate a causal association
14 between talcum powder use in the perineal area and
15 ovarian cancer, correct?
16     A.    To quote from that letter, as I
17 described in paragraph 150 of my opinion, the
18 letter says:
19         "While the growing body of evidence
20 to support a possible association ... is difficult
21 to dismiss, the evidence is insufficient for FDA
22 to require as definitive a warning as you are
23 seeking."
24         It's not exactly what you had quoted

Page 153

1  there.
2      Q.    Well, on the first page of the -- of
3  Exhibit No. 7, second last paragraph, last line,
4  it says:
5         "FDA did not find that the data
6  submitted presented conclusive evidence of a
7  causal association between talc use and the
8  perineal area and ovarian cancer."
9         Correct?
10     A.    Certainly with the emphasis on
11 "conclusive" which is the only word that makes
12 that consistent with the language that I quoted to
13 you.
14     Q.    And FDA did a comprehensive review
15 of the science in rejecting these opinions,
16 correct?  I'm sorry.  These petitions, correct?
17         DR. THOMPSON:  Object to form.
18         THE WITNESS:  I don't know
19     exactly what the FDA did.  There are
20     extraordinary gaps in time and
21     extraordinary issues of resources between
22     1994 petition and the 2014 response.
23 BY MR. HEGARTY:
24     Q.    Are you an expert in the process by

1 which FDA reviews and responds to Citizen
2 Petitions?
3          DR. THOMPSON: Object to form.
4          THE WITNESS: My expertise in
5      how agencies communicate with public and
6      industry is sufficient to make me an
7      expert in evaluating this letter.
8 BY MR. HEGARTY:
9      Q.    Have you ever been involved in an
10 FDA review of a Citizen Petition?
11     A.    No.
12     Q.    How many Citizen Petitions and FDA
13 responses have you ever read?
14     A.    Probably -- well, I certainly have
15 read the response from the 1990s on urocanic acid
16 because that one is highly relevant to this case.
17     Q.    On what? I'm sorry.
18     A.    Urocanic acid.
19     Q.    Okay.
20     A.    U-r-o-c-a-n-i-c.
21          Because that's rather relevant here
22 because it includes the "safety not determined"
23 language.
24          I have looked at the extent to which

1 Citizen's Petitions are publicly available on a
2 database. The ones relating to cosmetics do not
3 appear to be. So I've become very interested in
4 the Citizen Petition process.
5          But prior to considering these --
6 these issues, no, I had not looked at Citizen
7 Petitions except in passing. You do see Citizen's
8 Petitions when you teach regulatory topics.
9      Q.    And the urocanic acid Citizen
10 Petition was something you reviewed after being
11 hired as an expert in this case, correct?
12     A.    Yes.
13     Q.    Have you ever discussed with anyone
14 at FDA about FDA's handling of Citizen Petitions?
15     A.    No. It's very high on my list for
16 when I am in contact again with FDA officials, and
17 I am friends with a couple of former
18 commissioners, and should I run into them, it will
19 be one of the things I will be interested in
20 discussing.
21     Q.    Who are you friends with?
22     A.    I'm friends with Mark McClellan and
23 I'm acquaintances with Scott Gottlieb. And in the
24 old days, I was friends with Don Kennedy, but

1 that's many years -- many years ago.
2      Q.    Have you ever submitted materials in
3 connection with FDA considering a Citizen
4 Petition?
5      A.    No.
6      Q.    Have you ever drafted or been
7 involved in the drafting of FDA's responding to a
8 Citizen Petitions?
9      A.    No.
10     Q.    Do you know who Steve Musser is at
11 FDA?
12     A.    No.
13     Q.    Do you know where he went to school?
14     A.    No.
15     Q.    Do you know his educational
16 background?
17     A.    Well, he's got a PhD. So I can tell
18 you he didn't go to medical school; but, no, I
19 don't know where he went to school. I did not --
20 I did not look him up.
21     Q.    Did you try to talk to him about the
22 2014 letter?
23     A.    No.
24     Q.    Why not?

1      A.    I don't know him and I would have no
2 reason to contact him. I also, from perhaps lack
3 of experience with serving as an expert witness,
4 decided that my reviews and research should be
5 documentary and not involve individuals.
6      Q.    Did anybody instruct you as part of
7 your work as an expert witness that you couldn't
8 reach out to others and talk to them?
9      A.    No one instructed me. It was my --
10 it was my working assumption. Seemed a prudent
11 way to do a report.
12     Q.    Do you contend that the doctors and
13 scientists at the FDA involved in responding to
14 the two Citizen Petitions were not qualified to
15 assess the safety of talc?
16     A.    I --
17          DR. THOMPSON: Object to form.
18          THE WITNESS: I express no
19      opinions on their qualifications.
20          Again, I would point out that
21      responses to Citizen's Petitions are not
22      definitive responses on the underlying
23      scientific questions. They are responses
24      to a specific request for a specific

Page 158

1    action, in this case, for a specific
2    warning statement.
3  BY MR. HEGARTY:
4      Q.    Well, is it your contention that if
5  FDA believed a warning was needed beyond just what
6  was proposed that they would have taken -- they
7  would not have taken this action?
8            DR. THOMPSON:  Object to form.
9  BY MR. HEGARTY:
10     Q.    Let me ask it in a different way.
11        Is it your contention that FDA
12  believed a warning was needed, just not the ones
13  that were requested in the Citizen Petitions?
14           DR. THOMPSON:  Object to form.
15           THE WITNESS:  I have no basis
16    to know what FDA in some organizational
17    sense believes on that topic.  What I
18    have is the regulatory provisions under
19    which a Citizen's Petition is submitted,
20    and I have this particular response.
21  BY MR. HEGARTY:
22     Q.    Is it your contention that FDA
23  believed that there is a risk of ovarian cancer
24  with talc use and chose to do nothing about it?

Page 159

1      A.    Again --
2            DR. THOMPSON:  Object to form.
3            THE WITNESS:  -- I do not know
4    anything about FDA's belief.
5            I would repeat.  What we see
6    in this letter, which if I were
7    supervising does not meet my standards
8    for clarity, is the sentence you cited,
9    quoted, which was:
10           "FDA did not find that the
11    data submitted" -- notice submitted, not
12    all the data that might be available --
13    "presented conclusive evidence."
14           And then the language that I
15    quoted back, which says:
16           "Growing body of evidence to
17    support a possible association ... is
18    difficult to dismiss.  Evidence is
19    sufficient -- insufficient for FDA to
20    require as definitive a warning as you
21    are seeking."
22           I think this is a badly
23    drafted letter.  I think it is hard to
24    interpret and sounds rather evasive, but

Page 160

1    one thing I will opine is that there's
2    nothing in this letter that should
3    suggest to anyone that FDA thinks that
4    talcum powder products do not cause
5    ovarian cancer.
6  BY MR. HEGARTY:
7      Q.    I'm sorry.  What did you just say in
8  this last sentence?  I didn't...
9      A.    Would you rather it read back?
10           MR. HEGARTY:  Yeah.  Would you
11    read it back, the last part of that
12    response, please?
13           (The reporter read the record
14    on page 159 line 23 to page 160 line 5.)
15  BY MR. HEGARTY:
16     Q.    So is it your testimony in this case
17  that FDA believes that talcum powder use causes
18  ovarian cancer?
19     A.    I don't know what they believe, but
20  this letter doesn't say that they believe that
21  there is no causal association.  It is simply a
22  response, and a rather sloppily drafted response,
23  to two Citizen's Petitions issued 20 years after
24  the first one.  It says what it says, and I can't

Page 161

1  give you anymore insight into the dynamics of the
2  final text and what we have in front of us.
3      Q.    Is it your opinion in this case that
4  FDA failed to do its job with regard to responding
5  to the two Citizen Petitions?
6            DR. THOMPSON:  Object to form.
7            THE WITNESS:  It's my opinion
8    that FDA is grossly underresourced with
9    respect to cosmetics.
10           It's my opinion the Citizen's
11    Petition process needs a significant
12    revision, and I think this -- these two
13    petitions and this particular response as
14    issued at this time, you know, supports
15    my belief that -- that the Citizen's
16    Petition process is in need of
17    improvement.
18  BY MR. HEGARTY:
19     Q.    Well, my question wasn't very
20  specific.
21        Is it your opinion in this case that
22  FDA failed to do its job that it was tasked to do
23  by Congress with regard to responding to these two
24  Citizen Petitions?

Page 162

1    MS. PARFITT:  Objection.
2    DR. THOMPSON:  Object to form.
3    THE WITNESS:   See, this will
4 begin to move us into kind of the core of
5 the opinions, which is that FDA has very
6 limited authority over cosmetics.  FDA
7 does not supervise the self-regulatory
8 processes that cosmetics manufacturers in
9 the cosmetics industry engage in, and the
10 fundamental obligations remain on the
11 manufacturers.
12    This letter offered an
13 opportunity -- I should say, these two
14 Citizen's Petitions offered an
15 opportunity for the FDA to devote more of
16 its resources to this particular
17 cosmetics-related concern, and FDA
18 declined to take that opportunity.
19    But beyond that, I cannot
20 opine as to their motivation as to the
21 pressures brought to bear on them, as to
22 the competing uses of their resources.
23 All the things that sort of go into why
24 this letter is issued at this time.

Page 163

1 BY MR. HEGARTY:
2    Q.    My question was very specific and I
3 don't think you answered it.
4    My question was:  Is it your opinion
5 that FDA failed to do the job it was assigned to
6 do by Congress in responding to these two Citizen
7 Petitions?
8    MS. PARFITT:  Objection.
9 BY MR. HEGARTY:
10    Q.    It's whether you have that opinion.
11    MS. PARFITT:  Objection.
12    DR. THOMPSON:  Object to form.
13    MS. PARFITT:  Question was
14 answered.
15    THE WITNESS:  Let me -- let
16 me try to convey accurately what my
17 opinion is.
18    My opinion is that this letter
19 is not exculpatory of Johnson & Johnson.
20 FDA issued a response to a Citizen's
21 Petition within its authorities, and its
22 response says what its response says.
23    It does not in any way alter
24 the legal obligations of Johnson &

Page 164

1 Johnson regarding the hazards of perineal
2 application of talc.
3 BY MR. HEGARTY:
4    Q.    And I'm still not sure you answered
5 my question.
6    Is it, do you have an opinion that
7 FDA failed to do a proper job in responding to
8 these two Citizen Petitions?
9    MS. PARFITT:  Objection.
10    DR. THOMPSON:  Object to form.
11 Asked and answered.
12    THE WITNESS:   All I can do on
13 this one, respectfully, is say, this
14 process is one of the -- and this outcome
15 is one of the reasons that I strongly
16 support Congressional reform of the
17 cosmetics regulatory process.
18 BY MR. HEGARTY:
19    Q.    You don't know who at FDA was
20 involved in responding to these Citizen Petitions,
21 correct?
22    A.    Correct.
23    Q.    You don't know what resources they
24 devoted to respond to these Citizen Petitions,

Page 165

1 correct?
2    A.    I think we have a supportable
3 inference that resource constraints in the
4 cosmetic area make it very difficult for FDA to --
5 to assess Citizen's Petitions and assess sua
6 sponte actions that might be authorized by
7 Congress but not facilitated.
8    Q.    My question, though, is very -- is
9 specific to this Citizen Petition response.
10    Do you know the resources that FDA
11 devoted to respond to these two Citizen Petitions
12 as reflected in Exhibit No. 7?
13    DR. THOMPSON:  Object to form.
14    THE WITNESS:  I don't know
15 the resources, but I do know, as -- as I
16 imagine you do also, that the history of
17 the Citizen's Petitions, Citizen's
18 Petitions are supposed to generate a
19 response within 180 days.
20    And the, you know, earliest
21 response to the 1994 petition was
22 basically, we're kind of busy, we don't
23 have a lot of resources, and we'll get
24 back to you.

Page 166

1    And then we have a 2008
2  petition and then we have a 2014
3  response, and I think simply from the
4  time course you can very reasonably infer
5  that resources are insufficient to deal
6  with these as they should be dealt with.
7  BY MR. HEGARTY:
8    Q.    Is it your opinion that FDA believes
9  today that a warning with regard to the risk of
10 ovarian cancer is needed on talcum powder
11 products?
12         DR. THOMPSON:  Object to form.
13         THE WITNESS:  I think it is
14  clear that the -- that pending changes in
15  leadership or new statements from FDA
16  leadership that FDA believes that
17  cosmetics regulation needs to be
18  improved, and which would support an
19  inference that the things that FDA has
20  been involved in with cosmetics
21  regulation are things that they do not
22  think are adequate to protect the public.
23 BY MR. HEGARTY:
24    Q.    And my question is specific as it

Page 167

1  relates to talcum powder products and ovarian
2  cancer risk.
3         Is it your opinion that FDA believes
4  that a warning is needed today on talcum powder
5  products and ovarian cancer risk?
6         DR. THOMPSON:  Object to form.
7         THE WITNESS:  So this -- may
8  I refer to a document we've previously
9  discussed?
10 BY MR. HEGARTY:
11    Q.    Does that answer the question?
12    A.    Yes.
13    Q.    Sure.
14    A.    So if we -- if we go back to -- or
15  did you hand it back or do you still have it?  The
16  1998 FDA internal review.  That document includes
17  -- here it is.  This one that we looked at
18  (indicates).
19         That document includes a statement
20  upfront.  Again, it's not a statement of FDA
21  policy, but it is a statement specifically on talc
22  that pointing out FDA's Workshop says:
23         "Perineal talc has been linked to
24  increased risk of ovarian cancer.  Additional data

Page 168

1  obtained since the 1994 Workshop further suggests
2  a health hazard and that additional work for
3  possible action is needed."
4         So FDA has obviously been concerned
5  about this for a while.  In terms of an FDA
6  warning, again, the thing that -- one of the
7  things that distinguishes cosmetic oversight from,
8  say, drug oversight is that FDA's ability to
9  require a warning is far less self-executing.
10        FDA does not require -- does not
11  directly regulate the label or labeling of a lot
12  of aspects of cosmetics; and if FDA wishes to
13  require a warning, it has legal authority to do
14  so, but it has to do it through notice and comment
15  rulemaking at significant expense and a
16  significant degree of legal uncertainty.
17        So, you know, I am willing to
18  suggest that FDA institutionally sees some
19  significant concerns about causal relationships
20  between perineal talc and ovarian cancer, but the
21  regulatory system is not set up for FDA to
22  vindicate those concerns, which is another reason
23  why your client should have.
24    Q.    You have not talked to anybody at

Page 169

1  FDA with regard to talcum powder use or talcum
2  powder products and ovarian cancer, correct?
3    A.    I look forward to doing so.
4    Q.    Well, have you talked to anybody?
5    A.    No.
6    Q.    Paragraph 39 of your report, which
7  is on page 6, the second sentence refers states
8  that:
9         "Asbestos when present in talcum
10  powder product is an adulterant because it is
11  hazardous to human health."
12        Do you see where I'm reading?
13    A.    I do.
14    Q.    One of the materials you cite there
15  is a document, an NIH document entitled
16  "Asbestos Worker and Employer Guide to Hazards and
17  Recommended Controls."
18        Do you see that?
19    A.    I'm --
20         DR. THOMPSON:  What page are
21  you on, please?
22         MS. PARFITT:  Page 6 of the
23  report.
24         THE WITNESS:  Sorry.  I'm not

William M. Sage , MD, JD

Page 170

1      seeing that particular --
2           DR. THOMPSON:  Okay.
3           MS. PARFITT:  Paragraph 39.
4  BY MR. HEGARTY:
5      Q.    Yeah, if you look at --
6      A.    I'm not seeing that particular
7  paragraph.
8      Q.    -- 39 at the end, footnote 9 says
9  NIOSH.
10     A.    It's got the NIOSH and OSHA
11  material, which is where why the Material Safety
12  Data Sheets get revised --
13     Q.    Right.  That document --
14     A.    -- to give talc exposure.
15     Q.    I'm sorry.
16          That document is "Workplace Exposure
17  to Asbestos," correct?
18     A.    Yes.
19     Q.    Did you read that document?
20     A.    No.  I read various things that
21  referenced that document.
22     Q.    Do you understand that document is
23  about occupational exposure to asbestos?
24     A.    I understand that document is about

Page 171

1  occupational exposure to asbestos.  I don't recall
2  the details of all these documents, but I have
3  noticed that several of the documents that discuss
4  occupational exposure also at least have brief
5  mention of nonoccupational exposure risks.
6      Q.    Do you know that that document does
7  not discuss talcum powder use?
8      A.    I would -- I would have to -- I
9  would have to review that document to confirm
10  that; but, again, remember the assertion is about
11  the dangers of asbestos.  To the extent that
12  asbestos is present in talcum powder, it is by
13  FDA's own statement and by other sources
14  conclusively an adulterant.
15     Q.    But you're not -- I'm sorry.
16     A.    It's not dose-dependent.  It's not
17  dose-dependent.  It's not route-dependent.  It is
18  simply an adulterant.
19     Q.    But you understand that the support
20  you're citing for that statement is a document
21  that refers to "Workplace Exposure to Asbestos,"
22  one of the supporting documents?
23          DR. THOMPSON:  Object to form.
24          THE WITNESS:  I have seen

Page 172

1      workplace exposure documents, certainly.
2  BY MR. HEGARTY:
3      Q.    You're, of course, familiar with
4  NIH, correct?
5      A.    Yes.
6      Q.    And you're familiar with the NCI,
7  right?
8      A.    Yes.
9      Q.    And NCI is the federal government's
10  primary health agency on cancer research, correct?
11     A.    I would have -- that's -- that's a
12  strong statement, but for the federal government,
13  yes.
14     Q.    Have you ever had any dealings with
15  NCI?
16     A.    Institutionally, no.  Indirectly, I
17  have a very wide circle of contacts, and I serve
18  on a number of advisory committees, and
19  undoubtedly there's been overlap with -- with NCI
20  over the years.
21     Q.    If you go back and look at this
22  Exhibit No. 5, the literature materials we've been
23  talking -- we were talking about earlier?
24     A.    Uh-huh.

Page 173

1      Q.    You look over at page 6 of that
2  document.  Tell me when you're at page 6.
3      A.    I'm at page 6.
4      Q.    You refer in that document to "NCI
5  Snapshot of Ovarian Cancer."  It's the very top of
6  the page.
7          You see that?
8      A.    Yes, and it doesn't have the
9  snapshot exactly.  I have -- I have an NCI
10  document in front of me that is actually a D
11  exhibit.  It's a defense exhibit.
12     Q.    We're going to get to that.
13          But in terms of the document you
14  reference in your materials, it's this "Snapshot
15  of Ovarian Cancer," right?
16     A.    Yes.
17     Q.    Did you read that document?
18     A.    It was made available.  I don't
19  recall I read your defense exhibit word for word.
20     Q.    You don't cite that defense exhibit
21  in your materials?
22     A.    You're right.
23     Q.    Did you look at it in preparing your
24  report?

Page 174

1    A.    Did I look at the?
2    Q.    The document -- well, did you look
3 at the NCI PDQ that you reference as a defense
4 exhibit in preparing your report?
5    A.    It may have been brought to my
6 attention. Oh, yes. I did look at it in
7 preparing my report, yes.
8    Q.    And why didn't you reference it?
9    A.    I don't know. If that -- if that
10 was an oversight, I apologize.
11   Q.    You agree you didn't even reference
12 it in the materials that you reviewed, right?
13        MS. PARFITT: Objection.
14 Form.
15        THE WITNESS: Again, I don't
16 -- I would have to verify that but...
17        MR. HEGARTY: I'll mark as
18 Exhibit No. 8 what I think is the same --
19        THE WITNESS: I saw -- I saw
20 a reference to -- to that defense exhibit
21 perhaps in this other more general
22 document, and I specifically requested
23 the defense exhibit.
24        (Document marked for

Page 175

1 identification as Sage Exhibit 8.)
2 BY MR. HEGARTY:
3    Q.    I've marked as Exhibit 8 I think is
4 the same document you've been looking at. It's
5 the --
6    A.    Yes.
7    Q.    -- July 8, 2021 NCI Physician Data
8 Query.
9        Is this the same document you were
10 referencing before?
11   A.    Yes. Yours is printed two-sided so
12 it seems smaller.
13   Q.    Again, then you think -- strike
14 that.
15        Your testimony is that you did
16 review this document prior to completing your
17 expert report; is that correct?
18   A.    I believe so.
19        DR. THOMPSON: Object to form.
20        THE WITNESS: I believe so.
21 BY MR. HEGARTY:
22   Q.    And you also agree you make no
23 reference to it anywhere in your expert report,
24 right?

Page 176

1    A.    I will take your word for that.
2    Q.    Do you recall referencing it in the
3 body of the report?
4    A.    I don't think I did.
5    Q.    And do you recall any -- do you see
6 any reference in the list of materials that you
7 reviewed to this document?
8    A.    No. I do remember it well and I've
9 looked at it several times, and I have, you know,
10 I have evaluated it and did not think it warranted
11 direct inclusion in the report.
12   Q.    So you didn't -- is it your
13 testimony that you do not believe this document,
14 the NCI PDQ and what it says about talc and
15 ovarian cancer, is a relevant document to your
16 opinions in this case?
17   A.    I believe --
18        DR. THOMPSON: Object to form.
19        THE WITNESS: I believe it is
20 relevant and I considered it. I did not
21 think it was sufficiently important to
22 reference directly. Be happy to discuss
23 why.
24 BY MR. HEGARTY:

Page 177

1    Q.    Well, did you find this document on
2 your own or did plaintiffs' counsel provide it to
3 you?
4    A.    I asked for this document because I
5 believed it was either -- either I saw it or it
6 was referenced in that Facts About Talc document
7 collection that we were talking about before.
8 Because I remember specifically asking, as I was
9 asking for things that appeared to support the
10 defense's arguments, I asked specifically about
11 the NCI document, and that's how I got the NCI
12 document.
13   Q.    Prior to reading something about the
14 NCI PDQ document, Exhibit No. 8, had you ever been
15 aware that NCI puts out Physician Data Query
16 documents like this?
17   A.    In passing, probably, but I wouldn't
18 have had a need for them in clinical practice.
19   Q.    If you turn over to page 19 of 20 in
20 this document and the pages that are at the
21 bottom --
22   A.    Yes.
23   Q.    -- that reference 19 of 20, it says
24 that this PDQ in the -- let me back up.

Page 178

1    Under the purpose of this summary at
2  the top, it says that this is a summary for health
3  professionals -- let me read it specifically.
4    "This PDQ cancer information summary
5  for health professionals provides comprehensive
6  peer-reviewed evidence-based information about
7  ovarian, fallopian tube, and primary peritoneal
8  cancer."
9    Did I read that correctly?
10   A.    Peritoneal cancer prevention but...
11   Q.    Peritoneal cancer prevention.
12   And it goes on to say:
13   "It is intended as a resource to
14  inform and assist clinicians who care for cancer
15  patients."
16   Correct?
17   A.    Correct.
18   Q.    Then it goes down under the section
19  Reviewers and Updates that says:
20   "This summary is reviewed regularly
21  and updated as necessary by the PDQ Screening and
22  Prevention Editorial Board, which editorial
23  independent of the National Cancer Institute
24  (NCI)."

Page 179

1    Correct?
2  A.    Yes.
3  Q.    Then it goes on to say:
4    "This summary reflects an
5  independent review of literature and does not
6  represent a policy statement of NCI or the
7  National Institutes of Health (NIH)."
8    Correct?
9  A.    Correct.
10   Q.    Then it goes on to describe that:
11   "The board members review recently
12  published articles each month to determine whether
13  an article should" and then it describes what
14  their -- they can do with it, with the article,
15  discussing it, citing the text, replacing it with
16  an updated article, correct?
17   A.    Certainly.  It reminds me very much
18  of loosely electronic scientific American medicine
19  chapters that were published for many years and I
20  subscribed to.  I don't subscribe anymore, but the
21  notion is that you want to have some current
22  clinical guidance and you provide a mechanism
23  for -- for updates periodically.
24   Q.    Then if we turn over to page 13 of

Page 180

1  20, under section --
2  A.    Hold on.
3  Q.    I'm sorry.
4  A.    I have to go back to that.  Yeah.
5  Q.    Under the section Factored with
6  Inadequate Evidence of Association Risk of
7  Ovarian, Fallopian Tube, and Primary Peritoneal
8  Cancer, they specifically refer to perineal talc
9  exposure, correct?
10   A.    Correct.
11   Q.    The first line of that summary says:
12   "The weight of evidence does not
13  support an association between perineal talc
14  exposure and an increased risk of ovarian cancer."
15   Correct?
16   A.    Yes, that's their view expressed in
17  this particular --
18   Q.    And they --
19   A.    -- summary.
20   Q.    They don't -- they say there's not
21  even association in this statement, correct?
22   A.    Now --
23   DR. THOMPSON:  Object to form.
24   THE WITNESS:  -- again you are

Page 181

1  correctly saying.  They say in slightly
2  stylized form, the weight of evidence
3  does not support an association and that
4  results from the various case-controlled
5  and cohort studies are inconsistent, and
6  then they argue the points back and
7  forth.
8    It is -- this is to me
9  representative of much of the discussion
10  that I have seen in other sources.  There
11  are, you know, several studies here that
12  they cite that show confidence intervals
13  that are all above 1.
14    Their, you know, so, again,
15  their conclusion and their categorization
16  is based on what they consider
17  inconsistencies and how they weight
18  particular sort of dose-response style
19  associations, or lack thereof.
20    There's nothing in this that
21  is sort of new information to me beyond
22  the other studies and syntheses that I
23  have -- I've read and from the language
24  you yourself quoted.

Page 182

1    This is an editorial exercise
2  with an NIH-funded publication resource.
3  It is not an official clinical guideline.
4  It is not an official policy statement.
5    One could speculate if you ask
6  the authors of this what they would
7  advise their own patients regarding
8  perineal application of talcum powder, I
9  don't know it would be that "don't worry
10  about it" is the response that you'd get.
11    This is exactly the sort of
12  material that I think is highly relevant,
13  but is also, first of all, embedded in --
14  in a whole set of professional
15  relationships and traditions between
16  clinical physician practice and
17  government bodies that is really
18  tangential to my opinions about a
19  manufacturer's self-regulatory
20  obligations for cosmetics.
21  BY MR. HEGARTY:
22    Q.    Assume for purposes of my
23  question -- and it's a hypothetical -- that this
24  statement is true that the weight of evidence does

Page 183

1  not support an association between perineal talc
2  exposure and an increased risk of ovarian cancer.
3  So assume that's true.
4    Would it still be your opinion that
5  talcum powder is unsafe?
6    DR. THOMPSON:  Object to form.
7    THE WITNESS:  It would still
8    be my opinion that Johnson & Johnson has
9    not complied with its regulatory
10    obligations regarding information, and
11    there's a whole lot of ambiguities in
12    this particular statement.
13  BY MR. HEGARTY:
14    Q.    Again, assume for purposes of my
15  question that this -- that the statement I just
16  read to you is true.
17    Is it still your opinion that talcum
18  powder products should contain a warning about the
19  risk of ovarian cancer?
20    DR. THOMPSON:  Object to form.
21    THE WITNESS:  If this
22    statement were true as written, it is
23    still my opinion that Johnson & Johnson
24    is required to provide consumers with

Page 184

1  information it does not currently
2    provide.
3  BY MR. HEGARTY:
4    Q.    And what would that information be
5  if this statement is true?
6    A.    At a minimum, the statement -- the
7  statement that safety has not been determined.
8  Because, again, this is, you know, a weight of
9  evidence, inconsistencies, and things that they
10  cite certainly do not substantiate the safety
11  of -- of talcum powder products.
12    Moreover, you know, the exact
13  contents of talcum powder products are not really
14  dealt with in this particular report, and I don't
15  really know what assumptions they've made.
16    Q.    Have you told me in your responses
17  to the last few of my questions why you don't --
18  did not cite this document in your report?
19    A.    I --
20    DR. THOMPSON:  Object to form.
21    THE WITNESS:  Yes.  I've told
22    you that I reviewed it, and I did not
23    find that it added information in ways
24    that would modify my opinion.

Page 185

1  BY MR. HEGARTY:
2    Q.    Is that what your standard was for
3  citing material is whether it would modify your
4  opinions?
5    DR. THOMPSON:  Object to form.
6    THE WITNESS:  One's -- one
7    formulates one's opinions and modifies
8    one's opinions in light of new evidence.
9    If this is a piece of evidence
10    I'm being presented with, if it is
11    information that I think needs to be
12    conveyed to the audience of my report on
13    its own, I might include it.
14    But in terms of, is it
15    altering my then present analysis, if it
16    doesn't alter it, I have no other reason
17    to cite it, and that is simply a Bayesian
18    approach to formulating and modifying
19    conclusions.
20    If you're suggesting that
21    somehow I had decided in advance what my
22    conclusions are, I would strongly
23    disagree.
24  BY MR. HEGARTY:

William M. Sage, MD, JD

1    Q.    Well, I think the reader will
2 interpret that, but let me point this out.
3         You did cite to IARC in your report,
4 correct?
5    A.    Yes.
6    Q.    And what it said about talcum powder
7 use and ovarian cancer, correct?
8    A.    Yes.
9    Q.    You did cite to FDA in your report
10 and what it said about talcum powder use and
11 ovarian cancer, correct?
12   A.    Yes.
13   Q.    Those -- and you do cite to NIOSH
14 and what it says about asbestos exposure and risk,
15 correct?
16   A.    Indirectly in the footnote that you
17 read. I don't -- I don't emphasize a discussion
18 of the occupational hazards here, though I -- I do
19 think that the NIOSH conclusions and the way in
20 which the talc mining companies responded to them
21 in terms of worker protection are informative in
22 this case.
23   Q.    So you cite to IARC, you cite to
24 FDA, you cite to NIOSH, but you don't cite to NCI,

1 correct?
2    A.    Again --
3         DR. THOMPSON: Object to form.
4         THE WITNESS: Again, I really
5    have to be clear that this is a
6    NCI-supported journal that follows a
7    perfectly reasonable clinical update
8    process. It is not a statement of the
9    NCI, and the language that you read
10   confirmed that.
11 BY MR. HEGARTY:
12   Q.    So it's your opinion that a reader
13 looking at your report would not be interested in
14 what the NCI PDQ has to say about talcum powder
15 use and ovarian cancer?
16        MS. PARFITT: Objection.
17        DR. THOMPSON: Object to form.
18        THE WITNESS: It's my opinion
19   that I might be misleading a reader of my
20   report to suggest that an NCI -- that
21   this particular NCI document is a policy
22   statement of NCI, which it's not.
23 BY MR. HEGARTY:
24   Q.    You cite to other material in your

1 report that are not policy statements, right?
2    A.    Yes.
3    Q.    You cite to medical literature,
4 right?
5    A.    Yes.
6    Q.    Not a policy statement, is it?
7    A.    No.
8    Q.    So this document, though, you chose,
9 unlike some other articles that you cited, not to
10 cite, correct?
11        DR. THOMPSON: Object to form.
12        THE WITNESS: I didn't
13   affirmatively decide not to cite it. It
14   did not rise to the level where I felt
15   induced to cite it.
16        MR. HEGARTY: Let me show you
17   what I've marked as Exhibit No. 9.
18        (Document marked for
19   identification as Sage Exhibit 9.)
20 BY MR. HEGARTY:
21   Q.    This is the PDQ Screening and
22 Prevention Editorial Board for the PDQ that we
23 marked as Exhibit No. 8.
24        Have you seen this list of board

1 members?
2    A.    I have not. I have a medical school
3 classmate on the list.
4    Q.    Who is that?
5    A.    Joann Elmore.
6    Q.    She's got a Master of Public Health,
7 right?
8    A.    Yes, she does.
9    Q.    You do not have a Master of Public
10 Health, right?
11   A.    I do not.
12   Q.    And Joann Elmore, do you respect her
13 as an epidemiologist?
14   A.    As an epidemiologist? I would have
15 to go back and talk to her in a few years, but I
16 would have to go back and see what her work is.
17 But, yes, I respect her. I respect everybody on
18 this list.
19        But that's not the same thing as
20 saying that this particular statement of the
21 literature is in any sense definitive, in any
22 sense a policy statement, and I think on its own
23 terms an informed reader would -- would not simply
24 take their categorization at face value.

