Exhibit 7

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **IN RE JOHNSON & JOHNSON TALCUM POWDER PRODUCT MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION** | **Civil Action No. 3:16-md-2738- MAS-RLS** |
| | **MDL No. 2738** |
| ***This Document Relates to All Cases*** | |

**EXPERT REPORT OF**

**GEORGE E. NEWMAN, Ph.D.**

Dated:      November 15, 2023

_____

George E. Newman, Ph.D.

## TABLE OF CONTENTS

A.     Qualifications                                    3
B.     Methodology                                     4
C.     Summary of Opinions                            5
D.     Discussion                                      7
E.     Conclusion                                      24

Appendix 1. Abbreviated Timeline of JBP Marketing,        26
Health Concerns Regarding Talc, and Johnson &
Johnson Internal Communications

Appendix 2: Selected Examples of JBP Advertisements        31

A.    Qualifications

1.    I am an Associate Professor of Organizational Behavior, Human Resource Management and Marketing at the Rotman School of Management (University of Toronto) in Toronto, Ontario. Prior to that I was an Associate Professor of Management and Marketing at the Yale School of Management in New Haven, CT for 11 years, where I also held joint affiliations with the departments of Psychology and Cognitive Science at Yale University and was a faculty affiliate for the Yale Center for Customer Insights.

2.    I received a B.A. from Northwestern University in 2002, a M.S. in Psychology from Yale University in 2005, a M. Phil. in Psychology from Yale University in 2006, and a Ph.D. in Cognitive Psychology from Yale University in 2008. I completed a 3-year post-doctoral training in Marketing at the Yale School of Management (2008-2011) and was then hired as tenure-track faculty at the Yale School of Management in 2011.

3.    I have published over 60 peer-reviewed articles and 10 book chapters. These publications are relevant to the topics of marketing, consumer behavior, and branding and reflect both analytical and empirical research.

4.    In addition to my teaching and research obligations at the University of Toronto and Yale University, I have served as a Visiting Professor of Marketing at New York University, the University of Hawaii (Manoa), and Seoul National University (the top-ranked university in South Korea). I have taught classes in marketing, consumer behavior, and marketing management at the undergraduate and graduate (MBA and PhD) levels. I have also taught several seminars on the topics of marketing and management to executives in senior leadership positions in industry and the U.S. federal government.

5.    I have served in advisory roles for academic and professional organizations. Examples of present or recent leadership roles include the following: Editorial Board, Journal of Consumer Psychology; Editorial Board, Journal of Sustainable Marketing.

6.    Among other professional achievements, I am a recipient of the Academy of Management, Best Paper Award (2020), the Society for Philosophy and Psychology, Best Paper Award (2019) and I was a keynote speaker at the Association of National Advertisers Annual Conference in 2017. I regularly serve as an invited speaker and moderator at top universities, including Harvard, Stanford, Columbia, MIT, the Wharton School, the University of Chicago, Northwestern University, Carnegie Mellon, London Business School, and more.

7.    I have expertise in the areas of branding and consumer behavior. I have published extensively on the topics of marketing communications, brand heritage, brand authenticity, consumer perceptions of trust, and corporate social responsibility.

8.  My compensation is $600/hour. I have not testified in any litigation in the last 4 years. My most recent Curriculum Vitae is attached as Exhibit A.

B.  Methodology

9.  I was asked to review Johnson & Johnson's practices regarding the promotion and sale (i.e., marketing) of Johnson's talcum powder products, and to assess whether the company engaged in misleading and deceptive conduct that created confusion and misunderstanding among consumers by failing to communicate and appropriately inform consumers of health risks associated with Johnson's talcum powder products. I was not asked to give an opinion as to whether talcum powder products cause cancer.

10.  The methodology I employed for purposes of this report used the same objectivity and systematic analysis I apply in my professional and academic career. I reviewed documents I requested of counsel relevant to the promotion and sale of Johnson's Baby Powder (hereafter, JBP) and Shower to Shower (STS). Such documents included marketing materials and communications that were directed toward consumers (e.g., print advertisements, messaging, promotions, etc.), corporate documents discussing these products (as well as JBP alternatives such as Johnson's Baby Powder with Cornstarch), testimony from former employees of Johnson & Johnson, publicly available information (e.g., newspaper and magazine articles), and the peer-reviewed scientific literatures relevant to talcum powder use. In reviewing these documents, I sought to address six areas of inquiry:

   a.  Relevance. Identifying documents relevant to the marketing and distribution of JBP and STS, as well as how consumers perceive JBP and STS and talcum powder products, more generally.
   b.  Messaging. Understanding the timing and nature of how the company marketed JBP and STS using both direct advertising channels as well as indirect channels such as spokespeople.
   c.  Strategy. Identifying the stated reasoning behind that messaging as indicated by Johnson & Johnson corporate documents and testimony from former employees.
   d.  Impact. Understanding the effects of that messaging on consumers' perceptions of JBP, STS, Johnson's Baby, and Johnson & Johnson (parent brand) as indicated by corporate documents, market research conducted by (or on behalf of) Johnson & Johnson, and publicly available sources.
   e.  Product Risks. Assessing the timing and nature of health concerns regarding talcum powders by consulting publicly available information and scientific literature.
   f.  Response. Understanding the nature and timing of the company's awareness of and response to any health concerns regarding talcum powder products as indicated by external messaging and the company's internal communications.

11.  In forming my opinion, I considered the totality of evidence. I considered this evidence in light of scientifically validated principles and theories from the literatures on psychology, consumer behavior, and behavioral economics (Matthew

4

Rabin, *Psychology and Economics*, 11 J. Economic Literature 36 (1998)). Throughout this report I cite specific documents. I have also attached a list of materials I reviewed as background even if not specifically cited in this report. My opinions were formulated based on this research and my professional knowledge and expertise. I reserve the opportunity to revise or amend these opinions based on additional information obtained throughout the discovery process. I also reserve the right to review and comment on the testimony of defense experts.

C.    Summary of Opinion

12.    For over a century, Johnson & Johnson promised to prioritize the health and well-being of their customers above all else. As stated on the company's website, "Our Credo challenges us to put the needs and well-being of the people we serve first." This promise was reinforced repeatedly in marketing communications including product labeling, advertisements, public statements, and endorsements from medical professionals. Those communications sought to make the Johnson & Johnson brand name synonymous with trust. In the company's own words, the Johnson & Johnson brand was "not merely a Trademark, but a Trustmark" [JNJ000364540, slide 2].

13.    In addition to Johnson & Johnson's "Trustmark" and the company's Credo, the company also directed efforts toward developing (in their own words) "a deep, personal trust" with customers by associating talcum powder products with the mother-infant bond [JNJTALC000354984, slides 32;34]. In the company's own words, the mother-infant bond created "emotional trust" in Johnson's Baby Products and the Johnson & Johnson brand, creating "a "powerful corporate image," which made consumers "forgive brand crisis" [JNJTALC000354984, slides 29; 32]. The association of the Johnson's name with the mother infant bond was known within the company as "Johnson & Johnson's Golden Egg" and was referred to as "one of the Company's most precious assets" [JNJ000364540, slide 2].

14.    Market research conducted by Johnson & Johnson indicates that indeed, trust in the brand was a primary reason why consumers purchased Johnson & Johnson products instead of products manufactured by the company's competitors [JNJTALC000354984, slide 18]. Johnson's brand was perceived as a "caregiver" and "innocent" [JNJ000550561-65]. Consumers expected that Johnson & Johnson products were "safe and won't hurt me" [JNJTALC000354984, slide 25]. And, in the company's own estimation, trust in the brand resulted in "real business gains for the company" [JNJTALC000354984, slide 29]. Thus, the promise to prioritize customers' safety and well-being was a successful source of competitive advantage for the company, which resulted in significant product sales and revenue.

15.    Documents reviewed show that as early as the 1970s, Johnson & Johnson was aware of potential health hazards associated with talcum powder products. For example, a 1974 Johnson & Johnson corporate document noted that, "During the past couple of years, our need for a non-talc dusting powder has increased as a direct result of the talc/asbestos controversy" [JNJ000089115].  Earlier comments made within the

company directly linked consumer perceptions of JBP to the company's financial interests. A 1966 internal memo circulated by Wallace Steinberg, the Director of Development Johnson & Johnson's Health Care Division, stated, "we have a large investment in a talc mine. I am concerned over the conclusions drawn in the article." [The article, published in the <u>American Journal of Diseases of Children</u> stated that "at least three deaths and an unknown morbidity have resulted from this silicate powder" and argued that "the traditional association of talcum powder and babies be abandoned. It (talcum powder) has no medicinal value" [JNJ000235850].

16.    Over the subsequent five decades, serious potential health hazards associated with talc-based products, including the association between talcum powder use and cancer, were raised in dozens of peer-reviewed public health studies, meta-analyses, and expressions of concern from public interest groups. A 1986 Johnson & Johnson corporate document entitled, "Powders Forecast," noted that "Retrospective studies have implicated talc use in the vaginal area with incidence of ovarian cancer." "While sales of powders for use on baby continue, it is inevitable that a 'last straw' safety concern will lead to the abandonment of powder use, unless health benefits outweigh the risks" [JNJ000000535]. Internal documents show that within Johnson & Johnson there were guidelines and talking points which advised spokespeople about how to respond to these negative health concerns regarding talcum powder products, indicating that the company was aware of mounting health concerns [JNJ000035173].

17.    In the 1970s and early 1980s Johnson & Johnson developed a non-talc-based cosmetic powder made from cornstarch. A 1971 internal document indicates that the cornstarch product was intended "as a replacement (to talcum powder) in event of a crisis or as an extension product." [JNJ000351364]. And, a 1977 internal document indicated, "In view of possible government legislation banning the cosmetic use of talcum powder, the Brand (Johnson's Baby) is test marketing Johnson's Baby Powder with Corn Starch as a possible product replacement formula" [JNJ000245678]. Consumer research conducted by Johnson & Johnson confirmed that the cornstarch alternative was a feasible and commercially viable alternative to the traditional talc-based powder. Two U.S. patents were obtained (in 1953 and 1984) which afforded Johnson & Johnson the ability to manufacture and sell a cornstarch-based cosmetic powder.

18.    However, despite the decades of public health concerns regarding talcum powder and the existence of a feasible and market-tested alternative made from cornstarch, Johnson & Johnson did not discontinue the sale of talc-based cosmetic powders in the U.S. and Canada until 2020, and globally until 2023. Notably, the company continued to market and sell talc-based powders as "safe" and "natural" even after the FDA recommended that talc be discontinued in surgical gloves and condoms in 1990 and 1996, and after Health Canada warned consumers of the association between talcum powder use and ovarian cancer, concluding that "available data are indicative of a causal effect." (p.iii; Health Canada Final Screening Assessment).

19.    In light of Johnson & Johnson's marketing communications—and specifically, their "Trustmark" and the promise to prioritize customers' safety and well-being above all

else—the company should have communicated what it knew about the potential risks associated with talcum powder with the public. Instead, the company denied any potential health hazards associated with talcum powder and sought to compensate for declining sales of talcum powder products by targeting specific demographics of consumers including obese women, African American women, Hispanic women, and teens. In one meeting among Johnson & Johnson employees, a slide presentation noted "the need for a directed marketing effort against Hispanics" and that, in targeting such consumers, "I think we've found where the fish are" [JNJ000119537].

20.    Johnson & Johnson built a profitable, global brand by promising to put the health and safety of their customers first. The company reinforced that trust by aligning its talcum powder products with trusted figures including doctors and mothers. However, when concerns about the safety of talcum powder arose, the company did not take actions to fairly inform consumers of these health and wellbeing issues. Instead, the company continued to actively market and sell talcum powder products for decades. Such actions needlessly exposed millions of women to a potential hazard and violated the central promise of trust and safety upon which their relationship with customers was built.

D.    Discussion

**For over a century, Johnson & Johnson marketed their talcum powder products as "safe," "natural" and "pure." Through direct marketing strategies (e.g., print, radio, and television advertising, as well as promotions) and indirect marketing strategies, such as endorsements from doctors and medical professionals, Johnson & Johnson sought to build trust among consumers by associating talcum powder use with the deep, emotional bond between mother and child (see Appendix 2 for examples of advertisements).**

21.    In 1894, Johnson & Johnson's began producing and selling Johnson's Baby Powder (JBP), which was the company's first direct-to-consumer product [JNJ000881819_0003].

22.    Messaging for JBP consistently used language that portrayed talcum powder as "safe," "natural" and "pure." For example:

    a.    "Johnson's is soft and pure and doesn't have anything in it that could harm my (a baby's) delicate skin." [JNJ000313878]
    b.    "the purest, most absorbent, most trusted baby powder in the world." [JNJ000313867]
    c.    "Your touch tells him everything. That's why we make our powder so pure and soft and soothing. It feels like love." [JNJ000058794]
    d.    A 1929 advertisement in Good Housekeeping Magazine indicated, "Johnson's Baby Powder is made up of soft, tiny flakes—but the cheaper talc used for some baby powders, contains sharp, needle-like particles." [Appendix A2-E] This advertisement is significant as it indicates that by as early as 1929, the company

was aware of the potential for cosmetic talc products to contain "needle-like particles."

e. An informational pamphlet from 1976 reported that, "Johnson & Johnson is one of the few companies in the United States that owns its own talc mine. We therefore have complete control over the quality of our talc." "It is checked regularly for purity with sophisticated scientific equipment." "And the product is also monitored regularly to continuously assure us of its purity." [JNJ000881819_0003]. Other questions responded to in this pamphlet included, "Is there asbestos in Johnson's Baby Powder?"

23. Advertising for JBP sought to enhance consumers' trust in the safety of talcum powder products by creating an association between talcum powder use and the emotional bond between mother and child. This association was reinforced repeatedly in marketing communications regarding talcum powder products. Frequently used language in such communications included the following:

a. "In your hands, Johnson's Baby Powder feels like love. And that can be as important to your baby as the food you feed him." [JNJ000313874]
b. "Touching a baby with the soft, pure talc and gentle scent of Johnson's does a lot to spread a little love around." [JNJ000058785].
c. "Just the gentle touch of pure soft Johnson's Baby Powder tells him he's being cared for in more ways than one." [JNJ000058783]
d. "Johnson's is the most loving touch next to yours." [JNJ000058780]
e. "You can make your touch even more loving when you soften it with Johnson's baby powder." "If there's a better way to tell your baby you love him than with Johnson's Baby Powder, we can't think of it." This advertisement featured an endorsement from Nurse Practitioner and Professor of Nursing, Amy York [JNJ000058791].

24. Within Johnson & Johnson, it was known that such marketing messages enhanced consumers' trust in the safety of talc products as well as their trust in the Johnson's brand. In meetings among employees of Johnson & Johnson, it was stated that "JOHNSON'S is more than a Trademark, it's a Trustmark." "The association of the Johnson's name with both the mother infant bond and mother's touch as she uses the baby products is known as Johnson & Johnson's Golden Egg." "This association is one of the Company's most precious assets." [JNJ000364540, Slide 2].

**In the 1960s Johnson & Johnson began marketing talcum powder specifically for adult use. This was achieved by creating perceptions of need among adult and teenage women that talcum powder use on the body and genitals should be part of a woman's daily hygiene ritual. Marketing communications targeting adult and teen women encouraged the continued use of talcum powder from infancy into adulthood and capitalized on the same imagery and language that was used to build trust among mothers who used talcum powder on their infants.**

25.     By at least 1965, executives at Johnson & Johnson were aware that many adult women used Johnson's Baby Powder. As one executive at the time wrote, "the use of our baby powder for adult use has been considered by us on many occasions, and we know that many adults use Johnson's Baby Powder in the manner you mention." [JNJ000874481].

26.     In the late 1960s to early 1970s, a more concerted effort was made to market directly to adult women. For example, in communications directed to retailers, Johnson & Johnson noted that from 1968 to 1974 the Johnson's share of the baby powder market grew by 10%, while during the same time frame the adult market grew by 36%. [JNJ000877320_0004-5]. The company stated that, "Johnson's spends more on advertising dollars against women 18-49 than ALL COMPETITORS COMBINED." [JNJ000877320_0006-7]. "The combination of Johnson's Baby Powder adult advertising campaign and your retail support can only increase your sales and profits." [JNJ000877320_0009].

27.     In 1967, Johnson & Johnson launched "Shower to Shower," a talcum powder product directed specifically for adult use [JNJTALC000020925, JNJ000351582].