Page 190

1    As I said, I suspect that if you
2 asked the individuals who actually wrote this
3 article what they would advise their own patients,
4 I don't think "don't worry about it" would be the
5 answer from all of them, but that's just my
6 professional opinion.
7    Q.    Do you know any of the other
8 individuals on this list?
9    A.    Hmm.
10    (Reviews document.)
11    I suspect I know who David
12 Ransohoff's father was but, no.
13    Q.    Did you contact any of these
14 individuals about the NCI PDQ?
15    A.    No.
16    Q.    Did you even look at this editorial
17 board before preparing your report?
18    A.    No.
19    Q.    And the board members, as it says in
20 this document, represents -- represent the field
21 of oncology, cancer prevention, cancer screening,
22 hematology, radiology, urology, statistics,
23 epidemiology, and economics, correct?
24    A.    That's what it says.

Page 191

1    Q.    You don't represent any of those
2 fields, correct?
3    DR. THOMPSON:  Object to form.
4    THE WITNESS:  I certainly
5    have expertise in cancer prevention from
6    the work I've done.  I have expertise in
7    cancer screening from the work I've done.
8    I have some statistical expertise, some
9    epidemiological expertise, and a whole
10    lot of economic expertise.
11 BY MR. HEGARTY:
12    Q.    Okay.
13    A.    Do I practice any of these as my
14 dominant profession?  No.
15    Q.    Is it your contention that the
16 editorial board members did not properly review
17 the medical literature to come to the statements
18 that they set out in the PDQ we marked as Exhibit
19 No. 8?
20    DR. THOMPSON:  Object to form.
21    THE WITNESS:  I have no such
22    opinion, and I think it is tangential to
23    my opinions in this case.
24 BY MR. HEGARTY:

Page 192

1    Q.    Do you know who the CDC is?
2    A.    I do.
3    Q.    Do you know who the SGO is, the
4 Society of Gynecologic Oncologists?
5    A.    I never heard it with the acronym.
6 I've heard of the Society of Gynecologic
7 Oncologists.
8    Q.    Do you know who ACOG is, the
9 American College of --
10    A.    I know who ACOG --
11    Q.    -- Obstetricians and Gynecologists?
12    A.    Sorry to interrupt you.
13    Yes, I know who ACOG is.
14    Q.    Did you review their list of risk
15 factors for ovarian cancer?
16    A.    It's possible I did.  I don't -- I
17 don't recall.  If I -- if I had been looking
18 casually in my very initial investigations before
19 deciding whether or not to offer an opinion in
20 this case, ACOG would have been the household name
21 for me, and if I went to one place, that's where I
22 would have gone.  But I don't know that I found
23 anything.
24    Q.    Do you know that ACOG does not list

Page 193

1 talc as a risk factor for ovarian cancer?
2    DR. THOMPSON:  Object to form.
3    THE WITNESS:  Again, I can't
4    recall.  All of this, you know, is in
5    some sense tangential to, you know, the
6    fundamental questions in my opinion.
7 BY MR. HEGARTY:
8    Q.    Before being hired by the
9 plaintiffs' lawyers to work on this case, you had
10 never written anything about talc, correct?
11    A.    Correct.
12    Q.    You never commented on talc,
13 correct?
14    A.    Correct.
15    Q.    Before being hired by plaintiffs'
16 lawyers in this case, you had never written
17 anything about any cosmetic product, correct?
18    DR. THOMPSON:  Object to form.
19    THE WITNESS:  Anything that
20    was solely a cosmetic product?
21 BY MR. HEGARTY:
22    Q.    Correct.
23    A.    No.
24    Q.    Before being hired to testify on

William M. Sage, MD, JD

1  behalf of plaintiffs in this case, you had never
2  written anything about asbestos, correct?
3          DR. THOMPSON:  Object to form.
4          THE WITNESS:  That's probably
5      correct.  I'd have to go see.  I suspect
6      that in articles that I've written, I've
7      made references or comparative references
8      to asbestos litigation.  It would be
9      unavoidable given how much regulatory
10     health and safety work I've done.
11 BY MR. HEGARTY:
12     Q.     I think we did a search for your
13 name and asbestos and didn't come up with
14 anything.
15     A.     Good to know.  Thank you.  (Laugh.)
16     Q.     Do you recall ever talking about
17 asbestos in any article you've ever written?
18     A.     I don't.
19          DR. THOMPSON:  Object to form.
20          THE WITNESS:  I'm pretty sure
21     I've done it in passing because, as I
22     said, you know, if you're writing about
23     sort of major product-related personal
24     injury litigation, chances are you made

1      reference to asbestos.  But if you can't
2      find it, then it may not exist.
3  BY MR. HEGARTY:
4      Q.     Have you ever written anything in
5  the published literature about fragrance?
6      A.     No.
7      Q.     How about heavy metals?
8      A.     No.
9      Q.     Have you ever written anything in
10 the published literature about the manufacturers
11 who make cosmetic products?  As it relates to
12 their manufacture of cosmetic.
13     A.     Oh.  No.
14          DR. THOMPSON:  Object to form.
15 BY MR. HEGARTY:
16     Q.     Have you ever written anything on
17 the development, manufacture, marketing, or sale
18 of any cosmetic product?
19          DR. THOMPSON:  Object to form.
20          THE WITNESS:  Not that I can
21     recall.  I have to answer it that way
22     because when we're talking about
23     marketing activities, I write a whole lot
24     about relationship between marketing

1      activities and disclosure obligations,
2      and also about First Amendment claims
3      involved in government regulation of
4      information.
5  BY MR. HEGARTY:
6      Q.     And my question is specifically as
7  it relates to a cosmetic product.
8      A.     Again, it's not that I can recall in
9  the sense it would have been in passing.
10     Q.     Have you ever written anything in
11 the published medical literature or the literature
12 -- let me -- let me ask it a different way.
13          Have you ever published an article
14 or anything, any published document that talks
15 about ovarian cancer?
16     A.     Hmm.
17          DR. THOMPSON:  Object to form.
18          THE WITNESS:  Again, not that
19     I can recall and probably not.
20 BY MR. HEGARTY:
21     Q.     Have you ever spoken to an audience
22 about talcum powder?
23     A.     No.
24     Q.     Have you ever spoken to an audience

1  about asbestos?
2      A.     No.
3      Q.     Have you ever spoken to an audience
4  about heavy metals?
5      A.     No.
6      Q.     Fragrances?
7      A.     I have never spoken to an audience
8  about fragrances.
9      Q.     Have you ever spoken to an audience
10 about ovarian cancer?
11     A.     In passing, yes.
12     Q.     How have you done so in passing?
13     A.     About -- so I would use ovarian
14 cancer often as an example for my regulatory
15 theory classes on risk framing issues, and
16 specifically telling the story of Gilda Radner's
17 ovarian cancer and the misperception that many --
18 that the general public took away from that that
19 ovarian cancer was somehow preferentially a
20 disease of younger women when it's actually a
21 disease of older women.  So it would have been a
22 common anecdote I would use.
23          I actually teach a whole lot about
24 cancer prevention and -- and cancer screening

William M. Sage, MD, JD

Page 198

1  tests in my regulatory theory classes every time I
2  teach them.
3      Q.    Have you ever spoken to an audience
4  about the causes of ovarian cancer?
5      A.    No.
6      Q.    Have you ever taught any courses
7  where talc was discussed?
8      A.    No.
9      Q.    Where asbestos was part of the
10 course?
11     A.    Again, not that I can recall, but
12 it's a common example of, you know, I think
13 probably in discussing Stephen Jay Gould's
14 non-asbestos mesothelioma.
15     Q.    You're not an oncologist, correct?
16     A.    Correct.
17     Q.    You're not a gynecologist, correct?
18     A.    Correct.
19     Q.    You're not an expert in the overall
20 field of ovarian cancer, correct?
21     A.    I'm not a clinical or molecular
22 expert, cellular expert in ovarian cancer, no.
23     Q.    You're not an expert on the risk
24 factors for ovarian cancer, correct?

Page 199

1      A.    I evaluate risk factors in -- for
2  cancer in a lot of the work I do.  So I haven't
3  applied that expertise to ovarian cancer; but,
4  again, I reiterate that I'm not offering a medical
5  opinion or epidemiological opinion on causation.
6      Q.    Can you cite for me the risk factors
7  for serous invasive ovarian cancer?
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  Off the top of
10         my head, no.  I, you know, can suggest
11         that some of them have to do with parity.
12         Some of them have to do with various
13         exposures.  Some of them probably have to
14         do with family history.
15             But I would have to look them
16         up, as I would look up risk factors for
17         pretty much anything.
18 BY MR. HEGARTY:
19     Q.    You never performed any research on
20 ovarian cancer, correct?
21     A.    No.
22     Q.    You've never been the doctor who
23 diagnosed a patient's ovarian cancer, correct?
24     A.    I have diagnosed patients' cancers,

Page 200

1  but ovarian cancer, no.
2      Q.    You never treated a patient for
3  ovarian cancer, correct?
4      A.    I'm not sure of that, but it
5  wouldn't have been the primary diagnosis.  I
6  probably have treated a patient who had prior --
7  previously been diagnosed with ovarian cancer.
8      Q.    My question, though, is:  Have you
9  ever treated a patient for her ovarian cancer?
10     A.    No.
11     Q.    Have you ever treated a patient for
12 mesothelioma?
13     A.    No.
14     Q.    Have you ever treated a patient for
15 peritoneal mesothelioma?
16     A.    No.
17     Q.    Have you ever diagnosed a patient
18 with an asbestos-related disease?
19     A.    That's really interesting.
20         I did a lot of work at the Palo Alto
21 VA hospital, and it was a World War II era patient
22 base.
23         Not that I can recall.
24     Q.    Do you know what asbestosis is?

Page 201

1      A.    Yes.
2      Q.    Do you know what pleural plaques
3  are?
4      A.    I can -- I can imagine what pleural
5  plaques are.  I don't -- don't know if I've used
6  that term in a clinical setting.
7      Q.    Do you know what ferruginous bodies
8  are?
9      A.    Apparently not because I'll need you
10 to --
11     Q.    Ferruginous bodies.  Do you not?
12     A.    Ferruginous?  I do not.
13     Q.    If a woman needed to be evaluated
14 for a possible case of ovarian cancer, no one
15 would refer them to you, right?
16     A.    That would be correct.
17     Q.    If someone did, you would refer them
18 to someone else, right?
19     A.    With alacrity.
20     Q.    No one has ever sought out your
21 consultation regarding a patient with ovarian
22 cancer, correct?
23     A.    No one -- as we've established
24 repeated -- repeatedly, I do not have an active

William M. Sage , MD , JD

Page 202

¹ clinical practice. I do not have sort of subfield
² specialization in gynecology or obstetrics or in
³ oncology; but in the course of my teaching and
⁴ research and scholarly work, I encounter all of
⁵ these diseases and tests, symptoms, risk factors
⁶ and, frankly, access to and cost of treatment.
⁷      Q.     You never came to the opinion that
⁸ asbestos caused any patient's ovarian cancer,
⁹ correct?
¹⁰      A.     In this -- in this instance, I will
¹¹ rely on multiple statements about asbestos as a
¹² risk factor for ovarian cancer, as for other
¹³ cancers.
¹⁴      Q.     No. My question is very specific.
¹⁵            You never came to the opinion that
¹⁶ asbestos caused any particular patient's ovarian
¹⁷ cancer, correct?
¹⁸      A.     That would follow directly from not
¹⁹ having treated a patient for ovarian cancer.
²⁰      Q.     You've never discussed the risk
²¹ factors of ovarian cancer with a patient, correct?
²²      A.     Correct.
²³      Q.     You've never talked to a patient
²⁴ about talcum powder use, correct?

Page 203

¹      A.     Not -- not that I can recall.
²      Q.     Have you ever recommended to any
³ physician that they advise against talcum powder
⁴ use?
⁵      A.     No.
⁶      Q.     Have you ever told anybody to stop
⁷ using talcum powder?
⁸      A.     I certainly would now.
⁹      Q.     My question is: Prior to today,
¹⁰ have you ever told any person to stop using talcum
¹¹ powder?
¹²      A.     No. I have evaluated mentally my
¹³ own brief talcum powder use wondering.
¹⁴      Q.     You don't belong to any medical
¹⁵ organizations currently, do you?
¹⁶      A.     Yes.
¹⁷      Q.     What medical organization do you
¹⁸ belong to?
¹⁹      A.     I'm an AMA member and have been
²⁰ forever. I'm trying to think what else that would
²¹ qualify as a medical organization. But, I mean,
²² again, I'm a -- I'm an elected member of the
²³ National Academy of Medicine. So I think I have
²⁴ medical bona fides.

Page 204

¹      Q.     When is the last time you went to a
² meeting of a medical society?
³      A.     Probably about three years ago and
⁴ sat in on a whole variety of interesting
⁵ radiologic sessions, in addition to the one that I
⁶ spoke out on on policy issues. I have a basic
⁷ principle that I don't just go in and out when I
⁸ speak, and I always sit and listen to things.
⁹      Q.     Have you ever been involved in any
¹⁰ published article related to the female
¹¹ reproductive tract?
¹²      A.     No.
¹³            DR. THOMPSON: Object to form.
¹⁴ BY MR. HEGARTY:
¹⁵      Q.     In fact, you never published a
¹⁶ medical article, correct?
¹⁷      A.     Not correct. I have published
¹⁸ medical articles.
¹⁹      Q.     You published medical article about
²⁰ the clinical practice of medicine?
²¹      A.     Yes. When I -- when I was in
²² medical school, I was lead author on articles
²³ about intensive care practice and about urologic
²⁴ practice. They emphasized the outcomes and the

Page 205

¹ cost-related care choices. They weren't
² generating clinical practice guidelines, if you
³ will; but, yes, they are -- they were
⁴ fundamentally clinical articles.
⁵      Q.     And none of those articles had
⁶ anything to do with the reproductive tract, female
⁷ reproductive tract, correct?
⁸      A.     That's correct. I mean, obviously
⁹ the urologic article had to do with male
¹⁰ reproductive tract or reproductive organs.
¹¹      Q.     You're not an expert in talc,
¹² correct?
¹³            DR. THOMPSON: Object to form.
¹⁴            THE WITNESS: Could you ask
¹⁵       that in a way that I know what -- what
¹⁶       piece of the discipline you're interested
¹⁷       in?
¹⁸ BY MR. HEGARTY:
¹⁹      Q.     Well, would you call yourself an
²⁰ expert in talcum powder?
²¹      A.     No.
²²            DR. THOMPSON: Object to form.
²³            THE WITNESS: No.
²⁴ BY MR. HEGARTY:

William M. Sage , MD, JD

Page 206

1    Q.    Would you call yourself an expert in
2  asbestos?
3           DR. THOMPSON:  Object to form.
4           THE WITNESS:  No.
5  BY MR. HEGARTY:
6    Q.    Can you name the 6 types of
7  regulated asbestos?
8           DR. THOMPSON:  Object to form.
9           THE WITNESS:  Offhand, no.  I
10       can pronounce them, I believe, you know.
11 BY MR. HEGARTY:
12   Q.    Can you tell me the difference
13 between an amphibole and a serpentine form of
14 asbestos?
15          DR. THOMPSON:  Object to form.
16          THE WITNESS:
17       Mineralogically, no.  I know those are
18       two of the forms.
19 BY MR. HEGARTY:
20   Q.    You know what the most commercially
21 used asbestos was?
22          DR. THOMPSON:  Object to form.
23          THE WITNESS:  I have read --
24       read that.  I don't recall.

Page 207

1  BY MR. HEGARTY:
2    Q.    Did you analyze the toxicities of
3  asbestos across the various forms?
4           DR. THOMPSON:  Object to form.
5           THE WITNESS:  No, but nothing
6        in my opinion relates to my having done
7        any of this personally.
8  BY MR. HEGARTY:
9    Q.    You're not a toxicologist, correct?
10   A.    I am -- correct.
11   Q.    You're not an expert in fragrances,
12 correct?
13   A.    Correct.
14   Q.    You're not a genesis -- geneticist,
15 correct?
16   A.    I'm not a geneticist.
17   Q.    Not a mineralogist, correct?
18   A.    I took two geology classes in
19 college, but I'm not a mineralogist.
20   Q.    You've had no formal epidemiologic
21 training, correct?
22   A.    I've had some epidemiologic training
23 in medical school as, you know, consequence to
24 receiving a medical school.

Page 208

1    Q.    Have you ever conducted an
2  epidemiologic study?
3    A.    A lot of the research that I do uses
4  the quantitative techniques that are common in
5  epidemiology.  I haven't done -- I haven't been an
6  author or coauthor of something that is sort of a
7  primary epidemiological study.
8    Q.    Have you ever published a review of
9  epidemiologic evidence?
10   A.    No.
11   Q.    You're not an expert on the testing
12 of -- of talc for the presence of asbestos,
13 correct?
14          DR. THOMPSON:  Object to form.
15          THE WITNESS:  Correct.
16 BY MR. HEGARTY:
17   Q.    You're not an expert in geology,
18 correct?
19   A.    Again, I have preparation and
20 interest in geology.  So there are areas of
21 geology that I have far more than lay credentials
22 with respect to.
23   Q.    Would you call yourself a geologist?
24   A.    No.

Page 209

1    Q.    You're not an industrial hygienist,
2  correct?
3    A.    Correct, but, again, there is
4  considerable overlap; but I have experience with
5  OSHA regulations and practices.
6    Q.    You're not an expert in Johnson's
7  Baby Powder, are you?
8           DR. THOMPSON:  Object to form.
9           THE WITNESS:  I believe it
10       was applied to me in early childhood but,
11       no.
12 BY MR. HEGARTY:
13   Q.    Do you know where Johnson & Johnson
14 has mined its talc for its Johnson's Baby Powder
15 over the years?
16   A.    I have read that in connection
17 with -- with these issues.  I had no prior
18 knowledge of that.
19   Q.    Do you know where Johnson & Johnson
20 currently obtains its talcum powder for its baby
21 powder products?
22   A.    For the products it doesn't sell
23 here?  I don't know.
24   Q.    Well, you understand that Johnson's

William M. Sage, MD, JD

Page 210

1  Baby Powder is sold outside the United States and
2  Canada --
3      A.    Correct.
4      Q.    -- correct?
5      A.    Correct.
6      Q.    Do you know where Johnson & Johnson
7  sources its talc for those products?
8      A.    Again, I read this in passing in the
9  materials here.
10     Q.    Do you know what Johnson & Johnson's
11 testing protocols are for testing talc?
12     A.    I have read in the course of
13 preparing this report a lot regarding testing
14 protocols and history of testing protocols and the
15 different methods and the different thresholds for
16 detection, for sensitivities, you know, going --
17 going back to the CIR J4-1 standard.
18          This has all been very interesting
19 to read and I've learned a lot about it, you know.
20 So I -- I am glad to have that knowledge now and
21 to use that as part of, you know, the material
22 I've considered -- I've considered for these
23 opinions.
24          Before -- before becoming involved

Page 211

1  in this case, no, I had no knowledge about how
2  Johnson & Johnson tested for asbestos.
3      Q.    And do you still -- do you currently
4  today, as of today, do you know the protocols that
5  Johnson & Johnson uses in testing its baby powder
6  for the presence of asbestos?
7      A.    Again, I've seen references to these
8  that were interesting to read.  I couldn't --
9  couldn't tell you.
10     Q.    With regard to ovarian cancer, are
11 you able to cite for me the subtypes besides
12 serous?
13     A.    Again, no.  I would look them up.
14 That would be true for most cancers.
15     Q.    Do you know what the incidence rate
16 is of ovarian cancer in this country?
17     A.    I would only be guessing.  Again,
18 this is sort of a fundamental aspect of expertise
19 is you don't really memorize a lot of things.  You
20 look things up.
21     Q.    Have you ever spoken at a seminar at
22 the request of a plaintiff's lawyer?
23     A.    Hmm.  I've spoken at many
24 conferences at the request of defense lawyers.  I

Page 212

1  don't think I've ever spoken at one at the request
2  of a plaintiff's lawyer.
3      Q.    Have you ever been personally
4  involved in litigation?
5      A.    No.
6      Q.    Have you ever had any disciplinary
7  action initiated against you?
8      A.    No.
9          MR. HEGARTY:  You want to go
10 ahead and take that break.
11          DR. THOMPSON:  Sure.
12          MR. HEGARTY:  Take a break.
13 Let's go off the record.
14          (Whereupon, at 12:03 p.m., a
15 luncheon recess was taken.)
16
17
18
19
20
21
22
23
24

Page 213

1          AFTERNOON SESSION
2              (12:52 p.m.)
3          WILLIAM M. SAGE, MD, JD
4  called for continued examination and, having been
5  previously duly sworn, was examined and testified
6  further as follows:
7          EXAMINATION (CONTINUED).
8          MR. HEGARTY:  We're back on
9    the record.
10         (Document marked for
11   identification as Sage Exhibit 10.)
12 BY MR. HEGARTY:
13     Q.    Dr. Sage, over the break there was a
14 copy made of your current curriculum vitae, which
15 I marked as Exhibit No. 10.
16         Would you tell me if Exhibit No. 10
17 is a copy of your current curriculum vitae?
18     A.    I will look to see if it has the
19 current visiting positions on it.
20         Well, now we have the problem that
21 it only has the odd numbered pages in it.
22         MS. PARFITT:  Oh, great.
23 Well, that was --
24         MR. HEGARTY:  All right.

Page 214

1    Well, we'll -- we'll go ahead and replace
2  it at a break.
3         THE WITNESS:   That could be a
4  yes.
5  BY MR. HEGARTY:
6    Q.    Okay.
7    A.    Would it help you to work with the
8  one I have?
9    Q.    No.  We'll go ahead.  We need to
10 mark it for the -- for the record.  The next break
11 we'll get to it.
12        Now, you mentioned the notice of
13 deposition.
14        Do you have a copy of that?
15   A.    I do.
16   Q.    What is the exhibit sticker on
17 there?
18   A.    The exhibit sticker is 6.
19   Q.    No. 6.
20        You said you now had a chance to
21 read the 18 paragraphs in that exhibit?
22   A.    I have.
23   Q.    Did you provide to your counsel for
24 purposes of that notice all the materials that you

Page 215

1  have that are described in those paragraphs?
2    A.    Yes, absolutely.
3         DR. THOMPSON:  And --
4         THE WITNESS:   I had -- I had
5  gone through this orally.  I just had not
6  seen the document before.
7         MR. HEGARTY:  And Dr. Thompson
8  had something to say.
9         DR. THOMPSON:  And just for
10 the record, we filed objections to the
11 production request.
12        MR. HEGARTY:  And you've --
13 this is directed to Dr. Thompson.
14        You produced the documents
15 that you considered were not
16 objectionable to the deposition notice?
17        DR. THOMPSON:  Correct.
18 BY MR. HEGARTY:
19   Q.    Doctor, I want to talk in more
20 detail about your expert witness report.
21        So I'm going to start walking
22 through the paragraphs.  So you might want to have
23 that available.  That's previously been marked as
24 Exhibit No. 4.  Although I know you have your own

Page 216

1  a copy in front of you.
2         So do you have your report in front
3  of you?
4    A.    I do.
5    Q.    If we look at paragraph 10 of your
6  report, you say in the middle of the paragraph as
7  far as what you -- your research included and what
8  your review included were "relevant corporate
9  documents requested of counsel."
10        Do you see that phrase?
11   A.    Yes.
12   Q.    Are you saying that you specifically
13 asked for certain documents that were requested of
14 counsel for plaintiff?
15   A.    I'm saying that apart from Facts
16 About Talc and other easily accessible corporate
17 documents from public websites, I didn't have
18 access to corporate documents from the litigation
19 that were relevant to the report; and I asked for
20 as many of those as was feasible to be produced to
21 me.
22   Q.    And as best as you can, can you
23 reconstruct for me the language you were -- you
24 would have -- that you used in making that

Page 217

1  request?
2    A.    I would have asked for -- sure, I
3  can tell you.  Let me categorize that for you.
4         So category 1, as I've said
5  repeatedly, was making sure I had both sides of
6  the litigation story.  So if I had been receiving,
7  say, scientific studies that were generally
8  supportive of the plaintiffs' case, I wanted to
9  know what was generally supportive of the
10 defendants' case, etc., etc., and the big picture
11 of the litigation.
12        Point 2 would be information related
13 to Johnson & Johnson's regulatory compliance, or
14 attitudes towards regulatory compliance, or
15 contacts between the sort of drug side of the
16 business in a regulatory sense and the people who
17 were responsible for decisions regarding
18 cosmetics.
19        And point 3 would have been because
20 so much of my report is about the informational
21 environment and informational obligations, you
22 know, the sort of marketing strategy, branding
23 strategies, changes in that, those sorts of
24 things.  Some of which were provided to me in the

Page 218

1 form of deposition transcripts. Some of which may
2 have been, you know, exhibits to depositions. I
3 didn't track them in a formal way.
4        Q.    As you mentioned earlier, though,
5 you don't know the methods by which the attorneys
6 for the plaintiffs went about selecting documents
7 in response to those requests, correct?
8        A.    Correct.
9        Q.    And you indicated previously that
10 you have not done any type of quality control
11 analysis yourself as to whether you did get all
12 the documents that you were thinking you would get
13 pursuant to these requests, correct?
14              DR. THOMPSON:  Object to form.
15              THE WITNESS:  I felt I had
16        the quality control analysis I needed to
17        do, which really had to do with issues
18        that appeared to be incompletely handled
19        or issues that seemed to be not
20        documented at all.
21              I didn't feel like I was, you
22        know, looking for some type of smoking
23        gun documents.  Not the type of report
24        that I'm producing.