28.     In 1973, it was noted by employees at Johnson & Johnson that,

   a.  "75% of teen girls and 80% of women use a talc" [JNJ000221062]
   b.  "Johnson's share of the talcum powder market for adult use was 58%" [JNJ000877320_0005]
   c.  "Johnson's Baby Powder spends 80% of its advertising dollars against the adult market" [JNJ000873589_0013]

29.     Advertisements directed at teen and adult women sought to draw a direct link between use in infancy and use in adulthood. For example, "Now that you're older, haven't you got your own reasons for Johnson's baby Powder" [JNJ000873589_0022]. An advertisement series for Shower to Shower which ran for many years in the 1970s and 1980s, "A Sprinkle a Day Keeps the Odor Away," encouraged daily use of the product.

30.     In 1974, marketing executives at Johnson & Johnson noted that, "Since 1969, advertising dollars have increased 155%. 95% of the total category advertising expenditures come from the JOHNSON'S Baby Powder brand." [JNJTALC000024325]. In other words, for every $100 that was spent on advertising baby powder, $95 was spent by Johnson & Johnson.

31.     In 1978, sales data provided to retailers indicated that [JNJ000873754]:

   a.  "Johnson's Baby Powder spends $5 million in advertising support. That's over 250% more than any other talcum powder. 63% of all talcum powder advertising is for Johnson's Baby Powder. 80% of our advertising dollars are against the primary buyer: adult females." [JNJ000873754_0009].

    b.   Johnson's Baby Powder was "#1 selling baby and adult powder, outselling all other talcum powders combined" "Johnson's Baby Powder advertising will deliver in excess of 834,700,000 impressions to the adult female annually. This represents two-thirds of all talcum powder advertising combined." [JNJ000873754_0013].

**Market research conducted by Johnson & Johnson identified a group of so-called, "super-heavy users."  These were adults who used Johnson's talcum powder products with high levels of regularity and volume. Although this segment represented a small fraction of the total number of adult talcum product customers, they accounted for significant percentage of the total volume of use.**

32.    Market research conducted by Johnson & Johnson indicated that "6% of Shower to Shower customers, account for 37% of the brand's volume" [JNJ000228153].

33.    "As an additional follow up to the InfoScan panel powder category presentation are charts showing volume and buyer distributions for Johnson's Baby Powder and Shower to Shower. For both brands there is a super-heavy group of buyers (around 5%) who account for at least a quarter of the volume."  [JNJ000228152].

**Marketing efforts aimed at building trust with consumers were effective. Consumers perceived Johnson & Johnson's talcum powder products to be safe, and they reported high levels of trust in the Johnson & Johnson brand. Market research conducted by the company indicated that Johnson's talcum powder products were consistently ranked the highest among cosmetic body powders both in terms of consumer perceptions and total sales.**

34.    Market research conducted by Johnson & Johnson indicated that 72% of consumers trusted Johnson's talcum powder products and 75% saw them as safe, whereas only 47% of consumers trust Walmart talcum powder products and 48% see them as safe [JNJTALC000354984, slide 18]

35.    Customers believed that the products are safe "won't hurt me" and have a "familiar intimacy with the company" [JNJTALC000354984, slide 25]. And that, "Johnson & Johnson's unique trust results in real business gains for the company." [JNJTALC000354984, Slide 29].

36.    Johnson's brand was perceived as a "caregiver" and "innocent." [JNJ000550541-48].

**Favorable consumer perceptions of Johnson's talcum powder products created a brand "halo" that benefited sales of other Johnson & Johnson products. Johnson's Baby Powder was regarded as the company's flagship product and provided the basis for launching additional products within the Johnson's Baby and adult use product lines. Johnson's Baby Powder was also the launchpad for expanding the Johnson & Johnson's brand into overseas markets. As a result, maintaining favorable consumer perceptions of JBP was integral to the company's long-term marketing strategy.**

37.    Within Johnson & Johnson, JBP was credited with creating the baby category [JNJ000364540, slide 4].

38.    JBP and the Johnson's Baby brand were also credited with facilitating the expansion of the brand into foreign markets. As one marketing presentation noted, "our global expansion as a company was rooted in baby," which allowed Johnson & Johnson to become a "global mega-brand with worldwide credibility & reach." [JNJ000364540, slide 3, slide 9]

39.    Within Johnson & Johnson, it was believed that perceptions of the company were "deeply linked to baby products." [JNJTALC000354984, Slide 15].

40.    Analysis by Johnson & Johnson also indicated that doctors and medical professionals "view J&J as 'The baby company' [JNJ000674963, slide 5].

41.    Internally, Johnson baby products, including its flagship Baby Powder, were referred to as the "corporation's #1 asset" [JNJTALC000354984, Slide 3], "the face of Johnson & Johnson" and a "Golden egg" that "drives positive imagery and emotional attachment to the company" [JNJ000674963, slide 3].

42.    Maintaining favorable consumer perceptions of baby powder products was a key objective of the company's long-term marketing strategy. As one marketing executive directed, "We MUST protect and enhance the Baby Equity. Baby is the corporation #1 asset and the mother-infant bond is at its core." [JNJTALC000354984, slide 71]

43.    In internal communications directed toward the marketing division, an analogy to a "piggy bank" was made where "brand communication with the mother-infant bond" was the investment and "deep personal trust" was the return on investment. Marketing executives believed that the "equity" derived from those marketing communications would "fade unless we nourish and feed it." [JNJTALC00035498, Slides 51 & 52].

44.    **Summary of Marketing Strategy.** JNJTALC000354984 is a key document as it outlines Johnson & Johnson's marketing strategy with respect to talcum powder products and the Johnson & Johnson brand. The core of the strategy was that the association of JBP with the mother infant bond created a brand halo of trust that extended to Johnson's Baby and the Johnson & Johnson parent brand (see Kevin Keller, *Conceptualizing, Measuring, and Managing Customer-Based Brand Equity,* 1 J. Marketing 57 (1993); Lance Leuthesser, et al., *Brand Equity: The Halo* Effect Measure, 29 European J. Marketing 57 (1995); and, Elena Delgado-Ballester & Jose Luis Munuera-Aleman, *Does Brand Trust Matter to Brand Equity?*, 14 J. Product & Brand Manag. 187 (2005) for examples in the marketing literature).

    a.    "Johnson & Johnson (parent brand) is more than that (a logo, or brand, or parent company, or manufacturer). It is a complex sum of meanings, associations, values and feelings" [slide 12].

    b.   "The Johnson & Johnson (parent brand) is deeply linked to baby products" [slide 15-17].

    c.   The Mother-baby bond (associated with Johnson's baby products) is the core of Johnson's baby products and, in turn, the Johnson & Johnson's brand [slides 34-38] creates a feeling of "deep, personal trust" [slides 24, 27, 28].

    d.   Johnson's customers define trust as "(the product) is safe and won't hurt me" and having "personal feeling of intimacy with the company" [slide 25] and trust is especially important for healthcare companies where customers expect that the "product will work without any unexpected adverse physical/emotional effects" [slide 20].

    e.   Market research indicates that "deep, personal trust" is a key reason why consumers purchase Johnson & Johnson products instead of products made by competitor brands [slides 18].

    f.   Therefore, the emotional trust that consumers feel toward Johnson & Johnson—which stems from perceptions of JBP and the association of JBP with the mother-infant bond—is a significant source of the company's equity (i.e., value), which includes "forgiving brand crisis," meaning that because of the trust, consumers may be more likely to overlook a crisis associated with one of the company's products [slide 40].

**By as early as 1966, Johnson & Johnson was aware of health risks associated with the use of talcum powder products. In response to these safety concerns, Johnson & Johnson began developing a replacement powder that was made of cornstarch instead of talc.**

45.    In an internal memo distributed at Johnson & Johnson in 1966, W.H. Steinberg, the Director of Development Johnson & Johnson's Health Care Division referenced a recent article that appeared in <u>American Journal of Diseases of Children.</u> The article stated that, "In conclusion, it is strongly urged that talcum powder be removed from the environment of children and the traditional association of talcum powder and babies be abandoned. It has no medicinal value; wherever placed it serves as a foreign body; and at least three deaths and an unknown morbidity have resulted from this silicate powder." In response, Steinberg wrote "Baby Powder represents the cornerstone of our baby products franchise. In addition, we have a large investment in a talc mine. I am concerned over the conclusions drawn in the article… Would it be possible for use to initiate basic work to explore this phenomenon either to obtain data to refute this problem or to develop mechanisms to reduce the hazard." [JNJ000235850].

46.    Johnson & Johnson obtained a patent for a product made from cornstarch in 1953 [U.S. Patent No. 2,626,257, January 20, 1953]. The company began developing a commercial powder product made from cornstarch in 1964. Johnson's Cornstarch Baby Powder development was conducted in two periods with different objectives. The first development period took place between 1964 and 1968. The primary aim of this powder (Formula 117) was to prevent diaper rash and included 0.5% Hexachrophene. Clinical trials did not demonstrate a significant difference between the cornstarch product and soap and water. [JNJ000351363]

47.    In the second phase, which began in July 1971, the effort was directed at duplicating Johnson's Baby Powder (talc) with a biodegradable powder (Formula 31) "as a replacement (to talcum powder) in event of a crisis or as an extension product." [JNJ000351364]. Cornstarch was used because, according to Johnson & Johnson's research, cornstarch powder is "more absorbent, whiter, more flowable, apparently able to retain perfume better than the talc product" [JNJ000351364].

**Market research conducted by Johnson & Johnson throughout the 1970s and early 1980s, indicated that the cornstarch product was a technologically feasible and commercially viable replacement for talcum powder.**

48.    In 1971, the company released an internal memo which discussed how Johnson's Baby Powder (with talc) could be replaced with a cornstarch alternative. As was noted in internal communications, "Depending on the amount of publicity it received, we would prepare copy which would announce for both infant and adult usage that Johnson's Baby Powder has a new non-talc formula but still has the same clean, fresh scent. This would be used for the first few months in order to emphasize the non-talc formula. This would not be necessary if the removal of talc products was low key." [JNJ000342519].

49.    A product test was conducted in 1972 comparing Corn Starch Baby Powder #31 to Johnson's Baby Powder #34 (Talc) and Diaprene Corn Starch Baby powder. Johnson's Corn Starch labeled as such was preferred over Johnson's Baby Powder by 62% to 30%. Johnson's Corn Starch was preferred over current leading corn starch product (Diaparene) by 51% to 32% [JNJ000351362].

50.    In 1973, D.R. Pettersen from Johnson & Johnson sent a memo to D.D. Johnston, entitled "Windsor Minerals and Talc." Writing for himself and William Ashton (J&J R&D Director) and Roger Miller (Vice President of Operations, Windor Mines), he wrote that "It is our joint conclusion that we should not rely on the 'Clean Mine' approach as a protective device for Baby Powder in the current Asbestos or Asbestos-form controversy. We believe this mine to be very clean; however, we are also confident that fiber forming or fiber type minerals could be found." "Baby Powder contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of tremolite or actinolite are identifiable (optical Microscope) and these might be classified as asbestos fibers" [JNJ000251888 at 89]. "Corn Starch is obviously another answer. The product by its very nature does not contain fibers. Furthermore, it is assimilated by the body" [JNJ000251888 at 90].

51.    In 1973, Johnson & Johnson conducted an animal test and found that cornstarch is more readily degradable by the body than talc [JNJ000318505].

52.    In 1974, it was noted by executives at Johnson & Johnson that, "During the past couple of years, our need for a non-talc dusting powder has increased as a direct result of the talc/asbestos controversy." [JNJNL61_000001955]. "The chemical industry is

now aware of the present talc climate and a focus on potentially novel materials can be expected." [JNJNL61_000001966].

53. A 1975 Johnson & Johnson marked "confidential" document titled, "Review on the Present Status of Talc Safety Substantiation Activities and Update of Contingency Plans" noted:

   a. "Newer questions raised by proponents of talc safety now revolve around general mineral inhalation and presence of possible cancer producing trace impurities." [JNJ000026989].
   b. "When the Food and Drug Administration brought the talc issue to a head approximately 2 years ago, their consultant, Dr. Lewin, strongly asserted that he had found asbestos in Johnson & Johnson powder. Johnson & Johnson quickly reacted with consultants of their own, and after several meetings in Washington Dr. Lewin's original report was later amended and he retracted his statements on the occurrence of asbestos in Johnson & Johnson powders" [JNJ000026997].
   c. "Talc Strategy. Cornstarch appears to be the number one answer to any alternates to talcum powder. We presently have a cornstarch formula packaged and it is planned that a test market will ensue on the formula during the first quarter of 1975" [JNJ000027006].

54. In 1977, a test market evaluation of the cornstarch product was conducted in Fort Wayne, Indiana. This study was motivated specifically by safety concerns regarding talc. The section titled "Background," read as follows: "In view of possible government legislation banning the cosmetic use of talcum powder, the Brand is test marketing Johnson's Baby Powder with Corn Starch as a possible product replacement formula" [JNJ000245678]. The results of the test market indicated the following:

   a. "JBP with Corn Starch has been accepted by the consumer as formula replacement. This is illustrated by a directional increase in the Brand's usage share and strong repurchase intent among Johnson's Baby Powder with Corn Starch users."
   b. "The rating of Johnson's Baby Powder with Corn Starch was either parity or higher than the talc formula on all qualities which further supports the viability of corn starch as a product replacement."
   c. "The majority of Johnson's Baby Powder with Corn Starch users intend to make their next purchase a corn starch rather than talc based product (83% of consumers post-trial)."

55. In 1978, a focus group analysis was conducted in New Orleans. This focus group study compared consumer perceptions of Johnson's Baby Powder (JBP), Johnson's Baby Powder with cornstarch (JBPc), and Shower to Shower (Johnson & Johnson's adult-use talcum powder product). Results indicated that consumers preferred JBPc to JBP because the "fragrance was more adult oriented," and because it has "finer texture and less prone to caking". On the basis of this study, "In general, it was felt that the

14

product (JBPc) would be more effective for women and that it might satisfy women's need for a vaginal powder" [JNJ000245744].

56.     In 1981, a report in the peer-reviewed journal, <u>Pediatrics</u>, concluded that "there appears to be no medical indication for the use of these (baby) powders." And that, "to merely have a negative attitude toward these products is insufficient." [JNJ000277205].

**In 1982, Dr. Daniel Cramer and colleagues published an epidemiological study indicating an association between talcum powder use and increased prevalence of ovarian cancer. Shortly thereafter, several major media outlets discussed Dr. Cramer's findings and raised concerns abouts the health risks associated with talcum powder use.**

57.     The Cramer et al. (1982) study is significant because it raised the possibility that the link between talc and cancer could be caused by (a) fibers in talc itself, and (b) those fibers could implant in the body via a process of translocation, moving from the perineal area to the ovaries.

    a.  "If talc is involved in the etiology of ovarian cancer, it is not clear whether this derives from the asbestos content of talc or from the uniqueness of the ovary which might make it susceptible to carcinogenesis from both talc and other particulates." (p. 376)
    b.  "If present, talc or other particulates might be incorporated into these inclusion cysts. Apparently implantation of foreign bodies into the lumens of epithelial lined organs provides a favorable environment for carcinogenesis" (p. 376)
    c.  "Epidemiologic studies should focus on opportunities for excessive vaginal contamination with talc such as when it is repeatedly used in perineal dusting powders or sprays and in or on tampons, sanitary napkins, or other products intended for intravaginal use." (p. 376)

**In 1984, Johnson & Johnson obtained a second patent for a cornstarch powder and conducted market research to assess the "feasibility of substituting cornstarch for talc under the Johnson's Baby Powder name, without announcing the switch."**

58.     In 1984, Johnson & Johnson conducted a market opportunity analysis for JBPc and concluded that, "Cornstarch segment is the growing segment of the baby powder category" and that, "more than half of households that use baby powder of some kind." [JNJ000290508].

59.     On November 27 of 1984, Johnson & Johnson obtained a second patent for their unique formulation of Johnson's Baby Powder Corn starch [JNJ000060059].

60.     In 1984, Johnson & Johnson contracted with Marketing Information Systems Int'l Inc. to conduct a market research study. The stated purpose of the study was "Johnson's Baby Powder (talc) continues to suffer from health and safety concerns surrounding talcum powders. While there is no conclusive scientific evidence that shows that talc is

unsafe, it was decided to focus all marketing efforts on Johnson's Baby Cornstarch powder and to pursue the conversion of current talc users to cornstarch powder. To assess the potential of switching talc users to cornstarch. It was decided to conduct this study." Objectives of Researcher were "To evaluate the feasibility of substituting cornstarch for talc under the Johnson's Baby Powder name, without announcing the switch. The following areas need to be investigated: (a) Do current talc users perceive change in product/performance? (b) Is cornstarch a suitable replacement for talc?" [JNJ000404860].

61.   In 1984, the company created materials to distributed to retailers which announced JBP with Cornstarch as an improvement over the talc product [JNJ000332195]

   a.   "A change for the better" [JNJ000332195].
   b.   "The powder market is changing. The cornstarch segment is the growth segment." [JNJ000332196].
   c.   "Now we're changing for the better…" [JNJ000332198].