Page 219

1 BY MR. HEGARTY:
2        Q.    Did you do any sort of formal task
3 where you intentionally looked for documents
4 yourself that thought you should have to see
5 whether you did get those?
6              Do you follow my question where you
7 did some sort of quantitative or qualitative
8 analysis of the documents you were -- you received
9 to make sure that the methods used captured what
10 you were expecting to get?
11        A.    I follow your question.
12              I actually found that the deposition
13 transcripts were in some ways a good guide to the
14 full scope of available information.  I didn't try
15 to document them.  I sort of made a practice of
16 not doing marks and highlights and notes on
17 things.  It didn't seem practical to do so as
18 opposed to just drafting the report as, you know,
19 in sections and leaving areas of it for further
20 development.
21              But I was -- I was quite
22 comfortable.  This was, again, you know, this
23 skill of litigation is unfamiliar to me, and I was
24 working as best I could; but I felt like at the

Page 220

1 end of the day I had everything I needed.
2        Q.    In terms of the materials you do
3 have in front of you today, did you put any notes
4 or make any markings on any of them?
5        A.    In preparation for the deposition,
6 yes.  In preparation of the report, no.
7        Q.    I'm talking about specifically on
8 materials you have in front of you.
9              Did you put any handwritten notes
10 into them?
11        A.    What I'm saying is -- so my own
12 report, in preparation for talking to you today,
13 as you can see I have, you know, underlined things
14 as reminders to myself --
15        Q.    Okay.
16        A.    -- in particular areas.  I have not
17 annotated any of the other materials.
18        Q.    We're on, I think, Exhibit No. 11.
19 We'll designate for purposes of the deposition as
20 Exhibit No. 11 the notebook we have in front of
21 you.  So we'll -- why don't we go ahead and make a
22 copy of that after the deposition, okay?
23        A.    Sure.
24              (Notebook marked for

Page 221

1        identification as Sage Exhibit 11.)
2 BY MR. HEGARTY:
3        Q.    And that would include any mark --
4 the copies of any -- the copy of your report that
5 has some markings of yours on it, right?
6        A.    Yeah.
7        Q.    Okay.  I want to next look at
8 paragraph 11 of your report.  You say in paragraph
9 11 or paragraph 11 you reference -- you make a
10 reference to highly profitable cosmetic -- "a
11 highly profitable cosmetic industry."
12              Can you cite for me any information
13 you have on the profits of companies making
14 cosmetics over the 80 years you talk about in
15 paragraph 11?
16        A.    So -- so if -- if I may just in
17 terms of how I organized the report because it
18 would facilitate the conversation.
19              The bolded unnumbered statements in
20 the discussion are how I organized the key points
21 of the report.  Those are the major categories,
22 major insights, major conclusions and opinions.  I
23 just used the paragraph numbering sort of for
24 convenience for the elaboration of those major

Page 222

1 points.
2        I asked whether any particular
3 format was required by the court or by convention,
4 and I was told no.  So this was the approach that
5 I -- that I adopted.  Just so in case if you
6 wanted to talk about the major points, they'll be
7 in bold but not in numbered paragraphs.
8        With respect to profitability and
9 change in the industry, this statement was a
10 general statement consistent with statements that
11 were made in sort of the FDA's own documents over
12 the last couple of years talking about the need
13 for a more structured approach to cosmetic
14 regulation.
15    Q.    So ultimately the reason I ask that
16 question is there's no citation to authority at
17 the end of this paragraph.
18        So my question is:  What authority
19 did you -- do you rely on for the statement --
20 statements in paragraph 11?
21        DR. THOMPSON:  Object to form.
22        THE WITNESS:   Again, I will
23    reiterate that there is no standard
24    citation protocol that I'm aware of for

Page 223

1    this type of report.
2        This is a statement that
3    synthesizes things that I have read from
4    the FDA and from other commentators.  All
5    of which has been produced to you as
6    material to be considered.
7 BY MR. HEGARTY:
8    Q.    In making that statement, you did
9 not look at any specific profitability statements
10 by any company, correct?
11    A.    Correct.
12    Q.    Turning next to paragraph 13, you
13 refer to a list of 100, as you call, dangerous --
14 as is quoted "dangerous, deceptive, or worthless
15 products."
16        Talc was not on that list of hundred
17 products, correct?
18    A.    I don't believe it was.  This is a
19 historical reference, and I certainly wouldn't be
20 stating that talc was.  I don't know why it would
21 have been.
22    Q.    You have referenced in your report
23 and you made reference earlier to an FDA Workshop
24 in 1994 that ultimately whose results were

Page 224

1 published in a 1995 article by Carr.
2        Do you recall that?
3    A.    If you could refresh my --
4    Q.    Sure.
5    A.    -- recollection on that one.
6        MR. HEGARTY:  I'm going to
7    show you what I've marked as Exhibit
8    No. 12.
9        (Document marked for
10    identification as Sage Exhibit 12.)
11 BY MR. HEGARTY:
12    Q.    This is a 1995 article author C.
13 Jeffrey Carr in the Journal of Regulatory
14 Toxicology and Pharmacology that summarizes a 1994
15 Workshop attended by FDA personnel, industry
16 personnel, scientists, and academics.
17        Do you recall reading this article?
18 It is referenced in your materials.
19    A.    Yeah, that's what I was just going
20 to take a look to see where -- where it is
21 referenced.
22        It is referenced.
23    Q.    So my question --
24    A.    Yes, I recall --

Page 225

1    Q.    -- do you recall reading this?
2    A.    Yes, I recall seeing this.
3    Q.    And that article reported on a
4 two-day meeting that looked at the safety of talc
5 in 1994, correct?
6    A.    Correct.
7    Q.    You were not at this meeting, right?
8    A.    Correct.
9    Q.    If you look at page 213 of this
10 article.
11    A.    Yes.
12    Q.    On the -- in the right-hand column,
13 first full paragraph beginning with the word --
14 the name "Dr. Gilbertson."
15        Do you see that paragraph?
16    A.    Yes.
17    Q.    The last line of that paragraph
18 says:
19        "In their joint evaluation, talc was
20 proven to be among the safest of all consumer
21 products."
22        Do you see where I'm reading?
23    A.    I do.  That language jumps out at me
24 as -- as language that is often included in

Page 226

1  Johnson & Johnson's marketing materials.
2     Q.    But do you dispute that as of the
3  time of this meeting, 1994, that talc has proven
4  to be among the safest of all consumer products?
5           DR. THOMPSON:  Objection.
6  Form.
7           THE WITNESS:  I have no
8        particular reason to credit or doubt this
9        particular statement in this particular
10       journal at this time.
11          It -- as a statement, it
12       carries no particular authority for me,
13       but I have no basis for doubting the
14       sincerity of the people who wrote it.
15 BY MR. HEGARTY:
16    Q.    You agree that this article is
17 relevant to the analysis -- your analysis in your
18 report, correct?
19          DR. THOMPSON:  Objection.
20 Form.
21          THE WITNESS:  I would -- I
22       would agree in -- I would agree -- well,
23       let me -- let me go back and begin that
24       answer again.

Page 227

1           I would reiterate that I'm not
2        offering an opinion as to causation.  If
3        you are pointing to this as, at the time,
4        a casual synthesis of international
5        standards with respect to the regulation
6        of talc in consumer products, I would
7        say, yes, it's relevant.
8  BY MR. HEGARTY:
9     Q.    You do -- you do address in your
10 report within the context of your focus safety of
11 talcum powder, correct?
12    A.    Yes.
13    Q.    The statement I just read concerns
14 the safety of talcum powder, correct?
15          DR. THOMPSON:  Objection.
16 Form.
17          THE WITNESS:  Yes.  It is in
18       an executive summary.  It carries exactly
19       the weight that an executive summary of a
20       conference proceeding carries for me in
21       all my work, which is, it is relevant.
22       It is interesting.  It may be more
23       interesting for its presence in this
24       particular document than it is

Page 228

1        interesting for its value as scientific
2        truth.
3           I tend to look at all of this
4        type of material in any regulatory
5        context as telling a story.  It's usually
6        a very rich story about how regulators or
7        potential regulators and regulated
8        industries interact, including in such
9        workshops.
10          So it is interesting and
11       relevant, but it is not going to be a
12       major aspect of my conclusion or reliance
13       regarding the safety of talc.
14 BY MR. HEGARTY:
15    Q.    If you would next turn over to page
16 215 and look at the last line in the left-hand
17 column carried over to the top of the right-hand
18 column.  In particular, the sentence reads:
19          "Following the many issues raised by
20 all presenters, the ensuing discussion generally
21 agreed that, while some weak association between
22 talc and ovarian tumors has been reported, it was
23 not sufficient warning for concern."
24          Do you see where I'm reading?

Page 229

1     A.    I do.
2     Q.    Again, that is a statement that's
3  relevant to the safety of talc as of the time of
4  this workshop, correct?
5           DR. THOMPSON:  Object to form.
6           THE WITNESS:  Not
7        necessarily.  It's -- it's a summary of
8        attendees' impressions of a particular
9        workshop conversation.  It carries the
10       way that one would give that, which is
11       that at least in the opinion of the
12       person writing this summary I don't
13       know -- and we could, I guess, look up,
14       you know -- the discussion was generally
15       -- generally not -- the discussions were
16       generally unconcerned about talc safety
17       at the time, but it's the discussions at
18       a conference.
19 BY MR. HEGARTY:
20    Q.    You said the discussions were
21 generally unconcerned, or what did you say?  I
22 didn't hear you.
23    A.    Yes.  I was actually giving you the
24 answer that I suspect you wanted in that instance

Page 230

1  is, yes, for the -- as reported by this observer
2  and published in this unreviewed executive summary
3  of one conference that I'm sure was, you know,
4  convened with -- with decent scientific
5  intentions, the discussions appeared to not be
6  terribly concerned about toxicity.
7      Q.   You say "unreviewed."
8           You understand this is peer-reviewed
9  publication, right?
10     A.   Executive --
11          DR. THOMPSON:  Objection.
12          THE WITNESS:  -- summary --
13          DR. THOMPSON:  Whoa.
14     Objection.
15          THE WITNESS:  In my
16     experience, executive summaries of
17     conference proceedings are not
18     peer-reviewed.
19  BY MR. HEGARTY:
20     Q.   Do you know with regard to this
21  document specifically whether it was
22  peer-reviewed?
23     A.   I do not know, but it would be my
24  professional view that anybody reading this

Page 231

1  summary would not expect it to have been reviewed.
2      Q.   Are you aware that there's a
3  transcript of the two-day proceedings?
4      A.   I hope so, yes.  I am not aware of
5  that but...
6      Q.   Did you make a request for such a
7  transcript?
8      A.   No.
9      Q.   You don't cite to this -- this
10  article substantively in your expert report,
11  correct?
12     A.   Correct.
13     Q.   Okay.  From your analysis in this
14  case, do you dispute that as of the time of this
15  conference the statements that we looked at on
16  these two different pages?
17          DR. THOMPSON:  Object to form.
18          THE WITNESS:  I don't think I
19     understood that question.
20  BY MR. HEGARTY:
21     Q.   Sure.
22          In your analysis of what you did for
23  purposes of this case, do you dispute -- or from
24  your analysis that you did in this case, do you

Page 232

1  dispute that as of the time this publication was
2  made, 1995, concerning a meeting in 1994, that
3  these were proper conclusions to draw from the
4  evidence, the two conclusions we read from this
5  paper?
6          DR. THOMPSON:  Objection.
7     Form.
8          THE WITNESS:  These
9     conclusions strike me as telling an
10    incomplete story, and I wouldn't attach
11    any particular scientific weight to
12    those, again, in the way that I would
13    sort of read a regulatory history and
14    make sort of expert judgments about a
15    regulatory process.
16         I would say that as far as
17    this particular conference goes, it
18    appears that the discussion did not
19    result in inducing a sudden regulatory
20    change.  This was a conference, as I --
21    as I recall, jointly sponsored by the FDA
22    by industry and by an International
23    Society of Regulatory Toxicology and
24    Pharmacology, which I'm afraid I don't

Page 233

1  know anything about.
2          And, you know, in terms of
3  whether this particular topic -- whether
4  this particular topic, you know,
5  promoted, you know, sort of prompted
6  action that would dislodge the then
7  prevalent regulatory standards, it
8  appears not.
9          But that's more what I would
10  read this for.  I don't -- I don't read
11  this document as, you know, authoritative
12  science.  It's a conference proceeding.
13  BY MR. HEGARTY:
14     Q.   Let's look at paragraph 15 of your
15  report.
16          In that paragraph, you say a central
17  aspect of the federal cosmetics regulations are
18  "reliance on manufacturer and industry
19  self-regulation."
20          Where in the regulations for
21  cosmetics is the phrase "self-regulation"?
22     A.   It is clear from FDA's website.  It
23  is clear from every major address that has been
24  given either by the agency or, for that matter, by

William M. Sage , MD , JD

Page 234

1 representatives of the cosmetic industry that the
2 principal form of governance of cosmetics is
3 self-governance assigned to industry often in some
4 fairly -- I should say the manufacturers and
5 sellers -- often in very specific ways.
6         But, no, the word "self-regulation"
7 doesn't appear in the statute or the regulation.
8 It does, interestingly, appear in the remarks and
9 the characterization of the regulatory process
10 from both the, you know, from the FDA and from the
11 CFTA or successor organizations.
12         This does not seem to be something
13 that is seriously contested by any party.
14     Q.     You also state that FDA "lacks
15 routine authority to assure the safety of cosmetic
16 products or ingredients."
17         That's not true, is it?
18         DR. THOMPSON:  Object to form.
19         THE WITNESS:  That is true.
20 They do -- they do not have routine
21 authority.  There are foundational
22 pillars of food, drug, and cosmetic
23 regulation in terms of adulteration and
24 misbranding.  There are some subsidiary

Page 235

1 authorities.
2         But comparing FDA's drug
3 regulatory regime to what it would have
4 to do in order to make a significant
5 effort to -- to verify the safety of
6 cosmetics to prevent injuries, or even to
7 address injuries that would occur, is not
8 what I would call routine authority.
9 BY MR. HEGARTY:
10     Q.     Well, FDA can issue regulations that
11 require there to be a warning on a cosmetic,
12 correct?
13     A.     Indeed.
14     Q.     If FDA makes a determination that a
15 cosmetic product is adulterated or misbranded FDA
16 can take action, correct?
17     A.     Yes.
18     Q.     FDA can work through the Department
19 of Justice to remove adulterated or misbranded
20 products from market, correct?
21     A.     Yes.
22     Q.     FDA may request a federal court to
23 issue a restraining order against the sale of a
24 cosmetic, correct?

Page 236

1     A.     Yes.
2     Q.     FDA may seek a seizure of cosmetics
3 not in compliance with the law, correct?
4     A.     Yes.
5     Q.     FDA may initiate criminal action
6 against a person violating the law, correct?
7     A.     Through the Department of Justice,
8 yes.
9     Q.     FDA can also issue a warning letter
10 if they think a product is adulterated or
11 misbranded, correct?
12     A.     Yes.
13     Q.     FDA can also request that the
14 manufacturer recall a product, right?
15     A.     The recall, a voluntary recall,
16 indeed, the FDA can request it.  I could request
17 it just as much.
18     Q.     If FDA asks for a recall of the
19 product, most manufacturers comply with that
20 request, correct?
21     A.     Correct.
22         DR. THOMPSON:  Objection.
23 BY MR. HEGARTY:
24     Q.     FDA can also issue something called

Page 237

1 a guidance document, right?
2     A.     Yes.
3     Q.     And a guidance document is, like it
4 sounds, it sets forth FDA's thinking about a type
5 of product or an ingredient, correct?
6     A.     Yes.  The resources available to do
7 this in the cosmetics domain are a tiny fraction
8 of the resource available to issue guidance
9 documents in, say, drug or device domains.
10     Q.     And guidance document, while not
11 having the force of regulation, but it does tell
12 the industry very clearly what it should do in
13 regard to an ingredient, including what the
14 contents of a warning should be, correct?
15     A.     Not necessarily.  The -- the FDA
16 could issue a regulation that requires a warning.
17 That would go through an extensive procedure
18 regarding both issuance and evaluation and would
19 be subject to both formal and informal challenges.
20         All of this -- all of these
21 statements with which you've had me agree, some to
22 having residual authority to having some strong
23 pillars of obligation under the 1938 Act, which
24 really I will, you know, convey as my expert

Page 238

1  opinion are essentially informational obligations.
2  And there is a lot really -- and they really fall
3  exclusively on the manufacturers with very
4  little -- with very little advanced safeguards,
5  with very little continuing oversight, and with
6  almost no self-executing recourse.
7          I would characterize the sort of
8  post-1938 cosmetic regime as very similar to the
9  pre-1938 drug regime.
10     Q.    Are you aware of situations where
11 FDA has issued a guidance document regarding
12 warnings as it relates to a cosmetic?
13     A.    I believe I have seen those.  None
14 is immediately springing to mind, but, yes.
15     Q.    In particular, do you recall FDA
16 issuing a guidance document regarding certain
17 warnings that should be used on a product called
18 alpha hydroxy acids?  Do you recall seeing it?
19     A.    I recall seeing it.  I don't recall
20 the details right now.
21     Q.    But using a guidance document in
22 this sense is FDA's way of telling an industry
23 that a warning should be put on a label without
24 going through the entire process of issuing a

Page 239

1  regulation, correct?
2          DR. THOMPSON:  Object to form.
3          THE WITNESS:  If I may -- if
4      I may make an analogy.
5          The Federal Trade Commission
6      engages in competition advocacy all the
7      time where it sends letters to state
8      legislatures and to state regulators and
9      to other parties suggesting that
10     something they're doing is
11     anticompetitive, attempting to influence
12     them without the extreme measure of
13     filing an administrative action or a
14     federal lawsuit for a preliminary
15     injunction.
16         I do not think that FDA's
17     authority over cosmetics is that much
18     greater than FTC's authority over
19     potentially anticompetitive, you know,
20     state laws and practices.
21         Yes, it carries a lot of
22     weight.  It will be taken seriously.
23     Sometimes it will be acted on, but the
24     whole point is, it's not self-executing.

Page 240

1          And I think this is something
2      that both FDA and the industry
3      acknowledge and each of them alters their
4      feelings about it from time to time based
5      on familiar and predictable factors, and
6      that's one reason we have another major
7      bill in Congress at the moment.
8  BY MR. HEGARTY:
9      Q.    The FDA has not issued any guidance
10 document with regard to talcum powder products,
11 correct?
12     A.    I have not seen any -- any final
13 guidance documents.  You've shown me, you know,
14 responses to Citizen's Petitions.  I have shown
15 you internal -- internal evaluations from the
16 1990s.
17     Q.    And you would expect that FDA knows
18 about lawsuits brought over the use of talcum
19 powder products, correct?
20     A.    Of course.
21     Q.    And FDA knows about allegations of
22 finding asbestos in talc, right?
23         DR. THOMPSON:  Object to form.
24         THE WITNESS:  Yes.

Page 241

1  BY MR. HEGARTY:
2      Q.    FDA knows about epidemiology?
3      A.    FDA has found -- let me supplement.
4  I'm sorry to interrupt.
5          FDA has found asbestos in talc and
6  has requested voluntary recalls that have been
7  complied with by your client and others.
8      Q.    And we'll get to that.
9          FDA knows about epidemiologic
10 studies and toxicology studies involving talc and
11 ovarian cancer, correct?
12         DR. THOMPSON:  Object to form.
13         THE WITNESS:  Yes.  I mean,
14     this -- we are kind of
15     anthropormophasizing FDA a little bit
16     here.  I mean, we are -- FDA's cosmetic
17     oversight function is an office within a
18     Center that also deals with food safety.
19         And in terms of rising to the
20     level where FDA will expend resources
21     given its relatively limited and -- and
22     tentative regulatory authorities, you
23     know, I don't really know how to say what
24     FDA knows.

Page 242

1        FDA may know a lot of things
2    in that it's on notice, but there may be
3    many obstacles to FDA action.
4 BY MR. HEGARTY:
5    Q.    FDA has never issued a regulation
6 requiring that talcum powder products contain a
7 warning about the risk of ovarian cancer, correct?
8    A.    Correct.
9    Q.    FDA has never declared talc-based
10 slide patterns to be adulterated or misbranded,
11 correct?
12        MS. PARFITT:  Objection.
13    Form.
14        THE WITNESS:  Correct.
15 BY MR. HEGARTY:
16    Q.    FDA has never --
17    A.    I should -- may I correct that
18 statement?
19    Q.    Sure.
20    A.    So in connection with finding
21 asbestos in talcum powder products, FDA has
22 stated, if not formalized, a conclusion that those
23 products are adulterated.
24    Q.    Well, there's a particular

Page 243

1 formalized finding or statement that FDA makes if
2 it finds a product adulterated or misbranded,
3 correct?
4    A.    It makes such statements in
5 anticipation of a judicial procedure that would
6 result in the outcome it wants.  If it can obtain
7 that outcome less formally, it will not go to
8 those lengths.
9    Q.    FDA has never made the statement
10 that any talcum powder product manufactured by
11 Johnson & Johnson is adulterated or misbranded --
12        DR. THOMPSON:  Objection.
13    Form.
14 BY MR. HEGARTY:
15    Q.    -- correct?
16    A.    I'm not sure of that insofar as the
17 2019 voluntary recall was -- was made with a clear
18 signal from the FDA that an unrecalled product
19 would be considered adulterated and further steps
20 would be taken.  That was certainly my -- my
21 reading of what -- of the documents that I saw.
22    Q.    You know that the terms
23 "adulterated" and "misbranded" are terms of art
24 that FDA must use in order to take further action,

Page 244

1 correct?
2    A.    Exact --
3        DR. THOMPSON:  Objection.
4    Form.
5        THE WITNESS:  I exactly
6    agree, but that is my point.  These are
7    the two pillars of FDA authority.
8    Because there is so little other
9    authority conferred on FDA on the
10    cosmetic side of the FDCA and such that,
11    indeed, if FDA is committed to reaching a
12    result in case of something like asbestos
13    being found in talcum-based baby powder,
14    yes, it will make those findings because
15    that's how it goes to court and get the
16    results it seeks.
17 BY MR. HEGARTY:
18    Q.    You're aware that FDA has never
19 declared Johnson & Johnson talcum powder product
20 as being adulterated or misbranded?
21        DR. THOMPSON:  Objection.
22 BY MR. HEGARTY:
23    Q.    You know that, right?
24        DR. THOMPSON:  Object to form.

Page 245

1        THE WITNESS:  Again, I would
2    like to know what the statements were
3    made in 2019.  I've read this, without --
4    without reviewing those materials.
5    Because I know that there were statements
6    made that asbestos by the FDA or by FDA
7    senior officials that asbestos in talcum
8    powder would be an adulterant.
9        Did they -- did the FDA make a
10    formal declaration?  I don't believe they
11    did.
12 BY MR. HEGARTY:
13    Q.    Has FDA ever issued a guidance
14 document suggesting that products containing talc
15 have a warning on them regarding ovarian cancer?
16    A.    Not to my knowledge.
17    Q.    If you look at paragraph 17 of your
18 report, you say in paragraph 17 that "FDA itself
19 recognizes its limitations in effectively
20 regulating cosmetics."
21        And those are your words, not FDA's
22 words, correct?
23    A.    In paragraph 18, all of the quoted
24 testimony, which is what continues to paragraph 17

Page 246

1  thoughts, are FDA's words.
2     Q.    My question is specifically as it
3  relates to 17.
4        You cannot cite for me anyone from
5  FDA stating that it has limitations -- using the
6  words you use "limitations effectively regulating
7  cosmetics"?
8     A.    Both the Susan -- the Susan Mayne
9  testimony here, various statements from my
10  acquaintance, Scott Gottlieb, as commissioner have
11  all been, you know, in -- consistent with that
12  statement.
13     Q.    Well, let's talk about what you say
14  in paragraph 18 where you purport to provide
15  relevant selected excerpts of the testimony of
16  Susan Mayne, and I disagree that you did that and
17  I'll show you why I disagree that you did that.
18        And let me ask you first.
19        Is it your methodology -- was it
20  your methodology in your report to just cite
21  portions of a document that help your subjective
22  review, your subjective view and not give the
23  reader an objective summary?
24        DR. THOMPSON:  Objection.

Page 247

1     Form.
2        THE WITNESS:  The answer to
3     that accusation is, of course not.  The
4     elaborate -- the elaboration is that my
5     point is the FDA recognizes its
6     limitations.
7        I would also comment that no
8     head of an agency stands up and gives a
9     blanket condemnation of her or his own
10     work.  It's simply not done.
11  BY MR. HEGARTY:
12     Q.    Well, there are portions of
13  Ms. Mayne's testimony that are relevant that you
14  didn't tell the reader, aren't there?
15        MS. PARFITT:  Objection.
16     Form.
17        DR. THOMPSON:  Objection.
18     Form.
19        THE WITNESS:  If you would
20     like to show me something, which I think
21     you would.
22        MR. HEGARTY:  I'll show you.
23     I marked next as Exhibit No. 13 the
24     statement you cited from Susan Mayne.

Page 248

1        (Document marked for
2     identification as Sage Exhibit 13.)
3  BY MR. HEGARTY:
4     Q.    And the first statement I want to go
5  to that you left out of your report is over on
6  page 1 at the bottom, and in particular,
7  Ms. Mayne's testimony in this document that you
8  did not cite says:
9        "We believe that most cosmetics on
10  the market of the United States are indeed safe,
11  and in our experience, most firms are responsible
12  actors - they care about consumer safety and the
13  reputation of their brands, and in those rare
14  cases when safety issues do arise, many firms work
15  with us cooperatively to address them."
16        You didn't include that statement,
17  did you?
18     A.    I completely -- I think that is a
19  very well-crafted statement.  I saw no reason to
20  include that in this part of my report.
21     Q.    The next statement you didn't
22  include is the one that is right after that:
23        "We also understand that most
24  ingredients used in cosmetic products have been

Page 249

1  used in cosmetics for many decades, and we are not
2  aware of safety concerns regarding most
3  ingredients."
4        You didn't include that statement?
5     A.    I did not.
6     Q.    If you look over to page 4 at the
7  bottom of that page, second to last paragraph.
8        "FDA evaluates concerns about
9  ingredients or products based on currently
10  available science and data, much of which is
11  publicly available as FDA does not have authority
12  to require companies to provide it with safety,
13  compositional and other relevant information about
14  cosmetics.  FDA also supports and conducts
15  research related to cosmetics safety to support
16  our regulatory activities, as allowed by our
17  resources.  What we have safety concerns about
18  ingredients we will act swiftly to inform and
19  advise consumers of any identified public health
20  risks."
21        You did not include that statement
22  in your report, did you?
23     A.    I did not.  Though I do not think
24  anything you read is inconsistent with my

Page 250

1 statement in paragraph 17 regarding limitations
2 and effectively regulated cosmetics.
3     Q.    And in the last line of that
4 paragraph -- I'm sorry -- page 4 says that:
5         "Ensuring the safety of cosmetics is
6 a high priority for us."
7         You didn't include that statement,
8 did you?
9     A.    I did not.
10     Q.    FDA has never identified any health
11 -- any public health risks with talcum powder
12 products.  True?
13             DR. THOMPSON:  Objection to
14     form.
15             THE WITNESS:   Again, if we go
16     to that internal guidance document, there
17     is concerning language there.  And if we
18     go to the 2014 Citizen's Petition
19     response that we discussed earlier today,
20     there's concerning language there.
21         So indeed FDA has expressed
22     its -- its doubts regarding safety.
23 BY MR. HEGARTY:
24     Q.    Well, FDA says in this document that

Page 251

1 I just read that it will "act swiftly to inform
2 and advise consumers of any identified public
3 health risk," right?
4         And it has not done so with regard
5 to talcum powder products.  True?
6     A.    With respect, this is a speech that
7 a senior -- I'm not sure -- I would imagine -- I
8 don't know if she's a career political appointee.
9 I would imagine she's career, but a senior
10 official director of -- of an FDA Center is making
11 in Congressional testimony.  This statement is
12 crafted to serve that role very effectively.
13         I have no basis in giving my expert
14 opinions on Johnson & Johnson's lack of compliance
15 with the its regulatory and self-regulatory
16 obligations regarding why particular lines are in
17 this statement.  It strikes me as eminently
18 suitable and professional and appropriate for its
19 moment.
20     Q.    Well, has FDA done anything to
21 inform and advise consumers of any public health
22 risks with talcum powder products?
23             DR. THOMPSON:  Objection.
24     Form.

Page 252

1             THE WITNESS:  Yes.  Yes, its
2     2019 recall of talcum powder -- talcum
3     powder products containing asbestos.
4 BY MR. HEGARTY:
5     Q.    Besides that 2019 statement?
6     A.    Direct -- directly consumer -- to
7 consumers, not to my knowledge.
8     Q.    So you in your previous answer
9 indicated that there's somehow -- that this
10 statement should somehow be taken with a grain of
11 salt because she's a political appointee.
12         Is that what you're saying?
13             DR. THOMPSON:  Object to form.
14             THE WITNESS:  No, I'm sorry.
15     I was thinking out loud.
16         I concluded -- again, this is
17     verifiable.  I know that Susan Mayne
18     retains the director -- directorship of
19     the Center at present.  I said I do not
20     know whether she's a political appointee
21     or a career official.  Could be either.
22         No, that does not matter to my
23     answer.
24 BY MR. HEGARTY:

Page 253

1     Q.    You just admitted that and FDA found
2 a public health risk through the finding -- its
3 finding of asbestos -- in what it believes was
4 finding of asbestos in a talcum powder bottle, it
5 took action, correct?
6             DR. THOMPSON:  Object to form.
7             THE WITNESS:  I think -- I
8     think we're -- we're diving down into the
9     weeds when the essence of the opinions I
10     offer, you know, really -- really have to
11     do with -- with the big picture.
12         Everything that I have seen
13     and read from a number of sources,
14     including sources from industry over a
15     large number of years, identifies
16     cosmetics regulation as having very
17     limited statute -- statutory authority,
18     having very few directly self-executing
19     regulations, having very little FDA
20     supervisory oversight, and placing the
21     vast majority of the burden, really the
22     exclusive burden, on manufacturers and
23     sellers.
24         Such that I reject your

Page 254

1 suggestions that FDA taking occasional
2 action shows that they will take all
3 necessary action or that them refraining
4 from action means that there are no
5 problems.
6          That said, I am happy to
7 support the notion that most consumer
8 products that are sold in America are
9 sold by reputable companies trying to do
10 the best they can and turn out to be
11 safe. I certainly hope and expect that
12 to be the case.
13 BY MR. HEGARTY:
14     Q.     Let me go back to sort of where we
15 started.
16          You purported to say that you cited
17 relevant excerpts of the testimony of Susan Mayne
18 as it relates to any limitations on FDA's ability
19 to regulate the industry, but you didn't cite the
20 portion of the statement that we just read that
21 says, if FDA has safety concerns, it will act.
22          Is it your testimony that that's not
23 relevant to the points you were making in this
24 part of your -- your report?

Page 255

1          DR. THOMPSON: Objection.
2     Form.
3          THE WITNESS: I will defend
4     not only the contents, but the structure
5     of what I wrote here. I have a paragraph
6     that says the "FDA recognizes its
7     limitations" and then I have quotes that
8     support the recognition of the
9     limitations.
10          There might be another section
11     of this or another report that talked
12     about the things that FDA does well or
13     right, but this is exactly what I think
14     it should be to support the statements I
15     made.
16 BY MR. HEGARTY:
17     Q.     You read the statements and I read
18 to you, and you intentionally chose to leave them
19 out of your report, correct?
20          MS. PARFITT: Objection.
21     Form.
22          DR. THOMPSON: Objection.
23     Form.
24          THE WITNESS: Those

Page 256

1     statements are not the relevant support
2     for the statement in paragraph 17.
3 BY MR. HEGARTY:
4     Q.     Let's look paragraph 19.
5          What is your reliance materials for
6 the statements that you make in that paragraph?
7     A.     Most of the reliance materials come
8 from the collection of important, well-edited,
9 well-selected historical materials on cosmetics
10 regulation that are in the Hutt, Merrill, and
11 Grossman legal casebook, which is the leading
12 casebook, you know. And I did some, you know,
13 subsequent, as we've discussed, you know,
14 exploration of some of the things that are cited.
15 Some of the controversies that are described.
16          Others come from statements that
17 have been made in the Congressional hearings that
18 are also cited more recently, but that postdate
19 the last edition of that casebook.
20          And it's been -- as a -- as an
21 expert in regulatory design and the regulatory
22 process, I can say that the forces that have
23 induced the cosmetics industry at different times
24 to take different positions on the extent of

Page 257

1 federal government oversight are familiar and
2 predictable, and I would be happy to enumerate
3 them for you.
4     Q.     You in your report, as it relates to
5 this paragraph, cite from no one at Johnson &
6 Johnson commenting on federal safety regulations,
7 correct?
8          DR. THOMPSON: Object to form.
9          THE WITNESS: I cannot
10     recall. Though I did observe when I
11     looked at the companies that are
12     supportive of the current
13     Feinstein-Collins legislation that
14     Johnson & Johnson is supportive of that
15     legislation.
16 BY MR. HEGARTY:
17     Q.     In looking at paragraph number 20,
18 you cite the statements by the PCPC president.
19          Do you know that he's not authorized
20 to speak for Johnson & Johnson, correct?
21     A.     Well, he's --
22          DR. THOMPSON: Object to form.
23          THE WITNESS: I assume he's
24     the former president because this is

Page 258

1    historical material. If he's the current
2    president, I was not aware of that.
3            Again, sort of following the
4    way that I construct -- constructed this
5    report, 19 is a general statement that is
6    then documented in 20 and 21 and 22,
7    showing changes of position.
8            But, yes, I would assume that
9    the president of the industry trade
10   association has never been authorized to
11   speak for Johnson & Johnson.
12   BY MR. HEGARTY:
13       Q.     And he talks about and makes
14   reference to "no unnecessary or burdensome
15   regulation." That's what you cite in your -- in
16   your paragraph.
17           Are you advocating in your report
18   that there should be unnecessary or burdensome
19   regulation on the cosmetic industry?
20           DR. THOMPSON: Objection.
21       Form.
22           THE WITNESS: No. (Laugh).
23   BY MR. HEGARTY:
24       Q.     Okay. So is it your testimony that

Page 259

1    it is wrong to not want unnecessary or burdensome
2    regulation?
3            DR. THOMPSON: Objection.
4        Form.
5            THE WITNESS:  I am citing his
6        position expressed in 1995, which differs
7        from the industry's position in 1998
8        described in paragraph 21, which differs
9        from the 2012 position described in
10       paragraph 22, and which almost certainly
11       would differ from the position today as
12       representing the industry's equivocations
13       regarding a more aggressive federal
14       regulatory role.
15           I would also note that the
16       1975 position regarding self-regulation
17       is that we will do this or perhaps give
18       the appearance of doing this in order to
19       forestall regulations, which in 1995
20       Mr. Kavanaugh, on behalf of the industry,
21       you know, in general opposed.
22   BY MR. HEGARTY:
23       Q.     In paragraph 21, you make reference
24   to statements made as it relates to 1998.