62.   In a 1985 document titled, "Cornstarch Technology Forecast," analysts at Johnson & Johnson indicated that, "Cornstarch based cosmetic powders will most likely be the powders of choice in the future. Favorable safety, physiological and functional properties of cornstarch appear to support this premise" [JNJ000255601].

63.   On May 20, 1985, a meeting was held at Johnson & Johnson referred to as "Powders Technical review." Notes from that meeting reported that among the issues discussed were "Safety Issues: Inhalation, Translocation, Packaging."  The word "Translocation," is notable as it refers to safety concerns regarding the translocation of talcum powder from the vagina to the ovaries, indicating that Johnson & Johnson was aware of potential links between talcum powder use and ovarian cancer [JNJ000290680].

64.   In December 1985, Johnson & Johnson drafted a comprehensive "Q&A document" to respond to hypothetical questions from the media regarding how the introduction of a cornstarch powder may impact consumer perceptions of the brand [JNJ000035173]. The "Q&A" document which was marked at "Confidential" was directed as follows: "The attached Question and Answer document has been developed for limited internal distribution in response to the need for clarification of issues relating to baby powder and talc. Specifically, its sole purpose at this time is to provide designated company spokespersons with answers to questions which could be raised by the press. It is not meant for distribution to anyone other than the individuals who will act as company spokespersons as necessary."  [JNJ000035173].

65.   This document [JNJ000035173] confirms that Johnson & Johnson was aware of reports on the potential links between talcum powder use and ovarian cancer, that Johnson & Johnson was aware the introduction of a cornstarch alternative might be perceived as an admission that there were safety concerns regarding talc, and that Johnson & Johnson was aware the introduction of a cornstarch alternative might affect

brand perceptions, given that talcum powder was the brand's "flagship" product. Hypothetical questions that Johnson & Johnson anticipated and prepared their spokespeople to address included the following:

a.  Question: "Dr. Daniel Cramer in the journal Cancer has linked the use of talcum powder to ovarian cancer. Could you comment?"
b.  Question: "If your own studies should link talc to ovarian cancer, will you pull Johnson's Baby Powder off the market?"
c.  Question: "In 1976, scientists found asbestos in 10 of 19 baby powders tested. How is that possible?"
d.  Question: "What about the study by Egli & Newton that proved translocation of talc to the ovaries?"
e.  Question: "Why did you introduce the cornstarch powder?"  "Isn't it because it is safer?"
f.  Question: "Surgeons who used to dust their gloves with talc now use cornstarch. Do they know something we don't?"
g.  Question: "Are you putting cornstarch in Johnson's Baby Powder because you think talc is not safe?"
h.  Question: "When are you going to discontinue using talc in Johnson's Baby Powder?"

**In 1986, Johnson & Johnson began distributing and selling Johnson's Baby Powder with Cornstarch nationwide. Importantly, however, a decision was made to offer the cornstarch product alongside talcum powder, rather than replace the talc product with cornstarch. Thus, there appeared to be a shift in the "replacement" strategy that was considered pre-1986, and the dual-product strategy that was actually employed.  Corporate documents noted concerns that whereas Johnson's was the clear "market leader" for talc products, the company did not have the same business advantages with cornstarch (via the designation of cornstarch as a commodity food stuff). Additionally, consumers strongly associated the brand with the original (talc) formulation (e.g., "I pray they don't change it or go out of business.")**

66.    A 1986 Johnson & Johnson corporate document [JNJ000000523] noted that "Retrospective studies have implicated talc use in the vaginal area with incidence of ovarian cancer." However, this document also noted that Johnson & Johnson was the clear market leader for talcum products and had unique production capabilities and brand awareness which protected its talc business from competitors. Cornstarch by contrast, because of its designation as a "commodity food stuff," did not offer the same business advantages [JNJ000000525].

a.  "nearly one hundred years of talc based powder experience has kept us the market leader"
b.  "vertical integration, through ownership of the Windsor mine in the U.S., and major purchase agreements with 11 other world sources, has enabled us to define cosmetic grade talc."

17

c. "Johnson's Baby Powder is the standard for consumer comparison in the U.S., it is preferred over all other cosmetic powders"

d. "cornstarch used in cosmetic powders is a commodity food stuff in the U.S. Natural structural limitations and the desire to avoid chemical modification, preclude direct improvements in the current technology."

67.    A second issue related to the replacement of talc product was identified in market research. Research conducted on behalf of Johnson & Johnson indicated that consumers strongly identified with the original talc formula: "It's comforting because it's familiar; it's always consistent trustworthy, I count on it. It's timeless; It's classic; it's been around forever and works just the same/stood the test of time; They (customer) know who they are and kind of formed with this country; It's most mothers' choice because its trusted, gentle; You know about it, you're secure about it, you don't worry; I pray they don't change it or go out of business." [JNJ000550549]. In other words, consumers associated JBP with the company's long-standing history, and hence changing the original product may undermine the brand's equity with consumers (Minju Han, George E. Newman, Rosanna K. Smith & Ravi Dhar, *The Curse of the Original: How and When Heritage Branding Reduces Consumer Evaluation of Enhanced Products*, 48 J. Consumer Research 709 (2021).

**The marketing strategy differentiated the talc and cornstarch products through their intended uses, such that the original (talc) product was marketed for "softness," while the cornstarch product was marketed for "absorbency." The talc and cornstarch products were priced identically and offered same profit margins to Johnson & Johnson.**

68.    "New Johnson's baby Powder Pure Cornstarch. It has the same soft scent as original baby powder. Baby's Drier. Because new pure cornstarch is more absorbent. Now there are two. New Pure Cornstarch and original Baby Powder" [JNJ000304963]

69.    The costs to manufacture Johnson's Baby Powder with Cornstarch and Johnson's Baby Powder were nearly identical [JNJ000224869]. Johnson's Baby Powder with Cornstarch and Johnson's Baby Powder (talc) were priced identically [JNJ000224757]. Thus, the cornstarch alternative offered similar profit margins to the company.

70.    Sales data from 1989 and 1990 indicated that JBP with cornstarch performed well, despite lower distribution than talcum powder. The sales report noted that,

a. "Johnsons Baby Powder with Corn Starch (JBPCs) achieved an 11.9% share in March/April, its highest share ever."  [JNJ000224709].

b. Other reports indicated, "This points to upside potential for cornstarch factory sales in late 1989 and 1990. The Brand remains cautious because retail coverage figures for cornstarch have inexplicably moved higher than talc, despite JBPcs' lower distribution." [JNJ000224719].

71.     By 1989, market research conducted by Johnson & Johnson indicated that medical professionals recommended cornstarch powder over talcum powder. Specifically, the company's own research found that 22.6% of doctors recommended cornstarch, while only 10.3% of doctors recommended Talc. Moreover, 24.2% of doctors recommended *against* talc while only 12.1% recommended against cornstarch [JNJ000227119].

72.     In 1989, Johnson & Johnson sold their interest in the Windsor and Western mines to Cyprus Mines and entered into sales agreement where Windsor would be the supplier of talc to Johnson & Johnson [JNJNL61_000118282]

**Based on evidence of health risks associated with talcum powder, the FDA requested that talc be removed from surgical gloves (in 1990) and condoms (in 1996) and replaced with cornstarch where needed.**

73.     In 1990, the FDA asked manufacturers to discontinue the use of talc on surgical gloves and replace it with cornstarch. Studies confirmed that "talc molecules are not absorbed, whereas low cross-linked cornstarch is an absorbable substance; therefore, the latter is a safe material for use as surgical glove powder." [JNJ000312113].

74.     In 1996, the FDA requested U.S. manufacturers to cease using talc in manufacturing condoms and replace it with cornstarch. An FDA spokesperson at the time, Arthur Whitmore, was quoted as saying, "We'll probably never know for sure that talc is unsafe, but why take the risk? Cornstarch does just fine and doesn't pose risks. I think it's prudent for manufacturers to switch" [LUZ011817].

**On November 17, 1994, the Cancer Prevention Coalition (CPC), sent a citizens' petition to the FDA requesting that the FDA, "Immediately require cosmetic talcum powder products to bear labels with a warning such as talcum powder causes cancer in laboratory animals. Frequent talc application in the female genital area increases the risk of ovarian cancer," and grant the CPC a hearing with the FDA [1994 CPC Citizens Petition]. The petition noted that,**

    a.   "Minute particles, such as talc are able to translocate through the female reproductive tract and cause foreign body reactions in the ovary."
    b.   "Talc is a carcinogen, with or without the presence of asbestos-like fibers. In 1993, the National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity."
    c.   "Recent cancer research in the United States has found conclusively that frequent talcum powder application in the genital area increases a woman's risk of developing ovarian cancer."

75.     In 1997, Alfred Werner (a medical doctor and consultant of Johnson & Johnson) sent a letter to Michael Chudkowski (the manager of Preclinical Toxicology at Johnson & Johnson) critiquing the CFTA responses to the CPCs 1994 citizens' petition and the company's messaging about the safety of talc more broadly. Among other points, this letter notes that the claim that "industrial exposure to talc, both by skin contact and

inhalation… presents no significant risk" is "outright false." Werner writes that "all that (one) would have to do to demolish the credibility of the talc industry is refer to the studies by Kleinfeld et al., Thomas, and Thomas and Stewart!" [JNJ000040596].

76.    This letter also noted that CFTA response statement (dated November 17, 1994) is "just as bad." "Anybody who denies (the statistically significant association between hygienic talc use and ovarian cancer) risks that the talc industry will be perceived by the public like it perceived the cigarette industry: denying the obvious in the face of all evidence to the contrary." [JNJ000040597].

**Throughout the 1990s and early 2000s, sales of Johnson & Johnson talcum powder products declined. During this same time, Johnson & Johnson began targeting specific demographics of women including obese women, African American women, Hispanic women, and teens. Within Johnson & Johnson, this strategy was referred to as "adult leverage." It is notable that in these marketing meetings, "Damaging negative publicity on talc and ovarian cancer" was discussed [JNJ000021092].**

77.    In meetings, the marketing division at Johnson & Johnson was directed to "target African Americans and several other key target audiences: Overweight women, women who exercise, women in warm climates" [JNJ 000100785].

78.    In meetings of the marketing division at Johnson & Johnson, it was also noted that "African Americans have high affinity for the category and tend to be heavy users" and that the marketing efforts should "increase adult usage of powder through targeted communication" [JNJ000100785].

79.    In notes from a 2004 meeting of the "Shower to Shower task force," the "#1 Challenge" was to address "Powder Category Decline" [JNJ000058760]. Among the marketing strategies discussed were

   a.    Targeting even younger users of Shower to Shower by placing the products "in other spots to get younger potential users down the aisle," which the brand hoped "would also reinforce how everyday powder should be"
   b.    "Focus on African American women and obesity" which included strategies such as, "Team up with Ebony magazine to promote this idea," "promotions in churches, beauty salons, and barber shops" and "focus on getting promotions at African American concerts and jazz festivals."
   c.    "Do a deeper dive into finding out what is important to African American women and the younger ones in particular."

80.    A 2007 marketing meeting among Johnson & Johnson employees noted that consumption of baby powder was declining and that "Health Reasons" were a cause of that decline [JNJ000109468]. In response, it was suggested that the "#1" strategy was to pursue African American consumers due to "High HH (household) penetration among AA (African American) households, and positive disposition towards the product. Powder is still considered a relevant product among AA consumers," and that

with "a positive disposition towards the form and heavy usage, this could be an opportunity."

81.    In 2012, the marketing division also targeted the sale of talcum powder products to Hispanic women. In a marketing presentation, the question was asked, "Are Hispanic Women Important to our Franchise?" [JNJ000119537]. In this meeting it was noted that,

   a.  "The need for a directed marketing effort against Hispanics is such a big opportunity."
   b.  "In the last decade the Hispanic birth rate has actually increased +14%. I think we've found where the fish are."

**In 2008, a second citizens petition was filed by the Cancer Prevention Coalition, requesting the Commissioner of Food and Drugs require that all cosmetic talc products bear labels with a warning such as, "Frequent application of talcum powder in the female genital area substantially increases the risk of ovarian cancer."**

82.    The 2008 CPC petition noted that:

   a.  "The scientific basis of the 1994 Petition was also admitted by the industry. In an August 12, 1982, article in the *New York Times*, Johnson & Johnson, the manufacturer and retailer of talc dusting powder, stated it was aware of a publication which concluded that frequent genital application of talc was responsible for a three-fold increased risk of ovarian cancer." (p. 2)
   b.  "Evidence for the May 2008 Petition is supported by Edward Kavanaugh, President of the industry's Cosmetic Toiletry and Fragrance Association. In 2002, he admitted that talc is "toxic," that it "can reach the human ovaries," and that prior epidemiological investigations concluded that its genital application increased the risk of ovarian cancer."
   c.  On this basis, the 2008 CPC petition urged Johnson & Johnson to substitute cornstarch for talcum powder products and to label its products with a warning on cancer risks.

83.    The 2008 CPC petition was widely distributed within Johnson & Johnson in an email from Susan Nettesheim (Vice President of Product Stewardship & Health Care Compliance) [JNJ000426237], who noted that:

   a.  "This is not a new issue. We have a team that has been addressing the concern on talc use and ovarian cancer for more than 10 years. As this points out, a petition was previously filed in 1994. That being said, this may get significant media attention due to the current heightened concerns on cosmetic ingredients."
   b.  "The team will be finalizing a list of external spokespeople that are experts in this area that can speak on our behalf if necessary."

**Individuals in leadership positions within Johnson & Johnson discussed the citizens'
petitions and continued health concerns regarding talcum powder. Externally, however, the
company maintained that any of the health concerns regarding talc were unwarranted and
false and that product safety was the company's top priority.**

84.    On April 15, 2008 [JNJ 000457161], Todd True (Global Creative Director at J&J)
wrote in an email to Fred Koberna (Director, Global Public Insights at J&J), "The
reality that talc is unsafe for use on/around babies is disturbing. I don't mind selling
talc, I just don't think we can continue to call it Baby Powder and keep it in the baby
aisle. Have we done any research to determine the potential negative impact to our
brand or best for baby strategy by maintaining this ingredient? Have we looked at
replacing talc with cornstarch for our base powder as other brands have? What's the
value in maintaining talc under baby? Given a number of other ingredient issues we
are facing, this seems like an easy fix and win."

85.    On April 18, 2008 Todd True wrote in an email to Michael Rosolowsky (Vice
President of Global Strategic Insights), "I wanted to give you a heads-up that I am on a
bit of a mission to consider removing talc from the baby aisle." "Basically, I'm
thinking it would be in the brand's best interest to develop a strategy to move out of
the baby aisle for our talc product and either create a direct Adult proposition or
simply replace the talc ingredient with cornstarch. This would align with our Best for
Baby charter. I understand this is a $70M business in the U.S. alone, unsupported. So
any changes are risky. However, given a number of other ingredient issues we are
facing, this seems like an easy fix and win." [JNJ000457161].

86.    On April 18, 2008, Fred Koberna replied "My understanding is that we introduced the
cornstarch variant as an alternative to talc for use on babies. Due to the talc issue and
some doctors recommending for moms not to use powder on their babies, we don't
promote powder to moms. Many women prefer the feel of talc to cornstarch, both in
its application and for the skin feel. They know us as a baby powder and look for us in
the baby aisle." [JNJ000457161].

87.    On November 03, 2008, Craig Bernard (Regulatory Affairs & Product Stewardship at
Rio Tinto) wrote in an email, "Kathy Wille at J&J informed me that at a recent science
meeting in Washington DC she had a side conversation with a key figure from the
FDA cosmetic group that is responsible for responding to the Citizen's Petition. He
indicated that the FDA would rule against the petition and would not require warning
labels on cosmetic products. But the FDA is looking for scientific support from
industry that will help justify their position. She suggested that there is a collective
group working to have comments submitted to the FDA." [IMERYS250983].

88.    On July 08, 2011, Timothy McCarthy (Research Directory, Toxicologist at J&J) wrote
in an email, "Focus on the label restriction: not to be applied to perineal area. All other
applications are safe. Actually, all applications are safe, but we are acknowledging the
stupid-a$$ IARC decision." "Talc-based body powders not to be used in perineal
area." [JNJ000383964]. Such a warning was never released.