Page 260

1            What is the current number of FDA
2    personnel working in the Office of Cosmetics and
3    Colors?
4        A.     I do not know.
5        Q.     What was -- what were the numbers of
6    personnel working there between 2015 and 2020?
7        A.     I do not know. It is still a small
8    office.
9        Q.     What is the current budget for this
10   office for 2021?
11       A.     I have seen that number in passing.
12   But if we go -- go back to paragraph 18, the
13   direct quote from Susan Mayne, "our program for
14   cosmetics is approximately $10 million," which is
15   about 3 percent of just that one Center's annual
16   budget of $327 million. And, undoubtedly, if we
17   were going to compare this to the drug or device
18   oversight budget, it would be a pittance.
19           I would also note in that connection
20   if we want to talk about budgets, which I'm more
21   than happy to do, that a major aspect of the
22   current Senate proposal is to institute user fees
23   on cosmetics companies, which is one way of
24   addressing the -- the budgetary challenges, very

Page 261

1    similar to what happened in the prescription drug
2    domain in the early 2000s.
3        Q.     In this part of your report, is it
4    your contention that FDA has not brought
5    regulatory action regarding talcum powder products
6    because its resources are limited?
7        A.     Would you ask that again, please?
8        Q.     Sure.
9            Is it your contention as part of
10   this part of your report that FDA has not brought
11   regulatory action regarding talcum powder products
12   because its resources are limited?
13           DR. THOMPSON: Objection.
14       Form.
15           THE WITNESS:  My contention
16       in this part of the report is to
17       emphasize the twin responsibilities of
18       information disclosure and manufacturer
19       self-governance, substantiation of safety
20       for products and for cosmetic products
21       and ingredients.
22           In this particular part of
23       this report, I'm not using this language
24       to make a specific suggestion about

Page 262

1 action or inaction regarding talc, but
2 indeed budgetary shortfalls causes
3 relatively little action in any cosmetic
4 domain.
5       MR. HEGARTY:  Do you mind if
6 we take a quick break?
7       DR. THOMPSON:  Sure.
8       (Recess:  1:42 p.m. -
9       1:51 p.m.)
10       MR. HEGARTY:  Okay.  Let's go
11 back on the record.
12 BY MR. HEGARTY:
13    Q.    Okay.  We are back on the record,
14 Doctor, and next paragraph I want to look at is
15 paragraph 26 of your report.
16    A.    Certainly.
17    Q.    Actually, it's paragraph 27.
18    A.    Okay.
19    Q.    You make the statement at the end
20 that Johnson's Baby Powder -- "Johnson & Johnson's
21 talcum powder products include other potentially
22 hazardous substances in varying amounts."
23       What was your methodology for --
24 well, first of all, before I ask that.

Page 263

1       What potentially hazardous
2 substances are you referring to in that paragraph?
3    A.    Again, just forgive me because I
4 guess this should -- this should be evident, but,
5 again, to go to the structure of the report,
6 there's a bolded statement about paragraph 27.
7 Paragraph 27 basically introduces a series of
8 paragraphs that provide the detail on paragraph
9 27.
10       So those were the categories of
11 additional or incompletely specified or
12 potentially hazardous or hazardous substances that
13 either are or may be contained in talcum powder
14 products.
15    Q.    And your methodology for making that
16 conclusion was the review of the documents that we
17 talked about earlier in the deposition?
18    A.    Exactly.
19       DR. THOMPSON:  A late object
20    to form.
21       MR. HEGARTY:  That's okay.
22 BY MR. HEGARTY:
23    Q.    And we've already established that
24 you have not analyzed all of the testing documents

Page 264

1 on Johnson's Baby Powder and Shower to Shower that
2 Johnson & Johnson has produced in this litigation,
3 correct?
4    A.    Correct.
5    Q.    We've also established that you're
6 not an expert on the testing procedures for talc,
7 correct?
8    A.    Correct.
9    Q.    In particular, there's a test that
10 is conducted on talc called XRD.
11       Do you know what XRD is?  X-ray
12 diffraction?
13    A.    If you take it away from the
14 acronym, I understand what x-ray diffraction is.
15    Q.    You're not an expert in x-ray
16 diffraction, correct?
17    A.    No.
18    Q.    You're not an expert in transmission
19 electron microscopy, correct?
20    A.    Again, I know the difference between
21 transmission and scanning electron microscopy;
22 but, no, I'm not a transmission microscopist.
23    Q.    You're not an expert in polarized
24 light microscopy, correct?

Page 265

1    A.    Correct.
2    Q.    You're not an expert in scanning
3 electron microscopy?
4    A.    As I just said, no.
5    Q.    And before being contacted by
6 counsel for plaintiffs in this case, you had never
7 considered any of those testing procedures that we
8 just talked about, correct?
9       DR. THOMPSON:  Object to form.
10       THE WITNESS:  I had never
11       considered any of those testing
12       procedures for talc.  I have seen those
13       testing procedures in use or read about
14       them in use in various contexts over the
15       decades.
16 BY MR. HEGARTY:
17    Q.    If we look at -- well, let me back
18 up.
19       You had never prior to being
20 contacted by plaintiffs' counsel commented in any
21 publication of yours or in any lecture or in any
22 class of yours on XRD, TEM, PLM, or SEM, correct?
23    A.    That is correct.
24    Q.    If we look at the next paragraph 28,

Page 266

1 in that paragraph you refer to something called
2 "platy talc" (indicates).
3          Do you know where that phrase is
4 ever cited -- can you cite to me where that phrase
5 is cited in any publication?
6          DR. THOMPSON:  Object to form.
7          THE WITNESS:  I can't -- I
8     can't right now.  I have seen
9     descriptions of it in various of the
10    documents that I have reviewed.
11         The attempt here was not to be
12    exhaustive regarding terminology, but
13    where there were a couple of phrases that
14    seemed to be in common use for the same
15    substance, to put them in the same
16    paragraph.
17 BY MR. HEGARTY:
18    Q.    Do you consider yourself an expert
19 in IARC's processes and procedures for its review
20 of substances?
21    A.    No.
22    Q.    You've never been involved in an
23 IARC proceeding, correct?
24    A.    Correct.

Page 267

1    Q.    You've never before this report
2 cited to an IARC Monograph in any document you
3 prepared, correct?
4          DR. THOMPSON:  Object to form.
5          THE WITNESS:  Not that I
6     recall.
7 BY MR. HEGARTY:
8    Q.    You had not read the IARC monographs
9 for talc not containing asbestiform fibers and
10 asbestos prior to being contacted by counsel for
11 plaintiffs, correct?
12    A.    That is correct.
13    Q.    Next paragraph 29 begins by
14 referring to something called "fibrous
15 (asbestiform) talc."
16         What is your definition of "fibrous
17 (asbestiform) talc"?
18    A.    So my understanding is that talc
19 that doesn't have the flat morphology that makes
20 it hydrophobic and generally, you know, useful in
21 something like baby powder can exist in various
22 fiber forms.  And my review of the documents we
23 described refers to that as often "fibrous" or
24 "asbestiform talc" distinct from what we would

Page 268

1 consider asbestos, but geologically related in
2 terms of often being in the same deposits and at
3 least based on the IARC conclusions having similar
4 health hazards to asbestos.
5    Q.    You did not do a comprehensive
6 analysis of the literature on talc fibers and
7 ovarian cancer risk, correct?
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  I don't know
10    that anybody has done a lot of that
11    research because I think it's very hard
12    to do given that talc has not been
13    systematically assayed for fibrous
14    content.
15         But I think my -- my belief
16    would be -- I guess my opinion would be
17    that to the extent that fibers are an
18    inevitable component of a talc deposit,
19    that there can be some very significant
20    associations between talc fibers and
21    ovarian cancer.
22 BY MR. HEGARTY:
23    Q.    You said that talc fibers are an
24 inevitable component of talc.  I think that's what

Page 269

1 you said.
2    A.    That's my --
3    Q.    What's your source -- what's your
4 source for that statement?
5    A.    That's my understanding based on the
6 documents.  I, you know, can't say, you know, the
7 prevalence fiber count, the assays for talc
8 fibers.  In fact, the assays for asbestos seem to
9 be contested and in flux, and there seems to be a
10 consensus, at least within the FDA, that there
11 needs to be some improvement to those standards.
12    Q.    You cite in this paragraph, that is
13 paragraph 29, to IARC's 2012 monograph.
14         That 2012 monograph nowhere uses the
15 phrase "fibrous talc," does it?
16         DR. THOMPSON:  Object to form.
17         THE WITNESS:  I would -- I
18    would have to review it.  The -- the
19    monograph on talc not containing
20    asbestiform fibers -- hold on, figure out
21    where we are -- is an evaluation of the
22    platy talc.
23         I reviewed all of this to see
24    how they were cabining the questions they

Page 270

1    were asked, and I made sort of note of
2    all of that for purposes of the report.
3           I am not giving either geology
4    opinions or opinions on causation, but I
5    noted the conclusions in the later IARC
6    regarding asbestos that -- that its
7    conclusions regarding asbestos would
8    equally apply to -- to what we'll call
9    "fibrous talc" but to non-asbestos fibers
10   occurring in otherwise platy talc.
11   BY MR. HEGARTY:
12   Q.     You say in this paragraph 29 that:
13          "Asbestiform talc is classified
14   alongside asbestos in a 2012 IARC Monograph as
15   carcinogenic to humans (Group 1) and causing
16   ovarian cancer."
17          MR. HEGARTY:  I marked as
18   Exhibit No. 14 a copy of that 2012
19   monograph.  I didn't bring an extra
20   copy --
21          DR. THOMPSON:  That's all
22   right.
23          MR. HEGARTY:  -- because I
24   couldn't carry it.

Page 271

1           THE WITNESS:  That was mine
2    (indicates).
3           (Document marked for
4    identification as Sage Exhibit 14.)
5    BY MR. HEGARTY:
6    Q.     If you look over at page 219 of that
7    monograph?
8    A.     Uh-huh.
9    Q.     It says in the first paragraph
10   towards the bottom:
11          "The conclusions reached in this
12   Monograph about asbestos and its carcinogenic
13   risks apply to these six types of fibres wherever
14   they are found, and that includes talc containing
15   asbestiform fibres."
16          Do you see that?
17   A.     Yes.
18   Q.     Are you equating or are you saying
19   that what you're saying referring to in this
20   paragraph is talc containing asbestiform fibers?
21          DR. THOMPSON:  Object to form.
22   BY MR. HEGARTY:
23   Q.     In other words, are what you're
24   calling asbestiform talc, talc containing

Page 272

1    asbestiform fibers?
2    A.     It's the asbestiform fibers in talc
3    containing asbestiform fibers, to be precise.
4    Q.     So you're defining for purposes of
5    this paragraph talc containing asbestiform fibers
6    or -- I'm sorry.
7           You're defining in this paragraph
8    asbestiform talc as talc containing asbestiform
9    fibers, correct?
10   A.     Those fibers in talc, yes.  Again,
11   for my expert report, which we'll -- which draws
12   regulatory obligation and self-regulatory conduct
13   conclusions from the presence in talcum powder
14   products of asbestos and asbestiform fibers, I am
15   using the terms "asbestiform fibers," "talc
16   containing asbestiform fibers," and "fibrous talc"
17   to mean essentially the same thing.
18          If that is incorrect, I apologize,
19   but it's also something that's much more relevant
20   to, you know, a different expert's report than to
21   mine.
22   Q.     For purposes of this part of your
23   report, you made reference to the expert report of
24   Longo and Rigler that we mentioned earlier.

Page 273

1           Do you see that in paragraph -- in
2    footnote 7?
3    A.     Yes.
4    Q.     Are you aware that they are paid
5    plaintiffs' experts?
6           MS. PARFITT:  Objection.
7    Form.
8           DR. THOMPSON:  Objection.
9    Form.
10          THE WITNESS:  Yes, I am.
11   BY MR. HEGARTY:
12   Q.     Are you aware that they've been paid
13   millions of dollars by the plaintiffs' lawyers in
14   the talc litigation?
15          DR. THOMPSON:  Objection.
16   Form.
17          THE WITNESS:  I do not know
18   their compensation.
19   BY MR. HEGARTY:
20   Q.     Are you aware that they have not
21   published their findings in any peer-reviewed
22   journal?
23          DR. THOMPSON:  Objection.
24   Form.

William M. Sage, MD, JD

Page 274

1       THE WITNESS:  I was not aware
2    of that.
3  BY MR. HEGARTY:
4       Q.    What did you do, if anything, to
5  assess the validity of the findings of Drs. Longo
6  and Rigler?
7            DR. THOMPSON:  Objection.
8       Form.
9            THE WITNESS:  With reference
10      to asbestiform fibers in talc, the -- the
11      way I approached a lot of the medical and
12      scientific evidence in formulating my
13      opinions involve looking for multiple
14      consistent sources of the same
15      information.
16           And certainly with respect to
17      the presence of asbestos in talc, I saw
18      multiple consistent sources, of which the
19      Longo reports were only one.
20  BY MR. HEGARTY:
21      Q.    Do you have the expertise to
22  evaluate the testing that they did for its
23  reliability?
24           DR. THOMPSON:  Objection.

Page 275

1    Form.
2            THE WITNESS:  I have the
3       expertise to read descriptions of testing
4       approaches, and insofar as there's
5       information presented about the
6       advantages or disadvantages compared to
7       other testing approaches, I can reach a
8       general conclusion that would be at a
9       higher level than a layperson.
10  BY MR. HEGARTY:
11      Q.    Did you do anything independently to
12  assess the reliability of the findings reported in
13  the report by Drs. Longo and Rigler you cite here?
14      A.    Independently, no.
15           DR. THOMPSON:  Objection.
16      Form.
17           THE WITNESS:  But they were
18      consistent with -- at least specifically
19      with respect to asbestos content, they
20      were consistent with other sources.
21  BY MR. HEGARTY:
22      Q.    Were you provided with any expert
23  reports by Johnson & Johnson's experts as it
24  relates to commentary on Drs. Rigler and Longo's

Page 276

1  report?
2       A.    I don't recall, honestly.
3       Q.    Would you like to have seen such
4  expert reports if they exist?
5       A.    I would be happy to consider them.
6       Q.    Did you ask for any defense expert
7  reports commenting on the processes and procedures
8  and reliability of the findings of Drs. Longo and
9  Rigler in their report?
10      A.    On those, I don't believe I saw the
11  defense perspective.  Though it may have been
12  covered in the Health Canada submission from
13  Johnson & Johnson or in similar documentation.
14  Obviously, there was a lot of back and forth about
15  testing standards and the reliability of results,
16  and to the extent I needed to consider those to
17  formulate my own regulatory opinions, I considered
18  them.
19      Q.    In paragraph 30, you refer to a
20  document you call "Hopkins 28."
21           Do you see that?
22      A.    Yes.
23           MR. HEGARTY:  I'm going to
24      mark as Exhibit No. 15 the Hopkins 28

Page 277

1    document.
2            (Document marked for
3       identification as Sage Exhibit 15.)
4  BY MR. HEGARTY:
5       Q.    Does that look familiar to you?
6       A.    Yes, it does.
7       Q.    Do you know who created this
8  document?
9       A.    I believe I was told, but I can't
10  recall right now.
11      Q.    Do you know that this document was
12  created by plaintiffs' counsel in this case?
13           DR. THOMPSON:  Objection.
14      Form.  Misstates.
15           THE WITNESS:  I don't know
16      this.  I mean, it's a -- it's a synthesis
17      and it is an exhibit.  It doesn't have
18      any other markings on it that would tell
19      me where it comes from.
20  BY MR. HEGARTY:
21      Q.    Who is Hopkins?
22      A.    I was told that, and right now at
23  this point in this deposition I'm afraid I can't
24  -- I can't remember.

Page 278

1 　　What I -- what I do remember about
2 this is that this was one of the confirmatory
3 sources of information about asbestos risk in --
4 in baby powder products, and there was a
5 back-and-forth between, I guess, Mr. Hopkins and
6 defense experts as to whether these internal
7 Johnson & Johnson reports were actually asbestos
8 or were not asbestos, using the standards that
9 Johnson & Johnson applied.
10 　　And I was also shown a subsequent
11 document where I imagine it was Mr. Hopkins who
12 went back and responded to the defense's
13 objections to certain characterizations, and I'm
14 afraid that's the best I can do today in
15 remembering this particular document.
16 　　Q.　　Did you cite that other document
17 that you called a responsive document in your
18 report?
19 　　A.　　No. I believe I was shown that
20 responsive document subsequently to final --
21 　　Q.　　Shown by -- I'm sorry.
22 　　A.　　-- to finalizing the report.
23 　　Q.　　Shown by whom?
24 　　A.　　Shown -- shown my plaintiffs'

Page 279

1 counsel in a discussion about asbestos content.
2 　　Q.　　This document makes reference to
3 other exhibits.
4 　　Did you review the documents that
5 this exhibit references, the actual documents
6 themselves?
7 　　A.　　No.
8 　　It was evident that such documents
9 would exist because this was a compilation of
10 documents.
11 　　Q.　　Do you see on the very first line of
12 Exhibit or -- I'm sorry -- the line in Exhibit
13 No. 28 that's dated a 5/9/1958?
14 　　Do you see that line?
15 　　A.　　(Laugh) Unless we want to declare
16 a brief recess for me to get a magnifying glass
17 from my briefcase, I'm having trouble reading this
18 particular document.
19 　　Q.　　Needless to say, though, you did not
20 independently confirm whether any of the documents
21 that are referenced here actually show asbestos in
22 Johnson's Baby Powder, correct?
23 　　DR. THOMPSON: Object to form.
24 　　THE WITNESS: I did not

Page 280

1 independently confirm. This compilation
2 was something that I looked at and
3 thought about and discussed and saw the
4 defendants' position on.
5 BY MR. HEGARTY:
6 　　Q.　　You took this document at face
7 value, correct?
8 　　DR. THOMPSON: Object to form.
9 　　THE WITNESS: I took this
10 document as being an accurate list of
11 dates and internal testing and results.
12 BY MR. HEGARTY:
13 　　Q.　　If this document is inaccurate, you
14 agree that that can affect your opinions in this
15 case, correct?
16 　　DR. THOMPSON: Objection.
17 　　THE WITNESS: No, I don't
18 think my -- my opinions, again,
19 considering the totality of the opinions
20 and the other sources of evidence of
21 asbestos adulteration in baby powder
22 products, I don't think my opinions stand
23 on or fall on this or any other single
24 document.

Page 281

1 BY MR. HEGARTY:
2 　　Q.　　Again, you make reference in this
3 paragraph to what we talked about earlier, the
4 report of Drs. Longo and Rigler.
5 　　Did you do any analysis yourself as
6 far as where they obtained the product that they
7 tested and whose results they reported in this --
8 in this report?
9 　　A.　　No.
10 　　Q.　　You also make reference in this
11 paragraph, as you mentioned earlier, to FDA's 2019
12 testing.
13 　　Do you see that?
14 　　A.　　I'm sorry. I was taking a drink of
15 water. Hold on.
16 　　Q.　　That's all right.
17 　　A.　　Yes, of course.
18 　　Q.　　And did you actually review the
19 testing document from the lab that FDA relied upon
20 to report that finding?
21 　　A.　　I believe that document was
22 available. I most remember reviewing FDA's press
23 releases and other public statements at the time
24 of their testing and -- and their findings and

Page 282

1 what became, thankfully, voluntary recalls of the
2 products involved.
3     Q.     Do you recall what type of asbestos
4 FDA claimed to have found pursuant to its testing
5 results --
6     A.     No.
7     Q.     -- testing procedures?
8     A.     No, I don't at the moment.
9         MR. HEGARTY:  I'm going to
10     mark as Exhibit No. 16 a statement by
11     Johnson & Johnson of December 3, 2019.
12         (Document marked for
13     identification as Sage Exhibit 16.)
14 BY MR. HEGARTY:
15     Q.     Is this the first time you've ever
16 seen this?
17     A.     I was aware that Johnson & Johnson
18 had done its own testing of a number of samples
19 and had found no asbestos using its standards.  I
20 do think this is the first time I've seen this
21 press release.
22     Q.     Do you see in this document
23 number -- Exhibit No. 16 the third paragraph says
24 that:

Page 283

1         "The Company's investigation
2 included that the most probable root causes for
3 the FDA's reported results were either test sample
4 contamination and/or analyst error at the AMA
5 lab."
6         Do you see where I'm reading from?
7     A.     I just -- just one moment.  I'm
8 seeing -- I'm seeing a similar statement in the
9 "Over the course of the investigation" paragraph.
10 Is that where you're reading from?
11     Q.     I was reading from the third
12 paragraph.
13     A.     Oh.
14     Q.     The first page.
15     A.     Oh, I'm sorry, yes.  Yes.
16     Q.     Okay.  And then do you see a couple
17 paragraphs down where the statement notes that 155
18 tests conducted by two different third-party labs
19 confirmed that there is no asbestos in that
20 product?
21         Do you see that?
22     A.     I see that assertion.
23     Q.     And you said prior to seeing this
24 statement that you were aware at least of some of

Page 284

1 this being reported, correct?
2     A.     I am aware of -- of some of this
3 being reported, yes.
4     Q.     Do you agree that the testing that
5 was done calls -- by Johnson & Johnson calls into
6 question the accuracy of the FDA testing results?
7         DR. THOMPSON:  Objection.
8     Form.
9         THE WITNESS:  I don't have a
10     basis to agree with that.
11         If the FDA had retracted its
12     findings, then I would have a basis; but,
13     again, the core of my analysis is a
14     regulatory analysis, and I'm not offering
15     an expert opinion as to causation or as
16     to any particular set of -- of product
17     tests.
18 BY MR. HEGARTY:
19     Q.     You did not make any reference to
20 any follow-up testing done by Johnson & Johnson in
21 your report, correct?
22     A.     I don't believe so.
23     Q.     You also did not make reference to
24 testing done by FDA in 2009 and 2010 of Johnson's

Page 285

1 Baby Powder finding no asbestos, did you?
2         DR. THOMPSON:  Object to form.
3         THE WITNESS:  My recollection
4     of that -- and, you know, bear with me
5     complicated topic -- is that those were
6     tests of a rather small number of
7     samples; and, no, I did not make
8     reference to those.
9 BY MR. HEGARTY:
10     Q.     Well, you made reference to the 2019
11 testing by FDA.
12         Why did you not make reference to
13 the 2009 testing by FDA?
14         DR. THOMPSON:  Object to form.
15         THE WITNESS:  Because the
16     2019 testing resulted in regulatory
17     action and rose to the level that was
18     something widely reported and in my
19     opinion reliable.
20 BY MR. HEGARTY:
21     Q.     Well, you mentioned a moment ago
22 that you recall that the 2009 test results were of
23 a small number of samples.
24         Do you understand that the 2019 test

Page 286

1  result was from a single bottle of Johnson's Baby
2  Powder?
3         DR. THOMPSON:  Object to form.
4         THE WITNESS:  I understand
5     that the positive result was a single
6     bottle, but recall that if you're trying
7     to prove a negative and you test -- I'm
8     making up a number -- five bottles of
9     baby powder and don't find asbestos,
10    that's not going to be evidence that no
11    bottle has asbestos.
12        I suspect with regard to the
13    2019 testing that if we multiplied one
14    asbestos-laden bottle out to the full
15    number of bottles of baby powder that
16    Johnson & Johnson sold that year, I doubt
17    that your client would -- would decide
18    that, you know, we'd have to see how many
19    bottles -- was it 50 some that Johnson &
20    Johnson -- that FDA tested?
21        But, I mean, if we -- if we
22    divide your total production by 50 and
23    multiply that number by 1 and said
24    that's -- that's how many asbestos-laden

Page 287

1     bottles of baby powder in the market, I
2     don't think your client would be
3     comfortable with that.  You know, this is
4     not scientifically comparable, a negative
5     finding in three bottles.
6         If we want to do positive
7     predictive value and negative predictive
8     value calculations, these two are not
9     comparable pieces of logic.
10  BY MR. HEGARTY:
11    Q.    Well, according to your analysis, a
12  negative finding in every bottle tested would
13  still not be enough under your standard to prove
14  that talcum powder products don't contain
15  asbestos, correct?
16    A.    That --
17        DR. THOMPSON:  Object to form.
18        THE WITNESS:  That's
19    incorrect.
20  BY MR. HEGARTY:
21    Q.    How is that incorrect?
22    A.    The FDA used its laboratories and
23  its laboratory standards.  Johnson & Johnson used
24  others and disagreed with the FDA's finding.

Page 288

1         I'm not expressing an expert opinion
2  as -- as to who wins that particular argument; but
3  if there is asbestos in baby powder in one bottle,
4  it is unlikely that there is no asbestos in any
5  other bottle in an entire global production.
6     Q.    That's not my question.
7         My question is:  If -- under your
8  standard if every test that has been done on
9  Johnson's Baby Powder showed no asbestos, you
10 would still not believe that that was sufficient
11 to prove that Johnson's Baby Powder doesn't have
12 asbestos in it, correct?
13        MS. PARFITT:  Objection.
14        DR. THOMPSON:  Object to form.
15        THE WITNESS:  My belief in
16    some sense is irrelevant here.
17        I have documentary evidence of
18    asbestos in baby powder and that is
19    highly relevant to my regulatory
20    conclusions.
21        I have seen many documents
22    that cast doubt on the sufficiency of a
23    long-time testing standard for asbestos
24    in terms of actually determining whether

Page 289

1     there is asbestos or, for that matter,
2     asbestiform fibers in baby powder
3     products or has been over the years,
4     which has understandably produced in me
5     some skepticism around negative findings.
6         May not be applicable to these
7     particular assays because I can't weight
8     the details on short notice, but I think
9     I am no more demanding of Johnson &
10    Johnson than the law and the regulations
11    expect me to be.
12  BY MR. HEGARTY:
13    Q.    You do not have the expertise to
14  comment on how much asbestos exposure can cause
15  ovarian cancer, correct?
16        DR. THOMPSON:  Object.
17        THE WITNESS:  I do not, but
18    there is a consensus among experts and
19    regulatory authorities that the presence
20    of asbestos in consumer products is an
21    adulterant and is hazardous to health.
22  BY MR. HEGARTY:
23    Q.    If you look at paragraph 31, you
24  comment on fragrances.

William M. Sage , MD, JD

Page 290

1   And before being hired by
2   plaintiffs, have you ever commented on fragrances
3   in a consumer product?
4   A.   I have never commented on
5   fragrances.
6   Q.   Your entire -- your sole reference
7   in this paragraph is to an expert report of
8   Dr. Crowley.
9   Did you read that report in its
10  entirety?
11  A.   In its entirety, no.  I did look at
12  it, and the purpose of this is that consistent
13  with current FDA requirements, fragrance-related
14  disclosures for cosmetics are limited as a
15  fragrance being something that is often of great
16  proprietary value to the company making the
17  product.
18  I have -- I would have preference
19  for greater disclosure of fragrance-related
20  ingredients, but the purpose of including
21  paragraph 31 is that there are many ingredients in
22  talcum powder products beyond what's listed on the
23  label.
24  Q.   You did not do your own independent

Page 291

1   assessment of any risk associated with any of the
2   fragrances in Johnson's Baby Powder, correct?
3   A.   Correct.
4   Q.   If you look over at paragraph 32 of
5   your report, you cite in that paragraph to a Pier
6   Exhibit 47.
7   Do you see that?
8   A.   Yes.
9   Q.   Who is Pier?
10  A.   I cannot recall.
11  Q.   What's her name?  Do you know what
12  her name is?  First name?
13  A.   No.
14  Q.   Is she employed by Johnson &
15  Johnson?
16  A.   I would have to go back and -- and
17  look at the exhibits.
18  Q.   Did you read her deposition?
19  A.   I can't recall.
20  MR. HEGARTY:  I'm going to
21  mark as Exhibit 17 the Pier exhibit that
22  you cite in this paragraph.
23  (Document marked for
24  identification as Sage Exhibit 17.)