89.    The profound disconnect between the company's external messaging regarding the safety of talcum powder products and the company's internal conversations and actions is evident in the 2017 deposition of the company's Chief Medical Officer, Joanne Waldstreicher. In 2016, Waldstreicher, acting on behalf of the company as its chief medical spokesperson, attested to the unequivocal safety of talc. In 2016, Waldstreicher stated, "As the chief medical officer of Johnson & Johnson, I want to reassure anyone who may have questions or concerns related to talc that product safety is and will continue to be our highest priority." (p.317); and "based on the available data and a thorough review of our internal safety database" "there's no causal association between talc and ovarian cancer," (p. 309). Publicly the company also claimed that "asbestos, has never been found in the baby powder, and never will" (p. 198). However, as was revealed in Waldstreicher's deposition, those statements misrepresented when the company was first made aware of potential health concerns regarding talc (p. 71); they misrepresented that the company intervened to limit reports of asbestos in talc (p. 253; p. 261). Moreover, Waldstreicher herself had never personally reviewed the totality of the scientific literature on the association of talcum powder use and ovarian cancer, and corporate documents revealed that evidence of impurities in talc posed a significant "business threat" to the company and talc suppliers (p. 269).

90.    In 2018, the Johnson & Johnson released a full-page newspaper advertisement. The advertisement contained the header "Your Questions Deserve Answers." [JNJ Newspaper Advertisement December 2018]. This advertisement stated that,

   a.    "We did not hide anything. Ever."
   b.    "We have always acted with the utmost transparency in this matter."
   c.    "Nothing is more important to us than the health and safety of our customers."
   d.    "If we had any reason to believe our talc was unsafe, it would be off our shelves immediately."
   e.    "There is irrefutable scientific evidence that our talc is safe and beneficial to use."

91.    In 2020, Johnson & Johnson announced the discontinuation of Talc-based Johnson's Baby Powder in U.S. and Canada [J&J Media Statement May 19, 2020]. The stated reason for discontinuing the product was declining demand "due in large part to changes in consumer habits and fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The company also noted that "we will continue to vigorously defend the product, its safety, and the unfounded allegations against it and the Company in the courtroom." And that, "Cornstarch-based Johnson's Baby Powder will remain available in North America. Both types of Johnson's Baby Powder – talc-based and cornstarch-based – will continue to be sold in other markets around the world where there is significantly higher consumer demand for the product."

**In 2021 Health Canada released their final report in which they concluded that "talc meets the criteria under paragraph 64(c) of CEPA as it is entering or may enter the environment**

**in a quantity or concentration or under conditions that constitute or may constitute a danger in Canada to human life or health."**

92.    The 2021 Health Canada report noted that,

   a.   "Talc has been reviewed internationally by other organizations, including the International Agency for Research on Cancer (IARC) and the Danish Environmental Protection Agency. These assessments informed the human health risk assessment." (p.iii; Health Canada Final Screening Assessment).

   b.   "With regards to perineal exposure, analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect. Given that there is potential for perineal exposure to talc from the use of certain self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs, bubble bath), a potential concern for human health has been identified." (p.iii; Health Canada Final Screening Assessment).

**In 2022, Johnson & Johnson announced the decision to "transition to an all cornstarch-based baby powder portfolio," and that JBP would be discontinued globally in 2023 [J&J Media Statement, August 11, 2022].**

93.    The stated reason for the transition to cornstarch powders was that the "transition will help simplify our product offerings, deliver sustainable innovation, and meet the needs of our consumers, customers and evolving global trends." It also noted that "Cornstarch-based JOHNSON'S is a flagship global brand of Johnson & Johnson Consumer Health and we remain fully committed to ensuring JOHNSON'S® products are loved by parents and families for years to come."

94.    To this day, Johnson & Johnson maintains that "Talc is accepted as safe for use in cosmetic and personal care products by the European Union, Canada and many other countries around the world" [company's website, "Facts about Talc Safety"]. This statement is in direct contradiction to the Health Canada report released in 2021.

95.    To this day, the company maintains that asbestos in talc is nothing more "an urban legend." [company's website, "Facts about Talc"]. The company highlights four studies which do not find an elevated risk of cancer among cosmetic talcum powder users. However, it does not discuss the dozens of peer-reviewed studies and meta-analyses which do find evidence of a statistically significant relationship between talcum powder use and cancer. Such biased sampling of the peer-reviewed literature is in direct contradiction to universally accepted scientific practices as well as company's invitation for consumers to "review the evidence and make up your mind."

E.    Conclusion

96.     In my review of the relevant marketing and related materials, I observe that Johnson &
Johnson built a profitable global brand by promising to make customers' health and
safety the company's top priority. Through carefully crafted advertising and
messaging, the company cultivated a "deep, emotional trust" with customers. It
aligned itself with highly trusted figures, including doctors and mothers, and
capitalized on the emotional bond between mother and child. And these marketing
efforts were successful. The overwhelming majority of the talcum powder sold in the
U.S. and globally was manufactured by Johnson & Johnson precisely because the
company was seen as "innocent" and a "caregiver."

97.     Internal documents as well as the company's actions indicate that the health hazards
associated with talc were not regarded as mere "urban legend." In 1974 the company
acknowledged the "need for a non-talc dusting powder as a direct result of the
talc/asbestos controversy." In 1977, the company anticipated "possible government
legislation banning the cosmetic use of talcum powder." And, in 1986, the company
anticipated that "it is inevitable that a 'last straw' safety concern will lead to the
abandonment of powder use, unless health benefits outweigh the risks." The company
went so far as to develop a cornstarch alternative, obtain a patent, conduct market
research, and devise a marketing strategy which would communicate the benefits of a
replacement cornstarch product to consumers (e.g., "a change for the better").

98.     Based on my consideration of the totality of the evidence and my education, training,
and expertise, it is my opinion to a reasonable degree of professional certainty that
Johnson & Johnson engaged in misleading and deceptive conduct that created
confusion and misunderstanding among consumers. To this day, the company
continues to deny any potential health hazards associated with Johnson's talcum
powder products. It fails to communicate the totality of the scientific evidence on the
potential links between talcum powder use and ovarian cancer. And, rather than acting
with the "upmost transparency" as the company stated in 2018, there is a profound
disconnect between what the company externally communicates regarding JBP and
what the company's internal communications reveal. None of the current "Facts about
Talc" on the company's website communicate that the company developed a
cornstarch alternative 50 years ago in the advent of crisis or government regulation
banning the use of cosmetic talc. Nowhere does it mention the conclusions from
internationally recognized health bodies such as Health Canada, which find evidence
of a causal link between talcum powder and ovarian cancer. In recent messaging the
company has downplayed the importance of talc to their overall business (e.g.,
"powder represents approximately 0.5% of the (company's) total U.S. Consumer
Health business"). This, however, stands in stark contrast to the fact that the "deep,
emotional trust" that the company cultivated specifically through its marketing of JBP
was regarded as the company's "Golden Egg," "one of its most precious assets," and
"the cornerstone of baby franchise."

99.     The marketing issues in this case are of central importance to understanding how the
company affected and continues to affect consumers' beliefs about JBP and the health
concerns regarding talc. The company's marketing strategy for JBP was not simply to

make consumers aware of the product and communicate the product's benefits. Rather, Johnson & Johnson acted to target consumers' emotions and their core appreciations of trust, rooted in the sacred bond between mother and child. As the company's documents indicate, what consumers believed about Johnson's Baby Powder was central to what they believed about the Johnson's Baby brand; and what they believed about the Johnson's Baby brand was central to what they believed about Johnson & Johnson. At the core of all that was not a belief about Johnson Baby Powder's smoothness, or absorbency, or fragrance; rather, it was *trust.* Trust in the product and more importantly, trust in the company. And the effects of that trust in this case are immense. When consumers may have encountered concerns about the safety of JBP and talc, those concerns were not evaluated *tabula rasa*—devoid of any pre-existing expectations. Rather, those concerns were evaluated against generations of advertising which strategically portrayed the company as trustworthy, innocent, and first and foremost, concerned about customers' safety and wellbeing. As a result, the company's unequivocal denials of any wrongdoing or potential harm from talc had, and continue to have, an outsized impact on consumers' beliefs and behaviors. When the company states "We did not hide anything. Ever" or, "There is irrefutable scientific evidence that our talc is safe and beneficial to use" those words carry with them the emotional gravity of a century of strategic and carefully-crafted messaging built upon (in the company's words) "meanings, associations, values and feelings."

# APPENDIX 1



"It is strongly urged that talcum powder be removed from the environment of children. It has no medicinal value"
*THE AMERICAN JOURNAL OF DISEASES OF CHILDREN*

"Baby Powder represents the cornerstone of our franchise. In addition, we have a large investment in a talc mine."
*Wallace Steinberg, Director of Development J&J Health Care Division*

"During the past couple of years our need for a non-talc dusting powder base has increased as a direct result of the talc/asbestos controversy"
*J&J Internal Memo*

"In view of possible government legislation banning the cosmetic use of talc powder, the Brand is test marketing Johnson's Baby Powder with cornstarch (JBPc) as a possible product replacement"
*J&J Internal Memo*

"The rating of JBPc was either parity or higher than the talc formula on all qualities, which further supports the viability of corn starch as a replacement."
*J&J Internal Memo*

Ovarian Cancer and Talc
*A Case-Control Study*

Warn Your Patients Against Talc Use in Feminine Hygiene

"Retrospective studies have implicated talc use in the vaginal area with incidence of ovarian cancer. While sales of powders for use on babies continue, it is inevitable that a "last straw" safety concern will lead to the abandonment of powder use"
*J&J Internal Memo*

J&J sells interest in Windsor Talc mines

Medical professionals recommend against talc powder
*J&J's own research*

"Talc is a carcinogen, with or without the presence of asbestos like fibers."
*Cancer Prevention Coalition*

Citizen Petition Seeking Carcinogenic Labeling on All Cosmetic Talc Products

Women's health concerns prompt condom makers to stop using talc

slide from J&J Marketing

Negative publicity from the health community on talc (inhalation, dust, negative doctor endorsement, cancer linkage) continues.

"Explore Need states: pregnancy, menopause, "chubbiness", diabetes. African American consumers in particular would be good to target."
*J&J Marketing Meeting responding to "Powder Category Decline"*

PETITION SEEKING A CANCER WARNING ON COSMETIC TALC PRODUCTS

"Further evidence for this Petition is based on 12 publications since 1995, cited below. These confirm the causal relation between genital application of talc and ovarian cancer."

"The more I think about it, the more our proposition makes me uncomfortable. The reality that talc is unsafe for use on/around babies is disturbing. I don't mind selling talc, I just don't think we can continue to call it Baby Powder and keep it in the baby aisle."
*J&J Internal Email*

"Usage among African American women was 56%, which is twice the level for Caucasians (28%). This indicates that marketing to AA women could be a viable opportunity."
*J&J Internal Email*

The International Agency for Research on Cancer (IARC), part of the World Health Organization classifies the perineal use of talc-based body powder as "possibly carcinogenic to humans."

"The release of the 2010 census data has given us some very compelling data points highlighting just how essential it is for us to come up with an effective way to reach Hispanics. I think we've found where the fish *are*"
*J&J Marketing Meeting*

J&J promoted Baby Powder with coupons and giveaways as part of a 2010 campaign to reach African American Women

Baby powder manufacturers begin putting ovarian cancer warning labels on private label products, including those sold at Walmart and Dollar Tree stores

"A significant decrease in perceived Safety is most concerning with more believing that Johnson's products are unsafe."
*J&J internal report*

Your questions deserve answers.

Coupons for Johnson's Baby Powder

The Government of Canada concludes, "Analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect."

Talc is more common than you think.

Talc does not cause cancer.

J&J announces discontinuation sale of talc-based products in the U.S. and Canada (2020)

J&J announces discontinuation sale of talc-based products globally (2022)

Mother-Infant Bond (The "Golden Egg")

"One powder for the whole family"

"If a boy's interested in you, it should be because you're you. Baby Powder lets you be you"
*Ad in Seventeen Magazine*

"The softness is for you. The silkiness is for him."
"Johnson's Baby Powder feels like love"

Johnson's "Baby There" TV Commercial

1894    1966    1971    1977    1982    1989    1994-1996    2004-2006    2008    2011    2017-2018    2020-2023

"It is strongly urged that talcum powder be removed from the environment of children. It has no medicinal value"
*THE AMERICAN JOURNAL OF DISEASES OF CHILDREN*

"Baby Powder represents the cornerstone of our franchise. In addition, we have a large investment in a talc mine."
*Wallace Steinberg, Director of Development J&J Health Care Division*

"During the past couple of years our need for a non-talc dusting powder base has increased as a direct result of the talc/asbestos controversy"
*J&J Internal Memo*



Mother-Infant Bond (The "Golden Egg")



"One powder for the whole family"



"If a boy's interested in you, it should be because you're you. Baby Powder lets you be you"
*Ad in Seventeen Magazine*

1894          1966          1971

A1-B

**Ovarian Cancer and Talc**

*A Case-Control Study*

DANIEL W. CRAMER, MD,*†‡ WILLIAM R. WELCH, MD,§ ROBERT E. SCULLY, MD,‖
AND CAROL A. WOJCIECHOWSKI, RN‡

ortunities for genital exposure to talc were assessed in 215 white females with epithelial ov
ers and in 215 control women from the general population matched by age, race, and resid
rty-two (42.8%) cases regularly used talc either as a dusting powder on the perineum or on san

## Warn Your Patients Against
## Talc Use in Feminine Hygiene

*Questions from our Primary Care advisors:*
• *"Is there any evidence supporting a possible link between talcum powder*

Boston obstetrician-gynecologist Daniel W. Cramer advises his patients not to use talcum powder in feminine hygiene, and he urges other physicians concerned

"especially to the many users who come in just onc year for check-ups." [Ab 30% of the women who se as controls in the study had some time used talc, sugg

"In view of possible government legislation banning the cosmetic use of talc powder, the Brand is test marketing Johnson's Baby Powder with cornstarch (JBPc) as a possible product replacement"
*J&J Internal Memo*

"Retrospective studies have implicated talc use in the vaginal area with incidence of ovarian cancer. While sales of powders for use on babies continue, it is inevitable that a "last straw" safety concern will lead to the abandonment of powder use"
*J&J Internal Memo*

Medical professionals recommend against talc powder
J&J's own research

Medical Recommendation Levels

"The rating of JBPc was either parity or higher than the talc formula on all qualities, which further supports the viability of corn starch as a replacement."
*J&J Internal Memo*

J&J sells interest in Windsor Talc mines

"The softness is for you.
The silkiness is for him."



"Johnson's Baby Powder feels like love"

1977          1982          1989          A1-C

**Citizen Petition Seeking Carcinogenic Labeling on All Cosmetic Talc Products**



"Talc is a carcinogen, with or without the presence of asbestos like fibers."
*Cancer Prevention Coalition*

Talc suppliers place toxicity warning on shipments of talc to manufacturers

PETITION SEEKING A CANCER WARNING ON COSMETIC TALC PRODUCTS

"Further evidence for this Petition is based on 12 publications since 1995, cited below. These confirm the causal relation between genital application of talc and ovarian cancer."

Women's health concerns prompt condom makers to stop using talc

Negative publicity from the health community on talc (inhalation, dust, negative doctor endorsement, cancer linkage) continues.
*J&J Internal Memo*

"The more I think about it, the more our proposition makes me uncomfortable. The reality that talc is unsafe for use on/around babies is disturbing. I don't mind selling talc, I just don't think we can continue to call it Baby Powder and keep it in the baby aisle."
*J&J Internal Email*



slide from
J&J Marketing

"Explore Need states: pregnancy, menopause, "chubbiness", diabetes. African American consumers in particular would be good to target."
*J&J Marketing Meeting responding to "Powder Category Decline"*

"Usage among African American women was 56%, which is twice the level for Caucasians (28%). This indicates that marketing to AA women should be a viable opportunity."
*J&J Internal Email*



Johnson's "Baby Them"
TV Commercial

| 1994-1996 | 2004-2006 | 2008 | A1-D |

The International Agency for Research on Cancer (IARC), part of the World Health Organization classifies the perineal use of talc-based body powder as "possibly carcinogenic to humans."

Baby powder manufacturers begin putting ovarian cancer warning labels on private label products, including those sold at Walmart and Dollar Tree stores

The Government of Canada concludes, "Analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. The available data are indicative of a causal effect."

"A significant decrease in perceived Safety is most concerning with more believing that Johnson's products are unsafe."
*J&J internal report*

"The release of the 2010 census data has given us some very compelling data points highlighting just how essential it is for us to come up with an effective way to reach Hispanics. I think we've found where the fish are"
*J&J Marketing Meeting*




Talc is more common than you think.
It's in the foods we eat, including chewing gum, rice and olive oil, and many products we use every day (like makeup, soap and antiperspirant.)[1,2,3]


Talc does not cause cancer.
The National Cancer Institute's Physician Data Query Editorial Board concluded that the weight of evidence does not support an association between perineal talc exposure and increased risk of ovarian cancer.