Page 292

1   BY MR. HEGARTY:
2   Q.   Does that exhibit look familiar to
3   you?
4   A.   In passing, yes.  I don't think I
5   spent much time looking at this.
6   Q.   Did you look at the individual
7   documents from which this document was prepared?
8   A.   No.  I just looked at the list of,
9   you know, as presented here in the substances that
10  were -- that were present in -- in these samples
11  as a confirmation that indeed there are materials
12  here that in some instances, in some doses, in
13  some exposures are known to have health hazards.
14  But I'm not making -- the same way
15  I'm not offering an opinion as a scientific
16  expert as to whether, you know, talcum powder
17  exposure causes ovarian cancer, I'm not offering a
18  scientific opinion on the causal connection
19  between any one of these particular ingredients
20  and any particular health injury.
21  Q.   Do you know who prepared this
22  document?
23  A.   I would assume this is also a --
24  well, actually, no, I don't know.  I would

Page 293

1   assume -- I would assume this is also a
2   plaintiffs' exhibit or a plaintiffs' document, but
3   I don't know.
4   Q.   And plaintiffs' lawyers provided you
5   with this Exhibit Pier 47 and Hopkins 28, correct?
6   A.   Yes, and this was, you know, in
7   response to my request about having metal content
8   and other -- other potential contaminants or
9   adulterants of -- of baby powder products.
10  Q.   Did you independently investigate
11  any or independently assess the literature as it
12  relates to heavy metals and the risk of ovarian
13  cancer?
14  A.   I did not.  I considered these risks
15  worth mentioning in light of the regulatory
16  obligations, but less certain in their hazardous
17  consequences than asbestos, which is why I would
18  sort of go back to the bold heading above all of
19  these paragraphs which says "Contain or may
20  contain ingredients that pose health hazards to
21  consumers."
22  Q.   You did no independent assessment as
23  far as whether there are heavy metals in Johnson's
24  Baby Powder, correct?

William M. Sage, MD, JD

Page 294

1    A.    Correct.
2    Q.    You did no assessment, to the extent
3  there are any such materials in Johnson's Baby
4  Powder, as far as the extent of any such
5  materials, correct?
6    A.    In terms of concentrations and
7  overall prevalence and likelihood of exposure, no.
8    Q.    You did not read any medical
9  literature as it relates to exposure to these
10  heavy metals and cancer risk, correct?
11          DR. THOMPSON:  Object to form.
12          THE WITNESS:  I can't -- I
13    can't recall.  It wouldn't have been --
14    it wasn't the focus of any of the
15    scientific literature that I reviewed.
16    It might well have been mentioned in
17    passing.
18  BY MR. HEGARTY:
19    Q.    You reference -- or strike that.
20          There are monographs that refer to
21  these heavy metals.
22          Did you review the monographs for
23  these heavy metals by IARC?
24    A.    Did I review an IARC heavy metal

Page 295

1  monograph?  Not in any detail and perhaps not at
2  all.  I can't recall.
3    Q.    If you look over next at paragraph
4  39, you say that:
5          "Current literature suggests that
6  there is no safe level of asbestos."
7          Do you see where I'm reading?
8    A.    Yes.
9    Q.    Do you understand that there are
10  background levels of asbestos in urban and other
11  areas of the United States?
12          DR. THOMPSON:  Object to form.
13          THE WITNESS:  I did not know
14    that.  It would not surprise me.
15  BY MR. HEGARTY:
16    Q.    In your -- I'm sorry.  Go ahead.
17    A.    I'm done.
18    Q.    In your opinion, do background
19  levels of asbestos in the air cause ovarian
20  cancer?
21          DR. THOMPSON:  Object to form.
22          THE WITNESS:  I have no basis
23    for giving an opinion on that.
24  BY MR. HEGARTY:

Page 296

1    Q.    Does EPA allow levels of asbestos in
2  drinking water?
3          DR. THOMPSON:  Object to form.
4          THE WITNESS:  I do not know.
5  BY MR. HEGARTY:
6    Q.    If we look next at --
7    A.    I would say that, you know,
8  ingestation of asbestos has never been a root of
9  exposure that I have seen to be frequently
10  associated with a health hazard.  It doesn't mean
11  it couldn't be.  Very similar in some ways to
12  radon exposure.
13    Q.    If you look next at paragraph 42.
14    A.    Yes.
15    Q.    What is your authority for the
16  definition of risk that you have in that
17  paragraph?
18    A.    This is -- this is from my
19  longstanding expertise in risk regulation and risk
20  assessment, and this -- this is a, I would say,
21  majority view makes a distinction between risk and
22  uncertainty.  It is, again, a distinction that is
23  made for purposes of analysis and purposes of
24  regulatory action.

Page 297

1          It is -- it's not a matter of
2  scientific fact.  Most of this comes out of the
3  economics literature.  Some economists use the
4  umbrella term "risk" to describe both known
5  probabilities and unknown aspects of those
6  probabilities.
7          I would say more economists do what
8  I have done here and make a distinction for
9  discussion purposes between risk and uncertainty,
10  and I think that that distinction is essential to
11  these opinions because there's a specific
12  regulatory requirement, as you know, that
13  uncertainty be disclosed in connection with
14  cosmetic safety.
15    Q.    If we look at paragraph 45, you say:
16          "Both the risk and the uncertainty
17  must be disclosed under law."
18          First, to what law are you
19  referring?
20    A.    So -- so with respect to cosmetics,
21  you have these statutory pillars of adulteration
22  and misbranding because you don't have that much
23  more.
24          And then in terms of FDA regulation

William M. Sage, M.D., JD

Page 298

1 that's in the CFR, you have both 740.1 part A in
2 terms of warning labels. "Labels shall bear a
3 warning statement wherever necessary or
4 appropriate to prevent the health hazard that may
5 be associated with the product." You know, "may
6 be associated" clearly encompasses risks.
7           And then you have this really belt
8 and suspenders and, I think, extremely important
9 provision of 740.10(a), which -- which emphasizes
10 the manufacturer's independent obligation to
11 adequately substantiate safety of -- of cosmetic
12 products and ingredients prior to marketing.
13          And then says that anything that has
14 not been adequately substantiated -- meaning we
15 don't know what the -- the risks, or lack of
16 risks, are or the warnings or instructions that
17 might accompany them -- has to bear this
18 additional specified statement that the safety of
19 this product has not been determined.
20    Q.    Have you ever in any written
21 document of yours prior to your expert report made
22 the statement that with regard to the cosmetic
23 statutes and regulations both the risk and
24 uncertainty must be disclosed?

Page 299

1           DR. THOMPSON: Object to form.
2           THE WITNESS: No.
3 BY MR. HEGARTY:
4    Q.    Can you cite for me a statement by
5 anyone in any publication prior to you writing
6 your expert report where they said that with
7 regard to the cosmetic statutes and regulations
8 both the risk and uncertainty must be disclosed?
9           DR. THOMPSON: Object to form.
10          THE WITNESS: Using those
11    terms?
12 BY MR. HEGARTY:
13   Q.    Correct.
14   A.    No, but those concepts, absolutely.
15 The notion of a health hazard is a probabilistic
16 determination and that is a risk, and the 740.10
17 obligation, which has been referenced in many
18 settings over the years since the 1970s when it
19 was put into regulation, is uncertainty.
20   Q.    You make the statement over on page
21 7 that "Johnson & Johnson has known about risk and
22 uncertainty regarding talc and ovarian cancer for
23 decades."
24          Do you see where I'm reading?

Page 300

1    A.    If you just give me a moment.
2          Yes.
3    Q.    Can you cite for me any Johnson &
4 Johnson employee who has ever expressed the view
5 that there is risk and uncertainty regarding talc
6 and ovarian cancer?
7           DR. THOMPSON: Object to form.
8           THE WITNESS: I believe I
9     have seen some documentation regarding to
10    use a nonscientific term "queasiness" on
11    the part of Johnson & Johnson employees
12    regarding the possibility that baby
13    powder is not safe applied perineally in
14    terms of ovarian cancer risk.
15          Is that a description of risk
16    and uncertainty? I think so, but you
17    might not.
18 BY MR. HEGARTY:
19   Q.    Do you cite that document in this
20 report?
21   A.    No. In terms of corporate -- I make
22 no claims about corporate motive. And when I use
23 corporate knowledge, I'm really talking about
24 notice, and there has been, you know, 50 years of

Page 301

1 scientific literature raising concerns about
2 various aspects of talc and its potential or
3 actual adulterants and cancer risk.
4    Q.    You've never spoken to anyone at
5 Johnson & Johnson regarding talcum powder
6 products, correct?
7    A.    Correct.
8    Q.    If we look over at paragraph 47, you
9 state in the first line:
10          "Johnson & Johnson's resistance to
11 the presence in talcum powder products of fibrous
12 constituents that pose risk to human health is
13 strikingly at odds with the factual history."
14          You say "Johnson & Johnson's
15 resistance." To whom at Johnson & Johnson are you
16 referring to?
17   A.    I'm referring to the persistent
18 unwillingness in the context that I have examined,
19 including this litigation, of Johnson & Johnson to
20 make any concession whatsoever regarding the lack
21 of evidence of safety for its legacy product.
22   Q.    Are you able to -- strike that.
23          Are you commenting on any individual
24 person's view or opinion at Johnson & Johnson in

Page 302

1 your report?
2     A.    If we were to look at Facts About
3 Talc, either the depository of documents or the
4 consumer-facing reassurances, it makes no
5 concession even to uncertainty, which I actually
6 find disappointing, frankly shocking, and directly
7 at odds with its regulatory obligations.
8     Q.    That didn't answer my question.
9         Do you rely on any individual
10 person's statements at Johnson & Johnson for any
11 of the statements in your report?
12         DR. THOMPSON:  Object to form.
13         THE WITNESS:  I would -- do I
14     -- again, I have considered statements of
15     many employees.  Do I cite any particular
16     individual or today do I recall the
17     individual as being particularly
18     important to my conclusions?  No.
19 BY MR. HEGARTY:
20     Q.    In paragraph 48, you state:
21         "Johnson & Johnson Laboratories
22 recognized the inflammatory effects of talcum
23 powder in the peritoneal cavity."
24         And you cite as support an article

Page 303

1 by Eberl.
2         Do you see that?
3     A.    Yes.
4     Q.    Did you find this article yourself
5 through any search you did?
6     A.    No.
7     Q.    You know that that article makes no
8 reference to cancer risk, correct?
9     A.    I do know.  It has to do with talcum
10 powder on gloves and surgical inflammation.
11     Q.    Are you aware that FDA has banned
12 any type of powder, including corn starch, on
13 gloves?
14     A.    I am aware that those -- that powder
15 is not used on gloves.  Again, surgical gloves are
16 not cosmetics and, yes, I do believe that was an
17 FDA decision.
18     Q.    And you know that Eberl and the FDA
19 decision was based on the potential for powder on
20 gloves to cause adhesions or fibrosis
21 post-surgery, right?
22         DR. THOMPSON:  Object to form.
23         THE WITNESS:  I believe
24     adhesions are one of several conditions

Page 304

1     that might be resulting from powder on
2     gloves.  One could have granulomatosis
3     and other types of inflammation.
4 BY MR. HEGARTY:
5     Q.    But you're also aware that the FDA
6 action was not based on any concern about cancer
7 risk from particles on surgical gloves, correct?
8         DR. THOMPSON:  Object to form.
9         THE WITNESS:  I would be
10     interested in reviewing the details of
11     that determination.  I don't know for a
12     fact that cancer was not a consideration,
13     but it certainly wasn't the most pressing
14     consideration for surgical gloves.
15 BY MR. HEGARTY:
16     Q.    Does corn starch present a risk of
17 cancer?
18     A.    To my knowledge, no.
19         I believe the difference is that
20 corn starch can cause acute but not chronic
21 inflammation, and typically it's a chronic
22 inflammatory process that's considered a
23 contributor to carcinogenesis.
24     Q.    If you look over at paragraph 52 of

Page 305

1 your report, you make reference there to the "J4-1
2 method of asbestos detection."
3         Do you see that?
4     A.    I do.
5     Q.    What is the J4-1 method?
6     A.    The J4-1 method, based on the
7 documents I've reviewed, was an industry-based
8 standard that was developed in part to forestall a
9 more direct governmental or quasi-governmental
10 standard setting process for asbestos testing.
11 And it has been apparently controversial in this
12 litigation and other contexts of determining
13 whether something that is undetectable asbestos is
14 actually no asbestos.
15     Q.    What testing methods should be used
16 under the J4-1 method?
17         DR. THOMPSON:  Object to form.
18         THE WITNESS:  I remember this
19     was light microscopy and some other
20     things.  I don't remember the details
21     right now.  I've read the specifications,
22     but I can't recall.
23 BY MR. HEGARTY:
24     Q.    What's the level of detection

Page 306

1  under -- of asbestos under the J4-1 method?
2           DR. THOMPSON:  Object to form.
3           THE WITNESS:  That was hard
4      to assess from what I read because I read
5      correspondence with FDA and I believe
6      some internal perhaps corporate documents
7      that -- that talked about sort of one
8      percent thresholds and half percent
9      thresholds.
10          And it was never actually
11     clear to me exactly what was being --
12     what was being measured in those; but
13     there was, it seemed, some debate about
14     whether those sensitivities were actually
15     sufficient to declare some -- a talc --
16     talcum powder product asbestos-free with
17     industry asserting that they were
18     sufficient and others asserting they were
19     not.
20  BY MR. HEGARTY:
21     Q.    How does the J4-1 method compare to
22  the method Johnson & Johnson employs to test its
23  talcum powder products?
24          DR. THOMPSON:  Object to form.

Page 307

1           THE WITNESS:  I do not -- I
2      do not know.
3  BY MR. HEGARTY:
4     Q.    Is it your belief that Johnson &
5  Johnson uses only the J4-1 method to test its baby
6  powder?
7           MS. PARFITT:  Objection.
8           DR. THOMPSON:  Object to form.
9           THE WITNESS:  I would assume
10     that Johnson & Johnson has advanced its
11     detection methods beyond the J4-1 method
12     today.
13  BY MR. HEGARTY:
14    Q.    Have you investigated that issue?
15    A.    Have I investigated that?  No.
16  Again, the discussion of the J4-1 method related
17  for purposes of my opinion mostly to the
18  regulatory climate.
19    Q.    Do you believe you reviewed all the
20  documents that have been produced by all the
21  companies in this litigation as it relates to the
22  development of the J4-1 method?
23    A.    No.
24          DR. THOMPSON:  Object to form.

Page 308

1  BY MR. HEGARTY:
2     Q.    As far as what documents you did
3  review, those were documents provided to you by
4  plaintiffs' counsel, correct?
5     A.    Yes.
6     Q.    Did you make any specific requests
7  for particular documents about the development of
8  the J4-1 method to plaintiffs' counsel?
9     A.    No.
10    Q.    Paragraph 54 refers to or you make
11  -- you make the statement in paragraph 54 that:
12         "Condom manufacturers voluntarily
13  removed talc from their products because of
14  ovarian cancer concerns."
15         And you cite in that at the end of
16  that paragraph footnote 19, which is a document
17  PCPC MDL00062175.
18         Do you see that?
19    A.    I see that.
20          MR. HEGARTY:  I'm going to
21     mark as Exhibit 18 that very document you
22     cited there.
23          (Document marked for
24     identification as Sage Exhibit 18.)

Page 309

1  BY MR. HEGARTY:
2     Q.    Can you show me in that document to
3  what you're referring to as support for the
4  statement you make in paragraph 54?
5     A.    (Reviews document.)
6         This is, as you know, a compilation
7  of papers.  So it's -- unlike a single paper, it's
8  very hard for me to review it quickly.
9     Q.    Okay.
10    A.    So I would have to look through this
11  extensively for -- for that information.
12    Q.    Well, if you look over at page 15
13  and 16 and 17, there are references there to the
14  year of 1995, and you make reference to the year
15  1995 in paragraph 54.
16         So which of those documents there
17  that include a date of 1995 did you rely upon to
18  make the statement in paragraph 54?
19    A.    I can't identify one now.  I can --
20  I can say that I discussed this particular
21  statement and particular issues of the motivations
22  and concerns with respect to talcum powder on
23  condoms with plaintiffs' counsel to -- to verify
24  that I had the correct information, but I can't

William M. Sage , MD, JD

1 say -- I can't find the cite for you right now.

2    Q.    Is your authority for that statement

3 plaintiffs' counsel?

4          MS. PARFITT:  Objection.

5    Form.

6          DR. THOMPSON:  Objection.

7    Form.

8          THE WITNESS:   It did not

9    occur to me that this was a controversial

10   statement.  I did my best to verify

11   through plaintiffs' counsel that it was

12   accurate because I want to make sure that

13   anything that I am putting in the report

14   is accurate.  But --

15 BY MR. HEGARTY:

16   Q.    Would you agree --

17   A.    -- in retrospect, I would certainly

18 prefer to be citing a direct voluntary

19 reformulation document or a scientific study

20 rather than this particular footnoted study.

21   Q.    If we look over at paragraph 70.

22   A.    Are we back in my report?

23   Q.    Back in your report, paragraph 70.

24   A.    Sure.

1    Q.    You make several claims of Johnson &

2 Johnson being untruthful.

3          Are you saying that Johnson &

4 Johnson is lying on the talc -- the safety -- the

5 Facts About Talc website?

6    A.    I was not comfortable with the

7 representations to consumers that Johnson &

8 Johnson made on that website with respect to

9 safety and purity, particularly the content and

10 tone that suggests that these questions about

11 potential health hazards have been definitively

12 resolved.

13         And my objections in the report are

14 most relevant to my conclusion that Johnson &

15 Johnson has not complied with its disclosure

16 obligations regarding safety not being

17 substantiated.

18   Q.    Well, do you intend to testify in

19 this litigation about the veracity of Johnson &

20 Johnson as it relates to this website?

21   A.    I would testify about the content of

22 this website and the ways in which this content is

23 at odds with Johnson & Johnson's self-regulatory

24 obligations and their specific regulatory

1 obligations.

2          It is my opinion that this website,

3 which is very much consumer-facing and consumer

4 reassuring, is part of the labeling, if not the

5 label, of talc containing baby powder.  Much of

6 this being mooted by the fact that talc containing

7 baby powder is no longer manufactured or sold in

8 the United States and Canada, but, of course,

9 people outside there could access this website.

10   Q.    My question is a little bit

11 different.

12         And my question is:  Do you intend

13 to testify in this lawsuit about the veracity,

14 which you know the definition of veracity, of

15 Johnson & Johnson?

16   A.    I don't know the definition of

17 veracity for the purpose of this question.

18   Q.    Well, you know the definition of

19 veracity is the truthfulness, correct?  You're a

20 lawyer?

21   A.    Yes.  Yes, if we were to say

22 (laugh).  I am a lawyer.

23   Q.    Right.  You are a lawyer.  Let me

24 back -- let me start my question again.

1          You know as a lawyer what the word

2 "veracity" means?

3    A.    If are we using veracity as a

4 synonym for accuracy?  It appears to me that your

5 question allies distinctions between Johnson &

6 Johnson's motivation and character and the

7 accuracy of information presented.

8          I am -- it would be part of my

9 testimony that the information presented is at

10 odds with the required consumer-facing labeling of

11 these products to be compliant with FDA

12 regulations.

13   Q.    Do you intend to testify about the

14 intent of Johnson & Johnson in regards to any

15 document and, in particular, the Facts About Talc

16 website?

17   A.    No.

18   Q.    Do you intend to talk about the

19 motives of anyone at Johnson & Johnson as it

20 relates to talcum powder products?

21   A.    No.

22   Q.    Do you intend to testify that

23 Johnson & Johnson in setting up the Facts About

24 Talc website did so to lie to the public about the

Page 314

1 safety of talc?
2     A.    I am a student of institutions both
3 governmental and corporate in these regulatory
4 contexts.  I am extremely interested in how a
5 company as large and as experienced and as
6 accomplished as Johnson & Johnson has been in many
7 domains could, in my opinion, fall so far short of
8 its obligations in this respect.
9         So would I offer a conclusion about
10 corporate motivation?  No.
11         Were I to be questioned on it, might
12 I offer thoughts about how this type of thing
13 might happen?  I'm really shocked that this could
14 happen and that at this juncture between what is
15 presented to consumers as a pure and proved safe
16 product and the science and the regulatory
17 obligation is very disturbing to me, and indeed
18 that's part of my report and would be part of my
19 testimony.
20     Q.    You state that the website omits any
21 suggestion of uncertainty with respect to the
22 overall safety or carcinogenic risk of talcum
23 powder products.
24         Do you see where I'm reading?

Page 315

1     A.    Yes.  That was my read of the
2 website as I encountered it personally.
3     Q.    So your position is that a proper
4 analysis of the issues of talc and ovarian cancer
5 must include a discussion of all authorities on
6 the issue, correct?
7         MS. PARFITT:  Objection.
8         DR. THOMPSON:  Object to form.
9         THE WITNESS:  Would you
10     repeat that?
11 BY MR. HEGARTY:
12     Q.    Sure.
13         So it's your position that a proper
14 analysis of the issues of talc and ovarian cancer,
15 including as it relates to the Facts About Talc
16 website, should include a discussion of all the
17 authorities on the issue, correct?
18         DR. THOMPSON:  Object to form.
19         THE WITNESS:  I am failing to
20     see the connection between this question
21     and prior questions.  So I think I don't
22     know how to answer it.
23 BY MR. HEGARTY:
24     Q.    Well, is it your statement --

Page 316

1 contention that the Facts About Talc website
2 failed to provide a balanced discussion of the
3 medical and scientific literature on the subject
4 of talcum powder use and ovarian cancer?
5         DR. THOMPSON:  Object to form.
6         THE WITNESS:  It's my opinion
7     that the Facts About Talc website,
8     insofar as it is accessible to and easily
9     findable by someone who's using Johnson's
10     Baby Powder and wondering whether there
11     is risk or uncertainty, it is my position
12     that in that connection, the website
13     provides information that is at odds with
14     Johnson & Johnson's regulatory
15     obligations.
16 BY MR. HEGARTY:
17     Q.    Do you have any opinion as to -- is
18 it your opinion that the Facts About Talc website
19 is not valid, fair and balanced?
20         DR. THOMPSON:  Objection.
21         THE WITNESS:  We're not
22     discussing Fox News.  I do not see what
23     -- "fair and balanced" is not a phrase
24     that I think relates to --

Page 317

1 BY MR. HEGARTY:
2     Q.    Okay.  Let me use a different
3 phrase.
4         That's not -- by the way, Fox News
5 doesn't own the term "fair and balanced," right?
6     A.    They think they do, but we can leave
7 that aside.  (Laugh).
8     Q.    Well, is it your contention that the
9 Facts About Talc website is misleading because it
10 doesn't include contrary scientific and medical
11 literature as it relates to the safety of talcum
12 powder products?
13         DR. THOMPSON:  Object to form.
14         THE WITNESS:  I'm doing my
15     best to answer the questions you're
16     asking.
17         My -- my position is that,
18     first of all, the Facts About Talc
19     website omits any disclosure of
20     uncertainty, which is a specific
21     regulatory obligation, and, frankly, is
22     so conclusory that it might even negate
23     some other statement about an uncertainty
24     that Johnson & Johnson might make.

William M. Sage, MD, JD

Page 318

1 BY MR. HEGARTY:

2    Q.    Have you read the JAMA O'Brien 2020

3 article on talcum powder and ovarian cancer?

4    A.    I am pretty sure I have, but I would

5 love to be refreshed on any one of these.

6    Q.    You don't comment about that in your

7 report, do you?

8    A.    Again, presumably, you're asking me

9 this because I -- because I don't.

10         My -- my comments on the -- on the

11 scientific literature go through a timeline and

12 looking at key studies, but I do believe I've seen

13 that.  I'd love to see it again if you want to

14 show it to me.

15    Q.    If you look at paragraph 71 of your

16 report, is your only authority for the statements

17 you make what you cite at the end "21 CFR 740.1 et

18 seq."?

19    A.    So it is a combination of the nature

20 of cosmetics regulation compared to, say, the

21 nature of drug regulation, and a central aspect of

22 my analysis and opinions is that these two

23 regulatory regimes are quite different.

24         Mostly because in the -- in terms of

Page 319

1 drug authorities, FDA's role, its preventive role

2 and all of its regulatory authorities are far more

3 detailed, far more self-executing, and are much

4 more consistent with a compliance mind-set among

5 the regulated entities.

6         Whereas, for cosmetics regulation,

7 the principal obligations are informational and

8 virtually all of the requirements are for

9 self-regulation that results in safe products.

10    Q.    Can you cite for me any authority for

11 saying that there is a low threshold for

12 disclosure risk?

13    A.    That is my conclusion based on the

14 lack of offsetting benefit for cosmetic, and that

15 is -- and that's an established position in the

16 literature, but I don't cite specifically.

17    Q.    And you already told us that you

18 cannot cite any authority in the regulatory

19 setting that uses the word "uncertainty" when it

20 comes to the labeling of cosmetics, correct?

21         DR. THOMPSON:  Object to form.

22         THE WITNESS:  Disagree in

23         that the 740.10 obligation is about

24         safety not being determined, which is

Page 320

1 uncertainty.

2         The only way to -- the only

3 disagreement -- well, the only difference

4 of opinion in terms of risk and

5 uncertainty is whether uncertainty is

6 subsumed in risk in the -- in the

7 economics literature.

8         Once one teases the two things

9 out, I mean, if we could put it in the

10 national defense context and talk about

11 the known unknowns and the unknown

12 unknowns, but the uncertainty is the

13 central regulatory obligation of 740.10.

14         So I don't need more authority

15 than it's explicit in the regulation.

16 BY MR. HEGARTY:

17    Q.    My question is a little bit

18 different.  Listen to my question, Doctor.

19         Is the word "uncertainty" used

20 anywhere within 21 CFR 740.10 or anywhere in the

21 cosmetic regulations?

22         MS. PARFITT:  Objection.

23         DR. THOMPSON:  Objection.

24    Form.

Page 321

1         THE WITNESS:  No.

2 BY MR. HEGARTY:

3    Q.    For Johnson's Baby Powder, when

4 should it have carried a risk of a warning -- when

5 should it have carried a warning of a risk of

6 ovarian cancer?

7         DR. THOMPSON:  Object to form.

8         THE WITNESS:  I think, at a

9    minimum, by the early 1970s, it should

10    have carried a -- a warning of a

11    potential health hazard.  That was

12    informed by what was already worrisome

13    literature on ovarian cancer risk.

14 BY MR. HEGARTY:

15    Q.    Should a cosmetic manufacturer warn

16 of a risk that does not exist?

17         DR. THOMPSON:  Object to form.

18         THE WITNESS:  Again, a risk

19    is a known probability.  If the known

20    probability is zero, then there is no

21    risk and there's no warning obligation.

22 BY MR. HEGARTY:

23    Q.    Likewise, is a cosmetic -- is a

24 cosmetic manufacturer required to warn about a

Page 322

1 health hazard that does not exist?
2          DR. THOMPSON: Object to form.
3          THE WITNESS: So to answer
4    these questions, best -- best to use the
5    actual regulatory language. So we can --
6 BY MR. HEGARTY:
7    Q.   Well, do you need regulatory
8 language to say?
9    A.   Yes. Actually, when one is
10 paraphrasing an obligation, yeah.
11          So, you know, talks about "necessary
12 or appropriate to prevent a health hazard that may
13 be associated with the product."
14          So if you are saying that there is
15 no probability, no possibility that a health
16 hazard may be associated with a product, then
17 there is no warning obligation.
18    Q.   Okay. If you look over at paragraph
19 77.
20    A.   Uh-huh.
21    Q.   You talk about 740.1 in that
22 paragraph, correct?
23    A.   Correct.
24    Q.   Can you cite for me any published

Page 323

1 authorities that identify the studies that must be
2 done to adequately substantiate the safety of a
3 product?
4          DR. THOMPSON: Object to form.
5          THE WITNESS: I'm sorry. I
6    think -- I think that the paragraph -- I
7    thought you said paragraph 77, which is
8    about --
9 BY MR. HEGARTY:
10    Q.   I'm sorry. 78.
11    A.   All right.
12    Q.   Look at paragraph 78.
13    A.   Sorry about that.
14    Q.   Can you cite for me any published
15 authority that identifies the study that must be
16 done to adequately substantiate the safety of a
17 cosmetic product?
18          DR. THOMPSON: Object to form.
19          THE WITNESS: There are, I
20    believe, documents that nondefinitively
21    and nonexclusively and noncomprehensively
22    suggest the sorts of things that could
23    build into substantiation for safety.
24          But remember what we've been

Page 324

1 discussing and the reason we're here,
2 there are many, many scientific studies
3 that show non- -- non-1 confidence
4 intervals that -- that raise, I think,
5 indisputable concerns about possible
6 health hazards which means
7 nonsubstantiation for safety.
8          Is there a definitive
9 hierarchy? No, and it's going to be
10 depend on context. But, you know,
11 something that has never been
12 studied that nobody is really thinking,
13 much substantiation -- and there's no
14 suggestion that there's an injury,
15 substantiation for safety may be
16 accomplished in a relatively
17 straightforward way.
18          But when we have good science
19 that shows a possible increased risk of a
20 substantial degree for a fatal disease
21 and we have this repeatedly over decades,
22 I don't think it's seriously in doubt
23 that -- that talcum powder products
24 haven't been substantiated for safety.

Page 325

1 BY MR. HEGARTY:
2    Q.   Listen to my question. That's not
3 what I asked you, Doctor.
4          You make reference to the 740.10(a)
5 and talk about that "each ingredient used in a
6 cosmetic and each finished cosmetic product shall
7 be adequately substantiated for safety prior to
8 marketing."
9          My question is: Is there a written
10 published standard for what a manufacturer must --
11 for what tests a manufacturer of a cosmetic must
12 do to substantiate the safety of that product
13 before marketing?
14    A.   My opinion is that substantiation
15 for safety is contextual, and that they have been
16 statements from time to time in particular
17 contexts, but nothing that I regard as definitive.
18    Q.   The manufacturer must assess the
19 studies and determine if the cosmetic safety is
20 substantiated, correct?
21    A.   Correct.
22    Q.   You understand that Johnson &
23 Johnson has repeatedly done so as to Johnson's
24 Baby Powder, Shower to Shower, correct?

Page 326

1    DR. THOMPSON:  Object to form.
2        THE WITNESS:  I understand
3    those are Johnson & Johnson's conclusions
4    from the studies that it has done.
5        It is also my understanding
6    that Johnson & Johnson has not
7    participated actively in efforts to
8    further study its product.
9        If we're just talking -- if
10   we're talking only about asbestos, that's
11   one piece of this.  If we're talking
12   about the overall connections between
13   talc -- perineal use of talcum powder
14   products and ovarian cancer, it goes way
15   beyond asbestos testing.
16   BY MR. HEGARTY:
17   Q.     Well, you have reviewed, as we
18   talked earlier, about the 2020 Johnson's Baby
19   Talcum Powder: A Comprehensive Review document
20   dated March 17, 2020, correct?
21   A.     Yes.
22   Q.     That's the last document in the
23   notebook you have in front of you, correct?
24   A.     Correct.