J&J promoted Baby Powder with coupons and giveaways as part of a 2010 campaign to reach African American Women

Coupons for Johnson's Baby Powder

J&J announces discontinuation sale of talc-based products in the U.S. and Canada (2020)

J&J announces discontinuation sale of talc-based products globally (2022)

2011                    2017-2018                    2020-2023

A1-E

# APPENDIX 2



## WONDERFUL MOTHER

To be a Mother is to be among the greatest artists of the world. A tiny will, a tiny mind, even the threads of a Future are in her hands. What will she build with them?

"I had a wonderful mother," said Lincoln. "All that I am I owe to her."

If greatness is a gift, the greatest gift a baby can have is a wonderful mother —a mother who knows that hours and hours of restful sleep are essential to baby's future.

Does it seem odd that a mere "baby powder advertisement" should be so serious? Perhaps baby powder isn't so mere after all.

Do you realize that Johnson's Baby Powder was the suggestion of a famous physician who knew that skin comfort is the surest path to sounder sleep? And that it is made especially for babies in laboratories that prepare hundreds of articles for the medical profession?

The difference between Johnson's Baby Powder and ordinary talcums appeals to a mother.



*Johnson's*
Baby Powder
Best for baby—Best for you





Your touch tells him everything.
That's why we make our baby powder so pure and soft and soothing.

It feels like love.

Johnson&Johnson

A2-C



Your touch tells him everything.
That's why we make our baby powder so pure and soft and soothing. It feels like love.

Johnson & Johnson



"*Do you happen to know*'....*my mother asked
me*..... *'what ever became of the very cross baby who
used to be here?'...I didn't know...then she laughed and
told me....'It was you...all chafed and uncomfortable!
You see, we'd been using the wrong kind of powder!.....
Now this'...and something velvety soft nestled next
to me!...this is made specially for you, my dear!.....
that's why you're so nice....and comfortable, now!'*"

THE CHIEF CHEMIST SAYS....

BABY powders are different—largely
because of the difference in *talcs*. The
costly Italian talc used in Johnson's
Baby Powder is made up of soft, tiny
flakes—but the cheaper talc used for
some baby powders contains sharp,
*needle*-like particles! The trained ob-
server readily sees this difference under
a microscope, and you can feel it your-
self, this way . . .

Rub a little Johnson's Baby Powder
between your thumb and finger—then
try another powder. You'll know, soon
enough, if it's made with inferior talc!

Johnson's Baby Powder contains *no*
stearate of zinc.



*Johnson's
Baby
Powder*

*Ask your dealer also about Johnson's Baby Soap and Cream*

*Johnson & Johnson*

WORLD'S LARGEST MANUFACTURERS OF SURGICAL DRESSINGS:
"ZO" CARTRIDGE SPOOL ADHESIVE PLASTER, ETC.

**FREE SAMPLES:** *Let us send you a generous free sample of Johnson's Baby Powder. With it
we'll include free samples of Johnson's Baby Soap and Cream—two other products important to a baby's
comfort Write to Baby Products Division, Dept. M. A., Johnson & Johnson, New Brunswick N. J.*

A2-E

Case 3:16-md-02738-MAS-RLS     Document 33115-9     Filed 08/22/24     Page 40 of 84
PageID: 232598



## All for the Sake of Baby
## —*Your Baby*

WHEN physician, nurse, druggist or grandmother advises a mother to use Johnson's Baby Powder in place of ordinary talcums, it is *for baby's sake.* And it means something.

It reflects the wisdom and experience of years. It is an endless chain of approval. They know there is safety and comfort for *baby* in Johnson's—a powder of proved purity, with just the right proportion of antiseptics to keep the skin sweet, clean and healthy.

While Johnson's is made especially for babies, grown folks, too, enjoy its antiseptic, soothing qualities and dainty perfume. It is a product worthy the imprint of Johnson & Johnson—the world's largest makers of surgical dressings.

Is Johnson's used in your home? Isn't *your baby* entitled to the best?

## Johnson's
## BABY POWDER

### "BEST FOR BABY – BEST FOR YOU"

And now a word about your druggist. He is more than a merchant—he is a scientist. A scientific training has taught him how to safeguard your interests in selecting merchandise. For safety—"Try the drug store first."

### Johnson & Johnson
**NEW BRUNSWICK, N. J., U.S.A.**

The scientific J. & J. Tooth Paste aids in proper care of mouth and teeth. Send for information gathered through our experiments.

A2-F



A2-G



A2-H

# JOHNSON'S Baby Powder makes you feel soft and smooth. It's for when you're alone...... And for when you're not.




*You always feel good about yourself when you smooth on pure JOHNSON'S Baby Powder. You like your skin feeling soft and silky. With a fresh, clean smell that's incredibly gentle. Especially when you're with him.*

## Johnson & Johnson



©J&J 1975

A2-I

Wearing a fragrance won't really change me. It just adds a little interest.

That's why I don't like smells that shout what they are.

I like a smell that whispers something softly. That's why I use

JOHNSON'S Baby Powder. Because it's pure and fresh and natural.

Smoothing it on after I bathe, keeps my skin feeling soft and silky. And smelling soft and gentle.

And that's something I like to share. Just a little.



## Johnson & Johnson

I just don't like smelling like a lemon grove. I'm more subtle than that.





*Mummy can remember this herself*







**AND FOLKS I WON'T FORGET!** How can a fellow ever forget those soft, silky sprinkles of Johnson's Baby Powder! Specially when he's hot and prickly, and well . . . *so uncomfortable!* My Mummy says she can remember it herself, but I know right now how soft and silky it makes my skin, and really soothes me off to sleep!

**MUMMY __DOES__ KNOW BEST!** At least mine does, anyway! 'Cause it's not just me that enjoys *all* the soft, soothing sprinkles of Johnson's Baby Powder. Mummy says it's *best* for all the family, too! She knows the bigger, more economical tin of Johnson's Baby Powder means lots and lots of skin comfort for everyone. Quite a tip, eh?

**FAMOUS THE WORLD OVER.** Johnson's Baby Powder, Baby Soap, Baby Oil and Cream are of unsurpassed quality and have been proved through many years as *best for baby, best for you, too!* See that your nursery has a full range of Johnson's Baby Products, and, if not, enquire now at your nearest Chemist or store.

**Johnson's . . .** *Best for Baby — Best for You*

A2-K



"You had to learn sometime Mummy!"

**BABY**: Sorry that you had to learn about a baby's life the hard way, Mummy, by being *me* for a day!

**MUMMY**: Angel, it's awful! The wriggling. The squirming. My skin's so uncomfortable I could howl!

**BABY**: I hoped you'd learn the lesson that every baby needs Johnson's Baby Cream and Johnson's Baby Powder! That means *me!*

**MUMMY**: Honey, I'm a dunce, but — why both?

**BABY**: First, I need satiny Johnson's Baby Cream after my bath to help protect my skin and keep me a smoothie. It's grand at diaper changes, too.

And between times, plenty of silky Johnson's Baby Powder will help chase the chafes and prickles that plague a lively baby like me!

**MUMMY**: Guess I've been a backward mother, lamb! But from now on, watch me improve!

**BABY**: Mummy, let's go get the Johnson's now so you can start earning your M.A.M.A. degree!

# Johnson's
# BABY POWDER
## SOAP AND CREAM

**PRODUCTS OF JOHNSON & JOHNSON—WORLD'S LARGEST MANUFACTURERS OF SURGICAL DRESSINGS**

The Australian Women's Weekly—March 13, 1948

A2-L



"Should I leave you on the doorstep Mummy?"

**BABY**: Shame, Mummy, saying you'd leave a nice baby like me on the doorstep. I should leave *you!* **MUMMY**: But, lamb—you were driving me *wild* with your fussing . . . **BABY**: That's why you and I are changing places for a while. Wait'll you see how miserable a baby's skin gets, from woollies and wriggling around. Sure I fuss—but do you do anything about it? What I need is Johnson's pure Baby Cream to keep me like satin and prevent skin irritations. And don't forget—when chafes and prickles make me yip — whisk out soft, silky, Johnson's Baby Powder!

USE JOHNSON'S BABY SOAP AND BABY CREAM, TOO!
Baby Cream to soothe away irritations . . . Baby Soap that lathers richly and rinses easily . .

# Johnson's
## Baby Powder, Soap and Cream

PRODUCTS OF JOHNSON & JOHNSON, WORLD'S LARGEST MANUFACTURERS OF SURGICAL DRESSINGS · · · · · MAKERS OF TEK, MODESS, MEDS, ETC.

Page 8                    The Australian Women's Weekly—July 6, 1946

A2-M







# Let our family take loving care of yours.

Remember when your mother took care of you with JOHNSON's baby products? How good it made you feel? Well, you can feel that way again. You, and those you love.

Everyone, including the man of the house, will enjoy the fresh, clean feeling of pure JOHNSON's Baby Powder.

And thick, rich JOHNSON's Baby Lotion will help keep the whole family feeling soft and smooth. So they won't have to worry about the kind of dryness that shows.



JOHNSON's Baby Shampoo cares for your entire family with a trusted "No More Tears"™ formula that cleans hair gently, leaving it healthy-looking with a natural sheen.

JOHNSON's Baby Oil not only helps take care of your baby in lots of ways. It also works in many ways as a beauty oil for you.

Our JOHNSON's baby products have helped take care of families for almost fifty years. And we can help take loving care of yours.

Johnson & Johnson

Copyrighted material

A2-P



It's a feeling you never outgrow.

The powder that kept you feeling soft as a baby keeps you feeling soft today.
Johnson's baby powder. It's the softest powder there is.

A2-Q



A2-R



# Effective *Johnson's* baby powder "adult advertising" is the cause of the adult market expansion.

## IN FACT JOHNSON'S OUTSPENDS ALL COMPETITORS COMBINED.

Here are four of the high scoring JOHNSON'S Baby Powder commercials and advertisements that are expanding all-family usage.



### Adult Male

A real life problem/solution commercial shows how JOHNSON'S Baby Powder transforms "hot & sweaty" into "cool and dry". Any man who's ever come home from work hot and wet sees himself in this commercial.



### Adult Female

A slice of life commercial aimed at adult women — Mother-of-the-Bride using JOHNSON'S Baby Powder and talking about the first time she used JOHNSON'S Baby Powder on her daughter.



### Baby

Another touching, tender commercial that, like hundreds before it, have made Babies and JOHNSON'S inseparable.



### Teen Girl

Just one of many ads in the big Teen Campaign that's reaching 95% of all U.S. teens, not just once, but five times this year.

A2-S

# Your questions deserve answers.



The talc in Johnson's Baby Powder is the purest, safest pharmaceutical-grade talc on earth. It doesn't contain asbestos and never will. We test every single lot to ensure it.

The FDA has tested Johnson's talc since the '70s and has confirmed - every single time - that it did not contain asbestos.

We have always cooperated fully and openly with the FDA and other regulators and have given them full access to our talc testing results.

We did not hide anything. Ever. Our openness and collaboration with the FDA and regulatory agencies is well documented.

We have always acted with the utmost transparency in this matter. Nothing is more important to us than the health and safety of our customers. We're parents and grandparents, just like you. If we had any reason to believe our talc was unsafe, it would be off our shelves immediately.

There is irrefutable scientific evidence that our talc is safe and beneficial to use. Go to factsabouttalc.com. There you'll find independent studies from leading universities, research from medical journals, and third-party opinions, so you can learn the facts and make up your own mind.

*Johnson & Johnson*

A2-T

# 5 Important Facts About the Safety of Talc

JOHNSON'S® Baby Powder, made from cosmetic talc, has been a staple of baby care rituals and adult skin care and makeup routines worldwide for over a century.

The most common cosmetic applications for talc are face, body and baby powders, but it's also used as an ingredient in color cosmetics, soap, toothpaste, antiperspirant, chewing gum and drug tablets.



Following decades of studies conducted by medical experts across the globe, it has been demonstrated through science, research and clinical evidence that few ingredients have the same performance, mildness and safety profile as cosmetic talc.

Talc, also known as talcum powder, is a naturally occurring mineral that is highly stable, chemically inert and odorless. The grade of talc used in cosmetics is of high purity—comparable to that used for pharmaceutical applications—and it's only mined from select deposits in certified locations before being milled into relatively large, non-respirable-sized particles.

Today, talc is accepted as safe for use in cosmetic and personal care products throughout the world.

A2-U

# Talc is Safe

### Talc has been used for centuries.

It's the softest mineral on earth, and has been used for a variety of applications dating back to ancient Egypt. [1]



### Talc is more common than you think.

It's in the foods we eat, including chewing gum, rice and olive oil, and many products we use every day (like makeup, soap and antiperspirant.) [1,2,3]



### Talc is safe.

Research, clinical evidence and nearly 40 years of studies by independent medical experts around the world continue to support the safety of talc.



### Talc has been studied by independent authorities around the world.

Government and non-governmental agencies, such as the U.S. Food and Drug Administration and Cosmetic Ingredient Review Expert Panel have all investigated the potential harmfulness of talc and determined that talc is safe.



### Talc does not cause cancer.

The National Cancer Institute's Physician Data Query Editorial Board concluded that the weight of the evidence does not support an association between perineal talc exposure and increased risk of ovarian cancer.



A2-V

## TALC IS SAFE



### Talc has been used for centuries.

It's the softest mineral on earth, and has been used for a variety of applications dating back to ancient Egypt.[2]



### Talc is safe.

Research, clinical evidence and nearly 40 years of studies by independent medical experts around the world continue to support the safety of talc.

### Talc is more common than you think.

It's in the foods we eat, including chewing gum, rice and olive oil, and many products we use every day (like makeup, soap and antiperspirant.)[1,2,3]



### Talc does not cause cancer.

The National Cancer Institute's Physician Data Query Editorial Board concluded that the weight of evidence does not support an association between perineal talc exposure and increased risk of ovarian cancer.



A2-W

Baby Powder made from cosmetic talc is one of JOHNSON's oldest products and a longtime part of baby care rituals. JOHNSON's Baby Powder continues to be popular with adults as well, and in many parts of the world, it remains an essential part of the makeup and skin care routines. With over 100 years of use, few ingredients have the same demonstrated performance, mildness and safety profile as cosmetic talc.

We wanted to take this opportunity to share the facts about talc, so you're well-informed.



- JOHNSON's talc products do not contain asbestos. A frequent misperception is that JOHNSON's Baby Powder contains talc made with asbestos, a substance classified as cancer-causing. Since the 1970s, talc used in consumer products has been required to be asbestos-free. JOHNSON'S® Baby Powder products contain only U.S. Pharmacopeia (USP) grade talc, which meets the highest quality, purity and compliance standards.
- The safety of talc is based on a long history of safe use and decades of research by independent researchers and scientific review boards. Talc is accepted as safe for use in cosmetic and personal care products by the European Union, Canada and many other countries around the world, among them Argentina, Brazil, China, India, Israel, South Africa, Turkey and Indonesia. The U.S. Center for Disease Control (CDC), which identifies potential risk factors for many diseases, has not identified talc as a risk factor for ovarian cancer.
- The Nurses' Health Study (2010) and the Women's Health Initiative Observational Cohort (2014), the only two large-scale prospective studies looking at talc and ovarian cancer, found no causal relationship between talc and ovarian cancer.



A2-X

# EXHIBIT A

November, 2023

# GEORGE E. NEWMAN
—CURRICULUM VITAE—

## ACADEMIC APPOINTMENTS

2022-          Associate Professor of Organizational Behaviour & Human Resource
               Management & Marketing, Rotman School of Management, University of Toronto

2016- 2022     Associate Professor of Management & Marketing, Yale School of Management

2011- 2016     Assistant Professor of Management, Yale School of Management

2011- 2022     Affiliated Faculty, Department of Psychology, Yale University
               Affiliated Faculty, Department of Cognitive Science, Yale University
               Affiliated Faculty, Yale Center for Customer Insights

2008 - 2011    Postdoctoral Associate in Marketing, Yale School of Management

## EDUCATION

Ph.D. in Cognitive Psychology, Yale University, 2008
M.Phil. in Psychology, Yale University, 2006
M.S. in Psychology, Yale University, 2005
B.A. in Psychology, Northwestern University, 2002

## HONORS & AWARDS

Academy of Management, Annals, Best Paper, 2020
Society for Philosophy and Psychology, Best Paper, 2019
Richard Lanpher Dissertation Fellowship, Yale University, 2007-2008
National Science Foundation Graduate Fellowship Honorable Mention, 2004
Graduate Research Fellowship, Yale University 2003-2008
William H. Hunt Award for the Best Undergraduate Thesis in Psychology, Northwestern
        University, 2002
Northwestern University Undergraduate Research Grant, 2001-2002

## RESEARCH INTERESTS

Consumer Behavior, Brand Authenticity, Consumer Perceptions of Trust, Brand Heritage,
        Corporate Social Responsibility, Sustainability, Charitable Giving

NOVEMBER, 2023

## PUBLICATIONS

[61]. Vial, Andrea C., Melis Muradoglu, George E. Newman and Andrei Cimpian (2022). An Emphasis on Brilliance Fosters Masculinity Contest Cultures. *Psychological Science*

[60]. Kim, Jin, George E. Newman, Natalie O. Fedotova, and Paul Rozin. (2022). The spiritual contagion scale: A measure of beliefs in the transfer of metaphysical properties. *Journal of Consumer Psychology*

[59]. Han, Minju and George E. Newman (2022). Seeking Stability: Consumer Motivations for Communal Nostalgia. *Journal of Consumer Psychology*

[58]. Bailey, April, George E. Newman and Joshua Knobe (2021). Value-based Essentialism: Essentialist Beliefs About Social Groups with Shared Values. *Journal of Experimental Psychology: General.*

[57]. Han, Minju, George E. Newman, Rosanna K. Smith and Ravi Dhar (2021). The Curse of the Original: How and When Heritage Branding Leads Consumers to Resist Product Changes. *Journal of Consumer Research*

[56]. Silver, Ike, George E. Newman and Deborah Small (2021). Inauthenticity Aversion: Moral reactance toward tainted actors, actions, and objects. *Consumer Psychology Review, 4(1),* 70-82.