Page 327

1    Q.     And you -- have you reviewed the
2    testimony of Johnson & Johnson's chief medical
3    officer, Dr. Kuffner?
4    A.     I did not read that -- if that was
5    deposition testimony, I did not read that
6    deposition in detail.
7    Q.     You understand that Johnson &
8    Johnson currently and has always concluded that
9    its talcum powder products are safe and that the
10   safety is substantiated?
11       DR. THOMPSON:  Object to form.
12       THE WITNESS:  I clearly
13   understand that is the company's
14   position.  I do not understand the basis
15   for that judgment.
16   BY MR. HEGARTY:
17   Q.     The regulations and authorities you
18   cite all provide that the manufacturer is to make
19   this determination.
20       You understand that, right?
21   A.     That's not a statement of deference.
22   That's a statement of obligation.
23   Q.     Johnson & Johnson has done so.
24       You understand that?

Page 328

1        DR. THOMPSON:  Object to form.
2        THE WITNESS:  I don't believe
3    Johnson & Johnson has done that.
4    BY MR. HEGARTY:
5    Q.     You disagree with Johnson & Johnson,
6    correct?
7    A.     Correct.
8        DR. THOMPSON:  Object to form.
9    BY MR. HEGARTY:
10   Q.     You're making your own subjective
11   judgment on whether safety has been substantiated,
12   correct?
13       DR. THOMPSON:  Object to form.
14       THE WITNESS:  No.  I am making
15   an expert determination based on many
16   scientific determinations and compendia
17   and other regulatory judgments that raise
18   persistent and serious questions about
19   substantiation for safety, such that, no,
20   I do not believe that substantiation for
21   safety has occurred.
22       And I conclude that the 740.10
23   obligation of disclosure of uncertainty
24   is operative.

Page 329

1    BY MR. HEGARTY:
2    Q.     And you think that a jury should
3    believe you over Johnson & Johnson where you first
4    started looking at this issue three months ago; is
5    that correct?
6        DR. THOMPSON:  Objection.
7        THE WITNESS:  I think juries
8    are entitled to conclude what juries
9    conclude.
10       I think the existence of this
11   regulatory obligation and its connection
12   to the information environment that
13   Johnson & Johnson has created around this
14   one legacy product is something from
15   which juries may draw exactly the
16   conclusion that I have.
17   BY MR. HEGARTY:
18   Q.     You have never in any publication of
19   yours cited to 21 CFR 740.1, correct?
20   A.     Are we on .1 or .10?  But the answer
21   would be for both of them, no.
22   Q.     And you've never given a
23   presentation where you have talked about 21 CFR
24   740.1 or 740.10, or any cosmetic regulation that

William M. Sage, MD, JD

Page 330

1  you're talking about in this report, correct?
2      A.    Correct.
3           MR. HEGARTY:  Let's go ahead
4      and take a break.
5           (Recess:  3:02 p.m. -
6           3:17 p.m.)
7           MR. HEGARTY:  We are back on
8      the record.
9  BY MR. HEGARTY:
10     Q.    I wanted to look at next -- look
11 next at paragraph 81 of your expert report.
12     A.    Uh-huh.
13     Q.    In the first line of that paragraph
14 you say that:
15          "Johnson & Johnson has a legal duty
16 to account -- to take account of 'new information'
17 putting the safety of its talcum powder products
18 in question, even if the information is itself not
19 conclusive."
20          What is the authority for or what is
21 the legal duty?  Where -- what statute, what
22 regulation where that legal duty found?
23     A.    Okay.  So that -- that authority
24 comes -- comes right out of 740.10(b), you know,

Page 331

1  it's in the appendix on page 39 of the report that
2  says "An ingredient or product may at any time
3  have its safety brought into question by new
4  information that is itself not conclusive."
5      Q.    Okay.
6      A.    And that's intended to convey an
7  ongoing duty of the manufacturer to substantiate
8  safety.  We're not talking about a one-shot, and
9  meaning specifically that new information that
10 might suggest that -- that the prior assumed
11 substantiation was inaccurate needs to be taken
12 account of and a decision, again, made whether to
13 disclose that safety hasn't been determined.
14          And this is exactly the sorts of
15 thing you would expect to become operative in a
16 situation like ovarian cancer developing from --
17 from -- from talcum powder in that we have latency
18 and a relatively uncommon condition and, you know,
19 something that might have appeared safe in, you
20 know, 1950 might not appear safe by, you know,
21 1975.
22     Q.    And you made reference earlier to
23 the fact, according to you, that warning would
24 have been required in the '70s.

Page 332

1           What was it about the '70s from your
2  standpoint would have triggered the need to
3  provide a warning with regard to health risk with
4  talcum powder products?
5      A.    So as you know, in the 1970s, cancer
6  risks from asbestos became, you know, of general
7  concern, but environmental cancer risks became a
8  general concern.  Going into the history of
9  cancer, this is the period, and it's no
10 coincidence that this is, you know, the Nixon
11 Administration's, you know, the EPA, motor vehicle
12 safety.  There's a whole bunch of sort of kind of
13 post-NASA investments in scientific-based health
14 and safety regulations, the OSHA Act, the
15 Occupational Safety and Health Act.
16          So, you know, this is a period when
17 people are looking at potential environmental
18 triggers for various cancers, and that's when many
19 of these studies are done.  And more of them are
20 being done, and they're not motivated by anything
21 other than genuine scientific curiosity on about
22 environmental exposure and its health
23 consequences.
24     Q.    Assume for purpose of my question

Page 333

1  that there is no asbestos in talcum powder
2  products.
3           Would that change your opinions in
4  this case?
5           DR. THOMPSON:  Object to form.
6           THE WITNESS:  If, in fact,
7      there were zero fibers of asbestos or of
8      asbestiform talc in products, it would
9      change some, but not all, of my opinions;
10     and it certainly would not change my
11     opinions regarding nonsubstantiation for
12     safety.
13 BY MR. HEGARTY:
14     Q.    In paragraph 85, you make reference
15 to the IARC Monograph 100C, which we marked and is
16 sitting to your right, and you make the statement
17 in that paragraph that says that:
18          "The Monograph provides a detailed
19 discussion of occupational exposures to asbestos
20 and talc in which inhalation presents the primary
21 exposure, but this is not the only purpose."
22          That's not correct, is it?  That
23 monograph makes no reference to occupational
24 exposure -- studies of occupational exposure to

Page 334

1  talc, does it?
2           DR. THOMPSON:  Object to form.
3           THE WITNESS:   I would have to
4  -- I would have to go back and look if I
5  -- if I'm incorrect about -- well, no, in
6  the sense that it covers both asbestos
7  and fibrous product, I would have to
8  stand by that because that's all I meant
9  by the statement.  It was -- it was talc
10  fibers on a par with asbestos.
11           So that is correct.
12  BY MR. HEGARTY:
13      Q.    Are you aware that with regard to
14  IARC's findings as it relates to asbestos and
15  ovarian cancer that none of the studies they
16  evaluated involved exposure to talcum powder?
17           DR. THOMPSON:  Object to form.
18           THE WITNESS:   Would you
19  repeat that?
20  BY MR. HEGARTY:
21      Q.    Sure.
22      A.    I couldn't tell.
23      Q.    Are you aware that with regard to
24  IARC's findings as it relates to asbestos and

Page 335

1  ovarian cancer, particularly the studies they
2  looked at, none of those studies involved exposure
3  or alleged exposure to asbestos from talcum powder
4  products?
5           DR. THOMPSON:  Same objection.
6           THE WITNESS:   I don't know
7  that.  I would have to go back and look.
8  They may have looked at actual or
9  potential sources of asbestos.
10  BY MR. HEGARTY:
11      Q.    And do you recall that the IARC's
12  findings as it relates to asbestos and ovarian
13  cancer were based primarily on five cohorts --
14  five heavy occupational cohort studies --
15           DR. THOMPSON:  Objection.
16  BY MR. HEGARTY:
17      Q.    -- of workers exposed to raw
18  asbestos --
19           DR. THOMPSON:  Objection.
20  BY MR. HEGARTY:
21      Q.    -- in their employment?
22           DR. THOMPSON:  Objection.
23           THE WITNESS:   I have seen
24  discussions about occupational asbestos

Page 336

1  exposure.  I've seen the back-and-forth
2  about the advantages and disadvantages of
3  various designs and whether occupational
4  exposure to asbestos is relevant to
5  assessment of the studies regarding
6  talcum powder use exposure to whatever
7  the things are in talcum powder that
8  predispose to -- to ovarian cancer.
9           I've seen all of that
10  discussion.  I don't think any of it
11  changes my views.
12           My views are, you know,
13  fundamentally based on what I conclude is
14  the presence of asbestos and asbestiform
15  particles in talc and on the failure of
16  Johnson & Johnson to meet its regulatory
17  obligations regarding uncertainty.
18  BY MR. HEGARTY:
19      Q.    Did you read the individual studies
20  on asbestos exposure and ovarian cancer cited by
21  the IARC Monograph 100C?
22      A.    On asbestos exposure and ovarian
23  cancer?  I'd have to go look and see which those
24  were.

Page 337

1      Q.    Do you recall looking at the
2  monograph and pulling the studies that it cites
3  and reading the actual studies themselves?
4      A.    I did not pull underlying studies
5  from -- from this IARC report.  Whether there's
6  some overlap between studies that I reviewed in
7  detail and these I can't say without doing the
8  crosswalk.
9      Q.    Are you aware of the concern with
10  regard to the studies looking at asbestos exposure
11  and ovarian cancer risk of misclassification
12  between peritoneal mesothelioma and ovarian
13  cancer?
14           DR. THOMPSON:  Object to form.
15           THE WITNESS:  I cannot recall
16  an extensive discussion that -- of
17  potential confounders between peritoneal
18  mesothelioma and ovarian cancer, and I
19  invite you to show me something if you
20  have something to show me.
21           I have trouble seeing why that
22  would change the overall views that have
23  been expressed regarding from good
24  studies and large -- large organizational

Page 338

1    conclusions that there is a substantial
2    increased risk as a result of talcum
3    powder exposure perineally.
4  BY MR. HEGARTY:
5      Q.    As a doctor, do you understand
6  whether there's any difficulties in diagnosing
7  ovarian cancer from peritoneal mesothelioma?
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  As a -- as a
10    matter cellular pathology, I've never
11    considered the question.
12  BY MR. HEGARTY:
13      Q.    You're not a pathologist, right?
14      A.    No.
15      Q.    If we look over at paragraph 121 of
16  your report, on what documents do you rely for
17  your statement in paragraph 121 that "Johnson &
18  Johnson manipulated asbestos testing"?
19      A.    I was -- I was concerned by the
20  back-and-forth regarding what the sensitivity
21  thresholds should be with -- with whatever FDA
22  regarded as the acceptable assay method.
23          So if we look, again, that 121 is as
24  it says in some paragraph and it derives from the

Page 339

1  paragraphs that precede it.
2          So if we go -- if we go back and
3  review that, you see a proposed regulation in 1973
4  calling for an amphibole 99.9 percent purity
5  standard and 99.99 for chrysotile and using
6  polarized microscopy, and then correspondence
7  subsequently involving Johnson & Johnson and FDA
8  and the Personal Care Products Council, which
9  including the statement in paragraph 116.
10          "We believe it is critical for the"
11  then predecessor -- the predecessor organization
12  "to now recommend these methods to the FDA before
13  the art advances to more sophisticated techniques
14  with higher levels of sensitization."
15          Which I think a fair reading of that
16  is that Johnson & Johnson prefers to have no
17  asbestos detectable in its products.
18          And certainly if one combines that
19  even with the current website, which I have to say
20  really does concern me, these statements about
21  purity and the absence of contamination, I think
22  there is a historical story here that is a -- I
23  think it would be fair to characterize it as
24  woeful ignorance.

Page 340

1      Q.    Did you read -- have you read all
2  the associated documents in Johnson & Johnson
3  testimony with regard to the document referenced
4  in your paragraph 116?
5      A.    I doubt I have.
6      Q.    Is it your testimony that Johnson &
7  Johnson intended to deceive by its testing and
8  publicity as it relates to asbestos testing?
9          DR. THOMPSON:  Object to form.
10          THE WITNESS:  As we've
11    discussed previously, my testimony does
12    not go to Johnson & Johnson's corporate
13    motive or intent.
14  BY MR. HEGARTY:
15      Q.    Do all test methods for asbestos in
16  talcum powder products have limits of detection?
17          DR. THOMPSON:  Object to form.
18          THE WITNESS:  All practical
19    methods would.  Conceptually, not
20    necessarily.  If you look at everything,
21    in everything you presumably find it.
22    Fibers are fibers, and they are
23    conceptually detectable.
24  BY MR. HEGARTY:

Page 341

1      Q.    Is there a test method that shows
2  that no detection means none?
3          DR. THOMPSON:  Object to form.
4          THE WITNESS:  Is there a test
5    method that means none detected means
6    none?  In this context?
7  BY MR. HEGARTY:
8      Q.    Correct.
9      A.    There should be test methods that
10  can be applied to small samples that will say that
11  none detected in the sample means none in the
12  sample, but we're always in a sampling situation.
13          So, yes, there will always be
14  choices in terms of sensitivity and detection
15  limits as a practical matter.
16      Q.    So you acknowledge that with regard
17  to any testing method that humans are capable of
18  here in 2021, there will be limits of detection,
19  correct?
20          DR. THOMPSON:  Object to form.
21          THE WITNESS:  I think there
22    are different forms of limits, and here
23    -- here this ties back for me to -- to
24    disclosures of uncertainties as well as

1  to disclosures of -- of known risks.  In
2  the -- in the sense that there's no
3  suggestion, for example, on the Johnson &
4  Johnson website that other than, you
5  know, one lot that in Johnson & Johnson's
6  retelling was mistakenly characterized as
7  containing asbestos by FDA's contract
8  labs, that there could ever be asbestos
9  in Johnson & Johnson's talc.
10         I think that is, in some ways,
11  Johnson & Johnson is the one asserting
12  the position you're ascribing to me in
13  that question.  They're the ones who are
14  claiming that there are no -- there are
15  no limits.  That, in fact, they can
16  simply say there is nothing because we
17  didn't find it in the way we looked.
18  BY MR. HEGARTY:
19      Q.    Do you have an opinion as to what
20  testing methods of talc for asbestos are
21  acceptable to substantiate the safety of the
22  product as it relates to asbestos?
23            DR. THOMPSON:  Object to form.
24            THE WITNESS:  Again, that's

1  not the -- that's not an expert opinion
2  that I'm giving.
3         That said, I've seen the
4  descriptions of the last couple of years
5  of sort of FDA efforts to improve
6  asbestos detection, and I don't think any
7  of that has resulted in a definitive
8  statement, but perhaps one is
9  forthcoming.
10  BY MR. HEGARTY:
11      Q.    If you don't have an opinion as to
12  what testing method is appropriate to substantiate
13  that there's no asbestos in talcum powder
14  products, how do you know that that method is not
15  being used today?
16            DR. THOMPSON:  Object to form.
17            THE WITNESS:  I have an
18  opinion that over the relevant timeline
19  history of when the women plaintiffs
20  counsel represents have been exposed to
21  Johnson's Baby Powder, the testing
22  methods used were insufficient to rule
23  out levels of asbestos that could cause
24  carcinogenesis, and that as a regulatory

1  matter Johnson & Johnson has never
2  accounted for that in the ways that the
3  regulation requires.
4  BY MR. HEGARTY:
5      Q.    You already told us that you don't
6  know the testing methods that Johnson & Johnson
7  has used over the last 50 years to test its talc
8  for the presence of asbestos, correct?
9      A.    I know the correspondence regarding
10  J4-1, regarding some of these other thresholds, I
11  know are fairly significant; and these paragraphs
12  documented disagreement between the company's
13  position on sensitivity and the FDA's proposed
14  rule.  A lot of harm can be caused by the
15  differences between those testing standards.
16      Q.    Not my question.
17            My question is:  Do you agree that
18  you don't know what testing methods that Johnson &
19  Johnson used over the last 50 years to test its
20  talcum powder products for the presence of
21  asbestos --
22            DR. THOMPSON:  Object to form.
23  BY MR. HEGARTY:
24      Q.    -- correct?

1      A.    I could not map for you detection
2  methods used by Johnson & Johnson in each decade
3  over the last 50 years.
4      Q.    And it's not your testimony in this
5  case as far as what testing methods must be done
6  as it relates to asbestos, looking for asbestos in
7  talc, to substantiate the safety of that product
8  as it relates to asbestos, correct?
9            DR. THOMPSON:  Object to form.
10            THE WITNESS:  So the -- so,
11  again, forgive me.  I'm really not trying
12  to be argumentative here.
13         Substantiation for safety is
14  not a matter of detectable asbestos.
15         Substantiation for safety is:
16  Does perineal use of baby powder -- of
17  talc containing baby powder products
18  increase a woman's chance of contracting
19  ovarian cancer?
20         And that is a health hazard,
21  which, if that has not been proven to be
22  a zero risk or perhaps such a small risk
23  that we could not consider it clinically
24  significant, in that case, at a minimum,

William M. Sage, MD, JD

Page 346

1  disclosure of nonsubstantiation for
2  safety has to be made under the
3  regulation.
4       I don't want to get -- I mean,
5  the presence of asbestos to me is
6  compelling.  The presence of asbestiform
7  talc is compelling.
8       Those components, in my expert
9  opinion, place regulatory obligations of
10 disclosure and warning and instruction,
11 some type of mitigation effort by the
12 company, but some sort of mitigation
13 obligation on the company, which I don't
14 think the company has ever complied with
15 or even seriously attempted to consider
16 and -- but those are independent of this
17 740.10 obligation regarding uncertainty.
18      And every time there's a new
19 study, every time there's a new report,
20 every time there's a regulatory finding
21 by a non-U.S. regulator, all of this in
22 the paragraph that you asked me about a
23 few minutes ago constitutes new
24 information, of which the company is

Page 347

1  legally obligated to take account.
2  BY MR. HEGARTY:
3     Q.    Under your standard, it's Johnson &
4  Johnson's obligation to prove that talcum powder
5  use does not cause ovarian cancer, correct?
6          MS. PARFITT:  Objection.
7  Form.
8          DR. THOMPSON:  Object to form.
9          THE WITNESS:  If there were
10 no studies suggesting that it did and no
11 reason to think that it would, it's not
12 in my reading of cosmetic self-regulation
13 incumbent to specifically disprove every
14 conceivable harm.
15      The obligation is to
16 substantiate safety for the product as
17 labeled and as reasonably and customarily
18 used.  It's the same as the warning
19 standard, in essence.
20      But in light of 1970s to
21 today, roughly 40 years of sustained
22 scientific interest in and controversy
23 regarding ovarian cancer risk from
24 perineal talcum powder, yes, under those

Page 348

1  circumstances, it is Johnson & Johnson's
2  obligation to have done a whole lot more
3  study to this than they apparently have,
4  and that would be my testimony.
5  BY MR. HEGARTY:
6     Q.    But your -- and that testimony is,
7  according to your standard, as of 2021, to meet
8  the obligations under your interpretation of the
9  cosmetic regulations, Johnson & Johnson must prove
10 a negative, that talcum powder is incapable of
11 causing ovarian cancer, correct?
12         DR. THOMPSON:  Object to form.
13         THE WITNESS:  No, I did not
14 say that.
15 BY MR. HEGARTY:
16    Q.    So it's not your testimony that
17 Johnson & Johnson's obligation of the regulation
18 is to prove that talcum powder use cannot cause
19 ovarian cancer, correct?
20         DR. THOMPSON:  Object to form.
21         THE WITNESS:  Johnson &
22 Johnson's obligation under 740.10 is
23 either to prove that use of talcum powder
24 products does not cause ovarian cancer,

Page 349

1  which today in 2021 it will be unable to
2  do, or to put in place, as it should have
3  for many, many years, the required
4  disclosure of "safety not determined," or
5  as it has done for whatever reason it
6  asserts to reformulate the product so
7  it's not sold to the United States or
8  Canada.  And I wish it weren't sold
9  anywhere in the world.
10 BY MR. HEGARTY:
11    Q.    But you would agree, at least on
12 your medical background, as it relates to exposure
13 and disease, it's impossible for anybody to prove
14 a negative, correct?
15         DR. THOMPSON:  Objection.
16 Form.
17         THE WITNESS:  I can't really
18 answer that question.
19      There are negatives that can
20 be proved to high degrees of statistical
21 probability.  In the sense of conditions
22 that are extremely evident that have no
23 other causes, you know, there are ways to
24 prove a negative.

Page 350

1      When there is, you know, a
2   condition that is multifactorial, when
3   there is a condition that has latency,
4   there's conditions that suit a lot of --
5   a lot of cancer development, then, yes,
6   it would be very, very hard to prove a
7   negative.
8      And yet even there, we have
9   epidemiological studies all the time that
10  are done and, frankly, you know, drug and
11  device studies that are done -- well,
12  drug studies that are done all the time
13  that in essence demonstrate to a level of
14  statistical certainty that there's no
15  increased risk.
16  BY MR. HEGARTY:
17     Q.    You comment in this part of your
18  report beginning at page 19 about CIR; is that
19  correct?
20     A.    Yes.
21     Q.    Are you an expert on the process by
22  which CIR reviews cosmetic ingredients?
23     A.    I've read a fair amount about it in
24  connection with this case.

Page 351

1      Q.    Have you ever reviewed anything
2   about the CIR and its processes before being
3   contacted by plaintiffs' counsel in this case?
4      A.    No.  I find it very interesting,
5   though.
6      Q.    Have you ever been involved in a CIR
7   review?
8      A.    No.
9      Q.    Have you ever studied a CIR review
10  besides its review for talcum powder products?
11     A.    In connection with this case and
12  reviewing cosmetics law and regulation and
13  self-regulatory processes, yes, I have read about
14  other CIR processes.  And that 1998 internal
15  study -- FDA study that we've discussed, and that
16  you made a copy of, has a fairly extensive
17  discussion of both the advantages and the profound
18  disadvantages and questions around CIR.
19     Q.    Have you discussed with anyone at
20  CIR how it reviews cosmetic ingredient petitions?
21     A.    No.
22     Q.    Do you know who Alan Anderson is?
23     A.    No.
24     Q.    Do you know -- you have his

Page 352

1   testimony referenced in your materials.
2      Did you read his testimony?
3      A.    If we can point me to it, I might
4   remember.  I don't -- I don't -- just so you know,
5   I remember things by substance generally, not by
6   title.
7      Q.    He was the head of the CIR during
8   the time it reviewed talc.
9      Do you recall that?
10     A.    I do recall reading -- reading some
11  testimony about -- about the CIR -- the specifics
12  of the CIR talc review.  I don't recall reading
13  his testimony.
14     Q.    Are you aware that he testified that
15  the CIR properly reviewed talc?
16     A.    I'm not aware of that.  It wouldn't
17  surprise me.
18     Q.    Are you aware he testified that the
19  CIR review was independent of any industry or
20  other group?
21        DR. THOMPSON:  Object to form.
22        THE WITNESS:  Again, I don't
23     think I read his testimony, or at least I
24     can't recall it right now.  The

Page 353

1     particular information you're sharing is
2     not specific.
3   BY MR. HEGARTY:
4      Q.    Do you recall -- so you didn't read
5   his testimony that he said -- where he said that
6   CIR does not favor industry?
7        DR. THOMPSON:  Object to form.
8        THE WITNESS:  No, but there
9     is other evidence that CIR has both
10    perceived and actual conflicts of
11    interest.
12  BY MR. HEGARTY:
13     Q.    Are you aware that he prepared an
14  expert report?
15        DR. THOMPSON:  Object to form.
16        THE WITNESS:  No, I'm not.
17  BY MR. HEGARTY:
18     Q.    Have you reviewed his expert report
19  in this litigation?
20        DR. THOMPSON:  Object to form.
21        THE WITNESS:  No, but I'd be
22     very happy to.
23  BY MR. HEGARTY:
24     Q.    Would that be something you'd be

Page 354

1 interested in seeing?

2     A.    Very much.

3     Q.    Because you do comment on the CIR in

4 your report, correct?

5     A.    Yes.

6     Q.    Don't you think it would be

7 appropriate to read the testimony and the expert

8 report of the person who was overseeing the CIR

9 when it looked at talcum powder?

10         MS. PARFITT:  Object to form.

11         DR. THOMPSON:  Object to form.

12         THE WITNESS:  I would be

13     delighted to look at any information your

14     client would like to offer that bears on

15     my opinions.

16 BY MR. HEGARTY:

17     Q.    Have you asked plaintiffs' counsel

18 for any testimony from -- from individuals about

19 the CIR process?

20         DR. THOMPSON:  Object to form.

21         THE WITNESS:  I asked

22     plaintiffs' counsel for documentation

23     regarding the origins and early history

24     and general continuing activities of CIR.

Page 355

1         It didn't occur to me to ask

2     about current CIR operations testimony.

3     If I had known that was available, I

4     certainly would have asked for it.

5 BY MR. HEGARTY:

6     Q.    If you look over at page 143 of your

7 -- I'm sorry -- paragraph 143 of your report.

8     A.    Uh-huh.

9     Q.    What is your authority for the

10 statement you make in that paragraph?

11         In other words, where did you get

12 that information from?

13     A.    So there's a peer-review article on

14 Citizen Petition processes, which is cited in the

15 report, which -- which I read.  I think that -- I

16 think the information either came directly out of

17 that or was -- was my back-of-the-envelope

18 calculation from what I was seeing in that

19 article.

20         There's also either a -- either a

21 GAO or an Inspector General report on the

22 Citizen's Petition process that's about 20 years

23 old, but it sheds a lot of light on the delays

24 involved with the Citizen's Petition.

Page 356

1         I also did a little independent

2 investigation to see where Citizen's Petitions

3 were available online within the FDA, and they

4 were not available.  I think they were available

5 in the device area.  Though I can't exactly recall

6 now because I didn't take notes on that.  But

7 there were none -- there was not data available

8 currently on the cosmetics side.

9     Q.    Do you cite the authorities you just

10 provided in your answer in your expert report?

11     A.    The peer-review article is -- is

12 cited right -- right here in the paragraph above

13 the one that you cited, which was this Chen et al.

14 petitioning the FDA.

15         The GAO or IG report is not cited in

16 the -- in the report but -- in my report, I don't

17 believe, but was made available to me after it was

18 submitted, and I think has been shared with and

19 disclosed to you.

20     Q.    That's not referenced in your

21 report, is it?

22     A.    That particular, the G -- I think --

23 we'll call it the GAO report for lack of having to

24 say both each time.  It's not referenced in the

Page 357

1 report, but it confirmed what I had learned about

2 the Citizen's Petition process elsewhere.

3     Q.    If you turn over to page -- to

4 paragraph 162 of your report.

5     A.    Yes.

6     Q.    There you refer to FDA Congressional

7 activity --

8     A.    Yes.

9     Q.    -- concerning the safety of cosmetic

10 products?

11     A.    Yes.

12     Q.    And there you detail -- in the

13 section detail hearings that the House

14 subcommittee had in 2019 regarding the safety of

15 cosmetic products?

16     A.    Yes.

17     Q.    Did you read the transcripts or

18 watch the video of those hearings?

19     A.    I -- I read all the transcripts at

20 different levels of detail.  There were a lot.

21 There were, I think, several days of testimony.

22 Some I was able to read more thoroughly than

23 others, but I reviewed all -- all the people

24 testifying in each day of hearings.

Page 358

1    Q.    Are you aware that plaintiffs'
2  experts testified before that House subcommittee?
3    A.    I think at the time I reviewed those
4  transcripts, I wasn't aware of who might have been
5  a plaintiffs' expert; but I think in reading some
6  of the transcripts, it became apparent that at
7  least a couple of them were.
8    Q.    Do you know who Ann McTiernan is?
9    A.    I read it at the time.  I don't
10  recall now.
11    Q.    Are you aware that plaintiffs'
12  lawyers paid her way to attend that subcommittee
13  hearing?
14        DR. THOMPSON:  Object to form.
15        THE WITNESS:  I am now aware
16    of that.
17  BY MR. HEGARTY:
18    Q.    Are you aware that -- that she
19  checked with plaintiffs' lawyers before agreeing
20  to testify at that hearing?
21        DR. THOMPSON:  Object to form.
22        MS. PARFITT:  Object to form.
23        THE WITNESS:  I did not know
24    that.  Again, really all I know about the

Page 359

1    testimony is the testimony.
2  BY MR. HEGARTY:
3    Q.    Is it your position that -- let me
4  look at that.  Strike that.
5    A.    Again --
6    Q.    Would you consider Dr. McTiernan to
7  be an uninterested or disinterested scientist?
8        DR. THOMPSON:  Object to form.
9        THE WITNESS:  Thank you.
10    Thank you for using those words
11    correctly.  I do appreciate it.
12        I don't have an opinion on
13    that.  When I was reading the hearing
14    testimony -- as I'm sure you know,
15    Congressional hearings are planned and
16    orchestrated and, hopefully, useful and
17    testimony is expert and accurate.
18        Those hearings, as I recall,
19    were a combination of sort of expert
20    testimony and layperson testimony of the
21    sort of compelling anecdote variety that
22    is highly representative of Congressional
23    hearings.
24        So it would not have occurred

Page 360

1    to me, nor would it have mattered to my
2    interpretation of the testimony, to know
3    about people being disinterested in the
4    sense that in a properly convened
5    Congressional hearing everyone is
6    interested.
7  BY MR. HEGARTY:
8    Q.    Is it your contention that
9  Congressional hearings are motivated by --
10  Congressional hearings like this are motivated
11  because of safety concerns in every instance?
12        DR. THOMPSON:  Object to form.
13        THE WITNESS:  Congressional
14    hearings are motivated by many things,
15    but safety concerns are one of the many
16    things that elected representatives
17    receive political benefits from
18    addressing.
19  BY MR. HEGARTY:
20    Q.    They can also be motivated by
21  political concerns, correct?
22    A.    I would resist the characterization
23  of political because it's, I think, in my view,
24  it's a much overused term that we really can't

Page 361

1  explain or even define these days.
2        So, again, I don't know if I want to
3  -- to try to lecture in this -- in this forum on
4  what I know about -- about designing Congressional
5  hearings.
6        But in general, the committee chair
7  or subcommittee chair that controls the chamber
8  controls the hearings and then takes, insofar as
9  that person takes input from within her own party
10  or across the aisle, different people come to
11  testify.  Different committees, different
12  subcommittees have different levels of
13  bipartisanship, different levels of comity, and
14  different hearings as a result.
15    Q.    Is it your testimony that there were
16  no political motivations behind the hearing you
17  reference in your report?
18        DR. THOMPSON:  Object to form.
19        THE WITNESS:  I don't know
20    what you mean by "political motivations."
21  BY MR. HEGARTY:
22    Q.    Are you --
23    A.    I'm not being naive.  I really don't
24  know what you mean by "political motivations."