[55]. Makov, Tamar, George E. Newman and Gal Zauberman (2020). Inconsistent allocations of harms versus benefits may exacerbate environmental inequality. *Proceedings of the National Academy of Sciences. 117(16),* 8820-8824.

[54]. Savary, Jennifer, Charis Li and George E. Newman (2020). Exalted Purchases or Tainted Donations? The Effects of Product Incentives on Charitable Giving. *Journal of Consumer Psychology, 30(4),* 671-670.

[53]. Lehman, David W., Kieran O'Connor, Balazs Kovacs and George E. Newman (2019). Authenticity. Academy of Management Annals, 13, 1-42 (lead article)
*2020 Academy of Management Annals Best Paper Award

[52]. Newman, George E. The Psychology of Authenticity (2019). Review of General Psychology, 23, 8-18.

[51]. Tobia, Kevin, George E. Newman and Joshua Knobe (2019). Water is and is not H2O. Mind and Language, 35(2), 183-208.

[50]. Newman, George E. and Joshua Knobe (2019). The Essence of Essentialism. Mind and Language, 34(5), 585-605.

[49]. Newman, George E., Adam Schniderman, Daylian Cain and Kyle Sevel (2019). Do the Ends Justify the Means? The Relative Focus on Overhead Versus Outcomes in Charitable Fundraising, Nonprofit and Volunteer Sector Quarterly, 48, 71-90.

[48]. Fisher, Matthew and George E. Newman and Ravi Dhar (2018). Seeing Stars: How the Binary Bias Distorts the Interpretation of Customer Ratings. Journal of Consumer Research, 45, 471-489 (lead article).

[47]. Newman, George E. (2018). Bringing Narratives to Life: Animism, Totems and Intangible Value. Journal of the Association for Consumer Research, 3, 514-526.

[46]. Huang, Julie Y., Joshua Ackerman and George E. Newman (2017). Catching (up with) Magical Contagion: A Review of Contagion Effects in Consumer Contexts, Journal of the Association for Consumer Research, 2, 430-443.

[45]. De Freitas, Julian, George E. Newman, Hagop Sarkissian, Igor Grossmann, Felipe De Brigard, Andres Luco, and Joshua Knobe. (2017). Consistent Belief in a Good True Self in Misanthropes and Three Interdependent Cultures. Cognitive Science, 42, 134-160.

[44]. Strohminger, Nina, Joshua Knobe and George E. Newman (2017). The True Self: A psychological concept distinct from the self. Perspectives in Psychological Science, 12, 551-560.

[43]. De Freitas, Julian, Kevin Tobia, George E. Newman, Joshua Knobe (2017). Normative judgments and individual essence. Cognitive Science, 41, 382-402.

[42]. Stavrova, Olga, George E. Newman, Anna Kulemann and Detlef Fetchenhauer (2016). Contamination Without Contact: An Examination of Intention-based Contagion. Judgment and Decision Making, 6, 554-571.

[41]. Tierney et al. (2016). Data from a pre-publication independent replication initiative examining ten moral judgment effects. Nature: Scientific Data, 3, article number: 160082

[40]. Newman, George E. and Rosanna K. Smith (2016). The Need to Belong Motivates the Valuation of Authentic Objects. Cognition, 156, 129-134.

[39]. Makov, Tamar and George E. Newman (2016). "Economic Gains Stimulate Negative Evaluations of Sustainability Initiatives." Nature Climate Change, 6, 844–846.

[38]. Goldsmith, Kelly, George E. Newman and Ravi Dhar (2016). "Mental representation changes the evaluation of green product benefits." Nature Climate Change, 6, 847–850.

[37]. Newman, George E. and Rosanna K. Smith (2016). "Kinds of Authenticity." Philosophy Compass, 11, 609–618.

[36]. Smith, Rosanna K., George E. Newman and Ravi Dhar (2016). "Closer to the Creator: Temporal Contagion Explains the Preference for Earlier Serial Numbers," Journal of Consumer Research, 42, 653 – 668 (lead article).

[35]. Newman, George E. (2016). "An essentialist account of authenticity," Journal of Cognition and Culture, 16, 294 – 321.

[34]. Schweinsberg, M., at al. (2016). "The pipeline project: Pre-publication independent replications of a single laboratory's research pipeline," Journal of Experimental Social Psychology, 66, 55-67.

November, 2023

[33]. Keil, Frank C. and George E. Newman (2015). "Order, Order Everywhere, and Only an Agent to Think: The Cognitive Compulsion to Infer Intentional Agents," Mind and Language, 30, 117-139.

[32]. Luke Zhu, Victoria L. Brescoll, George E. Newman and Eric L. Uhlmann (2015), "Macho Nachos: The Implicit Effects of Gender Stereotypes on Preferences for Healthy and Unhealthy Foods," Social Psychology, 46, 182-196.

[31]. Rand, David G., George E. Newman and Owen M. Wurzbacher (2015), "Social context and the dynamics of cooperation," Journal of Behavioral Decision Making, 28, 159-166.

[30]. Newman, George E., Julian De Freitas and Joshua Knobe (2015), "Beliefs about the true self explain asymmetries based on moral judgment" Cognitive Science, 39, 96-125.

[29]. Newman, George E. and Paul Bloom (2014), "Physical contact influences how much people pay at celebrity auctions" Proceedings of the National Academy of Sciences, 110, 705–3708.

[28]. Newman, George E. and Daylian M. Cain (2014), "Tainted Altruism: When doing some good is evaluated worse than doing no good at all" Psychological Science, 25, 648-655.

[27]. Newman, George E. and Ravi Dhar (2014), "Authenticity is Contagious: Brand Essence and the Original Source of Production" Journal of Marketing Research, 51, 371-386.

[26]. Newman, George E., Margaret Gorlin and Ravi Dhar, (2014), "When Going Green Backfires: How Firm Intentions Shape the Evaluation of Socially Beneficial Product Enhancements," Journal of Consumer Research, 41, 823-839.

[25]. Rand, David G., Alexander Peysakhovich, Gordon T. Kraft-Todd, George E. Newman, Owen Wurzbacher, Martin A. Nowak, Joshua D. Greene (2014), "Intuitive cooperation and the Social Heuristics Hypothesis: Evidence from 15 time constraint studies" Nature Communications, 5, 3677.

[24]. Cain, Daylian M., Jason Dana and George E. Newman (2014), "Giving vs. giving-in," Academy of Management Annals, 8, 505-533.

[23]. Newman, George E., Paul Bloom & Joshua Knobe (2014), "Value Judgments and the True Self," Personality and Social Psychology Bulletin, 40, 203-216.

[22]. Smith, Rosanna K. and George E. Newman (2014) "When multiple creators are worse than one: Single author biases in the evaluation of art" Psychology of Aesthetics, Creativity and the Arts, 8, 303-310.

[21]. Poehlman, T. Andrew and George E. Newman (2014) "Potential: The Valuation of Imagined Future Achievement" Cognition, 130, 134-139.

[20]. Gjersoe, Nathalia L., George E. Newman, Vlad Chituc and Bruce Hood (2014), "Individualism and the extended-self: Cross-cultural differences in the valuation of authentic objects," PLoSONE, 9, e90787.

November, 2023

[19].  Newman, George E., Rosanna K. Smith and Daniel Bartels (2014), "Are artworks more like people than artifacts? Psychological connectedness and the extended self," Topics in Cognitive Science, 6, 647-662.

[18].  Urminsky, Oleg, Daniel M. Bartels, Paola Giuliano, George E. Newman, Stefano Puntoni and Lance Rips, (2014) "Choice and Self: How Identity Shapes Choices and Decision Making," Marketing Letters, 25, 281-291.

[17].  Brescoll, Victoria L., Eric Uhlmann and George E. Newman (2013) "The Effects of System Justifying Motives on Endorsement of Essentialist Explanations for Gender Differences" Journal of Personality and Social Psychology, 105, 891-908.

[16].  Knobe, Josh, Sandeep Prasada and George E. Newman (2013), "Dual Character Concepts and the Normative Dimension of Conceptual Representation" Cognition, 127, 242-257.

[15].  Newman, George E., and Paul Bloom (2012), "Art and Authenticity: The Importance of Originals in Judgments of Value" Journal of Experimental Psychology: General, 141, 558-669.

[14].  Newman, George E. and Brian J. Scholl (2012), "Bar Graphs Depicting Averages are Perceptually Misinterpreted: The within-the-bar bias," Psychonomic Bulletin & Review, 19, 601-607.

[13].  Newman, George E. and Y. Jeremy Shen (2012), "The Counterintuitive Effects of Thank-you Gifts on Charitable Giving" Journal of Economic Psychology, 33, 973-983.

[12].  Newman, George E., and Daniel Mochon (2012), "Why are lotteries valued less? Multiple tests of the direct risk-aversion hypothesis" Judgment and Decision Making, 7, 19-24.

[11].  Newman, George E., Gil Diesendruck and Paul Bloom (2011), "Celebrity Contagion and the Value of Objects," Journal of Consumer Research, 38, 215-228 (Lead article).

[10].  Newman, George E., Frank C. Keil, Valerie Kuhlmeier and Karen Wynn (2010), "Sensitivity to Design: Early Understandings of the Link Between Agents and Order," Proceedings of the National Academy of Sciences, 107, 17140-17145.

[9].  Newman, George E., Kritsi K. Lockhart and Frank C. Keil (2010), "'End-of-Life' biases in moral evaluations of others," Cognition, 115, 343-349.

[8].  Gao, Tao, George E. Newman and Brian J. Scholl (2009), "The psychophysics of chasing," Cognitive Psychology, 59, 154-179.

[7].  Hamlin, J. Kiley, George E. Newman and Karen Wynn (2009), "Eight-month-old infants infer unfulfilled goals, despite contrary physical evidence," Infancy, 14, 579-590.

[6].  Newman, George E., Hoon Choi, Karen Wynn, and Brian J. Scholl (2008), "The origins of causal perception," Cognitive Psychology, 57, 262-291.

[5].  Newman, George E., Patricia Hermann, Karen Wynn and Frank C. Keil (2008), "Biases towards intrinsic features in infants' reasoning about objects," Cognition, 107, 420-432.

NOVEMBER, 2023

[4]. Newman, George E. and Frank C. Keil (2008), "Where's the essence? Developmental shifts in children's beliefs about internal features," Child Development, 79, 1344-1356.

[3]. Blok, Serge V., George E. Newman and Lance J. Rips (2007), "Out of sorts? Remedies for theories of object concepts: A reply to Rhemtulla and Xu," Psychological Review, 114, 1096-1102.

[2]. Rips, Lance J., Serge V. Blok and George E. Newman (2006), "Tracing the identity of objects," Psychological Review, 113, 1–30.

[1]. Cheries, Erik W., George E. Newman, Laurie Santos, and Brian J. Scholl (2006), "Units of visual individuation in rhesus macaques: Objects or unbound features?" Perception, 35, 1057-1071.

## BOOK CHAPTERS & COMMENTARIES

Newman, George E. and Rosanna K. Smith (2018). Artworks are evaluated as extensions of their creators. Advances in Experimental Philosophy of Aesthetics. 103-120.

Uhlmann Eric L., Luke Zhu, Victoria Brescoll and George E. Newman (2014), "System Justifying Motives Can Lead to Both the Acceptance and Rejection of Innate Explanations for Group Differences" [commentary on Cimpian and Salomon] Brain & Behavioral Sciences, 37, 503- 504.

De Freitas, Julian, Kevin Tobia, George E. Newman, Joshua Knobe (2014), "The good ship Theseus: The effect of valence on object identity judgments," Proceedings of the 36th Annual Conference of the Cognitive Science Society, Mahwah, NJ: Erlbaum.

Newman, George E. (2013), "The Duality of Art: Body and Soul," [commentary on Bullot and Reber] Brain & Behavioral Sciences, 36, 153.

Newman, George E. (2012), "The Bias toward Cause and Effect," in Psychology of Bias, Nova Science Publishers.

Keil, Frank C. and George E. Newman (2010), "Darwin and development: Why ontogeny does not recapitulate phylogeny for human concepts," In. D. Mareschal, P. Quin, & S. Lea (eds.). The Making of Human Concepts. Oxford University Press.

Keil, Frank C. and George E. Newman (2008), "Two tales of conceptual change: what changes and what remains the same," In S. Vosniadou (Ed.), Handbook of Research on Conceptual Change, Earlbaum, 83-101.

Newman, George E., Serge V. Blok and Lance J. Rips (2006), "Beliefs in afterlife as a by-product of persistence judgments," [commentary on Bering], Behavioral & Brain Sciences, 29, 480-481.

Blok, Serge V., George E. Newman and Lance J. Rips (2005), "Individuals and their concepts," In W. K. Ahn, R. L. Goldstone, B. C. Love, A. B. Markman & P. Wolff (Eds.),

NOVEMBER, 2023

Categorization inside and outside the lab. Washington, D.C.: American Psychological Association.

Blok, Serge V., George E. Newman, Jennifer Behr and Lance J. Rips (2001), "Inferences about individual identity," Proceedings of the 23rd Annual Conference of the Cognitive Science Society (pp. 80–85). Mahwah, NJ: Erlbaum.

## MENTORSHIP

**Primary advisor:**

Rosanna K. Smith (Ph.D., 2017), Assistant Professor, Department of Marketing, Terry College of Business, University of Georgia

Nina Strohminger (Post-doc, 2015-2016), Assistant Professor, Department of Legal Studies & Business Ethics, The Wharton School, University of Pennsylvania

Tamar Makov (Ph.D., 2019), Senior Lecturer (Associate Professor equivalent) Department of Management, Guilford Glazer Faculty of Business and Management, Ben-Gurion University of the Negev

Minju Han (Ph.D., 2021), Assistant Professor, Department of Marketing, School of Business, Hanyang University

## GRANTS

**"Lay Theories of Creativity and Their Psychological and Organizational Consequences"** SSHRC IDG Grant. Principal Investigators: George Newman and Rachel Ruttan

"**Is Used a Substitute for New?"** Funded by Yale Research Grants in Business and the Collaborative Research Grant through the Sobotka Research Fund. Principal Investigators: George Newman and Tamar Makov

"**Authentic Happiness and the Moral True Self**" Funded by The Happiness and Well-Being Project, John Templeton Foundation. Investigators: Yarrow Dunham, Joshua Knobe, George Newman, Shaun Nichols, Nina Strohminger, Fan Yang

"**Perceptions of Authenticity."** Funded by Whitebox Research Grant. Principal Investigator: George Newman.

"**Framing Effects on Inferences about Green Product Quality**." Funded by Yale Research Grants in Business and the Environment and Jon Cummings and Holly Hegener. Principal Investigators: George Newman and Ravi Dhar.

NOVEMBER, 2023

## SELECTED MEDIA MENTIONS

New York Times, Time Magazine, Slate, Scientific American, Wall Street Journal, The Economist, Smithsonian Magazine, LA Times, Boston Globe, Chronicle of Higher Education, Forbes, Huffington Post, Harvard Business Review

## INVITED TALKS

Newman, G.E. (2021, October) *Resistance to COVID-19 Vaccines: A Case Study of the Binding Functions of Morality.* Presented at Virginia Tech Marketing Seminar

Newman, G.E. (2021, October) *Resistance to COVID-19 Vaccines: A Case Study of the Binding Functions of Morality.* Presented at Rotman OBHRM Seminar (virtual)

Newman, G.E. (2021, September) *Resistance to COVID-19 Vaccines: A Case Study of the Binding Functions of Morality.* Presented at Kellogg Marketing Camp

Newman, G. E.  (2021, April) *Unsustainable: How incompatible beliefs lead to environmental inaction.* Presented at Cornell University Marketing Seminar (virtual).