Page 362

1    Q.    Really?  You don't know what
2  political motivations are?
3    A.    In this instance, a partisan
4  motivation?  A particular electoral outcome?  I
5  don't know.  What might you mean?
6    Q.    Well, all of the above.
7        Do you know whether any of those
8  considerations went into the hearings?
9    A.    In these instances --
10       DR. THOMPSON:  Object to form.
11       THE WITNESS:  In these
12   instances, I have to say, I'm very much
13   struck by the fact that there has been
14   this Feinstein -- Feinstein-Collins
15   proposal for now I think close to more
16   than five, perhaps closer to 10 years in
17   some form.
18       There is bipartisan support
19   that, you know, the Trump's
20   administration FDA was quite clear on the
21   need for additional cosmetic regulation
22   and, for that matter, it appears that
23   Johnson & Johnson is supportive.
24       And I think my -- my struggle

Page 363

1   -- my struggle answering these particular
2   questions is best captured by taking us
3   back to the bolded language that precedes
4   the paragraphs that we're discussing,
5   which is just the "Cosmetics regulation
6   may be on the verge of significant reform
7   and improvement because of unprevented
8   harm to consumers" and I say "whether or
9   not manufacturers cooperate."
10       It doesn't mean manufacturers
11   won't cooperate.  It just means that it
12   appears to be a political moment where
13   something might happen to finally improve
14   cosmetics regulations and the funds that
15   support it.
16  BY MR. HEGARTY:
17   Q.    If you look at paragraph 165 of your
18  report, you again refer to a hearing on March 12,
19  2019, and then other hearings that followed in
20  2019.
21       Do you see that?
22   A.    Yes.
23   Q.    Are you aware that at those
24  hearings, at least the December 2019 hearing, that

Page 364

1  Dr. Longo whose report you cited spoke at that
2  hearing?
3    A.    I don't recall that, but I read the
4  names of all of the participants as I read the
5  hearing transcripts.  So I presumably was aware of
6  it at the time.
7    Q.    You made mention just a moment ago
8  to legislation introduced by Senator Feinstein.
9        And have you read the press releases
10  she issued with regard to that legislation?
11   A.    I actually focused on reading the
12  text of the bill.
13   Q.    And the text of the bill does not
14  refer to talcum powder products, does it?
15   A.    The text of the bill does not.  It's
16  a -- it's a very interesting bill with a lot of
17  provisions that I find attractive and with some
18  provisions that I find rather cryptic that reflect
19  the attempt to secure bipartisanship.
20   Q.    Did you read -- so you did not read
21  with regard to her press release that
22  organizations that support the Act include Johnson
23  & Johnson?
24   A.    Oh, I did read that part if that was

Page 365

1  the press release.  Yes, because I had mentioned
2  that to you earlier that I had seen some mention
3  that Johnson & Johnson was supportive.  I said
4  that several hours ago.
5    Q.    Did you make reference to that
6  support anywhere in your report?
7        DR. THOMPSON:  Object to form.
8        THE WITNESS:  I actually did
9    not have the text of the most recent bill
10   at the time that I submitted the report.
11   It was something I wanted to make sure I
12   was keeping track of as my expert service
13   continues.
14  BY MR. HEGARTY:
15   Q.    If you look at paragraph 171 of your
16  report, please.
17   A.    Sure.
18   Q.    You make reference there to
19  O'Shaughnessy and Wille deposition.
20       Who is O'Shaughnessy?
21   A.    I have forgotten who O'Shaughnessy
22  is.  Wille was the deposition over a number of
23  days that outlined Johnson & Johnson's regulatory
24  posture with respect to these products.  It was a

William M. Sage , MD, JD

Page 366

1 difficult transcript to read.

2    Q.    What testimony from them are you

3 relying on for purposes of any of your statements

4 in this paragraph?

5         DR. THOMPSON: Object to form.

6         THE WITNESS: So I point out

7    that this is a summary of opinions

8    paragraph that also includes subsumed all

9    of the prior -- the prior paragraphs

10   and -- and their references.

11        So, you know, in this case,

12   this has -- this focuses primarily on

13   your -- your client's apparent

14   uninterest, extensively discussed in the

15   Wille transcript, in supporting more

16   detailed or definitive studies over the

17   decades.

18 BY MR. HEGARTY:

19   Q.    What do you rely upon from

20 Mr. O'Shaughnessy's transcripts for purposes of

21 this paragraph?

22   A.    I can't recall.

23   Q.    Did you read the entirety of his

24 deposition transcript?

Page 367

1    A.    I don't believe I read the entirety.

2 I do believe I saw it.

3    Q.    Did you read the entirety of

4 Ms. Wille's transcript?

5    A.    Yes.

6    Q.    Are you aware that both testified --

7 Mr. O'Shaughnessy and Ms. Wille -- that -- Dr.

8 Wille -- that there's never been asbestos in

9 Johnson & Johnson's talcum powder products?

10        Do you recall that testimony?

11   A.    Again, it was a challenging

12 transcript to distill to draw clear conclusions

13 from, but I mainly recall Dr. Wille for all of

14 these relying herself on other conclusions by

15 other Johnson & Johnson employees and

16 representatives.

17        There was very little, as I recall,

18 in that very long transcript that -- that really

19 was a matter of her personal knowledge.

20   Q.    If you look at paragraph 172 of your

21 report, what did Johnson & Johnson not respond to

22 with regard to FDA?

23        DR. THOMPSON: Object to form.

24        THE WITNESS: That's --

Page 368

1    that's a badly written sentence.

2         So I -- I can't interpret

3    exactly what the "respond to" words mean,

4    but it -- it did not engage in the type

5    of responsible corporate behavior in a

6    voluntary system that I would like to see

7    a company do when it has as much

8    experience with event reporting and assay

9    and ingredient reporting as Johnson &

10   Johnson does in its other lines of

11   business.

12 BY MR. HEGARTY:

13   Q.    We've already established, I

14 think -- and you tell me if I'm wrong -- that

15 you've never published in the -- in the publicly

16 available literature the standards for what it

17 takes to be a responsible company as it relates to

18 a cosmetic, correct?

19   A.    Correct.

20   Q.    You've never lectured on what is

21 responsible corporate behavior with regard to a

22 cosmetic, correct?

23   A.    With regard to a cosmetic, correct.

24   Q.    You've never lectured or taught

Page 369

1 courses on the responsible corporate behavior of a

2 manufacturer of a cosmetic, correct?

3    A.    A cosmetic, correct.

4    Q.    And prior to being contacted by

5 plaintiffs' counsel in this case, you would not

6 have called yourself an expert on what is the

7 responsible corporate behavior of a manufacturer

8 of a cosmetic, correct?

9         DR. THOMPSON: Object to form.

10        THE WITNESS: I don't -- I

11   don't serve as an expert in litigation

12   very often, as we've discussed. This is

13   the first time in, roughly, a decade.

14        I would consider myself an

15   expert on responsible corporate behavior

16   with respect to health and safety

17   generally.

18 BY MR. HEGARTY:

19   Q.    You have never before this case

20 analyzed the -- what you consider to be the

21 corporate behavior of a manufacturer of a cosmetic

22 product, correct?

23        DR. THOMPSON: Object to form.

24        THE WITNESS: Correct.

Page 370

¹ BY MR. HEGARTY:
²    Q.    And never analyzed before being
³ hired in this case with regard to what is a
⁴ responsible -- what is responsible corporate
⁵ behavior compliance with the cosmetic regulations,
⁶ correct?
⁷       DR. THOMPSON:  Object to form.
⁸       THE WITNESS:   I've never
⁹    analyzed -- I've never compared a
¹⁰    corporation's conduct to the requirements
¹¹    of the cosmetic regulations before
¹²    becoming involved in this matter.
¹³ BY MR. HEGARTY:
¹⁴    Q.    If we look at paragraph 175, you say
¹⁵ "Johnson & Johnson did not register its cosmetics
¹⁶ accurately."
¹⁷      Where did Johnson & Johnson not
¹⁸ register its cosmetics?
¹⁹    A.    The registration requirements are
²⁰ voluntary under the existing scheme and, you know,
²¹ its registration of facilities, but then its
²² products and ingredients that are associated with
²³ each facility.
²⁴      Something that's very interesting is

Page 371

¹ under the proposed legislation, the
² Feinstein-Collins bill, not only would
³ registration be mandatory, but it would be an
⁴ explicit certification in the process of
⁵ registering a facility for safety of every product
⁶ and ingredient has been substantiated or that that
⁷ warning we've long described discussed has been
⁸ given. So there's a clear understanding that
⁹ there's a relationship between registering one's
¹⁰ facilities and substantiating the safety of one's
¹¹ products and ingredients.
¹²      This, again, these are -- these are
¹³ conclusions that summarize and distill a lot of
¹⁴ the prior contents of -- of my report, and the
¹⁵ notion of registering its cosmetics accurately is,
¹⁶ in my expert opinion, as we discussed very close
¹⁷ to the beginning of today, the ingredients listed
¹⁸ are not the full contents of these products.
¹⁹      MR. HEGARTY:  Let's take a
²⁰    break.  Let's go off the record.
²¹      (Recess:  4:01 p.m. -
²²      4:28 p.m.)
²³      MR. HEGARTY:  All right.
²⁴    We're back on the record, Dr. Sage.

Page 372

¹ BY MR. HEGARTY:
²    Q.    I'll be jumping around a little bit
³ because I went back over.  Probably just hit
⁴ things here or there that may not be a
⁵ concentrated set of questions about any subject
⁶ area.
⁷    A.    Okay.
⁸      MR. HEGARTY:  We talked
⁹    earlier about whether you had contact
¹⁰    with any and communicated with any of the
¹¹    expert of plaintiffs in this case, and
¹²    I'm going to mark as Exhibit 19 a list of
¹³    the plaintiffs' experts that have been
¹⁴    disclosed in these cases.
¹⁵      (Document marked for
¹⁶    identification as Sage Exhibit 19.)
¹⁷ BY MR. HEGARTY:
¹⁸    Q.    Would you look at that list and tell
¹⁹ me whether you know any of those names.  I should
²⁰ say, know any of them personally.
²¹    A.    (Reviews document.)
²²      I don't know any of them personally.
²³    Q.    Okay.  In talking about your
²⁴ methodology for your review of material, what was

Page 373

¹ your method yourself for ensuring that you had the
² pertinent information that you needed to come to
³ conclusions or opinions in this litigation?
⁴      In other words, what method did you
⁵ apply to -- to ensure that you had the information
⁶ you needed to provide opinions in your report?
⁷    A.    Yeah.  I applied the same method I
⁸ would be applying if I were writing an article.
⁹ The same method I would be applying if I were
¹⁰ planning a series of classes on a topic.
¹¹      Identify the questions in a
¹² regulatory context.  Go to the regulatory sources.
¹³ Look at commentary that might be out there.
¹⁴ Things that are very relevant to me are historical
¹⁵ context, political context, economic context,
¹⁶ industrial context.
¹⁷      Here there was a heavy overlay of --
¹⁸ of scientific research and epidemiology.  So I had
¹⁹ to sort of identify each of those areas and
²⁰ satisfy myself that I had asked the questions and
²¹ found the material that would -- that would
²² provide the information I needed.
²³    Q.    Have you ever published that
²⁴ methodology in any article or any document?

Page 374

1          DR. THOMPSON: Object to form.
2          THE WITNESS:  I have not
3     published it.  One could infer it from a
4     lot of my work.  I have a -- particularly
5     in my longer work, I have a voice and a
6     style that is fairly recognizable among
7     my peer group.
8  BY MR. HEGARTY:
9     Q.    Can you cite for me anyone who has
10 come to the same opinions as you set out in your
11 expert report?
12          DR. THOMPSON: Object to form.
13          THE WITNESS:  I can't cite
14     anyone who's come to those opinions in
15     this matter.
16 BY MR. HEGARTY:
17     Q.    And when I'm talking about anyone,
18 I'm talking about in the litigation or outside the
19 litigation.
20          Can you cite for me anyone that
21 you're aware of who's come to the same opinions
22 that you have that you set out in your expert
23 report?
24          DR. THOMPSON: Object to form.

Page 375

1          THE WITNESS:  I can't cite
2     anyone who has come to the opinions I
3     have regarding this situation and these
4     obligations.
5  BY MR. HEGARTY:
6     Q.    By citing it in your report, you
7  certainly agree that FDA's April 2014 letter is
8  relevant to the issues that you analyzed in this
9  case, correct?
10          MS. PARFITT:  Objection.
11     Form.
12          THE WITNESS:  It is relevant.
13     It is not directly relevant to
14     manufacturer's obligations to warn nor is
15     it directly relevant to manufacturer's
16     obligations to disclose a
17     nonsubstantiation of safety.
18          It is certainly relevant to
19     the relationship between the FDA and the
20     other parties who might be involved in
21     approving the safety of cosmetics.
22 BY MR. HEGARTY:
23     Q.    Do you have that exhibit?  It's
24 Exhibit No. 7, or you can look in your notebook to

Page 376

1  the FDA letter.
2     A.    I believe it's right here.  I can
3  grab it from the one you gave me.
4     Q.    If you look at the first page of
5  that exhibit, Exhibit No. 7, you see the third
6  line it refers to: "Year 1994 petition requested
7  all cosmetic talc bear labels with a warning such
8  as" and then lists the warning, correct?
9     A.    Yes.
10     Q.    Then if you look a few lines down,
11 it says: "Additionally, year 2008 petition
12 requested that cosmetic talcum powder products
13 bear labels with a prominent warning such as" and
14 then it lists another suggested warning, correct?
15     A.    Yes.
16     Q.    So is it your contention that even
17 with that "such as" language that FDA would only
18 or only based its conclusions with regard to this
19 letter as to the two samples of warnings in that
20 first paragraph?
21          DR. THOMPSON:  Object to form.
22          THE WITNESS:  I think the
23     "such as" is the writer of this letter's
24     not fully clear way of expressing in all

Page 377

1     material respects "equivalent to."  So
2     that a word or two might vary, but the
3     thrust of it was identical.
4          I don't think that this
5     paragraph implies that the FDA is
6     declining a request to pursue a warning
7     of any kind.  I think this is quite
8     specific to these -- to the requested
9     language, and that is my understanding of
10     the Citizen's Petition process.
11 BY MR. HEGARTY:
12     Q.    That was what I was going to ask
13 you.
14          What do you base that opinion on
15 that in particular that FDA was not saying in this
16 letter that it's not -- that it doesn't believe
17 any type of warning would be appropriate?
18     A.    Because the position process, which,
19 as we've discussed, has delays, gaps, and flaws
20 that are well-recognized and that are immediately
21 evident in the letter that says "Your petitions
22 dated 1994 and 2008 are being addressed in 2014."
23 That already tells you something, you know, about
24 the Citizen's Petition process is, to put it

Page 378

1  politely, suboptimal.
2        The Citizen's Petition process is
3  designed to make specific requests of FDA.  It's
4  not a generic request to do something about a
5  potential problem, and so the response to the
6  Citizen's Petition is exactly that.  It is either
7  agreeing or declining to do the action that's
8  requested.
9      Q.    Your authority for that is what?
10     A.    What I understand from the text of
11 the regulations, what I've seen in Citizen's
12 Petitions, and what I've read about the Citizen's
13 Petitions process including that, again, we're
14 just calling it the GAO report.
15     Q.    And prior to being hired to serve as
16 an expert witness in this case, you had never seen
17 any company documents of Johnson & Johnson,
18 correct?
19     A.    I certainly had seen no proprietary
20 company documents of Johnson & Johnson.  I'm sure
21 I had seen various documents of Johnson & Johnson
22 in, say, the drug and device domain in passing.
23     Q.    Do you know who Imerys is?
24     A.    Yes.

Page 379

1      Q.    Have you seen any documents by
2  Imerys prior to being hired to serve as an expert
3  in this case?
4      A.    No.
5      Q.    Had you done any work prior to being
6  hired in this case for any type of mining company?
7      A.    No.
8      Q.    Do you have any expertise with
9  regard to the obligations of a mining company as
10 it relates to talcum powder products?
11     A.    With respect to --
12           DR. THOMPSON:  Object to form.
13           THE WITNESS:  -- talcum powder
14     products, no.  In my legal practice days,
15     I wrote the brief in Supreme Court
16     litigation involving OSHA obligations,
17     which also touched on mine safety
18     obligations, and so I have some passing
19     acquaintance with mining safety.
20 BY MR. HEGARTY:
21     Q.    Prior to being contacted to serve as
22 an expert witness in this case, had you had any
23 dealings with PCPC, also known as CTFA?
24     A.    No.

Page 380

1      Q.    Had you ever reviewed any
2  documents -- internal documents prior to being
3  contacted to serve as an expert witness in this
4  case from PCPC or CTFA?
5      A.    No.
6      Q.    Had you ever heard of PCPC or CTFA
7  prior to being contacted by plaintiffs' counsel in
8  this case?
9      A.    In passing, probably, but I haven't
10 made a mental note of it.  Trade groups,
11 particularly trade groups involving health-related
12 consumer products, would be within what I would
13 read.
14     Q.    Is there such a mineral as
15 asbestos-free talc --
16           DR. THOMPSON:  Object to form.
17 BY MR. HEGARTY:
18     Q.    -- in your opinion?
19           DR. THOMPSON:  Object to form.
20           THE WITNESS:  I don't have a
21     scientific basis for giving an opinion on
22     that.  I have seen nothing in this matter
23     to persuade me that -- that the majority
24     or anything approximating all of talc

Page 381

1      products are truly asbestos-free.
2  BY MR. HEGARTY:
3      Q.    Do you have an opinion one way or
4  the other whether you can mine talc that's
5  asbestos-free?
6      A.    I have no --
7            DR. THOMPSON:  Object to form.
8            THE WITNESS:  I have no
9      opinion on that.  I have seen assertions
10     of that and I have seen contrary
11     positions.
12 BY MR. HEGARTY:
13     Q.    Do you have an opinion as to the
14 amount of exposure -- the minimum amount of
15 exposure to asbestos that can cause ovarian
16 cancer?
17     A.    I have relied, as we've discussed,
18 on positions and determinations by others that
19 there is no safe level of asbestos exposure, and
20 insofar as there are paths by which asbestos can
21 reach the ovaries, I would apply that same zero
22 threshold to ovarian cancer.
23     Q.    So is it your opinion that a single
24 fiber of asbestos is capable of causing ovarian

Page 382

1 cancer?

2     A.    I have no reason to think otherwise.

3     Q.    And with regard to the medical

4 literature as it relates to migration of talc or

5 asbestos fibers from perineal use of -- of talcum

6 powder products, have you done an analysis

7 yourself of that medical literature?

8     A.    I have read some of that literature,

9 and my -- my medical view, which is not the expert

10 view that I'm, you know, here presenting in terms

11 of regulatory design and regulatory obligation, my

12 medical -- my medical view is that there are

13 demonstrated pathways by which perineal use of

14 talc can reach the ovary.

15     Q.    And that's based on the medical

16 literature you reference in your expert report,

17 correct?

18     A.    Yes.

19     Q.    And are you aware of any studies

20 that have showed that external application or

21 perineal application of any powder or any particle

22 has migrated to the tubes and ovaries, in other

23 words, where it's been tracked from external

24 application to the tubes and ovaries?

Page 383

1     A.    I would have to go back and review

2 the studies to see if anything -- if any studies I

3 reviewed were designed to illustrate that exactly.

4     Q.    And you have not done any -- any of

5 your own analysis as to whether any bottle of

6 Johnson's Baby Powder or Shower to Shower actually

7 has -- has ever had asbestos in it, correct?

8     A.    My own analysis?  No.

9     Q.    Going back to your expert report and

10 we'll go back over a few paragraphs.

11     A.    Sure.

12     Q.    In paragraph 27, you make reference

13 to IARC's monograph with regard to -- IARC's

14 monograph in 2010 where it classified the perineal

15 use of talc-based body powder (non-asbestiform) as

16 Group 2B.

17        Do you see that reference?

18     A.    In paragraph 28?

19     Q.    28. I'm sorry.  Yes, 28.

20        The 2B finding means that chance,

21 bias, and confounding cannot be ruled out with

22 reasonable certainty, correct?

23        MS. PARFITT:  Objection to

24     form.

Page 384

1        THE WITNESS:  I would have --

2     I would have to go and reread the

3     criteria for the classification, but I'll

4     accept that characterization.

5 BY MR. HEGARTY:

6     Q.    Let me go ahead and show you the

7 Volume 93 Monograph 2010, and I've only got two

8 copies. I'm sorry.

9     A.    Oh, I have one if it's easier.  Do

10 you want --

11        MR. HEGARTY:  You can give

12     that to Margaret.

13        DR. THOMPSON:  I have it.

14        MR. HEGARTY:  We'll leave it

15     there so I don't have to take it back.

16     You still have to mark it as an exhibit.

17        THE WITNESS:  There you go.

18        (Document marked for

19     identification as Sage Exhibit 20.)

20 BY MR. HEGARTY:

21     Q.    And have you reviewed that

22 monograph?

23     A.    Yes.

24     Q.    And if you look at page 31 of that

Page 385

1 monograph, at the very bottom, is it your

2 understanding that with regard to a 2B finding,

3 that's a finding of limited notice of

4 carcinogenicity?

5     A.    I'm sorry.  I'm looking for the

6 correlation between the description and the -- and

7 the classification of the category.

8     Q.    Well, do you understand one way or

9 another?

10     A.    But I'm -- but if -- so, yes.  "A

11 positive association has been observed, but

12 chance, bias, or confounding could not be ruled

13 out."  Absolutely.

14        And I would -- and I would, again,

15 point out that -- that a 2B finding alone -- and

16 this is, you know, for platy talc -- would be

17 exactly the sort of information that's

18 contemplated by the regulation to support a

19 revisiting of substantiation and trigger a "safety

20 not determined" notice.

21        And I should have -- in what you

22 pointed me to -- I'm sorry and I hope that's not a

23 problem.

24     Q.    No, go ahead.

William M. Sage, MD, JD

Page 386

1    A.    "A positive association has been
2  observed for which a causal interpretation is
3  considered by the working group to be credible,"
4  and then it goes with the limitation language that
5  you quoted.
6    Q.    Is it your opinion that a single
7  epidemiologic study finding association between a
8  cosmetic and an illness is enough to consider that
9  cosmetic not proved safe?
10         DR. THOMPSON:  Object to form.
11         THE WITNESS:  It would depend
12     on the study, but conceptually, yes.
13  BY MR. HEGARTY:
14    Q.    Can you cite for me any published
15  standard for assessing the safety of a cosmetic?
16         DR. THOMPSON:  Object to form.
17         THE WITNESS:  I have seen CIR
18     material about their various
19     classifications.  I've also seen Health
20     Canada report.  I've also seen references
21     to other types of safety standards in
22     many of the materials that we've
23     discussed today.
24  BY MR. HEGARTY:

Page 387

1    Q.    Okay.  Other than the CIR and Health
2  Canada, can you cite for me any published
3  standards on assessing the safety of a cosmetic?
4    A.    No.
5    Q.    If you look over at paragraph 47 of
6  your report --
7    A.    Yes.
8    Q.    -- you cite in footnote 10 a number
9  of studies.
10         Do you know whether any of those
11  studies tested Johnson's Baby Powder?
12    A.    I would have to go back and look.  I
13  do not know.
14         Oh, wait a second.  In the -- in the
15  "Blunt" or Blount reference here, the quote is
16  then enhanced with confirmed that the tested --
17  the tested sample was, in fact, Johnson's Baby
18  Powder.
19    Q.    As to Dr. Blount, did you read her
20  deposition in this litigation?
21    A.    I -- I believe I received it.
22  Again, it's not one that I read in -- in full.
23    Q.    Did you read what she had to say
24  about the particular sample that she tested as

Page 388

1  referenced in that article?
2    A.    I can't -- I can't recall.  Probably
3  not.
4    Q.    Do you know whether certain forms of
5  asbestos come in asbestos and non-asbestos forms?
6    A.    I --
7         DR. THOMPSON:  Object to form.
8         THE WITNESS:  I know that to
9     be the case in some of the material that
10     I have reviewed in terms of how the
11     fibers and crystals are structured.
12  BY MR. HEGARTY:
13    Q.    If you look at paragraph 50 of your
14  report, your footnote 15, you include footnote 15.
15  You make a statement, though, in that paragraph
16  that said:
17         "Asbestos was known to cause lung
18  cancer since the 1930s and was suspected to cause
19  ovarian cancer since the 1960s."
20         And my question is:  What do you
21  cite as your authority for saying that asbestos
22  was suspected to cause ovarian cancer since the
23  1960s?
24         And, again, you refer only there to

Page 389

1  footnote 15, which is the 30(b)(6) deposition and
2  exhibits of John Hopkins and Exhibit 28.
3    A.    So I'm right now looking at the
4  appendix in my report that was the summary of
5  scientific evidence to see if one of those pieces
6  specifically supports that statement.
7         (Reviews document.)
8         None of these of the published
9  articles date to the 1960s, but the Henderson 1971
10  article talks about the possibility of an
11  association of talc and asbestos and the
12  possibility of relationship between those and
13  carcinoma changes in the ovary.
14         I think that is sufficient support
15  for concerns going back to the 1960s if it's a
16  1971 publication.
17    Q.    You have reviewed the epidemiologic
18  literature -- some of the epidemiologic literature
19  looking at talcum powder use and ovarian cancer,
20  correct?
21    A.    Correct.
22    Q.    That literature shows -- or strike
23  that.
24         Some of that literature reports the

1 relative risk in the range of 1.2 to 1.3; is that
2 right?
3      A.      Yes.
4      Q.      And such a relative risk in that
5 range is a weak relative risk, correct?
6           DR. THOMPSON:  Object to form.
7           THE WITNESS:  No.  No.  It
8      indicates for a serious disease that with
9      confidence intervals that fall between
10      1.2 and 1.3, a serious disease with a
11      substantial prevalence, even if not
12      incredibly common across the population,
13      that's a serious risk.
14 BY MR. HEGARTY:
15      Q.      Well, that's not exactly what you
16 said before, and I'll show you the context.
17           I marked as Exhibit No. 21 an
18 article of yours entitled "Lessons From Breast
19 Implant Litigation."
20           (Document marked for
21      identification as Sage Exhibit 21.)
22 BY MR. HEGARTY:
23      Q.      Do you recall this article?
24      A.      That's a book review.

1      Q.      Book review.  Okay.
2           If you look over at the second page
3 of that document, that book review, the paragraph
4 on the left-hand side where we say "What do we
5 know in 1996?"  Do you see that paragraph?
6      A.      Yes.
7      Q.      You note in that paragraph towards
8 the bottom that:
9           "The most recent and largest study
10 calculated a relative of risk of 1.24 for
11 self-reported disease and established with 95
12 percent confidence an upper bound of 1.41.  In
13 other words, a causal effect between breast
14 implants and connective tissue disease is
15 possible, but unlikely, and at any rate cannot be
16 substantial."
17           Correct?
18      A.      That's what I say here, interpreting
19 the information in Angell's book at the time.
20      Q.      And you're saying there that a study
21 that reports a relative risk of 1.24, while it
22 indicates a disease is possible, you're saying
23 it's unlikely, at any rate cannot be substantial,
24 correct?

1      A.      Well, just reading this paragraph, I
2 published this book review one year into my
3 teaching career in 1996 based on someone else's
4 book about breast implant litigation.
5           I could quote other parts from this
6 book review that I actually remember, which was
7 that the author of this book expected to think
8 that the plaintiffs' lawyers were the villains in
9 this situation and actually found her villains
10 elsewhere.
11           But in terms of these particular
12 statistics, all I can say is, as I reported them
13 in the book review, I talked about wide confidence
14 intervals.  And I talked about one study where I
15 talk about the upper bound of the confidence
16 interval, but don't give the lower bound.
17           So perhaps I said that then.
18 Perhaps I would still agree.  Perhaps I wouldn't.
19      Q.      Aren't you saying there, though,
20 that your take is that with regard to the study
21 described there that the link to the disease is
22 possible, but unlikely, and at any rate cannot be
23 substantial?
24           DR. THOMPSON:  Object to form.

1           THE WITNESS:  Possible --
2      well, again, it's a -- it's a (laugh)
3      book review of someone else's book where
4      my points in the book review are not
5      predominantly epidemiologic.
6           But I say what I say, and in
7      this instance, we know that at least two
8      studies that are -- that I refer to in
9      this paragraph have wide confidence
10      intervals and the third is whatever I say
11      it is.
12           And I draw some inference,
13      which, as I just said, if I were to go
14      back and revisit the data and revisit
15      these studies, I might or might not write
16      it the same way today.
17 BY MR. HEGARTY:
18      Q.      But the words that I read to you are
19 your words.  It's not quoted from the book you
20 reviewed, right?
21      A.      Correct.
22      Q.      This is your take on the book that
23 you reviewed, right?
24      A.      It is a small piece of a book review

Page 394

1  essay that is mainly about other topics.
2          MR. HEGARTY:  You mentioned or
3      we talked earlier in the deposition about
4      the O'Brien study.  I'll mark that study
5      as Exhibit No. 22.
6          (Document marked for
7      identification as Sage Exhibit 22.)
8  BY MR. HEGARTY:
9      Q.    Do you in your report anywhere
10 reference this study?
11     A.    I don't reference it directly.  It's
12 an analysis of pooled data.  I spent a fair amount
13 of time reading this when I was evaluating the
14 science and -- and the case.
15     Q.    You don't even cite this article in
16 your reference materials, though, do you?
17     A.    I'd have to look.  If I don't, I
18 don't.
19     Q.    Do you want to look?
20     A.    I did -- well.
21         (Reviews document.)
22         Apparently, I don't.
23     Q.    You do cite --
24     A.    I should have.  My apologies.