Newman, G. E.  (2021, February) *Unsustainable: How incompatible beliefs lead to environmental inaction.* Presented at Georgetown University Marketing Seminar (virtual).

Newman, G. E.  (2020, November). *Unsustainable: How incompatible beliefs lead to environmental inaction.* Presented at University of Toronto Marketing Seminar (virtual).

Newman, G. E.  (2020, November). *Unsustainable: How incompatible beliefs lead to environmental inaction.* Presented at UC Berkeley Behavioral Science Seminar (virtual).

Newman, G. E. (2020, June). *Customer Insights to Building an Authentic Brand.* Presented at Marketing Science Institute (virtual).

Newman G. E. (2019, February). *Authenticity and the Value of Objects.* Presented at Baruch College Marketing Seminar.

Newman G. E. (2018, November). *Authenticity and the Value of Objects.* Presented at New York University, Marketing Seminar.

Newman G. E. (2018, November). *Authenticity and the Value of Objects.* Presented at New York University Abu Dhabi, Psychology Department Seminar.

Newman, G. E. (2017, March). *Authenticity and the Value of Objects.* Paper presented at CUHK, Marketing Seminar.

Newman, G. E. (2016, August). *Authentic Altruism.* Paper presented at the UCSD, Marketing Seminar.

Newman, G. E. (2016, March). *Tainted Altruism.* Paper presented at Harvard University, Negotiations, Organizations and Markets Seminar.

NOVEMBER, 2023

Newman, G. E. (2016, August). *Authenticity and the Value of Objects.* Paper presented at Emory University, Organizations & Management Seminar.

Newman, G. E., (2014, November). *Tainted Altruism: When doing some good is evaluated worse than doing no good at all.* Paper presented at Leeds University, Department of Philosophy Seminar.

Newman, G. E. (2014, April). *Authentic Altruism.* University of Chicago, Center for Decision Research Seminar.

Newman, G. E. (2013, November). *Psychology of Authenticity,* University of British Columbia, Marketing Seminar.

Newman, G. E. (2013, October). *The Psychology of Authenticity.* University of Connecticut Department of Psychology Seminar.

Newman, G. E. (2012, April). *The Valuation of Authentic Goods.* Sloan School of Management, MIT, Marketing Seminar.

Newman, G. E. (2012, April). *Authentic Altruism and the Myth of Win-Win.* Yale University., Department of Psychology Developmental Psychology Seminar.

Newman, G.E, (2010, November). *The Valuation of Authentic Goods.* London Business School, Marketing Seminar.

Newman, G.E, (2010, November). *The Valuation of Authentic Goods.* Leeds School of Business, University of Colorado, Boulder, Marketing Seminar.

Newman, G.E, (2010, October). *The Valuation of Authentic Goods.* Tepper School of Business, CMU, Marketing Seminar.


## Conference Presentations

Newman G. E. (2019, January). *Significant Objects.* Presented at the Winter Decision Making Conference.

Newman G. E. and Minju Han. (2018, October). System Justification and Atavistic Products. Presented at the Association for Consumer Research.

Newman, G. E. (2018, May). *Intangible Value.* Paper presented at four schools conference.

Newman, G. E. (2016, May). *Kinds of Authenticity.* Paper presented at the Triennial Choice Symposium, Lake Louise, Canada.

Newman, G. E. (2016, May). *Kinds of Authenticity.* Paper presented at the Authenticity Workshop at UVA.

NOVEMBER, 2023

Newman, G. E. (2016, February). *Intentions Versus Outcomes in Charitable Fundraising.* Paper presented at the Society for Consumer Psychology, St. Pete's Beach, FL.

Newman, G. E. (2016, January). *The True Self.* Paper presented at the New England Marketing Conference.

Newman, G. E. (2015, September). *The Valuation of Authentic Goods.* Paper presented at the New England Marketing Conference.

Newman, G. E. (2015, May). *The Valuation of Authentic Goods.* Paper presented at the Authenticity Workshop at Stanford University, Palo Alto, CA.

Newman, G. E. (2015, May). *Why do we value authenticity?* Paper presented at the Annual Yale Center for Customer Insights Conference, New Haven, CT.

Newman, G. E. (2015, May). *The True Self.* Paper presented at the Personal Identity Workshop, University of Chicago, Chicago, IL.

Newman, G. E. (2014, November). *When do incentives help charitable giving and when do they hurt?* Paper presented at the Annual Meeting of the Social Philanthropy Initiative, Chicago, IL.

Newman, G. E., Bartels, D. M., Smith, Rosanna, K. (October, 2014). "*Are artworks more like people than artifacts?"* Paper presented at the Annual Meeting of the Association for Consumer Research, Baltimore, MD.

De Freitas, J., Tobia, K., Newman, G. E., & Knobe, J. (July, 2014). *The good ship Theseus: The effect of valence on object identity judgments.* Poster presented at the Annual Meeting of the Cognitive Science Society, Quebec City, Canada.

Newman, G. E., & Cain. D. (2014, July). *Tainted Altruism: When doing some good is evaluated worse than doing no good at all.* Paper presented at the Behavioral Decision Research in Management Conference, London, England.

Newman, G. E. (2014, July). *The Intuitive Link Between Order and Agency.* Paper presented at the Order-Disorder Preconference, European Society for Social Psychology Conferences, Amsterdam, Netherlands.

Newman, G. E., Brescoll, V. & Knobe, J. (2014, July). From Biology to Ideology: A Model For Integrating Psychological Essentialism Across Categories. Paper presented at the International Conference in Infant Studies, Berlin, Germany.

Newman, G. E., De Freitas, J., & Knobe, J. (2014, June). Beliefs about the true self explain asymmetries based on moral judgment. Poster presented at the Society for Philosophy and Psychology, Vancouver, Canada.

Newman, G. E. (2014, June). *The Moral Nature of the True Self.* Paper presented at the International Society for Justice Research Conference, New York, NY.

Newman, G. E. (2014, March). *Everyday Intuitions about the Value of Artwork.* Art, Mind and Markets Conference, Yale University.

November, 2023

Newman, G. E., & Cain. D. (2013, November). *Tainted Altruism: When doing some good is evaluated worse than doing no good at all.* Paper presented at the Society for Judgment and Decision Making Conference, Toronto, Ontario.

Poehlman, T. A., & Newman, G. E. (2013, October). *Potential: The Valuation of Imagined Future Achievement* Paper presented at the Association for Consumer Research North American Conference, Chicago, IL.

Newman, G. E. (2013, April). *An Essentialist Account of Authenticity.* Paper presented at the Society for Research in Child Development Conference, Seattle, WA.

Newman, G. E. (2012, June). *The Moral Nature of the True Self.* Paper presented at the Society for Philosophy and Psychology Conference, St. Louis, MO.

Newman, G. E. (2012, April). *The Valuation of Authentic Goods.* Marketing Seminar Series, Isenberg School of Management, University of Massachusetts.

Newman, G. E. & Shen, Y. J. (2011, October). *When do incentives help and when do they hurt?* Paper presented at the Association for Consumer Research North American Conference, St. Louis, MO.

Newman, G.E, (2010, December). *When do our moral intuitions lead us astray?* Invited talk at the School of Management, Yale University.

Newman, G. E. & Shen, Y. J. (2010, October). *The Counterintuitive Effects of Thank-you Gifts on Charitable Giving.* Paper presented at the Association for Consumer Research North American Conference, Jacksonville, FL.

Danilowitz, J. & Newman, G.E., (2010, October). *When Is It Better To Be Bad? Schema-Congruency Effects in Moral Evaluations of Products.* Poster presented at the Association for Consumer Research North American Conference, Jacksonville, FL.

Newman, G. E. & Shen, Y. J. (2010, June). *The Counterintuitive Effects of Thank-you Gifts on Charitable Giving.* Paper presented at Behavioral Decision Research in Management Conference, Pittsburgh, PA.

Newman, G. E. & Dhar, R. (2010, February). *It's The Thought That Counts: Causality and Compensatory Reasoning in Consumer Choice.* Paper presented at the Society for Consumer Psychology Conference, St. Pete Beach, FL.

Newman, G. E., Diesendruck, G., & Bloom, P. (2009, October). *Celebrity Contagion and the Value of Objects.* Paper presented at the Association for Consumer Research North American Conference, Pittsburgh, PA.

Newman, G.E & Bloom, P. (2009, February) *What's So Special about Art? The Role of Authenticity in Judgments of Value.* Poster presented at the Society for Consumer Psychology Conference, San Diego, CA.

NOVEMBER, 2023

Newman, G. E., Choi, H., Wynn, K., & Scholl, B. (2007, May). *The origins of causal perception: Evidence from postdictive processing in infancy.* Poster presented at Vision Sciences Society, Sarasota, FL.

Melamed, K., Hamlin, J. K., Newman, G. E., & Wynn, K. (2007, March). *Eight-month-old infants infer unfulfilled goals, despite contrary physical evidence.* Poster presented at the Society for Research in Child Development, Boston, MA.

Hermann, P., Newman, G. E., Wynn, K., & Keil, F. C. (2007, March). *Biases toward intrinsic features in infants reasoning about objects.* Poster presented at the Society for Research in Child Development, Boston, MA.

Newman, G. E., Cheries, E. W., & Wynn, K. (2007, March). *Infants attribute behaviors to individuals, not their appearances.* Poster presented at the Society for Research in Child Development, Boston, MA.

Newman, G. E., Keil, F. C., & Wynn, K. (2007, March). *Infants infer agents from deviations in regularity.* Poster presented at the Society for Research in Child Development, Boston, MA.

Newman, G. E. (2006, June). *Psychological foundations of the Argument from Design.* Paper presented at the Society for Philosophy and Psychology, St. Louis, MO.

Newman, G. E. (2006, February). *Darwin versus design: What challenges to evolution tell us about the mind.* Cognitive Lunch Series, Yale University.

Newman, G. E., & Junge, J. (2005, May). *The perception of order.* Poster presented at Vision Sciences Society. Sarasota, FL.

Newman, G. E., Keil, F. C., Kuhlmeier, V., & Wynn, K. (2005, April). *12 Month-olds Know That Agents Defy Entropy: Exploring the Relationship Between Order and Intentionality.* Poster presented at Society for Research in Child Development, Atlanta, GA.

Newman, G. E., Cheries, E. W., Keil, F. C., & Bloom, P. (2005, April). *Animate behavior and essentialist thinking: Does motion make the insides matter?* Poster presented at Society for Research in Child Development, Atlanta, GA.

## CITATION COUNTS (GOOGLE SCHOLAR)

Total # of cites: 7618

h-index: 42

i10-index: 64

# EXHIBIT B

## REFERENCES[1]

| |
|---|
| MDL First Amended Master Complaint |
| 1983 Citizen Petition |
| 1994 CPC Citizen Petition |
| 2008 CPC Citizen Petition |
| 21 C.F.R. 740.1 |
| Abstract: Michelle Ferranti, An Odor of Racism: Vaginal Deodorants in African-American Beauty Culture and Advertising, Advertising & Society Review (2011) |
| Advertisements and Documents Depicted in Appendices 1 & 2 |
| AMA Analytical Services, Inc. – Summary of Asbestos and Talc Analysis – Johnson & Johnson – Baby Powder Lot #22318RB – October 11, 2019 |
| Amended Expert Report of Anne McTiernan, MD, Ph.D., June 24, 2021 |
| Amended Expert Report of Laura Plunkett, Ph.D., DABT, June 30, 2021 |
| Bernard L. Harlow, et al., *Perineal Exposure to Talc and Ovarian Cancer Risk*, 80 Obstetrics & Gynecology 19 (1992); Alan Gross & Paul Berg, *A Meta-Analytical Approach Examining the Potential Relationship Between Talc Exposure and Ovarian Cancer*, 5 J. Exposure Analysis & Envtl. Epidemiology 181 (1995); Michael Huncharek, et al., *Perineal Application of Cosmetic Talc and Risk of Invasive Epithelial Ovarian Cancer: a Meta-Analysis of 11, 933 Subjects from Sixteen Observational Studies*, 23 Anticancer Research 1955 (2003); Michael Huncharek, et al., *Use of Cosmetic Talc on Contraceptive Diaphragms and Risk of Ovarian Cancer: a Meta-Analysis of Nine Observational Studies*, 16 Eur. J. Cancer Prev. 422 (2007); Hilde Langseth, et al., *Perineal Use of Talc and Risk of Ovarian Cancer*, 62 J. Epidemiology Comm. Health 358 (2008); Daniel W. Cramer, et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US States*, 27 Epidemiology 334 (2016); Wera Berge, et al., *Genital Use of Talc and Risk of Ovarian cancer: a Meta-Analysis*, 27 European J. Cancer Prev. 248 (2018); Ross Penninkilampi & Guy Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29 Epidemiology 41 (2018); Kadry Taher, et al., *Critical Review of the Association Between Perineal Use of Talc Powder and Risk of Ovarian Cancer,* 90 Reproductive Toxicology 88 (2019; Sean A. Woolen, et al., *Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: a Systematic Review and Meta-Analysis*, J. Gen. Intern. Med. (2022) |
| Cesario, Feminine Hygiene Product Use and the Risk of Ovarian Cancer (2016) |
| Daniel W. Cramer, et al., *Ovarian Cancer and Talc: A Case-Control Study*, 50 Cancer 372 (1982);Patricia Hartge, et al., *Talc and Ovarian Cancer*, 250 JAMA 1844 (1983); Alice S. Whittemore, et al., *Personal and Environmental Characteristics Related to Epithelial Ovarian Cancer*, 128 Am. J. Epidemiology (1988); Bernard L. Harlow & Noel S. Weiss, *A Case – Control Study of Borderline Ovarian Tumors: the Influence of Perineal Exposure to Talc*, 130 Am. J. Epidemiology 390 (1989); M. Booth, *Risk Factors for Ovarian Cancer: a Case-Control Study*, 60 Brit. J. Cancer 592 (1989); Bernard L. Harlow, et al., *Perineal Exposure to Talc and Ovarian Cancer Risk*, 80 Obstetrics & Gynecology 19 (1992); Patricia Hartge & Patricia Stewart, *Occupation and Ovarian Cancer: A Case-Control Study in the Washington,* |

---

[1] Any citations to a document number refers to the entire document, not just the page cited.

*DC, Metropolitan Area, 1978-1981*, J. Occupational Med. 924 (1994); Karin A. Rosenblatt, et al., *Mineral Fiber Exposure and the Development of Ovarian Cancer* 45 Gynecologic Oncology 20 (1992); Yong Chen, et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, 21 Int'l J. Epidemiology 23 (1992); Anastasia Tzonou, et al., *Hair Dyes, Analgesics, Tranquilizers and Perineal Talc Application as Risk Factors for Ovarian Cancer*, 55 Int'l J. Cancer 408 (1993); David Purdie, et al., *Reproductive and Other Factors and Risk of Epithelia Ovarian Cancer: an Australian Case-Control Study*, 62 Int'l J. Cancer 678 (1995); Asher Shushan, et al., *Human Menopausal Gonadotropin and the Risk of Epithelial Ovarian Cancer,* 65 Fertility & Sterility 13 (1996); Adele Green, et al., *Tubal Sterilisation, Hysterectomy and Decreased Risk of Ovarian Cancer,*71 Int'l J. Cancer 948 (1997); Stella Chang & Harvey A. Risch, *Perineal Talc Exposure and Risk of Ovarian Carcinoma*, 79 Cancer 2396 (1997); Linda S. Cook, et al., *Perineal Powder Exposure and the Risk of Ovarian Cancer*, 145 Am. J. Epidemiology 459 (1997); Beatrice Godard, et al., *Risk Factors for Familial and Sporadic Ovarian Cancer Among French Canadians: a Case-Control Study*, 179 Am. J. Obstetrics & Gynecology 403 (1998); Daniel W. Cramer, et al., *Genital Talc Exposure and Risk of Ovarian Cancer*, 81 Int'l J. Cancer 351 (1999); Cheung Wong, et al., *Perineal Talc Exposure and Subsequent Epithelial Ovarian Cancer: a Case-Control Study*, 93 Obstetrics & Gynecology 372 (1999); Roberta B. Ness, *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 Epidemiology 111 (2000); Paul K Mills, et al., *Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California*, 112 Int'l J. Cancer 458 (2004); Malcolm C. Pike, et al., *Hormonal Factors and the Risk of Invasive Ovarian Cancer: a Population-Based Case-Control Study*, 82 Fertility & Sterility 186 (2004); Susan J. Jordan, et al., *Risk Factors for Benign Serous and Mucinous Epithelial Ovarian Tumors*, 109 Obstetrics & Gynecology 647 (2007); Melissa A. Merritt, et al., *Talcum Powder, Chronic Pelvic Inflammation and NSAIDs in Relation to Risk of Epithelial Ovarian Cancer*, 122 Int'l J. Cancer 170 (2008); Margaret A. Gates, et al., *Talc Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 Cancer Epidemiology Biomarkers Prev. 2436 (2008); Patricia G. Moorman, et al., *Ovarian Cancer Risk Factors in African-American and White Women*, 170 Am. J. Epidemiology 598 (2009); Anna H. Wu, *Markers of Inflammation and Risk of Ovarian Cancer in Los Angeles County*, 124 Int'l J. Cancer 1409 (2009); Karin A. Rosenblatt, et al., *Genital Powder Exposure and the Risk of Epithelial Ovarian Cancer*, 22 Cancer Causes Control 737 (2011); Michelle L. Kurta, et al., *Use of Fertility Drugs and Risk of Ovarian Cancer: Results from a U.S.-Based Case-Control Study*, 21 Cancer Epidemiology Biomarkers Prev. 1282 (2012); Anna H. Wu, *African-Americans and Hipsanics Remain at Lower Risk of Ovarian Cancer than Non-Hispanice Whites After Considering Non-Genetic Risk Factors and Oophorectomy Rates*, 24 Cancer Epidemiology Biomarkers Prev. 1094 (2015); Daniel W. Cramer, et al., *The Association Between Talc Use and Ovarian Cancer: A Retrospective Case-Control Study in Two US* States, 27 Epidemiology 334 (2016); Joellen M. Shildkraut, et al., *Association Between Body Powder Use and Ovarian Cancer: The African American Epidemiology Study (AACES)*, 25 Cancer Epidemiology Biomarkers Prev. 1411(2016).