Page 395

1      Q.    I was going to say:  You cite a
2  number of other epidemiologic studies in your list
3  of materials, correct?
4      A.    Yes.
5      Q.    Certainly an article from 2020 from
6  JAMA is an article that should be referenced as
7  you would reference other articles of an
8  epidemiologic nature that you included in your
9  materials, correct?
10         DR. THOMPSON:  Object to form.
11         THE WITNESS:  I -- I agree
12     this is an article that would be worth
13     referencing as material considered.
14 BY MR. HEGARTY:
15     Q.    And why did you not reference it?
16         DR. THOMPSON:  Object to form.
17         THE WITNESS:  I can't answer
18     that.  Might be an oversight.  Might just
19     be -- I don't have an answer for that.  I
20     do -- I do -- I do recall reading --
21     reading this but --
22 BY MR. HEGARTY:
23     Q.    Do you -- I'm sorry.
24     A.    -- but the conclusions are as

Page 396

1  stated.
2          I just come back to the point we've
3  discussed at several junctures, though we're now
4  sort of doing skip-around questioning, which is,
5  I'm not offering a scientific expert opinion on
6  causation.
7      Q.    Did you do any sort of analysis
8  weighing the strengths and weaknesses of the
9  O'Brien study?
10         DR. THOMPSON:  Object.  Form.
11         THE WITNESS:  I read the
12     study.  I mean, again, it's -- it's a
13     pooled sample study to go back, you know,
14     and it's based on cohort studies that
15     have their own characteristics and have
16     their own weaknesses.
17         It is a peer-reviewed article.
18     It was worth my attention, and it should
19     have been noticed to you as among the
20     material I considered.
21         Beyond that, you'd have to ask
22     other questions.
23 BY MR. HEGARTY:
24     Q.    If you look at paragraph 71 of your

Page 397

1  report, you make the statement in that paragraph
2  that "studies of cosmetics are infrequent and
3  poorly funded compared to drugs."
4          What's your authority for that
5  statement?
6      A.    It's consistent with everything I've
7  read in reviews of cosmetic regulation and,
8  frankly, it's derivative of extensive expertise
9  with the drug regulatory regime, which requires
10 studies and the cost of which are constant matters
11 of public comment.
12     Q.    Do you have an opinion as to -- wait
13 a minute.  Strike that.
14         Is it your opinion that Johnson's
15 Baby Powder in 2019 should have carried a warning
16 about the risk of ovarian cancer?
17         MS. PARFITT:  Objection.
18         DR. THOMPSON:  Object to form.
19         THE WITNESS:  It is my
20     opinion that in 2019 and many years
21     before that Johnson & Johnson had a legal
22     obligation to disclose that safety had
23     not been determined.
24         It is my opinion that with

Page 398

1    respect to warnings, instructions, or
2    other mitigation options, such as
3    reformulation or withdrawal, Johnson &
4    Johnson had to do something.
5 BY MR. HEGARTY:
6    Q.    And do you have an opinion as to
7 what information should have been included on the
8 package for consumers as it relates to the
9 analysis that you have done in this case?
10    In other words, do you have specific
11 language that you believe should have been
12 included on Johnson & Johnson's packaging for its
13 Johnson's Baby Powder and Shower to Shower
14 products?
15    MS. PARFITT:  Object to form.
16    THE WITNESS:  I believe the
17    740.10 language should have been
18    included.  I think that was a direct
19    regulatory obligation.
20    I think other language should
21    have been offered by Johnson & Johnson to
22    better inform consumers about -- about
23    possibilities of harm, in other words,
24    about risk, about ways to mitigate that

Page 399

1    risk in terms of Instructions for Use or
2    nonuse.
3    But I wasn't asked to create
4    language for your client, and I think the
5    major lesson is that many things that
6    your client could have done would satisfy
7    me, but doing nothing does not satisfy
8    me.
9 BY MR. HEGARTY:
10    Q.    I was going to ask.  My next
11 question is:  Do you have an opinion as to what
12 specific language should have been included on
13 Johnson's Baby Powder and Shower to Shower during
14 the time it was being sold in the United States
15 and Canada?
16    MS. PARFITT:  Objection.
17    DR. THOMPSON:  Object to form.
18    THE WITNESS:  No.
19 BY MR. HEGARTY:
20    Q.    And do you have an opinion as to
21 what specific mitigation activities Johnson &
22 Johnson should have initiated with regard to its
23 talcum powder products?
24    A.    Again, there are a wide range of

Page 400

1 things that Johnson & Johnson could have and --
2 could have done, and I would have applauded any of
3 them.
4    I think it's worth pointing out that
5 seriously studying the problem in ways that they
6 did not study the problem would have been a good
7 start, but as for the rest of the mitigation
8 measures ranging from disclosure to warning to
9 instruction to reformulation to withdrawal, that
10 was up to your client.
11    Q.    What are you relying on for saying
12 that Johnson & Johnson did not seriously study its
13 talcum powder products?
14    A.    A lot of this came out of the Wille
15 testimony, but a lot of it also came out of the
16 history of the different studies, and the fact
17 that beyond those early studies of surgical
18 gloves, I was not made aware of any serious
19 research contributions that Johnson & Johnson had
20 made.
21    Q.    When you say you were not made aware
22 of, that's -- you're referring to materials that
23 you have reviewed, correct?
24    A.    Yes.

Page 401

1    Q.    If you look at paragraph 80 of your
2 report -- I'm sorry.  Let's not -- let's not go
3 there yet.  I think I skipped over a couple
4 points.
5    My methodology is to take the tabs
6 off the bottom of my notes.
7    (Laugh.)
8    MR. TISI:  Where was it
9    published?
10    MR. HEGARTY:  It's not been
11    published.
12    MR. TISI:  Well, then strike
13    you.
14    MR. HEGARTY:  It's not
15    reliable.
16    THE WITNESS:  My methodology
17    is, I need a little more Diet Coke.
18    MR. HEGARTY:  I realize at
19    times when I finish a deposition and I
20    figure out that I did miss things to ask.
21 BY MR. HEGARTY:
22    Q.    So if you look at paragraph 70 of
23 your expert report.
24    A.    Yes.

Page 402

1    Q.    I think we've established that you
2  have not read all of the expert reports provided
3  by the Johnson & Johnson defendants in this
4  litigation?
5    A.    Yes.
6    Q.    And particularly you have not read
7  the reports of Johnson & Johnson experts where
8  they say that talcum powder use is safe, correct?
9         MS. PARFITT:  Objection to
10       form.
11         THE WITNESS:   I have read
12       some testimony regarding their assertions
13       that talcum powder is safe.  I have seen
14       perhaps an expert report, but nothing
15       immediately springs to mind.
16         It has been the company's
17       consistent position essentially since
18       time immemorial, which is to me a big
19       part of the problem here.
20  BY MR. HEGARTY:
21    Q.    And with regard to Johnson &
22  Johnson's experts who have -- who testified and
23  prepared reports saying that talcum powder is
24  safe, is it your contention that they are not

Page 403

1  being truthful in making those statements?
2         DR. THOMPSON:  Object to form.
3         THE WITNESS:  Could you ask
4       that perhaps a slightly different way?
5  BY MR. HEGARTY:
6    Q.    Sure.
7         To the extent an expert for Johnson
8  & Johnson said in their report or their testimony
9  that talcum powder use is safe, is it your
10  contention that they're not being truthful in
11  making those statements?
12         DR. THOMPSON:  Object to form.
13  BY MR. HEGARTY:
14    Q.    In making that statement?
15    A.    I simply view it as their expressed
16  opinion.
17    Q.    Which you are doing here today
18  yourself, correct?
19    A.    Indeed.
20    Q.    Now we can turn over to paragraph 80
21  of your report.
22         You reference in that paragraph what
23  you call "long latency for carcinogenesis."
24         Do you see that?

Page 404

1    A.    I do.
2    Q.    And are you in that paragraph
3  referencing the long latency between talcum powder
4  use and the development of ovarian cancer, or
5  something else?
6    A.    Essentially -- essentially that, but
7  I've spent a fair amount of teaching time studying
8  and teaching occupational safety and health
9  examples that distinguish between workplace
10  accidents and workplace diseases, and long
11  latencies for studying those types of association
12  are frequently an obstacle to defend epidemiology,
13  and many of those cases involve cancer.
14    Q.    Do you have an opinion in this case
15  as far as the latency between talcum powder use
16  and ovarian cancer development?
17    A.    No.
18    Q.    Do you have any opinion as to the
19  minimum talcum powder use that is -- that is
20  required to increase -- that will increase the
21  risk of ovarian cancer?
22    A.    No.
23         DR. THOMPSON:  Object to form.
24  BY MR. HEGARTY:

Page 405

1    Q.    In your opinion, though, based on
2  this paragraph, it is impossible to substantiate
3  the safety of talc, correct?
4         DR. THOMPSON:  Object to form.
5         THE WITNESS:   Could I ask you
6       to repeat that question?
7  BY MR. HEGARTY:
8    Q.    Sure.
9         Based on the statements you're
10  making about the -- well, you actually say that
11  expeditious -- let me start over again.
12    A.    Ah.  Now I know.
13    Q.    "Expeditious and definitive studies
14  to determine safety are impossible given long
15  latency for carcinogenesis and other research
16  challenges."
17         So aren't you saying there that it
18  is impossible to substantiate the safety of talc
19  because of the latency period?
20         DR. THOMPSON:  Object to form.
21         THE WITNESS:  I'm not saying
22       that.  From an ex ante position, all of
23       this is possible, as it would be for any
24       cosmetic ingredient or cosmetic product.

Page 406

1    That paragraph that you
2  referenced is the continuation of the
3  paragraph above, which is explaining why
4  this situation does not under any
5  circumstances fall within the exception
6  of the regulation provides to the
7  obligation to provide the "safety not
8  determined" warning.
9  BY MR. HEGARTY:
10    Q.    But you mention that you have taught
11  with regard to latency in cancer.
12        Is it your testimony that with a
13  possible -- well, let me back up.
14        You agree that latency as it relates
15  to exposure and a disease assumes that the
16  exposure causes the disease, correct?
17    A.    Yes.
18    Q.    And in your opinion, how do you
19  substantiate the safety of a product with the
20  possibility of a long latency period?
21        DR. THOMPSON:  Object to form.
22        THE WITNESS:   There is always
23    the possibility of a long latency period.
24        We could pick any cosmetic,

Page 407

1    call it X, and any latent disease, call
2    it Y, and at the moment you begin to sell
3    the product, you do what you can to
4    substantiate the safety of the product,
5    and you do not observe the disease while
6    occurring and you regard having done
7    something to the product that
8    substantiated safe.
9        But as information surfaces,
10    as it has in abundance with respect to
11    talcum powder exposure and ovarian
12    cancer, that calls into question your
13    prior substantiation determination and
14    that's when you have the obligation to
15    disclose.
16  BY MR. HEGARTY:
17    Q.    So it's not your testimony then
18  before a cosmetic manufacturer can sell a product,
19  they have to weigh -- they have to test it for 10,
20  20, 30, 40 years?
21    A.    Certainly not.
22    Q.    If you could look at paragraph 112
23  of your expert report.
24    A.    Yes.

Page 408

1    Q.    You say in the first paragraph:
2        "As stated previously beginning in
3  the 1960s -- I'm sorry.  You state in the first
4  sentence:
5        "As stated previously, beginning in
6  the 1960s, the scientific literature presented
7  evidence of talcum powder containing asbestos and
8  fiber talc -- fibrous talc."
9        You go on to say:
10        "Johnson & Johnson testing results
11  and internal discussions also demonstrate the
12  presence of and concern about the presence of
13  asbestos in talc fibers."
14        Did I read that correctly?
15    A.    Yes.
16    Q.    What documents have you reviewed
17  that show internal discussions within Johnson &
18  Johnson that demonstrate the presence of and
19  concern about the presence of asbestos and talc
20  fibers?
21    A.    The presence of that exhibit that we
22  discussed earlier that had the Hopkins assessments
23  of the various prior testing that Johnson &
24  Johnson had done.  In terms of concern about the

Page 409

1    presence, I did early in my engagement review some
2    internal corporate documents that I read as
3    expressing concern.
4    Q.    Do you cite any of those corporate
5  documents in the body of your report?
6    A.    No.
7    Q.    If we turn over to paragraph 121 of
8  your report, you say in that paragraph:
9        "In sum, Johnson & Johnson
10  manipulated asbestos testing and associated
11  publicity so that 'none detectable' would be
12  interpreted as 'none.'"
13        What associated publicity are you
14  referring to in that paragraph?
15    A.    I'm -- I'm referring to things that
16  such as the Facts About Talc website, admittedly
17  not a comprehensive overview.  But in addition the
18  Koberna deposition testimony regarding marketing
19  activities, you know, included marketing efforts
20  that -- that certainly did not refer to the
21  possibility of adulteration of asbestos.
22    Q.    And whose deposition did you just
23  mention?
24    A.    Koberna.

Page 410

1    Q.    Can you show me that in your
2  reliance materials, the exhibit we've been looking
3  at?
4    A.    I believe the deposition was
5  subsequent to the submission of the report.
6          So -- so perhaps I guess the more
7  accurate way to give my answer is, I didn't
8  consider it in drafting the report, but it was
9  subsequently made available to me.
10   Q.    And how do you spell the name that
11 you're referring to?
12   A.    I think it's K-o-b-e-r-n-a.  It was
13 an uncompleted deposition and, frankly, I found it
14 incredibly interesting given my mom's career in
15 advertising.
16         MR. HEGARTY:  I'm going to
17    mark as Exhibit 23 a folder of
18    supplemental materials that we were
19    provided by counsel for the plaintiffs in
20    this case.
21         (Document marked for
22    identification as Sage Exhibit 23.)
23 BY MR. HEGARTY:
24   Q.    And it's just a printout of the page

Page 411

1  in the matter that they provided to us in a
2  Dropbox.  When you pull up the particular heading
3  for the supplemental materials, this is what you
4  can print out.
5          Do you understand that?
6    A.    Yes.
7    Q.    And do you recall after the initial
8  supplying of materials to you whether there were
9  supplemental materials provided to you at a later
10 date?
11   A.    As I said at some point earlier
12 today, I've continued to -- to research the basis
13 for the opinions that I have given, and I've
14 continued to ask questions again about both sides
15 of the issue.
16         And one of the areas that I do not
17 feel I had sufficiently explored for the original
18 report were marketing activities because there was
19 not a lot of content I could review for that, and
20 this was a subsequent deposition.  And so when it
21 came along, I was very pleased to receive it and
22 to read it in full.
23         It should have been provided to you.
24   Q.    What materials have you received or

Page 412

1  are you able to identify -- let me back up.
2          Have you received additional
3  materials from plaintiffs' counsel since you
4  signed your report on July 2, 2021?
5    A.    I said before that I had, and I
6  repeat that answer.
7    Q.    You identified some of those.
8          But do you know whether all of the
9  materials you received since July 2, 2021 are in
10 this Exhibit 23?
11   A.    I have worked with counsel as best
12 we could to make sure that anything that I saw
13 subsequently was properly cataloged and properly
14 shared with your client.
15   Q.    But do you -- are you able to recall
16 anything else that you have reviewed since you
17 signed your expert report on July 2, 2021, besides
18 what you've already provided to us -- to me in
19 this deposition?
20   A.    Right now, no.
21   Q.    Is there anything else that stands
22 out to you?
23         You mentioned that -- you mentioned
24 some things.  You mentioned the Koberna

Page 413

1  deposition.
2          Anything else you recall -- well,
3  let me ask it this way.
4          Is there anything else you are
5  relying on or using as a resource material for
6  purposes of what you testified here today that you
7  have received since signing your July 2, 2021
8  expert report?
9    A.    Everything that I have considered is
10 something that I have discussed with plaintiffs'
11 counsel in order so that that could be properly
12 listed and shared as required.  I don't know more
13 than that.
14   Q.    Is there anything that you know of
15 sitting here today that you rely upon or you
16 considered since your July 2, 2021 report was
17 signed that you know we have not talked about
18 today, that you have not referenced or I have not
19 asked about?
20   A.    Certainly -- certainly anything that
21 -- that I can think of and that was significant
22 enough that it matters to me sitting here is
23 something that you've seen or received.
24   Q.    We talked about the CIR and are you

Page 414

1  aware that the -- or is it --
2       Do you have any opinion with regard
3  to the way that CIR is funded, that is, that you
4  find to be part of your opinions as it relates to
5  the CIR review for talc and ovarian cancer -- I'm
6  sorry -- talc and the safety of talc?
7            MS. PARFITT: Objection.
8       Form.
9            THE WITNESS: I do not
10      currently recall the details of the CIR
11      funding support. The generally close
12      connection between the CIR, the trade
13      association, and the trade association's
14      members is concerning to me, as it was
15      concerning to FDA in that 1998 internal
16      review.
17 BY MR. HEGARTY:
18      Q.    You looked at the -- the document
19 setting out the CIR analysis by Fiume, correct?
20      A.    If you could provide it, I would
21 appreciate it.
22            MR. HEGARTY: I do have it.
23            I'll mark as Exhibit No. 24
24      the Fiume article.

Page 415

1            (Document marked for
2       identification as Sage Exhibit 24.)
3  BY MR. HEGARTY:
4       Q.    Do you recall reading that article?
5       A.    (Reviews document.)
6       Yes.
7       Q.    Do you know any of the individuals
8  whose names are listed at the top of that exhibit?
9       A.    No.
10      Q.    Do you have any criticism of the
11 capabilities of any of the individuals listed at
12 the top of that article?
13            MS. PARFITT: Objection to
14      form.
15            THE WITNESS: I wouldn't have
16      a basis for criticism.
17 BY MR. HEGARTY:
18      Q.    Is it your opinion that the CIR
19 panel did not do a proper analysis as reflected or
20 as set out in this -- this document?
21      A.    So the way I would answer that
22 question would be to reference Appendix 2 in my
23 report, which is a specific comparison of the CIR
24 and Health Canada assessments, because they took

Page 416

1  similar underlying data and reached rather
2  different conclusions. And I set forth in that
3  comparison a number of areas of concern, but the
4  detail that exists in my Appendix 2 is not detail
5  that I could reproduce for you right now.
6       Q.    And is it your -- did you read the
7  entirety of the CIR safety assessment of talc as
8  used in cosmetics?
9       A.    I read as much of it as I was
10 capable of reading at the time. (Laugh).
11      Q.    And understand and understood.
12            But my question is: Did you read
13 the entirety of it?
14      A.    I made a point of reading it,
15 seriously.
16      Q.    Oh, did you read every page, every
17 word on every page?
18      A.    No.
19      Q.    Did you read every word of every
20 page of the Health Canada safety assessment?
21      A.    No, but both of these are -- are
22 materials that I considered highly relevant and
23 important to my assessment and opinions, and I
24 engaged seriously with both of them.

Page 417

1       Q.    And if you look over Appendix 1 of
2  your report, which is "Summary of scientific
3  evidence relating to talcum powder and its
4  association with ovarian cancer"?
5       A.    Yes.
6       Q.    There's a section there where you
7  talk about some studies dealing with migration of
8  particles from the vagina to the ovaries.
9            Do you see that section paragraph 7?
10      A.    Yes.
11      Q.    Before this, before being hired to
12 serve as an expert witness in this case, had you
13 ever in any of your work looked at articles
14 regarding the migration of particles within
15 tissue?
16      A.    Certainly, but I couldn't specify
17 which. My father back in the 1950s did studies of
18 lymphatic spread using colloidal gold particles.
19      Q.    Well, I wasn't asking about what
20 your father did.
21            I asked you if you had any
22 experience in looking at the migration of
23 particles within the body prior to being hired as
24 an expert in this case.

Page 418

1    A.    In connection with my -- my medical
2 education and my medical interests, from time to
3 time.  I'm sorry.
4    Q.    And had you reviewed any of the
5 studies that you cite in this part of your report
6 prior to being -- that is, in paragraph 7 -- prior
7 to being contacted to serve as an expert witness
8 in this case?
9    A.    No.
10   Q.    You had -- we had designated as
11 Exhibit No. 11 the notebook of materials that you
12 have in front of you?
13   A.    Yes.
14   Q.    Do you recall that?
15       I want to go ahead and designate as
16 Exhibit No. 25 the loose materials that you have
17 brought with you.
18   A.    Okay.
19       (Document marked for
20       identification as Sage Exhibit 25.)
21 BY MR. HEGARTY:
22   Q.    So would you keep that together --
23   A.    Yes.
24   Q.    -- as a separate set of documents?

Page 419

1    A.    Yes.  I'm trying -- I'm trying to
2 keep it separate from.
3    Q.    Keep it separate from the exhibits
4 that --
5    A.    Yeah.  I think we're okay on that.
6 I'll do my -- I do my -- I don't think anything
7 has got mixed up yet but...
8    Q.    Well, anything that you have over
9 there should be marked as an exhibit sticker.  I
10 want to make sure that you have anything --
11   A.    Right.
12   Q.    -- that you brought with you loose
13 that was not marked as an exhibit --
14   A.    Correct.
15   Q.    -- we'll designate as Exhibit
16 No. 25.
17   A.    Certainly.
18   Q.    And with regard to the loose
19 materials and the notebook, are those all the
20 materials that you brought with you to the
21 deposition?
22   A.    Yes.
23   Q.    And can I look just for a second at
24 your notebook?

Page 420

1    A.    Sure.  This is without the loose
2 materials, right?
3    Q.    Correct.
4       (Reviews documents.)
5       The underlining in the notes that
6 are in your report, are those or those are from
7 you, correct?
8    A.    In the report, in the tab containing
9 the report, yes.  The dots on the CV are also from
10 me.
11   Q.    And when did you make these notes
12 and these underlining in relation to the
13 deposition?
14   A.    Roughly -- well, since we
15 rescheduled, it would have been, roughly, a week
16 before the original scheduled date.
17   Q.    And I'm almost finished.
18       (Reviews document.)
19       I'll give that back to you.
20       And can you hand me the loose
21 materials that we designated as Exhibit No. 25?
22   A.    Yes.  Here.  My report is in --
23   Q.    Yeah.
24   A.    -- a couple of these.

Page 421

1    Q.    A couple of exhibits are there.
2    A.    I think this --
3    Q.    Looks like more than a couple.
4    A.    Yeah, I think it's that.
5    Q.    And with regard to the FDA's
6 cosmetic program that you've been talking about,
7 was this a document that plaintiffs' counsel
8 provided to you?
9    A.    Yes.
10   Q.    This is actually an exhibit, too.
11   A.    Oh, sorry.
12   Q.    So is that.  And that.
13   A.    Yeah, this was an exhibit, also.
14   Q.    And I believe those are all the
15 questions I have.  Thank you, Doctor.
16   A.    My pleasure.
17       (Discussion off the record)
18       DR. THOMPSON:  I have a few
19 questions, but before that a
20 housekeeping.  I believe you have the
21 supplemental reliance list.
22       MR. HEGARTY:  You thought you
23 had sent us a list?
24       MS. PARFITT:  Right because

Page 422

1  the NCI article that you talked about
2  earlier, the Koberna, all of that, that's
3  all on there.  That, hopefully, will
4  clarify.  That may have happened when,
5  you know, the first deposition was
6  scheduled and then maybe...
7        MR. HEGARTY:  I did get last
8  night a couple of articles by e-mail.
9        MR. TISI:  That was different.
10 That was different.
11       MR. HEGARTY:  That was
12 different.
13       DR. THOMPSON:  No.  This was
14 done -- this was done --
15       MR. TISI:  This was done
16 before.
17       DR. THOMPSON:  -- prior to the
18 first scheduled deposition.
19       MR. HEGARTY:  I don't remember
20 seeing it.  I'm not saying that you did
21 not send it.
22       MS. PARFITT:  Yeah.
23       MR. HEGARTY:  But I don't
24 remember seeing it.

Page 423

1        Is it okay I mark it as an
2  exhibit?
3        DR. THOMPSON:  Yes.
4        MR. HEGARTY:  Is it okay if I
5  ask the doctor a couple questions about
6  it when you're done?  Or I can do it
7  right now.
8        DR. THOMPSON:  No.  You can go
9  ahead do it.
10       MR. HEGARTY:  I can do it
11 right now.
12       DR. THOMPSON:  That was in his
13 notebook also but that's a separate copy.
14       MR. HEGARTY:  Okay.  Yeah.  It
15 would be helpful if I could just clean
16 that and make a record of it.
17       (Discussion off the record).
18       MR. HEGARTY:  So I'm marking
19 as Exhibit No. 26 the list of materials
20 that Dr. Thompson provided to me that she
21 indicated had been provided to us before.
22       (Document marked for
23 identification as Sage Exhibit 26.)
24 BY MR. HEGARTY:

Page 424

1        Q.    And I'm going to show you this
2  exhibit, Dr. Sage, and would you look at that and
3  whether you've ever seen that exhibit before right
4  now?
5        A.    The actual -- this actual exhibit I
6  don't -- I don't recall, but it may be in my
7  materials.
8        Q.    Would you look at those listing of
9  materials and tell me whether you reviewed all of
10 them, some of them, none of them?
11       A.    (Reviews document.)
12             Several of them look familiar.
13 Several of them are things that I have read all or
14 parts of.  Certainly these deposition transcripts
15 were made available to me.  The Koberna one was
16 the one I spent the most time with, and then a lot
17 of the ones regarding more recent reform proposals
18 and the like I've engaged with extensively.
19       Q.    Do you recall when it was in
20 relation to your expert report when you received
21 these additional materials?
22       A.    It was sporadically after that.  It
23 wasn't as a batch.
24       Q.    Have you received any additional

Page 425

1  materials from plaintiffs' counsel since or in the
2  last two weeks?
3        A.    Not that I recall.
4              MR. TISI:  Although we did
5        send you stuff last night, right?
6  BY MR. HEGARTY:
7        Q.    You mentioned that you had read some
8  of the transcript of Koberna.
9              Did you read the trial transcripts
10 of the Cadagin case that are referenced here?
11       A.    They were sent to me.  I don't
12 believe I read them.
13       Q.    And did you ask for any of these
14 materials?
15       A.    I asked for a lot of these
16 materials, not by name, but I asked for -- I asked
17 for the Koberna materials and anything else
18 related to marketing.  I asked for a lot of the
19 reform efforts.  And I asked for, you know,
20 updated scientific literature.  This was, I'm
21 sure, provided in due course because of that
22 request.
23       Q.    Did you read all the scientific
24 literature that's referenced in this exhibit?

William M. Sage, MD, JD

Page 426

1    A.    Not -- not all of it.
2    Q.    In looking at these articles, can
3 you tell me which of these you did read?
4    A.    (Reviews document.)
5        Sitting here right now, I can't.
6        MR. HEGARTY:  Okay.  All
7 right.  Thank you.
8            EXAMINATION
9        DR. THOMPSON:  Let me go ahead
10 and mark one of the documents that you
11 brought with you that was loose,
12 Dr. Sage, and this is the "FDA Cosmetics
13 Program:  Current Projects and Resources
14 and a Discussion of the 'Model' Program,
15 FDA Cosmetics Mission Statement."
16        (Document marked for
17 identification as Sage Exhibit 28.)
18 BY DR. THOMPSON:
19    Q.    Did you consider this document in
20 forming -- relating the opinions that you gave
21 today?
22    A.    Yes.
23    Q.    Is it confirmatory of the opinions
24 that you provided in your report?

Page 427

1    A.    Yes, it is.
2    Q.    And is it confirmatory of the
3 opinions that you've offered here today as well?
4    A.    Yes.
5    Q.    You mentioned earlier that you
6 looked at the Johnson & Johnson website that was
7 Facts About Talc.
8        And did that website include
9 corporate documents?
10    A.    Yes.
11    Q.    And were those documents selected by
12 Johnson & Johnson to include on the website?
13    A.    Yes.
14    Q.    Did you review the documents from
15 that website?
16    A.    Yes, some of them.  I don't recall
17 how many there were but, yes.
18    Q.    And, Dr. Sage, were the opinions in
19 your report and the opinions that you gave today
20 given to a reasonable degree of scientific and
21 professional certainty?
22    A.    Yes, they were.
23    Q.    And do you reserve the right to
24 amend or supplement your report if new information

Page 428

1 becomes available?
2    A.    I do reserve that right.
3    Q.    Would that include any review of
4 defense expert reports in the regulatory area?
5    A.    Yes, certainly.
6        DR. THOMPSON:  No further
7 questions.
8        MR. HEGARTY:  No further
9 questions.

10        (Time noted:  5:33 p.m.)

11
12
13        *    *    *
14

Page 429

1        ERRATA SHEET
2
3 Page No._____Line No._____Change to:_____
4 _____
5 Page No._____Line No._____Change to:_____
6 _____
7 Page No._____Line No._____Change to:_____
8 _____
9 Page No._____Line No._____Change to:_____
10 _____
11 Page No._____Line No._____Change to:_____
12 _____
13 Page No._____Line No._____Change to:_____
14 _____
15 Page No._____Line No._____Change to:_____
16 _____
17 Page No._____Line No._____Change to:_____
18 _____
19 Page No._____Line No._____Change to:_____
20 _____
21 Page No._____Line No._____Change to:_____
22 _____
23 Page No._____Line No._____Change to:_____
24 _____

Page 430

```
1        DECLARATION UNDER PENALTY OF PERJURY
2
3
4           I declare under penalty of
5    perjury that I have read the entire transcript of
6    my Deposition taken in the captioned matter
7    or the same has been read to me, and
8    the same is true and accurate, save and
9    except for changes and/or corrections, if
10   any, as indicated by me on the DEPOSITION
11   ERRATA SHEET hereof, with the understanding
12   that I offer these changes as if still under
13   oath.
14
15           Signed on the _____ day of
16   _____, 2021.
17
18   _____
19   WILLIAM M. SAGE, MD, JD
20
21
22
23
24
```

Page 431

```
1           CERTIFICATE OF REPORTER
2    DISTRICT OF COLUMBIA     )
3           I, DENISE DOBNER VICKERY, CRR/RMR and
4    Notary Public, hereby certify the witness was by
5    me first duly sworn to testify to the truth; that
6    the said deposition was recorded stenographically
7    by me and thereafter reduced to printing under my
8    direction; and that said deposition is a true
9    record of the testimony given by said witness.
10           I certify the inspection, reading and
11   signing of said deposition were NOT waived by
12   counsel for the respective parties and by the
13   witness; and that I am not a relative or employee
14   of any of the parties, or a relative or employee
15   of either counsel, and I am in no way interested
16   directly or indirectly in this action.
17
18
19
20
21           Denise Dobner Vickery, CRR/RMR
             Notary Public in and for the
22           District of Columbia
23
24   My Commission expires:  February 28, 2023
```