David Rosner, Gerald Markowitz, and Merlin Chowkwanyun, "Nondetected": The Politics of Measurement of Asbestos in Talc, 1971-1976, 109 Am. J. Pub. Health 969 (2019)

Deposition Transcript & Video Recording of Frederick Koberna, July 8, 2021

Deposition Transcript & Video Recording of Frederick Koberna, September 14, 2021

| |
|---|
| Deposition Transcript of Carol Goodrich, September 21, 2021 |
| Deposition Transcript of Joanne Waldstreicher, April 19, 2017 |
| Deposition Transcript of Kathleen Wille, April 13, 2021 |
| Deposition Transcript of Kathleen Wille, April 26, 2021 |
| Dorota M. Gertig, et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. Nat'l Cancer Inst. 249 (2000); Margaret A. Gates, et al., *Risk Factors for Epithelial Ovarian Cancer by Histologic Subtype*, 171 Am. J. Epidemiology 45 (2010); Serena C. Houghton, et al., *Perineal Powder Use and Risk of Ovarian Cancer*, 106 J. Nat'l Cancer Inst. (2014); NL Gonzalez, et al., *Douching, Talc Use, and Risk of Ovarian Cancer*, 27 Epidemiology 797 (2016) |
| Elena Delgado-Ballester & Jose Luis Munuera-Aleman, *Does Brand Trust Matter to Brand Equity?*, 14 J. Product & Brand Manag. 187 (2005) |
| Proposed Complaint & Exhibits 1-185 to MDL Proposed Second Amended Master Complaint |
| Exhibits 1-35 from Deposition of Joanne Waldstreicher, April 19, 2017 |
| Exhibits to Deposition of Frederick Koberna, July 8, 2021: P1-274, P1-353, P1-357, P1-358, P1-360, P1-361, P1-362, P1-363, P1-365, P1-368, P1-369, P1-370, P1-371, P1-372, P1-376, P1-377, P1-378, P1-379, P1-380, P1-384, P1-387, P1-388, P1-393, P1-396, P1-405, P1-406, P1-407, P1-408, P1-409, P1-411, P1-412, P1-413, P1-414, P1-415, P2-2, P4-26, P5-1, P5-2, P5-3, P5-4, P5-6, P5-7, P5-9, P6-24 |
| Exhibits to Deposition of Frederick Koberna, September 14, 2021: P1-85, P1-277, P1-355, P1-356, P1-373, P1-374, P1-383, P1-390, P1-391, P1-392, P1-399, P1-400, P1-403, P1-404, P1-410, P1-481, P1-482, P1-490, P1-492, P5-5, P5-10 |
| Expert Report of Willam Longo & Mark Rigler, November 2018 |
| Expert Report of William Longo & Mark Rigler, February 2019 |
| Expert Report of William Sage, MD, JD, July 2, 2021 |
| Facts About Talc Website & Referenced Documents: https://www.factsabouttalc.com/safety |
| FDA Denial Letter to CPC Citizen Petitions, April 1, 2014 |
| FDA Response to CPC Citizen Petition, July 11, 1995 |
| FDA Response to Public Citizen Letter, January 11, 1979 |
| Health Canada Final Screening Assessment (2021) |
| IMERYS038563 |
| IMERYS095728 |
| IMERYS145558 |
| IMERYS250983 |
| IMERYS255384 |
| IMERYS279660 |
| IMERYS279682 |
| IMERYS280786 |
| IMERYS281179 |
| IMERYS282579 |

| |
|---|
| IMERYS303753 |
| IMERYS-A_0005886 |
| J&J Media Statement on Discontinuation of North America Talc Sales 2020 |
| J&J Media Statement on Discontinuation of Worldwide Talc Sales 2022 |
| J&J Newspaper Advertisement, December 2018 |
| J&J Print Advertisement – A baby's life isn't all sunshine |
| J&J Print Advertisement – Are you a quiz kid on babies |
| J&J Print Advertisement – Baby with pandas and powder |
| J&J Print Advertisement – Baby with pandas and powder #2 |
| J&J Print Advertisement – Baby with powder and wiener dogs |
| J&J Print Advertisement – Chafe guard baby's delicate skin |
| J&J Print Advertisement – Favorites with the sunset |
| J&J Print Advertisement – For when you're along…and for when you're not (1975) |
| J&J Print Advertisement – Fragile…handle with Johnson's |
| J&J Print Advertisement – Johnson's Baby Powder beach |
| J&J Print Advertisement – Like son, like father |
| J&J Print Advertisement – Only one smell I can wear anywhere (1978) |
| J&J Print Advertisement – Share the feeling |
| J&J Print Advertisement – Should I leave you on the doorstep mom |
| J&J Print Advertisement – Since 1920, Johnson's Baby Powder is the best you can buy |
| J&J Print Advertisement – Stay baby soft all summer through |
| J&J Print Advertisement – The difference between this and this |
| J&J Print Advertisement – When a woman wants to make a gentle impression |
| J&J Print Advertisement – Why reach for anything else (1920) |
| J&J Print Advertisement – Your touch tells him everything |
| J&J Production Spreadsheet – Marketing & Advertising Documents (12.6.2019) |
| James J. Eberl, et al., *Comparative Evaluation of the Effects of Talcum and a New Absorbable Substitute on Surgical Gloves*, 75 Am. J. Surgery 493 (1948) |
| JNJ 000576159 |
| JNJ 000576160 |
| JNJ 000576161 |
| JNJ 000576162 |
| JNJ000011150 |
| JNJ000011777 |
| JNJ000015565 |
| JNJ000018966 |
| JNJ000020759 |
| JNJ000020907 |

| |
|---|
| JNJ000021004 |
| JNJ000021008 |
| JNJ000021092 |
| JNJ000021285 |
| JNJ000026987 |
| JNJ000030027 |
| JNJ000030476 |
| JNJ000035173 |
| JNJ000035507 |
| JNJ000057773 |
| JNJ000057783 |
| JNJ000058185 |
| JNJ000058760 |
| JNJ000058780 |
| JNJ000058781 |
| JNJ000058783 |
| JNJ000058785 |
| JNJ000058787 |
| JNJ000058788 |
| JNJ000058790 |
| JNJ000058791 |
| JNJ000058793 |
| JNJ000058794 |
| JNJ000058795 |
| JNJ000058801 |
| JNJ000058804 |
| JNJ000058806 |
| JNJ000058807 |
| JNJ000058808 |
| JNJ000058810 |
| JNJ000058811 |
| JNJ000058813 |
| JNJ000058814 |
| JNJ000060059 |
| JNJ000060168 |
| JNJ000060175 |
| JNJ000060194 |
| JNJ000060248 |

| |
|---|
| JNJ000060260 |
| JNJ000060261 |
| JNJ000060265 |
| JNJ000060267 |
| JNJ000062722 |
| JNJ000062746 |
| JNJ000065321 |
| JNJ000066499 |
| JNJ000075260 |
| JNJ000085127 |
| JNJ000085443 |
| JNJ000085448 |
| JNJ000087077 |
| JNJ000087991 |
| JNJ000089413 |
| JNJ000092918 |
| JNJ000093167 |
| JNJ000093169 |
| JNJ000093512 |
| JNJ000093556 |
| JNJ000093949 |
| JNJ000094421 |
| JNJ000094811 |
| JNJ000095572 |
| JNJ000097777 |
| JNJ000098074 |
| JNJ000098089 |
| JNJ000099042 |
| JNJ000099714 |
| JNJ000100098 |
| JNJ000100272 |
| JNJ000100785 |
| JNJ000100862 |
| JNJ000100865 |
| JNJ000102114 |
| JNJ000102150 |
| JNJ000102495 |
| JNJ000103032 |

| |
|---|
| JNJ000105184 |
| JNJ000105678 |
| JNJ000106045 |
| JNJ000109468 |
| JNJ000114820 |
| JNJ000119532 |
| JNJ000119604 |
| JNJ000144652 |
| JNJ000147232 |
| JNJ000188572 |
| JNJ000221236 |
| JNJ000221528 |
| JNJ000224655 |
| JNJ000224709 |
| JNJ000224719 |
| JNJ000224757 |
| JNJ000224841 |
| JNJ000224869 |
| JNJ000225986 |
| JNJ000226146 |
| JNJ000226155 |
| JNJ000227118 |
| JNJ000227119 |
| JNJ000227698 |
| JNJ000227858 |
| JNJ000227887 |
| JNJ000228152 |
| JNJ000228153 |
| JNJ000229939 |
| JNJ000234241 |
| JNJ000235850 |
| JNJ000238236 |
| JNJ000239818 |
| JNJ000243134 |
| JNJ000244094 |
| JNJ000245678 |
| JNJ000245744 |
| JNJ000245901 |

| JNJ000246481 |
| --- |
| JNJ000246564 |
| JNJ000246808 |
| JNJ000248584 |
| JNJ000251888 |
| JNJ000253027 |
| JNJ000253830 |
| JNJ000255584 |
| JNJ000255596 |
| JNJ000257836 |
| JNJ000259267 |
| JNJ000260544 |
| JNJ000261640 |
| JNJ000265482 |
| JNJ000267139 |
| JNJ000269139 |
| JNJ000271085 |
| JNJ000278435 |
| JNJ000290375 |
| JNJ000290508 |
| JNJ000290680 |
| JNJ000295902 |
| JNJ000296717 |
| JNJ0002990508 |
| JNJ000300223 |
| JNJ000304364 |
| JNJ000304421 |
| JNJ000304963 |
| JNJ000306944 |
| JNJ000308280 |
| JNJ000310040 |
| JNJ000312113 |
| JNJ000312137 |
| JNJ00031349 |
| JNJ000313867 |
| JNJ000313869 |
| JNJ000313874 |
| JNJ000313878 |

| |
|---|
| JNJ000313939 |
| JNJ000313950 |
| JNJ000313951 |
| JNJ000330448 |
| JNJ000331174 |
| JNJ000331979 |
| JNJ000334246 |
| JNJ000336218 |
| JNJ000342519 |
| JNJ000346836 |
| JNJ000348778 |
| JNJ000351362 |
| JNJ000351581 |
| JNJ000354300 |
| JNJ000364540 |
| JNJ000366494 |
| JNJ000368353 |
| JNJ000373203 |
| JNJ000373214 |
| JNJ000373220 |
| JNJ000377123 |
| JNJ000377125 |
| JNJ000381090 |
| JNJ000383963 |
| JNJ000395300 |
| JNJ000404376 |
| JNJ000404860 |
| JNJ000405087 |
| JNJ000405425 |
| JNJ000405610 |
| JNJ000407282 |
| JNJ000407324 |
| JNJ000407337 |
| JNJ000409301 |
| JNJ000419844 |
| JNJ000420337 |
| JNJ000426237 |
| JNJ000436462 |

| |
|---|
| JNJ000441710 |
| JNJ000444327 |
| JNJ000456993 |
| JNJ000457161 |
| JNJ000457407 |
| JNJ000470844 |
| JNJ000521616 |
| JNJ000550529 |
| JNJ000550561 |
| JNJ000559770 |
| JNJ0005611528 |
| JNJ000561528 |
| JNJ000564167 |
| JNJ000566815 |
| JNJ000566816 |
| JNJ000576624 |
| JNJ000576831 |
| JNJ0008731830 |
| JNJ000873706 |
| JNJ000877540 |
| JNJ000089115 |
| JNJ100100102 |
| JNJ000000523 |
| JNJ000881819 |
| |
| JNJ430621 |
| JNJ-447 |
| JNJAZ55_000001032 |
| JNJNL61_000118282 |
| JNJTACL000279558 |
| JNJTALC000020925 |
| JNJTALC000024322 |
| JNJTALC000025308 |
| JNJTALC000078665 |
| JNJTALC000173802 |
| JNJTALC000173803 |
| JNJTALC000184699 |
| JNJTALC000279558 |

| |
|---|
| JNJTALC000300240 |
| JNJTALC000354984 |
| JNJTALC000355057 |
| JNJTALC000355255 |
| JNJTALC000386750 |
| JNJTALC000419217 |
| JNJTALC000457201 |
| JNJTALC000561124 |
| JNJTALC000674963 |
| JNJTALC000682216 |
| JNJTALC000799621 |
| JNJTALC000809452 |
| JNJTALC000847790 |
| JNJTALC000848216 |
| JNJTALC000917314 |
| JNJTALC000923782 |
| JNJTALC001014907 |
| JNJTALC001015163 |
| JNJTALC001085440 |
| JNJTALC001243556 |
| JNJTALC001277935 |
| JNJTALC001278135 |
| JNJTALC001278137 |
| JNJTALC001320796 |
| JNJTALC001399623 |
| JNJTALC001475527 |
| Kathryn L. Terry, et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 85,25 Cases and 9,859 Controls*, 6 Cancer Prev. Research 811 (2013); Katie M. O'Brien, et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020); Colette P. Davis, et al., *Genital Powder Use and Risk of Epithelial Ovarian Cancer in the Ovarian Cancer in Women of African Ancestry Consortium,* 30 Cancer Epi. Biomarkers Prev. 1660 (2021) |
| Kevin Keller, *Conceptualizing, Measuring, and Managing Customer-Based Brand Equity,* 1 J. Marketing 57 (1993) |
| Lance Leuthesser, et al., *Brand Equity: The Halo* Effect Measure, 29 European J. Marketing 57 (1995) |
| LUZ001298 |
| LUZ013094 |
| Matthew Rabin, *Psychology and Economics*, 11 J. Economic Literature 36 (1998) |

| |
|---|
| Minju Han, George E. Newman, Rosanna K. Smith & Ravi Dhar, *The Curse of the Original: How and When Heritage Branding Reduces Consumer Evaluation of Enhanced Products*, 48 J. Consumer Research 709 (2021) |
| Narod, Talc and Ovarian Cancer (2016) |
| Omise'eke Natasha Tinsley, Profiting from the Myths about Black Women's Bodies, TIME (April 6, 2016) |
| OSHA Report of Evaluation of Cosmetics and Cosmetic Talc for FDA, February 23, 2019 |
| P-0010 |
| P-0020 |
| P-0125 |
| P-0342 |
| P-0414 |
| P-0662 |
| P-0771 |
| P-0833 |
| P-19 (LUZ011817) |
| P-341 |
| P-558 |
| PCPC0005508 |
| Ronnie Cohen, Talc Linked to Ovarian Cancer Risk in African-American Women, Reuters (June 2, 2016) |
| Senate Judiciary Committee Hearing Video & Testimony, Evading Accountability: Corporate Manipulation of Chapter 11 Bankruptcy, September 19, 2023 |
| Shower to Shower Video Advertisements (YouTube) |
| Special Talc Study, Project No. 0503.01, Report for February – March 1977 |
| Statistica 2018 Survey Calculation: U.S. Population: Which brands of body and baby powder do you use most often? |
| U.S. Patent No. 2,626,257 (January 20, 1953) |
| W. J. Henderson, et al., *Talc and Carcinoma of the Ovary and Cervix,* 78 J. Obstetrics & Gynaecology British Commonwealth 266 (1971) |
| William S. Cain, *Odor Identification by Males and Females: Predictions vs. Performance*, 7 Chemical Senses 129 (1982) |